# EXHIBIT
# 6

O'CONNER, DENNIS

8/13/2008

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

IN RE:  KATRINA CANAL BREACHES     CIVIL ACTION
CONSOLIDATED LITIGATION

                                    NO. 05-4182
                                       "K" (2)
                                  JUDGE DUVAL

FILED IN:  05-4181, 05-4182,    MAG. WILKINSON
05-5237, 05-6073, 05-6314,
05-6324, 05-6327, 05-6359,
06-0225, 06-0886, 06-1885,
06-2152, 06-2278, 06-2287,
06-2824, 06-4024, 06-4065,
06-4066, 06-4389, 06-4634,
06-4931, 06-5032, 06-5155,
06-5159, 06-5161, 06-5162,
06-5260, 06-5771, 06-5786,
06-5937, 07-0206, 07-0621,
07-1073, 07-1271, 07-1285

                  Videotaped Deposition of

                DENNIS MICHAEL O'CONNER,

35745 Calle Nopal, Temecula, California 92592,

taken in the offices of Jones, Day, 12265 El

Camino Real, Suite 200, San Diego, California

92130, on Wednesday, August 13, 2008.

O'CONNER, DENNIS

8/13/2008

---

**Page 2**

```
 1    APPEARANCES:
 2
 3    LAW OFFICES OF JOSEPH M. BRUNO
         (BY: JOSEPH M. BRUNO, ESQ.)
 4            SCOTT JOANEN, ESQ.)
      855 Baronne Street
 5    New Orleans, Louisiana 70113
             PLAINTIFF LIAISON COUNSEL
 6
 7
      STONE PIGMAN WALTHER WITTMANN
 8       (BY:  WILLIAM D. TREEBY, ESQ.)
      546 Carondelet Street
 9    New Orleans, Louisiana  70130-3588
            AND
10
11    JONES DAY
         (BY:  ADRIAN WAGER-ZITO, ESQ.
12            DEBRA CLAYMAN ESQ.)
      51 Louisiana Avenue, N.W.
13    Washington, D.C.  20001-2113
            ATTORNEYS FOR WASHINGTON GROUP
14            INTERNATIONAL, INC.
15
16    JEANNE BAUGHMAN, ESQUIRE
      WASHINGTON GROUP INTERNATIONAL
17
18    UNITED STATES DEPARTMENT OF JUSTICE
         (BY: JEFF EHRLICH, ESQ.)
19    Torts Branch, Civil Division
      1331 Pennsylvania Avenue NW
20    Room 8095N
      Washington, D.C. 20004
21       ATTORNEY FOR UNITED STATES OF
            AMERICA
22
      VIDEOTAPED BY: Homouya Saifi,
23           Digital Legal Videography
             San Diego, California
24
      REPORTED BY:  ROGER D. JOHNS, RMR, CRR, CSR
25           Certified Court Reporter,
             State of Louisiana
```

---

**Page 4**

```
 1                  I N D E X
 2                                         PAGE
      WGI-5 in seriatim to 9.................... 82
 3    Exhibit 2................................. 82
      Exhibit Number 1......................... 82
 4    Exhibit 3................................. 85
      WGI-38704 to 38769....................... 85
 5    WGI-38705, 6 and 7....................... 86
      WGI-38726................................ 90
 6    WGI-3455 and 56.......................... 105
      Exhibit Number 4......................... 106
 7    WGI-40961, 62, 63........................ 109
      Exhibit Number 5......................... 109
 8    40964.................................... 114
      Exhibit 5................................ 121
 9    Exhibit 6................................ 121
      Exhibit Number 7......................... 121
10    Number 8................................. 122
      Exhibit Number 8......................... 129
11    Exhibit Number 9......................... 141
      WGI-139.................................. 144
12    Exhibit 10............................... 150
      WGI-48621................................ 150
13    Exhibit Number 11........................ 162
      Exhibit Number 12........................ 174
14    WGI-21810 through 812.................... 162
      2111..................................... 168
15    Exhibit Number 13........................ 174
      37614.................................... 178
16    Exhibit 14............................... 179
      Exhibit 15............................... 179
17    Exhibit Number 16........................ 187
      WGI-2877................................. 187
18    WGI-36696................................ 190
      Exhibit 16............................... 191
19    WGI-2877................................. 192
      Exhibit Number 17........................ 193
20    WGI-36696................................ 193
      36825.................................... 193
21    Exhibit Number 18........................ 201
      WGI-8583 and 84, 85...................... 209
22    Exhibit Number 19........................ 212
      Exhibit 20............................... 212
23    WGI-000641 through WGI-651............... 212
      EXAMINATION BY MR. BRUNO:................ 7
24    EXAMINATION BY MR. TREEBY:............... 203
      EXAMINATION BY MR. BRUNO:................ 208
25    EXAMINATION BY MR. BRUNO:................ 216
```

---

**Page 3**

```
 1          S T I P U L A T I O N
 2
 3       It is stipulated and agreed by and between
 4    counsel for the parties hereto
 5    that the deposition of the aforementioned
 6    witness is hereby being taken under the
 7    Federal Rules of Civil Procedure, for all
 8    purposes, in accordance with law;
 9       That the formalities of reading and
10    signing are specifically not waived;
11       That the formalities of certification and
12    filing are specifically waived;
13       That all objections, save those as to the
14    form of the question and the responsiveness of
15    the answer, are hereby reserved until such
16    time as this deposition, or any part thereof,
17    may be used or sought to be used in evidence.
18
19          * * * *
20
21       ROGER D. JOHNS, RDR, CRR, Certified Court
22    Reporter for the State of Louisiana,
23    officiated in administering the oath to the
24    witness.
25
```

---

**Page 5**

```
 1    VIDEO OPERATOR:
 2       Here begins volume number 1 of
 3    videotape number 1 in the deposition
 4    of Dennis O'Conner in the matter
 5    Katrina Canal Breaches Consolidation
 6    Litigation.  Case number reads 05-4182
 7    K-2 in the United States District,
 8    Eastern District of Louisiana.
 9    Today's date is August the 13th,
10    2008.  The time on the monitor reads
11    10:04 A.M.
12       The legal videographer for today
13    is Homouya Saifi, a Certified Legal
14    Video Specialist by NCRA from Digital
15    Legal Videography, San Diego,
16    California.
17       The video deposition is taking
18    place at 12265 El Camino Real, San
19    Diego, California.  The video and
20    audio portion of today's deposition
21    will be recorded at all times unless
22    instructed by the Counsel to go off
23    the record.  The videographer will be
24    announcing the beginning and the end
25    of each tape.
```

2  (Pages 2 to 5)

O'CONNER, DENNIS

8/13/2008

Page 6

1      Counsel, please identify
2   yourselves and then state whom you
3   represent.
4      MR. TREEBY:
5         William D. Treeby, representing
6   Washington Group International and the
7   witness.
8      MR. BRUNO:
9         You are representing the
10  witness?
11     MR. TREEBY:
12         Yes.
13     MR. BRUNO:
14         Okay.
15     MS. CLAYMAN:
16         Debra Clayman representing
17  Washington Group and the witness.
18     MS. WAGER-ZITO:
19         Adrian Wager-Zito representing
20  Washington Group and the witness.
21     MS. BAUGHMAN:
22         Jeanne Baughman, representing the
23  Washington Group and the witness.
24     MR. EHRLICH:
25         Jeff Ehrlich representing the

Page 7

1   United States.
2      MR. JOANEN:
3         Scott Joanen for the Plaintiffs.
4      MR. BRUNO:
5         And Joseph Bruno, Plaintiffs and
6   Plaintiffs Liaison Counsel.
7      VIDEO OPERATOR:
8         And the Court Reporter for today
9   is Roger Johns of Johns, Pendleton
10  Court Reporting.
11         Would the Reporter please swear
12  in the witness.
13         DENNIS MICHAEL O'CONNER,
14  35745 Calle Nopal, Temecula, California 92592,
15  after having been duly sworn by the
16  before-mentioned court reporter, did testify
17  as follows:
18         VIDEO OPERATOR:
19         You may proceed, Counsel.
20  EXAMINATION BY MR. BRUNO:
21     Q.  Good morning again.  We met before
22  we began.  My name is Joseph Bruno, Mr.
23  O'Conner.  Thank you very much for appearing
24  this morning.
25         Have you ever given a deposition

Page 8

1   before?
2      A.  Years ago.
3      Q.  Okay.  Well, let me just give you
4   some sense of what's happening here.  As you
5   can see all of this equipment and the fellow
6   with the machine, everything that we are
7   saying is being taken down.  Obviously you're
8   required to respond under oath.
9         You will from time to time hear
10  these lawyers object, because that's what they
11  get paid to do.  The rules are, though, that
12  you still have to answer the question.  Okay?
13  And the reason why they're making their
14  objections is because they are making a record
15  of the objection so that at some future point
16  the Judge can decide whether to allow the
17  question or the answer to be read into the
18  record.  You understand?
19     A.  Yes, I do.
20     Q.  Okay.  Now, what's unfair about that
21  process is some lawyers use that as a way to
22  kind of communicate to the witness how to
23  answer.  That's not fair to either side, and I
24  would appreciate that, even if it's tried,
25  that you just give me what you know and what

Page 9

1   you don't know, because that's all that we're
2   here to learn.
3         My view of these things is you're
4   the boss insofar as breaks.  If you need to
5   stop, just do this (indicating), we stop.
6   Bathroom, otherwise.  You can tell me when you
7   feel like you want to eat lunch.
8         Most importantly, if you don't
9   understand my question, tell me because I will
10  endeavor to change the phraseology of the word
11  so that you and I can be on the same page.
12  Because the better we can communicate,
13  frankly, the sooner we can get through this
14  process.  All right?
15     A.  (Witness nods head affirmatively.)
16     Q.  Now, first of all, I'm advised by
17  Counsel that they represent you in this
18  deposition.  Are you currently employed by
19  Washington Group International?
20     A.  No, I am not.
21     Q.  For how long have you been away from
22  Washington Group International?
23     A.  Two years approximately.
24     Q.  Did you request that these ladies
25  and gentleman represent you in this

O'CONNER, DENNIS

8/13/2008

Page 10

1  deposition?
2      A.  No.
3      Q.  How is it then that they came to
4  represent you in the context of this
5  deposition?
6      A.  We communicated and it just
7  developed that way.
8      Q.  Developed.  They just volunteered to
9  do that insofar as you know?
10     A.  I have no idea --
11     Q.  No idea?
12     A.  -- if they volunteered.
13     Q.  Are you paying them for their
14  services?
15     A.  No, I am not.
16     Q.  Do you know who is?
17     A.  No, I do not.
18     Q.  All right.  I understand.  Did you
19  prepare for this deposition?
20     A.  Yesterday we had a preparatory
21  meeting.
22     Q.  For how long did you meet?
23     A.  Half a day approximately.
24     Q.  All right.  Were you shown any
25  documents?

Page 11

1      A.  Some documents, yes.
2      Q.  Do you remember what documents you
3  looked at?
4      A.  No, I do not.
5      Q.  Okay.  Fair enough.  Before
6  yesterday, have you had an opportunity to
7  prepare for this deposition?
8      A.  No.
9      Q.  Have you before yesterday reviewed
10  any papers or documents just to refresh your
11  recollection as to the events which may form
12  the basis of this litigation?
13     A.  Maybe a year and a half ago.
14     Q.  Okay.  Well, tell me what happened a
15  year and a half ago.
16     A.  To the best of my recollection, this
17  came up, it may have been more than a year and
18  a half ago, I was in Iraq and as I flew back
19  from Iraq I stopped for one day in Atlanta to
20  provide any information or input and then I
21  continued on.  I was coming home on R and R.
22     Q.  All right.
23     A.  That would have been it.
24     Q.  Was that a meeting in Atlanta or a
25  telephone call?

Page 12

1      A.  Meeting.
2      Q.  A meeting.  I seem to recall that
3  there was also a telephone communication
4  between you and, I don't know, some
5  representative of WGI about some issues
6  related to this case?
7      A.  Not my recollection.  The only thing
8  I can think, when I was in Iraq is I spoke to
9  a gentleman named Lester.
10     Q.  Do you recall who he is or with whom
11  he's associated?
12     A.  He -- For lack of a better
13  description, he was a technician.
14     Q.  And who did he work for?
15     A.  Washington Group.
16     Q.  Now, in Atlanta, with whom did you
17  meet?
18     A.  George Manning.
19     Q.  M A N N I N G?
20     A.  Yes.
21     Q.  Thanks.
22     A.  That was the primary.  And there was
23  a couple of other people.  I can't remember
24  their names.
25     Q.  And Mr. Manning, was he a lawyer or

Page 13

1  does he work for WGI?
2      A.  I assume he's a lawyer.
3      Q.  Okay.  So you met at the law offices
4  of Jones, Day there in Atlanta?
5      A.  Yes, I did.
6      Q.  Were there any folks from WGI
7  there?
8      A.  No.
9      Q.  Now, you know we're taking your
10  deposition, so you know there's a lawsuit
11  involved; right?
12     A.  Correct.
13     Q.  Okay.  Do you have any understanding
14  of what claim is being made against the
15  Washington Group International?
16     A.  I have no real understanding.  I
17  have been away from the project.  I was, as I
18  say, in Iraq when I believe all of this
19  evolved and, quite frankly, after that I have
20  been very busy so I have not paid a great deal
21  of attention to it, except when I have
22  discussed it with representatives.
23     Q.  I understand that.  So as you sit
24  here today, you really don't know what it is
25  that the Plaintiffs are complaining about?  Is

4  (Pages 10 to 13)

O'CONNER, DENNIS

8/13/2008

Page 14

1  that fair?  Or tell me if I am wrong.
2      A.  I think that's fair.  I don't really
3  understand where they're trying to get to.
4      Q.  All right.  Are you employed today?
5      A.  I am semi-retired.
6      Q.  Lucky you.
7      A.  I still work.  I work short-term
8  local jobs.  That's what I want to do after
9  being away from home so long.
10     Q.  Sure.  I understand the nature of
11  your work calls for you to be away from home
12  for long periods of time, huh?
13     A.  Yes.
14     Q.  Why don't we for the record explain
15  what it is that you have been -- you know,
16  what is the nature of your work that you have
17  been doing these past many years?
18     A.  I am essentially in construction
19  management.
20     Q.  And tell us what -- Now, what the
21  reporter wrote down was "construction
22  management".  Are you a construction manager?
23  Or --
24     A.  It depends on the job and the
25  title.  There's three or four different titles

Page 15

1  that float around.  And the application that
2  is used on a specific job, I can either be a
3  construction manager, a project manager, or
4  simply a manager.
5      Q.  All right.  Generally what do you do
6  in these roles?
7      A.  You represent the company, be it
8  whichever company it is.  You are a point of
9  contact for the client.  And, depending on the
10  nature of the contract, you do what the client
11  requests you to do or, in some cases where
12  it's a hard money job, you perform principally
13  as a project manager in accomplishing the task
14  within a budget and a time frame.
15     Q.  Okay.  Now, as I think I understand
16  it, you don't really work for one company all
17  the time; you're available to work for
18  whomever has a job that requires a person of
19  your experience and training.  Is that
20  correct?
21     A.  That's -- That's correct.
22     Q.  Okay.  Now, I know that you worked
23  for Washington Group International in
24  connection with the job in New Orleans.  Let
25  me ask you about other jobs that you did for

Page 16

1  WGI.  Okay?  Were there a great number of
2  those?
3      A.  A considerable number.
4      Q.  Okay.  I am trying to get handle on
5  how far back we want to go.
6      A.  Certainly.
7      Q.  Well, let's do it this way then.
8  Would you just share with us your education?
9  Obviously you got a high school diploma.  Did
10  you get a college degree?
11     A.  High school diploma, college degree,
12  24 units of graduate work.  Numerous classes
13  with regards to construction.  Hazardous
14  materials, safety, things of that nature.
15     Q.  All right.  When did you obtain your
16  collegiate degree?  About.
17     A.  Absolutely.  1971 I received my
18  Bachelor's degree, I believe.
19     Q.  All right.  And are you an
20  engineer?
21     A.  No, I am not.
22     Q.  What subject did you obtain your
23  degree in?
24     A.  Geography and geology.
25     Q.  When did you first start working in

Page 17

1  the business of construction management?
2      A.  While I was in the process of
3  obtaining my Master's degree I was hired to
4  work not as a construction manager obviously
5  at that time, but something you work up to.
6      Q.  Sure.
7      A.  The first job was in Alaska directly
8  out of school.
9      Q.  What was the name of the company, if
10  you can remember?
11     A.  It changed names.  It was initially
12  a -- The eventual name was Earth --
13  Earthtech.
14     Q.  Okay.
15     A.  No.  Escatech.
16     Q.  Escatech?
17     A.  Earth Science Consulting and
18  Technology.  Escatech.
19     Q.  How long did that job last?
20     A.  Approximately a year and a half.
21     Q.  Do you recall what the project was?
22     A.  It was primarily dealing with land
23  resources, Indian -- native Indian
24  construction relocation throughout the Native
25  Claims Settlement Act area of Alaska.

5  (Pages 14 to 17)

Johns Pendleton Court Reporters                    800 562-1285

O'CONNER, DENNIS

8/13/2008

Page 18

1    Q.   Okay.  And what was Escatech there
2  to do?
3    A.   They were essentially a consulting
4  agency for the Indian Nations.  They were
5  hired through the Indian Nations at the
6  direction of the United States government's --
7  Well, at the direction of the Bureau of Indian
8  Affairs.
9    Q.   All right.  And what was the nature
10 of the consultation?
11   A.   We would evaluate the lands where
12 the Indians had their settlements; we would
13 evaluate what they were doing; we would give
14 them recommendations and directions as to what
15 lands to select and what lands to develop and
16 how to develop them.
17   Q.   All right.  After that job did you
18 continue employment on a project by project
19 basis?
20   A.   To a large degree, yes.
21   Q.   When did you first work for
22 Washington Group?  And I believe it may have
23 had another name.
24   A.   It was Morrison Knudsen.  And I
25 first started working for them -- I cannot

Page 19

1  remember the date.  I worked for them
2  approximately --
3    Q.   Approximately.
4    A.   Nine years, I believe.
5    Q.   Okay.  And during that nine years
6  were there other employers for whom you may
7  have done some project management?
8    A.   No.
9    Q.   So it was strictly for Morrison
10 Knudsen for that nine year period?
11   A.   Morrison Knudsen and Washington
12 Group International, yes.
13   Q.   Was that a continuous nine year
14 period or was it off and on?
15   A.   It was -- I was continuously
16 employed.
17   Q.   Okay.  Did the New Orleans job fall
18 within that nine year period?
19   A.   Yes, it did.
20      MR. BRUNO:
21      Take a two second break.
22      MR. TREEBY:
23      Are we off the record?
24      MR. BRUNO:
25      Yes.

Page 20

1       (Whereupon a discussion was held
2  off the record.)
3      VIDEO OPERATOR:
4       Counsel just took a short break
5  off the record.  The time reads 10:20
6  A.M.
7       (Recess.)
8      VIDEO OPERATOR:
9       Back on the record.  The time
10 reads 10:24 A.M.
11 EXAMINATION BY MR. BRUNO:
12   Q.   Mr. O'Conner, I apologize for that
13 interruption.  Okay.  The New Orleans job was
14 within the nine year period.  Was it in the
15 middle or the end?
16   A.   Three-quarters into it perhaps.
17   Q.   Right.  My memory is that you left
18 the New Orleans job to go do another WGI job?
19 Is that right?
20   A.   That's correct.  I went to Denver.
21   Q.   All right.  What I would like to
22 know, Mr. O'Conner, is your knowledge about
23 geotechnical issues or geology as it relates
24 to the kinds of things that you did as a
25 project manager.  But before we get there, let

Page 21

1  me just get a little background on the kinds
2  of jobs you did.  Was all of the work that you
3  did for WGI in connection with environmental
4  remediation?
5    A.   Not all of it, no.
6    Q.   All right.  Before you got to WGI,
7  did you do projects that had anything to do
8  with geotechnical or geological issues?
9    A.   Yes, I did.
10   Q.   Okay.  And I am doing it this way
11 because I am trying to avoid going through
12 every job that you ever had.
13   A.   I appreciate it.
14   Q.   I don't want you to be here all
15 day.  So if you can, first of all starting
16 with the earliest job that you had that had
17 this kind of a component to it, when and for
18 whom were you working, if you can recall?
19   A.   Would you rephrase that?  I am not
20 sure where you're headed with that.
21   Q.   I thought we just established that
22 you had done some jobs --
23   A.   For who?
24   Q.   -- before WGI.  Before WGI.
25   A.   All right.  I did not understand the

Johns Pendleton Court Reporters                    800 562-1285

O'CONNER, DENNIS

8/13/2008

Page 22

1   time.
2       Q.   That's okay.  As I said, I'm happy,
3   you know, to change --
4       A.   Before WGI, I worked for a company
5   called International Technology, which is now
6   Shaw Group, and the work I did was almost
7   identical to the work I did for MK and
8   Washington Group.  I was a project manager and
9   we did excavations, soil remediation,
10  construction, predominately environmental
11  construction, which would have to do with soil
12  borings, pipelines, things of that nature.
13      Q.   Okay.  Before you got to New
14  Orleans, did any of the work that you -- that
15  was a component part of some project that you
16  were, you know, working in project management,
17  have anything to do with or were proximate to
18  a flood protection structure like a levee or a
19  dam --
20      A.   Yes.
21      Q.   -- or something like that?
22      A.   Yes.
23      Q.   Okay.  Was there more than one?
24      A.   Yes.
25      Q.   All right.  A great number or a

Page 23

1   small number?
2       A.   Considering the size of the jobs,
3   they were large size jobs which were the ones
4   I was awarded, and I would say maybe half a
5   dozen jobs.
6       Q.   All right.  Can you share with me
7   what, if any, issues are important
8   considerations just because you're working on
9   or close to a flood protection structure that
10  you're aware of?
11      A.   Well, you have to consider what the
12  soils are going to be.  You have to consider
13  the environment, the environment being people,
14  what the area is being used for.  What the end
15  result should be.  Things of that nature.
16      Q.   Sure.
17      A.   Geology, of course.  And what you're
18  attempting to do.
19      Q.   All right.  Is it fair for me to
20  conclude that whatever project that you're on,
21  that -- and for whoever you are working, that
22  you guided the work as project management in
23  such a way as to not do any damage to any
24  flood control works or flood control
25  structures that may have been either on the

Page 24

1   site or proximate to the site?
2       A.   Yes.
3       Q.   Before you got to New Orleans,
4   again, okay, and I am including now your WGI
5   experience or Morrison Knudsen experience
6   before New Orleans, did you obtain any
7   knowledge or information about the particular
8   hazards that may exist in working either on or
9   proximate to a flood control structure, again
10  like a levee or a dam?
11      A.   Yes.
12      Q.   What hazards were you aware of
13  before you came to New Orleans?
14          MR. TREEBY:
15              Object to the form of the
16      question.
17          MR. BRUNO:
18              Why?
19          MR. TREEBY:
20              Because you asked what hazards
21      was he aware of before he came to New
22      Orleans.  That's a very vague
23      question.  Hazards he's aware of.
24      Airplane accidents?  I mean, it's just
25      a very vague question.

Page 25

1           MR. BRUNO:
2               No, it was not intended to be.  I
3       was -- Let me tell you what.  I don't
4       want to have to repeat the preceding
5       question every time.  So that I have
6       to --
7           MR. TREEBY:
8               We're not going to incorporate
9       prior questions into a question.
10      That's objectionable.
11          MR. BRUNO:
12              No, it's not objectionable.
13          MR. TREEBY:
14              So ask a question.  Ask a
15      question.
16          MR. BRUNO:
17              No, it's not objectionable.
18      Because then I have got to ask -- Then
19      I have got to put in each question
20      about ten lines of information, which
21      I am trying to avoid so that we can
22      get through this.
23  EXAMINATION BY MR. BRUNO:
24      Q.   But obviously when I ask you a
25  predicate about levees and hazards and the

7  (Pages 22 to 25)

Johns Pendleton Court Reporters                    800 562-1285

O'CONNER, DENNIS

8/13/2008

Page 26

1  next question is, okay, what did you learn
2  about those things, at least you and I can be
3  on the same page.
4      MR. TREEBY:
5      This isn't a conversation, Joe.
6  Just ask a question.
7      MR. BRUNO:
8      It is a conversation.
9      MR. TREEBY:
10     No, it's not.
11     MR. BRUNO:
12     It is a conversation, Mr. Treeby.
13     MR. TREEBY:
14     It is not.  Ask a question.
15     MR. BRUNO:
16     It's your opinion.  If you have
17  an objection, make it and then be
18  quiet.
19     MR. TREEBY:
20     I did.  You're the one who asked
21  me to explain --
22     MR. BRUNO:
23     A one word objection.
24     MR. TREEBY:
25     That's what I did, and you asked

Page 27

1  me to explain it, Mr. Bruno.
2      MR. BRUNO:
3      I asked you -- And we are well
4  beyond that, Mr. Treeby.
5      MR. TREEBY:
6      Ask a question.
7      MR. BRUNO:
8      Now we're trying to get into what
9  the witness should say, which I find
10  --
11     MR. TREEBY:
12     Ask a question.
13     MR. BRUNO:
14     -- objectionable and
15  reprehensible.  So stop it.
16     MR. TREEBY:
17     You did it.  Ask a question.
18     MR. BRUNO:
19     No, I didn't do it.  You are
20  trying --
21     MR. TREEBY:
22     The record will reflect you did
23  it.  Ask a question.
24     MR. BRUNO:
25     The record will reflect what it

Page 28

1  reflects.
2      MR. TREEBY:
3      Ask a question.
4      MR. BRUNO:
5      Mr. Treeby, please be quiet.
6      MR. TREEBY:
7      No, I will object when I need to.
8      MR. BRUNO:
9      How many times do you need to
10  object?  And then when we're done,
11  we'll proceed.  Let me know when
12  you're done.  Are you done?  We don't
13  know?
14     MR. TREEBY:
15     Ask a question.
16     MR. BRUNO:
17     Are we done yet?
18     MR. TREEBY:
19     Ask a question.
20     MR. BRUNO:
21     Are you finished objecting?
22     MR. TREEBY:
23     Depends on what your next
24  question is.
25     MR. BRUNO:

Page 29

1      My question is going to be my
2  next question.  Are you finished
3  objecting to the old question?
4      MR. TREEBY:
5      I had finished when you asked me
6  to explain why I objected.
7      MR. BRUNO:
8      Then you went well beyond that,
9  Mr. Treeby.  You went well beyond
10  explaining, and you never did
11  explain.  You simply said it was vague
12  without giving me any indication why
13  it was vague.
14     MR. TREEBY:
15     I did tell you why.
16     MR. BRUNO:
17     No, you didn't.  It made no sense
18  to me.
19     MR. TREEBY:
20     You want me to read --
21     MR. BRUNO:
22     No, it doesn't do any good for
23  you to explain.  Because when you
24  object to the form, you have to
25  indicate what's wrong with the form of

8  (Pages 26 to 29)

O'CONNER, DENNIS

8/13/2008

Page 30

1  the question so that I can change the
2  question in such a way that the
3  witness can understand me.  That's the
4  whole purpose of the vagueness --
5      MR. TREEBY:
6      I did.
7      MR. BRUNO:
8      -- objection.  And if it's vague
9  to you, it may not mean that it's
10  vague to the witness.
11      MR. TREEBY:
12      That's why I just said objection
13  to --
14      MR. BRUNO:
15      And that's what's unfair, and
16  that's what is -- you shouldn't be
17  doing.
18      MR. TREEBY:
19      That's what I -- I explained that
20  I didn't -- I didn't say anything
21  except objection as to form and then
22  you asked me for an explanation, and I
23  did.
24      MR. BRUNO:
25      You should have a form

Page 31

1  objection.
2      MR. TREEBY:
3      That's what I said.
4      MR. BRUNO:
5      An objection to form is a
6  different kind of objection, Mr.
7  Treeby.  I'm sorry you don't
8  understand that.  An objection to form
9  suggests that I can change the
10  question so that it is -- whatever the
11  basis is, is less objectionable.  When
12  you say something is vague, that is
13  not an objection to form.  Okay?
14  Those are not the rules, and we're not
15  playing by your rules.  We're playing
16  by the Court's rules.
17  EXAMINATION BY MR. BRUNO:
18      Q.  Now, let's get back to where we
19  were, Mr. O'Conner.  All I am trying to figure
20  out is -- Again, I am trying to short circuit
21  this, but we had established that you had,
22  through your work, had some experience, and
23  through that experience some knowledge about
24  hazards associated with working either on or
25  close to or proximate to flood control

Page 32

1  structures.  And you had enumerated that
2  there's conditions like the soil, the area,
3  the environment, the end result, things like
4  that.  So I was trying to focus on is what
5  particular hazards did you learn about through
6  that process?
7      A.  What you learn is to observe the
8  site; notice what conditions are on the site,
9  what conditions you may encounter, be they
10  people, equipment, machinery, physical
11  geology, whatever it may be, and hopefully
12  predict anything that you may encounter so you
13  can plan for it.
14      Q.  Right.  All right.  What about the
15  physical geology may have some impact -- Let
16  me withdraw the question, because I am going
17  to have to -- Mr. Treeby, he forgets what
18  we're talking about.  We're talking about
19  levees.  We're talking about flood control
20  structures.
21      A.  Uh-huh (affirmatively).
22      Q.  Okay.  And we're also talking about
23  what I believe you have acknowledged to be the
24  goal of you and your employer not to do any
25  damage to any adjacent flood control

Page 33

1  structures.  Okay?  That's what we're talking
2  about.  Now, what damage are you aware of that
3  can be done to a flood control structure
4  because of the fact that the work that you are
5  doing is either close to or on a flood control
6  structure?  What can happen?
7      A.  If you plan well, nothing should
8  happen.
9      Q.  All right.  I am sorry, what hazards
10  might you encounter?
11      A.  It depends -- I am not trying to be
12  difficult.  It depends on the situation and
13  the site.
14      Q.  All right.
15      A.  So to ask me about what would
16  happen, I have to tell you about, as you say,
17  twelve different sites, and we can go on and
18  on.
19      Q.  Fair enough.  Let's talk about
20  digging holes around or near to a levee or
21  flood control structure.  Do you know whether
22  or not the digging of holes has any potential,
23  or if there are any potential hazards
24  associated with digging holes either on or
25  near a flood control structure?

Johns Pendleton Court Reporters                    800 562-1285

O'CONNER, DENNIS

8/13/2008

Page 34

1      A.  If you're too close to whatever that
2  may be and you invade that area which is part
3  of the structure, then you either have a scope
4  of work to do so or you don't belong there.
5  So you wouldn't do that.  But there's also
6  numerous other conditions that you would have
7  to deal with.  What you're trying to do, what
8  your scope of work was, underground
9  utilities.  It goes on and on.  Over, above
10  ground utilities.  So you're asking what --
11  It's an accumulation of things.  It's not one
12  item.
13      Q.  Right.  Well, let's talk
14  specifically then about excavating material or
15  digging a hole.
16      A.  Okay.
17      Q.  All right.  Let's just talk about
18  that.  Are you aware of any potential hazards,
19  and I am defining "hazards" to be damage to
20  the flood control structure, that may be
21  encountered in digging holes, and I am
22  including in digging the hole how you fill up
23  the hole?
24      A.  You're asking about excavation, then
25  you're asking about backfill.  Which one do

Page 35

1  you want me to address?
2      Q.  Well, I am saying that excavation --
3  I am including -- When I use the word
4  "excavation", I am including not only the
5  digging of the hole, but the filling up of the
6  hole.  If you want me to break them up in two
7  parts, I'm happy to.  Let's talk about digging
8  a hole first.
9      A.  The excavation procedure would be
10  directed by what's to be accomplished and what
11  your guidelines are.  And let's just say the
12  client, with a regulatory agency involved,
13  would stipulate what you're going to dig.  In
14  other words, if you're going to excavate a
15  hole, you're not going to excavate on somebody
16  else's property that does not belong to the
17  client unless you address the client's
18  neighbors and everybody agrees that's what
19  you're trying to do.  So your excavation is
20  based on what you said you were going to do
21  and what you have to do and what the
22  perimeter, if you will, of the excavation has
23  been predetermined.  You don't freelance
24  excavate by no way, shape or form.
25      Q.  Sure.

Page 36

1      A.  All right.  If you are backfilling
2  for whatever reason after you excavate, you
3  determine how you're going to backfill and why
4  you're going to backfill and to what degree
5  you're going to backfill.
6          You asked open ended question.
7  Maybe you're not going to backfill at all.
8  Maybe you are only halfway because the
9  foundation is going in.  I can't answer that.
10  But your backfill is predetermined.  Because
11  you do not sit in the operator's cab and tell
12  him what to do.  There is a general procedure
13  that you will fill.
14      Q.  All right.  Are there any hazards
15  associated with digging a hole near a flood
16  control structure that may imperil the
17  integrity of the flood control structure that
18  you're aware of?  I am talking about you, not
19  scope of work, not somebody else.  Just what
20  Mr. O'Conner knows.
21      MR. TREEBY:
22          It's a hypothetical question.
23      MR. BRUNO:
24          No, it's not a hypothetical
25      question.

Page 37

1  EXAMINATION BY MR. BRUNO:
2      Q.  Based upon your knowledge that you
3  obtained before going to the New Orleans
4  site.
5      A.  From --
6      MR. TREEBY:
7          I'm going to object to the
8      question.
9      MR. BRUNO:
10          Noted.
11      THE WITNESS:
12          Before I would do or manage any
13      excavation, I think I have already
14      addressed the fact that I would try to
15      understand and get directions as to
16      what I am supposed to excavate.  And
17      then I would look at the site, study
18      the site, gather what information I
19      had about the site and determine if
20      that excavation would cause any
21      damage, such as near a building, which
22      I have encountered many times, where
23      we shored up and we built -- excavated
24      right next to the building.  We
25      wouldn't freelance dig.  We would make

Johns Pendleton Court Reporters

800 562-1285

O'CONNER, DENNIS

8/13/2008

Page 38

1    sure that we had shoring in place or
2    that we didn't dig that close to the
3    stability would remain the same.
4    EXAMINATION BY MR. BRUNO:
5        Q.  Let's use that example then of the
6    digging of a hole next to a building.  Because
7    I am trying to understand what hazards you're
8    thinking about in terms of protective measures
9    that you might decide to take or not take.
10   All right.  So you have got this building and
11   you're digging a hole.  So what -- where is
12   the potential harm and to what?
13       A.  The potential harm with excavation
14   would be to undercut or cut too close, and I
15   think after that you can figure out what would
16   happen on our own.
17       Q.  I understand that, but we have to
18   make a record, unfortunately, and other folks
19   may or may not understand that, but I need to
20   know what your understanding is.
21       A.  If I dug up to your house, up to the
22   foundation, without some kind of safety
23   measure such as shoring and walked away, then
24   your house would probably fall in the hole.  I
25   think that's very straightforward.  So you

Page 39

1    wouldn't do that.  You would go, and if you
2    had to come close to your house, using that as
3    an example, then I would probably -- I say
4    probably, but I don't know everything
5    about it, I would shore the hole so it
6    wouldn't fall in.  And then whatever I had to
7    do, and then backfill it or reinforce it and
8    then pull the shoring out.
9        Q.  Now, I know that you are well
10   acquainted with shoring, but please remember
11   that other folks may be reading this or
12   listening to this testimony in the future, so
13   would you explain to us what shoring means.
14       A.  Shoring is -- There are numerous
15   forms of shoring, and what shoring simply does
16   is protect the hole from caving in while some
17   sort of work is taking place in the hole.
18   Whatever that may be, from trench shoring to
19   sheet piling, which is pile that's drove into
20   it, to wood shoring which cold amount to
21   railroad ties which I have seen put in place
22   on a simple project.
23       Q.  All right.
24       A.  It is to protect the hole from
25   caving in.

Page 40

1        Q.  Okay.  And so if you don't protect
2    the hole from caving in, obviously it may cave
3    in; is that right?
4        A.  It could kill someone.
5        Q.  All right.  Now, how does that
6    affect the house or the building that's next
7    to the hole, though?
8        A.  Should not affect the house at all.
9        Q.  Okay.  Even if it has no shoring?  I
10   thought you said the house would fall in.  I'm
11   sorry.
12       MR. BRUNO:
13          He did say that.  You want to
14   read it back?
15       MR. TREEBY:
16          Yes, he did say that, so why are
17   you --
18       MR. BRUNO:
19          Let him answer the question.
20       MR. TREEBY:
21          He's already answered.
22       MR. BRUNO:
23          Let him answer the question.
24       MR. TREEBY:
25          Objection.

Page 41

1        MR. BRUNO:
2           Fine.
3    EXAMINATION BY MR. BRUNO:
4        Q.  Mr. O'Conner.
5        A.  I don't understand your question,
6    because I did think that I answered the
7    question.
8        Q.  What I thought --
9        A.  What is your question?
10       Q.  I thought you said that if you
11   didn't shore it, okay, the hole would cave in
12   and then somebody inside the hole would get
13   hurt.
14       A.  Uh-huh (affirmatively).
15       Q.  And we weren't talking about the
16   hazards to humans.  We were talking about the
17   hazards that relate to that building or that
18   house that might be next door to the hole.  So
19   what I am trying to understand is, what is the
20   relationship of the potential for the hole to
21   cave in and the potential for damage to that
22   house or that structure that's near that
23   hole?
24       A.  If the shoring is designed properly,
25   there should be no problem with, as the

11  (Pages 38 to 41)

Johns Pendleton Court Reporters

800 562-1285

O'CONNER, DENNIS

8/13/2008

Page 42

1  example we're using of a house falling in.
2  Once you're done with the excavation, whatever
3  you're doing with the excavation, you backfill
4  that excavation with the shoring still in
5  place.  This is typical.  Typical.  It's what
6  you do.  And then with the dirt in place you
7  proceed to remove the shoring.  There's
8  numerous ways to do that.  You can do it
9  partially and backfill, take one step, then
10 another, then another step, then another.
11     Q.  Right.
12     A.  But the concept is the shoring is
13 always in place until the hole is backfilled.
14     Q.  I guess I am confused.  I don't know
15 that I understand why it is that because you
16 have a hole and you have something like a
17 structure near the hole that the two are in
18 some way connected.  Why is there this need to
19 do what you just said?
20     MR. TREEBY:
21        Objection.
22 EXAMINATION BY MR. BRUNO:
23     Q.  How can that hole potentially affect
24 a structure which is near to the hole?  That's
25 what I don't understand.  Can you explain that

Page 43

1  to me?
2     MR. TREEBY:
3        Objection.
4     MR. BRUNO:
5        Noted.
6  EXAMINATION BY MR. BRUNO:
7     Q.  I know it seems obvious to you, Mr.
8  O'Conner, but you have to understand there's a
9  lot of folks who listen to this who don't have
10 any knowledge of construction, they don't know
11 anything about holes, they don't know anything
12 about houses, they know nothing about this
13 subject.  So I know it sounds real simple, but
14 forgive me for having to ask what appears to
15 you to be very simple and obvious questions.
16     A.  If you are asking why you would
17 shore a hole, it would be based on previous
18 knowledge, your own or someone in the area, or
19 your client's request to ensure that -- the
20 example we are using, the house -- if you had
21 to dig close to it, would not fall into the
22 hole.  Quite -- Not fall in the hole, but
23 collapse in -- you would be creating a
24 situation that would enable the house to fall
25 away.  Therefore, prior to anything, you would

Page 44

1  determine that you need to shore, if you will,
2  reinforce the excavation while you did your
3  work.  You do not leave the shoring in the
4  excavation unless, as was the case with some
5  of the pieces on the canal, they left shoring
6  in when it comes to water because they were
7  trying to create a wharf.  And this is right
8  next to the canal.
9     Q.  Right.
10     A.  And when it's done and everything is
11 put back in place, you take it out.  It's much
12 like doing a brace.  You put the brace in
13 place while you're working.  When you're
14 finished working, you take the brace out.
15     Q.  So if you have your house, and you
16 have your hole (indicating), if the hole caves
17 in, the fact that the hole caves in can
18 somehow affect the soil that's underneath the
19 house?
20     A.  The hole did not cave in because you
21 shored.
22     Q.  No, I'm saying if it -- I said if
23 the --
24     A.  If you dug it without shoring --
25     Q.  Right.  If the hole caves in -- I am

Page 45

1  trying to understand the connection between
2  the two still.  The hole cases in.  So you
3  have a hole that's now caved in.  That causes
4  the soil under the house to somehow change?
5     A.  No.
6     Q.  All right.  Well, how does this --
7     A.  You dug a hole.
8     Q.  Okay.  And it cases in.  How does
9  that affect the house that's next to it?
10     A.  You no longer have a surface to
11 support the house.
12     Q.  So how close does a house have to be
13 to a hole before you have these concerns about
14 the potential for the hole to cave in and
15 possibly damage that house?
16     MR. EHRLICH:
17        Object to the form, vague.
18     THE WITNESS:
19        It depends on the situation.
20 EXAMINATION BY MR. BRUNO:
21     Q.  Okay.  Is there some process that
22 you go through to analyze that?  In other
23 words, so that you will know whether to shore
24 or not shore to protect the house?
25     A.  It would depend on how deep you're

Johns Pendleton Court Reporters                    800 562-1285

O'CONNER, DENNIS

8/13/2008

Page 46

1  digging and it would depend -- depend on how
2  close you were to the house.
3      Q.  Okay.  Is this an analysis, Mr.
4  O'Conner, that you do, or do you ask some
5  other person to do the analysis for you so
6  that you will know whether to shore or how to
7  shore a hole in that kind of circumstance?
8      MR. TREEBY:
9          Object as to form.
10     MR. BRUNO:
11         It's noted.  I'm not even going
12     to bother asking what's the problem
13     with the form.
14     MR. TREEBY:
15         You don't need to keep saying
16     it's noted either.
17     MR. BRUNO:
18         You don't need to keep
19     objecting.  He knows it, too.
20     MR. TREEBY:
21         Joe, I'm going to object.  You
22     started off the deposition saying I'm
23     paid to object.  I'm going to object.
24 EXAMINATION BY MR. BRUNO:
25     Q.  He's paid to object.  It's becoming

Page 47

1  painfully obviously that he's earning his
2  keep.
3      MR. TREEBY:
4          You better believe it.
5      MR. BRUNO:
6          Yeah, I know.
7      THE WITNESS:
8          The concept of shoring depends on
9      the situation.
10 EXAMINATION BY MR. BRUNO:
11     Q.  Right.
12     A.  You don't shore a three foot
13  trench.  But there are objects when you do,
14  and you either know to shore or you bring in a
15  shoring engineer.
16     Q.  All right.  My question to you is,
17  though, when do you bring in somebody to
18  assist you in deciding whether to shore or not
19  to shore?
20     A.  There are regulations, and I can't
21  quote them right now, and I'll say they're
22  OSHA and I may be wrong, that stipulate the
23  depth and the situation where a registered
24  shoring engineer must be incorporated, and
25  we're guided by those.  Trenching, I don't

Page 48

1  need a shoring engineer.  I can go out and
2  rent a box shoring and just drop it in the
3  hole to protect people.
4      Q.  I understand.
5      A.  Then if I exceed those, if I know
6  the shoring is going to be, as an example, 10
7  foot and the regulations state that at 10 feet
8  I need a shoring engineer, then we have to go
9  out and get a registered shoring engineer,
10  which typically will be a subcontracting
11  engineer that's registered in that state.
12     Q.  I understand.  So I'm gathering from
13  your testimony that you, Mr. O'Conner,
14  yourself as the project engineer -- I'm sorry,
15  the project manager, you make the call as to
16  whether or not you believe there's a need for
17  any particular kind of shoring.  That's your
18  call?
19     MR. TREEBY:
20         Object --
21     THE WITNESS:
22         No.
23     MR. TREEBY:
24         -- to the form.
25     THE WITNESS:

Page 49

1          No.
2  EXAMINATION BY MR. BRUNO:
3      Q.  Well, who makes the call?  You just
4  told me, for example, that if it's a trench, I
5  don't need to shore it.
6      A.  Because regulations -- regulations
7  state.
8      Q.  Fair enough.  But it sounded to me
9  like you made that determination.  You said to
10  me "The regulations don't require it, Mr.
11  Bruno, so I don't do it".
12     A.  No.  No.
13     MR. TREEBY:
14         Object.  Argumentative.
15     MR. BRUNO:
16         It's noted.
17     THE WITNESS:
18         If I know the depth --
19  EXAMINATION BY MR. BRUNO:
20     Q.  Right.
21     A.  -- then I do not have to obtain the
22  services of a shoring engineer.  You dig a
23  trench and put PVC in your lawn, you don't
24  need a shoring engineer.
25     Q.  Right.

O'CONNER, DENNIS

8/13/2008

Page 50

1    A.  So -- And there's no statement in
2  any regulations that say you do.
3    Q.  I never said that.  Perhaps we're
4  talking at cross purposes.  I'm asking this --
5  The question is what -- I am not asking you
6  whether or not you have to do anything.  What
7  I am asking is whether you, Mr. O'Conner, make
8  the determination as to whether the
9  regulations apply or don't apply; and if they
10  do, whether or not the regulations call on you
11  to call somebody else.  Am I making any sense?
12    A.   Yes, you are, and you're asking a
13  question that depends on the job.  And I would
14  explain that to you as I say.
15    Q.  Okay.
16    A.  Project management, also
17  construction management, typically as
18  construction manager you work at the direction
19  of the client.  And if you can't call out or
20  get anyone on site without the direction of
21  the client.  If we're talking about New
22  Orleans, then I would not call out a shoring
23  engineer until I discussed it, or it was
24  discussed with me depending on how the
25  situation developed that day, of what I was

Page 51

1  going to do.
2    Q.  Right.
3    A.  In the case of the Army Corps in New
4  Orleans, no, I would not arbitrarily pick to
5  do that.  I would have sat down with the
6  Corps, or, as I say, they would have discussed
7  it with me, we would talk about the job and
8  then I would be directed to do that.
9    Q.  Okay.  But I am still not
10  understanding how the subject comes up in the
11  first place.  Okay?
12    A.  Because we need -- we know we need
13  to do something.
14    Q.  All right.  "We know we need to do
15  something."  Now, that's what I am trying to
16  understand.  When we say "We know we need to
17  do something", --
18    A.  Uh-huh (affirmatively).
19    Q.  -- Mr. O'Conner's been on the job
20  for a long time, he knows he's got a
21  structure, he knows he's got a hole.  Does he
22  know if he has an issue that requires him to
23  think about the business of whether to shore
24  or not shore?  And then that's what provokes
25  you to call in the owner and ask his advice?

Page 52

1  Or do you wait for somebody else to tell you
2  that you need to do something?
3    MR. TREEBY:
4    Object as to form.
5    MR. BRUNO:
6    That's fine.
7  EXAMINATION BY MR. BRUNO:
8    Q.  Do you understand my question?
9    A.  If I have a scope of work that tells
10  me to remove something, as an example, and I
11  know that we are going to have to go to a
12  certain depth to remove that excavation of
13  some sort, then I know certain procedures are
14  going to have to take place.  And foremost is
15  safety to keep the equipment from falling in
16  the excavation, to keep people from being
17  harmed, so we walk down and at any stage of
18  the work I talk with the client and in this
19  case, construction management effort, we will
20  arrive at a solution.  I can advise, but I
21  can't direct.
22    Q.  I understand.  So would you advise
23  -- Because you talked about the possibility
24  of damage to equipment, you talked about the
25  possibility of damage to people, what was left

Page 53

1  out was the possibility of damage to other
2  structures that may be nearby.  That would
3  also be --
4    A.  That would be considered.
5    Q.  All right.  The point is that you're
6  there on the site and if this comes -- you
7  know, if you encounter this situation, then
8  you call the --
9    A.  Shoring engineer.
10    Q.  Right.  But you don't do it until
11  you first consult the contracting party?
12    A.  Correct.
13    Q.  Right?  But you know, based upon
14  your vast experience, that you have to do
15  something; right?
16    MR. TREEBY:
17    Object to the form of the
18  question.
19    MR. BRUNO:
20    We'll note Mr. Treeby's dramatic
21  yawning and all the other stuff that
22  we get for the record just in case we
23  don't pick it up.
24    MR. TREEBY:
25    Well, since the camera is not on

14  (Pages 50 to 53)

Johns Pendleton Court Reporters                    800 562-1285

O'CONNER, DENNIS

8/13/2008

Page 54

1    Mr. Bruno, we'll notice his hand
2    gesturing --
3        MR. BRUNO:
4        Which was copying Mr. Treeby's
5    hand gesturing and all of his back
6    pulling.
7        MR. TREEBY:
8        I didn't --
9        MR. BRUNO:
10       Yes, you did.  You leaned back
11   and said it was a silly question.  All
12   of this drama.  Okay?
13   EXAMINATION BY MR. BRUNO:
14       Q.  Mr. O'Conner, I am just trying --
15   See, what I am trying to establish is that if
16   you have got this -- You are going to
17   encounter the hole first.  Okay?  And then you
18   are going to either decide or not decide to do
19   some shoring, but it's you who understands
20   that there's a potential hazard and you who
21   starts the ball rolling, if you will, to a
22   discussion with the contracting party as to
23   whether or not they want to bring in somebody
24   to shore or not shore; right?
25       MR. TREEBY:

Page 55

1        Objection.  That's contrary to
2    what the witness said.  He said
3    sometimes the client comes to him and
4    sometimes he speaks to his client.
5        MR. BRUNO:
6        It is a speaking objection.
7        MR. TREEBY:
8        It is.
9        MR. BRUNO:
10       It is a speaking objection.
11       MR. TREEBY:
12       You misrepresented what he said.
13       MR. BRUNO:
14       The witness will tell me whether
15   or not I misrepresented what I said.
16   EXAMINATION BY MR. BRUNO:
17       Q.  Would you answer the question and
18   then you can explain it, Mr. O'Conner?
19       A.  Could you repeat the question?
20       Q.  Sure.  You have -- I thought you
21   have told me, by virtue of your long
22   experience and knowledge, about the potential
23   hazards associated with digging holes is the
24   hazard to humans, the hazards to equipment,
25   the hazards to adjacent property.  So when you

Page 56

1    know you have a hole, you know you have this
2    potential hazard.  Is that right?  Is that
3    accurate?
4        A.  In general, yes.
5        Q.  In general.  Okay.  And so when you
6    know you have this situation, you then know
7    that you have to communicate with the
8    contracting party and say, "Look, I have got
9    this situation.  These are my potential
10   hazards.  How do you want to handle it?"  Is
11   that how it goes?
12       A.  Essentially that's correct.
13       Q.  All right.  Thank you.
14       Now, going back to what knowledge
15   and experience you have with regard to these
16   holes, I want to talk about the potential
17   hazards that exist when you dig a hole of some
18   depth near a flood control structure when you
19   have a body of water in close proximity just
20   like we had in New Orleans.  Okay?  Now, I
21   think you have already described the fact that
22   if you dig a hole, you may impair the
23   structural integrity of the levee because that
24   hole has a tendency to fall in if you don't
25   shore it up and keep it from --

Page 57

1        A.  If you're too close.
2        Q.  If you're too close.  All right.
3    Let's talk about that.  What is "too close"?
4        A.  It would depend on how deep you're
5    digging and what you're doing.  So it varies
6    with every situation.
7        Q.  All right.  Let's talk about --
8    Let's pick 20 feet.  If you're digging a 20
9    foot hole --
10       A.  No, it does not apply.
11       Q.  What doesn't apply?  I'm sorry.
12       A.  You're -- Assigning depth to a
13   generic levee does not apply.
14       Q.  All right.
15       A.  You may be able to dig a levee
16   within 10 foot -- 10 foot of it.  Others, you
17   may not.
18       Q.  All right.  So what information do
19   you need in order to assess the potential
20   hazards?
21       A.  One, you need to know, based on some
22   sort of information, what the soils are and
23   what had taken place before.  And then the
24   extent of how far away you are going to be
25   digging the excavation.  And again, if you're

Johns Pendleton Court Reporters                          800 562-1285

O'CONNER, DENNIS

8/13/2008

Page 58

1  going to shore near that end or not.
2      Q.  All right.  What characteristics of
3  the soil are relevant to this evaluation of
4  the potential for a hole to do some damage to
5  --
6      A.  Slope.  Slope is always an issue.
7      Q.  All right.  Is that a soil issue?
8      A.  It is a soil issue because it is
9  based on a consistency of the soil.  Hard
10  packed soils, for lack of a technical
11  description, you can go to any engineering
12  book and it will give you the slope that you
13  should dig based on what the soils consist
14  of.
15      Q.  Got you.
16      A.  And that's the second part of it,
17  what the soils consist of, be they all silt,
18  all sand, all rock, all shale.  Whatever
19  they're made of, they will hold a different
20  slope.  That's the answer.
21      Q.  Are there any other characteristics
22  in the soil that would be relevant to the
23  question of whether or not a hole may pose a
24  hazard to an adjacent flood control structure
25  when you have a body of water nearby?

Page 59

1      A.  Offhand, in general I can't think of
2  anything right now.
3      Q.  Are you aware of something called
4  under-seepage?
5      A.  I have heard the term.
6      Q.  Okay.  I know you've heard it, but
7  do you happen to know what it means or what it
8  refers to?
9      A.  In general, yes, I do.
10      Q.  Would you share with us your
11  understanding?
12      A.  My understanding is under-seepage
13  may be caused by some geological condition
14  that has soils running under a situation that
15  has a conduit for fluids from another area.
16  That's the simple --
17      Q.  Okay.  Before you got to New
18  Orleans, had you on any of the other jobs
19  encountered the issue of under-seepage in
20  connection with excavations that were either
21  adjacent to or near to a flood control
22  structure?
23      A.  You indicate that that existed in
24  New Orleans.  I do not know nor believe that
25  that existed in New Orleans, under-seepage, so

Page 60

1  you're telling me --
2      Q.  No, sir, I didn't.
3      A.  That's how I heard your question.
4      Q.  Well, fair enough.  Let me rephrase
5  it, because I was, frankly, specifically
6  asking you about jobs before you got to New
7  Orleans.
8      A.  All right.
9      Q.  Okay.  So let's make that clear.  I
10  want to know -- Okay.  And I will do it all
11  over again.  Before you got to New Orleans,
12  before you ever set foot in the city, were
13  you, in your experience, working on a job,
14  okay, where there was a flood control
15  structure or levee or dam or something like
16  that and there was water nearby, called upon
17  to deal with an under-seepage issue?  I know
18  that's general, but I am asking it purposeful
19  so we can see whether I need to ask some more
20  questions.
21      A.  The terminology wasn't used, but the
22  conditions existed where we had different
23  pathology, different soils.  There would be
24  sand on top of gravel.  And I can carry that
25  out a little bit further, but obviously gravel

Page 61

1  would transport fluids greater than silt and
2  sand.  So the answer is yes.
3      Q.  I think you said that it had a
4  different term?  What terminology was used on
5  those jobs before you got to New Orleans then?
6      A.  There was no terminology used.  It
7  was just acknowledged that the soil conditions
8  were and we knew that there was a potential
9  for the transport of water, if you will.  So
10  we had to consider that.
11      Q.  Can you explain to me what your
12  understanding was of the mechanism by which
13  the transmission of water might pose a hazard
14  to a flood control structure or dam, if you
15  know?
16      A.  Again, it depends on the situation.
17  What the hydrogradient is, what the time of
18  the year is.  Various areas have various
19  levels in various years, if water is perched
20  or if it's the water table.  So one -- one
21  answer does not fit all.
22      Q.  Well, I realize it may be different
23  levels of water and different permeabilities.
24      A.  Uh-huh (affirmatively).
25      Q.  But what can this process do to

Johns Pendleton Court Reporters                    800 562-1285

O'CONNER, DENNIS

8/13/2008

Page 62

1 cause damage to a flood control structure, if
2 you know?
3     A.  Depending on the site, none to some.
4     Q.  Sure.
5     A.  If you have had previous borings, if
6 you will, you should know from the geologist's
7 log what your problems are and then you can
8 decide from there what you need to do.
9     Q.  All right.  What do the borings tell
10 you?
11     A.  The borings tell you a number of
12 things depending on what you're trying to
13 get.  In the case of New Orleans, the major
14 goal was to determine contamination.  But it
15 will also tell you soil layers and soil
16 make-up.  It will tell you what the soil
17 consists of and, depending on how deep you go,
18 if they encounter water or a water table or
19 perched water.
20     Q.  Okay.
21     A.  There are other things, of course.
22 The density and, depending on how much
23 analysis you want, the permeability and
24 porosity.  Depending on what you're trying to
25 obtain.

Page 63

1     Q.  All right.  But we were talking
2 specifically about the business of the water
3 being able to move.
4     A.  Uh-huh (affirmatively).
5     Q.  So if you don't mind, let's just
6 limit --
7     A.  Sure.
8     Q.  -- our discussion to that, not the
9 contamination.  But once you do these borings
10 and you find out what the stratification of
11 the soil is below the surface, what, if
12 anything, does that tell you about the
13 potential for water to move and possibly
14 damage the flood control structure?
15     A.  Depending on how many holes you
16 drill, it will tell you, if the soils can tell
17 you that, the hydrogradient of the water, in
18 other words, which way the water is moving
19 hopefully if you have homogeneous soils.
20     Q.  All right.  What is a hydrogradient?
21     A.  It's the way the water runs.
22     Q.  Okay.
23     A.  You know, water runs down hill, but
24 not necessarily, based on the structure of the
25 soil.  It'll tell you -- You may think it's

Page 64

1 running down hill and it could be running at
2 right angles based on the geology.  Eventually
3 it runs down hill.  Water comes from a
4 mountain and ends up in the valley, but it
5 doesn't come in a straight line.  It may run
6 south and then southeast and then southwest.
7     Q.  Okay.
8     A.  The hydrogradient is the way -- the
9 simple version is the way the water is running
10 beneath the ground, not on top of the ground.
11     Q.  Okay.  So we now have our boring, we
12 now know which way the hydrogradient is
13 running.  How can that affect, if it does at
14 all, the integrity of a flood control
15 structure?
16     A.  You answered the question.  If it
17 does at all.
18     Q.  Well, --
19     A.  It may not at all.
20     Q.  Well, I know, but if it does, I am
21 trying to find out what is the mechanism by
22 which this movement of water could impact a
23 flood control structure?
24     MR. TREEBY:
25         Object to the form of the

Page 65

1 question.
2     THE WITNESS:
3         It would simply give you
4     information that you could adjust your
5     operations to, if required.
6 EXAMINATION BY MR. BRUNO:
7     Q.  That's what I am trying to figure
8 out.  Why is it required?
9     MR. EHRLICH:
10         Object to the form.
11     MR. TREEBY:
12         The same objection.
13 EXAMINATION BY MR. BRUNO:
14     Q.  Here's your answer.  "It would
15 simply give you information which you could
16 adjust your operations to, if required."
17     A.  If required.
18     Q.  I am trying to find out why do you
19 care?  If we haven't yet established how this
20 water could potentially damage the flood
21 control structure, then who cares?
22     MR. TREEBY:
23         Object to the form of the
24     question.
25     THE WITNESS:

17 (Pages 62 to 65)

Johns Pendleton Court Reporters                    800 562-1285

O'CONNER, DENNIS

8/13/2008

Page 66

```
1        If you're dealing with a
2    pre-existing flood control area, --
3    EXAMINATION BY MR. BRUNO:
4        Q.  Okay.
5        A.  -- it would simply tell you what is
6    going on.  It would not tell you how
7    pre-existing conditions are damaging
8    anything.  I don't understand where you're
9    going with this.
10       Q.  Well, you just said you may have to
11   adjust your operations.
12       A.  That's true.  You may have to put
13   sheet piling in based on water moving in or --
14       Q.  Why?
15         MR. TREEBY:
16           Object to the form of the
17         question.
18   EXAMINATION BY MR. BRUNO:
19       Q.  You said you may have --
20       A.  Safety -- For safety's sake
21   predominantly.
22       Q.  How does a sheet pile connect with
23   safety?
24       A.  It keeps the excavation from caving
25   in.
```

Page 67

```
1        Q.  All right.  And how does that relate
2    in any way to the movement of water?
3        A.  The movement of water could cause
4    unstable soils.
5        Q.  How does that happen?
6        A.  If you have a flooding condition or
7    high season rains -- Summertime, it may not be
8    a problem at all.  Wintertime, with high
9    rains, water level comes -- becomes greater.
10       Q.  Okay.  So it goes in this hole --
11       A.  No, it doesn't go in the hole.
12       Q.  Well, again --
13       A.  That's not what we're trying to
14   protect.  We're not trying to protect the
15   hole.  We're protecting the sides of the hole.
16       Q.  The sides of the hole.  And we're
17   trying to keep the water from going --
18       A.  No.
19       Q.  -- somewhere?  No.
20       A.  No.
21       Q.  Does the sheet --
22       A.  We're trying to keep the soil from
23   collapsing in the hole.
24       Q.  All right.  So all of this business
25   about the way the water moves under the soil,
```

Page 68

```
1    I am having a hard time understanding how that
2    impacts the ability --
3        A.  It tells you --
4        Q.  I'm sorry, go ahead.
5          MR. TREEBY:
6            Wait, wait, wait.  Don't answer
7          until he's given you a question.
8    EXAMINATION BY MR. BRUNO:
9        Q.  I am trying to understand how that
10   movement of water under the surface has
11   anything to do with the stability of the walls
12   of the hole.
13         MR. TREEBY:
14           Object to the form of the
15         question.
16         THE WITNESS:
17           When you are going to work in an
18         area, you need the information that is
19         available to you.  When the
20         information is not available, you may
21         go in with a drilling rig and obtain
22         information about those soils.
23   EXAMINATION BY MR. BRUNO:
24       Q.  Right.
25       A.  And that is one of the things it
```

Page 69

```
1    will tell you.  It's going to tell you if it's
2    solid, if it's dry, if it's wet, things you
3    need to know.
4        Q.  All right.  So it tells you it's
5    wet.  Does the fact that the soils below the
6    surface are wet tell you anything about what
7    you should or should not do if you're going to
8    dig a hole?
9          MR. TREEBY:
10           Object to the form of the
11         question.
12         THE WITNESS:
13           It gives you information to
14         consider what you should have to do.
15   EXAMINATION BY MR. BRUNO:
16       Q.  All right.  How does it impact what
17   you should consider?
18         MR. TREEBY:
19           Object to the form of the
20         question.
21         THE WITNESS:
22           Repeat the question, please.
23   EXAMINATION BY MR. BRUNO:
24       Q.  All right.  You said --
25       A.  Just the last part.
```

18  (Pages 66 to 69)

Johns Pendleton Court Reporters                    800 562-1285

O'CONNER, DENNIS

8/13/2008

Page 70

1    Q.  All right.  How does it impact what
2  it is that you should consider?
3        MR. TREEBY:
4        The same.  The same objection.
5        THE WITNESS:
6           It gives you a picture, if you
7        will, of the soils that you're going
8        to be working in.
9  EXAMINATION BY MR. BRUNO:
10   Q.  All right.
11   A.  Which determines what you need to
12 do.  It tells you what is below the ground in
13 the soils.  You can't see below the ground, so
14 you need to bore into the ground to obtain the
15 soils.  And, therefore, you know what you're
16 dealing with in the bore hole itself.
17   Q.  In the bore hole.
18   A.  Yes.
19   Q.  All right.  I am trying to determine
20 how this information impacts how you dig your
21 hole.  I mean, in one instance the boring
22 could indicate to you that everything is dry.
23 Another boring could indicate that everything
24 is wet.  All right.  Now, in the case of it
25 being dry, what does that tell you, if

Page 71

1  anything, about how to dig your hole as
2  opposed to if it's wet, what does it tell
3  you?
4    A.  You have to know, wet or dry, in
5  connection with the type of soils you're going
6  through.  And then it will tell you if the
7  soils can move, if they will stay compact as I
8  referenced earlier; if it's hard rock, if it's
9  sand, if it's silt.  And obviously each one
10 has a certain amount of compactness or
11 permeability or porosity.  And also you have
12 your guidelines which I referenced before as
13 to the slopes that you need to excavate at
14 based on the soils themselves.
15   Q.  All right.  So the higher the
16 porosity, the more the need to have a
17 concern?  Or is it the other way around?
18   A.  It depends on what the soil is.
19 Cork is very porous.
20   Q.  I'm sorry?
21   A.  Cork.
22   Q.  Oh, cork?
23   A.  Cork in a bottle.  Extremely
24 porous.
25   Q.  Right.

Page 72

1    A.  But water doesn't pass through it
2  because it's not permeable.
3    Q.  Let's suppose that --
4    A.  So that's am example.  Chalk is very
5  porous, but water passes through it.  That's
6  one of the things that drilling will tell you
7  what you're dealing with and what water will
8  pass through and what won't.  That's not the
9  primary objective.  It's one of the
10 objectives.
11   Q.  Well, in New Orleans if you did
12 encounter cork?
13   A.  In fact, we did.
14   Q.  You did?
15   A.  Yes.
16   Q.  And so did you make the
17 determination in New Orleans that the soils as
18 they were stratified below the surface were
19 not going to conduct water?
20   A.  The soils we worked in and excavated
21 and bored in were not homogeneous.
22 Predominantly they were, over the years, which
23 there appeared to be no real records, were
24 backfilled with trash, tree stumps, cars,
25 tanks, so there was no heter- --- homogeneous

Page 73

1  soil where we bored and where we -- where we
2  excavated.
3    Q.  How deep did those borings go?
4    A.  My recollection, the deepest borings
5  were 22 foot, but I would have to go back.  I
6  have -- I haven't looked at them --
7    Q.  That's fine.
8    A.  -- for three or four years.
9    Q.  So if you would have encountered
10 soils that were permeable, that would conduct
11 water, in other words, it's not cork, it's not
12 chalk, what, if anything, does that have to do
13 with how you dig your hole?
14   A.  A single boring would have nothing
15 to do with it.
16   Q.  A bunch of borings.
17   A.  A bunch of borings, then it would
18 determine what we needed to do and how we
19 could dig it and how big the slope needs to be
20 and how we can move the soils around.  And if
21 in fact we should dig at all.
22   Q.  All right.  Is there a relationship
23 between the degree of porosity and the ability
24 of the water to be conducted through the soils
25 and the slope that's safe?

19  (Pages 70 to 73)

O'CONNER, DENNIS

8/13/2008

Page 74

1      MR. TREEBY:
2          Object to the form of the
3    question.
4      THE WITNESS:
5          There are a number of things that
6    have to be considered together.  You
7    just asked about porosity.  I
8    previously explained as an example,
9    and it's a classic example, is cork is
10   porous.
11   EXAMINATION BY MR. BRUNO:
12     Q.  But I also added the degree of the
13   ability of water to move through the strata.
14     A.  It depends on what the soil was we
15   encountered.
16     Q.  All right.  And I am trying to
17   understand what difference does it make if the
18   water can move and it is porous, what does
19   that mean in the context of the slope of the
20   hole?
21     MR. TREEBY:
22         Objection.  Asked and answered.
23     THE WITNESS:
24         Please repeat the question.
25   EXAMINATION BY MR. BRUNO:

Page 75

1      Q.  You keep saying to me that there's
2    all of these variables.
3      A.  There are all of these variables.
4      Q.  Once you have got the answers to the
5    question, how does it impact the way you dig
6    your hole?  What is the connection between the
7    information?
8      A.  One, you dig the hole or not.
9      Q.  Okay.  Fair.  When can you not dig a
10   hole?
11     A.  You can't dig a hole, say, in the
12   bottom of the canal.
13     Q.  We're not talking about the bottom
14   of a canal.
15     A.  Well, you just asked me when --
16     Q.  No, I said what is the connection
17   between the characteristics and the decision
18   to dig or not dig?  I wasn't asking you about
19   --
20     A.  Well, I used that as an example.  If
21   it was slurry, we would not dig it because it
22   would just fill itself back in.  If it was
23   extremely wet, we would not dig it because it
24   wouldn't be profitable nor efficient to dig
25   it, because it would simply fall back in.

Page 76

1      Q.  All right.
2      A.  If we were digging an excavation and
3    the soils would not maintain it, we would have
4    an extremely large --
5      MR. BRUNO:
6          That's y'all.
7          (Whereupon a discussion was held
8    off the record.)
9    EXAMINATION BY MR. BRUNO:
10     Q.  So what I think you're telling me
11   is, is that the greater the potential of water
12   to move through the soils, the more difficult
13   it is to dig a hole.
14     A.  That's one of the considerations,
15   yes.
16     Q.  I didn't say it was all.
17     A.  I know.  But I am just saying it's
18   one.
19     Q.  You just gave me extra information.
20   Okay.  Fair enough.
21     MR. TREEBY:
22         Object.  Quit arguing with the
23   witness, Mr. Bruno.
24     MR. BRUNO:
25         I am not arguing with the

Page 77

1    witness, Mr. Treeby.  That's your
2    take, which again you're paid to do
3    that.  So I understand.  Doing your
4    job.
5      MR. TREEBY:
6          Thanks.
7    EXAMINATION BY MR. BRUNO:
8      Q.  Now, we were talking, though,
9    generally about how this movement of water
10   could affect a flood control structure.  Other
11   than the tendency of the hole to cave in and
12   thereby undermine the foundation of the flood
13   control structure, is there any other hazard
14   associated with doing something that would
15   cause the water to be conducted more
16   efficiently underneath the surface that you're
17   aware of?
18     MR. TREEBY:
19         Object to the form.
20     THE WITNESS:
21         Would you rephrase that, please?
22   EXAMINATION BY MR. BRUNO:
23     Q.  Well, if you've done your borings
24   and you know that the water is down there, you
25   know the water is moving in a certain

20  (Pages 74 to 77)

Johns Pendleton Court Reporters

800 562-1285

O'CONNER, DENNIS

8/13/2008



Page 78

1   direction, did you know before you got to New
2   Orleans that if you dug a hole that was on the
3   water side of a flood control structure and
4   you filled it with a porous material, that if
5   the level of the canal or the waterway went
6   up, then that hole might provide a conduit for
7   water to go down below the surface, intrude
8   into a porous layer of soil, and then move
9   laterally underneath the flood control
10  structure and cause some undermining of the
11  structural integrity of the levee?
12       MR. TREEBY:
13          Object to the form of the
14      question.
15  EXAMINATION BY MR. BRUNO:
16      Q.  Did you know that?
17      A.  Yes.
18      Q.  Okay.
19      A.  Hypothetical question, hypothetical
20  answer.
21      Q.  Oh, I understand.  Tell me what you
22  knew about that.
23      A.  I would know based on the soils,
24  based on the situation, based on the
25  hydrogradient, based on the water, based on

Page 79

1   the local climate, the local geology, I should
2   know what would occur.  To some degree you
3   would predict what was going to be either a
4   safe condition or a condition you did not want
5   to become involved in.  And the client would
6   direct you as to what to do, but obviously you
7   would have considerations as to what needed to
8   be put in place to ensure if this needed to be
9   done.
10      Q.  Right.  Let's assume that it needed
11  to be done.  As I understand your previous
12  testimony, because of your knowledge about
13  this, you would bring this issue to the
14  contracting party and say, "Listen, I have got
15  this problem.  What do you want to do about
16  it?"  Is that what you'd do?
17      A.  That's not necessarily what I would
18  do, because it would depend on the scope of
19  work.  If the scope of work already said that
20  we were going to do that, then I would come to
21  them, "This is what we intend to do" or "What
22  do you want to do with regards to your scope
23  of work?"  And also I would have to talk money
24  and labor of effort -- level of effort.
25      Q.  Sure.  Would you tell the

Page 80

1   contracting party, "Hey, look, you may not
2   realize it, but if we dig this hole as you
3   want me to and we dig it as deep as you want
4   me to, because of the fact that there's layers
5   of soil that are conducting water, we have a
6   problem, a potential problem with regard to
7   how we fill this hole or how we deal with this
8   hole to prevent water from going into the
9   hole, going down to a conducting layer, and
10  then perhaps impairing the structure of the
11  levee"?  Would you just tell them that?
12       MR. TREEBY:
13          Object to the form of the
14      question.
15       MR. EHRLICH:
16          Object.
17       THE WITNESS:
18          If he already knew it, I wouldn't
19      repeat it to him, if it was already
20      the scope of work.  If it was unknown,
21      if they did not know, we would address
22      it and --
23  EXAMINATION BY MR. BRUNO:
24      Q.  And you would tell them?
25      A.  I would make them aware of it if

Page 81

1   they weren't aware of it.  Or I would make
2   them aware of my concerns.
3       Q.  Okay.  I understand.  Now, when is
4   the first time that you were made aware of the
5   fact that you would be going to New Orleans?
6   If you can remember.
7       A.  I received a phone call while I was
8   in southern California.
9       Q.  Right.
10      A.  I can't remember the date.  But I
11  would say maybe 1999.  I am not sure if that's
12  the correct date or not.
13      Q.  All right.  I think you're close,
14  '99, 2000, thereabouts.  How were you advised
15  about what the nature of the work was going to
16  be?
17      A.  I was sent an initial scope of
18  work.  It may have been a memo.
19      Q.  And what do you recall that scope of
20  work said about what you were going to do?
21      A.  It was very -- I don't recall even
22  reading it now.  I guess I know I received it.
23  And essentially it was a remediation project
24  under the TERC in New Orleans.  And that's all
25  I recall.  It was very, very broad, very

O'CONNER, DENNIS

8/13/2008

Page 82

1    general, and it wasn't -- didn't consist of
2    anything.
3        Q.   I understand.  Let me just show you
4    this document.  It's WGI-5 in seriatim to 9.
5    It was marked as Exhibit 2 to what?
6        MR. BRUNO:
7            I guess it's an exhibit to this
8    deposition?
9        MR. JOANEN:
10           Yes.
11   EXAMINATION BY MR. BRUNO:
12       Q.   Would you take a look at that and
13   see if that refreshes your recollection?
14       MR. EHRLICH:
15           The notice is 1?
16       MR. BRUNO:
17           Yes.
18       MR. TREEBY:
19           You going to offer Number 1?
20       MR. BRUNO:
21           I thought I did.  If I didn't.
22   Exhibit Number 1 is the notice.
23       THE WITNESS:
24           I don't believe this is what I
25   received simply because at the point I

Page 83

1            was in California, I did not believe,
2            to my best recollection, a list of
3            documents.  I received a message that
4            made me aware of the job and what I
5            needed to do.
6    EXAMINATION BY MR. BRUNO:
7        Q.   All right.  What was your
8    understanding then of what it was that you
9    were needed to do?
10       A.   I would need to disengage myself
11   from my current work with, at that time,
12   Morrison Knudsen; I needed to go to Denver and
13   talk to some individuals regarding the
14   project, principally Steve Roe, who was the
15   program manager at the time, and subsequently
16   go back home and wait until the Corps was
17   ready to have me in New Orleans.  And that's
18   what I did.
19       Q.   All right.  Did you understand that
20   this was an environmental remediation --
21       A.   Yes.
22       Q.   -- project?  And again for the
23   record, you'll forgive me, but just please
24   explain what is an environmental remediation
25   project.

Page 84

1        A.   An environmental remediation project
2    depends on the contaminants, but it's simply a
3    project that attempts to take whatever
4    contaminants and remove them by some means, be
5    it excavation, transport, chemical, whatever
6    it may be, and achieve a level that is
7    acceptable to primarily the State
8    Environmental office.  Whatever goals they
9    have set.
10       Q.   All right.  Did you know at that
11   time that this project in New Orleans was also
12   going to include a demolition component of the
13   scope of work?
14       A.   I don't recall.
15       Q.   Okay.  Do you recall whether or not
16   the project called upon the Washington Group
17   to draft scopes of work or specifications for
18   the work?
19       A.   At that point in time I was informed
20   that we would probably develop what would --
21   probably, because the Corps had not made up
22   their mind yet if in fact we were really going
23   to go down there.  But we would probably
24   develop what we eventually termed a
25   recommendations report.

Page 85

1        Q.   And if you would for the record,
2    what is a recommendations report?
3        A.   It means -- It is what -- It
4    indicates that it's based on the scope of work
5    that the Corps gave us and subsequently the
6    information that we received from the Corps
7    and other sources, as many as we could obtain,
8    we wrote a recommendations report
9    recommending, as best that we knew based on
10   the information provided, of what needed to be
11   done to get closure for the site.
12       Q.   Okay.  Did you participate in the
13   drafting of this recommendation report?
14       A.   Yes, I did.
15       Q.   Okay.  Let me show you Exhibit 3,
16   which is WGI-38704 to 38769.  Just look at it
17   and tell me if the thing is something you
18   recall seeing.
19       A.   Yes.
20       Q.   Okay.  What is it?
21       A.   This, to my best recollection, is
22   probably the final draft of the
23   recommendations report that was submitted to
24   the Army Corps.
25       Q.   Good.  Do you need to see it to tell

O'CONNER, DENNIS

8/13/2008

Page 86

1  me what your role was in its drafting?
2      A.  No.
3      Q.  Okay.  What did you -- What was your
4  role?
5      A.  My primary role was project manager,
6  guidance and author of a considerable amount
7  of it.
8      Q.  All right.  Can you -- If you look
9  at the table of contents, which is at
10  WGI-38705, 6 and 7, would you be able to give
11  me just the general topics that you authored?
12      A.  A majority of section 5 was my
13  writing.  I participated in probably 50
14  percent of the other items in the table of
15  contents.  At some point I probably
16  participated in 90 percent of it, depending on
17  the technical aspects of it or the knowledge
18  of it.  And I reviewed -- I was one of the
19  reviewers of the final -- the final draft.
20      Q.  All right.  At page WGI-38708 of
21  this same report under "Executive Summary 1.0"
22  there's a paragraph called "Data gaps".  Let
23  me show it to you first before you -- before I
24  ask you anything.  Take a quick read if you
25  don't mind.

Page 87

1          All right.  Did you assist in
2  identifying the data gaps?
3      A.  Yes, I did.
4      Q.  And what were these data gaps?
5      A.  I can't recall.
6      Q.  All right.  This thing is dated
7  December 2, 1999.  Does that refresh your
8  recollection as to about when you came on
9  site, et cetera?
10      A.  Yes.
11      Q.  Do you remember when you first came
12  to New Orleans?
13      A.  It would probably be three months
14  prior to that.  Late summer.
15      Q.  All right.
16      A.  Of 1999.
17      Q.  1999.  Did you do a walk of the
18  site?
19      A.  Initially we could not because the
20  Corps did not own the site.  So initially we
21  gathered all the information provided by the
22  Corps and by the Department of Environmental
23  Quality.  Any place we could go to get
24  information.  But we were initially not even
25  allowed to step on the site.

Page 88

1      Q.  Okay.  At some point did you step on
2  the site?
3      A.  Yes.
4      Q.  And when was that?
5      A.  I would imagine -- not imagine.
6  Best recollection was somewhere, again, in the
7  late summer or early fall of 1999.
8      Q.  It was before the report was
9  finished; right?
10      A.  Oh, absolutely.
11      Q.  All right.  Is it fair for me to
12  conclude that really at the time that this
13  recommendations report was drafted, that the
14  -- with the exception of the removal of the
15  sewer lift station, that the deepest that you
16  all were required to excavate was about 5
17  feet?
18      A.  No.
19      Q.  Can you recall what you believe to
20  be the -- with the exception of the sewer lift
21  station, the deepest that you understood you
22  were going to have to excavate at that time in
23  1999?
24      A.  My best recollection is we were
25  aware of the fact that we were probably going

Page 89

1  to go to 22 foot, but I believe the Corps had
2  not determined at that time that that was the
3  exact depth.  There was still talk of a ship
4  channel and a barge channel.
5      Q.  I'm confused.  Were you all going to
6  excavate for the barge channel?
7      A.  No.  Well, for the bypass channel,
8  yes.
9      Q.  Well, I am talking just about the
10  TERC.  The TERC didn't involve the dredging of
11  the channel, did it?
12      A.  No.
13      Q.  Okay.  So I am talking only about
14  the TERC now.  Okay?
15          MR. TREEBY:
16          You mean Task Order 26, right?
17  EXAMINATION BY MR. BRUNO:
18      Q.  Oh, I'm sorry.  You're right.  The
19  Task Order 26 of the TERC, which I think we
20  have been talking actually, for the record, we
21  HAD been talking about the TERC, but you and I
22  have really been talking about Task Order 26
23  which is a subpart of the TERC.  Right?
24      A.  Yes.
25      Q.  All right.  The recommendations

Page 90

1  report itself is what I am saying.  Okay?
2  Which was a TERC contract, contemplated that
3  the Washington Group, with the exception of
4  the sewer lift station, would only excavate to
5  about 5 feet.  That's what I am referring to.
6      A.  I don't recall that being the
7  issue.  We were aware that there was
8  contamination deeper than 5 foot.  We did not
9  know at that time how deep contamination went,
10  but we knew we were going to dig deeper than 5
11  foot.
12      Q.  Take a look at page WGI-38726 of the
13  same document, Exhibit 3.  Under 4.1, "Project
14  assumptions".  I believe it suggests that you
15  all were contemplating going down 5 feet, but
16  I could be wrong.
17          MR. TREEBY:
18          Is there a question?
19          MR. BRUNO:
20          Yes.
21          MR. TREEBY:
22          What is the question?
23          MR. BRUNO:
24          The question is, in fact, doesn't
25  that document suggest that you were

Page 91

1  going down 5 feet.
2          MR. TREEBY:
3          The whole document?  There's a
4  whole lot more things in the document
5  about further depths.
6          MR. BRUNO:
7          Then you can find them for me
8  when --
9          MR. TREEBY:
10          I have found them.  But I am not
11  asking questions.  I am just wanting
12  you to ask a question.
13          MR. BRUNO:
14          I have a question.
15          MR. TREEBY:
16          What is it?
17          MR. BRUNO:
18          It's on the table.  If you don't
19  know, I'm sorry.  Read your realtime.
20          MR. TREEBY:
21          I have read it.  There's no
22  question.
23          MR. BRUNO:
24          Fine.
25          MR. TREEBY:

Page 92

1          What is the question?
2          MR. BRUNO:
3          Bill, let's not play games.
4  Okay?
5  EXAMINATION BY MR. BRUNO:
6      Q.  Mr. O'Conner, have you read the
7  document?
8      A.  I have read the document.
9          MR. TREEBY:
10          That page?
11          MR. BRUNO:
12          That page of the document.  The
13  document is the piece of paper that
14  the record will reflect that I handed
15  to the witness and asked him to read.
16  The record is clear that I asked him
17  to look at one page of a larger series
18  of pages which make up Exhibit 3.  But
19  "the document" was always referenced
20  as the piece of paper that I handed
21  him.
22  EXAMINATION BY MR. BRUNO:
23      Q.  And I directed you to look at
24  paragraph four.  And I just was curious to
25  know if that paragraph today refreshes your

Page 93

1  recollection that it was contemplated, in
2  terms of the remediation, was that you guys
3  would go to about 5 feet.
4      A.  I don't read it that way.
5      Q.  All right.  That's fine.
6      A.  It says to me the contaminated soil
7  of approximately 5 feet identified in the
8  supplied reports and any additional
9  contaminated soils identified through sampling
10  would be handled on various treatment
11  options.  All it's saying to me, and I may
12  have written this, is that the contaminated
13  soil was identified in the supplied reports.
14  It never directed that that's only where we
15  were -- and it also says additional soils
16  identified will be handled.  That does not
17  tell me we're only going to 5 foot.  It simply
18  says the supplied documents identified
19  contaminated soils to approximately 5 foot.
20      Q.  That wasn't the question.
21      A.  I thought it was.
22      Q.  My question was, at the time that
23  you wrote the report, you guys were
24  contemplating that you would go to about 5
25  feet.

24  (Pages 90 to 93)

O'CONNER, DENNIS

8/13/2008

Page 94

1      A.  No.
2      Q.  Okay.  So you knew before doing any
3  testing that there was contamination deeper
4  than 5 feet.  Right?
5      A.  Right.
6      Q.  You knew that?
7      A.  Based on experience, if nothing
8  else.
9      Q.  All right.  That's fine.  Even
10  though the document itself suggests that
11  you're going to have some drilling and borings
12  to find out if the contaminants go deeper than
13  5 feet; right?
14      A.  I don't know if that's what that
15  document says, no.
16      Q.  I thought it said right here.  It
17  says --
18      A.  It says -- If it does, I'll reread
19  it.
20      Q.  Well, we can say it.  "The
21  contaminated soil, approximate 5 feet,
22  identified in the supplied reports".
23      MR. TREEBY:
24      "And".
25  EXAMINATION BY MR. BRUNO:

Page 95

1      Q.  "And any additional contaminated
2  soils identified through sample," which is
3  going to be done in the future, hadn't been
4  done yet, right?  Isn't that what it says?  It
5  says you are going to do some more sampling.
6  Right?
7      A.  It alludes to that, I believe.
8      Q.  It alludes to the fact that you will
9  do so.  So at the time that you wrote this,
10  you hadn't done the sampling; right?
11      A.  No, we weren't allowed on the site
12  as I told you.
13      Q.  Precisely.
14      A.  No intrusive.
15      Q.  Right.  So all you had was what you
16  had, which was a series of reports provided to
17  you by the Corps; right?
18      A.  That and other agencies.
19      Q.  Fair enough.  But those documents
20  suggested that you guys would be going to
21  about 5 feet deep.  That's what they said?
22      A.  Not to me.
23      Q.  All right.  Fine.  So you knew
24  before you did any testing that you would go
25  deeper than 5 feet?

Page 96

1      A.  I knew.
2      Q.  That's fine.  All right.  That's
3  fine.  So did you know at the time that you
4  wrote this that there was a flood control
5  structure anywhere near the work site?
6      A.  Yes.
7      Q.  And where was that flood control
8  structure located in connection with the work
9  site?
10      A.  It was the levee, if that's what
11  you're referring to, and it was on the -- the
12  other side of Surekote Road running along the
13  perimeter -- the perimeter of the property.
14      Q.  All right.  Now, how did you know
15  when you wrote this that you were going to go
16  deeper than 5 feet?
17      A.  Because of my experience, there were
18  underground tanks, if nothing else,
19  underground tanks that were at least buried 4
20  foot deep, inverted probably 14 foot deep, and
21  I had worked on leaking tanks that have
22  excavations as deep as 40 feet to remove
23  contamination.  Therefore, I knew.  And based
24  on the history and what we could read, because
25  this was a well-maintained site by numerous

Page 97

1  owners and hearsay had indicated that there
2  was all kinds of dumping that had taken place.
3  So if for no other reasons, by the underground
4  storage tanks.
5      Q.  Well, just to help us, you all did
6  an inventory of those tanks and things that
7  were on the site?
8      A.  That we could identify.
9      Q.  Right.  All right.  And that's at
10  page 38713 through 38717; right?  That's what
11  that says?
12      A.  Right.  This is based on information
13  that we received.
14      Q.  All right.  And so that inventory is
15  going to reflect all of the tanks and
16  structures that you knew about before you got
17  there; right?
18      A.  That we were told about.
19      Q.  Fair enough.  That you just told me
20  that you were told that there were some tanks
21  and things that were deeper than 5 feet;
22  right?
23      A.  No, I knew they were.
24      Q.  You knew they were.  Well, if you
25  knew they were, then you put them in that

25  (Pages 94 to 97)

Johns Pendleton Court Reporters

800 562-1285

| Page 98 |
|---|

1 report; right?
2     A. No.
3     Q. Well, if you knew about it, why
4 didn't you --
5     A. I couldn't identify them. We found
6 numerous tanks afterwards.
7     Q. Okay.
8     A. I know that a tank is buried deep
9 enough. It has to be. And, therefore, these
10 tanks had been leaking. They removed the
11 tanks, they removed -- Our subcontractors
12 removed oil drums out of it.
13     Q. Sure.
14     A. Did not clean up the site. They had
15 been on the site before.
16     Q. I understand that. I am just trying
17 to understand.
18     A. No, I don't --
19     Q. This piece of paper is a document
20 that you assisted in writing and it's called a
21 demolition inventory and it --
22     A. Right.
23     Q. -- purports to list all the things
24 --
25     A. As best we knew.

| Page 99 |
|---|

1     Q. Knew. Okay. And your testimony
2 today is that despite what's on this piece of
3 paper, that you knew there were other things
4 on the site that were deeper than 5 feet?
5     A. We assumed there were.
6     Q. All right. And by the way, this
7 document also reflects height and depth of
8 these things.
9     A. Supplied information.
10     Q. Supplied. And is there anything on
11 here that reflects something that's deeper
12 than 5 feet?
13     A. I don't recall. I would --
14     Q. Take a quick peek.
15     A. There's nothing on here that
16 identifies depth. You have size and height,
17 but height is vertical from ground surface.
18     Q. That's what I am asking. Vertical
19 from ground surface.
20     Now, when you were drafting this
21 recommendations report, did you have any
22 understanding that the Washington Group would
23 be required to get any permits to do this
24 work?
25     A. I believe that that's noted in the

| Page 100 |
|---|

1 recommendations report, that we would need to
2 obtain permits.
3     Q. So you knew that you had to get a
4 permit from whom?
5     A. I don't recall. We asked everybody
6 what we needed to obtain. That was one of our
7 goals, to determine who we needed to address
8 and what needed to have happen when we were
9 waiting.
10     Q. Do you know as you sit here today,
11 and I know this is a long time ago, Mr.
12 O'Conner, whether or not the WGI had to get a
13 permit from the Orleans Levee Board?
14     A. I don't recall with regards to that
15 recommendation report if we knew then if we
16 needed to or not.
17     Q. Okay. At some point while we were
18 down in New Orleans, did you get any knowledge
19 or obtain any understanding as to whether or
20 not the Washington Group was ordered by the
21 Corps to get a permit from the Orleans Levee
22 District to do any work pursuant to this TERC
23 contract, Task Order 26?
24     A. We were directed by the Corps to
25 obtain every permit that was appropriate. And

| Page 101 |
|---|

1 we approached everyone, including the Orleans
2 Board, principally Bobby Smith because we were
3 not doing field work at the time. Bobby Smith
4 was our superintendent. And he contacted
5 those people and my best recollection now is
6 the response was that we did not, because we
7 were not working on any portion of the levee
8 or anything adjacent to it that was owned by
9 the Levee Board, that we do not need a levee
10 permit.
11     Q. All right. Who said that?
12     A. I believe the man's name was Spencer
13 -- Who said that was Bobby Smith to me.
14     Q. Bobby Smith, is -- help me, he's a
15 WGI employee?
16     A. WGI. In this case he was the
17 project superintendent, field superintendent.
18     Q. Let me ask you before we get too far
19 into it. Did you task Bobby Smith with the
20 job of ascertaining whether or not, and if you
21 needed to get one, to get a permit from the
22 Orleans Levee District?
23     A. Yes, I did.
24     Q. That was his job?
25     A. That was his job.

26 (Pages 98 to 101)

O'CONNER, DENNIS

8/13/2008

Page 102

1      Q.  All right.
2      A.  Not just that one, but every permit
3   we could come to.
4      Q.  I understand.  All right.  Now, so
5   at any time did anybody tell you that the
6   Corps had indicated to either Bobby Smith or
7   to you directly through some email that you
8   just didn't need to get a permit from the
9   Orleans Levee District in order to do the work
10  that was identified by Task Order 26?
11     A.  My recollection is that Bobby
12  submitted to me either a memo or a telecom
13  memo of his interface, if you will, and it was
14  told to me, and that information was passed on
15  to the Corps, that we did not need to get a
16  permit.  Simply notify them of what we were
17  doing.
18     Q.  All right.  So it's your
19  understanding from your conversation with Mr.
20  Smith --
21     A.  Communication.
22     Q.  -- that the Orleans Levee District
23  had told him that he didn't need to get a
24  permit; right?
25     A.  It was the -- If it's the Orleans

Page 103

1   Levee District, they didn't tell him.  They
2   told WGI.  He was representing WGI.  It was
3   not a casual conversation is what I am trying
4   to imply.  It was his task and he was being
5   paid to do it, and he was bringing back
6   information to me as to where we needed to go
7   and what we needed to do.  And if we needed to
8   do it, we did it.
9      Q.  Did you ever tell anybody, you, did
10  you ever tell anybody that it was your
11  understanding, based upon emails that you had
12  received from the Corps, that you didn't have
13  to get a permit from the Orleans Levee
14  District?
15     A.  I don't believe the Corps ever told
16  me not to get a permit.  The Corps told me to
17  get every permit that was required, that was
18  stated that we needed to get.
19     Q.  I understand.  And I know it's
20  nuance, but this is the precise question.  Did
21  you, if you can remember, tell anyone within
22  your organization, Washington Group
23  International, that you had been advised in a
24  communication, be it an email or telephone
25  call, by the Corps that it was not necessary

Page 104

1   to get a permit from the Orleans Levee
2   District?  That's the question.
3      A.  All right.  By way of communication,
4   yes.  But by way of DCS where various people
5   received that information and it went into
6   document control service, yes.
7         So did I walk up to someone and
8   tell them Bobby told me that?  I don't recall
9   or not, because Bobby did not tell me that.
10  He communicated that through either memo,
11  telecom or both.
12     Q.  All right.  Now, I'm a little
13  confused, because I thought you told me that
14  Bobby told you that the Orleans Levee District
15  said you didn't have to get a permit.  That
16  wasn't the question.
17     A.  He may have told me that while he
18  was handing me the telecom and/or the memo.
19  In other words, he just didn't come to my desk
20  and throw two papers on a project manager's
21  desk and walk out.
22     Q.  No, I understand that, Mr.
23  O'Conner.  What I am confused by is there's
24  two potential sources for the information.
25  One potential source is the Orleans Levee

Page 105

1   District and the other one is the Corps of
2   Engineers.  And I am asking you a very precise
3   question, if you can remember.  I thought you
4   told me that Bobby Smith told you that it was
5   the Levee District that, through whatever
6   means, had communicated to him you don't need
7   a permit.
8      A.  That's correct.
9      Q.  Okay.  Now, here's the question.
10  The question is not about the Orleans Levee
11  District.  The question is did the -- did you
12  communicate to anybody that it was the Corps
13  that was the source of the information about
14  not needing a permit?  That's the question.
15     A.  The question is did the Corps tell
16  me that I did not need, "I" being Washington
17  Group --
18     Q.  Yes.
19     A.  -- and the Corps -- No, the Corps
20  did not tell me that.
21     Q.  All right.
22     A.  They told me to get every permit
23  that was required.
24     Q.  Let me show you WGI-3455 and 56,
25  which we're going to mark for this

27 (Pages 102 to 105)

O'CONNER, DENNIS

8/13/2008

Page 106

1  deposition. This is Exhibit Number 4.
2       MR. EHRLICH:
3       May I see a copy?
4  EXAMINATION BY MR. BRUNO:
5       Q. Would you please look at the
6  document and tell me whether or not you know
7  what it is? Do you recall it?
8       A. I don't recall it. But it's got my
9  name on it.
10      Q. Well, I know. That's why I am
11 asking you.
12      A. I don't recall.
13      Q. You don't remember it. But it is --
14      A. It would be protocol to do something
15 like that.
16      Q. All right. It's a letter that you
17 wrote to the Orleans Levee District?
18      A. Yes.
19      Q. Right?
20      A. (Witness nods head affirmatively.)
21      Q. And Steven Spencer was the contact
22 person there? Do you remember that?
23      A. Vaguely, yes.
24      Q. All right. Do you know why you
25 wrote this letter?

Page 107

1       A. My recollection is they -- the
2  statement that Bobby either communicated to
3  me, it was simply "Just let us know what you
4  are doing." That's what that was. As opposed
5  to a permit being gotten. I believe.
6       Q. Well, is it --
7       A. Well, --
8       Q. I'm sorry. Did you finish?
9       A. I was just going to say this was not
10 a typical what we did with almost every agency
11 down there that was involved. Simply to make
12 sure that we would not run into difficulties
13 or that someone ran up to the gate and wanted
14 to know what we were doing.
15      Q. All right. When you wrote this
16 letter, did you know that you didn't need a
17 permit?
18      A. I can't recall --
19      Q. Take a look at it before you --
20      A. No, I am assuming --
21      Q. I mean, the record says --
22      A. I am assuming that Bobby -- That
23 says Bobby's already told me. I'm going to
24 make some assumptions here, but it says Bobby
25 had contacted Spencer. Therefore, I must have

Page 108

1  known that we didn't need a permit, and I was
2  fulfilling our obligation as it was discussed
3  between Bobby and Spencer to let them know
4  what we were doing.
5       Q. Okay.
6       A. That's my assumption based on that
7  letter that was written five years ago or
8  whatever.
9       Q. November 7, 2000, to be precise.
10      A. Seven years.
11      Q. A long time ago. I know. Well, it
12 says here that Bobby Smith contacted the Levee
13 Board District on 18 October to inquire about
14 permits and notifications required for the
15 work, and then there's a discussion of what
16 you're going to do. In the RE section or
17 subject section, it says "Levee Board permits
18 and notifications", right?
19      A. I don't know, I didn't read that.
20      Q. Take a look at it again. I don't
21 want anyone to think that I am just making
22 this stuff up.
23      A. What paragraph were we referring
24 to?
25      Q. The subject section.

Page 109

1       A. Oh. Oh, the subject section. All
2  right. Right. All right.
3       Q. Okay. So it's your best belief that
4  you knew before you wrote the letter that
5  Orleans Levee District was not requiring a
6  permit?
7       A. My best recollection, yes.
8       Q. Let me show you WGI-40961, 62, 63,
9  which we have marked as Exhibit Number 5 and
10 ask if you remember this document.
11      MR. EHRLICH:
12      May I see it?
13      MR. BRUNO:
14      I'm sorry. Let me have it back.
15      MR. TREEBY:
16      Hold on. He needs to look at
17 it.
18      (Whereupon a discussion was held
19 off the record.)
20      MR. TREEBY:
21      We need to break at noon.
22      MR. BRUNO:
23      Make the call. I told you,
24 you're the boss of breaks.
25      MR. TREEBY:

28 (Pages 106 to 109)

Johns Pendleton Court Reporters                              800 562-1285

O'CONNER, DENNIS

8/13/2008

Page 110

1      We do have lunch coming in.
2      MR. BRUNO:
3      Let me finish this.
4      MR. TREEBY:
5      At noon.  Yes.
6      MR. BRUNO:
7      I hate to stop while we have
8    something on the table.
9      MR. TREEBY:
10     Ten or fifteen minute window.
11     MR. BRUNO:
12     It won't take long.
13   EXAMINATION BY MR. BRUNO:
14     Q.  All right, Mr. O'Conner.  This is
15   Exhibit 5.  Take a look at that, please.  And
16   the same question.  Do you remember the
17   document?
18     A.  I can tell you right away I don't
19   remember it.
20     (Whereupon a discussion was held
21     off the record.)
22   EXAMINATION BY MR. BRUNO:
23     Q.  All right, sir.  You recall this
24   document?
25     A.  No, I do not.

Page 111

1      Q.  All right.  It's written to you?
2      A.  Right.
3      Q.  You would have read it?  Right?
4      A.  I would have -- I would have read
5    it.
6      Q.  You would have read it.  You
7    wouldn't have gotten something from the Levee
8    District and tossed it in the can?
9      A.  No.
10     Q.  You would have read it?
11     A.  No, absolutely not.
12     Q.  All right.  This letter seems to
13   suggest that your company has contracted with
14   the Corps of Engineers and you're telling them
15   about some work and they're approving your
16   request to do the work.  It looks like a
17   permit to me.  Is this a permit?
18     A.  I had several personal meetings with
19   Mr. Miller.
20     Q.  Mr. --
21     A.  Is that his last name?  I can't
22   remember.  Clayton.
23     Q.  Hold it --
24     MR. TREEBY:
25     He's referred to on the last

Page 112

1    page.
2    EXAMINATION BY MR. BRUNO:
3      Q.  No, it's Mr. Landry, in fairness to
4    you.
5      MR. TREEBY:
6      No, look at the last page, Joe.
7    No, right above the page.
8      MR. BRUNO:
9      You tell me where you're getting
10   the name from.
11   EXAMINATION BY MR. BRUNO:
12     Q.  Let the lawyers give it to you.
13     MR. TREEBY:
14     Right there (indicating).
15     MR. BRUNO:
16     It's his testimony.  First he
17   said he doesn't remember it.  But
18   that's okay.  That's good.  That's all
19   good.
20   EXAMINATION BY MR. BRUNO:
21     Q.  So now you remember?
22     A.  It says here I will coordinate all
23   work with Mr. Clayton Miller.
24     Q.  Exactly.
25     A.  Mr. Miller was my point of contact

Page 113

1    and I had several meetings with him, and
2    anything that we received from him would have
3    come through Mr. Miller.  That's how I
4    initiated contact with him.  So that this is a
5    result of my personal contact with Mr. Miller.
6      Q.  All right.  It says "Enclosed are
7    two originals of this permit".  It says that.
8    You see that?
9      MR. EHRLICH:
10     May I see the exhibit again?  Do
11   you have a copy for Counsel?
12     MR. BRUNO:
13     We just showed you this.
14     MR. EHRLICH:
15     You mind if I see it again?
16     MR. BRUNO:
17     Sure.  You can have it again.
18     MR. JOANEN:
19     You do have a copy.  You just
20   didn't bring it with you.
21     MR. EHRLICH:
22     I don't know what you are going
23   to use in the depositions.  Usually
24   you bring documents, copies of the
25   documents you're going to use for

Johns Pendleton Court Reporters                    800 562-1285

O'CONNER, DENNIS

8/13/2008

Page 114

1  Counsel who are present.  I'll be
2  quick.
3     MR. JOANEN:
4     You didn't tell me you're
5  coming.
6     MR. EHRLICH:
7     Most lawyers do.
8     (Whereupon a discussion was held
9  off the record.)
10 EXAMINATION BY MR. BRUNO:
11    Q.  The simple question is, the fact is
12 that on page 40964 it says "Enclosed are two
13 originals of this permit".  That would seem to
14 indicate that this document's a permit.  But
15 your testimony is that it's not a permit;
16 right?
17    A.  It doesn't look like a permit to
18 me.  A permit would not be a generated
19 letter.  It would be a form.  That's just my
20 typical acknowledgment of what a permit is.  I
21 could be wrong.
22    Q.  Okay.  Did you send this document to
23 anybody at corporate?
24    A.  I cannot tell you if I did.  I can
25 tell you what I probably did.  And that is, we

Page 115

1  had a document control system in place and
2  that document was sent -- not only kept in the
3  trailers, but sent to Denver into the document
4  control system.  There was two separate
5  document control systems.  Separate and equal.
6     Q.  Well, all right.  You signed this
7  document, didn't you?
8     A.  Uh-huh (affirmatively).  Is my
9  signature on it?
10    Q.  I don't know.  It looks like print
11 to me.  Did you sign it?
12    A.  That's my signature.
13    Q.  All right.  Did you have to get
14 authority from corporate or from the Legal
15 Department to sign this document?
16    A.  Reading that document, I probably
17 conferred about the insurance because I know
18 little or nothing about insurance matters.  So
19 just based on my own experience, I probably
20 called them with regard to insurance.  The
21 rest of it is -- I did not need any sort of
22 authority, because it's pretty general in the
23 statement.
24    Q.  Right.  Do you have any knowledge or
25 information about the fact that you were

Page 116

1  advised by your Legal Department not to sign
2  this document?
3     A.  I --
4     MR. TREEBY:
5     I object.  Wait, wait, wait.  I
6  object to the form of the question.
7     MR. BRUNO:
8     That's fine.
9     MR. TREEBY:
10    It assumes facts not in evidence.
11    MR. BRUNO:
12    Well, that's not true.  It's in
13 evidence.  Read your 30 (b)(6).
14    MR. TREEBY:
15    I know it.
16    MR. BRUNO:
17    You need to read it again.
18    MR. TREEBY:
19    I read the deposition as well.
20 It's not in evidence.
21    MR. BRUNO:
22    That's fine.  It is in evidence.
23 This is --
24    MR. TREEBY:
25    That's what I am saying, it's not

Page 117

1  in evidence.
2     MR. BRUNO:
3     Whatever.  It is in evidence.
4     MR. TREEBY:
5     We just disagree.
6     MR. BRUNO:
7     Well, that's fine.
8  THE WITNESS:
9     Typically if I signed anything, I
10 had authority to sign it.  If I had
11 questions about it, I would contact
12 either Denver or Boise.
13 EXAMINATION BY MR. BRUNO:
14    Q.  All right.  Do you recall or do you
15 have any information at all about this
16 document having been sent to the Legal
17 Department at Washington Group International?
18    A.  I do not recall.
19    Q.  All right.
20    A.  I will add, as I already said, if it
21 had anything to do with -- it does -- with
22 insurance, more than likely I would have
23 contacted someone simply because I am not that
24 familiar with insurance.
25    Q.  All right.  Well, do you know -- and

30  (Pages 114 to 117)

O'CONNER, DENNIS

8/13/2008

Page 118

1   as you said, it does talk about insurance as
2   you've told me already.  It says that your
3   company shall provide the following insurance
4   to cover the work permitted herein and that
5   your company will require all of its
6   subcontractors to meet these same insurance
7   requirements in its contracts with the
8   subcontractors.  Recognizing that insurance is
9   not your job, what did you do, if anything, to
10  make certain that this provision was complied
11  with?
12      A.  We had a subcontracts officer once
13  we began operating that was on site in the
14  trailer.  He would make sure that all the
15  obligations as he knew them, and that's what
16  he was experienced in, were fulfilled such as
17  insurance and so forth.  He also had another
18  individual in Denver that oversaw his work,
19  whose sole job, if you will, was the oversight
20  of contracts and anything that was pertinent
21  to those contracts, including insurance,
22  bonding, et cetera.
23      Q.  What did you do to make certain that
24  your company provided the insurances required
25  by this permit?

Page 119

1       A.  We were already insured to work on
2   the TERC, which was in my estimation at this
3   point in time in excess of what they
4   required.  We could not work on the TERC, New
5   Orleans -- in New Orleans unless we had
6   insurance that fulfilled the obligations of
7   our contract with the TERC and the Army Corps
8   of Engineers.
9       Q.  I understand that, but that's not
10  the question.  The question is what did you do
11  to comply with the requirements of the permit
12  which says that you have got to provide this
13  information to the Levee Board?  Did you do
14  that yourself or did you --
15      MR. TREEBY:
16          That's not the Levee Board.
17      That's not the Levee Board.
18      THE WITNESS:
19          That's the --
20      MR. TREEBY:
21          It's the Port of New Orleans.
22  EXAMINATION BY MR. BRUNO:
23      Q.  I'm sorry.  The Port of New
24  Orleans.
25      A.  If we were required to give them

Page 120

1   something, I'm sure we did.  Because we were
2   being paid to do that.  I don't recall hand
3   carrying it.  The subcontracting officer may
4   have hand carried it.
5       Q.  All right.
6       A.  We fulfilled, as I said, because we
7   were being paid to do it, so why wouldn't we?
8   We took care of everything we needed to do.
9       MR. TREEBY:
10          Is this a good time for lunch?
11      MR. BRUNO:
12          Sure.  Why not.
13      VIDEO OPERATOR:
14          Going off the record, the time
15      reads 12:03.
16      (Recess.)
17      VIDEO OPERATOR:
18          We are back on the record.  The
19      time reads 12:56 P.M.
20  EXAMINATION BY MR. BRUNO:
21      Q.  All right.  Mr. O'Conner, before the
22  break I was showing you a document which I
23  mistakenly thought was a letter from the Levee
24  Board, so I have just given you the whole
25  stack of papers for you to look at.

Page 121

1           Would you pick up each of those
2   papers, identify the exhibit number and just
3   indicate to us -- you have talked about that
4   one, but we will do it again just to clarify
5   -- what these documents are and whether or
6   not you recollect them?
7       A.  Exhibit 5 is a letter from the Port
8   of New Orleans and the resummation is that
9   they acknowledge that we will be doing work on
10  the Task Order 26.  And essentially in
11  summation, it's a go ahead letter.  That would
12  be it.
13      Q.  Okay.
14      A.  Exhibit 6 is a similar letter, where
15  we went out to everyone that we thought we
16  needed to go to or that other people had told
17  us.  This letter goes to the Department of
18  Transportation and Development and, again, I
19  believe it's essentially an acknowledgment of
20  the fact that we'll be work working there and
21  that they have no objections.
22      Q.  That's Exhibit Number --
23      A.  6.
24      Q.  6.
25      A.  Exhibit Number 7 is a letter from

31 (Pages 118 to 121)

O'CONNER, DENNIS

8/13/2008

Page 122

1  the Department of the Army, Corps of Engineers
2  to Mr. Steven Spencer of the Orleans Levee
3  District and it acknowledges that we are
4  working on Task Order 26 and that there is no
5  -- it's a letter of no objection come from
6  the Corps to -- absolutely, from the Corps to
7  the Orleans Levee District and it is cc'ing
8  the Department of Transportation, myself, and
9  Tony Bertucci.
10         Number 8 is a letter to me.  No
11  letterhead on it.  And it has a -- it's
12  regarding permission to do the activities that
13  we planned -- we planned to do on Task Order
14  26.  That's Exhibit Number 8.
15      Q.  All right.  As I indicated, I was
16  mistakenly thinking that Exhibit 5 was from
17  the Orleans Levee District.  It's not.  It's
18  from the Port of New Orleans.  But it does
19  seem to suggest that it is a permit.  The
20  reason why I am suggesting that is because I
21  had previously asked you about this document
22  in the context of the Levee District which is
23  inappropriate.
24         Do you know why you were
25  requesting an approval or a permit from the

Page 123

1  Port of New Orleans?
2      A.  We were told, as mentioned earlier,
3  to obtain any and all permits that were
4  required.  We were told that by the Corps.  So
5  we went out, either by recommendation or by
6  knowledge of local subcontractors we had, who
7  they had previous experience, and we
8  approached each and every one of these
9  individuals -- not individuals, but regulating
10  agencies or agencies and asked them what do we
11  need to do to work and be, if you will -- I
12  don't want to use the word "permit" because
13  that's not what we were trying to do.  "Trying
14  to fulfill our obligations with regards to
15  your agency".  And if a permit was it, that
16  was fine.
17      Q.  Okay.
18      A.  As you say, that appears to look
19  like a permit.  I don't consider that a
20  permit.  I consider it an acknowledgment of a
21  fact that "We know you're there and here are
22  the rules", but it's no permit.
23      Q.  All of this because, in fairness to
24  you, I asked you about whether or not when you
25  wrote the Port of New Orleans, you -- I'm

Page 124

1  sorry, I asked you about the Levee District.
2  It turns out that the document we're talking
3  about is the Port of New Orleans.  And you
4  looked at this document and answered the
5  question relative to the Levee District.  So I
6  need to rego through it again if you don't
7  mind.  I think it's fair to you.  Because I
8  asked you in the context of this document
9  whether or not you had knowledge of whether or
10  not you were required to get a permit from the
11  Orleans Levee District, and in fact I am
12  talking about the Port of New Orleans.  So the
13  question with regard to Exhibit 5 is, do you
14  know whether or not the Port of New Orleans
15  had indicated to you that there was no need to
16  get a permit?
17      A.  That -- My recollection, I had
18  personal interviews with the person mentioned
19  in there, Clayton --
20      Q.  Right.
21      A.  -- and my recollection is "No".  And
22  this was consistent with almost everybody, is
23  "No, just let us know what's going on."  And
24  that was it.  A permit per se, no.
25      Q.  Right.  But remember, we had -- you

Page 125

1  and I -- I was thinking, maybe not you.  When
2  I was asking the question, we were talking
3  about the Levee District.  So this guy Clayton
4  is not associated with the Orleans Levee
5  Board.
6      A.  No.
7      Q.  He's associated with the Port of New
8  Orleans.
9      A.  As the letter indicates.
10      Q.  That's fine.  I just wanted to
11  clarify that for the record.  Now getting to
12  the Levee District itself, we have the other
13  documents which I have shown you, which is
14  Exhibit 6, 7, and 8.
15         Number 6, as you previously
16  indicated, is a letter from the Department of
17  Transportation to the Orleans Levee District,
18  not to you, simply indicating that they don't
19  object to this work.  Now, do you know whether
20  or not you made a request to the Department of
21  Transportation for a permit to do work?
22      A.  No.  And that answer is yes, I
23  recall for some reason the Department of
24  Transportation.  And the fact is we again
25  asked the same question.  We did not ask for a

32  (Pages 122 to 125)

O'CONNER, DENNIS

8/13/2008

Page 126

1  permit.  We asked if they would inform us of
2  what we needed to do, be it a permit or
3  nothing or let them know what was going on.
4  And if I recall, we let them know what we
5  intended to do.  So that was not a permit.
6  And I -- I found it unusual because of the
7  situation that we needed something from the
8  Department -- that we even needed to contact
9  the Department of Transportation.
10     Q.  All right.  Well, this certainly
11  doesn't reflect that you did, in fairness to
12  you.  This would seem to indicate that it's
13  the Orleans Levee District who contacted the
14  Department of Transportation, not you, because
15  the letter is addressed to them.
16     A.  I remember we addressed the
17  Department of Transportation.
18     Q.  Oh, you did?
19     A.  Oh, yes.
20     Q.  Okay.
21     A.  That is what I am trying to say, is
22  I found it unusual that we should even contact
23  them, but it was suggested that we go to the
24  Department of Transportation.  I believe the
25  first time they ever heard about us was when

Page 127

1  we contacted the Department of Transportation
2  and said, "Hey, folks, we're going to go
3  working over here.  Is there anything we need
4  to do to get blessed by you?"
5     Q.  Now, I note, just perhaps
6  coincidence, the date of the request
7  references November the 7th, 2000, which is
8  the same date on Exhibit Number 4 and your
9  letter to the Orleans Levee District.  Is it
10  likely that all of these letters for request
11  or notification went out at the same time?
12     A.  It's possible.  It would have been a
13  task that needed to be accomplished.  It may
14  have been that was the work for the day, to
15  make sure that all of these items had been
16  addressed.  I can't say at this point.  But
17  that would be typical of something that I
18  would do or schedule.  I would either do it
19  myself or I would tell somebody "I need these
20  letters drafted and we'll get this issue
21  complete."
22     Q.  Now, Exhibit Number 7 is a letter by
23  the Department of the Army to the Levee
24  District, as you've indicated, and it says "We
25  have received a copy of a letter request dated

Page 128

1  November the 7th, 2000," again referencing
2  that same date, "addressed to your Board from
3  Washington Group International concerning
4  permission to remove existing structures and
5  install temporary facilities on the flood side
6  of the Inner Harbor Navigation Canal east
7  levee/floodwall between approximate baseline
8  stations 13 plus zero zero and 56 plus zero
9  zero in Orleans Parish.  The proposed work is
10  necessary to accommodate our lock replacement
11  project."  It says "The applicant has advised
12  --"  I'm sorry, "The applicant was advised to
13  submit additional information and revised
14  drawing for our further review."  So --
15        MR. TREEBY:
16          There's more to it than that.
17        MR. BRUNO:
18          I understand there is.
19        MR. TREEBY:
20          Subsequently it was done.
21        MR. BRUNO:
22          So what?  That's not my question.
23        MR. TREEBY:
24          Okay.
25  EXAMINATION BY MR. BRUNO:

Page 129

1     Q.  All I am trying to get at is, Mr.
2  O'Conner, is that this would appear, would it
3  not, to be a response by the Army to WGI's
4  request to the Orleans Levee District for, as
5  they call it, permission to remove?  Isn't
6  that true?
7     A.  I can't say what the Army's motive
8  was.  I know that -- I don't know.  Okay.
9  What it appears to be is they were simply
10  notifying the Board, I suppose.
11     Q.  All right.  Well, in any case, you
12  would agree that the objection here -- I mean,
13  the no objection says "We have no objection to
14  your Board's issuance of a permit for the
15  proposed work provided," it says, colon, "any
16  damage to the levee/floodwall resulting from
17  the applicant's activities is repaired at the
18  applicant's expense."  That's one of the
19  Corps' requirements, right?
20     A.  Yes.
21     Q.  Now, finally we have this letter
22  dated April 11, 2001, which is Exhibit Number
23  8, and it's addressed to you, although it's
24  got no, as you indicated, no --
25     A.  Letterhead.

Johns Pendleton Court Reporters                 800 562-1285

Page 130

1    Q.  Letterhead.  But it says "We are in
2  receipt of your letter dated November 7th,
3  2000," again referencing that same date, which
4  would seem to corroborate the assumption that
5  all the letters seeking notification or
6  requests were sent at the same time.  Right?
7    A.  Right.
8    Q.  It says "The Board of Commissioners
9  grants permission for the project."  So
10  whether this is a formal permit or not, would
11  you agree that this document seems to be an
12  attempt by the Board to give you permission to
13  do the work?
14    A.  I would agree that that appears to
15  be what they were doing.
16    Q.  Now, did you send this document to
17  the Legal Department of Washington Group
18  International for their approval and review?
19    A.  Not to my recollection.  I cannot
20  recall ever seeing this letter.
21    Q.  Okay.
22    A.  The reason I say that is two.  One,
23  I don't recall it.  And secondly, the address
24  is incorrect.
25    Q.  All right.

Page 131

1    A.  And that's -- I noticed that when I
2  didn't recall seeing the letter.
3    Q.  Are you aware of any testimony given
4  by Washington Group International by itself
5  through a 30 (b)(6) deposition or any of its
6  employees which may have suggested that the
7  Legal Department of Washington Group
8  International refused permission to anyone to
9  sign this letter?
10    A.  I know of no --
11    MR. TREEBY:
12      Object.
13    THE WITNESS:
14      -- no one that said that.
15  EXAMINATION BY MR. BRUNO:
16    Q.  All right.  And you have no
17  knowledge whatsoever of any suggestion or
18  review or any communications whatsoever by the
19  Legal Department of WGI about this letter?
20  Right?
21    A.  I do not recall that.
22    Q.  All right.  Now, this letter has a
23  place at the bottom where it says "The
24  Washington Group agrees", and there's no
25  signature here.  Okay.  Do you have any

Page 132

1  knowledge as to why there's no signature on
2  this document?
3    A.  No.
4    Q.  Now, you said the address is bad.
5  Isn't the address the address of MMG, one of
6  your subcontractors?
7    A.  That's correct.
8    Q.  Did you direct any of your
9  subcontractors to seek permits?
10    A.  I don't recall directing any
11  subcontractor to obtain permits other than
12  what would have been in the subcontract
13  documents as required by our legal system.
14    Q.  Do you know who MMG is?
15    A.  Do I know who MMG is?
16    Q.  Yes, sir.
17    A.  They were our subcontractor in New
18  Orleans for the environmental portion of the
19  work, an 8-A company.
20    Q.  Do you recall having any discussions
21  with any employee or representative of MMG
22  about any Orleans Levee District requests for
23  approval or permit or anything like that?
24    A.  Early on they were part of the
25  recommendations report development.  When we

Page 133

1  first moved, arrived in New Orleans, and I
2  told you we cannot or could not access the
3  property, we had no trailers, we couldn't put
4  trailers on it, so MMG let us use rooms, if
5  you will, offices in their complex.  So at
6  that time in the development of the
7  recommendations report, talk was made about
8  exactly what we would say, who we should go to
9  to see if we could obtain or need to obtain
10  any permits or letters of acknowledgment, et
11  cetera.  So I know, just based on the
12  development of the recommendations report,
13  that came up there.  That is as far as I can
14  go with that.
15    Q.  Right.  But that might explain why
16  this letter is addressed to Washington Group
17  at the General DeGaulle address; right?
18    A.  We received all of our mail until we
19  moved on site at the MMG address, because it
20  was our working address.
21    Q.  Okay.  So your testimony that
22  because it's got an incorrect address is not
23  actually accurate, is it?  Because you just
24  told me that this was the address that
25  Washington Group was using until you went on

34  (Pages 130 to 133)

O'CONNER, DENNIS

8/13/2008

Page 134

1  site.  Correct?
2      MR. TREEBY:
3          Object.  That's not what he said.
4  EXAMINATION BY MR. BRUNO:
5      Q.  Well, then you can clarify it for
6  me.  Isn't that what you said?  Did I get that
7  wrong?
8      A.  I believe you alluded to something
9  else.  We received mail at that address while
10  we were in that office.  By the time of this
11  letter, I believe we were on site.  Any mail
12  that could have went to this address should --
13  We did not receive mail at that address per
14  se.  The mail got there, their secretary would
15  carry it to our office.
16      Q.  Fair enough.
17      VIDEO OPERATOR:
18          Counsel?  We just went off the
19  air.  I got A call.  So would you like
20  to take a break?
21      MR. BRUNO:
22          I guess.  We have no choice.
23  No.  Let's break.
24      VIDEO OPERATOR:
25          Going off the record, the time

Page 135

1  reads 1:13 P.M.
2          (Whereupon a discussion was held
3  off the record.)
4      VIDEO OPERATOR:
5          We are back on the record.  The
6  time reads 1:17 P.M.
7  EXAMINATION BY MR. BRUNO:
8      Q.  Mr. O'Conner, just to clarify this
9  business about the address, the letter from
10  the Port of New Orleans also addresses the
11  General DeGaulle address, does it not?  The
12  letter from Washington Group to the Levee
13  District references that General DeGaulle
14  address as the return address, does it not?
15      A.  I can't see from here.
16      Q.  No, please.  Look.  It's in tiny
17  little print at the bottom of your letter.
18      A.  Yes.
19      Q.  Okay.  So if the Levee Board was
20  going to write you back, you would expect them
21  to write back at that address, wouldn't you?
22      A.  While we were there, yes.
23      Q.  How would they know your address
24  changed?
25      A.  Because we probably notified them by

Page 136

1  mail or an email that we sent to them or
2  anything like that that would carry a
3  letterhead on it.  Or if we were expecting a
4  response, we would notify them.
5      Q.  Right.  And certainly you would have
6  a copy of that in your file somewhere if you
7  did that, right?
8      A.  I would assume so.
9      Q.  Sure.
10      A.  I don't know.
11      Q.  All right.  At the end of all of
12  this, it's your testimony that the Washington
13  Group International did not get a permit from
14  the Orleans Levee District; right?
15      A.  That's correct.
16      Q.  Okay.  You had the belief that you
17  simply had to let them know what you guys were
18  doing?
19      A.  That's correct.
20      Q.  And you did that?
21      A.  Yes, we did.
22      Q.  All right.  Now, did you ever
23  communicate to the United States Army Corps of
24  Engineers, you, that you didn't need to get a
25  permit from the Levee District because they

Page 137

1  told you you didn't need one?
2      A.  I believe I told Mr. Jim Montegut
3  that very thing.  Based on what we said, that
4  we received information from them in Bobby
5  Smith's conversation.
6      Q.  Okay.
7      A.  And they would have received in
8  document control a telecom and/or memo that he
9  gave to me.  They would also get it, because
10  they received a copy of all documents that we
11  received from everybody.  They were -- The
12  word is not "cc'd", but the essential same
13  thing.
14      Q.  Okay.  So your testimony is that the
15  United States Army Corps of Engineers would
16  have gotten a copy of Exhibit Number 8?
17      A.  No.  I didn't say that.
18      Q.  Well, --
19      A.  How could I get it through document
20  control service if I never received it or
21  didn't recall it?
22      Q.  Well, I'm sorry, I thought you said
23  that the Corps got a copy of everything.
24      A.  No, I said they got a copy of
25  everything that we received.  I said I cannot

Johns Pendleton Court Reporters                    800 562-1285

O'CONNER, DENNIS

8/13/2008

---

Page 138

1    recall ever receiving this.
2        Q.  Well, but you don't know that you
3    didn't receive it.  You just have no memory of
4    it.  Right?
5        A.  That's true.
6        Q.  Okay.
7        A.  What you're saying.  But I would
8    also accept or assume that there is a document
9    control sheet that would be a cover sheet for
10   anything that was transferred to the Army
11   Corps.
12       Q.  Right.
13       A.  And apparently there's not.
14       Q.  How do you know that?
15       A.  Because you haven't handed it to
16   me.
17       Q.  I don't know.  We don't know if it
18   was produced.
19       A.  Well, that's what it's all about,
20   isn't it?
21       Q.  I don't know.  Did they advise from
22   you testimony from others who suggested that
23   the Legal Department of the Washington Group
24   said that don't sign this document?
25       A.  No.

Page 139

1        Q.  Okay.  Well, --
2        A.  No, but I --
3        Q.  -- did they show you that testimony?
4        A.  -- I had advised our office manager
5    and all of our people that we needed to have
6    the most strenuous document control system
7    around, and every document that went to the
8    Corps and went in our file has, and which I
9    would think you have seen, a document control
10   sheet which checks off the appropriate
11   individuals to receive that.
12       Q.  Okay.
13       A.  I have not seen that sheet.  So,
14   therefore, I am going to make the assumption
15   that it never made it to document control, and
16   I can't recall seeing this.
17       Q.  By the way, if someone testified
18   that you told them that you'd received an
19   email that said you didn't have to get a
20   permit and that you had gotten that
21   information from the Corps of Engineers, that
22   would not be correct testimony; right?
23       A.  You asked about three questions.
24   Break them up.
25       Q.  All right.  If someone testified

Page 140

1    that you told them through telephone
2    conversation or through email that the Corps
3    told you no permit was necessary, that would
4    be false testimony?
5        A.  That would be false, because the
6    Corps never told me that no -- a permit was
7    not required.  That was not the Corps' job.
8        Q.  Okay.
9        MR. TREEBY:
10       We've got a clean copy.  That was
11   in the document control system.
12   That's what he was referring to
13   (indicating).
14       Well, don't mark that.  Let's
15   make a clean one.
16       MR. BRUNO:
17       Yes.  We'll --
18       MR. TREEBY:
19       We'll make a clean one.
20       MR. BRUNO:
21       I mean, I can just show it to
22   him.
23       MR. TREEBY:
24       Yes, you can show it to him.
25       MR. BRUNO:

Page 141

1        We can do all of that other stuff
2    later
3    EXAMINATION BY MR. BRUNO:
4        Q.  Does that refresh your memory?
5        MR. EHRLICH:
6        Can I see it?
7        THE WITNESS:
8        Okay.  I just have to read what's
9    highlighted here is the fact that
10   Bobby -- This is at least one -- at
11   least one piece of paper that Bobby
12   was following my directions and I
13   instigated telecom reports, which are
14   not common on all projects.  Because I
15   wanted documentation.  This is Bobby
16   telling me that he had a
17   teleconference, if you will, phone
18   call with Steve Spencer of the Levee
19   Board.
20   EXAMINATION BY MR. BRUNO:
21       Q.  We're going to mark that as Exhibit
22   Number 9.  Let me let -- Before I ask you some
23   more questions, peek at it.
24       Okay.  This is to Dennis
25   O'Conner.  This is a telecom report, which

---

36 (Pages 138 to 141)

Johns Pendleton Court Reporters

800 562-1285

O'CONNER, DENNIS

8/13/2008

Page 142

1  obviously is a report of a telephone
2  conversation.
3      A.  Correct.
4      Q.  It's dated October 19, 2000.
5  Right?
6      A.  (Witness nods head affirmatively.)
7      Q.  Okay.  Now, this is clearly long
8  before all of these other emails.
9      A.  (Witness nods head affirmatively.)
10     Q.  I'm sorry, I said emails.  All of
11  these other letters --
12     A.  Uh-huh (affirmatively).
13     Q.  -- which are -- the earliest of
14  which is November of 2000.  Okay.  It says
15  "Talked with Steve Spencer of the Levee Board
16  about if we needed permit coordination with
17  them on construction of the fence.  He said --
18  he stated 'No, just send a letter letting us
19  know what you are planning to do.'  I also
20  asked him about the lift station and if we
21  needed anything for that.  He again stated no,
22  just put it in a letter letting him know what
23  was going to be done."  Now, why would he feel
24  the need to identify the lift station as a
25  particular issue?

Page 143

1      A.  I have no idea.
2      Q.  Might it have something to do with
3  the fact that the lift station, you knew at
4  this time that you were going to be going to
5  at least 20 feet to pull that lift station
6  out?
7      A.  I just told you I have no idea why
8  Bobby did that.  I gave Bobby directions, as
9  mentioned earlier, to contact numerous people
10  with regard to any potential permits, letters
11  of agreement, or anything of that nature.
12  Bobby was doing his job.  I also gave
13  direction, as I mentioned earlier, to note any
14  communication we had with anybody.
15     Q.  All right.  Are you aware of the
16  TERC contract -- Do you know whether or not
17  the TERC contract requires Washington Group
18  International to have available a geotechnical
19  engineer as a source or a -- a resource to
20  assist you in connection with any issues that
21  may come up on the site?
22     A.  Are we talking about Task Order 26
23  or are we talking about the TERC contract?
24     Q.  The TERC itself.
25     A.  The TERC itself, my understanding,

Page 144

1  there is no requirement for anything to be
2  assigned to a project.  It is task specific.
3  And the things in the contract are the
4  requirements for those individuals.
5      Q.  Let me show you WGI-139, which is a
6  page of the TERC I'll represent to you, but
7  I'm happy to give you the whole stack if you
8  want to go through it.  It says "The
9  contractor shall utilize a project
10  geotechnical engineer who will ensure that all
11  geotechnical engineering support goals
12  specified in the levee order are obtained."
13         MR. TREEBY:
14           Give him the prior pages.
15         MR. BRUNO:
16           Sure.
17  EXAMINATION BY MR. BRUNO:
18     Q.  It's for the record, it's everything
19  contained in C-1.
20         MR. EHRLICH:
21           Can I see it before the witness?
22       Excuse me.
23         (Whereupon a discussion was held
24       off the record.)
25         MR. TREEBY:

Page 145

1           You're referring to C-12.
2         MR. BRUNO:
3           Thank you.  I'll do it like
4       this.
5  EXAMINATION BY MR. BRUNO:
6      Q.  In case you want to -- I'm asking
7  you about 12, but Counsel made me give you
8  everything in front of that and so I did.
9      A.  I don't have to go back and look at
10  this, because this is not what is required for
11  the project.  It is the requirements of the
12  individual if we should choose to use, and I
13  say "we", the agreement between the Corps and
14  in this case Washington Group, to use such a
15  person, then they must fulfill these
16  requirements unless they're waived by the
17  Corps.  So this is not a list of what is
18  required on the site.  It is a list of
19  requirements for the person if they should be
20  put on the site.  Subsequently, also, the site
21  assignments were negotiated in Oklahoma City
22  with the Corps of Engineers as to who and what
23  would be there.  And they told us who was
24  going to be there and who was not.  We
25  submitted subsequently qualifications based on

Johns Pendleton Court Reporters                    800 562-1285

O'CONNER, DENNIS

8/13/2008

Page 146

1  these sites or exceptions to that so we can
2  put them on site.
3      Q.  Well, your testimony is that C-1 and
4  seriatim only refers to folks that you're
5  going to put on site?  Is that the only thing
6  that section refers to?
7      A.  No, people that were going to work
8  on the site, who would be assigned to the site
9  and who are identified.  In other words, if we
10  have a chemist and that chemist is working in
11  the home office --
12      Q.  Right.  He didn't have to be on the
13  site; he could be at the home office?
14      A.  That's right.  And they supposedly
15  should meet these requirements.
16      Q.  Sure.  And so your testimony is that
17  the government didn't anticipate that
18  Washington Group would have available to it --
19      A.  No.
20      Q.  -- expert geotechnical advice?
21      A.  Wrong.
22      Q.  Okay.  Well, let me ask you this
23  question.  Do you believe that the government
24  expected you, the Washington Group
25  International, to have available to you expert

Page 147

1  geotechnical advice?
2      A.  It was never discussed.  If the
3  situation came up, we would determine what
4  needed to be done and who needed --
5  Subsequently, that did happen and we brought
6  an engineer on site because we requested one
7  because we were doing multiple tasks.  That
8  engineer, it turned out that we didn't need
9  him as much and so the Corps asked us to
10  remove him.  So the answer is that was never
11  discussed, because at this point in time we
12  did not need a geotechnical engineer.
13      Q.  Well, why did you hire the engineer
14  then?
15      A.  It wasn't a geotechnical engineer.
16      Q.  It wasn't?
17      A.  No.  He was an engineer, period.
18      Q.  Just a pure engineer?
19      A.  Just a pure -- I can't recall; he
20  may have been a civil engineer.  I don't know.
21      Q.  Well, wasn't he hired to assist you
22  in designing a cofferdam?
23      A.  No.  He had no -- We subcontracted
24  out all of our cofferdam designs.  We built
25  three cofferdams and we contracted with a

Page 148

1  shoring engineer, cofferdam engineer
2  registered in the state of Louisiana.
3      Q.  Okay.  So you obviously did have
4  available to you the expertise of somebody,
5  may not be called an engineer, who knew
6  something about soils, especially as they
7  relate to cofferdams.  Isn't that true?
8      MR. TREEBY:
9          Object to the form.
10      THE WITNESS:
11          Did I have access to someone of
12      that nature?
13  EXAMINATION BY MR. BRUNO:
14      Q.  Yes.  Sure.
15      A.  I would assume.  I have no identity
16  of that person.
17      Q.  All right.  You said there were
18  three cofferdams or three large --
19      A.  Three cofferdams.
20      Q.  Three cofferdams.  And would you
21  agree that those were the three of the deepest
22  excavations that were done on the site?
23      A.  Two of them were.
24      Q.  And which two were those?
25      A.  The one referred to the wedding cake

Page 149

1  and the one that you mentioned earlier, the --
2      Q.  The sewer lift station?
3      A.  The sewer lift station.
4      Q.  So those were the two deepest
5  excavations on that job?
6      A.  They may have been.  I don't
7  recall.  We may have had another one that was
8  deeper, there was an excavation out there.
9      Q.  What was the third?
10      A.  The third one was a tank in the
11  canal, and we had to work on it in the dry.
12  So we built a waterproof cofferdam -- We, I
13  say "we", a subcontractor built a waterproof
14  cofferdam so we could go in and extract
15  whatever, which we believed or had the
16  potential for being hydrocarbons.  It was a
17  railroad tank car that had at some point in
18  time gone off a ship and was sitting there.
19  But we needed to be able to evacuate that tank
20  car without allowing hydrocarbons to go into
21  the canal.
22      Q.  Let's talk about the Boland wedding
23  cake structure for a minute.  October -- The
24  lift station.  I'm sorry.  The lift station
25  was first.  I want to take them in

38  (Pages 146 to 149)

Johns Pendleton Court Reporters

800 562-1285

O'CONNER, DENNIS

8/13/2008

Page 150

1 chronological order. This is Exhibit 10,
2 WGI-48621.
3     A. All right. What's your question?
4     Q. All right. Do you recall this?
5     A. Yes.
6     Q. What is it?
7     A. What is it? It's a statement of
8 work that Hamp presented on how they were
9 going to remove the lift station. They were
10 the subcontractor for that piece of work.
11     MR. TREEBY:
12         What's the date on that?
13     MR. BRUNO:
14         I just gave it. October 19,
15 2001.
16     MR. TREEBY:
17         You might want to use the final
18 one.
19     MR. BRUNO:
20         I'll use any one you want.
21     MR. TREEBY:
22         No, I don't care. It's up to
23 you. If you want to use that one,
24 that's fine. I am just trying to
25 help.

Page 151

1     MR. BRUNO:
2         This one says "Revised". I
3 assumed it was the final one.
4     MR. TREEBY:
5         The final one is dated December
6 6, 2001.
7     MR. JOANEN:
8         December 6th?
9     MR. TREEBY:
10         Yes.
11     MR. JOANEN:
12         That's the wedding cake
13 structure. We're talking about the
14 sewer lift station.
15     MS. CLAYMAN:
16         Oh, I'm sorry. I apologize. I
17 thought you said wedding cake.
18     MR. TREEBY:
19         Apologize. He did and then he
20 revised it.
21     MR. BRUNO:
22         It's about time.
23     MR. TREEBY:
24         Good job, Joe.
25     MR. BRUNO:

Page 152

1         Good job? You're the one that's
2 always correcting me. I'm fine.
3     MR. TREEBY:
4         I'm trying to help, Joe.
5     MR. BRUNO:
6         Oh, you're not. Yeah, right.
7 EXAMINATION BY MR. BRUNO:
8     Q. In any case, this is supposed to be
9 what exactly?
10     A. It's Hamp's response to a scope of
11 work or an RFP from Washington. I am not
12 saying that is the first response, but it is a
13 response. We sent out an RFP to individual
14 companies, request for proposal, to do this
15 work. They come back and tell us how they're
16 going to do it. That's the short version.
17 And then we either accept it, and I say "we",
18 this is the Corps and myself. The Corps
19 reviews everything we do in this respect.
20     Q. Right.
21     A. And -- And then if -- if everything
22 is agreeable with the Corps and with
23 Washington Group and the Subcontracts
24 Department based on their insurance as you
25 mentioned earlier and their approach, and any

Page 153

1 other local agency, be it licensing or
2 anything like that that should be involved in
3 the subcontract documents, then it will be
4 awarded and they will be held to the work as
5 it's written in there.
6     Q. WGI approved this lift station
7 removal plan as revised?
8     A. Well, the eventual one, whichever
9 one was the final one.
10     Q. Okay. Now, what did this document
11 call for with regard to backfill?
12     MR. EHRLICH:
13         May I see it?
14     MR. TREEBY:
15         He's got a copy. You got one for
16 me, too? I got it. I got it.
17 EXAMINATION BY MR. BRUNO:
18     Q. You got it?
19     A. I got it.
20     MR. EHRLICH:
21         Wait. It's October -- What
22 number exhibit is it? It's got a
23 yellow sticker on it.
24     MR. BRUNO:
25         10.

39 (Pages 150 to 153)

Johns Pendleton Court Reporters                                    800 562-1285

O'CONNER, DENNIS

8/13/2008

Page 154

1          MR. EHRLICH:
2          Okay.  What's the date on the
3    front of that?
4          MR. JOANEN:
5          October 19, 2001.
6          THE WITNESS:
7          October 19.
8          MR. EHRLICH:
9          Okay.
10         THE WITNESS:
11         There's two statements here.  One
12   is cofferdam backfilling.  And it says
13    "Backfill excavation with previously
14   excavated soil in two foot lifts."
15   Okay.  "Initial backfill of the bottom
16   of the whalers inside the cofferdam.
17   Complete backfilling from the top of
18   sheet piles with material to be
19   removed by WGI after whalers are
20   removed."  The second thing is
21    "Complete backfilling to grade with
22    material provided by WGI".
23   EXAMINATION BY MR. BRUNO:
24    Q.  All right.  Would you agree that the
25   specifications are general specifications as

Page 155

1    opposed to a prescriptive specification?
2     A.  Yes, I would agree with that.
3     Q.  All right.  And that this
4    specification allowed you to fill that hole
5    with sand if you wanted to?
6     A.  I suppose if you wanted to.
7     Q.  Now, it says to backfill with -- I
8    don't know where you found it, but you said
9    backfill with the previously excavated soil.
10    A.  That's correct.
11    Q.  Well, clearly because there was a
12   lift station in the hole, there wouldn't be
13   enough of the excavated material to fill the
14   hole.  Isn't that true?
15    A.  That's correct.
16    Q.  So you had to use something to fill
17   up the hole with.
18    A.  That's correct.
19    Q.  Do you recall what you used?
20    A.  Borrow pit soils.
21    Q.  Where did that come from?
22    A.  The borrow pit on site.
23    Q.  I know.  But any particular place?
24    A.  The only borrow pit that was there.
25    Q.  For the record, where was the only

Page 156

1    borrow pit on the site?
2     A.  It was at McDonogh.
3     Q.  And what do you know about the soils
4    that were taken from that borrow pit?
5     A.  I know the soils that were taken
6    from the borrow pit and used to backfill were
7    superior to what came out of the cofferdam.  I
8    know that we had -- we had culled the backfill
9     -- the borrow pit for stumps, pipes,
10   contamination.  No contaminated soils, no
11   stumps, no woods, no pipes.  So it was better
12   soil than what was excavated when the borrow
13   pit was initially dug.
14    Q.  All right.  Are you sure you didn't
15   use sand?
16    A.  I am pretty sure we did not use
17   sand.  If sand was incurred, it would have
18   been my -- against my direction.
19    Q.  Well, before I get to there, why
20   would it have been against your direction?
21    A.  Because we had the borrow pit to
22   use, and we weren't using sand.  We were
23   directed to use borrow pit soils.
24    Q.  Well, when you say "directed to
25   use", didn't we just establish a few moments

Page 157

1    ago that the contract work plan, which is your
2    specifications, didn't specify borrow pit
3    material, did it?
4     A.  No, but I think it states "Complete
5    backfilling to grade with material to be
6    provided by WGI" and in all cases it indicates
7    that WGI would provide the backfill with the
8    exception of initial backfill operations to be
9    provided to the bottom of the whalers inside
10   the cofferdam.  So WGI was supplying --
11    Q.  Sure.
12    A.  -- to the contractor -- We moved the
13   dirt for the contractor to put it in the
14   hole.
15    Q.  All "supply" means that you had to
16   get it.  Didn't tell you where to get it from,
17   did it?
18    A.  In this case, with this document,
19   no, it does not say where we get it.
20    Q.  Now, is there anything wrong with
21   putting sand in that hole?
22    A.  If I had good borrow, I would use
23   borrow from the borrow pit.  I would have to
24   pay for sand, which the Corps adamantly
25   opposed, and that's why we were using the

Johns Pendleton Court Reporters                    800 562-1285

Page 158

1   borrow pit as opposed to importing. While I
2   was on site, the only import that I can recall
3   we ever used was aggregate for the parking
4   lot. We paid for no import, to the very best
5   of my recollection, because we were under the
6   direction of the Corps not to.
7       Q.  Is there anything wrong -- I'll ask
8   the question again -- with using sand --
9       A.  Depending on the grade of the sand.
10  You're not going to use beach sand.
11      Q.  Well, --
12      A.  And sand is a terminology.  Sand is
13  not just sand.
14      Q.  All right.  Well, --
15      A.  Like dirt is not just dirt.
16      Q.  Well, is there something wrong with
17  using a certain type grade of sand as backfill
18  in the sewer lift station?
19      A.  Not at all.
20      Q.  Not at all?
21      A.  Depending on what you're doing.
22      Q.  All right.  Aren't we filling up --
23      A.  Underground storage tanks,
24  constantly use sand as a bed for 50,000 gallon
25  storage tanks to be put in.

Page 159

1       Q.  Mr. O'Conner, it wasn't me who said
2   that sand was bad.  I am just trying to get a
3   sense of what you're telling me.
4       A.  No, I am just trying to tell you --
5       Q.  You seem to be indicating, and maybe
6   I am confused, that there's a certain type of
7   sand that ought not to be used to fill up the
8   hole created by the removal of the lift
9   station.  Is that what you're telling me or
10  not?
11          MR. TREEBY:
12              Object.  Not what the witness
13      said.
14          THE WITNESS:
15              Not what I am telling you.
16  EXAMINATION BY MR. BRUNO:
17      Q.  Well, what are you telling me?  Is
18  there --
19      A.  I am telling you --
20      Q.  -- any kind of sand that you ought
21  not to use to fill up that hole?
22      A.  It would depend on -- Yes.  If it
23  was a poor grade of sand or if it was
24  contaminated sand or it had sand with
25  substances in it.  It would depend on the

Page 160

1   quality of the sand.  And also, and because we
2   shouldn't use sand because we had been
3   directed by the Corps to use borrow material.
4       Q.  Wait now.  For the third time, I
5   thought we established twice already --
6       A.  I just --
7       Q.  -- that you weren't directed by the
8   Corps to use borrow material.  You could use
9   anything you wanted.
10      A.  No.
11          MR. TREEBY:
12              Object.
13          THE WITNESS:
14              That's incorrect.
15  EXAMINATION BY MR. BRUNO:
16      Q.  Show me in here where it says you
17  have to use borrow material.  Just show it to
18  me.
19      A.  It doesn't.
20      Q.  It doesn't.  Wait now.  Wait.  The
21  document doesn't say that you have to use
22  borrow material.  While Mr. Treeby laughs,
23  maybe you can tell me, since you have already
24  told me this is a specifications document --
25      A.  This is not a specifications

Page 161

1   document.
2       Q.  Well, what is it --
3       A.  This --
4       Q.  What is it that directs you --
5          MR. TREEBY:
6              Let him answer.
7          MR. EHRLICH:
8              Let had answer.  He just said
9      it's not a specification document.
10          MR. TREEBY:
11              It's not a specification document.
12          MR. BRUNO:
13              Fine.  It came out.
14  EXAMINATION BY MR. BRUNO:
15      Q.  Now this is my question.  What is it
16  that directed to you use borrow material?
17  Just tell me what that is.
18      A.  The United States Army Corps of
19  Engineers said we were going to dig a borrow
20  pit to use to backfill in any and all
21  excavations.  That is why we used borrow
22  material.
23      Q.  So it's --
24      A.  And not --
25      Q.  It's an oral?

O'CONNER, DENNIS

8/13/2008

Page 162

1      A.  It's what?
2      Q.  It's somebody told you this?
3      A.  We were directed.
4      Q.  Okay.  Directed orally or in
5  writing?
6      A.  I cannot recall if it was in
7  writing, but it certainly was oral and we were
8  directed to dig a borrow pit for all backfill
9  materials.  And I am sure there is a document
10  somewhere that states that's why the backfill
11  borrow pit was created.
12      Q.  Right.  How about you explaining
13  Exhibit Number 11, which says "Hauling sand
14  for backfill at sewer lift station."  This is
15  document number WGI-21810 through 812.  It's
16  the fourth line from the bottom.
17      MR. EHRLICH:
18          November 7.
19      MR. BRUNO:
20          November 7.
21      MR. TREEBY:
22          What's the date on it?
23      MR. BRUNO:
24          He's got it.
25      THE WITNESS:

Page 163

1          Quality control report.
2      MR. TREEBY:
3          November 7, 2001.
4  EXAMINATION BY MR. BRUNO:
5      Q.  Do you see the line I am referring
6  to, Mr. O'Conner?
7      A.  No, I do not at this point.
8      Q.  Take your time.  We'll point it out
9  to you.
10      A.  McDonogh ITT.  "Loading out sand
11  fill".  Is that what you're referring to?
12      Q.  No.  "Hauling fill sand for backfill
13  at sewer lift station excavation."
14      A.  Okay.
15      Q.  That's what I am reading.
16      A.  All right.
17      Q.  Well, does that refresh your
18  recollection as to whether or not you put sand
19  in the hole?
20      A.  Yes, it does.
21      Q.  Did you put sand in the hole?
22      A.  Not to my knowledge.  And not at my
23  direction.  And it should not have happened.
24      Q.  Did it happen?
25      A.  This is a term that somebody -- They

Page 164

1  could have written "dirt" here.
2      Q.  Oh, okay.
3      MR. TREEBY:
4          Doesn't say it came from off
5  site.
6      MR. BRUNO:
7          What?
8  EXAMINATION BY MR. BRUNO:
9      Q.  Do you read the words, as I read the
10  words, "Hauling fill sand for backfill at
11  sewer lift station excavation"?  Do those
12  words appear?
13      A.  I read them.
14      Q.  Okay.  Now, --
15      MR. TREEBY:
16          Hauling from where?
17      MR. BRUNO:
18          Who cares?
19      THE WITNESS:
20          ITT -- ITT in Saucer.
21  EXAMINATION BY MR. BRUNO:
22      Q.  No, it doesn't say -- It says
23  "Hauling fill sand for backfill".  Now,
24  didn't you have a pile of sand at the ITT
25  site?

Page 165

1      A.  I don't recall.
2      Q.  You don't?  Okay.  We'll show you
3  that document in a minute.
4      A.  That's fine.
5      Q.  But I just want to make clear about
6  the terminology.  Because the word "sand fill"
7  appears on this document, so I want to see if
8  we're on same page.  Does the word "sand"
9  refer to something in particular or is it just
10  a generic term that means --
11      A.  Generic term.  As I mentioned
12  before, such as dirt.
13      Q.  So "sand" can mean dirt?
14      A.  Sand is dirt.
15      Q.  Fine.  Can "sand" mean dirt?
16      A.  It could.
17      Q.  Could "sand" mean material taken out
18  of a borrow pit?  Could it mean that?
19      A.  It could.
20      Q.  It could.  Sure, it could.
21  Absolutely.  "Sand" could mean anything.
22  Okay.  So every time you see the words
23  "borrow", that can mean "sand" because those
24  words are obviously interchangeable.  Right?
25      A.  I disagree, but somebody wrote

42  (Pages 162 to 165)

O'CONNER, DENNIS

8/13/2008

Page 166

1  something down and called it sand, that's
2  fine.
3      Q.  Somebody who is a quality control --
4  What's a quality control report for, by the
5  way?
6      A.  The daily report.  We do quality
7  control.  The Corps does quality assurance.
8  So it simply states what we did that day and
9  to make sure that we were doing what we were
10  supposed to be doing or it writes a violation.
11      Q.  Okay.  So this document is supposed
12  to be the document that you used to assure
13  that you're doing what you're supposed to do;
14  right?
15      A.  Essentially.
16      Q.  So the guy who's writing this report
17  to make sure that you're doing what you're
18  supposed to do used the word "sand"
19  incorrectly?
20      MR. TREEBY:
21         Object.
22  EXAMINATION BY MR. BRUNO:
23      Q.  Right?
24      MR. TREEBY:
25         Objection.

Page 167

1      THE WITNESS:
2         I don't think so.  They used the
3      word "sand" and -- just to describe
4      what was loaded.
5  EXAMINATION BY MR. BRUNO:
6      Q.  Well, let's see now.
7      A.  There was no sand in the borrow pit
8  per se.  There was a combination of sand,
9  silt, and clays.
10      Q.  So there was sand, silt, and clays
11  in the borrow pit?
12      A.  On the whole site.
13      Q.  On the whole -- On the borrow pit?
14      A.  On the borrow pit.  And the entire
15  site.
16      Q.  Okay.  Let's just talk about the
17  borrow pit.
18      A.  Okay.
19      Q.  The borrow pit contained material
20  and that material was a mixture of sand,
21  silts, clays, and organic material; right?
22      A.  In general.
23      Q.  In general; right?
24      A.  Right.
25      Q.  Okay.

Page 168

1      A.  As I said it was not homogeneous.
2      Q.  Now, do you remember a stockpile of
3  sand being located on the ITT site?
4      A.  No, I do not remember.
5      Q.  That's fine.  Now, on this same
6  report I see the phrase "Excavating and
7  loading fill material from the borrow pit", so
8  the same guy has decided to use "fill
9  material" as a descriptor of stuff and also
10  has decided to use "sand" in the same
11  document.  Right?
12      A.  (Witness nods head affirmatively.)
13      Q.  And is it your testimony that you
14  believe that this person is using "sand" and
15  "fill material" to be interchangeable?
16      A.  I believe so.
17      Q.  Okay.  That's fine.  All right.  And
18  on page 2111, under "McDonogh", it says
19  "Excavating and loading fill material from
20  the McDonogh Marine borrow pit into the
21  Denvalt's truck for backfill at Boland
22  Marine."  Okay?  The next sentence says
23  "Loaded sand from ITT to be hauled to Saucer
24  Marine for backfill at the cofferdam
25  excavation."  That's in the same sentence the

Page 169

1  guy is using these two different descriptors.
2  So is your testimony still that you believe
3  that whoever is writing this report is using
4  those descriptors to describe the same thing?
5      A.  Yes, I do.
6      Q.  Thank you.  Now, if we forget for a
7  moment and leave off the table the idea that
8  nobody wants to put contaminated materials
9  back on a site that you're supposed to be
10  remediating, okay, so obviously you sure don't
11  want to fill a hole with contaminated
12  material; right?
13      A.  Correct.
14      Q.  Is there anything wrong with putting
15  sand, using sand as a backfill material in a
16  hole 20 feet deep like the hole that was
17  created to remove the lift station --
18      MR. TREEBY:
19         Object to the form of the
20      question.
21  EXAMINATION BY MR. BRUNO:
22      Q.  -- that has anything to do with
23  undermining the foundation of that flood
24  protection structure?
25      MR. TREEBY:

O'CONNER, DENNIS

8/13/2008

Page 170

```
 1         Object to the assumptions, form
 2    of the question.
 3         THE WITNESS:
 4         It would depend on the
 5    situation.  If you had pre-existing
 6    sand and you excavated sand and you
 7    replaced it, you would be going with
 8    what was native; therefore, you would
 9    be doing no harm and you would just be
10    recreating the conditions and in fact
11    probably increasing the stability and
12    strength of that because -- when you
13    put it back in.  Sand does not compact
14    well.  It falls well.
15    EXAMINATION BY MR. BRUNO:
16         Q.  Right.  How about if just the
17    opposite were true?
18         MR. TREEBY:
19         Were you finished?  I'm sorry
20    EXAMINATION BY MR. BRUNO:
21         Q.  I thought you were.  I apologize.
22         A.  Uh-huh (affirmatively).
23         Q.  You were.  That's good.  How about
24    the opposite?  If you pull the lift station
25    and you pull native materials and you backfill
```

Page 171

```
 1    with sand, is there anything about using sand
 2    that might undermine the flood protection
 3    structure?
 4         A.  I can't say.
 5         Q.  Sand is porous, is it not?
 6         A.  It is porous and it is permeable.
 7         Q.  And it conducts water pretty well,
 8    doesn't it?
 9         A.  Yes.
10         Q.  And you know from your vast
11    experience that it's possible under high water
12    conditions in the canal that if you have a
13    hole filled with sand that that might conduct
14    water down to one of the strata below the
15    surface which conducts water and might conduct
16    the water underneath the foundation of the --
17         A.  It's possible.
18         Q.  It possible.  You knew that.  All
19    right.  Let's chat briefly about the Boland --
20    I'm sorry.
21         All right.  I'm sorry, Mr.
22    O'Conner.
23         MR. BRUNO:
24         You want to take a break?
25         MR. TREEBY:
```

Page 172

```
 1         No.
 2         MS. CLAYMAN:
 3         No.
 4    EXAMINATION BY MR. BRUNO:
 5         Q.  You told us that there were two
 6    sides of this quality inspection.  Your side
 7    was the quality assurance?  No.
 8         A.  Quality control.
 9         Q.  Quality control.  And the Corps'
10    side was the --
11         A.  Quality assurance.
12         Q.  Quality assurance.  All right.
13         (Exhibit 12 marked).
14         Here is a reference to the same
15    thing, but it's form the Corps' perspective.
16    It says "Excavated --"  I'm sorry, it says --
17    yes, "Excavated borrow pit McDonogh Marine and
18    loaded dump truck with backfill material for
19    Boland Marine and loaded dump truck with sand
20    pile from ITT for Saucer Marine sewer lift
21    station backfill."  Let me show you that.  And
22    I'll help you with the line if you need it.
23         A.  Okay.
24         Q.  All right.  So once again we have
25    the Corps's side evaluating the same thing
```

Page 173

```
 1    they're calling sand, too?
 2         A.  Okay.
 3         Q.  The same -- Never mind.  That's
 4    fine.  But obviously the Corps person is also
 5    using "sand" interchangeably with "borrow
 6    material" from the McDonogh borrow pit; right?
 7         A.  That's my assumption.
 8         Q.  That's your assumption.  Because
 9    based upon your training and experience, you
10    would not have used sand that you had trucked
11    in and made a pile of on the ITT site?
12         A.  I would not have used sand because
13    we were directed to use the borrow pit.
14         Q.  Let's go to Boland.  I don't want to
15    get the wrong plan, but let's see.  Have you
16    seen this?
17         MR. EHRLICH:
18         I don't know what you're holding
19    up.
20         MR. BRUNO:
21         This is the Boland Marine.  The
22    same stuff.
23         MR. EHRLICH:
24         No.  This is it (indicating)?
25         MR. BRUNO:
```

44  (Pages 170 to 173)

O'CONNER, DENNIS

8/13/2008

Page 174

1      Right.  Yes.
2      MR. EHRLICH:
3      That's going to be 13?
4      MR. BRUNO:
5      Well, let me identify these
6   things.  Let's look at exhibit -- I
7   have got three exhibits and I just am
8   going to give them all to you because
9   I don't know which one is the latest.
10  But for the record, Exhibit Number 13
11  is entitled the statement of work for
12  the excavation.  It's dated 6 August,
13  '01.
14  EXAMINATION BY MR. BRUNO:
15      Q.  Now, before I get here, just -- you
16  remember when we talked really early today
17  about the fact that you guys knew before you
18  started that you'd have to deal with the lift
19  station.
20      A.  Correct.
21      Q.  Right.  But the Boland Marine
22  wedding cake thing, that's something you all
23  discovered after you were there?
24      A.  That's correct.
25      Q.  So that -- and because it was

Page 175

1   something you discovered, you had to talk to
2   the Corps about, you know, what they wanted to
3   do with it; right?
4       A.  That's correct.
5       Q.  And, of course, if they wanted you
6   to do something with it, you had to talk about
7   money?
8       A.  Eventually, yes.
9       Q.  Right.  I mean, you had to talk
10  about the work and what it would cost?
11      A.  Right.
12      Q.  Because it's a cost plus job?
13      A.  (Witness nods head affirmatively.)
14      Q.  And so you were happy to do it, but
15  they have got to approve it first?
16      A.  They would have to approve it and
17  have to, if you will, give us the money.
18      Q.  Of course.  Right.  And once again,
19  because of that, you had this statement of
20  work which altered the original plan to
21  include Boland Marine.  That's what Number 13
22  is; right?
23      A.  It's a statement of work generated
24  by the Army Corps of Engineers.
25      Q.  Okay.  Right.  And it's generated

Page 176

1   because -- in part because they had to add the
2   Boland Marine thing.
3       A.  That's correct.
4       Q.  Just take a quick peek.  I think
5   that's accurate.  That's the right document.
6   But verify it, please.
7       A.  There were some unknowns that we
8   discovered.  I believe this addresses the
9   wedding cake.  And there was another eight
10  unknown subsurface concrete foundations.
11      Q.  Right.
12      A.  And so on and so forth.
13      Q.  Right.  So this is a document
14  generated by the Corps which says to you, WGI,
15  "Okay, you're now authorized to develop a
16  work plan, specifications for the work to
17  remove the wedding cake structure among other
18  things".  Right?
19      A.  Specifically that, yes.
20      Q.  Okay.  And you subcontracted that
21  work, that is, the drafting of the
22  specifications to Hamp's; right?
23      A.  I don't believe Hamp's was involved
24  in the wedding cake.
25      MR. EHRLICH:

Page 177

1      You asked questions from page --
2   I assume if you're asking questions
3   from pages of the document, I am going
4   to need to see them again.
5      MR. BRUNO:
6      I'm done.
7      MR. EHRLICH:
8      I have 13.  I need 14 and 15.
9      MR. BRUNO:
10     Okay.  In a minute.
11     (Whereupon a discussion was held
12  off the record.)
13  EXAMINATION BY MR. BRUNO:
14      Q.  Now, let's see.  Hamp's, look at
15  Number 15.  Does that refresh your
16  recollection that Hamp's was one that you guys
17  subcontracted with to do the specs for the
18  wedding cake?
19      A.  Okay.  It was Hamp's for a portion
20  of the work.
21      Q.  All right.  Okay.
22      (Exhibit 14 marked).
23      Let's see what comes first and
24  what comes second.  What comes next is August,
25  '01, a draft work plan prepared for you guys

Johns Pendleton Court Reporters                    800 562-1285

O'CONNER, DENNIS

8/13/2008

Page 178

1   by Coastal Environmental Specialists, Inc.
2   Who are they, if you know?
3       A.  They're a small company --
4       Q.  Okay.
5       A.  -- in Louisiana.  We obviously went
6   out -- I say "obviously".  Typically we go out
7   at least to three subcontractors.  This is my
8   best recollection about not going out to three
9   subcontractors to get the best --
10      Q.  Right.
11      A.  -- price to perform the work.
12      Q.  Are they an engineering firm or is
13  that a, you know, a subcontractor?
14      A.  They're -- they're -- It's been a
15  while, but I would -- I would think, and I
16  think we did some other work with them, small
17  work, that they're a licensed contractor in
18  the state --
19      Q.  Right.
20      A.  -- of Louisiana.
21      Q.  But they're also -- Do they do
22  engineering work as well, if you know?
23      A.  I don't recall.
24      Q.  Okay.  It talks about the fact that
25  the scope of work requested by you is general

Page 179

1   and they talk about what to do.  And I just
2   note that curiously at page 37614 they say
3   "Backfilling will continue using imported
4   material," open paren, "sand/sandy clay",
5   close paren "and excavated stockpiled
6   material".
7           MR. EHRLICH:
8           Can I see that, please?
9           MR. TREEBY:
10          Can we see these documents?
11          MR. BRUNO:
12          Sure.
13          (Whereupon a discussion was held
14          off the record.)
15  EXAMINATION BY MR. BRUNO:
16      Q.  You all didn't use them?
17      A.  Not for this piece of work.
18      Q.  Okay.  You used Hamp.
19      A.  My best recollection now, thinking
20  about it, yes, because I -- I remember Hamp's
21  being there.
22      Q.  Okay.  Now, Exhibit 15 is the Hamp
23  cofferdam installation concrete foundation
24  removal final work plan.  This is what was
25  approved by WGI and turned over to the --

Page 180

1           MR. EHRLICH:
2           May I see it before the witness,
3   please?
4   EXAMINATION BY MR. BRUNO:
5       Q.  -- Corps?
6           MR. EHRLICH:
7           I'm entitled to see it before you
8   show the witness.
9           MR. BRUNO:
10          No, you're not.
11          MR. EHRLICH:
12          Yes, I am.
13          MR. BRUNO:
14          No, you're not.  No, you're not.
15  No, you're not.  I mean, look, I'll be
16  courteous, but I'm tired of your
17  foolishness.  Okay?  Frankly, you're
18  not entitled to see anything I give
19  the guy until I choose to give it to
20  you.  All right?  You're not
21  representing the witness, you're not
22  even here defending the witness.
23  You're an also here.
24          MR. EHRLICH:
25          I'm not an also here.  I'm

Page 181

1   representing the United States, who's
2   a party in the case.
3           MR. BRUNO:
4           You certainly are.
5           MR. EHRLICH:
6           I'm entitled to see a document
7   before you show the witness.
8           MR. BRUNO:
9           Not before he sees it.
10          MR. EHRLICH:
11          Absolutely.  Absolutely.
12          MR. BRUNO:
13          No.  Show me the rule.  While
14  you're doing that --
15  EXAMINATION BY MR. BRUNO:
16      Q.  You finished?
17          MR. EHRLICH:
18          Mr. Treeby, can I see the
19  document?
20          THE WITNESS:
21          I suppose.
22  EXAMINATION BY MR. BRUNO:
23      Q.  Here's my question.
24          MR. TREEBY:
25          Wait no more questions until he

Page 182

1  sees the document.
2     MR. BRUNO:
3     All right. Fine.
4     MR. TREEBY:
5     He is not going to answer any
6  questions until he sees the document.
7     MR. BRUNO:
8     All right. Then take a break
9  then, and you all enjoy yourself.
10    MR. TREEBY:
11    Just let him see the document.
12    MR. BRUNO:
13    Let me know when you're done.
14 Okay?
15    MR. TREEBY:
16    We're done just as soon as he
17 sees the document.
18    MR. EHRLICH:
19    Hand me the document. We're on
20 the record, right?
21    MR. BRUNO:
22    Yes, we're on the record.
23    MR. EHRLICH:
24    Stay on.
25    MR. BRUNO:

Page 183

1     No, we're not staying on the
2  record.
3     MR. EHRLICH:
4     Well, I'm staying on the record.
5     MR. TREEBY:
6     Well, no, we are.
7     MR. BRUNO:
8     I'm turning it off. I am taking
9  a break.
10    MR. TREEBY:
11    You can't.
12    MR. EHRLICH:
13    You're leaving, that's fine.
14 We're on the record.
15    MR. TREEBY:
16    We're on the record.
17    MR. BRUNO:
18    You're telling me that I don't
19 have the right to go off the record
20 and you do? Just let me know that.
21    MR. TREEBY:
22    We -- You have got to get
23 agreement. You have to get agreement.
24    MR. BRUNO:
25    No, no, no, no, no.

Page 184

1     MR. TREEBY:
2     You have to get agreement.
3     MR. BRUNO:
4     No, Bill, that's not accurate.
5     MR. TREEBY:
6     You want to go off the record
7  now?
8     MR. BRUNO:
9     I would like to go off the
10 record.
11    MR. TREEBY:
12    You have my permission to go off
13 the record and then --
14    MR. BRUNO:
15    Thank you.
16    MR. TREEBY:
17    -- he can deal with the document
18 after he comes back on the record.
19    MR. BRUNO:
20    Why are we staying on the
21 record?
22    VIDEO OPERATOR:
23    We're off the record. The time
24 reads 2:06 P.M.
25    (Whereupon a discussion was held

Page 185

1  off the record.)
2     VIDEO OPERATOR:
3     We are back on the record. The
4  time reads 2:12 P.M.
5  EXAMINATION BY MR. BRUNO:
6     Q. All right. I was asking I thought
7  before we broke if Exhibit 15 was the final
8  work plan that you approved and that you
9  submitted to the government for its approval.
10    A. I believe it is.
11    Q. Okay. And this work plan at page
12 39044 calls for excavations to be backfilled
13 with either import sand or on site borrow back
14 to original grade, does it not?
15    A. Yes, that's what it states.
16    Q. All right. So WGI at its option
17 could use either one?
18    A. No, WGI did not have options to use
19 either one. Hamp's, that is their response to
20 our request for proposal and that's what they
21 proposed. We did not have that option because
22 we were directed that we could not do that and
23 we had to use borrow.
24    Q. Okay. I'm sorry, I thought you told
25 me that this is what you approved and

47 (Pages 182 to 185)

O'CONNER, DENNIS

8/13/2008

Page 186

1  submitted to the Corps.
2      A.  That's correct.
3      Q.  Did the Corps approve this?
4      A.  Yes.
5      Q.  Well, if they approved this, didn't
6  that permit you to use sand if you wanted to?
7      A.  No.  Not in my opinion.
8      Q.  Okay.
9      A.  As project manager and having
10  received direction from the Corps that we
11  would use the borrow pit, I could not
12  arbitrarily go out and buy sand and bring it
13  on site.
14      Q.  We're not talking about that.
15      A.  Yes, we are.
16      Q.  No.
17      A.  Because anything I bring on site has
18  to be paid for by the Corps and approved by
19  the Corps.
20      Q.  Well, let's look at document number
21  WGI --
22      MR. BRUNO:
23          Did you see this yet?
24      MR. EHRLICH:
25          I have not.

Page 187

1  EXAMINATION BY MR. BRUNO:
2      Q.  Is it your testimony that you all
3  didn't bring any sand on that site?
4      A.  Not while I was there, to my
5  knowledge.
6      Q.  Okay.
7      A.  Except as I stated, aggregate for
8  the parking lot.
9      Q.  Okay.
10      A.  Any other sand that would have come
11  on site would not have been incorporated in
12  the borrow pit.
13      Q.  All right.  Exhibit Number 16 is
14  WGI-22877.  Unless I am reading this thing
15  wrong -- Is this the right document?  It says
16  under -- Well, in any case, maybe you can help
17  me with this.  It says -- There's a line in
18  here that says "Sand/fill --" I'll let you --
19  your eyes may be better than mine, okay?
20  "Delivered 46,494.95 cubic yards."  A guy
21  named Gil, G I L.  Does that sound familiar?
22      MR. TREEBY:
23          Can we look at these documents?
24      MR. BRUNO:
25          Well, yes.  I just showed it --

Page 188

1      The date is on the document.
2      MR. EHRLICH:
3          As he pointed out, I don't
4  represent the witness.
5      THE WITNESS:
6          All right.  We removed asbestos
7  and transite.  This is a specialty
8  contractor.  And this was at Boland.
9  Had nothing to do with the wedding
10  cake.
11  EXAMINATION BY MR. BRUNO:
12      Q.  Never said it did.
13      A.  I'm sorry?
14      Q.  All I'm saying -- I never said it
15  did.
16      A.  I just -- I just stip- -- when I
17  said Boland, the association was we're then
18  discussing the wedding cake.
19      Q.  Yes.
20      A.  This deal is an asbestos contractor
21  that I recall, so they took the asbestos out
22  and we brought the level back up to prevent
23  flooding.
24      Q.  Okay.
25      A.  That's it.  And it's not necessarily

Page 189

1  sand.  It's just sand fill.  So they delivered
2  fill that was certified to be clean, and it
3  was not used for compaction or anything of
4  that nature.
5      Q.  Okay.  Let me ask my question before
6  you give me an answer to questions I haven't
7  asked you yet.  All I want to confirm is
8  whether or not this document shows that as of
9  January 25 of '02 this G I L person had
10  delivered something called sand/fill.  Is that
11  true?
12      A.  Based on that, yes.
13      Q.  Okay.  And that he delivered to that
14  date 46,494.95 cubic yards.
15      A.  That's what it states.
16      Q.  Okay.  So all I am asking you is,
17  doesn't this mean that there was sand on the
18  site, period?
19      A.  No.  It means there was fill on the
20  site, or sand/fill, whichever it was.
21      Q.  All right.  Doesn't this prove that
22  there was sand/fill on the site?
23      A.  Yes.
24      Q.  Right?
25      A.  Yes.

Johns Pendleton Court Reporters

800 562-1285

Page 190

1    Q. Okay. And that there was at least
2    46,494 cubic yards of it on the site?
3        A. Based on that.
4    Q. All right. And that whatever grade
5    of sand it was, it was going to be used as
6    fill? Right?
7        A. Yes.
8    Q. All right. Where is the other one?
9        (Whereupon a discussion was held
10       off the record.)
11   EXAMINATION BY MR. BRUNO:
12   Q. We're going to mark this document
13   which is Bates number WGI-36696 and it says
14   September 25th, 2001. Once again, "Sand/fill
15   delivered". It says "Daily quantity, 206". I
16   don't know what that means. And "JTD" -- I
17   guess means job to date --
18       A. I would assume so.
19   Q. -- 456.88 cubic yards. This again
20   is that Gil person. Does --
21       MR. EHRLICH:
22       Could I see it?
23       MR. BRUNO:
24       Why don't you just pass them
25       around the horn.

Page 191

1        MS. WAGER-ZITO:
2        At some point we need the rest of
3        the Bates numbers.
4    EXAMINATION BY MR. BRUNO:
5    Q. While they're looking, this piece of
6    paper, maybe we can learn about this piece of
7    paper. Tell us what this thing is.
8        MR. EHRLICH:
9        For the record, what is it? What
10       exhibit number?
11       MR. BRUNO:
12       Exhibit 16.
13       MR. EHRLICH:
14       Okay.
15       THE WITNESS:
16       All right. This is the contract
17       dated -- an addendum or piece of the
18       QC report, daily QC report.
19   EXAMINATION BY MR. BRUNO:
20   Q. All right. This is part of the QC
21   report. This is something filled out by
22   Washington Group International; right?
23       A. Yes.
24   Q. Okay. And they're basically
25   reporting on things that are moved off the

Page 192

1    site and things that are moved onto the site;
2    right?
3        A. No. But that would be part of it.
4    They report on the activity on the site, the
5    events on the site, so on and so forth.
6    Q. I'm sorry, this particular piece of
7    paper, not the QC, because it simply -- it
8    talks about tons of things by weight.
9        A. This part is a daily quantity
10   report. So it would either be things
11   assembled and/or transported off, transported
12   on, or simply moved.
13   Q. All right. Yes.
14       A. Yes.
15   Q. Where are we? The document that Mr.
16   Treeby is looking at, just so you will know,
17   is just simply a bunch of those for different
18   dates.
19       MR. TREEBY:
20       Exhibit 16, what is the Bates on
21   it?
22       MR. BRUNO:
23       WGI-22877. The date of it, Bill,
24   is 1/25/02. They're not going to be
25   in seriatim because they're pulled

Page 193

1    from quality control reports. Am I
2    saying that right? Quality control or
3    quality--
4        MR. JOANEN:
5        I don't know if they were
6    attached to that.
7        MR. BRUNO:
8        They're just random? Okay. All
9    right.
10   EXAMINATION BY MR. BRUNO:
11   Q. And again, I just want to confirm
12   what this is. Each of these dates is a day.
13   Right? In other words, you fill out one of
14   these pieces of paper every day?
15       A. Yes.
16   Q. Okay. Now, and so this reflects
17   that on Exhibit Number 17, WGI-36696, that
18   they delivered 206 cubic yards of sand/fill,
19   whatever that is --
20       A. Uh-huh (affirmatively).
21   Q. -- and that the cumulative total at
22   that time was 45688. And if we go back in
23   time -- I'm sorry, we go forward in time, on
24   9/27, they delivered 352 cubic yards. And
25   then the total goes up obviously. It's now

O'CONNER, DENNIS

8/13/2008

Page 194

1   1,000.  And then on 9/28, which is Bates
2   number 36825, they're delivering 265 cubic
3   yards and then they -- again the concomitant
4   increase in the job to date quantity of 1309.
5   Right?  So obviously every day they're
6   delivering this sand/fill to the site.
7        A.  Uh-huh (affirmatively).
8        MR. TREEBY:
9            Every day?  Every day that's
10       there you mean?
11       MR. BRUNO:
12           Yes.
13       THE WITNESS:
14           Yes.
15   EXAMINATION BY MR. BRUNO:
16       Q.  Every date that's in my hand.  How
17   about that?  Okay?  So there's a lot of this
18   sand/fill material being delivered.
19       A.  As it is described there, yes.
20       Q.  All right.  And didn't y'all put it
21   in a big pile on the ITT site?
22       A.  No.
23       Q.  Where did you put it?
24       A.  Behind Boland.  We had to excavate
25   based on the DEQ, we had asbestos transite to

Page 195

1   the depth of one and a half to two feet.  As
2   we excavated that and removed it through a
3   specialty subcontractor who was licensed by
4   the State of Louisiana to handle asbestos,
5   which we were not.
6        Q.  Okay.
7        A.  And then we backfilled that one and
8   a half, two feet and compacted it and put it
9   back in place to prevent flooding to the
10   site.
11       Q.  All right.  Now, so contrary to what
12   I thought you said, there is a lot of
13   sand/fill on the site?
14       A.  There is a lot of fill.  It's
15   because it was a -- it is a separate operation
16   that we were not involved in.  When I say
17   that, physically.  Because of the specialty
18   subcontractor, I did not remember that portion
19   of it.
20       Q.  But you remember it now?
21       A.  I remember it now because I was
22   involved in getting the subcontractor out
23   there, monitoring the site and watching the
24   compaction.
25       Q.  Now, you also, though, were in a

Page 196

1   similar position with regard to the Boland
2   excavation of the wedding cake.  You didn't do
3   it; you had that subcontracted to somebody
4   else?
5        A.  That's right.
6        Q.  So the relationships were the same
7   as between this sand/fill stuff and the
8   removal of the wedding cake; right?
9        A.  The relationships.
10       Q.  Yes.  You had a subcontractor for
11   each.
12       A.  Yes.
13       Q.  All right.  Now, do you remember Mr.
14   Guillory being concerned about the borrow pit
15   as it may damage the flood control structure
16   and, as a result, seeking some assistance from
17   other folks at the Corps of Engineers?
18       A.  Yes.
19       Q.  Tell me what you remember about
20   that.
21           (Whereupon a discussion was held
22       off the record.)
23       THE WITNESS:
24           My recollection is either Mr.
25       Montegut or Mr. Guillory came to me

Page 197

1       and requested that a survey be
2       conducted of the site, which we had
3       requested earlier, and this is for
4       elevations, for drainage and just to
5       stipulate where the soil was going.
6       When I say going, in regards to
7       elevation, not moving, and my
8       recollection is we had that performed
9       by a licensed surveyor.  We gave that
10      to Lee, and Lee came back and informed
11      me -- and at that time he did not
12      inform me who, except the people in
13      the local New Orleans office had given
14      him some advice which we would have
15      followed and he would direct us with
16      regards to where our cuts would take
17      place in the future and if -- and any
18      extra compaction we would have to take
19      with regards to that.  That second
20      part I don't recall, but I do recall
21      assigning Phil Staggs to that because
22      he was our construction manager and he
23      and Lee Guillory worked together on
24      that.
25   EXAMINATION BY MR. BRUNO:

50 (Pages 194 to 197)

O'CONNER, DENNIS

Page 198

1    Q.  All right.  Now, before we leave the
2  backfilling of the two different holes, you
3  have already told us that the Corps required
4  that you use borrow pit material; right?
5    A.  True.
6    Q.  Tell me what was the specification
7  for compaction.
8    A.  There were no specifications for
9  compaction.
10    Q.  Okay.
11    A.  Simply a general directive that if
12  we backfilled the hole, depending on the piece
13  of equipment and the size of the hole, we
14  would compact the soil mechanically, be it
15  with an excavator, or a backhoe if it was very
16  small, or a wheel roller if it was extremely
17  small.  And it would depend on the size of the
18  lifts and we would bring it up to grade.
19    Q.  Right.  And that was so that if you
20  rolled a tractor over, it wouldn't sink in the
21  hole; right?
22    A.  No.  That was so the soils wouldn't
23  subside, we wouldn't have flood.  So we would
24  have compaction greater than what was
25  pre-existing.

Page 199

1    Q.  All right.  (Exhibit 18 marked.)
2         What does -- Do you know what 90
3  percent Proctor compacted backfill within 5,
4  plus 5 percent, negative 3 percent optimum
5  water content means?
6    A.  90 percent is a relative measure of
7  compaction.  The Proctor is you have taken a
8  soil sample and had a soils lab analyze it for
9  the ideal moisture content at a certain ideal
10  percentage of compaction.
11    Q.  Okay.
12    A.  And you -- "you" being the
13  contractor or the op- -- the person with the
14  soil survey, takes a sample and runs a
15  compaction report based on moisture and
16  density.
17    Q.  All right.  The backfill in the
18  Boland wedding cake hole and the backfill in
19  the Saucer lift station hole, can you tell me
20  whether or not that backfill was a 90 percent
21  Proctor compacted backfill within plus 5
22  percent, negative 3 percent optimum water
23  content?
24    A.  No, I can't tell you that.
25    Q.  Do you have an opinion as to whether

Page 200

1  it was or not?
2    A.  I have an opinion that it was
3  probably very close to 90 because it was using
4  an excavator to tamp it, a word that was very
5  popular at the time, and with the weight of
6  the excavator and -- we were using a standard
7  excavate -- extended excavator, that I would
8  guess, that's all it would be, that we were
9  well above native and we were probably 85 to
10  90 percent, but we never tested the soils
11  because we weren't required to because they
12  were going to be dug back up.
13    Q.  Right.  The Proctor refers to water
14  content?
15    A.  Water content and density.  That's
16  the Proctor test.  It's a maximum water
17  content and the ideal density.  And if you see
18  a chart, you will -- it'll graphically display
19  what you want to have in regards to water
20  content.
21    Q.  Does it describe the nature of the
22  material?
23    A.  It will consider the nature of the
24  material, yes.  But Proctor content will work
25  against that.  You throw sand in there and you

Page 201

1  throw dirt in there, you going to get
2  different results.
3    Q.  I see.  So you couldn't get a 90
4  percent Proctor if you were using pure sand?
5    A.  I believe you could.
6    Q.  If you compacted it enough?
7    A.  Yes.
8    Q.  Okay.
9    A.  It depends on the material.
10    Q.  All right.  Did you know whether or
11  not there was any prohibition about excavating
12  within 15 feet of the center line of the flood
13  control structure?
14    A.  No.
15    Q.  Okay.  Do you know whether or not
16  there was any requirement that you use
17  bentonite caps to top off the holes that
18  resulted from the removal of sheet pile?
19    A.  No.
20    Q.  Did you all use bentonite caps?
21    A.  No.
22    Q.  How about, did you use bentonite
23  caps on the borings, the holes that resulted
24  from the borings?
25    A.  Yes.

O'CONNER, DENNIS

Page 202

1    Q.  Why was that?
2    A.  It's typically done and it's just a
3 DEQ requirement, if I believe right.  I say, I
4 believe right, I have worked with numerous DEQ
5 state organizations.  I don't recall which
6 states call and which states don't at this
7 point in time.
8    Q.  Are you familiar with any policy or
9 procedure that the Corps of Engineers has that
10 would require the Corps to do an engineering
11 evaluation of excavations that are proposed to
12 be done within 300 feet of a flood protection
13 structure?
14    A.  I have no knowledge of Corps
15 requirements regarding those issues.
16    Q.  Have you ever heard of such a thing?
17    A.  No.
18    MR. BRUNO:
19      Let's take a break.
20    VIDEO OPERATOR:
21      We're going off the record.  The
22 time reads 2:32 P.M.
23    MR. EHRLICH:
24      I agree to go off the record.
25    (Recess.)

Page 203

1    VIDEO OPERATOR:
2      Back on the record.  The time
3 reads 2:37 P.M.
4    MR. BRUNO:
5      Oh, I'm sorry.  Thank you, Mr.
6 O'Conner.  We have no further
7 questions.
8 EXAMINATION BY MR. TREEBY:
9    Q.  Mr. O'Conner, we have met, of
10 course, before.
11    A.  Yes.
12    Q.  And I have just a couple of
13 questions for you.  There's been a lot of
14 testimony that you've given about your
15 recollection while you were on the site of the
16 excavation and backfill of the sewer lift
17 station and of the wedding cake structure that
18 was on the Boland Marine site.  My question to
19 you is, were those two excavations filled by
20 the time you left the job?
21    A.  I believe so.  Yes.
22    Q.  And to the best of your
23 recollection, was any material other than
24 borrow pit material used, and the existing
25 structure that came out of the holes, used to

Page 204

1 backfill those two holes?
2    MR. BRUNO:
3      Objection, leading.
4    THE WITNESS:
5      My best recollection, and at my
6 direction, all backfill material came
7 from the borrow pit or the site.  No
8 import soil was used at either the
9 wedding cake structure or the lift
10 station.
11 EXAMINATION BY MR. TREEBY:
12    Q.  After looking at the documents that
13 you have looked at today that indicate
14 something called backfill/sand was brought
15 onto the site, what is your recollection as to
16 what that material was used for?
17    A.  The material I believe you're
18 referencing was used in an asbestos removal
19 process behind Boland Marine.  It was used to
20 a depth of one and a half to two feet, my best
21 recollection.  That the advice of the asbestos
22 -- and they removed it, the asbestos
23 contractor, and we backfilled it to prevent
24 surface flooding because the trailers were
25 directly adjacent to it.  When we did that, we

Page 205

1 compacted it with Caterpillar tracks and/or
2 excavator.
3    Q.  Okay.  If material was brought from
4 off site for any fill purposes such as what
5 you have described to fill -- to put back in
6 place of contaminated soils that had been
7 removed, did you have to get approval for that
8 from the Corps of Engineers?
9    A.  Absolutely.  Because we did not know
10 that that was asbestos at the beginning.  I
11 brought out an individual from the DEQ and
12 they told me what we needed to do, and then I
13 approached the Corps with the directions from
14 the DEQ as to what we had to do.
15    Q.  Was one of the concerns or one of
16 your understandings of the concerns of the --
17 Did the concerns of the Corps, to your
18 knowledge, have anything to do with the cost
19 of importing fill?
20    A.  There was always an issue of cost so
21 the answer is yes, they were concerned with
22 the issues of cost.  I had to address that
23 before I proceeded.
24    Q.  One of the questions that -- and I
25 -- it's on the transcript if Mr. Bruno wants

Johns Pendleton Court Reporters                    800 562-1285

O'CONNER, DENNIS

8/13/2008

Page 206

1  to look at it.
2      MR. TREEBY:
3          Do you have your realtime?
4      MR. BRUNO:
5          Yes.
6      MR. TREEBY:
7          If you want to look at it so that
8      I accurately represent it.
9  EXAMINATION BY MR. TREEBY:
10     Q.  Which is page 180, beginning at line
11  22 of the rough transcript, the question Mr.
12  Bruno asked you was "And you know from your
13  vast experience that it's possible under high
14  water conditions in the canal that if you have
15  a hole filled with sand that might conduct
16  water down to one of the --" and I can't read
17  that, "below the surface, which water might
18  conduct the water underneath the foundation of
19  the --"  You answered "It's possible".
20     A.  That is correct.
21     Q.  In fact, for the holes that were dug
22  on this site that you know of being the sewer
23  lift station and the wedding cake structure,
24  is it your -- what is your opinion about the
25  possibility of that?

Page 207

1      MR. BRUNO:
2          Objection.  This witness is not
3      an expert witness.  You haven't laid
4      an appropriate foundation for him to
5      answer such a question with regard --
6      MR. TREEBY:
7          If you --
8      MR. BRUNO:
9          No.  I said "possible".  And what
10     happened here would require a --
11     MR. TREEBY:
12         Objection to the form.
13     MR. BRUNO:
14         -- lot more evaluation.  No, Mr.
15     Treeby, that's objectionable.
16     MR. TREEBY:
17         That's a -- I won't respond to
18     it.  It's obviously --
19     MR. BRUNO:
20         Did you do the speaking
21     objection?  So can I.
22     MR. TREEBY:
23         Very good.  I'm glad you
24     acknowledge what you did.
25  EXAMINATION BY MR. TREEBY:

Page 208

1      Q.  Now, --
2      MR. BRUNO:
3          I don't acknowledge it.  I'm just
4      saying if you can, I can, too.
5  EXAMINATION BY MR. TREEBY:
6      Q.  I think Mr. Bruno laid the
7  foundation actually for your --
8      MR. BRUNO:
9          No, I did not.
10 EXAMINATION BY MR. BRUNO:
11     Q.  -- reason to be in this area.
12     MR. BRUNO:
13         I disagree.
14 EXAMINATION BY MR. TREEBY:
15     Q.  Now let me get an answer to my
16 question.  Do you believe that was possible
17 given what you saw on that site with those
18 two?
19     A.  No, I do not believe it was
20 possible.
21     MR. TREEBY:
22         That's all I have.
23 EXAMINATION BY MR. BRUNO:
24     Q.  The transite, Mr. O'Conner, that's
25 the asbestos-containing material?

Page 209

1      A.  That's correct.
2      Q.  Okay.  Well, if you look at WGI
3  document -- and you said that the fill/sand
4  was used to cover up the area from which the
5  transite contaminated material was removed.
6  Right?
7      A.  That's correct.
8      Q.  Well if you look at WGI-8583 and 84,
9  85 and read under where it says "Removal of
10 transite contaminated concrete and soil", and
11 tell me if you don't see that it says here
12 that the "Scraping 6 to 10 inches of clean
13 fill prior to excavating the ACM and removing
14 excessive concrete filled debris, assured
15 excavated areas had been inspected and
16 accepted as clean, and fabric placed along the
17 excavation limits prior to backfilling for
18 identifying stopping points", that's what
19 y'all did for that asbestos stuff, right?  You
20 put that fabric down?
21     A.  In some cases, sure.
22     Q.  And it says "Observed dozer
23 backfilling excavations with clay hauled from
24 McDonogh Marine borrow pit".  Does that
25 refresh your recollection that in fact you

Johns Pendleton Court Reporters                    800 562-1285

O'CONNER, DENNIS

8/13/2008

Page 210

1    didn't use the sand/fill to put where the
2    transite was removed; you in fact used
3    material pulled from the McDonogh borrow pit?
4        MR. TREEBY:
5            Objection as to form.  Compound.
6        Go ahead.
7        MR. BRUNO:
8            Good.
9    EXAMINATION BY MR. BRUNO:
10       Q.  You can look at the document if you
11   like. I'm going to mark it as Exhibit Number
12   -- The next.
13       MR. JOANEN:
14           20.
15       MR. BRUNO:
16           20?  You see where it says that
17   there?
18       MR. TREEBY:
19           Actually, you have already marked
20   this one 19.
21       MR. BRUNO:
22           I'm sorry. I did?  Wrong.  19.
23       THE WITNESS:
24           That's what it says.  I remember
25   bringing in soil, now that you brought

Page 211

1    it up, for the ACM fill.  That was
2    Gil.  So --
3    EXAMINATION BY MR. BRUNO:
4        Q.  So did you use borrow material to
5    put in place of the -- I forgot what it's
6    called now already.  In place of the transite
7    contaminated soil according to this document?
8        A.  According to that document, we did
9    do that.
10       MR. BRUNO:
11           All right.  I have no further
12   questions.
13           Did I number this wrong or
14   something?
15       MS. CLAYMAN:
16           I don't know.  I'm going to stay
17   out of it.
18       MR. BRUNO:
19           This for the record, this is
20   dated 6 November, '01.  It's Bates
21   Number 8583 to 8585, and we have
22   marked it as 19.
23       MS. CLAYMAN:
24           Okay.
25       MR. BRUNO:

Page 212

1            Okay.  Just so everybody is
2    clear.  And I have no further
3    questions.  Okay?
4        MR. TREEBY:
5            Well, I need to address the issue
6    you just went into.  And we need the
7    document, I guess.  It'll be -- This
8    will be Exhibit --
9        MR. BRUNO:
10           You want this?
11       MR. TREEBY:
12           No.  Exhibit 20 it'll be I guess
13   for this deposition.  Which is Bates
14   number WGI-000641 through WGI-651.
15   And it appears to be a November 15,
16   2001 letter from the contracting
17   officer here, F. Arlene Smith,
18   contracting officer, to Washington
19   Group.
20   EXAMINATION BY MR. TREEBY:
21       Q.  And first I'm going to ask you, Mr.
22   O'Conner, if you can take a look at this and
23   tell me what it is.  There's a cover letter
24   and then an attached document.
25       MR. JOANEN:

Page 213

1            Shouldn't you show us first?
2        MR. TREEBY:
3            You want to see it?
4        MR. BRUNO:
5            You don't mind?
6        MR. TREEBY:
7            No, I don't mind.
8    EXAMINATION BY MR. TREEBY:
9        Q.  Okay.  For the record, Mr. O'Conner,
10   tell us what that document is.
11       A.  Well, as it states, it's a revised
12   statement of work and it addresses certain
13   things, existing tasks and new tasks with new
14   funding for additional work.  The reason --
15   One of the reasons for this is the Army Corps
16   continually did not have enough money to run
17   the project, so it was a continuously funded.
18   Secondly, we had new tasks.  And one of them
19   was additional ACM excavation and disposal.
20   And one of the things it says is "Excavated
21   areas shall be backfilled with clay material
22   from approved on site McDonogh Marine borrow
23   area to the fullest extent possible.
24   Otherwise, imported sand/backfill will be
25   used."

54  (Pages 210 to 213)

O'CONNER, DENNIS

8/13/2008

Page 214

1       MR. BRUNO:
2           Okay.
3   EXAMINATION BY MR. TREEBY:
4       Q.  Okay.  So the provision you just
5   read -- And let me get you to, if you wouldn't
6   mind, to read the material -- In the first
7   place, this is under a paragraph entitled
8   "Additional ACM --"
9       A.  "Excavation and disposal".
10      Q.  "Excavation and disposal".  Is this
11  addressing the transite asbestos material that
12  was taken out of the site?
13      A.  To the best of my recollection, it
14  is, yes.
15      Q.  And does it also address what was to
16  be put back in place of that material?
17      MR. BRUNO:
18          Objection.  Objection.  It
19      doesn't say that.  It says what can be
20      put back.
21  EXAMINATION BY MR. TREEBY:
22      Q.  Does it address what --
23      A.  We -- It addresses the assumptions
24  of what could be put back in.
25      MR. BRUNO:

Page 215

1           That's right.
2   EXAMINATION BY MR. TREEBY:
3       Q.  Okay.  Would you read those
4   assumptions of what could be put back into the
5   place?
6       A.  The technical assumptions are 4,000
7   tons of ACM soil overrun and 14,000 tons of
8   PCM soil overrun.  And we are giving a price
9   per ton based on unit price and ton price.
10      Q.  And it indicates that sand could be
11  put back in as fill for the contaminated
12  transite contaminated material that was taken
13  out.  Is that --
14      A.  It says "otherwise imported
15  sand/backfill".
16      Q.  Now, my question to you is, looking
17  at the tonnages we're talking about, how many
18  cubic yards would be involved with those
19  tonnages?  Can you give us a rough idea?
20      A.  A rough idea is, and it depends on
21  what you're bringing in, but one cubic yard
22  could be the equivalent of one and a third to
23  one and a half tons.  So if you do the math,
24  4,000 tons and just come back off of that.
25      Q.  Okay.  And from your recollection of

Page 216

1   what was put back on that site in place of the
2   transite contaminated material, what was it?
3       A.  I don't recall.  That's too long
4   ago.
5       Q.  Okay.
6       A.  That was a specialty contract.
7       MR. TREEBY:
8           Okay.
9   EXAMINATION BY MR. BRUNO:
10      Q.  Just to follow up on that, clearly
11  you had the option once again, sand or the
12  backfill material; right?
13      A.  In accordance with what we could
14  do.
15      Q.  Right.
16      A.  I did not have the option, no.
17      Q.  Right.  You didn't have the option.
18  In fact, that document says you're supposed to
19  use the borrow material first until you run
20  out.  Right?  That's what it says.
21      A.  I don't think it says "use first".
22  It says "and/or".  I believe.
23      Q.  Well, --
24      A.  I don't have it in front of me.
25      Q.  Okay.  Fair enough.

Page 217

1       MR. TREEBY:
2           Do you have one?  We're going to
3       mark it.  So do you have one?
4       MS. CLAYMAN:
5           We're making a copy.
6       MR. BRUNO:
7           Where were you reading from,
8       Bill?  I'm sorry.  Oh, never mind.
9       Here it is.
10  EXAMINATION BY MR. BRUNO:
11      Q.  It says "Excavate --"
12      MR. BRUNO:
13          Thanks for the highlights.
14  EXAMINATION BY MR. BRUNO:
15      Q.  "Excavated area shall be backfilled
16  with clay material from the approved on site
17  -- to the fullest extent possible."  I didn't
18  give it to you, but that's what it says.  So
19  you're supposed to use the backfill from the
20  Boland Marine site first.
21      A.  To the fullest extent possible,
22  which means it could have included the
23  logistics.
24      Q.  Right.  Or it could have meant that
25  you didn't have enough.

55 (Pages 214 to 217)

Page 218

1    A.  Could have meant that.
2    Q.  All right.  So could not -- It's
3 possible you wouldn't have enough of that
4 material to fill up those holes either?
5    A.  I doubt that very seriously, because
6 we enlarged the borrow pit.
7    Q.  Okay.  Well, so you could have
8 enough material to --
9    A.  I don't know when we enlarged the
10 borrow pit.
11    Q.  Okay.  Thank you.
12    MR. BRUNO:
13       This is Exhibit Number 20.  Thank
14 you very much.  Are we done?
15    MR. EHRLICH:
16       Yes.
17    MR. BRUNO:
18       Done.
19    VIDEO OPERATOR:
20       This concludes the deposition of
21 Dennis O'Conner, volume 1.  The total
22 digital tapes are used four.  The
23 original videotapes will be retained
24 by Digital Technology Group
25 Corporation.

Page 219

1       Going off the record, the time
2 reads 2:51 P.M.
3          *   *   *
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 220

1
2               WITNESS'S CERTIFICATE
3
4       I, DENNIS O'CONNER, read or have had
5 the preceding testimony read to me, and hereby
6 certify that it is a true and correct
7 transcription of my testimony, with the
8 exception of any attached corrections or
9 changes.
10
11
            _____
12            (Witness' Signature)
13    _____
     DATE SIGNED
14
15    DEPONENT PLEASE INITIAL ONE:
16
     _____ Read with no corrections
17
18    _____ Read and correction sheet attached
19
20
     DATE TAKEN:  AUGUST 13, 2008
21
22
23
24
25

Page 221

1
2            REPORTER'S CERTIFICATE
3
4       I, ROGER D. JOHNS, RMR, RDR, CRR,
5 Certified Court Reporter, do hereby certify
6 that the above-named witness, after having
7 been first duly sworn by me to testify to the
8 truth, did testify as hereinabove set forth;
9 that the testimony was reported by me in
10 shorthand and transcribed under my personal
11 direction and supervision, and is a true and
12 correct transcript, to the best of my ability
13 and understanding; that I am not of counsel,
14 not related to counsel or the parties hereto,
15 and not in any way interested in the outcome
16 of this matter.
17
18
19
20            ROGER D. JOHNS
21         CERTIFIED COURT REPORTER
22            STATE OF LOUISIANA
23
24
25

56  (Pages 218 to 221)

O'CONNER, DENNIS

8/13/2008

Page 222

| A | | | | |
|---|---|---|---|---|
| **ability** 68:2 73:23 74:13 221:12 | **ACTION** 1:7 **activities** 122:12 129:17 | 77:10 **affirmatively** 9:15 32:21 41:14 51:18 | **analysis** 46:3,5 62:23 **analyze** 45:22 | **appreciate** 8:24 21:13 **approach** 152:25 |
| **able** 57:15 63:3 86:10 149:19 | **activity** 192:4 **adamantly** 157:24 **add** 117:20 176:1 | 61:24 63:4 106:20 115:8 142:6,9,12 168:12 170:22 | 199:8 **and/or** 104:18 137:8 192:11 | **approached** 101:1 123:8 205:13 **appropriate** 100:25 |
| **above-named** 221:6 **absolutely** 16:17 | **added** 74:12 **addendum** 191:17 | 175:13 193:20 194:7 | 205:1 216:22 **angles** 64:2 | 139:10 207:4 **approval** 122:25 |
| 88:10 111:11 122:6 165:21 | **additional** 93:8,15 95:1 128:13 | **aforementioned** 3:5 | **announcing** 5:24 **answer** 3:15 8:12 | 130:18 132:23 185:9 205:7 |
| 181:11,11 205:9 **accept** 138:8 | 213:14,19 214:8 **address** 35:1,17 | **agencies** 95:18 123:10,10 | 8:17,23 36:9 40:19,23 55:17 | **approve** 175:15,16 186:3 |
| 152:17 **acceptable** 84:7 | 80:21 100:7 130:23 132:4,5,5 | **agency** 18:4 35:12 107:10 123:15 | 58:20 61:2,21 65:14 68:6 78:20 | **approved** 153:6 179:25 185:8,25 |
| **accepted** 209:16 **access** 133:2 | 133:17,19,20,22 133:24 134:9,12 | 153:1 **aggregate** 158:3 | 125:22 147:10 161:6,8 182:5 | 186:5,18 213:22 217:16 |
| 148:11 **accidents** 24:24 | 134:13 135:9,11 135:14,14,21,23 | 187:7 **ago** 8:2 11:13,15,18 | 189:6 205:21 207:5 208:15 | **approving** 111:15 **approximate** 94:21 |
| **accommodate** 128:10 | 205:22 212:5 214:15,22 | 100:11 108:7,11 157:1 216:4 | **answered** 40:21 41:6 64:16 74:22 | 128:7 **approximately** |
| **accomplished** 35:10 127:13 | **addressed** 37:14 126:15,16 127:16 | **agree** 129:12 130:11,14 148:21 | 124:4 206:19 **answers** 75:4 | 9:23 10:23 17:20 19:2,3 93:7,19 |
| **accomplishing** 15:13 | 128:2 129:23 133:16 | 154:24 155:2 202:24 | **anticipate** 146:17 **anybody** 102:5 | **April** 129:22 **arbitrarily** 51:4 |
| **accumulation** 34:11 | **addresses** 135:10 176:8 213:12 | **agreeable** 152:22 **agreed** 3:3 | 103:9,10 105:12 114:23 143:14 | 186:12 **area** 17:25 23:14 |
| **accurate** 56:3 133:23 176:5 | 214:23 **addressing** 214:11 | **agreement** 143:11 145:13 183:23,23 | **apologize** 20:12 151:16,19 170:21 | 32:2 34:2 43:18 59:15 66:2 68:18 |
| 184:4 **accurately** 206:8 | **adjacent** 32:25 55:25 58:24 59:21 | 184:2 **agrees** 35:18 | **apparently** 138:13 **appear** 129:2 | 208:11 209:4 213:23 217:15 |
| **achieve** 84:6 **acknowledge** 121:9 | 101:8 204:25 **adjust** 65:4,16 | 131:24 **ahead** 68:4 121:11 | 164:12 **APPEARANCES** | **areas** 61:18 209:15 213:21 |
| 207:24 208:3 **acknowledged** | 66:11 **administering** 3:23 | 210:6 **air** 134:19 | 2:1 **appeared** 72:23 | **arguing** 76:22,25 **Argumentative** |
| 32:23 61:7 **acknowledges** | **Adrian** 2:11 6:19 **advice** 51:25 | **Airplane** 24:24 **Alaska** 17:7,25 | **appearing** 7:23 **appears** 43:14 | 49:14 **Arlene** 212:17 |
| 122:3 **acknowledgment** | 146:20 147:1 197:14 204:21 | **allow** 8:16 **allowed** 87:25 | 123:18 129:9 130:14 165:7 | **Army** 51:3 85:24 119:7 122:1 |
| 114:20 121:19 123:20 133:10 | **advise** 52:20,22 138:21 | 95:11 155:4 **allowing** 149:20 | 212:15 **applicant** 128:11 | 127:23 129:3 136:23 137:15 |
| **ACM** 209:13 211:1 213:19 214:8 | **advised** 9:16 81:14 103:23 116:1 | **alluded** 134:8 **alludes** 95:7,8 | 128:12 **applicant's** 129:17 | 138:10 161:18 175:24 213:15 |
| 215:7 **acquainted** 39:10 | 128:11,12 139:4 **Affairs** 18:8 | **altered** 175:20 **AMERICA** 2:21 | 129:18 **application** 15:1 | **Army's** 129:7 **arrive** 52:20 |
| **Act** 17:25 | **affect** 40:6,8 42:23 44:18 45:9 64:13 | **amount** 39:20 71:10 86:6 | **apply** 50:9,9 57:10 57:11,13 | **arrived** 133:1 **asbestos** 188:6,20 |

O'CONNER, DENNIS

188:21 194:25
195:4 204:18,21
204:22 205:10
209:19 214:11
**asbestos-containi...**
208:25
**ascertaining**
101:20
**asked** 24:20 26:20
26:25 27:3 29:5
30:22 36:6 74:7
74:22 75:15 92:15
92:16 100:5
122:21 123:10,24
124:1,8 125:25
126:1 139:23
142:20 147:9
177:1 189:7
206:12
**asking** 34:10,24,25
43:16 46:12 50:4
50:5,7,12 60:6,18
75:18 91:11 99:18
105:2 106:11
125:2 145:6 177:2
185:6 189:16
**aspects** 86:17
**assembled** 192:11
**assess** 57:19
**assigned** 144:2
146:8
**assigning** 57:12
197:21
**assignments**
145:21
**assist** 47:18 87:1
143:20 147:21
**assistance** 196:16
**assisted** 98:20
**associated** 12:11
31:24 33:24 36:15
55:23 77:14 125:4
125:7
**association** 188:17
**assume** 13:2 79:10
136:8 138:8

148:15 177:2
190:18
**assumed** 99:5
151:3
**assumes** 116:10
**assuming** 107:20
107:22
**assumption** 108:6
130:4 139:14
173:7,8
**assumptions** 90:14
107:24 170:1
214:23 215:4,6
**assurance** 166:7
172:7,11,12
**assure** 166:12
**assured** 209:14
**Atlanta** 11:19,24
12:16 13:4
**attached** 193:6
212:24 220:8,18
**attempt** 130:12
**attempting** 23:18
**attempts** 84:3
**attention** 13:21
**ATTORNEY** 2:21
**ATTORNEYS**
2:13
**audio** 5:20
**August** 1:24 5:9
174:12 177:24
220:20
**author** 86:6
**authored** 86:11
**authority** 115:14
115:22 117:10
**authorized** 176:15
**available** 15:17
68:19,20 143:18
146:18,25 148:4
**Avenue** 2:12,19
**avoid** 21:11 25:21
**awarded** 23:4
153:4
**aware** 23:10 24:12
24:21,23 33:2

34:18 36:18 59:3
77:17 80:25 81:1
81:2,4 83:4 88:25
90:7 131:3 143:15
**A.M** 5:11 20:6,10

---

**B**

**b** 116:13 131:5
**Bachelor's** 16:18
**back** 11:18 16:5
20:9 31:18 40:14
44:11 54:5,10
56:14 73:5 75:22
75:25 83:16 103:5
109:14 120:18
135:5,20,21 145:9
152:15 169:9
170:13 184:18
185:3,13 188:22
193:22 195:9
197:10 200:12
203:2 205:5
214:16,20,24
215:4,11,24 216:1
**backfill** 34:25 36:3
36:4,5,7,10 39:7
42:3,9 153:11
154:13,15 155:7,9
156:6,8 157:7,8
158:17 161:20
162:8,10,14
163:12 164:10,23
168:21,24 169:15
170:25 172:18,21
199:3,17,18,20,21
203:16 204:1,6
216:12 217:19
**backfilled** 42:13
72:24 185:12
195:7 198:12
204:23 213:21
217:15
**backfilling** 36:1
154:12,17,21
157:5 179:3 198:2
209:17,23

**backfill/sand**
204:14
**background** 21:1
**backhoe** 198:15
**bad** 132:4 159:2
**ball** 54:21
**barge** 89:4,6
**Baronne** 2:4
**based** 35:20 37:2
43:17 53:13 57:21
58:9,13 63:24
64:2 66:13 71:14
78:23,24,24,25,25
85:4,9 94:7 96:23
97:12 103:11
108:6 115:19
133:11 137:3
145:25 152:24
173:9 189:12
190:3 194:25
199:15 215:9
**baseline** 128:7
**basically** 191:24
**basis** 11:12 18:19
31:11
**Bates** 190:13 191:3
192:20 194:1
211:20 212:13
**Bathroom** 9:6
**Baughman** 2:16
6:21,22
**beach** 158:10
**becoming** 46:25
**bed** 158:24
**before-mentioned**
7:16
**began** 7:22 118:13
**beginning** 5:24
205:10 206:10
**begins** 5:2
**belief** 109:3 136:16
**believe** 13:18 16:18
18:22 19:4 32:23
47:4 48:16 59:24
82:24 88:19 89:1
90:14 95:7 99:25

101:12 103:15
107:5 121:19
126:24 134:8,11
137:2 146:23
168:14,16 169:2
176:8,23 185:10
201:5 202:3,4
203:21 204:17
208:16,19 216:22
**believed** 149:15
**belong** 34:4 35:16
**beneath** 64:10
**bentonite** 201:17
201:20,22
**Bertucci** 122:9
**best** 11:16 83:2
85:9,21 88:6,24
98:25 101:5 109:3
109:7 158:4 178:8
178:9 179:19
203:22 204:5,20
214:13 221:12
**better** 9:12 12:12
47:4 156:11
187:19
**beyond** 27:4 29:8,9
**big** 73:19 194:21
**Bill** 92:3 184:4
192:23 217:8
**bit** 60:25
**blessed** 127:4
**Board** 100:13
101:2,9 108:13,17
119:13,16,17
120:24 125:5
128:2 129:10
130:8,12 135:19
141:19 142:15
**Board's** 129:14
**Bobby** 101:2,3,13
101:14,19 102:6
102:11 104:8,9,14
105:4 107:2,22,24
108:3,12 137:4
141:10,11,15
143:8,8,12

---

O'CONNER, DENNIS

8/13/2008

Page 224

**Bobby's** 107:23
**body** 56:19 58:25
**Boise** 117:12
**Boland** 149:22
  168:21 171:19
  172:19 173:14,21
  174:21 175:21
  176:2 188:8,17
  194:24 196:1
  199:18 203:18
  204:19 217:20
**bonding** 118:22
**book** 58:12
**bore** 70:14,16,17
**bored** 72:21 73:1
**boring** 64:11 70:21
  70:23 73:14
**borings** 22:12 62:5
  62:9,11 63:9 73:3
  73:4,16,17 77:23
  94:11 201:23,24
**borrow** 155:20,22
  155:24 156:1,4,6
  156:9,12,21,23
  157:2,22,23,23
  158:1 160:3,8,17
  160:22 161:16,19
  161:21 162:8,11
  165:18,23 167:7
  167:11,13,14,17
  167:19 168:7,20
  172:17 173:5,6,13
  185:13,23 186:11
  187:12 196:14
  198:4 203:24
  204:7 209:24
  210:3 211:4
  213:22 216:19
  218:6,10
**boss** 9:4 109:24
**bother** 46:12
**bottle** 71:23
**bottom** 75:12,13
  131:23 135:17
  154:15 157:9
  162:16

**box** 48:2
**brace** 44:12,12,14
**Branch** 2:19
**Breaches** 1:7 5:5
**break** 19:21 20:4
  35:6 109:21
  120:22 134:20,23
  139:24 171:24
  182:8 183:9
  202:19
**breaks** 9:4 109:24
**briefly** 171:19
**bring** 47:14,17
  54:23 79:13
  113:20,24 186:12
  186:17 187:3
  198:18
**bringing** 103:5
  210:25 215:21
**broad** 81:25
**broke** 185:7
**brought** 147:5
  188:22 204:14
  205:3,11 210:25
**Bruno** 2:3,3 4:24
  4:25,25 6:8,13 7:4
  7:5,20,22 19:20
  19:24 20:11 24:17
  25:1,11,16,23
  26:7,11,15,22
  27:1,2,7,13,18,24
  28:4,8,16,20,25
  29:7,16,21 30:7
  30:14,24 31:4,17
  36:23 37:1,9 38:4
  40:12,18,22 41:1
  41:3 42:22 43:4,6
  45:20 46:10,17,24
  47:5,10 49:2,11
  49:15,19 52:5,7
  53:19 54:1,3,9,13
  55:5,9,13,16 65:6
  65:13 66:3,18
  68:8,23 69:15,23
  70:9 74:11,25
  76:5,9,23,24 77:7

  77:22 78:15 80:23
  82:6,11,16,20
  83:6 89:17 90:19
  90:23 91:6,13,17
  91:23 92:2,5,11
  92:22 94:25 106:4
  109:13,22 110:2,6
  110:11,13,22
  112:2,8,11,15,20
  113:12,16 114:10
  116:7,11,16,21
  117:2,6,13 119:22
  120:11,20 128:17
  128:21,25 131:15
  134:4,21 135:7
  140:16,20,25
  141:3,20 144:15
  144:17 145:2,5
  148:13 150:13,19
  151:1,21,25 152:5
  152:7 153:17,24
  154:23 159:16
  160:15 161:12,14
  162:19,23 163:4
  164:6,8,17,21
  166:22 167:5
  169:21 170:15,20
  171:23 172:4
  173:20,25 174:4
  174:14 177:5,9,13
  179:11,15 180:4,9
  180:13 181:3,8,12
  181:15,22 182:2,7
  182:12,21,25
  183:7,17,24 184:3
  184:8,14,19 185:5
  186:22 187:1,24
  188:11 190:11,23
  191:4,11,19
  192:22 193:7,10
  194:11,15 197:25
  202:18 203:4
  204:2 205:25
  206:4,12 207:1,8
  207:13,19 208:2,6
  208:8,10,12,23

  210:7,9,15,21
  211:3,10,18,25
  212:9 213:4 214:1
  214:17,25 216:9
  217:6,10,12,14
  218:12,17
**budget** 15:14
**building** 37:21,24
  38:6,10 40:6
  41:17
**built** 37:23 147:24
  149:12,13
**bunch** 73:16,17
  192:17
**Bureau** 18:7
**buried** 96:19 98:8
**business** 17:1 51:23
  63:2 67:24 135:9
**busy** 13:20
**buy** 186:12
**bypass** 89:7

      **C**
**cab** 36:11
**cake** 148:25 149:23
  151:12,17 174:22
  176:9,17,24
  177:18 188:10,18
  196:2,8 199:18
  203:17 204:9
  206:23
**California** 1:21,23
  2:23 5:16,19 7:14
  81:8 83:1
**call** 11:25 48:15,18
  49:3 50:10,11,19
  50:22 51:25 53:8
  81:7 103:25
  109:23 129:5
  134:19 141:18
  153:11 202:6
**Calle** 1:21 7:14
**called** 22:5 59:3
  60:16 84:16 86:22
  98:20 115:20
  148:5 166:1

  189:10 204:14
  211:6
**calling** 173:1
**calls** 14:11 185:12
**camera** 53:25
**Camino** 1:23 5:18
**canal** 1:7 5:5 44:5,8
  75:12,14 78:5
  128:6 149:11,21
  171:12 206:14
**caps** 201:17,20,23
**car** 149:17,20
**care** 65:19 120:8
  150:22
**cares** 65:21 164:18
**Carondelet** 2:8
**carried** 120:4
**carry** 60:24 134:15
  136:2
**carrying** 120:3
**cars** 72:24
**case** 5:6 12:6 44:4
  51:3 52:19 53:22
  62:13 70:24
  101:16 129:11
  145:6,14 152:8
  157:18 181:2
  187:16
**cases** 15:11 45:2,8
  157:6 209:21
**casual** 103:3
**Caterpillar** 205:1
**cause** 37:20 62:1
  67:3 77:15 78:10
**caused** 59:13
**causes** 45:3
**cave** 40:2 41:11,21
  44:20 45:14 77:11
**caved** 45:3
**caves** 44:16,17,25
**caving** 39:16,25
  40:2 66:24
**cc'd** 137:12
**cc'ing** 122:7
**center** 201:12
**certain** 52:12,13

O'CONNER, DENNIS

8/13/2008

Page 225

71:10 77:25
118:10,23 158:17
159:6 199:9
213:12
**certainly** 16:6
126:10 136:5
162:7 181:4
**CERTIFICATE**
220:2 221:2
**certification** 3:11
**certified** 2:25 3:21
5:13 189:2 221:5
221:21
**certify** 220:6 221:5
**cetera** 87:9 118:22
133:11
**chalk** 72:4 73:12
**change** 9:10 22:3
30:1 31:9 45:4
**changed** 17:11
135:24
**changes** 220:9
**channel** 89:4,4,6,7
89:11
**characteristics**
58:2,21 75:17
**chart** 200:18
**chat** 171:19
**checks** 139:10
**chemical** 84:5
**chemist** 146:10,10
**choice** 134:22
**choose** 145:12
180:19
**chronological**
150:1
**circuit** 31:20
**circumstance** 46:7
**city** 60:12 145:21
**civil** 1:7 2:19 3:7
147:20
**claim** 13:14
**Claims** 17:25
**clarify** 121:4
125:11 134:5
135:8

**classes** 16:12
**classic** 74:9
**clay** 179:4 209:23
213:21 217:16
**Clayman** 2:12 6:15
6:16 151:15 172:2
211:15,23 217:4
**clays** 167:9,10,21
**Clayton** 111:22
112:23 124:19
125:3
**clean** 98:14 140:10
140:15,19 189:2
209:12,16
**clear** 60:9 92:16
165:5 212:2
**clearly** 142:7
155:11 216:10
**client** 15:9,10 35:12
35:17 50:19,21
52:18 55:3,4 79:5
**client's** 35:17 43:19
**climate** 79:1
**close** 23:9 31:25
33:5 34:1 38:2,14
39:2 43:21 45:12
46:2 56:19 57:1,2
57:3 81:13 179:5
200:3
**closure** 85:11
**Coastal** 178:1
**cofferdam** 147:22
147:24 148:1
149:12,14 154:12
154:16 156:7
157:10 168:24
179:23
**cofferdams** 147:25
148:7,18,19,20
**coincidence** 127:6
**cold** 39:20
**collapse** 43:23
**collapsing** 67:23
**college** 16:10,11
**collegiate** 16:16
**colon** 129:15

**combination** 167:8
**come** 39:2 64:5
79:20 102:3
104:19 113:3
122:5 143:21
152:15 155:21
187:10 215:24
**comes** 44:6 51:10
53:6 55:3 64:3
67:9 177:23,24,24
184:18
**coming** 11:21
110:1 114:5
**Commissioners**
130:8
**common** 141:14
**communicate** 8:22
9:12 56:7 105:12
136:23
**communicated**
10:6 104:10 105:6
107:2
**communication**
12:3 102:21
103:24 104:3
143:14
**communications**
131:18
**compact** 71:7
170:13 198:14
**compacted** 195:8
199:3,21 201:6
205:1
**compaction** 189:3
195:24 197:18
198:7,9,24 199:7
199:10,15
**compactness** 71:10
**companies** 152:14
**company** 15:7,8,16
17:9 22:4 111:13
118:3,5,24 132:19
178:3
**complaining** 13:25
**complete** 127:21
154:17,21 157:4

**complex** 133:5
**complied** 118:10
**comply** 119:11
**component** 21:17
22:15 84:12
**Compound** 210:5
**concept** 42:12 47:8
**concern** 71:17
**concerned** 196:14
205:21
**concerning** 128:3
**concerns** 45:13
81:2 205:15,16,17
**conclude** 23:20
88:12
**concludes** 218:20
**concomitant** 194:3
**concrete** 176:10
179:23 209:10,14
**condition** 59:13
67:6 79:4,4
**conditions** 32:2,8,9
34:6 60:22 61:7
66:7 170:10
171:12 206:14
**conduct** 72:19
73:10 171:13,15
206:15,18
**conducted** 73:24
77:15 197:2
**conducting** 80:5,9
**conducts** 171:7,15
**conduit** 59:15 78:6
**conferred** 115:17
**confirm** 189:7
193:11
**confused** 42:14
89:5 104:13,23
159:6
**connect** 66:22
**connected** 42:18
**connection** 15:24
21:3 45:1 59:20
71:5 75:6,16 96:8
143:20
**consider** 23:11,12

61:10 69:14,17
70:2 123:19,20
200:23
**considerable** 16:3
86:6
**considerations**
23:8 76:14 79:7
**considered** 53:4
74:6
**Considering** 23:2
**consist** 58:13,17
82:1
**consistency** 58:9
**consistent** 124:22
**consists** 62:17
**CONSOLIDATED**
1:7
**Consolidation** 5:5
**constantly** 158:24
**construction** 14:18
14:21,22 15:3
16:13 17:1,4,24
22:10,11 43:10
50:17,18 52:19
142:17 197:22
**consult** 53:11
**consultation** 18:10
**consulting** 17:17
18:3
**contact** 15:9
106:21 112:25
113:4,5 117:11
126:8,22 143:9
**contacted** 101:4
107:25 108:12
117:23 126:13
127:1
**contained** 144:19
167:19
**contaminants** 84:2
84:4 94:12
**contaminated** 93:6
93:9,12,19 94:21
95:1 156:10
159:24 169:8,11
205:6 209:5,10

Johns Pendleton Court Reporters

800 562-1285

O'CONNER, DENNIS

8/13/2008

Page 226

211:7 215:11,12 216:2
**contamination** 62:14 63:9 90:8,9 94:3 96:23 156:10
**contemplated** 90:2 93:1
**contemplating** 90:15 93:24
**content** 199:5,9,23 200:14,15,17,20 200:24
**contents** 86:9,15
**context** 10:4 74:19 122:22 124:8
**continually** 213:16
**continue** 18:18 179:3
**continued** 11:21
**continuous** 19:13
**continuously** 19:15 213:17
**contract** 15:10 90:2 100:23 119:7 143:16,17,23 144:3 157:1 191:16 216:6
**contracted** 111:13 147:25
**contracting** 53:11 54:22 56:8 79:14 80:1 212:16,18
**contractor** 144:9 157:12,13 178:17 188:8,20 199:13 204:23
**contracts** 118:7,20 118:21
**contrary** 55:1 195:11
**control** 23:24,24 24:9 31:25 32:19 32:25 33:3,5,21 33:25 34:20 36:16 36:17 56:18 58:24 59:21 60:14 61:14

62:1 63:14 64:14 64:23 65:21 66:2 77:10,13 78:3,9 96:4,7 104:6 115:1,4,5 137:8 137:20 138:9 139:6,9,15 140:11 163:1 166:3,4,7 172:8,9 193:1,2 196:15 201:13
**conversation** 26:5 26:8,12 102:19 103:3 137:5 140:2 142:2
**coordinate** 112:22
**coordination** 142:16
**copies** 113:24
**copy** 106:3 113:11 113:19 127:25 136:6 137:10,16 137:23,24 140:10 153:15 217:5
**copying** 54:4
**cork** 71:19,21,22 71:23 72:12 73:11 74:9
**corporate** 114:23 115:14
**Corporation** 218:25
**Corps** 51:3,6 83:16 84:21 85:5,6,24 87:20,22 89:1 95:17 100:21,24 102:6,15 103:12 103:15,16,25 105:1,12,15,19,19 111:14 119:7 122:1,6,6 123:4 129:19 136:23 137:15,23 138:11 139:8,21 140:2,6 140:7 145:13,17 145:22 147:9 152:18,18,22

157:24 158:6 160:3,8 161:18 166:7 172:9,15 173:4 175:2,24 176:14 180:5 186:1,3,10,18,19 196:17 198:3 202:9,10,14 205:8 205:13,17 213:15
**Corps's** 172:25
**correct** 13:12 15:20 15:21 20:20 53:12 56:12 81:12 105:8 132:7 134:1 136:15,19 139:22 142:3 155:10,15 155:18 169:13 174:20,24 175:4 176:3 186:2 206:20 209:1,7 220:6 221:12
**correcting** 152:2
**correction** 220:18
**corrections** 220:8 220:16
**corroborate** 130:4
**cost** 175:10,12 205:18,20,22
**counsel** 2:5 3:4 5:22 6:1 7:6,19 9:17 20:4 113:11 114:1 134:18 145:7 221:13,14
**couple** 12:23 203:12
**course** 23:17 62:21 175:5,18 203:10
**court** 1:1 2:25 3:21 7:8,10,16 221:5 221:21
**courteous** 180:16
**Court's** 31:16
**cover** 118:4 138:9 209:4 212:23
**create** 44:7
**created** 159:8

162:11 169:17
**creating** 43:23
**cross** 50:4
**CRR** 2:24 3:21 221:4
**CSR** 2:24
**cubic** 187:20 189:14 190:2,19 193:18,24 194:2 215:18,21
**culled** 156:8
**cumulative** 193:21
**curious** 92:24
**curiously** 179:2
**current** 83:11
**currently** 9:18
**cut** 38:14
**cuts** 197:16
**C-1** 144:19 146:3
**C-12** 145:1

_____

**D**

**D** 2:8,24 3:21 4:1 6:5 221:4,20
**daily** 166:6 190:15 191:18 192:9
**dam** 22:19 24:10 60:15 61:14
**damage** 23:23 32:25 33:2 34:19 37:21 41:21 45:15 52:24,25 53:1 58:4 62:1 63:14 65:20 129:16 196:15
**damaging** 66:7
**data** 86:22 87:2,4
**date** 5:9 19:1 81:10 81:12 127:6,8 128:2 130:3 150:12 154:2 162:22 188:1 189:14 190:17 192:23 194:4,16 220:13,20
**dated** 87:6 127:25

129:22 130:2 142:4 151:5 174:12 191:17 211:20
**dates** 192:18 193:12
**day** 1:22 2:11 10:23 11:19 13:4 21:15 50:25 127:14 166:8 193:12,14 194:5,9,9
**DCS** 104:4
**deal** 13:20 34:7 60:17 80:7 174:18 184:17 188:20
**dealing** 17:22 66:1 70:16 72:7
**Debra** 2:12 6:16
**debris** 209:14
**December** 87:7 151:5,8
**decide** 8:16 38:9 54:18,18 62:8
**decided** 168:8,10
**deciding** 47:18
**decision** 75:17
**deep** 45:25 57:4 62:17 73:3 80:3 90:9 95:21 96:20 96:20,22 98:8 169:16
**deeper** 90:8,10 94:3,12 95:25 96:16 97:21 99:4 99:11 149:8
**deepest** 73:4 88:15 88:21 148:21 149:4
**defending** 180:22
**defining** 34:19
**DeGaulle** 133:17 135:11,13
**degree** 16:10,11,16 16:18,23 17:3 18:20 36:4 73:23 74:12 79:2

O'CONNER, DENNIS

8/13/2008

Page 227

delivered 187:20 189:1,10,13 190:15 193:18,24 194:18
delivering 194:2,6
demolition 84:12 98:21
Dennis 1:20 5:4 7:13 141:24 218:21 220:4
density 62:22 199:16 200:15,17
Denvalt's 168:21
Denver 20:20 83:12 115:3 117:12 118:18
Department 2:18 87:22 115:15 116:1 117:17 121:17 122:1,8 125:16,20,23 126:8,9,14,17,24 127:1,23 130:17 131:7,19 138:23 152:24
depend 45:25 46:1 46:1 57:4 79:18 159:22,25 170:4 198:17
depending 15:9 50:24 62:3,12,17 62:22,24 63:15 86:16 158:9,21 198:12
depends 14:24 28:23 33:11,12 45:19 47:8 50:13 61:16 71:18 74:14 84:2 201:9 215:20
DEPONENT 220:15
deposition 1:19 3:5 3:16 5:3,17,20 7:25 9:18 10:1,5 10:19 11:7 13:10 46:22 82:8 106:1

116:19 131:5 212:13 218:20
depositions 113:23
depth 47:23 49:18 52:12 56:18 57:12 89:3 99:7,16 195:1 204:20
depths 91:5
DEQ 194:25 202:3 202:4 205:11,14
describe 167:3 169:4 200:21
described 56:21 194:19 205:5
description 12:13 58:11
descriptor 168:9
descriptors 169:1,4
designed 41:24
designing 147:22
designs 147:24
desk 104:19,21
despite 99:2
determination 49:9 50:8 72:17
determine 36:3 37:19 44:1 62:14 70:19 73:18 100:7 147:3
determined 89:2
determines 70:11
develop 18:15,16 84:20,24 176:15
developed 10:7,8 50:25
development 121:18 132:25 133:6,12
Diego 1:23 2:23 5:15,19
difference 74:17
different 14:25 31:6 33:17 58:19 60:22,23 61:4,22 61:23 169:1 192:17 198:2

201:2
difficult 33:12 76:12
difficulties 107:12
dig 35:13 37:25 38:2 43:21 49:22 56:17,22 57:15 58:13 69:8 70:20 71:1 73:13,19,21 75:5,8,9,11,18,18 75:21,23,24 76:13 80:2,3 90:10 161:19 162:8
digging 33:20,22 33:24 34:15,21,22 35:5,7 36:15 38:6 38:11 46:1 55:23 57:5,8,25 76:2
digital 2:23 5:14 218:22,24
diploma 16:9,11
direct 52:21 79:6 132:8 197:15
directed 35:10 51:8 92:23 93:14 100:24 156:23,24 160:3,7 161:16 162:3,4,8 173:13 185:22
directing 132:10
direction 18:6,7 50:18,20 78:1 143:13 156:18,20 158:6 163:23 186:10 204:6 221:11
directions 18:14 37:15 141:12 143:8 205:13
directive 198:11
directly 17:7 102:7 204:25
directs 161:4
dirt 42:6 157:13 158:15,15 164:1 165:12,13,14,15

201:1
disagree 117:5 165:25 208:13
discovered 174:23 175:1 176:8
discussed 13:22 50:23,24 51:6 108:2 147:2,11
discussing 188:18
discussion 20:1 54:22 63:8 76:7 108:15 109:18 110:20 114:8 135:2 144:23 177:11 179:13 184:25 190:9 196:21
discussions 132:20
disengage 83:10
display 200:18
disposal 213:19 214:9,10
District 1:1,2 5:7,8 100:22 101:22 102:9,22 103:1,14 104:2,14 105:1,5 105:11 106:17 108:13 109:5 111:8 122:3,7,17 122:22 124:1,5,11 125:3,12,17 126:13 127:9,24 129:4 132:22 135:13 136:14,25
Division 2:19
document 82:4 90:13,25 91:3,4 92:7,8,12,13,19 94:10,15 98:19 99:7 104:6 106:6 109:10 110:17,24 114:22 115:1,2,3 115:5,7,15,16 116:2 117:16 120:22 122:21 124:2,4,8 130:11

130:16 132:2 137:8,19 138:8,24 139:6,7,9,15 140:11 153:10 157:18 160:21,24 161:1,9,11 162:9 162:15 165:3,7 166:11,12 168:11 176:5,13 177:3 181:6,19 182:1,6 182:11,17,19 184:17 186:20 187:15 188:1 189:8 190:12 192:15 209:3 210:10 211:7,8 212:7,24 213:10 216:18
documentation 141:15
documents 10:25 11:1,2,10 83:3 93:18 95:19 113:24,25 121:5 125:13 132:13 137:10 153:3 179:10 187:23 204:12
document's 114:14
doing 14:17 18:13 21:10 30:17 33:5 42:3 44:12 57:5 77:3,14 94:2 101:3 102:17 107:4,14 108:4 121:9 130:15 136:18 143:12 147:7 158:21 166:9,10,13,17 170:9 181:14
door 41:18
doubt 218:5
dozen 23:5
dozer 209:22
draft 84:17 85:22 86:19 177:25

O'CONNER, DENNIS

8/13/2008

Page 228

drafted 88:13 127:20
drafting 85:13 86:1 99:20 176:21
drainage 197:4
drama 54:12
dramatic 53:20
drawing 128:14
dredging 89:10
drill 63:16
drilling 68:21 72:6 94:11
drop 48:2
drove 39:19
drums 98:12
dry 69:2 70:22,25 71:4 149:11
dug 38:21 44:24 45:7 78:2 156:13 200:12 206:21
duly 7:15 221:7
dump 172:18,19
dumping 97:2
DUVAL 1:9
D.C 2:13,20

**E**

E 4:1
earlier 71:8 123:2 143:9,13 149:1 152:25 197:3
earliest 21:16 142:13
early 88:7 132:24 174:16
earning 47:1
Earth 17:12,17
Earthtech 17:13
east 128:6
Eastern 1:2 5:8
eat 9:7
education 16:8
efficient 75:24
efficiently 77:16
effort 52:19 79:24 79:24

Ehrlich 2:18 6:24 6:25 45:16 65:9 80:15 82:14 106:2 109:11 113:9,14 113:21 114:6 141:5 144:20 153:12,20 154:1,8 161:7 162:17 173:17,23 174:2 176:25 177:7 179:7 180:1,6,11 180:24 181:5,10 181:17 182:18,23 183:3,12 186:24 188:2 190:21 191:8,13 202:23 218:15
eight 176:9
either 8:23 15:2 23:25 24:8 31:24 33:5,24 34:3 46:16 47:14 54:18 59:20 79:3 102:6 102:12 104:10 107:2 117:12 123:5 127:18 152:17 185:13,17 185:19 192:10 196:24 204:8 218:4
El 1:22 5:18
elevation 197:7
elevations 197:4
else's 35:16
email 102:7 103:24 136:1 139:19 140:2
emails 103:11 142:8,10
employed 9:18 14:4 19:16
employee 101:15 132:21
employees 131:6
employer 32:24
employers 19:6

employment 18:18
enable 43:24
Enclosed 113:6 114:12
encounter 32:9,12 33:10 53:7 54:17 62:18 72:12
encountered 34:21 37:22 59:19 73:9 74:15
endeavor 9:10
ended 36:6
ends 64:4
engineer 16:20 47:15,24 48:1,8,9 48:11,14 49:22,24 50:23 53:9 143:19 144:10 147:6,8,12 147:13,15,17,18 147:20 148:1,1,5
engineering 58:11 144:11 178:12,22 202:10
Engineers 105:2 111:14 119:8 122:1 136:24 137:15 139:21 145:22 161:19 175:24 196:17 202:9 205:8
enjoy 182:9
enlarged 218:6,9
ensure 43:19 79:8 144:10
entire 167:14
entitled 174:11 180:7,18 181:6 214:7
enumerated 32:1
environment 23:13 23:13 32:3
environmental 21:3 22:10 83:20 83:24 84:1,8 87:22 132:18 178:1

equal 115:5
equipment 8:5 32:10 52:15,24 55:24 198:13
equivalent 215:22
Escatech 17:15,16 17:18 18:1
especially 148:6
ESQ 2:3,4,8,11,12 2:18
ESQUIRE 2:16
essential 137:12
essentially 14:18 18:3 56:12 81:23 121:10,19 166:15
establish 54:15 156:25
established 21:21 31:21 65:19 160:5
estimation 119:2
et 87:9 118:22 133:10
evacuate 149:19
evaluate 18:11,13
evaluating 172:25
evaluation 58:3 202:11 207:14
events 11:11 192:5
eventual 17:12 153:8
eventually 64:2 84:24 175:8
everybody 35:18 100:5 124:22 137:11 212:1
evidence 3:17 116:10,13,20,22 117:1,3
evolved 13:19
exact 89:3
exactly 112:24 133:8 152:9
EXAMINATION 4:24,24,25,25 7:20 20:11 25:23 31:17 37:1 38:4

41:3 42:22 43:6 45:20 46:24 47:10 49:2,19 52:7 54:13 55:16 65:6 65:13 66:3,18 68:8,23 69:15,23 70:9 74:11,25 76:9 77:7,22 78:15 80:23 82:11 83:6 89:17 92:5 92:22 94:25 106:4 110:13,22 112:2 112:11,20 114:10 117:13 119:22 120:20 128:25 131:15 134:4 135:7 141:3,20 144:17 145:5 148:13 152:7 153:17 154:23 159:16 160:15 161:14 163:4 164:8,21 166:22 167:5 169:21 170:15,20 172:4 174:14 177:13 179:15 180:4 181:15,22 185:5 187:1 188:11 190:11 191:4,19 193:10 194:15 197:25 203:8 204:11 206:9 207:25 208:5,10 208:14,23 210:9 211:3 212:20 213:8 214:3,21 215:2 216:9 217:10,14
example 38:5 39:3 42:1 43:20 48:6 49:4 52:10 72:4 74:8,9 75:20
excavate 35:14,15 35:24 36:2 37:16 71:13 88:16,22

O'CONNER, DENNIS

89:6 90:4 194:24
200:7 217:11
**excavated** 37:23
72:20 73:2 154:14
155:9,13 156:12
170:6 172:16,17
179:5 195:2
209:15 213:20
217:15
**excavating** 34:14
168:6,19 201:11
209:13
**excavation** 34:24
35:2,4,9,19,22
37:13,20 38:13
42:2,3,4 44:2,4
52:12,16 57:25
66:24 76:2 84:5
149:8 154:13
163:13 164:11
168:25 174:12
196:2 203:16
209:17 213:19
214:9,10
**excavations** 22:9
59:20 96:22
148:22 149:5
161:21 185:12
202:11 203:19
209:23
**excavator** 198:15
200:4,6,7 205:2
**exceed** 48:5
**exception** 88:14,20
90:3 157:8 220:8
**exceptions** 146:1
**excess** 119:3
**excessive** 209:14
**Excuse** 144:22
**Executive** 86:21
**exhibit** 4:3,4,4,7,8
4:9,9,10,11,11,12
4:13,14,15,16,17
4:17,19,20,21,22
4:23 82:5,7,22
85:15 90:13 92:18

106:1 109:9
110:15 113:10
121:2,7,14,22,25
122:14,16 124:13
125:14 127:8,22
129:22 137:16
141:21 150:1
153:22 162:13
172:13 174:6,10
177:22 179:22
185:7 187:13
191:10,12 192:20
193:17 199:1
210:11 212:8,12
218:13
**exhibits** 174:7
**exist** 24:8 56:17
**existed** 59:23,25
60:22
**existing** 128:4
203:24 213:13
**expect** 135:20
**expected** 100:20
146:24
**expecting** 136:3
**expense** 129:18
**experience** 15:19
24:5,5 31:22,23
53:14 55:22 56:15
60:13 94:7 96:17
115:19 123:7
171:11 173:9
206:13
**experienced** 118:16
**expert** 146:20,25
207:3
**expertise** 148:4
**explain** 14:14
26:21 27:1 29:6
29:11,23 39:13
42:25 50:14 55:18
61:11 83:24
133:15
**explained** 30:19
74:8
**explaining** 29:10

162:12
**explanation** 30:22
**extended** 200:7
**extent** 57:24
213:23 217:17,21
**extra** 76:19 197:18
**extract** 149:14
**extremely** 71:23
75:23 76:4 198:16
**eyes** 187:19

---

**F**

**F** 212:17
**fabric** 209:16,20
**facilities** 128:5
**fact** 33:4 37:14
44:17 56:21 69:5
72:13 73:21 80:4
81:5 84:22 88:25
90:24 95:8 114:11
115:25 121:20
123:21 124:11
125:24 141:9
143:3 170:10
174:17 178:24
206:21 209:25
210:2 216:18
**facts** 116:10
**fair** 8:23 11:5 14:1
14:2 23:19 33:19
49:8 60:4 75:9
76:20 88:11 95:19
97:19 124:7
134:16 216:25
**fairness** 112:3
123:23 126:11
**fall** 19:17 38:24
39:6 40:10 43:21
43:22,24 56:24
75:25 88:7
**falling** 42:1 52:15
**falls** 170:14
**false** 140:4,5
**familiar** 117:24
187:21 202:8
**far** 16:5 57:24

101:18 133:13
**Federal** 3:7
**feel** 9:7 142:23
**feet** 48:7 57:8 88:17
90:5,15 91:1 93:3
93:7,25 94:4,13
94:21 95:21,25
96:16,22 97:21
99:4,12 143:5
169:16 195:1,8
201:12 202:12
204:20
**fellow** 8:5
**fence** 142:17
**field** 101:3,17
**fifteen** 110:10
**figure** 31:19 38:15
65:7
**file** 136:6 139:8
**FILED** 1:10
**filing** 3:12
**fill** 34:22 36:13
75:22 80:7 155:4
155:13,16 159:7
159:21 163:11,12
164:10,23 165:6
168:7,8,15,19
169:11 189:1,2,19
190:6 193:13
195:14 205:4,5,19
209:13 211:1
215:11 218:4
**filled** 78:4 171:13
191:21 203:19
206:15 209:14
**filling** 35:5 158:22
**fill/sand** 209:3
**final** 85:22 86:19
86:19 150:17
151:3,5 153:9
179:24 185:7
**finally** 129:21
**find** 27:9 63:10
64:21 65:18 91:7
94:12
**fine** 41:2 52:6 73:7

91:24 93:5 94:9
95:23 96:2,3
116:8,22 117:7
123:16 125:10
150:24 152:2
161:13 165:4,15
166:2 168:5,17
173:4 182:3
183:13
**finish** 107:8 110:3
**finished** 28:21 29:2
29:5 44:14 88:9
170:19 181:16
**firm** 178:12
**first** 9:16 16:25
17:7 18:21,25
21:15 35:8 51:11
53:11 54:17 81:4
86:23 87:11
112:16 126:25
133:1 149:25
152:12 175:15
177:23 212:21
213:1 214:6
216:19,21 217:20
221:7
**fit** 61:21
**five** 108:7
**flew** 11:18
**float** 15:1
**flood** 22:18 23:9,24
23:24 24:9 31:25
32:19,25 33:3,5
33:21,25 34:20
36:15,17 56:18
58:24 59:21 60:14
61:14 62:1 63:14
64:14,23 65:20
66:2 77:10,12
78:3,9 96:4,7
128:5 169:23
171:2 196:15
198:23 201:12
202:12
**flooding** 67:6
188:23 195:9

O'CONNER, DENNIS

204:24
**fluids** 59:15 61:1
**focus** 32:4
**folks** 13:6 38:18
39:11 43:9 127:2
146:4 196:17
**follow** 216:10
**followed** 197:15
**following** 118:3
141:12
**follows** 7:17
**foolishness** 180:17
**foot** 47:12 48:7
57:9,16,16 60:12
73:5 89:1 90:8,11
93:17,19 96:20,20
154:14
**foremost** 52:14
**forget** 169:6
**forgets** 32:17
**forgive** 43:14 83:23
**forgot** 211:5
**form** 3:14 11:11
24:15 29:24,25
30:21,25 31:5,8
31:13 35:24 45:17
46:9,13 48:24
52:4 53:17 64:25
65:10,23 66:16
68:14 69:10,19
74:2 77:19 78:13
80:13 114:19
116:6 148:9
169:19 170:1
172:15 207:12
210:5
**formal** 130:10
**formalities** 3:9,11
**forms** 39:15
**forth** 118:17
176:12 192:5
221:8
**forward** 193:23
**found** 91:10 98:5
126:6,22 155:8
**foundation** 36:9

38:22 77:12
169:23 171:16
179:23 206:18
207:4 208:7
**foundations** 176:10
**four** 14:25 73:8
92:24 218:22
**fourth** 162:16
**frame** 15:14
**frankly** 9:13 13:19
60:5 180:17
**freelance** 35:23
37:25
**front** 145:8 154:3
216:24
**fulfill** 123:14
145:15
**fulfilled** 118:16
119:6 120:6
**fulfilling** 108:2
**fullest** 213:23
217:17,21
**funded** 213:17
**funding** 213:14
**further** 60:25 91:5
128:14 203:6
211:11 212:2
**future** 8:15 39:12
95:3 197:17

---

### G

**G** 12:19 187:21
189:9
**gallon** 158:24
**games** 92:3
**gaps** 86:22 87:2,4
**gate** 107:13
**gather** 37:18
**gathered** 87:21
**gathering** 48:12
**general** 36:12 56:4
56:5 59:1,9 60:18
82:1 86:11 115:22
133:17 135:11,13
154:25 167:22,23
178:25 198:11

**generally** 15:5 77:9
**generated** 114:18
175:23,25 176:14
**generic** 57:13
165:10,11
**gentleman** 9:25
12:9
**Geography** 16:24
**geological** 21:8
59:13
**geologist's** 62:6
**geology** 16:24
20:23 23:17 32:11
32:15 64:2 79:1
**George** 12:18
**geotechnical** 20:23
21:8 143:18
144:10,11 146:20
147:1,12,15
**gesturing** 54:2,5
**getting** 112:9
125:11 195:22
**Gil** 187:21 190:20
211:2
**give** 8:3,25 18:13
58:12 65:3,15
86:10 112:12
119:25 130:12
144:7,14 145:7
174:8 175:17
180:18,19 189:6
215:19 217:18
**given** 7:25 68:7
120:24 131:3
197:13 203:14
208:17
**gives** 69:13 70:6
**giving** 29:12 215:8
**glad** 207:23
**go** 5:22 16:5 20:18
33:17 39:1 45:22
48:1,8 52:11
58:11 62:17 67:11
68:4,21 73:3,5
78:7 83:12,16
84:23 87:23 89:1

93:3,24 94:12
95:24 96:15 103:6
121:11,16 126:23
127:2 133:8,14
144:8 145:9
149:14,20 173:14
178:6 183:19
184:6,9,12 186:12
193:22,23 202:24
210:6
**goal** 32:24 62:14
**goals** 84:8 100:7
144:11
**goes** 34:9 56:11
67:10 121:17
193:25
**going** 21:11 23:12
25:8 29:1 32:16
35:13,14,15,20
36:3,4,5,7,9 37:3
37:7 46:11,21,23
48:6 51:1 52:11
52:14 54:16,18
56:14 57:24 58:1
66:6,9 67:17
68:17 69:1,7 70:7
71:5 72:19 79:3
79:20 80:8,9 81:5
81:15,20 82:19
84:12,22 88:22,25
89:5 90:10,15
91:1 93:17 94:11
95:3,5,20 96:15
97:15 105:25
107:9,23 108:16
113:22,25 120:14
124:23 126:3
127:2 134:25
135:20 139:14
141:21 142:23
143:4,4 145:24
146:5,7 150:9
152:16 158:10
161:19 170:7
174:3,8 177:3
178:8 182:5 190:5

190:12 192:24
197:5,6 200:12
201:1 202:21
210:11 211:16
212:21 217:2
219:1
**good** 7:21 29:22
85:25 112:18,19
120:10 151:24
152:1 157:22
170:23 207:23
210:8
**gotten** 107:5 111:7
137:16 139:20
**government** 146:17
146:23 185:9
**government's** 18:6
**grade** 154:21 157:5
158:9,17 159:23
185:14 190:4
198:18
**graduate** 16:12
**grants** 130:9
**graphically** 200:18
**gravel** 60:24,25
**great** 13:20 16:1
22:25
**greater** 61:1 67:9
76:11 198:24
**ground** 34:10
64:10,10 70:12,13
70:14 99:17,19
**Group** 2:13,16 6:6
6:17,20,23 9:19
9:22 12:15 13:15
15:23 18:22 19:12
22:6,8 84:16 90:3
99:22 100:20
103:22 105:17
117:17 128:3
130:17 131:4,7,24
133:16,25 135:12
136:13 138:23
143:17 145:14
146:18,24 152:23
191:22 212:19

O'CONNER, DENNIS

8/13/2008

Page 231

218:24
**guess** 42:14 82:7
134:22 190:17
200:8 212:7,12
**guidance** 86:6
**guided** 23:22 47:25
**guidelines** 35:11
71:12
**Guillory** 196:14,25
197:23
**guy** 125:3 166:16
168:8 169:1
180:19 187:20
**guys** 93:2,23 95:20
136:17 174:17
177:16,25

**H**

**half** 10:23 11:13,15
11:18 17:20 23:4
195:1,8 204:20
215:23
**halfway** 36:8
**Hamp** 150:8
179:18,22
**Hamp's** 152:10
176:22,23 177:14
177:16,19 179:20
185:19
**hand** 54:1,5 120:2
120:4 182:19
194:16
**handed** 92:14,20
138:15
**handing** 104:18
**handle** 16:4 56:10
195:4
**handled** 93:10,16
**happen** 33:6,8,16
38:16 59:7 67:5
100:8 147:5
163:24
**happened** 11:14
163:23 207:10
**happening** 8:4
**happy** 22:2 35:7

**Harbor** 128:6
**hard** 15:12 58:9
68:1 71:8
**harm** 38:12,13
170:9
**harmed** 52:17
**hate** 110:7
**hauled** 168:23
209:23
**Hauling** 162:13
163:12 164:10,16
164:23
**hazard** 54:20 55:24
56:2 58:24 61:13
77:13
**Hazardous** 16:13
**hazards** 24:8,12,20
24:23 25:25 31:24
32:5 33:9,23
34:18,19 36:14
38:7 41:16,17
55:23,24,25 56:10
56:17 57:20
**head** 9:15 106:20
142:6,9 168:12
175:13
**headed** 21:20
**hear** 8:9
**heard** 59:5,6 60:3
126:25 202:16
**hearsay** 97:1
**height** 99:7,16,17
**held** 20:1 76:7
109:18 110:20
114:8 135:2
144:23 153:4
177:11 179:13
184:25 190:9
196:21
**help** 97:5 101:14
150:25 152:4
172:22 187:16
**hereinabove** 221:8
**hereto** 3:4 221:14
**heter** 72:25

**Hey** 80:1 127:2
**high** 16:9,11 67:7,8
171:11 206:13
**higher** 71:15
**highlighted** 141:9
**highlights** 217:13
**hill** 63:23 64:1,3
**hire** 147:13
**hired** 17:3 18:5
147:21
**history** 96:24
**hold** 58:19 109:16
111:23
**holding** 173:18
**hole** 34:15,22,23
35:5,6,8,15 36:15
38:6,11,24 39:5
39:16,17,24 40:2
40:7 41:11,12,18
41:20,23 42:13,16
42:17,23,24 43:17
43:22,22 44:16,16
44:17,20,25 45:2
45:3,7,13,14 46:7
48:3 51:21 54:17
56:1,17,22,24
57:9 58:4,23
67:10,11,15,15,16
67:23 68:12 69:8
70:16,17,21 71:1
73:13 74:20 75:6
75:8,10,11 76:13
77:11 78:2,6 80:2
80:7,8,9 155:4,12
155:14,17 157:14
157:21 159:8,21
163:19,21 169:11
169:16,16 171:13
198:12,13,21
199:18,19 206:15
**holes** 33:20,22,24
34:21 43:11 55:23
56:16 63:15 198:2
201:17,23 203:25
204:1 206:21
218:4

**home** 11:21 14:9,11
83:16 146:11,13
**homogeneous**
63:19 72:21,25
168:1
**Homouya** 2:22
5:13
**hopefully** 32:11
63:19
**horn** 190:25
**house** 38:21,24
39:2 40:6,8,10
41:18,22 42:1
43:20,24 44:15,19
45:4,9,11,12,15
45:24 46:2
**houses** 43:12
**huh** 14:12
**humans** 41:16
55:24
**hurt** 41:13
**hydrocarbons**
149:16,20
**hydrogradient**
61:17 63:17,20
64:8,12 78:25
**hypothetical** 36:22
36:24 78:19,19

**I**

**idea** 10:10,11 143:1
143:7 169:7
215:19,20
**ideal** 199:9,9
200:17
**identical** 22:7
**identified** 93:7,9,13
93:16,18 94:22
95:2 102:10 146:9
**identifies** 99:16
**identify** 6:1 97:8
98:5 121:2 142:24
174:5
**identifying** 87:2
209:18
**identity** 148:15

**imagine** 88:5,5
**impact** 32:15 64:22
69:16 70:1 75:5
**impacts** 68:2 70:20
**impair** 56:22
**impairing** 80:10
**imperil** 36:16
**imply** 103:4
**import** 158:2,4
185:13 204:8
**important** 23:7
**importantly** 9:8
**imported** 179:3
213:24 215:14
**importing** 158:1
205:19
**inappropriate**
122:23
**inches** 209:12
**include** 84:12
175:21
**included** 217:22
**including** 24:4
34:22 35:3,4
101:1 118:21
**incorporate** 25:8
**incorporated** 47:24
187:11
**incorrect** 130:24
133:22 160:14
**incorrectly** 166:19
**increase** 194:4
**increasing** 170:11
**incurred** 156:17
**Indian** 17:23,23
18:4,5,7
**Indians** 18:12
**indicate** 29:25
59:23 70:22,23
114:14 121:3
126:12 204:13
**indicated** 97:1
102:6 122:15
124:15 125:16
127:24 129:24
**indicates** 85:4

125:9 157:6
215:10
**indicating** 9:5
44:16 112:14
125:18 140:13
159:5 173:24
**indication** 29:12
**individual** 118:18
145:12 152:13
205:11
**individuals** 83:13
123:9,9 139:11
144:4
**inform** 126:1
197:12
**information** 11:20
24:7 25:20 37:18
57:18,22 65:4,15
68:18,20,22 69:13
70:20 75:7 76:19
85:6,10 87:21,24
97:12 99:9 102:14
103:6 104:5,24
105:13 115:25
117:15 119:13
128:13 137:4
139:21
**informed** 84:19
197:10
**initial** 81:17 154:15
157:8 220:15
**initially** 17:11
87:19,20,24
156:13
**initiated** 113:4
**Inner** 128:6
**input** 11:20
**inquire** 108:13
**inside** 41:12 154:16
157:9
**insofar** 9:4 10:9
**inspected** 209:15
**inspection** 172:6
**install** 128:5
**installation** 179:23
**instance** 70:21

**instigated** 141:13
**instructed** 5:22
**insurance** 115:17
115:18,20 117:22
117:24 118:1,3,6
118:8,17,21 119:6
152:24
**insurances** 118:24
**insured** 119:1
**integrity** 36:17
56:23 64:14 78:11
**intend** 79:21
**intended** 25:2
126:5
**interchangeable**
165:24 168:15
**interchangeably**
173:5
**interested** 221:15
**interface** 102:13
**International** 2:14
2:16 6:6 9:19,22
13:15 15:23 19:12
22:5 103:23
117:17 128:3
130:18 131:4,8
136:13 143:18
146:25 191:22
**interruption** 20:13
**interviews** 124:18
**intrude** 78:7
**intrusive** 95:14
**invade** 34:2
**inventory** 97:6,14
98:21
**inverted** 96:20
**involve** 89:10
**involved** 13:11
35:12 79:5 107:11
153:2 176:23
195:16,22 215:18
**Iraq** 11:18,19 12:8
13:18
**issuance** 129:14
**issue** 51:22 58:6,7,8
59:19 60:17 79:13

90:7 127:20
142:25 205:20
212:5
**issues** 12:5 20:23
21:8 23:7 143:20
202:15 205:22
**item** 34:12
**items** 86:14 127:15
**ITT** 163:10 164:20
164:20,24 168:3
168:23 172:20
173:11 194:21
**it'll** 63:25 200:18
212:7,12

**J**

**January** 189:9
**Jeanne** 2:16 6:22
**Jeff** 2:18 6:25
**Jim** 137:2
**Joanen** 2:4 7:2,3
82:9 113:18 114:3
151:7,11 154:4
193:4 210:13
212:25
**job** 14:24 15:2,12
15:18,24 17:7,19
18:17 19:17 20:13
20:18,18 21:12,16
50:13 51:7,19
60:13 77:4 83:4
101:20,24,25
118:9,19 140:7
143:12 149:5
151:24 152:1
175:12 190:17
194:4 203:20
**jobs** 14:8 15:25
21:2,22 23:2,3,5
59:18 60:6 61:5
**Joe** 26:5 46:21
112:6 151:24
152:4
**Johns** 2:24 3:21 7:9
7:9 221:4,20
**Jones** 1:22 2:11

13:4
**Joseph** 2:3,3 7:5,22
**JTD** 190:16
**Judge** 1:9 8:16
**JUSTICE** 2:18

**K**

**K** 1:8
**Katrina** 1:7 5:5
**keep** 46:15,18 47:2
52:15,16 56:25
67:17,22 75:1
**keeps** 66:24
**kept** 115:2
**kill** 40:4
**kind** 8:22 21:17
31:6 38:22 46:7
48:17 159:20
**kinds** 20:24 21:1
97:2
**knew** 61:8 78:22
80:18 85:9 90:10
94:2,6 95:23 96:1
96:23 97:16,23,24
97:25 98:3,25
99:1,3 100:3,15
109:4 118:15
143:3 148:5
171:18 174:17
**know** 8:25 9:1 10:9
10:16 12:4 13:9
13:10,24 14:15
15:22 20:22 22:3
22:16 28:11,13
33:21 38:20 39:4
39:9 42:14 43:7
43:10,11,12,13
45:23 46:6 47:6
47:14 48:5 49:18
51:12,14,16,22
52:11,13 53:7,13
56:1,1,6,6 57:21
59:6,7,24 60:10
60:17 61:15 62:2
62:6 63:23 64:12
64:20 69:3 70:15

71:4 76:17 77:24
77:25 78:1,16,23
79:2 80:21 81:22
84:10 90:9 91:19
92:25 94:14 96:3
96:14 98:8 100:10
100:11 103:19
106:6,10,24 107:3
107:14,16 108:3
108:11,19 113:22
115:10,17 116:15
117:25 122:24
123:21 124:14,23
125:19 126:3,4
129:8,8 131:10
132:14,15 133:11
135:23 136:10,17
138:2,14,17,17,21
142:19,22 143:16
147:20 155:8,23
156:3,5,8 171:10
173:18 174:9
175:2 178:2,13,22
182:13 183:20
190:16 192:16
193:5 199:2
201:10,15 205:9
206:12,22 211:16
218:9
**knowledge** 20:22
24:7 31:23 37:2
43:10,18 55:22
56:14 79:12 86:17
100:18 115:24
123:6 124:9
131:17 132:1
163:22 187:5
202:14 205:18
**known** 108:1
**knows** 36:20 46:19
51:20,21
**Knudsen** 18:24
19:10,11 24:5
83:12
**K-2** 5:7

O'CONNER, DENNIS

8/13/2008

Page 233

## L

**L** 3:1 187:21 189:9
**lab** 199:8
**labor** 79:24
**lack** 12:12 58:10
**ladies** 9:24
**laid** 207:3 208:6
**land** 17:22
**Landry** 112:3
**lands** 18:11,15,15
**large** 18:20 23:3
  76:4 148:18
**larger** 92:17
**late** 87:14 88:7
**laterally** 78:9
**latest** 174:9
**laughs** 160:22
**law** 2:3 3:8 13:3
**lawn** 49:23
**lawsuit** 13:10
**lawyer** 12:25 13:2
**lawyers** 8:10,21
  112:12 114:7
**layer** 78:8 80:9
**layers** 62:15 80:4
**leading** 204:3
**leaking** 96:21
  98:10
**leaned** 54:10
**learn** 9:2 26:1 32:5
  32:7 191:6
**leave** 44:3 169:7
  198:1
**leaving** 183:13
**Lee** 197:10,10,23
**left** 20:17 44:5
  52:25 203:20
**legal** 2:23 5:12,13
  5:15 115:14 116:1
  117:16 130:17
  131:7,19 132:13
  138:23
**Lester** 12:9
**letter** 106:16,25
  107:16 108:7

109:4 111:12
114:19 120:23
121:7,11,14,17,25
122:5,10 125:9,16
126:15 127:9,22
127:25 129:21
130:2,20 131:2,9
131:19,22 133:16
134:11 135:9,12
135:17 142:18,22
212:16,23
**letterhead** 122:11
  129:25 130:1
  136:3
**letters** 127:10,20
  130:5 133:10
  142:11 143:10
**letting** 142:18,22
**let's** 16:7 31:18
  33:19 34:13,17
  35:7,11 38:5 57:3
  57:7,8 60:9 63:5
  72:3 79:10 92:3
  134:23 140:14
  149:22 167:6,16
  171:19 173:14,15
  174:6 177:14,23
  186:20 202:19
**levee** 22:18 24:10
  33:20 56:23 57:13
  57:15 60:15 78:11
  80:11 96:10
  100:13,21 101:7,9
  101:9,22 102:9,22
  103:1,13 104:1,14
  104:25 105:5,10
  106:17 108:12,17
  109:5 111:7
  119:13,16,17
  120:23 122:2,7,17
  122:22 124:1,5,11
  125:3,4,12,17
  126:13 127:9,23
  129:4 132:22
  135:12,19 136:14
  136:25 141:18

142:15 144:12
**levees** 25:25 32:19
**levee/floodwall**
  128:7 129:16
**level** 67:9 78:5
  79:24 84:6 188:22
**levels** 61:19,23
**Liaison** 2:5 7:6
**licensed** 178:17
  195:3 197:9
**licensing** 153:1
**lift** 88:15,20 90:4
  142:20,24 143:3,5
  149:2,3,24,24
  150:9 151:14
  153:6 155:12
  158:18 159:8
  162:14 163:13
  164:11 169:17
  170:24 172:20
  174:18 199:19
  203:16 204:9
  206:23
**lifts** 154:14 198:18
**limit** 63:6
**limits** 209:17
**line** 64:5 162:16
  163:5 172:22
  187:17 201:12
  206:10
**lines** 25:20
**list** 83:2 98:23
  145:17,18
**listen** 43:9 79:14
**listening** 39:12
**litigation** 1:7 5:6
  11:12
**little** 21:1 60:25
  104:12 115:18
  135:17
**loaded** 167:4
  168:23 172:18,19
**loading** 163:10
  168:7,19
**local** 14:8 79:1,1
  123:6 153:1

197:13
**located** 96:8 168:3
**lock** 128:10
**log** 62:7
**logistics** 217:23
**long** 9:21 10:22
  14:9,12 17:19
  51:20 55:21
  100:11 108:11
  110:12 142:7
  216:3
**longer** 45:10
**look** 37:17 56:8
  80:1 82:12 85:16
  86:8 90:12 92:17
  92:23 106:5
  107:19 108:20
  109:16 110:15
  112:6 114:17
  120:25 123:18
  135:16 145:9
  174:6 177:14
  180:15 186:20
  187:23 206:1,7
  209:2,8 210:10
  212:22
**looked** 11:3 73:6
  124:4 204:13
**looking** 191:5
  192:16 204:12
  215:16
**looks** 111:16
  115:10
**lot** 43:9 91:4 158:4
  187:8 194:17
  195:12,14 203:13
  207:14
**Louisiana** 1:2 2:5,9
  2:12,25 3:22 5:8
  148:2 178:5,20
  195:4 221:22
**Lucky** 14:6
**lunch** 9:7 110:1
  120:10

## M

**M** 2:3,3 12:19
**machine** 8:6
**machinery** 32:10
**MAG** 1:10
**mail** 133:18 134:9
  134:11,13,14
  136:1
**maintain** 76:3
**major** 62:13
**majority** 86:12
**make-up** 62:16
**making** 8:13,14
  50:11 108:21
  217:5
**manage** 37:12
**management** 14:19
  14:22 17:1 19:7
  22:16 23:22 50:16
  50:17 52:19
**manager** 14:22
  15:3,3,4,13 17:4
  20:25 22:8 48:15
  50:18 83:15 86:5
  139:4 186:9
  197:22
**manager's** 104:20
**Manning** 12:18,25
**man's** 101:12
**Marine** 168:20,22
  168:24 172:17,19
  172:20 173:21
  174:21 175:21
  176:2 203:18
  204:19 209:24
  213:22 217:20
**mark** 105:25
  140:14 141:21
  190:12 210:11
  217:3
**marked** 82:5 109:9
  172:13 177:22
  199:1 210:19
  211:22
**Master's** 17:3
**material** 34:14
  78:4 154:18,22

O'CONNER, DENNIS

8/13/2008

Page 234

155:13 157:3,5
160:3,8,17,22
161:16,22 165:17
167:19,20,21
168:7,9,15,19
169:12,15 172:18
173:6 179:4,6
194:18 198:4
200:22,24 201:9
203:23,24 204:6
204:16,17 205:3
208:25 209:5
210:3 211:4
213:21 214:6,11
214:16 215:12
216:2,12,19
217:16 218:4,8
**materials** 16:14
162:9 169:8
170:25
**math** 215:23
**matter** 5:4 221:16
**matters** 115:18
**maximum** 200:16
**McDonogh** 156:2
163:10 168:18,20
172:17 173:6
209:24 210:3
213:22
**mean** 24:24 30:9
70:21 74:19 89:16
107:21 129:12
140:21 165:13,15
165:17,18,21,23
175:9 180:15
189:17 194:10
**means** 39:13 59:7
84:4 85:3 105:6
157:15 165:10
189:19 190:16,17
199:5 217:22
**meant** 217:24
218:1
**measure** 38:23
199:6
**measures** 38:8

**mechanically**
198:14
**mechanism** 61:12
64:21
**meet** 10:22 12:17
118:6 146:15
**meeting** 10:21
11:24 12:1,2
**meetings** 111:18
113:1
**memo** 81:18
102:12,13 104:10
104:18 137:8
**memory** 20:17
138:3 141:4
**mentioned** 123:2
124:18 143:9,13
149:1 152:25
165:11
**message** 83:3
**met** 7:21 13:3
203:9
**MICHAEL** 1:20
7:13
**middle** 20:15
**Miller** 111:19
112:23,25 113:3,5
**mind** 63:5 84:22
86:25 113:15
124:7 173:3 213:5
213:7 214:6 217:8
**mine** 187:19
**minute** 110:10
149:23 165:3
177:10
**misrepresented**
55:12,15
**mistakenly** 120:23
122:16
**mixture** 167:20
**MK** 22:7
**MMG** 132:5,14,15
132:21 133:4,19
**moisture** 199:9,15
**moment** 169:7
**moments** 156:25

**money** 15:12 79:23
175:7,17 213:16
**monitor** 5:10
**monitoring** 195:23
**Montegut** 137:2
196:25
**months** 87:13
**morning** 7:21,24
**Morrison** 18:24
19:9,11 24:5
83:12
**motive** 129:7
**mountain** 64:4
**move** 63:3,13 71:7
73:20 74:13,18
76:12 78:8
**moved** 133:1,19
157:12 191:25
192:1,12
**movement** 64:22
67:2,3 68:10 77:9
**moves** 67:25
**moving** 63:18
66:13 77:25 197:7
**multiple** 147:7

_____

**N**

N 3:1 4:1 12:19,19
12:19
**name** 7:22 17:9,12
18:23 101:12
106:9 111:21
112:10
**named** 12:9 187:21
**names** 12:24 17:11
**Nations** 18:4,5
**native** 17:23,24
170:8,25 200:9
**nature** 14:10,16
15:10 16:14 18:9
22:12 23:15 81:15
143:11 148:12
189:4 200:21,23
**Navigation** 128:6
**NCRA** 5:14
**near** 33:20,25

36:15 37:21 41:22
42:17,24 56:18
58:1 59:21 96:5
**nearby** 53:2 58:25
60:16
**necessarily** 63:24
79:17 188:25
**necessary** 103:25
128:10 140:3
**need** 9:4 28:7,9
38:19 42:18 44:1
46:15,18 48:1,8
48:16 49:5,24
51:12,12,14,16
52:2 57:19,21
60:19 62:8 68:18
69:3 70:11,14
71:13,16 83:10
85:25 100:1 101:9
102:8,15,23 105:6
105:16 107:16
108:1 109:21
115:21 116:17
123:11 124:6,15
127:3,19 133:9
136:24 137:1
142:24 147:8,12
172:22 177:4,8
191:2 212:5,6
**needed** 73:18 79:7
79:8,10 83:5,9,12
85:10 100:6,7,8
100:16 101:21
103:6,7,7,18
120:8 121:16
126:2,7,8 127:13
139:5 142:16,21
147:4,4 149:19
205:12
**needing** 105:14
**needs** 73:19 109:16
**negative** 199:4,22
**negotiated** 145:21
**neighbors** 35:18
**never** 29:10 50:3
93:14 137:20

139:15 140:6
147:2,10 173:3
188:12,14 200:10
217:8
**new** 2:5,9 15:24
19:17 20:13,18
22:13 24:3,6,13
24:21 37:3 50:21
51:3 56:20 59:17
59:24,25 60:6,11
61:5 62:13 72:11
72:17 78:1 81:5
81:24 83:17 84:11
87:12 100:18
119:4,5,21,23
121:8 122:18
123:1,25 124:3,12
124:14 125:7
132:17 133:1
135:10 197:13
213:13,13,18
**nine** 19:4,5,10,13
19:18 20:14
**nods** 9:15 106:20
142:6,9 168:12
175:13
**noon** 109:21 110:5
**Nopal** 1:21 7:14
**note** 53:20 127:5
143:13 179:2
**noted** 37:10 43:5
46:11,16 49:16
99:25
**notice** 32:8 54:1
82:15,22
**noticed** 131:1
**notification** 127:11
130:5
**notifications**
108:14,18
**notified** 135:25
**notify** 102:16 136:4
**notifying** 129:10
**November** 108:9
127:7 128:1 130:2
142:14 162:18,20

O'CONNER, DENNIS

163:3 211:20
212:15
**nuance** 103:20
**number** 4:4,7,8,10
4:10,11,11,13,14
4:15,17,20,21,22
5:2,3,6 16:1,3
22:25 23:1 62:11
74:5 82:19,22
106:1 109:9 121:2
121:22,25 122:10
122:14 125:15
127:8,22 129:22
137:16 141:22
153:22 162:13,15
174:10 175:21
177:15 186:20
187:13 190:13
191:10 193:17
194:2 210:11
211:13,21 212:14
218:13
**numbers** 191:3
**numerous** 16:12
34:6 39:14 42:8
96:25 98:6 143:9
202:4
**NW** 2:19
**N.W** 2:12

**O**

**O** 3:1
**oath** 3:23 8:8
**object** 8:10 24:15
28:7,10 29:24
37:7 45:17 46:9
46:21,23,23,25
48:20 49:14 52:4
53:17 64:25 65:10
65:23 66:16 68:14
69:10,19 74:2
76:22 77:19 78:13
80:13,16 116:5,6
125:19 131:12
134:3 148:9
159:12 160:12

166:21 169:19
170:1
**objected** 29:6
**objecting** 28:21
29:3 46:19
**objection** 8:15
26:17,23 30:8,12
30:21 31:1,5,6,8
31:13 40:25 42:21
43:3 55:1,6,10
65:12 70:4 74:22
122:5 129:12,13
129:13 166:25
204:3 207:2,12,21
210:5 214:18,18
**objectionable**
25:10,12,17 27:14
31:11 207:15
**objections** 3:13
8:14 121:21
**objective** 72:9
**objectives** 72:10
**objects** 47:13
**obligation** 108:2
**obligations** 118:15
119:6 123:14
**observe** 32:7
**Observed** 209:22
**obtain** 16:15,22
24:6 49:21 62:25
68:21 70:14 85:7
100:2,6,19,25
123:3 132:11
133:9,9
**obtained** 37:3
144:12
**obtaining** 17:3
**obvious** 43:7,15
**obviously** 8:7 16:9
17:4 25:24 40:2
47:1 60:25 71:9
79:6 142:1 148:3
165:24 169:10
173:4 178:5,6
193:25 194:5
207:18

**occur** 79:2
**October** 108:13
142:4 149:23
150:14 153:21
154:5,7
**offer** 82:19
**Offhand** 59:1
**office** 84:8 134:10
134:15 139:4
146:11,13 197:13
**officer** 118:12
120:3 212:17,18
**offices** 1:22 2:3
13:3 133:5
**officiated** 3:23
**Oh** 71:22 78:21
88:10 89:18 109:1
109:1 126:18,19
151:16 152:6
164:2 203:5 217:8
**oil** 98:12
**okay** 6:14 8:3,12,20
11:5,14 13:3,13
15:15,22 16:1,4
17:14 18:1 19:5
19:17 20:13 21:10
22:2,13,23 24:4
26:1 31:13 32:22
33:1 34:16 40:1,9
41:11 45:8,21
46:3 50:15 51:9
51:11 54:12,17
56:5,20 59:6,17
60:9,10,14 62:20
63:22 64:7,11
66:4 67:10 75:9
76:20 78:18 81:3
84:15 85:12,15,20
86:3 88:1 89:13
89:14 90:1 92:4
94:2 98:7 99:1
100:17 105:9
108:5 109:3
112:18 114:22
121:13 123:17
126:20 128:24

129:8 130:21
131:25 133:21
135:19 136:16
137:6,14 138:6
139:1,12 140:8
141:8,24 142:7,14
146:22 148:3
153:10 154:2,9,15
162:4 163:14
164:2,14 165:2,22
166:11 167:16,18
167:25 168:17,22
169:10 172:23
173:2 175:25
176:15,20 177:10
177:19,21 178:4
178:24 179:18,22
180:17 182:14
185:11,24 186:8
187:6,9,19 188:24
189:5,13,16 190:1
191:14,24 193:8
193:16 194:17
195:6 198:10
199:11 201:8,15
205:3 209:2
211:24 212:1,3
213:9 214:2,4
215:3,25 216:5,8
216:25 218:7,11
**Oklahoma** 145:21
**old** 29:3
**once** 42:2 63:9 75:4
118:12 172:24
175:18 190:14
216:11
**ones** 23:3
**op** 199:13
**open** 36:6 179:4
**operating** 118:13
**operation** 195:15
**operations** 65:5,16
66:11 157:8
**OPERATOR** 5:1
7:7,18 20:3,8
120:13,17 134:17

134:24 135:4
184:22 185:2
202:20 203:1
218:19
**operator's** 36:11
**opinion** 26:16
186:7 199:25
200:2 206:24
**opportunity** 11:6
**opposed** 71:2 107:4
155:1 157:25
158:1
**opposite** 170:17,24
**optimum** 199:4,22
**option** 185:16,21
216:11,16,17
**options** 93:11
185:18
**oral** 161:25 162:7
**orally** 162:4
**order** 57:19 89:16
89:19,22 100:23
102:9,10 121:10
122:4,13 143:22
144:12 150:1
**organic** 167:21
**organization**
103:22
**organizations**
202:5
**original** 175:20
185:14 218:23
**originals** 113:7
114:13
**Orleans** 2:5,9
15:24 19:17 20:13
20:18 22:14 24:3
24:6,13,22 37:3
50:22 51:4 56:20
59:18,24,25 60:7
60:11 61:5 62:13
72:11,17 78:2
81:5,24 83:17
84:11 87:12
100:13,18,21
101:1,22 102:9,22

O'CONNER, DENNIS

102:25 103:13
104:1,14,25
105:10 106:17
109:5 119:5,5,21
119:24 121:8
122:2,7,17,18
123:1,25 124:3,11
124:12,14 125:4,8
125:17 126:13
127:9 128:9 129:4
132:18,22 133:1
135:10 136:14
197:13
**OSHA** 47:22
**ought** 159:7,20
**outcome** 221:15
**overrun** 215:7,8
**oversaw** 118:18
**oversight** 118:19
**owned** 101:8
**owner** 51:25
**owners** 97:1
**O'Conner** 1:20 5:4
7:13,23 20:12,22
31:19 36:20 41:4
43:8 46:4 48:13
50:7 54:14 55:18
92:6 100:12
104:23 110:14
120:21 129:2
135:8 141:25
159:1 163:6
171:22 203:6,9
208:24 212:22
213:9 218:21
220:4
**O'Conner's** 51:19

**P**

**P** 3:1
**packed** 58:10
**page** 4:2 9:11 26:3
86:20 90:12 92:10
92:12,17 97:10
112:1,6,7 114:12
144:6 165:8

168:18 177:1
179:2 185:11
206:10
**pages** 92:18 144:14
177:3
**paid** 8:11 13:20
46:23,25 77:2
103:5 120:2,7
158:4 186:18
**painfully** 47:1
**paper** 92:13,20
98:19 99:3 141:11
191:6,7 192:7
193:14
**papers** 11:10
104:20 120:25
121:2
**paragraph** 86:22
92:24,25 108:23
214:7
**paren** 179:4,5
**Parish** 128:9
**parking** 158:3
187:8
**part** 3:16 22:15
34:2 58:16 69:25
132:24 176:1
191:20 192:3,9
197:20
**partially** 42:9
**participate** 85:12
**participated** 86:13
86:16
**particular** 24:7
32:5 48:17 142:25
155:23 165:9
192:6
**parties** 3:4 221:14
**parts** 35:7
**party** 53:11 54:22
56:8 79:14 80:1
181:2
**pass** 72:1,8 190:24
**passed** 102:14
**passes** 72:5
**pathology** 60:23

**pay** 157:24
**paying** 10:13
**PCM** 215:8
**peek** 99:14 141:23
176:4
**Pendleton** 7:9
**Pennsylvania** 2:19
**people** 12:23 23:13
32:10 48:3 52:16
52:25 101:5 104:4
121:16 139:5
143:9 146:7
197:12
**percent** 86:14,16
199:3,4,4,6,20,22
199:22 200:10
201:4
**percentage** 199:10
**perched** 61:19
62:19
**perform** 15:12
178:11
**performed** 197:8
**perimeter** 35:22
96:13,13
**period** 19:10,14,18
20:14 147:17
189:18
**periods** 14:12
**permeabilities**
61:23
**permeability** 62:23
71:11
**permeable** 72:2
73:10 171:6
**permission** 122:12
128:4 129:5 130:9
130:12 131:8
184:12
**permit** 100:4,13,21
100:25 101:10,21
102:2,8,16,24
103:13,16,17
104:1,15 105:7,14
105:22 107:5,17
108:1 109:6

111:17,17 113:7
114:13,14,15,17
114:18,20 118:25
119:11 122:19,25
123:12,15,19,20
123:22 124:10,16
124:24 125:21
126:1,2,5 129:14
130:10 132:23
136:13,25 139:20
140:3,6 142:16
186:6
**permits** 99:23
100:2 108:14,17
123:3 132:9,11
133:10 143:10
**permitted** 118:4
**person** 15:18 46:5
106:22 124:18
145:15,19 148:16
168:14 173:4
189:9 190:20
199:13
**personal** 111:18
113:5 124:18
221:10
**perspective** 172:15
**pertinent** 118:20
**Phil** 197:21
**phone** 81:7 141:17
**phrase** 168:6
**phraseology** 9:10
**physical** 32:10,15
**physically** 195:17
**pick** 51:4 53:23
57:8 121:1
**picture** 70:6
**piece** 92:13,20
98:19 99:2 141:11
150:10 179:17
191:5,6,17 192:6
198:12
**pieces** 44:5 193:14
**PIGMAN** 2:7
**pile** 39:19 66:22
164:24 172:20

173:11 194:21
201:18
**piles** 154:18
**piling** 39:19 66:13
**pipelines** 22:12
**pipes** 156:9,11
**pit** 155:20,22,24
156:1,4,6,9,13,21
156:23 157:2,23
158:1 161:20
162:8,11 165:18
167:7,11,13,14,17
167:19 168:7,20
172:17 173:6,13
186:11 187:12
196:14 198:4
203:24 204:7
209:24 210:3
218:6,10
**place** 5:18 38:1
39:17,21 42:5,6
42:13 44:11,13
51:11 52:14 57:23
79:8 87:23 97:2
115:1 131:23
155:23 195:9
197:17 205:6
211:5,6 214:7,16
215:5 216:1
**placed** 209:16
**PLAINTIFF** 2:5
**Plaintiffs** 7:3,5,6
13:25
**plan** 32:13 33:7
153:7 157:1
173:15 175:20
176:16 177:25
179:24 185:8,11
**planned** 122:13,13
**planning** 142:19
**play** 92:3
**playing** 31:15,15
**please** 6:1 7:11
28:5 39:10 69:22
74:24 77:21 83:23
106:5 110:15

O'CONNER, DENNIS

135:16 176:6 179:8 180:3 220:15
**plus** 128:8,8 175:12 199:4,21
**point** 8:15 15:8 53:5 82:25 84:19 86:15 88:1 100:17 112:25 119:3 127:16 147:11 149:17 163:7,8 191:2 202:7
**pointed** 188:3
**points** 209:18
**policy** 202:8
**poor** 159:23
**popular** 200:5
**porosity** 62:24 71:11,16 73:23 74:7
**porous** 71:19,24 72:5 74:10,18 78:4,8 171:5,6
**Port** 119:21,23 121:7 122:18 123:1,25 124:3,12 124:14 125:7 135:10
**portion** 5:20 101:7 132:18 177:19 195:18
**pose** 58:23 61:13
**position** 196:1
**possibility** 52:23,25 53:1 206:25
**possible** 127:12 171:11,17,18 206:13,19 207:9 208:16,20 213:23 217:17,21 218:3
**possibly** 45:15 63:13
**potential** 33:22,23 34:18 38:12,13 41:20,21 45:14 54:20 55:22 56:2

56:9,16 57:19 58:4 61:8 63:13 76:11 80:6 104:24 104:25 143:10 149:16
**potentially** 42:23 65:20
**preceding** 25:4 220:5
**precise** 103:20 105:2 108:9
**Precisely** 95:13
**predetermined** 35:23 36:10
**predicate** 25:25
**predict** 32:12 79:3
**predominantly** 66:21 72:22
**predominately** 22:10
**preparatory** 10:20
**prepare** 10:19 11:7
**prepared** 177:25
**prescriptive** 155:1
**present** 114:1
**presented** 150:8
**pretty** 115:22 156:16 171:7
**prevent** 80:8 188:22 195:9 204:23
**previous** 43:17 62:5 79:11 123:7
**previously** 74:8 122:21 125:15 154:13 155:9
**pre-existing** 66:2,7 170:5 198:25
**price** 178:11 215:8 215:9,9
**primarily** 17:22 84:7
**primary** 12:22 72:9 86:5
**principally** 15:12 83:14 101:2

**print** 115:10 135:17
**prior** 25:9 43:25 87:14 144:14 209:13,17
**probably** 38:24 39:3,4 84:20,21 84:23 85:22 86:13 86:15 87:13 88:25 96:20 114:25 115:16,19 135:25 170:11 200:3,9
**problem** 41:25 46:12 67:8 79:15 80:6,6
**problems** 62:7
**procedure** 3:7 35:9 36:12 202:9
**procedures** 52:13
**proceed** 7:19 28:11 42:7
**proceeded** 205:23
**process** 8:21 9:14 17:2 32:6 45:21 61:25 204:19
**Proctor** 199:3,7,21 200:13,16,24 201:4
**produced** 138:18
**profitable** 75:24
**program** 83:15
**prohibition** 201:11
**project** 13:17 15:3 15:13 17:21 18:18 18:18 19:7 20:25 22:8,15,16 23:20 23:22 39:22 48:14 48:15 50:16 81:23 83:14,22,25 84:1 84:3,11,16 86:5 90:13 101:17 104:20 128:11 130:9 144:2,9 145:11 186:9 213:17
**projects** 21:7

141:14
**properly** 41:24
**property** 35:16 55:25 96:13 133:3
**proposal** 152:14 185:20
**proposed** 128:9 129:15 185:21 202:11
**protect** 39:16,24 40:1 45:24 48:3 67:14,14
**protecting** 67:15
**protection** 22:18 23:9 169:24 171:2 202:12
**protective** 38:8
**protocol** 106:14
**prove** 189:21
**provide** 11:20 78:6 118:3 119:12 157:7
**provided** 85:10 87:21 95:16 118:24 129:15 154:22 157:6,9
**provision** 118:10 214:4
**provokes** 51:24
**proximate** 22:17 24:1,9 31:25
**proximity** 56:19
**pull** 39:8 143:5 170:24,25
**pulled** 192:25 210:3
**pulling** 54:6
**pure** 147:18,19 201:4
**purports** 98:23
**purpose** 30:4
**purposeful** 60:18
**purposes** 3:8 50:4 205:4
**pursuant** 100:22
**put** 25:19 39:21

44:11,12 49:23 66:12 79:8 97:25 133:3 142:22 145:20 146:2,5 157:13 158:25 163:18,21 169:8 170:13 194:20,23 195:8 205:5 209:20 210:1 211:5 214:16,20 214:24 215:4,11 216:1
**putting** 157:21 169:14
**PVC** 49:23
**P.M** 120:19 135:1,6 184:24 185:4 202:22 203:3 219:2

---

**Q**

**QC** 191:18,18,20 192:7
**qualifications** 145:25
**quality** 87:23 160:1 163:1 166:3,4,6,7 172:6,7,8,9,11,12 193:1,2,3
**quantity** 190:15 192:9 194:4
**question** 3:14 8:12 8:17 9:9 24:16,23 24:25 25:5,9,14 25:15,19 26:1,6 26:14 27:6,12,17 27:23 28:3,15,19 28:24 29:1,2,3 30:1,2 31:10 32:16 36:6,22,25 37:8 40:19,23 41:5,7,9 47:16 50:5,13 52:8 53:18 54:11 55:17 55:19 58:23 60:3 64:16 65:1,24

O'CONNER, DENNIS

66:17 68:7,15
69:11,20,22 74:3
74:24 75:5 78:14
78:19 80:14 90:18
90:22,24 91:12,14
91:22 92:1 93:20
93:22 103:20
104:2,16 105:3,9
105:10,11,14,15
110:16 114:11
116:6 119:10,10
124:5,13 125:2,25
128:22 146:23
150:3 158:8
161:15 169:20
170:2 181:23
189:5 203:18
206:11 207:5
208:16 215:16
**questions** 25:9
43:15 60:20 91:11
117:11 139:23
141:23 177:1,2
181:25 182:6
189:6 203:7,13
205:24 211:12
212:3
**quick** 86:24 99:14
114:2 176:4
**quiet** 26:18 28:5
**Quit** 76:22
**quite** 13:19 43:22
**quote** 47:21

_____

**R**

**R** 11:21,21
**railroad** 39:21
149:17
**rains** 67:7,9
**ran** 107:13
**random** 193:8
**RDR** 3:21 221:4
**read** 8:17 29:20
40:14 86:24 91:19
91:21 92:6,8,15
93:4 96:24 108:19

111:3,4,6,10
116:13,17,19
141:8 164:9,9,13
206:16 209:9
214:5,6 215:3
220:4,5,16,18
**reading** 3:9 39:11
81:22 115:16
163:15 187:14
217:7
**reads** 5:6,10 20:5
20:10 120:15,19
135:1,6 184:24
185:4 202:22
203:3 219:2
**ready** 83:17
**real** 1:23 5:18
13:16 43:13 72:23
**realize** 61:22 80:2
**really** 13:24 14:2
15:16 84:22 88:12
89:22 174:16
**realtime** 91:19
206:3
**reason** 8:13 36:2
122:20 125:23
130:22 208:11
213:14
**reasons** 97:3
213:15
**recall** 12:2,10
17:21 21:18 81:19
81:21,25 84:14,15
85:18 87:5 88:19
90:6 99:13 100:5
100:14 104:8
106:7,8,12 107:18
110:23 117:14,18
120:2 125:23
126:4 130:20,23
131:2,21 132:10
132:20 137:21
138:1 139:16
147:19 149:7
150:4 155:19
158:2 162:6 165:1

178:23 188:21
197:20,20 202:5
216:3
**receipt** 130:2
**receive** 83:1 134:13
138:3 139:11
**received** 16:17 81:7
81:22 82:25 83:3
85:6 97:13 103:12
104:5 113:2
127:25 133:18
134:9 137:4,7,10
137:11,20,25
139:18 186:10
**receiving** 138:1
**Recess** 20:7 120:16
202:25
**Recognizing** 118:8
**recollect** 121:6
**recollection** 11:11
11:16 12:7 73:4
82:13 83:2 85:21
87:8 88:6,24 93:1
101:5 102:11
107:1 109:7
124:17,21 130:19
158:5 163:18
177:16 178:8
179:19 196:24
197:8 203:15,23
204:5,15,21
209:25 214:13
215:25
**recommendation**
85:13 100:15
123:5
**recommendations**
18:14 84:25 85:2
85:8,23 88:13
89:25 99:21 100:1
132:25 133:7,12
**recommending**
85:9
**record** 5:23 8:14,18
14:14 19:23 20:2
20:5,9 27:22,25

38:18 53:22 76:8
83:23 85:1 89:20
92:14,16 107:21
109:19 110:21
114:9 120:14,18
125:11 134:25
135:3,5 144:18,24
155:25 174:10
177:12 179:14
182:20,22 183:2,4
183:14,16,19
184:6,10,13,18,21
184:23 185:1,3
190:10 191:9
196:22 202:21,24
203:2 211:19
213:9 219:1
**recorded** 5:21
**records** 72:23
**recreating** 170:10
**refer** 165:9
**reference** 172:14
**referenced** 71:8,12
92:19
**references** 127:7
135:13
**referencing** 128:1
130:3 204:18
**referred** 111:25
148:25
**referring** 90:5
96:11 108:23
140:12 145:1
163:5,11
**refers** 59:8 146:4,6
200:13
**reflect** 27:22,25
92:14 97:15
126:11
**reflects** 28:1 99:7
99:11 193:16
**refresh** 11:10 87:7
141:4 163:17
177:15 209:25
**refreshes** 82:13
92:25

**refused** 131:8
**regard** 56:15 80:6
115:20 124:13
143:10 153:11
196:1 207:5
**regarding** 83:13
122:12 202:15
**regards** 16:13
79:22 100:14
123:14 197:6,16
197:19 200:19
**registered** 47:23
48:9,11 148:2
**rego** 124:6
**regulating** 123:9
**regulations** 47:20
48:7 49:6,6,10
50:2,9,10
**regulatory** 35:12
**reinforce** 39:7 44:2
**relate** 41:17 67:1
148:7
**related** 12:6 221:14
**relates** 20:23
**relationship** 41:20
73:22
**relationships** 196:6
196:9
**relative** 124:5
199:6
**relevant** 58:3,22
**relocation** 17:24
**remain** 38:3
**remediating**
169:10
**remediation** 21:4
22:9 81:23 83:20
83:24 84:1 93:2
**remember** 11:2
12:23 17:10 19:1
39:10 81:6,10
87:11 103:21
105:3 106:13,22
109:10 110:16,19
111:22 112:17,21
124:25 126:16

O'CONNER, DENNIS

| | | | | |
|---|---|---|---|---|
| 168:2,4 174:16 179:20 195:18,20 195:21 196:13,19 210:24 | 221:2 **reporting** 7:10 191:25 **reports** 93:8,13 94:22 95:16 141:13 193:1 | 146:15 202:15 **requires** 15:18 51:22 143:17 **requiring** 109:5 **reread** 94:18 | 40:3,5 42:11 44:7 44:9,25 45:6 47:11,16,21 49:20 49:25 51:2,14 53:5,10,13,15 | 156:14 158:14,22 162:12 163:16 165:24 166:14,23 167:21,23,24 168:11,17 169:12 |
| **removal** 88:14 153:7 159:8 179:24 196:8 201:18 204:18 209:9 | **reprehensible** 27:15 **represent** 6:3 9:17 9:25 10:4 15:7 144:6 188:4 206:8 | **reserved** 3:15 **resource** 143:19 **resources** 17:23 **respect** 152:19 **respond** 8:8 207:17 | 54:24 56:2,13 57:2,7,14,18 58:2 58:7 59:2 60:8 62:9 63:1,20 64:2 67:1,24 68:24 | 170:16 171:19,21 172:12,24 173:6 174:1,21 175:3,9 175:11,18,22,25 176:5,11,13,18,22 |
| **remove** 42:7 52:10 52:12 84:4 96:22 128:4 129:5 147:10 150:9 169:17 176:17 | **representative** 12:5 132:21 **representatives** 13:22 **representing** 6:5,9 6:16,19,22,25 | **response** 101:6 129:3 136:4 152:10,12,13 185:19 **responsiveness** 3:14 | 69:4,16,24 70:1 70:10,19,24 71:15 71:25 73:22 74:16 76:1 79:10 81:9 81:13 83:7,19 | 177:21 178:10,19 180:20 182:3,8,20 183:19 185:6,16 187:13,15 188:6 189:21,24 190:4,6 |
| **removed** 98:10,11 98:12 154:19,20 188:6 195:2 204:22 205:7 209:5 210:2 | 103:2 180:21 181:1 **request** 9:24 43:19 111:16 125:20 127:6,10,25 129:4 | **rest** 115:21 191:2 **result** 23:15 32:3 113:5 196:16 **resulted** 201:18,23 | 84:10 86:8,20 87:1,6,15 88:9,11 89:16,18,23,25 93:5 94:4,5,9,13 | 190:8 191:16,20 191:22 192:2,13 193:2,9,13 194:5 194:20 195:11 |
| **removing** 209:13 **rent** 48:2 **repaired** 129:17 **repeat** 25:4 55:19 69:22 74:24 80:19 | 152:14 185:20 **requested** 147:6 178:25 197:1,3 **requesting** 122:25 **requests** 9:11 | **resulting** 129:16 **results** 201:2 **resummation** 121:8 **retained** 218:23 | 94:16 95:4,6,10 95:15,17,23 96:2 96:14 97:9,9,10 97:12,14,17,22 98:1,22 99:6 | 196:5,8,13 198:1 198:4,19,21 199:1 199:17 200:13 201:10 202:3,4 209:6,19 211:11 |
| **rephrase** 21:19 60:4 77:21 **replaced** 170:7 **replacement** 128:10 | 130:6 132:22 **require** 49:10 118:5 202:10 207:10 | **return** 135:14 **review** 128:14 130:18 131:18 **reviewed** 11:9 86:18 | 101:11 102:1,4,18 102:24 104:3,12 105:21 106:16,19 106:24 107:15 | 215:1 216:12,15 216:17,20 217:24 218:2 **RMR** 2:24 221:4 **Road** 96:12 |
| **report** 84:25 85:2,8 85:13,23 86:21 88:8,13 90:1 93:23 98:1 99:21 100:1,15 132:25 | **required** 8:8 65:5,8 65:16,17 88:16 99:23 103:17 105:23 108:14 118:24 119:4,25 | **reviewers** 86:19 **reviews** 152:19 **revised** 128:13 151:2,20 153:7 213:11 | 108:18 109:2,2,2 110:14,18,23 111:1,2,3,12 112:7,14 113:6 114:16 115:6,13 | **rock** 58:18 71:8 **Roe** 83:14 **Roger** 2:24 3:21 7:9 221:4,20 **role** 86:1,4,5 |
| 133:7,12 141:25 142:1 163:1 166:4 166:6,16 168:6 169:3 191:18,18 191:21 192:4,10 199:15 | 123:4 124:10 132:13 140:7 145:10,18 198:3 200:11 | **RFP** 152:11,13 **rig** 68:21 **right** 9:14 10:18,24 11:22 13:11 14:4 15:5 16:15,19 | 115:24 117:14,19 117:25 120:5,21 122:15 124:20,25 126:10 129:11,19 130:6,7,25 131:16 | **roles** 15:6 **rolled** 198:20 **roller** 198:16 **rolling** 54:21 **Room** 2:20 **rooms** 133:4 |
| **reported** 2:24 221:9 **reporter** 2:25 3:22 7:8,11,16 14:21 221:5,21 **REPORTER'S** | **requirement** 144:1 201:16 202:3 **requirements** 118:7 119:11 129:19 144:4 145:11,16,19 | 18:9,17 20:17,19 20:21 21:6,25 22:25 23:6,19 32:14,14 33:9,14 34:13,17 36:1,14 37:24 38:10 39:23 | 131:20,22 133:15 133:17 136:5,7,11 136:14,22 138:4 138:12 139:22,25 142:5 143:15 146:12,14 148:17 150:3,4 152:6,20 154:24 155:3 | **rough** 206:11 215:19,20 **rule** 181:13 **rules** 3:7 8:11 31:14,15,16 123:22 |

Johns Pendleton Court Reporters                    800 562-1285

O'CONNER, DENNIS

run 64:5 107:12
213:16 216:19
running 59:14 64:1
64:1,9,13 96:12
runs 63:21,23 64:3
199:14

## S

S 3:1
safe 73:25 79:4
safety 16:14 38:22
52:15 66:20,23
safety's 66:20
Saifi 2:22 5:13
sake 66:20
sample 95:2 199:8
199:14
sampling 93:9 95:5
95:10
San 1:23 2:23 5:15
5:18
sand 58:18 60:24
61:2 71:9 155:5
156:15,17,17,22
157:21,24 158:8,9
158:10,12,12,13
158:17,24 159:2,7
159:20,23,24,24
160:1,2 162:13
163:10,12,18,21
164:10,23,24
165:6,8,13,14,15
165:17,21,23
166:1,18 167:3,7
167:8,10,20 168:3
168:10,14,23
169:15,15 170:6,6
170:13 171:1,1,5
171:13 172:19
173:1,5,10,12
185:13 186:6,12
187:3,10 189:1,1
189:17 190:5
200:25 201:4
206:15 215:10
216:11

sand/backfill
213:24 215:15
sand/fill 187:18
189:10,20,22
190:14 193:18
194:6,18 195:13
196:7 210:1
sand/sandy 179:4
sat 51:5
Saucer 164:20
168:23 172:20
199:19
save 3:13
saw 208:17
saying 87:3 35:2
44:22 46:15,22
75:1 76:17 90:1
93:11 116:25
138:7 152:12
188:14 193:2
208:4
says 93:6,15,18
94:15,17,18 95:4
95:5 97:11 107:21
107:23,24 108:12
108:17 112:22
113:6,7 114:12
118:2 119:12
127:24 128:11
129:13,15 130:1,8
131:23 142:14
144:8 151:2
154:12 155:7
160:16 162:13
164:22 168:18,22
172:16,16 176:14
187:15,17,18
190:13,15 209:9
209:11,22 210:16
210:24 213:20
214:19 215:14
216:18,20,21,22
217:11,18
schedule 127:18
school 16:9,11 17:8
Science 17:17

scope 34:3,8 36:19
52:9 79:18,19,22
80:20 81:17,19
84:13 85:4 152:10
178:25
scopes 84:17
Scott 2:4 7:3
Scraping 209:12
se 124:24 134:14
167:8
season 67:7
second 19:21 58:16
154:20 177:24
197:19
secondly 130:23
213:18
secretary 134:14
section 86:12
108:16,17,25
109:1 146:6
see 8:5 54:15 60:19
70:13 82:13 85:25
106:3 109:12
113:8,10,15 133:9
135:15 141:6
144:21 153:13
163:5 165:7,22
167:6 168:6
173:15 177:4,14
177:23 179:8,10
180:2,7,18 181:6
181:18 182:11
186:23 190:22
200:17 201:3
209:11 210:16
213:3
seeing 85:18
130:20 131:2
139:16
seek 132:9
seeking 130:5
196:16
seen 39:21 139:9,13
173:16
sees 181:9 182:1,6
182:17

select 18:15
semi-retired 14:5
send 114:22 130:16
142:18
sense 8:4 29:17
50:11 159:3
sent 81:17 115:2,3
117:16 130:6
136:1 152:13
sentence 168:22,25
separate 115:4,5
195:15
September 190:14
seriatim 4:3 82:4
146:4 192:25
series 92:17 95:16
seriously 218:5
service 104:6
137:20
services 10:14
49:22
set 60:12 84:9
221:8
Settlement 17:25
settlements 18:12
Seven 108:10
sewer 88:15,20
90:4 149:2,3
151:14 158:18
162:14 163:13
164:11 172:20
203:16 206:22
shale 58:18
shape 35:24
share 16:8 23:6
59:10
Shaw 22:6
sheet 39:19 66:13
66:22 67:21 138:9
138:9 139:10,13
154:18 201:18
220:18
ship 89:3 149:18
shore 39:5 41:11
43:17 44:1 45:23
45:24 46:6,7

47:12,14,18,19
49:5 51:23,24
54:24,24 56:25
58:1
shored 37:23 44:21
shoring 38:1,23
39:8,10,13,14,15
39:15,18,20 40:9
41:24 42:4,7,12
44:3,5,24 47:8,15
47:24 48:1,2,6,8,9
48:17 49:22,24
50:22 53:9 54:19
148:1
short 20:4 31:20
152:16
shorthand 221:10
short-term 14:7
show 82:3 85:15
86:23 105:24
109:8 139:3
140:21,24 144:5
160:16,17 165:2
172:21 180:8
181:7,13 213:1
showed 113:13
187:25
showing 120:22
shown 10:24
125:13
shows 189:8
side 8:23 78:3
96:12 128:5 172:6
172:10,25
sides 67:15,16
172:6
sign 115:11,15
116:1 117:10
131:9 138:24
signature 115:9,12
131:25 132:1
220:12
signed 115:6 117:9
220:13
signing 3:10
silly 54:11

O'CONNER, DENNIS

**silt** 58:17 61:1 71:9 167:9,10
**silts** 167:21
**similar** 121:14 196:1
**simple** 39:22 43:13 43:15 59:16 64:9 114:11
**simply** 15:4 29:11 39:15 65:3,15 66:5 75:25 82:25 84:2 93:17 102:16 107:3,11 117:23 125:18 129:9 136:17 166:8 192:7,12,17 198:11
**single** 73:14
**sink** 198:20
**sir** 60:2 110:23 132:16
**sit** 13:23 36:11 100:10
**site** 24:1,1 32:8,8 33:13 37:4,17,18 37:19 50:20 53:6 62:3 85:11 87:9 87:18,20,25 88:2 95:11 96:5,9,25 97:7 98:14,15 99:4 118:13 133:19 134:1,11 143:21 145:18,20 145:20 146:2,5,8 146:8,13 147:6 148:22 155:22 156:1 158:2 164:5 164:25 167:12,15 168:3 169:9 173:11 185:13 186:13,17 187:3 187:11 189:18,20 189:22 190:2 192:1,1,4,5 194:6 194:21 195:10,13 195:23 197:2

203:15,18 204:7 204:15 205:4 206:22 208:17 213:22 214:12 216:1 217:16,20
**sites** 33:17 146:1
**sitting** 149:18
**situation** 33:12 43:24 45:19 47:9 47:23 50:25 53:7 56:6,9 57:6 59:14 61:16 78:24 126:7 147:3 170:5
**size** 23:2,3 99:16 198:13,17
**slope** 58:6,6,12,20 73:19,25 74:19
**slopes** 71:13
**slurry** 75:21
**small** 23:1 178:3,16 198:16,17
**Smith** 101:2,3,13 101:14,19 102:6 102:20 105:4 108:12 212:17
**Smith's** 137:5
**soil** 22:9,11 32:2 44:18 45:4 58:3,7 58:8,9,22 61:7 62:15,15,16 63:11 63:25 67:22,25 71:18 73:1 74:14 78:8 80:5 93:6,13 94:21 154:14 155:9 156:12 197:5 198:14 199:8,14 204:8 209:10 210:25 211:7 215:7,8
**soils** 23:12 57:22 58:10,13,17 59:14 60:23 63:16,19 67:4 68:22 69:5 70:7,13,15 71:5,7 71:14 72:17,20 73:10,20,24 76:3

76:12 78:23 93:9 93:15,19 95:2 148:6 155:20 156:3,5,10,23 198:22 199:8 200:10 205:6
**sole** 118:19
**solid** 69:2
**solution** 52:20
**somebody** 35:15 36:19 41:12 47:17 50:11 52:1 54:23 127:19 148:4 162:2 163:25 165:25 166:3 196:3
**soon** 182:16
**sooner** 9:13
**sorry** 31:7 33:9 40:11 48:14 57:11 68:4 71:20 89:18 91:19 107:8 109:14 119:23 124:1 128:12 137:22 142:10 149:24 151:16 170:19 171:20,21 172:16 185:24 188:13 192:6 193:23 203:5 210:22 217:8
**sort** 39:17 52:13 57:22 115:21
**sought** 3:17
**sound** 187:21
**sounded** 49:8
**sounds** 43:13
**source** 104:25 105:13 143:19
**sources** 85:7 104:24
**south** 64:6
**southeast** 64:6
**southern** 81:8
**southwest** 64:6
**speaking** 55:6,10

207:20
**speaks** 55:4
**Specialist** 5:14
**Specialists** 178:1
**specialty** 188:7 195:3,17 216:6
**specific** 15:2 144:2
**specifically** 3:10,12 34:14 60:5 63:2 176:19
**specification** 155:1 155:4 161:9,11 198:6
**specifications** 84:1 154:25,25 157:2 160:24,25 176:16,22 198:8
**specified** 144:12
**specify** 157:2
**specs** 177:17
**Spencer** 101:12 106:21 107:25 108:3 122:2 141:18 142:15
**spoke** 12:8
**stability** 38:3 68:11 170:11
**stack** 120:25 144:7
**stage** 52:17
**Staggs** 197:21
**standard** 200:6
**start** 16:25
**started** 18:25 46:22 174:18
**starting** 21:15
**starts** 54:21
**state** 2:25 3:22 6:2 48:7,11 49:7 84:7 148:2 178:18 195:4 202:5 221:22
**stated** 103:18 142:18,21 187:7
**statement** 50:1 107:2 115:23 150:7 174:11

175:19,23 213:12
**statements** 154:11
**states** 1:1 2:18,21 5:7 7:1 18:6 136:23 137:15 157:4 161:18 162:10 166:8 181:1 185:15 189:15 202:6,6 213:11
**station** 88:15,21 90:4 142:20,24 143:3,5 149:2,3 149:24,24 150:9 151:14 153:6 155:12 158:18 159:9 162:14 163:13 164:11 169:17 170:24 172:21 174:19 199:19 203:17 204:10 206:23
**stations** 128:8
**stay** 71:7 182:24 211:16
**staying** 183:1,4 184:20
**step** 42:9,10 87:25 88:1
**Steve** 83:14 141:18 142:15
**Steven** 106:21 122:2
**sticker** 153:23
**stip** 188:16
**stipulate** 35:13 47:22 197:5
**stipulated** 3:3
**stockpile** 168:2
**stockpiled** 179:5
**STONE** 2:7
**stop** 9:5,5 27:15 110:7
**stopped** 11:19
**stopping** 209:18
**storage** 97:4

O'CONNER, DENNIS

158:23,25
**straight** 64:5
**straightforward**
38:25
**strata** 74:13 171:14
**stratification** 63:10
**stratified** 72:18
**Street** 2:4,8
**strength** 170:12
**strenuous** 139:6
**strictly** 19:9
**structural** 56:23
78:11
**structure** 22:18
23:9 24:9 33:3,6
33:21,25 34:3,20
36:16,17 41:22
42:17,24 51:21
56:18 58:24 59:22
60:15 61:14 62:1
63:14,24 64:15,23
65:21 77:10,13
78:3,10 80:10
96:5,8 149:23
151:13 169:24
171:3 176:17
196:15 201:13
202:13 203:17,25
204:9 206:23
**structures** 23:25
32:1,20 33:1 53:2
97:16 128:4
**study** 37:17
**stuff** 53:21 108:22
141:1 168:9
173:22 196:7
209:19
**stumps** 72:24 156:9
156:11
**subcontract** 132:12
153:3
**subcontracted**
147:23 176:20
177:17 196:3
**subcontracting**
48:10 120:3

**subcontractor**
132:11,17 149:13
150:10 178:13
195:3,18,22
196:10
**subcontractors**
98:11 118:6,8
123:6 132:6,9
178:7,9
**subcontracts**
118:12 152:23
**subject** 16:22 43:19
51:10 108:17,25
109:1
**submit** 128:13
**submitted** 85:23
102:12 145:25
185:9 186:1
**subpart** 89:23
**subsequently** 83:15
85:5 128:20
145:20,25 147:5
**subside** 198:23
**substances** 159:25
**subsurface** 176:10
**suggest** 90:25
111:13 122:19
**suggested** 95:20
126:23 131:6
138:22
**suggesting** 122:20
**suggestion** 131:17
**suggests** 31:9 90:14
94:10
**Suite** 1:23
**Summary** 86:21
**summation** 121:11
**summer** 87:14 88:7
**Summertime** 67:7
**superintendent**
101:4,17,17
**superior** 156:7
**supervision** 221:11
**supplied** 93:8,13,18
94:22 99:9,10
**supply** 157:15

**supplying** 157:10
**support** 45:11
144:11
**suppose** 72:3
129:10 155:6
181:21
**supposed** 37:16
152:8 166:10,11
166:13,18 169:9
216:18 217:19
**supposedly** 146:14
**sure** 14:10 17:6
21:20 23:16 35:25
38:1 55:20 62:4
63:7 79:25 81:11
98:13 107:12
113:17 118:14
120:1,12 127:15
136:9 144:16
146:16 148:14
156:14,16 157:11
162:9 165:20
166:9,17 169:10
179:12 209:21
**Surekote** 96:12
**surface** 45:10
63:11 68:10 69:6
72:18 77:16 78:7
99:17,19 171:15
204:24 206:17
**survey** 197:1
199:14
**surveyor** 197:9
**swear** 7:11
**sworn** 7:15 221:7
**system** 115:1,4
132:13 139:6
140:11
**systems** 115:5

---
**T**
---

**T** 3:1,1
**table** 61:20 62:18
86:9,14 91:18
110:8 169:7
**take** 19:21 38:9,9

42:9 44:11,14
52:14 77:2 82:12
84:3 86:24 90:12
99:14 107:19
108:20 110:12,15
134:20 149:25
163:8 171:24
176:4 182:8
197:16,18 202:19
212:22
**taken** 1:22 3:6 8:7
57:23 97:2 156:4
156:5 165:17
199:7 214:12
215:12 220:20
**takes** 199:14
**talk** 33:19 34:13,17
35:7 51:7 52:18
56:16 57:3,7
79:23 83:13 89:3
118:1 133:7
149:22 167:16
175:1,6,9 179:1
**talked** 52:23,24
121:3 142:15
174:16
**talking** 32:18,18,19
32:22 33:1 36:18
41:15,16 50:4,21
63:1 75:13 77:8
89:9,13,20,21,22
124:2,12 125:2
143:22,23 151:13
186:14 215:17
**talks** 178:24 192:8
**tamp** 200:4
**tank** 98:8 149:10
149:17,19
**tanks** 72:25 96:18
96:19,21 97:4,6
97:15,20 98:6,10
98:11 158:23,25
**tape** 5:25
**tapes** 218:22
**task** 15:13 89:16,19
89:22 100:23

101:19 102:10
103:4 121:10
122:4,13 127:13
143:22 144:2
**tasks** 147:7 213:13
213:13,18
**technical** 58:10
86:17 215:6
**technician** 12:13
**Technology** 17:18
22:5 218:24
**telecom** 102:12
104:11,18 137:8
141:13,25
**teleconference**
141:17
**telephone** 11:25
12:3 103:24 140:1
142:1
**tell** 9:6,9 11:14
14:1,20 25:3
29:15 33:16 36:11
52:1 55:14 62:9
62:11,15,16 63:12
63:16,16,25 66:5
66:6 69:1,1,6
70:25 71:2,6 72:6
78:21 79:25 80:11
80:24 85:17,25
93:17 102:5 103:1
103:9,10,21 104:8
104:9 105:15,20
106:6 110:18
112:9 114:4,24,25
127:19 152:15
157:16 159:4
160:23 161:17
191:7 196:19
198:6 199:19,24
209:11 212:23
213:10
**telling** 60:1 76:10
111:14 141:16
159:3,9,15,17,19
183:18
**tells** 52:9 68:3 69:4

O'CONNER, DENNIS

8/13/2008

Page 243

70:12
**Temecula** 1:21
  7:14
**temporary** 128:5
**ten** 25:20 110:10
**tendency** 56:24
  77:11
**TERC** 81:24 89:10
  89:10,14,19,21,23
  90:2 100:22 119:2
  119:4,7 143:16,17
  143:23,24,25
  144:6
**term** 59:5 61:4
  163:25 165:10,11
**termed** 84:24
**terminology** 60:21
  61:4,6 158:12
  165:6
**terms** 38:8 93:2
**test** 200:16
**tested** 200:10
**testified** 139:17,25
**testify** 7:16 221:7,8
**testimony** 39:12
  48:13 79:12 99:1
  112:16 114:15
  131:3 133:21
  136:12 137:14
  138:22 139:3,22
  140:4 146:3,16
  168:13 169:2
  187:2 203:14
  220:5,7 221:9
**testing** 94:3 95:24
**Thank** 7:23 56:13
  145:3 169:6
  184:15 203:5
  218:11,13
**Thanks** 12:21 77:6
  217:13
**thereabouts** 81:14
**thereof** 3:16
**thing** 12:7 85:17
  87:6 137:3,13
  146:5 154:20

169:4 172:15,25
174:22 176:2
187:14 191:7
202:16
**things** 9:3 16:14
  20:24 22:12 23:15
  26:2 32:3 34:11
  62:12,21 68:25
  69:2 72:6 74:5
  91:4 97:6,21
  98:23 99:3,8
  144:3 174:6
  176:18 191:25
  192:1,8,10 213:13
  213:20
**think** 12:8 14:2
  15:15 37:13 38:15
  38:25 41:6 51:23
  56:21 59:1 61:3
  63:25 76:10 81:13
  89:19 108:21
  124:7 139:9 157:4
  167:2 176:4
  178:15,16 208:6
  216:21
**thinking** 38:8
  122:16 125:1
  179:19
**third** 149:9,10
  160:4 215:22
**thought** 21:21
  40:10 41:8,10
  55:20 82:21 93:21
  94:16 104:13
  105:3 120:23
  121:15 137:22
  151:17 160:5
  170:21 185:6,24
  195:12
**three** 14:25 47:12
  73:8 87:13 139:23
  147:25 148:18,18
  148:19,20,21
  174:7 178:7,8
**Three-quarters**
  20:16

**throw** 104:20
  200:25 201:1
**ties** 39:21
**time** 3:16 5:10 8:9
  8:9 14:12 15:14
  15:17 17:5 20:5,9
  22:1 25:5 51:20
  61:17 68:1 81:4
  83:11,15 84:11,19
  88:12,22 89:2
  90:9 93:22 95:9
  96:3 100:11 101:3
  102:5 108:11
  119:3 120:10,14
  120:19 126:25
  127:11 130:6
  133:6 134:10,25
  135:6 143:4
  147:11 149:18
  151:22 160:4
  163:8 165:22
  184:23 185:4
  193:22,23,23
  197:11 200:5
  202:7,22 203:2,20
  219:1
**times** 5:21 28:9
  37:22
**tiny** 135:16
**tired** 180:16
**title** 14:25
**titles** 14:25
**today** 5:12 7:8
  13:24 14:4 92:25
  99:2 100:10
  174:16 204:13
**today's** 5:9,20
**told** 49:4 55:21
  95:12 97:18,19,20
  102:14,23 103:2
  103:15,16 104:8
  104:13,14,17
  105:4,4,22 107:23
  109:23 118:2
  121:16 123:2,4
  133:2,24 137:1,2

139:18 140:1,3,6
143:7 145:23
160:24 162:2
172:5 185:24
198:3 205:12
**ton** 215:9,9
**tonnages** 215:17,19
**tons** 192:8 215:7,7
  215:23,24
**Tony** 122:9
**top** 60:24 64:10
  154:17 201:17
**topics** 86:11
**Torts** 2:19
**tossed** 111:8
**total** 193:21,25
  218:21
**tracks** 205:1
**tractor** 198:20
**trailer** 118:14
**trailers** 115:3
  133:3,4 204:24
**training** 15:19
  173:9
**transcribed** 221:10
**transcript** 205:25
  206:11 221:12
**transcription** 220:7
**transferred** 138:10
**transite** 188:7
  194:25 208:24
  209:5,10 210:2
  211:6 214:11
  215:12 216:2
**transmission** 61:13
**transport** 61:1,9
  84:5
**Transportation**
  121:18 122:8
  125:17,21,24
  126:9,14,17,24
  127:1
**transported** 192:11
  192:11
**trash** 72:24
**treatment** 93:10

**tree** 72:24
**Treeby** 2:8 4:24 6:4
  6:5,11 19:22
  24:14,19 25:7,13
  26:4,9,12,13,19
  26:24 27:4,5,11
  27:16,21 28:2,5,6
  28:14,18,22 29:4
  29:9,14,19 30:5
  30:11,18 31:2,7
  32:17 36:21 37:6
  40:15,20,24 42:20
  43:2 46:8,14,20
  47:3 48:19,23
  49:13 52:3 53:16
  53:24 54:7,25
  55:7,11 64:24
  65:11,22 66:15
  68:5,13 69:9,18
  70:3 74:1,21
  76:21 77:1,5,18
  78:12 80:12 82:18
  89:15 90:17,21
  91:2,9,15,20,25
  92:9 94:23 109:15
  109:20,25 110:4,9
  111:24 112:5,13
  116:4,9,14,18,24
  117:4 119:15,20
  120:9 128:15,19
  128:23 131:11
  134:2 140:9,18,23
  144:13,25 148:8
  150:11,16,21
  151:4,9,18,23
  152:3 153:14
  159:11 160:11,22
  161:5,10 162:21
  163:2 164:3,15
  166:20,24 169:18
  169:25 170:18
  171:25 179:9
  181:18,24 182:4
  182:10,15 183:5
  183:10,15,21
  184:1,5,11,16

O'CONNER, DENNIS

| | | | | |
|---|---|---|---|---|
| 187:22 192:16,19 194:8 203:8 204:11 206:2,6,9 207:6,11,15,16,22 207:25 208:5,14 208:21 210:4,18 212:4,11,20 213:2 213:6,8 214:3,21 215:2 216:7 217:1 | 42:17 45:2 104:20 104:24 113:7 114:12 115:4 130:22 148:23,24 149:4 154:11,14 169:1 172:5 195:1 195:8 198:2 203:19 204:1,20 208:18 | 81:3 82:3 83:19 98:16,17 102:4 103:19 104:22 119:9 128:18 | 201:22 210:1 211:4 216:19,21 217:19 | **W** |

**Treeby's** 53:20 54:4
**trench** 39:18 47:13 49:4,23
**Trenching** 47:25
**tried** 8:24
**truck** 168:21 172:18,19
**trucked** 173:10
**true** 66:12 116:12 129:6 138:5 148:7 155:14 170:17 189:11 198:5 220:6 221:11
**truth** 221:8
**try** 37:14
**trying** 14:3 16:4 21:11 25:21 27:8 27:20 31:19,20 32:4 33:11 34:7 35:19 38:7 41:19 44:7 45:1 51:15 54:14,15 62:12,24 64:21 65:7,18 67:13,14,17,22 68:9 70:19 74:16 98:16 103:3 123:13,13 126:21 129:1 150:24 152:4 159:2,4
**turned** 147:8 179:25
**turning** 183:8
**turns** 124:2
**twelve** 33:17
**twice** 160:5
**two** 9:23 19:21 35:6

**type** 71:5 158:17 159:6
**typical** 42:5,5 107:10 114:20 127:17
**typically** 48:10 50:17 117:9 178:6 202:2

**U**

**U** 3:1
**Uh-huh** 32:21 41:14 51:18 61:24 63:4 115:8 142:12 170:22 193:20 194:7
**undercut** 38:14
**underground** 34:8 96:18,19 97:3 158:23
**undermine** 77:12 171:2
**undermining** 78:10 169:23
**underneath** 44:18 77:16 78:9 171:16 206:18
**understand** 8:18 9:9 10:18 13:23 14:3,10 15:15 21:25 30:3 31:8 37:15 38:7,17,19 41:5,19 42:15,25 43:8 45:1 48:4,12 51:16 52:8,22 66:8 68:9 74:17 77:3 78:21 79:11

**understanding** 13:13,16 38:20 51:10 59:11,12 61:12 68:1 83:8 99:22 100:19 102:19 103:11 143:25 221:13
**understandings** 205:16
**understands** 54:19
**understood** 88:21
**under-seepage** 59:4,12,19,25 60:17
**unfair** 8:20 30:15
**unfortunately** 38:18
**unit** 215:9
**United** 1:1 2:18,21 5:7 7:1 18:6 136:23 137:15 161:18 181:1
**units** 16:12
**unknown** 80:20 176:10
**unknowns** 176:7
**unstable** 67:4
**unusual** 126:6,22
**use** 8:21 35:3 38:5 113:23,25 123:12 133:4 145:12,14 150:17,20,23 155:16 156:15,16 156:22,23,25 157:22 158:10,24 159:21 160:2,3,8 160:8,17,21 161:16,20 168:8 168:10 173:13 179:16 185:17,18 185:23 186:6,11 198:4 201:16,20

**Usually** 113:23
**utilities** 34:9,10
**utilize** 144:9

**V**

**vague** 24:22,25 29:11,13 30:8,10 31:12 45:17
**Vaguely** 106:23
**vagueness** 30:4
**valley** 64:4
**variables** 75:2,3
**varies** 57:5
**various** 61:18,18 61:19 93:10 104:4
**vast** 53:14 171:10 206:13
**verify** 176:6
**version** 64:9 152:16
**vertical** 99:17,18
**video** 5:1,14,17,19 7:7,18 20:3,8 120:13,17 134:17 134:24 135:4 184:22 185:2 202:20 203:1 218:19
**videographer** 5:12 5:23
**Videography** 2:23 5:15
**videotape** 5:3
**Videotaped** 1:19 2:22
**videotapes** 218:23
**view** 9:3
**violation** 166:10
**virtue** 55:21
**volume** 5:2 218:21
**volunteered** 10:8 10:12

**Wager-Zito** 2:11 6:18,19 191:1
**wait** 52:1 68:6,6,6 83:16 116:5,5,5 153:21 160:4,20 160:20 181:25
**waiting** 100:9
**waived** 3:10,12 145:16
**walk** 52:17 87:17 104:7,21
**walked** 38:23
**walls** 68:11
**WALTHER** 2:7
**want** 9:7 14:8 16:5 21:14 25:4 29:20 35:1,6 40:13 54:23 56:10,16 60:10 62:23 79:4 79:15,22 80:3,3 108:21 123:12 144:8 145:6 149:25 150:17,20 150:23 165:5,7 169:11 171:24 173:14 184:6 189:7 193:11 200:19 206:7 212:10 213:3
**wanted** 107:13 125:10 141:15 155:5,6 160:9 175:2,5 186:6
**wanting** 91:11
**wants** 169:8 205:25
**Washington** 2:13 2:13,16,20 6:6,17 6:20,23 9:19,22 12:15 13:15 15:23 18:22 19:11 22:8 84:16 90:3 99:22 100:20 103:22 105:16 117:17 128:3 130:17

O'CONNER, DENNIS

8/13/2008

Page 245

131:4,7,24 133:16
133:25 135:12
136:12 138:23
143:17 145:14
146:18,24 152:11
152:23 191:22
212:18
**wasn't** 60:21 75:18
82:1 93:20 104:16
147:15,16,21
159:1
**watching** 195:23
**water** 44:6 56:19
58:25 60:16 61:9
61:13,19,20,23
62:18,18,19 63:2
63:13,17,18,21,23
64:3,9,22 65:20
66:13 67:2,3,9,17
67:25 68:10 72:1
72:5,7,19 73:11
73:24 74:13,18
76:11 77:9,15,24
77:25 78:3,7,25
80:5,8 171:7,11
171:14,15,16
199:5,22 200:13
200:15,16,19
206:14,16,17,18
**waterproof** 149:12
149:13
**waterway** 78:5
**way** 8:21 10:7 16:7
21:10 23:23 30:2
35:24 42:18 63:18
63:21 64:8,9,12
67:2,25 71:17
75:5 93:4 99:6
104:3,4 139:17
166:5 221:15
**ways** 42:8
**wedding** 148:25
149:22 151:12,17
174:22 176:9,17
176:24 177:18
188:9,18 196:2,8

199:18 203:17
204:9 206:23
**Wednesday** 1:24
**weight** 192:8 200:5
**well-maintained**
96:25
**went** 20:20 29:8,9
78:5 90:9 104:5
121:15 123:5
127:11 133:25
134:12,18 139:7,8
178:5 212:6
**weren't** 41:15 81:1
95:11 156:22
160:7 200:11
**wet** 69:2,5,6 70:24
71:2,4 75:23
**we'll** 28:11 53:20
54:1 121:20
127:20 140:17,19
163:8 165:2
**we're** 9:1 13:9 25:8
27:8 28:10 31:14
31:15 32:18,18,19
32:22 33:1 42:1
47:25 50:3,21
67:13,14,15,16,22
75:13 93:17
105:25 124:2
127:2 141:21
151:13 165:8
182:16,19,22
183:1,14,16
184:23 186:14
188:17 190:12
202:21 215:17
217:2,5
**We've** 140:10
**WGI** 12:5 13:1,6
16:1 20:18 21:3,6
21:24,24 22:4
24:4 100:12
101:15,16 103:2,2
131:19 153:6
154:19,22 157:6,7
157:10 176:14

179:25 185:16,18
186:21 209:2
**WGI's** 129:3
**WGI-000641** 4:23
212:14
**WGI-139** 4:12
144:5
**WGI-21810** 4:14
162:15
**WGI-22877** 4:18
4:19 187:14
192:23
**WGI-3455** 4:6
105:24
**WGI-36696** 4:18
4:20 190:13
193:17
**WGI-38704** 4:5
85:16
**WGI-38705** 4:5
86:10
**WGI-38708** 86:20
**WGI-38726** 4:6
90:12
**WGI-40961** 4:7
109:8
**WGI-48621** 4:13
150:2
**WGI-5** 4:3 82:4
**WGI-651** 4:23
212:14
**WGI-8583** 4:22
209:8
**whalers** 154:16,19
157:9
**wharf** 44:7
**whatsoever** 131:17
131:18
**wheel** 198:16
**whichever** 15:8
153:8 189:20
**WILKINSON** 1:10
**William** 2:8 6:5
**window** 110:10
**Wintertime** 67:8
**withdraw** 32:16

**witness** 3:6,24 6:7
6:10,17,20,23
7:12 8:22 9:15
27:9 30:3,10
37:11 45:18 47:7
48:21,25 49:17
55:2,14 65:2,25
68:16 69:12,21
70:5 74:4,23
76:23 77:1,20
80:17 82:23 92:15
106:20 117:8
119:18 131:13
141:7 142:6,9
144:21 148:10
154:6,10 159:12
159:14 160:13
162:25 164:19
167:1 168:12
170:3 175:13
180:2,8,21,22
181:7,20 188:4,5
191:15 194:13
196:23 204:4
207:2,3 210:23
220:12 221:6
**WITNESS'S** 220:2
**WITTMANN** 2:7
**wood** 39:20
**woods** 156:11
**word** 9:10 26:23
35:3 123:12
137:12 165:6,8
166:18 167:3
200:4
**words** 35:14 45:23
63:18 73:11
104:19 146:9
164:9,10,12
165:22,24 193:13
**work** 12:14 13:1
14:7,7,11,16
15:16,17 16:12
17:4,5 18:21 21:2
22:6,7,14 23:22
31:22 33:4 34:4,8

36:19 39:17 44:3
50:18 52:9,18
68:17 79:19,19,23
80:20 81:15,18,20
83:11 84:13,17,18
85:4 96:5,8 99:24
100:22 101:3
102:9 108:15
111:15,16 112:23
118:4,18 119:1,4
121:9,20 123:11
125:19,21 127:14
128:9 129:15
130:13 132:19
146:7 149:11
150:8,10 152:11
152:15 153:4
157:1 174:11
175:10,20,23
176:16,16,21
177:20,25 178:11
178:16,17,22,25
179:17,24 185:8
185:11 200:24
213:12,14
**worked** 15:22 19:1
22:4 72:20 96:21
197:23 202:4
**working** 16:25
18:25 21:18 22:16
23:8,21 24:8
31:24 44:13,14
60:13 70:8 101:7
121:20 122:4
127:3 133:20
146:10
**works** 23:24
**wouldn't** 34:5
37:25 39:1,6
75:24 80:18 111:7
120:7 135:21
155:12 198:20,22
198:23 214:5
218:3
**write** 135:20,21
**writes** 166:10

Johns Pendleton Court Reporters

800 562-1285

O'CONNER, DENNIS

**writing** 86:13
  98:20 162:5,7
  166:16 169:3
**written** 93:12
  108:7 111:1 153:5
  164:1
**wrong** 14:1 29:25
  47:22 90:16
  114:21 134:7
  146:21 157:20
  158:7,16 169:14
  173:15 187:15
  210:22 211:13
**wrote** 14:21 85:8
  93:23 95:9 96:4
  96:15 106:17,25
  107:15 109:4
  123:25 165:25

**X**

**X** 4:1

**Y**

**yard** 215:21
**yards** 187:20
  189:14 190:2,19
  193:18,24 194:3
  215:18
**yawning** 53:21
**Yeah** 47:6 152:6
**year** 11:13,15,17
  17:20 19:10,13,18
  20:14 61:18
**years** 8:2 9:23
  14:17 19:4,5
  61:19 72:22 73:8
  108:7,10
**yellow** 153:23
**yesterday** 10:20
  11:6,9
**y'all** 76:6 194:20
  209:19

**Z**

**zero** 128:8,8,8,9

**0**

**01** 174:13 177:25
  211:20
**02** 189:9
**05-4181** 1:10
**05-4182** 1:8,10 5:6
**05-5237** 1:10
**05-6073** 1:10
**05-6314** 1:10
**05-6324** 1:11
**05-6327** 1:11
**05-6359** 1:11
**06-0225** 1:11
**06-0886** 1:11
**06-1885** 1:11
**06-2152** 1:12
**06-2278** 1:12
**06-2287** 1:12
**06-2824** 1:12
**06-4024** 1:12
**06-4065** 1:12
**06-4066** 1:13
**06-4389** 1:13
**06-4634** 1:13
**06-4931** 1:13
**06-5032** 1:13
**06-5155** 1:13
**06-5159** 1:14
**06-5161** 1:14
**06-5162** 1:14
**06-5260** 1:14
**06-5771** 1:14
**06-5786** 1:14
**06-5937** 1:15
**07-0206** 1:15
**07-0621** 1:15
**07-1073** 1:15
**07-1271** 1:15
**07-1285** 1:15

**1**

**1** 4:4 5:2,3 82:15,19
  82:22 218:21
**1,000** 194:1
**1.0** 86:21
**1/25/02** 192:24

**1:13** 135:1
**1:17** 135:6
**10** 4:12 48:6,7
  57:16,16 150:1
  153:25 209:12
**10:04** 5:11
**10:20** 20:5
**10:24** 20:10
**105** 4:6
**106** 4:7
**109** 4:7,8
**11** 4:13 129:22
  162:13
**114** 4:8
**12** 4:14 145:7
  172:13
**12:03** 120:15
**12:56** 120:19
**121** 4:9,9,10
**122** 4:10
**12265** 1:22 5:18
**129** 4:11
**13** 1:24 4:15 128:8
  174:3,10 175:21
  177:8 220:20
**13th** 5:9
**1309** 194:4
**1331** 2:19
**14** 4:16 96:20 177:8
  177:22
**14,000** 215:7
**141** 4:11
**144** 4:12
**15** 4:17 177:8,15
  179:22 185:7
  201:12 212:15
**150** 4:12,13
**16** 4:17,19 187:13
  191:12 192:20
**162** 4:13,14
**168** 4:15
**17** 4:20 193:17
**174** 4:14,15
**178** 4:16
**179** 4:16,17
**18** 4:21 108:13

**199:1**
**180** 206:10
**187** 4:17,18
**19** 4:22 142:4
  150:14 154:5,7
  210:20,22 211:22
**190** 4:18
**191** 4:19
**192** 4:19
**193** 4:20,20,21
**1971** 16:17
**1999** 81:11 87:7,16
  87:17 88:7,23

**2**

**2** 1:8 4:3 82:5 87:7
**2:06** 184:24
**2:12** 185:4
**2:32** 202:22
**2:37** 203:3
**2:51** 219:2
**20** 4:23 57:8,8
  143:5 169:16
  210:14,16 212:12
  218:13
**200** 1:23
**2000** 81:14 108:9
  127:7 128:1 130:3
  142:4,14
**20001-2113** 2:13
**20004** 2:20
**2001** 129:22 150:15
  151:6 154:5 163:3
  190:14 212:16
**2008** 1:24 5:10
  220:20
**201** 4:21
**203** 4:24
**206** 190:15 193:18
**208** 4:25
**209** 4:22
**2111** 4:15 168:18
**212** 4:22,23,23
**216** 4:25
**22** 73:5 89:1 206:11
**24** 16:12

**25** 189:9
**25th** 190:14
**26** 89:16,19,22
  100:23 102:10
  121:10 122:4,14
  143:22
**265** 194:2

**3**

**3** 4:4 85:15 90:13
  92:18 199:4,22
**30** 116:13 131:5
**300** 202:12
**352** 193:24
**35745** 1:21 7:14
**36825** 4:21 194:2
**37614** 4:16 179:2
**38713** 97:10
**38717** 97:10
**38769** 4:5 85:16
**39044** 185:12

**4**

**4** 4:7 96:19 106:1
  127:8
**4,000** 215:6,24
**4.1** 90:13
**40** 96:22
**40964** 4:8 114:12
**456.88** 190:19
**45688** 193:22
**46,494** 190:2
**46,494.95** 187:20
  189:14

**5**

**5** 4:8,9 86:12 88:16
  90:5,8,10,15 91:1
  93:3,7,17,19,24
  94:4,13,21 95:21
  95:25 96:16 97:21
  99:4,12 109:9
  110:15 121:7
  122:16 124:13
  199:3,4,21
**50** 86:13

O'CONNER, DENNIS

8/13/2008

Page 247

| | |
|---|---|
| **50,000** 158:24<br>**51** 2:12<br>**546** 2:8<br>**56** 4:6 105:24 128:8<br><br>────── **6** ──────<br>**6** 4:5,9 86:10<br>   116:13 121:14,23<br>   121:24 125:14,15<br>   131:5 151:6<br>   174:12 209:12<br>   211:20<br>**6th** 151:8<br>**62** 4:7 109:8<br>**63** 4:7 109:8<br><br>────── **7** ──────<br>**7** 4:5,10,24 86:10<br>   108:9 121:25<br>   125:14 127:22<br>   162:18,20 163:3<br>**7th** 127:7 128:1<br>   130:2<br>**70113** 2:5<br>**70130-3588** 2:9<br><br>────── **8** ──────<br>**8** 4:10,11 122:10,14<br>   125:14 129:23<br>   137:16<br>**8-A** 132:19<br>**8095N** 2:20<br>**812** 4:14 162:15<br>**82** 4:3,3,4<br>**84** 4:22 209:8<br>**85** 4:4,5,22 200:9<br>   209:9<br>**855** 2:4<br>**8583** 211:21<br>**8585** 211:21<br>**86** 4:5<br><br>────── **9** ──────<br>**9** 4:3,11 82:4<br>   141:22<br>**9/27** 193:24 | **9/28** 194:1<br>**90** 4:6 86:16 199:2<br>   199:6,20 200:3,10<br>   201:3<br>**92130** 1:24<br>**92592** 1:21 7:14<br>**99** 81:14 |