# EXHIBIT 9

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

IN RE:  KATRINA CANAL BREACHES      CIVIL ACTION
CONSOLIDATED LITIGATION
                                    NO. 05-4182
                                       "K" (2)
PERTAINS TO:  MRGO-ROBINSON          JUDGE DUVAL

FILED IN:  05-4181, 05-4182,     MAG. WILKINSON
05-5237, 05-6073, 05-6314,
05-6324, 05-6327, 05-6359,
06-0225, 06-0886, 06-1885,
06-2152, 06-2278, 06-2287,
06-2824, 06-4024, 06-4065,
06-4066, 06-4389, 06-4634,
06-4931, 06-5032, 06-5155,
06-5159, 06-5161, 06-5162,
06-5260, 06-5771, 06-5786,
06-5937, 07-0206, 07-0621,
07-1073, 07-1271, 07-1285

Videotaped Deposition of

WASHINGTON GROUP INTERNATIONAL BY
            ANNE PATTEN VEIGEL,
2763 North Woodview, Boise, Idaho 83702, taken
in the offices of Hawley, Troxell, Ennis &
Hawley, 877 Main Street, Suite 1000, Boise,
Idaho 83702, on Thursday, the 17th day of
April, 2008.

ANNE PATTEN VEIGEL                                          4/17/2008

---

Page 2

1  APPEARANCES:
2    LAW OFFICE OF JOSEPH M. BRUNO
       (BY: JOSEPH M. BRUNO, ESQ.
3        SCOTT JOANEN, ESQ.)
         855 Baronne Street
4    New Orleans, Louisiana 70113
         PLAINTIFFS LIAISON COUNSEL
5
6
7    LEVIN, PAPANTONIO, THOMAS, MITCHELL,
       ECHSNER & PROCTOR
8      (BY: MATT SCHULTZ, ESQ.)
       316 South Baylen Street
9      Suite 600
       Pensacola, Florida 32591
10       ATTORNEYS FOR PLAINTIFFS
11
12
13   JONES, DAY
       (BY:  ADRIAN WAGER-ZITO, ESQ.
14       DEBRA CLAYMAN, ESQ.
         JULIA CRONIN, ESQ.)
15   51 Louisiana Avenue, N.W.
     Washington, D.C. 20001
16       ATTORNEYS WASHINGTON GROUP
           INTERNATIONAL
17
18
19   UNITED STATES DEPARTMENT OF JUSTICE
     CIVIL DIVISION
20   TORTS BRANCH
       (BY: JEFF EHRLICH, ESQ.
21       RICHARD STONE, ESQ.)
     Post Office Box 888
22   Benjamin Franklin Station
     Washington, D.C. 20044
23       ATTORNEYS FOR UNITED STATES
24
25

---

Page 3

1
2  VIDEOTAPED BY:
3      Brad Fischer
       I-Dep, Inc.
4
5  REPORTED BY:
6      ROGER D. JOHNS, RMR, CRR, RDR, CSR
       Certified Court Reporter
7      State of Louisiana
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 4

1            S T I P U L A T I O N
2
3       It is stipulated and agreed by and between
4  counsel for the parties hereto
5  that the deposition of the aforementioned
6  witness is hereby being taken under the
7  Federal Rules of Civil Procedure, for all
8  purposes, in accordance with law;
9       That the formalities of reading and
10 signing are specifically not waived;
11      That the formalities of certification and
12 filing are specifically waived;
13      That all objections, save those as to the
14 form of the question and the responsiveness of
15 the answer, are hereby reserved until such
16 time as this deposition, or any part thereof,
17 may be used or sought to be used in evidence.
18
19            *  *  *  *
20
21      ROGER D. JOHNS, RDR, CRR, Certified Court
22 Reporter for the State of Louisiana,
23 officiated in administering the oath to the
24 witness.
25

---

Page 5

1            I N D E X
2
3                        PAGE
4  Exhibit Number 1........................... 7
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

JOHNS PENDLETON COURT REPORTERS                     800 562-1285

ANNE PATTEN VEIGEL                                                4/17/2008

Page 6

1       VIDEO OPERATOR:
2       Today is Thursday, April 17,
3   2008.  The approximate local time is
4   8:32 AM.  The location is Hawley,
5   Troxell, Ennis & Hawley, 877 Main
6   Street, Suite 1000, Boise, Idaho
7   83702.  My name is Brad Fischer.
8       This is case number 2005-CV-4182,
9   In Re: Katrina Canal Breaches
10  Consolidated Litigation.  This is the
11  Washington Group International 30
12  (b)(6) deposition of Anne Veigel.
13      Will the Counsel for all present
14  please identify yourselves for the
15  record.
16      MR. BRUNO:
17      Ladies first.
18      MS. CLAYMAN:
19      Debra Clayman for Washington
20  Group.
21      MS. WAGER-ZITO:
22      Adrian Wager-Zito, Jones, Day,
23  Washington Group.
24      MR. EHRLICH:
25      Jeff Ehrlich for the United

Page 7

1   States.
2       MR. STONE:
3       Richard Stone for the United
4   States.
5       MR. SCHULTZ:
6       Matt Schultz with the Levin,
7   Papantonio firm for the Plaintiffs.
8       MR. JOANEN:
9       Scott Joanen, Law Firm of Joseph
10  Bruno, for Plaintiffs.
11      MR. BRUNO:
12      And Joseph Bruno, Plaintiffs
13  Liaison Counsel.
14      VIDEO OPERATOR:
15      Can you swear the witness in,
16  please.
17      MR. BRUNO:
18      Not yet.  This is a 30 (b)(6)
19  witness -- Sorry, this is a 30 (b)(6)
20  deposition notice which I have marked
21  and will attach as Exhibit Number 1.
22      Would Counsel for the Washington
23  Group be so kind as to identify the
24  persons who are here this morning to
25  testify and further to identify the

Page 8

1   paragraphs on the exhibit which will
2   be the area of their testimony.
3       MS. CLAYMAN:
4       Okay.  Sure.  This is Anne
5   Veigel.
6       MR. BRUNO:
7       Thank you.
8       MS. CLAYMAN:
9       She is employed by the Washington
10  Division of URS Corporation, formerly
11  Washington Group International, and
12  she has been designated by the company
13  to testify as to topics 3 through 6 of
14  the 30 (b)(6) notice as they would
15  relate to the TERC only.  Not Task
16  Order 26.
17      MR. BRUNO:
18      We have a separate witness for
19  the task order?
20      MS. CLAYMAN:
21      Yes, we do.
22      MR. BRUNO:
23      Okay.  All right.  With that,
24  would you kindly swear the witness.
25      ANNE PATTEN VEIGEL,

Page 9

1   2763 North Woodview, Boise, Idaho 83702, after
2   being duly sworn, did testify as follows:
3   EXAMINATION BY MR. BRUNO:
4       Q.  Good morning again, Ms. Veigel.
5       A.  Good morning.
6       Q.  My name is Joseph Bruno.  If I may,
7   I would like to start with just the briefest
8   series of questions about you and who you
9   are.
10      A.  Uh-huh (affirmatively).
11      Q.  By whom are you employed?
12      A.  URS Corporation, Washington
13  Division.
14      Q.  Okay.  Does URS stand for something,
15  or is that -- just the name is URS?
16      A.  That's -- That's correct.
17      Q.  Okay.  That's new to us.  I guess I
18  wasn't paying attention.  But URS recently
19  acquired Washington Group?
20      A.  That's correct.
21      Q.  All right.  And what is your
22  position at the company?
23      A.  Vice President of Marketing and
24  Planning.
25      Q.  All right.  And how long -- Well, I

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

ANNE PATTEN VEIGEL                                      4/17/2008

---

**Page 10**

1  am going to ask how long have you been with
2  the company.  I guess I am going to assume
3  that you were with Washington Group before the
4  company was acquired by URS.  Is that
5  accurate?
6      A.  Yes, I was.  I have been with the
7  company 22 years.
8      Q.  Okay.  Great.  Can I conclude from
9  that that you were also with Morrison
10  Knudsen?
11     A.  Yes.
12     Q.  Okay.  Great.  All right.  When did
13  the Washington Group acquire Morrison Knudsen?
14     A.  Actually, Morrison Knudsen merged
15  with a company called Washington Constructors
16  in 1996, retained the name of Morrison
17  Knudsen, but the majority owner was a
18  gentleman by the name Dennis Washington and so
19  Morrison Knudsen then merged with Washington
20  Constructors -- Constructors, acquired two
21  additional companies, Westinghouse Government
22  Services and then subsequently Raytheon
23  Engineers and Constructors.  That second
24  acquisition was completed in the year 2000,
25  and it was at that point that we changed the

**Page 11**

1  name of the company from Morrison Knudsen to
2  Washington Group International.
3      Q.  Okay.  To give this some perspective
4  to what we're here to do today, do you know
5  the approximate date of the execution of what
6  we have been calling the TERC?
7      A.  Yes.
8      Q.  All right.  What is that date?
9      A.  That was in August, 1994 when the
10  contract was signed.
11     Q.  All right.  Now, and so the entity
12  in whatever form it was back in '94 that
13  actually executed the TERC was what entity?
14     A.  That was Morrison Knudsen.
15     Q.  And I should say Morrison Knudsen?
16     A.  Knudsen.
17     Q.  Knudsen.  All right.  Now, when the
18  Washington Group International acquired
19  Morrison Knudsen, was it a stock purchase?
20     A.  No.  Washington Group didn't --
21  didn't acquire Morrison Knudsen.  We changed
22  our name.
23     Q.  Okay.
24     A.  Morrison Knudsen changed their name
25  to Washington Group International.

---

**Page 12**

1      Q.  I'm sorry.  You said that.
2      A.  Yeah.
3      Q.  Please forgive me, because my head
4  is so stuffy right now I can hardly think.
5          So it's really the same company;
6  just a change of name?
7      A.  That's right.
8      Q.  All right.  And so obviously there
9  was no company known as Washington Group
10  International, Incorporated at the time that
11  the TERC was executed in August of 1994?
12     A.  That's correct.
13     Q.  All right.  And I take it the name
14  has something to do with the gentleman who has
15  a large ownership interest in the company?
16     A.  Who formerly had an ownership at the
17  time, yes.
18     Q.  Oh, formerly.  Okay.
19     A.  Yes.
20     Q.  I guess vanity is okay.  All right.
21          Well, then, let me move to
22  paragraph number 4 of the notice and see if we
23  can't learn a little bit about Morrison
24  Knudsen.  First of all, what generally was the
25  business of Morrison Knudsen?  What do they

**Page 13**

1  do?
2      A.  Morrison Knudsen was an engineering
3  and construction company; did work in a
4  variety of markets, both in the U.S. and
5  outside the U.S.
6      Q.  Okay.  Do you know whether or not
7  Morrison Knudsen did any work in Louisiana?
8  And I am just going to say generally the time
9  frame of about 19 -- the '80s and '90s.
10     A.  I do not.
11     Q.  All right.  Obviously Morrison
12  Knudsen, I take it, is a rather large
13  company?  It was a rather large company?
14     A.  Yes.
15     Q.  And I only ask because I am trying
16  to get focused on that component of the
17  company that would have had something to do
18  with the TERC.
19     A.  Uh-huh (affirmatively).
20     Q.  All right?  So can you tell me at
21  the largest division of the company, how is it
22  divided?  Are there divisions or branches or
23  regions or things like that?
24     A.  What time period are you referring
25  to?

---

4 (Pages 10 to 13)

ANNE PATTEN VEIGEL                                    4/17/2008

Page 14

1      Q.  The time period -- I'm sorry.  I'm
2  talking about now the time period including
3  the knowledge of the existence of an
4  opportunity to negotiate with the government,
5  the bid process and the execution of the
6  TERC.  Not knowing how long that was, that's
7  the general time frame that I would like to
8  talk to you about.
9      A.  Uh-huh (affirmatively).  In 1994 I
10  believe we were organized in business units as
11  we are today.
12     Q.  All right.  How many business units
13  were there if you can remember?
14     A.  I don't remember.
15     Q.  The business units, were they --
16  what would be the title of the person who
17  would be in charge of the unit?  Is there --
18  Was there a common title across these units?
19     A.  That changed over the course of the
20  years.  It might be president or a senior
21  executive vice president.
22     Q.  Okay.
23     A.  Something of that -- on that level.
24     Q.  All right.  And whatever their
25  title, the heads of these business units would

Page 15

1  report to whom?
2      A.  At that time I don't recall.
3      Q.  That's fine.  All right.  What would
4  have been the title of the business unit that
5  would have had some interest in this TERC?
6      A.  It was the Engineering Construction
7  and Environmental business unit or division.
8      Q.  Engineering Construction and
9  Environmental?
10     A.  Yes.
11     Q.  And it was unit or whatever it was?
12  Do you know who was in charge of that entity
13  or that -- I shouldn't call it an entity.  Who
14  was in charge of that component of the
15  company?
16     A.  That was Tom Zarges.
17     Q.  T O M?
18     A.  Yes.
19     Q.  The last name is?
20     A.  Zarges.
21     Q.  Z A R G E S?
22     A.  Correct.
23     Q.  Okay.  Is Mr. Zarges still around?
24     A.  He is.
25     Q.  Is he currently employed by URS?

Page 16

1      A.  He is.
2      Q.  Okay.  What is his current position?
3      A.  He is the president of the URS Div-
4  -- or, excuse me, the Washington Division of
5  URS.
6      Q.  And what does that division do?
7      A.  Engineering, construction and
8  management services.
9      Q.  All right.  So is that pretty much
10  the same thing that the Engineering,
11  Construction, and the Environmental unit of
12  Morrison Knudsen did?
13     A.  There are broader capabilities
14  within the division today than there were in
15  1994.
16     Q.  All right.  I don't really need for
17  you to give me an exhaustive list, but just
18  can you give me some sense of what the other
19  units would have been called?  That is, in
20  1994 during this time frame that we have just
21  established when the Engineering, Construction
22  and Environmental unit existed?
23     A.  No, I honestly don't recall what the
24  -- what the structure was in the other units
25  at that point in time.

Page 17

1      Q.  Well, not so much the structure, but
2  just what their names were.
3      A.  Well, that's what I mean.
4      Q.  Okay.  Sorry.  Okay.  And were you
5  working within the Engineering, Construction
6  and Environmental unit at that time?
7      A.  I was.
8      Q.  All right.  And what was your
9  position?
10     A.  In 1994 I was the Scientific
11  Services Manager in the Denver office.  It's
12  part of the Environmental Division.
13     Q.  All right.  Did the Scientific
14  Services office work in all of the areas that
15  the Engineering, Construction and
16  Environmental unit worked?
17     A.  No.
18     Q.  So I gather that they were -- Was it
19  a geographic limitation, or was there some
20  other limitation?
21     A.  There was both the -- the technical
22  focus --
23     Q.  Right.
24     A.  -- of the group and there were
25  geographic delineations as well to the work.

ANNE PATTEN VEIGEL                                    4/17/2008

Page 18

1      Q.  All right.  So what geography did
2  your office do business in?
3      A.  It was the, what we considered at
4  the time the central region.
5      Q.  All right.  And I take it the United
6  States?
7      A.  That's correct.
8      Q.  Which states made up the central
9  division?
10     A.  I don't recall where the geographic
11  boundaries were, but there were three regions,
12  the western, the central, and the eastern.
13     Q.  Can I assume that Louisiana was
14  included in your division?
15     A.  It was.
16     Q.  All right.  Do you recall having
17  done any work in Louisiana during the time
18  that you were the head of the Scientific
19  Services office?
20     A.  No.
21     Q.  Okay.  Now, you said there was also
22  a technical focus limitation.  What was the --
23  what was that limitation?
24     A.  Scientific Services were responsible
25  for environmental-related investigations and

Page 19

1  remediation.
2      Q.  Did you folks have any geotechnical
3  expertise in your office?
4      A.  In 1994?  I don't recall.
5      Q.  All right.  Where in the hierarchy
6  was the Scientific Services office, that is,
7  within the Engineering, Construction and
8  Environmental business unit?
9      A.  It was actually the Scientific
10  Services Group.
11     Q.  Group.  Okay.
12     A.  In the Denver office.
13     Q.  All right.
14     A.  Of the Environmental Division.
15     Q.  Well, we're going -- If I were
16  looking at an organizational chart of this
17  business unit -- First let me ask, how was it
18  divided?  That is, divisions, groups, regions
19  or -- what were the broad divisions of that
20  unit?
21     A.  Of which unit?
22     Q.  The Engineering, Construction and
23  Environmental unit.  Which I believe you told
24  me was the one that would have had some
25  interest in the TERC.

Page 20

1      A.  Yes.  The way I recall it, it was
2  the central, the western, and the eastern
3  regions.
4      Q.  Okay.  So the next level of
5  authority, if you will, would have been these
6  three regions, each of whom I take it would
7  have been reporting to Mr. Zarges?  Is that
8  correct?
9      A.  In 1994?  We went through several
10  organizational changes over the course of
11  several years and so what I tell you may not
12  be exactly correct for 1994.  It was the
13  Engineering, Construction and Environmental
14  business unit.  We were part of an
15  Environmental Division of that business unit
16  that had three regions:  western, central and
17  eastern.
18     Q.  I see.  All right.  Well, so is it
19  possible that the business unit itself would
20  have been within one of the three regions?
21     A.  No, the business unit covered the
22  entire -- The business unit was an entity of
23  the company so it would -- it would not -- it
24  was not constrained to a region.
25     Q.  I see.  But we do know at the next

Page 21

1  level there was a division by region, and that
2  would have been west, central, and eastern;
3  right?
4      A.  No.  The way I recall it was, the
5  next level was the Environmental Division of
6  the Engineering, Construction and
7  Environmental business unit.  And then that
8  division was organized by regions:  western,
9  central, and eastern.
10     Q.  Well, what was the principal work of
11  the business unit?
12        MS. CLAYMAN:
13          Objection, vague.  Which unit?
14        MR. BRUNO:
15          We are only talking about one
16      unit.  The Engineering, Construction
17      and Environmental unit.  She doesn't
18      even recall the names of any other
19      unit so I don't know how I could
20      possibly be vague.  But that's okay.
21  EXAMINATION BY MR. BRUNO:
22     Q.  Can you answer?
23     A.  The work was engineering,
24  construction, and environmental.
25     Q.  Okay.  So you guys built buildings?

                                6  (Pages 18 to 21)

ANNE PATTEN VEIGEL                                    4/17/2008

Page 22

1    A.  No, we did not.
2    Q.  You built bridges?
3    A.  No, that would have been part of an
4  infrastructure business unit, although I don't
5  know if that was the name of the unit at the
6  time.  But there was infrastructure work that
7  was in another business unit.
8    Q.  Okay.  Let's just talk about your
9  business unit.  When I think about engineering
10  construction, I'm thinking about building
11  stuff.  What kind of stuff did you build?
12    A.  Our division, which is what I was a
13  part of --
14    Q.  I apologize.
15      (Whereupon a discussion was held
16      off the record.)
17  EXAMINATION BY MR. BRUNO:
18    Q.  You were talking -- you were going
19  to tell us about stuff you guys built.
20    A.  Uh-huh (affirmatively).
21    Q.  And I have already learned that
22  there may have been some bricks and mortar
23  buildings somewhere else, but I am not
24  interested in that.  I just want to focus on
25  your, or your unit.  So what kind of things

Page 23

1  did you guys build?
2    A.  Our division was focused on
3  environmental work.  Everything from
4  consulting to investigations to environmental
5  remediation.  And when we -- when we say
6  environmental, generally our focus was
7  specific to hazard -- hazardous, toxic and
8  radioactive waste.
9    Q.  Okay.  So it was primarily -- I
10  guess -- not necessarily primarily
11  remediation, but was it?  Was it --
12    A.  Yes.
13    Q.  -- remediation?  Okay.  Did you all
14  consult with folks as to how to deal with
15  their potential environmental issues as well?
16    A.  Yes.
17    Q.  But primarily remediation?
18    A.  Uh-huh (affirmatively).
19    Q.  Who was in charge of the
20  Environmental Division?
21    A.  When would that be?
22    Q.  The same time frame.
23    A.  In 1994, I believe it was Steve
24  Allred.
25    Q.  Steve, A L R E D?

Page 24

1    A.  Two L's.  A L L R E D.
2    Q.  A L L R E D.  Okay.  And Mr. Allred,
3  the same questions.  Is he still with the
4  company?
5    A.  No, he is not.
6    Q.  Do you know where he might happen to
7  be today?
8    A.  No, I do not.
9    Q.  All right.  So Environmental
10  Division, Mr. Allred, and below that I think
11  we have established we have our three
12  regions.
13    A.  Yes.
14    Q.  Okay.  And what is the next highest
15  person in the hierarchy?  I guess it would be
16  the head of each of the regions?
17    A.  The central region.
18    Q.  Was that you?
19    A.  No, not at that time.
20    Q.  Okay.  At that time who was that?
21    A.  That was a gentleman named Dennis
22  Ferrigno.
23    Q.  F E --
24    A.  F E R R I G N O.
25    Q.  Great.  Okay.  And is Mr. Ferrigno

Page 25

1  still with the company?
2    A.  No, he is not.
3    Q.  Do you know where he is?
4    A.  I believe he has a private
5  consulting firm.
6    Q.  Okay.  Good.  Where?
7    A.  Based out of Denver.
8    Q.  Now, below Mr. Ferrigno, what's the
9  next level of the organization?
10    A.  In Denver there was a Denver
11  operations manager.  I believe that was the
12  title.
13    Q.  You keep referring to Denver.  I am
14  gathering that that's where the office was
15  located?
16    A.  That's correct.  That's where the
17  central region was headquartered.  The office
18  was in Denver.
19    Q.  Okay.  Is Colorado in the central
20  region?
21    A.  Yes, it was.
22    Q.  All right.  Were there any other --
23  I'm just curious.  Was the western region
24  officed in Denver as well?
25    A.  No, it was not.

JOHNS PENDLETON COURT REPORTERS                 800 562-1285

ANNE PATTEN VEIGEL                                           4/17/2008

Page 26

1    Q.  Where was it?
2    A.  It was in Boise.
3    Q.  Okay.  And the eastern region, where
4  was it officed?
5    A.  I believe that was Cleveland.
6    Q.  Okay.  Good.  All right.  So we have
7  an operations manager.  What's the next level
8  of the organization below office manager --
9  operations manager?
10   A.  I believe at that time, and again,
11 there were reorganizations, so -- but the best
12 of my recollection, in about 1994 we had an
13 Engineering Manager and a Scientific Services
14 Manager.
15   Q.  Okay.  Who was the Engineering
16 Manager?  I'm sorry.  Who was the Engineering
17 Manager?
18   A.  I don't recall.
19   Q.  How about the Scientific Services
20 Manager?
21   A.  That would have been me.
22   Q.  That's you.
23   A.  I do remember that.
24   Q.  Okay.  Good.  And what were your
25 responsibilities as the Scientific Services

Page 27

1  Manager?
2    A.  I was a line manager in that I was
3  responsible for the -- the individuals within
4  that group.  As well as for -- So in that
5  regard, I was responsible not only for
6  personnel issues, but for overseeing the work,
7  the quality of the work, and the projects that
8  those individuals were working on.
9    Q.  The work that you all did in that
10 time frame, 1994, was the work done by your
11 company or was there generally a process by
12 which you would subcontract the work to
13 others?
14   A.  Well, typically we worked as a prime
15 contractor to our clients.  We might have
16 subcontractors that worked for us.  But we did
17 not typically work as a subcontractor to
18 another prime.
19   Q.  All right.  Now, let's keep going
20 and see if we can just finish the
21 organizational issues.  Below the Engineering
22 Manager, what was the next level in the
23 structure, if you can remember?
24   A.  There may have been some discipline
25 grouping, so a lead for a particular

Page 28

1  discipline focus.
2    Q.  Right.
3    A.  Or that may have been the limit of
4  the structure at that point in time.
5    Q.  Okay.  Well, certainly within that
6  office there were a variety of disciplines
7  that may have been available to assist in the
8  work of the company.
9    A.  Uh-huh (affirmatively).
10   Q.  Do you recall whether there were any
11 geotechnical folks in that office?
12   A.  I don't recall at that time.
13   Q.  All right.  But let me ask you
14 this.  If you had some need for engineering
15 support, is that where you'd go?
16   A.  Where?  To the Engineering Services
17 --
18   Q.  Yes.
19   A.  -- Group?  Yes, I mean, we could go
20 to the -- to the people who were resident in
21 that office or other offices, or we could
22 subcontract work if we didn't have that
23 expertise.  So a variety of options.
24   Q.  Got you.  But can I assume that the
25 purpose for their existence was to provide the

Page 29

1  technical support to folks like yourself?
2    A.  Or directly to clients.
3    Q.  Okay.  So let's then talk about the
4  organization.  The next level below you, what
5  would be the next person?
6    A.  In my role as Scientific Services
7  Manager at the time?
8    Q.  Yes, ma'am.
9    A.  As I mentioned, there were either
10 discipline leads, discipline groupings or
11 there was no organizational structure below
12 that.
13   Q.  That's for your department as well?
14   A.  Yes.
15   Q.  Who actually did the spade work?
16   A.  I had a number of people that
17 reported to me as part of that group.
18   Q.  And that was in your group?
19   A.  Yes.
20   Q.  Okay.  How many folks did you manage
21 back in that time frame?
22   A.  Oh, I had -- I don't remember in
23 1994.
24   Q.  Well, was it like five or ten?  I
25 mean, was it a large number or small number?

8  (Pages 26 to 29)

ANNE PATTEN VEIGEL                                            4/17/2008

Page 30

1      A.  I would -- If I had to estimate, I
2   would say it was probably closer to 15, 20.
3      Q.  Oh, okay.  All right.  Do you happen
4   -- And this is a very general and I don't
5   expect you to have precise information at all,
6   but I am just trying to get a sense of how
7   much environmental work this group did as a
8   component part of what Morrison Knudsen did
9   generally.  Do you know how much environmental
10  remediation you guys were doing as a
11  percentage of the total business?
12     A.  No, I don't.  I mean, that's a
13  number I would have to research for 1994.
14     Q.  But that wasn't the primary work of
15  Morrison Knudsen, though, was it?  It was a --
16     A.  No, it wasn't, but it was a
17  significant component this the mid '90s.
18     Q.  All right.  Now, so can you tell us
19  who within that structure would have been the
20  person to sort of be on the lookout for
21  contracting opportunities?
22     A.  There were a number of people.  It
23  depends on what the client grouping was, what
24  the industry grouping.  Are you referring to
25  environmental projects?

Page 31

1      Q.  Well, that's a good point.  I just
2   assumed that most -- that really all you did
3   were environmental projects.  Did you do some
4   other kinds of works?
5      A.  We did work for the Federal
6   government that was not always necessarily
7   environmental-related, yes.
8      Q.  And give me a sense of the kinds of
9   projects that you did that were not
10  environmentally-related during that time
11  frame.
12     A.  We had -- Again, I am going to
13  qualify this based on I don't know --
14     Q.  I understand.
15     A.  -- if it was 1994, '96, '97, but in
16  that time frame we would have done some
17  engineering work at some Air Force bases,
18  strictly engineering work.  We did some
19  engineering work for some mining companies.
20  So there were some -- there was some work that
21  was not related to hazardous waste work.
22     Q.  And that was in your --
23     A.  And I am referring only to that,
24  yeah, the office in particular.
25     Q.  The Scientific Engineering Manager

Page 32

1   had responsibilities for these projects?
2      A.  No.  No.  But the office did.
3      Q.  The office, the Denver office did?
4      A.  Uh-huh (affirmatively).
5      Q.  Okay.  Let's talk about government
6   work, then, as they say down south.  Who would
7   be on the lookout for government contracting
8   opportunities?
9      A.  There were a variety of different
10  business development professionals who had
11  that responsibility.
12     Q.  All right.  And where were they in
13  the organizational structure that we have just
14  walked through, you and I?
15     A.  They would have had responsibility
16  at the division level so they weren't
17  necessarily -- they weren't tied specifically
18  to that central region, to the Denver region
19  or to the eastern or to the western, but they
20  worked at the division level.
21     Q.  I forgot to ask you, where was the
22  division office?
23     A.  I believe it was in Boise at that
24  time.
25     Q.  Do you know how the Morrison Knudsen

Page 33

1   company became aware of an opportunity to bid
2   on the TERC?
3      A.  I don't know exactly how we became
4   aware of the opportunity, although the Corps
5   of Engineers -- The formal step in that
6   process is the Corps of Engineers issues a
7   request for proposals.
8      Q.  And those are published, aren't
9   they, in some fashion?
10     A.  Yes, they are.
11     Q.  Okay.  Do you know, before the TERC,
12  do you know whether or not Morrison Knudsen
13  had ever done work on a TERC in the past?
14     A.  No, we had not.
15     Q.  So can I conclude this was your
16  first experience in working on a TERC?
17     A.  Yes.
18     Q.  Would you happen to know the folks
19  who were in the division who would have
20  learned or at least had the job responsibility
21  to be aware of the opportunity to bid on the
22  TERC?
23     A.  Uh-huh (affirmatively).  The
24  gentleman who I believe had that
25  responsibility at that time was a business

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

ANNE PATTEN VEIGEL                                    4/17/2008

Page 34

1  development professional by the name of Bob
2  Stevens.
3       Q.  Is that S T E V or S T E P?
4       A.  V.
5       Q.  V.  Thanks.  Mr. Stevens, is he
6  still with the company?
7       A.  He's not.
8       Q.  Do you know where he is?
9       A.  I do not.
10      Q.  Did you have any role at all in
11  evaluating the request for the proposal by the
12  United States Army Corps of Engineers for the
13  TERC?
14      A.  I don't believe I did.
15      Q.  Do you know who at Morrison Knudsen
16  had any role in evaluating the request for a
17  proposal for the TERC back then?
18      A.  Yes, Bob Stevens was involved in
19  that evaluation.  Dave Hartsfield.  Paul
20  Bengel.  And beyond that, I don't know.
21      Q.  May I ask, is Bengel B E N G E L?
22      A.  A L, I -- No.  I don't know.  I
23  don't recall.
24      Q.  Okay.
25      MS. WAGER-ZITO:

Page 35

1       It's in documents.
2       MR. BRUNO:
3       It is?
4       MS. WAGER-ZITO:
5       It's on some documents.
6       MR. BRUNO:
7       Fair enough.
8  EXAMINATION BY MR. BRUNO:
9       Q.  Okay.  What was Dan's position?
10      A.  Dan?  There was a Dave Hartsfield.
11      Q.  Dave.
12      A.  I don't recall Dan.
13      Q.  My handwriting is so bad.  Dave's
14  position.
15      A.  I don't remember what his position
16  was at the time.  He was I believe a project
17  manager.
18      Q.  How about Paul?
19      A.  The same.
20      Q.  What was the understanding of the
21  company as to what the TERC was?
22      A.  It was a contract for remediation of
23  hazardous, toxic, and radioactive waste at
24  sites within the southwest division of the
25  Corps of Engineers, and those sites could be a

Page 36

1  variety of different locations for a variety
2  of different government agencies.  So they
3  were sites, facilities, locations for the
4  Federal government.
5       Q.  Okay.
6       A.  And it was what was called an IDIQ
7  contract.  Indefinite delivery, indefinite
8  quantity.
9       Q.  Okay.  And so clearly at the time
10  that the company was considering bidding on
11  the contract, it really didn't know precisely
12  where it was going to be working and it didn't
13  really precisely know what it was going to do;
14  right?
15      A.  That is true in part.  However, the
16  contract -- there were two TERC contracts that
17  were being advertised at that time.  A single
18  solicitation covered two contracts.  And each
19  of those had what was called an anchor site.
20  And the contract that we elected to bid on was
21  anchored at the Pantex facility; it's a DOE
22  facility in Amarillo, Texas, and so that was
23   -- the understanding was that the bulk of the
24  work under that particular TERC would be
25  DOE-related.

Page 37

1       Q.  That was the understanding when you
2  made the application to bid; right?
3       A.  Yes.
4       Q.  That's not the way it turned out?
5       A.  We did begin work at the Pantex
6  facility.
7       Q.  Right.
8       A.  But then beyond that, you have the
9  option and the opportunity for work at a
10  variety of other sites.
11      Q.  All right.  And that was understood
12  when the company was making the bid for the
13  contract; right?
14      A.  Yes.
15      Q.  Okay.  So again, it is a true
16  statement that the company really didn't know
17  where specifically it would be working and nor
18  did the company know specifically what it
19  would be doing at a particular site other than
20  that it was generally environmental
21  remediation.  Isn't that accurate?
22      A.  Beyond the fact that we knew that
23  they would be at Federal facilities within the
24  southwest division and that they would include
25  work at Pantex, that the work would be total

ANNE PATTEN VEIGEL                                              4/17/2008

Page 38

1  environmental remediation at those facilities,
2  that is true.
3     Q.  All right.  Now, I imagine that that
4  would make it somewhat difficult to put
5  together a bid package, because it's hard to
6  figure out what it's going to cost to do
7  something if you're not quite sure what it is
8  you are going to be doing precisely and you're
9  not quite sure exactly where you're going to
10 be doing the work.  So how did Morrison
11 Knudsen decide to come up with a bid package?
12 What was the methodology, if you are able to
13 tell us?
14    A.  The request for proposal are very
15 prescribed in terms of what your responses
16 will be.  There are a variety of sections.  In
17 fact, this particular proposal was a six
18 volume and it was specified that it would be
19 six volumes.
20    Q.  I'm sorry, six what?
21    A.  Six volumes.
22    Q.  Okay.  Sorry.
23    A.  There were six sections.  And one of
24 the requirements in the proposal is that you
25 -- they provide a sample circumstance, a

Page 39

1  sample problem, or a sample project and you
2  provide a technical response and cost estimate
3  for that sample project which they deem to be
4  representative of the kind of work that you
5  would be doing.
6     Q.  All right.  But clearly it's not a
7  turnkey price; right?
8     A.  That's correct.  These were cost
9  reimbursable contracts, and so the cost
10 information that was provided in the proposals
11 is more on a rate basis.
12    Q.  All right.  So obviously the company
13 has to make money, so there has to be some
14 component for profit beyond cost
15 reimbursement.
16    A.  Yes.  Yes.
17    Q.  May I ask whether or not the cost
18 reimbursement component included any profit
19 margin?
20    A.  Yes, it does.  And in fact, in the
21 government regulations, in this case the
22 DFARS, it is specified what those margins will
23 be.  So this contract was -- It's called a
24 cost plus fee, and this had a fixed fee
25 component and an award fee component.

Page 40

1     Q.  All right.  And can you walk through
2  this idea that there was a sample
3  circumstance?  Do you remember what that was?
4     A.  The sample problem --
5     Q.  Yes, ma'am.
6     A.  -- in that particular request for
7  proposal.
8     Q.  Yes, ma'am.
9     A.  No, I don't.  I didn't work on the
10 proposal.  But I do know that the sample
11 problem focused on a Department of Energy or
12 -- or radioactive waste --
13    Q.  All right.
14    A.  -- in that particular one.
15    Q.  Do you remember what the -- whether
16 or not in being expected to respond to this
17 problem there was some description of what it
18 was that was -- that you were called upon to
19 do?  Or was it simply just "Okay, here's a
20 location, have at it"?
21    A.  In the sample project?
22    Q.  Yes, ma'am.
23    A.  In the request for proposal?  Yes,
24 there is a description of what that -- of what
25 the task would be, what the circumstances

Page 41

1  would be, what the task would be.
2     Q.  Right.
3     A.  And so it would be similar to the --
4  the delivery order or the task orders that we
5  would receive under the TERC contract.
6     Q.  Okay.  Am I correct in assuming that
7  all of the work under the TERC was
8  environmental remediation?
9     A.  That's correct.
10    Q.  So given the fact that it's
11 environmental remediation, we know that there
12 are levels to which a particular piece of
13 ground can be remediated; right?
14    A.  I don't --
15    Q.  By levels, I mean certain -- certain
16 regulatory criteria which define just how much
17 clean-up you're going to do.
18    A.  I am not certain I understand.
19    Q.  Well, how do you know then, if
20 there's no criteria, what's clean?  What is
21 remediation?
22    A.  That's -- That is specified for each
23 particular site and it's usually based on the
24 levels of contaminants in a particular media.
25    Q.  But the cleaning and remediation are

11 (Pages 38 to 41)

ANNE PATTEN VEIGEL                                           4/17/2008

Page 42

1  referenced to a particular standard, are they
2  not?
3      A.  The EPA has issued acceptable
4  levels, for instance, in drinking water and,
5  you know, a variety of different things.
6      Q.  Right.  So that when I ask you the
7  question how clean is clean, it depends on the
8  particular Environmental Protection Agency
9  standard that you're using; right?
10     A.  Yes.
11     Q.  And there are standards for air,
12 there's standards for water, and there's
13 standards for the soil.
14     A.  There are standards for air and
15 there are standards for water.  And I don't
16 believe there are specific criteria for soil.
17     Q.  Those are state standards?
18     A.  The EPA has standards.  The state
19 may also have.  I don't know.
20     Q.  So does the EPA have standards for
21 soil or not?
22     A.  I don't believe they do.  I don't
23 recall.
24     Q.  How does one then determine how
25 clean the soil needs to be specified?

Page 43

1      A.  It is specified in the work plans
2  and the remediation plans.  It's depends on
3  what's governing the remediation, whether it
4  is state -- a state agreement, a Federal
5  agreement, and it's specified in those plans.
6      Q.  All right.  The point is, there's a
7  reference to a particular level of clean,
8  whatever that may be, and then you can learn
9  or then you can figure out what you have to do
10 to get to that level of clean.  Is that fair?
11     A.  Correct.  That's fair.
12     Q.  All right.  Do you know if Louisiana
13 has any standards which would govern how clean
14 soils --
15     A.  I do not.
16     Q.  Did the bid process allow you to be
17 competitive with regard to the award component
18 of the cost plus award contract?
19     A.  I'm sorry, would you repeat that?
20     Q.  Did the bid process allow you to be
21 competitive on the award side of the cost
22 reimbursement plus award contract?
23     A.  I am not sure how to answer that
24 question.  It was a competitive procurement
25 and the evaluation criteria were weighted

Page 44

1  heavily towards the technical side.  The cost
2  volume is evaluated or scored separately.  So
3  it's what's called a best value procurement.
4      Q.  All right.  I guess what I was
5  driving at is you weren't suggesting to the
6  government, "Well, we'll take this award
7  versus my competitor may want as an award."
8  That wasn't quite like that?  The proposal had
9  built into it some kind of an award
10 mechanism?
11     A.  Yes.  This is very defined what the
12 evaluation criteria are going into the --
13 going into the process.
14     Q.  All right.  So what was your
15 understanding of what it was that was being
16 evaluated in terms of the government selecting
17 this contractor over that contractor?
18     A.  It's actually outlined in the
19 request for proposal, and they give you the
20 weighting for the various sections that you're
21 required to respond to.  So in other words,
22 the qualifications of your personnel, your
23 past experience on HTRW sites, your technical
24 and management approach, your cost volume.  So
25 there is a weighting, a weighting system

Page 45

1  that's built into the RFP.  The bidders are
2  aware of that before they propose.
3      Q.  Did you know or do you now know who
4  else was competing for the TERC?
5      A.  We knew who attended the prebid
6  meetings and we did know who some of the
7  bidders were.  Don't know exactly who --
8      Q.  Right.
9      A.  -- who all proposed on that.
10     Q.  Were there a great number of
11 competitors?
12     A.  There certainly were at the prebid
13 meeting.
14     Q.  Prebid meeting.  Do you mean folks
15 actually submitted a bid?
16     A.  I don't.
17     Q.  Let's get back to the sample
18 circumstance again.  So you're told there's a
19 particular area, and I think we have agreed
20 that you're told that there is some indication
21 of what the level of clean is expected.  Are
22 you told anything else other than those two
23 things?
24     A.  I'd have to review the sample --
25     Q.  All right.

12 (Pages 42 to 45)

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

Page 46

1      A. -- project again.
2      Q. Okay. Let's see. So I would
3  imagine, tell me if I am wrong, but one of the
4  first things that one would have to do is
5  assess the site to evaluate just what it is
6  that needs to be cleaned. Is that
7  reasonable?
8      A. For a sample project in the request
9  for proposal, it typically wouldn't -- you
10  typically wouldn't do a site visit and assess
11  the site. You would be relying on data that
12  is supplied within the context of the request
13  for proposal.
14      Q. All right. But if you got the
15  contract, you would be expected to go and
16  assess the site?
17      A. Under the contract we would receive
18  task orders or delivery orders as they're
19  called. So that would be -- And we would
20  prepare an actual proposal or an award plan
21  for that particular site. Some of these task
22  orders were competitively bid, and in that
23  case it was -- it was a proposal, I suppose.
24  And some of them were not competitively bid.
25  But we would prepare a work plan for that site

Page 47

1  based on the information that was provided by
2  the Corps of Engineers.
3      Q. All right. In terms then of your
4  design of the plan for remediation, you have
5  got the geography and apparently you have a
6  some indication of the chemical constituents
7  that need to be removed; right?
8      A. Typically.
9      Q. Are there any restraints placed on
10  you in terms of the technology that you may
11  call -- that you may decide to use to do the
12  remediation?
13      A. It may help if I walk through the
14  process.
15      Q. Okay.
16      A. The Corps of Engineers would provide
17  information available on that site, and from
18  that we would evaluate that information,
19  prepare a work plan of how we would approach
20  the work. That work plan was then submitted
21  in draft form to the Corps of Engineers for
22  their review and comment. It would come back;
23  we would revise that work plan into a final
24  draft; it would go through another review; and
25  then it would be approved by signature.

Page 48

1      Q. All right.
2      A. And so -- And within that work plan
3  there were separate, what did they call them,
4  defined elements of work. And if there was a
5  technology that was required for remediation,
6  that would probably be addressed as a defined
7  element of work. Those plans would also go to
8  the Corps of Engineers for their review and
9  approval and sign-off. So if technology was
10  not specified in the delivery order itself, if
11  that was something that we would recommend, it
12  would be vetted with the Corps of Engineers.
13      Q. The bottom line, though, is there
14  was no limit placed upon you as the designer
15  of the work plan in terms of what technologies
16  you in your good engineering judgment would
17  choose to use. Isn't that true?
18      A. No, I don't think that's true.
19      Q. You had a limit placed upon you?
20      A. We had -- We certainly had reviews.
21      Q. Well, I didn't ask you about
22  review. I asked you about the development of
23  the plan. This is before it goes to the
24  review.
25      A. Uh-huh (affirmatively).

Page 49

1      Q. You're still drafting, you're still
2  writing. Okay?
3      A. Okay. Yes.
4      Q. And I am just curious as to know as
5  you're sitting around the table drafting the
6  work plan, do you have a piece of paper on the
7  table that says you cannot do X?
8      A. No, we wouldn't -- unless -- unless
9  the delivery order specified a certain
10  technology.
11      Q. Right. And these delivery orders
12  did not specify any certain technology, did
13  they?
14      A. I don't know. I couldn't answer
15  that for all work orders.
16      Q. Can you think of one, just one time
17  on any TERC when they specified the
18  technology?
19      A. Well, we only worked on one TERC.
20      Q. I'm sorry. Task order.
21      A. One task order. Yes.
22      Q. Which one is that?
23      A. Well, I don't remember what it was,
24  but it was a filter press.
25      Q. A filter press?

ANNE PATTEN VEIGEL                                                4/17/2008

Page 50

1      A.  Uh-huh (affirmatively).
2      Q.  What's a filter press?
3      A.  It is -- It's actually what it
4   sounds like.  It's a -- It's a filter and
5   compression to dewater a material.  In this
6   case it would be waste.  So there were --
7   there were delivery orders that were far
8   enough along in the process, in other words,
9   there may have been a site that had been
10  through the investigations and recommendations
11  for remediation and then our -- our task would
12  be to implement that remediation, --
13     Q.  Sure.
14     A.  -- certainly with some -- you know,
15  our input and professional judgment associated
16  with -- with the stage that that site had --
17  had --
18     Q.  Right.
19     A.  -- matured to.
20     Q.  Sure.  Well, I can certainly
21  understand that there may be some constraints
22  placed upon you just by the nature of what it
23  is you're doing, but in terms of working
24  within the context of the geography or this
25  particular stage of the work, the TERC, and in

Page 51

1   particular the sample circumstance allowed you
2   as much latitude as was available to you in
3   terms of drafting your work order.  Isn't that
4   true?
5      A.  To draft the work order, yes, that's
6   -- we're hired --
7      Q.  You're hired to do?
8      A.  -- for our professional judgment,
9   yes.
10     Q.  And the Corps of Engineers is
11  relying on your professional judgment in terms
12  of making the recommendation for the type of
13  work that ought to be done in order to
14  accomplish the goal of the TERC itself, which
15  is the environmental remediation.  Isn't that
16  true?
17     A.  That is true, although not without
18  their oversight input as well.
19     Q.  All right.  Now, when you talk about
20  their oversight input as well, let's talk
21  about what that means.  When they're
22  evaluating the work, what is your
23  understanding of what it is that they're
24  evaluating?
25     A.  I'm not sure I understand what

Page 52

1   you're asking.
2      Q.  Well, you said not without their
3   input.  Some folks may look at the work order
4   and correct it for grammar.
5      A.  Oh.
6      Q.  That would be input.
7      A.  Uh-huh (affirmatively).
8      Q.  Some may do their own thorough,
9   detailed engineering analysis.
10     A.  Uh-huh (affirmatively).
11     Q.  So you would agree with me there are
12  a variety of degrees of input that one may
13  have in a review process.
14     A.  That's correct.
15     Q.  Right?  Okay.  So I'm wondering if
16  you can describe for me your understanding of
17  the input that you would have expected from
18  the United States Army Corps of Engineers in
19  connection with your proposed work order.
20     A.  They would comment on all aspects of
21  the work plan, including technical input.
22     Q.  All right.
23     A.  Because they had technical expertise
24  within the Corps of Engineers as well.
25     Q.  They would basically just check your

Page 53

1   work, wouldn't they?
2      A.  No, not necessarily.  I mean, in a
3   work -- if we're talking about the work plan
4   phase --
5      Q.  Work plan phase.
6      A.  Uh-huh (affirmatively).
7      Q.  They would check your proposal.
8      A.  Yes, they would review the proposal
9   for a variety of different things.
10     Q.  They wouldn't tell you how to do
11  your work, would they?
12     A.  They would -- They would evaluate
13  our work plan --
14     Q.  Right.
15     A.  -- from both a business and a
16  technical standpoint, provide review comments
17  and -- which would be incorporated, and then
18  that work plan would go back for a final
19  review before it was approved.
20     Q.  Right.  Well, from what I have read,
21  maybe I am wrong, and that's entirely possible
22  and not improbable, what I have seen is, if
23  you make a proposal for work, they will look
24  at your proposal and evaluate what you have
25  proposed.  They won't say "You shouldn't do

ANNE PATTEN VEIGEL                                    4/17/2008

Page 54

1    that, you should do something else entirely.
2    You should use --"  For example, if you
3    proposed the use of a particular piece of
4    equipment, they would not say to you, "Use a
5    different piece of equipment."  They would say
6    if you're going to use that particular piece
7    of equipment, these are our requirements or
8    our suggestions for the use of that particular
9    piece of equipment that you have proposed.
10   Isn't that the way it went?
11       A.  Well, no, that's a good example,
12   because there were cases where we would
13   propose a particular piece of equipment and
14   the Corps would come back and say "No, that's
15    -- we don't believe that that's the right
16   piece of equipment and we'd like you to use a
17   different piece of equipment."
18       Q.  Okay.  Were you expected, in the
19   process of doing your work plan, to assess the
20   impact of the work itself on the particular
21   area wherein you were working?
22       A.  There was a specific requirement in
23   work plans and in the quality assurance plan
24   where you -- where you did have to assess the
25   environmental conditions, the existing

Page 55

1    conditions, and ensure that there was minimum
2    impact to those things, like vegetation and
3    adjacent streams and adjacent structures and
4    those kinds of things, yes.
5        Q.  How was that dealt with, for lack of
6    a better word, in the context of a bid?
7        A.  Let me think about that for a
8    minute.  I would expect -- And here's what I
9    was thinking about it.  It's a common
10   requirement that's -- it's a general
11   requirement, regardless of what your work is,
12   to ensure that there is minimal impact.  On a
13   particular delivery order, there may be some
14   knowledge of a sensitive area or those kinds
15   of things that's outlined in the delivery
16   order that the Corps of Engineers provides;
17   and then so you would address that
18   specifically --
19       Q.  Sure.
20       A.  -- in your work plan.
21       Q.  Right.
22       A.  How you would mitigate that.
23       Q.  Sure.  Now, how about those things
24   that were not specifically identified in the
25   work plan, but that you, through your

Page 56

1    evaluation, based upon your general
2    understanding of the requirement that you not
3    do any damage, how would you handle that in
4    terms of the bid process?
5        A.  I would say that that was probably
6    addressed through the quality assurance plan.
7    The Corps has a quality assurance program that
8    is a three-phase program.  And the very first
9    phase of that is, prior to beginning any work,
10   you do that evaluation of your work plans and
11   of the work site and of the work environment
12   and you identify those areas that -- that need
13   to be addressed --
14       Q.  Sure.
15       A.  -- or that there's some sensitivity
16   to.  Oftentimes that's done as a site walk
17   with the Corps representative and so on.
18       Q.  All right.  So generally it was the
19   understanding of Morrison Knudsen, in
20   preparing a work order, that they were, as a
21   component part of drafting the quality plan, to
22   consider the potential of the work to damage
23   either adjacent lands and/or structures that
24   may be either on or in close proximity to the
25   work site?

Page 57

1        A.  Boy, would you repeat that?
2        Q.  I'm going to ask my learned Court
3    Reporter expert to my left.  We have this --
4    We have it on this realtime thing.  Would you
5    like to see it as well?
6        A.  Or if you could read it to me, that
7    would be fine.
8        Q.  You guys don't mind?  They usually
9    hate when I read.
10           MR. EHRLICH:
11               I would like to hear it out loud.
12   EXAMINATION BY MR. BRUNO:
13       Q.  So generally, was it the
14   understanding of Morrison Knudsen, in
15   preparing a work order, that they were, as a
16   component part of drafting the work order,
17   okay, to consider the potential of the work
18   embodied by the work order to damage either
19   the adjacent lands or the structures that may
20   be either on the site or in close proximity to
21   the site?  Did that help?
22       A.  I think so.
23       Q.  Thank you.
24       A.  Yes, it is part of the work scope to
25   ensure that those structures that are -- that

JOHNS PENDLETON COURT REPORTERS                     800 562-1285

Page 58

1   are not part of the work scope are not
2   impacted or minimally impacted by the work
3   that is accomplished.
4       Q.  I forgot to tell you that as the
5   witness, you are the boss of breaks.  But I
6   need one.
7       A.  That's fine.
8       Q.  So could I ask you for permission to
9   take a break?
10      A.  We may take a break.
11      Q.  Thank you.
12          VIDEO OPERATOR:
13          The time is 9:37.  We're now off
14      the record.
15          (Recess.)
16          VIDEO OPERATOR:
17          The time is 9:44.  We're now back
18      on the record.
19  EXAMINATION BY MR. BRUNO:
20      Q.  All right.  Was there some
21  understanding about -- And the Corps is a big
22  entity.  You agree?  I mean, when the work
23  orders would be reviewed, who in the Corps
24  would review them or where in the Corps, I
25  guess?  I don't even know how to ask the

Page 59

1   question.  Would it somehow relate to the
2   location of the project?
3       A.  It -- I'm sorry, did you say the
4   work order?
5       Q.  The work -- No, you're right.  The
6   work -- What do we call it right now?
7       A.  The work plan?
8       Q.  The work plan.
9       A.  So when we submit a draft work plan,
10  who reviews it?
11      Q.  Yes.
12      A.  You know, I am not sure I can answer
13  that specifically in the case of the TERC.  It
14  was obviously the management team within the
15  Tulsa district.  The individuals would, at
16  least some of the reviewers would change
17  depending on the particular site where we were
18  working and who had it oriented at that time.
19      Q.  At least in terms of the process of
20  bid, you had an expectation, did you not, that
21  the United States Army Corps of Engineers
22  would review the work orders?  I'm sorry, the
23  work plans.  Right?
24      A.  Yes.
25      Q.  And as far as you understood at that

Page 60

1   time, that would have been the Tulsa office at
2   least generally?
3       A.  Yes, if the Tulsa office was -- the
4   Tulsa office would review those plans
5   typically.  Now, there may be also some client
6   reviews of those plans.  So in other words, if
7   we were -- if Tulsa was working for the Air
8   Force, there may be someone on the Air Force's
9   side who would also review the plans for that
10  particular facility and those kinds of things.
11      Q.  Let's see if we can just kind of get
12  through this area.  The request for bid called
13  upon Morrison Knudsen to prepare a proposal
14  which outlined in a cost reimbursement and
15  award contract how it proposed to prepare work
16  plans and how it -- and I am gathering from
17  your testimony the larger component of the
18  quality of the bid was about how you guys
19  proposed to do your work.  Not so much how
20  much you were charging.
21          MR. EHRLICH:
22          I object to the form.
23  EXAMINATION BY MR. BRUNO:
24      Q.  If that makes sense.
25          MR. EHRLICH:

Page 61

1           I object to the form of the
2       question.
3   EXAMINATION BY MR. BRUNO:
4       Q.  Did you understand the question?
5       A.  Well, --
6       Q.  I can reask it.
7       A.  We're talk- --  We're talking again
8   about the request for proposal --
9       Q.  Yes.
10      A.  -- for the TERC itself.
11      Q.  Yes, ma'am.
12      A.  Okay.  So on that basis would you
13  restate the question for me?
14      Q.  Yes.  In other words, what I am
15  driving at, and I am trying to see if I can
16  summarize what we have accomplished this
17  morning, I think I am understanding that it
18  really wasn't -- I mean, when one thinks
19  normally about bids, it's all about how much
20  and then you choose the guy who has the lowest
21  amount of money in his bid.  But I am
22  gathering from what you've told me, because of
23  the nature of the contract, that it being a
24  cost reimbursement with certain very fixed
25  allowances for profit and an award process

ANNE PATTEN VEIGEL                                           4/17/2008

Page 62

1  which used an evaluation of the quality of the
2  work, et cetera, et cetera, et cetera, that
3  this was not a bid process that had as its
4  most important component the money.  Rather,
5  it was an assessment of how you were to do the
6  proposed work.  Did I get it wrong?
7       A.  Two things in response to that.
8  That's correct, it was a best value type
9  procurement, which means that it's evaluated
10  -- your proposal is evaluated on its -- on
11  its technical merits as well as cost.  So it's
12  considered best value to the government.
13       Q.  Right.
14       A.  In terms of how we would propose to
15  do the work, that is prescribed in the RFP.
16  In other words, how you develop a work plan,
17  what goes into the work plan, and all of those
18  kinds of things.  So that is -- that is --
19  it's very prescribed in that RFP.
20       Q.  Sure.
21       A.  So I don't know if that answers your
22  question.
23       Q.  But from the outside looking in, you
24  have to have some way to assess Mr. A versus
25  Mr. B.

Page 63

1       A.  Uh-huh (affirmatively).
2       Q.  It can't be that prescribed, because
3  you would have no way in which to decide that
4  you want Mr. A as opposed to Ms. B.  So there
5  has to be some component of quality even
6  though there's prescriptions over what it is
7  you are supposed to be doing.  Right?
8       A.  The evaluation criteria were based
9  on the experience of your -- your key
10  personnel, your prior experience in HTRW, the
11  kinds of systems that you had in place, your
12  work plan, a variety of different components.
13  Yes.
14       Q.  Right.  Okay.  So going back to my
15  question, the evaluation of the bid was not
16  focused on the money.  Isn't that true?
17       A.  Not entirely focused on cost.
18       Q.  And I think the way -- and you would
19  say that because obviously money is relevant,
20  but it was a value consideration as opposed to
21  let's just pick the lowest price and go home.
22  Right?
23       A.  That's correct.
24       Q.  And the value assessment regarded
25  how you were proposing to do the work; right?

Page 64

1       A.  The value assessment included
2  evaluation of the things that I mentioned
3  before as well as evaluation of a sample
4  project and your approach to a sample project.
5       Q.  Right.  Well, what would be your
6  characterization of the difference between you
7  and somebody else?
8       A.  If I put myself in the shoes of an
9  evaluator?
10       Q.  Yes, ma'am.
11       A.  Again, those evaluation criteria are
12  laid out by the Corps of Engineers of how they
13  will rank those proposals and they would
14  evaluate the different proposals based on the
15  experience levels, based on the quality of the
16  individuals, all of those things that I
17  mentioned before.
18       Q.  Right.  So you're still, again,
19  you're looking at the quality --
20       A.  Uh-huh (affirmatively).
21       Q.  -- of the proposed work plan which
22  obviously includes who is doing the work plan
23  as well as the scope of the work plan and
24  including the work plan itself.  Is that
25  reasonable?

Page 65

1       A.  Yes, although I think we'd need --
2  you'd need to go back to that RFP to determine
3  the weighting of all of those various
4  factors.
5       Q.  I didn't get into the weighting.  I
6  was just saying those were all relevant
7  considerations.
8       A.  Uh-huh (affirmatively).
9       Q.  Right?
10       A.  Uh-huh (affirmatively).
11       Q.  Good.  I don't think I even
12  suggested in my question about weighting.
13  What is HTRW?
14       A.  Hazardous, toxic, and radioactive
15  waste.
16       Q.  All right.  Now, I know that you're
17  not designated to speak specifically about
18  Task Order number 26, but I would like you to
19  look at paragraph 6 of Exhibit A.
20       A.  Uh-huh (affirmatively).
21       Q.  All right.  Because I want to ask
22  you a few questions about how the TERC might
23  relate to any particular task order.  Okay?
24  I'm sorry -- Yes, task order.  In terms of its
25  -- the TERC itself -- well, you all obviously

17 (Pages 62 to 65)

ANNE PATTEN VEIGEL                                          4/17/2008

Page 66

1    got the contract.
2        A.   Yes.
3        Q.   Okay.  Clearly.  Just for the
4    record.
5            And when was the contract signed?
6    I should have asked that.
7        A.   It was signed in August, '94.
8        Q.   Okay.  And I think you have
9    testified already that the TERC itself allowed
10   for the opportunity to do work in a variety of
11   locations within I think you said the
12   southwest and central division?
13       A.   Southwest division of the Corps
14   what I called it.
15       Q.   Okay.  And how would these
16   subsequent opportunities be made known to
17   you?  How did that process occur?
18       A.   Through the Corps of Engineers.
19       Q.   All right.
20       A.   They would actually approach us with
21   a potential site or a site that they wanted us
22   to either competitively bid with the other
23   TERC contractor or that they would offer to us
24   as a sole source.
25       Q.   I didn't hear that last part.  I'm

Page 67

1    sorry?
2        A.   Sole source.
3        Q.   Sole source.  Okay.  So even though
4    you had the contract, it didn't guarantee that
5    you were going to do all of the remediation in
6    a particular -- in the southwest region;
7    right?
8        A.   That's correct.  There were two TERC
9    contracts.
10       Q.   Who had the other TERC contract?
11       A.   A company called IT.
12       Q.   All right.  And I don't know if it's
13   appropriate for me to ask you, but I'll just
14   go ahead and ask you and listen to my
15   opponents yell at me.  Were there other
16   bidders on Task Order 26?
17       A.   I don't believe so.
18       MS. WAGER-ZITO:
19          She might just not know.
20       MR. BRUNO:
21          Well, I can handle that.  I can't
22       handle when ladies yell at me,
23       though.
24       MS. CLAYMAN:
25          Steve will know.

Page 68

1        MR. BRUNO:
2            I just can't -- I fall apart.
3        MS. WAGER-ZITO:
4            It's good to know.
5        MR. BRUNO:
6            Ouch.
7    EXAMINATION BY MR. BRUNO:
8        Q.   All right.  In what way did the TERC
9    contract relate to a particular task order in
10   terms of, you know, what you could or couldn't
11   do?  Or did it relate at all?
12       A.   Can you repeat that?
13       Q.   I am trying to figure out what is
14   the relationship of the overall TERC?  In
15   other words, other than having been approved,
16   if you will, to do this kind of work.
17       A.   Uh-huh (affirmatively).
18       Q.   Sort of you're in the game now.  And
19   you now have an opportunity to bid with
20   somebody else who's in the game.  Did the TERC
21   contract govern your rights, obligations,
22   responsibilities in a particular task order?
23       A.   The TERC contract was an umbrella
24   contract so there were the conditions of the
25   contract in general set forth in the TERC.

Page 69

1    Then each task order was specific to the site
2    and the issues at the site.  And any of those
3    -- any of those specific issues were laid out
4    in -- in what was ultimately that contract for
5    that task.
6        Q.   All right.  So the TERC would
7    outline the methods of remuneration; right?
8        A.   The methods of remuneration?
9        Q.   How you got paid?
10       A.   It -- It outlined a variety of
11   things.
12       Q.   Including --
13       A.   Yes, including invoicing
14   requirements and those kinds of things, yes.
15       Q.   Right.
16       A.   Now, that may be modified in a
17   particular delivery order, because they were
18   all unique and they all had their own unique
19   criteria.
20       Q.   All right.  Now, this obligation to
21   assess the work area, was that an obligation
22   that arose from the TERC or did that arise
23   from a particular task order?
24       A.   The obligation to assess the work
25   area?

JOHNS PENDLETON COURT REPORTERS                          800 562-1285

ANNE PATTEN VEIGEL                                           4/17/2008

Page 70

1    Q.  For the purposes of making certain
2  that your work didn't, you know, negatively
3  impact neighbors, you know, structures?
4        MS. CLAYMAN:
5          Objection.  Are we talking about
6    the TERC or a particular task order?
7        MR. BRUNO:
8          That was the question.  That's
9    why I asked it.  I'm trying to find
10   out.
11       MS. CLAYMAN:
12         I wanted the question --
13       MR. BRUNO:
14         That was the question.  I am
15   trying to find out if it's the TERC
16   that creates that obligation or -- and
17   I don't know the answer because I
18   haven't had an answer yet -- is it a
19   particular task order that creates
20   that obligation.
21       THE WITNESS:
22         Well, I think that what I
23   referenced before is the quality
24   control approach in those three phases
25   and that first initial site inspection

Page 71

1    with the Corps.
2  EXAMINATION BY MR. BRUNO:
3    Q.  Right.
4    A.  So there are some very general,
5  broad brush kinds of approaches in that TERC
6  contract --
7    Q.  Okay.
8    A.  -- that cover a lot of different
9  things.  Data quality collection, quality
10 control, those kinds of things.  But each
11 individual delivery order has more specific
12 information about the scope of that particular
13 task and information relative to the area.
14   Q.  Okay.  Let me just be as precise and
15 specific as I can, and that is, we have
16 already established that there was an
17 obligation on the part of the contractor to do
18 the work in such a fashion that it wouldn't do
19 harm either to the neighbors or the structures
20 or whatever.  Is that a part of the TERC or
21 not?
22   A.  It's -- What I am -- What I am
23 referencing and what -- What I am referencing
24 is the contractor quality control plan, and
25 there is a contractor quality control plan

Page 72

1  that has those general conditions.  It was
2  submitted as part of the responses to the
3  request for proposal.  It was submitted as
4  part of our proposal.  But that is a document
5  that is modified on a site specific basis for
6  each delivery order.  So specific conditions
7  will be -- will be referenced in that, in that
8  specific work plan.
9    Q.  All right.  I am confused, because
10 normally when one thinks about quality
11 control, one has in front of one the work
12 that's to be expected and you then can
13 determine the quality of each aspect of the
14 work.  Because you know what the work is going
15 to be.
16   A.  Uh-huh (affirmatively).
17   Q.  Right?
18   A.  Correct.
19   Q.  What I am driving at is, the
20 instance that -- I mean, if it's true that
21 there has to be a site assessment, and let's
22 just say for the sake of argument that the
23 work plan does not include a particular, I
24 don't know, part, obviously if it's not in the
25 work plan, then quality control is not going

Page 73

1  to help you determine whether or not that
2  component part of the work plan is being
3  complied with, because it's not there.  And so
4  that's why I am asking the question as to this
5  obligation to do this -- to -- Let me
6  withdraw.  We have already established, have
7  we not, that it's the contractor that gets to
8  write the specifications within the framework
9  of the task that's been assigned to the
10 contractor by the Corps of Engineers; right?
11   A.  No.
12       MS. CLAYMAN:
13         Objection.
14       THE WITNESS:
15         No.
16 EXAMINATION BY MR. BRUNO:
17   Q.  The Corps writes the
18 specifications?
19   A.  The Corps provides the
20 specifications in the -- in the work order.
21   Q.  When you say the specifications, as
22 -- Let's talk about what that means.  Does
23 the work plan contain specifications?
24   A.  Maybe you better define
25 "specifications".

19 (Pages 70 to 73)

ANNE PATTEN VEIGEL                                          4/17/2008

Page 74

1      Q.  Well, when I think about
2   specifications, and I could be wrong because I
3   am not an engineer and I don't have your
4   technical, nor do I have your work experience
5   in this field, but it's -- it's a description
6   with varying degrees of precision about what
7   one is expected to do.  The easiest example
8   for me to think about is if you are building a
9   house, you have a set of plans and you have
10  drawings, you have measurements and you have
11  heights and widths and so forth and they're
12  very precise.  It tells what you kind of wood
13  to use, tells you what kind of nails to use,
14  tells you what kind of sheeting to use, tells
15  you things about the soils, tells you about
16  piling, tells you a whole bunch of stuff.
17  Right?
18     A.  Uh-huh (affirmatively).
19     Q.  Now, from what I have seen -- and I
20  suppose in fairness to you, specifications
21  could also mean in the broadest sense a
22  general description of what it is that my
23  contracting party expects me to do.  Right?
24  Would you agree?
25     A.  Well, no, I wouldn't say

Page 75

1   specifications are kind of a broad brush
2   description, but --
3      Q.  It could be?  Couldn't they?
4      A.  I wouldn't call them
5   specifications.  I would call them a
6   description.
7      Q.  At what point do they get to be
8   called specifications?
9      A.  Specifications are, in the case of a
10  contract like this where you don't have a
11  completed design drawing, and in some cases
12  you might have a completed design drawing for
13  certain components --
14     Q.  Sure.
15     A.  -- of certain work on certain task
16  orders.  On others, you have specifications
17  about the area, about what is known about the
18  area, so it really depends on the task order.
19     Q.  Right.
20     A.  But then our response to that task
21  order, the work plan, is how we go about that
22  work.
23     Q.  Right.  Okay.
24     A.  So the task is defined by the Corps
25  of Engineers and we respond in the work plan

Page 76

1   with our approach to that task.
2      Q.  Exactly.
3      A.  I guess that the easiest way for me
4   to say it simply is it varies from task order
5   to task order.
6      Q.  All right.  And I think we have
7   already established that that general -- that
8   beyond that general request for work, there is
9   an understanding -- it's not even really an
10  understanding from this contract -- is it not
11  an understanding in all of the work that you
12  guys do that when you do your work, you're
13  going to do it in such a fashion that you
14  don't damage people or property in the course
15  of doing your work?  Isn't that a general true
16  statement?
17        MS. CLAYMAN:
18        I am going to -- Objection.
19  EXAMINATION BY MR. BRUNO:
20     Q.  I guess Counsel doesn't believe that
21  to be true.  Is that something that you guys
22  believe in or you don't?
23        MS. WAGER-ZITO:
24        Object to the form of the
25  question as well.  It's not true, Joe.

Page 77

1         MR. BRUNO:
2         What's wrong with the form?
3         MS. CLAYMAN:
4         You -- And you have also stated
5   --
6         MR. BRUNO:
7         You said "Objection to form."
8   That means, where I come from, that
9   you have a problem with the form.  So
10  tell me what the problem is and I'll
11  change the question.  I'm easy.
12        MS. CLAYMAN:
13        I object to you saying that
14  something has already been established.
15        MR. BRUNO:
16        That is an objection assuming
17  facts not in evidence.  Your objection
18  was to form.  So what's the problem
19  with the form?
20        MS. CLAYMAN:
21        Well, I am changing my objection
22  to --
23        MR. BRUNO:
24        You're changing your objection.
25        MS. CLAYMAN:

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

ANNE PATTEN VEIGEL                                                    4/17/2008

Page 78

1        Yes, I am.
2        MR. BRUNO:
3        Okay.  Fair enough.  I want to
4    work with you here.
5        MS. CLAYMAN:
6        Sure.
7    EXAMINATION BY MR. BRUNO:
8        Q.  Let's go back.  We'll start with the
9    basics.  We'll start with the baby steps.
10   Maybe I am wrong.  Most companies, when they
11   do work, don't want to damage people or
12   property.  Is your company one of those
13   companies?  Yes or no?  I mean, this isn't
14   hard, but it can be.
15       A.  Of course.
16       Q.  Of course.
17       A.  Of course, you don't want to damage
18   -- but we do work for our clients and we do
19   work within the context of what we were asked
20   to do by the client.  Yes.
21       Q.  So are you telling me that if your
22   client pays you to damage someone, you're
23   going to damage them?  I have got to ask.
24   That's the way you said it.  Is that what you
25   do?  No.  You don't do that, do you?  I need

Page 79

1    an answer.
2        A.  No.
3        Q.  Thank you.  All right.  And even if
4    your client asked you to do something, you
5    generally do an assessment to make sure what
6    they have to do isn't going to do
7    damage to somebody.  You do that, don't
8    you?
9        A.  We would make an assessment to
10   determine what the damage would be --
11       Q.  No, ma'am.
12       A.  -- on a contract?
13       Q.  No, ma'am.  That wasn't the
14   question.  Here's the question.  If your
15   client asked you to do something, you would
16   generally do an assessment to make sure that
17   what they have asked you to do is not going to
18   damage someone.  That's a part of what you
19   guys do.  Isn't that true?
20       A.  No, not necessarily.
21       Q.  No, you don't?  Okay.  So if someone
22   says "I want you to do X," you just do it and
23   you really don't really care if you hurt
24   somebody?  Right?
25       A.  No, that's not true either.

Page 80

1        Q.  Well, then how do you handle the
2    problem?
3        A.  If there is some indication that
4    there may be some damages that the client is
5    not aware of, because we don't believe that
6    the clients would ask us to do that kind of
7    thing, --
8        Q.  Right.
9        A.  -- then that precipitates a
10   discussion with the client.
11       Q.  In fact, let's take it a step
12   further.  Sometimes your clients don't always
13   understand the potential for damage in the
14   context of the work that they're asking you to
15   do.  Isn't that true?
16       A.  Don't know.
17       Q.  Don't know.  Is it possible?
18       A.  Certainly it's possible.
19       Q.  Is it one of the services that you
20   provide to your clients, that when they ask
21   you to do something, you tell them "Wait a
22   minute.  You know, you may not want to do that
23   because you may end up damaging this or that
24   and it may end up costing you some more
25   money"?  That's one of the things that you

Page 81

1    guys do; isn't that true?
2        A.  I think I already answered that --
3        Q.  How?
4        A.  -- question.  I said if it is
5    apparent that what we are being asked to do
6    might have consequences that the client
7    doesn't understand, then that would
8    precipitate a discussion with the client.
9        Q.  All right.  Apparent to whom?
10       A.  (Witness shakes head negatively.)
11       Q.  You don't know?
12       A.  Whomever is working on that project
13   and it becomes apparent to.
14       Q.  I am confused.  If it's the client
15   -- If it's not apparent to the client, the
16   other only party in the room is the
17   contractor.  So does the contractor who
18   represents his or herself to have engineering
19   expertise -- which I think your company does;
20   right?
21       A.  Of course.
22       Q.  Okay.  Then the client may rely on
23   the contractor with the engineering expertise
24   to tell them about hazards that they may not
25   be aware of?  Wouldn't you agree?

                                    21  (Pages 78 to 81)

ANNE PATTEN VEIGEL                                         4/17/2008

Page 82

1     A.  The client in this -- in -- on the
2  TERC contract --
3     Q.  We're not talking about the TERC
4  contract.  We're talking generally now.
5     A.  Oh.
6     Q.  Just answer my question and you can
7  explain about TERC all day long.
8     A.  Okay.  The client would rely on us
9  to notify them if there was a situation that
10  people were aware of in the field, that the
11  people in the field had some expertise and
12  some knowledge of.
13     Q.  Okay.  Well, that's limited by the
14  expertise and knowledge of the people in the
15  field; right?
16     A.  Yes.
17     Q.  Who puts the people in the field?
18     A.  The contractor does.
19     Q.  You do; right?
20     A.  (Witness nods head affirmatively.)
21     Q.  Okay.  And the people that you
22  choose to put in the field are based upon the
23  nature of the work and where it's located;
24  right?
25     A.  The scope of the work.

Page 83

1     Q.  Right.  If you're digging holes as
2  part of your work, would you expect to do some
3  geotechnical analysis?
4     A.  It depends on the -- the reason for
5  digging holes.
6     Q.  Okay.  Well, if you were digging
7  holes to take stuff out of the ground, would
8  you expect a geotechnical assessment of that
9  exercise?
10     A.  Not necessarily.
11     Q.  Let's see if these things are true.
12  Would you agree with me that the total
13  environmental remediation contract, which we
14  have been calling the TERC, --
15     A.  Uh-huh (affirmatively).
16     Q.  -- was an infinite delivery, infinite
17  quantity contract for the total remediation of
18  hazardous, toxic, and radioactive waste
19  projects at various sites in support of
20  various Corps customers?
21     A.  I would just correct one thing in
22  there.  It wasn't infinite.  It was indefinite
23  quantity -- indefinite delivery or indefinite
24  quantity, I believe.
25     Q.  That's my fault.  Let me do it

Page 84

1  again, because I screwed up.  Which is proof
2  that occasionally it happens.
3          The total -- I am going to run
4  through just a bunch of what we call proposed
5  uncontested facts, and this is what I am doing
6  here so I am not sneaking up on you or
7  anything.
8     A.  Okay.
9     Q.  Trying to get this distilled.  The
10  total environmental remediation contract,
11  known as TERC, was an indefinite delivery,
12  indefinite quantity contract for the total
13  remediation of HTRWs which we have learned is
14  hazardous, toxic, and radioactive waste
15  project sites in support of various Corps
16  customers.  Is that true?
17     A.  Yes, I think that's a statement
18  right out of the request for proposal.
19     Q.  It is.  Hotdog.  I'm not going to
20  slip anything past you.  All right.  The next
21  one.  The TERC contract, it provided the
22  government with the continuity of personnel
23  and institutional knowledge for developing
24  streamlined and cost effective remediations
25  through the use of a single contractor, namely

Page 85

1  you.
2     A.  Yes.
3     Q.  Is that true?
4     A.  That's also out of the RFP.
5     Q.  Yes, it is.  In order to instigate a
6  particular project under the TERC, the Corps
7  would prepare a statement of work spelling out
8  the overall scope of the project.  Is that
9  true?
10     A.  Yes.
11     Q.  The contractor would then be
12  required to provide input to support the
13  planning, scheduling, and formulation of the
14  core United States Army Corps of Engineers
15  statement of work.  Is that true?
16     A.  Yes.
17     Q.  Now, in order to provide the input,
18  the contractor would receive backup data from
19  the Corps that was available from its own
20  prior investigation.  That's true?
21     A.  Or the -- Or the Corps' client's
22  investigations.
23     Q.  Right.  And with this data, the
24  contractor, you, would develop plans within
25  regulations and they would then execute those

                          22  (Pages 82 to 85)

JOHNS PENDLETON COURT REPORTERS              800 562-1285

ANNE PATTEN VEIGEL                                          4/17/2008

Page 86

1    plans.  Isn't that true?
2       A.  Yes.
3       Q.  An essential role of the contractor
4    was to initiate recommendations to the
5    contracting officer of the Corps about any
6    alternative methods of executing a remediation
7    action that would result in improvements.
8    That's true, too?
9       A.  Yes.  That's a clause that's --
10   that's in there to ensure that the government
11   gets the best possible solution and the best
12   possible price.
13      Q.  All right.  One of the goals of the
14   TERC was for the contractor to develop the
15   performance specifications needed to remediate
16   a particular location and to consistently
17   monitor the project as the work proceeded to
18   keep the Corps informed of all developments.
19   That's true, too?
20      A.  Yes.
21      Q.  All right.  The specific
22   requirements of each remedial action project
23   would be described in an individual delivery
24   order which is later referred to as a task
25   order.

Page 87

1       A.  Yes.  I think I have used "task" and
2    "delivery" order interchangeably --
3       Q.  Thank you.
4       A.  -- this morning.
5       Q.  Now, once the delivery order is
6    placed, the contractor is expected to provide
7    complete architectural engineering services to
8    support the implementation of the remedial
9    action.  Isn't that true?
10      A.  It's a statement out of the TERC,
11   yes.
12      Q.  Okay.  The contractor would be
13   required to write and submit a work plan that
14   would describe the contractor's detailed
15   approach for the performance of the delivery
16   order, including the activities to be
17   performed in the field.
18      A.  Yes.
19      Q.  That's true?  And that's right out
20   of the contract.
21      A.  Yes.
22      Q.  The development of the work plan
23   would be based upon the government's statement
24   of work --
25      A.  Yes.

Page 88

1       Q.  -- which is a general description of
2    the work the contractor was expected to
3    perform.  That's true?
4       A.  Yes.
5       Q.  The plan was to be submitted to the
6    Corps for review and was required to be
7    approved by the Corps before the commencement
8    of field activities.  That's true?
9       A.  Yes.  It was actually a two-phase
10   process.
11      Q.  Share with us the two-phase process
12   if you don't mind.
13      A.  There was the draft plan submittal,
14   the review and comment, the incorporation of
15   those comments, the submittal of a final draft
16   work plan, review, any final comments, and
17   then authorization.
18      Q.  Thank you.  An additional contractor
19   responsibility was to obtain all permits
20   necessary to accomplish the work specified in
21   the individual delivery order.  That's true?
22      A.  Yes.
23      Q.  In particular, when the work was
24   done at a Federal facility, the required
25   clearances such as excavation, digging, or

Page 89

1    drilling permits were required to be obtained
2    prior to the initiation of site operations by
3    the contractor.  That's true, too?
4       A.  Yes.
5       Q.  We're almost there.  The Corps
6    contracted with Morrison Knudsen I guess to
7    accomplish the TERC, I don't know if I ought
8    to say this, on August 17, 1994.
9       A.  Yes.
10      Q.  All right.  And then finally, a
11   variety of delivery orders were presented to
12   Morrison Knudsen which are referred to as task
13   orders, including one which we now know to
14   have been numbered 26.
15      A.  Yes.
16      Q.  And I am not going to ask you
17   anything about 26.  Somebody else will talk
18   about the specifics of 26.
19      A.  Uh-huh (affirmatively).
20      Q.  Okay.  Obviously the TERC didn't
21   contemplate whatever it was that was
22   contemplated by 26.  Would you agree with me
23   that 26 would be the document that we would
24   look to -- and I shouldn't say the word
25   "document".  How shall I say this?  The

ANNE PATTEN VEIGEL                                        4/17/2008

Page 90

1   delivery order which later or at some point in
2   time is known as 26.
3       A.   Uh-huh (affirmatively).
4       Q.   Because 26 wasn't contemplated by
5   the original TERC.  The work that's
6   contemplated by 26 is going to be embodied in
7   the documents that refer to that particular
8   delivery order.  Right?
9       MR. EHRLICH:
10          Object to the form.
11      THE WITNESS:
12          The nature of the work in the
13      task order was contemplated under the
14      old -- the overall contract.
15  EXAMINATION BY MR. BRUNO:
16      Q.   Right.
17      A.   So that the HTRW remediation and the
18  types of remediation.  The particular site, I
19  don't know that it was -- that it was
20  contemplated at the point that the TERC was
21  let.
22      Q.   Right.  I guess what I am driving at
23  is this.  You and I have got into a discussion
24  about specifications.  The degree to which
25  there are any specifications which regard to

Page 91

1   the area wherein Task Order number 26 was to
2   be done, those specifications, to the extent
3   that they exist, would be found in that
4   delivery order?
5       A.   They would be found in that delivery
6   order or other documentation associated with
7   the task order.
8       Q.   Okay.  If you'll give us a moment,
9   we'll see if we haven't finished our inquiry.
10  Okay?
11      A.   Okay.
12      VIDEO OPERATOR:
13          Okay.  The time is 10:21.  We're
14      now off the record.
15      (Recess.)
16      VIDEO OPERATOR:
17          The current time is 10:28.  We're
18      now back on the record.
19  EXAMINATION BY MR. BRUNO:
20      Q.   Just to round this, this may be
21  obvious, but I have got this record I am
22  creating.  At the time that Morrison Knudsen
23  prepared its application to bid on the TERC,
24  did it have any understanding that it would be
25  doing work on the water side of the flood

Page 92

1   protection structure of the Lower Ninth Ward
2   between Claiborne Avenue and Florida Avenue in
3   New Orleans, Louisiana at some point in the
4   future?
5       A.   No.
6       Q.   And the same question.  At the time
7   that you executed the contract to do the TERC,
8   did Morrison Knudsen have any understanding
9   that it would be doing work at that same
10  location in the future?
11      A.   No.
12      MR. BRUNO:
13          That's all I have.  Thank you
14      very much.
15      THE WITNESS:
16          Okay.
17      MR. BRUNO:
18          Appreciate your time.
19      VIDEO OPERATOR:
20          This concludes the deposition of
21      Anne Veigel.  The time is 10:29.
22      We're now off the record.
23          *   *   *
24
25

Page 93

1
2          WITNESS'S CERTIFICATE
3
4       I, ANNE PATTEN VEIGEL, read or have had
5   the preceding testimony read to me, and hereby
6   certify that it is a true and correct
7   transcription of my testimony, with the
8   exception of any attached corrections or
9   changes.
10
11
        _____
12         (Witness' Signature)
13  _____
    DATE SIGNED
14
15  DEPONENT PLEASE INITIAL ONE:
16
    _____ Read with no corrections
17
18  _____ Read and correction sheet attached
19
20
    DATE TAKEN:  APRIL 17, 2008
21
22
23
24
25

ANNE PATTEN VEIGEL                                          4/17/2008

Page 94

1
2            REPORTER'S CERTIFICATE
3
4      I, ROGER D. JOHNS, RMR, RDR, CRR,
5   Certified Court Reporter, do hereby certify
6   that the above-named witness, after having
7   been first duly sworn by me to testify to the
8   truth, did testify as hereinabove set forth;
9   that the testimony was reported by me in
10  shorthand and transcribed under my personal
11  direction and supervision, and is a true and
12  correct transcript, to the best of my ability
13  and understanding; that I am not of counsel,
14  not related to counsel or the parties hereto,
15  and not in any way interested in the outcome
16  of this matter.
17
18
19
20            ROGER D. JOHNS
21         CERTIFIED COURT REPORTER
22            STATE OF LOUISIANA
23
24
25

JOHNS PENDLETON COURT REPORTERS                 800 562-1285

# EXHIBIT 10

STEPHEN CLAY ROE                                    4/17/2008

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE:  KATRINA CANAL BREACHES      CIVIL ACTION
CONSOLIDATED LITIGATION
                                      NO. 05-4182
                                       "K" (2)
PERTAINS TO:  MRGO-ROBINSON         JUDGE DUVAL

FILED IN:  05-4181, 05-4182,      MAG. WILKINSON
05-5237, 05-6073, 05-6314,
05-6324, 05-6327, 05-6359,
06-0225, 06-0886, 06-1885,
06-2152, 06-2278, 06-2287,
06-2824, 06-4024, 06-4065,
06-4066, 06-4389, 06-4634,
06-4931, 06-5032, 06-5155,
06-5159, 06-5161, 06-5162,
06-5260, 06-5771, 06-5786,
06-5937, 07-0206, 07-0621,
07-1073, 07-1271, 07-1285



Videotaped Deposition of


WASHINGTON GROUP INTERNATIONAL BY
STEPHEN CLAY ROE,
14054 West Cornell Avenue, Lakewood, Colorado
80228, taken in the offices of Hawley,
Troxell, Ennis & Hawley, 877 Main Street,
Suite 1000, Boise, Idaho 83702, on Thursday,
the 17th day of April, 2008.

STEPHEN CLAY ROE                                    4/17/2008

---

Page 2

```
 1   APPEARANCES:
 2   LAW OFFICE OF JOSEPH M. BRUNO
       (BY: JOSEPH M. BRUNO, ESQ.
 3        SCOTT JOANEN, ESQ.)
       855 Baronne Street
 4   New Orleans, Louisiana 70113
          PLAINTIFFS LIAISON COUNSEL
 5
 6
 7   LEVIN, PAPANTONIO, MITCHELL,
     ECHSNER & PROCTOR
 8     (BY: MATT SCHULTZ, ESQ.)
       316 South Baylen Street
 9     Suite 600
       Pensacola, Florida 32591
10        ATTORNEYS FOR PLAINTIFFS
11
12
13   JONES, DAY
       (BY: ADRIAN WAGER-ZITO, ESQ.
14         DEBRA CLAYMAN, ESQ.
           JULIA CRONIN, ESQ.)
15     51 Louisiana Avenue, N.W.
       Washington, D.C. 20001
16        ATTORNEYS WASHINGTON GROUP
             INTERNATIONAL
17
18
19   UNITED STATES DEPARTMENT OF JUSTICE
     CIVIL DIVISION
20   TORTS BRANCH
       (BY: JEFF EHRLICH, ESQ.
21         RICHARD STONE, ESQ.)
       Post Office Box 888
22     Benjamin Franklin Station
       Washington, D.C. 20044
23        ATTORNEYS FOR UNITED STATES
24
25
```

Page 3

```
 1
 2   VIDEOTAPED BY:
       Brad Fischer
 3     I-Dep, Inc.
 4
 5   REPORTED BY:
       ROGER D. JOHNS, RMR, CRR, RDR, CSR
 6     Certified Court Reporter
       State of Louisiana
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1              S T I P U L A T I O N
 2
 3       It is stipulated and agreed by and between
 4   counsel for the parties hereto
 5   that the deposition of the aforementioned
 6   witness is hereby being taken under the
 7   Federal Rules of Civil Procedure, for all
 8   purposes, in accordance with law;
 9       That the formalities of reading and
10   signing are specifically not waived;
11       That the formalities of certification and
12   filing are specifically waived;
13       That all objections, save those as to the
14   form of the question and the responsiveness of
15   the answer, are hereby reserved until such
16   time as this deposition, or any part thereof,
17   may be used or sought to be used in evidence.
18
19              *  *  *  *
20
21       ROGER D. JOHNS, RDR, CRR, Certified Court
22   Reporter for the State of Louisiana,
23   officiated in administering the oath to the
24   witness.
25
```

Page 5

```
 1              I N D E X
 2
 3                             PAGE
 4   Bates numbered WGI-000005 through 09....... 16
     38704...................................... 65
 5   WGI-38769.................................. 65
     038742..................................... 73
 6   WGI Number 2............................... 81
     Document 3................................. 94
 7   WGI page number 4......................... 100
     WGI-5 to 9................................ 101
 8   WGI-67877................................. 141
     67884..................................... 142
 9   WGI-81976................................. 142
     WGI-2..................................... 160
10   WGI-3..................................... 164
     WGI-40963................................. 166
11   WGI-4..................................... 166
     5......................................... 173
12   6......................................... 192
     WGI-81181 and WGI-81191.................. 206
13   WGI-081191................................ 210
     WGI-47665 in seriatim to 47761........... 215
14   WGI-245973................................ 225
     WGI-246010................................ 225
15
16
17
18
19
20
21
22
23
24
25
```

2 (Pages 2 to 5)

JOHNS PENDLETON COURT REPORTERS              800 562-1285

STEPHEN CLAY ROE                                                    4/17/2008

Page 6

1    VIDEO OPERATOR:
2        Today is Thursday, April 17th,
3    2008. The approximate local time is
4    10:46 A.M. The location is Hawley,
5    Troxell, Ennis and Hawley in Boise,
6    Idaho.
7        This is case number 2005-CV-4182,
8    entitled In Re: Katrina Canal Breaches
9    Consolidated Litigation.
10       This is the 30 (b)(6) deposition
11   of Stephen Roe.
12       Will the Counsel for all present
13   identify yourselves for the record.
14    MS. WAGER-ZITO:
15       Andrea Wager-Zito, Jones, Day,
16   for Washington Group. With me is
17   Debbie Clayman, Jones, Day; and Julia
18   Cronin will be present shortly.
19    MR. EHRLICH:
20       Jeff Ehrlich for the United
21   States.
22    MR. STONE:
23       Richard Stone for the United
24   States.
25    MR. SCHULTZ:

Page 7

1        Max Schultz with the Levin,
2    Papantonio firm for the Plaintiffs.
3     MR. JOANEN:
4        Scott Joanen for the Plaintiffs.
5     MR. BRUNO:
6        And Joseph Bruno, Plaintiffs
7    Liaison Counsel.
8        Okay. We obviously have a new
9    witness, and so I will ask for Counsel
10   to be so kind as to identify the next
11   individual selected by the Washington
12   Group to appear in response to this 30
13   (b)(6) notice and to share with us on
14   the record the particular paragraphs
15   on Exhibit A that you are here to
16   speak to us about.
17    MS. CLAYMAN:
18       Okay. Washington Division of
19   URS, formerly Washington Group
20   International, designates Stephen Roe
21   to testify regarding topics 7 through
22   17 of the 30 (b)(6) notice and 62 and
23   63.
24       We also have reached an agreement
25   with Plaintiff's Counsel on topic

Page 8

1    number 11, which currently includes
2    all project documents. So that also
3    has been limited to specific types of
4    documents.
5     MR. BRUNO:
6        Okay?
7     MS. CLAYMAN:
8        Okay.
9     MR. BRUNO:
10       Okay. Good.
11    VIDEO OPERATOR:
12       Please swear the witness.
13       STEPHEN CLAY ROE,
14   14054 West Cornell Avenue, Lakewood, Colorado
15   80228, after being duly sworn, did testify as
16   follows:
17   EXAMINATION BY MR. BRUNO:
18   Q. All right. Good morning, Mr. Roe.
19   A. Good morning.
20   Q. I take it you're not from Boise.
21   You're from Colorado?
22   A. No, I'm a Colorado boy.
23   Q. Well, thanks for being with us this
24   morning. Appreciate it.
25       What I would like to do first, if

Page 9

1    you don't mind, is learn a little bit about
2    you. Okay?
3    A. Okay.
4    Q. First of all, by whom are you
5    employed?
6    A. Washington -- or Washington Division
7    of URS Corporation.
8    Q. All right. And what is your title
9    today?
10   A. Right now I am a Senior Project
11   Manager with the company.
12   Q. What generally does a Senior Project
13   Manager do?
14   A. Manages projects.
15   Q. Okay. I like it simple.
16   A. I'm a simple guy.
17   Q. Would that include projects like
18   Task Order number 26?
19   A. Yes.
20   Q. Okay. For how long have you been
21   employed by URS and/or its predecessor
22   companies, Washington Group International
23   and/or Morrison Knudsen?
24   A. 18 years. Since '89.
25   Q. All right. You have been designated

JOHNS PENDLETON COURT REPORTERS                        800 562-1285

STEPHEN CLAY ROE                                                    4/17/2008

Page 10

1   to talk to us about paragraph 7, so let's just
2   start there.
3        A.  Okay.
4        Q.  We have asked about the submissions
5   prepared by I guess then it was Morrison
6   Knudsen clearly.  Right?
7        A.  Yes.
8        Q.  All right.  Broadly indicating
9   interest and/or efforts to obtain a contract
10  known as the TERC.  So first, what was your
11  job at that general period of time?  And, of
12  course, what I am referring to is the period
13  of time which would embody number 7.
14       A.  Okay.  Well, number 7 talks to TERC
15  Task Order 26, and I think originally we were
16  asked to look at the site and prepare a
17  proposal in the June, 1999 time frame.  At
18  that time I was Program Manager of the Tulsa
19  TERC contract.
20       Q.  Okay.  Before we even get another --
21  I'm a little confused.
22       MR. BRUNO:
23          I thought that you guys told me
24       that the witnesses today had no
25       knowledge specifically to 26.

Page 11

1        MS. WAGER-ZITO:
2          No, that was Anne Veigel.
3        MR. BRUNO:
4          Okay.  So we are --
5        MS. WAGER-ZITO:
6          Mr. Roe is here.
7        MR. BRUNO:
8          So we are going into 26 as well.
9        MS. WAGER-ZITO:
10         Absolutely.
11       MR. BRUNO:
12         Okay.  Fair enough.
13       MS. CLAYMAN:
14         He is only 26.
15       MR. BRUNO:
16         Only 26.  All right.  Okay.
17       Thanks.  I'll have to go down a
18       different path now, reorient my
19       thinking as they say.
20  EXAMINATION BY MR. BRUNO:
21       Q.  All right.  Well, let me back up,
22  because I started with a different thought.
23  So let me get oriented to where you are.
24       A.  Okay.
25       Q.  When did the company first become

Page 12

1   aware of the opportunity to do any work on
2   Task Order 26?
3        A.  Formally in writing, I know it was
4   June, 1999.  Now, I am positive we were
5   notified, you know, by phone, you know, months
6   before that.
7        Q.  Sure.
8        A.  But I don't remember when.
9        Q.  All right.  When the information is
10  conveyed to Morrison Knudsen, is it known at
11  that time as 26, or does it have some other --
12       A.  No.
13       Q.  -- descriptor?
14       A.  No, in fact, sometimes I remember
15  their RFPs would have "Statement of work, task
16  order" blank.
17       Q.  I see.
18       A.  Because, you know, we're already up
19  to 26.  Sometimes we might have been looking
20  at another job at another locale, and they
21  always wanted to go in sequential order.  So
22  sometimes the --
23       Q.  All right.  We have learned this
24  morning that there was at least one other
25  company who had succeeded in getting the TERC

Page 13

1   contract and that, you know, that company
2   would obviously then have an opportunity to do
3   certain work.  The sequential numbering, do
4   you know whether or not the sequential
5   numbering referred to the task orders
6   accomplished by Morrison Knudsen, or were
7   these sequential numbers related to any work
8   done by either you or the other company
9   pursuant to the TERC?
10       A.  Only Morrison --
11       MS. WAGER-ZITO:
12         Objection.  I believe that
13       misstates this morning's testimony.
14       MR. BRUNO:
15         How?
16       MS. WAGER-ZITO:
17         You said "the TERC".  Two
18       companies were awarded "the TERC".
19       MR. BRUNO:
20         Right.
21       MS. WAGER-ZITO:
22         There were different TERCs.
23       MR. BRUNO:
24         I know there were.
25       MS. WAGER-ZITO:

STEPHEN CLAY ROE                                                    4/17/2008

Page 14

1        One company got one TERC, one
2    company got the other TERC.
3        MR. BRUNO:
4            Oh, then I misunderstood.  I
5        thought she said -- I thought I
6        learned -- That's good.  That's
7        helpful, because I got confused by the
8        testimony this morning.
9    EXAMINATION BY MR. BRUNO:
10       Q.  I thought that there was more than
11   one company who was awarded the TERC.  That's
12   incorrect?
13       A.  They were two, I think, identical
14   contracts.
15       Q.  But they were identical?
16       A.  I think so.  Yeah.
17       Q.  Then my impression of what I heard
18   this morning is accurate.
19       A.  Right.  And, in other words, they
20   had an option -- and when they -- Well, I am
21   kind of going into what Anne was supposed to
22   cover, but they had a thought process going in
23   that for certain customers or military
24   installations they would use one; and then for
25   the others, they would use the other.

Page 15

1        Q.  I see.
2        A.  They didn't have us compete with
3    each other, in other words.  They would
4    pre-decide, "Okay, New Orleans, let's evaluate
5    whether that should go to the other one or to
6    Morrison Knudsen".
7        Q.  I got you.
8        A.  In this case they said Morrison
9    Knudsen.
10       Q.  I understand.
11       A.  So then it's just a matter of us
12   negotiating the Corps on it.
13       Q.  So let's get to the sequential
14   numbering then.  Am I correct in assuming,
15   then that the 26 refers to the 26th contract
16   that Morrison Knudsen did?
17       A.  The 26th task order under the
18   contract.  So they're sort of like
19   subcontracts, but still under the original
20   umbrella contract clauses, terms and
21   conditions.
22       Q.  All right.  So in June, '99, what
23   exactly does Morrison Knudsen receive from the
24   Corps that would describe the work that would
25   ultimately be called 26?

Page 16

1        A.  What they gave us, which was typical
2    of any task orders, they will give you an RFP
3    letter, request for proposal, signed by the
4    contracting officer and then a statement of
5    work.  And the statement of work in essence
6    lists the work elements, a little description
7    of the site, a little description of the work
8    to be performed, and in some cases they'd have
9    other supplemental information like wage
10   determinations if -- you know, if you had to
11   comply with the Davis Bacon and that sort of
12   thing.
13       Q.  Okay.
14       A.  But in essence the RFP letter and
15   the statement of work is the important stuff.
16       Q.  I'm going to show you a document
17   which has been Bates numbered WGI-000005.
18       MR. BRUNO:
19           This is really just document 5,
20       isn't it?  Do I have to say all of
21       those zeros?
22       MS. WAGER-ZITO:
23           Not for my benefit.
24       MR. BRUNO:
25           Okay.  Good.

Page 17

1    EXAMINATION BY MR. BRUNO:
2        Q.  So this is Bates numbered WGI-5 in
3    seriatim to 9.  Show you this document and see
4    if you recognize it.
5        A.  Yeah.  This is the statement of
6    work.  So 1 June '99, that must have been the
7    original.  You can see where, like I said,
8    there was a blank there and looks like
9    somebody kind of typed in "0026" for the task
10   order number.  So, like I said, there's a
11   cover letter that conveyed this to me from
12   probably John Weatherly or Earline Smith.  And
13   then this is the statement of work on which we
14   based a proposal.
15       Q.  Okay.  Now, your reference to a
16   cover letter from somebody, that's somebody
17   within your company?
18       A.  No, it's from our client, the Corps
19   of Engineers.
20       Q.  All right.  So they knew to send
21   this directly to you?
22       A.  Right.
23       Q.  All right.  And your job at that
24   time was what?
25       A.  Program Manager.

                                    5  (Pages 14 to 17)

JOHNS  PENDLETON  COURT  REPORTERS            800  562-1285

STEPHEN CLAY ROE                                              4/17/2008

Page 18

1          MS. WAGER-ZITO:
2          Are you going to mark this, Joe?
3          MR. BRUNO:
4          I wasn't planning on it because
5    we have got Bates number references.
6    I don't like to just waste paper.  But
7    if you do, we can mark it.
8          MS. WAGER-ZITO:
9          Fine.
10         MR. BRUNO:
11         Good.
12   EXAMINATION BY MR. BRUNO:
13         Q.  I am going to ask you this with
14   trepidation.  What does a Program Manager do
15   other than manage programs?
16         A.  Okay.  A program in this case is
17   multiple projects.  Okay?  So you can see on
18   the TERC we had at least 26 projects within
19   the program.  And within the TERC at any given
20   time there might have been, you know, anywhere
21   from one to ten going on at one time.
22         Q.  Okay.
23         A.  And I -- the Program Manager was
24   responsible -- There were project managers or
25   task order managers assigned to each one of

Page 19

1    these projects who reported to me.
2          Q.  Right.  Do I gather from your
3    testimony that you were the manager of the
4    TERC?
5          A.  Yes.
6          Q.  Would you agree with me that the
7    scope of work is defined in paragraph number 1
8    under "General"?  I apologize for us not
9    having multiple copies, but there's only so
10   much paper you can carry on an airplane.
11         A.  Well, no, I would not.
12         Q.  All right.  Identify for me all of
13   the paragraphs on that piece of paper which
14   identify the scope of work.
15         MR. EHRLICH:
16         Is this the same Bates number?
17         MR. BRUNO:
18         Yes, sir.
19         MR. EHRLICH:
20         That you numbered from the
21   exhibit?
22         THE WITNESS:
23         Well, the whole document needs to
24   be considered, because what we're
25   driving towards is defining

Page 20

1    requirements.  And, you know, there is
2    section 3, "Project requirements",
3    that talks about, you know, demolition
4    and remediation, and it talks about
5    generating a comprehensive report
6    recommending the scope and duration of
7    the remediation.  So they're asking us
8    in essence to, under our contract to
9    define the requirements by which this
10   work would be done.
11   EXAMINATION BY MR. BRUNO:
12         Q.  Okay.  As I appreciate it, the TERC
13   itself is the document that establishes the
14   method of compensation of Morrison Knudsen;
15   right?
16         A.  Yes.
17         Q.  And it describes generally the
18   process by which you're expected to accomplish
19   what's described in that document you're
20   looking at; right?
21         A.  It establishes some of the
22   guidelines and requirements --
23         Q.  Okay.
24         A.  -- by which you -- Yes.
25         Q.  All right.  Now, are you familiar

Page 21

1    with the TERC and its requirements?
2          A.  Yes.
3          Q.  Okay.  Do you know whether or not
4    the TERC requires the contractor, Morrison
5    Knudsen, in the process of evaluating the site
6    in order to prepare the work plan, to assess
7    whether or not the proposed work may damage
8    people or property?
9          A.  No, I am not aware of that
10   requirement.
11         Q.  All right.  Do you know if that is a
12   general -- Do you know if Morrison Knudsen, in
13   the process of drafting work orders under the
14   TERC, did that?  That is, evaluated the work
15   that it expected to do for the purposes of
16   ascertaining whether or not the proposed work
17   would damage people or property?
18         A.  That was not part of the scope or
19   the -- the -- I mean, that's not mentioned in
20   here.
21         Q.  Right.
22         A.  It's typically they're asking you to
23   clean up a site or study a site or
24   investigate, you know, the contaminants on the
25   site --

STEPHEN CLAY ROE                                          4/17/2008

Page 22

1     Q.  Right.  Sure.
2     A.  -- for the purposes of removing
3  them.
4     Q.  Right.  So let me see if I can
5  understand.  Clearly the remediation would
6  require Morrison Knudsen to put people and
7  equipment on a particular site; right?
8     A.  Right.
9     Q.  All right.  And there's always the
10 potential for harm to people or property when
11 you're undertaking that kind of activity;
12 right?
13    A.  Right.
14    Q.  All right.  So what, if anything,
15 does Morrison Knudsen do or did it do back
16 then, in 1999, to ascertain whether or not the
17 work that it was contemplating might cause
18 some harm to people or property?  If it did
19 anything at all.  It may have done nothing.  I
20 don't know.
21    A.  Well, if you were to look at the
22 plans that we developed, they're -- you know,
23 there's a site safety and health plan that
24 addresses worker safety, working around heavy
25 equipment; there's a perimeter air monitoring

Page 23

1  plan --
2     Q.  Right.
3     A.  -- for -- you know, to make sure
4  that contaminants aren't getting out into the
5  community.  I think it also addressed noise.
6  You know, you got these various work plans to
7  address those sorts of concerns.
8     Q.  All right.  And who decides to
9  include those considerations?  Is that
10 something Morrison Knudsen does as a
11 responsible contractor?
12    A.  Yes, in conjunction with the Corps'
13 requirements and their approvals.  These plans
14 are all submitted to the Corps and then they
15 review them and approve them.
16    Q.  All right.  But as I appreciate it,
17 it's Morrison Knudsen who has the first
18 responsibility of drafting the work plan;
19 right?
20    A.  Yes.
21    Q.  So it decides what it's going to
22 consider in the context of the potential for
23 harm to persons or property; right?
24    A.  Yes.
25    Q.  All right.  And certainly as a

Page 24

1  responsible contractor Morrison Knudsen is
2  concerned whether or not its work activity may
3  damage people or property off site?  Isn't
4  that true?
5     A.  Yes.
6     Q.  Okay.  I mean, for example, like
7  things like pile driving -- You guys do pile
8  driving, don't you?
9     A.  No.
10    Q.  You don't do pile driving?  Do you
11 remove piles?
12    A.  Do we move pile?
13    Q.  Remove.
14    A.  We tend to subcontract the work.
15 Yeah, we tend to subcontract those
16 activities.  So in the sense that our subs do
17 it, yes, we do it.
18    Q.  All right.  Well, just because you
19 subcontract the work doesn't mean that you
20 just turn a blind eye to what your
21 subcontractors do.  I know you guys don't do
22 that, --
23    A.  No.
24    Q.  -- do you?
25    A.  No.

Page 25

1     Q.  No, I didn't think so.  So you have
2  some interest in ascertaining whether or not
3  your subcontractors might do damage to folks
4  who are off site; right?
5     A.  Sure.
6     Q.  Of course.
7     A.  I mean, yeah.
8     Q.  Okay.  You have some interest.
9     A.  We don't have a reputation like we
10 have by, you know, turning a blind eye to our
11 own workers or the public we're working
12 around.
13    Q.  That's exactly my point.  It's not a
14 hard issue.
15        Okay.  Let's see if I can
16 determine whether there's some kind of a line
17 that gets drawn by you in the context of the
18 way you answered the question, because you did
19 tell us that there are quality control plans
20 in place with regard to things like worker
21 safety.  Right?  Do you remember telling me
22 that?
23    A.  Yeah, there are work plans --
24    Q.  All right.
25    A.  -- in place.

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

STEPHEN CLAY ROE                                                    4/17/2008

1      Q.  All right.  What I want to do is I
2  want to see if Morrison Knudsen makes any
3  distinction between the quality control with
4  regard to their worker safety folks on the
5  site versus people or property off the site.
6  Does the quality control plan to which you
7  make reference in your answer include taking
8  precautions to protect people or property off
9  site?
10     A.  Yeah, we -- Actually, it's not the
11 quality control plan.  It's the site safety
12 and health plan.
13     Q.  Site safety and health.  Okay.
14     A.  And we put a fence around -- You
15 know, we have -- the whole site is considered
16 an exclusion zone.  So we put a fence around
17 it.  We have security guards at the gate.  So
18 we do air monitoring, noise monitoring, these
19 sorts of things.
20     Q.  All right.
21     A.  So, you know, the thing is, is keep
22 people off the site and there won't be, you
23 know, -- That's how we control that.
24     Q.  All right.
25     MR. BRUNO:

1      Can I have that back, please?
2      MS. WAGER-ZITO:
3      (Counsel hands document to
4      Counsel).
5  EXAMINATION BY MR. BRUNO:
6      Q.  All right.  This document says in
7  paragraph 1 "The contractor shall furnish all
8  services, materials, supplies, labor, and
9  travel as required in coordination --"  I'm
10 sorry, "in connection with the coordination
11 and technical review of site documents for the
12 remediation and demolition of the east bank of
13 the Inner Harbor Navigation Canal between
14 Claiborne Avenue and Florida Avenues from the
15 IHNC east to the floodwall."  Now, the
16 reference to site documents, are those site
17 documents already in existence?
18     A.  The site documents I believe are
19 those listed in the back of that statement of
20 work.  Those are the ones provided to us.
21     Q.  Okay.
22     MS. WAGER-ZITO:
23     Joe, I don't have a problem with
24     you not marking this as an exhibit.
25     MR. BRUNO:

1      We can mark it.
2      MS. WAGER-ZITO:
3      But he needs to have one to
4  review.
5      MR. BRUNO:
6      Make a copy.
7      MR. SCHULTZ:
8      I've got an extra one.
9      MR. BRUNO:
10     It's got a different Bates number
11 on it, though.
12     MR. SCHULTZ:
13     June 1, '99?
14     MR. BRUNO:
15     Well, it's the same document.
16 It's got different Bates numbers on
17 it.
18     MS. CLAYMAN:
19     He'll use that one.
20     MR. BRUNO:
21     Okay.  Whatever you say.
22     THE WITNESS:
23     Or we can trade.  Whatever.
24 EXAMINATION BY MR. BRUNO:
25     Q.  Doesn't matter to me.

1      A.  You can see the "Government
2  furnished information", item 6.  These are the
3  documents that they provided to us and allowed
4  us to review, and we excluded or reviewed
5  those.
6      Q.  All right.  Well, just for my
7  understanding, the paragraph says "review of
8  site documents".  How do we know what the site
9  documents are?  Is that something that's
10 defined by the TERC?
11     A.  No, they're listed right here on the
12 statement of work.
13     Q.  Well, I know.  I am not trying to be
14 persnickety about it, but I don't see anything
15 that says site documents.  How do we know what
16 a site document is?
17     A.  It says "One copy of the following
18 site documents --"
19     Q.  That's fair enough.
20     A.  "-- for the contractor's technical
21 review".
22     Q.  So the site documents have the
23 little dot next to each of them under 6.
24     A.  Correct.
25     Q.  All right.  Now, it says "technical

STEPHEN CLAY ROE                                          4/17/2008

---

Page 30

1  review". So could you help me understand what
2  is the nature of the technical review of the
3  site documents that we have now identified?
4      A. The nature of the review is to take
5  that -- the knowledge in these reports to
6  direct our focus towards this recommendations
7  report, which will in turn direct our focus to
8  what activities we as a contractor will do for
9  the Corps on the site --
10     Q. Okay.
11     A. -- during the long-term
12  remediation.
13     Q. Well, the thing that's got me
14  confused is that we know that this is a
15  remediation contract, the TERC is a
16  remediation contract, --
17     A. Right.
18     Q. -- which in my mind means you're
19  removing toxins and the like.
20     A. Right.
21     Q. Right? But we know that this
22  contract ultimately called for the removal of
23  more than just the toxins on the site.
24  Right?
25     A. Right.

---

Page 31

1      Q. I mean we removed --
2      A. Structures.
3      Q. Structures.
4      A. Concrete.
5      Q. Exactly. And I am trying --
6      A. Right.
7      Q. -- to understand how the TERC in
8  Task Order 26, to the extent it did, moved
9  from the remediation of the toxic materials to
10  the removal of these structures, the --
11     A. Uh-huh (affirmatively).
12     Q. -- concrete stuff and the piling and
13  all of that business.
14     A. Well, these structures had materials
15  like asbestos, lead-contaminated -- you know,
16  lead-based paint, lighting ballast with
17  mercury. So in the process of demolishing the
18  buildings there was a lot of dealing with
19  waste, you know, segregating different types
20  of waste to go to different types of
21  facilities, you know. A steel salvage yard
22  could take the steel. But you don't want to
23  be sending them the asbestos and so forth.
24     Q. Again, I understand that. But let
25  me just ask it this way. We know that

---

Page 32

1  ultimately pursuant to Task Order 26 Morrison
2  Knudsen, later Washington Group, went below
3  the surface and removed piling and removed
4  locomotives and all kinds of other things that
5  would not ordinarily be characterized as the
6  removal of toxins. Isn't that true?
7      A. Well, even the piles, you know, had
8  creosote treating and stuff like that.
9      Q. Right.
10     A. But sure, you know, the site itself,
11  you know, apparently in the Corps' judgment,
12  had enough contamination to want to deal with
13  it with this contracting mechanism, with the
14  HTRW contracting mechanism.
15     Q. Well, I understand that, but I mean
16  the documents clearly reflect that the reason
17  for the removal of the piling and these other
18  structures was so that when the Corps came
19  back to dredge the area for its use as an
20  auxiliary canal, that the tools that they were
21  contemplating using wouldn't run into these
22  structures. Isn't that true?
23     A. Yes.
24     Q. All right. And all I am driving at
25  is that's not generally environmental

---

Page 33

1  remediation as contemplated by the TERC.
2  That's something a little bit different.
3  Isn't that true?
4      A. No, I think in the environmental
5  remediation world a lot of decontamination,
6  demolition of buildings is a fairly
7  significant part of that. Removal of tanks,
8  you know, underground storage tanks is a
9  common remediation activity.
10     Q. Well, that's true.
11     A. So whether it's oil or gas or
12  toxics, whatever.
13     Q. All right. That's true, but that's
14  not my question.
15     A. Uh-huh (affirmatively).
16     Q. Recall, please, that I suggested,
17  and I could be wrong, but I am just -- all I
18  can do is read the documents. The documents
19  seem to reflect that the reason for the
20  removal of some of these structures, not all,
21  was to allow for the Corps to come back and
22  dredge this area for the use of this space as
23  an auxiliary canal. And the reason why the
24  structures had to be pulled was so that their
25  excavating devices wouldn't be damaged in the

---

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

STEPHEN CLAY ROE                                    4/17/2008

Page 34

1  course of that excavation. Is that a fair
2  statement of that work or not?
3       A.  I already answered that question.
4       Q.  I didn't -- I missed it.
5       A.  I said yes, that is -- that was
6  their ultimate intent.  Yes.
7       Q.  Well, as regards that ultimate
8  intent, that's not typical environmental
9  remediation.  That is, removing structures to
10 make way for a dredge.  Isn't that true?
11      A.  The Corps of Engineers had criteria
12 by which they could use this contracting
13 mechanism.  They evaluated it, they determined
14 it was a good match, they picked up the phone,
15 they called us, they had us out to the site,
16 they provided this statement of work, and here
17 we are.
18      Q.  I understand all of that.  And I am
19 not suggesting that anybody did anything
20 wrong.  I am just trying to get an answer to a
21 very simple question.
22      A.  I am not at liberty to judge whether
23 it was an appropriate use or whether it is or
24 isn't hazardous waste work.  In my mind --
25      Q.  That wasn't the question.

Page 35

1       A.  -- it is a mixture.  Yes, there was
2  remediation work and yes, there was some
3  non-contaminated stuff that we dealt with.
4  That's true.
5       Q.  That wasn't the question.
6       A.  Okay.
7       Q.  I wasn't asking you to comment on
8  the philosophy, the correctness, the
9  appropriateness of anything.
10      A.  Okay.
11      Q.  Okay?  I was just trying to get a
12 frame of reference.  That's all.
13      A.  Okay.  You're trying to give --
14      Q.  Don't be so defensive.  It's okay.
15 Okay?  I am not here to trick you.  I just
16 want to know if -- We have established, I
17 think pretty clearly, the documents are a mile
18 high, the central focus of the TERC was
19 environmental remediation, the removal of
20 toxins.
21         MR. EHRLICH:
22           Object to the form.
23 EXAMINATION BY MR. BRUNO:
24      Q.  Isn't that true?
25      A.  Yes.

Page 36

1       Q.  Okay.  In fact, it even talks about,
2  I forgot, TH whatever it is.  I've got it
3  written down here somewhere.
4         MS. WAGER-ZITO:
5           HT.
6         THE WITNESS:
7           Hazardous toxic radiological
8      waste.  HTRW.
9  EXAMINATION BY MR. BRUNO:
10      Q.  I mean, it says it right here.  "The
11 total remediation of hazardous, toxic and
12 radioactive waste."  Those are words that
13 somebody chose to stick in this contract.
14 Right?
15      A.  Right.
16      Q.  Right.  And again, I am not
17 suggesting anybody did anything wrong here.  I
18 am just saying that the removal of the piling
19 and stuff and the structures to make way for
20 an excavating device is a little bit outside
21 of the general purposes, or I shouldn't say
22 "purposes", God forbid, of what is generally
23 contemplated by a TERC.  Right?  That's all I
24 am driving at.
25      A.  You know, --

Page 37

1         MS. WAGER-ZITO:
2           Objection, asked and answered.
3         THE WITNESS:
4           -- I would really need to look
5      at the original TERC statement of
6      work.  I don't know if it talked about
7      demolition of structures and that sort
8      of thing.  Possibly it did.  I haven't
9      reviewed that document in quite some
10     years.
11 EXAMINATION BY MR. BRUNO:
12      Q.  All right.  So you just don't know.
13      A.  Right.
14      Q.  Fair enough.  Can you tell me
15 whether or not the document that's in front of
16 you describes the removal of piling and
17 structures for the purposes of allowing
18 dredging equipment to dig a separate channel?
19 Can you tell me whether or not that's included
20 in this statement of work?  And if it is, just
21 show me where it is.
22      A.  I don't think it specifically -- I
23 don't see it in here, that it specifically
24 mentions removal of piles.
25      Q.  All right.

10  (Pages 34 to 37)

STEPHEN CLAY ROE                                                    4/17/2008

Page 38

1     A.  Just remediation and demolition.
2     Q.  All right.  Now, I think you've
3  testified that it's the site documents that
4  really give you a great deal of insight in
5  terms of what it is that you're going to do.
6  Right?
7     A.  Well, they give you the insight on
8  what's there now.
9     Q.  What's there now.  Okay.  Now,
10  because the document, we have just agreed,
11  doesn't really talk about removal of
12  structures for the purposes of dredging, these
13  documents that are referenced in this
14  particular piece of paper are there to help
15  you to have some understanding of the
16  remediation component of the work.  Isn't that
17  true?
18     A.  Yes.  And the structures.
19     Q.  All right.  As they relate to
20  remediation.
21     A.  Right.
22     Q.  But not as they relate to digging a
23  canal; right?
24     A.  Right.
25     Q.  And so we see things like "1992,

Page 39

1  land use history".  What information might you
2  gather from a document like that in the
3  context of this remediation contract?
4     A.  That, I assume, would discuss the
5  various marine activities, or the businesses
6  that occupied that so you could get an idea of
7  what their operations were and what sorts of
8  things they might have left behind.
9     Q.  Okay.  Fair enough.  And the next
10  one, "Assessment of potential hazardous toxic
11  and radiological wastes"?
12     A.  Yeah, this one I remember reading
13  the summary.  It had to do with the soil gas
14  investigation.  An original inves- -- kind of
15  a visual and high level contamination
16  investigation.  I think they collected quite a
17  few samples.
18     Q.  All right.  And did you have some
19  understanding of why the samples were
20  collected?
21     A.  For purposes of determining soil
22  contamination primarily.
23     Q.  Okay.  And the next one, "IHNC drums
24  and containers testing, collection,
25  disposal"?  How might that assist you in

Page 40

1  developing your work plan?
2     A.  Well, is it okay for me to
3  speculate?  Because I haven't read these
4  documents.  I can speculate that if, you know,
5  they tested drums, they tested containers,
6  hopefully, you know, there's somewhat of an
7  inventory and discussion of what's in those
8  things.
9     Q.  Yes.
10     A.  You know, in order for us to prepare
11  a plan, a schedule, and an estimate to do this
12  work, you really got to get into the
13  quantities of the various materials, where
14  that material is going to go off-site as far
15  as a disposal facility, a recycling facility.
16  So we're looking for information in which to
17  base an estimate --
18     Q.  All right.
19     A.  -- and to develop these plans.
20     Q.  All right.  Let's just walk through
21  the rest of them very quickly.  I just want to
22  ascertain that each of these things regards
23  only the environmental remediation component.
24  That's where I am going here.
25     A.  And structures.

Page 41

1     Q.  In connection with environmental
2  remediation and not dredging.
3     A.  Right.
4     Q.  Okay?  So we could perhaps
5  short-circuit this if you want to just look at
6  each of them and see if there's any one of
7  these documents referred to as site documents
8  which gives information on anything other than
9  remediation of the site and/or the structures
10  on the site.
11     MR. EHRLICH:
12        Do you have another copy of that
13     document you're asking him about?
14        (Whereupon a discussion was held
15     off the record.)
16     THE WITNESS:
17        Where are you?  On page 7 now?
18  EXAMINATION BY MR. BRUNO:
19     Q.  Yes.  I was just frankly trying to
20  avoid going through each dot.  We can do it
21  either way.  I was going to let you just look
22  at them, but we can take them one at a time.
23     A.  You know, I'm not an expert on these
24  documents.  What we did is we assigned two
25  individuals to New Orleans -- Well, one

JOHNS PENDLETON COURT REPORTERS                      800 562-1285

Case 2:05-cv-04182-SRD-JCW    Document 16208-10    Filed 10/30/08    Page 39 of 87

---

Page 42

1   already worked there for a subcontractor, MMG,
2   and then we moved Dennis O'Connor down there,
3   our project manager, and they reviewed these
4   documents.  And there's a good synopsis or,
5   you know, summary of each of them in the
6   recommendations report.  So, you know, it's
7   mostly conjecture on my part, is by reading
8   the title and saying what I would think would
9   be in the reports.  I don't know if that
10  serves your purpose or if it's the best thing
11  to do, but --
12      Q.  Well, I would like to know, though,
13  from your perspective as the project manager
14  what your expectation would be.  You would
15  expect that these documents would be reviewed
16  by whoever you assigned them to.  Right?
17      A.  Right.
18      Q.  And I am just trying to get a handle
19  on an understanding of the scope of the work.
20  Would you agree, and I think that this has
21  already been established, but to put it
22  bed, these one, two, three, four, five pages
23  of materials don't say anything about removing
24  structures for the purposes of assisting the
25  Corps in its dredging activities of the

---

Page 43

1   proposed relief canal that they were going to
2   build.
3       A.  Well, these five pages direct us to
4   develop the recommendations report to do the
5   remediation and demolition that will be
6   required, including, and I am reading now, "In
7   addition to reviewing the site documents, the
8   contractor shall prepare a comprehensive
9   report recommending the scope and duration of
10  the remediation and demolition that will be
11  required, including any data gaps that may
12  need to be filled by sampling and other
13  investigations."  The top of page 6.
14      Q.  Okay.
15      A.  So remember, it's -- it's not just
16  these documents.  We're out there walking
17  around the site with the Corps and they're
18  saying, "Okay, see that there?  You know,
19  here's -- here's what we need to do, you
20  know.  See those piles?  They got to go.
21  Guess what?  You know, there's sunken barges
22  out there.  Go read about them.  You know,
23  maybe they're discussed in this report," you
24  know.  So they're walking around telling us
25  what they know about the site.  And then they

---

Page 44

1   dump these documents and then it's Dennis and
2   Jim Blazek's job to go to work reviewing these
3   documents and putting together a plan, an
4   initial recommendations report of the scope
5   and magnitude of this effort.
6       Q.  Well, is it all important for you as
7   the contractor to have some understanding of
8   what it is that the Corps intends to do with
9   the site so that you can assess the degree to
10  which perhaps demolition is necessary?
11      A.  Well, they told us pretty much, you
12  know -- other than the way you put it, they
13  "Ultimately we're going to put a bypass
14  channel and that this area is going to be
15  dredged out."  I don't think we heard much
16  more than that.  But they would say stuff
17  like, "Gee, we need these things -- you know,
18  we want to go down" I think it was 36 feet or
19  something, so there were some criteria
20  provided by the Corps that was put into the
21  recommendations report as to how deep they may
22  be dredging and that sort of thing.
23      Q.  Okay.  Well, that's where I am
24  going.  When do you believe you understood
25  that the Corps intended to dredge the site for

---

Page 45

1   let's just say generally a canal without much
2   more than that, just keep it simple?  Was that
3   part of this process?
4       A.  Yes.  I'm sure when we did the first
5   site walk they told us, you know, the big
6   picture.
7       Q.  All right.
8       A.  You know, "This is a big navigation
9   project and you're one of -- one of the first
10  out of the chute as far as the contract to
11  begin the process of being able to improve
12  that navigation channel."
13      Q.  All right.  So you think you also
14  knew then how deep they wanted to go?
15      A.  Yes, I think that that was discussed
16  as part of the recommendations report.
17      Q.  All right.  Now, do you think it's
18  36 feet?
19      A.  I saw that somewhere in reviewing
20  the recommendations report.  Something about,
21  you know, piles, you know, when they pull the
22  piles, if -- I can't remember the context of
23  the 36 feet, but I saw that somewhere.
24      Q.  Right.  Well, I mean, that's kind of
25  where my confusion comes into play.  Because

---

STEPHEN CLAY ROE                                          4/17/2008

Page 46

1  if you want to create a space 36 feet below,
2  let's use sea level as our datum, and you know
3  you got piles down there, there's two ways you
4  could go.  You could either pull the pile or
5  you could cut the top off.  Right?
6      A.  Well, yeah, you'd rather pull it.
7      Q.  Well, that's where I am going.  I
8  mean, are those -- is that -- Maybe I am
9  crazy.  Is that an option?
10     A.  Right.  We were requested by the
11 Corps to pull them.  Okay?
12     Q.  To pull them?
13     A.  Now, if they break off, you know, in
14 the recommendations report there's some
15 discussion -- basically the Corps kind of
16 provided us with the spec, if you will, that
17 if the thing breaks off, then you locate that
18 thing, and I imagine there were some -- you
19 try to indicate how deep it was where it broke
20 off so that when those guys come around
21 dredging, they know they're about to hit this
22 thing.  And so there was a GPS or a survey,
23 you know, requirement to identify the exact
24 location of anything broken off and left if it
25 were above 36 feet.  I think that's what it

Page 47

1  was.
2      Q.  Okay.  I meant to ask you this
3  before and I should have.  Had you guys done
4  any work in Louisiana before this 26?
5      A.  On the TERC?  No.
6      Q.  Had you --
7          MS. WAGER-ZITO:
8          I'm sorry, when you say "you
9          guys", you mean all of Washington
10         Group?
11         MR. BRUNO:
12         Yes.
13         THE WITNESS:
14         You mean Washington Group?
15 EXAMINATION BY MR. BRUNO:
16     Q.  Yes.  I meant --
17         MS. WAGER-ZITO:
18         Or MK?
19 EXAMINATION BY MR. BRUNO:
20     Q.  Well, --
21     A.  Oh.  Well, certainly.  Yeah, I mean.
22     Q.  -- let me clarify the question for
23 the record in fairness to Counsel.  All
24 right.  Let's go back to 19- -- was is 1999, I
25 think June, 1999, you're Morrison Knudsen at

Page 48

1  that time.  Do you know whether or not
2  Morrison Knudsen had done any work in
3  Louisiana up until that time?
4      A.  I can't think of anything, but, you
5  know, it's a big company.  It's been around
6  since 1895.
7      Q.  I understand.  Yes.
8      A.  If we hadn't done work in Louisiana,
9  I'd be shocked.
10     Q.  You would be shocked.  But you have
11 no personal knowledge?
12     A.  I can't -- Nothing jumps out on me
13 that I can remember in my 20 years.
14     Q.  Okay.  But it is true that Morrison
15 Knudsen had done no work under the TERC in
16 Louisiana?
17     A.  Yes.
18     Q.  Okay.  Do you know if any inquiry
19 was made?  I mean, you know, within the
20 company, "Hey, guys, we're going to
21 Louisiana.  Anybody in the company have any
22 specialized knowledge about working in
23 Louisiana, the politics or whatever, good bars
24 to go to, et cetera"?  Things like that?
25         MS. WAGER-ZITO:

Page 49

1          Compound question.
2          THE WITNESS:
3          Well, --
4          MR. BRUNO:
5          It's compound, I'll admit.
6          THE WITNESS:
7          -- we did happen to have a
8          relationship with MMG, who is an 8-A
9          subcontractor, and that was one of the
10         benefits we felt was provided by this
11         very small business, was that they
12         knew the local -- they knew the local
13         businesses, the politics, the good
14         places to go eat, if you will.
15 EXAMINATION BY MR. BRUNO:
16     Q.  Good.
17     A.  So yeah, they helped us.
18     Q.  All right.  Tell me, who is MMG?
19     A.  Materials Management Group.
20     Q.  Okay.
21     A.  And they were a small business at
22 the time we used them.  They probably had 15,
23 20 employees.
24     Q.  All right.  Did you have a personal
25 relationship with any of the folks in that

13  (Pages 46 to 49)

STEPHEN CLAY ROE                                              4/17/2008

Page 50

1  particular company at that time?
2      A.  Well, as a result of this project I
3  developed a personal relationship with their
4  principal.
5      Q.  Okay.  What was the principal's
6  name?
7      A.  Paul Lo.
8      Q.  L?
9      A.  L O.
10     Q.  L O?
11     A.  Yeah.
12     Q.  That's easy to spell.  Before, what
13  was the relationship with, with either you or
14  Morrison Knudsen with this company before the
15  Task Order 26?
16     A.  Well, I had -- I was wondering that
17  myself, how we got on to them.  Because my
18  relationship with them started about the time
19  this RFP came out.  When we went down there, I
20  walked the site with Paul Lo and then we
21  started brainstorming how we were going to --
22  how we were going to work this project
23  together.  But before that, the company -- You
24  know, the government is very keen on involving
25  small local businesses, disadvantaged

Page 51

1  businesses, so we had set up a Mentor Protege
2  agreement with them, which was -- is a
3  government-sanctioned program where large
4  business helps support a small business.  What
5  the large business gets out of that is goals,
6  you know, towards your goals and also you
7  don't have to compete for work.  So we didn't
8  have to compete, you know, -- We could just
9  say "MMG is going to be our partner" and the
10  Corps said "Good enough, cost reimbursable,
11  you know, as long as you do your job and
12  making sure the money's well spent" and so
13  that was the relationship in a nutshell.
14     Q.  All right.  So when you received
15  this document, which is Bates number 8 -- I
16  forgot what it is, the first number.
17         MS. WAGER-ZITO:
18            5 to 9.
19  EXAMINATION BY MR. BRUNO:
20     Q.  5 to 9.  What exactly do you do?
21  You got it now.  What's the first thing you
22  do?
23     A.  Well, like I say, you walk the site,
24  you talk to the Corps, you know, you get an
25  understanding not only -- I don't know how to

Page 52

1  explain to you.  Of course, with the -- with
2  vertical construction, you know, the Corps can
3  give you drawings.  They can give you, you
4  know, your traditional specifications.  They
5  can give you everything that's going to define
6  everything down to the gnat's eyebrow.  But
7  when you're working below the ground or you're
8  dealing with contamination, you don't know if
9  it's, you know, 6,000 cubic yards or 60,000.
10  Then what they do is they use this cost plus,
11  cost reimbursable contracting strategy where
12  they provide you with a statement of work, you
13  provide them with a proposal, work plans, and
14  then as you get in and start doing the work,
15  you -- You're continually refining and
16  defining the requirements and the scope of
17  work as you go along.
18     Q.  Right.  Okay.
19     A.  So the recommendations report was
20  the first step in that process.  So what we
21  did was we wrote the report and then, you
22  know, tried to define quantities and
23  durations.  We did a lot of discussions with
24  local companies knowledgeable in pulling
25  piles, you know, pulling sunken barges out of

Page 53

1  the ground.  Starting figuring out, you know,
2  who the companies were who could support us in
3  this who really had the knowledge.
4      Q.  Okay.  But before you wrote the
5  report, I gather you went down to the site?
6      A.  Yes.
7      Q.  Is it fair to say that's one of the
8  first things you did?
9      A.  Yes, about the same time this thing
10  came out (indicating), we went to the site, we
11  walked the site, --
12     Q.  All right.
13     A.  -- talked to the Corps.
14     Q.  You don't recall how it was that Mr.
15  Lo was contacted, but he was contacted?
16     A.  Yes.
17     Q.  All right.
18     A.  Yes.
19     Q.  All right.  Do you recall about --
20     A.  Well, we had made a decision before
21  that that they would, you know, partner with
22  us in this effort.  Before this RFP came out,
23  we had already determined that this was a good
24  match to use this company that we'd already
25  enlisted as a potential subcontractor; it's

14 (Pages 50 to 53)

STEPHEN CLAY ROE                                          4/17/2008

Page 54

1  right in their back yard.
2       Q.  All right.  So clearly then you had
3  some knowledge before the paper came to you
4  that there was going to be work done in New
5  Orleans.
6       A.  Yes.
7       Q.  Okay.  And so I guess that's the
8  phone call that you made some reference to.
9  You know about the work that's contemplated,
10 so you guys start thinking about who you're
11 going to partner with down there, and that's
12 how ultimately Mr. Lo was selected?
13      A.  Yes.
14      Q.  All right.  Now, who went to New
15 Orleans with you?
16      A.  It was just me.
17      Q.  Just you?
18      A.  The first time.
19      Q.  And who did you meet with from the
20 Corps, if anyone?
21      A.  I don't remember, other than
22 John Weatherly.  I think it had -- Probably
23 was Lee Guillory.
24      Q.  Help me with the spelling if you
25 don't mind.  Weatherly is --

Page 55

1       A.  Weather like the weather.
2       Q.  All right.  W E A T H E R L Y?
3       A.  L Y.
4       Q.  Good enough.
5       A.  And then Guillory is G U I L L O R
6  Y.
7       Q.  All right.  Do you know whether or
8  not Mr. Lo had any experience doing any
9  excavating work before you guys partnered up
10 with him?
11      A.  I believe they had done some small,
12 you know, remediation-related excavation
13 work.
14      Q.  Okay.  Actually, that makes me
15 think.  What was Mr. Lo's business?  What --
16 Did he focus on a particular kind of work?
17      A.  Environmental remediation.
18      Q.  Oh, so he was a remediation?
19      A.  Yes.
20      Q.  He was focused on remediation as
21 well?
22      A.  Uh-huh (affirmatively).
23      Q.  It wasn't just an ordinary
24 contractor building stuff?
25      A.  No.  Not at all.

Page 56

1       Q.  Okay.
2       A.  They're mostly a scientific
3  environmental type firm.
4       Q.  Okay.  Do you know if Mr. Lo had any
5  knowledge about the soils and, you know, the
6  kinds of marsh or deposits that might be
7  encountered in, you know, digging around the
8  location of this Task Order 26?
9       A.  That, I don't know.
10      Q.  Okay.  When you guys went down
11 there, obviously you observed that you were
12 going to be doing work near a body of water;
13 right?
14      A.  Right.
15      Q.  It's pretty obvious.  It's right out
16 there.  Did you have any understanding about
17 the quality of the soils in Louisiana in or
18 around bodies of water like the one that you
19 saw when you went to the Inner Navigation
20 Canal?
21      A.  No.
22      Q.  All right.  Did you know whether or
23 not there was a flood control structure in the
24 vicinity of that site?
25      A.  We knew the -- You know, we saw the

Page 57

1  concrete floodwall structure.
2       Q.  Okay.  Did anybody say anything to
3  you at all about it other than it's there?
4       A.  To me, no.
5       Q.  All right.
6       A.  Not really.
7       Q.  Were you told anything at all about
8  what you could or could not do near that
9  wall?  That is, within a certain proximity of
10 that wall?
11      MS. WAGER-ZITO:
12         Can I just clarify, Joe?
13      MR. BRUNO:
14         Yes, ma'am.
15      MS. WAGER-ZITO:
16         You're talking about this visit?
17      MR. BRUNO:
18         Yes.
19      MS. WAGER-ZITO:
20         That first visit?
21      MR. BRUNO:
22         Oh, yeah.
23      THE WITNESS:
24         No, on that visit --
25 EXAMINATION BY MR. BRUNO:

STEPHEN CLAY ROE                                          4/17/2008

Page 58

1      Q.  No, I'm sorry, let me get you
2  focused.  That visit, you're walking the site,
3  --
4      A.  Okay.
5      Q.  -- you're there with Weatherly and
6  the other gentleman, Guillory.
7      A.  And it's almost nine years ago.  So
8  I don't remember.
9      Q.  "I don't remember" is a perfectly
10  reasonable answer.
11      A.  Yeah.  Right now I don't remember
12  any concerns.  And to me, it was something
13  that kind of kept us removed from the
14  neighborhood, you know, to the south.  And I
15  didn't think of it as much more than that.
16      Q.  All right.  Did you -- Well, let me
17  ask you this question.  Do you have any -- I
18  mean, you know, you're coming from a different
19  place in the country --
20      A.  Uh-huh (affirmatively).
21      Q.  -- than New Orleans.  Right?
22      A.  Right.
23      Q.  There's a big difference between
24  Denver and Boise and New Orleans.  Wouldn't
25  you agree?

Page 59

1      A.  Yeah.  Right.
2      Q.  All right.  And I am wondering if
3  you had any understanding about the importance
4  of flood protection to the people of the city
5  of New Orleans.  Is that --
6      A.  Personally?
7      Q.  Yes.  Back then.
8      A.  No, we felt like that was the Corps'
9  job.  You know, --
10      Q.  Right.  I understand.
11      A.  -- that's what they do.
12      Q.  We thought so, too.  But anyway, so
13  really, as you walked on the site, you have no
14  particular understanding of the degree to
15  which that floodwall had any impact on flood
16  protection other than it was simply there?  Is
17  that fair enough?
18      A.  From my standpoint, yes.  Maybe the
19  guys down there might have.
20      Q.  Did the Corps give you a set of
21  plans so that you would have some
22  understanding of how that thing was made?
23  That is, that floodwall?
24      A.  Not that I am aware of.
25      Q.  Did the Corps tell you how deep the

Page 60

1  sheet pile went?
2      A.  I did see a section in one of the
3  documents, it was probably one on here that
4  had a little teeny sketch and I saw some sheet
5  pile going down eight feet.
6      Q.  All right.
7      A.  So apparently it was something that
8  was in there kind of, "Oh, by the way," but I
9  think -- I think that sketch was really there
10  for a different purpose.  It was -- You know,
11  I don't think it was there to get into the
12  construction of the flood levee and wall.
13      Q.  I understand.  All right.  So can we
14  agree that the Corps did not say to you
15  "Listen, Morrison Knudsen, we, the Corps,
16  we're real worried about this flood control
17  structure.  You need to be careful, you need
18  to do this"?  They did not say that to you in
19  any way; right?
20          MR. EHRLICH:
21              Object to form.
22  EXAMINATION BY MR. BRUNO:
23      Q.  On that first visit.  That's where
24  we are.
25      A.  No, not that I can remember.

Page 61

1      Q.  All right.  Now, did you understand
2  at that time whether or not it was necessary
3  or appropriate to obtain any permits in order
4  to work near that flood control structure?
5      A.  In that initial meeting?
6      Q.  Yes.
7      A.  I don't recall permitting being
8  discussed.
9      Q.  All right.  Now, in the TERC, the
10  contractor is responsible to get permits if a
11  permit is required.  Right?
12      A.  Yes.
13      Q.  All right.  What does Morrison
14  Knudsen do to figure out what permits may be
15  necessary when they're about to get into
16  something like this Task Order 26?
17      A.  Pick up the phone, start calling the
18  authorities.
19      Q.  Okay.
20      A.  Which was done as part of the
21  recommendations report process.
22      Q.  All right.  And --
23      A.  And talk to your client, the Corps,
24  as far as what they know.  In a lot of cases
25  on the TERC, you're working on Super Fund

STEPHEN CLAY ROE                                                    4/17/2008

Page 62

1   sites and you're not required to have permits
2   at all on those, as long as you meet the
3   requirements, the set of requirements.  But
4   there was quite an effort put in to
5   identifying the permits needed for this job.
6       Q.  All right.  There was quite an
7   effort, you said.  First of all, who was in
8   charge of that effort?
9       A.  Dennis O'Connor.
10      Q.  Dennis O'Connor.  Okay.
11          MR. BRUNO:
12              Is he going to be here?  Is he
13      going to be a rep?
14          MS. WAGER-ZITO:
15              He is no longer with the company
16      and he is not going to be a rep.
17          MR. BRUNO:
18              Fair enough.
19          MS. WAGER-ZITO:
20              Phil Staggs is going to do the
21      rest of the 30 (b)(6).
22  EXAMINATION BY MR. BRUNO:
23      Q.  All right.  You had mentioned these
24  gentlemen's names in the past and I neglected
25  to ask you what their job titles were.

Page 63

1       A.  Uh-huh (affirmatively), okay.
2       Q.  What was Mr. O'Connor back then?
3       A.  He was the actual project manager in
4   charge of this Task Order 26.
5       Q.  Dennis O'Connor.  And the other
6   gentleman's name was Jim Blazek?
7       A.  Jim Blazek, B L A Z I K.
8       Q.  Z I K?
9       A.  Z I C.
10          MS. CLAYMAN:
11              B L A Z E K.
12          MR. BRUNO:
13              That's unfortunately an
14      unfortunate name in my past.  But
15      anyway.
16  EXAMINATION BY MR. BRUNO:
17      Q.  He doesn't work for Adams and Reese,
18  does he?
19              What was Jim Blazek's title back
20  then?
21      A.  I think we termed him the
22  Environmental Manager.
23      Q.  All right.  Who actually writes the
24  recommendation report?
25      A.  Those two individuals.

Page 64

1       Q.  These two guys?
2       A.  Yes.
3       Q.  Okay.  Do you have any input into
4   the report?
5       A.  I believe I reviewed it, but I was
6   not very involved in this.  It was being done
7   out of New Orleans.  I was in Denver.  They
8   were competent.  They were, you know, in very
9   close cooperation with the Corps.  So the
10  Corps was happy, so I was as well.
11      Q.  All right.  Now, you did mention --
12  Of course, you know you've got to be careful
13  about what you say because it gets you into
14  trouble, but you said there was this effort, I
15  think you said a big effort to make inquiry
16  about the permits.
17      A.  Yes.
18      Q.  All right.  Tell me what you know
19  about that.
20      A.  Well, I know that a lot of permits
21  were obtained.  Okay?  There were permits that
22  you had to get to knock down the buildings.
23  There were permits you had to get to enter the
24  various sites, you know, because it was turned
25  over from the Port to the Corps.  There --

Page 65

1   Storm water discharge permit.  Hot work
2   permits.  Quite a few different permits were
3   obtained.
4       Q.  All right.  Would you do me a favor
5   and take a look at the recommendation report,
6   which -- For the record, I am going to show
7   you a document which has been Bates numbered
8   by Washington Group International as Bates
9   number 1 -- I'm sorry, that's the I in WGI --
10          MS. WAGER-ZITO:
11              Skip the zeros.
12          MR. BRUNO:
13              Okay.  38704 is the first number
14      in seriatim to WGI-38769.
15  EXAMINATION BY MR. BRUNO:
16      Q.  Take a look at and see, first of
17  all, am I correct, is that the report?  I
18  don't want to give you something wrong.
19      A.  This is it.
20      Q.  Okay.
21          MS. WAGER-ZITO:
22              Well, take the time you need to
23      look through to make sure it's the
24      right one.
25  EXAMINATION BY MR. BRUNO:

17 (Pages 62 to 65)

STEPHEN CLAY ROE                                          4/17/2008

Page 66

1    Q.  That I didn't alter any of the type
2  faces.
3    A.  This is December 2nd.  I believe
4  that was the final version.  You know, the
5  Corps reviewed these things, you know.  We
6  might have had a couple of iterations before
7  we got to this point.
8        Is there a particular page I am
9  supposed to go to?  69?
10   Q.  Yes, but I want to make sure your
11  Counsel is satisfied that you looked at it
12  carefully enough to say to me that's the right
13  one.  I trusted you before, but we've got the
14  right document?  All I wanted to know is if
15  you could help me find where to look.
16     MS. CLAYMAN:
17       That --
18     MR. BRUNO:
19       That's what?
20     MS. CLAYMAN:
21       Can I?
22     THE WITNESS:
23       (Witness hands document to
24     Counsel.)
25  EXAMINATION BY MR. BRUNO:

Page 67

1    Q.  December --
2    A.  December 2nd.
3    Q.  Let's you and I get back to business
4  and they can do their thing.  All I want to do
5  is could you help me find the section --
6     MS. CLAYMAN:
7       It's not a complete copy.
8     MS. WAGER-ZITO:
9       It's not a complete copy, Joe.
10  That's the point that we're making.
11  And that's why I asked him.  It's not
12  that I don't trust you, it's not that
13  I think you're slipping things in
14  there.  That might happen later.  But
15  just for the record, this is not a
16  complete copy of the recommendations
17  report.
18     MR. BRUNO:
19       All right.
20     MS. WAGER-ZITO:
21       So don't ask him to say that it
22  is.
23     MR. BRUNO:
24       I never said that, used the
25  word.  All I said was is this the

Page 68

1  report, period.
2  EXAMINATION BY MR. BRUNO:
3    Q.  But anyway, all I am trying to do is
4  see if you can help me find the section that
5  deals with the permits.  Okay.
6    A.  Okay.
7    Q.  If you can.  I mean, you know, tell
8  me, you know, what I need to do to find it or
9  direct me or -- I appreciate that very much.
10  And if it's not in there, if it's somehow
11  incomplete, we'll go and get a complete
12  report.
13    A.  Okay.  It's section 5.1.4,
14  "Permitting procedures".
15    Q.  5.1.4.  Okay.
16     MR. EHRLICH:
17       What's the Bates number to that
18  page?
19     THE WITNESS:
20       The page is --
21     MR. EHRLICH:
22       I don't have a copy of it.
23     MR. BRUNO:
24       No, neither do I.
25     MR. EHRLICH:

Page 69

1       It's not being marked as an
2  exhibit, so I just want to follow it
3  along as I go.
4     MR. BRUNO:
5       If it was marked as an exhibit, I
6  don't know how it would help you in
7  any way in looking at it since it's
8  not in front of you.
9     MR. EHRLICH:
10       WELL, when the deposition was
11  over, we would have a deposition with
12  an exhibit attached to it and it would
13  be more complete.
14     MR. BRUNO:
15       You would also have a deposition
16  that's about eight feet high.  I'm
17  happy to do it if you want.  It's your
18  call, man.
19     MR. EHRLICH:
20       It's 30 pages.
21     MR. BRUNO:
22       No, it's the first of many, many
23  documents.  If you want to attach it
24  -- Guys, I have no qualms about
25  attaching everything.  It's just that

JOHNS PENDLETON COURT REPORTERS                  800 562-1285

STEPHEN CLAY ROE                                                          4/17/2008

Page 70

1  we have a huge amount of paper and
2  we're going to end up with something
3  that's unwieldy.
4      MS. WAGER-ZITO:
5      It's more to the point I think
6  right now that they don't have
7  something to look at.
8      MR. EHRLICH:
9      I just want to know what page
10  you're reading from.  You are asking
11  him questions about a document that
12  you didn't make copies for Counsel and
13  so I just want to know what page it
14  is.
15      MR. BRUNO:
16      No, I didn't and I don't think
17  it's my job to make copies for you.
18  If you want me to, I'm happy to.  I
19  can't do your work for you.
20      MR. EHRLICH:
21      How do I know what document
22  you're going to use when you're asking
23  the questions?
24      MR. BRUNO:
25      You know what?  I don't either

Page 71

1  and that's part of the process,
2  because I never know.  I can never
3  know what documents you're going to
4  use.  I don't know what documents
5  they're going to use.  I do my best.
6  Okay?
7      MR. EHRLICH:
8      But you know what documents
9  you're going to use.
10      MR. BRUNO:
11      I have thousands of pages of
12  documents.  I even have a hard drive
13  with about 50,000 documents on it.  I
14  have no idea where I am going to go
15  with this thing.  So no, I am not
16  going to make copies of everything
17  just because it's something we can do.
18      MR. EHRLICH:
19      Then all I ask is for the
20  opportunity to look at the document
21  that you are using to ask the question.
22      MR. BRUNO:
23      And you have had that
24  opportunity.
25      MR. EHRLICH:

Page 72

1      No, I just got it now.
2      MR. BRUNO:
3      Well, no one's denied you that
4  opportunity, have we?  You didn't --
5      MR. SCHULTZ:
6      Are we off the record?
7      MR. EHRLICH:
8      All I did was ask for it.  I got
9  it --
10      MR. BRUNO:
11      No, you didn't ask for it.  You
12  made a comment about attaching it, and
13  I am like happy to attach it if that's
14  what you want.
15      MR. EHRLICH:
16      No.
17      MR. BRUNO:
18      That's not what you said.  I have
19  got the record right here.
20      MR. EHRLICH:
21      I asked for a Bates number.
22      MR. BRUNO:
23      You got it.
24      MR. EHRLICH:
25      Right now I've got the document.

Page 73

1      MR. BRUNO:
2      No, you got the Bates number and
3  now you want the document.  I'm happy
4  to do that for you, too.
5      MR. EHRLICH:
6      No, you're wrong.  I've got the
7  document.  I'm still waiting for the
8  Bates number.
9      MR. BRUNO:
10      No, no, you're wrong.  No, we got
11  the Bates number.  We now got to get
12  the document.
13      THE WITNESS:
14      Let me answer his question.
15      MR. BRUNO:
16      The record says it right here.
17      THE WITNESS:
18      The Bates number is 038- --
19  EXAMINATION BY MR. BRUNO:
20      Q.  Thank you.
21      A.  038742.
22      MR. EHRLICH:
23      Well, --
24  EXAMINATION BY MR. BRUNO:
25      Q.  Thank you.

STEPHEN CLAY ROE                                                    4/17/2008

Page 74

```
 1         MR. EHRLICH:
 2         -- now, the problem is that the
 3   document I have is a different Bates
 4   number.
 5         MR. BRUNO:
 6         Gosh, another problem.
 7         MR. EHRLICH:
 8         Not your problem, but --
 9         THE WITNESS:
10         Maybe I should take a bathroom
11   break.
12         MS. WAGER-ZITO:
13         It's section 5.1.4 in the
14   document.
15         MR. EHRLICH:
16         Thank you.
17         MS. WAGER-ZITO:
18         Do you need to take a break
19   really?  Because you can take a break
20   when you need to.
21   EXAMINATION BY MR. BRUNO:
22      Q.  Yes, it's my rule and it's also
23   close to lunch.  Let me just -- Let me just
24   find the section and then we can break for
25   lunch.
```

Page 75

```
 1         MS. CLAYMAN:
 2         He said it was.
 3         MS. WAGER-ZITO:
 4         Yes.
 5         MR. BRUNO:
 6         Thank you.  Thank you.  Thank
 7   you.  All right.
 8         MS. WAGER-ZITO:
 9         I am going to give him my copy.
10         MR. BRUNO:
11         All right.
12         MS. WAGER-ZITO:
13         And you are not going to say that
14   because I gave him my copy which may
15   have highlighting on it that I have
16   waived work product privilege.
17         MR. BRUNO:
18         No, I won't.
19         MS. WAGER-ZITO:
20         Because I want him to read it.
21         MR. BRUNO:
22         I understand that.  I won't do
23   that to you.
24         MS. WAGER-ZITO:
25         Yet.
```

Page 76

```
 1         MR. BRUNO:
 2         I haven't done that yet.
 3   EXAMINATION BY MR. BRUNO:
 4      Q.  All right.  What is your expectation
 5   of the completeness of this paragraph?  In
 6   other words, do you think that what we have
 7   described here are all of the permits that may
 8   be required?
 9      A.  It says "expected to be as
10   follows".  That doesn't convey a whole lot of
11   certainty to me.
12      Q.  Right.  So there may be more?
13      A.  Yes.  Possibly.
14      Q.  Do you know what the nature of the
15   Levee Board permit was?
16      A.  No.
17      Q.  Okay.  But that's something I should
18   ask to Mr. --
19      A.  Staggs.
20      Q.  -- O'Connor.  Right?  No, I mean I
21   didn't mean to answer for you.  But you told
22   me O'Connor and Blazek wrote the report.
23      A.  Right.  But O'Connor was the one
24   that we mentioned is no longer with the
25   company, so our company representative is
```

Page 77

```
 1   going to be Phil Staggs.
 2      Q.  Okay.
 3         MR. JOANEN:
 4         He's designated.
 5         MS. CLAYMAN:
 6         He's designated.
 7         THE WITNESS:
 8         But I am designated to talk about
 9   this issue.  So go ahead.
10   EXAMINATION BY MR. BRUNO:
11      Q.  All right.  Well, do you know what
12   kind of permit had to be obtained from the
13   Levee Board?
14      A.  Yes.  They -- Counsel has provided
15   me with some backup on that.  And it turned
16   out that there wasn't a permit required from
17   the Levee Board.
18      Q.  What backup did you look at that
19   made that suggestion?
20      A.  I looked at a number of letters,
21   emails.  There was a couple of letters where
22   Dennis O'Connor -- Well, there was phone calls
23   first and then the Corps, between Dennis and
24   Mr. Spencer I believe it was with the Orleans
25   Levee District.
```

JOHNS PENDLETON COURT REPORTERS                         800 562-1285

STEPHEN CLAY ROE                                            4/17/2008

Page 78

```
 1        Q.  When did you see these documents?
 2          MS. WAGER-ZITO:
 3            Every one of these documents has
 4        been produced to you.
 5          MR. BRUNO:
 6            No, I know.
 7          MS. WAGER-ZITO:
 8            I just didn't want you --
 9          THE WITNESS:
10            Okay.
11          MS. WAGER-ZITO:
12            -- to think that he looked at
13        things that you do not have access to.
14          MR. BRUNO:
15            No, I didn't suggest that at
16        all.  We just got some documents from
17        the Levee Board the last couple of
18        days which seem to belie that.  That's
19        why I am pulling them out.  In
20        fairness to him, I want him to see
21        them, but that's why I am asking "when
22        did you see these documents".
23        EXAMINATION BY MR. BRUNO:
24        Q.  Was it recently or a long time ago?
25        A.  Recently.
```

Page 79

```
 1        Q.  All right.  Did you see the
 2     documents that were produced by the Orleans
 3     Levee District?
 4        A.  Yes.  Well, I --
 5        Q.  Are you sure?
 6        A.  Yeah, I think I saw a "No exceptions
 7     memorandum" or something like that.
 8        Q.  Right.  And I am curious because --
 9        A.  "No objections".  "Letter of no
10     objections", something like that.
11        Q.  Well, actually, where I am confused
12     is that these documents seem to suggest that a
13     permit was not only required, but requested.
14     And I am happy to show these to you and you
15     can look at them over the break.  In fact,
16     there's even a document dated December 29,
17     2000 which says "Permit request, form of no
18     objection".  So I guess what I need to ask you
19     first is what -- upon what do you base your
20     belief that no permit was required?
21        A.  I discussed it with Dennis O'Connor
22     and he was told by the Corps to provide the
23     Orleans Levee Board District with information
24     regarding our activities in the vicinity of
25     the floodwall and not to request a permit
```

Page 80

```
 1     application.  So he sent them a letter, you
 2     know, kind of laying out the plans of what we
 3     would be doing with the fence and the mowing
 4     and such close to the wall there, and then I
 5     think he was supposed to copy then -- what was
 6     it, the Department of Transportation?  And I
 7     believe a gentleman with the Corps, a
 8     different department of the Corps than who we
 9     were dealing with, and -- but the Corps'
10     position, you know, I saw notes when we had
11     our original -- some meeting in '99, there was
12     uncertainty as to whether we would need to get
13     this permit.  And that is because the Corps
14     has a perpetual easement to work along these
15     levees.  And ultimately that was the Corps'
16     feeling on this, was that "No, Washington
17     Group, you're okay.  You let the guys know
18     what you're up to.  You provide them the
19     information.  You don't need to proceed with
20     formal permit ap."  Yeah.
21        Q.  I am going to hand this to you.  It
22     doesn't have a Bates number.  And because it
23     doesn't, I do want to ask Counsel for the
24     courtesy of making some copies for folks
25     because they may not have this.  I am going to
```

Page 81

```
 1     attach this as WGI Number 2.
 2            Take a look at it first.  Did you
 3     see that document?
 4        A.  I saw this document yesterday for
 5     the first time.
 6        Q.  All right.  So clearly at least the
 7     Levee Board thought that you guys were seeking
 8     a permit.
 9          MS. WAGER-ZITO:
10            Objection.
11          MR. EHRLICH:
12            Object to form.
13     EXAMINATION BY MR. BRUNO:
14        Q.  Isn't that true?
15        A.  I don't know.  It's -- It's -- The
16     literal interpretation of this was that, you
17     know, they -- they referenced the letter dated
18     November 7th, 2000 and then go on to say
19     "Requesting permission for the subject
20     project".  But my understanding is the intent
21     of the November 7th letter was to provide
22     information of what we were up to, not to
23     request a permit.  And it doesn't say "Request
24     a permit."  It says "Requesting permission".
25     So, --
```

21 (Pages 78 to 81)

STEPHEN CLAY ROE                                                    4/17/2008

Page 82

1     Q.  Okay.
2     A.  -- you know, it seems like we were
3  providing notification as the Corps instructed
4  us to do, and they were taking that as, you
5  know, requesting permission.
6     Q.  All right.  This is probably a good
7  time to break, as I have a lot of questions
8  about this area and so we might as well just
9  take our lunch break now.  Unless you would
10  prefer --
11     A.  Okay.
12     Q.  -- not to.  I always let the witness
13  be the boss.
14     A.  No, I think it's a good time to
15  break.
16     Q.  Let me just mark that before we get
17  off the record.  I didn't put the number on
18  it.  All right.
19        MR. BRUNO:
20        Break for an hour?
21        MS. WAGER-ZITO:
22        That's fine.  It's pretty much
23        almost exactly 12:00.
24        (Whereupon a discussion was held
25        off the record.)

Page 83

1        VIDEO OPERATOR:
2        Going off the record, it's
3        12:02.
4        (Recess.)
5        VIDEO OPERATOR:
6        The time is 1:02.  We are now
7        back on the record.
8  EXAMINATION BY MR. BRUNO:
9     Q.  All right.  Good.  I trust everyone
10  had a decent lunch.  Let's get back on to the
11  record.
12        Mr. Roe, if you'll look at
13  paragraph number 7, which is the first of the
14  paragraphs for which you have been designated,
15  see if we can't sort of get through these
16  quickly.  As I understood your testimony, once
17  the TERC was executed by Morrison Knudsen for
18  the Corps, it wasn't necessary for you to
19  either indicate an interest or obtain the
20  contract to do Task Order 26.  Correct?
21     A.  I am not sure I am following that
22  question.  Can you repeat or restate that?
23     Q.  Sure.  I'll just read it.  If you
24  will look at paragraph number 7, which is the
25  first of the paragraphs for which you have

Page 84

1  been designated, I wanted to suggest -- to see
2  if we could get through this quickly, I guess
3  we cannot, but here's the question.  I just
4  warranted to clarify, if I understood your
5  testimony correctly, once the TERC has been
6  signed and executed, all right, with regard to
7  your work on Task Order 26, --
8     A.  Okay.
9     Q.  -- all right?  It wasn't necessary
10  for you guys to bid or express an interest in
11  that work; that was a component part of the
12  TERC.  Is that accurate?
13     A.  We -- Yes.  We did not have to
14  compete with another party to get the work.
15  We -- When you say we didn't have to express
16  an interest, maybe that's what confused me.
17     Q.  Okay.
18     A.  Okay.
19     Q.  Fair enough.
20     A.  I don't think we ever told the
21  Corps, "No, we don't want to do your work, we
22  don't want to work with you on this job."
23     Q.  Well, that's --
24     A.  But -- No, whenever they came up
25  with something, we were happy to go take a

Page 85

1  look and get involved.
2     Q.  Do I understand, Mr. Roe, that
3  within the TERC that you could decline work?
4     A.  I suppose you could, but it might
5  not go over real well with the Corps if you
6  did it.
7     Q.  That's good.  I am simply asking
8  questions based upon what you're telling me.
9  Okay?  I just assumed some things that perhaps
10  I shouldn't have, but what you're saying to me
11  is if the Washington Group was not interested
12  in, for example, Task Order 26, the way you
13  interpreted the TERC, WGI could say "We're not
14  interested."  Is that accurate?
15     A.  To my knowledge, yes, I think we
16  could -- If we were asked to do something that
17  the company just flat out for whatever reason,
18  you know, like whether it be a liability or we
19  didn't have the adequate resources or the
20  right expertise or whatever, --
21     Q.  Okay.
22     A.  -- we could tell them that.  I don't
23  see why not.
24     Q.  Well, was there a process whereby,
25  when you were notified by the Corps in this

STEPHEN CLAY ROE                                                4/17/2008

Page 86

1  instance by phone of the fact that they were
2  contemplating some work, that there was some
3  internal review or process by which you would
4  answer the question, well, do we want to do
5  this work or not?
6      A.  No.  No.  By exception, we -- you
7  know, we always wanted to do the work.
8      Q.  Okay.
9      A.  I'm just saying under the contract,
10 the way you phrased your earlier question,
11  "Would you be required to do it whether the
12 company had any business doing it or not," I'd
13 think we could, you know, tell the Corps this
14 is not appropriate or whatever.
15     Q.  Well, that wasn't the question,
16 which is where we're getting into difficulty.
17 I didn't ask you whether you were required to
18 do the work.  The question was whether you
19 were required to indicate in the form of, you
20 know, a bid or some --
21     A.  Oh.
22     Q.  -- interest in order to get the
23 work.
24     A.  Oh, yeah.  Absolutely.  We were
25 required -- There's no way they could give us

Page 87

1  a contract without us first giving them a
2  proposal.  We had -- Okay.  Let me explain.
3  They give us the RFP, which we discussed.
4  Then we price it out.  We estimate the
5  resources, being the labor, the subcontracts,
6  the other direct costs, you know, travel
7  costs, in this case office costs, computers.
8  We price it all out, we list our assumptions,
9  we talked about the basis of the estimate and
10 we negotiated that.  And once they feel that
11 we're giving them a fair estimate, it's not a
12 hard money commitment to do the work for that
13 price; it's an estimate going in, then you
14 negotiate it, they issue the task order or the
15 task order mod and authorize that additional
16 funding.
17     Q.  Well, is there a new contract?
18     MS. WAGER-ZITO:
19         Objection.
20     THE WITNESS:
21         No, it's a mod -- There's -- This
22     is kind of complicated.  There's an
23     umbrella of the TERC.
24 EXAMINATION BY MR. BRUNO:
25     Q.  Right.

Page 88

1      A.  Just think of it as a big umbrella.
2      Q.  Right.
3      A.  And it has a contract and it has
4  modifications, primarily modifications like,
5  okay, you have done your first four years.
6  Now we're going to give you a three-year
7  extension to the TERC.  Okay.  You have
8  finished your second three-year extension.
9  Now we're going to give you another three
10 years.  So those are the umbrella.  Then
11 there's task orders 1 through 26.  Or maybe we
12 got up to 28 or whatever.  Within each task
13 order, that's kind of like a mini contract.
14 You can also have modifications to provide
15 more funding or --
16     Q.  Right.
17     A.  -- authorize additional work.
18     Q.  And I guess where I am getting
19 confused is that, you know, the phone rings,
20 the Corps is calling and they say "We want you
21 to do some work in the Industrial Canal or the
22 Inner Harbor Navigation Canal in New Orleans,"
23 which then prompts you to review, for example,
24 a statement of work.  Right?
25     A.  Correct.

Page 89

1      Q.  Y'all get paid for that, don't you?
2      A.  Not on an original task order.  No.
3      Q.  Okay.  When do you get paid?  What
4  is the first work for which you will be paid
5  in the context of a task order or work order?
6      A.  That's a good question.  The
7  original proposal for a new task order is
8  non-reimbursable.  In other words, you don't
9  get paid for it.  But once you negotiate that
10 and they issue that task order, then you
11 can open that task order, you can start
12 billing the Corps against it.
13     Q.  Okay.
14     A.  And -- And from that point on, when
15 they say, "Okay, do more work on it," like the
16 arsenic investigation, go do an arsenic
17 investigation", go write the work plans was
18 the -- You know, if you look at this the way
19 it unfolded, first was the recommendations
20 report.  The original task order.  Then you
21 had the mod to do the arsenic background
22 investigation.  Then you had another mod to
23 write the six or so work plans.  And then
24 another big negotiation to do the actual
25 remediation part of it, the demolition

                                    23 (Pages 86 to 89)

STEPHEN CLAY ROE                                                4/17/2008

Page 90

1    remediation. And from that -- those
2    proposals, we already had staff billing to
3    these task orders, and typically we go ahead
4    and charge the effort to estimate the next
5    phase to the client under the task order.
6        Q.  Okay. I am just -- You need to help
7    me.
8        A.  Yeah.
9        Q.  At what point in this process --
10   Let's just take it one at a time. The
11   statement for work, it comes to you.
12       A.  Okay.
13       Q.  Does somebody bill for its review?
14       A.  No.
15       Q.  Okay. The drafting of the
16   recommendation report, does somebody bill for
17   its drafting?
18       A.  Yes.
19       Q.  All right. So it's somewhere in
20   between those two activities that the billing
21   begins?
22       A.  The only thing not billed was the
23   original proposal and the initial site visits
24   and all the stuff leading up to that task
25   order. Once the task order is in place, you

Page 91

1    know, we use a contractor who likes to make
2    profit on work.
3        Q.  Sure.
4        A.  We will do the work that we're paid
5    to do. We're not going to do additional items
6    that we're not paid to do. So we're pretty
7    well focused in on doing what the Corps wants
8    us to do at that point. And if they don't
9    feel it's cost effective, then we will, you
10   know -- In some cases they would tell us "We
11   don't think you need this sort of position on
12   site" even though we had it in our proposal.
13   They might say we don't need that guy; we
14   would take it out of our proposal. We
15   wouldn't staff it. We have never gotten in a
16   situation where, oh, we think we need it,
17   we'll put it on and we just won't bill you for
18   it. We only want to work what we get paid for
19   basically.
20       Q.  I know this is clear, but I think
21   I'm struggling a little bit. I think you said
22   you start billing when the task order is
23   issued, and I am just trying to figure out
24   when that is. I mean, for example, is the
25   task order issued before the recommendation

Page 92

1    report is written?
2        A.  Yes, because, if you recall, the
3    original task order statement of work said, --
4        Q.  Ah.
5        A.  -- "Okay, your first task is to do
6    this recommendation report".
7        Q.  Ah.
8        A.  So we put together an estimate,
9    okay, we're going to have two guys in New
10   Orleans and computers and blah, blah, blah,
11   and they're going to be there for three months
12   writing this report. Okay?
13       Q.  Okay.
14       A.  Negotiate it, issue the signed task
15   order, I sign it, "Okay, guys start to work.
16   Get after it."
17       Q.  Okay. And the reason I got confused
18   is, and it's my fault, but when we first
19   talked about the statement of work, I believe
20   you said it came to you guys and that task
21   order number was blank and at some point in
22   time it got a number.
23       A.  Right. But it was blank because
24   what if we were also putting in a proposal for
25   a job on a different site and that one got

Page 93

1    approved before this one? Okay.
2        Q.  Exactly. But what I am trying to
3    understand is, when the piece of paper
4    comes to you with the blank number on it, is
5    it a task order?
6        A.  No. It's just a request for
7    proposal.
8        Q.  Exactly.
9        A.  Or a task order number to be
10   determined.
11       Q.  When does it become a task order is
12   what I am trying to figure out.
13       A.  Okay. When this document that's
14   called the task order, standard government
15   form (indicating) --
16       Q.  What is what --
17       A.  That's not it.
18       Q.  Fair enough.
19       A.  Do we have an example that would
20   show?
21       Q.  I don't know. I don't know what the
22   documents are so I can't say.
23       A.  It's a government form signed by the
24   contracting officer. I sign it as basic --
25       Q.  Is this it (indicating)?

24  (Pages 90 to 93)

STEPHEN CLAY ROE                                                    4/17/2008

Page 94

1    A.  Right.
2    Q.  Okay.
3    A.  And now, this most likely, you know,
4  references that stage of work.
5    Q.  All right.
6    A.  And references, you know, stuff like
7  that.  So this is the task order.
8    Q.  Forgive me.  I don't know the ins
9  and outs of how you guys do work.  I'm
10 struggling with mounds and mounds of paper.
11 So I have to plead I'm doing my best.
12   A.  Yeah.
13   Q.  But would you -- For the record, is
14 there a Bates number on the bottom of that
15 document that we can read into the record?
16   A.  Yes.  It's five zeros and 3.
17   Q.  Okay.  So it's document 3?
18   A.  Document 3.
19   Q.  All right.
20     MR. BRUNO:
21        You want to look at it?
22     MS. WAGER-ZITO:
23        It just doesn't make sense to me,
24     because I thought we had 5 to 9
25     before.

Page 95

1      MR. BRUNO:
2        We do.  I didn't do the Bates
3      numbering.  Don't get mad at me.
4      MS. WAGER-ZITO:
5        This is part of --
6      MS. CLAYMAN:
7        Yes.
8      MS. WAGER-ZITO:
9        Okay.
10     MR. BRUNO:
11        We're together?
12     MS. WAGER-ZITO:
13        We're together.
14 EXAMINATION BY MR. BRUNO:
15   Q.  Document number 2, take a peek at
16 that; that's the transmittal letter for the
17 task order?
18   A.  Yes.  Right.
19   Q.  Okay.  Terrific.
20   A.  Just saying "I signed it, this is
21 coming back at you."
22   Q.  Just trying to get the sequence --
23   A.  No problem.
24   Q.  -- if you don't mind.  May I have
25 that?  Thanks.

Page 96

1      So the --
2      MS. WAGER-ZITO:
3        That's also incomplete.  I mean,
4      it's part of the task order.
5      MR. BRUNO:
6        I don't know what's incomplete or
7      complete, as you must know.  I cannot
8      possibly know what's a complete
9      document and is not a complete
10     document.  What I have is a production
11     of about a zillion documents.  I'm
12     pulling them out, I'm trying to
13     understand them.
14 EXAMINATION BY MR. BRUNO:
15   Q.  If you see anything that I put in
16 front of you that's incomplete, just tell me.
17   A.  Okay.
18   Q.  And if you need to see more pieces
19 of paper to assist you in answering a
20 question, please tell me.  But I don't claim
21 to know what's complete.  I have never
22 suggested on this record that a document is
23 complete.  Nothing.  It's not been a part of
24 my question.  Okay?
25   A.  Okay.

Page 97

1    Q.  In fairness to me.
2    A.  Okay.
3    Q.  Now.  To get to where I am trying to
4  go, this appears to be dated -- Well, is it
5  dated?  Let's see.  Where is there a date?
6  Date of order.  July 12th, 1999 appears to be
7  the date.  And then, of course, we go back to
8  the statement of work that has a date on it of
9  June 1, 1999.  So, frankly, not a lot of time
10 passes between the issuance of the written
11 statement of work and the issuance of the
12 actual work order.  Right?
13   A.  In this case, that's right.  Yes.
14   Q.  All right.  In other cases may there
15 be --
16   A.  Maybe a little more, but that's
17 typical, because, you know, the -- they're in
18 a hurry to get going.
19   Q.  Sure.
20   A.  They give you a statement of work,
21 you take a week or two or three to turn the
22 proposal around.  And then if they're
23 motivated, they can negotiate that within a
24 week or two.  Sometimes it may take two or
25 three months if they're not very motivated.

JOHNS PENDLETON COURT REPORTERS                          800 562-1285

STEPHEN CLAY ROE                                                4/17/2008

Page 98

```
 1      Q.  Okay.  Now, is it fair for me to
 2  conclude --
 3      A.  That's distracting.  I had a cell
 4  phone in my pocket.  It distracted me.  I
 5  wanted to get it away from me.
 6      Q.  That's fine.  So July 12, 1999 is
 7  when you're able to be paid for your work.
 8  Right?
 9      A.  Right.
10      Q.  Okay.  Now, the next thing that
11  happens is, and maybe I'm wrong, did you go to
12  New Orleans after you received the work
13  order?  If you can remember.  Or before?
14      A.  Well, I went to New Orleans before
15  we prepared the proposal.  Okay?  Now, I made
16  a number of trips to New Orleans, but it's not
17  that important when I went to New Orleans,
18  because I wasn't the guy doing the work per se
19  on Task Order 26.  It was Mr. Blazek and Mr.
20  O'Connor.  And I can't remember exactly when
21  Dennis arrived in New Orleans to sit down with
22  Jim and start working on that report, but it
23  must have been very shortly after the task
24  order was awarded.  Because they hit the
25  ground running fast.
```

Page 99

```
 1      Q.  You have referenced proposal and
 2  recommendations and, again for the record, I
 3  want to see if we're not talking about the
 4  same pieces of paper.  The report is the
 5  recommendation report?
 6      A.  Yes.
 7      Q.  Has that also been referred by you
 8  as the proposal?
 9      A.  No.
10      Q.  What's the proposal?
11      A.  The proposal?  I guess we'd have to
12  show you one.
13      Q.  Okay.
14      A.  Proposal.  Show him the proposal?
15      Q.  I think we can agree that the
16  recommendation report is dated December 12 --
17  December 2, 1999.  Well, let me show you.
18      A.  I think it's proposal 76.  It would
19  have been a cover letter signed by me.  It
20  would probably have went in like June 9th or
21  something like that.  It was pretty short
22  order after we received the request for
23  proposal.
24      Q.  Well, let me just show you the
25  document and maybe you can tell me what this
```

Page 100

```
 1  is.  I am going to hand you WGI page number
 2  4.  And then a second --
 3      A.  Okay.  Yeah.  What you're -- What
 4  you've got there is part of the task order.
 5  So if you give me item 3 back, I want to show
 6  you the complete task order.
 7      Q.  All right.
 8      A.  This is the task order.  This form
 9  (indicating).
10      Q.  Page --
11      A.  Which is some government form such
12  and such, DD-1155.
13      Q.  And it's Bates number 3 for the
14  record.
15      A.  Okay.  Then this is the work -- This
16  is a little summary of the work.  "The work
17  performed under this task order shall be in
18  accordance with the attached scope of work
19  dated June 1st, 1999."  Remember, that's the
20  one that was also attached with the RFP
21  letter.
22      Q.  Is that (indicating)?
23      A.  That's -- Exactly.
24      Q.  Counsel has got it right there?
25      MS. WAGER-ZITO:
```

Page 101

```
 1      WGI-5 to 9.
 2  EXAMINATION BY MR. BRUNO:
 3      Q.  WGI-5 to 9.  Good.
 4      A.  So you got this and then you have
 5  got the summary of the pricing, the estimated
 6  cost which comes from our proposal as
 7  negotiated with the Corps, and then the third
 8  item they talk about is the wage
 9  determination.  Are you familiar with Davis
10  Bacon?  So what it's saying -- And in this
11  case it had no relevance whatsoever because we
12  weren't working on site doing construction.
13  But if we were, this is what you've got to pay
14  your folks (indicating), this is a minimum, to
15  comply with Davis Bacon wage determinations.
16      Q.  Okay.
17      A.  Okay?
18      Q.  All right.
19      A.  And let's see if there's anything
20  else.  "The effort described in the attached
21  scope of work shall be completed not later
22  than 11 November 1999".  So just a quick
23  statement about the schedule.
24      Q.  All right.
25      A.  Okay?  So that is your initial
```

                                        26 (Pages 98 to 101)

STEPHEN CLAY ROE                                    4/17/2008

Page 102

1 contract to do your task order work in New
2 Orleans, with the scope being "generate that
3 recommendations report". Okay? This did not
4 --
5       MS. WAGER-ZITO:
6          This is not the proposal.
7       THE WITNESS:
8          -- quote any site work.
9 EXAMINATION BY MR. BRUNO:
10      Q. I know. I am not there yet. Okay.
11 But we were -- I thank you for that, because I
12 am trying to understand the proposal.
13      A. Okay.
14      Q. Having seen this, does it appear
15 that the proposal pre-dates this?
16      A. Absolutely. Because the proposal --
17 Without the proposal, you wouldn't have these
18 numbers (indicating). You wouldn't have
19 negotiated the proposal. So you can't -- you
20 can't -- They would never give you a task
21 order and tell us, "Okay, you do the work and
22 here's how much it's going to cost." They
23 want you to determine how much it's going to
24 cost. They will do an independent estimate.
25 Then you negotiate it, come to agreement.

Page 103

1 They roll the agreed costs, cost fee, in other
2 words, your profit, and then the total.
3 Okay? So the proposal is a necessary
4 predecessor of every task order and -- and
5 almost every mod.
6      Q. You wrote the proposal?
7      A. I worked -- I tended to be very
8 involved in proposals, but I worked with Jim
9 and Dennis on the proposal.
10      Q. All right. Now, as I said, I don't
11 know the documents. They're voluminous and I
12 don't know if I can pull out the proposal or
13 not. Is it -- How many pages is it?
14 Roughly. I am not holding you to a precise
15 number. I am just trying to get a handle on
16 what I am looking for.
17      A. On this one, it might have been 10,
18 20 pages.
19      Q. All right.
20      A. We have the proposal to actually do
21 the work, you know, all the demolition
22 remediation up and down the bank. It was
23 about that thick (indicating). Okay?
24      Q. Okay. So it was a large document?
25      A. Yes.

Page 104

1      Q. Okay.
2      MS. WAGER-ZITO:
3          He's talking about a subsequent
4      proposal when he says it's a large
5      document.
6      THE WITNESS:
7          Not for this recommendations
8      report.
9 EXAMINATION BY MR. BRUNO:
10      Q. Again, please know that I don't know
11 all of the words that you use to describe all
12 these documents. You're very familiar with
13 it. You have been doing this for a long, long
14 time. This is all very, very new to me and I
15 am trying to create a record which will allow
16 somebody who doesn't know what you do to
17 understand how you do these things.
18      A. Uh-huh (affirmatively), okay.
19      Q. All right. So let me ask the
20 question again. The document which gives the
21 Corps some idea of the cost, you have referred
22 to it as a proposal.
23      A. Yes.
24      Q. Does it contain anything more than
25 your estimate of the costs?

Page 105

1      A. Sure. It usually has an
2 introduction, then it's got basis of
3 estimate. It talks about all the information
4 available that was used to generate the
5 proposal. Then it also talks about any
6 assumptions we had to make in lieu of having
7 well-defined information. And then we have a
8 -- either an Excel spreadsheet or some sort
9 of cost estimation program generated, printout
10 of the costs, and then we'll have a section
11 that talks to the schedule.
12      Q. Now, do I understand by your
13 testimony that this work order -- you I think
14 called it a contract; right?
15      A. Task order. It's a task order and
16 it in essence is a contract document for the
17 task order itself. Not for the umbrella
18 contract.
19      Q. Okay.
20      A. Okay?
21      Q. Now, insofar as an understanding
22 that one may want to get by looking at these
23 documents relative to the scope of work
24 contemplated by the work order, what would
25 that person look at in this stack of

27 (Pages 102 to 105)

STEPHEN CLAY ROE                                                4/17/2008

Page 106

1   documents?
2       A.  They would look at the statement of
3   work, but also they should look at the
4   proposal as well.
5       Q.  All right.  They should look at the
6   statement of work.  As well as the proposal.
7   Right?
8       A.  Yes.
9       Q.  Okay.  Now, if I wanted to find out
10  all of the specifications given to you in
11  order for you to create the proposal by the
12  government, okay, where would I look?
13      A.  In the statement of work.  The
14  statement of work or the specifications
15  requirements, if you will.
16      Q.  Okay.
17      A.  And also the government-furnished
18  information which is listed in the statement
19  of work.  There's a little section called
20  "Government-furnished statement of work".
21      Q.  We have gone through that.
22      A.  Yes.
23      Q.  I want to see if we can agree on the
24  following.
25      A.  Okay.

Page 107

1       Q.  All of the specifications prepared
2   by the United States Army Corps of Engineers
3   and given to you in order for you to do your
4   projection is contained in this document which
5   is WGI-5, 6, 7, 8 and 9, or references other
6   documents which contain additional information
7   to assist in understanding those
8   specifications?
9       MR. EHRLICH:
10          Object to form.
11  EXAMINATION BY MR. BRUNO:
12      Q.  Is that accurate?
13      A.  Yes.
14      Q.  All right.  Is there anything in
15  these specifications which prevented
16  Washington Group International in
17  investigating whether or not the proposed work
18  would affect the flood control structure in
19  the area of the proposed work?  Period.
20      MR. EHRLICH:
21          Question.
22      THE WITNESS:
23          Is there anything that would
24      exclude us from doing that?
25  EXAMINATION BY MR. BRUNO:

Page 108

1       Q.  Yes.  Yes.
2       A.  Well, first of all, I don't
3   understand why we would do that if the Corps
4   wasn't paying us to do it or -- I mean, that
5   wasn't what they asked us to do.  I guess if
6   we wanted to take on a science project out of
7   curiosity or something, that scope of work
8   wouldn't exclude it, but it certainly wouldn't
9   have been sanctioned by the Corps of Engineers
10  for us to do that.
11      Q.  Well, in fairness to the record,
12  what sanctioned is what you tell the Corps you
13  believe needs to be done.  Right?  Isn't that
14  true?
15      A.  And -- And what they believe we
16  should be doing.
17      Q.  All right.
18      A.  Both.  It's both.
19      Q.  It's a collaboration?
20      A.  Yeah, it's a collaboration.  That's
21  a good word.
22      Q.  All right.  Now, do you believe --
23  and this is really factual, because you have
24  talked a little bit about subsequent mods, or
25  I should -- It's short for modification.

Page 109

1       A.  Right.
2       Q.  All right.  I just want to make
3   certain that the business of removal of
4   structures below the surface of the ground
5   that was not related to remediation, but
6   related to preparing for the dredging of the
7   channel, okay, do you believe that this
8   statement of work includes specifications to
9   accomplish that task?
10      MR. EHRLICH:
11          Object to form.
12      THE WITNESS:
13          Excuse me?
14      MS. WAGER-ZITO:
15          You can answer.
16      THE WITNESS:
17          No, the -- What they ask you to
18      do, asked Washington Group to do is
19      help develop the recommendations
20      report.  In other words, they're
21      asking us to develop a recommendations
22      report to evolve to develop these
23      specifications that are going to be
24      used for the subsequent site work,
25      whether it be remediation, demolition

28  (Pages 106 to 109)

STEPHEN CLAY ROE                                                    4/17/2008

Page 110

1     or whatever.
2     EXAMINATION BY MR. BRUNO:
3        Q.   All right.  Well, that's not really
4     the question.  Okay?  We have already agreed
5     that this document tells you what the Corps
6     wants you to do in a very general sense.
7     Right?
8        A.   Right.
9        Q.   And what you would do in response to
10    this is you develop this recommendations
11    report.  Right?
12       A.   Right.
13       Q.   All right.  Now, what I am driving
14    at is, obviously this piece of paper has to
15    have some general scope.  I mean, for example,
16    if for no other reason, you know you're
17    working in New Orleans and not in Gretna or
18    Harahan.  Right?  You have to have some --
19       A.   Right.
20       Q.   -- notion of where the work is going
21    to be and the general nature of the work.
22    That's what I am driving at.
23       A.   Yeah.  And it describes --
24       MS. WAGER-ZITO:
25           Let him finish his question.

Page 111

1     EXAMINATION BY MR. BRUNO:
2        Q.   Okay.  And so the question is, do
3     you agree with me that this document, since
4     you have already told me it contains all of
5     the specifications that you got from the
6     government, okay, before you prepared your
7     recommendation report, does it include a
8     description of the work regarding the removal
9     of these subsurface structures as a component
10    of the Corps' intended purpose in dredging
11    that area?
12       MS. WAGER-ZITO:
13           Objection.
14           You can answer.
15       THE WITNESS:
16           That particular scope does not
17       say a whole lot, to be honest with
18       you.  I mean, it says, "Okay, your
19       first task on this new task order is
20       go write a recommendations report."
21    EXAMINATION BY MR. BRUNO:
22       Q.   Right.
23       A.   Now, remember they have also walked
24    us around the site.  "Hey, we want you to do
25    this, this, this, this, this."  That was a big

Page 112

1     part of the data gathering, as well as the
2     pile of documents.  But nothing's as good as
3     walking the site, with the Corps saying "See
4     this barge here?  You know, see all of this
5     crud along the bank?  See this, see that?  It
6     all goes, gentlemen.  It's all got to go."
7        Q.   All right.
8        A.   Okay.  So now subsequent to that
9     scope of work and that recommendations report,
10    later on the Corps put out another statement
11    of work that basically said, "Okay, now you do
12    need to go remediate the site.  You do need to
13    go remove piles.  You do need to remove
14    wharves.  You do need to removal sunken
15    barges, tear down the buildings as well as do
16    the re-- -- the soil remediation and deal with
17    all the waste," so forth.
18       Q.   I am confused.  How is that
19    different from the work described by the
20    initial statement of work, if it's different
21    at all?
22       A.   The initial statement of work
23    encompassed -- If you look at that task order,
24    it was for about 100,000 bucks.  Okay?
25       Q.   Right.

Page 113

1        A.   100,000 bucks buys you that little
2     report.  Okay?  It doesn't buy you cleaning up
3     the whole site.  Okay?  So then that's what
4     the mods are for.  Okay?  You want -- Okay.
5     We did the report.  What's next?  Arsenic
6     investigation.  RFP, proposal, task order mod,
7     go do the arsenic investigation.  Okay.
8     "We're done with that.  Now what?"  Work
9     plans.  Okay.  RFP, proposal, task order mod,
10    go write the work plans.  Okay?  So now the --
11    the requirements are mounting.  We have got
12    these scopes, we have got the requirements
13    report, or the recommendations report.  We
14    have got the work plans.  We have done the
15    arsenic.  As we go along, we just build and
16    build our knowledge of this site.  We also
17    identify any concerns and data gaps in the
18    reports.
19       Q.   Whose idea was it to do the arsenic
20    investigation?
21       A.   You know, the arsenic investigation,
22    I don't know whose idea it was.  I don't know
23    whether it was the Corps or Washington Group.
24    The issue there is you tend to have to clean
25    up the soil to a certain level.

STEPHEN CLAY ROE                                          4/17/2008

Page 114

1    Q.  Right.
2    A.  And if I remember correctly, arsenic
3    was something that was used in the Mississippi
4    farmlands, and so the sediments and stuff
5    along there had a higher arsenic level.  So
6    they didn't want you -- You know, they wanted
7    to kind of find out what a reasonable
8    background for soils that already existed
9    there was as opposed to man-made additional
10   arsenic contamination.  So that was the intent
11   of that investigation, was to set a clean-up
12   standard for subsequent efforts of clean-up.
13   The Corps was pretty sophisticated, though.
14   Q.  All right.  Now, the recommendation
15   report for the demolition and site
16   preparation, does it include work to remove
17   the subsurface structures which need to be
18   removed as a part of this future dredging
19   project?  Or is that one of those later
20   modifications?
21   A.  Well, if you look in the table of
22   contents, you can see all the items of
23   remediation that we were, you know, told we
24   were going to go do are itemized and discussed
25   in this document.

Page 115

1    Q.  Okay.
2    A.  Now, this is stuff that we
3    understood to be activities that we will take
4    on under this task order.  We didn't talk in
5    terms of other activities by the Corps or
6    other entities afterwards.
7    Q.  That's fine.  So where do I look to
8    find out what you thought you were doing?
9    A.  Okay.  Under section 5,
10   "Recommendations", it talks about
11   mobilization, talks about the work plans we're
12   going to develop, so we got the project work
13   plan.  The waste management plan.  Storm water
14   pollution prevention plan.  Sampling analysis
15   plan.  Contractor quality control plan.  Site
16   safety and health plan.  I know they added at
17   least one other, a hurricane preparedness
18   plan.  Then we talk about kind of the site
19   layout.  You know, where we're going to have
20   lay-down, where we're going to have
21   decontamination facilities, where we're going
22   to have the office trailers.  You know,
23   generally how we're going to set up the site
24   to do the work.  Then we talk about
25   disconnecting utilities, talk about trash,

Page 116

1    debris, vegetation removal.  Talk about
2    above-ground contamination.  This is what I
3    was referring to earlier.  Asbestos, PCBs,
4    lead, fluorescent light bulbs, creosote
5    timbers.  Talk about structure demolition,
6    barges.  The recap, which is in essence the
7    soil remediation down to a certain level.
8    Clean-up level.  The Jourdan Street wharf
9    removal.  You know, all of these things,
10   certain -- you know, how you go about finding
11   things underground, obstructions, geophysical
12   survey, grid trenching.  Again, the soil
13   remediation.  When you dig a certain amount of
14   contaminated soil, then you do what's called
15   confirmatory sampling.  Excavation and recap.
16   All of these things -- So all the elements of
17   the work that we were told we needed to do
18   were touched on in section 5.
19   Q.  Well, yes.  And in section 5 it
20   describes the structures that you were
21   supposed to remove.
22   A.  (Witness nods head affirmatively.)
23   Q.  That's all listed.
24   A.  Yes.
25   Q.  In fact, 5.6, it talks about the

Page 117

1    barges that are submerged and you need to
2    remove.  Right?
3    A.  Right.
4    Q.  Does it talk about the sheet pile --
5    I'm sorry, does it talk about the piling?
6    A.  I sure thought it did.  5.5, part of
7    the structure demolition.
8    Q.  Okay.  Does it give you some
9    indication of -- It tells you how far below
10   the ground you have to go; right?
11   A.  The contractor will remove all
12   pilings down to 36 feet below mean water
13   level.
14   Q.  All right.  Now, so this -- it's
15   pretty clear that this recommendation plan
16   describes the work of the removal of the
17   structures that may have been below the
18   surface of the soil; right?
19   A.  Yes.
20   Q.  Okay.  And the only place that you
21   would have gotten some understanding of the
22   Corps' interest in doing that is through the
23   words of the original statement of work and
24   words that came out of the Corps engineer
25   representative's mouth when you walked the

30 (Pages 114 to 117)

STEPHEN CLAY ROE                                                    4/17/2008

Page 118

1    site. Right?
2        A.  Right.
3        Q.  Okay.  So all of the specifications
4    that you guys received from the United States
5    Army Corps of Engineers with regard to the
6    removal of the subsurface structures came from
7    either the work order or your conversation
8    with that gentleman who walked the site with
9    you.  Isn't that true?
10       A.  In regards to developing the
11   original work recommendations report, that is
12   the extent.
13       Q.  Okay.
14       A.  And then, you know, like I said, as
15   we developed these documents, then more and
16   more requirements, specifications, whatever
17   you want to call them, were developed and
18   reviewed and approved by the Corps as we went
19   along.
20       Q.  All right.  Did the Corps, either at
21   the time of that site walk-through, I am going
22   to call it, --
23       A.  Okay.
24       Q.  -- or maybe some other site
25   walk-through or some telephone conversation or

Page 119

1    through any communication whatsoever, up until
2    the time that WGI submitted their
3    recommendations report, okay, did the United
4    States Army Corps of Engineers tell you that
5    whenever anyone intended to dig within 300
6    feet of the center line of a flood control
7    structure an engineering analysis was required
8    in order to assess whether or not that
9    excavation may have impact on the flood
10   control structure?  Did they tell you that?
11       A.  Me personally?  No.
12       Q.  Well, no, unfortunately you're WGI
13   today.
14       A.  Yeah.
15       Q.  You got the hat on.
16       A.  Okay.
17       Q.  Did the Corps tell Washington Group
18   International that?
19       A.  I don't know.
20       Q.  Okay.
21       A.  I have not -- not investigated that.
22       MS. WAGER-ZITO:
23       You don't --
24   EXAMINATION BY MR. BRUNO:
25       Q.  That's fair.  WGI doesn't know.

Page 120

1        MS. CLAYMAN:
2        Excuse me.  We designated Phillip
3    Staggs to talk about all work plans
4    and this falls under the scope of work
5    plans.
6        MR. BRUNO:
7        No, you're not going to dictate
8    to me what falls under the scope of.
9        MS. CLAYMAN:
10       Well, I just --
11       MR. BRUNO:
12       You have an opinion, you have an
13   objection, you can make an objection
14   which is reasonable and fair, and I
15   recognize your objection.
16       MS. CLAYMAN:
17       Great.
18       MR. BRUNO:
19       But I am not going to allow you
20   to characterize the deposition.  I am
21   not going to do that to you and you're
22   not going to do that to me.  Fair
23   enough?
24       MS. CLAYMAN:
25       Fair enough.  You're done.

Page 121

1        MR. BRUNO:
2        I recognize your objection and I
3    encourage you to make all the
4    objections you want.
5        MS. CLAYMAN:
6        Thank you.
7        MR. BRUNO:
8        We have said that all during the
9    week.  You get yelled at if you don't
10   object.  And that's true.
11   EXAMINATION BY MR. BRUNO:
12       Q.  Let's see.  Where was I?  Forgive
13   me.  I lose my train of thought.  Let's see.
14   Boom.
15       All right.  Now, the reason I ask
16   you the question is because you told me before
17   the lunch break that when it came to
18   permitting and so forth, you did your best,
19   you got on the phone, you know, you started
20   making inquiries about the need for permits;
21   right?
22       A.  Right.
23       Q.  Okay.  And certainly if there was a
24   need for some kind of engineering evaluation
25   of excavations near a flood control project,

31 (Pages 118 to 121)

STEPHEN CLAY ROE                                              4/17/2008

---

Page 122

1   you would have expected the United States
2   Corps of Engineers to tell you that.  Isn't
3   that true?
4       A.  Yes.
5       Q.  Okay.  Did anyone at the Corps of
6   Engineers, up until the point in time when
7   this December 2 recommendations report was
8   drafted, tell you that under-seepage was an
9   issue to be considered when working around a
10  flood control project?
11      A.  No.  Not that I am aware of.
12      Q.  All right.  Has the Washington Group
13  International, and forgive me, it's a broad
14  question I know, so what it is, worked around
15  flood control projects in the past before?
16          MS. WAGER-ZITO:
17          Objection.
18  EXAMINATION BY MR. BRUNO:
19      Q.  Before December 2, 1999?
20          MS. WAGER-ZITO:
21          Objection.
22          MR. BRUNO:
23          Okay.  Thank you, Counsel.
24  EXAMINATION BY MR. BRUNO:
25      Q.  Answer.

---

Page 123

1       A.  Oh, I can answer it.
2           MS. WAGER-ZITO:
3           He is not going to discuss that.
4           You can answer that question.
5       It's not one of the categories, but
6       you can answer if you know.
7           THE WITNESS:
8           MK has built dams.  That was part
9       of our legacy here, building dams and
10      stuff.  But this was a remediation
11      contract.  That was our scope.  That
12      was our charter.
13  EXAMINATION BY MR. BRUNO:
14      Q.  Okay.  Do I gather from your answer
15  that the scope of the contract -- I'm sorry.
16  The fact that it's remediation is what
17  dictates whether or not you're going to
18  consider the potential impact of the
19  remediation on a flood control structure?  Is
20  that what you're testifying to?
21      A.  I was testifying that the scope was
22  not for us to investigate the flood control
23  structure.  Our customer, the Corps of
24  Engineers, are the ones who design flood
25  control, maintain flood control, contract to

---

Page 124

1   have them constructed, maintained.  So our
2   assumption was that the Corps had taken care
3   of all of that.  They hired us to knock down
4   buildings and pull out piles and remediate
5   soil.
6       Q.  All right.
7       A.  They didn't hire us for engineering
8   expertise on flood control.
9       Q.  Wasn't the -- I'm sorry, forgive
10  me.  I didn't mean -- I wanted to let you
11  finish your answer.
12      A.  That's it.
13      Q.  All right.  Wasn't the purpose of
14  the permitting from the Orleans Levee District
15  specifically to ascertain whether or not the
16  proposed work would affect the flood control
17  structure there?  That's why the permit was
18  necessary?
19          MR. EHRLICH:
20          Object to the form.
21          MS. WAGER-ZITO:
22          Objection.
23          THE WITNESS:
24          I don't know why.
25  EXAMINATION BY MR. BRUNO:

---

Page 125

1       Q.  Okay.  It's logical then that all of
2   that being so, that there's nothing in the
3   recommendation report whatsoever that
4   describes any proposal to investigate or
5   analyze the soils in or around the flood
6   control structure to ascertain whether or not
7   the proposed work may have a negative impact
8   on that flood control structure.  Right?
9       A.  Right.
10      Q.  Okay.  The bottom line is the
11  Washington Group International really didn't
12  do anything to ascertain whether or not the
13  work that it proposed to do or the work that
14  it in fact did would have any negative impact
15  on flood control -- the flood control
16  structure that was near the site.  Right?
17      A.  Right.  Because it wasn't in our
18  scope to do so.
19      Q.  Okay.  Can I conclude, since you
20  guys wrote the recommendation report, that the
21  recommendation report includes all of the
22  specifications for the scope of the work
23  contemplated to be done by Washington Group in
24  order to accomplish Task Order 26?
25      A.  That's not a valid conclusion.

---

32 (Pages 122 to 125)

Page 126

1    Because you said all of the specifications.
2        Q.   That was the question.  If I am
3    wrong, tell me I am wrong.  That's why I asked
4    the question.
5        A.   Yes.  You -- That is wrong.
6        Q.   All right.  Thank you.
7        MS. WAGER-ZITO:
8            Yes, you're wrong.
9        THE WITNESS:
10           Yes, you're wrong.
11   EXAMINATION BY MR. BRUNO:
12       Q.   It's easy.  This is really -- It
13   sounds complicated.  It's real easy.  No,
14   that's wrong.
15           Okay.  Where might I find all of
16   the specifications for work contemplated to be
17   done by Washington Group International?  Where
18   are they?
19       A.   All over those numerous boxes you
20   were describing.
21       Q.   All right.
22       A.   Because you have got the work plans
23   discussed in here (indicating), more
24   requirements.  Those things are signed off by
25   the Corps.  As we got on site and started

Page 127

1    digging around or poking around or doing grid
2    trenching or geophysical, if we found other
3    obstacles or unknowns, then we had this thing
4    called a contractor information request, which
5    is essentially a heads up to the Corps, hey,
6    we encountered something unique or unknown or,
7    you know, it's basically something we hadn't
8    accounted for in our work planning or in our
9    costing of the job, so we notify the Corps,
10   "Here's the situation."  I believe I saw one,
11   they ran into a 1,000 gallon underground
12   storage tank or something and said, "Okay, we
13   need to get it out.  Here's our
14   recommendation," present it to the Corps; the
15   Corps has a guy on site called the contracting
16   officer's representative who has the authority
17   to make technical direction to proceed or to
18   agree with that approach, but he doesn't have
19   authorization to bring us in more funding.
20       Q.   Right.
21       A.   So then that guy's got to go to
22   Tulsa, the contracting officer, and say,
23   "Okay, a CIR was raised.  We see a need for
24   -- to do this additional work," and then we'd
25   get in a situation, Washington Group projects

Page 128

1    that they can absorb this, they have enough
2    funding to deal with it or they don't.  If
3    they don't, then it could trigger another
4    modification.
5        Q.   Okay.
6        A.   It could even trigger a proposal.
7    Okay.  "Give us a proposal to remove the
8    tank."  You know, "here it is."  Here's
9    another mod.  Okay.  Go do the tank.  So all
10   along the way, you know, because it's --
11   there's so many unknowns on a site under the
12   ground or even aboveground in these structures
13   when we're walking around the site.  Half the
14   time you couldn't even get in the buildings.
15       Q.   Right.
16       A.   So, you know, a lot of the
17   requirements and work planning evolves as you
18   go along.
19           Another element is when you bring
20   your contract -- subcon- -- Again, we didn't
21   have -- We didn't direct hire the work.  In
22   other words, we hired local companies to do
23   the actual hands on, run the heavy equipment
24   and do the -- knock down the buildings or
25   whatever.  When those companies were brought

Page 129

1    on site, they always did a preparatory
2    inspection before the work started.  And in a
3    lot of cases they had to do work plans as
4    well.  So if it was a demolition guy, those
5    are the real experts.  You know, more so than
6    Washington Group in what equipment they're
7    going to use, what techniques they're going to
8    use, what they're going to do to mitigate
9    dust, noise, stuff like that.  So they do a
10   work plan; they do a preparatory inspection
11   where the Corps would attend.  Everybody
12   agrees it's a valid approach or, if they
13   don't, they make corrections.  And so you have
14   kind of got this ongoing approval process for
15   each discrete element of work as you work
16   through it.  It's also a safety thing called
17   an activity hazard analysis, that you're
18   always looking to do an activity hazard
19   analysis before you start work to make sure
20   you thought of all the things that could, you
21   know, result in an unsafe situation.
22           So I guess my point is, the
23   culmination of the specifications is kind of a
24   rolling, you know -- it's an evolving thing.
25   But everything is done in collaboration, as

33 (Pages 126 to 129)

STEPHEN CLAY ROE                                                    4/17/2008

Page 130

1  you said earlier, with the Corps and using
2  their approval process.
3      Q.  The activity hazards analysis sounds
4  awfully like what I, frankly, have more
5  experience with, which is a process hazard
6  analysis, whereby you don't make a change to
7  the process until you make certain that the
8  change is not going to adversely affect the
9  process.  Is it that kind of a thing?
10     A.  Yes, similar.  I'm working in the
11 process industry now.  But activity hazard is
12 more construction oriented.  "Hey, before you
13 go digging in there, have you cleared all the
14 utilities?"  Process hazard analysis is more
15 looking at flow sheets and trying to figure
16 out all the possible scenarios if this valve
17 fails or that valve fails.  But it's a similar
18 concept.
19     Q.  All right.  Help me understand.  At
20 some -- You have got this recommendation
21 report which describes, you know -- Let's just
22 take something, gridding.  When do you reach
23 the point of the work where you have to
24 prepare another set of, or I should say a more
25 detailed set of specifications or work and the

Page 131

1  like?
2      A.  Well, in the case of this project,
3  when we finished that report along about, what
4  was it, October or September of 2000, the
5  Corps provided us with a new request for
6  proposal, the new statement of work that said,
7  "Okay, now we want a proposal for the whole
8  -- basically the whole enchilada, if you
9  will, the whole up and down the -- up and down
10 the canal.  Do the whole thing."  And they
11 told us, "Now, look, we don't have the money
12 to give you the whole -- all the work,"
13 because they were getting money in bits and
14 pieces.  But they wanted us to take a shot at
15 estimating the entire job, which we did, and
16 we negotiated that proposal in October of
17 2000.  Okay?  And it borrowed heavily on the
18 recommendations report as the basis of our --
19 that's our knowledge base of what the work
20 would encompass going forward.
21     Q.  All right.  Just help me
22 understand.  What is the difference between
23 that and this recommendation report
24 (indicating)?
25     A.  Well, the proposal --

Page 132

1      Q.  Is it geography?
2      A.  The recommendations report doesn't
3  get into the costs, for one thing.
4      Q.  Okay.
5      A.  It's more like a thing to reach
6  mutual agreement with the Corps on the scope
7  and the -- what would be a reasonable schedule
8  to get this accomplished.  The proposal gets
9  more into the costs and the assumptions that
10 back up the costs.  It's the basis for them,
11 you know, being able to award additional funds
12 for us to proceed on the work.
13     Q.  Okay.  I guess I am a little
14 confused.  Is this just a step in the process
15 to the point where you actually are doing the
16 work?  Or is what you just described a radical
17 change from what you thought you were doing?
18     A.  No, it's just a step in the process.
19     Q.  That's what I thought.  Okay.  So
20 there's really no -- In terms of the scope of
21 the work, it's just you guys knew from the
22 beginning that you were going to do the work
23 necessary to allow the Corps to dig a
24 channel.  Right?  That's it.  Isn't that
25 true?

Page 133

1      A.  Yeah.  Well, conceptually we knew
2  that there was their objective.  Our objective
3  was basically to do the remediation according
4  to their specs.
5      Q.  Well, so that in terms of the
6  difference between the recommendations report
7  and -- what did you call the next larger
8  document, which is more detailed?  What's its
9  correct title?
10     A.  Well, I called it a proposal.
11 Because the first --
12     Q.  The second proposal.
13     A.  Yeah.  Well, actually it was the --
14     MS. WAGER-ZITO:
15         Actually, no.
16     THE WITNESS:
17         It was like the fourth proposal.
18     Okay?
19 EXAMINATION BY MR. BRUNO:
20     Q.  That's why I need your help.  Okay.
21     A.  Little bite-size chunks.  Okay.  We
22 do the recommendation report.  Then we do the
23 arsenic investigation.  Then we do the work
24 plans.  Then they say, "Okay, now we want you
25 to estimate the whole job."  We put together a

STEPHEN CLAY ROE                                              4/17/2008

Page 134

```
 1    proposal.  It was on the order of $20
 2    million.  And we included quotes from
 3    subcontractors, we included all of the costs.
 4    See, the recommendations report doesn't get
 5    into costs.
 6        Q.  Right.
 7        A.  It's cost -- It's a scope schedule,
 8    not cost.  Cost is strictly a contract thing
 9    between us and the Corps.  So the proposal is
10    we're -- we use that as a scoping tool, plus,
11    you know, vendor quotes, any other information
12    you can gather to price the thing out.
13        Q.  All right.  Well, so really the next
14     -- as the next document is a document whose
15    most important purpose was to allow the Corps
16    to understand how much this work was going to
17    cost.
18        A.  That's correct.  Because most of
19    these -- the deliverables, if you will, of a
20    task order like that recommendations report
21    and the work plans were -- were provided to
22    the Corps as deliverables.  You know, "Here's
23    what you paid us to do."  Whereas the proposal
24    is more of a scope -- you know, it's more of a
25    contract document --
```

Page 135

```
 1        Q.  All right.
 2        A.  -- to establish the costs and the
 3    basis of the costs.  So there's a lot of, you
 4    know, -- That's where you get into assumptions
 5    as far as quantities.  You know, it's hard to
 6    estimate something if you don't know how much.
 7        Q.  Well, of course.  What is the real
 8    difference with regard to the specifications
 9    in that document as opposed to the
10    specifications in this recommendation report?
11        A.  Well, it talked about all the
12    elements like we discussed in section 5 of the
13    recommendations report.
14        Q.  Yes.
15        A.  You need to do all of these.
16        Q.  All of these things.  Various
17    elements of work?  So they're really the
18    same.  Just in that subsequent report, there's
19    a costing out of these items; right?
20        A.  In the proposal.
21        Q.  Yes.
22        A.  Yes.
23        Q.  All right.
24        A.  Uh-huh (affirmatively).
25        Q.  Now, paragraph 11 is an area where
```

Page 136

```
 1    there's another person that's going to be
 2    deposed to discuss this issue.  Maybe if you
 3    wouldn't mind for me -- reading it just for me
 4    to understand from your perspective what you
 5    think you have to offer on this subject rather
 6    than me trying to attack it.
 7        A.  "All project documents, including,
 8    but not limited to, plans, specifications,
 9    surveys, modifications, design memoranda,
10    investigations, engineering investigations,
11    environmental impact studies, supplemental
12    environmental impact statements, High Level
13    Plan studies, proposals, work orders, change
14    orders, requests for payments, et cetera for
15    the East Bank Industrial Area TERC that regard
16    or concern the East Bank Industrial Canal from
17    1999 until present."  I guess --
18        MS. WAGER-ZITO:
19            You read it.
20    EXAMINATION BY MR. BRUNO:
21        Q.  I have been told that Phil Staggs or
22    Stagg?  Staggs.
23        MS. WAGER-ZITO:
24            Phil Staggs.
25    EXAMINATION BY MR. BRUNO:
```

Page 137

```
 1        Q.  Staggs.  As I said, I know he is
 2    going to talk about it, but I was given to
 3    understand by Counsel that you may have some
 4    information on this subject.  I don't know.
 5        MS. WAGER-ZITO:
 6            I am going to ask Debbie to tell
 7        you what she thinks the agreement was
 8        as to which part of this --
 9        MR. BRUNO:
10            Okay.  That's fair.
11        MS. WAGER-ZITO:
12            -- Mr. Roe is going to do and
13        which part Mr. Staggs, with an S, Joe,
14        was going to do.
15        MR. BRUNO:
16            Okay.
17        MS. CLAYMAN:
18            Right.  My understanding, this
19        list of environmental impacts,
20        environmental impact statements, et
21        cetera, we had already told you we
22        don't -- aren't aware of any of those
23        things, and Mr. Staggs will say that.
24            In terms of proposals, work
25        orders, change orders, Mr. Roe is here
```

35 (Pages 134 to 137)

STEPHEN CLAY ROE                                              4/17/2008

Page 138

```
1        to address that.
2           In terms of plans and
3    specifications for the actual work
4    done on the field, that will be
5    addressed by Mr. Staggs.
6           MR. BRUNO:
7             Okay.  All right.  Fine.
8           MS. CLAYMAN:
9             He's more of the business guy.
10   Staggs is the field.
11          MR. BRUNO:
12            I got you.  All right.  I got
13   you.  Why don't we do it this way.
14   EXAMINATION BY MR. BRUNO:
15      Q.  Let's move to 12; I think it'll back
16   into it.  Can you tell us -- First of all, you
17   have talked about -- you have used the word
18   "Mod" in the course of your testimony today.
19   Let's see if we can't for the record get a
20   definition of what mod or modification means.
21   And the context would be when you need a piece
22   of paper.  Okay?
23      A.  Okay.  In common vernacular, a mod
24   is in essence a change order.
25      Q.  Right.
```

Page 139

```
1       A.  Okay.  So if you need more scope,
2    more funding, more schedule, this is the
3    mechanism to do that.
4       Q.  All right.  And generally can I
5    assume from your testimony that you need to do
6    a written change order when you want more
7    money?
8       A.  In the case of this contract, either
9    the Corps would already initiate a change,
10   like, "Hey, we want them to do an arsenic
11   investigation --"  So it's like any other
12   job.  The client could initiate a change or
13   the contractor could.  And the contractor's
14   vehicle to do that was the contractor
15   information request form, which was basically
16   a change notification type of document.
17      Q.  All right.
18      A.  Okay?
19      Q.  Now, one of the things that you guys
20   were monitoring was the groundwater because of
21   the potential for contamination as a result of
22   this work.  Is that not correct?
23      A.  Yes, there was some limited
24   groundwater.  We put in a number of wells, and
25   my understanding is we only sampled them at
```

Page 140

```
1    the end of the project.
2       Q.  Okay.  Did you also take note of the
3    direction of the flow of the water
4    underground, whether it was moving away from
5    the canal or into the canal or going both
6    ways?
7       A.  No, that would have required
8    routine, you know, monitoring on a routine
9    basis; and my understanding is we just kind
10   of installed these wells and sampled them at
11   the end of the job, sent the data off and said
12   it looks good and --
13      Q.  Right.  If the water had been
14   flowing both ways in the beginning of the
15   project, and the water was flowing one way at
16   the end of the project, would that have any
17   significance at all to you as a project
18   manager?
19          MS. WAGER-ZITO:
20            Objection.  He can answer.
21          THE WITNESS:
22            No, not really.
23   EXAMINATION BY MR. BRUNO:
24      Q.  All right.  Are you able to identify
25   -- Let me ask you this.  How many
```

Page 141

```
1    modifications to the contract were there?  Do
2    you know?
3           MS. WAGER-ZITO:
4             To Task Order 26?
5           MR. BRUNO:
6             You're right.  Task Order 26.
7           THE WITNESS:
8             Lots.  There's a log somewhere.
9           MS. WAGER-ZITO:
10            Another technical term.
11   EXAMINATION BY MR. BRUNO:
12      Q.  Lots is cool.  I'll take it.
13      A.  Yeah, I think we were up to 6 or 7
14   by the time I left the project.  By the end
15   there was many because of the incremental
16   funding nature of the job.  They could only
17   give us so much money at a time to do the
18   demolition remediation work.
19      Q.  Well, if I could just get you to
20   take a look at this document.  And if this is
21   a document that we can adopt to identify all
22   the mods, that'll short-circuit this.  Let me
23   show you WGI-67877 in seriatim to 81976?  I'll
24   sorry.  To 67884.  Okay.  I see.  No it's not
25   in seriatim.  Forgive me.  Let me do it
```

STEPHEN CLAY ROE                                    4/17/2008

Page 142

1  again.
2       MS. WAGER-ZITO:
3       Please.
4  EXAMINATION BY MR. BRUNO:
5       Q.  All right.  The first document is in
6  seriatim WGI-67877 to 884.  And then we found
7  one more which is another Bates number,
8  WGI-81976.  Okay.  Let me just take a look at
9  that and see if this doesn't reflect all of
10 the modifications.
11      A.  Well, the first thing I would look
12 at is the date.  This is April of 2004.  I
13 think we finished the project May of 2005.  So
14 given that, there may be more mods subsequent
15 to this, but I see this talks about mod number
16 44.  So that's even more than I would have
17 envisioned.  So there were at least 44 mods.
18      Q.  All right.  But you can't confirm to
19 me by looking at the document -- I was just
20 trying to find a way to put a beginning and an
21 end on this.  Is there --
22      A.  There is -- If you were to get the
23 very -- Well, it's an administrative task that
24 could be done.  We could find out what the
25 last mod was.  It's probably in the reams of

Page 143

1  boxes somewhere.  Because we did have
2  administrative people keep track of all of
3  that in Denver.
4       Q.  All right.  Did you do any
5  investigation to ascertain how many
6  modifications there were in connection with
7  your preparation for this testimony?
8       A.  No.
9       Q.  Thanks.  All right.  When did the
10 actual work begin?  I mean, you know, spades
11 in the ground?
12      A.  On-site work?
13      Q.  Yes.
14      A.  The fencing I believe started before
15 we actually had access to the site in November
16 of 2000.  The actual access where we were
17 allowed to enter the site was January, maybe
18 February, 2001.  And that's when we pulled in
19 our trailers, secured the site, and began our
20 work.
21      Q.  Okay.  Is it fair for me to conclude
22 then that the modifications that may have
23 pre-existed the day that you got on the site
24 were all modifying the project documents and
25 finalizing the -- insofar as they finalized

Page 144

1  the work plans and the costs?
2       A.  Yeah, I think that's pretty
3  accurate.  Basically those mods and
4  predecessor proposals attempted to develop the
5  knowledge base, develop the plan, develop the
6  estimated costs as best you could do without,
7  you know, going out and digging around the
8  site.
9       Q.  All right.
10      A.  Now, they wasn't all funded at that
11 point.
12      Q.  Did each of these mods include
13 specifications?
14      A.  Each mod included a statement of
15 work, I believe.
16      Q.  All right.  So to that extent
17 contained, even if there are specifications
18 that were already in existence, they contained
19 some specifications?
20      A.  Yes.
21      Q.  So in terms of specifications where
22 I would look, I would look at the
23 recommendation report, I would look at the
24 modifications, I would look at the proposal.
25 Is there any other place for me to look in

Page 145

1  order for me to identify the specifications
2  that were prepared by the Washington Group
3  International?
4       A.  The work plans.  Remember, that we
5  developed I think under mod 3 or 4.  There's a
6  number of work plans.  Also the -- you know,
7  additional requirements were developed by
8  subcontractor work plans in these initial
9  preparatory, you know, quality assurance
10 reviews.
11      Q.  Well, the mod wasn't necessary for
12 you to draft the work plan; right?
13      A.  Yes.  If you look on -- on that
14 document, look under mod 3 or 4, one of them
15 --
16      Q.  Okay.  That's where I was looking.
17      A.  -- said "Okay, go write the work
18 plans."
19      Q.  Let's see.  "Mod 3, WGI NT".  What's
20 NT?
21      A.  International.
22      Q.  Oh, okay.  "Was awarded mod number 3
23 on June 30th, 2000.  The scope of work for
24 this mod was covered in proposal number 96,
25 dated May 31, 2000 for the development of work

37 (Pages 142 to 145)

STEPHEN CLAY ROE                                                4/17/2008

Page 146

1   plans and subcontracting plans and services."
2   That just gives you the go ahead to draft the
3   work plans; right?
4        A.   Right.
5        Q.   Okay.  Mod 4 is "The scope of work
6   for this mod was covered in proposal number
7   106, revision 1, dated September 26, 2000, for
8   additional funding to continue with the
9   procurement process, revising and finalizing
10  the work plans and other technical
11  requirements in preparation for the project."
12  So we're just continuing to evaluate the work
13  plans?
14       A.   Yes.  I think that mod was basically
15  to bridge us because they hadn't gotten site
16  access and we had to continue our efforts.  So
17  it was to provide additional funding for us to
18  continue getting ready to mobilize to the
19  site.
20       Q.   Okay.  So the specifications, to the
21  extent that they exist, they're going to be
22  embodied in the work plans; right?
23       A.   Yes, and those statements of work
24  and the proposals.
25       Q.   Well, those are what the work plan

Page 147

1   is based on; right?
2        A.   The work plans are based on, you
3   know, -- Yeah.  I mean, the recommendations
4   report, the statement of work and whatever
5   else that you can gather to meet the objective
6   of the plan, you know.  There's kind of a
7   general work plan, but then you have other
8   like quality control, safety, so, you know,
9   it's --
10       Q.   Right.  But all of that flows from a
11  work plan that's based upon the initial, you
12  know, --
13       A.   Well, yeah, it's based on the
14  knowledge of the site, the knowledge of the
15  work to be performed --
16       Q.   Sure.
17       A.   -- and the knowledge of the
18  discipline developing it.  In other words, the
19  safety plan, you're going to want you and your
20  safety experts putting that plan together.
21       Q.   Well, insofar as where I would go to
22  find out what you were going to do and how you
23  were going to do it, I would look at the work
24  plans, wouldn't I?
25       A.   Yes.

Page 148

1        Q.   Is there any other place I should
2   look?
3        A.   Yeah.  The statements of work, --
4        Q.   Okay.
5        A.   -- the recommendations report, and
6   then if the work plan, if they encountered
7   other situations, you -- the CIRs, --
8        Q.   Right.
9        A.   -- the preparatory inspection
10  documentation is where your really rubber hits
11  the road, because then you're bringing your
12  subs on and they're telling you what equipment
13  they're going to use and, you know, the real
14  detail.
15       Q.   All right.  Now, again I have to ask
16  this question again because we got all of
17  these additional possible sources of
18  specifications.  You would agree with me that
19  none of the specifications prepared by the
20  Washington Group at any time in connection
21  with the work performed on the water side of
22  the Lower Nine levee pursuant to Task Order 26
23  contained any consideration for the safety or
24  integrity of the floodwall that is located in
25  that vicinity.  Isn't that true?

Page 149

1        A.   I don't believe they addressed that
2   situation.
3        Q.   All right.  You may have already
4   addressed this, but we talked about water; and
5   there were some documents that do describe the
6   flow of water below the surface of the work
7   area.
8        A.   Uh-huh (affirmatively).
9        Q.   Did you all do any hydrology or
10  hydraulics analysis in connection with the
11  waters below the surface of the work site?
12       A.   Only at the end of the job as part
13  of the recap requirements.  They needed to do
14  a groundwater sampling and a hydraulic
15  analysis of the permeability of the soils to
16  classify the water into -- you know, and I am
17  not a hydrologist by any means, but to
18  determine what class of aquifer it was.  So
19  they did a slug test and they also took
20  samples and sent them to a lab for
21  permeability, and apparently they found that
22  the soils were very tight clay.  There wasn't
23  a whole lot of hydraulic conductivity.  And
24  because of that, the aquifer, if you call it
25  an aquifer, was not classified by the State as

                                    38  (Pages 146 to 149)

STEPHEN CLAY ROE                                                    4/17/2008

Page 150

1   a drinking water aquifer, which, if it were,
2   then that would bring in a more stringent set
3   of analytical or water quality parameters.
4   But apparently the water in essence complied
5   with the standards for the type of aquifer
6   that it was, so it was -- my understanding, it
7   was a one time deal where we installed 12
8   wells, we slug tested two of them, sampled
9   them all, sent some samples off to a lab.  So
10  it was kind of an end of the deal, check the
11  water, you know; things turned out pretty
12  well, so that was that.
13      Q.  Okay.
14          MR. BRUNO:
15          We have been going for about an
16      hour and 15 minutes.  Let's take a
17      little break.
18          THE WITNESS:
19          Okay.
20          VIDEO OPERATOR:
21          The time is 2:17.  We're now off
22      the record.
23          (Recess.)
24          VIDEO OPERATOR:
25          The time is 2:28.  We're now back

Page 151

1       on the record.
2   EXAMINATION BY MR. BRUNO:
3       Q.  You wanted to clarify something?
4       A.  Yes, I wanted to clarify the
5   record that the mods -- two things regarding
6   the mods.  One is that there were 60 total
7   mods, which was very unusual for a TERC task
8   order.  The reason there were so many was
9   because the Corps didn't have all the funding
10  to do this -- This was a big job, very big job
11  for the TERC.  You know, 20 million may not
12  sound like a lot, but we were being funded in,
13  you know, smaller chunks.  So that's why we
14  had a lot of mods.
15          And the other thing I wanted to
16  clarify, I misspoke.  There was not a
17  statement of work attached to every single
18  mod, because most of the mods for the
19  incremental funding just referenced back to
20  the August, 2000 statement of work.  It was
21  the one I referred to as the big enchilada,
22  the big proposal that we did.  Because almost
23  all the work was covered under that proposal.
24  They just had to fund it in increments as they
25  got the funding.

Page 152

1       Q.  All right.  Where did you go during
2   the break to get the information about the
3   number of mods so I can --
4       A.  Well, the Counsel had that
5   information in their file.
6       Q.  Did you look at some paper?  Or did
7   you --
8       A.  Yeah, we looked at the last monthly
9   report.  Remember, you had one you showed me
10  that went up to 44.  They had one that was --
11      Q.  Right.
12      A.  -- whatever, a year or more later
13  than that.
14      Q.  All right.
15          MR. BRUNO:
16          Would you be kind enough,
17      Counsel, to give me the Bates number?
18          MS. WAGER-ZITO:
19          Eventually.  I mean, not right
20      this second.
21          MR. BRUNO:
22          Oh, no, no, not this second.
23          MS. WAGER-ZITO:
24          Yes.  No, We can give you that.
25      Yes.

Page 153

1           MR. BRUNO:
2           When you get the chance.
3           MS. WAGER-ZITO:
4           Yes, we can give you that Bates
5       number.
6           MR. BRUNO:
7           All right.
8   EXAMINATION BY MR. BRUNO:
9       Q.  And the information about the work
10  orders not being attached to every single mod,
11  that came from Counsel as well?
12          MS. WAGER-ZITO:
13          And that --
14          THE WITNESS:
15          Well, no, I knew that.  I think I
16      just misspoke on that question.  I
17      knew that not every single mod had to
18      have a statement of work.  Up until
19      the point we did the big one, I think
20      they tended to have a statement of
21      work.  But after that, they didn't.
22  EXAMINATION BY MR. BRUNO:
23      Q.  Okay.  During the pendency of this
24  project, did you know that the United States
25  Army Corps of Engineers had guidelines for

39 (Pages 150 to 153)

JOHNS PENDLETON COURT REPORTERS                        800 562-1285

STEPHEN CLAY ROE                                                    4/17/2008

Page 154

1   work proposed near or within a federally
2   constructed flood control project?
3          MR. EHRLICH:
4              Object to the form.
5          THE WITNESS:
6              No.
7   EXAMINATION BY MR. BRUNO:
8      Q.  Did you know that the United States
9   Army Corps of Engineers defined something
10  called a critical area of a flood control
11  project as being generally the area from 300
12  feet riverward to 500 feet landward of a flood
13  control project center line?
14         MR. EHRLICH:
15             Object to the form.
16  EXAMINATION BY MR. BRUNO:
17     Q.  Did you know that?
18     A.  No.
19     Q.  Did you know that local sponsors are
20  responsible for controlling all construction
21  which occurs within the critical area, that
22  is, that 300 to 500 feet?  Did you know that?
23     A.  No.
24         MR. EHRLICH:
25             Object to the form.

Page 155

1   EXAMINATION BY MR. BRUNO:
2      Q.  Did you know that the Corps of
3   Engineers provides engineering review to
4   ensure that any work within or near the flood
5   control unit does not reduce the level of
6   protection and to ensure the continued
7   integrity of the flood control system?  Did
8   you know that?
9          MR. EHRLICH:
10             Object to form.
11         THE WITNESS:
12             No.
13  EXAMINATION BY MR. BRUNO:
14     Q.  Did Washington Group International
15  conduct any review of any Corps of Engineers
16  engineering manual, technical manual or the
17  like to ascertain whether or not there were
18  Corps recommendations or guidelines about
19  working within the critical area of a flood
20  control project?
21         MS. WAGER-ZITO:
22             Wait one second.  I'm sorry, I
23         just lost something there.  Can you
24         read that back?
25         MR. BRUNO:

Page 156

1      Fair enough.  Yes, I have got it
2   here.  "Did the Washington Group
3   International conduct any review of
4   any Corps of Engineers engineering
5   manuals or technical manuals or the
6   like to ascertain whether or not there
7   were Corps recommendation or
8   guidelines about working within the
9   critical area of a flood control
10  project?"
11         THE WITNESS:
12             No.
13  EXAMINATION BY MR. BRUNO:
14     Q.  Specifically have you ever reviewed
15  Engineering Manual 1110-2- -- Well I think
16  it's -- The manual is 11 -- 1110 of the United
17  States Army Corps of Engineers.
18     A.  No.
19         MR. STONE:
20             Let's have that attached as an
21         exhibit.
22         MR. BRUNO:
23             What do you want to attach?
24         MR. STONE:
25             The manual, 1110-2.

Page 157

1          MR. BRUNO:
2              I am not reading from that, in
3          fairness to you.  I am reading from
4          those Kansas City guidelines.
5          MR. STONE:
6              You don't have the manual here?
7          MR. BRUNO:
8              No.
9          MR. STONE:
10             Okay.  But it's Kansas city
11         guidelines; right?
12         MR. BRUNO:
13             Yes.
14         MR. STONE:
15             Okay.
16         MR. BRUNO:
17             All right?  I have shown you
18         these before.  I'll be happy to give
19         you a copy if you would like.
20  EXAMINATION BY MR. BRUNO:
21     Q.  All right.
22         MR. STONE:
23             The problem is you're not telling
24         the witness it's Kansas City
25         guidelines.  You're treating him as if

JOHNS PENDLETON COURT REPORTERS                        800 562-1285

Page 158

1    he should know there are certain
2    guidelines --
3        MR. BRUNO:
4        No, I'm not.  I am asking him
5    whether he knows.  When he says he
6    doesn't know, it doesn't really
7    matter, does it?  And that's my
8    point.
9        MR. STONE:
10       Okay.
11       MR. BRUNO:
12       Okay?  And don't get me into all
13   the testimony I got on this very
14   subject by your Corps of Engineers
15   witnesses in the New Orleans District
16   office of the Corps.
17   EXAMINATION BY MR. BRUNO:
18       Q.  Now, let's talk about the permit.
19   Do you know why the Orleans Levee District was
20   even mentioned as a potential permitter in the
21   recommendation report?
22       A.  Because we were working so close in
23   vicinity to it, it was logical that that would
24   be one of the bases that we should look to
25   cover.

Page 159

1        Q.  You'll have to forgive me.  You said
2    "to it".  What do you mean by "to it"?
3        A.  To the levee, the floodwall.
4        Q.  All right.  Did the Washington group
5    International recognize that the Orleans Levee
6    District was the local sponsor for that flood
7    control project?
8        A.  I don't have personal knowledge of
9    that.  I don't know if the guys on site did.
10       Q.  Well, unfortunately, again you're
11   wearing the WGI hat today.
12       A.  Uh-huh (affirmatively).
13       Q.  So did WGI know whether or not the
14   Orleans Levee District, based upon your
15   previous testimony, was the local sponsor of
16   the flood control project which was in the
17   vicinity of the work contemplated by Task
18   Order 26?
19       A.  I don't know.
20       Q.  Now, but I think you've testified
21   that, quote, it made sense to communicate with
22   the Levee District because of the location of
23   the flood control project as it related to the
24   work contemplated by Task Order 26; right?
25       A.  And because we discussed it with the

Page 160

1    Corps and we jointly agreed to keep them
2    informed, let them know what we were up to.
3        Q.  All right.  Do you think that the
4    Washington Group got the information about the
5    Levee District from the Corps or do you think
6    that the Washington Group just knew that
7    because of its past business experiences?
8        A.  I think because of discussions with
9    the Corps.
10       Q.  All right.  Now, I had previously
11   indicated that I was going to mark something
12   as WGI-2.  I am just going to withdraw and
13   renumber it.  So I am going to mark this
14   document as WGI-2.  This is for the record.
15   This is for you.
16       MS. WAGER-ZITO:
17       He'll look at the official one.
18       MR. BRUNO:
19       There you go.
20       MS. WAGER-ZITO:
21       I'll take this one.  Thank you.
22       MR. BRUNO:
23       And you guys -- Thanks, Counsel,
24   for making the copy.
25       MS. WAGER-ZITO:

Page 161

1        You're welcome.
2    EXAMINATION BY MR. BRUNO:
3        Q.  All right, now.  So first of all,
4    have you ever seen the document?
5        A.  Yes.
6        Q.  And I think you have already
7    testified the first time you saw it was within
8    the last few days in preparation for your
9    testimony today?
10       A.  That's right.
11       Q.  All right.  And who's Bobby Smith?
12       A.  Bobby was one of our superintendents
13   on site that worked for Dennis, or actually
14   more accurately for Phil Staggs.
15       Q.  All right.  Now, the subject of this
16   letter says "Levee Board permits and
17   notifications".
18       A.  Yes.
19       Q.  All right.  It says here that "WGI
20   contacted the Levee Board to inquire about
21   permits and notifications required for
22   demolition and remediation work.  Washington
23   Group International will be performing at the
24   East Bank Industrial Area of the Inner Harbor
25   Navigation Canal under contract United States

STEPHEN CLAY ROE                                                    4/17/2008

Page 162

1  Army Corps of Engineers". Now, do you have --
2  do you know why Mr. Smith contacted the Levee
3  Board other than, of course, what is
4  referenced hereby Mr. O'Connor?
5     A.  No, this pretty well sums it up.
6  Just to inquire what notifications they
7  needed.
8     Q.  All right.  Now, does this describe
9  the work that is going to be done by the
10 Washington Group in connection with Task Order
11 26?
12    A.  Yes, in a summary form.  This --
13 This is I think an attempt to kind of give a
14 sweeping overview of the whole work to be done
15 on this thing.
16    Q.  Would you agree with me that this
17 description does describe, to the extent that
18 it relates to the flood control project, all
19 of the work contemplated -- I'm sorry, not all
20 of the work, but very generally describes the
21 work to be done in proximity to the flood
22 control project?
23    A.  Yes.
24    Q.  Now, it refers to enclosures, which
25 we can't figure -- Again, we have no way of

Page 163

1  calculating what's complete and what's not
2  complete.  Do you know what enclosures were
3  included with this letter?
4     A.  No, I don't.
5        MR. BRUNO:
6        And, Counsel, not today, but I
7     would really appreciate if you would
8     identify what you believe to be the
9     complete document.
10       MS. CLAYMAN:
11       Sure.
12       MR. BRUNO:
13       Thank you.
14 EXAMINATION BY MR. BRUNO:
15    Q.  Now, would you agree with me that
16 this letter does not indicate where, as it
17 relates to the flood control project, this
18 work is to be done?
19    A.  I would agree and -- you know, it's
20 likely the enclosures have maps or drawings.
21    Q.  Right.  From which one could deduce
22 the proximity --
23    A.  Right.
24    Q.  -- of the work to the flood control
25 project; right?

Page 164

1     A.  Right.
2     Q.  The next letter in this batch I'm
3  going to mark as WGI-3.  One for you.  You can
4  take off that yellow thing.
5        MR. BRUNO:
6        One for you.
7        MS. WAGER-ZITO:
8        Thank you.
9        MR. BRUNO:
10       One for you guys.
11 EXAMINATION BY MR. BRUNO:
12    Q.  The first question is have you ever
13 seen this before your preparation for the
14 deposition?
15    A.  Yes, I believe the first time I saw
16 it was at lunch time, though, today.
17    Q.  Okay.  The question was did you see
18 it before your preparation and your answer is
19 "Yes, I saw it at lunch." So that can't
20 work.
21    A.  Preparation for the second half.
22 How's that?
23    Q.  All right.  Well, you didn't see it
24 yesterday.  How about that?  The first time
25 you saw it was today?

Page 165

1     A.  No, I don't believe I did.  That's
2  correct.
3     Q.  You have already said Dennis
4  O'Connor is the project manager; right?
5     A.  Right.
6     Q.  All right.  Are you aware of the
7  need to contact -- to have contacted the Port
8  of New Orleans for permission to do anything?
9     A.  They -- Yeah, I -- or speaking on
10 behalf of our company, sure, yes, we had to
11 contact them.
12    Q.  All right.  And this seems to say
13 that there's -- this is a permit.  It says in
14 paragraph 6 that "The granting of this permit
15 to your company".
16    A.  Uh-huh (affirmatively).
17    Q.  Do you know what this permit gives
18 your company the permission to do?
19    A.  No, I can only assume because I
20 haven't had time to digest this document.
21    Q.  Okay.
22    A.  It says "Includes continuing field
23 work required to demolish above-ground
24 structures, remove debris from the site,
25 remove and dispose of contaminated soils, and

JOHNS PENDLETON COURT REPORTERS                        800 562-1285

STEPHEN CLAY ROE                                              4/17/2008

Page 166

1   prepare the site for future dredging
2   operations in order to facilitate the lock
3   replacement project". So that sounds like,
4   again, a pretty accurate but sweeping overview
5   of the work we were going to do.
6       Q.  All right.  And if you would look at
7   paragraph number 8 at WGI-40963, it says that
8   "Your company shall be responsible for any
9   damages to Board property caused by the
10  actions, negligence, or fault of your
11  company's employees, subcontractors, agents,
12  representatives or servants".  Do you see
13  that?
14      A.  Yes, I do.
15      Q.  All right.  Do you know what the
16  Board property was?  Or I should say where was
17  it located?
18      A.  No, I thought the property had been
19  turned over to the Corps of Engineers from the
20  Port of New Orleans before we worked on it.
21      Q.  All right.  Let's go to the next
22  document, which is I think WGI-4.
23          MR. BRUNO:
24          I'll give this to you, Counsel.
25          MS. WAGER-ZITO:

Page 167

1          Thanks.
2          MR. BRUNO:
3          Counsel.  Sorry about that.  I
4      didn't mean to throw it at you.
5   EXAMINATION BY MR. BRUNO:
6       Q.  Have you seen this document before?
7       A.  Yes, I saw this before in
8   preparation.
9       Q.  All right.  Is this a lunch time
10  "saw"?
11      A.  No.  This was --
12      Q.  Or yesterday "saw"?  Two days ago
13  "saw"?
14      A.  This was last week.
15      Q.  Last week?  Okay.  Good.  Wasn't far
16  apart.  But before last week had you ever seen
17  it?
18      A.  No.
19      Q.  All right.  Do you know what this
20  is?
21      A.  Yes.  It's been explained to me it's
22  a --
23      Q.  Oh, by whom?
24      A.  By Counsel as explaining their
25  process by which they go about the permitting,

Page 168

1   and this is a step in that process, the form
2   of no objection.
3       Q.  All right.  So the first thing we
4   know is, is that it's from the State of
5   Louisiana, Department of Transportation and
6   Development; right?
7       A.  Yes.
8       Q.  Okay.  And it's not a permit.  It
9   just is an indication of a no objection.
10  Right?
11      A.  Right.
12      Q.  Now, look at paragraph 1.
13      A.  Okay.
14      Q.  "Any damage to the levee/floodwall
15  caused by the construction, operation and
16  maintenance of the facility be repaired by the
17  applicant at their expense and to the
18  satisfaction of the Levee Board".  Okay?
19      A.  Okay.
20      Q.  Now, did you recognize that WGI had
21  an obligation not to damage the levee or
22  floodwall that was in proximity to the work
23  site?
24      A.  Yes.
25      Q.  Now, would you agree that consistent

Page 169

1   with an obligation not to damage is the
2   necessity of an assessment to determine
3   whether or not the work contemplated might
4   damage the floodwall?
5       A.  As far as, you know -- No, we -- we
6   thought that this meant, you know, ramming a
7   truck into it or, you know, something like
8   that.
9       Q.  All right.  Despite whatever these
10  words may mean to anybody else on the planet,
11  --
12      A.  Uh-huh (affirmatively).
13      Q.  -- you did not understand these
14  words to mean damage from below the surface of
15  the earth?
16      A.  No.
17      Q.  All right.  Do you have any
18  understanding as to whether or not excavations
19  near a floodwall may in fact damage a
20  floodwall?  Does WGI know that?
21      A.  Does WGI know that?
22      Q.  Yes.
23      A.  I'm sure there are individuals
24  within the company with that expertise who
25  would have that knowledge.  Yes.

43 (Pages 166 to 169)

STEPHEN CLAY ROE                                              4/17/2008

Page 170

1    Q.  Okay.  So the answer is that WGI
2  understands that excavations below surface
3  work may, not will, may affect levees or
4  floodwalls; right?
5    A.  Right.  In general.  We're not
6  talking specific to this situation.
7    Q.  Right.  Because you have already
8  told me that you all didn't undertake the
9  investigation.
10   A.  Right.
11   Q.  You have already said that.
12   A.  Uh-huh (affirmatively).
13   Q.  Now, what I need to ask you, though
14 is, do you believe that this permit request
15 suggested to WGI that they do in fact
16 undertake an evaluation to see whether or not
17 the proposed work may damage the floodwall?
18   A.  No, we didn't interpret it that way.
19   Q.  Okay.  Do you agree with me that
20 somebody else might interpret it that way?
21     MS. WAGER-ZITO:
22       Objection.
23     THE WITNESS:
24       Again, we felt like our job was
25       -- we were being brought on as the

Page 171

1       people who knew how to knock down the
2       buildings and remediate the soils.  So
3       as a remediation effort, not -- not an
4       evaluation of hydrology and hurricane
5       situations and their impacts on
6       floodwalls.
7  EXAMINATION BY MR. BRUNO:
8    Q.  All right.
9    A.  Or -- Or what effect pulling a pile
10 would have.  We assumed that, you know, the
11 Corps' -- that's their expertise.
12   Q.  Would you look at paragraph two.
13   A.  Okay.
14   Q.  You see where it says "The Levee
15 District will be --"  No, I'm sorry, it
16 doesn't say "will be".  "That the Levee
17 District be notified upon completion of the
18 demolition activities so that an inspection
19 and an approval of the levee condition may be
20 made."  Okay.  Do you know, sir, whether that
21 ever occurred?
22   A.  We asked Dennis O'Connor that
23 question and we do not think that notification
24 was made.  His point was that, you know, they
25 were there -- you know, the Levee District was

Page 172

1  there doing maintenance on the -- you know,
2  mowing and such.  They were aware of what we
3  were up to and -- but we did not find any
4  record that this notification was made.
5    Q.  Where is Dennis?
6    A.  Dennis is near San Diego.  He just
7  retired.
8    Q.  When's the last time you talked to
9  him?
10   A.  Last Thursday.
11   Q.  Okay.  So he assisted in your
12 preparation?
13   A.  Yes.
14   Q.  All right.  And I take it that
15 obviously that you were -- you had some time
16 to prepare with the lawyers.  Your lawyers in
17 the room; right?
18   A.  Yes.
19   Q.  How long did that take?
20   A.  Oh, we spent probably six hours
21 between phone calls and yesterday.
22   Q.  Okay.  I'm going to mark the next
23 exhibit -- And this is the one that I had
24 incorrectly suggested I would mark Number 2.
25 I'm now going to remark it as --

Page 173

1      MS. WAGER-ZITO:
2       5.
3      MR. BRUNO:
4       5.  Okay.
5       (Whereupon a discussion was held
6       off the record.)
7  EXAMINATION BY MR. BRUNO:
8    Q.  When you were visiting with the
9  lawyers, was that when Mr. O'Connor was on the
10 phone?
11   A.  We made a special call to Dennis
12 with one of the -- one of the lawyers.
13   Q.  Okay.  All right.
14   A.  She facilitated getting the two of
15 us together to talk.
16   Q.  Did you talk in the presence of the
17 lawyer?
18   A.  Yes.
19   Q.  Did Mr. O'Connor speak in the
20 presence of the lawyer?
21   A.  Yes.
22   Q.  All right.  The next document.
23     MR. BRUNO:
24       This is 5.
25     MS. WAGER-ZITO:

44  (Pages 170 to 173)

STEPHEN CLAY ROE                                          4/17/2008

Page 174

1       Thanks.
2    EXAMINATION BY MR. BRUNO:
3       Q.  Now, have you seen this letter
4    before?
5       A.  Yes.
6       Q.  When is the first time you saw it?
7       A.  Yesterday.
8       Q.  Yesterday.
9       A.  This particular letter --
10      MS. WAGER-ZITO:
11         Just wait for him to ask you a
12   question.
13      THE WITNESS:
14         Okay.
15   EXAMINATION BY MR. BRUNO:
16      Q.  Let me give you this one.  It's got
17   a staple on it just for ease of the Court
18   Reporter.  How about that?
19      MS. WAGER-ZITO:
20         You're so thoughtful.
21      MR. BRUNO:
22         I'm taking care of my man here.
23   EXAMINATION BY MR. BRUNO:
24      Q.  All right.  You were about to say
25   something.

Page 175

1       MS. WAGER-ZITO:
2         Objection.  Ask him a question.
3       MR. EHRLICH:
4         Object to form.
5    EXAMINATION BY MR. BRUNO:
6       Q.  Well, I thought -- You weren't
7    saying something?
8       A.  I saw it yesterday.  It was provided
9    by the attorneys.
10      Q.  I'm sorry.  I thought you had
11   something else to add.
12         All right.  Anyway, you -- do you
13   know what this is?
14      A.  Well, it's a letter, it's unsigned,
15   and apparently it did not exist in our files
16   on site, but it appears to be either a permit
17   or a permit application or something of the
18   sort.
19      Q.  Okay.
20      A.  It says that we requested
21   permission, which is true.  But it was more of
22   a notification.  We didn't really request them
23   to send us an application for a permit.
24      Q.  All right.  Would you have any facts
25   which would tend to dispute the statement that

Page 176

1    this document would have become a permit if it
2    had been signed by the Washington Group and
3    returned to the Levee Board?
4       A.  It appears as so.  Looking at the
5    sign-off on the last page, or at least it's
6    concurrence with the terms and -- yeah,
7    there's a paragraph, "This permit is granted
8    based upon" blah, blah, blah.
9       Q.  Right.
10      A.  So that's what this appears to be.
11      Q.  Now, do you know -- Well, you had
12   the conversation with Mr. O'Connor.  Based
13   upon -- Well, does WGI know why this letter
14   was not signed?
15      A.  Two reasons.  There's a lot of
16   language in here that our Counsel would not
17   sign up for as far as --
18      MS. WAGER-ZITO:
19         I'm not going to let you testify
20   to --
21      THE WITNESS:
22         Yeah.
23      MS. WAGER-ZITO:
24         -- any advice of Counsel.
25      THE WITNESS:

Page 177

1         Okay.  So legal Counsel within
2    our own organization and the fact that
3    the Corps basically said "Don't worry
4    about it, we're -- we have got a
5    permanent situation with these guys."
6    EXAMINATION BY MR. BRUNO:
7       Q.  All right.  I need to qualify what
8    you just said.  Okay?
9       A.  Uh-huh (affirmatively).
10      Q.  Are you answering based upon your
11   view today or are you telling me what WGI
12   thought back in '01?
13      A.  Back in '01.
14      Q.  So in '01, it's your testimony that
15   legal Counsel would have said "We don't want
16   to sign this"?
17      A.  They did say that.
18      Q.  They did?  Oh, okay.  I didn't --
19   All right.  So that you had the letter?
20      A.  Dennis said he had -- he -- His
21   recollection that it was more of an
22   application form or something.  But it might
23   have been this letter for all I know.  He
24   couldn't remember exactly what it was.
25      Q.  All right.  Well, but in fairness,

STEPHEN CLAY ROE                                    4/17/2008

---

Page 178

1  it's been suggested that legal Counsel
2  rejected something.  Is it likely, based upon
3  the indemnity language that appears on page 2
4  and 3, that this is what legal Counsel
5  rejected?
6       MR. EHRLICH:
7         Object to the form.
8       MS. WAGER-ZITO:
9         Object.
10      THE WITNESS:
11        Something in the language they
12   objected to, yes.
13   EXAMINATION BY MR. BRUNO:
14      Q.  Yes.  Well, is it WGI's position
15   that it had this letter or it did not have
16   this letter?  Let's just do it that way.
17      MS. WAGER-ZITO:
18        That's fine.
19      THE WITNESS:
20        It's our position that we had
21   this language and --
22      MS. WAGER-ZITO:
23        No, the question was did we have
24   this letter.
25      THE WITNESS:

---

Page 179

1         Did we have this letter?
2  EXAMINATION BY MR. BRUNO:
3      Q.  This letter.  This letter.  I have
4  to ask the question.
5      A.  Yes, we'll assume we did.
6      Q.  Okay.
7      MS. WAGER-ZITO:
8        Well, --
9      MR. EHRLICH:
10        I think you can ask him about the
11       conversations and they can instruct
12       him not to answer.  The privilege has
13       been waived as far as -- I think we
14       have a good argument it has --
15   EXAMINATION BY MR. BRUNO:
16      Q.  Well, let me just establish some of
17   the fundamentals.  I'm a baby step kind of
18   guy.  So at least we recognize, we'll agree on
19   the record that this letter was received by
20   Dennis O'Connor.  Right?
21      MS. WAGER-ZITO:
22        Objection.  That misstates his
23       prior testimony.
24      MR. BRUNO:
25        Well, I mean, the letter is

---

Page 180

1  addressed to Mr. O'Connor.  How else
2  would it get here?
3      MS. WAGER-ZITO:
4        It came from OLD's files.  We
5  don't have it in our files.
6      MR. BRUNO:
7        Whoa, whoa, whoa.  Wait a
8  minute.  Wait a minute.  The witness
9  just said that WGI's taking the
10  position that it had the letter.
11   EXAMINATION BY MR. BRUNO:
12      Q.  Are you going to recant that
13   testimony?
14      MS. WAGER-ZITO:
15        No, I don't believe that's what
16  the witness just said.
17      THE WITNESS:
18        What I said is we had some
19  language provided by the OLD that was
20  forwarded by Dennis to our Counsel in
21  Denver and they --
22      MS. WAGER-ZITO:
23        And I don't want you to
24  testifying as to what Counsel said to
25  him.

---

Page 181

1      THE WITNESS:
2        Okay.
3      MS. WAGER-ZITO:
4        You can said that he forwarded it
5  to her and you can say what we did as
6  a result of that, but not the in
7  between.
8      THE WITNESS:
9        Okay.  Or what we did not do as a
10  result of it.
11     MS. WAGER-ZITO:
12        Or what we did not do as a result
13  of it.
14  EXAMINATION BY MR. BRUNO:
15     Q.  And I am not there.  I don't really
16  care about the Counsel.  I am trying to just
17  nail down the darn letter.  Okay?
18     A.  Okay.
19     Q.  I mean, if we look at it, --
20     A.  It --
21     Q.  -- there's a whole page of words
22  here.
23     A.  Yeah.
24     Q.  It's not likely that somebody could
25  just remember all of this stuff.  It's highly

---

46 (Pages 178 to 181)

STEPHEN CLAY ROE                                                          4/17/2008

Page 182

1  likely, is it not, that the document was given
2  to somebody in Legal?  Right?
3       A.  Yes.
4       Q.  I mean, based upon --
5            MS. WAGER-ZITO:
6            Objection.
7  EXAMINATION BY MR. BRUNO:
8       Q.  -- all that you know.
9            MS. WAGER-ZITO:
10           Objection.
11           MR. BRUNO:
12           Counsel, let's not play games.
13           MR. WAGER-ZITO:
14           I'm objecting for the record, Joe.
15           MR. BRUNO:
16           On what grounds?  What are they?
17           MS. WAGER-ZITO:
18           That you haven't established a
19  foundation that --
20           MR. BRUNO:
21           I just did.
22           MS. WAGER-ZITO:
23           -- that this letter -- No, you
24  are trying to see if this letter, as
25  opposed to some document, and you are

Page 183

1  misstating his prior testimony.
2            MR. BRUNO:
3            Whatever.  We'll let the jury
4  figure it out.  Okay?
5            MS. WAGER-ZITO:
6            That's fine.
7            MR. BRUNO:
8            You play that game with them, I'm
9  happy.  All right?
10  EXAMINATION BY MR. BRUNO:
11       Q.  So Counsel's suggestion that there
12  may be, must be, must be, not maybe, some
13  other piece of paper with all of this language
14  that somebody felt compelled to give to the
15  Legal Department because it contained the
16  language, not within the context of why the
17  language would need to be reviewed in the very
18  first instance.  That's what Counsel wants to
19  suggest.  I am trying to be reasonable about
20  this and say clearly the letter asks for
21  somebody to sign a piece of paper.  Right?
22  And clearly your company's not going to sign a
23  piece of paper until your Legal Department
24  signs off on it.  Isn't that reasonable?
25       A.  Yes.

Page 184

1       Q.  And isn't that likely what
2  occurred?
3       A.  The only reason we're not sure is we
4  didn't find this document in our files.
5       Q.  I understand that.  But -- but, you know,
6  understand you don't have it, but, you know,
7  life can't always be quite that specific.
8       A.  Right.
9       Q.  Isn't it highly likely that, given
10  that this piece of paper as it sits on the
11  desk in front of you, because it asks for a
12  signature, not from Mr. O'Connor, but from the
13  Washington Group, okay, that nobody in your
14  company's going to sign a letter like this
15  without giving it to the Legal Department for
16  their approval?  Right?
17       A.  That's true.
18           MS. WAGER-ZITO:
19           Objection, calls for
20  speculation.
21  EXAMINATION BY MR. BRUNO:
22       Q.  All right.  Is that speculation?  Is
23  -- are you --
24           MS. WAGER-ZITO:
25           You're asking him to speculate.

Page 185

1  EXAMINATION BY MR. BRUNO:
2       Q.  Are you just speculating now that if
3  somebody in your company says to you, you
4  know, a letter like this -- I want to know if
5  this is speculation or if you know this to be
6  absolutely the way you guys do business in
7  Washington Group International.  If somebody
8  gives you a document like this and says "I
9  want you to sign it," do you have to speculate
10  as to whether or not to give it to Legal, or
11  do you know in fact that you are required to
12  give it to Legal?
13           MS. WAGER-ZITO:
14           A letter like this or this
15  letter?
16           MR. BRUNO:
17           A letter like this.
18           MS. WAGER-ZITO:
19           That's a different question.
20           MR. BRUNO:
21           No, it's not.  No, it's not.
22           MS. WAGER-ZITO:
23           Fine, Joe.
24           MR. BRUNO:
25           It's not.

47 (Pages 182 to 185)

JOHNS PENDLETON COURT REPORTERS                          800 562-1285

STEPHEN CLAY ROE                                        4/17/2008

Page 186

1        MS. WAGER-ZITO:
2          Make your record.
3        MR. BRUNO:
4          Yes, I am making my record and
5     you are making yours.
6   EXAMINATION BY MR. BRUNO:
7        Q.  Is it speculation, sir?  Would you
8   have to speculate?  Would you have to look at
9   the sky and say, "Hmm, should I send this to
10  Legal or should I sign it?"  I mean, come on.
11  What's the answer?  Is it speculation?
12       A.  No.  No.
13       Q.  Of course not.
14       A.  The project manager would want to
15  send it to Legal.
16       Q.  Of course.  And Mr. O'Connor would
17  want to send something like this to Legal as
18  well.  Isn't that true?
19       A.  Yes.
20       Q.  All right.  And, in fact, when you
21  spoke to Mr. O'Connor, he told you that Legal
22  was asked their opinion on this letter.
23  Didn't he tell you that?
24       A.  No.
25       Q.  He didn't tell you that?  What did

Page 187

1   he tell you?
2        A.  That he couldn't remember exactly
3   the form of the document that he sent to
4   Legal.
5        Q.  Okay.  So it's a document at least.
6   Right?
7        A.  Right.
8        Q.  It's not verbal, it's a document.
9   Fine.
10       A.  He never called it a letter.
11       Q.  All right.  He called it a
12  document.
13       A.  And we asked him, "Well, what was
14  this letter?"  And he -- or "What was this
15  document?  Was it a permit application?"  I
16  asked.  He couldn't remember exactly.
17       Q.  All right.  Based upon that
18  conversation, your review of this letter, how
19  sure are you that this letter was given to
20  Legal?
21       A.  I can't answer that question.
22       Q.  You can't.  You have no way to even
23  just guess; right?
24       MS. WAGER-ZITO:
25          Objection.

Page 188

1        MR. BRUNO:
2          That's okay.  I want -- The
3     record needs to reflect this is the
4     WGI position on this letter.  I want
5     to know it and I want it confirmed.
6     Okay?
7        MS. WAGER-ZITO:
8          I didn't tell him not to answer.
9        THE WITNESS:
10         Yeah, you're asking me to kind of
11     speculate between absolutely certainty
12     and --
13  EXAMINATION BY MR. BRUNO:
14       Q.  No, no, no.
15       A.  -- no, he didn't at all.
16       Q.  I said isn't it highly likely that
17  this is the letter that was transmitted to
18  Legal.  And if your answer is no, that's
19  fair.  But based upon all you know about the
20  letter, about the context, about your
21  conversation with Mr. O'Connor, isn't it true
22  that it's highly likely that this is the
23  letter that was sent to Legal?
24       A.  It's possible.
25       Q.  All right.  Now, this letter

Page 189

1   references a letter of no objection from the
2   United States Army Corps of Engineers dated
3   April the 6th, 2001.  Do you know whether or
4   not such a letter exists?
5        A.  Yes.
6        Q.  Okay.  I haven't seen that.  Have
7   you seen that one?
8        A.  I have seen it.  It was one of the
9   documents we reviewed last week.
10       Q.  All right.  Well, we don't have it?
11       MR. JOANEN:
12         I don't know.
13       MR. BRUNO:
14         We have it?
15       MR. JOANEN:
16         I don't know.
17       MS. WAGER-ZITO:
18         You do have it.
19       MR. BRUNO:
20         Scott -- I know we have it -- I
21  know we have it in the world.
22       MS. WAGER-ZITO:
23         I'm not going to blame it on
24  Scott.
25       MR. BRUNO:

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

STEPHEN CLAY ROE                                          4/17/2008

Page 190

1        Wait, wait, wait.  If it's one of
2   800 millions documents, you're
3   probably absolutely correct.
4        MS. WAGER-ZITO:
5        We did not produce 800 million
6   documents to you.
7        MR. BRUNO:
8        You count them.
9        MS. WAGER-ZITO:
10       How many documents did we
11  produce?
12       MR. BRUNO:
13       How many?
14       MS. CRONIN:
15       We produced 136,000 pages and
16  another 300,000 pages and --
17       MR. BRUNO:
18       There you go.  In my world,
19  that's 800 million documents.  It
20  might as well be a billion.
21       MS. CRONIN:
22       That's a big difference between --
23       MR. BRUNO:
24       No, not in my mind, not when you
25  have to read them.

Page 191

1        MS. CRONIN:
2        I know.
3        MR. BRUNO:
4        You read them?
5        MS. CRONIN:
6        Yes, sir.
7        MR. BRUNO:
8        Ouch.
9        MS. WAGER-ZITO:
10       And you can't hire her.
11       MR. BRUNO:
12       Well, let's talk.
13  EXAMINATION BY MR. BRUNO:
14       Q.  All right.  Let's see.  Do you
15  recall what the letter dated April 6, '01
16  says, other than no objection?
17       A.  I recall it being similar to the one
18  that we just looked at from the Department of
19  Transportation.  They also had no objection.
20       Q.  All right.  Now, you have also
21  suggested, based upon -- Okay.  Never mind.
22       (Whereupon a discussion was held
23       off the record.)
24  EXAMINATION BY MR. BRUNO:
25       Q.  Looks like we do have it.

Page 192

1        MR. BRUNO:
2        Thank you, Scott.
3   EXAMINATION BY MR. BRUNO:
4        Q.  I'll mark yours before I give it to
5   you.
6        A.  Okay.
7        Q.  This is Number --
8        MR. EHRLICH:
9        6.
10       MR. BRUNO:
11       Thanks.
12  EXAMINATION BY MR. BRUNO:
13       Q.  Is that the letter?
14       MR. EHRLICH:
15       Which letter?
16       MR. BRUNO:
17       The one to which he made
18       reference, dated April 6, 2001,
19       indicating a no objection from the
20       Corps.
21  EXAMINATION BY MR. BRUNO:
22       Q.  Is that it?
23       A.  Okay.  Yes.
24       Q.  All right.  You'll see paragraph C?
25       A.  Yes.

Page 193

1        Q.  Also says "Any damage to the
2   levee/floodwall resulting from the applicant's
3   activities is repaired at the applicant's
4   expense."
5        A.  Okay.
6        Q.  All right.  Now, you'll recall I
7   asked you a series of questions about similar
8   language in the -- in the letter from the Port
9   of New Orleans.  Did you assume that this
10  sentence referred to physical damage to that
11  part of the floodwall which is sticking out of
12  the earth?
13       A.  Yes.
14       Q.  Okay.  And you did not take this
15  language to mean potential damage to the
16  floodwall from below?
17       A.  No.
18       Q.  All right.  Now, to follow up with
19  -- You gave us some tidbits of information
20  about your conversation with Mr. O'Connor
21  about needing or not needing a permit.  Would
22  you share with us what you learned about that
23  subject?
24       A.  Well, ultimately in this time frame,
25  with all of these letters, Dennis went to the

STEPHEN CLAY ROE                                          4/17/2008

Page 194

1    Corps and discussed it with them and -- and
2    they put his mind at ease that we're okay, "We
3    have got this perpetual easement to work
4    here.  Don't worry about getting the permit."
5      Q.  All right.  Now, do you know what
6    Dennis said to the Corps to describe the scope
7    of the work that was contemplated on the, you
8    know, on the water side of the floodwall?  In
9    other words, do you know, did he tell you in
10   his conversation with you whether he told the
11   Corps whether they were going to excavate or
12   not excavate?
13     A.  Well, the Corps that I am referring
14   to are the client people who are intimately
15   familiar with this project as well.  They
16   helped us develop the work plans basically.
17   They helped -- They weighed in with their
18   comment response on the recommendations
19   report.  They weighed in with their comments
20   on the work plan.  So they were intimately
21   familiar with what we were going to be doing.
22     Q.  All right.  Well, let me just ask
23   you a few questions about that.  We have had a
24   chance to take some Corps employees and we
25   have learned a little bit about their

Page 195

1    organizational structure.  Do you know
2    anything about the organizational structure of
3    the New Orleans District of the United States
4    Army Corps of Engineers?
5      A.  Not a whole lot.  A little bit.
6      Q.  I guess I should have asked before I
7    asked that question, there are lots of offices
8    of the Corps.  Which particular office of the
9    Corps would have been the office that would
10   have reviewed all of these proposed work
11   orders and other documents that we have been
12   talking about all morning long?
13     A.  The -- Well, --
14        MS. WAGER-ZITO:
15          Objection, vague.
16          You can answer it.
17        THE WITNESS:
18          In Tulsa they had an HTRW group.
19        So they had a specific group.  Now, in
20        New Orleans, I apologize, I am not
21        that sure.  The guys we dealt with
22        were environmental type people like,
23        you know.  I mean, their charter was
24        remediation.  So I don't know if it
25        was an HTRW group within New Orleans,

Page 196

1    but clearly the projects they worked
2    were remediation type projects and it
3    was -- As you can see here, we have
4    got a letter from the Corps of
5    Engineers, you know.  This is
6    Operations Division.  Okay?  So yes,
7    there's a lot of different, you know,
8    organizations within the New Orleans
9    Corps, but the one we dealt with was
10   different than the one that wrote this
11   letter.
12   EXAMINATION BY MR. BRUNO:
13     Q.  Right.
14     A.  I guess that's the point.
15     Q.  Well, we have learned, for example,
16   that the Operations Division has within its
17   ambit of responsibility a permitting section.
18   And then there's another section which is in
19   charge of projects like the navigation lock
20   expansion project and that they're different
21   from each other.
22     A.  Okay.
23     Q.  But you're telling me you have no
24   real knowledge of how they're organized or how
25   they were organized back in the 2000-2001 time

Page 197

1    frame; right?
2      A.  Not -- Not a real in-depth, no.
3      Q.  Would you remember any names in
4    particular of Corps employees in the New
5    Orleans office that you, the WGI, would have
6    worked with in either with regard to this
7    permit or any of the approvals?
8      A.  As far as the people we dealt with
9    on our project, it was Lee Guillory and Jim
10   Montegut.  Jim was kind of the on-site guy,
11   the contracting officer's representative.  And
12   Jim was more kind of the engineer out of the
13   office.  I mean Lee Guillory.  I'm sorry.
14        MS. WAGER-ZITO:
15          You said Jim and Jim.
16        THE WITNESS:
17          Yeah, Lee Guillory was the
18        engineer out of the office.
19   EXAMINATION BY MR. BRUNO:
20     Q.  Right.  Okay.
21          (Whereupon a discussion was held
22        off the record.)
23   EXAMINATION BY MR. BRUNO:
24     Q.  All right.  So anyway, Dennis is
25   talking to somebody at the Corps, or do we

50  (Pages 194 to 197)

JOHNS PENDLETON COURT REPORTERS                          800 562-1285

STEPHEN CLAY ROE                                          4/17/2008

Page 198

1  know who he's talking to?
2      A.  Well, Lee Guillory is I believe the
3  one that he was primarily discussing on this
4  issue.
5      Q.  Okay.  And this was all in 2000?
6      A.  Yes.  Well, that was -- When this
7  was going on, we have an email from Lee when
8  we were in the summer of -- Well, this is 2001
9  time frame here.  Early 2001 when things were
10 really getting cranked up on site.
11     Q.  Right.  But you hadn't --
12     A.  But before -- the summer before when
13 we were doing the sampling, which is the first
14 thing we were actually allowed on site to
15 start drilling holes, Lee sent us -- Lee sent
16 Dennis an email saying "Don't worry about the
17 levee permit.  We have got a perpetual
18 easement on them."
19     Q.  So you think -- Have you seen that
20 email?
21     A.  Yes.
22     Q.  Okay.  So there's an email from
23 Guillory to O'Connor and it says "Don't worry
24 about the permit"?
25     A.  Something to that effect, yes.

Page 199

1      Q.  Now, in 2000 you all haven't dug the
2  first hole.  Right?
3      A.  Only to collect these samples, you
4  know.
5      Q.  You really didn't start pulling
6  piling and digging the holes to pull out the
7  lift station until much later.
8      A.  Right.  In the 2001 time frame --
9      Q.  2001?
10     A.  -- is when the real site work got
11 going.
12     Q.  And you didn't really have a chance
13 yet to do any of the geotechnical
14 investigation of the soils to ascertain
15 whether or not your cofferdams are going to
16 work right or not?  That hadn't happened yet?
17     A.  Right.
18     Q.  And it was before you all found out
19 that soils were so bad you had to kind of
20 change the way you were going to do the
21 cofferdams; right?
22     MS. WAGER-ZITO:
23         Objection.
24     THE WITNESS:
25         Well, I'm not familiar with that

Page 200

1      part of the work.  I wasn't there.
2  EXAMINATION BY MR. BRUNO:
3      Q.  So I'll ask somebody else that.  All
4  right.
5          Did you ever come to any
6  information about the soils being really bad
7  in that area?
8      A.  Bad in terms of what?
9      Q.  In terms of the work that you were
10 all were doing, excavating, putting up
11 cofferdams and the like, how it really made
12 the work more difficult generally.
13     A.  No, I left the project, but -- in
14 May of '01.  But up until that time, no, I
15 never heard of any issues.
16     Q.  All right.  Help me.  We'll have to
17 look through the documents to find the email.
18 Did you give me a date on this email?
19     A.  Summer of 2000.
20     Q.  Summer of 2000?
21     A.  Right.  I would estimate July,
22 something like that.
23     Q.  All right.
24     MR. BRUNO:
25         Counsel, do you have access to

Page 201

1  that?
2      MS. WAGER-ZITO:
3          Do I have access to it right
4  now?
5      MR. BRUNO:
6          No, no, no.
7      MS. WAGER-ZITO:
8          Yes.
9      MR. BRUNO:
10         In the world.
11     MS. WAGER-ZITO:
12         You have it.  It was --
13     MR. BRUNO:
14         I'm sure I do.  I'm sure I do as
15 I've told you.  Would you mind giving
16 me a copy?
17     MS. WAGER-ZITO:
18         Oh, we'll give you a copy.
19     MR. BRUNO:
20         All right.  Thanks.  All right.
21     MS. WAGER-ZITO:
22         Put it on the list.
23 EXAMINATION BY MR. BRUNO:
24     Q.  Do you know if the issue of
25 permitting was ever revisited after this

51 (Pages 198 to 201)

STEPHEN CLAY ROE                                          4/17/2008

Page 202

1  business of the language being reviewed by the
2  Law Department, by WGI?
3      A.  According to my discussion with
4  Dennis, it was pretty well put to bed in this
5  time frame of April, 2001 as far as the levee
6  permit.  That was -- That was the end.
7      Q.  All right.  I am a little bit
8  curious to know why it would be if in the
9  summer of 2000, Guillory says to O'Connor,
10  "Don't worry about a permit" that O'Connor
11  would write the letter to the Levee Board
12  after having received that email.  That is the
13  sequence of events, isn't it?
14      A.  Yes.  But the letter was sent to the
15  Levee Board to provide them with information
16  and so they knew the activities we'd be doing
17  on site and in the vicinity, and also I guess
18  there was some discussions about, you know,
19  mowing along the wall, the floodwall.  And so
20  there was discussion, there was this fear of
21  keep these guys informed, but they took that
22  to be, okay, well, now we need to send them
23  this permit application or whatever.  So --
24  But that wasn't the intent.
25      Q.  All right.  Well, I understand

Page 203

1  that.  But O'Connor took -- still felt
2  compelled, despite all of that, in other
3  words, --
4      A.  Uh-huh (affirmatively).
5      Q.  -- O'Connor now knows that the Corps
6  doesn't really care about a permit.  He's
7  written the Levee Board, quote, "putting them
8  on notice".  He's received, if not the letter,
9  some piece of paper that has some words on it
10  that he feels compelled to send to Legal --
11      A.  Right.
12      Q.  -- for them to evaluate in order for
13  him to sign another piece of paper.
14      A.  Uh-huh (affirmatively).
15      Q.  Why would he do all of that, if you
16  know, if he's been told don't bother with
17  permits in the first instance?
18      MR. EHRLICH:
19          Object to form.
20      THE WITNESS:
21          Well, if I was going to put
22      myself in his mind, if it were an easy
23      matter of, yeah, we'll sign the thing
24      and Legal agreed to it, then --
25  EXAMINATION BY MR. BRUNO:

Page 204

1      Q.  Why not?
2      A.  -- you know, why not.  But it
3  wasn't.
4      MR. BRUNO:
5          Before I take a break, let me
6      look at the notice real quick.
7  (Whereupon a discussion was held off the
8  record.)
9      MR. BRUNO:
10          What is 60?  I did mark them.
11      Typical.  60, page 2.  62 and 63?
12      MS. WAGER-ZITO:
13          62 and 63.
14      THE WITNESS:
15          The groundwater investigation?
16  EXAMINATION BY MR. BRUNO:
17      Q.  Yes.
18      A.  We already talked about --
19      Q.  We have already talked about it.
20      A.  Yeah.
21      Q.  I think what you have told me is
22  that you -- the only groundwater testing you
23  did was at the end of the project, and you
24  have described that to me.  Did you do any
25  other groundwater testing?

Page 205

1      A.  Not that I am aware of, no.
2      Q.  And you all didn't use any
3  potentiometric surface maps, did you?
4      A.  We, from the limited data that we
5  had, the report did draw up a potentiometric
6  surface map.  What I looked at is, you know, I
7  kind of felt like, you know, you got a bunch
8  of wells going this way (indicating) it's kind
9  of hard to -- not a whole lot of data points
10  to draw it, but there was an attempt to draw
11  it, yes.
12      Q.  But the purpose of that exercise was
13  to address the environmental issues as they
14  relate to water contamination; right?
15      A.  Yes.
16      Q.  But they would tell you something
17  about water flowing below the surface, would
18  they not?
19      A.  Yes.
20      Q.  And they did tell you that water was
21  flowing away from the canal landward, didn't
22  they?
23      A.  It appeared, yeah, that there was
24  higher levels closer to the canal than -- than
25  to the floodwall.

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

STEPHEN CLAY ROE                                               4/17/2008

Page 206

1    Q.  And --
2    A.  And --
3    Q.  -- to be specific, let me show you
4  WGI-81181 and WGI-81191.  See if that -- Those
5  are two different documents that happen to
6  have a staple.  Don't ask me why.
7        MR. JOANEN:
8        I stapled them together.
9  EXAMINATION BY MR. BRUNO:
10   Q.  There you go.
11   A.  Okay.
12   Q.  Have you seen either of those two
13  documents before?
14   A.  Yes.
15   Q.  Was the first time during your
16  preparation for this deposition?
17   A.  Yes.
18   Q.  All right.  Do you know if the
19  measurements of the flow were below eight
20  feet?
21   A.  You mean the water levels?  Where
22  the water levels --
23   Q.  That is the flow of water which is
24  being referenced.  It says "The current
25  groundwater flow information taken by WGI in

Page 207

1  May-June of '05 points to a flow away from the
2  canal."  That sentence in particular, --
3    A.  Right.
4    Q.  -- that's describing some
5  groundwater movement.
6    A.  We didn't measure flow.  We measured
7  water levels in the wells.  So if you have a
8  higher water level in a well that's further
9  away from the wall than another one that's
10  closer to the wall, that would indicate, you
11  know, a pressure gradient or a flow gradient
12  to go towards the wall.  That's all.
13   Q.  Okay.  I understand that.  But
14  regardless --
15   A.  And this was just one snapshot in
16  time.  And when I looked at the data, it was
17  kind of surprising that -- I was surprised
18  that there -- there was a significant
19  variation.  You know, I would have thought
20  that being that close to the canal, you know,
21  everything would be pretty close to the level
22  of the water in the canal.  But I guess these
23  soils are very tight and so there's not a
24  whole lot of conductivity between the canal
25  and the soils between the canal and the bank.

Page 208

1  So you get various levels apparently.
2    Q.  The question was, at what depth was
3  this measurement taken?
4    A.  Well, what you do when you install a
5  well down to a certain depth, and I would have
6  to look at the boring logs to figure out how
7  deep we installed it, you go down with a
8  little probe.  When it hits the water level,
9  it beeps and then you measure that and you
10  convert it to your feet above sea level.  So
11  you --
12   Q.  Do you know --
13   A.  You measured the water level at
14  which it was, and it seemed like the levels
15  that I saw were in the 1 to 3 or minus -- I
16  don't know.  Minus 3 below sea level.  It was
17  -- It was sea level plus or minus 3 feet,
18  something like that.
19   Q.  All right.  Just for completeness,
20  it says "Note that the 1997 report Groundwater
21  Flow Information, open paren, actually the
22  groundwater data, which collected in
23  1993/1992, question mark, close paren,
24  indicate the influence of the structures, open
25  paren, foundation of buildings, canal

Page 209

1  drainage, et cetera, close paren, present at
2  that time on the shallow GW flow".  Now, that
3  just sounds to me like somebody is measuring
4  groundwater flow.  But your testimony is
5  they're not measuring groundwater flow;
6  they're just able to interpolate the data to
7  come up with a flow?
8    A.  Interpret the gradient, yes.
9    Q.  So they're not measuring groundwater
10  flow?
11   A.  Right.  A potentiometric surface is
12  just like a map of -- you know, like a
13  topographic map of the water table.
14   Q.  And do you know what the purpose of
15  this information as conveyed by this email,
16  August 3, '05, is?
17   A.  Apparently it -- it had something to
18  do with determine this dilution factor.  The
19  DF.  And to be honest with you, it didn't make
20  a whole lot of sense to me, the DF-1 versus
21  DF-16.  And --
22   Q.  Okay.
23   A.  -- to be honest -- Yeah, I think
24  that was the context.  That if you read this,
25  it talks about if it's flowing one way, you

53 (Pages 206 to 209)

STEPHEN CLAY ROE                                                    4/17/2008

Page 210

1  can use a DF of 1; if you it's going the other
2  way, you use a DF of 16.  But unfortunately,
3  --
4      Q.  There it is.
5      A.  -- I probably don't understand it
6  any better than you do without talking to Mr.
7  Lesser.
8      Q.  Absolutely not.  That's why we have
9  experts.
10     A.  Yeah.
11     Q.  If you look at the next page, if you
12 don't mind.
13     MS. WAGER-ZITO:
14         Well, the next page of what we
15     have may be different than what you
16     were looking at.
17     MR. BRUNO:
18         WGI-081191.  I thought I handed
19     you a document.  I'm sorry.
20     MS. WAGER-ZITO:
21         You took it back.
22     MR. BRUNO:
23         Oh, I did?  Okay.
24     MS. WAGER-ZITO:
25         I gave him mine of 81, but I do

Page 211

1      not have 91.
2  EXAMINATION BY MR. BRUNO:
3      Q.  All right.  I am going to show this
4  to you then.  It says "Post NFAA TT
5  groundwater characterization report, Inner
6  Harbor Navigation Canal, East Bank Industrial
7  Area", and then it says AI-1398.  At the
8  bottom it says "Washington Group
9  International", page is page, August, '05 and
10 I think I already gave the Bates number.
11     A.  Okay.
12     Q.  And I have got the area that I want
13 to ask you about highlighted.
14     A.  Okay.
15     Q.  Do you know what that is?
16     A.  Yes.  We looked at that report
17 yesterday and we actually contacted the
18 geologist who drilled the wells and helped
19 prepare the report.
20     Q.  First, what is the report?
21     A.  The report is the final groundwater
22 investigation report to satisfy the recap, the
23 Louisiana State Environmental folks.
24     Q.  Okay.  And who did you contact?
25     A.  Ed Bielicki is our geologist back in

Page 212

1  Denver.
2      Q.  Did you confirm that he's the
3  gentleman that wrote that sentence?
4      A.  No.  I didn't ask about that
5  sentence.
6      Q.  All right.  Do we know who wrote
7  that sentence?
8      A.  No.
9      Q.  All right.  So why did you call Mr.
10 Bielicki on the phone?
11     A.  Because I was asked to testify on
12 this report.
13     Q.  Oh, all right.
14     A.  So I wanted to learn as much as I
15 could in a short period of time to be able to
16 discuss it.
17     Q.  All right.  Well, it says on this
18 piece of paper "The data indicate that
19 groundwater flows eastward from the canal.
20 The large embayment on the north end of the
21 site is likely due to large volume of soils
22 removed during remediation of Boland Marine."
23 Okay?  First of all, what is an embayment?
24     A.  I don't know.  When I looked at the
25 map there was kind of a lobe or something

Page 213

1  where the groundwater level kind of, instead
2  of following lines, it kind of took a jog.
3      Q.  Well, it says "The large embayment
4  is due to the large volume of soils removed."
5  Is it a hole?
6      MS. WAGER-ZITO:
7          It's "likely due to".
8      THE WITNESS:
9          Yes.  You know, that's where
10     you're digging out contaminated soil
11     --
12 EXAMINATION BY MR. BRUNO:
13     Q.  Sure.
14     A.  -- and you're replacing it with
15 backfill from the site.  But not necessarily
16 compacting it, you know, to a state in which
17 it was prior to the --
18     Q.  Before it was excavated?
19     A.  Before.  Before.
20     Q.  Right.
21     A.  Because again, the Corps, you know,
22 every -- you know, they weren't too concerned
23 about putting up a building on this site so
24 that there wasn't a stringent compaction
25 requirement.

54 (Pages 210 to 213)

STEPHEN CLAY ROE                                                    4/17/2008

Page 214

1    Q.  All right.  So the gentleman that
2  you spoke to, so that I can sort of, you know
3  -- he -- he's the fellow who just -- who did
4  -- took the well -- who drilled the wells?
5  Just help me understand.  What is his role
6  with this report?
7    A.  His role was to -- I think he and a
8  chemist, Rich Lesser -- and both of these
9  individuals have since left the company --
10  basically planned and implemented this little
11  assessment.  They worked with the driller.  Ed
12  actually, as the holes were drilled, he logged
13  the soils.  He created also a well log, you
14  know, of the actual monitoring well, collected
15  the samples.  Then we have a chemist who deals
16  with the lab and deals with the data.  And
17  those two individuals, between the chemistry
18  and the geology, you know, put together the
19  report.
20    Q.  Okay.  You have given us some idea
21  that you have some understanding of the way
22  water would move, because the soil wasn't
23  compacted enough.  Does that come just from
24  your experience of working with the company
25  all of these many years?

Page 215

1    A.  No, that was just my interpretation
2  of what they meant by that sentence that you
3  -- you read me.
4    Q.  Okay.
5    A.  That since the soil was disturbed in
6  essence, it wasn't in its native position and
7  that might have caused kind of an anomaly of
8  the water levels in that area.
9    Q.  All right.  Let's take a little
10  break and see if we are done.
11    A.  Okay.
12      VIDEO OPERATOR:
13        The time is 3:32.  We're now off
14    the record.
15      (Recess.)
16      VIDEO OPERATOR:
17        All right.  The time is 3:40.
18    We're now back on the record.
19  EXAMINATION BY MR. BRUNO:
20    Q.  Mr. Roe, let me show you this
21  document.  It is Bates numbered WGI-47665 in
22  seriatim to 47761.  I'm going to hand you the
23  rest of it, but I am going to show you the
24  cover sheet first so I can direct you to the
25  page that I am interested in.

Page 216

1    A.  Okay.  The recap submittal report
2  criteria document, June, 2000.
3    Q.  Okay?
4    A.  Okay.
5    Q.  And the particular page that I am
6  going to direct you to is page number 25,
7  paragraph 4.2.  And just read it over for me
8  and then I'll ask you some questions about
9  it.
10      MS. WAGER-ZITO:
11        Joe, I'm happy to have him do
12    that.  Just so you know, Mr. Staggs
13    was indicated for recap reports.  If
14    you want to ask him if he knows --
15      MR. BRUNO:
16        I am not really asking about --
17    you will find that I am not asking
18    about recap.
19      MS. WAGER-ZITO:
20        Okay.
21      MR. BRUNO:
22        I am asking, very candidly, about
23    sheet pile depth.
24      MS. WAGER-ZITO:
25        Okay.

Page 217

1      MR. BRUNO:
2        Which is referenced.
3      MS. WAGER-ZITO:
4        That's fine.  Again --
5      MR. BRUNO:
6        No, I am not interested.
7      THE WITNESS:
8        4.2 you said; right?
9  EXAMINATION BY MR. BRUNO:
10    Q.  Yes, sir.
11    A.  Okay.
12    Q.  All right.  Do you see there a
13  description of a sheet pile wall part of the
14  flood control project?
15    A.  Yeah.  It talks about the reaching a
16  depth of at least 25 feet.
17    Q.  Right.  And do you remember you and
18  I discussing early on in the deposition where
19  you looked at a document which suggested a
20  sheet pile depth of eight feet?
21    A.  Eight feet -- Actually, I guess it
22  was eight feet below sea level.
23    Q.  Exactly.  Do you believe that the 25
24  feet referenced here is equal to the eight
25  feet below sea level?

STEPHEN CLAY ROE                                                    4/17/2008

Page 218

1    A.  I don't know.  I might come to that
2   assumption --
3       Q.  Do we know?
4       A.  -- if the documents are accurate.
5       Q.  Yes.  Okay.  That would mean, let's
6   see now, --
7       A.  This --
8       Q.  -- that the --
9       A.  It doesn't -- something doesn't seem
10  right.
11      Q.  No, you would have to be about ten
12  feet below sea level right where the water is,
13  which is kind of hard to say.  But anyway, it
14  does say 25 feet deep; right?
15      A.  Yeah.
16      Q.  All right.  And, of course, there is
17  no --
18      A.  But I thought I saw a sketch that
19  said eight feet below sea level.
20      Q.  Oh, I know.
21      A.  And the site is pretty darn close to
22  sea level, I believe.
23      Q.  Right.  Exactly.  In any case, are
24  you aware of Washington Group International
25  believing that the sheet pile tip at the

Page 219

1   floodwall was 25 feet as opposed to eight?  Or
2   do you think it's the eight that you made
3   reference to?
4       A.  I can only be aware of what I just
5   read.
6       Q.  Okay.
7       A.  This was written by -- by our guys,
8   Dennis and Jim.
9       Q.  They both signed off on it, didn't
10  they?
11      A.  So -- Yes.
12      Q.  All right.  Well, let's see.
13  There's also a discussion in that paragraph
14  about the fact that the sheet pile cuts off
15  water movement.  Right?
16      A.  That's its purpose, I assume.
17      Q.  Okay.  And obviously if you --
18  there's some confusion about the depth of the
19  sheet pile tip and somebody's thinking that
20  it's cutting off the flow of water, then
21  somebody kinds of needs to figure it out to
22  make sure they got the right information.
23  Don't you agree?
24      A.  Well, again, we're only looking at
25  it from the standpoint of the recap.

Page 220

1       Q.  I understand.  Even if it's only
2   limited to that.  Let's assume --
3       A.  Correct.
4       Q.  -- that it's limited to nothing more
5   or less than recap.  Okay?
6       A.  Okay.
7       Q.  The paragraph seems to suggest that
8   the sheet pile is acting as a barrier or a dam
9   in the context of something that relates to
10  recap.  And all I am just asking you is, would
11  you agree with me that if that depth is
12  somehow related to its ability to block water
13  going from one side to the other, then it's a
14  good idea to ascertain what the correct sheet
15  pile tip depth is.  Wouldn't you agree?
16      A.  It's probably not necessary for the
17  purposes of just doing these tests to find out
18  if it's a drinker water aquifer or not a
19  drinking water aquifer.
20      Q.  Okay.
21      A.  Invariably geologists, when they
22  plot this data, they're going to have to make
23  some sort of statements about it, and that's
24  probably what they were doing, is, you know,
25  trying to draw some conclusions from what the

Page 221

1   map was telling them.
2       Q.  Well, at least as relates to
3   paragraph 62, which you have been designated
4   to talk about, would you agree with me that to
5   the extent that a sheet pile blocks underwater
6   flow, which is what 62 is about, --
7       A.  Right.
8       Q.  -- if somebody thinks it's 25 and is
9   drawing conclusions about underwater flow
10  based upon that assumption and in fact it's
11  not 25 feet, then it needs to be reevaluated?
12  Wouldn't you agree?
13      A.  Not necessarily.  Whether it's 25 or
14  eight below sea level, it would still have the
15  effect of, you know, -- You know, if the Corps
16  keyed that into some sort of formation that
17  would, you know, be less permeable to where,
18  you know, maybe it wouldn't matter if it's 25
19  or eight, you know, for the purposes of what
20  we're up to.
21      Q.  Well, did the Corps use 25 or eight?
22      A.  I don't know.
23      Q.  Did you use 25 or eight?
24      A.  Again, it wasn't really pertinent to
25  the job that we set out to do on the site.  It

STEPHEN CLAY ROE                                                    4/17/2008

Page 222

1   just happened to come up in the context of
2   potentiometric surface and what the data may
3   be telling you. I think they're more
4   concerned about, you know, when they talk
5   about point of compliance and the point of --
6   of exposure, you know, they're -- they're
7   trying to figure out if you have contaminants
8   on the site, which way are they going to end
9   up. It's going to end up in the canals they
10  said.
11      Q.  Right. Would you be surprised to
12  learn that one of the documents which forms a
13  part of those site specific documents that you
14  got references the 25 feet?
15      A.  No, I wouldn't be too surprised.
16      Q.  I'm sorry, I had it backwards.
17  Rather, eight feet, not 25 feet. Let me show
18  you. This is Mississippi River Gulf Outlet,
19  new lock and connecting channels, Appendix C,
20  part 2. Sampling and analysis report, SAR,
21  phase 2-A-2, HTRW investigation Inner Harbor
22  Navigation Canal, prepared by the Foundation
23  and Materials Branch and Hydraulics and
24  Hydraulic Branch Engineering Division, U.S.
25  Army Corps of Engineers, New Orleans District,

Page 223

1   1993.
2       MR. EHRLICH:
3          And this is specifically
4   referencing the work --
5       MR. BRUNO:
6          The statement of work.
7       MR. JOANEN:
8          That was provided.
9   EXAMINATION BY MR. BRUNO:
10      Q.  Look at page 2. See if you can't
11  just confirm that it makes a reference that
12  the sheet pipe tip is eight feet, not 25.
13      A.  Okay. Well, that's consistent with
14  the document I saw yesterday.
15      Q.  Right.
16      A.  This document you just gave me, I
17  don't recall seeing it before.
18      Q.  All right. Who would have drafted,
19  if you know, the recap statement report --
20  recap submittal report?
21      A.  Jim Blazek was the main guy dealing
22  with recap and his MMG folks. He had some
23  other individuals helping him with that back
24  in the office.
25      Q.  All right. Thank you.

Page 224

1          All right. Let me just ask you
2   about preparing for the deposition and we can
3   wrap this thing up. How many --
4       MS. WAGER-ZITO:
5          I don't know if you put those
6   Bates numbers in the record. I may
7   have missed it.
8       MR. BRUNO:
9          Would you like me to?
10         Just to be absolutely certain,
11  the document which has the title
12  "Mississippi River Gulf Outlet new
13  lock and connecting channels",
14  Appendix C, part 2, sampling and
15  analysis report, open paren SAR, close
16  paren, phase 2-A-2, HTRW
17  investigation, Inner Harbor and
18  Navigation Canal, northeast bank canal
19  disposal side, New Orleans, Louisiana,
20  prepared by the Foundation Materials
21  Division -- I'm sorry, Branch, and
22  Hydraulics and Hydraulic Branch,
23  Engineering Division, U.S. Army Corps
24  of Engineers, New Orleans District,
25  has Bates number WGI-245973 and the

Page 225

1   second page, which we showed the
2   witness, is page 29 of the report,
3   which is WGI-246010.
4          All right. Good?
5       MS. WAGER-ZITO:
6          Yes. Thank you.
7   EXAMINATION BY MR. BRUNO:
8       Q.  Let just ask a few more. Now, you
9   were asked by your company to act as a
10  corporate designee in the context of this
11  deposition. Right?
12      A.  Right.
13      Q.  All right. And they showed you the
14  paragraphs that they wanted you to speak to.
15  Right?
16      A.  Yes.
17      Q.  All right. What I would like to
18  know is what you did to prepare. Again, I am
19  doing this because as the designee, I want the
20  record to reflect the degree to which you made
21  an investigation, if any --
22      A.  Yeah.
23      Q.  -- in responding to my questions.
24  So first, when did you learn that you were
25  going to be the corporate designee?

57 (Pages 222 to 225)

STEPHEN CLAY ROE                                                    4/17/2008

Page 226

1     A.  Oh, geez.  Within the last month.
2     Q.  Okay.  When is the first time that
3  you met with anyone in order to address the
4  areas for which you would be testifying?
5     A.  Two weeks ago I believe I had a
6  conference call with these three ladies.
7     Q.  All right.  And how long did that
8  call take?
9     A.  An hour and a half, two hours.
10    Q.  And did you have in front of you the
11 Notice of Deposition so that you could
12 reference the paragraphs?
13    A.  Yes.
14    Q.  All right.  Did you indicate to them
15 what subjects you felt familiar with, or were
16 you directed to be the witness for a
17 particular paragraph?
18    A.  It was the latter, but I also, you
19 know, expressed any -- You know, they asked me
20 also, you know, "Do you feel comfortable with
21 these?  Do you have knowledge of these areas?"
22    Q.  So it was more like you were
23 elected, but --
24    A.  So a little of both.
25    Q.  But you had maybe --

Page 227

1     A.  Yeah, I had a little bit to say in
2  the matter.
3     Q.  Okay.  I'm hearing you.  All right.
4        Now, and in that call were you --
5  was anybody on the call not employed by WGI
6  other than the lawyers?
7     A.  No.  It was just me on the call.
8     Q.  Just you.  All right.  Now, did you
9  do any investigating yourself, looking for
10 documents, reading documents, calling folks on
11 the phone, in order to prepare yourself for
12 coming here today and acting as the corporate
13 representative?
14    A.  Well, I was sent some documents
15 because, you know, I long since purged my
16 files.
17    Q.  Sure.
18    A.  The company purged their files, you
19 know.  But, you know, I was sent some of the
20 documents that we have been through today and
21 others, and I did review some of those.
22    Q.  All right.
23    MR. BRUNO:
24       Let me ask Counsel to produce the
25    documents that the witness was shown

Page 228

1  in connection with his preparation for
2  the deposition.  You can just do it by
3  Bates numbers if you want.
4     MS. WAGER-ZITO:
5        All documents he was shown you
6  already have.  If any documents
7  refreshed his recollection, then we
8  can produce those to you, but
9  otherwise --
10    MR. BRUNO:
11       No, no, that's not the point.
12    MS. WAGER-ZITO:
13       The compilation that we put
14 together for him is privileged.
15    MR. BRUNO:
16       No, it's not.  You must be
17 kidding.  You are helping the witness
18 to prepare for a 30 (b)(6) corporate
19 witness deposition and you're
20 selecting the documents that you want
21 him to look at and then act as a
22 corporate rep, and you're telling me
23 that I can't have that?  We'll address
24 that with the Court.
25       So your position is that you will

Page 229

1  not give me the documents that you
2  showed the witness in preparation for
3  this deposition.  Correct?
4     MR. EHRLICH:
5        If he's been refreshed.
6     MS. WAGER-ZITO:
7        No, no, no, no.  I said if they
8  refreshed, we will give them to you.
9     MR. BRUNO:
10       Okay.
11    MS. WAGER-ZITO:
12       Absolutely.
13    MR. BRUNO:
14       So you will at least undertake
15 some analysis --
16    MS. WAGER-ZITO:
17       Yes.
18    MR. BRUNO:
19       -- on the refreshing business?
20    MS. WAGER-ZITO:
21       Yes.
22    MR. BRUNO:
23       Will you do a privilege log so we
24 can make life easier for the Judge?
25    MS. WAGER-ZITO:

STEPHEN CLAY ROE                                                    4/17/2008

Page 230

```
1        A privilege log of what?
2        MR. BRUNO:
3        Of the documents that I have
4   requested that you produce.
5        MS. WAGER-ZITO:
6        Then why don't I give you the
7   documents if we're going to put them
8   on a privilege log, Joe?
9        MR. BRUNO:
10       Well, I would think that's the
11  way to do it, but if you want to put
12  it under seal, I don't care.
13       MS. WAGER-ZITO:
14       We will take this --
15       MR. BRUNO:
16       The Judge has to have something
17  to look at, you know.
18       MS. WAGER-ZITO:
19       We will take this under
20  advisement and I don't know that we
21  need to keep this fight in front of
22  the witness.
23       MR. BRUNO:
24       I know.  I would give you mine.
25  I could care less.  But apparently you
```

Page 231

```
1   have some concern about showing me
2   documents that you showed the witness
3   to prepare for a 30 (b)(6) deposition
4   notice, which is extraordinary, but
5   that's okay.
6   EXAMINATION BY MR. BRUNO:
7       Q.  Did you pull any documents
8   yourself?
9       A.  No, like I said, the documents had
10  been purged from our -- you know, they're
11  off-site.
12      Q.  A simple question, yes or no.  Did
13  you pull --
14      A.  No.
15      Q.  How easy is that?
16      A.  No.
17      Q.  Okay.  Now, did you call anybody on
18  the phone?  We know you spoke to Mr.
19  O'Connor.  Right?
20      A.  Right.
21      Q.  And you also called the gentleman --
22      MS. WAGER-ZITO:
23      Mr. Bielicki.
24      THE WITNESS:
25      Mr. Bielicki.
```

Page 232

```
1   EXAMINATION BY MR. BRUNO:
2       Q.  Right.  And that was done at your
3   suggestion or was that done at Counsel's
4   suggestion?
5       A.  Counsel's suggestion.
6       Q.  All right.  Did you call anybody on
7   your own that you felt would help you prepare
8   for today?
9       A.  No.
10      Q.  Now, when you were on the phone with
11  Mr. -- Please forgive me.
12      MS. WAGER-ZITO:
13      Bielicki.
14  EXAMINATION BY MR. BRUNO:
15      Q.  Bielicki.  Is he employed by WGI
16  today?
17      A.  No.
18      Q.  Was he employed by WGI when you
19  spoke to him on the phone with Counsel
20  present?
21      A.  No.
22      Q.  All right.  Anybody else?  Did you
23  call anybody else at the behest of Counsel?
24      A.  No.
25      Q.  All right.
```

Page 233

```
1       MR. BRUNO:
2       With that, thank you very much,
3   sir.  I appreciate your time.  I
4   really do.
5       THE WITNESS:
6       Okay.
7       MR. BRUNO:
8       And your patience with us.
9       THE WITNESS:
10      All right.
11      VIDEO OPERATOR:
12      This concludes the deposition.
13  The time is 3:55.  We are now off the
14  record.
15          *   *   *
16
17
18
19
20
21
22
23
24
25
```

                                        59 (Pages 230 to 233)

STEPHEN CLAY ROE                                                          4/17/2008

Page 234

```
 1
 2              WITNESS'S CERTIFICATE
 3
 4        I, STEPHEN CLAY ROE, read or have
 5   had the preceding testimony read to me, and
 6   hereby certify that it is a true and correct
 7   transcription of my testimony, with the
 8   exception of any attached corrections or
 9   changes.
10
11
              _____
12              (Witness' Signature)
13   _____
     DATE SIGNED
14
15   DEPONENT PLEASE INITIAL ONE:
16
     _____ Read with no corrections
17
18   _____ Read and correction sheet attached
19
20
     DATE TAKEN:  APRIL 17, 2008
21
22
23
24
25
```

Page 235

```
 1
 2              REPORTER'S CERTIFICATE
 3
 4        I, ROGER D. JOHNS, RMR, RDR, CRR,
 5   Certified Court Reporter, do hereby certify
 6   that the above-named witness, after having
 7   been first duly sworn by me to testify to the
 8   truth, did testify as hereinabove set forth;
 9   that the testimony was reported by me in
10   shorthand and transcribed under my personal
11   direction and supervision, and is a true and
12   correct transcript, to the best of my ability
13   and understanding; that I am not of counsel,
14   not related to counsel or the parties hereto,
15   and not in any way interested in the outcome
16   of this matter.
17
18
19
20              ROGER D. JOHNS
21         CERTIFIED COURT REPORTER
22            STATE OF LOUISIANA
23
24
25
```

60  (Pages 234 to 235)