# EXHIBIT 21

# Cofferdam Installation and Concrete Foundation Removal Final Work plan

Prepared for

Washington Group International, Inc.

Inner Harbor Navigational Canal, East Bank Project

New Orleans, LA

Prepared by:

Hamp Construction L.L.C

December 6, 2001



EXHIBIT

15

WGI039041

# CONCRETE FOUNDATION REMOVAL AND COFFERDAM WORKPLAN

All work that Hamp's intends to perform for the IHNC project shall be in accordance with the WGINT Request for proposal No., XL1-4423-SC524 Scope of Work and all applicable city, State and federal regulations, and all local codes.

Work to be performed at the EBIA project includes concrete anchor pad removal, and timber pile removal. In addition, concrete and /or material removed from foundation excavations will be consolidated, and loaded out into end dump trucks for subsequent offsite disposal.

Hamp's understands that foundation anchor pad removal operations will be performed at the Boland Marine site. The following activities will take place during the foundation removal operations:

- Installation of Sheet pile Coffer Dam
- Break/Remove Concrete Foundations
- Piling Removal
- Backfill Excavation

## Installation of Sheet pile Cofferdam – (Southern Block)

Due to the depth and the subgrade soil conditions around the southern block foundation, Hamp's is proposing to install a sheet pile cofferdam around the foundation prior to initiating concrete demolition operations. The cofferdam will be constructed by driving 60'Frodingham 4N (Grade 50) sheet pile around the perimeter of the southern block. The sheetpile will be supported with horizontal whalers and struts at elevations -9, -16, -23 and -30 (if necessary). The proposed cofferdam dimensions will be 41.0 feet by 36.5 feet square and will be installed to facilitate removing concrete and any potential pilings that may be encountered to a depth of -35 feet MSL. A copy of the cofferdam design is attached for your review and approval.

### Crew Size and Equipment Resources

| Sheet pile Cofferdam Installation | |
|---|---|
| Crew | Equipment |
| 1-Supervisor | N/A |
| 1 – Foreman | N/A |
| 1 – Operator | 110 –Ton Crane w/Pile Driver |
| 3 – Pile drivers/Welders | Welding Machines |

WGI039042

## Break/Remove Concrete Foundations

Hamp's will utilize an excavator equipped with a 7000 lb hydraulic hammer to break the concrete foundations. A second excavator equipped with a bucket will be used to remove the broken pieces of concrete from the excavation.

As the broken concrete is removed from the excavations, Hamp's will load the concrete into haul trucks for transport to a local concrete recycler. Any steel encountered during demolition operations will be removed from the excavation and loaded into haul trucks for transportation to a local metal recycler.

Due to the depth of the Southern block foundation, Hamp's is anticipating that we will encounter groundwater intrusion during demolition operations. As a result, we will use a 6X6 centrifugal pump to dewater the excavation. The water will be pumped out of the excavation.

### Crew Size and Equipment Resources

| Concrete Foundation Removal | |
|---|---|
| **Crew** | **Equipment** |
| 1 – Foreman | N/A |
| 2 – Operator | PC-270 or Equivalent & PC-400 w/Attachments |
| 1 - Laborer | N/A |

## Piling Removal

After the concrete foundations have been removed, Hamp's will be prepared to remove pilings that may be present at the base of the excavations. Hamp's assumes that if piles are present they will be timber piles and the size will be approximately 18 to 24 inches in diameter and 15 to 45 feet in vertical length. Extraction procedures to be implemented in the field are as follows:

Prior to extracting woodpiles, we will expose at least 2 feet of all timber piles with the excavator. Using either the PC 400 or the LS-418 110 Ton crane equipped with a MKT V5C hydraulic vibratory woodpile extractor attachment, the timber piles will be removed. In the event we have problems extracting any given pile, an effort shall be made for up to a maximum of 20 minutes extraction time per pile. In the event we cannot extract the pile after the 20 minutes, then the pile will be marked or flagged so WGINT can survey the pile location(s).

WGI039043

The extracted timber piles will be staged for testing by WGINT.  Assuming the timber piles are non-hazardous, they will be loaded onto 40-cubic yard dump trucks and transported to the Jefferson parish landfill facility.

### Crew Size and Equipment Resources

| Timber Pile Removal | |
|---|---|
| **Crew** | **Equipment** |
| 1 – Foreman | N/A |
| 1 – Operator | PC400 or 110 Ton crane w/Pile Extractor |
| 2 – Laborers | Misc. Equipment |

**Backfill Excavations**

Immediately following pile extraction operations, the excavations will be backfilled with either import sand or onsite borrow back to original grade.

During backfill operations of the southern block excavation, the whalers and struts associated with the cofferdam will be extracted.  The sheetpile will be removed upon completion of backfill operations.

### Crew Size and Equipment Resources

| Backfill Excavations | |
|---|---|
| **Crew** | **Equipment** |
| 2 – Operator | PC –270 & Dozer |
| 1 – Laborer | N/A |

# Sequence of Operations for Concrete Foundation (South Pad)
# Cofferdam Installation and Concrete Removal

### Site Degrading
- Excavate area around South Pad with PC 400 Excavator.  From existing grade ~ EL 3.8, area around south pad will be degraded approximately 5 feet.

### Sheetpile Installation
- Layout Cofferdam template
- Drive 60' Sheet piles around perimeter of template
- Survey to confirm proper elevation of EL – 1.5

### Cofferdam Excavation
- Excavate soil around the outside perimeter of the cofferdam as required to an approximate elevation EL. – 3.0.
- Excavate soil; remove steel sheeting and break/remove concrete from the inside of the cofferdam to an EL. – 9.0.
- Excavate soil; remove steel sheeting and break/remove concrete from the inside of the cofferdam to an EL. – 16.0.
- Excavate soil; remove steel sheeting and break/remove concrete from the inside of the cofferdam to an EL. – 23.0.
- Excavate soil, remove steel sheeting and break/remove concrete from the inside of the cofferdam to an EL. – 30.0  (if necessary)
- Survey to confirm bottom elevation after each excavation series.

### Whaler Installation
- Install 27" Whalers inside the perimeter of the cofferdam.  Shim, brace and tack weld whalers to the sheet piling.
- Install 15" corner braces in each corner of the cofferdam.
- Install 14" struts on center both ways within the cofferdam connecting to the whalers
- ✓ The aforementioned steps will be followed for each EL requiring whalers

WGI039045

## Cofferdam Excavation
- Excavate soil; remove steel sheeting and break/remove concrete within the cofferdam as required to remove Concrete Foundation, Pile Caps and Timber Piles. Excavation bottom will be at EL. – 23.0 for base bid and if necessary EL – 34 for option.
- Stockpile excavated soil outside the limits of the excavation.

## Pile Cap/Timber Pile Removal
- Remove pile caps from atop timber piles.
- Remove timber pile from bottom of excavation.

## Cofferdam Backfilling
- Backfill excavation with previously excavated soil in 2' lifts.
- Initial backfill operations will be to the bottom of the whalers inside the cofferdam.
- Complete backfilling to top of sheet piles with material to be provided by WGI after whalers are removed.

## Whaler Removal
- Remove corner bracing, struts and whalers from inside cofferdam.

## Sheetpile Removal
- Once backfilling operations reach top of steel piles, steel piling will be removed with the crane equipped with a vibratory pile extractor.

## Cofferdam Backfilling
- Complete backfilling to grade with material to be provided by WGI.

WGI039046

# Concrete Foundation (South Pad) Cofferdam Installation and Concrete Removal Safety Plan

## Cofferdam Installation

For Crane working hours we estimate that 80 to 85% of the work will be duty cycle work and 15 to 20% will be non-duty cycle work.

When non-duty cycle work is being performed, the following will be implemented in order to satisfy EM385-1-1 paragraph 16.D.05 (b).

1. International orange colored warning tape will be secured to the hoist line of the crane at a distance of 8 to 10 feet above the rigging.
2. a signal person will be identified and act as a spotter to alert the crane operator with a "stop" signal when the warning device approaches the boom tip at which time the crane operator will cease the lifting of the load.
3. during non-duty lifting, the signal person will have no other responsibilities.

Non-duty cycle lifts will include the following:
Unloading of Trucks
Setting/Removing of Whalers
Installation/Removal of Sheet pile

During these activities, all non-duty cycle work will be followed in accordance with EM385-1-1 requirements.

Adequate space will be provided for the staging of sheet piles. Driver safety rules will be observed at all times. Use of pelican hooks is the preferred method of offloading sheets. Vibro-hammer clamps will be inspected on a daily basis. Lifting sheets may require tag lines to aid in the alignment of interlocks. Under no circumstance will unauthorized personnel be allowed in the drop zone while sheet installation is taking place.

In accordance with USACE sheetpile specifications usually located in section 02411 or 02412, to the extent possible piles will be driven completely with the exception of the last two pair of piles in order to facilitate the lining up and starting of to next pile. Staggering of the two previous pair

of piles is required in order to prevent ceasing of interlocks and to ensure that during installation operations piles remain plume.

The crane boom will be lowered at the end of each workday.

## Excavation

Prior to excavation greater than four feet deep, the CSSHO or other must prepare an excavation permit designated person. Excavation will be facilitated by use of a PC 400 hydraulic excavator. Initial excavation will be to a depth of approximately nine feet. Spoils will be placed approximately twenty feet away from the excavation. Common safety practices will be in place while working near heavy equipment.

## Excavation Inspection

Excavation competent persons will perform excavation inspections on a daily basis. At least one excavation competent person will be present during excavation operations. Initial inspection will occur daily prior to the start of excavation work and at a frequency deemed necessary by ongoing operations. Inspection reports will be kept at the job site throughout the duration of each shift. Harry Foreman will be excavation competent person for this phase of the work. Attached please find a copy of the Excavation Inspection checklist for your review. (Attachment D)

## Installation of Whalers

During whaler installation activities, Whalers will be rigged for lifting in a manner that insures a balanced load. Tag lines will be used. Only authorized personnel will be allowed in the excavation during the positioning of the whalers and during welding operations, but not until all Permit Confined Space Provisions are satisfied. Hot work permits will be required when welding or cutting operations take place.

Under no circumstance will personnel be allowed to be under beams while beams are being supported by crane. This will be avoided by lowering the whaler into place with the crane. The whaler will be lowered into the cofferdam. Once lowered into place, the top of the whaler will be shimmed, braced and welded to the sheet pile.

WGI039048

## Air Monitoring

All personnel (confined space entrants) will be equipped with multi gas monitors. These monitors sample on a continuous basis. Prior to and as part of Confined Space permit requirements; the entry supervisor will monitor the space for oxygen percent, combustible gas percent and toxic vapor ppm. Frequency of monitoring will be determined by initial readings. Confined Space Entry Supervisor will determine time intervals between air monitoring. (See Attachment D - Permit Example)

## Site Access Control

A restricted area will be established around the work site to prevent unauthorized persons from entering the work zone. Adequate space will be required for equipment staging, lifting/lay down of sheets, etc. The restricted area will be erected using t-post and snow fence. At the end of each work shift, the excavation will be barricaded using orange snow fence.

## Rescue

All personnel entering the confined space will be required to wear a full body harness. A retrieval system will be available at all times in the event personnel retrieval becomes necessary. Entrants will also utilize 5-minute escape SCBA's in the event the air monitoring indicates a hazardous atmosphere. No site personnel will conduct entry for the purpose of rescue. The New Orleans Fire Department will be notified prior to entry and may be available to provide rescue personal and equipment. In addition, they have been offered an opportunity to conduct an inspection of the cofferdam prior to the first entry.

WGI039049

# EXHIBIT 22

GUILLORY (VOL II), LEE

8/22/2008

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE: KATRINA CANAL BREACHES      CIVIL ACTION

CONSOLIDATED LITIGATION            NO. 05-4182 K2

JUDGE DUVAL

PERTAINS TO:  MRGO AND ROBINSON

(No. 06-2268)


(V O L U M E   II)

Rule 30(b)(6) deposition of THE UNITED

STATES OF AMERICA, BY AND THROUGH THE UNITED

STATES ARMY CORPS OF ENGINEERS' DESIGNEE LEE

GUILLORY, given at the U.S. Army Corps of

Engineers New Orleans District offices, 7400

Leake Avenue, New Orleans, Louisiana

70118-3651, on August 22nd, 2008.


REPORTED BY:

JOSEPH A. FAIRBANKS, JR., CCR, RPR

CERTIFIED COURT REPORTER #75005

| Page 2 |
|---|
| 1   APPEARANCES: |
| 2   REPRESENTING THE PLAINTIFFS: |
| 3        BRUNO & BRUNO |
| 4        (BY:  JOSEPH M. BRUNO, ESQUIRE) |
| 5        (BY:  SCOTT JOANEN, ESQUIRE) |
| 6        855 Baronne Street |
| 7        New Orleans, Louisiana 70113 |
| 8        504-525-1335 |
| 9 |
| 10  REPRESENTING THE UNITED STATES OF AMERICA: |
| 11       UNITED STATES DEPARTMENT OF JUSTICE, |
| 12       TORTS BRANCH, CIVIL DIVISION |
| 13       (BY:  RICHARD STONE, ESQUIRE) |
| 14       (BY:  PAUL LEVINE, ESQUIRE) |
| 15       P.O. Box 888 |
| 16       Benjamin Franklin Station |
| 17       Washington, D.C. 20044 |
| 18       202-616-4289 |
| 19 |
| 20  REPRESENTING THE U.S. ARMY CORPS OF ENGINEERS. |
| 21       CORPS OF ENGINEERS, OFFICE OF COUNSEL |
| 22       (BY:  DAVID DYER, ESQUIRE) |
| 23       7400 Leake Avenue |
| 24       New Orleans, Louisiana 70118-3651 |
| 25       504-862-2843 |

| Page 3 |
|---|
| 1   REPRESENTING WASHINGTON GROUP INTERNATIONAL: |
| 2        JONES DAY |
| 3        (BY:  DEBRA S. CLAYMAN, ESQUIRE) |
| 4        (BY:  ADRIAN WAGER-ZITO, ESQUIRE) |
| 5        (BY:  CHRISTOPHER N. THATCH, ESQUIRE) |
| 6        51 Louisiana Avenue, N.W. |
| 7        Washington, D.C. 20001-2113 |
| 8        202-879-3939 |
| 9   - AND - |
| 10       STONE PIGMAN WALTHER WITTMANN, L.L.C. |
| 11       (BY:  WILLIAM D. TREEBY, ESQUIRE) |
| 12       546 Carondelet Street |
| 13       New Orleans, Louisiana 70130 |
| 14       504-581-3200 |
| 15 |
| 16  ALSO PRESENT: |
| 17       JOHN L. ROBERT, III, ESQ., RICHARD |
| 18  PAVLICK, ESQ., PHILIP WATSON, ESQ., |
| 19  NICOLE BOYER-DUPLASS, ESQ., DARCY DECKER, ESQ., |
| 20  MATTHEW CLARK, ESQ. |
| 21 |
| 22  PRESENT VIA I-DEP: |
| 23       ERIC GOLDBERG, ESQ., CHRISTOPHER |
| 24  ALFIERI, ESQ. |
| 25  VIDEOGRAPHER: GILLEY DELORIMIER (DEPO-VUE) |

| Page 4 |
|---|
| 1        E X A M I N A T I O N   I N D E X |
| 2 |
| 3   EXAMINATION BY:                        PAGE |
| 4 |
| 5   MS. CLAYMAN  ................................9 |
| 6   MR. BRUNO    ............................211 |
| 7   MS. CLAYMAN  ............................252 |
| 8        E X H I B I T   I N D E X |
| 9 |
| 10  EXHIBIT NO.                          PAGE |
| 11  Defendant's Exhibit 10 ......................9 |
| 12  Defendant's Exhibit 11 ....................10 |
| 13  Defendant's Exhibit 12 ....................21 |
| 14  Defendant's Exhibit 13 ....................33 |
| 15  Defendant's Exhibit 14 ....................41 |
| 16  Defendant's Exhibit 15 ....................44 |
| 17  Defendant's Exhibit 16 ....................51 |
| 18  Defendant's Exhibit 17 ....................58 |
| 19  Defendant's Exhibit 18 ....................61 |
| 20  Defendant's Exhibit 19 ....................64 |
| 21  Defendant's Exhibit 20 ....................65 |
| 22  Defendant's Exhibit 21 ....................67 |
| 23  Defendant's Exhibit 22 ....................68 |
| 24  Defendant's Exhibit 23 ....................70 |
| 25  Defendant's Exhibit 24 ....................71 |

| Page 5 |
|---|
| 1   Defendant's Exhibit 25 ....................74 |
| 2   Defendant's Exhibit 26 ....................77 |
| 3   Defendant's Exhibit 27 ....................79 |
| 4   Defendant's Exhibit 28 ....................81 |
| 5   Defendant's Exhibit 29 ....................84 |
| 6   Defendant's Exhibit 30 ....................86 |
| 7   Defendant's Exhibit 31 ....................89 |
| 8   Defendant's Exhibit 32 ....................95 |
| 9   Defendant's Exhibit 33 ....................96 |
| 10  Defendant's Exhibit 34 ....................98 |
| 11  Defendant's Exhibit 35 ..................101 |
| 12  Defendant's Exhibit 36 ..................104 |
| 13  Defendant's Exhibit 37 ..................106 |
| 14  Defendant's Exhibit 38 in globo ..........109 |
| 15  Defendant's Exhibit 39 ..................110 |
| 16  Defendant's Exhibit 40 ..................111 |
| 17  Defendant's Exhibit 41 ..................113 |
| 18  Defendant's Exhibit 42 ..................114 |
| 19  Defendant's Exhibit 43 ..................116 |
| 20  Defendant's Exhibit 44 ..................119 |
| 21  Defendant's Exhibit 45 ..................121 |
| 22  Defendant's Exhibit 46 ..................122 |
| 23  Defendant's Exhibit 47 ..................123 |
| 24  Defendant's Exhibit 48 ..................124 |
| 25  Defendant's Exhibit 49 ..................126 |

GUILLORY (VOL II), LEE

8/22/2008

Page 6

1   Defendant's Exhibit 50 in globo ............128
2   Defendant's Exhibit 51 ....................130
3   Defendant's Exhibit 52 ....................133
4   Defendant's Exhibit 53 ....................133
5   Defendant's Exhibit 54 ....................134
6   Defendant's Exhibit 55 ....................135
7   Defendant's Exhibit 56 ....................136
8   Defendant's Exhibit 57 ....................143
9   Defendant's Exhibit 58 ....................145
10  Defendant's Exhibit 59 ....................147
11  Defendant's Exhibit 60 ....................149
12  Defendant's Exhibit 61 ....................150
13  Defendant's Exhibit 62 ....................155
14  Defendant's Exhibit 63 ....................165
15  Defendant's Exhibit 64 ....................166
16  Defendant's Exhibit 65 ....................167
17  Defendant's Exhibit 66 ....................169
18  Defendant's Exhibit 67 ....................178
19  Defendant's Exhibit 68 ....................182
20  Defendant's Exhibit 69 ....................186
21  Defendant's Exhibit 70 ....................190
22  Defendant's Exhibit 71 ....................191
23  Defendant's Exhibit 72 ....................194
24  Defendant's Exhibit 73 ....................197
25  Defendant's Exhibit 74 ....................198

Page 7

1   Defendant's Exhibit 75 ....................203
2   Defendant's Exhibit 76 ....................204
3   Defendant's Exhibit 77 ....................207
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 8

1              S T I P U L A T I O N
2          IT IS STIPULATED AND AGREED by and
3   among counsel for the parties hereto that the
4   deposition of the aforementioned witness may be
5   taken for all purposes permitted within the
6   Federal Rules of Civil Procedure, in accordance
7   with law, pursuant to notice;
8          That all formalities, save reading
9   and signing of the original transcript by the
10  deponent, are hereby specifically waived;
11         That all objections, save those as to
12  the form of the question and the responsiveness
13  of the answer, are reserved until such time as
14  this deposition, or any part thereof, is used
15  or sought to be used in evidence.
16
17
18              *  *  *
19
20
21
22         JOSEPH A. FAIRBANKS, JR., CCR, RPR,
23  Certified Court Reporter in and for the State
24  of Louisiana, officiated in administering the
25  oath to the witness.

Page 9

1
2              LEE GUILLORY
3   USACE-NOD, 7400 Leake Avenue, New Orleans,
4   Louisiana 70118, a witness named in the above
5   stipulation, having been first duly sworn, was
6   examined and testified on his oath as follows:
7   EXAMINATION BY MS. CLAYMAN:
8      Q.  Hi, I'm Debra Clayman.
9          MS. CLAYMAN:
10             And I'm going to start by just
11     asking counsel to go around.
12         MR. STONE:
13             You don't need to, go right
14     ahead.
15  EXAMINATION BY MS. CLAYMAN:
16     Q.  I'd like to mark the first exhibit
17  which is Guillory Exhibit Number 10, and it's
18  just the Notice of Continued Videotaped Federal
19  Rule 30(b)(6) Deposition of Lee Guillory.
20         (Defendant's Exhibit 10 was marked for
21  identification and is attached hereto.)
22     A.  Okay.
23  EXAMINATION BY MS. CLAYMAN:
24     Q.  I'm going to mark the next exhibit is
25  going to be Guillory Exhibit 11.  It is Bates

3  (Pages 6 to 9)

GUILLORY (VOL II), LEE

8/22/2008

Page 10

1    numbered OFP-066-00001504.  And it is undated
2    and it says Mr. Lee Guillory, P.E. on top.
3    Mr. Guillory, do you recognize this document?
4        (Defendant's Exhibit 11 was marked for
5    identification and is attached hereto.)
6        MR. BRUNO:
7            May I see it please, first, if
8        you don't mind?
9    A.  Yes, I do.  This is a summary of my
10   experience, probably over twenty years now,
11   I've been with the Corps twenty-five and a half
12   years.
13   EXAMINATION BY MS. CLAYMAN:
14   Q.  Did you write this summary?
15   A.  Yes, I did.  It was part of a job
16   application.  It's called a knowledge, skills
17   and abilities, that supplements a job
18   application.
19   Q.  Do you remember what the approximate
20   date of this is?
21   A.  Let's see.  What job is this?  I would
22   estimate this was probably August of 2001.
23   Q.  Do you believe everything in this
24   document is accurate?
25   A.  Yes.

Page 11

1    Q.  Okay.  I want to direct your attention
2    to the paragraph -- the second paragraph on the
3    page that's labeled response to Number 1.
4    A.  Sure.
5    Q.  And five lines down it says, the most
6    rewarding experience has been as FTL and
7    assistant FTL on the IHNC lock replacement
8    project from 15 September 98 to present.  This
9    assignment has included intense coordination
10   meetings with the PPPMD senior project managers
11   for S&A cost estimates, contract work placement
12   estimates, budgeting and scheduling for
13   inclusion in annual project ex execution plans.
14       What does FTL mean?
15   A.  An FTL is a functional team leader.
16   Q.  And is that similar to a construction
17   manager?  What is the significance of
18   functional team leader?
19   A.  The significance of it is that an FTL
20   is the representative for the division that you
21   work in.  For instance, I was a member of the
22   project delivery team for the IHNC replacement
23   project, and as an FTL I represented
24   construction division on that team.
25   Q.  Is Task Order No. 26 part of the IHNC

Page 12

1    lock replacement project?
2    A.  Yes.
3    Q.  But there's more to it than just Task
4    Order No. 26?
5    A.  Absolutely.
6    Q.  What else was included?
7    A.  The whole gamut of all the major
8    contracts that were to be designed and
9    advertised and awarded for construction of the
10   IHNC lock, anything from dredging of the new
11   lock channels, construction of the lock
12   structure, the guide walls, um -- everything
13   you can imagine with a major navigation lock.
14   Q.  Was there levees and floodwalls
15   included in the lock replacement project?
16   A.  Absolutely.  The levees and floodwalls
17   adjacent to the IHNC were to be rebuilt and
18   realigned to tie into the new structure.
19   Q.  Were you involved in the design or
20   planning of the new levees and floodwalls?
21   A.  No.
22   Q.  Why did you characterize your
23   experience as FTL on the IHNC lock replacement
24   project as the most rewarding?
25   A.  Because it was a very challenging and

Page 13

1    rewarding situation to be involved with the
2    twenty-something person team that made up the
3    PDT led by senior project manager Joe Dicharry,
4    and to be intimately involved from the summer
5    of 1998 through August of 2005.
6    Q.  Were you involved at all during this
7    time in the selection of the site for the
8    bypass channel that was going to be dredged in
9    connection with the lock replacement project?
10   A.  No, the lay in and transit bypass
11   channels, preliminary designs were done on
12   those and included in the 1997 volumes of
13   reports on the MRGO and IHNC lock replacement
14   project.
15   Q.  So you were not involved in them.
16   A.  No.  This was done prior to my
17   involvement on the team.
18   Q.  Okay.  Directing your attention to the
19   next paragraph, it says I have been involved in
20   the design phases of projects both as a design
21   engineer in engineering division 's levees
22   section for a six-month ACTEDS assignment and
23   as a civil engineering specialist conducting
24   pre-design site visits, performing multiple
25   design reviews, and attending meetings with NOD

4  (Pages 10 to 13)

GUILLORY (VOL II), LEE

8/22/2008

Page 14

1   and architect/engineer (A/E) design firms.
2       First of all, can you tell me what
3   ACTEDS is?
4       A.   ACTEDS is an acronym.  I can't
5   remember the exact words for it, but it's a
6   developmental training assignment where we can
7   cross-train between our various technical
8   divisions here at New Orleans District anywhere
9   from six months to one year at a time.  And in
10  March -- no, October, '91, to March, '92, I
11  performed a six-month assignment as a design
12  engineer in engineering division, levee
13  section, designing contracts to be advertised
14  and awarded in the Atchafalaya Basin levee
15  system.
16      Q.   And did you say designing contracts?
17      A.   Yes, ma'am.  Preparing the plans and
18  specifications, drawings and acquiring the
19  right of way and getting the contract
20  advertised and awarded.
21      Q.   And what kind of levees or floodwalls
22  were you involved in designing?
23      A.   These were just strictly earthen
24  levees in the Atchafalaya Basin system.
25      Q.   Were they hurricane protection?

Page 15

1       A.   No.  These are river levees.
2       Q.   Moving to the next sentence, it says,
3   during construction phases I am responsible for
4   keeping superiors apprized of any contractual
5   problems or conflicts and serving as technical
6   advisor to the area resident office field
7   staff.
8       Is this construction phase tied into
9   your six-month assignment in the levees
10  section?
11      A.   No.  That was my duties mainly as a
12  civil engineer in the quality assurance branch
13  of construction division.
14      Q.   When was that?
15      A.   It varied in several different phases
16  but it started in January of 1990 through May
17  of 2006.
18      Q.   And tell me what levees you've worked
19  on between January, 1990 and May, 2006.
20      A.   I did buildability, constructability,
21  operability and environmental reviews on
22  various levee systems, hurricane protection
23  levees, river levees, floodwall systems around
24  southeast Louisiana, Atchafalaya Basin, Morgan
25  City area, um --

Page 16

1       Q.   Did that include the IHNC?
2       A.   Including the IHNC.
3       Q.   Did you do any of these buildability,
4   constructability, operability and something
5   with an E --
6       A.   BCOE is what we call it.
7       Q.   BCOE studies of the levees on the east
8   bank of the Industrial Canal?
9       A.   Yes.  As part of the PDT team, I did
10  review the 1997 report for the IHNC lock
11  replacement project, I also did an extensive
12  review on a, um -- architectural study on
13  enhancing the -- how can I say this --
14  enhancing the look of the new lock design,
15  including landscaping, visitors overlooks and
16  that sort of thing.
17      Q.   I use the term broadly, the east side
18  of the Industrial Canal, but would that include
19  the area between the Florida Avenue bridge and
20  Claiborne Avenue?
21      A.   Yes.  In fact, all of the new
22  landscaping features that were in that
23  particular report went from the intersection of
24  the IHNC and the Mississippi River all the way
25  to approximately where the Florida Avenue

Page 17

1   bridge is, on both sides of the canal.
2       Q.   And can you tell me a little bit more
3   about, just in specifically this area between
4   Florida Avenue and Claiborne Avenue, what
5   exactly you did?  Be more specific?
6       A.   Yes.  That might take all day.
7       Q.   You said enhancing the landscape.  Did
8   that involve looking at the as-built drawings
9   for the levees and floodwalls along the IHNC
10  between Florida and Claiborne Avenue?
11      A.   In regards to that, that was all done
12  in the review of the 1997 report, the
13  preliminary design.  That was included in all
14  that.  The additional report that I referred to
15  about the landscaping and enhancement of the
16  public sites along the IHNC, that included a
17  new visitors center, walking paths, jogging
18  paths, additional green space, um --
19  alternative designs for levees that would
20  increase more earthen levees as opposed to
21  concrete floodwalls along the tie-in levees,
22  extensive landscaping and trees along both
23  sides and tying the new IHNC lock and its
24  walking and jogging paths to the riverfront
25  pathways that would connect to the Woldenberg

GUILLORY (VOL II), LEE

8/22/2008

Page 18

1  Park.
2      Q.  If I say East Bank Industrial Area do
3  you know what I'm referring to?
4      A.  Absolutely.  It's the 32-acre portion
5  of property bounded by the Jourdan Avenue
6  floodwall on the east, the IHNC canal on the
7  west, Claiborne Avenue bridge on the south and
8  the Florida Avenue bridge on the north.
9      Q.  When you did this architectural study
10  about enhancing the landscape, were you
11  assuming that the EBIA was remediated at this
12  point?
13      A.  That was the assumption at the time,
14  because it was proposed to be part of the new
15  IHNC look replacement project once construction
16  got underway.
17      Q.  Okay.  Going back to construction of
18  levees and floodwalls, what was your job in
19  supervising the construction of hurricane
20  protection levees?
21      A.  Um -- as I pointed out in my last
22  30(b)(6) deposition, I had an extensive
23  experience of six years of being a project
24  engineer on the ground in two different area
25  offices, supervising, monitoring and

Page 19

1  administering construction contracts for
2  earthen levees, hurricane protection levees,
3  concrete floodwalls, revetments, and major
4  navigational structures during those six years.
5  And that was from 1983 through 1990.
6      Q.  So is it safe to assume that you
7  understand how levees and floodwalls are built
8  in New Orleans?
9      A.  Yes.
10      Q.  I'm going to have you turn to the
11  second-to-the-last page of the document, and
12  you'll see a heading Number 3.  And after that,
13  it's the second paragraph down, and it says,
14  looks like the third line, I've performed and
15  authored 330 BCOE reviews covering the full
16  spectrum of civil works projects from
17  navigation, revetments, water resources, flood
18  control, hurricane protection, highways,
19  bridges, maintenance, dredging of deep and
20  shallow draft channels.
21      We may have covered this, but you
22  already told me what BCOE means.  What kind of
23  BCOE would you do of a hurricane protection
24  structure?  What would you evaluate?
25      A.  Typical BCOE review of a contract is

Page 20

1  you review all the various government
2  specifications, technical specifications,
3  general provisions in the contract to make sure
4  that they all are applicable and included in
5  the contract.  You look at the plans and
6  drawings to make sure site access, vertical and
7  horizontal datum and control, horizontal
8  control is listed on the contract, the
9  definable features of work are identified,
10  um -- all aspects of the contract are biddable
11  to the various contractors, um -- the project
12  is constructable as shown and as identified in
13  the documents, look at the operations and
14  maintenance in the long term after the project
15  is completed and turned over to the local
16  sponsor what would be the O&M responsibilities
17  of that sponsor, and then from an environmental
18  standpoint look to see if there is any
19  particular environmental permitting, any
20  contamination that has to be removed or
21  mitigated during the course of the project, and
22  just look at the overall documents to make sure
23  they're complete and ready for advertisement to
24  the contractors.
25      Q.  Okay.  Let's mark the next document

Page 21

1  which will be Guillory Deposition Exhibit
2  Number 12.  And it is Bates labeled --
3  NCS-009-00000769.  This appears to be a fax
4  transmittal header sheet dated July 30th, 1999,
5  and it has your signature on it.  Do you
6  recognize this document?
7      (Defendant's Exhibit 12 was marked for
8  identification and is attached hereto.)
9      A.  Yes, I do.
10  EXAMINATION BY MS. CLAYMAN:
11      Q.  You can take a minute to flip through
12  it if you want.  This looks like it's from you
13  to a woman named Arlene Smith.  Who is Arlene
14  Smith?
15      A.  She was the contracting officer for
16  the TERC task order in Tulsa District Corps of
17  Engineers.
18      Q.  Okay.  And it says on the first line,
19  as we discussed, enclosed are COR authority
20  requests on three task orders for me and one
21  T.O. for Ward.  What are COR authority
22  requests?
23      A.  COR is contracting officer's
24  representative authority.  It's an authority
25  that can be delegated down from the contracting

GUILLORY (VOL II), LEE

8/22/2008

Page 22

1 officer to another employee that's responsible
2 for a contract, and by the letter shown
3 attached at the back it explicitly states what
4 the duties of that COR are and are not.
5     Q.  Okay.  And is this designation or COR
6 authority request for Task Order 26?
7     A.  Yes, and a couple of additional ones.
8     Q.  Okay.  I'll have you skip over to the
9 third page.  And it says across the top
10 authorized representative of the contracting
11 officer.  Did you draft this page?
12     A.  Yes.
13     Q.  And is everything in here correct or
14 accurate?
15     A.  Yes.  At that time, yes.
16     Q.  Sure.  Directing your attention to
17 Number 5 which says PROSPECT training, what is
18 PROSPECT training?
19     A.  That's another one of our great Corps
20 of Engineers acronyms.
21     Q.  I'm not going to try to remember this
22 one.
23     A.  And I don't remember what it even
24 stands for, but it is our formal training and
25 technical training program that's administered

Page 23

1 by our Huntsville Division in Huntsville,
2 Alabama.
3     Q.  Okay.  I just want to -- the very last
4 or second-to-the-last line, March 1996, it says
5 there was a training course called geotechnical
6 aspects of HTRW sites?
7     A.  Correct.
8     Q.  Do you remember that course?
9     A.  Yes.
10     Q.  What are geotechnical aspects of an
11 HTRW site?
12     A.  This particular course was a 36 or
13 40-hour course that I took in Denver, Colorado,
14 and it was taught by the HTRW Center of
15 Expertise in Omaha, Nebraska, to us, a whole
16 number of different instructors and
17 facilitators.  And we went over all of the
18 geotechnical, um -- qualities that we as HTRW
19 personnel should be aware of and could
20 possibility encounter on HTRW contracts, and
21 that is contaminants of concern and how they
22 migrate through various types of soil, various
23 layers and lenses of soil, how they affect
24 water tables and get trapped within certain
25 water tables and aquifers and that kind of

Page 24

1 thing, what's the mode of transport of that
2 contaminant, whether it's through water or
3 through soil contamination, that kind of thing.
4 It also discussed various excavation methods
5 that you could use for isolating and excavating
6 and removing those sources and points of
7 contamination, and the various means and
8 methods that you could use for transportation
9 and disposal of those particular contaminants
10 of concern.
11     Q.  Did any aspects of this HTRW site
12 course cover levees and floodwalls?
13     A.  No.
14     Q.  What about general underseepage issues
15 relating to structures?
16     A.  No.  It was mostly for the geochemical
17 aspects of contaminants and HTRW that you would
18 find on specific Corps of Engineers sites.
19     Q.  Generally, do you know whether HTRW --
20 or personnel working on HTRW projects are
21 supposed to have training in levees and --
22 training about levees and floodwalls?
23     A.  Not specifically, but overall in
24 our -- during our careers, we do -- we are
25 exposed tremendously to that aspect of it.

Page 25

1 Some of our personnel actually start as design
2 engineers, convert to construction personnel or
3 operations divisions personnel, and vice versa,
4 and the cross-training program that we had
5 called ACTEDS facilitates that, as well.
6     Q.  When you said our personnel, are you
7 referring to the Corps in the District of New
8 Orleans or are you referring to just HTR
9 personnel in general?
10     A.  I'm referring to Corps of Engineers
11 personnel here at New Orleans District and
12 nationally.
13     Q.  The Corps nationally.
14     A.  Uh-huh.
15     Q.  Okay.  I'm going to skip over two more
16 pages.  The Bates number at the bottom ends in
17 773.  The top of the document is dated
18 August 18th, 1999, and it looks like there's
19 another date August 23rd, 1999, and there are
20 some initials there.  Are those your initials?
21     A.  Yes, they are.  That's when I received
22 the document.
23     Q.  Okay.  Is that your practice to put
24 initials whenever you receive a document --
25     A.  Yes.

7  (Pages 22 to 25)

GUILLORY (VOL II), LEE

8/22/2008

Page 26

1    Q.  -- and a date?
2        Okay.  And is this your signature on
3    the last page?
4        A.  Yes, I had to acknowledge receipt and
5    send the original back.
6        Q.  Okay.  And you testified previously, I
7    believe, that this is your designation letter
8    to be designated at the contracting officer 's
9    representative?  Is that right?
10       A.  That's correct.
11       Q.  And is this for Task Order No. 26?
12       A.  Absolutely.  Just like the subject
13   line says.
14       Q.  Okay.  And the subject line for the
15   record says Task Order No. 26 for Demolition
16   and Site Preparation for Inner Harbor
17   Navigation Canal Lock Replacement Project, East
18   Bank Industrial Area, New Orleans.
19       Okay.  The second paragraph in the
20   letter, you are authorized by this designation
21   to take action with respect to the following:
22   A, verify that the contractor performs the
23   technical requirements of the contract in
24   accordance with contract terms, conditions and
25   specification.  Specific emphasis should be

Page 27

1    placed on the quality provisions for both
2    adherence to the contract provisions and to the
3    contractor's own quality control program.
4        MR. STONE:
5            Can I interrupt for a second?
6        Unless anybody here objects, can we
7        just ask Joe to make sure that the --
8        everything is read properly?
9            You can go right to this if you
10       need to look at these documents for
11       the --
12           And I don't know that you have to
13       read all of these to him.  If it's in
14       the record, if we just let him read it
15       to himself and you ask him questions
16       about it, it might move a little
17       faster.  If you'd rather do it your
18       way, go ahead.  I'm just trying to --
19       MS. CLAYMAN:
20           I know you want to save time.
21       I'll shorthand it a little bit.
22   EXAMINATION BY MS. CLAYMAN:
23       Q.  Okay.  Letter A that I just read, how
24   did you perform this function on Task Order 26?
25       A.  As HTRW construction manager of the

Page 28

1    project, I oversaw and monitored and managed
2    the Task Order No. 26 with respect to the
3    Washington Group International.  I also
4    monitored and supervised our on-site team of
5    Jim Montegut and our QA inspection staff to
6    ensure that they were performing their quality
7    assurance function, that Washington Group was
8    performing its quality control function, its
9    cost control planning, scheduling, a whole
10   number of features that go into administering
11   the contract.
12       Q.  Okay.  Letter B requires you to
13   perform or cause to be performed inspections
14   necessary in connection with letter A.
15           How did you perform that task?
16       A.  I visited the job site approximately
17   one to three times per week, met with my
18   on-site QA staff, met with Washington Group,
19   and we had team meetings to discuss the
20   progress and performance on the project, and
21   discussed any particular problems or issues
22   that came up that week, and anything that we
23   the government needed to do to help Washington
24   Group resolve any of those issues, take their
25   recommendations into consideration and work

Page 29

1    those out to the best of our ability.
2        Q.  Did you delegate the task of
3    performing inspections necessary to any members
4    of the Corps team that was on site?
5        A.  Yes.  We had a full-time senior team
6    leader Jim Montegut.  He was also a dual
7    contracting officer's representative for New
8    Orleans District on behalf of Tulsa District.
9    At one time we had anywhere between one and
10   three quality assurance inspectors on site, and
11   in the first year of Task Order No. 26 we also
12   had one GS-11 project engineer, on site.
13       Q.  And what was his name?
14       A.  Robert Ariatti, Jr.
15       Q.  Okay.  The second sentence under B
16   says, perform acceptance for the government of
17   services performed in this contract.
18           How did you do that?
19       A.  Okay.  That can take a whole gamut of
20   things, in reviewing and commenting on and
21   approving submittals by Washington Group to the
22   Corps, reviewing, commenting on and payment of
23   monthly invoices submitted by Washington Group
24   to the Corps for the work performed during that
25   particular month, um -- accepting

8 (Pages 26 to 29)

GUILLORY (VOL II), LEE

8/22/2008

Page 30

1  correspondence, permits, anything like that
2  that was involved in the project.
3      Q.  And at the end of the project, did you
4  accept the project as being complete on behalf
5  of the Corps?
6      A.  Absolutely.  In fact, we went through
7  two stages of acceptance and completion, the
8  first being the substantial completion of the
9  contract on May 27th of 2005 where we performed
10  an on-site inspection of the final contract
11  with the contracting officer, myself, Jim
12  Montegut, and several Washington Group
13  personnel I can't recall.  And we provided
14  substantial completion of the contract.  And
15  the significance of that is that it stops the
16  time, and we declared the contract physically
17  complete.
18      Also, throughout the summer of 2005,
19  Washington Group submitted the final
20  deliverables or documents on the contract, and
21  approximately August 23rd or 25th, 2005, I
22  signed off on the technical completion report,
23  which was the final deliverable that Washington
24  Group owed the government.
25      Q.  Okay.  Very quickly, Letter C:  Just

Page 31

1  take a minute to read that.  I'll just read the
2  first line.  Maintain liaison and direct
3  communications with the contractor.
4      Did you do this on Task Order No. 26?
5      A.  Absolutely.  That was done on a daily,
6  weekly, almost hourly basis with our Washington
7  Group counterparts on the project and my
8  counterparts in the WGI office in Denver.  The
9  program manager Dennis O'Connor was the project
10  manager on site for the first couple of years
11  and then transferred back to Denver.  Um --
12  also spoke with the construction manager, the
13  quality control officer, the safety officer,
14  all those personnel on site.
15      Q.  Okay.  Letter D.  If you'd just take a
16  minute to look at that, it's on the top of
17  Page 2.  Monitor contractor's performance,
18  notice contractor of deficiencies observed.
19      Did you perform that function on Task
20  Order 26?
21      A.  Which paragraph is it?
22      Q.  On Page 2.  You're missing Page 2.
23  Sorry about that.
24      MR. STONE:
25          That will need to be added to

Page 32

1      this.
2      MS. WAGER-ZITO:
3          Let's just switch them out.
4      A.  Yes.  My weekly visits to the project,
5  and my QA staff, if we noticed any
6  inconsistencies or anything that we were not
7  100 percent pleased with, we brought that to
8  the attention of the Washington Group on-site
9  staff, asked them to correct that nonconforming
10  work.  If there were delays in production or
11  progress and stuff, we sat down and had team
12  meetings with them and asked them how they
13  would propose to get back on schedule, what
14  additional manpower, equipment, trucking firms,
15  subcontracting, whatever, they would bring on
16  board to get the work back on schedule, and so
17  that we could complete on time budget.
18  EXAMINATION BY MS. CLAYMAN:
19      Q.  Was your designation as COR revoked?
20      A.  At the very end of the project I had
21  to turn in my COR authority back to Tulsa
22  District.
23      Q.  Do you remember when that was?
24      A.  I don't remember exactly, but I would
25  assume around the end of August 2005.

Page 33

1      Q.  Okay.  That's enough for that exhibit.
2      I'd like to mark this next exhibit as
3  Exhibit 13.  And it is dated June 9th, 1999,
4  and it says it is a memorandum for a CESWT-CT
5  contract files.  Do you know what this is?
6      (Defendant's Exhibit 13 was marked for
7  identification and is attached hereto.)
8      A.  Just a second.  Yes.  This is the
9  project execution plan that New Orleans
10  District proposed the Tulsa District HTRW
11  design center to utilize the TERC contract for
12  the site remediation, demolition on the East
13  Bank Industrial Area project, and it includes a
14  summary of the scope of work that was to be
15  performed, who was going to be involved in the
16  contract from the New Orleans District and who
17  were the signatory authorities and approving
18  authorities at Tulsa District to approve the
19  use of the TERC.
20  EXAMINATION BY MS. CLAYMAN:
21      Q.  On the very first page it mentions
22  that the Tulsa District project execution
23  planning board has evaluated all available
24  contracting mechanisms and recommends the TERC.
25      Do you know what kind of evaluation

9  (Pages 30 to 33)

GUILLORY (VOL II), LEE

8/22/2008

Page 34

1  they made?
2      A.  No.  I was not involved there at the
3  particular meeting.
4      Q.  Uh-huh.
5      A.  But in general, the TERC board meets
6  and evaluates PEPs like this to see if it was
7  applicable and within the scope of work of
8  using the TERC for -- mainly if it is an HTRW
9  job, its main components include environmental
10 remediation in the scope of work, um -- that it
11 is appropriate to use this type of cost
12 reimbursable contract under the TERC because of
13 unknown funding, unknown contamination, unknown
14 definable features of work that may be involved
15 in a particular project.
16     Q.  Okay.  Turning to the third page in
17 this document, the Bates number at the bottom
18 ends in 024.
19     A.  Correct.
20     Q.  Do you know who wrote this document?
21 It's dated June 1st, 1999, memorandum for the
22 record?
23     A.  I drafted it with some assistance from
24 my HTRW team.
25     Q.  And who did this go to, did this go to

Page 35

1  the Tulsa TERC board?
2      A.  Yes.  This is also a part of the PEP.
3      Q.  Okay.  I'm looking at Paragraph 4 on
4  that page, and under scope of current requests,
5  it says that the project requires remediation,
6  demolition and among other things excavation of
7  subsurface structures.  What subsurface
8  structures did you have in mind when you wrote
9  this?
10     A.  From the prior investigations that we
11 had on the project site, we knew that we had
12 some subsurface structures such as building
13 slabs and foundations with piling, the, um --
14 sewer lift station, let's see, sheet piling,
15 pipe piling, timber piling, concrete
16 structures, and other unknown debris that would
17 be beneath the surface.
18     Q.  Do you know at this time, June, 1999,
19 do you know how -- did you know how deep the
20 excavation of the sewer lift station would be?
21     A.  No.  We did not.
22     Q.  Okay.  Flipping to the next page,
23 Number 7, it says, special considerations.
24         What are special considerations?
25     A.  As a member of the project delivery

Page 36

1  team, we were highly aware that the adjacent
2  Ninth Ward neighborhood was a very sensitive
3  and historic neighborhood, and we wanted to use
4  special considerations during the project to
5  monitor air quality, dust control, dust
6  suppression, noise suppression, various
7  demolition methods that would reduce all of
8  those features, and we wanted to mitigate the
9  amount of truck and marine traffic that could
10 adversely affect the quality of life of the
11 adjacent neighborhoods.
12     Q.  Are there any other special
13 considerations that you may have left off this
14 paragraph?
15     A.  Yes, we also did vibration monitoring.
16 And then another notable feature that came on
17 board later in the project is that we did a job
18 training program to employ and utilize
19 10 percent of the workforce from the adjacent
20 neighborhoods.
21     Q.  What was your concern with vibration
22 monitoring; why did you do that?
23     A.  Our previous experience at the Corps
24 indicated that demolition, piling removal and
25 that sort of thing could have an adverse effect

Page 37

1  on the foundations and houses of the adjacent
2  neighborhoods if it wasn't done properly.  You
3  have to pick these certain specialized
4  equipment that can mitigate and minimize
5  vibrations in adjacent neighborhoods like that.
6      Q.  And did the Corps review the choice of
7  equipment that Washington Group proposed to use
8  to make sure that it would not cause excessive
9  vibrations?
10     A.  Absolutely.  During the entire
11 acquisition process of getting Task Order No.
12 26 on board, negotiating the methods and means
13 in October of 2000 through December of 2000,
14 all that was discussed.
15     Q.  So, for example, if Washington Group
16 had proposed to use a wrecking ball, and in
17 your judgment that was inappropriate, would you
18 allow them to use a wrecking ball?
19         MR. BRUNO:
20           Object to form.
21 EXAMINATION BY MS. CLAYMAN:
22     Q.  You can answer.
23     A.  We'd object against it and recommend
24 alternative means and methods.
25     Q.  Number 8 says acquisition strategy

GUILLORY (VOL II), LEE

8/22/2008

Page 38

1  selected.  Can you just generally explain what
2  you're trying to do in this section?
3      A.  This section shows a comparison of all
4  the various different acquisition strategies
5  and contracts that can be utilized to -- on
6  this particular site, and it states the
7  advantages and disadvantages of each type.
8      Q.  And you considered all of the
9  different contracting mechanisms that are
10  listed here?
11     A.  Absolutely.
12     Q.  What is an IFB; what does that stand
13  for?
14     A.  IFB is a traditional contract called
15  an invitation for bid.  It's just a
16  prescriptive contract that is advertised
17  regionally for any contractor who is interested
18  in submitting a firm fixed price contract.
19     Q.  Okay.  And directing your attention to
20  the -- I guess it's the third one down, it says
21  fixed price DO.  What does DO stand for?
22     A.  Delivery order.
23     Q.  That says not selected due to unknowns
24  in the scope of work and lack of flexibility of
25  this option.  Lack of flexibility for who, the

Page 39

1  Corps or the contractor?
2      A.  Both, but mainly the Corps.
3      Q.  And why is that?
4      A.  It's a fixed price contract that
5  assumes that you have a very well defined scope
6  of work, you know exactly what has to be done
7  and what it will cost to do, and the time and
8  money it will take to do it.  We knew this
9  being an HTRW project that that option was not
10  available to us.
11     Q.  Let's just go to the next one.  It
12  says TERC, and you can go ahead and read it,
13  but at the bottom it says the flexibility
14  available through a cost reimbursement contract
15  is highly desirable.
16        Flexibility again for who; is this
17  flexibility of the Corps or flexibility for the
18  contractor?
19     A.  Flexibility for the Corps to
20  accomplish the work within the time and money
21  and to be able to handle the unknowns, unknown
22  contamination, unknown debris, unknown
23  foundations, all the various things that could
24  arise during the course of the contract.
25     Q.  Why doesn't the cost reimbursement

Page 40

1  contract provide flexibility to the contractor
2  to be able to do whatever he wants to do to
3  clean up the site?
4      A.  It does to some extent, but the
5  contractor and the government both have a
6  fiduciary responsibility to track all costs and
7  schedule under a cost reimbursement contract
8  very carefully.  It's very labor intensive to
9  contract all costs, equipment, manpower,
10  personnel, engineering services, admin
11  services, all that kind of stuff.  It's very
12  desirable because it does give the contractor
13  flexibility to hire various subcontractors and
14  manage his staff to suit the scope of work.
15  It's very nice.
16     Q.  You talked about the flexibility of a
17  contractor.  Nevertheless, does the Corps
18  constantly monitor and inspect and approve
19  everything that the contractor does under a
20  cost reimbursement contract?
21     A.  Not everything.  But it is a labor
22  intensive process on the Corps' part also to
23  intently monitor, work with the contractor in a
24  team type approach, to track all costs, labor,
25  equipment, materials, personnel, and to check

Page 41

1  the monthly invoices for all applicable and
2  allowable costs under their particular task
3  order.
4      Q.  But you also testified previously as
5  COR you also monitored and inspected all of the
6  work and approved all the work plans, is that
7  right?
8      A.  Yes.  As COR we reviewed and approved
9  all work plans and did quality assurance of the
10  contractor's work.
11     Q.  I'd like to mark the next exhibit
12  Exhibit Guillory Exhibit 14.  It is a June 29,
13  1999 E-mail from Bruce Terrell to Lee Guillory.
14        Have you ever seen this E-mail before?
15        (Defendant's Exhibit 14 was marked for
16  identification and is attached hereto.)
17     A.  Yes.
18  EXAMINATION BY MS. CLAYMAN:
19     Q.  Okay.  You can read it very quickly if
20  you want.  I rust wanted to ask you why
21  Washington Group International or M-K (Morrison
22  Knudsen) was chosen to be the contractor on the
23  TERC, or the Task Order 26 project.
24        MR. BRUNO:
25        Objection.

11 (Pages 38 to 41)

GUILLORY (VOL II), LEE

8/22/2008

Page 42

```
1   EXAMINATION BY MS. CLAYMAN:
2      Q.  Go ahead.
3         MR. BRUNO:
4            Beyond the scope of this witness'
5      knowledge.  We've already established
6      that wasn't done here, that was done
7      somewhere else.
8   EXAMINATION BY MS. CLAYMAN:
9      Q.  You can answer if you know the answer.
10     A.  I personally was not involved in the
11  selection process, but New Orleans District as
12  a whole had a choice between two TERC
13  contractors, um -- offered by Tulsa District,
14  M-K being one and IT Corporation being the
15  second, and this particular E-mail is our
16  Assistant Chief of Construction Division Bruce
17  Terrell giving his perspective on why M-K was
18  chosen for the IHNC EBIA Task Order No. 26 in
19  lieu of IT group.
20     Q.  Were you copied on this email?
21     A.  Yes, I was.
22     Q.  Do you know why you were copied on it?
23     A.  Because as HTRW construction manager
24  on the project I was intimately involved with
25  it.
```

Page 43

```
1      Q.  Okay.
2         MR. STONE:
3            No problem with using this
4      document, but I'd really like for us
5      to be able to protect this discussion
6      of IT 's activities here because I
7      mean this really doesn't --
8         MR. BRUNO:
9            It's not germane.
10        MR. STONE:
11           It's not germane.
12        MS. CLAYMAN:
13           Okay.  We're happy to redact.
14        MR. STONE:
15           No.  It doesn't have to be --
16        MS. CLAYMAN:
17           Okay.  Fine.  I'm going to move
18     on.
19  EXAMINATION BY MS. CLAYMAN:
20     Q.  Mark the next exhibit Exhibit 15.
21        MR. BRUNO:
22           Personal observations objection,
23     Richard?
24        MR. STONE:
25           Trying to keep peace in the
```

Page 44

```
1      family.  That's all I'm doing.
2         MR. BRUNO:
3            I totally get it.
4      (Off the record.)
5   EXAMINATION BY MS. CLAYMAN:
6      Q.  This document is entitled Order for
7   Supplies or Services.  It looks like it's
8   dated -- date of order is July 12th, 1999.  Do
9   you recognize this document?
10        (Defendant's Exhibit 15 was marked for
11  identification and is attached hereto.)
12     A.  Yes, this is the original delivery
13  order that was awarded to M-K corporation for
14  IHNC EBIA Task Order No. 26.
15  EXAMINATION BY MS. CLAYMAN:
16     Q.  What's the delivery between a deliver
17  order and a task order, aren't they the same
18  thing?
19     A.  They're essentially the same thing.
20  When the very initial award is made it's called
21  a delivery order, and then subsequently you
22  refer to it as a task order after it's assigned
23  a number.
24     Q.  Okay.  On Page 2 of this document it
25  says the work performed under this task order
```

Page 45

```
1   shall be in accordance with attached scope of
2   work and your revised proposal dated July 2nd,
3   1999.
4         What was your role in preparing or
5   reviewing of Washington Group 's proposal dated
6   July 2nd, '99?
7      A.  Okay.  My role was to draft a
8   statement of work that you see on the following
9   page.  And after that -- that was done jointly
10  with our HTRW team of about six personnel here
11  at the district.  That was sent to Tulsa
12  District, they sent it to M-K, and --
13  Washington Group, and solicit a proposal from
14  them to perform this particular work.  When the
15  proposal came in I did a technical review and
16  technical analysis of that proposal indicating
17  to Tulsa what I thought was good, bad,
18  indifferent with things, what things -- what
19  costs needed to be adjusted or revised, and
20  evidently the proposal was revised on 2 July
21  and we recommended acceptance to Tulsa District
22  of that proposal.
23     Q.  Okay.  Directing your attention to the
24  statement of work which you just said you
25  drafted -- right?
```

12 (Pages 42 to 45)

GUILLORY (VOL II), LEE

8/22/2008

Page 46

1      A.  Yes.
2      Q.  Okay.  Under project requirements,
3  Number 3, the contractor shall furnish all
4  engineering services.  And you can read the
5  rest of the paragraph.  Feel free.
6          What did you understand all
7  engineering services to include?  And feel free
8  to read the rest of it if you need to.
9      A.  That's just a general description to
10  include all engineering, administration,
11  design, contract bidding, subcontract bidding,
12  award, any self-performed construction that
13  Washington Group or M-K would do themselves,
14  and just the entire gamut of contract
15  management and contract administration of the
16  task order.
17      Q.  Would that include -- were you asking
18  the contractor to provide any engineering
19  services relative to the levees and the
20  floodwalls in the East Bank Industrial Area?
21          MR. BRUNO:
22             Objection to form.
23  EXAMINATION BY MS. CLAYMAN:
24      Q.  You can answer.
25      A.  Not specifically to the levees and

Page 47

1  floodwall, but to the 32 acres of the EBIA.
2      Q.  Why not the levees and floodwalls?
3      A.  The Jourdan Avenue levee and floodwall
4  served mainly as a perimeter of our 32-acre
5  site.  It did not include any physical work on
6  that particular -- those two particular flood
7  control works.  It was merely a three-sided
8  perimeter of our 32-acre project, and the
9  closest we got to the levees and floodwalls was
10  building the permanent chain link fence just to
11  the protected side of the floodwall.
12      Q.  Okay.  Looking on the next page, the
13  very last sentence of Paragraph 3, it refers to
14  data gaps that may need to be filled by
15  sampling or other investigations.  And I take
16  it these are data gaps that Washington Group
17  may need to fill.  What kind of data gaps did
18  you expect Washington Group to identify?
19      A.  We did an extensive -- the Corps did
20  an extensive amount of preliminary site
21  investigations, environmental assessments done
22  by the Corps, the Port of New Orleans, Waldemar
23  S. Nelson, URS Corporation and other personnel.
24  And so we knew what we had at the beginning of
25  the project, but we also knew that there were

Page 48

1  some gaps in the data, there were some unknowns
2  that we did not know about the project that we
3  needed Washington Group to do, and that would
4  include an extensive grid sampling analysis of
5  the project, geophysical surveys to find any
6  unknown debris and gaps and holes and
7  contaminated waste in drums underground.  We
8  also did a subsurface trenching program on a
9  grid system to find any underground storage
10  tanks, unknown pipelines, utilities,
11  foundations, slabs, anything like that.
12      Q.  Okay.  Were all of the data gaps that
13  Washington Group identified reviewed by you?
14      A.  Yes, but --
15          MR. BRUNO:
16             Object to form.
17      A.  -- at this particular stage of the
18  task order we had not gone to that extent yet.
19  EXAMINATION BY MS. CLAYMAN:
20      Q.  Where were all the data gaps
21  identified?
22      A.  We went through a process of
23  Washington Group creating an outline of all
24  known information that we had at the time,
25  identifying potential data gaps and unknowns

Page 49

1  that we could encounter on the project, and we
2  had them develop it in about three or a four
3  stages; first an outline, a draft
4  recommendations report, a draft final
5  recommendations report, and then a final
6  recommendations report.
7      Q.  If there were data gaps that you were
8  aware of that were not included in the
9  recommendation report, would you have told
10  Washington Group?
11      A.  Absolutely.  And in various team
12  meetings that we had in August of '99 to
13  December of '99 while we were designing the
14  scope of the project and the eight major work
15  plans for the project, we met on a continual
16  basis to brainstorm together and identify all
17  the different gaps that we needed, all the
18  various agencies that we had to coordinate
19  with, permits that we needed and the like.
20      Q.  Okay.  Just looking at Number 6, this
21  is government furnished information.  As part
22  of the government furnished information that
23  you gave Washington Group to do this
24  recommendation report, did you provide them
25  with a copy of the as-built drawings of the

13  (Pages 46 to 49)

Johns Pendleton Court Reporters                    800 562-1285

GUILLORY (VOL II), LEE

8/22/2008

Page 50

1  levees and floodwalls border ing the EBIA?
2     A.  Specifically, I believe they were
3  included in the 1997 multivolume report for the
4  draft evaluation report MRGO New Lock and
5  Connecting Channels.
6     Q.  Okay.  Let me ask you something.  Did
7  you provide Washington Group with all of the
8  volumes?  Looking at this I only see Volume 5.
9  So I'm looking at the second bullet point which
10 appears to be Volume 5, Appendix C to the 1997
11 report.
12    A.  It looks like we gave them Volume 5,
13 and on the fourth bullet Volume 6.
14    Q.  And Volume 5 says it is Assessment of
15 Potential Hazardous Toxic and Radiological
16 Waste.  Would you expect that to have as-built
17 drawings for levees and floodwalls in it?
18    A.  No.
19    Q.  And Volume 6 on the next page is a
20 Section 404B1 evaluation.  Would that have
21 anything to do with the as-built drawings for
22 the levees and floodwalls?
23    A.  No.  That would probably be an
24 environmental analysis section.
25    Q.  And as far as you know, were any other

Page 51

1  volumes of the 1997 report given to Washington
2  Group?
3     A.  I don't recall specifically, but I had
4  all thirteen volumes available the share with
5  them if they needed them.
6     Q.  Do you recall them ever requesting
7  them?
8     A.  No, I don't recall.
9     Q.  I'd like to mark the next exhibit
10 Exhibit 16.  It's a fax cover sheet that says
11 Revised M-K Proposal dated 7/23/1999 addressed
12 to Lee Guillory from Steve Roe.
13       I just want to clarify one thing that
14 we just talked about.  As far as you know, did
15 Washington Group International ever receive a
16 copy of the as-built drawings of the levees and
17 floodwalls in the EBIA?
18    A.  Not that I'm aware of.
19    Q.  Okay.
20       (Tendering.)  Do you recognize this
21 document?
22       (Defendant's Exhibit 16 was marked for
23 identification and is attached hereto.)
24    A.  Yes, it's a proposal from Morrison
25 Knudsen to us, the Corps, and this must be

Page 52

1  revision Number 1 of the original delivery
2  audit.
3  EXAMINATION BY MS. CLAYMAN:
4     Q.  Okay.  And you've already testified
5  previously that you were involved in reviewing
6  this proposal.
7     A.  Correct.
8     Q.  Okay.  If you would turn to I believe
9  it's Page Number 3 of the actual proposal, so
10 the Bates number at the bottom will be NCS-002,
11 a whole bunch of zeros and then 28.
12       MR. STONE:
13          We've got two 28s in here.
14       They're all 28.
15       MS. CLAYMAN:
16          Oh, sorry.  This is
17       electronically stored information from
18       the government, so they're all Bates
19       numbered the same.
20 EXAMINATION BY MS. CLAYMAN:
21    Q.  On the top right-hand corner, the fax
22 page number is 7.  Do you have that?
23    A.  Correct.
24    Q.  Section 2.2, it says assumptions.  The
25 second line says, the administration and

Page 53

1  technical oversight will be provided by the
2  Denver home office.
3        Do you know what kind of technical
4  oversight was contemplated that Washington
5  Group would provide from the Denver home
6  office?
7     A.  Yes.  Initially, the staff was very
8  small here in New Orleans, with a very small
9  footprint operating out of the Materials
10 Management Group office in Algiers, Louisiana,
11 because we were in the preliminary stages of
12 the process and did not have office space
13 available, so the local staff was supplemented
14 by the M-K regional business center in Denver,
15 Colorado.  And that included contract
16 administration, cost control, planning, any
17 engineering services that we needed, or
18 technical support, directly from the Denver
19 office to the local staff.
20    Q.  You said technical support that we
21 needed.  Is that something that you would have
22 to request -- the Corps would have the request?
23    A.  Yes.
24    Q.  Just turn to the very last page of the
25 document.  This says Proposal Number 76,

GUILLORY (VOL II), LEE

8/22/2008

Page 54

1  Revision 1, Revised Estimate.  What is this
2  grid?
3      A.  This is an Excel spreadsheet showing
4  the personnel, staff and hours and equipment
5  that we anticipated using -- awarding for this
6  particular portion of the delivery order, the
7  types of personnel that we envisioned using and
8  the number of hours and hourly rates that would
9  be paid to those personnel.
10     Q.  And was this chart negotiated between
11  Washington Group and the Corps?
12     A.  Absolutely.
13     Q.  Okay.  Directing your attention to the
14  middle of the page, it says home office
15  support.
16     A.  Yes.
17     Q.  Is this what was referred to earlier
18  as Denver office support?
19     A.  Yes.
20     Q.  Okay.  And what is a project CIH?
21     A.  That is a -- I'm trying to recall.
22     Q.  I'm not sure if this is right, but is
23  it a certified industrial hygienist?
24     A.  That's correct.
25     Q.  Okay.  What is a cost schedule

Page 55

1  engineer?
2      A.  A cost scheduling engineer is someone
3  who tracks the schedule and the costs
4  associated with accomplishing the various
5  features of work.
6      Q.  So in summary, for this particular
7  proposal these are the folks from the home
8  office in Denver that you anticipated would be
9  working on the project.
10     A.  Yes.  And it also includes the program
11  manager which is a little further down for 80
12  hours.
13     Q.  Okay.
14     A.  And then there is also a project
15  accountant familiar the home office, and some
16  direct costs including project operations
17  charges.
18     Q.  Okay.  If I were to represent to you,
19  after reviewing all of these estimates or
20  spreadsheets attached to all of the
21  proposals -- final proposals submitted in this
22  case, that there was never listed a
23  geotechnical engineer under home office
24  support, would that indicate to you that the
25  Corps never requested a geotechnical engineer

Page 56

1  from the Denver home office to work on Task
2  Order No. 26?
3      A.  If none were specifically listed in
4  that particular -- on all the proposals, that
5  is correct.
6      Q.  I just really quickly want to look at
7  your testimony -- I believe you have a copy of
8  it -- from your first day of deposition,
9  Page 150, Line 21.  If you want to read it to
10  yourself, you can.  Basically, Mr. Bruno asked
11  you what geotechnical support did you expect
12  from Washington Group International?  And you
13  said, they had a staff at their home office in
14  Denver and we could pull upon any geotechnical
15  support we needed from them.
16        What kind of geotechnical support were
17  you referring to specifically?
18     A.  When we developed the recap and
19  corrective action plans for removal of the
20  contaminated areas in the EBIA, the corrective
21  action plan required us to identify the
22  horizontal and vertical limits of excavation of
23  each one of the contaminated sites, and to
24  design the engineering -- using engineering
25  considerations, design the, um -- slopes and

Page 57

1  cuts that we would use to reach those
2  particular elevations, and the Washington Group
3  staff made recommendations on what side slopes
4  and depths and equipment would be utilized for
5  those particular excavations and designed those
6  in the corrective action plans.
7      Q.  Were you referring to anything else
8  when you said this?
9      A.  In general, just whatever kind of,
10  um -- soil or geotechnical support that we
11  needed to be utilized on the project, whether
12  it be for removing underground obstructions or
13  pulling piling, pulling sheet piling, um --
14  demolition of concrete structures.  Ultimately
15  we had three cofferdams built on site to remove
16  underground obstructions.
17     Q.  Let me ask it this way:  Did you ever
18  request or require geotechnical support from
19  Washington Group relating specifically to the
20  levees and floodwalls in the East Bank
21  Industrial Area?
22     A.  No.
23        MR. BRUNO:
24          Object to form.
25  EXAMINATION BY MS. CLAYMAN:

15 (Pages 54 to 57)

GUILLORY (VOL II), LEE

8/22/2008

Page 58

1    Q.  Why didn't you; why didn't did Corps
2  request that?
3    A.  As I stated previously, the two flood
4  control works, the Jourdan Avenue floodwall and
5  the Jourdan Avenue levee, while they were
6  bounded on three sides of the project, were not
7  included in the actual scope of the demolition
8  and remediation of the site.
9    Q.  Okay.  I'd like to mark the next
10 Exhibit Guillory 17.  It's an E-mail from Lee
11 Guillory, and I believe it's attaching kickoff
12 meeting agenda and minutes dated July 20th,
13 1999.  Do you recognize this document?
14     (Defendant's Exhibit 17 was marked for
15 identification and is attached hereto.)
16   A.  Yes.
17 EXAMINATION BY MS. CLAYMAN:
18   Q.  What is it?
19   A.  Those are meeting minutes that were
20 drawn up by Washington Group -- written by
21 Washington Group on behalf of the Corps
22 documenting the July 20th, 1999 kickoff meeting
23 between the Corps, our HTRW team and the
24 Washington Group staff.
25   Q.  And the first E-mail, it seems to

Page 59

1  indicate that you revised a draft of these
2  minutes.  Is that accurate?
3    A.  That's correct.  Under the teaming
4  process that we used under the task order, we
5  normally had Washington Group and their staff
6  provide a draft to the government, and then
7  myself and the rest of the HTRW team would
8  review that and make any additions, deletions
9  or revisions that we felt were necessary or
10 that might have been left out or to fully
11 document the meeting, and then we would send
12 that back to Washington Group for final
13 revision.
14   Q.  So then you believe that everything
15 that's in these kickoff meeting minutes is
16 accurate?
17   A.  Yes.
18   Q.  Okay.  I'd just like to turn to the
19 page Bates numbered at the bottom 1028.
20   A.  Okay.
21   Q.  And under Understanding of Project
22 Execution, it says USACE comments will be
23 presented in parentheses and italics.  Is that
24 consistent with your understanding of how these
25 minutes are set up?

Page 60

1    A.  Yes.
2    Q.  And go to Page that ends 1030.  And
3  I'm looking specifically at Item Number 10.
4    A.  Okay.
5    Q.  And it says, will a levee board permit
6  be required?  If so, who will obtain the
7  permit?  Answer, in italics:  Not sure at this
8  time.  A levee board permit has not been
9  required on previous USACE projects.
10     Do you know who from the Corps made
11 this statement?
12   A.  No.
13   Q.  Do you know what kind of projects they
14 were referring to?
15   A.  Just any civil works projects that the
16 Corps normally administered and built in
17 conjunction with or as our local sponsors of
18 the levee boards.
19   Q.  And so is your understanding that this
20 is just limited to projects where the Corps was
21 a co-sponsor of the project?  I mean the levee
22 board was a co-sponsor of a project with the
23 Corps?
24     MR. STONE:
25       Now you're asking him to

Page 61

1        interpret this without him knowing who
2        said it and possibly with no memory of
3        it being said, right?  I mean, if you
4        are, let's make it clear --
5      MS. CLAYMAN:
6        That's fine.
7      MR. STONE:
8        -- that he's speculating.
9      MS. CLAYMAN:
10       Okay.
11   A.  Generally, this can include
12 co-sponsoring projects or 100 percent federal
13 projects.
14 EXAMINATION BY MS. CLAYMAN:
15   Q.  Okay.  This is going to be very quick:
16 You've already referenced that in preparing the
17 recommendation report there was a comment
18 submittal process where you reviewed outlines
19 and then drafts that Washington Group submitted
20 to you.  And I just wanted you to identify --
21 this is Exhibit 18, and it is titled Outline
22 Revision 1, Recommendation Report.
23     What is this document?
24     (Defendant's Exhibit 18 was marked for
25 identification and is attached hereto.)

Johns Pendleton Court Reporters                    800 562-1285

Page 62

1     A.  Overall this is the outline, revision
2  Number 1 of the recommendation report for
3  demolition and site preparation activities by
4  Washington Group to the Corps dated August 9th,
5  1999.
6  EXAMINATION BY MS. CLAYMAN:
7     Q.  Okay.  And then the top of the next
8  page says comments on Morrison Knudsen 's
9  outline for recommendation report.  Just to
10  clarify, whose comments are these?
11     A.  These are all the Corps of Engineers
12  comments back to Washington Group.
13     Q.  And I just want to run very quickly
14  through each of these columns, and can you tell
15  me what each of these columns is, what the
16  purpose of them are?
17     A.  Sure.  This is just a simple
18  spreadsheet document that we utilize to list
19  the various comments from beginning to end and
20  its resolution all the way through.  First
21  column is the comment number; second column is
22  the page, it's the reference page within the
23  actual document where the comment is referred
24  to; third column is the paragraph/line, which
25  is the designated paragraph or line that the

Page 63

1  comment is directed to; fourth column is the
2  actual comment.
3     Q.  These are comments from the Corps?
4     A.  Comments from the Corps.  Fifth column
5  is the code system, whether the respondent, in
6  this case Washington Group, concurs with the
7  comment is a C, D means do not concur, and E
8  means they take exception to the comment.
9     Q.  Okay.  What's the next column
10  Response?
11     A.  Sixth comment is the response comment.
12  If Washington Group had a response or a
13  rebuttal to the various comment proposed by the
14  Corps, the sixth column allowed them to clarify
15  that there; and the last column being the
16  seventh column is the Corps' commentator column
17  in which we could designate it with an A for
18  agree with response by Washington Group or a D,
19  does not agree with response.
20     Q.  What happens if the Corps says D,
21  disagree?
22     A.  We usually called a team meeting
23  together and completely discussed the issue
24  until we came to a consensus of opinion.
25     Q.  So would you agree with me that there

Page 64

1  is nothing in the recommendation, or the final
2  outline of the recommendation report, that the
3  Corps did not ultimately agree with?
4     A.  Well, this is not the actual final
5  document that went with the approval.
6     Q.  Oh.  I understand that.
7     A.  Because if that was the case there
8  would be an A in each one of the seven columns.
9     Q.  So if there was a comment submittal
10  with an A in all of the columns, that meant
11  that the Corps agreed with everything that
12  was --
13     A.  Correct.
14     Q.  Okay.
15     (Brief recess.)
16  EXAMINATION BY MS. CLAYMAN:
17     Q.  Mr. Guillory, I just handed you what's
18  been marked Guillory Deposition Exhibit Number
19  19.  And it's a cover letter dated
20  January 19th, 2000, attaching the final
21  revisions and recommendations report for
22  demolition and site preparation activities.
23     Do you recognize this document?
24     (Defendant's Exhibit 19 was marked for
25  identification and is attached hereto.)

Page 65

1     A.  Yes.
2  EXAMINATION BY MS. CLAYMAN:
3     Q.  Is that your signature on the cover
4  page?
5     A.  Absolutely.
6     Q.  And just flipping through this, do you
7  believe this is a complete copy of the
8  recommendations report?
9     A.  It appears that way.
10     Q.  All right.  That's all I have.
11     Okay.  The next document I'd like to
12  mark will be Exhibit 20.  This is a telecon
13  report to Dennis O'Connor from Bobby Smith.
14     Mr. Guillory, have you ever seen this
15  document?
16     (Defendant's Exhibit 20 was marked for
17  identification and is attached hereto.)
18     A.  Yes.
19  EXAMINATION BY MS. CLAYMAN:
20     Q.  Was this in your files at the Corps?
21     A.  This was in the project files, yes.
22     Q.  Do you remember reviewing it at the
23  time?
24     A.  No.
25     Q.  Okay.  Who is Bobby Smith?

Page 66

1      A.  Bobby is a Washington Group employee,
2  specifically a superintendent.
3      Q.  And who is Dennis O'Connor?
4      A.  Dennis O'Connor was the project
5  manager for the Washington Group on site for
6  two years and off site for two years.
7      Q.  The telecon purports -- or says that
8  talked with Steve Spencer of the levee board
9  about if we needed permit coordination with
10 them on construction of the fence.  He stated
11 no, just send us a letter letting us know what
12 you are planning to do.  I also asked him about
13 the lift station and if we needed anything for
14 that.  He stated no, just put it in a letter
15 letting them know what was going to be done.
16     Did you have any understanding at the
17 time that Washington Group did not need a levee
18 permit for construction of the fence or
19 excavation of the lift station?
20     A.  Correct.  For those particular
21 features of work, we did not.
22     Q.  Do you know if you sent this telecon,
23 which was in the Corps' files, to anyone else
24 at the Corps?
25     A.  I don't know that.

Page 67

1      Q.  Handing the witness what's been marked
2  as Exhibit 21.  It is a distribution sheet
3  dated 11/7/2000, enclosing an 11/7/2000 letter
4  from Dennis O'Connor to Steve Spencer.
5      Mr. Guillory, do you recognize this
6  document?
7      (Defendant's Exhibit 21 was marked for
8  identification and is attached hereto.)
9      A.  Yes, they were in the project files.
10 EXAMINATION BY MS. CLAYMAN:
11     Q.  Do you remember seeing this at the
12 time?
13     A.  No, it does not look like it was
14 forwarded to me on the distribution on the
15 first page.
16     Q.  So at the bottom of the distribution
17 sheet where it says IHNC and a checkmark,
18 that's not you?
19     A.  No.  That would go to the field
20 project files.
21     Q.  Okay.  That's all I have.
22     I'd like to mark the next Exhibit 22.
23 This is a fax from the Board of Commissioners
24 of the Orleans Levee District to Dennis
25 O'Connor, from Steven Spencer.

Page 68

1      Have you ever seen this before?
2      (Defendant's Exhibit 22 was marked for
3  identification and is attached hereto.)
4      A.  I have seen this in the project files.
5  EXAMINATION BY MS. CLAYMAN:
6      Q.  Do you remember receiving it at the
7  time --
8      A.  No.
9      Q.  -- that it was sent?
10     A.  Directing your attention document to
11 the message from Steve Spencer, it says, to
12 Dennis, send a copy of your letter dated
13 11/7/2000, with attachments, to Brian Keller
14 and Geneva Grille.
15     Do you know who Brian Keller is?
16     A.  Yes.  He's a Corps of Engineers
17 employee -- former Corps of Engineers employee
18 that worked in our operations division,
19 inspection of completed works section.
20     Q.  Did you ever talk to Mr. Keller about
21 Task Order No. 26?
22     A.  I do not recall speaking with him
23 about it.
24     Q.  Were you aware that Mr. O'Connor sent
25 correspondence, a copy of his letter, to

Page 69

1  Mr. Keller?
2      A.  Not specifically until I saw it later
3  in the project files.
4      Q.  To clarify, you weren't aware at the
5  time --
6      A.  At the time.
7      Q.  -- which is November, 2000.
8      Do you know who Geneva Grille is?
9      A.  Yes.  She was the former -- she has a
10 long title, but it's essential a district
11 engineer of the Louisiana Department of
12 Transportation and Development.
13     Q.  Do you know her personally?
14     A.  I worked with her several times
15 previously on Corps hurricane protection
16 levees,
17     Q.  Did you ever talk to Ms. Grille about
18 Task Order 26?
19     A.  No.
20     Q.  I'm going to represent to you that the
21 Bates number at the bottom which is
22 NCS-004-00000834 was found in the Corps' files.
23     Do you know how or why it was in the
24 Corps' files?
25     A.  It was probably copy furnished from

GUILLORY (VOL II), LEE

8/22/2008

Page 70

1 Washington Group 's field staff directly to the
2 Corps' field staff on site.
3     Q.  And why do they send you copies of all
4 of these -- of this letter report?
5     A.  To keep you fully informed of what they
6 were doing regarding canvassing the various
7 agencies for permits and responsibilities, and
8 these are actions they were doing on behalf of
9 the Corps for the project.
10    Q.  I'd like to mark the next exhibit,
11 it's going to be Exhibit Number 23, and it's a
12 distribution sheet that says document date
13 January 17th, 2001, attaching a letter from
14 Dennis O'Connor to Brian Keller.  Have you seen
15 this document before?
16        (Defendant's Exhibit 23 was marked for
17 identification and is attached hereto.)
18    A.  Yes.  As shown on the distribution
19 sheet it was sent directly to me with a
20 checkmark next to my name.
21 EXAMINATION BY MS. CLAYMAN:
22    Q.  So do you believe you saw this at the
23 time --
24    A.  Yes.
25    Q.  -- in January of '01?

Page 71

1        Turning to the first page of the
2 letter, are you aware that Dennis O'Connor
3 spoke to Mr. Keller at the Corps about this
4 project?
5     A.  Yes.  And he's answering Mr. Keller by
6 letter back.
7     Q.  And do you know why Mr. Keller
8 wouldn't just call you if he had a question,
9 since he's in the Corps and you're in the
10 Corps?  A question about your project Task
11 Order No. 26?
12    A.  Again, Washington Group was -- we
13 tasked Washington Group to act on behalf of the
14 Corps and construction division to obtain all
15 necessary permits for the project.
16    Q.  I don't have any other questions about
17 this.
18        The next document I'll mark
19 Exhibit 24.  This is a distribution sheet dated
20 12/29/2000 attaching a letter to the Orleans
21 Levee District from the State of Louisiana
22 Department of Transportation and Development.
23        Do you recognize this document?
24        (Defendant's Exhibit 24 was marked for
25 identification and is attached hereto.)

Page 72

1     A.  Yes.
2 EXAMINATION BY MS. CLAYMAN:
3     Q.  On the front cover sheet are those
4 your initials?
5     A.  Yes.  I received it January 16th,
6 2001.
7     Q.  Did that mean you reviewed it at the
8 time?
9     A.  Probably read it exactly when I
10 received it.
11    Q.  Okay.  What did you understand at the
12 time this letter dated December 29, 2000, from
13 the State of Louisiana was about?
14    A.  It's an approval from Louisiana DOTD,
15 specifically a letter of no objection to
16 Orleans Levee District providing a permit to
17 Washington Group for the demolition and
18 remediation of the EBIA site.
19    Q.  Did you at the time when you read this
20 understand that -- or believe that Washington
21 Group had requested a permit from the Orleans
22 Levee District?
23    A.  Yes.
24    Q.  Earlier you told me that Washington
25 Group told you that they didn't need a permit

Page 73

1 from the levee district.
2     MR. BRUNO:
3        Objection.  He didn't say that.
4     That's not accurate at all.
5     MS. CLAYMAN:
6        Okay.  Well, we can go back to
7     the record, but I'll rephrase the
8     question.
9     MR. BRUNO:
10       He talked about a fence and he
11    talked about a sewer lift station.  Do
12    not misrepresent this record.
13    MS. CLAYMAN:
14       Okay.  That's fine.  I'll
15    rephrase.
16 EXAMINATION BY MS. CLAYMAN:
17    Q.  Okay.  At what point did you
18 understand -- we looked at some correspondence
19 earlier from October 18th, 2000, and now it's
20 December, 2000.  At what point did you
21 understand that Washington Group needed a
22 permit to conduct activities in the East Bank
23 Industrial Area?
24    A.  I was told later when we mobilized on
25 site in January of 2001 that -- Washington

Johns Pendleton Court Reporters                    800 562-1285

GUILLORY (VOL II), LEE

Page 74

1   Group informed me that we did not need a permit
2   from OLD, we just needed to keep them fully
3   aware and apprised of the work as we went
4   along.
5       Q.  Okay.
6           I'm handing you another exhibit, and
7   this one is going to be Deposition Exhibit
8   Number 25.  And this is a distribution sheet
9   dated April 6, 2001, from Gregory Breerwood at
10  the Corps of Engineers.
11          And I see -- is that your signature or
12  your initials at the bottom?
13          (Defendant's Exhibit 25 was marked for
14  identification and is attached hereto.)
15      A.  Correct.
16  EXAMINATION BY MS. CLAYMAN:
17      Q.  So would you have received this at the
18  time?
19      A.  Yes.  On April 12th, 2001.
20      Q.  Okay.  Do you know who Mr. Breerwood
21  is?
22      A.  Yes.  At the time he worked in the
23  Corps of Engineers operations division
24  technical support branch, and he was the deputy
25  chief of operations division at the time.

Page 75

1       Q.  Do you know what kind of engineer
2   Mr. Breerwood is?
3       A.  Specifically what discipline, no.
4       Q.  Do you recall ever speaking to
5   Mr. Breerwood about Task Order 26?
6       A.  No, I do not.
7       Q.  Looking at the first paragraph, at the
8   bottom, it says the proposed work is necessary
9   to accommodate our IHNC lock replacement
10  project scheduled to be done in this area.
11          Do you know what involvement
12  Mr. Breerwood or the operations branch had in
13  the lock replacement project?
14      A.  They were not -- operations division
15  did not have a member on the project delivery
16  team that I recall, but it is their
17  responsibility for future operations and
18  maintenance of the new lock.
19      Q.  Okay.  That same paragraph, it says,
20  we have received a copy of your letter request
21  dated November, 2000.  And about four lines
22  down it references permission to remove
23  existing structures and install temporary
24  facilities on the flood side of the IHNC east
25  levee floodwall between approximate baseline

Page 76

1   stations 13+00 and 56+00.
2       Q.  Do you know where Mr. Breerwood got
3   that information about the baseline stations?
4       A.  The description was probably provided
5   by Washington Group in its initial letters to
6   Orleans Levee District.
7       Q.  We're not going to turn back to the
8   letters right now, but if I represent to you
9   that this information was not provided, the
10  baseline stations, do you know where that
11  information would have come from?
12      A.  Obviously if it wasn't in the letters,
13  the inspection of completed works personnel,
14  specifically Mr. Keller, probably referenced
15  some project maps or baseline maps in that
16  particular area between Florida Avenue and
17  Claiborne Avenue bridges and chose those
18  particular stations.
19      Q.  Okay.  At the very bottom of the
20  letter it says, this letter of no objection is
21  based on engineering criteria.
22          Do you know what engineering criteria
23  Mr. Breerwood or Mr. Keller would have used to
24  issue this, or to base this letter of no
25  objection?

Page 77

1       A.  No, I've never worked in that
2   particular office of operations division.
3       Q.  Okay, the next document I'm going to
4   mark Exhibit 26.  The title is Work Plan
5   General Discussion/Direction Meeting.  It's
6   dated August 3rd, 2000.  (Tendering.)
7           Have you ever seen this document
8   before?
9           (Defendant's Exhibit 26 was marked for
10  identification and is attached hereto.)
11      A.  Yes.
12  EXAMINATION BY MS. CLAYMAN:
13      Q.  This is minutes of a meeting that you
14  attended?
15      A.  Yes.
16      Q.  Okay.  Do you know who drafted the
17  minutes?
18      A.  Washington Group on behalf of the
19  Corps.
20      Q.  And you testified earlier that
21  whenever Washington Group submitted minutes to
22  the Corps they submitted them in draft form, is
23  that correct?
24      A.  Correct.
25      Q.  And then you reviewed them?

Johns Pendleton Court Reporters                    800 562-1285

GUILLORY (VOL II), LEE

Page 78

1    A.  Correct.
2    Q.  And made any corrections?
3    A.  Correct.
4    Q.  Okay.  Just turn to the very last
5  page.  It says, it was agreed that Washington
6  needed to go back to the organization chart and
7  indicate lengths of assignment for respective
8  staffing positions.
9       My question is why was the Corps
10  concerned about Washington Group 's choice of
11  staffing, or lengths of assignment?
12    A.  Washington Group proposed a certain
13  staffing organizational chart in their quality
14  control plan, and we as the Corps felt that due
15  to awards and modifications to the task order,
16  instead of Washington Group bringing on a full
17  staff from the very beginning we wanted it
18  ramped up in sequential steps according to the
19  scope of work.  In other words, if we needed a
20  construction manager at the beginning and then
21  a superintendent, we would later bring on a
22  site safety officer or a quality control
23  officer later on as the work materialized.
24    Q.  Okay.  When you say we needed, who
25  made that decision of what staffing was needed?

Page 79

1    A.  It was a joint decision between the
2  Corps and Washington Group, specifically the
3  project manager and myself and, um -- Jim
4  Montegut.
5    Q.  I'm going to give you two documents
6  together.  I'm going to mark them -- the first
7  document is Exhibit 27, and it's LDEQ meeting
8  minutes dated August 21, 2000.  The second
9  document is undated, and it appears to be a
10  draft letter from Jeff -- to Jeff from Jane.
11  (Tendering.)
12       Looking at the first, the LDEQ minutes
13  which are numbered 27, I believe --
14    A.  Correct.
15    Q.  -- do you recognize this document?
16       (Defendant's Exhibit 27 was marked for
17  identification and is attached hereto.)
18    A.  Yes.
19  EXAMINATION BY MS. CLAYMAN:
20    Q.  What is it?
21    A.  It's the meeting minutes of the
22  coordination meeting that Washington Group,
23  myself and a couple of members of the HTRW team
24  met with Mr. William Perry and Tom Harris of
25  Louisiana DEQ at their office in Baton Rouge,

Page 80

1  Louisiana.
2    Q.  And do you know who drafted the
3  minutes?
4    A.  Washington Group on behalf of the
5  Corps.
6    Q.  Okay.  The meeting attendees, the
7  third one down, who is Jane Morgan?
8    A.  She was a regulatory specialist with
9  Materials Management Group, a subcontractor to
10  Washington Group.
11    Q.  Do you know what her specialty within
12  the realm of regulatory specialist was?
13    A.  Yes.  She had a specialty in writing
14  environmental reports, um -- knowing all the
15  regulatory limits for the various constituents
16  and contaminants of concern and all the
17  documents that it would take to get this
18  cleanup criteria identified for each of the six
19  industrial sites at EBIA.
20    Q.  And Ms. Morgan, do you know if she was
21  a Ph.D. or had a Ph.D.?
22    A.  Don't know.
23    Q.  Okay.  You attended those meeting in
24  Baton Rouge?
25    A.  Yes.

Page 81

1    Q.  Do you recall at this meeting -- and
2  I'll represent to you it's not in these
3  minutes, but do you recall discussion about how
4  close to the floodwall that Washington Group
5  and MMG could remediate -- would be able to
6  remediate during Task Order No. 26?
7    A.  I don't believe we discussed it at
8  this particular meeting, um -- but a rule of
9  thumb that we created at the very beginning of
10  the project was to have a clearance zone of
11  15 feet from the flood side face of the wall to
12  the edge of Surekote Road.
13    Q.  Would you look at the second document
14  which I believe is Exhibit 28.  The top line of
15  the document -- it's not dated, but it's Bates
16  numbered WGI 338568 -- says Jeff, today we had
17  our meeting with the LDEQ.
18       And your name is listed as an
19  attendee.  How many meetings did you have with
20  the LDEQ?  Do you recall?
21       (Defendant's Exhibit 28 was marked for
22  identification and is attached hereto.)
23    A.  Initially, in the very early stages of
24  the project, I believe we had two coordination
25  meeting with DEQ.  And then during the course

GUILLORY (VOL II), LEE

8/22/2008

Page 82

1  of the project we probably had, um -- one site
2  visit from Mr. Bill Perry per month.
3  EXAMINATION BY MS. CLAYMAN:
4     Q.  Okay.  Directing your attention --
5  actually, at the bottom it says signed, sorry,
6  Jane.
7        Do you know if this is Jane Morgan?
8     A.  Yes.
9     Q.  Do you know who Jeff is, the
10  addressee?
11    A.  I believe that was a Washington Group
12  employee named Jeffrey Meyers.
13    Q.  And was he in the home office?
14    A.  Yes.  He worked out of the Denver
15  office.
16    Q.  Do you know what his specialty is?
17    A.  His specialty was also environmental,
18  environmental engineering, um -- that sort of
19  discipline.
20    Q.  Okay.  Directing your attention to the
21  middle paragraph that says quasi good news, it
22  says the USACE made a decision regarding the
23  proximity to the floodwall that we can work.
24  Work will start 15 feet away from the floodwall
25  on three sides that have floodwalls.  The good

Page 83

1  news is that we got a decision.
2        Do you know who at the USACE made a
3  decision regarding the proximity to the
4  floodwall Washington Group and MMG could work?
5     A.  I don't recall exactly, but it was
6  probably a consensus of opinion between myself
7  and the rest of the small HTRW team.
8     Q.  Do you know what the 15 feet mark was
9  tied to, the basis for it?
10    A.  Yes.  Generally, the 15 feet was the
11  distance from the flood side face of the
12  Jourdan Avenue floodwall to the concrete curb,
13  the eastern concrete curb of Surekote Road.
14    Q.  Okay.  Are you familiar with the term
15  minimum control line?
16    A.  Yes.
17    Q.  Does this 15 feet demarcation or line
18  have any connection to a minimum control line?
19    A.  No.
20    Q.  Do you know what the minimum control
21  line was for excavating near the levees in the
22  East Bank Industrial Area?
23    A.  No.
24        MR. BRUNO:
25           Objection to form.  Facts not in

Page 84

1  evidence.
2  EXAMINATION BY MS. CLAYMAN:
3     Q.  Okay.  That's all I have on this.
4        I would like to mark the next
5  Exhibit 29.  This is a transmittal cover sheet
6  signed by Lee Guillory dated November 16th --
7  well, there's three different dates.  It's
8  signed on November 16th, 2000 by Lee Guillory,
9  and it says work plan revised pages only, and
10  response to USACE comments.
11        Do you know what this is?
12        (Defendant's Exhibit 29 was marked for
13  identification and is attached hereto.)
14    A.  Yes.
15  EXAMINATION BY MS. CLAYMAN:
16    Q.  What is it?
17    A.  This is the final approval on some
18  revised pages that went into the Washington
19  Group project work plan.
20    Q.  And we already discussed how this
21  comment submittal works, this Excel spreadsheet
22  on the next page.
23    A.  Correct.
24    Q.  I'm looking at the far right column,
25  and it looks like under all, for each comment,

Page 85

1  there is an A in the right-hand section.  What
2  does the A mean?
3     A.  The A means the Corps agrees with
4  Washington Group 's resolution of the comment.
5     Q.  Okay.  And then the resolution, as
6  agreed to by the Corps, would that have been
7  incorporated into the final work plan?
8     A.  Correct.  The actual revisions would
9  have been written into the final pages, and in
10  this particular case the pages were just
11  swapped out page for page into the project work
12  plan.
13    Q.  Okay.  And just on the very front
14  page, it says -- on the very right-hand column,
15  it says for CE use code, and then it has a
16  letter A.  Does that also mean accepted?
17    A.  That means approved.
18    Q.  Oh.  Approved.  Okay.  That's all for
19  this one.
20        Then the next document I'm marking is
21  going to be Guillory Exhibit Number 30.  It's
22  called Field Sampling page, and it's dated
23  January, 2001.
24        Do you know what this is,
25  Mr. Guillory?

22 (Pages 82 to 85)

Johns Pendleton Court Reporters                    800 562-1285

GUILLORY (VOL II), LEE

Page 86

1       (Defendant's Exhibit 30 was marked for
2   identification and is attached hereto.)
3       A.  Yes.  This is part of the sampling and
4   analysis plan for the project.
5   EXAMINATION BY MS. CLAYMAN:
6       Q.  What is the purpose of the sampling
7   and analysis plan?
8       A.  It expressly discusses how Washington
9   Group will design and implement a grided
10  sampling and analysis system for the -- to
11  determine the various hot spots, contaminants
12  of concern across each of the six sites, and
13  from that will determine a statistical
14  evaluation of, um -- which contaminant sources
15  need to be removed and remediated from the site
16  and disposed of, and what quality assurance
17  samples will be taken subsequently to that to
18  determine if those remediated sites are clean,
19  and then at the very end we will write the no
20  further action at this time reports for each of
21  the six sites.
22      Q.  Okay.  Did you review this document
23  before it was finalized?
24      A.  Yes.
25      Q.  Did you fill out one of those comment

Page 87

1   submittal forms with an Excel spreadsheet?
2       A.  Yes.
3       Q.  Okay.  And do you know if you approved
4   the final version of the field sampling plan as
5   incorporated into the sampling and analysis
6   plan?
7       A.  Yes, and subsequent revisions.
8       Q.  Okay.  Do you know if this is the
9   final version?  I know it doesn't have a cover
10  sheet.
11      A.  I cannot tell.
12      Q.  I just want to direct your -- well, if
13  we found the version that had your signature,
14  and I would imagine you would have signed the
15  sampling and analysis page, not the field
16  sampling page.
17      A.  Correct.
18      Q.  Okay.
19      MR. STONE:
20          Do you think that's in those
21      boxes, the seventy-six boxes that we
22      turned over?
23      THE WITNESS:
24          Yes.
25      MS. CLAYMAN:

Page 88

1       I believe we have it.
2       MR. STONE:
3           Okay.
4   EXAMINATION BY MS. CLAYMAN:
5       Q.  Okay.  I just want to direct your
6   attention to Page WGI 59663.
7       A.  Okay.
8       Q.  Okay.  At the bottom of the page, Item
9   Number 6 says, RECAP requires consideration of
10  three soil intervals.  What is RECAP?
11      A.  That is the Louisiana Department of
12  Environmental Quality program called Risk
13  Evaluation Corrective Action Plan.
14      Q.  Is that a regulatory -- a regulation?
15  Are these regulations?
16      A.  That is a regulatory program they use
17  to determine remediation.
18      Q.  Okay.  And then it says, the three
19  soil intervals are surface soils 0 to 3 feet,
20  potential surface soil 3 to 15 feet, and
21  subsurface soil 15 to 22 feet.  And it all ends
22  in BGS.  What is BGS?
23      A.  That is a Washington Group term for
24  below ground surface.
25      Q.  I see.  So based on this Number 6, and

Page 89

1   this statement, did you understand at the time,
2   which is January, 2000, that Washington Group
3   intended to test for contamination down to
4   22 feet below ground surface?
5       A.  Yes.
6       Q.  Do you know why 22 feet?
7       A.  We set that as a standard limit for
8   our boring and drilling program because of the
9   proposed future lane and transit bypass
10  channels that the Corps was going to dredge
11  through the EBIA for construction of the new
12  lock.
13      Q.  Okay.  Did you understand that there
14  was a possibility that if contamination was
15  found going down to 22 feet that Washington
16  Group would be excavating down to 22 feet?
17      A.  It was a possibility, yes.
18      Q.  Okay.  I'm going to hand you another
19  document which I'm marking Guillory Exhibit 31.
20  It is a contractor quality control plan dated
21  October, 2000.
22          Do you recognize this document?
23          (Defendant's Exhibit 31 was marked for
24  identification and is attached hereto.)
25      A.  Yes.

Johns Pendleton Court Reporters                          800 562-1285

GUILLORY (VOL II), LEE

8/22/2008

Page 90

1  EXAMINATION BY MS. CLAYMAN:
2      Q.  Is that your signature on the second
3  page?
4      A.  Yes.
5      Q.  Okay.  Did you review this plan in
6  draft format?
7      A.  Yes.
8      Q.  And did you fill out a comment
9  submittal on an Excel spreadsheet?
10     A.  Yes.
11     Q.  I just want the direct your attention
12 to Bates number Page WGI 47227.
13     A.  Okay.
14     Q.  And in the middle of the page,
15 Section 4.4.  It says Three Phases of Control,
16 and then it goes on in 4.4.1 to discuss
17 preparatory phase, initial phase, and then
18 4.4.3 is follow-up phase.  Are you familiar
19 with this three phase system?
20     A.  Absolutely.
21     Q.  Can you just very briefly describe it
22 for me?
23     A.  Yeah.  The three phase quality control
24 system is a Corps system where we require all
25 our contractors to fully plan, implement and

Page 91

1  follow up with their quality control
2  inspections, testing of each definable feature
3  of work on a project.
4      Q.  Is this used in all Corps contracts?
5      A.  All Corps contracts.
6      Q.  Okay.  Under the preparatory phase,
7  can you just look at the bullet points -- I'm
8  not going the read them into the record, but
9  just read the bullet points under preparatory
10 phase, and I just want to ask you if you agree
11 or if you think this is an accurate description
12 of how the preparatory phase was used on Task
13 Order 26.
14     A.  Yes.  That's accurate.
15     Q.  Okay.  And do you know whether anyone
16 from the Corps attended the preparatory phase
17 meetings?
18     A.  Yes.  For each definable feature of
19 work we had Washington Group provide an agenda,
20 schedule a meeting, and one or more various
21 members of the Corps management and QA staff
22 would attend those meetings.
23     Q.  Okay.  Same drill for the initial
24 phase.  This is Section 4.4.2.  If you can,
25 take a look at that and just read the bullet

Page 92

1  point underneath and I'm going to ask you if
2  you think this is an accurate description of
3  how the initial phase was carried out on Task
4  Order 26.
5      A.  Correct.
6      Q.  And did a member of the Corps' quality
7  assurance staff attend initial phase
8  inspections?
9      A.  Yes.
10     Q.  Okay.  Next one is 4.4.3, follow-up
11 phase.  And again, if you would, just look at
12 the bullet points under 4.4.3, and I would like
13 to ask you to verify that this is an accurate
14 description of how follow-up phase inspections
15 were conducted on Task Order 26.
16     A.  Yes.
17     Q.  Okay.  And did the QAR on the staff --
18 which I'm using that abbreviation as Quality
19 Assurance Representative from the Corps.  Did
20 the QAR from the Corps document results of the
21 follow-up phase inspections?
22     A.  It's Washington Group 's
23 responsibility to document that on a daily
24 quality control report.
25     Q.  Uh-huh.

Page 93

1      A.  And follow-up phases are normally
2  attended by the QAR side by side with the
3  Washington Group QC manager or superintendent
4  or foreman for that particular feature of work.
5      Q.  Do you know whether the quality
6  assurance representatives on Task Order 26
7  recorded the results of follow-up phase
8  inspections on quality assurance reports?
9      A.  Yes.
10     Q.  Do you know what a quality assurance
11 report is?
12     A.  Absolutely.  It's a daily report that
13 is prepared and typed by the government QAR and
14 combined and stapled to the daily quality
15 control report.
16     Q.  Okay.  I'm going to direct your
17 attention to one more page, WGI 47235.
18     A.  Okay.
19     Q.  The very top of the page, it's 5.12.2,
20 Pre-final Inspection.  Are you familiar with
21 this?
22     A.  Yes.
23     Q.  If you could take a look at the
24 description, do you think this is an accurate
25 description of pre-final inspections that were

GUILLORY (VOL II), LEE

8/22/2008

Page 94

1   conducted by the Corps on Task Order 26?
2       A.  This is one of the inspections, yes.
3       Q.  Okay.  And what was the other
4   inspection?
5       A.  You will have a substantial completion
6   inspection and a final inspection.
7       Q.  Take a look at 5.12.3, final
8   acceptance inspection.  How often were these
9   final acceptance inspections performed, if you
10  know?
11      A.  Depending on the scope of the
12  definable feature of work, they could be --
13  occur on like a one to three month interval as
14  each particular feature of work was finished,
15  but the final inspection is done at the very
16  conclusion of the task order.
17      Q.  Okay.  Do you know if all the
18  definable features of work on Task Order 26
19  were finally accepted by the Corps?
20      A.  Yes.  They would be documented in the
21  QA and QC reports.
22      Q.  Okay.  And if you could just look at
23  the description of the final acceptance
24  inspection, and I'll ask you if it's accurate
25  with respect to how final acceptance

Page 95

1   inspections were performed on Task Order 26.
2       A.  That is correct.
3       Q.  Okay.
4           The next exhibit is a compilation of
5   five individual pages.  I'm going to mark it
6   Guillory Exhibit Number 32.  The Bates numbers
7   are non consecutive, and the dates are all
8   different, so I'm not going to read that into
9   the record unless anyone objects.
10          Do you know what these are?
11          (Defendant's Exhibit 32 was marked for
12  identification and is attached hereto.)
13      A.  Those are quality control final
14  acceptance reports prepared by Washington Group
15  personnel and signed off by Corps QA personnel.
16  EXAMINATION BY MS. CLAYMAN:
17      Q.  And it looks like I have here one from
18  the -- well, the scope, on the top, says
19  demolition ITT facility, and then underneath it
20  lists what's included within that scope.  Is
21  that accurate?
22      A.  Yes.
23      Q.  Okay.  And in the middle it says all
24  work is complete, acceptable and complies with
25  contract requirements.

Page 96

1           What does that mean?
2       A.  It means they've gone through the
3   entire portion and definable feature of work,
4   they've gone through the three phase QA/QC
5   process, and the work is acceptable to both
6   Washington Group and the Corps.
7       Q.  Okay.  And I just want you to quickly
8   look through -- there's five of them here,
9   there is one for ITT, one for Saucer Marine,
10  one for Indian Towing, one for Mayer Yacht, and
11  one for Boland Marine.  As far as you can tell,
12  are those all signed by the Corps?
13      A.  Yes.
14      Q.  Do you know who Alvin -- I'm going to
15  butcher his name.
16      A.  Alvin Clouatre, III was a QAR for the
17  government during a portion of the contract.
18      Q.  Clouatre.  Okay.  Thank you.
19          I'm marking this next document
20  Guillory Exhibit 33.  It's dated December 17th,
21  2001, memorandum for area engineer, New Orleans
22  area office.  Do you know what this document
23  is?
24          (Defendant's Exhibit 33 was marked for
25  identification and is attached hereto.)

Page 97

1       A.  Yes.  This is an internal assurance
2   inspection conducted by the Corps on its own QA
3   staff for this particular project.
4   EXAMINATION BY MS. CLAYMAN:
5       Q.  I noticed that you're copied on it on
6   the front page, attention Lee Guillory.  Is
7   this something you would have seen in December
8   of 2001?
9       A.  Yes.
10      Q.  Okay.  Do you know how often these
11  inspections -- internal inspections occurred?
12      A.  They were generally scheduled to be
13  done quarterly, not more than annually.
14      Q.  Okay.  And just turning to the second
15  page, I just want to ask you, it says QA
16  inspection team is R. Gonzalez.  Do you know
17  who that is?
18      A.  Yes.  That's Roger Gonzalez of
19  construction division.
20      Q.  Okay.  Just really quick flip to the
21  page at the bottom that's marked 0051 are the
22  last four digits.  The beginning Bates number
23  of this document is NCS-004-00000047.  And I
24  ask the witness the turn the page that ends in
25  0051.  It says definable feature of work, sewer

25  (Pages 94 to 97)

GUILLORY (VOL II), LEE

8/22/2008

Page 98

1  lift station removal and cofferdam
2  installation.
3      Do you know if Mr. Gonzalez attended
4  the preparatory meeting for the removal of the
5  sewer lift station?
6      A.  No.  He did not.
7      Q.  Do you know what he is basing his
8  evaluation on?
9      A.  He's reviewing all the documentation
10  and QA/QC reports and the preparatory
11  inspection meeting minutes and seeing if all of
12  that is very well documented and prepared and
13  scheduled.
14      Q.  Okay.  The next exhibit I would like
15  to mark will be Number 34.  And it is a
16  Morrison Knudsen Corporation Contractor
17  Information request dated February 2nd, 2001.
18      Do you know what this is,
19  Mr. Guillory?
20      (Defendant's Exhibit 34 was marked for
21  identification and is attached hereto.)
22      A.  The form in general is a standard form
23  developed by M-K/Washington Group to request
24  some clarification on a specific issue of the
25  project from the Corps.  They would

Page 99

1  specifically identify what the problem or the
2  issue was, an explanation of why it occurred,
3  why it has come up, they would give a possible
4  resolutions to the problem and what impact it
5  would have financially, physically to the
6  schedule of the project, and then they would
7  submit that to our on-site senior project
8  engineer Jim Montegut.
9      Q.  Okay.  Do you know how often these
10  were used by Washington Group?
11      A.  Just periodically as an issue came up
12  that was not addressed in the scope of work or
13  an M-K/Washington Group proposal or something
14  like that, or if Washington Group proposed a
15  change to the staff in any kind of way.
16      Q.  Change to the staff, is that what this
17  particular CIR is referencing?
18      A.  Yes.  Washington Group is requesting
19  permission to add a field engineer to the IHNC
20  staff for seventeen months.
21      Q.  And the first line it talks about an
22  environmental engineer.  Do you know if the
23  field engineer that Washington Group had in
24  mind was an environmental engineer or some
25  other kind of engineer?

Page 100

1      A.  Give me a second to read it.
2      Q.  Sure.
3      A.  Okay.  Now repeat your question.
4      Q.  Actually, let me rephrase it and try
5  to make it easier.  Under III, the second
6  paragraph describes the type of experience that
7  Washington Group is looking for in a field
8  engineer.  In your opinion is that an
9  environmental engineer or some kind of general
10  certified engineer or professional engineer?
11      A.  It appears to be just a general
12  engineer that could be utilized also as an
13  alternate quality control system manager on
14  site.
15      Q.  Uh-huh.  And he would have to have
16  experience in remediation, sampling and
17  analysis and risk-based corrective action, is
18  that correct?
19      A.  That's what it says.
20      Q.  I'm marking the next exhibit Guillory
21  Exhibit Number 35.  And it is a cover E-mail
22  and attachment from Lee Guillory dated
23  June 18th, 2001.  I'm going to give you a
24  minute to look at it, but do you recognize this
25  document?

Page 101

1      (Defendant's Exhibit 35 was marked for
2  identification and is attached hereto.)
3      A.  Let me check.
4  EXAMINATION BY MS. CLAYMAN:
5      Q.  Okay.
6      A.  Yes, this is a draft scope of work
7  that was developed by Washington Group and sent
8  to the Corps for our review and comments to
9  enter into a subcontract for excavation and
10  disposal of concrete, concrete rubble, fly ash,
11  soil, contaminated and hazardous soils, and any
12  underground objects found during the
13  geophysical and grid trenching survey at the
14  six sites of the EBIA.
15      Q.  Okay.  And the E-mail is from you, and
16  then there's -- it's to, and it looks just like
17  an E-mail address.  Do you know who that E-mail
18  address is DOco352475?
19      A.  That's Dennis O'Connor, Washington
20  Group project manager.
21      Q.  Okay.  Just looking at the third page
22  in with the Bates number 1388, do you know
23  whose handwriting is marked up all over this
24  page?
25      A.  Mine.

26 (Pages 98 to 101)

GUILLORY (VOL II), LEE

8/22/2008

Page 102

1    Q.  Are these your comments throughout --
2    A.  Yes.
3    Q.  -- the draft?
4       Okay.  And if you'll turn to the page
5  with Bates number ending 1391, Section 7 under
6  quality control, it looks like you've put --
7  the second paragraph under Section 7 you have
8  marked up with edits.  So you've inserted a
9  carat, it says Washington Group, and then
10  you've inserted and the Corps will review the
11  work plan as part of the subcontractor's
12  selection process.
13       Why did you add the Corps in there?
14    A.  Because using the collaborative
15  process between the Corps and Washington Group,
16  as you can see we worked hand in hand in
17  developing the scopes of work for the
18  subcontracts, then once Washington Group
19  advertised for bid on the subcontracts they
20  received the bids, did a technical evaluation
21  on proposals and evaluated the costs, put those
22  in a matrix, and then made a recommendation on
23  the top one, two or three subcontractors that
24  they would recommend awarding the subcontract
25  to.  That was then conveyed to the Corps and

Page 103

1  discussed with the contracting officer in
2  Tulsa, and then finally the contracting officer
3  would sign off on the recommendation, or make a
4  counter-recommendation as to who he thought the
5  subcontract should be awarded to, and then
6  Washington Group complemented that subcontract
7  and awarded that subcontract.
8    Q.  Okay.  I want to direct your attention
9  to the document with the Bates number ending in
10  1398.
11    A.  Okay.
12    Q.  At the very bottom, the bottom section
13  is 3.0, site maintenance, and it says -- I
14  guess it's the fifth line up from the bottom --
15  any areas requiring backfill may obtain it from
16  a borrow pit established at the McDonough
17  project site.  And it looks like a carat, and
18  then you have written in the words, or imported
19  material.  Is that your handwriting?
20    A.  Yes.
21    Q.  What did you mean by imported
22  material?
23    A.  If there was not sufficient
24  material -- borrow material available from the
25  McDonough Marine on-site borrow area, we could

Page 104

1  have the option of importing or having
2  Washington Group purchase additional material
3  to be truck hauled into the site for use as
4  backfill.
5    Q.  Did you have to approve the material
6  that Washington Group chose to import into the
7  site?
8    A.  Yes.  We had -- if that situation ever
9  came up, they proposed it to COR Jim Montegut
10  and gave him an estimate on, um -- where the
11  material would come from, what type of material
12  it would be and the cost associated with
13  purchasing and trucking the material on site.
14    Q.  Okay.  And so he would have to approve
15  it before Washington Group would be allowed to
16  actually bring it onto the site?
17    A.  Correct.
18    Q.  We talked about a three phase quality
19  assurance program or quality control program.
20  And I'd like to mark the next exhibit Guillory
21  Exhibit number 36.  It is Preparatory Phase
22  Meeting Minutes dated March 29, 2001.  Do you
23  recognize this document?
24       (Defendant's Exhibit 36 was marked for
25  identification and is attached hereto.)

Page 105

1    A.  Yes.
2  EXAMINATION BY MS. CLAYMAN:
3    Q.  What is it?
4    A.  It's the meeting minutes documenting
5  the preparatory phase meeting for building
6  demolition, concrete demolition and piling
7  removal.
8    Q.  And you attended this meeting?
9    A.  Yes.  I did.
10    Q.  Do you know why there's four
11  representatives from the Corps at this meeting?
12    A.  That's our entire three-person on-site
13  staff plus myself as construction manager.
14    Q.  Do you know who drafted these meeting
15  minutes?
16    A.  Again, Washington Group, and attached
17  to their quality control report.
18    Q.  Would someone from the Corps have
19  reviewed them to make sure that they were
20  accurate?
21    A.  Yes.
22    Q.  And under main topics discussed during
23  the meeting, Numbers 3 through 6 is building
24  demolition, concrete demolition, piling removal
25  and equipment.  Can you tell me in general what

27 (Pages 102 to 105)

GUILLORY (VOL II), LEE

8/22/2008

Page 106

1  level of detail these topics would have been
2  discussed?
3      A.  Generally, we would have taken the
4  actual scope of work from the subcontract and
5  the project work plans and quality control
6  plans and have discussed each of the phases of
7  work, what we expected from the contractors and
8  subcontractors, what level of quality control
9  that we expected of all the different tiers and
10  what type of QA the government would provide
11  during those phases of work.
12     Q.  The next document is going to be
13  Exhibit Number 37, and it is a cover submittal
14  page that says demolition work plan submitted
15  by Hamp's Construction L.L.C., building and
16  control demolition and onshore piling removal.
17  Have you ever seen this document before?
18     (Defendant's Exhibit 37 was marked for
19  identification and is attached hereto.)
20     A.  Yes, I signed it on April 12, 2001.
21  EXAMINATION BY MS. CLAYMAN:
22     Q.  When you just mentioned previously
23  that a subcontractor work plan would have been
24  discussed during the preparatory meeting for
25  demolition and onshore piling removal, is this

Page 107

1  what you were referring to?
2      A.  Yes.
3      Q.  Under the remarks on the first page,
4  it says approved except as noted, see red-lined
5  changes.  And then in the code box on the top
6  right-hand corner there's a letter B.  What
7  does that mean?
8      A.  B is approved except as noted by.
9  Comments.  However, a resubmittal is not
10  required by Washington Group.
11     Q.  And these red-lined changes would have
12  been your changes?
13     A.  Either my changes or the, um --
14  on-site field staff.
15     Q.  Okay.  I just want to direct your
16  attention to one thing in here.  It's
17  Section 3.9, and it's on Page NCS-012, and it
18  end in 068.
19     A.  Okay.
20     Q.  And looking at -- the title of this
21  section is lift station removal.  Looking down
22  at the third paragraph, it says that they're
23  contemplating a depth of excavation of
24  approximately 24 feet.
25     When did you first learn how deep the

Page 108

1  excavation of the lift station was going to be,
2  or proposed to be?
3      A.  During the course of developing the
4  scope of work for the subcontract to be
5  advertised by Washington Group.
6      Q.  So would it have been before you
7  received this work plan dated February 20th,
8  2001?
9      A.  We would have known the approximate
10  depth that we had to go at that point because
11  Washington Group requested and received some
12  as-built drawings from the New Orleans Sewerage
13  & Water Board on that particular lift station
14  showing the actual conditions of construction
15  and approximate depth of the base slab and the
16  foundation piling under it.
17     Q.  And did you review the request for
18  proposal that was sent out by Washington Group
19  in connection with the lift station?
20     A.  It was all contained within the entire
21  subcontract for excavation and piling removal
22  and all that stuff.  That was eventually
23  awarded to Hamp's Construction Company.
24     Q.  Right.  So is the answer to my
25  question you would have reviewed it, yes?

Page 109

1      A.  Yes.
2      Q.  Okay.  Thank you.  No other questions.
3      Next document -- I'm going to actually
4  hand you two documents together.  They're both
5  dated 4/11/2001.
6      Okay.  There are three documents,
7  sorry.  You're right, there are three
8  documents, and they're all dated 4/11/2001.
9  And I'm going to mark these Exhibit 38 to the
10  Guillory deposition.
11     This will be very quick:  Do you
12  recognize these three documents?  Just take a
13  minute to look at them.
14     MR. JOANEN:
15         Is this 38 in globo?
16     MS. CLAYMAN:
17         Yes.
18     (Defendant's Exhibit 38 in globo was
19  marked for identification and is attached
20  hereto.)
21     A.  Yes, this is the agenda and the
22  preparatory phase checklist and the preparatory
23  phase meeting minutes for the demolition
24  portion of work all written by Washington Group
25  and attached to their QC reports.

Johns Pendleton Court Reporters

800 562-1285

Page 110

1  EXAMINATION BY MS. CLAYMAN:
2      Q.  Okay.  Looking at the 4/11 -- well,
3  actually, what feature of work is this for?
4      A.  Demolition of structures.
5      Q.  Okay.  And looking at the document
6  Bates labeled WGI 26522 --
7      A.  Okay.
8      Q.  -- who is Steven Keen?
9      A.  Steven was another of our QARs on
10  site.
11     Q.  And he attended this preparatory phase
12  meeting?
13     A.  Yes.
14     Q.  And do you know if the Corps reviewed
15  the minutes of these meetings?
16     A.  Absolutely.
17         (Off the record.)
18  EXAMINATION BY MS. CLAYMAN:
19     Q.  I'd like to mark the next exhibit
20  Guillory 39.  And this is -- it says, Initial
21  Phase Inspection Checklist Form, Demolition at
22  Saucer Marine and Mayer Yacht dated 4/23/01.
23  Do you recognize this document?
24         (Defendant's Exhibit 39 was marked for
25  identification and is attached hereto.)

Page 111

1      A.  Yes.
2  EXAMINATION BY MS. CLAYMAN:
3      Q.  What is it?
4      A.  It's a typical quality control
5  document by Washington Group documenting that
6  they held an initial phase inspection on the
7  demolition definable feature of work, who
8  attended, what occurred, what they discussed,
9  and what if anything they needed to change.
10     Q.  Any reason to believe this is not an
11  accurate description of the results of the
12  initial inspection?
13     A.  Nope.
14     Q.  Okay.  The next is two documents, one
15  is dated 8/8/01, and it says Preparatory Phase
16  Inspection Checklist for Bulkhead and Sheet
17  Piling Removal, feature of work demolition, and
18  the second one is Initial Phase Inspection
19  Checklist Form dated 8/28/01, the definable
20  feature of work bulkhead steel sheet piling
21  removal.  They're going to be one exhibit.
22  We're going to mark them Number 40.
23         Do you recognize these documents?
24         (Defendant's Exhibit 40 was marked for
25  identification and is attached hereto.)

Page 112

1      A.  Yes.  Same three phase inspection type
2  of forms.
3  EXAMINATION BY MS. CLAYMAN:
4      Q.  And the bulkhead and sheet piling
5  removal, what is that referring to?
6      A.  There were a number of steel and
7  wooden bulkheads along the water's edge,
8  specifically around Mayer Yacht they had a,
9  um -- a slip that was built into the land, and
10  it was surrounded by steel sheet pile, a
11  concrete apron, and a lot of equipment, and an
12  abandoned boat lift.  And all of that had to be
13  removed.
14     Q.  Do you have any reason to believe that
15  this is not an accurate description of either
16  of the preparatory phase inspection checklists
17  and preparatory meeting minutes or the initial
18  phase inspection checklist form?
19     A.  Nope.
20     Q.  And both of these -- well, the meeting
21  and the inspection was attended by the Corps?
22     A.  Correct.
23     Q.  Okay.
24         The next document is a series of four
25  pages, and each one of them is labeled

Page 113

1  pre-final inspection report, and they're for
2  four different sites.  And I'm labeling all
3  four of them Guillory Exhibit Number 41.  Do
4  you know what those are?
5          (Defendant's Exhibit 41 was marked for
6  identification and is attached hereto.)
7      A.  QC reports for pre-final inspection;
8  Indian Towing, Mayer Yacht, Boland Marine and
9  McDonough Marine.
10  EXAMINATION BY MS. CLAYMAN:
11     Q.  Looking at the first one for Indian
12  Towing which is dated August 10th, 2001, under
13  the words scope and demolition, it says, punch
14  list items.  What are punch list items?
15     A.  Punch list items are those minor items
16  that have not been fully completed on that
17  particular definable feature of work, and
18  they're listed for the contractor to follow up
19  with until they're completed.
20     Q.  And after they're completed, is that
21  when the Corps will sign off that that
22  particular feature of work has been accepted?
23     A.  Correct.  There will be a final
24  inspection report that will sign off on those.
25     Q.  Do you know if there were pre-final

GUILLORY (VOL II), LEE

8/22/2008

Page 114

1  inspection actual forms filled out for every
2  single feature of work, or --
3      A.  I'm not sure.
4      Q.  Okay.
5      A.  If it was a major feature of work it
6  probably had both pre-final and a final.  If it
7  was just a normal, routine item of work they
8  may have just had a final inspection.
9      Q.  Okay.  I'm going to mark the next
10 document Guillory Exhibit 42.  It's undated,
11 and it's entitled Sketch 1 - Boland Marine
12 Subsurface Foundations.  I'll give you a minute
13 to look at it.
14     Do you know what this document is?
15     (Defendant's Exhibit 42 was marked for
16 identification and is attached hereto.)
17     A.  Yes.  This is a sketch or a map
18 developed by Washington Group and given to the
19 Corps of I believe there were eight unknown
20 concrete foundations and slabs at the Boland
21 Marine site that were discovered during the
22 course of the grid trenching and demolition
23 portions of work.
24 EXAMINATION BY MS. CLAYMAN:
25     Q.  I believe you testified about

Page 115

1  something previously called the wedding cake
2  structure?
3      A.  Correct.
4      Q.  Do you know which one of these
5  structures identified on this map is the
6  wedding cake structure?
7      A.  The one identified as the southern
8  block.
9      Q.  Southern block.  Okay.  And can you
10 tell from this map, or do you know from your
11 own personal experience, how far from the
12 floodwall the southern block or wedding cake
13 structure is?
14     A.  I would estimate a hundred to a
15 hundred and fifty feet away.
16     Q.  Okay.  Do you know if it was further
17 away than -- or further west than the sewer
18 lift station?
19     A.  Yes, it was.
20     Q.  Okay, it was.
21     I'd like to mark the next exhibit
22 Guillory 43.  And this is a memorandum for the
23 record regarding Modification 2610, Excavation
24 and Disposal of Additional Subsurface
25 Foundations, Technical Analysis of Morrison

Page 116

1  Knudsen 's proposal dated 28 August 2001.
2      Do you know what this document is?
3      (Defendant's Exhibit 43 was marked for
4  identification and is attached hereto.)
5      A.  Yes, it's a technical analysis of the
6  proposal and it was drafted and signed by me.
7  EXAMINATION BY MS. CLAYMAN:
8      Q.  And what's the purpose of a technical
9  analysis of Morrison Knudsen 's proposal?
10     A.  The contracting officer solicits a
11 proposal for any modification directly from the
12 contractor, they turn that in for our review.
13 Concurrently we develop a government estimate
14 for what we think the cost of equipment, labor,
15 overhead and all costs associated with that
16 modification will be, and the technical
17 analysis is a formal document comparing the two
18 between the contractor's proposal and the
19 government estimate and details the differences
20 between the two.
21     Q.  Okay.  I just wanted to turn to the
22 second page of the document.  And it's Section
23 b, and then it says Section 2.1, Page 3,
24 Technical Assumption Number 7:  WGI estimates
25 that 900 cys of off-site imported material will

Page 117

1  be necessary for backfilling removed
2  foundations.  WGI 's proposal should address
3  that the primary source of backfill material
4  will be the on-site McDonough Marine borrow
5  area.  And then it goes on to say that WGI and
6  NOD 's intent has been, from the beginning, to
7  utilize an on-site borrow area to minimize the
8  quantity, i.e., cost of importing backfill
9  material.
10     Did you write that section?
11     A.  Yes.
12     Q.  Maybe this is obvious, but what was
13 the concern with importing -- how does that
14 increase cost?
15     A.  The cost increased by having to
16 purchase off-site commercial material, whether
17 it be sand, clay, gravel, crushed stone or
18 whatever, and paying for the actual material
19 cost, the transportation and delivery cost,
20 and, um -- using that material on the site.
21     Likewise, for the scope of the overall
22 project, if that backfill material is placed in
23 an area that would be subsequently dredged when
24 the two bypass channels are done for the
25 overall project, it would increase the cost of

Johns Pendleton Court Reporters                    800 562-1285

GUILLORY (VOL II), LEE

8/22/2008

Page 118

1  that dredging because we would be not only
2  purchasing the material but hydraulically
3  dredging and disposing of it again at
4  additional cost.
5      Q.  Are you familiar with the -- or were
6  you familiar, at the time when you did this
7  technical analysis, of the design for the
8  bypass channels in the East Bank Industrial
9  Area?
10     A.  Yes.
11     Q.  Do you know approximately how much of
12  the site those -- or how much of the site those
13  two bypass channels would cover?
14     A.  Approximately two thirds of the site
15  would be involved in both the lay in and
16  transit bypass channels.
17     Q.  So two-thirds of the site would be
18  dredged down to I believe you said before
19  22 feet.  Is that correct?
20     A.  -22 elevation and -31.
21     Q.  And -31 is the second bypass channel?
22     A.  Right.  The lay in bypass channel is
23  down to -22 NGVD and the transit bypass channel
24  is -31 NGVD.
25     Q.  And which one is further west, the

Page 119

1  deeper one?
2      A.  The deeper one.
3      Q.  Okay.
4          Next document I'd like to mark is
5  going to be Guillory Deposition Exhibit 44.
6  And it is Preparatory Phase Meeting Minutes for
7  Excavation and Demolition of Concrete
8  Foundation Blocks dated November 14th, 2001.
9  Do you recognize this document?
10         (Defendant's Exhibit 44 was marked for
11  identification and is attached hereto.)
12     A.  Yes.
13  EXAMINATION BY MS. CLAYMAN:
14     Q.  What is it?
15     A.  Exactly as you described it,
16  preparatory phase meeting minutes of that
17  definable feature of work based on that
18  Modification 2610.
19     Q.  Do you know where these concrete
20  foundation blocks were?  What site?
21     A.  Eight of them were at Boland Marine's
22  site.
23     Q.  And would this include the wedding
24  cake structure?
25     A.  Yes.

Page 120

1      Q.  Okay.  Turning to the second page of
2  the notes -- or of the meeting minutes,
3  Paragraph B, starting at the fourth line up
4  from the bottom of that paragraph, walers will
5  be removed and backfill will continue to grade.
6  Backfill material will be provided by WGI from
7  the on-site borrow.
8          Where is the on-site borrow?
9      A.  The McDonough Marine borrow site.
10     Q.  Is it your understanding that the
11  wedding cake structure was backfilled with
12  material from the on-site borrow pit?
13     A.  First it was, the cofferdam was
14  backfilled by the material that was removed
15  from within the cofferdam excavation, and if
16  any additional makeup material was required it
17  came from the McDonough Marine borrow area.
18     Q.  Okay.  And what does backfill to grade
19  mean?
20     A.  That is essentially backfill and
21  compact to the existing grade of the adjacent
22  land.
23     Q.  Okay.  And do you understand that the
24  QARs on site from the Corps were responsible
25  for making sure that what was discussed during

Page 121

1  these preparatory phase meetings was actually
2  carried out by Washington Group and its subs?
3      A.  Absolutely.  The subcontractor was
4  responsible for his own quality control,
5  Washington Group 's personnel did quality
6  assurance on top of that sub, and then the
7  Corps did quality assurance on top of that.
8      Q.  Okay.  I'd like to mark the next
9  exhibit Guillory Exhibit 45.  And it is -- it
10  says it's an IHNC Project Initial Phase
11  Inspection Checklist Form dated 12/6/2001.  Do
12  you recognize this document?
13         (Defendant's Exhibit 45 was marked for
14  identification and is attached hereto.)
15     A.  Yes.
16  EXAMINATION BY MS. CLAYMAN:
17     Q.  Do you know whose handwriting this is?
18     A.  This is Ms. Sara Alvey, the Washington
19  Group contractor quality control system
20  manager.
21     Q.  Okay.  And it says location of work is
22  Boland Marine foundation block X-003.  Do you
23  know what X-003 refers to?
24     A.  That's one of the eight blocks
25  identified on that sketch previously.

GUILLORY (VOL II), LEE

8/22/2008

Page 122

1    Q.  Not the wedding cake structure?
2    A.  No.  The wedding cake structure was
3  identified as X-004.
4    Q.  Any reason to believe this initial --
5  or this record of the initial inspection is
6  inaccurate?
7    A.  No.
8    Q.  The next document is Guillory
9  Exhibit 46.  I believe a similar document has
10  already been marked as Guillory Exhibit 8.
11  This one just has more pages to it, so I wanted
12  to add it to the record.
13    Could you take a look at this
14  document.
15    (Defendant's Exhibit 46 was marked for
16  identification and is attached hereto.)
17    A.  Sure.
18  EXAMINATION BY MS. CLAYMAN:
19    Q.  Do you know what it is?
20    A.  This is the cofferdam plan designed
21  and written by the subcontractor Hamps
22  Construction -- Hamp's Enterprise, Inc. with
23  another subcontractor Shavers-Whittle.  This is
24  for removal of the Boland Marine concrete
25  foundation X-004 also known as the wedding

Page 123

1  cake.
2    Q.  And I believe you testified on your
3  previous day of deposition that you reviewed
4  this plan before it was approved.
5    A.  Yes.
6    Q.  And commented on various drafts.
7    A.  Yes.  It went through several drafts.
8    Q.  Okay.  You can put that aside.
9    Next document is going to be marked
10  Guillory Deposition Exhibit 47.  It's entitled
11  Quality Assurance Report Daily Log of
12  Construction, and it's dated 13 December of
13  2001.  Do you know what this is?
14    (Defendant's Exhibit 47 was marked for
15  identification and is attached hereto.)
16    A.  This is a typical QA report written by
17  our QAR on site.
18  EXAMINATION BY MS. CLAYMAN:
19    Q.  Okay.  And I noticed on the first page
20  it says copy to, and it has your name in
21  parentheses.  Would you have received a copy of
22  these?
23    A.  I received a copy of each one.
24    Q.  Okay.  Looking down in the middle of
25  the first page, it says work performed today,

Page 124

1  and letter B says drove sheet pile for
2  construction -- for constructing cofferdam for
3  removing concrete Foundation Number 004 at
4  Boland Marine.
5    I believe you just testified that
6  Foundation Number 004 is the wedding cake.
7    A.  Correct.
8    Q.  Okay.
9    A.  A/k/a the southern block.
10    Q.  And turning to the next page it looks
11  like there's a follow-up.  It says follow-up
12  excavation and demolition of concrete
13  foundations.  Was this something that was
14  written by the QAR on site?
15    A.  Correct.  He is documenting the
16  follow-up phase.
17    Q.  Any reason to believe this is an
18  inaccurate description of what happened?
19    A.  No.
20    Q.  Okay.  Next document is Guillory
21  Exhibit 48.  It is another quality assurance
22  report.  It's dated February 22nd, 2002.  Do
23  you recognize this document?
24    (Defendant's Exhibit 48 was marked for
25  identification and is attached hereto.)

Page 125

1    A.  Yes.
2  EXAMINATION BY MS. CLAYMAN:
3    Q.  Directing your attention to the second
4  page, it looks like it's been signed by Alvin
5  Clouatre.
6    A.  Correct.
7    Q.  And then next to it it has
8  supervisor 's initials.  Do you know whose
9  initials these are?
10    A.  Those are Jim Montegut.
11    Q.  Okay.  And on the first page under
12  letter B it refers again to Concrete Foundation
13  Number 4 cofferdam.  Is that the wedding cake
14  structure?
15    A.  Correct.
16    Q.  Any reason to believe this description
17  is inaccurate?
18    A.  No.
19    Q.  Okay.  If you could just turn to the
20  third page, on the top it says February 22nd,
21  2002, Washington Group International.  Do you
22  know what this is?
23    A.  This is the daily quality control
24  report prepared by Washington Group.
25    Q.  And when you received this QAR report,

32 (Pages 122 to 125)

GUILLORY (VOL II), LEE

8/22/2008

Page 126

1   was the daily quality control report from
2   Washington Group attached to it?
3       A.  Yes.  Typically each one is stapled to
4   the other.
5       Q.  Okay.  The next document is Guillory
6   Deposition Exhibit 49.  It's another quality
7   assurance report dated Sunday through Monday
8   February 24th and 25th, 2002.  Do you recognize
9   this document?
10          (Defendant's Exhibit 49 was marked for
11   identification and is attached hereto.)
12      A.  Yes.
13   EXAMINATION BY MS. CLAYMAN:
14      Q.  On the second page, are these the
15   signatures of Alvin Clouatre and Jim Montegut?
16      A.  The initials are Jim Montegut, yes.
17      Q.  Okay.  On the second page, under
18   remarks, it looks like your name is on here,
19   project manager.  You were on the site for two
20   hours; is that right?
21      A.  Correct.
22      Q.  And it says your duties were QAR.
23   What does that mean that you were doing?
24      A.  That's an error.  It should have said
25   construction manager.

Page 127

1       Q.  Okay.  What would you have been doing
2   at the site when you were there for two hours?
3   If you know or you remember?
4       A.  Chances are on that particular date we
5   had a meeting -- coordination meeting with
6   Hamp's Enterprises, Washington Group and our
7   Corps staff to discuss the, um -- removal and
8   disposal of the wedding cake.
9       Q.  All right.  And directing your
10   attention further up on the page, the same page
11   Bates numbered ending in 1096, under the second
12   paragraph of follow-up excavation and
13   demolition of concrete foundation, it says
14   observed SK220 excavator relaying borrow
15   material into deep grade and PC400 excavator
16   backfilling bottom of cofferdam to bottom of
17   second waler at approximately elevation -16.
18   Assure cofferdam is backfilled in two-foot
19   lifts and compacted with bucket.
20          First question:  Do you know what
21   borrow material means?
22      A.  Yes.  It could have been the adjacent
23   material that was previously excavated from
24   within the cofferdam or on-site material that
25   came from the McDonough Marine borrow area.

Page 128

1       Q.  Okay.  And do you know how a QAR,
2   which is a Corps inspector, would assure that a
3   cofferdam is backfilled in two-foot lifts and
4   compacted?  Is there anything beyond just
5   visually watching?
6       A.  Visual observation of the cofferdam
7   and the work, and if safe access is provided
8   down into the cofferdam he may climb down a
9   ladder and use a tape measure to measure the
10   lifts.
11      Q.  Any reason to believe this description
12   is inaccurate of the events that happened on
13   this day?
14      A.  No.
15      Q.  I'm going to next hand you two
16   documents.  I'm going to label them as one
17   Exhibit.  This will be Exhibit 50.  They are --
18   the top document is dated March 21, 2002, and
19   it says Pre-final Inspection Report, and the
20   second document is dated March 27th, 2002, and
21   it says Final Acceptance Report.  Do you
22   recognize these two documents?
23          (Defendant's Exhibit 50 in globo was
24   marked for identification and is attached
25   hereto.)

Page 129

1       A.  Yes.
2   EXAMINATION BY MS. CLAYMAN:
3       Q.  Okay.  What is the top one with the
4   Bates Number 23833?
5       A.  That is Pre-final Inspection QC Report
6   for excavation of the concrete anchor
7   foundation blocks and steel forms at Boland
8   Marine.
9       Q.  Would this include the wedding cake
10   structure?
11      A.  Yes.
12      Q.  Okay.  Looking at the second document,
13   it says final inspection report.  Is this also
14   for the concrete foundation blocks and steel
15   forms at Boland?
16      A.  Yes.
17      Q.  And this also includes the wedding
18   cake?
19      A.  Yes, it specifically says it in the
20   third line down under scope.
21      Q.  Oh, good.  The description under the
22   heading scope, is that all of the various items
23   that the QC manager from Washington Group and
24   the Corps QAR person inspected and accepted?
25      A.  Yes.

Johns Pendleton Court Reporters                    800 562-1285

GUILLORY (VOL II), LEE

8/22/2008

Page 130

1      Q.  So that includes backfill and
2   compaction of the excavations?
3      A.  Correct.
4      Q.  And installation and removal of the
5   cofferdam for Foundation Number 004?
6      A.  Correct.
7      Q.  And is that the Corps' signature, or
8   is that Alvin Clouatre 's signature?
9      A.  Yes.
10     Q.  Okay.  I'm handing the witness a
11  document marked Guillory Exhibit 51.
12        Do you recognize this document?
13        (Defendant's Exhibit 51 was marked for
14  identification and is attached hereto.)
15     A.  Yes, this is the monthly project
16  photos submitted by Washington Group to the
17  Corps.
18  EXAMINATION BY MS. CLAYMAN:
19     Q.  Why was Washington Group required to
20  submit monthly photographs to the Corps?
21     A.  We wrote in the scope of work that
22  Washington Group was supposed to submit
23  approximately thirty to forty progress
24  photographs to the Corps on a monthly basis for
25  the duration of the project.

Page 131

1       MR. STONE:
2         Anybody have any problem with us
3   substituting color photographs later
4   for this exhibit?
5       MR. TREEBY:
6         No.
7       MR. STONE:
8         Any problem with substituting
9   color photographs later for these
10  exhibits?
11      MR. JOANEN:
12        No, not at all.
13      MR. STONE:
14        Are you guys going to keep the
15  exhibits for it?
16      MS. WAGER-ZITO:
17        We'll substitute it.
18      MR. STONE:
19        Thanks.
20  EXAMINATION BY MS. CLAYMAN:
21     Q.  Turning to the second page of the
22  document, Bates label at the bottom ends in
23  6091.  At the bottom it says excavating inside
24  the cofferdam.  Do you know what this is a
25  cofferdam for?

Page 132

1      A.  This is the cofferdam for the sewer
2   lift station removal.
3      Q.  Okay.  Can you tell by looking at the
4   number at the bottom of the photograph what the
5   date is?
6      A.  Yes.
7      Q.  What's the date of this document?  Or
8   this photograph?
9      A.  Which one, top or bottom?
10     Q.  The top one.
11     A.  Top one is October 31, 2001.
12     Q.  Okay.  And looking at this
13  photograph -- and I apologize yours is in black
14  and white -- can you estimate looking at the
15  photograph how far away the sewer lift station
16  is from the floodwall?
17     A.  I would say the eastern face of the
18  cofferdam is approximately 80 to 100 feet away
19  from the wall.
20     Q.  Okay.  And how would you characterize
21  the relative size of this cofferdam, looking at
22  the picture, compared to the rest of the site?
23     A.  Very small and compact.
24     Q.  Do you know approximately how wide it
25  was?

Page 133

1      A.  Don't recall the dimensions.
2      Q.  Okay.  I'm marking the next exhibit
3   Guillory Exhibit 52.  And this is a QAR Daily
4   Log of Construction dated September 18, 2001.
5   Do you recognize this document?
6        (Defendant's Exhibit 52 was marked for
7   identification and is attached hereto.)
8      A.  Yes.
9   EXAMINATION BY MS. CLAYMAN:
10     Q.  Do you know who drafted this document?
11     A.  Alvin Clouatre, III.
12     Q.  Okay.  And do you have any reason to
13  believe anything Alvin wrote in this QAR is
14  inaccurate?
15     A.  No.  I would stand by the report.
16     Q.  The next document I'm going to label
17  Guillory Exhibit 53.  And it's entitled
18  Preparatory Phase Inspection Checklist, Sewer
19  Lift Station Removal dated 10/3/01.  And I
20  believe it also includes a preparatory phase
21  inspection meeting agenda and a preparatory
22  phase meeting minutes.  Do you recognize this
23  document?
24        (Defendant's Exhibit 53 was marked for
25  identification and is attached hereto.)

34 (Pages 130 to 133)

GUILLORY (VOL II), LEE

8/22/2008

Page 134

1    A.  Yes.  The typical QC documents for a
2  preparatory phase in a three phase inspection
3  system.
4    EXAMINATION BY MS. CLAYMAN:
5    Q.  Okay.  And it appears to indicate, if
6  you turn to the preparatory phase meeting
7  minutes Bates number ending 36984, um -- it
8  appears that there are three representatives
9  from the Corps at this meeting.
10    A.  Correct.
11    Q.  Mr. Ariatti you said was a project
12  engineer?
13    A.  Correct.
14    Q.  Okay.  Any reason to believe anything
15  in these meeting minutes are inaccurate?
16    A.  No.
17    Q.  Is this something that someone from
18  the Corps would have reviewed and approved?
19    A.  Yes.
20    Q.  Okay, the next document I'm handing
21  you is Guillory Exhibit 54.  And it is a
22  transmittal cover sheet dated October 19, 2001,
23  lift station removal plan, revision 2.  Do you
24  recognize this document?
25    (Defendant's Exhibit 54 was marked for

Page 135

1  identification and is attached hereto.)
2    A.  Yes.
3    EXAMINATION BY MS. CLAYMAN:
4    Q.  I believe a similar document was
5  marked as Exhibit 9 already to the Guillory
6  deposition, but this seems to have more pages
7  so I wanted to show it to you.  What does the
8  letter A in the right-hand corner stand for?
9    A.  Approved.
10    Q.  Approved?  And whose signature is that
11  at the bottom?
12    A.  Jim Montegut.
13    Q.  Do you have any reason to believe this
14  is not the finally approved cofferdam plan for
15  the lift station removal?
16    A.  No.  This is the final.
17    Q.  Okay.  And next I'm going to hand you
18  a document marked Guillory Exhibit 55.  And on
19  the top it says initial Phase Inspection
20  Checklist Form, Demolition - Sewer Lift Station
21  Removal Cofferdam Installation dated 10/30/01.
22  Do you recognize this document?
23    (Defendant's Exhibit 55 was marked for
24  identification and is attached hereto.)
25    A.  Yes.

Page 136

1  EXAMINATION BY MS. CLAYMAN:
2    Q.  Do you know who drafted this?
3    A.  Sara Alvey, CQC system manager for
4  Washington Group.
5    Q.  And the Corps would have reviewed
6  this?
7    A.  Yes.
8    Q.  Okay.
9    A.  And they participated in the meeting.
10    Q.  Okay.  Any reason to believe anything
11  in here is inaccurate?
12    A.  No.
13    Q.  I'm handing you a document marked
14  Guillory Exhibit 56.  It is a QAR dated
15  Tuesday, November 6th, 2001.  Do you recognize
16  this document?
17    (Defendant's Exhibit 56 was marked for
18  identification and is attached hereto.)
19    A.  Yes.
20  EXAMINATION BY MS. CLAYMAN:
21    Q.  Do you know who would have written
22  this?
23    A.  QAR Alvin Clouatre, III.
24    Q.  Okay.  And if you take a look at the
25  follow-up notes on the second page of the

Page 137

1  document under lift station removal, any reason
2  to believe that this is an inaccurate
3  description of the follow-up inspection?
4    A.  No.
5    Q.  I'd like you to take a look at your
6  testimony from June 30th, on Page 166, starting
7  at Line 13 and going down to Page 167, Line 5.
8  Look at that.  And I believe this testimony
9  relates to braced excavations of the lift
10  station.  Is that correct?
11    MR. BRUNO:
12      Objection.  I'm going to object
13    to counsel suggesting what the
14    testimony is or isn't.
15    MS. CLAYMAN:
16      That's fine.
17    MR. BRUNO:
18      No.  No.  Let the witness just
19    read the pages, and if you have a
20    question ask a question.
21  EXAMINATION BY MS. CLAYMAN:
22    Q.  I'll read it.
23    MR. BRUNO:
24      I object.
25    MS. CLAYMAN:

Johns Pendleton Court Reporters                    800 562-1285

GUILLORY (VOL II), LEE

8/22/2008

Page 138

1        You object to me reading it?
2     MR. BRUNO:
3        Yes, I do.
4     MS. CLAYMAN:
5        Too bad.
6     MR. BRUNO:
7        Because I think it's an improper
8     use of the deposition for
9     cross-examination or direct
10    examination.  The witness has a right
11    to read the deposition --
12    EXAMINATION BY MS. CLAYMAN:
13    Q.  All right.  Would you read it into the
14 record.  Go ahead.
15    MR. BRUNO:
16       May I finish what I'm saying
17    before you interrupt me?
18    MS. CLAYMAN:
19       Go ahead.  Sorry.
20    MR. BRUNO:
21       Thank you.
22    MR. TREEBY:
23       Speaking objection.
24    MR. BRUNO:
25       It's not a speaking objection.

Page 139

1        I'm indicating that the witness has
2     the right, it's part of the objection,
3     to read -- most people would give him
4     the courtesy to read the pages that
5     they're about to be questioned on so
6     that they can familiarize themselves
7     with what it is that they're about to
8     be questioned about.  That's all.
9     It's nothing heavy.
10    MS. CLAYMAN:
11       Okay.  That's fine.  But I did
12    give him ample time to read it, did I
13    not?
14    MR. BRUNO:
15       No, you did not give him ample
16    time to read it.  You started reading.
17    MS. CLAYMAN:
18       That is not true.
19    EXAMINATION BY MS. CLAYMAN:
20    Q.  Did I ask you to read these pages?
21    A.  Yes, you did.
22    MR. BRUNO:
23       Which pages?  One page or two
24    pages or five pages?
25    MS. CLAYMAN:

Page 140

1        I said, line -- you know, if
2     you're not going to listen --
3     MR. TREEBY:
4        Joe, you weren't listening.
5     MR. BRUNO:
6        I'm saying to you that it's not
7     fair to suggest that the witness only
8     needs to read one page.  He may need
9     to read three.
10    EXAMINATION BY MS. CLAYMAN:
11    Q.  Okay.  Would you like to read -- read
12 whatever you would like on Page 16, 167 --
13    A.  I have read the designated portions on
14 Page 166 and 167, as asked.
15    MR. TREEBY:
16       And you asked him to start at
17    Line 13 on 166, right?
18    EXAMINATION BY MS. CLAYMAN:
19    Q.  My question is, does this testimony
20 relate to the lift station excavation?
21    A.  Correct.  It does address the sewer
22 lift station.
23    Q.  Okay.  And the question from Mr. Bruno
24 was, I understand so that your expectation was
25 that if there was going to be any potential

Page 141

1     effect or damage to the floodwall, you would
2     have expected the licensed engineers that WGI
3     hired to address those issues.  Correct?
4        And you answered correct.
5        And all I want to ask you is, on this
6     project Task Order 26, did you have any
7     concerns about the potential effect or damage
8     to the floodwall from the excavation of the
9     lift station?
10    A.  No.
11    Q.  Why not?
12    A.  Because the design and installation of
13 a braced cofferdam system does not allow soil
14 movement to occur that would adversely affect a
15 flood control structure.  And this cofferdam
16 and the other two at Boland Marine were, um --
17 designed by a professional licensed engineer in
18 the state of Louisiana and installed by
19 professional contractors with full quality
20 control and quality assurance during the entire
21 process.
22    Q.  And Mr. Guillory, if you thought as
23 the construction manager on this project that
24 you needed geotechnical input from somebody at
25 the Corps familiar with the levees and the

Johns Pendleton Court Reporters                    800 562-1285

GUILLORY (VOL II), LEE

8/22/2008

Page 142

1    design of the levees and floodwalls, would you
2    have sought that?
3        A.  Yes, and we did in one particular
4    instance.
5        Q.  But you did not for the lift station.
6        A.  Not for the braced excavations
7    including the lift station, the wedding cake or
8    the sunken tanker diesel car.
9        Q.  Okay.  Do you recall that there was an
10   excavation of a submerged fuel tanker on site?
11       A.  Correct.
12       Q.  Do you know where in the EBIA that
13   submerged fuel tanker was?
14       A.  It was located at the Boland Marine
15   site at the water's edge, approximately
16   300 feet from the floodwall.
17       Q.  And was there a cofferdam for the
18   structure?
19       A.  Correct.  A cofferdam was designed by
20   a professional licensed engineer in the state
21   of Louisiana, and subcontractor Stewart
22   Construction, Inc. installed cofferdam, removed
23   the sunken tanker car and then removed the
24   cofferdam as well.
25       Q.  Okay.  Did you review the fuel tanker

Page 143

1    subcontractor plan --
2        A.  Yes.
3        Q.  -- or Stewart 's plan for the
4    submerged full tanker?
5            Did you comment on it?
6        A.  Yes.
7        Q.  And did you ultimately approve the
8    plan?
9        A.  Either myself or Mr. Montegut.
10       Q.  I'll mark the next Exhibit 57, which
11   is a QAR dated January 16th, 2002.  Do you
12   recognize this document?
13           (Defendant's Exhibit 57 was marked for
14   identification and is attached hereto.)
15       A.  Yes.
16   EXAMINATION BY MS. CLAYMAN:
17       Q.  On the second page, do you recognize
18   the two signatures or initials?
19       A.  Yes.
20       Q.  And also looking at the second page,
21   it says, on the last paragraph, under results
22   of QA inspections, that a preparatory meeting,
23   removal and disposal of barge, fuel tanker and
24   sunken debris.  Do you see that?
25       A.  Yes.

Page 144

1        Q.  Do you have any reason to believe that
2    this description of the preparatory meeting is
3    inaccurate?
4        A.  No.
5        Q.  Okay.  And attached to this QAR, do
6    you know what this document is?  It's Bates
7    number ending 352.
8        A.  Washington Group International 's
9    daily quality control report.
10       Q.  On Page --
11       MR. STONE:
12           Hold on a second.
13       MR. BRUNO:
14           We're multitasking here.
15           (Off the record.)
16   EXAMINATION BY MS. CLAYMAN:
17       Q.  I'm directing you to Page 356.  That's
18   the Bates number at the bottom of the
19   Washington Group daily quality control report.
20   It says feature of work, removal and disposal
21   of barge fuel tanker dated January 16th, 2002.
22           Do you recognize this document?
23       A.  Yes.
24       Q.  Any reason to believe this description
25   of what occurred at the preparatory phase

Page 145

1    meeting is inaccurate?
2        A.  No.
3        Q.  Okay.  Do you know who drafted these
4    minutes?
5        A.  WGI CQC system manager Sara Alvey.
6        Q.  Okay.  We would like to mark the next
7    exhibit Guillory 58.  (Tendering.)  This is
8    another QAR report dated March 19th, 2002.  Do
9    you recognize this document?
10           (Defendant's Exhibit 58 was marked for
11   identification and is attached hereto.)
12       A.  Yes.
13   EXAMINATION BY MS. CLAYMAN:
14       Q.  If you'll turn to the second page, I
15   believe in the remarks section it indicates
16   that Guillory, project manager, was on site for
17   eight hours?
18       A.  Correct.
19       Q.  And do you know what you would have
20   been doing on the site for eight hours on
21   March 19th, 2002?
22       A.  Periodically I replaced Jim Montegut
23   when he went on vacation.  I took his position
24   on site.
25       Q.  Okay.  Any reason to believe that the

37 (Pages 142 to 145)

GUILLORY (VOL II), LEE

8/22/2008

Page 146

1  description contained in this QAR is
2  inaccurate?
3      A.  No.
4      Q.  I just want to return to the sewer
5  lift station for a brief moment.  Do you know
6  if a final completion inspection was performed
7  after the removal of the sewer lift station?
8      A.  I don't know for certain.  If it was,
9  it would be documented in the QA/QC reports.
10     Q.  Okay.  Do you know whether the Corps
11  ultimately accepted that the excavation and
12  backfilling of the sewer lift station was in
13  accordance with scope of work you issued?
14     A.  Yes.
15     MR. STONE:
16         Was it or wasn't it?
17     MS. WAGER-ZITO:
18         He said yes.
19     MR. STONE:
20         No, he said he knows.
21  EXAMINATION BY MS. CLAYMAN:
22     Q.  Sorry.  Was it?
23     A.  Yes.
24     Q.  I'm sorry.  Thank you.
25         Let's go to the next exhibit.  Marking

Page 147

1  the next Exhibit 59.  This is another QAR dated
2  March 26th, 2002.  Do you recognize this
3  document?
4         (Defendant's Exhibit 59 was marked for
5  identification and is attached hereto.)
6      A.  Yes.
7  EXAMINATION BY MS. CLAYMAN:
8      Q.  And do you know who authored it?
9      A.  QAR Alvin Clouatre, III.
10     Q.  And turning to the page that ends 597,
11  what is that?
12     A.  WGI quality control report.
13     Q.  Okay.  And are initial inspections or
14  minutes of preparatory meeting normally
15  included or attached to Washington Group 's
16  quality control report?
17     A.  That is correct.
18     Q.  All right.  On Page 601, this page
19  purports to be an initial phase inspection
20  checklist form dated March 26th, 2002, for
21  removal and disposal of barge fuel tanker and
22  sunken debris.  Do you recognize this document?
23     A.  Yes.
24     Q.  Any reason to believe it's inaccurate?
25     A.  Nope.

Page 148

1      Q.  Do you know whether the U.S. Army
2  Corps of Engineers accepted the excavation and
3  backfilling of the fuel tanker excavation as
4  complete?
5      A.  For clarification, there was no
6  excavation and backfilling of that particular
7  cofferdam.
8      Q.  I'm sorry.  Okay.
9      A.  It was in the water, so the fuel
10  tanker was floated to the top, removed from the
11  cofferdam and disposed of, and then Stewart
12  Construction Company extracted the cofferdam
13  from there.
14     Q.  Thank you for that clarification.
15         Did the Army Corps accept the work
16  removing the fuel tanker car as you just
17  described as complete?
18     A.  Yes.  We did.
19         (Lunch break.)
20  EXAMINATION BY MS. CLAYMAN:
21     Q.  Good afternoon.
22     A.  Hello.
23     Q.  I believe you testified earlier today
24  that the borrow pit was located on the
25  McDonough Marine site?

Page 149

1      A.  Correct.
2      Q.  Okay.  I would like to mark the next
3  exhibit Guillory Exhibit Number 60.  And it is
4  entitled Borrow Pit Extension Application,
5  November 8th, 2001, revised January 8th, 2002.
6  Do you recognize this document?
7         (Defendant's Exhibit 60 was marked for
8  identification and is attached hereto.)
9      A.  Yes.
10  EXAMINATION BY MS. CLAYMAN:
11     Q.  Can you tell me what it is?
12     A.  It's a document that Washington Group
13  and the Corps used to provide to Louisiana DEQ
14  requesting permission to enlarge the McDonough
15  marine borrow pit from what was originally
16  approved by them.
17     Q.  Why did you need to seek approval to
18  enlarge the borrow pit?
19     A.  Once we did the RECAP evaluation of
20  the McDonough Marine area we found that there
21  was less contamination than anticipated and,
22  thus, more clean soil available for us to use
23  on site as backfill, so we made this proposal
24  as a cost-saving measure to more than double
25  the size of the McDonough Marine borrow area

38 (Pages 146 to 149)

GUILLORY (VOL II), LEE

8/22/2008

Page 150

1   thereby giving us additional borrow to backfill
2   the contaminated excavation sites.
3       Q.  Okay.  Do you know if this is the
4   final version of the application?
5       A.  I can't tell.  It doesn't have the
6   approval sheet on top of it.
7       Q.  Would you have reviewed and commented
8   on the draft of a borrow pit extension
9   application sent to LDEQ?
10      A.  Yes.  In fact, Washington group and
11  the Corps collaborated on this particular
12  document in a series of meetings to get it in
13  final form before we sent it to DEQ.
14      Q.  Okay.  I'd like to mark the next
15  exhibit Guillory Exhibit 61.  And it is a
16  transmittal cover sheet dated January 29, 2002.
17  The description says, change pages and response
18  to USACE comments, transmittal 26080, McDonough
19  Marine borrow pit extension revision 1.  Do you
20  recognize this document?
21          (Defendant's Exhibit 61 was marked for
22  identification and is attached hereto.)
23      A.  Yes.  This is the engineering form
24  4025 approving that borrow pit extension
25  submittal.

Page 151

1   EXAMINATION BY MS. CLAYMAN:
2       Q.  Is this your signature at the bottom
3   of the first page?
4       A.  Yes.
5       Q.  And the little -- the capital A in the
6   right-hand corner means what?
7       A.  Approved.
8       Q.  Okay.  Going to the second page, what
9   is this?
10      A.  This is the comment spreadsheet.
11      Q.  These are the Corps' comments?
12      A.  These are the Corps and DEQ comments.
13      Q.  Okay.  I'm looking at the reviewers on
14  the top line, and I don't see anyone from the
15  LDEQ.
16      A.  The very first comment, Number 1, says
17  LDEQ.
18      Q.  Okay.  Thank you.
19      A.  It's just confirming that they approve
20  without any further comments.
21      Q.  Okay.  And the U.S.A. approval date is
22  February 4th, 2002.  So now, do you know
23  whether the document we just looked at in the
24  previous exhibit, which is Number 60, if that
25  was a draft?

Page 152

1       A.  Um -- I cannot tell, but the official
2   approved one would definitely be in the
3   repository documents.
4       Q.  Okay.  But you do know that it wasn't
5   approved until February 4th, 2002, correct?
6       A.  Correct.
7       Q.  Okay.  Directing your attention to the
8   second page of the actual comments, which has
9   the Bates number at the bottom 207370, and I'm
10  looking at comment Number 5, and it says George
11  underneath the Number 5.
12      A.  Okay.
13      Q.  Who is George?
14      A.  There is Dr. George Bacuta.  He's a
15  professional geologist and on our HTRW team
16  here in engineering division.
17      Q.  George 's comment says, excavation of
18  this borrow area raises the following issues:
19  Based on the dimensions of the proposed
20  excavation area, e.g., depth and distances from
21  floodwall levee, are there any impacts to the
22  structural integrity of the adjacent levee
23  floodwall?  Recommend that the borrow
24  excavation design be coordinated with the
25  USACE 's geotechnical branch.

Page 153

1       Do you recall this comment?
2       A.  Yes.
3       Q.  Do you know why the Corps decided to
4   ask it's geotechnical branch to take a look at
5   this issue as opposed to Washington Group 's
6   employees to take a look at this issue?
7       A.  Yes.  We had two ways we could have
8   gone with it; we could have asked Washington
9   Group to evaluate the structural stability of
10  it and submit that to the Corps for final
11  review and approval, or we could just do it
12  in-house.  And for expediency, and being that
13  the Corps had the final say-so in the
14  structural stability analysis, um -- myself and
15  the HTRW team tasked Washington Group to
16  provide us with accurate cross-sections and
17  surveys of the area, and from that I
18  specifically requested, by memo, to our
19  geotechnical engineering branch in engineering
20  division to perform that analysis.
21      Q.  Do you know if Washington Group
22  provided the cross-sections that you requested?
23      A.  Yes, they did.  They hired Wink
24  Engineering, Inc. to take those cross-sections
25  and had them plotted, provided them to us, and

GUILLORY (VOL II), LEE

8/22/2008

Page 154

1  I forwarded them with my request.
2      Q.  Turn to the very last page of this
3  document.  And the Bates number ending 207372,
4  and it's comment Number 9.  And it says, Lee
5  under it.  Is that referring to you?
6      A.  Yes.
7      Q.  So this means this Comment Number 9 is
8  yours?
9      A.  Yes.
10     Q.  Okay.  The second sentence in that
11  comment says, upon completion of all borrow
12  operations the dikes between the IHNC and the
13  borrow area shall be slowly breached to allow
14  IHNC water to fill borrow area and allow
15  intertidal flow between the two water bodies.
16         Why did you direct Washington Group to
17  breach the dikes between the IHNC and the
18  borrow area?
19     A.  Just as stated.  Rather than have a
20  stagnant water within the borrow area, it's
21  better to have a little small ditch connecting
22  the two together so that you get that
23  intertidal flow of as much as 0 to 2 feet
24  because of tidal fluctuations in the area.
25     Q.  Did you have any concerns relative to

Page 155

1  the levees and the floodwalls about having the
2  borrow pit filled with water?
3      A.  No.  And in fact it's an advantage to
4  have the borrow pit filled with water at the
5  conclusion of the task order rather than
6  staying in the dry.
7      Q.  Why is that?
8      A.  Because the hydrostatic force of the
9  water down upon the bottom of the borrow pit
10  makes it more stable.
11     Q.  That's it for this document.
12         This next document I'm going to mark
13  as Guillory Exhibit Number 62.  I believe
14  another copy of this has also been marked
15  Guillory Exhibit 2, but it's missing two pages
16  at the end so this is a more complete copy.
17         Mr. Guillory, is this the memo that
18  you were referring to just a minute ago?
19         (Defendant's Exhibit 62 was marked for
20  identification and is attached hereto.)
21     A.  Yes.
22  EXAMINATION BY MS. CLAYMAN:
23     Q.  And are these your initials on the
24  top?
25     A.  Correct.

Page 156

1      Q.  This is dated May 10th -- or sorry,
2  the 2nd of May, 2002.  Memo attention Lee
3  Guillory, and it's from Gerard S. Satterlee,
4  engineering division.  Would you turn to the
5  second page of this document?
6      A.  Sure.
7      Q.  I believe you testified during your
8  first day of deposition that you wrote this
9  memo --
10     A.  Correct.
11     Q.  -- even though it's signed by James
12  Miles?
13     A.  Correct.
14     Q.  Did you copy Washington -- or anyone
15  from Washington Group on this memo?
16     A.  I don't believe, but I did inform them
17  that this action was taking place.
18     Q.  Did you show them this memo?
19     A.  I don't recall.
20     Q.  Looking at Paragraph Number 2, it says
21  construction division requests your office
22  assistance in evaluating the following two
23  items such that remedial action can be
24  accomplished in compliance with NOD's
25  geotechnical engineering principles and

Page 157

1  practices.
2         Did you explain what NOD 's
3  engineering principles and practices were to
4  anyone from Washington Group?
5      A.  I'm sure we discussed with them that
6  we were going to evaluate the stability
7  analysis of the proposed excavation of the
8  McDonough Marine borrow area with the slopes
9  and depths annotated on the cross-sections and
10  to determine whether there is any violation of
11  the stability control line with respect to the
12  flood control structure.  Um -- I don't think I
13  went into any detail into the engineering
14  principles and practices because those are the
15  purview of the geotechnical engineers rather
16  than myself.
17     Q.  Okay.  Did you expect anyone from
18  Washington Group to review the geotechnical
19  division 's analysis -- stability analysis that
20  they did of the levees and floodwalls in
21  connection with this borrow pit review?
22     A.  No, none other than to implement what
23  was recommended and to take quality assurance
24  cross-sections of the ongoing work at the
25  McDonough Marine borrow area to make sure the

40  (Pages 154 to 157)

GUILLORY (VOL II), LEE

8/22/2008

Page 158

1  slopes and excavations that they actually cut
2  were within the bounds that was approved.
3      Q.  Okay.  And looking at Letter B where
4  you asked that the geotechnical division to
5  evaluate the structural stability of the
6  proposed Surekote Road remedial soil
7  excavation, do you recall discussing this
8  analysis that you requested with Washington
9  Group?
10     A.  Yes.  This one particular hot spot was
11 directly underneath Surekote Road, and it was
12 proposed to dig three feet deep, 25 feet wide
13 and 125 feet long, and we specifically
14 requested geotechnical evaluation as to whether
15 this would have any effect on structural
16 stability and if we needed to utilize any
17 sheeting, shoring or bracing to accomplish this
18 adjacent to the, um -- flood control works.
19     Q.  Did the geotechnical group for either
20 of these analysis provide you with a stability
21 control line?
22     A.  Yes, in the form that they annotated the
23 allowable slopes, depths -- front slope, bottom
24 depth and westward slope on the cross-sections.
25     Q.  Looking at Enclosure Number 1, which

Page 159

1  ends in Number 254, Bates Number 254, it looks
2  like this is a drawing of the McDonough Marine
3  site.  Or can you actually just tell me what
4  this is?
5      A.  This is a plate or a drawing that
6  Washington Group and MMG designed and put into
7  Exhibit Number 54 as part of the -- no, not 54,
8  sorry.
9      Q.  Are you talking about the borrow pit
10 extension application?
11         MR. STONE:
12             60.
13 EXAMINATION BY MS. CLAYMAN:
14     Q.  Exhibit 60?
15     A.  61.  The final approved.  So this is a
16 plate that came directly out of that.
17     Q.  So this plate is a proposal.
18     A.  This is a proposal that we sent to
19 Louisiana DEQ for their approval and subsequent
20 approval.
21     Q.  Okay.  The rectangular squares on the
22 right-hand side of the drawing, are these the
23 proposed excavations under Surekote Road?
24     A.  Yes.  That's correct.
25     Q.  I don't know if you'll remember this,

Page 160

1  but do you recall what area numbers these were
2  identified as, these two excavations?
3      A.  No.  They had specific numbers like a
4  43A or something like that as the exact
5  numbers.
6      Q.  Okay.
7          MR. STONE:
8              On this drawing, are you talking
9          about the ones that are marked
10         25 feet?
11     MS. CLAYMAN:
12         Yes, I am.
13     MR. STONE:
14         Okay.
15     MS. CLAYMAN:
16         Thank you.
17 EXAMINATION BY MS. CLAYMAN:
18     Q.  Okay.  Moving to the next page, what
19 is this?
20         MS. WAGER-ZITO:
21             Just one second.
22     A.  This is a hand-drawn sketch that I
23 drew.  And essentially, I took the
24 recommendations and stability control lines
25 from our, um -- geotechnical branch and

Page 161

1  translated those dimensions so that we could
2  reference them off of the floodwall itself.
3  EXAMINATION BY MS. CLAYMAN:
4      Q.  Okay.  Do believe this accurately
5  depicts how far the borrow pit actually was
6  from the floodwall?
7      A.  Yes.
8      Q.  And so it looks like -- I think this
9  is the north.  What are the dimensions -- or
10 how far from the floodwall is the borrow pit
11 based on this drawing?
12     A.  It has two different dimensions.  On a
13 northern end, which is the bottom of this
14 sketch, it's 95 feet from the face of the
15 floodwall to the edge where the borrow pit
16 starts.  And on the south end, it has a
17 dimension of 86 feet.
18     Q.  And how wide is Surekote Road?
19     A.  If you subtract them -- um --
20 approximately 24 or 25 feet wide.
21     Q.  And you would subtract -- are you
22 subcontracting the number 42, which is the
23 western edge of the road, from 16 which is the
24 eastern edge of the road?
25     A.  Yes.  And I also did the same with 45

Johns Pendleton Court Reporters                     800 562-1285

GUILLORY (VOL II), LEE

8/22/2008

Page 162

1  minus 21.
2      Q.  Okay.  Fair enough.  Going back to the
3  previous page again, I just want to clarify
4  something.  There's three excavations here that
5  have a 25 feet designation on them.  Could you
6  tell me which ones were the excavations under
7  Surekote Road, which of the three?
8      A.  It's the two long ones closest to the
9  right-hand black line.
10     Q.  Okay.  Turning back to the front, the
11 first page of the memo, when you received this
12 memo from Gerard Satterlee did you transmit it
13 to somebody at Washington Group?
14     A.  Not immediately.  I went back to the
15 author Julie Oliphant who is a geotechnical
16 engineer in geotechnical branch, went back and
17 brought the drawings to her and discussed with
18 her in some more detail -- after they lined out
19 Paragraph Number 2 in their response, I went
20 back for additional clarification as to what
21 the -- what we could do on the western side
22 slope to make it stable.  And she gave me some
23 additional information of about a, um -- five
24 foot wide crown to elevation 5 on the west with
25 a 1 vertical on 7 horizontal slope, sloping

Page 163

1  from west to east towards the borrow pit.  And
2  so I annotated that on the revised drawings and
3  then met with Washington Group and my site
4  staff and conveyed that information to them.
5      Q.  Do you know if you actually
6  transmitted a copy of this memo to Washington
7  Group?
8      A.  I don't recall.
9      Q.  If you had, would there be some formal
10 record of it in the files?
11     A.  There would.  It probably would have
12 been sent by a cover letter or an E-mail or
13 something to that effect.
14     Q.  Okay.  Sorry.  One more thing: The
15 very last two pages appears to be an E-mail
16 from Jean Spadaro to you dated September 14th,
17 2000.  Do you recognize this E-mail?
18     A.  Yes.  This is general geotechnical
19 input that Jean requested of geotechnical
20 branch.  Jean was in engineering division,
21 general engineering branch.  She was a member
22 of our HTRW team, and she was requesting
23 general guidance on our behalf from Mr. Jim
24 Gately, a geotechnical engineer in geotechnical
25 branch.

Page 164

1      Q.  Did you forward this E-mail to anybody
2  at Washington Group after receiving it?
3      A.  I would have probably forwarded it to
4  my QA staff on site, and they may have shared
5  it with Washington Group.  These were general
6  guidelines and engineering considerations that
7  we had to use during the course of the project.
8      Q.  If you had forwarded, yourself
9  directly, to Washington Group, that would have
10 been in your E-mail file on your computer?
11     A.  It would have been in E-mail, and I
12 probably would have sent it directly to Dennis
13 O'Connor.
14     Q.  Okay.  And you said you believe you
15 may have sent this to QAR inspectors on the
16 site, or the QA inspectors on the site, is that
17 right?
18     A.  Probably COR Jim Montegut.
19     Q.  And how would you have sent this to
20 him, by E-mail?
21     A.  Probably forwarded by E-mail or fax.
22     Q.  And there would be a record of that in
23 the project documents?
24     A.  Yes.
25     Q.  Okay.  Thank you.

Page 165

1      Let's mark the next document
2  Exhibit 63.  This is a QAR dated June 21, 2002.
3      Do you recognize this document?
4      (Defendant's Exhibit 63 was marked for
5  identification and is attached hereto.)
6      A.  Yes.
7  EXAMINATION BY MS. CLAYMAN:
8      Q.  Turning to the next page, do you
9  recognize the signature at the bottom Tom?
10     A.  Yes.  COR James Montegut.
11     Q.  Do you know why he would be signing it
12 instead of one of the QAR representatives?
13     A.  If the QAR was on vacation, Jim
14 traditionally prepared the reports for that
15 particular day until they returned.
16     Q.  Okay.  Any reason to believe this QAR,
17 the descriptions contained in this document,
18 are inaccurate?
19     A.  No.
20     Q.  Okay.  Turning to the next page, it
21 says follow-up site work.  And the very last
22 sentence says, observed WGI site superintendent
23 and survey party chief from Wink Engineering
24 laying out initial grade stakes for the final
25 borrow pit slopes to conform with stability

42  (Pages 162 to 165)

GUILLORY (VOL II), LEE

8/22/2008

---

Page 166

1  design provided by NOD.  No deficiencies
2  observed.
3       Do you know what stability design
4  provided by the NOD is being referred to here?
5       A.  That would be the revised drawings and
6  cross-sections and that memo that, um -- was
7  Exhibit Number 62.
8       Q.  Okay.
9       I'll mark the next exhibit which is
10  going to be Guillory Deposition Exhibit 64.  It
11  is a QAR dated January 21, 2004.
12       Do you recognize this document?
13       (Defendant's Exhibit 64 was marked for
14  identification and is attached hereto.)
15       A.  Yes.
16  EXAMINATION BY MS. CLAYMAN:
17       Q.  Turning to the second page, who is --
18  who is Alex -- or Bernard Alex Brogna?
19       A.  He was our last QAR that completed the
20  project with us.
21       Q.  And next to his signature, is that the
22  signature of Jim Montegut -- or the initials of
23  Jim Montegut?
24       A.  Initials, correct.
25       Q.  Okay.  Do you have any reason to

---

Page 167

1  believe that the descriptions contained in this
2  QAR are inaccurate?
3       A.  No.
4       Q.  Look at the top of the second page
5  where it says follow-up - site work, it says,
6  the very last sentence, assured borrow pit
7  excavation conforms to its design limits.  No
8  deficiencies observed.
9       Do you know what those design limits
10  would be?
11       A.  That would be the allowable, um --
12  slope stability cross-sections provided by
13  geotechnical branch.
14       Q.  Okay.
15       I'll mark this next document
16  Exhibit 65.  It is a QAR dated January 18th,
17  2005.  Do you recognize this document?
18       (Defendant's Exhibit 65 was marked for
19  identification and is attached hereto.)
20       A.  Yes.
21  EXAMINATION BY MS. CLAYMAN:
22       Q.  And are those Jim Montegut 's initials
23  at the bottom?
24       A.  Correct.
25       Q.  It looks like he's signing because the

---

Page 168

1  QAR is not there.  Is that right?
2       A.  Correct.
3       Q.  Okay.  Do you have any reason to
4  believe the description contained in this QAR
5  is inaccurate?
6       A.  No.
7       Q.  On the top of the page under
8  follow-up, it says
9  remediation/asbestos-contaminated soil removal.
10  And then it says observed the PC270 excavator,
11  complete removal of the asbestos from the
12  McDonough Marine boat slip and borrow pit.
13       After this dam separating the borrow
14  pit from the canal was breached, was WGI 's
15  work with respect to the borrow pit complete?
16       A.  I'm assuming that's probably why it
17  was, they were doing a controlled ditching
18  operation to let the IHNC water slowly migrate
19  into the McDonough Marine borrow pit.
20       Q.  At the end of the project, you
21  participated in the walk through inspection I
22  believe you said it was May 27th, 2005?
23       A.  Correct.
24       Q.  Did you inspect the borrow pit?  Did
25  you see it filled with water?

---

Page 169

1       A.  Yes, it was at that time.
2       Q.  And did the Corps, following that
3  inspection, accept Washington Group 's work in
4  the field as complete or substantially
5  complete?
6       A.  Yes.
7       Q.  I'll mark the next exhibit Guillory
8  Deposition Exhibit 66.  This is a QAR dated
9  October 30th through November 1st, 2004.  Do
10  you recognize this document?
11       (Defendant's Exhibit 66 was marked for
12  identification and is attached hereto.)
13       A.  Yes.
14  EXAMINATION BY MS. CLAYMAN:
15       Q.  Are these your initials at the bottom?
16  Oh.  I'm sorry.  Not your initials.
17       Is that Alex Brogna 's signature at
18  bottom?
19       A.  Alex Brogna 's signature and Jim
20  Montegut's initials.
21       Q.  And do you have any reason to believe
22  this QAR is not accurate?
23       A.  No.
24       Q.  Okay.  On the first page, directing
25  your attention to the bottom, it says, four

---

43  (Pages 166 to 169)

GUILLORY (VOL II), LEE

8/22/2008

Page 170

1   100 percent lost time days since the start date
2   of January, 2001 due to Tropical Storm Isidore,
3   Hurricane Lilly and Hurricane Ivan.
4       MR. STONE:
5           That's 2 January, 2001.
6       MS. CLAYMAN:
7           Sorry.
8   EXAMINATION BY MS. CLAYMAN:
9       Q.  Start date of 2 January, 2001.
10          Do you recall these three systems
11  affecting the East Bank Industrial Area during
12  Washington Group 's work on Task Order 26?
13      A.  Yes.
14      Q.  And what was the effect of these
15  storms on this site?
16      MR. JOANEN:
17          Object to form.
18  EXAMINATION BY MS. CLAYMAN:
19      Q.  Let's start with Tropical Storm
20  Isidore.  Do you remember when that was?
21      A.  Not the exact dates, no.
22      Q.  Generally?
23      A.  2002?
24      Q.  I believe that's right, but we can
25  always look it up.

Page 171

1           Well, do you remember what the effect
2   of Tropical Storm Isidore was on the physical
3   East Bank Industrial Area site?
4       A.  Yes.  I don't recall if it was
5   actually Isidore or Lilly, but one of those two
6   flooded the site extensively with three and
7   half to four feet of water.  It put water up
8   against the Jourdan Avenue floodwall, flooded
9   our entire project site, filled in all the
10  borrow areas with water, and flooded our
11  project trailers by approximately 15 to
12  18 inches of water in three project trailers.
13      Q.  Do you know if anyone conducted an
14  inspection of the protected side of the
15  floodwall following that flooding event?  Or
16  those flooding events?
17      A.  Not that I'm aware of.
18      Q.  Was it Washington Group 's
19  responsibility to conduct an inspection of the
20  protected side of the floodwalls following
21  these flooding events?
22      MR. STONE:
23          You mean if anyone had such a
24          responsibility?
25  EXAMINATION BY MS. CLAYMAN:

Page 172

1       Q.  If anyone had a responsibility, was
2   Washington Group expected to do that?
3       A.  No.  We just did a visual observation
4   and cleaned up the floating debris and flotsam
5   that came onto the site.
6       Q.  That was on the protected side or the
7   flood side?
8       A.  Oh, the protected side.  I'm sorry.
9           Your question was to the protected
10  side?
11      Q.  Yes.
12      A.  No.  They had no responsibility to
13  inspect the protected side.
14      Q.  Did anyone from the Corps work on Task
15  Order 26 have a responsibility to do that?
16      A.  We did a visual inspection of the
17  entire job site, including the protected side
18  and the safety fence on the protected side, to
19  ascertain if there was any damage to the
20  project and the, um -- the remediation site.
21      Q.  And who would have participated in
22  that inspection?
23      A.  It would have been myself and the
24  QA/QC staff.
25      Q.  Does the QA/QC staff include someone

Page 173

1   from Washington Group?
2       A.  Yes.  The quality control staff from
3   Washington Group.
4       Q.  Hurricane Ivan.  Do you recall when
5   that occurred?
6       A.  Yes.  That was in 2004.
7       Q.  And what was the effect of Hurricane
8   Ivan to the physical EBIA site where Task Order
9   26 was being performed?
10      A.  As I recall, Hurricane Ivan went into
11  the Florida panhandle and did severe damage
12  over there, went inland a ways, made a loop,
13  came back out in the gulf and then came back
14  across the southeast Louisiana area, and again,
15  flooded our project site to approximately six
16  to twelve inches of water maximum.
17      Q.  You said before, during either Isidore
18  Lilly the water was all the way up to the
19  floodwall.  Was that the case had during
20  Hurricane Ivan?
21      A.  It may have reached the very base of
22  the concrete portion of the floodwall, but it
23  certainly flooded Surekote Road, all of the
24  land areas between Surekote and IHNC canal, and
25  that's about it.

44 (Pages 170 to 173)

GUILLORY (VOL II), LEE

8/22/2008

Page 174

1    Q.  I should have asked you this before
2  when we were talking about the inspection that
3  you and the QA/QC staff conducted of the
4  floodwalls after either Hurricane Isidore or
5  Lilly:  Did you find or notice any problems
6  such as underseepage, or any other
7  abnormalities with the floodwalls during that
8  inspection?
9    A.  No, we did not find any damage to the
10  floodwall, the levees or the fencing or
11  anything like that.  Just a lot of floating
12  debris flooded the site.
13    Q.  Okay.  After Hurricane Ivan, after the
14  flooding did anyone that you're aware of
15  conduct an inspection of the protected side of
16  the floodwall along the EBIA?
17    A.  Just visual observation.
18    Q.  And who would have done that?
19    A.  It would have been the Corps staff and
20  Washington Group.
21    Q.  As far as you know, were there any --
22  was there any damage noticed during that visual
23  inspection?
24    A.  No damage except flooding the project
25  site and filling the McDonough Marine borrow

Page 175

1  pit with water, which we had to pump out.
2    Q.  Directing your attention to the next
3  page, under follow-up site work, and I'm
4  looking at the last sentence in that paragraph,
5  and it says observed semi-compacted backfill
6  placed in remaining excavation with EC270
7  excavator and compacted with the D41P dozer.
8      What is semi-compacted backfill?
9    A.  Semi-compacted backfill is when you
10  take a dozer that pushes clay material into
11  layers and generally makes six passes of the
12  dozer tracks over that material it is
13  considered semi-compacted.
14    Q.  Okay.  And then I'd like to contrast
15  that with the previous sentence which says
16  observed PC27, the excavator and D41P dozer
17  pacing -- I think it should be placing --
18  compacted and semi-compacted backfill at BH51A
19  through 53A, compacted clay backfill was placed
20  in excavated area less than two foot in depth
21  of the levee profile, assured compacted
22  backfill placed in 8-inch lifts with each lift
23  given four passes with the dozer.
24    A.  I misspoke on my previous answer.
25    Q.  Okay.

Page 176

1    A.  Semi-compacted backfill is 3 passes
2  with the dozer.
3    Q.  And what is compacted backfill?
4    A.  Compacted backfill is a backfill where
5  you try and obtain 90 percent of the standard
6  proctor of the backfill.  And that can be
7  accomplished by multiple passes with a dozer,
8  five, six, seven times, or you can use an
9  actual bucket of a hydraulic track hoe and ram
10  it and beat it until it compacts.
11    Q.  Okay.  I guess I should have asked you
12  this at the beginning, but do you know what
13  excavation is being referred to here?
14    A.  Without looking at an actual, um --
15  schematic of the job site I cannot tell you
16  where Hole 51A through 53A is.
17    Q.  Okay.  Let me see if I can help you.
18  Yeah.  I don't think we need to mark this.  I'm
19  just going to show you this document.  I'll
20  read the Bates numbers into the record.  This
21  is a December 2004 NFAATT submittal report for
22  McDonough Marine, and it's Bates numbered WGI
23  257946 through 258047.
24      And Mr. Guillory, if you would turn
25  to -- it says Page 19 at the bottom, the Bates

Page 177

1  number ends in 965.
2    A.  Okay.
3    Q.  And do you see where bore holes 51A
4  through 53A are on this chart?
5    A.  Yes.  It's designated as Area 2.
6    Q.  Okay.  And then I'll have you turn
7  to -- it looks like the Bates number somehow is
8  missing on this page, which is very weird --
9  the page right after 57981 -- it just cut off.
10  Do you see that?
11    A.  Actually, I'm on 982.
12    Q.  Yeah.  Oh.  Mine's upside down.
13  Sorry.  So we're on Page WGI 1257982.
14      And do you see where area 2 is on this
15  map?
16    A.  Yeah.  Area 2 is one of the excavation
17  areas directly under Surekote Road, one of the
18  two areas that I asked for geotechnical
19  evaluation on by the memo.
20      MR. STONE:
21        It's shown as the southernmost
22      area on the chart; right?
23      THE WITNESS:
24        Correct.
25      MR. STONE:

45 (Pages 174 to 177)

GUILLORY (VOL II), LEE

8/22/2008

Page 178

1          Okay.
2     EXAMINATION BY MS. CLAYMAN:
3        Q.  So geotechnical group, in the memo
4     that we already looked at, and I don't
5     recall --
6          MR. LEVINE:
7             That was going to be Exhibit 62.
8     EXAMINATION BY MS. CLAYMAN:
9        Q.  In 62, there was some geotechnical
10    advice about compaction of the excavations
11    under Surekote Road.  Do you believe that what
12    is described here in this follow-up site work
13    on page Bates number ending 631 of Exhibit 66
14    comports with the advice given by the
15    geotechnical group?
16       A.  Yes, it does.  In fact, there are some
17    excellent photos in the repository showing this
18    wedge of fully compacted clay being placed and
19    compacted in that excavation.
20       Q.  You anticipated my next exhibit.  I'd
21    like to mark the next exhibit Number 67.  And
22    those are, as it says on the top, photo logs
23    for progress photos, November 29, 2007.
24          Do you recognize this photo log?
25          (Defendant's Exhibit 67 was marked for

Page 179

1     identification and is attached hereto.)
2        A.  Yes, I do.
3     EXAMINATION BY MS. CLAYMAN:
4        Q.  You testified earlier that Washington
5     Group was required to submit monthly
6     photographs of its work on the site?
7        A.  Correct.
8        Q.  Is that what this is?
9        A.  Yes, it is.
10       Q.  Okay.  Directing your attention to the
11    page marked Bates Number WGI 015044, are these
12    the photographs that you just referenced a
13    minute ago?
14       A.  Yes, it is.
15       Q.  Can you tell by looking at the
16    photograph, let's start with the top one, what
17    the date is?
18       A.  Sure.  That is November 1st, 2004.
19       Q.  Okay.  And what does this picture
20    depict?
21       A.  This is the excavation in bore holes
22    51A through 53A.  You can see, looking from
23    north to south, and you can see the wedge of
24    brown clay material that is being replaced
25    within a three-foot deep excavation and fully

Page 180

1     compacted in place to restore the levee
2     stability control line on the flood side of
3     EBIA.
4        Q.  And this was accomplished in
5     accordance with the geotechnical engineering
6     direction from the New Orleans Army Corps of
7     Engineers?
8        A.  Yes.
9        Q.  Okay.  Turning to Bates Number WGI
10    015047, it's the third page from the end, I'm
11    looking at the top document.  And do you know
12    what the date of this document -- I'm sorry.
13    I'm looking a top picture.  Do you know what
14    the date of this photograph is?
15       A.  Same as previously, 11/1/04.
16       Q.  Okay.  And the caption underneath says
17    placing sand backfill material in 51A through
18    53A excavation at McDonough Marine.  Where is
19    51A through 53A?
20       A.  That's identified as Area 2 that we've
21    previously discussed, which is the hot spot
22    underneath the Surekote Road adjacent to
23    McDonough Marine.
24       Q.  Well, why don't you explain to me why
25    here they're placing sand backfill and earlier

Page 181

1     in the photo we looked at for the same area it
2     says wedge of clay placed?
3        A.  As shown in the previous photo, we put
4     the wedge of brown fat clay against the -- that
5     would be the easternmost wall of the excavation
6     to restore the net levee section at that point,
7     and then we came in with a river sand backfill
8     for the remainder of the hole.  And you can see
9     the Kamatsu dozer pushing that material in for
10    the remainder of the hole and tracking it with
11    his tracks.
12       Q.  What is -- I'm not from New Orleans.
13    What is river sand?
14       A.  River sand is just a colloquial term
15    that we use here for the silty sand material
16    that is hydraulically dredged out of the base
17    of the Mississippi River, and commercial
18    suppliers sell it as a traditional backfill for
19    sub-base and foundation material throughout New
20    Orleans.
21       Q.  And the Corps would have approved the
22    importation of sand backfill for use in this
23    area?
24       A.  Yes, in this particular instance, it
25    is very applicable and normal to backfill.

46  (Pages 178 to 181)

GUILLORY (VOL II), LEE

8/22/2008

Page 182

1      Q.  I want to talk a little bit about the
2    RECAP submittal reports that were done on the
3    East Bank Industrial Area.
4      A.  Sure.
5      Q.  I'm going to mark this first document
6    as Guillory Exhibit 68.  It says RECAP
7    Submittal Report - Criteria Document, and it's
8    dated April 2001.
9        Do you recognize this document?
10       (Defendant's Exhibit 68 was marked for
11   identification and is attached hereto.)
12     A.  Yes, I do.
13   EXAMINATION BY MS. CLAYMAN:
14     Q.  What is a criteria document?
15     A.  If you recall, going back to August of
16   2000 when we started having coordination
17   meetings with the Louisiana DEQ regulators and
18   our senior regulator Mr. William Perry, we
19   tasked Washington Group to come up with this
20   RECAP criteria document listing all the
21   regulatory levels and limits that we'd have to
22   remediate the various six sites to in order to
23   acquire a final clean or NFAATT letter from the
24   Louisiana DEQ at the end of the project, and
25   this particular work goes through in great

Page 183

1    detail all of those parameters and regulatory
2    guidelines that we had to meet to reach that
3    goal.
4      Q.  Okay.  And is this something that you
5    would have reviewed --
6      A.  Yes.
7      Q.  -- in draft form?
8      A.  Yes.
9      Q.  Who else would have reviewed this?
10     A.  Our entire six-person HTRW team and
11   Washington Group, and MMG also.
12     Q.  Was there a comment submittal which is
13   one of those Excel spreadsheets with
14   line-by-line comments on it by the Corps?
15     A.  Sure.  The original document would
16   have that.
17     Q.  Okay.  I'd like to direct your
18   attention to WGI 47496.  Top of the page it
19   says Section 4.2, identification of groundwater
20   classification.  Can you just take a minute and
21   read that?  Just let me know when you're done.
22     A.  Okay.
23     Q.  Okay.  In the middle of this paragraph
24   it says the groundwater would flow west toward
25   the IHNC and to the east away from the canal,

Page 184

1    however the floodwall to the east of the site
2    is supported on sheet pile that reaches a depth
3    of at least 25 feet and this would essentially
4    interrupt the water flow in the easterly
5    direction at lower elevations to 25 feet.
6        Just based on reading this, do you
7    understand what depth of groundwater flow is
8    being referred to?
9      A.  Generally, in New Orleans we have a
10   high groundwater around here.  You dig within
11   from 0 to 3 feet deep and you'll normally hit a
12   groundwater table.  On the EBIA site, it had
13   been built up by landfill materials to
14   approximately elevation 5, so you could
15   essentially hit groundwater anywhere between
16   5 feet down to ten feet down, somewhere in that
17   neighborhood.
18     Q.  Okay.  I believe you testified
19   previously that you were unaware of what the
20   sheet pile depth was in the East Bank
21   Industrial Area.  Is that correct?
22     A.  Correct.
23     Q.  Looking at this document does this
24   refresh your recollection of what the depth in
25   the East Bank Industrial Area the sheet pile

Page 185

1    tip depth was?
2      A.  No, this is just estimating that it
3    could be as much as 25 feet.
4      Q.  How did the Corps rely on this
5    statement in this report that says the depth of
6    the sheet pile goes down 25 feet?  How did you
7    rely on that, for what purpose?
8        MR. BRUNO:
9          Object to form.  Assumes facts
10         not in evidence.
11   EXAMINATION BY MS. CLAYMAN:
12     Q.  You can answer.
13     A.  I just assumed the estimation was
14   correct as written.
15     Q.  Okay.  Did you base any of your
16   determinations or approvals of the excavations
17   of the sewer lift station or the braced
18   excavation at Boland Marine on this statement
19   that the depth of the sheet pile was 25 feet
20   down?
21     A.  No.  The depth -- the actual depth of
22   the sheet pile was immaterial to the project.
23     Q.  Okay.  Do you know what a RECAP
24   corrective action plan is?
25     A.  Yes, I do.

47 (Pages 182 to 185)

GUILLORY (VOL II), LEE

8/22/2008

Page 186

1      Q.   Okay.  I'm handing you what's marked
2  Guillory Exhibit 69.  It is a RECAP Corrective
3  Action Plan for Saucer Marine, and the date on
4  it says May, 2002.  Can you tell me what this
5  is?
6           (Defendant's Exhibit 69 was marked for
7  identification and is attached hereto.)
8      A.   Following each RECAP report that was
9  submitted to Louisiana DEQ for review and
10 approval, it was Washington Group 's
11 responsibility to submit -- prepare and submit
12 a corrective action plan.  And the focus of
13 that particular CAP for the RECAP report was to
14 identify the specific sites and hot spots and
15 contaminated hot spots of the six industrial
16 sites to determine what the, um -- the lateral
17 and vertical depths of excavation for each one
18 of the hot spots will be and what the backfill
19 will be.  Um -- then this CAP report was
20 submitted to Louisiana DEQ for their review and
21 approval, and to the Corps also, saying this is
22 what we intend to do to remediate that
23 industrial portion of this site.  Once approval
24 was granted by DEQ and the Corps, back to
25 Washington Group, then they could implement

Page 187

1  this CAP for that particular six-site.
2      Q.   Okay.  And on the second page of this
3  document is that your signature?
4      A.   Yes, it is.
5      Q.   Okay.  And does that mean you approved
6  this CAP?
7      A.   That must be the date, but it would
8  have an Engineering 4025 Form on the front with
9  an actual signature and code.
10     Q.   And before you would have approved
11 this CAP, would you have reviewed it in a draft
12 form?
13     A.   Correct.
14     Q.   And would you have done a comment
15 submittal on an Excel spreadsheet?
16     A.   Yes.
17     Q.   Directing your attention to Page WGI
18 356191 --
19     A.   Okay.
20     Q.   -- it says Table 3, estimated volume
21 of soil to be removed.  And then it has a
22 column with maximum depth.  What is this
23 supposed to represent?
24     A.   This is a maximum depth that we would
25 cut or excavate that particular area or hot

Page 188

1  spot to reach clean soil for that particular
2  contaminant of concern before we would take a
3  quality assurance sample and send it to the
4  testing lab for confirmation.
5      Q.   So if you excavated -- the first one,
6  area one, says ten feet.  If you excavated ten
7  feet and you sent it to the lab and it came
8  back that the area was still not clean, then
9  what would you do?
10     A.   Then we would address it -- do
11 additional testing with field instrumentation
12 and additional soil sampling, send it back to
13 the lab to determine if there was any
14 additional depth how much deeper we would have
15 to go to reach clean material.
16     Q.   I just want to turn to WGI 356197.
17     A.   Okay.
18     Q.   What are these drawings?
19     A.   Those are isometric drawings of each
20 particular hot spot in the excavation that we
21 would possibly encounter to remediate that
22 particular bore hole location.
23     Q.   And what's the purpose of including
24 them in this CAP plan?
25     A.   It's just a pictorial or graphical

Page 189

1  representation of the maximum of volume
2  we would use to remediate that particular bore
3  hole and to estimate how much we would excavate
4  and how much we would need in backfill after
5  the hole was clean.
6      Q.   Okay.  And then turning to Page WGI
7  356207, it says Appendix A, Engineering
8  Considerations.
9      A.   Okay.
10     Q.   And then there's a whole bunch of
11 drawings.  Can you tell me generally what this
12 is for?
13     A.   Sure.  As was shown previously, you
14 have an isometric drawing showing the cube of
15 contaminated soil that would be taken out to
16 remediate that particular bore hole or area.
17 The engineering considerations were designed by
18 Washington Group as recommendations to the
19 Corps as the slopes that the excavations would
20 have to be cut to under normal engineering
21 principles and practices to prevent sloughing,
22 sliding and endangering the track hoes and
23 personnel from collapsing into the hole.
24     Q.   And this is part of the CAP, correct?
25     A.   Correct.

GUILLORY (VOL II), LEE

8/22/2008

---

Page 190

```
 1      Q.  Let's see.  This is Tab 109.  I'm
 2  handing you what's been marked Guillory
 3  Deposition 70.  And this is the RECAP
 4  Corrective Action Plan dated November, 2002 for
 5  Boland Marine.  Do you recognize this document?
 6          (Defendant's Exhibit 70 was marked for
 7  identification and is attached hereto.)
 8      A.  Yes.
 9  EXAMINATION BY MS. CLAYMAN:
10      Q.  Is that your signature?
11      A.  Yes, it is, dated March 11th, 2003.
12      Q.  Okay.  Well, actually, I'm sorry.  Did
13  you approve the CAP for Boland Marine?
14      A.  Yes, all six sites the CAPS were
15  approved.
16      Q.  And did you review the CAP in its
17  draft form before it was submitted to LDEQ?
18      A.  Yes.
19      Q.  And did you fill out one of those
20  comment submittal forms in an Excel
21  spreadsheet?
22      A.  Yes and yes.
23      Q.  I'm handing you a QAR dated
24  April 16th, 2002.  It's been marked Guillory
25  Exhibit 71.  Do you recognize this document?
```

Page 191

```
 1          (Defendant's Exhibit 71 was marked for
 2  identification and is attached hereto.)
 3      A.  Yes.
 4  EXAMINATION BY MS. CLAYMAN:
 5      Q.  Turning to the next page, do you
 6  recognize the signatures at the bottom of the
 7  page?
 8      A.  Yes.  Signed by QAR Alvin Clouatre,
 9  III and initialed by Jim Montegut.
10      Q.  And who would have drafted this?
11      A.  Alvin.
12      Q.  Do you have any reason to believe
13  anything in here is inaccurate?
14      A.  No.
15      Q.  And I'd like to direct your attention
16  now to the page Bates labeled 0986.
17      A.  Okay.
18      Q.  Do you recognize this document?
19      A.  This preparatory phase meeting minutes
20  by Washington Group on the definable feature
21  work of soil remediation.
22      Q.  Okay.  Do you know who would have
23  drafted these minutes?
24      A.  Drafted and signed by Sara Alvey of
25  Washington Group.
```

Page 192

```
 1      Q.  Okay.  I just have one question on
 2  this.  Turning the second page of the
 3  preparatory meeting minutes on Page 987, the
 4  first full paragraph, second sentence says, the
 5  USACE advised they would like to inspect each
 6  excavation and confirm measurements prior to
 7  backfilling.  WGI will revise the, quote,
 8  location excavation form in the remediation
 9  procedures for the USACE QA rep and WGI QA rep
10  to sign off on each location.
11          Do you know why the Corps wanted to
12  inspect and confirm measurements for each
13  excavation?
14      A.  Since this was a cost reimbursable
15  TERC, the Corps wanted to make sure that for
16  cost control and cost measures that each
17  individual remediation hole was fully inspected
18  by quality control personnel and QA personnel
19  and that QA samples were taken and cleared by
20  the laboratory prior to that particular hole
21  being backfilled with clean backfill.
22      Q.  Okay.  If you could turn to Page
23  ending 1006, this says it is an Initial Phase
24  Inspection Checklist Form dated 4/16/02.  Do
25  you recognize this document?
```

Page 193

```
 1      A.  Yes.  Typical quality control form for
 2  initial phase.
 3      Q.  And what definable feature of work is
 4  at issue?
 5      A.  This is soil remediation.
 6      Q.  And this is for all of the sites?
 7      A.  It says all sites west of the
 8  floodwall to the canal, yes.
 9      Q.  Okay.  And the personnel present at
10  this initial phase inspection, did that include
11  someone from the Army Corps of Engineers?
12      A.  Yes.  QAR Alvin Clouatre.
13      Q.  And who drafted this?
14      A.  Sara Alvey of Washington Group.
15      Q.  Do you have any reason to doubt the
16  accuracy of this form?
17      A.  No.
18      Q.  Okay.  I believe when we were talking
19  before the break you mentioned a no further
20  action at this time submittal report.  Is that
21  correct?
22      A.  Correct.
23      Q.  I'm handing you what's been marked
24  Guillory Exhibit Number 72.  (Tendering.)  What
25  is this document?
```

Johns Pendleton Court Reporters

800 562-1285

GUILLORY (VOL II), LEE

8/22/2008

Page 194

1     (Defendant's Exhibit 72 was marked for
2 identification and is attached hereto.)
3     A.  This is the NFAATT report for Saucer
4 Marine.  That was submitted by Washington Group
5 to the Corps and reviewed by the Corps and
6 Louisiana DEQ.
7 EXAMINATION BY MS. CLAYMAN:
8     Q.  Okay.  And after Washington Group
9 completes this no further action at this time,
10 is the remediation process for this site Saucer
11 Marine complete?
12     A.  Nearly complete.  After this document
13 is approved by DEQ and the Corps, we send the
14 approved submittal back to Washington Group,
15 and then Louisiana DEQ senior environmental
16 scientist William Perry sends the Corps a
17 letter on DEQ letterhead saying that the Saucer
18 Marine industrial site does not need -- needs
19 no further action at this time, which is a
20 clean bill of health for that particular site.
21     Q.  And once that letter is received from
22 William Perry, does that mean the Corps has
23 officially accepted Washington Group's
24 remediation work on a particular site as
25 complete?

Page 195

1     A.  It's essentially complete, but the,
2 um -- final ending of the task order, the
3 contract, doesn't occur until that substantial
4 completion date, and then that final completion
5 date.
6     Q.  And the substantial completion date we
7 know is May 27th, 2005?
8     A.  Yes.
9     Q.  Okay.  This particular document does
10 not have your signature.  Do you believe this
11 is a complete copy of the Saucer marine NFAATT?
12     A.  I cannot tell.  The original copy
13 would have the approved 4025 on the front with
14 my signature and the signature pages on the
15 second page.
16     Q.  Turning to Page WGI 077971 --
17     A.  Okay.
18     Q.  -- what does this chart called Saucer
19 Marine Excavation Information depict?
20     A.  It lists the sixteen areas that were
21 remediated on the Saucer Marine site, their
22 applicable bore hoes or bank locations that
23 were excavated, the dates they were excavated,
24 the dimensions -- horizontal and vertical
25 dimensions of each of the excavations, and the

Page 196

1 calculated excavated volume of each of the
2 areas in cubic yards.
3     Q.  Okay.  Turning to Page 27 which is WGI
4 078043, it says --
5     A.  What page?
6     Q.  Sorry.  It ends in 8043.
7     A.  Okay.
8     Q.  This says Table of Contents for
9 Excavation Logs.  And feel free to flip through
10 this, but what are these excavation logs?
11     A.  Those are a Washington Group quality
12 control form that was used for each of the
13 excavated sites.  It listed the site number and
14 description, the dimensions of it, the
15 approximate cubic yardage of backfill it would
16 take to fill the hole, and then based on actual
17 excavation it had the actual dimensions, the
18 actual depth, the actual amount of backfill,
19 and it was, um -- each individual one was
20 signed by a, um -- Washington Group quality
21 control person, a Corps QA person, Washington
22 Group field coordinator, um -- a Washington
23 Group environmental manager, each individual
24 milestone, date when each portion of the
25 excavation was completed, and when the

Page 197

1 laboratory results came back clean, and when
2 the waste from that particular hole or area was
3 transported and disposed of.
4     In other words, it's a document that
5 covers each one of the excavation sites from
6 cradle to grave.
7     Q.  Okay.  I know I didn't show you a copy
8 of the Saucer Marine NFAATT that was not signed
9 by you.  Do you have any reason to believe you
10 did not sign off or approve the NFAATT
11 submittal report for Saucer marine?
12     A.  No, I do not.  All six were signed.
13     Q.  Okay.  I'd like to mark the next
14 exhibit which is the NFAATT submittal report
15 for Boland Marine.  And it has the date on the
16 front June 2005.
17     Do you recognize this document?
18     (Defendant's Exhibit 73 was marked for
19 identification and is attached hereto.)
20     A.  Yes.
21     MR. STONE:
22     It's Exhibit 73, right?
23     MS. CLAYMAN:
24     I'm sorry.  Yes.  It is Guillory
25 Deposition Exhibit 73.

50 (Pages 194 to 197)

Page 198

1   EXAMINATION BY MS. CLAYMAN:
2      Q.  What is this?
3      A.  Again, this is the NFAATT report on
4   Boland Marine prepared by Washington Group
5   submit to the Corps and DEQ for review and
6   comment.
7      Q.  And is that your signature on the
8   second page?
9      A.  Absolutely.
10     Q.  Did you review and comment on this
11  submittal report in its draft form?
12     A.  Yes.
13     Q.  Did other people from the Corps also
14  review and comment on this form?
15     A.  Yes.
16     Q.  That's all for this one.
17        Do you recall an amendment that needed
18  to be filed with the LDEQ for the canal bank?
19     A.  Yes.
20     Q.  I'll mark the next exhibit as Guillory
21  Exhibit 74.  It has a transmittal cover sheet
22  dated 7/1/02, and it says RECAP Work Plan
23  Amendment Bank Material Remediation.
24        Do you recognize this document?
25        (Defendant's Exhibit 74 was marked for

Page 199

1   identification and is attached hereto.)
2      A.  Yes.
3   EXAMINATION BY MS. CLAYMAN:
4      Q.  Can you tell us what it is?
5      A.  During the course of the task order,
6   um -- we did a sampling program of 36 bore
7   holes along the entire lengths of the bankline
8   from ITT to Boland Marine, and found that we
9   had some contaminated sites along there that
10  needed some special, um -- excavation and
11  remediation techniques to remove small portions
12  of that contamination, and so we had tasked
13  Washington Group to develop this RECAP work
14  plan for bank material remediation, and it was
15  reviewed both by the Corps and Louisiana DEQ
16  for completeness and for means and methods and
17  equipment, and ultimately it was approved on
18  August 12th, 2002.
19     Q.  You just said that special excavation
20  and remediation techniques were required for
21  the remediation of these, the canal bank?  Why
22  is that?
23     A.  Being that the canal bank was adjacent
24  to the water 's edge of the IHNC, um -- we
25  could not excavate these canal banks in the

Page 200

1   dry -- or in a dry state as we did on the
2   on-land portions, so we had to design a
3   two-phased wet excavation plus a dry, Phase 2
4   dry excavation to remove approximately 10 to
5   15 feet of the contaminated bankline for
6   remediation and disposal.
7      Q.  Is a diagram of the -- is there a
8   diagram of the two-phase remediation process
9   that you just described attached to this?
10     A.  Yes, the plan included several
11  sketches showing how the procedure would take
12  place, and I believe it had several different
13  sketches, yes, from a top view and from a side
14  view, and showing how the two-phase excavation
15  would take place and where the confirmation
16  samples would be taken.
17     Q.  Okay.
18     A.  In each of those phases.
19     Q.  If you turn to Page 5 which is Bates
20  numbered NCS 030-000000012.
21     A.  Okay.
22     Q.  In the middle of the page it says that
23  this is a plan of action suggested in regard to
24  canal bank remediation.  And I want to draw
25  your attention to the fifth bullet, which says

Page 201

1   the north and south and east-west access shall
2   maintain 4 feet bgs as the maximum depth.  And
3   then the next bullet says, should remediation
4   be required to extend east beyond the initially
5   proposed canal bank excavation the depth of the
6   excavations shall increase based on levels of
7   contamination, soils stability and distance
8   from water.
9        Can you explain what this means?
10     A.  Sure.  We would cut to the four-foot
11  level, four foot below ground level initially,
12  and if our QA confirmation samples indicated
13  that we still had some hot or contaminated
14  material we would come up with another flexible
15  plan to do additional soil sampling and testing
16  sent to the laboratory to determine what the
17  extent of how far that plume of contaminated
18  material may extend.  And then, if necessary
19  from those test results, we could deviate from
20  that four-foot bgs excavation depth to ensure
21  that we remove the contaminated material on
22  that bankline.
23     Q.  Okay.  And were the results or the
24  depths of the excavations included in the
25  NFAATT submittals for each site, for the canal

GUILLORY (VOL II), LEE

Page 202

1   bank -- the depth of the excavations of the
2   canal bank?
3      A.  Yes.  As you pointed out previously on
4   those checklists for each of the excavation
5   sites, the actual dimensions were listed for
6   each of the canal bank excavations and
7   documented and signed off on by --
8      Q.  Okay.
9      A.  -- the contractor and Corps staff.
10        MR. STONE:
11           Did you mean to have Pages 13 and
12        14 in here?  Because they're missing
13        from this.  I don't know if it matters
14        to the exhibit.
15        MS. CLAYMAN:
16           They're missing in mine, as well.
17        We'll have to supplement the record.
18        I'm not sure if that was an
19        intentional oversight or not.  It
20        could be those were missing from the
21        production.  I'm not sure.
22        MR. STONE:
23           Skips those two Bates numbers is
24        the reason I ask, because you've got
25        Bates Number 12 and then Bates number

Page 203

1        15.  13 and 14 aren't in there, so I
2     just thought maybe it was just a
3     coping error.
4        MS. WAGER-ZITO:
5           Probably.
6        MS. CLAYMAN:
7           I think you're right.
8   EXAMINATION BY MS. CLAYMAN:
9      Q.  I'm handing you what has been marked
10  Guillory Exhibit 75.  Go ahead and take a look
11  at this.  What is this document?
12        (Defendant's Exhibit 75 was marked for
13  identification and is attached hereto.)
14      A.  This is a draft document that
15  Washington Group submitted for the bank
16  remediation plan, and includes some annotations
17  on it with my handwriting.
18  EXAMINATION BY MS. CLAYMAN:
19      Q.  Okay.  The cover E-mail is addressed
20  from -- well, it's dated June 25th, 2002, from
21  you to Dennis O'Connor.  And who is Dennis?
22      A.  Project manager for Washington Group.
23      Q.  Okay.  And Jane Morgan you've already
24  said was from MMG.
25      A.  Correct.

Page 204

1      Q.  And do you know who Jerry Staggs is?
2      A.  Yeah.  She was the administrative
3   assistant for Washington Group on site.
4      Q.  Okay.  And then the closed text says,
5   here are George and my comments, revisions on
6   the draft.  Who are you referring to as George?
7      A.  Dr. George Bacuta.
8      Q.  Okay.  And after you sent these
9   comments on the draft to Dennis O'Connor, what
10  did you expect him to do?
11      A.  To review and incorporate them into a
12  revised document.  And you can see here that we
13  had a 26 June meeting at 10:00 a.m. to
14  collaborate with Washington Group and to
15  finalize this document and the figures for the,
16  um -- final submission.
17      Q.  Okay.  Okay.  That's all I have for
18  that one.
19           I'd like to mark the next exhibit
20  Guillory Exhibit 76.  And I believe you've
21  testified about this document already, but I'm
22  asking you, what is this?
23        (Defendant's Exhibit 76 was marked for
24  identification and is attached hereto.)
25      A.  This is the letter from COR Jim

Page 205

1   Montegut documenting that we had a final site
2   visit inspection conducted on the 26th of
3   May -- sorry I was off by one day -- 26
4   May 2005.  In attendance were Jim Montegut,
5   myself, contracting officer John Weatherly from
6   Tulsa District, superintendent Bobby Smith from
7   Washington Group International, and Mr. Rick
8   Hedrick from the Corps of Engineers Tulsa
9   District, chief of contracting division.
10      Q.  Do you know what kind of engineer
11  Mr. Ricky Hedrick is?
12      A.  I don't believe he's an engineer at
13  all.  He was chief of contracting division.  So
14  he's more in the contracting, acquisition.
15      Q.  What about John Weatherly; is he an
16  engineer?
17      A.  I don't know.  He was also in
18  contracting division.  I don't know his
19  discipline.
20      Q.  Okay.  What did the inspection that
21  you all participated in on this date involve?
22      A.  It consisted of a briefing and
23  overview of the entire site, a visual
24  inspection of the entire site to make sure that
25  the final dressing and grading had occurred on

Johns Pendleton Court Reporters                    800 562-1285

GUILLORY (VOL II), LEE

8/22/2008

Page 206

1   the site, that the site was fully, um --
2   planted and grass was growing over the site,
3   that the, um -- the chain link perimeter fence
4   was in very good shape, and after the site was
5   over with we shook hands, drove out the gate,
6   officially locked up the gate, and Washington
7   Group gave us the keys to the lock.
8       Q.  Who determined that the fence should
9   be left standing on the site rather than taken
10  down at the end?
11      A.  The Corps did.
12      Q.  Why is that?
13      A.  Initially it was going to be a
14  temporary fence for the duration of the task
15  order, but after the Corps purchased 110 acres,
16  of which the 32 acres was a part of that, from
17  the Port of New Orleans and it was now
18  Corps-owned property, um -- we came to realize
19  that there was going to be a delay between the
20  completion of our project and any subsequent
21  contract being awarded for dredging the bypass
22  channel or surveying and engineering the design
23  of the future IHNC lock replacement project, so
24  we felt that it was in the best interest of the
25  government to levee that fence up as a

Page 207

1   permanent, um -- barrier so that the site would
2   not be vandalized.
3       Q.  Had a contractor, at that time, been
4   hired to conducted do dredging of the bypass
5   channels?
6       A.  No.
7       Q.  Okay.  The next exhibit I'd like to
8   mark is Defendant's Exhibit 77.  It appears to
9   be dated August, 2005, and it is entitled
10  Technical Completion Report and Record
11  Drawings.  Do you recognize this document?
12      (Defendant's Exhibit 77 was marked for
13  identification and is attached hereto.)
14      A.  Yes.
15  EXAMINATION BY MS. CLAYMAN:
16      Q.  Can you tell my what it is?
17      A.  This was the final deliverable report
18  that Washington Group had to turn into the
19  Corps on Task Order 26.  It was a summary
20  report to roll-up all definable features of
21  work that occurred on the project, all
22  clearance NFAATT letters from Louisiana DEQ to
23  the Corps, a tabular listing of all, um --
24  subcontractors and vendors that worked on the
25  project -- it was just some representative

Page 208

1   photos of the definable features of work, and
2   it was a final document to conclude Task Order
3   26.
4       Q.  Is a technical completion report, is
5   that a term of art used in the Corps?  Do you
6   do these for every project?
7       A.  Yes, but our traditional Corps
8   projects reports are called narrative
9   completion reports and as builts.  And
10  Washington Group just came up with this
11  different name for it.
12      Q.  Okay.  Turning to -- I'm going to try
13  to find your signature.  Okay.  Turning to the
14  page Bates numbered it looks like there's eight
15  zeros and a 5 at the end.  And this is dated it
16  looks like a transmittal cover sheet dated
17  August 18th, 2005.  Is that your signature?
18      A.  Yes, it is.  Dated 23 August 2005.
19      Q.  And the As in the right-hand corner
20  mean that you have approved this technical
21  completion report?
22      A.  That is correct.
23      Q.  Did you do a -- did you review this in
24  its draft form?
25      A.  Yes, it went through at least one

Page 209

1   iteration before this.
2       Q.  Okay.  I think on the next page it
3   looks like there's a comments submittal on an
4   Excel spreadsheet.
5       A.  Yes.
6       Q.  Were you one of the commenters?
7       A.  Yes, I was.
8       Q.  Okay.  Are you aware of any other
9   technical completion report that may have been
10  done by Washington Group subsequent to
11  August 23rd, 2005?
12      A.  Not submitted to New Orleans District,
13  but I understand that Washington Group did an
14  internal completion report that they submitted
15  or discussed with Tulsa District after August
16  of 2005.
17      Q.  Um -- is this a document you saw in
18  2005?
19      A.  No, I just recently saw it a couple of
20  months ago as part of the deposition process.
21      Q.  So as far as you are concerned and the
22  Corps is concerned, this document right here is
23  the final technical completion report and
24  record drawings for Task Order 26.
25      A.  Absolutely as far as New Orleans

GUILLORY (VOL II), LEE

8/22/2008

Page 210

1  District was concerned, the only remaining
2  think to be done under Task Order No. 26 was to
3  do the financial closeout of the task order
4  between Washington Group, New Orleans District
5  and Tulsa District.
6     Q.  And you know when that happened or if
7  it has happened?
8     A.  It has not happened because Washington
9  Group requested, after Hurricane Katrina hit,
10 that that be delayed until after the, um --
11 class action lawsuits were resolved.
12    Q.  Okay.  One more document and then we
13 are done.
14       MR. LEVINE:
15          Exhibit 74, we have made copies
16       of NCS 030-0000013 and 14, those were
17       the two pages Richard indicated were
18       missing, and so we're going to attach
19       them to this.
20 EXAMINATION BY MS. CLAYMAN:
21    Q.  Do you know whether the IHNC was used
22 as a site for borrow material to repair the
23 levees following Hurricane Katrina?
24    A.  I don't know for certain, but I
25 believe after Task Force Guardian replaced the

Page 211

1  Jourdan Avenue floodwall, to repair the
2  breaches, that a certain portion of the EBIA
3  site was used as some backfill or dressing
4  material against that particular T-wall.
5     Q.  I think that is -- we have no more
6  questions.  Thank you very much for your time
7  and patience with me.
8     A.  You're welcome.
9        MR. BRUNO:
10          All right, Richard.  Let's take a
11       little break.
12 EXAMINATION BY MR. BRUNO:
13    Q.  Mr. Guillory, we've met once before.
14    A.  Yes.
15    Q.  I have a few questions based upon the
16 questions that were propounded to you this
17 afternoon and this morning by Washington Group.
18 First, if I may, I would like to go back to the
19 beginning of discussion this morning about the
20 description of the site.  You'll remember you
21 described the site for the record, and I
22 believe you said that the site was bounded on
23 the east by the Jourdan Avenue floodwall.  Is
24 that true?
25    A.  And the levee, yes.

Page 212

1     Q.  The levee is a component part of the
2  flood protection structure?
3     A.  Right.
4     Q.  Okay.  And that is an eye wall, is it
5  not?
6     A.  Yes, sir.
7     Q.  As distinguished from a T-wall.
8     A.  Yes, sir.
9     Q.  Would you just very briefly for the
10 record explain, what is the difference between
11 an I-wall and a T-wall?
12    A.  All right.  An I-wall is a sheet pile
13 cantilevered floodwall.  Essentially, it has a
14 concrete CAP on top of a sheet pile floodwall.
15    Q.  All right.
16    A.  Whereas, a T-wall is an inverted T,
17 upside-down T, that is usually pile founded by
18 either concrete piles or steal H piles with a
19 seepage -- sheet pile seepage cutoff wall
20 underneath it.
21    Q.  Okay.  All right.  Does the sheet pile
22 in a I-wall perform seepage cutoff in the same
23 way that the sheet pile in a T-wall performs an
24 underseepage cutoff?
25    A.  I'm not a design engineer, but I think

Page 213

1  it serves a dual purpose.
2     Q.  All right.  Now, I think you've
3  already testified today that you don't know the
4  sheet pile tip elevation of the sheet pile in
5  the I-wall on the Jourdan Avenue boundary of
6  the site.  Right?
7     A.  Yes, sir.
8     Q.  All right.  Now, if you would, and if
9  you can remember this, walk me along the east
10 boundary of the site along the Jourdan Avenue
11 sheet pile wall, north until you reach the
12 northeast corner of the site.  Okay?
13    A.  (Nods affirmatively.)
14    Q.  All right.  The Surekote Road is
15 located in that general vicinity where it goes
16 over the flood control structure; isn't that
17 true?
18    A.  Yes.
19    Q.  Okay.  Does the I-wall make a
20 left-hand turn there?
21    A.  It makes a 90-degree --
22 approximately -- no, it's probably more than 90
23 degrees -- approximately a 110-degree turn
24 toward the west northwest.
25    Q.  Okay.  And what's the rough estimate

Johns Pendleton Court Reporters                    800 562-1285

Page 214

1 of the distance between the Jourdan Avenue
2 floodwall and the Surekote Road on that line?
3    A.  Approximately fifteen feet.
4    Q.  Fifteen feet.  And the next thing we
5 encounter on our imaginary walk is the Surekote
6 Road.
7    A.  Yes.  The ramp that goes over the
8 floodwall.
9    Q.  If we keep going toward the canal,
10 what is the next thing we run into?
11    A.  I believe you had a concrete cap sheet
12 pile wall that also tied into a, um -- concrete
13 wall or something associated with the Florida
14 Avenue bridge.
15    Q.  All right.  And that's where there's a
16 transition between the I-wall and the T-wall.
17 Isn't that correct?
18    A.  I'm not sure what the construction is
19 right at that point, but it does tie in at that
20 point.
21    MR. STONE:
22       When you say there, you're
23    talking about at the time of Katrina?
24    MR. BRUNO:
25       Yes, sir.  Not now.  At the time

Page 215

1    of Katrina.
2 EXAMINATION BY MR. BRUNO:
3    Q.  Okay.  Do you know if, again, going
4 back to the eastern boundary of the site, that
5 whole eastern boundary, what you referred to as
6 the Jourdan Avenue floodwall and levee, all of
7 that is an I-wall, right?
8    A.  Yes, sir.
9    Q.  Okay.  And of course you have some
10 drawings that would give us clear indications
11 of the sheet pile tip depth of the sheet pile
12 in that wall, right?
13    A.  They were showing it in the 1997
14 documents, yes.
15    Q.  The same documents that you gave to
16 Washington Group International, right?
17    A.  Yes.
18    MS. CLAYMAN:
19       Objection.
20    A.  But as indicated during testimony
21 today, it looks like we only gave them Volumes
22 5 and 6 of that document.
23 EXAMINATION BY MR. BRUNO:
24    Q.  Okay.  Didn't your initial work plan
25 describe that the documents that were available

Page 216

1 to them for their review, if they wanted to
2 look at them --
3    A.  Yes, all thirteen volumes were
4 available.
5    Q.  They were available.  Did they ever
6 ask for them?
7    A.  Not that I recall.
8    Q.  If they had asked for them, would you
9 have told them no, they can't look at it?
10    A.  Of course not.
11    Q.  Of course not.
12       All right.  But somewhere, somehow,
13 they got the idea that that sheet pile tip
14 elevation on the Jourdan wall was 25 feet,
15 right?
16    A.  Evidently.
17    Q.  Okay.  And we know you didn't tell
18 them that.
19    A.  I don't recall.
20    Q.  Okay.  All right.  You might have told
21 them that?
22    A.  Maybe.
23    Q.  Okay.  All right.  And certainly if
24 you had you would have done so after carefully
25 reviewing the documents which would have

Page 217

1 indicated to you exactly what that precise
2 sheet pile tip elevation was.  Right?
3    A.  Perhaps.
4    Q.  You might not have, you just would
5 have guessed?
6    A.  If I knew definitively from the
7 documents, I would have verified it.
8    Q.  That's what I'm saying, you wouldn't
9 have guessed.
10    A.  I would have relied on those
11 documents.
12    Q.  You wouldn't have given them bad
13 information, Mr. Guillory; right?
14    A.  Not intentionally.
15    Q.  Not intentionally.  Okay.  But you
16 might have?  Is that what or you're saying?
17    A.  I don't know.
18    Q.  You don't know.  Okay.  All right.
19       Now, we talked a lot today about the
20 scope of the work as well as the site of the
21 work.  Those two are not necessarily the same,
22 isn't that true?
23    A.  Sure.
24    Q.  In fact, one of the things that the
25 scope of the work called upon the Washington

GUILLORY (VOL II), LEE

8/22/2008

Page 218

1  Group International to do was to not damage the
2  homes of the folks who lived in the Lower Ninth
3  Ward through the use of vibratory equipment
4  like pile drivers and the like.  Isn't that
5  true?
6      A.  Those are part of the special
7  considerations that we took under advisement.
8      Q.  All right.  The point is, is it not,
9  Mr. Guillory, that it was within the scope of
10  the work that you expected the Washington Group
11  international to undertake?  Isn't that true?
12      A.  Can you rephrase it to say
13  specifically what is or is not true?
14      Q.  All right.  Specifically, you expected
15  that the scope of the work undertaken by the
16  Washington Group International included an
17  obligation not to damage the property of the
18  folks who lived on the other side of the
19  Jourdan Avenue floodwall and levee.
20      A.  Yes.  It was a goal of the project not
21  to damage or cause adverse conditions to the
22  adjacent Ninth Ward neighborhood.
23      Q.  Of course.  And the scope of work also
24  included an obligation on the part of the
25  Washington Group International not to cause

Page 219

1  damage to the floodwall and the levee itself,
2  isn't that also true?
3      A.  That is correct.
4      Q.  All right.  Now there are lots of ways
5  that one can damage that floodwall.  Isn't that
6  true?
7      A.  Yes, there can be several means.
8      Q.  All right.  You can drive a truck and
9  hit it.  One possibility; isn't that true?
10      A.  Yes.
11      Q.  You can undermine the structural
12  foundation of the floodwall and the levee,
13  possibly; isn't that true?
14      A.  That's a possibility.
15      Q.  All right.  And you could undermine --
16  you could also undermine the foundation by
17  providing a way for water to seep under the
18  foundation and cause it to somehow impact the
19  structure of the levee and the floodwall.
20  That's a possibility; isn't that true?
21      A.  Possibility.
22      Q.  All right.  Now, you've already told
23  us, and I want to make sure that we agree, that
24  you're not an expert on underseepage issues.
25      A.  Correct.

Page 220

1      Q.  Right?  That's not your expertise.
2      A.  Correct.
3      Q.  Right?  It is also not your job; isn't
4  that true?
5      A.  It's not my primary job, no.
6      Q.  Well, it is -- does the evaluation of
7  the potential for underseepage in a project
8  that you're overseeing like the Washington
9  Group International project that they did there
10  on the East Bank Industrial Area, does your job
11  include overseeing the potential for
12  underseepage causing damage to the levee
13  structure?
14      MR. STONE:
15          Object to form.
16      A.  No.
17  EXAMINATION BY MR. BRUNO:
18      Q.  All right.  And so, Mr. Guillory, when
19  you're signing off and accepting work, you're
20  approving work through all these many, many
21  documents that the attorneys for the Washington
22  Group showed you today, every time you may have
23  accepted a document or a work or whatever, you
24  were not saying to them or to anyone that you
25  were approving or agreeing that whatever work

Page 221

1  was done was not, or was, having any impact on
2  the potential for underseepage to affect that
3  floodwall, isn't that true?
4      A.  Correct, not with respect to
5  underseepage.
6      Q.  All right.  And just to make it clear,
7  the business of evaluating underseepage, that's
8  done by geotechnical engineers, isn't that
9  true?
10      A.  Correct.
11      Q.  Okay.  And you are not a geotechnical
12  engineer.
13      A.  Correct.  I'm a civil engineer.
14      Q.  And the TERC required that the
15  Washington Group International have available
16  to them a geotechnical engineer, isn't that
17  true?
18      A.  Um -- that's your testimony from the
19  first deposition, yes.
20      Q.  Well, I don't want it to be my
21  testimony.  Do you know it to be true or false?
22  If you don't know, it's okay.
23      A.  You pointed out in the base contract
24  in the original deposition.
25      Q.  All right.  I showed you the contract

56  (Pages 218 to 221)

GUILLORY (VOL II), LEE

8/22/2008

Page 222

1  and you agreed with me that the contract said
2  what it said, right?
3      A.  Yes, sir.
4      Q.  Okay.  So it's not my testimony, it's
5  whatever was on the page that I showed you.
6      A.  Correct.
7      Q.  Fair enough?
8      A.  Correct.  I stand corrected.
9      Q.  All right.  So I don't mean to put
10  testimony in your mouth.  You've previously
11  testified that there were two potential sources
12  of backfill for use by the Washington Group
13  international on the site.  There was the
14  material that can be taken from the borrow
15  pit -- right?
16      A.  Correct.
17      Q.  Or they could buy it from some other
18  source.
19      A.  Correct.
20      Q.  Okay.  Explain to me the difference in
21  the characteristics or the quality of the
22  material, that is the soil itself, between the
23  stuff they could take off the site and the
24  stuff that they could buy off site.  If there
25  is any difference it at all.

Page 223

1      A.  You could buy similar materials from
2  off site and import it as fill, whether it be a
3  clay or sand or crushed stone or whatever.
4      Q.  Right.
5      A.  Versus the material that was in the
6  McDonough Marine borrow area could be a
7  combination of clays, silts, sand layers, um --
8      Q.  Right.
9      A.  -- wood debris, that kind of thing.
10      Q.  Okay.  And that's the point; the
11  materials that were available to be used by the
12  Washington Group that were located within the
13  boundary of the borrow pit was not a
14  homogeneous material, it was a variety of
15  materials, isn't that true?
16      A.  Correct.  It had various layers and
17  lenses of different types of material.
18      Q.  All right.  And likewise, you didn't
19  provide to he Washington Group International
20  a -- you'll forgive me, I forgot the word that
21  you gave me -- prescribed specification for
22  fill other than that whatever Washington Group
23  bought to be used as fill had to be clean and
24  not contaminated and not full of debris.  Isn't
25  that true?

Page 224

1      A.  Correct.  But the location that the
2  backfill was going in had to be order to be
3  acceptable for its use by the Corps.
4      Q.  All right.  Now, when you say
5  acceptable for use, you're not saying that you
6  had approved either the materials that WGI
7  purchased off site or the materials that they
8  used from on-site borrow pits for the purposes
9  of preventing any underseepage situation which
10  may or may not have existed.  Isn't that true?
11      A.  Correct.
12      Q.  Okay.  In other words, underseepage
13  wasn't part of the analysis when it came to the
14  selection of soil for backfill purposes.  Isn't
15  that true?
16      MR. STONE:
17          Object to form.
18      MR. BRUNO:
19          What's wrong with the form?  I'll
20      change it.
21      MR. STONE:
22          The form here is -- well, it's
23      more than that.  This witness may not
24      have personal knowledge of what was
25      done before he was involved in the

Page 225

1  project regarding underseepage
2  analysis and the type of backfills to
3  be used to prevent that.  He's not the
4  only person working --
5      MR. BRUNO:
6          But he's the 30(b)(6) witness.
7      MR. STONE:
8          But you've got to stick within
9      his area.  Grieshaber is the geotech.
10      I don't want to just argue with you.
11      MR. BRUNO:
12          I don't want to argue.  This
13      witness was asked all day long about
14      whether he approved, okay, in quotes,
15      the use of fill in the context of
16      filling a hole, Richard.  That's all
17      I'm saying.
18      MR. STONE:
19          And he was asked specifics.
20      MR. BRUNO:
21          All right.  And this is as
22      specific as it can get.
23  EXAMINATION BY MR. BRUNO:
24      Q.  Each time you were asked the question
25  today as to whether or not you approved the use

57 (Pages 222 to 225)

GUILLORY (VOL II), LEE

8/22/2008

Page 226

1  of any particular type of fill for any type of
2  hole, your approval did not include an analysis
3  of whether or not that fill would stop or not
4  stop any potential underseepage situation,
5  isn't that true?
6       MR. STONE:
7           Same objection.
8           If you can answer the question,
9           answer the question. But I just raise
10          the same objection, that's all.
11      A.   And in specific instances like the
12  Surekote Road excavation, um -- where we knew
13  that the three-foot deep excavation went into
14  the stability control line, we ensured that we
15  used fat clay material to replace that net
16  levee section in that place. In other backfill
17  locations where the backfill was not as
18  important, we used -- we prioritized using the
19  McDonough Marine borrow area material --
20  EXAMINATION BY MR. BRUNO:
21      Q.   Right.
22      A.   -- which had been excavated and
23  stockpiled. And if any makeup fill was
24  required then we either used river sand or
25  imported clay material.

Page 227

1       Q.   Exactly. Okay. And the material that
2  you approved to be put into -- how about this:
3  I don't want to draw another objection. To the
4  extent that you were asked at all today about
5  whether or not you had approved any particular
6  type of fill to be put into the Boland Marine
7  wedding cake hole or excavation, all right,
8  that was just general as to simply material to
9  fill the hole and nothing more. You didn't do
10  nor were you contemplating any underseepage
11  issue when you made such an approval.
12      MR. STONE:
13          Objection.
14      A.   Correct. But the repository
15  photographs include explicit photographs
16  showing the excavation of the clay material out
17  of that cofferdam, and being backfilled -- that
18  same material being backfilled within that
19  cofferdam.
20  EXAMINATION BY MR. BRUNO:
21      Q.   Right. And you'll also remember that
22  you told me that that hole was about 80 percent
23  full of concrete so there really wasn't enough
24  of that material to fill the hole. You
25  remember that.

Page 228

1       A.   Yes. There was some makeup material
2  that went on top after that material was put
3  in.
4       Q.   About 80 percent, right? Isn't that
5  true?
6       MR. STONE:
7           Objection. It's an incomplete
8           question.
9  EXAMINATION BY MR. BRUNO:
10      Q.   All right. Well, you've testified
11  that the concrete structure occupied 80 percent
12  of the hole; therefore, you needed to have at
13  least 80 percent of new material from some
14  source to fill up the hole. Isn't that true?
15      A.   That was an estimation from my 30
16  June.
17      Q.   Fair enough. But the point is the
18  same. Isn't that true?
19      A.   It was backfilled by a clay material
20  that was taken out of the hole and makeup clay
21  material.
22      Q.   All right. Now, by the way, looking
23  at Exhibit Number 30, this is a document
24  prepared by the Washington Group itself, right?
25      A.   Yes.

Page 229

1       Q.   And I just want to see if I'm wrong,
2  but if you look at Page WGI Number 59622,
3  there's a whole section on site geology, am I
4  right?
5       A.   Yes. There's several paragraphs.
6       Q.   Right. Which describes the soils and
7  the layers, the stuff that can be expected to
8  be encountered by the Washington Group in
9  digging holes on the East Bank Industrial Area,
10  right?
11      A.   Correct.
12      Q.   Thanks. Now, I'm going to try to do
13  this in order, so I'm at 35, Mr. Guillory.
14      A.   Okay.
15      Q.   This is the document where you have
16  your notes. If you would look with me at 1398.
17      A.   Go ahead.
18      Q.   All right. Here, this is the -- you
19  were asked this -- I hate to recover the same
20  ground, but just to give you where we are, the
21  areas requiring backfill may obtain it from
22  borrow pit established at the McDonough project
23  site or, um -- sorry, I can't read your
24  handwriting.
25      A.   Imported material.

58  (Pages 226 to 229)

Johns Pendleton Court Reporters                        800 562-1285

GUILLORY (VOL II), LEE

8/22/2008

Page 230

1    Q. -- imported material.
2        As far as you were concerned, the
3    ability of each of these materials to fill the
4    hole was the same.
5    A. Depending on location, sir, yes.
6    Q. Well, this is in particular to --
7    isn't this in particular to the -- I'm sorry.
8    This is not -- this sentence is not particular
9    to a special hole or a particular hole?
10   A. It's a general sentence that went into
11   the scope of work for this subcontract.
12   Q. Would it apply to the Boland Marine
13   wedding cake hole?
14   A. Yes.
15   Q. Would it apply to the Saucer lift
16   station hole?
17   A. Yes, sir.
18   Q. All right. But it wouldn't apply to
19   the -- I hate to call it -- repairs, I suppose,
20   to the levee made necessary when the Surekote
21   Road excavation was done?
22   A. For the Area 2 and bore hole 41 to 43,
23   we took special consideration to put clay
24   material there to reestablish that net levee
25   section.

Page 231

1    Q. And by the way, so that we can
2    understand the nomenclature, if you were to
3    specify clay as a fill, you would use the word
4    clay fill, would you not?
5    A. Yes, sir. Or a CL CH designation or
6    something like that.
7        MR. LEVINE:
8        In Area 51 to 53 or 41 to 43?
9    THE WITNESS:
10       Don't recall.
11   MR. BRUNO:
12       That wasn't part of my question
13   anyway, so -- I didn't follow it.
14   MS. WAGER-ZITO:
15       It was in a way part of your
16   question.
17   MR. BRUNO:
18       No, it wasn't.
19   MS. WAGER-ZITO:
20       Surekote Road excavation.
21   MR. BRUNO:
22       I didn't ask him for numbers or
23   places, so no, it wasn't part of my
24   question. It was all voluntary.
25   EXAMINATION BY MR. BRUNO:

Page 232

1    Q. Now, if you go the Exhibit Number 43
2    at Page 247 --
3    A. Okay.
4    Q. -- you were asked about Subparagraph
5    B?
6    A. Yes, sir.
7    Q. Okay. And there, you know, you've
8    already made the point that you really
9    preferred that they use the on-site material
10   first because it was cheaper, right?
11   A. Yes, sir.
12   Q. All right. In other words, the only
13   real reason for using on-site versus off-site
14   was it cost less money.
15   A. It was more advantageous for the
16   government because the bypass channels would
17   subsequently remove that same material anyway.
18   Q. Right. There was nothing about the
19   characteristics of the soil which were
20   contained in the borrow pit that made it a more
21   desirable material to use as backfill than
22   material that one could purchase outside.
23   Right?
24       MR. STONE:
25       Object to form.

Page 233

1    EXAMINATION BY MR. BRUNO:
2    Q. Isn't that true?
3    A. Clay material is a better material
4    than, um -- than other forms, especially a,
5    um -- an aggregate type material.
6    Q. Well, I understand that, but that
7    wasn't the question.
8        Are you now saying to me that the
9    McDonough borrow pit was a homogeneous clay
10   borrow pit?
11   A. No, sir.
12   Q. Okay. Well, here's the question: The
13   question was, whether or not material that
14   could be pulled from the borrow pit, where clay
15   wasn't specified -- I need say that, in
16   fairness to you -- was just as good a material
17   as material that you would purchase off site
18   that was free of contaminants and debris.
19   A. Yes, sir.
20   Q. Okay. And that's why if you look at
21   Subparagraph D you'll see there that WGI is
22   estimating how much imported backfill material
23   it will need in connection with the
24   concrete/pozzolanic.
25       Can I ask you, though, why it is that

59 (Pages 230 to 233)

Johns Pendleton Court Reporters                    800 562-1285

GUILLORY (VOL II), LEE

8/22/2008

Page 234

1  in the same document, given the fact that the
2  government preferred that you use up all the
3  borrow material first, that before they have
4  obviously used up all of the borrow material
5  thinking about buying some stuff off site?
6      A.   In that particular case for the ITT
7  site, that waste concrete and pozzolanic
8  material was located between 0 and 3 feet in
9  very shallow layers of the ITT site.
10      Q.   Right.
11      A.   So, um -- you could use river sand in
12  those points very simply because that job, that
13  particular site was going to be undergoing
14  final grading and dressing later on and sloped
15  to drain part of the canal.
16      Q.   Okay.  So does that make the river
17  sand preferable?
18      A.   Preferable in that it's easier to work
19  with, it's easier to get grass growth and
20  fertilizer and seeding, that kind of thing.
21      Q.   I understand.  So in this instance
22  you're letting them go with the off-site stuff
23  because it's frankly a better suited material
24  for that particular use.
25      A.   And it was a very shallow excavation.

Page 235

1  P-O-Z-Z-O-L-A-N-I-C.
2      Q.   Maybe we should learn what that is,
3  just for our future reference if we play
4  scrabble.  What is it?
5      A.   It's essentially the same thing we use
6  in the concrete industry called fly ash.
7      Q.   Okay.  Again, I'm trying to -- if I
8  need to find it, but I recall that some or more
9  than one of these logs in the context of the
10  Boland site reported the need to pump water out
11  of the bottom of the excavation.  Do you recall
12  that?
13      A.   Not specifically.
14      Q.   Can you recall any instance of there
15  being a need to pump water out of either the
16  Boland Marine excavation hole or the Saucer
17  hole?
18      A.   Yes.  The cofferdam for the Boland
19  Marine site was being constructed in
20  January-February time frame, in the middle of
21  the winter.  They had lot of excessive rainfall
22  and it was very wet, and any rainfall that fell
23  within the cofferdam had to be pumped out to
24  keep the hole dry.
25      Q.   I see.  Is it your testimony that any

Page 236

1  water that would have been inside the cofferdam
2  would have come from rain and not from
3  underneath?
4      A.   It could have been a combination of
5  rainfall and water table.
6      Q.   So if it's not rain, if there's water
7  at the bottom, water can find its way to the
8  bottom of the excavation, right?
9      A.   Yes.
10      Q.   Would you explain for the record how
11  that happens?
12      A.   Generally, since the IHNC canal was
13  very close, within 1 to 200 feet, the canal
14  water could surcharge the water table and you
15  could have some seepage migrating into the
16  cofferdam.
17      Q.   In other words, because the bottom of
18  the hole is lower than the surface of the
19  water, that is, the water of the IHNC, there's
20  pressure brought to bear on the water table
21  which causes the water in the water table to
22  move up through the soil and into the bottom of
23  the excavation, is that accurate?
24      A.   Either that way or the interlocks of
25  the steel sheet piles are not watertight and

Page 237

1  water from the water table can migrate
2  horizontally through those interlocks and down
3  to the bottom of the hole.
4      Q.   So clearly there's water moving
5  through the strata below the surface of the
6  soil.  Right?
7          MR. STONE:
8              Objection.  Vague and overly
9          broad.
10  EXAMINATION BY MR. BRUNO:
11      Q.   Okay.  Isn't that true?
12      A.   The various layers and lenses of the
13  different strata can transport groundwater in
14  various rates.
15      Q.   All right.  And that's what you have
16  referred to as the water table, right?
17      A.   Yes, sir.
18      Q.   There's a level of water underneath
19  the surface at some definable depths below the
20  surface, isn't that true?
21      A.   Yes.
22      Q.   And the height of that water has some
23  relationship to the height of the water in the
24  canal?
25      A.   Yes.

60 (Pages 234 to 237)

GUILLORY (VOL II), LEE

8/22/2008

Page 238

1    Q.  Am I right about that?
2    A.  It's interconnected with the tidal
3  fluctuations, the atmospheric conditions,
4  drought or wet season, whatever.
5    Q.  For the record, here's the document.
6  It's Exhibit Number 48, it's dated February 22,
7  '02, and it's the one that says pumping
8  water -- I'm sorry.  Let's just go ahead and
9  read it together.  Or you read it.  Where it
10  says follow-up, excavation and demolition of
11  concrete foundations --
12      MR. LEVINE:
13        What page?
14      MR. BRUNO:
15        I'm sorry.  058.  I thought I
16      said that.  I apologize.
17  EXAMINATION BY MR. BRUNO:
18    Q.  Do you see that, under follow-up
19  excavation?  Observed WGI pumping water with
20  three-inch pump from degrade area and keeping
21  seepage water pumped from bottom of sheet pile
22  excavation with a four-inch pump.  Right?
23    A.  Yes, sir.  That's what it says.
24    Q.  Okay.  And that's consistent with what
25  you just told me, right?

Page 239

1    A.  Right.
2    Q.  Was there a place on the site where
3  the imported fill that was approved by the
4  Corps to be purchased and used on the site was
5  stored or stockpiled?
6    A.  Various places, as we remediate each
7  individual six sites we would stockpile in
8  certain locations.
9    Q.  All right.  Envirocon.  Do you know
10  who that is?
11    A.  Yes, sir.  They were a subcontractor
12  under subcontractor Hamp's Enterprises, Inc.
13    Q.  All right.  So do you know whether or
14  not they worked on the Boland Marine wedding
15  cake excavation?
16    A.  That happened later in the project,
17  and I believe the subcontract was awarded to
18  Hamp's Enterprises, Inc. with a subcontract to
19  Shavers-Whittle Construction Company.  So I
20  don't recall if Envirocon was involved in that
21  portion of work.
22    Q.  Do you know what Envirocon did on the
23  site?
24    A.  They were -- their main definable
25  feature of work they were involved with was the

Page 240

1  building demolition, concrete slab and
2  foundation and piling removal, that major
3  feature of work.
4    Q.  If you wouldn't mind, sir, picking up
5  Exhibit Number 49 and looking at Page 1098.
6    A.  Okay.
7    Q.  And I thought that counsel for WGI had
8  identified the Foundation 004 as the wedding
9  cake excavation.  Is that accurate?
10    A.  Yes, sir.
11    Q.  And then it says, Envirocon.  WGI
12  performed dewatering of the cofferdam
13  excavation, Envirocon continued with backfill
14  of the cofferdam using fill material from the
15  borrow pit and spoil piles excavated from the
16  cofferdams.
17        I'm just wondering if that would
18  indicate whether or not Envirocon might have
19  been involved in backfilling the wedding cake
20  excavation.
21    A.  Obviously my memory was not as good as
22  I anticipated, and they were a subcontractor on
23  that portion of work.
24    Q.  That's okay.  No problem.
25        Next sentence:  If you can, help me

Page 241

1  understand this.  Observed the 220 excavator --
2  which describes a machine, obviously --
3  relaying soil into the degrade area.
4        What is a degrade area?
5    A.  The way the design engineer designed
6  that cofferdam, we had to degrade the
7  existing -- existing ground was about elevation
8  5.  We had to degrade a platform down to about
9  elevation zero, and then the cofferdam sheet
10  pile was driven at that elevation zero down
11  from there.
12    Q.  Got you.  Okay.  Now, so he says he's
13  relaying soil into the degrade area from the
14  staged fill soil.  Do you know what that's
15  referring to?
16    A.  Yes, sir.  As we, being Washington
17  Group and its subcontractors, as they excavated
18  that degrade area from elevation 5 down to
19  approximately zero, they took that material and
20  stockpiled it a distance away from the
21  cofferdam for stability purposes and just to
22  keep it for reuse as backfill.
23    Q.  Okay.  All right.  So fill soil there
24  refers to the material that had been removed
25  from the hole?

61 (Pages 238 to 241)

GUILLORY (VOL II), LEE

8/22/2008

Page 242

1    A.  Or the degrade area, yes.
2    Q.  Or the degrade area.  Either way, I
3  see.
4    A.  (Nods affirmatively.)
5    Q.  I see.  Then, it says, observed this,
6  the PC400 -- which is a machine, right?
7    A.  Yes, a track hoe.
8    Q.  -- performing bucket compaction at
9  every two to three feet of lift.  Right?
10   A.  Yes, sir.
11   Q.  All right.  And that's pretty
12  consistent with your request because it was
13  supposed to be every two feet.  Right?
14   A.  I believe that's what the plans said.
15   Q.  Okay.  It also called for bucket
16  compaction.  Right?
17   A.  Yes, sir.
18   Q.  What does bucket compaction mean?
19   A.  They use the actual bucket of the
20  LS400, and after it put a load of material down
21  into that two-foot layer, used the bucket --
22  the hydraulics of the bucket to compact within
23  the footprint of the cofferdams.
24   Q.  Good.  You'll remember you described
25  for counsel for the Washington Group the

Page 243

1  compaction with the bulldozer, and there was a
2  certain number of times that the bulldozer was
3  supposed to go over the hole.  Would that also
4  be true of the bucket compaction; is there a
5  certain numbers of times that they're supposed
6  to tamp in order to achieve what one would call
7  bucket compaction?
8    A.  No, sir.
9    Q.  So you just -- you just eyeball it;
10  right?
11   A.  Correct.
12   Q.  All right.  Thank you very much.
13      How deep was the borrow pit?
14   A.  Minus 12 NGVD.
15   Q.  The hole or -- was that the lowest
16  point?
17   A.  It had a flat bottom on it.  The whole
18  pit.
19   Q.  Exhibit 62, please.
20   A.  Go ahead.
21   Q.  Okay.  It's not my intent to ask this
22  if I have already asked this before, but I
23  don't recall whether it was Mr. Grieshaber or
24  you, but 90 percent proctor, that refers to a
25  compaction specification, does it not?

Page 244

1    A.  Yes, sir.
2    Q.  It does not refer to a type of soil.
3  Or does it?
4    A.  It varies with the type of soil.
5    Q.  Okay.  So if you read this -- I'm
6  sorry.  For the record, if you read the first
7  page of Exhibit 62, at Number 3, and you read
8  where it says 12-inch lifts of 90 percent
9  proctor, is that telling you what kind of soil
10  you have to use?
11   A.  No, sir, it's not.
12   Q.  Okay.  Now, in fact, though, you used
13  clay.
14   A.  Yes.
15   Q.  Can you explain for me how you got
16  there; in other words, was it your reading of
17  this sentence Number 3 that persuaded you to
18  use clay, or is there some other piece of
19  information or some other directive which
20  suggested the use of clay in connection with
21  the McDonough -- I'm going to call them the
22  repairs to the levee, if that's okay with
23  everybody, as a descriptor.
24      MR. STONE:
25         Replacement of soil removed from

Page 245

1      the levee extended slope?
2    MR. BRUNO:
3        Yes, at McDonough.
4    MR. STONE:
5        No, not at McDonough.  You're
6      talking about Surekote Road.
7    A.  It's adjacent to McDonough.
8    MR. BRUNO:
9        It was adjacent to McDonough.
10     Trust me on this, boys.  I've read
11     something.
12   A.  I forgot the question.
13  EXAMINATION BY MR. BRUNO:
14   Q.  Mr. Guillory, for the record, in
15  connection with the replacement of material at
16  the levee toe underneath Surekote Road, at the
17  McDonough site, you used clay, and am I correct
18  in assuming that Exhibit 62 is a document which
19  suggests the degree of compaction that you
20  should use for that installation of material?
21   A.  Yes, sir.
22   Q.  Okay.  Now, what I'd like to know is
23  why did you use clay, if this Sentence 3
24  doesn't say use clay?
25   A.  Because our earthen levees are built

62  (Pages 242 to 245)

GUILLORY (VOL II), LEE

8/22/2008

Page 246

1   of clay material.
2       Q.  All right.  That's just something you
3   know.
4       A.  Yes, sir.
5       Q.  All right.  Now but you also said that
6   there was another material used after the clay
7   was replaced.  Right?
8       A.  After the clay wedge was placed in,
9   yes.
10      Q.  What material was that?
11      A.  It was a semi-compacted sand fill and
12  clay combination as shown on the pictures.
13      Q.  Okay.  Now, this says 12-inch lift as
14  opposed to two or three-feet lift.  Is that
15  significant at all --
16      A.  Yes.
17      Q.  -- with regard to compaction?
18      A.  Yes.  To achieve compaction you need
19  to put it in small lifts so that the dozer can
20  walk it in and get the proper compaction on it.
21      Q.  All right.  Thank you.
22          (Off the record.)
23  EXAMINATION BY MR. BRUNO:
24      Q.  Please help me understand, what is the
25  difference, and maybe it's just I don't

Page 247

1   understand this, but between compacted and
2   semi-compacted fill?  And the reason I ask the
3   question is I'm curious to know whether or not
4   fill can be compacted before you actually put
5   it on the ground.
6       A.  No, sir.  It's compacted in place.
7       Q.  In place.  All right.  So when one
8   says compacted as opposed to semi-compacted,
9   they're describing something that was done to
10  the material after it was put on the ground.
11      A.  Correct.
12      Q.  Okay.  Obviously, the same is true
13  with semi-compacted as opposed to compacted,
14  right?
15      A.  Correct.
16      Q.  And does the lift have anything to do,
17  or lift size have anything to do with whether
18  it is compacted or semi-compacted?
19      A.  Yes.  The Corps uses three different
20  levels of terminology:  Uncompacted fill, which
21  is file that is just spread out and fills up a
22  void or a hole; semi-compacted fill, which is
23  normally placed in, um -- twelve-inch layers,
24  lifts, and three passes with dozer tracks over
25  it; and then compacted fill, where you can

Page 248

1   either describe it as put in six-inch lifts and
2   compacted with a dozer with multiple passes, or
3   you can use the ASTM 90 percent proctor.
4       Q.  All right.  Well, which of those
5   descriptors applies to a two-foot lift
6   compacted with the bucket?
7       A.  That would probably be somewhere
8   between uncompacted and semi-compacted.
9       Q.  Thank you, sir.
10          (Off the record.)
11  EXAMINATION BY MR. BRUNO:
12      Q.  Okay.  First of all, if you look at
13  the picture which describes the excavation for
14  the purpose of obtaining the clay, which is WGI
15  15043, you see there's a square-looking hole?
16      A.  Yes, but that's not a borrow
17  excavation.
18      Q.  That's not the borrow?
19      A.  That's a hot spot excavation.
20      Q.  That's a hot spot.  Okay.  I'm sorry.
21          Is there a picture that shows where
22  the clay came from?
23      A.  The borrow material?
24      Q.  Yes.
25      A.  Um -- probably not in this set, but

Page 249

1   there are plenty of them.
2       Q.  Okay.  Where would the clay come from?
3       A.  The McDonough Marine borrow area.
4       Q.  And how would one know that one was
5   getting clay as opposed to other various
6   materials that we described already on the
7   record that were in that borrow pit?
8       A.  Visually and consistency.
9       Q.  So that you would be told, we want to
10  use clay, and so person would know to go into
11  the borrow pit and look around for a clay-like
12  material.
13      A.  Yes.
14      Q.  Which from my childhood memory is kind
15  of like Play Dough?
16      A.  Correct.
17      Q.  It's very heavy -- it's very hard to
18  work with, isn't it?
19      A.  It can be.
20      Q.  Sorry?
21      A.  Can be at times.
22      Q.  It can be?  There are times when it's
23  easy to work with?
24      A.  Yes.
25      Q.  When is it easy to work with?

GUILLORY (VOL II), LEE

8/22/2008

Page 250

1    A.  When it's at the right moisture
2  content.
3    Q.  Which is when it's got a lot of water
4  in it.
5    A.  No.
6    Q.  No water in it?
7    A.  The right -- optimum moisture
8  content --
9    Q.  Okay.
10    A.  -- to it.
11    Q.  Do you know, is there a number?
12    A.  No.  It's in the classification.
13    Q.  Let me show you 75, and I think we'll
14  be done.
15    A.  Okay.
16    Q.  Go to Page 37.  You with me?
17    A.  Yes, sir.
18    Q.  Paragraph -- well, actually, I'm
19  sorry.  There a little square thing.
20    A.  Bullets?
21    Q.  Yeah, bullets.  And you see where --
22  these are your notes; right?
23    A.  Yes.
24    Q.  I thought we established that already.
25  Forgive me.  You scratched out clay?

Page 251

1    A.  Yes, sir.
2    Q.  All right.  And so the reason why you
3  scratched out clay is because why?
4    A.  I don't recall why.
5    Q.  All right.  Well, were you intending
6  that you didn't need to use clay?
7    A.  Give me a second to read it.  It was
8  my intention that after the Phase I excavation
9  was done the contractor could use either clay
10  or river sand.
11    Q.  All right.  The key here is that if
12  you take out and scratch out the word clay, you
13  leave it to the contractor to choose regular
14  soil, or better, if he chooses to, right?
15    A.  Yes.
16    Q.  All right.  If you put clay, he's got
17  to use clay.
18    A.  Correct.
19    Q.  That's the whole purpose of indicating
20  with more precision a specification, right?
21    A.  Yes, if I needed that.
22    Q.  If you need to use clay, then you need
23  to specify clay, isn't that true?
24    A.  You can write the specifications that
25  way, yes.

Page 252

1    Q.  That's not what I'm asking you.
2      If you are intending to convey to your
3  contractor that you want him to use clay, you
4  have to indicate the word clay, isn't that
5  true?
6    A.  That or CL or CH.
7    Q.  All right.  Something that would say
8  to him you got to use clay.  Right?
9    A.  Correct.
10    Q.  And if you use the phrase fill or
11  backfill, you are not necessarily indicating
12  that clay is prescribed, right?
13    A.  Correct.
14    Q.  Okay.  Let's take a quick break.
15      (Off the record.)
16      MR. BRUNO:
17        All right.  I'm done.  Thank you.
18  EXAMINATION BY MS. CLAYMAN:
19    Q.  Okay.  Mr. Guillory, I just have a
20  couple of follow-up questions for you.  I'm
21  handing you a document that I'm not going to
22  mark.  The title is TERC Section C
23  description/spec/work statement.  It's WGI
24  000128.  It's the first page, the title page.
25  And I'm going to specifically ask you to look

Page 253

1  at Pages WGI 00135 through 139.  (Tendering.)
2    A.  Okay.
3    Q.  I don't have a copy of the document,
4  so what I'm going to ask you to do is turn to
5  the second page that I gave you.  And if you
6  could, go ahead and just read into the record
7  the highlighted portion starting with the first
8  full sentence.
9    A.  The contractor shall demonstrate
10  experience in all categories, open parens,
11  i.e., HTRW, close parens.  Personnel assigned
12  to individual delivery orders shall have the
13  required qualifications pertaining to the
14  specific categories anticipated to be
15  encountered at the site.  The requirements for
16  on-site and off-site personnel will differ for
17  each project and shall be specifically
18  identified in individual delivery orders.
19    Q.  Okay.  Thank you.  Can I have that
20  back?
21    A.  (Tendering.)
22    Q.  I think you testified -- I believe you
23  testified before that a delivery order is the
24  same thing as a task order?
25    A.  Correct.  When it's initially awarded,

GUILLORY (VOL II), LEE

8/22/2008

Page 254

1  it is called Delivery Order 0026, and
2  subsequent modifications to it are called Task
3  Order 26.
4      Q.  Okay.  Was there anything in the
5  delivery order for Task Order 26 which required
6  Washington Group to have a geotechnical
7  engineer on site at the EBIA?
8      A.  No.
9      Q.  Do you know how to test for
10 underseepage of a levee or floodwall?
11     A.  No.
12     Q.  The question I asked you was did the
13 delivery order require you to have a
14 geotechnical engineer, or Washington Group to
15 have a geotechnical engineer on site.
16         Now I'm going to ask you, did the
17 delivery order require Washington Group to have
18 a geotechnical engineer familiar with levees
19 and floodwalls in the home office in Denver?
20     A.  No.
21     Q.  If the Corps had wanted Washington
22 Group to undertake an underseepage analysis of
23 what the impact of its excavations were going
24 to have on the levees and floodwalls, would
25 that have to be specified in the delivery

Page 255

1  order?
2      MR. BRUNO:
3          Objection.  Beyond the scope of
4      this witness' expertise, knowledge,
5      beyond the scope of the deposition
6      notice.
7  EXAMINATION BY MS. CLAYMAN:
8      Q.  You can answer.
9      A.  I can answer it this way:  If there
10 was a specific requirement that the government
11 wanted to task Washington Group with or a
12 specific discipline that the government wanted
13 of Washington Group, we would have addressed it
14 in a modification to Task Order 26.
15     Q.  Was there ever a modification to Task
16 Order 26 relating to -- or requiring Washington
17 Group to undertake an underseepage analysis of
18 the levees and floodwalls in the East Bank
19 Industrial Area?
20     A.  No.
21     Q.  We have no more questions.  Thank you
22 again for your time.
23
24
25

Page 256

1              WITNESS' CERTIFICATE
2
3          I, LEE GUILLORY, do hereby certify
4  that the foregoing testimony was given by me,
5  and that the transcription of said testimony,
6  with corrections and/or changes, if any, is
7  true and correct as given by me on the
8  aforementioned date.
9
10 _____  _____
11 DATE SIGNED         LEE GUILLORY
12
13 _____  Signed with corrections as noted.
14
15 _____  Signed with no corrections noted.
16
17
18
19
20
21
22
23
24
25 DATE TAKEN:  August 22, 2008

Page 257

1          REPORTER'S CERTIFICATE
2          I, JOSEPH A. FAIRBANKS, JR., CCR, RPR,
3  Certified Court Reporter in and for the State
4  of Louisiana, do hereby certify that the
5  aforementioned witness, after having been first
6  duly sworn by me to testify to the truth, did
7  testify as hereinabove set forth;
8          That said deposition was taken by me
9  in computer shorthand and thereafter
10 transcribed under my supervision, and is a true
11 and correct transcription to the best of my
12 ability and understanding.
13         I further certify that I am not of
14 counsel, nor related to counsel or the parties
15 hereto, and am in no way interested in the
16 result of said cause.
17
18
19
20
21
22
23
24 _____
   JOSEPH A. FAIRBANKS, JR., CCR, RPR
25 CERTIFIED COURT REPORTER #75005

65  (Pages 254 to 257)

**A**

**abandoned** 112:12
**abbreviation** 92:18
**abilities** 10:17
**ability** 29:1 230:3
  257:12
**able** 39:21 40:2
  43:5 81:5
**abnormalities**
  174:7
**Absolutely** 12:5,16
  18:4 26:12 30:6
  31:5 37:10 38:11
  49:11 54:12 65:5
  90:20 93:12
  110:16 121:3
  198:9 209:25
**accept** 30:4 148:15
  169:3
**acceptable** 95:24
  96:5 224:3,5
**acceptance** 29:16
  30:7 45:21 94:8,9
  94:23,25 95:14
  128:21
**accepted** 85:16
  94:19 113:22
  129:24 146:11
  148:2 194:23
  220:23
**accepting** 29:25
  220:19
**access** 20:6 128:7
  201:1
**accommodate** 75:9
**accomplish** 39:20
  158:17
**accomplished**
  156:24 176:7
  180:4
**accomplishing** 55:4
**accountant** 55:15
**accuracy** 193:16
**accurate** 10:24
  22:14 59:2,16

73:4 91:11,14
92:2,13 93:24
94:24 95:21
105:20 111:11
112:15 153:16
169:22 236:23
240:9
**accurately** 161:4
**achieve** 243:6
  246:18
**acknowledge** 26:4
**acquire** 182:23
**acquiring** 14:18
**acquisition** 37:11
  37:25 38:4 205:14
**acres** 47:1 206:15
  206:16
**acronym** 14:4
**acronyms** 22:20
**act** 71:13
**ACTEDS** 13:22
  14:3,4 25:5
**action** 1:4 26:21
  56:19,21 57:6
  86:20 88:13
  100:17 156:17,23
  185:24 186:3,12
  190:4 193:20
  194:9,19 200:23
  210:11
**actions** 70:8
**activities** 43:6 62:3
  64:22 73:22
**actual** 52:9 58:7
  62:23 63:2 64:4
  85:8 106:4 108:14
  114:1 117:18
  152:8 176:9,14
  185:21 187:9
  196:16,17,18,18
  202:5 242:19
**add** 99:19 102:13
  122:12
**added** 31:25
**additional** 17:14,18
  22:7 32:14 104:2

115:24 118:4
120:16 150:1
162:20,23 188:11
188:12,14 201:15
**additions** 59:8
**address** 101:17,18
  117:2 140:21
  141:3 188:10
**addressed** 51:11
  99:12 203:19
  255:13
**addressee** 82:10
**adherence** 27:2
**adjacent** 12:17
  36:1,11,19 37:1,5
  120:21 127:22
  152:22 158:18
  180:22 199:23
  218:22 245:7,9
**adjusted** 45:19
**admin** 40:10
**administered** 22:25
  60:16
**administering** 8:24
  19:1 28:10
**administration**
  46:10,15 52:25
  53:16
**administrative**
  204:2
**ADRIAN** 3:4
**advantage** 155:3
**advantageous**
  232:15
**advantages** 38:7
**adverse** 36:25
  218:21
**adversely** 36:10
  141:14
**advertised** 12:9
  14:13,20 38:16
  102:19 108:5
**advertisement**
  20:23
**advice** 178:10,14
**advised** 192:5

**advisement** 218:7
**advisor** 15:6
**affect** 23:23 36:10
  141:14 221:2
**affirmatively**
  213:13 242:4
**aforementioned**
  8:4 256:8 257:5
**afternoon** 148:21
  211:17
**agencies** 49:18 70:7
**agenda** 58:12 91:19
  109:21 133:21
**aggregate** 233:5
**ago** 155:18 179:13
  209:20
**agree** 63:18,19,25
  64:3 91:10 219:23
**agreed** 8:2 64:11
  78:5 85:6 222:1
**agreeing** 220:25
**agrees** 85:3
**ahead** 9:14 27:18
  39:12 42:2 138:14
  138:19 203:10
  229:17 238:8
  243:20 253:6
**air** 36:5
**Alabama** 23:2
**Alex** 166:18,18
  169:17,19
**ALFIERI** 3:24
**Algiers** 53:10
**allow** 37:18 141:13
  154:13,14
**allowable** 41:2
  158:23 167:11
**allowed** 63:14
  104:15
**alternate** 100:13
**alternative** 17:19
  37:24
**Alvey** 121:18 136:3
  145:5 191:24
  193:14
**Alvin** 96:14,16

125:4 126:15
130:8 133:11,13
136:23 147:9
191:8,11 193:12
**amendment** 198:17
  198:23
**AMERICA** 1:12
  2:10
**amount** 36:9 47:20
  189:1 196:18
**ample** 139:12,15
**analysis** 45:16 48:4
  50:24 86:4,7,10
  87:5,15 100:17
  115:25 116:5,9,17
  118:7 153:14,20
  157:7,19,19 158:8
  158:20 224:13
  225:2 226:2
  254:22 255:17
**anchor** 129:6
**and/or** 256:6
**annotated** 157:9
  158:22 163:2
**annotations** 203:16
**annual** 11:13
**annually** 97:13
**answer** 8:13 37:22
  42:9,9 46:24 60:7
  108:24 175:24
  185:12 226:8,9
  255:8,9
**answered** 141:4
**answering** 71:5
**anticipated** 54:5
  55:8 149:21
  178:20 240:22
  253:14
**anybody** 27:6
  131:2 164:1
**anyway** 231:13
  232:17
**apologize** 132:13
  238:16
**APPEARANCES**
  2:1

GUILLORY (VOL II), LEE

**appears** 21:3 50:10 65:9 79:9 100:11 134:5,8 163:15 207:8
**Appendix** 50:10 189:7
**applicable** 20:4 34:7 41:1 181:25 195:22
**application** 10:16 10:18 149:4 150:4 150:9 159:10
**applies** 248:5
**apply** 230:12,15,18
**apprised** 74:3
**apprized** 15:4
**approach** 40:24
**appropriate** 34:11
**approval** 64:5 72:14 84:17 149:17 150:6 151:21 153:11 159:19,20 186:10 186:21,23 226:2 227:11
**approvals** 185:16
**approve** 33:18 40:18 104:5,14 143:7 151:19 190:13 197:10
**approved** 41:6,8 85:17,18 87:3 107:4,8 123:4 134:18 135:9,10 135:14 149:16 151:7 152:2,5 158:2 159:15 181:21 187:5,10 190:15 194:13,14 195:13 199:17 208:20 224:6 225:14,25 227:2,5 239:3
**approving** 29:21 33:17 150:24 220:20,25

**approximate** 10:19 75:25 108:9,15 196:15
**approximately** 16:25 28:16 30:21 107:24 118:11,14 127:17 130:23 132:18,24 142:15 161:20 171:11 173:15 184:14 200:4 213:22,23 214:3 241:19
**April** 74:9,19 106:20 182:8 190:24
**apron** 112:11
**aquifers** 23:25
**architectural** 16:12 18:9
**architect/engineer** 14:1
**area** 15:6,25 16:19 17:3 18:2,24 26:18 33:13 46:20 57:21 73:23 75:10 76:16 83:22 96:21 96:22 103:25 117:5,7,23 118:9 120:17 127:25 149:20,25 152:18 152:20 153:17 154:13,14,18,20 154:24 157:8,25 160:1 170:11 171:3 173:14 175:20 177:5,14 177:16,22 180:20 181:1,23 182:3 184:21,25 187:25 188:6,8 189:16 197:2 220:10 223:6 225:9 226:19 229:9 230:22 231:8 238:20 241:3,4,13 241:18 242:1,2

249:3 255:19
**areas** 56:20 103:15 171:10 173:24 177:17,18 195:20 196:2 229:21
**argue** 225:10,12
**Ariatti** 29:14 134:11
**Arlene** 21:13,13
**Army** 1:13,14 2:20 148:1,15 180:6 193:11
**art** 208:5
**ascertain** 172:19
**ash** 101:10 235:6
**aside** 123:8
**asked** 32:9,12 56:10 66:12 140:14,16 153:8 158:4 174:1 176:11 177:18 216:8 225:13,19 225:24 227:4 229:19 232:4 243:22 254:12
**asking** 9:11 46:17 60:25 204:22 252:1
**aspect** 24:25
**aspects** 20:10 23:6 23:10 24:11,17
**Assessment** 50:14
**assessments** 47:21
**assigned** 44:22 253:11
**assignment** 11:9 13:22 14:6,11 15:9 78:7,11
**assistance** 34:23 156:22
**assistant** 11:7 42:16 204:3
**associated** 55:4 104:12 116:15 214:13
**assume** 19:6 32:25

**assumed** 185:13
**assumes** 39:5 185:9
**assuming** 18:11 168:16 245:18
**assumption** 18:13 116:24
**assumptions** 52:24
**assurance** 15:12 28:7 29:10 41:9 86:16 92:7,19 93:6,8,10 97:1 104:19 121:6,7 123:11 124:21 126:7 141:20 157:23 188:3
**assure** 127:18 128:2
**assured** 167:6 175:21
**ASTM** 248:3
**as-built** 17:8 49:25 50:16,21 51:16 108:12
**Atchafalaya** 14:14 14:24 15:24
**atmospheric** 238:3
**attach** 210:18
**attached** 9:21 10:5 21:8 22:3 33:7 41:16 44:11 45:1 51:23 55:20 58:15 61:25 64:25 65:17 67:8 68:3 70:17 71:25 74:14 77:10 79:17 81:22 84:13 86:2 89:24 95:12 96:25 98:21 101:2 104:25 105:16 106:19 109:19,25 110:25 111:25 113:6 114:16 116:4 119:11 121:14 122:16 123:15 124:25 126:2,11 128:24 130:14 133:7,25

135:1,24 136:18 143:14 144:5 145:11 147:5,15 149:8 150:22 155:20 165:5 166:14 167:19 169:12 179:1 182:11 186:7 190:7 191:2 194:2 197:19 199:1 200:9 203:13 204:24 207:13
**attaching** 58:11 64:20 70:13 71:20
**attachment** 100:22
**attachments** 68:13
**attend** 91:22 92:7
**attendance** 205:4
**attended** 77:14 80:23 91:16 93:2 98:3 105:8 110:11 111:8 112:21
**attendee** 81:19
**attendees** 80:6
**attending** 13:25
**attention** 11:1 13:18 22:16 32:8 38:19 45:23 54:13 68:10 82:4,20 88:6 90:11 93:17 97:6 103:8 107:16 125:3 127:10 152:7 156:2 169:25 175:2 179:10 183:18 187:17 191:15 200:25
**attorneys** 220:21
**audit** 52:2
**August** 1:17 10:22 13:5 25:18,19 30:21 32:25 49:12 62:4 77:6 79:8 113:12 116:1 182:15 199:18 207:9 208:17,18

GUILLORY (VOL II), LEE

| | | | | |
|---|---|---|---|---|
| 209:11,15 256:25 | 107:6,8 116:23 | **bank** 16:8 18:2 | 179:11 180:9 | **best** 29:1 206:24 |
| **author** 162:15 | 120:3 124:1 | 26:18 33:13 46:20 | 191:16 200:19 | 257:11 |
| **authored** 19:15 | 125:12 158:3 | 57:20 73:22 83:22 | 202:23,25,25 | **better** 154:21 233:3 |
| 147:8 | 232:5 | 118:8 170:11 | 208:14 | 234:23 251:14 |
| **authorities** 33:17 | **back** 18:17 22:3 | 171:3 182:3 | **Baton** 79:25 80:24 | **beyond** 42:4 128:4 |
| 33:18 | 26:5 31:11 32:13 | 184:20,25 195:22 | **BCOE** 16:6,7 19:15 | 201:4 255:3,5 |
| **authority** 21:19,21 | 32:16,21 59:12 | 198:18,23 199:14 | 19:22,23,25 | **bgs** 88:22,22 201:2 |
| 21:24,24 22:6 | 62:12 71:6 73:6 | 199:21,23 200:24 | **bear** 236:20 | 201:20 |
| 32:21 | 76:7 78:6 162:2 | 201:5 202:1,2,6 | **beat** 176:10 | **BH51A** 175:18 |
| **authorized** 22:10 | 162:10,14,16,20 | 203:15 220:10 | **beginning** 47:24 | **bid** 38:15 102:19 |
| 26:20 | 173:13,13 182:15 | 229:9 255:18 | 62:19 78:17,20 | **biddable** 20:10 |
| **available** 33:23 | 186:24 188:8,12 | **bankline** 199:7 | 81:9 97:22 117:6 | **bidding** 46:11,11 |
| 39:10,14 51:4 | 194:14 197:1 | 200:5 201:22 | 176:12 211:19 | **bids** 102:20 |
| 53:13 103:24 | 211:18 215:4 | **banks** 199:25 | **behalf** 29:8 30:4 | **bill** 82:2 194:20 |
| 149:22 215:25 | 253:20 | **barge** 143:23 | 58:21 70:8 71:13 | **bit** 17:2 27:21 |
| 216:4,5 221:15 | **backfill** 103:15 | 144:21 147:21 | 77:18 80:4 163:23 | 182:1 |
| 223:11 | 104:4 117:3,8,22 | **Baronne** 2:6 | **believe** 10:23 26:7 | **black** 132:13 162:9 |
| **Avenue** 1:16 2:23 | 120:5,6,18,20 | **barrier** 207:1 | 50:2 52:8 56:7 | **block** 115:8,9,12 |
| 3:6 9:3 16:19,20 | 130:1 149:23 | **base** 76:24 108:15 | 58:11 59:14 65:7 | 121:22 124:9 |
| 16:25 17:4,4,10 | 150:1 175:5,8,9 | 173:21 181:16 | 70:22 72:20 79:13 | **blocks** 119:8,20 |
| 18:5,7,8 47:3 58:4 | 175:18,19,22 | 185:15 221:23 | 81:7,14,24 82:11 | 121:24 129:7,14 |
| 58:5 76:16,17 | 176:1,3,4,4,6 | **based** 76:21 88:25 | 88:1 111:10 | **board** 32:16 33:23 |
| 83:12 171:8 211:1 | 180:17,25 181:7 | 119:17 152:19 | 112:14 114:19,25 | 34:5 35:1 36:17 |
| 211:23 213:5,10 | 181:18,22,25 | 161:11 184:6 | 118:18 122:4,9 | 37:12 60:5,8,22 |
| 214:1,14 215:6 | 186:18 189:4 | 196:16 201:6 | 123:2 124:5,17 | 66:8 67:23 108:13 |
| 218:19 | 192:21 196:15,18 | 211:15 | 125:16 128:11 | **boards** 60:18 |
| **award** 44:20 46:12 | 211:3 222:12 | **baseline** 75:25 76:3 | 133:13,20 134:14 | **boat** 112:12 168:12 |
| **awarded** 12:9 | 224:2,14 226:16 | 76:10,15 | 135:4,13 136:10 | **Bobby** 65:13,25 |
| 14:14,20 44:13 | 226:17 229:21 | **Basically** 56:10 | 137:2,8 144:1,24 | 66:1 205:6 |
| 103:5,7 108:23 | 232:21 233:22 | **Basin** 14:14,24 | 145:15,25 147:24 | **bodies** 154:15 |
| 206:21 239:17 | 240:13 241:22 | 15:24 | 148:23 155:13 | **Boland** 96:11 113:8 |
| 253:25 | 252:11 | **basing** 98:7 | 156:7,16 161:4 | 114:11,20 119:21 |
| **awarding** 54:5 | **backfilled** 120:11 | **basis** 31:6 49:16 | 164:14 165:16 | 121:22 122:24 |
| 102:24 | 120:14 127:18 | 83:9 130:24 | 167:1 168:4,22 | 124:4 129:7,15 |
| **awards** 78:15 | 128:3 192:21 | **Bates** 9:25 21:2 | 169:21 170:24 | 141:16 142:14 |
| **aware** 23:19 36:1 | 227:17,18 228:19 | 25:16 34:17 52:10 | 178:11 184:18 | 185:18 190:5,13 |
| 49:8 51:18 68:24 | **backfilling** 117:1 | 52:18 59:19 69:21 | 191:12 193:18 | 197:15 198:4 |
| 69:4 71:2 74:3 | 127:16 146:12 | 81:15 90:12 95:6 | 195:10 197:9 | 199:8 227:6 |
| 171:17 174:14 | 148:3,6 192:7 | 97:22 101:22 | 200:12 204:20 | 230:12 235:10,16 |
| 209:8 | 240:19 | 102:5 103:9 110:6 | 205:12 210:25 | 235:18 239:14 |
| **a.m** 204:13 | **backfills** 225:2 | 127:11 129:4 | 211:22 214:11 | **border** 50:1 |
| **A/E** 14:1 | **Bacuta** 152:14 | 131:22 134:7 | 239:17 242:14 | **bore** 177:3 179:21 |
| **A/k/a** 124:9 | 204:7 | 144:6,18 152:9 | 253:22 | 188:22 189:2,16 |
| | **bad** 45:17 138:5 | 154:3 159:1 | **beneath** 35:17 | 195:22 199:6 |
| **B** | 217:12 | 176:20,22,25 | **Benjamin** 2:16 | 230:22 |
| **b** 4:8 28:12 29:15 | **ball** 37:16,18 | 177:7 178:13 | **Bernard** 166:18 | **boring** 89:8 |

GUILLORY (VOL II), LEE

**borrow** 103:16,24
103:25 117:4,7
120:7,8,9,12,17
127:14,21,25
148:24 149:4,15
149:18,25 150:1,8
150:19,24 152:18
152:23 154:11,13
154:14,18,20
155:2,4,9 157:8
157:21,25 159:9
161:5,10,15 163:1
165:25 167:6
168:12,13,15,19
168:24 171:10
174:25 210:22
222:14 223:6,13
224:8 226:19
229:22 232:20
233:9,10,14 234:3
234:4 240:15
243:13 248:16,18
248:23 249:3,7,11
**bottom** 25:16 34:17
39:13 52:10 59:19
67:16 69:21 74:12
75:8 76:19 82:5
88:8 97:21 103:12
103:12,14 120:4
127:16,16 131:22
131:23 132:4,9
135:11 144:18
151:2 152:9 155:9
158:23 161:13
165:9 167:23
169:15,18,25
176:25 191:6
235:11 236:7,8,17
236:22 237:3
238:21 243:17
**bought** 223:23
**boundary** 213:5,10
215:4,5 223:13
**bounded** 18:5 58:6
211:22
**bounds** 158:2

**box** 2:15 107:5
**boxes** 87:21,21
**BOYER-DUPLA...**
3:19
**boys** 245:10
**braced** 137:9
141:13 142:6
185:17
**bracing** 158:17
**brainstorm** 49:16
**branch** 2:12 15:12
74:24 75:12
152:25 153:4,19
160:25 162:16
163:20,21,25
167:13
**breach** 154:17
**breached** 154:13
168:14
**breaches** 1:4 211:2
**break** 148:19
193:19 211:11
252:14
**Breerwood** 74:9,20
75:2,5,12 76:2,23
**Brian** 68:13,15
70:14
**bridge** 16:19 17:1
18:7,8 214:14
**bridges** 19:19
76:17
**brief** 64:15 146:5
**briefing** 205:22
**briefly** 90:21 212:9
**bring** 32:15 78:21
104:16
**bringing** 78:16
**broad** 237:9
**broadly** 16:17
**Brogna** 166:18
169:17,19
**brought** 32:7
162:17 236:20
**brown** 179:24
181:4
**Bruce** 41:13 42:16

**Bruno** 2:3,3,4 4:6
10:6 37:19 41:24
42:3 43:8,21 44:2
46:21 48:15 56:10
57:23 73:2,9
83:24 137:11,17
137:23 138:2,6,15
138:20,24 139:14
139:22 140:5,23
144:13 185:8
211:9,12 214:24
215:2,23 220:17
224:18 225:5,11
225:20,23 226:20
227:20 228:9
231:11,17,21,25
233:1 237:10
238:14,17 245:2,8
245:13 246:23
248:11 252:16
255:2
**bucket** 127:19
176:9 242:8,15,18
242:19,21,22
243:4,7 248:6
**budget** 32:17
**budgeting** 11:12
**buildability** 15:20
16:3
**building** 35:12
47:10 105:5,23
106:15 240:1
**built** 19:7 57:15
60:16 112:9
184:13 245:25
**builts** 208:9
**bulkhead** 111:16
111:20 112:4
**bulkheads** 112:7
**bulldozer** 243:1,2
**bullet** 50:9,13 91:7
91:9,25 92:12
200:25 201:3
**bullets** 250:20,21
**bunch** 52:11
189:10

**business** 53:14
221:7
**butcher** 96:15
**buy** 222:17,24
223:1
**buying** 234:5
**bypass** 13:8,10
89:9 117:24 118:8
118:13,16,21,22
118:23 206:21
207:4 232:16

---

## C

**C** 30:25 50:10 63:7
252:22
**cake** 115:1,6,12
119:24 120:11
122:1,2 123:1
124:6 125:13
127:8 129:9,18
142:7 227:7
230:13 239:15
240:9,19
**calculated** 196:1
**call** 16:6 71:8
230:19 243:6
244:21
**called** 10:16 23:5
25:5 38:14 44:20
63:22 85:22 88:12
115:1 195:18
208:8 217:25
235:6 242:15
254:1,2
**canal** 1:4 16:8,18
17:1 18:6 26:17
168:14 173:24
183:25 193:8
198:18 199:21,23
199:25 200:24
201:5,25 202:2,6
214:9 234:15
236:12,13 237:24
**cantilevered**
212:13
**canvassing** 70:6

**cap** 186:13,19
187:1,6,11 188:24
189:24 190:13,16
212:14 214:11
**capital** 151:5
**CAPS** 190:14
**caption** 180:16
**car** 142:8,23
148:16
**carat** 102:9 103:17
**careers** 24:24
**carefully** 40:8
216:24
**Carondelet** 3:12
**carried** 92:3 121:2
**case** 55:22 63:6
64:7 85:10 173:19
234:6
**categories** 253:10
253:14
**cause** 28:13 37:8
218:21,25 219:18
257:16
**causes** 236:21
**causing** 220:12
**CCR** 1:24 8:22
257:2,24
**CE** 85:15
**center** 17:17 23:14
33:11 53:14
**certain** 23:24 37:3
78:12 146:8
210:24 211:2
239:8 243:2,5
**certainly** 173:23
216:23
**CERTIFICATE**
256:1 257:1
**certified** 1:25 8:23
54:23 100:10
257:3,25
**certify** 256:3 257:4
257:13
**CESWT-CT** 33:4
**CH** 231:5 252:6
**chain** 47:10 206:3

GUILLORY (VOL II), LEE

**challenging** 12:25
**Chances** 127:4
**change** 99:15,16
  111:9 150:17
  224:20
**changes** 107:5,11
  107:12,13 256:6
**channel** 13:8
  118:21,22,23
  206:22
**channels** 12:11
  13:11 19:20 50:5
  89:10 117:24
  118:8,13,16 207:5
  232:16
**characteristics**
  222:21 232:19
**characterize** 12:22
  132:20
**charges** 55:17
**chart** 54:10 78:6,13
  177:4,22 195:18
**cheaper** 232:10
**check** 40:25 101:3
**checklist** 109:22
  110:21 111:16,19
  112:18 121:11
  133:18 135:20
  147:20 192:24
**checklists** 112:16
  202:4
**checkmark** 67:17
  70:20
**chief** 42:16 74:25
  165:23 205:9,13
**childhood** 249:14
**choice** 37:6 42:12
  78:10
**choose** 251:13
**chooses** 251:14
**chose** 76:17 104:6
**chosen** 41:22 42:18
**CHRISTOPHER**
  3:5,23
**CIH** 54:20
**CIR** 99:17

**City** 15:25
**civil** 1:4 2:12 8:6
  13:23 15:12 19:16
  60:15 221:13
**CL** 231:5 252:6
**Claiborne** 16:20
  17:4,10 18:7
  76:17
**clarification** 98:24
  148:5,14 162:20
**clarify** 51:13 62:10
  63:14 69:4 162:3
**CLARK** 3:20
**class** 210:11
**classification**
  183:20 250:12
**clay** 117:17 175:10
  175:19 178:18
  179:24 181:2,4
  223:3 226:15,25
  227:16 228:19,20
  230:23 231:3,4
  233:3,9,14 244:13
  244:18,20 245:17
  245:23,24 246:1,6
  246:8,12 248:14
  248:22 249:2,5,10
  250:25 251:3,6,9
  251:12,16,17,22
  251:23 252:3,4,8
  252:12
**Clayman** 3:3 4:5,7
  9:7,8,9,15,23
  10:13 21:10 27:19
  27:22 32:18 33:20
  37:21 41:18 42:1
  42:8 43:12,16,19
  44:5,15 46:23
  48:19 52:3,15,20
  57:25 58:17 61:5
  61:9,14 62:6
  64:16 65:2,19
  67:10 68:5 70:21
  72:2 73:5,13,16
  74:16 77:12 79:19
  82:3 84:2,15 86:5

87:25 88:4 90:1
  95:16 97:4 101:4
  105:2 106:21
  109:16 110:1,18
  111:2 112:3
  113:10 114:24
  116:7 119:13
  121:16 122:18
  123:18 125:2
  126:13 129:2
  130:18 131:20
  133:9 134:4 135:3
  136:1,20 137:15
  137:21,25 138:4
  138:12,18 139:10
  139:17,19,25
  140:10,18 143:16
  144:16 145:13
  146:21 147:7
  148:20 149:10
  151:1 155:22
  159:13 160:11,15
  160:17 161:3
  165:7 166:16
  167:21 169:14
  170:6,8,18 171:25
  178:2,8 179:3
  182:13 185:11
  190:9 191:4 194:7
  197:23 198:1
  199:3 202:15
  203:6,8,18 207:15
  210:20 215:18
  252:18 255:7
**clays** 223:7
**clay-like** 249:11
**clean** 40:3 86:18
  149:22 182:23
  188:1,8,15 189:5
  192:21 194:20
  197:1 223:23
**cleaned** 172:4
**cleanup** 80:18
**clear** 61:4 215:10
  221:6
**clearance** 81:10

207:22
**cleared** 192:19
**clearly** 237:4
**climb** 128:8
**close** 81:4 236:13
  253:11
**closed** 204:4
**closeout** 210:3
**closest** 47:9 162:8
**Clouatre** 96:16,18
  125:5 126:13
  130:8 133:11
  136:23 147:9
  191:8 193:12
**code** 63:5 85:15
  107:5 187:9
**cofferdam** 98:1
  120:13,15 122:20
  124:2 125:13
  127:16,18,24
  128:3,6,8 130:5
  131:24,25 132:1
  132:18,21 135:14
  135:21 141:13,15
  142:17,19,22,24
  148:7,11,12
  227:17,19 235:18
  235:23 236:1,16
  240:12,14 241:6,9
  241:21
**cofferdams** 57:15
  240:16 242:23
**collaborate** 204:14
**collaborated**
  150:11
**collaborative**
  102:14
**collapsing** 189:23
**colloquial** 181:14
**color** 131:3,9
**Colorado** 23:13
  53:15
**column** 62:21,21
  62:24 63:1,4,9,14
  63:15,16,16 84:24
  85:14 187:22

**columns** 62:14,15
  64:8,10
**combination** 223:7
  236:4 246:12
**combined** 93:14
**come** 76:11 99:3
  104:11 182:19
  201:14 236:2
  249:2
**comment** 61:17
  62:21,23 63:1,2,7
  63:8,11,11,13
  64:9 84:21,25
  85:4 86:25 90:8
  143:5 151:10,16
  152:10,17 153:1
  154:4,7,11 183:12
  187:14 190:20
  198:6,10,14
**commentator**
  63:16
**commented** 123:6
  150:7
**commenters** 209:6
**commenting** 29:20
  29:22
**comments** 59:22
  62:8,10,12,19
  63:3,4 84:10
  101:8 102:1 107:9
  150:18 151:11,12
  151:20 152:8
  183:14 204:5,9
  209:3
**commercial** 117:16
  181:17
**Commissioners**
  67:23
**communications**
  31:3
**compact** 120:21
  132:23 242:22
**compacted** 127:19
  128:4 175:7,18,19
  175:21 176:3,4
  178:18,19 180:1

247:1,4,6,8,13,18
247:25 248:2,6
**compaction** 130:2
178:10 242:8,16
242:18 243:1,4,7
243:25 245:19
246:17,18,20
**compacts** 176:10
**Company** 108:23
148:12 239:19
**compared** 132:22
**comparing** 116:17
**comparison** 38:3
**compilation** 95:4
**complemented**
103:6
**complete** 20:23
30:4,17 32:17
65:7 95:24 148:4
148:17 155:16
168:11,15 169:4,5
194:11,12,25
195:1,11
**completed** 20:15
68:19 76:13
113:16,19,20
166:19 196:25
**completely** 63:23
**completeness**
199:16
**completes** 194:9
**completion** 30:7,8
30:14,22 94:5
146:6 154:11
195:4,4,6 206:20
207:10 208:4,9,21
209:9,14,23
**compliance** 156:24
**complies** 95:24
**component** 212:1
**components** 34:9
**comports** 178:14
**computer** 164:10
257:9
**concern** 23:21
24:10 36:21 80:16

86:12 117:13
188:2
**concerned** 78:10
209:21,22 210:1
230:2
**concerns** 141:7
154:25
**conclude** 208:2
**conclusion** 94:16
155:5
**concrete** 17:21
19:3 35:15 57:14
83:12,13 101:10
101:10 105:6,24
112:11 114:20
119:7,19 122:24
124:3,12 125:12
127:13 129:6,14
173:22 212:14,18
214:11,12 227:23
228:11 234:7
235:6 238:11
240:1
**concrete/pozzola...**
233:24
**concur** 63:7
**Concurrently**
116:13
**concurs** 63:6
**conditions** 26:24
108:14 218:21
238:3
**conduct** 73:22
171:19 174:15
**conducted** 92:15
94:1 97:2 171:13
174:3 205:2 207:4
**conducting** 13:23
**confirm** 192:6,12
**confirmation** 188:4
200:15 201:12
**confirming** 151:19
**conflicts** 15:5
**conform** 165:25
**conforms** 167:7
**conjunction** 60:17

**connect** 17:25
**connecting** 50:5
154:21
**connection** 13:9
28:14 83:18
108:19 157:21
233:23 244:20
245:15
**consecutive** 95:7
**consensus** 63:24
83:6
**consideration**
28:25 88:9 230:23
**considerations**
35:23,24 36:4,13
56:25 164:6 189:8
189:17 218:7
**considered** 38:8
175:13
**consisted** 205:22
**consistency** 249:8
**consistent** 59:24
238:24 242:12
**CONSOLIDATED**
1:5
**constantly** 40:18
**constituents** 80:15
**constructability**
15:20 16:4
**constructable**
20:12
**constructed** 235:19
**constructing** 124:2
**construction** 11:16
11:24 12:9,11
15:3,8,13 18:15
18:17,19 19:1
25:2 27:25 31:12
42:16,23 46:12
66:10,18 71:14
78:20 89:11 97:19
105:13 106:15
108:14,23 122:22
123:12 124:2
126:25 133:4
141:23 142:22

148:12 156:21
214:18 239:19
**contained** 108:20
146:1 165:17
167:1 168:4
232:20
**contaminant** 24:2
86:14 188:2
**contaminants**
23:21 24:9,17
80:16 86:11
233:18
**contaminated** 48:7
56:20,23 101:11
150:2 186:15
189:15 199:9
200:5 201:13,17
201:21 223:24
**contamination**
20:20 24:3,7
34:13 39:22 89:3
89:14 149:21
199:12 201:7
**contemplated** 53:4
**contemplating**
107:23 227:10
**content** 250:2,8
**Contents** 196:8
**context** 225:15
235:9
**continual** 49:15
**continue** 120:5
**continued** 9:18
240:13
**contract** 11:11
14:19 19:25 20:3
20:5,8,10 22:2
26:23,24 27:2
28:11 29:17 30:9
30:10,14,16,20
33:5,11,16 34:12
38:14,16,18 39:4
39:14,24 40:1,7,9
40:20 46:11,14,15
53:15 95:25 96:17
195:3 206:21

221:23,25 222:1
**contracting** 21:15
21:23,25 22:10
26:8 29:7 30:11
33:24 38:9 103:1
103:2 116:10
205:5,9,13,14,18
**contractor** 26:22
31:3,18 38:17
39:1,18 40:1,5,12
40:17,19,23 41:22
46:3,18 89:20
98:16 113:18
116:12 121:19
202:9 207:3 251:9
251:13 252:3
253:9
**contractors** 20:11
20:24 42:13 90:25
106:7 141:19
**contractor's** 27:3
31:17 41:10
116:18
**contracts** 12:8
14:13,16 19:1
23:20 38:5 91:4,5
**contractual** 15:4
**contrast** 175:14
**control** 19:18 20:7
20:8 27:3 28:8,9
31:13 36:5 47:7
53:16 58:4 78:14
78:22 83:15,18,20
89:20 90:15,23
91:1 92:24 93:15
95:13 100:13
102:6 104:19
105:17 106:5,8,16
111:4 121:4,19
125:23 126:1
141:15,20 144:9
144:19 147:12,16
157:11,12 158:18
158:21 160:24
173:2 180:2
192:16,18 193:1

GUILLORY (VOL II), LEE

196:12,21 213:16
226:14
**controlled** 168:17
**convert** 25:2
**convey** 252:2
**conveyed** 102:25
163:4
**coordinate** 49:18
**coordinated** 152:24
**coordination** 11:9
66:9 79:22 81:24
127:5 182:16
**coordinator** 196:22
**copied** 42:20,22
97:5
**copies** 70:3 210:15
**coping** 203:3
**copy** 49:25 51:16
56:7 65:7 68:12
68:25 69:25 75:20
123:20,21,23
155:14,16 156:14
163:6 195:11,12
197:7 253:3
**COR** 21:19,21,23
22:4,5 32:19,21
41:5,8 104:9
164:18 165:10
204:25
**corner** 52:21 107:6
135:8 151:6
208:19 213:12
**corporation** 42:14
44:13 47:23 98:16
**Corps** 1:13,14 2:20
2:21 10:11 21:16
22:19 24:18 25:7
25:10,13 29:4,22
29:24 30:5 36:23
37:6 39:1,2,17,19
40:17,22 47:19,22
51:25 53:22 54:11
55:25 58:1,21,23
60:10,16,20,23
62:4,11 63:3,4,14
63:16,20 64:3,11

65:20 66:23,24
68:16,17 69:15,22
69:24 70:2,9 71:3
71:9,10,14 74:10
74:23 77:19,22
78:9,14 79:2 80:5
85:3,6 89:10
90:24 91:4,5,16
91:21 92:6,19,20
94:1,19 95:15
96:6,12 97:2
98:25 101:8
102:10,13,15,25
105:11,18 110:14
112:21 113:21
114:19 120:24
121:7 127:7 128:2
129:24 130:7,17
130:20,24 134:9
134:18 136:5
141:25 146:10
148:2,15 149:13
150:11 151:11,12
153:3,10,13 169:2
172:14 174:19
180:6 181:21
183:14 185:4
186:21,24 189:19
192:11,15 193:11
194:5,5,13,16,22
196:21 198:5,13
199:15 202:9
205:8 206:11,15
207:19,23 208:5,7
209:22 224:3
239:4 247:19
254:21
**Corps-owned**
206:18
**correct** 22:13 23:7
26:10 32:9 34:19
52:7,23 54:24
56:5 59:3 64:13
66:20 74:15 77:23
77:24 78:1,3
79:14 84:23 85:8

87:17 92:5 95:2
100:18 104:17
112:22 113:23
115:3 118:19
124:7,15 125:6,15
126:20,21 130:3,6
134:10,13 137:10
140:21 141:3,4
142:11,19 145:18
147:17 149:1
152:5,6 155:25
156:10,13 159:24
166:24 167:24
168:2,23 177:24
179:7 184:21,22
185:14 187:13
189:24,25 193:21
193:22 203:25
208:22 214:17
219:3,25 220:2
221:4,10,13 222:6
222:8,16,19
223:16 224:1,11
227:14 229:11
243:11 245:17
247:11,15 249:16
251:18 252:9,13
253:25 256:7
257:11
**corrected** 222:8
**corrections** 78:2
256:6,13,15
**corrective** 56:19,20
57:6 88:13 100:17
185:24 186:2,12
190:4
**correspondence**
30:1 68:25 73:18
**cost** 11:11 28:9
34:11 39:7,14,25
40:7,20 53:16
54:25 55:2 104:12
116:14 117:8,14
117:15,19,19,25
118:4 192:14,16
192:16 232:14

**costs** 40:6,9,24 41:2
45:19 55:3,16
102:21 116:15
**cost-saving** 149:24
**counsel** 2:21 8:3
9:11 137:13 240:7
242:25 257:14,14
**counterparts** 31:7
31:8
**counter-recomm...**
103:4
**couple** 22:7 31:10
79:23 209:19
252:20
**course** 20:21 23:5,8
23:12,13 24:12
39:24 81:25 108:3
114:22 164:7
199:5 215:9
216:10,11 218:23
**Court** 1:1,25 8:23
257:3,25
**courtesy** 139:4
**cover** 24:12 51:10
64:19 65:3 72:3
84:5 87:9 100:21
106:13 118:13
134:22 150:16
163:12 198:21
203:19 208:16
**covered** 19:21
**covering** 19:15
**covers** 197:5
**co-sponsor** 60:21
60:22
**co-sponsoring**
61:12
**CQC** 136:3 145:5
**cradle** 197:6
**created** 81:9
**creating** 48:23
**criteria** 76:21,22
80:18 182:7,14,20
**cross-examination**
138:9
**cross-sections**

153:16,22,24
157:9,24 158:24
166:6 167:12
**cross-train** 14:7
**cross-training** 25:4
**crown** 162:24
**crushed** 117:17
223:3
**cube** 189:14
**cubic** 196:2,15
**curb** 83:12,13
**curious** 247:3
**current** 35:4
**cut** 158:1 177:9
187:25 189:20
201:10
**cutoff** 212:19,22,24
**cuts** 57:1
**cys** 116:25

---

**D**

**D** 3:11 4:1,8 31:15
63:7,18,20 233:21
**daily** 31:5 92:23
93:12,14 123:11
125:23 126:1
133:3 144:9,19
**dam** 168:11,13
**damage** 141:1,7
172:19 173:11
174:9,22,24 218:1
218:17,21 219:1,5
220:12
**DARCY** 3:19
**data** 47:14,16,17
48:1,12,20,25
49:7
**date** 10:20 25:19
26:1 44:8 70:12
127:4 132:5,7
151:21 170:1,9
179:17 180:12,14
186:3 187:7 195:4
195:5,6 196:24
197:15 205:21
256:8,11,25

GUILLORY (VOL II), LEE

**dated** 21:4 25:17
33:3 34:21 44:8
45:2,5 51:11
58:12 62:4 64:19
67:3 68:12 71:19
72:12 74:9 75:21
77:6 79:8 81:15
84:6 85:22 89:20
96:20 98:17
100:22 104:22
108:7 109:5,8
110:22 111:15,19
113:12 116:1
119:8 121:11
123:12 124:22
126:7 128:18,20
133:4,19 134:22
135:21 136:14
143:11 144:21
145:8 147:1,20
150:16 156:1
163:16 165:2
166:11 167:16
169:8 182:8 190:4
190:11,23 192:24
198:22 203:20
207:9 208:15,16
208:18 238:6
**dates** 84:7 95:7
170:21 195:23
**datum** 20:7
**DAVID** 2:22
**day** 3:2 17:6 56:8
123:3 128:13
156:8 165:15
205:3 225:13
**days** 170:1
**Debra** 3:3 9:8
**debris** 35:16 39:22
48:6 143:24
147:22 172:4
174:12 223:9,24
233:18
**December** 37:13
49:13 72:12 73:20
96:20 97:7 123:12

176:21
**decided** 153:3
**decision** 78:25 79:1
82:22 83:1,3
**DECKER** 3:19
**declared** 30:16
**deep** 19:19 35:19
107:25 127:15
158:12 179:25
184:11 226:13
243:13
**deeper** 119:1,2
188:14
**Defendant's** 4:11
4:12,13,14,15,16
4:17,18,19,20,21
4:22,23,24,25 5:1
5:2,3,4,5,6,7,8,9
5:10,11,12,13,14
5:15,16,17,18,19
5:20,21,22,23,24
5:25 6:1,2,3,4,5,6
6:7,8,9,10,11,12
6:13,14,15,16,17
6:18,19,20,21,22
6:23,24,25 7:1,2,3
9:20 10:4 21:7
33:6 41:15 44:10
51:22 58:14 61:24
64:24 65:16 67:7
68:2 70:16 71:24
74:13 77:9 79:16
81:21 84:12 86:1
89:23 95:11 96:24
98:20 101:1
104:24 106:18
109:18 110:24
111:24 113:5
114:15 116:3
119:10 121:13
122:15 123:14
124:24 126:10
128:23 130:13
133:6,24 134:25
135:23 136:17
143:13 145:10

147:4 149:7
150:21 155:19
165:4 166:13
167:18 169:11
178:25 182:10
186:6 190:6 191:1
194:1 197:18
198:25 203:12
204:23 207:8,12
**deficiencies** 31:18
166:1 167:8
**definable** 20:9
34:14 91:2,18
94:12,18 96:3
97:25 111:7,19
113:17 119:17
191:20 193:3
207:20 208:1
237:19 239:24
**defined** 39:5
**definitely** 152:2
**definitively** 217:6
**degrade** 238:20
241:3,4,6,8,13,18
242:1,2
**degree** 245:19
**degrees** 213:23
**delay** 206:19
**delayed** 210:10
**delays** 32:10
**delegate** 29:2
**delegated** 21:25
**deletions** 59:8
**deliver** 44:16
**deliverable** 30:23
207:17
**deliverables** 30:20
**delivery** 11:22
35:25 38:22 44:12
44:16,21 52:1
54:6 75:15 117:19
253:12,18,23
254:1,5,13,17,25
**DELORIMIER**
3:25
**demarcation** 83:17

**demolition** 26:15
33:12 35:6 36:7
36:24 57:14 58:7
62:3 64:22 72:17
95:19 105:6,6,24
105:24 106:14,16
106:25 109:23
110:4,21 111:7,17
113:13 114:22
119:7 124:12
127:13 135:20
238:10 240:1
**demonstrate** 253:9
**Dennis** 31:9 65:13
66:3,4 67:4,24
68:12 70:14 71:2
101:19 164:12
203:21,21 204:9
**Denver** 23:13 31:8
31:11 53:2,5,14
53:18 54:18 55:8
56:1,14 82:14
254:19
**Department** 2:11
69:11 71:22 88:11
**Depending** 94:11
230:5
**depict** 179:20
195:19
**depicts** 161:5
**deponent** 8:10
**deposition** 1:11 8:4
8:14 9:19 18:22
21:1 56:8 64:18
74:7 109:10 119:5
123:3,10 126:6
135:6 138:8,11
156:8 166:10
169:8 190:3
197:25 209:20
221:19,24 255:5
257:8
**DEPO-VUE** 3:25
**depth** 107:23
108:10,15 152:20
158:24 175:20

184:2,7,20,24
185:1,5,19,21,21
187:22,24 188:14
196:18 201:2,5,20
202:1 215:11
**depths** 57:4 157:9
158:23 186:17
201:24 237:19
**deputy** 74:24
**DEQ** 79:25 81:25
149:13 150:13
151:12 159:19
182:17,24 186:9
186:20,24 194:6
194:13,15,17
198:5 199:15
207:22
**describe** 90:21
215:25 248:1
**described** 119:15
148:17 178:12
200:9 211:21
242:24 249:6
**describes** 100:6
229:6 241:2
248:13
**describing** 247:9
**description** 46:9
76:4 91:11 92:2
92:14 93:24,25
94:23 111:11
112:15 124:18
125:16 128:11
129:21 137:3
144:2,24 146:1
150:17 168:4
196:14 211:20
**descriptions**
165:17 167:1
**description/spec/...**
252:23
**descriptor** 244:23
**descriptors** 248:5
**design** 12:19 13:20
13:20,25 14:1,11
16:14 17:13 25:1

GUILLORY (VOL II), LEE

33:11 46:11 56:24
56:25 86:9 118:7
141:12 142:1
152:24 166:1,3
167:7,9 200:2
206:22 212:25
241:5
**designate** 63:17
**designated** 26:8
62:25 140:13
177:5
**designation** 22:5
26:7,20 32:19
162:5 231:5
**designed** 12:8 57:5
122:20 141:17
142:19 159:6
189:17 241:5
**DESIGNEE** 1:13
**designing** 14:13,16
14:22 49:13
**designs** 13:11
17:19
**desirable** 39:15
40:12 232:21
**detail** 106:1 157:13
162:18 183:1
**details** 116:19
**determinations**
185:16
**determine** 86:11,13
86:18 88:17
157:10 186:16
188:13 201:16
**determined** 206:8
**develop** 49:2
116:13 199:13
**developed** 56:18
98:23 101:7
114:18
**developing** 102:17
108:3
**Development** 69:12
71:22
**developmental**
14:6

**deviate** 201:19
**dewatering** 240:12
**diagram** 200:7,8
**Dicharry** 13:3
**diesel** 142:8
**differ** 253:16
**difference** 212:10
222:20,25 246:25
**differences** 116:19
**different** 15:15
18:24 23:16 38:4
38:9 49:17 84:7
95:8 106:9 113:2
161:12 200:12
208:11 223:17
237:13 247:19
**dig** 158:12 184:10
**digging** 229:9
**digits** 97:22
**dikes** 154:12,17
**dimension** 161:17
**dimensions** 133:1
152:19 161:1,9,12
195:24,25 196:14
196:17 202:5
**direct** 11:1 31:2
55:16 87:12 88:5
90:11 93:16 103:8
107:15 138:9
154:16 183:17
191:15
**directed** 63:1
**directing** 13:18
22:16 38:19 45:23
54:13 68:10 82:4
82:20 125:3 127:9
144:17 152:7
169:24 175:2
179:10 187:17
**direction** 180:6
184:5
**directive** 244:19
**directly** 53:18 70:1
70:19 116:11
158:11 159:16
164:9,12 177:17

**disadvantages** 38:7
**disagree** 63:21
**discipline** 75:3
82:19 205:19
255:12
**discovered** 114:21
**discuss** 28:19 90:16
127:7
**discussed** 21:19
24:4 28:21 37:14
63:23 81:7 84:20
103:1 105:22
106:2,6,24 111:8
120:25 157:5
162:17 180:21
209:15
**discusses** 86:8
**discussing** 158:7
**discussion** 43:5
81:3 211:19
**Discussion/Direc...**
77:5
**disposal** 24:9
101:10 115:24
127:8 143:23
144:20 147:21
200:6
**disposed** 86:16
148:11 197:3
**disposing** 118:3
**distance** 83:11
201:7 214:1
241:20
**distances** 152:20
**distinguished**
212:7
**distribution** 67:2
67:14,16 70:12,18
71:19 74:8
**district** 1:1,2,15
14:8 21:16 25:7
25:11 29:8,8
32:22 33:10,10,16
33:18,22 42:11,13
45:11,12,21 67:24
69:10 71:21 72:16

72:22 73:1 76:6
205:6,9 209:12,15
210:1,4,5
**ditch** 154:21
**ditching** 168:17
**division** 2:12 11:20
11:24 13:21 14:12
15:13 23:1 42:16
68:18 71:14 74:23
74:25 75:14 77:2
97:19 152:16
153:20 156:4,21
157:19 158:4
163:20 205:9,13
205:18
**divisions** 14:8 25:3
**DOco352475**
101:18
**document** 10:3,24
19:11 20:25 21:6
25:17,22,24 34:17
34:20 43:4 44:6,9
44:24 51:21 53:25
58:13 59:11 61:23
62:18,23 64:5,23
65:11,15 67:6
68:10 70:12,15
71:18,23 77:3,7
79:7,9,15 81:13
81:15 85:20 86:22
89:19,22 92:20,23
96:19,22 97:23
100:25 103:9
104:23 106:12,17
109:3 110:5,23
111:5 112:24
114:10,14 116:2
116:17,22 119:4,9
121:12 122:8,9,14
123:9 124:20,23
126:5,9 128:18,20
129:12 130:11,12
131:22 132:7
133:5,10,16,23
134:20,24 135:4
135:18,22 136:13

136:16 137:1
143:12 144:6,22
145:9 147:3,22
149:6,12 150:12
150:20 151:23
154:3 155:11,12
156:5 165:1,3,17
166:12 167:15,17
169:10 176:19
180:11,12 182:5,7
182:9,14,20
183:15 184:23
187:3 190:5,25
191:18 192:25
193:25 194:12
195:9 197:4,17
198:24 203:11,14
204:12,15,21
207:11 208:2
209:17,22 210:12
215:22 220:23
228:23 229:15
234:1 238:5
245:18 252:21
253:3
**documentation**
98:9
**documented** 94:20
98:12 146:9 202:7
**documenting** 58:22
105:4 111:5
124:15 205:1
**documents** 20:13
20:22 27:10 30:20
79:5 80:17 109:4
109:6,8,12 111:14
111:23 128:16,22
134:1 152:3
164:23 215:14,15
215:25 216:25
217:7,11 220:21
**doing** 44:1 70:6,8
126:23 127:1
145:20 168:17
**DOTD** 72:14
**double** 149:24

GUILLORY (VOL II), LEE

**doubt** 193:15
**Dough** 249:15
**dozer** 175:7,10,12
  175:16,23 176:2,7
  181:9 246:19
  247:24 248:2
**Dr** 152:14 204:7
**draft** 19:20 22:11
  45:7 49:3,4 50:4
  59:1,6 77:22
  79:10 90:6 101:6
  102:3 150:8
  151:25 183:7
  187:11 190:17
  198:11 203:14
  204:6,9 208:24
**drafted** 34:23
  45:25 77:16 80:2
  105:14 116:6
  133:10 136:2
  145:3 191:10,23
  191:24 193:13
**drafts** 61:19 123:6
  123:7
**drain** 234:15
**draw** 200:24 227:3
**drawing** 159:2,5,22
  160:8 161:11
  189:14
**drawings** 14:18
  17:8 20:6 49:25
  50:17,21 51:16
  108:12 162:17
  163:2 166:5
  188:18,19 189:11
  207:11 209:24
  215:10
**drawn** 58:20
**dredge** 89:10
**dredged** 13:8
  117:23 118:18
  181:16
**dredging** 12:10
  19:19 118:1,3
  206:21 207:4
**dressing** 205:25

  211:3 234:14
**drew** 160:23
**drill** 91:23
**drilling** 89:8
**drive** 219:8
**driven** 241:10
**drivers** 218:4
**drought** 238:4
**drove** 124:1 206:5
**drums** 48:7
**dry** 155:6 200:1,1,3
  200:4 235:24
**dual** 29:6 213:1
**due** 38:23 78:14
  170:2
**duly** 9:5 257:6
**duration** 130:25
  206:14
**dust** 36:5,5
**duties** 15:11 22:4
  126:22
**DUVAL** 1:6
**DYER** 2:22
**D.C** 2:17 3:7
**D41P** 175:7,16

---

**E**

**E** 1:10 4:1,1,8,8
  16:5 63:7
**earlier** 54:17 72:24
  73:19 77:20
  148:23 179:4
  180:25
**early** 81:23
**earthen** 14:23
  17:20 19:2 245:25
**easier** 100:5 234:18
  234:19
**east** 16:7,17 18:2,6
  26:17 33:12 46:20
  57:20 73:22 75:24
  83:22 118:8 163:1
  170:11 171:3
  182:3 183:25
  184:1,20,25 201:4
  211:23 213:9

  220:10 229:9
  255:18
**easterly** 184:4
**eastern** 1:2 83:13
  132:17 161:24
  215:4,5
**easternmost** 181:5
**east-west** 201:1
**easy** 249:23,25
**EBIA** 18:11 42:18
  44:14 47:1 50:1
  51:17 56:20 72:18
  80:19 89:11
  101:14 142:12
  173:8 174:16
  180:3 184:12
  211:2 254:7
**EC270** 175:6
**edge** 81:12 112:7
  142:15 161:15,23
  161:24 199:24
**edits** 102:8
**effect** 36:25 141:1,7
  158:15 163:13
  170:14 171:1
  173:7
**eight** 49:14 114:19
  119:21 121:24
  145:17,20 208:14
**either** 107:13
  112:15 143:9
  158:19 173:17
  174:4 212:18
  224:6 226:24
  235:15 236:24
  242:2 248:1 251:9
**electronically**
  52:17
**elevation** 118:20
  127:17 162:24
  184:14 213:4
  216:14 217:2
  241:7,9,10,18
**elevations** 57:2
  184:5
**email** 42:20

**emphasis** 26:25
**employ** 36:18
**employee** 22:1 66:1
  68:17,17 82:12
**employees** 153:6
**enclosed** 21:19
**enclosing** 67:3
**Enclosure** 158:25
**encounter** 23:20
  49:1 188:21 214:5
**encountered** 229:8
  253:15
**endangering**
  189:22
**ends** 25:16 34:18
  60:2 88:21 97:24
  131:22 147:10
  159:1 177:1 196:6
**engineer** 13:21
  14:12 15:12 18:24
  29:12 55:1,2,23
  55:25 69:11 75:1
  96:21 99:8,19,22
  99:23,24,25 100:8
  100:9,10,10,12
  134:12 141:17
  142:20 162:16
  163:24 205:10,12
  205:16 212:25
  221:12,13,16
  241:5 254:7,14,15
  254:18
**engineering** 13:21
  13:23 14:12 40:10
  46:4,7,10,18
  53:17 56:24,24
  76:21,22 82:18
  150:23 152:16
  153:19,19,24
  156:4,25 157:3,13
  163:20,21 164:6
  165:23 180:5
  187:8 189:7,17,20
  206:22
**engineers** 1:13,15
  2:20,21 21:17

  22:20 24:18 25:2
  25:10 62:11 68:16
  68:17 74:10,23
  141:2 148:2
  157:15 180:7
  193:11 205:8
  221:8
**enhancement**
  17:15
**enhancing** 16:13
  16:14 17:7 18:10
**enlarge** 149:14,18
**ensure** 28:6 201:20
**ensured** 226:14
**enter** 101:9
**Enterprise** 122:22
**Enterprises** 127:6
  239:12,18
**entire** 37:10 46:14
  96:3 105:12
  108:20 141:20
  171:9 172:17
  183:10 199:7
  205:23,24
**entitled** 44:6
  114:11 123:10
  133:17 149:4
  207:9
**Envirocon** 239:9
  239:20,22 240:11
  240:13,18
**environmental**
  15:21 20:17,19
  34:9 47:21 50:24
  80:14 82:17,18
  88:12 99:22,24
  100:9 194:15
  196:23
**envisioned** 54:7
**equipment** 32:14
  37:4,7 40:9,25
  54:4 57:4 105:25
  112:11 116:14
  199:17 218:3
**ERIC** 3:23
**error** 126:24 203:3

GUILLORY (VOL II), LEE

**especially** 233:4
**ESQ** 3:17,18,18,19
3:19,20,23,24
**ESQUIRE** 2:4,5,13
2:14,22 3:3,4,5,11
**essential** 69:10
**essentially** 44:19
120:20 160:23
184:3,15 195:1
212:13 235:5
**established** 42:5
103:16 229:22
250:24
**estimate** 10:22 54:1
104:10 115:14
116:13,19 132:14
189:3 213:25
**estimated** 187:20
**estimates** 11:11,12
55:19 116:24
**estimating** 185:2
233:22
**estimation** 185:13
228:15
**evaluate** 19:24
153:9 157:6 158:5
**evaluated** 33:23
102:21
**evaluates** 34:6
**evaluating** 156:22
221:7
**evaluation** 33:25
50:4,20 86:14
88:13 98:8 102:20
149:19 158:14
177:19 220:6
**event** 171:15
**events** 128:12
171:16,21
**eventually** 108:22
**everybody** 244:23
**evidence** 8:15 84:1
185:10
**evidently** 45:20
216:16
**ex** 11:13

**exact** 14:5 160:4
170:21
**exactly** 17:5 32:24
39:6 72:9 83:5
119:15 217:1
227:1
**examination** 4:3
9:7,15,23 10:13
21:10 27:22 32:18
33:20 37:21 41:18
42:1,8 43:19 44:5
44:15 46:23 48:19
52:3,20 57:25
58:17 61:14 62:6
64:16 65:2,19
67:10 68:5 70:21
72:2 73:16 74:16
77:12 79:19 82:3
84:2,15 86:5 88:4
90:1 95:16 97:4
101:4 105:2
106:21 110:1,18
111:2 112:3
113:10 114:24
116:7 119:13
121:16 122:18
123:18 125:2
126:13 129:2
130:18 131:20
133:9 134:4 135:3
136:1,20 137:21
138:10,12 139:19
140:10,18 143:16
144:16 145:13
146:21 147:7
148:20 149:10
151:1 155:22
159:13 160:17
161:3 165:7
166:16 167:21
169:14 170:8,18
171:25 178:2,8
179:3 182:13
185:11 190:9
191:4 194:7 198:1
199:3 203:8,18

207:15 210:20
211:12 215:2,23
220:17 225:23
226:20 227:20
228:9 231:25
233:1 237:10
238:17 245:13
246:23 248:11
252:18 255:7
**examined** 9:6
**example** 37:15
**excavate** 187:25
189:3 199:25
**excavated** 127:23
175:20 188:5,6
195:23,23 196:1
196:13 226:22
240:15 241:17
**excavating** 24:5
83:21 89:16
131:23
**excavation** 24:4
35:6,20 56:22
66:19 101:9
107:23 108:1,21
115:23 119:7
120:15 124:12
127:12 129:6
140:20 141:8
142:10 146:11
148:2,3,6 150:2
152:17,20,24
157:7 158:7 167:7
175:6 176:13
177:16 178:19
179:21,25 180:18
181:5 185:18
186:17 188:20
192:6,8,13 195:19
196:9,10,17,25
197:5 199:10,19
200:3,4,14 201:5
201:20 202:4
226:12,13 227:7
227:16 230:21
231:20 234:25

235:11,16 236:8
236:23 238:10,19
238:22 239:15
240:9,13,20
248:13,17,19
251:8
**excavations** 57:5
130:2 137:9 142:6
158:1 159:23
160:2 162:4,6
178:10 185:16
189:19 195:25
201:6,24 202:1,6
254:23
**excavator** 127:14
127:15 168:10
175:7,16 241:1
**Excel** 54:3 84:21
87:1 90:9 183:13
187:15 190:20
209:4
**excellent** 178:17
**exception** 63:8
**excessive** 37:8
235:21
**execution** 11:13
33:9,22 59:22
**exhibit** 4:10,11,12
4:13,14,15,16,17
4:18,19,20,21,22
4:23,24,25 5:1,2,3
5:4,5,6,7,8,9,10
5:11,12,13,14,15
5:16,17,18,19,20
5:21,22,23,24,25
6:1,2,3,4,5,6,7,8,9
6:10,11,12,13,14
6:15,16,17,18,19
6:20,21,22,23,24
6:25 7:1,2,3 9:16
9:17,20,24,25
10:4 21:1,7 33:1,2
33:3,6 41:11,12
41:12,15 43:20,20
44:10 51:9,10,22
58:10,14 61:21,24

64:18,24 65:12,16
67:2,7,22 68:2
70:10,11,16 71:19
71:24 74:6,7,13
77:4,9 79:7,16
81:14,21 84:5,12
85:21 86:1 89:19
89:23 95:4,6,11
96:20,24 98:14,20
100:20,21 101:1
104:20,21,24
106:13,18 109:9
109:18 110:19,24
111:21,24 113:3,5
114:10,15 115:21
116:3 119:5,10
121:9,9,13 122:9
122:10,15 123:10
123:14 124:21,24
126:6,10 128:17
128:17,23 130:11
130:13 131:4
133:2,3,6,17,24
134:21,25 135:5
135:18,23 136:14
136:17 143:10,13
145:7,10 146:25
147:1,4 149:3,3,7
150:15,15,21
151:24 155:13,15
155:19 159:7,14
165:2,4 166:7,9
166:10,13 167:16
167:18 169:7,8,11
178:7,13,20,21,25
182:6,10 186:2,6
190:6,25 191:1
193:24 194:1
197:14,18,22,25
198:20,21,25
202:14 203:10,12
204:19,20,23
207:7,8,12 210:15
228:23 232:1
238:6 240:5
243:19 244:7

GUILLORY (VOL II), LEE

245:18
**exhibits** 131:10,15
**existed** 224:10
**existing** 75:23
   120:21 241:7,7
**expect** 47:18 50:16
   56:11 157:17
   204:10
**expectation** 140:24
**expected** 106:7,9
   141:2 172:2
   218:10,14 229:7
**expediency** 153:12
**experience** 10:10
   11:6 12:23 18:23
   36:23 100:6,16
   115:11 253:10
**expert** 219:24
**expertise** 23:15
   220:1 255:4
**explain** 38:1 157:2
   180:24 201:9
   212:10 222:20
   236:10 244:15
**explanation** 99:2
**explicit** 227:15
**explicitly** 22:3
**exposed** 24:25
**expressly** 86:8
**extend** 201:4,18
**extended** 245:1
**extension** 149:4
   150:8,19,24
   159:10
**extensive** 16:11
   17:22 18:22 47:19
   47:20 48:4
**extensively** 171:6
**extent** 40:4 48:18
   201:17 227:4
**extracted** 148:12
**eye** 212:4
**eyeball** 243:9
**E-mail** 41:13,14
   42:15 58:10,25
   100:21 101:15,17

101:17 163:12,15
163:17 164:1,10
164:11,20,21
203:19
**e.g** 152:20

---

**F**

**face** 81:11 83:11
   132:17 161:14
**facilitates** 25:5
**facilitators** 23:17
**facilities** 75:24
**facility** 95:19
**fact** 16:21 30:6
   150:10 155:3
   178:16 217:24
   234:1 244:12
**facts** 83:25 185:9
**fair** 140:7 162:2
   222:7 228:17
**FAIRBANKS** 1:24
   8:22 257:2,24
**fairness** 233:16
**false** 221:21
**familiar** 55:15
   83:14 90:18 93:20
   118:5,6 141:25
   254:18
**familiarize** 139:6
**family** 44:1
**far** 50:25 51:14
   84:24 96:11
   115:11 132:15
   161:5,10 174:21
   201:17 209:21,25
   230:2
**faster** 27:17
**fat** 181:4 226:15
**fax** 21:3 51:10
   52:21 67:23
   164:21
**feature** 36:16 91:2
   91:18 93:4 94:12
   94:14 96:3 97:25
   110:3 111:7,17,20
   113:17,22 114:2,5

119:17 144:20
191:20 193:3
239:25 240:3
**features** 16:22 20:9
   28:10 34:14 36:8
   55:5 66:21 94:18
   207:20 208:1
**February** 98:17
   108:7 124:22
   125:20 126:8
   151:22 152:5
   238:6
**federal** 8:6 9:18
   61:12
**feel** 46:5,7 196:9
**feet** 81:11 82:24
   83:8,10,17 88:19
   88:20,21 89:4,6
   89:15,16 107:24
   115:15 118:19
   132:18 142:16
   154:23 158:12,12
   158:13 160:10
   161:14,17,20
   162:5 171:7 184:3
   184:5,11,16,16
   185:3,6,19 188:6
   188:7 200:5 201:2
   214:3,4 216:14
   234:8 236:13
   242:9,13
**fell** 235:22
**felt** 59:9 78:14
   206:24
**fence** 47:10 66:10
   66:18 73:10
   172:18 206:3,8,14
   206:25
**fencing** 174:10
**fertilizer** 234:20
**fiduciary** 40:6
**field** 15:6 67:19
   70:1,2 85:22 87:4
   87:15 99:19,23
   100:7 107:14
   169:4 188:11

196:22
**fifteen** 214:3,4
**fifth** 63:4 103:14
   200:25
**fifty** 115:15
**figures** 204:15
**file** 164:10 247:21
**filed** 198:18
**files** 33:5 65:20,21
   66:23 67:9,20
   68:4 69:3,22,24
   163:10
**fill** 47:17 86:25
   90:8 154:14
   190:19 196:16
   223:2,22,23
   225:15 226:1,3,23
   227:6,9,24 228:14
   230:3 231:3,4
   239:3 240:14
   241:14,23 246:11
   247:2,4,20,22,25
   252:10
**filled** 47:14 114:1
   155:2,4 168:25
   171:9
**filling** 174:25
   225:16
**fills** 247:21
**final** 30:10,19,23
   49:4,5 55:21
   59:12 64:1,4,20
   84:17 85:7,9 87:4
   87:9 94:6,7,9,15
   94:23,25 95:13
   113:23 114:6,8
   128:21 129:13
   135:16 146:6
   150:4,13 153:10
   153:13 159:15
   165:24 182:23
   195:2,4 204:16
   205:1,25 207:17
   208:2 209:23
   234:14
**finalize** 204:15

**finalized** 86:23
**finally** 94:19 103:2
   135:14
**financial** 210:3
**financially** 99:5
**find** 24:18 48:5,9
   174:5,9 208:13
   235:8 236:7
**fine** 43:17 61:6
   73:14 137:16
   139:11
**finish** 138:16
**finished** 94:14
**firm** 38:18
**firms** 14:1 32:14
**first** 9:5,16 10:7
   14:2 21:18 29:11
   30:8 31:2,10
   33:21 49:3 56:8
   58:25 62:20 67:15
   71:1 75:7 79:6,12
   99:21 107:3,25
   113:11 120:13
   123:19,25 125:11
   127:20 151:3,16
   156:8 162:11
   169:24 182:5
   188:5 192:4
   211:18 221:19
   232:10 234:3
   244:6 248:12
   252:24 253:7
   257:5
**five** 11:5 95:5 96:8
   139:24 162:23
   176:8
**fixed** 38:18,21 39:4
**flat** 243:17
**flexibility** 38:24,25
   39:13,16,17,17,19
   40:1,13,16
**flexible** 201:14
**flip** 21:11 97:20
   196:9
**flipping** 35:22 65:6
**floated** 148:10

GUILLORY (VOL II), LEE

**floating** 172:4
174:11
**flood** 19:17 47:6
58:3 75:24 81:11
83:11 141:15
157:12 158:18
172:7 180:2 212:2
213:16
**flooded** 171:6,8,10
173:15,23 174:12
**flooding** 171:15,16
171:21 174:14,24
**floodwall** 15:23
18:6 47:1,3,11
58:4 75:25 81:4
82:23,24 83:4,12
115:12 132:16
141:1,8 142:16
152:21,23 161:2,6
161:10,15 171:8
171:15 173:19,22
174:10,16 184:1
193:8 211:1,23
212:13,14 214:2,8
215:6 218:19
219:1,5,12,19
221:3 254:10
**floodwalls** 12:14,16
12:20 14:21 17:9
17:21 18:18 19:3
19:7 24:12,22
46:20 47:2,9 50:1
50:17,22 51:17
57:20 82:25 142:1
155:1 157:20
171:20 174:4,7
254:19,24 255:18
**Florida** 16:19,25
17:4,10 18:8
76:16 173:11
214:13
**flotsam** 172:4
**flow** 154:15,23
183:24 184:4,7
**fluctuations** 154:24
238:3

**fly** 101:10 235:6
**focus** 186:12
**folks** 55:7 218:2,18
**follow** 91:1 113:18
231:13
**following** 26:21
45:8 152:18
156:22 169:2
171:15,20 186:8
210:23
**follows** 9:6
**follow-up** 90:18
92:10,14,21 93:1
93:7 124:11,11,16
127:12 136:25
137:3 165:21
167:5 168:8 175:3
178:12 238:10,18
252:20
**foot** 162:24 175:20
201:11
**footprint** 53:9
242:23
**force** 155:8 210:25
**foregoing** 256:4
**foreman** 93:4
**forgive** 223:20
250:25
**forgot** 223:20
245:12
**form** 8:12 37:20
46:22 48:16 57:24
77:22 83:25 98:22
98:22 110:21
111:19 112:18
121:11 135:20
147:20 150:13,23
158:22 170:17
183:7 185:9 187:8
187:12 190:17
192:8,24 193:1,16
196:12 198:11,14
208:24 220:15
224:17,19,22
232:25
**formal** 22:24

116:17 163:9
**formalities** 8:8
**format** 90:6
**former** 68:17 69:9
**forms** 87:1 112:2
114:1 129:7,15
190:20 233:4
**forth** 257:7
**forty** 130:23
**forward** 164:1
**forwarded** 67:14
154:1 164:3,8,21
**found** 69:22 87:13
89:15 101:12
149:20 199:8
**foundation** 108:16
119:8,20 121:22
122:25 124:3,6
125:12 127:13
129:7,14 130:5
181:19 219:12,16
219:18 240:2,8
**foundations** 35:13
37:1 39:23 48:11
114:12,20 115:25
117:2 124:13
238:11
**founded** 212:17
**four** 49:2 75:21
97:22 105:10
112:24 113:2,3
169:25 171:7
175:23 201:11
**fourth** 50:13 63:1
120:3
**four-foot** 201:10,20
**four-inch** 238:22
**frame** 235:20
**Franklin** 2:16
**frankly** 234:23
**free** 46:5,7 196:9
233:18
**front** 72:3 85:13
97:6 158:23
162:10 187:8
195:13 197:16

**FTL** 11:6,7,14,15
11:19,23 12:23
**fuel** 142:10,13,25
143:23 144:21
147:21 148:3,9,16
**full** 19:15 78:16
141:19 143:4
192:4 223:24
227:23 253:8
**fully** 59:10 70:5
74:2 90:25 113:16
178:18 179:25
192:17 206:1
**full-time** 29:5
**function** 27:24 28:7
28:8 31:19
**functional** 11:15,18
**funding** 34:13
**furnish** 46:3
**furnished** 49:21,22
69:25
**further** 55:11
86:20 115:16,17
118:25 127:10
151:20 193:19
194:9,19 257:13
**future** 75:17 89:9
206:23 235:3

---

**G**

**gamut** 12:7 29:19
46:14
**gaps** 47:14,16,17
48:1,6,12,20,25
49:7,17
**gate** 206:5,6
**Gately** 163:24
**general** 20:3 24:14
25:9 34:5 46:9
57:9 77:5 98:22
100:9,11 105:25
163:18,21,23
164:5 213:15
227:8 230:10
**generally** 24:19
38:1 61:11 83:10

97:12 106:3
170:22 175:11
184:9 189:11
236:12
**Geneva** 68:14 69:8
**geochemical** 24:16
**geologist** 152:15
**geology** 229:3
**geophysical** 48:5
101:13
**George** 152:10,13
152:14,17 204:5,6
204:7
**geotech** 225:9
**geotechnical** 23:5
23:10,18 55:23,25
56:11,14,16 57:10
57:18 141:24
152:25 153:4,19
156:25 157:15,18
158:4,14,19
160:25 162:15,16
163:18,19,24,24
167:13 177:18
178:3,9,15 180:5
221:8,11,16 254:6
254:14,15,18
**Gerard** 156:3
162:12
**germane** 43:9,11
**getting** 14:19 37:11
249:5
**GILLEY** 3:25
**give** 40:12 79:5
99:3 100:1,23
114:12 139:3,12
139:15 215:10
229:20 251:7
**given** 1:14 51:1
114:18 175:23
178:14 217:12
234:1 256:4,7
**giving** 42:17 150:1
**globo** 5:14 6:1
109:15,18 128:23
**go** 9:11,13 27:9,18

GUILLORY (VOL II), LEE

8/22/2008

Page 271

28:10 34:25,25
39:11,12 42:2
60:2 67:19 73:6
78:6 108:10
138:14,19 146:25
188:15 203:10
211:18 229:17
232:1 234:22
238:8 243:3,20
249:10 250:16
253:6
**goal** 183:3 218:20
**goes** 90:16 117:5
182:25 185:6
213:15 214:7
**going** 9:10,24,25
13:8 18:17 19:10
22:21 25:15 33:15
43:17 61:15 66:15
69:20 70:11 74:7
76:7 77:3 79:5,6
85:21 89:10,15,18
91:8 92:1 93:16
95:5,8 96:14
100:23 106:12
108:1 109:3,9
111:21,22 114:9
119:5 123:9
128:15,16 131:14
133:16 135:17
137:7,12 140:2,25
151:8 155:12
157:6 162:2
166:10 176:19
178:7 182:5,15
206:13,19 208:12
210:18 214:9
215:3 224:2
229:12 234:13
244:21 252:21,25
253:4 254:16,23
**GOLDBERG** 3:23
**Gonzalez** 97:16,18
98:3
**good** 45:17 82:21
82:25 129:21

148:21 206:4
233:16 240:21
242:24
**government** 20:1
28:23 29:16 30:24
40:5 49:21,22
52:18 59:6 93:13
96:17 106:10
116:13,19 206:25
232:16 234:2
255:10,12
**grade** 120:5,18,21
127:15 165:24
**grading** 205:25
234:14
**granted** 186:24
**graphical** 188:25
**grass** 206:2 234:19
**grave** 197:6
**gravel** 117:17
**great** 22:19 182:25
**green** 17:18
**Gregory** 74:9
**grid** 48:4,9 54:2
101:13 114:22
**grided** 86:9
**Grieshaber** 225:9
243:23
**Grille** 68:14 69:8
69:17
**ground** 18:24
88:24 89:4 201:11
229:20 241:7
247:5,10
**groundwater**
183:19,24 184:7
184:10,12,15
237:13
**group** 3:1 28:3,7,18
28:24 29:21,23
30:12,19,24 31:7
32:8 37:7,15
41:21 42:19 45:5
45:13 46:13 47:16
47:18 48:3,13,23
49:10,23 50:7

51:2,15 53:5,10
54:11 56:12 57:2
57:19 58:20,21,24
59:5,12 61:19
62:4,12 63:6,12
63:18 66:1,5,17
70:1 71:12,13
72:17,21,25 73:21
74:1 76:5 77:18
77:21 78:10,12,16
79:2,22 80:4,9,10
81:4 82:11 83:4
84:19 85:4 86:9
88:23 89:2,16
91:19 92:2 93:3
95:14 96:6 98:23
99:10,13,14,18,23
100:7 101:7,20
102:9,15,18 103:6
104:2,6,15 105:16
107:10 108:5,11
108:18 109:24
111:5 114:18
121:2,5,19 125:21
125:24 126:2
127:6 129:23
130:16,19,22
136:4 144:8,19
147:15 149:12
150:10 153:5,9,15
153:21 154:16
156:15 157:4,18
158:9,19 159:6
162:13 163:3,7
164:2,5,9 169:3
170:12 171:18
172:2 173:1,3
174:20 178:3,15
179:5 182:19
183:11 186:10,25
189:18 191:20,25
193:14 194:4,8,14
194:23 196:11,20
196:22,23 198:4
199:13 203:15,22
204:3,14 205:7

206:7 207:18
208:10 209:10,13
210:4,9 211:17
215:16 218:1,10
218:16,25 220:9
220:22 221:15
222:12 223:12,19
223:22 228:24
229:8 241:17
242:25 254:6,14
254:17,22 255:11
255:13,17
**growing** 206:2
**growth** 234:19
**GS-11** 29:12
**Guardian** 210:25
**guess** 38:20 103:14
176:11
**guessed** 217:5,9
**guidance** 163:23
**guide** 12:12
**guidelines** 164:6
183:2
**Guillory** 1:14 9:2
9:17,19,25 10:2,3
21:1 41:12,13
51:12 58:10,11
64:17,18 65:14
67:5 84:6,8 85:21
85:25 89:19 95:6
96:20 97:6 98:19
100:20,22 104:20
109:10 110:20
113:3 114:10
115:22 119:5
121:9 122:8,10
123:10 124:20
126:5 130:11
133:3,17 134:21
135:5,18 136:14
141:22 145:7,16
149:3 150:15
155:13,15,17
156:3 166:10
169:7 176:24
182:6 186:2 190:2

190:24 193:24
197:24 198:20
203:10 204:20
211:13 217:13
218:9 220:18
229:13 245:14
252:19 256:3,11
**gulf** 173:13
**guys** 131:14

---

**H**

**H** 4:8 212:18
**half** 10:11 171:7
**Hamps** 122:21
**Hamp's** 105:16
108:23 122:22
127:6 239:12,18
**hand** 89:18 102:16
102:16 109:4
128:15 135:17
**handed** 64:17
**handing** 67:1 74:6
130:10 134:20
136:13 186:1
190:2,23 193:23
203:9 252:21
**handle** 39:21
**hands** 206:5
**handwriting**
101:23 103:19
121:17 203:17
229:24
**hand-drawn**
160:22
**happened** 124:18
128:12 210:6,7,8
239:16
**happens** 63:20
236:11
**happy** 43:13
**Harbor** 26:16
**hard** 249:17
**Harris** 79:24
**hate** 229:19 230:19
**hauled** 104:3
**hazardous** 50:15

GUILLORY (VOL II), LEE

| | | | | |
|---|---|---|---|---|
| 101:11 | **highly** 36:1 39:15 | 145:17,20 | 130:14 133:7,25 | **impact** 99:4 219:18 |
| **header** 21:4 | **highways** 19:18 | **houses** 37:1 | 135:1,24 136:18 | 221:1 254:23 |
| **heading** 19:12 | **hire** 40:13 | **HTR** 25:8 | 143:14 145:11 | **impacts** 152:21 |
| 129:22 | **hired** 141:3 153:23 | **HTRW** 23:6,11,14 | 147:5 149:8 | **implement** 86:9 |
| **health** 194:20 | 207:4 | 23:18,20 24:11,17 | 150:22 155:20 | 90:25 157:22 |
| **heavy** 139:9 249:17 | **historic** 36:3 | 24:19,20 27:25 | 165:5 166:14 | 186:25 |
| **Hedrick** 205:8,11 | **hit** 184:11,15 210:9 | 33:10 34:8,24 | 167:19 169:12 | **import** 104:6 223:2 |
| **height** 237:22,23 | 219:9 | 39:9 42:23 45:10 | 179:1 182:11 | **important** 226:18 |
| **held** 111:6 | **hoe** 176:9 242:7 | 58:23 59:7 79:23 | 183:19 186:7 | **importation** 181:22 |
| **Hello** 148:22 | **hoes** 189:22 195:22 | 83:7 152:15 | 190:7 191:2 194:2 | **imported** 103:18 |
| **help** 28:23 176:17 | **Hold** 144:12 | 153:15 163:22 | 197:19 199:1 | 103:21 116:25 |
| 240:25 246:24 | **hole** 176:16 181:8 | 183:10 253:11 | 203:13 204:24 | 226:25 229:25 |
| **hereinabove** 257:7 | 181:10 188:22 | **hundred** 115:14,15 | 207:13 | 230:1 233:22 |
| **hereto** 8:3 9:21 | 189:3,5,16,23 | **Huntsville** 23:1,1 | **identified** 20:9,12 | 239:3 |
| 10:5 21:8 33:7 | 192:17,20 196:16 | **hurricane** 14:25 | 48:13,21 80:18 | **importing** 104:1 |
| 41:16 44:11 51:23 | 197:2 225:16 | 15:22 18:19 19:2 | 115:5,7 121:25 | 117:8,13 |
| 58:15 61:25 64:25 | 226:2 227:7,9,22 | 19:18,23 69:15 | 122:3 160:2 | **improper** 138:7 |
| 65:17 67:8 68:3 | 227:24 228:12,14 | 170:3,3 173:4,7 | 180:20 240:8 | **inaccurate** 122:6 |
| 70:17 71:25 74:14 | 228:20 230:4,9,9 | 173:10,20 174:4 | 253:18 | 124:18 125:17 |
| 77:10 79:17 81:22 | 230:13,16,22 | 174:13 210:9,23 | **identify** 47:18 | 128:12 133:14 |
| 84:13 86:2 89:24 | 235:16,17,24 | **hydraulic** 176:9 | 49:16 56:21 61:20 | 134:15 136:11 |
| 95:12 96:25 98:21 | 236:18 237:3 | **hydraulically** | 99:1 186:14 | 137:2 144:3 145:1 |
| 101:2 104:25 | 241:25 243:3,15 | 118:2 181:16 | **identifying** 48:25 | 146:2 147:24 |
| 106:19 109:20 | 247:22 248:15 | **hydraulics** 242:22 | **IFB** 38:12,14 | 165:18 167:2 |
| 110:25 111:25 | **holes** 48:6 177:3 | **hydrostatic** 155:8 | **IHNC** 11:7,22,25 | 168:5 191:13 |
| 113:6 114:16 | 179:21 199:7 | **hygienist** 54:23 | 12:10,17,23 13:13 | **inappropriate** |
| 116:4 119:11 | 229:9 | | 16:1,2,10,24 17:9 | 37:17 |
| 121:14 122:16 | **home** 53:2,5 54:14 | **I** | 17:16,23 18:6,15 | **inches** 171:12 |
| 123:15 124:25 | 55:7,15,23 56:1 | **idea** 216:13 | 42:18 44:14 67:17 | 173:16 |
| 126:11 128:25 | 56:13 82:13 | **identification** 9:21 | 75:9,24 99:19 | **include** 16:1,18 |
| 130:14 133:7,25 | 254:19 | 10:5 21:8 33:7 | 121:10 154:12,14 | 34:9 46:7,10,17 |
| 135:1,24 136:18 | **homes** 218:2 | 41:16 44:11 51:23 | 154:17 168:18 | 47:5 48:4 61:11 |
| 143:14 145:11 | **homogeneous** | 58:15 61:25 64:25 | 173:24 183:25 | 119:23 129:9 |
| 147:5 149:8 | 223:14 233:9 | 65:17 67:8 68:3 | 199:24 206:23 | 172:25 193:10 |
| 150:22 155:20 | **horizontal** 20:7,7 | 70:17 71:25 74:14 | 210:21 236:12,19 | 220:11 226:2 |
| 165:5 166:14 | 56:22 162:25 | 77:10 79:17 81:22 | **II** 1:10 | 227:15 |
| 167:19 169:12 | 195:24 | 84:13 86:2 89:24 | **III** 3:17 96:16 | **included** 11:9 12:6 |
| 179:1 182:11 | **horizontally** 237:2 | 95:12 96:25 98:21 | 100:5 133:11 | 12:15 13:12 17:13 |
| 186:7 190:7 191:2 | **hot** 86:11 158:10 | 101:2 104:25 | 136:23 147:9 | 17:16 20:4 49:8 |
| 194:2 197:19 | 180:21 186:14,15 | 106:19 109:19 | 191:9 | 50:3 53:15 58:7 |
| 199:1 203:13 | 186:18 187:25 | 110:25 111:25 | **imaginary** 214:5 | 95:20 147:15 |
| 204:24 207:13 | 188:20 201:13 | 113:6 114:16 | **imagine** 12:13 | 200:10 201:24 |
| 257:15 | 248:19,20 | 116:4 119:11 | 87:14 | 218:16,24 |
| **Hi** 9:8 | **hourly** 31:6 54:8 | 121:14 122:16 | **immaterial** 185:22 | **includes** 33:13 |
| **high** 184:10 | **hours** 54:4,8 55:12 | 123:15 124:25 | **immediately** | 55:10 129:17 |
| **highlighted** 253:7 | 126:20 127:2 | 126:11 128:24 | 162:14 | 130:1 133:20 |

203:16
**including** 16:2,15
55:16 142:7
172:17 188:23
**inclusion** 11:13
**incomplete** 228:7
**inconsistencies**
32:6
**incorporate** 204:11
**incorporated** 85:7
87:5
**increase** 17:20
117:14,25 201:6
**increased** 117:15
**Indian** 96:10 113:8
113:11
**indicate** 55:24 59:1
78:7 134:5 240:18
252:4
**indicated** 36:24
201:12 210:17
215:20 217:1
**indicates** 145:15
**indicating** 45:16
139:1 251:19
252:11
**indications** 215:10
**indifferent** 45:18
**individual** 95:5
192:17 196:19,23
239:7 253:12,18
**industrial** 16:8,18
18:2 26:18 33:13
46:20 54:23 57:21
73:23 80:19 83:22
118:8 170:11
171:3 182:3
184:21,25 186:15
186:23 194:18
220:10 229:9
255:19
**industry** 235:6
**inform** 156:16
**information** 48:24
49:21,22 52:17
76:3,9,11 98:17

162:23 163:4
195:19 217:13
244:19
**informed** 70:5 74:1
**ing** 50:1
**initial** 44:20 76:5
90:17 91:23 92:3
92:7 110:20 111:6
111:12,18 112:17
121:10 122:4,5
135:19 147:13,19
165:24 192:23
193:2,10 215:24
**initialed** 191:9
**initially** 53:7 81:23
201:4,11 206:13
253:25
**initials** 25:20,20,24
72:4 74:12 125:8
125:9 126:16
143:18 155:23
166:22,24 167:22
169:15,16,20
**inland** 173:12
**Inner** 26:16
**input** 141:24
163:19
**inserted** 102:8,10
**inside** 131:23 236:1
**inspect** 40:18
168:24 172:13
192:5,12
**inspected** 41:5
129:24 192:17
**inspection** 28:5
30:10 68:19 76:13
93:20 94:4,6,6,8
94:15,24 97:2,16
98:11 110:21
111:6,12,16,18
112:1,16,18,21
113:1,7,24 114:1
114:8 121:11
122:5 128:19
129:5,13 133:18
133:21 134:2

135:19 137:3
146:6 147:19
168:21 169:3
171:14,19 172:16
172:22 174:2,8,15
174:23 192:24
193:10 205:2,20
205:24
**inspections** 28:13
29:3 91:2 92:8,14
92:21 93:8,25
94:2,9 95:1 97:11
97:11 143:22
147:13
**inspector** 128:2
**inspectors** 29:10
164:15,16
**install** 75:23
**installation** 98:2
130:4 135:21
141:12 245:20
**installed** 141:18
142:22
**instance** 11:21
142:4 181:24
234:21 235:14
**instances** 226:11
**instructors** 23:16
**instrumentation**
188:11
**integrity** 152:22
**intend** 186:22
**intended** 89:3
**intending** 251:5
252:2
**intense** 11:9
**intensive** 40:8,22
**intent** 117:6 243:21
**intention** 251:8
**intentional** 202:19
**intentionally**
217:14,15
**intently** 40:23
**interconnected**
238:2
**interest** 206:24

**interested** 38:17
257:15
**interlocks** 236:24
237:2
**internal** 97:1,11
209:14
**international** 3:1
28:3 41:21 51:15
56:12 125:21
144:8 205:7
215:16 218:1,11
218:16,25 220:9
221:15 222:13
223:19
**interpret** 61:1
**interrupt** 27:5
138:17 184:4
**intersection** 16:23
**intertidal** 154:15
154:23
**interval** 94:13
**intervals** 88:10,19
**intimately** 13:4
42:24
**inverted** 212:16
**investigations**
35:10 47:15,21
**invitation** 38:15
**invoices** 29:23 41:1
**involve** 17:8 205:21
**involved** 12:19
13:1,4,6,15,19
14:22 30:2 33:15
34:2,14 42:10,24
52:5 118:15
224:25 239:20,25
240:19
**involvement** 13:17
75:11
**in-house** 153:12
**Isidore** 170:2,20
171:2,5 173:17
174:4
**isolating** 24:5
**isometric** 188:19
189:14

**issue** 63:23 76:24
98:24 99:2,11
153:5,6 193:4
227:11
**issued** 146:13
**issues** 24:14 28:21
28:24 141:3
152:18 219:24
**italics** 59:23 60:7
**item** 60:3 88:8
114:7
**items** 113:14,14,15
113:15 129:22
156:23
**iteration** 209:1
**ITT** 95:19 96:9
199:8 234:6,9
**Ivan** 170:3 173:4,8
173:10,20 174:13
**I-DEP** 3:22
**I-wall** 212:11,12,22
213:5,19 214:16
215:7
**i.e** 117:8 253:11

---

**J**

**James** 156:11
165:10
**Jane** 79:10 80:7
82:6,7 203:23
**January** 15:16,19
64:20 70:13,25
72:5 73:25 85:23
89:2 143:11
144:21 149:5
150:16 166:11
167:16 170:2,5,9
**January-February**
235:20
**Jean** 163:16,19,20
**Jeff** 79:10,10 81:16
82:9
**Jeffrey** 82:12
**Jerry** 204:1
**Jim** 28:5 29:6
30:11 79:3 99:8

GUILLORY (VOL II), LEE

8/22/2008

Page 274

104:9 125:10
126:15,16 135:12
145:22 163:23
164:18 165:13
166:22,23 167:22
169:19 191:9
204:25 205:4
**JOANEN** 2:5
109:14 131:11
170:16
**job** 10:15,17,21
18:18 28:16 34:9
36:17 172:17
176:15 220:3,5,10
234:12
**Joe** 13:3 27:7 140:4
**jogging** 17:17,24
**John** 3:17 205:5,15
**joint** 79:1
**jointly** 45:9
**JONES** 3:2
**JOSEPH** 1:24 2:4
8:22 257:2,24
**Jourdan** 18:5 47:3
58:4,5 83:12
171:8 211:1,23
213:5,10 214:1
215:6 216:14
218:19
**Jr** 1:24 8:22 29:14
257:2,24
**JUDGE** 1:6
**judgment** 37:17
**Julie** 162:15
**July** 21:4 44:8 45:2
45:6,20 58:12,22
**June** 33:3 34:21
35:18 41:12
100:23 137:6
165:2 197:16
203:20 204:13
228:16
**JUSTICE** 2:11

**K**

**Kamatsu** 181:9

**Katrina** 1:4 210:9
210:23 214:23
215:1
**Keen** 110:8
**keep** 43:25 70:5
74:2 131:14 214:9
235:24 241:22
**keeping** 15:4
238:20
**Keller** 68:13,15,20
69:1 70:14 71:3,5
71:7 76:14,23
**key** 251:11
**keys** 206:7
**kickoff** 58:11,22
59:15
**kind** 14:21 19:22
23:25 24:3 33:25
40:11 47:17 53:3
56:16 57:9 60:13
75:1 99:15,25
100:9 205:10
223:9 234:20
244:9 249:14
**knew** 35:11 39:8
47:24,25 217:6
226:12
**know** 18:3 24:19
27:12,20 33:5,25
34:20 35:18,19,19
39:6 42:9,22 48:2
50:25 51:14 53:3
60:10,13 66:11,15
66:22,25 68:15
69:8,13,23 71:7
74:20 75:1,11
76:2,10,22 77:16
80:2,11,20,22
82:7,9,16 83:2,8
83:20 84:11 85:24
87:3,8,9 89:6
91:15 93:5,10
94:10,17 95:10
96:14,22 97:10,16
98:3,7,18 99:9,22
101:17,22 105:10

105:14 110:14
113:4,25 114:14
115:4,10,16 116:2
118:11 119:19
121:17,23 122:19
123:13 125:8,22
127:3,20 128:1
131:24 132:24
133:10 136:2,21
140:1 142:12
144:6 145:3,19
146:5,8,10 147:8
148:1 150:3
151:22 152:4
153:3,21 159:25
163:5 165:11
166:3 167:9
171:13 174:21
176:12 180:11,13
183:21 185:23
191:22 192:11
195:7 197:7
202:13 204:1
205:10,17,18
210:6,21,24 213:3
215:3 216:17
217:17,18 221:21
221:22 232:7
239:9,13,22
241:14 245:22
246:3 247:3 249:4
249:10 250:11
254:9
**knowing** 61:1
80:14
**knowledge** 10:16
42:5 224:24 255:4
**known** 48:24 108:9
122:25
**knows** 146:20
**Knudsen** 41:22
51:25 62:8 98:16
116:1,9
**K2** 1:5

**L**

**L** 1:10 3:17 8:1
**lab** 188:4,7,13
**label** 128:16 131:22
133:16
**labeled** 11:3 21:2
110:6 112:25
191:16
**labeling** 113:2
**labor** 40:8,21,24
116:14
**laboratory** 192:20
197:1 201:16
**lack** 38:24,25
**ladder** 128:9
**land** 112:9 120:22
173:24
**landfill** 184:13
**landscape** 17:7
18:10
**landscaping** 16:15
16:22 17:15,22
**lane** 89:9
**lateral** 186:16
**law** 8:7
**lawsuits** 210:11
**lay** 13:10 118:15,22
**layer** 242:21
**layers** 23:23 175:11
223:7,16 229:7
234:9 237:12
247:23
**laying** 165:24
**LDEQ** 79:7,12
81:17,20 150:9
151:15,17 190:17
198:18
**leader** 11:15,18
29:6
**Leake** 1:16 2:23
9:3
**learn** 107:25 235:2
**leave** 251:13
**led** 13:3
**Lee** 1:13 9:2,19
10:2 41:13 51:12
58:10 84:6,8 97:6

100:22 154:4
156:2 256:3,11
**left** 36:13 59:10
206:9
**left-hand** 213:20
**lengths** 78:7,11
199:7
**lenses** 23:23 223:17
237:12
**letter** 22:2 26:7,20
27:23 28:12,14
30:25 31:15 64:19
66:11,14 67:3
68:12,25 70:4,13
71:2,6,20 72:12
72:15 75:20 76:20
76:20,24 79:10
85:16 107:6 124:1
125:12 135:8
158:3 163:12
182:23 194:17,21
204:25
**letterhead** 194:17
**letters** 76:5,8,12
207:22
**letting** 66:11,15
234:22
**let's** 10:21 20:25
32:3 35:14 39:11
61:4 146:25 165:1
170:19 179:16
190:1 211:10
238:8 252:14
**levee** 14:12,14
15:22 47:3 58:5
60:5,8,18,21 66:8
66:17 67:24 71:21
72:16,22 73:1
75:25 76:6 152:21
152:22 175:21
180:1 181:6
206:25 211:25
212:1 215:6
218:19 219:1,12
219:19 220:12
226:16 230:20,24

GUILLORY (VOL II), LEE

8/22/2008

Page 275

244:22 245:1,16
254:10
**levees** 12:14,16,20
13:21 14:21,24
15:1,9,18,23,23
16:7 17:9,19,20
17:21 18:18,20
19:2,2,7 24:12,21
24:22 46:19,25
47:2,9 50:1,17,22
51:16 57:20 69:16
83:21 141:25
142:1 155:1
157:20 174:10
210:23 245:25
254:18,24 255:18
**level** 106:1,8
201:11,11 237:18
**levels** 182:21 201:6
247:20
**LEVINE** 2:14
178:6 210:14
231:7 238:12
**liaison** 31:2
**licensed** 141:2,17
142:20
**lieu** 42:19
**life** 36:10
**lift** 35:14,20 66:13
66:19 73:11 98:1
98:5 107:21 108:1
108:13,19 112:12
115:18 132:2,15
133:19 134:23
135:15,20 137:1,9
140:20,22 141:9
142:5,7 146:5,7
146:12 175:22
185:17 230:15
242:9 246:13,14
247:16,17 248:5
**lifts** 127:19 128:3
128:10 175:22
244:8 246:19
247:24 248:1
**likewise** 117:21

223:18
**Lilly** 170:3 171:5
173:18 174:5
**limit** 89:7
**limited** 60:20
**limits** 56:22 80:15
167:7,9 182:21
**line** 19:14 21:18
23:4 26:13,14
31:2 52:25 56:9
62:25 81:14 83:15
83:17,18,21 99:21
103:14 120:3
129:20 137:7,7
140:1,17 151:14
157:11 158:21
162:9 180:2 214:2
226:14
**lined** 162:18
**lines** 11:5 75:21
160:24
**line-by-line** 183:14
**link** 47:10 206:3
**list** 62:18 113:14,14
113:15
**listed** 20:8 38:10
55:22 56:3 81:18
113:18 196:13
202:5
**listen** 140:2
**listening** 140:4
**listing** 182:20
207:23
**lists** 95:20 195:20
**LITIGATION** 1:5
**little** 17:2 27:16,21
55:11 151:5
154:21 182:1
211:11 250:19
**lived** 218:2,18
**load** 242:20
**local** 20:15 53:13
53:19 60:17
**located** 142:14
148:24 213:15
223:12 234:8

**location** 121:21
188:22 192:8,10
224:1 230:5
**locations** 195:22
226:17 239:8
**lock** 11:7 12:1,10
12:11,11,13,15,23
13:9,13 16:10,14
17:23 26:17 50:4
75:9,13,18 89:12
206:7,23
**locked** 206:6
**log** 123:11 133:4
178:24
**logs** 178:22 196:9
196:10 235:9
**long** 20:14 69:10
158:13 162:8
225:13
**look** 16:14 18:15
20:5,13,18,22
27:10 31:16 56:6
67:13 81:13 91:7
91:25 92:11 93:23
94:7,22 96:8
100:24 109:13
114:13 122:13
136:24 137:5,8
153:4,6 167:4
170:25 203:10
216:2,9 229:2,16
233:20 248:12
249:11 252:25
**looked** 73:18
151:23 178:4
181:1
**looking** 17:8 35:3
47:12 49:20 50:8
50:9 60:3 75:7
79:12 84:24 100:7
101:21 107:20,21
110:2,5 113:11
123:24 129:12
132:3,12,14,21
143:20 151:13
152:10 156:20

158:3,25 175:4
176:14 179:15,22
180:11,13 184:23
228:22 240:5
**looks** 19:14 21:12
25:18 44:7 50:12
84:25 95:17
101:16 102:6
103:17 124:10
125:4 126:18
159:1 161:8
167:25 177:7
208:14,16 209:3
215:21
**loop** 173:12
**lost** 170:1
**lot** 112:11 174:11
217:19 235:21
250:3
**lots** 219:4
**Louisiana** 1:2,16
2:7,24 3:6,13 8:24
9:4 15:24 53:10
69:11 71:21 72:13
72:14 79:25 80:1
88:11 141:18
142:21 149:13
159:19 173:14
182:17,24 186:9
186:20 194:6,15
199:15 207:22
257:4
**lower** 184:5 218:2
236:18
**lowest** 243:15
**LS400** 242:20
**Lunch** 148:19
**L.L.C** 3:10 106:15

## M

**M** 1:10 2:4 4:1
**machine** 241:2
242:6
**main** 34:9 105:22
239:24
**maintain** 31:2

201:2
**maintenance** 19:19
20:14 75:18
103:13
**major** 12:7,13 19:3
49:14 114:5 240:2
**makeup** 120:16
226:23 228:1,20
**making** 120:25
**manage** 40:14
**managed** 28:1
**management** 46:15
53:10 80:9 91:21
**manager** 11:17
13:3 27:25 31:9
31:10,12 42:23
55:11 66:5 78:20
79:3 93:3 100:13
101:20 105:13
121:20 126:19,25
129:23 136:3
141:23 145:5,16
196:23 203:22
**managers** 11:10
**manpower** 32:14
40:9
**map** 114:17 115:5
115:10 177:15
**maps** 76:15,15
**March** 14:10,10
23:4 104:22
128:18,20 145:8
145:21 147:2,20
190:11
**marine** 36:9 96:9
96:11 103:25
110:22 113:8,9
114:11,21 117:4
120:9,17 121:22
122:24 124:4
127:25 129:8
141:16 142:14
148:25 149:15,20
149:25 150:19
157:8,25 159:2
168:12,19 174:25

GUILLORY (VOL II), LEE

8/22/2008

Page 276

176:22 180:18,23
185:18 186:3
190:5,13 194:4,11
194:18 195:11,19
195:21 197:8,11
197:15 198:4
199:8 223:6
226:19 227:6
230:12 235:16,19
239:14 249:3
**Marine's** 119:21
**mark** 9:16,24 20:25
33:2 41:11 43:20
51:9 58:9 65:12
67:22 70:10 71:18
77:4 79:6 83:8
84:4 95:5 98:15
104:20 109:9
110:19 111:22
114:9 115:21
119:4 121:8
143:10 145:6
149:2 150:14
155:12 165:1
166:9 167:15
169:7 176:18
178:21 182:5
197:13 198:20
204:19 207:8
252:22
**marked** 9:20 10:4
21:7 33:6 41:15
44:10 51:22 58:14
61:24 64:18,24
65:16 67:1,7 68:2
70:16 71:24 74:13
77:9 79:16 81:21
84:12 86:1 89:23
95:11 96:24 97:21
98:20 101:1,23
102:8 104:24
106:18 109:19
110:24 111:24
113:5 114:15
116:3 119:10
121:13 122:10,15

123:9,14 124:24
126:10 128:24
130:11,13 133:6
133:24 134:25
135:5,18,23
136:13,17 143:13
145:10 147:4
149:7 150:21
155:14,19 160:9
165:4 166:13
167:18 169:11
178:25 179:11
182:10 186:1,6
190:2,6,24 191:1
193:23 194:1
197:18 198:25
203:9,12 204:23
207:12
**marking** 85:20
89:19 96:19
100:20 133:2
146:25
**material** 103:19,22
103:24,24 104:2,5
104:11,11,13
116:25 117:3,9,16
117:18,20,22
118:2 120:6,12,14
120:16 127:15,21
127:23,24 175:10
175:12 179:24
180:17 181:9,15
181:19 188:15
198:23 199:14
201:14,18,21
210:22 211:4
222:14,22 223:5
223:14,17 226:15
226:19,25 227:1,8
227:16,18,24
228:1,2,13,19,21
229:25 230:1,24
232:9,17,21,22
233:3,3,5,13,16
233:17,22 234:3,4
234:8,23 240:14

241:19,24 242:20
245:15,20 246:1,6
246:10 247:10
248:23 249:12
**materialized** 78:23
**materials** 40:25
53:9 80:9 184:13
223:1,11,15 224:6
224:7 230:3 249:6
**matrix** 102:22
**matters** 202:13
**MATTHEW** 3:20
**maximum** 173:16
187:22,24 189:1
201:2
**Mayer** 96:10
110:22 112:8
113:8
**ma'am** 14:17
**McDonough**
103:16,25 113:9
117:4 120:9,17
127:25 148:25
149:14,20,25
150:18 157:8,25
159:2 168:12,19
174:25 176:22
180:18,23 223:6
226:19 229:22
233:9 244:21
245:3,5,7,9,17
249:3
**mean** 11:14 43:7
60:21 61:3 72:7
85:2,16 96:1
103:21 107:7
120:19 126:23
171:23 187:5
194:22 202:11
208:20 222:9
242:18
**means** 19:22 24:7
37:12,24 63:7,8
85:3,17 96:2
127:21 151:6
154:7 199:16

201:9 219:7
**meant** 64:10
**measure** 128:9,9
149:24
**measurements**
192:6,12
**measures** 192:16
**mechanisms** 33:24
38:9
**meet** 183:2
**meeting** 34:3 58:12
58:19,22 59:11,15
63:22 77:5,13
79:7,21,22 80:6
80:23 81:1,8,17
81:25 91:20 98:4
98:11 104:22
105:4,5,8,11,14
105:23 106:24
109:23 110:12
112:17,20 119:6
119:16 120:2
127:5,5 133:21,22
134:6,9,15 136:9
143:22 144:2
145:1 147:14
191:19 192:3
204:13
**meetings** 11:10
13:25 28:19 32:12
49:12 81:19 91:17
91:22 110:15
121:1 150:12
182:17
**meets** 34:5
**member** 11:21
35:25 75:15 92:6
163:21
**members** 29:3
79:23 91:21
**memo** 153:18
155:17 156:2,9,15
156:18 162:11,12
163:6 166:6
177:19 178:3
**memorandum** 33:4

34:21 96:21
115:22
**memory** 61:2
240:21 249:14
**mentioned** 106:22
193:19
**mentions** 33:21
**merely** 47:7
**message** 68:11
**met** 28:17,18 49:15
79:24 163:3
211:13
**methods** 24:4,8
36:7 37:12,24
199:16
**Meyers** 82:12
**middle** 54:14 82:21
90:14 95:23
123:24 183:23
200:22 235:20
**migrate** 23:22
168:18 237:1
**migrating** 236:15
**Miles** 156:12
**milestone** 196:24
**mind** 10:8 35:8
99:24 240:4
**mine** 101:25
202:16
**Mine's** 177:12
**minimize** 37:4
117:7
**minimum** 83:15,18
83:20
**minor** 113:15
**minus** 162:1
243:14
**minute** 21:11 31:1
31:16 100:24
109:13 114:12
155:18 179:13
183:20
**minutes** 58:12,19
59:2,15,25 77:13
77:17,21 79:8,12
79:21 80:3 81:3

Johns Pendleton Court Reporters

800 562-1285

98:11 104:22
105:4,15 109:23
110:15 112:17
119:6,16 120:2
133:22 134:7,15
145:4 147:14
191:19,23 192:3
**misrepresent** 73:12
**missing** 31:22
155:15 177:8
202:12,16,20
210:18
**Mississippi** 16:24
181:17
**misspoke** 175:24
**mitigate** 36:8 37:4
**mitigated** 20:21
**MMG** 81:5 83:4
159:6 183:11
203:24
**mobilized** 73:24
**mode** 24:1
**modification**
115:23 116:11,16
119:18 255:14,15
**modifications**
78:15 254:2
**moisture** 250:1,7
**moment** 146:5
**Monday** 126:7
**money** 39:8,20
232:14
**monitor** 31:17 36:5
40:18,23
**monitored** 28:1,4
41:5
**monitoring** 18:25
36:15,22
**Montegut** 28:5
29:6 30:12 79:4
99:8 104:9 125:10
126:15,16 135:12
143:9 145:22
164:18 165:10
166:22,23 167:22
191:9 205:1,4

**Montegut's** 169:20
**month** 29:25 82:2
94:13
**monthly** 29:23 41:1
130:15,20,24
179:5
**months** 14:9 99:20
209:20
**Morgan** 15:24 80:7
80:20 82:7 203:23
**morning** 211:17,19
**Morrison** 41:21
51:24 62:8 98:16
115:25 116:9
**mouth** 222:10
**move** 27:16 43:17
236:22
**movement** 141:14
**moving** 15:2
160:18 237:4
**MRGO** 1:7 13:13
50:4
**multiple** 13:24
176:7 248:2
**multitasking**
144:14
**multivolume** 50:3
**M-K** 41:21 42:14
42:17 44:13 45:12
46:13 51:11 53:14
**M-K/Washington**
98:23 99:13

**N**

N 3:5 4:1,1,1,8 8:1
**name** 29:13 70:20
81:18 96:15
123:20 126:18
208:11
**named** 9:4 21:13
82:12
**narrative** 208:8
**nationally** 25:12,13
**navigation** 12:13
19:17 26:17
**navigational** 19:4

**NCS** 200:20 210:16
**NCS-002** 52:10
**NCS-004-000000...**
97:23
**NCS-004-000008...**
69:22
**NCS-009-000007...**
21:3
**NCS-012** 107:17
**near** 83:21
**Nearly** 194:12
**Nebraska** 23:15
**necessarily** 217:21
252:11
**necessary** 28:14
29:3 59:9 71:15
75:8 117:1 201:18
230:20
**need** 9:13 27:10
31:25 46:8 47:14
47:17 66:17 72:25
74:1 86:15 140:8
149:17 176:18
189:4 194:18
233:15,23 235:8
235:10,15 246:18
251:6,22,22
**needed** 28:23 45:19
48:3 49:17,19
51:5 53:17,21
56:15 57:11 66:9
66:13 73:21 74:2
78:6,19,24,25
111:9 141:24
158:16 198:17
199:10 228:12
251:21
**needs** 140:8 194:18
**negotiated** 54:10
**negotiating** 37:12
**neighborhood** 36:2
36:3 184:17
218:22
**neighborhoods**
36:11,20 37:2,5
**Nelson** 47:23

**net** 181:6 226:15
230:24
**never** 55:22,25
77:1
**Nevertheless** 40:17
**new** 1:15,16 2:7,24
3:13 9:3 12:10,18
12:20 14:8 16:14
16:21 17:17,23
18:14 19:8 25:7
25:11 26:18 29:7
33:9,16 42:11
47:22 50:4 53:8
75:18 89:11 96:21
108:12 180:6
181:12,19 184:9
206:17 209:12,25
210:4 228:13
**news** 82:21 83:1
**NFAATT** 176:21
182:23 194:3
195:11 197:8,10
197:14 198:3
201:25 207:22
**NGVD** 118:23,24
243:14
**nice** 40:15
**NICOLE** 3:19
**Ninth** 36:2 218:2
218:22
**NOD** 13:25 117:6
157:2 166:1,4
**Nods** 213:13 242:4
**NOD's** 156:24
**noise** 36:6
**nomenclature**
231:2
**non** 95:7
**nonconforming**
32:9
**Nope** 111:13
112:19 147:25
**normal** 114:7
181:25 189:20
**normally** 59:5
60:16 93:1 147:14

184:11 247:23
**north** 18:8 161:9
179:23 201:1
213:11
**northeast** 213:12
**northern** 161:13
**northwest** 213:24
**notable** 36:16
**noted** 107:4,8
256:13,15
**notes** 120:2 136:25
229:16 250:22
**notice** 8:7 9:18
31:18 174:5 255:6
**noticed** 32:5 97:5
123:19 174:22
**November** 69:7
75:21 84:6,8
119:8 136:15
149:5 169:9
178:23 179:18
190:4
**number** 9:17 11:3
19:12 21:2 22:17
23:16 25:16 28:10
34:17 35:23 37:25
44:23 46:3 49:20
52:1,9,10,22
53:25 54:8 60:3
62:2,21 64:18
69:21 70:11 74:8
85:21 88:9,25
90:12 95:6 97:22
98:15 100:21
101:22 102:5
103:9 104:21
106:13 111:22
112:6 113:3
116:24 124:3,6
125:13 129:4
130:5 132:4 134:7
144:7,18 149:3
151:16,24 152:9
152:10,11 154:3,4
154:7 155:13
156:20 158:25

GUILLORY (VOL II), LEE

8/22/2008

Page 278

159:1,1,7 161:22
162:19 166:7
177:1,7 178:13,21
179:11 180:9
193:24 196:13
202:25,25 228:23
229:2 232:1 238:6
240:5 243:2 244:7
244:17 250:11
**numbered** 10:1
52:19 59:19 79:13
81:16 127:11
176:22 200:20
208:14
**numbers** 95:6
105:23 160:1,3,5
176:20 202:23
231:22 243:5
**N.W** 3:6

**O**

**O** 1:10 4:1 8:1
**oath** 8:25 9:6
**object** 37:20,23
48:16 57:24
137:12,24 138:1
170:17 185:9
220:15 224:17
232:25
**objection** 41:25
43:22 46:22 72:15
73:3 76:20,25
83:25 137:12
138:23,25 139:2
215:19 226:7,10
227:3,13 228:7
237:8 255:3
**objections** 8:11
**objects** 27:6 95:9
101:12
**obligation** 218:17
218:24
**observation** 128:6
172:3 174:17
**observations** 43:22
**observed** 31:18

127:14 165:22
166:2 167:8
168:10 175:5,16
238:19 241:1
242:5
**obstructions** 57:12
57:16
**obtain** 60:6 71:14
103:15 176:5
229:21
**obtaining** 248:14
**obvious** 117:12
**obviously** 76:12
234:4 240:21
241:2 247:12
**occupied** 228:11
**occur** 94:13 141:14
195:3
**occurred** 97:11
99:2 111:8 144:25
173:5 205:25
207:21
**October** 14:10
37:13 73:19 89:21
132:11 134:22
169:9
**offered** 42:13
**office** 2:21 15:6
31:8 53:2,6,10,12
53:19 54:14,18
55:8,15,23 56:1
56:13 77:2 79:25
82:13,15 96:22
156:21 254:19
**officer** 21:15 22:1
22:11 26:8 30:11
31:13,13 78:22,23
103:1,2 116:10
205:5
**officer's** 21:23 29:7
**offices** 1:15 18:25
**official** 152:1
**officially** 194:23
206:6
**officiated** 8:24
**off-site** 116:25

117:16 232:13
234:22 253:16
**OFP-066-000015...**
10:1
**Oh** 52:16 64:6
85:18 129:21
169:16 172:8
177:12
**okay** 9:22 11:1
13:18 18:17 20:25
21:18 22:5,8 23:3
25:15,23 26:2,6
26:14,19 27:23
28:12 29:15,19
30:25 31:15 33:1
34:16 35:3,22
38:19 41:19 43:1
43:13,17 44:24
45:7,23 46:2
47:12 48:12 49:20
50:6 51:19 52:4,8
54:13,20,25 55:13
55:18 58:9 59:18
59:20 60:4 61:10
61:15 62:7 63:9
64:14 65:11,25
67:21 72:11 73:6
73:14,17 74:5,20
75:19 76:19 77:3
77:16 78:4,24
80:6,23 82:4,20
83:14 84:3 85:5
85:13,18 86:22
87:3,8,18 88:3,5,7
88:8,18 89:13,18
90:5,13 91:6,15
91:23 92:10,17
93:16,18 94:3,17
94:22 95:3,23
96:7,18 97:10,14
97:20 98:14 99:9
100:3 101:5,15,21
102:4 103:8,11
104:14 107:15,19
109:2,6 110:2,5,7
111:14 112:23

114:4,9 115:9,16
115:20 116:21
119:3 120:1,18,23
121:8,21 123:8,19
123:24 124:8,20
125:11,19 126:5
126:17 127:1
128:1 129:3,12
130:10 132:3,12
132:20 133:2,12
134:5,14,20
135:17 136:8,10
136:24 139:11
140:11,23 142:9
142:25 144:5
145:3,6,25 146:10
147:13 148:8
149:2 150:3,14
151:8,13,18,21
152:4,7,12 154:10
157:17 158:3
159:21 160:6,14
160:18 161:4
162:2,10 163:14
164:14,25 165:16
165:20 166:8,25
167:14 168:3
169:24 174:13
175:14,25 176:11
176:17 177:2,6
178:1 179:10,19
180:9,16 183:4,17
183:22,23 184:18
185:15,23 186:1
187:2,5,19 188:17
189:6,9 190:12
191:17,22 192:1
192:22 193:9,18
194:8 195:9,17
196:3,7 197:7,13
200:17,21 201:23
202:8 203:19,23
204:4,8,17,17
205:20 207:7
208:12,13 209:2,8
210:12 212:4,21

213:12,19,25
215:3,9,24 216:17
216:20,23 217:15
217:18 221:11,22
222:4,20 223:10
224:12 225:14
227:1 229:14
232:3,7 233:12,20
234:16 235:7
237:11 238:24
240:6,24 241:12
241:23 242:15
243:21 244:5,12
244:22 245:22
246:13 247:12
248:12,20 249:2
250:9,15 252:14
252:19 253:2,19
254:4
**OLD** 74:2
**Oliphant** 162:15
**Omaha** 23:15
**once** 18:15 102:18
149:19 186:23
194:21 211:13
**ones** 22:7 160:9
162:6,8
**ongoing** 157:24
**onshore** 106:16,25
**on-land** 200:2
**on-site** 28:4,18
30:10 32:8 99:7
103:25 105:12
107:14 117:4,7
120:7,8,12 127:24
224:8 232:9,13
253:16
**open** 253:10
**operability** 15:21
16:4
**operating** 53:9
**operation** 168:18
**operations** 20:13
25:3 55:16 68:18
74:23,25 75:12,14
75:17 77:2 154:12

GUILLORY (VOL II), LEE

**opinion** 63:24 83:6
100:8
**opposed** 17:20
153:5 246:14
247:8,13 249:5
**optimum** 250:7
**option** 38:25 39:9
104:1
**order** 11:25 12:4
21:16 22:6 26:11
26:15 27:24 28:2
29:11 31:4,20
37:11 38:22 41:3
41:23 42:18 44:6
44:8,13,14,17,17
44:21,22,25 46:16
48:18 54:6 56:2
59:4 68:21 69:18
71:11 75:5 78:15
81:6 91:13 92:4
92:15 93:6 94:1
94:16,18 95:1
141:6 155:5
170:12 172:15
173:8 182:22
195:2 199:5
206:15 207:19
208:2 209:24
210:2,3 224:2
229:13 243:6
253:23,24 254:1,3
254:5,5,13,17
255:1,14,16
**orders** 21:20
253:12,18
**organization** 78:6
**organizational**
78:13
**original** 8:9 26:5
44:12 52:1 183:15
195:12 221:24
**originally** 149:15
**Orleans** 1:15,16
2:7,24 3:13 9:3
14:8 19:8 25:8,11
26:18 29:8 33:9

33:16 42:11 47:22
53:8 67:24 71:20
72:16,21 76:6
96:21 108:12
180:6 181:12,20
184:9 206:17
209:12,25 210:4
**outline** 48:23 49:3
61:21 62:1,9 64:2
**outlines** 61:18
**outside** 232:22
**overall** 20:22 24:23
62:1 117:21,25
**overhead** 116:15
**overlooks** 16:15
**overly** 237:8
**oversaw** 28:1
**overseeing** 220:8
220:11
**oversight** 53:1,4
202:19
**overview** 205:23
**owed** 30:24
**O&M** 20:16
**O'Connor** 31:9
65:13 66:3,4 67:4
67:25 68:24 70:14
71:2 101:19
164:13 203:21
204:9

---

**P**

**P** 8:1
**pacing** 175:17
**page** 4:3,10 11:3
19:11 22:9,11
26:3 31:17,22,22
33:21 34:16 35:4
35:22 44:24 45:9
47:12 50:19 52:9
52:22 53:24 54:14
56:9 59:19 60:2
62:8,22,22 65:4
67:15 71:1 78:5
84:22 85:11,11,14
85:22 87:15,16

88:6,8 90:3,12,14
93:17,19 97:6,15
97:21,24 101:21
101:24 102:4
106:14 107:3,17
116:22,23 120:1
123:19,25 124:10
125:4,11,20
126:14,17 127:10
127:10 131:21
136:25 137:6,7
139:23 140:8,12
140:14 143:17,20
144:10,17 145:14
147:10,18,18
151:3,8 152:8
154:2 156:5
160:18 162:3,11
165:8,20 166:17
167:4 168:7
169:24 175:3
176:25 177:8,9,13
178:13 179:11
180:10 183:18
187:2,17 189:6
191:5,7,16 192:2
192:3,22 195:15
195:16 196:3,5
198:8 200:19,22
208:14 209:2
222:5 229:2 232:2
238:13 240:5
244:7 250:16
252:24,24 253:5
**pages** 25:16 84:9
84:18 85:9,10
95:5 112:25
122:11 135:6
137:19 139:4,20
139:23,24,24
150:17 155:15
163:15 195:14
202:11 210:17
253:1
**paid** 54:9
**panhandle** 173:11

**paragraph** 11:2,2
13:19 19:13 26:19
31:21 35:3 36:14
46:5 47:13 62:25
75:7,19 82:21
100:6 102:7
107:22 120:3,4
127:12 143:21
156:20 162:19
175:4 183:23
192:4 250:18
**paragraphs** 229:5
**paragraph/line**
62:24
**parameters** 183:1
**parens** 253:10,11
**parentheses** 59:23
123:21
**Park** 18:1
**part** 8:14 10:15
11:25 16:9 18:14
35:2 40:22 49:21
86:3 102:11 139:2
159:7 189:24
206:16 209:20
212:1 218:6,24
224:13 231:12,15
231:23 234:15
**participated** 136:9
168:21 172:21
205:21
**particular** 16:23
20:19 23:12 24:9
28:21 29:25 34:3
34:15 38:6 41:2
42:15 45:14 47:6
47:6 48:17 54:6
55:6 56:4 57:2,5
66:20 76:16,18
77:2 81:8 85:10
93:4 94:14 97:3
99:17 108:13
113:17,22 127:4
142:3 148:6
150:11 158:10
165:15 181:24

182:25 186:13
187:1,25 188:1,20
188:22 189:2,16
192:20 194:20,24
195:9 197:2 211:4
226:1 227:5 230:6
230:7,8,9 234:6
234:13,24
**parties** 8:3 257:14
**party** 165:23
**passes** 175:11,23
176:1,7 247:24
248:2
**paths** 17:17,18,24
**pathways** 17:25
**patience** 211:7
**PAUL** 2:14
**PAVLICK** 3:18
**paying** 117:18
**payment** 29:22
**PC27** 175:16
**PC270** 168:10
**PC400** 127:15
242:6
**PDT** 13:3 16:9
**peace** 43:25
**people** 139:3
198:13
**PEP** 35:2
**PEPs** 34:6
**percent** 32:7 36:19
61:12 170:1 176:5
227:22 228:4,11
228:13 243:24
244:8 248:3
**perform** 27:24
28:13,15 29:16
31:19 45:14
153:20 212:22
**performance** 28:20
31:17
**performed** 14:11
19:14 28:13 29:17
29:24 30:9 33:15
44:25 94:9 95:1
123:25 146:6

GUILLORY (VOL II), LEE

173:9 240:12
**performing** 13:24
28:6,8 29:3 242:8
**performs** 26:22
212:23
**perimeter** 47:4,8
206:3
**periodically** 99:11
145:22
**permanent** 47:10
207:1
**permission** 75:22
99:19 149:14
**permit** 60:5,7,8
66:9,18 72:16,21
72:25 73:22 74:1
**permits** 30:1 49:19
70:7 71:15
**permitted** 8:5
**permitting** 20:19
**Perry** 79:24 82:2
182:18 194:16,22
**person** 13:2 129:24
196:21,21 225:4
249:10
**personal** 43:22
115:11 224:24
**personally** 42:10
69:13
**personnel** 23:19
24:20 25:1,2,3,6,9
25:11 30:13 31:14
40:10,25 45:10
47:23 54:4,7,9
76:13 95:15,15
121:5 189:23
192:18,18 193:9
253:11,16
**perspective** 42:17
**persuaded** 244:17
**pertaining** 253:13
**PERTAINS** 1:7
**phase** 15:8 90:17
90:17,18,19,23
91:6,10,12,16,24
92:3,7,11,14,21

93:7 96:4 104:18
104:21 105:5
109:22,23 110:11
110:21 111:6,15
111:18 112:1,16
112:18 119:6,16
121:1,10 124:16
133:18,20,22
134:2,2,6 135:19
144:25 147:19
191:19 192:23
193:2,10 200:3
251:8
**phases** 13:20 15:3
15:15 90:15 93:1
106:6,11 200:18
**PHILIP** 3:18
**photo** 178:22,24
181:1,3
**photograph** 132:4
132:8,13,15
179:16 180:14
**photographs**
130:20,24 131:3,9
179:6,12 227:15
227:15
**photos** 130:16
178:17,23 208:1
**phrase** 252:10
**physical** 47:5 171:2
173:8
**physically** 30:16
99:5
**Ph.D** 80:21,21
**pick** 37:3
**picking** 240:4
**pictorial** 188:25
**picture** 132:22
179:19 180:13
248:13,21
**pictures** 246:12
**piece** 244:18
**PIGMAN** 3:10
**pile** 112:10 124:1
184:2,20,25 185:6
185:19,22 212:12

212:14,17,19,21
212:23 213:4,4,11
214:12 215:11,11
216:13 217:2
218:4 238:21
241:10
**piles** 212:18,18
236:25 240:15
**piling** 35:13,14,15
35:15 36:24 57:13
57:13 105:6,24
106:16,25 108:16
108:21 111:17,20
112:4 240:2
**pipe** 35:15
**pipelines** 48:10
**pit** 103:16 120:12
148:24 149:4,15
149:18 150:8,19
150:24 155:2,4,9
157:21 159:9
161:5,10,15 163:1
165:25 167:6
168:12,14,15,19
168:24 175:1
222:15 223:13
229:22 232:20
233:9,10,14
240:15 243:13,18
249:7,11
**pits** 224:8
**place** 156:17 180:1
200:12,15 226:16
239:2 247:6,7
**placed** 27:1 117:22
175:6,19,22
178:18 181:2
246:8 247:23
**placement** 11:11
**places** 231:23
239:6
**placing** 175:17
180:17,25
**PLAINTIFFS** 2:2
**plan** 33:9 56:21
77:4 78:14 84:9

84:19 85:7,12
86:4,7 87:4,6
88:13 89:20 90:5
90:25 102:11
106:14,23 108:7
122:20 123:4
134:23 135:14
143:1,3,8 185:24
186:3,12 188:24
190:4 198:22
199:14 200:10,23
201:15 203:16
215:24
**planning** 12:20
28:9 33:23 53:16
66:12
**plans** 11:13 14:17
20:5 41:6,9 49:15
56:19 57:6 106:5
106:6 242:14
**planted** 206:2
**plate** 159:5,16,17
**platform** 241:8
**play** 235:3 249:15
**please** 10:7 243:19
246:24
**pleased** 32:7
**plenty** 249:1
**plotted** 153:25
**plume** 201:17
**plus** 105:13 200:3
**point** 18:12 50:9
73:17,20 92:1
108:10 181:6
214:19,20 218:8
223:10 228:17
232:8 243:16
**pointed** 18:21
202:3 221:23
**points** 24:6 91:7,9
92:12 234:12
**Port** 47:22 206:17
**portion** 18:4 54:6
96:3,17 109:24
173:22 186:23
196:24 211:2

239:21 240:23
253:7
**portions** 114:23
140:13 199:11
200:2
**position** 145:23
**positions** 78:8
**possibility** 23:20
89:14,17 219:9,14
219:20,21
**possible** 99:3
**possibly** 61:2
188:21 219:13
**potential** 48:25
50:15 88:20
140:25 141:7
220:7,11 221:2
222:11 226:4
**pozzolanic** 234:7
**PPPMD** 11:10
**practice** 25:23
**practices** 157:1,3
157:14 189:21
**precise** 217:1
**precision** 251:20
**preferable** 234:17
234:18
**preferred** 232:9
234:2
**preliminary** 13:11
17:13 47:20 53:11
**preparation** 26:16
62:3 64:22
**preparatory** 90:17
91:6,9,12,16 98:4
98:10 104:21
105:5 106:24
109:22,22 110:11
111:15 112:16,17
119:6,16 121:1
133:18,20,21
134:2,6 143:22
144:2,25 147:14
191:19 192:3
**prepare** 186:11
**prepared** 93:13

95:14 98:12
125:24 165:14
198:4 228:24
**preparing** 14:17
45:4 61:16
**prescribed** 223:21
252:12
**prescriptive** 38:16
**present** 3:16,22
11:8 193:9
**presented** 59:23
**pressure** 236:20
**pretty** 242:11
**prevent** 189:21
225:3
**preventing** 224:9
**previous** 36:23
60:9 123:3 151:24
162:3 175:15,24
181:3
**previously** 26:6
41:4 52:5 58:3
69:15 106:22
115:1 121:25
127:23 180:15,21
184:19 189:13
202:3 222:10
**pre-design** 13:24
**pre-final** 93:20,25
113:1,7,25 114:6
128:19 129:5
**price** 38:18,21 39:4
**primary** 117:3
220:5
**principles** 156:25
157:3,14 189:21
**prior** 13:16 35:10
192:6,20
**prioritized** 226:18
**probably** 10:10,22
50:23 69:25 72:9
76:4,14 82:1 83:6
114:6 163:11
164:3,12,18,21
168:16 203:5
213:22 248:7,25

**problem** 43:3 99:1
99:4 131:2,8
240:24
**problems** 15:5
28:21 174:5
**procedure** 8:6
200:11
**procedures** 192:9
**process** 37:11
40:22 42:11 48:22
53:12 59:4 61:18
96:5 102:12,15
141:21 194:10
200:8 209:20
**proctor** 176:6
243:24 244:9
248:3
**production** 32:10
202:21
**professional**
100:10 141:17,19
142:20 152:15
**profile** 175:21
**program** 22:25
25:4 27:3 31:9
36:18 48:8 55:10
88:12,16 89:8
104:19,19 199:6
**progress** 28:20
32:11 130:23
178:23
**project** 11:8,10,13
11:22,23 12:1,15
12:24 13:3,9,14
16:11 18:15,23
20:11,14,21 26:17
28:1,20 29:12
30:2,3,4 31:7,9
32:4,20 33:9,13
33:22 34:15 35:5
35:11,25 36:4,17
39:9 41:23 42:24
46:2 47:8,25 48:2
48:5 49:1,14,15
54:20 55:9,14,16
57:11 58:6 59:21

60:21,22 65:21
66:4 67:9,20 68:4
69:3 70:9 71:4,10
71:15 75:10,13,15
76:15 79:3 81:10
81:24 82:1 84:19
85:11 86:4 91:3
97:3 98:25 99:6,7
101:20 103:17
106:5 117:22,25
121:10 126:19
130:15,25 134:11
141:6,23 145:16
164:7,23 166:20
168:20 171:9,11
171:12 172:20
173:15 174:24
182:24 185:22
203:22 206:20,23
207:21,25 208:6
218:20 220:7,9
225:1 229:22
239:16 253:17
**projects** 13:20
19:16 24:20 60:9
60:13,15,20 61:12
61:13 208:8
**proper** 246:20
**properly** 27:8 37:2
**property** 18:5
206:18 218:17
**proposal** 45:2,5,13
45:15,16,20,22
51:11,24 52:6,9
53:25 55:7 99:13
108:18 116:1,6,9
116:11,18 117:2
149:23 159:17,18
**proposals** 55:21,21
56:4 102:21
**propose** 32:13
**proposed** 18:14
33:10 37:7,16
63:13 75:8 78:12
89:9 99:14 104:9
108:2 152:19

157:7 158:6,12
159:23 201:5
**propounded**
211:16
**PROSPECT** 22:17
22:18
**protect** 43:5
**protected** 47:11
171:14,20 172:6,8
172:9,13,17,18
174:15
**protection** 14:25
15:22 18:20 19:2
19:18,23 69:15
212:2
**provide** 40:1 46:18
49:24 50:7 53:5
59:6 91:19 106:10
149:13 153:16
158:20 223:19
**provided** 30:13
53:1 76:4,9 120:6
128:7 153:22,25
166:1,4 167:12
**providing** 72:16
219:17
**provisions** 20:3
27:1,2
**proximity** 82:23
83:3
**public** 17:16
**pull** 56:14
**pulled** 233:14
**pulling** 57:13,13
**pump** 175:1 235:10
235:15 238:20,22
**pumped** 235:23
238:21
**pumping** 238:7,19
**punch** 113:13,14
113:15
**purchase** 104:2
117:16 232:22
233:17
**purchased** 206:15
224:7 239:4

**purchasing** 104:13
118:2
**purports** 66:7
147:19
**purpose** 62:16 86:6
116:8 185:7
188:23 213:1
248:14 251:19
**purposes** 8:5 224:8
224:14 241:21
**pursuant** 8:7
**purview** 157:15
**pushes** 175:10
**pushing** 181:9
**put** 25:23 66:14
102:6,21 123:8
159:6 171:7 181:3
222:9 227:2,6
228:2 230:23
242:20 246:19
247:4,10 248:1
251:16
**P-O-Z-Z-O-L-A-...**
235:1
**P.E** 10:2
**P.O** 2:15

---

**Q**

**QA** 28:5,18 32:5
91:21 94:21 95:15
97:2,15 106:10
123:16 143:22
164:4,16 192:9,9
192:18,19 196:21
201:12
**QAR** 92:17,20 93:2
93:13 96:16
123:17 124:14
125:25 126:22
128:1 129:24
133:3,13 136:14
136:23 143:11
144:5 145:8 146:1
147:1,9 164:15
165:2,12,13,16
166:11,19 167:2

GUILLORY (VOL II), LEE

8/22/2008

Page 282

167:16 168:1,4
169:8,22 190:23
191:8 193:12
**QARs** 110:9
120:24
**QA/QC** 96:4 98:10
146:9 172:24,25
174:3
**QC** 93:3 94:21
109:25 113:7
129:5,23 134:1
**qualifications**
253:13
**qualities** 23:18
**quality** 15:12 27:1
27:3 28:6,8 29:10
31:13 36:5,10
41:9 78:13,22
86:16 88:12 89:20
90:23 91:1 92:6
92:18,24 93:5,8
93:10,14 95:13
100:13 102:6
104:18,19 105:17
106:5,8 111:4
121:4,5,7,19
123:11 124:21
125:23 126:1,6
141:19,20 144:9
144:19 147:12,16
157:23 173:2
188:3 192:18
193:1 196:11,20
222:21
**quantity** 117:8
**quarterly** 97:13
**quasi** 82:21
**question** 8:12 71:8
71:10 73:8 78:9
100:3 108:25
127:20 137:20,20
140:19,23 172:9
192:1 225:24
226:8,9 228:8
231:12,16,24
233:7,12,13

245:12 247:3
254:12
**questioned** 139:5,8
**questions** 27:15
71:16 109:2 211:6
211:15,16 252:20
255:21
**quick** 61:15 97:20
109:11 252:14
**quickly** 30:25
41:19 56:6 62:13
96:7
**quote** 192:7
**quotes** 225:14

**R**
**R** 97:16
**Radiological** 50:15
**rain** 236:2,6
**rainfall** 235:21,22
236:5
**raise** 226:9
**raises** 152:18
**ram** 176:9
**ramp** 214:7
**ramped** 78:18
**rates** 54:8 237:14
**reach** 57:1 183:2
188:1,15 213:11
**reached** 173:21
**reaches** 184:2
**read** 27:8,13,14,23
31:1,1 39:12
41:19 46:4,8 56:9
72:9,19 91:8,9,25
95:8 100:1 137:19
137:22 138:11,13
139:3,4,12,16,20
140:8,9,11,11,13
176:20 183:21
229:23 238:9,9
244:5,6,7 245:10
251:7 253:6
**reading** 8:8 138:1
139:16 184:6
244:16

**ready** 20:23
**real** 232:13
**realigned** 12:18
**realize** 206:18
**really** 43:4,7 56:6
97:20 227:23
232:8
**realm** 80:12
**reason** 111:10
112:14 122:4
124:17 125:16
128:11 133:12
134:14 135:13
136:10 137:1
144:1,24 145:25
147:24 165:16
166:25 168:3
169:21 191:12
193:15 197:9
202:24 232:13
247:2 251:2
**rebuilt** 12:17
**rebuttal** 63:13
**recall** 30:13 51:3,6
51:8 54:21 68:22
75:4,16 81:1,3,20
83:5 133:1 142:9
153:1 156:19
158:7 160:1 163:8
170:10 171:4
173:4,10 178:5
182:15 198:17
216:7,19 231:10
235:8,11,14
239:20 243:23
251:4
**recap** 56:18 88:9
88:10 149:19
182:2,6,20 185:23
186:2,8,13 190:3
198:22 199:13
**receipt** 26:4
**receive** 25:24 51:15
**received** 25:21 72:5
72:10 74:17 75:20
102:20 108:7,11

123:21,23 125:25
162:11 194:21
**receiving** 68:6
164:2
**recess** 64:15
**recognize** 10:3 21:6
44:9 51:20 58:13
64:23 67:5 71:23
79:15 89:22
100:24 104:23
109:12 110:23
111:23 119:9
121:12 124:23
126:8 128:22
130:12 133:5,22
134:24 135:22
136:15 143:12,17
144:22 145:9
147:2,22 149:6
150:20 163:17
165:3,9 166:12
167:17 169:10
178:24 182:9
190:5,25 191:6,18
192:25 197:17
198:24 207:11
**recollection** 184:24
**recommend** 37:23
102:24 152:23
**recommendation**
49:9,24 61:17,22
62:2,9 64:1,2
102:22 103:3
**recommendations**
28:25 49:4,5,6
57:3 64:21 65:8
160:24 189:18
**recommended**
45:21 157:23
**recommends** 33:24
**record** 26:15 27:14
34:22 44:4 73:7
73:12 91:8 95:9
110:17 115:23
122:5,12 138:14
144:15 163:10

164:22 176:20
202:17 207:10
209:24 211:21
212:10 236:10
238:5 244:6
245:14 246:22
248:10 249:7
252:15 253:6
**recorded** 93:7
**recover** 229:19
**rectangular** 159:21
**redact** 43:13
**reduce** 36:7
**red-lined** 107:4,11
**reestablish** 230:24
**refer** 44:22 244:2
**reference** 62:22
161:2 235:3
**referenced** 61:16
76:14 179:12
**references** 75:22
**referencing** 99:17
**referred** 17:14
54:17 62:23 166:4
176:13 184:8
215:5 237:16
**referring** 18:3 25:7
25:8,10 56:17
57:7 60:14 107:1
112:5 154:5
155:18 204:6
241:15
**refers** 47:13 121:23
125:12 241:24
243:24
**refresh** 184:24
**regard** 200:23
246:17
**regarding** 70:6
82:22 83:3 115:23
225:1
**regards** 17:11
**regional** 53:14
**regionally** 38:17
**regular** 251:13
**regulation** 88:14

Johns Pendleton Court Reporters

800 562-1285

GUILLORY (VOL II), LEE

**regulations** 88:15
**regulator** 182:18
**regulators** 182:17
**regulatory** 80:8,12
  80:15 88:14,16
  182:21 183:1
**reimbursable**
  34:12 192:14
**reimbursement**
  39:14,25 40:7,20
**relate** 140:20
**related** 257:14
**relates** 137:9
**relating** 24:15
  57:19 255:16
**relationship** 237:23
**relative** 46:19
  132:21 154:25
**relaying** 127:14
  241:3,13
**relied** 217:10
**rely** 185:4,7
**remainder** 181:8
  181:10
**remaining** 175:6
  210:1
**remarks** 107:3
  126:18 145:15
**remedial** 156:23
  158:6
**remediate** 81:5,6
  182:22 186:22
  188:21 189:2,16
  239:6
**remediated** 18:11
  86:15,18 195:21
**remediation** 33:12
  34:10 35:5 58:8
  72:18 88:17
  100:16 172:20
  191:21 192:8,17
  193:5 194:10,24
  198:23 199:11,14
  199:20,21 200:6,8
  200:24 201:3
  203:16

**remediation/asbe...**
  168:9
**remember** 10:19
  14:5 22:21,23
  23:8 32:23,24
  65:22 67:11 68:6
  127:3 159:25
  170:20 171:1
  211:20 213:9
  227:21,25 242:24
**removal** 36:24
  56:19 98:1,4
  105:7,24 106:16
  106:25 107:21
  108:21 111:17,21
  112:5 122:24
  127:7 130:4 132:2
  133:19 134:23
  135:15,21 137:1
  143:23 144:20
  146:7 147:21
  168:9,11 240:2
**remove** 57:15
  75:22 199:11
  200:4 201:21
  232:17
**removed** 20:20
  86:15 112:13
  117:1 120:5,14
  142:22,23 148:10
  187:21 241:24
  244:25
**removing** 24:6
  57:12 124:3
  148:16
**rep** 192:9,9
**repair** 210:22
  211:1
**repairs** 230:19
  244:22
**repeat** 100:3
**rephrase** 73:7,15
  100:4 218:12
**replace** 226:15
**replaced** 145:22
  179:24 210:25

246:7
**replacement** 11:7
  11:22 12:1,15,23
  13:9,13 16:11
  18:15 26:17 75:9
  75:13 206:23
  244:25 245:15
**report** 16:10,23
  17:12,14 30:22
  49:4,5,6,9,24 50:3
  50:4,11 51:1
  61:17,22 62:2,9
  64:2,21 65:8,13
  70:4 92:24 93:11
  93:12,15 105:17
  113:1,24 123:11
  123:16 124:22
  125:24,25 126:1,7
  128:19,21 129:5
  129:13 133:15
  144:9,19 145:8
  147:12,16 176:21
  182:7 185:5 186:8
  186:13,19 193:20
  194:3 197:11,14
  198:3,11 207:10
  207:17,20 208:4
  208:21 209:9,14
  209:23
**reported** 1:23
  235:10
**Reporter** 1:25 8:23
  257:3,25
**REPORTER'S**
  257:1
**reports** 13:13
  80:14 86:20 93:8
  94:21 95:14 98:10
  109:25 113:7
  146:9 165:14
  182:2 208:8,9
**repository** 152:3
  178:17 227:14
**represent** 55:18
  69:20 76:8 81:2
  187:23

**representation**
  189:1
**representative**
  11:20 21:24 22:10
  26:9 29:7 92:19
  207:25
**representatives**
  93:6 105:11 134:8
  165:12
**represented** 11:23
**REPRESENTING**
  2:2,10,20 3:1
**request** 22:6 53:22
  53:22 57:18 58:2
  75:20 98:17,23
  108:17 154:1
  242:12
**requested** 55:25
  72:21 108:11
  153:18,22 158:8
  158:14 163:19
  210:9
**requesting** 51:6
  99:18 149:14
  163:22
**requests** 21:20,22
  35:4 156:21
**require** 57:18
  90:24 254:13,17
**required** 56:21
  60:6,9 107:10
  120:16 130:19
  179:5 199:20
  201:4 221:14
  226:24 253:13
  254:5
**requirement**
  255:10
**requirements**
  26:23 46:2 95:25
  253:15
**requires** 28:12 35:5
  88:9
**requiring** 103:15
  229:21 255:16
**reserved** 8:13

**resident** 15:6
**resolution** 62:20
  85:4,5
**resolutions** 99:4
**resolve** 28:24
**resolved** 210:11
**resources** 19:17
**respect** 26:21 28:2
  94:25 157:11
  168:15 221:4
**respective** 78:7
**respondent** 63:5
**response** 11:3
  63:10,11,12,18,19
  84:10 150:17
  162:19
**responsibilities**
  20:16 70:7
**responsibility** 40:6
  75:17 92:23
  171:19,24 172:1
  172:12,15 186:11
**responsible** 15:3
  22:1 120:24 121:4
**responsiveness**
  8:12
**rest** 46:5,8 59:7
  83:7 132:22
**restore** 180:1 181:6
**resubmittal** 107:9
**result** 257:16
**results** 92:20 93:7
  111:11 143:21
  197:1 201:19,23
**return** 146:4
**returned** 165:15
**reuse** 241:22
**revetments** 19:3,17
**review** 16:10,12
  17:12 19:25 20:1
  37:6 45:15 59:8
  86:22 90:5 101:8
  102:10 108:17
  116:12 142:25
  153:11 157:18,21
  186:9,20 190:16

GUILLORY (VOL II), LEE

198:5,10,14
204:11 208:23
216:1
**reviewed** 41:8
48:13 61:18 72:7
77:25 105:19
108:25 110:14
123:3 134:18
136:5 150:7 183:5
183:9 187:11
194:5 199:15
**reviewers** 151:13
**reviewing** 29:20,22
45:5 52:5 55:19
65:22 98:9 216:25
**reviews** 13:25
15:21 19:15
**revise** 192:7
**revised** 45:2,19,20
51:11 54:1 59:1
84:9,18 149:5
163:2 166:5
204:12
**revision** 52:1 54:1
59:13 61:22 62:1
134:23 150:19
**revisions** 59:9
64:21 85:8 87:7
204:5
**revoked** 32:19
**rewarding** 11:6
12:24 13:1
**Richard** 2:13 3:17
43:23 210:17
211:10 225:16
**Rick** 205:7
**Ricky** 205:11
**right** 9:13 14:19
26:9 27:9 41:7
45:25 54:22 61:3
65:10 76:8 84:24
108:24 109:7
118:22 127:9
138:10,13 139:2
140:17 147:18
164:17 168:1

170:24 177:9,22
197:22 203:7
209:22 211:10
212:3,12,15,21
213:2,6,8,14
214:15,19 215:7
215:12,16 216:12
216:15,20,23
217:2,13,18 218:8
218:14 219:4,8,15
219:22 220:1,3,18
221:6,25 222:2,9
222:15 223:4,8,18
224:4 225:21
226:21 227:7,21
228:4,10,22,24
229:4,6,10,18
230:18 232:10,12
232:18,23 234:10
236:8 237:6,15,16
238:1,22,25 239:1
239:9,13 241:23
242:6,9,11,13,16
243:10,12 246:2,5
246:7,21 247:7,14
248:4 250:1,7,22
251:2,5,11,14,16
251:20 252:7,8,12
252:17
**right-hand** 52:21
85:1,14 107:6
135:8 151:6
159:22 162:9
208:19
**Risk** 88:12
**risk-based** 100:17
**river** 15:1,23 16:24
181:7,13,14,17
226:24 234:11,16
251:10
**riverfront** 17:24
**road** 81:12 83:13
158:6,11 159:23
161:18,23,24
162:7 173:23
177:17 178:11

180:22 213:14
214:2,6 226:12
230:21 231:20
245:6,16
**Robert** 3:17 29:14
**ROBINSON** 1:7
**Roe** 51:12
**Roger** 97:18
**role** 45:4,7
**roll-up** 207:20
**Rouge** 79:25 80:24
**rough** 213:25
**routine** 114:7
**RPR** 1:24 8:22
257:2,24
**rubble** 101:10
**rule** 1:11 9:19 81:8
**Rules** 8:6
**run** 62:13 214:10
**rust** 41:20

**S**

**s** 3:3 8:1 13:21 26:8
43:6 45:5 47:23
62:8 70:1 78:10
85:4 92:22 112:7
116:1,9 117:2,6
121:5 125:8 130:8
143:3 144:8
147:15 152:17,25
153:5 156:3 157:2
157:19 167:22
168:14 169:3,17
169:19 170:12
171:18 186:10
194:23 199:24
**safe** 19:6 128:7
**safety** 31:13 78:22
172:18
**sample** 188:3
**samples** 86:17
192:19 200:16
201:12
**sampling** 47:15
48:4 85:22 86:3,6
86:10 87:4,5,15

87:16 100:16
188:12 199:6
201:15
**sand** 117:17 180:17
180:25 181:7,13
181:14,15,22
223:3,7 226:24
234:11,17 246:11
251:10
**Sara** 121:18 136:3
145:5 191:24
193:14
**sat** 32:11
**Satterlee** 156:3
162:12
**Saucer** 96:9 110:22
186:3 194:3,10,17
195:11,18,21
197:8,11 230:15
235:16
**save** 8:8,11 27:20
**saw** 69:2 70:22
209:17,19
**saying** 138:16
140:6 186:21
194:17 217:8,16
220:24 224:5
225:17 233:8
**says** 10:2 11:5
13:19 15:2 19:13
21:18 22:9,17
23:4 26:13,15
29:16 33:4 35:5
35:23 37:25 38:20
38:23 39:12,13
44:25 50:14 51:10
52:24,25 53:25
54:14 59:22 60:5
62:8 63:20 66:7
67:17 68:11 70:12
75:8,19 76:20
78:5 81:16 82:5
82:21,22 84:9
85:14,15 88:9,18
90:15 95:18,23
97:15,25 100:19

102:9 103:13
106:14 107:4,22
110:20 111:15
113:13 116:23
121:10,21 123:20
123:25 124:1,11
125:20 126:22
127:13 128:19,21
129:13,19 131:23
135:19 143:21
144:20 150:17
151:16 152:10,17
154:4,11 156:20
165:21,22 167:5,5
168:8,10 169:25
175:5,15 176:25
178:22 180:16
181:2 182:6
183:19,24 185:5
186:4 187:20
188:6 189:7 192:4
192:23 193:7
196:4,8 198:22
200:22,25 201:3
204:4 238:7,10,23
240:11 241:12
242:5 244:8
246:13 247:8
**say-so** 153:13
**schedule** 32:13,16
40:7 54:25 55:3
91:20 99:6
**scheduled** 75:10
97:12 98:13
**scheduling** 11:12
28:9 55:2
**schematic** 176:15
**scientist** 194:16
**scope** 33:14 34:7,10
35:4 38:24 39:5
40:14 42:4 45:1
49:14 58:7 78:19
94:11 95:18,20
99:12 101:6 106:4
108:4 113:13
117:21 129:20,22

GUILLORY (VOL II), LEE

130:21 146:13
217:20,25 218:9
218:15,23 230:11
255:3,5
**scopes** 102:17
**SCOTT** 2:5
**scrabble** 235:4
**scratch** 251:12
**scratched** 250:25
251:3
**season** 238:4
**second** 11:2 19:13
26:19 27:5 29:15
33:8 42:15 50:9
52:25 62:21 79:8
81:13 90:2 97:14
100:1,5 102:7
111:18 116:22
118:21 120:1
125:3 126:14,17
127:11,17 128:20
129:12 131:21
136:25 143:17,20
144:12 145:14
151:8 152:8
154:10 156:5
160:21 166:17
167:4 187:2 192:2
192:4 195:15
198:8 251:7 253:5
**second-to-the-last**
19:11 23:4
**section** 13:22 14:13
15:10 38:2,3
50:20,24 52:24
68:19 85:1 90:15
91:24 102:5,7
103:12 107:17,21
116:22,23 117:10
145:15 181:6
183:19 226:16
229:3 230:25
252:22
**see** 10:7,21 19:12
20:18 34:6 35:14
45:8 50:8 74:11

88:25 102:16
107:4 143:24
151:14 168:25
176:17 177:3,10
177:14 179:22,23
181:8 190:1
204:12 229:1
233:21 235:25
238:18 242:3,5
248:15 250:21
**seeding** 234:20
**seeing** 67:11 98:11
**seek** 149:17
**seen** 41:14 65:14
68:1,4 70:14 77:7
97:7 106:17
**seep** 219:17
**seepage** 212:19,19
212:22 236:15
238:21
**selected** 38:1,23
**selection** 13:7
42:11 102:12
224:14
**self-performed**
46:12
**sell** 181:18
**semi-compacted**
175:5,8,9,13,18
176:1 246:11
247:2,8,13,18,22
248:8
**send** 26:5 59:11
66:11 68:12 70:3
188:3,12 194:13
**sends** 194:16
**senior** 11:10 13:3
29:5 99:7 182:18
194:15
**sensitive** 36:2
**sent** 45:11,12 66:22
68:9,24 70:19
101:7 108:18
150:9,13 159:18
163:12 164:12,15
164:19 188:7

201:16 204:8
**sentence** 15:2
29:15 47:13
154:10 165:22
167:6 175:4,15
192:4 230:8,10
240:25 244:17
245:23 253:8
**separating** 168:11
168:13
**September** 11:8
133:4 163:16
**sequential** 78:18
**series** 112:24
150:12
**served** 47:4
**serves** 213:1
**services** 29:17
40:10,11 44:7
46:4,7,19 53:17
**serving** 15:5
**set** 59:25 89:7
248:25 257:7
**seven** 64:8 176:8
**seventeen** 99:20
**seventh** 63:16
**seventy-six** 87:21
**severe** 173:11
**sewer** 35:14,20
73:11 97:25 98:5
115:17 132:1,15
133:18 135:20
140:21 146:4,7,12
185:17
**Sewerage** 108:12
**shallow** 19:20
234:9,25
**shape** 206:4
**share** 51:4
**shared** 164:4
**Shavers-Whittle**
122:23 239:19
**sheet** 21:4 35:14
51:10 57:13 67:2
67:17 70:12,19
71:19 72:3 74:8

84:5 87:10 111:16
111:20 112:4,10
124:1 134:22
150:6,16 184:2,20
184:25 185:6,19
185:22 198:21
208:16 212:12,14
212:19,21,23
213:4,4,11 214:11
215:11,11 216:13
217:2 236:25
238:21 241:9
**sheeting** 158:17
**shook** 206:5
**shoring** 158:17
**shorthand** 27:21
257:9
**show** 135:7 156:18
176:19 197:7
250:13
**showed** 220:22
221:25 222:5
**showing** 54:3
108:14 178:17
189:14 200:11,14
215:13 227:16
**shown** 20:12 22:2
70:18 177:21
181:3 189:13
246:12
**shows** 38:3 248:21
**side** 16:17 47:11
57:3 75:24 81:11
83:11 93:2,2
159:22 162:21
171:14,20 172:6,7
172:8,10,13,17,18
174:15 180:2
200:13 218:18
**sides** 17:1,23 58:6
82:25
**sign** 103:3 113:21
113:24 192:10
197:10
**signatory** 33:17
**signature** 21:5 26:2

65:3 74:11 87:13
90:2 130:7,8
135:10 151:2
165:9 166:21,22
169:17,19 187:3,9
190:10 195:10,14
195:14 198:7
208:13,17
**signatures** 126:15
143:18 191:6
**signed** 30:22 82:5
84:6,8 87:14
95:15 96:12
106:20 116:6
125:4 156:11
191:8,24 196:20
197:8,12 202:7
256:11,13,15
**significance** 11:17
11:19 30:15
**significant** 246:15
**signing** 8:9 165:11
167:25 220:19
**silts** 223:7
**silty** 181:15
**similar** 11:16 122:9
135:4 223:1
**simple** 62:17
**simply** 227:8
234:12
**single** 114:2
**sir** 212:6,8 213:7
214:25 215:8
222:3 230:5,17
231:5 232:6,11
233:11,19 237:17
238:23 239:11
240:4,10 241:16
242:10,17 243:8
244:1,11 245:21
246:4 247:6 248:9
250:17 251:1
**site** 13:7,24 20:6
23:11 24:11 26:16
28:16 29:4,10,12
31:10,14 33:12

GUILLORY (VOL II), LEE

8/22/2008

35:11 38:6 40:3
47:5,20 57:15
58:8 62:3 64:22
66:5,6 70:2 72:18
73:25 78:22 82:1
86:15 100:14
103:13,17 104:3,7
104:13,16 110:10
114:21 117:20
118:12,12,14,17
119:20,22 120:9
120:24 123:17
124:14 126:19
127:2 132:22
142:10,15 145:16
145:20,24 148:25
149:23 159:3
163:3 164:4,16,16
165:21,22 167:5
170:15 171:3,6,9
172:5,17,20 173:8
173:15 174:12,25
175:3 176:15
178:12 179:6
184:1,12 186:23
194:10,18,20,24
195:21 196:13
201:25 204:3
205:1,23,24 206:1
206:1,2,4,9 207:1
210:22 211:3,20
211:21,22 213:6
213:10,12 215:4
217:20 222:13,23
222:24 223:2
224:7 229:3,23
233:17 234:5,7,9
234:13 235:10,19
239:2,4,23 245:17
253:15 254:7,15
**sites** 17:16 23:6
24:18 56:23 80:19
86:12,18,21
101:14 113:2
150:2 182:22
186:14,16 190:14

193:6,7 196:13
197:5 199:9 202:5
239:7
**situation** 13:1
104:8 224:9 226:4
**six** 14:9 18:23 19:4
45:10 80:18 86:12
86:21 101:14
173:15 175:11
176:8 182:22
186:15 190:14
197:12 239:7
**sixteen** 195:20
**sixth** 63:11,14
**six-inch** 248:1
**six-month** 13:22
14:11 15:9
**six-person** 183:10
**six-site** 187:1
**size** 132:21 149:25
247:17
**sketch** 114:11,17
121:25 160:22
161:14
**sketches** 200:11,13
**skills** 10:16
**skip** 22:8 25:15
**Skips** 202:23
**SK220** 127:14
**slab** 108:15 240:1
**slabs** 35:13 48:11
114:20
**sliding** 189:22
**slip** 112:9 168:12
**slope** 158:23,24
162:22,25 167:12
245:1
**sloped** 234:14
**slopes** 56:25 57:3
157:8 158:1,23
165:25 189:19
**sloping** 162:25
**sloughing** 189:21
**slowly** 154:13
168:18
**small** 53:8,8 83:7

132:23 154:21
199:11 246:19
**Smith** 21:13,14
65:13,25 205:6
**soil** 23:22,23 24:3
57:10 88:10,19,20
88:21 101:11
141:13 149:22
158:6 168:9
187:21 188:1,12
189:15 191:21
193:5 201:15
222:22 224:14
232:19 236:22
237:6 241:3,13,14
241:23 244:2,4,9
244:25 251:14
**soils** 88:19 101:11
201:7 229:6
**solicit** 45:13
**solicits** 116:10
**somebody** 141:24
162:13
**sorry** 31:23 52:16
82:5 109:7 138:19
146:22,24 148:8
156:1 159:8
163:14 169:16
170:7 172:8
177:13 180:12
190:12 196:6
197:24 205:3
229:23 230:7
238:8,15 244:6
248:20 249:20
250:19
**sort** 16:16 36:25
82:18
**sought** 8:15 142:2
**source** 117:3
222:18 228:14
**sources** 24:6 86:14
222:11
**south** 18:7 161:16
179:23 201:1
**southeast** 15:24

173:14
**southern** 115:7,9
115:12 124:9
**southernmost**
177:21
**space** 17:18 53:12
**Spadaro** 163:16
**speaking** 68:22
75:4 138:23,25
**special** 35:23,24
36:4,12 199:10,19
218:6 230:9,23
**specialist** 13:23
80:8,12
**specialized** 37:3
**specialty** 80:11,13
82:16,17
**specific** 17:5 24:18
26:25 98:24 160:3
186:14 225:22
226:11 253:14
255:10,12
**specifically** 8:10
17:3 24:23 46:25
50:2 51:3 56:3,17
57:19 60:3 66:2
69:2 72:15 75:3
76:14 79:2 99:1
112:8 129:19
153:18 158:13
218:13,14 235:13
252:25 253:17
**specification** 26:25
223:21 243:25
251:20
**specifications**
14:18 20:2,2
251:24
**specifics** 225:19
**specified** 233:15
254:25
**specify** 231:3
251:23
**spectrum** 19:16
**speculating** 61:8
**Spencer** 66:8 67:4

67:25 68:11
**spoil** 240:15
**spoke** 31:12 71:3
**sponsor** 20:16,17
**sponsors** 60:17
**spot** 158:10 180:21
188:1,20 248:19
248:20
**spots** 86:11 186:14
186:15,18
**spread** 247:21
**spreadsheet** 54:3
62:18 84:21 87:1
90:9 151:10
187:15 190:21
209:4
**spreadsheets** 55:20
183:13
**square** 250:19
**squares** 159:21
**square-looking**
248:15
**stability** 153:9,14
157:6,11,19 158:5
158:16,20 160:24
165:25 166:3
167:12 180:2
201:7 226:14
241:21
**stable** 155:10
162:22
**staff** 15:7 28:5,18
32:5,9 40:14 53:7
53:13,19 54:4
56:13 57:3 58:24
59:5 70:1,2 78:17
91:21 92:7,17
97:3 99:15,16,20
105:13 107:14
127:7 163:4 164:4
172:24,25 173:2
174:3,19 202:9
**staffing** 78:8,11,13
78:25
**stage** 48:17
**staged** 241:14

GUILLORY (VOL II), LEE

8/22/2008

Page 287

**stages** 30:7 49:3
  53:11 81:23
**Staggs** 204:1
**stagnant** 154:20
**stakes** 165:24
**stand** 38:12,21
  133:15 135:8
  222:8
**standard** 89:7
  98:22 176:5
**standing** 206:9
**standpoint** 20:18
**stands** 22:24
**stapled** 93:14 126:3
**start** 9:10 25:1
  82:24 140:16
  170:1,9,19 179:16
**started** 15:16
  139:16 182:16
**starting** 120:3
  137:6 253:7
**starts** 161:16
**state** 8:23 71:21
  72:13 141:18
  142:20 200:1
  257:3
**stated** 58:3 66:10
  66:14 154:19
**statement** 45:8,24
  60:11 89:1 185:5
  185:18 252:23
**states** 1:1,12,13
  2:10,11 22:3 38:6
**station** 2:16 35:14
  35:20 66:13,19
  73:11 98:1,5
  107:21 108:1,13
  108:19 115:18
  132:2,15 133:19
  134:23 135:15,20
  137:1,10 140:20
  140:22 141:9
  142:5,7 146:5,7
  146:12 185:17
  230:16
**stations** 76:1,3,10

76:18
**statistical** 86:13
**staying** 155:6
**steal** 212:18
**steel** 111:20 112:6
  112:10 129:7,14
  236:25
**steps** 78:18
**Steve** 51:12 66:8
  67:4 68:11
**Steven** 67:25 110:8
  110:9
**Stewart** 142:21
  143:3 148:11
**stick** 225:8
**STIPULATED** 8:2
**stipulation** 9:5
**stockpile** 239:7
**stockpiled** 226:23
  239:5 241:20
**stone** 2:13 3:10
  9:12 27:4 31:24
  43:2,10,14,24
  52:12 60:24 61:7
  87:19 88:2 117:17
  131:1,7,13,18
  144:11 146:15,19
  159:11 160:7,13
  170:4 171:22
  177:20,25 197:21
  202:10,22 214:21
  220:14 223:3
  224:16,21 225:7
  225:18 226:6
  227:12 228:6
  232:24 237:7
  244:24 245:4
**stop** 226:3,4
**stops** 30:15
**storage** 48:9
**stored** 52:17 239:5
**Storm** 170:2,19
  171:2
**storms** 170:15
**strata** 237:5,13
**strategies** 38:4

**strategy** 37:25
**Street** 2:6 3:12
**strictly** 14:23
**structural** 152:22
  153:9,14 158:5,15
  219:11
**structure** 12:12,18
  19:24 115:2,6,13
  119:24 120:11
  122:1,2 125:14
  129:10 141:15
  142:18 157:12
  212:2 213:16
  219:19 220:13
  228:11
**structures** 19:4
  24:15 35:7,8,12
  35:16 57:14 75:23
  110:4 115:5
**studies** 16:7
**study** 16:12 18:9
**stuff** 32:11 40:11
  108:22 222:23,24
  229:7 234:5,22
**sub** 121:6
**subcontract** 46:11
  101:9 102:24
  103:5,6,7 106:4
  108:4,21 230:11
  239:17,18
**subcontracting**
  32:15 161:22
**subcontractor** 80:9
  106:23 121:3
  122:21,23 142:21
  143:1 239:11,12
  240:22
**subcontractors**
  40:13 102:23
  106:8 207:24
  241:17
**subcontractor's**
  102:11
**subcontracts**
  102:18,19
**subject** 26:12,14

**submerged** 142:10
  142:13 143:4
**submission** 204:16
**submit** 99:7 130:20
  130:22 153:10
  179:5 186:11,11
  198:5
**submittal** 61:18
  64:9 84:21 87:1
  90:9 106:13
  150:25 176:21
  182:2,7 183:12
  187:15 190:20
  193:20 194:14
  197:11,14 198:11
  209:3
**submittals** 29:21
  201:25
**submitted** 29:23
  30:19 55:21 61:19
  77:21,22 106:14
  130:16 186:9,20
  190:17 194:4
  203:15 209:12,14
**submitting** 38:18
**Subparagraph**
  232:4 233:21
**subs** 121:2
**subsequent** 87:7
  159:19 206:20
  209:10 254:2
**subsequently** 44:21
  86:17 117:23
  232:17
**substantial** 30:8,14
  94:5 195:3,6
**substantially** 169:4
**substitute** 131:17
**substituting** 131:3
  131:8
**subsurface** 35:7,7
  35:12 48:8 88:21
  114:12 115:24
**subtract** 161:19,21
**sub-base** 181:19
**sufficient** 103:23

**suggest** 140:7
**suggested** 200:23
  244:20
**suggesting** 137:13
**suggests** 245:19
**suit** 40:14
**suited** 234:23
**summary** 10:9,14
  33:14 55:6 207:19
**summer** 13:4 30:18
**Sunday** 126:7
**sunken** 142:8,23
  143:24 147:22
**superintendent**
  66:2 78:21 93:3
  165:22 205:6
**superiors** 15:4
**supervised** 28:4
**supervising** 18:19
  18:25
**supervision** 257:10
**supervisor** 125:8
**supplement** 202:17
**supplemented**
  53:13
**supplements** 10:17
**suppliers** 181:18
**Supplies** 44:7
**support** 53:18,20
  54:15,18 55:24
  56:11,15,16 57:10
  57:18 74:24
**supported** 184:2
**suppose** 230:19
**supposed** 24:21
  130:22 187:23
  242:13 243:3,5
**suppression** 36:6,6
**surcharge** 236:14
**sure** 11:4 20:3,6,22
  22:16 27:7 37:8
  54:22 60:7 62:17
  100:2 105:19
  114:3 120:25
  122:17 156:6
  157:5,25 179:18

GUILLORY (VOL II), LEE

182:4 183:15 189:13 192:15 201:10 202:18,21 205:24 214:18 217:23 219:23
**Surekote** 81:12 83:13 158:6,11 159:23 161:18 162:7 173:23,24 177:17 178:11 180:22 213:14 214:2,5 226:12 230:20 231:20 245:6,16
**surface** 35:17 88:19,20,24 89:4 236:18 237:5,19 237:20
**surrounded** 112:10
**survey** 101:13 165:23
**surveying** 206:22
**surveys** 48:5 153:17
**swapped** 85:11
**switch** 32:3
**sworn** 9:5 257:6
**system** 14:15,24 48:9 63:5 86:10 90:19,24,24 100:13 121:19 134:3 136:3 141:13 145:5
**systems** 15:22,23 170:10
**S&A** 11:11

**T**
**T** 4:1,8 8:1,1 212:16,17
**Tab** 190:1
**table** 184:12 187:20 196:8 236:5,14,20,21 237:1,16
**tables** 23:24,25

**tabular** 207:23
**take** 17:6 21:11 26:21 28:24 29:19 31:1,15 39:8 47:15 63:8 80:17 91:25 93:23 94:7 109:12 122:13 136:24 137:5 153:4,6,24 157:23 175:10 183:20 188:2 196:16 200:11,15 203:10 211:10 222:23 251:12 252:14
**taken** 8:5 86:17 106:3 189:15 192:19 200:16 206:9 222:14 228:20 256:25 257:8
**talk** 68:20 69:17 182:1
**talked** 40:16 51:14 66:8 73:10,11 104:18 217:19
**talking** 159:9 160:8 174:2 193:18 214:23 245:6
**talks** 99:21
**tamp** 243:6
**tanker** 142:8,10,13 142:23,25 143:4 143:23 144:21 147:21 148:3,10 148:16
**tanks** 48:10
**tape** 128:9
**task** 11:25 12:3 21:16,20 22:6 26:11,15 27:24 28:2,15 29:2,11 31:4,19 37:11 41:2,23 42:18 44:14,17,22,25 46:16 48:18 56:1 59:4 68:21 69:18

71:10 75:5 78:15 81:6 91:12 92:3 92:15 93:6 94:1 94:16,18 95:1 141:6 155:5 170:12 172:14 173:8 195:2 199:5 206:14 207:19 208:2 209:24 210:2,3,25 253:24 254:2,5 255:11,14 255:15
**tasked** 71:13 153:15 182:19 199:12
**taught** 23:14
**team** 11:15,18,22 11:24 13:2,17 16:9 28:4,19 29:4 29:5 32:11 34:24 36:1 40:24 45:10 49:11 58:23 59:7 63:22 75:16 79:23 83:7 97:16 152:15 153:15 163:22 183:10
**teaming** 59:3
**technical** 14:7 15:5 20:2 22:25 26:23 30:22 45:15,16 53:1,3,18,20 74:24 102:20 115:25 116:5,8,16 116:24 118:7 207:10 208:4,20 209:9,23
**techniques** 199:11 199:20
**telecon** 65:12 66:7 66:22
**tell** 14:2 15:18 17:2 62:14 87:11 96:11 105:25 115:10 132:3 149:11 150:5 152:1 159:3 162:6 176:15

179:15 186:4 189:11 195:12 199:4 207:16 216:17
**telling** 244:9
**temporary** 75:23 206:14
**ten** 184:16 188:6,6
**Tendering** 51:20 77:6 79:11 145:7 193:24 253:1,21
**TERC** 21:16 33:11 33:19,24 34:5,8 34:12 35:1 39:12 41:23 42:12 192:15 221:14 252:22
**term** 16:17 20:14 83:14 88:23 181:14 208:5
**terminology** 247:20
**terms** 26:24
**Terrell** 41:13 42:17
**test** 89:3 201:19 254:9
**testified** 9:6 26:6 41:4 52:4 77:20 114:25 123:2 124:5 148:23 156:7 179:4 184:18 204:21 213:3 222:11 228:10 253:22,23
**testify** 257:6,7
**testimony** 56:7 137:6,8,14 140:19 215:20 221:18,21 222:4,10 235:25 256:4,5
**testing** 91:2 188:4 188:11 201:15
**text** 204:4
**Thank** 96:18 109:2 138:21 146:24 148:14 151:18

160:16 164:25 211:6 243:12 246:21 248:9 252:17 253:19 255:21
**Thanks** 131:19 229:12
**THATCH** 3:5
**thereof** 8:14
**thing** 16:16 24:1,3 36:25 44:18,19 51:13 107:16 163:14 214:4,10 223:9 234:20 235:5 250:19 253:24
**things** 29:20 35:6 39:23 45:18,18 217:24
**think** 87:20 91:11 92:2 93:24 116:14 138:7 157:12 161:8 175:17 176:18 203:7 209:2 210:2 211:5 212:25 213:2 250:13 253:22
**thinking** 234:5
**third** 19:14 22:9 34:16 38:20 62:24 80:7 101:21 107:22 125:20 129:20 180:10
**thirds** 118:14
**thirteen** 51:4 216:3
**thirty** 130:23
**thought** 45:17 103:4 141:22 203:2 238:15 240:7 250:24
**three** 21:20 28:17 29:10 49:2 57:15 58:6 82:25 84:7 88:10,18 90:15,19 90:23 94:13 96:4 102:23 104:18

GUILLORY (VOL II), LEE

109:6,7,12 112:1
134:2,8 140:9
158:12 162:4,7
170:10 171:6,12
242:9 247:19,24
**three-feet** 246:14
**three-foot** 179:25
226:13
**three-inch** 238:20
**three-person**
105:12
**three-sided** 47:7
**thumb** 81:9
**tidal** 154:24 238:2
**tie** 12:18 214:19
**tied** 15:8 83:9
214:12
**tiers** 106:9
**tie-in** 17:21
**timber** 35:15
**time** 8:13 13:7 14:9
18:13 22:15 27:20
29:9 30:16 32:17
35:18 39:7,20
48:24 60:8 65:23
66:17 67:12 68:7
69:5,6 70:23 72:8
72:12,19 74:18,22
74:25 86:20 89:1
118:6 139:12,16
169:1 170:1
193:20 194:9,19
207:3 211:6
214:23,25 220:22
225:24 235:20
255:22
**times** 28:17 69:14
176:8 243:2,5
249:21,22
**tip** 185:1 213:4
215:11 216:13
217:2
**title** 69:10 77:4
107:20 252:22,24
**titled** 61:21
**today** 81:16 123:25

148:23 213:3
215:21 217:19
220:22 225:25
227:4
**toe** 245:16
**told** 19:22 49:9
72:24,25 73:24
216:9,20 219:22
227:22 238:25
249:9
**Tom** 79:24 165:9
**top** 10:2 22:9 25:17
31:16 52:21 62:7
81:14 93:19 95:18
102:23 107:5
121:6,7 125:20
128:18 129:3
132:9,10,11
135:19 148:10
150:6 151:14
155:24 167:4
168:7 178:22
179:16 180:11,13
183:18 200:13
212:14 228:2
**topics** 105:22 106:1
**TORTS** 2:12
**totally** 44:3
**Towing** 96:10
113:8,12
**Toxic** 50:15
**track** 40:6,24 176:9
189:22 242:7
**tracking** 181:10
**tracks** 55:3 175:12
181:11 247:24
**traditional** 38:14
181:18 208:7
**traditionally**
165:14
**traffic** 36:9
**trailers** 171:11,12
**training** 14:6 22:17
22:18,24,25 23:5
24:21,22 36:18
**transcribed** 257:10

**transcript** 8:9
**transcription** 256:5
257:11
**transferred** 31:11
**transit** 13:10 89:9
118:16,23
**transition** 214:16
**translated** 161:1
**transmit** 162:12
**transmittal** 21:4
84:5 134:22
150:16,18 198:21
208:16
**transmitted** 163:6
**transport** 24:1
237:13
**transportation**
24:8 69:12 71:22
117:19
**transported** 197:3
**trapped** 23:24
**TREEBY** 3:11
131:5 138:22
140:3,15
**trees** 17:22
**tremendously**
24:25
**trenching** 48:8
101:13 114:22
**Tropical** 170:2,19
171:2
**truck** 36:9 104:3
219:8
**trucking** 32:14
104:13
**true** 139:18 211:24
213:17 217:22
218:5,11,13 219:2
219:6,9,13,20
220:4 221:3,9,17
221:21 223:15,25
224:10,15 226:5
228:5,14,18 233:2
237:11,20 243:4
247:12 251:23
252:5 256:7

257:10
**Trust** 245:10
**truth** 257:6
**try** 22:21 100:4
176:5 208:12
229:12
**trying** 27:18 38:2
43:25 54:21 235:7
**Tuesday** 136:15
**Tulsa** 21:16 29:8
32:21 33:10,18,22
35:1 42:13 45:11
45:17,21 103:2
205:6,8 209:15
210:5
**turn** 19:10 32:21
52:8 53:24 59:18
76:7 78:4 97:24
102:4 116:12,21
125:19 134:6
145:14 154:2
156:4 176:24
177:6 188:16
192:22 200:19
207:18 213:20,23
253:4
**turned** 20:15 87:22
**turning** 34:16 71:1
97:14 120:1
124:10 131:21
147:10 162:10
165:8,20 166:17
180:9 189:6 191:5
192:2 195:16
196:3 208:12,13
**twelve** 173:16
**twelve-inch** 247:23
**twenty** 10:10
**twenty-five** 10:11
**twenty-something**
13:2
**two** 18:24 25:15
30:7 42:12 47:6
52:13 58:3 66:6,6
79:5 81:24 102:23
109:4 111:14

116:17,20 117:24
118:13,14 126:19
127:2 128:15,22
139:23 141:16
143:18 153:7
154:15,22 155:15
156:22 160:2
161:12 162:8
163:15 171:5
175:20 177:18
202:23 210:17
217:21 222:11
242:9,13 246:14
**two-foot** 127:18
128:3 242:21
248:5
**two-phase** 200:8,14
**two-phased** 200:3
**two-thirds** 118:17
**tying** 17:23
**type** 34:11 38:7
40:24 100:6
104:11 106:10
112:1 225:2 226:1
226:1,17 227:6
233:5 244:2,4
**typed** 93:13
**types** 23:22 54:7
223:17
**typical** 19:25 111:4
123:16 134:1
193:1
**Typically** 126:3
**T-wall** 211:4 212:7
212:11,16,23
214:16
**T.O** 21:21

U

**U** 1:10 8:1
**Uh-huh** 25:14 34:4
92:25 100:15
**ultimately** 57:14
64:3 143:7 146:11
199:17
**um** 12:12 15:25

GUILLORY (VOL II), LEE

16:12 17:18 18:21
20:10,11 23:18
29:25 31:11 34:10
35:13 42:13 56:25
57:10,13 79:3
80:14 81:8 82:1
82:18 86:14
104:10 107:13
112:9 117:20
127:7 134:7
141:16 152:1
153:14 157:12
158:18 160:25
161:19 162:23
166:6 167:11
172:20 176:14
186:16,19 195:2
196:19,20,22
199:6,10,24
204:16 206:1,3,18
207:1,23 209:17
210:10 214:12
221:18 223:7
226:12 229:23
233:4,5 234:11
247:23 248:25
**unaware** 184:19
**uncompacted**
247:20 248:8
**undated** 10:1 79:9
114:10
**undergoing** 234:13
**underground** 48:7
48:9 57:12,16
101:12
**undermine** 219:11
219:15,16
**underneath** 92:1
95:19 152:11
158:11 180:16,22
212:20 236:3
237:18 245:16
**underseepage**
24:14 174:6
212:24 219:24
220:7,12 221:2,5

221:7 224:9,12
225:1 226:4
227:10 254:10,22
255:17
**understand** 19:7
46:6 64:6 72:11
72:20 73:18,21
89:1,13 120:23
140:24 184:7
209:13 231:2
233:6 234:21
241:1 246:24
247:1
**understanding**
59:21,24 60:19
66:16 120:10
257:12
**undertake** 218:11
254:22 255:17
**undertaken** 218:15
**underway** 18:16
**UNITED** 1:1,11,12
2:10,11
**unknown** 34:13,13
34:13 35:16 39:21
39:22,22 48:6,10
114:19
**unknowns** 38:23
39:21 48:1,25
**upside** 177:12
**upside-down**
212:17
**URS** 47:23
**USACE** 59:22 60:9
82:22 83:2 84:10
150:18 152:25
192:5,9
**USACE-NOD** 9:3
**use** 16:17 24:5,8
33:19 34:11 36:3
37:7,16,18 57:1
85:15 88:16 104:3
128:9 138:8
149:22 164:7
176:8 181:15,22
189:2 218:3

222:12 224:3,5
225:15,25 231:3
232:9,21 234:2,11
234:24 235:5
242:19 244:10,18
244:20 245:20,23
245:24 248:3
249:10 251:6,9,17
251:22 252:3,8,10
**uses** 247:19
**usually** 63:22
212:17
**utilities** 48:10
**utilize** 33:11 36:18
62:18 117:7
158:16
**utilized** 38:5 57:4
57:11 100:12
**U.S** 1:14 2:20 148:1
**U.S.A** 151:21

---
**V**
---

**V** 1:10
**vacation** 145:23
165:13
**Vague** 237:8
**vandalized** 207:2
**varied** 15:15
**varies** 244:4
**variety** 223:14
**various** 14:7 15:22
20:1,11 23:22,22
24:4,7 36:6 38:4
39:23 40:13 49:11
49:18 55:4 62:19
63:13 70:6 80:15
86:11 91:20 123:6
129:22 182:22
223:16 237:12,14
239:6 249:5
**vendors** 207:24
**verified** 217:7
**verify** 26:22 92:13
**versa** 25:3
**version** 87:4,9,13
150:4

**versus** 223:5
232:13
**vertical** 20:6 56:22
162:25 186:17
195:24
**vibration** 36:15,21
**vibrations** 37:5,9
**vibratory** 218:3
**vice** 25:3
**vicinity** 213:15
**VIDEOGRAPH...**
3:25
**Videotaped** 9:18
**view** 200:13,14
**violation** 157:10
**visit** 82:2 205:2
**visited** 28:16
**visitors** 16:15
17:17
**visits** 13:24 32:4
**visual** 128:6 172:3
172:16 174:17,22
205:23
**visually** 128:5
249:8
**void** 247:22
**volume** 50:8,10,12
50:13,14,19
187:20 189:1
196:1
**volumes** 13:12 50:8
51:1,4 215:21
216:3
**voluntary** 231:24

---
**W**
---

**WAGER-ZITO**
3:4 32:2 131:16
146:17 160:20
203:4 231:14,19
**waived** 8:10
**Waldemar** 47:22
**waler** 127:17
**walers** 120:4
**walk** 168:21 213:9
214:5 246:20

**walking** 17:17,24
**wall** 81:11 132:19
181:5 212:4,19
213:11 214:12,13
215:12 216:14
**walls** 12:12
**WALTHER** 3:10
**want** 11:1 21:12
23:3 27:20 41:20
51:13 56:6,9
62:13 87:12 88:5
90:11 91:10 96:7
97:15 103:8
107:15 141:5
146:4 162:3 182:1
188:16 200:24
219:23 221:20
225:10,12 227:3
229:1 249:9 252:3
**wanted** 36:3,8
41:20 61:20 78:17
116:21 122:11
135:7 192:11,15
216:1 254:21
255:11,12
**wants** 40:2
**Ward** 21:21 36:2
218:3,22
**Washington** 2:17
3:1,7 28:3,7,18,23
29:21,23 30:12,19
30:23 31:6 32:8
37:7,15 41:21
45:5,13 46:13
47:16,18 48:3,13
48:23 49:10,23
50:7 51:1,15 53:4
54:11 56:12 57:2
57:19 58:20,21,24
59:5,12 61:19
62:4,12 63:6,12
63:18 66:1,5,17
70:1 71:12,13
72:17,20,24 73:21
73:25 76:5 77:18
77:21 78:5,10,12

GUILLORY (VOL II), LEE

| | | | | |
|---|---|---|---|---|
| 78:16 79:2,22 | 242:25 254:6,14 | 129:9,17 142:7 | 195:16 196:3 | 91:3,19 93:4 |
| 80:4,10 81:4 | 254:17,21 255:11 | 227:7 230:13 | 224:6 229:2 | 94:12,14,18 95:24 |
| 82:11 83:4 84:18 | 255:13,16 | 239:14 240:8,19 | 233:21 238:19 | 96:3,5 97:25 |
| 85:4 86:8 88:23 | **wasn't** 37:2 42:6 | **wedge** 178:18 | 240:7,11 248:14 | 99:12 101:6 |
| 89:2,15 91:19 | 76:12 146:16 | 179:23 181:2,4 | 252:23 253:1 | 102:11,17 106:4,5 |
| 92:22 93:3 95:14 | 152:4 224:13 | 246:8 | **white** 132:14 | 106:7,11,14,23 |
| 96:6 99:10,14,18 | 227:23 231:12,18 | **week** 28:17,22 | **wide** 132:24 158:12 | 108:4,7 109:24 |
| 99:23 100:7 101:7 | 231:23 233:7,15 | **weekly** 31:6 32:4 | 161:18,20 162:24 | 110:3 111:7,17,20 |
| 101:19 102:9,15 | **waste** 48:7 50:16 | **weird** 177:8 | **William** 3:11 79:24 | 113:17,22 114:2,5 |
| 102:18 103:6 | 197:2 234:7 | **welcome** 211:8 | 182:18 194:16,22 | 114:7,23 119:17 |
| 104:2,6,15 105:16 | **watching** 128:5 | **went** 16:23 23:17 | **Wink** 153:23 | 121:21 123:25 |
| 107:10 108:5,11 | **water** 19:17 23:24 | 30:6 48:22 64:5 | 165:23 | 128:7 130:21 |
| 108:18 109:24 | 23:25 24:2 108:13 | 74:3 84:18 123:7 | **winter** 235:21 | 144:20 146:13 |
| 111:5 114:18 | 112:7 148:9 | 145:23 157:13 | **witness** 8:4,25 9:4 | 148:15 157:24 |
| 121:2,5,18 125:21 | 154:14,15,20 | 162:14,16,19 | 42:4 67:1 87:23 | 165:21 167:5 |
| 125:24 126:2 | 155:2,4,9 168:18 | 173:10,12 208:25 | 97:24 130:10 | 168:15 169:3 |
| 127:6 129:23 | 168:25 171:7,7,10 | 226:13 228:2 | 137:18 138:10 | 170:12 172:14 |
| 130:16,19,22 | 171:12 173:16,18 | 230:10 | 139:1 140:7 | 175:3 178:12 |
| 136:4 144:8,19 | 175:1 184:4 | **weren't** 69:4 140:4 | 177:23 224:23 | 179:6 182:25 |
| 147:15 149:12 | 199:24 201:8 | **west** 18:7 115:17 | 225:6,13 231:9 | 191:21 193:3 |
| 150:10 153:5,8,15 | 219:17 235:10,15 | 118:25 162:24 | 255:4 256:1 257:5 | 194:24 198:22 |
| 153:21 154:16 | 236:1,5,6,7,14,14 | 163:1 183:24 | **WITTMANN** 3:10 | 199:13 207:21 |
| 156:14,15 157:4 | 236:19,19,20,21 | 193:7 213:24 | **Woldenberg** 17:25 | 208:1 215:24 |
| 157:18 158:8 | 236:21 237:1,1,4 | **western** 161:23 | **woman** 21:13 | 217:20,21,25 |
| 159:6 162:13 | 237:16,18,22,23 | 162:21 | **wondering** 240:17 | 218:10,15,23 |
| 163:3,6 164:2,5,9 | 238:8,19,21 250:3 | **westward** 158:24 | **wood** 223:9 | 220:19,20,23,25 |
| 169:3 170:12 | 250:6 | **wet** 200:3 235:22 | **wooden** 112:7 | 230:11 234:18 |
| 171:18 172:2 | **watertight** 236:25 | 238:4 | **word** 223:20 231:3 | 239:21,25 240:3 |
| 173:1,3 174:20 | **water's** 142:15 | **we'll** 131:17 202:17 | 251:12 252:4 | 240:23 249:18,23 |
| 179:4 182:19 | **WATSON** 3:18 | 250:13 | **words** 14:5 78:19 | 249:25 |
| 183:11 186:10,25 | **way** 14:19 16:24 | **we're** 43:13 76:7 | 103:18 113:13 | **worked** 15:18 |
| 189:18 191:20,25 | 27:18 57:17 62:20 | 111:22 144:14 | 197:4 224:12 | 68:18 69:14 74:22 |
| 193:14 194:4,8,14 | 65:9 99:15 173:18 | 177:13 210:18 | 232:12 236:17 | 77:1 82:14 102:16 |
| 194:23 196:11,20 | 212:23 219:17 | **we've** 42:5 52:13 | 244:16 | 207:24 239:14 |
| 196:21,22 198:4 | 228:22 231:1,15 | 180:20 211:13 | **work** 11:11,21 20:9 | **workforce** 36:19 |
| 199:13 203:15,22 | 236:7,24 241:5 | **WGI** 31:8 81:16 | 28:25 29:24 32:10 | **working** 24:20 55:9 |
| 204:3,14 205:7 | 242:2 251:25 | 88:6 90:12 93:17 | 32:16 33:14 34:7 | 225:4 |
| 206:6 207:18 | 255:9 257:15 | 110:6 116:24 | 34:10,14 38:24 | **works** 19:16 47:7 |
| 208:10 209:10,13 | **ways** 153:7 173:12 | 117:2,5 120:6 | 39:6,20 40:14,23 | 58:4 60:15 68:19 |
| 210:4,8 211:17 | 219:4 | 141:2 145:5 | 41:6,6,9,10 44:25 | 76:13 84:21 |
| 215:16 217:25 | **Weatherly** 205:5 | 147:12 165:22 | 45:2,8,14,24 47:5 | 158:18 |
| 218:10,16,25 | 205:15 | 168:14 176:22 | 49:14 55:5 56:1 | **wouldn't** 71:8 |
| 220:8,21 221:15 | **wedding** 115:1,6,12 | 177:13 179:11 | 66:21 74:3 75:8 | 217:8,12 230:18 |
| 222:12 223:12,19 | 119:23 120:11 | 180:9 183:18 | 77:4 78:19,23 | 240:4 |
| 223:22 228:24 | 122:1,2,25 124:6 | 187:17 188:16 | 82:23,24 83:4 | **wrecking** 37:16,18 |
| 229:8 241:16 | 125:13 127:8 | 189:6 192:7,9 | 84:9,19 85:7,11 | **write** 10:14 86:19 |

GUILLORY (VOL II), LEE

8/22/2008

Page 292

117:10 251:24
**writing** 80:13
**written** 58:20 85:9
103:18 109:24
122:21 123:16
124:14 136:21
185:14
**wrong** 224:19
229:1
**wrote** 34:20 35:8
130:21 133:13
156:8

---

**X**

**X** 4:1,1,8,8
**X-003** 121:22,23
**X-004** 122:3,25

---

**Y**

**Yacht** 96:10 110:22
112:8 113:8
**yardage** 196:15
**yards** 196:2
**Yeah** 90:23 176:18
177:12,16 204:2
250:21
**year** 14:9 29:11
**years** 10:10,12
18:23 19:4 31:10
66:6,6

---

**Z**

**zero** 241:9,10,19
**zeros** 52:11 208:15
**zone** 81:10

---

**#**

**#75005** 1:25 257:25

---

**0**

**0** 88:19 154:23
184:11 234:8
**000128** 252:24
**00135** 253:1
**0026** 254:1
**004** 124:3,6 130:5

240:8
**0051** 97:21,25
**01** 70:25
**015044** 179:11
**015047** 180:10
**02** 238:7
**024** 34:18
**030-000000012**
200:20
**030-0000013**
210:16
**05-4182** 1:5
**058** 238:15
**06-2268** 1:8
**068** 107:18
**077971** 195:16
**078043** 196:4
**0986** 191:16

---

**1**

**1** 11:3 52:1 54:1
61:22 62:2 114:11
150:19 151:16
158:25 162:25
236:13
**1st** 34:21 169:9
179:18
**10** 4:11,12 9:17,20
36:19 60:3 200:4
**10th** 113:12 156:1
**10/3/01** 133:19
**10/30/01** 135:21
**10:00** 204:13
**100** 32:7 61:12
132:18 170:1
**1006** 192:23
**101** 5:11
**1028** 59:19
**1030** 60:2
**104** 5:12
**106** 5:13
**109** 5:14 190:1
**1096** 127:11
**1098** 240:5
**11** 4:12 9:25 10:4
**11th** 190:11

**11/1/04** 180:15
**11/7/2000** 67:3,3
68:13
**110** 5:15 206:15
**110-degree** 213:23
**111** 5:16
**113** 5:17
**114** 5:18
**116** 5:19
**119** 5:20
**12** 4:13 21:2,7
106:20 202:25
243:14
**12th** 44:8 74:19
199:18
**12-inch** 244:8
246:13
**12/29/2000** 71:20
**12/6/2001** 121:11
**121** 5:21
**122** 5:22
**123** 5:23
**124** 5:24
**125** 158:13
**1257982** 177:13
**126** 5:25
**128** 6:1
**13** 4:14 33:3,6
123:12 137:7
140:17 202:11
203:1
**13+00** 76:1
**130** 6:2
**133** 6:3,4
**134** 6:5
**135** 6:6
**136** 6:7
**1388** 101:22
**139** 253:1
**1391** 102:5
**1398** 103:10 229:16
**14** 4:15 41:12,15
202:12 203:1
210:16
**14th** 119:8 163:16
**143** 6:8

**145** 6:9
**147** 6:10
**149** 6:11
**15** 4:16 11:8 43:20
44:10 81:11 82:24
83:8,10,17 88:20
88:21 171:11
200:5 203:1
**150** 6:12 56:9
**15043** 248:15
**155** 6:13
**16** 4:17 51:10,22
127:17 140:12
161:23
**16th** 72:5 84:6,8
143:11 144:21
190:24
**165** 6:14
**166** 6:15 137:6
140:14,17
**167** 6:16 137:7
140:12,14
**169** 6:17
**17** 4:18 58:10,14
**17th** 70:13 96:20
**178** 6:18
**18** 4:19 61:21,24
133:4 171:12
**18th** 25:18 73:19
100:23 167:16
208:17
**182** 6:19
**186** 6:20
**19** 4:20 64:19,24
134:22 176:25
**19th** 64:20 145:8
145:21
**190** 6:21
**191** 6:22
**194** 6:23
**197** 6:24
**198** 6:25
**1983** 19:5
**1990** 15:16,19 19:5
**1996** 23:4
**1997** 13:12 16:10

17:12 50:3,10
51:1 215:13
**1998** 13:5
**1999** 21:4 25:18,19
33:3 34:21 35:18
41:13 44:8 45:3
58:13,22 62:5

---

**2**

**2** 31:17,22,22 44:24
45:20 134:23
154:23 155:15
156:20 162:19
170:5,9 177:5,14
177:16 180:20
200:3 230:22
**2nd** 45:2,6 98:17
156:2
**2.1** 116:23
**2.2** 52:24
**20** 4:21 65:12,16
**20th** 58:12,22
108:7
**200** 236:13
**2000** 37:13,13
64:20 69:7 72:12
73:19,20 75:21
77:6 79:8 84:8
89:2,21 163:17
182:16
**20001-2113** 3:7
**2001** 10:22 70:13
72:6 73:25 74:9
74:19 85:23 96:21
97:8 98:17 100:23
104:22 106:20
108:8 113:12
116:1 119:8
123:13 132:11
133:4 134:22
136:15 149:5
170:2,5,9 182:8
**2002** 124:22 125:21
126:8 128:18,20
143:11 144:21
145:8,21 147:2,20

Johns Pendleton Court Reporters

800 562-1285

GUILLORY (VOL II), LEE

| | | | | |
|---|---|---|---|---|
| 149:5 150:16 | **24** 4:25 71:19,24 | **3** | **4.2** 183:19 | **5.12.3** 94:7 |
| 151:22 152:5 | 107:24 161:20 | **3** 19:12 46:3 47:13 | **4.4** 90:15 | **50** 6:1 128:17,23 |
| 156:2 165:2 | **24th** 126:8 | 52:9 88:19,20 | **4.4.1** 90:16 | **504-525-1335** 2:8 |
| 170:23 186:4 | **247** 232:2 | 105:23 116:23 | **4.4.2** 91:24 | **504-581-3200** 3:14 |
| 190:4,24 199:18 | **25** 5:1 74:8,13 | 176:1 184:11 | **4.4.3** 90:18 92:10 | **504-862-2843** 2:25 |
| 203:20 | 158:12 160:10 | 187:20 234:8 | 92:12 | **51** 3:6 4:17 6:2 |
| **2003** 190:11 | 161:20 162:5 | 244:7,17 245:23 | **4/11** 110:2 | 130:11,13 231:13 |
| **2004** 166:11 169:9 | 184:3,5 185:3,6 | **3rd** 77:6 | **4/11/2001** 109:5,8 | **51A** 176:16 177:3 |
| 173:6 176:21 | 185:19 216:14 | **3.0** 103:13 | **4/16/02** 192:24 | 179:22 180:17,19 |
| 179:18 | **25th** 30:21 126:8 | **3.9** 107:17 | **4/23/01** 110:22 | **52** 6:3 133:3,6 |
| **20044** 2:17 | 203:20 | **30** 5:6 85:21 86:1 | **40** 5:16 111:22,24 | **53** 6:4 133:17,24 |
| **2005** 13:5 30:9,18 | **252** 4:7 | 228:15,23 | **40-hour** 23:13 | 231:8 |
| 30:21 32:25 | **254** 159:1,1 | **30th** 21:4 137:6 | **4025** 150:24 187:8 | **53A** 175:19 176:16 |
| 167:17 168:22 | **257946** 176:23 | 169:9 | 195:13 | 177:4 179:22 |
| 195:7 197:16 | **258047** 176:23 | **30(b)(6)** 1:11 9:19 | **404B1** 50:20 | 180:18,19 |
| 205:4 207:9 | **26** 5:2 11:25 12:4 | 18:22 225:6 | **41** 4:15 5:17 113:3 | **54** 6:5 134:21,25 |
| 208:17,18 209:11 | 22:6 26:11,15 | **300** 142:16 | 113:5 230:22 | 159:7,7 |
| 209:16,18 | 27:24 28:2 29:11 | **31** 5:7 89:19,23 | 231:8 | **546** 3:12 |
| **2006** 15:17,19 | 31:4,20 37:12 | 118:20,21,24 | **42** 5:18 114:10,15 | **55** 6:6 135:18,23 |
| **2007** 178:23 | 41:23 42:18 44:14 | 132:11 | 161:22 | **56** 6:7 136:14,17 |
| **2008** 1:17 256:25 | 56:2 68:21 69:18 | **32** 5:8 47:1 95:6,11 | **43** 5:19 115:22 | **56+00** 76:1 |
| **202-616-4289** 2:18 | 71:11 75:5 77:4,9 | 206:16 | 116:3 230:22 | **57** 6:8 143:10,13 |
| **202-879-3939** 3:8 | 81:6 91:13 92:4 | **32-acre** 18:4 47:4,8 | 231:8 232:1 | **57981** 177:9 |
| **203** 7:1 | 92:15 93:6 94:1 | **33** 4:14 5:9 96:20 | **43A** 160:4 | **58** 4:18 6:9 145:7 |
| **204** 7:2 | 94:18 95:1 141:6 | 96:24 | **44** 4:16 5:20 119:5 | 145:10 |
| **207** 7:3 | 170:12 172:15 | **330** 19:15 | 119:10 | **59** 6:10 147:1,4 |
| **207370** 152:9 | 173:9 204:13 | **338568** 81:16 | **45** 5:21 121:9,13 | **59622** 229:2 |
| **207372** 154:3 | 205:3 207:19 | **34** 5:10 98:15,20 | 161:25 | **59663** 88:6 |
| **21** 4:13,22 56:9 | 208:3 209:24 | **35** 5:11 100:21 | **46** 5:22 122:9,15 | **597** 147:10 |
| 67:2,7 79:8 | 210:2 254:3,5 | 101:1 229:13 | **47** 5:23 123:10,14 | |
| 128:18 162:1 | 255:14,16 | **352** 144:7 | **47227** 90:12 | **6** |
| 165:2 166:11 | **26th** 147:2,20 | **356** 144:17 | **47235** 93:17 | **6** 49:20 50:13,19 |
| **211** 4:6 | 205:2 | **356191** 187:18 | **47496** 183:18 | 74:9 88:9,25 |
| **22** 4:23 67:22 68:2 | **26080** 150:18 | **356197** 188:16 | **48** 5:24 124:21,24 | 105:23 215:22 |
| 88:21 89:4,6,15 | **2610** 115:23 119:18 | **356207** 189:7 | 238:6 | **6th** 136:15 |
| 89:16 118:19,20 | **26522** 110:6 | **36** 5:12 23:12 | **49** 5:25 126:6,10 | **60** 6:11 149:3,7 |
| 118:23 238:6 | **27** 5:3 79:7,13,16 | 104:21,24 199:6 | 240:5 | 151:24 159:12,14 |
| 256:25 | 196:3 | **36984** 134:7 | | **601** 147:18 |
| **22nd** 1:17 124:22 | **27th** 30:9 128:20 | **37** 5:13 106:13,18 | **5** | **6091** 131:23 |
| 125:20 | 168:22 195:7 | 250:16 | **5** 22:17 50:8,10,12 | **61** 4:19 6:12 150:15 |
| **220** 241:1 | **28** 5:4 52:11,14 | **38** 5:14 109:9,15,18 | 50:14 137:7 | 150:21 159:15 |
| **23** 4:24 70:11,16 | 81:14,21 116:1 | **39** 5:15 110:20,24 | 152:10,11 162:24 | **62** 6:13 155:13,19 |
| 208:18 | **28s** 52:13 | | 184:14,16 200:19 | 166:7 178:7,9 |
| **23rd** 25:19 30:21 | **29** 5:5 41:12 72:12 | **4** | 208:15 215:22 | 243:19 244:7 |
| 209:11 | 84:5,12 104:22 | **4** 35:3 125:13 201:2 | 241:8,18 | 245:18 |
| **23833** 129:4 | 150:16 178:23 | **4th** 151:22 152:5 | **5.12.2** 93:19 | **63** 6:14 165:2,4 |

GUILLORY (VOL II), LEE

**631** 178:13
**64** 4:20 6:15 166:10
    166:13
**65** 4:21 6:16 167:16
    167:18
**66** 6:17 169:8,11
    178:13
**67** 4:22 6:18 178:21
    178:25
**68** 4:23 6:19 182:6
    182:10
**69** 6:20 186:2,6

---
**7**

**7** 35:23 52:22 102:5
    102:7 116:24
    162:25
**7/1/02** 198:22
**7/23/1999** 51:11
**70** 4:24 6:21 190:3
    190:6
**70113** 2:7
**70118** 9:4
**70118-3651** 1:17
    2:24
**70130** 3:13
**71** 4:25 6:22 190:25
    191:1
**72** 6:23 193:24
    194:1
**73** 6:24 197:18,22
    197:25
**74** 5:1 6:25 198:21
    198:25 210:15
**7400** 1:15 2:23 9:3
**75** 7:1 203:10,12
    250:13
**76** 7:2 53:25 204:20
    204:23
**77** 5:2 7:3 207:8,12
**773** 25:17
**79** 5:3

---
**8**

**8** 37:25 122:10
**8th** 149:5,5

**8-inch** 175:22
**8/28/01** 111:19
**8/8/01** 111:15
**80** 55:11 132:18
    227:22 228:4,11
    228:13
**8043** 196:6
**81** 5:4
**84** 5:5
**855** 2:6
**86** 5:6 161:17
**888** 2:15
**89** 5:7

---
**9**

**9** 4:5,11 135:5
    154:4,7
**9th** 33:3 62:4
**90** 176:5 213:22
    243:24 244:8
    248:3
**90-degree** 213:21
**900** 116:25
**91** 14:10
**92** 14:10
**95** 5:8 161:14
**96** 5:9
**965** 177:1
**98** 5:10 11:8
**982** 177:11
**987** 192:3
**99** 45:6 49:12,13