EXHIBIT
27

**From:**   Bacuta, George C MVN [George.C.Bacuta@mvn02.usace.army.mil]
**Sent:**   Thursday, August 04, 2005 10:27 PM
**To:**   Lesser, Richard
**Cc:**   Bielecki, Edward; Guillory, Lee A MVN
**Subject:** RE: New Orleans IHNC

Another info on the groundwater and drainage (Jourdan Avenue) across the floodwall --- geotech maps show that the levee/floodwall along the eastside of Surekote road has the sheet pile that goes to -8 feet NGVD . This info is contained in that USACE 1997 Design memorandum Report (Appendix C, Volume 5 of 9). WGI/MMG should have a copy of this report.

-----Original Message-----
**From:** Bacuta, George C MVN
**Sent:** Thursday, August 04, 2005 3:08 PM
**To:** 'Lesser, Richard'
**Cc:** Bielecki, Edward; Guillory, Lee A MVN
**Subject:** RE: New Orleans IHNC

Rich .... Report looks good. Below my input/comments (in red - track changes), if OK with Lee.   ... George

-----Original Message-----
**From:** Lesser, Richard [mailto:Richard.Lesser@wgint.com]
**Sent:** Thursday, August 04, 2005 1:07 PM
**To:** Guillory, Lee A MVN; Bacuta, George C MVN
**Cc:** Bielecki, Edward
**Subject:** RE: New Orleans IHNC

I should call my Congressmen. Both of you are working overtime. You deserve a raise.

In the next few e-mails, attached please find:

1)   a re-worked discussion section of the ground water report. You may find the detailed discussion of our hits above detection limit / below action level too detailed, but, I thought this report would be an opportunity to clearly present what was found.

2)   as discussed, our Inner Harbor files somehow became 'corrupted' when preparing our draft completion report. Figure 2 is now "3-dimensional". I plan to re-work the legends, but, this should give you a heads up.

3)   lastly, our Figure 3 from the completion report is being re-cast to show the current shoreline. We're still working it, but, I wanted to let you know that we're recasting our figures prior to receiving your comments.

As we rush to completion, I'd appreciate a quick review of these so that our final submittal meets all your expectations.

We can address comments to our completion report as soon as we get the text. call me if you have questions or concerns.

Rich Lesser
TO Mgr.

PLAINTIFF'S
EXHIBIT
16

-----Original Message-----
**From:** Guillory, Lee A MVN [mailto:Lee.A.Guillory@mvn02.usace.army.mil]

8/29/2006

**Sent:** Thursday, August 04, 2005 6:49 AM
**To:** Lesser, Richard; Bacuta, George C MVN
**Subject:** RE: New Orleans IHNC

Rich:

I included a diskette of GW report comments (Word format) in the mail Monday.  Should have received it by now, but here it is again.

Lee

    -----Original Message-----
    **From:** Lesser, Richard [mailto:Richard.Lesser@wgint.com]
    **Sent:** Wednesday, August 03, 2005 7:28 PM
    **To:** Bacuta, George C MVN
    **Cc:** Guillory, Lee A MVN
    **Subject:** RE: New Orleans IHNC

    You guys sure are workin' late.

    Let's just say a "Flat File" is one accessible / formatted for Microsoft Access.  I'm not a database guru, so, I'm not sure how to explain it.

    LDEQ was comfortable with the approach, but the "16" is derived from their look-up table.  We had other options with the fact this salty groundwater gave us sample cleanup factors that elevated detection limits, but, he thought this approach was best.

    I'll send you a re-written section of our g-water report tomorrow.

    Rich

    **From:** Bacuta, George C MVN [mailto:George.C.Bacuta@mvn02.usace.army.mil]
    **Sent:** Wed 8/3/2005 5:18 PM
    **To:** Lesser, Richard
    **Cc:** Guillory, Lee A MVN
    **Subject:** RE: New Orleans IHNC

    Rich:

    What are "flat files"? Since you say that this will be accessible with Microsoft Access, then this would be an electronic file. WGI will provide us soft copy of the "flat file" - yes?

    I think the basis for MMG's soil DF is it's closeness to the Canal.  And since the 1997 USACE Design Memo Report showed a pre-remediation groundwater flow both towards and away from the Canal, they have decided to use a DF = 1 on account of the closeness of the site to the Canal.  Note that the 1997 report groundwater flow information (actually the groundwater data was collected in 1993/1992?) indicate the influence of the structures (foundation of buildings, canal drainage, etc.) present at that time on the shallow gw flow. After remediation, the structures are gone, the soil subsurface had been modified on account of excavation/removal/new fill, the current groundwater flow information (taken by WGI in May/June 2005) points to a flow away from the Canal.  Did the LDEQ toxicologist you talked to concurr with the DF 16 estimate?  Please describe in the report how you arrive at this DF 16 or justification for using this DF.

    George

    PS: If Lee is satisfied with soft copies, then he'll have no problem his office floor load bearing capacity.

WGI079930

-----Original Message-----
**From:** Lesser, Richard [mailto:Richard.Lesser@wgint.com]
**Sent:** Wednesday, August 03, 2005 1:30 PM
**To:** Bacuta, George C MVN
**Cc:** Guillory, Lee A MVN
**Subject:** RE: New Orleans IHNC

George,

Thanks for the soft copy. We will modify as directed.

The data validation report is in hard copy and partial soft copy.

The data validation deliverable consists of the summary report, analytical certificates, and the analytical backup (backup includes tuning data for the mass spec, etc. etc., etc., etc. etc.)

We plan to submit the summary PARCCS report (20-40 pages) in hard copy and *.pdf. The backup will be in hard copy only. I was told that a decision was made early in the project to exclude the "back-up" data from the electronic record; in retrospect, that seems to be a wise decision. Importantly, the measurement data (10,000 or so samples) will be in a "flat file" accessible by Microsoft Access.

Be advised that I had a nice talk with LDEQ's toxicologist yesterday. Where MMG used a dilution attenuation factor (DAF) of "1" for calculating its soil action level given potential impacts to the canal and potential impacts to any receiving site designated to receive the dredged spoils, I didn't explore the basis for that and its relevance to our g-water report. "*Mea culpa*", as the attorneys say. Given that we measured ground water flowing AWAY from the canal, we are entitled to a dilution factor under RECAP of at least 16. This DF of 16 was extremely conservatively estimated (it could be as high as several hundred, but we used as a receiving water body the small 'Bayou' northeast of Boland Marine). Nevertheless, a DF of 16 allows us to conclude that there are no impacts to groundwater above a RECAP enforceable concentration anywhere at EBIA. So, we think we need to substantially modify Sections 4.3 and 4.4 of the groundwater report to properly respond to George's comment # 5 to say, simply, "There ain't no impacts nowhere at EBIA", so to speak.

Nice catch George!

I'd like to send this new text to both of you by e-mail for a review before putting it into our final submittal.

Rich

PS: I informed the crew that Lee Guillory is concerned that our final deliverables will exceed his floor's load bearing capacity. That made them worry about OUR office cube and ITS load bearing capacity . . .

:-)

-----Original Message-----
**From:** Bacuta, George C MVN [mailto:George.C.Bacuta@mvn02.usace.army.mil]
**Sent:** Wednesday, August 03, 2005 12:08 PM
**To:** Lesser, Richard
**Cc:** Guillory, Lee A MVN
**Subject:** RE: New Orleans IHNC

Rich : Attach is a copy of my input (in Word) to Lee. Modify to reflect Lee's submittal copy that I fax to you.

Is the data validation (26 five inch binders) all in hard copies? electronic?. Is USACE-NOD going to have copies of the measurement data in Microsoft Access?

George

WGI079931

-----Original Message-----
**From:** Lesser, Richard [mailto:Richard.Lesser@wgint.com]
**Sent:** Wednesday, August 03, 2005 12:56 PM
**To:** Bacuta, George C MVN; Guillory, Lee A MVN
**Subject:** RE: New Orleans IHNC

George and Lee,

I'm double checking, but to our knowledge we have submitted in *.pdf all plans/reports except BM, closure, and groundwater. We will do those in *.pdf when we do final submittal. I've found a stack of cd*'s in archive, we can run duplicates for you if it makes things easier for you. (again, I'm still dubl-checking, we've given you folks a lot of reports and plans !!!! ).

Be advised that we do not plan to do the datavalidation back-up in *.pdf (remember, it's 26 five inch thick binders), as the measurement data will be accessible (and searchable) through Microsoft Access, and much better format for data.

Could we have please the ground water report comments in Word so we can input our responses????

Thanks

Rich

-----Original Message-----
**From:** Bacuta, George C MVN [mailto:George.C.Bacuta@mvn02.usace.army.mil]
**Sent:** Wednesday, August 03, 2005 11:44 AM
**To:** Lesser, Richard; Guillory, Lee A MVN; Wiegand, Danny L MVN
**Subject:** FW: New Orleans IHNC

Rich ... Thanks. Danny here is interested with info on the IHNC eastbank since he is involved with the Team charge with sampling and testing the sediments (including the eastbank soils) for dredging. By the way, do you have all the report (Planning documents {eg. SAP, QAPP, SSHP}, RECAP, CAP, NFATT) in electronic format (e.g. cds)?

Lee .... Is WGI required to provide USACE electronic copies of all pertinent plans/reports?

Danny .... FYI below on the electronic copy of the survey data.

George

-----Original Message-----
**From:** Lesser, Richard [mailto:Richard.Lesser@wgint.com]
**Sent:** Wednesday, August 03, 2005 12:11 PM
**To:** Bacuta, George C MVN
**Subject:** RE: New Orleans IHNC

We use AutoCADD, however I am told that Microstation will work as well.

We are not sure about GeoMedia.

Rich

-----Original Message-----
**From:** Bacuta, George C MVN [mailto:George.C.Bacuta@mvn02.usace.army.mil]
**Sent:** Wednesday, August 03, 2005 9:14 AM
**To:** Lesser, Richard
**Subject:** FW: New Orleans IHNC

Rich .... Can you open the AutoCADD file below in MicroStation or GeoMedia? ... George

8/29/2006

-----Original Message-----
**From:** Lesser, Richard [mailto:Richard.Lesser@wgint.com]
**Sent:** Tuesday, August 02, 2005 4:05 PM
**To:** Bacuta, George C MVN
**Subject:** FW: New Orleans IHNC

George,

As promised, here are the revised surveyor's drawings.  Please notice that they are signed by the registered surveyor.  They are in AutoCADD and *.pdf format.

We are currently re-creating Figures 2 and 3.  As discussed, our files somehow became corrupted when we were finishing up the figures for the first draft, and could not be re-created in time to get this draft into your hands for review.  We are proceeding now with revisions as we discussed.

If you have any other revisions to the figures, I would appreciate a "heads up" notice so we can start working as soon as possible.

Rich Lesser
TO Mgr.

PS:  I particularly appreciated the pelicans' picture in the photo-log as well.

WGI079933

# EXHIBIT 28

**January 2002**

# INNER HARBOR NAVIGATION CANAL
# EAST BANK INDUSTRIAL AREA
# NEW ORLEANS, LOUISIANA

## SAUCER MARINE
## SITE ASSESSMENT
## DRILLING REPORT - IV

**Prepared for:**

 **Washington**

**2500 Surekote Road**
**New Orleans, LA  70117**

**By:**



**3520 General DeGaulle Drive, Suite 3010**
**New Orleans, LA  70114**

DACA56-94-D-0021
Task Order #0008
MMG # 3002-MKC

WGI069840

IHNC/EBIA Drilling Report – IV                          3002-MKC-DRG
Saucer Marine Site Assessment

## SIGNATURE PAGE

### DRILLING REPORT – IV
### INNER HARBOR NAVIGATION CANAL
### EAST BANK INDUSTRIAL AREA
### NEW ORLEANS, LOUISIANA

### Total Environmental Contract DACA56-94-D-0021
### Task Order #0026

Developed/Received By:

_____
Materials Management Group, Inc.
Geologist

_____
Materials Management Group, Inc.
Sr. Regulatory Specialist

MATERIALS MANAGEMENT GROUP. INC

IHNC/EBIA Drilling Report – IV                                    3002-MKC-DRG
Saucer Marine Site Assessment

## Table of Contents

Table of Contents ................................................................................................1
Acronyms .............................................................................................................2
Introduction ..........................................................................................................3
Drilling Method ....................................................................................................3
Sampling & Field Screening Methods ..................................................................4
Soil Types ............................................................................................................4
   Table 1: Fill Materials.....................................................................................5
Classification .......................................................................................................5
   Table 2: Native Materials ...............................................................................6
Groundwater Data ...............................................................................................6
Conclusions.........................................................................................................7


APPENDIX A...............................................................Site Maps
APPENDIX B...............................................................Saucer Marine Borehole
                                       Information
APPENDIX C ...............................................................Boring Logs
APPENDIX D ...............................................................Cross Sections
APPENDIX E...............................................................Field Screening
                                         Data

WGI069842

**Acronyms**

| | |
|---|---|
| ASTM | American Society for Testing and Materials |
| EBIA | East Bank Industrial Area |
| FID | Flame Ionization Detector |
| Fugro | Fugro Geosciences, Inc. |
| IHNC | Inner Harbor Navigation Canal |
| LDEQ | Louisiana Department of Environmental Quality |
| LDOTD | Louisiana Department of Transportation and Development |
| MMG | Materials Management Group, Inc. |
| PID | Photo Ionization Detector |
| SM | Saucer Marine |
| USCS | Unified Soil Classification System |
| XRF | X-Ray Fluorescence Analyzer |

WGI069843

## MMG IHNC/EBIA DRILLING REPORT - IV

### SAUCER MARINE
### SITE ASSESSMENT

**Introduction**

The purpose of this site assessment is to characterize the geology of the site, obtain chemical data of potential and known contamination, and to delineate areas of known contamination.

Saucer Marine, of the Inner Harbor Navigation Canal/East Bank Industrial Area (IHNC/EBIA), is located at 1910 Surekote Road, New Orleans, Louisiana, 70117. This site had been leased to Saucer Marine, a shipbuilding company, since 1954. Numerous tanks were once located at this site to accommodate fueling operations. Sandblast materials can still be found on the ground surface of the site. The International Tank Terminal site bounded the southern property line of the SM site. Mayer Yacht was located just north of the SM site. The Inner Harbor Navigation Canal forms the western boundary line of SM. The flood wall is the eastern boundary of the SM site.

All drilling efforts were completed in accordance with Louisiana Department of Environmental Quality (LDEQ) and Louisiana Department of Transportation and Development (LDOTD) drilling standards and regulations, in addition to LDEQ's RECAP. Under the direction of WGI personnel, all borehole locations were placed according to a sampling grid approved by LDEQ, and were located by Differential Global Positioning System (DGPS) upon completion.

A total of 99 boreholes were advanced in 91 locations at Saucer Marine and along Mayer Yacht's southern border during this drilling effort. Several boreholes had to be drilled more than once due to various obstructions. Boreholes drilled more than once are indicated by a letter in parenthesis attached to the borehole name. A list of all Saucer Marine boreholes can be found in Appendix B. This work took place between the dates of July 10 through August 16, 2001. Drilling services were provided by both Materials Management Group, Inc. (MMG) and Fugro Geosciences, Inc. (Fugro). MMG provided geology and sample technician services to support drilling activities for the entire site.

**Drilling Method**

Several drilling techniques were used to collect the soil samples for this site. MMG used a direct-push SIMCO Earthprobe 200 to push clean, standard-sized, two (2) inch diameter, two (2) foot long split spoons in continuous intervals. Fugro used a CME 75 High Torque drill rig to push two (2) inch diameter, two (2) foot long split spoons and/or four (4) inch diameter, five (5) foot long split spoons. Solid flight augers were used to penetrate obstructions. Hollow stem augers were used to keep boreholes open when flowing soils were encountered. All sampling equipment was decontaminated by the acting drilling crew prior to advancing to the next borehole.

WGI069844

## Sampling & Field Screening Methods

Once the soils were brought to the surface in the split spoons, the split spoons were opened and a geologist logged the soil types and characteristics, according to the ASTM D 2488-00 standard and using the Unified Soil Classification System (USCS). The soils were split and then bagged in separate sealed plastic bags and allowed to equilibrate for a minimum of fifteen minutes.  One bag of soil was used for field screening and non-volatile samples; the other bag was preserved on ice for collecting volatile samples and was not disturbed until those samples had been collected.  The headspace gases were screened using a flame ionization detector (FID) and/or photo ionization detector (PID).  The FID used was a Model 680, manufactured by Thermo Environmental Instruments, Inc.  The PID used was a Model 580B also manufactured by Thermo Environmental.  FID readings were corrected via methane subtraction; i.e., the headspace was analyzed first by direct measurement then with a methane-only activated charcoal filter.  The methane value was then subtracted from the total value. Because native soils in this area contain a fair amount of plant-derived organics, methane occurs naturally from the biodegradation of plant-derived organics and produces high methane readings on the FID.  This methane value must be subtracted in order to give an accurate indication of non-methane contamination.  The PID does not detect methane and, therefore, requires no correction.

The soils were then field screened for metals (arsenic, chromium, cobalt, copper, iron, lead, manganese, mercury, molybdenum, nickel, rubidium, selenium, strontium, titanium, zinc, and zirconium) using a multi-element x-ray fluorescence analyzer (XRF) for screening, the Niton 700 Series.  Lead was used as the indicator element for inorganic contamination as stated in the Field Sampling Plan.  The XRF screening consisted of putting soils into small plastic bags, (Whirlpaks, by NASCO), approved by Niton for this process.  The bagged soil was then analyzed for approximately 60 nominal seconds as registered on the XRF.

The purpose of collecting field screening data, in addition to field observations, is to guide the geologist and sample technician in deciding where to collect samples.

All FID, PID and lead XRF readings were recorded and can be found in Appendix E.

## Soil Types

Fill material varied in thickness from 1–10 feet, and varied in content. The principal fill materials used at Saucer Marine were concrete, mortar, shell, sands, gravel, fly ash, silts, clays, and debris.

Refer to Table 1 for fill descriptions.

WGI069845

**Table 1: Fill Materials**

| Classification | Description |
|---|---|
| Top Soil | Organic rich sandy top soil. |
| Asphalt | Roadbed surfacing. |
| CH | Fat Clay, used as fill. |
| CL | Lean inorganic clay used as fill, or that has been disturbed. |
| CL-ML | Silty Clay, used as fill |
| CL-GM | Gravelly Clay |
| Concrete | Discarded concrete waste used as fill. |
| Debris | Brick, wood, plastic, metal, glass, cloth, burned trash, tires, all used as fill. |
| GM | Silty Gravel |
| GW | Gravel without fines |
| ML | Silt |
| ML-CL | Clayey Silt |
| ML-GM | Gravelly Silt |
| Mortar | Cementitous material easily crumbled, always pink in color. |
| Shell | Common bi-valve shells used to build up low areas and for roadbeds and parking areas. |
| SP | Poorly graded sands used as fill. |
| SW | Well-graded sands used as fill; also found under asphalt as part of the roadbed construction. |

**Classification**

Native soil types for Saucer Marine site were fairly consistent. Silts and clays, including organic rich clays and silts, were the main constituents of the native soils to the limiting borehole depth of 22 feet. Varved[1] sediments and color change were often used as indicators of native and undisturbed soils. Native soils were most commonly encountered at four (4) feet; the average depth at which native soils were encountered was 4.9 feet.

Plant-derived organics were found throughout the borehole depth. Plant-derived organics consisted of roots, grasses, leaves, wood and peat. The percentage of organic content usually increased after fourteen feet in depth. Peat layers were encountered in several boreholes at varied depths.

All of the native soils logged during this drilling event are typical of deltaic or lacustrine environments. The varved sediments indicate that still or quiet water, such as a lake or a deltaic ponding area, was prevalent in this area during the time these sediments were deposited. High plant-derived organic content indicates a swamp or marsh-like area.

See Table 2 for native soil classifications.

---

[1] Varved – Distinct lamination of sediments indicating change in seasons or depositional source.

Refer to Appendix C for boring logs and Appendix D for geologic cross sections.

**Table 2: Native Materials**

| Classification | Description |
|---|---|
| CH | Fat Inorganic Clay. |
| CL | Lean Inorganic Clay. |
| CL-ML | Silty Clay |
| CL-PT | High plant-derived organic containing clay. |
| ML | Silt |
| ML-CL | Clayey Silt. |
| PT | Peat with both decomposed and intact plant-derived organic components. Commonly lacks any other soil characteristics. |
| ML-PT | Silt w/ Peat layers. |
| OH | Organic Rich Clay. |
| OH-OL | Organic Rich Silty Clay. |
| SM | Silty Sand. |
| OH-ML | Interbedded Organic Rich Clay and Silt. |
| GM | Silty Sandy Gravel |
| CH-ML | Fat Clay w/ Silt layers. |
| SP-ML | Silty Sand |
| ML-SP | Sandy Silt |
| Wood | Intact wood, could be native cypress. |

**Groundwater Data**

Water table in the boreholes completed during the drilling at Saucer Marine ranged from 2-10 feet below ground surface (bgs). The average water table depth for this set of boreholes at this site is 5.25 feet bgs. The most common water table depth for this set of boreholes was at five (5) feet bgs. The water table at this site is defined by the upper limit of saturation as noted by the geologist logging the borehole. (Fetter, C.W., Applied Hydrogeology, 2nd Edition, pg. 5.)

The variable depth of the saturated zone may be due to a combination of soil type, proximity to the IHNC, proximity to the flood wall, and the presence of various onsite drainage ditches and altered sediments. There was also some soil mounding on this site that influenced the range of depth to water table. The surface elevation of the boreholes is unknown. Although the site appears to be fairly level, subtle differences in elevation could also be partially responsible for the variable below ground surface depth of the saturated zone.

The potentiometric groundwater level for the site appears to be very near the surface. This means that once a borehole is advanced through the water table, the water will rise above the water table and will approach the surface.

WGI069847

**Conclusions**

The principal intent of the drilling report is to present and summarize the geological features found at the site, and to report field-screening results. Laboratory analytical chemical data for this site will be submitted in the RECAP Submittal Report.

Geological and hydrogeological conclusions are as follows:

1.  Fill materials cover the entire surface of the site. The average depth of fill encountered during this phase of drilling was 4.94 feet below ground surface.

2.  Silts and clays are the main constituents of the native soils to a depth of at least 22 feet.

3.  The water table varies greatly for such a small site due to altered stratigraphy and hydrogeological processes. The average water table for the boreholes advanced at SM was 5.25 feet below ground surface.

4.  The potentiometric groundwater level for the site is located near the ground surface.

WGI069848

# EXHIBIT 29

**July 2002**

# INNER HARBOR NAVIGATION CANAL
# EAST BANK INDUSTRIAL AREA
# NEW ORLEANS, LOUISIANA

## BOLAND MARINE
## SITE ASSESSMENT
## DRILLING REPORT - VII

Prepared for:



2500 Surekote Road
New Orleans, LA  70117

By:



3520 General DeGaulle Drive, Suite 3010
New Orleans, LA  70114

DACA56-94-D-0021
Task Order #0026
MMG # 3002-MKC

WGI357813

## SIGNATURE PAGE

**DRILLING REPORT – VII**
**INNER HARBOR NAVIGATION CANAL**
**EAST BANK INDUSTRIAL AREA**
**NEW ORLEANS, LOUISIANA**

**Total Environmental Contract DACA56-94-D-0021**
**Task Order #0026**

Developed/Received By:



_____
Materials Management Group, Inc.
Geologist

_____
Materials Management Group, Inc.
Sr. Regulatory Specialist

MATERIALS MANAGEMENT GROUP, INC

WGI357814

## Table of Contents

Table of Contents...................................................................................................1
Acronyms.................................................................................................................2
Introduction .............................................................................................................3
Drilling Method.........................................................................................................4
Sampling & Field Screening Methods .....................................................................4
Soil Types ................................................................................................................5
    Table 1: Fill Materials ......................................................................................6
    Table 2: Native Materials .................................................................................6
Groundwater Data....................................................................................................7
Conclusions .............................................................................................................7


APPENDIX A ...................................................................Site Maps
APPENDIX B ...................................................................Borehole Information
APPENDIX C ...................................................................Boring Logs
APPENDIX D ...................................................................Cross Sections
APPENDIX E ...................................................................Field Screening
                                         Data
APPENDIX F...................................................................References

WGI357815



**Acronyms**

| | |
|---|---|
| AST | Aboveground Storage Tank |
| ASTM | American Society for Testing and Materials |
| bgs | Below Ground Surface |
| BM | Boland Marine |
| DGPS | Differential Global Positioning System |
| EBIA | East Bank Industrial Area |
| FID | Flame Ionization Detector |
| Fugro | Fugro Geosciences, Inc. |
| IHNC | Inner Harbor Navigation Canal |
| LDEQ | Louisiana Department of Environmental Quality |
| LDOTD | Louisiana Department of Transportation and Development |
| LEL/O$_2$ | Lower Explosive Limit / Oxygen |
| MMG | Materials Management Group, Inc. |
| PID | Photo Ionization Detector |
| RECAP | Risk Evaluation and Corrective Action Plan |
| SAP | Sampling and Analysis Plan |
| USCS | Unified Soil Classification System |
| UST | Underground Storage Tank |
| WGI | Washington Group International, Inc. |
| XRF | X-Ray Fluorescence Analyzer |

WGI357816

## MMG IHNC/EBIA DRILLING REPORT - VII

### BOLAND MARINE
### SITE ASSESSMENT

**Introduction**

The purpose of this site assessment is to characterize the geology of the site, obtain chemical data of potential and known contamination, and to delineate areas of known contamination.

The Boland Marine site (BM) is the northern most site of the Inner Harbor Navigation Canal / East Bank Industrial Area (IHNC/EBIA). The site lies just south of Florida Avenue.

Geographically, BM is located at 2500 Surekote Road. BM is bounded to the south by the McDonough Marine site and to the north by the floodwall and then Florida Avenue. The Inner Harbor Navigation Canal forms the western boundary line. The floodwall is the eastern boundary. Refer to the Site Map located in Appendix A.

For a historical perspective, the Boland Marine company used this site for approximately 20 years. An unaffiliated ship repair company then occupied the site until the Port of New Orleans terminated the lease in 1988. This site was primarily used for ship repairs, including office and storage space, painting operations, fabrication and welding[1]. Boland Marine environmental concerns include sandblasting materials, discarded drum areas, aboveground and underground storage tanks (ASTs and USTs, respectively), electrical transformer units and the fact that Boland Marine was listed by the State of Louisiana as an unspecified hazardous waste generator.

All structures and contents were removed from the site prior to drilling activities. A subsurface asbestos remedial action was conducted on some areas of Boland Marine prior to drilling activities. Asbestos-containing transite materials were widely used on the site for fill. (Transite is a cement-asbestos material commonly used for siding and roofing purposes.)

Boreholes were located onsite according to the statistically derived sampling grid presented in the Sampling and Analysis Plan (SAP). Upon completion, each borehole was geo-located using a Differential Global Positioning System (DGPS).

A total of 99 boreholes were drilled in 96 locations and the 96 locations sampled on the BM site. The boreholes included in this report are 61A through 83I. A list of all BM boreholes can be found in Appendix B. This work took place between the dates of September 13 through October 11, 2001 for all boreholes except borehole 61A. Borehole 61A was drilled on May 31, 2001 by Materials Management Group, Inc..

[1] USACE Document, "Mississippi River – Gulf Outlet New Lock and Connecting Channels, App. C, Pt. III." October 1993.

Fugro Geosciences, Inc. (Fugro) provided drilling services for all of the remaining boreholes located on BM. MMG provided geology and sample technician services to support all drilling activities.

**Drilling Method**
Fugro used a CME 75 High Torque drill rig to push two (2) inch diameter, two (2) foot long split spoons and/or four (4) inch diameter, five (5) foot long split spoons in continuous intervals. Solid flight augers were used to penetrate obstructions. Hollow stem augers were used to keep boreholes open when flowing or unconsolidated soils were encountered. The acting drilling crew decontaminated all sampling equipment prior to moving to the next borehole.

MMG used a direct-push SIMCO Earthprobe 200 to push clean, standard-sized, two (2) inch diameter, two (2) foot long split spoons in continuous intervals.

All drilling efforts were completed in accordance with Louisiana Department of Environmental Quality (LDEQ) and Louisiana Department of Transportation and Development (LDOTD) drilling standards and regulations, in addition to LDEQ's Risk Evaluation and Corrective Action Plan (RECAP) and the Sampling and Analysis Plan (SAP) approved by USACE and LDEQ.

**Sampling & Field Screening Methods**
Once the soils were brought to the surface in the split spoons, the split spoons were opened and a geologist logged the soil types and characteristics, according to the ASTM D 2488-00 standard and using the Unified Soil Classification System (USCS). The soils were split and then bagged in separate sealed plastic bags. One split was immediately put on ice to limit loss of volatiles. The other split was allowed to equilibrate for a minimum of fifteen minutes to allow headspace gases to develop before field screening was performed. Field screening for volatiles and inorganics was performed on the split that was not put on ice. The split that was preserved on ice was used for collecting volatile samples and was not disturbed until those samples had been collected.

Headspace gases were screened using a flame ionization detector (FID) and/or photo ionization detector (PID). The FID used was a Microfid I/S, manufactured by Photovac. The PID used was a Model 580B manufactured by Thermo Environmental. FID readings were corrected via methane subtraction; i.e., the headspace was analyzed first by direct measurement then with a methane-only activated charcoal filter. The methane value was then subtracted from the total value. Because native soils in this area contain a fair amount of plant-derived organics, methane occurs naturally from the biodegradation of these organics and produces high methane readings on the FID. This methane value must be subtracted in order to give an accurate indication of non-methane volatile contamination. The PID does not detect methane and, therefore, requires no correction.

The soils were also field screened for metals (arsenic, chromium, cobalt, copper, iron, lead, manganese, mercury, molybdenum, nickel, rubidium, selenium, strontium, titanium, zinc, and zirconium) using a multi-element x-ray fluorescence analyzer (XRF)

for screening, the Niton 700 Series.  Lead was used as the indicator element for inorganic contamination as stated in the SAP.  The XRF screening consisted of putting soils into small plastic bags (Whirlpaks, by NASCO) approved by Niton for this process. The bagged soil was then analyzed for approximately 60 nominal seconds as registered on the XRF.

The purpose of collecting field screening data in addition to field observations is to guide the geologist and sample technician in deciding where to collect samples and to help determine the presence or lack of contamination throughout the advancement of the borehole.

All FID, PID and lead XRF readings were recorded and can be found in Appendix E.

**Soil Types**
Drilling activities indicate that the soil at the BM site can be divided into two different categories, Fill and Native.

Fill material varied in thickness from three (3) to greater than 22 feet below ground surface (bgs), and varied in content. The most common depth to native soils on BM was four (4) feet bgs.  Typical fill materials used at BM were sands, silts, clays, concrete, shell, gravel, transite, wood and other debris.  At several boring locations soils disturbed by excavation or surface activity were encountered.  These disturbed soils were also classified as fill.  Refer to Table 1 for fill descriptions.

Some of the fill material at this site was transite.  A partial transite removal at BM was performed prior to drilling activities.  Transite that was not remediated prior to drilling activities was found in boreholes as deep as nine (9) feet bgs, but more commonly did not appear to extend beyond four and one-half (4.5) feet bgs.  Please refer to the Borehole Information Summary for Boland Marine in Appendix B for more information.

Native soils were classified using the Unified Soil Classification System (USCS).  The symbol of "W" was added for the naturally occurring wood that was encountered in several borings.

Native soil types for the BM site were fairly consistent.  Silts and clays, including organic rich clays and silts, were the main constituents of the native soils to the limiting borehole depth of 22 feet.  Varved[2] sediments and color change were often used as indicators of native and undisturbed soils.  Native soils were most commonly encountered at four (4) feet; the average depth at which native soils were encountered was 4.45 feet.

Plant-derived organics were found throughout the borehole depth.   Plant-derived organics consisted of roots, grasses, leaves, wood and peat.

All native soils logged during this drilling event are typical of deltaic or lacustrine environments and are consistent with historic depositional events in the area.  The varved sediments indicate that still or quiet water, such as a lake or a deltaic ponding

---

[2] Varved – Distinct lamination of sediments indicating change in seasons or depositional source.

area, was prevalent in this area during the time these sediments were deposited. The greatly interbedded sediments logged at this site indicate a deltaic environment during deposition. High plant-derived organic content indicates a swamp or marsh-like area.

See Table 2 for native soil classifications. Refer to Appendix C for boring logs and Appendix D for geologic cross sections.

**Table 1: Fill Materials**

| Classification | Description |
| --- | --- |
| Top Soil | Organic rich sandy top soil. |
| Asphalt | Roadbed surfacing. |
| CL | Lean inorganic clay used as fill, or that has been disturbed. |
| CL-ML | Silty Clay used as fill. |
| CL-GM | Gravelly Clay |
| Concrete | Discarded concrete waste used as fill. |
| Debris | Brick, wood, plastic, metal, glass, cloth, burned trash, tires, all used as fill. |
| GM | Silty Gravel |
| GW | Gravel without fines |
| ML | Silt |
| ML-CL | Clayey Silt |
| ML-GM | Gravelly Silt |
| Shell | Common bi-valve shells used to build up low areas and for roadbeds and parking areas. |
| SM | Silty Sand used as fill. |
| SP | Poorly graded sands used as fill. |
| SW | Well-graded sands used as fill; also found under asphalt as part of the roadbed construction. |
| Transite | A non-friable asbestos-containing material commonly used as siding or roofing on buildings. Encountered as fill during drilling activities. |

**Table 2: Native Materials**

| Classification | Description |
| --- | --- |
| CH | Fat Inorganic Clay |
| CL | Lean Inorganic Clay |
| CL-ML | Silty Clay |
| ML | Silt |
| ML-CL | Clayey Silt |
| ML-PT | Silt w/ Peat layers |
| ML-SP | Sandy Silt |
| OH | Organic Rich Clay |
| OH-OL | Organic Rich Silty Clay |
| OL | Organic Rich Silt |
| OL-OH | Organic Rich Clayey Silt |
| PT | Peat with both decomposed and intact plant-derived organic components. Commonly lacks any other soil characteristics. |
| SM | Silty Sand |
| SP-ML | Silty Sand |
| W | Intact naturally occurring wood |

WGI357820

**Groundwater Data**

The water table in the boreholes completed at BM ranged from 1.5 - 20 feet bgs. The average water table depth for this site is 5.21 feet bgs. The most common water table depth was four (4) feet bgs. The water table is defined by the upper limit of saturation as noted by the geologist logging the borehole[3].

The variable depth of the saturated zone may be due to a combination of soil type, proximity to the IHNC, proximity to the floodwall, and the presence of various onsite drainage ditches and altered sediments. The surface elevation of the boreholes is unknown. Although the site appears to be fairly level, subtle differences in elevation could also be partially responsible for the variable below ground surface depth of the saturated zone.

The potentiometric surface in boreholes at the site appears to be very near the surface. This means that once a borehole is advanced through the water table, the water will rise above the water table and will approach the surface.

**Conclusions**

The principal intent of the drilling report is to present and summarize the geological features found at the site, and to report field-screening results. Laboratory analytical chemical data for this site will be submitted in the Boland Marine RECAP Submittal Report.

Geological and hydrogeological conclusions are as follows:

1. Fill materials, including transite, cover the entire surface of the site. The average depth of fill encountered during this phase of drilling was 4.45 feet below ground surface.

2. Silts and clays are the main constituents of the native soils to a depth of at least 22 feet.

3. The water table varies greatly for such a small site due to altered stratigraphy, man-made structures and hydrogeological processes. The average water table for the boreholes advanced at BM was 5.21 feet below ground surface.

4. The potentiometric groundwater level for the site is located near the ground surface.

5. Cross sections of the site (Appendix D) show interbedded sediments are prevalent at Boland Marine. These interbedded sediments are indicative of deltaic depositional environments.

---

[3] Felter, C.W., Applied Hydrogeology, 2nd. Edition, pg. 5.

MATERIALS MANAGEMENT GROUP, INC.                                   Page 7

# EXHIBIT 30

GRIESHABER (VOL II), JOHN

8/21/2008

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE: KATRINA CANAL BREACHES      CIVIL ACTION

CONSOLIDATED LITIGATION            NO. 05-4182 K2

                                   JUDGE DUVAL

PERTAINS TO:  MRGO AND ROBINSON

              (No. 06-2268)


            (V O L U M E   II)


        Rule 30(b)(6) deposition of THE UNITED

STATES OF AMERICA, BY AND THROUGH THE UNITED

STATES ARMY CORPS OF ENGINEERS' DESIGNEE JOHN

GRIESHABER, Ph.D., P.E., given at the U.S. Army

Corps of Engineers New Orleans District

offices, 7400 Leake Avenue, New Orleans,

Louisiana 70118-3651, on August 21st, 2008.




REPORTED BY:

        JOSEPH A. FAIRBANKS, JR., CCR, RPR

        CERTIFIED COURT REPORTER #75005

GRIESHABER (VOL II), JOHN

8/21/2008

| | Page 2 |
|---|---|
| 1 | APPEARANCES: |
| 2 | REPRESENTING THE PLAINTIFFS: |
| 3 | BRUNO & BRUNO |
| 4 | (BY:  SCOTT JOANEN, ESQUIRE) |
| 5 | 855 Baronne Street |
| 6 | New Orleans, Louisiana 70113 |
| 7 | 504-525-1335 |
| 8 | |
| 9 | REPRESENTING THE UNITED STATES OF AMERICA: |
| 10 | UNITED STATES DEPARTMENT OF JUSTICE, |
| 11 | TORTS BRANCH, CIVIL DIVISION |
| 12 | (BY:  RICHARD STONE, ESQUIRE) |
| 13 | (BY:  PAUL LEVINE, ESQUIRE) |
| 14 | P.O. Box 888 |
| 15 | Benjamin Franklin Station |
| 16 | Washington, D.C. 20044 |
| 17 | 202-616-4289 |
| 18 | |
| 19 | REPRESENTING THE U.S. ARMY CORPS OF ENGINEERS. |
| 20 | CORPS OF ENGINEERS, OFFICE OF COUNSEL |
| 21 | (BY:  JENNIFER LABOURDETTE, ESQUIRE) |
| 22 | 7400 Leake Avenue |
| 23 | New Orleans, Louisiana 70118-3651 |
| 24 | 504-862-2843 |
| 25 | |

| | Page 3 |
|---|---|
| 1 | REPRESENTING WASHINGTON GROUP INTERNATIONAL: |
| 2 | STONE PIGMAN WALTHER WITTMANN, L.L.C. |
| 3 | (BY:  WILLIAM D. TREEBY, ESQUIRE) |
| 4 | 546 Carondelet Street |
| 5 | New Orleans, Louisiana 70130 |
| 6 | 504-581-3200 |
| 7 | - and - |
| 8 | JONES DAY |
| 9 | (BY:  ADRIAN WAGER-ZITO, ESQUIRE) |
| 10 | (BY:  CHRISTOPHER N. THATCH, ESQUIRE) |
| 11 | 51 Louisiana Avenue N.W. |
| 12 | Washington, D.C. 20001-2113 |
| 13 | 202-879-3939 |
| 14 | |
| 15 | ALSO PRESENT: |
| 16 | CHARLES SUTTON, ESQ. |
| 17 | R. SCOTT HOGAN, ESQ. |
| 18 | JOSEPH E. BEARDEN, III, ESQ. |
| 19 | JOHN L. ROBERT, III, ESQ. |
| 20 | |
| 21 | PRESENT VIA I-DEP: |
| 22 | CHRISTOPHER ALFIERI, ESQ. |
| 23 | |
| 24 | VIDEOGRAPHER: |
| 25 | GILLEY DELORIMIER (DEPO-VUE) |

| | Page 4 |
|---|---|
| 1 | E X A M I N A T I O N   I N D E X |
| 2 | |
| 3 | EXAMINATION BY:                    PAGE |
| 4 | |
| 5 | MR. TREEBY  .................................6 |
| 6 | MR. JOANEN  ...............................59 |
| 7 | MR. TREEBY  ...............................78 |
| 8 | MR. JOANEN  ...............................86 |
| 9 | E X H I B I T   I N D E X |
| 10 | |
| 11 | EXHIBIT NO.                    PAGE |
| 12 | Exhibit 18  ...............................30 |
| 13 | Exhibit 19  ...............................33 |
| 14 | Exhibit 20  ...............................38 |
| 15 | Exhibit 21  ...............................40 |
| 16 | Exhibit 22  ...............................43 |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

| | Page 5 |
|---|---|
| 1 | S T I P U L A T I O N |
| 2 | IT IS STIPULATED AND AGREED by and |
| 3 | among counsel for the parties hereto that the |
| 4 | deposition of the aforementioned witness may be |
| 5 | taken for all purposes permitted within the |
| 6 | Federal Rules of Civil Procedure, in accordance |
| 7 | with law, pursuant to notice; |
| 8 | That all formalities, save reading |
| 9 | and signing of the original transcript by the |
| 10 | deponent, are hereby specifically waived; |
| 11 | That all objections, save those as to |
| 12 | the form of the question and the responsiveness |
| 13 | of the answer, are reserved until such time as |
| 14 | this deposition, or any part thereof, is used |
| 15 | or sought to be used in evidence. |
| 16 | |
| 17 | |
| 18 | * * * |
| 19 | |
| 20 | |
| 21 | |
| 22 | JOSEPH A. FAIRBANKS, JR., CCR, RPR, |
| 23 | Certified Court Reporter in and for the State |
| 24 | of Louisiana, officiated in administering the |
| 25 | oath to the witness. |

2  (Pages 2 to 5)

GRIESHABER (VOL II), JOHN

Page 6

```
 1            JOHN GRIESHABER
 2    USACE HPO, NOD, 7400 Leake Avenue, New Orleans,
 3    Louisiana 70118, a witness named in the above
 4    stipulation, having been first duly sworn, was
 5    examined and testified on his oath as follows:
 6    EXAMINATION BY MR. TREEBY:
 7        Q.  Dr. Grieshaber, my name is Bill
 8    Treeby.
 9        A.  Bill, how you doing?
10        Q.  Doing well.  The law firm of Stone,
11    Pigman, Walther, Wittmann here in New Orleans,
12    and I together with counsel on my right from
13    Jones, Day in Washington represent Washington
14    Group, which was Washington Group International
15    Inc., it's now got a longer lingo that I don't
16    have memorized.  They're part of URS
17    corporation.  Many of my questions today are
18    going to be based on the testimony you gave
19    Mr. Bruno in response to his questions at the
20    beginning of this deposition which was a few
21    weeks ago now.
22        A.  I understand.
23        Q.  And so I will probably give you, and
24    presumably counsel have or we probably have
25    some extra copies, a transcript of that
```

Page 7

```
 1    testimony that you can refer to from time to
 2    time if you wish to, and I will direct you to
 3    in some instances.
 4            Dr. Grieshaber, do you know Lee
 5    Guillory?
 6        A.  Yes, I do.
 7        Q.  How long have you known him?
 8        A.  He's an employee of the construction
 9    division, um -- I mean, I really can't -- you
10    know, it seems like he's been around a long
11    time.  I can't tell you when I first met him.
12    He's someone we deal with in construction
13    division.
14        Q.  Are you familiar in any respects with
15    his experience and credentials with the Corps
16    of Engineers?
17        A.  Only that, you know, he's been
18    involved in construction division for a good
19    while.  But as far as a résumé type knowledge,
20    no, I have none.
21        Q.  Do you know whether he's a civil
22    engineer?
23        A.  I don't know that for a fact, no.
24        Q.  Would you expect him to be?
25        A.  Um -- I would expect that he's part of
```

Page 8

```
 1    the -- in the construction division he's
 2    qualified to do the task he has been assigned.
 3    Whether or not by education he's a civil
 4    engineer, or by experience, I don't know.
 5        Q.  Now your examination by Mr. Bruno on
 6    June 27, and I'm going to hand you a copy of
 7    the transcript of that deposition, if you would
 8    look at Page 28, Lines 4 through 15, I believe
 9    that version there are four pages to a page.
10        A.  Okay.  So it's not really Page 48.
11    We're look at the little page numbers.
12        Q.  Right.  The page of the deposition,
13    and there are four to a page so we're not
14    killing quite so many trees.
15        A.  Okay.  Page 28, 4 through --
16        Q.  15.  Have you got that?
17        A.  Yes.
18        Q.  You testified that -- and I'm going to
19    quote part of it -- quote, there was someone
20    from construction division who oversaw that
21    contract, which was Task Order No. 26, and as
22    far as the geotechnical branch would go,
23    problems or concerns of a geotechnical nature
24    that are identified by the construction
25    individual would come back through engineering,
```

Page 9

```
 1    and if they're geotechnical in nature they
 2    would go to the geotech branch to look at, make
 3    recommendations on, interpretation of.  Now end
 4    quote.
 5            Now, we've identified that the
 6    construction manager for the Corps of Engineers
 7    on Task Order No. 26 was Lee Guillory.
 8        A.  Okay.
 9        Q.  Assuming that is true, would he be the
10    person to determine whether or not there were
11    problems or concerns of a geotechnical nature
12    on this project that required more expertise
13    than he had on site?
14        A.  Yes.  That would be his -- he's
15    giving -- he has personal expertise and he has
16    been given guidance on how to handle things.
17    Now, if it's outside of his personal expertise
18    and the guidance he has, yes, I would expect
19    him to come back through engineering division
20    for help.
21        Q.  Okay.  So he would be the one to make
22    the initial determination whether or not there
23    were problems or concerns of a geotechnical
24    nature.
25        A.  Problems or concerns that he could not
```

Johns Pendleton Court Reporters                    800 562-1285

GRIESHABER (VOL II), JOHN

Page 10

1   deal with.
2       Q.   Right.  Do you know James Montegut?
3       A.   I know he works in construction
4   division but I think he retired.  I'm not sure.
5       Q.   Okay.  Did you know anything about his
6   experience and qualification as a civil
7   engineer?
8       A.   Other than, you know, he's an employee
9   of construction division.
10      Q.   Okay.  If Mr. Montegut was the project
11  engineer on Task Order 26, and I'm going to
12  tell you to assume he was --
13      A.   Okay.
14      Q.   -- would he have had input to the
15  decision by the construction manager Lee
16  Guillory as to whether or not there were
17  problems or concerns of a geotechnical nature
18  that required further input from the New
19  Orleans District office of the Corps of
20  Engineers?
21      A.   He would be feeding that information
22  to him, yes.
23      Q.   And I'm going to ask you to assume,
24  since apparently you don't know of your own
25  knowledge, that both Mr. Montegut and

Page 11

1   Mr. Guillory were licensed civil engineers with
2   significant experience in the construction
3   branch but also in the engineering, and one of
4   them in the geotechnical branch of the Corps of
5   Engineers New Orleans District office.
6           As such, would Mr. Guillory and
7   Mr. Montegut be given discretion as to whether
8   or not problems or concerns of a geotechnical
9   nature required input from others at the New
10  Orleans District office?
11          MR. JOANEN:
12              Object to the form.
13      A.   Let's try it again.  I got distracted.
14  Exactly what's the question?
15  EXAMINATION BY MR. TREEBY:
16      Q.   First I'm going to ask you to assume
17  that Mr. Guillory and Mr. Montegut are licensed
18  civil engineers with experience in engineering
19  and geotechnical work in the Corps of Engineers
20  New Orleans District.
21      A.   I understand.
22      Q.   Okay.  As such, would Mr. Guillory and
23  Mr. Montegut be given discretion as to whether
24  or not problems or concerns of a geotechnical
25  nature required input from others in the New

Page 12

1   Orleans District office in connection with
2   their work on Task Order No. 26?
3       A.   Okay.  It is their call to decide when
4   they need to go and get additional help from
5   the geotechnical community within the district.
6       Q.   They have that discretion.
7       A.   Yes.
8       Q.   And you need to answer verbally.
9       A.   Yes.  That's correct.
10      Q.   Dr. Grieshaber, during Mr. Bruno's
11  questions there was discussion about what you
12  meant when you used the term engineering
13  considerations.
14      A.   Okay.
15      Q.   And you defined an engineering
16  consideration as facts that are given to the
17  people in the field about the design of a flood
18  control structure.
19      A.   Okay.
20      Q.   Do you still agree with that
21  definition?
22      A.   Yeah.  Close enough.
23      Q.   Would one of the pertinent engineering
24  considerations that Lee Guillory as
25  construction manager had available to him in

Page 13

1   connection with his work on Task Order No. 26
2   be something known as the minimum control line
3   resulting from the design of the levee and
4   floodwall in the East Bank Industrial Area?
5       A.   That is the type of consideration he
6   would be giving.  There is also a general
7   guidance that is followed, which is a continued
8   projection of the backside slope of the levee
9   embankment.  And those are two things that he
10  would have.  I'm not sure he had the formal
11  minimum control line, but he would have
12  information as far as guidance what would
13  impact the stability of the embankment.
14      Q.   And you've indicated that that general
15  guidance would -- part of it would be, at
16  least, a continuation of the slope of the levee
17  that support the floodwall?
18      A.   Right.  Correct.
19      Q.   Could you elaborate on what that
20  means?
21      A.   Okay.  If the slope is a 1 on 3 slope,
22  you just follow it underground as far down
23  as -- you know, you just continue that 1 on 3
24  slope.  And you would say any excavations that
25  does not violate that line will not impact the

GRIESHABER (VOL II), JOHN

8/21/2008

Page 14

1  stability of the wall.
2     Q.  Okay.  And you testified in response
3  to Mr. Bruno's questions that the construction
4  manager Lee Guillory cannot create a minimum
5  control line by himself.
6        Could Lee Guillory, as an experienced
7  civil engineer with that Corps of Engineers New
8  Orleans District, determine whether or not the
9  remediation work in the East Bank Industrial
10  Area violated that minimum control line for
11  that levee and floodwall, if he had it?
12     MR. JOANEN:
13         Object to form.
14     A.  If he had a minimum control line, he
15  most certainly contain determine whether or not
16  it violates.
17  EXAMINATION BY MR. TREEBY:
18     Q.  What other engineering considerations
19  would Lee Guillory as construction manager for
20  the New Orleans District on Task Order No. 26
21  normally have available to him to evaluate
22  whether or not remediation work done by
23  Washington Group called for further evaluation
24  by other engineers in the New Orleans District?
25     A.  He probably would have wanted some

Page 15

1  type of information on backfilling criteria.
2  There's a set of plans and specifications that
3  the contractor is going by, and the engineering
4  consideration speaks to a logic of why we're
5  doing things in certain ways in the plans and
6  specifications.  Since this job was fairly
7  simplistic, the only way you could endanger the
8  flood system is by some form of inappropriate
9  excavation or inappropriate backfill.  And as
10  long as he had something that related back to
11  that, he should be in good shape.
12     Q.  Okay.  Dr. Grieshaber, I want you to
13  look at a particular page in Exhibit 10.  We'll
14  do 10 for now and we'll probably pull them out
15  as we need them.  Here's a copy of Exhibit 10.
16  Let's have a look at the originals.
17        I'm going to have you look at a
18  particular page in this exhibit, and we'll find
19  it for you in a minute.  They're not in Bates
20  order number.  They're I think in logical
21  order, but -- okay.  The page I want you to
22  look at is the first page -- it's turned the
23  other way, which has a number at the bottom,
24  WGI 076654.
25     A.  Okay.

Page 16

1     Q.  You see that?  I want you to look at
2  that particular page in Exhibit 10 that
3  Mr. Bruno asked you to look at.
4     A.  Okay.
5     Q.  And it indicates that there were
6  issues with the sewer lift station removal plan
7  dated October 10, 2001, causing it to be
8  disapproved, and so you testified, actually.
9     A.  Okay.  That's what it says.
10     Q.  Would you please look at the next page
11  in sequence --
12     A.  Okay.
13     Q.  -- which is -- which bears Bates
14  Number WGI 228430.
15     A.  Okay.
16     Q.  Does that appear to be some indication
17  by the Corps of Engineers as to what precisely
18  was disapproved about the plan?
19     A.  Yeah.  It says you must address the
20  following comments, revise, resubmit and obtain
21  approval.
22     Q.  If you would, look at those -- you
23  don't need to read them aloud, but look at
24  those comments.  And the question is, do any of
25  those comments relate to issues with regard to

Page 17

1  the stability of the levees and floodwall?
2     MR. JOANEN:
3         Object to the form.
4     A.  Just one page?
5  EXAMINATION BY MR. TREEBY:
6     Q.  Yeah.
7     A.  I don't see anything that speaks
8  directly to the stability of the floodwall.
9     Q.  Okay.  Do you have any personal
10  knowledge as to whether the excavation related
11  to the sewer lift station on the Saucer Marine
12  and Mayer Yacht sites impinged on the minimum
13  control line or on the slope of the -- the
14  extended slope of the levee?
15     MR. JOANEN:
16         Object to the form.
17     A.  I don't have any knowledge that --
18  whether it did or it didn't, but this is a
19  braced excavation, which is something that is
20  not the same as an open excavation as you
21  address the minimum control lines.
22  EXAMINATION BY MR. TREEBY:
23     Q.  Okay.  Why is that -- tell me the
24  significance of that.
25     A.  The braced excavation is designed such

5 (Pages 14 to 17)

GRIESHABER (VOL II), JOHN

---

Page 18

1  that the extra load that the levee would be
2  putting on the foundation is picked up by a
3  steel frame, or the bracing. So you go in and
4  actually build a structural member in the soil
5  that does not allow that hole to fail. So by
6  not allowing that hole to fail you have no
7  stability issues on the embankment.
8      Q.  Is that something known as a
9  cofferdam?
10     A.  Cofferdam, temporary retraining
11  structure, it goes by a number of names.
12     Q.  To your knowledge, were the civil
13  engineers in the construction branch trained to
14  make those kind of determinations as to whether
15  or not an excavation would require further
16  analysis by others in the Corps of Engineers?
17         MR. JOANEN:
18             Object to the form.
19     A.  I can't speak to what their training
20  is, but what they have is a responsibility to
21  look at the documents, the documents were
22  supposed to be designed by a professional
23  engineer, and compare the information that they
24  had in front of them with the requirements of
25  the specifications.

---

Page 19

1  EXAMINATION BY MR. TREEBY:
2      Q.  Was your answer just now referring
3  specifically to a cofferdam or a retaining
4  structure?
5      A.  Correct. That's what we're speaking
6  of, right?
7      Q.  Right. In that connection, would
8  Mr. Guillory and Mr. Montegut have the
9  discretion to accept the analysis of a
10  third-party engineering firm licensed in
11  Louisiana for the safety of the construction
12  plan for the building of those cofferdams?
13     A.  I'm pretty sure the specification
14  allows for that as a requirement. If they meet
15  the requirement they meet the specifications.
16     Q.  Mr. Bruno attached as Exhibit 3 --
17  this is a two-paged exhibit, Exhibit 3, and he
18  showed you this. And actually, if you --
19  Mr. Bruno attached as Exhibit 3 a couple of
20  drawings that appear to be as-constructed
21  drawings related to a portion of the levee and
22  floodwall adjacent to the East Bank Industrial
23  Area; is that correct?
24     A.  I think we went around with this. I'm
25  not sure that these are as-constructed

---

Page 20

1  drawings. I don't see it on here.
2      Q.  I think at least it says -- on the
3  bottom of the first page, just above the words
4  plan and profile, it says --
5      A.  Oh, I'm sorry. It's right there,
6  okay.
7      Q.  -- as-constructed, right?
8      A.  I apologize.
9      Q.  And I think you so testified in your
10  deposition.
11     A.  Okay.
12     Q.  Can you determine the date on those
13  as-constructed drawings?
14     A.  Okay. The date on the sheet is
15  November of '69.
16     Q.  Is that on both of the --
17     A.  That's what it looks like.
18     Q.  Both of them? Okay. Both pages of
19  Exhibit 3.
20     A.  Correct.
21     Q.  Does that mean that the construction
22  related to those drawings was completed prior
23  to that date?
24     A.  I would assume if those are
25  as-constructed drawings the construction has to

---

Page 21

1  be completed.
2      Q.  Did you attempt to verify prior to
3  your deposition last time, or in the interim,
4  if any subsequent construction had taken place
5  after the 1960s to replace all or any part of
6  those levees or floodwalls?
7      A.  No, I did not. There was construction
8  that was done post-Katrina, but I don't think
9  you're looking for that information.
10     Q.  No. I will ask you some questions
11  about post-Katrina, but no.
12     A.  Okay.
13     Q.  Can you, then, state definitively that
14  the sheet pile tip depths shown on Exhibit 3
15  were the sheet pile tip depths that existed in
16  all of the levees and floodwalls adjacent to
17  the East Bank Industrial Area as of the time
18  period 2001 through August of 2005?
19         MR. JOANEN:
20             Object to the form.
21     A.  Those drawings are not -- you know,
22  they're not for the whole area, they're only
23  for the areas that are delineated. So no, I
24  can't tell you what it is for the whole area.
25  I don't have the information in front of me.

---

6 (Pages 18 to 21)

Page 22

1    EXAMINATION BY MR. TREEBY:
2        Q.  Okay.  Were you generally aware that
3    the long-term scope of the work in the East
4    Bank Industrial Area, not necessarily by
5    Washington Group but involving the replacement
6    of the existing lock in the Industrial Canal,
7    would involve at some point the excavation of a
8    bypass channel through the East Bank Industrial
9    Area?
10       A.  I'm aware of that.
11       Q.  Are you aware of any stability
12   analysis that was done in connection with the
13   effect of the dredging or excavation of those
14   bypass channels on the floodwalls and levees in
15   the East Bank Industrial Area?
16       A.  I know analyses were run.
17       Q.  Stability analyses?
18       A.  Stability analyses, classical LMVD
19   method of plane slope stability.
20       Q.  If you know, would the results of
21   those stability analyses be engineering
22   considerations that Lee Guillory and Jim
23   Montegut could take into consideration in
24   evaluating the effect of the excavations in the
25   East Bank Industrial Area by Washington Group?

Page 23

1            MR. JOANEN:
2                Object to the form.
3        A.  I don't -- yeah, they could use them.
4    I don't think, um -- it would have been
5    necessary, but they could use them.
6    EXAMINATION BY MR. TREEBY:
7        Q.  Okay.  Now, in response to Mr. Bruno's
8    questions related to Exhibit 3, Dr. Grieshaber,
9    you testified that to the best of your
10   knowledge those as-constructed drawings
11   reflected the sheet pile tip depths in place
12   from 1969 to the time of Katrina.
13       A.  As far as I knew.  The tip elevations
14   as shown per levee station.
15       Q.  Right.  And in fact -- well, in fact,
16   has your information been supplemented since
17   the first session of your deposition as to the
18   depth of the sheet pile tips in the site of the
19   north breach of the floodwall adjacent to the
20   East Bank Industrial Area?
21       A.  Not that I know.
22       Q.  I'm going to ask you, I know this
23   isn't a familiar scenario for you but you need
24   to let me finish asking my questions.
25       A.  Okay.  Got it.

Page 24

1        Q.  It will help the court reporter.
2            Now I want to show you Exhibit 11 to
3    your deposition.  Here's the original.
4    (Tendering.)  These are actually in order,
5    which helps.  And I want you to look at the
6    Page WGI 051611, about halfway into the
7    exhibit.
8        A.  Okay, it's not in here.  051610?  Then
9    it's goes to 6122.
10       Q.  Okay.
11           MR. STONE:
12               It's in your copy here, if you
13           want to just give him that and let him
14           look at it.
15           MR. TREEBY:
16               We'll need to determine whether
17           or not the original contains it
18           because this was the subject of quite
19           a few questions by Mr. Bruno.
20           MR. STONE:
21               If this is the original that
22           you've given him that doesn't contain
23           it, just add this as an exhibit to
24           today's deposition.
25           MR. TREEBY:

Page 25

1                We're going to look and see.  It
2            might be misplaced.  These were not
3            stapled together and it was taken
4            separately.
5    EXAMINATION BY MR. TREEBY:
6        Q.  But I want you to look at WGI 051611.
7    Under the heading Identification of
8    Groundwater Classification, the point of
9    compliance (POC) and the point of exposure
10   (POE), that the floodwall to the east of the
11   site is supported on sheet pile that reaches a
12   depth of at least 25 feet, and this would
13   essentially interrupt the water flow in the
14   easterly direction at the lower elevations to
15   25 feet.  Do you see that --
16       A.  Yes, I see it.
17       Q.  -- statement?
18           Now Mr. Bruno asked you in the first
19   session of your deposition to agree with him
20   that this statement was flat out wrong.  That's
21   at Page 150, Lines 10 through 15.  You don't
22   need to look there unless you doubt what I'm
23   saying is correct.  And you testified, correct,
24   to his assertion that this was flat out wrong.
25       My question is this:  If in fact the

Page 26

1  sheet piling that had been built in 1969 or
2  1970 had been replaced with sheet piling that
3  was supposed to go to -25 NGVD, would that
4  reference having to do with groundwater cutoff
5  be wrong?
6     A.  No.  That would be valid.
7     Q.  Now, with regard to the statement on
8  that page we've just looked at which is
9  actually Page 25 of the exhibit, and bearing
10  that same Bates Number WGI 051611, does that
11  statement, to you, as a geotechnical engineer,
12  indicate any NGVD reference for a depth of at
13  least 25 feet?
14        MR. JOANEN:
15           Object to the form.
16     A.  Okay.  At no point do they reference a
17  datum.
18  EXAMINATION BY MR. TREEBY:
19     Q.  There's no reference plane at all in
20  that paragraph.
21     A.  Right.
22     Q.  Would you agree with me that without
23  such a reference plane, the statement depth of
24  at least 25 feet does not have any precise
25  meaning?

Page 27

1        MR. JOANEN:
2           Object to form.
3        MR. STONE:
4           I have to object here.  He may
5        not know what the writer intended
6        here, but are you asking from his
7        perspective as the reader of the
8        document?
9        MR. TREEBY:
10           I'll rephrase the question.  I
11        hoped it was clear but I'll try to
12        make it even clearer.
13  EXAMINATION BY MR. TREEBY:
14     Q.  As a geotechnical expert --
15     A.  Okay.
16     Q.  -- which is what you are, reading that
17  language in context does it give you any
18  precise information?
19        MR. JOANEN:
20           I'm going to object to form.
21     A.  The only information it tells me is
22  that the depth of the sheeting underneath the
23  wall reaches 25 feet.
24  EXAMINATION BY MR. TREEBY:
25     Q.  Okay.  Now, even if the sheet piling

Page 28

1  originally went, per the as-constructed
2  drawings we've looked at, to minus 8 feet NGVD,
3  would you agree with me that it could have had
4  a depth of 25 feet from the crown of the levee?
5     A.  Let's see the drawings, please.  Okay,
6  based on the as-built drawing, the crown of the
7  levee is 9, and the tips are -8 at these
8  highlighted stations, so you would only have
9  17-foot of penetration.
10     Q.  Okay.  So it could be 17 feet depths,
11  is that correct?
12     A.  Correct.  It could be interpreted that
13  way.
14     Q.  Okay.  Would you agree with me that
15  the reference in this Exhibit 11, which is a
16  recap submittal report criteria document, and
17  then talking about the reference in
18  Paragraph 4.2 that we've been looking at, was
19  written for the purposes of providing
20  information related to possible migration of
21  contamination via groundwater?
22     A.  That's correct.
23     Q.  Was this reference in the recap
24  submittal report criteria document, as you read
25  it in context, related to the provision of any

Page 29

1  information related to the stability of the
2  levee or floodwalls?
3     A.  No.
4        MR. JOANEN:
5           Object to the form.
6  EXAMINATION BY MR. TREEBY:
7     Q.  Do you know Rob Dauenhauer?
8     A.  Yes.  I do.
9     Q.  Who is he?
10     A.  He's a structural engineer in
11  structures branch, engineering division.
12     Q.  Do you know Richard Pinner?
13     A.  Yes, I do.
14     Q.  Who is he?
15     A.  He's currently the chief of
16  engineering division -- I mean chief of
17  geotechnical branch in engineering division.
18     Q.  Do you know Noah Vroman.
19     A.  He's a -- he works, I think, at ERDC.
20  He's in the geotechnical community of practice,
21  and I think he's at ERDC.  I think he works
22  under Reed Mosher.
23     Q.  And I think you've now answered my
24  next question, whether you know Reed Mosher.
25     A.  Yes.

GRIESHABER (VOL II), JOHN

Page 30

1    Q.  And who is he?
2    A.  Well, Reed Mosher has been recently
3  promoted to an SES, and he's in charge or has a
4  significant role in the ERDC lab system.
5    Q.  I'm going to show you a document
6  that -- I guess the next exhibit number is
7  Exhibit 18, so we're going to mark this as
8  Exhibit 18.
9      This is an E-mail string that we've
10 marked Exhibit 18.  It's dated May 23 and
11 May 24, 2006, after Katrina.  Please read the
12 string and then I will ask you a couple of
13 questions, but if you would, read through that
14 string first.
15     (Exhibit 18 was marked for
16 identification and is attached hereto.)
17     MR. JOANEN:
18       Are these Bates numbered?
19     MR. TREEBY:
20       No.
21     MR. THATCH:
22       Yeah.  They're from the
23 government production, but we're still
24 trying to gets the Bates numbers.
25     MR. TREEBY:

Page 31

1       There are several documents we've
2  gotten from the government 's
3  production that we're still trying to
4  determine the Bates numbers of and
5  these are some of those.
6     MR. JOANEN:
7       Do you have a copy for me?
8  Asking the question.  Yes or no?
9     MR. TREEBY:
10      No.  You can share those.
11    MR. LEVINE:
12      I believe all that E-mail is from
13 our ESI production so it wouldn't have
14 a Bates number on it.  But there's
15 probably a way to refer to it in our
16 production protocol.  There is.
17    MR. TREEBY:
18      There is a way to refer to it in
19 your production protocol?
20    MR. LEVINE:
21      Yes.
22    MR. TREEBY:
23      Are you able to tell us what that
24 is?
25    MR. STONE:

Page 32

1       Let's save that for a different
2       time, but he can tell you what it is.
3       If anybody knows anything about our
4       ESI, it's Paul Levine.
5    A.  Okay.  I read it.
6  EXAMINATION BY MR. TREEBY:
7    Q.  Okay.  Do you know why Mr. Pinner
8  would make the representation that the -8-foot
9  I-wall tip elevation was built in 1968 but was
10 replaced in the area of the ripped sheet pile
11 in 1982 when a new I-wall was constructed with
12 an I-wall that went to the elevation of -25
13 feet NGVD?
14   A.  I don't know -- I don't know why he
15 would have made the statement unless he knew
16 something had in fact happened that way.
17   Q.  And do you know anything about this?
18   A.  No, I don't.
19     MR. JOANEN:
20       Object to form.
21 EXAMINATION BY MR. TREEBY:
22   Q.  Do you know what the length of the new
23 I-wall that was built in 1982 was?
24   A.  I have no idea.
25   Q.  I show you --

Page 33

1       MR. LEVINE:
2         What's the last one --
3  EXAMINATION BY MR. TREEBY:
4    Q.  I show you another E-mail string dated
5  November 28 and November 29, 2006, which we've
6  marked Exhibit 19.  If you would, please look
7  at the names on those E-mails and tell me if
8  you know who these people are, one at a time.
9      (Exhibit 19 was marked for
10 identification and is attached hereto.)
11   A.  Okay.  It's from Fred Young who
12 formerly worked in the New Orleans District.
13 Um -- Noah we've already talked about.  Frank
14 Vojkovich, geotechnical engineer; Neil Schwanz,
15 geotechnical engineer; George Sill, retired
16 geotechnical engineer; um -- Ronald Wahl, don't
17 know; Rob Dauenhauer, Tom Hassenboehler, Darryl
18 Bonura, all structural engineers; Walter Baumy,
19 chief of engineering division; Stuart Waits, at
20 the time I think he was working in construction
21 division; Rich Varuso, geotech; Brandstetter,
22 Charles, Craig Waugaman is both structurals;
23 Denny Lundberg is the chief of engineering
24 division in Rock Island.
25 EXAMINATION BY MR. TREEBY:

9  (Pages 30 to 33)

GRIESHABER (VOL II), JOHN

Page 34

1      Q.  Okay.  Do you know what is being
2  referenced there as the shorter and longer
3  sheet pile in this E-mail?  You may need to
4  read it first, but that's my question.
5          MR. JOANEN.
6              Object to form.
7  EXAMINATION BY MR. TREEBY:
8      Q.  My question is whether or not you know
9  what is being referenced there as the shorter
10 and longer sheet pile?
11         MR. JOANEN.
12             Object to the form.
13     A.  Okay, where are you referring to
14 shorter --
15 EXAMINATION BY MR. TREEBY:
16     Q.  If you will -- in fact, maybe it would
17 be best, and you need to read slowly because I
18 know you can read fast, I can tell, read the
19 paragraph beginning at the bottom of the first
20 page that begins with the word finally, and
21 you'll come to what I'm talking about.  And
22 also that will help the record, as well.  Just
23 read it aloud.
24     A.  Okay.  Finally, the best example of
25 overuse of the tension crack theory is the

Page 35

1  failure on the IHNC.  It is phenomenal to all
2  personnel that I have talked to at the site of
3  the small failure that the small failure and
4  the large failure near the lock look very
5  similar but somewhat different mechanisms.  The
6  site investigation does not show a deep-seated
7  failure but an erosion failure similar to the
8  large failure.  The soils behind the wall were
9  eroded and the wall unzipped and rolled over
10 just like the large failure.  I will provide
11 photos from the site tomorrow.  It is amazing
12 that the construction between the short sheet
13 pile and the longer sheet pile at the
14 connection between the old and new wall was not
15 considered critical to this failure.
16     Q.  Now, stop there.
17     A.  Okay.
18     Q.  And I think you misread it.  It's
19 amazing that the connection between the short
20 sheet pile and the longer sheet pile -- not
21 construction.  Is that correct?
22     A.  I thought I said connection, but.
23     Q.  Well, whatever.  I just want to make
24 sure.
25     A.  Okay.  Got it.

Page 36

1      Q.  Okay.  That's what I meant when I
2  referenced the short sheet pile and the longer
3  sheet pile.
4      A.  Okay.
5      Q.  And my question to you is, do you know
6  what was being referenced there by the shorter
7  and longer sheet pile?
8          MR. JOANEN.
9              Object to the form.
10     A.  I can only, um -- hypothesize that
11 it's the area where you're talking about the
12 wall changed from 8 to 25, but I do not know
13 that for a fact.
14 EXAMINATION BY MR. TREEBY:
15     Q.  Okay.  Now, having looked at these
16 issues that we've just walked through on these
17 several E-mail strings, would you still say
18 that Mr. Bruno was correct when he represented
19 to you that the Washington Group recap report,
20 Page 25, which stated that the sheet pile
21 reaches a depths of 25 feet was, quote, flat
22 out wrong, close quote?
23     A.  Okay, ask the question again, please.
24     Q.  Sure.  We've looked at several E-mail
25 strings and other references to the existence

Page 37

1  of a longer sheet pile and a transition between
2  a shorter pile and a longer pile.
3          Having looked at these issues, would
4  you still say that Mr. Bruno was correct when
5  he represented to you that Washington Group 's
6  recap report on Page 25 which stated that the
7  sheet pile reaches a depth of 25 feet was,
8  quote, flat out wrong, close quote?
9      A.  Okay, obviously based on this
10 information it was not flat out wrong as
11 Mr. Bruno suggested, but once again I'm
12 troubled by the fact that we don't know where
13 we're talking about.  I see no station numbers
14 anywhere to know where I am on the map.
15     Q.  I don't know if what I'm going to show
16 you will help you in that regard or not --
17     A.  Okay.
18     Q.  -- but we're doing our best.  I'm
19 going to show you a document we've marked as
20 Exhibit 20, which is a document that was
21 produced by the Corps of Engineers to us which
22 is entitled Design Memorandum Number 4, General
23 Design, Florida Avenue Complex, IHNC plan and
24 profile east IHNC.  And if I'm not mistaken
25 it's dated -- my old eyes try to tell me it's

GRIESHABER (VOL II), JOHN

Page 38

1  April of 1980, I think.
2      (Exhibit 20 was marked for
3  identification and is attached hereto.)
4      A.  Okay.
5  EXAMINATION BY MR. TREEBY:
6      Q.  First, can you tell me what this is?
7      A.  Apparently this is a page out of a
8  design memorandum Number 4 for the Florida
9  Avenue Complex for the IHNC, and it looks like
10 it's 1980 -- and maybe 1990, huh?  I can't
11 tell.  Okay.  And what we have here is a
12 section of wall between Station 0+00 and 5+00.
13     Q.  Okay.  If you would look at the bottom
14 of the drawing, and there's some writing -- and
15 I apologize for the size of these, it's the
16 best we could do -- but the second set of
17 writing or printing at the bottom of the
18 drawing from the left, it begins bottom of --
19     A.  Bottom of sheet piles is 25.
20     Q.  -25?
21     A.  -25.
22     Q.  Can you tell from this drawing where,
23 on the map, this cross-section is?
24     A.  I need a bigger map to tell.  I really
25 can't tell.

Page 39

1      Q.  Okay.  If you go to the right-hand --
2  upper right-hand corner, I read something that
3  I think I can read which says enlarged plan of
4  existing and new I-wall connection at Station
5  0+00.00 W/L.  Does that tell you anything?
6      A.  What happens is they're starting new
7  station numbers where the new work is.  I can't
8  really tell where the work is.  I need to see,
9  you know, where this fits on a bigger map.
10     Q.  Okay.  If we assume that this is at
11 the north end of the East Bank Industrial Area,
12 would this indicate that at least there were
13 some plans for an I-wall connection between a
14 -25 feet and a minus 8 feet?
15     A.  Okay, I see an existing PZ-27 but I
16 don't see an elevation to it.  Unless you can
17 read an elevation.  On the left-hand side,
18 they're showing PZ-27 as existing, and then
19 they're showing new PZ-27, and they're showing
20 it all has the same tip elevation.  I don't see
21 a -8 anywhere, unless you all see it.
22     Q.  Okay.  I have another drawing that
23 might help.
24        MR. TREEBY:
25           And maybe in a break, if these

Page 40

1      larger drawings are available here, I
2  don't know if they're or not --
3  EXAMINATION BY MR. TREEBY:
4      Q.  But I'm going to show you a document
5  that we've marked Exhibit 21.  I believe it
6  does show -- I believe if you will look at the
7  bottom left-hand.
8      (Exhibit 21 was marked for
9  identification and is attached hereto.)
10     A.  Okay.  Now that one does say it's
11 elevation 8.  The old PZ-27s are elevation 8.
12 EXAMINATION BY MR. TREEBY:
13     Q.  And this one, the date is a little
14 clearer.  I believe it's May 3, 1982.  Is that
15 right?
16     A.  That's what it looks like.
17        MR. STONE:
18           It looks like a -8.
19        THE WITNESS:
20           Yeah.
21 EXAMINATION BY MR. TREEBY:
22     Q.  This is obviously one sheet out of 79
23 pages, so -- sheet number 4 out of 79 pages of
24 these plans.  So is there anything on this
25 drawing that will help you locate the -- locate

Page 41

1  this drawing at all?  And I would call to your
2  attention on the top part of the plan where it
3  has Florida Avenue -- do you see that?
4      A.  Yes.  I do see Florida Avenue.
5      Q.  And you see which way north is.
6      A.  Yes.
7      Q.  Would you say this is south of Florida
8  Avenue?
9      A.  This area right here is south of
10 Florida Avenue, yes.
11     Q.  Okay.  And can you tell where on the
12 drawing at the top, the plan view, the
13 cross-section that's at the bottom was done?
14     A.  Right at the very start of it, right
15 there.  (Indicating.)
16     Q.  Okay.  So this profile that shows a
17 tip depth of -25 feet and an existing of
18 -8 feet was a profile, or a cross-section if
19 you will, of an area south of Florida Avenue on
20 that floodwall, is that correct?
21     A.  South of -- yes.  That's correct.
22     Q.  Okay.
23     A.  But before we go too far here, are
24 you -- these are design documents.  These
25 aren't -- these don't say constructed

GRIESHABER (VOL II), JOHN

8/21/2008

Page 42

1  documents.
2    Q. I started off this whole line of
3  questioning by saying I'm going to do the best
4  I can.
5    A. Okay, I'm just --
6    Q. This is what we have.
7    A. Okay. I understand.
8    Q. Okay. And these were drawings -- and
9  I don't know -- well in any case, this is what
10  way. Let's leave it at that.
11    Okay. Going on, on -- and you may
12  want to look at this, on Page 45 of your
13  deposition, beginning at Line 20 -- tell me
14  when you get there.
15    A. Got it. John Doe is putting a spade
16  in the ground.
17    Q. Mr. Bruno asked you a John Doe
18  hypothetical, as follows, quote: John Doe is
19  putting his spade into the ground. He's within
20  300 feet. Would you agree with me that if you
21  put the spade into the ground that you're going
22  to disturb the soil?
23    Answer: That's correct.
24    A. That's correct.
25    Q. Question: That's correct. Okay.

Page 43

1  Now, and is that something that would require
2  some kind of evaluation by the Corps?
3    Answer: That would require a permit.
4    All right. Close quote.
5    Again, he's quoting from the
6  deposition.
7    A. Okay.
8    Q. Now, Mr. Bruno's question was about
9  some kind of evaluation by the Corps. And
10  that's a quote, that's what he said -- asked
11  you. And you answered by referring to the
12  requirement of a permit.
13    Now, let me show you a letter from the
14  Corps of Engineers New Orleans District, and
15  this is a letter in January of 2001 that I'll
16  show you. It bears Bates number, for the
17  record, NCS-005-000000455. And I mark it as
18  Exhibit 22. (Tendering.)
19    Again, Mr. Bruno's question was about
20  some kind of eval --
21    (Exhibit 22 was marked for
22  identification and is attached hereto.)
23    A. I'm still reading. Just a second,
24  please.
25  EXAMINATION BY MR. TREEBY:

Page 44

1    Q. Okay. Sure.
2    A. I don't know if I can recant what's
3  here, but I don't think this is what I said.
4    Q. You mean in the deposition?
5    A. In the deposition. If I did, then I
6  misspoke.
7    Q. Okay. Well, I mean, correct it. I
8  mean, let's correct it on the record. We're
9  still in the same deposition.
10    A. Because I do not agree -- I agree that
11  if someone puts a spade in the ground it will
12  disturb the soil. And then he said would that
13  require -- that would require a permit,
14  correct? No, putting as spade in the ground
15  would not require a permit.
16    Q. No, well, I'm not looking -- I don't
17  think that's what the question was. I think
18  the question was --
19    A. I'm missing something here?
20    Q. I think so. I think what he asked
21  was, now, and is that something that would
22  require some kind of evaluation by the Corps?
23  And your answer is recorded as being, that
24  would require a permit.
25    A. Yeah. But I'm saying I don't -- I

Page 45

1  don't think -- putting the spade in the ground
2  does not require a permit.
3    Q. Okay.
4    A. Okay? This was --
5    Q. Well, and let me correct something. I
6  misspoke. This letter that I've shown you and
7  that we've marked as Exhibit 22, I said January
8  of 2001. Actually, it's dated April 6th, 2001,
9  not January of 2001, if you look at the letter
10  on the New Orleans District stationery.
11    A. Okay.
12    Q. Okay. Do you know what that letter
13  is? I mean, just in general terms what this
14  kind of letter is?
15    A. Okay, it's a permit request.
16    Q. Well, this -- it's self-described, is
17  it not, in the last paragraph on the first
18  page, this letter of no objection?
19    A. Uh-huh.
20    Q. Is that something commonly that the
21  Corps of Engineers issues if they don't have
22  any objection to specific work that's being
23  done?
24    A. Correct.
25    Q. Okay. Now, let's change the subject.

Johns Pendleton Court Reporters                    800 562-1285

GRIESHABER (VOL II), JOHN

8/21/2008

---

Page 46

1    I'm skipping around here a little bit.
2        (Brief recess.)
3    EXAMINATION BY MR. TREEBY:
4        Q.  Dr. Grieshaber, did you have anything
5    to do with the work done by the Corps to build
6    the new floodwalls and levees adjacent to the
7    East Bank Industrial Area after Katrina?
8        A.  No, I did not.
9        Q.  Dr. Grieshaber, in response to
10   questions by Mr. Bruno in this deposition, you
11   described various Army Corps of Engineers
12   engineering manuals as, and I quote, one of the
13   tools used in the design of flood control
14   structures and for evaluation of work around
15   flood control structures.
16       A.  That's correct.
17       Q.  Are the civil engineers at the New
18   Orleans District such as Mr. Guillory and Mr.
19   Montegut, based on what you know, knowledgeable
20   about these tools generally?
21       A.  I would assume they're knowledgeable
22   of their existence.
23       Q.  Are they authorized to use these tools
24   in the evaluations they must make in doing
25   their work?

---

Page 47

1        A.  I don't see why they would not.
2        Q.  In the positions that they held as
3    construction manager and project engineer for
4    Task Order No. 26, did they have the
5    responsibility and the discretion to make
6    judgments based on engineering considerations
7    as to whether the work they were overseeing for
8    the Corps would jeopardize the integrity of the
9    adjacent flood control structures?
10       A.  Yes, they did.
11       Q.  Now, Dr. Grieshaber, I note that you
12   have been provided as the specific
13   representative of the Army Corps of Engineers
14   for this case as a designated 30(b)(6) witness
15   on certain subjects.  Do you understand here
16   that you are testifying as the Corps of
17   Engineers?
18       A.  Yes, I do.
19       Q.  Okay.  And in your deposition you
20   testified -- and if you want to look at it,
21   Page 55, beginning with Line 1 --
22       A.  Okay.
23       Q.  -- you testified that, quote, the
24   configuration of the wall is designed to carry
25   a certain loading.  And we -- and I emphasize

---

Page 48

1    the word we -- check to make sure that the
2    excavation does not reduce the ability of that
3    wall to carry that loading.  And you go on
4    down -- so we go back to the design of the wall
5    and use excavation in the design and see if
6    that in fact -- see if it in fact impacts the
7    stability of the wall so we have -- in order to
8    determine whether or not the ex-vacation is
9    impacting the wall, we have to look at the wall
10   design.  And I emphasize, in going down through
11   that answer, the word we.  That was the point
12   of what I was reading to you from your
13   deposition.
14           In that line of testimony you used the
15   personal pronoun we four separate times.  My
16   question is whether or not the we in your
17   answer includes the qualified civil engineers
18   in the construction division?
19       A.  It includes the U.S. Army Corps of
20   Engineers.
21       Q.  And that would include those people,
22   is that correct?
23       A.  Yes, it would.
24       Q.  Now, Mr. Bruno followed up on that
25   subject by asking you on Page 70, Lines 8

---

Page 49

1    through 14, and I quote, what proposed work
2    would be the kind of work that you guys believe
3    you need to evaluate to determine --
4        A.  Wait, wait, wait.  Page 70?
5        Q.  I think so.
6        A.  Line 18?
7            MR. STONE:
8                Line 8, starting right there.
9            (Indicating.)
10       A.  Oh.  Okay.  I'm sorry.
11   EXAMINATION BY MR. TREEBY:
12       Q.  Let's' start over, make sure we've got
13   a clean record here.
14           He, Mr. Bruno, asked what proposed
15   work would be the kind of work that you guys
16   believe you need to evaluate to determine
17   whether there's a potential for damage to the
18   flood control structure?
19           Answer:  Anything that would change
20   the loading on the wall.
21           Now, in answering that question would
22   the you guys you included in your answer
23   include the qualified civil engineers in the
24   construction branch such as Lee Guillory and
25   Jim Montegut?

---

GRIESHABER (VOL II), JOHN

Page 50

1     A.  That's correct.
2     Q.  Now, I hesitate to go through all of
3   them, but so I'm going to try to do this with
4   one general question.  And I can refer you to
5   many examples in the deposition, but there were
6   many questions asked by Mr. Bruno and answered
7   by you regarding the use of we and us to
8   describe the Corps of Engineers.
9         Did you intend, in giving those
10  answers, to exclude the civil engineers in the
11  construction branch with those answers?
12    A.  No, I think I was speaking for the
13  U.S. Army Corps of Engineers.
14    Q.  Which would include the construction
15  branch.
16    A.  That's correct.
17    Q.  And I'm skipping a bunch of them, but
18  there was a little bit of a different twist on
19  this same subject.  I'm going to refer you to
20  Pages 72 through 73.  And on Page 73, Lines 12
21  through 21, Mr. Bruno gave you an example of a
22  hole 25 feet deep within 30 feet of the levee
23  and asked whether that is something -- and I'm
24  quoting him now -- your office would feel that
25  it would need to evaluate to determine whether

Page 51

1   or not the hole could possibly negatively
2   impact a flood control structure like the one
3   that existed at the Lower Nine before Katrina,
4   close quote.
5         Your answer to that question is
6   recorded, and it ended with this:  Quote, we
7   would look at it, close quote.
8         And Mr. Bruno continued to probe that
9   question, and you ended up, on Page 75, Lines 4
10  and 5, by answering, quote, I'd have to look at
11  it, that's correct.
12        Did you see that?  Now, my question is
13  this:  When you say in that answer, I'd have to
14  look at it, are you saying that you personally
15  would have to look at it or are you including
16  the other qualified civil engineers?
17    A.  It would have to be looked at is
18  probably the correct terminology.
19    Q.  It wouldn't be that you personally --
20    A.  No, I do not -- there are many people
21  who are qualify to do what I do.
22    Q.  Okay.  And are you including in that
23  answer, then, other qualified civil engineers
24  in the construction branch of the Corps who are
25  familiar with the engineering considerations

Page 52

1   for that particular site?
2     A.  That's correct.
3     Q.  Now, earlier this morning -- I want to
4   go back to something you answered to my
5   question.  In answer to one of my questions,
6   I'll give you the whole answer, you said, he
7   probably would have wanted some type of
8   information on backfilling criteria.  There's a
9   set of plans and specifications that the
10  contractor is going by, and the engineering
11  considerations speaks to a logic of why we're
12  doing things in certain ways in the plans and
13  specifications.  Since this job was fairly
14  simplistic, the only way you could endanger the
15  flood system is by some form of inappropriate
16  excavation or inappropriate backfill.  And as
17  long as he had something that related back to
18  that, he should be in good shape.
19        Now, would the construction manager
20  Guillory and the project engineer Montegut be
21  qualified to determine the quality of the
22  required backfill and its compaction in
23  connection with the backfill excavations in the
24  East Bank Industrial Area?
25    A.  Yes, they had the tools to determine

Page 53

1   that.
2     Q.  Okay.  Showing you an Exhibit 14, the
3   original exhibit in this deposition.  And
4   please look through that.  I'm going to give
5   you a few minutes to look through that.
6     A.  Okay.
7     Q.  Now, in your deposition -- and
8   you might want to turn to this page, Page 204,
9   Lines 1 through 8 --
10    A.  Okay.
11    Q.  -- it appears that Mr. Bruno is
12  suggesting that the distance from the floodwall
13  to the canal side of the road, which is
14  Surekote Road, is 20 feet.
15    A.  Talking about on the sketch?
16    Q.  And so I want you to look at the
17  drawings or the sketch that's in Exhibit 14 and
18  tell me what the drawing says about the
19  distance from the floodwall to the eastern edge
20  of the road, that is, the floodwall edge of the
21  road.
22    MR. STONE:
23        Edge of the road or edge of the
24        borrowed pit?
25    MR. TREEBY:

Johns Pendleton Court Reporters                    800 562-1285

GRIESHABER (VOL II), JOHN

8/21/2008

Page 54

1        No, first the edge of the road.
2   EXAMINATION BY MR. TREEBY:
3        Q.  And if you would look at the very last
4   page of the exhibit that's where I think it's
5   shown.
6        A.  Right.  Um -- okay, you want the
7   eastern edge of the road?
8        Q.  Right.  Floodwall to the eastern edge
9   of the road.
10       A.  It varies from 21 to 16 feet.
11       Q.  Okay.  And look at the drawings and
12   tell me what the drawing saying says about the
13   distance from the floodwall to the western edge
14   of the road?  The canal edge of the road.
15       A.  Between 42 and 45 feet.
16       Q.  And then finally, look at the distance
17   that this drawing shows from the floodwall to
18   the edge of the proposed borrow pit.
19       A.  Okay, 86 to 95 feet.
20       Q.  Okay.  So it's not 20 feet to the edge
21   of the borrow pit, is that correct?  According
22   to that proposed sketch.
23       A.  Okay.  Where is the -- what page?
24       MR. STONE:
25            Page 204.

Page 55

1        A.  What line number?
2   EXAMINATION BY MR. TREEBY:
3        Q.  1 through 8.  You have to read I think
4   all eight lines.
5        A.  (Witness complies.)  Okay.
6            Where does he say -- okay, what was
7   your question?
8        Q.  Well, I just wanted to make sure, and
9   I may be wrong, but I think that line of
10   questions in Line 1 through 8 gives the
11   implication that it's only 20 feet from the
12   floodwall to the edge of the borrow pit.
13           Whether or not it gives that
14   implication, these drawings would not support
15   that; is that correct?
16       A.  Correct.  This drawing right here does
17   not support it.
18       Q.  Okay.  Based on your review of matters
19   in this case, did the construction manager and
20   the experienced project engineer determine,
21   best you can tell, in their discretion to get
22   the services of the engineering division and
23   the geotechnical branch involved in evaluating
24   this excavation, the one at the borrow pit?
25       A.  That's correct.  They did.

Page 56

1        Q.  Was that an appropriate exercise of
2   their discretion based on your experience?
3        A.  That was appropriate.  They did not
4   feel comfortable.
5        Q.  Okay.  I'm going to show you the
6   original Plaintiff's Exhibit 15 which I think
7   is -- it's some of the material in
8   Plaintiff's Exhibit 14 but it includes some
9   additional material.
10       A.  Okay.
11       Q.  And some of the additional material
12   that's included here has a name on it.  I just
13   wanted to make sure we understood who this is.
14   It's on the fifth page of the exhibit at the
15   end of that -- of the typing on that page.  It
16   says the POC is Jim Gately, Extension 2980.
17   You see that?
18       A.  Right.
19       Q.  Who is Jim Gately?
20       A.  He was employed by the geotechnical
21   branch.  He's currently employed by
22   construction division.
23       Q.  Is that something that happens, that
24   people go from one division in the Corps here
25   to another from time to time?

Page 57

1        A.  Yes.  Yes.
2        Q.  Looking at the fourth and fifth pages,
3   that page and the one just before it of this
4   exhibit, are the issues listed and directed to
5   Jean Spadaro here some examples of engineering
6   considerations?
7        A.  Yes.  They are.
8        Q.  And would this indicate that these
9   were given to Jim Guillory?  I mean to Lee
10   Guillory?  I'm sorry.
11       A.  Yes.
12       Q.  I'm going to go back to an answer you
13   gave to one of my questions earlier this
14   morning.  And I better read the question and
15   the answer so it makes sense.  My question was,
16   if you know, would the results of those
17   stability analyses -- and I was talking about
18   the stability analyses for the bypass
19   channel --
20       A.  Okay.
21       Q.  -- be engineering considerations that
22   Lee Guillory and Jim Montegut could take into
23   consideration in evaluating the effect of the
24   excavations in the East Bank Industrial Area by
25   Washington Group?

15 (Pages 54 to 57)

Johns Pendleton Court Reporters                    800 562-1285

GRIESHABER (VOL II), JOHN

Page 58

1       And there was an objection to form
2   which I assume still stands.
3       And then answer:  I don't -- yeah.
4   They could use them.  I don't think it would
5   have been necessary, but they could use them.
6       A.  That's correct.
7       Q.  Okay.  You said I don't think it would
8   have been necessary.
9       And why is that?
10      A.  Because, um -- I don't -- the
11  stability analysis would have addressed a total
12  removal of all of the material.  What they were
13  looking at is incremental removals of parts and
14  pieces of the foundation and backfilling.  It
15  would give them information as far as
16  stratigraphy, but as far as the actual shear
17  analysis, um -- I don't know exactly how they
18  would apply it.
19      Q.  Would the guidance that you referred
20  to earlier, the general guidance that relies on
21  the slope, extending the slope of the levee,
22  would that be a tool that they would more
23  likely use?
24      A.  I think that would be what they would
25  probably use.

Page 59

1       Q.  Would that be appropriate?
2       A.  That would be appropriate.
3       Q.  And within their discretion?
4       A.  Within their discretion.
5       (Off the record.)
6       MR. TREEBY:
7           I tender the witness.  And the
8       only questions I'll have are ones that
9       Mr. Joanen, if he's going to ask
10      questions, causes me to ask.
11  EXAMINATION BY MR. JOANEN:
12      Q.  Mr. Grieshaber, my name is Scott
13  Joanen.  I'm here on behalf of the plaintiffs
14  in these cases.  I'm pinch hitting for Joe
15  Bruno today.  I just have a few questions
16  about some of the things you discussed today.
17      There was a point when Mr. Treeby was
18  questioning you where you indicated that the
19  stability of the levee was evaluated with a 1
20  on 3 slope?
21      A.  No, I didn't say that.  I said a
22  continuation of the backside slope, I used the
23  1 on 3 as an example.
24      Q.  Does that deal with wall stability or
25  with seepage?

Page 60

1       A.  Wall stability.
2       Q.  Mr. Treeby asked you a number of
3   questions about the sheet pile tip depth of the
4   sheet piles that were at the north breach area
5   which was often referred to as the Boland site
6   and the south breach area which is often
7   referred to as the Saucer Marine site.  Would
8   agree with me that -- obviously you know that
9   there were breaches at those areas.
10      A.  That's correct.
11      Q.  Would you agree with me that the
12  engineers who measured the sheet pile, the
13  exposed sheet pile after it would fall, would
14  be the ones with the accurate calculations of
15  the length of the sheet pile?
16      A.  That's correct.
17      Q.  If those accurate calculations were
18  included in the IPET report, would that give us
19  guidance as to what the true length of the
20  sheet pile tips were?
21      A.  If the IPET report references the
22  length of the sheets as measured in the field,
23  yes.
24      Q.  The plates that Mr. Treeby went over
25  with you, Exhibits Number 20 and 21, I believe,

Page 61

1   those were referencing the Florida Avenue
2   complex.
3       A.  That's correct.
4       Q.  Do you know what the Florida Avenue
5   complex is?
6       A.  I'm assuming it's the area adjacent to
7   the Florida Avenue bridge.
8       Q.  And would that general -- do you know
9   for a fact whether that design memorandum was
10  utilized, or those plates were utilized in
11  engineering the sheet piles when they replaced
12  the bridge?
13      A.  I have no idea.
14      Q.  When you look at the, those plates,
15  numbers 20 and 21, does that indicate that the
16  floodwall and the sheet pile that is being
17  utilized is on the pump station side of the
18  Surekote Road?
19      A.  Let me see what you're referring to.
20      Q.  And as I recall, on Surekote Road,
21  there's -- you can drive over the levee right
22  there to get into the East Bank Industrial
23  Area.
24      A.  Okay.  This is 20 and 21?  Okay.  And
25  your question is?

Johns Pendleton Court Reporters                    800 562-1285

GRIESHABER (VOL II), JOHN

8/21/2008

Page 62

1    Q.  The areas where they're indicating
2  that there's, in the design, sheet pipe tip
3  that would go down 25 feet, is that in the area
4  north of the Surekote Road crossover?
5    A.  It's north of the Surekote Road
6  crossover, that's correct.  Because here's the
7  Surekote Road crossover right here.
8  (Indicating.)
9    Q.  And so those design plates, they have
10  nothing to do with the Saucer marine site, do
11  they?
12        MR. TREEBY:
13            Object to the form of the
14            question.
15        MR. JOANEN:
16            What's wrong with the form?
17        MR. TREEBY:
18            That's it.
19  EXAMINATION BY MR. JOANEN:
20    Q.  You can answer the question.
21    A.  They're north of the Surekote Road,
22  they're on the, um -- I guess what's the
23  question? I don't -- they are what they are.
24  They're located where they're located.
25    Q.  All right.  Do they have anything to

Page 63

1  do with the sheet piles and the flood walls at
2  the Saucer Marine site?
3    A.  Based on this sketch, they don't.
4    Q.  And I'm asking you this question
5  because you were with the Corps of Engineers:
6  Do you understand what the term data gaps
7  means?
8    A.  Yes, I do.
9    Q.  In a report or a design memorandum
10  that indicates that there are certain data gaps
11  in the information known, what steps does the
12  Corps of Engineers expect its contractors to do
13  to resolve any data gaps?
14        MR. STONE:
15            Objection.  That's overly broad.
16            But you can answer the question
17            if you can.
18    A.  Okay.  It's peculiar to the actual
19  contract.  It's peculiar to the types of data
20  gaps and what it would take to fill them in.
21  EXAMINATION BY MR. JOANEN:
22    Q.  Are you familiar with the fact that
23  there was a data gap regarding the subsurface
24  stratigrafication at the East Bank Industrial
25  Area?

Page 64

1    A.  I'm not familiar with that.
2    Q.  Are you familiar with the difference
3  between engineering manuals and engineering
4  regulations?
5    A.  Yes, I am.
6    Q.  Is it your understanding that
7  engineering regulations convey mandatory policy
8  requirements for management of engineering
9  functions?
10    A.  That is probably a definition of them,
11  yes.
12    Q.  If a project manager wanted to get a
13  variance from a mandatory requirement of an
14  engineering regulations, what steps would he
15  have to go through?
16        MR. STONE:
17            Objection.  That's overly broad,
18            and it's a hypothetical without any
19            facts set up in it so it's incomplete
20            and misleading.
21    A.  Okay.  Ask the question again so I
22  don't forget.
23  EXAMINATION BY MR. JOANEN:
24    Q.  If a project manager chose to
25  deviate -- or wanted to deviate from an

Page 65

1  engineering regulation, what steps would he
2  have to go through to get approval from the
3  Corps?
4    A.  Okay, I need to know who project
5  manager is.  What are you defining as a project
6  manager?
7    Q.  Let's in this case talk about Lee
8  Guillory.  If he wanted to deviate from an
9  engineering regulation, what steps would he
10  have to go through -- in the project that was
11  taking place at the East Bank Industrial Area,
12  what steps would he have to go through to
13  deviate from an engineering regulations?
14        MR. STONE:
15            Another objection is I believe
16            that's outside the scope of the
17            30(b)(6) that you've noticed here,
18            because that's not something that
19            we've prepared him to address and it
20            has legal implications, but if I can
21            answer the question I'd ask him to go
22            ahead and do that.
23    A.  Okay.  A project manager, by your
24  definition, would have to go up his chain,
25  because you're not talking about -- you're

17  (Pages 62 to 65)

GRIESHABER (VOL II), JOHN

8/21/2008

Page 66

1   talking about an employee of construction
2   division.  And he would go up his chain into
3   the engineering chain, and then a determination
4   would be made if in fact it was a true
5   variation.  And if it is a true variation you
6   would end up having to go all the way to
7   headquarters.
8   EXAMINATION BY MR. JOANEN:
9       Q.  You had indicated in your previous
10  testimony that you thought that Lee Guillory 's
11  job -- I think I wrote this down -- as being
12  fairly simplistic.
13      A.  I didn't say his job was simplistic,
14  no, sir.
15      Q.  Okay.  If I understood -- and that's
16  why I'm trying to get a clarification.  The
17  things he has to be concerned about are
18  inappropriate excavations and inappropriate
19  backfill.
20      A.  Right.  I'm saying that the issues
21  that he had to look at were not complex.  The
22  contributing factors to wall stability that he
23  was dealing with was inappropriate excavation
24  and/or backfill.
25      Q.  In excavating a hole down to

Page 67

1   approximately 20 feet within 300 feet of a
2   floodwall, would the use of sand as backfill be
3   acceptable to the Corps of Engineers?
4       A.  It would be specific to the case.  I'd
5   have to -- I'd have to see the stratification.
6       Q.  Does the Corps of Engineers know of
7   any stratification studies that were done prior
8   to 2000 of the East Bank Industrial Area?
9       A.  Well, any of the boring probings would
10  give you the stratification studies.
11      Q.  And which ones were those?
12      A.  All of the borings that were taken
13  that were used for the design of the walls.
14  And if there were any borings that were taken
15  as part of the excavation of the canals.
16      Q.  And do you know the dates of those
17  borings?
18      A.  No, I really don't.
19      Q.  Do you know whether any of those
20  borings were done in the 1970s?
21      A.  I would assume borings were done prior
22  to the construction of the walls, and, um --
23  you know, someplace in the early seventies,
24  late sixties, probably, but I can't give you
25  dates.

Page 68

1       Q.  Do you know of any borings that were
2   done -- does the Corps of Engineers know of any
3   borings that were done in the East Bank
4   Industrial Area where the Saucer marine site
5   was during the 1980s?
6       A.  I don't know off the top of my head
7   whether borings were done there.
8       Q.  Does the Corps of Engineers know
9   whether any borings were done at the Saucer
10  Marine site at the East Bank Industrial Area
11  during the 1990s?
12      MR. STONE:
13          One second.  I have an objection
14      here.  I don't think this kind of --
15      you know, I'm only going to interfere
16      with you for a moment because I don't
17      think this kind of questioning is fair
18      to the witness when you have these
19      documents that have been provided to
20      you and you don't bring name and ask
21      him, is this the kind of boring
22      information you're talking about, or
23      is this the stratification information
24      you're talking about?  So I don't
25      think that kind of question or line of

Page 69

1       questioning is fair to any witness.
2       But the witness can answer your
3       question.  I'd ask him to continue.
4       A.  Okay.  You are continuously saying the
5   Corps of Engineers.  The Corps of Engineers
6   knows what it has.  I personally don't know.
7   But there are databases in the Corps of
8   Engineers that can delineate what we have and
9   where it is.
10      MR. STONE:
11          And if you can identify something
12      that we haven't provided you, we'll do
13      everything we can to do that.  I
14      guarantee it.
15  EXAMINATION BY MR. JOANEN:
16      Q.  Do you know whether any soil borings
17  were provided to Morrison Knudsen or WGI that
18  evaluated the stratification of the soils at
19  the Saucer Marine site prior to them developing
20  any of their recommendation reports or project
21  work plans?
22      A.  I don't know.
23      Q.  That same line of questioning for the
24  Boland Marine site; do you know whether there
25  were any soil borings done at the Boland Marine

Johns Pendleton Court Reporters                    800 562-1285

GRIESHABER (VOL II), JOHN

8/21/2008

Page 70

1  site at the East Bank Industrial Area in the
2  1980s and 1990s?
3      A.  I do not know right now.
4      Q.  Do you know whether any soil
5  borings -- the results of any soil borings were
6  provided to Morrison Knudsen and/or Washington
7  Group prior to it drafting any recommendation
8  report or project work plans?
9      A.  I do not know.
10      Q.  Do you know whether fill -- silty sand
11  and shell as a soil layer would be permeable?
12      A.  Okay, what are you referring to as
13  fill?
14      Q.  I'm just asking you the question.
15      A.  I don't know the definition of fill.
16  Silty sand has -- all soils have a
17  permeability.  Okay?  Obviously, shell has a
18  greater permeability than sand.  Permeability
19  is relative.  And you could rate them one
20  against the other.  But all soils are
21  permeable.
22      Q.  With that being said, obviously silty
23  sand is permeable, as well.  Correct?
24      A.  That's correct.  All soils are
25  permeable.

Page 71

1      Q.  If a stratification of soils indicated
2  that there was silt with organics in it, what
3  would that mean to a geotechnical person such
4  as yourself?
5      A.  The soil has, um -- some decomposing
6  organic material that is engrained within the
7  soil matrix.
8      Q.  The fact that a silt has organics in
9  it, would that make that more permeable or less
10  permeable?
11      A.  It would probably make it a little bit
12  less permeable because you'd have materials in
13  the voids.  Silt has a very low permeability as
14  it is.
15      Q.  Is it your understanding, just to
16  address one of Mr. Treeby's questions, your
17  understanding that if an excavation to a depth
18  of 20 feet is going to take place within
19  300 feet of a floodwall on the flood side of
20  the floodwall that a permit should be obtained?
21      A.  What's the relevance of the 30 feet?
22  Is that a number you're just pulling out?  I
23  mean, I don't know what the relevance is.
24      Q.  It's the one that's been bandied about
25  through the depositions.  I'm asking you a

Page 72

1  question based upon what you've been asked in
2  previous depositions.
3      A.  Okay.  Now repeat the question,
4  please.
5      Q.  If an excavation is going to take
6  place to depths of 20 feet on the flood side of
7  the floodwall within 300 feet of the floodwall,
8  would the Corps of Engineers expect that a
9  permit be obtained?
10      MR. STONE:
11          Objection.  It's an improper
12      hypothetical.
13      A.  Not knowing any more than what you
14  said, a permit probably would be needed.  But
15  there are -- I'll let it go at that.
16  EXAMINATION BY MR. JOANEN:
17      Q.  When you said it would probably be
18  needed, are there instances where it would not
19  be needed?
20      A.  Well, there may be -- it may be
21  covered by other existing permits, it may be
22  part of other work that's being done.
23      Q.  Would there have to be a review by the
24  Corps' geotechnical branch to determine whether
25  a permit would not be needed?

Page 73

1      A.  No, the permit -- the Corps'
2  geotechnical branch would look at the impact of
3  an excavation if in fact someone determined
4  that that excavation required a permit.  It may
5  be that that work is being done under something
6  else that's already permitted.
7      Q.  You had indicated in your testimony
8  that Lee Guillory would have the tools to
9  determine the needs for excavation and
10  backfill, I believe when Mr. Treeby was
11  following up on some of his previous questions.
12      A.  Yes.
13      Q.  What type of tools would he have
14  available to him to determine the need of
15  excavation and backfill?
16      A.  He would have whatever guidances he
17  was given in the engineering considerations, he
18  would have whatever personal knowledge he has
19  as far as appropriate construction techniques.
20      Q.  What else?
21      A.  I guess that would be sufficient to do
22  what he had to do.
23      Q.  Did the Corps of Engineers have any
24  objective standards to determine whether the
25  guidance that Lee Guillory had in the

19  (Pages 70 to 73)

Johns Pendleton Court Reporters                    800 562-1285

GRIESHABER (VOL II), JOHN

8/21/2008

Page 74

1   engineering considerations and his known
2   knowledge was sufficient to make decisions as
3   the project progressed?
4        A.  What do you mean by --
5            MR. STONE:
6                Objection.
7        A.  -- objective standards?
8   EXAMINATION BY MR. JOANEN:
9        Q.  Was there anybody supervising what Lee
10  Guillory did?
11       A.  Lee Guillory is part of a chain that
12  goes all the way up to the chief of
13  construction division, all the way through the
14  commander of the district.
15       Q.  Was there a supervisor who would be
16  involved with the East Bank Industrial Area
17  project who would supervise Lee Guillory 's
18  daily decision making?
19       A.  I don't know the inner workings of the
20  construction division, but based on the
21  construction, my understanding of the chains of
22  command, he obviously has a supervisor between
23  him and the chief of construction division.
24       Q.  What processes are in place to make
25  sure that Lee Guillory just isn't making a

Page 75

1   mistake about something?
2        A.  That would be an internal process to
3   the construction difficult.  I don't know what
4   they are.
5        Q.  Do you know whether in fact there is
6   any sheet pile tips that extend down to 25 feet
7   at the East Bank Industrial Area?
8        A.  I don't know for a fact one way or the
9   other.
10       Q.  Do you know whether any materials were
11  provided to Washington Group International
12  prior to 2001 that would lead them to believe
13  that the sheet pile tip did reach down to
14  25 feet?
15       A.  I do not know.
16       Q.  Who would know that?
17       A.  Whoever was the contracting officer on
18  that contract would know what they were
19  providing.
20       Q.  Do you know whether there was a
21  procedure in place wherein WGI could request
22  additional materials from the Corps of
23  Engineers to resolve any data gaps for the
24  construction project?
25       A.  I don't know what the procedure is,

Page 76

1   but I'm sure there was one in place.
2        Q.  If WGI were to request any materials
3   from the Corps of Engineers to address any data
4   gaps in the construction project, what type of
5   documentation would they have to utilize to
6   request those materials?  Would it be something
7   in writing or could they just make a phone call
8   and go to a library somewhere over here?
9            MR. TREEBY:
10               Objection.  Form.
11       A.  Okay.  The question -- could you ask
12  it one question at a time?  What's the first
13  question?
14  EXAMINATION BY MR. JOANEN:
15       Q.  If WGI wanted to look at other
16  materials that were in the possession of the
17  Corps of Engineers to address any data gaps
18  that were not previously provided to it, would
19  there be any documentation with the Corps of
20  Engineers indicating that they did request
21  that?
22       A.  Depending on how the request was made.
23  If it was made in writing, um -- they made a
24  written request, they got the information back
25  as a written request.  If it was a verbal

Page 77

1   request for some type of clarification or
2   additional information, they would have gone
3   through construction division and construction
4   division may have had that information, and you
5   would have to ask, you know, how they handled
6   that.
7        Q.  Does the Corps of Engineers have a
8   library, so to speak, of materials that the
9   contractors can seek out information?
10       A.  All of the design manuals and
11  everything that the Corps has that was
12  developed with taxpayer money is available to
13  all taxpayers so they can get whatever
14  information was developed with taxpayer money.
15       Q.  And I'm going back now, I guess, to
16  1999.  I can't remember when the Internet
17  really got to be popular.  Obviously, I know a
18  lot of it is available now.  That's why I'm
19  asking, at the time was there a repository or a
20  library where that material was stored?
21       A.  There were areas where you could
22  actually request the documents and get them
23  provide provided to you.
24       Q.  And that was here at the New Orleans
25  District?

20 (Pages 74 to 77)

GRIESHABER (VOL II), JOHN

8/21/2008

Page 78

1     A.  No.
2     Q.  Where was that?
3     A.  Um -- I'd have to -- I assume it's
4   someplace probably out of headquarters.  But I
5   don't know the actual process or procedure you
6   go through to get it.
7     Q.  Had WGI requested any of the design
8   manuals that included the plates that are
9   exhibited as Number 20 and 21, they would have
10   had to ultimately get those materials from
11   headquarters or would they have been available
12   here?
13     A.  Plates 20 and 21 would have been
14   available here.  They were located here.
15     Q.  I have no other questions.
16     A.  Okay.
17         MR. TREEBY:
18         I have a few.
19   EXAMINATION BY MR. TREEBY:
20     Q.  Let me first deal with Exhibit 21.  I
21   want to get exactly what the question was, so
22   give me a minute to find it.  In answer to one
23   of Mr. Joanen 's questions you indicated, and
24   he was asking about these drawings, Exhibit 21,
25   and you said they're north of the Surekote

Page 79

1   Road.
2     A.  Surekote Road crossover.
3     Q.  Okay.  And that was my next question.
4         What are you referring to when you
5   say -- he actually -- Mr. Joanen used that term
6   first, the Surekote Road crossover.  What are
7   you referring to?
8     A.  Where the road crosses over the flood
9   protection.
10     Q.  Okay.  Correct me if I'm wrong, but
11   the -- I thought we established in my earlier
12   questions that the cross-section that we're
13   looking at at the bottom of Exhibit 21 is
14   actually south of that point where it crosses
15   over the flood protection.  Is that not
16   correct?
17         North is the arrow up here at the top.
18   It's pointing this way.  It's pointing to the
19   right.
20         Here's the crossover.  This is south,
21   it is not?  This is south of the crossover.
22     A.  This plate addresses everything from
23   here to here, which is north of Surekote Road.
24   (Indicating.)  Of the crossover.
25     Q.  Okay.  Let's specifically talk about

Page 80

1   the cross-section which is at the bottom.
2   Right?  That's a profile of a cut through of
3   the levee; right?  This bottom section of
4   Exhibit 21.  The bottom section.
5     A.  This is the profile of what's on this
6   top sheet.
7     Q.  I thought we had established that it
8   was in fact the cross-section which is right at
9   the connection point.
10     A.  This connection right here is right
11   here.
12     Q.  Okay.  Now, would you agree with me
13   that the line that says alignment of Surekote
14   Road reconstruction -- do you see that?
15     A.  Okay.
16     Q.  That line is this cross-section, is it
17   not?
18     A.  No, this is not this entire
19   cross-section.
20     Q.  Are you saying this is a generic
21   cross-section that applied to the whole thing?
22     A.  No.  No.  This point right here is
23   this point right here.  This point right here
24   is this point right here.
25     Q.  Okay.

Page 81

1     A.  So this piece right here is this piece
2   right here.  (Indicating.)
3     Q.  Okay.  Let's take that to its
4   logical -- so all the way to the left at the
5   bottom -- you see that?
6     A.  Correct.
7     Q.  -- there is an arrow pointing to it
8   saying bottom of sheet piling elevation -25
9   feet.  Right?
10     A.  Correct.  Right there.
11     Q.  And the line all the way to the left,
12   which is the farthest point that it says
13   elevation -25 feet, is actually the line that
14   says limit of Surekote Road reconstruction,
15   right?
16     A.  Correct.
17     Q.  And that point is south of the
18   crossover, is it not?
19     A.  That is south of the crossover.  That
20   wasn't the quote.
21     Q.  Well, I just --
22     A.  Okay  I got it.
23     Q.  I don't know what his question
24   intended, I'm just trying to clarify the
25   record.

21  (Pages 78 to 81)

GRIESHABER (VOL II), JOHN

8/21/2008

Page 82

1      A.  Okay.
2      Q.  Okay.  Mr. Joanen asked you is it your
3  understanding that engineering regulations
4  convey mandatory policy requirements for
5  management of engineering functions?
6          Your answer was that is probably a
7  definition of them, yes.
8      A.  That's correct.
9      Q.  I wanted to get a little bit of
10  clarification about that subject.
11          What are engineering regulations?
12      A.  Engineering regulations are specific,
13  um -- processes and/or results that you need to
14  get in the course of a design.
15      Q.  And where are those?  If I wanted to
16  go find regulations that are engineering
17  regulations, where would I go?
18      A.  There are a number of documents,
19  they're called ERs.  And you would have to go
20  into the ER documents.
21      Q.  And would those ERs typically be very
22  specific as to what they applied to?
23      A.  Yes, they most certainly do.
24      Q.  Would I be correct to say that
25  engineering regulations are not the same thing

Page 83

1  as engineering considerations?
2      A.  Different -- totally different things.
3      Q.  I've been in New Orleans for a long
4  time, and I've worked somewhat -- not worked in
5  construction, you but as a lawyer I've dealt
6  with construction in New Orleans, and there's
7  terminology that's typically used as sand, as
8  it's referred to in New Orleans, which is river
9  sand.
10      A.  Okay.
11      Q.  Is that correct?  Is river sand, as
12  that term is used in the New Orleans area,
13  typically sand that was pumped from dredging in
14  the Mississippi River?
15      A.  Traditionally it's material that was
16  either pumped from the river or it was
17  deposited at point bar deposits.  That's where
18  the river actually builds up sand bars.  And
19  it's traditionally a very silty sand, fine
20  grain sand.
21      Q.  And would it be correct that silty
22  sand is a far different thing than, say, beach
23  sand?
24      A.  Totally different grain size curves,
25  different permeabilities.

Page 84

1      Q.  Is it typical that river sand as that
2  term is used in the New Orleans area at least
3  colloquially is far less permeable than beach
4  sand?
5      A.  That's correct.
6      Q.  And is that the kind of sand that is
7  commonly used for fill in the New Orleans area?
8      A.  That is what we normally use, that's
9  correct.
10      Q.  I think you answered -- actually at
11  your last session of your deposition, you were
12  generally familiar with a TERC type contract
13  and the task orders under it like Task Order
14  No. 26 in the sense that it's essentially a
15  time and materials type contract --
16      A.  Correct.
17      Q.  -- is that correct?
18      A.  That's correct.
19      Q.  In such a contract, when fill from
20  outside of the site that was being worked on
21  needed to be brought into the site, would the
22  construction manager, project engineer,
23  typically have to approve whatever was brought
24  in for fill from outside because of the cost?
25      A.  Yeah.  He has to approve of the type

Page 85

1  of fill, yes, for sure.  Because --
2      Q.  And then when it's actually being put
3  into use, would the Corps of Engineers on the
4  site have the responsibility to make sure that
5  it was appropriate for the use it was put to?
6      A.  Appropriate for the use it was put to
7  and put in under the appropriate conditions.
8      Q.  And when you say put in according to
9  the appropriate conditions, are you referring
10  to the tamping of it or the --
11      A.  Yeah, the density.
12      Q.  -- or the consolidation of it?
13      A.  The density, whether or not you put it
14  in through water, whether or not you put it in
15  dry, how you get the compaction.
16      Q.  Would one type of direction, let's
17  say, or guidance that could be used would be
18  the -- and there's a term that's escaping me
19  right now, but the depth of the layers that
20  you --
21      A.  Lift thickness.
22      Q.  Lift thickness.  Thank you.  There
23  would be a specification or a direction as to
24  how deep that lift should be.
25      A.  That's correct.

Johns Pendleton Court Reporters                    800 562-1285

GRIESHABER (VOL II), JOHN

8/21/2008

Page 86

1    Q.  And is the purpose of that so that
2  that lift is put in and then some consolidation
3  occurs through either mechanical means or
4  otherwise?
5    A.  That's correct.  What happens is the
6  thickness of the lift, you put a certain amount
7  of energy to compact it.  And obviously the
8  same amount of energy would do less compaction
9  if the lift was thicker.
10    (Off the record.)
11 EXAMINATION BY MR. TREEBY:
12    Q.  I know you'll be disappointed
13 Dr. Grieshaber, but I'm finished.
14    A.  Breaks the heart.
15 EXAMINATION BY MR. JOANEN:
16    Q.  My last question was, the Corps
17 doesn't use river sand to build its flood
18 control structures, does it?
19    A.  It depends what aspect.  We'll use it
20 for structural backfill on the back side of
21 structures.
22    Q.  No other questions.
23    MR. STONE:
24       No further questions.
25

Page 88

1         REPORTER'S CERTIFICATE
2      I, JOSEPH A. FAIRBANKS, JR., CCR, RPR,
3  Certified Court Reporter in and for the State
4  of Louisiana, do hereby certify that the
5  aforementioned witness, after having been first
6  duly sworn by me to testify to the truth, did
7  testify as hereinabove set forth;
8      That said deposition was taken by me
9  in computer shorthand and thereafter
10 transcribed under my supervision, and is a true
11 and correct transcription to the best of my
12 ability and understanding.
13     I further certify that I am not of
14 counsel, nor related to counsel or the parties
15 hereto, and am in no way interested in the
16 result of said cause.
17
18
19
20
21
22
23 _____
24 JOSEPH A. FAIRBANKS, JR., CCR, RPR
25 CERTIFIED COURT REPORTER #75005

Page 87

1      WITNESS' CERTIFICATE
2
3      I, JOHN GRIESHABER, do hereby
4  certify that the foregoing testimony was given
5  by me, and that the transcription of said
6  testimony, with corrections and/or changes, if
7  any, is true and correct as given by me on the
8  aforementioned date.
9
10 _____     _____
11 DATE SIGNED        JOHN GRIESHABER
12
13 _____ Signed with corrections as noted.
14
15 _____ Signed with no corrections noted.
16
17
18
19
20
21
22
23
24
25  DATE TAKEN:  August 21st, 2008

23  (Pages 86 to 88)

800 562-1285

GRIESHABER (VOL II), JOHN

8/21/2008

## A

**ability** 48:2 88:12
**able** 31:23
**accept** 19:9
**acceptable** 67:3
**accurate** 60:14,17
**ACTION** 1:4
**actual** 58:16 63:18 78:5
**add** 24:23
**additional** 12:4 56:9,11 75:22 77:2
**address** 16:19 17:21 65:19 71:16 76:3,17
**addressed** 58:11
**addresses** 79:22
**adjacent** 19:22 21:16 23:19 46:6 47:9 61:6
**administering** 5:24
**ADRIAN** 3:9
**aforementioned** 5:4 87:8 88:5
**ago** 6:21
**agree** 12:20 25:19 26:22 28:3,14 42:20 44:10,10 60:8,11 80:12
**AGREED** 5:2
**ahead** 65:22
**ALFIERI** 3:22
**alignment** 80:13
**allow** 18:5
**allowing** 18:6
**allows** 19:14
**aloud** 16:23 34:23
**amazing** 35:11,19
**AMERICA** 1:13 2:9
**amount** 86:6,8
**analyses** 22:16,17 22:18,21 57:17,18
**analysis** 18:16 19:9

22:12 58:11,17
**and/or** 66:24 70:6 82:13 87:6
**answer** 5:13 12:8 19:2 42:23 43:3 44:23 48:11,17 49:19,22 51:5,13 51:23 52:5,6 57:12,15 58:3 62:20 63:16 65:21 69:2 78:22 82:6
**answered** 29:23 43:11 50:6 52:4 84:10
**answering** 49:21 51:10
**answers** 50:10,11
**anybody** 32:3 74:9
**apologize** 20:8 38:15
**apparently** 10:24 38:7
**appear** 16:16 19:20
**APPEARANCES** 2:1
**appears** 53:11
**applied** 80:21 82:22
**apply** 58:18
**appropriate** 56:1,3 59:1,2 73:19 85:5 85:6,7,9
**approval** 16:21 65:2
**approve** 84:23,25
**approximately** 67:1
**April** 38:1 45:8
**area** 13:4 14:10 19:23 21:17,22,24 22:4,9,15,25 23:20 32:10 36:11 39:11 41:9,19 46:7 52:24 57:24 60:4,6 61:6,23 62:3 63:25 65:11

67:8 68:4,10 70:1 74:16 75:7 83:12 84:2,7
**areas** 21:23 60:9 62:1 77:21
**Army** 1:14,15 2:19 46:11 47:13 48:19 50:13
**arrow** 79:17 81:7
**asked** 16:3 25:18 42:17 43:10 44:20 49:14 50:6,23 60:2 72:1 82:2
**asking** 23:24 27:6 31:8 48:25 63:4 70:14 71:25 77:19 78:24
**aspect** 86:19
**assertion** 25:24
**assigned** 8:2
**assume** 10:12,23 11:16 20:24 39:10 46:21 58:2 67:21 78:3
**assuming** 9:9 61:6
**as-built** 28:6
**as-constructed** 19:20,25 20:7,13 20:25 23:10 28:1
**attached** 19:16,19 30:16 33:10 38:3 40:9 43:22
**attempt** 21:2
**attention** 41:2
**August** 1:18 21:18 87:25
**authorized** 46:23
**available** 12:25 14:21 40:1 73:14 77:12,18 78:11,14
**Avenue** 1:17 2:22 3:11 6:2 37:23 38:9 41:3,4,8,10 41:19 61:1,4,7
**aware** 22:2,10,11

## B

**B** 4:9
**back** 8:25 9:19 15:10 48:4 52:4 52:17 57:12 76:24 77:15 86:20
**backfill** 15:9 52:16 52:22,23 66:19,24 67:2 73:10,15 86:20
**backfilling** 15:1 52:8 58:14
**backside** 13:8 59:22
**bandied** 71:24
**Bank** 13:4 14:9 19:22 21:17 22:4 22:8,15,25 23:20 39:11 46:7 52:24 57:24 61:22 63:24 65:11 67:8 68:3 68:10 70:1 74:16 75:7
**bar** 83:17
**Baronne** 2:5
**bars** 83:18
**based** 6:18 28:6 37:9 46:19 47:6 55:18 56:2 63:3 72:1 74:20
**Bates** 15:19 16:13 26:10 30:18,24 31:4,14 43:16
**Baumy** 33:18
**beach** 83:22 84:3
**BEARDEN** 3:18
**bearing** 26:9
**bears** 16:13 43:16
**beginning** 6:20 34:19 42:13 47:21
**begins** 34:20 38:18
**behalf** 59:13
**believe** 8:8 31:12 40:5,6,14 49:2,16 60:25 65:15 73:10

75:12
**Benjamin** 2:15
**best** 23:9 34:17,24 37:18 38:16 42:3 55:21 88:11
**better** 57:14
**bigger** 38:24 39:9
**Bill** 6:7,9
**bit** 46:1 50:18 71:11 82:9
**Boland** 60:5 69:24 69:25
**Bonura** 33:18
**boring** 67:9 68:21
**borings** 67:12,14 67:17,20,21 68:1 68:3,7,9 69:16,25 70:5,5
**borrow** 54:18,21 55:12,24
**borrowed** 53:24
**bottom** 15:23 20:3 34:19 38:13,17,18 38:19 40:7 41:13 79:13 80:1,3,4 81:5,8
**Box** 2:14
**braced** 17:19,25
**bracing** 18:3
**branch** 2:11 8:22 9:2 11:3,4 18:13 29:11,17 49:24 50:11,15 51:24 55:23 56:21 72:24 73:2
**Brandstetter** 33:21
**breach** 23:19 60:4 60:6
**breaches** 1:4 60:9
**break** 39:25
**Breaks** 86:14
**bridge** 61:7,12
**Brief** 46:2
**bring** 68:20
**broad** 63:15 64:17
**brought** 84:21,23

GRIESHABER (VOL II), JOHN

**Bruno** 2:3,3 6:19
8:5 16:3 19:16,19
24:19 25:18 36:18
37:4,11 42:17
46:10 48:24 49:14
50:6,21 51:8
53:11 59:15
**Bruno's** 12:10 14:3
23:7 43:8,19
**build** 18:4 46:5
86:17
**building** 19:12
**builds** 83:18
**built** 26:1 32:9,23
**bunch** 50:17
**bypass** 22:8,14
57:18

**C**

**calculations** 60:14
60:17
**call** 12:3 41:1 76:7
**called** 14:23 82:19
**canal** 1:4 22:6
53:13 54:14
**canals** 67:15
**Carondelet** 3:4
**carry** 47:24 48:3
**case** 42:9 47:14
55:19 65:7 67:4
**cases** 59:14
**cause** 88:16
**causes** 59:10
**causing** 16:7
**CCR** 1:24 5:22
88:2,24
**certain** 15:5 47:15
47:25 52:12 63:10
86:6
**certainly** 14:15
82:23
**CERTIFICATE**
87:1 88:1
**Certified** 1:25 5:23
88:3,25
**certify** 87:4 88:4,13

**chain** 65:24 66:2,3
74:11
**chains** 74:21
**change** 45:25 49:19
**changed** 36:12
**changes** 87:6
**channel** 22:8 57:19
**channels** 22:14
**charge** 30:3
**Charles** 3:16 33:22
**check** 48:1
**chief** 29:15,16
33:19,23 74:12,23
**chose** 64:24
**CHRISTOPHER**
3:10,22
**civil** 1:4 2:11 5:6
7:21 8:3 10:6
11:1,18 14:7
18:12 46:17 48:17
49:23 50:10 51:16
51:23
**clarification** 66:16
77:1 82:10
**clarify** 81:24
**classical** 22:18
**Classification** 25:8
**clean** 49:13
**clear** 27:11
**clearer** 27:12 40:14
**close** 12:22 36:22
37:8 43:4 51:4,7
**cofferdam** 18:9,10
19:3
**cofferdams** 19:12
**colloquially** 84:3
**come** 8:25 9:19
34:21
**comfortable** 56:4
**command** 74:22
**commander** 74:14
**comments** 16:20,24
16:25
**commonly** 45:20
84:7
**community** 12:5

29:20
**compact** 86:7
**compaction** 52:22
85:15 86:8
**compare** 18:23
**completed** 20:22
21:1
**complex** 37:23 38:9
61:2,5 66:21
**compliance** 25:9
**complies** 55:5
**computer** 88:9
**concerned** 66:17
**concerns** 8:23 9:11
9:23,25 10:17
11:8,24
**conditions** 85:7,9
**configuration**
47:24
**connection** 12:1
13:1 19:7 22:12
35:14,19,22 39:4
39:13 52:23 80:9
80:10
**consideration**
12:16 13:5 15:4
22:23 57:23
**considerations**
12:13,24 14:18
22:22 47:6 51:25
52:11 57:6,21
73:17 74:1 83:1
**considered** 35:15
**CONSOLIDATED**
1:5
**consolidation**
85:12 86:2
**constructed** 32:11
41:25
**construction** 7:8,12
7:18 8:1,20,24 9:6
10:3,9,15 11:2
12:25 14:3,19
18:13 19:11 20:21
20:25 21:4,7
33:20 35:12,21

47:3 48:18 49:24
50:11,14 51:24
52:19 55:19 56:22
66:1 67:22 73:19
74:13,20,21,23
75:3,24 76:4 77:3
77:3 83:5,6 84:22
**contain** 14:15
24:22
**contains** 24:17
**contamination**
28:21
**context** 27:17
28:25
**continuation** 13:16
59:22
**continue** 13:23
69:3
**continued** 13:7
51:8
**continuously** 69:4
**contract** 8:21 63:19
75:18 84:12,15,19
**contracting** 75:17
**contractor** 15:3
52:10
**contractors** 63:12
77:9
**contributing** 66:22
**control** 12:18 13:2
13:11 14:5,10,14
17:13,21 46:13,15
47:9 49:18 51:2
86:18
**convey** 64:7 82:4
**copies** 6:25
**copy** 8:6 15:15
24:12 31:7
**corner** 39:2
**corporation** 6:17
**Corps** 1:14,16 2:19
2:20 7:15 9:6
10:19 11:4,19
14:7 16:17 18:16
37:21 43:2,9,14
44:22 45:21 46:5

46:11 47:8,13,16
48:19 50:8,13
51:24 56:24 63:5
63:12 65:3 67:3,6
68:2,8 69:5,5,7
72:8,24 73:1,23
75:22 76:3,17,19
77:7,11 85:3
86:16
**correct** 12:9 13:18
19:5,23 20:20
25:23,23 28:11,12
28:22 35:21 36:18
37:4 41:20,21
42:23,24,25 44:7
44:8,14 45:5,24
46:16 48:22 50:1
50:16 51:11,18
52:2 54:21 55:15
55:16,25 58:6
60:10,16 61:3
62:6 70:23,24
79:10,16 81:6,10
81:16 82:8,24
83:11,21 84:5,9
84:16,17,18 85:25
86:5 87:7 88:11
**corrections** 87:6,13
87:15
**cost** 84:24
**counsel** 2:20 5:3
6:12,24 88:14,14
**couple** 19:19 30:12
**course** 82:14
**court** 1:1,25 5:23
24:1 88:3,25
**covered** 72:21
**crack** 34:25
**Craig** 33:22
**create** 14:4
**credentials** 7:15
**criteria** 15:1 28:16
28:24 52:8
**critical** 35:15
**crosses** 79:8,14
**crossover** 62:4,6,7

79:2,6,20,21,24
81:18,19
**cross-section** 38:23
41:13,18 79:12
80:1,8,16,19,21
**crown** 28:4,6
**currently** 29:15
56:21
**curves** 83:24
**cut** 80:2
**cutoff** 26:4

**D**

**D** 3:3 4:1,9
**daily** 74:18
**damage** 49:17
**Darryl** 33:17
**data** 63:6,10,13,19
63:23 75:23 76:3
76:17
**databases** 69:7
**date** 20:12,14,23
40:13 87:8,11,25
**dated** 16:7 30:10
33:4 37:25 45:8
**dates** 67:16,25
**datum** 26:17
**Dauenhauer** 29:7
33:17
**Day** 3:8 6:13
**deal** 7:12 10:1
59:24 78:20
**dealing** 66:23
**dealt** 83:5
**decide** 12:3
**decision** 10:15
74:18
**decisions** 74:2
**decomposing** 71:5
**deep** 50:22 85:24
**deep-seated** 35:6
**defined** 12:15
**defining** 65:5
**definition** 12:21
64:10 65:24 70:15
82:7

**definitively** 21:13
**delineate** 69:8
**delineated** 21:23
**DELORIMIER**
3:25
**Denny** 33:23
**density** 85:11,13
**DEPARTMENT**
2:10
**Depending** 76:22
**depends** 86:19
**deponent** 5:10
**deposited** 83:17
**deposition** 1:12 5:4
5:14 6:20 8:7,12
20:10 21:3 23:17
24:3,24 25:19
42:13 43:6 44:4,5
44:9 46:10 47:19
48:13 50:5 53:3,7
84:11 88:8
**depositions** 71:25
72:2
**deposits** 83:17
**DEPO-VUE** 3:25
**depth** 23:18 25:12
26:12,23 27:22
28:4 37:7 41:17
60:3 71:17 85:19
**depths** 21:14,15
23:11 28:10 36:21
72:6
**describe** 50:8
**described** 46:11
**design** 12:17 13:3
37:22,23 38:8
41:24 46:13 48:4
48:5,10 61:9 62:2
62:9 63:9 67:13
77:10 78:7 82:14
**designated** 47:14
**designed** 17:25
18:22 47:24
**DESIGNEE** 1:14
**determination** 9:22
66:3

**determinations**
18:14
**determine** 9:10
14:8,15 20:12
24:16 31:4 48:8
49:3,16 50:25
52:21,25 55:20
72:24 73:9,14,24
**determined** 73:3
**developed** 77:12,14
**developing** 69:19
**deviate** 64:25,25
65:8,13
**difference** 64:2
**different** 32:1 35:5
50:18 83:2,2,22
83:24,25
**difficult** 75:3
**direct** 7:2
**directed** 57:4
**direction** 25:14
85:16,23
**directly** 17:8
**disappointed** 86:12
**disapproved** 16:8
16:18
**discretion** 11:7,23
12:6 19:9 47:5
55:21 56:2 59:3,4
**discussed** 59:16
**discussion** 12:11
**distance** 53:12,19
54:13,16
**distracted** 11:13
**district** 1:1,2,16
10:19 11:5,10,20
12:1,5 14:8,20,24
33:12 43:14 45:10
46:18 74:14 77:25
**disturb** 42:22
44:12
**division** 2:11 7:9,13
7:18 8:1,20 9:19
10:4,9 29:11,16
29:17 33:19,21,24
48:18 55:22 56:22

56:24 66:2 74:13
74:20,23 77:3,4
**document** 27:8
28:16,24 30:5
37:19,20 40:4
**documentation**
76:5,19
**documents** 18:21
18:21 31:1 41:24
42:1 68:19 77:22
82:18,20
**Doe** 42:15,17,18
**doing** 6:9,10 15:5
37:18 46:24 52:12
**doubt** 25:22
**Dr** 6:7 7:4 12:10
15:12 23:8 46:4,9
47:11 86:13
**drafting** 70:7
**drawing** 28:6 38:14
38:18,22 39:22
40:25 41:1,12
53:18 54:12,17
55:16
**drawings** 19:20,21
20:1,13,22,25
21:21 23:10 28:2
28:5 40:1 42:8
53:17 54:11 55:14
78:24
**dredging** 22:13
83:13
**drive** 61:21
**dry** 85:15
**duly** 6:4 88:6
**DUVAL** 1:6
**D.C** 2:16 3:12

**E**

**E** 1:10 3:18 4:1,1,9
4:9
**earlier** 52:3 57:13
58:20 79:11
**early** 67:23
**east** 13:4 14:9
19:22 21:17 22:3

22:8,15,25 23:20
25:10 37:24 39:11
46:7 52:24 57:24
61:22 63:24 65:11
67:8 68:3,10 70:1
74:16 75:7
**easterly** 25:14
**eastern** 1:2 53:19
54:7,8
**edge** 53:19,20,23
53:23 54:1,7,8,13
54:14,18,20 55:12
**education** 8:3
**effect** 22:13,24
57:23
**eight** 55:4
**either** 83:16 86:3
**elaborate** 13:19
**elevation** 32:9,12
39:16,17,20 40:11
40:11 81:8,13
**elevations** 23:13
25:14
**embankment** 13:9
13:13 18:7
**emphasize** 47:25
48:10
**employed** 56:20,21
**employee** 7:8 10:8
66:1
**endanger** 15:7
52:14
**ended** 51:6,9
**energy** 86:7,8
**engineer** 7:22 8:4
10:7,11 14:7
18:23 26:11 29:10
33:14,15,16 47:3
52:20 55:20 84:22
**engineering** 8:25
9:19 11:3,18
12:12,15,23 14:18
15:3 19:10 22:21
29:11,16,17 33:19
33:23 46:12 47:6
51:25 52:10 55:22

GRIESHABER (VOL II), JOHN

57:5,21 61:11
64:3,3,7,8,14 65:1
65:9,13 66:3
73:17 74:1 82:3,5
82:11,12,16,25
83:1
**engineers** 1:14,16
2:19,20 7:16 9:6
10:20 11:1,5,18
11:19 14:7,24
16:17 18:13,16
33:18 37:21 43:14
45:21 46:11,17
47:13,17 48:17,20
49:23 50:8,10,13
51:16,23 60:12
63:5,12 67:3,6
68:2,8 69:5,5,8
72:8 73:23 75:23
76:3,17,20 77:7
85:3
**engrained** 71:6
**enlarged** 39:3
**entire** 80:18
**entitled** 37:22
**ER** 82:20
**ERDC** 29:19,21
30:4
**eroded** 35:9
**erosion** 35:7
**ERs** 82:19,21
**escaping** 85:18
**ESI** 31:13 32:4
**ESQ** 3:16,17,18,19
3:22
**ESQUIRE** 2:4,12
2:13,21 3:3,9,10
**essentially** 25:13
84:14
**established** 79:11
80:7
**eval** 43:20
**evaluate** 14:21 49:3
49:16 50:25
**evaluated** 59:19
69:18

**evaluating** 22:24
55:23 57:23
**evaluation** 14:23
43:2,9 44:22
46:14
**evaluations** 46:24
**evidence** 5:15
**exactly** 11:14 58:17
78:21
**examination** 4:3
6:6 8:5 11:15
14:17 17:5,22
19:1 22:1 23:6
25:5 26:18 27:13
27:24 29:6 32:6
32:21 33:3,25
34:7,15 36:14
38:5 40:3,12,21
43:25 46:3 49:11
54:2 55:2 59:11
62:19 63:21 64:23
66:8 69:15 72:16
74:8 76:14 78:19
86:11,15
**examined** 6:5
**example** 34:24
50:21 59:23
**examples** 50:5 57:5
**excavating** 66:25
**excavation** 15:9
17:10,19,20,25
18:15 22:7,13
48:2,5 52:16
55:24 66:23 67:15
71:17 72:5 73:3,4
73:9,15
**excavations** 13:24
22:24 52:23 57:24
66:18
**exclude** 50:10
**exercise** 56:1
**exhibit** 4:11,12,13
4:14,15,16 15:13
15:15,18 16:2
19:16,17,17,19
20:19 21:14 23:8

24:2,7,23 26:9
28:15 30:6,7,8,10
30:15 33:6,9
37:20 38:2 40:5,8
43:18,21 45:7
53:2,3,17 54:4
56:6,8,14 57:4
78:20,24 79:13
80:4
**exhibited** 78:9
**Exhibits** 60:25
**existed** 21:15 51:3
**existence** 36:25
46:22
**existing** 22:6 39:4
39:15,18 41:17
72:21
**expect** 7:24,25 9:18
63:12 72:8
**experience** 7:15 8:4
10:6 11:2,18 56:2
**experienced** 14:6
55:20
**expert** 27:14
**expertise** 9:12,15
9:17
**exposed** 60:13
**exposure** 25:9
**extend** 75:6
**extended** 17:14
**extending** 58:21
**Extension** 56:16
**extra** 6:25 18:1
**ex-vacation** 48:8
**eyes** 37:25
**E-mail** 30:9 31:12
33:4 34:3 36:17
36:24
**E-mails** 33:7

---
**F**

**fact** 7:23 23:15,15
25:25 32:16 34:16
36:13 37:12 48:6
48:6 61:9 63:22
66:4 71:8 73:3

75:5,8 80:8
**factors** 66:22
**facts** 12:16 64:19
**fail** 18:5,6
**failure** 35:1,3,3,4,7
35:7,8,10,15
**fair** 68:17 69:1
**FAIRBANKS** 1:24
5:22 88:2,24
**fairly** 15:6 52:13
66:12
**fall** 60:13
**familiar** 7:14 23:23
51:25 63:22 64:1
64:2 84:12
**far** 7:19 8:22 13:12
13:22 23:13 41:23
58:15,16 73:19
83:22 84:3
**farthest** 81:12
**fast** 34:18
**Federal** 5:6
**feeding** 10:21
**feel** 50:24 56:4
**feet** 25:12,15 26:13
26:24 27:23 28:2
28:4,10 32:13
36:21 37:7 39:14
39:14 41:17,18
42:20 50:22,22
53:14 54:10,15,19
54:20 55:11 62:3
67:1,1 71:18,19
71:21 72:6,7 75:6
75:14 81:9,13
**field** 12:17 60:22
**fifth** 56:14 57:2
**fill** 63:20 70:10,13
70:15 84:7,19,24
85:1
**finally** 34:20,24
54:16
**find** 15:18 78:22
82:16
**fine** 83:19
**finish** 23:24

**finished** 86:13
**firm** 6:10 19:10
**first** 6:4 7:11 11:16
15:22 20:3 23:17
25:18 30:14 34:4
34:19 38:6 45:17
54:1 76:12 78:20
79:6 88:5
**fits** 39:9
**flat** 25:20,24 36:21
37:8,10
**flood** 12:17 15:8
46:13,15 47:9
49:18 51:2 52:15
63:1 71:19 72:6
79:8,15 86:17
**floodwall** 13:4,17
14:11 17:1,8
19:22 23:19 25:10
41:20 53:12,19,20
54:8,13,17 55:12
61:16 67:2 71:19
71:20 72:7,7
**floodwalls** 21:6,16
22:14 29:2 46:6
**Florida** 37:23 38:8
41:3,4,7,10,19
61:1,4,7
**flow** 25:13
**follow** 13:22
**followed** 13:7
48:24
**following** 16:20
73:11
**follows** 6:5 42:18
**foregoing** 87:4
**forget** 64:22
**form** 5:12 11:12
14:13 15:8 17:3
17:16 18:18 21:20
23:2 26:15 27:2
27:20 29:5 32:20
34:6,12 36:9
52:15 58:1 62:13
62:16 76:10
**formal** 13:10

GRIESHABER (VOL II), JOHN

formalities 5:8
formerly 33:12
forth 88:7
foundation 18:2
  58:14
four 8:9,13 48:15
fourth 57:2
frame 18:3
Frank 33:13
Franklin 2:15
Fred 33:11
front 18:24 21:25
functions 64:9 82:5
further 10:18
  14:23 18:15 86:24
  88:13

**G**

gap 63:23
gaps 63:6,10,13,20
  75:23 76:4,17
Gately 56:16,19
general 13:6,14
  37:22 45:13 50:4
  58:20 61:8
generally 22:2
  46:20 84:12
generic 80:20
George 33:15
geotech 9:2 33:21
geotechnical 8:22
  8:23 9:1,11,23
  10:17 11:4,8,19
  11:24 12:5 26:11
  27:14 29:17,20
  33:14,15,16 55:23
  56:20 71:3 72:24
  73:2
GILLEY 3:25
give 6:23 24:13
  27:17 52:6 53:4
  58:15 60:18 67:10
  67:24 78:22
given 1:15 9:16
  11:7,23 12:16
  24:22 57:9 73:17

87:4,7
gives 55:10,13
giving 9:15 13:6
  50:9
go 8:22 9:2 12:4
  18:3 26:3 39:1
  41:23 48:3,4 50:2
  52:4 56:24 57:12
  62:3 64:15 65:2
  65:10,12,21,24
  66:2,6 72:15 76:8
  78:6 82:16,17,19
goes 18:11 24:9
  74:12
going 6:18 8:6,18
  10:11,23 11:16
  15:3,17 23:22
  25:1 27:20 30:5,7
  37:15,19 40:4
  42:3,11,21 48:10
  50:3,19 52:10
  53:4 56:5 57:12
  59:9 68:15 71:18
  72:5 77:15
good 7:18 15:11
  52:18
gotten 31:2
government 30:23
  31:2
grain 83:20,24
greater 70:18
Grieshaber 1:15
  6:1,7 7:4 12:10
  15:12 23:8 46:4,9
  47:11 59:12 86:13
  87:3,11
ground 42:16,19,21
  44:11,14 45:1
groundwater 25:8
  26:4 28:21
Group 3:1 6:14,14
  14:23 22:5,25
  36:19 37:5 57:25
  70:7 75:11
guarantee 69:14
guess 30:6 62:22

73:21 77:15
guidance 9:16,18
  13:7,12,15 58:19
  58:20 60:19 73:25
  85:17
guidances 73:16
Guillory 7:5 9:7
  10:16 11:1,6,17
  11:22 12:24 14:4
  14:6,19 19:8
  22:22 46:18 49:24
  52:20 57:9,10,22
  65:8 66:10 73:8
  73:25 74:10,11,17
  74:25
guys 49:2,15,22

**H**

H 4:9
halfway 24:6
hand 8:6
handle 9:16
handled 77:5
happened 32:16
happens 39:6 56:23
  86:5
Hassenboehler
  33:17
head 68:6
heading 25:7
headquarters 66:7
  78:4,11
heart 86:14
held 47:2
help 9:20 12:4 24:1
  34:22 37:16 39:23
  40:25
helps 24:5
hereinabove 88:7
hereto 5:3 30:16
  33:10 38:3 40:9
  43:22 88:15
hesitate 50:2
highlighted 28:8
hitting 59:14
HOGAN 3:17

hole 18:5,6 50:22
  51:1 66:25
hoped 27:11
HPO 6:2
huh 38:10
hypothesize 36:10
hypothetical 42:18
  64:18 72:12

**I**

idea 32:24 61:13
identification 25:7
  30:16 33:10 38:3
  40:9 43:22
identified 8:24 9:5
identify 69:11
IHNC 35:1 37:23
  37:24 38:9
II 1:10
III 3:18,19
impact 13:13,25
  51:2 73:2
impacting 48:9
impacts 48:6
impinged 17:12
implication 55:11
  55:14
implications 65:20
improper 72:11
inappropriate 15:8
  15:9 52:15,16
  66:18,18,23
include 48:21
  49:23 50:14
included 49:22
  56:12 60:18 78:8
includes 48:17,19
  56:8
including 51:15,22
incomplete 64:19
incremental 58:13
indicate 26:12
  39:12 57:8 61:15
indicated 13:14
  59:18 66:9 71:1
  73:7 78:23

indicates 16:5
  63:10
indicating 41:15
  49:9 62:1,8 76:20
  79:24 81:2
indication 16:16
individual 8:25
Industrial 13:4
  14:9 19:22 21:17
  22:4,6,8,15,25
  23:20 39:11 46:7
  52:24 57:24 61:22
  63:24 65:11 67:8
  68:4,10 70:1
  74:16 75:7
information 10:21
  13:12 15:1 18:23
  21:9,25 23:16
  27:18,21 28:20
  29:1 37:10 52:8
  58:15 63:11 68:22
  68:23 76:24 77:2
  77:4,9,14
initial 9:22
inner 74:19
input 10:14,18 11:9
  11:25
instances 7:3 72:18
integrity 47:8
intend 50:9
intended 27:5
  81:24
interested 88:15
interfere 68:15
interim 21:3
internal 75:2
International 3:1
  6:14 75:11
Internet 77:16
interpretation 9:3
interpreted 28:12
interrupt 25:13
investigation 35:6
involve 22:7
involved 7:18
  55:23 74:16

GRIESHABER (VOL II), JOHN

**involving** 22:5
**IPET** 60:18,21
**Island** 33:24
**issues** 16:6,25 18:7
  36:16 37:3 45:21
  57:4 66:20
**I-DEP** 3:21
**I-wall** 32:9,11,12
  32:23 39:4,13

---

**J**

**James** 10:2
**January** 43:15 45:7
  45:9
**Jean** 57:5
**JENNIFER** 2:21
**jeopardize** 47:8
**Jim** 22:22 49:25
  56:16,19 57:9,22
**Joanen** 2:4 4:6,8
  11:11 14:12 17:2
  17:15 18:17 21:19
  23:1 26:14 27:1
  27:19 29:4 30:17
  31:6 32:19 34:5
  34:11 36:8 59:9
  59:11,13 62:15,19
  63:21 64:23 66:8
  69:15 72:16 74:8
  76:14 78:23 79:5
  82:2 86:15
**job** 15:6 52:13
  66:11,13
**Joe** 59:14
**John** 1:14 3:19 6:1
  42:15,17,18 87:3
  87:11
**Jones** 3:8 6:13
**JOSEPH** 1:24 3:18
  5:22 88:2,24
**JR** 1:24 5:22 88:2
  88:24
**JUDGE** 1:6
**judgments** 47:6
**June** 8:6
**JUSTICE** 2:10

---

**K**

**Katrina** 1:4 23:12
  30:11 46:7 51:3
**killing** 8:14
**kind** 18:14 43:2,9
  43:20 44:22 45:14
  49:2,15 68:14,17
  68:21,25 84:6
**knew** 23:13 32:15
**know** 7:4,10,17,21
  7:23 8:4 10:2,3,5
  10:8,24 13:23
  21:21 22:16,20
  23:21,22 27:5
  29:7,12,18,24
  32:7,14,14,17,22
  33:8,17 34:1,8,18
  36:5,12 37:12,14
  37:15 39:9 40:2
  42:9 44:2 45:12
  46:19 57:16 58:17
  60:8 61:4,8 65:4
  67:6,16,19,23
  68:1,2,6,8,15 69:6
  69:16,22,24 70:3
  70:4,9,10,15
  71:23 74:19 75:3
  75:5,8,10,15,16
  75:18,20,25 77:5
  77:17 78:5 81:23
  86:12
**knowing** 72:13
**knowledge** 7:19
  10:25 17:10,17
  18:12 23:10 73:18
  74:2
**knowledgeable**
  46:19,21
**known** 7:7 13:2
  18:8 63:11 74:1
**knows** 32:3 69:6
**Knudsen** 69:17
  70:6
**K2** 1:5

---

**L**

**L** 1:10 3:19 5:1
**lab** 30:4
**LABOURDETTE**
  2:21
**language** 27:17
**large** 35:4,8,10
**larger** 40:1
**late** 67:24
**law** 5:7 6:10
**lawyer** 83:5
**layer** 70:11
**layers** 85:19
**lead** 75:12
**Leake** 1:17 2:22
  6:2
**leave** 42:10
**Lee** 7:4 9:7 10:15
  12:24 14:4,6,19
  22:22 49:24 57:9
  57:22 65:7 66:10
  73:8,25 74:9,11
  74:17,25
**left** 38:18 81:4,11
**left-hand** 39:17
  40:7
**legal** 65:20
**length** 32:22 60:15
  60:19,22
**letter** 43:13,15 45:6
  45:9,12,14,18
**let's** 11:13 15:16
  28:5 32:1 42:10
  44:8 45:25 49:12
  65:7 79:25 81:3
  85:16
**levee** 13:3,8,16
  14:11 17:14 18:1
  19:21 23:14 28:4
  28:7 29:2 50:22
  58:21 59:19 61:21
  80:3
**levees** 17:1 21:6,16
  22:14 46:6
**Levine** 2:13 31:11
  31:20 32:4 33:1
**library** 76:8 77:8

---

  77:20
**licensed** 11:1,17
  19:10
**lift** 16:6 17:11
  85:21,22,24 86:2
  86:6,9
**limit** 81:14
**line** 13:2,11,25 14:5
  14:10,14 17:13
  42:2,13 47:21
  48:14 49:6,8 55:1
  55:9,10 68:25
  69:23 80:13,16
  81:11,13
**lines** 8:8 17:21
  25:21 48:25 50:20
  51:9 53:9 55:4
**lingo** 6:15
**listed** 57:4
**LITIGATION** 1:5
**little** 8:11 40:13
  46:1 50:18 71:11
  82:9
**LMVD** 22:18
**load** 18:1
**loading** 47:25 48:3
  49:20
**locate** 40:25,25
**located** 62:24,24
  78:14
**lock** 22:6 35:4
**logic** 15:4 52:11
**logical** 15:20 81:4
**long** 7:7,10 15:10
  52:17 83:3
**longer** 6:15 34:2,10
  35:13,20 36:2,7
  37:1,2
**long-term** 22:3
**look** 8:8,11 9:2
  15:13,16,17,22
  16:1,3,10,22,23
  18:21 24:5,14
  25:1,6,22 33:6
  35:4 38:13 40:6
  42:12 45:9 47:20

---

  48:9 51:7,10,14
  51:15 53:4,5,16
  54:3,11,16 61:14
  66:21 73:2 76:15
  76:18
**looked** 26:8 28:2
  36:15,24 37:3
  51:17
**looking** 21:9 28:18
  44:16 57:2 58:13
  79:13
**looks** 20:17 38:9
  40:16,18
**lot** 77:18
**Louisiana** 1:2,18
  2:6,23 3:5,11 5:24
  6:3 19:11 88:4
**low** 71:13
**lower** 25:14 51:3
**Lundberg** 33:23
**L.L.C** 3:2

---

**M**

**M** 1:10 4:1
**making** 74:18,25
**management** 64:8
  82:5
**manager** 9:6 10:15
  12:25 14:4,19
  47:3 52:19 55:19
  64:12,24 65:5,6
  65:23 84:22
**mandatory** 64:7,13
  82:4
**manuals** 46:12
  64:3 77:10 78:8
**map** 37:14 38:23
  38:24 39:9
**marine** 17:11 60:7
  62:10 63:2 68:4
  68:10 69:19,24,25
**mark** 30:7 43:17
**marked** 30:10,15
  33:6,9 37:19 38:2
  40:5,8 43:21 45:7
**material** 56:7,9,11
  58:12 71:6 77:20

---

83:15
**materials** 71:12
75:10,22 76:2,6
76:16 77:8 78:10
84:15
**matrix** 71:7
**matters** 55:18
**Mayer** 17:12
**mean** 7:9 20:21
29:16 44:4,7,8
45:13 57:9 71:3
71:23 74:4
**meaning** 26:25
**means** 13:20 63:7
86:3
**meant** 12:12 36:1
**measured** 60:12,22
**mechanical** 86:3
**mechanisms** 35:5
**meet** 19:14,15
**member** 18:4
**memorandum**
37:22 38:8 61:9
63:9
**memorized** 6:16
**met** 7:11
**method** 22:19
**migration** 28:20
**minimum** 13:2,11
14:4,10,14 17:12
17:21
**minus** 28:2 39:14
**minute** 15:19 78:22
**minutes** 53:5
**misleading** 64:20
**misplaced** 25:2
**misread** 35:18
**missing** 44:19
**Mississippi** 83:14
**misspoke** 44:6 45:6
**mistake** 75:1
**mistaken** 37:24
**moment** 68:16
**money** 77:12,14
**Montegut** 10:2,10
10:25 11:7,17,23

19:8 22:23 46:19
49:25 52:20 57:22
**morning** 52:3
57:14
**Morrison** 69:17
70:6
**Mosher** 29:22,24
30:2
**MRGO** 1:7

_____

**N**

N 3:10 4:1,1,1,9 5:1
**name** 6:7 56:12
59:12 68:20
**named** 6:3
**names** 18:11 33:7
**nature** 8:23 9:1,11
9:24 10:17 11:9
11:25
**NCS-005-000000...**
43:17
**near** 35:4
**necessarily** 22:4
**necessary** 23:5
58:5,8
**need** 12:4,8 15:15
16:23 23:23 24:16
25:22 34:3,17
38:24 39:8 49:3
49:16 50:25 65:4
73:14 82:13
**needed** 72:14,18,19
72:25 84:21
**needs** 73:9
**negatively** 51:1
**Neil** 33:14
**new** 1:16,17 2:6,23
3:5 6:2,11 10:18
11:5,9,20,25 14:7
14:20,24 32:11,22
33:12 35:14 39:4
39:6,7,19 43:14
45:10 46:6,17
77:24 83:3,6,8,12
84:2,7
**NGVD** 26:3,12

28:2 32:13
**Nine** 51:3
**Noah** 29:18 33:13
**NOD** 6:2
**normally** 14:21
84:8
**north** 23:19 39:11
41:5 60:4 62:4,5
62:21 78:25 79:17
79:23
**note** 47:11
**noted** 87:13,15
**notice** 5:7
**noticed** 65:17
**November** 20:15
33:5,5
**number** 15:20,23
16:14 18:11 26:10
30:6 31:14 37:22
38:8 40:23 43:16
55:1 60:2,25
71:22 78:9 82:18
**numbered** 30:18
**numbers** 8:11
30:24 31:4 37:13
39:7 61:15
**N.W** 3:11

_____

**O**

O 1:10 4:1 5:1
**oath** 5:25 6:5
**object** 11:12 14:13
17:3,16 18:18
21:20 23:2 26:15
27:2,4,20 29:5
32:20 34:6,12
36:9 62:13
**objection** 45:18,22
58:1 63:15 64:17
65:15 68:13 72:11
74:6 76:10
**objections** 5:11
**objective** 73:24
74:7
**obtain** 16:20
**obtained** 71:20

72:9
**obviously** 37:9
40:22 60:8 70:17
70:22 74:22 77:17
86:7
**occurs** 86:3
**October** 16:7
**office** 2:20 10:19
11:5,10 12:1
50:24
**officer** 75:17
**offices** 1:17
**officiated** 5:24
**Oh** 20:5 49:10
**okay** 8:10,15 9:8,21
10:5,10,13 11:22
12:3,14,19 13:21
14:2 15:12,21,25
16:4,9,12,15 17:9
17:23 20:6,11,14
20:18 21:12 22:2
23:7,25 24:8,10
26:16 27:15,25
28:5,10,14 32:5,7
33:11 34:1,13,24
35:17,25 36:1,4
36:15,23 37:9,17
38:4,11,13 39:1
39:10,15,22 40:10
41:11,16,22 42:5
42:7,8,11,25 43:7
44:1,7 45:3,4,11
45:12,15,25 47:19
47:22 49:10 51:22
53:2,6,7,10 54:6
54:11,19,20,23
55:5,6,18 56:5,10
57:20 58:7 61:24
61:24 63:18 64:21
65:4,23 66:15
69:4 70:12,17
72:3 76:11 78:16
79:3,10,25 80:12
80:15,25 81:3,22
82:1,2 83:10
**old** 35:14 37:25

40:11
**once** 37:11
**ones** 59:8 60:14
67:11
**open** 17:20
**order** 8:21 9:7
10:11 12:2 13:1
14:20 15:20,21
24:4 47:4 48:7
84:13
**orders** 84:13
**organic** 71:6
**organics** 71:2,8
**original** 5:9 24:3,17
24:21 53:3 56:6
**originally** 28:1
**originals** 15:16
**Orleans** 1:16,17
2:6,23 3:5 6:2,11
10:19 11:5,10,20
12:1 14:8,20,24
33:12 43:14 45:10
46:18 77:24 83:3
83:6,8,12 84:2,7
**outside** 9:17 65:16
84:20,24
**overly** 63:15 64:17
**oversaw** 8:20
**overseeing** 47:7
**overuse** 34:25

_____

**P**

P 5:1
**page** 4:3,11 8:8,9
8:10,11,12,13,15
15:13,18,21,22
16:2,10 17:4 20:3
24:6 25:21 26:8,9
34:20 36:20 37:6
38:7 42:12 45:18
47:21 48:25 49:4
50:20 51:9 53:8,8
54:4,23,25 56:14
56:15 57:3
**pages** 8:9 20:18
40:23,23 50:20

GRIESHABER (VOL II), JOHN

8/21/2008

57:2
**paragraph** 26:20
28:18 34:19 45:17
**part** 5:14 6:16 7:25
8:19 13:15 21:5
41:2 67:15 72:22
74:11
**particular** 15:13,18
16:2 52:1
**parties** 5:3 88:14
**parts** 58:13
**Paul** 2:13 32:4
**peculiar** 63:18,19
**penetration** 28:9
**people** 12:17 33:8
48:21 51:20 56:24
**period** 21:18
**permeabilities**
83:25
**permeability** 70:17
70:18,18 71:13
**permeable** 70:11
70:21,23,25 71:9
71:10,12 84:3
**permit** 43:3,12
44:13,15,24 45:2
45:15 71:20 72:9
72:14,25 73:1,4
**permits** 72:21
**permitted** 5:5 73:6
**person** 9:10 71:3
**personal** 9:15,17
17:9 48:15 73:18
**personally** 51:14
51:19 69:6
**personnel** 35:2
**perspective** 27:7
**PERTAINS** 1:7
**pertinent** 12:23
**phenomenal** 35:1
**phone** 76:7
**photos** 35:11
**Ph.D** 1:15
**picked** 18:2
**piece** 81:1,1
**pieces** 58:14

**Pigman** 3:2 6:11
**pile** 21:14,15 23:11
23:18 25:11 32:10
34:3,10 35:13,13
35:20,20 36:2,3,7
36:20 37:1,2,2,7
60:3,12,13,15,20
61:16 75:6,13
**piles** 38:19 60:4
61:11 63:1
**piling** 26:1,2 27:25
81:8
**pinch** 59:14
**Pinner** 29:12 32:7
**pipe** 62:2
**pit** 53:24 54:18,21
55:12,24
**place** 21:4 23:11
65:11 71:18 72:6
74:24 75:21 76:1
**plaintiffs** 2:2 59:13
**Plaintiff's** 56:6,8
**plan** 16:6,18 19:12
20:4 37:23 39:3
41:2,12
**plane** 22:19 26:19
26:23
**plans** 15:2,5 39:13
40:24 52:9,12
69:21 70:8
**plate** 79:22
**plates** 60:24 61:10
61:14 62:9 78:8
78:13
**please** 16:10 28:5
30:11 33:6 36:23
43:24 53:4 72:4
**POC** 25:9 56:16
**POE** 25:10
**point** 22:7 25:8,9
26:16 48:11 59:17
79:14 80:9,22,23
80:23,24 81:12,17
83:17
**pointing** 79:18,18
81:7

**policy** 64:7 82:4
**popular** 77:17
**portion** 19:21
**positions** 47:2
**possession** 76:16
**possible** 28:20
**possibly** 51:1
**post-Katrina** 21:8
21:11
**potential** 49:17
**practice** 29:20
**precise** 26:24 27:18
**precisely** 16:17
**prepared** 65:19
**PRESENT** 3:15,21
**presumably** 6:24
**pretty** 19:13
**previous** 66:9 72:2
73:11
**previously** 76:18
**printing** 38:17
**prior** 20:22 21:2
67:7,21 69:19
70:7 75:12
**probably** 6:23,24
14:25 15:14 31:15
51:18 52:7 58:25
64:10 67:24 71:11
72:14,17 78:4
82:6
**probe** 51:8
**probings** 67:9
**problems** 8:23 9:11
9:23,25 10:17
11:8,24
**procedure** 5:6
75:21,25 78:5
**process** 75:2 78:5
**processes** 74:24
82:13
**produced** 37:21
**production** 30:23
31:3,13,16,19
**professional** 18:22
**profile** 20:4 37:24
41:16,18 80:2,5

**progressed** 74:3
**project** 9:12 10:10
47:3 52:20 55:20
64:12,24 65:4,5
65:10,23 69:20
70:8 74:3,17
75:24 76:4 84:22
**projection** 13:8
**promoted** 30:3
**pronoun** 48:15
**proposed** 49:1,14
54:18,22
**protection** 79:9,15
**protocol** 31:16,19
**provide** 35:10
77:23
**provided** 47:12
68:19 69:12,17
70:6 75:11 76:18
77:23
**providing** 28:19
75:19
**provision** 28:25
**pull** 15:14
**pulling** 71:22
**pump** 61:17
**pumped** 83:13,16
**purpose** 86:1
**purposes** 5:5 28:19
**pursuant** 5:7
**put** 42:21 85:2,5,6
85:7,8,13,14 86:2
86:6
**puts** 44:11
**putting** 18:2 42:15
42:19 44:14 45:1
**PZ-27** 39:15,18,19
**PZ-27s** 40:11
**P.E** 1:15
**P.O** 2:14

**Q**

**qualification** 10:6
**qualified** 8:2 48:17
49:23 51:16,23
52:21

**qualify** 51:21
**quality** 52:21
**question** 5:12
11:14 16:24 25:25
27:10 29:24 31:8
34:4,8 36:5,23
42:25 43:8,19
44:17,18 48:16
49:21 50:4 51:5,9
51:12 52:5 55:7
57:14,15 61:25
62:14,20,23 63:4
63:16 64:21 65:21
68:25 69:3 70:14
72:1,3 76:11,12
76:13 78:21 79:3
81:23 86:16
**questioning** 42:3
59:18 68:17 69:1
69:23
**questions** 6:17,19
12:11 14:3 21:10
23:8,24 24:19
30:13 46:10 50:6
52:5 55:10 57:13
59:8,10,15 60:3
71:16 73:11 78:15
78:23 79:12 86:22
86:24
**quite** 8:14 24:18
**quote** 8:19,19 9:4
36:21,22 37:8,8
42:18 43:4,10
46:12 47:23 49:1
51:4,6,7,10 81:20
**quoting** 43:5 50:24

**R**

**R** 3:17
**rate** 70:19
**reach** 75:13
**reaches** 25:11
27:23 36:21 37:7
**read** 16:23 28:24
30:11,13 32:5
34:4,17,18,18,23

GRIESHABER (VOL II), JOHN

8/21/2008

39:2,3,17 55:3 57:14
**reader** 27:7
**reading** 5:8 27:16 43:23 48:12
**really** 7:9 8:10 38:24 39:8 67:18 77:17
**recall** 61:20
**recant** 44:2
**recap** 28:16,23 36:19 37:6
**recess** 46:2
**recommendation** 69:20 70:7
**recommendations** 9:3
**reconstruction** 80:14 81:14
**record** 34:22 43:17 44:8 49:13 59:5 81:25 86:10
**recorded** 44:23 51:6
**reduce** 48:2
**Reed** 29:22,24 30:2
**refer** 7:1 31:15,18 50:4,19
**reference** 26:4,12 26:16,19,23 28:15 28:17,23
**referenced** 34:2,9 36:2,6
**references** 36:25 60:21
**referencing** 61:1
**referred** 58:19 60:5 60:7 83:8
**referring** 19:2 34:13 43:11 61:19 70:12 79:4,7 85:9
**reflected** 23:11
**regard** 16:25 26:7 37:16
**regarding** 50:7 63:23

**regulation** 65:1,9
**regulations** 64:4,7 64:14 65:13 82:3 82:11,12,16,17,25
**relate** 16:25
**related** 15:10 17:10 19:21 20:22 23:8 28:20,25 29:1 52:17 88:14
**relative** 70:19
**relevance** 71:21,23
**relies** 58:20
**remediation** 14:9 14:22
**remember** 77:16
**removal** 16:6 58:12
**removals** 58:13
**repeat** 72:3
**rephrase** 27:10
**replace** 21:5
**replaced** 26:2 32:10 61:11
**replacement** 22:5
**report** 28:16,24 36:19 37:6 60:18 60:21 63:9 70:8
**REPORTED** 1:23
**reporter** 1:25 5:23 24:1 88:3,25
**REPORTER'S** 88:1
**reports** 69:20
**repository** 77:19
**represent** 6:13
**representation** 32:8
**representative** 47:13
**represented** 36:18 37:5
**REPRESENTING** 2:2,9,19 3:1
**request** 45:15 75:21 76:2,6,20 76:22,24,25 77:1 77:22

**requested** 78:7
**require** 18:15 43:1 43:3 44:13,13,15 44:22,24 45:2
**required** 9:12 10:18 11:9,25 52:22 73:4
**requirement** 19:14 19:15 43:12 64:13
**requirements** 18:24 64:8 82:4
**reserved** 5:13
**resolve** 63:13 75:23
**respects** 7:14
**response** 6:19 14:2 23:7 46:9
**responsibility** 18:20 47:5 85:4
**responsiveness** 5:12
**resubmit** 16:20
**result** 88:16
**resulting** 13:3
**results** 22:20 57:16 70:5 82:13
**retaining** 19:3
**retired** 10:4 33:15
**retraining** 18:10
**review** 55:18 72:23
**revise** 16:20
**Rich** 33:21
**Richard** 2:12 29:12
**right** 6:12 8:12 10:2 13:18 19:6,7 20:5,7 23:15 26:21 40:15 41:9 41:14,14 43:4 49:8 54:6,8 55:16 56:18 61:21 62:7 62:25 66:20 70:3 79:19 80:2,3,8,10 80:10,22,23,23,24 81:1,2,9,10,15 85:19
**right-hand** 39:1,2
**ripped** 32:10

**river** 83:8,11,14,16 83:18 84:1 86:17
**road** 53:13,14,20 53:21,23 54:1,7,9 54:14,14 61:18,20 62:4,5,7,21 79:1,2 79:6,8,23 80:14 81:14
**Rob** 29:7 33:17
**ROBERT** 3:19
**ROBINSON** 1:7
**Rock** 33:24
**role** 30:4
**rolled** 35:9
**Ronald** 33:16
**RPR** 1:24 5:22 88:2 88:24
**Rule** 1:12
**Rules** 5:6
**run** 22:16
**résumé** 7:19

**S**

**s** 5:1 31:2 37:5 66:10 74:17 78:23
**safety** 19:11
**sand** 67:2 70:10,16 70:18,23 83:7,9 83:11,13,18,19,20 83:22,23 84:1,4,6 86:17
**Saucer** 17:11 60:7 62:10 63:2 68:4,9 69:19
**save** 5:8,11 32:1
**saying** 25:23 42:3 44:25 51:14 54:12 66:20 69:4 80:20 81:8
**says** 16:9,19 20:2,4 39:3 53:18 54:12 56:16 80:13 81:12 81:14
**scenario** 23:23
**Schwanz** 33:14
**scope** 22:3 65:16

**Scott** 2:4 3:17 59:12
**second** 38:16 43:23 68:13
**section** 38:12 80:3 80:4
**see** 16:1 17:7 20:1 25:1,15,16 28:5 37:13 39:8,15,16 39:20,21 41:3,4,5 47:1 48:5,6 51:12 56:17 61:19 67:5 80:14 81:5
**seek** 77:9
**seepage** 59:25
**self-described** 45:16
**sense** 57:15 84:14
**separate** 48:15
**separately** 25:4
**sequence** 16:11
**services** 55:22
**SES** 30:3
**session** 23:17 25:19 84:11
**set** 15:2 38:16 52:9 64:19 88:7
**seventies** 67:23
**sewer** 16:6 17:11
**shape** 15:11 52:18
**share** 31:10
**shear** 58:16
**sheet** 20:14 21:14 21:15 23:11,18 25:11 26:1,2 27:25 32:10 34:3 34:10 35:12,13,20 35:20 36:2,3,7,20 37:1,7 38:19 40:22,23 60:3,4 60:12,13,15,20 61:11,16 62:2 63:1 75:6,13 80:6 81:8
**sheeting** 27:22
**sheets** 60:22

GRIESHABER (VOL II), JOHN

**shell** 70:11,17
**short** 35:12,19 36:2
**shorter** 34:2,9,14
    36:6 37:2
**shorthand** 88:9
**show** 24:2 30:5
    32:25 33:4 35:6
    37:15,19 40:4,6
    43:13,16 56:5
**showed** 19:18
**showing** 39:18,19
    39:19 53:2
**shown** 21:14 23:14
    45:6 54:5
**shows** 41:16 54:17
**side** 39:17 53:13
    61:17 71:19 72:6
    86:20
**Signed** 87:11,13,15
**significance** 17:24
**significant** 11:2
    30:4
**signing** 5:9
**Sill** 33:15
**silt** 71:2,8,13
**silty** 70:10,16,22
    83:19,21
**similar** 35:5,7
**simplistic** 15:7
    52:14 66:12,13
**sir** 66:14
**site** 9:13 23:18
    25:11 35:2,6,11
    52:1 60:5,7 62:10
    63:2 68:4,10
    69:19,24 70:1
    84:20,21 85:4
**sites** 17:12
**sixties** 67:24
**size** 38:15 83:24
**sketch** 53:15,17
    54:22 63:3
**skipping** 46:1
    50:17
**slope** 13:8,16,21,21
    13:24 17:13,14

22:19 58:21,21
    59:20,22
**slowly** 34:17
**small** 35:3,3
**soil** 18:4 42:22
    44:12 69:16,25
    70:4,5,11 71:5,7
**soils** 35:8 69:18
    70:16,20,24 71:1
**someplace** 67:23
    78:4
**somewhat** 35:5
    83:4
**sorry** 20:5 49:10
    57:10
**sought** 5:15
**south** 41:7,9,19,21
    60:6 79:14,20,21
    81:17,19
**Spadaro** 57:5
**spade** 42:15,19,21
    44:11,14 45:1
**speak** 18:19 77:8
**speaking** 19:5
    50:12
**speaks** 15:4 17:7
    52:11
**specific** 45:22
    47:12 67:4 82:12
    82:22
**specifically** 5:10
    19:3 79:25
**specification** 19:13
    85:23
**specifications** 15:2
    15:6 18:25 19:15
    52:9,13
**stability** 13:13 14:1
    17:1,8 18:7 22:11
    22:17,18,19,21
    29:1 48:7 57:17
    57:18 58:11 59:19
    59:24 60:1 66:22
**standards** 73:24
    74:7
**stands** 58:2

**stapled** 25:3
**start** 41:14 49:12
**started** 42:2
**starting** 39:6 49:8
**state** 5:23 21:13
    88:3
**stated** 36:20 37:6
**statement** 25:17,20
    26:7,11,23 32:15
**STATES** 1:1,13,14
    2:9,10
**station** 2:15 16:6
    17:11 23:14 37:13
    38:12 39:4,7
    61:17
**stationery** 45:10
**stations** 28:8
**steel** 18:3
**steps** 63:11 64:14
    65:1,9,12
**STIPULATED** 5:2
**stipulation** 6:4
**Stone** 2:12 3:2 6:10
    24:11,20 27:3
    31:25 40:17 49:7
    53:22 54:24 63:14
    64:16 65:14 68:12
    69:10 72:10 74:5
    86:23
**stop** 35:16
**stored** 77:20
**stratification** 67:5
    67:7,10 68:23
    69:18 71:1
**stratigrafication**
    63:24
**stratigraphy** 58:16
**Street** 2:5 3:4
**string** 30:9,12,14
    33:4
**strings** 36:17,25
**structural** 18:4
    29:10 33:18 86:20
**structurals** 33:22
**structure** 12:18
    18:11 19:4 49:18

51:2
**structures** 29:11
    46:14,15 47:9
    86:18,21
**Stuart** 33:19
**studies** 67:7,10
**subject** 24:18 45:25
    48:25 50:19 82:10
**subjects** 47:15
**submittal** 28:16,24
**subsequent** 21:4
**subsurface** 63:23
**sufficient** 73:21
    74:2
**suggested** 37:11
**suggesting** 53:12
**supervise** 74:17
**supervising** 74:9
**supervision** 88:10
**supervisor** 74:15
    74:22
**supplemented**
    23:16
**support** 13:17
    55:14,17
**supported** 25:11
**supposed** 18:22
    26:3
**sure** 10:4 13:10
    19:13,25 35:24
    36:24 44:1 48:1
    49:12 55:8 56:13
    74:25 76:1 85:1,4
**Surekote** 53:14
    61:18,20 62:4,5,7
    62:21 78:25 79:2
    79:6,23 80:13
    81:14
**SUTTON** 3:16
**sworn** 6:4 88:6
**system** 15:8 30:4
    52:15

**T**
**T** 4:1,9 5:1,1
**take** 22:23 57:22

63:20 71:18 72:5
    81:3
**taken** 5:5 21:4 25:3
    67:12,14 87:25
    88:8
**talk** 65:7 79:25
**talked** 33:13 35:2
**talking** 28:17 34:21
    36:11 37:13 53:15
    57:17 65:25 66:1
    68:22,24
**tamping** 85:10
**task** 8:2,21 9:7
    10:11 12:2 13:1
    14:20 47:4 84:13
    84:13
**taxpayer** 77:12,14
**taxpayers** 77:13
**techniques** 73:19
**tell** 7:11 10:12
    17:23 21:24 31:23
    32:2 33:7 34:18
    37:25 38:6,11,22
    38:24,25 39:5,8
    41:11 42:13 53:18
    54:12 55:21
**tells** 27:21
**temporary** 18:10
**tender** 59:7
**Tendering** 24:4
    43:18
**tension** 34:25
**TERC** 84:12
**term** 12:12 63:6
    79:5 83:12 84:2
    85:18
**terminology** 51:18
    83:7
**terms** 45:13
**testified** 6:5 8:18
    14:2 16:8 20:9
    23:9 25:23 47:20
    47:23
**testify** 88:6,7
**testifying** 47:16
**testimony** 6:18 7:1

GRIESHABER (VOL II), JOHN

48:14 66:10 73:7
  87:4,6
**Thank** 85:22
**THATCH** 3:10
  30:21
**theory** 34:25
**thereof** 5:14
**thicker** 86:9
**thickness** 85:21,22
  86:6
**thing** 80:21 82:25
  83:22
**things** 9:16 13:9
  15:5 52:12 59:16
  66:17 83:2
**think** 10:4 15:20
  19:24 20:2,9 21:8
  23:4 29:19,21,21
  29:23 33:20 35:18
  38:1 39:3 44:3,17
  44:17,20,20 45:1
  49:5 50:12 54:4
  55:3,9 56:6 58:4,7
  58:24 66:11 68:14
  68:17,25 84:10
**third-party** 19:10
**thought** 35:22
  66:10 79:11 80:7
**time** 5:13 7:1,2,11
  21:3,17 23:12
  32:2 33:8,20
  56:25,25 76:12
  77:19 83:4 84:15
**times** 48:15
**tip** 21:14,15 23:11
  23:13 32:9 39:20
  41:17 60:3 62:2
  75:13
**tips** 23:18 28:7
  60:20 75:6
**today** 6:17 59:15
  59:16
**today's** 24:24
**Tom** 33:17
**tomorrow** 35:11
**tool** 58:22

**tools** 46:13,20,23
  52:25 73:8,13
**top** 41:2,12 68:6
  79:17 80:6
**TORTS** 2:11
**total** 58:11
**totally** 83:2,24
**traditionally** 83:15
  83:19
**trained** 18:13
**training** 18:19
**transcribed** 88:10
**transcript** 5:9 6:25
  8:7
**transcription** 87:5
  88:11
**transition** 37:1
**Treeby** 3:3 4:5,7
  6:6,8 11:15 14:17
  17:5,22 19:1 22:1
  23:6 24:15,25
  25:5 26:18 27:9
  27:13,24 29:6
  30:19,25 31:9,17
  31:22 32:6,21
  33:3,25 34:7,15
  36:14 38:5 39:24
  40:3,12,21 43:25
  46:3 49:11 53:25
  54:2 55:2 59:6,17
  60:2,24 62:12,17
  73:10 76:9 78:17
  78:19 86:11
**Treeby's** 71:16
**trees** 8:14
**troubled** 37:12
**true** 9:9 60:19 66:4
  66:5 87:7 88:10
**truth** 88:6
**try** 11:13 27:11
  37:25 50:3
**trying** 30:24 31:3
  66:16 81:24
**turn** 53:8
**turned** 15:22
**twist** 50:18

**two** 13:9
**two-paged** 19:17
**type** 7:19 13:5 15:1
  52:7 73:13 76:4
  77:1 84:12,15,25
  85:16
**types** 63:19
**typical** 84:1
**typically** 82:21
  83:7,13 84:23
**typing** 56:15

---

**U**

**U** 1:10 5:1
**Uh-huh** 45:19
**ultimately** 78:10
**um** 7:9,25 23:4
  33:13,16 36:10
  54:6 58:10,17
  62:22 67:22 71:5
  76:23 78:3 82:13
**underground**
  13:22
**underneath** 27:22
**understand** 6:22
  11:21 42:7 47:15
  63:6
**understanding**
  64:6 71:15,17
  74:21 82:3 88:12
**understood** 56:13
  66:15
**UNITED** 1:1,12,13
  2:9,10
**unzipped** 35:9
**upper** 39:2
**URS** 6:16
**USACE** 6:2
**use** 23:3,5 46:23
  48:5 50:7 58:4,5
  58:23,25 67:2
  84:8 85:3,5,6
  86:17,19
**utilize** 76:5
**utilized** 61:10,10
  61:17

**U.S** 1:15 2:19 48:19
  50:13

---

**V**

**V** 1:10
**valid** 26:6
**variance** 64:13
**variation** 66:5,5
**varies** 54:10
**various** 46:11
**Varuso** 33:21
**verbal** 76:25
**verbally** 12:8
**verify** 21:2
**version** 8:9
**VIDEOGRAPH...**
  3:24
**view** 41:12
**violate** 13:25
**violated** 14:10
**violates** 14:16
**voids** 71:13
**Vojkovich** 33:14
**Vroman** 29:18

---

**W**

**WAGER-ZITO**
  3:9
**Wahl** 33:16
**wait** 49:4,4,4
**Waits** 33:19
**waived** 5:10
**walked** 36:16
**wall** 14:1 27:23
  35:8,9,14 36:12
  38:12 47:24 48:3
  48:4,7,9,9 49:20
  59:24 60:1 66:22
**walls** 63:1 67:13,22
**Walter** 33:18
**Walther** 3:2 6:11
**want** 15:12,21 16:1
  24:2,5,13 25:6
  35:23 42:12 47:20
  52:3 53:8,16 54:6
  78:21

**wanted** 14:25 52:7
  55:8 56:13 64:12
  64:25 65:8 76:15
  82:9,15
**Washington** 2:16
  3:1,12 6:13,13,14
  14:23 22:5,25
  36:19 37:5 57:25
  70:6 75:11
**wasn't** 81:20
**water** 25:13 85:14
**Waugaman** 33:22
**way** 15:7,23 28:13
  31:15,18 32:16
  41:5 42:10 52:14
  66:6 74:12,13
  75:8 79:18 81:4
  81:11 88:15
**ways** 15:5 52:12
**weeks** 6:21
**went** 19:24 28:1
  32:12 60:24
**western** 54:13
**we'll** 15:13,14,18
  24:16 69:12 86:19
**we're** 8:11,13 15:4
  19:5 25:1 30:7,23
  31:3 37:13,18
  44:8 52:11 79:12
**we've** 9:5 26:8 28:2
  28:18 30:9 31:1
  33:5,13 36:16,24
  37:19 40:5 45:7
  49:12 65:19
**WGI** 15:24 16:14
  24:6 25:6 26:10
  69:17 75:21 76:2
  76:15 78:7
**WILLIAM** 3:3
**wish** 7:2
**witness** 5:4,25 6:3
  40:19 47:14 55:5
  59:7 68:18 69:1,2
  87:1 88:5
**Wittmann** 3:2 6:11
**word** 34:20 48:1,11

GRIESHABER (VOL II), JOHN

**words** 20:3
**work** 11:19 12:2
  13:1 14:9,22 22:3
  39:7,8 45:22 46:5
  46:14,25 47:7
  49:1,2,15,15
  69:21 70:8 72:22
  73:5
**worked** 33:12 83:4
  83:4 84:20
**working** 33:20
**workings** 74:19
**works** 10:3 29:19
  29:21
**wouldn't** 31:13
  51:19
**writer** 27:5
**writing** 38:14,17
  76:7,23
**written** 28:19
  76:24,25
**wrong** 25:20,24
  26:5 36:22 37:8
  37:10 55:9 62:16
  79:10
**wrote** 66:11
**W/L** 39:5

#### X
**X** 4:1,1,9,9

#### Y
**Yacht** 17:12
**yeah** 12:22 16:19
  17:6 23:3 30:22
  40:20 44:25 58:3
  84:25 85:11
**Young** 33:11

#### #
**#75005** 1:25 88:25

#### 0
**0+00** 38:12
**0+00.00** 39:5
**05-4182** 1:5

**051610** 24:8
**051611** 24:6 25:6
  26:10
**06-2268** 1:8
**076654** 15:24

#### 1
**1** 13:21,23 47:21
  53:9 55:3,10
  59:19,23
**10** 15:13,14,15 16:2
  16:7 25:21
**11** 24:2 28:15
**12** 50:20
**14** 49:1 53:2,17
  56:8
**15** 8:8,16 25:21
  56:6
**150** 25:21
**16** 54:10
**17** 28:10
**17-foot** 28:9
**18** 4:12 30:7,8,10
  30:15 49:6
**19** 4:13 33:6,9
**1960s** 21:5
**1968** 32:9
**1969** 23:12 26:1
**1970** 26:2
**1970s** 67:20
**1980** 38:1,10
**1980s** 68:5 70:2
**1982** 32:11,23
  40:14
**1990** 38:10
**1990s** 68:11 70:2
**1999** 77:16

#### 2
**20** 4:14 37:20 38:2
  42:13 53:14 54:20
  55:11 60:25 61:15
  61:24 67:1 71:18
  72:6 78:9,13
**2000** 67:8
**20001-2113** 3:12

**2001** 16:7 21:18
  43:15 45:8,8,9
  75:12
**20044** 2:16
**2005** 21:18
**2006** 30:11 33:5
**2008** 1:18 87:25
**202-616-4289** 2:17
**202-879-3939** 3:13
**204** 53:8 54:25
**21** 4:15 40:5,8
  50:21 54:10 60:25
  61:15,24 78:9,13
  78:20,24 79:13
  80:4
**21st** 1:18 87:25
**22** 4:16 43:18,21
  45:7
**228430** 16:14
**23** 30:10
**24** 30:11
**25** 25:12,15 26:3,9
  26:13,24 27:23
  28:4 32:12 36:12
  36:20,21 37:6,7
  38:19,20,21 39:14
  41:17 50:22 62:3
  75:6,14 81:8,13
**26** 8:21 9:7 10:11
  12:2 13:1 14:20
  47:4 84:14
**27** 8:6
**28** 8:8,15 33:5
**29** 33:5
**2980** 56:16

#### 3
**3** 13:21,23 19:16,17
  19:19 20:19 21:14
  23:8 40:14 59:20
  59:23
**30** 4:12 50:22 71:21
**30(b)(6)** 1:12 47:14
  65:17
**300** 42:20 67:1
  71:19 72:7

**33** 4:13
**38** 4:14

#### 4
**4** 8:8,15 37:22 38:8
  40:23 51:9
**4.2** 28:18
**40** 4:15
**42** 54:15
**43** 4:16
**45** 42:12 54:15
**48** 8:10

#### 5
**5** 51:10
**5+00** 38:12
**504-525-1335** 2:7
**504-581-3200** 3:6
**504-862-2843** 2:24
**51** 3:11
**546** 3:4
**55** 47:21
**59** 4:6

#### 6
**6** 4:5
**6th** 45:8
**6122** 24:9
**69** 20:15

#### 7
**70** 48:25 49:4
**70113** 2:6
**70118** 6:3
**70118-3651** 1:18
  2:23
**70130** 3:5
**72** 50:20
**73** 50:20
**7400** 1:17 2:22 6:2
**75** 50:20 51:9
**78** 4:7
**79** 40:22,23

#### 8
**8** 28:2,7 36:12

**39**:14,21 40:11,11
  40:18 41:18 48:25
  49:8 53:9 55:3,10
**8-foot** 32:8
**855** 2:5
**86** 4:8 54:19
**888** 2:14

#### 9
**9** 28:7
**95** 54:19