# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: KATRINA CANAL BREACHES | * | CIVIL ACTION |
| CONSOLIDATED LITIGATION | * | |
| | * | NUMBER: 05-4182 "K"(2) |
| | * | |
| | * | JUDGE DUVAL |
| PERTAINS TO: MRGO | * | |
| | * | MAG. WILKINSON |
| ************************************** | | |

# MRGO PSLC'S OPPOSITION TO WASHINGTON GROUP INTERNATIONAL, INC.'S

# MOTION FOR SUMMARY JUDGEMENT (Doc. No. 15861)

# TABLE OF CONTENTS

I.      Prologue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     THERE CAN BE NO DERIVATIVE IMMUNITY VIA THE
        GOVERNMENTAL CONTRACTOR DEFENSE WHEN THERE
        IS NO ORIGINATING IMMUNITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

III.    WGI HAS NOT PROVEN THAT DISPLACEMENT
        OF STATE LAWS APPLIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

IV.     WGI BEARS THE BURDEN OF PROOF IN
        ESTABLISHING ITS DERIVATIVE IMMUNITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

V.      WGI FAILED TO SATISFY ANY OF THE BOYLE REQUIREMENTS . . . . . . . . . . . 9

        A.      The Work Plans Developed By WGI Did Not Contain
                Reasonably Precise Specifications . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

                1.      WGI Failed To Provide Reasonably Precise
                        Geotechnical Specifications . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

                2.      WGI Failed To Address The Data Gaps That Would Have
                        Given The Corps Further Specifications To Evaluate
                        The Scope Of The Work . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

                        A.      The Orleans Levee District Permit . . . . . . . . . . . . . . . . . . . . . 18

                        B.      The Wedding Cake Structure . . . . . . . . . . . . . . . . . . . . . . . . . . 20

                        C.      The Lift Station Excavation . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

                3.      The Corps Did Not Perform A Substantive Review
                        Of The Specifications . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

        B.      WGI Failed To Conform To Specifications That The Work Not
                Harm The Flood Wall . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

        C.      WGI Withheld Knowledge That Would Have Influenced
                The Corps's Decision Making Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

VI.     CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

## TABLE OF AUTHORITIES

### CASES

*Bailey v. McDonnell Douglas Corp.*, 989 F.2d 794, 802 (5th Cir. 1993) . . . . . . . . . . . . . . . . 8, 27

*Boyle v. United Tech. Corp.*, 487 U.S. 500, 511, 108 S.Ct. 2510,
        101 L.Ed.2d 442 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 7-9, 26, 28

*Carley v. Wheeled Coach*, 991 F.2d 1117 (3rd Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Densberger v. United Techs. Corps.*, 297 F.3d 66 (2d Cir.2002), *cert. denied*,
        537 U.S. 1147, 123 S.Ct. 876, 154 L.Ed.2d 849 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . 23

*In re Joint E. & S. Dist. N.Y. Asbestos Litig.*, 897 F.2d 626, 632 (2d Cir.1990) . . . . . . . . . . . . . 7

*In re Agent Orange Product Liability Litigation*, 517 F.3d 76 (C.A.2 (N.Y.),2008) . . . . . . . . 28

*In re Air Disaster at Ramstein Air Base, Germany*, 81 F.3d 570 (5th Cir.1996) . . . . 5, 10, 23, 24

*International Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257 (5th Cir.1991) . . . . . . . . . . . . . . . . . 8

*J.L. Simmons Co. v. United States,* 412 F.2d 1360 (Ct. Cl. 1969) . . . . . . . . . . . . . . . . . . . . . . . . 10

*Jacobellis v. Ohio*, 378 U.S. 184, 197, 84 S.Ct. 1676, 1683, 12 L.Ed.2d 793 (1964) . . . . . . . . . 10

*Kerstetter v. Pacific Scientific Co.*, 210 F.3d 431 (5th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . 5, 24

*Malesko v. Corr. Servs. Corp.*, 229 F.3d 374, 382 (2d Cir.2000), *rev'd on*
        *other grounds*, 534 U.S. 61, 122 S.Ct. 515, 151 L.Ed.2d 456 (2001) . . . . . . . . . . . . . . . 23

*Mitchell v. Lone Star Ammunition, Inc.*, 913 F.2d 242 (5th Cir.1990) . . . . . . . . . . . . . . . . . . . . 27

*Stout v. Borg-Warner Corp.*, 933 F.2d 331 (5th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Trevino v. General Dynamics Corp.*, 865 F.2d 1474 (5th Cir. 1989) . . . . . . . . . . . . . 9, 23, 24, 27

*United States v. Spearin*, 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166 (1918) . . . . . . . . . . . . . . . . . 11

*Winters v. Diamond Shamrock Chemical Co.*, 149 F.3d 387 (5th Cir. 1998) . . . . . . . . . . . . . . . . 5

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: KATRINA CANAL BREACHES | * | CIVIL ACTION |
| CONSOLIDATED LITIGATION | * | |
| | * | NUMBER: 05-4182 "K"(2) |
| | * | |
| | * | JUDGE DUVAL |
| PERTAINS TO: MRGO | * | |
| | * | MAG. WILKINSON |

**************************************

## MRGO PSLC'S OPPOSITION TO WASHINGTON GROUP INTERNATIONAL, INC.'S MOTION FOR SUMMARY JUDGEMENT (Doc. No. 15861)

As will be specified below, this Court must deny the Washington Group International Inc.'s ("WGI") Motion for Summary Judgment. Because the government contractor defense is an affirmative defense, WGI has the burden of establishing the conditions for application of the defense in addition to its summary judgment burden: WGI has failed to satisfy these burdens.

## I.

## PROLOGUE

Before Hurricane Katrina struck the City of New Orleans, the lower 9th Ward was protected by an I-Wall structure 3900 feet long with a sheet pile tip depth of -8 to -10.5 feet.[1] The Independent Performance Evaluation Team ("IPET"), at the behest of the U.S. Army Corps of Engineers ("Corps"), evaluated the two failures of this structure. IPET concluded that the south breach (900 feet long) was caused by overtopping even though overtopping occurred over the entire length of

---

[1] Exhibit 3 - IPET report, Vol. V Appendix 11, page 23.

1

the wall.  The north breach (250 feet long), they suggest, was caused by a foundation failure.

Plaintiffs have argued, and have produced expert opinion, that shows that these two breaches occurred because WGI and the Corps improperly back filled two excavations: each of which were approximately 20-22 feet in depth, one the result of the removal of a buried lift station on the Saucier Marine site, the other from the removal of a concrete structure called the "wedding cake" at the Boland Marine.

The south breach near the Saucier excavation and the north breach near the Boland excavation, Plaintiffs suggest, is no mere coincidence.  These excavations should have been back filled with impermeable material and compacted to a minimum 95 percent Standard Proctor density. They were not.  In fact, WGI's work plans did not contain any prescriptive specifications for backfill and compaction. The plans contained only general specifications for backfill, which were broad enough to permit the use of anything from sand to clay to be used, as long as the fill was not contaminated. The general specifications for compaction were equally broad.

It is an engineering fact that an improperly backfilled 'hole' in the 'impermeable' foundation materials on the 'flood side' of a levee may cause underseepage in pervious foundations beneath that levee which may result in (a) excessive hydrostatic pressures beneath an impervious top stratum on the landslide, (b) sand boils, and ( c) piping beneath the levee itself.  Underseepage problems are most acute when a pervious structure underlies a levee and extends both landward and riverward of the levee and where a relatively thin top stratum exists on the landside of the levee.[2]

This fact was well known to Dennis Michael O'Connor, the project manger and  the highest

_____

[2] Exhibit 4 - Technical Report No. IV Review of USACE Excavation and Backfill Guidelines and Practices Near Flood Control Structures, Bea at p. 4 citing EB 1110-2-1913, Design and Construction of Levees (USACE 2000).

ranking WGI employee on the EBIA.[3]  Mr. O'Connor  was the author of a considerable amount of

the Recommendation Report submitted by WGI to the Corp regarding the scope and duration of the

work.[4]  Consider his testimony starting at page 31 line 18 of his deposition taken on August 13, 2008

and culminating with this exchange at page 77 line 8- page 78 line 17:

> Q:     Now, we were talking, though generally about how the movement of water
> could affect a flood control structure.  Other than the tendency of the hole
> to cave in and thereby undermine the foundation of the flood control
> structure , is there any other hazard associated with doing something that
> would cause the water to be conducted more efficiently underneath the
> surface that you're aware of?
>
> Mr. Treeby:
>        Objects to the form.
>
> The Witness:
>        Would you rephrase that, please?
>
> Examination by Mr. Bruno:
> Q:     Well, if you've done your borings and you know that the water is down
> there, you know the water is moving in a certain direction, did you know
> before you got to New Orleans that if you dug a hole that was on the water
> side of a flood control structure and you filled it with a porous material, that
> if the level of the canal or the waterway went up, then that hole might
> provide a conduit for water to go down below the surface, intrude into a
> porous layer of soil, and then move laterally underneath the flood control
> structure and cause some undermining of the structural integrity of the
> levee?
>
> Mr. Treeby:
>        Objects to the form of the question.
>
> Examination by Mr. Bruno:
> Q:     Did you know that?
>
> A:     Yes.

---

[3] Exhibit 5 - Depo. transcript of WGI by Phillip Lee Staggs,p. 28, l.23 through p. 30, l. 11.

[4] Exhibit 6 - Depo. transcript of Dennis O'Connor, p.86, l.5-7.

As to whether he would share this knowledge with a client, O'Connor goes on to say "...that not necessarily would he do that because it would depend on the scope of the work. If the scope of the work already said that we were going to do that, then I would come to them, "This is what we intend to do" or "What do you want to do with regards to your scope of work?" "And also I would have to talk money and labor of effort – level of effort. If he already knew it, I wouldn't repeat it to him, if it was already the scope of the work. If it was unknown, if they didn't know, we would address it and would make them aware of it if they weren't aware if it. Or I would make them aware of my concerns."

In fact, all USACE design guidelines pertaining to flood protection systems require seepage analysis to be performed as part of the design.[5] The Corps understood that it was mandatory that holes near a flood protection structure must be evaluated,[6] and in fact assumed that it had occurred.[7]

Mr. Lee Guillory, the second 30 (b) (6) witness for the Corps and the highest ranking Corps employee on the EBIA site, testified that the Corps did not perform the engineering evaluation that Mr. Grieshaber testified was mandatory because the Corps relied on WGI's advice and design as recommended by WGI, as to deeper hole, WGI was required to retain a licensed professional engineer to do an evaluation.[8]

---

[5] (USACE, 1985; USACE, 1993a; USACE,1994; USACE, 2000). Technical Report No. IV, by Bea.

[6] Exhibit 7 -Corps 30(b)(6) (Grieshaber) deposition transcript, pg. 88, l. 7-21.

[7] Exhibit 7 -Corps 30(b)(6) (Grieshaber) deposition transcript, pg. 106, l. 5-18.

[8] Exhibit 8 -Corps 30(b)(6) (Guillory) deposition transcript, pg. 157, l.24 thru p.161, l.21.

4

## II.

### THERE CAN BE NO DERIVATIVE IMMUNITY VIA THE GOVERNMENTAL CONTRACTOR DEFENSE WHEN THERE IS NO ORIGINATING IMMUNITY

"Government contractor immunity is derived from the government's immunity from suit where performance of a discretionary function is at issue."[9]  The United States Supreme Court developed the derivative immunity of the governmental contractor defense to shield the government from ultimately paying for transgressions involving the balancing of technical, military, and social considerations from which Congress intended to insulate itself.

By specifying that the government's immunity inured to the benefit of the contractor because it was derivative of the government's own immunity, the U.S. Supreme Court established that the parameters of the "federal common law" governmental contractor defense were dictated by the application of the discretionary function exception to the FTCA.[10] [11]  It follows that if the Government does not enjoy discretionary function exception immunity for a particular task or project, then the government contractor employed on that same project likewise should not enjoy a derivative of this immunity.

The MR-GO Master Consolidated Class Action Complaint set forth that the negligent acts of **both** the U.S. Army Corps of Engineers ("Corps") and WGI caused or contributed to the failures of the flood walls at the East Bank Industrial Area ("EBIA") of the Inner Harbor

---

[9]  Kerstetter v. Pacific Scientific Co., 210 F.3d 431, 435 (5th Cir. 2000), quoting Boyle v. United Tech. Corp, 487 U.S. 500, 511, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988).

[10]  In re Air Disaster at Ramstein Air Base, Germany, 81 F.3d 570, 574 (5th Cir.1996) (citing Boyle, 487 U.S. at 511, 108 S.Ct. 2510); Winters v. Diamond Shamrock Chemical Co., 149 F.3d 387 (5th Cir. 1998).

[11]  Carley v. Wheeled Coach, 991 F.2d 1117 (3rd Cir. 1993).

Navigational Canal ("IHNC").[12]  The defendant United States of America, by and for the Corps, has already asserted that it should be immune from the claims lodged against it in the MR-GO Master Consolidated Class Action Complaint because it was exercising its discretion in administering the EBIA project.[13] As a result, the Court can appreciate that the defendant United States should not enjoy this immunity. (See Exhibit 1[14] & Exhibit 2[15]).

By failing to establish that the original intent of the derivative immunity is satisfied, i.e., that the government is shielded from liability for exercising a discretionary function (such as the balancing of considerations for greater combat effectiveness), WGI has failed to prove that the governmental contractor defense is even applicable to the case at bar.

Given the procedural posture here, it is WGI's burden to prove immunity exists, not Plaintiffs's burden to prove it does not. For this reason alone, the Motion for Summary Judgment should be denied.

### III.

### WGI HAS NOT PROVEN THAT DISPLACEMENT OF STATE LAW APPLIES

Assuming *arguendo* that the Court disregards WGI's lack of derivative immunity, the Court must then determine whether WGI has met its burden of proof in establishing that the U.S. Supreme Court's requirements to preempt state law have been met.

---

[12] Record Doc. 3415.

[13] Record Docs. 13653 & 14444.

[14] Exhibit 1- MRGO PSLC, as *amicus curiae*, Memorandum in Support of the Robinson Plaintffs' Opposition to the United States of America's Motion to Dismiss Counts Two and Three of the Amended Complaint (Record Doc 14252).

[15] Exhibit 2 - Sur Reply of the MRGO PSLC, as *amicus curiae*, to the Reply Memorandum of the United States of America's Motion to Dismiss Counts Two and Three of the Amended Complaint. (Rec.Doc. 14784).

The "federal common law" defense identified as the governmental contractor defense allows for the displacement of state law only where a "significant conflict" exists between an identifiable federal policy or interest and the operation of state law.[16]  The scope of displacement is not all-encompassing: signing a contract to perform work for the government does give a contractor a free pass to myopically engage in conduct that falls below the professional standards of care that would apply in all other circumstances.

When the duty sought to be imposed on the contractor is not identical to one assumed under the contract, but also not contrary to any assumed under the contract, then a uniquely federal interest is not involved and the application of state law will not frustrate the specific objectives of federal legislation.[17]  Only when the state-imposed duty of care (that conduct that is the asserted basis of the contractor's liability) is precisely contrary to the duty imposed by the government contract should the contractor defense displace state law.  In essence, because the contractor could not comply with both its contractual obligations and the state prescribed duty of care, the contractor claims that "[t]he Government made me do it"[18] and the immunity applies.

As will be shown below, WGI's fulfillment of its state law duty of care would not have conflicted with the fulfillment of the Task Order 26 contract; and as a result, there is

---

[16] Boyle, 487 U.S. at 507, 108 S.Ct. at 2516, 101 L.Ed.2d 442 (1988).

[17] In Boyle, the U.S. Supreme Court identified an example of a situation where state law would not be preempted, as when the United States contracts for the purchase and installation of an air conditioning unit, specifying the cooling capacity but not the precise manner of construction, a state law imposing upon the manufacturer of such units a duty of care to include a certain safety feature would not be a duty identical to anything promised the Government, but neither would it be contrary. The contractor could comply with both its contractual obligations and the state-prescribed duty of care. In such a case, there is no need to preempt state law.

[18] In re Joint E. & S. Dist. N.Y. Asbestos Litig., 897 F.2d 626, 632 (2d Cir.1990).

no need to preempt state law by applying the governmental contractor defense.  Plaintiffs are entitled to their day in court to prove to a finder of fact that the negligence of both the Corps *and* WGI caused the horrific events that engulfed the Lower Ninth Ward and St. Bernard Parish.

**IV.**

**<u>WGI BEARS THE BURDEN OF PROFF IN ESTABLISHING ITS DERIVATIVE IMMUNITY</u>**

Because the government contractor defense is an affirmative defense, the burden is on the defendant to establish the conditions for application of the defense.[19]  As the moving party, WGI will bear the burden of proof at trial; therefore, it must come forward with evidence on summary judgment that would entitle it to a directed verdict if the evidence went uncontroverted at trial.[20]

WGI can only avoid liability on state law claims under the government contractor defense only by showing the following:

> (1) that the United States government approved reasonably precise specifications;

> (2) that the product conformed to those specifications; and

> (3) the contractor must warn the United States government about dangers associated with the use of the product known to the manufacturer but not to the government.[21]

---

[19]  <u>Bailey v. McDonnell Douglas Corp.</u>, 989 F.2d 794, 802 (5th Cir. 1993).

[20]  <u>International Shortstop, Inc. v. Rally's, Inc.</u>, 939 F.2d 1257, 1264-65 (5th Cir.1991) (internal quotation omitted).

[21]  <u>Boyle</u>, 487 U.S. at 512, 108 S.Ct. at 2518, 101 L.Ed.2d 442 (1988).

To prevail at trial, WGI bears the burden of proving all three of these elements.  To prevail on summary judgment, it must prove the absence of any disputed material facts in this regard.  As will be shown below, a majority of the assertions espoused by WGI will be controverted at trial.  The result is that there are substantial questions of material fact concerning matters probative to the claims set forth by the Plaintiffs.

## V.

### WGI HAS FAILED TO SATISFY ANY OF THE BOYLE REQUIREMENTS

The first two conditions established in Boyle ensure that the suit from which protection is sought is within the area where the policy of the discretionary function would be frustrated if it were allowed to proceed.  As a result, Boyle makes clear that the requirements of *reasonably precise specifications* and conformity to them refer to the particular feature of the product claimed to be defective.[22]  Boyle can only be applied to provide protection to government contractors from liability where "discretion over significant details of the *design feature in question* was exercised by the government."[23]

The third condition is necessary because, in its absence, the displacement of state tort law would create some incentive for the manufacturer to withhold knowledge of risks, since conveying that knowledge might disrupt the contract but withholding it would produce no liability.

## A.    The Work Plans Developed By WGI Did Not Contain Reasonably Precise Specifications

The very essence of the Plaintiffs' claim is that the work performed by WGI at the EBIA allowed for under-seepage erosion that caused or substantially contributed to the failures of the flood

---

[22] Boyle, 487 U.S. at 512, 108 S.Ct. at 2518.

[23] Trevino v. General Dynamics Corp., 865 F.2d 1474, 1486 (5th Cir. 1989).(Emphasis added).

walls at the EBIA.   Under the first element of <u>Boyle</u>, WGI must prove that the Corps approved *reasonably precise specifications* relative to the features of work that are brought into question by Plaintiffs claims.  This they have failed to do.

In <u>Stout v. Borg-Warner Corp.</u>,[24] the Fifth Circuit examined the questions of what constitutes "reasonably precise specifications" and "approval" for purposes of applying the first element of the government contractor defense.[25]   However, no clear cut definition of "reasonably precise specifications" can be gleaned.  <u>Boyle</u> and its progeny dictate that the Court must evaluate the specifications of the particular project on a case by case basis to determine whether the facts presented constituted "reasonably precise specifications."   In essence, the Court must utilize an approach not unlike Justice Potter Stewart in defining obscenity-"I know it when I see it."[26]

Before evaluating the particular specifications of the project, the Court must first understand the peculiar nature of the relationship between the Corps and WGI, as well as the nature of the contract itself.  The Court will see that WGI's contract was a performance specifications contract, as opposed to a design specifications contract, a distinction clarified by the Court of Claims in disputes between the government and its contractors.

Performance specifications contracts set forth an objective or standard to be achieved, leaving the contractor leeway in determining the manner in which to achieve the end result.[27]   If the government approved imprecise or general guidelines, ***then discretion over important design***

---

[24] 933 F.2d 331, 335 (5th Cir. 1991)

[25] <u>In re Air Disaster at Ramstein Air Base, Germany</u>, 81 F.3d at 574.

[26] <u>Jacobellis v. Ohio</u>, 378 U.S. 184, 197, 84 S.Ct. 1676, 1683, 12 L.Ed.2d 793 (1964).

[27] <u>J.L. Simmons Co. v. United States</u>, 412 F.2d 1360, 1362 (Ct. Cl. 1969).

*choices would be left to the government contractor*.  Design specifications contracts set forth in precise detail the materials to be employed and the manner in which the work is performed;  detailed design specifications contain an implied warranty that if they are followed, an acceptable result will be produced.[28]

To handle the project at the EBIA, the Corps retained WGI specifically intended that WGI would develop the specifications to fulfill the project's scope of work.  This project differed from standard military design/procurement contracts because the Corps initially tasked WGI to fulfill a future objective by providing the results of prior investigations and then asking WGI to  "show us how" to meet that objective.  The institutional mismanagement that followed, along with WGI's own failure to fulfill its independent duty of due care, led to critical errors in the design features of the project.

These critical errors contributed directly to the under-seepage erosion during hurricane Katrina that Plaintiffs' expert Robert Bea has opined caused or contributed to the failure of the flood walls at the EBIA.

### 1.      *WGI Failed To Provide Reasonably Precise Geotechnical Specifications*

With the completion of the 1997 Mississippi River-Gulf Outlet New Lock and Connecting Channels Report, the Corps was ready to proceed with the replacement of the lock that regulated waterborne traffic between the Mississippi River and the IHNC.   This project required the development of a bypass channel parallel to the IHNC that included dredging the EBIA to accommodate the bypass channel.  Because the EBIA still housed industrial structures from defunct companies, along with the presence of contaminants in the soils intended to be dredged, the New

---

[28] United States v. Spearin, 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166 (1918).

11

Orleans District of the Corps ("NOD") undertook to retain a contractor to handle both the demolition

of surface and subsurface structures and the remediation of the area to be dredged.  The NOD sought

and obtained approval from the Corps's Tulsa Division to utilize a TERC[29] contractor, with WGI

being awarded the opportunity to perform the work through the TERC.

The TERC was intended to provide the Government with a single contractor that possessed

sufficient institutional knowledge to develop a streamlined and cost-effective remediation.[30]  This

"umbrella" contract established the responsibilities of the Corps and WGI for all future site specific

projects once a particular site-specific Statement of Work[31] (known as a Task Order under the

TERC) was issued by the Corps.  Once the Statement of Work was issued, WGI was then "required

to provide input to support the planning, scheduling and formulation of the [Corps]'s statement of

work."[32]  In order to accomplish this task, WGI would receive back up data from the Corps that was

available from the Corps' prior investigations.[33]  WGI's review of these documents would allow it

to meet one of the goals of the TERC - **"to develop the performance specifications needed to

remediate a particular location**."

On June 1,1999 the Corps issued a Statement of Work that constituted the opening of Task

Order 26, and set forth the project requirements that WGI would "**furnish all engineering services,**

---

[29] The Total Environmental Remediation Contract ("TERC") was an Indefinite Delivery-Indefinite Quantity contract for the total remediation of HTRW (Hazardous, Toxic, and Radioactive Waste) projects/sites in support of various Corps customers.

[30] Exhibit 9 - Depo. transcript of WGI by Anne Patten Veigel, p. 84, l.21-25 & p.85, l. 1-2.

[31] "The Statement of Work lists the work elements, a little description of the site, a little description of the work to be performed." Exhibit 10 - Depo. transcript of WGI by Stephen Clay Roe,p. 16.

[32] Exhibit 9 - Depo. transcript of WGI by Anne Patten Veigel,, p. 85, l. 11-16.

[33] Exhibit 9 - Depo. transcript of WGI by Anne Patten Veigel, p. 86, l. 13-20.

**materials, supplies, labor, as required, in connection with the technical review of site documents ... associated with the demolition and remediation of the [EBIA].**"[34][35] One of WGI's essential roles as the contractor at this point was to "initiate recommendations to the ... Corps about any alternative methods of executing a remedial action that would result in improvements."[36] WGI was expected to provide complete architectural-engineering services to support the implementation of the remedial action.[37]

Having no "understanding about the quality of the soils in Louisiana in or around bodies of water like ...[IHNC],"[38] WGI assigned Dennis O'Connor (not an engineer)[39] to perform a technical review of the site documents provided by the Corps and draft an initial Recommendation Report.[40] Then, without reviewing any Corps engineering manuals or technical manuals to ascertain whether or not there were Corps recommendations or guidelines about working within the critical area of the flood control project,[41] O'Connor along with Jim Blazek[42] produced WGI's Recommendation Report. This report set forth both the scope and duration of the remediation and demolition that would be required, as well as any *data gaps* that might need to be filled at a later date by sampling

---

[34] Exhibit 11 - Statement of Work, § 3;

[35] Exhibit 9 - Depo. transcript of WGI by Anne Patten Veigel, p. 85, l. 17-16.

[36] Exhibit 9 - Depo. transcript of WGI by Anne Patten Veigel, p. 86, l. 3-9.

[37] Exhibit 9 - Depo. transcript of WGI by Anne Patten Veigel, p. 87, l. 5-11.

[38] Exhibit 10 - Depo. transcript of WGI by Stephen Clay Roe, p. 56, l. 16-21.

[39] Exhibit 6 - Depo. transcript of Dennis O'Connor, p.16, l. 19-21.

[40] Exhibit 10 - Depo. transcript of WGI by Stephen Clay Roe, p. 43, l. 7-13 & p. 44, 1.1-5.

[41] Exhibit 10 - Depo. transcript of WGI by Stephen Clay Roe, p. 156, l. 2-12.

[42] An environmental manager and project engineer, employed by WGI's subcontractor Materials Management Group ("MMG"), specializing in environmental services, including Louisiana RECAP.

and other investigations.[43]

Once the Corps had a chance to digest the scope of work as specified by WGI, the Corps directed WGI to develop a number of work plans to act as specifications and guidelines to accomplish the work.[44]   However, a specific plan, the "Project Work Plan," would set the performance standards regarding the project processes, including the depths of excavation.[45] Because the Project Work Plan would involve a vast array of engineering processes, WGI would be required to provide engineering details, including geotechnical and geology/hydrology.[46]

The Corps knew that the TERC required WGI to have available a geotechnical engineer, and expected WGI to advise it of geotechnical issues it encountered.[47]   WGI recognized it had an obligation not to damage the levee or flood wall that was in the proximity of the work site, and realized that there was a potential for damage to a flood control structure caused by subsurface excavations near a flood wall.[48]   Nonetheless, WGI failed to recommend or undertake further investigation of this potential for harm,[49] and did not feel it had an obligation to warn the government of the potential for harm because it *assumed* that the government was going to evaluate that potential

---

[43] Exhibit 10 - Depo. transcript of WGI by Stephen Clay Roe,p. 43, l. 3-13.;  Exhibit 5 - Depo. transcript of WGI by Phillip Lee Staggs,p. 159, l. 10-18.

[44] Exhibit 8 -Corps 30(b)(6) (Guillory) deposition transcript, pg. 154, l.8-10.

[45]  Exhibit 12 -WGI038704 @ WGI38731, Sec 5.1.2.1.3.

[46] Exhibit 12 - WGI038704 @ WGI38731-2, 5.1.2.1.5.

[47] Exhibit 8 -Corps 30(b)(6) (Guillory) deposition transcript, p. 83, l. 24-25 & p. 84, l. 1-18; p. 151, l.5-12.

[48] Exhibit 10 - Depo. transcript of WGI by Stephen Clay Roe, p. 168, l. 20 to p. 170, l. 11.

[49] Exhibit 10 - Depo. transcript of WGI by Stephen Clay Roe, p. 170, l.1-10.

14

for harm.[50]   This assumption prove fatal, because WGI failed to confirm that the Corps was evaluating the proposed work to determine if it would damage the flood wall.[51]

In addition to the proposed work plans, WGI's Recommendation Report specifies that it would develop procedures to remediate the EBIA to meet the State of Louisiana's RECAP Standards.[52]   In furtherance of this responsibility, Dennis O'Connor and Jim Blazek prepared a RECAP Submittal Report-Criteria Document, first dated June 2000.[53]   This was a "master document" providing information for the entire EBIA; [54] in it W.I. indicated to the Corps that the flood wall sheet pile adjacent to the EBIA  reached "a depth of at least 25 ft. and this would essentially interrupt the water flow in the easterly direction at lower elevations to 25 ft."[55]   This assertion was patently false; the sheet pile tip depth only reached to minus eight (-8) feet, therefore sub-surface ground water flow was not interrupted below the depth of the sheet pile.[56]

WGI developed its "Project Work Plan" in October of 2000 to direct the work activities.[57]   WGI acknowledged data gaps for soils and subsurface issues,[58] but indicated that these data gaps

---

[50] Exhibit 5 - Depo. transcript of WGI by Phillip Staggs, p. 192, l.5-19 & p. 194, l. 21 through p. 195, l. 16.

[51] Exhibit 5 - Depo. transcript of WGI by Phillip Lee Staggs, p. 183, l.14-19.

[52] Exhibit 12 - WGI038704 @ WGI38754, Sec. 5.7.

[53] Exhibit 10 - Depo. transcript of WGI by Stephen Clay Roe, p. 218, l. 23 to p. 219, l. 16; Exhibit 5 - Depo. transcript of WGI by Phillip Lee Staggs, p. 264, l.6-9.

[54] Exhibit 13  - WGI047682-83.

[55] Exhibit 13  - WGI047691.

[56] Exhibit 7 -Corps 30(b)(6) (Grieshaber) deposition transcript, pg. 150, l. 9-25.

[57] Exhibit 14 - WGI041879; WGI041887, Sec.1.1.

[58] Exhibit 14 - WGI041893, Sec 1.5.

would be addressed after the completion of the various phases of the demolition.[59]  As of October, 2000, the depth of soils considered to be removed was indicated as three (3) feet at the Boland site and seven (7) feet at the Saucer site.[60]

Having undertaken no independent geotechnical investigations of the EBIA, and providing the Corps with a crucially defective report misleading the Corps's EBIA project team about the depth of the sheet pile at the adjacent flood wall, W.I. mobilized on site in January, 2001 to commence the physical aspects of the EBIA project.

## 2.   *WGI Failed To Address The Data Gaps That Would Have Given The Corps Further Specifications To Evaluate The Scope Of The Work*

It was the agreed between the Corps and WGI that once the physical aspects of the project were underway, additional work plans would be developed by WGI to address engineering considerations for specific tasks not addressed in the Project Work Plan.  This would include the removal of bank materials from the Industrial Canal, the removal of a sewer lift station at the Saucer Marine site, the removal of a submerged railroad car from the Industrial Canal bank, the removal of a concrete anchor foundation at the Boland Marine site, as well as any additional subsurface structures encountered.

WGI's failure to provide reasonably precise geotechnical specifications in the initial work plans was compounded by its failure to provide sufficient information to resolve the data gaps previously identified.   As a precursor to the specific defalcations that WGI would soon be perpetrating, WGI had already assured the Corps of the following:

1.   that it had the relevant engineering expertise to develop the project's scope of work;

---

[59] Exhibit 14 -WGI041928, Sec 3.7.

[60] Exhibit 14 - WGI041930, Sec. 3.7.4.

2.      that it had reviewed the relevant technical documents provided to it;

3.      that it would secure any necessary permits to perform works on the facility;

4.      that the adjacent flood wall sheet pile tip depth reached down to minus twenty five (-25) feet below ground surface essentially interrupting any ground water flow to that depth;

5.      that any data gaps from the prior reports would be filled by further investigation.

In fact none of these assurances held true. This resulted in substantial excavations throughout the EBIA that altered the flow of sub-surface ground water, opened portals to sub-surface permeable layers, and allowed the unabated under-seepage through permeable soils below the flood wall during hurricane Katrina when the EBIA was covered with high water.

Two particularly deep excavations requiring specific excavation plans were for the Sewer Lift Station at the Saucer Marine site and the "wedding cake" structure at Boland Marine. However, in presenting their "specifications" for review, WGI did not know that the Corps had "guidelines for work proposed near or within a federally constructed flood control project," nor did it know that local sponsors were "responsible for controlling all construction that occurs within a critical area" of the flood wall (an area defined as being generally the area from 300 feet riverward to 500 feet landward of a flood control project center line).[61]  Both of these deep excavations (>20 ft.) were within 300 feet of the center line of the flood wall;[62] however, WGI chose to use what engineers refer to as general specifications for important considerations (such as the type of materials to use as backfill and the compaction specifications of the backfill) instead of the more precise "prescribed"

---

[61] Exhibit 10 - Depo. transcript of WGI by Stephen Clay Roe, p. 153, l.23-25 & p. 154, l. 1-23.

[62] Exhibit 8 - Corps 30(b)(6) (Guillory) deposition transcript, pg. 160, l.20 through p. 161, l. 6.

17

specifications.

Additionally, WGI had been originally tasked with determining which permits would be necessary to carry out the project, in particular that of the Orleans Levee District ("OLD"), the local sponsor of the flood wall. This permitting requirement would have provided an additional level of investigation to perhaps insure the integrity of the flood wall; however, WGI never obtained the permit.

### a. *The Orleans Levee District Permit*

On August 28, 2000, the Corps produced a Statement of Work for Project Site Development and Remedial Action of EBIA, requiring WGI to "furnish all services, materials, supplies labor, equipment, superintendence, procurement, security services, surveying services, subcontracting, **all necessary permits, licenses**...for the project site."[63]

WGI understood that both pursuant to the TERC and the August 2000 Statement of Work that it was responsible for obtaining all necessary permits to undertake the project. WGI assigned Dennis O'Connor with the task of identifying the permits needed for the job.[64] The Orleans Levee District ("OLD") was quickly identified as potential permitter because WGI would be working so close to the vicinity of the flood wall.[65] The Corps contemplated that WGI would make application for any permit on behalf of the Corps that was deemed necessary by OLD.[66]

In November 2000, WGI made contact with the OLD to inquire about permits for work at the EBIA, confirmed by letter dated November 7, 2000 from Dennis O'Connor to Steven Spencer

---

[63] Exhibit 15 - WGI000093.

[64] Exhibit 10 - Depo. transcript of WGI by Stephen Clay Roe, p. 62, l. 6-9.

[65] Exhibit 10 - Depo. transcript of WGI by Stephen Clay Roe, p. 158, l.18 through p. 159, l. 3.

[66] Exhibit 8 -Corps 30(b)(6) (Guillory) deposition transcript, pg. 103, l.19 through p. 104, l. 11.

of the OLD.[67]  Additionally, The State of Louisiana, Department of Transportation and Development issued a Letter of No Objection on December 29, 2000 in response to WGI's permit request conditioned upon WGI's agreement to notify the Levee District upon "completion of the demolition activities, so that an inspection and approval of the levee condition may be made."[68]

On April 6, 2001, the Corps of Engineers issued a Letter of No Objection to OLD informing them that it had no objection to the issuance of a permit to WGI.[69]  Based upon this Letter of No Objection, the OLD forwarded a permit letter to WGI requiring strict adherence to the DOTD letter of December 29, 2000 as well as to establish an initial inspection.[70] In order for this permit to be executory, WGI was required to sign the permit and return it to the OLD.

However, once the permit was sent to WGI's legal counsel, WGI was advised not to sign the permit letter.[71]  This issue regarding the permit did not get past the time frame of April 2001,[72] and the Corps did not press the matter any further after WGI reported to Lee Guillory that it (WGI) had talked to the levee district and "the levee district told them, you don't need to get a permit, just keep us apprized as to what's going on."[73]

It will likely never be known what Mr. O'Connor told the OLD about what the ramifications of the works taking place at the EBIA, but it is know that WGI did not inform the OLD of the

---

[67] Exhibit 16 - WGI-003455.

[68] Exhibit 17 - WGI 040965

[69] Exhibit 18.

[70] Exhibit 19.

[71] Exhibit 10 - Depo. transcript of WGI by Stephen Clay Roe, p. 177, l.1-17.

[72] Exhibit 10 - Depo. transcript of WGI by Stephen Clay Roe, p. 202, l. 3-6.

[73] Exhibit 8 - Corps 30(b)(6) (Guillory) deposition transcript, pg. 130, l.3-15.

completion of demolition activities. Per Dennis O'Connor, the OLD was aware of what WGI was up to... "the Levee District was there doing maintenance on the – you know, mowing and such."[74]

The credibility of Mr. O'Connor alone should provide a sufficient questions of material fact to preclude summary judgment.

### b.    *The Wedding Cake Excavation*

As work proceeded at the EBIA, a large subsurface structure was discovered at the Boland Marine site. The removal of this concrete and steel anchor block (known informally as the "wedding cake structure") had not been previously contemplated by the Corps or WGI. On August 6, 2001, the Corps issued Modification 2610, a Statement of Work for Excavation and Removal of Additional Subsurface Foundations that required a specialized excavation plan.[75]

WGI prepared its Final Work Plan on or December 6, 2001.[76] The Corps acceptance of this work plan was based upon the Corps expectation that if there was going to be any potential effect or damage to the flood wall, that the licensed engineers that WGI hired would address those issues.[77] WGI was free to use either on-site borrow or import sand to fill the Boland Marine wedding cake structure excavation,[78] believing that either material was acceptable to use as backfill.[79] There was

---

[74] Exhibit 10 - Depo. transcript of WGI by Stephen Clay Roe, p. 171, l.14 through p. 172, l.4.

[75] Exhibit 20 - WGI054419 & WGI054420, Sec. 3.1.

[76] Exhibit 21 - WGI039041.

[77] Exhibit 8 -Corps 30(b)(6) (Guillory) deposition transcript, pg. 166, l.25 through p. 166, l. 6.

[78] Exhibit 5 - Depo. transcript of WGI by Phillip Lee Staggs, p. 219, l.5-21.

[79] Exhibit 5 - Depo. transcript of WGI by Phillip Lee Staggs, p. 220, l.2-14.

no specification for the compaction of the backfill.[80]

The non-specific designations of the type of backfill material to use, as well as the lack of compaction requirements, were general specifications.[81]  WGI could easily have opted to use "prescribed specifications" that delineate a soil type based upon its impervious nature, as well as a degree of compaction based upon the moisture content of the soil as regulated by recognized engineering standards.  Such a specification would have allowed WGI to meet the contractual requirements of Task Order 26 while still fulfilling its legal duty of due care under Louisiana law.

With the work plan allowing the excavation to be filled with either import sand or onsite borrow, WGI's project manager Dennis O'Connor insisted that sand would not be used as backfill because the Corps would not have allowed WGI to purchase sand and bring it on site, instead requiring that WGI utilize on-site borrow.  In fact, Mr. O'Connor testified that WGI didn't bring any sand on the site.[82] However, when confronted with daily quantity reports, O'Connor admitted that at least 46,494 cubic yards of sand/fill had been brought onto the Boland Marine site by one of the contractors.[83]  Nonetheless, Mr. O'Connor denied that this material was utilized as backfill for the wedding cake excavation.

Even if correct, that does not change the unassailable fact that the the borrow pit did not contain just clay.  It was non-homogeneous, containing various layers and lenses of different types

---

[80] Exhibit 5 - Depo. transcript of WGI by Phillip Lee Staggs, p. 222, l.19-24; Exhibit 10 - Depo. transcript of WGI by Stephen Clay Roe, p. 213, l.3-25; Exhibit 6 - Depo. transcript of Dennis O'Connor, p.198, l.1-10.

[81] Exhibit 8 -Corps 30(b)(6) (Guillory) deposition transcript, pg. 203, l.21 through p. 204, l. 25.

[82] Exhibit 6 - Depo. transcript of Dennis O'Connor, p.187, l.1-9.

[83] Exhibit 6 - Depo. transcript of Dennis O'Connor, p.189, l.16 through p. 190, l. 3.

of materials, including sand layers, silts and clays.[84]

### c.        The Lift Station Excavation

Although the sewer lift station at Saucer Marine had been identified by the Corps as an obstruction to future dredging operations, no specific excavation plan had been developed.  On October 19, 2001, WGI produced a Lift Station Removal Plan that again provided general specifications that would allow WGI to fill the excavation with sand if it chose to do so.[85]

Despite this general specification, Mr. O'Connor insisted that sand was not used as backfill; and if it was it would have been against his direction.[86]  Again, Mr. O'Connor's statement was directly contradicted by contemporaneous daily reports prepared by both WGI's Quality Control Manager and the Corps Quality Assurance Officer.

Sara Alvey, WGI's quality control manager, noted on November 7, 2001 that the subcontractor McDonald's was loading sand from ITT to be hauled for backfill at the cofferdam excavation.[87]  Dennis O'Connor could not recall if a stockpile of sand was located at the ITT site,[88] but continually insisted that his own employee used the wrong terminology in identifying this backfill material.  However, this denial could not be sustained when confronted with the Corps's Quality Assurance Report from that same date similarly reported that McDonald "loaded dump truck with  sand pile from ITT for Saucer marine sewer lift station backfill."[89]

---

[84] Exhibit 22 -Corps 30(b)(6) (Guillory II) deposition transcript, pg. 223, l.1-25.

[85] Exhibit 6 - Depo. transcript of Dennis O'Connor, p.154, l. 2 through p. 155, l. 6.

[86] Exhibit 6 - Depo. transcript of Dennis O'Connor, p.154, l. 2 through p. 155, l. 6.

[87] Exhibit 23 - WGI021810 & WGI021811.

[88] Exhibit 6 - Depo. transcript of Dennis O'Connor, p.168, l.2-4.

[89] Exhibit 24 - WGI008586.

Mr. O'Connor, upon admitting that sand is "porous," "permeable," and "conducts water pretty well" admitted that it was "possible under high water conditions in the canal that if you have a hole filled with sand that it might conduct water down to one of the strata below the surface which conducts water and might conduct water underneath the foundation" of the flood wall. [90]

### 3.    The Corps Did Not Perform A Substantive Review Of The Specifications

The Fifth Circuit has specified that the first prong of Boyle is only met when the government has exercised its discretion in approving "**significant details and all critical design choices**."[91] Government  "approval" requires more than a "rubber stamp"; there must be a substantive review of the specifications, a "continuous back and forth" between the contractor and the government.[92] The government contractor defense only shields a government contractor from claims arising out of its actions where the government has exercised its discretion and judgment in approving precise specifications to which the contractor must adhere.[93] [94]

The **significant details and critical design choices** that are at issue in the present case encompass geotechnical evaluations of the subsurface excavations at the EBIA, as well as the failure to prevent under-seepage erosion that would reduce the integrity of the flood wall.  WGI has failed to prove that the Corps performed any substantive review of these critical design choices.

---

[90] Exhibit 6 - Depo. transcript of Dennis O'Connor, p.171, l.10-18.

[91] Trevino v. General Dynamics Corp., 865 F.2d 1474, 1481(5th Cir.1989).,

[92] In re Air Disaster at Ramstein Air Base, Germany, at 574.

[93] Malesko v. Corr. Servs. Corp., 229 F.3d 374, 382 (2d Cir.2000), rev'd on other grounds, 534 U.S. 61, 122 S.Ct. 515, 151 L.Ed.2d 456 (2001).

[94] "The affirmative defense applies only if the government exercised significant control over the relevant actions of the contractor." Densberger v. United Techs. Corp., 297 F.3d 66, 75 (2d Cir.2002), cert. denied, 537 U.S. 1147, 123 S.Ct. 876, 154 L.Ed.2d 849 (2003).

The EBIA flood wall was built on alluvial deposits, with pervious organic zones that allow water to pass through that layer.[95]  This type of soil stratification allows for under-seepage of the flood wall at the EBIA.[96] Because of the adverse affect under-seepage could have on the integrity of the flood wall, the Corps considers it mandatory that a geotechnical evaluation be performed on excavations such as the two at the Saucer Marine and Boland Marine sites.[97]  This would be the type of "extensive government testing" specified by the Fifth Circuit in <u>Trevino</u>, <u>Kerstetter</u>, and <u>In re Air Disaster at Ramstein Air Base, Germany</u>.  However, the Corps did not perform any geotechnical evaluations of WGI's proposed work plans related to under-seepage that could qualify as "extensive testing."

 John Grieshaber, a geotechnical engineer testifying on behalf of the Corps, stated that in order to understand an excavation's potential impact on a  flood wall, proper specifications must begin with an examination of the soil stratigraphy to evaluate if it impacts the stability and/or seepage analysis.[98]  In particular, for an excavation 25 ft deep excavation within 300 ft. of the flood wall, it is mandatory that the Corps evaluate the wall stability, seepage, and global stability of the wall.[99]  So substantial is this mandate that Grieshaber testified, erroneously, that a seepage analysis of WGI's excavation work plans had actually been performed.[100]

Of course, further investigation revealed that the Corps did not perform any such

---

[95] Exhibit 7 -Corps 30(b)(6) (Grieshaber) deposition transcript, pg. 106, l.23 through p.107, l. 6.

[96] Exhibit 7 -Corps 30(b)(6) (Grieshaber) deposition transcript, pg. 100, l. 5-25.

[97] Exhibit 7 -Corps 30(b)(6) (Grieshaber) deposition transcript, pg. 88, l. 7-21.

[98] Exhibit 7 -Corps 30(b)(6) (Grieshaber) deposition transcript, pg. 74, l.11 through p. 75, l. 13.

[99] Exhibit 7 -Corps 30(b)(6) (Grieshaber) deposition transcript, pg. 88, l.7-21.

[100] Exhibit 7 -Corps 30(b)(6) (Grieshaber) deposition transcript, pg. 90 through 91.

geotechnical evaluations of WGI's excavation work plans.  Lee Guillory, the Corps' Task Order 26 Project Manager and head of the Project Delivery Team, did not ask the geotechnical division to evaluate the plan that was submitted by WGI for removal of the sewer lift station.[101]   Guillory testified that he had George Bacuta, a geochemist[102] on the Corps' team, review the excavation plan. Unfortunately, Bacuta did not review the excavation plan.[103]  Here, we see that ultimately the Corps performed absolutely ***NO*** geotechnical evaluation whatsoever.  Ultimately, the southern breach of the flood wall took place adjacent to this deep excavation.

The northern breach likewise occurred adjacent to a deep excavation of the "wedding cake" structure at the Boland Marine site.  Similarly, Lee Guillory did not ask the geotechnical division to evaluate the plan that was submitted by WGI.[104]   This again led to ***NO*** geotechnical analysis evaluating the potential for under-seepage beneath the flood wall sheet pile curtain at the location of the north breach site.[105]

Lee Guillory was neither a geotechnical engineer, nor an expert on under seepage issues.[106] For each of the project work plans that he signed off on and "approved," the Corps was not approving or agreeing that whatever work was done was not having any impact on the potential for under seepage to affect the flood wall.[107]

---

[101]  Exhibit 8 - Corps 30(b)(6) (Lee Guillory) deposition transcript, pg. 154.

[102]  Exhibit 25 - George Bacuta deposition transcript, pg. 146, l. 5-6.

[103]  Exhibit 25 - George Bacuta deposition transcript, pg. 142, l. 21-25.

[104]  Exhibit 8- Corps 30(b)(6) (Lee Guillory) deposition transcript, pg. 206,l. 23- pg. 207, l. 10.

[105]  Exhibit 25 - George Bacuta deposition transcript, pg. 176, l. 20 - p.179 l. 12.

[106]  Exhibit 22 - Corps 30(b)(6) (Guillory II) deposition transcript, pg. 219, l. 22-25.

[107]  Exhibit 22 -Corps 30(b)(6) (Guillory II) deposition transcript, pg. 219, l.22 through p. 222, l. 8.

WGI, by its own admission, was not evaluating the potential for under seepage, nor was concerned about making sure that the Corps was either.  WGI assumed that the Corps's site representative Jim Montegut was knowledgeable about the potential for excavations to affect the flood wall.[108]  However, Mr. Montegut had never studied the soil stratigraphy of the EBIA,[109] did not know the depth of the sheet pile at the EBIA flood wall,[110] and was not involved with the analysis of subsurface ground water flow.[111]

WGI was so far out of touch with providing reasonably precise specifications for approval by the Corps that WGI was of the impression that Mr. Montegut could approve the work plan to remove the wedding cake structure at the Boland site.[112]  As testified by Mr. Montegut, he did not consider himself an expert in geotechnical issues such as foundations subsidence or seepage,[113]and in fact opined that the removal of the sub-surface structures probably improved the potential for seepage.[114]

**B.     WGI Failed To Conform To Specifications That The Work Not Harm The Flood Wall**

The second element of the Boyle defense requires that the "product" conform to the specifications.  The Fifth Circuit has ruled that Boyle makes it clear that the requirement of conformity to "reasonably precise specifications" refers to the *particular feature* of the product

---

[108] Exhibit 5 - Depo. transcript of WGI by Phillip Lee Staggs, p. 146, l.6-20.

[109] Exhibit 26 - Depo. transcript of James Montegut,p. 50, l.9-16.

[110] Exhibit 26 - Depo. transcript of James Montegut,p. 77, l.16-22.

[111] Exhibit 26 - Depo. transcript of James Montegut,p. 138, l. 8-20.

[112] Exhibit 5 - Depo. transcript of WGI by Phillip Lee Staggs, p. 204, l.14-25.

[113] Exhibit 26 - Depo. transcript of James Montegut,p. 52, l. 2-10.

[114] Exhibit 26 - Depo. transcript of James Montegut,p. 139, l. 13-20.

claimed to be defective.[115]  In the present case, the contract was for performance specifications, not design specifications.  As shown above, there are number of questions of material fact about what activities actually took place at the site.

The Fifth Circuit Court of Appeals has likewise acknowledged that the primary purpose behind the formulation of the government contractor defense was to prevent a contractor from being held liable when the government is actually at fault.[116]  Therefore, the protective shield in favor of the contractor collapses when the actions of the government contractor-and not those of the Government-produced the damaging condition.

Despite contemporaneous documentation proving that sand was used as backfill for the excavations, Dennis O'Connor insists that sand was not used; but if it was, it would have been against his direction.  Likewise, Mr. O'Connor insists that there was only one borrow pit at the EBIA, but evidence reveals that there were actually two, one at the McDonough Marine site and one at the ITT site.  Finally, Plaintiffs have uncovered evidence that after the remediation of the EBIA and the removal of structures, the soil subsurface had been modified on account of excavation/removal/new fill, and the groundwater flow had been altered to flow away from the IHNC.[117]

Clearly, there are substantial questions of material fact concerning whether the actions of WGI caused the harm complained of by the Plaintiffs.

---

[115] <u>Bailey v. McDonnell Douglas Corp.</u>, 989 F.2d at 799.

[116] <u>Mitchell v. Lone Star Ammunition, Inc.</u>, 913 F.2d 242, 245 & n. 5 (5th Cir.1990)(quoting <u>Trevino v. General Dynamics Corp.</u>, 865 F.2d 1474, 1478 (5th Cir.1989)).

[117] Exhibit 27 - WGI079929.

**C.      WGI Withheld Knowledge That Would Have Influenced The Corps's Decision Making Process**

The third condition prescribed by Boyle is necessary because, in its absence, the displacement of state tort law would create some incentive for the manufacturer/contractor to withhold knowledge of risks, since conveying that knowledge might disrupt the contract but withholding it would produce no liability.    In evaluating this prong, the Court is called upon to decide what constitutes "knowledge" of a "danger" that would trigger a duty to inform the government of the danger.

In Boyle, the Supreme Court was concerned primarily with protecting the government's ability to assume certain kinds of risks without assuming the costs of liability for those risks.[118]  The Court protected the government's ability to assume certain kinds of risks by ensuring that where the government accepts such a risk knowingly, a state law that would require finding that same risk unacceptable would be displaced.  To benefit from the displacement of state law, the contractor would have to demonstrate that it fully informed the government about hazards related to the government's exercise of discretion that were "substantial enough to influence the ...decision made."[119]

Beginning in July of 2001 and continuing through August 2002, WGI's subcontractor MMG conducted exploratory drilling at the Saucer Marine site to characterize the geology of the soils by drilling 99 boreholes of up to depths of 22 feet around the site.  These boreholes revealed plant-derived organics throughout the borehole depth, but increasing after fourteen (14) feet.  Additionally, peat layers were encountered in several boreholes at varied depths, indicating a swamp or marsh like

---

[118] Boyle, 487 U.S. at 511-12, 108 S.Ct. 2510.

[119] In re Agent Orange Product Liability Litigation, 517 F.3d 76, 99 (C.A.2 (N.Y.),2008).

28

area.[120]

A similar drilling effort to characterize the geology of the soils at the Boland Marine site was undertaken by MMG between September 13, 2001 and October 11, 2001 by drilling 99 boreholes of up to depths of 22 feet around the site. Silts and clays, including organic rich clays and silts, were the main constituents of the native soils containing greatly interbedded sediments. As at the Saucer Marine site, plant-derived organics such as roots, grasses, leaves, wood and peat were found throughout the borehole depth.[121]

WGI's project manager Dennis O'Connor understood that the soils of the EBIA were not homogenous;[122] and that once a porous layer was charged with water from above, water could flow laterally underneath the flood control structure and cause some undermining of the structural integrity of the levee.[123] By utilizing only general specifications for both the fill material used and the degree of compaction, WGI was exposing the sub-surface permeable layers to being charged by a hydrostatic head during high water conditions. Both of these drilling exercises were completed before the execution of the deep excavation work plans, and this confirmation that sub-surface permeable layers existed throughout the Saucer Marine and Boland Marine sites substantiated the potential for under-seepage erosion of the flood walls in high water conditions.

By failing to adequately report the findings of the drilling reports to the Corps, along with failing to properly specify the depth of the sheet pile depth that would cut off potential under-

---

[120] Exhibit 28 - Saucer Marine Site Assessment Drilling Report (WGI069840), p.5 (WGI069846).

[121] Exhibit 29 - Boland Marine Site Assessment Drilling Report (WGI357813), p.5 (WGI357819).

[122] Exhibit 6 - Depo. transcript of Dennis O'Connor, p.72, l. 16-21.

[123] Exhibit 6 - Depo. transcript of Dennis O'Connor, p.78, l. 2-17; p. 171, l. 10-18.

seepage, WGI failed to fully inform the government about a hazard related to the government's exercise of discretion, one that was "substantial enough to influence the ...decision made" regarding the various work plans and the acceptance of general specifications to perform the work at the EBIA.

As a result, WGI should not benefit from the displacement of state law.

## V.

## CONCLUSION

The Corps's John Grieshaber, the only deponent with any geotechnical expertise who has testified, explained that the EBIA job was "fairly simplistic, the only way you could endanger the flood wall was by some form of inappropriate excavation or inappropriate backfill."[124]   The Court now sees that WGI did in fact endanger the flood wall, unnecessarily.   WGI, by utilizing proper geotechnical investigations and prescriptive specifications, could have complied with the contractual requirements of Task Order 26 while still fulfilling its state law duty of care.

As a result, the Court must deny WGI's Motion for Summary Judgement.

**Respectfully Submitted,**
**APPROVED PLAINTIFFS LIAISON COUNSEL**
   /s/  Joseph M. Bruno
JOSEPH M. BRUNO (La. Bar # 3604)
PLAINTIFFS LIAISON COUNSEL
Law Offices of Joseph M. Bruno
855 Baronne Street
New Orleans, Louisiana 70113
Telephone: (504) 525-1335
Facsimile: (504) 561-6775
Email: jbruno@jbrunolaw.com

---

[124] Exhibit 30 -Corps 30(b)(6) (Grieshaber II) deposition transcript, pg. 15, l. 6-9.

MR-GO PLAINTIFFS SUB-GROUP
LITIGATION COMMITTEE

s/ James Parkerson Roy
JAMES PARKERSON ROY
MR-GO PSLC Liaison Counsel
LA Bar Roll Number: 11511
Domengeaux Wright Roy & Edwards LLC
Post Office Box 3668
Lafayette, Louisiana 70502
Telephone: (337) 593-4190 or (337) 233-3033
Email: jimr@wrightroy.com

for
MR-GO PLAINTIFFS SUB GROUP
LITIGATION COMMITTEE

Jonathan Andry (The Andry Law Firm,
   New Orleans, Louisiana)
Clay Mitchell (Levin, Papantonio, et al.,
   Pensacola, Florida)
Pierce O'Donnell (O'Donnell & Associates,
   Los Angeles, California)
James Parkerson Roy (Domengeaux, Wright, et al.,
   Lafayette, Louisiana)

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the above and foregoing upon all counsel of record by placing same in the United States mail, properly addressed and with first-class postage, or by facsimile or other electronic transmission this 30th day of October, 2008.

     /s/ Joseph M. Bruno
Joseph M. Bruno

31