# EXHIBIT 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: KATRINA CANAL BREACHES | * | CIVIL ACTION |
| CONSOLIDATED LITIGATION | * | NUMBER: 05-4182 "K"(2) |
| | * | JUDGE DUVAL |
| | * | MAG. WILKINSON |
| | * | |
| | * | |
| PERTAINS TO: MRGO, Robinson | * | |
| (No. 06-2268) | * | |

*********************************************************************************

## MOTION OF THE MRGO PSLC FOR LEAVE TO FILE MEMORANDUM AS *AMICUS CURIAE* IN SUPPORT OF THE ROBINSON PLAINTIFFS' OPPOSITION TO THE UNITED STATES OF AMERICA'S MOTION TO DISMISS COUNTS TWO AND THREE OF THE AMENDED COMPLAINT

**NOW INTO COURT**, through undersigned counsel, comes the MRGO PSLC, as *amicus curiae*, which files its Memorandum in Support of the Robinson Plaintffs' Opposition to the United States of America's Motion to Dismiss Counts Two and Three of the Amended Complaint as it relates to the discretionary function exception raised in the United States's motion.

The United States has moved the Court to dismiss Count Three of the Amended Complaint filed on June 13, 2008, claiming that pursuant to the Federal Tort Claims Act ("FTCA"), the United States may not be held liable for the complain of conduct as it enjoys an immunity specified by the FTCA's discretionary function exception. The MRGO PSLC plaintiffs' have a very strong and direct interest in the resolution of a discretionary function exception ruling as the claims specified against the United States in the MRGO Administrative

Master Complaint allege defalcations of the United States Corps Of Engineers for works performed adjacent to the flood walls that failed along the Industrial Canal.

As will be shown below, the Court should deny the United States's Motion because the complained of conduct is not subject of the discretionary function exception.

**I.**

**FACTS**

*A.*    *OVERVIEW OF THE MRGO PSLC PLAINTIFFS' CLAIMS REGARDING THE FLOOD WALL FAILURES*

The Inner Harbor Navigational Canal ("IHNC"), known colloquially as the Industrial Canal, is a waterway 5.5 miles long that provides access from Lake Pontchartrain to the Mississippi River, approximately 2 miles downstream of Canal Street in New Orleans. The canal was constructed by the Port of New Orleans between 1918 and 1923, with a lock being placed in service in 1923 as a unit of the IHNC.

As years passed, the IHNC lock was deemed to be dimensionally inadequate; and in March of 1997, the U.S. Corp of Engineers ("the Corps") issued a New Lock and Connecting Channels Evaluation Report[1] in which it proposed a new lock to be placed in the IHNC between the Claiborne Avenue and Florida Avenue bridges. Because the new lock would be situated in the existing channel, a temporary bypass channel between Claiborne and Florida Avenues on the east side of the canal would be required to allow for continued navigation during new lock construction.

The area where the bypass channel would be located is known as the East Bank Industrial

---

[1] See Notice of Manual Attachment, No. 1 - nine (9) volume 1997 Evaluation Report.

Area ("EBIA"), a parcel nearly 32 acres in size and subdivided into six (6) distinct sites. This area had been owned by the Port of New Orleans and leased to various industrial entities; however, by 1997 the industrial entities were defunct and the Corps was undertaking efforts to purchase the site.[2]

In further preparation for eventual construction of the new lock and bypass channel, in February 1999, the Corps completed the Inner Harbor Navigation Canal Lock Replacement Project Design Documentation Report (DDR)[3] wherein it was specified that material dredged for the bypass channel would be hydraulically deposited along the south bank of the Mississippi River Gulf Outlet ("MRGO"). However, the U.S. Wildlife and Fisheries Services determined that the canal bottom sediment and some of the soil (down to about 5 feet) from the east bank of the IHNC was too contaminated for use in wetland restoration.

In June 1999, Morrison Knudsen (now the Washington Group International, Inc. ("WGI")) was engaged by the Corps through a unique contract (the TERC, Task Order 26) to perform demolition and site preparation for the IHNC Lock Replacement Project in the EBIA. By the summer of 2005, WGI had completed a substantial portion of the physical work in the EBIA.

On August 29, 2005, Hurricane Katrina struck southeastern Louisiana. The storm surge from the Gulf of Mexico and Lake Borne, hydraulically connected to the IHNC by the Gulf Intercoastal Waterway ("GIWW")/MRGO channel, raised the water levels in the IHNC and

---

[2] Each of the six (6) distinct sites was named for a defunct entity that had occupied the area. These sites are as follows: Boland Marine (Boland), McDonough Marine, Indian Towing, Mayer Yacht - Distributor's Oil, Saucer Marine (Saucer), and International Tank Terminal.

[3] See Notice of Manual Attachment, No. 2 -eight (8) volume 1999 Design Documentation Report.

induced two distinct breaches of the flood wall adjacent to the Lower Ninth Ward destroying neighborhoods and killing hundreds of residents as far east as Paris Road in St. Bernard Parish.

The larger of the two breaches along the east bank of the IHNC, the South Breach, was approximately 900 feet in length adjacent to the area known as the Saucer Marine site. The smaller North Breach was approximately 250 feet long at the area adjacent to the Boland Marine Site. Both breaches occurred adjacent to improper excavations that allowed under-seepage of the flood walls causing them to fail.

## B. THE TERC

The Total Environmental Remediation Contract ("TERC") was an Indefinite Delivery-Indefinite Quantity contract for the total remediation of HTRW (Hazardous, Toxic, and Radioactive Waste) projects/sites in support of various Corps customers. This contract was designed by the Corps to provide the Government with a continuity of personnel and institutional knowledge for developing streamlined and cost-effective remediations through the use of a single contractor.[4]

In order to instigate a particular project under the TERC, the Corps would prepare a statement of work spelling out the overall scope of the project. The Contractor would then be required to "provide input to support the planning, scheduling and formulation of the [Corps]'s USACE's statement of work."[5] In order to provide this input, the Contractor would receive back up data from the Corps that was available from prior investigations. With this data, the Contractor would "develop plans **within regulations** and execute those plans.[Emphasis

---

[4] See Exhibit 3 - WGI000128, paragraph 1.

[5] See Exhibit 3 - WGI000128, paragraph 1.

added]."[6]  An essential role of the Contractor was to "initiate recommendations to the

Contracting Officer [of the Corps] about any alternative methods of executing a remedial action

that would result in" improvements.[7]  Clearly, the intent of the TERC was for the Contractor to

develop the performance specifications needed to remediate a particular location, and to

consistently monitor the project as the work proceeded to keep the Corps informed of all

developments.

The specific requirements of each remedial action project would be described in an

individual delivery order, later referred to as Task Orders.  Once the delivery order was placed,

the contractor was expected to provide complete Architect-Engineering (A-E) services to support

the implementation of the remedial action.  The Contractor would be required to write and

submit a Work Plan that would describe the Contractor's detailed approach for the performance

of the Delivery Order, including the activities to be performed in the field. [8]

The development of the work plan would be based upon the Government's statement of

work, which is a general description of the work the Contractor was expected to perform.  This

plan was to be submitted to the Corps for review, and was required to be approved by the Corps

before the commencement of field activities.[9]

An additional Contractor responsibility was to obtain all permits necessary to accomplish

the work specified in the individual Delivery Order.  In particular, when the work was done at a

---

[6] See Exhibit 3 - WGI000128, paragraph 1.

[7] See Exhibit 3 - WGI000129, paragraph 2.1.3.

[8] See Exhibit 3 - WGI000133, paragraph 3.

[9] See Exhibit 3 - WGI000134, paragraph 3.2 & 3.2.

federal facility, the required clearances, such as excavation, digging, or drilling permits, were

required to be obtained prior to the initiation of site operations by the Contractor.[10]

### C.    *TASK ORDER 26 PROJECT TIME LINE*

The Corps entered into the TERC with Morrison Knudsen on August 17, 1994.[11]  Various

delivery orders were presented to Morrison Knudsen, then referred to as Task Orders, with the

project for the EBIA being known as Task Order 26 ("T.O. 26").

As per the TERC, the Corps issued a Statement of Work for the demolition and site

preparation for the Inner Harbor Navigational Canal Lock Replacement Project on the EBIA

adjacent to the Industrial Canal on June 1, 1999.[12]  The June 1, 1999 Statement of Work for Task

Order 26 set forth the project requirements that WGI would "furnish all engineering services,

materials, supplies, labor, as required, in connection with the technical review of site documents

... associated with the demolition and remediation of the EBIA."[13] In addition, WGI was to

prepare a "comprehensive report recommending the scope and duration of the remediation and

demolition that would be required, as well as any *data gaps* that may need to be filed by

sampling or other investigations."[14]

On December 2, 1999, WGI produced the Recommendation Report for Demolition and

---

[10] See Exhibit 3 - WGI000156, paragraph 8.2.

[11] See Exhibit 3 - WGI000122

[12] See Exhibit 4 - WGI00005.

[13] See Exhibit 4 - WGI00005-6, paragraph 3.

[14] See Exhibit 4 - WGI00006, paragraph 3.

Site Preparation Activities of the EBIA.[15]  The purpose of this report was to present

recommendations regarding the scope and duration of the remediation/demolition activities of

the EBIA.[16]  This report in particular was designed to instruct the Corps about what needed to be

done to prepare the EBIA for future activity associated with the lock replacement project.

In preparing the Recommendation Report, a number of data gaps were identified that

would effect the scope of work, yet these were not addressed at this stage.  The Recommendation

Report recommended the development of a number of work plans, including a Project Work Plan

that would be a stand alone document to serve as guidance and reference for the execution of the

project activities.[17]  The proposed Project Work Plan would set performance standards regarding

the project processes, including the depth of excavations.[18]  The proposed Project Work Plan

likewise would require WGI to provide engineering details including geotechnical details and

geology/hydrology details.[19]  The Recommendation Report specifies that WGI handle RECAP

constituents of concern, and that WGI would establish the extent of excavation necessary to meet

RECAP Standards.[20]

Thereafter, the Corps issued a *Statement of Work for Development of Work Plans and*

---

[15] See Exhibit 5 - WGI38704.

[16] See Exhibit 5 - WGI38708, Sec. 1.0.

[17] See Exhibit 5 - WGI38730, Sec. 5.1.2.

[18] See Exhibit 5 - WGI38731, Sec. 5.1.2.1.3.

[19] See Exhibit 5 - WGI38731-2, Sec. 5.1.2.1.5.

[20] See Exhibit 5 - WGI38754, Sec. 5.7.

*Subcontracting Plan/Services for EBIA* on May 15, 2000.[21] This Statement of Work required WGI to "furnish all services, materials, supplies, labor, equipment, superintendence and travel, as required, for the **development**, submission, review and approval of the required Work Plans" for the EBIA.[22]

Prior to the completion of the Project Work Plan, WGI prepared a RECAP Submittal Report-Criteria Document, first dated June 2000.[23] This criteria document was the "master document" that would provide information for the entire EBIA, followed by supplemental submittals for the individual facilities.[24] It is in this "master document" that WGI erroneously instructs the Corps that the flood wall sheet pile reached "a depth of at least 25 ft. and this would essentially interrupt the water flow in the easterly direction at lower elevations to 25 ft."[25] It has since been proven that sheet pile depth only reached minus 8.0 to minus 10.0 feet; thus groundwater flow below minus 8.0 to minus 10.0 feet was not interrupted.

On August 28, 2000, the Corps produced a Statement of Work for Project Site Development and Remedial Action of EBIA[26] This Statement of Work required WGI to "furnish all services, materials, supplies labor, equipment, superintendence, procurement, security services, surveying services, subcontracting, **all necessary permits, licenses**...for the project

---

[21] See Exhibit 4 - WGI000067.

[22] See Exhibit 4 - WGI000067, paragraph 1.

[23] See Exhibit 6 - WGI047665.

[24] See Exhibit 6 - WGI047682-83, paragraph 1.1.

[25] See Exhibit 6 - WGI047691, paragraph 4.2.

[26] See Exhibit 4 - WGI000093.

site"[27] Even as of this date, there was no analysis of the effect that excavations to a depth greater than the actual depth of the sheet pile would have on the integrity of the flood wall. WGI developed and submitted its Project Work Plan in October of 2000 to direct the work activities.[28] WGI defined the scope of the project to consist of the demolition and removal of surface and subsurface obstructions, characterization of contaminants present at the site and remediation of the site in accordance with LDEQ RECAP Standards.[29] WGI acknowledged that a number of demolition and remediation issues had not been detailed in previous reports.[30]

In the Project Work Plan, a demolition inventory was included for above ground structures. Additionally, WGI detailed the demolition of foundations, and indicated that "unusual foundation conditions" greater than 24 inches may be encountered and interrupt the demolition sequence. These "unusual" conditions would be documented and reported to the Corps.[31] Only after the completion of the various phases of the demolition would the soils and subsurface issues be addressed.[32] As of October, 2000, the depth of soils considered to be removed was indicated as three (3) feet at the Boland site and seven (7) feet at the Saucer site.[33]

As work proceeded at the EBIA, a large subsurface was discovered at the Boland Marine

---

[27] See Exhibit 4 - WGI000093, paragraph 1.

[28] See Exhibit 7 - WGI0879.

[29] See Exhibit 7 - WGI0893, Sec. 1.4.

[30] See Exhibit 7 - WGI0893, Sec. 1.5.

[31] See Exhibit 7 - WGI0923, Sec. 3.5.2.

[32] See Exhibit 7 - WGI0928, Sec. 3.7.

[33] See Exhibit 7 - WGI0930, Sec. 3.7.4.

site. The removal of this concrete and steel anchor block (known informally as the "wedding cake structure") had not been previously contemplated by the Corps or WGI. On August 6, 2001, the Corps issued Modification 2610, a Statement of Work for Excavation and Removal of Additional Subsurface Foundations that required a specialized excavation plan in accordance the approved work plans.[34] Interestingly, the excavation plan would have a depth limit of minus twenty-five (25) feet, the same depth as the erroneous assertion by WGI that the adjacent flood wall sheet pile curtain extended to interrupt ground water flow. WGI, through its subcontractor, prepared An excavation plan was prepared on or about October 8, 2001.[35]

Simultaneously, WGI undertook the excavation of a sewer lift station at the Saucer Marine site. After a number of permutations of an excavation plan again developed by WGI, a *Lift Station Removal Plan (Revised)* was finalized which allowed fr an excavation to approximately minus twenty (20) feet without any consideration for the potential effects of ground water migration and its effect on the integrity of the adjacent flood wall due to under-seepage.[36]

WGI with the physical aspects of the EBIA project through August of 2005, wherein it prepared a Technical Completion Report and Record Drawings, not once indicating any consideration for the harmful effects of under-seepage to the integrity of the adjacent flood wall.[37] This reckless disregard would prove catastrophic by the end of that month.

───────────────

[34] See Exhibit 8 - WGI054419 & WGI054420, Sec. 3.1.

[35] See Exhibit 9 - WGI037607.

[36] See Exhibit 10 - WGI048621.

[37] See Exhibit 11 - WGI078124.

## II.

## BECAUSE IT FAILED TO COMPLY WITH MANDATORY ENGINEERING REGULATIONS, THE UNITED STATES IS NOT ENTITLED TO DISCRETIONARY FUNCTION IMMUNITY

The United States, as sovereign, is immune from suit except as it consents to be sued, and the terms of its consent define the federal courts' jurisdiction over suits against it.[38] The United States has consented to be sued via the Federal Tort Claims Act ("FTCA"). [39] While the FTCA provides that the United States is liable for torts in the same manner and to the same extent as private individuals, the FTCA carves out an exception, and thus retains government immunity for performance of discretionary functions or duties.[40]

The purpose of the discretionary function exception is to insulate certain governmental actions and decisions based on considerations of public policy from tort liability by private individuals.[41] The exception is intended to preclude "judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy."[42] It "marks the

---

[38] United States v. Sherwood, 312 U.S. 584, 61 S.Ct. 767, 85 L.Ed. 1058 (1941).

[39] The FTCA is a broad authorization for suits against the United States for loss of property, or personal injury or death, caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred. 28 U.S.C. § 1346(b).

[40] Under 28 U.S.C. § 2680(a), the United States may not be held liable under the Act for:"[a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."

[41] Berkovitz v. United States, 486 U.S. 531, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988).

[42] United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines ), 467 U.S. 797, 814, 104 S.Ct. 2755, 2765, 81 L.Ed.2d 660 (1984)).

-11-

boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals."[43] Thus, the discretionary function exception "insulates the Government from liability if the action challenged in the case involves the permissible exercise of policy judgment."[44]

Where, as here, the government avers that it is immune from suit because the challenged conduct falls under the protection of the discretionary function exception, the court must determine whether the disputed conduct involved the "permissible exercise of policy judgment."[45] In a series of cases, the United States Supreme Court has promulgated an analytical framework via a two-part test for determining whether the complained of conduct warrants discretionary function immunity.[46]

A court is to ask first whether the challenged action involves an element of judgment or choice - i.e., whether it was governed by a mandatory statute, policy, or regulation. Conduct is non-discretionary "if a federal statute, regulation, or policy specifically instructed federal officials to follow a specified course of action."[47] If the action is not discretionary, it cannot be shielded under the discretionary function exception. Second, the court must ask whether the challenged action is of the type Congress meant to protect - i.e., whether the action involves a decision

---

[43] Aragon v. United States, 146 F.3d 819, 822 (10th Cir.1998).

[44] Berkovitz, 486 U.S. at 537, 108 S.Ct. at 1959.

[45] Berkovitz, 486 U.S. at 539, 108 S.Ct. at 1960.

[46] United States v. Gaubert, 499 U.S. 315, 322-25, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991); Berkovitz, supra.

[47] Muniz-Rivera v. United States, 326 F.3d 8, 15 (1st Cir.), cert. denied, 540 U.S. 873, 124 S.Ct. 224, 157 L.Ed.2d 134, 2003 WL 21692180 (U.S. Oct. 6, 2003) (No. 03-25).

susceptible to social, economic, or political policy analysis.[48] The exception, properly construed, therefore protects only governmental actions and decisions based on considerations of public policy.

In sum, the discretionary function exception insulates the Government from liability only if the action challenged in the case involves the permissible exercise of policy judgment.

### A.   THE CORPS FAILED TO FOLLOW ITS OWN MANDATORY GUIDELINES

It is well established that "the discretionary function exception will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow."[49]   Berkovitz thus established that a safety or engineering standard operates to remove discretion under the FTCA when it is embodied in a specific and mandatory regulation or statute which creates clear duties incumbent upon the governmental actors.  The U.S. Supreme Court recognized this important difference finding that the rationale behind excluding from immunity under the discretionary function exception conduct which violates specific mandatory safety standards is simple. Once the government, having balanced economic, social and political policy considerations, adopts safety standards in the form of specific and mandatory regulations or policy, employees do not have any discretion to violate these standards.

The United States Army Corp of Engineers has enacted Engineering Regulations, based upon sound engineering principles and the standard of care for the particular engineering

---

[48] Berkovitz, 486 U.S. at 536-37, 108 S.Ct. at 1959.

[49] Berkovitz, 486 U.S. at 536, 108 S.Ct. at 1959.

-13-

discipline, that dictate mandatory requirements for the conduct of its employees.[50]

Engineer Regulation ("ER") 1110-2-1150 defines the engineering responsibilities, requirements, and procedures during the planning, design, construction and operations phases of civil works projects.[51] This regulation places responsibility for the technical content and engineering sufficiency of all Engineering products with the Chief of the Engineering organization.[52]

This regulation further specifies that a Project Delivery Team (PDT) be established for the project, which consists of a Project Manager (PM) and the technical personnel necessary to develop the project.[53] The Corps specifies the utilization of five (5) phases to present the engineering and design policy and process that applies to the project. These five (5) phases are identified as reconnaissance; feasibility; preconstruction; engineering and design; and construction, operation and maintenance.[54]

The 1997 MRGO New Lock and Connecting Channels Evaluation Report[55] was developed to provide guidance for the overall lock replacement project. In addition, a 1999 Design Documentation Report (DDR)[56] was developed by the Corps. The DDR is "a record of

---

[50] See Exhibit 12 - Engineering and Design - Engineering and Design for Civil Works Projects, pg. 23, sect. 19.1.1.

[51] See Exhibit 12 - pg. 1, sec. 1

[52] See Exhibit 12 - pg. 1, sec. 6

[53] See Exhibit 12 - pg. 3, sec.7

[54] See Exhibit 12 - pg. 1, sec.6. 1.

[55] See footnote 1 - All volumes provided to the Clerk via Manual Attachment.

[56] See footnote 3 - All volumes provided to the Clerk via Manual Attachment.

final design effort after the feasibility phase" and is "required for all engineering design products." It "provides the technical basis for the plans and specifications and serves as a summary of the final design."[57] As a result of these two reports, the overall scope of the project was established before WGI became involved; however it did not include geotechnical evaluations regarding excavations below five (5) feet and its effect of under-seepage on the adjacent flood walls.

WGI was engaged through Task Order 26 to evaluate the prior documentation relative to the EBIA and develop a Recommendation Report that the Corps could use to analyze the scope of work to be done on the HTRW site, with a requirement that it identify any data gaps in the supplied information that needed further evaluation. But even as WGI identified these relevant data gaps the Corps did not undertake further geotechnical evaluation. Until the end of 2000, this was immaterial as the deepest excavation contemplated and evaluated was to a depth of approximately eight (8) feet.[58] However immaterial it was at that time, the failure if the Corps to submit the excavation plans developed by WGI to the Engineering Department violated mandatory Corps regulations.

Section 16 of ER 1110-2-1150 requires that "engineering support shall be provided to those maintenance activities that require [plans and specifications]..." as support for operations activities. This engineering support was required to be provided to review operational deviations, identify and address project deficiencies, and evaluate replacement plans."[59] These

---

[57] See Exhibit 12 - pg. 3, sec. 8.2.

[58] See Exhibit 14 - Corps 30(b)(6) (Lee Guillory) deposition transcript, pg. 80 & 81.

[59] See Exhibit 12 - pg. 21, sec. 16.1.

"deviations ... of any portion of a project" were required to be "reviewed and approved by engineering."[60]

Lee Guillory, the Project Manager and head of the Project Delivery Team ("PDT"), failed to follow this regulation in considering the deviation from the DDR relative to the deeper excavation plans. He did not ask the geotechnical division of the engineering division to evaluate the plan that was submitted by WGI for removal of the sewer lift station.[61] Guillory testified that he had George Bacuta, a geochemist[62] on the team review the excavation plan. Unfortunately, Bacuta did not review the excavation plan.[63] Here, we see that not only did the head of the PDT fail to follow mandatory regulations requiring an analysis of the deviation from the DDR by the engineering department, but ultimately had absolutely *NO* geotechnical evaluation whatsoever. Ultimately, the southern breach of the flood wall took place adjacent to this deep excavation.

The northern breach likewise occurred adjacent to a deep excavation of the "wedding cake" structure at the Boland Marine site. This excavation plan also deviated from the DDR: and similarly, Lee Guillory failed to comply with ER 1110-2-1150 and present the excavation plan to the Engineering Department.[64] This reckless disregard for the Engineering Regulation again led to *NO* geotechnical analysis being performed to evaluate under-seepage below the sheet pile

---

[60] See Exhibit 12 - pg. 21, sec. 16.4.

[61] See Exhibit 14 - Corps 30(b)(6) (Lee Guillory) deposition transcript, pg. 154.

[62] See Exhibit 13 - George Bacuta deposition transcript, pg. 146, l. 5-6.

[63] See Exhibit 13 - George Bacuta deposition transcript, pg. 142, l. 21-25.

[64] See Exhibit 14 - Corps 30(b)(6) (Lee Guillory) deposition transcript, pg. 206,l. 23- pg. 207, l. 10.

curtains at the location of the north breach site.[65]

According to the Plaintiffs' expert Robert Bea, this under-seepage is exactly what caused or contributed to the failures at these locations.

The regulation that Mr. Guillory should have observed was Engineering Regulation 1110-1-8157. [66] The stated purpose of this regulation is to "prescribe Geotechnical Data Quality Management (GDQM) responsibilities and requirements, from initial investigation through closeout at sites contaminated with hazardous, toxic, and radioactive waste."[67] The utilization of this regulation is "to assure that a site is sufficiently characterized, and the geotechnical data of acceptable quality are obtained and used properly within the project."[68] To accomplish this goal, the regulation mandates a number of relevant geotechnical requirements.

"All geotechnical input, review or confirmation of no geotechnical involvement will be certified in a project specific *Project Management Plan*."[69] This required a review of existing site data and technical literature, and the usability of this data needed to be evaluated.[70] The regulation further required that the products generated from project activities "shall be reviewed and approved by project geotechnical personnel for compliance."[71] "Geotechnical input is also

---

[65] See Exhibit 13 - George Bacuta deposition transcript, pg. 176, l. 20 - p.179 l. 12.

[66] See Exhibit 15 - Engineering and Design - Geotechnical Data Quality Management for Hazardous Waste Remedial Activities.

[67] See Exhibit 15 - pg. 1, sec. 1.

[68] See Exhibit 15 - pg. 1, sec. 1.

[69] See Exhibit 15 - pg. 2, sec. (8)(a).

[70] See Exhibit 15 - pg. 2, sec. (8)(a)(2).

[71] See Exhibit 15 - pg. 2, sec. (8)(a)(3).

required for design services such as plans and specifications, where the project involves any earthwork or work related to the subsurface."[72] We know from the testimony of Lee Guillory and George Bacuta that these requirements were not met.

The Corps further ignored mandatory directives relative to the project by ignoring the permitting requirement of the Orleans Levee District ("OLD"). Section 17 of ER 1110-2-1150 "[p]roduct quality is the responsibility of everyone on the PDT [Project Delivery Team]. Execution of design and technical quality is the responsibility of engineering." "Technical quality shall be achieved mainly through a process that includes development of realistic comprehensive work plans, definition of functional and technical criteria, adequate coordination among the project team and technical disciplines, and continuous coordination with the PM and the non-Federal sponsor."[73]

It was the Corps understanding that WGI would procure the permit to perform the work on the EBIA adjacent to the flood wall.[74] This permit would require WGI to inform the OLD when it was completed its work to allow an inspection of the flood wall by OLD. However, when the documentation was sent to WGI by OLD, WGI refused to sign it because its lawyers would not allow this, and the Corps advised WGI to disregard the need for the permit.[75]

The United States argues that it is entitled to immunity because the decisions made in supervising a contractor involve judgements grounded in public policy. The United States has

---

[72] See Exhibit 15 - pg. 2, sec. (8)(a)(4).

[73] See Exhibit 12 - pg. 22, sec. 17.

[74] See Exhibit 14 - Corps 30(b)(6) (Lee Guillory) deposition transcript, pg. 104, l.5-11

[75] See Exhibit 16 - Corps 30(b)(6) (Stephen Roe) deposition transcript, pg. 175, l 14- pg. 177, l. 17

failed to point out that oversight and quality assurance testing of geotechnical work for construction projects is to be performed in accordance with Engineering Regulation No 1110-1-8157.[76] The Corps appointed Alvin Clouatre as the quality assurance representative for the project.[77] However, Mr. Clouatre was not qualified for this position due to the technical nature of the project.[78] Engineering Regulation No. 1110-1-8157 mandates that if field oversight on an HTRW site done by someone "other than project geotechnical personnel, the project delivery team will prepare *Engineering Considerations and Instruction* (ECI)."[79] It has already been established the Corps did not have a geotechnical person performing field oversight, and there were no *Engineering Considerations and Instruction* developed or provided to Mr. Clouatre. As the mandates set forth in Engineering Regulation No. 1110-1-8157 were not met, the Corps's supervision of its contractor did not involve judgements grounded in public policy.

As revealed extensively through out the EBIA project, the Corps failed to comply with a substantial number of mandatory regulations. That these omissions are so closely related to the two flood wall breaches is not coincidence. By failing to comply with mandatary regulations governing the conduct of the Corps employees, the United States is not entitle to enjoy the immunity it seeks via the discretionary function exception of the FTCA.

**B.** **THE COMPLAINED OF CONDUCT OF THE CORPS IS NOT THE SUBJECT OF POLICY CONSIDERATIONS, BUT INSTEAD WAS SIMPLE, OBJECTIVE**

---

[76] See Exhibit 15 - pg. 5, sec. (8)(I).

[77] See Exhibit 17 - Alvin Clouatre deposition transcript, pg. 55, l. 13-25.

[78] See Exhibit 17 - Alvin Clouatre deposition transcript, pg. 90. l. 10 - pg.92, l. 8.

[79] See Exhibit 15 - pg. 5, sec. (8)(I)(3).

## ENGINEERING JUDGEMENTS

As shown above, the Corps had no discretion in performing the tasks that led to the institutional errors complained of by the Plaintiffs. However, even if the Court were decide that they were, these decisions are not the type that Congress intended to protect.

An analysis of the Supreme Court's second Berkovitz/Gaubert factor must begin with the Supreme Court's decision in Indian Towing Co. v. United States,[80] where the Coast Guard's failure to maintain a lighthouse in good working order caused the loss of a ship. In Indian Towing, the Court rejected the government's claim of an implied exception to the FTCA for activities of a uniquely governmental function by holding that once the Coast Guard "exercised its discretion to operate [the] light ... and engendered reliance on the guidance afforded by the light, it was obligated to use due care to make certain that the light was kept in good working order...."[81]

However, the Supreme Court distinguished Indian Towing in Varig Airlines,[82] and explicitly stated that the discretionary function exception was not at issue in Indian Towing because the government had conceded that the exception did not apply. The government, therefore, never claimed either that a permissible judgment had been made or that it was based on policy considerations. The Varig Airlines court emphasized that the issue required inquiry into "whether the challenged acts of a Government employee-whatever his or her rank-are of the

---

[80] Indian Towing Co. v. United States, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955)

[81] Indian Towing, 350 U.S. at 69, 76 S.Ct. at 126

[82] Varig, 467 U.S. at 812, 104 S.Ct. at 2763.

nature and quality that Congress intended to shield from tort liability."[83] The Supreme Court later clarified in Berkovitz[84] that this inquiry involves the application of a two-part test - whether a permissible judgment was involved and whether that judgment was based on policy considerations.

While clearly articulating this two-step standard, Berkovitz made reference to Indian Towing, stating that the initial decision to undertake and maintain lighthouse service was a discretionary judgment; however, that the failure to maintain the lighthouse in good condition subjected the Government to suit under the FTCA. The latter course of conduct did not involve any permissible exercise of policy judgment. This reference fails even to mention that Varig Airlines had distinguished Indian Towing as not involving the discretionary function exception.

As the circuits wrestled with this inconsistency, one clear trend has remained: that the Court's analysis must focus on whether the complained of conduct was the type that Congress intended to protect.

In Arizona Maintenance Co. v. U.S., [85] the discretionary function exception was not deemed to apply when the complained of conduct was simply the amount of dynamite used in a blasting operation. The Ninth Circuit ruled that the choice of how much dynamite to use at the particular location was not one "grounded in social, economic, or political policy." It was one governed by objective standards which the government must use due care in following.

---

[83] Varig, 467 U.S. at 813, 104 S.Ct. at 2764.

[84] Berkovitz, 486 U.S. at 536-537, 108 S.Ct. at 1958-1959

[85] 864 F.2d 1497 (C.A.9 (Ariz.),1989).

Thereafter in <u>Kennewick Irr. Dist. v. U.S.,</u> [86] the court examined a factual scenario in which involved a claim of negligence in the construction of a canal. In <u>Kennewick</u>, there were factual findings that the section of the canal where both breaks occurred were constructed by a general contractor that was overseen by a governmental contracting officer who oversaw this construction and exercised considerable control of the general contractor's day-to-day operations. Additionally, the construction took place under a contract that contained specifications and provided that unsuitable material, as determined by the contracting officer, be stripped from underneath compacted embankments to the depth directed by him. The contract also provided that the surface under the embankments be scarified or plowed thoroughly to a depth of not less than 6 inches. It was further determined that the contracting officer negligently failed to require excavation of unsuitable materials at the sites of breaks, and that the contracting officer was negligent in failing to install any kind of filter material between the fine silt and the open gravel and cobble, with this negligence being the proximate cause of the canal breaks.

In applying the two-step <u>Berkovitz</u> framework to determine whether the Bureau's construction decisions constituted discretionary functions, the Court found that the contracting officer was vested with discretion to determine when unsuitable material was present, and any duty to remove it was contingent upon a determination that such material was indeed present. However, the Court further found that the contracting officer's on-site decisions were not of the nature and quality that Congress intended to shield from tort liability. The decisions were not based on public policy and they are not entitled to immunity from lawsuit based on negligence under the discretionary function exception. The contracting officer had no room for policy

---

[86] 880 F.2d 1018 (C.A.9 (Wash.),1989).

judgment and decision.

In 1991, the United States Supreme Court addressed this issue in case that emanated from the Fifth Circuit Court of Appeal.[87] The Fifth Circuit in <u>Gaubert v. U.S.</u>[88] relied upon <u>Indian Towing</u> and ruled that the discretionary function exception does not reach decisions made at the operational or management level. The Supreme Court reversed, indicating that <u>Berkovitz</u> did not support the Fifth Circuit's position that there was a dichotomy between discretionary function and operational activities. The Supreme Court then analyzed the complained of conduct and found it to fall within the agency's discretionary function since there were no formal regulations governing the conduct in question and the relevant statutory provisions left it to the agency's judgment when to institute proceedings and what mechanism to use.

Ultimately, the Supreme Court ruled that if a regulation mandates particular conduct, and the employee obeys the direction, the Government will be protected be because the action os deemed in furtherance of policies which led to the promulgation of the regulation. However the Supreme Court, recognizing that such evaluations must be made on a case-by-case basis, went on to substantiate the long standing rule that if the employee violates the mandatory regulation, there will be no shelter from liability because there is no room for choice and the action will be contrary to policy.[89]

Following <u>Gaubert</u>, the courts continued to evaluate the complained of conduct on a case-by-case basis. The standard that is followed now is that "decisions involving the application of

---

[87] <u>Gaubert</u>, supra.

[88] 885 F.2d 1284 (5th Cir. 1989).

[89] <u>Gaubert</u>, 499 U.S. at 324, 111 S.Ct.at 1274.

objective scientific standards ... are not insulated by the discretionary function exception because they do not involve the weighing of economic, political and social policy."[90]

In Whisnant v. U.S.,[91] the Ninth Circuit found that the discretionary function exception does not bar Plaintiff claim of negligence in the negligent operation of a commissary on a naval base because the complained of conduct concerned technical and professional judgments about safety rather than broad questions of social, economic, or political policy.

Similarly in Myers v. U.S.,[92] the Sixth Circuit found that governmental inspectors were required to determine compliance to a regulation, and in the event of non-compliance, issue the mandatory citations and orders; they were not authorized to reweigh these interests on a case-by-case basis. Therefore, the Court found that assessments made by the inspectors are not "policy" decisions protected by the discretionary function exception to the FTCA.

In Cope v. Scott,[93] the D.C Circuit Court ruled that government claims regarding the placement of signs involved technical judgments because although engineering and aesthetic concerns determine where they are placed, such judgments were not necessarily protected from suit; only if they are "fraught with public policy considerations" would they fall within the exception. The Court ruled that those judgment were not fraught with public policy considerations because the "engineering judgment" the government relied on was no more a matter of policy than were the "objective scientific principles" that the Berkovitz court

---

[90] In re Glacier Bay, 71 F.3d 1447 (C.A.9 (Alaska),1995).

[91] 400 F.3d 1177 (C.A.9 (Wash.),2005).

[92] 17 F.3d 890 (C.A.6 (Tenn.),1994)

[93] 45 F.3d 445, 448-49 (D.C.Cir.1995)

distinguished from exempt exercises of policy judgment.

In Ayala v. U.S., [94] the Court ruled that a federal mine inspector's incorrect technical advice was not immune from suit because the specific decision being challenged - where to connect lights - did not involve any considerations of social, economic, or political policy. The discretion involved in the inspector's decision was governed solely by technical considerations.

As the Court can see from the long line of cases extending from Indian Towing, the United States is not entitled to discretionary function immunity where the complained of conduct is governed solely by technical considerations. As indicated above, the complained of conduct of the Corps in performing the works at the EBIA were solely technical, engineering considerations, none of which involve any considerations of social, economic, or political policy. In reading the United State's memorandum, it is clear that the United States cannot specified any such specific social, economic, or political policies it intended to satisfy.

Therefore, the Motion to Dismiss pursuant to the discretionary function exception should be denied.

## III.

## CONCLUSION

Fore the reasons set forth above, the Court must deny the United States of America's Motion to Dismiss Counts Two and Three of the Amended Complaint as it relates to the discretionary function exception raised in the United States's motion.

---

[94] 980 F.2d 1342, (C.A.10 (Colo.),1992).

Respectfully Submitted,

**APPROVED PLAINTIFFS LIAISON COUNSEL**

   /s/  Joseph M. Bruno
JOSEPH M. BRUNO (La. Bar # 3604)
PLAINTIFFS LIAISON COUNSEL
Law Offices of Joseph M. Bruno
855 Baronne Street
New Orleans, Louisiana 70113
Telephone: (504) 525-1335
Facsimile: (504) 561-6775
Email: jbruno@jbrunolaw.com


MR-GO PLAINTIFFS SUB-GROUP
LITIGATION COMMITTEE

s/ James Parkerson Roy
JAMES PARKERSON ROY
MR-GO PSLC Liaison Counsel
LA Bar Roll Number: 11511
Domengeaux Wright Roy & Edwards LLC
Post Office Box 3668
Lafayette, Louisiana 70502
Telephone: (337) 593-4190 or (337) 233-3033
Email: jimr@wrightroy.com

for

MR-GO PLAINTIFFS SUB GROUP
LITIGATION COMMITTEE

Jonathan Andry (The Andry Law Firm,
  New Orleans, Louisiana)
Clay Mitchell (Levin, Papantonio, et al.,
  Pensacola, Florida)
Pierce O'Donnell (O'Donnell & Associates,
  Los Angeles, California)
James Parkerson Roy (Domengeaux, Wright, et al.,
  Lafayette, Louisiana)

**CERTIFICATE OF SERVICE**

I hereby certify that I have served a copy of the above and foregoing upon all counsel of record by placing same in the United States mail, properly addressed and with first-class postage, or by facsimile or other electronic transmission this 31st day of July, 2008.


    /s/ Joseph M. Bruno

    Joseph M. Bruno

# EXHIBIT 2

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: KATRINA CANAL BREACHES | * | CIVIL ACTION |
| CONSOLIDATED LITIGATION | * | |
| | * | NUMBER: 05-4182 "K"(2) |
| | * | |
| | * | JUDGE DUVAL |
| | * | |
| PERTAINS TO: MRGO, Robinson | * | MAG. WILKINSON |
| (No. 06-2268) | * | |

**********************************************************************************

SUR REPLY OF THE MRGO PSLC, AS *AMICUS CURIAE*, TO THE REPLY
MEMORANDUM OF THE UNITED STATES OF AMERICA'S MOTION TO DISMISS
COUNTS TWO AND THREE OF THE AMENDED COMPLAINT

**NOW INTO COURT**, through undersigned counsel, comes the MRGO PSLC, as *amicus curiae*, which files its Sur Reply to the Reply Memorandum of the United States of America's Motion to Dismiss Counts Two and Three of the Amended Complaint, as it relates to the discretionary function exception to the Federal Tort Claims Act ("FTCA").

## I.

## THE UNITED STATES HAS MISINTERPRETED THE ALLEGATIONS AGAINST IT

Throughout it's argument regarding the discretionary function exception, the United States would have the Court believe that the entirety of the allegations lodged against it stem merely from the "negligent supervision" of its contractor, Washington Group International, Inc. ("WGI"). However, the *Robinson* Amended Complaint sets forth detailed allegations of the U.S. Army Corps of Engineers ("Army Corps"or "Corps") *own negligent acts*, coupled with additional negligent acts in administering the construction contract at the East Bank Industrial

Area ("EBIA").  The *Robinson* Amended Complaint sets forth the following specific allegations:

1.   *Defendant Army Corps knew or should have known* that the Washington Group's work was causing, and caused, damage to the levee and/or flood wall structures adjacent to the IHNC/Industrial Canal, but *was negligent because it did nothing to prevent the damage or remediate damage once it was discovered*.

2.   *The Army Corps negligently failed to insure* that the Washington Group followed and complied with the Army Corps guidelines, specifications, policies, regulations or practices and/or professionally acceptable engineering and construction practices while performing its work.

3.   *Defendant Army Corps negligently failed to notice* the damage caused by the Washington Group's work.

4.   *The Army Corps negligently failed to adequately train, inform, or caution the Washington Group* about the potential damage to the levee and/or flood wall system that could result from conducting its work in an improper, unsafe or haphazard manner, or in any manner that failed to comport or comply with Army Corps guidelines, specifications, policies, regulations or practices and/or in any manner that failed to comply with professionally acceptable engineering and construction practices.

5.   *The Army Corps negligently failed to adequately evaluate* the potential damage to, and the damage, actually inflicted on, the levee and/or flood wall structure caused by the Washington Group.

6.   *The Army Corps negligently failed to correct, repair, or in any way remediate* the damage caused by the Washington Group to the levee and/or flood wall system.

7.   *The Army Corps negligently failed to discharge its duty* to maintain the strength and integrity of the levee and/ or flood wall system of the IHNC/Industrial Canal.

8.   *The Army Corps negligently allowed* the work of the Washington group to substantially degrade the strength, integrity and performance of the levee and/or flood wall system.[1]

Each of these allegations not only sets forth specific negligent conduct by the Corps in failing to

fulfill its own mandatory "in house" engineering obligations for this construction project, but

also for its negligent managerial acts during the Corps's interaction with WGI.

---

[1] See Record Document 13527-2, ¶120 & 121. (Emphasis added).

-2-

Of particular importance to the Court's evaluation of the applicability of the discretionary function exception is a thorough review of the nature of the contract between the Corps and WGI, as well as the institutional failures by each during the progress of the project.  The MRGO PSLC has previously set forth the Corps defalcations in administering the EBIA project in its Administrative Master Complaint,[2] as well as providing the Court with the basic facts of the project in its Amicus Curiae Opposition, to allow the Court to understand the import of the mandatory guidelines that the Corps was obligated to follow.  The United States has failed to address these matters in its Reply Brief.

As set forth in the Amicus Curiae Opposition, the Corps failed to follow specific mandatory regulations in administering the construction project.  By the Corps's own testimony in the recent continuation of the Rule 30(b)(6) deposition on August 21st, 2008, these engineering regulations convey mandatory policy requirements for the management of engineering functions.[3]  The failure of the United States to grasp the import of this assertion is shown by its reliance on specific testimony of Alvin Clouatre, the Corps's Quality Assurance Officer, in its Reply Memorandum.  Neither the MRGO PSLC nor the *Robinson* Plaintiffs have taken issue with the Corps's procedure to assure that the "public fisc is not milked."  To the contrary, the allegations by Plaintiffs are that the Corps failed to meet the mandatory guidelines established to insure that collateral damage greater than what Mr. Clouatre could appreciate

---

[2] Previously, the MRGO PSLC asserted in its Master Complaint that the negligence of the Corps (including allowing the work to proceed; failing to caution WGI about potential damage to the floodwall system by its work; failing to monitor /and/or inspect the work of WGI; failing to adequately evaluate the potential damage to the flood wall structure by WGI; failing to correct damage caused by the actions of WGI; failing to discharge its duty to maintain the integrity of the flood wall system) resulted in underseepage-induced erosion to the flood wall that caused or contributed to its catastrophic failure.  Master Complaint, ¶ 47.

[3] See Exhibit 1 - (Greishaber (Vol. II), pg. 64, l.6-11).

-3-

would occur.[4]  The failure of the Corps to comply with these mandatory regulations precludes the benefit of immunity it seeks.

In each of the cases cited by the United States in its Reply Memorandum as providing factual guidance, the conduct reviewed by the Court was related to the direct scope of supervision of the contractor, not the administration of an entire construction contract.

1.  <u>Guile v. U.S.</u>,[5] (Army's decision to hire, supervise, and degree of oversight were "discretionary");

2.  <u>Kirchmann v. United States</u>,[6] (monitoring of a contractor's work where no statute or regulation controls is a question of judgment);

3.  <u>Cohen v. U.S.</u>,[7] (Bureau of Prison's decisions concerning classification of prisoners and what institution to place them in involves an element of judgment or choice);

4.  <u>Terbush v. U.S.</u>,[8] (management policies implicate Park Service's mandate to balance access with conservation);

5.  <u>Garcia v. U.S. Air Force</u>,[9] ("field guide"- whose purpose "is to provide ready reference for establishing and conducting a roof management program for steep-sloped roofing systems - does not prescribe a mandatory course of conduct").

Each of these cases differs starkly from the present case because the complained of conduct was not governed by mandatory regulations.  In the *Robinson* case, however, the Corps was obligated both to perform certain tasks to meet the necessary criteria of the construction

---

[4] See MRGO PSLC Amicus Curiae Opposition, pg. 18-19.

[5] 422 F.3d 221 (C.A.5 (Tex.),2005).

[6] 8 F.3d 1273, 1276-77 (8th Cir.1993).

[7] 151 F.3d 1338, (C.A.11 (Ga.),1998).

[8] 516 F.3d 1125 (C.A.9 (Cal.), 2008).

[9] 533 F.3d 1170 (C.A.10 (N.M.),2008).

-4-

project, *AND* to meet additional criteria in administering the contract.  The failure of the Corps to meet either one of these essential obligations allowed institutional errors by both WGI and the Corps to propagate unchecked; ultimately contributing to the catastrophic failure of the flood walls adjacent to the EBIA.

Moreover, the Defendant also conveniently ignores its burden on the first prong of the discretionary function exception to establish that "all actions . .. were **not** in contravention of the relevant regulations and policies of the Army Corps . . . . This issue is one that must be examined in discovery. . . . Did the Corps violate any of its own engineering policies when it acted?" In re Katrina Canal Breaches Consolidated Litigation,[10]; *see also* Griffin v. United States,[11] (A government agency had no discretion "to disregard the mandatory regulatory command," and violation of a nondiscretionary command removed the action from the scope of the statutory exception.").  Plaintiffs maintain that here the Corps violated clear, mandatory engineering standards with regard to the EBIA activities.  *See* Opposition, pp. 16-21.  If proven, this would defeat any immunity at the outset because a set of Army Corps standards, guidelines and regulatons "specifically prescribes a course of action for an employee to follow…the employee has no rightful option but to adhere to the directive."  Berkovitz v. United States[12]; *see also* Bean Horizon Corp. v. Tennessee Gas Pipeline Co..[13]

Furthermore, at the pleading stage and in the face of  Plaintiffs' detailed factual allegations, a motion to dismiss on this immunity ground must be denied. As noted in the

---

[10] 471 F.Supp.2d 684, 699.

[11] 500 F.2d 1059, 1068-69 (3rd Cir. 1974).

[12] 486 U.S. 531, 536 (1988).

[13] 1998 WL 113935, (E.D. La. 1998), *citing* United States v. Gaubert, 499 U.S. 315, 322 (1991).

Opposition filed by the *Robinson* Plaintiffs, resolution of the discretionary function exception at the motion to dismiss stage is, as this Court ruled in denying the Government's first motion to dismiss, procedurally inappropriate, particularly in light of the disputed facts developed without even the benefit of discovery.  Opposition, p. 14.  The Court should deny this motion for the same reasons for its denial of the Government's first motion to dismiss: "The MRGO is not a simple, one-time isolated project  . . The Court cannot accept on the record before it that all actions done by the Corps were based on policy determinations." *See* In re Katrina Canal Breaches Consolidated Litigation; Oppostion at pp. 22-23.

## II.

## ONLY "SIMPLE" ENGINEERING ANALYSIS WAS NEEDED BY THE CORP

Only if the Court finds that the Corps had discretion to ignore the specific guidelines established for the management of engineering functions should the Court concern itself with whether the Corps's decisions were based on considerations of public policy.  Not surprisingly, the United States urges the Court to so find, but curiously relies upon the benchmark case regarding governmental contractor immunity to convince the Court that the Corps's actions were justified.

In Boyle v. United Technologies Corp.,[14] a widow brought suit against an independent contractor, not the United States, alleging that the defective design of an emergency escape hatch on a Sikorsky helicopter led to the death of her husband because the escape hatch opened out instead of in, preventing him from exiting the aircraft after it crashed.  The United States Supreme Court found that more than "merely engineering analysis" was at issue; there was a

---

[14]  487 U.S. 500, 108 S.Ct. 2510 (U.S.,1988)

specific balancing of military considerations to achieve greater combat effectiveness that had to be reviewed.[15]

No such analysis is involved in the present case.  Here, the Court is not analyzing decisions regarding the combat effectiveness of military aircraft.  By the Corps's own testimony, we are dealing with the evaluation of a "fairly simplistic" job. "The only way you could endanger the flood wall system is by some form of inappropriate excavation or inappropriate backfill." [16]  These "fairly simplistic" parameters do not require the balancing of technical, military or social considerations, just simple engineering analysis.

Under longstanding case law, engineering and safety matters do not implicate the kinds of discretionary policy choices at issue in the second prong of the discretionary function exception to the waiver of sovereign immunity in the Federal Tort Claims Act.  *See* In re Katrina Canal Breaches Consolidated Litigation,[17] (while the decision whether to embark on a course of action such as  whether to adopt safety precautions may involve a discretionary policy choice, the manner in which that decision is implemented is not a policy consideration); *see also* Bear Medicine v. United States,[18] ("Safety  measures, once undertaken, cannot be shortchanged in the name of policy.").

However, even simple jobs can have substantial ramifications, and a trickle of water can carve away mountains.  In the present case, geotechnical analysis was required to understand the

---

[15] Id., at U.S. 511, S.Ct. 2518.

[16] See Exhibit 1- (Greishaber (Vol. II), pg. 14-15, l.18-11).

[17] 471 F.Supp.2d 684, 699-705.

[18] 241 F.3d 1208, 1215 (9th Cir. 2001).

effects of groundwater migration and under seepage potential of the flood wall. The Corps failed to ensure that either it or its contractor performed this analysis.  This neglect was the undoing of the neighborhoods the flood wall was designed to protect.  There was no balancing of technical, military or social considerations undertaken by the Corps; and unfortunately for the residents of the Lower Ninth Ward and St. Bernard Parish, there wasn't even a simple relevant geotechnical engineering analysis done.

Finally, resolution of the discretionary function exception is premature.  The Court will be addressing this issue in later in the year.  As matter of judicial economy and in the interest of comprehensive briefing and a full record, the motion on this issue should be denied without prejudice to renewal at a later time.

## III.

## <u>CONCLUSION</u>

For the reasons set forth above, the Court should deny the United States of America's Motion to Dismiss Counts Two and Three of the Amended Complaint as it relates to the discretionary function exception raised in the United States's motion.

**Respectfully Submitted,**

**APPROVED PLAINTIFFS LIAISON COUNSEL**

  /s/  Joseph M. Bruno
JOSEPH M. BRUNO (La. Bar # 3604)
PLAINTIFFS LIAISON COUNSEL
Law Offices of Joseph M. Bruno
855 Baronne Street
New Orleans, Louisiana 70113
Telephone: (504) 525-1335
Facsimile: (504) 561-6775
Email: jbruno@jbrunolaw.com

-8-

MR-GO PLAINTIFFS SUB-GROUP
LITIGATION COMMITTEE

s/ James Parkerson Roy
JAMES PARKERSON ROY
MR-GO PSLC Liaison Counsel
LA Bar Roll Number: 11511
Domengeaux Wright Roy & Edwards LLC
Post Office Box 3668
Lafayette, Louisiana 70502
Telephone: (337) 593-4190 or (337) 233-3033
Email: jimr@wrightroy.com

for

MR-GO PLAINTIFFS SUB GROUP
LITIGATION COMMITTEE

Jonathan Andry (The Andry Law Firm,
   New Orleans, Louisiana)
Clay Mitchell (Levin, Papantonio, et al.,
   Pensacola, Florida)
Pierce O'Donnell (O'Donnell & Associates,
   Los Angeles, California)
James Parkerson Roy (Domengeaux, Wright, et al.,
   Lafayette, Louisiana)

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the above and foregoing upon all counsel of

record by placing same in the United States mail, properly addressed and with first-class postage,

or by facsimile or other electronic transmission this 9th day of September, 2008.


   /s/ Joseph M. Bruno
   Joseph M. Bruno


-9-

# EXHIBIT
# 3

# Appendix 11
# Analysis of Performance of the Inner Harbor Navigation Canal

## Executive Summary

Four breaches occurred on the Inner Harbor Navigation Canal (IHNC) during Hurricane Katrina, on the morning of August 29th. Two of the breaches occurred on the east bank between the Florida Avenue Bridge and the North Claiborne Avenue Bridge adjacent to the 9th Ward, and two on the west bank just north of the intersection of France Road and Florida Avenue (Figure 11-1). Three of the breaches involved failures of floodwalls on levees, and one involved failure of a levee.

All of the IHNC floodwalls and levees were overtopped on August 29th. The peak storm surge elevation in the IHNC was 14.2 ft[1] at 9:00 AM, about 1.7 ft above the tops of the floodwalls and levees. The reaches where the floodwalls and levees did not collapse have therefore survived water loading considerably higher than the design loading.

Water flowing over the I-walls when they were overtopped eroded trenches on the protected side of the walls as it cascaded onto the levee fill. Soil that was providing support for the walls eroded away, making the walls less stable.

Although it is clear that the walls were overtopped, and that their stability was compromised by the erosion that occurred, it is also clear that one of the east side breaches occurred before the wall was overtopped. Eyewitness reports indicate that the water level in the 9th Ward near Florida Avenue was rising as early as 5:00 AM, when the water level in the IHNC was still below the top of the floodwall. Stability analyses indicate that foundation instability would occur before overtopping at the north breach on the east side of the IHNC. This breach location is thus the likely source of the early flooding in the 9th Ward. Stability analyses indicate that the other three breach locations would not have failed before they were overtopped.

The soil immediately beneath the levees and floodwalls at all four breach locations included marsh, beneath which was clay, and beneath the clay, sand. Through most of their lengths, the

---

[1] All elevations refer to NAVD88(2004.65) datum.



Figure 11-8. IHNC – East Bank (Between Florida Ave. and North Claiborne Ave.), Boring and CPTU Location Map

Volume V  The Performance – Levees and Floodwalls – Technical Appendix

This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.

V-11-23

# EXHIBIT
# 4

# <u>Technical Report No. IV.</u>

# Review of USACE Excavation and Backfill Guidelines and Practices Near Flood Control Structures

Technical Report to

**Katrina Canal Breaches Consolidated Litigation**

[Civil Action Number: 05-4182 "K" (2)]

United States District Court

Eastern District of Louisiana

Pertains to MR-GO, Robinson [No. 06-2268]

By

Dr. Robert Bea and Rune Storesund

**Risk Assessment and Management Services**

Moraga, California

July 11, 2008

EM 1110-2-1913, Design and Construction of Levees (USACE, 2000):

> *Without control, underseepage in pervious foundations beneath levees may result in (a)*
>
> *excessive hydrostatic pressures beneath an impervious top stratum on the landside, (b)*
>
> *sand boils, and (c) piping beneath the levee itself. Underseepage problems are most*
>
> *acute when a pervious stratum underlies a levee and extends both landward and*
>
> *riverward of the levee and where a relatively thin top stratum exists on the landside of the*
>
> *levee.*



**Figure 1.1. The presence of a 'hole' in the 'impermeable' foundation materials on the 'flood side' of the levee requires appropriate mitigation (installation of a landside seepage berm in this example from EM 1110-2-1913). Note that the 'hole' is situated outside the 'footprint' of the levee.**

Additional evaluation zones are recommended in EM 1110-2-1913 in Appendix B:



**Figure 1.2.  Identification of spatial zones judged to influence seepage behavior beneath levees, as outlined in EM 1110-2-1913.**

Special conditions, such as pipeline crossings beneath levee footprints are highlighted in EM

1110-2-1923 (USACE, 2000):

> *General.  The installation of pipes or other structures within the levee or foundation*
>
> *probably requires the greatest care and closest supervision and inspection of any aspect*
>
> *of levee construction.  Most failures of levee systems have initiated at the soil-structure*
>
> *interface and therefore every effort must be made to ensure that these areas are not*
>
> *susceptible to piping.  <u>Of overriding importance is good compaction of the backfill</u>*
>
> *<u>material along the structure.</u> (underline added for emphasis) Pipes installed by open*
>
> *trench excavation should be installed in the dry and a dewatering system should be used*