# EXHIBIT 5

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

IN RE:  KATRINA CANAL BREACHES      CIVIL ACTION
CONSOLIDATED LITIGATION
                                      NO. 05-4182
                                        "K" (2)
PERTAINS TO:  MRGO-ROBINSON         JUDGE DUVAL

FILED IN:  05-4181, 05-4182,     MAG. WILKINSON
05-5237, 05-6073, 05-6314,
05-6324, 05-6327, 05-6359,
06-0225, 06-0886, 06-1885,
06-2152, 06-2278, 06-2287,
06-2824, 06-4024, 06-4065,
06-4066, 06-4389, 06-4634,
06-4931, 06-5032, 06-5155,
06-5159, 06-5161, 06-5162,
06-5260, 06-5771, 06-5786,
06-5937, 07-0206, 07-0621,
07-1073, 07-1271, 07-1285

Videotaped Deposition of

WASHINGTON GROUP INTERNATIONAL BY
PHILLIP LEE STAGGS,
225 South Tropical Trail, Merritt Island,
Florida 32952, taken in the Marriott Hotel,
3435 North Atlantic Avenue, Cocoa Beach,
Florida 32931, on Saturday, the 26th day of
April, 2008.

Page 2

```
 1   APPEARANCES:
 2     LAW OFFICE OF JOSEPH M. BRUNO
       (BY: JOSEPH M. BRUNO, ESQ.
 3       SCOTT JOANEN, ESQ.)
         855 Baronne Street
 4       New Orleans, Louisiana 70113
           PLAINTIFFS LIAISON COUNSEL
 5
 6
       JONES, DAY
 7       (BY:  ADRIAN WAGER-ZITO, ESQ.
           DEBRA CLAYMAN, ESQ.)
 8       51 Louisiana Avenue, N.W.
         Washington, D.C. 20001
 9           ATTORNEYS WASHINGTON GROUP
             INTERNATIONAL
10
11     STONE, PIGMAN
         (BY: WILLIAM D. TREEBY, ESQ.)
12       546 Carondelet Street
         New Orleans, Louisiana 70130
13           ATTORNEYS FOR WASHINGTON GROUP
             INTERNATIONAL
14
15     UNITED STATES DEPARTMENT OF JUSTICE
         CIVIL DIVISION
16       TORTS BRANCH
         (BY: JEFF EHRLICH, ESQ.
17         RICHARD STONE, ESQ.)
18       Post Office Box 888
         Benjamin Franklin Station
19       Washington, D.C.  20044
             ATTORNEYS FOR UNITED STATES
20
21   VIDEOTAPED BY:
         Gilly Delaumier
22       Depo-Vue, Inc.
23
     REPORTED BY:
24       ROGER D. JOHNS, RMR, CRR, RDR, CSR
         Certified Court Reporter
25       State of Louisiana
```

Page 4

```
                    I N D E X

                                              PAGE
     WGI-000140................................ 53
     WGI-91 and 92............................. 64
     90........................................ 64
     89........................................ 64
     WGI-89.................................... 76
     number 90................................. 77
     WGI-93.................................... 77
     93 through 100............................ 79
     96........................................ 79
     Bates number 156.......................... 82
     WGI-259144............................... 126
     WGI-39041 in seriatim to 39049........... 176
     39041 and 39049.......................... 182
     Exhibit 7................................ 201
     39044.................................... 212
     37....................................... 215
     NCS-007252 through 255................... 224
     NCS-007277, 278, and 279................. 224
     8........................................ 224
     9........................................ 224
     WGI-47665................................ 254
     WGI-47665................................ 264
     WGI-47682 and 83......................... 264
     WGI-54420................................ 267
     54420.................................... 272
     54420.................................... 275
     WGI-37609................................ 280
```

Page 3

```
 1          S T I P U L A T I O N
 2
 3        It is stipulated and agreed by and between
 4   counsel for the parties hereto
 5   that the deposition of the aforementioned
 6   witness is hereby being taken under the
 7   Federal Rules of Civil Procedure, for all
 8   purposes, in accordance with law;
 9        That the formalities of reading and
10   signing are specifically not waived;
11        That the formalities of certification and
12   filing are specifically waived;
13        That all objections, save those as to the
14   form of the question and the responsiveness of
15   the answer, are hereby reserved until such
16   time as this deposition, or any part thereof,
17   may be used or sought to be used in evidence.
18
19                * * * *
20
21        ROGER D. JOHNS, RDR, CRR, Certified Court
22   Reporter for the State of Louisiana,
23   officiated in administering the oath to the
24   witness.
25
```

Page 5

```
 1        VIDEO OPERATOR:
 2        This is the videotaped deposition
 3   of Phillip Staggs.  This deposition is
 4   being had at the Courtyard Marriott in
 5   Cocoa Beach, Florida on April the
 6   26th, 2008.  The time is 8:29.
 7        Would Counsel present please
 8   introduce themselves.
 9        MS. WAGER-ZITO:
10        Adrian Wager-Zito, Jones, Day,
11   for Washington Group.
12        MS. CLAYMAN:
13        Debra Clayman Jones, Day, for
14   Washington Group.
15        MR. TREEBY:
16        William B. Treeby, Stone, Pigman,
17   Walther for Washington Group.
18        MR. EHRLICH:
19        Jeff Ehrlich, United States
20   Department of Justice, for the United
21   States.
22        MR. STONE:
23        Richard Stone, United States
24   Department of Justice, for the United
25   States.
```

2 (Pages 2 to 5)

PHILLIP STAGGS                                                    4/26/2008

Page 6

1      MR. JOANEN:
2        Scott Joanen for the Plaintiffs.
3      MR. BRUNO:
4        And Joseph Bruno, Plaintiffs
5    Liaison Counsel.
6        Okay.  This is the continuation
7    of a notice of videotaped Federal 30
8    (b)(6) Deposition of the Washington
9    Group International, Incorporated.
10   This is the third witness in the
11   series of depositions pursuant to this
12   notice.
13       Counsel, would you be so kind as
14   to identify the person or persons who
15   WGI has appointed this morning to
16   represent it and, if you would,
17   identify the paragraphs that this
18   witness is designated to talk to us
19   about this morning?  Thank you.
20     MS. WAGER-ZITO:
21       The witness this morning is
22   Phillip Staggs.  He will be addressing
23   topics 18 through 66 with the
24   exception of already covered topic 62
25   and 63, which were handled by Steve

Page 7

1    Roe last week.  Topics 27 and 28,
2    although we didn't designate them for
3    Steve Roe, are duplicative of topics
4    that Roe handled as we don't believe
5    there's anything to ask this witness
6    about, and the same would be true for
7    topic 25.
8      MR. BRUNO:
9        Are you going to instruct the
10   witness not to answer questions for 27
11   and 28?
12     MS. WAGER-ZITO:
13       I will not instruct him not to
14   answer, but I believe they have
15   already been covered.
16     MR. BRUNO:
17       No, they have not been covered,
18   and I will ask this witness questions
19   about those subjects.  And we I
20   believe also -- Isn't there another
21   paragraph though, was a cross-over?
22   Was that 11?
23     MS. WAGER-ZITO:
24       There are -- He will be
25   addressing project documents to the

Page 8

1    extent they weren't handled by Steve
2    Roe.  Yes, that's topic 11.
3      MR. BRUNO:
4        Is that the one that we talked
5    about?
6      MS. CLAYMAN:
7        Yes.
8      MR. BRUNO:
9        It is 11?  Okay.  I just wanted
10   to check my memory banks.
11     MS. CLAYMAN:
12       Yes.
13     MR. BRUNO:
14       So I take it this would be the
15   last witness that the company would be
16   producing.
17     MS. WAGER-ZITO:
18       Yes.
19     MR. BRUNO:
20       Okay.  Fair enough.
21         PHILLIP LEE STAGGS,
22   225 South Tropical Trail, Merritt Island,
23   Florida 32952, after being duly sworn, did
24   testify as follows:
25   EXAMINATION BY MR. BRUNO:

Page 9

1    Q.  Where is Merritt Island?
2    A.  You came across it to get here.
3    Q.  I did?
4    A.  Yes.
5    Q.  That's --
6    A.  When you go from Cocoa to here, when
7    you leave Cocoa, you're on Merritt Island.
8    Q.  Interesting.
9    A.  When you cross I guess it's the
10   Indian River.
11   Q.  All right.  Would you once again for
12   the record, please, give us your full name?
13   A.  Phillip Lee Staggs.
14   Q.  Mr. Staggs, by whom are you
15   currently employed?
16   A.  David Boland, Incorporated.
17   Q.  And what kind of work does David
18   Boland, Incorporated do?
19   A.  We're a general contractor.
20   Q.  Even though the company's a general
21   contractor, does it have any particular focus
22   with regard to the kinds of things that it
23   builds?
24   A.  We primarily do government work;
25   much of it's for the Corps of Engineers.

PHILLIP STAGGS                                                    4/26/2008

Page 10

1  Buildings, building construction.
2      Q.  Okay.  It's buildings as opposed to
3  earth works or dams or bridges?  That's what I
4  was trying to find out.
5      A.  Yes.
6      Q.  For example, does David Boland build
7  bridges?
8      A.  No.
9      Q.  Okay.  Does it build dams?
10     A.  No.
11     Q.  Build levees?
12     A.  No.
13     Q.  Okay.  Again, as you told me,
14 buildings, ordinary structures.
15     A.  Schools, aircraft hangers, training
16 facilities.  That type of building.
17     Q.  All right.  For how long have you
18 worked for David Boland?
19     A.  I started with them in June of last
20 year.
21     Q.  And what do you do for David --
22     A.  I'm a construction manager.
23     Q.  Okay.  And what does a construction
24 manager do?  At least at David Boland.
25     A.  We're responsible for -- for

Page 11

1  contract management for the subcontractors.
2  The resolution of issues that come up in the
3  field.  Change orders.  Monthly billing.
4  Budget management.
5      Q.  Okay.  For whom did you work before
6  you started with David Boland, Incorporated?
7      A.  I worked for Washington Group.
8      Q.  Okay.  Why did you leave Washington
9  Group?
10     A.  I had an opportunity for a permanent
11 position in Florida and I -- and I have got a
12 home in Florida and the -- the opportunity
13 that I had with Washington Group was in
14 Houston, Texas and I didn't want to work in
15 Houston for five years.
16     Q.  Okay.  You said permanent.  Was the
17 work -- Help me just understand what you meant
18 by that.
19     A.  I was a project person with
20 Washington Group, so I moved from project to
21 project.
22     Q.  Okay.  Did that mean that when the
23 project was done, you were no longer employed?
24     A.  It meant that you had to find
25 another project to work on.

Page 12

1      Q.  Oh, I see.  Okay.  So that the work
2  would be continuous as long as -- this is an
3  extreme -- but when the last day of the
4  project you were working on ended, you were
5  able to start a new project the next day?  Is
6  that?
7      A.  I'm sorry, say again.
8      Q.  I said I am trying to understand
9  what you just said there.  And that you said
10 was that as long as there was another project
11 to work on.  I am wondering if what that means
12 is that, and this is an extreme example, but
13 on the last day of a project you would move
14 from that project to another project the next
15 day.
16     A.  How I would characterize it is some
17 people get laid off at the end of projects, so
18 being a project person, your -- your duration
19 is the duration of the project and then you
20 have to be assigned to another project.  And
21 there's no guarantee that you'll be assigned
22 to another project.  With David Boland, I am a
23 home office construction manager, so that's a
24 permanent position in the office.  Not project
25 to project.

Page 13

1      Q.  Thank you.  That's very helpful.
2      All right.  So for how long --
3  Well, let me ask it this way.  In view of what
4  you have just told me, did you work for any
5  other companies during the same time that you
6  performed project management services for
7  Washington Group International?
8      A.  No.
9      Q.  Okay.  So over what period of time
10 then did you work for Washington Group?
11     A.  19 years.  From 1988 until June or
12 May of last year.
13     Q.  I should have asked, do you have a
14 curriculum vitae or a resume or anything like
15 that?
16     A.  I do not.
17     Q.  That's okay.  Just if you had one.
18 No big deal.
19     Okay.  Let's just skip over the
20 Washington Group time frame for a moment to
21 learn a little bit more about yourself if you
22 don't mind.
23     A.  Okay.
24     Q.  Who did you work for before
25 Washington Group?

JOHNS PENDLETON COURT REPORTERS                          800 562-1285

PHILLIP STAGGS                                                    4/26/2008

Page 14

1      A.  I worked for a joint venture,
2  Pullman-Kenith Fortson.  Pullman-Kenith
3  Fortson.  K E N I T H   F O R T S O N, I
4  believe.
5      Q.  All right.  And for how long were
6  you employed by them?
7      A.  For approximately three years.
8      Q.  All right.  What did you do for
9  Pullman -- I'm just going to call it Pullman
10 if you don't mind.
11     A.  Sure.  That's fine.  I was a quality
12 control supervisor lead.
13     Q.  All right.  And what was the focus
14 of the work of Pullman?
15     A.  It was a nuclear power plant.  So it
16 was quality control work for mechanical
17 contractor on a nuclear power plant.
18     Q.  So Pullman's a mechanical
19 contractor?
20     A.  They were.
21     Q.  And was that a three year project?
22     A.  That was a three year -- Well, I
23 didn't hire in at the beginning of it, but it
24 was -- it was about three years from the time
25 I hired in to the end of it.

Page 15

1      Q.  Okay.  So that the only project that
2  you worked on was this nuclear power plant
3  project?
4      A.  Yes.
5      Q.  All right.  And before then for whom
6  were you employed?
7      A.  A company called Pullman Power
8  Products.
9      Q.  And what did you do for those guys?
10     A.  The same thing.  They were the
11 piping contractor.
12     Q.  Is it the same job?
13     A.  The same job.  The same project.
14     Q.  Where was the nuclear power plant?
15     A.  Plant Vogtle near Waynesboro,
16 Georgia.
17     Q.  And how long did you work for
18 Pullman Products, I am going to call them?
19     A.  About a year and a half.
20     Q.  Okay.  And before then?
21     A.  Before then?  Daniel International,
22 Fluor Daniel I think it was at that time.
23     Q.  Fluor Daniel?  That's a contractor,
24 too, isn't it?
25     A.  Uh-huh (affirmatively).

Page 16

1      Q.  And you did -- They're also a
2  construction firm?
3      A.  Yes.
4      Q.  I have heard of them.  What's the
5  focus of their work?
6      A.  This was in 1981, so it was a
7  different power plant.  A power nuclear plant
8  in Kansas, near New Straughn, Kansas.
9      Q.  Okay.  And what kind of work did you
10 do for Fluor Daniels?
11     A.  Quality control, non-destructive
12 testing.
13     Q.  Okay.  How long did you work for
14 them?
15     A.  Oh, a year and a half, two years,
16 something like that.
17     Q.  Got you.  All right.  Before then?
18     A.  Sauder Industries.  Sauder Tank or
19 Sauder Industries.
20     Q.  Sauder, S O --
21     A.  S A U D E R.
22     Q.  Oh, S A U D E R.  Industries.  And
23 what does Sauder Industries do and for how
24 long did you work there?
25     A.  They were an ASME code vessel

Page 17

1  fabricator.  It was a boilermaker shop.  They
2  built pressure vessels.
3      Q.  Okay.  And how long did you work for
4  them?
5      A.  Oh, about two years.
6      Q.  And before that company?
7      A.  Before that was a company called
8  Peabody Testing.
9      Q.  And what did they do?
10     A.  Non-destructive testing.
11     Q.  How long did you work for them?
12     A.  I believe it was about a year and a
13 half.
14     Q.  All right.  And before that
15 company?
16     A.  That's 1978.  It wasn't long -- It
17 was --
18     Q.  You're not that old.  I figure at
19 some point we had to get to college.  Okay?
20 At least you don't look that old.  I'm going
21 to tell you that right now.  So was --
22     A.  Thank you.
23     Q.  Was that school?
24     A.  I had some -- I can't remember all
25 the, you know, the part time jobs.

5  (Pages 14 to 17)

PHILLIP STAGGS                                                    4/26/2008

Page 18

1    Q.  Oh, sure.
2    A.  I mean, that was when my career
3  employment began, was with Peabody in 1978.
4    Q.  That's fine.
5    A.  I went to college -- I graduated
6  high school in 1974 and went to college in
7  '75.
8    Q.  All right.  And where did you finish
9  college?
10    A.  I didn't finish college.  I didn't
11  graduate.  I went to Arkansas Tech University
12  in Russellville, Arkansas.
13    Q.  All right.  How many years did you
14  get done?
15    A.  About a year.
16    Q.  Okay.  Thank you.  Now let's go back
17  to Washington Group.  19 years is a long time,
18  so let me see if I can get my arms around
19  this.
20    A.  Sure.
21    Q.  How many projects roughly do you
22  think you worked on while you were employed at
23  Washington Group?
24    A.  I could count them.  Let me see
25  here.

Page 19

1    Q.  You want a piece of paper?  Will
2  that help you?
3    A.  About seven.
4    Q.  70?
5    A.  Seven.
6    MS. WAGER-ZITO:
7    Seven.
8  EXAMINATION BY MR. BRUNO:
9    Q.  Oh, seven.  I almost had a heart
10  attack.  Seven.  We can handle seven.  We
11  can't handle 70.
12    So all right.  Good.  Seven.
13  Thank you.  What was your entry level position
14  at -- By the way, when you started.  I guess
15  it was Morrison Knudsen?
16    A.  Yes, it was.
17    Q.  Okay.  Am I saying that right,
18  Morrison Knudsen?
19    A.  Knudsen.
20    Q.  Knudsen.  I never --
21    MS. WAGER-ZITO:
22    You do better than most people
23    do.  That's okay.
24  EXAMINATION BY MR. BRUNO:
25    Q.  Fair enough.  All right.  What's the

Page 20

1  first job that you held at Morrison Knudsen?
2    A.  Quality control inspector.
3    Q.  All right.  Which makes sense.
4  That's what you had done in the past.
5    A.  Yes.
6    Q.  What was the project?
7    A.  Savannah Riverside.
8    Q.  Savannah?
9    A.  Riverside.
10    Q.  All right.
11    A.  It's a DOE facility.
12    Q.  Okay.  And that's Department of
13  Energy for --
14    A.  Yes.
15    Q.  -- those who might read this
16  transcript?  And what kind of facility was
17  it?
18    A.  The facility that I worked on was
19  the defense waste processing facility.  It was
20  a vitrification facility.
21    Q.  Teach us.  What is vitrification?
22    A.  It was --
23    Q.  It's a scary name.
24    A.  It's designed to solidify and
25  stabilize high level radioactive waste.  High

Page 21

1  level liquid radioactive waste.
2    Q.  Okay.  When I ask you how long, you
3  already know I am not looking for anything
4  really precise.  I just want to get a general
5  feel for it.  How long did you work as the
6  quality control inspector for that project?
7    A.  I was there for about three and a
8  half years.  During that three and a half
9  years, I went from being the quality control
10  inspector to being the quality engineering
11  lead for the area.
12    MS. WAGER-ZITO:
13    Joe, this witness is here as a 30
14    (b)(6) witness.  I know some
15    background is relevant, but we are
16    sticking with the seven hours; and if
17    you go through seven projects in this
18    level of detail, it's going to take a
19    while.
20    MR. BRUNO:
21    Well, we are not sticking to
22    anything.  The Judge will tell us how
23    long we have.  We have already talked
24    to the Judge.  We've had a
25    conversation with him about the

PHILLIP STAGGS                                          4/26/2008

Page 22

1    potential for going over. We'll
2    address it, hopefully don't need to
3    address it, but I am not going to have
4    you tell me what I can ask and not
5    ask. So let's just get that done. If
6    you want to make an objection as I was
7    admonished on Thursday, make an
8    objection.
9    EXAMINATION BY MR. BRUNO:
10   Q.  I'm sorry, sir. I want to learn a
11   little bit about you. What you know obviously
12   is relevant for me in the context of WGI. So
13   okay. Quality control -- I'm sorry, I got
14   thrown off here. You were the quality
15   engineering lead, so you got a promotion.
16   A.  Yes.
17   Q.  Were you the head guy for quality
18   control on that project?
19   A.  Uh-huh (affirmatively).
20   Q.  Okay.
21   A.  At the end of the project, yes.
22   Q.  Okay. Great. Now, so the next
23   project. What was the next project?
24   A.  That was -- It was in Boston,
25   Massachusetts, or Watertown, Massachusetts,

Page 23

1    and it was demolition of a research reactor
2    and clean-up of buildings on an Army base for
3    the BRAC closure. AMTL I think was the name
4    of the project, Army Testing Materials
5    Laboratory.
6    Q.  Was this your first encounter with
7    remediation?
8    A.  It was.
9    Q.  By the way, all of the work -- was
10   all of the work that WGI did government work
11   --
12   A.  No.
13   Q.  -- for the whole 19 years?
14   A.  No.
15   Q.  Was it mostly government work?
16   A.  Primarily government work.
17   Q.  All right. How long at the Boston
18   site?
19   A.  Two years.
20   Q.  Okay. Number three project, what
21   was that one?
22   A.  That was a copper mine
23   modernization, tailings modernization for
24   Kennecott Utah Copper.
25   Q.  Okay. Was there a remediation

Page 24

1    component to that job?
2    A.  If there was, it was very minor.
3    Q.  Fair enough. How long at the copper
4    mine?
5    A.  About three and a half years.
6    Q.  All right. Project number four,
7    what was that?
8    A.  It was Denver. It was the arsenal
9    at Denver.
10   Q.  Okay. What were you -- What was
11   your role?
12   A.  It was a short job. It was an
13   interim job. We were doing preliminary work
14   for construction of a hazardous waste
15   landfill.
16   Q.  How long were you at Denver?
17   A.  From August until December.
18   Q.  Oh, very short. Okay. Number 55?
19   A.  Number 5 --
20   MR. EHRLICH:
21       Object to form.
22   THE WITNESS:
23       Number 5 was Phoenix, Arizona,
24   Luke Air Force Base. It was a
25   hospital remodel, asbestos abatement

Page 25

1    and remodel.
2    EXAMINATION BY MR. BRUNO:
3    Q.  Okay. What was your role on that
4    project?
5    A.  When I came there at the end of 1997
6    or early 1998 I was the quality manager for
7    the project.
8    Q.  Okay.
9    A.  At the end of the job I finished as
10   a project manager.
11   Q.  All right. I think I did ask you
12   how long that project was? I don't remember.
13   A.  It was two years.
14   Q.  Two years.
15   A.  Approximately two years.
16   Q.  All right. And then number six?
17   A.  Was IHNC.
18   Q.  Okay. So obviously there was a
19   project after the IHNC, number seven.
20   A.  Yeah, Ft. Lauderdale. It was a New
21   River Bridge.
22   Q.  Let's get that one out of the way.
23   Were you a project manager for --
24   A.  No, I was a quality manager there.
25   Q.  Quality manager. Okay. And how

7 (Pages 22 to 25)

PHILLIP STAGGS                                          4/26/2008

Page 26

1    long did the bridge take?  Well, I'm sorry, I
2    shouldn't say that.  How long were you on that
3    project?
4         A.  I was there about a year and a
5    half.
6         Q.  All right.  Good.  Thank you very
7    much.  Let's talk about the IHNC.  Again, for
8    those reading the deposition, what is IHNC?
9         A.  It was the Inner Harbor Navigation
10   Canal.
11        Q.  Okay.  Had you been in New Orleans
12   before that job began?
13        A.  I had come through there for
14   vacation, for just -- flew in, saw the place
15   as part of a vacation.
16        Q.  All right.  Now, what was your --
17   Maybe I'll ask it this way if you don't mind.
18   Did your job change during the time that you
19   were working at the IHNC?  Or did you have the
20   same job the whole time?
21        A.  The same job.  I was a construction
22   manager.
23        Q.  You were the construction manager.
24   Okay.  Who was the, by title, okay, highest
25   ranking Morrison Knudsen or, you know, later

Page 27

1    WGI employee physically located on that site
2    to do work?
3         A.  When it began it was Dennis
4    O'Connor.  He was the project manager.
5         Q.  All right.  He was the -- I'm sorry,
6    you said and I just missed it, he was the
7    project --
8         A.  Project manager.
9         Q.  Project manager.  So is it fair for
10   me to conclude that the title project manager
11   is the title of the highest ranking Morrison
12   Knudsen or Washington Group International
13   employee on the site at the Inner Harbor
14   Navigation Canal?
15        A.  It is.
16        Q.  Okay.  Now, as part of the work done
17   by Morrison Knudsen or WGI, do those companies
18   require that their project manager live near
19   the site?  That is, at least in the same city
20   as the site during the course of the work?
21        A.  I don't think that they require
22   that, no.
23        Q.  Okay.  Did the project manager or
24   managers reside in the New Orleans area while
25   the work was ongoing at the Inner Harbor

Page 28

1    Navigation Canal?
2         A.  Yes.
3         Q.  Okay.  How long did the Inner Harbor
4    Navigation project take, if you know?
5         A.  It was approximately five years.
6         Q.  Okay.  From about somewhere in '99
7    to the middle of '05, something like that?
8         A.  In 2000 to -- to '05.
9         Q.  Work actually --
10        A.  I mean, the --
11        Q.  I'm sorry, I didn't mean to
12   interrupt you.  Go ahead.  I apologize.
13        A.  Yeah.  I got there in July of 2000
14   and I think I left in March of 2005.
15        Q.  Okay.  When you arrived, had work
16   physical -- I'm going to say physical work on
17   the site began, a spade to the earth?
18        A.  No.
19        Q.  Okay.  And with you left in March of
20   '05, had the job been completed?
21        A.  I think we were working on the last
22   site at Boland Marine.
23        Q.  All right.  Now, you said -- you
24   told us already that Dennis O'Connor was the
25   project manager for a time.

Page 29

1         A.  Uh-huh (affirmatively).
2         Q.  Who took Dennis' place?
3         A.  Actually, he -- he moved to the home
4    office in Denver and remained as a project
5    manager.  He just wasn't part of the site
6    staff.
7         Q.  Oh, okay.  All right.  So about in
8    this five year time frame when did Mr.
9    O'Connor move from New Orleans back to
10   Denver?
11        A.  I -- I don't remember the -- I mean,
12   it -- I'd have to look at the project records
13   to see.
14        Q.  All right.  When Mr. O'Connor moved
15   to Denver, who was the highest ranking -- I
16   guess by then would it have been Washington
17   Group?
18        A.  Yes.
19        Q.  Okay.  It'll make my questions a
20   little bit easier.  When Mr. O'Connor moved to
21   Denver, who was the highest ranking Washington
22   Group employee on the site?
23        A.  That was me.
24        Q.  That was you?
25        A.  I was the construction manager.

8  (Pages 26 to 29)

JOHNS PENDLETON COURT REPORTERS                        800 562-1285

PHILLIP STAGGS                                              4/26/2008

Page 30

1    Q.   Okay.  I would like to learn a
2    little bit by the hierarchy.  Okay?  We have
3    just learned that the project manager is the
4    highest ranking employee on site.  And
5    obviously the construction manager is the next
6    highest ranking person on site.  Right?
7        A.   Yes.
8        Q.   Okay.  Now, who is below you in the
9    hierarchy?
10       A.   There really isn't a management
11   chain below me.  There's project personnel.
12       Q.   Okay.  Now, before I go there, were
13   there any project personnel employed by WGI
14   for the Inner Harbor Navigation project who
15   are not -- who are working on the project, but
16   are not physically located in the New Orleans
17   area to do the work?
18       A.   Would you repeat that?
19       Q.   Yes.  I am trying to find out
20   whether or not this project personnel, that's
21   where we are in the hierarchy, any of those
22   folks do work on this job but they do their
23   work in a different location, not in New
24   Orleans?  Maybe Denver, maybe, you know,
25   wherever?

Page 31

1        A.   The project personnel designation is
2    for people who are designated as project
3    employees whose normal function occurs on the
4    project.
5        Q.   All right.  Are there -- Okay.  So
6    let me ask you this.  Are there any personnel
7    at your level, okay, at the construction
8    manager level who may be working on the Inner
9    Harbor Navigation Canal project but who aren't
10   doing that work in New Orleans, perhaps
11   they're located somewhere else?
12       A.   No.
13       Q.   Did you have any engineering or
14   technical support persons employed by
15   Washington Group International who were
16   assigned to work on the Inner Harbor
17   Navigation project?
18       A.   There were technical support people.
19       Q.   All right.  Were they in New
20   Orleans?
21       A.   There were people during the project
22   planning and plan development that were
23   temporary -- temporarily assigned to New
24   Orleans and who went back to the home office
25   when the plans that they were developing were

Page 32

1    complete.
2        Q.   All right.  Did you have anything to
3    do with the planning side of this project?
4        A.   The project work plan, development
5    of the project work plan.
6        Q.   Well, there's a series of project
7    work plans, aren't there?
8        A.   There was one designated I believe
9    as the project work plan.  But there's a
10   number of project plans.
11       Q.   All right.  That's fair enough.
12   Would the one designated as the project work
13   plan be the one -- let's see, is it August of
14   2000?
15       MR. EHRLICH:
16       October.
17   EXAMINATION BY MR. BRUNO:
18       Q.   October of 2000?
19       A.   I couldn't say --
20       Q.   Okay.
21       A.   -- without looking at the document.
22       Q.   All right.  You'll have to forgive
23   me.  Federal Express is to thank for me not
24   having that right in my hands to show you, but
25   they promised me by noon I'll have it.  But we

Page 33

1    have some other stuff --
2        A.   Okay.
3        Q.   -- we'll show you.  We can only try
4    in this business.
5        Okay.  In any case, we do agree
6    that the project work plan, which is the main
7    one, that's the one that describes the general
8    work of the project; right?
9        A.   It described the demolition
10   activities and the environmental concerns in
11   the buildings and the structures.
12       Q.   All right.  So we were at the
13   project personnel level.  What project
14   personnel were -- Who would be the next layer
15   of people in this hierarchy?
16       A.   Well, we had -- we had a safety
17   manager, quality manager, environmental
18   manager, and a couple of superintendents.
19       Q.   All right.  Who was the safety
20   manager?
21       MS. WAGER-ZITO:
22       Objection, vague as to time.
23   EXAMINATION BY MR. BRUNO:
24       Q.   Was there more than one?
25       A.   There was.  I don't remember -- I

JOHNS PENDLETON COURT REPORTERS                      800 562-1285

PHILLIP STAGGS                                                    4/26/2008

Page 34

1   don't remember the circumstance, if it was a
2   fill-in because the original manager quit or
3   was on vacation.  Yeah, there was more than
4   one.
5       Q.  Okay.
6       A.  There was more than one.
7       Q.  May I know their names?
8       A.  The initial one was Michael
9   Bradshaw.
10      Q.  Michael Bradshaw.  Okay.  And the
11  other one?  If you can remember.
12      A.  I don't remember.
13      Q.  That's fine.  The quality manager?
14      A.  Initially, it was Sarah Alvey.
15      Q.  A --
16      A.  L V E Y.
17      Q.  Okay.  And it obviously changed to
18  --
19      A.  It changed.  She left the company in
20  -- I think for an interim period Brenda
21  Casey, who was initially a quality manager.  I think
22  assumed that role as quality manager.  I think
23  we had a couple more before the end of the
24  project.
25      Q.  Environmental manager?  Who?

Page 35

1       A.  I think we had two or three.  I
2   mean, just the length of the job was five
3   years.
4       Q.  Sure.  Five years, of course.
5       A.  Jim Blazek was the initial.
6       Q.  Not our Jim Blazek?
7           MR. TREEBY:
8             No.  Don't hold it against him.
9           MR. BRUNO:
10            I won't.  We've already made this
11          comment official for the record.
12  EXAMINATION BY MR. BRUNO:
13      Q.  It's an inside joke between -- you
14  don't want to know.
15          Any other names you can recall?
16      A.  Daniel Terlington.
17      Q.  Daniel?  Okay.
18      A.  And then we had a Robert Lundburg.
19      Q.  Okay.  And now we're at the -- we
20  have a couple of superintendents?
21      A.  A couple of superintendents.  Bobby
22  Smith and Brenda Casey.
23      Q.  All right.  Now, what is a safety
24  manager's job?  What is he supposed to do?
25      A.  Implement the site safety and health

Page 36

1   plan, monitor -- monitor activities for safety
2   controls and identify safety hazards, et
3   cetera.  Make sure people are using their
4   personal protective equipment.
5       Q.  All right.  Quality manager?  What
6   is the job of the quality manager?
7       A.  Daily monitoring of the work for
8   compliance with the work plans and
9   specifications, preparatory meeting
10  requirements.
11      Q.  All right.  Environmental manager?
12      A.  Sampling, verification that samples
13  are acceptable prior to backfilling, et
14  cetera.  Primarily sampling.
15      Q.  Now, when you say making certain
16  that -- I don't want -- Let me just make sure
17  I have got it correct.  Verification that
18  samples are acceptable prior to backfilling.
19  Okay.  Let me understand what samples you are
20  referring to and from where those samples are
21  taken.
22      A.  During the remediation phase you
23  take clearance samples.  And I am talking
24  about those after you have done your
25  excavation, you take your clearance samples,

Page 37

1   you send them to your lab, the results come
2   back.  If the results are acceptable, then he
3   -- he acknowledges that they're acceptable
4   and you proceed with backfilling.
5       Q.  Okay.  And then what is the job of a
6   superintendent?
7       A.  A superintendent was coordination
8   with the subcontractors, making sure that
9   there were no issues from one subcontractor to
10  another.  Seeing that they were working in
11  accordance with their schedule, that they were
12  working on the right activities.
13      Q.  Okay.  Now, below the level of
14  superintendent were there any WGI employees?
15      A.  We had a site foreman.
16      Q.  Okay.  More than one of those?
17      A.  Oh, several of those.
18      Q.  Several?
19      A.  Uh-huh (affirmatively).
20      Q.  Okay.  And what was their job?
21      A.  Just general work.  Bush-hogging,
22  vehicle maintenance, --
23      Q.  Okay.
24      A.  -- miscellaneous labor, site labor
25  activities.

10 (Pages 34 to 37)

PHILLIP STAGGS                                                    4/26/2008

Page 38

1     Q.  All right.  Do I gather then from
2  your description of the WGI personnel on the
3  ground out there that the bulk of the work was
4  subcontracted to others?  That is, the actual
5  physical labor, if you will, of earth moving
6  and, you know, pile pulling and --
7     A.  Earth -- Earth moving was not.  But
8  most of the other activities were.
9     Q.  Okay.  The pulling of the piles,
10  that was subcontracted?
11     A.  Primarily.
12     Q.  All right.  Building the cofferdams?
13     A.  Yes.
14     Q.  And then removing the earth inside
15  the cofferdam?  Is that something --
16     A.  Yes.
17     Q.  Okay.  And so what you have told me
18  is that bulldozing, you guys did yourself?
19     A.  We did.  Other contractors did as
20  well.
21     Q.  Okay.  What physical work did WGI do
22  on that site?  Generally.
23     A.  We did remediation, the excavation
24  and backfill.
25     Q.  I mean, your personnel actually dug

Page 39

1  the --
2     A.  Direct hire labor.
3     Q.  Yes.
4     A.  Direct hire operators out of a local
5  union hall.
6     Q.  Okay.  The direct hire was to do the
7  excavation of what exactly?
8     A.  Contaminated soil.
9     Q.  Okay.
10     A.  The remediation effort.
11     Q.  All right.  Just to distinguish it
12  from the excavation that was necessary to
13  remove the concrete foundations, et cetera,
14  what was the scope of that effort?  That is,
15  the -- Let me see if I can ask it this way.
16  The remediation, when you get down to it, was
17  the removal of topsoil from the site.  Is that
18  accurate?
19     A.  No.
20     Q.  Okay.  Tell me how to describe the
21  remediation effort.
22     A.  There was a Corrective Action Plan
23  that identified the areas that were designated
24  to be remediated.  And they had a map and then
25  an identification with dimensions that

Page 40

1  described what was to be remediated.
2     Q.  Okay.  And so once we learned where
3  the remediation was to take place, wasn't that
4  the removal of the topsoil?
5     A.  It was the removal of contaminated
6  soils.
7     Q.  Okay.  How deep was it anticipated
8  that when you all started this job you would
9  have to go for that purpose?
10     MS. WAGER-ZITO:
11     Objection.
12     THE WITNESS:
13     The Corrective Action Plans
14  identified the depth of the
15  excavations, and each of them was
16  unique.
17  EXAMINATION BY MR. BRUNO:
18     Q.  Okay.
19     A.  It was based on the contaminants
20  that they identified during the
21  characterization.
22     Q.  I understand.  Are you able to tell
23  me the deepest that you all thought you had to
24  go for remediation before you started the
25  work?

Page 41

1     A.  Without looking at the plans I could
2  not.
3     Q.  Okay.  Well, I mean, was it like
4  more than 10 feet?  I am not looking for, you
5  know, 1.6.  I am not looking for the precision
6  that you may be thinking I'm asking.  I am
7  just trying to get a general sense of --
8     A.  I would have to review the work
9  plans.  I mean, some of them were three feet,
10  were ten by ten by three feet, and some of
11  them were larger, but every one of them is
12  unique.
13     Q.  All right.  But you are not able to
14  tell me the deepest level that you had
15  anticipated at the start of the job you would
16  have to go for this remediation effort?
17     MS. WAGER-ZITO:
18     Objection.
19     THE WITNESS:
20     Without looking at the plans I
21  could not.
22  EXAMINATION BY MR. BRUNO:
23     Q.  We'll go there.  I just want -- I'm
24  trying to get a general sense.
25     A.  Sure.

JOHNS PENDLETON COURT REPORTERS                          800 562-1285

PHILLIP STAGGS                                                          4/26/2008

Page 42

1    Q.  The reason I am asking this question
2  is to differentiate between when you were
3  using the local or the fellows out of the
4  local to dig as opposed to getting a
5  subcontractor.  But we do know, though, that
6  you guys used local labor out of the union
7  halls to do the remediation.  Right?
8    A.  Yes.
9    Q.  Okay.  And we're defining
10 remediation as the removal of a certain depth
11 of soil that was found to be contaminated.  Is
12 that reasonable?
13    A.  Yes.
14    Q.  A reasonable way to describe it?
15    A.  Yes.
16    Q.  All right.  Now, generally did --
17 what -- did the -- the site was about how many
18 acres?
19    A.  I think it was approximately 32.
20    Q.  All right.  Now, did you do a
21 walk-through before the work began with
22 anybody?
23    A.  We did.
24    Q.  And because we have had a
25 description of a walk-through by I think it

Page 43

1  was Mr. Roe, R O E?  Roe.  Did you walk the
2  site with Mr. Roe?  Do you recall that?
3    A.  There were a number of people there
4  and I believe he was there the same time when
5  we did the initial site.  There may have been
6  multiple site walk-throughs.
7    Q.  All right.  Now, did you have an
8  understanding, sir, about who owned the site
9  that WGI was going to remediate?
10    A.  I think the Corps of Engineers was
11 in the process of procuring the property from
12 -- from the Port, I believe.
13    Q.  All right.  Now, when you were on
14 the site, did you notice or see a flood
15 protection structure?
16    A.  Yes, there was a floodwall there.
17    Q.  A floodwall.  All right.  Did you
18 have any understanding as to who owned that
19 floodwall?
20    A.  I don't recall without looking at
21 the documents.  I mean, that -- it wasn't
22 significant as far as the ownership of the
23 floodwall.  That was the eastern boundary of
24 the property.
25    Q.  Okay.  Well, that was my next

Page 44

1  question, actually.  Was the floodwall or any
2  part of the floodwall in the boundary of the
3  work site?
4    A.  Say again?  Was the --
5    Q.  Was the floodwall, okay -- Well, let
6  me just back up.  The floodwall, for those who
7  would read this, is not just a wall.  It's got
8  an earth berm component to it; right?
9    A.  Yes.
10    Q.  Okay.  On both -- on the protected
11 side and the water side as folks have
12 described --
13    A.  Uh-huh (affirmatively).
14    Q.  -- each side of the floodwall.  Are
15 those appropriate terms for me to describe the
16 --
17    A.  I don't know if they are or not.
18    MS. WAGER-ZITO:
19      Ask your question.
20 EXAMINATION BY MR. BRUNO:
21    Q.  That's fine.  Fair enough.  I just
22 want -- I am not trying to trick you or
23 anything.  I just want the find some
24 descriptors that would make sense to you and I
25 in our conversation.  But you do remember that

Page 45

1  there was some earth piled up against both
2  sides of this what appears to be a wall?
3    A.  There was a levee and a floodwall.
4    Q.  There you go.  All right.  There's a
5  levee and a floodwall.  Now, what I am trying
6  to figure out is, as far as you understood it,
7  was that levee and floodwall inside the work
8  site or was it outside the work site, or
9  perhaps was a part of the levee and floodwall
10 inside the work site?
11    A.  It was the east boundary of the
12 project site.  It was -- It was east of the
13 area that was to be worked.
14    Q.  Okay.
15    A.  So the levee was not part of our
16 work area, but it was within the limits of our
17 project site.
18    Q.  Okay.  Can you help me understand
19 what part of the levee and/or floodwall would
20 have been the boundary of the work site?
21    A.  The floodwall itself was -- I think
22 in our plans was defined as the eastern
23 boundary of the property.
24    Q.  Okay.  Now, you all installed a
25 chain link fence to demarcate the work site,

PHILLIP STAGGS                                            4/26/2008

Page 46

1  did you not?
2      A.  We installed a fence to protect and
3  provide security for the work site.
4      Q.  Well, I understand that.  But you
5  didn't build it on other folks' land, did
6  you?  You built it on land that demarcated the
7  work site?
8      A.  We built it at the location that the
9  government identified to be for it to be
10 installed.
11     Q.  And wasn't that coexistent with the
12 work site?
13     A.  I'm not sure -- I don't understand
14 the question.  The -- The -- I think the plans
15 -- the plans established the floodwall as the
16 eastern boundary of the project site.
17     Q.  Right.
18     A.  The government had us install a
19 fence on the outboard side of that on the
20 protected side.  Beyond that, I am not
21 following your question.
22     Q.  Well, I mean, anybody who had
23 nothing to do with the project, would you
24 agree, walking up to the site and seeing a
25 chain link fence, would assume that the work

Page 47

1  site is all that that's on the other side of
2  the chain link fence?
3          MR. EHRLICH:
4              Object to form.
5          MS. WAGER-ZITO:
6              Objection.
7  EXAMINATION BY MR. BRUNO:
8      Q.  Is that a reasonable conclusion for
9  somebody to make?
10     A.  I don't know.
11     Q.  You don't know?  Okay.  That's
12 fine.  All right.  But the purpose of the
13 chain link fence was what?
14     A.  Security.
15     Q.  But to secure what?
16     A.  Well, you -- you have got a site
17 with environmental contaminants that you want
18 to protect the public from, so you have
19 security.
20     Q.  So the fence was to keep people out
21 of the site?
22     A.  Yes.
23     Q.  Okay.
24     A.  Protect equipment when you got
25 expensive equipment in there as well.

Page 48

1      Q.  Sure.  All right.  And the part of
2  the fence that went from the floodwall to the
3  water's edge, there are two of those, right?
4          MR. EHRLICH:
5              Object to form.
6          THE WITNESS:
7              At the north and south boundary
8          of the property.
9  EXAMINATION BY MR. BRUNO:
10     Q.  All right.  And do you know whether
11 or not those two fences were located on the
12 northern and southern boundary of the work
13 site, or were they a little bit outside, in
14 the same way that you have described the fence
15 on the floodwall side?
16         MR. EHRLICH:
17             Object to form.
18         THE WITNESS:
19             I don't know.  I know they were
20         -- they were installed at the
21         locations that was directed by the
22         government.  Whether that was
23         inclusive of the -- I mean, the -- I
24         don't -- I don't understand where
25         you're -- what you're trying to define

Page 49

1  by -- by the question.
2  EXAMINATION BY MR. BRUNO:
3      Q.  Well, this is a contract for
4  remediation and you know, do you not, that the
5  TERC itself and the work plan required
6  Washington Group International to develop the
7  work plan and the work that Washington Group
8  felt was necessary in order to comply with the
9  work plan?  Right?
10         MS. WAGER-ZITO:
11             Objection.
12         THE WITNESS:
13             Could you restate that?
14 EXAMINATION BY MR. BRUNO:
15     Q.  Well, the bottom line is, Washington
16 Group wrote the specs; right?
17         MS. WAGER-ZITO:
18             Objection.
19         THE WITNESS:
20             Washington Group developed work
21         plans that were submitted for
22         approval.
23 EXAMINATION BY MR. BRUNO:
24     Q.  Exactly.  And the work plan
25 described where the fence was supposed to go;

13  (Pages 46 to 49)

PHILLIP STAGGS                                                    4/26/2008

Page 50

1   right?
2       A.  I would have to look and -- and
3   confirm that.
4       Q.  Well, all right.
5       A.  I don't know the level of detail
6   that was described in the work plan regarding
7   installation of the chain link fence.
8       Q.  That's fair enough.  But in any --
9   there was really never any specific -- I mean,
10  let me see if I can -- Can you think of a
11  single piece of paper that came from the
12  government with regard to directing the work
13  of the WGI, okay, just one, that was not a
14  comment on a work plan that you had submitted
15  to the government for approval?  In other
16  words, something that came outside of WGI's
17  suggestion, and a comment on that section by
18  the government?
19          MR. EHRLICH:
20          Objection.
21          MS. WAGER-ZITO:
22          Objection.
23  EXAMINATION BY MR. BRUNO:
24      Q.  Just one piece of paper.
25      A.  If allowed access to the project

Page 51

1   records, I believe we could find numerous
2   pieces of paper.
3       Q.  All right.  Well, what kinds of
4   things would the government tell you to do
5   that were not part of the work plan?  Maybe I
6   can ask it on a general level.  Work down.
7       A.  Say again?
8       Q.  What kinds of things -- You have
9   already told me that you were asked to develop
10  a work plan and then you told me that the --
11  there was really one -- Let's see.  How did
12  you distinguish it from the others.  Yes.  You
13  made -- You said that there was one project
14  work plan and that there were numerous project
15  plans, I think.  Did I write that down
16  correctly?
17      A.  I believe so.
18      Q.  All right.  So there's one project
19  work plan.  That was written by the Washington
20  Group International, submitted to the
21  government, and they approved it.  Or made
22  comments and then ultimately approved it?
23      A.  Uh-huh (affirmatively).
24      Q.  Right?
25      A.  Yes.

Page 52

1       Q.  Okay.  And you have no memory as you
2   sit here today as to whether or not that work
3   plan called for WGI to install a fence?
4       A.  I don't remember the specifics of
5   it.
6       Q.  All right.  That's fine.  But in any
7   case, we do know that generally the purpose of
8   the fence was the protect the work site;
9   right?
10      A.  Yes.
11      Q.  And that, in fact, the fence had
12  barbed wire on it; right?
13      A.  Yes.
14      Q.  Okay.  And that was to keep people
15  out?
16      A.  Yes.
17      Q.  All right.  And that the fence was
18  on the protected side of the concrete wall
19  which was a component part of the flood
20  control structure; right?
21      A.  It was on the protected side of the
22  floodwall, yes.
23      Q.  All right.  Good.  Thanks.  Now,
24  have you read the TERC?  You know, at any time
25  since you were employed?

Page 53

1       A.  I don't recall if I read it at the
2   beginning of the project or not.
3       Q.  Okay.  So at some point, though, you
4   read it?
5       A.  No, I said I don't recall whether I
6   read it at the beginning of the project.
7       Q.  I'm sorry.  I apologize.  I thought
8   you were referencing a time period.  So you
9   don't remember having read it; right?
10      A.  No, I don't.
11      Q.  All right.  Was there a project
12  geotechnical engineer assigned by the
13  Washington Group International to work on the
14  Inner Harbor Navigation Canal project?
15      A.  No.
16      Q.  Was there a project environmental
17  engineer assigned to work on the project?
18      A.  Was that as a -- as a project
19  person?  Or -- I mean, we had an environmental
20  manager.
21      Q.  I know you did.  I know you did.
22  And look, I am not trying to, you know, pull a
23  rabbit out of the hat.  I am reading the TERC
24  and I am reading it at 4.11, and I will show
25  it to you.  It's Bates number WGI-000140.  It

PHILLIP STAGGS                                                    4/26/2008

Page 54

1  says, and I am going to show -- Let me read it
2  for the record and I will show it to you.
3     A.  Sure.
4     Q.  "The contractor shall utilize a
5  project environmental engineer who will ensure
6  that all related goals, including required
7  analytical data of the delivery order, are
8  attained.  The project environmental engineer
9  shall have as a minimum the following
10  qualifications," and it talks about their
11  qualifications.  Just to show you what I am
12  reading.  And that's why I am asking the
13  question.
14     MS. WAGER-ZITO:
15        Is there a question pending,
16  Joe?
17     MR. BRUNO:
18        Yes.
19     MS. WAGER-ZITO:
20        Is it just whether there was an
21  engineer on site?
22     MR. TREEBY:
23        He answered the question.
24     MR. BRUNO:
25        He answered the question.  But he

Page 55

1        had a question to me about whether or
2        not this is the same guy as the --
3        because you told me --
4  EXAMINATION BY MR. BRUNO:
5     Q.  I think in response to my question,
6  in fairness to you, "We did have an
7  environmental guy on the site".  Right?
8     A.  Yes.
9     Q.  All right.  And I said in fairness
10  to you, I wanted to tell you where I was
11  coming from --
12     A.  Okay.
13     Q.  -- when I asked you project engineer
14  as opposed to general engineer so that you and
15  I could be speaking the same language.
16     A.  Uh-huh (affirmatively).
17     Q.  And so I said to you, well, the
18  question I am asking you is based upon this
19  sentence from the TERC.  So I am going to ask
20  it again now that you have had a chance to
21  look at it.  Do you know whether or not there
22  was a project environmental engineer assigned
23  by the WGI to work on this project?
24     A.  It's unclear to me whether that
25  refers to the environmental manager or a home

Page 56

1  office environmental engineer, which we did
2  have environmental specialists that I suspect
3  met the requirements of that who worked out of
4  the home office.  So I don't know the intent
5  of that.  And I don't know if the jargon is
6  different from what's described in there and
7  what eventually ended up in the project work
8  plans as environmental manager.
9     Q.  All right.  Let me ask you -- Fair
10  enough.  Let me ask it to you this way then.
11  If you had the need to get engineering support
12  with regard to geotechnical issues while you
13  were employed on that site, who would you have
14  called at your home office to get that
15  technical support?
16     MR. EHRLICH:
17        Object to the form.
18     MS. WAGER-ZITO:
19        Objection.
20     THE WITNESS:
21        We wouldn't have called anybody
22     at the home office, because we didn't
23     have any responsibility for
24     geotechnical issues.
25  EXAMINATION BY MR. BRUNO:

Page 57

1     Q.  That's not --
2     A.  We didn't --
3     Q.  I am not --
4     A.  We didn't have any --
5     Q.  I know that's -- Listen.
6     MS. WAGER-ZITO:
7        Let him finish answering.
8     MR. BRUNO:
9        Wait, wait.  Hold the phone,
10     guys.  Let's be fair here.
11     MR. TREEBY:
12        Let him finish.
13     MR. BRUNO:
14        Bill, it's not responsive.
15     MS. WAGER-ZITO:
16        It is responsive.
17     MR. BRUNO:
18        No, it's not responsive.
19     MS. WAGER-ZITO:
20        He wasn't finished answering.
21     You should let him finish his answer.
22     MR. BRUNO:
23        No, no, it's not responsive.
24     It's not responsive.  It's not
25     responsive.  Listen, guys.

JOHNS PENDLETON COURT REPORTERS                          800 562-1285

PHILLIP STAGGS                                                    4/26/2008

Page 58

1          MR. TREEBY:
2          He's not finished.
3          MR. BRUNO:
4          Bill, --
5          MR. TREEBY:
6          You have got to let him finish.
7     EXAMINATION BY MR. BRUNO:
8     Q.  All right.  Finish.  It's not
9     responsive, because I understand what the
10    lawyers have told you to say, but that wasn't
11    my question.  Okay?
12         MS. WAGER-ZITO:
13         Objection.
14         MR. BRUNO:
15         It's no objection.
16    EXAMINATION BY MR. BRUNO:
17    Q.  Finish and I will illustrate my
18    point.
19         MS. WAGER-ZITO:
20         It is an objection.
21         MR. BRUNO:
22         All right?
23         MS. WAGER-ZITO:
24         If you can even remember what you
25    were in the middle of.

Page 59

1          THE WITNESS:
2          The scope of our work didn't
3     include geotechnical engineering, so
4     we would not have anybody in -- in the
5     WGI organization that we would have
6     contacted for those issues.
7     EXAMINATION BY MR. BRUNO:
8     Q.  Finished?
9     A.  Yes.
10    Q.  All right.  Here's the question.
11    It's an "if" question.  If, and I am reading
12    it, because I've got my little realtime here.
13    And I understand how they told you and talked
14    to you about how to prepare for this
15    deposition.
16         MS. WAGER-ZITO:
17         Objection.
18    EXAMINATION BY MR. BRUNO:
19    Q.  But here's the question, and all I
20    want is an answer and then you can explain
21    it.  You can say all of that stuff about, you
22    know, covering WGI.  But here's the question.
23    If you had the need, if you had the need to
24    get engineering support, okay?  You understand
25    it's an "if".  I am not saying you had the

Page 60

1     need.  I am saying if you had the need.
2     Okay?  And that's why I am, you know, -- it's
3     a little testy here.  Because I didn't ask you
4     about did you.  I said if you had the need.
5     If you had the need to get engineering support
6     with regard to geotechnical issues while you
7     were employed on the site, who would you have
8     called?
9          MR. EHRLICH:
10         Object to form
11    EXAMINATION BY MR. BRUNO:
12    Q.  Okay?
13         MS. WAGER-ZITO:
14         Objection.
15         MR. BRUNO:
16         Noted.
17    EXAMINATION BY MR. BRUNO:
18    Q.  Now may I have an answer to that
19    question?
20         MS. WAGER-ZITO:
21         Objection.
22    EXAMINATION BY MR. BRUNO:
23    Q.  You can explain.
24         MS. WAGER-ZITO:
25         Asked and answered.

Page 61

1          MR. BRUNO:
2          It has not been answered.
3          MS. WAGER-ZITO:
4          It has been answered.
5          MR. BRUNO:
6          It has not been answered.
7     Anybody -- If you want to call the
8     Judge, I will, but this is
9     ridiculous.
10         THE WITNESS:
11         We would have presented it to the
12    Corps of Engineers, because that's --
13    EXAMINATION BY MR. BRUNO:
14    Q.  That's fine.
15    A.  They were responsible for
16    geotechnical issues.
17    Q.  Thank you, sir.  That's not hard.
18    Okay.  That's the answer to the question.  All
19    right.
20         Now, was there a geotechnical --
21    Did you guys, WGI, have a geotechnical
22    engineer at the home office, in other words, a
23    person at home office who had the training as
24    a geotechnical engineer?  That person, did you
25    have somebody with that technical expertise at

JOHNS PENDLETON COURT REPORTERS                        800 562-1285

PHILLIP STAGGS                                              4/26/2008

Page 62

1   the home office?
2         MS. WAGER-ZITO:
3         Objection.
4       THE WITNESS:
5         Not associated with this project.
6   EXAMINATION BY MR. BRUNO:
7     Q.  All right.  Thank you.  But you had
8   people in WGI who, I mean, had geotechnical
9   expertise, didn't you?
10    A.  Absolutely.
11    Q.  Sure.  Of course.  Of course.
12  Thanks.
13        MR. BRUNO:
14        Man, all of that coaching doesn't
15  work.
16      MR. TREEBY:
17        Objection.
18      MR. EHRLICH:
19        Is that on the record?
20      MR. BRUNO:
21        It doesn't work.  No, it's not on
22  the record.  I'm mumbling to myself.
23      MR. TREEBY:
24        It is on the record.
25      MR. EHRLICH:

Page 63

1         It is on the record.  You said it
2   on the record.
3       MR. BRUNO:
4         Well, I'm sorry.  I was mumbling
5   to myself.
6       MR. TREEBY:
7         Do you withdraw it?
8       MR. BRUNO:
9         I withdraw it.
10  EXAMINATION BY MR. BRUNO:
11    Q.  All right.  Now, did you know
12  whether or not WGI had the following
13  obligation in connection with the work that
14  WGI contracted to do for the government at the
15  Inner Harbor Navigation Canal?  Okay?  And I
16  am going to read this so that you'll know what
17  obligation I am talking about and then I will
18  show it to you, too, --
19    A.  Okay.
20    Q.  -- before you have to answer so you
21  know what I am doing.  You'll know where it
22  comes from, too.  So here's the question.  I
23  mean, the obligation.  "The contractor shall,
24  without additional expense to the government,
25  be responsible for obtaining any necessary

Page 64

1   licenses and permits and for complying with
2   any Federal, state and municipal laws, codes
3   and regulations applicable to the performance
4   of the work.  The contractor shall also be
5   responsible for all damages to persons or
6   property that occur as a result of the
7   contractor's fault or negligence.  The
8   contractor shall also be responsible for all
9   materials delivered and work performed until
10  completion and acceptance of the entire work
11  except for any completed unit or work which
12  may have been accepted under the contract."
13        Okay?  So that's the obligation
14  that I am asking you if you knew that WGI
15  had.  Now, as I promised, in fairness to you,
16  what I am reading from is a document which has
17  been Bates numbered, first, by the lawyers,
18  WGI-91 and 92.  I am going to show you the
19  whole document.  I want to make sure I get all
20  the documents.  I am going to give you 90,
21  because I don't know if this is a part of this
22  or not, Mr. Staggs.  In fact I'm going to give
23  you maybe 89, too.  What the heck.  All
24  right?  So when I give you these stack of
25  documents, I am not suggesting to you that

Page 65

1   they all belong together.  They just came
2   Bates numbered that way.
3     A.  Uh-huh (affirmatively).
4     Q.  Okay?  So with that, I am going to
5   hand them to you.  Give you a chance first
6   just to look at them so that you can answer my
7   question and then we'll have some follow-ups
8   from those papers if you don't mind.
9       MS. WAGER-ZITO:
10        Object to the form of the
11  question.
12      MR. BRUNO:
13        What's wrong with the form
14  again?
15      MS. WAGER-ZITO:
16        It's asking for a legal
17  conclusion, it's compound, and it was
18  so long I have forgotten some of the
19  other problems with it, but it clearly
20  is asking for a legal conclusion and
21  it's compound.
22      MR. BRUNO:
23        It's asking for a legal
24  conclusion?
25      MS. WAGER-ZITO:

17 (Pages 62 to 65)

PHILLIP STAGGS                                                    4/26/2008

Page 66

1      Whether Washington Group
2   undertook obligations?  Yes.
3      MR. BRUNO:
4      This obligation.  Yes.
5      MS. WAGER-ZITO:
6      Yes.
7      MR. BRUNO:
8      Okay.  Fine.  That's not legal.
9   That's reading a contract.
10     MS. WAGER-ZITO:
11     There's several obligations you
12  asked about.
13     MR. BRUNO:
14     So you're telling me that any
15  time that I ask a question about
16  whether or not a contract contains
17  words which require somebody to do
18  something, that calls for a legal
19  conclusion?  Is that your objection?
20  So I can understand it.
21     MS. WAGER-ZITO:
22     I stated my objection.
23     MR. BRUNO:
24     Is that your objection?  Can you
25  explain it to me?

Page 67

1      MS. WAGER-ZITO:
2      You're asking him -- You're
3   asking him what obligations Washington
4   Group undertook under the TERC.
5      MR. BRUNO:
6      No.
7      MS. WAGER-ZITO:
8      Which, there's also another
9   objection.
10     MR. BRUNO:
11     No.  That's not the objection.
12  That's not the question.
13     MS. WAGER-ZITO:
14     He's not designated to answer
15  questions --
16     MR. BRUNO:
17     That's not the question.
18     MS. WAGER-ZITO:
19     -- about the TERC nor was he to
20  answer questions about the permits.
21     MR. BRUNO:
22     He is designated to answer
23  questions about the permits.  We
24  talked about that this week, Bill.
25     MS. WAGER-ZITO:

Page 68

1      May I see them, please?
2      THE WITNESS:
3      (Witness hands documents to
4   Counsel.)
5   EXAMINATION BY MR. BRUNO:
6      Q.  Okay.
7      A.  Was the question --
8      Q.  All right.
9      A.  -- if I was aware of those
10  requirements?
11     Q.  No, sir, that wasn't my question.
12     A.  I'm sorry.
13     Q.  That wasn't my question.  So it was
14  a little while ago, so I will ask it again.
15  What I wanted to know was whether or not you
16  as the construction manager, all right, knew
17   -- you were on the site, whether you knew
18  that your company was obligated to do certain
19  things.  Okay?  And then I read that paragraph
20  to describe the certain things that I was
21  asking you if you knew your company was
22  obligated to do.  Period.  All right?  So I
23  read the whole thing, to be fair with you.
24  And then I can break it down.  Because, I
25  mean, it's more than one sentence.  But

Page 69

1   generally did you have that understanding,
2   that your company had that obligation?
3      A.  You're referring to the TERC.  You
4   asked me if I had read the TERC and I said I
5   didn't recall if I had read it.
6      Q.  Right.
7      A.  So it's the specific excerpt from
8   the TERC, I couldn't say that I was aware of
9   that specific requirement.
10     Q.  All right.  Well, let me ask it to
11  you a different way.  As the construction
12  manager, did you have an understanding that
13  your company would be responsible if you
14  damaged somebody's property?  How about that?
15     MS. WAGER-ZITO:
16     Objection.
17     MR. BRUNO:
18     May I have that back, please?
19     MS. WAGER-ZITO:
20     (Counsel hands document to
21  Counsel.)
22     MR. BRUNO:
23     Thank you.
24     THE WITNESS:
25     Did I have the understanding that

JOHNS PENDLETON COURT REPORTERS                        800 562-1285

1      -- that if -- if the company was
2      responsible for damage to others'
3      property, that we would responsible
4      for that damage?
5    EXAMINATION BY MR. BRUNO:
6      Q.  Yes.
7      A.  I don't know that -- Without seeing
8    it specifically in a document, I don't know
9    that that was -- that that was an
10   understanding.
11     Q.  Mr. Staggs, isn't that generally an
12   obligation that every responsible contractor
13   has no matter what the project is, that is,
14   that they're responsible for damages that
15   occur as a result of their fault?  I mean,
16   that's not something terribly unusual, is it?
17       MS. WAGER-ZITO:
18         Objection.
19       THE WITNESS:
20         I generally don't get involved in
21       the responsibility and liability
22       issues of the work being performed.  I
23       mean, we're talking about the -- a
24       property where we were doing
25       demolition and site preparation, so I

1      -- I am not sure -- I am not sure I
2      understand the question as it relates
3      to that.
4    EXAMINATION BY MR. BRUNO:
5      Q.  Well, if you had a piece of
6    equipment, a bulldozer -- I think you did have
7    some bulldozers on the site, didn't you?
8      A.  We did.
9      Q.  Sure.  You had some employees who
10   were working for you who were operating that
11   bulldozer; right?
12     A.  Yes.
13     Q.  If you saw the operator of the
14   bulldozer drive his bulldozer into the
15   floodwall, just drive it into the floodwall,
16   would you have some interest in that?
17     A.  Certainly.
18     Q.  Why?
19     A.  Because we've damaged the floodwall.
20     Q.  Well, exactly.  You would -- And the
21   reason why you would have an interest is
22   because generally you know that contractors
23   have an obligation not to damage other
24   people's property.  Right?
25       MS. WAGER-ZITO:

1        Objection.
2    EXAMINATION BY MR. BRUNO:
3      Q.  Isn't that true?
4      A.  Within the limits of their scope of
5    work.
6      Q.  Well, as you said, that's dependent
7    upon how you read the scope of work; right?
8    You told me yourself you can't even tell me
9    the scope of work without reading the
10   documents again.  Isn't that true?
11     A.  I told you I couldn't tell you the
12   specifics of the fence --
13     Q.  Exactly.
14     A.  -- without looking at the documents.
15     Q.  Precisely.  And so to learn the
16   whole scope of work, you had to read the
17   documents; right?
18     A.  I don't know what you're asking.
19     Q.  Well, because I asked you a very
20   simple question.  If you damage somebody's
21   property, you're responsible for it; and you
22   told me, well, it kind of depends, and I am
23   trying to see if we can't just agree to
24   something that at least in my mind is very
25   fundamental and very basic.  All right?  You

1    try your best as a contractor not to damage
2    other people's property within the limitations
3    of what you know and what you don't know.  How
4    about that?  Isn't that true?
5        MS. WAGER-ZITO:
6          Objection.
7        THE WITNESS:
8          You're obligated to execute the
9        work in accordance with the contract
10       documents and take whatever
11       responsibility the contract documents
12       say that you take.
13   EXAMINATION BY MR. BRUNO:
14     Q.  All right.  So if the contract
15   documents don't say "Don't run the bulldozer
16   into the brick wall," it's okay to run the
17   bulldozer into the brick wall?  I mean, you
18   just told me it's got to be written down in a
19   contract document.  So if somebody doesn't
20   write down that sentence  "Don't drive the
21   bulldozer into the floodwall", you're telling
22   me it's okay to drive the bulldozer into the
23   floodwall?  Is that what you're telling me?
24     A.  That's not what I am saying.
25     Q.  I know it's not what you're saying.

PHILLIP STAGGS                                    4/26/2008

Page 74

1    The fact is that you recognize, as a prudent
2    contractor, that you do your best not to
3    damage other people's property.  Isn't that
4    true?
5        A.  I think that -- that it is true that
6    you do your best not to damage other people's
7    property.
8        Q.  All right.  Now, the document that I
9    showed you, that I read from, and I will give
10   it back to you if you need -- if I need to.
11   Here, let me just give it to you.  The first
12   thing I need to sort of understand is -- You
13   know, I told you I didn't know if all of those
14   papers go together.  Are you able to tell me
15   whether or not there's any relationship
16   between those papers that I have handed to you
17   and I previously identified for the record?
18       A.  Yeah, it appears to be the cover
19   letter and the -- and MOD for Task Order 26.
20       MR. BRUNO:
21           You want to break now?
22       VIDEO OPERATOR:
23           Please.
24       MR. BRUNO:
25           He needs to break.  Well, please

Page 75

1    break.
2        VIDEO OPERATOR:
3            Off the record.  It is 9:41.
4        (Recess.)
5        VIDEO OPERATOR:
6            Returning to the record, it is
7    9:58.
8    EXAMINATION BY MR. BRUNO:
9        Q.  All right.  While we were on break,
10   I showed you a few more documents on my
11   supposition that maybe I didn't give you a
12   complete document, and I don't even know if I
13   have yet given you a complete document.  But
14   the papers that I have shown you, first of
15   all, do you know what they are?
16       A.  Yes.
17       Q.  Okay.  What are they?
18       A.  It's the modification for the IHNC
19   work.
20       Q.  Okay.  But it's not the actual --
21   It's not the approval of the project work plan
22   yet, right?  That comes a little later?
23       A.  Yes.
24       Q.  In fact, that's the modification
25   which tells WGI to draft the project work

Page 76

1    plan; right?
2        A.  It describes the scope of work, but
3    I don't see a reference to development of the
4    work plans, although it may be here.  I didn't
5    see a specific reference to the work plans,
6    but it may be in there.
7        Q.  All right.  Let's just talk about
8    then what this says.  The first piece of
9    paper, which is marked as WGI-89 is a letter
10   by the contracting officer to Mr. Steven --
11   Steve Roe.  And Steve Roe, do you know Steve
12   Roe?
13       A.  Yes.
14       Q.  All right.  And do you recall what
15   his job was at the time?
16       A.  I think he was the program manager.
17       Q.  Okay.  And it says  "This concerns
18   the infinite delivery type contract number
19   DACA 56-94-D-0021 for total environmental
20   restoration contract, TERC and modification
21   number 2605 that was faxed to your office for
22   signature before award.  Enclosed are two hard
23   copies of modifications number 2605 along with
24   faxed order."  So would I be correct in
25   assuming that what this letter transmits is

Page 77

1    modification number 2605?
2        A.  I think that's correct.
3        Q.  All right.  And then there's a
4    government form.  Are you familiar with these
5    government forms?
6        A.  Somewhat.
7        Q.  Okay.  Do you know what this -- This
8    says "Amendment of solicitation/modification
9    of contract".  Does it have any meaning to you
10   as a construction manager?
11       A.  No, I didn't deal with contract
12   modifications.
13       Q.  Okay.  Fair.  That's fine.  That's,
14   by the way, number 90 for the record.
15           Now, it says here "Task Order
16   number 26 is hereby modified in accordance
17   with the attached scope of work dated 28
18   August, 2000."  So there's a scope of work to
19   which it makes reference.  And that's the
20   document which is marked WGI-93.  Right?
21       A.  Okay.
22       Q.  All right.  Now, WGI-93 is a
23   document that's written by WGI; right?
24       A.  I don't know that to be the case.
25       Q.  You don't?

20  (Pages 74 to 77)

JOHNS PENDLETON COURT REPORTERS                  800 562-1285

PHILLIP STAGGS                                                    4/26/2008

Page 78

1    A.  No, I don't.
2    Q.  All right.  That's fine.  It says
3 here that "The contractor shall furnish all
4 services, materials, supplies, labor,
5 equipment, superintendence, procurement,
6 security services, surveying services,
7 subcontracting, all necessary permits,
8 licenses, laboratory services, and travel as
9 required for the project site development and
10 remedial action of the IHNC East Bank
11 Industrial Area in accordance with the USACE
12 approved recommendation report for demolition
13 and site preparation activities work plans."
14 Do you have any idea what that means?
15    A.  It's a mouthful.  Can I read it?
16    Q.  Sure.
17    A.  Just a general description of the
18 scope of services Washington Group's to
19 provide.
20    Q.  Okay.
21    A.  So I think that document -- You
22 asked if it was prepared by Washington.
23 That's the government's document.
24    Q.  Okay.
25    MR. EHRLICH:

Page 79

1        What's the Bates number on the
2 one he just read?
3    MR. BRUNO:
4        93.  And really, it's 93 through
5 -- the whole document, to 100.
6    MR. EHRLICH:
7        But the page, you read part of
8 the page and he looked at it.
9    MR. BRUNO:
10        93.  93.
11 EXAMINATION BY MR. BRUNO:
12    Q.  Now, at page 96 of this document,
13 which you -- "this document" meaning the
14 statement of work which we have identified as
15 93 to 100, you have told us is prepared by the
16 government, given to WGI to assist WGI in
17 responding to the contract.  Right?
18    A.  To identify the scope of work
19 included in that modification.
20    Q.  All right.  So this is telling WGI
21 what to do?
22    A.  Yes.
23    Q.  Is that fair?  All right.  So on
24 page 96 it says "The contractor shall
25 concurrently develop, apply for, and acquire

Page 80

1 from all appropriate agencies permits that
2 will enable the contractor to proceed with
3 remedial action work on behalf of the USACE.
4 Examples of activities requiring permits
5 include the removal of a sewer lift station,
6 utility connects/disconnects, Orleans Levee
7 District permits, City of New Orleans permits,
8 LPDES permits, LDEQ permits," and then it says
9 "et cetera".  Once again, I'll let you see it
10 before I ask you to even answer.  The top
11 paragraph.  Okay?  Here's the question.  You
12 got it?
13    A.  Sure.
14    Q.  I apologize for there being so much
15 paper here.  If there was any need for WGI to
16 get a permit, okay, this is one of those "if"
17 questions again, I am trying to determine who
18 would be responsible for getting the permit.
19 Is it somebody, for example, in New Orleans on
20 the site or somebody at home office?  Do you
21 understand my question?
22    A.  I do.
23    Q.  Okay.  So whose job is it to get
24 permits?
25    A.  I don't know the answer to that.

Page 81

1    Q.  Okay.  Did you, while you were
2 working on that site, have any interaction
3 with the Orleans Levee District?
4    A.  Not that I recall.
5    Q.  Okay.  I neglected to ask you this
6 before, and I apologize.  Was there a site
7 geologist assigned by WGI to this project?
8    A.  We had a geologist for the
9 sampling.  There was a subcontract.  It was a
10 consultant.
11    Q.  All right.  Would this subcontractor
12 have been "on site for all drilling, sampling,
13 and monitoring well installation activities to
14 ensure the goals of the field investigations
15 are achieved.  A site geologist shall be
16 responsible for only one operating drilling
17 rig.  If additional drilling rigs are required
18 or used, a separate geologist must be assigned
19 to each rig"?  Is that what the geologist
20 subcontractor was called upon to do?
21    MS. WAGER-ZITO:
22        Object to the form.
23        You can answer.
24    THE WITNESS:
25        I think that's generally what the

PHILLIP STAGGS                                                    4/26/2008

Page 82

1    geologist was responsible for.
2    EXAMINATION BY MR. BRUNO:
3       Q.  Okay.  Would you have regarded this
4    site as a Federal facility?
5       A.  I -- I think it was under the
6    government's ownership of it.
7       Q.  All right.  And again, I am going to
8    show you this before I even -- I am going to
9    read it first before I even ask you a question
10   so you will know where I am coming from.
11      A.  Okay.
12      Q.  I am at page 156 of the basic
13   contract, which is the TERC, which starts at
14   121 and continues on for a whole bunch of
15   pages.  But I am going to show you page 156 --
16   Bates number 156.  Not page 156.  And I am
17   looking at the paragraph numbered 8.2.  Okay?
18      A.  Okay.
19      Q.  I am going to ask you to read that.
20      A.  "8.2, permits, the con- --"
21         MS. WAGER-ZITO:
22         Do you want him to read it out
23      loud?
24   EXAMINATION BY MR. BRUNO:
25      Q.  If you don't mind.

Page 83

1       A.  I didn't know.  I assumed that's
2    what he meant.
3       Q.  You and I are on the same page,
4    man.  We're connected.
5          MS. WAGER-ZITO:
6          Please.
7          THE WITNESS:
8          "8.2, permits.  The contractor
9       shall investigate the requirements for
10      and obtain environmental permits,
11      licenses and/or certificates as
12      necessary to accomplish the work
13      specified in the individual delivery
14      orders.  When the work is to be
15      performed on a Federal facility, the
16      required clearances such as
17      excavation, digging, or drilling
18      permits shall be obtained prior to
19      initiation of site operations by the
20      contractor."
21   EXAMINATION BY MR. BRUNO:
22      Q.  All right.  Now, you have already
23   told me that you are unfamiliar with the terms
24   of the contract; right?
25      A.  That's -- That's reasonably

Page 84

1    accurate.  I am not intimately --
2       Q.  Okay.
3       A.  I haven't read it and committed it
4    to memory or anything.
5       Q.  Yes.  I understand that.  But you
6    did volunteer during one of my questions about
7    your understanding of the Corps's obligations
8    pursuant to this contract as relates to
9    geotechnical expertise, did you not?
10      A.  Yes.
11         MS. WAGER-ZITO:
12         Objection.
13   EXAMINATION BY MR. BRUNO:
14      Q.  Okay.  Well, where did that come
15   from?  Where did that piece of information
16   that you shared with us come from?
17      A.  The government acknowledged that.
18   The government representatives at the site
19   acknowledged that they had responsibility for
20   that role.
21      Q.  Okay.  Can you show me where --
22   Well, do you know if that's in writing in any
23   of these documents, work orders, work permits,
24   work plans, project work plans?  Is that in
25   writing anywhere?

Page 85

1       A.  I believe it is.
2       Q.  Where would I go to find it?
3       A.  I can't identify the document, but I
4    believe I have read it.
5       Q.  You have read it?  Did you read it
6    -- Well, tell me about the occasion that you
7    read such a document.  Were you with lawyers?
8       A.  Yeah, I think during the review I
9    reviewed documents for a day and I think I saw
10   a document that indicated the government's
11   responsibility for geotechnical issues.
12      Q.  All right.  When you say during the
13   review, was that the time that was spent with
14   the lawyers in preparation for this
15   deposition?
16      A.  Yes.
17      Q.  Okay.  So the lawyers selected a
18   number of documents for you to review?  You
19   didn't select the documents; right?
20      A.  No, there -- there was a couple of
21   banker's boxes full of documents.
22      Q.  Okay.
23      A.  And -- And those were generally
24   reviewed.
25      Q.  Fine.  Who selected the documents

22  (Pages 82 to 85)

PHILLIP STAGGS                                                          4/26/2008

Page 86

1    that were contained in the banker's boxes?
2        A.  The attorneys.
3        Q.  Well, that's what I just asked you.
4    Okay.  So the attorneys selected documents and
5    asked you to review those documents; right?
6        A.  I requested specific documents that
7    I needed to review to refresh my memory.
8        Q.  All right.  The document that you
9    reviewed that you believe suggested that the
10   government undertook geotechnical engineering
11   responsibilities, was that a document that you
12   requested or was that a document that the
13   lawyers selected and put into the box?
14       A.  Oh, it was in the box.
15       Q.  I understand that.
16       A.  I mean, I didn't select --
17       Q.  We already got there.  I want to
18   know whether or not it's a document you
19   requested or it's a document that the lawyers
20   selected out and put in this box that you
21   subsequently reviewed.
22       A.  I didn't review all the documents in
23   the box.
24       Q.  I'm talking about the one document.
25   Okay?  The document that you reviewed that you

Page 87

1    say suggested to you that the government
2    undertook all geotechnical engineering
3    responsibilities.  That document, did you
4    request that document or did the lawyers stick
5    that document in the box?
6        A.  The lawyers stuck all the documents
7    in the box.  The -- The records that were
8    reviewed, I asked to look at the work plan
9    documents, preparatory meeting documents, and
10   I believe this document -- I don't recall if
11   -- if it was provided for my review or if I'd
12   requested that document.
13       Q.  All right.
14       A.  Requested the information and that
15   document was provided.
16       Q.  All right.  Tell me as much as you
17   possibly --
18           MR. BRUNO:
19           Well, I would like to call for
20       production of that document first.
21   EXAMINATION BY MR. BRUNO:
22       Q.  And then ask you if you can tell me
23   what it is.
24       A.  I -- I recall it being an email,
25   interoffice memo or something to that effect.

Page 88

1        Q.  All right.  It's an email.
2        A.  Corps interoffice document.
3           MS. WAGER-ZITO:
4           It's not what he said.
5           MR. BRUNO:
6           I'm sorry?  What?
7           MR. TREEBY:
8           You didn't quote his whole
9       answer.
10          MS. WAGER-ZITO:
11          You didn't quote his whole
12      answer.
13   EXAMINATION BY MR. BRUNO:
14       Q.  So it's an email or it's an
15   interoffice memo?
16          MR. TREEBY:
17          He said Corps.  Corps interoffice
18      memo.
19          THE WITNESS:
20          Yes.
21          MR. BRUNO:
22          Well, I don't know.  I am just --
23      I don't care what he -- I just want to
24      get it right.
25          MR. TREEBY:

Page 89

1           I am just reading the record
2       which you have available to you.
3    EXAMINATION BY MR. BRUNO:
4        Q.  It's a Corps interoffice memo?
5           MR. BRUNO:
6           That's what you said.  That's not
7       what I am saying.
8    EXAMINATION BY MR. BRUNO:
9        Q.  It's a Corps --
10       A.  Yes, I believe it was.
11       Q.  It was a Corps interoffice memo.  So
12   that obviously, if it's interoffice, somehow
13   or another WGI's copied with the thing?
14          MS. WAGER-ZITO:
15          Objection.
16          THE WITNESS:
17          I don't understand the question.
18   EXAMINATION BY MR. BRUNO:
19       Q.  Well, I mean, if it's interoffice,
20   "interoffice" means to me inside the Corps of
21   Engineers.  Is that my -- Is that so foreign?
22       A.  I think it was -- it was interoffice
23   within the Corps.
24       Q.  Right.
25       A.  And then subsequently provided to

1   Washington Group.
2       Q.  All right.  Do you recall the names
3   of anybody who were on this interoffice memo?
4       A.  Yeah.  It was from Lee Guillory.
5   One of the correspondence was from Lee
6   Guillory and I don't recall who it was to.
7       Q.  All right.  And can you generally
8   remember what it said?
9       A.  It was a request for geotechnical or
10  engineering evaluation of some of the
11  excavation related to stability of the levee.
12      Q.  Was it referring to excavations
13  generally or was it referring to a specific
14  excavation?
15      A.  A specific excavation.
16      Q.  Which one?
17      A.  The one at McDonough Marine under
18  Surekote Road.
19      Q.  Is that where the borrow site was?
20      A.  McDonough Marine was where the
21  borrow site was.  The excavation that we're
22  talking about was not the borrow pit.
23      Q.  Okay.  I'm sorry.  You're fair.  In
24  fairness to you.  There was a borrow site, but
25  the excavation that's referenced in this email

1   was on the McDonough site?
2       A.  Actually, I think both of them may
3   have been referenced.
4       Q.  The borrow site as well?
5       A.  Uh-huh (affirmatively).
6       Q.  All right.  And do you recall what
7   the memo said?
8       A.  In general.  Well, I guess we could
9   look at the document.  Is it of more value for
10  me to try and remember what it said?
11      Q.  No, if we had the document handy.
12          MR. BRUNO:
13          I call for its production.  That
14      would be great.  Save us all a lot --
15          MS. WAGER-ZITO:
16          It's already been produced.
17          MS. CLAYMAN:
18          I don't have it here in this
19      room.
20          MR. BRUNO:
21          Do we have a Bates numbers?  We
22      have all the documents on the
23      computer.
24          MS. CLAYMAN:
25          Sure.  It's a Corps of Engineers

1   document.  I would have to go.
2       MR. BRUNO:
3       Oh, it's not one of yours.
4       MS. CLAYMAN:
5       No, it was not produced by
6   Washington Group.
7       MR. BRUNO:
8       All right.  So it's a Corps
9   document.  With all due respect to
10  your colleague, there are bazillions
11  of government documents.  Is it Bates
12  numbered?
13      MS. CLAYMAN:
14      It is Bates numbered, but.  You
15  know, --
16      MS. WAGER-ZITO:
17      I mean, it's been produced.  We
18  don't have it right now.  That's all
19  we can say.
20      MR. BRUNO:
21      Do you have access to the Bates
22  number?
23      MS. CLAYMAN:
24      I do.  I have to run up and get
25  my laptop.

1       MR. BRUNO:
2       If you don't mind.  Not right
3   now.  If you'd give us the courtesy.
4       MS. CLAYMAN:
5       Sure.
6       MR. BRUNO:
7       If we try to get ahold of it, it
8   would be very helpful.
9   EXAMINATION BY MR. BRUNO:
10      Q.  Okay.  Did you have any personal
11  knowledge of what provoked Mr. Guillory to
12  write this email?
13      A.  Based on the discussion with Jim
14  Montegut, I believe that he indicated that the
15  question was presented to the Corps's
16  engineering group about the excavations of the
17  borrow pit and -- and remediation under
18  Surekote Road and any potential impact to the
19  levee.  I think that was the question.
20      Q.  All right.  Who is Jim Montegut?
21      A.  He was the COR, contracting
22  officer's representative.
23      Q.  He worked for WGI?
24      A.  No, he was a Corps of Engineers
25  on-site.

PHILLIP STAGGS                                                    4/26/2008

Page 94

1    Q.  Okay.  So Montegut is the Corps of
2  Engineers guy.  And did you have any role?  I
3  mean, did -- did you have any role in it?
4        MR. EHRLICH:
5          Object to form.
6        MS. WAGER-ZITO:
7          Objection.
8  EXAMINATION BY MR. BRUNO:
9    Q.  In this conversation?
10   A.  Montegut was making me aware that --
11 that Lee Guillory had presented that question
12 to the government's engineering group.
13   Q.  All right.  So the answer to the
14 question is yes, you were involved in this
15 discussion?
16       MS. WAGER-ZITO:
17         Object to the form.
18 EXAMINATION BY MR. BRUNO:
19   Q.  Is that true or false?
20   A.  I was involved in the discussion as
21 I described.
22   Q.  All right.  Well, that was my simple
23 question, so I can then know to ask some more
24 questions.
25   A.  I didn't -- It was unclear to me

Page 95

1  whether you were talking about the discussion
2  with Lee Guillory or the discussion with Jim
3  Montegut.
4    Q.  No, I was talking about --
5        MS. WAGER-ZITO:
6          Therein lies the objection.
7  EXAMINATION BY MR. BRUNO:
8    Q.  No, the discussion was -- the
9  reference was a general discussion, because I
10 said do you have anything to do with this
11 issue several questions back.  I am just
12 trying to understand, you know, how these
13 things arose.  So am I understanding that
14 Montegut speaks to you with a concern?
15   A.  No.
16   Q.  All right.  Well, tell me how it
17 occurred.  How did this whole issue come up?
18 If you know.
19   A.  I don't recall the specifics of it,
20 but he was merely relating that Lee Guillory
21 had presented that to the government's
22 engineers.
23   Q.  All right.  Do you know how Lee
24 Guillory got information about this issue in
25 the first instance?

Page 96

1    A.  Well, Lee Guillory was associated
2  with the project --
3    Q.  Okay.
4    A.  -- at the District level and visited
5  the site fairly frequently.
6    Q.  Okay.
7    A.  I can't make assumptions about what
8  he --
9    Q.  The question was did you know.
10       MS. WAGER-ZITO:
11         If you don't know, say you don't
12      know.
13 EXAMINATION BY MR. BRUNO:
14   Q.  It's okay.  See, that's why I asked
15 "do you know".  If you know, that tells me to
16 ask you more questions.  If you don't know,
17 I'll move on to something else.
18       So do you know how it was that
19 Guillory got interested in this subject?
20   A.  No.
21   Q.  Do you know or not?  You don't
22 know.  Okay.  That's fine.  Is it fair for me
23 to conclude that your only knowledge about
24 this entire issue comes from a conversation
25 that you had with Montegut reporting what

Page 97

1  Montegut spoke to Guillory about?
2    A.  It's -- It's fair that -- It's a
3  fair understanding that the -- my
4  understanding was what I described.
5    Q.  I just don't know what came first,
6  second, or third.  Can you give me the history
7  of this event?  I mean, it's very important
8  for me to know how this evolved.  What I have
9  learned from you so far is that you had a
10 conversation with Jim Montegut.  That much I
11 know.  Okay?  Now, did that conversation take
12 place before or after Guillory wrote the
13 email?
14   A.  I don't know.
15   Q.  Okay.  What did Mr. Mon- -- Before
16 you had the conversation with Montegut, did
17 you have any knowledge at all about any issues
18 related to the impact of the excavation on the
19 flood structure?  Before the conversation.
20       MS. WAGER-ZITO:
21         Can you read that back, please?
22     MR. BRUNO:
23         Here it is.  "Before you had the
24      conversation with Montegut, did you
25      have any knowledge at all about any

25 (Pages 94 to 97)

PHILLIP STAGGS                                                    4/26/2008

Page 98

1    issues related to the impact of the
2    excavation," and I am referring to the
3    Boland Marine -- I'm sorry, the
4    McDonough excavations, the borrow and
5    the excavation -- related to the flood
6    control structure?"
7        THE WITNESS:
8        No.
9    EXAMINATION BY MR. BRUNO:
10   Q.   Okay.  So it's fair for me to
11   conclude that your first knowledge of the
12   issue of the potential for the excavation to
13   have any impact on the flood control structure
14   is the conversation with Jim Montegut; right?
15   A.   I think that's correct.
16   Q.   Okay.  Now, you have told us about
17   your background.  You don't have a
18   geotechnical background; right?
19   A.   That's correct.
20   Q.   All right.  You're not a
21   geotechnical engineer?
22   A.   No.
23   Q.   And you don't pretend to be?
24   A.   No.
25   Q.   All right.  Did you have any

Page 99

1    knowledge or belief that -- at any time that
2    any of the work performed by WGI may impact
3    the flood control structure?
4    A.   No.
5    Q.   All right.  Now, were you surprised
6    then to learn when Mr. Montegut described to
7    you his conversation with Guillory that there
8    might be a connection between excavation work
9    and a flood control structure?
10   A.   Was I surprised?
11   Q.   Yes.
12   A.   No.
13   Q.   Why not?
14   A.   I mean, I think that's probably what
15   -- the government's responsibility for
16   protection of the levee.  I think that would
17   be a reasonable consideration.
18   Q.   I don't know if you understood my
19   question.  I wasn't asking you if you were
20   surprised that the government would be
21   interested.  I was asking you if you were
22   surprised that an excavation was a relevant
23   thing to look at in terms of the potential for
24   impact of a flood control structure.  That's
25   what I was asking you.

Page 100

1    A.   No, I don't think that would be a
2    surprise.
3    Q.   Why not?
4    A.   I don't know how to answer that.
5    Q.   Well, did you know -- did you know
6    that digging holes next to a flood control
7    structure like a levee might damage the
8    levee?
9        MR. EHRLICH:
10       Object to the form.
11   EXAMINATION BY MR. BRUNO:
12   Q.   Did you know that?
13       MR. EHRLICH:
14       Object to the form.
15       THE WITNESS:
16       I -- I don't -- The way you have
17       characterized it, it's hard to define
18       if you -- if you dig a two foot square
19       hole 1,000 yards from a levee, then
20       no.  If you dig a mile square hole
21       immediately adjacent to the levee,
22       then perhaps.
23   EXAMINATION BY MR. BRUNO:
24   Q.   All right.  So it's a matter of
25   degree; right?

Page 101

1    A.   I think there's a potential for
2    excavations to impact a levee.
3    Q.   Okay.  That's fine.  And you have
4    just described that it depends on how close
5    you get to the levee and depends on how deep
6    you go.  Right?
7    A.   Yes.
8    Q.   And you knew that.
9    A.   I am not a geotechnical engineer.
10   We have established that.
11   Q.   I am not suggesting you're a
12   geotechnical engineer.  I am just trying to
13   understand what you know and you understand,
14   what you don't know and you don't understand.
15       I think you have told me that you
16   have a general understanding that holes near
17   levees might be a problem for the levee.
18   Right?
19   A.   Could potentially be.
20   Q.   Sure.  Now, where does that
21   knowledge come from?
22   A.   Probably general construction
23   knowledge.
24   Q.   All right.  Do you know how close to
25   the floodwall and/or levee the excavation,

26 (Pages 98 to 101)

1  which was the subject of the memo, okay,
2  between Guillory and whoever, was to the
3  floodwall?
4      A.  The excavation was under Surekote
5  Road.
6      Q.  Under the road?
7      A.  Under the road.
8      Q.  All right.  But again, the question
9  is, how close, if you know, to the levee?
10     A.  It -- From the floodwall, it
11 varied.  But it was 15 to 20 feet from the
12 floodwall.
13     Q.  All right.
14     A.  The near edge of the excavation.
15     Q.  All right.  And, in fact, it
16 impacted the toe of the levee, did it not?
17     A.  We were instructed to project a
18 one-on-three slope from the levee into our
19 excavation and fill anything that fell within
20 that one-on-three slope with clay.  We were
21 not told necessarily that that was the levee,
22 but to project that profile.
23     Q.  Well, I guess I am a little confused
24 here.  You say slope and you know there's a
25 floodwall there and you know that there's a

1  bunch of earth piled up against the floodwall
2  which you have told me is a levee.  Right?  I
3  didn't tell you it was a levee.  You told me
4  it was a levee.  Isn't that true?
5      A.  The --
6      Q.  Just answer that simple question.
7  Isn't that true?
8      A.  Your characterization of dirt piled
9  up against the floodwall, I don't think that's
10 the characterization of how I would classify
11 the levee, but --
12     Q.  Exactly.  You called it a levee.
13 That's all I am trying to establish.  You
14 called it a levee.  Well, I mean, did you call
15 it a levee or not?  It's a simple question.
16 Yes or no?
17     A.  Yes.
18     Q.  Okay.
19     A.  The east --
20     Q.  Fine.  Now, here's the next
21 question.  Where did the levee start and where
22 did the levee end, in your mind?  From the
23 floodwall on the water side of the wall.  Not
24 hard, I don't believe.
25     A.  Generally the -- the area 15 feet

1  west of the floodwall was identified as the
2  levee.
3      Q.  Okay.  And was there a slope beyond
4  the 15 feet?
5      A.  It was not identified.
6      Q.  Okay.  So the slope referenced by
7  the Corps was in fact a part of the levee.
8  Isn't that true?
9          MR. EHRLICH:
10             Object to form.
11         MS. WAGER-ZITO:
12             Objection.
13         THE WITNESS:
14             I don't know that to be the case.
15 EXAMINATION BY MR. BRUNO:
16     Q.  Well, where was the slope?  You said
17 it was one-on-two.
18     A.  One-on-three.
19     Q.  One-on-three.  That's a pretty good
20 slope, isn't it?
21     A.  I don't know what the angle is, but
22 it's a pretty flat slope.
23     Q.  All right.  The bottom line is you
24 don't know if this area which the Corps
25 required a one-on-three slope was part of the

1  levee or not part of the levee; right?
2      A.  Never saw a plan that showed
3  construction of the levee.
4      Q.  Right.  Well, you have already told
5  us that it was 15 feet is why I was asking
6  that question.  Was it inside of the 15 feet
7  or outside of the 15 feet?
8      A.  Was what inside or outside?
9      Q.  The place where the Corps told you
10 to put clay on a one-on-three slope.
11     A.  Outside of the 15 feet.
12     Q.  Thank you.  All right.  Now, how
13 deep was that excavation?
14     A.  Four feet I recall.
15     Q.  All right.  And I think you said
16 that there was also a discussion of the borrow
17 pit.  How close to the 15 feet was the borrow
18 pit?
19     A.  I couldn't say without looking at
20 the documents.
21     Q.  All right.  Was there any specific
22 or particularized instruction about the borrow
23 pit as it relates to the floodwall?
24     A.  No.
25     Q.  All right.  So let me see if I can

PHILLIP STAGGS                                                    4/26/2008

Page 106

1   understand this.  You guys were digging a hole
2   only four feet deep, and that four foot deep
3   hole caused a level of concern by the Corps to
4   motivate them to tell you to fill the hole
5   with clay.  Is that accurate?
6          MR. EHRLICH:
7          Objection.
8          THE WITNESS:
9          I don't know how to characterize
10      their motivation.  I would -- I would
11      say that -- Did they tell us to do
12      that?  Yes.
13  EXAMINATION BY MR. BRUNO:
14      Q.  All right.  Let me reask the
15  question then.  So what you are telling me is
16  that when the Corps learned that you were
17  digging a hole just four feet deep -- I'm
18  sorry, I have to ask you one more question.
19  How close to the 15 feet is the four foot
20  hole?
21      A.  It's immediately adjacent to it.
22      Q.  Okay.
23      A.  You have got the floodwall, 15 feet,
24  the east edge of the excavation.
25      Q.  All right.  So I am clear on this,

Page 107

1   the Corps learns -- Now, -- And I guess I am
2    -- Wouldn't the Corps have known about this
3   hole before you did the work?  Because the
4   specifications would have clearly indicated
5   that this hole was going to be built?
6       A.  Absolutely.
7          MR. EHRLICH:
8          Objection to form.
9          MS. WAGER-ZITO:
10         Objection.
11  EXAMINATION BY MR. BRUNO:
12      Q.  I think you understand my question.
13  The answer was "absolutely".
14      A.  It was in the work plans.
15      Q.  All right.  It was in the work
16  plans.
17      A.  It was in the CAP.
18      Q.  I'm sorry?
19      A.  The Corrective Action Plan.
20      Q.  I had the thing on the computer and
21  now we lost the --
22         MR. TREEBY:
23         You can get it back.
24         MR. BRUNO:
25         I just want to make sure we're

Page 108

1       referencing the right documents.
2          (Whereupon a discussion was held
3       off the record.)
4   EXAMINATION BY MR. BRUNO:
5       Q.  So anyway, this four foot hole was
6   in the plan for work; right?
7       A.  In the Corrective Action Plan.
8       Q.  In the Corrective Action Plan.  Is
9   that different from the project work plan?
10      A.  Yes.
11      Q.  Okay.  What is the difference
12  between the Corrective Action Plan and the
13  project work plan?
14      A.  The project work plan described the
15  demolition activities and the environmental
16  concerns in the buildings and structures, and
17  the Corrective Action Plan identified the
18  results of the site characterization and the
19  areas to be remediated.
20      Q.  All right.  The point that you're
21  making to me is that as part of the original
22  scope of work, the Washington Group developed
23  a set of specifications which dealt with the
24  Corrective Action Plan, and in that plan the
25  Corps could plainly see that there was going

Page 109

1   to be a four foot excavation that abutted the
2   15 foot line of which we have indicated
3   represents the distance between the floodwall
4   and the toe of the levee on the water side of
5   the floodwall.  Is that correct?
6       A.  One -- The work plan wasn't
7   developed as part of the initial activities.
8   It was a result -- a plan that was developed
9   as a result of the site characterization.  So
10  it wasn't the plans that were developed in the
11  office before the project started.  It was in
12  the plans that were developed after the site
13  characterization was performed.  And then the
14  -- If you could restate the last part of your
15  question.
16      Q.  Well, the site characterization was
17  developed as a result of the original scope of
18  work, wasn't it?
19      A.  Yes.
20      Q.  All right.  So it all flowed from
21  the original scope of work.  That was my
22  question.
23      A.  Okay.
24      Q.  I mean, you know, you could nitpick
25  it, but the fact of the matter is that --

Page 110

1     MS. WAGER-ZITO:
2        Objection.
3  EXAMINATION BY MR. BRUNO:
4     Q.  And that's what you're doing.  I
5  mean, the fact is that this --
6     MS. WAGER-ZITO:
7        Objection.
8  EXAMINATION BY MR. BRUNO:
9     Q.  -- all comes from the original Task
10  Order 26.  Right?
11     MR. TREEBY:
12        Ask that the commentary be
13     stricken.
14  EXAMINATION BY MR. BRUNO:
15     Q.  Isn't that accurate?
16     MS. WAGER-ZITO:
17        Objection.
18     THE WITNESS:
19        It results as I stated.  As we
20     had a scope of work for site
21     characterization.
22  EXAMINATION BY MR. BRUNO:
23     Q.  All right.
24     A.  And as a result of site
25  characterization, this plan was developed.

Page 111

1     Q.  All right.  The point is that the
2  Corrective Action Plan described -- and I
3  don't know, help me understand, what is the
4  degree of specificity in the Corrective Action
5  Plan which identified this excavation 4 foot
6  deep 15 feet from the floodwall on the water
7  side of the flood structure?
8     A.  Yes, it did.
9     Q.  I said what was the degree of
10  specificity?
11     A.  What was the degree?
12     Q.  Yes.
13     A.  It identified the size of the
14  excavation, the location, that it was under
15  Surekote Road.
16     Q.  Okay.
17     A.  The size, length, and depth of the
18  excavation.
19     Q.  All right.  So one who would be
20  evaluating the plans could ascertain, could
21  they not, that this 4 foot excavation was 15
22  feet from the floodwall on the water side.
23  Right?
24     A.  Yes.
25     Q.  Okay.  And the United States Army

Page 112

1  Corps of Engineers approved those
2  specifications, did they not?
3     A.  Yes.
4     Q.  Okay.  And in approving those
5  specifications, the United States Army Corps
6  of Engineers did not say anything to you about
7  using clay.  Isn't that true?
8     A.  Re -- Restate your question.
9     Q.  I thought you told me that this
10  whole episode about installing the clay
11  resulted from Mr. Guillory sending a memo to
12  somebody that you don't know and that they,
13  upon seeing the hole, undertook some, I don't
14  know, something, without really knowing what,
15  they did something; and what they did resulted
16  in them telling you to put clay.  Did I get
17  that wrong?
18     MR. EHRLICH:
19        Objection.
20     MS. WAGER-ZITO:
21        Objection.
22     THE WITNESS:
23        I don't know the timing of the
24     memos relative to the excavation.  I
25     don't know if it was done prior to or

Page 113

1     after -- You said as a result of
2     seeing the excavation.  It could have
3     been done a couple of months before in
4     anticipation of that work.
5  EXAMINATION BY MR. BRUNO:
6     Q.  My question was, was it done in
7  connection with the approval of the Corrective
8  Action Plan and the specifications contained
9  therein?  That was my question.
10     A.  I don't believe that was the case.
11     Q.  Okay.
12     A.  I think it was something that was
13  subsequent to that.
14     Q.  That's my point.  All right?  The
15  point is, that the specifications indicated
16  the excavation, they indicated where the
17  excavation was relative to the floodwall, and
18  the United States Army Corps of Engineers
19  approved those specifications without any
20  comment to you to put clay as they later told
21  you to do.  Isn't that true?
22     A.  Based on my recollection, that's
23  correct.
24     Q.  All right.  Now, what, if you know,
25  is the time sequence, okay?  How much time

Page 114

1  passed between the approval of the Corrective
2  Action Plan and the request by the United
3  States Army Corps of Engineers that you
4  install clay as a fill for that excavation?
5  I'm sorry, not as a -- I think it's a partial
6  fill.  Not the whole fill, to be fair.  Clap
7  cap.
8       A.  I don't have recollection of that.
9       Let me back up and try to clarify
10  something.  We had a borrow pit and the borrow
11  pit was full of clay.  So the intent
12  originally was that all excavations were
13  filled with clay.
14       Q.  So what was different --
15       A.  So absent the -- any direction in
16  the Corrective Action Plan -- because it
17  really directed -- It was an environmental
18  work plan.  It was really geared towards
19  removing the contaminated soils.
20       Q.  So what was different about what the
21  government told you to do from the Corrective
22  Action Plan, if there was any difference?
23       A.  No difference.
24       Q.  Well, what was the purpose of the
25  memo then?

Page 115

1       A.  There was --
2       MS. WAGER-ZITO:
3       I object to the form.
4       You can answer.
5       THE WITNESS:
6       The purpose of the memo was just
7       what we talked about, to have the
8       engineer evaluate the consideration of
9       excavation in proximity to the levee.
10  EXAMINATION BY MR. BRUNO:
11       Q.  All right.  So your testimony is
12  that the Corrective Action Plan itself called
13  for you to put clay?
14       A.  The Corrective Action Plan I don't
15  believe specified whether you were using clay
16  fill or whatever.  The Corrective Action Plan
17  was an environmental plan that was really
18  geared towards removal of the contaminated
19  material.
20       Q.  Well, help me understand this.  The
21  only document that I would look at -- If I
22  wanted to find out what -- if there was a
23  specification for what fill to use, okay,
24  would I not look at the Corrective Action
25  Plan?

Page 116

1       A.  I'd have to review it and see if it
2  -- if it did address that.
3       Q.  Well, where else would I go?
4       A.  I don't know if -- if the -- there
5  were general descriptions of the -- of the
6  backfill in the work plan or -- or if there
7  was something in the Corrective Action Plan.
8       Q.  Your answer before was, "I don't
9  believe --" I am going to read the whole
10  thing, but Roger has got some --
11       MR. BRUNO:
12       Maybe you want to read it for
13       me.
14  EXAMINATION BY MR. BRUNO:
15       Q.  "The Corrective Action Plan I don't
16  believe specified whether you were using clay
17  fill or whatever.  The Corrective Action Plan
18  was an environmental plan that was really
19  geared towards removal of the contaminated
20  material."  That was your testimony.  Right?
21       A.  Okay.
22       Q.  All right.  Is that your testimony
23  now?
24       A.  It is.  If you want to dissect the
25  plans, I'd be happy to -- to review a plan and

Page 117

1  give you specific information related to the
2  plan.  Trying to recall information from plans
3  from six or eight years ago, I don't have as
4  vivid a recall as if I had the document in
5  front of me.
6       Q.  Well, you're right, except for the
7  fact that you spent a whole day looking at
8  documents in order to prepare yourself for
9  this very 30 (b)(6) deposition.  Some of those
10  documents you requested, some of the documents
11  the lawyers picked for you.
12       MR. TREEBY:
13       Object to the commentary.  I ask
14       it to be stricken.
15       MR. BRUNO:
16       No, I am not going to tolerate
17       that.
18  EXAMINATION BY MR. BRUNO:
19       Q.  You were asked to be a corporate
20  representative; right?
21       A.  I volunteered to be a
22  representative.
23       Q.  You volunteered.  That's even
24  better.  And so in order to be a volunteer, in
25  order to come here and testify as a 30 (b)(6)

PHILLIP STAGGS                                                    4/26/2008

Page 118

1    witness you said to these folks, "I want to be
2    prepared," didn't you?
3         MS. WAGER-ZITO:
4         Objection.
5    EXAMINATION BY MR. BRUNO:
6    Q.   Didn't you?
7         MS. WAGER-ZITO:
8         We're not going to discuss the
9    conversations he had with Counsel.
10        MR. BRUNO:
11        I am not.
12   EXAMINATION BY MR. BRUNO:
13   Q.   I am just saying you --
14        MR. TREEBY:
15        Yes, you asked him a question.
16        MS. WAGER-ZITO:
17        You asked him the question.
18   EXAMINATION BY MR. BRUNO:
19   Q.   You wanted to be prepared.  Isn't
20   that true?
21        MR. STONE:
22        You know, you're just arguing
23   with the witness.
24        MR. TREEBY:
25        That's all you're doing.

Page 119

1         MR. BRUNO:
2         Fine.
3         MR. STONE:
4         You don't have the documents here
5    that you can show him.  Why are you
6    attacking him?  He's prepared.  You're
7    not prepared.  So --
8         MR. BRUNO:
9         That's not fair, Richard.
10        MR. JOANEN:
11        We are prepared.  Those are
12   multiple objections.  No speaking
13   objections.
14        MR. BRUNO:
15        Listen, guys.  You know that the
16   documents were supposed to be here.
17   The Fed-Ex truck didn't bring them on
18   time.
19        MR. STONE:
20        That's not the point.
21        MR. BRUNO:
22        Yes, it is.  I am not attacking
23   the witness.  I am asking a simple
24   question.
25   EXAMINATION BY MR. BRUNO:

Page 120

1    Q.   You tell me "I didn't review all the
2    documents", yet you did review documents.
3         MR. STONE:
4         That's not what he said.
5    EXAMINATION BY MR. BRUNO:
6    Q.   Did you review documents or not?
7    A.   I reviewed --
8    Q.   Okay.
9    A.   -- some documents --
10   Q.   Well, --
11   A.   -- for some period of time.
12   Q.   And you knew in fact that one of the
13   biggest issues in this case was the degree to
14   which the specifications in the contract spell
15   out certain things or don't spell out certain
16   things.  I'm sure you knew that, didn't you?
17        MS. WAGER-ZITO:
18        Objection.
19   EXAMINATION BY MR. BRUNO:
20   Q.   Didn't you?
21   A.   I wouldn't characterize it as you
22   did, no.
23   Q.   All right.
24   A.   Did I know that specifications were
25   -- were --

Page 121

1    Q.   Important?
2    A.   -- significant?  Yes.
3    Q.   You knew that the specifications
4    were significant to this case and that's why I
5    am asking you whether or not you can remember,
6    and you told me already that the Corrective
7    Action Plan really didn't specify the type of
8    fill that could be used to remediate the
9    site.  Isn't that true?
10   A.   We can look.  I think I said I don't
11   believe it does.
12   Q.   We have your booklet.  We have the
13   computer.  We have the documents on computer.
14   If you tell me what document we should go to,
15   we can pull that up.  Should we look at the
16   Corrective Action Plan?
17   A.   Your question was related to the
18   Corrective Action Plan so I -- that would --
19   Q.   I mean, is there some place else we
20   should look for this specification?  I am just
21   trying to get a framework of documents.  I got
22   all of these complaints about me not showing
23   you documents.  I need to know what documents
24   to show you.
25   A.   You're asking me if it's in the

                                          31  (Pages 118 to 121)

PHILLIP STAGGS                                                                    4/26/2008

Page 122

1    Corrective Action Plan.  We can look in the
2    Corrective Action Plan and see if it is indeed
3    there.
4        Q.   Is there another place to look?
5        A.   We could look at all the project
6    plans.  We can look in the project work plan
7    and see if that gives us an indicator if it's
8    in there.
9        Q.   All right.  Well, is it in the
10   criteria document?  Should we look there?
11       A.   Do I think it's there?  No, I don't
12   think it's in the criteria document, but --
13       Q.   Well, that's what I am asking you.
14   Is it in the site specific recap plan?
15       A.   That's what I said, it may or may
16   not be.  We can look there.
17       Q.   All right.  Well, would you agree
18   with me that as regards any of these
19   specifications, they're not -- you can't go to
20   any one document and get all the
21   specifications for this job, can you?
22       A.   For the job?
23       Q.   Right.
24       A.   No.
25       Q.   You have got to look at a whole

Page 123

1    bunch of different documents and you have got
2    to assimilate them and cross-reference them in
3    order for you to understand the precise, or
4    the degree to which these specifications are
5    precise.  Isn't that true?
6        A.   For the degree to which they're
7    precise is what you said?
8        Q.   Yes.  You just told me there may be
9    three or four different documents that might
10   reference what one would use to fill the
11   remediated site, didn't you?
12       A.   I said that it might be in the CAP,
13   it might be in the work plan.
14       Q.   All right.  Well, at least I've got
15   to go to at least two different documents in
16   order to understand the specifications.
17   Right?  At least two.  Maybe more.  Isn't that
18   true?
19       A.   I would say maybe more.
20       Q.   Maybe more.  All right.
21           Does the phrase "work plan"
22   adequately characterize the corrective action
23   remediation plan which you've referenced in
24   answering some of these questions?
25       A.   I don't know if it falls under the

Page 124

1    heading, the generic heading of "work plan".
2    It was one of the project plans.
3        Q.   Would you agree with me that work
4    plans, whatever those may be, those are
5    supposed to be standalone documents?  I mean,
6    that's what the Task Order 26 requires.
7        MS. WAGER-ZITO:
8            Objection.
9    EXAMINATION BY MR. BRUNO:
10       Q.   Isn't that true?
11       A.   I don't know that each work plan is
12   a standalone document.
13       Q.   Well, that's fine.  So in terms of
14   this business of me wanting to learn about the
15   specifications in a particular work plan,
16   okay?  Your testimony is I can't rely on any
17   one work plan; I need to make sure that I've
18   looked at other documents to satisfy myself as
19   to the completeness of the specifications that
20   might cover that particular work?  Right?
21       A.   I think that's correct.
22       Q.   All right.  So what other work --
23   what is -- what is -- I mean, you're the
24   contract manager.  Right?
25       A.   Construction manager.

Page 125

1        Q.   Construction.  I'm sorry.  You're
2    the construction manager.  And as a
3    construction manager, your job was to make
4    sure that the subcontractors and the folks on
5    the site do what the plans and specifications
6    require them to do; right?
7        A.   Among other things.
8        Q.   Okay.  Well, I mean, would you agree
9    with me that you have to be able to know where
10   to find the specifications?
11       A.   Yes.
12       Q.   That's your job.
13       A.   One of many things.
14       Q.   It's one of many, but it's your job;
15   right?
16       A.   We just established that.
17       Q.   All right.  Did this job belong to
18   anybody else but you?  I mean, who's the --
19   where did the buck stop with regard to making
20   certain that the plans and specifications were
21   complied with?  Was it you or was it Mr.
22   O'Connor or somebody higher up?
23       A.   Well, ultimately the project manager
24   is responsible for overall management of the
25   project.

                                                      32 (Pages 122 to 125)

PHILLIP STAGGS                                                    4/26/2008

Page 126

1      Q.  Okay.
2      A.  There's several people that have a
3  role.  The quality manager has responsibility
4  to assure that the plans are correctly
5  implemented.
6      Q.  Okay.
7      A.  The government's quality assurance
8  personnel monitor --
9      Q.  All right.
10     A.  -- work for compliance with the
11 specifications.
12     Q.  Okay.  So there's a variety of
13 documents that need to be reviewed in order to
14 understand the specifications, and there's a
15 variety of people who have responsibility for
16 WGI in making certain that these
17 specifications are complied with.  Right?
18     A.  That's right.
19     Q.  All right.  Well, if we would go to
20 the recommendation -- You all wrote the
21 recommendation report.  We do know that;
22 right?
23     A.  Yes.
24     Q.  Okay.  And the recommendation report
25 at page WGI-259144 says -- it's section 5.1.2,

Page 127

1  "Project plans and procedures", says "Six
2  separate plans providing guidance and
3  requirements of technical field execution are
4  to be submitted in draft and final format for
5  review and approval."  Do you recall that to
6  be true?  Is that what y'all did?
7      A.  I don't know if that was the final
8  number of plans, but --
9      Q.  That was the --
10     A.  -- we developed a number of plans
11 for review and approval.
12     Q.  It says the plans are -- It may have
13 changed, but the plans are as described in
14 this document, work plan?  Y'all did a work
15 plan?
16     A.  We did a work plan.
17     Q.  You did a waste management plan?
18     A.  We did a waste management plant.
19     Q.  You did a storm water pollution
20 prevention plan?
21     A.  That's correct.
22     Q.  You did a sample analysis plan?
23     A.  That's correct.
24     Q.  And you did a contractor quality
25 control plan?

Page 128

1      A.  That's correct.
2      Q.  And you did a site safety and health
3  plan.  We know that.
4      A.  Yes.
5      Q.  You talked about that.  Okay.  And
6  it says "The project plans and procedures
7  presented in the following subsections are not
8  definable features of the site work."  What
9  does that mean, if you know?
10     A.  Could you read it again?
11     Q.  Yes.  "The project plans and
12 procedures presented in the following
13 subsections are not definable features of the
14 site work."
15     A.  What are the following --
16     MS. WAGER-ZITO:
17         Joe, can I ask you where you are
18     reading from?  Because this one
19     actually we can show him so he can
20     follow along.
21     MR. BRUNO:
22         Thank you.  It's Bates page --
23     MS. CLAYMAN:
24         Don't go by Bates number.  Just
25     go by the section number.

Page 129

1      MR. BRUNO:
2          Oh.  5.1.2.
3      MS. CLAYMAN:
4          Okay.
5      MS. WAGER-ZITO:
6          We have a different document than
7      you.  A different Bates numbered
8      document.
9      MR. BRUNO:
10         All right.  Well, that's -- We're
11     trying.
12     MS. WAGER-ZITO:
13         Okay.  I'm sorry.  I just wanted
14     him to be able to read it.
15     MR. BRUNO:
16         That's fine.  That's fine.
17     MS. WAGER-ZITO:
18         Repeat the question.
19         Do you remember the question?
20     THE WITNESS:
21         Did the question relate to the
22     one sentence, "The project plans and
23     procedures presented in the following
24     subsections are not definable features
25     of work"?

JOHNS  PENDLETON  COURT  REPORTERS                    800  562-1285

PHILLIP STAGGS                                                    4/26/2008

Page 130

EXAMINATION BY MR. BRUNO:
1     Q.  Yes, sir.  Would you help me
2  understand that, please?  "Definable
3  features", I didn't know what that means.
4     A.  Definable features of work were
5  demolition, remediation, wharf removal, barge
6  removal, that type of thing.  That -- That's
7  what they were clarifying, what it appears to
8  me.
9     Q.  It says "However, considerable
10  effort should be put forth to ensure that each
11  plan is specifically tailored to meet the
12  needs of the demolition and site preparation
13  efforts."  So what does that mean?  If you
14  know.
15     A.  I mean, it appears that they're just
16  saying that each plan should recognize the
17  overall project scope.
18     Q.  All right.  So there's a work plan
19  for each of these -- is it five sites?
20     A.  Six sites.
21     Q.  Six sites.  There's a work plan for
22  each site, and each site is characterized by
23  the use to which it was put before the
24  remediation effort.  Right?  Boland,

Page 131

1  McDonough, et cetera?
2     A.  Each site had its own Corrective
3  Action Plan --
4     Q.  Okay.
5     A.  -- for remediation.
6     Q.  Did it have its own work plan?
7     A.  No.
8     Q.  All right.  So it just had its own
9  Corrective Action Plan.  You already told us
10  the Correction Action Plan was the remediation
11  component.
12     A.  Yes.
13     Q.  All right.  Now, so then it says
14  "During the course of the project's progress
15  the plans should serve as guidance and
16  reference for the execution of project
17  activities."  Which plans are referenced?  Is
18  that the work plan, the Corrective Action
19  Plan, or all of those plans listed above, if
20  you know?
21     A.  Talking about all of the plans.
22     Q.  All right.  Now, finally it says
23  "The plans themselves are considered to be
24  standalone documents."  That's why I asked you
25  the question.  Okay?

Page 132

1     A.  Okay.
2     Q.  "That is, for example, a staff
3  member attempting to resolve a health and
4  safety issue should not have to look in any
5  other document other than the SSHP, which is
6  the site safety and health plan, to know what
7  to do about a site specific health and safety
8  question."  All right.  Do you know what that
9  means?  If you know.
10     A.  I -- I think it's obvious what
11  they're saying there.
12     Q.  Would you share it with me?
13     A.  I mean, it -- when you read it, you
14  have really stated what it means.  It's that
15  you shouldn't have to look another -- in
16  another document other than the site safety
17  and health plans if you had a question about
18  health and safety.
19     Q.  All right.  Well, if you had a
20  question about specifications, you should only
21  look at one document, too, right?  Is it
22  saying that?
23     A.  I think that's implied there.
24     Q.  Okay.
25     A.  I think that's what it's trying to

Page 133

1  state.
2     Q.  All right.  I mean, you'd agree with
3  me, if you have got to look at four or five
4  documents to figure out specifications, that's
5  just making your job a whole lot harder than
6  it needs to be; right?
7     A.  I think the intent was to have all
8  the information for an activity in a single
9  plan so that you didn't have to go to multiple
10  plans.
11     Q.  All right.
12     A.  But it all goes back to the question
13  about whether the CAP identified the fill
14  material to be used, and the CAP was primarily
15  an environmental -- the environmental
16  component of the plans and -- and -- and
17  wasn't -- It didn't tell you the specifics of
18  the sampling and analysis, but yet sampling
19  and analysis was required to complete the work
20  --
21     Q.  Right.
22     A.  -- for that.  So you weren't in all
23  cases able to identify all the requirements in
24  a single plan.
25     Q.  Right.  Well, a lot of the

JOHNS PENDLETON COURT REPORTERS                     800 562-1285

1  specifications weren't specific; right?
2  That's what you just told me.
3      A.  No, I said they were specific in
4  that the Corrective Action Plan would address
5  the remediation effort, but the specifics of
6  the sampling required to support that would be
7  in the sampling and analysis plan.
8      Q.  And the specifics of what material
9  to use as fill, that was not specific either.
10  Right?
11      MS. WAGER-ZITO:
12         Object to the form.
13  EXAMINATION BY MR. BRUNO:
14      Q.  I mean, for example, generally you
15  knew you had to backfill.  I mean, the plans
16  and specifications said that.
17      A.  Generally we had to backfill.
18      Q.  You knew that.  All right.  But they
19  didn't tell you what material to use, they
20  didn't tell you a level of compaction.  That
21  wasn't there; right?
22      A.  If -- If we can review the
23  documents, I'll be happy to look at it and
24  tell you what was and wasn't there.
25      Q.  All right.  We'll do that when they

1  get here at noon.  We'll have them all.
2         Do you know if -- Well, I think we
3  can agree that the Corrective Action Plans as
4  prepared by WGI did not have as a component a
5  consideration of whether or not that work as
6  contemplated by those plans might damage the
7  flood protection structure.  Isn't that true?
8      A.  Your questions are so lengthy, by
9  the time you get to the end of them I have
10  forgot what you said in the beginning of them.
11      Q.  Okay.
12      A.  If -- The brief and direct would be
13  easier for me to respond to.
14      Q.  Well, you have to understand they
15  have got all of these folks on the other side
16  of the table and when I am brief, they object,
17  say "vague".
18      A.  Okay.
19      Q.  So, you know, I am in a trick bag.
20  I am trying to do my best.  But if I keep it
21  short, they say "vague".  If I stay long, they
22  say "compound".  So, you know, I am --
23      A.  I am just --
24      Q.  I am doing -- Listen, I don't fault
25  you one bit.  You are absolutely correct.  I

1  am sharing with you it ain't easy sometimes.
2  All right?
3         What I am trying to understand is
4  this.  And I think this is -- I don't think
5  it's a terribly long or difficult question.
6  But the Washington Group International in
7  preparing its Corrective Action Plans did not
8  do any -- Let's do it this way.  In preparing
9  the Corrective Action Plans, Washington Group
10  did not do a geotechnical evaluation to
11  determine whether or not the work contemplated
12  by the Corrective Action Plans might damage
13  the levee.
14      A.  I think that's correct.
15      Q.  Okay.  And the reason for that is,
16  as you're sitting here as a representative of
17  Washington Group International, your
18  understanding was that was the Corps' problem;
19  right?
20      A.  The Corps' responsibility.
21      Q.  And they had accepted that
22  responsibility; right?  Or no?  Maybe you
23  don't know.
24      A.  I can tell you that it wasn't in our
25  work scope.  If you look at the scope of our

1  work, it clearly was not in there.
2      Q.  All right.
3      A.  What the Corps accepts as their
4  responsibility, one would assume that that is
5  correct.
6      Q.  All right.
7      A.  But --
8      Q.  Now, and the only -- Is there
9  another piece of paper other than this email,
10  that one email, which is an interoffice
11  memorandum, we have talked about it, between
12  Mr. Guillory and some other person, which
13  deals with this issue of the excavation at the
14  McDonough site near the 15 foot point on the
15  water side of the levee?  Are you aware of any
16  other pieces of paper that would reflect the
17  Corps of Engineers' involvement with issues
18  related to damage to that floodwall?
19      A.  There may be others, but I don't
20  recall one off the top of my head.
21      Q.  All right.  How about this?  Were
22  there any other such documents in the boxes
23  that the lawyers gave you to review?
24      MS. WAGER-ZITO:
25         Object to the form of the

PHILLIP STAGGS                                                    4/26/2008

Page 138

1    question.
2       THE WITNESS:
3       I don't know if it was all in a
4    single document. I mean. I think
5    there was one document that was the --
6    presented the question. There's
7    another document that presents the
8    answer. So are we -- Is that two
9    documents or is that one document?
10   EXAMINATION BY MR. BRUNO:
11      Q. That's fair. I didn't know that. I
12   thought there was only one. So there's a
13   series of emails that regard the subject?
14      A. I think there was a question and
15   answer.
16      Q. All right. Well, that's fine. Are
17   there any other pieces of paper regarding
18   other instances where the government indicates
19   some interest in the potential for the WGI
20   work to impact the floodwall?
21      MR. EHRLICH:
22      Objection, asked and answered.
23      THE WITNESS:
24      Is there another document? I
25   think there is -- there's another

Page 139

1    document related to that that
2    identifies a sketch developed by the
3    Corps of Engineers related to this
4    same issue. Again, I think it's a
5    separate document.
6    EXAMINATION BY MR. BRUNO:
7       Q. Well, but is it -- I am confused.
8    Is it the same hole or is it a different
9    hole?
10      A. It was related -- I think the
11   question Guillory asked was related to borrow
12   pit excavation and excavation under Surekote
13   Road, and I think there was a separate
14   document that was a sketch that showed the
15   profile of excavation at the borrow pit.
16      Q. Okay.
17      A. It's related, but a separate
18   document.
19      Q. I realize that. But we're still
20   talking about the same McDonough holes, I
21   thought. I mean -- Please forgive me. I
22   thought you told me that this whole back and
23   forth regarded an excavation right next to the
24   15 foot line and the borrow pit. Those two
25   issues. I am just curious to know if there

Page 140

1    are emails or pieces of paper that regard
2    holes on different areas like the -- is it
3    Saucer or Saucier?
4       A. Saucer.
5       Q. Saucer? I don't know. Saucer,
6    Boland. That's what I am asking.
7       A. Oh. No. Not that I am aware of.
8       Q. Okay. He needs a break for the
9    tape, so let's take a little break if you
10   don't mind.
11      A. Sure.
12      VIDEO OPERATOR:
13      Off the record, it is 11:11.
14      (Recess.)
15      VIDEO OPERATOR:
16      Returning to the record, it's
17   11:29.
18   EXAMINATION BY MR. BRUNO:
19      Q. Okay. So we're quite comfortable
20   believing that you didn't see any papers or
21   emails or the like that would have described
22   holes or excavations on any of the other
23   sites, meaning other than McDonough; right?
24      A. That's right.
25      Q. Okay.

Page 141

1       MS. WAGER-ZITO:
2       Well, other holes relating to the
3    levees and the floodwall, because
4    there were lots of other holes on the
5    other sites.
6    EXAMINATION BY MR. BRUNO:
7       Q. No, we were talking about -- I hope
8    we have context. See what I mean about if you
9    don't add another 35,000 words, we get that.
10   So yes, I thought we were still talking about
11   the holes related to the Corps's interest in
12   impacting the floodwall. Okay. So welcome to
13   my world.
14      How often would you meet on the
15   site with Corps employees?
16      A. Weekly with Jim Montegut for
17   planning, a weekly planning meeting.
18      Q. Yes. My next question was going to
19   be, did that meeting have a name?
20      A. And daily probably with -- with
21   other -- other Corps QA reps, et cetera.
22      Q. Okay. So there's a weekly meeting
23   with Jim Montegut.
24      A. Yes.
25      Q. True?

JOHNS PENDLETON COURT REPORTERS                            800 562-1285

PHILLIP STAGGS                                                4/26/2008

Page 142

1     A.  Yes.
2     Q.  And what was the name of that
3  meeting, if it had one?
4     A.  Didn't have a meeting.
5     Q.  A name?
6     A.  I mean, didn't have a name.
7     Q.  Right.
8     A.  Because I don't think it had -- I
9  don't think it had a formal name.
10     Q.  All right.  Who would attend those
11  meetings?
12     A.  Initially Dennis O'Connor, myself,
13  Jim Montegut, and whichever members of his
14  staff he wanted there.  He might have -- He
15  might have his QA and he might have -- I think
16  he had a project engineer there.
17     Q.  Did you know Mr. Montegut's position
18  at the Corps?  In other words, what was he?
19     A.  He was the contracting officer's
20  representative.
21     Q.  Do you know what division or branch
22  or section he's in over at the New Orleans
23  District office?
24     A.  No.  I mean, he's -- he works out of
25  the NOD office.  I think his card says "civil

Page 143

1  engineer".  He was designated as the COR.
2     Q.  Do you know if he's an engineer?
3     A.  I believe he's a civil engineer.
4     Q.  Okay.  Now, do I understand that if
5  -- I don't know that we ever established
6  this, but let me just ask it again.  Was it
7  Montegut who provoked the series of emails
8  with Guillory about the potential for the
9  excavation to affect the floodwall?
10     A.  I don't think that was the case.
11     Q.  Do you know how that -- Do you know
12  who provoked or who started the conversation?
13     A.  I think Lee Guillory did.
14     Q.  Okay.  Did Lee Guillory come to the
15  site from time to time?
16     A.  Yes.
17     Q.  Did you have a regularly scheduled
18  meeting with Guillory?
19     A.  No.
20     Q.  Okay.  How often would Guillory come
21  to the site?
22     A.  It varied.  There would be periods
23  where you would see him once a week and, if
24  Jim was going to be gone, he might be there
25  for a full week every day.  Otherwise, you

Page 144

1  would see him generally once a week.
2     Q.  Now, I am not trying to be flip, but
3  it sounds like that if Guillory hadn't noticed
4  this issue, whatever it was, with the four
5  foot excavation, if he hadn't seen it himself,
6  then there would have been no direction
7  provided from the Corps of Engineers on that
8  issue, whatever it was.
9         MR. EHRLICH:
10         Object to form.
11         MS. WAGER-ZITO:
12         Object to the form
13  EXAMINATION BY MR. BRUNO:
14     Q.  Do you understand the question?
15     A.  I do, and I don't know that to be
16  the case.  I mean, I have no way of knowing
17  that.
18     Q.  Well, how -- You see, how else would
19  -- You have already told me it's not your
20  job, right, to be concerned about whether an
21  excavation could impact the floodwall?
22  Right?
23     A.  Not under contract scope.
24     Q.  Okay.  And it's Guillory is the one
25  who has the -- who demonstrated an interest.

Page 145

1  Is that fair?
2     A.  Yes.
3     Q.  All right.  So if Guillory's not
4  there, who else from the Corps would have any
5  interest in evaluating issues like that?
6         MR. EHRLICH:
7         Object to form.
8         MS. WAGER-ZITO:
9         Object to the form.
10  EXAMINATION BY MR. BRUNO:
11     Q.  If you know.
12     A.  I don't know.
13     Q.  Well, you have already testified
14  that you had some general knowledge about
15  holes and levees.  If you had a question about
16  the potential for an excavation to affect a
17  floodwall, who would you have called?
18         MR. EHRLICH:
19         Object to the form.
20         MS. WAGER-ZITO:
21         Object to form.
22  EXAMINATION BY MR. BRUNO:
23     Q.  At the Corps.
24         MS. WAGER-ZITO:
25         Object to the form.

                                    37 (Pages 142 to 145)

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

PHILLIP STAGGS                                                    4/26/2008

Page 146

1          THE WITNESS:
2             I guess it's -- it's the
3       hypothetical "if". I mean, the work
4       plan --
5    EXAMINATION BY MR. BRUNO:
6       Q. It's an "if".
7       A. -- you know, identified all of our
8    excavations and, you know, the government
9    approved the plan. But if I had a question, I
10   would have presented it to the Corps of
11   Engineers.
12      Q. Okay. But I said who at the Corps.
13      A. Who at the Corps. To Jim Montegut,
14   because he was our -- he was the site rep. He
15   was the on-site rep.
16      Q. Okay. Do you know whether or not
17   Jim Montegut was knowledgeable about the
18   potential for excavations to affect the
19   floodwall?
20      A. I would assume that he is.
21      Q. Okay. Now, you said that there were
22   daily contact with the QA reps from the
23   Corps. Is there more than one quality
24   assurance person?
25      A. At different times over the five

Page 147

1    year period they had a series of different
2    people.
3       Q. All right.
4       A. They had some initially and -- I
5    think they had three initially, and by the end
6    of the project they had one.
7       Q. All right. But there's only one
8    quality assurance person from the Corps at any
9    one point in time?
10      A. No, they had -- they had two or
11   three. They had at least two at the beginning
12   of the project.
13      Q. On-site every day?
14      A. Yeah.
15      Q. Okay. And what was their role? If
16   you know.
17      A. Government quality assurance
18   oversight.
19      Q. And at any time did any of the
20   quality assurance representatives suggest that
21   there was any need for a geotechnical or
22   engineering evaluation of a particular
23   excavation because it may impact the integrity
24   of the floodwall?
25      A. No.

Page 148

1       Q. Now, in these weekly meetings with
2    Montegut -- Those were formal meetings,
3    right? I mean, they were scheduled; you knew
4    you had a meeting once a week?
5       A. They -- At the beginning of the
6    project they were more formal and with a set
7    time, although I don't remember the day of the
8    week or the time. But further into the
9    project it was a one-on-one with me and Jim
10   and his -- It was less formal in terms of
11   time. It was just a weekly planning meeting.
12      Q. All right. Now, you're saying
13   weekly planning meeting and I just need to
14   understand what kinds of things were discussed
15   at the weekly planning meeting.
16      A. What work would be accomplished for
17   the week, budget considerations and weather
18   considerations. Scheduling of subcontractors,
19   et cetera. Equipment, manpower.
20      Q. Would the subject of potential
21   engineering problems be on the agenda?
22      A. I don't recall that they were ever
23   discussed in our weekly meetings.
24      Q. Now, do you know how deep the burrow
25   pit got before -- or at least the point at

Page 149

1    which you stopped using it as a source of
2    clay?
3       A. I think, from my recollection, it
4    was about 12 to 15 feet, somewhere in that --
5    in that range.
6       Q. All right. And was the borrow pit
7    identified in any of these work plans? In
8    other words, to use it as a borrow pit?
9       A. Yes.
10      Q. All right. And did the
11   specifications describe the length and width
12   of the top surface of the borrow pit?
13      A. Yes.
14      Q. Okay. And did it describe how close
15   you could go to the levee?
16      A. I think it identified the footprint
17   of it so that you could -- I don't know if it
18   was dimensioned from the levee. But it
19   identified the footprint of it.
20      Q. All right. And did the
21   specifications reflect what was to be used to
22   fill the borrow pit?
23      A. There was never any intent to fill
24   the borrow pit.
25      Q. Okay. So I take it that it was

JOHNS PENDLETON COURT REPORTERS                          800 562-1285

PHILLIP STAGGS                                                    4/26/2008

Page 150

1    never filled?
2        A.  Well, I don't know what you mean by
3    filled, but it wasn't --
4        Q.  I mean --
5        A.  -- backfilled with -- It was never
6    intended that it be backfilled with soil.
7    That was our source of borrow for the area.
8    But it was intended that the area be opened up
9    to the canal so let water flow in and out of
10   that area.
11       Q.  Okay.
12       A.  That area was intended to be open to
13   the canal water.
14       Q.  All right.  So at the end of the
15   project it was contemplated that it would just
16   be left as it was when the last scoop of clay
17   was removed?
18       A.  Yeah, I think when the borrow pit
19   was expended, it was opened up to the canal.
20       Q.  All right.  And the plans and specs
21   didn't call for you to do anything other than
22   that to the borrow pit?
23       A.  Not that I am aware of.
24       Q.  Were there any -- Did you all
25   perform any engineering, I should say any

Page 151

1    geotechnical engineering evaluations of the
2    soils below the borrow pit?
3        A.  No.
4        Q.  Did you all -- Were there any
5    specifications which regarded whether or not
6    you could, in the course of getting the
7    borrow, puncture the clay layer and reach
8    other types of soils below the clay layer?
9        A.  The whole -- The borrow pit, once
10   you got past the topsoil and miscellaneous
11   fill that had been spread across the site, it
12   was all clay.
13       Q.  How deep was the clay?
14       A.  So -- I don't know the specific
15   depth of it, but there -- I mean, there was
16   clay until you got to the bottom of the borrow
17   pit.
18       Q.  I understand that.  But, I mean, did
19   somebody make a -- somebody at all interested
20   in learning how deep the clay was so that you
21   wouldn't go past the bottom of the clay and
22   reach some other strata?
23       MR. EHRLICH:
24           Object to the form.
25       THE WITNESS:

Page 152

1            We had a sketch that showed the
2        depth of the borrow pit.
3    EXAMINATION BY MR. BRUNO:
4        Q.  Okay.
5        A.  That showed the footprint and the
6    depth of the borrow pit from the Corps.
7        Q.  All right.  But my -- Go ahead.  I'm
8    sorry.
9        A.  Was there any investigation beyond
10   that?  No.
11       Q.  Okay.  Do we know, was there an
12   engineering -- was there any geotechnical
13   evaluation performed by Washington Group of
14   that location which would have indicated how
15   deep the clay was?  And by that I mean the
16   point at which it went from clay to some other
17   material?
18       A.  Not that I am aware of.
19       Q.  Okay.  Do you know whether or not
20   any -- You know that in connection with the
21   original request for work, the Washington --
22   well, I guess then Morrison Knudsen was
23   provided with a bunch of site specific
24   materials.  Do you know whether or not those
25   site specific materials included any

Page 153

1    information about the nature of the soils and
2    the depths of those various types of soils
3    within the work site?
4        A.  I don't know the specifics, but
5    there were work plan -- or previous
6    investigations that were done.  There was
7    documentation provided.  The content of all of
8    those I couldn't attest to.  I know a lot of
9    it or some of it related to previous
10   environmental investigations that had occurred
11   there.
12       Q.  All right.  Now, we have this
13   circumstance with Guillory doing whatever he's
14   doing with regard to the excavation at the
15   McDonough site.  Did you, after having --
16   Well, let me withdraw the question.
17           I know that you saw these
18   documents in the box.  I guess I need to ask
19   you if you remember independently this whole
20   episode of the Guillory and Montegut and the
21   discussions about the excavation at the
22   McDonough site as you sit here today.
23       A.  I do remember Montegut telling me
24   that Guillory had requested their engineering
25   group evaluate the, you know, the excavation

39 (Pages 150 to 153)

PHILLIP STAGGS                                          4/26/2008

Page 154

1  of the borrow pit relative to the levee.
2      Q.  All right.  Now, so when Montegut
3  tells you, "Look, the Corps is going to
4  evaluate from a geotechnical perspective
5  whether the borrow pit may do some damage to
6  the flood structure," does that indicate to
7  you that because you know you're digging holes
8  at other locations at the site, that you need
9  to be vigilant on that issue generally?
10     A.  There was no indication from him
11  that we had any other areas on the site where
12  that was a consideration.
13     Q.  All right.  I gather from your
14  answer that -- Well, let me ask you this.
15  Were you at all curious to learn what it was
16  about the borrow site that caused Guillory to
17  feel the need to perform this engineering
18  investigation?
19     A.  Really wasn't within our scope or --
20  You know, I didn't have a reason to be
21  interested in it.
22     Q.  Okay.  Well, the answer is then you
23  were not curious.
24     A.  No.  The answer would be the
25  answer.

Page 155

1      Q.  Well, the question was, were you
2  curious.
3      A.  Okay.
4      Q.  The answer is yes or no?
5      A.  No, I wasn't curious.
6      Q.  Fair enough.  Fair enough.  All
7  right.  How close did the boundary of the
8  borrow pit get to that 15 foot line?
9      A.  I think I said before that I don't
10  know that.  I think we talked about that
11  earlier, and I don't know the distance from
12  the borrow pit to the edge of the levee.
13     Q.  Now, what was the clay that was
14  removed from the borrow pit supposed to be
15  used for?
16     A.  For backfill of the excavations.
17     Q.  Which?
18     A.  And grading as needed.  I mean,
19  generally you had a final contour of the site
20  that you were trying to achieve, too, so that
21  you didn't have ponding water.  So in addition
22  to just backfilling the holes, you might have
23  to put it in areas just to adjust the grade to
24  make the site drain properly.
25     Q.  All right.  Let's see now.  You

Page 156

1  would agree that on June 1, 1999 the Corps
2  issued a statement of work for the demolition
3  and site preparation for the Inner Harbor
4  Navigation Canal lock replacement project on
5  the EBIA adjacent to the Industrial Canal?
6      A.  If that -- If that's the date of the
7  document, then yes.
8      Q.  Okay.  And you would also agree that
9  the June 1, 1999 statement of work for Task
10  Order 26 set forth the project requirements
11  that WGI would, and I am quoting, "furnish all
12  engineering services, materials, supplies,
13  labor as required in connection with the
14  technical review of site documents associated
15  with the demolition and remediation of the
16  EBIA"?  Right?
17     A.  If that's what's stated there.  I
18  mean.  You're reading it and I don't have it
19  in front of me.
20     Q.  I'm sorry.  You want to see it?  Do
21  you agree with that?  Is it false?
22     A.  It --
23     Q.  I am just asking if it's true or
24  false.
25     A.  You're reading the document and I

Page 157

1  don't have it in front of me, so I -- I -- I
2  guess I don't understand the question.  If
3  you're reading it verbatim, then that is what
4  it is.
5      Q.  The question is, do you agree that
6  -- I mean, you see, you have to understand,
7  you're not sitting here as yourself; you're
8  sitting here as WGI?
9          MS. WAGER-ZITO:
10             But not for this topic.
11         MR. BRUNO:
12             Well, I don't know about that.  I
13  am not going to get into a debate with
14  you.  I mean, it's --
15         MR. TREEBY:
16             Well, we're the ones who
17  designated him for topics.
18         MR. BRUNO:
19             18 -- Yeah, but, Bill, there's 30
20  topics.
21         MR. TREEBY:
22             I understand, but this isn't one
23  of them.
24         MR. BRUNO:
25             I think it is.

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

PHILLIP STAGGS                                                    4/26/2008

Page 158

1    MS. WAGER-ZITO:
2        This was Steve Roe's topic.  But
3    if you want to waste your time on this
4    one --
5    MR. BRUNO:
6        Well, just to pick one, 20 covers
7    this.  21 covers this.  22 covers
8    this.  23 covers this.
9    MS. WAGER-ZITO:
10       No, it doesn't.
11   MR. BRUNO:
12       25 covers this.  26 covers this.
13   You know, I mean, it says "all".  I
14   don't know why we have to make a big
15   issue out of something that not
16   controversial.
17   MR. TREEBY:
18       You can ask the question.  We're
19   not stopping you.  You can ask the
20   questions.  You're just wasting your
21   time.
22   MR. BRUNO:
23       I don't appreciate you suggesting
24   whether I am wasting my time or not.
25   EXAMINATION BY MR. BRUNO:

Page 159

1    Q.  The June 1, 1999 statement of work
2    was to -- was payment -- or an indication that
3    you were supposed to review the site documents
4    in order for you to prepare your
5    recommendation.  Isn't that true?
6    A.  If that's what you're -- I mean, it
7    -- I think that's the case.
8    Q.  Okay.
9    A.  I think.
10   Q.  That's all I am asking.  And would
11   you agree that WGI was supposed to prepare a
12   comprehensive report concerning the scope and
13   duration of the remediation and demolition
14   that would be required as well as any data
15   gaps that maybe needed to be filled by
16   sampling or other investigations?  That's what
17   they were asked to do; right?
18   A.  I think that's correct.
19   Q.  Okay.  And the Corps provided copies
20   of site documents to assist you in the
21   technical review and for your use in the
22   preparation of the recommendation report.
23   Isn't that true?
24   A.  I believe that's correct.
25   Q.  All right.  And one of these things

Page 160

1    that was included for the review of WGI was
2    volume 5, Appendix C of the Mississippi River
3    Gulf Outlet new lock and connecting channels
4    evaluation report, which was the sampling and
5    analysis report of the area prepared by the
6    Foundation and Materials Branch and the
7    Hydraulics and Hydraulic Branch of the
8    Engineering Division of the Corps' New Orleans
9    office.  That's one of the documents that the
10   Corps gave you.
11   A.  Okay.
12   Q.  And that's --
13   MS. WAGER-ZITO:
14       You're asking him if he knows
15   that?
16   MR. BRUNO:
17       I am asking him if he knows
18   that.  Yes.
19   THE WITNESS:
20       I don't know that.  If that's
21   what the -- that document states, I
22   would assume that that's correct, but
23   I don't know that.  I don't -- That
24   wouldn't be a document that I would
25   have necessarily seen.

Page 161

1    EXAMINATION BY MR. BRUNO:
2    Q.  Did you have any understanding or
3    appreciation for the sheet pipe tip depth of
4    the sheet pile in the floodwall along the
5    eastern boundary of the work site?
6    A.  No.
7    Q.  Was it relevant to you?
8    A.  No.
9    Q.  You have been designated, and this
10   is the answer -- I am referring specifically
11   to paragraph 31.  And you have been I think
12   designated to talk to us about this issue.
13   All plans, specifications, surveys and/or
14   reports identifying the sheet pile depth of
15   the East Bank Industrial Area flood protection
16   system.
17   MR. BRUNO:
18       I mean, am I wrong?  Is he
19   designated for this?
20   MS. WAGER-ZITO:
21       He is designated for this and
22   he's prepared to speak to that.  I
23   think the question you just asked him
24   was different than that.  He's
25   designated to talk about the sheet

JOHNS PENDLETON COURT REPORTERS                          800 562-1285

PHILLIP STAGGS                                          4/26/2008

Page 162

1    piles on the site that he worked on.
2    You asked him a question about the
3    sheet pile depths of the floodwall.
4        MR. BRUNO:
5        The sheet pile depth of the East
6    Bank Industrial Area flood protection
7    system.  It couldn't be clearer than
8    that.
9        MS. WAGER-ZITO:
10       And we told you there were
11   several things he wasn't going to know
12   the answer to.  You kept it in here so
13   that he could tell you that that
14   wasn't something he did.
15       MR. BRUNO:
16       It's not he.  It's WGI.  If WGI
17   doesn't know how deep the sheet pile
18   is --
19       MR. TREEBY:
20       He's the man.
21       MR. BRUNO:
22       He' the man.  All I am asking you
23   to confirm to me is this.
24       MR. TREEBY:
25       He's the man.  He's the man.

Page 163

1        MR. BRUNO:
2        He's the man for 31.  Thank you,
3    Bill.
4        MR. TREEBY:
5        He's the man.
6        MR. BRUNO:
7        Good.
8        MS. WAGER-ZITO:
9        And he's answered your question.
10       MR. TREEBY:
11       He answered your question.  He
12   doesn't know.
13   EXAMINATION BY MR. BRUNO:
14       Q.  The Washington Group International
15   does not know how deep the sheet pile is in
16   the floodwall; right?
17       A.  I was not aware.
18       Q.  Well, the WGI is not aware.  Right?
19       MR. TREEBY:
20       Well, he's the designee.  Of
21   course.
22       MR. BRUNO:
23       He's -- Then fine.  Let him
24   answer.
25       MR. TREEBY:

Page 164

1        Stipulated.
2        MR. BRUNO:
3        Let him -- Stipulated?
4        MR. TREEBY:
5        We stipulate he's the designee
6    for 31.  Yes.
7        MR. BRUNO:
8        All right.  So he then can say
9    WGI didn't know how deep the sheet
10   pile was in the floodwall.
11   EXAMINATION BY MR. BRUNO:
12       Q.  Right?
13       A.  That's right.
14       Q.  Thank you.  Do you know, sir,
15   whether or not the United States Army Corps of
16   Engineers furnished the WGI with any
17   information that would allow WGI to ascertain
18   how deep the sheet pile was?
19       A.  Do not know.
20       Q.  Do you know whether or not WGI
21   evidenced believing that the sheet pile was 25
22   feet in depth?
23       MR. STONE:
24       Object to form.
25       MS. WAGER-ZITO:

Page 165

1        Object.
2        THE WITNESS:
3        Could you restate the question?
4    EXAMINATION BY MR. BRUNO:
5        Q.  Do you know of any document, piece
6    of information, fact wherein the document
7    suggests that WGI believed that the sheet pile
8    depth was 25 feet?
9        A.  I don't recall that.
10       Q.  Are you familiar with the recap
11   document at all?
12       A.  Yes.
13       Q.  The recap criteria document that the
14   WGI published, produced?
15       A.  I am familiar with the document.  I
16   am not -- You know, I don't -- I don't know --
17   I know the general kind of information that's
18   in there.
19       Q.  Okay.  Are you designated to talk
20   about paragraph number 27?
21       MS. WAGER-ZITO:
22       Do you have it in front of you?
23       THE WITNESS:
24       Yes.
25       MS. CLAYMAN:

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

PHILLIP STAGGS                                                    4/26/2008

|  | Page 166 |
|---|---|

1       You want me --
2       MS. WAGER-ZITO:
3       Steve Roe is designated to
4   address permits.  Steve Roe did
5   address permits.  27 is "All permits
6   obtained by you from U.S. Corps of
7   Engineers and the Orleans Levee
8   District concerning the East Bank
9   Industrial Area from 1999 to the
10  present."  And it's duplicative of 17,
11  which Steve Roe did address.
12      MR. BRUNO:
13      At the beginning of the
14  deposition I asked you to tell us on
15  the record the paragraphs and you told
16  me 18 through 66.
17      MS. WAGER-ZITO:
18      And I took out several.
19      MR. BRUNO:
20      62 and 63.
21      MS. WAGER-ZITO:
22      Including --
23      MR. BRUNO:
24      No.
25      MS. WAGER-ZITO:

|  | Page 168 |
|---|---|

1   of the levee floodwall along the eastern
2   boundary of the site?
3       A.  We may have done an initial
4   inspection of the area for, you know, for
5   damage that would have been present before we
6   started work versus damage that would result
7   from our work.  I don't know if there -- I
8   don't know that that was done, but we may have
9   done that.
10      Q.  All right.  Do you know what
11  under-seepage is?
12      A.  Not being a geotech, I mean, I have
13  a general idea of what it might be, but I
14  don't think I have been -- formally been given
15  a definition of it.
16      Q.  Well, are there employees of WGI
17  who, in your opinion, know what under-seepage
18  is?
19      A.  I would assume that there would be.
20      Q.  Can you tell me what effort you
21  undertook to make inquiry of other employees
22  of WGI so that you could properly come to this
23  deposition and be prepared to speak to this
24  issue?
25      MS. WAGER-ZITO:

|  | Page 167 |
|---|---|

1       No, I said on the record 27.
2       MR. TREEBY:
3       The record shows.
4       MR. BRUNO:
5       The record shows what it shows.
6   All right.  The question is really
7   simple.  Is he designated for 27?  Yes
8   or no?
9       MS. WAGER-ZITO:
10      No.  He does not know about
11  permits.
12  EXAMINATION BY MR. BRUNO:
13      Q.  Are you designated for paragraph
14  28?
15      MS. WAGER-ZITO:
16      That's another one I pointed out
17  the record that Steve Roe addressed.
18  The ground- --
19      MR. BRUNO:
20      29.
21      MS. WAGER-ZITO:
22      -- water.  He is designated on
23  29.
24  EXAMINATION BY MR. BRUNO:
25      Q.  Did the WGI do any inspection at all

|  | Page 169 |
|---|---|

1       The issue of under-seepage?
2       MR. BRUNO:
3       Number 30, paragraph 30,
4   generally.
5       THE WITNESS:
6       Would you restate the question?
7   EXAMINATION BY MR. BRUNO:
8       Q.  What did you do in order to prepare
9   yourself to be able to discuss the subject
10  identified in paragraph 30?
11      A.  I didn't contact anybody or do
12  anything with regards to addressing
13  under-seepage.
14      Q.  Well, is it possible that some of
15  the specifications that were drafted by WGI
16  may have taken some of these issues in
17  consideration?
18      MS. WAGER-ZITO:
19      Object to the form.
20      THE WITNESS:
21      I wouldn't expect them to.
22  EXAMINATION BY MR. BRUNO:
23      Q.  Well, it's not about whether you
24  expected it.  I said is it possible.
25      A.  I think it's not likely.

43 (Pages 166 to 169)

Page 170

1      Q.  Well, if you didn't ask anybody,
2   then you're not able to say for sure that it
3   didn't occur.  Isn't that true?
4      A.  That's true.  Is it possible?  Yes.
5      Q.  Well, I mean, --
6      A.  I thought when you began your line
7   of questioning perhaps that you were going to
8   give me a definition of under-seepage.  Based
9   on your initial question.
10      Q.  Well, the notice is given to WGI;
11   WGI reads the paragraph and they picked you.
12   Right?  So they decided that you're the guy
13   and, as Mr. Treeby has pointed out to me,
14   you're the man to speak to this issue for
15   WGI.  And you're telling me on the record that
16   you didn't really ask anybody anything about
17   this.  Isn't that what you're telling me?
18      A.  That's correct.
19      Q.  And you're telling me that you
20   really don't have a geotechnical -- the
21   geotechnical experience to even explain what
22   under-seepage is.  Right?
23      A.  That's correct.
24      Q.  Okay.  Well, --
25      MS. WAGER-ZITO:

Page 171

1      He also told you it wasn't in the
2   scope of work that WGI --
3      MR. BRUNO:
4      Well, wait a minute.  I thought
5   you said that was Roe's area.  You
6   just told me -- I mean, you can't have
7   it both ways.
8      MS. WAGER-ZITO:
9      I did not tell you --
10      MR. BRUNO:
11      Well, yes, you did.
12      MS. WAGER-ZITO:
13      I said groundwater.  Not
14   under-seepage.  They're different
15   issues.
16   EXAMINATION BY MR. BRUNO:
17      Q.  Okay.  So did you evaluate all of
18   the work plans in order to be prepared to
19   answer questions about 30?
20      A.  Did I evaluate all of the work
21   plans?
22      Q.  Yes.
23      A.  I reviewed in part the work plans.
24   Did I sit down and turn every page of every
25   work plan?  No.

Page 172

1      Q.  All right.  Well, one of the safety
2   precautions taken by WGI to prevent damage to
3   the flood protection system was the action
4   taken by WGI at the request of the Corps to
5   install the clay cap on the excavated hole
6   which was right next to that 15 foot line.
7   Isn't that at least one of the things that WGI
8   did?
9      A.  The clay cap?  I don't think -- If
10   you're talking about the excavation --
11      Q.  Yes.
12      A.  -- adjacent to the levee, --
13      Q.  Yes.
14      A.  -- clay cap wouldn't tell me that
15   that's what you're talking about.  But --
16      Q.  Well, I don't want to recover all of
17   what we have talked about before, but there
18   was -- how about this -- some recommendation
19   made by the Corps relative to its
20   investigation of the potential impact of the
21   excavation on the levee.  Right?
22      A.  Yes.
23      Q.  All right.  They told you to do
24   something; right?
25      A.  Yes.  We talked about the --

Page 173

1      Q.  I understand.  Whatever they told
2   you to do is a safety precaution or a measure
3   taken by you to prevent damage.  Even though
4   it wasn't at your own suggestion, it was -- it
5   falls within paragraph 30.  Right?
6      A.  I would say that it does.
7      Q.  Okay.  That's -- I just want you to
8   get a sense of what I am trying to focus on.
9   All right?  Now, does WGI understand that if
10   you dig a hole through the clay layer and
11   reach either a sandy layer of soil or a layer
12   of soil which would conduct water, that that
13   could potentially cause damage to a flood
14   control structure if the hole is near to a
15   flood control structure?
16      MR. EHRLICH:
17      Object to form.
18      THE WITNESS:
19      Not being responsible for the
20   geotechnical aspects of it, we didn't
21   have any evaluation of that.
22   EXAMINATION BY MR. BRUNO:
23      Q.  Well, you say not being responsible
24   for that.  Didn't you already acknowledge that
25   WGI had a general obligation not to damage the

Page 174

1  floodwall?
2      A.  Within the limits of our scope of
3  work.
4      Q.  All right.  Well, the limits of your
5  scope of work was to dig into the ground.
6  Right?  That was --
7      A.  It was.
8      Q.  -- without question.
9      A.  It was included within our work
10 scope.
11     Q.  No question.
12     A.  No question.
13     Q.  That your scope of work called for
14 you to dig into the ground; right?
15     A.  Yes.
16     Q.  There was no question that the scope
17 of your work called upon you to dig holes.
18 Isn't that true?
19     A.  No question.
20     Q.  No question.  No question that some
21 of those holes were as deep as 25 feet?
22 Right?
23     A.  No, I don't think that's -- I don't
24 know that to be true.  I mean, that -- that's
25 a number that you're throwing out there, but I

Page 175

1  don't know the basis for that number.  If you
2  can --
3      Q.  Yes.
4      A.  We documented the depth of each of
5  our excavations.  We may have had 100
6  excavations.  I haven't a clue as to where
7  that number comes from.
8      Q.  It comes from the excavation from
9  the removal of a concrete foundation at the
10 Boland site.
11     A.  Okay.
12     Q.  I mean, I didn't just pull it out of
13 the air.
14     A.  Okay.  Given that there's 100 plus
15 excavations, I haven't knowledge off the top
16 of my head of the depth of what the deepest
17 one was.
18     Q.  Well, and again that's why I said
19 some of those excavations went as deep as 25
20 feet.  Right?  You knew that, and that was
21 part of --
22     MS. WAGER-ZITO:
23          Asked and answered.
24     THE WITNESS:
25          No.

Page 176

1  EXAMINATION BY MR. BRUNO:
2      Q.  Oh, you don't know that?
3      A.  That excavations went as deep as 25
4  feet?
5      Q.  Yes.
6      A.  No, without reviewing the record, I
7  don't know that.
8      Q.  All right.  Well, let me show you
9  the work plan for the cofferdam installation
10 and concrete foundation removal, final work
11 plan, which is Bates numbered WGI-39041 in
12 seriatim to 39049.  And see if that doesn't
13 assist you in answering my question.
14     A.  Yeah, our work plan indicates that
15 we were prepared to go to minus 23 with
16 excavation.
17     MR. EHRLICH:
18          Joe, before you ask the next
19     question, do you mind if I just take a
20     quick look?
21     MR. BRUNO:
22          Of course not.
23     MR. EHRLICH:
24          Whenever you're done.
25     THE WITNESS:

Page 177

1          Sure.
2      MR. BRUNO:
3          You want to break for lunch?
4      MR. TREEBY:
5          You said 12:15.
6      MR. BRUNO:
7          Let him finish evaluating the
8      document.  Let me ask this line of
9      questions --
10     MR. TREEBY:
11          Sure.
12     MR. BRUNO:
13          -- and let Counsel for the
14     government review the document.
15          (Whereupon a discussion was held
16     off the record.)
17     MR. EHRLICH:
18          I'm going to ask that
19     document be attached to the deposition
20     as an exhibit.
21     MR. BRUNO:
22          Sure.  If you don't mind, we'll
23     supply another copy, though.
24     MR. EHRLICH:
25          Yes.

Page 178

1    MR. BRUNO:
2       Did you see it yet?
3    MR. EHRLICH:
4       I saw their version of it.
5    MR. BRUNO:
6       I said how did you do that?
7    Magic.
8    THE WITNESS:
9       This -- This tells me what our
10   plan was.  And it appears that the
11   initial plan was that we would go to
12   minus 23.  I mean, it -- it's not an
13   as-built of what we actually did.  And
14   then acknowledges that -- that as
15   necessary we'd go to minus 30.
16   EXAMINATION BY MR. BRUNO:
17     Q.  Right.  Well, that's -- I mean, help
18   me understand.  I thought you told me that the
19   work plans were the specifications.  Isn't
20   that a specification?
21     MS. WAGER-ZITO:
22       Objection.
23   EXAMINATION BY MR. BRUNO:
24     Q.  If it's not, it's not.  Either it is
25   or it's not.  Just tell me.

Page 179

1      A.  If this is the approved work plan,
2    then that is in part the specification.
3      Q.  All right.  Now, the -- All I was
4    giving you this document for is to confirm
5    that you guys knew that you would be digging
6    holes as deep as 30 feet on the site.  Right?
7    That's all I was asking you about.
8      A.  I don't -- I don't know if there
9    were any comments about that, but -- or
10   anything reviewed in the preparatory meeting
11   minutes.  If that was the final plan.  But
12   that's what it appears from that plan.
13     Q.  Well, the point I am making and the
14   question I asked you, you knew that you could
15   be digging holes as deep as 34 feet deep as
16   part of the work that you had contracted to do
17   for the United States Army Corps of
18   Engineers.  Right?
19     A.  No.  We know that one subcontractor
20   developed a work plan that proposed digging to
21   that depth to remove a concrete block.
22     Q.  Okay.  Well, after that
23   subcontractor gave you the proposal, you then
24   knew that that subcontractor and, therefore,
25   you, might be digging to a depth of negative

Page 180

1    34 feet.  Right?  That's what it says.
2      A.  That's what's indicated there.  Yes.
3      Q.  Right.  Now, and we also knew that
4    this hole was within 300 feet of the
5    floodwall.  Right?
6      A.  I don't think there's any question
7    about that.
8      Q.  Okay.  Now, so with regard to the
9    potential, you knew that there's a hole, it's
10   within 300 feet, and it could go as deep as 34
11   feet.  Right?  And your testimony is that the
12   WGI did not at any time evaluate the potential
13   for that proposed excavation depth, because we
14   may not ever get down there, --
15     A.  Uh-huh (affirmatively).
16     Q.  -- did not evaluate the potential
17   for that hole to cause any damage to the
18   floodwall.  Right?
19     A.  That's correct.
20     Q.  Okay.  And you are telling me that
21   the way WGI interpreted the TERC, the Task
22   Order 26, the work orders, the work plans,
23   that you were not called upon, nor were you
24   expected by the Corps, to make such an
25   evaluation.  Is that correct?

Page 181

1      A.  That's correct.
2      Q.  All right.  And as you understood
3    the way the Corps was addressing this issue
4    through your experience on the site, the Corps
5    while on site may tell you that there was a
6    potential problem and that they were going to
7    investigate the potential for the hole to
8    affect the floodwall?  Is that correct?
9      A.  It was a long question.  You lost me
10   from the beginning to the end.
11     Q.  All right.  Let me read it to you.
12   And as you understood the way the Corps was
13   addressing this issue through your experience
14   on the site, the Corps while on site may tell
15   you that there was a potential problem, but
16   that they were going to investigate the
17   potential for the hole to affect the
18   floodwall.  Is that correct?
19     A.  Yes.
20     Q.  All right.  Did you understand that
21   in the process of -- Let's -- You have already
22   testified that this work plan is a work plan
23   that would have been given to the Corps for
24   their approval.  Right?
25     A.  It would have been submitted to the

PHILLIP STAGGS                                                    4/26/2008

Page 182

1    Corps.
2        Q.  All right.  And there's nothing on
3    this work plan that addresses the question of
4    the potential for the work to damage a
5    floodwall.  Right?  You looked at it.
6        A.  I didn't see anything in there.
7        Q.  Nothing in here.  Okay.  Now, what
8    was your understanding of the purpose of the
9    Corps' evaluation of this document?  And I am
10   going to 39041 and 39049.  What was it that
11   the Corps was evaluating as far as you
12   understood it?
13       A.  Really everything from contractor
14   means, methods, equipment, safety.  Just the
15   -- the entire work associated with that work
16   plan.
17       Q.  Okay.  Did you know as a matter of
18   fact that the Corps was going to evaluate this
19   work plan to ascertain whether or not the work
20   contemplated by this work plan was going to
21   damage the floodwall?  Did you know that as a
22   fact?
23       A.  I think it would be a reasonable
24   expectation.
25       Q.  That wasn't the question.  Did you

Page 183

1    know it as a fact, yes or no?
2        A.  We would accept that as a fact.  I
3    mean, we would -- WGI would consider that --
4    that that would be the government's
5    responsibility.
6        Q.  That's fine, but that wasn't the
7    question.  I need you to answer my question,
8    which is did you understand that as a matter
9    of fact, not conjecture, not supposition, not
10   hope, not expectation, did you know as a
11   matter of fact whether or not the United
12   States Army Corps of Engineers, in evaluating
13   this cofferdam installation and concrete
14   foundation removal, final work plan, did you
15   know as a matter of fact that the Corps was
16   evaluating this work plan for, among other
17   reasons, whether or not this work as proposed
18   would damage the floodwall?
19       A.  Do I know that as a fact?  No.
20       Q.  All right.  Now, you have told me,
21   though, that you have this expectation, this
22   hope, this whatever, that's what you said.
23   Right?  A few moments ago.
24           MS. WAGER-ZITO:
25               Object to the form.

Page 184

1    EXAMINATION BY MR. BRUNO:
2        Q.  In connection with the question that
3    I previously proposed, did you not tell me
4    that you had some expectation or some belief
5    that the Corps would do that evaluation?
6        A.  Yes.
7        Q.  Yes or no?  All right.  Now, what is
8    the basis for that statement?  Do you have any
9    documents, conversations, anything that allows
10   you to reach that conclusion and, if so, what
11   are they?
12       A.  I think probably a number of
13   things.  I would say, one, the absence of any
14   geotechnical engineering requirement by WGI.
15   Any -- The previous evaluation of the levee
16   and potential impacts to the levee from the
17   McDonough excavations.  Those two for certain.
18       Q.  Okay.  Well, how do you know that
19   the McDonough excavations was before December
20   6, '01?
21       A.  It may not have been.
22       Q.  I know.  So that's obviously off the
23   table.  And the other thing you say is because
24   there's no geotechnical --
25           MS. WAGER-ZITO:

Page 185

1           Objection.
2    EXAMINATION BY MR. BRUNO:
3        Q.  Well, is it -- You're going to tell
4    me that you don't even know when the McDonough
5    evaluation took place and now you're going to
6    tell me that that forms the basis for your
7    opinion that the government probably evaluated
8    this to determine whether or not the
9    excavation would damage the levee?  That's
10   what you're telling me?  Just -- Since
11   Counsel's chuckling, I want to make sure that
12   we make this clear for the record.  And more
13   chuckles by Mr. Treeby.
14           MR. TREEBY:
15               It's hard to know how anything
16           could be clear from that mess.  I'm
17           reading it.  It's hard to be clear.
18           It's not clear.  Make a clear
19           question.  Make a clear question.
20           MR. BRUNO:
21               Well, we'll try.  We'll try
22           really hard.
23           MR. TREEBY:
24               Do it again.
25           MR. BRUNO:

PHILLIP STAGGS                                                    4/26/2008

Page 186

1        All right.
2   EXAMINATION BY MR. BRUNO:
3        Q.  I asked you for what information you
4   had, be it documents, conversations, anything,
5   that would support your view that the United
6   States Army Corps of Engineers probably
7   evaluated this work plan to determine whether
8   or not the proposed work could damage the
9   levee.  And you told me in response, I
10  thought, the absence of a geotechnical request
11  for engineering services.
12       A.  Uh-huh (affirmatively).
13       Q.  And the previous, you said,
14  McDonough experience.  Right?  Yes?
15       A.  Yes.
16       Q.  All right.  Now, then I asked you
17  when did the McDonough experience occur and
18  you said you didn't know.  Right?
19       A.  I don't know the -- specifically.
20       Q.  All right.  Not knowing when the
21  McDonough experience occurred means then that
22  it's really unfair for you to suggest that
23  that's the basis of that opinion.  Right?
24       A.  That may be right.
25       Q.  Because we don't know when that

Page 187

1   occurred.
2        A.  That may be correct.
3        Q.  So I'm trying to --
4            MR. BRUNO:
5            You want to answer for the
6        witness now, Mr. Treeby?  All right.
7        Fine.
8            MR. TREEBY:
9            Your logic is lacking, Mr. Bruno.
10           MR. BRUNO:
11           Well, the witness is answering
12       affirmatively, Mr. Treeby.
13           MR. TREEBY:
14           The record is there.
15           MR. BRUNO:
16           Yes, the record is there.  The
17       record is there.
18  EXAMINATION BY MR. BRUNO:
19       Q.  Do we know when, since we -- the
20  McDonough issues arose time-wise?
21       A.  I don't recall.
22       Q.  All right.
23       A.  I think there's a general assumption
24  that the Corps of Engineers was in part
25  responsible for construction of the levee

Page 188

1   system and maintenance, and I know that Jim
2   Montegut, part of his responsibility during
3   the course of the project was that they
4   actually rode and did a visual of the levees
5   when the -- when the river reached a certain
6   flood stage, reached a certain level.  So I'm
7   -- the government, the Corps of Engineers are
8   the levee experts.
9        Q.  Right.
10       A.  I mean, that would -- that would be
11  the basis for our assumption that they
12  considered it in all things.
13       Q.  All right.  Well, here's where I get
14  confused with that.  Okay?  Because you're
15  saying they're the levee experts.  That's
16  fine.  And they're riding the top of the
17  levee.  And now I am asking you, though, about
18  what's happening underground.  And so you're
19  assuming that something happening underground
20  is of interest to the Corps.  Right?
21       A.  I assume that any consideration
22  should be performed by them.  They're aware of
23  the levee construction; they're aware of the
24  work that we're doing; and that they would
25  make a connection between the two and do any

Page 189

1   evaluation that was necessary.
2        Q.  All right.  You see, but here's the
3   problem.  In answering the question about
4   evaluating the cofferdam, you are assuming it
5   to be true that there's a connection between
6   the cofferdam and the potential for harm.
7   Right?
8        A.  You presented that as the premise.
9        Q.  No, I didn't.
10           MR. TREEBY:
11           Yes, you did.
12           MS. WAGER-ZITO:
13           Yes, you did.
14           MR. BRUNO:
15           No, no, no, no, no.  No, I
16       didn't.
17           MR. TREEBY:
18           Absolutely.  Absolutely.
19  EXAMINATION BY MR. BRUNO:
20       Q.  I asked you if they had done the
21  evaluation.  Right?  That's what I asked you.
22  Did they do an evaluation.  And your answer
23  was "I think they probably did".  Right?
24           MR. TREEBY:
25           Object to the characterization of

JOHNS PENDLETON COURT REPORTERS                       800 562-1285

PHILLIP STAGGS                                      4/26/2008

Page 190

1      the witness' testimony.
2      EXAMINATION BY MR. BRUNO:
3      Q.  Is that what you said?  Yes or no?
4          MR. TREEBY:
5              The record will show what he
6      said.
7      EXAMINATION BY MR. BRUNO:
8      Q.  Is that what you said?
9      A.  Look at the record and see what I
10     said.
11     Q.  It says -- Well, we can go back.  It
12     says just that.
13         MR. TREEBY:
14             But --
15         MR. BRUNO:
16             You want me to show it to him?
17         MR. TREEBY:
18             Objection.  I just think you're
19     -- I don't know what you're doing,
20     but it's not fruitful, whatever it is,
21     for anyone.
22         MR. BRUNO:
23             Because you don't believe it's
24     fruitful, I don't really care about
25     what you think.  Okay?

Page 191

1          MR. TREEBY:
2              That's fine, but don't try to
3      recharacterize what the witness said
4      unless you're going to --
5          MR. BRUNO:
6              Fine.  Then I will ask him
7      again.  I will keep asking it until we
8      can get something rock solid in your
9      collective memory that that's what he
10     said.
11         MR. TREEBY:
12             We have a record.
13         MR. BRUNO:
14             Yeah, I know we have a record and
15     I am trying to ask a question --
16         MR. TREEBY:
17             Use it.
18         MR. BRUNO:
19             -- about a previous question.
20     EXAMINATION BY MR. BRUNO:
21     Q.  Now, didn't you tell me that you had
22     an expectation that the government would have
23     evaluated this cofferdam work plan to
24     determine whether or not it may impact the
25     levee?

Page 192

1      A.  Yes.
2          MR. EHRLICH:
3              Objection.
4      EXAMINATION BY MR. BRUNO:
5      Q.  Okay.  Doesn't that mean that you
6      would have some suspicion that an excavation
7      may be relevant to whether or not it could
8      impact the levee?
9      A.  I think the government had a
10     responsibility to review all of the
11     excavations, not anything unique to this one.
12     But in general that responsibility.
13     Q.  And that's because excavations could
14     impact negatively the flood control structure;
15     right?
16         MR. EHRLICH:
17             Object to the form.
18         THE WITNESS:
19             Excavations could.
20     EXAMINATION BY MR. BRUNO:
21     Q.  Okay.  But that's why you're saying
22     what you're saying.  Excavations may cause a
23     problem and you would expect the United States
24     Army Corps of Engineers to evaluate
25     excavations for that reason; right?

Page 193

1      A.  Yes.
2      Q.  Okay.  Thank you.
3          MR. BRUNO:
4              Let's break for lunch.
5          VIDEO OPERATOR:
6              We're off the record.  It's
7      12:27.
8          (Recess.)
9          VIDEO OPERATOR:
10             Returning to the record, it is
11     1:29.
12     EXAMINATION BY MR. BRUNO:
13     Q.  Okay.  Mr. Staggs, before we broke
14     for lunch we were -- Just to get you
15     recentered on where we were, let's see, I was
16     asking you about -- I said "Doesn't that mean
17     that you would have some suspicion that an
18     excavation may be relevant to whether or not
19     it could impact the levee?" and your answer,
20      "I think the government had a responsibility
21     to review all of the excavations, not anything
22     unique to this one.  But in general that
23     responsibility."  And then my question "And
24     that's because excavations could impact
25     negatively the flood control structure;

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

Page 194

```
 1   right?"  "Objection to form," and your answer
 2   "Excavations could."  "Okay.  But that's why
 3   you're saying what you're saying, excavations
 4   may cause a problem and you would expect the
 5   United States Army Corps of Engineers to
 6   evaluate excavations for that reason; right?"
 7   Answer, "Yes."
 8             That's where we were.
 9             Can I conclude from that question
10   and answer then that WGI did not believe it
11   had any obligation to warn the government
12   about the potential for harm to the flood
13   control structure arising out of excavations
14   that may have been contemplated by any of
15   these work plans on that site?
16       A.  I think that we -- we considered
17   that the government had that responsibility
18   and I think if you -- Could you -- It was a
19   long question.  Can you go through the
20   question again?
21       Q.  I think it was just simply this.
22   Can I conclude from the questions and answers
23   that I read to you that WGI did not believe it
24   had any obligation to warn the government,
25   okay?  About the potential for harm to the
```

Page 195

```
 1   structure, the flood control structure,
 2   arising out of any excavations that were
 3   contemplated by any of these work plans on the
 4   site?
 5           MR. EHRLICH:
 6             Object to the form.
 7           THE WITNESS:
 8             I think that's correct.
 9   EXAMINATION BY MR. BRUNO:
10       Q.  All right.  I think you've testified
11   that WGI knew that there was a potential for
12   damage to a levee arising out of digging
13   excavations and that you assumed that the
14   government was going to evaluate that
15   potential; right?
16       A.  Yes.
17       Q.  Okay.  And, I mean, this is obvious,
18   but clearly the objective of the contract was
19   certainly not to damage the levee.  Right?
20       A.  Yes.
21       Q.  Okay.  And that consequence was not
22   in the plans or the specifications; right?
23       A.  No.
24       Q.  Okay.  And so when WGI did the
25   digging, it was doing the digging to remove
```

Page 196

```
 1   the concrete structure or whatever it was you
 2   were pulling out and really you weren't
 3   digging to in any way address whatever the
 4   Corps had in the back of its mind with regard
 5   to the flood control project; right?
 6       A.  The excavation of the concrete was
 7   -- was strictly that: the excavation of the
 8   concrete.
 9       Q.  All right.  And, of course, in fact
10   then, because of everything that you have told
11   me, the Washington Group in fact did not warn
12   the government about the fact that excavations
13   that it had to do to remove these concrete
14   structures -- and I think in the case of this
15   one, was at least 20 feet.  How about that?
16   Fair enough?
17       A.  Uh-huh (affirmatively).
18       Q.  All right.  This one being the
19   cofferdam.  It didn't warn the government of
20   any potential hazards associated with digging
21   the cofferdam at the Boland site.  Right?
22       A.  That's correct?
23       Q.  Okay.  Now, I neglected to ask you,
24   and forgive me, I am switching the subject on
25   you; all right?  I am going back to the
```

Page 197

```
 1   meetings, the weekly meetings --
 2       A.  Yes.
 3       Q.  -- with Mr. --
 4           MS. WAGER-ZITO:
 5             Montegut.
 6   EXAMINATION BY MR. BRUNO:
 7       Q.  -- Montegut.  Those meetings, was
 8   there any sort of written record or written
 9   report made regarding, first, the fact of the
10   meeting?
11       A.  I don't think there were -- I don't
12   think there was at all.  There may have been
13   for the first few.
14       Q.  Okay.
15       A.  But when it was just one-on-one with
16   me and Montegut, there were no meeting
17   minutes.
18       Q.  Okay.  To the extent there may have
19   been any meeting minutes, what information
20   would have been recorded in those minutes?
21           MR. EHRLICH:
22             Object to the form.
23           THE WITNESS:
24             I don't think there were any
25           meeting minutes.
```

Page 198

1  EXAMINATION BY MR. BRUNO:
2     Q.  Okay.
3     A.  But -- But we would just take notes
4  as to direction, any points that the
5  government, you know, that they made regarding
6  our approach to the work or anything we were
7  to do differently than what we had planned.
8     Q.  Okay.  How about the meetings -- I'm
9  sorry, how about the interaction with quality
10 assurance folks?  Was there a record, written
11 record made of interaction with the quality
12 assurance people?
13    A.  There was if they gave us specific
14 direction on something.  We would include it
15 in our daily QC report under -- There's a
16 section for -- I believe there's a section for
17 government direction.
18    Q.  Okay.
19    A.  Or if there's not, it would still be
20 annotated in there.
21    Q.  Now, the daily quality control
22 report, was that for WGI or was that for the
23 Corps?  In other words, why was that report
24 made?
25    A.  It was a requirement to be

Page 199

1  submitted, but it was to document the
2  manpower, equipment, weather, work performed,
3  inspections performed, et cetera.
4     Q.  All right.  And I may have asked you
5  this, but allow me just to round it out and
6  move on.  You cannot as you sit here today
7  recollect any meeting with any quality
8  assurance person of the Corps wherein the
9  subject of the potential for the work to harm
10 the levee was discussed?
11    A.  I don't recall such a -- such a
12 meeting or discussion.
13    Q.  All right.  And if there was such a
14 discussion, how likely is it that a written
15 record would have been made of that?
16       MR. EHRLICH:
17          Object to form.
18       THE WITNESS:
19          If there was a direction, then
20       there probably would be a written
21       record.
22 EXAMINATION BY MR. BRUNO:
23    Q.  Okay.
24    A.  If there was a discussion, then it
25 depends on the nature of the discussion.

Page 200

1     Q.  I understand.  I understand.  But if
2  they told you to do something, I think I am
3  hearing you say that would have been written
4  down.
5        MR. EHRLICH:
6           Object to the form.
7        THE WITNESS:
8           Generally it would.
9  EXAMINATION BY MR. BRUNO:
10    Q.  So let me, if I may, use this
11 cofferdam installation and concrete foundation
12 removal final work plan to understand the
13 government's role, okay, not you, the
14 government's approval process and the like.
15 Okay?
16    A.  Okay.
17    Q.  Now, you have already testified that
18 -- Well, let me ask you this question.  Why,
19 if it was necessary to draft a final -- I'm
20 sorry, a cofferdam -- withdrawn.  Why was it
21 necessary for WGI to draft a cofferdam
22 installation and concrete foundation removal
23 final work plan if there already was in
24 existence a project work plan?
25    A.  It was site specific one.  That

Page 201

1  particular --
2     Q.  You need to see it?
3     A.  Look at it.
4     Q.  Of course.  Forgive me for tossing
5  it to you.
6        MR. EHRLICH:
7           That will be Exhibit 7?  Because
8        you said you would attach it.
9        MR. BRUNO:
10          Oh, yes, I will.  We haven't --
11       You have asked me to attach it and we
12       have agreed to attach it and we will
13       mark it as --
14       MR. EHRLICH:
15          I think 7.
16       MR. BRUNO:
17          7 is the next number?  Yes, 7 is
18       the next number.
19 EXAMINATION BY MR. BRUNO:
20    Q.  If you don't mind, let me hand that
21 to you.  Thank you.
22    A.  I think it was required for a couple
23 of reasons.  One, when the project work plan
24 was developed, this particular piece of work
25 had not been discovered, this large block that

PHILLIP STAGGS                                                    4/26/2008

Page 202

1   had to be removed.  It was subsurface.  So we
2   didn't know about it.  And the subcontractors
3   developed specific detailed plans for
4   individual work activities.
5       Q.   Okay.  The simple, direct answer is
6   WGI didn't know it was going to have to remove
7   that structure when it drafted the project
8   work plan; right?
9       A.   That's correct.
10      Q.   Okay.
11      A.   And that is not WGI's work plan.
12  That's a subcontractor work plan.
13      Q.   Well, but it's you.
14      A.   True.
15      Q.   WGI's ultimately responsible for it?
16      A.   Yes.
17      Q.   Okay.  I understand that this
18  company was subcontracted to WGI.
19      A.   Yes.
20      Q.   All right.  And it would have been
21  WGI that would have submitted this work plan
22  to the Corps, not Hamp's; right?
23      A.   Yes.
24      Q.   Okay.  So that document is prepared,
25  maybe not by WGI, but by one of WGI's

Page 203

1   subcontractors and, of course, WGI stands
2   behind whatever they recommend there; right?
3       A.   It's our subcontractor's work plan
4   to accomplish the work.  If we found something
5   unreasonable in there, we would comment on it
6   and ask them to revise it.
7       Q.   Well, isn't that then saying that
8   once WGI reviewed it, comments were exchanged;
9   what was submitted to the Corps was what was
10  approved by WGI?  Right?
11      A.   I think that that's a fair
12  understanding.
13      Q.   Okay.  And you have already
14  indicated that -- and I don't think between
15  the lawyers we have been able to figure out
16  whether or not that's the approved plan.
17  Okay?  But that would be submitted to the
18  Corps as you've testified; right?
19      A.   Yes.
20      Q.   All right.  Now, who at the Corps
21  would receive the submittal?
22          MR. EHRLICH:
23          I object to form.
24          THE WITNESS:
25          I believe that went to the

Page 204

1       District office, but I don't know.
2   EXAMINATION BY MR. BRUNO:
3       Q.   Okay.  So there wasn't a person that
4   you worked with who would -- you know, you
5   would hand it over to them?
6       A.   They have different technical
7   experts, so you would give it to the Corps and
8   they would distribute it internally to the
9   appropriate reviewer.  Now, this plan, it may
10  have been reviewed only by -- by Jim
11  Montegut.  I don't know.  We would have to
12  look at the transmittal to see who reviewed
13  and approved it.
14      Q.   Well, with regard to what you need,
15  WGI, to satisfy yourself that it's been
16  approved by the government, would you have
17  been satisfied with Montegut's signature?
18      A.   Yes.
19      Q.   You see what I am saying?  In other
20  words, I am trying to figure out who -- at
21  what point does WGI get satisfied that the
22  Corps approves, so Montegut could approve it?
23      A.   I believe Mr. Montegut could approve
24  it.
25      Q.   He could approve it.  All right.

Page 205

1   And the WGI doesn't know, or does it, perhaps
2   maybe you do, do you know or not know how the
3   government goes about the approval of a work
4   plan like that?
5       A.   I would have to look at the
6   documents and see if they were all reviewed by
7   Jim Montegut or if others reviewed it.  I
8   don't know what the review process was.
9       Q.   Right.  I wasn't asking you about
10  Jim -- I was just trying to get a sense of
11  whether the WGI in fact knew what the process
12  was on the side of the Corps when they
13  reviewed these documents.  And the answer is
14  you really don't know?
15      A.   No.
16      Q.   Okay.  And so you really don't know
17  what it was, if anything, that the Corps was
18  evaluating when they evaluated a work plan
19  like Exhibit 7.  Right?  Isn't that true?
20      A.   Do I -- Do I know what they
21  evaluated when they reviewed our work plans?
22      Q.   Yes.
23      A.   No.
24      Q.   Okay.  Do you recall receiving any
25  comments by the Corps on this work plan?

PHILLIP STAGGS                                        4/26/2008

Page 206

1      A.  I do not.
2      Q.  Now, does that work plan, as it's
3  sitting on the table -- because once again I
4  have told you I don't know if I have a
5  complete document.  I am just going through
6  the production and doing my best.  Are there
7  any more documents that would make up this
8  work plan other than what's on the table?
9      A.  I think that would -- the -- that
10  would be the complete document.  I believe.
11      Q.  All right.  So in terms of
12  specifications for the work, and you remember
13  our discussion about where would I go to
14  look?  Can I conclude that for me to
15  understand what the specifications for the
16  work that was contemplated to be done by WGI
17  for the removal of that -- I think they call
18  it a wedding cake structure, --
19      A.  Yes.
20      Q.  -- the concrete thing?  They're
21  provided in Exhibit Number 7; right?
22      A.  No.
23      Q.  Where?
24      A.  Not in their entirety, because you
25  have the preparatory -- If there's indeed a

Page 207

1  separate preparatory meeting before this.  I
2  don't know whether there was or not.  But for
3  some items there was preparatory and you would
4  have additional -- you would have a review of
5  the work plan with the subcontractor,
6  Washington, and the government representatives
7  and it is possible there was one for that.
8  Because it was a unique piece of work.
9      Q.  Okay.  Would the work plan reference
10  a preparatory plan?
11      A.  I don't -- I don't they do.
12      Q.  All right.  And if we wanted to
13  figure it all out, how would we find out
14  whether or not there was a preparatory work
15  plan or not?
16      A.  There is a record of every
17  preparatory that was held.
18      Q.  Okay.  And would that be -- you know
19  how there is in the close-out document,
20  there's a list of all the modifications of the
21  TERC?  It lists every single one of them?
22      A.  The close-out document?
23      Q.  On the close-out document, yes.
24  Would that include these preparatory meetings
25  as well?

Page 208

1      A.  I don't know.  I am not familiar
2  with that, what you're talking about.
3      Q.  Oh, okay.  All right.  Now, just so
4  I can reference the preparatory stuff, it says
5  here in the work plan that you're installing a
6  sheet pile cofferdam.  Can I gather from that
7  that to the extent there may have been this
8  preparatory document, that obviously that
9  preparatory document didn't address the
10  installation of the sheet pile cofferdam?
11         MR. EHRLICH:
12          I object to the form.
13         MS. WAGER-ZITO:
14          Object.
15         THE WITNESS:
16          You would -- You would review the
17      plan during the preparatory so that
18      the preparatory would -- it was a
19      prework planning meeting.
20  EXAMINATION BY MR. BRUNO:
21      Q.  Okay.
22      A.  So you would go through the
23  process.  You know, the subcontractor's work
24  plan, equipment, manpower, schedule, et
25  cetera.

Page 209

1      Q.  Well, --
2      A.  Safety considerations.
3      Q.  Yes.  I was asking you about
4  specifications, though.  Would the -- and I
5  thought that the -- the reason why you talked
6  to me about this preparatory meeting or the
7  preparatory document is because the
8  preparatory document might have some
9  specifications that are not contained in the
10  work plan.  Did I get that wrong?
11      A.  Yes.  No, that's correct.
12      Q.  That's correct.  Okay.  So what I am
13  trying to figure out is what specifications
14  might be in the preparatory document that are
15  not in the work plan?
16      A.  There may have been a clarification
17  of what's in the work plan.
18      Q.  Okay.
19      A.  There may be a more specific
20  requirement.  There may be something
21  generically addressed in there and there would
22  be a more specific requirement defined in the
23  work plan.
24      Q.  All right.
25      A.  I mean, in the preparatory meeting.

53 (Pages 206 to 209)

PHILLIP STAGGS                                          4/26/2008

Page 210

1      Q.  Now, it says here, under "Backfill
2  excavations", it says "Immediately following
3  the pile extraction operations".  So that
4  there were obviously some piling removed;
5  right?
6      A.  Yes.
7      Q.  Was anything put in the voids
8  created by the removal of the piling?
9      A.  They were -- They were backfilled
10  with an excavator or dozer or a combination
11  thereof.
12      Q.  Maybe I confused you.  It says
13  "Piling removal".  "After the concrete
14  foundations have been removed," that wedding
15  cake thing, --
16      A.  Yes.
17      Q.  -- "Hamp's will be prepared to
18  remove pilings that may be present at the base
19  of the excavation."  So I am not talking about
20  the cofferdam pilings.  I am talking about the
21  pilings that were -- may have been there at
22  the base.
23      A.  Right.
24      Q.  Okay.  Do you recall whether piling
25  were removed from the base?

Page 211

1      A.  I believe pilings were removed.
2      Q.  Okay.  And those things go down
3  pretty deep, don't they?
4      A.  I don't recall how long they were.
5      Q.  Well, they're longer than ten feet?
6      A.  I think most of them probably were.
7      Q.  Okay.  And so that there's
8  obviously, when you pull out a pile, there's a
9  void created over the length of the piling
10  that you pulled out; right?
11      A.  Yes.
12      Q.  Okay.  And so just running a
13  bulldozer on top of those holes is not going
14  to fill up all the voids, is it?
15      A.  No, it'll fill up a portion of the
16  void.
17      Q.  A portion.  Okay.  And so this -- at
18  least this piece of paper, maybe there are
19  others, but the only thing that this piece of
20  paper says to do about filling those voids is
21  to backfill with either import sand or on-site
22  borrow back to original grade.  That's what it
23  says.
24      A.  Yes.
25      Q.  All right.  So we now know we have

Page 212

1  the potential for voids where the sheet pile
2  were that are not filled with either borrow --
3      MR. BRUNO:
4        Am I saying it right to your
5  satisfaction yet?  Borrow?
6      MR. TREEBY:
7        Did you mean sheet pile in that
8  question?
9      MR. BRUNO:
10        I didn't mean sheet pile.  I
11  meant pile.  Thank you, Bill.
12      MR. TREEBY:
13        You're welcome.
14  EXAMINATION BY MR. BRUNO:
15      Q.  When you pull a pile from the bottom
16  of the hole --
17      A.  Uh-huh (affirmatively).
18      Q.  -- and you run the equipment over
19  it, WGI knows there's going to be some voids
20  below that surface; right?
21      A.  I think that's expected.
22      Q.  Okay.  And the backfill excavation
23  specification is found at page 39044.  Right?
24      A.  Okay.
25      Q.  Do you have more -- Do we know if

Page 213

1  this has been approved or -- No?
2      MS. WAGER-ZITO:
3        This is the same document we
4  showed him before.  It's the same as
5  yours.  It's got different Bates
6  numbers, so don't refer to Bates
7  numbers.
8      MR. BRUNO:
9        Oh, I won't.  Okay.
10      MS. WAGER-ZITO:
11        Right now he is looking at the
12  same page that you are.
13      MR. BRUNO:
14        So it's a Corps copy though?
15      MS. CLAYMAN:
16        Yes.
17      MR. BRUNO:
18        Okay.  Can we give the Corps
19  Bates numbers just so we can
20  cross-reference them?  Would that be
21  okay?
22      MS. CLAYMAN:
23        Sure.
24      MS. WAGER-ZITO:
25        It's fine.  I mean, he can tell

                        54 (Pages 210 to 213)

PHILLIP STAGGS                                                    4/26/2008

Page 214

```
1    you the Bates number of the page he's
2    looking at right now.
3        MR. BRUNO:
4        Yes, I just want the whole series
5    of the Corps documents.  That's all.
6        MR. EHRLICH:
7        Why don't you attach yours as an
8    exhibit?
9        MR. BRUNO:
10       Mine is attached.  It's the other
11   one that I want to attach.
12       MS. CLAYMAN:
13       Just read the Bates number.
14       MR. EHRLICH:
15       But when you say attached, we all
16   know what copy.
17       MR. BRUNO:
18       Yes, but there are two different
19   sets of Bates numbers.
20       MR. EHRLICH:
21       What does it matter if it's
22   attached as an exhibit to the
23   deposition?
24       MR. BRUNO:
25       Because it matters to me to know
```

Page 215

```
1    the Bates numbers.  That's all I am
2    trying to do, is cross-reference Bates
3    numbers.  That's all.  It ain't heavy,
4    man.
5        MS. WAGER-ZITO:
6        I'll telling you right now I'm
7    going to give you the Bates numbers,
8    but this is a longer document than the
9    one you're looking at, Joe.
10       MR. BRUNO:
11       Primarily why I want the Bates
12   numbers.
13       MS. WAGER-ZITO:
14       So it's --
15       MR. EHRLICH:
16       Then we have it
17   cross-referenced.
18       MS. WAGER-ZITO:
19       NCS-055-000000002 and then
20   through 37.
21       MR. BRUNO:
22       All right.  Great.
23   EXAMINATION BY MR. BRUNO:
24       Q.  Now, can we trade?
25       MR. BRUNO:
```

Page 216

```
1        Can I look at that one, please,
2    if it's all right?
3        MR. TREEBY:
4        It's got their comments --
5        MS. WAGER-ZITO:
6        No.  It's got our commenting on
7    it.
8        MR. BRUNO:
9        Oh, it's got comments?  Okay.
10       MS. CLAYMAN:
11       Sorry.
12       MR. BRUNO:
13       Never mind.
14       MS. WAGER-ZITO:
15       Give him back that one.
16       MR. BRUNO:
17       All right.  Well, can we learn if
18   there are any comments in the stack of
19   paper that Counsel is looking at,
20   without referring to any of your
21   lawyer notes, by the Corps on the work
22   plan?
23       MR. TREEBY:
24       There are highlights right there.
25       MR. BRUNO:
```

Page 217

```
1        Bill, I don't want to know about
2    that.  Don't even mention the
3    highlights.  Just let him tell me if
4    there's comments, yes or no.  Don't
5    tell me that they're highlighted.
6    Just tell that there are comments.
7    Because I don't want your work
8    product.
9        MS. WAGER-ZITO:
10       There's no handwritten comments
11   on this document.
12       MR. BRUNO:
13       Okay.  Fair enough.
14       MS. WAGER-ZITO:
15       There's no comments on here that
16   reflect it's the Corps looking at this
17   at the time and commenting on it.
18   This is the same document you're
19   looking at.  It's more pages.
20       MR. BRUNO:
21       It's the Corps document; right?
22   It came out Corps files?
23       MS. WAGER-ZITO:
24       Yes.
25       MR. BRUNO:
```

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

Page 218

1        So I have to -- One, was it not
2   reasonable to assume that there might
3   be some Corps comments on there?  And
4   since I can't see it, is it not
5   reasonable for me to ask the witness
6   to look at the document to see if
7   there are Corps comments?  I just
8   don't know why this is so difficult.
9        THE WITNESS:
10        Don't appear to be any -- don't
11   appear to be any comments.
12   EXAMINATION BY MR. BRUNO:
13   Q.  All right.  Thanks.
14        Okay.  We were at the backfill
15   excavations and again Counsel has indicated
16   that the Bates numbers are different.  And I
17   don't need to see what you're looking at.
18   Just let me show you what I am looking at.
19   Are we on the same page?
20   A.  Yes.
21   Q.  All right.  Would you agree with me
22   that these are the backfill specifications as
23   outlined in this particular work plan?
24   A.  Yes.
25   Q.  All right.  And do you know in fact

Page 219

1   whether there are any other more specific
2   specifications regarding backfill other than
3   what you see here in front of you?
4   A.  I do not believe there are.
5   Q.  All right.  Now, do you know what
6   material you guys used to backfill the, I'm
7   going to call it the wedding cake hole on the
8   Boland Marine site?
9   A.  I don't recall.  I'd have to look at
10   -- It would be the material that came out of
11   there and whatever the balance was that -- to
12   fill it back up to grade.
13   Q.  All right.  Would you agree with me
14   that at least according to this specification
15   on Exhibit 7, you had the option to use either
16   on-site borrow --
17        MR. TREEBY:
18        Good.
19   EXAMINATION BY MR. BRUNO:
20   Q.  -- or import sand?
21   A.  Yes.
22   Q.  Okay.  And can I also conclude that
23   both of these materials would accomplish the
24   same thing with regard to backfilling the
25   hole?

Page 220

1   A.  I think in general, yes.
2   Q.  Is one better than the other one?
3   In other words, is sand better than on-site
4   borrow?  Or is borrow better than sand?  Or is
5   the material that you took out of the hole
6   better than the other two?
7   A.  What do you mean by "better"?
8        MR. EHRLICH:
9        Object to the form.
10   EXAMINATION BY MR. BRUNO:
11   Q.  Okay.  Good question.  In terms of
12   what you -- to best accomplish the goals as
13   elucidated by the TERC and Task Order 26.
14   A.  I think either one would be
15   acceptable.
16   Q.  Now, based upon your knowledge, your
17   many, many, years of knowledge in the
18   contracting business, particularly as it
19   relates to filling holes near a floodwall, to
20   the extent you have any such experience, is
21   any one of these things better than the
22   other?  Import sand, borrow, or putting back
23   in the hole what you took out?
24   A.  From a technical standpoint, I mean,
25   I am not a geotech.

Page 221

1   Q.  I never said that.  Just based on
2   you.  Just you.
3   A.  If one works better than the other,
4   no, I don't.
5   Q.  That's fine.  I didn't mean to
6   suggest that I was making you into something
7   that you're not.  You as you're sitting here
8   based upon your own personal experience in the
9   construction business, that was the intent of
10   my question.  So if you don't mind, just
11   answer it based on that.
12        MR. TREEBY:
13        He did.
14        MS. WAGER-ZITO:
15        He did.
16   EXAMINATION BY MR. BRUNO:
17   Q.  Okay.  But just help me out here,
18   because I had all the other stuff.  Based upon
19   you as a contractor, your testimony is you
20   can't say one's better than the other; right?
21   A.  That's correct.
22   Q.  All right.  When the sheet -- You
23   see here, it says "During backfill operations
24   of the southern block, the whalers and struts
25   associated with the cofferdam will be

Page 222

1  extracted"?  And then it says "The sheet pile
2  will be removed upon completion of backfill
3  operations"?
4      A.  Yes.
5      Q.  Do you see that?  Okay.  So when you
6  pull the sheet pile, there's going to be voids
7  created by the sheet pile; right?
8      A.  There's -- I mean, you have
9  displaced some material with it, so --
10     Q.  Right.  Did WGI do anything to
11  address those voids other than just run maybe
12  a dozer over it or something?
13     A.  When you run your equipment over it
14  in the nature of clay, then you're
15  consolidating the materials underneath it.  So
16  by -- by compacting the fill, whatever --
17  whether it was track walked with a dozer, you
18  would consolidate that material.
19     Q.  Okay.  Now, would you agree with me
20  that there's no specification for compaction?
21  And take your time and look at it before you
22  answer.  Again, this is just this Exhibit 7.
23     A.  I don't -- I don't think there was
24  any specific specification for compaction.
25     Q.  Absent a specific specification for

Page 223

1  compaction, can you share with us what you
2  guys probably did?  If you know.  You may not
3  know.
4      A.  I think it would have been filled --
5  We had a large excavator, a 40 ton excavator
6  that has a large bucket on it and you would
7  take your fill material bucket by bucket and
8  put it in the hole --
9      Q.  Okay.
10     A.  And compact it with taking the
11  bucket and pushing it, pushing it down to
12  compact the material.
13     Q.  Okay.  And then when you got to the
14  surface what would you do, if anything?
15     A.  If they had a dozer there, they
16  would have graded it just for uniformity; and
17  if they didn't, they may have used an
18  excavator to bucket dress it to -- to
19  establish the correct grade for drainage.
20     Q.  All right.  Now, I think we may have
21  addressed this, but this is unfortunately a
22  committee and I am getting questions shot at
23  me online.  With regard to the quality
24  assurance done by the Corps folks, okay,
25  quality assurance people, am I correct in

Page 224

1  concluding that their role was simply to make
2  certain that you, WGI, complied with the
3  contract specifications?
4      A.  Yes.
5      Q.  Okay.  Were they there to do
6  anything else that you know of?
7      A.  That was their primary function.
8      Q.  All right.  Now, Counsel was kind
9  enough to supply me with these emails which
10  you -- which -- Well, let me show them to you
11  before I say what they are.  But for the
12  record, may I indicate that what Counsel was
13  kind enough to give me is NCS-007 -- I am just
14  going to say 252, 253, 254, and 255, and then
15  a second document which is NCS-007277, 278,
16  and 279.  Okay?  And we'll mark these as 8 and
17  9 respectively.
18         (Whereupon a discussion was held
19     off the record.)
20         MR. EHRLICH:
21         Joe, can we add these two
22     exhibits marked as 8 and 9.
23         MR. BRUNO:
24         I did.  I said I am going to mark
25     them 8 and 9 respectively.  So the

Page 225

1  lower number is 8 and the higher
2  number --
3         MR. EHRLICH:
4         I understand.
5         MR. BRUNO:
6         It's A-OK.
7         THE WITNESS:
8         Okay.
9  EXAMINATION BY MR. BRUNO:
10     Q.  All right.  Do you recognize the
11  documents?
12     A.  Yes.
13     Q.  What are they?
14     A.  Well, one is an email, or a fax from
15  Jim, Jim Montegut to Lee Guillory with the
16  sections that he drew for the borrow pit
17  area.
18         MS. WAGER-ZITO:
19         Just for the record, that's 277
20     through 279, which is Exhibit --
21         MR. BRUNO:
22         9.
23         MS. WAGER-ZITO:
24         9.
25         MR. BRUNO:

PHILLIP STAGGS                                        4/26/2008

---

Page 226

1        And it's three pages I think,
2    just to be safe.
3        MS. WAGER-ZITO:
4        I said 277 through 279.
5        MR. BRUNO:
6        Oh. Sorry. Got it. You got
7    it. You got it.
8    EXAMINATION BY MR. BRUNO:
9        Q.   Why don't you let me just put them
10   -- No, no, I'm going to put a sticker on
11   them.
12       A.   And two memorandum. One asking the
13   question from James Miles, Chief of
14   Construction Division, for evaluation of the
15   structural stability of the proposed 16 foot
16   deep borrow pit. And then, 2, the structural
17   stability of the proposed Surekote Road
18   remediation. And then a response back from
19   Gerard Satterlee, Chief of Engineering
20   Division. That's what the documents are.
21       Q.   All right. But I know that's -- But
22   do you recognize them other than just reading
23   what's on their face?
24       A.   We did not -- I don't recall seeing
25   these two documents during construction, but

---

Page 227

1    we did have that profile that was attached to
2    --
3        Q.   (Indicating).
4        A.   -- that document.
5        Q.   Okay. Now, are these the documents
6    to which you made reference about documents in
7    connection with your suggestion that these
8    were documents reflecting the Corps's interest
9    in evaluating the potential of impact on the
10   flood structures?
11       A.   Yes.
12       Q.   Okay. So these were in the box?
13       A.   Yes.
14       Q.   Boxes or box? And do you recall now
15   as you sit here looking at the documents
16   whether these are documents that you requested
17   that the lawyers provide for you to review or
18   whether they were just in the box?
19       A.   I don't recall. I believe the -- I
20   may have asked the question about the sketch,
21   the profile, but these I hadn't seen
22   (indicating) prior to.
23       Q.   "These" being -- I'm sorry. Forgive
24   me. Exhibit 8.
25       A.   Yeah. The -- The question from the

---

Page 228

1    Chief of Construction and the response by the
2    Chief of Engineering.
3        Q.   All right. So clearly --
4        MS. WAGER-ZITO:
5        Joe, you haven't actually marked
6    that one.
7        MR. BRUNO:
8        I will. Just give me two
9    seconds.
10   EXAMINATION BY MR. BRUNO:
11       Q.   So the reference to the interoffice
12   -- inner office document is the one from
13   Guillory to Montegut -- I'm sorry, from
14   Montegut to Guillory with the little map.
15       A.   Yes.
16       Q.   Okay. Now, do you know what this --
17   it's page 278 of the NCS-07 document. What
18   are we looking at here? If you know, I mean.
19   If you don't --
20       A.   It's a section of the borrow pit
21   with what -- what looks like some as-built
22   survey information and the design template for
23   the borrow pit. See, at the bottom it
24   says "Design template".
25       Q.   Yes. Just help me. Are we looking

---

Page 229

1    north-south cut or east-west cut?
2        A.   You're looking north-south.
3        Q.   Which --
4        A.   It's a section that runs from the
5    floodwall to the -- to the canal. So you're
6    looking -- you're -- This one, the design
7    template is looking north, I believe.
8        Q.   Right. In other words, if one were
9    to draw a line, one is drawing a line from the
10   water's edge, which is on the west, to the
11   flood control structure, which is on the
12   east. Right?
13       A.   I am not sure. You were saying --
14   If you were drawing a line?
15       Q.   Well, from those two points. It's a
16   cut. It's a cross-section.
17       A.   Right.
18       Q.   So if you drew a line to the middle
19   of this cross-section you would be going from
20   the bank to the flood control project.
21       A.   Right. From -- This is the canal
22   side (indicating).
23       Q.   The left is the canal?
24       A.   Yeah.
25       Q.   And the right-hand side is the flood

---

58 (Pages 226 to 229)

PHILLIP STAGGS                                                    4/26/2008

Page 230

1  control project. Okay. And, I mean, I am
2  just trying to orient us. So that means that
3  the west is on the left and the east is on the
4  right. That's all.
5       MS. WAGER-ZITO:
6         You have to answer.
7       THE WITNESS:
8         Yes.
9  EXAMINATION BY MR. BRUNO:
10      Q.  All right. And the section lines,
11 do you know what those represent, the little
12 dashed lines? "Section line of June 4,
13 2002"?
14      A.  I think that is the actual
15 excavation complete as of that date.
16      Q.  And how about the other one?
17      A.  Which one?
18      Q.  Well, the other -- I see another
19 little U. Forgive me. (Indicating).
20      A.  That's all part of that dotted line
21 that I thought we were describing.
22      Q.  Oh, I see. Okay. The whole dotted
23 line. All right. So at least a part of this
24 dotted line is outside the design template.
25      A.  That's what I think is depicted

Page 231

1  there.
2       Q.  Got you. All right. Do you know
3  what is 279 depicting?
4       A.  2 --
5       MS. WAGER-ZITO:
6         The next.
7  EXAMINATION BY MR. BRUNO:
8       Q.  It's the next document.
9       A.  It shows the same section X-28. So
10 it appears to be the same thing, only it shows
11 a little bit further east.
12      Q.  Okay.
13      A.  It shows the floodwall and it has
14 the elevations on the levee.
15      Q.  All right. So the flood control
16 says "not to scale". And it's showing a chain
17 link fence and then it's also showing
18 something called a baseline. Do you know what
19 the baseline refers to? "East 4985.00"?
20      A.  I don't know what that is.
21      Q.  All right. Does negative 12
22 indicate the bottom of the design template for
23 the borrow pit?
24      A.  Yes.
25      Q.  And there's nothing which reflects

Page 232

1  the sheet pile depth, right? On the floodwall
2  -- I'm sorry, on the floodwall?
3       A.  No. Not that I --
4       Q.  All right. Now, on the front of
5  this thing it says "Take a look at --"
6  "Lee." This is from Jim Tekley, I guess.
7  "Take a look at Wink's cross-section of the
8  PT". Is that "PT" or "pit"?
9       A.  Pit.
10      Q.  Which one is it? I don't know.
11      A.  Pit.
12      Q.  Pit. Thank you. Like Degas again.
13      "Taken last week. Assuming I
14 plotted our design temp correctly, the
15 roadside pits fall within the allowable cut.
16 The canal bank pit is a different story. Also
17 note his current pit depth." Which I can't
18 read. Looks like negative 6.2 if you look at
19 the little map.
20      A.  Uh-huh (affirmatively).
21      Q.  Okay? "Did you assume negative 12
22 or did you actually measure?" Do you know
23 what he is saying there?
24      A.  Which part?
25      Q.  The "Did you assume negative 12 or

Page 233

1  did you actually measure"?
2       A.  I don't know exactly what he means.
3       Q.  Okay. Can I have the other
4  documents and I'm going to put my label on
5  them?
6       MR. BRUNO:
7         Does anybody have a stapler?
8         Okay. Let the record reflect I am
9         putting my exhibit sticker on 252 and
10        it's being marked as 8.
11 EXAMINATION BY MR. BRUNO:
12      Q.  All right. Now, so I'm clear, this
13 Exhibit 9 is the document that you recollect
14 was the reason for your belief that the
15 government was evaluating the excavations for
16 their potential impact on the flood control
17 structure? Did I get that right?
18      A.  I think it was -- it was
19 confirmation that they did take responsibility
20 for geotechnical engineering.
21      Q.  That's this Exhibit 9? Right?
22      A.  Yes.
23      Q.  All right. But back then when the
24 work was being done, you didn't see this fax
25 cover sheet? Did I get that wrong?

PHILLIP STAGGS                                                    4/26/2008

Page 234

```
 1      A.  No, I didn't -- I don't recall
 2  seeing the fax cover sheet previously.
 3      Q.  All right.  But you do recall seeing
 4  this drawing (indicating) --
 5      A.  Yes.
 6      Q.  -- which is the second and third
 7  page.  Perhaps -- Perhaps it's the way they
 8  faxed it, it turned into two pages, but it's
 9  at least one drawing --
10      A.  Yes.
11      Q.  -- of the site.  So it's probably
12  the drawing you saw?
13      A.  Yes.
14      Q.  All right.  So at the time that the
15  work was ongoing, did you have any piece of
16  paper which would have suggested to you that
17  the Corps was in fact evaluating the
18  excavations for their potential impact on the
19  floodwall?
20      A.  No.
21      Q.  Okay.  So it's an after the fact
22  assessment based upon the review of the
23  documents in the box that allows to you make
24  that conclusion; right?
25      MS. WAGER-ZITO:
```

Page 235

```
 1      Object to the form.
 2      THE WITNESS:
 3      No, it was always Washington's
 4      understanding that the government had
 5      the geotechnical responsibility from
 6      the very onset of the project.
 7  EXAMINATION BY MR. BRUNO:
 8      Q.  I probably asked that question
 9  wrong.  I think the better question was, the
10  only hard pieces of paper, documents which
11  allow to you draw that conclusion are
12  documents that you have seen after the review
13  of the materials in the box.  Isn't that
14  true?
15      A.  I don't know if there are others or
16  not.
17      Q.  Well, you.  I'm talking about you.
18      A.  Right.  I don't know if there are
19  other documents that -- that -- I mean, we're
20  talking about a long period of time and some
21  period of time ago.
22      Q.  All right.
23      A.  I don't know if there were other
24  documents that would have led me to that
25  conclusion or if -- if this is -- if this is
```

Page 236

```
 1  the only one that is I recall seeing.
 2      Q.  Okay.  How about this?  You cannot
 3  recall as you sit here today whether or not
 4  there were any other documents which may exist
 5  that you saw before you evaluated the
 6  documents in the box?  Okay?  That would --
 7  That you would suggest demonstrate the fact
 8  that the Corps exhibited an intent to evaluate
 9  excavations for their input on the flood
10  structure, flood control structure?
11      A.  I don't recall another specific
12  document.
13      Q.  That's all I am trying to
14  establish.  And the documents that you now
15  recall are documents that you have seen as
16  part of the preparation for this deposition;
17  right?
18      A.  Which in part were -- was a document
19  that we had used during the construction, or
20  during the work.  The template, the design
21  template.
22      Q.  I know you used it during your work,
23  but you have already told me that, in fairness
24  to me, at the time that you saw the document,
25  you didn't connect that document with the
```

Page 237

```
 1  Corps having an interest in evaluating holes
 2  for their impact on the flood protection.
 3  Right?
 4      A.  At the time?
 5      MS. WAGER-ZITO:
 6      Objection.
 7      THE WITNESS:
 8      At the time I saw that document?
 9  EXAMINATION BY MR. BRUNO:
10      Q.  Yes.  Way back whenever you saw it,
11  you know, whenever that was, I don't know,
12  '02.
13      A.  To me it was intuitively obvious
14  that they had that responsibility when -- when
15  that document was presented, then -- then that
16  made it clear to me that they did take
17  responsibility for the geotechnical design.
18      Q.  Okay.  So this drawing, this cut
19  section --
20      A.  Yes.
21      Q.  -- without any -- again, -- and
22  again.  I am only doing this because I want
23  the record to be clear.  You have already
24  testified you didn't see the fax cover sheet.
25  You only saw the drawing; right?
```

JOHNS PENDLETON COURT REPORTERS                          800 562-1285

PHILLIP STAGGS                                                    4/26/2008

Page 238

1     A.  That's my recollection.
2     Q.   And as you sit here today, it's your
3   testimony that your recollection is that when
4   you saw this document back in '02 or '3 or
5   whenever you saw it, at the time that the work
6   was being done, that this document would have
7   indicated to you that the Corps was interested
8   in evaluating excavations for their potential
9   effect, negative or otherwise, on the flood
10  control structure?  Right?
11    A.  That wasn't what I said, but you
12  could -- I think you could deduce that from
13  what I said.
14    Q.  Well, just what did you say about --
15  What was in your brain when you saw this
16  document?
17    A.  I said it was intuitively obvious
18  that they acknowledged responsibility for
19  geotechnical issues by generation of this
20  template.
21    Q.  Well, look, the reason I have a
22  problem is because geotechnical issues, you
23  have to admit to me, sir, is far broader than
24  the question I was asking you.  Yes, any time
25  you have a drawing with a hole on it, it's

Page 239

1   going to exhibit information about
2   geotechnical issues, but I was asking I think
3   a very narrow question, which was whether or
4   not your review of this cross-section back in
5   '02 or '03 told you then that the Corps was
6   interested in evaluating holes, excavations
7   for the purpose of determining whether or not
8   the hole or the excavation might negatively
9   impact the flood control structure.  That was
10  my question.
11    A.  Yes.
12      MS. WAGER-ZITO:
13        Objection.  Asked and answered.
14  EXAMINATION BY MR. BRUNO:
15    Q.  The answer is yes?
16    A.  Yes.
17    Q.  All right.  So what about this
18  drawing tells you that somebody's interested
19  in flood protection?
20    A.  What about the drawing?
21    Q.  Yes.  Tells the person looking at it
22  that the person who drew it is interested in
23  the flood protection structure.
24    A.  It's a design.
25    Q.  Okay.

Page 240

1     A.  It's a design for the --
2     Q.  Borrow pit.
3     A.  For the borrow pit.
4     Q.  Right.
5     A.  Even called a design template.
6     Q.  Okay.  So the fact that somebody
7   designed the borrow pit is proof to you -- did
8   I say it wrong?  The fact that somebody
9   designed the borrow pit --
10      MR. TREEBY:
11        Thank you.
12  EXAMINATION BY MR. BRUNO:
13    Q.  -- is proof to you that the designer
14  did the design because the designer was
15  concerned about the impact of the borrow pit
16  on the flood control structure.  Right?
17    A.  That is my understanding.
18    Q.  From reviewing the document.
19    A.  At the time.
20    Q.  Right.  But, I mean, it's your
21  understanding based upon your review of the
22  document, right?  Or did you have some other
23  pieces of information?
24    A.  No.
25    Q.  Conversations?  You see where I am

Page 241

1   going?  Okay.  So just by looking at the
2   document, that's your conclusion?  Right?
3     A.  At the time --
4     Q.  At the time.
5     A.  -- looking at the document, it was
6   clear to me that that -- that that is correct.
7     Q.  All right.  Who did the design
8   template, if you know?
9     A.  I mean, by reading the fax cover
10  sheet, it's from Jim, "Take a look at Wink's
11  section of the pit.  Assuming I plotted our
12  design template correctly."  It appears to be
13  Jim.
14    Q.  Okay.  That's these words on Exhibit
15  Number 9.
16    A.  Yes.
17    Q.  All right.  And that to you shows
18  that it was the Corps who designed the
19  template; right?
20    A.  Yes.
21    Q.  All right.  Now, on Exhibit Number
22  8, we have another name that -- I have
23  it.  Let me give it back to you.  There's
24  another name here that we hadn't talked
25  about.  A gentleman by the name of Satterlee?

PHILLIP STAGGS                                    4/26/2008

Page 242

1   Do you see that on the bottom?
2       A.  Yes.
3       Q.  Okay.  Do you recall him?
4       A.  I do not.
5       Q.  Did you have -- All right.  He is
6   the construction -- What's his title?
7       A.  Chief, Engineering Division.
8       Q.  All right.  Did you have any
9   interaction with the Engineering Division of
10  the District office, of the New Orleans
11  District office?
12      A.  No.
13      Q.  Okay.  And yet you certainly had no
14  interaction with Mr. Satterlee?
15      A.  No.
16      Q.  All right.  Let me have it back.
17  We're handing it back and forth.
18          Now, it says here that "As per
19  your request in the 15 April, '02 memo, the
20  section forwarded were analyzed for
21  stability."  Do you know what that means?
22      A.  Yeah, I think I know what it means.
23      Q.  Okay.  What does that mean?
24      A.  It means they evaluated the -- the
25  stability of the levee based on the

Page 243

1   excavations.
2       Q.  Might it reflect the stability of
3   the hole?
4       A.  I -- That wouldn't be my
5   interpretation.
6       Q.  Fair enough.  "The proposed Surekote
7   Road remedial soil excavation," which they
8   report is "3 feet deep by 25 feet wide and
9   approximately 15 feet from the adjacent
10  Jourdan Avenue floodwall/levee did not present
11  a stability problem.  The proposed 16 foot
12  deep McDonough Marine borrow area did present
13  a stability problem with respect to the
14  eastern side of the borrow area.  Various
15  options were analyzed and are shown on the
16  enclosures."  The first thing that this
17  suggests is that the original burrow pit was 3
18  feet deep and that somebody's proposing to go
19  to 16 feet.  Do you have any recollection of
20  that?
21      A.  I don't think that -- I don't think
22  -- I think they're two different subjects.
23      Q.  Oh, they're different holes?
24      A.  Yes.
25      Q.  Okay.  Let me read it again.  I'm

Page 244

1   sure you're right.  "The proposed Surekote
2   Road Excavation," that refers to remediation
3   of the soil for remediation purposes; right?
4       A.  Yes.
5       Q.  And that's 3 feet deep by 25 feet
6   wide.  That's that excavation that you
7   referenced this morning.
8       A.  Yes.
9       Q.  Okay.  And it says it's 15 feet, as
10  you indicated, from the adjacent Jourdan
11  Avenue floodwall/levee.  That didn't present a
12  stability problem, but it says that "The
13  proposed 16 foot deep McDonough Marine borrow
14  area did present a stability problem with
15  respect to the eastern side of the borrow
16  area.  Various options were analyzed and are
17  shown on the enclosures."  Do you know if
18  anybody shared these options with you?
19      A.  No.
20      Q.  Okay.
21          MR. EHRLICH:
22          That's Number 8?
23          MR. BRUNO:
24          Yes.
25  EXAMINATION BY MR. BRUNO:

Page 245

1       Q.  The second paragraph, and it's
2   scratched out, it says "Although analysis was
3   not requested, it should be noted that the
4   proposed 16 foot deep McDonough Marine borrow
5   area with respect to the western side is not
6   stable.  The stability with respect to the
7   western side is below unity."  Now, I could be
8   crazy here, but doesn't that seem to suggest
9   that what they're evaluating really is the
10  hole and not the levee?
11      A.  They may be addressing the stability
12  of the -- the berm itself that could impact
13  the levee if it failed.  Or has the potential
14  to impact the levee if it failed.
15      Q.  So that the western side could --
16  The western side of this thing, which there's
17  no indication of where it is, the western side
18  of this cross-section which you told me is on
19  the left, that could affect the levee as
20  well?  This side (indicating)?
21      A.  I am -- You're asking me what I
22  thought, and what I thought was being
23  evaluated there.
24      Q.  Right.
25      A.  I think they're evaluating the

JOHNS PENDLETON COURT REPORTERS          800 562-1285

PHILLIP STAGGS                                                    4/26/2008

<table>
<tr><td>

Page 246

1  stability of that outboard berm at the canal.
2      Q.  That's this one here (indicating)?
3      A.  Yes.
4      Q.  And this one here (indicating).  And
5  they're also evaluating the eastern --
6      A.  And that one.  The stability of the
7  hole and the stability of the levee for that
8  one would be one and the same, wouldn't they?
9      Q.  I don't know.  First of all, for the
10 record, though, you said berm and I don't want
11 -- I want to see if -- "berm" refers to the
12 side of the hole; right?
13     A.  Yes.
14     Q.  All right.  So can we agree that one
15 might conclude by reading Exhibit 8 that what
16 is being evaluated is the hole on the east and
17 on the west?  Right?
18        MS. WAGER-ZITO:
19          Objection.
20        THE WITNESS:
21          I am not sure what you mean by
22        "the hole" versus the land.
23 EXAMINATION BY MR. BRUNO:
24     Q.  Okay.  What I am asking you is this.
25 It's inartfully asked.  Let me reask the

</td><td>

Page 248

1  me, Mr. Staggs.  Didn't you tell me the 25
2  foot business didn't have anything to do with
3  the borrow hit?  Had something to do with the
4  other location?
5      A.  15 feet off of Surekote Road.
6      Q.  Right.
7      A.  Which was the width of the
8  excavation under Surekote Road.
9      Q.  Which is not the borrow pit?
10     A.  Which is not part.
11     Q.  You pointed that out to me, that
12 this memo discusses two different holes.
13     A.  Yes.
14     Q.  It's two entirely different holes.
15 One of them is the borrow pit and the other
16 one is the --
17        MR. TREEBY:
18          Surekote Road.
19 EXAMINATION BY MR. BRUNO:
20     Q.  -- Surekote Road, which is 25 feet
21 by 3 feet deep.  Okay?  And that's -- So the
22 one that references the 25 foot by 3 feet deep
23 is the one that's 15 feet from the floodwall.
24     A.  Yes.
25     Q.  And they say there's no problem with

</td></tr>
<tr><td>

Page 247

1  question.  It could be concluded by someone
2  reading Exhibit 8 that what's being evaluated
3  here is whether or not the slope of the side
4  of the hole on the east and the west is what
5  is being evaluated, or I should say it's what
6  is being requested to be evaluated by this
7  memo.
8         MR. EHRLICH:
9          Object to form.
10        THE WITNESS:
11          Can I look at that again?
12 EXAMINATION BY MR. BRUNO:
13     Q.  Yes, sir.  Of course.  Let me give
14 you the whole stack.
15     A.  I believe this item 1, "As per your
16 request in the 15 April, '02 memo, the section
17 forwarded were analyzed for stability."
18 Okay.  They were talking about -- and it's not
19 really on here.  Let's see if it's on the
20 second one.  The first one they're talking
21 about is from a point 15 feet west of the
22 levee to the 25 foot width of the excavation.
23 So I don't think they're talking about the
24 stability of this (indicating) in that.
25     Q.  Well, didn't you tell me -- Forgive

</td><td>

Page 249

1  that.
2      A.  Yes.
3      Q.  What I read.
4      A.  Yes.
5      Q.  The second hole that they're
6  referencing is the borrow pit, and they're
7  looking at the east and west side of the hole
8  and they're evaluating the sides of the hole,
9  aren't they?  That's what they're talking
10 about in that memo.
11        MR. EHRLICH:
12          Object to the form.
13 EXAMINATION BY MR. BRUNO:
14     Q.  Okay.
15     A.  Not in this first item, though.  I
16 mean, you're -- we're talking about the sum
17 total of what this evaluation was.
18     Q.  Okay.
19     A.  And there's really two separate --
20 It applies to two separate things and I would
21 -- I would consider them to be different.
22     Q.  That's fine.  Okay.  That's great.
23 Thanks.  Then 3 talks about the "12 inch lifts
24 of 90 percent Proctor compacted backfill
25 within 5 percent and negative 3 percent

</td></tr>
</table>

PHILLIP STAGGS                                                    4/26/2008

Page 250

1  optimum water content prior to compacting is
2  recommended." Just do you know what hole
3  they're talking about?
4      A.  I don't know if they're talking
5  about both of them or --
6      MS. WAGER-ZITO:
7          He asked if you know.
8      THE WITNESS:
9          Yes. I don't know.
10 EXAMINATION BY MR. BRUNO:
11     Q.  Yes. If you don't know, you don't
12 know.
13         Do you know what a stability
14 control line is?
15     A.  I do not.
16     Q.  Have you seen that before? This is
17 an aerial it looks like of the borrow pit
18 (indicating).
19     A.  I think we -- we plotted something
20 similar to this on our -- on our maps, but I
21 don't know if it's the same thing. We plotted
22 the excavations on there.
23     Q.  Where was Surekote Road relative to
24 the flood control structure?
25     A.  It was generally 15 feet west of the

Page 251

1  floodwall. But that -- the area between the
2  floodwall and Surekote Road varied. It wasn't
3  exactly 15 feet. Some places it was 20 feet.
4      Q.  So the road, would that be on the
5  crown of the levee, the road?
6      A.  From -- From the floodwall with a
7  tape pulling west, 15 feet would put you at
8  the curb for that road.
9      Q.  All right. And I am assuming
10 because it's a road, it's flat?
11     A.  Yes.
12     Q.  And the point being, then -- then
13 that was in fact the crown of the levee on the
14 -- on the water side of the floodwall; right?
15     A.  No.
16     Q.  Was there another levee or was there
17 some earth works between Surekote Road and the
18 wall itself?
19     MR. EHRLICH:
20         Object to the form.
21     THE WITNESS:
22         There was. I mean, there was a
23     contour to the soil.
24 EXAMINATION BY MR. BRUNO:
25     Q.  Okay.

Page 252

1      A.  There was -- There was soil, the
2  levee between the curb of Surekote Road and
3  the floodwall.
4      Q.  Was that about 16 feet according to
5  this?
6      A.  16 feet from where to where?
7      Q.  Floodwall to the edge of the road.
8  I'll show it to you.
9      MS. WAGER-ZITO:
10         The borrow?
11 EXAMINATION BY MR. BRUNO:
12     Q.  I'm trying to see what's what.
13 That's why I am asking the questions.
14     A.  Yeah, that's what I was saying.
15     MR. EHRLICH:
16         Object to form.
17     THE WITNESS:
18         At some particular spot it may
19     have been -- wherever this person
20     measured this, it may have been 16
21     feet, but it ranged from 15 to 21 or
22     something.
23 EXAMINATION BY MR. BRUNO:
24     Q.  All right. Bottom line, wall,
25 levee, then road.

Page 253

1      A.  Yes.
2      Q.  Okay.
3      MR. BRUNO:
4          This is for you, Roger.
5  EXAMINATION BY MR. BRUNO:
6      Q.  For the record, Exhibit 8, this is a
7  memo from Gerard S. Satterlee, Chief,
8  Engineering Division, for the C/Construction
9  Division, attention Lee Guillory. And the
10 second document, which is 253, is a memorandum
11 for C/Engineering Division, attention CEMVN,
12 which I think is Vicksburg, Engineering
13 Division F. And that's from a Mr. James L.
14 Miles, the Chief of the Construction
15 Division. I neglected to ask you if you know
16 this gentleman, Mr. Miles.
17     A.  No.
18     Q.  Have you ever heard of him?
19     A.  No.
20     Q.  Okay. Whose idea was it to do the
21 arsenic investigation? Was that WGI's or the
22 Corps?
23     A.  I am not aware. I don't know.
24     Q.  You don't know?
25     A.  No, I don't know.

PHILLIP STAGGS                                                    4/26/2008

Page 254

1      Q.  Do you know how that came about?
2      A.  I think it came about before I --
3   before I mobilized to the project.
4      Q.  All right.
5         MR. BRUNO:
6            Let's show the witness, and maybe
7      this would be a good time to take a
8      break so he can review it, the recap
9      submittal report, criteria document,
10     first dated June, 2000.  It's
11     WGI-47665.
12        Scott, can we pull that?  And show
13     him the master document.
14        MR. EHRLICH:
15           That one has a December --
16        MR. BRUNO:
17           We'll go off the record so he can
18     do it.
19        MS. WAGER-ZITO:
20           We have it in paper.  We'll give
21     him a paper one.
22        MR. BRUNO:
23           Let's let him take a look at it.
24        MS. WAGER-ZITO:
25           Yes.

Page 255

1         VIDEO OPERATOR:
2            Going off the record, it is
3      2:44.
4         (Recess.)
5         VIDEO OPERATOR:
6            Returning to the record, it is
7      2:58.
8   EXAMINATION BY MR. BRUNO:
9      Q.  Okay.  You'll forgive me, I have a
10  few more questions about the holes, the
11  McDonough holes.  First of all, -- And the
12  correspondence.  Isn't it a fact that the
13  reason that there was any dialogue between Mr.
14  Montegut and Mr. Guillory with regard to the
15  holes on the McDonough site is because Mr.
16  Richard Lesser of WGI had some concerns about
17  excavating within the 15 foot line limit of
18  the flood control structure?
19        MR. EHRLICH:
20           Object to the form.
21  EXAMINATION BY MR. BRUNO:
22     Q.  To which you have made some
23  reference before.
24     A.  If I understand your question, I
25  don't think there's any relation.  I think

Page 256

1   that the timing of those events are -- are --
2   Rich Lesser wasn't involved in the project
3   when this occurred, when the memo regarding
4   the stability occurred.  My recollection.
5      Q.  Okay.  Well, certainly if he wrote
6   some emails at or about that time, that might
7   tend to suggest that your memory is not
8   correct.  Right?
9         MR. EHRLICH:
10           Object to the form.  Move to
11     strike.
12        THE WITNESS:
13           Could you go back to -- Were you
14     asking about a relation between
15     questions by Rich Lesser --
16  EXAMINATION BY MR. BRUNO:
17     Q.  Yes.
18     A.  -- and the stability questions by
19  the Corps of Engineers?
20     Q.  Yes.  I was.  You're right.  That's
21  what I was asking you.
22        MR. EHRLICH:
23           Object to form.
24        THE WITNESS:
25           I don't think there was any

Page 257

1      relation between the two.  I think the
2      timing of them were -- I think Rich
3      Lesser was involved in the project at
4      a later date.
5   EXAMINATION BY MR. BRUNO:
6      Q.  First, who is Rich Lesser?
7      A.  He was technical support in the home
8   office who, after Dennis O'Connor left, became
9   the part -- the project manager.
10     Q.  All right.  And what is Rich
11  Lesser's background?  I mean, is he an
12  engineer or what -- what is he?
13     A.  He's an environmental specialist.
14  Whether I -- I don't know if he's a chemist or
15  an environmental engineer.  But he's an
16  environmental specialist.
17     Q.  Okay.  Do you believe he's an
18  engineer?
19        MS. WAGER-ZITO:
20           If you know.
21        THE WITNESS:
22           I don't know.
23  EXAMINATION BY MR. BRUNO:
24     Q.  All right.  Now, but he was in
25  technical support at the main office.  We do

                                    65 (Pages 254 to 257)

PHILLIP STAGGS                                                           4/26/2008

Page 258

1    know that much.
2        A.  Yes.
3        Q.  And he was available as a resource
4    to you while he was located at the main
5    office; right?
6            MS. WAGER-ZITO:
7            Objection, vague as to time.
8            MR. BRUNO:
9            I just said while he was located
10       at the main office.
11           MS. WAGER-ZITO:
12           No, you said "he was a resource
13       to you".  At what point in time were
14       you asking him he was a resource?
15   EXAMINATION BY MR. BRUNO:
16       Q.  While Mr. Lesser was at the main
17   office.
18       A.  He was the project manager when he
19   was in the -- I guess he -- he may have worked
20   on the project -- he worked on the project
21   when Dennis was project manager.
22       Q.  Right.
23       A.  I'm not sure of the timing of --
24   When he was in the home office, was he a
25   resource?  Yes.

Page 259

1        Q.  Okay.  Now, it seems to me like you
2    have some independent recollection of Mr.
3    Lesser and this business of encroaching on the
4    15 feet.  Do you have some independent
5    recollection of that episode?
6        A.  No.  No.  My recollection was that
7    it was unrelated to this event.
8        Q.  I know.  But it -- you sound like
9    you have some memory of it.  So what is "it"?
10       A.  I thought we were talking --
11           MR. EHRLICH:
12           Object to form.
13           MS. WAGER-ZITO:
14           Objection to form.
15   EXAMINATION BY MR. BRUNO:
16       Q.  Okay.  We know about this event.
17   You're relating to things and "it" and these
18   emails.  I want to find out about the "it".
19   We already know about the emails.  So what
20   were you thinking in your mind was not related
21   that regards Rich Lesser?  What is "it"?
22           MR. EHRLICH:
23           Object to the form.
24           THE WITNESS:
25           I'm not following you.

Page 260

1    EXAMINATION BY MR. BRUNO:
2        Q.  Oh, good Lord.
3        A.  I don't know what I am missing, but
4    --
5        Q.  Well, you just told me a few moments
6    ago -- I said Richard Lesser and you said,
7    "Oh, no, I think that was a different time."
8    So you had to have something in the back of
9    your mind that associated Rich Lesser with
10   some other time.  So what was -- What were you
11   thinking about?  I don't know what you were
12   saying.  You said there's no connection.
13   Well, when someone says no connection, there's
14   no connection between A and B.  What's the B?
15       A.  What I was trying to explain was
16   that the events surrounding this evaluation in
17   6 of '02 --
18       Q.  Okay.
19       A.  -- were unrelated to any emails by
20   Rich Lesser, because Rich Lesser wasn't
21   working on the project at that time --
22       Q.  Okay.
23       A.  -- as far as I recall.
24       Q.  All right.  So --
25       A.  That's what I was trying to --

Page 261

1        Q.  All right.  Fine.  So he wasn't
2    around.
3        A.  Wasn't around.
4        Q.  All right.  Now, have you ever heard
5    of something called bentonite?
6        A.  Yes.
7        Q.  Do you know what its used for?
8        A.  I think it's bentonite clay for
9    plugging wells.
10       Q.  Okay.  Is there any specification in
11   the cofferdam installation and concrete
12   foundation removal final work plan that would
13   have prohibited you from injecting bentonite
14   into the voids created when the piling at the
15   bottom of the excavation were removed?
16       A.  Nothing that would have prohibited
17   from doing it.
18       Q.  Was there anything in the
19   specification that would have prohibited you
20   from using clay to backfill the hole created
21   when the wedding cake concrete structure was
22   removed?
23       A.  No.  And, in fact, it may have been
24   clay.
25       Q.  Sure.  And was there anything in the

PHILLIP STAGGS                                                    4/26/2008

Page 262

1  contract specification that would have
2  prohibited WGI from compacting whatever was
3  put in the hole to some level of compaction?
4      A.  Well, it was compacted to some
5  level, whatever that method provided.
6      Q.  How about this.  A greater level, a
7  greater degree of compaction.  How about
8  that?
9      A.  No, nothing that prohibited.  But
10 what we were -- what we were to do was to
11 follow the specifications, because we were a
12 cost reimbursable contractor.  So had we
13 wanted to go to additional effort, it would be
14 something that the government would have to
15 pay for and they would have to approve.
16     Q.  All right.  Now, we were -- Let's
17 see.
18         MR. BRUNO:
19         Has he gotten the -- Okay.
20 EXAMINATION BY MR. BRUNO:
21     Q.  All right.  Washington Group
22 prepared a recap submittal report criteria
23 document which was first dated in June of
24 2000.  Is that true?
25     A.  June, 2001?

Page 263

1      Q.  Well, 2000.
2          MS. WAGER-ZITO:
3          We gave him a document, a recap
4  submittal document that maybe is dated
5  differently and we talked to Scott
6  about it.  So the one he is looking
7  at, Joe, is dated --
8          MR. BRUNO:
9          Okay.
10         MS. WAGER-ZITO:
11         -- June, 2001.
12         MR. EHRLICH:
13         There is one, but there's also
14 one in 2000.
15         MR. BRUNO:
16         I am just trying to walk through
17 it.  Then show him the 2000, because I
18 want --
19         MR. JOANEN:
20         Okay.
21         MS. WAGER-ZITO:
22         Right now Joe's kids are on the
23 screen.  Very cute.
24         MR. BRUNO:
25         Thank you.

Page 264

1          (Whereupon a discussion was held
2          off the record.)
3  EXAMINATION BY MR. BRUNO:
4      Q.  This is WGI-47665.
5      A.  Okay.  I read up that paragraph 442.
6      Q.  Okay.  So is it true or false?  WGI
7  prepared a recap submittal report criteria
8  document first dated June, 2000.
9      A.  I think that's true.
10     Q.  And that this criteria document was
11 the master document that would provide
12 information for the entire EBIA followed by
13 supplemental submittals for the individual
14 facilities.  That's document WGI-47682 and
15 83.
16     A.  Back up to the beginning of that
17 statement.
18     Q.  Okay.  This criteria document was
19 the master document that would provide
20 information for the entire EBIA followed by
21 supplemental submittals for the individual
22 facilities.
23     A.  For environmental concerns.
24     Q.  That's true?
25     A.  Yes.

Page 265

1      Q.  Okay.  Now, in that document, WGI
2  says that the sheet pile tip reached a depth
3  of at least 25 feet and that that would
4  essentially interrupt the water flow in the
5  easterly direction to elevations of 25 feet.
6  Right?
7      A.  That's what's in the document.
8      Q.  Okay.  Now, that's not true, is it?
9  The sheet pile tip was only eight feet.
10     A.  Oh, I don't -- I don't know what the
11 sheet pile depth was.
12     Q.  Okay.  Do you know if in fact that
13 the sheet pile tip is eight feet, whether or
14 not the mistaken assumption that it's 25 would
15 have in any way impacted this report?
16     A.  Say again?
17     Q.  If they're wrong, if 25 is wrong and
18 it's really eight, would that have impacted
19 the report in any way?
20         MR. EHRLICH:
21         Object.  Object to the form.
22         THE WITNESS:
23         They're -- They're acknowledging
24 that -- that this would interrupt the
25 flow of water, so that assumption

Page 266

1      would be incorrect if it were at eight
2      feet.
3  EXAMINATION BY MR. BRUNO:
4      Q.  All right.  Do you know whether it
5  was desired that the water flow be interrupted
6  as a premise to that report?
7      MR. EHRLICH:
8        Object to the form.
9  EXAMINATION BY MR. BRUNO:
10      Q.  In other words, I am reading this --
11  the sentence to say WGI -- It's a quote.
12  "The sheet pile reached a depth of at least
13  25 feet and this would essentially interrupt
14  the water flow in the easterly direction at
15  lower elevations 25 feet."  So my question
16  to you is, do you know if WGI intended to
17  interrupt the water flow in the easterly
18  direction at lower elevations?  Was that what
19  the WGI intended?
20      A.  I think it was a commentary that
21  they thought that was what was happening as a
22  result of the sheet pile tip elevation.
23      Q.  Okay.  Do you know whether or not
24  there was any understanding on the part of WGI
25  that they ought not excavate below 25 feet,

Page 267

1  that that was some sort of a line below which
2  they ought not go?
3      A.  I don't recall that.  I don't recall
4  that being the threshold that we were not to
5  exceed.
6      Q.  Okay.  At -- I don't know which
7  document this is, it's WGI-54420, section 3.1,
8  it's got -- this is the statement of work.
9      MR. JOANEN:
10        544?
11      MR. BRUNO:
12        54420, section 3.1.
13      MR. JOANEN:
14        Okay.
15  EXAMINATION BY MR. BRUNO:
16      Q.  Do you know, sir, whether or not an
17  excavation plan would be required when the
18  excavation reached a depth of 25 feet?
19      MS. WAGER-ZITO:
20        Is this in the same document?
21  We're in a different document?
22      MR. JOANEN:
23        A different one.
24      MR. BRUNO:
25        A different one.  That's why I

Page 268

1  gave him the number.
2      MS. WAGER-ZITO:
3        Could you just state for the
4  record what document?
5      MR. BRUNO:
6        When he pulls it up.  Forgive me
7  for being handicapped, but I don't
8  have the document.
9      MS. WAGER-ZITO:
10        Scott is showing him.  What's the
11  title?
12      MR. JOANEN:
13        You want to read it?
14      THE WITNESS:
15        "Statement of work for
16  excavation and disposal of additional
17  subsurface foundations,
18  asbestos-containing materials,
19  concrete waste at EBIA, IHNC".
20  EXAMINATION BY MR. BRUNO:
21      Q.  All right.  First of all, do you
22  know what that document is?
23      A.  I need to review that document.
24      Q.  All right.  Fine.  Take your time,
25  please.

Page 269

1      MS. WAGER-ZITO:
2        What's the date?
3      THE WITNESS:
4        August -- 6 August, '01.  We
5  don't have -- Do we have a paper
6  copy?
7  EXAMINATION BY MR. BRUNO:
8      Q.  We said this is August, '01 or '00?
9      MR. JOANEN:
10        '1.
11      MR. BRUNO:
12        '01.
13      MR. JOANEN:
14        Modification 10.
15      MS. WAGER-ZITO:
16        You ready for a question?
17      THE WITNESS:
18        Yes.
19      MS. WAGER-ZITO:
20        He's ready, Joe.
21  EXAMINATION BY MR. BRUNO:
22      Q.  All right.  First of all, do you
23  know what the document is?
24      A.  Yes.
25      Q.  What is it?

68  (Pages 266 to 269)

PHILLIP STAGGS                                                4/26/2008

Page 270

1    A.  It's the scope for the additional
2  materials discovered after -- after we started
3  initial work out there.  There was
4  asbestos-containing materials, transite, in
5  the soils, concrete foundations, et cetera.
6    Q.  All right.
7    A.  And it was to acknowledge that.
8    Q.  All right.  With that, I have
9  probably -- I should have done this for you
10  before, but I refer to it as the wedding
11  cake.  There's a wedding cake -- a concrete
12  structure that has been referred to as the
13  wedding cake concrete structure.  Does this
14  work order refer to that?
15    A.  I believe that it does.
16    Q.  Okay.  Do you know what I am talking
17  about when I say the wedding cake concrete
18  structure?
19    A.  That's what I was referring to.
20    Q.  And it's on the Boland site?
21    A.  Yes.
22    Q.  All right.  Now, the other thing,
23  the other deep excavation at the Boland site,
24  was the lift station removal?
25    A.  No, not at Boland.

Page 271

1    Q.  And were there any other deep
2  excavations at Boland other than the removal
3  of this wedding cake structure?
4    A.  I don't know what you consider
5  deep.  But, I mean --
6    Q.  As deep as.
7    A.  No.
8    Q.  Okay.
9    A.  Not that I am aware of.
10    Q.  All right.  How about Saucier or
11  Saucier?  Saucier.  I don't know how that is
12  pronounced.  Saucier Marine.
13    MR. TREEBY:
14      Saucier.
15  EXAMINATION BY MR. BRUNO:
16    Q.  That's Saucier, actually, if you
17  want to do the French.  But the -- I think
18  it's Saucier Marine now that I am thinking
19  about it.  Was there a deep excavation at
20  Saucier Marine as deep as the wedding cake
21  thing?
22    A.  I don't know if it was the same, but
23  it was fairly deep.  The sewer lift station.
24    Q.  All right.  But the sewer lift
25  station, that was contemplated from the outset

Page 272

1  that that would have to be removed?
2    A.  That was known.
3    Q.  That was known?
4    A.  It was on the plans.  You could see
5  it.
6    Q.  I'm with you.  So the work plan that
7  you're looking at on the computer, that does
8  cover this wedding cake structure; right?
9    A.  The statement of work from the
10  government.
11    Q.  All right.  Now, does it say that
12  future decisions to excavate beyond 25 feet
13  would require an excavation plan?
14    A.  If you can point me to an article.
15    MR. JOANEN:
16      3.1.
17  EXAMINATION BY MR. BRUNO:
18    Q.  Yes, I do have it for you.  It's
19  3.1.  It's page 54420.
20    MR. EHRLICH:
21      The question is whether the
22      document says that.
23    MR. BRUNO:
24      Yes.
25    THE WITNESS:

Page 273

1      It doesn't -- It acknowledges
2      that a decision will be made to -- a
3      decision will be made to excavate
4      further when the excavation reaches a
5      depth of minus 25 MSL.
6  EXAMINATION BY MR. BRUNO:
7    Q.  Do you know what is significant, if
8  anything at all is significant about 25 feet?
9    A.  I think there were equipment
10  limitations as far as trying to work deeper
11  than 25 feet.  There would certainly be cost
12  considerations.
13    Q.  Okay.  So is it your view that the
14  25 foot is arbitrary but based upon the need
15  for different types of equipment, et cetera,
16  as you --
17    A.  And cost.
18    Q.  In other words, I mean, is it -- it
19  could be 15, 20, 25 based upon all of those
20  considerations.  Is there something magical
21  about 25?  That you know.
22    A.  Not that I am aware of.
23    Q.  All right.  But those considerations
24  would also be relevant at 20; right?
25    A.  Our -- I think the -- I think it's a

PHILLIP STAGGS                                                    4/26/2008

Page 274

1  cost of equipment restriction.  They would
2  have needed a different -- a different
3  excavator which would have resulted in an
4  additional level of effort and additional cost
5  and I think that was -- I believe that was
6  it.  Based on my recollection, that would be
7  my understanding.
8      Q.  Okay.  And can you tell me whether
9  or not the 25 foot line of demarcation for
10  this issue came from WGI or the Corps?
11     A.  In this document it's from the
12  Corps.
13     Q.  Okay.  Well, isn't it usually the
14  purview of you guys to make the assessments of
15  the equipment limitations?
16     A.  Well, it may have been based on
17  their understanding of our equipment
18  limitations.
19     Q.  Okay.  Now, the sewer lift station,
20  do you recall whether or not it had this 25
21  foot issue, for lack of a better way to
22  describe it?
23     A.  No, I do not.
24     Q.  Now, it says here that, I think,
25  that if you had to go deeper than 25 feet, you

Page 275

1  had to have another excavation plan.  Right?
2      A.  MS. WAGER-ZITO:
3          Objection.  Asked and answered.
4      MR. BRUNO:
5          Well, then we can get --
6  EXAMINATION BY MR. BRUNO:
7      Q.  Is that true?  Apparently you have
8  answered it, so let's buzz through it.  Right?
9      A.  It says an excavating plan will be
10 required.  It doesn't say if it's beyond 25
11 feet an additional plan would be required.
12     Q.  Well, I thought we just read that
13 subsurface removal would require an excavation
14 plan generally.  We know that.  And that when
15 the excavation reaches a depth of 25 feet, we
16 had to make another decision as to whether to
17 excavate further.  Did I read that
18 incorrectly?  That's at page 54420, section
19 3.1.
20     A.  I just see the one reference to an
21 excavation plan will be required and then a
22 decision will be made to excavate further when
23 the excavation reaches a depth of 25 MSL.
24     Q.  Fair enough.  Do you interpret that
25 to mean that you would need another excavation

Page 276

1  plan if you wanted to go below 25?  That's
2  what I am asking you.
3      A.  I would think there would either be
4  another plan or a concurrence, you know, a
5  meeting to review it and a concurrence on how
6  to proceed.  One or the other.
7      Q.  Right.  In other words, the original
8  -- First of all, you have an excavation plan
9  any time you're doing an excavation; right?
10     A.  We -- I am not sure what you mean.
11 You have got an excavation plan unique to the
12 -- to this item --
13     Q.  Right.
14     A.  -- that we looked at earlier.  But
15 there's -- you have got a CAP for all of your
16 remediation areas that identify the dimensions
17 of it.  There wasn't an excavation plan for
18 each of those areas.
19     Q.  Well, there was a excavation plan
20 for the whole area.
21     A.  For the entire project.
22     Q.  That's what I am saying.
23     A.  Okay.
24     Q.  You have generally an excavation
25 plan and the excavation plan guides you

Page 277

1  insofar as what you're doing there, and it
2  could be that you could contemplate the need
3  to go further than 25 feet in that plan and
4  have that concurrence that you were talking
5  about as opposed to a whole other plan.
6  That's all I was driving at.  Right?
7      MR. EHRLICH:
8          Object to form.
9      THE WITNESS:
10         I think I understand what you're
11     saying.  I think that --
12 EXAMINATION BY MR. BRUNO:
13     Q.  All right.  So do you agree or --
14 You say you think you understand what I am
15 saying, so what's the answer?
16     MR. EHRLICH:
17         Object to form.
18     THE WITNESS:
19         Could you restate it again for
20     clarity?
21 EXAMINATION BY MR. BRUNO:
22     Q.  Well, I was just trying to
23 understand your answer.  You said that either,
24 A, you could have a new work plan or, B, there
25 could be a concurrence; and I am just trying

PHILLIP STAGGS                                                4/26/2008

Page 278

1    to understand if the concurrence would be
2    something that would happen if the original
3    excavation plan contemplated the possibility
4    of going below 25 feet.
5        A.  Would you have another one if the
6    original plan acknowledged that?
7        MR. EHRLICH:
8          Object to form.
9    EXAMINATION BY MR. BRUNO:
10       Q.  Yes.  That's all I'm asking.
11       A.  Maybe not.
12       Q.  Because it's already contemplated;
13   right?  You've already got your cost built in?
14       MR. EHRLICH:
15         Objection to form.
16       THE WITNESS:
17         No, I don't think that is the
18   case.
19   EXAMINATION BY MR. BRUNO:
20       Q.  All right.
21       A.  I think the -- I think the plan was
22   predicated on stopping at a certain depth.
23   Were it to go further, there would be other
24   cost considerations.
25       Q.  Right.  But would you need any more

Page 279

1    specifications other than go deeper?  Is what
2    I am driving at.
3        A.  You would certainly have to have the
4    Corps' concurrence, because it says a decision
5    will be made.  I think the intent was if you
6    got down to minus 25 and you were unable to
7    complete the task, then there would have to be
8    a review.
9        Q.  All right.  Let me just ask you very
10   directly.  Do you believe that the 25 foot
11   indication had anything whatsoever to do with
12   the potential impact of the excavation on the
13   flood control structure?
14       A.  Not that I am aware of.
15       Q.  Okay.  Mr. Roe talked about the
16   business of permitting with regard to the OLD
17   and he testified that he spoke to Mr. O'Connor
18   in order to get information about that.  So I
19   am compelled to ask you if you know anything
20   about interacting with the OLD with regard to
21   any permitting.
22       A.  I do not.
23       Q.  There is another reference, and you
24   may be able to answer this just based upon my
25   representation to you that if it is true, that

Page 280

1    with regard to the excavation of the concrete
2    anchor foundation block and steel forms in
3    August of '01, okay?  If there is a -- if that
4    report limited the excavation to negative 25
5    feet, would your answers be the same with
6    regard to why 25 feet would have been
7    selected?  Or do you want to go ahead and read
8    that report?
9        MR. EHRLICH:
10         Object to the form.
11   EXAMINATION BY MR. BRUNO:
12       Q.  Either way.  I mean it's WGI-37609,
13   section 1.0.
14       A.  Yeah, I would like to look at that.
15       Q.  That's fine.
16       MR. JOANEN:
17         What is it?
18       MR. BRUNO:
19         37609, section 1.0.
20       MS. WAGER-ZITO:
21         We can do the same thing.
22         Identify what document he's reading
23       from.
24       MR. BRUNO:
25         Oh, yes.  Absolutely.

Page 281

1        THE WITNESS:
2          I think what it is, is, it's a
3        draft work -- I know what it is.  It's
4        a draft work plan for the excavation
5        of concrete anchor foundation blocks
6        and steel forms in August of 2001.
7    EXAMINATION BY MR. BRUNO:
8        Q.  It starts on 07 according to this
9    summary.
10       MR. EHRLICH:
11         Will you make that an exhibit,
12       that summary?
13       MR. BRUNO:
14         No.
15       MR. EHRLICH:
16         Why not?
17       MR. BRUNO:
18         It's my work product.
19       MR. EHRLICH:
20         Oh, I thought you were reading
21       from the document.
22       MR. BRUNO:
23         No, I'm reading from an outline.
24       MR. EHRLICH:
25         That's even better.

71 (Pages 278 to 281)

PHILLIP STAGGS                                                    4/26/2008

|  | Page 282 |
|---|---|

```
 1         (Whereupon a discussion was held
 2      off the record.)
 3         THE WITNESS:
 4         I think I've read the section of
 5      that.
 6   EXAMINATION BY MR. BRUNO:
 7      Q.  Is that right?
 8      A.  I don't think I would have any
 9   different view of that 25 feet based on that.
10      Q.  All right.
11      A.  I mean, because it actually
12   indicates that you could go deeper in two foot
13   increments beyond that.
14      Q.  But in fairness to Counsel, was I
15   right?  It is the draft work plan for the
16   excavation of the concrete anchor foundation
17   blocks and steel forms in August of '01?
18   2001?
19      A.  Yes.
20      Q.  All right.  Would you agree with me
21   that your contract with the government
22   included, if not specifically, the general
23   admonition that the work would not damage the
24   integrity of the flood control structure on
25   the eastern boundary of the site?
```

|  | Page 283 |
|---|---|

```
 1      A.  I think that was the intent, that it
 2   would not.
 3      Q.  And it's your view that the
 4   government did not expect WGI to consider
 5   under-seepage and/or under-seepage controls
 6   that may have become necessary as a result of
 7   the work done pursuant to the contract?
 8      A.  That's correct.
 9      Q.  And it is true that WGI did not
10   consider the impact that excavation may have
11   had in allowing water to intrude into porous
12   soil layers below the surface of the work
13   site?
14      A.  You would have to --
15      Q.  Read it back to you?
16      A.  Yes.
17      Q.  Sure.  Let me pull it up.  All
18   right.  Here's the question.  And it is true
19   that WGI did not consider the impact that
20   excavation may have had in allowing water to
21   intrude into porous soil layers below the
22   surface of the work?  Isn't that true?
23      A.  Can you -- Can you be specific about
24   an area that we're talking about?  Or what are
25   we specifically talking about?
```

|  | Page 284 |
|---|---|

```
 1      Q.  Well, let me ask you this then.
 2   You're aware, are you not, that there are a
 3   variety of layers of different types of soil
 4   below the work surface?  That was the subject
 5   of the contract with the government; right?
 6      A.  There are varying -- It's not a
 7   homogeneous material.  There's some different
 8   materials.
 9      Q.  The top layer may be clay, the next
10   layer may be peat, the next layer may be sand,
11   et cetera.  Right?
12      A.  I think --
13         MS. WAGER-ZITO:
14         Objection.
15         THE WITNESS:
16         I think typically most of the top
17      surface of materials, there was some
18      topsoil and some sand on the surface,
19      and clay below that.
20   EXAMINATION BY MR. BRUNO:
21      Q.  All right.  And these materials have
22   varying degrees of porosity.  Isn't that true?
23      A.  That's true.
24      Q.  All right.  And porosity is a
25   measure of how easily water can move through
```

|  | Page 285 |
|---|---|

```
 1   the material; right?
 2      A.  Yes.
 3      Q.  All right.  And the issue with
 4   seepage and porosity is that if water can more
 5   easily move under the surface than it did
 6   before the work, then in high water level
 7   conditions, the pressure of that high water
 8   level can push this water through the porous
 9   soils and then under the particular structure,
10   a house or whatever, and cause what's called
11   upheave?  Right?
12         MS. WAGER-ZITO:
13         Objection.
14         THE WITNESS:
15         I am -- You would have to --
16      You're talking in a generality of
17      something --
18   EXAMINATION BY MR. BRUNO:
19      Q.  Yes.
20      A.  -- that could occur?
21      Q.  Yes.  I'm not saying specifically
22   anything.  Just generalities.  Because I am
23   giving you the context of my question which I
24   am going to reask.
25      A.  But you're saying before the work
```

                                  72 (Pages 282 to 285)

Page 286

1  and after the work.
2      Q.  Right.
3      A.  And that ties it to something, an
4  actual occurrence versus potential, an "if" or
5  something.
6      Q.  Well, and the only reason I did is
7  because my question related to that
8  potential.  So I have to ask it that way.
9      A.  Okay.
10     Q.  I didn't say it happened, but the
11 potential for it happening.  So I am saying
12 then, let me just clarify for you, that if you
13 have soil conditions which block the ability
14 of water to cause heave and then one does some
15 work on the site which puts a hole in that
16 layer such that the water can now travel
17 through and cause heave in high water
18 conditions, the process is that the head
19 pressures become higher and, because there's
20 nothing keeping the water down, it goes up and
21 causes a heave.  I am just trying to see if
22 you agree with me that's the general method by
23 which the porosity of materials could be
24 related to heave.  That's all.
25         MR. EHRLICH:

Page 287

1         Object to form.
2         MS. WAGER-ZITO:
3         Object to the form.
4         THE WITNESS:
5         Yeah, it's really a geotechnical
6     question.  I don't know how to answer.
7  EXAMINATION BY MR. BRUNO:
8      Q.  Okay.  So you don't know how the
9  porosity of materials may be related to heave;
10 right?
11     A.  I understand that water passes
12 through permeable materials more quickly than
13 it was -- or more easily than it does
14 non-porous materials or non-permeable
15 materials.
16     Q.  Have you heard of heave in that
17 context of the permeability of soils?
18     A.  No.
19     Q.  Have you heard of sand boils?
20     A.  Yes.
21     Q.  What is a sand boil?
22     A.  I don't -- I saw it in one of the
23 documents.  I don't think I saw it defined in
24 a document.
25     Q.  All right.  Now, all of that to ask,

Page 288

1  to go back to this question, which was do you
2  agree with me that WGI did not consider the
3  effect that an excavation may have in allowing
4  water to penetrate into a porous strata and
5  potentially impact negatively the flood
6  control structure?
7      A.  I think that was not within the
8  scope of what we were trying to do.
9      Q.  Okay.
10     A.  Or what we were contracted to do.
11     Q.  All right.  So you didn't do it.
12 Fair?
13     A.  I think we didn't do it.
14     Q.  Okay.
15         MR. EHRLICH:
16         How much longer do you have?  I
17     know we're at the seven hours since we
18     started this morning.
19         MR. BRUNO:
20         Are we really?  I don't have much
21     longer.
22         MR. EHRLICH:
23         Okay.
24         MR. BRUNO:
25         In fact, we'll break and I'll

Page 289

1  visit with Scott and see if we haven't
2  finished.
3         MR. EHRLICH:
4         Okay.
5         MR. BRUNO:
6         How about that?
7         VIDEO OPERATOR:
8         Off the record, it is 3:41.
9     (Recess.)
10        VIDEO OPERATOR:
11        Returning to the record, it is
12     3:43.
13 EXAMINATION BY MR. BRUNO:
14     Q.  Just one or two more questions.  Mr.
15 Staggs, we have talked all day about the Corps
16 approving your work plans.  The Corps is a big
17 organization.  The office of the Corps that
18 approved the work plans was the New Orleans
19 District office.  Isn't that true?
20     A.  That's true.
21     Q.  Okay.  Did you have any interaction
22 with the Vicksburg Division office?
23     A.  No.
24     Q.  Do you know if the Vicksburg office,
25 Division office which I believe is called the

PHILLIP STAGGS                                                    4/26/2008

Page 290

1   Lower Mississippi Valley office, approved any
2   of the plans or specifications that were
3   developed by Washington Group International?
4      A.  I don't know.
5      Q.  Okay.  Do you recall seeing any
6   signatures or approvals from the Vicksburg
7   office as opposed to the New Orleans District
8   office?
9      A.  I do not.
10     Q.  Okay.  Would it be fair for me to
11  conclude that all of the approvals that you
12  recall having seen were from the New Orleans
13  District office?
14     A.  That's what I recall.
15     Q.  All right.
16        MR. BRUNO:
17           With that, I do appreciate your
18        sitting here and visiting with us
19        today and hope you have some time with
20        your family.
21        THE WITNESS:
22           All right.
23        MR. BRUNO:
24           Thank you very much.
25        VIDEO OPERATOR:

Page 291

1           This concludes this deposition.
2        It's 3:55.
3              *    *    *
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 292

1
2        WITNESS'S CERTIFICATE
3
4      I, PHILLIP LEE STAGGS, read or have
5   had the preceding testimony read to me, and
6   hereby certify that it is a true and correct
7   transcription of my testimony, with the
8   exception of any attached corrections or
9   changes.
10
11
         _____
12         (Witness' Signature)
13   _____
     DATE SIGNED
14
15   DEPONENT PLEASE INITIAL ONE:
16
     _____ Read with no corrections
17
18   _____ Read and correction sheet attached
19
20   DATE TAKEN:  APRIL 26, 2008
21
22
23
24
25

Page 293

1
2        REPORTER'S CERTIFICATE
3
4      I, ROGER D. JOHNS, RMR, RDR, CRR,
5   Certified Court Reporter, do hereby certify
6   that the above-named witness, after having
7   been first duly sworn by me to testify to the
8   truth, did testify as hereinabove set forth;
9   that the testimony was reported by me in
10  shorthand and transcribed under my personal
11  direction and supervision, and is a true and
12  correct transcript, to the best of my ability
13  and understanding; that I am not of counsel,
14  not related to counsel or the parties hereto,
15  and not in any way interested in the outcome
16  of this matter.
17
18
19
20        ROGER D. JOHNS
21      CERTIFIED COURT REPORTER
22        STATE OF LOUISIANA
23
24
25