# EXHIBIT 7

GRIESHABER, Ph.D., JOHN

6/27/2008

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE: KATRINA CANAL BREACHES      CIVIL ACTION

CONSOLIDATED LITIGATION            NO. 05-4182 K2

                                   JUDGE DUVAL

PERTAINS TO:  MRGO AND ROBINSON

                 (No. 06-2268)


        Rule 30(b)(6) deposition of THE UNITED

STATES OF AMERICA, BY AND THROUGH THE UNITED

STATES ARMY CORPS OF ENGINEERS' DESIGNEE JOHN

GRIESHABER, Ph.D., P.E., given at the U.S. Army

Corps of Engineers New Orleans District

offices, 7400 Leake Avenue, New Orleans,

Louisiana 70118-3651, on June 27th, 2008.


REPORTED BY:

        JOSEPH A. FAIRBANKS, JR., CCR, RPR

        CERTIFIED COURT REPORTER #75005

GRIESHABER, Ph.D., JOHN

6/27/2008

---

Page 2

1  APPEARANCES:
2  REPRESENTING THE PLAINTIFFS:
3      BRUNO & BRUNO
4      (BY:  JOSEPH M. BRUNO, ESQUIRE)
5      (BY:  SCOTT JOANEN, ESQUIRE)
6      (BY:  FLORIAN BUCHLER, ESQUIRE)
7      855 Baronne Street
8      New Orleans, Louisiana 70113
9      504-525-1335
10
11  REPRESENTING THE UNITED STATES OF AMERICA:
12      UNITED STATES DEPARTMENT OF JUSTICE,
13      TORTS BRANCH, CIVIL DIVISION
14      (BY:  RICHARD STONE, ESQUIRE)
15      (BY:  DAN BAEZA, ESQUIRE)
16      P.O. Box 888
17      Benjamin Franklin Station
18      Washington, D.C. 20044
19      202-616-4289
20
21
22
23
24
25

---

Page 4

1      E X A M I N A T I O N   I N D E X
2
3  EXAMINATION BY:                    PAGE
4
5  MR. BRUNO  ...............................6
6      E X H I B I T   I N D E X
7
8  EXHIBIT NO.                    PAGE
9  Exhibit 1  ...............................11
10 Exhibit 2  ...............................11
11 Exhibit 3  ...............................11
12 Exhibit 4  ...............................47
13 Exhibit 5  ...............................94
14 Exhibit 6  ...........................109
15 Exhibit 7  ...........................110
16 Exhibit 8  ...........................115
17 Exhibit 9  ...........................115
18 Exhibit 10  ...........................133
19 Exhibit 11  ...........................148
20 Exhibit 12  ...........................151
21 Exhibit 13  ...........................197
22 Exhibit 14  ...........................198
23 Exhibit 15  ...........................218
24 Exhibit 17  ...........................234
25

---

Page 3

1  REPRESENTING THE U.S. ARMY CORPS OF ENGINEERS.
2      CORPS OF ENGINEERS, OFFICE OF COUNSEL
3      (BY:  JENNIFER LABOURDETTE, ESQUIRE)
4      7400 Leake Avenue
5      New Orleans, Louisiana 70118-3651
6      504-862-2843
7
8  ALSO PRESENT:
9      ROBERT FISHER, ESQ.
10     WILLIAM D. TREEBY, ESQ.
11     CHARLES SUTTON, ESQ.
12     R. SCOTT HOGAN, ESQ.
13     JOSEPH E. BEARDEN, III, ESQ.
14     CHRISTOPHER ALFIERI, ESQ.
15     RICHARD PAVLICK, ESQ.
16
17  PRESENT VIA I-DEP:
18     ERIC GOLDBERG, ESQ.
19     RONALD KITTO, ESQ.
20     CHRISTOPHER ALFIERI, ESQ.
21
22  VIDEOGRAPHER:
23     TODD MEAUX (DEPO-VUE)
24
25

---

Page 5

1      S T I P U L A T I O N
2          IT IS STIPULATED AND AGREED by and
3  among counsel for the parties hereto that the
4  deposition of the aforementioned witness may be
5  taken for all purposes permitted within the
6  Federal Rules of Civil Procedure, in accordance
7  with law, pursuant to notice;
8          That all formalities, save reading
9  and signing of the original transcript by the
10 deponent, are hereby specifically waived;
11         That all objections, save those as to
12 the form of the question and the responsiveness
13 of the answer, are reserved until such time as
14 this deposition, or any part thereof, is used
15 or sought to be used in evidence.
16
17
18          *  *  *
19
20
21
22          JOSEPH A. FAIRBANKS, JR., CCR, RPR,
23 Certified Court Reporter in and for the State
24 of Louisiana, officiated in administering the
25 oath to the witness.

---

2 (Pages 2 to 5)

GRIESHABER, Ph.D., JOHN

6/27/2008

Page 6

1    MR. BRUNO:
2        This is a Notice of Deposition
3    taken pursuant to Rule 30(b)(6) of the
4    Federal Rules.
5        Counsel, would you be so kind as
6    to identify the person who the
7    government has appointed today to
8    appear in response to this notice and
9    the particular paragraphs to which he
10   will be speaking?
11   MR. STONE:
12       It's Mr. John Grieshaber,
13   G-R-I-E-S-H-A-B-E-R.  And the topics
14   are 27, 28, 31, 34 to 37.
15   MR. BRUNO:
16       Great.  Thank you.
17       With that, would you swear the
18   witness?
19   JOHN GRIESHABER, PH.D., P.E.
20   USACE HPO, NOD, 7400 Leake Avenue, New Orleans,
21   Louisiana 70118, a witness named in the above
22   stipulation, having been first duly sworn, was
23   examined and testified on his oath as follows:
24   EXAMINATION BY MR. BRUNO:
25   Q.  Good morning, sir.  My name is Joseph

Page 7

1    Bruno.
2        First, have you ever given a
3    deposition before?
4    A.  Yes, I have.
5    Q.  So you're you generally know the rules
6    of the game.
7    A.  (Nods affirmatively.)
8    Q.  Let me just share with you just once
9    again what you may encounter this morning.
10   From time to time counsel for the government
11   may object, which is their right; however, we
12   are reserving a ruling on the objection until
13   the deposition is sought to be used at trial.
14   So unless your counsel instructs you not to
15   answer, you should answer the question.  Okay?
16   Is that fair?
17   A.  I understand.
18   Q.  All right.  As between you and I, my
19   rules are real simple.  You're the boss of
20   breaks.  If you need to get a cup of coffee or
21   you need a personal break, you just hold up
22   your hand, we'll stop immediately.  Okay?
23       With regard to my questions, if you
24   don't understand them or they don't make any
25   sense to you, just holler, just tell me, and I

Page 8

1    will do what I can to rephrase the question so
2    that you and I can be on the same page.
3    A.  I understand.
4    Q.  There it is.
5        All right.  When is the first time
6    that you were made aware that the government
7    was going to appoint you to represent it in the
8    context of this deposition?
9    A.  I guess about two weeks ago.
10   Q.  Okay.  How many times did you meet
11   with counsel for the government in preparation
12   for the deposition?
13   A.  Twice.
14   Q.  Okay.  And for how long did you meet
15   with them on each of those occasions?
16   A.  I guess a half hour the first time,
17   two plus hours the second time.
18   Q.  Okay.  Now, do you know how it was
19   that you were selected to speak on behalf of
20   the government for the particular paragraphs?
21   A.  Um -- I really don't know the definite
22   way it happened.  I just was told it was
23   happening.
24   Q.  It's you.
25   A.  Got it.

Page 9

1    Q.  All right.  That's fine.
2        Did you review any documents in
3    preparation for this deposition?
4    A.  I was shown some documents, and I went
5    and reviewed the page in the DM, the P&S that
6    showed the pile lengths, tip elevations and top
7    of wall.
8    Q.  Okay.  Let me get you to explain for
9    the record, DM means?
10   A.  That's a design manual.  The, um --
11   P&S are the plans by which the wall was
12   built.
13   Q.  All right.  The wall is which wall?
14   A.  Is the wall -- the IHNC floodwall that
15   we're speaking of.
16   Q.  Okay.
17   MR. BRUNO:
18       Richard, can you just give me the
19   Bates number on that?
20   MR. STONE:
21       I don't have a Bates number.
22   MR. BRUNO:
23       Why don't we just produce it,
24   then, if you don't mind.
25   MR. STONE:

3  (Pages 6 to 9)

GRIESHABER, Ph.D., JOHN

6/27/2008

Page 10

```
1          We will produce it if you ask for
2     it.
3          MR. BRUNO:
4              I'm trying to make it easier on
5          both of us.
6     EXAMINATION BY MR. BRUNO:
7      Q.  Is there more than one design
8     memorandum?  I'm trying to recall.  I think
9     there were some amendments over time.
10     A.  I really don't know.
11     Q.  Do you recall the year of this
12    particular document?  Since you're looking at
13    it --
14         MR. STONE:
15             If you have it there with you,
16         share it with him, it's okay.  It's
17         not a problem.
18    EXAMINATION BY MR. BRUNO:
19     Q.  All right.
20     A.  I'm looking for a date on it.  I think
21    I was like 1969, but --
22     Q.  All right.  Is that your only copy?
23     A.  Yeah.  But I'm sure that wherever I
24    got it from we can get another one.
25         MR. BRUNO:
```

Page 11

```
1              Do you mind if I mark it,
2          Richard?
3          MR. STONE:
4              No.  Go right ahead.
5          MR. BRUNO:
6              By the way, I've marked for the
7          record already the Notice of
8          Deposition, I've marked that as
9          Number 1.
10         (Exhibit 1 was marked for
11    identification and is attached hereto.)
12         MR. BRUNO:
13             Counsel has been kind enough to
14         provide me with a biography which I've
15         marked as Number 2.
16         (Exhibit 2 was marked for
17    identification and is attached hereto.)
18         MR. BRUNO:
19             And I'm going to mark this piece
20         of paper as Number 3.
21         (Exhibit 3 was marked for
22    identification and is attached hereto.)
23         MR. TREEBY:
24             Is it possible -- I mean, this
25         has been -- the depositions I've been
```

Page 12

```
1     at I thought we had an understanding
2     that documents that were used we were
3     going to get documents.
4          MR. BRUNO:
5              No, we don't have an
6     understanding, particularly with you.
7          MR. TREEBY:
8              I provide documents at every --
9          MR. BRUNO:
10             I know that.
11         MR. TREEBY:
12             To you.
13         MR. BRUNO:
14             I know.
15         MR. TREEBY:
16             So you're not going to provide
17         them the other way?
18         MR. BRUNO:
19             Bill, the witness showed up with
20         one copy of the document.
21             Do you want to stop the
22         deposition to get copies?  I just
23         don't want it to count against my
24         time.
25         MR. TREEBY:
```

Page 13

```
1              I don't know about your time --
2          MR. BRUNO:
3              I know about my time.
4          MR. TREEBY:
5              The problem exists --
6          MR. BRUNO:
7              Bill, the witness just gave me
8          this piece of paper.  He doesn't have
9          copies.  Do you want copies, yes or
10         no?  Make it simple
11         MR. TREEBY:
12             Yes.
13         MR. BRUNO:
14             Yes.  Let's stop the deposition.
15             Would you make some copies for
16         Mr. Treeby.
17         (Off the record.)
18    EXAMINATION BY MR. BRUNO:
19     Q.  All right.  Now, you previously
20    indicated on the record that this document
21    which we've marked as Plaintiff 3 was provided
22    to you by counsel for the government?
23     A.  No.
24     Q.  I'm sorry.
25     A.  It was provided by someone in
```

4 (Pages 10 to 13)

GRIESHABER, Ph.D., JOHN

6/27/2008

Page 14

1    structures branch in engineering division.
2        Q.  All right.  It doesn't have a Bates --
3        MR. STONE:
4            I won't let you inquire into
5        anything that I've provided him as
6        counsel.  That's attorney/client
7        privilege and work product.
8        MR. BRUNO:
9            Well, we'll deal with that with
10       the judge.
11       MR. STONE:
12           We certainly will.
13       MR. BRUNO:
14           That's fine.  It doesn't have a
15       Bates number on it, so -- you think
16       it's necessary for us to figure out
17       this Bates number or you just want to
18       go with this?
19       MR. STONE:
20           It's in our Rule 26 --
21       MR. BRUNO:
22           I know it is.
23       MR. STONE:
24           -- and we can get you a Bates
25       number if we need it.  Let's go with

Page 15

1        it like it is.  Let witness identify
2        it.
3        MR. BRUNO:
4            We'll go with it like it is.  I
5        will, Richard.  I still want to get a
6        Bates number for it.  It will take us
7        hours and hours and hours to figure
8        out the Bates number.  Do you think --
9        MR. STONE:
10           We'll help you with that.
11       MR. BRUNO:
12           Thanks.  I appreciate that.
13   EXAMINATION BY MR. BRUNO:
14       Q.  All right.  Now, what is this
15   document, Mr. Grieshaber?
16       A.  That is a document that shows a
17   cross-section of the wall in the vicinity of
18   the failures.
19       Q.  All right.  In the vicinity of one or
20   both?
21       A.  Um -- I will have to look and see.
22       Q.  Sure.  (Tendering.)
23       A.  I think it's just the south failure.
24       Q.  Okay.  And for the record, we have
25   been, I think, referring to the breaches on the

Page 16

1    east bank of the IHNC as the north and south
2    breach.  But for the record, this is the breach
3    that's closer to --
4        A.  The Claiborne bridge.
5        Q.  Okay.  Now, this is what's commonly
6    referred to as an as-built drawing, right?
7        A.  I do not -- I don't know.  I just
8    asked structures to give me a cross-section,
9    and that's what I got.
10       Q.  Okay.  When you maintain files of what
11   the Corps has built, you keep in your file a
12   plan which describes what was actually built in
13   the field, right?
14       A.  Correct.
15       Q.  All right.  Are you familiar with the
16   term as-built drawings?
17       A.  Yes, I am.
18       Q.  Okay.  On this document, it says, as
19   constructed.  Can I conclude that this is an
20   as-built drawing?
21       A.  I would assume so.
22       Q.  All right.  You are certainly relying
23   on this document to reflect, for your
24   appearance today, the sheet pipe tip; right?
25       A.  That's correct.

Page 17

1        Q.  All right.  Now would you kindly show
2    me where on the document one might look in
3    order to ascertain what the depth is of the
4    sheet pile tip in that wall?
5        A.  You would look at the section, go to
6    the bottom, it will give the tip elevation.  It
7    says, existing sheet pile, and it gives you the
8    tip elevation.
9        Q.  All right.  And I see you've
10   highlighted it in yellow, and it says elevation
11   -8.0?
12       A.  Correct.
13       Q.  Do you know what datum is being
14   referenced by the elevation -8.0, plus or
15   minus?
16       A.  I don't know.
17       Q.  All right.  Now, do you know whether
18   or not this drawing which you've told me is
19   near the south break reflects the sheet pile
20   depth for the entire length of that floodwall
21   from the -- I forget, what's the bridge?  The
22   Florida bridge?
23       A.  Florida Avenue is the bridge --
24       Q.  Florida is on the north?
25       A.  Yes.

5  (Pages 14 to 17)

GRIESHABER, Ph.D., JOHN

6/27/2008

Page 18

1  Q.  And Claiborne to the south?
2  A.  I do not know that for a fact.
3  Q.  Okay.  All right.
4     MR. STONE:
5        Before you go any further, Joe,
6     Item Number 27 asks for us to present
7     a witness who can speak to all plans,
8     specifications, surveys, et cetera,
9     that you have there.  We assumed that
10    you would pull plans and surveys that
11    you wanted to specifically ask about.
12    So if you have any for any of this,
13    um --
14    MR. BRUNO:
15       Well, I don't know that I need to
16    pull anything.  The witness is
17    supposed to be knowledgeable about the
18    subject, and I'm presuming that
19    knowledge.
20    MR. STONE:
21       Well, he's going to cover this
22    topic.
23    MR. BRUNO:
24       Well, this topic, do you agree
25    with me, covers all plans,

Page 19

1     specifications, surveys, and/or
2     reports identifying the sheet pile
3     depth of the East Bank Industrial Area
4     flood protection system?
5     MR. STONE:
6        Yes, if you have a plan you want
7     to ask him about --
8     MR. BRUNO:
9        I thought I was.  I was asking
10    him those questions, and he told me he
11    didn't know.
12    MR. STONE:
13       I'm trying not to interfere here.
14    MR. BRUNO:
15       I understand that.  I want to
16    make it clear for the record, I am
17    asking questions about the sheet pile
18    depth, and the witness said he didn't
19    know.
20    MR. STONE:
21       Go forward.
22    MR. BRUNO:
23       Thank you.
24    EXAMINATION BY MR. BRUNO:
25    Q.  So at the north breach,

Page 20

1  Mr. Grieshaber, do you know what the sheet pile
2  tip elevation is?  Or was, I should say.  It's
3  not there anymore.
4     A.  I would have to see a set of plans.  I
5  don't know it off the top of my head.
6     Q.  All right.  But do you know -- how
7  does one reference these plans to a particular
8  location along the length of this wall between
9  Florida Avenue and South Claiborne Avenue?
10    A.  It would be by station numbers.
11    Q.  Okay.  All right.  Do you know what
12 the station numbers are that are applicable to
13 this length of wall?
14    A.  Not off the top of my head.
15    Q.  Okay.  Does the document Plaintiffs'
16 Exhibit 3 at least give you some reference to
17 some of the stations?
18    A.  Yes, it does.  It gives station
19 numbers.
20    Q.  What station numbers do you see there?
21    A.  30+00 coming off of Drawing 6 to --
22    Q.  I'm sorry.  30+ --
23    A.  00, going to 36+50, it looks like.
24    Q.  All right.
25    A.  It might be 90.  It's hard to read on

Page 21

1  this drawing.
2     Q.  Okay.  Am I correct that you're
3  reading from what's indicated here as the match
4  line 30+00, and it says drawing -- I guess that
5  says Drawing 6, I'm not sure.  That makes
6  sense.  And in the bottom here, it says, match
7  line 36+90, Drawing Number 8.
8     A.  Correct.
9     Q.  Okay.  So this must be Drawing
10 Number 7.
11    A.  Correct.
12    Q.  Got you.  Now, if you go on Page 2, it
13 refers to 0+67S to 0+00S.  Can you tell me what
14 that reference is?
15    A.  This says this is the wall section
16 between those stations.
17    Q.  Can you please tell me how those
18 stations relate to the 30+0-0 to 36+90?
19    A.  Well, they're off the page.  They're
20 way over on this end.  Okay?
21    Q.  Okay.
22    A.  The only section that represents, on
23 this page, sheet 7, would be -- it goes from 30
24 to 36 -- would be this one down here.
25 (Indicating.)  22 to 56.

6  (Pages 18 to 21)

GRIESHABER, Ph.D., JOHN

6/27/2008

---

Page 22

1     Q. All right. So that the one that
2  you've highlighted, what station -- if you
3  don't mind, let's highlight that in pink. It's
4  a nice color.
5     A. The one that's highlighted is Station
6  7+50 to 16+08.
7     Q. Okay. And then the one you're
8  highlighting in pink is the one you've just
9  described.
10    A. Right.
11    Q. Okay. Would you happen to know,
12 Mr. Grieshaber, if the one in pink, the 16+ to
13 22, do you know where that is?
14    A. You'd have to look on a plan map.
15 It's however many feet it lays out.
16    Q. Okay. From this location.
17    A. Correct.
18    Q. All right, sir. But it appears that
19 from 1+57 -- I'm sorry. From 0 to 56, all of
20 these elevations show a sheet pile tip of -8.
21    A. That's correct.
22    Q. All right. Do you know if the 0 is
23 the start point and the 56 is this finish
24 point?
25    A. I'd have to see the plans to know.

---

Page 23

1     Q. Okay. All right. Fair enough.
2        Now, these plans are dated November
3  '69, with an added note January 14, 1970.
4        Can we conclude that what's depicted
5  here was as built at the time of Hurricane
6  Katrina?
7     A. To the best of my knowledge, that's
8  what was there.
9     Q. Okay. And can we also accept this to
10 accurately reflect the sheet pipe tip depths in
11 place from 1969 to the time of Katrina?
12    A. We should be able to.
13    Q. Okay. Good. Thank you very much.
14    A. Now, that's dependent on which datum
15 you tied to.
16    Q. Of course.
17    A. Okay.
18    Q. Do you know if the datum changed, that
19 is -- forgive me. The datum that the Corps was
20 using in 1969, did it change up until the time
21 of Hurricane Katrina?
22    MR. STONE:
23        Objection.
24    A. I would have to see the datum
25 referenced on the plans to say for sure.

---

Page 24

1  EXAMINATION BY MR. BRUNO:
2     Q. Is there a datum referenced on the
3  document which we've marked as Plaintiffs'
4  Number 3?
5     A. I don't see it on this section.
6     Q. All right. Thank you. Okay. Your
7  biography reflects that you became the chief
8  for the execution support in the New Orleans
9  District Hurricane Protection Office in March
10 of 07.
11    A. That's correct.
12    Q. Was there such an office before
13 Hurricane Katrina?
14    A. No, there was not. This office was
15 developed for the rebuilding of the hurricane
16 protection system.
17    Q. Okay. It says here that you've served
18 your time. You've got 30 years in.
19    A. Yes. That is true.
20    Q. God bless you. And the majority of
21 your time has been spent at the geotechnical
22 branch in the engineering division.
23    A. That's correct.
24    Q. So you've seen some folks come and go
25 over time.

---

Page 25

1     A. Yes, I have.
2     Q. For the record, would you share with
3  us what is a geotechnical engineer?
4     A. Geotechnical engineering, um -- is the
5  study of soils and their response to loading,
6  and it is an area of engineering that addresses
7  how loads are transferred into soils, how
8  they're carried by soils.
9     Q. Okay. Does it include the study of
10 underseepage as it relates to levees?
11    A. Yes, it does.
12    Q. Okay. Can you tell me where you
13 worked from 1999 until Hurricane Katrina?
14    A. I was in the geotechnical branch up
15 and to around 2002. I did a short stint of
16 four months as a chief of civil branch, and
17 then I became the assistant chief of
18 engineering division.
19    Q. All right. So let's see now. You
20 became the assistant chief of the engineering
21 division in approximately what year?
22    A. Um -- I guess it was late '02, early
23 '03.
24    Q. All right. And you were the chief
25 of -- I'm sorry. Of?

---

7 (Pages 22 to 25)

GRIESHABER, Ph.D., JOHN

6/27/2008

Page 26

1   A.  Civil branch.
2   Q.  For the civil branch.
3   A.  And that was from August until -- it
4  was like four months.
5   Q.  Until you became the assistance
6  chief --
7   A.  Right.
8   Q.  -- of engineering division.
9     And what was your role in the
10  geotechnical branch?
11   A.  Um -- I was a section chief in the
12  structural section.  At the time, geotech was
13  broken down into two distinct design sections;
14  one was structures, and one was dams, levees
15  and channel slopes.
16   Q.  Are you familiar with the east bank
17  area and the work that was done by the
18  Washington Group International in that area?
19   A.  I know -- I know excavations were done
20  as part of an HTRW cleanup.
21   Q.  What I'd like to do first is
22  understand how the organization -- which part
23  or components of the organization would have
24  been responsible for overseeing this project.
25  Okay?

Page 27

1     MR. STONE:
2       Joe, I'm going to object to this
3     line of questioning, but I'm not going
4     to instruct the witness not to answer.
5     I'll give you some leeway on it.  But
6     he's here as a 30(b)(6) witness on
7     these topics that we've listed.
8     MR. BRUNO:
9       All right.
10     MR. STONE:
11       So proceed, if you would, but I
12     do object.
13  EXAMINATION BY MR. BRUNO:
14   Q.  Well, to get right to the point, I
15  guess what I'd like to know is, you've been
16  designated as the 30(b)(6) witness for these
17  areas.  These areas obviously regard work done
18  in that area.
19   A.  Okay.
20   Q.  What I'm trying to figure out is who
21  would have been in charge of the day-to-day
22  responsibilities as related to these issues in
23  this notice within the organizational structure
24  at the Corps during the time that WGI did this
25  work.  Would it have been you, for example?

Page 28

1   A.  No.  What happens, there was an actual
2  contract out there --
3   Q.  Right.
4   A.  -- and the work was done by the
5  contractor.  Um -- a task order was set up with
6  certain requirements in it.  There was someone
7  from construction division who oversaw that
8  contract.  And as far as the geotechnical
9  branch would go, problems or concerns of a
10  geotechnical nature that are identified by the
11  construction individual would come back through
12  engineering, and if they're geotechnical in
13  nature they would go to the geotech branch to
14  look at, make recommendations on,
15  interpretations of.
16   Q.  All right.  Now, when you say the
17  construction individual, are you referring to a
18  Corps employee?
19   A.  A Corps employee.
20   Q.  All right.  And that would be the same
21  guy, whoever was in charge of the construction
22  contract.
23   A.  Correct.
24   Q.  All right, sir.  Do you recall who
25  that was?

Page 29

1   A.  Not really.
2   Q.  Lee Guillory?
3   A.  That's a possibility.  He was here.
4   Q.  And I know you're not designated for
5  that.  I'm trying to get some reference points
6  here.
7   A.  Okay.
8   Q.  So but the bottom line is, though,
9  that the way the Corps is organized, you in
10  geotechnical support don't go out to the site
11  to see what problems exist, you respond to
12  requests for assistance by the Corps
13  construction person who may or may not have
14  been Mr. Guillory.
15   A.  There are site visits.  There's no one
16  restricting site visits.  But as far as going
17  out to look at a particular aspect, it's
18  usually a request from the construction side of
19  the house to have an engineering individual
20  come look at something.  We send individuals
21  out to jobs so they're knowledgeable of what's
22  going on, to see just the day-to-day operations
23  of the jobs.  But it's strictly as an
24  oversight, you know, so that they're -- they
25  can learn what's going on out there and

8  (Pages 26 to 29)

GRIESHABER, Ph.D., JOHN

6/27/2008

Page 30

1  hopefully take some of that and have a better
2  understanding the next time we get into a
3  situation like this. But problems, you know,
4  that's a totally different thing; there's a
5  formal process where they actually go to
6  engineering division for help.
7     Q.  Are you familiar with this document
8  which --
9     MR. BRUNO:
10       Let's pass it around first.
11    MR. STONE:
12       The parties have agreed that we'd
13    just pass the document to Mr. Treeby
14    and then down to me and to the
15    witness.
16    MR. JOANEN:
17       And this is from the IPET
18    website.
19    MR. TREEBY:
20       Does this have Bates numbers?
21    MR. JOANEN:
22       No. It's from the IPET website.
23    MR. TREEBY:
24       Since I'm sure you'll ask the
25    witness this, but since it's doesn't

Page 31

1  have Bates numbers, would you have the
2  witness, or would you, Joe, just read
3  the title on the document?
4     MR. BRUNO:
5       If he doesn't know anything about
6     it I may not even do that.
7  EXAMINATION BY MR. BRUNO:
8     Q.  The question on the table,
9  Mr. Grieshaber, is just to take a look at the
10 document for the purposes of ascertaining
11 whether or not you have any knowledge or
12 information about the document or the subject
13 of the document.
14    MR. STONE:
15       Now, that's -- I mean, this
16    gentleman is really a knowledgeable
17    person in the Corps. He probably
18    knows a lot about all this stuff.
19    MR. BRUNO:
20       It ain't that hard.
21    MR. STONE:
22       If you've got a specific question
23    about it --
24    MR. BRUNO:
25       That's a very specific question.

Page 32

1       This document regards the construction
2       of the new lock, which is obviously
3       why the work was done to clear out the
4       area next to the east bank industrial
5       site.
6     A.  This is a part of one of the designs
7  that was done for the float in scheme of the
8  IHNC lock.
9  EXAMINATION BY MR. BRUNO:
10    Q.  Right.
11    A.  Have I gone through it and looked at
12 it?
13    Q.  No. No. That wasn't the question.
14 All I want to know is --
15    A.  Got it.
16    Q.  I'm not playing that with you. I just
17 wanted to know if you're familiar with --
18    A.  Yes, I am. There were designs done in
19 association with the, um -- the float in scheme
20 of the IHNC lock.
21    Q.  All right. For the purposes of the
22 record, what we have shown the witness is a
23 document that is entitled Inner Harbor
24 Navigation Canal Lock Replacement Project,
25 Orleans Parish, Louisiana, Lateral Flood

Page 33

1  Protection Design Report, Contract Number DACW
2  29-99-D-0022, prepared for the Department of
3  the Army, the New Orleans District Corps of
4  Engineers, New Orleans, Louisiana, prepared by
5  Brown, Cunningham & Gannuch, Engineers,
6  Architects and Consultants, who are located at
7  2701 Kingman Street, Metairie, Louisiana, if
8  one should need engineering services.
9       Now, it's a lengthy document and I
10 think there's a something called an
11 alternate -- there it is. To be fair, there's
12 a second document behind it that simply says
13 Lateral Flood Protection, DDR Number 2,
14 Alternative Study, same contract number, same
15 engineers and architects.
16      Now, all I want to know is, do you
17 know whether or not this design called for the
18 installation of sheet pile to a depth of I
19 think it's over 60 feet around this lock?
20    A.  I would have to see the design to see
21 what loading they were using.
22    Q.  Okay.
23    A.  Off the top of my head I don't know
24 what the tip elevation is in that report, no.
25    Q.  All right. That's fine. That's fine.

Johns Pendleton Court Reporters                    800 562-1285

GRIESHABER, Ph.D., JOHN

Page 34

```
 1        Do you know if this design called for
 2  the installation of sheet pile for the purposes
 3  of cutting off underseepage that may have been
 4  caused or may be caused by the dredging of the
 5  canal to the depth of 36 feet for ships, I
 6  think it's 21 feet for barges?
 7      A.  I would have to go through the report
 8  to know that.
 9      Q.  Okay.  As a person knowledgeable about
10  underseepage and its effect, is that something
11  that the Corps would consider to be possibly
12  necessary if one were to dig a channel to
13  36 feet in the location of the proposed lock
14  site?
15        MR. STONE:
16            Objection.  You say is that
17        something.  What does that
18        something -- what does that mean?
19        MR. BRUNO:
20            I don't know.
21        MR. STONE:
22            Are you adding onto your previous
23        question and using the previous
24        question?
25        MR. BRUNO:
```

Page 35

```
 1            I don't get it.  The question is
 2        what it is.  You can object to form.
 3        The witness can tell me, Joe, I don't
 4        know what the heck you're talking
 5        about.
 6        MR. STONE:
 7            Object to form.
 8  EXAMINATION BY MR. BRUNO:
 9      Q.  We made the deal, you and I, right?
10      A.  Okay.  Got it.
11      Q.  He's objecting to form, which means he
12  doesn't get it, which is fine.  It's possible
13  that -- there's a lot of reasons for that.  But
14  I want to talk to you.  And if you didn't get
15  it, I will re --
16      A.  Okay, then let's start all over again.
17      Q.  Fair enough.  Okay.  Well, let's do it
18  the hard way.  Do you have any knowledge of
19  what --
20      A.  We don't have to do it the hard way.
21  However you want to do it.
22      Q.  All right.  Well, I'm just trying to
23  give some background because I'm trying to
24  avoid future -- I always try to avoid the
25  objections.  People don't believe that.  I
```

Page 36

```
 1  really try.
 2        But what I'm trying to learn is is
 3  that when the Corps, in a situation like this,
 4  is dredging to 36 feet, possibly -- I know that
 5  the plans are not set in stone yet.  Are they?
 6      A.  No, they're not.
 7      Q.  Okay.  Would the Corps consider the
 8  necessity, perhaps, of installing a sheet pile
 9  to cut off the potential for underseepage under
10  the flood protection structure that may or may
11  not be affected by such dredging to 36-foot
12  depth?
13        MR. STONE:
14            Object to the hypothetical.
15        MR. BRUNO:
16            Okay.
17      A.  In the course of the design, we look
18  at all aspects of the geotechnical loading that
19  a wall could see.  And one of the aspects we
20  would look at is the effect of seepage.  If in
21  fact there is a seepage issue, then we would
22  mitigate that seepage issue by a number of
23  different methods, and one of them could be,
24  you know, driving sheets deep enough to either
25  cut off the seepage or lengthen the path of
```

Page 37

```
 1  seepage.
 2  EXAMINATION BY MR. BRUNO:
 3      Q.  Now, I'm just curious, because as I
 4  was looking at this document, and I'm showing
 5  you page Plate III-3.  This design, that is,
 6  this design for this lock replacement
 7  project -- again, understanding it hasn't been
 8  adopted by the Corps -- calls for another
 9  floodwall to be built outside of the existing
10  floodwall.  At least this is pre-Katrina, so
11  I'm going to say the then existing floodwall,
12  for the completeness of the question.
13        Is that accurate?
14      A.  Yes, that's what it's calling for.
15      Q.  All right.  Now, I guess what I'm
16  curious about is, I see -- and maybe I'm
17  reading it wrong, but I see that the sheet pile
18  tip is 65 feet.
19      A.  That's correct.
20      Q.  All right.  Now, so I'm wondering, is
21  that sheet pile tip depth necessary in order to
22  keep the sheet pile from sinking into the
23  earth?  Is that the reason why it's so deep?
24      A.  Okay.  Looking at this one plate, we
25  need to clarify that this is being loaded by
```

GRIESHABER, Ph.D., JOHN

6/27/2008

Page 38

1   Mississippi River water, the top of the sheet
2   pile is 23, and the elevation on the opposite
3   side is 0, which is a 23-foot head.  This plate
4   that we're looking at is a strictly a stability
5   plate.  Now, without weighing into the entire
6   process, I can't tell you whether or not
7   they're using this sheet pile to cut off a
8   failure surface or whether it's in here for
9   seepage.  Just looking at the stratification,
10  I'm not really seeing why it would be in here
11  for seepage cutoff.  But I mean I have to
12  weigh into the report.  You can also use sheet
13  pile to cut off a failure surface, and that may
14  be what they're using it for.
15      Q.  Okay.  Thank you.  Would you take a
16  quick look at Page 3-7 just the check to see if
17  maybe seepage was in fact one of the
18  considerations for that sheet pile tip
19  elevation?
20      MR. STONE:
21          Objection.  The report speaks for
22      itself.
23      A.  Okay, this is just a standard
24  statement that you would make as far as I-wall
25  seepage analysis.  It says the minimum sheet

Page 39

1   pile tip elevation was determined from the
2   worst case.  Tip elevation based on
3   overturning, which is the stability of the
4   wall --
5       Q.  Uh-huh.
6       A.  -- tip elevation based on the 3:1
7   penetration ratio, or a tip elevation based on
8   seepage.
9       Q.  All right.  And then it talks about
10  the plates right below it.
11      A.  Sheet pile overturning analysis was
12  formed by seawall sheet, computer program and
13  appropriate USACE criteria.  Seepage analysis
14  were performed for each design using Lane's
15  Weighted Creep Ratio.  All seepage analysis
16  contained a minimum factor of safety of 3
17  against piping.
18      Q.  Okay.  And then doesn't it refer to
19  the actual plates that we were just looking at?
20      A.  Right.  But these plates are stability
21  plates.  The results of the sheet pile analysis
22  using seawall sheet.  We were looking at a
23  stability plate.  That was not a seawall sheet
24  plate.
25      Q.  All right.

Page 40

1       A.  Okay?  Computer program were provided
2   in plate 3-16, 3-17, for I-walls on the east
3   side of the canal.
4       Q.  Right.
5       A.  Seawall sheet computer data for each
6   case is provided in Appendix A, which is
7   nothing but the computer printout.  The results
8   of the seepage analysis for each design case
9   are provided on Plate 3-3 through 3-15.
10      Q.  All right.  But that's what we're
11  looking at right?  We were looking at III-7.
12      A.  You'll have to show me.  I don't think
13  that's what it was.
14      Q.  Maybe I screwed up.  It's entirely
15  possible.  But it does say that the results of
16  the seepage analysis for each design case are
17  provided on Plates III-3 through III-15.
18      A.  Okay.  Got it.
19      Q.  Got it.  All right.  You're the
20  expert.  I don't know.
21          Okay.  Here is, I think, III-3, and
22  then the rest follow in seriatim.  And take a
23  quick look at that for me.
24      A.  It says, based on Lane's Weighted
25  Creep Ratio analysis, a minimum factor of

Page 41

1   safety of 3 against piping is achieved for a
2   sheet pile tip at elevation -16 based on a
3   water elevation of 22.
4       Q.  Okay.
5       A.  Okay?  So that was not a governing
6   case.  That's why this is a stability.
7       Q.  Right.  Now, but what we have here is
8   an analysis of this design, and we are trying
9   to determine whether or not seepage is a
10  problem.  Right?
11      A.  And it is not.
12      Q.  And is it not, in this location.
13      A.  Okay.
14      Q.  And we have a what, you say 16 feet
15  was deemed --
16      A.  -16.
17      Q.  -16.
18      A.  And that's from water at the top of a
19  well at 22, I think it is.
20      Q.  All right.  Now, so obviously, then,
21  the Corps regards it as necessary to the design
22  of a structure that is going to be placed near
23  a hurricane protection structure to do analysis
24  to determine whether or not underseepage could
25  potentially be a problem, right?

11  (Pages 38 to 41)

GRIESHABER, Ph.D., JOHN

Page 42

1      A.  That's correct.
2      Q.  Okay.  Now, and I understand that this
3  New Orleans District has in place a set of
4  guidelines or procedures that one is supposed
5  to follow anytime one does any digging around a
6  flood protection structure.  Is that true?
7      A.  We'd follow the design guidelines.  We
8  make sure that whatever is done does not
9  violate the integrity of whatever the flood
10  protection is.
11      Q.  All right.  But do you know
12  Mr. Colletti?
13      A.  Jerry Colletti.
14      Q.  You know Jerry?
15      A.  Yes.
16      Q.  And we took Jerry 's deposition, and
17  Jerry told us -- and I could be wrong, so just
18  take this at face value -- that in this office,
19  if you do any digging within 300 feet of a
20  flood control structure you're supposed to get
21  a permit.  Now, is he wrong?
22          MR. STONE:
23              Objection to foundation and
24          overbreadth.
25          MR. BRUNO:

Page 43

1              Okay.  Fine.
2      A.  To my knowledge, that is a criteria
3  that operations applies to permit requirements.
4  EXAMINATION BY MR. BRUNO:
5      Q.  All right.  You'll have to help me
6  understand that sentence.
7      A.  Okay.  Operations --
8      Q.  All right.  Let's do it this way:
9      A.  Okay.
10      Q.  John Doe wants to dig a hole within
11  300 feet of the Lower Ninth Ward east bank
12  protection I-wall that's in place before
13  Katrina.
14      A.  Okay.
15      Q.  Okay?  Now, what if anything does John
16  Doe need to do before John Doe sticks his spade
17  into the ground?
18      A.  He needs to --
19          MR. STONE:
20              Objection.  That doesn't fit with
21          any of the categories of the things
22          that you've -- now, I'll let the
23          witness answer this question, but I
24          want you to understand that when he's
25          speaking here to something other than

Page 44

1  within these categories --
2          MR. BRUNO:
3              It's 28.
4          MR. STONE:
5              Okay.  Let's look at 28 quickly.
6          MR. BRUNO:
7              You can look at 28 all day long.
8  I mean, I'm not going the play this
9  game, Richard, of having to test each
10  question against the --
11          MR. STONE:
12              I disagree.  It doesn't fit
13  within 28.
14          MR. BRUNO:
15              That's what I'm saying.  Do you
16  want -- I mean, you and I are going
17  the disagree all day long.
18          MR. STONE:
19              It may happen.
20          MR. BRUNO:
21              It's going to happen.
22          MR. STONE:
23              Okay.
24          MR. BRUNO:
25              Okay?  Now, the question is, do

Page 45

1  we get through this or do we just
2  adjourn and do this in the courtroom,
3  which I'm happy to do?
4          MR. STONE:
5              I have an objection pending.
6          MR. TREEBY:
7              It's just an objection.
8          MR. BRUNO:
9              I understand that, but I can't
10  relate to these objections because
11  they don't make any sense to me.
12  You're required to object to form.
13          MR. STONE:
14              Object to form.
15          MR. BRUNO:
16              All right.  That's fine.  I got
17  that one.  Now let's go back to where
18  we were.
19  EXAMINATION BY MR. BRUNO:
20      Q.  John Doe is putting his spade into the
21  ground, he's within 300 feet.
22          Would you agree with me that if you
23  put the spade into the ground that you're going
24  to disturb the soil?
25      A.  That's correct.

GRIESHABER, Ph.D., JOHN

Page 46

1    Q.  That's correct.  Okay.  Now, and is
2  that something that would require some kind of
3  in evaluation by the Corps?
4    A.  That would require a permit, that's
5  correct.
6    Q.  All right.  It requires a permit.  All
7  right.
8      Now, how does one know that one needs
9  a permit?  I mean, is there a sign, you know,
10  next to the floodwall that says, hey, fellows,
11  if you guys are going to dig, come get a
12  permit?
13      MR. STONE:
14        Objection again.  Permitting is
15      not part of this analysis.  It's not
16      part of what you've asked for here.
17      It's not part of --
18      MR. BRUNO:
19        I respectfully disagree.
20      MR. STONE:
21        It is not part of what we've
22      presented this witness for, so
23      permitting is not part of it.
24      MR. BRUNO:
25        All right.  Fine.

Page 47

1  EXAMINATION BY MR. BRUNO:
2    Q.  Mr. Grieshaber, how does a person know
3  that you need to get a permit?
4    A.  The same way you know any of the
5  rules.  It's posted.  If you're in the business
6  of doing excavations, you've seen the thing
7  you've got to call Louisiana One Call, if
8  you're too close to a flood protection you've
9  got to get a permit.  Um -- you know, there are
10  probably people who could swear ignorance and
11  tell the truth --
12    Q.  Sure.
13    A.  -- but this is -- people who do this
14  type work know you need a permit.
15    Q.  All right.  Let me show you a document
16  which we've marked as Plaintiffs' Number 4.
17  And the purpose of the question first is just
18  to ask you whether or not you've ever seen this
19  document.
20      (Exhibit 4 was marked for
21  identification and is attached hereto.)
22    A.  I don't remember ever seeing this
23  particular document.
24  EXAMINATION BY MR. BRUNO:
25    Q.  All right.  Let me just for the record

Page 48

1  identify it, if you don't mind.
2    A.  Okay.
3    Q.  Thanks.
4      MR. BRUNO:
5        For the record, this is
6      Geotechnical Design and Dam Safety
7      Section, Construction Guidance page,
8      and it is attached to something called
9      Guidance for Work Proposed Near or
10      Within a Federally Constructed Flood
11      Control Project.
12  EXAMINATION BY MR. BRUNO:
13    Q.  Now, you've already testified you
14  haven't seen this.  I will represent to you
15  that this is a document prepared by the
16  district office in Kansas City.  Okay?
17    A.  Okay.
18    Q.  All right, sir.  Now, while you may
19  not have seen this particular document, have
20  you seen documents which give guidance for work
21  proposed near or within a federally constructed
22  flood control project?
23    A.  Off the top open my head I don't
24  remember, but I would think I probably have.
25  We do have processes and procedures, but I

Page 49

1  can't give them to you off the top of my head.
2    Q.  That's fine.  All right.
3      Does this office, the New Orleans
4  District office, have a written guideline for
5  guidance for work proposed near or within a
6  federally constructed flood control project?
7    A.  Um -- yes.  There is.  You would have
8  to ask Mr. Colletti, you know, for copies of
9  it.
10    Q.  Okay.  Well, Mr. Colletti told us
11  there wasn't a written one.
12    A.  There is a, um -- there are
13  guidelines, and that's the question that you
14  asked, that are established.  And as far as I
15  know, and we're going back ancient history when
16  Jerry Satterlee was chief of engineering
17  division, they definitely existed.
18    Q.  All right.  Well, let me see, just for
19  the record, because I want us to make certain
20  that we're, you know, not talking at
21  cross-purposes.  The Corps has -- I'm trying to
22  find the right -- precise word.
23      They're called EMs?
24    A.  Engineering manuals.
25    Q.  Engineering manual.  And why don't you

GRIESHABER, Ph.D., JOHN

Page 50

1　tell us first, what is an engineering manual?
2　　A.　Engineering manual -- an engineering
3　manual is a document that guides designers in
4　some aspect of a design.
5　　Q.　Okay.　And these are drafted by the
6　Corps of Engineers?
7　　A.　They're usually drafted by the Corps
8　of Engineers.　They're -- they sometimes engage
9　expertise outside the Corps of Engineers,
10　whatever is required to get the right team to
11　put it together.
12　　Q.　All right, sir.　And there are
13　engineering guidelines for the design and
14　construction of levees, right?
15　　A.　Yes, there are.
16　　Q.　And there are engineering guidelines
17　for retaining and floodwalls.
18　　A.　That's correct.
19　　Q.　There are engineering guidelines for
20　the design of a sheet pile wall; right?
21　　A.　That's correct.
22　　Q.　There are guidelines for seepage
23　analysis and control for dams; right?
24　　A.　That's correct.
25　　Q.　And these are engineering guidelines

Page 51

1　that this office, and you in particular,
2　reference in order to assist you in performing
3　engineering services in support of the district
4　office, right?
5　　A.　They're one of the tools that we use
6　in design, that's correct.
7　　Q.　All right, sir.　And they're also in
8　particular one of the tools that you use in
9　order to evaluate excavations around flood
10　control projects, right?
11　　A.　One of the tools, yes.
12　　Q.　One of the tools, all right.　Fine.
13　　Now, I asked you those questions,
14　Mr. Grieshaber, because I wanted to see if
15　there's a distinction that could be made
16　between these engineering guidelines and a
17　document like was prepared by the Kansas City
18　office which is sort of a written -- their own
19　written interpretation of these guidelines and
20　what one should do.
21　　Do you see such a distinction between
22　this and the engineering manual?
23　　MR. STONE:
24　　　Objection.
25　　A.　First of all, I don't know what's in

Page 52

1　that document in your hand.
2　EXAMINATION BY MR. BRUNO:
3　　Q.　All right.　Okay.
4　　A.　But for the interest of clarity, an
5　engineering manual with its guidelines, okay,
6　is a tool that's used.　It may be that there
7　are things that are unique in Kansas City that
8　require them to have certain processes and
9　procedures in place that are not necessarily
10　have to be in place in Little Rock District or
11　some other districts.
12　　Q.　Okay.　Well, let me show you -- have
13　you ever seen this before?　(Tendering.)
14　　A.　This is the retaining -- this is a
15　retaining and floodwall EM.
16　　Q.　Okay.　I understand that, but --
17　　A.　Dated 1989.
18　　Q.　-- have you ever seen it?
19　　A.　Yes, I have.
20　　Q.　Do you use it?
21　　A.　We probably use aspects of it.　I'm
22　not saying we follow it specifically, without
23　getting into it step by step.
24　　Q.　All right.
25　　A.　Um --

Page 53

1　　Q.　Does it provide guidance with
2　regard --
3　　A.　It provides guidance.
4　　Q.　All right.　With regard specifically
5　to the business of evaluating excavations near
6　floodwalls?
7　　A.　I don't know.　The way we would
8　evaluate an excavation near the floodwall is to
9　verify that the excavation does not jeopardize
10　the integrity of the floodwall.　I don't know
11　if there is any kind of rule of thumb or
12　something in here.
13　　Q.　Okay.　All right.　That's fine.
14　　MR. STONE:
15　　　When you get to a good stopping
16　　point --
17　　MR. BRUNO:
18　　　Fine.　Take one now.
19　　(Brief recess.)
20　EXAMINATION BY MR. BRUNO:
21　　Q.　I think the last comment you made was
22　that obviously the district office here, in
23　assessing excavations near floodwalls, does
24　what it thinks is appropriate to assess whether
25　there's a potential impact on the wall.　Right?

GRIESHABER, Ph.D., JOHN

6/27/2008

Page 54

1      A.  Correct.
2      Q.  And you don't have a set of written
3  guidelines to guide you, you just simply make
4  reference, yourself, to existing engineering
5  manuals and the guidelines and statements
6  therein.
7      A.  We have a process -- if we want to
8  talk specifically to walls, we have process and
9  procedure by which these walls are designed,
10  and when we make that evaluation we make sure
11  that we do not compromise the stability of the
12  walls, which means we do have a procedure that
13  we're checking.
14      Q.  Wait.  Now, that regards design of the
15  wall, though, right?
16      A.  That's correct.
17      Q.  We're not talking about design of the
18  wall.  We're talking about -- remember, our
19  John Doe who is about to put his spade into the
20  earth within 300 feet of the wall.  That's what
21  we're talking about.
22      A.  Okay.  That's what I am talking about;
23  design.
24      Q.  Of the wall or the hole?
25      A.  Of the wall.  You said, the wall is

Page 55

1  designed.  The configuration of the wall --
2      Q.  Right.
3      A.  -- is designed to carry a certain
4  loading.
5      Q.  Okay.
6      A.  And we check to make sure that the
7  excavation does not reduce the ability of that
8  wall to carry that loading.
9      Q.  Okay.
10      A.  So we go back to the design of the
11  wall --
12      Q.  All right.
13      A.  -- and use excavation in the design
14  and see if it in fact impacts the stability of
15  the wall.  So we have -- in order to determine
16  whether or not the excavation is impacting the
17  wall, we have to look at the wall design.
18      Q.  Okay.  That's fine.  Okay.  But you
19  said you had a procedure in place to do that.
20      A.  To do design.
21      Q.  Okay.  Now, my question, though, was
22  not whether there was a written procedure to do
23  design, my question is whether or not there's a
24  written procedure to guide you through the
25  evaluation of this proposed digging.

Page 56

1      A.  Obviously I'm not making myself clear.
2  We go back to the design.  The design is based
3  on certain conditions.  We modify those
4  conditions consistent with what that excavation
5  would be and see if in fact that violates the
6  minimum factor of safety of design.
7      Q.  Okay.  Do you see this document here?
8  This is a part of the Kansas City document,
9  Plaintiffs' Exhibit Number 4.  (Tendering.)
10      A.  Okay.
11      Q.  You see it's a checklist?
12      A.  Okay.
13      Q.  All right.  And it's a checklist about
14  the proposed excavation, right?
15      A.  That's what it looks to be.
16      Q.  All right.  So there's a process that
17  at least in Kansas City they go through to
18  evaluate not the wall but the hole.  Right?
19      A.  I haven't -- okay.  I'll take your
20  word for it.  I have not read the document.
21      Q.  Well, it says checklist, construction
22  in the critical area of flood control projects
23  constructed by the Corps of Engineers.
24      A.  I would think it is to determine the
25  impact of the hole on the design.

Page 57

1      Q.  Absolutely.  All right.
2      A.  Okay.
3      Q.  So we have to know a little bit about
4  the hole.
5      A.  Correct.
6      Q.  The point is, though, there is a
7  written checklist that guides the Kansas City
8  guys through the process of this evaluation,
9  right?
10      A.  That's what you say -- that's what
11  you're saying that is, yes.
12      Q.  Well, is it not that?
13      MR. STONE:
14          Objection here.  The witness not
15      have personal knowledge of Kansas
16      City 's guidelines.
17      MR. BRUNO:
18          There's piece of paper right in
19      front of him.
20  EXAMINATION BY MR. BRUNO:
21      Q.  Does the piece of paper not do that?
22  You can tell me that.
23      A.  I don't know.
24      Q.  You don't know.  Fair enough.
25      A.  I don't know what is in that document.

Johns Pendleton Court Reporters                    800 562-1285

GRIESHABER, Ph.D., JOHN

6/27/2008

| | Page 58 |
|---|---|
| 1 | I can read the first page from three feet away. |
| 2 | Q. Okay. And I'll take -- I'm not going |
| 3 | to be as accused of that. You can take the |
| 4 | checklist and you can look at it. Okay? It's |
| 5 | not long. And what I want know is really |
| 6 | simply this: Whether or not this is a |
| 7 | checklist the purpose of which is to guide the |
| 8 | Kansas City office through the process of |
| 9 | evaluating work proposed to be done within the |
| 10 | vicinity of a flood control project. If it's |
| 11 | not that, then it's not that. Fair enough. |
| 12 | MR. STONE: |
| 13 | Objection. The document speaks |
| 14 | for itself. |
| 15 | MR. BRUNO: |
| 16 | Apparently it doesn't. Right? |
| 17 | Because the witness says he can't |
| 18 | tell. So he's reviewing it now. |
| 19 | A. Okay. It is a list of all the things |
| 20 | that they're documenting that they looked into. |
| 21 | EXAMINATION BY MR. BRUNO: |
| 22 | Q. Right. Okay. |
| 23 | A. Okay. |
| 24 | Q. So it's a checklist that these guys |
| 25 | use? |

| | Page 59 |
|---|---|
| 1 | A. Okay. |
| 2 | Q. Here's the question: Do you guys, the |
| 3 | New Orleans office, have such a checklist? |
| 4 | A. We do not have that detailed |
| 5 | checklist. What we do have is a process in |
| 6 | place -- |
| 7 | Q. All right. |
| 8 | A. -- by which we visit the design and |
| 9 | determine the impact of the hole. |
| 10 | Q. Is that process written down |
| 11 | somewhere? |
| 12 | A. The design process is written down. |
| 13 | Q. No, no, no, no. I didn't ask you |
| 14 | about the design process. You just told me, we |
| 15 | have a process with which we visit the design |
| 16 | of the proposed work to determine whether or |
| 17 | not it may negatively impact the flood control |
| 18 | structure. |
| 19 | Isn't that what you just told me? |
| 20 | A. The design is a process that's |
| 21 | documented. Okay? We agree to that. |
| 22 | Q. The design of what? |
| 23 | A. The design of a floodwall is a |
| 24 | documented process. |
| 25 | Q. Yeah. And we've been over that |

| | Page 60 |
|---|---|
| 1 | several times already. The wall is already in |
| 2 | place -- |
| 3 | A. Okay. |
| 4 | Q. -- right? |
| 5 | Okay. So what we're evaluating, |
| 6 | Mr. Grieshaber, is whether or not the proposed |
| 7 | work will affect the design. I recognize that |
| 8 | part of the process would require that you |
| 9 | evaluate the design of the wall. But I'm not |
| 10 | asking you about that. I'm asking you about |
| 11 | the process by which you evaluate the proposed |
| 12 | work. Okay? That is what I want to |
| 13 | understand. |
| 14 | Is it written or not? The process of |
| 15 | evaluating the work. |
| 16 | A. The process by which we evaluate the |
| 17 | permit for the work is to go and determine the |
| 18 | impact of that work on the design. Now, is |
| 19 | that written on a piece of paper? I don't |
| 20 | think so. |
| 21 | Q. Fair enough. That's all I wanted to |
| 22 | find out. Thank you. |
| 23 | A. Okay. |
| 24 | Q. We got that. It's not written down. |
| 25 | So you'll understand why I would ask |

| | Page 61 |
|---|---|
| 1 | this question, how do you guys know what to do |
| 2 | when you evaluate proposed work that's in the |
| 3 | vicinity of a floodwall? |
| 4 | A. We take the proposed work -- |
| 5 | Q. Okay. |
| 6 | A. -- and see what the impact of the |
| 7 | proposed work is on the design. |
| 8 | Q. Please go slow. I'm writing this |
| 9 | down. |
| 10 | A. Got it. |
| 11 | Q. You take the proposed work and you |
| 12 | determine -- |
| 13 | A. The impact of the proposed work on the |
| 14 | design of the wall. |
| 15 | Q. Okay. Fair enough. Now, is there -- |
| 16 | there's no writing that will guide you through |
| 17 | this determination process, right? |
| 18 | A. You revisit the design. The same |
| 19 | rule -- the same process you use in design you |
| 20 | use in doing that. |
| 21 | Q. Okay. All right. So it's almost like |
| 22 | you're redesigning the wall. |
| 23 | A. You're revisiting the design of the |
| 24 | wall. That's correct. |
| 25 | Q. Right. Because you designed the wall |

GRIESHABER, Ph.D., JOHN

6/27/2008

Page 62

1  with certain things in place back when you
2  built it, and now you've got this person who
3  wants to do this work so you're basically
4  reevaluating the design with this new work in
5  place; is that fair enough?
6      A.  That's correct.  Correct.
7      Q.  Okay.  Now, you'll remember a couple
8  of weeks ago we had the high water on the
9  river?
10     A.  Correct.
11     Q.  All right.  And you remember that this
12 office -- at least it was reported in the news
13 that this office had given instruction that
14 anybody who was doing any construction work on
15 the protected side of the levees had to stop
16 that construction work during this high water
17 period.  You remember that?
18     A.  Correct.
19     Q.  Did that actually happen?
20     A.  Yes.
21     Q.  Okay.  All right.  Tell me why that
22 happened.
23         MR. STONE:
24            Objection.  You're continuing to
25         go off of the list --

Page 63

1          MR. BRUNO:
2             No, you --
3          MR. STONE:
4             No, you're going to let me give
5          my objection.
6          MR. BRUNO:
7             No, you're not.  No speaking
8          objections.  Call the judge.
9          MR. STONE:
10            You're --
11         MR. BRUNO:
12            There's no speaking objections.
13         MR. STONE:
14            This has nothing to do with what
15         he's talking about now.  This is your
16         going off the list here.
17         MR. BRUNO:
18            I'm not going off the list, and
19         I'll be happy to show you --
20         MR. STONE:
21            At some point you to need to come
22         back to the list --
23         MR. BRUNO:
24            I'm on the list.
25         MR. STONE:

Page 64

1             -- of topics that you've listed.
2          MR. BRUNO:
3             I'm on the list.  In fact, if you
4          would let the witness answer the
5          question, you'll understand why this
6          is germane to the subject of the
7          deposition.
8          MR. STONE:
9             The witness has answered all your
10         questions, but I'm objecting now
11         because you can't --
12         MR. BRUNO:
13            No, you keep objecting, and you
14         keep --
15         MR. STONE:
16            -- stay with the topics.
17         MR. BRUNO:
18            And through those objections
19         you're instructing the witness.
20            (Off the record.)
21         MR. STONE:
22            Stick with the topics.
23         MR. BRUNO:
24            I am.
25         MR. STONE:

Page 65

1             All right.  Let's get back to the
2          topics.
3          MR. BRUNO:
4             And I'm tired of you suggesting
5          that I'm off the -- I'm on topic.  You
6          don't know what you're talking about.
7          I know what I'm talking about, because
8          you don't know why I'm asking the
9          questions.
10         MR. STONE:
11            The record will reflect who's on
12         topic.
13         MR. BRUNO:
14            I know you don't want me to ask
15         these questions, and I understand
16         that.
17         MR. STONE:
18            You're off topic here.
19         MR. BRUNO:
20            I'm not off topic.  Now you done?
21         MR. STONE:
22            I'm done.
23         MR. BRUNO:
24            Good.
25 EXAMINATION BY MR. BRUNO:

17 (Pages 62 to 65)

GRIESHABER, Ph.D., JOHN

6/27/2008

Page 66

1    Q.  Now, Mr. Grieshaber --
2        MR. STONE:
3            You have an objective pending.
4        MR. BRUNO:
5            I understand your objection is
6    pending.
7    EXAMINATION BY MR. BRUNO:
8        Q.  -- what was the concern about allowing
9    folks to do construction during high water when
10   we had high water out here on this river?
11       A.  The concern is the possibility of
12   inducing liquefaction as far as pile driving
13   goes.
14       Q.  Right.
15       A.  That's a concern.  Another concern.
16       Q.  What's so bad about liquefaction; what
17   might that cause?
18       A.  Liquefaction could cause a bank
19   failure which could eventually lead to a levee
20   failure.
21       Q.  And what is the mechanism by which
22   liquefaction could cause bank failure?
23       A.  It's a seismic reaction.
24       Q.  All right.  Underseepage?  Does
25   underseepage play a role there?

Page 67

1        A.  No.
2        Q.  No underseepage at all?
3        A.  Not for liquefaction.
4        Q.  All right.  That's fine.
5        A.  Okay?  That's -- the pile driving and
6    high vibrations could cause liquefaction which
7    could cause flow failures of the bank.
8        Q.  Uh-huh.
9        A.  Another issue is that excavations
10   could end up causing seepage which could cause
11   movement of material from the foundation.
12       Q.  All right.  So just so we can instruct
13   counsel here, the reason.
14       MR. STONE:
15           I guess I was right, huh?
16       MR. BRUNO:
17           No, you're wrong.
18       MR. STONE:
19           I'm absolutely right.
20   EXAMINATION BY MR. BRUNO:
21       Q.  Say it again.  What did you say about
22   underseepage?  Maybe he didn't hear you.  Say
23   what you just said about underseepage so he
24   gets it.
25       A.  The secondary concern is --

Page 68

1        Q.  Is?
2        A.  -- a development of a seepage path.
3        Q.  Seepage.
4        MR. BRUNO:
5            Oh, is that not on the subject
6    here?
7        MR. STONE:
8            It's not on the subject at all.
9        MR. BRUNO:
10           Whatever you say, Richard.
11       MR. STONE:
12           Look at you topics.
13       MR. BRUNO:
14           I understand.  Look, if you want
15   to play games like this all day long,
16   you just continue to do so.
17       MR. STONE:
18           You phrased the topics.
19   EXAMINATION BY MR. BRUNO:
20       Q.  The point is that the district office
21   in New Orleans gave instruction to folks who
22   were doing work within how many feet of the
23   levee?
24       A.  I would have to go look at the news
25   release.

Page 69

1        Q.  Within a certain distance from the
2    levee, this office told those people don't do
3    any work, no pile driving, no construction work
4    of any kind because of the potential that that
5    work may have had to cause damage to the levee.
6    Is that right?
7        A.  Correct.
8        Q.  All right.  And one of the potential
9    harms that could have been caused is to promote
10   liquefaction, to promote underseepage, which
11   would -- could possibly undermine the levee, is
12   that true?
13       MR. STONE:
14           Object to form.
15       A.  That's correct.
16   EXAMINATION BY MR. BRUNO:
17       Q.  That's correct.  Isn't that amazing.
18       MR. STONE:
19           Object to the commentary.
20       MR. BRUNO:
21           Whatever.
22   EXAMINATION BY MR. BRUNO:
23       Q.  Now, let's see.  How important is it
24   to evaluate proposed work in the vicinity of
25   the floodwall?  Is it something that you

18  (Pages 66 to 69)

Johns Pendleton Court Reporters                    800 562-1285

GRIESHABER, Ph.D., JOHN

Page 70

1  just -- it's no big deal? Is it important?
2  You know --
3      A. I guess the question is what is
4  proposed work?
5      Q. All right. Well, that's a good
6  question. Because since there is nothing
7  written down, how would one know what proposed
8  work would be -- help me with that. What
9  proposed work would be the kind of work that
10 you guys believe you need to evaluate to
11 determine whether there's a potential for
12 damage to the flood control structure?
13     A. Anything that would change the loading
14 on the wall.
15     Q. All right. Well, you would agree
16 that's not something that the guy who's digging
17 or building the thing could do, that's
18 something that the Corps of Engineers has to
19 do, right?
20     A. Correct.
21     Q. Okay. All right. So since the guy
22 who's doing the work doesn't know it, then, you
23 know, what is the criteria that should be
24 utilized in order to determine whether or not
25 to ask the Corps to do this evaluation?

Page 71

1      MR. STONE:
2          Object to form and foundation.
3      MR. BRUNO:
4          It's noted.
5      A. If they're removing any material or
6  they're adding any material. If they're
7  actually changing the cross-section in the
8  vicinity of the flood protection.
9  EXAMINATION BY MR. BRUNO:
10     Q. All right. Now, can we agree that
11 300 feet is a parameter within which if the
12 work is proposed that's a start point for
13 asking the Corps for an evaluation? Or do we
14 use a different number?
15     A. Are you -- if you're looking at a
16 one-size-fits-all number, 300 is probably an
17 acceptable number.
18     Q. Okay. All right. Is that on the
19 water side and the land side, or just -- or
20 does it matter?
21     A. Either side.
22     Q. All right. Okay. But I'm gathering
23 from your answer that it may well be that
24 something that's further away than 300 feet may
25 merit some evaluation.

Page 72

1      A. That's a possibility, depending on the
2  circumstances, the height of the wall --
3      Q. Okay. All right. Now, I asked that
4  question in order to understand this: How
5  important is this evaluation to the Corps?
6      MR. STONE:
7          Object to form.
8      A. I guess I don't understand the
9  question. How important?
10 EXAMINATION BY MR. BRUNO:
11     Q. Yeah.
12     A. The flood protection is extremely
13 important to us. We do not jeopardize the
14 flood protection.
15     Q. All right. I will ask you to accept
16 that Engineering Manual 1110-2-1913 entitled
17 Design and Construction of Levees, USACE 2000,
18 states as follows: Without control,
19 underseepage in pervious foundations beneath
20 levees may result in, a -- and I'll show this
21 to you if you like -- excessive hydrostatic
22 pressures beneath an impervious top stratum on
23 the land side, b, sand boils, and c, piping
24 beneath the levee itself. Underseepage
25 problems are most acute when a pervious stratum

Page 73

1  underlies a levee and extends both landward and
2  riverward of the levee and where a relatively
3  thin top stratum exists on the land side of the
4  levee.
5          All right. Are you familiar with
6  that?
7      A. That's correct.
8      Q. All right. And this is the design
9  consideration that this district office
10 follows, right?
11     A. That's correct.
12     Q. All right. What I'd like is for you
13 to explain to me how -- and I'll give you an
14 example, a hole, all right, 25 feet deep,
15 within 30 feet of the levee. First question:
16 Is that something that your office would feel
17 that it would need to evaluate to determine
18 whether or not the hole could possibly
19 negatively impact a flood control structure
20 like the one that existed at the Lower Nine
21 before Katrina?
22     A. It depends when the hole is there. If
23 the hole is on the flood side --
24     Q. Yes.
25     A. -- and, you know, we're outside of

GRIESHABER, Ph.D., JOHN

6/27/2008

Page 74

1  hurricane season and there is no possibility of
2  loading of that hole with water, then I
3  wouldn't think it would be jeopardizing it.  We
4  would look at it --
5      Q.  Okay.
6      A.  -- but it would not -- it would not be
7  jeopardizing the wall 's stability at all.
8      Q.  All right.  Fair enough.
9          You said you would look at it.
10     A.  That's correct.
11     Q.  All right.  Why?
12     A.  Because anything that impacts the
13  cross-sectional geometry of these walls we
14  would look at.
15     Q.  All right.
16     A.  It changes our design conditions.
17     Q.  Okay.  So did I understand you to say
18  that it would be permissible to dig a hole
19  25 feet down and leave the hole open and not
20  fill it back in?  Is that what you're saying to
21  me?  And again, it's within 300 feet of the --
22     A.  I would have to see the actual case; I
23  would have to see the height of the wall, I
24  would have to see the stratigraphy, and to see
25  if in fact it impacts the stability analysis

Page 75

1  and/or seepage analysis.
2      Q.  Fair enough.  Okay.  The point is,
3  you'd have to do an evaluation.
4      A.  I'd have to look at it, that's
5  correct.
6      Q.  By the way, you used the word
7  stratigraphy.
8      A.  Stratification.
9      Q.  I understand.  We have a record.
10  Would you mind defining that for the record?
11     A.  Stratigraphy is the laydown of the
12  soils and the types of materials versus the
13  properties of the materials.
14     Q.  All right. okay.  Now, how
15  important -- I mean, again, we've got this
16  hole.  This hole is on the water side of the
17  Lower Nine levee.  How important is it to the
18  district office to perform such an evaluation?
19  Or is it the kind of thing that you can say, I
20  don't need to look at it, it's okay, don't
21  worry about it, you're on your own?
22     MR. STONE:
23          Object to form.
24     A.  I guess I don't understand what you're
25  asking by how important.  You know, we would be

Page 76

1  mindful that it's there.  We would be mindful
2  of whether or not it's having an impact.  Um --
3  EXAMINATION BY MR. BRUNO:
4      Q.  You see, that's what I'm getting
5  confused by.  Because you say you would be
6  mindful if it's having an impact only if you
7  did the evaluation to figure out whether it was
8  having an impact.  Right?  That's what you just
9  told me a couple of minutes ago.
10     A.  Correct.
11     Q.  So what I'm trying to figure out is,
12  is this something -- and maybe I'm just not
13  getting it here -- when someone digs a hole
14  that deep, is it a mandatory -- is it mandatory
15  for the Corps to evaluate the potential that
16  that hole may have on that floodwall?
17     MR. STONE:
18          Object to foundation.
19  EXAMINATION BY MR. BRUNO:
20     Q.  Or is it, you know, discretionary, or
21  is it something that the Corps believes it can
22  simply ignore?
23     MR. STONE:
24          Objection to foundation.
25     A.  First of all, the Corps would not

Page 77

1  ignore it.  Okay?
2  EXAMINATION BY MR. BRUNO:
3      Q.  Okay.  We've eliminated -- ignoring is
4  off the table.
5      A.  Yes.
6      Q.  All right.  Now, so we've got hole.
7  We have discretion whereby you look at the hole
8  and you say, okay, I'm going to walk away.
9  Mandatory means, oh, wait, I've got a hole, I
10  got to do something.  Without defining the
11  something yet.
12         So is it mandatory or discretionary
13  that you do something with regard to that hole?
14     MR. STONE:
15          Object to form.
16     MR. BRUNO:
17          Noted.
18     A.  We would do something.  Okay?
19  EXAMINATION BY MR. BRUNO:
20     Q.  Okay.  Is it mandatory, though?
21     A.  Define mandatory.
22     Q.  You got to do it.
23     A.  It's engineeringly sound to do it --
24     Q.  Okay.
25     A.  -- you know.

GRIESHABER, Ph.D., JOHN

6/27/2008

Page 78

1    Q.  Thank you.  Would it be -- would it
2  violate engineering principles to simply look
3  at the hole, walk away and do nothing?
4        MR. STONE:
5          Object to foundation.  Lack of
6        foundation.
7        MR. BRUNO:
8          That's fine.
9    A.  That is not --
10        MR. BRUNO:
11          It's your witness, so, you know,
12        keep saying there's no foundation
13        here.  By the way, he's your appointed
14        witness for the Corps.
15        MR. STONE:
16          It's your question which lacks
17        foundation.
18        MR. BRUNO:
19          With all due respect, no, sir.
20    A.  Let's start all over again.  What's
21  the question?
22  EXAMINATION BY MR. BRUNO:
23    Q.  The question is this: I'm trying to
24  get sense of the degree to which there is a
25  requirement by your office, and frankly that's

Page 79

1  why I brought up the business of the high water
2  on the Mississippi River and the construction.
3        That was a mandatory situation, was it
4  not?  It wasn't discretionary.  You guys said,
5  stop, don't do any work; isn't that true?
6        MR. STONE:
7          Objection.
8    A.  That's true.
9  EXAMINATION BY MR. BRUNO:
10    Q.  That's true.
11    A.  That's true.
12    Q.  Okay.  So it wasn't discretionary, it
13  was -- you came out there and you said, listen,
14  man, that water's high, the potential for
15  destruction here is enormous, stop the work
16  until the water goes down.  Right?
17    A.  Um --
18        MR. STONE:
19          Object to form.
20    A.  That's not totally correct.
21  EXAMINATION BY MR. BRUNO:
22    Q.  All right.
23    A.  Okay?  Depending on the river stage,
24  there were certainly things that we permit
25  based on river stage.

Page 80

1    Q.  Right.
2    A.  If you go -- if the stage goes higher,
3  you have to cease those things.
4    Q.  Right.
5    A.  But you can come in on a case-by-case
6  basis, and we will look and see if your case
7  allows you to still be doing whatever task
8  you're doing.  And we go and look at it as a
9  design.
10    Q.  Exactly?
11    A.  So it's not a one-size-fits-all type
12  thing.
13    Q.  No.  But it's mandatory.  What you
14  just described to me is mandatory.  You either
15  stop or you let us look at it, and if we can
16  assess it and we're comfortable that you're not
17  going to do something to hurt our levee, we'll
18  let you to it.  The point I think you're making
19  to us on this record is that it's a mandatory
20  evaluation, this not something that you take
21  very lightly, because you could floods the
22  city.  Isn't that right?
23        MR. STONE:
24          Objection.  Ambiguous.
25    A.  Yes.

Page 81

1        MR. BRUNO:
2          Yeah.  Flooding the city is
3        ambiguous.
4  EXAMINATION BY MR. BRUNO:
5    Q.  So let's get back to our hole.
6        We have a hole.  It's mandatory, is it
7  not, for the Corps, pursuant to its own
8  policies and procedures, to do something?
9  Let's start with that.  With that hole.
10        MR. STONE:
11          Objection.
12    A.  Okay.  You know, we're going in
13  circles here.
14  EXAMINATION BY MR. BRUNO:
15    Q.  I know.
16    A.  I've got a hole.  I don't know why I
17  have a hole, I don't know where this hole is --
18    Q.  Right.
19    A.  -- and you're asking me very specific
20  questions about the hole.
21    Q.  Well --
22    A.  Okay?  How did the hole get there?
23    Q.  Somebody dug it.
24    A.  Okay, where is it?
25    Q.  They put a spade in the ground.

21  (Pages 78 to 81)

GRIESHABER, Ph.D., JOHN

Page 82

1    A.  Well, where is it?
2    Q.  Wait, wait.  We've already established
3  where it is.  Mr. Grieshaber, wait.  Hold the
4  phone.  We've already established --
5    A.  Well, then, I apologize because I
6  don't know where I am.
7    MR. STONE:
8       Let the witness speak and stop
9       the argument.
10  EXAMINATION BY MR. BRUNO:
11   Q.  Let's go back --
12   MR. BRUNO:
13      There's no argument here,
14   Mr. Stone.  There's interruption by
15   you, but --
16   MR. TREEBY:
17      Objection to interrupting the
18   witness.
19   MR. BRUNO:
20      In fairness to me --
21   MR. STONE:
22      You let the witness finish his
23      statement.
24  EXAMINATION BY MR. BRUNO:
25   Q.  We've already establish where the hole

Page 83

1  was, did we not?
2    A.  Okay.  Are you saying the hole is on
3  the flood side of the IHNC?
4    Q.  I already said that.
5    A.  Okay.  I just want to make sue.
6    Q.  Did I not?
7    A.  I'm not sure I heard that, but I may
8  be wrong.
9    Q.  Fine.  We'll say it again.  It's on
10  flood side of the IHNC, it's within 300 feet.
11   A.  So there is a hole 300 feet on the
12  flood side of the IHNC.
13   Q.  No, there's a hole within 300 feet.  I
14  said that two or three times, and this is the
15  fourth time.  So there's a hole within 300 feet
16  on the flood side of the IHNC.
17   A.  Of the IHNC.
18   Q.  And we're talking about --
19   A.  Okay, and this -- let me finish
20  getting my boundaries here, please.
21   Q.  All right.
22   A.  Okay.  There is an ongoing
23  construction contract that caused this hole to
24  happen, or was this somebody that just came out
25  and dug the hole?

Page 84

1    Q.  Either way.
2    A.  Well, no, there's a big difference.
3    Q.  Well, then, we'll talk about each
4  difference then.  I would like to talk because
5  I'm trying to understand what the parameters --
6  that's why I'm asking the questions.
7       What are the parameters, if any?
8  That's why I didn't say what should you do, I
9  said, do you have to do something?  Okay?
10      So here's the question:  You got the
11  hole.  Do you have to do something; yes or no?
12   MR. STONE:
13      I'm trying to give you all the
14   leeway I can here, but --
15   MR. BRUNO:
16      You're going to give me all the
17   leeway that I am entitled to.
18   MR. STONE:
19      I absolutely will.
20   MR. BRUNO:
21      You don't need to try anything.
22   And don't try to hard because
23   something is going to break if you try
24   to hard.
25   MR. STONE:

Page 85

1       I want you to understand, my
2  absolute goal is to give you all the
3  leeway --
4    MR. BRUNO:
5       I don't really care about what
6  you understand or don't understand or
7  what you have to say or not say,
8  Richard.  Okay?  It's of no moment to
9  he.
10   MR. STONE:
11      I realize that.
12   MR. BRUNO:
13      We have a record, and you can
14  make your objections all day long.
15  And if you want to adjourn, we'll take
16  this to the courtroom because that's
17  the only place I'm going to be able to
18  get some answers, obviously.
19   MR. STONE:
20      I don't think the magistrate
21  wants to hear from you anymore this
22  week.  But anyway.
23   MR. BRUNO:
24      You know, I don't know about
25  that, Richard.  How do we know?  You

GRIESHABER, Ph.D., JOHN

6/27/2008

Page 86

```
1    know the answer to that already?
2    MR. STONE:
3        I believe I do.
4    MR. BRUNO:
5        Oh, you do?  Based on what?
6    MR. STONE:
7        Based on where you've been all
8    week and the things you've been doing
9    here.
10   MR. BRUNO:
11       What are you talking about?
12   MR. STONE:
13       You clearly do not understand
14   what a 30(b)(6) deposition is.
15   MR. BRUNO:
16       Richard, don't you dare.  Don't
17   you dare lecture me about how to
18   practice law.  You of all people who
19   are on record telling all of us that
20   when Mr. Varuso gave his first
21   30(b)(6) deposition he did it to your
22   script.  Of all people to tell me how
23   to practice law, it ain't you.  Okay?
24   MR. STONE:
25       So you're going to attack me now,
```

Page 87

```
1    right?
2    MR. BRUNO:
3        You just attacked me, Richard.
4    So you know, when you throw stuff on
5    this side of the table it's going to
6    come back at you twice as hard.
7    MR. STONE:
8        Ask the questions from this set
9    of --
10   MR. BRUNO:
11       Richard, don't lecture me.
12   Richard, enough already.  Stop.
13   MR. STONE:
14       You've got a set of parameters
15   here.
16   MR. BRUNO:
17       Stop.
18   MR. STONE:
19       Your parameters here--
20   MR. BRUNO:
21       Stop, Richard.  Stop.  Stop.  You
22   finished?  Just stop.
23   MR. STONE:
24       I object.
25   MR. BRUNO:
```

Page 88

```
1        Stop.  Good.
2        Now, we're going to stay on this
3    until it's done.  Okay?
4    MR. STONE:
5        Then I have a --
6    EXAMINATION BY MR. BRUNO:
7        Q.  Now, this United States Army Corps of
8    Engineers is already on record.  You're on
9    record.  If you have a hole near a flood
10   control structure, it merits evaluation.  Okay?
11   You've already told me that.
12       A.  That's correct.
13       Q.  Now, I'm trying to get a sense of the
14   importance of that, whether it's something that
15   is mandatory, discretionary or something that
16   they can ignore.  I think we've established so
17   far it's not something that you guys ignore.
18       A.  Correct.
19       Q.  And it's not discretionary, it's
20   mandatory that you do something.  Right?
21       A.  Correct.
22   MR. STONE:
23       Objection.
24   EXAMINATION BY MR. BRUNO:
25       Q.  Now, you've already told me, though,
```

Page 89

```
1    that if it's on ongoing construction project
2    that might get you in one direction, if it's
3    just some guy out there digging a hole that
4    might got you someplace else.  Right?
5        A.  Correct.
6        Q.  You need more information.
7        A.  Correct.
8        Q.  All right.  That's where I am.  So the
9    Corps needs to ask some questions.  Right?
10       A.  Correct.
11       Q.  Okay.  So if it's an ongoing
12   construction contract, let's assume that
13   they've asked that question.  All right, guys,
14   this is an ongoing construction contract.  What
15   does the Corps do next?
16       A.  Okay.  Is it an ongoing construction
17   contract that the hole was intended to be part
18   of?
19       Q.  Yes.
20       A.  All right.  So this was a designed
21   hole.
22       Q.  Yes?
23       A.  In other words -- so then the Corps of
24   Engineers designed that hole.
25       Q.  No.
```

GRIESHABER, Ph.D., JOHN

6/27/2008

Page 90

1    A. Well, I'm asking.
2    Q. They didn't.
3    A. Okay. So it's not a de -- it wasn't
4  designed by the Corps of Engineers.
5    Q. No, it was not.
6    A. Okay. Was the excavation of that hole
7  done as part of the contract and had to be
8  submitted to the Corps of Engineers?
9    Q. Yes.
10    A. Okay. So if it was submitted to the
11  Corps of Engineers, the Corps of Engineers
12  looked over that submittal to make sure that
13  hole had no impact on the floodwall.
14    Q. Okay. Got you. So if the contractor
15  designed the specifications, the Corps
16  evaluated those specifications, and you're here
17  to testify today as the representative of the
18  United States Army Corps of Engineers that the
19  Corps would have done an evaluation of that
20  hole, right?
21    A. I'm saying if it was a required
22  submittal --
23    Q. Yes.
24    A. -- the Corps reviewed the impact of
25  that hole on flood protection.

Page 91

1    Q. Okay. Fair. Now, good.
2      What would the Corps have done to
3  review the impact? You talked before about a
4  bunch of stuff, stratification, depth of the
5  hole, height of the -- tell me in detail what
6  the Corps would have done.
7    A. The Corps would have looked at the
8  impact of that hole --
9    Q. All right.
10    A. -- on the design of that floodwall.
11    Q. All right. How did they do that?
12    A. They looked into the change of the
13  boundary conditions around the wall that the
14  excavation caused and saw that -- and checked
15  to see whether or not it impacted the required
16  factor of safety.
17    Q. How did they do that? Tell me the
18  process by which they do that.
19    A. Okay. You go in and you re run the
20  loading on the sheet pile.
21    Q. Wait. Forgive me. I'm writing this
22  down. Before you re run, don't you need some
23  information, like how deep the hole is?
24    A. Well, I assume I have all that
25  information in the submittal.

Page 92

1    Q. All right. Do you have to know
2  something about the stratification?
3    A. The stratification exists because I
4  have a design right there. So I go --
5    Q. Wait. Wait. I'm sorry. Forgive me.
6  So you're telling me that the design documents
7  will give you the stratification.
8    A. That's correct.
9    Q. And that's the guy that did the
10  designing, not you. Because it's on a piece of
11  paper.
12    A. Wait. I'm saying the design for the
13  wall.
14    Q. No. The hole. We're talking about
15  the hole.
16    A. You asked me how would I go about
17  designing -- checking the impact of the hole on
18  the flood protection.
19    Q. Right.
20    A. Okay.
21    Q. So you've got -- because you've got
22  the plans from the contractor you know how deep
23  the hole is going to be.
24    A. Correct.
25    Q. All right. And then in order to get

Page 93

1  information about the stratification, I think
2  what you're telling me is you don't rely on the
3  contractor, you've got that already in your
4  plans and specifications for the floodwall.
5    A. Correct.
6    Q. So you go look at that.
7    A. Correct.
8    Q. Fair enough. What do you do next?
9    A. I take the difference between the
10  ground line that was assumed in the plans and
11  specifications for the design of the wall and
12  modify it to the new ground line that results
13  of having excavated the hole.
14    Q. Please, you'll have to explain what is
15  a ground line?
16    A. The cross-section, the ground on each
17  side -- the ground on each side of the wall.
18    Q. The floodwall.
19    A. On the floodwall. The floodwall sits
20  on an embankment.
21    Q. All right. Why don't you draw it for
22  me.
23      (Brief recess.)
24  EXAMINATION BY MR. BRUNO:
25    Q. All right. We're back on the record

Johns Pendleton Court Reporters                    800 562-1285

GRIESHABER, Ph.D., JOHN

Page 94

1  now, and you've done this drawing.  By the way,
2  I've marked it as P Exhibit 5.
3          (Exhibit 5 was marked for
4  identification and is attached hereto.)
5      A.  Okay.  What we have here is the black
6  line is the assumed ground line configuration
7  with the wall in place on the flood side.
8      Q.  Right.
9      A.  Okay.  We assume this pink is where
10  you excavated a hole.  We would -- the original
11  design assumed this ground line.
12          The new design that you would go
13  revisit would be the exact same analysis, the
14  same methodology of analysis, the same
15  stratifications, and you would just assume that
16  you only had this much material.
17      Q.  The pink line.
18      A.  The pink line.  And you would run to
19  verify that you have not impacted the design
20  factor of safety.
21      Q.  Okay.  And so just walk me through the
22  process.  You've -- now we have got our line,
23  we have got our stratification.  How do you
24  determine whether or not there's no impact on
25  the structure?  Is there some formula or some

Page 95

1  test or some --
2      A.  No, you would run the exact same
3  designs that you spoke of earlier, those three
4  designs.  You'd do wall stability --
5      Q.  Wall stability.  Okay.
6      A.  And you would check seepage --
7      Q.  Seepage.
8      A.  And you would check global stability.
9      Q.  I'm sorry?
10      A.  Global stability.
11      Q.  Global stability.  All right.
12          And would you walk me through the
13  process of evaluating wall stability.  What do
14  you do?
15      A.  Wall stability, basically you take --
16  you really don't want to hear this -- the
17  active and passive pressures, you get a net
18  pressure diagram -- you know, suffice to say
19  that you take all the loads that are on the
20  wall and you make sure that the wall does not
21  rotate, that it doesn't lose its integrity and
22  it stays -- stays exactly where you want it.
23      Q.  Okay.
24      A.  Okay?  As far as global stability, you
25  look at the overall embankment with the wall in

Page 96

1  it to see that it is stable.  And in this case,
2  you want to make sure that it is not going to
3  rotate into this hole.
4      Q.  Okay.
5      A.  Okay?
6      Q.  And finally, the seepage?
7      A.  As far as seepage, we would run the
8  Lane's Weighted Creep Ratio --
9      Q.  L-A --
10      A.  L-A-N-E.
11      Q.  Okay.
12      A.  Weighted Creep Ratio.
13      Q.  Weighted Creep Ratio.  Okay.
14      A.  And check to make sure we still have
15  an adequate factor of safety for seepage.
16      Q.  Okay.  Fine.  I'm going to ask you to
17  just accept that I'm reading this accurately.
18  And if there is any concern that I'm not we'll
19  just pull it out of all these piles of paper.
20  But the Engineering Manual Number 1110-2-2502,
21  entitled Retaining and Floodwalls, USACE, 1989,
22  General Considerations:  Water retaining
23  structures are subject to through seepage,
24  underseepage and seepage around their sides or
25  ends.  Seepage control is a primary

Page 97

1  consideration for floodwall design.
2  Uncontrolled seepage may result in water
3  pressures and uplift forces on the wall base in
4  excess of design assumptions and consequent
5  structural instability.  Seepage control
6  entails the design of measures to ensure that
7  seepage pressures and velocities are maintained
8  below tolerable values.  Okay?  As floodwalls
9  are usually found on alluvial materials,
10  pervious zones of significant thickness are
11  often present at some depth below relatively
12  impervious top stratum materials and may be
13  hydraulically connected.  Because of horizontal
14  stratification of alluvial deposits, horizontal
15  permeability may be greatly in excess of the
16  vertical permeability.  Underseepage control
17  measures vary because the selection and design
18  of appropriate control scheme is highly
19  dependent on site specific conditions,
20  particularly the stratification and
21  permeability of foundation materials,
22  availability of right-of-way and local
23  construction practices and costs.
24          Are you familiar with that design
25  consideration?

25  (Pages 94 to 97)

GRIESHABER, Ph.D., JOHN

6/27/2008

Page 98

1      A.  I'm familiar with the design
2   consideration.  I'm not sure that I'm familiar
3   with those exact verbiage.
4      Q.  Okay.  All right.  Does the Corps --
5   well, perhaps we should pull it out, then, if
6   you -- let's get it out.
7         Let me see if I can ask you this
8   question:
9      A.  You see, you're talking about I-walls,
10   and I don't think that manual is about I-walls.
11   I think that's floodwalls and retaining walls.
12      Q.  Which one?
13      A.  Does that also address I-walls?
14      Q.  Let's see.  It says retaining and
15   floodwalls.
16      A.  Yeah.
17      Q.  There it is.
18      A.  I know, but what happens is -- is
19   there a separate section in here on I-walls?
20      Q.  You're the expert.
21      A.  That's why I'm asking.
22      Q.  Because you're the expert?
23      A.  These are gravity concrete walls,
24   cantilevered reinforced concrete walls,
25   alternative types of designs -- see, if you

Page 99

1   notice, you don't see any I-walls in here.
2      Q.  All right.
3      A.  This manual doesn't apply to I-walls.
4      Q.  Doesn't apply to I-walls is what
5   you're telling me.  Okay.
6      A.  Yes.  I'm not saying that design
7   concept doesn't apply to I-walls, but you're
8   quoting me a manual that doesn't apply to
9   I-walls.
10      Q.  Okay.  That's fine.  Let me see if we
11   can work through that.
12         We have a floodwall which has got a
13   -8 foot sheet pile tip, right?
14      A.  Okay.
15      Q.  And let's see if we can understand
16   whether or not principles apply.
17         Is the I-wall at the Lower Nine -- I
18   hope I don't have to be more specific than
19   that -- is that possibly subject to
20   underseepage, just generally?
21      A.  No, I agree that all those things
22   apply to the wall analysis.
23      Q.  Okay.
24      A.  What I'm saying is you are pulling it
25   out of a manual that doesn't address I-walls.

Page 100

1      Q.  Well, if they apply, though -- do we
2   agree they apply?
3      A.  To a certain extent, but let's go
4   through them.
5      Q.  Well, that's right.  So let's see what
6   doesn't apply.  So my question to you is this,
7   and that is, we now know what the floodwall
8   looks like at the Lower Nine, we've got a
9   document Plaintiffs' Exhibit 3.
10      A.  Okay.
11      Q.  Is there the potential for
12   underseepage at that location?
13      A.  Um -- based on stratification, there's
14   a potential for some of the organics to give up
15   water.  Not classical underseepage through
16   aquifers.
17      Q.  All right.  And when you say some of
18   the organics, you're referring to that marsh or
19   peat layer?
20      A.  Right, the organic stratification.
21      Q.  In fact, there is a marsh and a peat
22   layer, isn't there?
23      A.  Yeah.  Both of them lumped together is
24   what I'm referring to as the organic
25   stratification.

Page 101

1      Q.  All right.  And so there's the
2   potential that water could pass through that
3   layer.
4      A.  That's correct.
5      Q.  All right.  Now, let's see.  It says,
6   uncontrolled seepage may result in water
7   pressures and uplift forces on the wall base in
8   excess of the design assumptions and consequent
9   structural instability.  All right.  Is that a
10   potential issue at the Lower Nine in a
11   hurricane situation, that is, the water is real
12   high?
13      A.  The only way that becomes an issue is
14   if the wall itself deflects and a crack forms
15   at the interface of the wall and the embankment
16   which would short-circuit and put that excess
17   pressure into the organic stratas.
18      Q.  Okay.  I got you.  How about if you
19   had a hole next to the wall backfilled with
20   sand that punctured this marsh layer; is it
21   possible that that could be a route through
22   which water could travel because of the high
23   water caused by the hurricane could create
24   these high pressures and force that water down
25   into the hole and then through that marsh

26  (Pages 98 to 101)

GRIESHABER, Ph.D., JOHN

6/27/2008

Page 102

1  layer? Is that a possibility?
2      MR. STONE:
3          Object to form.
4      A. It's probably not. The methodology
5  that you're describing has eliminated the fact
6  that for that drop of water to go through the
7  tortuous path of going through the sands to get
8  to that organic, it's going to have lost a lot
9  of its head. And so it's highly unlikely that
10  you could come up with a scenario that you
11  would have enough pressure to cause a problem.
12      The crack analysis allowed for the
13  wall itself to have completely moved away from
14  the foundation, so the full impact of that
15  elevation ten, eleven, whatever it was, was
16  felt inside that organic strata.
17      Q. All right. Now, what you just said,
18  that it's impossible, I guess then that the
19  Corps of Engineers --
20      A. I didn't say the word impossible.
21      Q. Oh. Okay. Unlikely?
22      THE WITNESS:
23          Would you tell me what I said?
24      THE REPORTER:
25          "It's highly unlikely."

Page 103

1      A. Okay.
2  EXAMINATION BY MR. BRUNO:
3      Q. Okay. I guess, then, that the Corps
4  did do an analysis in order to determine that
5  that kind of thing could not have happened.
6  Right? Y'all did that analysis. You evaluated
7  the hole, or the --
8      A. With its backfill.
9      Q. All right. With its backfill. You
10  did that in the context of the east bank area.
11      You did that, didn't you?
12      A. I didn't personally do it. I would
13  assume that's part of the process of design and
14  it was done.
15      Q. All right. Your assumption is that it
16  was done. Do you know whether it was done in
17  fact?
18      A. No, I don't know.
19      Q. Okay. All right. Well, have you done
20  the necessary study or evaluation in order to
21  tell us today whether or not, if you have a
22  hole and it goes -- it's backfilled with sand
23  and it cuts through this marsh layer that it's
24  likely or unlikely or impossible or whatever
25  that that might provide a route for

Page 104

1  underseepage? Have you done that evaluation?
2      A. I personally have not done that
3  evaluation, but there's a tremendous amount of
4  evaluation that was done post-Katrina to modes
5  of failure, a lot of it documented in the IPET
6  report --
7      Q. All right.
8      A. -- that spoke to the mode of failure,
9  and the only way you could get that kind of
10  excess seepage would be if a crack analysis --
11  if a crack had formed and actually injected the
12  full head at the tip.
13      Q. All right. Well, but the bottom line
14  is the Corps of engineers did not conduct such
15  an analysis, right?
16      A. Did not conduct such analysis at what
17  point?
18      Q. At any point.
19      A. We did not do the crack analysis.
20      Q. You didn't do the analysis of a hole
21  either, did you? Of a 25-foot hole on --
22      A. I don't -- I'm not saying that. If
23  that hole was there and we evaluated the, um --
24  the backfill of that hole, I mean, we're
25  talking about a hole that's backfilled, right?

Page 105

1      Q. Uh-huh. We sure are.
2      A. Okay. So it's -- the analysis is
3  fairly simplistic.
4      Q. Well, I know, but one of the subjects
5  that you've been designated specifically to
6  talk about is Paragraph Number 31, which is the
7  analysis of geologic cross-sections of the East
8  Bank Industrial Area relative to the TERC,
9  including those areas adjacent to both the
10  north and south breach sites of the EBIA
11  floodwall. So you're the guy --
12      A. Okay. The analysis of the geologic
13  cross-section. Bring me the cross-section.
14  I'll analyze it for you.
15      Q. No. You're supposed to be able to
16  tell me whether you did one or not. I don't
17  have to bring anything.
18      A. The geologic profile it says.
19      Q. Geologic cross-sections.
20      A. Right. Bring the geologic
21  cross-section and I'll --
22      Q. You want me to bring that to you.
23      A. No. I mean, that's what you're
24  talking about is the geologic crossing. You're
25  not talking about a hole. I'm not trying to be

GRIESHABER, Ph.D., JOHN

Page 106

1    argumentative, and I apologize.
2         MR. STONE:
3              Just relax.
4    EXAMINATION BY MR. BRUNO:
5         Q.  That's fine.  All I want to know is
6    whether or not you know in fact whether the
7    Corps analyzed any holes that were dug and
8    backfilled on the water side of the Lower Nine
9    levee before Hurricane Katrina.  If you did the
10   analysis, fine.  If you didn't do the analysis,
11   fine.  It's one way or the other.
12        A.  Oh, if you want to know if I did the
13   analysis, no, I did not do the analysis.
14        Q.  No, you're not you anymore, you're the
15   Corps.  You're the Corps.
16        A.  I'm willing to assume that that
17   analysis was done because that is our process
18   and procedure, to revisit the design.
19        Q.  All right.  Would you agree that the
20   Lower Nine floodwall is built on alluvial
21   materials?
22        A.  Yes.
23        Q.  Would you agree that there are
24   pervious zones of significant thickness present
25   at some depth below the Lower Nine floodwalls?

Page 107

1         A.  There are organic zones which can be
2    pervious.  They can transmit water.  But those
3    pervious zones that they're referring to in
4    that document are open work materials, sands,
5    gravel, sand/clay gravel type stuff, aquifer
6    type materials.
7         Q.  All right.
8         A.  That I would --
9         Q.  Do you have any understanding of the
10   work that was done in connection with the
11   preparation for the east bank industrial site
12   for dredging?
13        MR. STONE:
14             Objection.  Vague.
15        A.  I guess I don't understand the
16   question.  I'm aware that was going to be
17   the location of the bypass channel.
18   EXAMINATION BY MR. BRUNO:
19        Q.  Right.
20        A.  I'm aware that were HTRW issues that
21   had to be taken care of before that can be set
22   up so it could be dredged out as a bypass
23   channel.
24        Q.  All right.  And the -- you're aware of
25   the work that was done by the Washington Group

Page 108

1    International?
2         A.  That was a remediation job of removing
3    HTRW type stuff that had to be taken care of
4    prior to any kind of dredging.
5         Q.  Okay.  Would you characterize the work
6    done by WGI as only remediation, or was there a
7    component of demolition?
8         A.  They were taking down structures, too,
9    from what I remember.
10        Q.  All right.  So while certainly they
11   were hired to do removal of toxins, the WGI was
12   also hired to do demolition, right?
13        A.  To my recollection, yes.
14        Q.  Okay.
15        MR. STONE:
16             Just note for the record the
17        document is highlighted.  I don't know
18        if that has any significance here.
19             Did you have a question on that
20        document, Joe?
21        MR. BRUNO:
22             Yes.  The witness is still
23        looking at it.
24        A.  Okay.  I know enough to be dangerous.
25   EXAMINATION BY MR. BRUNO:

Page 109

1         Q.  Thank you, sir.  Have you ever seen
2    this document?
3         A.  I may have.  I don't really remember.
4         Q.  All right.  It's Plaintiffs' Exhibit
5    Number 6.
6             (Exhibit 6 was marked for
7    identification and is attached hereto.)
8         MR. TREEBY:
9             Go ahead and put the Bates number
10        if you would, Joe.
11        MR. BRUNO:
12             Yeah.  WGI 56789 are the numbers.
13   EXAMINATION BY MR. BRUNO:
14        Q.  Now it says here that the contractor
15   shall furnish all engineering services,
16   materials, supplies, labor as required in
17   connection with technical review site
18   documents, et cetera, et cetera.  So WGI was
19   supposed to prepare all the plans and
20   specifications and they should be submitted to
21   the Corps of Engineers.
22        A.  (Nods affirmatively.)
23        Q.  Did your department evaluates any
24   plans and specifications submitted by WGI to
25   the Corps in connection with this TERC or Task

28  (Pages 106 to 109)

GRIESHABER, Ph.D., JOHN

6/27/2008

Page 110

1  Order No. 26?
2      MR. STONE:
3          Objection.  It's outside of the
4      scope of the 30(b)(6) request.
5      A.  I don't really remember if they did or
6  not.  It would have gone through engineering
7  division.  And any aspect of it that was
8  geotechnical in nature would have gone through
9  the geotechnical branch.
10         But, you know, whether or not, you
11  know, there's a submittal register that shows
12  that it came through engineering division into
13  geotech, I do not know.
14  EXAMINATION BY MR. BRUNO:
15     Q.  I'm going to show you Plaintiff's
16  Exhibit 7 which is WGI 54419 in seriatim to
17  54433.  (Tendering.)
18         (Exhibit 7 was marked for
19  identification and is attached hereto.)
20     A.  Okay.
21  EXAMINATION BY MR. BRUNO:
22     Q.  All right.  First of all, so we can
23  get some context here, this is statement of
24  work for the excavation and disposal of
25  additional subsurface foundations.  Okay?  It's

Page 111

1  Plaintiffs' Exhibit Number 7.
2          Do you know what it is that the
3  contractor is supposed to do by virtue of one
4  of these kinds of documents?
5      A.  Well, I see it's a mod to -- to
6  something, an existing task order or a
7  contract.
8      Q.  Right.
9      A.  So it's a statement of work to
10  whatever the modification is.
11     Q.  All right.  But with regard to the
12  preparation of specifications, do you have any
13  knowledge of what it is, what the Corps expects
14  the contractor to do and what the Corps is
15  supposed to do?
16     A.  I'd have to read it a lot more
17  closely.
18         MR. STONE:
19             And objection here that it's not
20         within the scope of this --
21         MR. BRUNO:
22             It is within the scope.  I can't
23         ask the next question without getting
24         some context.  I don't know how in the
25         heck you expect -- as if don't know

Page 112

1      this deposition is about the damned
2      east bank industrial site.
3          Is this a surprise to you or
4      something?  Maybe I'm shocked.
5      MR. STONE:
6          I also object to all the
7      commentary.  It costs us all a lot of
8      money.
9      MR. BRUNO:
10         It's costing us a lot more money,
11     you know, since you've flooded our
12     city and caused us billions of dollars
13     in damage.  So don't talk about money.
14     A.  This is just additional work that's to
15  the task order, I assume.
16  EXAMINATION BY MR. BRUNO:
17     Q.  Right.  And to help you out, it's the
18  one that regards the removal of the concrete
19  structures at the Boland Marine site, and it
20  gets us to the hole.
21     A.  Okay.
22     Q.  I just wanted to give you some
23  context, you know, so you'll know where I'm
24  coming from.  That's all.
25     A.  Got it.

Page 113

1      Q.  Okay.  So specifically, at Page --
2  there's Bates numbered Page 54420, Subparagraph
3  3.1 says, subsequent to the award of
4  modifications, the contractor discovered
5  additional eight unknown subsurface concrete
6  and steel foundations beneath the existing
7  building slab at the Boland Marine site during
8  building and slab demolition operations.  Okay?
9      A.  (Nods affirmatively.)
10     Q.  These items were left behind by the
11  port's former industrial marine tenants and
12  were unknown due to the absence of any as-built
13  drawings.  Anecdotal remarks from a former
14  Boland Marine employee suggests that some of
15  the foundations may have served as the
16  foundation of a former three-legged tower
17  crane.  The mass concrete and steel foundations
18  are assumed to be reinforced with rebar and
19  pile founded on treated wood piling assumed to
20  be 30 to 35 feet long.  All concrete, steel and
21  pilings shall be removed in their entirety and
22  disposed of off site at appropriate disposal
23  facilities and material recyclers.  Salvage
24  value of any recycled steel or rebar shall be
25  credited to WGI or its subcontractor to defray

29 (Pages 110 to 113)

GRIESHABER, Ph.D., JOHN

Page 114

1   the cost of this work.  See Enclosure 1,
2   original photos and sketch for more
3   information.  And these are lousy pictures, I
4   apologize, but we've got some bad pictures to
5   look at.
6       A.  Okay.  No problem.  I've got the gist.
7       Q.  Okay.  And I believe it's been
8   referred to as the wedding cake structure.
9           Now, do you have any knowledge of this
10  work --
11      A.  No.
12      Q.  -- done by WGI.
13      A.  I knew that we had to go back out
14  because they found some things that weren't
15  initially -- but as far as knowing them
16  individually as the wedding cake or anything
17  like that, no.
18      Q.  Fair enough.  Fair enough.  But in the
19  context of this business of evaluating the
20  holes --
21      A.  Okay.
22      Q.  -- this is where I'm going here, just
23  to get background so we can connect the dots to
24  where we are.
25      A.  Okay.

Page 115

1       Q.  So this thing says, go out,
2   Mr. Contractor, and come back to me with a set
3   of plans and specifications for the removal of
4   these things.  Right?
5       A.  (Nods affirmatively.)
6       Q.  Now, and that comes back in the form
7   of a proposal which is Exhibit 8.  Take a look
8   at that.  (Tendering.)
9           And it's accompanied by drawings,
10  Number 9.
11          (Exhibit 8 was marked for
12  identification and is attached hereto.)
13          (Exhibit 9 was marked for
14  identification and is attached hereto.)
15          MR. BRUNO:
16              I'll give you the Bates number in
17          a second, Bill, when he's finished
18          looking at them.
19      A.  I've got the flavor of it.  I didn't
20  read all the words.
21      Q.  Sure.  And what I'm trying to get at
22  is, so then this comes back to the Corps in
23  response to the statement of work.  And is this
24  the document that the Corps evaluates to
25  determine whether or not there is an impact on

Page 116

1   the flood protection?
2           MR. STONE:
3               You're showing him Exhibit 8?
4           MR. BRUNO:
5               Yes, I am.
6       A.  Okay.  That was what I just looked at?
7   EXAMINATION BY MR. BRUNO:
8       Q.  Yeah.
9       A.  We would look at the RFP -- if that is
10  the only form of the submittal -- I mean, I
11  don't know if there was a secondary submittal
12  of exactly what they were doing, because they
13  show the braced cofferdam and stuff in these
14  drawings.
15      Q.  Right.
16      A.  You know, I'm not sure if there was
17  another package of paper that was a little more
18  definitive.  But we would take whatever the
19  plan is and look at it.
20      Q.  Okay.
21      A.  I mean, I didn't read the whole thing.
22  It looked like -- it seemed like there ought to
23  have been more to it.
24      Q.  Well, there's not.
25      A.  Because you've got those drawings.

Page 117

1       Q.  All right.  Well, at the very least,
2   can you find anything in this document which
3   would seem to reflect that anybody did an
4   evaluation of the holes:  And I'm referring
5   specifically to Page 3.  It says, with
6   regard -- I'm going to read it for the record
7   if you don't mind.  Paragraph 6.  First of all,
8   it says, an excavation plan and activity hazard
9   analysis, AHA, shall be developed by the
10  selected subcontractor and submitted prior to
11  initiation of the work.  All elevation
12  measurements are to be made from mean sea
13  level.
14          Then it says, with regard to the
15  eighth block, the large block, upon reaching
16  -25 feet excavation depth, a decision by WGINT
17  and the USACE shall be made to continue
18  excavation or quit.
19          Okay.  So this indicates at least that
20  somebody is digging a how to 25 feet.  All
21  right?
22      A.  Okay.
23      Q.  If there would have been some kind of
24  an evaluation of this hole, what would it have
25  looked like?  Because I can't find it.

GRIESHABER, Ph.D., JOHN

6/27/2008

Page 118

1    A.  Well, you're saying -- basically, what
2  you just read, that they were going to submit a
3  plan -- um -- you know, what paragraph --
4    Q.  They were going to evaluate the
5  subcontractor's plan for an action hazards
6  analysis.
7    A.  Someplace you read something about --
8  hear it is.  With regard to the eighth block --
9    Q.  Right.
10    A.  -- upon reaching -25.
11    Q.  Right.  You decided to go lower, I
12  think it is what it says.  Or decide what they
13  were going to do when it got that deep.
14    A.  Okay.  So the question is?
15    Q.  Okay.  Let's break it down.  That
16  indicates somebody is digging a hole --
17    A.  Correct.
18    Q.  -- within 300 feet of a floodwall,
19  right?
20    A.  That's correct.
21    Q.  Okay.  Now, and you've already told me
22  that the Corps needs to do something in
23  connection with the evaluation of whether or
24  not that may or may not have any impact on the
25  flood control walls.

Page 119

1    A.  Okay.
2    Q.  And you've told me that the things
3  that would be done would include wall
4  stability, seepage analysis, global stability
5  and the like.  Okay.  Now I'm just trying to
6  learn from you if that was done by somebody
7  would there be a piece of paper that would have
8  reflected that it was done?  In this office.
9    A.  I believe that there's two ways to
10  look at it.  There's the possibility that there
11  was an overall design done that allowed -- that
12  would allow for saying as long as you stayed so
13  many feet away you could go so deep, it's
14  called a minimum control line, where we would
15  say do not violate this line and you can do
16  whatever you want in there and it will not
17  impact the flood protection.  Okay?  Now --
18    Q.  And that would be in the form of?
19    A.  That would have been done in
20  geotechnical, it would have been -- you know,
21  it would have been forwarded through the chief
22  of engineering division, through the chief of
23  construction division.
24    Q.  Okay.
25    A.  You know, it would have been early on

Page 120

1  in the contract, that, you know, this is the
2  minimum control line, you can do what you need
3  to do as long as you stay outside the minimum
4  control line.
5    If you're going to violate the minimum
6  control line you would have to come in and look
7  at specific things.
8    Q.  I got you now.  But let's talk about
9  that for a moment, if I may.  Okay?
10    A.  Okay.
11    Q.  So that would mean that somebody did
12  an evaluation to draw that line.  Right?
13    A.  Correct.
14    Q.  Okay.  It would also mean that at the
15  time that line was drawn that the person knew
16  how deep the holes might get.  Right?
17    A.  No.
18    Q.  No?
19    A.  What happens is, he goes to the
20  allowable factor of safety, and he figures out
21  what ground line would maintain the allowable
22  factor of safety.  If the activity does not
23  violate that minimum ground line --
24    Q.  Oh.  I see what you're saying.  Ground
25  line, you mean depth.

Page 121

1    A.  Right.
2    Q.  I have to tell you, I was thinking
3  distance from the wall?
4    A.  No.  No.  The ground.
5    Q.  All right.  Because there is, in
6  fairness to you, some reference as to a line,
7  but it's not depth, it's within 15 feet of the
8  center line of the flood control wall.
9    A.  Okay.
10    Q.  Okay?  But that's not what you're
11  talking about, you're talking about a depth.
12    A.  Well, what I'm talking about is, if
13  you look at this profile right here on the
14  flood side?
15    Q.  Sure.
16    A.  Okay, we could have very well have
17  said, you know what?  As long as you stay above
18  that blue line it's not a problem.
19    Q.  Got you.  All right.
20    A.  And that would have answered a whole
21  lot of cross-correspondence.
22    Q.  Makes sense.
23    MR. TREEBY:
24      Joe, is that an exhibit, that
25      drawing he did?

31 (Pages 118 to 121)

GRIESHABER, Ph.D., JOHN

Page 122

1     MR. BRUNO:
2         Yes.
3     MR. TREEBY:
4         What's the number of it?
5     MR. BRUNO:
6         5.
7     MR. TREEBY:
8         Thank you.
9  EXAMINATION BY MR. BRUNO:
10    Q.  And perhaps the record should reflect
11  you just added a line to this exhibit and it's
12  a blue line in pen.
13    A.  Right.
14    Q.  Okay.  But let's --
15    A.  And nothing is to scale.
16    Q.  Oh, I know that.  No one was holding
17  you to scale.
18    A.  Okay.
19    Q.  But in terms of this line thing, okay?
20  I want to make sure that the record is crystal
21  clear that you're not talking about a distance
22  from the wall, you're talking about a depth.
23    A.  I'm talking about -- it's both depth
24  and distance from the wall.  In other words,
25  you would come some distance out --

Page 123

1     Q.  Right.
2     A.  -- for a certain depth.
3     Q.  Okay.
4     A.  So it defines whatever that line is.
5     Q.  Sure.  And that's logical,
6  Mr. Grieshaber, because essentially what the
7  Corps would have done is the Corps would have
8  had some sense of how deep these holes might
9  get, because they know it's an ongoing
10  construction site.  Right?
11    A.  Uh-huh.
12    Q.  And they would have done their wall
13  stability analysis, their seepage analysis, and
14  their global stability analysis, assuming the
15  worst case scenario, and then thereby they can
16  draw this line.  Right.  Okay.
17    A.  Correct.
18    Q.  You're shaking your head.  You need to
19  say yes.
20    A.  Correct.
21    Q.  And that piece of information should
22  be written down somewhere, right?
23    A.  I would assume it is.
24    Q.  All right.  And then there should also
25  be some documents that reflect that evaluation,

Page 124

1  some math, some calculations, some something
2  that reflect that it occurred, right?
3     A.  I would assume it's in a file folder.
4     Q.  Sure.  Because good engineering and
5  sound engineering principles require that you
6  document those kind of analyses.  Right?
7     A.  Correct.
8     Q.  Okay.  Now, let's assume -- because
9  again I can't find such a document or such a
10  line.
11    A.  Okay.
12    Q.  So let's -- we've talked about that,
13  let's talk about the next possibility.
14        All right.  Now, what would I look for
15  to see if the Corps did some evaluation of the
16  hole that they're talking about on this Exhibit
17  Number 8, if there is no, what did you call it,
18  ground line --
19    A.  Minimum control line.
20    Q.  If there is no minimum control line,
21  what document should I look for to ascertain
22  what evaluations the Corps did of that Boland
23  Marine hole?
24    A.  Wait.  Of --
25    Q.  This 25-foot hole.

Page 125

1     A.  Just the 25-foot hole?
2     Q.  Let's make it easy.  That one hole.
3     A.  I guess I would -- you know, if I had
4  to look, I would look in the contract file to
5  see if there is correspondence back and forth
6  between the chief of engineering division and
7  the chief of construction division.  If it's
8  not in the transmittal, you know, everything
9  that goes back and forth between the
10  contractors and the --
11    Q.  Fair enough.
12    A.  You know, there's a couple of places
13  to look, but it seems like it would be in the
14  contract file.
15    Q.  All right.  Now, if is not in the
16  contract file, can we conclude it didn't
17  happen?
18        MR. STONE:
19            Objection.  Witness may not
20  have --
21    A.  I wouldn't.  I mean, I'm not -- you
22  know, I'm not saying that the contract files
23  are perfect.  Um -- I mean, you could check in
24  the -- into the geotechnical branch to see if
25  there was documentation in the geotechnical

GRIESHABER, Ph.D., JOHN

Page 126

1    branch.
2    EXAMINATION BY MR. BRUNO:
3        Q.  Okay.
4        A.  Um -- you know, there's a myriad of
5    ways that it could have been transmitted.
6        Q.  All right.  That's fine.
7            You say it could have been
8    transmitted.  From whom to whom would it have
9    been transmitted if the evaluation had been
10   conducted?
11       A.  Okay.  That's a multiple question
12   here.  It would have gone from -- it could have
13   been Lee Guillory actually went to the chief of
14   geotechnical branch and asked a question.
15       Q.  And you were there.  You were the
16   chief.
17       A.  No.  I was the section chief.
18   Depending on how the question came into
19   engineering division, you know, the records
20   would be -- at that point, it would just be Lee
21   Guillory 's records and the geotechnical branch
22   records.  If, in fact, it went through a
23   transmittal process as a formal transmittal,
24   there's a process for that.  Um -- you know,
25   there's a process where if the chief of

Page 127

1    engineering division received a request from
2    the chief of construction to look at something,
3    then that would be in the chief's reading
4    files.
5        Q.  Okay.  Is the chief of construction a
6    guy who would have the requisite knowledge and
7    experience to do such an evaluation?
8        A.  No.  He would send it to the chief of
9    engineering division.
10       Q.  All right.  It has to be done by
11   somebody in the engineering division.  And in
12   particular, does it have to be done by somebody
13   in the geotechnical section?
14       A.  The geotechnical section would be part
15   of it.  There would also be somebody in the
16   structures section would also look at it.
17       Q.  Okay.  All right.  Would you look at
18   Number 7?  It talks about the excavations
19   resulting from the removal and backfill.
20       A.  Okay.
21       Q.  All right.  It says, backfill with
22   borrow material from either on-site
23   borrow source or off-site borrow source.
24       A.  Okay.
25       Q.  Right?  Now, what does that mean,

Page 128

1    borrow material?
2        A.  That is material that they mine from
3    someplace and bring it in to backfill the hole.
4        Q.  All right.  Now, you -- as I
5    understand it -- I'm not an engineer, but as I
6    understand there's a variety of descriptors for
7    soils and in particular the types of soils and
8    materials you would use for backfill.  Is that
9    true?
10       A.  You could use a myriad of, um -- of
11   materials for backfill.  You could use anything
12   from open work material to a fat clay and
13   everything in between.
14       Q.  This particular indication is for
15   anything, any type of thing, all of those
16   things you just said, right?
17       A.  Correct.
18       Q.  I mean, there's no limit on what you
19   could use to backfill here.
20       A.  Right.  You're just backfilling.
21       Q.  Just backfilling.  And there is no
22   real limitation on compaction either, is there?
23       A.  No.
24       Q.  There's no specification for
25   compaction.

Page 129

1        A.  There's no specifications for
2    compaction.
3        Q.  So the contractor could have compacted
4    it more if they wanted to, right?  Is that
5    right?
6        A.  Correct.
7        Q.  The contractor could have used clay if
8    he want to, right?
9        A.  That's correct.
10       Q.  All right.  I know you have no, you
11   know, familiarity with this particular
12   document, but if the Corps had approved this
13   proposal, do you know what that piece of paper
14   would look like?
15       A.  Like I say, it would have come in as a
16   transmittal, it would have -- oh, you talking
17   about the Corps back to --
18       Q.  WGI.
19       A.  -- Washington Group?
20       Q.  Yeah.  Yeah.
21       A.  That would be coming through Lee
22   Guillory 's shop.  Out of construction.
23       Q.  I'll ask him.  Not him.  I'm doing a
24   guy on Monday.
25       MR. STONE:

GRIESHABER, Ph.D., JOHN

6/27/2008

| Page 130 |
| --- |

```
 1        Lee Guillory Monday.
 2     A.  That would be somebody from the
 3  construction side of the house.
 4     (Off the record.)
 5     MR. BRUNO:
 6        Plaintiffs' Exhibit Number 8 is
 7  WGI 57606 in seriatim to 57601, and
 8  the drawing which has been marked as
 9  Plaintiffs' Exhibit Number 9 is WGI
10  212862 in seriatim --
11     MR. STONE:
12        Did you say 606 to 601 for
13  Number 8?
14     MR. BRUNO:
15        Sorry.  All right.  Number 8 is
16  57606 to -- you're right.  Maybe it's
17  two documents.  614, and then it
18  switches to 615, and it goes back to
19  92.  All right.  So I guess --
20        All right.  Well, I'm sorry then.
21  P-8 are two documents.
22     MR. STONE:
23        Well, um -- Joe will just --
24     MR. BRUNO:
25        I'll mark them any way you want
```

| Page 131 |
| --- |

```
 1  me to.
 2     MR. STONE:
 3        Leave it 8 since you've been
 4  talking about it.  And when Joe takes
 5  it back he will staple it together and
 6  it will just be treated as one
 7  exhibit, but we know on the record
 8  that it's two different.
 9     MR. TREEBY:
10        It would be nice to get the Bates
11  ranges.
12     MR. BRUNO:
13        I will.  Let me just see if I can
14  figure it out.  Here's when I've got.
15  Exhibit 8 is in fact the proposal.
16  Okay?  There are two documents,
17  because one of them is the original
18  proposal and one of them is the final.
19  The original is WGI 57592 to WGI
20  57601.  Okay?  And the thing that says
21  final on it is WGI 057606 to 057615.
22  Okay?
23     MR. STONE:
24        And the questions you asked the
25  witness were from the original.
```

| Page 132 |
| --- |

```
 1     A.  Were based upon which one?
 2  EXAMINATION BY MR. BRUNO:
 3     Q.  I was just going to look at that and
 4  to make sure that all the language is the same
 5  for those paragraphs, and I think it is.
 6        Let's look at Page 3.
 7     A.  Okay.  This is final and this is
 8  the --
 9     Q.  That's the final and here's the
10  proposal.  And so I asked you questions about
11  4, 5, 6 and 7.  Yeah.  And you can see that
12  they're the same.
13     A.  Okay.
14     Q.  Okay?  All right.
15     MR. SUTTON:
16        Joe, can you tell us again
17     Exhibit 9, the Bates range, the
18     numbers?
19     MR. BRUNO:
20        212862 to 212866.
21     MR. SUTTON:
22        All right.
23  EXAMINATION BY MR. BRUNO:
24     Q.  All right.  Let's talk about the other
25  hole.  This is the south breach hole.
```

| Page 133 |
| --- |

```
 1        This is Plaintiffs' Exhibit Number 11,
 2  WGI 36984 --
 3     MR. SUTTON:
 4        Exhibit 10, Joe.  Isn't it?
 5     (Exhibit 10 was marked for
 6  identification and is attached hereto.)
 7     MR. STONE:
 8        At the risk of causing problems I
 9  object to the characterization of a
10  south breach hole, because I don't
11  really know what you're talking about
12  and I don't think that's an accurate
13  statement.
14     MR. TREEBY:
15        I join the objection.
16     MR. BRUNO:
17        Well, since it's not a question I
18  don't know what the point is.
19     MR. STONE:
20        Well, the point is it's prefatory
21  and I don't want it in the record as
22  something that I just let go without
23  raising --
24     MR. BRUNO:
25        That's fine.  You can raise all
```

34  (Pages 130 to 133)

GRIESHABER, Ph.D., JOHN

6/27/2008

Page 134

1     the sand you want to.
2   EXAMINATION BY MR. BRUNO:
3     Q.  What I am referencing is a hole which
4   we allege was dug near the south breach.  Okay?
5     A.  Okay.
6     Q.  This hole is well documented in a
7   whole pile of pieces of paper that regard a
8   lift station removal.  Okay?  Exhibit
9   Plaintiffs' 10 is a series of documents and I'm
10  going to put them together just because it's
11  better for that purpose, but the first document
12  is WGI 36984, the second document is something
13  entitled Lift Station Removal Plan, As Revised,
14  October 10, 2001, and it's in seriatim to 27
15  then we have a transmittal --
16    MR. TREEBY:
17      To 27?  I'm sorry.  Can you give
18  the Bates range?
19    MR. BRUNO:
20      Yeah.  To 52127.  That's the
21  ending Bates of that document.
22    MR. SUTTON:
23      What's the starting range?
24    MR. BRUNO:
25      I'll try it one more time.  52123

Page 135

1   to 27.
2       The next document is WGI 76655
3   and 54.
4       The next one is WGI 228430.
5       Next one is WGI 037475, 76, it's
6   two documents.
7       And then WGI 6454; WGI 6423, 25;
8   WGI 8583, 84, 85; WGI 2544393; WGI
9   36981, 82; WGI 18015, 16, 17; WGI
10  51682; WGI 36985; WGI 343375 and 76;
11  WGI 71142, 43, 45, 46, 47; WGI 229272;
12  WGI 76330; WGI 76659; WGI 76660; WGI
13  48621 all the way to 630; and finally,
14  WGI 76657 and 58.
15  EXAMINATION BY MR. BRUNO:
16    Q.  I'm sorry.  I forgot to ask you some
17  questions on the other thing.  I apologize.
18      Before we get to the lift station let
19  me ask you a few more questions.  You'll
20  remember that not only were they to remove this
21  wedding cake thing, but they would remove
22  piling underneath it.  Okay?  I asked you a
23  whole bunch of questions about holes, but I
24  forgot to ask you questions about the holes
25  created when you pull out a piling or other,

Page 136

1   you know, structure.
2       You'll remember the document suggested
3   that some of the piling were a certain length.
4   Let's see if I can find it for you.  Yeah.  It
5   says, at Page WGI 54420 --
6     MR. STONE:
7       Which exhibit is that?
8   EXAMINATION BY MR. BRUNO:
9     Q.  -- of 7, it says that the mass
10  concrete and steel foundations are assumed to
11  be reinforced with rebar and pile founded on
12  treated wood pilings assumed to be 30 to
13  35 feet long.  So if you go down 25 feet and
14  that's the bottom of this concrete thing, then
15  you're going down another 30, 35 feet,
16  possibly.  Okay?
17      But for your purposes, first question
18  is:  If you have a series of piling, again in
19  this general area within 300 feet of our
20  floodwall -- all right?  Is there any need to
21  evaluate what impact there may be to the
22  removal of these piling in that same location?
23    MR. STONE:
24      Object to form.
25    MR. BRUNO:

Page 137

1       What's wrong with the form?
2     MR. STONE:
3       The hypothetical is incomplete
4   and misleading.
5     MR. BRUNO:
6       What's incomplete about it?
7     MR. STONE:
8       Well, you're not telling him
9   whether it's located on land or in the
10  water.  That's a couple of problems.
11    MR. BRUNO:
12      Yes, I did.
13    MR. STONE:
14      There are other problems.
15    MR. BRUNO:
16      I said it's below the wedding
17  cake.
18      So what are the other problems?
19  Give them to me.  I'll write them
20  down.
21    MR. STONE:
22      They're the kind of problems you
23  have there.  I'm not going to fill out
24  your hypothetical for you.
25    MR. BRUNO:

35 (Pages 134 to 137)

GRIESHABER, Ph.D., JOHN

Page 138

1      Yes, you do.  You object to form,
2  you tell me what's wrong with the
3  form.
4      MR. STONE:
5          It's an incomplete and misleading
6  hypothetical.
7      MR. BRUNO:
8          What's incomplete about it?
9      MR. STONE:
10         Well, next you're going to accuse
11  me of talking to the witness about
12  this.
13     MR. BRUNO:
14         Really.
15     MR. STONE:
16         It's an incomplete and
17  misleading.  That's all I have to give
18  you.
19     MR. BRUNO:
20         What that tells me is -- no, on
21  the contrary, the reason why,
22  Mr. Stone, you make your objections to
23  form at the time of the deposition is
24  so that the questioner can change the
25  question to perhaps alleviate your

Page 139

1  objection.  Obviously, you have no
2  clue as to why the form is defective
3  because you can't tell me what's wrong
4  with the form.  So I will proceed.
5  Thank you, sir.
6      MR. STONE:
7          It's incomplete and misleading.
8      MR. BRUNO:
9          No, you can say that, but
10  obviously it's not because you can't
11  tell me what's incomplete, nor can you
12  tell me what's misleading about it.
13  I'll wait.  You want to take some time
14  off and figure it out?  You want to
15  maybe take a five-minute break and
16  write down what's misleading about it?
17  Go ahead and do that.
18     MR. STONE:
19         If you're comfortable with your
20  question --
21     MR. BRUNO:
22         No, I'll wait.  Let's go off the
23  record.  You go outside and you write
24  down a list of all the things that's
25  misleading and incomplete about the

Page 140

1  hypothet.  You do it.
2      MR. STONE:
3          I'm not going anywhere and I'm
4  not going to argue with you.
5      MR. BRUNO:
6          Then you have to withdraw your
7  objection.
8      MR. STONE:
9          I won't withdrew it.
10     MR. BRUNO:
11         Whatever.  Okay.  I'm getting
12  tired of your silly games, counsel.
13  It's like a nine-year-old.
14  EXAMINATION BY MR. BRUNO:
15     Q.  We're talking about the wedding cake
16  structure which we've located a hundred times.
17  It's on the damned drawings.  We know how deep
18  at least they thought it was.  We know they
19  thought there may be piling below this thing.
20  We know it's within 300 feet.  We know it's on
21  the water side of the flood protection
22  structure.  All I'm trying to learn is, is the
23  United States Army Corps of Engineers
24  interested in ascertaining whether the removal
25  of pilings as I've described -- I'm sorry.  Is

Page 141

1  the United States Army Corps of Engineers
2  interested in whether or not after one removes
3  a piling like this it may impact a flood
4  protection structure?  That's my question.
5      A.  It depends on the stratification the
6  pile was set in.
7      Q.  Right.
8      A.  And it depends on how the pile came up
9  out the ground.  If these are just Class 5, 30,
10  35-foot piles, as you pull that pile out it
11  closed up right away just from the excessive
12  pressures.
13     Q.  Okay.  All right.  Now, so you really
14  gave me two answers.  You said it depends on
15  the stratification.
16     A.  It depends on the stratification --
17     Q.  But then you said it doesn't matter,
18  so --
19     A.  No.  First of all, it depends on the
20  stratification.  Okay?
21     Q.  All right.  The stratification we've
22  got because we're going to go back and look at
23  our original design of the floodwall.  And so
24  if the stratification has some sands or silts
25  or marsh, that would merit some further

36  (Pages 138 to 141)

GRIESHABER, Ph.D., JOHN

6/27/2008

Page 142

1  investigation, right?
2     A.  It would, but what we're saying is
3  you're telling me on 35 feet below the surface,
4  so I'm somewhere around -30 --
5     Q.  You're more than that, yeah.  You're
6  way down to --
7     A.  You know --
8     Q.  -- fifty or sixty?
9     A.  -- and so, you know, a void at that
10  point is going to close immediately.  And, you
11  know, I don't think -- you know, barring, you
12  know, some kind of stratification that I don't
13  see here, um -- it would not be an issue.
14     Also, that there's no way you could
15  really close it because it's closing itself as
16  you're pulling the piles.
17     Q.  All right.  What about this stuff
18  called bentonite; don't they use that to fill
19  in piling holes when the piling is removed?
20     A.  Okay.  What you're talking about is as
21  you pull up -- and that's because you're
22  worried about infiltration of surface
23  contaminants into the aquifer.  What you're
24  telling me is we're 30, 40 feet below the
25  ground.

Page 143

1     Q.  Right.
2     A.  We're going to have a cylindrical hole
3  that we're going to backfill the top of anyway.
4  So there's real no -- there's no advantage or
5  no need to take this isolated cylindrical hole
6  in the formation which closed anyway and try
7  and do something with it.
8     Q.  All right.  Well, y'all have to
9  forgive me, because when you say isolated, I
10  have to then ask this question because the
11  documents reflect that there are as many as
12  three thousand piling on that site.  Is your
13  answer dependent --
14     A.  It's a function of the spacing of the
15  piles.
16     Q.  Okay.  Thank you.  Okay.
17     A.  If you're telling me these piles are
18  on 4 or 5-foot centers, and they're Class 5,
19  30, 35-foot piles, the butt is only 8 inches in
20  diameter.  So the thing just closes right up.
21     Q.  Right.
22     A.  The other thing is, it's 40 feet into
23  the ground, and it's well below anything that
24  could contribute to groundwater contamination
25  or a seepage issue because you're covering the

Page 144

1  top of it.
2     Q.  So bottom line, it's the Corps'
3  position that with regard to the removal -- and
4  please accept the three thousand or thereabouts
5  is remotely accurate.  It's the Corps' position
6  that there's no needed to do the kind of
7  evaluation that we've been talking about this
8  morning in the context of excavating holes with
9  regard to the potential for negative impacts in
10  a flood control structure.  Right?  That's the
11  Corps' position?
12     A.  Let me rephrase it.
13     Q.  Okay.
14     A.  Okay?  The void that may or may not
15  have been left by pulling the pile that is
16  40 -- that starts 40 feet below the ground
17  surface will not impact the wall's stability.
18     Q.  I'm sorry.  Starts 40 feet.  Um --
19  actually starts 25 feet.  I'm just trying to
20  keep us consistent.
21     A.  I thought you said they went deeper
22  than the 25 feet.
23     Q.  Yeah.  But you said starts.  You've
24  got the concrete structure.  The bottom of the
25  concrete structure is about 25 feet.

Page 145

1     A.  And it went deeper.
2     Q.  And then the piling is below that.
3     A.  Okay.
4     Q.  So --
5     A.  Okay.  Quick question:  Did the
6  excavation go deeper than the 25 feet?
7     Q.  Of the hole?
8     A.  Yeah.
9     Q.  No.
10     A.  Okay.  So what I have is I've got a --
11  I start a 30-foot pile at a depth of 25 feet.
12     Q.  Right.  Okay.  So in that
13  circumstance, the Corps' position is there's no
14  need to do an evaluation of those piles?
15     A.  I would have to look at the
16  stratification at that site.
17     Q.  That tells me then that the Corps
18  would have to do at least something.
19     A.  Someone would look at the
20  stratification.
21     Q.  That's all I'm trying to get at.
22     So with regard to the removal of
23  piling on this site, the Corps would say, you
24  have to do something with regard to whether or
25  not there may be an impact on the flood

GRIESHABER, Ph.D., JOHN

6/27/2008

---

Page 146

1  protection structure. I'm trying to make it
2  easy. It not trying to say what it is, just
3  something. It's the whole business of don't
4  worry about it versus we're going to do
5  something.
6      A. It has to be looked at.
7      Q. That's it. Okay. So it has to be
8  looked at. Okay.
9          And can I conclude that your answers
10 would be same, that in the context of a
11 contract where some contractor like WGI did all
12 the plans and described all the work, that the
13 Corps would be in the position of simply
14 approving their plans and then would have done
15 an evaluation of the piling, or whether or not
16 something that's to be done to safeguard the
17 floodwall when it reviews their plans and
18 specifications?
19     A. Okay, I'm lost. Got lost halfway
20 through the question.
21         (Brief interruption.)
22 EXAMINATION BY MR. BRUNO:
23     Q. All right. We're talking about the
24 piling.
25     A. Right.

---

Page 147

1      Q. Okay. Was it the Corps' position that
2  the Corps would have to evaluate the potential
3  negative impact of the pile removal on the
4  floodwall before letting WGI go forward with
5  that pile removal work? Make it simple.
6      A. Yes.
7      Q. Okay. All right. And as you sit here
8  today, you don't know whether the Corps did
9  that or not.
10     A. I do not know.
11     Q. All right. Your expectation is that
12 they would have, right?
13     A. That's correct.
14     Q. And your further expectation is that
15 not only would they have done it but there
16 would be some documentation of that evaluation.
17 Right?
18     A. There would be documentation of the
19 fact that they looked at the overall plan, and
20 if they had an objection it would have been,
21 you know, stated.
22     Q. All right. But let's take it the next
23 step. I think you also said that with regards
24 to, you know, the wall stability, seepage
25 analysis and global stability that should have

---

Page 148

1  been done in that context, there should be some
2  writings or documents that would reflect that
3  that was done.
4      A. Correct. What happens is they would
5  have gotten something in, and somebody asked is
6  this okay? And, you know, if it came in, you
7  know, as a question, it went out answered.
8      Q. Okay. And Mr. Guillory, if he's the
9  guy, is supposed to know that he's supposed to
10 tell you -- or not you, but supposed to tell
11 somebody in engineering to undertake this
12 evaluation.
13     A. That would be my understanding of the
14 way construction division would work.
15     Q. All right. Did you in preparation for
16 this deposition ask Guillory if he did that?
17     A. No, I didn't. I haven't talked to Lee
18 Guillory in years.
19     Q. Let me show you a document which is
20 identified by Plaintiffs' Exhibit Number 11
21 which is WGI 51585 --
22         (Exhibit 11 was marked for
23 identification and is attached hereto.)
24     MR. SUTTON:
25         It should be 12, huh? You

---

Page 149

1  already identified 11.
2      MR. TREEBY:
3          No, it was a mistake. That was
4  10. He made 11 10.
5      MR. BRUNO:
6          No, somebody said I made a
7  mistake so we switched.
8  EXAMINATION BY MR. BRUNO:
9      Q. All right. This is in seriatim to WGI
10 51656. I show you Page WGI 51611. And in
11 particular the sentence I'm going to ask you
12 the look at is the following: It says,
13 however, the floodwall to the east of the site
14 is supported on sheet pile that reaches a depth
15 of at least 25 feet. Okay? And this would
16 essentially interrupt the water flow in the
17 easterly direction at lower elevations to
18 25 feet.
19         Let me highlight it for you so you
20 don't have to struggle. There you go.
21 (Tendering.)
22     A. Okay.
23     Q. All right. I see you're checking your
24 diagram there to look at the sheet pile tip
25 depths.

---

38 (Pages 146 to 149)

GRIESHABER, Ph.D., JOHN

6/27/2008

| Page 150 |
|---|

1      First of all, this is not a document
2  that was written by you guys.
3      A.  All right.
4      Q.  You can see that, right?  I mean, this
5  was -- from the cover, it was written by -- it
6  was prepared for the Corps under contract by
7  Washington Group, not you.
8      A.  I understand.
9      Q.  So nobody is pointing a finger at you.
10      But it's clear, is it not, that this
11  sentence is inaccurate, that the sentence that
12  says the floodwall to the east of the site is
13  supported on sheet pile that reaches a depth of
14  at least 25 feet, that's flat out wrong.
15  Right?
16      A.  That's correct.
17      Q.  All right.  Now, and for whatever
18  reason, and I'm not suggesting you know what
19  the reason may be, that anybody was relying on
20  this sheet pile to interrupt water flow, okay,
21  the fact is, because the sheet pile only goes
22  to eight feet it would not -- there was no
23  sheet pile there to interrupt water flow below
24  that sheet pile tip depth, correct?
25      A.  Correct.

| Page 151 |
|---|

1      Q.  All right.  Thank you.
2      (Lunch break.)
3  EXAMINATION BY MR. BRUNO:
4      Q.  You referred to a stratification
5  document which was a document that was part of
6  the original construction of the flood control
7  structures?  Can we attach those, please, if
8  you don't mind?  As exhibit number what?
9      MS. LABOURDETTE:
10      12.
11      (Exhibit 12 was marked for
12  identification and is attached hereto.)
13  MR. STONE:
14      Ask the witness if that's it.
15  EXAMINATION BY MR. BRUNO:
16      Q.  Is this it?  There are two documents
17  there.
18      A.  This is geologic profiles, um --
19  MR. STONE:
20      Is that what you were talking
21  about?
22  MR. BRUNO:
23      Yes.  I mean, I guess.
24      A.  This is at the location that we're
25  concerned with?

| Page 152 |
|---|

1  MR. STONE:
2      This one?
3  THE WITNESS:
4      Yeah.
5  EXAMINATION BY MR. BRUNO:
6      Q.  If you don't know --
7      A.  Well, I'm looking for the title block.
8  See, normally you have to go -- for the
9  locations of the borings, you see the plans.
10      Q.  I'm sorry.  You need to do what?
11      A.  See right here it says, for the
12  location of the borings -- this doesn't tell me
13  where these -- I need to know where these
14  borings are so I know where the profiles are.
15      Q.  Okay.  Well, it gives you the stations
16  at the top, 0 to 90 there, and this one is from
17  90 to 800, which presumably is the entire
18  length.
19      A.  Okay.  So we're sure that's the east
20  side.  That's why I'm asking the question.
21      Q.  Well, I can only do so much of the
22  work for you.  Okay?  No, I'll help you any way
23  I can.  Let me help me look at it some more.
24      Well, actually --
25  MR. STONE:

| Page 153 |
|---|

1      Joe, that may be not the IHNC
2  part of MRGO right there, around the
3  corner, or the GIWW, somewhere along
4  there.
5  MR. BRUNO:
6      You mean the 0?
7  MR. STONE:
8      One of these is for the part of
9  the IHNC, the other isn't.
10      A.  See, this is showing a levee.  There
11  is an I-wall that ties in at a higher
12  elevation, another I-wall.
13  EXAMINATION BY MR. BRUNO:
14      Q.  And this one showing the stationing,
15  and my memory is -- where's -- does anybody
16  remember, it went to -- the history station
17  number, the highest station number, was it 800?
18  It wasn't that high.  It's like 600 something.
19  MR. BAEZA:
20      Along here?
21  MR. TREEBY:
22      Well, the exhibit is there.
23  MR. BRUNO:
24      No, no, no no.  Reach 2.
25  MR. BAEZA:

Johns Pendleton Court Reporters                    800 562-1285

GRIESHABER, Ph.D., JOHN

Page 154

```
 1            Oh.  Reach 2, it goes up to --
 2      MR. BRUNO:
 3            Like 800, doesn't it?  I think
 4      Richard is right.
 5      MR. BAEZA:
 6            I think Bayou Dupre is around
 7      700.  It goes a little bit higher.
 8      MR. BRUNO:
 9            Yeah, I think you're right.
10      Well, there's no Bates number on here,
11      so I'd like a copy if that's okay with
12      you.
13      MR. STONE:
14            Just attach them.
15      MR. BAEZA:
16            This is from General Design
17      Memorandum 3, Chalmette area plan from
18      our general disclosures.
19            On the IPET website, too.
20      MR. BRUNO:
21            All right.  And that's fine.
22            So for the record, I've marked as
23      Exhibits 12 Plate Number 28 and Plate
24      Number 29.  Plate Number 28 seems to
25      be -- it says, north end of lock.
```

Page 155

```
 1      That will help us out pretty good
 2      there.  And then it says top of levee,
 3      so -- um -- seems like.
 4      A.  Well, it's either the east or the west
 5      side, and that's my question.
 6      EXAMINATION BY MR. BRUNO:
 7      Q.  Right.  Where's your other ones?
 8      Let's take a look at this.  Where's the look on
 9      this sucker?
10      A.  It's not on the page.
11      Q.  It will be south, huh?
12      A.  The lock.  (Nods affirmatively.)
13      MR. JOANEN:
14            That's it right there.  That's
15      all your plates.  That's the whole
16      thing.  So that's Plate 28 you're
17      looking at, so it would be right up in
18      there.
19      THE WITNESS:
20            Okay.  So that is on the east
21      side?
22      MR. JOANEN:
23            I don't know.
24      EXAMINATION BY MR. BRUNO:
25      Q.  Here's the whole stack.  Will that
```

Page 156

```
 1      help you?
 2      MR. TREEBY:
 3            Could we identify what the
 4      witness is looking at, please.
 5      MR. BRUNO:
 6            We sure will, after he looks at
 7      it.
 8      A.  This is Design Memorandum Number 3,
 9      Lake Pontchartrain and Vicinity.
10      EXAMINATION BY MR. BRUNO:
11      Q.  All right.
12      A.  Let's see.  Okay, that's the east
13      side.
14      Q.  That's the east side.  Great.  Okay.
15      All right.
16            So to kind of just center us, this is
17      the document that you, the Corps of Engineers,
18      would reference in order to do your seepage
19      analysis, your wall stability analysis, and
20      your global stability analysis.  I'm not saying
21      its the only thing you look at, I'm just saying
22      it's one of the things you would look at to --
23      A.  Correct.
24            (Brief interruption.)
25      EXAMINATION BY MR. BRUNO:
```

Page 157

```
 1      Q.  Right?
 2      A.  One of the things I would use.
 3      Q.  Right.  We got that.
 4      A.  Okay.
 5      Q.  I didn't mean to suggest otherwise.
 6            Now, this shows that there's a pretty
 7      good marsh deposit between 10 and, I don't
 8      know, 20 feet that underlays -- it's right
 9      below the sheet pile tip.  (Tendering.)
10      A.  Yeah.  It's showing the marsh deposit
11      as a clay deposit, though.  Organic clay with,
12      um -- organic matters in it.
13      Q.  Right.  So it's got -- but it's got a
14      lot of organic matter in it, doesn't it?
15      A.  It depends where you are in the
16      deposit.
17      Q.  All right.  And that's --
18      A.  It's more than 50 percent clay, though
19      by classification.
20      Q.  Well, it says, according to the
21      legend, marsh, very soft organic clays with
22      peat.
23      A.  Right.
24      Q.  So --
25      A.  But if you look at the crosshatched
```

Johns Pendleton Court Reporters                              800 562-1285

GRIESHABER, Ph.D., JOHN

Page 158

1   area -- look at the crosshatched area and look
2   at legend on the bottom, this is a CHO.  It's an
3   organic clay, which means it's more than half
4   clay.
5       Q.  All right.
6       A.  If it was an OH, that means it would
7   be all organic.
8       Q.  Okay.  Well, why are there two
9   different -- well, let me ask you this:  Do you
10  regard the description to the left under the
11  word legend which says marsh to be different
12  from the crosshatch on the right which says
13  clay with organic matter?  Are they saying the
14  same thing?
15      A.  No.  The marsh is the environment.
16  It's a type of environment.  Like you see where
17  it says fill is channel fill.
18      Q.  Right.
19      A.  That tells you what type of
20  environment it is.  The legend by your thumb on
21  the right is telling you what type of material
22  it is, and that's a clay with organics.
23      Q.  Okay.  Well, the environment that the
24  clay lives in is a very soft organic clay with
25  peat in it.

Page 159

1       A.  Correct.
2       Q.  All right.  So it's permeable.
3       A.  It has some forms of permeability.
4       Q.  All right.
5       A.  Not like a sand or a gravel or
6   anything like that.
7       Q.  I understand that.  But it's got
8   permeability.  Right?
9       A.  (Nods affirmatively.)
10      Q.  Okay.  Now, that means, then, that
11  there's the potential for water to travel
12  through this area, right?
13      A.  Correct.
14      Q.  Okay.  Let's go to the, um -- lift
15  station removal.  I have already identified
16  Plaintiffs' Exhibit Number 10.  It says on Page
17  WGI 48626, excavation bottom will be at
18  elevation -19.75?
19      A.  Okay.
20      Q.  All right.  Assuming that that's
21  accurate, because I know you haven't had a
22  chance to carefully, you know, go through this.
23  But simple question:  If they're digging a hole
24  which requires a cofferdam and the bottom is at
25  elevation 19.75, is this the kind of hole that

Page 160

1   would mandate a review by the Corps of
2   Engineers to determine whether or not there's
3   the potential for impact to the flood control
4   structure?
5       A.  Well, depending on its location with
6   respect to the floodwall, we'd want to see it.
7       Q.  All right.  It's within 300 feet.
8   It's on the water side of the IHNC.
9       A.  Okay, we would probably expect to see
10  it.
11      Q.  All right.  And without me having to
12  ask all the same questions again that I asked
13  with regard to the Boland Marine hole --
14      A.  Uh-huh.
15      Q.  -- would you believe that a wall
16  stability analysis would be required?
17      A.  Yes.
18      Q.  Would you believe a seepage analysis
19  would be required?
20      A.  Yes.
21      Q.  Would you believe a global stability
22  analysis would be required?
23      A.  Yes, as well as a TRS analysis for the
24  stability of the actual temporary retaining
25  structure.

Page 161

1       Q.  And the reference would be in the
2   context of the analysis to this Plaintiffs'
3   Exhibit Number 12, the first page.
4       A.  That would be some of the information.
5   There's probably some updated information, more
6   recent borings than what were used to develop
7   that.
8       Q.  All right.  Now, here we have among
9   these papers a lift station plan, revised, and
10  then we have -- we have a document WGI 76654,
11  and it says transmittal of shop drawings,
12  equipment, data, materials, samples and
13  manufacturers' certificate of compliance.  You
14  see that?
15      A.  Okay.  Uh-huh.
16      Q.  Let's talk for a moment about the only
17  form only, just this form piece of paper.
18      MR. STONE:
19          Is this from that composite
20      document that you had?
21      MR. BRUNO:
22          Yes.
23      MR. STONE:
24          What's the --
25      MR. BRUNO:

GRIESHABER, Ph.D., JOHN

Page 162

1        I just gave it.
2      MR. TREEBY:
3        What's the Bates number?
4      MR. BRUNO:
5        You want -- again?
6      MR. TREEBY:
7        Of that one page.
8      MR. BRUNO:
9        I just gave it.
10     MR. TREEBY:
11       Oh, I'm sorry.  I got it.
12     MR. STONE:
13       Exhibit number?  It's 10.
14   EXAMINATION BY MR. BRUNO:
15     Q.  Exhibit number 10, for the record,
16   again, WGI 076654.  My question is only about
17   the form.  Okay?  Not what's on this piece of
18   paper.
19     A.  Okay.
20     Q.  Is this the form that would be
21   utilized to approve or disapprove the proposal
22   made by the contracting group, the Washington
23   Group International?
24     A.  This is how it would be transmitted.
25   Um --

Page 163

1      Q.  How what would be transmitted?
2      A.  This is how the drawings -- shop
3    drawings, the contractor would transmit the
4    data to the Corps, and then the Corps would use
5    this and a cover form to transmit it within its
6    organization.
7      Q.  Okay.  But again, the question is, is
8    this the form that would be used to indicate
9    approval or disapproval?
10     A.  No.  That's not -- not within the
11   organization.  This is between construction
12   division and the, um -- contractor.  There's a
13   separate form that we in the organization would
14   use.
15     Q.  Maybe I didn't ask my question well
16   enough.  The question is whether or not this
17   form would be the form that the Corps would
18   utilize to tell WGI that the Corps approves or
19   disapproves the proposed work?
20     A.  There's coding that goes on that form,
21   yes.
22     Q.  So this would be the form.
23     A.  (Nods affirmatively.)
24     Q.  All right.  And just to jump back to
25   Boland for a second, if the Corps had approved

Page 164

1    that proposal, there should be a form like this
2    that says approved, signed by the Corps and
3    accepted by the contracting -- I'm sorry.
4    Signed by the contracting officer and then
5    signed by the Washington Group people?
6      A.  If that excavation was a required
7    submittal, like I told you, it could be handled
8    in different ways.  It could have been part of
9    the plans, the initial task order that didn't
10   require a submittal.
11     Q.  Okay.
12     A.  So this is for a submittal.  This is
13   how you transmit required submittals.
14     Q.  Okay.  All right.  And when it's
15   required or not required depends upon --
16     A.  It's called out in the task order.  If
17   it's a required submittal, it's actually called
18   out in the task order.
19     Q.  Well, if there's -- if it's not
20   required, there would be an indication about
21   your, what you call it, your line?
22     A.  Minimum control line.
23     Q.  Yeah.  I mean, if you are not going to
24   require evaluation by the engineering group,
25   then there should be language in the task order

Page 165

1    that says the minimum control line is whatever
2    it is so that somebody would know whether to
3    submit it to engineering or not, right?
4      A.  Well, there is also what's called
5    engineering considerations that the people in
6    the field have.
7      Q.  Who are the people?
8      A.  That's the Lee Guillory group.  The
9    people who are actually in the field.
10     Q.  All right.
11     A.  You know, what we have is called
12   engineering considerations, and that's
13   things -- design aspects that they have.  That
14   minimum control line would have been considered
15   an engineering consideration.  Anything that
16   doesn't violate this minimum control line is
17   not a problem.
18     Q.  Okay.  Well, you got me totally
19   confused because we didn't talk about that this
20   morning.
21     A.  You didn't ask about that this
22   morning.
23     Q.  Oh, yes, I did.  Yes, I did.  I asked
24   you --
25     MR. STONE:

GRIESHABER, Ph.D., JOHN

Page 166

1          Don't argue with the witness.
2   EXAMINATION BY MR. BRUNO:
3      Q.  -- to cover all the circumstances
4   about the hole.  You said to me that one way to
5   deal with these holes is that you could have
6   had a --
7      A.  Minimum control line.
8      Q.  -- minimum control line.  You said
9   without a minimum control line you'd have to
10  have them evaluated.
11     A.  Correct.
12     Q.  Are you saying something different
13  now?
14     A.  No.
15     Q.  Okay.
16     A.  The minimum control line would have
17  been considered an engineering consideration.
18     Q.  I'm not sure I understand that.  What
19  do you mean?  If it's within your control line,
20  then what's the engineering consideration?
21     A.  Let's redefine an engineering
22  consideration.
23     Q.  Okay.
24     A.  An engineering consideration is some
25  facts that are given to the people in the field

Page 167

1   about the design.  Okay?  And the minimum
2   control line would have been one of the facts
3   that the people in the field would have been
4   given.
5      Q.  Okay.  But I thought this morning you
6   told me that that would be documented in the
7   task order.
8      A.  No, engineering considerations are
9   what the people in the field -- additional
10  information that they have to help them
11  administer the contract.
12     Q.  All right.  And you're telling me that
13  the minimum control line is, itself, an
14  engineering consideration.
15     A.  An engineering consideration, correct.
16     Q.  Is that documented somewhere?
17     A.  It would normally be transmitted to
18  the construction division.  I mean, Lee
19  Guillory could tell you.
20     Q.  All right.  If there was an
21  engineering consideration which included a
22  control line, there would be documentation
23  between the engineering department and the
24  contracting department that Lee Guillory could
25  rely on, right?

Page 168

1      A.  Construction division, yes.
2      Q.  Lee Guillory can't create this
3   himself, can he?
4      A.  No.
5      Q.  And he does not have the authority of
6   this district office to make those decisions by
7   himself.
8      A.  Correct.
9      Q.  And absent him having in his hands a
10  control line, if he encounters a hole, or at
11  least he comes to know that there's going to be
12  an excavation down to 25 feet, or in this case
13  20 feet, he knows that he's required to notify
14  the engineering department so that they can
15  evaluate the potential impact of the hole on
16  the flood control structure, right?
17     A.  Absent engineering considerations that
18  cover it.
19     Q.  Okay.  The answer is he's required to
20  give that to the engineering department for
21  their review.  Yes?
22     A.  Correct.
23     Q.  All right.  Now, does it ever become
24  necessary to get Vicksburg engineering involved
25  in these issues?  And I'm going to define these

Page 169

1   issues to be the business of evaluating a hole
2   to ascertain whether or not -- a hole, work,
3   excavation, anything, that may impact --
4      A.  When you refer to Vicksburg, you're
5   referring to who?
6      Q.  Vicksburg engineering.
7      A.  Well, wait.  There's a Vicksburg
8   District, which would not get involved because
9   it's outside of the district boundaries.
10  There's the division office which is set up
11  there which is a regional business center that
12  has some level of expertise that uses what's
13  called a community of practice where if New
14  Orleans needed additional technical help we
15  would ask division to get -- go into the
16  community of practice.  Now, you also have
17  ERDIC up there which is the research lab.  So I
18  see no reason why any of them would be
19  involved.
20     Q.  Okay.  That's fair enough.  Do you
21  know Jim Montegut?
22     A.  The name is familiar.  I think he
23  works in construction division.
24     Q.  All right.  Now, attached to this
25  denial is -- it says, the revised lift station

43  (Pages 166 to 169)

GRIESHABER, Ph.D., JOHN

6/27/2008

Page 170

1    removal plan is returned code E, disapproved.
2        A.   Okay.
3        Q.   And this is obviously the indication
4    by the Corps of what they perceive to be the
5    problems.
6        A.   Okay.
7        Q.   And they're obviously not going to
8    approve the proposed work until they come in --
9    they're consistent with the Corps' critique,
10   right?
11       A.   Correct.
12       Q.   Okay.
13           MR. TREEBY:
14               I'm sorry, Joe, but would you
15           read -- I don't think you gave the
16           Bates number of that page that you're
17           referring to when it said disapproved.
18           MR. BRUNO:
19               Yeah, that was the one I said was
20           the form, but this is the third time.
21           MR. TREEBY:
22               Oh, it's the same page?
23           MR. BRUNO:
24               Same page.  Same page.
25           MR. TREEBY:

Page 171

1               I didn't know it was the same
2           page.
3           MR. BRUNO:
4               Same page.
5    EXAMINATION BY MR. BRUNO:
6        Q.   I'm now looking at WGI 76657, which
7    appears to be now the approval of the proposal
8    to remove the lift station.  But just check me
9    out on that if you don't mind.  (Tendering.)
10       A.   Okay.  Well, it's a partial approval
11   here.
12       Q.   Right.  He's letting them start the
13   work, though.
14       A.   Resubmit revised removal plan to
15   include addendum items plus a sequence of work
16   section as per discussion with USACE Harry
17   Fermin on 10/15/01.  Approve to commence pile
18   removal and sheet pile driving provided a
19   revised plan is submitted no later than.  So he
20   can't dig anything, he can just start --
21       Q.   He can pull those piles.
22       A.   Right.  I don't think he's -- the
23   piles he's talking about are probably adjacent
24   piles so he can drive his sheets.
25       Q.   No.  I'm with you.  I was going to ask

Page 172

1    this question:  Obviously, because they're
2    piling there, once again you would assume that
3    the Corps had -- the engineering department of
4    this local office would have approved the
5    pulling of those piles as to whether or not
6    that activity could potentially affect the
7    flood control structures there.  Right?
8        A.   I would assume that.
9        Q.   All right.  And once again, if those
10   piles were deeper than 20 feet from the
11   surface, you would expect the engineering
12   department to have reviewed them.
13       A.   That whole plan was reviewed by the
14   engineering department.
15       Q.   What whole plan?
16       A.   The whole concept.  The braced
17   excavation.  And this is all part of the braced
18   excavation.
19       Q.   I don't think the piling was in there.
20   Let me just check it.
21       A.   Apparently, the removal of the piling
22   is required to build the braced excavation.
23       Q.   It says -- I'm sorry.  I'm reading
24   from WGI 52125.  The area of soil around the 8
25   timber piles located on the bottom of the

Page 173

1    excavation will be excavated to expose the tops
2    of the piles.  The piles will be extracted from
3    the ground using an LS 410 one-ton crawler
4    crane equipped with a hydraulic vibratory pile
5    extractor.  The extracted timber piles will be
6    staged for testing by WGINT, et cetera, et
7    cetera.
8            So, again, your testimony is that the
9    Corps, being advised of the fact that they were
10   going to remove piles, would have had the
11   engineering department review this activity.
12       A.   That whole document.
13       Q.   The whole document.
14       A.   Correct.
15       Q.   And again, for the purposes of
16   ascertaining whether or not there was any
17   potential impact to the flood control structure
18   there.  Right?
19       A.   Correct.
20       Q.   And it's mandatory, it's not
21   discretionary.  Right?
22       A.   That document was -- was reviewed
23   based on the stability of the wall.
24       Q.   Right.  But the review is mandatory,
25   it's not discretionary by the Corps.

44  (Pages 170 to 173)

Johns Pendleton Court Reporters                    800 562-1285

GRIESHABER, Ph.D., JOHN

6/27/2008

Page 174

1        MR. STONE:
2            Object.
3    EXAMINATION BY MR. BRUNO:
4        Q.  According to own internal procedures.
5    Right?
6        A.  Right.  By our own internal procedures
7    we look at it, yes.
8        Q.  Meaning you have to do it.
9        A.  Yeah.  Okay.  I mean, that's -- as
10   opposed to not have to do it?  Is that the --
11   you know.
12       Q.  Well, I mean, you have to do it or you
13   don't have to do it.  That's pretty black and
14   white to me.
15       A.  It's in our process and procedures, we
16   follow our process and procedures.
17       Q.  And your process and procedures say do
18   it.
19       A.  Correct.
20       Q.  Thank you.
21           Now, the piling -- I'm sorry.  The
22   cofferdam itself has sheet piles which create
23   the opportunity to remove whatever concrete
24   thing is in there, and then they backfill that
25   and then they are going to remove those

Page 175

1    pilings.
2        A.  Correct.
3        Q.  Is it necessarily to do an engineering
4    evaluation for the purposes of determining
5    whether or not the removal of those sheet piles
6    may impact the floodwall?
7        A.  No.
8        Q.  Okay.  Why not?
9        A.  They're non displacement piles.  When
10   they come out, the hole closes itself up.
11       Q.  All right.  Now, I'm just curious,
12   only because, frankly -- and I'm no engineer.
13   I've heard other engineers say something
14   different.  Okay?  So I have to ask, is there
15   some kind of a journal or publication or
16   scientific text that we can -- that you base
17   that view on, that is, when you pull a Z pile
18   that it closes itself up?
19       A.  I would -- I'm sure it's in numerous
20   texts.  To quote a text right now, I can't come
21   off the top of my head.  You've got to realize
22   when you pull that sheet pile it doesn't take
23   any soil with it, or rarely takes any soil with
24   it.
25       Q.  Right.  I've seen that.  I agree.

Page 176

1        A.  It's a grand total of maybe three
2    eighths of an inch thick.
3        Q.  Right.
4        A.  So all you've got is a three-eighths
5    of an inch thick sliver that, um -- of soil
6    that closes up instantaneously.  They pull it
7    with a vibratory hammer.  The whole pile is
8    vibrating and it closes up.
9        Q.  Well --
10       A.  We went through a lot of this as part
11   of the SELA Project with the TRSs adjacent to
12   the canals and stuff like that, and, you know,
13   there were test sections that were done, and we
14   found that, you know, that you could have a
15   plug at the top, but as far as deep down it
16   closed itself up.
17       Q.  All right.  Now, and just let me
18   finish this line if you don't mind.
19       A.  Sure.
20       Q.  When you were trained as an engineer,
21   did you receive any training which allows you
22   to draw that conclusion; was there some course
23   or lecture or some textbook?
24       A.  I would say in basic soil mechanics,
25   which talks about active earth pressure, which

Page 177

1    explains why the hole would close itself up.
2        Q.  All right.  And would the answer be
3    the same with regard to holes created by the
4    removal of the piling?
5        A.  Over time, those holes will close, but
6    it takes a longer amount of time.  That's also
7    a function of depth and diameter of hole, and
8    the actual overburden pressure.
9        Q.  Okay.  Overburden pressure coming from
10   above?
11       A.  Is the weight of the soil above.
12       Q.  Right.  And we're looking at WGI
13   36984, and it talks about the -- it says,
14   backfill should be completed with -- in two to
15   three foot lifts with bucket compaction, so
16   there's no indication as to any precise
17   specification for backfill, right?  You can
18   just fill it up.
19       A.  And compact it so there's no big
20   voids.
21       Q.  All right.  And there is no compaction
22   requirement other than you can roll over the
23   top of it.
24       A.  Well, bucket compaction is when you
25   take the weight of the bucket and push the

Johns Pendleton Court Reporters                    800 562-1285

GRIESHABER, Ph.D., JOHN

6/27/2008

Page 178

1    soils down.
2       Q.   Right.
3       A.   And that takes out all the air voids,
4    it gets it down to its natural void ratio.
5       Q.   Okay.  And there's nothing that would
6    have prohibited WGI from compacting it further.
7       A.   Correct.
8       Q.   Now, WGI 52124, and I'll show this to
9    you if you need to, but it says after reviewing
10   the soil borings with our engineers and
11   performing exploratory excavations around the
12   lift station, we discovered that the subgrade
13   and the soil conditions surrounding the lift
14   station are weak and, therefore, not ideal for
15   slide rail type shoring system initially
16   proposed.  Furthermore, the subgrade is wet and
17   consists of primarily sandy silt type soils
18   which are not conducive when using the slide
19   rail type shoring system.
20         Is that the kind of soils that you
21   would have expected to be there based upon an
22   evaluation of this Exhibit 12?
23      A.   What happens is that's probably
24   backfill that was used when the thing was
25   constructed.

Page 179

1       Q.   You men that list station thing.
2       A.   That lift station.
3       Q.   Okay.  And I gather from your answer
4    that, therefore, that's not the kind of soil
5    that you would have expected to be there in
6    their natural state.
7       A.   It's not a real accurate description
8    of soil.  What he has is more of a, you know, a
9    layman 's description.
10      Q.   Right.
11      A.   But what I'm hearing is it's a wet
12   sandy material, sandy silty material, which is
13   the type of material you'd use in backfill.
14   Now, I don't think they're saying it as having
15   a very large extent, they're just saying it in
16   the vicinity of the structure.
17      Q.   Right.
18      A.   Which was obviously built in the
19   ground and came up and was backfilled.
20      Q.   Okay.  All right.  But bottom line,
21   it's inconsistent with what you would expect by
22   review of Plaintiffs' Exhibit 12.
23      A.   Correct.  It's an anomaly in that
24   system.
25      Q.   Thank you.  Now, just a few more

Page 180

1    questions about -- we talked about holes, we
2    talked about removing the pile, but what we
3    haven't talked about is using the vibrator pile
4    drive device.  Okay?  Is there any potential
5    that the use of a vibrator pile driving device
6    to extract piles or to put pile in could have
7    any deleterious effect on the flood control
8    structure?
9       A.   No, not in the way it was used here,
10   you know, as long as you're not doing it to the
11   structure itself.
12      Q.   To the flood control structure itself?
13      A.   Right.  In other words, as long as the
14   piles aren't hitting up against the flood
15   control structure, no.
16      Q.   Would it be the kind of thing that
17   would require this engineering evaluation that
18   we talked about in the context of holes and the
19   removal of piling?
20      A.   There is a, um -- a vibration
21   threshold that we establish, that the
22   contractor, you know, has to stay underneath.
23      Q.   Okay.
24      A.   And it's an extremely low threshold.
25   And so that would not have any impact on the

Page 181

1    integrity of the wall.
2       Q.   All right.  Well, so that -- forgive
3    me what, did you call it, a --
4       A.   Vibration threshold.
5       Q.   -- vibration threshold.  That would be
6    assigned by the Corps and that would be
7    communicated by the Corps to the contractor in
8    writing, right?
9       A.   That I would think would be part of
10   the task order.
11      Q.   Okay.  Are you aware as to whether or
12   not there's -- well, first of all, what is a
13   growth fault?
14      A.   That's a fault that's actually going
15   up instead of going down.
16      Q.   Okay.  Do you know whether or not
17   there is a growth fault at any location within
18   this flood protection structure along the Lower
19   Ninth?
20      A.   I know that the whole near surface
21   faulting is, you know, a, um -- a theory of
22   some people.  And I know of no faulting at all
23   in this area.
24      Q.   All right.  You've heard of
25   Mr. Gagliano?

46 (Pages 178 to 181)

GRIESHABER, Ph.D., JOHN

6/27/2008

Page 182

1      A.  Woody Gagliano.  Very familiar with
2   him.
3      Q.  I know you are.  And he's the one that
4   suggests that there's this growth fault in that
5   area, right?
6      A.  Correct.
7      Q.  Okay.  What if anything has the Corps
8   done to ascertain whether there is or is not a
9   growth fault zone at the location of the Lower
10  Nine flood protection structure?
11     A.  We've listened to Mr. Gagliano on a
12  number of occasions, many occasions.
13     Q.  Right.
14     A.  We have looked at what he brings to
15  the table, and he has yet to show anything
16  substantive of the whole faulting issue.  Quite
17  frankly, he's still looking -- it's a theory
18  that he has, and he's looking for someone to
19  help fund a very deep research project to prove
20  the theory.
21     Q.  Okay.  I take it by your answer that
22  the Corps has not done any evaluation of its
23  own on that issue.
24     A.  We have not looked into, um -- his
25  theory any further than looking at the data

Page 183

1   that he's presented.  You know, we're well
2   aware of general subsidence, we're well aware
3   of benchmark movement, but the explanations
4   that we have for those are different than the
5   explanation that he offers.
6      Q.  All right.  Are you aware of the
7   location of the breaks in the flood protection
8   structures that occurred during Hurricane
9   Betsy, as to where they were located relative
10  to the breaks that occurred during Katrina?
11        MR. STONE:
12        I will object to this, but I'm
13     not asking the witness not to answer
14     it.
15        MR. BRUNO:
16        I know.  But I'm establishing a
17     foundation for the next question,
18     Richard.
19     A.  No.  I don't know exactly where the
20  breaks were in Betsy.
21  EXAMINATION BY MR. BRUNO:
22     Q.  Okay.  And to be fair, the reason I'm
23  asking the question was to learn whether or
24  not -- whether the break that occurred in Betsy
25  in that area might have or should have played

Page 184

1   any role in assessing whether or not
2   construction activities on the water side of
3   that wall might have any deleterious effect on
4   the flood control structure.
5      A.  I have no idea of either the location
6   or the depth of the break at Betsy.  So I
7   really can't answer.
8      Q.  All right.  Now, are you familiar with
9   the IPET report?
10     A.  Somewhat.
11     Q.  Okay.
12     A.  It's got 8 volumes.
13     Q.  Yeah.  Well, I only want to talk about
14  the first page.
15     A.  Okay.
16     Q.  First page of the report says,
17  generally, and I'm paraphrasing here, that
18  there are only four foundation failures that
19  occurred as a result of Katrina.
20     A.  Okay.
21     Q.  Do you recall that to be accurate?
22     A.  I vaguely remember something to that
23  effect.
24     Q.  All right.  And there is a phrase that
25  said -- that goes guess something like this:

Page 185

1   With regard to all of the other levee breaching
2   that occurred in the entire system, the levees
3   performed as designed.
4      A.  Okay.  I agree with that.
5      Q.  All right.  Well, you've answered --
6   well, the first question was is that accurate?
7   And the second question was going to be do you
8   agree?  And I guess the answer to both is yes.
9      A.  Yes.  The levees performed as they
10  were designed, as far as --
11     Q.  And that is that the Corps new and had
12  an expectation that if water went over the top
13  there was the potential for back side scouring
14  and the failure of the levee.  Right?
15     A.  Yeah.  The levees were designed for a
16  specific elevation.
17     Q.  Right.
18     A.  Okay?  And they met their job for that
19  elevation.
20     Q.  All right.  And to be specific, the
21  original authorization says built to a standard
22  project hurricane.
23        When you take the standard project
24  hurricane and you boil it down to its basics,
25  that's an elevation.  Right?

47  (Pages 182 to 185)

GRIESHABER, Ph.D., JOHN

Page 186

1     A.  Correct.
2     Q.  Okay.  And the Corps of Engineers was
3  not authorized to do anything more than build
4  to that elevation, right?
5     A.  Correct.
6     Q.  Okay.  Now, so that the south breach
7  on Lower Nine was caused, in the Corps' view,
8  by overtopping and back side failure, right?
9     A.  Correct.
10    Q.  Okay.  Now, the north side, not north
11 side, but the northern breach, is one of those
12 locations where there's a discussion of
13 foundation failure.
14    A.  Correct.
15    Q.  All right.  Does the Corps believe
16 that underseepage had any role in that
17 foundation failure?
18    A.  The Corps' belief is that the
19 methodology of failure was the crack formed
20 between the sheet pile and the embankment as a
21 result of sheet pile deflection, that excess of
22 full hydrostatic pressure went down into the
23 formation directly below the tip of the
24 sheet --
25    Q.  Uh-huh.

Page 187

1     A.  -- and fully charged it to whatever
2  the elevation was at the canal, and that
3  weakened the inner particle pressure because of
4  the excess pore pressure, and that was the
5  mechanism for failure.
6     Q.  That doesn't exclude any contribution
7  by underseepage, does it?
8     A.  Well, at the end of the day we're
9  talking underseepage.  What we're talking about
10 is an increase in pore pressure.  The cause for
11 the increase in pore pressure was the injection
12 of the hydrostatic pressure that was in the
13 canal down the face of the sheet pile without
14 any head loss so as it hit the tip of the sheet
15 pile, it had it's full excess head.
16    Q.  Uh-huh.
17    A.  Okay?  If you were looking at
18 underseepage, you would have to have a head
19 loss as the water had to go through this
20 tortuous path to get to that point.  So.
21    Q.  So in your view, that explanation does
22 exclude underseepage as a contributing factor?
23    A.  It excludes it as a primary, as the
24 primary factor.
25    Q.  I didn't say that.  I said

Page 188

1  contributing now.
2     A.  Well, the trouble with the verbiage
3  we're using right now is, by definition
4  underseepage is water passing under the wall.
5     Q.  Right.
6     A.  And water passed under that much of
7  the wall because a crack formed along the flood
8  side of the wall and passed underneath it.  So
9  by definition, that's seepage passing under the
10 wall.  You're using underseepage as something
11 entering --
12    Q.  From away?
13    A.  -- from away, your 25-foot hole, and
14 following a tortuous path to get to the tip.
15    Q.  Uh-huh.
16    A.  So obviously you would have much
17 higher pressures at the tip as a result of the
18 wall opening up and getting full hydrostatic
19 pressure as opposed to water entering at the
20 bottom of this excavation and taking this
21 tortuous path.
22    Q.  Does the Corps regard that foundation
23 failure as a defect in design?  I'm sorry.
24    Does the Corps regard that foundation
25 failure to have resulted from a defect in the

Page 189

1  design of the levee?
2  MR. STONE:
3     Objection.  The witness is not
4  called to speak to that.  You're
5  asking for an expert opinion and he's
6  not brought here as an expert.
7  MR. BRUNO:
8     No, I'm really not.
9  MR. STONE:
10    You've actually asked for certain
11 topics here that he's been prepared to
12 speak to and he's spoken very well to
13 them, but that's not of the topics
14 he's been prepared.  Now, if you want
15 to ask him --
16 MR. BRUNO:
17    Lateral transition failure -- I
18 mean, it's all in here, Richard.  All
19 considerations, concerns -- I mean,
20 it's all here.  Lateral transition
21 failure.  I mean, I'm just trying to
22 find out.  I'm not suggesting that
23 there is any expert opinion here.
24 What I'm trying to find out is what is
25 the Corps' view.  Now, is the Corps'

48  (Pages 186 to 189)

GRIESHABER, Ph.D., JOHN

6/27/2008

Page 190

```
1    view that there was a defect in that
2    levee design, or is it the Corps' view
3    that there was no defect?  And
4    whatever that position is I'd like to
5    know it.
6        MR. STONE:
7            And the objection here is the
8        witness is not called to speak for
9        that.  Now you can ask him what his
10       opinion is or whatever, but he's not
11       called to speak for the Corps on that
12       issue and you haven't asked for that.
13       MR. BRUNO:
14           Well, I think any and all
15       considerations or concerns of lateral
16       transition failure, it's all over this
17       document.  So let's leave that fight
18       for another day.
19   EXAMINATION BY MR. BRUNO:
20       Q.  Let me get the Corps' opinion subject
21   to Richard 's objection.
22           Is it the Corps' opinion that there
23   was a defect in the design of the levee at the
24   north breach?
25       THE WITNESS:
```

Page 191

```
1            You want me to answer or not?
2        MR. STONE:
3            Answer from your own perspective
4        out of your own personal knowledge.
5            But he's not speaking for the
6        Corps on this issue.
7        MR. BRUNO:
8            That's your view.  He's a
9        30(b)(6) witness, and we'll fight
10       another day as to whether or not it's
11       in here or not.
12       MR. STONE:
13           And we can do that.
14       MR. BRUNO:
15           That's fine.  Your objection is
16       reserved.
17       A.  The study as presented by IPET,
18   reviewed by the USACE and numerous people in
19   academia, indicate that the methodology of
20   failure was not a methodology that the Corps of
21   Engineers studied back in 1969 when the wall
22   was designed.
23   EXAMINATION BY MR. BRUNO:
24       Q.  Okay.  So it's your opinion, your
25   view, that there's no defect in the design;
```

Page 192

```
1    fair enough?
2        A.  The design as was done in 1969,
3    correct.
4        Q.  It's not defective.
5        A.  The design in 1969 was not defective.
6        Q.  Not defective.  The construction is
7    not defective.  Right?
8        A.  I don't know.  You know, I don't know
9    of any construction defect.
10       Q.  Okay.  All right.  That's all.  I'm
11   just --
12       A.  I understand.
13       Q.  It's not heavy, man.
14           Okay.  Now, isn't the method of
15   failure exactly the same method of failure
16   experienced by the Corps when it did its test
17   in the Atchafalaya basin in 1986 or '7?
18       MR. STONE:
19           Objection.  Once again you're
20       getting outside the area.
21       MR. BRUNO:
22           Well, it specifically relates to
23       underseepage and disturbance of soil
24       and lateral transition failure and --
25       I mean, it's all there.
```

Page 193

```
1        MR. STONE:
2            No, it's not.
3        MR. BRUNO:
4            Well, we have a difference of
5        opinion.
6        MR. STONE:
7            Because your request here focused
8        on --
9        MR. BRUNO:
10           It says any and all
11       considerations.  Any and all.  There
12       is nothing broader than any and all
13       considerations.
14       MR. STONE:
15           You're reading your own language
16       out of context.  So you've got my --
17       MR. BRUNO:
18           That's interesting since I wrote
19       it.
20       MR. STONE:
21           You've got my objection.
22       MR. BRUNO:
23           I'm reading my own language out
24       of context.  And I put in here, the
25       Corps' knowledge.  Right?  So the
```

49  (Pages 190 to 193)

GRIESHABER, Ph.D., JOHN

Page 194

1     Corps knows about the tests that it
2  did.  Right?
3     MR. STONE:
4        I'm not going to argue with you.
5  I've just objected here.
6     MR. BRUNO:
7        Okay.  That's fine.
8     A.  Ask the question again.  I've got a
9  short attention span.
10  EXAMINATION BY MR. BRUNO:
11     Q.  I'm with you, man.  We could be out of
12  here.
13        You did some tests at the Atchafalaya
14  Basin?
15     A.  Atchafalaya Basin.  E-99 test.
16     Q.  There you go.  Okay?  Just tell me, in
17  the Corps' opinion, isn't what happened in that
18  test exactly what happened at the Lower Nine
19  north breach?
20     A.  The wall deflection with the
21  development of the crack was observed in the
22  E-99 test.  The deflection was not as great as
23  what happened in the Ninth Ward on the north
24  side.  But a crack, a displacement, a
25  horizontal displacement at the ground line was

Page 195

1  noted in E-99.
2     Q.  Okay.  Does the Corps regard the
3  failure at the Lower Nine north breach to be
4  the same mechanism of failure that was
5  experienced at the 17th Street Canal?
6     MR. STONE:
7        Objection.  Not within the scope
8     of your requests.
9     MR. BRUNO:
10        Subject to the objection.
11     A.  The failure at the 17th Street Canal
12  initiated with the wall deflecting in the
13  excess pressure, but the method of failure at
14  the 17th Street Canal was an actually sliding
15  effect, a block type sliding effect.  And this
16  took place on a, either in a very, very weak
17  clay strata or in an organic clay strata.
18  EXAMINATION BY MR. BRUNO:
19     Q.  All right.
20     A.  But it was a seam, a very weak seam,
21  and there was a block translation at 17th
22  Street.
23        The failure at the -- in the Ninth
24  Ward on the north side was more of a blowout
25  rotational failure where it popped up early.

Page 196

1     Q.  Right.  Did underseepage play a role
2  at 17th?
3     MR. STONE:
4        Objection.
5     MR. BRUNO:
6        It's noted.
7     A.  Okay.  The reduced shear strength was
8  a result of the fact that you had excess pore
9  pressure induced when the wall opened up.  Just
10  like I said before, you had full hydrostatic
11  pressure inserted at the tip of the sheet.
12  EXAMINATION BY MR. BRUNO:
13     Q.  Let me make sure I ask the question
14  appropriately.
15     A.  Okay.
16     Q.  Because no, I'm not -- I'm using
17  underseepage, as you put it, the way I refer to
18  it, which is seepage coming through another
19  source other than from the top.
20        Is underseepage from below?  Okay, the
21  strata underneath the sheet pile tip, was that
22  a mechanism of failure?
23     A.  That was not a contributing factor to
24  the failure.
25     Q.  Okay.  All right.  This is Plaintiffs'

Page 197

1  Exhibit 13, and these do have some Bates
2  numbers on them from the government, for a
3  change.  This is NCS 007277, 278, 279, and
4  007252, 253, 254, and 255.  Okay.  Here you go.
5  (Tendering.)
6     MR. BRUNO:
7        Richard, you saw those at the
8     depo of, um --
9     MR. STONE:
10        Yes.  Just looking at them again.
11     Thank you.
12        (Exhibit 13 was marked for
13     identification and is attached hereto.)
14     A.  Okay.
15  EXAMINATION BY MR. BRUNO:
16     Q.  All right.  This, as you can see, is
17  from Jim Montegut to Guillory.
18     A.  Correct.
19     Q.  You know about Guillory.  He says,
20  take a look at Wink's cross-section of the
21  PT -- of the pit, I'm sorry -- taken last week,
22  assuming I plotted our design temp correctly,
23  the roadside pits fall within the allowable
24  cut.  The canal bank pit is a different story.
25  Also note its current depth.  Did you assume

50  (Pages 194 to 197)

GRIESHABER, Ph.D., JOHN

6/27/2008

Page 198

1    -12 or did you actually measure?
2        So here Montegut is asking Guillory
3    for some information about the borrow pit.
4        A.  Correct.
5        Q.  And here's Exhibit 14, which I just
6    gave the Bates numbers to, and here is
7    Satterlee responding to Guillory.
8        (Exhibit 14 was marked for
9    identification and is attached hereto.)
10       A.  No -- well, actually going through the
11   chief of construction division, attention Lee
12   Guillory.  Okay.
13   EXAMINATION BY MR. BRUNO:
14       Q.  All right.  And then on the back is
15   something from Miles, looks like Vicksburg.
16   (Tendering.)
17       A.  Memorandum to Chief of Engineering
18   Division.  He sent it to Chief of Engineering
19   Division, CEMVN -- Attention CEMVN, Corps of
20   Engineers Mississippi Valley New Orleans
21   Engineering Division Foundation Branch.
22       Q.  Okay.  So this is going -- I was just
23   trying -- is there some way I can figure out
24   who is writing this and who is it to?
25       A.  Okay.  This document is from Jim

Page 199

1    Miles.  Okay?  To the chief of engineering
2    division.  Okay?  Knowing that it should go to
3    someone in the foundations branch.
4        Q.  I see.
5        A.  So Jim Miles -- this goes to Jerry
6    Satterlee desk.  After Jerry Satterlee sees it
7    it goes to the chief of geotech branch.
8        Q.  Got you.  All right.
9        And so he is saying the 32-acre tract
10   of land designated as the East Bank Industrial
11   Area is currently undergoing demolition and
12   site remediation.  He says, construction
13   requests your office's assistance in evaluating
14   two things.  So this is the kind of piece of
15   paper you would expect from the construction
16   division to the engineering division if they
17   wanted to evaluate something like a hole next
18   to a flood protection structure, right?
19       A.  If it wasn't covered in the
20   document -- in the initial document itself.
21       Q.  Okay.  All right.  Well, can we assume
22   that the subject of this memo was not covered
23   in the original construction document itself
24   because he's in fact asking for assistance?
25       A.  He's asking for it, so I assume that

Page 200

1    it had -- that design was not included in the
2    document.
3        Q.  All right.  And the design in question
4    is a borrow pit which goes to -12.
5        A.  Okay.  Are these both the same, for
6    the same thing?
7        Q.  Yes.
8        A.  Okay, this is the same borrow pit as
9    what that is?
10       Q.  You can read it yourself.
11       A.  I'm asking.  I don't know.
12       Q.  It's McDonogh.  It's a 16-foot pit.
13   He makes a reference there.
14       A.  Okay.
15       Q.  All right?
16       A.  Got it.
17       Q.  Now, so the first thing we can
18   conclude is that if there is this, um --
19   line -- what's it called again?
20       A.  Minimum control line.
21       Q.  If there's a minimum control line,
22   it's not as deep as 25 feet.  That's for sure.
23   Right?  Because --
24       A.  The minimum control --
25       Q.  It's pit 16.

Page 201

1        A.  The minimum control line is a function
2    of distance -- depth versus distance.
3        Q.  All right.
4        A.  Okay?  So at whatever this point is,
5    he has a stability line right here --
6        Q.  Right.
7        A.  -- that he's allowed to have.  And if
8    you look at that, you can see it's right up
9    against the wall.  Okay?
10       Q.  Well, actually the pit is away from
11   the wall.
12       A.  No.  The section that he's showing
13   right here.
14       Q.  Yeah.
15       A.  The section he's showing right here,
16   okay, this is his design template.  This is how
17   much you can dig, and that is the wall right
18   there.  So you could actually theoretically dig
19   all the way up to that point right there.
20       MR. TREEBY:
21           Could we get some designation of
22       that specific page and markings of
23       what the witness is saying?  It's just
24       hard, on the deposition, to say what
25       he's referring to.

51 (Pages 198 to 201)

GRIESHABER, Ph.D., JOHN

6/27/2008

Page 202

1  EXAMINATION BY MR. BRUNO:
2      Q.  Let's back up and clarify, then.
3          First of all, this cross-section goes
4  through the levee, right?
5      A.  I'm assuming this is the embankment
6  right there.  You see right here.  Isn't
7  that --
8      Q.  I cannot be sure is my problem.
9      A.  I mean, it's showing an elevation 5 at
10  that point right there.
11      Q.  I don't know that we can make that
12  conclusion is the problem.  I really -- no,
13  this is better one.  This shows -- all right.
14  Document Number 007279 seems to show a
15  chain-link fence, a floodwall, as well as a
16  base line.  Let's see if that assists you in
17  figuring out where this is relative to the
18  floodwall.
19      A.  Okay.
20      Q.  All right?  Now, this hole goes all
21  the way out to here, which is the extreme left
22  hand of the page.  Right?
23      A.  Uh-huh.
24      Q.  So it's not right up against the
25  floodwall, it's some distance out.

Page 203

1      A.  Let's see.  It's maybe ten foot out.
2      Q.  This side of the hole is a lot further
3  away than ten foot.
4      A.  No, no.  The start of the cut.
5      Q.  I understand.
6      A.  Okay.  I understand.
7      Q.  The evaluation is for the whole cut,
8  not just for a part of the cut.  All right?
9      A.  Okay.
10      Q.  I mean, it says it in black and white
11  on the first page of the document.
12      A.  I understand.
13      Q.  They're evaluating both slopes of the
14  borrow pit; right?
15      A.  Correct.
16      Q.  So obviously they're evaluating the
17  slope that's closer to the water as well as the
18  slope that's closer to the levee.
19      MR. STONE:
20          Actually, I believe they're
21          evaluating all four slopes.
22      MR. BRUNO:
23          Fair enough.  They're evaluating
24          all four --
25  EXAMINATION BY MR. BRUNO:

Page 204

1      Q.  Richard 's point is well taken.
2  They're evaluating all four slopes.  Okay?
3          The point is that not only looking at
4  the location which is about -- I mean, you've
5  got the roadway there, how wide is the roadway,
6  about ten feet, plus another ten feet, that's
7  twenty feet from the center line of the levee.
8      A.  Uh-huh.
9      Q.  And then you've got this long distance
10  where the hole is, right?
11      A.  (Nods affirmatively.)
12      Q.  Okay.  Do we agree they're not simply
13  evaluating a location twenty feet from the
14  levee crest, they're evaluating the entire
15  hole?
16      A.  Got it.
17      Q.  Okay.  Now, I don't know about you,
18  but there doesn't seem to be a way for me to
19  calculate how big the hole is, length and width
20  across the surface.
21      A.  Other than putting a scale on it?
22      Q.  Okay.  Now, so they're asking -- take
23  a look at 07254.  It says borrow pit.
24      MR. TREEBY:
25          Part of Exhibit --

Page 205

1      MR. BRUNO:
2          14.
3      A.  Okay.
4  EXAMINATION BY MR. BRUNO:
5      Q.  It's a big hole.
6      A.  (Nods affirmatively.)
7      Q.  It goes all the way out almost to the
8  water.
9      A.  Correct.
10      Q.  Okay.  So we're not talking about
11  something that's real close to the flood
12  control structure, we're talking about
13  something that goes all way out to the canal.
14      A.  Okay.
15      Q.  All right.  So we've established that,
16  right?
17          Now, next question:  What Mr. Miles
18  wants to know, from the engineering department,
19  is he wants engineering office assistance in
20  evaluating the following two items --
21      A.  Okay.
22      Q.  -- such that the remedial action can
23  be accomplished in compliance with NODs
24  geotechnical engineering principles and
25  practice.  Okay?

GRIESHABER, Ph.D., JOHN

6/27/2008

Page 206

1    A.  Okay.
2    Q.  First thing he wants to do is he wants
3  to evaluate the structural stability of the
4  hole.  Right?
5    A.  Correct.
6    Q.  And to get to the bottom line, he's
7  concerned because he doesn't want the hole to
8  fall in on top of somebody.  Right?  That's the
9  structural stability component.
10    MR. STONE:
11      Objection.  The witness may not
12      know from his personal knowledge
13      what's in the mind of the requester,
14      but --
15    A.  It's probably twofold.  He doesn't
16  want the hole to fall in on someone, and he
17  doesn't want the back side of the hole to fail
18  and progress closer to the wall and jeopardize
19  the stability.
20  EXAMINATION BY MR. BRUNO:
21    Q.  Fair enough.  All right.
22      So he says, see attached plan.  He
23  says, provide a stability control line with
24  respect to eastern side of the borrow area.
25  Right?

Page 207

1    A.  Uh-huh.
2    Q.  Now, he's not asking for a stability
3  control line on the western side.
4    A.  Okay.
5    Q.  Should he have?
6    A.  I guess I don't understand what
7  difference it would make.
8    Q.  Okay.  Well, I guess what I'm -- is he
9  only asking them to evaluate the east side of
10  the borrow pit and he's not asking them to
11  evaluate the west side?
12    A.  Well, the west side of the borrow pit
13  is far away from the flood protection.
14    Q.  Right.  But it's within 300 feet.  We
15  have got your picture.  There it is right
16  there.
17    A.  But what he's asking for is he wants
18  to make sure that this is stable with respect
19  to the floodwall.
20    Q.  No, I'm with you.  I got all that.
21      What I'm -- it's a different question.
22  I know that.  We're not asking about what he is
23  asking about, I'm asking now about what he's
24  not asking about.
25    A.  Okay.  But why would he be concerned

Page 208

1  with the back side?
2    Q.  Because it's a 16-foot hole in an area
3  within 300 feet of a levee protection
4  structure.  I thought we established this
5  morning that when you're digging holes within
6  300 feet of a flood protection structure your
7  local New Orleans District office requires
8  engineering to do an evaluation as to whether
9  or not that hole --
10    A.  And did engineering do that
11  evaluation?  I'm showing you right here.
12  Look --
13    Q.  Wait.  My question is -- we're not
14  there yet.  I'm going to let you --
15    A.  Okay.  Fine.
16    Q.  I'm just asking this:  Shouldn't he
17  have asked -- Mr. Miles -- for them to evaluate
18  the entire hole, not just one part of the hole,
19  to be consistent with the testimony you gave us
20  this morning?
21    A.  I would think that Mr. Miles as chief
22  of engineering division -- I mean as chief of
23  construction division asked engineering to do
24  their job.
25    Q.  All right.

Page 209

1    A.  And I would believe that engineering
2  did their job and looked at both sides.
3    Q.  Excellent.  Okay.  That's fine.  Now,
4  then he says, evaluate the structural stability
5  of the proposed Surekote Road remedial soil
6  excavation three feet deep by twenty-five feet
7  wide, and less than fifteen -- or about fifteen
8  feet from the adjacent Jourdan Avenue floodwall
9  levee.  So this is a second place.
10    A.  (Nods affirmatively.)
11    Q.  And he wants a stability control line,
12  and assess whether the construction division
13  and the contractor should utilize a sheeting,
14  shoring or bracing system to safely accomplish
15  this soil excavation.
16      So he's asking now about a second
17  thing.  This thing is only three feet deep, but
18  it's about fifteen feet from the floodwall.
19    A.  Okay.
20    Q.  Now, so my first question to you is,
21  so is it -- it's obviously the case, then, that
22  something as shallow as three feet but that
23  close to the floodwall could potentially cause
24  damage?
25    A.  It's a possibility.  I mean, what

Page 210

1  Mr. Miles is asking is for engineering to
2  examine this excavation, and engineering
3  examined the excavation with respect to the
4  stability of the wall.
5      Q.  All right.  Now, okay.  You'll
6  remember I said shouldn't Mr. Miles have asked
7  about the western side of the wall?  You said,
8  well, I don't know, but they should have.
9  Well, here's the memo where Mr. Satterlee who
10  is chief of the engineering division says --
11      A.  Okay.
12      Q.  Although analysis was not requested --
13      A.  Okay.
14      Q.  -- it should be noted that the
15  proposed 16-foot deep McDonogh Marine borrow
16  area with respect to the western side is not
17  stable.  He says that.
18      A.  Okay.
19      Q.  Okay.  Now --
20      A.  So engineering did their job.
21      Q.  That's exactly my point.
22      A.  Okay.
23      Q.  And somebody scratched it out.  Right?
24  You see a line?  I didn't put that line.
25      Do you know who put that line?

Page 211

1      A.  I have no idea who put that line.
2      Q.  No idea.  Okay.  That's fine.  Now,
3  but this is the way it came to me from
4  Mr. Stone, with a line through it.
5      MR. STONE:
6          I didn't do that line.
7      MR. BRUNO:
8          That's okay.  You can't run from
9  that line, man.  If I'm you, I'd run.
10      MR. STONE:
11          I don't know why it matters.
12      MR. TREEBY:
13          I confess.  I did it.
14      MR. BRUNO:
15          You know what?  If there's one
16  believable thing that ever came out of
17  your mouth, that's it.
18      MR. TREEBY:
19          Can I see the document a minute?
20      MR. BRUNO:
21          Can I finish my
22  cross-examination?
23      MR. TREEBY:
24          I think you misread something.
25          No, no.  I'll look at it later.

Page 212

1      MR. BRUNO:
2          We'll do it.  Get it right.  I
3  want this right.
4  EXAMINATION BY MR. BRUNO:
5      Q.  Okay.  Now, but you're right, he's
6  doing his job, he's doing the analysis that the
7  construction chief asked him to do.  In fact he
8  went beyond --
9      A.  Correct.
10      Q.  -- what the construction chief --
11  because he knew he had to evaluate both sides
12  of that borrow pit, right?
13      A.  Correct.
14      Q.  Okay.  Now, let's go through his
15  answers.  Number 1:  As per your request in the
16  15 April '2 memo, the section forwarded were
17  analyzed for stability.  And we've talked about
18  that this morning.  That's that wall stability
19  analysis and that's also that global stability
20  analysis.
21      A.  Correct.
22      Q.  Okay.  They didn't do a seepage
23  analysis.  Right?  At least there is nothing
24  reflected that they did.
25      A.  I would consider that part of

Page 213

1  stability.  When we talk about stability we're
2  talking about wall stability and global
3  stability of which seepage is part of.
4      Q.  Thank you, that's fine.
5          The proposed Surekote Road remedial
6  soil excavation, that's that 3-foot deep by
7  25-foot wide, and about 15 feet from the
8  adjacent Jourdan Avenue floodwall levee, did
9  not present a stability problem.
10      A.  Okay.
11      Q.  He says, don't worry about it.
12          The proposed 16 feet deep McDonogh
13  Marine borrow area did present a stability
14  problem with respect to the eastern side of the
15  borrow area.  Various options were analyzed and
16  are shown on the enclosures.  Which I don't
17  see.  Do you?  Any other options?
18      A.  Okay.  Let me just tell you, that's
19  not how an enclosure would have been sent out
20  of geotech branch.  National Rent 100 North
21  Suite, you don't have the enclosure.
22      Q.  No sweat.  That's fine.
23      A.  That's what I'm telling you.
24      Q.  We get what we get through the good
25  graces of learned opposing counsel Rich Stone,

GRIESHABER, Ph.D., JOHN

6/27/2008

Page 214

1  so.
2      A.  You know -- see, what happens is, it
3  says two enclosures.
4  EXAMINATION BY MR. BRUNO:
5      Q.  Right.
6      A.  Okay?  And this is, there's two
7  enclosures that came with this.  Okay?  You
8  should have four enclosures, as stated.
9      Q.  Right.  Right.
10     A.  So you don't have --
11     Q.  I'm with you.
12     A.  Okay.  Got it.
13     Q.  You see this Bates number thing here?
14     A.  Uh-huh.
15     Q.  See?  That's put on there by the
16  government.  And that says 255 Nations Rent,
17  and there's 254.  So I'm with you.  So not my
18  fault.
19         But in any case, back to the document.
20  So Number 3:  Says 12-inch lists of 90 percent
21  Proctor compacted backfill within +5 percent
22  and -3 percent optimum water content prior to
23  compacting is recommended.
24         What does that mean?
25     A.  That means that they're putting the

Page 215

1  material back in what is classically called
2  semi-compacted fill.  Every type of fill has a
3  naturally occurring moisture content, its
4  optimum moisture content.  We're allowing you
5  to put material a little bit wetter or a little
6  bit drier.  You put it in in whatever it was,
7  12-inch lifts, 24-inch lifts, and compact it by
8  some methodology, you know, rolling a dozer
9  over it, hire cows to walk over it, whatever,
10  until such time as it has a density that's
11  what's called 90 percent Proctor.  Proctor is a
12  laboratory type test that you use to get
13  compaction.
14     Q.  Right.
15     A.  And if the Proctor of this soil is
16  100 pounds per cubic foot, if you do the
17  Proctor, then we're saying, you go out there
18  and you perform mechanical energy transmitted
19  into that soil, dozers, sheepsfoot roller,
20  until you get 90 percent density.
21     Q.  Right.
22     A.  So if it was 100-pound Proctor, 90
23  percent would be a 90-pound.
24     Q.  Okay.  Compare this, this 90 percent
25  Proctor to what we saw on some of the other

Page 216

1  documents.  You take the back of the shovel and
2  you beat it a few times.  Which one compacts
3  the soil more?
4      A.  The Proctor gives you an
5  identification of what the compaction is.
6      Q.  It's a specification.
7      A.  Right.
8      Q.  And the other one is?
9      A.  And what we have here is an end
10  result.  And what you had in the other one is
11  what's called a methods spec.
12     Q.  Right.
13     A.  You told him how to do something.
14     Q.  Right.  So why wouldn't you just tell
15  them in this piece of paper here, just get your
16  backhoe and just beat it a little bit?  Why
17  would you, as an engineer, give somebody this
18  very specific spec, 12-inch lifts of 90 percent
19  Proctor compacted backfill with +5 percent and
20  -2 percent optimum water content?  It's a very
21  specific spec, isn't it?
22     A.  That's a standard semi-compacted --
23  you know, he could have called that
24  semi-compacted fill and everybody know what
25  that is.

Page 217

1      Q.  All right.  Why that spec; what does
2  this spec do?
3      A.  My guess is he was worried about
4  semi-compacted fill because it was near surface
5  and he was worried about erodibility.  You're
6  going to get a bunch of rainfall coming off
7  that embankment of the levee and be washing
8  through there, you'd end up getting ruts and
9  stuff like that if you would put the material
10  in real loose.  This way it's going in at close
11  to its natural moisture content.
12     Q.  All right.  Well, is he talking about
13  the three-foot hole or is he talking about the
14  16-foot hole?
15     A.  Okay.  There's another document that's
16  floating around someplace.  Is it here?
17     Q.  Right.  Well, not with this group.
18     A.  Out of geotech.  No, out of geotech,
19  that Jim Gately --
20         MR. STONE:
21         13.
22  EXAMINATION BY MR. BRUNO:
23     Q.  Yeah.  But I mean that's the original
24  request.
25     A.  We had one with Gately 's name on it,

55 (Pages 214 to 217)

Johns Pendleton Court Reporters                    800 562-1285

GRIESHABER, Ph.D., JOHN

Page 218

1    I think?
2        Q.  Are we missing a number?  Here's my
3    12, my 13, my 14.  I'm sorry.  Mr. Grieshaber,
4    I don't know -- I will --
5        (Brief recess.)
6    EXAMINATION BY MR. BRUNO:
7        Q.  All right.  Let's mark this document
8    as Plaintiffs' Exhibit Number 15.  This is
9    what's been provided to us by counsel for the
10   government, and it contains, in addition to
11   Bates numbered document NCS 7252, and NCS
12   document 253, and NCS document 254, and NCS
13   document 255, another document which is an
14   E-mail from Jean Spadaro to Lee Guillory which
15   then contains another E-mail from Jim Gately to
16   Jean Spadaro, and then apparently attaches to
17   this a letter with a variety of information.
18       So let me show this to you and see if
19   that helps you answer the question.
20       (Exhibit 15 was marked for
21   identification and is attached hereto.)
22       A.  Okay, what is the question?  It was a
23   long time ago.
24       Q.  Yeah, I know.  I'm sorry.  The
25   question was whether or not Paragraph 3 of

Page 219

1    Exhibit 15 -- I'm sorry.  Paragraph 3 of
2    Exhibit 14, Bates NCS 7252, referred to the
3    three-foot depth hole or the borrow pit.  We're
4    talking about backfill specifications.
5        MR. TREEBY:
6            Are there Bates numbers on those
7        new pages?
8        MR. BRUNO:
9            No, Bill.  That's why I just went
10       through the exercise that I did.
11       A.  What we have here is what I referred
12   to earlier as the engineering considerations.
13       When the contract was getting ready,
14   okay, engineering division went to a meeting,
15   okay, on the 8th of September, 2000, and they
16   were requesting input into this contract, and
17   they came in and they made these
18   recommendations which construction division has
19   in hand.
20   EXAMINATION BY MR. BRUNO:
21       Q.  Right.
22       A.  And they, when they get -- when
23   there's a question and the question is answered
24   by the engineering considerations, it wouldn't
25   come back.

Page 220

1        Now, the questions that we have here
2    aren't covered by these engineering
3    considerations, so Jim Miles came back and
4    said, Mr. Satterlee, I've got a question.
5    Okay?  So it went back into engineering.
6        MR. STONE:
7            Let's mark that document as the
8        next exhibit so that you have it.
9        MR. BRUNO:
10           I did.
11       MR. STONE:
12           Is it 15?
13       MR. BRUNO:
14           Yeah.  And I already indicated
15       the differences between 14 and 15.
16       Okay?  You have one new document which
17       we've been talking about.
18   EXAMINATION BY MR. BRUNO:
19       Q.  Now, first of all it says Ms. Spadaro.
20   Do we know who she is?
21       A.  I think she works in construction
22   division, but I'm not positive.
23       Q.  It says, requesting geotech input to
24   the above-named contract.  So obviously they're
25   talking about the TERC contract, right?

Page 221

1        A.  Correct.
2        Q.  Now, you think there are more of
3    these?
4        A.  I don't see why there would be.  I
5    mean, that's pretty inclusive of the question.
6    They probably met on excavation issues with
7    that contract looking for guidance, and the
8    geotech branch put together guidance that could
9    be universally applied.
10       Q.  Okay.  All right.  It says -- there's
11   no guide -- there's no line in here, is there?
12       A.  No.  But it's in the text of it.  Read
13   it.
14       Q.  All right.  It says, after any
15   excavation or soil displacement on the canal
16   bank or above or below, the waterline has been
17   completed, the contractor shall finish the
18   slope to a 1 vertical on 3 horizontal.
19       A.  In other words, all excavations have
20   to be finaled out at 1 on 3s.
21       Q.  All right.  Additionally, the
22   contractor shall provide compliance surveys to
23   the contracting office showing that this has
24   been accomplished.  Okay?
25       B:  Any excavations deeper than 3 feet

GRIESHABER, Ph.D., JOHN

6/27/2008

Page 222

1  shall have the slopes cut on a 1 vertical on 3
2  horizontal slope.  Right?
3      A.  Correct.
4      Q.  Now, that obviously doesn't pertain to
5  cofferdam structures.  Right?
6      A.  Not braced cofferdams, no.  There was
7  a separate submittal and review of a braced
8  cofferdam.
9      Q.  Right.  Indicating that that's the
10  kind of thing which has to be re reviewed.
11      A.  Correct.
12      Q.  Stockpiles that will be no more than
13  five feet above the surrounding terrain, and
14  shall be placed no closer than 20 feet from the
15  edge of the excavation.  Right?
16      A.  (Nods affirmatively.)
17      Q.  Soil used to backfill any of the
18  excavations shall be compacted to density of
19  the existing soil, right?
20      A.  (Nods affirmatively.)
21      Q.  E: When the fence posts are removed,
22  the soil used the backfill shall be the soil
23  that was removed or sand brought up to the
24  existing grade and hand tamped to the density
25  of the surrounding terrain.  Right?

Page 223

1      A.  (Nods affirmatively.)
2      Q.  The contractor shall smooth the finish
3  surface and slope to drain so that the surface
4  water will drain freely to the canal and not
5  cause ponding of the runoff.
6          The minimum elevation that the
7  contractor should dress the area is 3 feet
8  NGVD.  It gives us your datum now.
9      A.  For the three feet, yes.
10      Q.  Right.  The contractor should cut the
11  bank to no closer than 260 feet as measured
12  perpendicular to the existing wall.  I'm sorry.
13  The contractor should cut the bank to no closer
14  than 260 feet as measured perpendicular to the
15  existing floodwall.  3: The POC is Jim Gately,
16  Extension 2980.
17          First:  POC is point of contact?
18      A.  Point of contact.
19      Q.  So if I've got an engineering
20  question, I call Jim?
21      A.  On this issue, yeah.  He was in
22  geotech at the time.  He's since left geotech.
23      Q.  But on this issue, is he the geotech
24  engineering guy on all geotech issues on this
25  contract?

Page 224

1      A.  No.  On this issue, on anything to
2  deal with that list of --
3      Q.  Oh.  That list.
4      A.  Right.
5      Q.  But can we assume that this list
6  addresses all of the Task Order No. 26?
7      A.  That is something that can be used by
8  construction division to answer questions.  If
9  you look at this one over here, you know, they
10  were coming in and they were asking could they
11  use a 1 on 1-1/2.  Okay?
12      Q.  Uh-huh.
13      A.  Because the 1 on 3 obviously wouldn't
14  get them what they needed.  So they had to come
15  back and ask again.  But as long as they met
16  the engineering considerations in that
17  E-mail --
18      Q.  All right.
19      A.  -- they can make their own calls.
20          MR. BRUNO:
21              For the record, Bill, he just
22          referred the Number 13.
23          MR. TREEBY:
24              Thanks.
25  EXAMINATION BY MR. BRUNO:

Page 225

1      Q.  There's no --
2      A.  Well, the minimum control line that he
3  gave you --
4      Q.  There is no minimum control line in
5  here.
6      A.  -- is the 1 on 3.
7      Q.  That's for your slope.
8      A.  Right.
9      Q.  He's not giving you a control line for
10  depth.  Hole depth.
11      A.  So you'd have to come back to
12  engineering division.
13      Q.  Exactly.  That's all I was trying to
14  establish.
15      A.  Okay.
16      Q.  So the holes that we talked about this
17  morning and after lunch, at the Boland site and
18  at the Saucer site, those holes should have
19  been addressed by separate memo directed to the
20  engineering division.
21      A.  Or they were addressed in the actual
22  task order.  I don't know which.
23      Q.  Well, the task order didn't
24  contemplate, you'll remember, those holes
25  because the holes came up later when they

Johns Pendleton Court Reporters

800 562-1285

GRIESHABER, Ph.D., JOHN

6/27/2008

Page 226

1  discovered these structures below. Okay?
2      A.  Okay.
3      Q.  All right. Can you explain to me why
4  there would be any need to -- this business
5  with the fence posts -- why you have to
6  backfill, you know, when you pull the fence
7  posts out?
8      A.  Safety issue. Somebody step in it,
9  break an ankle.
10      Q.  It has nothing to do with erosion?
11      A.  (Shakes head negatively.) No. It's
12  strictly given them guidance on how to
13  backfill. You don't have to put concrete in
14  it, you don't have to put grout in it, just put
15  the in situ material right back in.
16      Q.  All right. Okay. I'm sorry. Who is
17  Spadaro again? You told me this and it just
18  went in one ear and out the other. Is she
19  still with the Corps?
20      A.  I think she's remarried. She
21  married --
22      Q.  All right. But she's not here?
23      A.  I don't know if she's still with the
24  Corps or not. I really don't.
25      Q.  Okay. Let's take a break. I think I

Page 227

1  might be done.
2      (Brief recess.)
3  EXAMINATION BY MR. BRUNO:
4      Q.  All right. Just a few more questions,
5  Mr. Grieshaber.
6      A.  Sure.
7      Q.  Now, the Orleans Levee District is the
8  local sponsoring agency for that floodwall,
9  right?
10      A.  Correct.
11      Q.  All right. And when you do work
12  around that floodwall, you're required to get a
13  permit from them.
14      MR. STONE:
15          Objection. It's not within the
16      categories that you've asked for here
17      for this deposition.
18      MR. BRUNO:
19          Okay.
20  EXAMINATION BY MR. BRUNO:
21      Q.  I guess the reason I'm asking, you're
22  the guy who's designate on the potential for
23  harm to the floodwall. I just want to know if
24  the levee board comes into this at all. Are
25  you doing this for you or are you doing this

Page 228

1  for the levee board since it's their floodwall?
2      A.  Am I doing what?
3      Q.  This evaluation of the holes to
4  determine whether or not there's a potential
5  for harm.
6      A.  I'm guaranteeing that the work is not
7  impacting the flood protection.
8      Q.  Okay.
9      A.  Okay?
10      Q.  Regardless who owns it.
11      A.  Correct.
12      Q.  Fair enough.
13          Now, just one more document. This is
14  WGI 262218. What's highlighted in pink there
15  talks about the fact that groundwater flow has
16  changed over time as before remediation and
17  after remediation. And you'll see before
18  remediation groundwater flow is going both
19  ways, and after remediation, at least that memo
20  says, groundwater flow is going away from the
21  canal toward the floodwall.
22          You see that?
23      A.  Okay. I'm in the process of reading
24  it a second time.
25      Q.  Right.

Page 229

1      A.  I just don't understand who this is --
2  who is this from? Who is --
3      Q.  I'm not going to ask you to believe
4  that it's accurate. Okay?
5      A.  No, I'm just asking, who is MMG?
6      MR. JOANEN:
7          Materials Management Group.
8      A.  It says, I think the basis for MMG 's
9  soil DF --
10      MR. JOANEN:
11          Dilution factor.
12      MR. STONE:
13          Okay.
14      MR. BRUNO:
15          He knows some stuff.
16      MR. STONE:
17          But where are you getting this?
18      MR. BRUNO:
19          A lot of reading, writing and
20      arithmetic.
21  EXAMINATION BY MR. BRUNO:
22      Q.  Again, I'm not asking you to --
23      A.  Okay. No, I understand.
24      Q.  The question I'm going to ask you,
25  Mr. Grieshaber --

58 (Pages 226 to 229)

GRIESHABER, Ph.D., JOHN

6/27/2008

Page 230

1      A.  Okay.  Make it easy.
2      Q.  Yeah.  I'm not testing you on this,
3   okay?  I don't know if it's true or false.  But
4   I'm just wondering, if in fact the groundwater
5   flow is changing from going both ways to going
6   away from the canal to the floodwall, doesn't
7   that mean that the groundwater flow is going
8   underneath the sheet pile tip?  Because if the
9   sheet pile tip were blocking the groundwater
10  flow there would be no continuous flow, it
11  would run into the wall and stop.
12      MR. STONE:
13         Objection.
14      A.  Well, I mean, sheet pile has what's
15  called interlock leakage.
16  EXAMINATION BY MR. BRUNO:
17      Q.  Right.
18      A.  So there is flow that takes place
19  through the interlocks.
20      Q.  Some.
21      A.  Um -- but if in fact the groundwater
22  flow is going away from the canal, which I'm
23  not sure there's buy-in on it, it doesn't sound like
24  Mr. Bacuta buys in on it.
25      Q.  Again, I didn't ask you to accept it

Page 231

1   now.  I don't want to get into no big argument.
2   Because I don't have a clue whether he's
3   accurate or not.  I'm just asking a real simple
4   question.
5         Doesn't that mean that if water flow
6   is going away from the canal it's going
7   underneath the sheet pile tip?
8      MR. STONE:
9         Then the objection is that you're
10        asking the witness about facts that
11        you don't even consider necessarily
12        relevant to the case.  So.
13     MR. BRUNO:
14        What?  Are you crazy?  Are you
15        out of your mind?  You must be crazy.
16        Of course it's relevant to the case.
17     MR. STONE:
18        I object.
19     MR. BRUNO:
20        Good Lord.  Of course it's
21        relevant to the case.  My goodness.
22     A.  Okay.  Let me give you a long answer.
23  Underwater flow is a function of head, it flows
24  from a higher head to a lower head.  The IHNC
25  canal is tied to Lake Pontchartrain which

Page 232

1   varies anywhere from 3 to 0, so there are times
2   when groundwater will flow from the canal into
3   the aquifer, there is time when water flows out
4   of the aquifer into the canal.
5      Q.  Right.
6      A.  So to say that there is groundwater
7   flow in only one direction in that aquifer is
8   not consistent.  So I can't see how you can
9   tell me the groundwater is only flowing in one
10  direction when the recharge is in fact the
11  canal.
12      Q.  Well, unless the water is going under
13  the sheet pile.
14      A.  But eventually it has -- when the
15  canal is at 3, the water flows and maybe it
16  goes toward the sheet pile.  When the canal is
17  at 0, then the water flows out.
18      Q.  Yeah.
19      A.  So there's no reason to believe that
20  it's ever crossing the sheet pile.
21      Q.  Here's your problem:  Your assumption
22  is that the land on the other side of the
23  floodwall is higher than the low tide, if you
24  will, of the Industrial Canal.  And you'll
25  remember there's a canal bottom there just like

Page 233

1   at the 17th Street Canal, where the street
2   level is lower than the low tide of the 17th
3   Street Canal where you had people reporting
4   water in their yards for a whole year before
5   any hurricane.
6      MR. STONE:
7         There's no question pending.
8      MR. BRUNO:
9         You know, if you would just allow
10        me the courtesy of finishing my
11        question you will then learn a lot, of
12        course, and then you will learn
13        whether or not there's a question
14        attached.
15     MR. TREEBY:
16        Uh-huh.
17  EXAMINATION BY MR. BRUNO:
18      Q.  So the fact is, Mr. Grieshaber, if the
19  land on the protected side of the floodwall is
20  lower than the height of the water at low tide,
21  if you will, and the water's continually
22  flowing out, that means the water is going
23  underneath the sheet pile tip, isn't that true?
24     MR. TREEBY:
25        Objection to the form of the

59  (Pages 230 to 233)

GRIESHABER, Ph.D., JOHN

6/27/2008

Page 234

1    question.
2       MR. STONE:
3          Objection.
4       MR. BRUNO:
5          Yeah.
6    A.  I'm going to have to draw you a
7  picture.
8  EXAMINATION BY MR. BRUNO:
9    Q.  I knew you would.
10   A.  And I really apologize --
11      MR. BRUNO:
12         No.  That's fine.  Let's mark it,
13      too, exhibit the next.
14      MR. JOANEN:
15         17.
16      (Exhibit 17 was marked for
17  identification and is attached hereto.)
18   A.  Okay.  You're telling me there's a
19  canal.  Okay, we've got sheet pile.
20  EXAMINATION BY MR. BRUNO:
21   Q.  Right.
22   A.  And someplace down here is a
23  water-bearing strata --
24   Q.  Yep.
25   A.  -- that you're talking about.

Page 235

1    Q.  Right.
2    A.  Okay.  If we put a piezometer, or we
3  read what the head is right here --
4    Q.  Underneath the ground.
5    A.  -- underneath the ground.
6    Q.  Uh-huh.
7    A.  Okay?  And we put another piezometer
8  right here that measures the head -- right?
9  When the canal is up here at +3 the water is
10 going to be flowing in this direction.
11   Q.  Uh-huh.
12   A.  If it stays up here long enough, this
13 is going to get to be +3.  Okay?
14      And this over here is going to get --
15 just for talking purposes, +2 because of the
16 head loss to get to this point.
17   Q.  Okay.
18   A.  Low tide comes along.  Now, the canal
19 is reading 0.
20   Q.  Okay.
21   A.  This drop of water that was right here
22 doesn't go this way, it's going back that way.
23   Q.  Mr. Grieshaber, suppose --
24   A.  This is basic aquifer theory.
25   Q.  Except that if the low tide is up here

Page 236

1  and the high tide is up there, your aquifer
2  theory --
3    A.  It's all a function of head.  Okay?
4  What this piezometer reads close enough to this
5  is going to be whatever this elevation is.
6    Q.  Right.
7    A.  When this elevation is +3, the water
8  is going to go this way.  When this goes to low
9  tide, the water is going to come back.  Water
10 seeks its own level.
11   Q.  Yeah.
12   A.  Okay.  You agree right here on the
13 surface --
14   Q.  On the surface of what?
15   A.  -- on the surface of the canal, that
16 if I have a drop of water right here, when the
17 tide is high the water is flowing in, when the
18 tide drops, the water flows out.
19   Q.  Well, except that it assumes that this
20 pipe, if you will, is at the same height of the
21 surface of the water.  And no one is suggesting
22 that it is.
23   A.  No.  I've got this as an aquifer,
24 okay, a confined aquifer.
25   Q.  It's below --

Page 237

1    A.  It's below the ground.  And if you put
2  a piezometer, you're reading +3.  You're
3  reading whatever this canal --
4    Q.  +3 means what?
5    A.  In elevation.  +3NGV.  Whatever, Lake
6  Pontchartrain levee.
7    Q.  What's the difference in tide, about a
8  foot?
9    A.  Well, anywhere between 3 feet --
10 between 3 and 0 is the tidal range down there.
11   Q.  All right.  If at 0 it's above the
12 hole, you're telling me it's not going to force
13 water into the hole --
14   A.  No, because --
15   Q.  -- on the other side?
16   A.  -- this is a confined aquifer.
17   Q.  Yes.
18   A.  Okay?  The pressure in this aquifer
19 equals the pressure in this canal.
20   Q.  Okay.
21   A.  If you believe that there's intimate
22 contact here, which you apparently do --
23   Q.  Right.
24   A.  -- then the pressure here is equal to
25 the pressure in the canal.

Johns Pendleton Court Reporters

800 562-1285

GRIESHABER, Ph.D., JOHN

Page 238

1    Q.  Okay.
2    A.  So when the pressure in the canal goes
3  down from high tide, water flows back out.
4    Q.  So that that means that every time
5  it's high tide you're going to get water in
6  people's backyards.
7    A.  No, because there's head loss going
8  in.  What I'm trying to explain to you is, you
9  cannot tell me that there's flow only going in
10  one direction, and that's what that E-mail is
11  stating.
12    Q.  All right.
13    A.  It's illogical.
14    Q.  So you're telling me that it's
15  impossible for anybody to have seen, at the
16  Lower Ninth Ward, ponding of water on the
17  protected side?
18    A.  No, that's not what I'm explaining.
19    Q.  All right.
20    A.  What I'm explaining is flow in the
21  aquifer.
22    Q.  Okay.
23    A.  Okay?  What that memo is about is flow
24  in the aquifer.  When you go on the other side
25  of that wall, there's a piezometer that shows

Page 239

1  you the water is higher than the ground line.
2    Q.  All this says is that at a certain
3  point in time, that water is flowing in one
4  direction.
5    A.  No, that says it's only flowing in one
6  direction is what you highlighted to me --
7    Q.  Well, we don't know --
8    A.  -- which is contrary to aquifer
9  theory.
10    Q.  Okay.  All right.  So this -- the fact
11  that this piece of paper says flowing one way
12  or the other has nothing to do, in your
13  opinion, with visualizing water on the
14  protected side of the levee?
15    A.  No, visualizing water on the protected
16  side has to do with the excess head that is the
17  result of the fact that the water is higher
18  than the land.
19    Q.  All right.  So that if you see water
20  on the protected side of the levee, and that
21  means the water is higher, it also means that
22  there's a method by which the water can travel
23  underneath the floodwall into the protected
24  side.
25    A.  There's a hydrostatic link, yes.

Page 240

1    Q.  All right.  So that means that there's
2  a layer of soil which is permeable enough to
3  allow that water to travel through.  Right?
4    A.  Correct.
5    Q.  Okay.  All right.
6    MR. TREEBY:
7      Can I see the document?
8    MR. BRUNO:
9      That's all I've got.  And we will
10  reserve any redirect that may be
11  appropriate after Mr. Treeby conducts
12  his examination.
13    MR. FISHER:
14      And this is Robert Fisher for
15  Lafarge.  We reserve our rights to
16  cross-examine the witness for his
17  deposition.
18
19
20
21
22
23
24
25

Page 241

1      WITNESS' CERTIFICATE
2
3      I, JOHN GRIESHABER, PH.D., P.E., do
4  hereby certify that the foregoing testimony was
5  given by me, and that the transcription of said
6  testimony, with corrections and/or changes, if
7  any, is true and correct as given by me on the
8  aforementioned date.
9
10  _____   _____
11  DATE SIGNED     JOHN GRIESHABER, PH.D., P.E.
12
13  _____  Signed with corrections as noted.
14
15  _____  Signed with no corrections noted.
16
17
18
19
20
21
22
23
24
25  DATE TAKEN:  June 27th, 2008

61  (Pages 238 to 241)

GRIESHABER, Ph.D., JOHN

6/27/2008

Page 242

```
 1        REPORTER'S CERTIFICATE
 2        I, JOSEPH A. FAIRBANKS, JR., CCR, RPR,
 3   Certified Court Reporter in and for the State
 4   of Louisiana, do hereby certify that the
 5   aforementioned witness, after having been first
 6   duly sworn by me to testify to the truth, did
 7   testify as hereinabove set forth;
 8        That said deposition was taken by me
 9   in computer shorthand and thereafter
10   transcribed under my supervision, and is a true
11   and correct transcription to the best of my
12   ability and understanding.
13        I further certify that I am not of
14   counsel, nor related to counsel or the parties
15   hereto, and am in no way interested in the
16   result of said cause.
17
18
19
20
21
22
23   _____
24   JOSEPH A. FAIRBANKS, JR., CCR, RPR
25   CERTIFIED COURT REPORTER #75005
```

Johns Pendleton Court Reporters

800 562-1285

GRIESHABER, Ph.D., JOHN

## A

ability 55:7 242:12
able 23:12 85:17
  105:15
above-named
  220:24
absence 113:12
absent 168:9,17
absolute 85:2
absolutely 57:1
  67:19 84:19
academia 191:19
accept 23:9 72:15
  96:17 144:4
  230:25
acceptable 71:17
accepted 164:3
accompanied 115:9
accomplish 209:14
accomplished
  205:23 221:24
accurate 37:13
  133:12 144:5
  159:21 179:7
  184:21 185:6
  229:4 231:3
accurately 23:10
  96:17
accuse 138:10
accused 58:3
achieved 41:1
action 1:4 118:5
  205:22
active 95:17 176:25
activities 184:2
activity 117:8
  120:22 172:6
  173:11
actual 28:1 39:19
  74:22 160:24
  177:8 225:21
acute 72:25
added 23:3 122:11
addendum 171:15
adding 34:22 71:6

addition 218:10
additional 110:25
  112:14 113:5
  167:9 169:14
Additionally
  221:21
address 98:13
  99:25
addressed 225:19
  225:21
addresses 25:6
  224:6
adequate 96:15
adjacent 105:9
  171:23 176:11
  209:8 213:8
adjourn 45:2 85:15
administer 167:11
administering 5:24
adopted 37:8
advantage 143:4
advised 173:9
affect 60:7 172:6
affirmatively 7:7
  109:22 113:9
  115:5 155:12
  159:9 163:23
  204:11 205:6
  209:10 222:16,20
  223:1
aforementioned
  5:4 241:8 242:5
agency 227:8
ago 8:9 62:8 76:9
  218:23
agree 18:24 45:22
  59:21 70:15 71:10
  99:21 100:2
  106:19,23 175:25
  185:4,8 204:12
  236:12
agreed 5:2 30:12
AHA 117:9
ahead 11:4 109:9
  139:17
ain't 31:20 86:23

air 178:3
ALFIERI 3:14,20
allege 134:4
alleviate 138:25
allow 119:12 233:9
  240:3
allowable 120:20
  120:21 197:23
allowed 102:12
  119:11 201:7
allowing 66:8
  215:4
allows 80:7 176:21
alluvial 97:9,14
  106:20
alternate 33:11
alternative 33:14
  98:25
amazing 69:17
ambiguous 80:24
  81:3
amendments 10:9
AMERICA 1:11
  2:11
amount 104:3
  177:6
analyses 124:6
analysis 38:25
  39:11,13,15,21
  40:8,16,25 41:8
  41:23 46:15 50:23
  74:25 75:1 94:13
  94:14 99:22
  102:12 103:4,6
  104:10,15,16,19
  104:20 105:2,7,12
  106:10,10,13,13
  106:17 117:9
  118:6 119:4
  123:13,13,14
  147:25 156:19,19
  156:20 160:16,18
  160:22,23 161:2
  210:12 212:6,19
  212:20,23
analyze 105:14

analyzed 106:7
  212:17 213:15
ancient 49:15
and/or 19:1 75:1
  241:6
Anecdotal 113:13
ankle 226:9
anomaly 179:23
answer 5:13 7:15
  7:15 27:4 43:23
  64:4 71:23 86:1
  143:13 168:19
  177:2 179:3
  182:21 183:13
  184:7 185:8 191:1
  191:3 218:19
  224:8 231:22
answered 64:9
  121:20 148:7
  185:5 219:23
answers 85:18
  141:14 146:9
  212:15
anybody 62:14
  117:3 150:19
  153:15 238:15
anymore 20:3
  85:21 106:14
anytime 42:5
anyway 85:22
  143:3,6
apologize 82:5
  106:1 114:4
  135:17 234:10
apparently 58:16
  172:21 218:16
  237:22
appear 6:8
appearance 16:24
APPEARANCES
  2:1
appears 22:18
  171:7
Appendix 40:6
applicable 20:12
applied 221:9

applies 43:3
apply 99:3,4,7,8,16
  99:22 100:1,2,6
appoint 8:7
appointed 6:7
  78:13
appreciate 15:12
appropriate 39:13
  53:24 97:18
  113:22 240:11
appropriately
  196:14
approval 163:9
  171:7,10
approve 162:21
  170:8 171:17
approved 129:12
  163:25 164:2
  172:4
approves 163:18
approving 146:14
approximately
  25:21
April 212:16
aquifer 107:5
  142:23 232:3,4,7
  235:24 236:1,23
  236:24 237:16,18
  238:21,24 239:8
aquifers 100:16
architects 33:6,15
area 19:3 25:6
  26:17,18 27:18
  32:4 56:22 103:10
  105:8 136:19
  154:17 158:1,1
  159:12 172:24
  181:23 182:5
  183:25 192:20
  199:11 206:24
  208:2 210:16
  213:13,15 223:7
areas 27:17,17
  105:9
argue 140:4 166:1
  194:4

GRIESHABER, Ph.D., JOHN

6/27/2008

Page 244

**argument** 82:9,13
231:1
**argumentative**
106:1
**arithmetic** 229:20
**Army** 1:12,13 3:1
33:3 88:7 90:18
140:23 141:1
**ascertain** 17:3
124:21 169:2
182:8
**ascertaining** 31:10
140:24 173:16
**asked** 16:8 46:16
49:14 51:13 72:3
89:13 92:16
126:14 131:24
132:10 135:22
148:5 160:12
165:23 189:10
190:12 208:17,23
210:6 212:7
227:16
**asking** 19:9,17
60:10,10 65:8
71:13 75:25 81:19
84:6 90:1 98:21
152:20 183:13,23
189:5 198:2
199:24,25 200:11
204:22 207:2,9,10
207:17,22,23,23
207:24 208:16
209:16 210:1
224:10 227:21
229:5,22 231:3,10
**asks** 18:6
**aspect** 29:17 50:4
110:7
**aspects** 36:18,19
52:21 165:13
**assess** 53:24 80:16
209:12
**assessing** 53:23
184:1
**assigned** 181:6

**assist** 51:2
**assistance** 26:5
29:12 199:13,24
205:19
**assistant** 25:17,20
**assists** 202:16
**association** 32:19
**assume** 16:21
89:12 91:24 94:9
94:15 103:13
106:16 112:15
123:23 124:3,8
172:2,8 197:25
199:21,25 224:5
**assumed** 18:9
93:10 94:6,11
113:18,19 136:10
136:12
**assumes** 236:19
**assuming** 123:14
159:20 197:22
202:5
**assumption** 103:15
232:21
**assumptions** 97:4
101:8
**as-built** 16:6,16,20
113:12
**Atchafalaya**
192:17 194:13,15
**attach** 151:7
154:14
**attached** 11:11,17
11:22 47:21 48:8
94:4 109:7 110:19
115:12,14 133:6
148:23 151:12
169:24 197:13
198:9 206:22
218:21 233:14
234:17
**attaches** 218:16
**attack** 86:25
**attacked** 87:3
**attention** 194:9
198:11,19

**attorney/client**
14:6
**August** 26:3
**authority** 168:5
**authorization**
185:21
**authorized** 186:3
**availability** 97:22
**Avenue** 1:15 3:4
6:20 17:23 20:9,9
209:8 213:8
**avoid** 35:24,24
**award** 113:3
**aware** 8:6 107:16
107:20,24 181:11
183:2,2,6

—————

**B**

**b** 4:6 72:23 221:25
**back** 28:11 45:17
49:15 55:10 56:2
62:1 63:22 65:1
74:20 81:5 82:11
87:6 93:25 114:13
115:2,6,22 125:5
125:9 129:17
130:18 131:5
141:22 163:24
185:13 186:8
191:21 198:14
202:2 206:17
208:1 214:19
215:1 216:1
219:25 220:3,5
224:15 225:11
226:15 235:22
236:9 238:3
**backfill** 103:8,9
104:24 127:19,21
128:3,8,11,19
143:3 174:24
177:14,17 178:24
179:13 214:21
216:19 219:4
222:17,22 226:6
226:13

**backfilled** 101:19
103:22 104:25
106:8 179:19
**backfilling** 128:20
128:21
**background** 35:23
114:23
**backhoe** 216:16
**backyards** 238:6
**Bacuta** 230:24
**bad** 66:16 114:4
**BAEZA** 2:15
153:19,25 154:5
154:15
**bank** 16:1 19:3
26:16 32:4 43:11
66:18,22 67:7
103:10 105:8
107:11 112:2
197:24 199:10
221:16 223:11,13
**barges** 34:6
**Baronne** 2:7
**barring** 142:11
**base** 97:3 101:7
175:16 202:16
**based** 39:2,6,7
40:24 41:2 56:2
79:25 86:5,7
100:13 132:1
173:23 178:21
**basic** 176:24
235:24
**basically** 62:3
95:15 118:1
**basics** 185:24
**basin** 192:17
194:14,15
**basis** 80:6 229:8
**Bates** 9:19,21 14:2
14:15,17,24 15:6
15:8 30:20 31:1
109:9 113:2
115:16 131:10
132:17 134:18,21
154:10 162:3

170:16 197:1
198:6 214:13
218:11 219:2,6
**Bayou** 154:6
**BEARDEN** 3:13
**beat** 216:2,16
**behalf** 8:19
**belief** 186:18
**believable** 211:16
**believe** 35:25 70:10
86:3 114:7 119:9
160:15,18,21
186:15 203:20
209:1 229:3
232:19 237:21
**believes** 76:21
**benchmark** 183:3
**beneath** 72:19,22
72:24 113:6
**Benjamin** 2:17
**bentonite** 142:18
**best** 23:7 242:11
**Betsy** 183:9,20,24
184:6
**better** 30:1 134:11
202:13
**beyond** 212:8
**big** 70:1 84:2
177:19 204:19
205:5 231:1
**Bill** 12:19 13:7
115:17 219:9
224:21
**billions** 112:12
**biography** 11:14
24:7
**bit** 57:3 154:7
215:5,6 216:16
**black** 94:5 174:13
203:10
**bless** 24:20
**block** 117:15,15
118:8 152:7
195:15,21
**blocking** 230:9
**blowout** 195:24

GRIESHABER, Ph.D., JOHN

**blue** 121:18 122:12
**board** 227:24 228:1
**boil** 185:24
**boils** 72:23
**Boland** 112:19
  113:7,14 124:22
  160:13 163:25
  225:17
**borings** 152:9,12
  152:14 161:6
  178:10
**borrow** 127:22,23
  127:23 128:1
  198:3 200:4,8
  203:14 204:23
  206:24 207:10,12
  210:15 212:12
  213:13,15 219:3
**boss** 7:19
**bottom** 17:6 21:6
  29:8 104:13
  136:14 144:2,24
  158:2 159:17,24
  172:25 179:20
  188:20 206:6
  232:25
**boundaries** 83:20
  169:9
**boundary** 91:13
**Box** 2:16
**braced** 116:13
  172:16,17,22
  222:6,7
**bracing** 209:14
**branch** 2:13 14:1
  24:22 25:14,16
  26:1,2,10 28:9,13
  110:9 125:24
  126:1,14,21
  198:21 199:3,7
  213:20 221:8
**breach** 16:2,2
  19:25 105:10
  132:25 133:10
  134:4 186:6,11
  190:24 194:19

195:3
**breaches** 1:4 15:25
**breaching** 185:1
**break** 7:21 17:19
  84:23 118:15
  139:15 151:2
  183:24 184:6
  226:9,25
**breaks** 7:20 183:7
  183:10,20
**bridge** 16:4 17:21
  17:22,23
**Brief** 53:19 93:23
  146:21 156:24
  218:5 227:2
**bring** 105:13,17,20
  105:22 128:3
**brings** 182:14
**broader** 193:12
**broken** 26:13
**brought** 79:1 189:6
  222:23
**Brown** 33:5
**Bruno** 2:3,3,4 4:5
  6:1,15,24 7:1 9:17
  9:22 10:3,6,18,25
  11:5,12,18 12:4,9
  12:13,18 13:2,6
  13:13,18 14:8,13
  14:21 15:3,11,13
  18:14,23 19:8,14
  19:22,24 24:1
  27:8,13 30:9 31:4
  31:7,19,24 32:9
  34:19,25 35:8
  36:15 37:2 42:25
  43:4 44:2,6,14,20
  44:24 45:8,15,19
  46:18,24 47:1,24
  48:4,12 52:2
  53:17,20 57:17,20
  58:15,21 63:1,6
  63:11,17,23 64:2
  64:12,17,23 65:3
  65:13,19,23,25
  66:4,7 67:16,20

68:4,9,13,19
69:16,20,22 71:3
71:9 72:10 76:3
76:19 77:2,16,19
78:7,10,18,22
79:9,21 81:1,4,14
82:10,12,19,24
84:15,20 85:4,12
85:23 86:4,10,15
87:2,10,16,20,25
88:6,24 93:24
103:2 106:4
107:18 108:21,25
109:11,13 110:14
110:21 111:21
112:9,16 115:15
116:4,7 122:1,5,9
126:2 130:5,14,24
131:12 132:2,19
132:23 133:16,24
134:2,19,24
135:15 136:8,25
137:5,11,15,25
138:7,13,19 139:8
139:21 140:5,10
140:14 146:22
149:5,8 151:3,15
151:22 152:5
153:5,13,23 154:2
154:8,20 155:6,24
156:5,10,25
161:21,25 162:4,8
162:14 166:2
170:18,23 171:3,5
174:3 183:15,21
189:7,16 190:13
190:19 191:7,14
191:23 192:21
193:3,9,17,22
194:6,10 195:9,18
196:5,12 197:6,15
198:13 202:1
203:22,25 205:1,4
206:20 211:7,14
211:20 212:1,4
214:4 217:22

218:6 219:8,20
220:9,13,18
224:20,25 227:3
227:18,20 229:14
229:18,21 230:16
231:13,19 233:8
233:17 234:4,8,11
234:20 240:8
**BUCHLER** 2:6
**bucket** 177:15,24
  177:25
**build** 172:22 186:3
**building** 70:17
  113:7,8
**built** 9:12 16:11,12
  23:5 37:9 62:2
  106:20 179:18
  185:21
**bunch** 91:4 135:23
  217:6
**business** 47:5 53:5
  79:1 114:19 146:3
  169:1,11 226:4
**butt** 143:19
**buys** 230:24
**buy-in** 230:23
**bypass** 107:17,22

---

**C**

**c** 72:23
**cake** 114:8,16
  135:21 137:17
  140:15
**calculate** 204:19
**calculations** 124:1
**call** 47:7,7 63:8
  124:17 164:21
  181:3 223:20
**called** 33:10,17
  34:1 48:8 49:23
  119:14 142:18
  164:16,17 165:4
  165:11 169:13
  189:4 190:8,11
  200:19 215:1,11
  216:11,23 230:15

**calling** 37:14
**calls** 37:8 224:19
**canal** 1:4 32:24
  34:5 40:3 187:2
  187:13 195:5,11
  195:14 197:24
  205:13 221:15
  223:4 228:21
  230:6,22 231:6,25
  232:2,4,11,15,16
  232:24,25 233:1,3
  234:19 235:9,18
  236:15 237:3,19
  237:25 238:2
**canals** 176:12
**cantilevered** 98:24
**care** 85:5 107:21
  108:3
**carefully** 159:22
**carried** 25:8
**carry** 55:3,8
**case** 39:2 40:6,8,16
  41:6 74:22 80:6
  96:1 123:15
  168:12 209:21
  214:19 231:12,16
  231:21
**case-by-case** 80:5
**categories** 43:21
  44:1 227:16
**cause** 66:17,18,22
  67:6,7,10 69:5
  102:11 187:10
  209:23 223:5
  242:16
**caused** 34:4,4 69:9
  83:23 91:14
  101:23 112:12
  186:7
**causing** 67:10
  133:8
**CCR** 1:24 5:22
  242:2,24
**cease** 80:3
**CEMVN** 198:19,19
**center** 121:8

GRIESHABER, Ph.D., JOHN

156:16 169:11
204:7
**centers** 143:18
**certain** 28:6 49:19
52:8 55:3 56:3
62:1 69:1 100:3
123:2 136:3
189:10 239:2
**certainly** 14:12
16:22 79:24
108:10
**certificate** 161:13
241:1 242:1
**Certified** 1:25 5:23
242:3,25
**certify** 241:4 242:4
242:13
**cetera** 18:8 109:18
109:18 173:6,7
**chain-link** 202:15
**Chalmette** 154:17
**chance** 159:22
**change** 23:20 70:13
91:12 138:24
197:3
**changed** 23:18
228:16
**changes** 74:16
241:6
**changing** 71:7
230:5
**channel** 26:15
34:12 107:17,23
158:17
**characterization**
133:9
**characterize** 108:5
**charge** 27:21 28:21
**charged** 187:1
**CHARLES** 3:11
**check** 38:16 55:6
95:6,8 96:14
125:23 171:8
172:20
**checked** 91:14
**checking** 54:13

92:17 149:23
**checklist** 56:11,13
56:21 57:7 58:4,7
58:24 59:3,5
**chief** 24:7 25:16,17
25:20,24 26:6,11
49:16 119:21,22
125:6,7 126:13,16
126:17,25 127:2,5
127:8 198:11,17
198:18 199:1,7
208:21,22 210:10
212:7,10
**chief's** 127:3
**CHO** 158:2
**CHRISTOPHER**
3:14,20
**circles** 81:13
**circumstance**
145:13
**circumstances** 72:2
166:3
**city** 48:16 51:17
52:7 56:8,17 57:7
57:16 58:8 80:22
81:2 112:12
**civil** 1:4 2:13 5:6
25:16 26:1,2
**Claiborne** 16:4
18:1 20:9
**clarify** 37:25 202:2
**clarity** 52:4
**Class** 141:9 143:18
**classical** 100:15
**classically** 215:1
**classification**
157:19
**clay** 128:12 129:7
157:11,11,18
158:3,4,13,22,24
158:24 195:17,17
**clays** 157:21
**cleanup** 26:20
**clear** 19:16 32:3
56:1 122:21
150:10

**clearly** 86:13
**close** 47:8 142:10
142:15 177:1,5
205:11 209:23
217:10 236:4
**closed** 141:11
143:6 176:16
**closely** 111:17
**closer** 16:3 203:17
203:18 206:18
222:14 223:11,13
**closes** 143:20
175:10,18 176:6,8
**closing** 142:15
**clue** 139:2 231:2
**code** 170:1
**coding** 163:20
**coffee** 7:20
**cofferdam** 116:13
159:24 174:22
222:5,8
**cofferdams** 222:6
**Colletti** 42:12,13
49:8,10
**color** 22:4
**come** 24:24 28:11
29:20 46:11 63:21
80:5 87:6 102:10
115:2 120:6
122:25 129:15
170:8 175:10,20
219:25 224:14
225:11 236:9
**comes** 115:6,22
168:11 227:24
235:18
**comfortable** 80:16
139:19
**coming** 20:21
112:24 129:21
177:9 196:18
217:6 224:10
**commence** 171:17
**comment** 53:21
**commentary** 69:19
112:7

**commonly** 16:5
**communicated**
181:7
**community** 169:13
169:16
**compact** 177:19
215:7
**compacted** 129:3
214:21 216:19
222:18
**compacting** 178:6
214:23
**compaction** 128:22
128:25 129:2
177:15,21,24
215:13 216:5
**compacts** 216:2
**Compare** 215:24
**completed** 177:14
221:17
**completely** 102:13
**completeness** 37:12
**compliance** 161:13
205:23 221:22
**component** 108:7
206:9
**components** 26:23
**composite** 161:19
**compromise** 54:11
**computer** 39:12
40:1,5,7 242:9
**concept** 99:7
172:16
**concern** 66:8,11,15
66:15 67:25 96:18
**concerned** 151:25
206:7 207:25
**concerns** 28:9
189:19 190:15
**conclude** 16:19
23:4 125:16 146:9
200:18
**conclusion** 176:22
202:12
**concrete** 98:23,24
112:18 113:5,17

113:20 136:10,14
144:24,25 174:23
226:13
**conditions** 56:3,4
74:16 91:13 97:19
178:13
**conducive** 178:18
**conduct** 104:14,16
**conducted** 126:10
**conducts** 240:11
**confess** 211:13
**configuration** 55:1
94:6
**confined** 236:24
237:16
**confused** 76:5
165:19
**connect** 114:23
**connected** 97:13
**connection** 107:10
109:17,25 118:23
**consequent** 97:4
101:8
**consider** 34:11
36:7 212:25
231:11
**consideration** 73:9
97:1,25 98:2
165:15 166:17,20
166:22,24 167:14
167:15,21
**considerations**
38:18 96:22 165:5
165:12 167:8
168:17 189:19
190:15 193:11,13
219:12,24 220:3
224:16
**considered** 165:14
166:17
**consistent** 56:4
144:20 170:9
208:19 232:8
**consists** 178:17
**CONSOLIDATED**
1:5

GRIESHABER, Ph.D., JOHN

6/27/2008

Page 247

**constructed** 16:19 48:10,21 49:6 56:23 178:25
**construction** 28:7 28:11,17,21 29:13 29:18 32:1 48:7 50:14 56:21 62:14 62:16 66:9 69:3 72:17 79:2 83:23 89:1,12,14,16 97:23 119:23 123:10 125:7 127:2,5 129:22 130:3 148:14 151:6 163:11 167:18 168:1 169:23 184:2 192:6,9 198:11 199:12,15,23 208:23 209:12 212:7,10 219:18 220:21 224:8
**Consultants** 33:6
**contact** 223:17,18 237:22
**contained** 39:16
**contains** 218:10,15
**contaminants** 142:23
**contamination** 143:24
**contemplate** 225:24
**content** 214:22 215:3,4 216:20 217:11
**context** 8:8 103:10 110:23 111:24 112:23 114:19 144:8 146:10 148:1 161:2 180:18 193:16,24
**continually** 233:21
**continue** 68:16 117:17
**continuing** 62:24

**continuous** 230:10
**contract** 28:2,8,22 33:1,14 83:23 89:12,14,17 90:7 111:7 120:1 125:4 125:14,16,22 146:11 150:6 167:11 219:13,16 220:24,25 221:7 223:25
**contracting** 162:22 164:3,4 167:24 221:23
**contractor** 28:5 90:14 92:22 93:3 109:14 111:3,14 113:4 115:2 129:3 129:7 146:11 163:3,12 180:22 181:7 209:13 221:17,22 223:2,7 223:10,13
**contractors** 125:10
**contrary** 138:21 239:8
**contribute** 143:24
**contributing** 187:22 188:1 196:23
**contribution** 187:6
**control** 42:20 48:11 48:22 49:6 50:23 51:10 56:22 58:10 59:17 70:12 72:18 73:19 88:10 96:25 97:5,16,18 118:25 119:14 120:2,4,6 121:8 124:19,20 144:10 151:6 160:3 164:22 165:1,14,16 166:7 166:8,9,16,19 167:2,13,22 168:10,16 172:7 173:17 180:7,12 180:15 184:4

200:20,21,24 201:1 205:12 206:23 207:3 209:11 225:2,4,9
**copies** 12:22 13:9,9 13:15 49:8
**copy** 10:22 12:20 154:11
**corner** 153:3
**Corps** 1:12,14 3:1 3:2 16:11 23:19 27:24 28:18,19 29:9,12 31:17 33:3 34:11 36:3,7 37:8 41:21 46:3 49:21 50:6,7,9 56:23 70:18,25 71:13 72:5 76:15 76:21,25 78:14 81:7 88:7 89:9,15 89:23 90:4,8,11 90:11,15,18,19,24 91:2,6,7 98:4 102:19 103:3 104:14 106:7,15 106:15 109:21,25 111:13,14 115:22 115:24 118:22 123:7,7 124:15,22 129:12,17 140:23 141:1 144:2,5,11 145:13,17,23 146:13 147:1,2,8 150:6 156:17 160:1 163:4,4,17 163:18,25 164:2 170:4,9 172:3 173:9,25 181:6,7 182:7,22 185:11 186:2,7,15,18 188:22,24 189:25 189:25 190:2,11 190:20,22 191:6 191:20 192:16 193:25 194:1,17 195:2 198:19

226:19,24
**correct** 16:14,25 17:12 21:2,8,11 22:17,21 24:11,23 28:23 37:19 42:1 45:25 46:1,5 50:18,21,24 51:6 54:1,16 57:5 61:24 62:6,6,10 62:18 69:7,15,17 70:20 73:7,11 74:10 75:5 76:10 79:20 88:12,18,21 89:5,7,10 92:8,24 93:5,7 101:4 118:17,20 120:13 123:17,20 124:7 128:17 129:6,9 147:13 148:4 150:16,24,25 156:23 159:1,13 166:11 167:15 168:8,22 170:11 173:14,19 174:19 175:2 178:7 179:23 182:6 186:1,5,9,14 192:3 197:18 198:4 203:15 205:9 206:5 212:9 212:13,21 221:1 222:3,11 227:10 228:11 240:4 241:7 242:11
**corrections** 241:6 241:13,15
**correctly** 197:22
**correspondence** 125:5
**cost** 114:1
**costing** 112:10
**costs** 97:23 112:7
**counsel** 3:2 5:3 6:5 7:10,14 8:11 11:13 13:22 14:6 67:13 140:12

213:25 218:9 242:14,14
**count** 12:23
**couple** 62:7 76:9 125:12 137:10
**course** 23:16 36:17 176:22 231:16,20 233:12
**Court** 1:1,25 5:23 242:3,25
**courtesy** 233:10
**courtroom** 45:2 85:16
**cover** 18:21 150:5 163:5 166:3 168:18
**covered** 199:19,22 220:2
**covering** 143:25
**covers** 18:25
**cows** 215:9
**crack** 101:14 102:12 104:10,11 104:19 186:19 188:7 194:21,24
**crane** 113:17 173:4
**crawler** 173:3
**crazy** 231:14,15
**create** 101:23 168:2 174:22
**created** 135:25 177:3
**credited** 113:25
**Creep** 39:15 40:25 96:8,12,13
**crest** 204:14
**criteria** 39:13 43:2 70:23
**critical** 56:22
**critique** 170:9
**crosshatch** 158:12
**crosshatched** 157:25 158:1
**crossing** 105:24 232:20
**cross-correspond...**

GRIESHABER, Ph.D., JOHN

121:21
**cross-examination** 211:22
**cross-examine** 240:16
**cross-purposes** 49:21
**cross-section** 15:17 16:8 71:7 93:16 105:13,13,21 197:20 202:3
**cross-sectional** 74:13
**cross-sections** 105:7,19
**crystal** 122:20
**cubic** 215:16
**Cunningham** 33:5
**cup** 7:20
**curious** 37:3,16 175:11
**current** 197:25
**currently** 199:11
**cut** 36:9,25 38:7,13 197:24 203:4,7,8 222:1 223:10,13
**cutoff** 38:11
**cuts** 103:23
**cutting** 34:3
**cylindrical** 143:2,5

**D**

**D** 3:10 4:1,6
**DACW** 33:1
**Dam** 48:6
**damage** 69:5 70:12 112:13 209:24
**damned** 112:1 140:17
**dams** 26:14 50:23
**DAN** 2:15
**dangerous** 108:24
**dare** 86:16,17
**data** 40:5 161:12 163:4 182:25
**date** 10:20 241:8,11

241:25
**dated** 23:2 52:17
**datum** 17:13 23:14 23:18,19,24 24:2 223:8
**day** 44:7,17 68:15 85:14 187:8 190:18 191:10
**day-to-day** 27:21 29:22
**DDR** 33:13
**de** 90:3
**deal** 14:9 35:9 70:1 166:5 224:2
**decide** 118:12
**decided** 118:11
**decision** 117:16
**decisions** 168:6
**deemed** 41:15
**deep** 36:24 37:23 73:14 76:14 91:23 92:22 118:13 119:13 120:16 123:8 140:17 176:15 182:19 200:22 209:6,17 210:15 213:6,12
**deeper** 144:21 145:1,6 172:10 221:25
**defect** 188:23,25 190:1,3,23 191:25 192:9
**defective** 139:2 192:4,5,6,7
**define** 77:21 168:25
**defines** 123:4
**defining** 75:10 77:10
**definite** 8:21
**definitely** 49:17
**definition** 188:3,9
**definitive** 116:18
**deflecting** 195:12
**deflection** 186:21

194:20,22
**deflects** 101:14
**defray** 113:25
**degree** 78:24
**deleterious** 180:7 184:3
**demolition** 108:7 108:12 113:8 199:11
**denial** 169:25
**density** 215:10,20 222:18,24
**department** 2:12 33:2 109:23 167:23,24 168:14 168:20 172:3,12 172:14 173:11 205:18
**dependent** 23:14 97:19 143:13
**depending** 72:1 79:23 126:18 160:5
**depends** 73:22 141:5,8,14,16,19 157:15 164:15
**depicted** 23:4
**depo** 197:8
**deponent** 5:10
**deposit** 157:7,10,11 157:16
**deposition** 1:10 5:4 5:14 6:2 7:3,13 8:8,12 9:3 11:8 12:22 13:14 42:16 64:7 86:14,21 112:1 138:23 148:16 201:24 227:17 240:17 242:8
**depositions** 11:25
**deposits** 97:14
**DEPO-VUE** 3:23
**depth** 17:3,20 19:3 19:18 33:18 34:5 36:12 37:21 91:4

97:11 106:25 117:16 120:25 121:7,11 122:22 122:23 123:2 145:11 149:14 150:13,24 177:7 184:6 197:25 201:2 219:3 225:10,10
**depths** 23:10 149:25
**described** 22:9 80:14 140:25 146:12
**describes** 16:12
**describing** 102:5
**description** 158:10 179:7,9
**descriptors** 128:6
**design** 9:10 10:7 26:13 33:1,17,20 34:1 36:17 37:5,6 39:14 40:8,16 41:8,21 42:7 48:6 50:4,13,20 51:6 54:14,17,23 55:10 55:13,17,20,23 56:2,2,6,25 59:8 59:12,14,15,20,22 59:23 60:7,9,18 61:7,14,18,19,23 62:4 72:17 73:8 74:16 80:9 91:10 92:4,6,12 93:11 94:11,12,19 97:1 97:4,6,17,24 98:1 99:6 101:8 103:13 106:18 119:11 141:23 154:16 156:8 165:13 167:1 188:23 189:1 190:2,23 191:25 192:2,5 197:22 200:1,3 201:16
**designate** 227:22

**designated** 27:16 29:4 105:5 199:10
**designation** 201:21
**designed** 54:9 55:1 55:3 61:25 89:20 89:24 90:4,15 185:3,10,15 191:22
**DESIGNEE** 1:12
**designers** 50:3
**designing** 92:10,17
**designs** 32:6,18 95:3,4 98:25
**desk** 199:6
**destruction** 79:15
**detail** 91:5
**detailed** 59:4
**determination** 61:17
**determine** 41:9,24 55:15 56:24 59:9 59:16 60:17 61:12 70:11,24 73:17 94:24 103:4 115:25 160:2 228:4
**determined** 39:1
**determining** 175:4
**develop** 161:6
**developed** 24:15 117:9
**development** 68:2 194:21
**device** 180:4,5
**DF** 229:9
**diagram** 95:18 149:24
**diameter** 143:20 177:7
**difference** 84:2,4 93:9 193:4 207:7 237:7
**differences** 220:15
**different** 30:4 36:23 71:14 131:8 158:9,11 164:8

183:4 197:24 207:21
**dig** 34:12 43:10 46:11 74:18 171:20 201:17,18
**digging** 42:5,19 55:25 70:16 89:3 117:20 118:16 159:23 208:5
**digs** 76:13
**Dilution** 229:11
**directed** 225:19
**direction** 89:2 149:17 232:7,10 235:10 238:10 239:4,6
**directly** 186:23
**disagree** 44:12,17 46:19
**disapproval** 163:9
**disapprove** 162:21
**disapproved** 170:1 170:17
**disapproves** 163:19
**disclosures** 154:18
**discovered** 113:4 178:12 226:1
**discretion** 77:7
**discretionary** 76:20 77:12 79:4 79:12 88:15,19 173:21,25
**discussion** 171:16 186:12
**displacement** 175:9 194:24,25 221:15
**disposal** 110:24 113:22
**disposed** 113:22
**distance** 69:1 121:3 122:21,24,25 201:2,2 202:25 204:9
**distinct** 26:13
**distinction** 51:15 51:21

**district** 1:1,2,14 24:9 33:3 42:3 48:16 49:4 51:3 52:10 53:22 68:20 73:9 75:18 168:6 169:8,9 208:7 227:7
**districts** 52:11
**disturb** 45:24
**disturbance** 192:23
**division** 2:13 14:1 24:22 25:18,21 26:8 28:7 30:6 49:17 110:7,12 119:22,23 125:6,7 126:19 127:1,9,11 148:14 163:12 167:18 168:1 169:10,15,23 198:11,18,19,21 199:2,16,16 208:22,23 209:12 210:10 219:14,18 220:22 224:8 225:12,20
**DM** 9:5,9
**document** 10:12 12:20 13:20 15:15 15:16 16:18,23 17:2 20:15 24:3 30:7,13 31:3,10 31:12,13 32:1,23 33:9,12 37:4 47:15,19,23 48:15 48:19 50:3 51:17 52:1 56:7,8,20 57:25 58:13 100:9 107:4 108:17,20 109:2 115:24 117:2 124:6,9,21 129:12 134:11,12 134:21 135:2 136:2 148:19 150:1 151:5,5 156:17 161:10,20 173:12,13,22

190:17 198:25 199:20,20,23 200:2 202:14 203:11 211:19 214:19 217:15 218:7,11,12,12,13 218:13 220:7,16 228:13 240:7
**documentation** 125:25 147:16,18 167:22
**documented** 59:21 59:24 104:5 134:6 167:6,16
**documenting** 58:20
**documents** 9:2,4 12:2,3,8 48:20 92:6 109:18 111:4 123:25 130:17,21 131:16 134:9 135:6 143:11 148:2 151:16 216:1
**Doe** 43:10,16,16 45:20 54:19
**doing** 47:6 61:20 62:14 68:22 70:22 80:7,8 86:8 116:12 129:23 180:10 212:6,6 227:25,25 228:2
**dollars** 112:12
**dots** 114:23
**dozer** 215:8
**dozers** 215:19
**drafted** 50:5,7
**drain** 223:3,4
**draw** 93:21 120:12 123:16 176:22 234:6
**drawing** 16:6,20 17:18 20:21 21:1 21:4,5,7,9 94:1 121:25 130:8
**drawings** 16:16 113:13 115:9

116:14,25 140:17 161:11 163:2,3
**drawn** 120:15
**dredged** 107:22
**dredging** 34:4 36:4 36:11 107:12 108:4
**dress** 223:7
**drier** 215:6
**drive** 171:24 180:4
**driving** 36:24 66:12 67:5 69:3 171:18 180:5
**drop** 102:6 235:21 236:16
**drops** 236:18
**due** 78:19 113:12
**dug** 81:23 83:25 106:7 134:4
**duly** 6:22 242:6
**Dupre** 154:6
**DUVAL** 1:6
**D.C** 2:18

E

**E** 3:13 4:1,1,6,6 170:1 222:21
**ear** 226:18
**earlier** 95:3 219:12
**early** 25:22 119:25 195:25
**earth** 37:23 54:20 176:25
**easier** 10:4
**east** 16:1 19:3 26:16 32:4 40:2 43:11 103:10 105:7 107:11 112:2 149:13 150:12 152:19 155:4,20 156:12 156:14 199:10 207:9
**easterly** 149:17
**eastern** 1:2 206:24 213:14

**easy** 125:2 146:2 230:1
**EBIA** 105:10
**edge** 222:15
**effect** 34:10 36:20 180:7 184:3,23 195:15,15
**eight** 113:5 150:22
**eighth** 117:15 118:8
**eighths** 176:2
**either** 36:24 71:21 80:14 84:1 104:21 127:22 128:22 155:4 184:5 195:16
**elevation** 17:6,8,10 17:14 20:2 33:24 38:2,19 39:1,2,6,7 41:2,3 102:15 117:11 153:12 159:18,25 185:16 185:19,25 186:4 187:2 202:9 223:6 236:5,7 237:5
**elevations** 9:6 22:20 149:17
**eleven** 102:15
**eliminated** 77:3 102:5
**EM** 52:15
**embankment** 93:20 95:25 101:15 186:20 202:5 217:7
**employee** 28:18,19 113:14
**EMs** 49:23
**enclosure** 114:1 213:19,21
**enclosures** 213:16 214:3,7,8
**encounter** 7:9
**encounters** 168:10
**ends** 96:25
**energy** 215:18

GRIESHABER, Ph.D., JOHN

engage 50:8
engineer 25:3
  128:5 175:12
  176:20 216:17
engineering 14:1
  24:22 25:4,6,18
  25:20 26:8 28:12
  29:19 30:6 33:8
  49:16,24,25 50:1
  50:2,2,13,16,19
  50:25 51:3,16,22
  52:5 54:4 72:16
  78:2 96:20 109:15
  110:6,12 119:22
  124:4,5 125:6
  126:19 127:1,9,11
  148:11 164:24
  165:3,5,12,15
  166:17,20,21,24
  167:8,14,15,21,23
  168:14,17,20,24
  169:6 172:3,11,14
  173:11 175:3
  180:17 198:17,18
  198:21 199:1,16
  205:18,19,24
  208:8,10,22,23
  209:1 210:1,2,10
  210:20 219:12,14
  219:24 220:2,5
  223:19,24 224:16
  225:12,20
engineeringly
  77:23
engineers 1:12,14
  3:1,2 33:4,5,15
  50:6,8,9 56:23
  70:18 88:8 89:24
  90:4,8,11,11,18
  102:19 104:14
  109:21 140:23
  141:1 156:17
  160:2 175:13
  178:10 186:2
  191:21 198:20
enormous 79:15

ensure 97:6
entails 97:6
entering 188:11,19
entire 17:20 38:5
  152:17 185:2
  204:14 208:18
entirely 40:14
entirety 113:21
entitled 32:23
  72:16 84:17 96:21
  134:13
environment
  158:15,16,20,23
equal 237:24
equals 237:19
equipment 161:12
equipped 173:4
ERDIC 169:17
ERIC 3:18
erodibility 217:5
erosion 226:10
ESQ 3:9,10,11,12
  3:13,14,15,18,19
  3:20
ESQUIRE 2:4,5,6
  2:14,15 3:3
essentially 123:6
  149:16
establish 82:25
  180:21 225:14
established 49:14
  82:2,4 88:16
  205:15 208:4
establishing 183:16
et 18:8 109:18,18
  173:6,6
evaluate 51:9 53:8
  56:18 60:9,11,16
  61:2 69:24 70:10
  73:17 76:15 118:4
  136:21 147:2
  168:15 199:17
  206:3 207:9,11
  208:17 209:4
  212:11
evaluated 90:16

103:6 104:23
  166:10
evaluates 109:23
  115:24
evaluating 53:5
  58:9 60:5,15
  95:13 114:19
  169:1 199:13
  203:13,16,21,23
  204:2,13,14
  205:20
evaluation 46:3
  54:10 55:25 57:8
  70:25 71:13,25
  72:5 75:3,18 76:7
  80:20 88:10 90:19
  103:20 104:1,3,4
  117:4,24 118:23
  120:12 123:25
  124:15 126:9
  127:7 144:7
  145:14 146:15
  147:16 148:12
  164:24 175:4
  178:22 180:17
  182:22 203:7
  208:8,11 228:3
evaluations 124:22
eventually 66:19
  232:14
everybody 216:24
evidence 5:15
exact 94:13 95:2
  98:3
exactly 80:10 95:22
  116:12 183:19
  192:15 194:18
  210:21 225:13
examination 4:3
  6:24 10:6,18
  13:18 15:13 19:24
  24:1 27:13 31:7
  32:9 35:8 37:2
  43:4 45:19 47:1
  47:24 48:12 52:2
  53:20 57:20 58:21

65:25 66:7 67:20
  68:19 69:16,22
  71:9 72:10 76:3
  76:19 77:2,19
  78:22 79:9,21
  81:4,14 82:10,24
  88:6,24 93:24
  103:2 106:4
  107:18 108:25
  109:13 110:14,21
  112:16 116:7
  122:9 126:2 132:2
  132:23 134:2
  135:15 136:8
  140:14 146:22
  149:8 151:3,15
  152:5 153:13
  155:6,24 156:10
  156:25 162:14
  166:2 171:5 174:3
  183:21 190:19
  191:23 194:10
  195:18 196:12
  197:15 198:13
  202:1 203:25
  205:4 206:20
  212:4 214:4
  217:22 218:6
  219:20 220:18
  224:25 227:3,20
  229:21 230:16
  233:17 234:8,20
  240:12
examine 210:2
examined 6:23
  210:3
example 27:25
  73:14
excavated 93:13
  94:10 173:1
excavating 144:8
excavation 53:8,9
  55:7,13,16 56:4
  56:14 90:6 91:14
  110:24 117:8,16
  117:18 145:6

159:17 164:6
  168:12 169:3
  172:17,18,22
  173:1 188:20
  209:6,15 210:2,3
  213:6 221:6,15
  222:15
excavations 26:19
  47:6 51:9 53:5,23
  67:9 127:18
  178:11 221:19,25
  222:18
Excellent 209:3
excess 97:4,15
  101:8,16 104:10
  186:21 187:4,15
  195:13 196:8
  239:16
excessive 72:21
  141:11
exclude 187:6,22
excludes 187:23
execution 24:8
exercise 219:10
exhibit 4:8,9,10,11
  4:12,13,14,15,16
  4:17,18,19,20,21
  4:22,23,24 11:10
  11:16,21 20:16
  47:20 56:9 94:2,3
  100:9 109:4,6
  110:16,18 111:1
  115:7,11,13 116:3
  121:24 122:11
  124:16 130:6,9
  131:7,15 132:17
  133:1,4,5 134:8
  136:7 148:20,22
  151:8,11 153:22
  159:16 161:3
  162:13,15 178:22
  179:22 197:1,12
  198:5,8 204:25
  218:8,20 219:1,2
  220:8 234:13,16
Exhibits 154:23

GRIESHABER, Ph.D., JOHN

exist 29:11
existed 49:17 73:20
existing 17:7 37:9
  37:11 54:4 111:6
  113:6 222:19,24
  223:12,15
exists 13:5 73:3
  92:3
expect 111:25
  160:9 172:11
  179:21 199:15
expectation 147:11
  147:14 185:12
expected 178:21
  179:5
expects 111:13
experience 127:7
experienced 192:16
  195:5
expert 40:20 98:20
  98:22 189:5,6,23
expertise 50:9
  169:12
explain 9:8 73:13
  93:14 226:3 238:8
explaining 238:18
  238:20
explains 177:1
explanation 183:5
  187:21
explanations 183:3
exploratory 178:11
expose 173:1
extends 73:1
Extension 223:16
extent 100:3
  179:15
extract 180:6
extracted 173:2,5
extractor 173:5
extreme 202:21
extremely 72:12
  180:24
E-mail 218:14,15
  224:17 238:10
E-99 194:15,22

195:1
_____
F
face 42:18 187:13
facilities 113:23
fact 18:2 36:21
  38:17 55:14 56:5
  64:3 74:25 100:21
  102:5 103:17
  106:6 126:22
  131:15 147:19
  150:21 173:9
  196:8 199:24
  212:7 228:15
  230:4,21 232:10
  233:18 239:10,17
factor 39:16 40:25
  56:6 91:16 94:20
  96:15 120:20,22
  187:22,24 196:23
  229:11
facts 166:25 167:2
  231:10
fail 206:17
failure 15:23 38:8
  38:13 66:19,20,22
  104:5,8 185:14
  186:8,13,17,19
  187:5 188:23,25
  189:17,21 190:16
  191:20 192:15,15
  192:24 195:3,4,11
  195:13,23,25
  196:22,24
failures 15:18 67:7
  184:18
fair 7:16 23:1 33:11
  35:17 57:24 58:11
  60:21 61:15 62:5
  74:8 75:2 91:1
  93:8 114:18,18
  125:11 169:20
  183:22 192:1
  203:23 206:21
  228:12
FAIRBANKS 1:24

5:22 242:2,24
fairly 105:3
fairness 82:20
  121:6
fall 197:23 206:8
  206:16
false 230:3
familiar 16:15
  26:16 30:7 32:17
  73:5 97:24 98:1,2
  169:22 182:1
  184:8
familiarity 129:11
far 28:8 29:16
  38:24 49:14 66:12
  88:17 95:24 96:7
  114:15 176:15
  185:10 207:13
fat 128:12
fault 181:13,14,17
  182:4,9 214:18
faulting 181:21,22
  182:16
Federal 5:6 6:4
federally 48:10,21
  49:6
feel 73:16
feet 22:15 33:19
  34:5,6,13 36:4
  37:18 41:14 42:19
  43:11 45:21 54:20
  58:1 68:22 71:11
  71:24 73:14,15
  74:19,21 83:10,11
  83:13,15 113:20
  117:16,20 118:18
  119:13 121:7
  136:13,13,15,19
  140:20 142:3,24
  143:22 144:16,18
  144:19,22,25
  145:6,11 149:15
  149:18 150:14,22
  157:8 160:7
  168:12,13 172:10
  200:22 204:6,6,7

204:13 207:14
  208:3,6 209:6,6,8
  209:17,18,22
  213:7,12 221:25
  222:13,14 223:7,9
  223:11,14 237:9
fellows 46:10
felt 102:16
fence 202:15
  222:21 226:5,6
Fermin 171:17
field 16:13 165:6,9
  166:25 167:3,9
fifteen 209:7,7,18
fifty 142:8
fight 190:17 191:9
figure 14:16 15:7
  27:20 76:7,11
  131:14 139:14
  198:23
figures 120:20
figuring 202:17
file 16:11 124:3
  125:4,14,16
files 16:10 125:22
  127:4
fill 74:20 137:23
  142:18 158:17,17
  177:18 215:2,2
  216:24 217:4
final 131:18,21
  132:7,9
finaled 221:20
finally 96:6 135:13
find 49:22 60:22
  117:2,25 124:9
  136:4 189:22,24
fine 9:1 14:14
  33:25,25 35:12
  43:1 45:16 46:25
  49:2 51:12 53:13
  53:18 55:18 67:4
  78:8 83:9 96:16
  99:10 106:5,10,11
  126:6 133:25
  154:21 191:15

194:7 208:15
  209:3 211:2 213:4
  213:22 234:12
finger 150:9
finish 22:23 82:22
  83:19 176:18
  211:21 221:17
  223:2
finished 87:22
  115:17
finishing 233:10
first 6:22 7:2 8:5,16
  26:21 30:10 47:17
  50:1 51:25 58:1
  73:15 76:25 86:20
  110:22 117:7
  134:11 136:17
  141:19 150:1
  161:3 181:12
  184:14,16 185:2
  200:17 202:3
  203:11 206:2
  209:20 220:19
  223:17 242:5
Fisher 3:9 240:13
  240:14
fit 43:20 44:12
five 222:13
five-minute 139:15
flat 150:14
flavor 115:19
float 32:7,19
floating 217:16
flood 19:4 32:25
  33:13 36:10 42:6
  42:9,20 47:8
  48:10,22 49:6
  51:9 56:22 58:10
  59:17 70:12 71:8
  72:12,14 73:19,23
  83:3,10,12,16
  88:9 90:25 92:18
  94:7 116:1 118:25
  119:17 121:8,14
  140:21 141:3
  144:10 145:25

GRIESHABER, Ph.D., JOHN

151:6 160:3
168:16 172:7
173:17 180:7,12
180:14 181:18
182:10 183:7
184:4 188:7
199:18 205:11
207:13 208:6
228:7
**flooded** 112:11
**Flooding** 81:2
**floods** 80:21
**floodwall** 9:14
17:20 37:9,10,11
46:10 52:15 53:8
53:10 59:23 61:3
69:25 76:16 90:13
91:10 93:4,18,19
93:19 97:1 99:12
100:7 105:11
106:20 118:18
136:20 141:23
146:17 147:4
149:13 150:12
160:6 175:6
202:15,18,25
207:19 209:8,18
209:23 213:8
223:15 227:8,12
227:23 228:1,21
230:6 232:23
233:19 239:23
**floodwalls** 50:17
53:6,23 96:21
97:8 98:11,15
106:25
**FLORIAN** 2:6
**Florida** 17:22,23
17:24 20:9
**flow** 67:7 149:16
150:20,23 228:15
228:18,20 230:5,7
230:10,10,18,22
231:5,23 232:2,7
238:9,20,23
**flowing** 232:9

233:22 235:10
236:17 239:3,5,11
**flows** 231:23 232:3
232:15,17 236:18
238:3
**focused** 193:7
**folder** 124:3
**folks** 24:24 66:9
68:21
**follow** 40:22 42:5,7
52:22 174:16
**following** 149:12
188:14 205:20
**follows** 6:23 72:18
73:10
**foot** 99:13 177:15
203:1,3 215:16
237:8
**force** 101:24
237:12
**forces** 97:3 101:7
**foregoing** 241:4
**forget** 17:21
**forgive** 23:19 91:21
92:5 143:9 181:2
**forgot** 135:16,24
**form** 5:12 35:2,7
35:11 45:12,14
69:14 71:2 72:7
75:23 77:15 79:19
102:3 115:6
116:10 119:18
136:24 137:1
138:1,3,23 139:2
139:4 161:17,17
162:17,20 163:5,8
163:13,17,17,20
163:22 164:1
170:20 233:25
**formal** 30:5 126:23
**formalities** 5:8
**formation** 143:6
186:23
**formed** 39:12
104:11 186:19
188:7

**former** 113:11,13
113:16
**forms** 101:14 159:3
**formula** 94:25
**forth** 125:5,9 242:7
**forward** 19:21
147:4
**forwarded** 119:21
212:16
**found** 97:9 114:14
176:14
**foundation** 42:23
67:11 71:2 76:18
76:24 78:5,6,12
78:17 97:21
102:14 113:16
183:17 184:18
186:13,17 188:22
188:24 198:21
**foundations** 72:19
110:25 113:6,15
113:17 136:10
199:3
**founded** 113:19
136:11
**four** 25:16 26:4
184:18 203:21,24
204:2 214:8
**fourth** 83:15
**Franklin** 2:17
**frankly** 78:25
175:12 182:17
**freely** 223:4
**front** 57:19
**full** 102:14 104:12
186:22 187:15
188:18 196:10
**fully** 187:1
**function** 143:14
177:7 201:1
231:23 236:3
**fund** 182:19
**furnish** 109:15
**further** 18:5 71:24
141:25 147:14
178:6 182:25

203:2 242:13
**Furthermore**
178:16
**future** 35:24

## G

**Gagliano** 181:25
182:1,11
**game** 7:6 44:9
**games** 68:15
140:12
**Gannuch** 33:5
**Gately** 217:19,25
218:15 223:15
**gather** 179:3
**gathering** 71:22
**general** 96:22
136:19 154:16,18
183:2
**generally** 7:5 99:20
184:17
**gentleman** 31:16
**geologic** 105:7,12
105:18,19,20,24
151:18
**geometry** 74:13
**geotech** 26:12
28:13 110:13
199:7 213:20
217:18,18 220:23
221:8 223:22,22
223:23,24
**geotechnical** 24:21
25:3,4,14 26:10
28:8,10,12 29:10
36:18 48:6 110:8
110:9 119:20
125:24,25 126:14
126:21 127:13,14
205:24
**germane** 64:6
**getting** 52:23 76:4
76:13 83:20
111:23 140:11
188:18 192:20
217:8 219:13

229:17
**gist** 114:6
**give** 9:18 16:8 17:6
20:16 27:5 35:23
48:20 49:1 63:4
73:13 84:13,16
85:2 92:7 100:14
112:22 115:16
134:17 137:19
138:17 168:20
216:17 231:22
**given** 1:13 7:2
62:13 166:25
167:4 226:12
241:5,7
**gives** 17:7 20:18
152:15 216:4
223:8
**giving** 225:9
**GIWW** 153:3
**global** 95:8,10,11
95:24 119:4
123:14 147:25
156:20 160:21
212:19 213:2
**go** 11:4 14:18,25
15:4 17:5 18:5
19:21 21:12 24:24
28:9,13 29:10
30:5 34:7 45:17
55:10 56:2,17
60:17 61:8 62:25
68:24 80:2,8
82:11 91:19 92:4
92:16 93:6 94:12
100:3 102:6 109:9
114:13 115:1
118:11 119:13
133:22 136:13
139:17,22,23
141:22 145:6
147:4 149:20
152:8 159:14,22
169:15 187:19
194:16 197:4
199:2 212:14

GRIESHABER, Ph.D., JOHN

6/27/2008

Page 253

| | | | | |
|---|---|---|---|---|
| 215:17 235:22<br>236:8 238:24<br>**goal** 85:2<br>**God** 24:20<br>**goes** 21:23 66:13<br>79:16 80:2 103:22<br>120:19 125:9<br>130:18 150:21<br>154:1,7 163:20<br>184:25 199:5,7<br>200:4 202:3,20<br>205:7,13 232:16<br>236:8 238:2<br>**going** 8:7 11:19<br>12:3,16 18:21<br>20:23 27:2,3<br>29:16,22,25 37:11<br>41:22 44:8,16,21<br>45:23 46:11 49:15<br>58:2 63:4,16,18<br>77:8 80:17 81:12<br>84:16,23 85:17<br>86:25 87:5 88:2<br>92:23 96:2,16<br>102:7,8 107:16<br>110:15 114:22<br>117:6 118:2,4,13<br>120:5 132:3<br>134:10 136:15<br>137:23 138:10<br>140:3,4 141:22<br>142:10 143:2,3<br>146:4 149:11<br>164:23 168:11,25<br>170:7 171:25<br>173:10 174:25<br>181:14,15 185:7<br>194:4 198:10,22<br>208:14 217:6,10<br>228:18,20 229:3<br>229:24 230:5,5,7<br>230:22 231:6,6<br>232:12 233:22<br>234:6 235:10,13<br>235:14,22 236:5,8<br>236:9 237:12 | 238:5,7,9<br>**GOLDBERG** 3:18<br>**good** 6:25 23:13<br>53:15 65:24 70:5<br>88:1 91:1 124:4<br>155:1 157:7<br>213:24 231:20<br>**goodness** 231:21<br>**gotten** 148:5<br>**governing** 41:5<br>**government** 6:7<br>7:10 8:6,11,20<br>13:22 197:2<br>214:16 218:10<br>**graces** 213:25<br>**grade** 222:24<br>**grand** 176:1<br>**gravel** 107:5,5<br>159:5<br>**gravity** 98:23<br>**great** 6:16 156:14<br>194:22<br>**greatly** 97:15<br>**Grieshaber** 1:13<br>6:12,19 15:15<br>20:1 22:12 31:9<br>47:2 51:14 60:6<br>66:1 82:3 123:6<br>218:3 227:5<br>229:25 233:18<br>235:23 241:3,11<br>**ground** 43:17<br>45:21,23 81:25<br>93:10,12,15,16,17<br>94:6,11 120:21,23<br>120:24 121:4<br>124:18 141:9<br>142:25 143:23<br>144:16 173:3<br>179:19 194:25<br>235:4,5 237:1<br>239:1<br>**groundwater**<br>143:24 228:15,18<br>228:20 230:4,7,9<br>230:21 232:2,6,9 | **group** 26:18 107:25<br>129:19 150:7<br>162:22,23 164:5<br>164:24 165:8<br>217:17 229:7<br>**grout** 226:14<br>**growth** 181:13,17<br>182:4,9<br>**guaranteeing** 228:6<br>**guess** 8:9,16 21:4<br>25:22 27:15 37:15<br>67:15 70:3 72:8<br>75:24 102:18<br>103:3 107:15<br>125:3 130:19<br>151:23 184:25<br>185:8 207:6,8<br>217:3 227:21<br>**guidance** 48:7,9,20<br>49:5 53:1,3 221:7<br>221:8 226:12<br>**guide** 54:3 55:24<br>58:7 61:16 221:11<br>**guideline** 49:4<br>**guidelines** 42:4,7<br>49:13 50:13,16,19<br>50:22,25 51:16,19<br>52:5 54:3,5 57:16<br>**guides** 50:3 57:7<br>**Guillory** 29:2,14<br>126:13,21 129:22<br>130:1 148:8,16,18<br>165:8 167:19,24<br>168:2 197:17,19<br>198:2,7,12 218:14<br>**guy** 28:21 70:16,21<br>89:3 92:9 105:11<br>127:6 129:24<br>148:9 223:24<br>227:22<br>**guys** 46:11 57:8<br>58:24 59:2 61:1<br>70:10 79:4 88:17<br>89:13 150:2<br>**G-R-I-E-S-H-A-...**<br>6:13 | **H**<br>**H** 4:6<br>**half** 8:16 158:3<br>**halfway** 146:19<br>**hammer** 176:7<br>**hand** 7:22 52:1<br>202:22 219:19<br>222:24<br>**handled** 164:7<br>**hands** 168:9<br>**happen** 22:11<br>44:19,21 62:19<br>83:24 125:17<br>**happened** 8:22<br>62:22 103:5<br>194:17,18,23<br>**happening** 8:23<br>**happens** 28:1 98:18<br>120:19 148:4<br>178:23 214:2<br>**happy** 45:3 63:19<br>**Harbor** 32:23<br>**hard** 20:25 31:20<br>35:18,20 84:22,24<br>87:6 201:24<br>**harm** 227:23 228:5<br>**harms** 69:9<br>**Harry** 171:16<br>**hazard** 117:8<br>**hazards** 118:5<br>**head** 20:5,14 33:23<br>38:3 48:23 49:1<br>102:9 104:12<br>123:18 175:21<br>187:14,15,18<br>226:11 231:23,24<br>231:24 235:3,8,16<br>236:3 238:7<br>239:16<br>**hear** 67:22 85:21<br>95:16 118:8<br>**heard** 83:7 175:13<br>181:24<br>**hearing** 179:11<br>**heavy** 192:13 | **heck** 35:4 111:25<br>**height** 72:2 74:23<br>91:5 233:20<br>236:20<br>**help** 15:10 30:6<br>43:5 70:8 112:17<br>152:22,23 155:1<br>156:1 167:10<br>169:14 182:19<br>**helps** 218:19<br>**hereinabove** 242:7<br>**hereto** 5:3 11:11,17<br>11:22 47:21 94:4<br>109:7 110:19<br>115:12,14 133:6<br>148:23 151:12<br>197:13 198:9<br>218:21 234:17<br>242:15<br>**hey** 46:10<br>**high** 62:8,16 66:9<br>66:10 67:6 79:1<br>79:14 101:12,22<br>101:24 153:18<br>236:1,17 238:3,5<br>**higher** 80:2 153:11<br>154:7 188:17<br>231:24 232:23<br>239:1,17,21<br>**highest** 153:17<br>**highlight** 22:3<br>149:19<br>**highlighted** 17:10<br>22:2,5 108:17<br>228:14 239:6<br>**highlighting** 22:8<br>**highly** 97:18 102:9<br>102:25<br>**hire** 215:9<br>**hired** 108:11,12<br>**history** 49:15<br>153:16<br>**hit** 187:14<br>**hitting** 180:14<br>**HOGAN** 3:12<br>**hold** 7:21 82:3 |

GRIESHABER, Ph.D., JOHN

holding 122:16
hole 43:10 54:24
56:18,25 57:4
59:9 73:14,18,22
73:23 74:2,18,19
75:16,16 76:13,16
77:6,7,9,13 78:3
81:5,6,9,16,17,17
81:20,22 82:25
83:2,11,13,15,23
83:25 84:11 88:9
89:3,17,21,24
90:6,13,20,25
91:5,8,23 92:14
92:15,17,23 93:13
94:10 96:3 101:19
101:25 103:7,22
104:20,21,23,24
104:25 105:25
112:20 117:24
118:16 124:16,23
124:25 125:1,2
128:3 132:25,25
133:10 134:3,6
143:2,5 145:7
159:23,25 160:13
166:4 168:10,15
169:1,2 175:10
177:1,7 188:13
199:17 202:20
203:2 204:10,15
204:19 205:5
206:4,7,16,17
208:2,9,18,18
217:13,14 219:3
225:10 237:12,13
holes 106:7 114:20
117:4 120:16
123:8 135:23,24
142:19 144:8
166:5 177:3,5
180:1,18 208:5
225:16,18,24,25
228:3
holler 7:25
hope 99:18

hopefully 30:1
horizontal 97:13,14
194:25 221:18
222:2
hour 8:16
hours 8:17 15:7,7,7
house 29:19 130:3
HPO 6:20
HTRW 26:20
107:20 108:3
huh 67:15 148:25
155:11
hundred 140:16
hurricane 23:5,21
24:9,13,15 25:13
41:23 74:1 101:11
101:23 106:9
183:8 185:22,24
233:5
hurt 80:17
hydraulic 173:4
hydraulically
97:13
hydrostatic 72:21
186:22 187:12
188:18 196:10
239:25
hypothet 140:1
hypothetical 36:14
137:3,24 138:6

I
idea 184:5 211:1,2
ideal 178:14
identification
11:11,17,22 47:21
94:4 109:7 110:19
115:12,14 133:6
148:23 151:12
197:13 198:9
216:5 218:21
234:17
identified 28:10
148:20 149:1
159:15
identify 6:6 15:1

48:1 156:3
identifying 19:2
ignorance 47:10
ignore 76:22 77:1
88:16,17
ignoring 77:3
IHNC 9:14 16:1
32:8,20 83:3,10
83:12,16,17 153:1
153:9 160:8
231:24
III 3:13
III-15 40:17
III-3 37:5 40:17,21
III-7 40:11
illogical 238:13
immediately 7:22
142:10
impact 53:25 56:25
59:9,17 60:18
61:6,13 73:19
76:2,6,8 90:13,24
91:3,8 92:17
94:24 102:14
115:25 118:24
119:17 136:21
141:3 144:17
145:25 147:3
160:3 168:15
169:3 173:17
175:6 180:25
impacted 91:15
94:19
impacting 55:16
228:7
impacts 55:14
74:12,25 144:9
impervious 72:22
97:12
importance 88:14
important 69:23
70:1 72:5,9,13
75:15,17,25
impossible 102:18
102:20 103:24
238:15

inaccurate 150:11
inch 176:2,5
inches 143:19
include 25:9 119:3
171:15
included 167:21
200:1
including 105:9
inclusive 221:5
incomplete 137:3,6
138:5,8,16 139:7
139:11,25
inconsistent 179:21
increase 187:10,11
indicate 163:8
191:19
indicated 13:20
21:3 220:14
indicates 117:19
118:16
Indicating 21:25
222:9
indication 128:14
164:20 170:3
177:16
individual 28:11,17
29:19
individually 114:16
individuals 29:20
induced 196:9
inducing 66:12
industrial 19:3
32:4 105:8 107:11
112:2 113:11
199:10 232:24
infiltration 142:22
information 31:12
89:6 91:23,25
93:1 114:3 123:21
161:4,5 167:10
198:3 218:17
initial 164:9 199:20
initially 114:15
178:15
initiated 195:12
initiation 117:11

injected 104:11
injection 187:11
inner 32:23 187:3
input 219:16
220:23
inquire 14:4
inserted 196:11
inside 102:16
instability 97:5
101:9
installation 33:18
34:2
installing 36:8
instantaneously
176:6
instruct 27:4 67:12
instructing 64:19
instruction 62:13
68:21
instructs 7:14
integrity 42:9
53:10 95:21 181:1
intended 89:17
interest 52:4
interested 140:24
141:2 242:15
interesting 193:18
interface 101:15
interfere 19:13
interlock 230:15
interlocks 230:19
internal 174:4,6
International
26:18 108:1
162:23
interpretation
51:19
interpretations
28:15
interrupt 149:16
150:20,23
interrupting 82:17
interruption 82:14
146:21 156:24
intimate 237:21
investigation 142:1

GRIESHABER, Ph.D., JOHN

**involved** 168:24
  169:8,19
**IPET** 30:17,22
  104:5 154:19
  184:9 191:17
**isolated** 143:5,9
**issue** 36:21,22 67:9
  101:10,13 142:13
  143:25 182:16,23
  190:12 191:6
  223:21,23 224:1
  226:8
**issues** 27:22 107:20
  168:25 169:1
  221:6 223:24
**Item** 18:6
**items** 113:10
  171:15 205:20
**I-DEP** 3:17
**I-wall** 38:24 43:12
  99:17 153:11,12
**I-walls** 40:2 98:9
  98:10,13,19 99:1
  99:3,4,7,9,25

**J**

**January** 23:3
**Jean** 218:14,16
**JENNIFER** 3:3
**jeopardize** 53:9
  72:13 206:18
**jeopardizing** 74:3,7
**Jerry** 42:13,14,16
  42:17 49:16 199:5
  199:6
**Jim** 169:21 197:17
  198:25 199:5
  217:19 218:15
  220:3 223:15,20
**JOANEN** 2:5 30:16
  30:21 155:13,22
  229:6,10 234:14
**job** 108:2 185:18
  208:24 209:2
  210:20 212:6
**jobs** 29:21,23

**Joe** 18:5 27:2 31:2
  35:3 108:20
  109:10 121:24
  130:23 131:4
  132:16 133:4
  153:1 170:14
**John** 1:12 6:12,19
  43:10,15,16 45:20
  54:19 241:3,11
**join** 133:15
**Joseph** 1:24 2:4
  3:13 5:22 6:25
  242:2,24
**Jourdan** 209:8
  213:8
**journal** 175:15
**JR** 1:24 5:22 242:2
  242:24
**judge** 1:6 14:10
  63:8
**jump** 163:24
**June** 1:16 241:25
**JUSTICE** 2:12

**K**

**Kansas** 48:16
  51:17 52:7 56:8
  56:17 57:7,15
  58:8
**Katrina** 1:4 23:6
  23:11,21 24:13
  25:13 43:13 73:21
  106:9 183:10
  184:19
**keep** 16:11 37:22
  64:13,14 78:12
  144:20
**kind** 6:5 11:13 46:2
  53:11 69:4 70:9
  75:19 103:5 104:9
  108:4 117:23
  124:6 137:22
  142:12 144:6
  156:16 159:25
  175:15 178:20
  179:4 180:16

199:14 222:10
**kindly** 17:1
**kinds** 111:4
**Kingman** 33:7
**KITTO** 3:19
**knew** 114:13
  120:15 212:11
  234:9
**know** 7:5 8:18,21
  10:10 12:10,14
  13:1,3 14:22 16:7
  17:13,16,17 18:2
  18:15 19:11,19
  20:1,5,6,11 22:11
  22:13,22,25 23:18
  26:19,19 27:15
  29:4,24 30:3 31:5
  32:14,17 33:16,17
  33:23 34:1,8,20
  35:4 36:4,24
  40:20 42:11,14
  46:8,9 47:2,4,9,14
  49:8,15,20 51:25
  53:7,10 57:3,23
  57:24,25 58:5
  61:1 65:6,7,8,14
  70:2,7,22,23
  73:25 75:25 76:20
  77:25 78:11 81:12
  81:15,16,17 82:6
  85:24,24,25 86:1
  87:4 92:1,22
  95:18 98:18 100:7
  103:16,18 105:4
  106:5,6,12 108:17
  108:24 110:10,11
  110:13 111:2,24
  111:25 112:11,23
  112:23 116:11,16
  118:3 119:20,25
  120:1 121:17
  122:16 123:9
  125:3,8,12,22
  126:4,19,24
  129:10,11,13
  131:7 133:11,18

136:1 140:17,18
  140:20,20 142:7,9
  142:11,11,12
  147:8,10,21,24
  148:6,7,9 150:18
  152:6,13,14
  155:23 157:8
  159:21,22 165:2
  165:11 168:11
  169:21 171:1
  174:11 176:12,14
  179:8 180:10,22
  181:16,20,21,22
  182:3 183:1,16,19
  190:5 192:8,8,8
  197:19 200:11
  202:11 204:17
  205:18 206:12
  207:22 210:8,25
  211:11,15 214:2
  215:8 216:23,24
  218:4,24 220:20
  224:9 225:22
  226:6,23 227:23
  230:3 233:9 239:7
**knowing** 114:15
  199:2
**knowledge** 18:19
  23:7 31:11 35:18
  43:2 57:15 111:13
  114:9 127:6 191:4
  193:25 206:12
**knowledgeable**
  18:17 29:21 31:16
  34:9
**knows** 31:18
  168:13 194:1
  229:15
**K2** 1:5

**L**

**L** 5:1
**lab** 169:17
**labor** 109:16
**laboratory** 215:12
**LABOURDETTE**

3:3 151:9
**Lack** 78:5
**lacks** 78:16
**Lafarge** 240:15
**Lake** 156:9 231:25
  237:5
**land** 71:19 72:23
  73:3 137:9 199:10
  232:22 233:19
  239:18
**landward** 73:1
**Lane's** 39:14 40:24
  96:8
**language** 132:4
  164:25 193:15,23
**large** 117:15
  179:15
**late** 25:22
**lateral** 32:25 33:13
  189:17,20 190:15
  192:24
**law** 5:7 86:18,23
**laydown** 75:11
**layer** 100:19,22
  101:3,20 102:1
  103:23 240:2
**layman** 179:9
**lays** 22:15
**lead** 66:19
**leakage** 230:15
**Leake** 1:15 3:4
  6:20
**learn** 29:25 36:2
  119:6 140:22
  183:23 233:11,12
**learned** 213:25
**leave** 74:19 131:3
  190:17
**lecture** 86:17 87:11
  176:23
**Lee** 29:2 126:13,20
  129:21 130:1
  148:17 165:8
  167:18,24 168:2
  198:11 218:14
**leeway** 27:5 84:14

GRIESHABER, Ph.D., JOHN

84:17 85:3
**left** 113:10 144:15
158:10 202:21
223:22
**legend** 157:21
158:2,11,20
**length** 17:20 20:8
20:13 136:3
152:18 204:19
**lengthen** 36:25
**lengths** 9:6
**lengthy** 33:9
**letter** 218:17
**letting** 147:4
171:12
**let's** 13:14 14:25
22:3 25:19 30:10
35:16,17 43:8
44:5 45:17 65:1
69:23 78:20 81:5
81:9 82:11 89:12
98:6,14 99:15
100:3,5 101:5
118:15 120:8
122:14 124:8,12
124:13 125:2
132:6,24 136:4
139:22 147:22
155:8 156:12
159:14 161:16
166:21 190:17
202:2,16 203:1
212:14 218:7
220:7 226:25
234:12
**levee** 66:19 68:23
69:2,5,11 72:24
73:1,2,4,15 75:17
80:17 106:9
153:10 155:2
185:1,14 189:1
190:2,23 202:4
203:18 204:7,14
208:3 209:9 213:8
217:7 227:7,24
228:1 237:6

239:14,20
**levees** 25:10 26:14
50:14 62:15 72:17
72:20 185:2,9,15
**level** 117:13 169:12
233:2 236:10
**lift** 134:8,13 135:18
159:14 161:9
169:25 171:8
178:12,13 179:2
**lifts** 177:15 215:7,7
216:18
**lightly** 80:21
**limit** 128:18
**limitation** 128:22
**line** 21:4,7 27:3
29:8 93:10,12,15
94:6,6,11,17,18
94:22 104:13
119:14,15 120:2,4
120:6,12,15,21,23
120:25 121:6,8,18
122:11,12,19
123:4,16 124:10
124:18,19,20
144:2 164:21,22
165:1,14,16 166:7
166:8,9,16,19
167:2,13,22
168:10 176:18
179:20 194:25
200:19,20,21
201:1,5 202:16
204:7 206:6,23
207:3 209:11
210:24,24,25
211:1,4,6,9
221:11 225:2,4,9
239:1
**link** 239:25
**liquefaction** 66:12
66:16,18,22 67:3
67:6 69:10
**list** 58:19 62:25
63:16,18,22,24
64:3 139:24 179:1

224:2,3,5
**listed** 27:7 64:1
**listen** 79:13
**listened** 182:11
**lists** 214:20
**LITIGATION** 1:5
**little** 52:10 57:3
116:17 154:7
215:5,5 216:16
**lives** 158:24
**loaded** 37:25
**loading** 25:5 33:21
36:18 55:4,8
70:13 74:2 91:20
**loads** 25:7 95:19
**local** 97:22 172:4
208:7 227:8
**located** 33:6 137:9
140:16 172:25
183:9
**location** 20:8 22:16
34:13 41:12
100:12 107:17
136:22 151:24
152:12 160:5
181:17 182:9
183:7 184:5 204:4
204:13
**locations** 152:9
186:12
**lock** 32:2,8,20,24
33:19 34:13 37:6
154:25 155:12
**logical** 123:5
**long** 8:14 44:7,17
58:5 68:15 85:14
113:20 119:12
120:3 121:17
136:13 180:10,13
204:9 218:23
224:15 231:22
235:12
**longer** 177:6
**look** 15:21 17:2,5
22:14 28:14 29:17
29:20 31:9 36:17

36:20 38:16 40:23
44:5,7 55:17 58:4
68:12,14,24 74:4
74:9,14 75:4,20
77:7 78:2 80:6,8
80:15 93:6 95:25
114:5 115:7 116:9
116:19 119:10
120:6 121:13
124:14,21 125:4,4
125:13 127:2,16
127:17 129:14
132:3,6 141:22
145:15,19 149:12
149:24 152:23
155:8,8 156:21,22
157:25 158:1,1
174:7 197:20
201:8 204:23
208:12 211:25
224:9
**looked** 32:11 58:20
90:12 91:7,12
116:6,22 117:25
146:6,8 147:19
182:14,24 209:2
**looking** 10:12,20
37:4,24 38:4,9
39:19,22 40:11,11
71:15 108:23
115:18 152:7
155:17 156:4
171:6 177:12
182:17,18,25
187:17 197:10
204:3 221:7
**looks** 20:23 56:15
100:8 156:6
198:15
**loose** 217:10
**Lord** 231:20
**lose** 95:21
**loss** 187:14,19
235:16 238:7
**lost** 102:8 146:19
146:19

**lot** 31:18 35:13
102:8 104:5
111:16 112:7,10
121:21 157:14
176:10 203:2
229:19 233:11
**Louisiana** 1:2,16
2:8 3:5 5:24 6:21
32:25 33:4,7 47:7
242:4
**lousy** 114:3
**low** 180:24 232:23
233:2,20 235:18
235:25 236:8
**lower** 43:11 73:20
75:17 99:17 100:8
101:10 106:8,20
106:25 118:11
149:17 181:18
182:9 186:7
194:18 195:3
231:24 233:2,20
238:16
**LS** 173:3
**lumped** 100:23
**lunch** 151:2 225:17
**L-A** 96:9
**L-A-N-E** 96:10

**M**

**M** 2:4 4:1
**magistrate** 85:20
**maintain** 16:10
120:21
**maintained** 97:7
**majority** 24:20
**making** 56:1 80:18
**man** 79:14 192:13
194:11 211:9
**Management** 229:7
**mandate** 160:1
**mandatory** 76:14
76:14 77:9,12,20
77:21 79:3 80:13
80:14,19 81:6
88:15,20 173:20

GRIESHABER, Ph.D., JOHN

173:24
**manual** 9:10 49:25
50:1,2,3 51:22
52:5 72:16 96:20
98:10 99:3,8,25
**manuals** 49:24
54:5
**manufacturers**
161:13
**map** 22:14
**March** 24:9
**marine** 112:19
113:7,11,14
124:23 160:13
210:15 213:13
**mark** 11:1,19
130:25 218:7
220:7 234:12
**marked** 11:6,8,10
11:15,16,21 13:21
24:3 47:16,20
94:2,3 109:6
110:18 115:11,13
130:8 133:5
148:22 151:11
154:22 197:12
198:8 218:20
234:16
**markings** 201:22
**married** 226:21
**marsh** 100:18,21
101:20,25 103:23
141:25 157:7,10
157:21 158:11,15
**mass** 113:17 136:9
**match** 21:3,6
**material** 67:11
71:5,6 94:16
113:23 127:22
128:1,2,12 158:21
179:12,12,13
215:1,5 217:9
226:15
**materials** 75:12,13
97:9,12,21 106:21
107:4,6 109:16

128:8,11 161:12
229:7
**math** 124:1
**matter** 71:20
141:17 157:14
158:13
**matters** 157:12
211:11
**McDonogh** 200:12
210:15 213:12
**mean** 11:24 31:15
34:18 38:11 44:8
44:16 46:9 75:15
104:24 105:23
116:10,21 117:12
120:11,14,25
125:21,23 127:25
128:18 150:4
151:23 153:6
157:5 164:23
166:19 167:18
174:9,12 189:18
189:19,21 192:25
202:9 203:10
204:4 208:22
209:25 214:24
217:23 221:5
230:7,14 231:5
**Meaning** 174:8
**means** 9:9 35:11
54:12 77:9 158:3
158:6 159:10
214:25 233:22
237:4 238:4
239:21,21 240:1
**measure** 198:1
**measured** 223:11
223:14
**measurements**
117:12
**measures** 97:6,17
235:8
**MEAUX** 3:23
**mechanical** 215:18
**mechanics** 176:24
**mechanism** 66:21

187:5 195:4
196:22
**meet** 8:10,14
**meeting** 219:14
**memo** 199:22
210:9 212:16
225:19 228:19
238:23
**memorandum** 10:8
154:17 156:8
198:17
**memory** 153:15
**men** 179:1
**merit** 71:25 141:25
**merits** 88:10
**met** 185:18 221:6
224:15
**Metairie** 33:7
**method** 192:14,15
195:13 239:22
**methodology** 94:14
102:4 186:19
191:19,20 215:8
**methods** 36:23
216:11
**Miles** 198:15 199:1
199:5 205:17
208:17,21 210:1,6
220:3
**mind** 9:24 11:1
22:3 48:1 75:10
117:7 151:8 171:9
176:18 206:13
231:15
**mindful** 76:1,1,6
**mine** 128:2
**minimum** 38:25
39:16 40:25 56:6
119:14 120:2,3,5
120:23 124:19,20
164:22 165:1,14
165:16 166:7,8,9
166:16 167:1,13
200:20,21,24
201:1 223:6 225:2
225:4

**minus** 17:15
**minute** 211:19
**minutes** 76:9
**misleading** 137:4
138:5,17 139:7,12
139:16,25
**misread** 211:24
**missing** 218:2
**Mississippi** 38:1
79:2 198:20
**mistake** 149:3,7
**mitigate** 36:22
**MMG** 229:5,8
**mod** 111:5
**mode** 104:8
**modes** 104:4
**modification**
111:10
**modifications**
113:4
**modify** 56:3 93:12
**moisture** 215:3,4
217:11
**moment** 85:8 120:9
161:16
**Monday** 129:24
130:1
**money** 112:8,10,13
**Montegut** 169:21
197:17 198:2
**months** 25:16 26:4
**morning** 6:25 7:9
144:8 165:20,22
167:5 208:5,20
212:18 225:17
**mouth** 211:17
**moved** 102:13
**movement** 67:11
183:3
**MRGO** 1:7 153:2
**multiple** 126:11
**myriad** 126:4
128:10

_____
**N**
_____
**N** 4:1,1,1,6 5:1

**name** 6:25 169:22
217:25
**named** 6:21
**National** 213:20
**Nations** 214:16
**natural** 178:4
179:6 217:11
**naturally** 215:3
**nature** 28:10,13
110:8
**Navigation** 32:24
**NCS** 197:3 218:11
218:11,12,12
219:2
**near** 17:19 41:22
48:9,21 49:5 53:5
53:8,23 88:9
134:4 181:20
217:4
**necessarily** 52:9
175:3 231:11
**necessary** 14:16
34:12 37:21 41:21
103:20 168:24
**necessity** 36:8
**need** 7:20,21 14:25
18:15 33:8 37:25
43:16 47:3,14
63:21 70:10 73:17
75:20 84:21 89:6
91:22 120:2
123:18 136:20
143:5 145:14
152:10,13 178:9
226:4
**needed** 144:6
169:14 224:14
**needs** 43:18 46:8
89:9 118:22
**negative** 144:9
147:3
**negatively** 59:17
73:19 226:11
**net** 95:17
**new** 1:14,15 2:8 3:5
6:20 24:8 32:2

GRIESHABER, Ph.D., JOHN

33:3,4 42:3 49:3
59:3 62:4 68:21
93:12 94:12
169:13 185:11
198:20 208:7
219:7 220:16
**news** 62:12 68:24
**NGVD** 223:8
**nice** 22:4 131:10
**Nine** 73:20 75:17
99:17 100:8
101:10 106:8,20
106:25 182:10
186:7 194:18
195:3
**nine-year-old**
140:13
**Ninth** 43:11 181:19
194:23 195:23
238:16
**NOD** 6:20
**Nods** 7:7 109:22
113:9 115:5
155:12 159:9
163:23 204:11
205:6,23 209:10
222:16,20 223:1
**non** 175:9
**normally** 152:8
167:17
**north** 16:1 17:24
19:25 105:10
154:25 186:10,10
190:24 194:19,23
195:3,24 213:20
**northern** 186:11
**note** 23:3 108:16
197:25
**noted** 71:4 77:17
195:1 196:6
210:14 241:13,15
**notice** 5:7 6:2,8
11:7 27:23 99:1
**notify** 168:13
**November** 23:2
**number** 9:19,21

11:9,15,20 14:15
14:17,25 15:6,8
18:6 21:7,10 24:4
33:1,13,14 36:22
47:16 56:9 71:14
71:16,17 96:20
105:6 109:5,9
111:1 115:10,16
122:4 124:17
127:18 130:6,9,13
130:15 133:1
148:20 151:8
153:17,17 154:10
154:23,24,24
156:8 159:16
161:3 162:3,13,15
170:16 182:12
202:14 212:15
214:13,20 218:2,8
224:22
**numbered** 113:2
218:11
**numbers** 20:10,12
20:19,20 30:20
31:1 109:22
132:18 197:2
198:6 219:6
**numerous** 175:19
191:18

--- O ---

**O** 4:1 5:1
**oath** 5:25 6:23
**object** 7:11 27:2,12
35:2,7 36:14
45:12,14 69:14,19
71:2 72:7 75:23
76:18 77:15 78:5
79:19 87:24 102:3
112:6 133:9
136:24 138:1
174:2 183:12
231:18
**objected** 194:5
**objecting** 35:11
64:10,13

**objection** 7:12
23:23 34:16 38:21
42:23 43:20 45:5
45:7 46:14 51:24
57:14 58:13 62:24
63:5 66:5 76:24
79:7 80:24 81:11
82:17 88:23
107:14 110:3
111:19 125:19
133:15 139:1
140:7 147:20
189:3 190:7,21
191:15 192:19
193:21 195:7,10
196:4 206:11
227:15 230:13
231:9 233:25
234:3
**objections** 5:11
35:25 45:10 63:8
63:12 64:18 85:14
138:22
**objective** 66:3
**observed** 194:21
**obtained** 127:22
**obviously** 27:17
32:2 41:20 53:22
56:1 85:18 139:1
139:10 170:3,7
172:1 179:18
188:16 203:16
209:21 220:24
222:4 224:13
**occasions** 8:15
182:12,12
**occurred** 124:2
183:8,10,24
184:19 185:2
**occurring** 215:3
**October** 134:14
**offers** 183:5
**office** 3:2 24:9,12
24:14 42:18 48:16
49:3,4 51:1,4,18
53:22 58:8 59:3

62:12,13 68:20
69:2 73:9,16
75:18 78:25 119:8
168:6 169:10
172:4 205:19
208:7 221:23
**officer** 164:4
**offices** 1:15
**office's** 199:13
**officiated** 5:24
**off-site** 127:23
**oh** 68:5 77:9 86:5
102:21 106:12
120:24 122:16
129:16 154:1
158:6 162:11
165:23 170:22
224:3
**okay** 7:15,22 8:10
8:14,18 9:8,16
10:16 15:24 16:5
16:10,18 18:3
20:11,15 21:2,9
21:20,21 22:7,11
22:16 23:1,9,13
23:17 24:6,17
25:9,12 26:25
27:19 29:7 33:22
34:9 35:10,16,17
36:7,16 37:24
38:15,23 39:18
40:1,18,21 41:4,5
41:13 42:2 43:1,7
43:9,14,15 44:5
44:23,25 46:1
48:2,16,17 49:10
50:5 52:3,5,12,16
53:13 54:22 55:5
55:9,18,18,21
56:7,10,12,19
57:2 58:2,4,19,22
58:23 59:1,21
60:3,5,12,23 61:5
61:15,21 62:7,21
67:5 70:21 71:18
71:22 72:3 74:5

74:17 75:2,14,20
77:1,3,8,18,20,24
79:12,23 81:12,22
81:24 83:2,5,19
83:22 84:9 85:8
86:23 88:3,10
89:11,16 90:3,6
90:10,14 91:1,19
92:20 94:5,9,21
95:5,23,24 96:4,5
96:11,13,16 97:8
98:4 99:5,10,14
99:23 100:10
101:18 102:21
103:1,3,19 105:2
105:12 108:5,14
108:24 110:20,25
112:21 113:1,8
114:6,7,21,25
116:6,20 117:19
117:22 118:14,15
118:21 119:1,5,17
119:24 120:9,10
120:14 121:9,10
121:16 122:14,18
122:19 123:3,16
124:8,11 126:3,11
127:5,17,20,24
131:16,20,22
132:7,13,14 134:4
134:5,8 135:22
136:16 140:11
141:13,20 142:20
143:16,16 144:13
144:14 145:3,5,10
145:12 146:7,8,19
147:1,7 148:6,8
149:15,22 150:20
152:15,19,22
154:11 155:20
156:12,14 157:4
158:8,23 159:10
159:14,19 160:9
161:15 162:17,19
163:7 164:11,14
165:18 166:15,23

GRIESHABER, Ph.D., JOHN

167:1,5 168:19
169:20 170:2,6,12
171:10 174:9
175:8,14 177:9
178:5 179:3,20
180:4,23 181:11
181:16 182:7,21
183:22 184:11,15
184:20 185:4,18
186:2,6,10 187:17
191:24 192:10,14
194:7,16 195:2
196:7,15,20,25
197:4,14 198:12
198:22,25 199:1,2
199:21 200:5,8,14
201:4,9,16 202:19
203:6,9 204:2,12
204:17,22 205:3
205:10,14,21,25
206:1 207:4,8,25
208:15 209:3,19
210:5,11,13,18,19
210:22 211:2,8
212:5,14,22
213:10,18 214:6,7
214:12 215:24
217:15 218:22
219:14,15 220:5
220:16 221:10,24
224:11 225:15
226:1,2,16,25
227:19 228:8,9,23
229:4,13,23 230:1
230:3 231:22
234:18,19 235:2,7
235:13,17,20
236:3,12,24
237:18,20 238:1
238:22,23 239:10
240:5
**once** 7:8 172:2,9
192:19
**ones** 155:7
**one-size-fits-all**
71:16 80:11

**one-ton** 173:3
**ongoing** 83:22 89:1
89:11,14,16 123:9
**on-site** 127:22
**open** 48:23 74:19
107:4 128:12
**opened** 196:9
**opening** 188:18
**operations** 29:22
43:3,7 113:8
**opinion** 189:5,23
190:10,20,22
191:24 193:5
194:17 239:13
**opportunity** 174:23
**opposed** 174:10
188:19
**opposing** 213:25
**opposite** 38:2
**optimum** 214:22
215:4 216:20
**options** 213:15,17
**order** 17:3 28:5
37:21 51:2,9
55:15 70:24 72:4
92:25 103:4,20
110:1 111:6
112:15 156:18
164:9,16,18,25
167:7 181:10
224:6 225:22,23
**organic** 100:20,24
101:17 102:8,16
107:1 157:11,12
157:14,21 158:3,7
158:13,24 195:17
**organics** 100:14,18
158:22
**organization** 26:22
26:23 163:6,11,13
**organizational**
27:23
**organized** 29:9
**original** 5:9 94:10
114:2 131:17,19
131:25 141:23

151:6 185:21
199:23 217:23
**Orleans** 1:14,15
2:8 3:5 6:20 24:8
32:25 33:3,4 42:3
49:3 59:3 68:21
169:14 198:20
208:7 227:7
**ought** 116:22
**outside** 37:9 50:9
73:25 110:3 120:3
139:23 169:9
192:20
**overall** 95:25
119:11 147:19
**overbreadth** 42:24
**overburden** 177:8
177:9
**oversaw** 28:7
**overseeing** 26:24
**oversight** 29:24
**overtopping** 186:8
**overturning** 39:3
39:11
**owns** 228:10

---

# P

**P** 5:1 94:2
**package** 116:17
**page** 4:3,8 8:2 9:5
21:12,19,23 37:5
38:16 48:7 58:1
113:1,2 117:5
132:6 136:5
149:10 155:10
159:16 161:3
162:7 170:16,22
170:24,24 171:2,4
184:14,16 201:22
202:22 203:11
**pages** 219:7
**paper** 11:20 13:8
57:18,21 60:19
92:11 96:19
116:17 119:7
129:13 134:7

161:17 162:18
199:15 216:15
239:11
**papers** 161:9
**paragraph** 105:6
117:7 118:3
218:25 219:1
**paragraphs** 6:9
8:20 132:5
**parameter** 71:11
**parameters** 84:5,7
87:14,19
**paraphrasing**
184:17
**Parish** 32:25
**part** 5:14 26:20,22
32:6 46:15,16,17
46:21,23 56:8
60:8 89:17 90:7
103:13 127:14
151:5 153:2,8
164:8 172:17
176:10 181:9
203:8 204:25
208:18 212:25
213:3
**partial** 171:10
**particle** 187:3
**particular** 6:9 8:20
10:12 20:7 29:17
47:23 48:19 51:1
51:8 127:12 128:7
128:14 129:11
149:11
**particularly** 12:6
97:20
**parties** 5:3 30:12
242:14
**pass** 30:10,13 101:2
**passed** 188:6,8
**passing** 188:4,9
**passive** 95:17
**path** 36:25 68:2
102:7 187:20
188:14,21
**PAVLICK** 3:15

**peat** 100:19,21
157:22 158:25
**pen** 122:12
**pending** 45:5 66:3
66:6 233:7
**penetration** 39:7
**people** 35:25 47:10
47:13 69:2 86:18
86:22 164:5 165:5
165:7,9 166:25
167:3,9 181:22
191:18 233:3
**people's** 238:6
**perceive** 170:4
**percent** 157:18
214:20,21,22
215:11,20,23,24
216:18,19,20
**perfect** 125:23
**perform** 75:18
215:18
**performed** 39:14
185:3,9
**performing** 51:2
178:11
**period** 62:17
**permeability** 97:15
97:16,21 159:3,8
**permeable** 159:2
240:2
**permissible** 74:18
**permit** 42:21 43:3
46:4,6,9,12 47:3,9
47:14 60:17 79:24
227:13
**permitted** 5:5
**permitting** 46:14
46:23
**perpendicular**
223:12,14
**person** 6:6 29:13
31:17 34:9 47:2
62:2 120:15
**personal** 7:21
57:15 191:4
206:12

GRIESHABER, Ph.D., JOHN

personally 103:12 104:2
perspective 191:3
pertain 222:4
PERTAINS 1:7
pervious 72:19,25 97:10 106:24 107:2,3
phone 82:4
photos 114:2
phrase 184:24
phrased 68:18
Ph.D 1:13 6:19 241:3,11
picture 207:15 234:7
pictures 114:3,4
piece 11:19 13:8 57:18,21 60:19 92:10 119:7 123:21 129:13 161:17 162:17 199:14 216:15 239:11
pieces 134:7
piezometer 235:2,7 236:4 237:2 238:25
pile 9:6 17:4,7,19 19:2,17 20:1 22:20 33:18 34:2 36:8 37:17,21,22 38:2,7,13,18 39:1 39:11,21 41:2 50:20 66:12 67:5 69:3 91:20 99:13 113:19 134:7 136:11 141:6,8,10 144:15 145:11 147:3,5 149:14,24 150:13,20,21,23 150:24 157:9 171:17,18 173:4 175:17,22 176:7 180:2,3,5,6 186:20,21 187:13

187:15 196:21 230:8,9,14 231:7 232:13,16,20 233:23 234:19
piles 96:19 141:10 142:16 143:15,17 143:19 145:14 171:21,23,24 172:5,10,25 173:2 173:2,5,10 174:22 175:5,9 180:6,14
piling 113:19 135:22,25 136:3 136:18,22 140:19 141:3 142:19,19 143:12 145:2,23 146:15,24 172:2 172:19,21 174:21 177:4 180:19
pilings 113:21 136:12 140:25 175:1
pink 22:3,8,12 94:9 94:17,18 228:14
pipe 16:24 23:10 236:20
piping 39:17 41:1 72:23
pit 197:21,24 198:3 200:4,8,12,25 201:10 203:14 204:23 207:10,12 212:12 219:3
pits 197:23
place 23:11 42:3 43:12 52:9,10 55:19 59:6 60:2 62:1,5 85:17 94:7 195:16 209:9 230:18
placed 41:22 222:14
places 125:12
Plaintiff 13:21
Plaintiffs 2:2 20:15 24:3 47:16 56:9

100:9 109:4 111:1 130:6,9 133:1 134:9 148:20 159:16 161:2 179:22 196:25 218:8
Plaintiff's 110:15
plan 16:12 19:6 22:14 116:19 117:8 118:3,5 134:13 147:19 154:17 161:9 170:1 171:14,19 172:13,15 206:22
plans 9:11 18:7,10 18:25 20:4,7 22:25 23:2,25 36:5 92:22 93:4 93:10 109:19,24 115:3 146:12,14 146:17 152:9 164:9
plate 37:5,24 38:3 38:5 39:23,24 40:2,9 154:23,23 154:24 155:16
plates 39:10,19,20 39:21 40:17 155:15
play 44:8 66:25 68:15 196:1
played 183:25
playing 32:16
please 21:17 61:8 83:20 93:14 144:4 151:7 156:4
plotted 197:22
plug 176:15
plus 8:17 17:14 171:15 204:6
POC 223:15,17
point 22:23,24 27:14 53:16 57:6 63:21 68:20 71:12 75:2 80:18 104:17 104:18 126:20

133:18,20 142:10 187:20 201:4,19 202:10 204:1,3 210:21 223:17,18 235:16 239:3
pointing 150:9
points 29:5
policies 81:8
ponding 223:5 238:16
Pontchartrain 156:9 231:25 237:6
popped 195:25
pore 187:4,10,11 196:8
port's 113:11
position 144:3,5,11 145:13 146:13 147:1 190:4
positive 220:22
possibility 29:3 66:11 72:1 74:1 102:1 119:10 124:13 209:25
possible 11:24 35:12 40:15 101:21
possibly 34:11 36:4 69:11 73:18 99:19 136:16
posted 47:5
posts 222:21 226:5 226:7
post-Katrina 104:4
potential 36:9 53:25 69:4,8 70:11 76:15 79:14 100:11,14 101:2 101:10 144:9 147:2 159:11 160:3 168:15 173:17 180:4 185:13 227:22 228:4
potentially 41:25

172:6 209:23
pounds 215:16
practice 86:18,23 169:13,16 205:25
practices 97:23
precise 49:22 177:16
prefatory 133:20
preparation 8:11 9:3 107:11 111:12 148:15
prepare 109:19
prepared 33:2,4 48:15 51:17 150:6 189:11,14
present 3:8,17 18:6 97:11 106:24 213:9,13
presented 46:22 183:1 191:17
pressure 95:18 101:17 102:11 176:25 177:8,9 186:22 187:3,4,10 187:11,12 188:19 195:13 196:9,11 237:18,19,24,25 238:2
pressures 72:22 95:17 97:3,7 101:7,24 141:12 188:17
presumably 152:17
presuming 18:18
pretty 155:1 157:6 174:13 221:5
previous 34:22,23
previously 13:19
pre-Katrina 37:10
primarily 178:17
primary 96:25 187:23,24
principles 78:2 99:16 124:5 205:24
printout 40:7

GRIESHABER, Ph.D., JOHN

**prior** 108:4 117:10 214:22
**privilege** 14:7
**probably** 31:17 47:10 48:24 52:21 71:16 102:4 160:9 161:5 171:23 178:23 206:15 221:6
**problem** 10:17 13:5 41:10,25 102:11 114:6 121:18 165:17 202:8,12 213:9,14 232:21
**problems** 28:9 29:11 30:3 72:25 133:8 137:10,14 137:18,22 170:5
**procedure** 5:6 54:9 54:12 55:19,22,24 106:18
**procedures** 42:4 48:25 52:9 81:8 174:4,6,15,16,17
**proceed** 27:11 139:4
**process** 30:5 38:6 54:7,8 56:16 57:8 58:8 59:5,10,12 59:14,15,20,24 60:8,11,14,16 61:17,19 91:18 94:22 95:13 103:13 106:17 126:23,24,25 174:15,16,17 228:23
**processes** 48:25 52:8
**Proctor** 214:21 215:11,11,15,17 215:22,25 216:4 216:19
**produce** 9:23 10:1
**product** 14:7

**profile** 105:18 121:13
**profiles** 151:18 152:14
**program** 39:12 40:1
**progress** 206:18
**prohibited** 178:6
**project** 26:24 32:24 37:7 48:11,22 49:6 58:10 89:1 176:11 182:19 185:22,23
**projects** 51:10 56:22
**promote** 69:9,10
**properties** 75:13
**proposal** 115:7 129:13 131:15,18 132:10 162:21 164:1 171:7
**proposed** 34:13 48:9,21 49:5 55:25 56:14 58:9 59:16 60:6,11 61:2,4,7,11,13 69:24 70:4,7,9 71:12 163:19 170:8 178:16 209:5 210:15 213:5,12
**protected** 62:15 233:19 238:17 239:14,15,20,23
**protection** 19:4 24:9,16 33:1,13 36:10 41:23 42:6 42:10 43:12 47:8 71:8 72:12,14 90:25 92:18 116:1 119:17 140:21 141:4 146:1 181:18 182:10 183:7 199:18 207:13 208:3,6 228:7

**prove** 182:19
**provide** 11:14 12:8 12:16 53:1 103:25 206:23 221:22
**provided** 13:21,25 14:5 40:1,6,9,17 171:18 218:9
**provides** 53:3
**PT** 197:21
**publication** 175:15
**pull** 18:10,16 96:19 98:5 135:25 141:10 142:21 171:21 175:17,22 176:6 226:6
**pulling** 99:24 142:16 144:15 172:5
**punctured** 101:20
**purpose** 47:17 58:7 134:11
**purposes** 5:5 31:10 32:21 34:2 136:17 173:15 175:4 235:15
**pursuant** 5:7 6:3 81:7
**push** 177:25
**put** 45:23 50:11 54:19 81:25 101:16 109:9 134:10 180:6 193:24 196:17 210:24,25 211:1 214:15 215:5,6 217:9 221:8 226:13,14,14 235:2,7 237:1
**putting** 45:20 204:21 214:25
**P&S** 9:5,11
**P-8** 130:21
**P.E** 1:13 6:19 241:3 241:11
**P.O** 2:16

**Q**

**question** 5:12 7:15 8:1 31:8,22,25 32:13 34:23,24 35:1 37:12 43:23 44:10,25 47:17 49:13 55:21,23 59:2 61:1 64:5 70:3,6 72:4,9 73:15 78:16,21,23 84:10 89:13 98:8 100:6 107:16 108:19 111:23 118:14 126:11,14 126:18 133:17 136:17 138:25 139:20 141:4 143:10 145:5 146:20 148:7 152:20 155:5 159:23 162:16 163:7,15,16 172:1 183:17,23 185:6,7 194:8 196:13 200:3 205:17 207:21 208:13 209:20 218:19,22 218:25 219:23,23 220:4 221:5 223:20 229:24 231:4 233:7,11,13 234:1
**questioner** 138:24
**questioning** 27:3
**questions** 7:23 19:10,17 51:13 64:10 65:9,15 81:20 84:6 87:8 89:9 131:24 132:10 135:17,19 135:23,24 160:12 180:1 220:1 224:8 227:4
**quick** 38:16 40:23 145:5

**quickly** 44:5
**quit** 117:18
**Quite** 182:16
**quote** 175:20
**quoting** 99:8

**R**

**R** 3:12
**rail** 178:15,19
**rainfall** 217:6
**raise** 133:25
**raising** 133:23
**range** 132:17 134:18,23 237:10
**ranges** 131:11
**rarely** 175:23
**ratio** 39:7,15 40:25 96:8,12,13 178:4
**Reach** 153:24 154:1
**reaches** 149:14 150:13
**reaching** 117:15 118:10
**reaction** 66:23
**read** 20:25 31:2 56:20 58:1 111:16 115:20 116:21 117:6 118:2,7 170:15 200:10 221:12 235:3
**reading** 5:8 21:3 37:17 96:17 127:3 172:23 193:15,23 228:23 229:19 235:19 237:2,3
**reads** 236:4
**ready** 219:13
**real** 7:19 101:11 128:22 143:4 179:7 205:11 217:10 231:3
**realize** 85:11 175:21
**really** 8:21 10:10 29:1 31:16 36:1

GRIESHABER, Ph.D., JOHN

38:10 58:5 85:5
95:16 109:3 110:5
133:11 138:14
141:13 142:15
184:7 189:8
202:12 226:24
234:10
**reason** 37:23 67:13
138:21 150:18,19
169:18 183:22
227:21 232:19
**reasons** 35:13
**rebar** 113:18,24
136:11
**rebuilding** 24:15
**recall** 10:8,11
28:24 184:21
**receive** 176:21
**received** 127:1
**recess** 53:19 93:23
218:5 227:2
**recharge** 232:10
**recognize** 60:7
**recollection** 108:13
**recommendations**
28:14 219:18
**recommended**
214:23
**record** 9:9 11:7
13:17,20 15:24
16:2 19:16 25:2
32:22 47:25 48:5
49:19 64:20 65:11
75:9,10 80:19
85:13 86:19 88:8
88:9 93:25 108:16
117:6 122:10,20
130:4 131:7
133:21 139:23
154:22 162:15
224:21
**records** 126:19,21
126:22
**recycled** 113:24
**recyclers** 113:23
**redefine** 166:21

**redesigning** 61:22
**redirect** 240:10
**reduce** 55:7
**reduced** 196:7
**reevaluating** 62:4
**refer** 39:18 169:4
196:17
**reference** 20:7,16
21:14 29:5 51:2
54:4 121:6 156:18
161:1 200:13
**referenced** 17:14
23:25 24:2
**referencing** 134:3
**referred** 16:6 114:8
151:4 219:2,11
224:22
**referring** 15:25
28:17 100:18,24
107:3 117:4 169:5
170:17 201:25
**refers** 21:13
**reflect** 16:23 23:10
65:11 117:3
122:10 123:25
124:2 143:11
148:2
**reflected** 119:8
212:24
**reflects** 17:19 24:7
**regard** 7:23 27:17
53:2,4 77:13
111:11 117:6,14
118:8 134:7 144:3
144:9 145:22,24
158:10 160:13
177:3 185:1
188:22,24 195:2
**Regardless** 228:10
**regards** 32:1 41:21
54:14 112:18
147:23
**regional** 169:11
**register** 110:11
**reinforced** 98:24
113:18 136:11

**relate** 21:18 45:10
**related** 27:22
242:14
**relates** 25:10
192:22
**relative** 105:8
183:9 202:17
**relatively** 73:2
97:11
**relax** 106:3
**release** 68:25
**relevant** 231:12,16
231:21
**rely** 93:2 167:25
**relying** 16:22
150:19
**remarks** 113:13
**remarried** 226:20
**remedial** 205:22
209:5 213:5
**remediation** 108:2
108:6 199:12
228:16,17,18,19
**remember** 47:22
48:24 54:18 62:7
62:11,17 108:9
109:3 110:5
135:20 136:2
153:16 184:22
210:6 225:24
232:25
**remotely** 144:5
**removal** 108:11
112:18 115:3
127:19 134:8,13
136:22 140:24
144:3 145:22
147:3,5 159:15
170:1 171:14,18
172:21 175:5
177:4 180:19
**remove** 135:20,21
171:8 173:10
174:23,25
**removed** 113:21
142:19 222:21,23

**removes** 141:2
**removing** 71:5
108:2 180:2
**Rent** 213:20 214:16
**rephrase** 8:1
144:12
**replacement** 32:24
37:6
**report** 33:1,24 34:7
38:12,21 104:6
184:9,16
**reported** 1:23
62:12
**Reporter** 1:25 5:23
102:24 242:3,25
**REPORTER'S**
242:1
**reporting** 233:3
**reports** 19:2
**represent** 8:7 48:14
**representative**
90:17
**REPRESENTING**
2:2,11 3:1
**represents** 21:22
**request** 29:18
110:4 127:1 193:7
212:15 217:24
**requested** 210:12
**requester** 206:13
**requesting** 219:16
220:23
**requests** 29:12
195:8 199:13
**require** 46:2,4 52:8
60:8 124:5 164:10
164:24 180:17
**required** 45:12
50:10 90:21 91:15
109:16 160:16,19
160:22 164:6,13
164:15,15,17,20
168:13,19 172:22
227:12
**requirement** 78:25
177:22

**requirements** 28:6
43:3
**requires** 46:6
159:24 208:7
**requisite** 127:6
**research** 169:17
182:19
**reserve** 240:10,15
**reserved** 5:13
191:16
**reserving** 7:12
**respect** 78:19 160:6
206:24 207:18
210:3,16 213:14
**respectfully** 46:19
**respond** 29:11
**responding** 198:7
**response** 6:8 25:5
115:23
**responsibilities**
27:22
**responsible** 26:24
**responsiveness**
5:12
**rest** 40:22
**restricting** 29:16
**Resubmit** 171:14
**result** 72:20 97:2
101:6 184:19
186:21 188:17
196:8 216:10
239:17 242:16
**resulted** 188:25
**resulting** 127:19
**results** 39:21 40:7
40:15 93:12
**retaining** 50:17
52:14,15 96:21,22
98:11,14 160:24
**returned** 170:1
**review** 9:2 91:3
109:17 160:1
168:21 173:11,24
179:22 222:7
**reviewed** 9:5 90:24
172:12,13 173:22

GRIESHABER, Ph.D., JOHN

| | | | | |
|---|---|---|---|---|
| 191:18 222:10 | 58:22 59:7 60:4 | 150:3,4,15,17 | 222:2,5,9,15,19 | **S** |
| **reviewing** 58:18 | 61:17,21,25 62:11 | 151:1 152:11 | 222:25 223:10 | **s** 5:1 42:16 57:16 |
| 178:9 | 62:21 65:1 66:14 | 153:2 154:4,9,21 | 224:4,18 225:8 | 74:7 126:21 |
| **reviews** 146:17 | 66:24 67:4,12,15 | 155:7,14,17 | 226:3,15,16,22 | 129:22 179:9 |
| **revised** 134:13 | 67:19 69:6,8 70:5 | 156:11,15 157:1,3 | 227:4,9,11 228:25 | 190:21 204:1 |
| 161:9 169:25 | 70:15,19,21 71:10 | 157:8,13,17,23 | 230:17 232:5 | 217:25 229:8 |
| 171:14,19 | 71:18,22 72:3,15 | 158:5,12,18,21 | 234:21 235:1,3,8 | **safeguard** 146:16 |
| **revisit** 61:18 94:13 | 73:5,8,10,12,14 | 159:2,4,8,12,20 | 235:8,21 236:6,12 | **safely** 209:14 |
| 106:18 | 74:8,11,15 75:14 | 160:7,11 161:8 | 236:16 237:11,23 | **safety** 39:16 41:1 |
| **revisiting** 61:23 | 76:8 77:6 79:16 | 163:24 164:14 | 238:12,19 239:10 | 48:6 56:6 91:16 |
| **RFP** 116:9 | 79:22 80:1,4,22 | 165:3,10 167:12 | 239:19 240:1,3,5 | 94:20 96:15 |
| **Rich** 213:25 | 81:18 83:21 87:1 | 167:20,25 168:16 | **rights** 240:15 | 120:20,22 226:8 |
| **Richard** 2:14 3:15 | 88:20 89:4,8,9,13 | 168:23 169:24 | **right-of-way** 97:22 | **Salvage** 113:23 |
| 9:18 11:2 15:5 | 89:20 90:20 91:9 | 170:10 171:12,22 | **risk** 133:8 | **samples** 161:12 |
| 44:9 68:10 85:8 | 91:11 92:1,4,19 | 172:7,9 173:18,21 | **river** 38:1 62:9 | **sand** 72:23 101:20 |
| 85:25 86:16 87:3 | 92:25 93:21,25 | 173:24 174:5,6 | 66:10 79:2,23,25 | 103:22 134:1 |
| 87:11,12,21 154:4 | 94:8 95:11 98:4 | 175:11,20,25 | **riverward** 73:2 | 159:5 222:23 |
| 183:18 189:18 | 99:2,13 100:5,17 | 176:3,17 177:2,12 | **Road** 209:5 213:5 | **sands** 102:7 107:4 |
| 190:21 197:7 | 100:20 101:1,5,9 | 177:17,21 178:2 | **roadside** 197:23 | 141:24 |
| 204:1 | 102:17 103:6,9,15 | 179:10,17,20 | **roadway** 204:5,5 | **sandy** 178:17 |
| **right** 7:11,18 8:5 | 103:19 104:7,13 | 180:13 181:2,8,24 | **Robert** 3:9 240:14 | 179:12,12 |
| 9:1,13 10:19,22 | 104:15,25 105:20 | 182:5,13 183:6 | **ROBINSON** 1:7 | **sand/clay** 107:5 |
| 11:4 13:19 14:2 | 106:19 107:7,19 | 184:8,24 185:5,14 | **Rock** 52:10 | **Satterlee** 49:16 |
| 15:14,19 16:6,13 | 107:24 108:10,12 | 185:17,20,25 | **role** 26:9 66:25 | 198:7 199:6,6 |
| 16:15,22,24 17:1 | 109:4 110:22 | 186:4,8,15 188:3 | 184:1 186:16 | 210:9 220:4 |
| 17:9,17 18:3 20:6 | 111:8,11 112:17 | 188:5 192:7,10 | 196:1 | **Saucer** 225:18 |
| 20:11,24 22:1,10 | 115:4 116:15 | 193:25 194:2 | **roll** 177:22 | **save** 5:8,11 |
| 22:18,22 23:1 | 117:1,21 118:9,11 | 195:19 196:1,25 | **roller** 215:19 | **saw** 91:14 197:7 |
| 24:6 25:19,24 | 118:19 120:12,16 | 197:16 198:14 | **rolling** 215:8 | 215:25 |
| 26:7 27:9,14 28:3 | 121:1,5,13,19 | 199:8,18,21 200:3 | **RONALD** 3:19 | **saying** 44:15 52:22 |
| 28:16,20,24 32:10 | 122:13 123:1,10 | 200:15,23 201:3,5 | **rotate** 95:21 96:3 | 57:11 74:20 78:12 |
| 32:21 33:25 35:9 | 123:16,22,24 | 201:6,8,13,15,17 | **rotational** 195:25 | 83:2 90:21 92:12 |
| 35:22 37:15,20 | 124:2,6,14 125:15 | 201:19 202:4,6,6 | **route** 101:21 | 99:6,24 104:22 |
| 39:9,10,20,25 | 126:6 127:10,17 | 202:10,13,20,22 | 103:25 | 118:1 119:12 |
| 40:4,10,11,19 | 127:21,25 128:4 | 202:24 203:8,14 | **RPR** 1:24 5:22 | 120:24 125:22 |
| 41:7,10,20,25 | 128:16,20 129:4,5 | 204:10 205:15,16 | 242:2,24 | 142:2 156:20,21 |
| 42:11 43:5,8 | 129:8,10 130:15 | 206:4,8,21,25 | **rule** 1:10 6:3 14:20 | 158:13 166:12 |
| 45:16 46:6,7,25 | 130:16,19,20 | 207:14,15 208:11 | 53:11 61:19 | 179:14,15 199:9 |
| 47:15,25 48:18 | 132:14,22,24 | 208:25 210:5,23 | **rules** 5:6 6:4 7:5,19 | 201:23 215:17 |
| 49:2,18,22 50:10 | 136:20 141:7,11 | 212:2,3,5,12,23 | 47:5 | **says** 16:18 17:7,10 |
| 50:12,14,20,23 | 141:13,21 142:1 | 214:5,9,9 215:14 | **ruling** 7:12 | 21:4,5,6,15 24:17 |
| 51:4,7,10,12 52:3 | 142:17 143:1,8,20 | 215:21 216:7,12 | **run** 91:19,22 94:18 | 33:12 38:25 40:24 |
| 52:24 53:4,13,25 | 143:21 144:10 | 216:14 217:1,12 | 95:2 96:7 211:8,9 | 46:10 56:21 58:17 |
| 54:15 55:2,12 | 145:12 146:23,25 | 217:17 218:7 | 230:11 | 98:14 101:5 |
| 56:13,14,16,18 | 147:7,11,12,17,22 | 219:21 220:25 | **runoff** 223:5 | 105:18 109:14 |
| 57:1,9,18 58:16 | 148:15 149:9,23 | 221:10,14,21 | **ruts** 217:8 | |

GRIESHABER, Ph.D., JOHN

113:3 115:1 117:5
117:8,14 118:12
127:21 131:20
136:5,9 149:12
150:12 152:11
154:25 155:2
157:20 158:11,12
158:17 159:16
161:11 164:2
165:1 169:25
172:23 177:13
178:9 184:16
185:21 193:10
197:19 199:12
203:10 204:23
206:22,23 209:4
210:10,17 213:11
214:3,16,20
220:19,23 221:10
221:14 228:20
229:8 239:2,5,11
**scale** 122:15,17
204:21
**scenario** 102:10
123:15
**scheme** 32:7,19
97:18
**scientific** 175:16
**scope** 110:4 111:20
111:22 195:7
**SCOTT** 2:5 3:12
**scouring** 185:13
**scratched** 210:23
**screwed** 40:14
**script** 86:22
**sea** 117:12
**seam** 195:20,20
**season** 74:1
**seawall** 39:12,22,23
40:5
**second** 8:17 33:12
115:17 134:12
163:25 185:7
209:9,16 228:24
**secondary** 67:25
116:11

**section** 17:5 21:15
21:22 24:5 26:11
26:12 48:7 98:19
126:17 127:13,14
127:16 171:16
201:12,15 212:16
**sections** 26:13
176:13
**see** 15:21 17:9 20:4
20:20 22:25 23:24
24:5 25:19 29:11
29:22 33:20,20
36:19 37:16,17
38:16 49:18 51:14
51:21 55:14 56:5
56:7,11 61:6
69:23 74:22,23,24
74:24 76:4 80:6
91:15 96:1 98:7,9
98:14,25 99:1,10
99:15 100:5 101:5
111:5 114:1
120:24 124:15
125:5,24 131:13
132:11 136:4
142:13 149:23
150:4 152:8,9,11
153:10 156:12
158:16 160:6,9
161:14 169:18
197:16 199:4
201:8 202:6,16
203:1 206:22
210:24 211:19
213:17 214:2,13
214:15 218:18
221:4 228:17,22
232:8 239:19
240:7
**seeing** 38:10 47:22
**seeks** 236:10
**seen** 24:24 47:6,18
48:14,19,20 52:13
52:18 109:1
175:25 238:15
**seepage** 36:20,21

36:22,25 37:1
38:9,11,17,25
39:8,13,15 40:8
40:16 41:9 50:22
67:10 68:2,3 75:1
95:6,7 96:6,7,15
96:23,24,25 97:2
97:5,7 101:6
104:10 119:4
123:13 143:25
147:24 156:18
160:18 188:9
196:18 212:22
213:3
**sees** 199:6
**seismic** 66:23
**SELA** 176:11
**selected** 8:19
117:10
**selection** 97:17
**semi-compacted**
215:2 216:22,24
217:4
**send** 29:20 127:8
**sense** 7:25 21:6
45:11 78:24 88:13
121:22 123:8
**sent** 198:18 213:19
**sentence** 43:6
149:11 150:11,11
**separate** 98:19
163:13 222:7
225:19
**September** 219:15
**sequence** 171:15
**seriatim** 40:22
110:16 130:7,10
134:14 149:9
**series** 134:9 136:18
**served** 24:17
113:15
**services** 33:8 51:3
109:15
**set** 20:4 28:5 36:5
42:3 54:2 87:8,14
107:21 115:2

141:6 169:10
242:7
**Shakes** 226:11
**shaking** 123:18
**shallow** 209:22
**share** 7:8 10:16
25:2
**shear** 196:7
**sheepsfoot** 215:19
**sheet** 16:24 17:4,7
17:19 19:2,17
20:1 21:23 22:20
23:10 33:18 34:2
36:8 37:17,21,22
38:1,7,12,18,25
39:11,12,21,22,23
40:5 41:2 50:20
91:20 99:13
149:14,24 150:13
150:20,21,23,24
157:9 171:18
174:22 175:5,22
186:20,21,24
187:13,14 196:11
196:21 230:8,9,14
231:7 232:13,16
232:20 233:23
234:19
**sheeting** 209:13
**sheets** 36:24 171:24
**ships** 34:5
**shocked** 112:4
**shop** 129:22 161:11
163:2
**shoring** 178:15,19
209:14
**short** 25:15 194:9
**shorthand** 242:9
**short-circuit**
101:16
**shovel** 216:1
**show** 17:1 22:20
40:12 47:15 52:12
63:19 72:20
110:15 116:13
148:19 149:10

178:8 182:15
202:14 218:18
**showed** 9:6 12:19
**showing** 37:4 116:3
153:10,14 157:10
201:12,15 202:9
208:11 221:23
**shown** 9:4 32:22
213:16
**shows** 15:16 110:11
157:6 202:13
238:25
**side** 29:18 38:3
40:3 62:15 71:19
71:19,21 72:23
73:3,23 75:16
83:3,10,12,16
87:5 93:17,17
94:7 106:8 121:14
130:3 140:21
152:20 155:5,21
156:13,14 160:8
184:2 185:13
186:8,10,11 188:8
194:24 195:24
203:2 206:17,24
207:3,9,11,12
208:1 210:7,16
213:14 232:22
233:19 237:15
238:17,24 239:14
239:16,20,24
**sides** 96:24 209:2
212:11
**sign** 46:9
**signed** 164:2,4,5
241:11,13,15
**significance** 108:18
**significant** 97:10
106:24
**signing** 5:9
**silly** 140:12
**silt** 178:17
**silts** 141:24
**silty** 179:12
**simple** 7:19 13:10

GRIESHABER, Ph.D., JOHN

147:5 159:23 231:3
**simplistic** 105:3
**simply** 33:12 54:3 58:6 76:22 78:2 146:13 204:12
**sinking** 37:22
**sir** 6:25 22:18 28:24 48:18 50:12 51:7 78:19 109:1 139:5
**sit** 147:7
**site** 29:10,15,16 32:5 34:14 97:19 107:11 109:17 112:2,19 113:7,22 123:10 143:12 145:16,23 149:13 150:12 199:12 225:17,18
**sites** 105:10
**sits** 93:19
**situ** 226:15
**situation** 30:3 36:3 79:3 101:11
**sixty** 142:8
**sketch** 114:2
**slab** 113:7,8
**slide** 178:15,18
**sliding** 195:14,15
**sliver** 176:5
**slope** 203:17,18 221:18 222:2 223:3 225:7
**slopes** 26:15 203:13 203:21 204:2 222:1
**slow** 61:8
**smooth** 223:2
**soft** 157:21 158:24
**soil** 45:24 172:24 175:23,23 176:5 176:24 177:11 178:10,13 179:4,8 192:23 209:5,15 213:6 215:15,19

216:3 221:15 222:17,19,22,22 229:9 240:2
**soils** 25:5,7,8 75:12 128:7,7 178:1,17 178:20
**somebody** 81:23 83:24 117:20 118:16 119:6 120:11 127:11,12 127:15 130:2 148:5,11 149:6 165:2 206:8 210:23 216:17 226:8
**someplace** 89:4 118:7 128:3 217:16 234:22
**Somewhat** 184:10
**sorry** 13:24 20:22 22:19 25:25 92:5 95:9 130:15,20 134:17 135:16 140:25 144:18 152:10 162:11 164:3 170:14 172:23 174:21 188:23 197:21 218:3,24 219:1 223:12 226:16
**sort** 51:18
**sought** 5:15 7:13
**sound** 77:23 124:5 230:23
**source** 127:23,23 196:19
**south** 15:23 16:1 17:19 18:1 20:9 105:10 132:25 133:10 134:4 155:11 186:6
**spacing** 143:14
**Spadaro** 218:14,16 220:19 226:17
**spade** 43:16 45:20 45:23 54:19 81:25

**span** 194:9
**speak** 8:19 18:7 82:8 189:4,12 190:8,11
**speaking** 6:10 9:15 43:25 63:7,12 191:5
**speaks** 38:21 58:13
**spec** 216:11,18,21 217:1,2
**specific** 31:22,25 81:19 97:19 99:18 120:7 185:16,20 201:22 216:18,21
**specifically** 5:10 18:11 52:22 53:4 54:8 105:5 113:1 117:5 192:22
**specification** 128:24 177:17 216:6
**specifications** 18:8 19:1 90:15,16 93:4,11 109:20,24 111:12 115:3 129:1 146:18 219:4
**spent** 24:21
**spoke** 95:3 104:8
**spoken** 189:12
**sponsoring** 227:8
**stability** 38:4 39:3 39:20,23 41:6 54:11 55:14 74:7 74:25 95:4,5,8,10 95:11,13,15,24 119:4,4 123:13,14 144:17 147:24,25 156:19,20 160:16 160:21,24 173:23 201:5 206:3,9,19 206:23 207:2 209:4,11 210:4 212:17,18,19 213:1,1,2,3,9,13
**stable** 96:1 207:18

210:17
**stack** 155:25
**stage** 79:23,25 80:2
**staged** 173:6
**standard** 38:23 185:21,23 216:22
**staple** 131:5
**start** 22:23 35:16 71:12 78:20 81:9 145:11 171:12,20 203:4
**starting** 134:23
**starts** 144:16,18,19 144:23
**state** 5:23 179:6 242:3
**stated** 147:21 214:8
**statement** 38:24 82:23 110:23 111:9 115:23 133:13
**statements** 54:5
**states** 1:1,11,12 2:11,12 72:18 88:7 90:18 140:23 141:1
**stating** 238:11
**station** 2:17 20:10 20:12,18,20 22:2 22:5 134:8,13 135:18 153:16,17 159:15 161:9 169:25 171:8 178:12,14 179:1,2
**stationing** 153:14
**stations** 20:17 21:16,18 152:15
**stay** 64:16 88:2 120:3 121:17 180:22
**stayed** 119:12
**stays** 95:22,22 235:12
**steel** 113:6,17,20 113:24 136:10
**step** 52:23,23

147:23 226:8
**Stick** 64:22
**sticks** 43:16
**stint** 25:15
**STIPULATED** 5:2
**stipulation** 6:22
**Stockpiles** 222:12
**stone** 2:14 6:11 9:20,25 10:14 11:3 14:3,11,19 14:23 15:9 18:4 18:20 19:5,12,20 23:22 27:1,10 30:11 31:14,21 34:15,21 35:6 36:5,13 38:20 42:22 43:19 44:4 44:11,18,22 45:4 45:13 46:13,20 51:23 53:14 57:13 58:12 62:23 63:3 63:9,13,20,25 64:8,15,21,25 65:10,17,21 66:2 67:14,18 68:7,11 68:17 69:13,18 71:1 72:6 75:22 76:17,23 77:14 78:4,15 79:6,18 80:23 81:10 82:7 82:14,21 84:12,18 84:25 85:10,19 86:2,6,12,24 87:7 87:13,18,23 88:4 88:22 102:2 106:2 107:13 108:15 110:2 111:18 112:5 116:2 125:18 129:25 130:11,22 131:2 131:23 133:7,19 136:6,23 137:2,7 137:13,21 138:4,9 138:15,22 139:6 139:18 140:2,8 151:13,19 152:1

GRIESHABER, Ph.D., JOHN

6/27/2008

Page 266

152:25 153:7
154:13 161:18,23
162:12 165:25
174:1 183:11
189:2,9 190:6
191:2,12 192:18
193:1,6,14,20
194:3 195:6 196:3
197:9 203:19
206:10 211:4,5,10
213:25 217:20
220:6,11 227:14
229:12,16 230:12
231:8,17 233:6
234:2
**stop** 7:22 12:21
13:14 62:15 79:5
79:15 80:15 82:8
87:12,17,21,21,21
87:22 88:1 230:11
**stopping** 53:15
**story** 197:24
**strata** 102:16
195:17,17 196:21
234:23
**stratas** 101:17
**stratification** 38:9
75:8 91:4 92:2,3,7
93:1 94:23 97:14
97:20 100:13,20
100:25 141:5,15
141:16,20,21,24
142:12 145:16,20
151:4
**stratifications**
94:15
**stratigraphy** 74:24
75:7,11
**stratum** 72:22,25
73:3 97:12
**street** 2:7 33:7
195:5,11,14,22
233:1,1,3
**strength** 196:7
**strictly** 29:23 38:4
226:12

**structural** 26:12
97:5 101:9 206:3
206:9 209:4
**structure** 27:23
36:10 41:22,23
42:6,20 59:18
70:12 73:19 88:10
94:25 114:8 136:1
140:16,22 141:4
144:10,24,25
146:1 160:4,25
168:16 173:17
179:16 180:8,11
180:12,15 181:18
182:10 184:4
199:18 205:12
208:4,6
**structures** 14:1
16:8 26:14 96:23
108:8 112:19
127:16 151:7
172:7 183:8 222:5
226:1
**struggle** 149:20
**studied** 191:21
**study** 25:5,9 33:14
103:20 191:17
**stuff** 31:18 87:4
91:4 107:5 108:3
116:13 142:17
176:12 217:9
229:15
**subcontractor**
113:25 117:10
**subcontractor's**
118:5
**subgrade** 178:12
178:16
**subject** 18:18 31:12
64:6 68:5,8 96:23
99:19 190:20
195:10 199:22
**subjects** 105:4
**submit** 118:2 165:3
**submittal** 90:12,22
91:25 110:11

116:10,11 164:7
164:10,12,17
222:7
**submittals** 164:13
**submitted** 90:8,10
109:20,24 117:10
171:19
**Subparagraph**
113:2
**subsequent** 113:3
**subsidence** 183:2
**substantive** 182:16
**subsurface** 110:25
113:5
**sucker** 155:9
**sue** 83:5
**suffice** 95:18
**suggest** 157:5
**suggested** 136:2
**suggesting** 65:4
150:18 189:22
236:21
**suggests** 113:14
182:4
**Suite** 213:21
**supervision** 242:10
**supplies** 109:16
**support** 24:8 29:10
51:3
**supported** 149:14
150:13
**suppose** 235:23
**supposed** 18:17
42:4,20 105:15
109:19 111:3,15
148:9,9,10
**sure** 10:23 15:22
21:5 23:25 30:24
42:8 47:12 54:10
55:6 83:7 90:12
95:20 96:2,14
98:2 105:1 115:21
116:16 121:15
122:20 123:5
124:4 132:4
152:19 156:6

166:18 175:19
176:19 196:13
200:22 202:8
207:18 227:6
230:23
**Surekote** 209:5
213:5
**surface** 38:8,13
142:3,22 144:17
172:11 181:20
204:20 217:4
223:3,3 236:13,14
236:15,21
**surprise** 112:3
**surrounding**
178:13 222:13,25
**surveys** 18:8,10
19:1 221:22
**SUTTON** 3:11
132:15,21 133:3
134:22 148:24
**swear** 6:17 47:10
**sweat** 213:22
**switched** 149:7
**switches** 130:18
**sworn** 6:22 242:6
**system** 19:4 24:16
178:15,19 179:24
185:2 209:14

---

**T**

**T** 4:1,6 5:1,1
**table** 31:8 77:4
87:5 182:15
**take** 15:6 30:1 31:9
38:15 40:22 42:18
53:18 56:19 58:2
58:3 61:4,11
80:20 85:15 93:9
95:15,19 115:7
116:18 139:13,15
143:5 147:22
155:8 175:22
177:25 182:21
185:23 197:20
204:22 216:1

226:25
**taken** 5:5 6:3
107:21 108:3
197:21 204:1
241:25 242:8
**takes** 131:4 175:23
177:6 178:3
230:18
**talk** 35:14 54:8
84:3,4 105:6
112:13 120:8
124:13 132:24
161:16 165:19
184:13 213:1
**talked** 91:3 124:12
148:17 180:1,2,3
180:18 212:17
225:16
**talking** 35:4 49:20
54:17,18,21,22
63:15 65:6,7
83:18 86:11 92:14
98:9 104:25
105:24,25 121:11
121:11,12 122:21
122:22,23 124:16
129:16 131:4
133:11 138:11
140:15 142:20
144:7 146:23
151:20 171:23
187:9,9 205:10,12
213:2 217:12,13
219:4 220:17,25
234:25 235:15
**talks** 39:9 127:18
176:25 177:13
228:15
**tamped** 222:24
**task** 28:5 80:7
109:25 111:6
112:15 164:9,16
164:18,25 167:7
181:10 224:6
225:22,23
**team** 50:10

GRIESHABER, Ph.D., JOHN

technical 109:17
   169:14
tell 7:25 21:13,17
   25:12 35:3 38:6
   47:11 50:1 57:22
   58:18 62:21 86:22
   91:5,17 102:23
   103:21 105:16
   121:2 132:16
   138:2 139:3,11,12
   148:10,10 152:12
   163:18 167:19
   194:16 213:18
   216:14 232:9
   238:9
telling 86:19 92:6
   93:2 99:5 137:8
   142:3,24 143:17
   158:21 167:12
   213:23 234:18
   237:12 238:14
tells 138:20 145:17
   158:19
temp 197:22
template 201:16
temporary 160:24
ten 102:15 203:1,3
   204:6,6
tenants 113:11
Tendering 15:22
   52:13 56:9 110:17
   115:8 149:21
   157:9 171:9 197:5
   198:16
TERC 105:8
   109:25 220:25
term 16:16
terms 122:19
terrain 222:13,25
test 44:9 95:1
   176:13 192:16
   194:15,18,22
   215:12
testified 6:23 48:13
testify 90:17 242:6
   242:7

testimony 173:8
   208:19 241:4,6
testing 173:6 230:2
tests 194:1,13
text 175:16,20
   221:12
textbook 176:23
texts 175:20
Thank 6:16 19:23
   23:13 24:6 38:15
   60:22 78:1 109:1
   122:8 139:5
   143:16 151:1
   174:20 179:25
   197:11 213:4
Thanks 15:12 48:3
   224:24
theoretically
   201:18
theory 181:21
   182:17,20,25
   235:24 236:2
   239:9
thereabouts 144:4
thereof 5:14
thick 176:2,5
thickness 97:10
   106:24
thin 73:3
thing 30:4 47:6
   70:17 75:19 80:12
   103:5 115:1
   116:21 122:19
   128:15 131:20
   135:17,21 136:14
   140:19 143:20,22
   155:16 156:21
   158:14 174:24
   178:24 179:1
   180:16 200:6,17
   206:2 209:17,17
   211:16 214:13
   222:10
things 43:21 52:7
   58:19 62:1 79:24
   80:3 86:8 99:21

114:14 115:4
   119:2 120:7
   128:16 139:24
   156:22 157:2
   165:13 199:14
think 10:8,20 14:15
   15:8,23,25 33:10
   33:19 34:6 40:12
   40:21 41:19 48:24
   53:21 56:24 60:20
   74:3 80:18 85:20
   88:16 93:1 98:10
   98:11 118:12
   132:5 133:12
   142:11 147:23
   154:3,6,9 169:22
   170:15 171:22
   172:19 179:14
   181:9 190:14
   208:21 211:24
   218:1 220:21
   221:2 226:20,25
   229:8
thinking 121:2
thinks 53:24
third 170:20
thought 12:1 19:9
   140:18,19 144:21
   167:5 208:4
thousand 143:12
   144:4
three 58:1 83:14
   95:3 143:12 144:4
   176:1 177:15
   209:6,17,22 223:9
three-eighths 176:4
three-foot 217:13
   219:3
three-legged
   113:16
threshold 180:21
   180:24 181:4,5
throw 87:4
thumb 53:11
   158:20
tidal 237:10

tide 232:23 233:2
   233:20 235:18,25
   236:1,9,17,18
   237:7 238:3,5
tied 23:15 231:25
ties 153:11
timber 172:25
   173:5
time 5:13 7:7,10,10
   8:5,16,17 10:9
   12:24 13:1,3 23:5
   23:11,20 24:18,21
   24:25 26:12 27:24
   30:2 83:15 120:15
   134:25 138:23
   139:13 170:20
   177:5,6 215:10
   218:23 223:22
   228:16,24 232:3
   238:4 239:3
times 8:10 60:1
   83:14 140:16
   216:2 232:1
tip 9:6 16:24 17:4,6
   17:8 20:2 22:20
   23:10 33:24 37:18
   37:21 38:18 39:1
   39:2,6,7 41:2
   99:13 104:12
   149:24 150:24
   157:9 186:23
   187:14 188:14,17
   196:11,21 230:8,9
   231:7 233:23
tired 65:4 140:12
title 31:3 152:7
today 6:7 16:24
   90:17 103:21
   147:8
TODD 3:23
told 8:22 17:18
   19:10 42:17 49:10
   59:14,19 69:2
   76:9 88:11,25
   118:21 119:2
   164:7 167:6

216:13 226:17
tolerable 97:8
tool 52:6
tools 51:5,8,11,12
   33:23 38:1 41:18
   48:23 49:1 72:22
   73:3 97:12 143:3
   144:1 152:16
   155:2 175:21
   176:15 177:23
   185:12 196:19
   206:8
topic 18:22,24 65:5
   65:12,18,20
topics 6:13 27:7
   64:1,16,22 65:2
   68:12,18 189:11
   189:13
tops 173:1
TORTS 2:13
tortuous 102:7
   187:20 188:14,21
total 176:1
totally 30:4 79:20
   165:18
tower 113:16
toxins 108:11
tract 199:9
trained 176:20
training 176:21
transcribed 242:10
transcript 5:9
transcription 241:5
   242:11
transferred 25:7
transition 189:17
   189:20 190:16
   192:24
translation 195:21
transmit 107:2
   163:3,5 164:13
transmittal 125:8
   126:23,23 129:16
   134:15 161:11
transmitted 126:5

GRIESHABER, Ph.D., JOHN

126:8,9 162:24
163:1 167:17
215:18
**travel** 101:22
159:11 239:22
240:3
**treated** 113:19
131:6 136:12
**Treeby** 3:10 11:23
12:7,11,15,25
13:4,11,16 30:13
30:19,23 45:6
82:16 109:8
121:23 122:3,7
131:9 133:14
134:16 149:2
153:21 156:2
162:2,6,10 170:13
170:21,25 201:20
204:24 211:12,18
211:23 219:5
224:23 233:15,24
240:6,11
**tremendous** 104:3
**trial** 7:13
**trouble** 188:2
**TRS** 160:23
**TRSs** 176:11
**true** 24:19 42:6
69:12 79:5,8,10
79:11 128:9 230:3
233:23 241:7
242:10
**truth** 47:11 242:6
**try** 35:24 36:1
84:21,22,23
134:25 143:6
**trying** 10:4,8 19:13
27:20 29:5 35:22
35:23 36:2 41:8
49:21 76:11 78:23
84:5,13 88:13
105:25 115:21
119:5 140:22
144:19 145:21
146:1,2 189:21,24

198:23 225:13
238:8
**twenty** 204:7,13
**twenty-five** 209:6
**twice** 8:13 87:6
**two** 8:9,17 26:13
83:14 119:9
130:17,21 131:8
131:16 135:6
141:14 151:16
158:8 177:14
199:14 205:20
214:3,6
**twofold** 206:15
**type** 47:14 80:11
107:5,6 108:3
128:15 158:16,19
158:21 178:15,17
178:19 179:13
195:15 215:2,12
**types** 75:12 98:25
128:7

_____

**U**

**U** 5:1
**Uh-huh** 39:5 67:8
105:1 123:11
160:14 161:15
186:25 187:16
188:15 202:23
204:8 207:1
214:14 224:12
233:16 235:6,11
**um** 8:21 9:10 15:21
18:13 25:4,22
26:11 28:5 32:19
47:9 49:7,12
52:25 76:2 79:17
100:13 104:23
118:3 125:23
126:4,24 128:10
130:23 142:13
144:18 151:18
155:3 157:12
159:14 162:25
163:12 176:5

180:20 181:21
182:24 197:8
200:18 230:21
**uncontrolled** 97:2
101:6
**undergoing** 199:11
**underlays** 157:8
**underlies** 73:1
**undermine** 69:11
**underneath** 135:22
180:22 188:8
196:21 230:8
231:7 233:23
235:4,5 239:23
**underseepage**
25:10 34:3,10
36:9 41:24 66:24
66:25 67:2,22,23
69:10 72:19,24
96:24 97:16 99:20
100:12,15 104:1
186:16 187:7,9,18
187:22 188:4,10
192:23 196:1,17
196:20
**understand** 7:17
7:24 8:3 19:15
26:22 42:2 43:6
43:24 45:9 52:16
60:13,25 64:5
65:15 66:5 68:14
72:4,8 74:17 75:9
75:24 84:5 85:1,6
85:6 86:13 99:15
107:15 128:5,6
150:8 159:7
166:18 192:12
203:5,6,12 207:6
229:1,23
**understanding**
12:1,6 30:2 37:7
107:9 148:13
242:12
**undertake** 148:11
**Underwater**
231:23

**unique** 52:7
**United** 1:1,10,11
2:11,12 88:7
90:18 140:23
141:1
**universally** 221:9
**unknown** 113:5,12
**updated** 161:5
**uplift** 97:3 101:7
**USACE** 6:20 39:13
72:17 96:21
117:17 171:16
191:18
**use** 38:12 51:5,8
52:20,21 55:13
58:25 61:19,20
71:14 128:8,10,11
128:19 142:18
157:2 163:4,14
179:13 180:5
215:12 224:11
**uses** 169:12
**usually** 29:18 50:7
97:9
**utilize** 163:18
209:13
**utilized** 70:24
162:21
**U.S** 1:13 3:1

_____

**V**

**Vague** 107:14
**vaguely** 184:22
**Valley** 198:20
**value** 42:18 113:24
**values** 97:8
**varies** 232:1
**variety** 128:6
218:17
**Various** 213:15
**Varuso** 86:20
**vary** 97:17
**velocities** 97:7
**verbiage** 98:3
188:2
**verify** 53:9 94:19

**versus** 75:12 146:4
201:2
**vertical** 97:16
221:18 222:1
**vibrating** 176:8
**vibration** 180:20
181:4,5
**vibrations** 67:6
**vibrator** 180:3,5
**vibratory** 173:4
176:7
**vicinity** 15:17,19
58:10 61:3 69:24
71:8 156:9 179:16
**Vicksburg** 168:24
169:4,6,7 198:15
**VIDEOGRAPH...**
3:22
**view** 175:17 186:7
187:21 189:25
190:1,2 191:8,25
**violate** 42:9 78:2
119:15 120:5,23
165:16
**violates** 56:5
**virtue** 111:3
**visit** 59:8,15
**visits** 29:15,16
**visualizing** 239:13
239:15
**void** 142:9 144:14
178:4
**voids** 177:20 178:3
**volumes** 184:12

_____

**W**

**wait** 54:14 77:9
82:2,2,3 91:21
92:5,5,12 124:24
139:13,22 169:7
208:13
**waived** 5:10
**walk** 77:8 78:3
94:21 95:12 215:9
**wall** 9:7,11,13,13
9:14 15:17 17:4

GRIESHABER, Ph.D., JOHN

20:8,13 21:15
36:19 39:4 50:20
53:25 54:15,18,20
54:24,25,25 55:1
55:8,11,15,17,17
56:18 60:1,9
61:14,22,24,25
70:14 72:2 74:7
74:23 91:13 92:13
93:11,17 94:7
95:4,5,13,15,20
95:20,25 97:3
99:22 101:7,14,15
101:19 102:13
119:3 121:3,8
122:22,24 123:12
147:24 156:19
160:15 173:23
181:1 184:3 188:4
188:7,8,10,18
191:21 194:20
195:12 196:9
201:9,11,17
206:18 210:4,7
212:18 213:2
223:12 230:11
238:25
**walls** 54:8,9,12
74:13 98:11,23,24
118:25
**wall's** 144:17
**want** 12:21,23 13:9
14:17 15:5 19:6
19:15 32:14 33:16
35:14,21 43:24
44:16 49:19 54:7
58:5 60:12 65:14
68:14 83:5 85:1
85:15 95:16,22
96:2 105:22 106:5
106:12 119:16
122:20 129:8
130:25 133:21
134:1 139:13,14
160:6 162:5
184:13 189:14

191:1 206:7,16,17
212:3 227:23
231:1
**wanted** 18:11 32:17
51:14 60:21
112:22 129:4
199:17
**wants** 43:10 62:3
85:21 205:18,19
206:2,2 207:17
209:11
**Ward** 43:11 194:23
195:24 238:16
**washing** 217:7
**Washington** 2:18
26:18 107:25
129:19 150:7
162:22 164:5
**wasn't** 32:13 49:11
79:4,12 90:3
153:18 199:19
**water** 38:1 41:3,18
62:8,16 66:9,10
71:9 74:2 75:16
79:1,16 96:22
97:2 100:15 101:2
101:6,11,22,23,24
102:6 106:8 107:2
137:10 140:21
149:16 150:20,23
159:11 160:8
184:2 185:12
187:19 188:4,6,19
203:17 205:8
214:22 216:20
223:4 231:5 232:3
232:12,15,17
233:4,20,22 235:9
235:21 236:7,9,9
236:16,17,18,21
237:13 238:3,5,16
239:1,3,13,15,17
239:19,21,22
240:3
**waterline** 221:16
**water's** 79:14

233:21
**water-bearing**
234:23
**way** 8:22 11:6
12:17 21:20 29:9
35:18,20 43:8
47:4 53:7 75:6
78:13 84:1 94:1
101:13 104:9
106:11 130:25
135:13 142:6,14
148:14 152:22
166:4 180:9
196:17 198:23
201:19 202:21
204:18 205:7,13
211:3 217:10
235:22,22 236:8
239:11 242:15
**ways** 119:9 126:5
164:8 228:19
230:5
**weak** 178:14
195:16,20
**weakened** 187:3
**website** 30:18,22
154:19
**wedding** 114:8,16
135:21 137:16
140:15
**week** 85:22 86:8
197:21
**weeks** 8:9 62:8
**weigh** 38:12
**weighing** 38:5
**weight** 177:11,25
**Weighted** 39:15
40:24 96:8,12,13
**went** 9:4 126:13,22
144:21 145:1
148:7 153:16
176:10 185:12
186:22 212:8
219:9,14 220:5
226:18
**weren't** 114:14

**west** 155:4 207:11
207:12
**western** 207:3
210:7,16
**wet** 178:16 179:11
**wetter** 215:5
**we'll** 7:22 14:9 15:4
15:10 80:17 83:9
84:3 85:15 96:18
191:9 212:2
**we're** 9:15 38:4
40:10 49:15,20
54:13,17,18,21
60:5 73:25 80:16
81:12 83:18 88:2
92:14 93:25
104:24 140:15
141:22 142:2,24
143:2,3 146:4,23
151:24 152:19
177:12 183:1,2
187:8,9 188:3
205:10,12 207:22
208:13 213:1
215:4,17 219:3
**we've** 13:21 24:3
27:7 46:21 47:16
59:25 75:15 77:3
77:6 82:2,4,25
88:16 100:8 114:4
124:12 140:16
141:21 144:7
182:11 205:15
212:17 220:17
234:19
**WGI** 27:24 108:6
108:11 109:12,18
109:24 110:16
113:25 114:12
129:18 130:7,9
131:19,21
133:2 134:12
135:2,4,5,7,7,8,8
135:8,9,9,10,10
135:11,11,12,12
135:12,12,14

136:5 146:11
147:4 148:21
149:9,10 159:17
161:10 162:16
163:18 171:6
172:24 177:12
178:6,8 228:14
**WGINT** 117:16
173:6
**white** 174:14
203:10
**wide** 204:5 209:7
213:7
**width** 204:19
**WILLIAM** 3:10
**willing** 106:16
**Wink's** 197:20
**withdraw** 140:6
**withdrew** 140:9
**witness** 5:4,25 6:18
6:21 12:19 13:7
15:1 18:7,16
19:18 27:4,6,16
30:15,25 31:2
32:22 35:3 43:23
46:22 57:14 58:17
64:4,9,19 78:11
78:14 82:8,18,22
102:22 108:22
125:19 131:25
138:11 151:14
152:3 155:19
156:4 166:1
183:13 189:3
190:8,25 191:9
201:23 206:11
231:10 240:16
241:1 242:5
**wondering** 37:20
230:4
**wood** 113:19
136:12
**Woody** 182:1
**word** 49:22 56:20
75:6 102:20
158:11

GRIESHABER, Ph.D., JOHN

| | | | | |
|---|---|---|---|---|
| **words** 89:23 115:20 122:24 180:13 221:19 | 150:2,5 **wrong** 37:17 42:17 42:21 67:17 83:8 137:1 138:2 139:3 150:14 | 152:16 153:6 232:1,17 235:19 237:10,11 **0+00S** 21:13 | 200:4 218:3 **12-inch** 214:20 215:7 216:18 **13** 4:21 197:1,12 | **20** 157:8 168:13 172:10 222:14 **2000** 72:17 219:15 **2001** 134:14 |
| **work** 14:7 26:17 27:17,25 28:4 32:3 47:14 48:9 48:20 49:5 58:9 59:16 60:7,12,15 60:17,18 61:2,4,7 61:11,13 62:3,4 62:14,16 68:22 69:3,3,5,24 70:4,8 70:9,9,22 71:12 79:5,15 99:11 107:4,10,25 108:5 110:24 111:9 112:14 114:1,10 115:23 117:11 128:12 146:12 147:5 148:14 152:22 163:19 169:2 170:8 171:13,15 227:11 228:6 | **wrote** 193:18 ——— **X** ——— **X** 4:1,1,6,6 ——— **Y** ——— **yards** 233:4 **yeah** 10:23 59:25 72:11 81:2 98:16 100:23 109:12 116:8 129:20,20 132:11 134:20 136:4 142:5 144:23 145:8 152:4 154:9 157:10 164:23 170:19 174:9 184:13 185:15 201:14 217:23 218:24 220:14 223:21 230:2 232:18 234:5 236:11 | **007252** 197:4 **007277** 197:3 **007279** 202:14 **02** 25:22 **03** 25:23 **037475** 135:5 **05-4182** 1:5 **057606** 131:21 **057615** 131:21 **06-2268** 1:8 **07** 24:10 **07254** 204:23 **076654** 162:16 ——— **1** ——— **1** 4:9 11:9,10 114:1 212:15 221:18,20 222:1 224:11,13 225:6 **1+57** 22:19 **1-1/2** 224:11 **10** 4:18 133:4,5 134:9,14 149:4,4 157:7 159:16 162:13,15 | 217:21 218:3 224:22 **133** 4:18 **14** 4:22 23:3 198:5 198:8 205:2 218:3 219:2 220:15 **148** 4:19 **15** 4:23 121:7 212:16 213:7 218:8,20 219:1 220:12,15 **151** 4:20 **16** 22:12 41:2,14,16 41:17 135:9 200:25 213:12 **16+08** 22:6 **16-foot** 200:12 208:2 210:15 217:14 **17** 4:24 135:9 234:15,16 **17th** 195:5,11,14 195:21 196:2 233:1,2 | **2002** 25:15 **20044** 2:18 **2008** 1:16 241:25 **202-616-4289** 2:19 **21** 34:6 **212862** 130:10 132:20 **212866** 132:20 **218** 4:23 **22** 21:25 22:13 41:3 41:19 **228430** 135:4 **229272** 135:11 **23** 38:2 **23-foot** 38:3 **234** 4:24 **24-inch** 215:7 **25** 73:14 74:19 117:16,20 118:10 135:7 136:13 144:19,22,25 145:6,11 149:15 149:18 150:14 168:12 200:22 |
| **worked** 25:13 **works** 169:23 220:21 **worried** 142:22 217:3,5 **worry** 75:21 146:4 213:11 **worst** 39:2 123:15 **wouldn't** 74:3 125:21 216:14 219:24 224:13 | **year** 10:11 25:21 233:4 **years** 24:18 148:18 **yellow** 17:10 **Yep** 234:24 **y'all** 103:6 143:8 | **10/15/01** 171:17 **100** 213:20 215:16 **100-pound** 215:22 **109** 4:14 | **18015** 135:9 **19.75** 159:18,25 **1969** 10:21 23:11 23:20 191:21 192:2,5 **197** 4:21 | **25-foot** 104:21 124:25 125:1 188:13 213:7 **253** 197:4 218:12 **254** 197:4 214:17 218:12 |
| **write** 137:19 139:16,23 **writing** 61:8,16 91:21 181:8 198:24 229:19 **writings** 148:2 **written** 49:4,11 51:18,19 54:2 55:22,24 57:7 59:10,12 60:14,19 60:24 70:7 123:22 | ——— **Z** ——— **Z** 175:17 **zone** 182:9 **zones** 97:10 106:24 107:1,3 ——— **#** ——— **#75005** 1:25 242:25 ——— **0** ——— **0** 22:19,22 38:3 | **11** 4:9,10,11,19 133:1 148:20,22 149:1,4 **110** 4:15 **1110-2-1913** 72:16 **1110-2-2502** 96:20 **115** 4:16,17 **12** 4:20 148:25 151:10,11 154:23 161:3 178:22 179:22 198:1 | **1970** 23:3 **198** 4:22 **1986** 192:17 **1989** 52:17 96:21 **1999** 25:13 ——— **2** ——— **2** 4:10 11:15,16 21:12 33:13 153:24 154:1 212:16 216:20 235:15 | **2544393** 135:8 **255** 197:4 214:16 218:13 **26** 14:20 110:1 224:6 **260** 223:11,14 **262218** 228:14 **27** 6:14 18:6 134:14 134:17 135:1 **27th** 1:16 241:25 **2701** 33:7 **278** 197:3 |

GRIESHABER, Ph.D., JOHN

**279** 197:3
**28** 6:14 44:3,5,7,13
   154:23,24 155:16
**29** 154:24
**29-99-D-0022** 33:2
**2980** 223:16

---

**3**

**3** 4:11 11:20,21
   13:21 20:16 24:4
   39:16 41:1 100:9
   117:5 132:6
   154:17 156:8
   214:20,22 218:25
   219:1 221:18,25
   222:1 223:7,15
   224:13 225:6
   232:1,15 235:9,13
   236:7 237:2,4,9
   237:10
**3NGV** 237:5
**3s** 221:20
**3-foot** 213:6
**3-15** 40:9
**3-16** 40:2
**3-17** 40:2
**3-3** 40:9
**3-7** 38:16
**3.1** 113:3
**3:1** 39:6
**30** 20:22 21:23
   24:18 73:15
   113:20 136:12,15
   141:9 142:4,24
   143:19
**30(b)(6)** 1:10 6:3
   27:6,16 86:14,21
   110:4 191:9
**30+0-0** 21:18
**30+00** 20:21 21:4
**30-foot** 145:11
**300** 42:19 43:11
   45:21 54:20 71:11
   71:16,24 74:21
   83:10,11,13,15
   118:18 136:19

**140:20** 160:7
   207:14 208:3,6
**31** 6:14 105:6
**32-acre** 199:9
**34** 6:14
**343375** 135:10
**35** 113:20 136:13
   136:15 142:3
**35-foot** 141:10
   143:19
**36** 21:24 34:5,13
   36:4
**36+50** 20:23
**36+90** 21:7,18
**36-foot** 36:11
**36981** 135:9
**36984** 133:2 134:12
   177:13
**36985** 135:10
**37** 6:14

---

**4**

**4** 4:12 47:16,20
   56:9 132:11
   143:18
**40** 142:24 143:22
   144:16,18
**410** 173:3
**43** 135:11
**45** 135:11
**46** 135:11
**47** 4:12 135:11
**48621** 135:13
**48626** 159:17

---

**5**

**5** 4:13 94:2,3 122:6
   132:11 141:9
   143:18 202:9
   214:21 216:19
**5-foot** 143:18
**50** 157:18
**504-525-1335** 2:9
**504-862-2843** 3:6
**51585** 148:21
**51611** 149:10

**51656** 149:10
**51682** 135:10
**52123** 134:25
**52124** 178:8
**52125** 172:24
**52127** 134:20
**54** 135:3
**54419** 110:16
**54420** 113:2 136:5
**54433** 110:17
**56** 21:25 22:19,23
**56789** 109:12
**57592** 131:19
**57601** 130:7 131:20
**57606** 130:7,16
**58** 135:14

---

**6**

**6** 4:5,14 20:21 21:5
   109:5,6 117:7
   132:11
**60** 33:19
**600** 153:18
**601** 130:12
**606** 130:12
**614** 130:17
**615** 130:18
**630** 135:13
**6423** 135:7
**6454** 135:7
**65** 37:18
**69** 23:3

---

**7**

**7** 4:15 21:10,23
   110:16,18 111:1
   127:18 132:11
   136:9 192:17
**7+50** 22:6
**700** 154:7
**70113** 2:8
**70118** 6:21
**70118-3651** 1:16
   3:5
**71142** 135:11
**7252** 218:11 219:2

**7400** 1:15 3:4 6:20
**76** 135:5,10
**76330** 135:12
**76654** 161:10
**76655** 135:2
**76657** 135:14 171:6
**76659** 135:12
**76660** 135:12

---

**8**

**8** 4:16 21:7 22:20
   99:13 115:7,11
   116:3 124:17
   130:6,13,15 131:3
   131:15 143:19
   172:24 184:12
**8th** 219:15
**8.0** 17:11,14
**800** 152:17 153:17
   154:3
**82** 135:9
**84** 135:8
**85** 135:8
**855** 2:7
**8583** 135:8
**888** 2:16

---

**9**

**9** 4:17 115:10,13
   130:9 132:17
**90** 20:25 152:16,17
   214:20 215:11,20
   215:22,24 216:18
**90-pound** 215:23
**92** 130:19
**94** 4:13