# EXHIBIT
# 8

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE: KATRINA CANAL BREACHES        CIVIL ACTION

CONSOLIDATED LITIGATION              NO. 05-4182 K2

                                     JUDGE DUVAL

PERTAINS TO:  MRGO AND ROBINSON

                  (No. 06-2268)


        Rule 30(b)(6) deposition of THE UNITED

STATES OF AMERICA, BY AND THROUGH THE UNITED

STATES ARMY CORPS OF ENGINEERS' DESIGNEE LEE

GUILLORY, given at the U.S. Army Corps of

Engineers New Orleans District offices, 7400

Leake Avenue, New Orleans, Louisiana

70118-3651, on June 30th, 2008.


REPORTED BY:

        JOSEPH A. FAIRBANKS, JR., CCR, RPR

        CERTIFIED COURT REPORTER #75005

GUILLORY, LEE

6/30/2008

---

Page 2

```
1   APPEARANCES:
2   REPRESENTING THE PLAINTIFFS:
3       BRUNO & BRUNO
4       (BY:  JOSEPH M. BRUNO, ESQUIRE)
5       (BY:  SCOTT JOANEN, ESQUIRE)
6       855 Baronne Street
7       New Orleans, Louisiana 70113
8       504-525-1335
9
10  REPRESENTING THE UNITED STATES OF AMERICA:
11      UNITED STATES DEPARTMENT OF JUSTICE,
12      TORTS BRANCH, CIVIL DIVISION
13      (BY:  RICHARD STONE, ESQUIRE)
14      (BY:  TAHEERAH EL-AMIN, ESQUIRE)
15      P.O. Box 888
16      Benjamin Franklin Station
17      Washington, D.C. 20044
18      202-616-4289
19
20  REPRESENTING THE U.S. ARMY CORPS OF ENGINEERS.
21      CORPS OF ENGINEERS, OFFICE OF COUNSEL
22      (BY:  DAVID DYER, ESQUIRE)
23      7400 Leake Avenue
24      New Orleans, Louisiana 70118-3651
25      504-862-2843
```

---

Page 4

```
1        E X A M I N A T I O N   I N D E X
2
3   EXAMINATION BY:                    PAGE
4
5   MR. BRUNO   ..............................10
6        E X H I B I T   I N D E X
7
8   EXHIBIT NO.                    PAGE
9   Plaintiff's Exhibit 1 ....................143
10  Plaintiff's Exhibit 2 ....................144
11  Plaintiff's Exhibit 5 ....................162
12  Plaintiff's Exhibit 6 ....................162
13  Plaintiff's Exhibit 7 ....................202
14  Plaintiff's Exhibit 8 ....................202
15  Plaintiff's Exhibit 9 ....................215
16
17
18
19
20
21
22
23
24
25
```

---

Page 3

```
1   ALSO PRESENT:
2       JOHN L. ROBERT, III, ESQ.
3       WILLIAM D. TREEBY, ESQ.
4       THOMAS P. ANZELMO, ESQ.
5       RICHARD PAVLICK, ESQ.
6       NICOLE BOYER-DUPLASS, ESQ.
7       DEBRA CLAYMAN, ESQ.
8
9   PRESENT VIA I-DEP:
10      ADRIAN WAGER-ZITO, ESQ.
11      ERIC GOLDBERG, ESQ.
12      RONALD KITTO, ESQ.
13      CHRISTOPHER ALFIERI, ESQ.
14      J. WARREN GARDNER, JR., ESQ.
15
16  VIDEOGRAPHER:
17      TODD MEAUX (DEPO-VUE)
18
19
20
21
22
23
24
25
```

---

Page 5

```
1        S T I P U L A T I O N
2        IT IS STIPULATED AND AGREED by and
3   among counsel for the parties hereto that the
4   deposition of the aforementioned witness may be
5   taken for all purposes permitted within the
6   Federal Rules of Civil Procedure, in accordance
7   with law, pursuant to notice;
8        That all formalities, save reading
9   and signing of the original transcript by the
10  deponent, are hereby specifically waived;
11       That all objections, save those as to
12  the form of the question and the responsiveness
13  of the answer, are reserved until such time as
14  this deposition, or any part thereof, is used
15  or sought to be used in evidence.
16
17
18             *  *  *
19
20
21
22       JOSEPH A. FAIRBANKS, JR., CCR, RPR,
23  Certified Court Reporter in and for the State
24  of Louisiana, officiated in administering the
25  oath to the witness.
```

---

2 (Pages 2 to 5)

GUILLORY, LEE

6/30/2008

Page 6

1    MR. BRUNO:
2        Listen, guys, some of you all may
3    not have been here, but this is
4    noticed both in Robinson and in gthe
5    class actions. WGI has reserved its
6    right to question this witness at a
7    later time, as I believe has Lafarge,
8    but if you -- standing here present
9    and not asking questions is not going
10   to allow you to reserve your right to
11   cross-examine. Just to make that
12   clear for the record.
13       Am I right, Richard?
14   MR. STONE:
15       That's correct.
16   MR. BRUNO:
17       All right. This is a
18   continuation of our previously noticed
19   30(b)(6) deposition. Counsel, I
20   notice that we have a new designee.
21   Would you be so kind as to identify
22   the new designee and the paragraphs
23   for which this gentleman has been
24   designated to speak on behalf of the
25   United States of America here through

Page 7

1    the U.S. Army Corps of Engineers.
2    MR. STONE:
3        Mr. Guillory will speak to Items
4    2, 4 through 6, and parts of Number 7.
5    In Number 7, he will speak to project
6    construction documents except for
7    environmental impact statements,
8    supplemental impact statements, high
9    level plans and studies.
10       He will also speak to Items 8 and
11   9, 11 through 16, 22 through 24, 26,
12   29, 32 and 33, 38, 40 and 41, 43
13   through 46 -- I'm sorry, 43 through 56
14   and 58 through 60.
15       As to Item 19, if asked
16   Mr. Guillory can speak to on-site
17   assessment of the work being performed
18   with respect to effect on the
19   floodwalls. For example, analyses
20   done regarding the borrow pit and
21   Surekote Road excavations.
22       As to Item 30, Mr. Guillory can
23   speak to the vibration testing done
24   and the results of those tests.
25       Additionally, as the Item 21,

Page 8

1    Mr. Guillory can speak to whether the
2    Task Order 26 required dredging.
3        And essentially I just read the
4    E-mail that I forwarded to Scott
5    Joanen to identify the items last
6    week.
7    MR. BRUNO:
8        I guess I'm a little confused.
9    He's still a designee, then, for 19;
10   right?
11   MR. BRUNO:
12       I don't understand the
13   distinction between speak to and
14   designee for.
15   MR. STONE:
16       No, I don't mean to --
17   MR. BRUNO:
18       Okay. So he's the designee for
19   19?
20   MR. STONE:
21       To the extent that I mentioned
22   there.
23   MR. BRUNO:
24       No, I understand. Let's just
25   clear it up now.

Page 9

1    MR. STONE:
2        Ask him anything you want to
3    about 19 and he'll tell you whether he
4    can answer on it because the guy who's
5    qualified.
6    MR. BRUNO:
7        All right. So bottom line is,
8    the gentleman is the designee for 19.
9        And what's the other one you say,
10   Richard? I'm sorry. Maybe I'll just
11   read the memo.
12   MR. STONE:
13       Yeah. There's the E-mail.
14   MR. BRUNO:
15       All right. He's also the
16   designee for 30 and 21. It's not your
17   intention to produce anybody else for
18   these three paragraphs, right?
19   MR. STONE:
20       If he can't cover everything that
21   you need to talk to about these, then
22   I will try to find someone else if
23   necessary.
24   MR. BRUNO:
25       Great.

3 (Pages 6 to 9)

GUILLORY, LEE

6/30/2008

Page 10

1    MR. STONE:
2         I'm hoping we don't have to do
3    that, of course.
4         LEE GUILLORY
5    USACE-NOD, 7400 Leake Avenue, New Orleans,
6    Louisiana 70118, a witness named in the above
7    stipulation, having been first duly sworn, was
8    examined and testified on his oath as follows:
9    EXAMINATION BY MR. BRUNO:
10    Q.  Good morning, Mr. Guillory.  We've
11   already met.  My name is Joseph Bruno.  I am
12   plaintiffs' liaison counsel.
13        Have you ever given a deposition?
14    A.  First one.
15    Q.  It's your first one.  Okay.  So let me
16   tell you a little bit about what you can
17   expect.  All right?  First of all, if you need
18   to take a break for whatever reason, let me
19   know, we'll stop.  You're the boss of breaks.
20        Secondly, you will from time to time
21   hear objections from counsel for the government
22   or other counsel in the room.  They get paid to
23   make objections.  The Point is, though, that
24   unless the objection instructs you not to
25   answer the question you must answer the

Page 11

1    question.  They're making these objections to
2    preserve them for this record.  Okay?  And it's
3    not fair for anybody on either side to make an
4    objection and then speak so that the witness
5    gets some idea of what the lawyer wants them to
6    say.
7         You understand?
8    A.  Right.
9    Q.  We're here to hear what you have to
10   say.
11        If you don't understand a question,
12   which is likely, I'm not an engineer, I'm not
13   as expert as you are in this field, please tell
14   me that you don't understand and I will attempt
15   to rephrase the question so that you understand
16   it.  If you don't tell me I don't understand,
17   I'm going to assume that you do, in fairness to
18   me.  Okay?  Is that okay?
19    A.  That's fair.
20    Q.  All right.  Now, I understand in
21   preparation for this deposition you met with
22   counsel for WGI?
23        MR. STONE:
24         Objection.
25        MR. BRUNO:

Page 12

1         Okay.
2    MR. STONE:
3         And I would instruct the
4    witness --
5    MR. BRUNO:
6         I'm not going to ask him anything
7    about what was said, I just want to
8    confirm for the record that they met.
9    MR. STONE:
10         But he didn't meet with them in
11   preparation for this question.  He's
12   met with them in the past but not in
13   preparation.
14   MR. BRUNO:
15         Then he can answer no, Richard.
16   I mean, thanks but --
17   EXAMINATION BY MR. BRUNO:
18    Q.  You see what I mean by -- that's
19   exactly what I mean by an objection that gives
20   you an answer.  All right?
21        How about this:  Have you ever met
22   with counsel for the Washington Group
23   International?
24    A.  Yes.
25    Q.  Okay.  Does counsel for the Washington

Page 13

1    Group International represent the government
2    through the United States Army Corps of
3    Engineers?  Do you know that?
4    A.  I don't know.
5    Q.  Don't know that.  Okay.
6         Were you asked questions by counsel
7    for WGI during the opportunity that they had to
8    meet with you?
9    A.  Yes.
10    Q.  Did you produce any documents at their
11   request?
12        MR. STONE:
13         I object here, and I'd instruct
14    the witness not to answer anything
15    further about any meetings with WGI
16    because the United States and WGI have
17    a joint defense agreement.
18    MR. BRUNO:
19         Okay.  I call for its production.
20    MR. TREEBY:
21         CMO No. 41C1B provides
22    specifically for this proposition.  It
23    says, communications of any kind
24    whatsoever whether written oral or
25    electronic between and among

Johns Pendleton Court Reporters                    800 562-1285

GUILLORY, LEE

6/30/2008

Page 14

1  defendants' counsel and between or
2  among defendants counsel and any
3  defendant shall be privileged.
4  MR. BRUNO:
5      That's fine. I'm calling for
6  production of the document, that's
7  all, Bill. No big deal. Does that
8  phrase respond to my request for the
9  production of the joint defense
10  agreement?
11  MR. TREEBY:
12      We believe it does.
13  MR. BRUNO:
14      It does?
15  MR. TREEBY:
16      We believe it does.
17  MR. BRUNO:
18      Does it say don't produce it? Am
19  I missing something? Read it to me.
20  Where does it say don't produce it?
21  MR. TREEBY:
22      I read it once. We're going to
23  disagree about what it means and --
24  MR. BRUNO:
25      Well, does it say don't produce

Page 15

1  the document?
2  MR. TREEBY:
3      We believe it does.
4  MR. STONE:
5      The United States does not agree
6  to produce the document to you.
7  MR. BRUNO:
8      Fair enough.
9  MR. STONE:
10      If necessary, we will produce it
11  in camera to the magistrate at any
12  time.
13  MR. BRUNO:
14      Fair enough. That's good. I
15  just want to put it on the record.
16  Okay?
17      And I don't appreciate the
18  suggestion that a document says
19  something it doesn't say. It has
20  nothing to do with the production of
21  any joint defense agreement. We'll
22  let the judge decide that. And that's
23  easy the get through.
24  EXAMINATION BY MR. BRUNO:
25      Q. All right. Did you have a chance to

Page 16

1  prepare for this deposition --
2      A. Yes.
3      Q. -- with counsel?
4      All right. And how many hours were
5  spent in preparation?
6      A. Approximately four total.
7      Q. Okay. And were you shown some
8  documents?
9      A. I reviewed my own project documents.
10      Q. Okay. You have a file that contains
11  your project documents? Or did you have to go
12  somewhere else and assemble those, you know,
13  pull them out of some other files in order to
14  have a set of documents to look at?
15      A. They were project documents that are
16  all part of the repository in the case.
17      Q. Okay. All right. But my question
18  was, do you, Mr. Guillory, have your own file
19  that's yours, that you maintain, that contains
20  project documents?
21      A. No, sir. All project documents were
22  consolidated and sent to the records holding
23  which became a part of the repository.
24      Q. Great. Thank you. So did you go to
25  the repository and reassemble those documents?

Page 17

1      A. No. They were shipped here to New
2  Orleans District office.
3      Q. Now, when you say project documents,
4  can you describe for me what those documents
5  would be.
6      A. It was, um -- approximately twelve
7  boxes of seventy-six contract documents for the
8  IHNC Task Order No. 26 project.
9      Q. Twelve boxes of seventy-six documents?
10      A. No. Seventy-six total boxes.
11      Q. Oh, I see. Twelve of seventy-six
12  total boxes.
13      A. Correct.
14      Q. Thank you. I didn't understand that.
15      What was in the twelve boxes?
16      A. Various reports, correspondence, um --
17  all the financial documents of the project,
18  pertinent documents that I felt addressed the,
19  um -- items in Exhibit A.
20      Q. Now, you say -- well, did you direct
21  someone to go retrieve these documents for you?
22      A. Yes. I asked our Office of Counsel
23  here to pull those twelve boxes so I could
24  review them before the deposition.
25      Q. And how did you designate those twelve

5  (Pages 14 to 17)

GUILLORY, LEE

6/30/2008

Page 18

1    boxes; in other words, what did you -- did you
2    say Box Number 5, or did you say the box
3    containing X?  How did they know which twelve
4    to pull?
5        A.  I gave them a list of the numbers of
6    boxes that I wanted based on an inventory that
7    was sent to records holding two, two and a half
8    years ago.
9        Q.  All right.  Would you mind sharing
10   that list with us so that we would know what
11   you deemed to be pertinent?
12       A.  Box numbers?
13       Q.  Yes.
14       A.  Sure.  1 through 4, 6, 9, 10, 12, 20
15   and 21, and 30 and Box 45.
16       Q.  Okay.  Thanks.  Now, let me learn a
17   little bit about you, if you don't mind.
18       A.  Sure.  Go ahead.
19       Q.  Do you happen to have a curriculum
20   vitae or a résumé?
21       A.  No, not with me.
22       Q.  That's okay.  All right.  When did you
23   finish college?
24       A.  Graduated December of 1982 from
25   University of Southwestern Louisiana in

Page 19

1    Lafayette, Louisiana, with a bachelor of
2    science in civil engineering.
3        Q.  Okay.  When did you begin with the
4    Corps?
5        A.  January 10th, 1983.
6        Q.  Can I gather from that that your
7    employment with the Corps was your first
8    full-time employment?
9        A.  First and only.
10       Q.  Okay.  All right.  What was your entry
11   level position?
12       A.  I was a GS-7 civil engineer.
13       Q.  You've got a bachelor of science, you
14   told me.
15       A.  Yes.
16       Q.  Are you licensed as an engineer by the
17   State of Louisiana?
18       A.  Yes.  January, 1991, professional
19   engineer in civil engineering.
20       Q.  And when you began your employment,
21   were you in the engineering department -- I'm
22   sorry.  I didn't even ask.  You're in this
23   office, the district office of New Orleans?
24       A.  I worked in the New Orleans District.
25   Started in Lafayette, Louisiana, for our

Page 20

1    construction division.
2        Q.  The district office has an office in
3    Lafayette?
4        A.  Yes.  It's an area office.
5        Q.  All right.  Have you always been in
6    the construction division during your entire
7    tenure?
8        A.  No, sir.
9        Q.  All right.  So let's walk through
10   this, then.  For how long were you first in the
11   construction division as a CS7?
12       MR. STONE:
13           GS.
14       A.  GS.
15   EXAMINATION BY MR. BRUNO:
16       Q.  GS.  Sorry.
17       A.  So I assume you want a synopsis of my
18   whole career?
19       Q.  Yeah, that's probably the easiest way
20   to get through this.
21       A.  Okay.  First year I was here at the
22   New Orleans District from January through
23   December of 1983, as a junior engineer in
24   training.
25           Three years -- next three years were

Page 21

1    in the Lafayette area office.
2        Q.  '84, '85 and '86, then, right?
3        A.  As project engineer.  (Witness nods
4    affirmatively.)
5            '86 through '90, I was in the New
6    Orleans area office as a project engineer.
7            January, 1990, through May of 1998, I
8    was in construction division, quality assurance
9    branch.
10           And from May of '98 to June, 2006, I
11   was in construction division as an HTRW
12   construction manager.  And that stands for
13   hazardous, toxic, radioactive waste.
14           June, 2006 to the present, I'm in
15   operations division, emergency operations
16   center, EOC, as a natural disaster manager.
17       Q.  Okay.
18       MR. STONE:
19           Joe, before we started you were
20       thinking about putting on the record
21       the fact that you're taking
22       Mr. Guillory both as a 30(b)(6)
23       witness and as a fact witness, and
24       we've agreed to try to do that.
25       MR. BRUNO:

6  (Pages 18 to 21)

Johns Pendleton Court Reporters                    800 562-1285

GUILLORY, LEE

Page 22

1       Yes, we've agreed -- right.
2  EXAMINATION BY MR. BRUNO:
3     Q.  I guess I'm going to presume that your
4  answers will be as a representative of the
5  Corps unless you tell me that they're not.
6  Okay?
7     A.  (Nods affirmatively.)
8     Q.  You've got notice in front of
9  you, and in order to be fair to you and
10 Richard, if you have some question about
11 whether you believe you're not speaking for the
12 Corps and it's probably a question that's, you
13 know, an individual response, take a moment and
14 speak to Richard.  Okay?
15     MR. STONE:
16        Actually, I think that will
17     depend on how you intend to use the
18     testimony later.  But I don't want to
19     belabor this here.
20     MR. BRUNO:
21        Richard, that won't work.  I
22     can't possibly know how I'm going
23     to -- I'm going to have to assume that
24     the answers are as a corporate rep or
25     a representative of the Corps now

Page 23

1  because I may want to explore further.
2  I think the fairer way is if you have
3  a problem or a question, just go ahead
4  and consult.
5     MR. STONE:
6        There are probably several
7     different ways you can do this
8     deposition.  If you stuck with the
9     categories and asked him about the
10    categories and went through those,
11    then you can have a bright line.  I'm
12    not asking you to do that.  I'm just
13    saying that if you're not --
14     MR. BRUNO:
15        That's almost impossible.
16     MR. STONE:
17        -- asking him for something
18     that's outside of these categories,
19     then we will object later if you're
20     trying to use that as if it's -- we
21     can potentially object later if
22     it's --
23     MR. BRUNO:
24        What you're saying is, what we
25     can do is reserve for another day an

Page 24

1       argument about whether the scope of
2     the paragraph covers the question?
3     MR. STONE:
4        Yes.
5     MR. BRUNO:
6        Okay.  That's fine.  I can do
7     that.  That's fine.
8  EXAMINATION BY MR. BRUNO:
9     Q.  You understand that?  In other words,
10 we have got these paragraphs which describe the
11 areas which we'd like to talk to you about, at
12 least you have been designated as the person to
13 talk to these areas, and rather than get into a
14 discussion about whether it's a 30(b)(6)
15 material or individual material, we'll let the
16 judge decide at some later time.
17        All right.  We were talking about your
18 vitae.  Now, so, let's see.  From '98 to '06
19 you were construction manager of the HTRW.
20        Does that mean that you -- let's see.
21 As I understand it, WGI -- there's only one of
22 two companies that had a TERC contract during
23 that period of time, so that you would only
24 have worked with WGI and perhaps one other
25 company?

Page 25

1     A.  Correct.
2     Q.  What's the other company you worked
3  with?
4     A.  At the time, they were IT Corporation.
5     Q.  IT.
6     A.  They have seen been bought out by Shaw
7  Group.
8     Q.  Okay.  Let's see.  So that was eight
9  years.  I imagine that you developed a pretty
10 good relationship with the folks at WGI over
11 that period of time.
12     A.  Yes.
13     Q.  Were there perhaps one or two contact
14 people that you dealt with on a regular basis
15 at Washington Group?
16     A.  Sure.  There was the TERC program
17 managers Stephen Roe and Gregory Jones, and
18 then we had a number of task order managers,
19 um -- Dennis O'Connor, Joseph Sensebe, and,
20 um -- finally we concluded Task Order 26 with
21 Richard Lesser.
22     Q.  Okay.  How many different projects did
23 WGI do for the Corps while you were
24 construction manager for HTRW?
25     A.  I can only speak to the effect of New

Johns Pendleton Court Reporters          800 562-1285

GUILLORY, LEE

Page 26

1    Orleans District.
2       Q.   Yes.
3       A.   They only did Task Order No. 26 for
4    New Orleans District.
5       Q.   All right.  Now, Task Order No. 26 is
6    a contract for environmental remediation, is
7    that correct?
8       A.   It's a task order cut off of a larger
9    parent contract.  The larger parent contract
10   was awarded in 1994 for ten years by Tulsa
11   District Corps of Engineers, and Task Order No.
12   26 was a 30 million-dollar portion of that
13   contract.
14      Q.   Okay.  Well, I understand that, but
15   Task Order No. 26 still is an environmental
16   remediation contract, isn't it?
17      A.   Correct.
18      Q.   In other words, the purpose of the
19   work, the purpose of the contract was to remove
20   toxic materials from a particular geographic
21   location, right?
22      A.   It also involved building demolition,
23   site demolition and removal, and the remedial
24   action of the 32 acres of the East Bank
25   Industrial Area.

Page 27

1       Q.   Right.  Well, are you familiar with
2    TERC in general?
3       A.   Yes.
4       Q.   All right.  TERC, in general, is a
5    program by the U.S. Army Corps of Engineers to
6    facilitate the Army Corps' environmental
7    cleanup activities; isn't that true?
8       A.   Correct.
9       Q.   All right.
10      A.   Stands for Total Environmental
11   Restoration Contract.
12      Q.   Well, was the intent of the TERC to
13   also use those funds for building demolition
14   and the like?  Do you know?
15      A.   It's within the scope of work of the
16   original contract, yes.
17      Q.   When you say it's within the scope of
18   the original contract, you mean the original
19   basic contract, the '94 contract, or is it
20   within the scope of the Task Order 26?
21      A.   Both.
22      Q.   It is.  Okay.  All right.  Now, all
23   that means is that the words of the scope of
24   work contains words that say demolition, right?
25   When you say within the scope of work, scope of

Page 28

1    work is written by the Washington Group, isn't
2    it?
3       A.   No, the scopes of work are written by
4    the government representatives and issued to
5    Washington Group for a request for proposals.
6       Q.   Okay.  All right.  I'm speaking
7    specifically to Paragraph Number 58.  Okay?
8       A.   All right.
9       Q.   Now, the fact is that the overall
10   purpose in remediating and/or demolishing this
11   area is because this area is an area that was
12   going to be used for a lock expansion project,
13   isn't that true?
14      A.   Correct.
15      Q.   Okay.  Now, when did the Congress of
16   the United States authorize the Corps to do
17   that work?
18      A.   I don't know.
19      Q.   Wasn't it authorized at the same time
20   that the Congress authorized the construction
21   of the MRGO?
22      A.   I don't know.
23      Q.   Okay.  It is often the case that there
24   may be a lapse of time between the time at
25   which the Congress authorizes the Corps to do a

Page 29

1    project and the time at which the Congress
2    funds the same project.  Isn't that true?
3       A.   Correct.  It's authorization versus
4    appropriation.
5       Q.   All right.  And as you sit here you
6    don't know when the Congress authorized the
7    lock expansion project.
8       A.   No.
9       Q.   Okay.  Can we agree that the United
10   States Congress authorized the lock expansion
11   project at some time in the past, that is,
12   before 1998, at least?
13      A.   Correct.
14      Q.   And can we agree that that
15   authorization had been around for a long period
16   of time, without you telling me when the
17   authorization occurred?
18      A.   Correct.
19      Q.   You knew that much.  Okay.  Now, so
20   can you tell me what was the event or what was
21   the catalyst for starting the project when it
22   was started?
23      A.   What portion of the project are you
24   referring to?
25      Q.   Well, that's a good question.

8  (Pages 26 to 29)

Johns Pendleton Court Reporters                    800 562-1285

GUILLORY, LEE

Page 30

1   What would be the first step -- how
2   would you describe the first action -- let's
3   withdraw it because I want to make sure we have
4   a very clear record.
5   Number one, tell me what is the right
6   way to describe the lock expansion project at
7   the Lower Nine; what's the right words or
8   acronym or whatever, so you and I are on the
9   same page?
10  MR. STONE:
11      Objection.  Vague.
12  MR. BRUNO:
13      How can that be vague?  I'm
14  asking him to tell me.
15  MR. STONE:
16      You want a name for it, or you
17  want something else?
18  MR. BRUNO:
19      Yes.  I want to know how to
20  describe it.  You describe it in a
21  way -- boy, I'll tell you, Richard.
22  Those are some interesting objections.
23  EXAMINATION BY MR. BRUNO:
24  Q.  I want you and I to be able to talk
25  about the same thing.  All right?  We

Page 31

1   understand the location we're talking about;
2   right?
3   A.  Correct.
4   Q.  We're talking about a piece of turf in
5   the Industrial Canal between the river and the
6   intracoastal waterway.  And we understand that
7   the Corps was going to build a new lock in that
8   general area, right?
9   A.  Correct.
10  Q.  Okay.  I just want to see if you can
11  tell me what is the best way to describe that
12  work so that you and I can be talking about the
13  same thing.
14  A.  Senior project manager Joseph Dicharry
15  would be the best person to describe that to
16  you.
17  Q.  All right.
18  A.  But it is the IHNC lock replacement
19  contract.
20  Q.  All right.  IHNC lock replacement
21  contract?
22  A.  Project.  Sorry.  Scratch contract.
23  Q.  Project.  Fair.  Thank you, sir.
24  Now, the Task Order No. 26 was a
25  component of that project, right?

Page 32

1   A.  Correct.
2   Q.  Okay.  Now, so do you know, sir, what
3   is the first activity that occurred with regard
4   to the IHNC lock replacement project?  After
5   authorization, I mean, the first thing that the
6   Corps did to implement that project.
7   A.  I don't know.
8   Q.  Okay.  All right.
9   A.  I can answer your question with
10  respect to the TERC Task Order No. 26 and
11  that's all.
12  Q.  Fair enough.  And who should I ask
13  about, you know, what was the first thing that
14  they did to implement?
15  A.  That would be senior project manager,
16  now retired, Joseph Dicharry, Jr., or his
17  subsequent replacement Carol Burdine.
18  Q.  Okay.  All right.  This project called
19  for the dredging of the east bank of the
20  Industrial Canal between Florida Avenue and N.
21  Claiborne, right?
22  A.  No, sir.  I disagree with that.
23  Q.  Oh, it didn't?  Wasn't there an intent
24  to remove or to create a channel, a new channel
25  alongside the Lower Nine east bank in the

Page 33

1   Industrial Canal?
2   A.  The overall IHNC lock replacement
3   project included, um -- a contract in the
4   future for hydraulic dredging of bypass
5   channels.
6   Q.  Right.  Okay.  I guess I'm -- how did
7   I -- what was -- how did I mess up my first
8   question, then?  I don't understand.
9   The project called for dredging at
10  some point in the future; right?
11  A.  Yes.
12  Q.  I wasn't -- did you think I was
13  talking about 26?  Was that it?
14  A.  Yes.
15  Q.  Okay.  All right.  Fair.  I just want
16  to make sure you and I are on the same page.
17  Because I wasn't intending to ask that that
18  way.  What I'm trying to do is give the
19  background.
20  So that the original IHNC lock
21  replacement --
22  MR. BRUNO:
23      If you're like having to huff and
24  puff, would you take it outside,
25  Mr. Treeby?  You did this all day

Johns Pendleton Court Reporters

GUILLORY, LEE

Page 34

1      Friday, and I don't want to listen to
2  it all day today.
3      MR. TREEBY:
4        I'm sorry.  If I offend you, it's
5  just too bad.
6      MR. BRUNO:
7        Okay.  That's fine.  I just think
8  the huffing and puffing is a little
9  much for anybody to deal with.
10  EXAMINATION BY MR. BRUNO:
11     Q.  In any case, it was contemplated by
12  the Corps that at some point in the future
13  there would be dredging of the Industrial Canal
14  on the east bank, and to prepare for that
15  dredging there was a need to remove the
16  wharves, buildings and other items that were
17  located where that future dredging was proposed
18  to take place, isn't that true?
19     A.  Correct.
20     Q.  Okay.  All right.  Now, do you know,
21  sir, whether or not the Congress of the United
22  States appropriated money in order for the
23  Corps to implement the IHNC lock replacement
24  project?
25     A.  Yes, I don't know the time frame or

Page 35

1  the amounts.
2     Q.  All right.  Now, this particular
3  component of the project, the Task Order
4  No. 26, it -- do you know if the Congress of
5  the United States appropriated money,
6  specifically, for Task Order No. 26?
7     A.  No.
8     Q.  Okay.  Well, so where did the Corps go
9  to get the money in order to implement, or at
10  least to take the steps necessary to do the
11  demolition and the site remediation where the
12  dredging was going to take place?
13     A.  To my knowledge, it came from the IHNC
14  lock replacement project funds.
15     Q.  Okay.  All right.  And where did those
16  funds come from?
17     A.  Congress through the headquarters of
18  the Corps of Engineers.
19     Q.  I'm sorry.  I thought I just asked you
20  if there was a special Congressional
21  authorization for Task Order No. 26 and you
22  said no.  Right?
23     A.  I'm not aware of a specific
24  Congressional authorization for Task Order No.
25  26.

Page 36

1     Q.  All right.  In fact, the Corps got the
2  money from the TERC, which is already funded,
3  isn't that true?
4     A.  No.  That is not true.  Each
5  individual task order is funded on its own
6  basis, whether it is a Superfund project it's
7  funded by USEPA, if it's a Corps project it's
8  funded by whatever source of funding is
9  associated with that project.
10     Q.  Okay.  All right.  Do you know how the
11  TERC gets its funds?
12     A.  Are you referring to the base
13  contract?
14     Q.  No, no.  I'm talking about -- isn't
15  there an office in Tulsa which administers
16  TERC?  Are you familiar with that?
17     A.  Yes.  Tulsa District Corps of
18  Engineers awarded two TERC contracts in 1994
19  for use in a five state region.
20     Q.  Okay.  And Tulsa has got its own
21  money, right?  Tulsa has money which has
22  already been appropriated by Congress for TERC
23  projects.  Isn't that true?
24     A.  To award the two base contracts, yes.
25     Q.  All right.  So that money has already

Page 37

1  been appropriated by the Congress for
2  environmental remediation, right?
3     A.  As minimum guarantees to award the two
4  contracts to IT Corporation and M-K, they have
5  appropriated a certain amount of money.  As
6  each individual task order is awarded off of
7  the base or parent contract, each task order is
8  funded by a separate source, depending on which
9  project it is associated with.
10     Q.  All right.  So the source of funds, is
11  it Tulsa or a is it from the Corps' district
12  office budget?
13     A.  It is from the geographic district
14  where it is being, um -- executed,
15  administered.
16     Q.  Okay.  Well, didn't you all contact
17  Tulsa and ask them to send you money?  In
18  particular Arlene Smith.  Do you know who
19  Arlene Smith is?
20     A.  Yes.  She was the contracting officer
21  with the Corps of Engineers in Tulsa District.
22     Q.  And didn't this office make requests
23  of Arlene Smith for the transfer of funds from
24  the TERC to this office in order to fund the
25  TERC, the Task Order No. 26?

10  (Pages 34 to 37)

GUILLORY, LEE

6/30/2008

Page 38

1    A.  No.  New Orleans District supplied the
2  funds for Task Order No. 26 to Tulsa District.
3    Q.  So the funds went from the New Orleans
4  District office to Tulsa, and then from Tulsa
5  back to New Orleans?
6    A.  They did not physically transfer.  The
7  funds always stayed here within the New Orleans
8  District and we provided proof that every time
9  we funded the original delivery order or any
10  subsequent modifications to the task order, we
11  provided that funding source and proof to the
12  contracting officer for their documentation.
13    Q.  All right.  What would the funding
14  source and proof look like; is that a piece of
15  paper?  Is that -- tell me what form that
16  takes.
17    A.  We do the funding in the Corps of
18  Engineers Financial Management System; CEFMS.
19    Q.  All right.  That is another one of
20  those great acronyms that you guys have.  What
21  does that stand for?
22    A.  Corps of Engineers Financial
23  Management System.
24    Q.  Okay.  And what exactly is that?
25    A.  That's a realtime financial database.

Page 39

1    Q.  Okay.  All right.  Now, how does the
2  CEFMS identify the source of congressionally
3  appropriated funds?
4    A.  Each contract or action is identified
5  by its appropriation, it's a funded work item.
6    Q.  I'm sorry.  Each contract is
7  identified by a particular appropriation.
8    A.  By an appropriation.
9    Q.  Okay.  And I think all of the -- all
10  of the appropriations, according to this nice
11  little pamphlet that you guys have outside,
12  comes from either the Energy & Water
13  Development Appropriations Act -- is that
14  right?  Or some other act?
15    A.  Or Congressional add-ons.
16    Q.  But the add-ons are always to the same
17  act, aren't they?
18    A.  No, it can be a special supplemental.
19    Q.  Well, do you know where the funding
20  for the IHNC lock replacement project, in
21  particular Task Order No. 26, came from?  Did
22  it come from an Energy & water Development
23  Appropriation Act?
24    A.  I did not know.
25    Q.  Okay.  Where would I go to find out

Page 40

1  which act was the basis of the appropriation
2  which funded Task Order No. 26?
3    A.  We'd have to ask our resource
4  management office.
5    Q.  And is that in the district office
6  here?
7    A.  Yes.
8    Q.  And who's in charge of that?  I'm
9  sorry.  Who was in charge of that, '98 to '06?
10    A.  I don't recall the chief at that time.
11    Q.  Is there somebody with whom you
12  interacted in order to get these funds?
13    A.  Senior project manager Joseph Dicharry
14  and Carol Burdine.
15    Q.  What is your role, Mr. Guillory, in
16  working with this CEFMS; did you have anything
17  to do with that?
18    A.  Yes.  I approved PR&Cs and contractor
19  payments to Washington Group for Task Order No.
20  26.
21    Q.  All right.  Would you will tell me
22  what is a PR&C?
23    A.  Let's see.  I don't remember the exact
24  name.  I just flow the acronym.
25    Q.  All right.  Got you.  Glad to know

Page 41

1  that I'm not the only one that can't remember
2  the meaning of these acronyms.
3      But let's -- can you tell me what it
4  is?
5    MR. STONE:
6      If he remembers the term later,
7    you don't have any problem with him
8    just supplying it for you, right?
9    MR. BRUNO:
10      No, of course not.  This is not a
11    test.
12    A.  It will come to me later.
13  EXAMINATION BY MR. BRUNO:
14    Q.  I'm sure it will.  But just for our
15  purposes, what is it?
16    A.  It's a commitment of funds.
17    Q.  All right.  Again, you'll have to help
18  me understand, what does that mean, a
19  commitment of funds?
20    A.  Generally, in CEFMS we do a commitment
21  of funds which is the PR&C, and have that
22  approved, and then our resource management
23  office does an obligation of funds on that
24  PR&C, and then the funds are disbursed to
25  vendor, contractor, whatever.

11  (Pages 38 to 41)

Johns Pendleton Court Reporters                    800 562-1285

GUILLORY, LEE

6/30/2008

Page 42

1    Q.  All right.  For a poor taxpayer like
2  me, I'm just curious to know how the system
3  works.  You got an authorization that says, all
4  right, Corps of Engineers, you can build this
5  thing.  The Corps has to get some money to
6  build this thing.  All right?
7         Who decides when to build this thing,
8  is it the Corps or is it somebody else?  The
9  when.  Just the when.
10    A.  The senior project managers develop a
11  project execution plan, have that signed, and
12  they go in to the engineering and design of the
13  individual contracts which make up the overall
14  project, and then we execute the projects and
15  build the individual projects -- contracts that
16  build the projects.
17    Q.  Okay.  Does the money come first or
18  does the senior project manager decide the
19  when?
20    A.  The money comes first.
21    Q.  All right.  The money comes first.
22  Okay.
23         So how do you get the money?
24    A.  I'm not involved in that portion of
25  the process.

Page 43

1    Q.  Okay.  All right.  So you're not the
2  person who I would ask about the funding
3  process to implement the project at the EBIA
4  relative to the TERC, right?  I've got to ask
5  somebody else.
6    A.  If you want the details of the where
7  and when and the amounts --
8    Q.  Yes.
9    A.  -- I'm not the person to answer that.
10    Q.  All right.  Can you tell me who I
11  should ask?
12    A.  The two previous senior project
13  managers that I spoke to you about.
14    Q.  All right.  That's Mr. Dicharry --
15    A.  And Ms. Burdine.
16    Q.  -- and Ms. Burdine.
17         But insofar as your role, what you
18  know is the Congress has authorized the
19  project, one, and two, the Congress has
20  appropriated some money.
21         Now, whether the Congress has
22  appropriated some money, it is I guess
23  available funds?  Is that -- for use by this
24  office for that particular project, right?
25    A.  Correct.

Page 44

1    Q.  And do I gather that that fact is
2  identified in the CEFMS?
3    A.  Yes.
4    Q.  In other words, once the Congress says
5  okay, here's your money, then there's a record
6  of that fact placed into the financial
7  management system, right?
8    A.  Correct.
9    Q.  Okay.  And that's why you said what I
10  then do is I, if I'm going to go get Arlene
11  Smith's approval, I need to give her, you told
12  us, the source of the funding and the proof --
13    A.  Correct.
14    Q.  -- that I've got my funding.
15    A.  Correct.
16    Q.  All right.  Now, the source is a piece
17  of information, right?  You're going to tell
18  her the source of the funding is information
19  for her, right?
20    A.  Correct.
21    Q.  All right.  So what is the source of
22  the funding for Task Order No. 26?
23    A.  We printed a report from CEFMS, faxed
24  it or E-mailed to the Tulsa District.
25    Q.  Right.  But do you happen to know what

Page 45

1  the source of the funding was; in other words,
2  I -- maybe I'm assuming something.  I'm
3  assuming that the source is an identification
4  of a particular act or appropriation of
5  Congress.  Am I wrong about that?  What is the
6  source?
7    A.  It's an appropriation of funds to the
8  overall project.
9    Q.  And how -- how does one describe the
10  source, does one say Water Act of '94?  House
11  Bill blah, blah, blah?  I mean, what is the
12  descriptor that is used; when one says, what's
13  the source of this funds, what do you give them
14  back?
15    A.  I don't know the specifics of that.
16    Q.  Okay.  But if you go to your financial
17  management system and you press a button that
18  says source, it will spit out a piece of paper
19  that gives whatever information is needed to
20  identify the source, correct?
21    A.  Correct.
22    Q.  All right.  Now, is the CEFMS report
23  in one of those boxes that you described for us
24  this morning that you asked to have brought to
25  you?

Page 46

1    A.  Possibly.  Each individual
2  modification to Task Order 26 included that
3  funding.
4    Q.  Okay.  Now, the second thing you said
5  you had to provide to Ms. Smith is proof.  So
6  what do you provide to her as proof?
7    A.  A funding document printed from CEFMS.
8    Q.  Okay.  All right.  So the document
9  itself is the proof, and the proof contains the
10  source information.
11    A.  (Nods affirmatively.)
12    Q.  You send that to her, she evaluates
13  it, makes sure that everything is right, and
14  then she signs off on it and then that allows
15  the money to be released.
16    A.  Allows the money to be spent on Task
17  Order No. 26, correct.
18    Q.  Okay.  Can you help me understand why
19  it was necessary at all to involve Tulsa?  I
20  mean, if you had an appropriation from Congress
21  to do the lock expansion, why bother with
22  Tulsa, why not just, you know, spend the money
23  and do the work that you guys had to do?
24    A.  Here in New Orleans District we had
25  two choices, or the senior project manager had

Page 47

1  two choices, to put out an individual
2  environmental remediation contract based in New
3  Orleans District, advertised, awarded here, or
4  utilize either of two pre-awarded, pre-placed
5  TERC contracts anchored at Tulsa District for a
6  five-state region.
7    Q.  Got you.  Uh-huh.
8    A.  For the sake of time, expediency,
9  experience, we preferred to use the TERC
10  contracts that were pre-awarded through Tulsa.
11    Q.  Okay.  Do you know if there is any
12  limitation on this basic contract?  In other
13  words, as I read this basic contract, it
14  obviously talks a lot about remediation.  All
15  right?  But what I don't see is any discussion
16  here about other work, like demolition or
17  construction, for example.  Can you use a TERC
18  contract to build something?
19    A.  Probably of a temporary nature that
20  would be used in the environmental remediation
21  portion, yes.
22    Q.  Okay.  So I'm hearing you tell me that
23  there's got to be some connection to
24  environmental remediation.  Right?
25    A.  Yes.

Page 48

1    Q.  All right.  So you can't use the TERC
2  as a substitute for -- well, let me ask it this
3  way:  What are the limitations, if any, of the
4  New Orleans District office 's use of a TERC
5  contractor's services?  How about that?
6    A.  It would have to be for the
7  environmental remediation or cleanup of a
8  Superfund site, a DERP site --
9    Q.  What's that?
10    A.  Defense Environmental Restoration
11  Program.
12        Um -- any HTRW site.  Those sort of
13  things.
14    Q.  Those are the three?
15    A.  Well --
16    Q.  Those are the ones you can remember.
17  There are others, possibly, but these are the
18  main ones.  How about that?  Fair enough?
19    A.  Those are the main ones.
20    Q.  Good.  All right.  So that if there
21  was work that could be tied to that effort,
22  then you could use a TERC contractor to do that
23  extra works like demolition.
24    A.  Correct.
25    Q.  All right.  Are there some regulations

Page 49

1  or are there some written guidelines that
2  someone could look at to understand what the
3  limitations are, if any, on the use of a TERC
4  contractor?
5    A.  Probably, but you would have to ask
6  the Tulsa District contracting officers that
7  awarded the two base contracts.
8    Q.  Okay.  Whose decision was it to use a
9  TERC contractor for this HTRW remediation and
10  demolition?
11    A.  No individual one person.  We put
12  together a project execution plan, submitted it
13  through Joseph Dicharry to Tulsa District
14  contracting officers and requested to use the
15  TERC on the East Bank Industrial Area.
16    Q.  All right.  Who -- sorry.  Let's see.
17  Who put together the team that drafted the
18  project execution plan?
19    A.  Joe Dicharry assembled the team.
20    Q.  All right.  And who was on the team?
21    A.  Approximately twelve to fifteen
22  persons.
23    Q.  Okay.  Meaning you can't remember all
24  the names.
25    A.  Correct.

GUILLORY, LEE

6/30/2008

Page 50

1      Q.   Were you on the team?
2      A.   Yes.
3      Q.   All right.  Does Joe need a particular
4   authorization from anybody in order to do the
5   business of appointing a project execution
6   plan?
7      A.   Not that I'm aware of.
8      Q.   Okay.  Well, I'm still trying to
9   understand, what is it that gives the Corps the
10  green light to start its efforts toward, you
11  know, building the lock, do you know?
12     A.   No, I don't.
13     Q.   Okay.  All right.  As far as you know,
14  then, your green light to do what you did came
15  from Mr. Dicharry --
16     A.   Correct.
17     Q.   -- right?  I mean, that's all you need
18  to be concerned about is he tells you to do
19  something and you go and do it.
20     A.   Correct.
21     Q.   You don't question whether he has the
22  authority or whether he has the money to do it,
23  you just do it; right?
24     A.   I became a member of the project
25  delivery team in the summer of 1998, and we

Page 51

1   decided to -- we started pursuing applicable
2   portions of the project at that time.
3      Q.   Okay.  Now, as a member of the -- I'm
4   sorry.  The project execution plan, is that a
5   written document?
6      A.   Yes.
7      Q.   Okay.  Can you generally remember what
8   that plan called for in terms of the execution
9   of the project?
10     A.   Generally, we described the scope of
11  work on the 32 acres of the East Bank
12  Industrial Area, the six marine industrial
13  sites that formerly were under the Port of New
14  Orleans, the extent of contaminant concern that
15  we anticipated encountering, the numbers and
16  types of buildings, slabs, piling, wharves that
17  had to be demolished and removed, and it gave a
18  projected time frame, an approximate cost and
19  an approximate start and ending date.
20     Q.   At the time that the project execution
21  plan was drafted, was there any sense of the
22  depth to which any contractor would have to go
23  in order to remove the toxins and environmental
24  issues, let's just say generally, in order to
25  accomplish the HTRW?

Page 52

1      MR. STONE:
2          Now, are you asking about when
3      it's final?
4      MR. BRUNO:
5          No, I'm not.  I thought I made it
6      clear.  At the time of the project
7      execution plan as it was written.
8      Okay?
9   EXAMINATION BY MR. BRUNO:
10     Q.   Not later; then.  What was
11  contemplated in terms of the depth to which a
12  contractor would have to go?
13     A.   We knew some general guidelines,
14  because we had some preliminary investigations
15  done by the port of New Orleans, Dames & Moore
16  corporation, Waldemar S. Nelson Company.
17     Q.   Uh-huh.
18     A.   And we knew from that data and those
19  preliminary reports approximately what we'd
20  have to accomplish.
21     Q.   Okay.  So what did you learn about the
22  depth to which a contractor would have to dig,
23  and what was in your project execution plan on
24  that issue?
25     A.   We made assumptions that we would have

Page 53

1   to go anywhere between 0 and 22 feet.
2      Q.   So at the time of the project
3   execution plan, you knew that the contractor
4   would be called upon to dig as deep as 22 feet
5   in that area, is that correct?
6      A.   Approximately.
7      Q.   Okay.  All right.  Now, were there any
8   engineers who made up the twelve member team?
9      A.   Yes.
10     Q.   All right.  Can you remember who the
11  engineers were?
12     A.   Myself, Joe Dicharry, Gary Brouse BRO
13  U.S. E reporter spelling, Jean Vossen, and we
14  had a professional geologist Dr. George Bacuta,
15  and other members that I cannot recall.
16     Q.   Were any of those folks in the
17  engineering section or division of the New
18  Orleans District office?
19     A.   Yes.
20     Q.   And who was that?
21     A.   Dr. Bacuta, Ms. Vossen -- I believe
22  that's all of the names that I gave you.
23     Q.   All right.  Now, before we get too far
24  along on this subject, who was it that made the
25  determination that this was an HTRW site?

Johns Pendleton Court Reporters                    800 562-1285

GUILLORY, LEE

6/30/2008

Page 54

1    A.  It was a joint decision between New
2  Orleans District and Tulsa District.
3    Q.  Well, can you tell me why it was even
4  necessary to consider HTRW when in fact the
5  Corps had always intended to dredge that area
6  and remove those soils anyway?
7    A.  From the three preliminary reports
8  that I told you about, it was determined that
9  there were known and unknown contaminants of
10  concern from the previous seventy years of
11  industrial and marine facilities that had taken
12  place on those sites.
13    Q.  Right.  Right.  Well, I understand
14  that.  But the fact is that the Corps had
15  always intended to remove those soils
16  completely and put them somewhere else because
17  they were going to dredge for a new channel.
18  Right?
19    A.  Correct.
20    Q.  All right.  In essence, what the Corps
21  did was remediate so that it removed the toxins
22  and put the soil back in so that it could later
23  come back with a dredge and take it out again.
24  Right?
25    A.  Correct.

Page 55

1    Q.  That's what you guys did.  Okay.
2     So why wouldn't you -- why put soil
3  back in if it was your intent to dredge it all
4  out anyway?
5    A.  Because it was the Corps' onus of
6  responsibility to clean up the site as we
7  purchased the property from the Port of New
8  Orleans.
9    Q.  Okay.
10    A.  We have to abide by environmental
11  regulations and all types of regulations that
12  are passed by the EPA, Louisiana Department of
13  Environmental Quality, et cetera.
14    Q.  So it's your view that it was the fact
15  of purchase of the property which required
16  cleanup?  Was that it?
17    A.  Plus all the previous environmental
18  impact statements that had been prepared in the
19  1997 report.
20    Q.  All right.  Well, again, I'm just
21  curious as a taxpayer why wouldn't you just
22  simply -- let me just understand -- withdraw
23  that question.
24     WGI comes along, and their remediation
25  is they get a machine and they scoop out the

Page 56

1  material, they put it in the back of a dump
2  truck, and the dump truck drives it off and
3  dumps the stuff somewhere.  Right?  Isn't that
4  what they did, essentially?
5    A.  It's called transportation and
6  disposal.
7    Q.  Well, I know it's got nice pretty
8  words, but let's get down to facts.  They
9  scooped it up, put it in a dump truck and drove
10  off.  And in fact, that same material was going
11  to be scooped up, perhaps by a different kind
12  of machine, maybe a dredging device, the
13  material would be put on the back of some dump
14  truck and be driven off and disposed somewhere
15  as part of the dredging project, right?
16    A.  That was to be done by hydraulic
17  dredging under Section 404B.
18    Q.  Okay.  And you'll have to help me.  Is
19  that some kind of special dredging method, I
20  mean, that --
21    A.  That is for navigational channel
22  dredging.
23    Q.  Well, I understand that.  But you guys
24  have the facility to use hydraulic dredge, or
25  you can use a bucket dredge if you want, right?

Page 57

1    A.  Correct.
2    Q.  Okay.  I mean, so -- you're the Corps,
3  you can decide what method of dredging you want
4  to use, right?
5    A.  Correct.
6    Q.  All right.  I'm trying to understand
7  why couldn't you just simply dredge the channel
8  and, as the old adage goes, kill two birds with
9  one stone?
10    A.  Because the contamination sources had
11  to be removed from the East Bank Industrial
12  Area prior to doing the hydraulic dredging of
13  the bypass channels.
14    Q.  Right.  Well, if you were going to use
15  hydraulic dredging I imagine that might be
16  true, but you could have used a different form
17  of dredging.  Right?
18    A.  I suppose so.
19    Q.  And you, in fact, could have
20  accomplished both ends at the same time if you
21  wanted to, right?  You could have done the
22  cleanup and the dredging at the same time,
23  because essentially cleanup is scooping it up,
24  putting it on the back of a truck.  Right?
25     MR. STONE:

15  (Pages 54 to 57)

GUILLORY, LEE

6/30/2008

Page 58

1        Objection.  I don't think that
2    follows.
3        MR. BRUNO:
4            You may not think it follows but
5        it doesn't really matter.
6    EXAMINATION BY MR. BRUNO:
7        Q.  Isn't that accurate?
8        A.  I don't understand your question,
9    Mr. Bruno.
10        Q.  All right.  Well, how about you tell
11    me.  What is it that WGI did to remove the
12    material from the site?  What special equipment
13    did they use?
14        A.  They used specialized drilling
15    equipment to determine the area what were the
16    areas of contamination, the extent of the
17    contamination, the sources of the
18    contamination, and then from that we determined
19    what point sources had to be removed, to a
20    certain extent, horizontally, laterally and in
21    depth.
22        Q.  Uh-huh.
23        A.  We had to hydraulically -- use
24    hydraulic track hoes to remove those
25    contaminants concerned, place them in dump

Page 59

1    trucks, sometimes lined, sometimes covered,
2    depending on what the contaminant was, and
3    disposed of them at permitted, regulated
4    landfills.
5        Q.  Right.  The fact is that you, the
6    Corps, removed approximately three feet of
7    topsoil on the whole area, right?
8        A.  No.  We did discreet excavation at
9    certain contamination sites.
10        Q.  All right.  So you didn't remove three
11    feet of the whole site, you just removed three
12    feet from certain parts of the whole site.
13    Right?
14        A.  Correct.
15        Q.  Okay.  All right.  And so you did all
16    this drilling stuff in odd to identify those
17    areas where you removed three feet of topsoil,
18    right?
19        A.  Not three feet.  It depends what the
20    contaminants concerned and statistically what
21    areas we should remove to remove the pollutants
22    in the ground.
23        Q.  What's the deepest you guys went to
24    remove topsoil for environmental remediation
25    purposes on that east bank area?

Page 60

1        A.  I believe it was approximately
2    15 feet.
3        Q.  And what was that -- what occasioned
4    that depth of removal?
5        A.  Can you be more specific with the
6    question?
7        Q.  Yeah.  What was the -- do you remember
8    what it was that was 15 feet deep?
9        A.  Um -- I believe on the Saucer Marine
10    site we had a large excavation that had to go
11    down approximately 15 feet.
12        Q.  To get what?
13        A.  To remove some contaminants concerned.
14    I don't know the specific ones at this point.
15        Q.  All right.  Okay.  Were there any
16    others that went as deep as 15 feet?
17        A.  There were some braced excavations to
18    remove objects and debris under the ground that
19    went below 15 feet.
20        Q.  We're not talking about them, though.
21    We're just talking about environmental.  Okay?
22            The fact of matter is that except for
23    that one 15-foot excavation you're talking
24    about, all of the remediation that was done by
25    WGI was no more than three feet deep.  Isn't

Page 61

1    that true?
2        A.  The majority of the excavations were
3    three feet deep.
4        Q.  All right.  I'm just wondering,
5    couldn't you have just taken three feet off the
6    top of the whole site without regard to all
7    that boring and drilling and stuff that you
8    guys did and accomplished the same end?
9        A.  No.  That would have been cost
10    prohibitive.
11        Q.  Even though you were going to take a
12    dredge and dredge it all out anyway?
13        MR. STONE:
14            Is there a question in there?
15    EXAMINATION BY MR. BRUNO:
16        Q.  Isn't that true?
17        A.  No.
18        Q.  Why not?  Why is it not true?  Why
19    would it have been cost prohibitive if you were
20    going to come back and dredge the whole site
21    anyway?
22        A.  Because we were not dredging the
23    entire site.  The lane and transit bypass
24    channels.  We were only dredging a portion of
25    the site.

                                16  (Pages 58 to 61)

GUILLORY, LEE

6/30/2008

Page 62

1    Q.  All right.
2        MR. STONE:
3            When you get to a good stopping
4        point --
5        MR. BRUNO:
6            Any time.  You want to stop?
7            (Brief recess.)
8    EXAMINATION BY MR. BRUNO:
9    Q.  Okay.  We were talking about how it
10   was that this site was designated as an HTRW
11   site.  Let me show you -- have you seen this
12   evaluation report?  It's Bates Number
13   NPM-006-1458, and it's entitled Evaluation
14   Report Design Plates for Engineering
15   Investigations, Volume 4 of 9, Appendix B1,
16   1997.
17   A.  Yes.  This is part of the 1997 nine
18   volume report.
19   Q.  Okay.  All right.  Well, how does this
20   fit within the process of the site being
21   characterized as an HTRW site?  If it does at
22   all.  I don't even know.
23   A.  That was the general design
24   memorandum, that nine volume set, that was
25   determined at the very beginning of the design

Page 63

1    of the overall project.  Once we went into
2    specific preliminary investigations and
3    sampling, and analysis that I referred to with
4    Dames & Moore, URS, Waldemar S. Nelson, we were
5    able to characterize the site by its
6    contaminants concerned that were found, drums,
7    waste paint, creosote pilings, um -- diesel/gas
8    contamination, that kind of thing.
9    Q.  Uh-huh.
10   A.  And from that, we determined that we
11   should use an environmental contract to clean
12   up this 32 acres of the EBIA.
13   Q.  All right.  Well, first of all, how
14   did this evaluation report come into existence?
15   The nine volume set.  If you know.
16   A.  The Corps did its preliminary design
17   for the lock replacement project.
18   Q.  All right.  So again, Mr. Dicharry
19   would be the right guy to talk to about how
20   this came into existence, right?
21   A.  Right.  He's more intimately involved
22   in it.
23   Q.  Okay.  But in terms of the Corps and
24   its processes, where does this evaluation
25   report fit in the context of the lock

Page 64

1    replacement project, is this something that you
2    always do when you're about to implement a
3    project?  Do you always do an evaluation
4    report?
5    A.  Mr. Dicharry could answer that better
6    than I could.
7    Q.  Okay.  Fine.  Okay.  But in any case,
8    in this report the site is evaluated and
9    determinations were made about whether or not
10   there are potential hazardous, toxic or
11   radiological waste on the site, right?
12   A.  It's probably addressed in the EIS and
13   supplemental EIS, yes.
14   Q.  You said probably addressed somewhere
15   else.  Is it addressed here --
16   A.  That's --
17   Q.  -- in the evaluation report?
18   A.  There's portions of that report that
19   address contaminants, yes.
20   Q.  Okay.  Well, it says, assessment of
21   potential hazardous reports.  That would
22   suggest to me that it's addressing -- that is
23   the sole purpose of 5 of 9 is to make that
24   assessment.  Am I wrong about that?  I'll give
25   you the whole volume, by the way, which is NPM

Page 65

1    6-1605.  (Tendering.)
2            And this is an appendix to it.
3    (Tendering.)
4            So does that volume assess whether or
5    not the site will be characterized as an HTRW
6    site?
7    A.  It addressed the contaminants concern
8    known at that point in time when it was
9    produced.
10   Q.  Okay.  Well, who is it that designates
11   any site as an HTRW site?
12   A.  No one particular person.  It depends
13   on the regulations that are looked at by the
14   USEPA, Louisiana DEQ, or those entities.
15   Q.  Well, how does a site get
16   characterized as an HTRW site?
17   A.  In the specific case of the EBIA, we
18   went through preliminary reports and
19   assessments and determined that it had
20   sufficient contaminants of concern that would
21   characterize it as that, and it would be in the
22   government 's best interest to remove those
23   contaminants prior to proceeding and using that
24   32 acres for the project.
25   Q.  All right.  I appreciate that very

Johns Pendleton Court Reporters                    800 562-1285

GUILLORY, LEE

6/30/2008

Page 66

1  much, but I still would like to know, if you
2  know -- if you don't know, and if I should ask
3  someone else, that's fair -- how does a site
4  get characterized as an HTRW site?
5      A.  I don't know the specific answer to
6  your question.
7      Q.  Good.  Now, this site was
8  characterized as an HTRW site, right?
9      A.  Yes.
10     Q.  And you said we characterized it as
11  such, correct?
12     A.  We being New Orleans District and
13  Tulsa District.
14     Q.  Okay.  So who within Tulsa and the New
15  Orleans District is the we who made the
16  characterization?
17     A.  The project delivery team of New
18  Orleans District.
19     Q.  That's the twelve guys and ladies,
20  right?
21     A.  And the contracting officers from
22  Tulsa District.
23     Q.  Is there a piece of paper that someone
24  signs that's the official, you know,
25  designation as an HTRW site?

Page 67

1      A.  No, sir.
2      Q.  Okay.  How does one know then whether
3  a site is an HTRW site or not?
4      A.  Based on the prior documents,
5  preliminary assessments that we made, we made a
6  proposal to Tulsa District to have this site
7  remediated as an HTRW site, we made the pitch
8  to Tulsa District, they evaluated it, reviewed
9  it, determined whether it was applicable to the
10  TERC parent contracts, agreed it was, and
11  approved it and we were awarded a delivery
12  order 26 to accomplish that.
13     Q.  All right.  That sounds like -- and
14  stop me, Mr. Guillory, if I'm wrong, but it
15  sound like it's the Tulsa office that accepts
16  a designation of a site as an HTRW.
17         Is that accurate?
18     A.  Only to the extent to utilize either
19  of the two TERC contracts they had awarded at
20  their district.
21     Q.  Well, in order for Tulsa to accept --
22  I'm sorry.  In order for Tulsa to allow you to
23  use the TERC contractors, the Tulsa office has
24  to agree that the site in question is in fact
25  an HTRW site, right?

Page 68

1      A.  Correct.
2      Q.  Okay.  So in some sense Tulsa has to
3  either designate or accept somebody else's
4  designation that a particular site is an HTRW
5  site, right?
6      A.  Correct.
7      Q.  All right.  And the folks who
8  suggested that it was an HTRW site were the
9  project execution team, the twelve?
10     A.  Project delivery team.
11     Q.  All right.  I'm sorry.  Is the project
12  delivery team different from the folks who
13  drafted the project execution plan?
14     A.  No.  The project delivery team is the
15  overall group of people in charge of the
16  project that are members of the project team.
17  The project execution plan is a written plan
18  that's developed on how to accomplish the
19  project.
20     Q.  So that's the same twelve folks?
21     A.  The same twelve folks had input into
22  the project execution plan, but it's overall
23  drafting is done by the senior project manager.
24     Q.  Mr. Dicharry?
25     A.  Mr. Dicharry.

Page 69

1      Q.  Okay.  So the twelve -- and maybe I
2  got this wrong, but the twelve folks that you
3  have been describing for me, and you've
4  identified some of the folks on that team who
5  were engineers, the correct way to describe
6  those twelve is the project delivery team.
7      A.  Right.  We call it the PDT.
8      Q.  And when in time was this team put
9  together?
10     A.  I don't know when it was initially put
11  together.  I joined it in the summer of '98.
12     Q.  Okay.  Did the project delivery team
13  have anything to do with the valuation report
14  which is these nine volumes of material?
15     A.  We reviewed them, but that was
16  generated in 1997, as you can see by the dates.
17     Q.  Does that mean, then, that the project
18  delivery team came into existence after '97?
19     A.  I don't know.
20     Q.  All right.  Do you know who did the
21  evaluation report?
22     A.  No, it was a whole team of New Orleans
23  District personnel that generated this.
24     Q.  All right.  And that team was a
25  different team than the project delivery team.

GUILLORY, LEE

6/30/2008

Page 70

1     A.  Right.  That was prior to my
2  involvement in the project.
3     Q.  Okay.  All right.
4     A.  Mr. Dicharry could give have you the
5  background on how all this was generated and by
6  whom.
7     Q.  All right, sir.  Do you know whether
8  or not this evaluation report would have been
9  included in the materials that would have been
10 sent to Tulsa in order to persuade Tulsa that
11 this was in fact a HTRW site?
12    A.  They were not sent to Tulsa.  They
13 were reviewed here at the district and a
14 recommendation was made to Tulsa District and
15 evaluated in conjunction with the contracting
16 officers.
17    Q.  Okay.  This request to Tulsa, is it in
18 the form of a writing; that is, this request
19 for TERC contractor assistance, is that a
20 writing or is that something done on the phone?
21    A.  It's done in writing as a project
22 execution plan, PEP.
23    Q.  So the project execution plan is the
24 document that gets sent to Tulsa.
25    A.  Correct.

Page 71

1     Q.  Now, did I understand that the project
2  execution plan is limited only to the TERC
3  component or does the project execution plan
4  cover the whole project, that is, the whole
5  construction of a new lock?
6     A.  There is another plan called a project
7  management plan, I believe -- Mr. Dicharry
8  could confirm this -- that covers the overall
9  project.  The project execution plan that we
10 wrote was for the TERC Task Order 26 portion of
11 the work.
12    Q.  And only that portion, right?
13    A.  Only that portion.
14    Q.  All right.  And the title of the
15 document is project execution plan, right?
16    A.  Correct.
17    Q.  So when I go look for it if I see
18 those words I'll know I've got it.
19    A.  Correct.
20    Q.  Okay, good.  All right.  So I see we
21 have another document here entitled the design
22 documentation report.  And this was done by
23 Waldemar Nelson, and you've made a reference to
24 this.  How did this document come into being,
25 do you know?

Page 72

1     A.  I do not know.
2     Q.  Okay.  Now, this document which is
3  unfortunately not Bates numbered but for the
4  folks in the room is a document entitled Inner
5  Harbor Navigation Canal Lock Replacement
6  Project, Design Documentation Report Number 1,
7  Site Preparation and Demolition, Volume
8  Number 6 of 8, prepared for the Department of
9  the Army, prepared by Waldemar Nelson, dated
10 February, 1999, at Page 1 says, the purpose of
11 this document is to identify the materials of
12 the East Bank Industrial Area along the IHNC
13 between 0 to 5 feet below ground surface that
14 are subject to environmental and safety
15 regulations.  The soil and dredge sediments of
16 the East Bank Industrial Area are to be
17 excavation for the placement of a bypass
18 channel during the construction of a new lock.
19       Does this refresh your memory as to
20 the depth to which the TERC Task Order 26 was
21 supposed to address?
22    A.  Yes.  That is one of the preliminary
23 reports we utilized, um -- to develop the TERC
24 scope of work.
25    Q.  All right.  So is it -- I was wrong

Page 73

1  when I said 3 feet, it's really five feet of
2  earth that was subject to remediation.  Right?
3       MR. STONE:
4          Objection.  That may misstate the
5       record because I believe you asked him
6       what depth they dug certain sites to.
7       MR. BRUNO:
8          No, I didn't.  No, I didn't.  No,
9       I didn't.  I did not ask them -- I
10      haven't even gotten to that site.  We
11      all know that it's deeper than five
12      feet, Richard.  Come on.
13 EXAMINATION BY MR. BRUNO:
14    Q.  Once again, this is why we don't make
15 speccing objection, because it confuses the
16 question.
17       What I want to know is whether or not
18 this documents refreshes your recollection that
19 the Corps contemplated that approximately five
20 feet of material would have to be removed, at
21 certain areas, depending upon where the
22 environmental issues were, which necessitated
23 the application to Tulsa for a TERC contractor.
24    A.  It depends on what the scope of work
25 tasked Waldemar Nelson to assess.  And it may

19  (Pages 70 to 73)

GUILLORY, LEE

Page 74

1  have only assessed them from 0 to 5 feet.
2      Q.  Well, it says, very specifically, the
3  purpose.  At least in their minds, the purpose
4  of this document is to identify -- all right?
5  They're saying, you asked us to identify the
6  materials, okay, of the east bank between 0 to
7  5 feet that are subject to environmental and
8  safety regulation.
9          So it sounds to me like at least these
10  guys are thinking that the environmental
11  regulations refer to 0 to 5 feet.
12     A.  No.  It sounds to me like they were
13  tasked to only assess between 0 and 5 feet.
14     Q.  Okay.  Well, so who was tasked to
15  assess from 5 feet and below?
16     A.  Those were probably subsequent reports
17  done by Dames & Moore, URS and Washington
18  Group.
19     Q.  Okay.  Well, Washington Group wasn't
20  yet hired --
21     A.  Correct.
22     Q.  -- at the time.
23          Okay.  So, again, this is before --
24  this is before you got the TERC.  Okay?  You
25  had to have some sense of what it was that

Page 75

1  needed to be done before you went to Tulsa;
2  correct?
3      A.  Correct.
4      Q.  Okay.  And what it was that the
5  district office here in New Orleans
6  contemplated had to be done was some
7  environmental remediation, right?
8      A.  Right.
9      Q.  And that that environmental
10  remediation was guided by Waldemar Nelson and
11  Dames & Moore.  Right?
12     A.  Right.
13     Q.  Okay.  Let's go to, then, 1999 when
14  we've got Washington Group.  And this is WGI
15  38704.  It's entitled Recommendation Report for
16  Demolition and Site Preparation Activities of
17  the East Bank Industrial Area of the Inner
18  Harbor Navigation Canal Look Replacement
19  Project, and it's prepared by none other than
20  Morrison Knudsen Corporation.
21          You see that?
22     A.  Correct.
23     Q.  Okay.  And you see at Page 38726 it
24  says, project assumptions at 4.1?  It says,
25  the -- the contaminated soil, open paren,

Page 76

1  approximate top five feet, close paren,
2  identified in the supplied reports, and any
3  additional contaminated soils identified
4  through sampling will be handled by various
5  treatment options.
6          So even Washington Group is
7  contemplating a five-foot depth, right?
8      A.  No.
9          MR. STONE:
10             Objection.  Misstates the
11         document that you just read.
12  EXAMINATION BY MR. BRUNO:
13     Q.  Sir, you can answer all by yourself.
14  I know you can.
15     A.  We supplied all of the Dames & Moore
16  and Waldemar Nelson preliminary documentation
17  to Washington Group for them to review, and one
18  of the first orders of work in the scope of the
19  task order was to review all of that
20  information, consolidate it down into this
21  recommendation report as so what we could
22  potentially encounter on the site.
23     Q.  Exactly.  Right.  And what you
24  understood you could potentially encounter was
25  contamination to five feet.

Page 77

1      A.  At that preliminary stage, that was
2  the depths that we anticipated.
3      Q.  Okay.  Now, at that time, that is at
4  the time that this document was prepared
5  December 2, 1999 --
6      A.  Uh-huh.
7      Q.  -- you also knew that there would be a
8  need to remove pilings to a maximum depth of
9  36 feet below IHNC mean water level, right?
10     A.  That was estimated, yes.
11     Q.  Okay.  All right.  Now, this report
12  should have in it other excavations that were
13  contemplated at that time -- that were known at
14  that time, right?
15     A.  The extent of an environmental project
16  is that you do not know what the unknowns are.
17     Q.  Well, that's my point.  What's in this
18  report is what they knew, not what they didn't
19  know.
20     A.  Correct.
21     Q.  All right?  Okay.  So that if it's in
22  the report --
23     A.  That is the best available information
24  we had at that time.
25     Q.  Okay.  All right.  So if this report

Johns Pendleton Court Reporters                    800 562-1285

Page 78

1  does not reflect a need to dig holes as deep as
2  25 feet, obviously that's something that was
3  not known in December of 1999, rather that was
4  something that somebody figured out later on.
5  Right?
6      A.  Correct.
7      Q.  Okay.  But it is this recommendation
8  in the report that formed the basis for
9  subsequent specifications for work and work
10  orders and proposals, right?
11     A.  Correct.
12     Q.  Okay.  Now, do you know what this
13 document is?  This is WGI 41879.  It's entitled
14 Project Work Plan, Site Development and
15 Remedial Action of the East Bank Industrial
16 Area Inner Harbor Navigation Canal Lock
17 Replacement Project.  And it's -- I think I
18 gave the Bates numbers -- in seriatim all the
19 way to WGI 41944.
20         Have you season this document?
21     A.  Yes.
22     Q.  And you're familiar with this
23 document?
24     A.  Yes, it's one of the eight project
25 plans that we developed jointly between

Page 79

1  Washington Group and the Corps to, um -- begin
2  the remediation at the site.
3      Q.  Now, this describes the work
4  contemplated to be done at least as of this
5  time, that is, October 2000.  Right?
6      A.  (Nods affirmatively.)
7      Q.  And as of this time, it's contemplated
8  that there's going to be removal of topsoil
9  down to three feet, and that -- I'm going to
10 show this to you in a second, it's Pages 3-30,
11 3-31, 3-32, and then down to there's some
12 mounds at Saucer Marine.  It talks about 70.
13 Why don't you take a look at that.
14     A.  Yes.  All these areas and locations
15 that are listed in here came from the
16 preliminary reports from Dames & Moore and
17 Waldemar Nelson.
18     Q.  Sure.
19     A.  So Washington Group just consolidated
20 all that into the project work plan.
21     Q.  So when WGI shows up on the site --
22 and they are on the site in October of 2000,
23 right?  I mean, they're physically there.
24     A.  No.
25     Q.  When do they start?

Page 80

1      A.  We mobilized in January of 2001.
2      Q.  All right.  So this is in preparation
3  for them mobilizing in January, 2001, right?
4      A.  Correct.
5      Q.  And this work plan, does this tell WGI
6  what it is that they're going to do?
7      A.  Yes.  That's one of eight major plans
8  that determine the scope of work.
9      Q.  All right.  Now, I understand over
10 time that the scope of work may have changed,
11 but this is the first document which defines
12 the scope of work for the actual physical work
13 that's to be done on the site.
14     A.  Correct.
15     Q.  And I understand there were other
16 scopes of work for writing and drafting and
17 things, but this one here, WGI 41879, is the
18 one that describes the actual physical work,
19 the first one that describes physical work.
20     A.  Yes.
21     Q.  Okay.  Thank you.  So when WGI shows
22 up on the site, the expectation by the Corps
23 and the expectation by Washington Group
24 International is that it's going to remove
25 about three feet of soil -- well, no, three

Page 81

1  feet in fact at International Tank, Saucer
2  Marine, Mayer Yacht, Distributors Oil, Indian
3  Towing, McDonough Marine, Boland Marine,
4  Distributors Oil -- I'm sorry.  And at
5  Distributors Oil there's actually an eight-foot
6  one, to be fair to you.  And there's some
7  mounds on Saucer that are seven feet.  Right?
8      A.  Correct.
9      Q.  Okay.  So that's the deepest that
10 anybody, at least at that time, in 2000,
11 contemplates digging.  Right?
12     A.  Yes.  Identified by those specific
13 item numbers and photographs identified by
14 Dames & Moore and Waldemar S. Nelson.
15     Q.  And for the record, what you're
16 referring to, there's a site ID number, right?
17     A.  Correct.
18     Q.  And this ID number points to a
19 particular location on the site?
20     A.  Right.
21     Q.  And in fact, it even tells you how big
22 each of those site locations are.
23     A.  Estimated.
24     Q.  For example, let's just pick one, 204
25 is a 20 x 20 foot block.  Right?

GUILLORY, LEE

6/30/2008

Page 82

1    A.  Correct.
2    Q.  Okay.  Like 116 is a 35 x 85 foot
3  block.
4        Now 84A doesn't say, it just says
5  7,000.  Do you know what that refers to?
6  (Indicating.)
7    A.  84A?
8    Q.  Yeah.
9    A.  It doesn't say.
10    Q.  But do you know what the 7,000 refers
11  to?
12    A.  No.
13    Q.  Okay.  All right.  Do you know if it
14  was contemplated in January of '01 that the WGI
15  would be called upon to dig any holes that went
16  deeper than the seven feet that's referenced on
17  this document?
18    A.  Yes, specifically the sewer lift
19  station removal.
20    Q.  Okay.  Anything else?
21    A.  I don't know.
22    Q.  Okay.  All right.  And I guess really,
23  in fairness, the removal of piling.
24    A.  Right.
25    Q.  To pull those holes.

Page 83

1    A.  Separate issue.
2    Q.  Separate issue.  Okay.  All right.
3        Where was the sewer lift station
4  located, if you can remember?
5    A.  It was at the corner of Saucer Marine
6  and Mayer Yacht.
7    Q.  And what, if you can remember,
8  is the distance from the center line of the
9  floodwall to the sewer lift station?
10    A.  I could not hazard a guess.
11    Q.  Can we agree that it was between the
12  water 's edge and the center line of the
13  floodwall?
14    A.  Yes.
15    Q.  And can we agree that the waterline,
16  the distance between the waterline and the
17  center line of the floodwall, was about
18  300 feet?
19    A.  It varied between 300 and 500 feet, I
20  believe.
21    Q.  Okay.  Are you familiar with the basic
22  TERC contract?
23    A.  Somewhat.
24    Q.  Somewhat?  Well, do you know whether
25  or not the basic TERC contract required the

Page 84

1  contracting party, that is, the TERC
2  contractor, to have available a geotechnical
3  engineer for any particular project work?
4    A.  Sounds reasonable.
5    Q.  Have you seen the contract?
6    A.  I've never seen the entire contract
7  before, no.
8    Q.  Okay.  All right.  Well, there is a
9  section that says requirements for, um -- the
10  contractor shall utilize a -- I'm sorry.  I'm
11  reading from WGI 139, which is the basic
12  contract.  And I'm reading at -- sorry.
13  Paragraph 4.1.0.  It says, the contractor shall
14  utilize a project geotechnical engineer who
15  will ensure that all geotechnical engineering
16  support goals specified in delivery order are
17  obtained.  It talks about the qualifications.
18    A.  (Nods affirmatively.)
19    Q.  All right.  First, what is a
20  geotechnical engineer?
21    A.  A licensed professional engineer that
22  specializes in soils and subsurface conditions.
23    Q.  All right.  Now, you interacted with
24  WGI for, gosh, six, seven years, right?
25    A.  Yes.

Page 85

1    Q.  All right.  Did you ever encounter a
2  geotechnical engineer employed by Washington
3  Group International?
4    A.  I interacted with many employees.  I
5  don't know what their, um -- their disciplines
6  were.
7    Q.  Okay.  Well, were you ever introduced
8  to someone at WGI who was introduced as the
9  project geotechnical engineer for Task Order
10  26?
11    A.  Not that I recall.
12    Q.  Okay.  Can you tell me whether or not
13  it was the understanding at the Corps that the
14  TERC contractor, in the performance of its
15  obligations under the contract, were obligated
16  not to do any damage to people or property in
17  the process of executing the contract?
18    A.  Correct.
19    Q.  Are you familiar with the TERC
20  contract management procedures?
21    A.  No.
22    Q.  Are you familiar with something called
23  an activity hazards analysis?
24    A.  Yes.
25    Q.  What is that?

Johns Pendleton Court Reporters                    800 562-1285

GUILLORY, LEE

6/30/2008

Page 86

1     A.  That is a part of the site safety and
2  health plan.  That activity hazards analysis is
3  also listed in the Corps of Engineers EM385-1-1
4  safety manual.  It essentially identifies the
5  potential hazards that maybe exist on a site to
6  personnel, employees, um -- workers, the
7  public, and what steps should be taken to
8  ameliorate, minimize or mitigate those hazards.
9     Q.  It also includes an evaluation of
10 whether the particular activity may pose a
11 damage or pose a hazard to property, as well,
12 right?
13    A.  I don't know.
14    Q.  If we refer to the Tulsa TERC Contract
15 Management Procedures Index, at WGI 394, where
16 it talks about activity hazards analysis, and
17 it says that, um -- I'm sorry.  Okay.  I'm
18 sorry to have taken so long, but just to make
19 certain that we're clear here, at WGI 370,
20 general provisions entitled Organization and
21 Responsibilities, at Page 371, it says, the
22 safety organization for M-K, which is
23 Morrison-Knudsen, has been established and the
24 safety and health policies, regulations and
25 procedures contained in reference herein shall

Page 87

1  have been compiled and adopted in order to --
2  and it lists a bunch of these dots -- to
3  eliminate injuries to personnel, occupational
4  injuries and illnesses, and equipment and
5  property damage.
6     So would you agree with me that,
7  obviously, as well as had preventing injury to
8  persons, Morrison-Knudsen and WGI were to
9  attempt to prevent injury to property, as well?
10    A.  Correct.
11    Q.  Now, just to identify the particular
12 forms that you guys were using, okay?  First,
13 we start with this something called a
14 distribution sheet, it's WGI 1.
15    Can you -- first of all, just the
16 form, okay?  What is that form used for?
17    A.  It's just a standard distribution form
18 that we use to route documents or project files
19 among the various personnel associated with the
20 task order.
21    Q.  Okay.  So its use is limited to the
22 task orders under the TERC.  A TERC.  I'm
23 sorry.
24    A.  Yes.
25    Q.  Okay.  All right.  And this one, just

Page 88

1  as an example, says issued to A. Smith from
2  S. Roe, Task Order 26, order for supplies or
3  services.  So this is coming from Morrison
4  Knudsen.  And here's the letter.  This is
5  Number 2.  (Tendering.)
6     Can you tell me what that's about?
7     A.  I don't know.
8     Q.  Okay.  All right.  And then here we
9  have WGI 3, and it's another form.
10    So what is this form for, first,
11 before we get into this particular filled out
12 form?
13    A.  Oh.  This was an actual form --
14 government form awarding Delivery Order 26 to
15 M-K --
16    Q.  All right.
17    A.  -- by Tulsa District.
18    Q.  So it's issued by the Tulsa District,
19 and it's signed off by, it says, name of
20 contractor's signature, um -- and that's the
21 acceptance.  I'm sorry.  That's the acceptance
22 by Morrison Knudsen.
23    A.  Correct.
24    Q.  Okay.  All right.  Number 4.
25 (Tendering.)  Do we know what that is?

Page 89

1     A.  It's the continuation page that went
2  with the delivery order.
3     Q.  And this tells them how much money
4  they're going to be paid for this part of the
5  work.
6     A.  Correct.
7     Q.  It's $113,092, right?
8     A.  (Nods affirmatively.)
9     Q.  And then the work that they're going
10 to do is defined by this document here called
11 statement of work which is WGI 5 through 9.  Is
12 that correct?
13    A.  Correct.
14    Q.  Okay.  All right.  And the scope of
15 the work is, in fact, the coordination and
16 technical review of site documents for the
17 remediation and demolition of the east bank of
18 the Inner Harbor Navigation Canal.  The first
19 thing I note is that it's for remediation and
20 demolition.  Right?
21    Now, demolition is not something that
22 falls within a TERC.  Right?
23    A.  It is if it's associated with the
24 remedial action.
25    Q.  Okay.  Do you know why, then, it says

23  (Pages 86 to 89)

GUILLORY, LEE

6/30/2008

Page 90

1  remediation and demolition?
2      A.  It could just as well have said
3  demolition and remediation.  It's just the way
4  it was worded.
5      Q.  Well, but if it's included within
6  remediation, why wouldn't it just simply say
7  remediation?
8      A.  That's just the way it was authored.
9      Q.  That's fine.  All right.  And then it
10  says -- it talks about the site history, and it
11  basically talks about what they're going to do,
12  and they're supposed to review a bunch of
13  information.  Right?
14      A.  Correct.  All the preliminary reports
15  I referred to earlier.
16      Q.  And there's a long laundry list of
17  things that they're supposed to review.  And
18  frankly, all they're doing is coordinating and
19  reviewing these site documents, right?
20      A.  Correct.
21      Q.  Okay.  And they are to review the 1992
22  land use, '97 assessment of potential hazards,
23  which we've talked about a little bit ago, the
24  '94 drums and container testing, and all these
25  things are listed.

Page 91

1      A.  All the preliminary documentation the
2  government had in its presence at that time.
3      Q.  All right.  And what was the purpose,
4  if you know, of the review of these materials?
5      A.  It was to review, determine and
6  consolidate all that information, eventually,
7  into the recommendations report.
8      Q.  Okay.  Now, you would agree with me
9  that there is nothing in those site review
10  documents that really addresses the demolition
11  component, it all addresses the remediation
12  component of the work that's to be done.
13  Right?
14      A.  No, I wouldn't agree with that.
15      Q.  You wouldn't?  Okay.
16          Would you mind showing me which of
17  these government furnished documents would
18  reflect documents which would provide
19  information regarding demolition.
20      A.  Without reviewing each one I could not
21  give you an answer on that.
22      Q.  Well, at least -- never mind.  Let me
23  show you documents WGI 31 through 42.  Can you
24  tell me what that is.
25      A.  It's labeled as Modification Number 1

Page 92

1  to Task Order 26, signed by the contracting
2  officer on November 23rd, 1999, and increasing
3  the amount of the task order $115,160.
4      Q.  Okay.  So they're modifying the
5  original contract to add some more work.
6      A.  Additional work.
7      Q.  Okay.  All right.  And what are they
8  asking to do now?
9      A.  We are tasking Washington Group to do
10  some investigation and prepare an arsenic
11  background report for the Corps.
12      Q.  Now what's the purpose of that?
13      A.  In researching the, um --
14  environmental regulations by the Louisiana DEQ,
15  EPA and such regulatory agencies, um -- there
16  was a very low, minor threshold of arsenic,
17  um -- listed in the regulations, and we
18  proposed to do this environmental investigation
19  for indigenous or ambient arsenic in this area
20  to determine a specific cleanup level for
21  arsenic that we would abide by during the
22  course of the project.  And this was
23  recommended and approved by Louisiana
24  Department of Environmental Quality personnel
25  that were working on the site with.

Page 93

1      Q.  All right.  And just for the record,
2  when you say cleanup level, you're talking
3  about the depth to which one would go to remove
4  contaminated soils, right?
5      A.  No.
6      Q.  What are you referring to, then?  What
7  do you mean by level?
8      A.  A level would be so many parts per
9  million or kilograms per deciliter, of that
10  particular contaminant.
11      Q.  Okay.  Well, what is the depth to
12  which one has to go in order to be in
13  compliance with that rule?  In other words, the
14  parts per million, would you have to go down a
15  hundred feet to make sure there's no arsenic at
16  a 100-foot level or 90 foot or 50 feet or
17  30 feet?  How far down do you have to clean up?
18      A.  It doesn't depend on depth, it depends
19  on concentration.
20      Q.  Well, at what point -- are you telling
21  me then that it doesn't matter if the
22  concentration is at -1 below the surface as
23  opposed to a -100, you still have to clean it
24  up?
25      A.  That's what this study was going to

24  (Pages 90 to 93)

GUILLORY, LEE

Page 94

1    determine, what was the extent of arsenic and
2    what was an ambient amount of arsenic that was
3    indigenous to this area due from prior land use
4    as agricultural property.
5        Q.  Isn't it a fact that the regulations
6    describe permissible concentrations of toxins
7    at certain depths below the top surface?
8        A.  I don't know that.
9        Q.  You don't know.  Okay.  That's not
10   your job.
11       A.  (Shakes head negatively.)
12       Q.  I mean, logically, wouldn't you agree
13   that the whole concept of removing toxins is to
14   eliminate the potential for exposure to humans?
15   Right?
16       A.  Yes.
17       Q.  So if you're going to have toxins in
18   the soil, there's going to be a certain depth
19   below which toxins are not going to be harmful
20   to humans because they're not going to be
21   playing in soils lower than a certain depth.
22   Right?
23       A.  It depends if those soils are in the
24   future going to be disturbed in any way or
25   brought to the surface.

Page 95

1        Q.  And that, of course, is all dealt with
2    by the regulatory agencies in understanding
3    whether or not the site is industrial use or
4    residential use or the like.  We have
5    characterizations just for that purpose, don't
6    they?
7        A.  Exactly.
8        Q.  And they have a whole set of
9    characterizations for groundwater
10   contamination, too, as well, don't they?
11       A.  Exactly.
12       Q.  So that they consider the potential
13   for exposure from groundwater, which is
14   separate and distinct from the potential for
15   exposure for folks coming in contact with the
16   soils.  Right?
17       A.  Correct.
18       Q.  Okay.  So the first thing you do is
19   you need to understand the purpose to which the
20   site is going to be put, industrial versus
21   residential, right?
22       A.  Right.
23       Q.  And in fact, the industrial
24   concentration levels are -- the permissible
25   concentrations of toxins in industrial setting

Page 96

1    are higher than the permissible concentrations
2    in a residential setting, right?
3        A.  Correct.
4        Q.  Okay.  And the depths to which you
5    need to go -- sorry.  The depth to which the
6    concentrations have to stay within regulatory
7    guidelines are deeper for residential use than
8    they are for industrial use.  Aren't they?
9        A.  Stricter.  I'm not sure if they're
10   deeper.
11       Q.  Okay.  I show you mod -- it doesn't
12   tell me the number, sorry.  WGI 43.  Maybe you
13   can tell me the mod number.  I didn't see it.
14       A.  Sure.  It's modification 2601.
15       Q.  So we're still in mod 1.
16       A.  Correct.
17       Q.  Am I showing you the same thing that I
18   just showed you?  I thought that was mod 1.
19       A.  Possibly.  $115,160.  Arsenic
20   background investigation.  Yes, this is the
21   same thing.
22       Q.  All right.  It's got different Bates
23   numbers on it.  Let me just confirm that that's
24   the same thing.
25           Okay.  Let's skip that one then.  Go

Page 97

1    to mod 2.  WGI 55 in seriatim to 58.  I think
2    that's mod 2.  (Tendering.)
3        A.  Correct.  2602.
4        Q.  Okay.  Changes the contract again?
5        A.  (Nods affirmatively.)
6        Q.  What are we asking WGI to do now?
7        A.  We're further tasking them to modify
8    and increase additional work on the arsenic
9    background investigation, revising their field
10   work.  And I don't see the statement of work
11   attached but it would have more specifics.
12       Q.  Okay.  All right.  Apparently we don't
13   have one because the next document is 59.  All
14   right.  Let's go to -- I guess they gave us two
15   copies of everything.
16           This is the next document in seriatim,
17   but it's labeled 59 to 62.  Same thing, so
18   let's skip that.
19           Go to WGI 63.  This does have a scope
20   of work.  (Tendering.)
21       MR. STONE:
22           Do you have a question for him on
23   this?
24       MR. BRUNO:
25           I was going to let him look at it

Johns Pendleton Court Reporters                    800 562-1285

GUILLORY, LEE

6/30/2008

Page 98

1    first. And he was looking at it. I'm
2    trying to be polite. I know you don't
3    want me to be, but that's okay.
4        (Off the record.)
5    A.  Okay. Go ahead.
6    EXAMINATION BY MR. BRUNO:
7    Q.  All right. So this is, we said, mod
8    3.
9    A.  Correct.
10   Q.  What are we asking WGI to do for us
11   now?
12   A.  We're tasking them with developing the
13   first project plans, lab validation, permits,
14   and I don't recall the rest of it.
15   Q.  Okay. Now, who's the author of the
16   statement of work?
17   A.  I generally drafted them with my,
18   um -- project team, had those reviewed by Tulsa
19   District, and then they were issued as a
20   request for proposal to Washington Group.
21   Q.  Okay. All right. So you're the
22   actual drafter of the document, right?
23   A.  One of several, with input from other
24   team members.
25   Q.  Well, I mean, who's got the draft from

Page 99

1    which everybody else is working?
2    A.  Me.
3    Q.  Okay. And you're saying here you want
4    them to develop, submit, review and approve
5    required work plans, and you want them to
6    develop subcontracting plan and services for
7    the site assessment and demolition. All right.
8        And here you also tell them that you
9    want them to -- you want the contractor, at
10   Page 68, to develop and submit to appropriate
11   agencies permits that will enable the
12   contractor to proceed with the remedial action
13   work on the site at a future date. It says,
14   examples of activities requiring permits
15   include the removal of a sewer lift station and
16   utility connects and disconnects. Right?
17   A.  Correct.
18   Q.  All right. So why did you believe
19   that the sewer lift station removal might need
20   a permit?
21   A.  We assumed they would need a permit
22   from the New Orleans Sewerage & Water Board,
23   who own that list station, for its removal.
24   Q.  Anybody else?
25   A.  Not for that particular feature of

Page 100

1    work. We knew there would be other permitting
2    requirements. And those were addressed in the
3    subsequent mods.
4    Q.  Okay. So when you wrote this and you
5    told them to develop and submit to appropriate
6    agencies, the lift station which you had in
7    mind was only the Sewerage & Water Board.
8    A.  For that feature of work, yes.
9    Q.  And what did you anticipate the
10   Sewerage & Water Board would have to issue a
11   permit for them to do?
12   A.  To physically remove that station.
13   And they wanted to recover certain components
14   from that station to be turned over to them.
15   Q.  Okay. And let's see. They were going
16   to get -- this is Mod Number 2, still, right?
17   Nope. Mod 1, Mod 2? They were going to give
18   them an extra $339,000 for this one.
19   (Tendering.)
20   A.  Yeah.
21   Q.  Okay. Thanks. Then we go to Mod
22   Number 4. All right. Let me show you, this is
23   from WGI 80 to 100. (Tendering.) Would that
24   be Mod 5?
25   A.  No. This is Mod Number 4. 2604.

Page 101

1    Q.  4. Okay. Sorry.
2    MR. STONE:
3        Would you like for him to show
4    you where you can find that on there?
5    MR. BRUNO:
6        Yeah.
7    A.  On each executed document -- well, you
8    can see it on the cover letter here. It's also
9    at the very top of the page.
10   EXAMINATION BY MR. BRUNO:
11   Q.  What does it say?
12   A.  Amendment/Modification Number 0002604.
13   Q.  All right. So that last number --
14   A.  The last two digits are the
15   modification number.
16   Q.  Okay. All right. Thanks.
17   A.  Okay.
18   Q.  All right. So that's 4.
19       This one goes into 5.
20       Can you tell me what 4 tells them to
21   do? Did we just give them some more money?
22   A.  This one gave them some additional
23   funding of $80,975 to continue preconstruction
24   activities in anticipation of FY '01 funds
25   coming through.

26  (Pages 98 to 101)

GUILLORY, LEE

6/30/2008

Page 102

1      Q.   Meaning in anticipation of fiscal year
2   money coming from the '01 budget?
3      A.   Correct.
4      Q.   Okay.  All right.  And I misspoke, by
5   way.  Task Order Number 4 is 80 to 87.  I had
6   said 100.
7           Number 5 is 88, I think --
8      MR. STONE:
9           Those are modifications, not task
10   orders.
11      MR. BRUNO:
12           I'm sorry.  Yeah.  I meant to say
13   that.
14   EXAMINATION BY MR. BRUNO:
15      Q.   This is Mod Number 5 of Task Order 26.
16   (Tendering.)
17      A.   Question?
18      Q.   Is that right?
19      A.   Yes.
20      Q.   Okay.  What are we asking them to do
21   there?
22      A.   We're asking them to do the first
23   initial task, mobilize to the job site, develop
24   the project office, trailers, computers,
25   establish security services, perimeter fencing,

Page 103

1   establish the Corps' project safety sign.  And,
2   um -- under permits and licenses, contractor
3   shall develop, apply for and acquire all
4   appropriate agency permits, on behalf of the
5   Corps of Engineers, to proceed with the
6   remedial action at the job site.
7      Q.   Now, once again I notice that you're
8   not telling WGI what permits are necessary.
9           Was it the Corps' understanding that
10   WGI would make the determination of what
11   permits were necessary?
12      A.   No.  It was not.  We asked WGI to
13   contact all appropriate agencies in the area
14   that could possibly have any permitting
15   requirements for the project site and find out
16   what those requirements are and inform the
17   government of what they are and apply for them
18   on our behalf.
19      Q.   Okay.  So to be crystal clear here,
20   this work order contemplated that Washington
21   Group International would contact the Orleans
22   Levee District to find out what permits were
23   necessary and make application for any permit
24   that was deemed necessary by the Orleans Levee
25   Board.  Right?

Page 104

1      A.   And many other agencies, yes.
2      Q.   I understand that.  I'm only asking
3   you about that one.
4      A.   Yes.
5      Q.   Right?  As clear as day, you expected
6   WGI to call up the Orleans Levee District and
7   ask them, do we need a permit?  And if Orleans
8   Levee District said you need a permit, they
9   were expected to get the permit.  Right?
10      A.   They were to apply for it on behalf of
11   the Corps of Engineers.
12      Q.   If they didn't get the permit, what
13   was going to happen?  If they applied for it
14   and they were turned down, what happens then?
15      A.   We would negotiate with all the
16   parties together and find out what the holdup
17   was and proceed from there.
18      Q.   All right.  Well, was it the intent of
19   the Corps to ignore the permitting
20   requirements, if any, that may have been in
21   place by the Orleans Levee District?
22      A.   No.
23      Q.   Okay.  Now, I also note that on Page
24   91 -- and again, you're the author of the --
25   well, I don't know, let me see now. This page

Page 105

1   says 2 of 3.  I don't see a 1.  And then you
2   can see how the WGI numbers go.  This is 90 and
3   that's 91?
4      A.   Uh-huh.
5      Q.   So am I missing a page?
6      A.   No.  You're right.
7      Q.   So this page follows this form.
8      A.   Right.
9      Q.   Okay.  So who's the author of the form
10   that's identified as 90?
11      A.   The form is actually filled out in
12   Tulsa District.
13      Q.   Okay.  And who wrote 91?
14      A.   Um -- I drafted that in conjunction
15   with Tulsa District.
16      Q.   Okay.  Now, at 5.0, it says the FAR
17   clause, 52.236-7, titled, open quotes, Permits
18   and Responsibilities, close quotes, open paren,
19   November, 1991, close paren, is hereby
20   incorporated into this task order.
21           It read -- it meant to say it reads --
22   as follows:  The contractor shall, without
23   additional expense to the government, be
24   responsible for obtaining any necessary
25   licenses and permits and for complying with any

27 (Pages 102 to 105)

GUILLORY, LEE

6/30/2008

Page 106

1  federal state and municipal laws, codes and
2  regulations applicable to the performance of
3  the work.  The contractor shall also be
4  responsible for all damages to persons or
5  property that occur as a result of the
6  contractor's fault or negligence.  The
7  contractor shall also be responsible for all
8  materials delivered and work performed until
9  completion and acceptance of the entire work
10  except for any completed unit of work which may
11  have been accepted under the contract.  Okay.
12       So, why did you put this language into
13  the document?
14       A.  As a general FAR clause that we use in
15  most all of our Corps contracts.
16       Q.  Why wasn't it in the original Task
17  Order 26?  That itself makes reference to -- in
18  fact I'll show it to you, there's a whole
19  reference of clauses that they could have put
20  in there, isn't there?
21       A.  Sure.  In the base contract there's a
22  whole list of clauses in there, too.
23       Q.  So why was this one not put in the
24  original contract and, instead, added here as
25  an amendment?

Page 107

1       A.  As we were expanding the scope of work
2  we want to point out to them that this is a
3  definitive item that we want addressed.
4       Q.  At WGI 186, you see, and this is on
5  the original TERC contract, it says, Part 2,
6  applicable to delivery orders for construction
7  services, and there's a whole pile of standard
8  form documents and amendments like this FAR
9  clause, right?  And in fact, the FAR clause is
10  referenced at Page 6.  It's already there.
11  Right?  You want to see it?
12       A.  If you're pointing to it, that's fine.
13       Q.  It says right there, applicable to
14  delivery orders.  And it says, right there,
15  52.236-07, Permits and Responsibilities,
16  November, 1991, reference -- it gives a
17  reference.  So it's already in the contract,
18  right?  It's already in the original contract.
19       A.  Yeah.  I didn't have a copy of the
20  base contract.
21       Q.  Okay.  Well, there's a whole bunch of
22  other clauses that you could have added.  Why
23  did you decide that you needed to add this
24  particular clause?
25       A.  Because we, the government, wanted to

Page 108

1  reiterate that this was an important portion of
2  the work that we wanted addressed in this
3  particular modification to the task order.
4       Q.  All right.  So the Corps felt it very
5  important, number one, that WGI get all the
6  right permits -- right?
7       A.  On behalf of the Corps.
8       Q.  Okay.  And number two, that WGI
9  understood clearly that it was responsible for
10  any damages to property that it may cause.
11  Right?
12       A.  That's what the clause says.
13       Q.  Okay.  All right.  Let's go to Mod
14  Number 6.  It's WGI 101.  Can you tell me what
15  Modification Number 6 does, if anything?
16       A.  It was issued 1 December 2000, in the
17  amount of $1.91 million --
18       Q.  What's the 9 million for?
19       A.  To award -- to have Washington Group
20  perform Task Number 3 which was previously
21  identified in their proposal.  Task Number 4,
22  additional funding for Task Number 1 --
23       MR. STONE:
24            You meant 1.9 million.
25       MR. BRUNO:

Page 109

1            I'm sorry.  I though he said nine
2       million.
3       MR. TREEBY:
4            You misspoke.
5  EXAMINATION BY MR. BRUNO:
6       Q.  Whatever the number is.  What is it?
7       A.  $1,906,103.
8       Q.  All right.  We're giving them
9  $1.9 million to do what again?
10       A.  Additional tasks that had been
11  identified in their previous proposal of
12  October of 2000.
13       Q.  Okay.  So is there a document where in
14  the Corps approves the whole work plan, or is
15  it that the Corps is approving task by task?
16       A.  In October we all met in Tulsa and
17  negotiated the overall scope of work and broke
18  it down into tasks.  But due to funding
19  constraints we were only awarding specific
20  tasks per mod, in a progressive fashion.
21       Q.  All right.  So this document, the
22  project work plan?
23       A.  No, it's not the project work plan.
24       Q.  (Indicating.)
25       A.  Well, that's one you're looking at,

28  (Pages 106 to 109)

GUILLORY, LEE

6/30/2008

Page 110

1  but what I'm talking about is the revised
2  proposal from 24 October 2000.
3     Q.  Okay.  Is that a revision of this
4  document, which is WGI 41849 in seriatim to
5  41944?
6     A.  No.  It's separate.
7     Q.  Separate document altogether?
8     A.  Uh-huh.
9     Q.  What is the distinction between that
10 document and the document that I have in my
11 hand?
12       MR. STONE:
13          Could you just identify the
14       exhibit and the --
15       MR. BRUNO:
16          That's why I gave you the Bates
17       numbers.  It's not the right one so I
18       wasn't going to --
19       MR. STONE:
20          I thought it was an exhibit to
21       another deposition.
22 EXAMINATION BY MR. BRUNO:
23     Q.  Anyway, what's the difference between
24 this and --
25     A.  The 24 October revised proposal

Page 111

1  covered the entire scope of work, demolition
2  and remediation of the entire site.
3     Q.  Okay.
4     A.  The project work plans, and there were
5  a total of eight of them, identified specific
6  features and salient, um -- parts of the work
7  that we'd have to accomplish of the overall
8  contract.  And that's a project work plan,
9  there was a site sampling -- I mean a sampling
10 and analysis plan, there was a site safety and,
11 um -- and health plan, there was a perimeter
12 monitoring plan, there was a quality control
13 plan, environmental pollution control plan, a
14 hurricane plan -- there was a total of eight
15 project plans that were used as guidelines to
16 accomplish the entire work.
17    Q.  Okay.  Used as guidelines by whom?  By
18 WGI?
19    A.  The government and WGI.
20    Q.  Okay.  Well, which of the documents
21 defines what it is that the government expects
22 WGI to actually go out in the field and do?
23    A.  Those eight project work plans, plus
24 what was contained in his 24 October 2000
25 revised proposal.

Page 112

1     Q.  Okay.  Now, these project work plans,
2  and there are eight of them, they're prepared
3  by Washington Group International, right?
4     A.  Yes.  And reviewed and commented on by
5  the government.
6     Q.  All right.  And they're reviewed and
7  commented on and --
8     A.  And approved or disapproved by the
9  government.
10    Q.  So there's a piece of paper that says
11 approved on it?
12    A.  Correct.
13    Q.  Is it like your other documents, that
14 there will be the document and then on top of
15 them there will be the comments and then the
16 final will be approval?
17    A.  Exactly.  Just like this.  It's an
18 Engineering Form 4025.  (Indicating.)
19    Q.  All right.  Let me see it.  Those are
20 your originals, obviously.  They've got -- and
21 this came out of the box?
22    A.  Correct.
23    Q.  And there is no Bates number on them,
24 so --
25       MR. STONE:

Page 113

1          They were I think Bates numbered
2       after --
3       MR. BRUNO:
4          After they were photocopied.
5       MR. STONE:
6          -- when your guys took your
7       copies, whatever you wanted out of the
8       boxes, I think those were Bates
9       numbered.
10    A.  They came specifically out of Box
11 Number 21, if you want to review them.
12 EXAMINATION BY MR. BRUNO:
13    Q.  This came out of 21?
14    A.  Uh-huh.
15    Q.  Is this the -- what is this; is this
16 an approval of this project work plan WGI
17 41879?
18    A.  No.  This is approval of a cofferdam
19 plan.
20    Q.  Oh, this.  This is the cofferdam plan
21 for the removal of the lift station?
22    A.  Correct.
23    Q.  Okay.  All right.  Well, this is
24 probably a good time to break.  It's five
25 minutes to 12:00.

29 (Pages 110 to 113)

GUILLORY, LEE

6/30/2008

Page 114

1    (Lunch break.)
2   EXAMINATION BY MR. STONE:
3    Q.  All right.  Now, Mr. Guillory, before
4   we broke we were talking about those documents,
5   those things that describe the actual work that
6   WGI is posed to do.  You told us that at least
7   one of the documents that describe the work is
8   something called the project work plan, which
9   is WGI 41879 in seriatim to 41944.  Right?
10   A.  Correct.
11   Q.  And this project work plan is the
12  result of the statement of work dated 15 May
13  2000, wherein the Corps directs the contractor
14  WGI to in fact draft a project work plan as
15  well as a site safety and health plan, a
16  revised contractor quality control plan, a
17  revised sampling and analysis plan, a waste
18  management plan and a storm water pollution
19  prevention plan, right?
20   A.  Right.
21   Q.  Okay.  Now, the thing that describes
22  the work, that is, the actual physical labor,
23  is this project work plan, project site
24  development and remedial action.  Is that
25  right?

Page 115

1    A.  Correct.  Plus the details are listed
2   in their 24 October revised proposal.
3    Q.  Okay.  All right.  So between this
4   document, the project work plan, and the
5   revised proposal, we have all the plans and
6   specifications that describe the work, at least
7   what was contemplated at that time -- I
8   understand there may have been some subsequent
9   changes -- they're all in there, right?
10   A.  Yes.  The whole eight conglomeration
11  of work plans, not just the project work plan.
12   Q.  Well, but those don't really describe
13  what it is they're doing, those describe, as I
14  said, things like --
15   A.  Site safety, perimeter monitoring, all
16  that kind of stuff.  Sampling and analysis.
17   Q.  But so the real description of the
18  work is the project work plan and the proposal
19  dated October 21, 2000.
20   A.  Correct.  Especially the definable
21  features of work that it's broken down into.
22   Q.  Now, in August there was a meeting.
23  And I guess I was unclear.  Was that meeting in
24  Tulsa or was that meeting in New Orleans?
25   A.  August of when?

Page 116

1    Q.  Of 2000.
2    A.  August of 2000.  Um -- can I see the
3   document?
4    Q.  Yes.  This may not be the right one,
5   that's why -- I'm happy to show it to you,
6   but --
7    A.  Yes, I recall this meeting.
8    Q.  All right.  Were there any other
9   meetings?
10   A.  Oh, yes.  Quite often.  This was
11  planning for the -- this was a scoping meeting
12  for the project work plans with the whole team
13  from Washington Group and the Corps, as to what
14  we expected and what we wanted addressed in
15  these eight major work plans.
16   Q.  Okay.  And would you have also
17  discussed the proposal, as well?  I'm sorry.
18  The drafting of the proposals?
19   A.  That wasn't under development at that
20  time.  I think the actual proposal period was
21  like from August through, um -- and like I
22  said, the final revised one was the 24th of
23  October, and we had the -- I'd say in early
24  October is when we had the negotiation meeting
25  in Tulsa District.

Page 117

1    Q.  Okay.  What is the difference in terms
2   of the work that's to be performed as described
3   by the proposal dated October 21, 2000 and the
4   work plan dated October, 2000?  In terms of the
5   scope.
6    A.  The work plans themselves are general
7   in nature, saying this is what we anticipate is
8   going to happen.  The proposal goes into all
9   the details and nuts and bolts and price on
10  what everything is going to cost, and a
11  detailed schedule, um -- when things are going
12  to occur and in what sequence and that kind of
13  thing.
14   Q.  Right.  Well, I gather that the
15  proposal deals more with money and timing as
16  opposed to what it is that the WGI is expected
17  to do.  Is that accurate or is that inaccurate?
18   A.  That's inaccurate because it does
19  include costs and schedule.
20   Q.  Right.
21   A.  Whereas, the general work plans are
22  just a general definable feature of work with
23  no costs or schedule attached to them.
24   Q.  Well, I understand that.  But in terms
25  of -- I wasn't -- I was specifically excluding

30  (Pages 114 to 117)

GUILLORY, LEE

6/30/2008

Page 118

1  scheduling costs. What I'm trying to
2  understand is the degree of specificity that
3  describes the work. Is this one, October,
4  2000, more or less specific than October 21,
5  2000, the proposal, in describing the work
6  itself that the Corps has contracted with the
7  WGI to do?
8      A.  The eight work plans act as a contract
9  specifications and guidelines to accomplish the
10  work.
11      Q.  Okay.  I gather, then, that this
12  project work plan is more specific than the
13  proposal.
14      A.  Not in all cases.  The proposal would
15  have a lot more details about staffing,
16  personnel, costs, and scheduling, of course.
17      Q.  Once again, I'm limiting my question.
18  Okay?  And I'm -- listen to the question very
19  carefully.  Because I'm excluding from the
20  question money, staffing and the like.  I'm
21  limiting my question to project specifications
22  and plans.  Okay?  Do understand what I'm
23  saying?
24      A.  Yes.
25      Q.  All right.  Is it not a fact that this

Page 119

1  project work plan dated October, 2000, is much
2  more specific with regard to that aspect alone
3  than the proposal?
4      A.  All of the work plans, not just the
5  project work plan, yes.
6      Q.  Okay.  Now, the August 3rd meeting,
7  2000, that was to sit down with the Washington
8  Group and discuss the development of the work
9  plan, which is this document right here.
10      A.  All of the work plans.
11      Q.  All of the work plans.
12         Can we agree, though, that this one
13  that is the project site development and
14  remedial action plan is the one that really
15  describes the work, that is, the digging, the
16  removal of soils, et cetera?
17      A.  It is the general work plan, yes.
18      Q.  All right.  Let's call it the general
19  work plan, then.  In August 3 of 2000, you all
20  met to discuss the general work plan, what your
21  expectations were, what issues might come up
22  and the like, right?
23      A.  Right.  What information we had, what
24  we needed to gather, additional permits and
25  responsibilities and authorities that we had

Page 120

1  to, um -- investigate, um -- what all our legal
2  and environmental regulations were going to be,
3  which ones would and would not apply in this
4  particular case, and that sort of thing.
5      Q.  All right.  Now, you knew,
6  Mr. Guillory, that the site was right next to
7  the flood protection structure or the floodwall
8  which was built as a hurricane protection
9  structure to protect the Lower Ninth Ward,
10  right?
11      A.  Yes.  It was all part of the hurricane
12  protection system.
13      Q.  All right.  Now, did the work site
14  include or exclude the hurricane protection
15  structure?
16      A.  Exclude.  It was up to the face of the
17  flood side face of the wall.
18      Q.  Well, the fence was installed on the
19  protected side, wasn't it?
20      A.  Correct.
21      Q.  All right.  So to someone who didn't
22  know any better, they would have assumed that
23  the work site included the flood protection
24  structure, wouldn't you agree?
25      A.  That's a possible assumption.

Page 121

1      Q.  As far as you understood, though, the
2  flood protection structure was outside of your
3  work site.  Is that true?  Is that what you
4  just told me?
5      A.  Yes.
6      Q.  Okay.  Now, do you know, sir, who
7  owned the flood protection structure back in
8  August of 2000?
9      A.  Yes.  The owner was Orleans Levee
10  District.
11      Q.  All right.  And were you aware, sir,
12  of whether or not the Orleans Levee District
13  had any regulations or requirements with regard
14  to the necessity for a permit by anyone who
15  intended to work in the immediate vicinity of
16  that floodwall?
17      A.  Yes.  We asked the Washington Group to
18  contact Orleans Levee District on our behalf
19  and to assess and acquire any permits that we
20  would need.
21      Q.  Okay.  Did the Washington Group
22  acquire that permit?
23      A.  They did contact Orleans Levee
24  District on several occasions, a lot of
25  correspondence went back and forth between

31 (Pages 118 to 121)

GUILLORY, LEE

6/30/2008

Page 122

1  Washington Group, Orleans Levee District,
2  Orleans Levee District to the Corps here at the
3  operations division, and, um -- the ultimate
4  decision was that no additional -- no Orleans
5  Levee District permit was required to
6  accomplish this work by the Corps, we merely
7  had to coordinate with them and keep them
8  informed of what was being accomplished.
9      Q.  All right.  Is what you just said
10  embodied in some kind of writing from the
11  Orleans Levee District so that you could have
12  documented your file?
13      A.  I don't recall if we had a specific
14  letter from them, but there is a whole chain of
15  correspondence in the project files between
16  Washington to OLD and OLD to the Corps --
17      Q.  Right.
18      A.  -- and, um -- documentation of
19  telephone calls --
20      Q.  Right.
21      A.  -- and the like.
22      Q.  Yeah.  And that exchange is an
23  exchange which asks the Washington Group
24  International to sign a permit, isn't it?  And
25  the Washington Group refused to sign.  Isn't

Page 123

1  that what that correspondence reveals?
2      A.  Not that I recall.
3      Q.  You don't recall seeing a letter from
4  the Orleans Levee District to the WGI which
5  acted as a permit and the only thing that was
6  needed from the WGI to make it a permit was a
7  simple signature?  You don't recall seeing
8  anything like that?
9      A.  I don't recall seeing that.
10      Q.  Never saw that.
11      A.  I don't recall.
12      Q.  Did you know that the WGI 's legal
13  department had advised its people on the ground
14  not to sign that document?
15      A.  Not aware of that.
16      Q.  Were you surprised to know that?
17      A.  It's surprising to hear it today, but
18  I wasn't aware of it at the time.
19      Q.  Would you be surprised to know that
20  the WGI claims that they received an E-mail
21  from you in June of July which indicated that
22  there was no need for them to apply for a
23  permit, based upon your representation?
24      A.  I know.
25      MR. STONE:

Page 124

1      Q.  July of when?
2      MR. BRUNO:
3      Q.  Of 2000.
4      A.  The document you're referring to is
5  out of context and does not, um -- go with this
6  current line of questioning.  If you pull that
7  specific document, that was when we were doing
8  the arsenic background investigation summary
9  report, and that specifically was asking if a
10  permit was required for us to do drilling along
11  the MRGO levee, approximately right here
12  between Southern Scrap and a few thousand feet
13  down here.
14      Q.  Okay.  Let me slow you down because,
15  as you know, we're typing everything and I want
16  to see if we can put some more meat on the bone
17  so that somebody reading this thing will know
18  what you and I are talking about.
19      A.  Okay.
20      Q.  First of all, you've seen that E-mail
21  apparently.
22      A.  Yes.
23      Q.  Who showed it to you?
24      A.  DOJ lawyers.
25      Q.  Okay.  And that E-mail is dated

Page 125

1  approximately June, July, 2000, right?
2      A.  Uh-huh.
3      Q.  Okay.  Now, if -- if -- just if
4  someone suggested that that E-mail from you to
5  WGI was intended to communicate to WGI that WGI
6  didn't need to get a permit from the Orleans
7  Levee District in order to do the work
8  contemplated by this project work plan -- okay?
9  Your testimony today is that would be an
10  inaccurate and inappropriate conclusion; isn't
11  that true?
12      A.  Correct.  That was only for the
13  arsenic background investigation study
14  drilling.
15      Q.  Okay.  Now, to complete the record,
16  because you're pointed to some stuff -- okay?
17  All right, now, the arsenic investigation --
18  all right.  Let's see now where we are.  You're
19  pointing to -- all right.
20      MR. BRUNO:
21          For the record, counsel, the
22      witness is pointing to where the
23      Intracoastal Waterway intersects with
24      the Industrial Canal on the protected
25      side of the flood protection structure

32 (Pages 122 to 125)

Johns Pendleton Court Reporters                    800 562-1285

GUILLORY, LEE

6/30/2008

Page 126

1    where the two come into contact.
2    A.  East of the Southern Scrap yard area.
3    EXAMINATION BY MR. BRUNO:
4    Q.  All right.  And is that where this
5    arsenic investigation was supposed to take
6    place?
7    A.  That's one of two areas.
8    Q.  Okay.
9    A.  We did some preliminary drilling,
10   approximately a thousand to fifteen hundred
11   linear feet along the protected side portion of
12   this levee.
13   Q.  All right.  This levee being the Reach
14   1 levee on the south of the Intracoastal
15   Waterway.  The protected side, right?
16   A.  Yes.  And then adjacent to the
17   existing IHNC lock, we call it the oak tree
18   grove area, we did some additional sampling and
19   analysis for the arsenic study there.
20   Q.  Again, on the protected side?
21   A.  Protected side, east side of the
22   existing lock.
23   Q.  Okay.  All right.
24   A.  Within the government reservation.
25   Q.  Okay.  And how did that E-mail -- what

Page 127

1    provoked the E-mail, if you can remember?
2    A.  I believe I made a phone call to
3    Orleans Levee District, or coordinated with
4    them, and asked them permission if we needed to
5    acquire any permits to do that, um -- shallow
6    soil drilling in that particular area along the
7    Intracoastal Waterway.
8    Q.  Okay.
9    A.  And the answer I received was no, it
10   was not necessary --
11   Q.  Okay.
12   A.  -- for that particular portion of
13   work, and so I wrote that into an E-mail and
14   conveyed that to Washington Group.
15   Q.  Okay.  Now, and why did you convey
16   that to the Washington Group?
17   A.  Because as construction manager I was
18   inquiring about it, and I conveyed to them that
19   this was not necessary for them to proceed with
20   the arsenic background study drilling.
21   Q.  Okay.  And the reason why you
22   communicated with them was because you had
23   contracted with them to do the arsenic
24   investigation, right?
25   A.  Right.

Page 128

1    Q.  Okay.  Now, for completeness of the
2    record, you in your statement of work had
3    requested that the Washington Group do its own
4    investigation as to the need for permits,
5    didn't you?
6    A.  Yes.  But that came later.
7    Q.  Okay.
8    A.  Keep the chronology in --
9    Q.  Frankly, that's exactly why I'm asking
10   the question.
11      So finish your answer, because I'm
12   sorry.
13   A.  Okay.  Just as you said, this occurred
14   in June of 2000.  The previous mods we
15   discussed, 2603 and 2605 that called for
16   writing the, um -- project work plans and
17   permits and responsibilities clause and stuff,
18   those occurred later on, um -- I think you said
19   between the June and August of 2000 time frame.
20   Q.  Okay.  All right.  So at the time of
21   the arsenic investigation, because you
22   understood the potential need for permits you
23   decided to call the Orleans Levee District
24   yourself, right?
25   A.  Right.

Page 129

1    Q.  Subsequent statements of work, because
2    of your knowledge, suggested to you that you
3    ought to tell the WGI to do that as part of
4    their work.
5    A.  Correct.
6    Q.  And that's why you put that in the
7    statement of work.
8    A.  Right.
9    Q.  Right.  And so it was your expectation
10   that the WGI would have gotten a permit from
11   the levee board if the levee board had believed
12   that there was a need for a permit.
13   A.  Correct.
14   Q.  Okay.  Now, ultimately, you knew, did
15   you not, that the WGI didn't get a permit?
16   A.  Correct.
17   Q.  Okay.  How did you get -- how did you
18   come to that information?
19   A.  I don't recall.  I think we had, um --
20   on-the-job-site meetings or something, and they
21   told us they had gone through all the
22   coordination, made the contacts by letters and
23   stuff, and telephone inquiries and all that
24   kind of stuff, and the final outcome was that
25   OLD said we did not need a permit, we just had

33 (Pages 126 to 129)

GUILLORY, LEE

6/30/2008

Page 130

1  to coordinate our activities and work with them
2  on a monthly basis.
3      Q.   Okay.  Now, Mr. Guillory, did you
4  learn that in your conversations with WGI or
5  did you, as they say, get that straight from
6  the Orleans Levee District, what you just told
7  us?
8      A.   I believe it was through Washington
9  Group.
10     Q.   All right.  So Washington Group
11  reported to you that they talked to the Orleans
12  Levee District and the levee district told
13  them, you don't need to get a permit, just keep
14  us apprized as to what's going on, right?
15     A.   I believe that's the way it occurred.
16     Q.   Okay.  Thank you.  Now --
17     A.   And there's a whole paper trial and
18  documentation showing that they contacted OLD
19  on multiple occasions by phone, by letter, by
20  all that kind of stuff.  OLD contacted the
21  Corps, specifically the inspection of completed
22  works folks in operations division, discussed
23  the situation with them, and then there was
24  correspondence back and forth, and I was not
25  aware that there was an actual permit that was

Page 131

1  requested to be signed.
2      Q.   Okay.  All right.  Now, did someone
3  from -- in August, when you and others, were
4  sitting around talking about the work and what
5  problems might be encountered, was there
6  someone in attendance from the geotechnical
7  section of the engineering division of the New
8  Orleans District?
9      A.   Yes.  Dr. George Bacuta is a
10  professional geologist.
11     Q.   All right.  And is that the meeting at
12  which there was some discussions about
13  geotechnical issues that resulted in a letter
14  or -- I guess was that a letter or an E-mail?
15  It was a letter that someone attached as an
16  E-mail -- describing some engineering or
17  geotechnical considerations?  Do you recall
18  what I'm referring to?
19     A.   No.
20     Q.   Forgive me.  It went with the court
21  reporter on Friday and we don't have it back.
22  So anyway --
23         MR. STONE:
24           Are you talking about the exhibit
25         that we talked about?  I have a copy

Page 132

1  if you'd like to --
2         MR. BRUNO:
3           Yeah, if you don't mind.
4         MR. STONE:
5           Just go ahead and I'll find it.
6         MR. BRUNO:
7           Okay, yeah.  I'm trying to figure
8  out if that was the meeting.
9  EXAMINATION BY MR. BRUNO:
10     Q.   Now, in August of 2000, the Corps
11  understood that there was going to be at least
12  one excavation which was going to be deeper
13  than five feet, right?  The excavation of the
14  sewer lift station.
15     A.   Correct.
16     Q.   To what depth at that time did you
17  expect the excavation to go?
18     A.   I don't recall the specifics, but I
19  believe it was somewhere in the neighborhood
20  of, um -- 23 to -25 or something.
21     Q.   Okay.  Now --
22     A.   I have the actual approval of the plan
23  right here if you want me to look at it.
24     Q.   Yes.  That would be great.  Let's go
25  ahead and grab that.

Page 133

1           Actually, before we leave that let's
2  go ahead and finish this little area.
3         MR. STONE:
4           (Tendering.)
5  EXAMINATION BY MR. BRUNO:
6      Q.   Let me show it to you.  I don't
7  remember how we marked it last time.
8         MR. STONE:
9           I think it says Exhibit 15 there.
10         MR. BRUNO:
11           It does.
12  EXAMINATION BY MR. BRUNO:
13     Q.   This is Exhibit 15 to the deposition
14  of Mr. Grieshaber, and it's the fourth and
15  fifth page.  Would you mind taking a quick look
16  at that for me?
17     A.   Sure.
18     Q.   Okay.  You see that it's attention
19  Ms. Spadaro?  And Ms. Spadaro -- Jean Spadaro
20  is at this meeting in August of 2000?
21     A.   Yes.
22     Q.   And you can see this is an E-mail
23  dated September 13, 2000, but we don't know the
24  date of this attachment.  I guess it's an
25  attachment, or a copy and paste.

34  (Pages 130 to 133)

GUILLORY, LEE

6/30/2008

Page 134

1    A.  No, it's not.  It's the same E-mail.
2    Q.  We'll, it's different typeface,
3  though.
4    A.  Yeah, but it doesn't matter.  It's
5  from September 13th, 2000.
6    Q.  All right.  It says, reference the
7  meeting on 8 September 2000 -- which is
8  obviously not this meeting, I guess you're
9  right, it talks about a different meeting.
10    Were you in attendance at a meeting on
11  8 September 2000?
12    A.  I don't recall.
13    Q.  I know.  Anyway, it says -- it's
14  requesting geotech input to the above-named
15  contract.
16    Let me do it this way:  Did you
17  request any geotechnical support to this -- to
18  the issues discussed on August the 3rd, 2000?
19    Different date than this one.
20    A.  We had geotechnical personnel there
21  like Dr. George Bacura, and some of the issues
22  that may have been brought up, um -- is that
23  like a meeting minutes of the entire meeting?
24    Q.  Yes.  There are.
25    A.  I think there's a list of issues that

Page 135

1  needed to be addressed --
2    Q.  Right.
3    A.  -- and, um -- and followed up on.
4    Q.  Okay.  Well, I'm going to let you take
5  a quick look at it.  I could find no
6  geotechnical issues, but you may be able to
7  find some.  Take a quick look at it for me.
8  (Tendering.)?
9    A.  No, the only geotechnical issue I see
10  is a reference to the removal of the sewer lift
11  station.
12    Q.  And in that regard, what is the
13  geotechnical issue other than just describing
14  it?
15    A.  It just mentioned that it had to be
16  removed.
17    Q.  Okay.  All right.  And then we have
18  this document here which says, very
19  specifically, requesting geotechnical input.
20    A.  Uh-huh.
21    Q.  And then we have a list of items on
22  there, right?
23    A.  Right.
24    Q.  Okay.  Do you recall who made the
25  request for the geotechnical input?

Page 136

1    A.  Evidently Jean Spadaro to Jim Gately.
2  And Mr. Gately is responding back to Jean.
3    Q.  What is Jean 's position?
4    A.  She was one of the civil engineers in
5  engineering division, general engineering
6  branch.  She worked side way side with
7  Dr. Bacuta.  She's now Jean Vossen.  You'll
8  hear her married name pronounced every once in
9  a while.
10    Q.  Exactly.  Okay.  So --
11    A.  And now she's the chief of civil
12  branch in engineering division.
13    Q.  All right.  So Gately is -- he's a
14  geotechnical guy?
15    A.  Yes.  He worked in our geotechnical
16  branch in engineering division.
17    Q.  He's responding to Jean Spadaro who's
18  also in the geotechnical branch?
19    A.  No.  She's in general engineering
20  branch at that time.
21    Q.  General engineering.  And Bacuta, he's
22  also --
23    A.  General engineering branch.
24    Q.  All right.  Okay.
25    So can I gather from this document

Page 137

1  that this is a very specific geotechnical
2  request -- I'm sorry.  This is a request for
3  geotechnical engineering support?
4    A.  Yes.  From one branch to the other.
5    Q.  Thanks.  Now, it says here -- there
6  are certain items in here.  It says, for
7  example, after any excavation or soil
8  displacement on the canal bank above or below
9  the waterline has been completed, the
10  contractor shall finish the slope to a 1
11  vertical on 3 horizontal.
12    A.  Correct.
13    Q.  Additionally, the contractor shall
14  provide compliance surveys to the contracting
15  office showing that this has been accomplished.
16    Do you know why the geotechnical folks
17  would have made that recommendation?
18    A.  Probably had something to do with
19  stability analysis of the adjacent flood
20  control structures --
21    Q.  Okay.
22    A.  -- and bank line adjacent to the IHNC
23  canal.
24    Q.  All right.  Then it says, any
25  excavations deeper than three feet shall have

35  (Pages 134 to 137)

Page 138

1  the slopes cut in a 1 vertical on 3 horizontal
2  slope.
3      A.  Correct.  That's standard engineering
4  practice.
5      Q.  What is the purpose of that
6  admonition, if you know?
7      A.  So you do not get cave in or sloughing
8  of the banks into the hole.
9      Q.  All right.  It says, stockpiles shall
10  be no higher than five feet above the
11  surrounding terrain and shall be placed no
12  closer than 20 feet from the edge of the
13  excavation.
14      Do you know the geotechnical purpose
15  of that recommendation?
16      A.  Again, slope failure into the hole.
17      Q.  Okay.  Soil used to backfill any of
18  the excavation shall be compacted to the
19  density of the existing soil.
20      What is the purpose of that
21  recommendation?
22      A.  To replace it and compact it with the
23  same soil and compact it to the existing
24  conditions or better.
25      Q.  And what's the -- why would you do

Page 139

1  that?
2      A.  For stability analysis of the site.
3      Q.  Would that include the prevention of
4  underseepage issues?
5      A.  I don't know.
6      Q.  Okay.  When the fence -- it says E.
7  I'm sorry.  When the fence posts are removed,
8  the soil used to backfill shall be the soil
9  that was removed or sand brought up to the
10  existing grade and hand tamped to the density
11  of the surrounding terrain.
12      Do you know what the purpose of that
13  admonition is?
14      A.  Just to replace with in kind material
15  and compaction.
16      Q.  Next one is the contractor shall
17  smooth the finished surface and slope to drain
18  so that the surface water will drain freely to
19  the canal and not cause ponding of the runoff.
20      Do you know why that's there?
21      A.  That is to do a final slope to drain
22  and dressing of the site so that it slopes from
23  the floodwall and levee down towards the canal.
24      Q.  All right.  And the minimum elevation
25  that the contractor should dress the area is to

Page 140

1  3.0 NGVD.
2      First, can you tell us what that
3  means?
4      A.  NGVD is the National Geodetic Vertical
5  Datum.  And 3 feet is three feet above 0 NGVD.
6      Q.  Okay.  So does that mean that the --
7  what does dress mean?
8      A.  Final dressing, smooth it out.
9      Q.  Okay.  So that means that all the
10  surfaces on the water side of the flood control
11  structure should have been, after the project
12  is completed, 3 feet above NGVD?
13      A.  Possibly.
14      Q.  Okay.  And then finally, it says, the
15  contractor shall cut the bank to no closer than
16  260 feet as measured perpendicular to the
17  existing floodwall.  Do you know why that's
18  there?
19      A.  No.
20      Q.  Okay.  Do you know what that means?
21      A.  260 feet from the water 's edge to
22  the, um -- floodwall.
23      Q.  Well, I know, but what does cut the
24  bank mean?
25      A.  Excavate.

Page 141

1      Q.  Okay.  In fact, the water got a whole
2  lot closer than 260 feet during the course of
3  the work done by WGI, didn't it?
4      A.  In certain instances, yes.
5      Q.  Because the borrow pit I think had a
6  break in it on the water side, among other
7  things?
8      A.  At the conclusion of the project we
9  intentionally breached that to flood the borrow
10  area.
11      Q.  Okay.  All right.  Despite this
12  admonition?
13      A.  Yes.  Because we specifically asked
14  for a stability analysis on the McDonough
15  Marine borrow pit in a separate document.
16      Q.  Okay.  All right.  Now, let's go to
17  the -- you'll forgive me.  I got off of the
18  question.  The question I asked you was --
19      MR. BRUNO:
20          Thank you, Richard.  Let me give
21      it back to you in its entire.
22      MR. STONE:
23          Let's just attach it to this
24      one --
25      MR. BRUNO:

GUILLORY, LEE

6/30/2008

Page 142

```
1          Not a problem.  If you don't
2    mind.
3    MR. STONE:
4         -- as Exhibit 15 to the
5    Grieshaber deposition.  So we'll have
6    it as a reference.
7    EXAMINATION BY MR. BRUNO:
8    Q.  Good.  I had asked you about the
9    removal of the sewer lift station.  And the
10   question I believe on the stable was, you knew
11   at the time that WGI prepared the project work
12   plan that the sewer lift station was going --
13   contemplated to be removed, right?
14   A.  Correct.
15   Q.  Okay.  And so I think my next question
16   was, did you have some understanding of how
17   deep WGI would have to excavate in order to
18   remove the station?
19   A.  Yes.  And it was specifically -- when
20   we got the that point in the scope of work, we
21   had Washington Group put out a subcontracting,
22   um -- plan to various vendors to bid on, and it
23   was ultimately awarded to Hamps Construction
24   Company, and they had a subcontractor to them
25   called Shavers-Whittle.  And as part of that,
```

Page 143

```
1    the subcontractor was required to hire a
2    Louisiana licensed professional engineer to
3    design a braced cofferdam system for removal of
4    the lift station, and he did so, Mr. David
5    Huval, H-U-V-A-L --
6    Q.  Uh-huh.
7    A.  -- designed that cofferdam system, and
8    it was I believe including 60-foot deep sheet
9    piling with wide flange beam bracing down to
10   elevation -58.0.
11   Q.  Okay.  When did all of that take
12   place?
13   A.  Let's see.  That was over several
14   months where the contractor submitted a, um --
15   a design of this braced cofferdam through
16   Washington Group, and was it was actually
17   during the time frame of September and October
18   of 2001.
19   Q.  Okay.  Now, the work plan didn't
20   contemplate, did it not, a Washington Group --
21   that is, at the time that the work plan was
22   prepared, this piece of paper, which I'm going
23   to go ahead and mark as Guillory 1, I guess --
24        (Plaintiff's Exhibit 1 was marked for
25   identification and is attached hereto.)
```

Page 144

```
1    MR. BRUNO:
2         Let's just mark this one which is
3    Grieshaber 15, mark that as Guillory
4    2.
5         (Plaintiff's Exhibit 2 was marked for
6    identification and is attached hereto.)
7    EXAMINATION BY MR. BRUNO:
8    Q.  This Exhibit 1 didn't contemplate that
9    WGI would hire a subcontractor and do all this
10   other stuff, did it?
11   A.  It could be accomplished several ways.
12   WGI could self-perform the work if they felt
13   they're comfortable and had the capability of
14   doing it, or they could subcontract it out.
15   Generally, they subcontracted 80 to 90 percent
16   of the work out.
17   Q.  Maybe I didn't ask the question well.
18        This document Guillory 1 doesn't have
19   words in it that say, WGI, we want you to hire
20   or prepare for us an excavation plan, of all
21   these things that they ultimately did.  Isn't
22   that correct?
23   A.  Correct.  It's a general work plan.
24   Q.  Okay.  So how did it come about that
25   WGI was asked to do more than what is described
```

Page 145

```
1    in Number 1?
2    A.  In developing the scope of work and
3    the specifics for each individual item or task
4    that was to be designed, um -- the Corps and
5    Washington Group got together, discussed what
6    had to be accomplished, the best way to
7    accomplish it, um -- and developed --
8    Washington Group wrote the subcontracting plan,
9    and the subcontracting packages that would be
10   advertised for subcontractors to bid on, and
11   the government reviewed those.
12   Q.  All right.
13   A.  Once the, um -- request for proposals
14   came in, Washington Group evaluated them based
15   on technical merit and cost, made a spreadsheet
16   of all the different bidders, and made a
17   recommendation to the Corps as to who they
18   thought would be the most appropriate
19   subcontractor to do that portion of the work.
20   The government reviewed that, um -- our local
21   on site government staff either concurred or
22   did not concur with it, and then they,
23   Washington Group, had to send to the
24   contracting officer in Tulsa a request for a
25   subcontractor's agreement, and the contracting
```

37 (Pages 142 to 145)

GUILLORY, LEE

6/30/2008

Page 146

1   officer had to sign off on that prior to
2   proceeding with that work.
3       Q.  Okay.  Maybe I didn't ask it well
4   enough.  I'm sorry.  But I'm just trying to
5   understand what is it that gave the government
6   the right to say to WGI, hey, look, I want you
7   to give me some more detailed plans and
8   specifications for this particular excavation.
9       A.  Um -- one of the good things about the
10  TERC is that it's a cost reimbursable contract,
11  and it's a collaborative process where the
12  government and the contractor both jointly,
13  um -- develop the scopes of work and the items
14  of work as you proceed.
15      Q.  Okay.  So you have the right to
16  address any issue that you may want to,
17  collaboratively with WGI, as those things
18  arise, right?
19      A.  Correct.
20      Q.  Okay.  So this issue obviously didn't
21  come up until, I think you said, October,
22  September?
23      A.  September-October, 2001.
24      Q.  2001.  Okay.  So that's going to be in
25  the future.  Let's just stay with October,

Page 147

1   2000, just for the moment.  Okay?
2           Now, this document, that is,
3   plaintiffs' Exhibit Number 1 -- and by the way,
4   we have he -- we'll mark as 3 and 4 the
5   proposals that you referred to this morning
6   dated -- well, let's see.  It says Proposal
7   Number 99, Revision 1 and 2, which I guess
8   is -- you said October 21.
9       A.  October 24th.
10      Q.  No, it just says October, 2000.  Am I
11  missing something?
12      A.  There was probably a cover letter.
13      Q.  Let me show them to you, 3 and 4.
14          Is that what you were referring to?
15  Let's make it easy on you, not on me.
16      A.  Okay.
17          MR. STONE:
18              I guess your question is has he
19          referred to these two documents today
20          at some point?  Because I'm not sure
21          for the record what you're talking
22          about.
23          MR. BRUNO:
24              No.  The question is, are these
25          the documents that you were referring

Page 148

1   to when you described a proposal dated
2   October -- I thought you said 21 -- I
3   couldn't find 21 on the document, so I
4   said let me show them to the witness
5   to make absolutely certain that these,
6   3 and 4, are the documents to which he
7   was referring.
8       A.  Yes.  These were the ones I was
9   referring to, but the final revised proposal
10  which the government accepted was dated 24
11  October.  So there probably were preliminaries,
12  and then as we went through negotiations the
13  final one was 24 October.
14  EXAMINATION BY MR. BRUNO:
15      Q.  Okay.  In any case, now that we have
16  these in front of us we can confirm that
17  these -- both of these documents really don't
18  have a lot of specificity with regard to the
19  nature of the work that's to be done, it's
20  really, as you had told us earlier, rates per
21  hour, time, et cetera.  Isn't that right?
22      A.  Yes.  But it shows each specific task
23  that was to be accomplished under the definable
24  features of work by Washington Group.
25      Q.  So this is how we can learn what

Page 149

1   tasks -- I'm sorry.  When we go to MOD Number 6
2   which is the one that finally says go forward
3   and do Tasks Number 3, 4 and 1, we can go to
4   this document to understand what Tasks
5   Number 3, 4 and 1 was.  Right?
6       A.  Correct.
7       Q.  And for the record, Task Number 3 is
8   miscellaneous abatement operations, Task
9   Number 4 is above-ground structure demolition,
10  and Task Number 1 is -- let's see what that
11  is -- mobilization inside of the structure.
12  Right?
13      A.  Yes.  You should always refer to the
14  most recent revision number, but that's the --
15  that was 1.  2 would be the most current.
16      Q.  All right.  These came from the
17  website, right?
18          MR. JOANEN:
19              WGI.
20          MR. BRUNO:
21              Oh, WGI.  We can't really on
22          that, can we?
23      A.  And all of these are in the project
24  files.  Including the final one.
25  EXAMINATION BY MR. BRUNO:

38 (Pages 146 to 149)

Johns Pendleton Court Reporters                    800 562-1285

GUILLORY, LEE

6/30/2008

Page 150

1    Q.  Okay.  Can you please indicate for me
2  which of the tasks would have included the
3  removal of the lift station?
4    A.  It's Task Number 5, surface cleanup,
5  specifically Item Number 4.
6    Q.  Okay.  All right.  Thank you.
7       Whose job is it to request
8  geotechnical support on the Corps side of this
9  contract?
10   A.  We had a small team of personnel from
11 engineering division, construction division,
12 working on this particular task order, and
13 evidently I requested Jean Spadaro contacted
14 geotechnical branch, engineering division, for
15 some guidelines on geotechnical support.
16   Q.  I gather from your answer that you are
17 the person who's ultimately responsible for
18 requesting geotechnical support when you think
19 it's appropriate.  Right?
20   A.  Yes.
21   Q.  All right.  What geotechnical support
22 did you expect from Washington Group
23 International?
24   A.  They had a staff at their home office
25 in Denver that we could always pull upon any

Page 151

1  geotechnical support that we needed from them.
2    Q.  All right, sir.
3    A.  Any geochemical, geostatistical
4  support -- anything that we needed they could hire.
5    Q.  Did you have an expectation that
6  Washington Group International would advise you
7  as the person on the site and encountering the
8  site itself and the peculiarities and
9  particular nuances of the site, that they would
10 advise you of any geotechnical issues that they
11 encountered?
12   A.  Yes.  In fact, they did in our
13 corrective action plans that we did for the six
14 individual industrial sites, they designed the
15 geotechnical excavations, depths and slopes for
16 each one of those contamination holes that had
17 to be excavated.
18   Q.  Right.  And the issue there was making
19 certain that the hole wouldn't fall in on the
20 folks in the hole.  Right?
21   A.  Correct.
22   Q.  Okay.  Now of --
23   A.  And also, Washington Group 's
24 subcontractor, Materials Management Group, had
25 geologists on their staff.

Page 152

1    Q.  Right.  Now, let's talk a moment
2  now -- go back to the pump station.  Okay?  The
3  lift station.  Those sheet pile go 60 feet into
4  the ground, right?
5    A.  -58 was the tip elevation.
6    Q.  -58.  Now, the hole wasn't 58 feet
7  deep, was it?
8    A.  No, sir.
9    Q.  The hole was about what, 20 feet deep?
10   A.  I would have to check the plan.  I
11 don't know.
12   Q.  Okay.  Why on earth would it be
13 necessary to drive a piece of sheet pile
14 58 feet into the ground in order to excavate a
15 hole that was 20 feet deep?  Can you think of
16 any reason for that?
17   A.  I'm not a design engineer of
18 cantilevered sheet pipe systems, but it is to
19 prevent soil displacement of the adjacent soil
20 into the hole and to have any movement of soil.
21 It's also designed for the protection of the
22 workers and equipment within the hole from
23 collapsing upon them.
24   Q.  Right.  And it's also to prevent
25 water --

Page 153

1    MR. STONE:
2       I didn't hear the part of that
3  about the movement of the soil.
4    MR. BRUNO:
5       Oh, I'm sorry.  You want to read
6  it back?
7       Actually, Richard makes a good
8  point.  Let's read it back to make
9  absolutely certain that it's on the
10 record.  I really appreciate that.
11      (Whereupon the previous answer was
12 read back.)
13   MR. BRUNO:
14      So you got it?
15   MR. STONE:
16      I heard it now.
17 EXAMINATION BY MR. BRUNO:
18   Q.  So is it possible that one of the
19 purposes may be to cut off permeable soils so
20 that water that might be coming from the canal
21 side wouldn't go below and fill up the hole
22 with water?
23   A.  Possible, but that's not my line of
24 expertise.
25   Q.  Okay.  So you don't know.  Fair

39 (Pages 150 to 153)

GUILLORY, LEE

6/30/2008

Page 154

1    enough.
2        So did you ask the geotechnical folks
3    to evaluate the plan that was submitted by the
4    WGI for the removal of the lift station?
5        A.  No.  We did not.  We did review it
6    internally within the Corps in our small HTRW
7    team.
8        Q.  Okay.
9        A.  I was designed for by a registered
10   professional engineer, Mr. David Huval,
11   licensed in the state of Louisiana.
12       Q.  Okay.  Now, have you talked to
13   Mr. Grieshaber about this deposition?
14       A.  No.
15       Q.  Have you talked to Mr. Colletti?
16       A.  No.
17       Q.  Okay.  All right.  Are you aware of
18   any New Orleans District office regulations,
19   requirements, et cetera, that require that
20   someone who wants to work within 300 feet of a
21   flood protection structure needs to get a
22   permit before they can dig or trench or work
23   around a flood protection structure?
24       A.  No.
25       Q.  Are you aware of any Corps of

Page 155

1    Engineers engineering manual regulations or
2    guidelines which require that some evaluation
3    be made before someone dig a hole within
4    300 feet of a flood protection structure?
5        MR. STONE:
6            Object to form.
7        MR. BRUNO:
8            What's wrong with the form?  I'll
9        change it.  This is important.  I will
10       change the form.
11       MR. STONE:
12           I don't know what a manual
13       regulation is, but --
14       MR. BRUNO:
15           Engineering manual?  What did I
16       say?
17       MR. STONE:
18           You said engineering manual
19       regulation.
20       MR. BRUNO:
21           Okay.  Fair enough.
22   EXAMINATION BY MR. BRUNO:
23       Q.  Just a few moments ago you quoted off
24   the top of your head an EM1 dot dot dot dot
25   dot.  Remember that?

Page 156

1        A.  (Nods affirmatively.)
2        Q.  What is an EM?
3        A.  An engineering manual.
4        Q.  What do the numbers refer to, are
5    they --
6        A.  It's just a sequential number that
7    refers to that specific series of manual.
8        Q.  Do I describe it as a regulation, a
9    guideline or what?  It's an engineering manual
10   what?  You give me the right word so I can ask
11   this question.
12       A.  There's just various engineering
13   pamphlets, engineering circulars, engineering
14   manuals, that sort of thing.
15       Q.  All right.  So your testimony is that
16   you don't know of any United States Army Corps
17   of Engineers procedures which require that an
18   engineering evaluation be done before someone
19   is permitted to dig a hole within 300 feet of a
20   flood protection structure, right?
21       MR. STONE:
22           Objection.  That's a different
23       question than the one you were asking
24       before.
25       MR. BRUNO:

Page 157

1            Its intended be a different
2        question.  Why would it be
3        objectionable?
4        MR. STONE:
5            It's objectionable because one
6        time you're talking about permitting
7        and now you're talking about design
8        and-
9        MR. BRUNO:
10           I changed the question because
11       you objected.  And I told you I'm here
12       to serve you.  I want to change my
13       questions to suit your objections to
14       form.  And I told you, it is my
15       promise, my solemn vow.
16       MR. STONE:
17           Let's just go forward.
18       MR. BRUNO:
19           Thank you.  Now let's go back to
20       the record.  Because I will change the
21       phrases because I'm not familiar with
22       the words that you guys use.
23   EXAMINATION BY MR. BRUNO:
24       Q.  Mr. Grieshaber on Friday told us that
25   he is absolutely certain that this office did

40  (Pages 154 to 157)

GUILLORY, LEE

6/30/2008



Page 158

1  an engineering evaluation -- the geotechnical
2  department -- I'm sorry, the geotechnical
3  section of the engineering department did an
4  evaluation of the sewer lift station
5  excavation.
6      It's your testimony that that did not
7  happen; isn't that true?
8      A.  I do not recall that happening for
9  that specific feature of work.
10     Q.  And you didn't make that request.
11     A.  I did not request that in writing and
12  I don't remember a document about that.
13     Q.  What is your understanding of the need
14  to do any engineering evaluations of holes, to
15  whatever depth, within the 300-foot of a flood
16  protection structure?
17     A.  Under this task order, um -- if it was
18  a shallow draft hole that was to be dug, we
19  depended on the, um -- advice and design that
20  Washington Group recommended to us.  When we
21  went to deep excavations, such as braced
22  cofferdam excavations, we required the use of a
23  licensed professional engineer in the state of
24  Louisiana to design those.  In specific
25  instances like in the McDonough Marine borrow

Page 159

1  area, that was a change to the project work
2  plan, I specifically requested geotechnical
3  support and stability analysis of that proposed
4  borrow area from our engineering division,
5  geotechnical branch, to see if it was safe and
6  stable and would not adversely affect the IHNC
7  canal.
8      Q.  Did you make that request because you
9  had some concern that that work might damage
10 the flood protection structure?
11     A.  Not concern, but I was, um --
12 knowledgeable of the location with proximity to
13 the flood control structure and floodwall.
14     Q.  All right.  And that's because you had
15 some, and I don't recall -- let me just ask it
16 this way:  I remember, tell me if I'm right or
17 wrong, seeing somewhere in these documents that
18 work was not supposed to occur within 15 feet
19 of the center line of the floodwall.
20     Is that accurate?
21     A.  We established that as a goal and a
22 guideline at the beginning of the project that
23 the contractors, Washington Group, should not
24 place any moving equipment, heavy equipment,
25 within 15 feet of the floodwall face, which

Page 160

1  coincided with the curb side of Surekote Road,
2  and would use that as like a clearance zone
3  that you do not do any work in there because it
4  has the possibility of the equipment impacting
5  the floodwall.
6      Q.  Okay.  All right.  Now, you have
7  already testified that you did not know or
8  understand that there was a need for an
9  engineering evaluation of holes, and in
10 particular a hole as deep as 20 feet or 25 feet
11 within 300 feet of the floodwall.  You've
12 already said that, right?
13     MR. STONE:
14         Objection.  I don't think he said
15     that at all.
16     MR. BRUNO:
17         Okay.  Then let's go through it
18     again.
19 EXAMINATION BY MR. BRUNO:
20     Q.  We know we had a hole as deep as what,
21 20 feet for the Saucer site to remove the sewer
22 lift station, right?
23     A.  Correct.
24     Q.  We know we had a hole as deep as
25 25 feet to remove the so-called wedding cake

Page 161

1  structure at the Boland site.
2      A.  Correct.
3      Q.  Both of those holes are within 300
4  feet of the center line of the flood protection
5  structure, right?
6      A.  Correct.
7      Q.  Okay.  Now, and your testimony is that
8  you, the Corps of Engineers, relied on
9  Washington Group International to hire its own
10 engineers to do that work safely, right?
11     A.  Right.
12     Q.  And to do that work in such a way that
13 that work would not negatively affect property,
14 or damage anybody's property.  Isn't that true?
15     A.  Correct.
16     Q.  And you expected that they would hire
17 an engineer to make certain that that hole
18 didn't damage the flood protection structure
19 itself, isn't that true?
20     A.  That's correct.  And it was reviewed
21 by the government.
22     Q.  I'm going to mark these as -- I'm
23 going to mark this one, this document, Exhibit
24 Number 5.  And this document, the exhibit that
25 I've marked as Exhibit Number 5 is an E-mail

41 (Pages 158 to 161)

GUILLORY, LEE

Page 162

1  with attachments, to the attention of Lee
2  Guillory, dated 2 May '02.  And the second one
3  is a fax to Lee Guillory from Jim Montegut
4  which is Plaintiffs' Exhibit 6.
5       Take a moment to review these
6  documents if you don't mind.
7       (Plaintiff's Exhibit 5 was marked for
8  identification and is attached hereto.)
9       (Plaintiff's Exhibit 6 was marked for
10 identification and is attached hereto.)
11 EXAMINATION BY MR. BRUNO:
12  Q.  Just let me know when you're done.
13      MR. BRUNO:
14      I'm not killing time here.  I
15      want to make sure he has a chance to
16      read it, Richard.
17      (Off the record.)
18  A.  Okay.  Proceed.
19 EXAMINATION BY MR. BRUNO:
20  Q.  Okay.  All right.  Are these the
21 E-mails to which you made reference just a few
22 moments ago about your concern?
23  A.  They're not an E-mail.  Exhibit 5 is a
24 memorandum.
25  Q.  I'm sorry.  And Exhibit 6 is a fax.

Page 163

1  You're right.  Okay.  I'm so used to E-mails.
2  All right.
3       So Exhibit 5, by the way, is
4  NCS-7-252, 7-253, 7-254 and 7-255.
5       Exhibit 6 is 7-277, 78 and 79.
6       Okay.  Which one of these comes first?
7  Let's see.
8  A.  The request.
9  Q.  Okay.  Let's start from there.  It
10 says -- to your attention, and it's from Gerald
11 Satterlee.  Who is Gerald Satterlee?
12  A.  Former chief of engineering division.
13  Q.  Okay.  So the way the district office
14 works, if you as the construction -- I'm sorry.
15 What's your title again?
16  A.  Construction manager.
17  Q.  If the construction manager wants some
18 engineering assistance, you talk to the head of
19 engineering and he talks to people within his
20 division to answer your requests, right?
21  A.  Right.  It goes from the chief of
22 construction to the chief of engineering, and
23 then vice versa, back.
24  Q.  Now, it talks about an April 15 memo,
25 which is -- is that this one?

Page 164

1  A.  Yes.  That's mine that I authored.
2  Q.  Okay.  So you authored this, but it's
3  signed by James Miles.
4  A.  Chief of construction division.
5  Q.  All right.  How come if you wrote it
6  he's signing it?
7  A.  Because that's the chain of hierarchy.
8  Q.  Oh, I see.  He's your boss.
9  A.  (Nods head affirmatively.)
10  Q.  I got you.  So really, you don't go
11 directly to the chief of the engineering
12 section, you go to the chief of the
13 construction division, the chief of the
14 construction division goes to the chief of the
15 engineering division, chief of the engineering
16 division goes to the head of the geotechnical
17 section, et cetera.  Right?
18  A.  Correct.
19  Q.  Okay.  All right.  So you say here,
20 the 32-acre tract of land designated as the
21 East Bank Industrial Area is currently
22 undergoing demolition and site remediation by
23 TERC contractor Washington Group International
24 for the New Orleans District.  Upon completion
25 of this remediation effort in 2003 the New

Page 165

1  Orleans District and Louisiana Development of
2  Environmental Quality will environmental clear
3  the EBIA for future dredging of the IHNC lock
4  replacement bypass channel.  2, construction
5  division requests your office's assistance in
6  evaluating the following two items, such that
7  the remedial action can be accomplished in
8  compliance with the New Orleans District 's
9  geotechnical engineering principles and
10 practices.  Okay?
11  A.  (Nods head affirmatively.)
12  Q.  So obviously you have some sense of
13 the geotechnical engineering principles and
14 practices.  Right?
15  A.  I know they exist, yes.
16  Q.  Oh.  They exist.  All right.  Now, you
17 say, we want two things:  You want them to
18 evaluate the structural stability of the
19 proposed 16-foot deep McDonough Marine borrow
20 area with respect to the existing Jourdan
21 Avenue levee and floodwall.  See attached plan,
22 Enclosure 1, and cross-section Enclosure 2 for
23 evaluation, provide a stability control line
24 with respect to eastern side of the borrow
25 area.

Johns Pendleton Court Reporters                    800 562-1285

GUILLORY, LEE

6/30/2008

---

Page 166

1          All right.  What was your concern
2   about this hole?
3       A.  If our proposed use of the McDonough
4   Marine borrow area would have any effect on the
5   adjacent Jourdan Avenue floodwall and levee.
6       Q.  What made you think that it might?
7       A.  Just being a civil engineer, I know
8   standard engineering practices and principles,
9   that it had to be addressed and evaluated to
10  see if it was safe.
11      Q.  Okay.  Safe for the levee.
12      A.  Correct.
13      Q.  Now, explain for me then the
14  difference between the concerns that you had
15  for this hole and the fact that you did not
16  have that concern for the Saucer hole that was
17  dug to remove the lift station.
18      A.  Because the lift station and the other
19  braced excavations were designed by licensed
20  professional engineers in the state of
21  Louisiana --
22      Q.  Okay.  All right.
23      A.  -- as subcontractors under Washington
24  Group.
25      Q.  I understand.  So that your

---

Page 167

1   expectation was that if there was going to be
2   any potential effect or damage to the
3   floodwall, you would have expected the licensed
4   engineers that WGI hired to address those
5   issues.  Correct?
6       A.  Correct.
7       Q.  All right.  And so that to the extent
8   they did or did not, when the plans came back
9   to you for review, you're simply evaluating
10  what you see in front of you and ascertaining
11  whether or not it looks safe or not from the
12  piece of paper.  Right?
13      A.  No, that's too simplistic.  Our HTRW
14  team, including Dr. George Bacuta who's a
15  professional geologist, and several of the
16  civil engineers that are on the team, reviewed
17  and commented on those submittals.
18      Q.  Right.
19      A.  And in fact, that sewer lift station
20  removal plan by Hamps Construction and Shavers
21  and Whittle went through three review cycles
22  before it was approved.
23      Q.  Right.  And the reason why it went
24  through three review cycles was because there
25  was a tremendous amount of concern about

---

Page 168

1   whether those walls would fall in, right?
2       A.  I disagree with that.
3       Q.  Well, was there any concern that the
4   hole might damage the flood control structure?
5       A.  I disagree with that.
6       Q.  That was a question.  Yes or no?
7       A.  No.
8       Q.  All right.  So the back and forth
9   between the Corps and Hamps about the cofferdam
10  structure had nothing to do with whether or not
11  the hole might damage the flood protection
12  structure, right?  It had to do with whether
13  the hole would or would not fall in on itself.
14      A.  It had to do with structural integrity
15  of the hole and preventing soil displacement
16  outside the hole, inside the hole, worker
17  safety, equipment safety --
18      Q.  Right.
19      A.  -- et cetera.
20      Q.  I'm trying to nail this down.  Okay?
21  And I'm not sure that I'm asking the questions
22  properly, but here, in your memo, you have a
23  concern about the levee.  I'm trying to get an
24  understanding from you.
25          You had the same concern about the

---

Page 169

1   levee in connection with the lift station and
2   with the Boland Marine hole.  Did you not?  You
3   certainly didn't want anybody to damage the
4   levee.  Right?
5       A.  Of course not.
6       Q.  Okay.  My point is that in fact you
7   relied on the Washington Group International to
8   make that engineering assessment, that is,
9   whether or not the hole might damage the levee.
10  You relied on them.  Isn't that true?
11      A.  We relied on them, their
12  subcontractors and their licensed professional
13  engineer designer to design a safe braced
14  cofferdam system.
15      Q.  And your review of what they gave us
16  back was a review to determine whether or not
17  what was drawn was safe to the people who were
18  working in the hole because that's the only
19  thing that that engineer addressed.  Isn't that
20  true?
21      A.  I disagree with that.
22      Q.  Well, did you see, in anything that
23  Washington Group provided to you, that the
24  cofferdam was not going to damage the flood
25  protection structure?

---

GUILLORY, LEE

6/30/2008

Page 170

1      A.  No, we were not concerned it was going
2  to damage the flood control structures.
3      Q.  Why not?
4      A.  Location, proximity, um -- the
5  rigidity and, um -- of the design, the depth of
6  the design, the bracing and the waler system.
7  I felt confident that that was not going to
8  adversely affect any of the adjacent soil or
9  site.
10     Q.  Okay.  Now, what about the backfill;
11 that was also something that was addressed by
12 both of these proposal for work or work plans,
13 right?
14     A.  Yes.
15     Q.  Okay.  And there were no real
16 specifications for backfill in terms of what
17 they could use and the degree of compaction,
18 right?
19     A.  Right.  We just backfilled with the
20 adjacent soil that was excavated out, removed,
21 stockpiled on the side.  After the lift station
22 was removed, that soil was put back in in
23 layers and compacted to the compaction of the
24 adjacent soil.
25     Q.  Well, that's not entirely accurate, is

Page 171

1  it? I mean, the specification that's written
2  in the work plans says that you take the
3  backhoe and you smash it down so that anything
4  traveling across it wouldn't get caught in the
5  muck.  Isn't that what it says?
6      A.  I don't recall.  I haven't read the
7  plan recently.
8      Q.  All right.  Well, the point is that in
9  terms of backfill, WGI could have filled the
10 hole with sand if they wanted to, right?
11     A.  Whatever the adjacent soil was that
12 was excavated out from the inside of the
13 cofferdam.
14     Q.  In fact, they did fill it with
15 off-site sand, didn't they?
16     A.  I don't recall.
17     Q.  You don't recall?  Okay.
18        Going back to your concerns about the
19 16-foot hole, you were also concerned about --
20 you see evaluate the structural stability of
21 the proposed Surekote Road remedial soil
22 excavation, 3-foot deep by 25-foot wide and
23 approximately 15 feet from the adjacent Jourdan
24 Avenue floodwall levee.  Right?
25     A.  Yes.

Page 172

1      Q.  You say, provide a stability control
2  line and assessment of the construction
3  division, and the contractor should utilize a
4  sheeting, shoring and bracing system to safely
5  accomplish the soil excavation.  Recommended
6  soil backfill and compaction requirements would
7  be appreciated, as well.  Right?
8        So here you're asking them to give you
9  specific soil backfill and compaction
10 requirements, right?
11     A.  Correct.
12     Q.  Okay.  Now, and here's the response
13 from Mr. Satterlee at 252, right?
14     A.  Uh-huh.
15     Q.  I see there's some lines numbered
16 Paragraph 2.  Do you know who put that there?
17     A.  That came back from engineering
18 division that way.  Because we did not --
19 because I did not specifically address in the
20 request their interpretation of the western
21 side stability, I only asked for the eastern
22 side.  So I guess they, um -- lined that out
23 before it came back to us.
24     Q.  Right.  Now, but what's lined out
25 happens to say, although analysis was not

Page 173

1  requested, it should be noted that the proposed
2  16-foot deep McDonough Marine borrow area with
3  respect to western side isn't stable.  The
4  stability with respect to the western side is
5  below unity.
6        Even though it's lined out, shouldn't
7  that cause you some concern?
8      A.  Sure.
9      Q.  Did you do anything about it?
10     A.  Yes, I did.
11     Q.  What did you do?
12     A.  Went back to the engineering
13 geotechnical branch and discussed the situation
14 with Julie Oliphant.
15     Q.  And?
16     A.  And we came up with some revised,
17 um -- stability control lines and elevations to
18 use for the McDonogh borrow pit area.
19     Q.  Right.  Now, Number 3 says, 12-inch
20 lifts of 90 percent Proctor compacted backfill
21 within +5 percent and -3 percent optimum water
22 content prior to compacting is recommended.
23        What does that mean?
24     A.  That's standard geotechnical language
25 for a backfill of clay material.

44  (Pages 170 to 173)

GUILLORY, LEE

6/30/2008

Page 174

1    Q. Of clay material?
2    A. Yes.
3    Q. You said clay?
4    A. Clay.
5    Q. Which is not what was out there,
6  right?
7    A. It depends where you were excavating.
8  You had a combination of all kind of
9  geotechnical strata in there.
10   Q. Fair enough. Well, would you agree
11 with me that this specification is far
12 different from a specification that just says
13 fill with what's out there?
14   A. Yes. That is a prescriptive
15 specification right there.
16   Q. Prescriptive? What does that mean?
17   A. Prescribes or describes exactly what
18 is necessary.
19   Q. All right. And what is this -- is
20 90 percent Proctor, is that clay?
21   A. Yes. A Proctor is a normal testing
22 for compaction, and 90 percent compaction is
23 the standard.
24   Q. For? Clay or for any material?
25   A. For clay.

Page 175

1    Q. All right. And what is within
2  5 percent and -3 percent optimum water content?
3    A. That has to do with the specific
4  wetness of the soil when it goes in.
5    Q. Okay. All right. What is the impact
6  of +5, -3?
7    A. There is an optimum point where if
8  it's too dry it doesn't compact well, if it's
9  too wet it doesn't compact well. There is an
10 optimum point in the middle that's the best
11 compaction that can be obtained.
12   Q. What is the relevance of compaction to
13 this particular issue, your concern about
14 damaging the floodwall?
15   A. Because those two adjacent excavations
16 under Surekote Road were right at that 15-foot
17 clearance zone level that we had established as
18 a guideline early on in the project, and I was
19 concerned that the 3-foot excavation into that
20 would possibly get into that stability control
21 line on the flood side of the Jourdan Avenue
22 floodwall.
23   Q. What is a stability control line?
24   A. If you go back to the original design
25 of a levee or a floodwall, it is based on the

Page 176

1  number of parameters and the design engineers
2  develop a stability control elevation, slope,
3  which we call the line, um -- so that you have
4  a factor of safety greater than 1, usually 1.3.
5    Q. Okay. And how far from the flood
6  control structure does this line extend?
7    A. It depends on the design of the actual
8  flood control works.
9    Q. Well, how far did it go at the Lower
10 Nine floodwall?
11   A. You can actually see from one of those
12 sketches on there that -- on that fax, what the
13 actual stability control line was.
14   Q. Okay. (Tendering.)
15   A. This was the actual stability control
16 line that they came up with. And part of the
17 page is cut off, but you would have the center
18 line of the levee floodwall or the levee center
19 line over here.
20   Q. Would that help?
21   A. That would help.
22   Q. I'm sorry. We're going to, for the
23 record, 7-279.
24      Where is the line there?
25   A. They're going off of the baseline

Page 177

1  right here.
2    Q. Which is which line?
3    A. This vertical line right here labeled
4  baseline.
5    Q. Okay.
6    A. And evidently it's -- I don't know
7  what the scale is on this, but anyway, whatever
8  would be the scale from the center line.
9  Center line of levee or center line of the
10 baseline, and I'd have to scale it to this
11 point. And that's the beginning of the
12 stability control line. It goes down on a 1 on
13 6.5 vertical, down to elevation -12, and it's
14 at the design template for the bottom. And
15 then a 1 on vertical 7 horizontal on the
16 western slope.
17   Q. Well, what you've just shown me is the
18 design template for the hole, haven't you?
19   A. Correct. But that was the stability
20 control line with respect to the levee and
21 floodwall. It started at this point and it
22 goes down there.
23   Q. Okay. So how far from the center line
24 of the floodwall does it get to -12?
25   A. Just by the numbers, it looks like

45 (Pages 174 to 177)

GUILLORY, LEE

Page 178

1   143 feet.
2       Q.   Okay.  So does that mean that if
3   you -- at 143 feet you shouldn't dig deeper
4   than -12 feet?
5       A.   Correct.  At that particular location,
6   in that particular cross-section.
7       Q.   All right.  And it goes all -- and
8   this 12 feet elevation goes all the way out to
9   what?
10      A.   Looks like 229 feet.
11      Q.   Okay.  So this document reflects that
12  if you were going to dig lower than 12 feet
13  within 229 feet, we'd have to do some
14  engineering analysis.  Right?
15      A.   That is the result of the engineering
16  analysis.
17      Q.   Okay.  So you know -- well, what
18  happens, then, if you want to dig lower than
19  12; what do you do then?
20      A.   We cannot, because you'll violate the
21  integrity of the flood control works.
22      Q.   Okay.  Well, we know we dug deeper
23  than that for the lift control station in the
24  Boland Marine excavation.
25      A.   True.  But that's a different animal.

Page 179

1   This is an unbraced excavation versus a braced
2   excavation.
3       Q.   Right.  So the only issue, then, we
4   have to be concerned about is our backfill,
5   right?  Because it's braced but had brace is
6   not intended to stay there forever, it's going
7   to be removed.
8       A.   Right.
9       Q.   So once you remove the bracing, then
10  you have to hole to contend with.  Right?
11      A.   Right.
12      Q.   So you have to have some concern about
13  what you backfill with, right?
14      A.   (Nods affirmatively.)
15      Q.   You have to say yes.
16      A.   Right.
17      Q.   Okay.  All right.  And these guys
18  here -- Mr. Satterlee is telling you to use
19  12 inches lifts of 90 percent Proctor.  Right?
20      A.   In those specific holes that are
21  underneath Surekote Road.
22      Q.   Okay.  Fair enough.
23          (Brief recess.)
24  EXAMINATION BY MR. BRUNO:
25      Q.   All right.  I show you WGI 51580.

Page 180

1   This is just an example, 51583.  51583.
2           Can you tell me what the form of this
3   document is, without getting into the specifics
4   just yet?
5       A.   Oh, okay.  It's just standard
6   spreadsheet that I developed to record all
7   comments and resolutions of comments on any
8   submittal that came from Washington Group to
9   the Corps and the Corps back to Washington
10  Group.
11      Q.   All right.  So that there would be one
12  of these pieces of paper for the evaluation of
13  the work contemplated to be done to remove the
14  sewer lift station at Saucer Marine, right?
15      A.   Maybe.  I don't know if we actually
16  used that form at that time.
17      Q.   This one is dated July 11, '01 -- and
18  I thought you told me that the activities that
19  regarded the lift station were after that, but
20  I could be wrong.
21      A.   That's correct.  The submittal went
22  through a series, like I said, of three
23  different reviews and subsequent meetings to
24  discuss them after each particular review
25  between the Corps and Washington Group.  And it

Page 181

1   looks like on the actual conditional approval
2   submittal dated October 15, '01, the project
3   engineer Jim Montegut actually just wrote some
4   comments in the remarks column rather than
5   using one of those particular forms, and
6   then --
7       Q.   So that's an approval?
8       A.   Yes.  Well, it's a conditional
9   approval.  Is approved subject to comments is
10  what the C stands for.
11      Q.   That's doesn't mean you're going to
12  see another piece of paper that says approved.
13      A.   Yes.  You will.
14      Q.   Oh, you will.  Okay.  Do you have that
15  there?
16      A.   Yes.  The final approval came looks
17  like October 19th of 2001, this document here.
18  And this was the Revised Lift Station Removal
19  Plan Revision Number 2 dated October 19, 2001.
20  In other words, Washington Group and its
21  subcontractors and professional engineer
22  redesigned and incorporated all of the review
23  comments in this revised final plan.
24      Q.   All right.  What is that revised final
25  plan?

46  (Pages 178 to 181)

GUILLORY, LEE

Page 182

1      Can I just ask for a copy of this
2 letter and we'll just attach and mark the whole
3 thing as Exhibit Number 7.
4      A.  If David wants to copy it.
5      MR. BRUNO:
6         No.  We'll do it later.  I'll be
7      done with it.  We'll do it afterwards.
8 EXAMINATION BY MR. BRUNO:
9      Q.  I don't mean to take this out of your
10 hand, but show me the final approved work plan.
11      A.  A in this column.
12      Q.  All right.  So where is it?
13      A.  That entire plan behind that piece of
14 paper.
15      Q.  So what's behind here is approved.
16      A.  Yes.
17      Q.  Okay.  All right.  So let's see.  We
18 have the lift station removal plan revised,
19 talks about the cofferdam, it says here that
20 it's going to go -- we've got a 60-foot sheet
21 pile around the perimeter and we're going to go
22 down to -19.75.
23         That's the depth of the bottom, right?
24      A.  Bottom will be at elevation -19.75,
25 yes.

Page 183

1      Q.  Okay.  All right.  Now, you used the
2 word -- you said prescriptive specifications.
3         Could you define for me a prescriptive
4 specification?
5      A.  Sure.  A standard Corps of Engineers
6 contract will go out with, um -- definitive
7 written specifications saying contractor, you
8 will do following to perform X, Y and Z and
9 accomplish this work.
10      Q.  Right.
11      A.  It's usually advertised, bids come in,
12 the government assesses those bids and awards
13 the lowest responsible contractor.
14      Q.  Okay.  All right.  Now, would you
15 agree with me that what's indicated here for
16 backfilling is not prescriptive, it's really
17 general?
18      A.  Yes.  It is very general.
19      Q.  All right.  And for the record, it
20 says, cofferdam backfilling, complete
21 backfilling to grade with material to be
22 provided by WGI.
23         This is the final absolute approved by
24 the Corps of Engineers plan for the removal of
25 the lift station; isn't that correct?

Page 184

1      A.  That might just be a listing of
2 taskings.  I'd have to read the entire plan to
3 see if that's --
4      Q.  I'm sorry.  I thought that's what I
5 was looking at.  This says, lift station
6 removal plan revised.  And I just kept turning
7 over the pages until I got to the section that
8 said -- and we can keep going.  Here's some
9 more.
10      A.  Sequence of operations, Mr. Bruno.
11      Q.  Okay.  Well, why don't you show me,
12 then, what the -- here's a whole stack of
13 papers.  (Tendering.)  You find in there what
14 it says about backfilling so that I will know
15 what you expected WGI to do with regard to
16 backfill.
17      A.  All right.  Take a break and I'll read
18 the plan.
19      Q.  Yes, sir.  Happy to do so.
20         (Off the record.)
21 EXAMINATION BY MR. BRUNO:
22      Q.  Did you have a chance to review those
23 documents?
24      A.  Yes, I did.
25      Q.  All right.  Why don't we walk through

Page 185

1 them, each place in the documents where there
2 is an indication of how the backfilling should
3 be done.
4      A.  Okay.  First off, the design engineer,
5 um -- used the soil conditions to design the
6 braced excavation and the various layers and
7 the soil strength in each one and where the
8 walers should be placed as the excavation went
9 down.  Conversely, on the reverse operation,
10 when the backfilling goes on, um -- the
11 excavation we backfill with the previously
12 excavated material, in two-foot lifts to the
13 bottom of each individual waler.  And then as
14 that waler is removed, additional two-foot
15 lifts will be put in, compacted with the bucket
16 of the hydraulic excavator up to the top of the
17 sheet piling.  And once the backfilling
18 operation reaches the top of the sheet piling,
19 the steel sheet piling will be removed with a
20 crane equipped with a vibratory pile extractor.
21 And then the backfill is completed to the
22 adjacent material provided by Washington Group.
23      Q.  Okay.  So let's see now.  You were
24 reading from?
25      MR. STONE:

GUILLORY, LEE

6/30/2008

Page 186

1      He's got Post-its where he was
2  reading, Joe.
3      MR. BRUNO:
4      Let me see if I can compare it
5  to -- because we're both going off
6  of --
7  EXAMINATION BY MR. BRUNO:
8      Q.  Okay.  Looks to me like -- I'm looking
9  at WGI 48623.  All right.  And it says here
10  that excavation created to remove the lift
11  station, wet well and associated support will
12  be backfilled with the previously excavated
13  material.  Due to the depth of the excavation,
14  Hamps will tamp the backfilled material with
15  the bucket of the hydraulic excavator in an
16  effort to compact the backfilled material.
17  During the course of backfill operations,
18  previously installed walers will be removed,
19  additional fill material necessary to complete
20  the backfill will be supplied by WGI.
21      Okay.  This is a general
22  specification, isn't it?
23      A.  Yes.
24      Q.  It's not a prescriptive specification,
25  right?

Page 187

1      A.  Not like the Corps traditionally uses.
2      Q.  Okay.  And even though you referenced,
3  you know, the engineer 's -- remember you
4  showed us a few moments ago --
5      A.  Sure.
6      Q.  -- the stratification?
7      A.  Uh-huh.
8      Q.  There is nothing in here that suggests
9  that the stratification should be exactly the
10  same, is there?
11      A.  No.  But I was showing you that the
12  braced excavation was designed by the licensed
13  professional engineer based on the actual
14  ground conditions and soil conditions and
15  layers, and it was to prevent any movement or
16  displacement of the adjacent soils into the
17  cofferdam or any kind of, um -- movement of
18  soils, protection of the workers, life safety,
19  all that kind of stuff.
20      Q.  Okay.  All right.
21      A.  And it goes on to say that, um -- the
22  backfill will be done from the same soil that
23  was removed from within the cofferdams.
24      Q.  Okay.
25      A.  It does not say anything about

Page 188

1  backfilling from sand like you reiterated
2  earlier.
3      Q.  Okay.  Well, first question:  Who
4  approved this revised --
5      A.  The Corps of Engineers, specifically
6  contracting office's representative James
7  Montegut.
8      Q.  Okay.  Who in the geotechnical section
9  of the engineering department reviewed this
10  removal plan?
11      A.  As I previously stated, no one.
12      Q.  No one.  Okay.  All right.  Who in the
13  engineering section -- general engineering
14  section reviewed this lift station removal
15  plan?
16      A.  Dr. George Bacuta probably reviewed
17  it.
18      Q.  Well, probably or did he?
19      A.  I don't know for certain.  It went
20  through three iterations before this final plan
21  was --
22      Q.  That just means it got looked at three
23  times, it doesn't mean that he looked at it,
24  right?
25      A.  I would have to go back through all

Page 189

1  the iterations of the documents to verify that.
2      Q.  Okay.  All right.  The person who
3  signed it, though, was Mr. Montegut.
4      A.  Yes.
5      Q.  Who is he?
6      A.  He was the senior project engineer on
7  site and the contracting office's
8  representative for Tulsa District.
9      Q.  And the going back and forth business
10  had nothing to do with the backfill issue, did
11  it?
12      A.  I don't know that unless I saw the
13  comments.
14      Q.  Okay.  All right.  Now, in fact, what
15  did WGI put in this hole?
16      A.  The same soil that came out.
17      Q.  How do you know that?
18      A.  Because we did intensive quality
19  assurance, quality control while this was going
20  on, and WGI did the quality control on Hamps
21  Construction and Shavers and Whittle while it
22  was being backfilled, and the government did
23  quality assurance inspection immediately behind
24  them.
25      Q.  All right.  So there's a piece of

48 (Pages 186 to 189)

GUILLORY, LEE

6/30/2008

Page 190

1  paper somewhere that will indicate what's put
2  on this hole?
3      A.  Daily quality assurance QC reports
4  will state exactly this entire operation from
5  start to finish.
6      Q.  And your testimony is that everything
7  that's in that hole was taken from the
8  surrounding area, right?  You know that to be
9  true as a matter of fact.
10     A.  I don't know that for certain.  Some
11 of the backfill may have come from a non marine
12 borrow area or an adjacent area in Saucer
13 Marine.
14     Q.  Okay.  So we really don't know what's
15 in the hole, do we?
16     A.  Is that a question?
17     Q.  Yeah.  We really don't know what's in
18 the hole, do we?  Question mark?  I can draw
19 it.  (Gesturing.)  Do we?  We don't know what's
20 in that hole today.  No idea.
21     A.  I cannot tell you for a fact of
22 everything that's in that hole, no.
23     Q.  All right.  It says, additional fill
24 material necessary to complete the backfill
25 operations will be provided by WGI.

Page 191

1      Doesn't that allow WGI to use other
2  kinds of material to fill up the hole?
3      A.  It just says provided to the
4  subcontractor.  It could be indigenous, on site
5  clay material, it could have been commercially
6  truck hauled clay material.
7      Q.  Or it could have been sand, right?
8  That's what it says.  It says additional
9  material.
10     MR. STONE:
11         Objection.  It doesn't say sand.
12     MR. BRUNO:
13         It says additional material.
14 EXAMINATION BY MR. BRUNO:
15     Q.  It could have been sand; isn't that
16 true?
17     MR. STONE:
18         That's your question now.
19     MR. BRUNO:
20         That was the question I asked
21     before.
22     (Brief interruption.)
23 EXAMINATION BY MR. BRUNO:
24     Q.  Mr. Guillory, I was reading from the
25 page which you had pointed us to to make sure I

Page 192

1  understand.  All right.  It says, will be
2  backfilled with previously excavated material.
3  And then it says, additional fill material
4  necessary to complete backfill operations will
5  be provided by WGI.  Okay?
6          Now that means there's no limitation
7  on what WGI can use to put in the hole.  Right?
8      A.  I disagree with that.
9      Q.  All right.  Well, if WGI is providing
10 it, doesn't that mean that they're not -- there
11 is not sufficient material on site to fill the
12 hole?
13     A.  One thing you have to understand is
14 that you're referring to a sewer lift station
15 within a steel cofferdam.  As you remove the
16 sewer lift station, the concrete stab and the
17 piling creates a void that has to be filled by
18 backfill.
19     Q.  Right.
20     A.  So I'm confident that Washington Group
21 took all of the indigenous soil that was
22 excavated from the hole and backfilled that
23 into the cofferdam first in two-foot layers and
24 lifts, tamped it down and backfilled.
25     Q.  Sure.

Page 193

1      A.  And then there was probably was a
2  small portion at the very top of the sheet pile
3  of the cofferdam that had to be backfilled by
4  soil and replaced from soil on site.
5      Q.  When you say small, I'm a little
6  confused.  How big is this sewer lift station?
7      A.  I forgot the approximate dimensions,
8  but it's rather large.  And it's a steel
9  structure.
10     Q.  How deep into the ground did it go?
11     A.  I believe we stated on the record it
12 went down to a -19.75 feet.
13     Q.  All right.  So help me here.  I may
14 just a little slow, but if you take out this
15 structure you don't have enough dirt to fill
16 the hole because the structure was filling the
17 hole to a large extent.  Wasn't it?  The lift
18 station itself was filling the void.
19     A.  Yes.
20     Q.  Right?  So when you take that out,
21 then you have a big void to fill, don't you?
22 Don't you?
23     A.  Yes.  The contractor and their
24 subcontractors.
25     Q.  I'm with you.  All I'm saying is, you

49  (Pages 190 to 193)

GUILLORY, LEE

Page 194

1   got to get some material from somewhere to put
2   into the place where the sewer lift station
3   was, which we both agree is a big thing.
4   Right?
5       A.  Correct.
6       Q.  Okay.  And so this document
7   contemplates that, and it says, if you need
8   additional fill, WGI can provide it.  It
9   doesn't specify with any particularity where
10  they go to get the backfill.
11      A.  The record already shows that we had
12  the McDonough Marine borrow pit on site with
13  thousands of yards of clay that were used
14  exactly for those purposes
15      Q.  But you don't know if they used the
16  clay from the borrow pit, do you?
17      A.  No.  The quality assurance, quality
18  control reports could actually tell you that.
19      Q.  Okay.  Why would it be important to
20  use the material from the borrow pit?  Who
21  really cares?  There is nothing in here that
22  says that it's an important issue, does it.
23      A.  It's an economics issue, for one
24  thing, that the Corps and the contractor do not
25  have to go off site and commercially buy

Page 195

1   additional borrow.  We use clean soil from the
2   McDonogh Marine borrow pit.
3       Q.  Well, I mean, in fact, there was a lot
4   of material removed from the site.  I mean,
5   after all, this was remediation exercise.
6   Right?  You were taking soil -- contaminated
7   soil away and sticking it someplace else.
8       A.  Transportation and disposal, yes.
9       Q.  Right.  So I mean you had a tremendous
10  need for backfill material, didn't you?
11      A.  Correct.  That's why the government
12  and Washington Group proposed using the
13  McDonough Marine borrow area for that purpose.
14      Q.  Okay.  Do you know if any material was
15  brought onto the site by WGI from another
16  location to be used as backfill?  Anywhere?
17      A.  Yes.
18      Q.  Okay.  What did they bring onto the
19  site?
20      A.  Some of the shallow excavations in the
21  Boland Marine area were backfilled two to three
22  feet with sand material.  Some of the transite
23  or asbestos-containing materials, shallow
24  excavations were backfilled with sands, as
25  well.

Page 196

1       Q.  Okay.  So that there was sand on the
2   site.  Right?
3       A.  There was some existing sand, and yes,
4   we did truck in some additional sand.
5       Q.  You did truck in some sand.  All
6   right.
7           Did anybody in the engineering
8   department or in the geotechnical section
9   evaluate the impact of the removal of sheet
10  pile on the flood protection structure?
11      A.  Which particular sheet pile are you
12  referring to?
13      Q.  Any of them.
14      A.  Any of them.  Um -- not that I'm aware
15  of.
16      Q.  All right.  When you pull a sheet
17  pile, there's a hole that's left behind, right?
18  I'm sorry.  I didn't mean a sheet pile.  I mean
19  a piling, a wooden piling.
20          When you pull a piling there's a hole
21  that's left behind.
22      MR. STONE:
23          Did you many piling for both
24  questions?
25      MR. BRUNO:

Page 197

1           Yeah.  What did I say?
2       MR. STONE:
3           Sheet pile for the first one --
4       MR. BRUNO:
5           No, that's why I changed it.  No,
6   no, no.  I did mean pile both times,
7   but I didn't mean sheet pile.  That's
8   why I changed it to wooden pile,
9   because I want to ask about wooden
10  piles, because they're round.
11      MR. STONE:
12          Okay.  So --
13      MR. BRUNO:
14          No, I'll withdraw both questions.
15      We'll do it again.
16  EXAMINATION BY MR. BRUNO:
17      Q.  When you pull out a round pile -- were
18  they round piles that y'all pulled out?
19      A.  The majority of them were wooden
20  timber, round piles, steel pile, pipe piles, a
21  few H piles, steel piles.
22      Q.  Okay.  Did they leave a hole when they
23  were pulled?
24      A.  Very rarely.  Um -- the clay
25  conditions and silty layers in the ground

GUILLORY, LEE

6/30/2008

Page 198

1  generally close in and collapse as soon as you
2  pull a sheet pile out.
3      Q.  Okay.  Was it necessary, or did
4  engineering -- but as you've already told me --
5      A.  Foundation pilings.  Sorry.
6      Q.  You've already told me engineering did
7  not review the potential impact of that on the
8  flood protection structure, right?
9      A.  Correct.
10     Q.  And neither did the geotechnical
11 section, right?
12     A.  Right.
13     Q.  That was just your conclusion was you
14 pull the pile, the hole seals up, everybody's
15 happy, right?
16     A.  Correct.
17     Q.  Okay.  Let's talk about the Boland.
18         All right.  Now, the Boland work was
19 done pursuant to a modification, right?
20     A.  Sure.  Most of the remaining contract
21 was done by modification.
22     Q.  Well, in particular, the Boland
23 removal of the so-called wedding cake structure
24 was done by modification.
25     A.  Yes.  There were eight unknown

Page 199

1  concrete structures discovered and removed.
2      Q.  All right.  And the wedding cake
3  structure was a pretty large structure.
4      A.  Quite large, yes.
5      Q.  All right.  And it went down to about
6  25 feet?
7      A.  I don't recall exactly, around -23 or
8  something like that.
9      Q.  All right.  And it was a huge thing
10 such that when it was removed we had to find
11 material to replace the concrete structure that
12 had been removed, right?
13     A.  Yes.
14     Q.  What percentage of the hole do you
15 think was occupied by the wedding cake
16 structure, that is, the cofferdam hole?
17     A.  It was a fairly tight cofferdam with
18 respect to the concrete structure, so the
19 structure took up about 85 percent of the
20 volume.
21     Q.  Okay.  And just to shift back to
22 Saucer Marine for just a moment, what
23 percentage of the hole did that lift station
24 occupy of the cofferdam structure that was
25 created to remove the sewer lift station?

Page 200

1      A.  I don't recall on that one.
2      Q.  Was it as much as 80 percent?
3      A.  No.  I would estimate less than
4  half -- less than 50 percent.
5      Q.  Less than 50.  But close to 50?
6      A.  Don't know.
7      Q.  Don't know.  All right.
8          In any case other than the work
9  order -- I'm sorry.  Other than the statement
10 of work, is there anything other than the
11 statement of work which you prepared which
12 would have controlled what the Washington Group
13 International did to remove the wedding cake
14 structure?
15     A.  Yes.  Likewise, there was another
16 cofferdam design and removal plan.
17     Q.  Okay.  All right.  So first came your
18 statement of work, which at WGI 260 says
19 subsequent to the award of Mods 2608 and 2609,
20 the contractor discovered an additional eight
21 unknown subsurface concrete and steel
22 foundations beneath the exist building slabs at
23 the Boland Marine site during building and slab
24 demolition operations.  These items were left
25 behind by the port's former industrial/marine

Page 201

1  tenants and were unknown through the absence of
2  any as-built drawings.  Anecdotal marks from a
3  former Boland Marine employee suggests that
4  some of the foundations may have served as the
5  foundation of a former 3-legged tower crane.
6  The mass concrete and steel foundations are
7  assumed to be reinforced with rebar and pile
8  founded on treated wood pilings assumed to be
9  30 feet to 35 feet long.  All concrete steel
10 and pilings shall be removed in their entirety
11 and disposed off site at appropriate disposal
12 facilities and material recyclers.  Salvage
13 value of any recycled or rebar shall be
14 credited to WGI or its subcontractor to defray
15 the cost of this work.  See Enclosure 1,
16 digital photographs and Sketch 1 for more
17 information.
18         Okay.  And you are asking WGI to
19 furnish services, materials, supplies, labor,
20 equipment, superintendents, procurement
21 subcontracting, all on site permits, licenses,
22 laboratory services, waste characterization,
23 waste profiling, transportation and disposal
24 required for the excavation and disposal of
25 additional subsurface foundations,

GUILLORY, LEE

6/30/2008

Page 202

1  asbestos-containing materials and concrete
2  waste for the IHNC East Bank Industrial Area.
3      So you want WGI to give you some plans
4  to remove this, among another things, the
5  wedding cake structure, correct?
6      A.  Correct.  The total of eight.
7      Q.  And that comes back to you in the form
8  of a proposal.  Right?  And there are various
9  revisions that go back and forth.
10      Do you remember what the final -- this
11  one says final revised.  Can we rely on that to
12  be the final?  It's WGI 57606.  (Tendering.)
13      A.  Yes.  That should be the final.
14      Q.  All right.  That's the final.  And I'm
15  going to say the final I'm going to mark as
16  Exhibit Number 7.
17      And then the Cofferdam Installation
18  and Concrete Foundation Removal Final Work Plan
19  by Hamps is Number 8.  Okay?
20      (Plaintiff's Exhibit 7 was marked for
21  identification and is attached hereto.)
22      (Plaintiff's Exhibit 8 was marked for
23  identification and is attached hereto.)
24      A.  Okay.
25  EXAMINATION BY MR. BRUNO:

Page 203

1      Q.  All right.  So the proposal by WGI,
2  and what's finally approved by the Corps, is
3  that with regard to the eight block, the large
4  block, upon reaching the -25-foot MSL
5  excavation depth, a decision by WGINT and the
6  USACE shall be made to continue excavation or
7  quit.  Should it be determined to continue, an
8  optional second phase mobilization will be
9  initiated that includes mobilization of
10  equipment capable of excavating to greater
11  depth, -35 MSL.  Second phase shall also
12  include installation of walers to remove
13  concrete from the depth of 25 to 35 MSL.
14      Okay.  Now, do you recall how far down
15  you guys went?
16      A.  I believe -23 NGVD.
17      Q.  All right.  So we didn't have to go
18  further than the 25 that's contemplated here,
19  right?
20      A.  Right.
21      Q.  And Number 7 is a discussion of the
22  backfill.  It says, the excavations resulting
23  from concrete foundation removal will be
24  backfilled with borrow material obtained from
25  either the on-site borrow source or an off-site

Page 204

1  source as required.  An estimated 900 CYs will
2  be needed.  The material will be placed in
3  lifts and compacted, however, no compaction
4  testing will be required.  Revegetation will
5  not be required.
6      Okay.  So would you regard this as a
7  general specification?
8      A.  Yes.
9      Q.  Okay.  It's certainly not a prescribed
10  specification, right?
11      A.  Right.
12      Q.  And it doesn't indicate what kind of
13  material you can use to backfill the hole, does
14  it?
15      A.  No, it doesn't.
16      Q.  All right.  And they can take some
17  stuff from off site if they want to.  It says
18  it in black and white.
19      A.  Bring in additional material from off
20  site.
21      Q.  Right.  Okay.  And there compaction
22  requirements at all.
23      A.  No.
24      Q.  Okay.  And then finally, we have --
25  and that's just the proposal.  The actual work

Page 205

1  that's going to be done is described by Exhibit
2  Number 8.  Right?
3      A.  Correct.
4      Q.  Okay.  And that's, for the record, WGI
5  39041.  And, um -- it says, backfill
6  excavations.  It says, immediately following
7  pile extraction operations, the excavations
8  will be backfilled with either imported sand or
9  on-site borrow back to the original grade.
10      So this specifically allows them to
11  use sand.  Right?
12      A.  Okay.
13      Q.  During backfill operations of
14  the southern block excavation, the walers and
15  struts associated with cofferdam will be
16  extracted.  The sheet pile will be removed upon
17  completion of backfill operations.
18      There's another indication here, just
19  to be clear.  This is that sequence of events
20  things that we looked at before, but I want to
21  give it to you anyway.  It says, excavation,
22  soil remove steel sheeting and break remove
23  concrete within the cofferdam as required to
24  remove concrete foundation pile caps and timber
25  piles.  Excavation bottom will be elevation -23

52 (Pages 202 to 205)

GUILLORY, LEE

6/30/2008

Page 206

1  for base bid. Elevation 34 for option.
2  Stockpile excavated soil outside the limits of
3  the excavation.
4      What does that mean?
5      A. It has to be stockpiled back away from
6  the excavation for stability.
7      Q. Okay. And then it says cofferdam
8  backfilling. It says, backfill excavation with
9  previously excavated soil in two-foot lifts,
10  initial backfill operations will be to the
11  bottom of the walers inside the cofferdam,
12  complete backfilling to top of sheet piles with
13  material to be provided by WGI after walers are
14  removed.
15      You see that?
16      A. (Nods affirmatively.)
17      Q. So once again, WGI, at it's option,
18  can brings in material from off site if it
19  wants to, to fill the holes.
20      A. Only if we didn't have any additional
21  on-site material from the McDonough Marine
22  borrow area.
23      Q. All right. Did engineering review
24  either the revised final proposal Number 113 or
25  the cofferdam installation and concrete

Page 207

1  foundation removal final work plan?
2      A. No.
3      Q. Did anybody in the geotechnical
4  section of the engineering division review
5  either the revised final excavation and
6  disposal of additional subsurface foundations
7  ACM and concrete wastes or the cofferdam
8  installation and concrete foundation removal
9  final work plan?
10      A. No.
11      Q. Who reviewed them?
12      A. The government team.
13      Q. Which was you, Bacuta and --
14      A. Jim Montegut and a couple of other
15  people.
16      Q. Okay. Who were -- I showed you this
17  document, and I forgot to ask you, we talked
18  about it being a form for approvals.
19      What I wanted to ask you was, it says
20  reviewers.
21      A. Uh-huh.
22      Q. It says --
23      MR. TREEBY:
24          This document?
25      MR. BRUNO:

Page 208

1      This document previously
2  identified as WGI 51580.
3  EXAMINATION BY MR. BRUNO:
4      Q. It says reviewers. Lee Guillory, Gary
5  Brouse --
6      A. Yes.
7      Q. Am I saying that right -- George
8  Bacuta and Rubin Mabry. I guess the reviewers
9  change from time to time. Or is that always
10  the same group?
11      A. It changed depending on which
12  submittal was being reviewed.
13      Q. Okay. All right. It looks like it's
14  three generally. Is it three generally, or are
15  there more?
16      A. Generally, three to four. Sometimes
17  five. If Louisiana DEQ, Mr. William Perry
18  might be included in there, too.
19      Q. So it's generally three Corps
20  employees.
21      A. Corps.
22      Q. Is there possibly a fourth Corps
23  employee or just a fourth person?
24      A. There could be a fourth or fifth Corps
25  employee depending on what plan it was and

Page 209

1  their area of expertise.
2      Q. You have no specific recollection of
3  who actually in fact reviewed these documents,
4  that is, Exhibits Number 7 and Number 8.
5      A. Not, not without seeing the
6  engineering 4025 forms and the comment sheets.
7      Q. Do you know, Mr. Guillory, the sheet
8  pile tip depth of the sheet pile in the flood
9  control structure there at the Lower Nine?
10      A. No, I do not.
11      Q. Okay. Do you have any information as
12  to what WGI thought the sheet pile tip depth
13  was?
14      A. I have no idea what they thought.
15      Q. Okay. All right. I only ask you
16  because the documents seem to show that it's an
17  8-foot sheet pile depth, and some other
18  documents which we saw which WGI prepared that
19  suggested 25. But you have no knowledge of any
20  controversy or issue with regard to the sheet
21  pile tip depth of the sheet pile in the
22  floodwall, right?
23      A. Correct.
24      Q. Okay. We'll leave that alone.
25      Why didn't the Corps do any evaluation

Johns Pendleton Court Reporters                    800 562-1285

GUILLORY, LEE

6/30/2008

Page 210

1  of the Boland hole to ascertain whether or not
2  it might damage the flood protection structure?
3      MR. STONE:
4          Object to foundation.
5  EXAMINATION BY MR. BRUNO:
6      Q.  As I said, he's making house objection
7  for the record.
8      THE WITNESS:
9          Does he need to restate or
10         anything?
11     MR. STONE:
12         No.
13 EXAMINATION BY MR. BRUNO:
14     Q.  I will.  If you don't understand it I
15 will, sure.
16     A.  Just repeat it again.
17     Q.  All right.  I thought we went -- and
18 I'm frankly shortening my questions because we
19 have a lot of history, you and I, after this
20 long day.
21         Let me just go through it the long
22 way.  We talked about the fact that at least on
23 one occasion you felt it necessary to evaluate
24 a hole or holes at the McDonough site to
25 ascertain whether or not they may potentially

Page 211

1  damage the flood control structure.  Right?
2      A.  Correct.
3      Q.  And you called in the engineering
4  division and they did their thing.
5          Why didn't you do that in the context
6  of the Boland Marine excavation and backfill?
7      A.  Two reasons:  The location and
8  proximity of those concrete foundations with
9  respect to the floodwall and the levee were
10 quite a bit far away as opposed to McDonough
11 Marine borrowing area.  Also, where those
12 concrete block foundations were located were
13 within the footprint of where the future bypass
14 channels were to be dredged.  There were two
15 bypass channels to be dredged in a stairstep
16 fashion to -22 NGVD and -31 NGVD, and those
17 concrete foundations and their cofferdams fit
18 within those footprints.  So that -- those
19 braced structural excavations were designed by
20 a professional engineer, professionally --
21     Q.  WGI 's professional engineer.
22     A.  -- hired by WGI and their
23 subcontractors -- professionally reviewed by
24 all parties, and constructed, and intense
25 quality control and quality assurance

Page 212

1  inspection followed on how those were installed
2  and removed.
3      Q.  Okay.  Now, first of all, the Boland
4  Marine hole is within 30 feet of the center
5  line of the floodwall, isn't that true?
6      A.  Correct.
7      Q.  So if there's some local requirement
8  by this office to do an engineering analysis,
9  that requirement was breached, isn't that true?
10     A.  As I stated previously, I was not
11 aware of that requirement.
12     Q.  Okay.  If there is one which you don't
13 know about, somebody didn't follow it, right?
14 I said if.
15     MR. STONE:
16         Objection.
17 EXAMINATION BY MR. BRUNO:
18     Q.  Right?
19     A.  (Witness gesturing.)
20     Q.  You don't know?  Okay.
21     A.  Don't understand your question.
22     Q.  Well, if there is -- if Mr. Colletti
23 is right and if Mr. Grieshaber is right that
24 there is such a requirement, the requirement
25 wasn't complied with, isn't that true?

Page 213

1      A.  Correct.
2      Q.  Now, have you seen the plans for the
3  new lock?
4      A.  In the nine volume set for 1997, yes.
5      Q.  All right, sir.  There's a 2000 plan.
6  Do you know about that one?
7      A.  No, I haven't seen that one.
8      Q.  Do you know about a plan to put
9  another floodwall outside of the existing
10 floodwall?
11     A.  Flood side of the existing Jourdan
12 Avenue wall?
13     Q.  Land side.
14     A.  No, I was not aware of that.
15     Q.  Were you aware of the sheet pile tip
16 depth contemplated by that plan?
17     A.  No.
18     Q.  Do you know it goes down to 60 feet?
19     A.  No.
20     Q.  So let me ask you this:  Have you ever
21 seen sheet pile being used to cut off a
22 potential seepage problem?
23     A.  Sure.
24     Q.  Okay.
25         (Brief recess.)

54 (Pages 210 to 213)

GUILLORY, LEE

6/30/2008

---

Page 214

1   EXAMINATION BY MR. BRUNO:
2       Q.   Okay.  All right.  We're almost done
3   here, Mr. Guillory.
4           You ever heard of a contractor called
5   MMG?
6       A.   Sure.  Materials Management Group in
7   Algiers, Louisiana.
8       Q.   And what were they doing for WGI?
9       A.   They were one of the primary
10  subcontractors.  They did a lot of the
11  environmental science and investigation for
12  them.
13      Q.   They didn't do any of the engineering
14  work, did they?
15      A.   Um --
16          MR. STONE:
17              If you know.
18              He may not be speaking with
19          personal knowledge about what people
20          did for WGI.
21  EXAMINATION BY MR. BRUNO:
22      Q.   Well, if you don't know the answer I'm
23  assuming you're going to tell me you don't
24  know.  You've been doing a good job of telling
25  me --

---

Page 215

1       A.   Not that I'm aware of to what extent
2   of engineering they may have done.
3       Q.   Who did you -- did you know who did
4   the engineering work for WGI that you've
5   referenced with regard to the holes at Saucer
6   and Boland?
7       A.   Yeah.  Its various documents were
8   authored by engineering staff back in the
9   Denver home office.
10      Q.   Okay.  All right.  And did they
11  subcontract any of the engineering work, do you
12  know?  If you know?
13      A.   They subcontracted some of the
14  engineering work via these braced cofferdams
15  from a subcontract to consulting firms with
16  professional engineers on staff.
17      Q.   Okay.  I'm done.  I, of course,
18  reserve my right to further question based on
19  questions by Messrs. Treeby and Messrs. Aldock
20  and company.
21          Thank you.  We're off the record.
22          (Plaintiffs' Exhibit 9 was marked as
23  such, by agreement of counsel, at the
24  conclusion of the deposition.)
25          (Plaintiff's Exhibit 9 was marked for

---

Page 216

1   identification and is attached hereto.)

---

Page 217

1                WITNESS' CERTIFICATE
2
3           I, LEE GUILLORY, do hereby certify
4   that the foregoing testimony was given by me,
5   and that the transcription of said testimony,
6   with corrections and/or changes, if any, is
7   true and correct as given by me on the
8   aforementioned date.
9
10  _____    _____
11  DATE SIGNED         LEE GUILLORY
12
13  _____ Signed with corrections as noted.
14
15  _____ Signed with no corrections noted.
16
17
18
19
20
21
22
23
24
25  DATE TAKEN:  June 30th, 2008

---

55  (Pages 214 to 217)

Johns Pendleton Court Reporters                    800 562-1285

GUILLORY, LEE

6/30/2008

Page 218

```
 1          REPORTER'S CERTIFICATE
 2          I, JOSEPH A. FAIRBANKS, JR., CCR, RPR,
 3   Certified Court Reporter in and for the State
 4   of Louisiana, do hereby certify that the
 5   aforementioned witness, after having been first
 6   duly sworn by me to testify to the truth, did
 7   testify as hereinabove set forth;
 8          That said deposition was taken by me
 9   in computer shorthand and thereafter
10   transcribed under my supervision, and is a true
11   and correct transcription to the best of my
12   ability and understanding.
13          I further certify that I am not of
14   counsel, nor related to counsel or the parties
15   hereto, and am in no way interested in the
16   result of said cause.
17
18
19
20
21
22
23   _____
24   JOSEPH A. FAIRBANKS, JR., CCR, RPR
25   CERTIFIED COURT REPORTER #75005
```

Johns Pendleton Court Reporters                    800 562-1285

GUILLORY, LEE

## A

**abatement** 149:8
**abide** 55:10 92:21
**ability** 218:12
**able** 30:24 63:5
  135:6
**above-ground**
  149:9
**above-named**
  134:14
**absence** 201:1
**absolute** 183:23
**absolutely** 148:5
  153:9 157:25
**accept** 67:21 68:3
**acceptance** 88:21
  88:21 106:9
**accepted** 106:11
  148:10
**accepts** 67:15
**accomplish** 51:25
  52:20 67:12 68:18
  111:7,16 118:9
  122:6 145:7 172:5
  183:9
**accomplished**
  57:20 61:8 122:8
  137:15 144:11
  145:6 148:23
  165:7
**accurate** 58:7
  67:17 117:17
  159:20 170:25
**ACM** 207:7
**acquire** 103:3
  121:19,22 127:5
**acres** 26:24 51:11
  63:12 65:24
**acronym** 30:8
  40:24
**acronyms** 38:20
  41:2
**act** 39:13,14,17,23
  40:1 45:4,10
  118:8

**acted** 123:5
**action** 1:4 26:24
  30:2 39:4 78:15
  89:24 99:12 103:6
  114:24 119:14
  151:13 165:7
**actions** 6:5
**activities** 27:7
  75:16 99:14
  101:24 130:1
  180:18
**activity** 32:3 85:23
  86:2,10,16
**actual** 80:12,18
  88:13 98:22 114:5
  114:22 116:20
  130:25 132:22
  176:7,13,15 181:1
  187:13 204:25
**adage** 57:8
**add** 92:5 107:23
**added** 106:24
  107:22
**additional** 76:3
  92:6 97:8 101:22
  105:23 108:22
  109:10 119:24
  122:4 126:18
  185:14 186:19
  190:23 191:8,13
  192:3 194:8 195:1
  196:4 200:20
  201:25 204:19
  206:20 207:6
**Additionally** 7:25
  137:13
**address** 64:19
  72:1 146:16
  167:4 172:19
**addressed** 17:18
  64:12,14,15 65:7
  100:2 107:3 108:2
  116:14 135:1
  166:9 169:19
  170:11
**addresses** 91:10,11

**addressing** 64:22
**add-ons** 39:15,16
**adjacent** 126:16
  137:19,22 152:19
  166:5 170:8,20,24
  171:11,23 175:15
  185:22 187:16
  190:12
**administered** 37:15
**administering** 5:24
**administers** 36:15
**admonition** 138:6
  139:13 141:12
**adopted** 87:1
**ADRIAN** 3:10
**adversely** 159:6
  170:8
**advertised** 47:3
  145:10 183:11
**advice** 158:19
**advise** 151:6,10
**advised** 123:13
**affect** 159:6 161:13
  170:8
**affirmatively** 21:4
  22:7 46:11 79:6
  84:18 89:8 97:5
  156:1 164:9
  165:11 179:14
  206:16
**aforementioned**
  5:4 217:8 218:5
**agencies** 92:15 95:2
  99:11 100:6
  103:13 104:1
**agency** 103:4
**ago** 18:8 90:23
  155:23 162:22
  187:4
**agree** 15:5 29:9,14
  67:24 83:11,15
  87:6 91:8,14
  94:12 119:12
  120:24 174:10
  183:15 194:3
**agreed** 5:2 21:24

22:1 67:10
**agreement** 13:17
  14:10 15:21
  145:25 215:23
**agricultural** 94:4
**ahead** 18:18 23:3
  98:5 132:5,25
  133:2 143:23
**Aldock** 215:19
**ALFIERI** 3:13
**Algiers** 214:7
**allow** 6:10 67:22
  191:1
**allows** 46:14,16
  205:10
**alongside** 32:25
**altogether** 110:7
**ambient** 92:19 94:2
**ameliorate** 86:8
**amendment** 106:25
**amendments** 107:8
**Amendment/Mo...**
  101:12
**America** 1:11 2:10
  6:25
**amount** 37:5 92:3
  94:2 108:17
  167:25
**amounts** 35:1 43:7
**analyses** 7:19
**analysis** 63:3 85:23
  86:2,16 111:10
  114:17 115:16
  126:19 137:19
  139:2 141:14
  159:3 172:25
  178:14,16 212:8
**anchored** 47:5
**and/or** 28:10 217:6
**Anecdotal** 201:2
**animal** 178:25
**answer** 5:13 9:4
  10:25,25 12:15,20
  13:14 32:9 43:9
  64:5 66:5 76:13
  91:21 127:9

128:11 150:16
  153:11 163:20
  214:22
**answers** 22:4,24
**anticipate** 100:9
  117:7
**anticipated** 51:15
  77:2
**anticipation** 101:24
  102:1
**anybody** 9:17 11:3
  34:9 50:4 81:10
  99:24 169:3 196:7
  207:3
**anybody's** 161:14
**anyway** 54:6 55:4
  61:12,21 110:23
  131:22 134:13
  177:7 205:21
**ANZELMO** 3:4
**apparently** 97:12
  124:21
**APPEARANCES**
  2:1
**appendix** 62:15
  65:2
**applicable** 51:1
  67:9 106:2 107:6
  107:13
**application** 73:23
  103:23
**applied** 104:13
**apply** 103:3,17
  104:10 120:3
  123:22
**appointing** 50:5
**appreciate** 15:17
  65:25 153:10
**appreciated** 172:7
**apprized** 130:14
**appropriate** 99:10
  100:5 103:4,13
  145:18 150:19
  201:11
**appropriated**
  34:22 35:5 36:22

GUILLORY, LEE

37:1,5 39:3 43:20
43:22
**appropriation** 29:4
39:5,7,8,23 40:1
45:4,7 46:20
**appropriations**
39:10,13
**approval** 44:11
112:16 113:16,18
132:22 181:1,7,9
181:16
**approvals** 207:18
**approve** 99:4
**approved** 40:18
41:22 67:11 92:23
112:8,11 167:22
181:9,12 182:10
182:15 183:23
188:4 203:2
**approves** 109:14
**approving** 109:15
**approximate** 51:18
51:19 76:1 193:7
**approximately**
16:6 17:6 49:21
52:19 53:6 59:6
60:1,11 73:19
124:11 125:1
126:10 171:23
**April** 163:24
**area** 20:4 21:1,6
26:25 28:11,11,11
31:8 49:15 51:12
53:5 54:5 57:12
58:15 59:7,25
72:12,16 75:17
78:16 92:19 94:3
103:13 126:2,18
127:6 133:2
139:25 141:10
159:1,4 164:21
165:20,25 166:4
173:2,18 190:8,12
190:12 195:13,21
202:2 206:22
209:1 211:11

**areas** 24:11,13
58:16 59:17,21
73:21 79:14 126:7
**argument** 24:1
**Arlene** 37:18,19,23
44:10
**Army** 1:12,13 2:20
7:1 13:2 27:5,6
72:9 156:16
**arsenic** 92:10,16,19
92:21 93:15 94:1
94:2 96:19 97:8
124:8 125:13,17
126:5,19 127:20
127:23 128:21
**asbestos-containi...**
195:23 202:1
**ascertain** 210:1,25
**ascertaining**
167:10
**asked** 7:15 13:6
17:22 23:9 35:19
45:24 73:5 74:5
103:12 121:17
127:4 141:13,18
142:8 144:25
172:21 191:20
**asking** 6:9 23:12,17
30:14 52:2 92:8
97:6 98:10 102:20
102:22 104:2
124:9 128:9
156:23 168:21
172:8 201:18
**asks** 122:23
**aspect** 119:2
**assemble** 16:12
**assembled** 49:19
**assess** 65:4 73:25
74:13,15 121:19
**assessed** 74:1
**assesses** 183:12
**assessment** 7:17
64:20,24 90:22
99:7 169:8 172:2
**assessments** 65:19

67:5
**assistance** 70:19
163:18 165:5
**associated** 36:9
37:9 87:19 89:23
186:11 205:15
**assume** 11:17
20:17 22:23
**assumed** 99:21
120:22 201:7,8
**assuming** 45:2,3
214:23
**assumption** 120:25
**assumptions** 52:25
75:24
**assurance** 21:8
189:19,23 190:3
194:17 211:25
**as-built** 201:2
**attach** 141:23
182:2
**attached** 97:11
117:23 131:15
143:25 144:6
162:8,10 165:21
202:21,23 216:1
**attachment** 133:24
133:25
**attachments** 162:1
**attempt** 11:14 87:9
**attendance** 131:6
134:10
**attention** 133:18
162:1 163:10
**August** 115:22,25
116:2,21 119:6,19
121:8 128:19
131:3 132:10
133:20 134:18
**author** 98:15
104:24 105:9
**authored** 90:8
164:1,2 215:8
**authorities** 119:25
**authority** 50:22
**authorization** 29:3

29:15,17 32:5
35:21,24 42:3
50:4
**authorize** 28:16
**authorized** 28:19
28:20 29:6,10
43:18
**authorizes** 28:25
**available** 43:23
77:23 84:2
**Avenue** 1:15 2:23
10:5 32:20 165:21
166:5 171:24
175:21 213:12
**award** 36:24 37:3
108:19 200:19
**awarded** 26:10
36:18 37:6 47:3
49:7 67:11,19
142:23
**awarding** 88:14
109:19
**awards** 183:12
**aware** 35:23 50:7
121:11 123:15,18
130:25 154:17,25
196:14 212:11
213:14,15 215:1

---

**B**

**B** 4:6
**bachelor** 19:1,13
**back** 38:5 45:14
54:22,23 55:3
56:1,13 57:24
61:20 121:7,25
130:24 131:21
136:2 141:21
152:2 153:6,8,12
157:19 163:23
167:8 168:8
169:16 170:22
171:18 172:17,23
173:12 175:24
180:9 188:25
189:9 199:21

202:7,9 205:9
206:5 215:8
**backfill** 138:17
139:8 170:10,16
171:9 172:6,9
173:20,25 179:4
179:13 184:16
185:11,21 186:17
186:20 187:22
189:10 190:11,24
192:4,18 194:10
195:10,16 203:22
204:13 205:5,13
205:17 206:8,10
211:6
**backfilled** 170:19
186:12,14,16
189:22 192:2,2
192:24 193:3
195:21,24 203:24
205:8
**backfilling** 183:16
183:20,21 184:14
185:2,10,17 188:1
206:8,12
**background** 33:19
70:5 92:11 96:20
97:9 124:8 125:13
127:20
**backhoe** 171:3
**Bacura** 134:21
**Bacuta** 53:14,21
131:9 136:7,21
167:14 188:16
207:13 208:8
**bad** 34:5
**bank** 26:24 32:19
32:25 34:14 49:15
51:11 57:11 59:25
72:12,16 74:6
75:17 78:15 89:17
137:8,22 140:15
140:24 164:21
202:2
**banks** 138:8
**Baronne** 2:6

GUILLORY, LEE

base 36:12,24 37:7 49:7 106:21 107:20 206:1
based 18:6 47:2 67:4 123:23 145:14 175:25 187:13 215:18
baseline 176:25 177:4,10
basic 27:19 47:12 47:13 83:21,25 84:11
basically 90:11
basis 25:14 36:6 40:1 78:8 130:2
Bates 62:12 72:3 78:18 96:22 110:16 112:23 113:1,8
beam 143:9
began 19:20
beginning 62:25 159:22 177:11
behalf 6:24 103:4 103:18 104:10 108:7 121:18
belabor 22:19
believe 6:7 14:12 14:16 15:3 22:11 53:21 60:1,9 71:7 73:5 83:20 99:18 127:2 130:8,15 132:19 142:10 143:8 193:11 203:16
believed 129:11
beneath 200:22
Benjamin 2:16
best 31:11,15 65:22 77:23 145:6 175:10 218:11
better 64:5 120:22 138:24
bid 142:22 145:10 206:1
bidders 145:16

bids 183:11,12
big 14:7 81:21 193:6,21 194:3
Bill 14:7 45:11
birds 57:8
bit 10:16 18:17 90:23 211:10
black 204:18
blah 45:11,11,11
block 81:25 82:3 203:3,4 205:14 211:12
board 99:22 100:7 100:10 103:25 129:11,11
Boland 81:3 161:1 169:2 178:24 195:21 198:17,18 198:22 200:23 201:3 210:1 211:6 212:3 215:6
bolts 117:9
bone 124:16
boring 61:7
borrow 7:20 141:5 141:9,15 158:25 159:4 165:19,24 166:4 173:2,18 190:12 194:12,16 194:20 195:1,2,13 203:24,25 205:9 206:22
borrowing 211:11
boss 10:19 164:8
bother 46:21
bottom 9:7 177:14 182:23,24 185:13 205:25 206:11
bought 25:6
box 2:15 18:2,2,12 18:15 112:21 113:10
boxes 17:7,9,10,12 17:15,23 18:1,6 45:23 113:8
boy 30:21

BOYER-DUPLA... 3:6
brace 179:5
braced 60:17 143:3 143:15 158:21 166:19 169:13 179:1,5 185:6 187:12 211:19 215:14
bracing 143:9 170:6 172:4 179:9
branch 2:12 21:9 136:6,12,16,18,20 136:23 137:4 150:14 159:5 173:13
breached 141:9 212:9
BREACHES 1:4
break 10:18 113:24 114:1 141:6 184:17 205:22
breaks 10:19
Brief 62:7 179:23 191:22 213:25
bright 23:11
bring 195:18 204:19
brings 206:18
BRO 53:12
broke 109:17 114:4
broken 115:21
brought 45:24 94:25 134:22 139:9 195:15
Brouse 53:12 208:5
Bruno 2:3,3,4 4:5 6:1,16 8:7,11,17 8:23 9:6,14,24 10:9,11 11:25 12:5,14,17 13:18 14:4,13,17,24 15:7,13,24 20:15 21:25 22:2,20 23:14,23 24:5,8 30:12,18,23 33:22

34:6,10 41:9,13 52:4,9 58:3,6,9 61:15 62:5,8 73:7 73:13 76:12 97:24 98:6 101:5,10 102:11,14 108:25 109:5 110:15,22 113:3,12 124:2 125:20 126:3 132:2,6,9 133:5 133:10,12 141:19 141:25 142:7 144:1,7 147:23 148:14 149:20,25 153:4,13,17 155:7 155:14,20,22 156:25 157:9,18 157:23 160:16,19 162:11,13,19 179:24 182:5,8 184:10,21 186:3,7 191:12,14,19,23 196:25 197:4,13 197:16 202:25 207:25 208:3 210:5,13 212:17 214:1,21
bucket 56:25 185:15 186:15
budget 37:12 102:2
build 31:7 42:4,6,7 42:15,16 47:18
building 26:22 27:13 50:11 200:22,23
buildings 34:16 51:16
built 120:8
bunch 87:2 90:12 107:21
Burdine 32:17 40:14 43:15,16
business 50:5 189:9
button 45:17
buy 194:25
bypass 33:4 57:13

61:23 72:17 165:4 211:13,15
B1 62:15

---
### C

C 181:10
cake 160:25 198:23 199:2,15 200:13 202:5
call 13:19 69:7 104:6 119:18 126:17 127:2 128:23 176:3
called 32:18 33:9 51:8 53:4 56:5 71:6 82:15 85:22 87:13 89:10 114:8 128:15 142:25 211:3 214:4
calling 14:5
calls 122:19
camera 15:11
canal 1:4 31:5 32:20 33:1 34:13 72:5 75:18 78:16 89:18 125:24 137:8,23 139:19 139:23 153:20 159:7
cantilevered 152:18
capability 144:13
capable 203:10
caps 205:24
career 20:18
carefully 118:19
cares 194:21
Carol 32:17 40:14
case 16:16 28:23 34:11 64:7 65:17 120:4 148:15 200:8
cases 118:14
catalyst 29:21
categories 23:9,10 23:18

GUILLORY, LEE

**caught** 171:4
**cause** 108:10
 139:19 173:7
 218:16
**cave** 138:7
**CCR** 1:24 5:22
 218:2,24
**CEFMS** 38:18 39:2
 40:16 41:20 44:2
 44:23 45:22 46:7
**center** 21:16 83:8
 83:12,17 159:19
 161:4 176:17,18
 177:8,9,9,23
 212:4
**certain** 37:5 58:20
 59:9,12 73:6,21
 86:19 94:7,18,21
 100:13 137:6
 141:4 148:5
 151:19 153:9
 157:25 161:17
 188:19 190:10
**certainly** 169:3
 204:9
**CERTIFICATE**
 217:1 218:1
**Certified** 1:25 5:23
 218:3,25
**certify** 217:3 218:4
 218:13
**cetera** 55:13
 119:16 148:21
 154:19 164:17
 168:19
**chain** 122:14 164:7
**chance** 15:25
 162:15 184:22
**change** 155:9,10
 157:12,20 159:1
 208:9
**changed** 80:10
 157:10 197:5,8
 208:11
**changes** 97:4 115:9
 217:6

**channel** 32:24,24
 54:17 56:21 57:7
 72:18 165:4
**channels** 33:5
 57:13 61:24
 211:14,15
**characterization**
 66:16 201:22
**characterizations**
 95:5,9
**characterize** 63:5
 65:21
**characterized**
 62:21 65:5,16
 66:4,8,10
**charge** 40:8,9
 68:15
**check** 152:10
**chief** 40:10 136:11
 163:12,21,22
 164:4,11,12,13,14
 164:15
**choices** 46:25 47:1
**CHRISTOPHER**
 3:13
**chronology** 128:8
**circulars** 156:13
**civil** 1:4 2:12 5:6
 19:2,12,19 136:4
 136:11 166:7
 167:16
**Claiborne** 32:21
**claims** 123:20
**class** 6:5
**clause** 105:17
 106:14 107:9,9,24
 108:12 128:17
**clauses** 106:19,22
 107:22
**clay** 173:25 174:1,3
 174:4,20,24,25
 191:5,6 194:13,16
 197:24
**CLAYMAN** 3:7
**clean** 55:6 63:11
 93:17,23 195:1

**cleanup** 27:7 48:7
 55:16 57:22,23
 92:20 93:2 150:4
**clear** 6:12 8:25
 30:4 52:6 86:19
 103:19 104:5
 165:2 205:19
**clearance** 160:2
 175:17
**clearly** 108:9
**close** 76:1 105:18
 105:19 198:1
 200:5
**closer** 138:12
 140:15 141:2
**CMO** 13:21
**codes** 106:1
**cofferdam** 113:18
 113:20 143:3,7,15
 158:22 168:9
 169:14,24 171:13
 182:19 183:20
 187:17 192:15,23
 193:3 199:16,17
 199:24 200:16
 202:17 205:15,23
 206:7,11,25 207:7
**cofferdams** 187:23
 211:17 215:14
**coincided** 160:1
**collaborative**
 146:11
**collaboratively**
 146:17
**collapse** 198:1
**collapsing** 152:23
**college** 18:23
**Colletti** 154:15
 212:22
**column** 181:4
 182:11
**combination** 174:8
**come** 35:16 39:22
 41:12 42:17 54:23
 61:20 63:14 71:24
 73:12 119:21

 126:1 129:18
 144:24 146:21
 164:5 183:11
 190:11
**comes** 39:12 42:20
 42:21 55:24 163:6
 202:7
**comfortable**
 144:13
**coming** 88:3 95:15
 101:25 102:2
 153:20
**comment** 209:6
**commented** 112:4
 112:7 167:17
**comments** 112:15
 180:7,7 181:4,9
 181:23 189:13
**commercially**
 191:5 194:25
**commitment** 41:16
 41:19,20
**communicate**
 125:5
**communicated**
 127:22
**communications**
 13:23
**compact** 138:22,23
 175:8,9 186:16
**compacted** 138:18
 170:23 173:20
 185:15 204:3
**compacting** 173:22
**compaction** 139:15
 170:17,23 172:6,9
 174:22,22 175:11
 175:12 204:3,21
**companies** 24:22
**company** 24:25
 25:2 52:16 142:24
 215:20
**compare** 186:4
**compiled** 87:1
**complete** 125:15
 183:20 186:19

 190:24 192:4
 206:12
**completed** 106:10
 130:21 137:9
 140:12 185:21
**completely** 54:16
**completeness** 128:1
**completion** 106:9
 164:24 205:17
**compliance** 93:13
 137:14 165:8
**complied** 212:25
**complying** 105:25
**component** 31:25
 35:3 71:3 91:11
 91:12
**components** 100:13
**computer** 218:9
**computers** 102:24
**concentration**
 93:19,22 95:24
**concentrations**
 94:6 95:25 96:1,6
**concept** 94:13
**concern** 51:14
 54:10 65:7,20
 159:9,11 162:22
 166:1,16 167:25
 168:3,23,25 173:7
 175:13 179:12
**concerned** 50:18
 58:25 59:20 60:13
 63:6 170:1 171:19
 175:19 179:4
**concerns** 166:14
 171:18
**concluded** 25:20
**conclusion** 125:10
 141:8 198:13
 215:24
**concrete** 192:16
 199:1,11,18
 200:21 201:6,9
 202:1,18 203:13
 203:23 205:23,24
 206:25 207:7,8

GUILLORY, LEE

6/30/2008

Page 223

211:8,12,17
**concur** 145:22
**concurred** 145:21
**conditional** 181:1,8
**conditions** 84:22
138:24 185:5
187:14,14 197:25
**confident** 170:7
192:20
**confirm** 12:8 71:8
96:23 148:16
**confused** 8:8 193:6
**confuses** 73:15
**conglomeration**
115:10
**Congress** 28:15,20
28:25 29:1,6,10
34:21 35:4,17
36:22 37:1 43:18
43:19,21 44:4
45:5 46:20
**Congressional**
35:20,24 39:15
**congressionally**
39:2
**conjunction** 70:15
105:14
**connection** 47:23
169:1
**connects** 99:16
**consider** 54:4
95:12
**considerations**
131:17
**consolidate** 76:20
91:6
**consolidated** 1:5
16:22 79:19
**constraints** 109:19
**constructed** 211:24
**construction** 7:6
20:1,6,11 21:8,11
21:12 24:19 25:24
28:20 47:17 71:5
72:18 107:6
127:17 142:23

150:11 163:14,16
163:17,22 164:4
164:13,14 165:4
167:20 172:2
189:21
**consult** 23:4
**consulting** 215:15
**contact** 25:13
37:16 95:15
103:13,21 121:18
121:23 126:1
**contacted** 130:18
130:20 150:13
**contacts** 129:22
**contained** 86:25
111:24
**container** 90:24
**containing** 18:3
**contains** 16:10,19
27:24 46:9
**contaminant** 51:14
59:2 93:10
**contaminants** 54:9
58:25 59:20 60:13
63:6 64:19 65:7
65:20,23
**contaminated**
75:25 76:3 93:4
195:6
**contamination**
57:10 58:16,17,18
59:9 63:8 76:25
95:10 151:16
**contemplate**
143:20 144:8
**contemplated**
34:11 52:11 73:19
75:6 77:13 79:4,7
82:14 103:20
115:7 125:8
142:13 180:13
203:18 213:16
**contemplates** 81:11
194:7
**contemplating** 76:7
**contend** 179:10

**content** 173:22
175:2
**context** 63:25
124:5 211:5
**continuation** 6:18
89:1
**continue** 101:23
203:6,7
**contract** 17:7 24:22
26:6,9,9,13,16,19
27:11,16,18,19,19
31:19,21,22 33:3
36:13 37:7 39:4,6
47:2,12,13,18
63:11 83:22,25
84:5,6,12 85:15
85:17,20 86:14
92:5 97:4 106:11
106:21,24 107:5
107:17,18,20
111:8 118:8
134:15 146:10
150:9 183:6
198:20
**contracted** 118:6
127:23
**contracting** 37:20
38:12 49:6,14
66:21 70:15 84:1
92:1 137:14
145:24,25 188:6
189:7
**contractor** 40:18
41:25 48:22 49:4
49:9 51:22 52:12
52:22 53:3 70:19
73:23 84:2,10,13
85:14 99:9,12
103:2 105:22
106:3,7 114:13,16
137:10,13 139:16
139:25 140:15
143:14 146:12
164:23 172:3
183:7,13 193:23
194:24 200:20

214:4
**contractors** 67:23
159:23
**contractor's** 48:5
88:20 106:6
**contracts** 36:18,24
37:4 42:13,15
47:5,10 49:7
67:10,19 106:15
**control** 111:12,13
114:16 137:20
140:10 159:13
165:23 168:4
170:2 172:1
173:17 175:20,23
176:2,6,8,13,15
177:12,20 178:21
178:23 189:19,20
194:18 209:9
211:1,25
**controlled** 200:12
**controversy** 209:20
**conversations**
130:4
**Conversely** 185:9
**convey** 127:15
**conveyed** 127:14
127:18
**coordinate** 122:7
130:1
**coordinated** 127:3
**coordinating** 90:18
**coordination** 89:15
129:22
**copies** 97:15 113:7
**copy** 107:19 131:25
133:25 182:1,4
**corner** 83:5
**corporate** 22:24
**corporation** 25:4
37:4 52:16 75:20
**Corps** 1:12,13 2:20
2:21 7:1 13:2
19:4,7 22:5,12,25
25:23 26:11 27:5
27:6 28:16,25

31:7 32:6 34:12
34:23 35:8,18
36:1,7,17 37:11
37:21 38:17,22
42:4,5,8 50:9 54:5
54:14,20 55:5
57:2 59:6 63:16
63:23 73:19 79:1
80:22 85:13 86:3
92:11 103:1,5,9
104:11,19 106:15
108:4,7 109:14,15
114:13 116:13
118:6 122:2,6,16
130:21 132:10
145:4,17 150:8
154:6,25 156:16
161:8 168:9 180:9
180:9,25 183:5,24
187:1 188:5
194:24 203:2
208:19,21,22,24
209:25
**correct** 6:15 17:13
25:1 26:7,17 27:8
28:14 29:3,13,18
31:3,9 32:1 34:19
43:25 44:8,13,15
44:20 45:20,21
46:17 48:24 49:25
50:16,20 53:5
54:19,25 57:1,5
59:14 66:11 68:1
68:6 69:5 70:25
71:16,19 74:21
75:2,3,22 77:20
78:6,11 80:4,14
81:8,17 82:1
85:18 87:10 88:23
89:6,12,13 90:14
90:20 95:17 96:3
96:16 97:3 98:9
99:17 102:3
112:12,22 113:22
114:10 115:1,20
120:20 125:12

GUILLORY, LEE

129:5,13,16
132:15 137:12
138:3 142:14
144:22,23 146:19
149:6 151:21
160:23 161:2,6,15
161:20 164:18
166:12 167:5,6
172:11 177:19
178:5 180:21
183:25 194:5
195:11 198:9,16
202:5,6 205:3
209:23 211:2
212:6 213:1 217:7
218:11
**corrections** 217:6
217:13,15
**corrective** 151:13
**correspondence**
17:16 121:25
122:15 123:1
130:24
**cost** 51:18 61:9,19
117:10 145:15
146:10 201:15
**costs** 117:19,23
118:1,16
**counsel** 2:21 5:3
6:19 10:12,21,22
11:22 12:22,25
13:6 14:1,2 16:3
17:22 125:21
215:23 218:14,14
**couple** 207:14
**course** 10:3 41:10
92:22 95:1 118:16
141:2 169:5
186:17 215:17
**court** 1:1,25 5:23
131:20 218:3,25
**cover** 9:20 71:4
101:8 147:12
**covered** 59:1 111:1
**covers** 24:2 71:8
**crane** 185:20 201:5

**create** 32:24
**created** 186:10
199:25
**creates** 192:17
**credited** 201:14
**creosote** 63:7
**cross-examine** 6:11
**cross-section**
165:22 178:6
**crystal** 103:19
**CS7** 20:11
**curb** 160:1
**curious** 42:2 55:21
**current** 124:6
149:15
**currently** 164:21
**curriculum** 18:19
**cut** 26:8 138:1
140:15,23 153:19
176:17 213:21
**cycles** 167:21,24
**CYs** 204:1

**D**
**D** 3:3 4:1,6
**Daily** 190:3
**damage** 85:16
86:11 87:5 159:9
161:14,18 167:2
168:4,11 169:3,9
169:24 170:2
210:2 211:1
**damages** 106:4
108:10
**damaging** 175:14
**Dames** 52:15 63:4
74:17 75:11 76:15
79:16 81:14
**data** 52:18
**database** 38:25
**date** 51:19 99:13
133:24 134:19
217:8,11,25
**dated** 72:9 114:12
115:19 117:3,4
119:1 124:25

133:23 147:6
148:1,10 162:2
180:17 181:2,19
**dates** 69:16
**Datum** 140:5
**David** 2:22 143:4
154:10 182:4
**day** 23:25 33:25
34:2 104:5 210:20
**deal** 14:7 34:9
**deals** 117:15
**dealt** 25:14 95:1
**DEBRA** 3:7
**debris** 60:18
**December** 18:24
20:23 77:5 78:3
108:16
**decide** 15:22 24:16
42:18 57:3 107:23
**decided** 51:1
128:23
**decides** 42:7
**deciliter** 93:9
**decision** 49:8 54:1
122:4 203:5
**deemed** 18:11
103:24
**deep** 53:4 60:8,16
60:25 61:3 78:1
142:17 143:8
152:7,9,15 158:21
160:10,20,24
165:19 171:22
173:2 193:10
**deeper** 73:11 82:16
96:7,10 132:12
137:25 178:3,22
**deepest** 59:23 81:9
**defendant** 14:3
**defendants** 14:1,2
**defense** 13:17 14:9
15:21 48:10
**definable** 115:20
117:22 148:23
**define** 183:3
**defined** 89:10

**defines** 80:11
111:21
**definitive** 107:3
183:6
**defray** 201:14
**degree** 118:2
170:17
**delivered** 106:8
**delivery** 38:9 50:25
66:17 67:11 68:10
68:12,14 69:6,12
69:18,25 84:16
88:14 89:2 107:6
107:14
**demolished** 51:17
**demolishing** 28:10
**demolition** 26:22
26:23 27:13,24
35:11 47:16 48:23
49:10 72:7 75:16
89:17,20,21 90:1
90:3 91:10,19
99:7 111:1 149:9
164:22 200:24
**Dennis** 25:19
**density** 138:19
139:10
**Denver** 150:25
215:9
**department** 2:11
19:21 55:12 72:8
92:24 123:13
158:2,3 188:9
196:8
**depend** 22:17
93:18
**depended** 158:19
**depending** 37:8
59:2 73:21 208:11
208:25
**depends** 59:19
65:12 73:24 93:18
94:23 174:7 176:7
**deponent** 5:10
**deposition** 1:10 5:4
5:14 6:19 10:13

11:21 16:1 17:24
23:8 110:21
133:13 142:5
154:13 215:24
218:8
**DEPO-VUE** 3:17
**depth** 51:22 52:11
52:22 58:21 60:4
72:20 73:6 76:7
77:8 93:3,11,18
94:18,21 96:5
132:16 158:15
170:5 182:23
186:13 203:5,11
203:13 209:8,12
209:17,21 213:16
**depths** 77:2 94:7
96:4 151:15
**DEQ** 65:14 92:14
208:17
**DERP** 48:8
**describe** 17:4 24:10
30:2,6,20,20
31:11,15 45:9
69:5 94:6 114:5,7
115:6,12,13 156:8
**described** 45:23
51:10 117:2
144:25 148:1
205:1
**describes** 79:3
80:18,19 114:21
118:3 119:15
174:17
**describing** 69:3
118:5 131:16
135:13
**description** 115:17
**descriptor** 45:12
**design** 42:12 62:14
62:23,25 63:16
71:21 72:6 143:3
143:15 152:17
157:7 158:19,24
169:13 170:5,6
175:24 176:1,7

GUILLORY, LEE

177:14,18 185:4,5
200:16
**designate** 17:25
68:3
**designated** 6:24
24:12 62:10
164:20
**designates** 65:10
**designation** 66:25
67:16 68:4
**designed** 143:7
145:4 151:14
152:21 154:9
166:19 187:12
211:19
**designee** 1:12 6:20
6:22 8:9,14,18 9:8
9:16
**designer** 169:13
**Despite** 141:11
**detailed** 117:11
146:7
**details** 43:6 115:1
117:9 118:15
**determination**
53:25 103:10
**determinations**
64:9
**determine** 58:15
80:8 91:5 92:20
94:1 169:16
**determined** 54:8
58:18 62:25 63:10
65:19 67:9 203:7
**develop** 42:10
72:23 99:4,6,10
100:5 102:23
103:3 146:13
176:2
**developed** 25:9
68:18 78:25 145:7
180:6
**developing** 98:12
145:2
**development** 39:13
39:22 78:14

114:24 116:19
119:8,13 165:1
**device** 56:12
**Dicharry** 31:14
32:16 40:13 43:14
49:13,19 50:15
53:12 63:18 64:5
68:24,25 70:4
71:7
**diesel/gas** 63:7
**difference** 110:23
117:1 166:14
**different** 23:7
25:22 56:11 57:16
68:12 69:25 96:22
134:2,9,19 145:16
156:22 157:1
174:12 178:25
180:23
**dig** 52:22 53:4 78:1
82:15 154:22
155:3 156:19
178:3,12,18
**digging** 81:11
119:15
**digital** 201:16
**digits** 101:14
**dimensions** 193:7
**direct** 17:20
**directly** 164:11
**directs** 114:13
**dirt** 193:15
**disagree** 14:23
32:22 168:2,5
169:21 192:8
**disapproved** 112:8
**disaster** 21:16
**disbursed** 41:24
**disciplines** 85:5
**disconnects** 99:16
**discovered** 199:1
200:20
**discreet** 59:8
**discuss** 119:8,20
180:24
**discussed** 116:17

128:15 130:22
134:18 145:5
173:13
**discussion** 24:14
47:15 203:21
**discussions** 131:12
**displacement** 137:8
152:19 168:15
187:16
**disposal** 56:6 195:8
201:11,23,24
207:6
**disposed** 56:14
59:3 201:11
**distance** 83:8,16
**distinct** 95:14
**distinction** 8:13
110:9
**distribution** 87:14
87:17
**Distributors** 81:2,4
81:5
**district** 1:1,2,14
17:2 19:23,24
20:2,22 26:1,4,11
36:17 37:11,13,21
38:1,2,4,8 40:5
44:24 46:24 47:3
47:5 48:4 49:6,13
53:18 54:2,2
66:12,13,15,18,22
67:6,8,20 69:23
70:13,14 75:5
88:17,18 98:19
103:22 104:6,8,21
105:12,15 116:25
121:10,12,18,24
122:1,2,5,11
123:4 125:7 127:3
128:23 130:6,12
130:12 131:8
154:18 163:13
164:24 165:1,8
189:8
**disturbed** 94:24
**division** 2:12 20:1,6

20:11 21:8,11,15
53:17 122:3
130:22 131:7
136:5,12,16
150:11,11,14
159:4 163:12,20
164:4,13,14,15,16
165:5 172:3,18
207:4 211:4
**document** 14:6
15:1,6,18 46:7,8
51:5 70:24 71:15
71:21,24 72:2,4
72:11 74:4 76:11
77:4 78:13,20,23
80:11 82:17 89:10
97:13,16 98:22
101:7 106:13
109:13,21 110:4,7
110:10,10 112:14
115:4 116:3 119:9
123:14 124:4,7
135:18 136:25
141:15 144:18
147:2 148:3 149:4
158:12 161:23,24
178:11 180:3
181:17 194:6
207:17,24 208:1
**documentation**
38:12 71:22 72:6
76:16 91:1 122:18
130:18
**documented**
122:12
**documents** 7:6
13:10 16:8,9,11
16:14,15,20,21,25
17:3,4,7,9,17,18
17:21 67:4 73:18
87:18 89:16 90:19
91:10,17,18,23
107:8 111:20
112:13 114:4,7
147:19,25 148:6
148:17 159:17

162:6 184:23
185:1 189:1 209:3
209:16,18 215:7
**doing** 57:12 90:18
115:13 124:7
144:14 214:8,24
**DOJ** 124:18
**dot** 155:24,24,24
155:24,25
**dots** 87:2
**Dr** 53:14,21 131:9
134:21 136:7
167:14 188:16
**draft** 98:25 114:14
158:18
**drafted** 49:17
51:21 68:13 98:17
105:14
**drafter** 98:22
**drafting** 68:23
80:16 116:18
**drain** 139:17,18,21
**draw** 190:18
**drawings** 201:2
**drawn** 169:17
**dredge** 54:5,17,23
55:3 56:24,25
57:7 61:12,12,20
72:15
**dredged** 211:14,15
**dredging** 8:2 32:19
33:4,9 34:13,15
34:17 35:12 56:12
56:15,17,19,22
57:3,12,15,17,22
61:22,24 165:3
**dress** 139:25 140:7
**dressing** 139:22
140:8
**drilling** 58:14
59:16 61:7 124:10
125:14 126:9
127:6,20
**drive** 152:13
**driven** 56:14
**drives** 56:2

GUILLORY, LEE

**drove** 56:9
**drums** 63:6 90:24
**dry** 175:8
**due** 94:3 109:18
  186:13
**dug** 73:6 158:18
  166:17 178:22
**duly** 10:7 218:6
**dump** 56:1,2,9,13
  58:25
**dumps** 56:3
**DUVAL** 1:6
**DYER** 2:22
**D.C** 2:17

**E**

**E** 4:1,1,6,6 53:13
  139:6
**earlier** 90:15
  148:20 188:2
**early** 116:23
  175:18
**earth** 73:2 152:12
**easiest** 20:19
**east** 26:24 32:19,25
  34:14 49:15 51:11
  57:11 59:25 72:12
  72:16 74:6 75:17
  78:15 89:17 126:2
  126:21 164:21
  202:2
**eastern** 1:2 165:24
  172:21
**easy** 15:23 147:15
**EBIA** 43:3 63:12
  65:17 165:3
**economics** 194:23
**edge** 83:12 138:12
  140:21
**effect** 7:18 25:25
  166:4 167:2
**effort** 48:21 164:25
  186:16
**efforts** 50:10
**eight** 25:8 78:24
  80:7 111:5,14,23

112:2 115:10
116:15 118:8
198:25 200:20
202:6 203:3
**eight-foot** 81:5
**EIS** 64:12,13
**either** 11:3 39:12
  47:4 67:18 68:3
  145:21 203:25
  205:8 206:24
  207:5
**electronic** 13:25
**elevation** 139:24
  143:10 152:5
  176:2 177:13
  178:8 182:24
  205:25 206:1
**elevations** 173:17
**eliminate** 87:3
  94:14
**else's** 68:3
**EL-AMIN** 2:14
**EM** 156:2
**embodied** 122:10
**emergency** 21:15
**employed** 85:2
**employee** 201:3
  208:23,25
**employees** 85:4
  86:6 208:20
**employment** 19:7,8
  19:20
**EM1** 155:24
**EM385-1-1** 86:3
**enable** 99:11
**Enclosure** 165:22
  165:22 201:15
**encounter** 76:22,24
  85:1
**encountered** 131:5
  151:11
**encountering** 51:15
  151:7
**ends** 57:20
**Energy** 39:12,22
**engineer** 11:12

19:12,16,19 20:23
21:3,6 84:3,14,20
84:21 85:2,9
143:2 152:17
154:10 158:23
161:17 166:7
169:13,19 181:3
181:21 185:4
187:3,13 189:6
211:20,21
**engineering** 19:2
  19:19,21 42:12
  53:17 62:14 84:15
  112:18 131:7,16
  136:5,5,12,16,19
  136:21,23 137:3
  138:3 150:11,14
  155:1,15,18 156:3
  156:9,12,13,13,18
  158:1,3,14 159:4
  160:9 163:12,18
  163:19,22 164:11
  164:15,15 165:9
  165:13 166:8
  169:8 172:17
  173:12 178:14,15
  188:9,13,13 196:7
  198:4,6 206:23
  207:4 209:6 211:3
  212:8 214:13
  215:2,4,8,11,14
**engineers** 1:12,14
  2:20,21 7:1 13:3
  26:11 27:5 35:18
  36:18 37:21 38:18
  38:22 42:4 53:8
  53:11 69:5 86:3
  103:5 104:11
  136:4 155:1
  156:17 161:8,10
  166:20 167:4,16
  176:1 183:5,24
  188:5 215:16
**ensure** 84:15
**entire** 20:6 61:23
  84:6 106:9 111:1

111:2,16 134:23
141:21 182:13
184:2 190:4
**entirely** 170:25
**entirety** 201:10
**entities** 65:14
**entitled** 62:13
  71:21 72:4 75:15
  78:13 86:20
**entry** 19:10
**environmental** 7:7
  26:6,15 27:6,10
  37:2 47:2,20,24
  48:7,10 51:23
  55:10,13,17 59:24
  60:21 63:11 72:14
  73:22 74:7,10
  75:7,9 77:15
  92:14,18,24
  111:13 120:2
  165:2,2 214:11
**EOC** 21:16
**EPA** 55:12 92:15
**equipment** 58:12
  58:15 87:4 152:22
  159:24,24 160:4
  168:17 201:20
  203:10
**equipped** 185:20
**ERIC** 3:11
**Especially** 115:20
**ESQ** 3:2,3,4,5,6,7
  3:10,11,12,13,14
**ESQUIRE** 2:4,5,13
  2:14,22
**essence** 54:20
**essentially** 8:3 56:4
  57:23 86:4
**establish** 102:25
  103:1
**established** 86:23
  159:21 175:17
**estimate** 200:3
**estimated** 77:10
  81:23 204:1
**et** 55:13 119:16

148:21 154:19
164:17 168:19
**evaluate** 154:3
  165:18 171:20
  196:9 210:23
**evaluated** 64:8
  67:8 70:15 145:14
  166:9
**evaluates** 46:12
**evaluating** 165:6
  167:9
**evaluation** 62:12
  62:13 63:14,24
  64:3,17 69:21
  70:8 86:9 155:2
  156:18 158:1,4
  160:9 165:23
  180:12 209:25
**evaluations** 158:14
**event** 29:20
**events** 205:19
**eventually** 91:6
**everybody** 99:1
**everybody's** 198:14
**evidence** 5:15
**evidently** 136:1
  150:13 177:6
**exact** 40:23
**exactly** 12:19 38:24
  76:23 95:7,11
  112:17 128:9
  136:10 174:17
  187:9 190:4
  194:14 199:7
**EXAMINATION**
  4:3 10:9 12:17
  15:24 20:15 22:2
  24:8 30:23 34:10
  41:13 52:9 58:6
  61:15 62:8 73:13
  76:12 98:6 101:10
  102:14 109:5
  110:22 113:12
  114:2 126:3 132:9
  133:5,12 142:7
  144:7 148:14

149:25 153:17
155:22 157:23
160:19 162:11,19
179:24 182:8
184:21 186:7
191:14,23 197:16
202:25 208:3
210:5,13 212:17
214:1,21
**examined** 10:8
**example** 7:19 47:17
81:24 88:1 137:7
180:1
**examples** 99:14
**excavate** 140:25
142:17 152:14
**excavated** 151:17
170:20 171:12
185:12 186:12
192:2,22 206:2,9
**excavating** 174:7
203:10
**excavation** 59:8
60:10,23 72:17
132:12,13,17
137:7 138:13,18
144:20 146:8
158:5 171:22
172:5 175:19
178:24 179:1,2
185:6,8,11 186:10
186:13 187:12
201:24 203:5,6
205:14,21,25
206:3,6,8 207:5
211:6
**excavations** 7:21
60:17 61:2 77:12
137:25 151:15
158:21,22 166:19
175:15 195:20,24
203:22 205:6,7
211:19
**excavator** 185:16
186:15
**exchange** 122:22

122:23
**exclude** 120:14,16
**excluding** 117:25
118:19
**execute** 42:14
**executed** 37:14
101:7
**executing** 85:17
**execution** 42:11
49:12,18 50:5
51:4,8,20 52:7,23
53:3 68:9,13,17
68:22 70:22,23
71:2,3,9,15
**exercise** 195:5
**exhibit** 4:8,9,10,11
4:12,13,14,15
17:19 110:14,20
131:24 133:9,13
142:4 143:24
144:5,8 147:3
161:23,24,25
162:4,7,9,23,25
163:3,5 182:3
202:16,20,22
205:1 215:22,25
**Exhibits** 209:4
**exist** 86:5 165:15
165:16 200:22
**existence** 63:14,20
69:18
**existing** 126:17,22
138:19,23 139:10
140:17 165:20
196:3 213:9,11
**expanding** 107:1
**expansion** 28:12
29:7,10 30:6
46:21
**expect** 10:17
132:17 150:22
**expectation** 80:22
80:23 129:9 151:5
167:1
**expectations**
119:21

**expected** 104:5,9
116:14 117:16
161:16 167:3
184:15
**expects** 111:21
**expediency** 47:8
**expense** 105:23
**experience** 47:9
**expert** 11:13
**expertise** 153:24
209:1
**explain** 166:13
**explore** 23:1
**exposure** 94:14
95:13,15
**extend** 176:6
**extent** 8:21 51:14
58:16,20 67:18
77:15 94:1 167:7
193:17 215:1
**extra** 48:23 100:18
**extracted** 205:16
**extraction** 205:7
**extractor** 185:20
**E-mail** 8:4 9:13
123:20 124:20,25
125:4 126:25
127:1,13 131:14
131:16 133:22
134:1 161:25
162:23
**E-mailed** 44:24
**E-mails** 162:21
163:1

**F**
**face** 120:16,17
159:25
**facilitate** 27:6
**facilities** 54:11
201:12
**facility** 56:24
**fact** 21:21,23 28:9
36:1 44:1,6 54:4
54:14 55:14 56:10
57:19 59:5 60:22

67:24 70:11 81:1
81:21 89:15 94:5
95:23 106:18
107:9 114:14
118:25 141:1
151:12 166:15
167:19 169:6
171:14 189:14
190:9,21 195:3
209:3 210:22
**factor** 176:4
**facts** 56:8
**failure** 138:16
**fair** 11:3,19 15:8,14
22:9 31:23 32:12
33:15 48:18 66:3
81:6 153:25
155:21 174:10
179:22
**FAIRBANKS** 1:24
5:22 218:2,24
**fairer** 23:2
**fairly** 199:17
**fairness** 11:17
82:23
**fall** 151:19 168:1
168:13
**falls** 89:22
**familiar** 27:1 36:16
78:22 83:21 85:19
85:22 157:21
**far** 50:13 93:17
105:16 106:14
107:8,9 121:1
174:11 176:5,9
177:23 203:14
211:10
**fashion** 109:20
211:16
**fault** 106:6
**fax** 162:3,25 176:12
**faxed** 44:23
**feature** 99:25 100:8
117:22 158:9
**features** 111:6
115:21 148:24

**February** 72:10
**federal** 5:6 106:1
**feet** 53:1,4 59:6,11
59:12,17,19 60:2
60:8,11,16,19,25
61:3,5 72:13 73:1
73:1,12,20 74:1,7
74:11,13,15 76:1
76:25 77:9 78:2
79:9 80:25 81:1,7
82:16 83:18,19
93:15,16,17
124:12 126:11
132:13 137:25
138:10,12 140:5,5
140:12,16,21
141:2 152:3,6,9
152:14,15 154:20
155:4 156:19
159:18,25 160:10
160:10,11,21,25
161:4 171:23
178:1,3,4,8,10,12
178:13 193:12
195:22 199:6
201:9,9 212:4
213:18
**felt** 17:18 108:4
144:12 170:7
210:23
**fence** 120:18 139:6
139:7
**fencing** 102:25
**field** 11:13 97:9
111:22
**fifteen** 49:12
126:10
**fifth** 133:15 208:24
**figure** 132:7
**figured** 78:4
**file** 16:10,18 122:12
123:15 149:24
**files** 16:13 87:18
122:15 149:24
**fill** 153:21 171:14
174:13 186:19
190:23 191:2

GUILLORY, LEE

192:3,11 193:15
193:21 194:8
206:19
**filled** 88:11 105:11
171:9 192:17
**filling** 193:16,18
**final** 52:3 112:16
116:22 129:24
139:21 140:8
148:9,13 149:24
181:16,23,24
182:10 183:23
188:20 202:10,11
202:12,13,14,15
202:18 206:24
207:1,5,9
**finally** 25:20
140:14 149:2
203:2 204:24
**financial** 17:17
38:18,22,25 44:6
45:16
**find** 9:22 39:25
101:4 103:15,22
104:16 132:5
135:5,7 148:3
184:13 199:10
**fine** 14:5 24:6,7
34:7 64:7 90:9
107:12
**finish** 18:23 128:11
133:2 137:10
190:5
**finished** 139:17
**firms** 215:15
**first** 10:7,14,15,17
19:7,9 20:10,21
30:1,2 32:3,5,13
33:7 42:17,20,21
63:13 76:18 80:11
80:19 84:19 87:12
87:15 88:10 89:18
95:18 98:1,13
102:22 124:20
140:2 163:6 185:4
188:3 192:23

197:3 200:17
212:3 218:5
**fiscal** 102:1
**fit** 62:20 63:25
211:17
**five** 36:19 73:1,11
73:19 76:1,25
113:24 132:13
138:10 208:17
**five-foot** 76:7
**five-state** 47:6
**flange** 143:9
**flood** 120:7,17,23
121:2,7 125:25
137:19 140:10
141:9 154:21,23
155:4 156:20
158:15 159:10,13
161:4,18 168:4,11
169:24 170:2
175:21 176:5,8
178:21 196:10
198:8 209:8 210:2
211:1 213:11
**floodwall** 83:9,13
83:17 120:7
121:16 139:23
140:17,22 159:13
159:19,25 160:5
160:11 165:21
166:5 167:3
171:24 175:14,22
175:25 176:10,18
177:21,24 209:22
211:9 212:5 213:9
213:10
**floodwalls** 7:19
**Florida** 32:20
**flow** 40:24
**folks** 25:10 53:16
68:7,12,20,21
69:2,4 72:4 95:15
130:22 137:16
151:20 154:2
**follow** 212:13
**followed** 135:3

212:1
**following** 165:6
183:8 205:6
**follows** 10:8 58:2,4
105:7,22
**foot** 81:25 82:2
93:16
**footprint** 211:13
**footprints** 211:18
**foregoing** 217:4
**forever** 179:6
**forgive** 131:20
141:17
**forgot** 193:7
207:17
**form** 5:12 38:15
57:16 70:18 87:16
87:16,17 88:9,10
88:12,13,14 105:7
105:9,11 107:8
112:18 155:6,8,10
157:14 180:2,16
202:7 207:18
**formalities** 5:8
**formed** 78:8
**former** 163:12
200:25 201:3,5
**formerly** 51:13
**forms** 87:12 181:5
209:6
**forth** 121:25
130:24 168:8
189:9 202:9 218:7
**forward** 149:2
157:17
**forwarded** 8:4
**found** 63:6
**foundation** 198:5
201:5 202:18
203:23 205:24
207:1,8 210:4
**foundations** 200:22
201:4,6,25 207:6
211:8,12,17
**founded** 201:8
**four** 16:6 208:16

**fourth** 133:14
208:22,23,24
**frame** 34:25 51:18
128:19 143:17
**Franklin** 2:16
**frankly** 90:18
128:9 210:18
**freely** 139:18
**Friday** 34:1 131:21
157:24
**front** 22:8 148:16
167:10
**full-time** 19:8
**fund** 37:24
**funded** 36:2,5,7,8
37:8 38:9 39:5
40:2
**funding** 36:8 38:11
38:13,17 39:19
43:2 44:12,14,18
44:22 45:1 46:3,7
101:23 108:22
109:18
**funds** 27:13 29:2
35:14,16 36:11
37:10,23 38:2,3,7
39:3 40:12 41:16
41:19,21,23,24
43:23 45:7,13
101:24
**furnish** 201:19
**furnished** 91:17
**further** 13:15 23:1
97:7 203:18
215:18 218:13
**future** 33:4,10
34:12,17 94:24
99:13 146:25
165:3 211:13
**FY** 101:24

───────

**G**

**GARDNER** 3:14
**Gary** 53:12 208:4
**Gately** 136:1,2,13
**gather** 19:6 44:1

117:14 118:11
119:24 136:25
150:16
**general** 27:2,4 31:8
52:13 62:23 86:20
106:14 117:6,21
117:22 119:17,18
119:20 136:5,19
136:21,23 144:23
183:17,18 186:21
188:13 204:7
**generally** 41:20
51:7,10,24 98:17
144:15 198:1
208:14,14,16,19
**generated** 69:16,23
70:5
**gentleman** 6:23 9:8
**geochemical** 151:3
**Geodetic** 140:4
**geographic** 26:20
37:13
**geologist** 53:14
131:10 167:15
**geologists** 151:25
**George** 53:14
131:9 134:21
167:14 188:16
208:7
**geostatistical** 151:3
**geotech** 134:14
**geotechnical** 84:2
84:14,15,20 85:2
85:9 131:6,13,17
134:17,20 135:6,9
135:13,19,25
136:14,15,18
137:1,3,16 138:14
150:8,14,15,18,21
151:1,10,15 154:2
158:1,2 159:2,5
164:16 165:9,13
173:13,24 174:9
188:8 196:8
198:10 207:3
**Gerald** 163:10,11

GUILLORY, LEE

gesturing 190:19
212:19
getting 180:3
give 33:18 44:11
45:13 64:24 70:4
91:21 100:17
101:21 141:20
146:7 156:10
172:8 202:3
205:21
given 1:13 10:13
217:4,7
gives 12:19 45:19
50:9 107:16
giving 19:8
Glad 40:25
go 16:11,24 17:21
18:18 23:3 35:8
39:25 42:12 44:10
45:16 50:19 51:22
52:12 53:1 60:10
71:17 75:13 93:3
93:12,14 96:5,25
97:14,19 98:5
100:21 105:2
108:13 111:22
124:5 132:5,17,24
133:2 141:16
143:23 149:1,2,3
152:2,3 153:21
157:17,19 160:17
164:10,12 175:24
176:9 182:20,21
183:6 188:25
193:10 194:10,25
202:9 203:17
210:21
goal 159:21
goals 84:16
goes 57:8 101:19
117:8 163:21
164:14,16 175:4
177:12,22 178:7,8
185:10 187:21
213:18
going 6:9 11:17

12:6 14:22 22:3
22:22,23 28:12
31:7 35:12 44:10
44:17 54:17 56:10
57:14 61:11,20
79:8,9 80:6,24
89:4,9 90:11
93:25 94:17,18,19
94:20,24 95:20
97:25 100:15,17
104:13 110:18
117:8,10,11 120:2
130:14 132:11,12
135:4 142:12
143:22 146:24
161:22,23 167:1
169:24 170:1,7
171:18 176:22,25
178:12 179:6
181:11 182:20,21
184:8 186:5 189:9
189:19 202:15,15
205:1 214:23
GOLDBERG 3:11
good 10:10 15:14
25:10 29:25 48:20
62:3 66:7 71:20
113:24 142:8
146:9 153:7
214:24
gosh 84:24
gotten 73:10
129:10
government 10:21
13:1 28:4 65:22
88:14 91:2,17
103:17 105:23
107:25 111:19,21
112:5,9 126:24
145:11,20,21
146:5,12 148:10
161:21 183:12
189:22 195:11
207:12
grab 132:25
grade 139:10

183:21 205:9
Graduated 18:24
great 9:25 16:24
38:20 132:24
greater 176:4
203:10
green 50:10,14
Gregory 25:17
Grieshaber 133:14
142:5 144:3
154:13 157:24
212:23
ground 59:22
60:18 72:13
123:13 152:4,14
187:14 193:10
197:25
groundwater 95:9
95:13
group 12:22 13:1
25:7,15 28:1,5
40:19 68:15 74:18
74:19 75:14 76:6
76:17 79:1,19
80:23 85:3 92:9
98:20 103:21
108:19 112:3
116:13 119:8
121:17,21 122:1
122:23,25 127:14
127:16 128:3
130:9,10 142:21
143:16,20 145:5,8
145:14,23 148:24
150:22 151:6,23
151:24 158:20
159:23 161:9
164:23 166:24
169:7,23 180:8,10
180:25 181:20
185:22 192:20
195:12 200:12
208:10 214:6
grove 126:18
GS 20:13,14,16
GS-7 19:12

gthe 6:4
guarantees 37:3
guess 8:8 22:3 33:6
43:22 82:22 83:10
97:14 115:23
131:14 133:24
134:8 143:23
147:7,18 172:22
208:8
guided 75:10
guideline 156:9
159:22 175:18
guidelines 49:1
52:13 96:7 111:15
111:17 118:9
150:15 155:2
Guillory 1:13 7:3
7:16,22 8:1 10:4
10:10 16:18 21:22
40:15 67:14 114:3
120:6 130:3
143:23 144:3,18
162:2,3 191:24
208:4 209:7 214:3
217:3,11
guy 9:4 63:19
136:14
guys 6:2 38:20
39:11 46:23 55:1
56:23 59:23 61:8
66:19 74:10 87:12
113:6 157:22
179:17 203:15

_____
**H**
H 4:6 197:21
half 18:7 200:4
Hamps 142:23
167:20 168:9
186:14 189:20
202:19
hand 110:11
139:10 182:10
handled 76:4
happen 18:19
44:25 104:13

117:8 158:7
happening 158:8
happens 104:14
172:25 178:18
happy 116:5
184:19 198:15
Harbor 72:5 75:18
78:16 89:18
harmful 94:19
hauled 191:6
hazard 83:10 86:11
hazardous 21:13
64:10,21
hazards 85:23 86:2
86:5,8,16 90:22
head 94:11 155:24
163:18 164:9,16
165:11
headquarters
35:17
health 86:2,24
111:11 114:15
hear 10:21 11:9
123:17 136:8
153:2
heard 153:16 214:4
hearing 47:22
heavy 159:24
help 41:17 46:18
56:18 176:20,21
193:13
hereinabove 218:7
hereto 5:3 143:25
144:6 162:8,10
202:21,23 216:1
218:15
hey 146:6
he'll 9:3
hierarchy 164:7
high 7:8
higher 96:1 138:10
hire 143:1 144:9,19
151:4 161:9,16
hired 74:20 167:4
211:22
history 90:10

GUILLORY, LEE

210:19
**hoes** 58:24
**holding** 16:22 18:7
**holdup** 104:16
**hole** 138:8,16
151:19,20 152:6,9
152:15,20,22
153:21 155:3
156:19 158:18
160:10,20,24
161:17 166:2,15
166:16 168:4,11
168:13,15,16,16
169:2,9,18 171:10
171:17 177:18
179:10 189:15
190:2,7,15,18,20
190:22 191:2
192:7,12,22
193:16,17 196:17
196:20 197:22
198:14 199:14,16
199:23 204:13
210:1,24 212:4
**holes** 78:1 82:15,25
151:16 158:14
160:9 161:3
179:20 206:19
210:24 215:5
**home** 150:24 215:9
**hoping** 10:2
**horizontal** 137:11
138:1 177:15
**horizontally** 58:20
**hour** 148:21
**hours** 16:4
**house** 45:10 210:6
**HTRW** 21:11
24:19 25:24 48:12
49:9 51:25 53:25
54:4 62:10,21
65:5,11,16 66:4,8
66:25 67:3,7,16
67:25 68:4,8
70:11 154:6
167:13

**huff** 33:23
**huffing** 34:8
**huge** 199:9
**humans** 94:14,20
**hundred** 93:15
126:10
**hurricane** 111:14
120:8,11,14
**Huval** 143:5
154:10
**hydraulic** 33:4
56:16,24 57:12,15
58:24 185:16
186:15
**hydraulically**
58:23
**H-U-V-A-L** 143:5

**I**
**ID** 81:16,18
**idea** 11:5 190:20
209:14
**identification** 45:3
143:25 144:6
162:8,10 202:21
202:23 216:1
**identified** 39:4,7
44:2 69:4 76:2,3
81:12,13 105:10
108:21 109:11
111:5 208:2
**identifies** 86:4
**identify** 6:21 8:5
39:2 45:20 59:16
72:11 74:4,5
87:11 110:13
**ignore** 104:19
**IHNC** 17:8 31:18
31:20 32:4 33:2
33:20 34:23 35:13
39:20 72:12 77:9
126:17 137:22
159:6 165:3 202:2
**III** 3:2
**illnesses** 87:4
**imagine** 25:9 57:15

**immediate** 121:15
**immediately**
189:23 205:6
**impact** 7:7,8 55:18
175:5 196:9 198:7
**impacting** 160:4
**implement** 32:6,14
34:23 35:9 43:3
64:2
**important** 108:1,5
155:9 194:19,22
**imported** 205:8
**impossible** 23:15
**inaccurate** 117:17
117:18 125:10
**inappropriate**
125:10
**inches** 179:19
**include** 99:15
117:19 120:14
139:3 203:12
**included** 33:3 46:2
70:9 90:5 120:23
150:2 208:18
**includes** 86:9 203:9
**including** 143:8
149:24 167:14
**incorporated**
105:20 181:22
**increase** 97:8
**increasing** 92:2
**Index** 86:15
**Indian** 81:2
**indicate** 150:1
190:1 204:12
**indicated** 123:21
183:15
**Indicating** 82:6
109:24 112:18
**indication** 185:2
205:18
**indigenous** 92:19
94:3 191:4 192:21
**individual** 22:13
24:15 36:5 37:6
42:13,15 46:1

47:1 49:11 145:3
151:14 185:13
**industrial** 26:25
31:5 32:20 33:1
34:13 49:15 51:12
51:12 54:11 57:11
72:12,16 75:17
78:15 95:3,20,23
95:25 96:8 125:24
151:14 164:21
202:2
**industrial/marine**
200:25
**inform** 103:16
**information** 44:17
44:18 45:19 46:10
76:20 77:23 90:13
91:6,19 119:23
129:18 201:17
209:11
**informed** 122:8
**initial** 102:23
206:10
**initially** 69:10
**initiated** 203:9
**injuries** 87:3,4
**injury** 87:7,9
**Inner** 72:4 75:17
78:16 89:18
**input** 68:21 98:23
134:14 135:19,25
**inquiries** 129:23
**inquiring** 127:18
**inside** 149:11
168:16 171:12
206:11
**insofar** 43:17
**inspection** 130:21
189:23 212:1
**installation** 202:17
203:12 206:25
207:8
**installed** 120:18
186:18 212:1
**instances** 141:4
158:25

**instruct** 12:3 13:13
**instructs** 10:24
**integrity** 168:14
178:21
**intend** 22:17
**intended** 54:5,15
121:15 125:5
157:1 179:6
**intending** 33:17
**intense** 211:24
**intensive** 189:18
**intent** 27:12 32:23
55:3 104:18
**intention** 9:17
**intentionally** 141:9
**interacted** 40:12
84:23 85:4
**interest** 65:22
**interested** 218:15
**interesting** 30:22
**internally** 154:6
**International**
12:23 13:1 80:24
81:1 85:3 103:21
112:3 122:24
150:23 151:6
161:9 164:23
169:7 200:13
**interpretation**
172:20
**interruption**
191:22
**intersects** 125:23
**intimately** 63:21
**intracoastal** 31:6
125:23 126:14
127:7
**introduced** 85:7,8
**inventory** 18:6
**investigate** 120:1
**investigation** 92:10
92:18 96:20 97:9
124:8 125:13,17
126:5 127:24
128:4,21 214:11
**investigations**

GUILLORY, LEE

52:14 62:15 63:2
**involve** 46:19
**involved** 26:22
42:24 63:21
**involvement** 70:2
**issue** 52:24 83:1,2
100:10 135:9,13
146:16,20 151:18
175:13 179:3
189:10 194:22,23
209:20
**issued** 28:4 88:1,18
98:19 108:16
**issues** 51:24 73:22
119:21 131:13
134:18,21,25
135:6 139:4
151:10 167:5
**item** 7:15,22,25
39:5 81:13 107:3
145:3 150:5
**items** 7:3,10 8:5
17:19 34:16
135:21 137:6
146:13 165:6
200:24
**iterations** 188:20
189:1
**I-DEP** 3:9

**J**

**J** 3:14
**James** 164:3 188:6
**January** 19:5,18
20:22 21:7 80:1,3
82:14
**Jean** 53:13 133:19
136:1,2,3,7,17
150:13
**Jim** 136:1 162:3
181:3 207:14
**Joanen** 2:5 8:5
149:18
**job** 94:10 102:23
103:6 150:7
214:24

**Joe** 21:19 49:19
50:3 53:12 186:2
**JOHN** 3:2
**joined** 69:11
**joint** 13:17 14:9
15:21 54:1
**jointly** 78:25
146:12
**Jones** 25:17
**Joseph** 1:24 2:4
5:22 10:11 25:19
31:14 32:16 40:13
49:13 218:2,24
**Jourdan** 165:20
166:5 171:23
175:21 213:11
**Jr** 1:24 3:14 5:22
32:16 218:2,24
**judge** 1:6 15:22
24:16
**Julie** 173:14
**July** 123:21 124:1
125:1 180:17
**June** 1:16 21:10,14
123:21 125:1
128:14,19 217:25
**junior** 20:23
**JUSTICE** 2:11

**K**

**KATRINA** 1:4
**keep** 122:7 128:8
130:13 184:8
**kept** 184:6
**kill** 57:8
**killing** 162:14
**kilograms** 93:9
**kind** 6:21 13:23
56:11,19 63:8
115:16 117:12
122:10 129:24
130:20 139:14
174:8 187:17,19
204:12
**kinds** 191:2
**KITTO** 3:12

**knew** 29:19 52:13
52:18 53:3 77:7
77:18 100:1 120:5
129:14 142:10
**know** 10:19 13:3,4
13:5 16:12 18:3
18:10 22:13,22
27:14 28:18,22
29:6 30:19 32:2,7
32:13 34:20,25
35:4 36:10 37:18
39:19,24 40:25
42:2 43:18 44:25
45:15 46:22 47:11
50:11,11,13 56:7
60:14 62:22 63:15
66:1,2,2,5,24 67:2
69:10,19,20 70:7
71:18,25 72:1
73:11,17 76:14
77:16,19 78:12
82:5,10,13,21
83:24 85:5 86:13
88:7,25 89:25
91:4 94:8,9 98:2
104:25 120:22
121:6 123:12,16
123:19,24 124:15
124:17 133:23
134:13 137:16
138:6,14 139:5,12
139:20 140:17,20
140:23 152:11
153:25 155:12
156:16 160:7,20
160:24 162:12
165:15 166:7
172:16 177:6
178:17,22 180:15
184:14 187:3
188:19 189:12,17
190:8,10,14,17,19
194:15 195:14
200:6,7 209:7
212:13,20 213:6,8
213:18 214:17,22

214:24 215:3,12
215:12
**knowledge** 35:13
129:2 209:19
214:19
**knowledgeable**
159:12
**known** 54:9 65:8
77:13 78:3
**Knudsen** 75:20
88:4,22
**K2** 1:5

**L**

**L** 3:2 5:1
**lab** 98:13
**labeled** 91:25 97:17
177:3
**labor** 114:22
201:19
**laboratory** 201:22
**ladies** 66:19
**Lafarge** 6:7
**Lafayette** 19:1,25
20:3 21:1
**land** 90:22 94:3
164:20 213:13
**landfills** 59:4
**lane** 61:23
**language** 106:12
173:24
**lapse** 28:24
**large** 60:10 193:8
193:17 199:3,4
203:3
**larger** 26:8,9
**laterally** 58:20
**laundry** 90:16
**law** 5:7
**laws** 106:1
**lawyer** 11:5
**lawyers** 124:24
**layers** 170:23 185:6
187:15 192:23
197:25
**Leake** 1:15 2:23

10:5
**learn** 18:16 52:21
130:4 148:25
**leave** 133:1 197:22
209:24
**Lee** 1:12 10:4 162:1
162:3 208:4 217:3
217:11
**left** 196:17,21
200:24
**legal** 120:1 123:12
**Lesser** 25:21
**letter** 88:4 101:8
122:14 123:3
130:19 131:13,14
131:15 147:12
182:2
**letters** 129:22
**let's** 8:24 20:9
24:18,20 25:8
30:2 40:23 41:3
49:16 51:24 56:8
75:13 81:24 96:25
97:14,18 100:15
108:13 119:18
125:18 132:24
133:1 141:16,23
143:13 144:2
146:25 147:6,15
149:10 152:1
153:8 157:17,19
160:17 163:7,9
182:17 185:23
198:17
**levee** 103:22,24
104:6,8,21 121:9
121:12,18,23
122:1,2,5,11
123:4 124:11
125:7 126:12,13
126:14 127:3
128:23 129:11,11
130:6,12,12
139:23 165:21
166:5,11 168:23
169:1,4,9 171:24

GUILLORY, LEE

175:25 176:18,18
177:9,20 211:9
**level** 7:9 19:11 77:9
92:20 93:2,7,8,16
175:17
**levels** 95:24
**liaison** 10:12
**licensed** 19:16
84:21 143:2
154:11 158:23
166:19 167:3
169:12 187:12
**licenses** 103:2
105:25 201:21
**life** 187:18
**lift** 82:18 83:3,9
99:15,19 100:6
113:21 132:14
135:10 142:9,12
143:4 150:3 152:3
154:4 158:4
160:22 166:17,18
167:19 169:1
170:21 178:23
180:14,19 181:18
182:18 183:25
184:5 186:10
188:14 192:14,16
193:6,17 194:2
199:23,25
**lifts** 173:20 179:19
185:12,15 192:24
204:3 206:9
**light** 50:10,14
**Likewise** 200:15
**limitation** 47:12
192:6
**limitations** 48:3
49:3
**limited** 71:2 87:21
**limiting** 118:17,21
**limits** 206:2
**line** 9:7 23:11 83:8
83:12,17 124:6
137:22 153:23
159:19 161:4

165:23 172:2
175:21,23 176:3,6
176:13,16,18,19
176:24 177:2,3,8
177:9,9,12,20,23
212:5
**linear** 126:11
**lined** 59:1 172:22
172:24 173:6
**lines** 172:15 173:17
**list** 18:5,10 90:16
99:23 106:22
134:25 135:21
**listed** 79:15 86:3
90:25 92:17 115:1
**listen** 6:2 34:1
118:18
**listing** 184:1
**lists** 87:2
**LITIGATION** 1:5
**little** 8:8 10:16
18:17 34:8 39:11
90:23 133:2 193:5
193:14
**local** 145:20 212:7
**located** 34:17 83:4
211:12
**location** 26:21 31:1
81:19 159:12
170:4 178:5
195:16 211:7
**locations** 79:14
81:22
**lock** 28:12 29:7,10
30:6 31:7,18,20
32:4 33:2,20
34:23 35:14 39:20
46:21 50:11 63:17
63:25 71:5 72:5
72:18 78:16
126:17,22 165:3
213:3
**logically** 94:12
**long** 20:10 29:15
86:18 90:16 201:9
210:20,21

**look** 16:14 38:14
49:2 71:17 75:18
79:13 97:25
132:23 133:15
135:5,7 146:6
**looked** 65:13
188:22,23 205:20
**looking** 98:1
109:25 184:5
186:8
**looks** 167:11
177:25 178:10
181:1,16 186:8
208:13
**lot** 47:14 118:15
121:24 141:2
148:18 195:3
210:19 214:10
**Louisiana** 1:2,15
2:7,24 5:24 10:6
18:25 19:1,17,25
55:12 65:14 92:14
92:23 143:2
154:11 158:24
165:1 166:21
208:17 214:7
218:4
**low** 92:16
**lower** 30:7 32:25
94:21 120:9 176:9
178:12,18 209:9
**lowest** 183:13
**Lunch** 114:1

---

# M

**M** 2:4 4:1
**Mabry** 208:8
**machine** 55:25
56:12
**magistrate** 15:11
**main** 48:18,19
**maintain** 16:19
**major** 80:7 116:15
**majority** 61:2
197:19
**making** 11:1

151:18 210:6
**management** 38:18
38:23 40:4 41:22
44:7 45:17 71:7
85:20 86:15
114:18 151:24
214:6
**manager** 21:12,16
24:19 25:24 31:14
32:15 40:13 42:18
46:25 68:23
127:17 163:16,17
**managers** 25:17,18
42:10 43:13
**manual** 86:4 155:1
155:12,15,18
156:3,7,9
**manuals** 156:14
**marine** 51:12 54:11
60:9 79:12 81:2,3
81:3 83:5 141:15
158:25 165:19
166:4 169:2 173:2
178:24 180:14
190:11,13 194:12
195:2,13,21
199:22 200:23
201:3 206:21
211:6,11 212:4
**mark** 143:23 144:2
144:3 147:4
161:22,23 182:2
190:18 202:15
**marked** 133:7
143:24 144:5
161:25 162:7,9
202:20,22 215:22
215:25
**marks** 201:2
**married** 136:8
**mass** 201:6
**material** 24:15,15
56:1,10,13 58:12
69:14 73:20
139:14 173:25
174:1,24 183:21

185:12,22 186:13
186:14,16,19
190:24 191:2,5,6
191:9,13 192:2,3
192:11 194:1,20
195:4,10,14,22
199:11 201:12
203:24 204:2,13
204:19 206:13,18
206:21
**materials** 26:20
70:9 72:11 74:6
91:4 106:8 151:24
195:23 201:19
202:1 214:6
**matter** 58:5 60:22
93:21 134:4 190:9
**maximum** 77:8
**Mayer** 81:2 83:6
**McDonogh** 173:18
195:2
**McDonough** 81:3
141:14 158:25
165:19 166:3
173:2 194:12
195:13 206:21
210:24 211:10
**mean** 8:16 12:16,18
12:19 24:20 27:18
32:5 41:18 45:11
46:20 50:17 56:20
57:2 69:17 77:9
79:23 93:7 94:12
98:25 111:9 140:6
140:7,24 171:1
173:23 174:16
178:2 181:11
182:9 188:23
192:10 195:3,4,9
196:18,18 197:6,7
206:4
**meaning** 41:2
49:23 102:1
**means** 14:23 27:23
140:3,9,20 188:22
192:6

GUILLORY, LEE

**meant** 102:12
105:21 108:24
**measured** 140:16
**meat** 124:16
**MEAUX** 3:17
**meet** 12:10 13:8
**meeting** 115:22,23
115:24 116:7,11
116:24 119:6
131:11 132:8
133:20 134:7,8,9
134:10,23,23
**meetings** 13:15
116:9 129:20
180:23
**member** 50:24 51:3
53:8
**members** 53:15
68:16 98:24
**memo** 9:11 163:24
168:22
**memorandum**
62:24 162:24
**memory** 72:19
**mentioned** 8:21
135:15
**merely** 122:6
**merit** 145:15
**mess** 33:7
**Messrs** 215:19,19
**met** 10:11 11:21
12:8,12,21 109:16
119:20
**method** 56:19 57:3
**middle** 175:10
**Miles** 164:3
**million** 93:9,14
108:17,18,24
109:2,9
**million-dollar**
26:12
**mind** 18:9,17 91:16
91:22 100:7 132:3
133:15 142:2
162:6
**minds** 74:3

**mine** 164:1
**minimize** 86:8
**minimum** 37:3
139:24
**minor** 92:16
**minutes** 113:25
134:23
**miscellaneous**
149:8
**missing** 14:19
105:5 147:11
**misspoke** 102:4
109:4
**misstate** 73:4
**Misstates** 76:10
**mitigate** 86:8
**MMG** 214:5
**mobilization**
149:11 203:8,9
**mobilize** 102:23
**mobilized** 80:1
**mobilizing** 80:3
**mod** 96:11,13,15
96:18 97:1,2 98:7
100:16,17,17,21
100:24,25 102:15
108:13 109:20
149:1
**modification** 46:2
91:25 96:14
101:15 108:3,15
198:19,21,24
**modifications**
38:10 102:9
**modify** 97:7
**modifying** 92:4
**mods** 100:3 128:14
200:19
**moment** 22:13
147:1 152:1 162:5
199:22
**moments** 155:23
162:22 187:4
**money** 34:22 35:5,9
36:2,21,21,25
37:5,17 42:5,17

42:20,21,23 43:20
43:22 44:5 46:15
46:16,22 50:22
89:3 101:21 102:2
117:15 118:20
**monitoring** 111:12
115:15
**Montegut** 162:3
181:3 188:7 189:3
207:14
**monthly** 130:2
**months** 143:14
**Moore** 52:15 63:4
74:17 75:11 76:15
79:16 81:14
**morning** 10:10
45:24 147:5
**Morrison** 75:20
88:3,22
**Morrison-Knuds...**
86:23 87:8
**mounds** 79:12 81:7
**movement** 152:20
153:3 187:15,17
**moving** 159:24
**MRGO** 1:7 28:21
124:11
**MSL** 203:4,11,13
**muck** 171:5
**multiple** 130:19
**municipal** 106:1
**M-K** 37:4 86:22
88:15

_____
**N**
_____
**N** 4:1,1,1,6 5:1
32:20
**nail** 168:20
**name** 10:11 30:16
40:24 88:19 136:8
**named** 10:6
**names** 49:24 53:22
**National** 140:4
**natural** 21:16
**nature** 47:19 117:7
148:19

**Navigation** 72:5
75:18 78:16 89:18
**navigational** 56:21
**NCS-7-252** 163:4
**necessary** 9:23
15:10 35:10 46:19
54:4 103:8,11,23
103:24 105:24
127:10,19 152:13
174:18 186:19
190:24 192:4
198:3 210:23
**necessitated** 73:22
**necessity** 121:14
**need** 9:21 10:17
34:15 44:11 50:3
50:17 77:8 78:1
95:19 96:5 99:19
99:21 104:7,8
121:20 123:22
125:6 128:4,22
129:12,25 130:13
158:13 160:8
194:7 195:10
210:9
**needed** 45:19 75:1
107:23 119:24
123:6 127:4 135:1
151:1,4 204:2
**needs** 154:21
**negatively** 94:11
161:13
**negligence** 106:6
**negotiate** 104:15
**negotiated** 109:17
**negotiation** 116:24
**negotiations**
148:12
**neighborhood**
132:19
**neither** 198:10
**Nelson** 52:16 63:4
71:23 72:9 73:25
75:10 76:16 79:17
81:14
**never** 84:6 91:22

123:10
**new** 1:14,15 2:7,24
6:20,22 10:5 17:1
19:23,24 20:22
21:5 25:25 26:4
31:7 32:24 38:1,3
38:5,7 46:24 47:2
48:4 51:13 52:15
53:17 54:1,17
55:7 66:12,14,17
69:22 71:5 72:18
75:5 99:22 115:24
131:7 154:18
164:24,25 165:8
213:3
**NGVD** 140:1,4,5
140:12 203:16
211:16,16
**nice** 39:10 56:7
**NICOLE** 3:6
**nine** 30:7 32:25
62:17,24 63:15
69:14 109:1
176:10 209:9
213:4
**Ninth** 120:9
**nods** 21:3 22:7
46:11 79:6 84:18
89:8 97:5 156:1
164:9 165:11
179:14 206:16
**non** 190:11
**Nope** 100:17
**normal** 174:21
**note** 89:19 104:23
**NPM** 64:25
**NPM-006-1458**
62:13
**nuances** 151:9

GUILLORY, LEE

**number** 7:4,5 18:2
25:18 28:7 30:5
62:12 72:6,8
81:16,18 88:5,24
91:25 96:12,13
100:16,22,25
101:12,13,15
102:5,7,15 108:5
108:8,14,15,20,21
108:22 109:6
112:23 113:11
145:1 147:3,7
149:1,3,5,7,9,10
149:14 150:4,5
156:6 161:24,25
173:19 176:1
181:19 182:3
202:16,19 203:21
205:2 206:24
209:4,4
**numbered** 72:3
113:1,9 172:15
**numbers** 18:5,12
51:15 78:18 81:13
96:23 105:2
110:17 156:4
177:25
**nuts** 117:9

**O**

**O** 4:1 5:1
**oak** 126:17
**oath** 5:25 10:8
**object** 13:13 23:19
23:21 155:6 210:4
**objected** 157:11
**objection** 10:24
11:4,24 12:19
30:11 58:1 73:4
73:15 76:10
156:22 160:14
191:11 210:6
212:16
**objectionable**
157:3,5
**objections** 5:11

10:21,23 11:1
30:22 157:13
**objects** 60:18
**obligated** 85:15
**obligation** 41:23
**obligations** 85:15
**obtained** 84:17
175:11 203:24
**obtaining** 105:24
**obviously** 47:14
78:2 87:7 112:20
134:8 146:20
165:12
**occasion** 210:23
**occasioned** 60:3
**occasions** 121:24
130:19
**occupational** 87:3
**occupied** 199:15
**occupy** 199:24
**occur** 106:5 117:12
159:18
**occurred** 29:17
32:3 128:13,18
130:15
**October** 79:5,22
109:12,16 110:2
110:25 111:24
115:2,19 116:23
116:24 117:3,4
118:3,4 119:1
143:17 146:21,25
147:8,9,10 148:2
148:11,13 181:2
181:17,19
**odd** 59:16
**offend** 34:4
**office** 2:21 17:2,22
19:23,23 20:2,2,4
21:1,6 36:15
37:12,22,24 38:4
40:4,5 41:23
43:24 48:4 53:18
67:15,23 75:5
102:24 137:15
150:24 154:18

157:25 163:13
212:8 215:9
**officer** 37:20 38:12
92:2 145:24 146:1
**officers** 49:6,14
66:21 70:16
**offices** 1:14
**office's** 165:5 188:6
189:7
**official** 66:24
**officiated** 5:24
**off-site** 171:15
203:25
**Oh** 17:11 32:23
88:13 113:20
116:10 149:21
153:5 164:8
165:16 180:5
181:14
**Oil** 81:2,4,5
**okay** 8:18 10:15
11:2,18,18 12:1
12:25 13:5,19
15:16 16:7,10,17
18:16,22 19:3,10
20:21 21:17 22:6
22:14 24:6 25:8
25:22 26:14 27:22
28:6,7,15,23 29:9
29:19 31:10 32:2
32:8,18 33:6,15
34:7,20 35:8,15
36:10,20 37:16
38:24 39:1,9,25
42:17,22 43:1
44:5,9 45:16 46:4
46:8,18 47:11,22
49:8,23 50:8,13
51:3,7 52:8,21
53:7 55:1,9 56:18
57:2 59:15 60:15
60:21 62:9,19
63:23 64:7,7,20
65:10 66:14 67:2
68:2 69:1,12 70:3
70:17 71:20 72:2

74:6,14,19,23,24
75:4,13,23 77:3
77:11,21,25 78:7
78:12 80:21 81:9
82:2,13,20,22
83:2,7,21 84:8
85:7,12 86:17
87:12,16,21,25
88:8,24 89:14,25
90:21 91:8,15
92:4,7 93:11 94:9
95:18 96:4,11,25
97:4,12 98:3,5,15
98:21 99:3 100:4
100:15,21 101:1
101:16,17 102:4
102:20 103:19
104:23 105:9,13
105:16 106:11
107:21 108:8,13
109:13 110:3
111:3,17,20 112:1
113:23 114:21
115:3 116:16
117:1 118:11,18
118:22 119:6
121:6,21 124:14
124:19,25 125:3,8
125:15,16 126:8
126:23,25 127:8
127:11,15,21
128:1,7,13,20
129:14,17 130:3
130:16 131:2
132:7,21 133:18
135:4,17,24
136:10,24 137:21
138:17 139:6
140:6,9,14,20
141:1,11,16
142:15 143:11,19
144:24 146:3,15
146:20,24 147:1
147:16 148:15
150:1,6 151:22
152:2,12 153:25

154:8,12,17
155:21 160:6,17
161:7 162:18,20
163:1,6,9,13
164:2,19 165:10
166:11,22 168:20
169:6 170:10,15
171:17 172:12
175:5 176:5,14
177:5,23 178:2,11
178:17,22 179:17
179:22 180:5
181:14 182:17
183:1,14 184:11
185:4,23 186:8,21
187:2,20,24 188:3
188:8,12 189:2,14
190:14 192:5
194:6,19 195:14
195:18 196:1
197:12,22 198:3
198:17 199:21
200:17 201:18
202:19,24 203:14
204:6,9,21,24
205:4,12,13 206:7
207:16 208:13
209:11,15,24
212:3,12,20
213:24 214:2
215:10,17
**old** 57:8 122:16,16
129:25 130:18,20
**Oliphant** 173:14
**once** 14:22 44:4
63:1 73:14 103:7
118:17 136:8
145:13 179:9
185:17 206:17
**ones** 48:16,18,19
60:14 120:3 148:8
**onus** 55:5
**on-site** 7:16 203:25
205:9 206:21
**on-the-job-site**
129:20

GUILLORY, LEE

**open** 75:25 105:17
105:18
**operation** 185:9,18
190:4
**operations** 21:15
21:15 122:3
130:22 149:8
184:10 186:17
190:25 192:4
200:24 205:7,13
205:17 206:10
**opportunity** 13:7
**opposed** 93:23
117:16 211:10
**optimum** 173:21
175:2,7,10
**option** 206:1,17
**optional** 203:8
**options** 76:5
**oral** 13:24
**order** 8:2 16:13
17:8 22:9 25:18
25:20 26:3,5,8,11
26:15 27:20 31:24
32:10 34:22 35:3
35:6,9,21,24 36:5
37:6,7,24,25 38:2
38:9,10 39:21
40:2,12,19 44:22
46:2,17 50:4
51:23,24 67:12,21
67:22 70:10 71:10
72:20 76:19 84:16
85:9 87:1,20 88:2
88:2,14 89:2 92:1
92:3 93:12 102:5
102:15 103:20
105:20 106:17
108:3 125:7
142:17 150:12
152:14 158:17
200:9
**orders** 76:18 78:10
87:22 102:10
107:6,14
**organization** 86:20

86:22
**original** 5:9 27:16
27:18,18 33:20
38:9 92:5 106:16
106:24 107:5,18
175:24 205:9
**originals** 112:20
**Orleans** 1:14,15
2:7,24 10:5 17:2
19:23,24 20:22
21:6 26:1,4 38:1,3
38:5,7 46:24 47:3
48:4 51:14 52:15
53:18 54:2 55:8
66:12,15,18 69:22
75:5 99:22 103:21
103:24 104:6,7,21
115:24 121:9,12
121:18,23 122:1,2
122:4,11 123:4
125:6 127:3
128:23 130:6,11
131:8 154:18
164:24 165:1,8
**ought** 129:3
**outcome** 129:24
**outside** 23:18 33:24
39:11 121:2
168:16 206:2
213:9
**overall** 28:9 33:2
42:13 45:8 63:1
68:15,22 71:8
109:17 111:7
**owned** 121:7
**owner** 121:9
**O'Connor** 25:19

---

**P**

**P** 3:4 5:1
**packages** 145:9
**page** 4:3,8 30:9
33:16 72:10 75:23
86:21 89:1 99:10
101:9 104:23,25
105:5,7 107:10

133:15 176:17
191:25
**pages** 79:10 184:7
**paid** 10:22 89:4
**paint** 63:7
**pamphlet** 39:11
**pamphlets** 156:13
**paper** 38:15 45:18
66:23 112:10
130:17 143:22
167:12 180:12
181:12 182:14
190:1
**papers** 184:13
**paragraph** 24:2
28:7 84:13 172:16
**paragraphs** 6:22
9:18 24:10
**parameters** 176:1
**paren** 75:25 76:1
105:18,19
**parent** 26:9,9 37:7
67:10
**part** 5:14 16:16,23
56:15 62:17 86:1
89:4 107:5 120:11
129:3 142:25
153:2 176:16
**particular** 26:20
35:2 37:18 39:7
39:21 43:24 45:4
50:3 65:12 68:4
81:19 84:3 86:10
87:11 88:11 93:10
99:25 107:24
108:3 120:4 127:6
127:12 146:8
150:12 151:9
160:10 175:13
178:5,6 180:24
181:5 196:11
198:22
**particularity** 194:9
**parties** 5:3 104:16
211:24 218:14
**parts** 7:4 59:12

93:8,14 111:6
**party** 84:1
**passed** 55:12
**paste** 133:25
**PAVLICK** 3:5
**payments** 40:19
**PDT** 69:7
**peculiarities** 151:8
**people** 25:14 68:15
85:16 123:13
163:19 169:17
207:15 214:19
**PEP** 70:22
**percent** 144:15
173:20,21,21
174:20,22 175:2,2
179:19 199:19
200:2,4
**percentage** 199:14
199:23
**perform** 108:20
183:8
**performance** 85:14
106:2
**performed** 7:17
106:8 117:2
**perimeter** 102:25
111:11 115:15
182:21
**period** 24:23 25:11
29:15 116:20
**permeable** 153:19
**permissible** 94:6
95:24 96:1
**permission** 127:4
**permit** 99:20,21
100:11 103:23
104:7,8,9,12
121:14,22 122:5
122:24 123:5,6,23
124:10 125:6
129:10,12,15,25
130:13,25 154:22
**permits** 98:13
99:11,14 103:2,4
103:8,11,22

105:17,25 107:15
108:6 119:24
121:19 127:5
128:4,17,22
201:21
**permitted** 5:5 59:3
156:19
**permitting** 100:1
103:14 104:19
157:6
**perpendicular**
140:16
**Perry** 208:17
**person** 24:12 31:15
43:2,9 49:11
65:12 150:17
151:7 189:2
208:23
**personal** 214:19
**personnel** 69:23
86:6 87:3,19
92:24 118:16
134:20 150:10
**persons** 49:22 87:8
106:4
**persuade** 70:10
**PERTAINS** 1:7
**pertinent** 17:18
18:11
**phase** 203:8,11
**phone** 70:20 127:2
130:19
**photocopied** 113:4
**photographs** 81:13
201:16
**phrase** 14:8
**phrases** 157:21
**physical** 80:12,18
80:19 114:22
**physically** 38:6
79:23 100:12
**pick** 81:24
**piece** 31:4 38:14
44:16 45:18 66:23
112:10 143:22
152:13 167:12

GUILLORY, LEE

181:12 182:13
189:25
**pieces** 180:12
**pile** 107:7 152:3,13
182:21 185:20
193:2 196:10,11
196:17,18 197:3,6
197:7,8,17,20
198:2,14 201:7
205:7,16,24 209:8
209:8,12,17,21,21
213:15,21
**piles** 197:10,18,20
197:20,21,21
205:25 206:12
**piling** 51:16 82:23
143:9 185:17,18
185:19 192:17
196:19,19,20,23
**pilings** 63:7 77:8
198:5 201:8,10
**pipe** 152:18 197:20
**pit** 7:20 141:5,15
173:18 194:12,16
194:20 195:2
**pitch** 67:7
**place** 34:18 35:12
54:12 58:25
104:21 126:6
143:12 159:24
185:1 194:2
**placed** 44:6 138:11
185:8 204:2
**placement** 72:17
**plaintiffs** 2:2 10:12
147:3 162:4
215:22
**Plaintiff's** 4:9,10
4:11,12,13,14,15
143:24 144:5
162:7,9 202:20,22
215:25
**plan** 42:11 49:12
49:18 50:6 51:4,8
51:21 52:7,23
53:3 68:13,17,17

68:22 70:22,23
71:2,3,6,7,9,15
78:14 79:20 80:5
86:2 99:6 109:14
109:22,23 111:8
111:10,11,12,13
111:13,14 113:16
113:19,20 114:8
114:11,14,15,16
114:17,18,19,23
115:4,11,18 117:4
118:12 119:1,5,9
119:14,17,19,20
125:8 132:22
142:12,22 143:19
143:21 144:20,23
145:8 152:10
154:3 159:2
165:21 167:20
171:7 181:19,23
181:25 182:10,13
182:18 183:24
184:2,6,18 188:10
188:15,20 200:16
202:18 207:1,9
208:25 213:5,8,16
**planning** 116:12
**plans** 7:9 78:25
80:7 98:13 99:5
111:4,15,23 112:1
115:5,11 116:12
116:15 117:6,21
118:8,22 119:4,10
119:11 128:16
146:7 151:13
167:8 170:12
171:2 202:3 213:2
**Plates** 62:14
**playing** 94:21
**please** 11:13 150:1
**plus** 55:17 111:23
115:1
**point** 10:23 33:10
34:12 58:19 60:14
62:4 65:8 77:17
93:20 107:2

142:20 147:20
153:8 169:6 171:8
175:7,10 177:11
177:21
**pointed** 125:16
191:25
**pointing** 107:12
125:19,22
**points** 81:18
**policies** 86:24
**polite** 98:2
**pollutants** 59:21
**pollution** 111:13
114:18
**ponding** 139:19
**poor** 42:1
**port** 51:13 52:15
55:7
**portion** 26:12
29:23 42:24 47:21
61:24 71:10,12,13
108:1 126:11
127:12 145:19
193:2
**portions** 51:2 64:18
**port's** 200:25
**pose** 86:10,11
**posed** 114:6
**position** 19:11
136:3
**possibility** 160:4
**possible** 120:25
153:18,23
**possibly** 22:22 46:1
48:17 96:19
103:14 140:13
175:20 208:22
**posts** 139:7
**Post-its** 186:1
**potential** 64:10,21
86:5 90:22 94:14
95:12,14 128:22
167:2 198:7
213:22
**potentially** 23:21
76:22,24 210:25

**practice** 138:4
**practices** 165:10,14
166:8
**preconstruction**
101:23
**preferred** 47:9
**preliminaries**
148:11
**preliminary** 52:14
52:19 54:7 63:2
63:16 65:18 67:5
72:22 76:16 77:1
79:16 90:14 91:1
126:9
**preparation** 11:21
12:11,13 16:5
72:7 75:16 80:2
**prepare** 16:1 34:14
92:10 144:20
**prepared** 55:18
72:8,9 75:19 77:4
112:2 142:11
143:22 200:11
209:18
**prescribed** 204:9
**Prescribes** 174:17
**prescriptive** 174:14
174:16 183:2,3,16
186:24
**presence** 91:2
**present** 3:1,9 6:8
21:14
**preserve** 11:2
**press** 45:17
**presume** 22:3
**pretty** 25:9 56:7
199:3
**prevent** 87:9
152:19,24 187:15
**preventing** 87:7
168:15
**prevention** 114:19
139:3
**previous** 43:12
54:10 55:17
109:11 128:14

153:11
**previously** 6:18
108:20 185:11
186:12,18 188:11
192:2 206:9 208:1
212:10
**pre-awarded** 47:4
47:10
**pre-placed** 47:4
**price** 117:9
**primary** 214:9
**principles** 165:9,13
166:8
**printed** 44:23 46:7
**prior** 57:12 65:23
67:4 70:1 94:3
146:1 173:22
**privileged** 14:3
**probably** 20:19
22:12 23:6 47:19
49:5 64:12,14
74:16 113:24
137:18 147:12
148:11 188:16,18
193:1
**problem** 23:3 41:7
142:1 213:22
**problems** 131:5
**Procedure** 5:6
**procedures** 85:20
86:15,25 156:17
**proceed** 99:12
103:5 104:17
127:19 146:14
162:18
**proceeding** 65:23
146:2
**process** 42:25 43:3
62:20 85:17
146:11
**processes** 63:24
**Proctor** 173:20
174:20,21 179:19
**procurement**
201:20
**produce** 9:17 13:10

GUILLORY, LEE

14:18,20,25 15:6
15:10
**produced** 65:9
**production** 13:19
14:6,9 15:20
**professional** 19:18
53:14 84:21
131:10 143:2
154:10 158:23
166:20 167:15
169:12 181:21
187:13 211:20,21
215:16
**professionally**
211:20,23
**profiling** 201:23
**program** 25:16
27:5 48:11
**progressive** 109:20
**prohibitive** 61:10
61:19
**project** 7:5 16:9,11
16:15,20,21 17:3
17:8,17 21:3,6
28:12 29:1,2,7,11
29:21,23 30:6
31:14,22,23,25
32:4,6,15,18 33:3
33:9 34:24 35:3
35:14 36:6,7,9
37:9 39:20 40:13
42:10,11,14,18
43:3,12,19,24
45:8 46:25 49:12
49:18 50:5,24
51:2,4,9,20 52:6
52:23 53:2 56:15
63:1,17 64:1,3
65:24 66:17 68:9
68:10,11,13,14,16
68:16,17,19,22,23
69:6,12,17,25
70:2,21,23 71:1,3
71:4,6,9,9,15 72:6
75:19,24 77:15
78:14,17,24 79:20

84:3,14 85:9
87:18 92:22 98:13
98:18 102:24
103:1,15 109:22
109:23 111:4,8,15
111:23 112:1
113:16 114:8,11
114:14,23,23
115:4,11,18
116:12 118:12,21
119:1,5,13 122:15
125:8 128:16
140:11 141:8
142:11 149:23
159:1,22 175:18
181:2 189:6
**projected** 51:18
**projects** 25:22
36:23 42:14,15,16
**promise** 157:15
**pronounced** 136:8
**proof** 38:8,11,14
44:12 46:5,6,9,9
**properly** 168:22
**property** 55:7,15
85:16 86:11 87:5
87:9 94:4 106:5
108:10 161:13,14
**proposal** 67:6
98:20 108:21
109:11 110:2,25
111:25 115:2,5,18
116:17,20 117:3,8
117:15 118:5,13
118:14 119:3
147:6 148:1,9
170:12 202:8
203:1 204:25
206:24
**proposals** 28:5
78:10 116:18
145:13 147:5
**proposed** 34:17
92:18 159:3
165:19 166:3
171:21 173:1

195:12
**proposition** 13:22
**protect** 120:9
**protected** 120:19
125:24 126:11,15
126:20,21
**protection** 120:7,8
120:12,14,23
121:2,7 125:25
152:21 154:21,23
155:4 156:20
158:16 159:10
161:4,18 168:11
169:25 187:18
196:10 198:8
210:2
**provide** 46:5,6
91:18 137:14
165:23 172:1
194:8
**provided** 38:8,11
169:23 183:22
185:22 190:25
191:3 192:5
206:13
**provides** 13:21
**providing** 192:9
**provisions** 86:20
**provoked** 127:1
**proximity** 159:12
170:4 211:8
**PR&C** 40:22 41:21
41:24
**PR&Cs** 40:18
**public** 86:7
**puff** 33:24
**puffing** 34:8
**pull** 16:13 17:23
18:4 82:25 124:6
150:25 196:16,20
197:17 198:2,14
**pulled** 197:18,23
**pump** 152:2
**purchase** 55:15
**purchased** 55:7
**purpose** 26:18,19

28:10 64:23 72:10
74:3,3 91:3 92:12
95:5,19 138:5,14
138:20 139:12
195:13
**purposes** 5:5 41:15
59:25 153:19
194:14
**pursuant** 5:7
198:19
**pursuing** 51:1
**put** 15:15 47:1
49:11,17 54:16,22
55:2 56:1,9,13
69:8,10 95:20
106:12,19,23
124:16 129:6
142:21 170:22
172:16 185:15
189:15 190:1
192:7 194:1 213:8
**putting** 21:20
57:24
**P.O** 2:15

**Q**

**QC** 190:3
**qualifications**
84:17
**qualified** 9:5
**quality** 21:8 55:13
92:24 111:12
114:16 165:2
189:18,19,20,23
190:3 194:17,17
211:25,25
**question** 5:12 6:6
10:25 11:1,11,15
12:11 16:17 22:10
22:12 23:3 24:2
29:25 32:9 33:8
50:21 55:23 58:8
60:6 61:14 66:6
67:24 73:16 97:22
102:17 118:17,18
118:20,21 128:10

141:18,18 142:10
142:15 144:17
147:18,24 156:11
156:23 157:2,10
168:6 188:3
190:16,18 191:18
191:20 212:21
215:18
**questioning** 124:6
**questions** 6:9 13:6
157:13 168:21
196:24 197:14
210:18 215:19
**quick** 133:15 135:5
135:7
**quit** 203:7
**quite** 116:10 199:4
211:10
**quoted** 155:23
**quotes** 105:17,18

**R**

**radioactive** 21:13
**radiological** 64:11
**rarely** 197:24
**rates** 148:20
**Reach** 126:13
**reaches** 185:18
**reaching** 203:4
**read** 8:3 9:11 14:19
14:22 47:13 76:11
105:21 153:5,8,12
162:16 171:6
184:2,17
**reading** 5:8 84:11
84:12 124:17
185:24 186:2
191:24
**reads** 105:21
**real** 115:17 170:15
**really** 58:5 73:1
82:22 91:10
115:12 119:14
148:17,20 149:21
153:10 164:10
183:16 190:14,17

GUILLORY, LEE

194:21
**realtime** 38:25
**reason** 10:18
    127:21 152:16
    167:23
**reasonable** 84:4
**reasons** 211:7
**reassemble** 16:25
**rebar** 201:7,13
**recall** 40:10 53:15
    85:11 98:14 116:7
    122:13 123:2,3,7
    123:9,11 129:19
    131:17 132:18
    134:12 135:24
    158:8 159:15
    171:6,16,17 199:7
    200:1 203:14
**received** 123:20
    127:9
**recess** 62:7 179:23
    213:25
**recollection** 73:18
    209:2
**recommendation**
    70:14 75:15 76:21
    78:7 137:17
    138:15,21 145:17
**recommendations**
    91:7
**recommended**
    92:23 158:20
    172:5 173:22
**record** 6:12 11:2
    12:8 15:15 21:20
    30:4 44:5 73:5
    81:15 93:1 98:4
    125:15,21 128:2
    147:21 149:7
    153:10 157:20
    162:17 176:23
    180:6 183:19
    184:20 193:11
    194:11 205:4
    210:7 215:21
**records** 16:22 18:7

**recover** 100:13
**recycled** 201:13
**recyclers** 201:12
**redesigned** 181:22
**refer** 74:11 86:14
    149:13 156:4
**reference** 71:23
    86:25 106:17,19
    107:16,17 134:6
    135:10 142:6
    162:21
**referenced** 82:16
    107:10 187:2
    215:5
**referred** 63:3 90:15
    147:5,19
**referring** 29:24
    36:12 81:16 93:6
    124:4 131:18
    147:14,25 148:7,9
    192:14 196:12
**refers** 82:5,10
    156:7
**reflect** 78:1 91:18
**reflects** 178:11
**refresh** 72:19
**refreshes** 73:19
**refused** 122:25
**regard** 32:3 61:6
    119:2 121:13
    135:12 148:18
    184:15 203:3
    204:6 209:20
    215:5
**regarded** 180:19
**regarding** 7:20
    91:19
**region** 36:19 47:6
**registered** 154:9
**regular** 25:14
**regulated** 59:3
**regulation** 74:8
    155:13,19 156:8
**regulations** 48:25
    55:11,11 65:13
    72:15 74:11 86:24

92:14,17 94:5
106:2 120:2
121:13 154:18
155:1
**regulatory** 92:15
    95:2 96:6
**reimbursable**
    146:10
**reinforced** 201:7
**reiterate** 108:1
**reiterated** 188:1
**related** 218:14
**relationship** 25:10
**relative** 43:4
**released** 46:15
**relevance** 175:12
**relied** 161:8 169:7
    169:10,11
**rely** 202:11
**remaining** 198:20
**remarks** 181:4
**remedial** 26:23
    78:15 89:24 99:12
    103:6 114:24
    119:14 165:7
    171:21
**remediate** 54:21
**remediated** 67:7
**remediating** 28:10
**remediation** 26:6
    26:16 35:11 37:2
    47:2,14,20,24
    48:7 49:9 55:24
    59:24 60:24 73:2
    75:7,10 79:2
    89:17,19 90:1,3,6
    90:7 91:11 111:2
    164:22,25 195:5
**remember** 40:23
    41:1 48:16 49:23
    51:7 53:10 60:7
    83:4,7 127:1
    133:7 155:25
    158:12 159:16
    187:3 202:10
**remembers** 41:6

**removal** 26:23 60:4
    79:8 82:19,23
    99:15,19,23
    113:21 119:16
    135:10 142:9
    143:3 150:3 154:4
    167:20 181:18
    182:18 183:24
    184:6 188:10,14
    196:9 198:23
    200:16 202:18
    203:23 207:1,8
**remove** 26:19
    32:24 34:15 51:23
    54:6,15 58:11,24
    59:10,21,21,24
    60:13,18 65:22
    77:8 80:24 93:3
    100:12 142:18
    160:21,25 166:17
    179:9 180:13
    186:10 192:15
    199:25 200:13
    202:4 203:12
    205:22,22,24
**removed** 51:17
    54:21 57:11 58:19
    59:6,11,17 73:20
    135:16 139:7,9
    142:13 170:20,22
    179:7 185:14,19
    186:18 187:23
    195:4 199:1,10,12
    201:10 205:16
    206:14 212:2
**removing** 94:13
**rep** 22:24
**repeat** 210:16
**rephrase** 11:15
**replace** 138:22
    139:14 199:11
**replaced** 193:4
**replacement** 31:18
    31:20 32:4,17
    33:2,21 34:23
    35:14 39:20 63:17

64:1 72:5 75:18
78:17 165:4
**report** 44:23 45:22
    55:19 62:12,14,18
    63:14,25 64:4,8
    64:17,18 69:13,21
    70:8 71:22 72:6
    75:15 76:21 77:11
    77:18,22,25 78:8
    91:7 92:11 124:9
**reported** 1:23
    130:11
**reporter** 1:25 5:23
    53:13 131:21
    218:3,25
**REPORTER'S**
    218:1
**reports** 17:16
    52:19 54:7 64:21
    65:18 72:23 74:16
    76:2 79:16 90:14
    190:3 194:18
**repository** 16:16
    16:23,25
**represent** 13:1
**representation**
    123:23
**representative** 22:4
    22:25 188:6 189:8
**representatives**
    28:4
**REPRESENTING**
    2:2,10,20
**request** 13:11 14:8
    28:5 70:17,18
    98:20 134:17
    135:25 137:2,2
    145:13,24 150:7
    158:10,11 159:8
    163:8 172:20
**requested** 49:14
    128:3 131:1
    150:13 159:2
    173:1
**requesting** 134:14
    135:19 150:18

GUILLORY, LEE

**requests** 37:22
  163:20 165:5
**require** 154:19
  155:2 156:17
**required** 8:2 55:15
  83:25 99:5 122:5
  124:10 143:1
  158:22 201:24
  204:1,4,5 205:23
**requirement** 212:7
  212:9,11,24,24
**requirements** 84:9
  100:2 103:15,16
  104:20 121:13
  154:19 172:6,10
  204:22
**requiring** 99:14
**researching** 92:13
**reservation** 126:24
**reserve** 6:10 23:25
  215:18
**reserved** 5:13 6:5
**residential** 95:4,21
  96:2,7
**resolutions** 180:7
**resource** 40:3
  41:22
**respect** 7:18 32:10
  165:20,24 173:3,4
  177:20 199:18
  211:9
**respond** 14:8
**responding** 136:2
  136:17
**response** 22:13
  172:12
**responsibilities**
  86:21 105:18
  107:15 119:25
  128:17
**responsibility** 55:6
**responsible** 105:24
  106:4,7 108:9
  150:17 183:13
**responsiveness**
  5:12

**rest** 98:14
**restate** 210:9
**Restoration** 27:11
  48:10
**result** 106:5 114:12
  178:15 218:16
**resulted** 131:13
**resulting** 203:22
**results** 7:24
**retired** 32:16
**retrieve** 17:21
**reveals** 123:1
**Revegetation** 204:4
**reverse** 185:9
**review** 17:24 76:17
  76:19 89:16 90:12
  90:17,21 91:4,5,9
  99:4 113:11 154:5
  162:5 167:9,21,24
  169:15,16 180:24
  181:22 184:22
  198:7 206:23
  207:4
**reviewed** 16:9 67:8
  69:15 70:13 98:18
  112:4,6 145:11,20
  161:20 167:16
  188:9,14,16
  207:11 208:12
  209:3 211:23
**reviewers** 207:20
  208:4,8
**reviewing** 90:19
  91:20
**reviews** 180:23
**revised** 110:1,25
  111:25 114:16,17
  115:2,5 116:22
  148:9 173:16
  181:18,23,24
  182:18 184:6
  188:4 202:11
  206:24 207:5
**revising** 97:9
**revision** 110:3
  147:7 149:14

  181:19
**revisions** 202:9
**Richard** 2:13 3:5
  6:13 9:10 12:15
  22:10,14,21 25:21
  30:21 73:12
  141:20 153:7
  162:16
**right** 6:6,10,13,17
  8:10 9:7,15,18
  10:17 11:8,20
  12:20 15:25 16:4
  16:17 18:9,22
  19:10 20:5,9 21:2
  22:1 24:17 26:5
  26:21 27:1,4,9,22
  27:24 28:6,8 29:5
  30:5,7,25 31:2,8
  31:17,20,25 32:8
  32:18,21 33:6,10
  33:15 34:20 35:2
  35:15,22 36:1,10
  36:21,25 37:2,10
  38:13,19 39:1,14
  40:21,25 41:8,17
  42:1,4,6,21 43:1,4
  43:10,14,24 44:7
  44:16,17,19,21,25
  45:22 46:8,13
  47:15,24 48:1,20
  48:25 49:16,20
  50:3,13,17,23
  53:7,10,23 54:13
  54:13,18,20,24
  55:20 56:3,15,25
  57:4,6,14,17,21
  57:24 58:10 59:5
  59:7,10,13,15,18
  60:15 61:4 62:1
  62:19 63:13,18,19
  63:20,21 64:11
  65:25 66:8,20
  67:13,25 68:5,7
  68:11 69:7,20,24
  70:1,3,7 71:12,14
  71:15,20 72:25

  73:2 74:4 75:7,8
  75:11,12 76:7,23
  77:9,11,14,21,25
  78:5,10 79:5,23
  80:2,3,9 81:7,11
  81:16,20,25 82:13
  82:22,24 83:2
  84:8,19,23,24
  85:1 86:12 87:25
  88:8,16,24 89:7
  89:14,20,22 90:9
  90:13,19 91:3,13
  92:7 93:1,4 94:15
  94:22 95:16,21,22
  96:2,22 97:12,14
  98:7,21,22 99:7
  99:16,18 100:16
  100:22 101:13,16
  101:18 102:4,18
  103:25 104:5,9,18
  105:6,8 107:9,11
  107:13,14,18
  108:4,6,6,11,13
  109:8,21 110:17
  112:3,6,19 113:23
  114:3,9,19,20,25
  115:3,9 116:4,8
  117:14,20 118:25
  119:9,18,22,23
  120:5,6,10,13,21
  121:11 122:9,17
  122:20 124:11
  125:1,17,18,19
  126:4,13,15,23
  127:24,25 128:20
  128:24,25 129:8,9
  130:10,14 131:2
  131:11 132:13,23
  134:6,9 135:2,17
  135:22,23 136:13
  136:24 137:24
  138:9 139:24
  141:11,16 142:13
  145:12 146:6,15
  146:18 148:21
  149:5,12,16,17

  150:6,19,21 151:2
  151:18,20 152:1,4
  152:24 154:17
  156:10,15,20
  159:14,16 160:6
  160:12,22 161:5
  161:10,11 162:20
  163:1,2,20,21
  164:5,17,19
  165:14,16 166:1
  166:22 167:7,12
  167:18,23 168:1,8
  168:12,18 169:4
  170:13,18,19
  171:8,10,24 172:7
  172:10,13,24
  173:19 174:6,15
  174:19 175:1,5,16
  177:1,3 178:7,14
  179:3,5,8,10,11
  179:13,16,17,19
  179:25 180:11,14
  181:24 182:12,17
  182:23 183:1,10
  183:14,19 184:17
  184:25 186:9,25
  187:20 188:12,24
  189:2,14,25 190:8
  190:23 191:7
  192:1,7,9,19
  193:13,20 194:4
  195:6,9 196:2,6
  196:16,17 198:8
  198:11,12,15,18
  198:19 199:2,5,9
  199:12 200:7,17
  202:8,14 203:1,17
  203:19,20 204:10
  204:11,16,21
  205:2,11 206:23
  208:7,13 209:15
  209:22 210:17
  211:1 212:13,18
  212:23,23 213:5
  214:2 215:10,18
**rigidity** 170:5

GUILLORY, LEE

**river** 31:5
**Road** 7:21 160:1
  171:21 175:16
  179:21
**ROBERT** 3:2
**Robinson** 1:7 6:4
**Roe** 25:17 88:2
**role** 40:15 43:17
**RONALD** 3:12
**room** 10:22 72:4
**round** 197:10,17,18
  197:20
**route** 87:18
**RPR** 1:24 5:22
  218:2,24
**Rubin** 208:8
**rule** 1:10 93:13
**Rules** 5:6
**runoff** 139:19
**résumé** 18:20

**S**

**s** 5:1 48:4 52:16
  63:4 65:22 81:14
  83:12 88:2 123:12
  136:3 140:21
  151:23 165:8
  187:3 211:21
**safe** 159:5 166:10
  166:11 167:11
  169:13,17
**safely** 161:10 172:4
**safety** 72:14 74:8
  86:1,4,22,24
  103:1 111:10
  114:15 115:15
  168:17,17 176:4
  187:18
**sake** 47:8
**salient** 111:6
**Salvage** 201:12
**sampling** 63:3 76:4
  111:9,9 114:17
  115:16 126:18
**sand** 139:9 171:10
  171:15 188:1

191:7,11,15
  195:22 196:1,3,4
  196:5 205:8,11
**sands** 195:24
**Satterlee** 163:11,11
  172:13 179:18
**Saucer** 60:9 79:12
  81:1,7 83:5
  160:21 166:16
  180:14 190:12
  199:22 215:5
**save** 5:8,11
**saw** 123:10 189:12
  209:18
**saying** 23:13,24
  74:5 99:3 117:7
  118:23 183:7
  193:25 208:7
**says** 13:23 15:18
  42:3 44:4 45:12
  45:18 64:20 72:10
  74:2 75:24,24
  82:4 84:9,13
  86:17,21 88:1,19
  89:25 90:10 99:13
  105:1,16 107:5,13
  107:14 108:12
  112:10 133:9
  134:6,13 135:18
  137:5,6,24 138:9
  139:6 140:14
  147:6,10 149:2
  163:10 171:2,5
  173:19 174:12
  181:12 182:19
  183:20 184:5,14
  186:9 190:23
  191:3,8,8,13
  192:1,3 194:7,22
  200:18 202:11
  203:22 204:17
  205:5,6,21 206:7
  206:8 207:19,22
  208:4
**scale** 177:7,8,10
**schedule** 117:11,19

117:23
**scheduling** 118:1
  118:16
**science** 19:2,13
  214:11
**scoop** 55:25
**scooped** 56:9,11
**scooping** 57:23
**scope** 24:1 27:15,17
  27:20,23,25,25
  51:10 72:24 73:24
  76:18 80:8,10,12
  89:14 97:19 107:1
  109:17 111:1
  117:5 142:20
  145:2
**scopes** 28:3 80:16
  146:13
**scoping** 116:11
**Scott** 2:5 8:4
**Scrap** 124:12 126:2
**Scratch** 31:22
**seals** 198:14
**season** 78:20
**second** 46:4 79:10
  162:2 203:8,11
**Secondly** 10:20
**section** 53:17 56:17
  84:9 131:7 158:3
  164:12,17 184:7
  188:8,13,14 196:8
  198:11 207:4
**security** 102:25
**sediments** 72:15
**see** 12:18 17:11
  24:18,20 25:8
  31:10 40:23 47:15
  49:16 69:16 71:17
  71:20 75:21,23
  96:13 97:10
  100:15 101:8
  104:25 105:1,2
  107:4,11 112:19
  116:2 124:16
  125:18 133:18,22
  135:9 143:13

147:6 149:10
  159:5 163:7 164:8
  165:21 166:10
  167:10 169:22
  171:20 172:15
  176:11 181:12
  182:17 184:3
  185:23 186:4
  201:15 206:15
**seeing** 123:3,7,9
  159:17 209:5
**seen** 25:6 62:11
  84:5,6 124:20
  213:2,7,21
**seepage** 213:22
**self-perform**
  144:12
**send** 37:17 46:12
  145:23
**senior** 31:14 32:15
  40:13 42:10,18
  43:12 46:25 68:23
  189:6
**sense** 51:21 68:2
  74:25 165:12
**Sensebe** 25:19
**sent** 16:22 18:7
  70:10,12,24
**separate** 37:8 83:1
  83:2 95:14 110:6
  110:7 141:15
**September** 133:23
  134:5,7,11 143:17
  146:22
**September-Octo...**
  146:23
**sequence** 117:12
  184:10 205:19
**sequential** 156:6
**seriatim** 78:18 97:1
  97:16 110:4 114:9
**series** 156:7 180:22
**serve** 157:12
**served** 201:4
**services** 48:5 88:3
  99:6 102:25 107:7

201:19,22
**set** 16:14 62:24
  63:15 95:8 213:4
  218:7
**setting** 95:25 96:2
**seven** 81:7 82:16
  84:24
**seventy** 54:10
**seventy-six** 17:7,9
  17:10,11
**sewer** 82:18 83:3,9
  99:15,19 132:14
  135:10 142:9,12
  158:4 160:21
  167:19 180:14
  192:14,16 193:6
  194:2 199:25
**Sewerage** 99:22
  100:7,10
**Shakes** 94:11
**shallow** 127:5
  158:18 195:20,23
**sharing** 18:9
**Shavers** 167:20
  189:21
**Shavers-Whittle**
  142:25
**Shaw** 25:6
**sheet** 87:14 143:8
  152:3,13,18
  182:20 185:17,18
  185:19 193:2
  196:9,11,16,18
  197:3,7 198:2
  205:16 206:12
  209:7,8,12,17,20
  209:21 213:15,21
**sheeting** 172:4
  205:22
**sheets** 209:6
**shift** 199:21
**shipped** 17:1
**shoring** 172:4
**shortening** 210:18
**shorthand** 218:9
**show** 62:11 79:10

GUILLORY, LEE

91:23 96:11
100:22 101:3
106:18 116:5
133:6 147:13
148:4 179:25
182:10 184:11
209:16
**showed** 96:18
124:23 187:4
207:16
**showing** 91:16
96:17 130:18
137:15 187:11
**shown** 16:7 177:17
**shows** 79:21 80:21
148:22 194:11
**side** 11:3 120:17,19
125:25 126:11,15
126:20,21,21
136:6,6 140:10
141:6 150:8
153:21 160:1
165:24 170:21
172:21,22 173:3,4
175:21 213:11,13
**sign** 103:1 122:24
122:25 123:14
146:1
**signature** 88:20
123:7
**signed** 42:11 88:19
92:1 131:1 164:3
189:3 217:11,13
217:15
**signing** 5:9 164:6
**signs** 46:14 66:24
**silty** 197:25
**simple** 123:7
**simplistic** 167:13
**simply** 55:22 57:7
90:6 167:9
**sir** 16:21 20:8
31:23 32:2,22
34:21 67:1 70:7
76:13 121:6,11
151:2 152:8

184:19 213:5
**sit** 29:5 119:7
**site** 26:23 35:11
48:8,8,12 53:25
55:6 58:12 59:11
59:12 60:10 61:6
61:20,23,25 62:10
62:11,20,21 63:5
64:8,11 65:5,6,11
65:11,15,16 66:3
66:4,7,8,25 67:3,3
67:6,7,16,24,25
68:4,5,8 70:11
72:7 73:10 75:16
76:22 78:14 79:2
79:21,22 80:13,22
81:16,19,22 86:1
86:5 89:16 90:10
90:19 91:9 92:25
95:3,20 99:7,13
102:23 103:6,15
111:2,9,10 114:15
114:23 115:15
119:13 120:6,13
120:23 121:3
139:2,22 145:21
151:7,8,9 160:21
161:1 164:22
170:9 189:7 191:4
192:11 193:4
194:12,25 195:4
195:15,19 196:2
200:23 201:11,21
204:17,20 206:18
210:24
**sites** 51:13 54:12
59:9 73:6 151:14
**sitting** 131:4
**situation** 130:23
173:13
**six** 51:12 84:24
151:13
**Sketch** 201:16
**sketches** 176:12
**skip** 96:25 97:18
**slab** 200:23

**slabs** 51:16 200:22
**slope** 137:10 138:2
138:16 139:17,21
176:2 177:16
**slopes** 138:1 139:22
151:15
**sloughing** 138:7
**slow** 124:14 193:14
**small** 150:10 154:6
193:2,5
**smash** 171:3
**Smith** 37:18,19,23
46:5 88:1
**Smith's** 44:11
**smooth** 139:17
140:8
**soil** 54:22 55:2
72:15 75:25 80:25
94:18 127:6 137:7
138:17,19,23
139:8,8 152:19,19
152:20 153:3
168:15 170:8,20
170:22,24 171:11
171:21 172:5,6,9
175:4 185:5,7
187:14,22 189:16
192:21 193:4,4
195:1,6,7 205:22
206:2,9
**soils** 54:6,15 76:3
84:22 93:4 94:21
94:23 95:16
119:16 153:19
187:16,18
**sole** 64:23
**solemn** 157:15
**somebody** 40:11
42:8 43:5 68:3
78:4 124:17
212:13
**someplace** 195:7
**Somewhat** 83:23
83:24
**soon** 198:1
**sorry** 7:13 9:10

19:22 20:16 31:22
34:4 35:19 39:6
40:9 49:16 51:4
67:22 68:11 81:4
84:10,12 86:17,18
87:23 88:21 96:5
96:12 101:1
102:12 109:1
116:17 128:12
137:2 139:7 146:4
149:1 153:5 158:2
162:25 163:14
176:22 184:4
196:18 198:5
200:9
**sort** 48:12 120:4
156:14
**sought** 5:15
**sound** 67:15
**sounds** 67:13 74:9
74:12 84:4
**source** 36:8 37:8,10
38:11,14 39:2
44:12,16,18,21
45:1,3,6,10,13,18
45:20 46:10
203:25 204:1
**sources** 57:10
58:17,19
**south** 126:14
**southern** 124:12
126:2 205:14
**Southwestern**
18:25
**so-called** 160:25
198:23
**Spadaro** 133:19,19
133:19 136:1,17
150:13
**speak** 6:24 7:3,5,10
7:16,23 8:1,13
11:4 22:14 25:25
**speaking** 22:11
28:6 214:18
**speccing** 73:15
**special** 35:20 39:18

56:19 58:12
**specialized** 58:14
**specializes** 84:22
**specific** 35:23 60:5
60:14 63:2 65:17
66:5 81:12 92:20
109:19 111:5
118:4,12 119:2
122:13 124:7
137:1 148:22
156:7 158:9,24
172:9 175:3
179:20 209:2
**specifically** 5:10
13:22 28:7 35:6
74:2 82:18 113:10
117:25 124:9
130:21 135:19
141:13 142:19
150:5 159:2
172:19 188:5
205:10
**specification** 171:1
174:11,12,15
183:4 186:22,24
204:7,10
**specifications** 78:9
115:6 118:9,21
146:8 170:16
183:2,7
**specificity** 118:2
148:18
**specifics** 45:15
97:11 132:18
145:3 180:3
**specified** 84:16
**specify** 194:9
**spelling** 53:13
**spend** 46:22
**spent** 16:5 46:16
**spit** 45:18
**spoke** 43:13
**spreadsheet** 145:15
180:6
**stab** 192:16
**stability** 137:19

GUILLORY, LEE

6/30/2008

Page 242

139:2 141:14
159:3 165:18,23
171:20 172:1,21
173:4,17 175:20
175:23 176:2,13
176:15 177:12,19
206:6
**stable** 142:10 159:6
173:3
**stack** 184:12
**staff** 145:21 150:24
151:25 215:8,16
**staffing** 118:15,20
**stage** 77:1
**stairstep** 211:15
**stand** 38:21
**standard** 87:17
107:7 138:3 166:8
173:24 174:23
180:5 183:5
**standing** 6:8
**stands** 21:12 27:10
181:10
**start** 50:10 51:19
79:25 87:13 163:9
190:5
**started** 19:25 21:19
29:22 51:1 177:21
**starting** 29:21
**state** 5:23 19:17
36:19 106:1
154:11 158:23
166:20 190:4
218:3
**stated** 188:11
193:11 212:10
**statement** 89:11
97:10 98:16
114:12 128:2
129:7 200:9,11,18
**statements** 7:7,8
55:18 129:1
**States** 1:1,11,12
2:10,11 6:25 13:2
13:16 15:5 28:16
29:10 34:22 35:5

156:16
**station** 2:16 82:19
83:3,9 99:15,19
99:23 100:6,12,14
113:21 132:14
135:11 142:9,12
142:18 143:4
150:3 152:2,3
154:4 158:4
160:22 166:17,18
167:19 169:1
170:21 178:23
180:14,19 181:18
182:18 183:25
184:5 186:11
188:14 192:14,16
193:6,18 194:2
199:23,25
**statistically** 59:20
**stay** 96:6 146:25
179:6
**stayed** 38:7
**steel** 185:19 192:15
193:8 197:20,21
200:21 201:6,9
205:22
**step** 30:1
**Stephen** 25:17
**steps** 35:10 86:7
**sticking** 195:7
**STIPULATED** 5:2
**stipulation** 10:7
**Stockpile** 206:2
**stockpiled** 170:21
206:5
**stockpiles** 138:9
**stone** 2:13 6:14 7:2
8:15,20 9:1,12,19
10:1 11:23 12:2,9
13:12 15:4,9
20:12 21:18 22:15
23:5,16 24:3
30:10,15 41:5
52:1 57:9,25
61:13 62:2 73:3
76:9 97:21 101:2

102:8 108:23
110:12,19 112:25
113:5 114:2
123:25 131:23
132:4 133:3,8
141:22 142:3
147:17 153:1,15
155:5,11,17
156:21 157:4,16
160:13 185:25
191:10,17 196:22
197:2,11 210:3,11
212:15 214:16
**stop** 10:19 62:6
67:14
**stopping** 62:3
**storm** 114:18
**straight** 130:5
**strata** 174:9
**stratification** 187:6
187:9
**Street** 2:6
**strength** 185:7
**Stricter** 96:9
**structural** 165:18
168:14 171:20
211:19
**structure** 120:7,9
120:15,24 121:2,7
125:25 140:11
149:9,11 154:21
154:23 155:4
156:20 158:16
159:10,13 161:1,5
161:18 168:4,10
168:12 169:25
176:6 193:9,15,16
196:10 198:8,23
199:3,3,11,16,18
199:19,24 200:14
202:5 209:9 210:2
211:1
**structures** 137:20
170:2 199:1
**struts** 205:15
**stuck** 23:8

**studies** 7:9
**study** 93:25 125:13
126:19 127:20
**stuff** 56:3 59:16
61:7 115:16
125:16 128:17
129:23,24 130:20
144:10 187:19
204:17
**subcontract** 144:14
215:11,15
**subcontracted**
144:15 215:13
**subcontracting**
99:6 142:21 145:8
145:9 201:21
**subcontractor**
142:24 143:1
144:9 145:19
151:24 191:4
201:14
**subcontractors**
145:10 166:23
169:12 181:21
193:24 211:23
214:10
**subcontractor's**
145:25
**subject** 53:24 72:14
73:2 74:7 181:9
**submit** 99:4,10
100:5
**submittal** 180:8,21
181:2 208:12
**submittals** 167:17
**submitted** 49:12
143:14 154:3
**subsequent** 32:17
38:10 74:16 78:9
100:3 115:8 129:1
180:23 200:19
**substitute** 48:2
**subsurface** 84:22
200:21 201:25
207:6
**sufficient** 65:20

192:11
**suggest** 64:22
**suggested** 68:8
125:4 129:2
209:19
**suggestion** 15:18
**suggests** 187:8
201:3
**suit** 157:13
**summary** 124:8
**summer** 50:25
69:11
**Superfund** 36:6
48:8
**superintendents**
201:20
**supervision** 218:10
**supplemental** 7:8
39:18 64:13
**supplied** 38:1 76:2
76:15 186:20
**supplies** 88:2
201:19
**supplying** 41:8
**support** 84:16
134:17 137:3
150:8,15,18,21
151:1,4 159:3
186:11
**suppose** 57:18
**supposed** 72:21
90:12,17 126:5
159:18
**sure** 18:14,18 25:16
30:3 33:16 41:14
46:13 79:18 93:15
96:9,14 106:21
133:17 147:20
162:15 168:21
173:8 183:5 187:5
191:25 192:25
198:20 210:15
213:23 214:6
**Surekote** 7:21
160:1 171:21
175:16 179:21

GUILLORY, LEE

**surface** 72:13
  93:22 94:7,25
  139:17,18 150:4
**surfaces** 140:10
**surprised** 123:16
  123:19
**surprising** 123:17
**surrounding**
  138:11 139:11
  190:8
**surveys** 137:14
**sworn** 10:7 218:6
**synopsis** 20:17
**system** 38:18,23
  42:2 44:7 45:17
  120:12 143:3,7
  169:14 170:6
  172:4
**systems** 152:18

---

**T**

**T** 4:1,6 5:1,1
**TAHEERAH** 2:14
**take** 10:18 22:13
  33:24 34:18 35:10
  35:12 54:23 61:11
  79:13 126:5 135:4
  135:7 143:11
  162:5 171:2 182:9
  184:17 193:14,20
  204:16
**taken** 5:5 54:11
  61:5 86:7,18
  190:7 217:25
  218:8
**takes** 38:16
**talk** 9:21 24:11,13
  30:24 63:19 152:1
  163:18 198:17
**talked** 90:23
  130:11 131:25
  154:12,15 207:17
  210:22
**talking** 24:17 31:1
  31:4,12 33:13
  36:14 60:20,21,23

62:9 93:2 110:1
  114:4 124:18
  131:4,24 147:21
  157:6,7
**talks** 47:14 79:12
  84:17 86:16 90:10
  90:11 134:9
  163:19,24 182:19
**tamp** 186:14
**tamped** 139:10
  192:24
**Tank** 81:1
**task** 8:2 17:8 25:18
  25:20 26:3,5,8,11
  26:15 27:20 31:24
  32:10 35:3,6,21
  35:24 36:5 37:6,7
  37:25 38:2,10
  39:21 40:2,19
  44:22 46:2,16
  71:10 72:20 76:19
  85:9 87:20,22
  88:2 92:1,3 102:5
  102:9,15,23
  105:20 106:16
  108:3,20,21,22
  109:15,15 145:3
  148:22 149:7,8,10
  150:4,12 158:17
**tasked** 73:25 74:13
  74:14
**tasking** 92:9 97:7
  98:12
**taskings** 184:2
**tasks** 109:10,18,20
  149:1,3,4 150:2
**taxpayer** 42:1
  55:21
**team** 49:17,19,20
  50:1,25 53:8
  66:17 68:9,10,12
  68:14,16 69:4,6,8
  69:12,18,22,24,25
  69:25 98:18,24
  116:12 150:10
  154:7 167:14,16

207:12
**technical** 89:16
  145:15
**telephone** 122:19
  129:23
**tell** 9:3 10:16 11:13
  11:16 22:5 29:20
  30:5,14,21 31:11
  38:15 40:21 41:3
  43:10 44:17 47:22
  54:3 58:10 80:5
  85:12 88:6 91:24
  96:12,13 99:8
  101:20 108:14
  129:3 140:2
  159:16 180:2
  190:21 194:18
  214:23
**telling** 29:16 93:20
  103:8 179:18
  214:24
**tells** 50:18 81:21
  89:3 101:20
**template** 177:14,18
**temporary** 47:19
**ten** 26:10
**tenants** 201:1
**Tendering** 65:1,3
  88:5,25 97:2,20
  100:19,23 102:16
  133:4 135:8
  176:14 184:13
  202:12
**tenure** 20:7
**TERC** 24:22 25:16
  27:2,4,12 32:10
  36:2,11,16,18,22
  37:24,25 43:4
  47:5,9,17 48:1,4
  48:22 49:3,9,15
  67:10,19,23 70:19
  71:2,10 72:20,23
  73:23 74:24 83:22
  83:25 84:1 85:14
  85:19 86:14 87:22
  87:22 89:22 107:5

146:10 164:23
**term** 41:6
**terms** 51:8 52:11
  63:23 117:1,4,24
  170:16 171:9
**terrain** 138:11
  139:11
**test** 41:11
**testified** 10:8 160:7
**testify** 218:6,7
**testimony** 22:18
  125:9 156:15
  158:6 161:7 190:6
  217:4,5
**testing** 7:23 90:24
  174:21 204:4
**tests** 7:24
**Thank** 16:24 17:14
  31:23 80:21
  130:16 141:20
  150:6 157:19
  215:21
**thanks** 12:16 18:16
  100:21 101:16
  137:5
**thereof** 5:14
**thing** 30:25 31:13
  32:5,13 42:5,6,7
  46:4 63:8 89:19
  95:18 96:17,21,24
  97:17 114:21
  117:13 120:4
  123:5 124:17
  156:14 169:19
  182:3 192:13
  194:3,24 199:9
  211:4
**things** 48:13 80:17
  90:17,25 114:5
  115:14 117:11
  141:7 144:21
  146:9,17 165:17
  202:4 205:20
**think** 22:16 23:2
  33:12 34:7 39:9
  58:1,4 78:17 97:1

102:7 113:1,8
  116:20 128:18
  129:19 133:9
  134:25 141:5
  142:15 146:21
  150:18 152:15
  160:14 166:6
  199:15
**thinking** 21:20
  74:10
**THOMAS** 3:4
**thought** 35:19 52:5
  96:18 110:20
  145:18 148:2
  180:18 184:4
  209:12,14 210:17
**thousand** 124:12
  126:10
**thousands** 194:13
**three** 9:18 20:25,25
  48:14 54:7 59:6
  59:10,11,17,19
  60:25 61:3,5 79:9
  80:25,25 137:25
  140:5 167:21,24
  180:22 188:20,22
  195:21 208:14,14
  208:16,19
**threshold** 92:16
**tied** 48:21
**tight** 199:17
**timber** 197:20
  205:24
**time** 5:13 6:7 10:20
  10:20 15:12 24:16
  24:23 25:4,11
  28:19,24,24 29:1
  29:11,16 34:25
  38:8 40:10 47:8
  51:2,18,20 52:6
  53:2 57:20,22
  62:6 65:8 69:8
  74:22 77:3,4,13
  77:14,24 79:5,7
  80:10 81:10 91:2
  113:24 115:7

GUILLORY, LEE

116:20 123:18
128:19,20 132:16
133:7 136:20
142:11 143:17,21
148:21 157:6
162:14 180:16
208:9,9
**times** 188:23 197:6
**timing** 117:15
**tip** 152:5 209:8,12
209:21 213:15
**title** 71:14 163:15
**titled** 105:17
**today** 34:2 123:17
125:9 147:19
190:20
**TODD** 3:17
**told** 19:14 44:11
54:8 100:5 114:6
121:4 129:21
130:6,12 148:20
157:11,14,24
180:18 198:4,6
**top** 61:6 76:1 94:7
101:9 112:14
155:24 185:16,18
193:2 206:12
**topsoil** 59:7,17,24
79:8
**TORTS** 2:12
**total** 16:6 17:10,12
27:10 111:5,14
202:6
**tower** 201:5
**Towing** 81:3
**toxic** 21:13 26:20
64:10
**toxins** 51:23 54:21
94:6,13,17,19
95:25
**track** 58:24
**tract** 164:20
**traditionally** 187:1
**trailers** 102:24
**training** 20:24
**transcribed** 218:10

**transcript** 5:9
**transcription** 217:5
218:11
**transfer** 37:23 38:6
**transit** 61:23
**transite** 195:22
**transportation**
56:5 195:8 201:23
**traveling** 171:4
**treated** 201:8
**treatment** 76:5
**tree** 126:17
**Treeby** 3:3 13:20
14:11,15,21 15:2
33:25 34:3 109:3
207:23 215:19
**tremendous** 167:25
195:9
**trench** 154:22
**trial** 130:17
**truck** 56:2,2,9,14
57:24 191:6 196:4
196:5
**trucks** 59:1
**true** 27:7 28:13
29:2 34:18 36:3,4
36:23 57:16 61:1
61:16,18 121:3
125:11 158:7
161:14,19 169:10
169:20 178:25
190:9 191:16
212:5,9,25 217:7
218:10
**truth** 218:6
**try** 9:22 21:24
**trying** 23:20 33:18
50:8 57:6 98:2
118:1 132:7 146:4
168:20,23
**Tulsa** 26:10 36:15
36:17,20,21 37:11
37:17,21 38:2,4,4
44:24 46:19,22
47:5,10 49:6,13
54:2 66:13,14,22

67:6,8,15,21,22
67:23 68:2 70:10
70:10,12,14,17,24
73:23 75:1 86:14
88:17,18 98:18
105:12,15 109:16
115:24 116:25
145:24 189:8
**turf** 31:4
**turned** 100:14
104:14
**turning** 184:6
**twelve** 17:6,9,11,15
17:23,25 18:3
49:21 53:8 66:19
68:9,20,21 69:1,2
69:6
**two** 18:7,7 24:22
25:13 36:18,24
37:3 43:12,19
46:25 47:1,4 49:7
57:8 67:19 97:14
101:14 108:8
126:1,7 147:19
165:6,17 175:15
195:21 211:7,14
**two-foot** 185:12,14
192:23 206:9
**typeface** 134:2
**types** 51:16 55:11
**typing** 124:15

---
**U**

**U** 5:1
**Uh-huh** 47:7 52:17
58:22 63:9 77:6
105:4 110:8
113:14 125:2
135:20 143:6
172:14 187:7
207:21
**ultimate** 122:3
**ultimately** 129:14
142:23 144:21
150:17
**um** 17:6,16,19

25:19,20 33:3
37:14 48:12 60:9
63:7 72:23 79:1
84:9 85:5 86:6,17
88:20 92:13,15,17
98:18 103:2
105:14 111:6,11
116:2,21 117:11
120:1,1 122:3,18
124:5 127:5
128:16,18 129:19
132:20 134:22
135:3 140:22
142:22 143:14
145:4,7,13,20
146:9,13 158:17
158:19 159:11
170:4,5 172:22
173:17 176:3
183:6 185:5,10
187:17,21 196:14
197:24 205:5
214:15
**unbraced** 179:1
**unclear** 115:23
**undergoing** 164:22
**underneath** 179:21
**underseepage**
139:4
**understand** 8:12
8:24 11:7,11,14
11:15,16,20 17:14
24:9,21 26:14
31:1,6 33:8 41:18
46:18 49:2 50:9
54:13 55:22 56:23
57:6 58:8 71:1
80:9,15 95:19
104:2 115:8
117:24 118:2,22
146:5 149:4 160:8
166:25 192:1,13
210:14 212:21
**understanding**
85:13 95:2 103:9
142:16 158:13

168:24 218:12
**understood** 76:24
108:9 121:1
128:22 132:11
**unfortunately** 72:3
**unit** 106:10
**United** 1:1,10,11
2:10,11 6:25 13:2
13:16 15:5 28:16
29:9 34:21 35:5
156:16
**unity** 173:5
**University** 18:25
**unknown** 54:9
198:25 200:21
201:1
**unknowns** 77:16
**URS** 63:4 74:17
**USACE** 203:6
**USACE-NOD** 10:5
**use** 22:17 23:20
27:13 36:19 43:23
47:9,17 48:1,4,22
49:3,8,14 56:24
56:25 57:4,14
58:13,23 63:11
67:23 87:18,21
90:22 94:3 95:3,4
96:7,8 106:14
157:22 158:22
160:2 166:3
170:17 173:18
179:18 191:1
192:7 194:20
195:1 204:13
205:11
**USEPA** 36:7 65:14
**uses** 187:1
**usually** 176:4
183:11
**utility** 99:16
**utilize** 47:4 67:18
84:10,14 172:3
**utilized** 72:23
**U.S** 1:13 2:20 7:1
27:5 53:13

GUILLORY, LEE

**V**

**vague** 30:11,13
**validation** 98:13
**valuation** 69:13
**value** 201:13
**varied** 83:19
**various** 17:16 76:4
87:19 142:22
156:12 185:6
202:8 215:7
**vendor** 41:25
**vendors** 142:22
**verify** 189:1
**versa** 163:23
**versus** 29:3 95:20
179:1
**vertical** 137:11
138:1 140:4 177:3
177:13,15
**vibration** 7:23
**vibratory** 185:20
**vice** 163:23
**vicinity** 121:15
**VIDEOGRAPH...**
3:16
**view** 55:14
**violate** 178:20
**vitae** 18:20 24:18
**void** 192:17 193:18
193:21
**volume** 62:15,18,24
63:15 64:25 65:4
72:7 199:20 213:4
**volumes** 69:14
**Vossen** 53:13,21
136:7
**vow** 157:15

**W**

**WAGER-ZITO**
3:10
**waived** 5:10
**Waldemar** 52:16
63:4 71:23 72:9
73:25 75:10 76:16
79:17 81:14

**waler** 170:6 185:13
185:14
**walers** 185:8
186:18 203:12
205:14 206:11,13
**walk** 20:9 184:25
**wall** 120:17 213:12
**walls** 168:1
**want** 9:2 12:7
15:15 20:17 22:18
23:1 30:3,16,17
30:19,24 31:10
33:15 34:1 43:6
56:25 57:3 62:6
73:17 98:3 99:3,5
99:9,9 107:2,3,11
113:11 124:15
132:23 144:19
146:6,16 153:5
157:12 162:15
165:17,17 169:3
178:18 197:9
202:3 204:17
205:20
**wanted** 18:6 57:21
100:13 107:25
108:2 113:7
116:14 171:10
207:19
**wants** 11:5 154:20
163:17 182:4
206:19
**Ward** 120:9
**WARREN** 3:14
**Washington** 2:17
12:22,25 25:15
28:1,5 40:19
74:17,19 75:14
76:6,17 79:1,19
80:23 85:2 92:9
98:20 103:20
108:19 112:3
116:13 119:7
121:17,21 122:1
122:16,23,25
127:14,16 128:3

130:8,10 142:21
143:16,20 145:5,8
145:14,23 148:24
150:22 151:6,23
158:20 159:23
161:9 164:23
166:23 169:7,23
180:8,9,25 181:20
185:22 192:20
195:12 200:12
**wasn't** 28:19 32:23
33:12,17 74:19
106:16 110:18
116:19 117:25
120:19 123:18
152:6 193:17
212:25
**waste** 21:13 63:7
64:11 114:17
201:22,23 202:2
**wastes** 207:7
**water** 39:12,22
45:10 77:9 83:12
99:22 100:7,10
114:18 139:18
140:10,21 141:1,6
152:25 153:20,22
173:21 175:2
**waterline** 83:15,16
137:9
**waterway** 31:6
125:23 126:15
127:7
**way** 20:19 23:2
30:6,21 31:11
33:18 48:3 64:25
69:5 78:19 90:3,8
94:24 102:5
130:15 134:16
136:6 145:6 147:3
159:16 161:12
163:3,13 172:18
178:8 210:22
218:15
**ways** 23:7 144:11
**website** 149:17

**wedding** 160:25
198:23 199:2,15
200:13 202:5
**week** 8:6
**went** 23:10 38:3
59:23 60:16,19
63:1 65:18 75:1
82:15 89:1 121:25
131:20 148:12
158:21 167:21,23
173:12 180:21
185:8 188:19
193:12 199:5
203:15 210:17
**western** 172:20
173:3,4 177:16
**wet** 175:9 186:11
**wetness** 175:4
**we'll** 10:19 15:21
24:15 134:2 142:5
147:4 182:2,6,7
197:15 209:24
**we're** 11:9 14:22
31:1,4 60:20,21
86:19 96:15 97:7
98:12 102:22
109:8 124:15
176:22 182:21
186:5 214:2
215:21
**we've** 10:10 21:24
22:1 75:14 90:23
182:20
**WGI** 6:5 11:22
13:7,15,16 24:21
24:24 25:10,23
55:24 58:11 60:25
75:14 78:13,19
79:21 80:5,17,21
82:14 84:11,24
85:8 86:15,19
87:8,14 88:9
89:11 91:23 96:12
97:1,6,19 98:10
100:23 103:8,10
103:12 104:6

105:2 107:4 108:5
108:8,14 110:4
111:18,19,22
113:16 114:6,9,14
117:16 118:7
123:4,6,12,20
125:5,5,5 129:3
129:10,15 130:4
141:3 142:11,17
144:9,12,19,25
146:6,17 149:19
149:21 154:4
167:4 171:9
179:25 183:22
184:15 186:9,20
189:15,20 190:25
191:1 192:5,7,9
194:8 195:15
200:18 201:14,18
202:3,12 203:1
205:4 206:13,17
208:2 209:12,18
211:21,22 214:8
214:20 215:4
**WGINT** 203:5
**wharves** 34:16
51:16
**whatsoever** 13:24
**white** 204:18
**Whittle** 167:21
189:21
**wide** 143:9 171:22
**William** 3:3 208:17
**withdraw** 30:3
55:22 197:14
**witness** 5:4,25 6:6
10:6 11:4 12:4
13:14 21:3,23,23
125:22 148:4
210:8 212:19
217:1 218:5
**wondering** 61:4
**wood** 201:8
**wooden** 196:19
197:8,9,19
**word** 156:10 183:2

GUILLORY, LEE

**worded** 90:4
**words** 18:1 24:9
26:18 27:23,24
30:7 44:4 45:1
47:13 56:8 71:18
93:13 144:19
157:22 181:20
**work** 7:17 22:21
26:19 27:15,24,25
28:1,3,17 31:12
39:5 46:23 47:16
48:21 51:11 71:11
72:24 73:24 76:18
78:9,9,14 79:3,20
80:5,8,10,12,12
80:16,18,19 84:3
89:5,9,11,15
91:12 92:5,6 97:8
97:10,10,20 98:16
99:5,13 100:1,8
103:20 106:3,8,9
106:10 107:1
108:2 109:14,17
109:22,23 111:1,4
111:6,8,16,23
112:1 113:16
114:5,7,8,11,12
114:14,22,23
115:4,6,11,11,18
115:18,21 116:12
116:15 117:2,4,6
117:21,22 118:3,5
118:8,10,12 119:1
119:4,5,8,10,11
119:15,17,19,20
120:13,23 121:3
121:15 122:6
125:7,8 127:13
128:2,16 129:1,4
129:7 130:1 131:4
141:3 142:11,20
143:19,21 144:12
144:16,23 145:2
145:19 146:2,13
146:14 148:19,24
154:20,22 158:9

159:1,9,18 160:3
161:10,12,13
170:12,12 171:2
180:13 182:10
183:9 198:18
200:8,10,11,18
201:15 202:18
204:25 207:1,9
214:14 215:4,11
215:14
**worked** 19:24
24:24 25:2 136:6
136:15
**worker** 168:16
**workers** 86:6
152:22 187:18
**working** 40:16
92:25 99:1 150:12
169:18
**works** 42:3 48:23
130:22 163:14
176:8 178:21
**wouldn't** 55:2,21
90:6 91:14,15
94:12 120:24
151:19 153:21
171:4
**writing** 70:18,20,21
80:16 122:10
128:16 158:11
**written** 13:24 28:1
28:3 49:1 51:5
52:7 68:17 171:1
183:7
**wrong** 45:5 64:24
67:14 69:2 72:25
155:8 159:17
180:20
**wrote** 71:10 100:4
105:13 127:13
145:8 164:5 181:3

| X |
| --- |

**x** 4:1,1,6,6 18:3
81:25 82:2 183:8

| Y |
| --- |

**Y** 183:8
**Yacht** 81:2 83:6
**yard** 126:2
**yards** 194:13
**yeah** 9:13 20:19
60:7 82:8 100:20
101:6 102:12
107:19 122:22
132:3,7 134:4
190:17 197:1
215:7
**year** 20:21 102:1
**years** 18:8 20:25,25
25:9 26:10 54:10
84:24
**y'all** 197:18

| Z |
| --- |

**Z** 183:8
**zone** 160:2 175:17

| $ |
| --- |

**$1,906,103** 109:7
**$1.9** 109:9
**$1.91** 108:17
**$113,092** 89:7
**$115,160** 92:3
96:19
**$339,000** 100:18
**$80,975** 101:23

| # |
| --- |

**#75005** 1:25 218:25

| 0 |
| --- |

**0** 53:1 72:13 74:1,6
74:11,13 140:5
**0002604** 101:12
**01** 82:14 101:24
102:2 180:17
181:2
**02** 162:2
**05-4182** 1:5
**06** 24:18 40:9
**06-2268** 1:8

| 1 |
| --- |

**1** 4:9 18:14 72:6,10
87:14 91:25 93:22
96:15,18 100:17
105:1 108:16,22
126:14 137:10
138:1 143:23,24
144:8,18 145:1
147:3,7 149:3,5
149:10,15 165:22
176:4 177:12,15
201:15,16
**1.3** 176:4
**1.9** 108:24
**10** 4:5 18:14
**10th** 19:5
**100** 93:23 100:23
102:6
**100-foot** 93:16
**101** 108:14
**11** 7:11 180:17
**113** 206:24
**116** 82:2
**12** 18:14 177:13,24
178:4,8,12,19
179:19
**12-inch** 173:19
**12:00** 113:25
**13** 133:23
**13th** 134:5
**139** 84:11
**143** 4:9 178:1,3
**144** 4:10
**15** 60:2,8,11,16,19
114:12 133:9,13
142:4 144:3
159:18,25 163:24
171:23 181:2
**15-foot** 60:23
175:16
**16** 7:11
**16-foot** 165:19
171:19 173:2
**162** 4:11,12
**186** 107:4

**19** 7:15 8:9,19 9:3,8
181:19
**19th** 181:17
**19.75** 182:22,24
193:12
**1982** 18:24
**1983** 19:5 20:23
**1990** 21:7
**1991** 19:18 105:19
107:16
**1992** 90:21
**1994** 26:10 36:18
**1997** 55:19 62:16
62:17 69:16 213:4
**1998** 21:7 29:12
50:25
**1999** 72:10 75:13
77:5 78:3 92:2

| 2 |
| --- |

**2** 4:10 7:4 77:5 88:5
97:1,2 100:16,17
105:1 107:5 144:4
144:5 147:7
149:15 162:2
165:4,22 172:16
181:19
**20** 18:14 81:25,25
138:12 152:9,15
160:10,21
**2000** 79:5,22 81:10
108:16 109:12
110:2 111:24
114:13 115:19
116:1,2 117:3,4
118:4,5 119:1,7
119:19 121:8
124:3 125:1
128:14,19 132:10
133:20,23 134:5,7
134:11,18 147:1
147:10 213:5
**2001** 80:1,3 143:18
146:23,24 181:17
181:19
**2003** 164:25

GUILLORY, LEE

**20044** 2:17
**2006** 21:10,14
**2008** 1:16 217:25
**202** 4:13,14
**202-616-4289** 2:18
**204** 81:24
**21** 7:25 9:16 18:15
  113:11,13 115:19
  117:3 118:4 147:8
  148:2,3
**215** 4:15
**22** 7:11 53:1,4
  211:16
**229** 178:10,13
**23** 132:20 199:7
  203:16 205:25
**23rd** 92:2
**24** 7:11 110:2,25
  111:24 115:2
  148:10,13
**24th** 116:22 147:9
**25** 78:2 132:20
  160:10,25 199:6
  203:13,18 209:19
**25-foot** 171:22
  203:4
**252** 172:13
**26** 7:11 8:2 17:8
  25:20 26:3,5,12
  26:15 27:20 31:24
  32:10 33:13 35:4
  35:6,21,25 37:25
  38:2 39:21 40:2
  40:20 44:22 46:2
  46:17 67:12 71:10
  72:20 85:10 88:2
  88:14 92:1 102:15
  106:17
**260** 140:16,21
  141:2 200:18
**2601** 96:14
**2602** 97:3
**2603** 128:15
**2604** 100:25
**2605** 128:15
**2608** 200:19

**2609** 200:19
**29** 7:12

———— **3** ————
**3** 73:1 88:9 98:8
  105:1 108:20
  119:19 137:11
  138:1 140:5,12
  147:4,13 148:6
  149:3,5,7 173:19
  173:21 175:2,6
**3rd** 119:6 134:18
**3-foot** 171:22
  175:19
**3-legged** 201:5
**3-30** 79:10
**3-31** 79:11
**3-32** 79:11
**3.0** 140:1
**30** 7:22 9:16 18:15
  26:12 93:17 201:9
  212:4
**30th** 1:16 217:25
**30(b)(6)** 1:10 6:19
  21:22 24:14
**300** 83:18,19
  154:20 155:4
  156:19 160:11
  161:3
**300-foot** 158:15
**31** 91:23 211:16
**32** 7:12 26:24 51:11
  63:12 65:24
**32-acre** 164:20
**33** 7:12
**34** 206:1
**35** 82:2 201:9
  203:11,13
**36** 77:9
**370** 86:19
**371** 86:21
**38** 7:12
**38704** 75:15
**38726** 75:23
**39041** 205:5
**394** 86:15

———— **4** ————
**4** 7:4 18:14 62:15
  88:24 100:22,25
  101:1,18,20 102:5
  108:21 147:4,13
  148:6 149:3,5,9
  150:5
**4.1** 75:24
**4.1.0** 84:13
**40** 7:12
**4025** 112:18 209:6
**404B** 56:17
**41** 7:12
**41C1B** 13:21
**41849** 110:4
**41879** 78:13 80:17
  113:17 114:9
**41944** 78:19 110:5
  114:9
**42** 91:23
**43** 7:12,13 96:12
**45** 18:15
**46** 7:13
**48623** 186:9

———— **5** ————
**5** 4:11 18:2 64:23
  72:13 74:1,7,11
  74:13,15 89:11
  100:24 101:19
  102:7,15 150:4
  161:24,25 162:7
  162:23 163:3
  173:21 175:2,6
**5.0** 105:16
**50** 93:16 200:4,5,5
**500** 83:19
**504-525-1335** 2:8
**504-862-2843** 2:25
**51580** 179:25 208:2
**51583** 180:1,1
**52.236-07** 107:15
**52.236-7** 105:17
**55** 97:1
**56** 7:13
**57606** 202:12

**58** 7:14 28:7 97:1
  152:5,6,6,14
**58.0** 143:10
**59** 97:13,17

———— **6** ————
**6** 4:12 7:4 18:14
  72:8 107:10
  108:14,15 149:1
  162:4,9,25 163:5
**6-1605** 65:1
**6.5** 177:13
**60** 7:14 152:3
  213:18
**60-foot** 143:8
  182:20
**62** 97:17
**63** 97:19
**68** 99:10

———— **7** ————
**7** 4:13 7:4,5 177:15
  182:3 202:16,20
  203:21 209:4
**7,000** 82:5,10
**7-253** 163:4
**7-254** 163:4
**7-255** 163:4
**7-277** 163:5
**7-279** 176:23
**70** 79:12
**70113** 2:7
**70118** 10:6
**70118-3651** 1:16
  2:24
**7400** 1:14 2:23 10:5
**78** 163:5
**79** 163:5

———— **8** ————
**8** 4:14 7:10 72:8
  134:7,11 202:19
  202:22 205:2
  209:4
**8-foot** 209:17
**80** 100:23 102:5

**144**:15 200:2
**84** 21:2
**84A** 82:4,7
**85** 21:2 82:2 199:19
**855** 2:6
**86** 21:2,5
**87** 102:5
**88** 102:7
**888** 2:15

———— **9** ————
**9** 4:15 7:11 18:14
  62:15 64:23 89:11
  108:18 215:22,25
**90** 21:5 93:16 105:2
  105:10 144:15
  173:20 174:20,22
  179:19
**900** 204:1
**91** 104:24 105:3,13
**94** 27:19 45:10
  90:24
**97** 69:18 90:22
**98** 21:10 24:18 40:9
  69:11
**99** 147:7