# EXHIBIT 26

MONTEGUT, III, JAMES

8/8/2008

---

**Page 1**

```
                UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF LOUISIANA

IN RE: KATRINA CANAL BREACHES    CIVIL ACTION
CONSOLIDATED LITIGATION          NO. 05-4182 K2
                                 JUDGE DUVAL
PERTAINS TO:  MRGO AND ROBINSON
                (No. 06-2268)

        Deposition of JAMES A. MONTEGUT, III,
given at the McKernan Law Firm, 8710 Jefferson
Highway, Baton Rouge, Louisiana 70809, on
August 8th, 2008.




REPORTED BY:
        JOSEPH A. FAIRBANKS, JR., CCR, RPR
        CERTIFIED COURT REPORTER #75005
```

---

**Page 3**

```
 1   ALSO PRESENT:
 2       JOSEPH E. BEARDEN, III, ESQ.
 3       LAURA ROUGEAU, ESQ.
 4       JULIA CRONIN, ESQ.
 5       WILLIAM D. TREEBY, ESQ.
 6
 7   PRESENT VIA I-DEP:
 8       ERIC GOLDBERG, ESQ.
 9       CHRIS ALFIERI, ESQ.
10       SCOTT GASPARD, ESQ.
11       DEBRA S. CLAYMAN, ESQ.
12       BRIAN RYCKMAN, ESQ.
13
14   VIDEOGRAPHER:
15       GILLEY DELORIMIER (DEPO-VUE)
16
17
18
19
20
21
22
23
24
25
```

---

**Page 2**

```
 1   APPEARANCES:
 2   REPRESENTING THE PLAINTIFFS:
 3       BRUNO & BRUNO
 4       (BY: L. SCOTT JOANEN, ESQUIRE)
 5       855 Baronne Street
 6       New Orleans, Louisiana 70113
 7       504-525-1335
 8
 9   REPRESENTING THE UNITED STATES OF AMERICA:
10       UNITED STATES DEPARTMENT OF JUSTICE,
11       TORTS BRANCH, CIVIL DIVISION
12       (BY: PAUL LEVINE, ESQUIRE)
13       (BY: DAN BAEZA, ESQUIRE)
14       P.O. Box 888
15       Benjamin Franklin Station
16       Washington, D.C. 20044
17       202-616-4289
18
19   REPRESENTING THE U.S. ARMY CORPS OF ENGINEERS.
20       CORPS OF ENGINEERS, OFFICE OF COUNSEL
21       (BY: DAVID DYER, ESQUIRE)
22       7400 Leake Avenue
23       New Orleans, Louisiana 70118-3651
24       504-862-2843
25
```

---

**Page 4**

```
 1         E X A M I N A T I O N   I N D E X
 2
 3   EXAMINATION BY:                        PAGE
 4
 5   MR. JOANEN  ...............................6
 6   MR. LEVINE  .............................146
 7
 8   EXHIBIT NO.                            PAGE
 9
10   Plaintiff's Exhibit 1 ...................... 9
11   Plaintiff's Exhibit 2 ....................60
12   Plaintiff's Exhibit 3 ....................62
13   Plaintiff's Exhibit 4 ....................93
14   Plaintiff's Exhibit 5 ...................109
15   Plaintiff's Exhibit 6 ...................139
16
17
18
19
20
21
22
23
24
25
```

---

1 (Pages 1 to 4)

MONTEGUT, III, JAMES

8/8/2008

1           S T I P U L A T I O N
2           IT IS STIPULATED AND AGREED by and
3     among counsel for the parties hereto that the
4     deposition of the aforementioned witness may be
5     taken for all purposes permitted within the
6     Federal Rules of Civil Procedure, in accordance
7     with law, pursuant to notice;
8           That all formalities, save reading
9     and signing of the original transcript by the
10    deponent, are hereby specifically waived;
11          That all objections, save those as to
12    the form of the question and the responsiveness
13    of the answer, are reserved until such time as
14    this deposition, or any part thereof, is used
15    or sought to be used in evidence.
16
17
18                    *   *   *
19
20
21
22          JOSEPH A. FAIRBANKS, JR., CCR, RPR,
23    Certified Court Reporter in and for the State
24    of Louisiana, officiated in administering the
25    oath to the witness.
                                        Page 5

1           JAMES A. MONTEGUT, III
2     6190 Tezcuco Court, Gonzales, Louisiana 70737
3     70118, a witness named in the above
4     stipulation, having been first duly sworn, was
5     examined and testified on his oath as follows:
6     EXAMINATION BY MR. JOANEN:
7         Q.   Mr. Montegut, my name is Scott Joanen.
8     I'm an attorney for the MRGO PSLC.  That's the
9     plaintiffs that have brought suit against the
10    Corps of Engineers and WGI for damage they
11    allege for the floodwalls falling down in the
12    Lower Ninth Ward.
13          The reason we're here today is because
14    your name has appeared on a number of documents
15    and I understand you to be being involved in
16    the project that became known as Task Order 26
17    or the remediation work at the East Bank
18    Industrial Area.  So we're here to ask you some
19    questions.
20        A.   Okay.
21        Q.   Have you ever given a deposition
22    before?
23        A.   Yes, I have.
24        Q.   How many times have you given a
25    deposition?
                                        Page 6

1         A.   Two or three.  This being the third or
2     fourth.
3         Q.   Have they been recent depositions?
4         A.   No.
5         Q.   Were they depositions that involved
6     personal injury or contract disputes, things of
7     that nature?
8         A.   Contract disputes with the Corps of
9     Engineers.
10        Q.   So you understand the procedure.
11    Basically, I'm here to ask you questions.  I'm
12    going to ask you to let me finish my question
13    before you begin your answer so that the court
14    reporter can get that down.  You understand
15    that.
16        A.   Yes.  Sounds fair.
17        Q.   Also, it's very important that you
18    answer yes or no or give a verbal response and
19    not nods of the head and shakes of the head
20    because the court reporter may not get it down
21    accurately.  It's important that what is said
22    here today is taken down accurately because
23    others may be reviewing this at a later date
24    and they will be interpreting what was said and
25    if it's unclear it can cause confusion later.
                                        Page 7

1           You understand that.
2         A.   I understand that.
3         Q.   Also, too, I have to as always tell
4     you that this is a deposition pursuant to the
5     Rules of Civil Procedure, so you've been sworn
6     to tell the truth the same as if you were in
7     court.  You understand that, as well?
8         A.   Yes, I do.
9         Q.   If at any time you don't understand my
10    question, just ask me to repeat it.  I'll be
11    glad to do so.  Either I'll rephrase it or I'll
12    have the court reporter read it back.  Okay?
13        A.   Okay.
14        Q.   I'm not one to really hold people's
15    feet to the fire so if you want to take a break
16    for any reason I'm glad to do so, although I
17    would ask if you can to be patient with me and
18    try and allow me to get as close to the noon
19    hour before we break as we can.  I would like
20    to get you out of here as quick as possible.
21    Okay?
22        A.   Sounds fair.
23        Q.   The first thing I would like to do
24    just for a matter of bookkeeping, I've marked
25    for Plaintiff's Exhibit 1, this is the Amended
                                        Page 8

2  (Pages 5 to 8)

MONTEGUT, III, JAMES

8/8/2008

1    Notice of Deposition, it's the Third Amended
2    Notice of Deposition, which is piece of paper
3    that tells everybody that we're asking you to
4    be here today and testify.  We'll put that into
5    the record.
6            Mr. Montegut, let me ask you first
7    just for some background information.  From
8    where are you from; where were you born and
9    raised?
10           (Plaintiff's Exhibit 1 was marked for
11   identification and is attached hereto.)
12   A.   Born and raised in New Orleans.
13   EXAMINATION BY MR. JOANEN:
14   Q.   Okay.  Where did you go to high
15   school?
16   A.   Brother Martin.
17   Q.   What year did you graduate?
18   A.   1970.
19   Q.   After Brother Martin, did you continue
20   with your education?
21   A.   Yes.  I attended University of --
22   well, at the time it was LSUNO, but now it's
23   the University of New Orleans.  UNO.
24   Q.   Okay.  And how far did you progress in
25   your education?

Page 9

1    A.   I got a Bachelor's of science degree
2    in engineering.
3    Q.   At the time, when you get a BS in
4    engineering was there any focus or specialty
5    within the engineering field that you were
6    achieving?
7    A.   At that time, at UNO, there wasn't a
8    civil, mechanical, electrical designation, they
9    had what was referred to at that time at UNO as
10   an option.  And I graduated with a mechanical
11   engineering option.  You know, I haven't looked
12   at my diploma in a thousand years, but if you
13   would read the diploma, it says, bachelor of
14   science in engineering with a mechanical
15   option.
16   Q.   Okay.  Did you take any formal
17   education after achieving your BS in
18   engineering?
19   A.   No, I did not.
20   Q.   And what year did you receive that
21   Bachelor of Science?
22   A.   1974 or '5.
23   Q.   Upon graduating from LSUNO, did you
24   enter the workforce?
25   A.   Yes.

Page 10

1    Q.   And what was the first job you took?
2    A.   I took a job with the Corps of
3    Engineers as a civil engineer.
4    Q.   Let me ask you, because I've not ever
5    taken an engineering class, what qualifies you
6    with a BS in engineering with a mechanical
7    option to qualify for a job as a civil
8    engineer?  Had you taken sufficient classes to
9    get your BS in engineering to qualify as a
10   civil engineer job title?
11   A.   Part of the engineering curriculum
12   that I took had certain civil engineering
13   courses, like soil mechanics, things like that,
14   dynamics, statics, those type of courses that
15   are typically found in a civil engineering
16   curriculum.  Apparently when I applied the
17   Corps of Engineers determined that that was
18   sufficient qualifications to be hired as a
19   civil engineer.  And of course I've been
20   there -- well, until I retired I was there for
21   thirty some odd years, so I would like to think
22   that they thought it was sufficient
23   qualifications.
24   Q.   I understand.  When you entered the
25   Corps in 1974 as a civil engineer, was there a

Page 11

1    particular branch that you were assigned to?
2    A.   Actually, you know, we need to back up
3    maybe just a little bit, because my career at
4    the Corps started prior to my graduation as an
5    engineer.
6    Q.   Okay.
7    A.   For about a year and a half prior to
8    my graduation I was working as a student for
9    the Corps of Engineers.
10   Q.   Okay.
11   A.   And so really, when I graduated it was
12   more of just a rollover from a student position
13   into a civil engineering position.  So when I
14   actually started at the Corps of Engineers I
15   was working as a student in their engineering
16   division, what they called back then the
17   engineering systems and programming branch
18   where we wrote a lot of computer programs to do
19   engineering type calculations.
20   Q.   And so while you were at the civil
21   engineer student program function, you were
22   actually doing engineering calculations and
23   things of that nature?
24   A.   Yeah.  Working more with what was
25   referred to as a technician, doing more

Page 12

3  (Pages 9 to 12)

Johns Pendleton Court Reporters                    800 562-1285

MONTEGUT, III, JAMES

8/8/2008

1  technical type work, doing, um -- you know,
2  being assigned work by an engineer to do
3  certain calculations, computations and work on
4  drawings, things like that.
5      Q.  When you became a full-time employee
6  with the Corps, did your job responsibilities
7  change and, if so, how so?
8      A.  To some degree.  Switching from maybe
9  analyzing computer data at the time to when I
10 became an engineer to actually writing computer
11 programs to perform certain calculations.
12     Q.  And what would have been your title at
13 that time?  Civil engineer?
14     A.  Yeah.  Civil engineer.
15     Q.  And how long did you stay in the
16 position of civil engineer?
17     A.  Until my retirement.
18     Q.  The job position that you were in
19 originally in 1974 upon taking a full-time
20 employment, how long did you stay within that
21 job function?  Roughly.
22     A.  Yeah.
23     Q.  We're going to move pretty quickly
24 through this.
25     A.  Four or five years, yeah.
                              Page 13

1      Q.  At the end of the five-year period,
2  what were the new responsibilities that you
3  undertook?
4      A.  I switched from what was then the
5  engineering division to construction division,
6  and actually, the duties were somewhat similar
7  when I first went to work in construction
8  division.  I was still writing programs.  I
9  think they hired me because I had obtained a
10 certain amount of programming knowledge and
11 expertise, and they had a position open for
12 duties such as that, and that's how I
13 transferred over into the construction
14 division.
15     Q.  And both the time when you entered in
16 1974 and then switching over to the
17 construction division, that was within the New
18 Orleans District?
19     A.  Yes.  Yes.  All of my employment with
20 the Corps has been in the New Orleans District.
21     Q.  When you transferred into the
22 construction division, what types of things
23 were you involved with constructing?
24     A.  Levees, um -- different -- dredging of
25 different channels.  Primarily worked in a
                              Page 14

1  section that did the computations to determine
2  the pay quantities.  As you probably know,
3  typical Corps contracts are based, are let to
4  contractors and they're paid usually by unit
5  priced items, and typically in dirt work like
6  levees or dredging, they're paid by the cubic
7  yard.  It's called a firm fixed price contract.
8  In order to make payment to those contractors
9  as they complete the work and as they progress
10 through it, they have surveyors that go out and
11 survey cross-sections of the whatever, the
12 levee or the channel, and the computations
13 determine the cubic yardage.  So we worked
14 in -- I worked in the section that did those
15 computations.
16     Q.  And how long did you remain in that
17 job capacity?
18     A.  Probably I'm going to say until about
19 1992, so about fifteen years, roughly.  '78 to
20 '92; fourteen, fifteen years.
21     Q.  Was there, during this time period up
22 until 1982, where the construction division in
23 essence loaned you out to a division such that
24 you were doing work on levees in other areas
25 outside of New Orleans region?
                              Page 15

1      A.  Not as I recall, no.
2      Q.  So it would be fair to say as a
3  summarization that from the time you entered
4  the construction division up until about 1992,
5  you were focused primarily on works within the
6  New Orleans region?
7      A.  Yes.  Yes.  Absolutely.
8      Q.  During that time period, did you have
9  to attend any courses or further education,
10 seminars, dealing with geotechnical issues,
11 subsoil strata, things of that nature?
12     A.  Yeah.  No.  No.
13     Q.  During the time -- let me get your
14 history first.  In 1992, you switched job
15 roles.  What was your next function for the
16 Corps?
17     A.  I switched -- stayed within
18 construction division but switched from what's
19 called upstairs in the construction division to
20 the area office, which was the New Orleans area
21 office.  New Orleans District has two area
22 offices under its jurisdiction, the New Orleans
23 area office and the Lafayette area office.
24     Q.  And you were in the New Orleans area
25 office?
                              Page 16

4 (Pages 13 to 16)

MONTEGUT, III, JAMES

1      A.   Yes.  That's correct.
2      Q.   And what was your role for the New
3  Orleans area office?
4      A.   I was project engineer.
5      Q.   And could you describe what that
6  entailed?
7      A.   It entailed oversight of various
8  construction projects.  In my case, they were
9  typically dredging type projects, an occasional
10 levee depending on workload.  But I was
11 primarily, in my case, dredging, um -- that
12 related to the contract administration of a
13 particular project that may require a
14 contractor to furnish a dredge to dredge the
15 Mississippi River, at the time the MRGO or, you
16 know, just any type of navigable waterway.
17     Q.   How long did you stay in that job
18 function or role?
19     A.   You know, it's kind of getting a
20 little bit fuzzy now but I'm going to say about
21 three or four years.
22     Q.   And in approximately 1995 or 1996 when
23 your role changed, what was your next role for
24 the government?
25     A.   I was assigned to the Bayou Bonfouca

Page 17

1      hazardous toxic and radioactive waste--
2         A.   Yeah.  It was what was classified as a
3  Superfund site.
4         Q.   And who were some of the contractors
5  that were involved in that Bayou Bonfouca?
6         A.   It was the IT Corporation was the
7  prime contractor.  I think C.F. Bean was a sub
8  at that time, and they were primarily
9  responsible for the dredging work.  Actually,
10 as I think back a little bit now it was IT and
11 OHM.  I can't remember what the letters stood
12 for, but there was actually a joint venture
13 with those two companies.
14        Q.   You know this already, but in the East
15 Bank Industrial Area, Morrison Knudsen and
16 later Washington Group was engaged through a
17 task order pursuant to the TERC, the total
18 environmental restoration project.
19        A.   Right.
20        Q.   Was the Bayou Bonfouca engagement of
21 IT and/or OHM also a task order pursuant to a
22 TERC contract?  If you know.
23        A.   The original contract for Bayou
24 Bonfouca was not a TERC contract as best I can
25 remember.  There was additional work decided to

Page 19

1  project out in Slidell which was a hazardous
2  waste cleanup project.
3      Q.   Did that involve dredging or was that
4  just a soil remediation?
5      A.   It involved both.
6      Q.   And that was the creosote plant they
7  had up there?
8      A.   That's correct.
9         MR. LEVINE:
10           What plant?
11        MR. JOANEN:
12           Creosote.  The junk they put on
13        the telephone poles so the termites
14        don't eat it.
15     A.   The coating of a timber piling, a wood
16 preservative.  It's a black wood preservative.
17 You know, telephone poles, mother nature
18 doesn't make them black.
19 EXAMINATION BY MR. JOANEN:
20     Q.   How long were you with that project?
21     A.   Until its completion.  I want to say
22 like 1999, somewhere up around in there.
23     Q.   Would the Bayou Bonfouca project be
24 considered an HTRW site, by that, in reference
25 in previous depositions and documents as a

Page 18

1      be performed at Bayou Bonfouca to clean up
2         Southern Ship, which was another site that
3  during the course of the original Bayou
4  Bonfouca project they discovered additional
5  creosote further down the bayou and the EPA got
6  with the Corps and they decided to clean that
7  site up, as well.  And that particular site was
8  accomplished with a TERC contract.  IT
9  Corporation had a contract with Tulsa District,
10 a TERC contract with Tulsa District.
11        Q.   Were you engaged with the work at
12 Southern Ship pursuant to the TERC?
13        A.   Yes.
14        Q.   Is that the first time you became
15 familiar with the processes of the TERC?
16        A.   Yes.
17        Q.   To your understanding, are there
18 different reporting requirements, in your
19 involvement, regarding pay and things of that
20 nature with the TERC as opposed to other
21 contracts which you had said were firm fixed
22 price type contracts?
23        MR. LEVINE:
24           Objection.  Vague, compound.
25           You can answer.

Page 20

MONTEGUT, III, JAMES

8/8/2008

1      MR. JOANEN:
2          I'm sure y'all have talked about
3      this already, but a lot of times he
4      will object to things, and that's for
5      us to discuss with the judge later as
6      to whether it's maybe utilized later.
7      Unless he tells you not to answer,
8      which he may -- I usually don't ask
9      those types of questions, but if he
10     does instruct you not answer you
11     wouldn't.  But unless he does, you
12     give me the answer.  Okay?
13         You remember the question?
14     A.  No.  Please repeat it.
15         (Whereupon the previous question was
16     read back.)
17     EXAMINATION BY MR. JOANEN:
18     Q.  Did you understand the question?
19     A.  You said with regards to reporting.
20     Q.  Right.
21     A.  I don't --
22     Q.  Maybe I'm showing my hand a little bit
23     here, but in reviewing a lot of documents I
24     understand that you were involved with the
25     oversight of payments and the requests for
                                        Page 21

1      payments from WGI.
2      A.  Right.
3      Q.  So I'm trying to get the background as
4      to your understanding of what the TERC was back
5      then in contrast to what was the firm fixed
6      price contracts, and that will lead me to
7      understand more of what your vernacular is
8      about this so that I can ask you questions
9      regarding the WGI project that he won't be
10     objecting to the whole time we're getting
11     through it.  So that's why I'm asking the
12     question.
13         Are there any differences in
14     reporting, to you and to your involvement, than
15     in a firm fixed price contract?
16     A.  Yes.  There were significant
17     differences in the way payments were evaluated,
18     or the requests for payments were evaluated.
19     Q.  And what were some of those?  I don't
20     mean to cut you off.  I'm sorry.
21     A.  The major difference being that under
22     the TERC, being a cost reimbursable contract,
23     the contractor was obligated to provide
24     substantiation or proof, records, if you will,
25     of every expenditure he made in conjunction
                                        Page 22

1      with that work, with that project.  Um -- this
2      led to a virtual stack of literally
3      approximately this high, about a foot high of
4      his monthly submission, where everything that,
5      like I said, that he -- expense that he
6      incurred, every time sheet for every employee
7      who worked on that project for that period,
8      month, would have to be included in that
9      submission and have to be reviewed to
10     substantiate.
11     Q.  Would you be the person that would be
12     reviewing that --
13     A.  Yes, I would.
14     Q.  -- in the Bayou Bonfouca --
15     A.  Yes.  Yeah.  For ease of maybe
16     clarification, let's refer to Bayou Bonfouca as
17     being the original firm fixed price and
18     Southern Ship as being the TERC.
19     Q.  Fair enough.  For the Southern Ship
20     part, was that the first time that you become
21     involved in such a process where these
22     voluminous expenditure reports and receipts
23     were provided?
24     A.  Yes.
25     Q.  Why is it, if you know, that the Corps
                                        Page 23

1      would have you reviewing those as opposed to an
2      accountant, a bookkeeper who would run that
3      little machine?
4      A.  Yeah.  Um -- probably because I was
5      there on site and would be more familiar with
6      what was being spent and why it was being spent
7      and could probably make a better determination
8      if it was justifiable or not.  Um -- but I
9      agree with what you're saying, yeah, maybe a
10     lot of times I kind of felt like an accountant.
11     Q.  Was the review of these that you were
12     doing, were they with an eye towards being
13     necessary from an engineering perspective, or
14     just your understanding of how an engineering
15     project has to take place?
16         MR. LEVINE:
17             Objection.  Vague.
18     EXAMINATION BY MR. JOANEN:
19     Q.  If you understand the question.
20     A.  Well, you're saying from an
21     engineering perspective.
22     Q.  Right.  To run an office, for example
23     this law office, you don't need to be a lawyer
24     to necessarily run an office.  You got to know
25     you got to pay your people on a certain day and
                                        Page 24

MONTEGUT, III, JAMES

8/8/2008

```
 1    have the lights on, electricity and pens and
 2    paper and things of that nature.  Same with an
 3    engineering project, I would guess, not being
 4    an engineer, you need to run an office, however
 5    there may be certain functions that only an
 6    engineer may understand the necessity for.  And
 7    so my question was improperly worded.  It
 8    probably was now that I think about it.  Was
 9    the role that you played focused more on the
10    necessity of the financial outlays geared
11    toward understanding how the engineering
12    process, the engineering project took place?
13              MR. LEVINE:
14              Same objection.
15       A.  I don't know how to answer that.
16    EXAMINATION BY MR. JOANEN:
17       Q.  Fair enough.  If I can figure out a
18    better way to ask it I'll come back to it
19    later.
20              How long were you involved in that
21    Southern Ship project?
22       A.  The whole time, from beginning to end.
23    It was a couple of years I guess, maybe a
24    little less.
25       Q.  Do you know when about it ended?
```
Page 25

```
 1    involved with from 1999 when the Southern Ship
 2    project ended up until the time you became
 3    involved with Task Order No. 26 which I believe
 4    is also 2001?
 5       A.  I was involved -- well, I went back as
 6    a project engineer in the area office for a
 7    time on the dredging work, and I was also
 8    involved for a period of time, maybe
 9    approximately twelve months, um -- on what was
10    called the west bank asbestos remediation
11    project, which was another EPA funded -- I
12    believe it was a Superfund site.  Don't hold me
13    to that.  But it was a similar type of a
14    cleanup.
15       Q.  And where was that located?
16       A.  It was all over the west bank of New
17    Orleans, or Jefferson Parish, in the New
18    Orleans area.  It wasn't a site, per se, it was
19    literally at residences.  People had come
20    across this asbestos-containing material, and
21    we went from, you know, location to location,
22    door to door, if you will, to remediate those
23    sites.
24       Q.  Were you --
25       A.  Excuse me.  Things are kind of
```
Page 27

```
 1       A.  Around about 2000 -- 2000, yeah.  I
 2    want to think around 2000.  No, I'm sorry.  It
 3    ended in 1999.  I'm kind of confusing my times
 4    a little bit here because the Bayou Bonfouca
 5    didn't last until '99, the first phase of it,
 6    that original phase, it probably lasted until
 7    about '97.  And then Southern Ship kind of came
 8    in on the -- you know, piggybacked in on the
 9    back end of it, and it ran from roughly '97 to
10    '99.
11       Q.  When was the first time that you
12    became involved in the project that we'll refer
13    to as the Task Order 26 project which was the
14    work that was performed on the East Bank
15    Industrial Area of the Industrial Canal?
16       A.  When was the first time I became
17    involved?
18       Q.  What year, if you recall?
19       A.  It was whenever they mobilized to the
20    site.  That's typically when I become involved
21    in a project, when the contractor is ready to
22    mobilize to the site.  So I believe, if memory
23    serves me right, it was early in the year of
24    '01.
25       Q.  Do you recall what projects you were
```
Page 26

```
 1    clicking into this old brain where the memory
 2    is kind of fogged.  In addition to that, I also
 3    worked on the Agriculture Street remediation
 4    project, which was another EPA lead funded
 5    Superfund type project that -- the Corps was
 6    doing work for EPA in that regard as far as
 7    managing the work and overseeing the contracts,
 8    the TERC contracts for EPA.
 9       Q.  And was your role similar as it had
10    been on the Southern Ship --
11       A.  Yes.
12       Q.  -- where you would review the
13    documentation, make sure that was justified?
14       A.  Yes.
15       Q.  If you felt that something was not
16    justified, what would be the steps that you
17    would take to resolve the issue?
18       A.  It would depend on the issue.  Um --
19    if it was -- if it was an issue that was of a
20    contractual type nature, I would probably
21    consult with the contracting officer.  If it
22    was of a technical nature, then I would consult
23    with the technical folks, um -- you know,
24    construction manager, project manager.  Not
25    that the project manager would be -- have the
```
Page 28

7 (Pages 25 to 28)

MONTEGUT, III, JAMES

8/8/2008

1  technical responsibility, but he could get the
2  person that could assist you in resolving your
3  issue.
4      Q.   Were you involved with any of the
5  development of the 1997 MRGO and connecting
6  channels lock replacement evaluation report? I
7  understand a guy by the name of Dicharry may
8  have been --
9      A.   Oh, Dicharry.
10     Q.   He may have been heavily involved in
11 the overseeing of that report.
12     A.   I was not involved in that.
13     Q.   Also regarding this East Bank
14 Industrial Area, there was a design memorandum
15 called the DDR or DDM 1.  Were you involved in
16 the development of that?
17     A.   No.
18     Q.   It was a 1999 report?
19     A.   No.
20     Q.   They also had associated with this
21 project, it was going to be to replace the lock
22 in the Industrial Canal --
23     A.   Correct.
24     Q.   -- which then led to them -- I
25 understand they needed to develop that

Page 29

1  temporary bypass channel, and that's what led
2  to the cleanup of the East Bank Industrial
3  Area.  But in 2000, there were two reports
4  developed about lateral protection, they were
5  going to drive sheet pile to I guess protect
6  the neighborhoods when they put the lock in.
7      Were you involved in the development
8  of that report?  I think there was also an
9  alternative report, too.  They were both dated
10 2000.
11     A.   No, I was not.
12     Q.   When you first became involved in 2001
13 with Task Order No. 26, what was your
14 understanding of what your job responsibilities
15 were going to be?
16     A.   Similar to what they had been on
17 previous jobs, um -- project engineer was the
18 title, um -- with the responsibility for
19 overseeing the work that Washington -- in this
20 particular case Washington Group was going to
21 be performing out there, and with a primary
22 focus on ensuring that they were spending money
23 correctly.  And by correctly, I mean that the
24 work that they were doing was being
25 accomplished in an efficient and an effective

Page 30

1  manner, basically, that us taxpayers were
2  getting value for the money that we were
3  spending.
4      Q.   How did you first find out that you
5  were going to be -- or how does one with your
6  credentials become involved in a project like
7  this?  Does the Corps evaluate who's available
8  and assign people or do you actually apply for
9  that position, for that project?
10     A.   No.  There was no application process
11 or formal announcement, to my knowledge, of
12 this job.  It was conveyed to me through my
13 chain of supervisors, through my management,
14 that when, you know, the project that I was on
15 at the time, probably Agriculture Street
16 finished, that I was going to go on over and
17 start working on the EBIA job, as you call it.
18     Q.   Were there any other people in the
19 Corps that were your peers, such that if there
20 were two projects going on simultaneously they
21 would fulfill the role that you would play on
22 one project on that other second project?
23     A.   I don't know.  I mean, I wasn't
24 privileged to know what management's thinking
25 was.  That would be a better question to ask

Page 31

1  maybe my boss or somebody in management.
2      Q.   On the EBIA project, who was your
3  boss?
4      A.   I got to think back now, but, um -- it
5  probably changed, but when it started, at the
6  outset, it was probably -- it would have been
7  John Fogarty.  Not the singer.  Not that he
8  could sing anyway.
9      Q.   Was there anyone at the Corps that you
10 felt you could turn to to talk about issues
11 that were unique to the job role that you
12 played on the projects?
13         MR. LEVINE:
14             Objection.  Vague.
15 EXAMINATION BY MR. JOANEN:
16     Q.   Do you understand my question?
17     A.   This don't mean I can't answer --
18         MR. LEVINE:
19             You can answer unless I instruct
20         you not to answer.
21     A.   Oh.
22 EXAMINATION BY MR. JOANEN:
23     Q.   Unless he says don't answer, you'll be
24 able to answer.
25     A.   So who was my go to guy?  Is that what

Page 32

8  (Pages 29 to 32)

MONTEGUT, III, JAMES

8/8/2008

| | |
|---|---|
| 1   you're asking me? | 1     Q.   In your initial introductions to the |
| 2     Q.   Right. | 2   project, what was your understanding of what |
| 3     A.   Lee Guillory. | 3   the scope of the project was going to be? |
| 4     Q.   Was he your go to guy before 2001 when | 4     A.   Very similar to what you had stated |
| 5   you got involved? | 5   earlier in that this was going to be the |
| 6     A.   Lee Guillory was the construction | 6   precursor to coming in and dredging a bypass |
| 7   manager on Agriculture Street as well as -- I | 7   channel. And the disposal material -- or the |
| 8   call it IHNC, you call it EBIA. | 8   disposal site where this dredge material was |
| 9     Q.   I call it IHNC. | 9   planned to go wasn't capable or wasn't |
| 10     A.   Yeah. | 10   authorized, whatever the correct term would be, |
| 11     Q.   And so Lee Guillory is one, if you had | 11   to receive contaminated dredge disposal, so |
| 12   an issue come up during the course of your | 12   before you could dredge it and dispose in this |
| 13   workday and you were on the fence on which way | 13   site it had to be remediated. And I hesitate |
| 14   to go with it, you would go to Lee Guillory and | 14   to use the word cleaned, because cleaned |
| 15   kick the ideas around with him? | 15   implies contamination free. It had to be |
| 16     A.   Yeah. How does this sound, Lee, type | 16   remediated which, to me, and the way it was |
| 17   thing. Now if it was a contractual issue, I | 17   always explained to me, is that remediation is |
| 18   may go to the contracting officer. | 18   something that you do to lessen or to improve |
| 19     Q.   That's someone within the Corps? | 19   but not necessarily clean. If you clean |
| 20     A.   Yes. | 20   something, you know, you clean your plate, you |
| 21     Q.   On the task orders, was the | 21   can go eat on it again. But if you remediate |
| 22   contracting officer someone that -- I'm sorry. | 22   it, you might just scrape it off and put it in |
| 23   On the TERC issues, was the contracting officer | 23   the dishwasher or something. So it was to |
| 24   someone that was up in Tulsa that you would | 24   remediate the site in preparation for the |
| 25   have to turn to or was there someone locally | 25   dredging of this bypass channel. And part of |
| Page 33 | Page 35 |

| | |
|---|---|
| 1   that you would turn to? | 1   that remediation also included the demolition |
| 2     A.   No, the contracting officer, to my | 2   work, obviously. |
| 3   recollection, was always in Tulsa. | 3     Q.   That was going to be my next question. |
| 4     Q.   When you first became involved in the | 4   The project was going to involve both |
| 5   IHNC project, were you introduced to all the | 5   remediation and demolition. Was your function |
| 6   players for Morrison Knudsen and ultimately | 6   going to be focused both on the remediation |
| 7   Washington Group? | 7   aspect and the demolition -- |
| 8     A.   I was introduced to certain people. | 8     A.   Oh, yes. |
| 9   Now, whether they were all the players, I mean, | 9     Q.   -- aspect? |
| 10   when you're new to a project how do you know? | 10   To your knowledge, what was the scope |
| 11     Q.   That leads to my next question. How | 11   of the demolition when you first got involved? |
| 12   was it that you first became introduced to | 12     A.   It was to remove all of the structures |
| 13   these people? Was there a formal meeting that | 13   that were on the site. Those structures -- |
| 14   you were involved with, or was it just a walk | 14   above ground structures, consisting of various |
| 15   around where you're actually just saying, | 15   buildings, um -- the majority to my |
| 16   hello, how you doing? | 16   recollection were like tin type constructed |
| 17     A.   I think I was invited to one of the | 17   buildings, something that you would typically |
| 18   meetings that they had in Tulsa when the | 18   have seen maybe back around in the 1940s |
| 19   Washington guys were going to be there, and I | 19   construction, you know, style, motif, if you |
| 20   sat strictly as an observer to the meeting and | 20   will, in an industrial type setting. That was |
| 21   just to maybe get a feel, put a face with a | 21   primarily what the demolition work involved. |
| 22   name type thing. | 22   Removing any concrete slab, foundation |
| 23     Q.   Okay. | 23   slabs that were under these buildings and any |
| 24     A.   That's what I recollect as being how I | 24   foundation pilings that were supporting those |
| 25   first came to know some of these guys. | 25   slabs. And basically, removing everything from |
| Page 34 | Page 36 |

9 (Pages 33 to 36)

MONTEGUT, III, JAMES

| | |
|---|---|
| Page 37 | Page 39 |

**Page 37**

1  the site.  We used to always kind of remark to
2  ourselves that this was one of the few Corps of
3  Engineers sites that when it was done there
4  would be nothing to show.  You know, there
5  would be no ribbon cutting ceremony to open a
6  new lock or a flood gate or some type of
7  structure or levee.  There was nothing there
8  other than a lock the gate and go home.
9      Q.  We do know that there were some
10  subsurface structures that would have to be
11  removed.  When you first got involved in the
12  project, did you have an understanding of what
13  subsurface structures would have to be removed?
14      A.  Well, just through discussing it with
15  the Washington guys and with Lee who had been
16  working on the project, and, you know, I guess
17  from the inception of the design portions of
18  it, um -- that's how I learned about it, you
19  know.
20      Q.  Were there any documents that were
21  assigned to you to review to understand the
22  project?  And by assigned I mean they said go
23  read this so you get up to speed?
24      A.  Um -- not as I recall, no.
25      Q.  Were there any documents that you

**Page 38**

1  sought out to review to educate yourself about
2  the project and the scope of the work that was
3  to be performed?
4      A.  I probably reviewed the scope of work.
5  I believe there were several documents involved
6  with that, the work plans and things of that
7  nature.
8      Q.  When you say scope of work, just so
9  that we're on the same page, as I understand
10  what you're saying there was a scope of work
11  that could be produced by the Corps telling the
12  contractor what to do.  Is that what you were
13  referring to as the scope of work?  Or in this
14  particular project we know that the Corps
15  advised WGI or Morrison Knudsen to develop
16  certain work plans that ultimately became the
17  guide, initially, as to what work would be
18  done.
19      MR. TREEBY:
20          Object.
21  EXAMINATION BY MR. JOANEN:
22      Q.  When you say scope of work, what were
23  you referring to?
24      MR. TREEBY:
25          Object to the form of the

**Page 39**

1      question.  It's compound, it's
2  confusing.
3      MR. LEVINE:
4          Objection.  Vague,
5  mischaracterizes the evidence.
6  EXAMINATION BY MR. JOANEN:
7      Q.  Okay.  To solve that, what I'll tell
8  you is, in 1999 --
9      A.  See, I feel like I shouldn't answer a
10  question like that.
11      Q.  Maybe you shouldn't.  I'm trying to
12  make this easy to go through quickly and not
13  have to go through this whole box of stuff.
14  But in 1999, a task order was issued and
15  ultimately a direction was given to Morrison
16  Knudsen to perform certain works.  When you
17  refer to a scope of work, are you referring to
18  what the Corps was telling the contractor to do
19  or were you referring to what the contractor
20  developed to tell the Corps what they were
21  going to do?
22      MR. TREEBY:
23          Object to the form of the
24  question.
25  EXAMINATION BY MR. JOANEN:

**Page 40**

1      Q.  You can answer.  He doesn't represent
2  you.
3      A.  The second thing what you said, what
4  Washington 's work plan said they were going to
5  do.
6      Q.  That's all I'm trying to get to is
7  right there.  Thank you.
8          Had you been involved in the
9  development or review of any documentation that
10  led to the drafting of this project or the
11  project work plans?
12      A.  No.
13      Q.  To your recollection, were you
14  involved in the review of pay proposed work
15  plans prior to them being accepted and being
16  the final document that would be relied upon to
17  perform the work at the East Bank Industrial
18  Area?
19      A.  Not that I can recall, no.
20      Q.  To your knowledge, was -- what was the
21  deepest excavation that was considered to be
22  taking place at the IHNC when you first became
23  involved?
24      A.  I don't think we knew.  You know, I
25  think by nature of a TERC job you don't really

MONTEGUT, III, JAMES

8/8/2008

1    know -- you don't really know an exact scope of
2    work.  That's why it's -- the TERC works well
3    in that setting because it allows you some
4    flexibility contractually in that the
5    contractor can work and you don't have to give
6    him specific objectives to bid on.  He's not
7    bidding on excavating down three feet and three
8    hundred cubic yards.  He's bidding on cleaning
9    up the job, and you're agreeing to pay him his
10   expenses plus, you know, an agreed-to profit
11   or, you know, award fee, as they called it, for
12   his efforts.  So I don't know that that would
13   even be significant.
14       Q.  Do you recall approximately when it
15   was that physical labor actually took place at
16   the IHNC?
17       A.  When they mobilized to the site, um --
18   you're talking about when Washington Group
19   started physical labor at the site.
20       Q.  (Nods affirmatively.)
21       A.  Um -- again, I'm going to say early of
22   '01, maybe January of '01.
23       Q.  And that's when you became involved?
24       A.  Yes.  Right.  You know, because 9/11
25   was in '01, right?  This is how I -- sorry,
                                          Page 41

1    that I recall, Alex Brogna.
2        Q.  Would they report to you?
3        A.  Yeah.  We shared a job site trailer,
4    so.  They were on one end of the trailer, I was
5    on the other.
6        Q.  I was --
7        A.  It was a pretty close arrangement.
8        Q.  I was thinking more on the lines of
9    hierarchy, chain of command type thing.
10           Did they report to you --
11       A.  I was not their official supervisor in
12   that I didn't do any performance appraisals, I
13   couldn't -- you know, I couldn't approve leave
14   or anything like that.  I was not their --
15   technically not their supervisor.  But I was
16   what was referred to as a team leader, and so
17   if they had an issue as it related to the job,
18   they had a problem, say, with the job, then yes
19   they would come to me.  But was I their
20   supervisor?  No.
21       Q.  How much interaction did you have
22   personally with the members of the contractor
23   WGI and Morrison Knudsen?
24       A.  Well, that depends on who you're
25   talking about at Morrison Knudsen or WGI.  I
                                          Page 43

1    guys, this is how I got to remember things.
2    But 9/11 was in '01, so it was before 9/11
3    because we were out there for 9/11.  And it was
4    in the winter, so it was probably January of
5    '01.
6        Q.  When mobilization first started, was
7    your role to review the documentation that was
8    being produced by Washington Group or at that
9    time Morrison Knudsen perhaps, to determine
10   what they should be paid?
11       A.  If you're referring to the stack of
12   documents --
13       Q.  Yes, sir.
14       A.  -- yeah.
15       Q.  Did you have any other job
16   responsibilities out there?
17       A.  Well, as project engineer you had
18   other responsibilities, yeah.  I mean, we
19   had -- there were some inspectors, some Corps
20   quality assurance representatives out there
21   that reported to me.
22       Q.  And who were they, do you remember
23   their names?
24       A.  They were different from -- you know,
25   they came in and out.  Alvin Clouatre was one
                                          Page 42

1    had daily contact with the guys that were out
2    on the site.
3        Q.  And who were those people?
4        A.  Phillip Staggs was one.  He was the
5    primary guy.  Earlier on in the project, there
6    was another gentleman Dennis -- I can't
7    remember --
8           THE WITNESS:
9              You remind me of him.
10   EXAMINATION BY MR. JOANEN:
11       Q.  O'Connor?  Dennis O'Connor?  Does that
12   name sound right?
13       A.  Yeah.
14           THE WITNESS:
15              In fact, I thought you were
16           Dennis when you got out the car.
17   EXAMINATION BY MR. JOANEN:
18       Q.  What type of involvement would you
19   have with them, would it be where you'd have to
20   ask them questions about what their solutions
21   were, or was it more along the lines of what
22   actual physical labor was taking place?
23           MR. TREEBY:
24              Object to the form of the
25           question.
                                          Page 44

11  (Pages 41 to 44)

MONTEGUT, III, JAMES

8/8/2008

1       MR. LEVINE:
2            Same objection.
3       A.   Both.  If I had any question or issue
4   with something that was going on out there,
5   they would be the first two guys that I would
6   go to.
7   EXAMINATION BY MR. JOANEN:
8       Q.   Can you give me some examples of some
9   of the things that you would take issue with?
10      A.   If in my opinion they were doing
11  something that was not efficient, maybe -- as
12  an example, not to say that this happened, but
13  just to use as an example, maybe they were
14  working on a particular project to dig a hole,
15  let's say maybe I felt that they may have had
16  too many people or too much equipment or the
17  wrong type of equipment to accomplish the job,
18  I would have -- I would never -- it was never
19  my policy to go out to the, you know, to the
20  people actually doing the work, to the
21  laborers, if you, and question them.  I would
22  always go to Phillip or to Dennis and say, hey,
23  you know, I was just out at the site and I saw
24  ten guys trying to dig a hole the size of this
25  table, and you had three backhoes and seven

Page 45

1   dump trucks out there.  Obviously I'm
2   exaggerating here.
3       Q.   Sure.
4       A.   But that's what -- issues of that
5   nature.  I always tried to emphasize efficiency
6   and also being effective in what you do.  By
7   effective, I mean doing the right things as
8   opposed to just -- you know, you can be very
9   efficient, but if you're doing the wrong thing
10  you're not being very effective.  So.
11          So, um -- those were primarily -- and
12  early on it was always something that I wanted
13  to establish with my relationship with the
14  contractor, that efficiency and being effective
15  was very important.  Safety of course is always
16  the Number 1 priority, but efficiency and
17  effectiveness is probably a 1A priority.  And
18  that's what I wanted to impress upon --
19      Q.   In your work in the past working with
20  levees, had you ever performed any development
21  of I-walls --
22      A.   No.
23      Q.   -- as a flood control project?
24      A.   No.  Perhaps when -- if we go back to
25  the time when I was working with the

Page 46

1   computations, perhaps we in the office did some
2   computations that involved excavations on an
3   I-wall project, but other than that no.
4       Q.   Did you ever develop any expertise
5   regarding the issues of underseepage with flood
6   walls?
7       A.   Thirty-three years of experience on
8   the job.  Now, other than that, no.
9       Q.   And you do understand what I mean by
10  underseepage of a floodwall?
11      A.   You're talking about seepage, water
12  traveling underground.
13      Q.   Yes, sir.
14      A.   Passing underground and maybe, yeah,
15  causing damage, causing erosion, whatever.
16      Q.   Yes, sir.
17      A.   Yes.
18      Q.   When you first got involved with the
19  project in early 2001, were there any
20  discussions between you and Lee Guillory and
21  any of the people at WGI regarding potential
22  for underseepage?
23      A.   Not to my recollection.
24      Q.   If that type of discussion would have
25  taken place, would that have been the type of

Page 47

1   thing that would have taken place on the site,
2   or would that be something that would take
3   place more in an office setting higher up the
4   chain of command, perhaps, in the planning
5   phase?
6       MR. TREEBY:
7            Object to the form of the
8            question.
9       A.   It could have happened either case.
10  EXAMINATION BY MR. JOANEN:
11      Q.   And your testimony was you don't
12  recall that those discussions took place --
13      A.   Not in my presence, no.
14      Q.   At any time in the course of your
15  presence on this project, was the issue of
16  underseepage discussed with members of the
17  Corps and members of the contractor?
18      A.   Not to my recollection.
19      Q.   To your knowledge, were any directives
20  given to the contractor -- I'll just refer to
21  them as WGI -- to the contractor while you were
22  involved with it to not do anything that would
23  damage the levee or the floodwall?
24      MR. LEVINE:
25           Objection.  Vague.

Page 48

12  (Pages 45 to 48)

1    A.   Please repeat that.
2    EXAMINATION BY MR. JOANEN:
3        Q.   To your knowledge, while you were
4    involved with the project were any directives
5    given to WGI to not perform any works that
6    would damage the floodwall?
7        A.   Not to my recollection.
8        Q.   Do you recall whether there was any
9    directives that no works would take place
10   within 15 feet of a floodwall?
11       A.   Not -- you're saying directives.  No,
12   I have to say no, because I'm not aware of any
13   directives.
14       Q.   Were you, in the course of -- and I
15   use the term supervise in a very loose sense,
16   but when you go over and look at the project,
17   do you recall whether there was any works that
18   were taking place within 15 feet of the
19   floodwall that you would have had to stop and
20   tell them they couldn't do that?
21           MR. LEVINE:
22               Object to form.
23       A.   Do I recall of any occurrences of
24   that?
25   EXAMINATION BY MR. JOANEN:

Page 49

1        Q.   Uh-huh.  Yes, sir.
2        A.   No.
3        Q.   And how long did you stay out at the
4    IHNC project?
5        A.   Until-- the whole time that Washington
6    was mobilized on site.
7        Q.   And that was until 2005, right?
8        A.   Yeah.  Something like that.
9        Q.   Did you as the team leader and project
10   engineer ever review the soil stratigraphies of
11   the East Bank Industrial Area to understand
12   what the layers were and the makeup of those
13   layers, soil layers?
14           MR. LEVINE:
15               Objection.  Compound.
16       A.   No.
17   EXAMINATION BY MR. JOANEN:
18       Q.   To your knowledge, did Lee Guillory
19   ever study the stratigraphy of the soils to
20   understand the composition of the soils?
21           MR. LEVINE:
22               Objection.  Calls for
23   speculation.
24       A.   Yeah.  I don't know what --
25   EXAMINATION BY MR. JOANEN:

Page 50

1        Q.   I said to your knowledge.
2        A.   To my knowledge, no.
3        Q.   To your knowledge, was anyone assigned
4    by the Corps of Engineers as a Corps employee
5    to understand the stratigraphy of the soils at
6    the East Bank Industrial Area and the
7    composition of the soils?
8            MR. LEVINE:
9                Objection.  Compound.
10       A.   Not to my knowledge.
11   EXAMINATION BY MR. JOANEN:
12       Q.   To your knowledge, was there anyone
13   that was WGI employee that was expected to
14   understand the composition of soils and the
15   composition and stratigraphy of the soils in
16   the East Bank Industrial Area?
17           MR. LEVINE:
18               Compound.
19       A.   I don't know what WGI assigned people
20   to do.
21   EXAMINATION BY MR. JOANEN:
22       Q.   Was there a geologist that you would
23   go to that was a WGI employee, if you had any
24   soils concerns?
25       A.   I would go to Dennis or Phil.  Who

Page 51

1    they would go to was up to them.
2        Q.   How about a geotechnical -- let me ask
3    you first, do you understand what a
4    geotechnical engineer is?
5        A.   My understanding would be someone
6    who's knowledgeable in foundations or
7    subsidence or seepage, things like that.
8        Q.   Would that be the field that you
9    consider yourself an expert in?
10       A.   No.
11       Q.   Was there someone that would be either
12   a geotechnical engineer or someone who was
13   knowledgeable in the foundations work assigned
14   to WGI, the project by WGI?
15       A.   Could have been.  There again, I don't
16   know.
17       Q.   To your knowledge, was any surveys
18   done while you were out at the project to
19   determine what the soil stratigraphies were?
20       A.   There were some sampling done,
21   borings, soil borings, things of that nature,
22   to determine the level of contamination, to
23   identify contaminated areas and the extent of
24   the contamination.  To me, that's a
25   geotechnical type of a, you know, study or

Page 52

13  (Pages 49 to 52)

MONTEGUT, III, JAMES

1   survey.
2      Q.   Were those the studies that were done
3   in 2002 by Materials Management Group?
4      A.   Yeah, they did some of them.  I
5   believe there was another company that took
6   some borings, as well.
7      Q.   Were you involved in the supervision
8   of those projects?
9      A.   Those companies were subcontractors to
10  Washington, um -- it was never, ever my policy
11  to go directly to a subcontractor.  I always
12  worked through the prime.  If I had an issue
13  with something a subcontractor was doing I
14  would address it with Washington and give them
15  the opportunity to, um -- solve the problem.
16     Q.   The results of these borings, did you
17  ever have the opportunity to review them?
18     A.   I never asked to review them.  I went
19  by what Washington said the results were.  They
20  were -- in my eyes, they were the, for lack of
21  a better word, experts, and that's what they
22  were hired to do.  Excuse me.  That was one of
23  the things they were hired to do.
24     Q.   Sure.  As part of your job
25  responsibilities at the IHNC, did you have any

Page 53

1      Q.   As the project progressed into 2002,
2   there was an understanding that there would be
3   the need to do some fairly deep excavations
4   below ten feet, one of which was the removal of
5   the sewer lift station.  Do you recall that?
6      A.   Do I recall the sewer lift station
7   being removed?
8      Q.   Yes, sir.
9      A.   Yes.
10     Q.   Or the little project that would be
11  involved with removing that subsurface
12  structure.
13     A.   Yeah.  The activity.
14     Q.   What was the scope of your involvement
15  in that distinct project?
16     A.   Well, that was I guess an activity.
17  You know, to me a project was the overall
18  project from mobilization to demobilization,
19  but that was an activity within the project was
20  to remove that lift station.
21          Um -- I don't recall how it was
22  accomplished contractually, if there was a
23  modification issued to do that work, if it was
24  part of the original work, I don't recall.  But
25  as far as the accomplishment of the work, I was

Page 55

1   interaction with George Bacuta?
2      A.   George Bacuta.  I'm familiar with who
3   you're referring to.  He came out to the site
4   occasionally for a visit.  Generally, he came
5   with Lee Guillory.  And other than just having
6   cordial type discussions with him and maybe
7   giving him an update on what was occurring at
8   that particular time, I didn't really have any
9   dealings with George.
10     Q.   That would be my question.  He, at his
11  deposition, indicated that he was a soils
12  geochemist for the project.  My question would
13  be was he someone that was at the site
14  regularly such that you would have interaction
15  with him?  By regularly, I mean multiple times
16  a week.
17     A.   No.
18     Q.   The work that he was performing, was
19  that the type of work that would have been
20  information funneled through you?
21     A.   No, it's my understanding that George
22  was involved with the what I call the up front
23  work, the preliminary work, the work that was
24  done and accomplished prior to me arriving on
25  site.

Page 54

1   there on a daily basis and I witnessed some of
2   the work.  I wasn't out there, you know, from
3   starting time to quitting time, but, you know,
4   I was out there.  I was curious, for one thing,
5   just to see what a sewer lift station looked
6   like when you pulled it out.  I had never seen
7   one out of the ground before.  So --
8      Q.   To your knowledge, the plan that was
9   developed to remove that lift station, was that
10  already in place before you came on site, or
11  was that developed as the project was ongoing?
12  To your knowledge.
13     A.   You know, I really don't know.  I
14  guess it never -- it was never something that I
15  thought was significant as to when it was
16  developed.  I don't recall participating in the
17  development of that plan.
18     Q.   My next question was, it's my
19  understanding that a plan was developed to
20  accomplish that activity, to use your word
21  activity.  My question was going to be, were
22  you involved in the development of that plan to
23  accomplish that activity?
24     A.   Not that I recall.
25     Q.   The engineering that would be involved

Page 56

14  (Pages 53 to 56)

1  in removing that subsoil structure, would that
2  be the type of thing that you as the project
3  engineer and team leader would have expected to
4  be involved with?
5      A.  You know, if you would tell me when
6  that plan was developed -- you know, if it was
7  developed when I was on site I was involved
8  with it.  If it was developed prior to January
9  of '01, I wasn't involved with it.
10     Q.  It was in 2002.  I'll give it to you.
11     A.  If it was in '02, then yeah, I was
12 involved with it.  I don't remember it.  I
13 guess that's what I'm trying to answer.
14     Q.  Let me ask you while I'm looking for
15 it --
16     A.  Well, you don't have to -- I mean, I
17 think I've kind of answered it.  If it was post
18 '01, then yeah, I was involved with it.  If it
19 was prior to that, the answer would be no.
20     Q.  To your knowledge, was any soil
21 stratification studies done in relation to that
22 engineering study to accomplish that activity?
23     A.  I don't know.  That work was
24 accomplished by Washington -- WGI and their
25 subs.  Um -- the engineering -- if what you're
                                        Page 57

1  calling the engineering, if you're referring to
2  the design of the cofferdam that was put there
3  to brace the excavation, that was all done by
4  Washington Group or their subcontractor who I
5  don't recall at the time who that was.  But I
6  don't know what they did to design that.  I
7  know it had to be stamped by a licensed
8  engineer.  We wouldn't put somebody and I know
9  Washington wouldn't put somebody down in a hole
10 that was a braced excavation that wasn't
11 designed and, you know, certified to be
12 structurally sound by a capable and competent
13 licensed engineer.
14     Q.  To show you just -- the date of this
15 was October 19, 2001.  This is referenced as
16 WGI 48621, called Lift Station Removal Plan
17 Revised.
18     A.  Uh-huh.
19     Q.  And I'll just show it to you just to
20 show you the date.  And my understanding -- my
21 understanding is that this is the one that was
22 utilized.
23         MR. LEVINE:
24             WGI 48621 through WGI 48630.
25         MR. JOANEN:
                                        Page 58

1          I wasn't going to attach, but
2  I'll be glad to.
3      MR. BAEZA:
4          You'll be marking this as
5  Exhibit 10, or --
6      MR. JOANEN:
7          If you want to attach it, I'll
8  mark it as an exhibit.
9      MR. LEVINE:
10         Attaching it as 2.
11     A.  Well, I'm not going to read it all,
12 but just from, you know, looking over it here
13 real quickly, it's what, um -- it's what
14 Washington 's subcontractor, apparently Hamps
15 Construction, prepared to submit to Washington
16 to explain to them this is how we plan to
17 accomplish the removal of the lift station.
18 Probably what happened was Washington in turn
19 transferred -- or transmitted this to us and we
20 looked at it and made comments to it.
21 EXAMINATION BY MR. JOANEN:
22     Q.  My question is, when you say we looked
23 at it, I know you're referring to the Corps --
24     A.  Yes.
25     Q.  -- but my question is more specific.
                                        Page 59

1          Did you look at it?  And would this be
2  the type of thing that you would look at from
3  an engineering perspective and say it will work
4  or maybe there's a more efficient way to do it?
5  If you recall whether you were involved in any
6  of those tasks.
7      A.  Yeah.  I don't recall.
8      Q.  I'll be glad to mark this as Exhibit 2
9  since we're referring to it.
10         (Plaintiff's Exhibit 2 was marked for
11 identification and is attached hereto.)
12     A.  '01, that was seven years ago.  I
13 don't remember what I had for breakfast
14 yesterday.
15 EXAMINATION BY MR. JOANEN:
16     Q.  There also was another excavation
17 further up in the northern part of the IHNC
18 which was referred to I guess informally by a
19 lot of people as the wedding cake structure.
20 Do you recall that excavation and the
21 subsurface structure?
22     A.  I recall it.  I think I'm the one who
23 named it the wedding cake.
24     Q.  Really.
25     A.  Yeah.
                                        Page 60

15  (Pages 57 to 60)

MONTEGUT, III, JAMES

8/8/2008

```
 1     Q.   Good deal.
 2     A.   There's a story behind that, but --
 3     Q.   The need to remove this anchor
 4  foundation was discovered as the project was --
 5     A.   Yeah.  Subsequent to the mobilization
 6  on site.
 7     Q.   And it was I guess then understood by
 8  both the Corps and WGI that a specific plan had
 9  to be developed to accomplish the activity of
10  removing that wedding cake structure, correct?
11     A.   Correct.
12     Q.   And I'll show you what I'll mark as
13  Exhibit 3.  And this is WGI 37607 through WGI
14  37615.  It's a Draft Work Plan dated
15  August 2001.  (Tendering.)  My understanding,
16  whether correct or incorrect, is that this was
17  a work plan that ultimately was utilized to
18  accomplish the activity of removing it.
19          And my question to you will be the
20  same as it was for this lift station removal
21  plan:  Were you involved in the analysis of
22  this work plan to determine its engineering
23  parameters, and then also, although it's
24  somewhat of a compound question, the efficiency
25  of the plan?
                                        Page 61
```

```
 1  up a computer somewhere and run a program
 2  that's going to spit out some numbers and say
 3  yeah or no.  Um -- no, I didn't do that.  But
 4  if I would have felt that it needed that, I
 5  would have passed it on to Lee Guillory for him
 6  to determine who needed to perform that task.
 7     Q.   Do you recall whether in fact in
 8  looking at this you felt the need for that and
 9  you passed it on to Lee Guillory?
10     A.   I don't recall, but for something like
11  that I would have to say that I would have
12  passed it on for Lee to look at.
13     Q.   Do you recall whether having any
14  interaction with Lee Guillory about the
15  engineering efficiency of this plan?
16     A.   No, I do not.
17     Q.   Do you recall having any conversations
18  with Lee Guillory about the engineering
19  specifications about this plan?
20          MR. LEVINE:
21              Objection.  Vague.
22     A.   No, I don't.
23  EXAMINATION BY MR. JOANEN:
24     Q.   On this plan that involves the
25  excavation of the wedding cake structure,
                                        Page 63
```

```
 1          (Plaintiff's Exhibit 3 was marked for
 2  identification and is attached hereto.)
 3          MR. LEVINE:
 4              I'm going to make the objection
 5          now that you pointed it out for me.
 6          I'm also objecting to the vagueness of
 7          the question.  But go ahead.
 8          MR. JOANEN:
 9              Okay.  Just trying to move things
10          along as quickly as possible for you.
11  EXAMINATION BY MR. JOANEN:
12     Q.   Were you involved in the engineering
13  analysis of this plan on behalf of the Corps of
14  Engineers?
15     A.   If reading through the plan and
16  looking it over to determine if it looked like
17  it was going to work, if it was feasible, if it
18  didn't have anything that was really, um --
19  unsafe, you know, obviously unsafe, inherently
20  unsafe, um -- if that's what you mean by
21  engineering analysis, then yes.  If there was
22  something in here that required some type of
23  calculations, some type of analysis, like me
24  being an engineer when you used the word
25  analysis, I think somebody has got to go crank
                                        Page 62
```

```
 1  there's indication here that there would need
 2  to be, of course, backfill into the hole.
 3  Correct?
 4     A.   Correct.
 5     Q.   All right.  Were there specifications
 6  regarding the backfill that would have been
 7  included in this plan?
 8     A.   Specifications as to what, as to the
 9  amount of the backfill, the application of the
10  backfill?
11     Q.   Good question.  I guess I'll first say
12  what type of materials would be put back into
13  the hole?
14     A.   The hole, um -- that structure, that
15  wedding cake, was not a contaminated structure,
16  that I know of.  Um -- the material that was
17  excavated to expose it was placed back in the
18  hole.  So we basically, you know, dug it out
19  and put the same dirt back in.
20     Q.   Okay.  But when you take a structure
21  out -- do you know how much -- if you make a
22  rectangular box which will encompass the scope
23  of the excavation, it was going to include both
24  the soils that surround the structure you
25  remove and the solid structure.  Do you know
                                        Page 64
```

16  (Pages 61 to 64)

Johns Pendleton Court Reporters

800 562-1285

MONTEGUT, III, JAMES

8/8/2008

| | |
|---|---|
| 1  how much -- what percentage of that excavation | 1    Q.   For all the materials that were |
| 2  rectangle the wedding cake structure | 2  removed from the IHNC, was all the material |
| 3  incorporated? | 3  that was put back all from the borrow pit, or |
| 4     A.   You're talking about the makeup fill. | 4  was there any soils or sand brought in, |
| 5        MR. LEVINE: | 5  imported? |
| 6           Right. | 6     A.   What they call imported materials? |
| 7     A.   You're talking about makeup. | 7        MR. LEVINE: |
| 8  EXAMINATION BY MR. JOANEN: | 8           Objection.  Vague, compound. |
| 9     Q.   I'm trying to get to that, correct. | 9     A.   I remember at the end of the job, to |
| 10    A.   Yeah.  What percentage did the makeup | 10 do final grading and final dressing we brought |
| 11 fill constitute as opposed to the overall | 11 in material to do that.  That was -- I believe |
| 12 thing?  I don't know.  You know, it was a | 12 that was sand.  River sand. |
| 13 fairly large excavation they had to do to get | 13 EXAMINATION BY MR. JOANEN: |
| 14 access to it, to get machines on it and break | 14    Q.   During this time period of 2001-2002, |
| 15 it up and remove it.  I'll hazard a guess and | 15 it's not your understanding that any sand was |
| 16 say maybe it was 25 percent of, you know, the | 16 imported to utilize in the backfill operations. |
| 17 amount of material excavated, meaning that | 17       MR. LEVINE: |
| 18 75 percent of the material went back into the | 18          Objection.  Vague. |
| 19 hole.  The makeup fill was probably coming from | 19    A.   I don't remember.  Can I ask you a |
| 20 our borrow site there that we had on site. | 20 question? |
| 21    Q.   Do you know for a fact whether there | 21 EXAMINATION BY MR. JOANEN: |
| 22 was any specifications regarding where the | 22    Q.   Talk to your lawyer.  I'm glad to -- |
| 23 makeup fill would come from? | 23 yeah. |
| 24    A.   It would be in there. | 24    A.   What's the concern with this sand? |
| 25    Q.   Would that have been anything that you | 25    Q.   I'm just asking about the |
|                                    Page 65 |                                    Page 67 |
| 1  would have been involved with as the project | 1  specifications of the project, that's all. |
| 2  engineer? | 2     A.   Okay. |
| 3     A.   As far as what?  Approving it? | 3     Q.   That's all I'm asking. |
| 4     Q.   Sure.  Or establishing or approving | 4        To your knowledge, was there any sand |
| 5  the specifications. | 5  utilized in the backfill operations of the |
| 6     A.   Yeah, that was something that I would | 6  wedding cake structure? |
| 7  be involved with. | 7     A.   I don't recall. |
| 8     Q.   Do you know whether in fact sand was | 8     Q.   If there was sand utilized or was not |
| 9  an approved backfill material as the makeup | 9  utilized, would that have been a charge that |
| 10 fill? | 10 would have been associated with the project? |
| 11    A.   I don't -- I don't really recall.  You | 11    A.   Oh, yeah. |
| 12 know, we were using the material that came from | 12    Q.   If there was a charge associated with |
| 13 the -- on site, you know, from the borrow pit | 13 the project, would that have been something |
| 14 on site. | 14 that you would have reviewed? |
| 15    Q.   The McDonough borrow pit? | 15    A.   Yes. |
| 16    A.   Yeah.  I don't recall that being sand. | 16    Q.   That would have been in that stack of |
| 17    Q.   Do you recall whether any sand was | 17 documents? |
| 18 sent -- was brought to the site to be utilized | 18    A.   Yeah.  Right. |
| 19 in backfill operations? | 19    Q.   Is there a cover sheet for that stack |
| 20       MR. LEVINE: | 20 of documents, and if so, what would be your |
| 21          By site, you mean the wedding | 21 term for it? |
| 22          cake structure? | 22    A.   Transmittal letter. |
| 23       MR. JOANEN: | 23    Q.   Would the transmittal letter summarize |
| 24          Any of them. | 24 what the supporting documentation -- |
| 25 EXAMINATION BY MR. JOANEN: | 25    A.   No, the transmittal letter was |
|                                    Page 66 |                                    Page 68 |

17  (Pages 65 to 68)

MONTEGUT, III, JAMES

1 generally just a one or two sentence document
2 that said, you know, attached herewith is the
3 invoice backup data for the month of blah,
4 blah, blah, you know, in the amount of a
5 million dollars.
6      Q.   I have seen that there are things
7 called I think daily quantity reports?  Were
8 you involved in the development of those?
9      A.   No.  Those were something that
10 Washington Group probably, um -- accumulated
11 and tallied up, kept track of, and probably
12 they attached them as part of their QC -- their
13 daily QC report which they submitted to us, to
14 our, um -- quality assurance representatives,
15 our inspectors.  And then they, in turn, did a
16 report of their own and attached it to
17 Washington 's QC. report.  So you had a QA
18 stapled to a QC that went in the file on a
19 daily basis.
20      Q.   Would you have reviewed those QA/QC
21 reports, and I understand that was Mr. Clouatre
22 and Brogna preparing those -- primarily
23 preparing those.  Would that be the type of
24 think that would have reviewed on a daily
25 basis?

Page 69

1      A.   I would review them.  Not necessarily
2 on a daily basis.  I would review them when
3 they submitted them to me.
4      Q.   Would there be a scheduled interval in
5 which they would be submitted to you?
6      A.   They tried to maybe give me a week 's
7 worth at a time.  You know, like today is
8 Friday, maybe they would give -- on a Friday
9 they would give me that week 's worth of
10 reports, um -- that sort of thing.
11      Q.   And what was your review of those
12 reports entail?
13      A.   Generally, when I'm looking at those
14 reports I'm looking for comments that they may
15 have made -- there's a few little -- it's a
16 form.  The report is a form and there are a few
17 little boxes on that form -- areas on the form
18 that pertain to controversial issues that the
19 inspector may have encountered with the
20 contractor, so my primary focus was on if there
21 were any controversial issues that occurred on
22 that particular day, in which case I would go
23 and ask and find out, you know, what happened
24 or what the problem was and what was the
25 solution.

Page 70

1      Q.   Going back to these work plans for the
2 specific activity, in dealing with the lift
3 station do you know whether there was any
4 specifications regarding the compaction of the
5 backfill once the subsurface structure was
6 removed?
7      A.   I believe there was some, um --
8 statement to the effect that they had to
9 compact it with the bucket of the machine or
10 the excavator.  Um --
11      Q.   Were you involved in the approval
12 process of that specification of the work plan,
13 the compaction specification?
14      A.   Well, it's not -- as I recall, it's
15 not a separate specification, it's probably a
16 paragraph in that document that you're holding
17 there, or a couple of sentences of the
18 paragraph that addresses how they're going to
19 compact it.
20      Q.   Was there any testing of the
21 compaction?
22      A.   No.  Can I say something here?
23      MR. JOANEN:
24           You want to talk to your attorney
25 first.

Page 71

1      MR. LEVINE:
2           We'll talk at a break.
3           (Brief recess.)
4 EXAMINATION BY MR. JOANEN:
5      Q.   You wanted to say something?
6      A.   Yeah.  Based on the line of your
7 questioning, it seems like you have a concern
8 about the backfill material that was used in
9 these excavations and, um -- some question as
10 to maybe if that backfill could have induced
11 some type of a seepage, caused some type of, I
12 forget the term you used, but --
13      Q.   Underseepage.
14      A.   -- underseepage.  Yeah.
15      Q.   Right.
16      A.   I'd like to explain a little bit my
17 thought process --
18      Q.   Sure.  Sure.
19      A.   -- and maybe why I think you guys
20 might be missing the boat a little bit on it.
21      Q.   I look forward to your insight.
22      A.   Yeah.  I tend to approach things from
23 a practical nature.  Thirty-five years of
24 experience have kind of taught me that that's
25 the best way to go most of the time.

Page 72

18  (Pages 69 to 72)

MONTEGUT, III, JAMES

8/8/2008

1        And if you stop to think about this
2  for a minute, as far as the backfill I'm
3  talking about, what my thought process was is
4  that a Proctor is good, you know, it proves
5  something, it shows that compaction was
6  achieved.  But I didn't need a Proctor, I had
7  other things in my favor here that didn't make
8  it necessary to spend our taxpayers' money on a
9  Proctor.  Because chances are if I would have
10  gotten a Proctor, you guys would be here asking
11  me why I didn't take two Proctors or three
12  Proctors.  What I had in my -- you know, I
13  guess the luxury that I had was two things; I
14  had the luxury of time on my side because this
15  job was -- I believe you said it was in '01 or
16  '02 at this time.
17      Q.  Yes, sir.
18      A.  We were still going to be on site for
19  another two to three years.  Washington wasn't
20  going anywhere.  I had them under contract,
21  under a cost reimbursable contract.  And if we
22  had a problem with any of these backfill
23  operations it would have been nothing -- that's
24  a poor choice of words -- it would have been
25  quite simple for me to direct them, as

Page 73

1  contracting officer 's representative, to
2  correct deficient work and to go in and to do
3  whatever it took, probably just add fill
4  material.  And it would have been very easy to
5  notice if there was a problem because material,
6  over time, it will achieve a certain amount of
7  compaction on its own.  Rain and just elements,
8  natural vibrations, would cause the material to
9  settle and compact on its own.  Had it -- if it
10  were not compacted properly, the area that was
11  excavated would have subsided and there would
12  have been a depression or a hole in the ground
13  at that site.  It would have been very simple
14  to notice that and to direct Washington to go
15  back and fix it.  So that was my thought
16  process at the time.
17      If you want to be concerned about
18  seepage, you have to consider what was removed
19  from the site.  We were talking about a slab
20  that, I don't know, it may have been cracked up
21  and damaged in some sort of a way.  The lift
22  station that you referred to earlier, that was
23  an abandoned lift station that had been
24  there -- I don't know, it might have been there
25  before the levee.  I don't know how long it had

Page 74

1  been there.  It was in a deteriorated state
2  when it was removed.
3      The lift station is basically a
4  pipe -- it's a large diameter pipe with pumps
5  in it, valves and ladders to get down into it,
6  all encased in a -- I want to think that that
7  was a metal pipe.  Over the years, being
8  exposed to a brackish water in the Industrial
9  Canal, that thing was deteriorated
10  substantially.  You don't think that was a
11  seepage -- a source for potential seepage?
12      So we were out there remediating the
13  site.  What we did, regardless of what the
14  backfill was -- and I honestly don't recall
15  what it was, but regardless, if it was sand, at
16  the very worst what we put back was every bit
17  as good as what we took out.  Because you had
18  this deteriorating structure, vessel, in the
19  ground that was just holding dirt around it
20  loosely.
21      There was a lot of sand that came out
22  of that hole for the, um -- for the lift
23  station because that's typical construction
24  practice -- whenever you put a pipe or
25  something in the ground, a conduit, you

Page 75

1  typically lay a bed of sand down so that when
2  it rests it's supported consistently.  If you'd
3  put clay and it was balls of clay like bricks,
4  it would point load the structure and, you
5  know, pushing on it harder in one spot than
6  another and it would tend to cause breakage.
7  So to avoid that, an engineering solution to
8  that is to lay a bed of sand, set it down in
9  sand as a kind of like a cushion almost,
10  something that will conform uniformly around
11  the vessel and support it.  They do that in
12  tanks, whenever they put down underground
13  tanks.  You do that in -- you know, whenever
14  you're laying a utility line or a sewer line,
15  an electrical line or whatever, you always put
16  gravel or some type of a material like that to
17  support it evenly.
18      Talking about utility lines, we
19  removed numerous utility lines.  They were
20  running all over the place out there, from
21  front to back.  By front I mean from Surekote
22  Road being the front of those properties to the
23  back being the canal of those properties.
24  Numerous utility lines, waterlines, um -- there
25  was no natural gas back there.  Sewer lines,

Page 76

19  (Pages 73 to 76)

MONTEGUT, III, JAMES

8/8/2008

| | |
|---|---|
| 1 electrical lines.  Um -- we removed all of | 1 the sheet pile tips did not exceed -8 to |
| 2 that.  You don't think that was potential | 2 -10 feet? |
| 3 seepage problem waiting to happen? | 3    A.  I have no idea what the sheet pile |
| 4    I mean, you had all of these trenches | 4 tips were. |
| 5 that were dug with deteriorated conduit and | 5    Q.  If I showed you a document that was |
| 6 whatnot in it laid with sand in the trenches. | 6 produced by WGI that said the sheet pile tip |
| 7 I mean, we remediated all of that. | 7 went down to -25 feet and would therefore cut |
| 8    So if you want to consider harm that | 8 off any groundwater flow down to that level, |
| 9 we did, okay, give us credit for the good that | 9 would you have any reason to believe that is |
| 10 we did.  And that's my point.  My point is is | 10 correct or incorrect based upon your |
| 11 that what was done out there was remediation. | 11 understanding of the actual facts? |
| 12 I wasn't a cleanup, it was a remediation.  And | 12    A.  No, I base my belief of it on whether |
| 13 when we left that site it was better than when | 13 it was stamped by a professional land surveyor |
| 14 we drove up to it because of that. | 14 or a licensed engineer. |
| 15    Thank you for listening. | 15    Q.  If you're the project engineer and WGI |
| 16    Q.  No.  The sheet pile that was beneath | 16 gives you a document that they produce that |
| 17 the floodwall at the East Bank Industrial Area, | 17 indicates that the sheet pile tip depth was |
| 18 IHNC -- | 18 -25 feet, would you have any reason to question |
| 19    A.  Yeah. | 19 it? |
| 20    Q.  -- do you know how far down it | 20    A.  If it was -- no, if it was stamped by |
| 21 reached? | 21 a professional engineer or a licensed land |
| 22    A.  No. | 22 surveyor. |
| 23    Q.  The Corps of Engineers says it reached | 23    Q.  Do you believe that was necessary for |
| 24 down to about -8 feet, per the design. | 24 them to have it stamped by a professional |
| 25    A.  Elevation -8. | 25 engineer or licensed land surveyor? |
| Page 77 | Page 79 |
| 1    MR. LEVINE: | 1    A.  Well, I think that's the only way you |
| 2    Objection. | 2 can make it a legal document. |
| 3 EXAMINATION BY MR. JOANEN: | 3    Q.  Were there documents produced by WGI |
| 4    Q.  And then when it was measured after -- | 4 that the Corps relied upon that were not |
| 5 you know where the south breach occurred, which | 5 stamped such as you said they need to be? |
| 6 is near where the Saucer site was? | 6    A.  Um -- you know, I can remember taking |
| 7    A.  No. | 7 surveys, or not me taking surveys, but I can |
| 8    Q.  You know where the Saucer site was -- | 8 remember surveys being taken that may not have |
| 9 you know that IHNC was divided into six | 9 been stamped, but I know that they were done by |
| 10 distinct sites? | 10 a professional land surveying company.  So in |
| 11    A.  Yeah.  That's portion closest to the | 11 that context, yes, I think there would have |
| 12 Claiborne Avenue bridge. | 12 been some situations where they submit |
| 13    Q.  Yes, sir.  And then you had the Boland | 13 documents that weren't stamped, but knowing |
| 14 site was the northern part? | 14 that they came from a licensed company it's the |
| 15    A.  Correct. | 15 equivalent in my mind to it being stamped. |
| 16    Q.  At the Boland site, that's adjacent to | 16    Q.  Was WGI considered a licensed company? |
| 17 where one of the breaches occurred that flooded | 17    A.  Their company was licensed, and I'm |
| 18 the Lower Ninth Ward? | 18 sure they had professional engineers and land |
| 19    A.  Unh-unh. | 19 surveyors on the payroll.  If not, I'm sure |
| 20    Q.  You're familiar with that? | 20 they knew where to go hire them. |
| 21    A.  Yeah. | 21    Q.  Was it your understanding or your |
| 22    Q.  And then the southern breach was | 22 expectation that the project engineer knew that |
| 23 adjacent to the Saucer site? | 23 they would be the ones to handle those |
| 24    A.  Okay. | 24 obligations? |
| 25    Q.  Do you have any reason to believe that | 25    MR. TREEBY: |
| Page 78 | Page 80 |

20  (Pages 77 to 80)

MONTEGUT, III, JAMES

8/8/2008

| | |
|---|---|
| 1            Objection vague; those | 1     A.  No.  One of the, um -- I guess |
| 2   obligations. | 2   requirements -- requirements is a bad word, but |
| 3   EXAMINATION BY MR. JOANEN: | 3   one of the principles of a TERC contract is |
| 4     Q.   You the ones you just referred to in | 4   that the money has to be there before the |
| 5   your previous answer. | 5   contractor is allowed to do the work.  I can't |
| 6       MR. TREEBY: | 6   direct them to go do something, commit the |
| 7         He didn't refer to any | 7   government to funds -- I can't do it because |
| 8   obligations in his previous answer. | 8   I'm a COR.  But the contracting officer can't |
| 9     A.  Repeat the question, please. | 9   do something to commit -- or have them go do |
| 10  EXAMINATION BY MR. JOANEN: | 10  work that funds aren't available to pay them |
| 11     Q.   As the project engineer, was it your | 11  for. |
| 12  expectation that WGI would go out and get the | 12     Q.   Who would actually write the check to |
| 13  proper stamps? | 13  WGI when they would submit an invoice? |
| 14       MR. TREEBY: | 14     A.   That's a good question.  I don't know. |
| 15         Objection.  Vague. | 15  It wasn't me.  What I would do is I would |
| 16  EXAMINATION BY MR. JOANEN: | 16  review the invoice for completeness, and then |
| 17     Q.   Either of a professional engineer or | 17  when I was satisfied that the invoice, that |
| 18  that they would do it themselves. | 18  there were no issues -- typically what would |
| 19       MR. TREEBY: | 19  happen is I would question a few things, send |
| 20         Objection.  Vague. | 20  it back to WGI, and then they would rectify |
| 21       MR. LEVINE: | 21  those costs that I would question, resubmit it, |
| 22         Objection.  Compound. | 22  and then we would prepare a form -- I forget |
| 23     A.  I would think if I requested them to | 23  the number of the form, but it was a form that |
| 24  get it stamped, yes, they would. | 24  our finance and accounting folks would use to |
| 25  EXAMINATION BY MR. JOANEN: | 25  cut the check.  I don't even think there was a |
|                           Page  81 |                           Page  83 |
| 1     Q.   But that wasn't my question. | 1  check, per se, cut.  I think it was an |
| 2     A.  I was willing to pay for it. | 2  electronic funds transfer probably into one of |
| 3     Q.   Well, was there a time during the | 3  their bank accounts. |
| 4  course of this project where the Corps was not | 4      But once I've signed that invoice, I |
| 5  able to met their financial obligations to keep | 5  would give it to Lee Guillory, he would in turn |
| 6  the project moving? | 6  forward it to the paying office, the finance |
| 7     A.  I'm thinking.  I'm thinking back.  I | 7  center, and I want to think it was in |
| 8  mean, there was a time when funding levels were | 8  Millington, Tennessee.  I think for some reason |
| 9  below what was originally anticipated, but we | 9  Millington, Tennessee shoots out in my mind as |
| 10  always meet our financial obligations.  We | 10  being on that form as the address of where to |
| 11  worked closely with Washington Group on things | 11  send the invoice to. |
| 12  or measures to take to make sure that we would | 12     Q.   Just so I understand, the steps I |
| 13  meet those financial obligations.  But with the | 13  guess would be that you would review WGI 's |
| 14  approval of the contracting officer and the | 14  invoice submission -- |
| 15  project manager, we scaled back from time to | 15     A.  Right. |
| 16  time on operations to ensure that we would have | 16     Q.   -- make sure it met the standards that |
| 17  enough money.  And that kind of goes back to | 17  you required. |
| 18  what I was saying toward the beginning of this | 18     A.  Right. |
| 19  discussion, this deposition, one of my biggest | 19     Q.   Once it met your standards you would |
| 20  concerns, one of my biggest responsibilities, I | 20  forward it to Lee Guillory; is that correct? |
| 21  felt, was to make sure that any work that was | 21     A.  That's correct. |
| 22  done we had the money to pay for it. | 22     Q.   And then Lee Guillory at that point |
| 23     Q.   Did you ever have an understanding | 23  would approve it?  Is that correct? |
| 24  that WGI felt that they had advanced in their | 24     A.  No, um -- Lee never signed it.  I |
| 25  work further than they were being paid? | 25  signed it.  Once I signed it, it was approved |
|                           Page  82 |                           Page  84 |

21  (Pages  81 to 84)

MONTEGUT, III, JAMES

8/8/2008

1  for payment.  Um -- in that particular sense --
2  we didn't really have a fax machine out on the
3  office, so I would give it to Lee who would fax
4  it -- or Fed Ex it.  I think he Fed Ex'd it.
5  We never really that had type of a setup.  I
6  gave it to Lee just to expedite it.
7      Q.   Would there be communication between
8  the New Orleans District and the Tulsa office
9  to effectuate payment?
10     A.   I don't know.  Nothing that I did
11  along those lines.  Now, if maybe Lee did
12  something -- probably what he -- as a minimum
13  what he would have done is probably faxed them
14  a copy of the forms.  Not the twelve-inch stack
15  of backup documents, but, you know, the little
16  four or five pages of forms.
17     Q.   So if in fact there were communication
18  between the New Orleans District and the Tulsa
19  District relative to payment of WGI 's specific
20  invoice, it would have taken place between
21  individuals other than you; is that correct?
22     A.   Yeah.  That's not to say, though, that
23  if someone in Tulsa had an issue or had a
24  question that they wouldn't necessarily pick up
25  the phone and call me.  But typically the

Page 85

1  it was less easy -- it was less difficult.
2      Because Agriculture Street, for
3  example -- the west bank, for example, we were
4  literally working in people's front and
5  backyards, and you had to please the public
6  with varying, I guess, expectations as to what
7  they should get in return for the work.  You
8  know, just the public relations, the
9  coordination of that was difficult.
10     That wasn't present on this job, per
11  se.  I mean, we weren't working in people 's
12  backyards.  So.
13     Q.   Other than working on the canal and
14  the tank car issue where they had to remove it,
15  what other activities at that work site would
16  lead you to believe that it was more difficult
17  than others that you have worked on in your
18  experience?
19     A.   I can't think of any.
20     Q.   In your relationship --
21     A.   Washington might tell you that working
22  with me was difficult.
23     Q.   I'm building up to that.  My question
24  to you was what was -- in your dealings with
25  Washington Group, what was your analysis of

Page 87

1  standard operating procedure would have been
2  for them to work through Lee.  Lee was kind of
3  the liaison, I guess, between the field and the
4  technical and the other district elements.  I
5  believe his official title was like
6  construction manager or something.  Something
7  along those lines.  Not that it matters.
8      Q.   Of the projects that you worked on for
9  the Corps, how would you rate them as -- how
10  would you rate the IHNC project as -- relative
11  difficulty, would you find that a difficult
12  job?
13     A.   In some ways.  In other ways I think
14  it was probably average.  Um --
15     Q.   In what ways did you think it was more
16  difficult than some of the others that you
17  worked on?
18     A.   Primarily because it was along the
19  bank of the canal and you had some marine work
20  involved.  They had to remove a pier, a dock.
21  They had -- we discovered at some point that
22  there was a, um -- a sunken railroad tank car
23  that had apparently fallen off of a barge and
24  was in the canal and had to be removed.  In
25  those respects, um -- in other respects, um --

Page 86

1  whether they thought this was a difficult
2  project or not?
3      MR. LEVINE:
4          Objection.  Calls for
5      speculation.
6      A.   Yeah.
7  EXAMINATION BY MR. JOANEN:
8      Q.   I'm saying what's your analysis.  I
9  don't want you to speculate about what you
10  think, I want to know what you actually thought
11  in your analysis.
12     A.   Personally, it didn't matter to me
13  what they thought, if they thought the job was
14  difficult or not.  What mattered to me was that
15  they did it.
16     Q.   Well, you as the project engineer can
17  tell whether they're getting along easily or
18  they're having some technical issues that need
19  to be addressed.
20     A.   Oh.
21     Q.   And so in your analysis, did you think
22  that they were having an easy job of it or was
23  it a difficult job?
24     MR. LEVINE:
25          Same objection.

Page 88

22  (Pages 85 to 88)

MONTEGUT, III, JAMES

8/8/2008

1      A.   I never got the impression from them
2   that they were in over their heads or that they
3   stumbled upon something that they didn't know
4   what to do or who to call or who to hire to fix
5   a problem.  No.  They were top notch.
6   EXAMINATION BY MR. JOANEN:
7      Q.   In your analysis of removing the
8   aboveground structures, the sheds that had the
9   forties motif --
10     A.   Yeah.
11     Q.   -- was that a hard job?  Anything any
12  competent demolition contractor couldn't do?
13     A.   Yeah.  I don't -- if I recall
14  correctly, Washington, you know, subbed that
15  out to a demolition guy.
16     Q.   Same with concrete slab removals;
17  nothing difficult about that?
18     A.   They may have self-performed the slab
19  removals, you know.  If I recall correctly, I
20  think that was Washington 's forces that did
21  the slab removals.
22     Q.   That's not rocket science, right?  You
23  put a chisel hammer on it, break it up and put
24  it on a truck and get rid of it; right?
25     A.   Any caveman can do it.

Page 89

1      Q.   Done it myself.
2      MR. LEVINE:
3         I'm not so sure about that.
4   EXAMINATION BY MR. JOANEN:
5      Q.   The excavations that are done, the
6   removal of the soils around the subsurface
7   structures, obviously you have to have a
8   specialized machinery there which is a backhoe
9   or something like that.  Was that anything that
10  requires extraordinary technical experience?
11     A.   No, but I'm not real sure what you
12  mean by the removal of the soils around the
13  subsurface foundation.
14     Q.   Scooping -- when you build a cofferdam
15  you got to scoop the soils up to lift the thing
16  out?
17     A.   You're back to talking about
18  cofferdams now.
19     Q.   I'm talking about excavations, right.
20  Well, let's talk about the shallow excavations
21  they did.  Originally, they were planning on
22  only removing --
23         (Off the record.)
24  EXAMINATION BY MR. JOANEN:
25     Q.   If you want to talk about the shallow

Page 90

1   excavations first, scooping up the soils, is
2   there any special technical experience you need
3   to have to scoop that first five feet up?
4      A.   No.
5      Q.   The deeper excavations, when we go to
6   the wedding cake structure and the sewer lift
7   station, other than having the specialized
8   machinery to get down deep into there, is there
9   any specialized technical experience that needs
10  to be hired by the Corps to get that hole dug?
11     A.   Yeah.  Um -- you are getting into a
12  little bit more technical issues there because
13  you've got a cofferdam involved so you've got
14  to drive the sheet piling, you know, to
15  construct the cofferdam, you've got welding
16  involved, you've got pile driving involved.  I
17  guess at that point it becomes a question do
18  you consider that complicated?  Um -- it's more
19  complicated than having a backhoe there with a
20  bucket on it and a guy on back of the backhoe
21  digging three feet deep, you know.
22     Q.   Do you think that the driving of the
23  cofferdam and tack welding the walers is a
24  complicated activity such that Washington Group
25  would have difficulty with it?

Page 91

1      A.   No.  There again, though, Washington
2   Group did not self-perform those activities,
3   they subbed it out.
4      Q.   The actual lifting of the sewer lift
5   station, do you know whether Washington Group
6   did that themselves or whether they
7   subcontracted it out?
8      A.   I don't recall.
9      Q.   The wedding cake structure, I know
10  that wasn't just lifted out, it was broken up.
11     A.   Right.
12     Q.   Was that anything that was a
13  complicated activity that Washington Group did
14  themselves?
15     MR. LEVINE:
16        Objection.  Compound.
17     A.   Um -- you know, I'm a little fuzzy on
18  that.  I remember the actual removal of it, and
19  like you said, they had to break it up with a
20  hammer.  They actually had a big iron cube in
21  the middle of the thing that had to be cut up
22  with a torch.
23  EXAMINATION BY MR. JOANEN:
24     Q.   Uh-huh.
25     A.   I want to think Washington did some of

Page 92

23  (Pages 89 to 92)

Johns Pendleton Court Reporters

800 562-1285

MONTEGUT, III, JAMES

8/8/2008

| | |
|---|---|

1  that work.  They didn't do the construction of
2  the cofferdam, though.
3      Q.   They subbed that out.
4      A.   Yeah.
5      Q.   I'm going to show you an E-mail
6  that -- so you understand where this comes
7  from.  In this litigation the Washington Group
8  has produced reams of documents that I've had
9  the pleasure of going through.
10          (Plaintiff's Exhibit 4 was marked for
11  identification and is attached hereto.)
12      A.   God love you.
13  EXAMINATION BY MR. JOANEN:
14      Q.   And this is one from Dennis O'Connor,
15  someone that you knew of, and it was from
16  Dennis O'Connor to Richard Lesser.
17          Do you know who Richard Lesser is?
18      A.   The name is familiar, but -- I mean,
19  he's familiar in the sense that he was a
20  Washington employee.
21      Q.   Uh-huh.  I'll let you read it but I'm
22  going to just read it into the record.  This is
23  dated August 2nd, 2005.  And it says, a month
24  or so ago I was asked what I thought of working
25  in Iraq.  I responded by saying, "I've been on

Page 93

1      Q.   My question to you, as the project
2  engineer, what in your observation would lead
3  this guy Dennis O'Connor, who is one of the
4  senior guys on site, to feel that working in
5  the East Bank Industrial Area in New Orleans,
6  Louisiana is harder than working in Iraq?
7          MR. LEVINE:
8              Objection.  Speculation.
9  EXAMINATION BY MR. JOANEN:
10      Q.   I'm asking about your observations.
11      A.   Well, you know, anybody who's good at
12  what they do as a professional has -- be it a
13  football player or a dancer or an engineer or a
14  lawyer, anybody who's good at it, has a way, a
15  knack to make something that's very difficult
16  for the average person to appear to be very
17  easy.  If you're sitting down watching a
18  football game or a golf match, you watch these
19  guys perform, and they'll catch a football
20  that's flying 60 yards in the air, or kick a
21  football, or hit a golf ball three hundred and
22  fifty yards right down the middle of the
23  fairway.  You go try to do that.  I try to do
24  it every day playing golf and I can't come
25  close.  So what I'm trying to say is, a true

Page 95

1  harder jobs, I've dealt with tougher problems.
2  Of course, I was referring to the EBIA.  The
3  people that worked on the EBIA should be
4  congratulated.  I always thought that the
5  company failed to understand the difficulties
6  this particular project presented.
7  Nonetheless, thanks for letting me know that
8  the job got finished and no one shot the
9  Montegut.  My thanks to the folks that I was
10  privileged to work with, you know who you are
11  (now get over it)."  And it's signed by him,
12  electronically, I guess, as a project manager
13  for the Middle East Construction Program.  And
14  I'll read that, it's WGI 262190.
15          MR. LEVINE:
16              Do you have any more copies?
17          MR. JOANEN:
18              No.
19          MR. LEVINE:
20              Is there a question pending?
21          MR. JOANEN:
22              I'm going to ask a question but I
23          want him to look at it before I ask a
24          question.
25  EXAMINATION BY MR. JOANEN:

Page 94

1  professional can take the difficult and make it
2  appear easy.  So maybe I didn't know everything
3  Dennis O'Connor had going on and all of the,
4  you know, balls he had to juggle to make it
5  look easy to me.  Um -- if he felt it was
6  difficult, then I'm kind of glad in a way,
7  because that means I pushed him and got a good
8  job out of him, in a way.  In another way, I'm
9  somewhat, you know, sad that he was glad nobody
10  shot me.  But that's okay.  I'm glad nobody
11  shot him in Iraq.
12      Q.   I guess the question that I have that
13  pops in into my mind on this is if the
14  difficulties that he's referring to were in
15  getting paid, that's different than the
16  difficulties that he's experiencing in actually
17  performing the labor to accomplish the tasks.
18  Correct?
19          MR. LEVINE:
20              Objection.  Speculation.
21          MS. CRONIN:
22              Speculation.
23      A.   Correct.
24  EXAMINATION BY MR. JOANEN:
25      Q.   And we have already gone through this

Page 96

24  (Pages 93 to 96)

MONTEGUT, III, JAMES

8/8/2008

1  when we went through the various tasks that you
2  were asking them to perform; they weren't
3  overly complicated, correct?
4      A.   Taken on an individual analysis, yeah,
5  it's not complicated to dig a three-foot hole
6  with an excavator, no.
7      Q.   And as you said, the time constraints
8  were not that overbearing because they had a
9  number of years to be out there, correct?
10     A.   That's correct.
11     Q.   So it would appear to me that the
12 difficulties that they had were getting paid.
13 And of course every big corporation, the reason
14 they're out there is to --
15     A.   Make money.
16     Q.   -- get paid.
17         MR. LEVINE:
18             Objection.   Speculation.
19         MS. CRONIN:
20             Speculation and
21         mischaracterization.
22 EXAMINATION BY MR. JOANEN:
23     Q.   While you were the project engineer
24 for this project, did you ever hear anyone at
25 WGI refer to this project as an upside-down

Page 97

1  project?
2      A.   No.
3      Q.   Have you ever in your experience as an
4  engineer with the Corps of Engineers heard of a
5  project being an upside-down project?
6      A.   I don't know what that means.
7         MR. LEVINE:
8             Did you mark that last document?
9         MR. JOANEN:
10            Yeah.   It's 4.
11 EXAMINATION BY MR. JOANEN:
12     Q.   At any time while you were a project
13 engineer on this project, did you hear someone
14 from WGI comment that they had made a deal with
15 the devil during funding?
16     A.   No.
17     Q.   Did you ever hear someone from WGI say
18 they made a deal with the devil during --
19 regarding the interruptions; i.e., all funds
20 went to maintain on-site staff?
21     A.   No.
22     Q.   I'll show you -- this is a document --
23 again it's produced by WGI.   It's WGI 57505
24 through 57523.   I'm sorry I only have one copy.
25 I didn't think we would get into this.   But in

Page 98

1  the same paragraph it talks about this deal
2  with the devil, and it indicates that the logic
3  is that it was easy to reassign office pukes
4  and if we left the site we might not be called
5  back.
6         Did you ever hear of anyone at WGI
7  make those comments to you?   And I'll show you
8  just a page.
9         MR. LEVINE:
10            Are we going to attach --
11        MR. JOANEN:
12            If I give them all to him.
13     A.   No.   I never did.
14 EXAMINATION BY MR. JOANEN:
15     Q.   And this just -- like I said, it's
16 obviously -- it's something that was being
17 worked on by WGI with angry comments from WGI
18 people, as I understand it.   You also see up
19 here where it says upside-down.   Obviously
20 there's some overlying concepts that were on
21 this guy 's mind.
22     A.   Yeah.   I'm kind of curious what
23 upside-down means.   I don't know.   I know what
24 it is to be upside-down on a car loan.
25     Q.   Well, that's what instigated my

Page 99

1  questions to you, since you're the finance --
2  there's a financial interaction through you, to
3  see if you understand what they're talking
4  about here.
5         And again, on the second page, it's
6  WGI 57506, they have in quotes, upside-down,
7  that's the table of contents, but they have a
8  whole section on that.
9         Moving into Section 1.1.0 which is the
10 introduction, there's some amendments in here,
11 and it's difficult to read but my understanding
12 of what this says, this report -- and I can't
13 read the word, it starts with a C -- the
14 problem of subcontracting Washington Group 's
15 core competence and its detrimental effect on
16 Washington Group 's long-term business
17 interests.   The bottom of that second
18 paragraph.
19        MR. LEVINE:
20            Core competence, that's spelled,
21        so the record is clear, that's C-O-R-E
22        not C-O-R-P-S.
23        MR. JOANEN:
24            Good point.
25        (Off the record.)

Page 100

25 (Pages 97 to 100)

EXAMINATION BY MR. JOANEN:
Q. Have you had a chance to look at that?
A. Yeah.
Q. While you were the project engineer, did you ever hear anyone at WGI say to you that they had subcontracted out tasks which fell within their core competence?
A. No.
Q. Were there any discussions between you and Dennis O'Connor or anyone else that would indicate that the things that they were doing were difficult and that they were outside of the scope of their core competence?
A. Not as I recall, no.
Q. Did Dennis O'Connor or anyone else involved with the management of the project on site say to you that they were concerned about the issues that they were having at the East Bank -- at the IHNC would be detrimental to their long-term business interests?
A. Not that I recall.
Q. Were you familiar with any WGI 's difficulties at the Tar Creek project?
A. None whatsoever.
Q. I'm sorry?

Page 101

A. None whatsoever.
Q. Were you familiar as the project engineer with any difficulties that WGI was having with its subcontractor MMG which is Materials Management Group?
A. I'm thinking. There were some issues with MMG early on in the project as it related to their efficiency in accomplishing certain activities. Whether that caused difficulties with Washington I can't speak to that.
Q. If Washington were having difficulty with that, would that be something that you would have been brought in on?
A. I think that that would be something you'd have to ask Washington. That would be a decision they would have to, um -- make if they wanted to bring me in on a difficulty they were having with a sub that I was unaware of.
Q. I guess that was a bad question.
If you realized that -- as the project engineer, in your responsibilities at the project, if you realized that WGI was having some difficulties and you knew from observation and experience that it was because one of their subs was not performing to the best of their

Page 102

abilities, would that be the type of thing that you would get involved with? Or maybe someone else, perhaps it would be Lee Guillory and not you.
A. Yes. Yes. And I think it would be me.
Q. Okay. Did you -- and if I asked the question before, I apologize. Did you observe any such difficulties that WGI was having with its subcontractors such that you did get involved?
A. Yes.
Q. And what issues were those? Or what activities?
A. As I recall, MMG was performing soil borings to determine contamination levels. Um -- the performance, in my opinion, was inefficient due to the fact that while the people on the ground were working hard and doing the best they could, the equipment that they were utilizing was just too small to work effectively and efficiently in the large scope of the borings that they had to do. If I recall correctly, they may have had to do three hundred and some odd borings. Maybe more, I

Page 103

don't know. But let's just say for the sake of discussion they had to do 365 borings. Um -- it was my observation when they were out there initially that it would take them, based on my recollection, in excess of a day to complete one boring. And we're talking about a boring that may be ten feet deep, twenty feet deep. They had -- the borings were varying in depth, some were ten, some were twenty. It didn't take a whole lot of complicated arithmetic to figure out that they would be out there at that rate for well over a year. And it was not through a lack of effort from the people. It's not that the people were, you know, taking a break every five minutes or anything like that, they were out there doing the best they could.
So I went to Dennis and expressed my concerns over the amount of time this was taking, and I said that in my estimation we would come out cheaper in the long run to get a larger drill rig out there, one that could really drill and go and collect a sample and maybe do two or three holes a day as opposed to point something. At first I believe Dennis was reluctant because there were certain, um --

Page 104

26  (Pages 101 to 104)

MONTEGUT, III, JAMES

8/8/2008

1  maybe agreements or arrangements that they had
2  with MMG that I wasn't privy to, that I don't
3  want to be privy to, that I had no business
4  being privy to as contracting officer's
5  representative. What they did, arrangements
6  they made with their subcontractors was within
7  their own business discretion as far as I was
8  concerned. I was only concerned about the
9  efficiency with the people that they put on the
10  site.
11      And to a lesser degree, I was
12  concerned also somewhat from a safety
13  standpoint, because when they first came out,
14  as I recall, it was kind of like this time of
15  year, it was hot, and some of the folks that
16  they had out there, although they tried very
17  hard they were not typical field worker, they
18  were more office people. And I consider myself
19  an office person. I can't go out and
20  physically do what it takes in this type of a
21  climate to accomplish a day's worth of work.
22  And I felt, based on my experience, that some
23  of the people in that crew were like me. I
24  expressed that to him, too.
25      And we went, we had discussions, we
                                    Page 105

1      Had we been working in my backyard or
2  your backyard or somebody's backyard, MMG would
3  have probably been the person for the job. But
4  on a 32-acre site like we were out in, you
5  know, in an industrial type site where you're
6  going to encounter trip hazards, wasps, bees,
7  you know, just elements, they weren't the
8  people for the job.
9      Q. Do you remember when it was that MMG
10  was replaced?
11      A. No. I mean shortly after all of
12  the -- I can't recall how many holes they
13  completed or what, but --
14      Q. Do you remember the name of the
15  company that replaced MMG?
16      A. No, it was a drill rig company -- the
17  guy on the crew we called him Jaws. I can
18  remember Jaws, but I can't remember the name of
19  the company. I'm sorry.
20      Q. Do you remember whether MMG was
21  replaced only to perform the physical labor of
22  drilling the hole, or were they also replaced
23  to do the analysis of the soils?
24      A. I don't remember. My concern was only
25  in regards to the physical, um -- collecting or
                                    Page 107

1  had disagreements over it, and eventually the
2  decision was made to replace that operation
3  with another company. And I even at the time
4  expressed to Dennis that my only interest was
5  getting it done efficiently, if he wanted to
6  give MMG the opportunity to sub it out to --
7  you know, if they didn't have a bigger rig in
8  their equipment inventory, if they wanted to
9  sub out a bigger rig, it didn't matter to me as
10  long as we got better than a hole a day because
11  we couldn't live with that. I couldn't afford
12  to -- I couldn't justify -- I mean I could
13  afford it, but I couldn't justify, in my mind,
14  the overhead cost of the other field personnel
15  waiting for this process to, you know, be
16  accomplished.
17      So anyway, long story short, we
18  replaced them. Washington replaced them.
19  Because if I recall correctly, MMG chose not to
20  sub the work out. And the other company came
21  in and they performed, um -- to an efficiency
22  level that I would expect a drill rig crew to
23  perform and accomplish, you know, a pace of
24  production that you would typically expect for
25  a job of that magnitude.
                                    Page 106

1  the drilling, you know, the borings.
2      Q. That was somewhat my next question.
3      Would that have been the type of task
4  that you would have had to familiarize yourself
5  with as a project engineer to know whether the
6  company that was doing the soil testings and
7  analyzing those borings was in fact MMG or a
8  replacement?
9          MR. TREEBY:
10              Objection. Vague.
11      A. It kind of goes back to my answer
12  about the professional engineer. You know, as
13  long as it was a company that did that kind of
14  thing and was a certified lab or whatever the
15  designation of -- a Corps approved lab, I had
16  no preference.
17  EXAMINATION BY MR. JOANEN:
18      Q. From my amateur point of view it seems
19  to me that George Bacuta who was the soils
20  geochemist would be the one more integrally
21  involved in that type or part of the project.
22      A. Yeah. Right. Yeah.
23          MR. LEVINE:
24              Object.
25  EXAMINATION BY MR. JOANEN:
                                    Page 108

27  (Pages 105 to 108)

MONTEGUT, III, JAMES

8/8/2008

1    Q.   In this report, it indicates a
2  statement that says -- and this is part 1.0 --
3  I'm sorry, 1.1, Subsection B, and it's on WGI
4  57516.  It indicates that importantly, although
5  Washington Group staff did not have sufficient
6  oversight capacity, Washington Group
7  nonetheless defended its subcontractor's
8  technical decisions.
9       Do you know whether in fact that is
10 true?
11      (Plaintiff's Exhibit 5 was marked for
12 identification and is attached hereto.)
13   A.   Could you read that again for me?
14 EXAMINATION BY MR. JOANEN:
15   Q.   I'll show it to you right here.  It
16 talks about -- I'll read the line that predates
17 it.
18   A.   But what is the context of this?
19   Q.   I'm trying to -- it's from --
20      MR. TREEBY:
21         Let the witness look at the
22         document so he can understand it.
23 EXAMINATION BY MR. JOANEN:
24   Q.   I'll show it to you.  (Tendering.)
25 This page.  It says --

Page 109

1      MS. CRONIN:
2         I understand what you're saying.
3  And I understand the writing on the
4  document is the project completion
5  report, but the writing on the
6  document -- what you're referring to
7  is the writings on the document, and
8  that's a different thing than making
9  the witness think that this is the
10 project completion document that was
11 submitted to the Corps.  This is a
12 document that has handwriting on it
13 which is what you've been asking
14 questions about.
15      MR. TREEBY:
16         You're asking questions about
17 handwriting; right?
18      MS. CRONIN:
19         Which is from WGI 's files, not
20 something that was given to the Corps.
21      MR. JOANEN:
22         I think the record will indicate
23 that I explained to him originally
24 that this was something produced to
25 me, it was something that was produced

Page 111

1    A.   Oh, this is project completion report.
2    Q.   It's the same --
3    A.   This is part of the project completion
4  report --
5    Q.   Yes, sir.
6    A.   -- which was done --
7    Q.   And so this sentence --
8      MS. CRONIN:
9         I would like to stop and look at
10 the document because I think the
11 witness thinks -- he just said it's
12 part of the project completion
13 document.  I don't know if that's
14 accurate.
15         I don't understand, but I
16 don't --
17      MR. JOANEN:
18         It's a document that you guys
19 produced.
20      MS. CRONIN:
21         I understand it's a document I
22 produced, but --
23      MR. JOANEN:
24         I'm asking him questions based
25 upon information in that production.

Page 110

1  on WGI with their little stamp on
2  there.  I did nothing more than that.
3  Therefore I'm asking him questions
4  about the content of it, if he has any
5  information about that.  I think
6  that's what I led him to believe.
7         If I led you to believe something
8  different, I apologize.
9         But I thought that's what I led
10 him to believe.
11      MS. CRONIN:
12         It's my understanding at this
13 time he has a different understanding.
14      MR. JOANEN:
15         I don't know anything about this,
16 I think your people have testified
17 they don't know what it is, so that's
18 why I'm asking the questions.
19      MS. CRONIN:
20         I was just concerned if he had a
21 misunderstanding at this point about
22 which document he was looking at,
23 that's all.
24      MR. JOANEN:
25         And I understand you have a joint

Page 112

28  (Pages 109 to 112)

MONTEGUT, III, JAMES

8/8/2008

```
 1        defense agreement.  If y'all want to
 2   go outside and talk --
 3        MS. CRONIN:
 4             No.  Thank you.
 5        MR. TREEBY:
 6             Scott, were you reading
 7        handwritten stuff?  Is that what you
 8        were reading?
 9        MR. JOANEN:
10             No, that was actually the
11        typewritten part.  I was asking him
12        that part.
13        MS. CRONIN:
14             I apologize for the
15        misunderstanding.  I wasn't looking at
16        it, I was just trying to make sure we
17        were all on the same page.
18        MR. LEVINE:
19             Where were you reading from, just
20        to make sure?
21        (Off the record.)
22        MR. LEVINE:
23             Do you have a question pending?
24        You're just asking him to read it?
25        MR. JOANEN:
                                   Page 113
```

```
 1        A.  No.
 2   EXAMINATION BY MR. JOANEN:
 3        Q.  Were you aware as a project engineer
 4   of any issues wherein Washington Group felt it
 5   was necessary to defend its subcontractors
 6   technical decisions?
 7        MR. LEVINE:
 8             Same objection.
 9        MR. JOANEN:
10             What is the objection?
11        MR. LEVINE:
12             Ambiguous and vague.
13        MR. JOANEN:
14             Were you aware?
15        MR. LEVINE:
16             You're asking to know about
17        defending the subcontractors'
18        technical decisions.  There's multiple
19        subcontractors in the project and this
20        is only speaking about one of them.
21   EXAMINATION BY MR. JOANEN:
22        Q.  Okay.  Were you aware of any instances
23   where the Washington Group defended
24   subcontractors' technical decisions to the
25   Corps of Engineers?
                                   Page 115
```

```
 1             I was asking him a question if he
 2        knew about any of those issues as the
 3        project engineer.
 4   EXAMINATION BY MR. JOANEN:
 5        Q.  So my question to you, and just so
 6   that you understand, obviously I wasn't at the
 7   site while WGI was doing all of their work, and
 8   just in reviewing the things that have been
 9   produced in this litigation it leads me to have
10   certain questions, and I'm just telling you
11   background from which I ask the question, and
12   the question is from a document that was
13   developed apparently by WGI which indicates
14   that they're putting in a report that
15   Washington Group staff did not have sufficient
16   oversight capacity, Washington Group
17   nonetheless defended its subcontractors'
18   technical decisions.
19             My question to you is, as the project
20        engineer in involvement with this IHNC project,
21   were you aware of any difficulties Washington
22   Group was having in supervising their
23   subcontractors?  First question.
24        MR. LEVINE:
25             Objection.  Ambiguous, vague.
                                   Page 114
```

```
 1        MR. LEVINE:
 2             Same objections.
 3        A.  You know, the way I would look at it
 4   is is that I had a contract with Washington
 5   Group, not with MMG or any of their other
 6   subcontractors.  I really wasn't that
 7   concerned.  I mean, I would expect Washington
 8   Group to defend any position that the
 9   subcontractor did, be it, you know, from a
10   labor standpoint or a time management
11   standpoint or from a technical standpoint,
12   because they would want to do that because they
13   had their contract with me.  And they saw it
14   as -- the contractor's subcontractor was really
15   their agent, essentially them.  They were
16   responsible for him.
17   EXAMINATION BY MR. JOANEN:
18        Q.  Would you have had the expectation,
19   when you said they had the contract with you,
20   that they would analyze the subcontractor's
21   technical evaluations?
22        MR. LEVINE:
23             Objection.  Calls for
24        speculation.
25        A.  What do you mean by technical
                                   Page 116
```

29 (Pages 113 to 116)

MONTEGUT, III, JAMES

8/8/2008

| | |
|---|---|
| 1    evaluations? | 1         A.   I don't know. |
| 2    EXAMINATION BY MR. JOANEN: | 2         Q.   Do you know whether it should have |
| 3       Q.   If you are the contractor -- if you're | 3    been? |
| 4    the Corps of Engineers and you have, like you | 4            MR. LEVINE: |
| 5    said, a contract with Washington Group and you | 5               Objection. |
| 6    were expecting them to perform certain | 6         MR. JOANEN: |
| 7    technical evaluations and you know they're | 7            Which is? |
| 8    going to subcontract it out -- | 8         MR. LEVINE: |
| 9       A.   Uh-huh. | 9            Speculation. |
| 10      Q.   -- would you expect, as the person | 10   EXAMINATION BY MR. JOANN: |
| 11   paying for the service to WGI, expect them to | 11        Q.   Do you know whether it should have |
| 12   review what their subcontractor did as opposed | 12   been? |
| 13   to just passing it on to you without looking at | 13           MR. LEVINE: |
| 14   it? | 14              Calls for speculation. |
| 15           MR. LEVINE: | 15        MR. JOANEN: |
| 16              Objection.  Same objection. | 16           I'm asking, do you know? |
| 17      A.   I don't know.  It's -- really, to me, | 17   EXAMINATION BY MR. JOANEN: |
| 18   it's immaterial because the way I look at it is | 18        Q.   Do you know? |
| 19   MMG is Washington Group.  If I have a problem | 19           MR. TREEBY: |
| 20   with something that it so happened that MMG was | 20              Same objection. |
| 21   doing, I wasn't going to go discuss it with | 21        A.   Whether the Corps of Engineers should |
| 22   MMG, I was going to go resolve the problem with | 22   have reviewed that document? |
| 23   Washington Group.  You know, it's not, hey, | 23   EXAMINATION BY MR. JOANN: |
| 24   Washington Group, you know, MMG has got a | 24        Q.   Whether this should have been |
| 25   problem.  It's, hey, Washington Group, you have | 25   forwarded to the engineering division for |
| Page 117 | Page 119 |
| 1    a problem.  The problem is, in this particular | 1    review? |
| 2    case, MMG.  What are you going to do to fix it? | 2         A.   I think I would know whether it should |
| 3    Or what am I missing that I'm seeing it | 3    be forwarded or not, yes. |
| 4    incorrectly?  So yeah, they would have to | 4         Q.   Should it have been or not? |
| 5    defend it. | 5            MR. LEVINE: |
| 6       Q.   Was the Corps taking the engineering | 6               Same objection. |
| 7    evaluations that were being done by Washington | 7         A.   The lift station? |
| 8    Group and its subcontractors and forwarding | 8    EXAMINATION BY MR. JOANEN: |
| 9    those to the engineering department for review? | 9         Q.   (Tendering.) |
| 10           MR. TREEBY: | 10           MR. TREEBY: |
| 11              Objection. | 11              What page are you looking at in |
| 12           MR. LEVINE: | 12           that report? |
| 13              Objection.  Compound. | 13           MR. LEVINE: |
| 14      A.   I guess I don't exactly know what you | 14              This is Exhibit 2. |
| 15   refer to as engineering evaluations. | 15        MR. JOANEN: |
| 16   EXAMINATION BY MR. JOANEN: | 16           That's different. |
| 17      Q.   Technical considerations regarding any | 17        MR. LEVINE: |
| 18   engineering that was done on the site.  For | 18           Let the record reflect that the |
| 19   example, I'll go to this -- this lift station | 19           witness is looking at Exhibit 2. |
| 20   removal plan. | 20        A.   I would have forwarded this to Lee |
| 21      A.   Uh-huh. | 21   Guillory for him to take a look at and leave it |
| 22      Q.   Do you know whether as a project | 22   up to him to decide if it was something that |
| 23   engineer when this was produced by WGI it was | 23   was so technical in nature that it would |
| 24   reviewed by the engineering division of the | 24   require further review by technical staff. |
| 25   Corps of Engineers? | 25   EXAMINATION BY MR. JOANEN: |
| Page 118 | Page 120 |

30  (Pages 117 to 120)

MONTEGUT, III, JAMES

8/8/2008

1    Q.    This -- the excavation of the concrete
2  anchor foundation blocks, that was prepared by
3  WGI by a subcontractor.
4    A.    Uh-huh.
5    Q.    Was that --
6    A.    That other one was prepared by a
7  subcontractor as well.
8    Q.    Which you would expect WGI to defend
9  the technical considerations.
10    A.    Right.  But from my viewpoint, once it
11  was presented to the Corps, it was WGI
12  presenting it, it wasn't the subcontractor at
13  that point.
14    Q.    This document right here which we've
15  marked as Exhibit 3, would you expect that this
16  document be forwarded to the engineering
17  division of the Corps of Engineers for
18  evaluation prior to the activities taking
19  place?
20    A.    Again --
21        MR. LEVINE:
22            Objection.
23    A.    Again, it's the same response.  If it
24  was something in here that I felt questionable,
25  then I would have given it to Lee Guillory,

Page 121

1  asked him to take a look at it and make a
2  decision as to whether or not it should go
3  further.
4  EXAMINATION BY MR. JOANEN:
5    Q.    So you'd have relied upon his
6  expertise as the higher ranking official at
7  that time?
8    A.    As the liaison, just to be familiar
9  with the organization well enough to know who
10  to send it to, what office would have the
11  expertise to review that document, yes.
12    Q.    In this same -- going back to this
13  what was defined as the project completion
14  report, the bottom of Page WGI 57516 indicates
15  that they should insert a time line, 2000,
16  2001, and it says this is possibly a good place
17  to use the phrase "upside-down."  And then the
18  next sentence says, note when changes in
19  approach occurred.
20        And I'll show you, it's on the bottom
21  in the handwriting.  (Tendering.)
22    A.    What's the question?
23        MR. TREEBY:
24            I don't see a question.  I'm
25        looking at what you've said and I

Page 122

1  don't see a question.
2        MR. LEVINE:
3            There's no question yet.
4        MR. JOANEN:
5            I'm giving him the context for
6        the question.  Thank you for pointing
7        that out.
8        MR. TREEBY:
9            I want to make sure he doesn't
10        start answering before you ask a
11        question.
12  EXAMINATION BY MR. JOANEN:
13    Q.    And me giving you some background
14  information, does this give you any reason to
15  understand what the use of the term upside-down
16  would be in relationship to the IHNC project?
17        MR. TREEBY:
18            Objection.  Calls for
19        speculation.
20    A.    No.  I still don't know what
21  upside-down means.
22        MR. LEVINE:
23            Let the record reflect that
24        earlier I think you called this the
25        project completion report.  And so we

Page 123

1  had a further dispute about that.
2  So --
3        MR. JOANEN:
4            It's called a project completion
5        report.
6        MS. CRONIN:
7            Yes, but you haven't established
8        any foundation for the document.
9        MR. LEVINE:
10            There's a whole bunch of
11        handwriting on it, so it's not the
12        project completion report.  It's a
13        document labeled as the project
14        completion report --
15        MR. JOANEN:
16            Right.
17        MR. LEVINE:
18            -- but this is clearly not the
19        project completion report that was
20        provided to the Corps of Engineers
21        from WGI.
22        MR. JOANEN:
23            Well, I will also tell you that
24        in the context of a 30(b)(6)
25        deposition we had a inquiry about all

Page 124

31 (Pages 121 to 124)

1    project completion reports, we were
2    advised by WGI counsel there is no
3    such thing as a project completion
4    report, it's a technical completion
5    report.
6    MS. CRONIN:
7        That's correct and that's not it.
8    MR. JOANEN:
9        I'm not asking about the
10   technical completion report.  I'm
11   asking about this document.
12   MS. CRONIN:
13       But you haven't established any
14   foundation for that document.
15   MR. JOANEN:
16       I'm not introducing it into
17   evidence.  I'm asking the witness --
18   MR. TREEBY:
19       The witness has said he
20   doesn't -- he can't answer your
21   question.  And it is calling for
22   speculation, it's about handwriting
23   he's never seen before.  I think
24   that's really all we need to say.
25   MR. LEVINE:

Page 125

1        Can you just ameliorate it by
2    calling it Exhibit 5 from here on out?
3    MR. JOANEN:
4        Exhibit 5.
5    EXAMINATION BY MR. JOANEN:
6    Q.  I'm not going to read all of this, and
7    I'm just trying to get an understanding of what
8    this upside-down terminology is.  This is Page
9    WGI 57518, and I'll ask you to just look at the
10   whole page.  I'm not going to even read it or
11   evaluate it, and see if that does anything to
12   jog your memory or give you any insight as to
13   what upside-down means as it relates to this
14   IHNC project.
15   MR. TREEBY:
16       Object to the reference of jog
17       your memory since this witness has not
18       indicated he's ever seen this before.
19   A.  So the question is what now?
20   EXAMINATION BY MR. JOANEN:
21   Q.  Well, here they're talking about
22   substantial additional costs.  Would that lead
23   you to believe that there's an issue with costs
24   and that the upside-down scenario referred to
25   in this Exhibit 5 is something that you were

Page 126

1    familiar with or aware of?
2    MR. LEVINE:
3        Objection.  Speculation.
4    A.  What I did in the way of processing an
5    invoice or, if you will, paying WGI, was if
6    they presented an invoice or an expense, a
7    receipt, if you will, for a cost that I could
8    recognize, I would check it off and go on.  The
9    only time I questioned a cost would be is if
10   there was something that I didn't recognize.
11   Could have been I forgot about it.  Could have
12   been I just didn't remember.  I'd go contact
13   Dennis or Phil or maybe one of their
14   accountants, as you say, up in Denver, and
15   maybe they would clear it up for me.  Um --
16   maybe they would say, oh, you know what?  That
17   goes on another job, you know, we mixed it up.
18   Sorry, take it out.
19       But once that process was completed
20   and once everything in that invoice was, you
21   know, satisfactory to me and I was confident
22   that it was a justifiable cost for this EBIA
23   project, I signed it and processed it on.
24       Um -- what I would do, if I got a
25   stack of invoices and I knew it was going to

Page 127

1    take me two weeks, three weeks to go through
2    that, I would process the invoice.  I wouldn't
3    hold up their payments.  And the agreement I
4    had with them was that if anything subsequent
5    came out that was a questionable cost that we
6    had to at a later date back out, they would
7    back it out.  And I think you can probably see
8    instances of that.
9        So it was never my intent to, you
10   know, use that as a stick or a punishment or
11   anything like that.  I always tried, whenever I
12   was presented an invoice, to get it, so to
13   speak, off of my desk and into the processing,
14   um -- cycle within two or three days.
15       The Corps has a policy, as far as I
16   know they still do, prompt payment act, to pay
17   a contractor within 14 days of him submitting a
18   correct invoice.  I don't think we ever had a
19   situation where we didn't meet that.  And
20   charges that turned out to be, you know,
21   incorrect were always backed out on a
22   subsequent invoice.
23       Beyond that, what's -- what I read on
24   that page you just gave me, it relates
25   apparently to some internal type of, um --

Page 128

MONTEGUT, III, JAMES

1  situation that WGI had with subcontractors or
2  maybe had certain feelings about subcontractors
3  that they never, ever expressed to me.
4  EXAMINATION BY MR. JOANEN:
5      Q.  As the project engineer, what does the
6  term to recast the property's performance
7  criteria mean?
8      A.  Yeah.  I read that and I wondered what
9  that meant myself.  I don't know.
10     Q.  As the project engineer, what does it
11 mean when it says acquiring raw data from the
12 analytical laboratory which was recast to
13 obtain measurements sufficient to propose that
14 the site met the state 's closure criteria?  Do
15 you know what that means, as the project
16 engineer?
17         MR. LEVINE:
18             Objection.  Speculation.
19     A.  I'm not real sure what it means.
20 Um -- I would sure like to know who wrote that
21 and maybe they could better explain than I
22 could.
23 EXAMINATION BY MR. JOANEN:
24     Q.  I'd like to know who wrote it, too,
25 but they won't tell me.
                                        Page 129

1      MR. TREEBY:
2          You haven't asked.  So you're not
3  representing it correctly, Scott.
4      A.  But if you want me to respond to what
5  I think it would mean, collecting raw data from
6  the lab would be they went back to the lab and
7  started over from scratch because apparently
8  somebody made a mistake in processing --
9  taking the raw data and processing it into an
10 interpretable form.  So that's what they did,
11 they went back to the lab, got the raw data so
12 that they could start from scratch and
13 reperform the analysis so that they could have
14 a valid set of data that the LDEQ, the
15 Louisiana Department of Environmental Quality,
16 would accept and issue the NFFAT, whatever
17 those letters were, which was basically the
18 LDEQ 's blessing that the site was clean and
19 you could go forward with the next phase of
20 your project, that being the construction of
21 the new lock.
22 EXAMINATION BY MR. JOANEN:
23     Q.  Moving on to Page WGI 057520,
24 Section 7.1, there is an indication here --
25 this is not handwriting, this is typed -- lack
                                        Page 130

1  of transparency allowed the project 's pace to
2  exceed available funding on two occasions.
3      Q.  Do you know of any instances where the
4  project 's pace exceeded available funding?
5      A.  No.  If I did I wouldn't have allowed
6  it to proceed.
7      Q.  The next paragraph, I'm going to show
8  it to you in a second, says, in response to the
9  project outpacing available funding, and it
10 says the client -- scratched out with Jones
11 written in next to it -- demanded near realtime
12 evaluations of expenditures as a way to track
13 project development and prevent future work
14 flow interruptions.
15         Do you know of any work flow
16 interruptions that took place?
17     A.  You mean like had to shut down because
18 we ran out of money type thing?
19     Q.  That's why I'm asking you the
20 questions.  That's why I came up here.  I don't
21 know if there were, but I'm asking you as the
22 project engineer were there any work flow
23 interruptions?
24     A.  Like I had said earlier, you know,
25 when funding started to slow down we had to
                                        Page 131

1  match that funding pace with our work pace, so
2  we throttled back and reduced the pace that we
3  had originally anticipated performing at.
4      Q.  And do you know of any instances where
5  the project was outpacing available funding?
6      A.  No.  Like I said, if I did we would
7  have had to have taken corrective action.
8      Q.  There's a handwritten note in here,
9  I'm going to show you this after, it says
10 Montegut came up with his version that
11 convoluted things that no one could understand.
12         I'm going to ask you -- the question
13 is, was there a procedure in place for
14 invoicing and funding that was changed as the
15 project developed?
16     A.  A procedure in place that changed.
17 Not as I recall.
18     Q.  Were there any changes that you made
19 to the invoicing and funding procedure?
20     A.  Not that I recall.
21     Q.  If there were changes, would they be
22 indicated in any documents as a directive or a
23 written document that would say we want you to
24 do things different now?
25         MR. LEVINE:
                                        Page 132

MONTEGUT, III, JAMES

Page 133

1      Objection.  Speculation,
2   hypothetical.
3      A.  I don't know.  I can't recall.
4   EXAMINATION BY MR. JOANEN:
5      Q.  Moving on to the next page, I think I
6   may have asked you this question already, this
7   is on Page 57522, on Part 6.0, under project
8   achievements, Number 1.  It says, client
9   regards Washington Group's technical
10  performance as superior.  And then handwritten
11  under there it says don't even mention Tar
12  Creek, why should we?
13      Have I asked you, do you know anything
14  about their involvement with the Tar Creek
15  project?
16      A.  Yeah.
17      MR. TREEBY:
18          Objection.  Asked and answered.
19      A.  Yeah.  You did, and I said no.
20  EXAMINATION BY MR. JOANEN:
21      Q.  I apologize.  I'm not meaning to waste
22  your time.
23      On the last page, 57523, under the
24  conclusions and recommendations, the statement
25  for conclusions that's typed in here says

Page 134

1   Washington Group is at risk whenever it
2   subcontracts its core competence, particularly
3   where sufficient oversight by Washington Group
4   is precluded by a project budget or misguided
5   corporate strategies.  And then handwritten
6   under there Number 1 says the project was set
7   up upside-down.
8      Would you understand what that would
9   mean, a project being set up upside-down?
10      MR. TREEBY:
11          Objection.  Asked and answered.
12      MR. LEVINE:
13          Same objection.
14      MR. JOANEN:
15          No, this is different because
16      this is set up upside-down, not being
17      upside-down.
18      MR. LEVINE:
19          Po-tay-to, po-tah-to.
20      A.  I wasn't involved in the setup of the
21  project.
22  EXAMINATION BY MR. JOANEN:
23      Q.  And then there's another handwriting
24  written on here, it says deals made with the
25  devil during funding interruptions prevented

Page 135

1   the Corps Tulsa District from assign the work
2   to one of its CEC contractors.
3      Do you know what a CEC contractor is?
4      A.  No.  And I wasn't aware that the devil
5   was an employee of the Corps.
6      Q.  There's a statement in here, the
7   handwritten statement that indicates that
8   significant environmental remediation -- we
9   completed a significant environmental
10  remediation job in spite of the fact the
11  environmental staff had atrophied to the point
12  of being nonexistent.
13      Do you recall any times while you were
14  the project engineer where the environmental
15  staff had atrophied to the point of being
16  nonexistent?
17      A.  No.  That could possibly be referring
18  to there was nobody on site at a particular
19  point maybe toward the end of the project, but
20  that doesn't mean that there wasn't people
21  available back in their main office to call
22  upon if needed.
23      Q.  Do you know whether they were calling
24  upon people in the main office?
25      MR. LEVINE:

Page 136

1          Objection.  Calls for
2      speculation.
3      A.  No.
4      MR. JOANEN:
5          I'm asking if he knows.
6      MR. LEVINE:
7          I understand what you're asking.
8   EXAMINATION BY MR. JOANEN:
9      Q.  I want know if you know as you sit
10  here today whether --
11      A.  No, I do not.
12      Q.  Do you know as you sit here today
13  whether in fact the Washington Group was
14  utilizing geotechnical engineers to evaluate
15  their work and the work the subcontractors were
16  doing?
17      A.  No.
18      Q.  Do you know in your experience with
19  the TERC that the TERC requires that they have
20  geotechnical engineers assigned to the project?
21      A.  No.  I don't know that.
22      Q.  You want to look at this?
23  (Tendering.)
24      (Off the record.)
25      MR. TREEBY:

34 (Pages 133 to 136)

MONTEGUT, III, JAMES

8/8/2008

1     Oh, the same document?
2   MS. CRONIN:
3     The document with handwriting on
4   it that he's never seen before and
5   he's asking him to interpret it.
6   MR. JOANEN:
7     I'm not asking him to interpret.
8   I'm asking him questions. I'm telling
9   him the basis from which I developed
10   my questions.
11   MR. LEVINE:
12     And this particular page is WGI
13   57523.
14     Do you have a question?
15   MR. JOANEN:
16     I just felt it was unfair to not
17   show it to him when I asked him
18   questions about it. I'm just trying
19   to be fair to the guy. I asked him do
20   you want to look at it. He could have
21   told me no.
22   MR. LEVINE:
23     I'm just asking if you have a
24   question about the document you just
25   showed him.

Page 137

1   with WGI, that the 1997 report on groundwater
2   flow information indicated the influence of
3   structures present at the time on the shallow
4   groundwater flow.
5     Are you familiar with that?
6     (Plaintiff's Exhibit 6 was marked for
7   identification and is attached hereto.)
8   A.   (Shakes head negatively.)
9   MR. LEVINE:
10     You got to answer yes or no.
11   A.   No. I'm sorry.
12   EXAMINATION BY MR. JOANEN:
13   Q.   Are you familiar with the concept that
14   subsurface structures can affect the migration
15   of subsurface groundwater?
16   A.   Yes. I think that's kind of related
17   to what I was discussing earlier when we were
18   talking about seepage. All of the structures
19   that we removed probably improved the potential
20   for seepage.
21   Q.   Do you know whether in fact the 1997
22   design memorandum showed the pre-remediation
23   groundwater flow flowed both towards and away
24   from the Industrial Canal?
25   A.   No.

Page 139

1   EXAMINATION BY MR. JOANEN:
2   Q.   I'll make this easy: As the project
3   engineer, were you involved in the analysis or
4   evaluation of groundwater flow?
5   MR. JOANEN:
6     Objection. Vague.
7   EXAMINATION BY MR. JOANEN:
8   Q.   As an engineer, do you know what
9   groundwater flow is?
10   A.   I'm not real sure.
11   Q.   As an engineer, do you know what
12   subsurface groundwater flow is?
13   A.   I'm familiar with terms like, you
14   know, groundwater flowing in an aquifer or
15   wells, water wells, things of that nature.
16   That's groundwater.
17   Q.   You were the project engineer at the
18   IHNC project. Were you involved in the
19   analysis of subsurface groundwater flow?
20   A.   No.
21   Q.   I have E-mail communications from
22   George Bacuta to Richard Lesser cc'ing Lee
23   Guillory -- and I'll show you this in a second,
24   it's WGI 262218 -- wherein George Bacuta is
25   indicating to Richard Lesser, Richard Lesser

Page 138

1   Q.   I'll mark this as Exhibit 6. In this
2   same E-mail, and I'm going to show it to you in
3   just a second, it says that the current
4   groundwater flow taken by WGI in May and June,
5   2005, points to flow away from the canal as
6   opposed to going both ways in 1997.
7   A.   Uh-huh.
8   Q.   Do you, as project engineer, have any
9   reason to disagree with such a report?
10   MR. LEVINE:
11     Objection.
12   A.   I'm not really familiar with it, so I
13   don't know how I could possibly disagree or
14   agree with something I'm not familiar with.
15   EXAMINATION BY MR. JOANEN:
16   Q.   The final portion of the E-mail back
17   and forth indicates that regarding other
18   information on the groundwater across the
19   floodwall, the geotech map showed that the
20   levee/floodwall along the east side of Surekote
21   Road had sheet pile the goes down to -8 feet
22   NGVD. This information is contained in that
23   USACE 1997 design memorandum report, Appendix
24   C, Volume 5 of 9. WGI/MMG should have a copy
25   of this report. (Tendering.)

Page 140

35 (Pages 137 to 140)

MONTEGUT, III, JAMES

8/8/2008

1        My question to you, in relation to
2  that, were you as the project engineer involved
3  in the analysis of groundwater flow across the
4  floodwall at the IHNC?
5     A.  No.
6     Q.  Do you as a project engineer know why
7  there would be groundwater flow across the
8  floodwall at the IHNC?
9        MR. LEVINE:
10          Objection.
11        MR. JOANEN:
12          What's the basis of your
13     objection?
14        MR. LEVINE:
15          He says he wasn't involved with
16     it.  How is he going to know it?
17     Lacks foundation.
18        MR. JOANEN:
19          That's a different question.
20        MR. LEVINE:
21          Lacks foundation.
22  EXAMINATION BY MR. JOANEN:
23     Q.  You can answer.
24     A.  No.
25        (Brief recess.)

Page 141

1  EXAMINATION BY MR. JOANEN:
2     Q.  Just a last couple of follow-up
3  questions and we'll finish, Mr. Montegut.  The
4  delivery of outside materials for backfill, if
5  there were to be sand brought, those are the
6  types of materials or the type of things that
7  would be documented in the reports prepared by
8  WGI, is that correct?
9        MR. LEVINE:
10          Objection.  Hypothetical.
11     A.  I would expect that they would, yeah.
12  EXAMINATION BY MR. JOANEN:
13     Q.  If the quality -- is quality assurance
14  report done by WGI or the Corps?
15     A.  Corps.
16     Q.  So the quality control is the WGI
17  document.
18     A.  Right.
19     Q.  If sand is brought onto the site,
20  would that be included in the quality control
21  report or the quality assurance report?
22        MR. LEVINE:
23          Same objection as before.
24     A.  It might actually be in both, but if
25  it were going to be in only one I would expect

Page 142

1  it to be in the QC, the quality control report.
2  EXAMINATION BY MR. JOANEN:
3     Q.  Would the indication in a quality
4  control report that sand was brought onto the
5  site on a particular date, would that have been
6  something that you would have known of or have
7  been concerned with in reviewing those QC-QA
8  reports?
9        MR. LEVINE:
10          Same objection.
11     A.  Not as a matter of routine, no.  I
12  mean, you know, it was a delivery of sand, a
13  load of sand.  The way that the site was laid
14  out, my trailer -- all the trailers were right
15  there by the front gate, and you were pretty
16  aware of when a dump truck was rolling through.
17  So it wouldn't -- you know, you obviously
18  wouldn't know that it was five or ten or one,
19  but you would know that on that particular day
20  they probably had some material brought in.
21  EXAMINATION BY MR. JOANEN:
22     Q.  Would the sand that was brought in,
23  would that be included as a cost that you would
24  review?
25        MR. LEVINE:

Page 143

1          Objection.
2     A.  Yeah.  I would fully expect Washington
3  to submit that in their monthly invoice for
4  whatever period that it would have been brought
5  in on.  They certainly weren't going to give it
6  to the government.
7  EXAMINATION BY MR. JOANEN:
8     Q.  When you say -- originally when you
9  got involved in this deposition you said that a
10  lot of the fixed cost contracts were by how
11  much material was either removed or brought in.
12        Was the materials that were being
13  brought into this job site under a fixed cost
14  type payment scenario?
15     A.  No.  It was cost reimbursement.  So if
16  they paid $100 for a load of material, then we
17  reimbursed them $100.
18     Q.  By the time that you left the project
19  in 2005, had the physical labor completed at
20  the IHNC?
21     A.  Yeah.  The last day that I was there
22  we literally locked the gate and walked away.
23  Drove away.
24     Q.  And that was before Hurricane Katrina,
25  correct?

Page 144

36 (Pages 141 to 144)



1      A.   Yes.
2      Q.   Have you had any discussions with any
3  engineers at the Corps of Engineers or
4  associated with the IPET team that did the
5  investigation of the floodwall failures at the
6  IHNC?
7      A.   No.
8      Q.   When did you retire?
9      A.   February of this year.
10     Q.   Have you undertaken of your own
11 volition to review the IPET report that
12 discussed the failures at the Lower Ninth Ward?
13     A.   No.
14     Q.   Do you know of any communications
15 you've had with some of your colleagues, or now
16 former colleagues, at the Corps about the IPET
17 report?
18     A.   No.
19     Q.   Have you formulated any of your own
20 personal opinions about the conclusions of the
21 IPET report?
22         MR. LEVINE:
23             Objection.  Lacks foundation.
24     A.   No, I've never read it, so I mean I'm
25 not familiar with it, so therefore no
                                    Page 145

1      government that if we -- since this
2  deposition was noticed both in MRGO
3  and Robinson, our choices were to ask
4  all the questions we needed to, we had
5  an agreement with Mr. Bruno previously
6  that for these depositions we would
7  not need to do that, and if we needed
8  to take them later we would arrange it
9  at a mutually convenient time to
10 continue the deposition.  So I just
11 wanted to confirm that agreement and
12 that we're reserving our right to ask
13 this witness questions, if necessary,
14 later.
15     MR. BEARDEN:
16         Lake Borgne Levee District also
17 joins.
18     MR. LEVINE:
19         We'll read and sign.
                                    Page 147

1  conclusions.
2  EXAMINATION BY MR. JOANEN:
3      Q.   I have no other questions.  Someone
4  else may.
5         (Brief recess.)
6  EXAMINATION BY MR. LEVINE:
7      Q.   Mr. Montegut, I just have a few
8  questions for you.  I'm going to hand you
9  what's been labeled as Plaintiff's Exhibit 5
10 which for the record is WGI 57505 through WGI
11 57523.  Do you know what this is?
12     A.   I've never seen it before today.  Only
13 by the title here project completion report.
14 The date September 5 is after I was involved --
15 after I had stopped being involved in the
16 project.
17     Q.   Do you know whether this document was
18 transmitted from WGI to the U.S. Army Corps of
19 Engineers?
20     A.   I do not know.
21     Q.   I have no more questions.
22     MR. TREEBY:
23         For Washington Group, we are
24 reserving the right pursuant to the
25 agreement with Mr. Bruno and with the
                                    Page 146

1         WITNESS' CERTIFICATE
2
3      I, JAMES A. MONTEGUT, III, do
4  hereby certify that the foregoing testimony was
5  given by me, and that the transcription of said
6  testimony, with corrections and/or changes, if
7  any, is true and correct as given by me on the
8  aforementioned date.
9
10 _____   _____
11 DATE SIGNED       JAMES A. MONTEGUT, III
12
13 _____ Signed with corrections as noted.
14
15 _____ Signed with no corrections noted.
16
25 DATE TAKEN:  August 8th, 2008
                                    Page 148

MONTEGUT, III, JAMES

8/8/2008

```
 1          REPORTER'S CERTIFICATE
 2        I, JOSEPH A. FAIRBANKS, JR., CCR, RPR,
 3    Certified Court Reporter in and for the State
 4    of Louisiana, do hereby certify that the
 5    aforementioned witness, after having been first
 6    duly sworn by me to testify to the truth, did
 7    testify as hereinabove set forth;
 8        That said deposition was taken by me
 9    in computer shorthand and thereafter
10    transcribed under my supervision, and is a true
11    and correct transcription to the best of my
12    ability and understanding.
13        I further certify that I am not of
14    counsel, nor related to counsel or the parties
15    hereto, and am in no way interested in the
16    result of said cause.
17
18
19
20
21
22
23    _____
24    JOSEPH A. FAIRBANKS, JR., CCR, RPR
25    CERTIFIED COURT REPORTER #75005
                              Page 149
```

38  (Page 149)

MONTEGUT, III, JAMES

8/8/2008

Page 150

## A

**abandoned** 74:23
**abilities** 103:1
**ability** 149:12
**able** 32:24 82:5
**aboveground** 89:8
**Absolutely** 16:7
**accept** 130:16
**accepted** 40:15
**access** 65:14
**accomplish** 45:17 56:20,23 57:22 59:17 61:9,18 96:17 105:21 106:23
**accomplished** 20:8 30:25 54:24 55:22 57:24 106:16
**accomplishing** 102:8
**accomplishment** 55:25
**accountant** 24:2 24:10
**accountants** 127:14
**accounting** 83:24
**accounts** 84:3
**accumulated** 69:10
**accurate** 110:14
**accurately** 7:21 7:22
**achieve** 74:6
**achieved** 73:6
**achievements** 133:8
**achieving** 10:6 10:17
**acquiring** 129:11
**act** 128:16

**action** 1:4 132:7
**activities** 87:15 92:2 102:9 103:14 121:18
**activity** 55:13,16 55:19 56:20,21 56:23 57:22 61:9,18 71:2 91:24 92:13
**actual** 44:22 79:11 92:4,18
**add** 74:3
**addition** 28:2
**additional** 19:25 20:4 126:22
**address** 53:14 84:10
**addressed** 88:19
**addresses** 71:18
**adjacent** 78:16 78:23
**administering** 5:24
**administration** 17:12
**advanced** 82:24
**advised** 38:15 125:2
**affect** 139:14
**affirmatively** 41:20
**afford** 106:11,13
**aforementioned** 5:4 148:8 149:5
**agent** 116:15
**ago** 60:12 93:24
**agree** 24:9 140:14
**AGREED** 5:2
**agreed-to** 41:10
**agreeing** 41:9
**agreement** 113:1 128:3 146:25 147:5,11
**agreements**

105:1
**Agriculture** 28:3 31:15 33:7 87:2
**ahead** 62:7
**air** 95:20
**Alex** 43:1
**ALFIERI** 3:9
**allege** 6:11
**allow** 8:18
**allowed** 83:5 131:1,5
**allows** 41:3
**alternative** 30:9
**Alvin** 42:25
**amateur** 108:18
**Ambiguous** 114:25 115:12
**ameliorate** 126:1
**Amended** 8:25 9:1
**amendments** 100:10
**AMERICA** 2:9
**amount** 14:10 64:9 65:17 69:4 74:6 104:18
**analysis** 61:21 62:13,21,23,25 87:25 88:8,11 88:21 89:7 97:4 107:23 130:13 138:3 138:19 141:3
**analytical** 129:12
**analyze** 116:20
**analyzing** 13:9 108:7
**anchor** 61:3 121:2
**and/or** 19:21 148:6
**angry** 99:17

**announcement** 31:11
**answer** 5:13 7:13,18 20:25 21:7,10,12 25:15 32:17,19 32:20,23,24 39:9 40:1 57:13,19 81:5 81:8 108:11 125:20 139:10 141:23
**answered** 57:17 133:18 134:11
**answering** 123:10
**anticipated** 82:9 132:3
**anybody** 95:11 95:14
**anyway** 32:8 106:17
**apologize** 103:8 112:8 113:14 133:21
**apparently** 11:16 59:14 86:23 114:13 128:25 130:7
**appear** 95:16 96:2 97:11
**APPEARANC...** 2:1
**appeared** 6:14
**Appendix** 140:23
**application** 31:10 64:9
**applied** 11:16
**apply** 31:8
**appraisals** 43:12
**approach** 72:22 122:19
**approval** 71:11 82:14
**approve** 43:13

84:23
**approved** 66:9 84:25 108:15
**approving** 66:3 66:4
**approximately** 17:22 23:3 27:9 41:14
**aquifer** 138:14
**area** 6:18 16:20 16:20,21,23,23 16:24 17:3 19:15 26:15 27:6,18 29:14 30:3 40:18 50:11 51:6,16 74:10 77:17 95:5
**areas** 15:24 52:23 70:17
**arithmetic** 104:10
**Army** 2:19 146:18
**arrange** 147:8
**arrangement** 43:7
**arrangements** 105:1,5
**arriving** 54:24
**asbestos** 27:10
**asbestos-conta...** 27:20
**asked** 53:18 93:24 103:7 122:1 130:2 133:6,13,18 134:11 137:17 137:19
**asking** 9:3 22:11 33:1 67:25 68:3 73:10 95:10 97:2 110:24 111:13 111:16 112:3 112:18 113:11

MONTEGUT, III, JAMES

8/8/2008

Page 151

113:24 114:1
115:16 119:16
125:9,11,17
131:19,21
136:5,7 137:5
137:7,8,23
**aspect** 36:7,9
**assign** 31:8
135:1
**assigned** 12:1
13:2 17:25
37:21,22 51:3
51:19 52:13
136:20
**assist** 29:2
**associated** 29:20
68:10,12 145:4
**assurance** 42:20
69:14 142:13
142:21
**atrophied**
135:11,15
**attach** 59:1,7
99:10
**attached** 9:11
60:11 62:2
69:2,12,16
93:11 109:12
139:7
**Attaching** 59:10
**attend** 16:9
**attended** 9:21
**attorney** 6:8
71:24
**August** 1:13
61:15 93:23
148:25
**authorized**
35:10
**available** 31:7
83:10 131:2,4
131:9 132:5
135:21
**Avenue** 2:22
78:12
**average** 86:14

95:16
**avoid** 76:7
**award** 41:11
**aware** 49:12
114:21 115:3
115:14,22
127:1 135:4
143:16

_____
**B**

**B** 109:3
**bachelor** 10:13
10:21
**Bachelor's** 10:1
**back** 8:12 12:2
12:16 19:10
21:16 22:4
25:18 26:9
27:5 32:4
36:18 46:24
64:12,17,19
65:18 67:3
71:1 74:15
75:16 76:21,23
76:25 82:7,15
82:17 83:20
90:17 91:20
99:5 108:11
122:12 128:6,7
130:6,11 132:2
135:21 140:16
**backed** 128:21
**backfill** 64:2,6,9
64:10 66:9,19
67:16 68:5
71:5 72:8,10
73:2,22 75:14
142:4
**background** 9:7
22:3 114:11
123:13
**backhoe** 90:8
91:19,20
**backhoes** 45:25
**backup** 69:3
85:15
**backyard** 107:1

107:2,2
**backyards** 87:5
87:12
**Bacuta** 54:1,2
108:19 138:22
138:24
**bad** 83:2 102:19
**BAEZA** 2:13
59:3
**ball** 95:21
**balls** 76:3 96:4
**bank** 6:17 19:15
26:14 27:10,16
29:13 30:2
40:17 50:11
51:6,16 77:17
84:3 86:19
87:3 95:5
101:19
**barge** 86:23
**Baronne** 2:5
**base** 79:12
**based** 15:3 72:6
79:10 104:4
105:22 110:24
**basically** 7:11
31:1 36:25
64:18 75:3
130:17
**basis** 56:1 69:19
69:25 70:2
137:9 141:12
**Baton** 1:12
**bayou** 17:25
18:23 19:5,20
19:23 20:1,3,5
23:14,16 26:4
**Bean** 19:7
**BEARDEN** 3:2
147:15
**bed** 76:1,8
**bees** 107:6
**beginning** 25:22
82:18
**behalf** 62:13
**belief** 79:12

**believe** 26:22
27:3,12 38:5
53:5 67:11
71:7 73:15
78:25 79:9,23
86:5 87:16
104:24 112:6,7
112:10 126:23
**beneath** 77:16
**Benjamin** 2:15
**best** 19:24 72:25
102:25 103:20
104:16 149:11
**better** 24:7
25:18 31:25
53:21 77:13
106:10 129:21
**Beyond** 128:23
**bid** 41:6
**bidding** 41:7,8
**big** 92:20 97:13
**bigger** 106:7,9
**biggest** 82:19,20
**bit** 12:3 17:20
19:10 21:22
26:4 72:16,20
75:16 91:12
**black** 18:16,18
**blah** 69:3,4,4
**blessing** 130:18
**blocks** 121:2
**boat** 72:20
**Boland** 78:13,16
**Bonfouca** 17:25
18:23 19:5,20
19:24 20:1,4
23:14,16 26:4
**bookkeeper** 24:2
**bookkeeping**
8:24
**Borgne** 147:16
**boring** 104:6,6
**borings** 52:21,21
53:6,16 103:16
103:23,25
104:2,8 108:1

108:7
**born** 9:8,12
**borrow** 65:20
66:13,15 67:3
**boss** 32:1,3
**bottom** 100:17
122:14,20
**box** 2:14 39:13
64:22
**boxes** 70:17
**brace** 58:3
**braced** 58:10
**brackish** 75:8
**brain** 28:1
**branch** 2:11
12:1,17
**breach** 78:5,22
78:17
**break** 8:15,19
65:14 72:2
89:23 92:19
104:15
**breakage** 76:6
**breakfast** 60:13
**BRIAN** 3:12
**bricks** 76:3
**bridge** 78:12
**Brief** 72:3
141:25 146:5
**bring** 102:17
**Brogna** 43:1
69:22
**broken** 92:10
**Brother** 9:16,19
**brought** 6:9
66:18 67:4,10
102:13 142:5
142:19 143:4
143:20,22
144:4,11,13
**Bruno** 2:3,3
146:25 147:5
**BS** 10:3,17 11:6
11:9
**bucket** 71:9

MONTEGUT, III, JAMES

91:20
**budget** 134:4
**build** 90:14
**building** 87:23
**buildings** 36:15
36:17,23
**bunch** 124:10
**business** 100:16
101:20 105:3,7
**bypass** 30:1 35:6
35:25

**C**

**C** 100:13 140:24
**cake** 60:19,23
61:10 63:25
64:15 65:2
66:22 68:6
91:6 92:9
**calculations**
12:19,22 13:3
13:11 62:23
**call** 31:17 33:8,8
33:9 54:22
67:6 85:25
89:4 135:21
**called** 12:16 15:7
16:19 27:10
29:15 41:11
58:16 69:7
99:4 107:17
123:24 124:4
**calling** 58:1
125:21 126:2
135:23
**Calls** 50:22 88:4
116:23 119:14
123:18 136:1
**canal** 1:4 26:15
29:22 75:9
76:23 86:19,24
87:13 139:24
140:5
**capable** 35:9
58:12
**capacity** 15:17
109:6 114:16

**car** 44:16 86:22
87:14 99:24
**career** 12:3
**case** 17:8,11
30:20 48:9
70:22 118:2
**catch** 95:19
**cause** 7:25 74:8
76:6 149:16
**caused** 72:11
102:9
**causing** 47:15,15
**caveman** 89:25
**CCR** 1:24 5:22
149:2,24
**cc'ing** 138:22
**CEC** 135:2,3
**center** 84:7
**ceremony** 37:5
**certain** 11:12
13:3,11 14:10
24:25 25:5
34:8 38:16
39:16 74:6
102:8 104:25
114:10 117:6
129:2
**certainly** 144:5
**CERTIFICATE**
148:1 149:1
**certified** 1:25
5:23 58:11
108:14 149:3
149:25
**certify** 148:4
149:4,13
**chain** 31:13 43:9
48:4
**chance** 101:2
**chances** 73:9
**change** 13:7
**changed** 17:23
32:5 132:14,16
**changes** 122:18
132:18,21
148:6

**channel** 15:12
30:1 35:7,25
**channels** 14:25
29:6
**charge** 68:9,12
**charges** 128:20
**cheaper** 104:20
**check** 83:12,25
84:1 127:8
**chisel** 89:23
**choice** 73:24
**choices** 147:3
**chose** 106:19
**CHRIS** 3:9
**civil** 1:4 2:11 5:6
8:5 10:8 11:3,7
11:10,12,15,19
11:25 12:13,20
13:13,14,16
**Claiborne** 78:12
**clarification**
23:16
**class** 11:5
**classes** 11:8
**classified** 19:2
**clay** 76:3,3
**CLAYMAN**
3:11
**clean** 20:1,6
35:19,19,20
130:18
**cleaned** 35:14,14
**cleaning** 41:8
**cleanup** 18:2
27:14 30:2
77:12
**clear** 100:21
127:15
**clearly** 124:18
**clicking** 28:1
**client** 131:10
133:8
**climate** 105:21
**close** 8:18 43:7
95:25
**closely** 82:11

**closest** 78:11
**closure** 129:14
**Clouatre** 42:25
69:21
**coating** 18:15
**cofferdam** 58:2
90:14 91:13,15
91:23 93:2
**cofferdams**
90:18
**colleagues**
145:15,16
**collect** 104:22
**collecting**
107:25 130:5
**come** 25:18
27:19 33:12
43:19 65:23
95:24 104:20
**comes** 93:6
**coming** 35:6
65:19
**command** 43:9
48:4
**comment** 98:14
**comments** 59:20
70:14 99:7,17
**commit** 83:6,9
**communication**
85:7,17
**communicatio...**
138:21 145:14
**compact** 71:9,19
74:9
**compacted**
74:10
**compaction** 71:4
71:13,21 73:5
74:7
**companies** 19:13
53:9
**company** 53:5
80:10,14,16,17
94:5 106:3,20
107:15,16,19
108:6,13

**competence**
100:15,20
101:7,13 134:2
**competent** 58:12
89:12
**complete** 15:9
104:5
**completed**
107:13 127:19
135:9 144:19
**completeness**
83:16
**completion**
18:21 110:1,3
110:12 111:4
111:10 122:13
123:25 124:4
124:12,14,19
125:1,3,4,10
146:13
**complicated**
91:18,19,24
92:13 97:3,5
104:10
**composition**
50:20 51:7,14
51:15
**compound** 20:24
39:1 50:15
51:9,18 61:24
67:8 81:22
92:16 118:13
**computations**
13:3 15:1,12
15:15 47:1,2
**computer** 12:18
13:9,10 63:1
149:9
**concept** 139:13
**concepts** 99:20
**concern** 67:24
72:7 107:24
**concerned** 74:17
101:17 105:8,8
105:12 112:20
116:7 143:7

MONTEGUT, III, JAMES

concerns 51:24
82:20 104:18
conclusions
133:24,25
145:20 146:1
concrete 36:22
89:16 121:1
conduit 75:25
77:5
confident 127:21
confirm 147:11
conform 76:10
confusing 26:3
39:2
confusion 7:25
congratulated
94:4
conjunction
22:25
connecting 29:5
consider 52:9
74:18 77:8
91:18 105:18
considerations
118:17 121:9
considered
18:24 40:21
80:16
consistently 76:2
consisting 36:14
CONSOLIDA...
1:5
constitute 65:11
constraints 97:7
construct 91:15
constructed
36:16
constructing
14:23
construction
14:5,7,13,17
14:22 15:22
16:4,18,19
17:8 28:24
33:6 36:19
59:15 75:23

86:6 93:1
94:13 130:20
consult 28:21,22
contact 44:1
127:12
contained
140:22
contaminated
35:11 52:23
64:15
contamination
35:15 52:22,24
103:16
content 112:4
contents 100:7
context 80:11
109:18 123:5
124:24
continue 9:19
147:10
contract 7:6,8
15:7 17:12
19:22,23,24
20:8,9,10
22:15,22 73:20
73:21 83:3
116:4,13,19
117:5
contracting
28:21 33:18,22
33:23 34:2
74:1 82:14
83:8 105:4
contractor 17:14
19:7 22:23
26:21 38:12
39:18,19 41:5
43:22 46:14
48:17,20,21
70:20 83:5
89:12 117:3
128:17 135:3
contractors 15:4
15:8 19:4
135:2
contractor's

116:14
contracts 15:3
20:21,22 22:6
28:7,8 144:10
contractual
28:20 33:17
contractually
41:4 55:22
contrast 22:5
control 46:23
142:16,20
143:1,4
controversial
70:18,21
convenient
147:9
conversations
63:17
conveyed 31:12
convoluted
132:11
coordination
87:9
copies 94:16
copy 85:14 98:24
140:24
COR 83:8
cordial 54:6
core 100:15,20
101:7,13 134:2
corporate 134:5
corporation
19:6 20:9
97:13
Corps 2:19,20
6:10 7:8 11:2
11:17,25 12:4
12:9,14 13:6
14:20 15:3
16:16 20:6
23:25 28:5
31:7,19 32:9
33:19 37:2
38:11,14 39:18
39:20 42:19
48:17 51:4,4

59:23 61:8
62:13 77:23
80:4 82:4 86:9
91:10 98:4
108:15 111:11
111:20 115:25
117:4 118:6,25
119:21 121:11
121:17 124:20
128:15 135:1,5
142:14,15
145:3,16
146:18
correct 17:1
18:8 29:23
35:10 61:10,11
61:16 64:3,4
65:9 74:2
78:15 79:10
84:20,21,23
85:21 96:18,23
97:3,9,10
125:7 128:18
142:8 144:25
148:7 149:11
corrections
148:6,13,15
corrective 132:7
correctly 30:23
30:23 89:14,19
103:24 106:19
130:3
cost 22:22 73:21
106:14 127:7,9
127:22 128:5
143:23 144:10
144:13,15
costs 83:21
126:22,23
counsel 2:20 5:3
125:2 149:14
149:14
couple 25:23
71:17 142:2
course 11:19
20:3 33:12

46:15 48:14
49:14 64:2
82:4 94:2
97:13
courses 11:13,14
16:9
court 1:1,25
5:23 6:2 7:13
7:20 8:7,12
149:3,25
cover 68:19
cracked 74:20
crank 62:25
credentials 31:6
credit 77:9
Creek 101:23
133:12,14
creosote 18:6,12
20:5
crew 105:23
106:22 107:17
criteria 129:7,14
CRONIN 3:4
96:21 97:19
110:8,20 111:1
111:18 112:11
112:19 113:3
113:13 124:6
125:6,12 137:2
cross-sections
15:11
cube 92:20
cubic 15:6,13
41:8
curious 56:4
99:22
current 140:3
curriculum
11:11,16
cushion 76:9
cut 22:20 79:7
83:25 84:1
92:21
cutting 37:5
cycle 128:14
C-O-R-E 100:21

MONTEGUT, III, JAMES

**C-O-R-P-S**
100:22
**C.F** 19:7

**D**

**D** 3:5 4:1
**daily** 44:1 56:1
69:7,13,19,24
70:2
**damage** 6:10
47:15 48:23
49:6
**damaged** 74:21
**DAN** 2:13
**dancer** 95:13
**data** 13:9 69:3
129:11 130:5,9
130:11,14
**date** 7:23 58:14
58:20 128:6
143:5 146:14
148:8,11,25
**dated** 30:9 61:14
93:23
**DAVID** 2:21
**day** 24:25 70:22
95:24 104:5,23
106:10 143:19
144:21
**days** 128:14,17
**day's** 105:21
**DDM** 29:15
**DDR** 29:15
**deal** 61:1 98:14
98:18 99:1
**dealing** 16:10
71:2
**dealings** 54:9
87:24
**deals** 134:24
**dealt** 94:1
**DEBRA** 3:11
**decide** 120:22
**decided** 19:25
20:6
**decision** 102:16
106:2 122:2

**decisions** 109:8
114:18 115:6
115:18,24
**deep** 55:3 91:8
91:21 104:7,7
**deeper** 91:5
**deepest** 40:21
**defend** 115:5
116:8 118:5
121:8
**defended** 109:7
114:17 115:23
**defending**
115:17
**defense** 113:1
**deficient** 74:2
**defined** 122:13
**degree** 10:1 13:8
105:11
**delivery** 142:4
143:12
**DELORIMIER**
3:15
**demanded**
131:11
**demobilization**
55:18
**demolition** 36:1
36:5,7,11,21
89:12,15
**Dennis** 44:6,11
44:16 45:22
51:25 93:14,16
95:3 96:3
101:10,15
104:17,24
106:4 127:13
**Denver** 127:14
**department** 2:10
118:9 130:15
**depend** 28:18
**depending** 17:10
**depends** 43:24
**deponent** 5:10
**deposition** 1:10
5:4,14 6:21,25

8:4 9:1,2 54:11
82:19 124:25
144:9 147:2,10
149:8
**depositions** 7:3,5
18:25 147:6
**DEPO-VUE**
3:15
**depression**
74:12
**depth** 79:17
104:8
**describe** 17:5
**design** 29:14
37:17 58:2,6
77:24 139:22
140:23
**designation** 10:8
108:15
**designed** 58:11
**desk** 128:13
**deteriorated**
75:1,9 77:5
**deteriorating**
75:18
**determination**
24:7
**determine** 15:1
15:13 42:9
52:19,22 61:22
62:16 63:6
103:16
**determined**
11:17
**detrimental**
100:15 101:19
**develop** 29:25
38:15 47:4
**developed** 30:4
39:20 56:9,11
56:16,19 57:6
57:7,8 61:9
114:13 132:15
137:9
**development**
29:5,16 30:7

40:9 46:20
56:17,22 69:8
131:13
**devil** 98:15,18
99:2 134:25
135:4
**diameter** 75:4
**Dicharry** 29:7,9
**difference** 22:21
**differences**
22:13,17
**different** 14:24
14:25 20:18
42:24 96:15
111:8 112:8,13
120:16 132:24
134:15 141:19
**difficult** 86:11
86:16 87:1,9
87:16,22 88:1
88:14,23 89:17
95:15 96:1,6
100:11 101:12
**difficulties** 94:5
96:14,16 97:12
101:23 102:3,9
102:23 103:9
114:21
**difficulty** 86:11
91:25 102:11
102:17
**dig** 45:14,24
97:5
**digging** 91:21
**diploma** 10:12
10:13
**direct** 73:25
74:14 83:6
**direction** 39:15
**directive** 132:22
**directives** 48:19
49:4,9,11,13
**directly** 53:11
**dirt** 15:5 64:19
75:19
**disagree** 140:9

140:13
**disagreements**
106:1
**discovered** 20:4
61:4 86:21
**discretion** 105:7
**discuss** 21:5
117:21
**discussed** 48:16
145:12
**discussing** 37:14
139:17
**discussion** 47:24
82:19 104:2
**discussions**
47:20 48:12
54:6 101:9
105:25 145:2
**dishwasher**
35:23
**disposal** 35:7,8
35:11
**dispose** 35:12
**dispute** 124:1
**disputes** 7:6,8
**distinct** 55:15
78:10
**district** 1:1,2
14:18,20 16:21
20:9,10 85:8
85:18,19 86:4
135:1 147:16
**divided** 78:9
**division** 2:11
12:16 14:5,5,8
14:14,17,22
15:22,23 16:4
16:18,19
118:24 119:25
121:17
**dock** 86:20
**document** 40:16
69:1 71:16
79:5,16 80:2
98:8,22 109:22
110:10,13,18

MONTEGUT, III, JAMES

110:21 111:4,6
111:7,10,12
112:22 114:12
119:22 121:14
121:16 122:11
124:8,13
125:11,14
132:23 137:1,3
137:24 142:17
146:17
**documentation**
28:13 40:9
42:7 68:24
**documented**
142:7
**documents** 6:14
18:25 21:23
37:20,25 38:5
42:12 68:17,20
80:3,13 85:15
93:8 132:22
**doing** 12:22,25
13:1 15:24
24:12 28:6
30:24 34:16
45:10,20 46:7
46:9 53:13
101:11 103:20
104:16 108:6
114:7 117:21
136:16
**dollars** 69:5
**door** 27:22,22
**Draft** 61:14
**drafting** 40:10
**drawings** 13:4
**dredge** 17:14,14
35:8,11,12
**dredging** 14:24
15:6 17:9,11
18:3 19:9 27:7
35:6,25
**dressing** 67:10
**drill** 104:21,22
106:22 107:16
**drilling** 107:22

108:1
**drive** 30:5 91:14
**driving** 91:16,22
**drove** 77:14
144:23
**due** 103:18
**dug** 64:18 77:5
91:10
**duly** 6:4 149:6
**dump** 46:1
143:16
**duties** 14:6,12
**DUVAL** 1:6
**DYER** 2:21
**dynamics** 11:14
**D.C** 2:16

---

**E**

**E** 3:2 4:1,1
**earlier** 35:5 44:5
74:22 123:24
131:24 139:17
**early** 26:23
41:21 46:12
47:19 102:7
**ease** 23:15
**easily** 88:17
**east** 6:17 19:14
26:14 29:13
30:2 40:17
50:11 51:6,16
77:17 94:13
95:5 101:18
140:20
**EASTERN** 1:2
**easy** 39:12 74:4
87:1 88:22
95:17 96:2,5
99:3 138:2
**eat** 18:14 35:21
**EBIA** 31:17 32:2
33:8 94:2,3
127:22
**educate** 38:1
**education** 9:20
9:25 10:17
16:9

**effect** 71:8
100:15
**effective** 30:25
46:6,7,10,14
**effectively**
103:22
**effectiveness**
46:17
**effectuate** 85:9
**efficiency** 46:5
46:14,16 61:24
63:15 102:8
105:9 106:21
**efficient** 30:25
45:11 46:9
60:4
**efficiently**
103:22 106:5
**effort** 104:13
**efforts** 41:12
**either** 8:11 48:9
52:11 81:17
144:11
**electrical** 10:8
76:15 77:1
**electricity** 25:1
**electronic** 84:2
**electronically**
94:12
**elements** 74:7
86:4 107:7
**Elevation** 77:25
**emphasize** 46:5
**employee** 13:5
23:6 51:4,13
51:23 93:20
135:5
**employment**
13:20 14:19
**encased** 75:6
**encompass**
64:22
**encounter** 107:6
**encountered**
70:19
**ended** 25:25

26:3 27:2
**engaged** 19:16
20:11
**engagement**
19:20
**engineer** 11:3,8
11:10,19,25
12:5,21 13:2
13:10,13,14,16
17:4 25:4,6
27:6 30:17
42:17 50:10
52:4,12 57:3
58:8,13 62:24
66:2 79:14,15
79:21,25 80:22
81:11,17 88:16
95:2,13 97:23
98:4,13 101:4
102:3,21 108:5
108:12 114:3
114:20 115:3
118:23 129:5
129:10,16
131:22 135:14
138:3,8,11,17
140:8 141:2,6
**engineering** 10:2
10:4,5,11,14
10:18 11:5,6,9
11:11,12,15
12:13,15,17,19
12:22 14:5
24:13,14,21
25:3,11,12
56:25 57:22,25
58:1 60:3
61:22 62:12,21
63:15,18 76:7
118:6,9,15,18
118:24 119:25
121:16
**engineers** 2:19
2:20 6:10 7:9
11:3,17 12:9
12:14 37:3

51:4 62:14
77:23 80:18
98:4 115:25
117:4 118:25
119:21 121:17
124:20 136:14
136:20 145:3,3
146:19
**ensure** 82:16
**ensuring** 30:22
**entail** 70:12
**entailed** 17:6,7
**enter** 10:24
**entered** 11:24
14:15 16:3
**environmental**
19:18 130:15
135:8,9,11,14
**EPA** 20:5 27:11
28:4,6,8
**equipment**
45:16,17
103:20 106:8
**equivalent** 80:15
**ERIC** 3:8
**erosion** 47:15
**ESQ** 3:2,3,4,5,8
3:9,10,11,12
**ESQUIRE** 2:4
2:12,13,21
**essence** 15:23
**essentially**
116:15
**establish** 46:13
**established**
124:7 125:13
**establishing**
66:4
**estimation**
104:19
**evaluate** 31:7
126:11 136:14
**evaluated** 22:17
22:18
**evaluation** 29:6
121:18 138:4

MONTEGUT, III, JAMES

8/8/2008

Page 156

evaluations
116:21 117:1,7
118:7,15
131:12
evenly 76:17
eventually 106:1
everybody 9:3
evidence 5:15
39:5 125:17
Ex 85:4
exact 41:1
exactly 118:14
exaggerating
46:2
EXAMINATI...
4:3 6:6 9:13
18:19 21:17
24:18 25:16
32:15,22 38:21
39:6,25 44:10
44:17 45:7
48:10 49:2,25
50:17,25 51:11
51:21 59:21
60:15 62:11
63:23 65:8
66:25 67:13,21
72:4 78:3 81:3
81:10,16,25
88:7 89:6 90:4
90:24 92:23
93:13 94:25
95:9 96:24
97:22 98:11
99:14 101:1
108:17,25
109:14,23
114:4 115:2,21
116:17 117:2
118:16 119:10
119:17,23
120:8,25 122:4
123:12 126:5
126:20 129:4
129:23 130:22
133:4,20

134:22 136:8
138:1,7 139:12
140:15 141:22
142:1,12 143:2
143:21 144:7
146:2,6
examined 6:5
example 24:22
45:12,13 87:3
87:3 118:19
examples 45:8
excavated 64:17
65:17 74:11
excavating 41:7
excavation
40:21 58:3,10
60:16,20 63:25
64:23 65:1,13
121:1
excavations 47:2
55:3 72:9 90:5
90:19,20 91:1
91:5
excavator 71:10
97:6
exceed 79:1
131:2
exceeded 131:4
excess 104:5
Excuse 27:25
53:22
exhibit 4:8,10,11
4:12,13,14,15
8:25 9:10 59:5
59:8 60:8,10
61:13 62:1
93:10 109:11
120:14,19
121:15 126:2,4
126:25 139:6
140:1 146:9
expect 106:22,24
116:7 117:10
117:11 121:8
121:15 142:11
142:25 144:2

expectation
80:22 81:12
116:18
expectations
87:6
expected 51:13
57:3
expecting 117:6
expedite 85:6
expenditure
22:25 23:22
expenditures
131:12
expense 23:5
127:6
expenses 41:10
experience 47:7
72:24 87:18
90:10 91:2,9
98:3 102:24
105:22 136:18
experiencing
96:16
expert 52:9
expertise 14:11
47:4 122:6,11
experts 53:21
explain 59:16
72:16 129:21
explained 35:17
111:23
expose 64:17
exposed 75:8
expressed
104:17 105:24
106:4 129:3
extent 52:23
extraordinary
90:10
Ex'd 85:4
eye 24:12
eyes 53:20
E-mail 93:5
138:21 140:2
140:16

─── F ───

face 34:21
fact 44:15 63:7
65:21 66:8
85:17 103:18
108:7 109:9
135:10 136:13
139:21
facts 79:11
failed 94:5
failures 145:5,12
fair 7:16 8:22
16:2 23:19
25:17 137:19
FAIRBANKS
1:24 5:22
149:2,24
fairly 55:3 65:13
fairway 95:23
fallen 86:23
falling 6:11
familiar 20:15
24:5 54:2
78:20 93:18,19
101:22 102:2
122:8 127:1
138:13 139:5
139:13 140:12
140:14 145:25
familiarize
108:4
far 9:24 28:6
55:25 66:3
73:2 77:20
105:7 128:15
favor 73:7
fax 85:2,3
faxed 85:13
feasible 62:17
February 145:9
Fed 85:4,4
Federal 5:6
fee 41:11
feel 34:21 39:9
95:4
feelings 129:2
feet 8:15 41:7

49:10,18 55:4
77:24 79:2,7
79:18 91:3,21
104:7,7 140:21
fell 101:6
felt 24:10 28:15
32:10 45:15
63:4,8 82:21
82:24 96:5
105:22 115:4
121:24 137:16
fence 33:13
field 10:5 52:8
86:3 105:17
106:14
fifteen 15:19,20
fifty 95:22
figure 25:17
104:11
file 69:18
files 111:19
fill 65:4,11,19,23
66:10 74:3
final 40:16 67:10
67:10 140:16
finance 83:24
84:6 100:1
financial 25:10
82:5,10,13
100:2
find 31:4 70:23
86:11
finish 7:12 142:3
finished 31:16
94:8
fire 8:15
firm 1:11 15:7
20:21 22:5,15
23:17
first 6:4 8:23 9:6
11:1 14:7
16:14 20:14
23:20 26:5,11
26:16 30:12
31:4 34:4,12
34:25 36:11

MONTEGUT, III, JAMES

37:11 40:22
42:6 45:5
47:18 52:3
64:11 71:25
91:1,3 104:24
105:13 114:23
149:5
**five** 13:25 85:16
91:3 104:15
143:18
**five-year** 14:1
**fix** 74:15 89:4
118:2
**fixed** 15:7 20:21
22:5,15 23:17
144:10,13
**flexibility** 41:4
**flood** 37:6 46:23
47:5
**flooded** 78:17
**floodwall** 47:10
48:23 49:6,10
49:19 77:17
140:19 141:4,8
145:5
**floodwalls** 6:11
**flow** 79:8 131:14
131:15,22
138:4,9,12,19
139:2,4,23
140:4,5 141:3
141:7
**flowed** 139:23
**flowing** 138:14
**flying** 95:20
**focus** 10:4 30:22
70:20
**focused** 16:5
25:9 36:6
**Fogarty** 32:7
**fogged** 28:2
**folks** 28:23
83:24 94:9
105:15
**follows** 6:5
**follow-up** 142:2

**foot** 23:3
**football** 95:13,18
95:19,21
**forces** 89:20
**foregoing** 148:4
**forget** 72:12
83:22
**forgot** 127:11
**form** 5:12 38:25
39:23 44:24
48:7 49:22
70:16,16,17,17
83:22,23,23
84:10 130:10
**formal** 10:16
31:11 34:13
**formalities** 5:8
**former** 145:16
**forms** 85:14,16
**formulated**
145:19
**forth** 140:17
149:7
**forties** 89:9
**forward** 72:21
84:6,20 130:19
**forwarded**
119:25 120:3
120:20 121:16
**forwarding**
18:8
**found** 11:15
**foundation**
36:22,24 61:4
90:13 121:2
124:8 125:14
141:17,21
145:23
**foundations**
52:6,13
**four** 13:25 17:21
85:16
**fourteen** 15:20
**fourth** 7:2
**Franklin** 2:15
**free** 35:15

**Friday** 70:8,8
**front** 54:22
76:21,21,22
87:4 143:15
**fulfill** 31:21
**fully** 144:2
**full-time** 13:5,19
**function** 12:21
13:21 16:15
17:18 36:5
**functions** 25:5
**funded** 27:11
28:4
**funding** 82:8
98:15 131:2,4
131:9,25 132:1
132:5,14,19
134:25
**funds** 83:7,10
84:2 98:19
**funneled** 54:20
**furnish** 17:14
**further** 16:9
20:5 60:17
82:25 120:24
122:3 124:1
149:13
**future** 131:13
**fuzzy** 17:20
92:17

_____
**G**
**game** 95:18
**gas** 76:25
**GASPARD** 3:10
**gate** 37:6,8
143:15 144:22
**geared** 25:10
**generally** 54:4
69:1 70:13
**gentleman** 44:6
**geochemist**
54:12 108:20
**geologist** 51:22
**George** 54:1,2,9
54:21 108:19
138:22,24

**geotech** 140:19
**geotechnical**
16:10 52:2,4
52:12,25
136:14,20
**getting** 17:19
22:10 31:2
88:17 91:11
96:15 97:12
106:5
**GILLEY** 3:15
**give** 7:18 21:12
41:5 45:8
53:14 57:10
70:6,8,9 77:9
84:5 85:3
99:12 106:6
123:14 126:12
144:5
**given** 1:11 6:21
6:24 39:15
48:20 49:5
111:20 121:25
148:5,7
**gives** 79:16
**giving** 54:7
123:5,13
**glad** 8:11,16
59:2 60:8
67:22 96:6,9
96:10
**go** 9:14 15:10
31:16 32:25
33:4,14,14,18
35:9,21 37:8
37:22 39:12,13
45:6,19,22
46:24 49:16
51:23,25 52:1
53:11 62:7,25
70:22 72:25
74:2,14 80:20
81:12 83:6,9
91:5 95:23
104:22 105:19
113:2 117:21

117:22 118:19
122:2 127:8,12
128:1 130:19
**God** 93:12
**goes** 82:17
108:11 127:17
140:21
**going** 7:12 13:23
15:18 17:20
29:21 30:5,15
30:20 31:5,16
31:20 34:19
35:3,5 36:3,4,6
39:21 40:4
41:21 45:4
56:21 59:1,11
62:4,17 63:2
64:23 71:1,18
73:18,20 93:5
93:9,22 94:22
96:3 99:10
107:6 117:8,21
117:22 118:2
122:12 126:6
126:10 127:25
131:7 132:9,12
140:2,6 141:16
142:5 144:5
146:8
**GOLDBERG**
3:8
**golf** 95:18,21,24
**Gonzales** 6:2
**good** 61:1 64:11
73:4 75:17
77:9 83:14
95:11,14 96:7
100:24 122:16
**gotten** 73:10
**government**
17:24 83:7
144:6 147:1
**grading** 67:10
**graduate** 9:17
**graduated** 10:10
12:11

MONTEGUT, III, JAMES

8/8/2008

Page 158

graduating
10:23
graduation 12:4
12:8
gravel 76:16
ground 36:14
56:7 74:12
75:19,25
103:19
groundwater
79:8 138:4,9
138:12,14,16
138:19 139:1,4
139:15,23
140:4,18 141:3
141:7
Group 19:16
30:20 34:7
41:18 42:8
53:3 58:4
69:10 82:11
87:25 91:24
92:2,5,13 93:7
100:14,16
102:5 109:5,6
114:15,16,22
115:4,23 116:5
116:8 117:5,19
117:23,24,25
118:8 134:1,3
136:13 146:23
Group's 133:9
guess 25:3,23
30:5 37:16
55:16 56:14
57:13 60:18
61:7 64:11
65:15 73:13
83:1 84:13
86:3 87:6
91:17 94:12
96:12 102:19
118:14
guide 38:17
Guillory 33:3,6
33:11,14 47:20

50:18 54:5
63:5,9,14,18
84:5,20,22
103:3 120:21
121:25 138:23
guy 29:7 32:25
33:4 44:5
89:15 91:20
95:3 99:21
107:17 137:19
guys 34:19,25
37:15 42:1
44:1 45:5,24
72:19 73:10
95:4,19 110:18

H

half 12:7
hammer 89:23
92:20
Hamps 59:14
hand 21:22
146:8
handle 80:23
handwriting
111:12,17
122:21 124:11
125:22 130:25
134:23 137:3
handwritten
113:7 132:8
133:10 134:5
135:7
happen 77:3
83:19
happened 45:12
48:9 59:18
70:23 117:20
hard 89:11
103:19 105:17
harder 76:5 94:1
95:6
harm 77:8
hazard 65:15
hazardous 18:1
19:1
hazards 107:6

head 7:19,19
139:8
heads 89:2
hear 97:24 98:13
98:17 99:6
101:5
heard 98:4
heavily 29:10
hello 34:16
hereinabove
149:7
hereto 5:3 9:11
60:11 62:2
93:11 109:12
139:7 149:15
herewith 69:2
hesitate 35:13
hey 45:22 117:23
117:25
hierarchy 43:9
high 9:14 23:3,3
higher 48:3
122:6
Highway 1:12
hire 80:20 89:4
hired 11:18 14:9
53:22,23 91:10
history 16:14
hit 95:21
hold 8:14 27:12
128:3
holding 71:16
75:19
hole 45:14,24
58:9 64:2,13
64:14,18 65:19
74:12 75:22
91:10 97:5
106:10 107:22
holes 104:23
107:12
home 37:8
honestly 75:14
hot 105:15
hour 8:19
HTRW 18:24

hundred 41:8
95:21 103:25
Hurricane
144:24
hypothetical
133:2 142:10

I

idea 79:3
ideas 33:15
identification
9:11 60:11
62:2 93:11
109:12 139:7
identify 52:23
IHNC 33:8,9
34:5 40:22
41:16 50:4
53:25 60:17
67:2 77:18
78:9 86:10
101:19 114:20
123:16 126:14
138:18 141:4,8
144:20 145:6
III 1:10 3:2 6:1
148:3,11
immaterial
117:18
implies 35:15
important 7:17
7:21 46:15
importantly
109:4
imported 67:5,6
67:16
impress 46:18
impression 89:1
improperly 25:7
improve 35:18
improved
139:19
inception 37:17
include 64:23
included 23:8
36:1 64:7
142:20 143:23

incorporated
65:3
incorrect 61:16
79:10 128:21
incorrectly
118:4
incurred 23:6
indicate 101:11
111:22
indicated 54:11
126:18 132:22
139:2
indicates 79:17
99:2 109:1,4
114:13 122:14
135:7 140:17
indicating
138:25
indication 64:1
130:24 143:3
individual 97:4
individuals
85:21
induced 72:10
industrial 6:18
19:15 26:15,15
29:14,22 30:2
36:20 40:17
50:11 51:6,16
75:8 77:17
95:5 107:5
139:24
inefficient
103:18
influence 139:2
informally 60:18
information 9:7
54:20 110:25
112:5 123:14
139:2 140:18
140:22
inherently 62:19
initial 35:1
initially 38:17
104:4
injury 7:6

MONTEGUT, III, JAMES

inquiry 124:25
insert 122:15
insight 72:21
  126:12
inspector 70:19
inspectors 42:19
  69:15
instances 115:22
  128:8 131:3
  132:4
instigated 99:25
instruct 21:10
  32:19
integrally
  108:20
intent 128:9
interaction
  43:21 54:1,14
  63:14 100:2
interest 106:4
interested
  149:15
interests 100:17
  101:20
internal 128:25
interpret 137:5
  137:7
interpretable
  130:10
interpreting
  7:24
interruptions
  98:19 131:14
  131:16,23
  134:25
interval 70:4
introduced 34:5
  34:8,12
introducing
  125:16
introduction
  100:10
introductions
  35:1
inventory 106:8
investigation

145:5
invited 34:17
invoice 69:3
  83:13,16,17
  84:4,11,14
  85:20 127:5,6
  127:20 128:2
  128:12,18,22
  144:3
invoices 127:25
invoicing 132:14
  132:19
involve 18:3
  36:4
involved 6:15
  7:5 14:23 18:5
  19:5 21:24
  23:21 25:20
  26:12,17,20
  27:1,3,5,8 29:4
  29:10,12,15
  30:7,12 31:6
  33:5 34:4,14
  36:11,21 37:11
  38:5 40:8,14
  40:23 41:23
  47:2,18 48:22
  49:4 53:7
  54:22 55:11
  56:22,25 57:4
  57:7,9,12,18
  60:5 61:21
  62:12 66:1,7
  69:8 71:11
  86:20 91:13,16
  91:16 101:16
  103:2,11
  108:21 134:20
  138:3,18 141:2
  141:15 144:9
  146:14,15
involvement
  20:19 22:14
  44:18 55:14
  114:20 133:14
involves 63:24

IPET 145:4,11
  145:16,21
Iraq 93:25 95:6
  96:11
iron 92:20
issue 28:17,18
  28:19 29:3
  33:12,17 43:17
  45:3,9 48:15
  53:12 85:23
  87:14 126:23
  130:16
issued 39:14
  55:23
issues 16:10
  32:10 33:23
  46:4 47:5
  70:18,21 83:18
  88:18 91:12
  101:18 102:6
  103:13 114:2
  115:4
items 15:5
I-DEP 3:7
I-wall 47:3
I-walls 46:21
i.e 98:19

———————
          J
———————
JAMES 1:10 6:1
  148:3,11
January 41:22
  42:4 57:8
Jaws 107:17,18
Jefferson 1:11
  27:17
Joanen 2:4 4:5
  6:6,7 9:13
  18:11,19 21:1
  21:17 24:18
  25:16 32:15,22
  38:21 39:6,25
  44:10,17 45:7
  48:10 49:2,25
  50:17,25 51:11
  51:21 58:25
  59:6,21 60:15

62:8,11 63:23
  65:8 66:23,25
  67:13,21 71:23
  72:4 78:3 81:3
  81:10,16,25
  88:7 89:6 90:4
  90:24 92:23
  93:13 94:17,21
  94:25 95:9
  96:24 97:22
  98:9,11 99:11
  99:14 100:23
  101:1 108:17
  108:25 109:14
  109:23 110:17
  110:23 111:21
  112:14,24
  113:9,25 114:4
  115:2,9,13,21
  116:17 117:2
  118:16 119:6
  119:15,17
  120:8,15,25
  122:4 123:4,12
  124:3,15,22
  125:8,15 126:3
  126:5,20 129:4
  129:23 130:22
  133:4,20
  134:14,22
  136:4,8 137:6
  137:15 138:1,5
  138:7 139:12
  140:15 141:11
  141:18,22
  142:1,12 143:2
  143:21 144:7
  146:2
JOANN 119:10
  119:23
job 11:1,2,7,10
  13:6,18,21
  15:17 16:14
  17:17 30:14
  31:12,17 32:11
  40:25 41:9

42:15 43:3,17
  43:18 45:17
  47:8 53:24
  67:9 73:15
  86:12 87:10
  88:13,22,23
  89:11 94:8
  96:8 106:25
  107:3,8 127:17
  135:10 144:13
jobs 30:17 94:1
jog 126:12,16
John 32:7
joins 147:17
joint 19:12
  112:25
Jones 131:10
JOSEPH 1:24
  3:2 5:22 149:2
  149:24
JR 1:24 5:22
  149:2,24
judge 1:6 21:5
juggle 96:4
JULIA 3:4
June 140:4
junk 18:12
jurisdiction
  16:22
JUSTICE 2:10
justifiable 24:8
  127:22
justified 28:13
  28:16
justify 106:12,13

———————
          K
———————
Katrina 1:4
  144:24
keep 82:5
kept 69:11
kick 33:15 95:20
kind 17:19 24:10
  26:3,7 27:25
  28:2 37:1
  57:17 72:24
  76:9 82:17

MONTEGUT, III, JAMES

8/8/2008

Page 160

86:2 96:6
99:22 105:14
108:11,13
139:16
**knack** 95:15
**knew** 40:24
80:20,22 93:15
102:23 114:2
127:25
**know** 10:11 12:2
13:1 15:2
17:16,19 18:17
19:14,22 23:25
24:24 25:15,25
26:8 27:21
28:23 31:14,23
31:24 34:10,25
35:20 36:19
37:4,9,16,19
38:14 40:24
41:1,1,10,11
41:12,24 42:24
43:13 45:19,23
46:8 50:24
51:19 52:16,25
55:17 56:2,3
56:13,13 57:5
57:6,23 58:6,7
58:8,11 59:12
59:23 62:19
64:16,18,21,25
65:12,12,16,21
66:8,12,13
69:2,4 70:7,23
71:3 73:4,12
74:20,24,25
76:5,13 77:20
78:5,8,9 80:6,9
83:14 85:10,15
87:8 88:10
89:3,14,19
91:14,21 92:5
92:9,17 93:17
94:7,10 95:11
96:2,4,9 98:6
99:23,23 104:1

104:14 106:7
106:15,23
107:5,7 108:1
108:5,12 109:9
110:13 112:15
112:17 115:16
116:3,9 117:7
117:17,23,24
118:14,22
119:1,2,11,16
119:18 120:2
122:9 123:20
127:16,17,21
128:10,16,20
129:9,15,20,24
131:3,15,21,24
132:4 133:3,13
135:3,23 136:9
136:9,12,18,21
138:8,11,14
139:21 140:13
141:6,16
143:12,17,18
143:19 145:14
146:11,17,20
**knowing** 80:13
**knowledge**
14:10 31:11
36:10 40:20
48:19 49:3
50:18 51:1,2,3
51:10,12 52:17
56:8,12 57:20
68:4
**knowledgeable**
52:6,13
**known** 6:16
143:6
**knows** 136:5
**Knudsen** 19:15
34:6 38:15
39:16 42:9
43:23,25
**K2** 1:5

---
## L
**L** 2:4 5:1

**lab** 108:14,15
130:6,6,11
**labeled** 124:13
146:9
**labor** 41:15,19
44:22 96:17
107:21 116:10
144:19
**laboratory**
129:12
**laborers** 45:21
**lack** 53:20
104:13 130:25
**Lacks** 141:17,21
145:23
**ladders** 75:5
**Lafayette** 16:23
**laid** 77:6 143:13
**Lake** 147:16
**land** 79:13,21,25
80:10,18
**large** 65:13 75:4
103:22
**larger** 104:21
**lasted** 26:6
**lateral** 30:4
**LAURA** 3:3
**law** 1:11 5:7
24:23
**lawyer** 24:23
67:22 95:14
**lay** 76:1,8
**layers** 50:12,13
50:13
**laying** 76:14
**LDEQ** 130:14
130:18
**lead** 22:6 28:4
87:16 95:2
126:22
**leader** 43:16
50:9 57:3
**leads** 34:11
114:9
**Leake** 2:22
**learned** 37:18

**leave** 43:13
120:21
**led** 23:2 29:24
30:1 40:10
112:6,7,9
**Lee** 33:3,6,11,14
33:16 37:15
47:20 50:18
54:5 63:5,9,12
63:14,18 84:5
84:20,22,24
85:3,6,11 86:2
86:2 103:3
120:20 121:25
138:22
**left** 77:13 99:4
144:18
**legal** 80:2
**lessen** 35:18
**lesser** 93:16,17
105:11 138:22
138:25,25
**letter** 68:22,23
68:25
**letters** 19:11
130:17
**letting** 94:7
**let's** 23:16 45:15
90:20 104:1
**levee** 15:12
17:10 37:7
48:23 74:25
147:16
**levees** 14:24 15:6
15:24 46:20
**levee/floodwall**
140:20
**level** 52:22 79:8
106:22
**levels** 82:8
103:16
**LEVINE** 2:12
4:6 18:9 20:23
24:16 25:13
32:13,18 39:3
45:1 48:24

49:21 50:14,21
51:8,17 58:23
59:9 62:3
63:20 65:5
66:20 67:7,17
72:1 78:1
81:21 88:3,24
90:2 92:15
94:15,19 95:7
96:19 97:17
98:7 99:9
100:19 108:23
113:18,22
114:24 115:7
115:11,15
116:1,22
117:15 118:12
119:4,8,13
120:5,13,17
121:21 123:2
123:22 124:9
124:17 125:25
127:2 129:17
132:25 134:12
134:18 135:25
136:6 137:11
137:22 139:9
140:10 141:9
141:14,20
142:9,22 143:9
143:25 145:22
146:6 147:18
**liaison** 86:3
122:8
**licensed** 58:7,13
79:14,21,25
80:14,16,17
**lift** 55:5,6,20
56:5,9 58:16
59:17 61:20
71:2 74:21,23
75:3,22 90:15
91:6 92:4
118:19 120:7
**lifted** 92:10
**lifting** 92:4

MONTEGUT, III, JAMES

8/8/2008

Page 161

**lights** 25:1
**line** 72:6 76:14
  76:14,15
  109:16 122:15
**lines** 43:8 44:21
  76:18,19,24,25
  77:1 85:11
  86:7
**listening** 77:15
**literally** 23:2
  27:19 87:4
  144:22
**litigation** 1:5
  93:7 114:9
**little** 12:3 17:20
  19:10 21:22
  24:3 25:24
  26:4 55:10
  70:15,17 72:16
  72:20 85:15
  91:12 92:17
  112:1
**live** 106:11
**load** 76:4 143:13
  144:16
**loan** 99:24
**loaned** 15:23
**locally** 33:25
**located** 27:15
**location** 27:21
  27:21
**lock** 29:6,21
  30:6 37:6,8
  130:21
**locked** 144:22
**logic** 99:2
**long** 13:15,20
  15:16 17:17
  18:20 25:20
  50:3 74:25
  104:20 106:10
  106:17 108:13
**long-term**
  100:16 101:20
**look** 49:16 60:1
  60:2 63:12

72:21 94:23
96:5 101:2
109:21 110:9
116:3 117:18
120:21 122:1
126:9 136:22
137:20
**looked** 10:11
  56:5 59:20,22
  62:16
**looking** 57:14
  59:12 62:16
  63:8 70:13,14
  112:22 113:15
  117:13 120:11
  120:19 122:25
**loose** 49:15
**loosely** 75:20
**lot** 12:18 21:3,23
  24:10 60:19
  75:21 104:10
  144:10
**Louisiana** 1:2,12
  2:6,23 5:24 6:2
  95:6 130:15
  149:4
**love** 93:12
**Lower** 6:12
  78:18 145:12
**LSUNO** 9:22
  10:23
**luxury** 73:13,14

—————————
**M**
**M** 4:1
**machine** 24:3
  71:9 85:2
**machinery** 90:8
  91:8
**machines** 65:14
**magnitude**
  106:25
**main** 135:21,24
**maintain** 98:20
**major** 22:21
**majority** 36:15
**makeup** 50:12

65:4,7,10,19
65:23 66:9
**making** 111:8
**management**
  31:13 32:1
  53:3 101:16
  102:5 116:10
**management's**
  31:24
**manager** 28:24
  28:24,25 33:7
  82:15 86:6
  94:12
**managing** 28:7
**manner** 31:1
**map** 140:19
**marine** 86:19
**mark** 59:8 60:8
  61:12 98:8
  140:1
**marked** 8:24
  9:10 60:10
  62:1 93:10
  109:11 121:15
  139:6
**marking** 59:4
**Martin** 9:16,19
**match** 95:18
  132:1
**material** 27:20
  35:7,8 64:16
  65:17,18 66:9
  66:12 67:2,11
  72:8 74:4,5,8
  76:16 143:20
  144:11,16
**materials** 53:3
  64:12 67:1,6
  102:5 142:4,6
  144:12
**matter** 8:24
  88:12 106:9
  143:11
**mattered** 88:14
**matters** 86:7
**McDonough**

66:15
**McKernan** 1:11
**mean** 22:20
  30:23 31:23
  32:17 34:9
  37:22 42:18
  46:7 47:9
  54:15 57:16
  62:20 66:21
  76:21 77:4,7
  82:8 87:11
  90:12 93:18
  106:12 107:11
  116:7,25 129:7
  129:11 130:5
  131:17 134:9
  135:20 143:12
  145:24
**meaning** 65:17
  133:21
**means** 96:7 98:6
  99:23 123:21
  126:13 129:15
  129:19
**meant** 129:9
**measured** 78:4
**measurements**
  129:13
**measures** 82:12
**mechanical** 10:8
  10:10,14 11:6
**mechanics** 11:13
**meet** 82:10,13
  128:19
**meeting** 34:13
  34:20
**meetings** 34:18
**members** 43:22
  48:16,17
**memorandum**
  29:14 139:22
  140:23
**memory** 26:22
  28:1 126:12,17
**mention** 133:11
**met** 82:5 84:16

84:19 129:14
**metal** 75:7
**middle** 92:21
  94:13 95:22
**migration**
  139:14
**Millington** 84:8
  84:9
**million** 69:5
**mind** 80:15 84:9
  96:13 99:21
  106:13
**minimum** 85:12
**minute** 73:2
**minutes** 104:15
**mischaracteri...**
  97:21
**mischaracteri...**
  39:5
**misguided** 134:4
**missing** 72:20
  118:3
**Mississippi**
  17:15
**mistake** 130:8
**misunderstan...**
  112:21 113:15
**mixed** 127:17
**MMG** 102:4,7
  103:15 105:2
  106:6,19 107:2
  107:9,15,20
  108:7 116:5
  117:19,20,22
  117:24 118:2
**mobilization**
  42:6 55:18
  61:5
**mobilize** 26:22
**mobilized** 26:19
  41:17 50:6
**modification**
  55:23
**money** 30:22
  31:2 73:8
  82:17,22 83:4

97:15 131:18
**Montegut** 1:10
6:1,7 9:6 94:9
132:10 142:3
146:7 148:3,11
**month** 23:8 69:3
93:23
**monthly** 23:4
144:3
**months** 27:9
**Morrison** 19:15
34:6 38:15
39:15 42:9
43:23,25
**mother** 18:17
**motif** 36:19 89:9
**move** 13:23 62:9
**moving** 82:6
100:9 130:23
133:5
**MRGO** 1:7 6:8
17:15 29:5
147:2
**multiple** 54:15
115:18
**mutually** 147:9

**N**
**N** 4:1,1,1 5:1
**name** 6:7,14
29:7 34:22
44:12 93:18
107:14,18
**named** 6:3 60:23
**names** 42:23
**natural** 74:8
76:25
**nature** 7:7 12:23
16:11 18:17
20:20 25:2
28:20,22 38:7
40:25 46:5
52:21 72:23
120:23 138:15
**navigable** 17:16
**near** 78:6 131:11
**necessarily**

24:24 35:19
70:1 85:24
**necessary** 24:13
73:8 79:23
115:5 147:13
**necessity** 25:6,10
**need** 12:2 24:23
25:4 55:3 61:3
63:8 64:1 73:6
80:5 88:18
91:2 125:24
147:7
**needed** 29:25
63:4,6 135:22
147:4,7
**needs** 91:9
**negatively** 139:8
**neighborhoods**
30:6
**never** 45:18,18
53:10,18 56:6
56:14,14 84:24
85:5 89:1
99:13 125:23
128:9 129:3
137:4 145:24
146:12
**new** 2:6,23 9:12
9:23 14:2,17
14:20 15:25
16:6,20,21,22
16:24 17:2
27:16,17 34:10
37:6 85:8,18
95:5 130:21
**NFFAT** 130:16
**NGVD** 140:22
**Ninth** 6:12 78:18
145:12
**nods** 7:19 41:20
**nonexistent**
135:12,16
**noon** 8:18
**northern** 60:17
78:14
**notch** 89:5

**note** 122:18
132:8
**noted** 148:13,15
**notice** 5:7 9:1,2
74:5,14
**noticed** 147:2
**number** 6:14
46:16 83:23
97:9 133:8
134:6
**numbers** 63:2
**numerous** 76:19
76:24

**O**
**O** 4:1 5:1
**oath** 5:25 6:5
**object** 21:4
38:20,25 39:23
44:24 48:7
49:22 108:24
126:16
**objecting** 22:10
62:6
**objection** 20:24
24:17 25:14
32:14 39:4
45:2 48:25
50:15,22 51:9
62:4 63:21
67:8,18 78:2
81:1,15,20,22
88:4,25 92:16
95:8 96:20
97:18 108:10
114:25 115:8
115:10 116:23
117:16,16
118:11,13
119:5,20 120:6
121:22 123:18
127:3 129:18
133:1,18
134:11,13
136:1 138:6
140:11 141:10
141:13 142:10

142:23 143:10
144:1 145:23
**objections** 5:11
116:2
**objectives** 41:6
**obligated** 22:23
**obligations**
80:24 81:2,8
82:5,10,13
**observation** 95:2
102:23 104:3
**observations**
95:10
**observe** 103:8
**observer** 34:20
**obtain** 129:13
**obtained** 14:9
**obviously** 36:2
46:1 62:19
90:7 99:16,19
114:6 143:17
**occasional** 17:9
**occasionally**
54:4
**occasions** 131:2
**occurred** 70:21
78:5,17 122:19
**occurrences**
49:23
**occurring** 54:7
**October** 58:15
**odd** 11:21
103:25
**office** 2:20 16:20
16:21,23,23,25
17:3 24:22,23
24:24 25:4
27:6 47:1 48:3
84:6 85:3,8
99:3 105:18,19
122:10 135:21
135:24
**officer** 28:21
33:18,22,23
34:2 74:1
82:14 83:8

**officer's** 105:4
**offices** 16:22
**official** 43:11
86:5 122:6
**officiated** 5:24
**oh** 29:9 32:21
36:8 68:11
88:20 110:1
127:16 137:1
**OHM** 19:11,21
**okay** 6:20 8:12
8:13,21 9:14
9:24 10:16
12:6,10 21:12
34:23 39:7
62:9 64:20
68:2 77:9
78:24 96:10
103:7 115:22
**old** 28:1
**once** 71:5 84:4
84:19,25
121:10 127:19
127:20
**ones** 80:23 81:4
**ongoing** 56:11
**on-site** 98:20
**open** 14:11 37:5
**operating** 86:1
**operation** 106:2
**operations** 66:19
67:16 68:5
73:23 82:16
**opinion** 45:10
103:17
**opinions** 145:20
**opportunity**
53:15,17 106:6
**opposed** 20:20
24:1 46:8
65:11 104:23
117:12 140:6
**option** 10:10,11
10:15 11:7
**order** 6:16 15:8
19:17,21 26:13

MONTEGUT, III, JAMES

8/8/2008

Page 163

27:3 30:13
39:14
**orders** 33:21
**organization**
122:9
**original** 5:9
19:23 20:3
23:17 26:6
55:24
**originally** 13:19
82:9 90:21
111:23 132:3
144:8
**Orleans** 2:6,23
9:12,23 14:18
14:20 15:25
16:6,20,21,22
16:24 17:3
27:17,18 85:8
85:18 95:5
**outlays** 25:10
**outpacing** 131:9
132:5
**outset** 32:6
**outside** 15:25
101:12 113:2
142:4
**overall** 55:17
65:11
**overbearing**
97:8
**overhead** 106:14
**overly** 97:3
**overlying** 99:20
**overseeing** 28:7
29:11 30:19
**oversight** 17:7
21:25 109:6
114:16 134:3
**O'Connor** 44:11
44:11 93:14,16
95:3 96:3
101:10,15

___

**P**

**P** 5:1
**pace** 106:23

131:1,4 132:1
132:1,2
**page** 4:3,8 38:9
99:8 100:5
109:25 113:17
120:11 122:14
126:8,10
128:24 130:23
133:5,7,23
137:12
**pages** 85:16
**paid** 15:4,6
42:10 82:25
96:15 97:12,16
144:16
**paper** 9:2 25:2
**paragraph**
71:16,18 99:1
100:18 131:7
**parameters**
61:23
**Parish** 27:17
**part** 5:14 11:11
23:20 35:25
53:24 55:24
60:17 69:12
78:14 108:21
109:2 110:3,12
113:11,12
133:7
**participating**
56:16
**particular** 12:1
17:13 20:7
30:20 38:14
45:14 54:8
70:22 85:1
94:6 118:1
135:18 137:12
143:5,19
**particularly**
134:2
**parties** 5:3
149:14
**passed** 63:5,9,12
**passing** 47:14

117:13
**patient** 8:17
**PAUL** 2:12
**pay** 15:2 20:19
24:25 40:14
41:9 82:2,22
83:10 128:16
**paying** 84:6
117:11 127:5
**payment** 15:8
85:1,9,19
128:16 144:14
**payments** 21:25
22:1,17,18
128:3
**payroll** 80:19
**peers** 31:19
**pending** 94:20
113:23
**pens** 25:1
**people** 24:25
27:19 31:8,18
34:8,13 44:3
45:16,20 47:21
51:19 60:19
87:11 94:3
99:18 103:19
104:13,14
105:9,18,23
107:8 112:16
135:20,24
**people's** 8:14
87:4
**percent** 65:16,18
**percentage** 65:1
65:10
**perform** 13:11
39:16 40:17
49:5 63:6
95:19 97:2
106:23 107:21
117:6
**performance**
43:12 103:17
129:6 133:10
**performed** 20:1

26:14 38:3
46:20 106:21
**performing**
30:21 54:18
96:17 102:25
103:15 132:3
**period** 14:1
15:21 16:8
23:7 27:8
67:14 144:4
**permitted** 5:5
**person** 23:11
29:2 95:16
105:19 107:3
117:10
**personal** 7:6
145:20
**personally** 43:22
88:12
**personnel**
106:14
**perspective**
24:13,21 60:3
**pertain** 70:18
**PERTAINS** 1:7
**phase** 26:5,6
48:5 130:19
**Phil** 51:25
127:13
**Phillip** 44:4
45:22
**phone** 85:25
**phrase** 122:17
**physical** 41:15
41:19 44:22
107:21,25
144:19
**physically**
105:20
**pick** 85:24
**piece** 9:2
**pier** 86:20
**piggybacked**
26:8
**pile** 30:5 77:16
79:1,3,6,17

**piling** 18:15
91:14
**pilings** 36:24
**pipe** 75:4,4,7,24
**pit** 66:13,15 67:3
**place** 24:15
25:12 40:22
41:15 44:22
47:25 48:1,3
48:12 49:9,18
56:10 76:20
85:20 121:19
122:16 131:16
132:13,16
**placed** 64:17
**plaintiffs** 2:2 6:9
**Plaintiff's** 4:10
4:11,12,13,14
4:15 8:25 9:10
60:10 62:1
93:10 109:11
139:6 146:9
**plan** 40:4 56:8
56:17,19,22
57:6 58:16
59:16 61:8,14
61:17,21,22,25
62:13,15 63:15
63:19,24 64:7
71:12 118:20
**planned** 35:9
**planning** 48:4
90:21
**plans** 38:6,16
40:11,15 71:1
**plant** 18:6,10
**plate** 35:20
**play** 31:21
**played** 25:9
32:12
**player** 95:13
**players** 34:6,9
**playing** 95:24
**please** 21:14
49:1 81:9 87:5

| | | | | |
|---|---|---|---|---|
| **pleasure** 93:9 | **prepared** 59:15 | **privy** 105:2,3,4 | 114:9 118:23 | 88:2,16 94:6 |
| **plus** 41:10 | 121:2,6 142:7 | **probably** 15:2 | **production** | 94:12 95:1 |
| **point** 76:4 77:10 | **preparing** 69:22 | 15:18 24:4,7 | 106:24 110:25 | 97:23,24,25 |
| 77:10 84:22 | 69:23 | 25:8 26:6 | **professional** | 98:1,5,5,12,13 |
| 86:21 91:17 | **presence** 48:13 | 28:20 31:15 | 79:13,21,24 | 101:4,16,23 |
| 100:24 104:24 | 48:15 | 32:5,6 38:4 | 80:10,18 81:17 | 102:2,7,20,22 |
| 108:18 112:21 | **present** 3:1,7 | 42:4 46:17 | 95:12 96:1 | 108:5,21 110:1 |
| 121:13 135:11 | 87:10 139:3 | 59:18 65:19 | 108:12 | 110:3,12 111:4 |
| 135:15,19 | **presented** 94:6 | 69:10,11 71:15 | **profit** 41:10 | 111:10 114:3 |
| **pointed** 62:5 | 121:11 127:6 | 74:3 84:2 | **program** 12:21 | 114:19,20 |
| **pointing** 123:6 | 128:12 | 85:12,13 86:14 | 63:1 94:13 | 115:3,19 |
| **points** 140:5 | **presenting** | 107:3 128:7 | **programming** | 118:22 122:13 |
| **poles** 18:13,17 | 121:12 | 139:19 143:20 | 12:17 14:10 | 123:16,25 |
| **policy** 45:19 | **preservative** | **problem** 43:18 | **programs** 12:18 | 124:4,12,13,19 |
| 53:10 128:15 | 18:16,16 | 53:15 70:24 | 13:11 14:8 | 125:1,3 126:14 |
| **poor** 73:24 | **pretty** 13:23 | 73:22 74:5 | **progress** 9:24 | 127:23 129:5 |
| **pops** 96:13 | 43:7 143:15 | 77:3 89:5 | 15:9 | 129:10,15 |
| **portion** 78:11 | **prevent** 131:13 | 100:14 117:19 | **progressed** 55:1 | 130:20 131:1,4 |
| 140:16 | **prevented** | 117:22,25 | **project** 6:16 | 131:9,13,22 |
| **portions** 37:17 | 134:25 | 118:1,1 | 17:4,13 18:1,2 | 132:5,15 133:7 |
| **position** 12:12 | **previous** 18:25 | **problems** 94:1 | 18:20,23 19:18 | 133:15 134:4,6 |
| 12:13 13:16,18 | 21:15 30:17 | **procedure** 5:6 | 20:4 22:9 23:1 | 134:9,21 |
| 14:11 31:9 | 81:5,8 | 7:10 8:5 86:1 | 23:7 24:15 | 135:14,19 |
| 116:8 | **previously** 147:5 | 132:13,16,19 | 25:3,12,21 | 136:20 138:2 |
| **possible** 8:20 | **pre-remediation** | **proceed** 131:6 | 26:12,13,21 | 138:17,18 |
| 62:10 | 139:22 | **process** 23:21 | 27:2,6,11 28:4 | 140:8 141:2,6 |
| **possibly** 122:16 | **price** 15:7 20:22 | 25:12 31:10 | 28:5,24,25 | 144:18 146:13 |
| 135:17 140:13 | 22:6,15 23:17 | 71:12 72:17 | 29:21 30:17 | 146:16 |
| **post** 57:17 | **priced** 15:5 | 73:3 74:16 | 31:6,9,14,22 | **projects** 17:8,9 |
| **potential** 47:21 | **primarily** 14:25 | 106:15 127:19 | 31:22 32:2 | 26:25 31:20 |
| 75:11 77:2 | 16:5 17:11 | 128:2 | 34:5,10 35:2,3 | 32:12 53:8 |
| 139:19 | 19:8 36:21 | **processed** | 36:4 37:12,16 | 86:8 |
| **po-tah-to** 134:19 | 46:11 69:22 | 127:23 | 37:22 38:2,14 | **prompt** 128:16 |
| **Po-tay-to** 134:19 | 86:18 | **processes** 20:15 | 40:10,11 42:17 | **proof** 22:24 |
| **practical** 72:23 | **primary** 30:21 | **processing** 127:4 | 44:5 45:14 | **proper** 81:13 |
| **practice** 75:24 | 44:5 70:20 | 128:13 130:8,9 | 46:23 47:3,19 | **properly** 74:10 |
| **precluded** 134:4 | **prime** 19:7 | **Proctor** 73:4,6,9 | 48:15 49:4,16 | **properties** 76:22 |
| **precursor** 35:6 | 53:12 | 73:10 | 50:4,9 52:14 | 76:23 |
| **predates** 109:16 | **principles** 83:3 | **Proctors** 73:11 | 52:18 54:12 | **property's** 129:6 |
| **preference** | **prior** 12:4,7 | 73:12 | 55:1,10,15,17 | **propose** 129:13 |
| 108:16 | 40:15 54:24 | **produce** 79:16 | 55:18,19 56:11 | **proposed** 40:14 |
| **preliminary** | 57:8,19 121:18 | **produced** 38:11 | 57:2 61:4 66:1 | **protect** 30:5 |
| 54:23 | **priority** 46:16 | 42:8 79:6 80:3 | 68:1,10,13 | **protection** 30:4 |
| **preparation** | 46:17 | 93:8 98:23 | 79:15 80:22 | **proves** 73:4 |
| 35:24 | **privileged** 31:24 | 110:19,22 | 81:11 82:4,6 | **provide** 22:23 |
| **prepare** 83:22 | 94:10 | 111:24,25 | 82:15 86:10 | **provided** 23:23 |

MONTEGUT, III, JAMES

124:20
**PSLC** 6:8
**public** 87:5,8
**pukes** 99:3
**pulled** 56:6
**pumps** 75:4
**punishment**
 128:10
**purposes** 5:5
**pursuant** 5:7 8:4
 19:17,21 20:12
 146:24
**pushed** 96:7
**pushing** 76:5
**put** 9:4 18:12
 30:6 34:21
 35:22 58:2,8,9
 64:12,19 67:3
 75:16,24 76:3
 76:12,15 89:23
 89:23 105:9
**putting** 114:14
**P.O** 2:14

**Q**

**QA** 69:17
**QA/QC** 69:20
**QC** 69:12,13,17
 69:18 143:1
**QC-QA** 143:7
**qualifications**
 11:18,23
**qualifies** 11:5
**qualify** 11:7,9
**quality** 42:20
 69:14 130:15
 142:13,13,16
 142:20,21
 143:1,3
**quantities** 15:2
**quantity** 69:7
**question** 5:12
 7:12 8:10
 21:13,15,18
 22:12 24:19
 25:7 31:25
 32:16 34:11

36:3 39:1,10
39:24 44:25
45:3,21 48:8
54:10,12 56:18
56:21 59:22,25
61:19,24 62:7
64:11 67:20
72:9 79:18
81:9 82:1
83:14,19,21
85:24 87:23
91:17 94:20,22
94:24 95:1
96:12 102:19
103:8 108:2
113:23 114:1,5
114:11,12,19
114:23 122:22
122:24 123:1,3
123:6,11
125:21 126:19
132:12 133:6
137:14,24
141:1,19
**questionable**
121:24 128:5
**questioned**
127:9
**questioning** 72:7
**questions** 6:19
7:11 21:9 22:8
44:20 100:1
110:24 111:14
111:16 112:3
112:18 114:10
131:20 137:8
137:10,18
142:3 146:3,8
146:21 147:4
147:13
**quick** 8:20
**quickly** 13:23
39:12 59:13
62:10
**quite** 73:25
**quitting** 56:3

**quotes** 100:6

**R**

**radioactive** 19:1
**railroad** 86:22
**Rain** 74:7
**raised** 9:9,12
**ran** 26:9 131:18
**ranking** 122:6
**rate** 86:9,10
104:12
**raw** 129:11
130:5,9,11
**reached** 77:21
77:23
**read** 8:12 10:13
21:16 37:23
59:11 93:21,22
94:14 100:11
100:13 109:13
109:16 113:24
126:6,10
128:23 129:8
145:24 147:19
**reading** 5:8
62:15 113:6,8
113:19
**ready** 26:21
**real** 59:13 90:11
129:19 138:10
**realized** 102:20
102:22
**really** 8:14 12:11
40:25 41:1
54:8 56:13
60:24 62:18
66:11 85:2,5
104:22 116:6
116:14 117:17
125:24 140:12
**realtime** 131:11
**reams** 93:8
**reason** 6:13 8:16
78:25 79:9,18
84:8 97:13
123:14 140:9
**reassign** 99:3

**recall** 16:1 26:18
26:25 37:24
40:19 41:14
43:1 48:12
49:8,17,23
55:5,6,21,24
56:16,24 58:5
60:5,7,20,22
63:7,10,13,17
66:11,16,17
68:7 71:14
75:14 89:13,19
92:8 101:14,21
103:15,24
105:14 106:19
107:12 132:17
132:20 133:3
135:13
**recast** 129:6,12
**receipt** 127:7
**receipts** 23:22
**receive** 10:20
35:11
**recess** 72:3
141:25 146:5
**recognize** 127:8
127:10
**recollect** 34:24
**recollection** 34:3
36:16 40:13
47:23 48:18
49:7 104:5
**recommendati...**
133:24
**record** 9:5 90:23
93:22 100:21
100:25 111:22
113:21 120:18
123:23 136:24
146:10
**records** 22:24
**rectangle** 65:2
**rectangular**
64:22
**rectify** 83:20
**reduced** 132:2

**refer** 23:16
26:12 39:17
48:20 81:7
97:25 118:15
**reference** 18:24
126:16
**referenced**
58:15
**referred** 10:9
12:25 43:16
60:18 74:22
81:4 126:24
**referring** 38:13
38:23 39:17,19
42:11 54:3
58:1 59:23
60:9 94:2
96:14 111:6
135:17
**reflect** 120:18
123:23
**regard** 28:6
**regarding** 20:19
22:9 29:13
47:5,21 64:6
65:22 71:4
98:19 118:17
140:17
**regardless** 75:13
75:15
**regards** 21:19
107:25 133:9
**region** 15:25
16:6
**regularly** 54:14
54:15
**reimbursable**
22:22 73:21
**reimbursed**
144:17
**reimbursement**
144:15
**related** 17:12
43:17 102:7
139:16 149:14
**relates** 126:13

MONTEGUT, III, JAMES

128:24
**relation** 57:21
141:1
**relations** 87:8
**relationship**
46:13 87:20
123:16
**relative** 85:19
86:10
**relied** 40:16 80:4
122:5
**reluctant** 104:25
**remain** 15:16
**remark** 37:1
**remediate** 27:22
35:21,24
**remediated**
35:13,16 77:7
**remediating**
75:12
**remediation**
6:17 18:4
27:10 28:3
35:17 36:1,5,6
77:11,12 135:8
135:10
**remember** 19:11
19:25 21:13
42:1,22 44:7
57:12 60:13
67:9,19 80:6,8
92:18 107:9,14
107:18,20
107:24 127:12
**remind** 44:9
**removal** 55:4
58:16 59:17
61:20 90:6,12
92:18 118:20
**removals** 89:16
89:19,21
**remove** 36:12
55:20 56:9
61:3 64:25
65:15 86:20
87:14

**removed** 37:11
37:13 55:7
67:2 71:6
74:18 75:2
76:19 77:1
86:24 139:19
144:11
**removing** 36:22
36:25 55:11
57:1 61:10,18
89:7 90:22
**repeat** 8:10
21:14 49:1
81:9
**reperform**
130:13
**rephrase** 8:11
**replace** 29:21
106:2
**replaced** 106:18
106:18 107:10
107:15,21,22
**replacement**
29:6 108:8
**report** 29:6,11
29:18 30:8,9
43:2,10 69:13
69:16,17 70:16
100:12 109:1
110:1,4 111:5
114:14 120:12
122:14 123:25
124:5,12,14,19
125:4,5,10
139:1 140:9,23
140:25 142:14
142:21,21
143:1,4 145:11
145:17,21
146:13
**reported** 1:23
42:21
**reporter** 1:25
5:23 7:14,20
8:12 149:3,25
**REPORTER'S**

149:1
**reporting** 20:18
21:19 22:14
**reports** 23:22
30:3 69:7,21
70:10,12,14
125:1 142:7
143:8
**represent** 40:1
**representative**
74:1 105:5
**representatives**
42:20 69:14
**representing** 2:2
2:9,19 130:3
**requested** 81:23
**requests** 21:25
22:18
**require** 17:13
120:24
**required** 62:22
84:17
**requirements**
20:18 83:2,2
**requires** 90:10
136:19
**reserved** 5:13
**reserving** 146:24
147:12
**residences** 27:19
**resolve** 28:17
117:22
**resolving** 29:2
**respects** 86:25
86:25
**respond** 130:4
**responded** 93:25
**response** 7:18
121:23 131:8
**responsibilities**
13:6 14:2
30:14 42:16,18
53:25 82:20
102:21
**responsibility**
29:1 30:18

**responsible** 19:9
116:16
**responsiveness**
5:12
**restoration**
19:18
**rests** 76:2
**resubmit** 83:21
**result** 149:16
**results** 53:16,19
**retire** 145:8
**retired** 11:20
**retirement**
13:17
**return** 87:7
**review** 24:11
28:12 37:21
38:1 40:9,14
42:7 50:10
53:17,18 70:1
70:2,11 83:16
84:13 117:12
118:9 120:1,24
122:11 143:24
145:11
**reviewed** 23:9
38:4 68:14
69:20,24
118:24 119:22
**reviewing** 7:23
21:23 23:12
24:1 114:8
143:7
**Revised** 58:17
**ribbon** 37:5
**Richard** 93:16
93:17 138:22
138:25,25
**rid** 89:24
**rig** 104:21 106:7
106:9,22
107:16
**right** 19:19
21:20 22:2
24:22 26:23
33:2 40:7

41:24,25 44:12
46:7 50:7 64:5
65:6 68:18
72:15 84:15,18
89:22,24 90:19
92:11 95:22
108:22 109:15
111:17 121:10
121:14 124:16
142:18 143:14
146:24 147:12
**risk** 134:1
**River** 17:15
67:12
**Road** 76:22
140:21
**Robinson** 1:7
147:3
**rocket** 89:22
**role** 17:2,18,23
17:23 25:9
28:9 31:21
32:11 42:7
**roles** 16:15
**rolling** 143:16
**rollover** 12:12
**Rouge** 1:12
**ROUGEAU** 3:3
**roughly** 13:21
15:19 26:9
**routine** 143:11
**RPR** 1:24 5:22
149:2,24
**Rules** 5:6 8:5
**run** 24:2,22,24
25:4 63:1
104:20
**running** 76:20
**RYCKMAN**
3:12

_____
S
_____
**s** 3:11 5:1 40:4
59:14 69:17
70:6,9 74:1
84:13 85:19
87:11 89:20

MONTEGUT, III, JAMES

8/8/2008

Page 167

99:21 100:14
100:16 101:22
111:19 129:14
130:18 131:1,4
**sad** 96:9
**safety** 46:15
105:12
**sake** 104:1
**sample** 104:22
**sampling** 52:20
**sand** 66:8,16,17
67:4,12,12,15
67:24 68:4,8
75:15,21 76:1
76:8,9 77:6
142:5,19 143:4
143:12,13,22
**sat** 34:20
**satisfactory**
127:21
**satisfied** 83:17
**Saucer** 78:6,8,23
**save** 5:8,11
**saw** 45:23
116:13
**saying** 24:9,20
34:15 38:10
49:11 82:18
88:8 93:25
111:2
**says** 10:13 32:23
77:23 93:23
99:19 100:12
109:2,25
122:16,18
129:11 131:8
131:10 132:9
133:8,11,25
134:6,24 140:3
141:15
**scaled** 82:15
**scenario** 126:24
144:14
**scheduled** 70:4
**school** 9:15
**science** 10:1,14

10:21 89:22
**scoop** 90:15 91:3
**scooping** 90:14
91:1
**scope** 35:3 36:10
38:2,4,8,10,13
38:22 39:17
41:1 55:14
64:22 101:13
103:22
**Scott** 2:4 3:10
6:7 113:6
130:3
**scrape** 35:22
**scratch** 130:7,12
**scratched**
131:10
**se** 27:18 84:1
87:11
**second** 31:22
40:3 100:5,17
131:8 138:23
140:3
**section** 15:1,14
100:8,9 130:24
**see** 39:9 56:5
99:18 100:3
122:24 123:1
126:11 128:7
**seeing** 118:3
**seen** 36:18 56:6
69:6 125:23
126:18 137:4
146:12
**seepage** 47:11
52:7 72:11
74:18 75:11,11
77:3 139:18,20
**self-perform**
92:2
**self-performed**
89:18
**seminars** 16:10
**send** 83:19 84:11
122:10
**senior** 95:4

**sense** 49:15 85:1
93:19
**sent** 66:18
**sentence** 69:1
110:7 122:18
**sentences** 71:17
**separate** 71:15
**September**
146:14
**serves** 26:23
**service** 117:11
**set** 76:8 130:14
134:6,9,16
149:7
**setting** 36:20
41:3 48:3
**settle** 74:9
**setup** 85:5
134:20
**seven** 45:25
60:12
**sewer** 55:5,6
56:5 76:14,25
91:6 92:4
**shakes** 7:19
139:8
**shallow** 90:20,25
139:3
**shared** 43:3
**sheds** 89:8
**sheet** 23:6 30:5
68:19 77:16
79:1,3,6,17
91:14 140:21
**Ship** 20:2,12
23:18,19 25:21
26:7 27:1
28:10
**shoots** 84:9
**short** 106:17
**shorthand** 149:9
**shortly** 107:11
**shot** 94:8 96:10
96:11
**show** 37:4 58:14
58:19,20 61:12

93:5 98:22
99:7 109:15,24
122:20 131:7
132:9 137:17
138:23 140:2
**showed** 79:5
137:25 139:22
140:19
**showing** 21:22
**shows** 73:5
**shut** 131:17
**side** 73:14
140:20
**sign** 147:19
**signed** 84:4,24
84:25,25 94:11
127:23 148:11
148:13,15
**significant** 22:16
41:13 56:15
135:8,9
**signing** 5:9
**similar** 14:6
27:13 28:9
30:16 35:4
**simple** 73:25
74:13
**simultaneously**
31:20
**sing** 32:8
**singer** 32:7
**sir** 42:13 47:13
47:16 50:1
55:8 73:17
78:13 110:5
**sit** 136:9,12
**site** 18:24 19:3
20:2,7,7 24:5
26:20,22 27:12
27:18 35:8,13
35:24 36:13
37:1 41:17,19
43:3 44:2
45:23 48:1
50:6 54:3,13
54:25 56:10

57:7 61:6
65:20,20 66:13
66:14,18,21
73:18 74:13,19
75:13 77:13
78:6,8,14,16
78:23 87:15
95:4 99:4
101:17 105:10
107:4,5 114:7
118:18 129:14
130:18 135:18
142:19 143:5
143:13 144:13
**sites** 27:23 37:3
78:10
**sitting** 95:17
**situation** 128:19
129:1
**situations** 80:12
**six** 78:9
**size** 45:24
**slab** 36:22 74:19
89:16,18,21
**slabs** 36:23,25
**Slidell** 18:1
**slow** 131:25
**small** 103:21
**soil** 11:13 18:4
50:10,13 52:19
52:21 57:20
103:15 108:6
**soils** 50:19,20
51:5,7,14,15
51:24 54:11
64:24 67:4
90:6,12,15
91:1 107:23
108:19
**solid** 64:25
**solution** 70:25
76:7
**solutions** 44:20
**solve** 39:7 53:15
**somebody** 32:1
58:8,9 62:25

MONTEGUT, III, JAMES

130:8
**somebody's**
107:2
**somewhat** 14:6
61:24 96:9
105:12 108:2
**sorry** 22:20 26:2
33:22 41:25
98:24 101:25
107:19 109:3
127:18 139:11
**sort** 70:10 74:21
**sought** 5:15 38:1
**sound** 33:16
44:12 58:12
**Sounds** 7:16
8:22
**source** 75:11
**south** 78:5
**southern** 20:2,12
23:18,19 25:21
26:7 27:1
28:10 78:22
**speak** 102:10
128:13
**speaking** 115:20
**special** 91:2
**specialized** 90:8
91:7,9
**specialty** 10:4
**specific** 41:6
59:25 61:8
71:2 85:19
**specifically** 5:10
**specification**
71:12,13,15
**specifications**
63:19 64:5,8
65:22 66:5
68:1 71:4
**speculate** 88:9
**speculation**
50:23 88:5
95:8 96:20,22
97:18,20
116:24 119:9

119:14 123:19
125:22 127:3
129:18 133:1
136:2
**speed** 37:23
**spelled** 100:20
**spend** 73:8
**spending** 30:22
31:3
**spent** 24:6,6
**spit** 63:2
**spite** 135:10
**spot** 76:5
**stack** 23:2 42:11
68:16,19 85:14
127:25
**staff** 98:20 109:5
114:15 120:24
135:11,15
**Staggs** 44:4
**stamp** 112:1
**stamped** 58:7
79:13,20,24
80:5,9,13,15
81:24
**stamps** 81:13
**standard** 86:1
**standards** 84:16
84:19
**standpoint**
105:13 116:10
116:11,11
**stapled** 69:18
**start** 31:17
123:10 130:12
**started** 12:4,14
32:5 41:19
42:6 130:7
131:25
**starting** 56:3
**starts** 100:13
**state** 5:23 75:1
129:14 149:3
**stated** 35:4
**statement** 71:8
109:2 133:24

135:6,7
**STATES** 1:1 2:9
2:10
**statics** 11:14
**station** 2:15 55:5
55:6,20 56:5,9
58:16 59:17
61:20 71:3
74:22,23 75:3
75:23 91:7
92:5 118:19
120:7
**stay** 13:15,20
17:17 50:3
**stayed** 16:17
**steps** 28:16
84:12
**stick** 128:10
**STIPULATED**
5:2
**stipulation** 6:4
**stood** 19:11
**stop** 49:19 73:1
110:9
**stopped** 146:15
**story** 61:2
106:17
**strata** 16:11
**strategies** 134:5
**stratification**
57:21
**stratigraphies**
50:10 52:19
**stratigraphy**
50:19 51:5,15
**Street** 2:5 28:3
31:15 33:7
87:2
**strictly** 34:20
**structurally**
58:12
**structure** 37:7
55:12 57:1
60:19,21 61:10
63:25 64:14,15
64:20,24,25

65:2 66:22
68:6 71:5
75:18 76:4
91:6 92:9
**structures** 36:12
36:13,14 37:10
37:13 89:8
90:7 139:3,14
139:18
**student** 12:8,12
12:15,21
**studies** 53:2
57:21
**study** 50:19
52:25 57:22
**stuff** 39:13 113:7
**stumbled** 89:3
**style** 36:19
**sub** 19:7 102:18
106:6,9,20
**subbed** 89:14
92:3 93:3
**subcontract**
117:8
**subcontracted**
92:7 101:6
**subcontracting**
100:14
**subcontractor**
53:11,13 58:4
59:14 102:4
116:9,14
117:12 121:3,7
121:12
**subcontractors**
53:9 103:10
105:6 114:17
114:23 115:5
115:17,19,24
116:6 118:8
129:1,2 136:15
**subcontractor's**
109:7 116:20
**subcontracts**
134:2
**submission** 23:4

23:9 84:14
**submit** 59:15
80:12 83:13
144:3
**submitted** 69:13
70:3,5 111:11
**submitting**
128:17
**subs** 57:25
102:25
**Subsection**
109:3
**subsequent** 61:5
128:4,22
**subsided** 74:11
**subsidence** 52:7
**subsoil** 16:11
57:1
**substantial**
126:22
**substantially**
75:10
**substantiate**
23:10
**substantiation**
22:24
**subsurface**
37:10,13 55:11
60:21 71:5
90:6,13 138:12
138:19 139:14
139:15
**sufficient** 11:8
11:18,22 109:5
114:15 129:13
134:3
**suit** 6:9
**summarization**
16:3
**summarize**
68:23
**sunken** 86:22
**Superfund** 19:3
27:12 28:5
**superior** 133:10
**supervise** 49:15

| | | | | |
|---|---|---|---|---|
| **supervising** 114:22 | **take** 8:15 10:16 24:15 28:17 45:9 48:2 49:9 64:20 73:11 82:12 96:1 104:4,10 120:21 122:1 127:18 128:1 147:8 | **technical** 13:1 28:22,23 29:1 86:4 88:18 90:10 91:2,9 91:12 109:8 114:18 115:6 115:18,24 116:11,21,25 117:7 118:17 120:23,24 121:9 125:4,10 133:9 | **terminology** 126:8 | 62:25 69:7,24 72:19 73:1 75:6,10 77:2 80:1,11 81:23 83:25 84:1,7,8 85:4 86:13,15 87:19 88:10,21 89:20 91:22 92:25 98:25 102:14 103:5 110:10 111:9 111:22 112:5 112:16 120:2 123:24 125:23 128:7,18 130:5 133:5 139:16 |
| **supervision** 53:7 149:10 | | | **termites** 18:13 | |
| **supervisor** 43:11 43:15,20 | | | **terms** 138:13 | |
| **supervisors** 31:13 | | | **testified** 6:5 112:16 | |
| **support** 76:11 76:17 | | | **testify** 9:4 149:6 149:7 | |
| **supported** 76:2 | | | **testimony** 48:11 148:4,6 | |
| **supporting** 36:24 68:24 | | **technically** 43:15 | **testing** 71:20 | |
| **sure** 21:2 28:13 46:3 53:24 66:4 72:18,18 80:18,19 82:12 82:21 84:16 90:3,11 113:16 113:20 123:9 129:19,20 138:10 | **taken** 5:5 7:22 11:5,8 47:25 48:1 80:8 85:20 97:4 132:7 140:4 148:25 149:8 | **technician** 12:25 | **testings** 108:6 | |
| | | **telephone** 18:13 18:17 | **Tezcuco** 6:2 | |
| | | **tell** 8:3,6 39:7,20 49:20 57:5 87:21 88:17 124:23 129:25 | **Thank** 40:7 77:15 113:4 123:6 | |
| | | | **thanks** 94:7,9 | |
| | | | **thereof** 5:14 | |
| | **takes** 105:20 | | **thing** 8:23 33:17 34:22 40:3 43:9 46:9 48:1 56:4 57:2 60:2 65:12 70:10 75:9 90:15 92:21 103:1 108:14 111:8 125:3 131:18 | **thinking** 31:24 43:8 82:7,7 102:6 |
| | **talk** 32:10 67:22 71:24 72:2 90:20,25 113:2 | | | **thinks** 110:11 |
| | **talked** 21:2 | **telling** 38:11 39:18 114:10 137:8 | | **third** 7:1 9:1 |
| | **talking** 41:18 43:25 47:11 65:4,7 73:3 74:19 76:18 90:17,19 100:3 104:6 126:21 139:18 | | | **thirty** 11:21 |
| **Surekote** 76:21 140:20 | | **tells** 9:3 21:7 | | **Thirty-five** 72:23 |
| **surround** 64:24 | | **temporary** 30:1 | | **Thirty-three** 47:7 |
| **survey** 15:11 53:1 | | **ten** 45:24 55:4 104:7,9 143:18 | **things** 7:6 11:13 12:23 13:4 14:22 16:11 20:19 21:4 25:2 27:25 38:6 42:1 45:9 46:7 52:7,21 53:23 62:9 69:6 72:22 73:7,13 82:11 83:19 101:11 114:8 132:11 132:24 138:15 142:6 | **thought** 11:22 44:15 56:15 72:17 73:3 74:15 88:1,10 88:13,13 93:24 94:4 112:9 |
| **surveying** 80:10 | | **tend** 72:22 76:6 | | |
| **surveyor** 79:13 79:22,25 | **talks** 99:1 109:16 | **Tendering** 61:15 109:24 120:9 122:21 136:23 140:25 | | |
| **surveyors** 15:10 80:19 | **tallied** 69:11 | | | **thousand** 10:12 |
| **surveys** 52:17 80:7,7,8 | **tank** 86:22 87:14 | | | **three** 7:1 17:21 41:7,7 45:25 73:11,19 91:21 95:21 103:24 104:23 128:1 128:14 |
| **switched** 14:4 16:14,17,18 | **tanks** 76:12,13 | **Tennessee** 84:8 84:9 | | |
| **switching** 13:8 14:16 | **Tar** 101:23 133:11,14 | **TERC** 19:17,22 19:24 20:8,10 20:12,15,20 22:4,22 23:18 28:8 33:23 40:25 41:2 83:3 136:19,19 | | |
| **sworn** 6:4 8:5 149:6 | **task** 6:16 19:17 19:21 26:13 27:3 30:13 33:21 39:14 63:6 108:3 | | | **three-foot** 97:5 |
| **systems** 12:17 | **tasks** 60:6 96:17 97:1 101:6 | | **think** 11:21 14:9 19:7,10 25:8 26:2 30:8 32:4 34:17 40:24,25 57:17 60:22 | **throttled** 132:2 |
| | **taught** 72:24 | | | **timber** 18:15 |
| **T** | **taxpayers** 31:1 73:8 | **term** 35:10 49:15 68:21 72:12 123:15 129:6 | | **time** 5:13 8:9 9:22 10:3,7,9 13:9,13 14:15 15:21 16:3,8 |
| **T** 4:1 5:1,1 | | | | |
| **table** 45:25 100:7 | **team** 43:16 50:9 57:3 145:4 | | | |
| **tack** 91:23 | | | | |

MONTEGUT, III, JAMES

16:13 17:15
19:8 20:14
22:10 23:6,20
25:22 26:11,16
27:2,7,8 31:15
42:9 46:25
48:14 50:5
54:8 56:3,3
58:5 67:14
70:7 72:25
73:14,16 74:6
74:16 82:3,8
82:15,16 97:7
98:12 104:18
105:14 106:3
112:13 116:10
122:7,15 127:9
133:22 139:3
144:18 147:9
**times** 6:24 21:3
24:10 26:3
54:15 135:13
**tin** 36:16
**tip** 79:6,17
**tips** 79:1,4
**title** 11:10 13:12
30:18 86:5
146:13
**today** 6:13 7:22
9:4 70:7
136:10,12
146:12
**told** 137:21
**top** 89:5
**torch** 92:22
**TORTS** 2:11
**total** 19:17
**tougher** 94:1
**toxic** 19:1
**track** 69:11
131:12
**trailer** 43:3,4
143:14
**trailers** 143:14
**transcribed**
149:10

**transcript** 5:9
**transcription**
148:5 149:11
**transfer** 84:2
**transferred**
14:13,21 59:19
**transmittal**
68:22,23,25
**transmitted**
59:19 146:18
**transparency**
131:1
**traveling** 47:12
**TREEBY** 3:5
38:19,24 39:22
44:23 48:6
80:25 81:6,14
81:19 108:9
109:20 111:15
113:5 118:10
119:19 120:10
122:23 123:8
123:17 125:18
126:15 130:1
133:17 134:10
136:25 146:22
**trenches** 77:4,6
**tried** 46:5 70:6
105:16 128:11
**trip** 107:6
**truck** 89:24
143:16
**trucks** 46:1
**true** 95:25
109:10 148:7
149:10
**truth** 8:6 149:6
**try** 8:18 95:23
95:23
**trying** 22:3
39:11 40:6
45:24 57:13
62:9 65:9
95:25 109:19
113:16 126:7
137:18

**Tulsa** 20:9,10
33:24 34:3,18
85:8,18,23
135:1
**turn** 32:10 33:25
34:1 59:18
69:15 84:5
**turned** 128:20
**twelve** 27:9
**twelve-inch**
85:14
**twenty** 104:7,9
**two** 7:1 16:21
19:13 30:3
31:20 45:5
69:1 73:11,13
73:19 104:23
128:1,14 131:2
**type** 11:14 12:19
13:1 17:9,16
20:22 27:13
28:5,20 33:16
34:22 36:16,20
37:6 43:9
44:18 45:17
47:24,25 52:25
54:6,19 57:2
60:2 62:22,23
64:12 69:23
72:11,11 76:16
85:5 103:1
105:20 107:5
108:3,21
128:25 131:18
142:6 144:14
**typed** 130:25
133:25
**types** 14:22 21:9
142:6
**typewritten**
113:11
**typical** 15:3
75:23 105:17
**typically** 11:15
15:5 17:9
26:20 36:17

76:1 83:18
85:25 106:24

_____
**U**
**U** 5:1
**Uh-huh** 50:1
58:18 92:24
93:21 117:9
118:21 121:4
140:7
**ultimately** 34:6
38:16 39:15
61:17
**um** 13:1 14:24
17:11 23:1
24:4,8 27:9
28:18,23 30:17
30:18 32:4
36:15 37:18,24
41:17,21 46:11
53:10,15 55:21
57:25 59:13
62:18,20 63:3
64:14,16 69:10
69:14 70:10
71:7,10 72:9
75:22 76:24
77:1 80:6 83:1
84:24 85:1
86:14,22,25,25
91:11,18 92:17
96:5 102:16
103:17 104:2
104:25 106:21
107:25 127:15
127:24 128:14
128:25 129:20
**unaware** 102:18
**unclear** 7:25
**underground**
47:12,14 76:12
**underseepage**
47:5,10,22
48:16 72:13,14
**understand** 6:15
7:10,14 8:1,2,7
8:9 11:24

21:18,24 22:7
24:19 25:6
29:7,25 32:16
37:21 38:9
47:9 50:11,20
51:5,14 52:3
69:21 84:12
93:6 94:5
99:18 100:3
109:22 110:15
110:21 111:2,3
112:25 114:6
123:15 132:11
134:8 136:7
**understanding**
20:17 22:4
24:14 25:11
30:14 35:2
37:12 52:5
54:21 55:2
56:19 58:20,21
61:15 67:15
79:11 80:21
82:23 100:11
112:12,13
126:7 149:12
**understood** 61:7
**undertaken**
145:10
**undertook** 14:3
**unfair** 137:16
**Unh-unh** 78:19
**uniformly** 76:10
**unique** 32:11
**unit** 15:4
**UNITED** 1:1 2:9
2:10
**University** 9:21
9:23
**UNO** 9:23 10:7,9
**unsafe** 62:19,19
62:20
**update** 54:7
**upside-down**
97:25 98:5
99:19,23,24

MONTEGUT, III, JAMES

100:6 122:17
123:15,21
126:8,13,24
134:7,9,16,17
**upstairs** 16:19
**USACE** 140:23
**use** 35:14 45:13
49:15 56:20
83:24 122:17
123:15 128:10
**usually** 15:4
21:8
**utility** 76:14,18
76:19,24
**utilize** 67:16
**utilized** 21:6
58:22 61:17
66:18 68:5,8,9
**utilizing** 103:21
136:14
**U.S** 2:19 146:18

_____
**V**
**vague** 20:24
24:17 32:14
39:4 48:25
63:21 67:8,18
81:1,15,20
108:10 114:25
115:12 138:6
**vagueness** 62:6
**valid** 130:14
**value** 31:2
**valves** 75:5
**various** 17:7
36:14 97:1
**varying** 87:6
104:8
**venture** 19:12
**verbal** 7:18
**vernacular** 22:7
**version** 132:10
**vessel** 75:18
76:11
**vibrations** 74:8
**VIDEOGRAP...**
3:14

**view** 108:18
**viewpoint**
121:10
**virtual** 23:2
**visit** 54:4
**volition** 145:11
**Volume** 140:24
**voluminous**
23:22

_____
**W**
**waiting** 77:3
106:15
**waived** 5:10
**walers** 91:23
**walk** 34:14
**walked** 144:22
**walls** 47:6
**want** 8:15 18:21
26:2 59:7
71:24 74:17
75:6 77:8 84:7
88:9,10 90:25
92:25 94:23
105:3 113:1
116:12 123:9
130:4 132:23
136:9,22
137:20
**wanted** 46:12,18
72:5 102:17
106:5,8 147:11
**Ward** 6:12 78:18
145:12
**Washington**
2:16 19:16
30:19,20 34:7
34:19 37:15
40:4 41:18
42:8 50:5
53:10,14,19
57:24 58:4,9
59:14,15,18
69:10,17 73:19
74:14 82:11
87:21,25 89:14
89:20 91:24

92:1,5,13,25
93:7,20 100:14
100:16 102:10
102:11,15
106:18 109:5,6
114:15,16,21
115:4,23 116:4
116:7 117:5,19
117:23,24,25
118:7 133:9
134:1,3 136:13
144:2 146:23
**wasn't** 10:7
27:18 31:23
35:9,9 56:2
57:9 58:10
59:1 73:19
77:12 82:1
83:15 87:10
92:10 105:2
113:15 114:6
116:6 117:21
121:12 134:20
135:4,20
141:15
**wasps** 107:6
**waste** 18:2 19:1
133:21
**watch** 95:18
**watching** 95:17
**water** 47:11 75:8
138:15
**waterlines** 76:24
**waterway** 17:16
**way** 22:17 25:18
33:13 35:16
60:4 72:25
74:21 80:1
95:14 96:6,8,8
116:3 117:18
127:4 131:12
143:13 149:15
**ways** 86:13,13
86:15 140:6
**wedding** 60:19
60:23 61:10

63:25 64:15
65:2 66:21
68:6 91:6 92:9
**week** 54:16 70:6
70:9
**weeks** 128:1,1
**welding** 91:15
91:23
**wells** 138:15,15
**went** 14:7 27:5
27:21 53:18
65:18 69:18
79:7 97:1
98:20 104:17
105:25 130:6
130:11
**weren't** 80:13
87:11 97:2
107:7 144:5
**west** 27:10,16
87:3
**we'll** 9:4 26:12
72:2 142:3
147:19
**we're** 6:13,18
9:3 13:23
22:10 38:9
60:9 104:6
147:12
**we've** 121:14
**WGI** 6:10 22:1,9
38:15 43:23,25
47:21 48:21
49:5 51:13,19
51:23 52:14,14
57:24 58:16,24
58:24 61:8,13
61:13 79:6,15
80:3,16 81:12
82:24 83:13,20
84:13 85:19
94:14 97:25
98:14,17,23,23
99:6,17,17
100:6 101:5,22
102:3,22 103:9

109:3 111:19
112:1 114:7,13
117:11 118:23
121:3,8,11
122:14 124:21
125:2 126:9
127:5 129:1
130:23 137:12
138:24 139:1
140:4 142:8,14
142:16 146:10
146:10,18
**WGI/MMG**
140:24
**whatnot** 77:6
**whatsoever**
101:24 102:1
**WILLIAM** 3:5
**willing** 82:2
**winter** 42:4
**witness** 5:4,25
6:3 44:8,14
109:21 110:11
111:9 120:19
125:17,19
126:17 147:13
148:1 149:5
**witnessed** 56:1
**wondered** 129:8
**wood** 18:15,16
**word** 35:14
53:21 56:20
62:24 83:2
100:13
**worded** 25:7
**words** 73:24
**work** 6:17 13:1,2
13:3 14:7 15:5
15:9,24 19:9
19:25 20:11
23:1 26:14
27:7 28:6,7
30:19,24 36:2
36:21 38:2,4,6
38:8,10,13,16
38:17,22 39:17

MONTEGUT, III, JAMES

40:4,11,14,17
41:2,5 45:20
46:19 52:13
54:18,19,23,23
54:23 55:23,24
55:5 56:2
57:23 60:3
61:14,17,22
62:17 71:1,12
74:2 82:21,25
83:5,10 86:2
86:19 87:7,15
93:1 94:10
103:21 105:21
106:20 114:7
131:13,15,22
132:1 135:1
136:15,15
**workday** 33:13
**worked** 14:25
15:13,14 23:7
28:3 53:12
82:11 86:8,17
87:17 94:3
99:17
**worker** 105:17
**workforce** 10:24
**working** 12:8,15
12:24 31:17
37:16 45:14
46:19,25 87:4
87:11,13,21
93:24 95:4,6
103:19 107:1
**workload** 17:10
**works** 16:5
39:16 41:2
49:5,9,17
**worst** 75:16
**worth** 70:7,9
105:21
**wouldn't** 21:11
58:8,9 85:24
128:2 131:5
143:17,18
**write** 83:12

**writing** 13:10
14:8 111:3,5
**writings** 111:7
**written** 131:11
132:23 134:24
**wrong** 45:17
46:9
**wrote** 12:18
129:20,24

_____

**X**

**X** 4:1,1

_____

**Y**

**yard** 15:7
**yardage** 15:13
**yards** 41:8 95:20
95:22
**yeah** 12:24 13:14
13:22,25 16:12
19:2 23:15
24:4,9 26:1
33:10,16 42:14
42:18 43:3
44:13 47:14
50:8,24 53:4
55:13 57:11,18
60:7,25 61:5
63:3 65:10
66:6,16 67:23
68:11,18 72:6
72:14,22 77:19
78:11,21 85:22
88:6 89:10,13
91:11 93:4
97:4 98:10
99:22 101:3
108:22,22
118:4 129:8
133:16,19
142:11 144:2
144:21
**year** 9:17 10:20
12:7 26:18,23
104:12 105:15
145:9
**years** 10:12

11:21 13:25
15:19,20 17:21
25:23 47:7
60:12 72:23
73:19 75:7
97:9
**yesterday** 60:14
**y'all** 21:2 113:1

_____

**$**

**$100** 144:16,17

_____

**#**

**#75005** 1:25
149:25

_____

**0**

**01** 26:24 41:22
41:22,25 42:2
42:5 57:9,18
60:12 73:15
**02** 57:11 73:16
**05-4182** 1:5
**057520** 130:23
**06-2268** 1:8

_____

**1**

**1** 4:10 8:25 9:10
29:15 46:16
133:8 134:6
**1A** 46:17
**1.0** 109:2
**1.1** 109:3
**1.1.0** 100:9
**10** 59:5 79:2
**109** 4:14
**139** 4:15
**14** 128:17
**146** 4:6
**15** 49:10,18
**19** 58:15
**1940s** 36:18
**1970** 9:18
**1974** 10:22 11:25
13:19 14:16
**1982** 15:22
**1992** 15:19 16:4

16:14
**1995** 17:22
**1996** 17:22
**1997** 29:5 139:1
139:21 140:6
140:23
**1999** 18:22 26:3
27:1 29:18
39:8,14

_____

**2**

**2** 4:11 59:10
60:8,10 120:14
120:19
**2nd** 93:23
**2000** 26:1,1,2
30:3,10 122:15
**2001** 27:4 30:12
33:4 47:19
58:15 61:15
122:16
**2001-2002** 67:14
**2002** 53:3 55:1
57:10
**20044** 2:16
**2005** 50:7 93:23
140:5 144:19
**2008** 1:13 148:25
**202-616-4289**
2:17
**25** 65:16 79:7,18
**26** 6:16 26:13
27:3 30:13
**262190** 94:14
**262218** 138:24

_____

**3**

**3** 4:12 61:13
62:1 121:15
**30(b)(6)** 124:24
**32-acre** 107:4
**365** 104:2
**37607** 61:13
**37615** 61:14

_____

**4**

**4** 4:13 93:10

98:10
**48621** 58:16,24
**48630** 58:24

_____

**5**

**5** 4:14 10:22
109:11 126:2,4
126:25 140:24
146:9,14
**504-525-1335**
2:7
**504-862-2843**
2:24
**57505** 98:23
146:10
**57506** 100:6
**57516** 109:4
122:14
**57518** 126:9
**57522** 133:7
**57523** 98:24
133:23 137:13
146:11

_____

**6**

**6** 4:5,15 139:6
140:1
**6.0** 133:7
**60** 4:11 95:20
**6190** 6:2
**62** 4:12

_____

**7**

**7.1** 130:24
**70113** 2:6
**70118** 6:3
**70118-3651** 2:23
**70737** 6:2
**70809** 1:12
**7400** 2:22
**75** 65:18
**78** 15:19

_____

**8**

**8** 77:24,25 79:1
140:21
**8th** 1:13 148:25

_____

Johns Pendleton Court Reporters

800 562-1285

MONTEGUT, III, JAMES

**855** 2:5
**8710** 1:11
**888** 2:14

---
**9**

**9** 4:10 140:24
**9/11** 41:24 42:2
  42:2,3
**92** 15:20
**93** 4:13
**97** 26:7,9
**99** 26:5,10