UNITED  STATES  DISTRICT  COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re:  KATRINA CANAL BREACHES | § | CIVIL ACTION |
| CONSOLIDATED LITIGATION | § | NO. 05-4182 "K" (2) |
| | § | JUDGE DUVAL |
| | § | MAG. WILKINSON |
| | § | |
| PERTAINS TO: MRGO, Robinson (06-2268) | § | |
| | § | |

DEFENDANT UNITED STATES' REPLY MEMORANDUM
IN SUPPORT OF DEFENDANT'S MOTION
FOR PARTIAL SUMMARY JUDGMENT

Because Plaintiffs have adduced no evidence that the alleged negligent "operation and

maintenance" of the Mississippi River-Gulf Outlet caused their alleged damage, the United

States has moved for a summary judgment on that claim.  In opposition to the motion,

Plaintiffs have asserted that the record is "brimming" with evidence that the negligent

"design, construction, operation, and maintenance" of the waterway had a synergistic

hydraulic effect that was a substantial factor in causing their alleged damage.  Plaintiffs'

assertion, however, begs the question whether there is any evidence that the alleged

negligent "operation and maintenance"—which allegedly resulted in the widening of the

MRGO at its top—had more than a de minimis hydraulic effect.  If there is no evidence that

the "operation and maintenance" of the MRGO was either a "but for" cause or a substantial factor in causing harm, then the United States is entitled to a summary judgment against Plaintiffs on that claim.

Plaintiffs argue that they need not—indeed, they argue that they cannot—adduce evidence that the gradual widening of the MRGO standing alone caused any damage.  They assert that they need not adduce such evidence because Louisiana law merely requires evidence that negligent operation and maintenance had some hydraulic effect which, when combined with the hydraulic effects of the design and construction of the MRGO, amounted cumulatively to a substantial factor.  They assert that the hydraulic effects of the widening of the MRGO cannot be separately calculated or in any way isolated from the effects of design and construction.  Plaintiffs' failure to adduce any evidence that the widening of the MRGO caused their alleged damage requires that Defendant's motion be granted and that Plaintiffs' claim for negligent "operation and maintenance" be dismissed.

## ARGUMENT

I. SUMMARY JUDGMENT MUST BE ENTERED BECAUSE PLAINTIFFS HAVE ADDUCED NO EVIDENCE THAT THE ALLEGED NEGLIGENT "OPERATION AND MAINTENANCE" OF THE MRGO CAUSED THEIR ALLEGED DAMAGE.

"[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential

element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  Summary judgment must be entered on Plaintiffs' "operation and maintenance" claim because there is a complete failure of proof that the "operation and maintenance" of the MRGO was a cause in fact of their alleged damage.  Proving that the "operation and maintenance" of the MRGO caused their damage is an essential element on which they will bear the burden of proof at trial.  See Long v. State, 916 So. 2d 87, 101 (La. 2005).

As the United States has demonstrated, Plaintiffs have adduced no evidence that the flooding of Plaintiffs' properties was caused by Defendant's allegedly negligent operation and maintenance of the MRGO.  To the contrary, the reports of Plaintiffs' own Dutch experts, from which Plaintiffs now attempt to distance themselves, demonstrate that there is no causal relationship between the widening of the MRGO and Plaintiffs' alleged damage.  The United States is therefore "entitled to a judgment as a matter of law" because Plaintiffs have failed to make a sufficient showing on an essential element of their case with respect to which they bear the burden of proof.  Celotex Corp., 477 U.S. at 323.

II. PLAINTIFFS' DUTCH EXPERTS REPORTED THAT THE HYDRAULIC EFFECTS OF THE WIDENED MRGO (AS IT EXISTED ON AUGUST 29, 2005) WERE SIMILAR TO THE EFFECTS OF THE "MRGO AS DESIGNED."

A. PLAINTIFFS' DUTCH EXPERTS REPORTED THAT THE STORM SURGE IN THE "KATRINA REAL RUN" SCENARIO (FEATURING THE WIDENED MRGO) WAS VIRTUALLY IDENTICAL TO THE SURGE IN THE "MRGO AS DESIGNED" SCENARIO.

"[T]o better understand the flow dynamics of the surge event during Hurricane Katrina and the MRGO's impacts on the flooding," Plaintiffs' Dutch experts devised three base scenarios. L. De Wit et al., Flow Modeling New Orleans–Mississippi River Gulf Outlet 4 (Final Report) (June 23, 2008) (Def. Ex. 19) [hereinafter Plaintiffs' Surge Report].

> Three scenario runs are executed; one simulating the actual Katrina event with the topography and geomorphology as present in early August 2005 including the MRGO channel (Reach 1 and 2); the MRGO levees and the highly degraded wetlands. The second simulation (2C) reflects the 1958 healthy wetlands conditions with a no-MRGO situation (No Reach 2, pre-MRGO GIWW/Reach 1, levees along MRGO as before Katrina, and 40 Arpent levee as is before Katrina). The third simulation reflects the 1958 healthy wetlands conditions with a MRGO maintained at authorized dimensions (depth and width MRGO as designed, pre-Katrina levees along MRGO).

Id. at 4-5.[1]

_____

[1]Plaintiffs' Dutch experts actually modeled a total of six scenarios, because they devised four variations of their second scenario. Scenario 2A is "[t]he 'virgin' no-MRGO Scenario and a simulated Katrina storm without MRGO levees with 40 Arpent levee crest at 17.5 ft+NAVD." Id. at 115 (emphasis omitted). Scenario 2B is "[t]he 'virgin' no-MRGO Scenario and a simulated Katrina storm without MRGO levees with 40 Arpent levee crest at 6.5 ft+NAVD." Id. at 142 (emphasis omitted). Scenario 2D is "[t]he 'virgin' no-MRGO Scenario and a simulated Katrina storm with spoil piles and 40 Arpent levee crest at 6.5+NAVD." Id. at 170 (emphasis omitted). "Scenario 2A is similar to 2C, but without levees along the MRGO and the 40 Arpent levee is at 17.5 ft to represent a potential LPV levee and the grid ends at this levee. Scenario 2B is also similar to 2C, but without levees along the MRGO. Scenario 2D is similar to Scenario 2B, but with spoil piles along MRGO Reach 2." Id. at 5; cf. id. at 4 (explaining that "Scenario 2A was run without MRGO levees and

(continued...)

"Scenario 1 is the 'Katrina real run.' . . . Here the model is run to as precisely as possible mimic the physical environment immediately prior to Hurricane Katrina's landfall, and the actual Katrina storm." Id. at 7. Scenario 2 is the "No MRGO" scenario. The model is run to mimic the physical environment prior to the construction of the waterway. See id. at 37, 115, 142, 170. Scenario 3 is "[t]he maintained MRGO Scenario." Id. at 64 (emphasis omitted). This chart, created by the Dutch experts, shows how they varied the landscape to gauge the hydraulic effects of various elements in the overall hydrodynamic system:

Table 1.1 FINEL MRGO Scenarios for hurricane Katrina conditions

| Scenario | MRGO channel | GIWW channel | Reach 2 EBSBs | 40 Arpent Levee | Vegetation |
|----------|--------------|--------------|---------------|-----------------|------------|
| 1 | Existing 8/2005 | Existing 2/2005 | Existing 8/2005 | Existing 8/2005 | Existing 8/2005 |
| 2C | None | Pre MRGO | Existing 8/2005 | Existing 8/2005 & grid extension to Mississippi | Pre MRGO 1958 |
| 3 | As authorized | As authorized | Existing 8/2005 | Existing 8/2005 | Pre MRGO 1958 |
| 2A | None | Pre MRGO | None | LPV authorized | Pre MRGO 1958 |
| 2B | None | Pre MRGO | None | Existing 8/2005 & grid extension to Mississippi | Pre MRGO 1958 |
| 2D | None | Pre MRGO | Spoil piles 8/1965 | Existing 8/2005 & grid extension to Mississippi | Pre MRGO 1958 |

Id. at 5.

----

[1](...continued)
assuming the 40 Arpent levee crest at an elevation of 17.5 feet" to see what would have happened if the Lake Pontchartrain and Vicinity Hurricane Protection Project levee had been located at the 40 Arpent line instead of along the MRGO).

The modeling of these scenarios "generate[d] detailed information about water motion in the area of study." Id. at 4. It "produce[d] details of the water currents especially along the MRGO levees." Id. at 15 (Scenario 1); accord id. at 42 (Scenario 2C), 68 (Scenario 3). Hydrographs were compared in order to determine how the storm surge would have been different if the MRGO and the LPV levees had been configured differently or had not even existed when the storm struck.[2] Id. at 90-99. A full array of information was plugged into the surge model.[3] Modeling the various scenarios produced a vast quantity of results that provided "details of the water currents especially along the MRGO levees." Id. at 15.[4]

The very same full array of detailed data was generated for each of the three base scenarios. Plaintiffs' Dutch experts then examined the data, and by comparing it the experts were able to identify the hydrologic effects of varying the width of the MRGO, the existence

_____

[2]A surge hydrograph is a "model generated time-histor[y] of surge elevation at a single point." G. Paul Kemp, Mississippi River Gulf Outlet Effects on Storm Surge, Waves, and Flooding During Hurricane Katrina [hereinafter Kemp Report] (July 11, 2008), at 95 (Def. Ex. 20). Notwithstanding the Declaration of Pierce O'Donnell, Plaintiffs' Exhibit 3 is not a true and correct copy of this report. Plaintiffs' submission omits several portions of it. Defendant's Exhibit 21 is a true copy of the complete report.

[3]The input data included the following: bathymetry and topography (i.e., land surface features and water depths), see id. at 8, 38, 64; bottom roughness ("based on the presence or lack of wetlands; shoreline location and presence; and lack or presence of levees"), id. at 10, 41, 67; and wind (based in part on the presence or absence of trees and the density of forests), id. at 11, 42, 68.

[4]The results of the surge modeling were depicted in three series of graphs that depicted water levels, rates of water level rise (i.e., surge), wind fields, water current directions, water current velocities, levee overtopping velocities, and levee overtopping volumes. See id. at 16-36 (Scenario 1), 43-63 (Scenario 2C), 69-89 (Scenario 3) (Def. Ex. 10, Doc. 15317-5).

of the MRGO, the location of the levees, and the condition of the wetlands.  See id. at 90.

The Dutch experts reported substantial reductions in the surge durations when the MRGO

was eliminated entirely (Scenario 2C) but found no significant difference in any aspect of the

surge that would have been produced if the MRGO had been at its design dimensions

(Scenario 3).  "The hydrographs for Scenario 1 and 3 are almost similar; [only] some small

differences are visible."  Id.  The virtually identical hydrographs indicate that the onset, rate

of rise, peak elevation, and rate of decline would not have been any different during

Hurricane Katrina if the MRGO had been in place at its authorized size, with no diminution

of wetlands from those present in the region prior to construction of the waterway.  Id. at

92-97.

> B.   PLAINTIFFS' DUTCH EXPERTS REPORTED THAT THE WAVES IN THE "KATRINA REAL
> RUN," (FEATURING THE WIDENED MRGO) WERE ONLY MARGINALLY LARGER THAN
> THE WAVES IN THE "MRGO AS DESIGNED" SCENARIO.

Plaintiffs' Dutch experts used "wave simulation models to try to decipher what

happens in the MRGO during the passage of major hurricanes."  C. Gautier et al., Wave

Modeling New Orleans—Mississippi River Gulf Outlet 6 (Final Report) (July 9, 2008) (Def.

Ex. 22) [hereinafter Plaintiffs' Wave Report].  "This present report describes model runs for

two different scenarios [1 and 2C] each depicting a variation on the configuration of the

MRGO and the funnel area. . . . Additional runs [of other scenarios, including Scenario 3] are

presented in the appendices."  Id.  As the report explains, "The SWAN model was used to

derive wave spectra on Lake Borgne and more specifically along the MRGO Reach 2 that

were generated during hurricane Katrina, August 2005.  The wave spectra are being used to

assess the impact of the presence of the deep, wide and unmaintained MRGO channel during hurricane Katrina on the Lake Pontchartrain and Vicinity (LPV) flood protection structures along the MRGO." Id. at 6-7.

"The SWAN wave model is used to simulate the waves during Katrina. SWAN computes on a grid how waves generate, dissipate and propagate under the influence of wind, bathymetry, water levels, currents and incoming waves. . . . Output is given for a number of pre[-]described output locations in the area of interest." Id. at 8. Using the numerical model, the Dutch experts were able to derive a variety of wave data for Scenarios 1, 2C, and 3: significant wave heights, peak wave periods, wave directions, and surge water levels at the seven pre-determined locations. See id. at 15, 23; Plaintiffs' Wave Report App. E, at 35.

By comparing the results obtained, the Dutch experts were able to draw some conclusions about the effects of the MRGO as it existed on August 29, 2005:

> In Scenario 2C the situation without the MRGO but with the levees has been simulated. The absence of the deep and wide MRGO prevents the waves to grow as they did in Scenario 1. Furthermore, the vegetation suppresses the waves. Since it is hard to know the exact vegetation patterns now if the MRGO would not have been constructed, three versions have been simulated with more or less dense vegetation. Additional SWAN tests indicate that the vegetation—included in the friction coefficient—has considerable effect on the waves. The general outcome of the SWAN simulations of Scenario 2C is that the waves on the location of the present levee would be lower if there were no MRGO.

Plaintiffs' Wave Report 25.

In the same way, the Dutch experts compared the results of their modeling of Scenario 3 with Scenario 1 to see how the waves would have differed if the MRGO had been at its design dimensions and the wetlands had been in their pre-construction condition:

> In Scenario 3 the MRGO has its authorized dimensions which are smaller than its actual size. The Cypress forest is present south west of Lake Borgne. The levees are in place.

> Scenario 1 revealed that the waves grow as they cross the MRGO; we expect smaller waves in Scenario 3 as the MRGO is narrower. Also the trees and marsh vegetation will dampen the waves since they reduce the wind velocity and physically obstruct the waves. The water levels of Scenario 3 . . . are more or less similar to the ones from Scenario 1.

Plaintiffs' Wave Report App. E, at 34-35. From the data set forth in a series of charts and graphs, the experts were able to compare the significant wave heights, peak periods, wave directions, and water levels for pre-determined locations and draw conclusions about how the presence of a MRGO at its authorized dimensions would have affected the wave dynamics during Hurricane Katrina. See id. at 35.

   C.   SCENARIO 3 PROVIDES A SOUND BASIS FOR ANALYZING WHETHER THE ALLEGED NEGLIGENT "OPERATION AND MAINTENANCE" OF THE MRGO WAS EITHER A "BUT FOR" CAUSE OR A SUBSTANTIAL FACTOR IN CAUSING PLAINTIFFS' ALLEGED DAMAGE.

In their Opposition, Plaintiffs argue that "it is inappropriate to separate out only the effects of two challenged activities (MR-GO's operation and maintenance) from the complex and interdependent hydraulic system that was created by the project's design and construction." Plt. Opp. at 12. They say the United States' reliance on Scenario 3 is "unscientific" "because we are dealing with linked system responses throughout the entire hydraulic system at different locations." Id. Further, they argue that the United States'

reliance on the Dutch comparative studies "ignor[es] the MRGO's combined dynamic hydraulic influences" based on "an artificial construct that ignores sound scientific principles and the reality on the ground."  Plt. Opp. at 12-13.

One can only wonder what the Dutch would make of this critique of their work.[5]  As has been demonstrated in painstaking detail above, creating "artificial constructs" is the very foundation of parametric studies.  Scenarios 2A, 2B, 2C, 2D, and 3 are all "artificial constructs."  And far from "ignor[ing] sound scientific principles and the reality on the ground," parametric studies compare the data generated through analysis of artificial constructs with the data generated through analysis of "the reality on the ground" to figure out the effects of specific elements in "a linked system."  That the Dutch considered Scenario 1 to reflect "the reality on the ground" is made obvious by the name that they coined to describe it: "Katrina Real Run."  See Plaintiffs' Surge Report 7 (Def. Ex. 19).  Their own words refute Plaintiffs' argument:  "Here the model is run to as precisely as possible mimic the physical environment immediately prior to Hurricane Katrina's landfall, and the actual Katrina storm.  The FINEL model allows one to better understand the hydrodynamics and interpret the various impacts of MRGO."  Id.

––––––––––––––––––––

[5]We are left to wonder because Plaintiffs, unsurprisingly, did not provide any supplemental declaration from the Dutch experts, even though they would be in the best position to say whether the United States has abused their studies.  (Plaintiffs also rebuffed Defendant's attempt to depose Plaintiffs' experts prior to the filing of this motion, going so far as to seek and obtain an informal ruling from the Court to prevent Defendant from obtaining the testimony of these witnesses.)  Plaintiffs' acts and omissions warrant an inference that the Dutch do not agree with the assertions of Plaintiffs' attorneys and the declarations of their stateside experts.

Equally unfounded is Plaintiffs' suggestion that Scenario 3 ("MRGO as Designed") does not take into account that "we are dealing with linked system responses throughout the entire hydraulic system at different locations." Plt. Opp. at 12. Even a cursory review of the Dutch experts' description of the way they devised Scenario 3 and ran the FINEL and SWAN models across it refutes Plaintiffs' assertion that Scenario 3 "ignor[es] the MRGO's combined dynamic hydraulic influences." Id.; cf. Plaintiffs' Surge Report 64-68 (Def. Ex. 19) (describing in detail the application of FINEL to Scenario 3); Plaintiffs' Wave Report 8 (Def. Ex. 22) (describing approach taken in applying SWAN to various scenarios, including "Scenario 3: Katrina 'neutral MRGO' with original dimensions"); Plaintiffs' Wave Report App. E, at 33-35 (describing in detail application of SWAN to Scenario 3). As the charts, graphs, and tables set forth on pages 69 to 89 of Plaintiffs' Surge Report (Def. Ex. 10) and pages 36 to 46 of Plaintiffs' Wave Report Appendix E make clear, the analysis of the hydraulic effects of a waterway maintained at its authorized dimensions is not limited to a few isolated effects but takes into account all of the combined dynamic hydraulic influences that would have been exerted by such a waterway had it existed during Hurricane Katrina and had the topography of the region otherwise been in its pre-MRGO configuration (i.e., no wetlands loss).

Plaintiffs erroneously assert that the Dutch experts' analysis of Scenario 3 does not take into account the effects of the project's design and construction. On the contrary, that is precisely what it does do. It puts "[t]he maintained MRGO" into the pre-MRGO landscape and then looks at every hydraulic effect such a waterway would have exerted at every point

in the system throughout the storm.  See Plaintiffs' Surge Report 64 (Def. Ex. 19); Plaintiffs'

Wave Report App. E, at 33 ("We run a Katrina storm with a scenario run modified with a

MRGO channel as originally designed.").

The analysis of Scenario 3 is no different in nature or extent or rigor from the analysis

of Scenario 2C.  The only difference is that it gauges the effects of the design and

construction of the MRGO as authorized, without any additional wetlands impacts.[6]  And

just as the hydraulic effects of not constructing the waterway (Scenario 2C, "No MRGO") can

be compared with the effects of building the waterway and allowing the top width to expand

(Scenario 1, the "Katrina Real Run"), so also the hydraulic effects of building the waterway

and preventing the top width from expanding (Scenario 3, "MRGO as Designed") can be

compared with the effects of building it and failing to maintain it at its original dimensions

(Scenario 1, the "Katrina Real Run").  Because the comparison reveals that the hydraulic

effects of failing to maintain the MRGO at its authorized dimensions were minimal, it is fatal

to Plaintiff's negligent maintenance claim.

---

[6]The modeling of Scenario 3 assumed that "[t]he authorized dimensions of the
MRGO, as originally designed, refer to a bottom width of 500 ft, slopes 1:2 and a depth of 36
ft."  Plaintiffs' Wave Report App. E, at 33.  These indeed are the specifications set forth in
the design documents.  See MRGO Design Mem. No. 1-A (Rev. July 1957) ¶ 7 (Def. Ex. 23);
MRGO Design Mem. No. 1-B (Rev. May 1959) ¶ 7 (Def. Ex. 24); Gen. Design Mem. 2 (Sept.
1959) ¶¶ 17, 40, 46 (Def. Ex. 25).  The authorization did not require adherence to any
particular specifications but merely required that construction be "substantially in
accordance with the recommendation of the Chief of Engineers."  Pub. L. No. 84-455, 70
Stat. 65 (1956) (Def. Ex.  26).

III. PLAINTIFFS' FAILURE TO ADDUCE ANY EVIDENCE OF "BUT FOR" CAUSATION IS FATAL TO THEIR NEGLIGENT "OPERATION AND MAINTENANCE" CLAIM BECAUSE THE HYDRAULIC EFFECTS OF THE "UNMAINTAINED MRGO" HAVE BEEN ANALYZED BY PLAINTIFFS' OWN EXPERTS AND SHOWN TO BE AN INSUBSTANTIAL FACTOR.

At the outset of their Opposition, Plaintiffs contend that "[t]he United States was obligated to build, operate and maintain the MR-GO in a safe manner that did not enhance the risk of flooding its neighbors." Plt. Opp. at 2. This contention about duty is beside the point. Even if the United States had had such a legal duty and had breached it by allowing the waterway to widen, the United States would nevertheless be entitled to a summary judgment on the negligent "maintenance and operation" claim. It is hornbook law that a plaintiff must not only "show damage and fault but he must also show that there exists between them the relation of cause and effect." 12 William E. Crawford, Louisiana Civil Law Treatise § 3.11 (2000).

> The key notion is "being in relation of cause and effect." The burden of proving this relationship is on the one claiming reparation of the damage. The importance of this fact is that damage the cause of which is unknown or incapable of proof must be borne by the victim. A defendant is not obliged to repair damage which he did not cause or cannot be shown to have caused.

Id. (footnotes omitted).

The Louisiana Supreme Court has stated that "[a] negligent party may not be held liable where his negligence is not a cause in fact of the accident—i.e., where the negligence is not a substantial factor in bringing about the harm." LeJeune v. Allstate Ins. Co., 365 So. 2d 471, 475 (La. 1978) (citations omitted). "Every act leading to an event which is the subject matter of litigation cannot be said to be a cause-in-fact. However, where such

antecedent act supports a conclusion that, more probably than not, it was a necessary

ingredient of the ultimate event, it then constitutes a cause in fact." Cheatham v. City of

New Orleans, 368 So. 2d 146, 149 (La. Ct. App.) (emphasis added), aff'd in part and rev'd in

part on other grounds, 378 So. 2d 369 (La. 1979).

Plaintiffs contend that they need not prove "but for" causation but can establish

causation merely by proving that the MRGO increased the risk of harm or "had something to

do with" their alleged damage. See Plt. Opp. at 6-7. In this they greatly err. Under well-

established tenets of Louisiana law, the widening of the MRGO cannot be deemed a

substantial factor unless there is evidence that the widening was a "but for" cause of their

alleged damage. As a rule, conduct cannot be considered a substantial factor in causing

damage unless there is evidence that the conduct is a "but for" cause of that damage:

> [A] party's conduct is a cause-in-fact of the harm if it was a substantial factor
> in bringing about the harm. The act is a cause-in-fact in bringing about the
> injury when the harm would not have occurred without it. While a party's
> conduct does not have to be the sole cause of the harm, it is a necessary
> antecedent essential to an assessment of liability.

Long v. State, 916 So. 2d 87, 107-08 (La. 2005) (citations omitted); see also Dixie Drive It

Yourself Sys. v. Am. Bev. Co., 137 So. 2d 298, 302 (La. 1962) ("Negligent conduct is a cause-

in-fact of harm to another if it was a substantial factor in bringing about that harm. . . . A

cause-in-fact is a necessary antecedent."); Thibodeaux v. Asbestos Corp. Ltd., 976 So. 2d 859,

866 (La. Ct. App. 2008) ("In Dixie Drive It Yourself System the Supreme Court 'stated that

negligent conduct is a substantial factor if the harm would not have occurred without the

conduct, i.e., but for defendant's conduct, plaintiff would not have sustained injury.' The

court thereby equated the two concepts of substantial factor and necessary antecedent.")
(internal citation omitted).

> As Professor Crawford succinctly states:
>
> [T]he time-honored "but for" test functions well in the Louisiana jurisprudence. "Defendant's conduct need not be the sole cause of the harm but it must be a necessary antecedent. Stated another way, if the plaintiff can show that more probably than not he would not have suffered damage, absent defendant's wrongful conduct, he has carried his burden of proving cause in fact."
>
>    . . . While the term "substantial factor" has received recognition in the courts of Appeal, the "but for" test clearly prevails.

12 William E. Crawford, Louisiana Civil Law Treatise § 4.6  (footnote omitted) (quoting La. Rev. Stat. Ann. § 9:2794) (footnote omitted).

Plaintiffs do not even argue that there is any evidence that the "operation and maintenance" of the MRGO was a "but for" cause of their alleged damage.  Instead they urge that this failure of proof be excused because the maintenance of the MRGO combined with the effects of design and construction to cause their damage.  In their view, "but for" causation can be dispensed with because there were concurrent causes that acted "synergistic[ally]" to harm them.  See Plt. Opp. at 6, 10.  On the contrary, however, Louisiana law does not allow "but for" causation to be dispensed with merely because there are multiple causes that concur in causing damage.  Only in the rare instance in which multiple causes combine in such a way as to prevent the contribution of each from being analyzed separately does the law allow the substantial factor test to be the sole test of causation in fact.  See LeJeune, 365 So. 2d at 477 ("Louisiana courts use the 'substantial factor'

test, which is similar to the 'but-for' test, except that where more than one party's negligence would have caused the collision absent another party's negligence, all are held to be causative.").  But even then, each individual cause must, when considered separately, be a substantial factor in order to be deemed a cause in fact under Louisiana law.  Liability cannot be imposed upon a showing that concurrent causes, considered cumulatively, constituted a substantial factor.  See Quick v. Murphy Oil Co., 643 So. 2d 1291, 1296 (La. Ct. App. 1994) (holding that plaintiff's trivial exposure to defendant's asbestos-containing product was not a substantial factor in causing plaintiff's asbestosis), cert. denied, 648 So. 2d 923 (La. 1995).  In Quick, the court of appeal rejected the plaintiff's "argu[ment] that the 'but for' or substantial factor test should not be applied to any single factor in a concurrent cause case but rather should be applied to all factors in combination."  Quick, 643 So. 2d at 1296.  Citing In re Manguno, 961 F.2d 533 (5th Cir. 1992), the state court of appeal ruled that "[u]nder Louisiana and applicable federal jurisprudence, [the plaintiff's] exposure to [the defendant's] asbestos-containing products must constitute a substantial factor in causing his asbestosis." Id.

LeJeune makes it clear that the exception to the "but for" rule applies to avoid the injustice that would otherwise result when there is evidence that challenged conduct (1) combined with other conduct to cause harm and (2) was a substantial factor in causing the harm, but (3) cannot be separately analyzed to determine whether the harm would have ensued without the causal contribution of each individual cause.  LeJeune arose from a traffic accident that occurred as a funeral cortege was proceeding through an intersection that was

controlled by a flashing traffic signal.  As the hearse was entering the intersection against the

flashing red light, a speeding car traveling on a crossroad crashed into the hearse, killing a

passenger in the hearse.  A sheriff's deputy, who was escorting the cortege, had failed to

control the intersection adequately and to warn the speeding driver that the cortege was

about to pass through against the light.  See LeJeune, 365 So. 2d at 474-75.

The decedent's widow and children brought a wrongful death action to recover from

several persons, including the driver of the speeding car, who failed to exercise caution when

entering the intersection under the flashing amber light; the insurers of the sheriff's

department; the insurer of the driver of the hearse; and the insurer of that driver's

employers.  The trial court held that the accident was caused by the concurrent negligence

of the speeding driver and the driver of the hearse.  It determined that the conduct of the

deputy sheriff, albeit negligent, was not a cause-in-fact of the collision.  On this basis, the

trial court entered a judgment against some of the defendants, and the court of appeal

essentially affirmed.  The supreme court granted certiorari, principally to consider whether

the deputy sheriff's negligent failure to secure the intersection was a cause-in-fact of the

decedent's death.  Id. at 473.

Holding that the deputy's failure to ensure that funeral cortege could pass safely

through the intersection was a substantial factor in causing the collision, the supreme court

reversed.  The supreme court reasoned that the speeding driver might have stopped if the

deputy had stationed his police cruiser in the intersection with flashing red lights, indicating

that the traffic signal was being superseded.  The court could not discount this possibility

even though the speeding driver had disregarded the flashing amber traffic signal and proceeded to enter the intersection at a dangerously high speed. See id. at 476. In the court's view it would be unjust to absolve the deputy sheriff of liability simply because it was possible that the speeding driver would have disregarded the flashing red light of the police cruiser just as he had disregarded the flashing amber traffic light:

> All three of these parties were negligent, Molitor [the speeding driver], Lafleur [the driver of the hearse] and Deputy Smith. It is true that the accident might possibly have happened anyway if one of the actors was not negligent, but it is equally true that the accident might not have happened except for the negligence of any of these three parties. The negligence of each of the three actors was a substantial factor in producing the situation which resulted in the harm sustained by the plaintiffs' decedent, and there is no substantial reason to absolve the negligence of any one of the three actors as not a cause in fact of the tragic accident.

Id. at 476-77.

As LeJeune makes plain, even conduct that combines with other conduct to cause harm cannot be considered a legally sufficient cause-in-fact unless the conduct itself, considered alone, is shown to have been a substantial causative factor. LeJeune therefore refutes Plaintiffs' argument that they need not show that "operation and maintenance," standing alone, was a substantial factor but must merely "demonstrate that the Army Corps's negligent management of the MRGO [i.e., the MRGO in toto] was a substantial factor in causing their damages." Plt. Opp. at 6.

The exception to the rule requiring "but for" causation does not apply here, for two reasons. First, the contribution of the widened waterway can and has been separately analyzed from the contribution of the maintained waterway. Second, the analysis of the

causal contribution of the alleged negligent maintenance shows that it was not a substantial factor.

Two numerical models were applied to Scenario 1 to identify the hydraulic effects of "the deep, wide and unmaintained MRGO."  Plaintiffs' Wave Report 7 (Def. Ex. 22).  The same two models were applied to Scenario 3 to identify the hydraulic effects of "the maintained MRGO."  Plaintiffs' Surge Report 64 (Def. Ex. 19).  Through parametric studies in which the FINEL and SWAN numerical models were applied to these two scenarios, Plaintiffs' Dutch experts determined that a narrower waterway (i.e., a MRGO "as authorized") would not have affected either storm surge or waves to any significant extent. The ability of Plaintiffs' Dutch experts to separately analyze the impact of "the maintained MRGO" and "the unmaintained MRGO" is fatal to Plaintiffs' negligent "operation and maintenance" claim because, as Plaintiffs concede, there is no evidence that the alleged negligent maintenance of the MRGO was a "but for" cause of their alleged damage.

Lacking evidence of "but for" causation, and in the face of evidence that any hydraulic effects of the widened waterway were negligible, Plaintiffs contend that they can nonetheless satisfy their burden of proving causation merely by adducing evidence that the widened MRGO was a substantial factor in causing the alleged damage—a substantial factor because it "had something to do with" their alleged damage.  See id.  Here, again, their position is untenable.

Plaintiffs attempt to support their insupportable position by the worst sort of proof-texting.  They truncate quotations, omit necessary explanations, and proffer misleading

phrases in a futile attempt to prove their point.  For example, the "had something to do with"

clause was wrenched out of a discussion of causation in Westchester Fire Ins. Co. v. Haspel-

Kansas Inv. P'ship, 342 F.3d 416, 420 (5th Cir. 2003).  Plaintiffs quote only part of the

discussion, and they omit a telling sentence in the middle of the part that they do quote

because it is contrary to their position.  See Plt. Opp. at 6-7 & n.5.  The effect of these

maneuvers is to create an appearance of support for the false proposition that the widening

of the MRGO can be considered a substantial factor in causing Plaintiffs' alleged damage if it

merely "had something to do with" the flood.  But the Fifth Circuit's discussion (the entire

discussion) in Westchester Fire  makes it clear that a plaintiff cannot carry his burden of

proving causation merely by demonstrating that the challenged conduct "had something to

do with" the damage:

> Westchester relies on Hill [v. Lundin & Assocs., Inc., 256 So. 2d 620 (1972)]
> contending that the proper inquiry is whether Haspel-Kansas's conduct "had
> something to do with" Stinson's injuries.  Post Roberts [v. Benoit, [605 So. 2d
> 1032 (La. 1991)], however, the Louisiana Supreme Court has indicated that the
> cause-in-fact requirement is no longer so limited. See Lasyone v. Kansas City
> Southern Railroad, 786 So.2d 682, 691 (La.2001).  Determining cause-in-fact,
> particularly in a multi-causal context, however, requires a substantial factor
> inquiry.
>
> . . . .
>
>    In light of Lasyone, it appears that the Louisiana Supreme Court has
> transformed the earlier threshold test—that the conduct have "something to
> do" with the plaintiff's injuries—into an inquiry of "to what extent" did the
> defendant's conduct have something to do with the plaintiff's injuries.
>
> . . . .

. . . As the Louisiana Supreme Court articulated, a party's act may be a substantial factor in bringing about harm when "the act is a cause-in-fact in bringing about the injury when the harm would not have occurred without it. While a party's conduct does not have to be the sole cause of the harm, it is a necessary antecedent essential to an assessment of liability." Lasyone, 786 So.2d at 691.

Id. at 420-21 (emphasis added).

As the full discussion makes clear, the Fifth Circuit has recognized that the causation standard set forth in Louisiana law is not a watered-down version of the substantial factor test in which conduct having "something to do with" plaintiff's harm suffices to establish a prima facie case but is rather a stringent test in which conduct cannot be considered a substantial factor unless there is evidence that it is "a necessary antecedent" of the harm—i.e., is a "but for" cause.

Plaintiffs intersperse their Opposition with pejoratives ("slice-and-dice," "straw man") to distract from the inadequacy of their evidence. See id. at 10. But florid flummery will not prevent a grant of summary judgment for Defendant. Nor can a summary disposition of their "operation and maintenance" claim be avoided by vacuously arguing that "operation and maintenance" combined "synergistic[ally]" with "design and construction" to cause harm. See id. Whatever "synergy" existed is reflected in Scenario 1 ("Katrina Real Run"), and a comparison of that scenario with Scenario 3 ("MRGO as Designed") confirms that the "synergy" had very little effect. In addition, merely adducing evidence that the three challenged phases of the MRGO project cumulatively constituted a substantial factor does not satisfy Louisiana law. See LeJeune, 365 So. 2d at 475 (no liability unless conduct is

substantial factor); Quick, 643 So. 2d at 1296 (each concurrent cause must be a substantial

factor in order to impose liability).

LeJeune and Quick dispose of Plaintiffs' "operation and maintenance" claim because

there is no evidence that the maintenance of the MRGO was itself a substantial factor in

causing the harm.  As they are forced to admit, "[a]t no time have Plaintiffs asserted that

operation and maintenance, standing alone, was a substantial factor in causing the

catastrophic destruction of their properties."  Plt. Opp. at 11.  Summary judgment must be

granted on Plaintiffs' "operation and maintenance" claim because their causation theory is

fatally flawed: "Plaintiffs' causation theory is predicated on the claim that the cumulative

effect of the MRGO's negligent design, construction, operation, and maintenance . . . were

[sic] substantial factors in causing the flooding of Plaintiffs' properties."  Plt. Uncontested

Fact No. 3 (emphasis added).  Inasmuch as Plaintiffs concede that there is no evidence that

the "operation and maintenance" of the MRGO was either a "but for" cause or a substantial

factor in causing damage to their properties, the United States is entitled to a summary

judgment on that claim.

IV.  THE FACTS ADDUCED BY PLAINTIFFS DO NOT CREATE A GENUINE ISSUE FOR TRIAL:  THEY
     ARE NOT PROBATIVE OF WHETHER "OPERATION AND MAINTENANCE" OF THE MRGO WAS
     EITHER A "BUT FOR" CAUSE OR A SUBSTANTIAL FACTOR IN CAUSING THE ALLEGED DAMAGE.

Plaintiffs conclude their Opposition with a recitation of the evidence that they

contend "demonstrat[es] that the MR-GO was a substantial factor in causing the destruction

of Plaintiffs' properties."  Plt. Opp. at 20 (emphasis omitted and capitalization altered).

"[T]he record is brimming with facts demonstrating that the MR-GO in all of its destructive

fury . . . was a substantial factor . . . ."  Id. at 20-21.  This assertion, no matter how often

repeated, is irrelevant.  The pending motion does not attack Plaintiffs' entire case but only

their claim that negligent "operation and maintenance" of the MRGO caused the alleged

damage.

In the same vein, Plaintiffs' American experts opine that the MRGO was a substantial

factor.  Professor Robert Bea:  "the combined effects of the integrated combination of

MR-GO life-cycle negative environmental impacts" adversely affected the levees.  Id. at 21.

Dr. Paul Kemp:  "the cumulative impact of all four defects . . . in combination" had

significant hydraulic effects during the storm.  Id.  These opinions are not probative of

whether the "operation and maintenance" of the MRGO was either a "but for" cause or a

substantial causal factor.  These opinions would not support a finding that the "operation and

maintenance" of the MRGO was a cause in fact of Plaintiffs' alleged damage.  They do not

address, much less controvert, the evidence that allowing the waterway to widen had only a

de minimis effect on storm surge and waves.

The remaining "non-expert" evidence cited by Plaintiffs is likewise irrelevant

because, generously construed, it shows nothing more than that the MRGO increased the

risk of flooding.  See Plt. Opp. at 22-25.  It is undisputed that Reach 1 provides a direct route

for storm surge to travel between Lake Borgne and the Inner Harbor Navigation Canal.  It is

undisputed that Reach 1 "had the potential to deliver storm surges that would cause

catastrophic property damage and loss of human life."  Id. at 23.  And it is undisputed that

construction of a storm surge barrier at the eastern end of Reach 1 would have provided (and

is now intended to provide) additional protection and redundancy to the Lake Pontchartrain and Vicinity Hurricane Protection Project.  See id. at 23-25.  But Plaintiffs cannot carry their burden of proving causation by adducing evidence that the MRGO increased the risk of harm.  Nor can they prevent an entry of a partial summary judgment by adducing evidence that the design and construction of the MRGO may have increased the risk of harm by effecting hydraulic changes in the regional hydrodynamic system.  Congress mandated the construction of a large hydraulic conduit from the Gulf of Mexico through the wetlands near Lake Borgne and into the IHNC. [7]  Plaintiffs' complaints about the waterway functioning as a conduit are a challenge to the congressional mandate that the deep draft shipping channel be constructed from the Gulf through the marsh and into the IHNC, which, as Plaintiffs have frequently noted, lay near the heart of New Orleans.  If the evidence adduced by Plaintiffs is relevant at all, it is relevant to their complaint about the design and construction of the MRGO, not its "operation and maintenance."

_____

[7]By law the Corps of Engineers was required to prosecute the construction of the MRGO "under the direction of the Secretary of the Army and supervision of the Chief of Engineers, substantially in accordance with the recommendation of the Chief of Engineers contained in House Document Numbered 245, Eighty-second Congress."  Pub. L. No. 84-455, 70 Stat 65 (1956) (Def. Ex. 26).  The Chief's recommendation, which had previously been reported to Congress, described the nature, dimensions, and location of the prospective project:  "a seaway canal 36 feet deep and 500 feet wide extending 70 miles as a land and water cut on tangents and easy curves from a point south of the Intracoastal Waterway at Micheaud southeasterly to and along the south shore of Lake Borgne and through the marshes to and across Chandeleur Sound . . . and a connecting channel 36 feet deep and 500 feet wide extending westerly along the Gulf Intracoastal Waterway from the turning basin to the Industrial Canal."  H.R. Doc. No. 82-245 (Def. Ex. 27), at 5 ; accord id. at 38, 43; see also MR-GO Design Mem. No. 1-A (Rev. Jul. 1957) (Def. Ex. 23), Plate 1 (Project Location); MRGO Design Mem. No. 2 (Def. Ex. 25), Plate 2 (location map for routes B, D, E-6, and alt. E-6).

Plaintiffs' utter lack of evidentiary support is evinced by their citation to "evidence" that they well know to be incompetent and unreliable. They rely on a graph created by the Corps of Engineers in the 1960s and on testimony by Dr. Robert Dalrymple (provided in another case) in a hopeless attempt to prop up their baseless assertion that the MRGO increased storm surge by three feet. See Plt. Opp. at 16-17. Plaintiffs' American expert Paul Kemp included the Corps graph in his initial expert report and was questioned about it under oath when he was deposed in November of 2007:

Q.    Storm surge modelers don't rely on this Figure 14 analysis anymore, do they?

A.    No.

Q.    And isn't that because it's overly simplistic?

A.    Yes.

Q.    It does not consider a number of factors that are presently understood to influence storm surge; isn't that correct? For instance, it doesn't take wind stress into account, does it?

A.    Storm surge doesn't take wind stress—I mean, storm surge is a—I mean, wind stress causes storm surge, which—and then storm surge interacts with wetlands to cause, um—elevation change, dropoff of elevation for the most part. This does not take into consideration unique characteristics of every storm. So this is kind of a generalized view. What it says is that—something that everybody has noticed for a long time, and that is that when you propagate surge over wetlands this surge elevation drops. Okay?

Q.    But it's not a reliable indicator of how much, is it?

A.    It doesn't tell you—it doesn't tell you how much it's going to drop for a particular storm.

Q.    All right.

A.    So it's not a good predictive tool.

Q.    All right.  And so you couldn't extrapolate from this table to the impact of wetlands during Hurricane Katrina, could you?

A.    No.

Deposition of G. Paul Kemp (Nov. 27, 2007) (Def. Ex. 28), at 197:10-198:19.

Plaintiffs also know that the testimony of Dr. Robert Dalrymple is not reliable and indeed reflects nothing more than his mistaken recollection of what the Interagency Performance Evaluation Task Force reported.  Dr. Dalrymple testified as follows:

Q.    Okay.  Have you done any study to determine what the surge height would have been in Reach 2 if the wetlands had not been destroyed?

A.    I have not.  IPET has done some sensitivities of the ADCIRC modeling with and without the wetlands.

Q.    Have you studied those or have an opinion on those, one way or the other?

A.    Only to the extent that I know that there's about a meter of water level difference with and without the wetlands.

Q.    Okay.  That's their conclusion, right?

A.    Yes.

Q.    But you haven't independently studied that?

A.    No, I have not.

Q.    And don't have an opinion whether it's good, bad or indifferent?

A.    I haven't studied it myself.  I would think that the ADCIRC modeling done by the IPET team was fairly reasonable.

Deposition of Robert A. Dalrymple (Sept. 17, 2007) (Def. Ex. 29), at 143:6-144:3.

Plaintiffs' counsel elicited this testimony but incuriously did not ask where the IPET reported a surge reduction of three feet—even though Dr. Dalrymple testified that he was relying entirely on the IPET's surge modeling.  Plaintiffs and their experts have extensively studied and relied on the IPET Report.[8]  If there were any finding or conclusion in the report that remotely supported Dr. Dalrymple's testimony, Plaintiffs would have adduced it long ago and would adduce it here.  Instead, they trot out testimony that they well know to be mistaken.  In the words of their counsel, "that's our proof."  Mar. 11, 2008, hearing transcript (Def. Ex. 2) at 48.[9]

Plaintiffs cannot avoid a summary judgment against them on their negligent "operation and maintenance" claim by "hotly disput[ing]" the issue.  Plt. Opp. at 8.  Nor can they avoid it by adducing conclusory opinions from their experts and dramatizing immaterial facts.  See, e.g., id. at 15 & n.11, 21-25.  Such tactics have been roundly rejected.  See Boudreaux v. Swift Transp. Co., 402 F.3d 536, 540 (5th Cir. 2005); Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994).  "[T]he non-moving party must 'set forth specific facts showing the existence of a "genuine" issue concerning every essential component of its

---

[8]Dr. Paul Kemp, when asked what data he relied upon as a basis for his understanding of the effect of the MRGO on storm surge, testified, "Well, I was probably one of the most, um—consummate consumers of the IPET report, for example.  Probably one of the few people that has read every volume of it."  Kemp Dep. (Def. Ex. 28) at 83:23-84:5.

[9]Notably, the Plaintiffs' Dutch experts refuted the notion that the MRGO had any such effect during Hurricane Katrina.  See Plaintiffs' Surge Report 90 (eliminating the MRGO and restoring wetlands to pre-MRGO dimensions (Scenario 2C "No MRGO") yielded as little as half a foot and, at most, not even a foot and a half of surge reduction along Reach 2) (Def. Ex. 19).

case.'  A dispute as to a material fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Boudreaux, 402 F.3d at 540 (footnotes omitted) (emphasis added).  "[I]n any case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the non-movant," summary judgment must be granted.  Id. (footnote omitted) (emphasis in original).

CONCLUSION

For these reasons, the United States' motion for partial summary judgment should be granted.

Respectfully Submitted,

GREGORY G. KATSAS
Assistant Attorney General

THOMAS DUPREE
Principal Deputy Assistant Attorney General

PHYLLIS J. PYLES
Director, Torts Branch

JAMES G. TOUHEY, JR
Assistant Director, Torts Branch

 s/ Robin D. Smith
ROBIN D. SMITH
Senior Trial Counsel
Torts Branch, Civil Division
U.S. Department of Justice
Benjamin Franklin Station, P.O. Box 888
Washington, D.C.  20044
(202) 616-4289 / (202) 616-5200 (Fax)
Attorneys for the Defendant United States

CERTIFICATE OF SERVICE

I certify that the foregoing document was served by ECF on all counsel of record on

November 5, 2008.

 s/  Robin D. Smith
ROBIN D. SMITH