# Exhibit 21 Part A

# MISSISSIPPI RIVER GULF OUTLET EFFECTS ON STORM SURGE, WAVES AND FLOODING DURING HURRICANE KATRINA

## EXPERT REPORT

### BY

### G. PAUL KEMP, Ph.D.

*ROBINSON V. UNITED STATES*

**JULY 11, 2008**

# MISSISSIPPI RIVER GULF OUTLET EFFECTS ON STORM SURGE, WAVES AND FLOODING DURING HURRICANE KATRINA

## TABLE OF CONTENTS

**PREFACE**                                                    **2**

**1.0 INTRODUCTION**                                           **5**

**2.0 FUNNEL GEOGRAPHY, TERMINOLOGY AND KATRINA
     FLOOD DAMAGES**                                           **8**

**3.0 BRIEF HISTORY**                                          **21**

**4.0 EARLIER SURGE STUDIES**                                  **40**

**5.0 METHODS**                                                **69**

**6.0 FUNNEL EFFECT ON SURGE**                                 **96**

**7.0 EFFECTS OF REACHES 1 AND 2 ON SURGE**                    **148**

**8.0 EFFECTS ON WAVES**                                       **159**

**9.0 NEED FOR INSTITUTIONAL REFORM**                          **185**

**10.0 CONCLUSIONS**                                           **197**

**11.0 REFERENCES**                                            **199**

**12.0 APPENDICES**                                            **205**

    **A. QUALIFICATIONS**

    **B. MRGO CHRONOLOGY**

# MISSISSIPPI RIVER GULF OUTLET EFFECTS ON STORM SURGE, WAVES AND FLOODING DURING HURRICANE KATRINA

## G. PAUL KEMP, Ph.D.

### July 11, 2008

### PREFACE

I, G. Paul Kemp, am a geologist and oceanographer currently employed by the National Audubon Society, and at the time of Katrina by the Louisiana State University (LSU) Hurricane Center.  My qualifications are attached as Appendix A.  The opinions expressed in this report are solely my own, and not those of the National Audubon Society or LSU.  This is the fourth expert report that I have written as a member of the Robinson expert team, including ones submitted to the Court on July 28, 2007 (Kemp Class Certification 2007a), September 14, 2007 (Kemp 702(c) immunity 2007b) and May 1, 2008.  The current report supplements and essentially replaces the report of May 1, 2008, with the addition of information developed over the past two months.  I incorporate by reference everything I have written in the three previous reports into the current report.

The Government takes the position that the Mississippi River Gulf Outlet navigation project (MRGO) had no effect on the catastrophic flooding of Greater New Orleans during Hurricane Katrina.  Our analyses show that the Government is incorrect.  It is my opinion that the MRGO navigation project:

> (1) created a funnel, the dangerous convergence of channels and spoil disposal areas, later augmented by addition of the Lake Pontchartrain & Vicinity (LPV) berms east of New Orleans, and by the subtraction of buffering wetlands, that foreseeably amplified the threat posed by hurricane surge to the Greater New Orleans area; and
>
> (2) greatly enlarged the original Gulf Intracoastal Waterway (GIWW) connection between the throat of the funnel and the IHNC (MRGO Reach 1), which foreseeably increased surge transmission into the city earlier, adding to the height and duration of surge experienced in the IHNC during Katrina and contributing to the early failure of floodwalls and levees adjacent to the IHNC; and
>
> (3) created a Reach 2 channel with unstable side slopes that caused it to predictably expand over time, reducing the natural marsh buffer that previously separated it from Lake Borgne and from the adjacent LPV berms, thereby compromising foreshore protection fort the man-made surge protection elements and hastening the onset of damaging wave action on these delicate structures (EBSBs) so that they breached earlier in the storm sequence; and

2

> (4) created a channel in Reach 2 that predictably exposed freshwater swamps and marshes within the Lake Borgne funnel to increased salinity, accelerating their conversion to open water and thereby reducing the wetland surge and wave buffer between Lake Borgne and populated areas; and
>
> (5) was a substantial contributing factor to the catastrophic flooding of the Robinson plaintiffs' homes and communities.

In addition, throughout the history of the MRGO project, up to the time of Hurricane Katrina, the U.S. Army Corps of Engineers (USACE or Corps), in my opinion, has continuously adopted a policy of denial and deliberate disregard of well documented adverse effects of the channel, most of which were known or suspected prior to construction and others that became apparent later, soon thereafter ensuring that a real threat for flooding during hurricanes remained unaddressed for five decades. Throughout this period, the USACE issued increasingly soothing but inaccurate statements to two generations of New Orleans and St. Bernard residents that they were well protected and that the MRGO project posed no hazard to their lives or property.

Furthermore, this approach is much the same today, in my opinion, coloring the conclusions of the Corps sponsored investigations that have followed Katrina, and the nature of solutions that have been proposed. This, in particular, includes an obdurate unwillingness to provide wave protection to the hastily rebuilt berms that parallel MRGO Reach 2 despite overwhelming evidence that they were largely destroyed by waves. Today, the Corps still refuses to acknowledge, in the face of compelling scientific evidence, that the MRGO project was a significant cause of the early and catastrophic flooding of the Upper and Lower 9th Ward, St. Bernard Parish and New Orleans East during Hurricane Katrina.

Ultimately, the extent of damage and the harm caused by the flooding of St. Bernard and the Lower 9th Ward through the MRGO was not significantly reduced by the LPV berms and floodwalls. The structures that Dr. Bea has described as "earthen berm/spoil banks" (EBSBs) (to differentiate them from properly engineered coastal defense dykes) along MRGO Reach 2 served merely as "speed bumps" that were swept aside during Katrina by the surge and waves generated in, and transmitted by the MRGO channel. Most of the flooding of the Lower 9th Ward and New Orleans East, as well as a significant portion of the early flooding of the Orleans Metro area, is attributable to the enlarged cross-section of MRGO Reach 1.

Finally, I believe that the USACE, and certainly the larger oceanographic community, possessed a knowledge base prior to the construction of the MRGO project, and certainly after the Betsy disaster, that should have led to actions to tightly integrate the MRGO economic development project with the LPV public safety project, and thereby reduce or eliminate the added and substantial hazards uniquely posed by the ship channel. Instead, with regard to this particular project and, significantly, not in all comparable cases around the country, the Corps adopted a policy of institutional denial that stymied efforts of local leaders, engineers and scientists to address critical, long-known deficiencies that were

fully manifested during the Katrina event. My reading of the record indicates that certainly by 1988, if not earlier, the Corps knew about the nexus between many of the deficiencies noted above and the likelihood of catastrophic flooding. Nevertheless, before Hurricane Katrina, the Corps never completed any study recommending a plan to Congress to mitigate known hazards. The storm has provided an opportunity for new leadership at the Corps to mobilize all of the authority, resources and expertise that it has been given by Congress to mitigate the damage that the MRGO has caused. We are still waiting.

I declare under the penalty of perjury under the laws of the United States of America and the State of Louisiana that the foregoing is true and correct.

Executed on July 14, in Baton Rouge, Louisiana.

G. Paul Kemp, Ph.D.

4

# CHAPTER 1
# INTRODUCTION

The Mississippi River Gulf Outlet (MRGO) is a free-flowing, man-made navigation channel connecting the Gulf of Mexico to the interior of the City of New Orleans that we will demonstrate played a substantial role in the initiation and enhancement of flooding during Hurricane Katrina (**Figure 1.1**). The MRGO project was approved by the U.S. Congress under the Rivers and Harbor Act of 1956 (PL 84-455). The U.S. Army Corps of Engineers (USACE) New Orleans District (NOD) began construction of this project in 1958 and completed it in 1968 at a cost of approximately $92 million. In the process, they dredged more earth than was moved during construction of the Panama Canal and destroyed thousands of acres of swamps and marshes. Subsequent operations and maintenance costs have totaled in excess of $500 million (Gunn, 1977; USACE 2007). The MRGO was authorized as a 76-mile ship channel with a 36 foot controlling depth, 500 feet wide at the bottom and 650 feet wide at the top, that would cut through the marshes of lower St. Bernard Parish and, with a somewhat larger cross-section (**Figure 1.2**), across the shallow waters of Breton Sound (USACE, 1999). The MRGO was promoted by New Orleans port interests as a federally-funded economic development project that would stimulate a boom in industrial and port development for New Orleans and St. Bernard Parish. The anticipated economic renaissance, like the ship traffic that peaked in 1978 and diminished afterward, never materialized (USACE 2007).



**Figure 1.1   Graphic created by the New Orleans Time-Picayune newspaper to explain the role of the Lake Borgne funnel in the flooding of New Orleans during Hurricane Katrina.**

5



**Figure 1.2  MRGO Project from the Inner Harbor Navigation Canal (IHNC) lock in New Orleans to the Gulf of Mexico (USACE 2007).  IPET Reach 1 extends from the IHNC to the turn southeast and Reach 2 runs through the marsh from there to the jetties.  IPET Reach 3 traverses Breton Sound past the Chandeleur Islands.**

## 1.1  Objectives and Organization of Expert Report

The Government takes a position that the 1958 MRGO navigation project had no effect on the flooding of New Orleans during Hurricane Katrina or on the damage suffered by adjacent flood protection structures erected as part of the Lake Pontchartrain & Vicinity (LPV) project following severe flooding from Hurricane Betsy in 1965.  We have carried out a detailed analysis of the oceanographic dynamics stimulated by Hurricane Katrina. This analysis focuses on the effect of the MRGO project on surge and waves throughout the Lake Borgne funnel (**Figure 1.1**) using information derived from observations made in this area immediately after the storm coupled with results of a comprehensive modeling program.  This modeling program was carried out primarily by colleagues working under my direction in the Netherlands at Svasek Hydraulics and the Delft Institute of Technology, as is described in a chapter to follow.  We believe the evidence we have developed clearly shows that the MRGO project:

> (1)  created a funnel, the dangerous convergence of channels and spoil disposal areas, later augmented by addition of the Lake Pontchartrain & Vicinity (LPV) berms east of New Orleans, and by the subtraction of buffering

6

wetlands, that foreseeably amplified the threat posed by hurricane surge to the Greater New Orleans area; and;

(2) greatly enlarged the original Gulf Intracoastal Waterway (GIWW) connection between the throat of the funnel and the IHNC (MRGO Reach 1), which foreseeably increased surge transmission into the city earlier, adding to the height and duration of surge experienced in the IHNC during Katrina and contributing to the early failure of floodwalls and levees adjacent to the IHNC; and

(3) created a Reach 2 channel with unstable side slopes that caused it to predictably expand over time, reducing the natural marsh buffer that previously separated it from Lake Borgne and from the adjacent LPV berms, thereby compromising foreshore protection fort the man-made surge protection elements and hastening the onset of damaging wave action on these delicate structures (EBSBs) so that they breached earlier in the storm sequence; and

(4) created a channel in Reach 2 that predictably exposed freshwater swamps and marshes within the Lake Borgne funnel to increased salinity, accelerating their conversion to open water and thereby reducing the wetland surge and wave buffer between Lake Borgne and populated areas; and

(5) was a substantial contributing factor to the catastrophic flooding of the Robinson plaintiffs' homes and communities.

Each of the conclusions presented here is addressed in separate chapters to follow, combining results from new analyses carried out by the Robinson expert team with those contributed by others since Katrina. To facilitate this discussion, however, we first lay out in Chapter 2 our understanding of the geography, terminology and hydraulic significance of the various man-made and natural components of the Lake Borgne funnel, our study area for this project. Then, in Chapter 3, we describe a chronology of actions and positions taken by the USACE that cover the roughly 50 year period from the authorization of the MRGO project through its recent de-authorization, and continuing on into current mitigation efforts. We review earlier studies of surge dynamics in Chapter 4, and explain the modeling techniques adopted for the current investigation in Chapter 5 showing how that forms the basis of the technical oceanographic discussion. The results of that analysis are then discussed in separate chapters (Chapters 6 through 8) that address sequentially the points enumerated above. Chapter 9 reviews high points of an MRGO chronology that has been created and is included with this report (Appendix B) and is followed by a short statement of my opinion in Chapter 10. We conclude with a summation chapter that pulls together all of the elements supporting our overarching contention that the MRGO project played a significant causative and contributory role in the catastrophic flooding and damages experienced by the Robinson plaintiffs in New Orleans East, the Lower 9th Ward and St. Bernard Parish, and a supporting role in the inundation of the Orleans Metro area west of the Inner Harbor Navigation Canal (IHNC).

## CHAPTER 2
## FUNNEL GEOGRAPHY, TERMINOLOGY AND KATRINA FLOOD DAMAGES

The east bank of New Orleans and all of St. Bernard Parish flooded on the morning of August 29, 2005, when two storm surges sequentially struck the city.  The first originated east of the City in the Lake Borgne funnel, while the second struck the south shore of Lake Pontchartrain (**Figure 2.1**).  The Lake Borgne surge, although it was similar in many ways to that in Lake Pontchartrain, attained a maximum elevation about 6 feet higher against the earthen berms protecting St. Bernard Parish along the MRGO channel, 18 compared to 12 feet (**Figure 2.2**).  Decades of erosion of the MRGO channel banks into the protective wetland buffer south of Lake Borgne enhanced the severity of the wave attack there in a predictable way.  The EBSBs along the MRGO, unlike the coastal sea dikes constructed along the south shore of Lake Pontchartrain, were not designed to resist the threat posed by waves reforming and growing over thousands of feet of deep water in the artificial channel.



**Figure 2.1  ADCIRC hind cast of maximum surge elevations around Greater New Orleans  (http://hurricane.lsu.edu/floodprediction/katrina32/images/katrina32.JPG) created by the LSU Hurricane Center**

The Lake Borgne surge, though it reached a higher maximum than in Lake Pontchartrain, dropped more quickly after Katrina passed as it drained through many routes back to the Gulf of Mexico (**Figure 2.2**).  Lake Pontchartrain stayed higher than Lake Borgne for two more days, allowing floodwaters to flow continuously into the Orleans Metro area through the deeply breached walls on the 17th Street and London Avenue drainage canals long after water was draining out of St. Bernard.



**Figure 2.2  Katrina surge hydrographs reconstructed from ADCIRC model output and high water mark data for Lake Borgne surge in the throat of the funnel and in Lake Pontchartrain near the mouth of the IHNC at Seabrook.**

Our focus here is on surge and waves generated in the Lake Borgne funnel (**Figure 2.3**). The geography of the funnel includes the pre-existing GIWW canal along the northern margin, the enlarged portion of the GIWW that IPET has called MRGO Reach 1 that serves as an outlet to the IHNC, the MRGO Reach 2 channel along the south margin, and LPV embankments paralleling all of the artificial channels on the inland side.  The funnel also contains more or less natural features including the southern half of Lake Borgne itself, which is divided into two embayments or lobes, and thousands of acres of wetlands both on the inboard and outboard sides of the LPV hurricane protection structures.  Three drained and developed polders surround the Lake Borgne funnel, including New Orleans East to the north, the Orleans Metro area to the west, and the combined Lower 9th Ward and St. Bernard Parish neighborhoods.   All of these developed polders received floodwaters from the Lake Borgne funnel, specifically through or across channels constructed or enlarged as a part of the MRGO navigation project (**Figure 2.3**).

We will show how the flooding of these areas during Hurricane Katrina was initiated and exacerbated by the presence of the MRGO project in a way that rendered the subsequently authorized 1965 LPV Hurricane Protection projects largely futile.  In the St. Bernard polder, where the water rose to an elevation of +11 feet (NAVD88) almost everywhere, it was as if the LPV flood protection works had never been built.  Given that 98 percent of the structures within the parish flooded, as they did, it is difficult to imagine how it could have been worse.  Yet to the people living there, the 200 to 300 year level of

LPV protection that the USACE claimed it had provided was a crucial factor underpinning the choice to move or stay there after the Hurricane Betsy disaster. The same argument applies to a lesser degree for New Orleans East and the Orleans Metro polders that also received water through the MRGO during Katrina.



**Figure 2.3  Relationship of MRGO Reaches 1 and 2, and the GIWW to the Lake Borgne funnel, showing undeveloped marsh contained within the LPV flood protection system on the east side of New Orleans East, and north of the developed area of St. Bernard Parish.  Notice breakthrough of eastern lobe of Lake Borgne into MRGO Reach 2 channel at Bayou Dupre.**

## 2.1 MRGO Reach Classification.

We adopt the terminology used by the IPET to describe four relevant reaches of the MRGO project (**Figure 2.3**), beginning, first, with the portion of the Inner Harbor Navigation Canal (IHNC) that extends north from the Mississippi River lock to the junction with the 6-mile long portion of the combined Gulf Intracoastal Waterway (GIWW) and MRGO.  The junction with the IHNC is discussed on navigation charts as MRGO Mile 66 (Figure 3.X).   IPET describes the conjoined segment extending due east and bounded by earthen LPV berms as MRGO Reach 1.  East of the Paris Road high-rise bridge, near MRGO Mile 60, MRGO Reach 1 becomes Reach 2 heading southeast toward the Gulf, while the much smaller GIWW barge canal continues to the east north east (See **Figure 3.1**).

Inner Harbor Navigation Canal.  The Inner Harbor Navigation Canal (IHNC), also called the Industrial Canal, is the oldest of the pre-existing artificial channels that were partially incorporated into the MRGO project.  It was originally dredged in the 1920s, and runs north from the IHNC Lock at the Mississippi River to an opening into Lake Pontchartrain at Seabrook.  It has a complicated geometry, with constrictions at bridge crossings, and side slips constructed to accommodate various port activities over the years.  It has a controlling depth of about 40 ft, with a number of deeper sections up to 80 feet deep where scour has occurred near constrictions (Team Louisiana 2007).

Gulf Intracoastal Waterway.  A portion of the shallow-draft GIWW was incorporated into the MRGO project as MRGO Reach 1, but it trends in its original state on a northeasterly direction along the south side of New Orleans East polder adjacent to earthen berms erected as part of the LPV.  The GIWW is one of the features defining the north side of the funnel where it passes south of the New Orleans East polder.  It was originally dredged during World War II to facilitate barge traffic with authorized dimensions of 125 feet wide and 12 feet deep.  Like all channels dredged through the marsh, it has become wider over time, but remains relatively shallow.  The GIWW provided the first connection between the funnel and the IHNC.

MRGO Reach 1.  The east-west oriented 6 mile section of the GIWW that connects with the IHNC (Mile 60 to 66) was enlarged by more than a factor of 10 to give it a controlling depth greater than 36 feet and a bottom width of 500 feet as part of the MRGO project authorized in 1958.  This section is commonly referred to by the Corps as the GIWW/MRGO, or simply as a part of the GIWW, but the majority of its cross-section is attributable to dredging carried out under the MRGO project.  The top-width of GIWW/MRGO Reach 1 has enlarged, on average, by nearly 300 feet to nearly a 1,000 feet (**Figure 2.4**), largely through erosion into the south bank (Morris Expert Report 2008).  MRGO Reach 1 is paralleled by LPV levees on both the north and south sides, located about 1,800 feet apart, with about 800 feet of overbank between the channel and the toe of the levee along the south side.

MRGO Reach 2.  IPET describes the deep-draft reach that turns to the southeast from the GIWW junction (**Figure 2.5**) and passes south of Lake Borgne as MRGO Reach 2 (MRGO Mile 60 to 23).  MRGO Reach 2 extends nearly 40 miles southeast through the marsh past the end of the hurricane protection system and the unprotected community of Shell Beach (Alluvial City) until it reaches the open, and generally salty, waters of Breton Sound. Between Mile 50 and 55, in the vicinity of the Bayou Dupre water control structure, the MRGO channel has eroded into the eastern lobe of Lake Borgne through the lake rim marsh (**Figure 2.3**).  This gap figures prominently into wave model results as will be seen later.  Farther south, beyond the Chalmette LPV EBSBs, dredging for MRGO breached a ridge constructed by Bayou LaLoutre when it was a distributary for the Mississippi River.  This breach played an important role in allowing salt water to move into what were once relatively fresh swamps and marshes closer to the populated areas of St. Bernard.  Millions are now being spent to rebuild this ridge as mitigation and restoration for the destruction associated with MRGO, as will be discussed in the next chapter.

11

MRGO Reach 2 is bounded on its south bank by a large band of former marsh that was used as a spoil disposal area (**Figure 2.5**) and extends all the way to the jetties at the Lake Borgne shoreline.  The marsh within the disposal site has been buried under many feet of material dredged from the channel.  A portion of this spoil disposal area was used as a platform for construction of the EBSBs of the Chalmette portion of the LPV after that project was authorized in 1965.

A segment of MRGO Reach 2 extending 10 miles southeast from the Bayou Bienvenue water control structure (Mile 58) was over-dredged to nearly 60 feet deep in the late 1960s to provide the material that was dewatered and mounded to form the LPV berm (Fitzgerald et al. Expert Report 2008).  Both MRGO Reaches 1 and 2 have been dredged repeatedly to 42 feet during maintenance operations to remove material that sloughed into the channel.  MRGO Reach 2 has an authorized top width of 650 feet but has widened to more than 3,000 feet in places, particularly on its north bank where, until recently, no effort was made to control erosion (**Figure 2.4**).  The retreat of the north bank, which has diminished the marsh buffer on the Lake Borgne side, averages more than 700 feet (**Figure 2.5**), while the retreat on the south bank averages more than 300 feet.  Dr. Bea has found that erosion of the south bank affected the severity of wave attack for the LPV EBSBs as the scrub vegetation that formerly protected the structures has been reduced to less than 100 feet in some places (Bea Expert Report 2008).  Dredging beyond the controlling depth of 36 feet hastened the slumping of the unstable banks, but was a common practice over the years even if it appears never to have been specifically authorized by Congress.

MRGO Reach 3.  The remainder of the MRGO is dredged through open water and has been called MRGO Reach 3 (See **Figure 1.2**).  It served as a deep route for salt water to invade and damage inland freshwater swamps and marshes that previously were protected by the Bayou LaLoutre ridge.  This reach shoaled after Katrina, as it did after even minor storms, so that it could not be used by seagoing vessels.  The Corps' inability to keep this reach reliably maintained at its authorized controlling depth has been a constant factor in ship-owner decisions to eschew the MRGO in favor of the longer but more dependable Mississippi River route.  When the USACE sought to spend additional millions to reopen Reach 3 after Katrina, they encountered a public outcry.  Congress responded by refusing to allow expenditure for this purpose.  This provided some breathing space for public debate that led to the de-authorization of the MRGO project that was finalized by the November override of the Presidential veto and ultimate passage of the Water Resources and Development Act of 2007.



**Figure 2.4  Expansion of MRGO channel by mile from the IHNC on left to jetties on right at Breton Sound shoreline.  Top width is variable but tends to increase toward the coast.  Original design top width is also shown (Team Louisiana 2007).**

## 2.2 The Funnel

A triangle that opens east to Lake Borgne and thence to Mississippi Sound and the Gulf of Mexico is formed by the GIWW on the north and MRGO Reach 2 on the south (**Figure 2.5**).  This layout has been described as a "funnel" by virtually everyone who has taken a bird's-eye look at the plan developed by the USACE in the 1950s to accommodate navigation and economic development east of New Orleans (**see Chapter 3**).  The funnel is dominated by Lake Borgne, a very large shallow bay similar to Lake Pontchartrain that is elongated along a southwest to northeast axis, providing more than 40 miles of open water in this direction -- a very long "fetch" over which hurricane winds can build surge and waves.  Any hurricane generating winds from the north (0°), east (90°) or southeast (135°) will cause a buildup of surge against flood protection levees and in the adjacent artificial channels somewhere on the margins of the funnel, which is then conducted through the common GIWW/Reach 1 outlet toward the IHNC.

13



**Figure 2.5 "Golden Triangle" marsh separating Lake Borgne from throat of the Lake Borgne funnel.**

The funnel still includes about 5 miles of degraded tidal wetlands in the "throat" area between the western shore of Lake Borgne and the MRGO/GIWW junction that is euphemistically called the "Golden Triangle" by local residents (**Figure 2.5**). Broken marsh also fringes the north and south shores of Lake Borgne, except where erosion has connected the Lake directly with the MRGO channel. Additional, more intact wetlands occur in the Biloxi marshes to the north and east beyond the ends of the LPV berm system. As will be seen, these marshes separating Lake Borgne from Breton Sound played an important role in keeping long-period swell waves from propagating into the funnel, but they did nothing to stop the shorter-period seas that were generated within Lake Borgne itself. We discuss the dynamics of surge and wave amplification facilitated by the geometry of the funnel in Chapter 5.

### 2.3  Developed Areas Under Pump

<u>Orleans Metro.</u>  This is the part of New Orleans that most visitors see. It extends from the Inner Harbor Navigation Canal (IHNC) at the inland terminus of the MRGO west to the 17th Street Canal on the Jefferson Parish line, and covers all the land between the Mississippi River and Lake Pontchartrain (**Figure 2.3**). This compartment includes the central business district and some of the highest lands along the River (5 to 15 ft), but

also very low areas on the lake and river sides of the Metairie Ridge.  The suburbs on the lake side of the Metairie ridge are reclaimed swamp and marsh that have sunk well below sea level as a result of forced drainage.  A rim of higher land occurs along the lakefront where it was built up by dredging from the Lake and along the IHNC where dredged material was also placed. The part of the Orleans Metro polder that flooded during Katrina averages about 2 ft below sea level (**Figure 2.6**). Floodwaters that initially entered the Orleans Metro polder came through the MRGO into the IHNC and from there initially through a missing railroad flood gate, then through a major breach in an earthen embankment along the south side of the Port of New Orleans facility, and then finally over floodwalls and through one section that failed (van Heerden and Bryan 2006, Team Louisiana 2007).

<u>New Orleans East.</u>  This compartment includes the easternmost suburbs of Orleans Parish.  It is located between the IHNC on the west and Lake Pontchartrain to the north. MRGO Reach 1 and the GIWW form the southern boundary (**Figure 2.3**). Orleans East consists almost entirely of drained wetlands and is the "deepest" of the drained marsh polders, having subsided to 5.8 ft below sea level on average in the area flooded during Katrina (**Figure 2.6**).   The federal LPV levees that surround Orleans East have impounded a formerly tidal marsh that covers nearly 22,000 acres now at or below sea level.  This impounded marsh became the Bayou Sauvage National Wildlife Refuge after it was recognized that further drainage and development would not be permitted.  It is separated from suburban subdivisions by a local levee that allows more intensive drainage of the developed area.  MRGO water first entered New Orleans East from MRGO Reach 1 over the Citrus Levee, and, to a lesser degree, from overtopping of floodwalls on the east side of the IHNC.  Floodwaters also entered this compartment later when the federal New Orleans East Back Levee was breached from the GIWW. This failure allowed water into the Refuge from the GIWW, which then flowed over the low interior drainage levee (Maxent Levee).

<u>St. Bernard Polder</u>.  "The Parish" extends east from the IHNC along the higher land of the Mississippi River natural levee, and then farther east along the old Bayou LaLoutre ridge (**Figure 2.3**). The St. Bernard polder includes the Lower 9th Ward even though that neighborhood is a political subdivision of Orleans Parish. It also contains a large swatch of tidal marsh, nearly 32,000 acres, called the Central Wetlands, located between the main federal LPV berm along the south bank of the MRGO and a lower state-built levee known as the 40 Arpent or Florida Avenue Levee. Two gated structures were constructed as part of the LPV project through the federal EBSB alignment where Bayou Bienvenue crosses on the west end, and at Bayou Dupre farther to the east, to allow water exchange with the MRGO, and for small vessels to pass between the wetlands and the ship channel during normal tides.

The developed and drained portion of the St. Bernard polder lies south of the 40 Arpent Levee, sheltered behind 2.4 to 3.0 miles of former fresh water cypress-tupelo swamp that have become intermediate to salt marshes since the construction of the MRGO. Pump stations located along the 40 Arpent levee discharge storm drainage into these

wetlands and this limited freshwater introduction has preserved a few stands of the once more extensive swamp forest that covered this area prior to construction of the MRGO.

St. Bernard has some of the highest land on the East Bank of New Orleans, following as it does the natural levee of the Mississippi River and some of its abandoned distributaries (**Figure 2.3**).  Despite being relatively high by local standards, the St. Bernard polder experienced the most violent, spatially expansive and deepest flooding in the entire metro area during the Katrina event.  Except for a limited contribution from rainfall, all flooding of the St. Bernard polder was caused by water that passed through or across one or more reaches of the MRGO.  This water entered the developed area as a result of catastrophic floodwall failures along the IHNC on the western margin, by overtopping of berms on MRGO Reach 1, and by flow through breaches in the federally built EBSBs along the MRGO.  The interior 40 Arpent Levee was protected by over two miles of the Central Wetlands and was relatively undamaged, but it average only 6.5 feet high and was completely overtopped when floodwaters from the MRGO filled the Central Wetlands beyond this level.



**Figure 2.6   Comparison of mean maximum floodwater elevation with average elevation of flooded land in three New Orleans polders (Team Louisiana 2007).**

## 2.4 Connecting the MRGO Project with Damages to People and Property

To show that the extent of damage to property in St. Bernard Parish, the Lower 9th Ward, Orleans Metro, and New Orleans East was initiated or aggravated by the presence of the MRGO, we must demonstrate that flooding occurred earlier in the surge sequence than it would have otherwise.  The maximum elevation of flooding experienced in each of the three Greater New Orleans (GNO) polders most affected by Katrina was quite different (**Figure 2.6**), reaching 10 to 12 feet above sea level in populated areas of the Lower 9th Ward and St. Bernard Parish, but only a little over a foot above sea level in the much lower New Orleans East polder (Team Louisiana 2007).  The extent of damage to property is related to the depth of flooding, a measure obtained by subtracting the land or floor elevation of buildings from the maximum elevation of water.  The average land elevations in each of the flooded polders also differed (**Figure 2.6**), ranging from nearly 6 feet below the NAVD88 datum (-7 feet relative to mean sea level) to +2.5 feet in St. Bernard (Team Louisiana 2007).  In the Lower 9th Ward and St. Bernard, 98 percent of all structures were seriously damaged by flooding.  While the maximum elevation of water is important to property damage, the maximum rate of rise, estimated at 8 feet per hour in the Lower 9th Ward (Team Louisiana 2007), was perhaps the most important factor contributing to greater loss of life there.

The difference among the polders in maximum flood elevation during Katrina was independent of the relative elevation of the land flooded, attaining its highest level in the St. Bernard Polder, which has the highest average land elevation of all of the GNO polders that flooded (**Figure 2.6**).  The maximum elevation of water attained in each of the GNO polders was more closely related to the time of flooding onset and the length of time during which water continued to flow in.  The St. Bernard polder flooded to such a high elevation because it flooded earlier in the surge sequence, while water in the MRGO was still rising.  If the time-of-onset of flooding was advanced by the MRGO navigation project, then one must conclude that the MRGO project contributed substantially to the severity of flooding wherever this occurred.

All breaching of LPV structures, whether floodwalls or earthen berms, within the Lake Borgne funnel took place where these structures were inboard of, and in close proximity to, artificial channels.  Except for the New Orleans East Back Levee EBSB, all of the LPV structures that breached were adjacent to some part of the MRGO project, whether between the lock and the MRGO junction in the IHNC, along the north bank of MRGO Reach 1 or along the south side of MRGO Reach 2.  Conversely, no LPV structures separated from artificial channels breached even though many of them experienced overtopping.  We will show that breaching was generally initiated by the excess stress applied to LPV structures as a result of proximity to deep channels, either by a surge that reached a higher elevation or lasted longer, or, in some cases, by a higher intensity of wave attack than would have occurred if the channel was not there or farther away. Because the LPV and MRGO projects were never explicitly integrated with each other, we have found no evidence that the MRGO project was ever modified to reduce the predictable excess surge stresses and wave attack caused by the encroachment of the

17

channels on LPV structures, or, alternatively, that the LPV structures were bolstered in any way to withstand the obviously increasing threat.

Reduced to fundamentals, the extent of damage posed by the MRGO in each of these areas was affected, first, by the timing and duration of flooding during the storm, namely, whether flooding started early in the surge sequence or later.  Because storm surge is a transient phenomenon, flooding that begins later, at or after the peak of the surge hydrograph (**Figure 2.2**), will not be as severe as flooding that begins earlier, while the surge is still rising.  While the Katrina storm surge rose first in Lake Borgne and later in Lake Pontchartrain, it dropped precipitously everywhere at about the same time (**Figure 2.2**), as the storm completed its due north traverse through the area (**Figure 2.7**) where both lakes are at similar latitude.  Multiple features of the landscape affect the onset of surge at any given location, most notably proximity to large lakes and bays where surge is generated, as well as to large channels which preferentially convey it.  The end of the surge event is, in contrast, determined rather simply by the speed of translation of the storm, which sets the schedule for reversal of the prevailing winds as it leaves the area.



**Figure 2.7  Track of the eye of Hurricane Katrina on August 29, 2005**

Some LPV floodwalls, levees and EBSBs failed during the passage of Katrina, while others did not.  We will show that segments adjacent to the MRGO project, whether in the IHNC, or on MRGO Reaches 1 or 2, were exposed to greater Katrina-induced stress, -- the effect of higher surge and/or more damaging waves – for a longer period than would have occurred if the MRGO project had been built and maintained in the manner that it could be called "hurricane neutral," namely that it did no harm to the public safety function of the LPV project.  We conclude that for the Robinson plaintiffs this spelled the difference between survivable flooding and catastrophe.

**CHAPTER 3**
**A BRIEF HISTORY OF THE MRGO PROJECT**

In 1957, before the MRGO moved into the construction phase, the Police Jury (county government) of St. Bernard Parish was concerned enough to establish a "Tidewater Channel Advisory Committee" to review plans then being developed for the MRGO. The Chairman presented a report to the full Police Jury recommending that St. Bernard Parish oppose the project, stating that enhanced tidal action caused by the channel "will have adverse effects on the entire marsh area with consequent crosive (*sic*) action and the intrusion of high saline content water into areas normally fresh or only slightly brackish" (St. Bernard Tidal Channel Advisory Committee 1957). This report goes on to state presciently:

> "During times of hurricane conditions, the existence of the channel will be an enormous danger to the heavily populated areas of the Parish due to the rapidity of the rising waters reaching the protected areas in full force through the avenue of this proposed channel. This danger is one that cannot be discounted. No matter how small a flood may be, or how small the area to which it is confined, to the families that have water in their houses, it is a major catastrophe."
> (St. Bernard Tidal Channel Advisory Committee 1957, p. 3)



**Figure 3.1  View east from above the GIWW/MRGO Reach 1 into the Lake Borgne Funnel defined by MRGO Reach 2 on right and the GIWW on left.**

The brief history of the MRGO that I recount here is indeed brief, and should not be regarded as comprehensive.  To facilitate a more in-depth review, the Robinson expert team has compiled a searchable, hyperlinked chronological inventory of MRGO documents that begins in 1852 with the first concepts for a tidewater channel east of New Orleans and extends up to the present.  That comprehensive "MRGO Chronology" is attached as **Appendix B**.

Once the MRGO was built, local residents quickly came to understand that the project was far more effective as an agent of environmental and community destruction than as an engine of economic development.  For five decades, they tried unsuccessfully to put the MRGO genie back in the bottle, while the taxpayers of the Nation continued to pay an average of $12.5 million every year to keep the MRGO open to the few ships that ever came to call (USACE 2007).

Two months after the Hurricane Betsy flood in 1965, the New Orleans East based Citizens Committee for Hurricane Flood Control, recommended revisions to the 1962 USACE hurricane protection plan for Lake Pontchartrain and Vicinity, that was about to be adopted by Congress in the Flood Control Act of 1965 (PL 89-298).  The Citizens Committee sent a letter and report to the USACE New Orleans District Engineer containing these recommendations (Citizens Committee for Hurricane Flood Control 1965).  Significantly, the recommendations of this committee were ignored then, but have now been adopted almost in their entirety by the USACE since Hurricane Katrina for the 100 year protection plan (http://www.mvn.usace.army.mil/hps/100yr_design_map.html). One reason that the 1965 Committee made such recommendations was as follows:

> "The US Engineers proposal for a levee along the south shore of the Gulf Outlet to Bayou Dupre, and along the north shore of the Intracoastal Waterway would *form a funnel* channeling surges and wind driven water into the Intracoastal Waterway and Industrial Canal."
> (Citizens Committee for Hurricane Flood Control 1965, p. 2, *emphasis added*).

The second reference made in this 1965 statement to the "Intracoastal Waterway" is to that segment of the MRGO project that occupies the original GIWW right-of-way (**Figure 3.1**) that has become known since Katrina as "MRGO Reach 1," the six-mile connection to the Inner Harbor Navigation Canal (IHNC).  The IHNC is still commonly called the Industrial Canal.  MRGO Reach 1 was often described in USACE documents over the years as a part of the GIWW, though it has the far greater dimensions of the MRGO ship channel rather than those of the original GIWW barge canal.  The channels of the pre-existing GIWW to the north and MRGO Reach 2 to the south delineate the sides of the "funnel" referred to in the 1965 Committee report (**Figure 3.1**).  The 1965 Committee report and recommendations included a sketch of what later was called the "Crosby" plan or alternative discussed below (**Figure 3.2**).

21

By this time, construction of the LPV flood control project was in progress on the east side of New Orleans. The oceanographic basis for the LPV Barrier Plan had been developed by a joint USACE/Weather Bureau study team in the mid- to late-1950s prior to the construction of the MRGO (Team Louisiana 2007). Local engineers at the USACE New Orleans District (NOD) faced the task of re-interpreting the 1950s hurricane science and oceanography to incorporate the massive new channel – not included in the original hurricane analysis -- they had now built into the City. For this reason, and because the NOD was facing legal proceedings similar to those now before the federal court in *Robinson v. United States*, the USACE commissioned the National Science and Engineering Company (NESCO) to quickly study the potential of the MRGO to enhance and transmit storm surge to populated areas (Bretschneider and Collins 1966). Significantly, the NESCO study was limited to hurricane effects on surge in the Lake Borgne funnel and included no discussion of waves, although one of the authors, Dr. Bretschneider, was at the time perhaps the worlds foremost authority on wave forecasting.

The NESCO study released in 1966 would remain the only investigation commissioned by the USACE on potential impacts of the MRGO project for almost 40 years. A second, more narrowly focused investigation was conducted by the USACE at the request of the State of Louisiana beginning in 1999, but it was not completed until September, 2005, a month after New Orleans was flooded (USACE 2005). Neither of these studies considered wave regeneration in the MRGO channel.

The NESCO study was a respectable piece of "armchair science" for the time, given the limitations of modeling technology and the lack of an independent field data collection program to confirm and augment information provided by the NOD. This important document will be discussed in more detail later. Suffice it to say here that it raised as many questions as it answered, and included numerous caveats about how broadly the findings should be interpreted (See Team Louisiana 2007, p. 244-252). The limitations of the NESCO study were well understood by scientists at the time, including the eminent oceanographic meteorologist, S. A. Hsu, a professor at the Louisiana State University (LSU) Coastal Studies Institute. He produced a report that was finalized in 1973 entitled "The Impact of the Mississippi River-Gulf Outlet on Hurricane Floods of St. Bernard Parish and New Orleans Metropolitan Area." This report was appended to a larger volume produced by Coastal Environments, Inc. (CEI), under contract to St. Bernard Parish (Hsu 1973; CEI 1973). In his analysis of the NESCO report, Dr. Hsu states the following (p. A-11).

> "(a) The basic technique used in the [NESCO] report is to first develop a reasonably sound theoretical model and then compare it to observations. The comparison is poor as clearly admitted by the authors on page 62, (here is an excellent negative critique on its own).

> (b) The next steps utilize various techniques which essentially readjust the assumed coefficients or factors to force them to the agreement with observations….The weakness of the technique is that it utilizes a circular

argument.   The same observations are used to verify the model that
provided the basis for calibration.  In other words, the authors started with
a model, then readjusted it with data from one observational case, and then
compared the models predicted results with the same observational case
data.  The approach virtually guarantees good agreement."
(Hsu 1973, p. A-11)

Several proposals were developed by the USACE NOD and by local interests to provide
enhanced hurricane surge protection for port facilities and developed areas adjacent to the
combined MRGO Reach 1/GIWW and the IHNC in the years following Hurricane Betsy,
and in the immediate aftermath of flooding caused by Hurricane Camille in 1969.  These
proposals included placing floodgates in the IHNC at its junction with the MRGO, a
floating gate in MRGO Reach 1 in the vicinity of Paris Road, and a crescent-shaped levee
to connect the proposed barrier structure at Chef Menteur Pass with the LPV in the
vicinity of Bayou Bienvenue (**Figure 3.2**).   Furthermore, the Corps realized that the
enormous outflow of surge during Hurricanes Betsy and Camille from the IHNC to Lake
Pontchartrain -- what Dr. Bea has called "venting"-- was effective in preventing surge
levels from rising higher in the IHNC and causing more damage to the adjacent dock
areas then more heavily populated by businesses than they are today.   This led the
USACE to reassess the controlling elevation of the "Seabrook Lock," at that time a
proposed component of both the MRGO -- to prevent saltwater from entering Lake
Pontchartrain under normal tides -- and LPV projects.   Its role under LPV would be to
prevent storm surge from entering the IHNC from the Lake, and vice versa.   It is
important to note that this first tentative step toward integrating the two projects never
made it past the drawing board.

In all instances, the Corps chose the "no-action alternative."   The three structural
proposals to supply enhanced protection were rejected on the rationale that the
incremental cost increase to the overall LPV project was not deemed justified by the
incremental reduction in expected flood damage to businesses along the IHNC.  *None of
the relevant design memoranda discuss a weighing of public safety concerns, just
property damage.*  Significantly, one of these plans, known as the Crosby Plan, appeared
as Alternate Plan C in the Citrus Back Levee Design Memorandum 2, (USACE 1967,
App. C, Plate 4).  This plan incorporated features similar to those included in the 1965
recommendations of the Citizens Committee (**Figure 3.2**).  Additional reasons that the
Corps rejected this plan were given in a September 23, 1969 letter from Colonel Herbert
Haar, Jr., NOD District Engineer, to Congressman F. Edward Hebert (Haar,1969),
stating:

"Beyond the fact that the plan is not economically justified, it is
undesirable for a number of other reasons.  Its adoption would mean that
none of the work already accomplished by local interests subsequent to the
project authorization would be incorporated into the Federal project and
no credit for such work would be allowed.  Further, the modifications
involved are so broad in scope as to be beyond the discretionary authority
of the Chief of Engineers to adopt, so that project review and subsequent

Congressional action would be required.  During the time that this process was being accomplished, progress in planning and construction of some of the most urgently needed project features would be discontinued…In addition to the above, operation of two features of the plan, namely the navigation gate in the Mississippi River-Gulf Outlet and the lock in the Gulf Intracoastal Waterway, would significantly impede seagoing and inland navigation…The interest expressed by Mr. Crosby relative to the need for construction of the aforementioned project is greatly appreciated."
(USACE Col. Haar, Jr., in 1969 letter to Congressman F. Edward Hebert)

Upon receiving this shot across the bows from the USACE with respect to the Crosby Plan, the Orleans Levee District and Louisiana Department of Public Works -- the two state agencies that had originally asked for its consideration -- quickly withdrew their support for this alternative.  Ironically, a variant of this plan has re-emerged since Katrina as the 100-year protection plan for which the Corps has recently let a $750 million design-build construction contract, as will be discussed in more detail below.

This brings us to a central theme that I will return to several times in this report, namely, that the USACE adopted a policy of denial following Hurricane Betsy that effectively stifled acquisition or analysis of new information on the potential of the MRGO to increase hurricane surge, waves and flooding.  This policy was clearly expressed in 1973 by Mr. P.A. Becnel, Jr., then Chief of the Hydraulics and Hydrologic Branch, NOD, in a "Memorandum for Record" addressing the "Apparent Funneling Effects of Citrus and Chalmette Hurricane Protection Levees" in 1973 (Becnel Memorandum 1973).



**Figure 3.2 Alternate Plan C from Citrus Back Levee Design Memorandum 2 showing a rejected proposal to incorporate the MRGO into the LPV flood protection plan through construction of a levee across the funnel and a floating closure gate across the MRGO (USACE 1967).  See USACE post-Katrina "100-Year Hurricane Protection Plan" for comparison (Figure 3.6)**

24

Mr. Becnel was responding to statements made in public hearings by Dr. Sherwood Gagliano, a respected coastal geologist, LSU professor and president of CEI who often served as a consultant to the Corps, and had provided early drafts of the St. Bernard Parish report quoted above (CEI 1973).  In one of them, Dr. Gagliano recommended a "re-evaluation of hurricane storm surge threat in the funnel formed by the MRGO and the GIWW and associated hurricane protection levees" stating that "the buildup of tides in naturally constricting estuaries is a well known phenomenon" (CEI 1972).

Mr. Cecil Soileau, then an employee in Mr. Becnel's branch, has described his role in drafting this important memorandum for Mr. Becnel's signature in his deposition (Deposition of Mr. Cecil Soileau).  In the first enumerated paragraph, the Becnel (1973) memorandum states that:

> "The purpose of this memorandum is to provide a *unitive statement on the position of the New Orleans District* concerning the accusation by Dr. Sherwood M. Gagliano or anyone else, that the alinement (*sic*) of the protection levees creates a funnel effect in the vicinity of Paris Road at Lake Borgne…At these meetings Dr. Gagliano et al., presented three reports which are a matter of record of the public hearings." (*emphasis added*)

It is an added irony that the hearings referenced in Mr. Becnel's memorandum were being held not to address public safety concerns, but to receive input on a proposal being floated by the Corps at that time to enlarge the MRGO from a bottom width of 500 feet to 750 feet, and to increase the authorized depth from 36 to 50 feet.  This context may help explain the frustrated tone of the memo.  Mr. Becnel seems aggrieved that those who were flooded during Hurricane Betsy would continue, seven years later, to "accuse" the Corps of operating a ship channel that posed a hazard to public safety.  The channel expansion then under discussion was never authorized, at least in part because such concerns continued to be expressed.  But local residents knew that the channel was expanding anyway, and taking the swamps and marshes with it.  In the second paragraph, Mr. Becnel's memorandum goes on to describe what is termed the "Bases of Position."

> "The bases of our position are the results of a study performed by the National Engineering Science Company (NESCO) in 1966 while under contract with the U.S. Army Corps of Engineers and the heights of water levels experienced during hurricanes Betsy and Camille."
> (1973 Memo from USACE-NOD Chief Hydraulics and Hydrologic Branch)

The rest of this memorandum provides an apparent technical justification for a lack of NOD concern.  Becnel (1973) ignores the clearly stated caveats expressed by the authors of the NESCO study that he cites to avoid extending the Betsy statistical model to other storms.   Instead, he bases an official position that all is well – and therefore that any further analysis is unnecessary and disruptive -- on the observation that a similar peak surge elevation was observed at one gage on the MRGO (Paris Road) during Camille as

25

was recorded four years earlier during Betsy.  Oceanographers who have tried to follow this logic find any similarity at a single gage station to be purely coincidental, given the profound differences between the two storms and the unique characteristics of the surge that each generated (**Figure 3.3**).  Hurricane Betsy, a category 3 storm at landfall, followed a track to the south and then west of the City, while Hurricane Camille passed well east of New Orleans in 1969 to strike the Mississippi coast as a compact category 5 storm.



**Figure 3.3 Paths of Hurricane Betsy (left) on September 8-9, 1965 (USACE 1965) and Hurricane Camille (right) on the evening of August 17, 1969 (USACE 1970).**

The technical justification stated in the Becnel Memorandum is thin, but what is missing entirely is any evidence, again, of a weighing or balancing of competing public policy concerns.  Why did a high-level NOD official find it necessary to counter legitimate technical questions about MRGO with a subjective "unitive statement" (party line) designed to be imposed hierarchically upon an entire organization responsible for public safety?  This is a recurring feature in the annals of the District.  The reluctance to update the 1959 Standard Project Hurricane surge analyses with new weather service information is now well known (Team Louisiana 2007, p. 95-114), as is the infamous 1985 benchmark "policy" forcing contractors to use an obsolete survey datum that resulted in construction of drainage canal floodwall crowns two feet lower than design grade in the 1990s (IPET 2006, Vol. II, p. 78).  The 1973 Becnel memo is woven of the same fabric.

Similarly, the Corps' had a long-standing policy against spending operations and maintenance (O&M) funds on stabilizing the banks of any of its navigation channels against erosion unless shoreline slumping and retreat began to affect the ability to maintain the controlling navigation channel dimensions.  The standard practice apparently has been to force local partners to take on this task if at all possible.  The MRGO GDM 1B (USACE 1959) specifically excluded any engineered measures to maintain the bank lines following construction, even though the side slopes of the dredged cut were specified at a highly unrealistic 1V:2H slope.  It was known prior to construction that they would not be stable.

> "No channel protection is recommended initially; however, erosion due to wave wash in open areas can be expected in the upper part of the channel slope where the peat and highly organic clays are exposed. Protection for this area can be provided if and when the need for it becomes necessary. No channel protection is included in the overall cost estimate of the project. It is presumed that sufficient rights-of-way will be furnished by local interests to preclude use of channel protection, or that additional rights-of-way will be furnished if the need arises" (GDM 1B 1959, p. 5).

The Corps did purchase a relatively wide right-of-way extending well outside of the authorized channel footprint so that any issues arising from bank retreat could be put off for some time, perhaps forever, given that there was no development or government asset near the MRGO channel ROW at the time the channel was dredged (USACE 1959).

Later, after the Corps constructed the LPV Chalmette structures, it became apparent that the first asset that would be threatened by the rapid retreat of the channel bank on the south side was theirs. A useful chronology of the development of this issue appears in a briefing package dated September 15, 1982, prepared by the New Orleans District and titled "Data for Testifying Officers on FY 1984 Civil Works Budget, Mississippi River-Gulf Outlet, Louisiana," where it is stated on p. 3 (AIN-046-000000862) that in 1967:

> "The project was modified under the discretionary authority of the Chief of Engineers to include as a mitigating measure, the costs of protecting a portion of the foreshore lying between the Lake Pontchartrain and Vicinity Hurricane Protection project and the Mississippi River-Gulf Outlet. Construction of the Mississippi River-Gulf Outlet project exposed levees and their foreshore along both banks of the navigation channel in the City of New Orleans to damages from waves generated by seagoing vessels utilizing the waterway. *The navigation project should have included adequate protection for these levees and their foreshore. The new levees in the Lake Pontchartrain project located adjacent to the Mississippi River-Gulf Outlet ship channel will also require protection.* The cost of this work has been deleted from the Lake Pontchartrain project and added to the Mississippi River-Gulf Outlet project. (There are about 6 miles of levees along the north bank and 18 miles along the south bank of the Gulf Outlet navigation project which require protection.)

> The chairman of the House and Senate Committees on Appropriations were informed by the Chief of Engineers of the modification to include, as a *mitigation measure*, the wavewash protection for levees and foreshore…being included in the project. The above change in scope was first reflected in the project cost estimate presented to Congress in connection with the appropriation request for FY 1969." (*emphasis added*)

Technical memos were exchanged over the years between 1967 and 1990 between the USACE District and Division offices indicating an increasing level of alarm over the

27

potential for MRGO bank erosion to undermine the foundational stability of the LPV EBSBs, but no action was taken beyond installation of some test sections of foreshore armor for the banks of the channel (not EBSBs) with rocks, geotextiles or articulated concrete mattresses. These tests demonstrated that the channel bank erosion could indeed be abated by one or more of these standard techniques.

A bureaucratic snafu appears to have arisen about where the money would come from for the relatively expensive measures required. This partly explains why nothing happened on the ground in that diminishing "foreshore," until the Secretary of the Louisiana Department of Natural Resources (LDNR) provoked a crisis in a May 5, 1991, letter to the District threatening to find that the next proposed cycle of maintenance dredging for the MRGO was "inconsistent" with Coastal Use Guidelines approved by the State under its newly reauthorized, federally approved Coastal Zone Management Plan (CZMP) because the dredging plan did include measures for stabilizing the banks of the federal channel. This letter resulted in a May 30, 1991, briefing memo from the District to the Chief of Engineers that enumerated ten additional "policy" justifications for inaction in "Tab B: Policy and other considerations" (NOP-007-000000779) that begins:

1. "Long standing Army/Corps policy that bank stabilization projects have low funding priority (effectively zero funding)

2. Precedent – if Corps fixes mi 50-56 as condition of dredged material placement, expect continued demands throughout LA coastal zone

3. Corps policy says Sec 1136 will not be used to fix bank erosion

4. Per 33 CFR 336, when at impasse with State, Corps should defer dredging awaiting additional Congressional appropriations"

And continuing….

7. If Congressional "add," Cong must tell us in law – forces LA delegation to get agreement of colleagues

8. Long term viability is questionable. 36 ft channel is not as competitive as deeper drafts. PONO is considering container port facilities on Mississippi River to access deep draft channel

9. Local opposition to MRGO is considerable based on perceptions that MRGO is environmental disaster and its economic promises never materialized"

Nearly 40 years after the 1967 discretionary modification of the MRGO project, an MRGO "Fact Sheet" was prepared for the public (in contrast to the internal 1991 memo above) by the District and dated May 12, 2004, that gives perhaps the clearest

explanation of what had happened in the intervening years on p. 5 (NOP-004-000000984):

> "By-in-large, the MRGO banks remain un-lined with protection. This is a feature of the channel established upon its initial design and construction. Ship wakes generated by vessels passing along the MRGO have been for many years and continue to be major contributors to bank erosion. Measured long-term erosion rates are about 15 and 32 feet per year, on the south and north banks, respectively. This is an on-going problem, widely recognized by the Corps, other agencies, state and local governments, as well as the general public.
>
> Form 1990 to the present, the district has built and maintained about 8.3 miles of foreshore rock bank protection along the MRGO. This armoring substantially abates wave erosion; reduces channel sedimentation, and associated cyclic dredging needs and costs; as well as preserves valued wetlands, land features, and infrastructure along the channel. An additional 17.8 miles of foreshore rock protection are planned for construction and maintenance are planned for construction and maintenance in the future."

All of the bank armoring completed at that time was along the south shore of MRGO Reach 2, where it would more effectively address LPV stability concerns than any for the environment. But clearly the attitude within the district had changed since 1991, primarily in response to the growing public support and funding for environmental restoration, but the District felt obliged to justify the slow progress as follows:

> "Bank armoring will curtail erosion and cyclic O&M dredging requirements along the inland reach of the MRGO, in proportion to the rate that program is funded for execution. The project's O&M budget, indexed for inflation, has been relatively constant over the last decade. *This has limited the rate of execution in bank armoring, in favor of dredging to sustain the critical function of providing serviceable dimensions for shipping.* There is a capability to accomplish bank armoring at a higher rate with increased O&M Program funding levels, as well as through other authorizations and funding streams." (*emphasis added*)

It can be seen that the old "policy considerations" expressed in the 1991 internal memo continued to exert an influence on Corps behavior with respect to the MRGO project right up to a year before Hurricane Katrina. Furthermore, the 1973 Becnel "unitive statement" appeared to be fully in effect, in that public safety considerations and protection from hurricane surge and waves exacerbated by the MRGO project are never mentioned.

The most serious consequence of this tendency to meet new ideas, information and technology from external sources with officially imposed "policies" of denial had a cumulative effect over time of isolating NOD technical personnel from much of the rest of the technical community.  The self-imposed insularity of the District was compounded by a lack of truly independent review or critical oversight at the Division or Headquarters levels, as Woolley and Shabman (2008) have pointed out in their Corps-commissioned LPV decision-making chronology (that ignores the MRGO).  This combination ensured that mistakes made would not be corrected.  Regrettably, we believe, the long conditioned response of the Corps to ignore or deny conflicting information on MRGO continues to influence some critical post-Katrina decisions on the re-engineering of the hurricane protection system on the east side of New Orleans, and the remediation of MRGO-caused impacts.

In 1999, the State of Louisiana and the USACE started a seemingly endless "re-evaluation study" of the MRGO that was not concluded until immediately after Hurricane Katrina in 2005 (USACE 2005).  This study provided some useful information, confirming, for example, that the MRGO had more than doubled salinity in Lake Borgne (**Table 3.1**), and in the eastern part of Lake Pontchartrain, providing a robust explanation for much of the conversion and loss of wetlands that had been observed.  The study documented the retreat of the unstable MRGO Reach 2 channel banks.  This re-evaluation study also included an early ADCIRC model study of the effects of a closure of MRGO Reach 2 at Bayou LaLoutre on hurricane surge (USACE 2005).  Despite being unable to accurately capture wetland effects on surge, the modelers got roughly the same answer for a closure east of Lake Borgne (where the surge comes from) as have all subsequent model studies, namely that the surge reduction effects of a flood gate at this location would be negligible.  Establishing a tradition that IPET also adopted (2007), this USACE study never looked at the effects of such a closure in the more surge "critical" GIWW/MRGO Reach 1.

More importantly, however, the 2005 MRGO re-evaluation study explored a range of remedies to these problems and identified those thought to be most effective short of complete closure.  It was found, for example, that narrowing the Reach 2 channel would more effectively reduce salinity intrusion on normal tides than reducing its depth, and that a closure at Bayou LaLoutre would be perform even better for this purpose.  Similarly, the study saw no difficulty with stabilizing the MRGO banks using lightweight articulated concrete mattresses similar to those used on the Mississippi River banks for decades (USACE 2005).

But, despite showing that it was feasible to address some of the problems known to be caused by the MRGO Reach 2, the USACE fell back into the old denial pattern and concluded *in the month after Katrina hit* that the MRGO – an anachronism before its time – remained economically viable:

> "The analysis of National Economic Development (NED) benefits shows, that when compared to the alternatives, continued O & M (maintenance dredging) of the MRGO is justified.  The recommended plan is the No

Action Alternative, i.e., to continue current O & M activities to maintain deep-draft navigation on the MRGO.  Interested parties, the most vocal of which are St. Bernard Parish and the Lake Pontchartrain Basin Foundation, remain very concerned about the loss of wetlands due to bank erosion caused by vessel wave action and the environmental consequences caused by saltwater intrusion.  However, ecosystem restoration measures are outside the authority of the re-evaluation study and are not included in this report"
(USACE 2005, MRGO General Reevaluation Study Report Executive Summary, p. 11)

Further, it is significant that even after Katrina, the USACE never thought to mention in this report the possibility that encroachment of the Reach 2 channel into the toe of the adjacent EBSBs might have contributed to their catastrophic destruction by waves.  This is another example of an institutional blind spot (Team Louisiana 2007) that will loom larger when we compare the results of our more comprehensive analysis using the SWAN wave model (Gautier et al. 2008) with that conducted by IPET (2006, 2007).

It took almost exactly two years after the 2005 report was issued – and some very insistent Congressional prodding -- for the USACE to confront reality and reverse itself in November 2007 with a new report recommending MRGO de-authorization and a closure at the Bayou LaLoutre ridge (USACE 2007).  The Corps still refuses to acknowledge that the waterway poses a threat to public safety, relying on a newly-discovered deficiency in the cost-benefit ratio. This break with the past on MRGO, the first chink in the defensive policy armor built by the USACE after Hurricane Betsy, is discussed in more detail below.  But still no weighing of the costs in lives and property.

**Table 3.1   Increase in salinity in Lake Borgne funnel caused by USACE after construction of the MRGO ship channel in 1963 (USACE 2005)_**

| | Shell Beach/South L. Borgne | | | Chef Menteur Pass/North L. Borgne | | |
| Month | Salinity 1951-63 (ppt) | Salinity 1963-77 (ppt) | % Increase | Salinity 1951-63 (ppt) | Salinity 1963-77 (ppt) | % Increase |
| --- | --- | --- | --- | --- | --- | --- |
| January | 6.5 | 9.8 | 51 | 3.8 | 5.7 | 50 |
| February | 6.4 | 9.7 | 52 | 2.9 | 4.8 | 66 |
| March | 6.3 | 10.4 | 65 | 2.2 | 4.3 | 95 |
| April | 7.0 | 10.0 | 43 | 2.2 | 4.0 | 82 |
| May | 9.5 | 10.2 | 7 | 2.6 | 4.0 | 54 |
| June | 9.0 | 12.3 | 37 | 3.3 | 4.2 | 27 |
| July | 7.9 | 16.0 | 103 | 3.2 | 6.3 | 97 |
| August | 8.6 | 16.1 | 87 | 4.8 | 7.5 | 56 |
| September | 8.2 | 12.9 | 57 | 6.0 | 8.5 | 42 |
| October | 7.6 | 13.8 | 82 | 5.2 | 8.4 | 62 |
| November | 8.0 | 13.1 | 64 | 5.2 | 8.0 | 54 |
| December | 8.0 | 12.5 | 56 | 4.2 | 7.0 | 67 |
| **Mean** | **7.8** | **12.2** | **59** | **3.8** | **6.1** | **63** |

### 3.1  Failure to Integrate the MRGO and LPV

The LPV had a public safety mission while the MRGO was strictly an economic development project.  One might expect that public safety would trump economic development whenever they conflict, particularly after the extreme flooding experienced during Hurricane Betsy.  The Dutch version of the Corps, called the Rijkwaterstaat, is, for example, guided by the motto "Safety above All."  On the east side of New Orleans, however, public safety was considered only to the degree that the design and operation of the MRGO channel might affect vessel maneuverability to avoid groundings and collisions.

The USACE chose the MRGO channel alignment partly to reduce future costs of maintaining the authorized channel by routing it as much as possible within the marsh, and partly to allow for development of potential industrial sites on the relatively high land created in the spoil disposal area along its south bank (**Figure 3.4**).  Later, when the LPV project was authorized in 1965, a decision was made to build the Chalmette loop of the federal flood control structures in the MRGO spoil disposal area even though foundation conditions were known to be poorer there than, for example, at the more inland 40 Arpent location where a levee already existed that was supported by sturdier soils.  It was further known in 1965 that founding the levee on this spoil material would delay completion because of subsidence and the long consolidation periods required between lifts.  More importantly, the Corps knew that a levee closer to Lake Borgne would be exposed to higher surge elevations and wave attack during hurricanes than a more sheltered line of defense farther inland.

These good reasons to look for a different right-of-way for the LPV levee were overwhelmed by considerations that did not include public safety, including the lure of 100 million cubic yards of inexpensive material that could be mined hydraulically from the MRGO to make earthen berms.  The end result, however, was to shift a portion of MRGO maintenance dredging costs from the navigation project to the under-funded hurricane protection project.

The opportunity to supply berm material by using hydraulic dredges to over-deepen the adjacent MRGO channel also trumped quality assurance concerns about whether material supplied in this way would be suitable to construct a structure that met USACE standards for a coastal defense dike, or indeed, an urban flood control levee of any kind.  In the end, as Dr. Bob Bea and Mr. Jesse Arnold have pointed out in earlier expert reports (relative to the 702 (c) immunity question), the LPV structures along MRGO Reach 2 never met any established USACE levee construction standards, and should not have been considered engineered "levees," but merely earthen berms/spoil banks (EBSBs).  Again, it appears that a narrow expedience prevailed over a careful weighing of the public safety risks.

The MRGO channel supplied material for the LPV Chalmette EBSBs, but the MRGO project was never incorporated into the LPV plan except as a pre-existing, static landscape feature.   We discussed earlier how the Corps rejected adding MRGO

floodgates to the LPV in the late 1960s that would have given the MRGO project a nexus with the flood control project.  Rocks were later added to the south bank to slow the alarming encroachment of the channel into the EBSB alignment, but not to protect the EBSBs against waves.   Otherwise, the USACE never contemplated significant modification of the MRGO project to make it compatibile with – or truly integrate it with -- the LPV public safety project.

The USACE (2005) re-evaluation study lists numerous tried and true remedial steps that could have been taken at any time during the life of the MRGO.  They might have, for example, considered protecting the Chalmette EBSBs against waves, as the channel enlarged and diminished the intervening vegetated buffer on one side, and between the channel and Lake Borgne on the other.  The rapid bank line retreat was well documented before the storm (USACE 1988).  Surely, the USACE knew or should have known that this would increase the potential that storm-driven forces impinging on the EBSBs might damage these delicate structures, thereby increasing the likelihood that they would be overtopped and breached and rendered ineffective earlier in a serious storm sequence than would have been true otherwise (and cause catastrophic flooding).

The Corps never seriously revisited the original 1950s era oceanographic assumptions about surge and waves in the Lake Borgne funnel although they were quite aware of the changing conditions on the ground.  The MRGO, a failed economic development project, was a pre-existing hazard that was maintained and operated by the Corps in such a way that it became a greater threat with each passing day.  For reasons that remain unknown and inexplicable the shocking expansion of the top width of the MRGO channel -- cultivated under USACE care – never was addressed by the chronically under-funded and incomplete LPV hurricane protection project or with MRGO funds.

## 3.2  MRGO De-authorization and Remediation

After Hurricane Katrina, the USACE estimated that $60 to $130 million would be required to remove the sediment that the storm had pushed into the channel in the open water MRGO Reach 3 segment (USACE 2007). Responding to public outcry, Congress directed that no public funds be used to reopen the channel to navigation unless and until the USACE undertook a public evaluation of the desirability of permanently closing, or de-authorizing, the MRGO project.   With much prodding, the USACE reached a conclusion that would have been equally true at any time in at least the last three decades, namely that there was no economic justification to keep the MRGO open (USACE 2007). Congress thereupon de-authorized the MRGO in the Water Resources Development Act of 2007, a half century after it had set the destructive jugernaut in motion.

The first physical, as contrasted with the legal, closure is scheduled to begin this fall with construction of the first of two massive dams.  One, at the Bayou LaLoutre ridge south of Shell Beach (**Figure 3.4**) is promised before the start of the 2009 hurricane season (**Figure 3.5**).   This structure is an important first step in reversing decades of environmental destruction caused by the channel.  But because this dam is located east of Lake Borgne where the surge is generated, and not between the City and the Lake, it will

not restore any significant increment of protection to New Orleans against the hurricane surge hazard that continues to be posed by the now-deauthorized MRGO project (USACE 2007).

In February 2008, the USACE revealed a plan that, if constructed as promised by 2011, would represent a major surge protection upgrade for the City (**Figure 3.6**). This plan includes a second dam across the MRGO to the west of Lake Borgne in the vicinity of Bayou Bienvenue, eerily similar to that recommended in the Crosby Plan 42 years ago (**Figure 3.2**).



**Figure 3.4  Inland portion of MRGO project area showing the spoil disposal area adjacent to the south bank of the MRGO channel, and the location of Bayou LaLoutre ridge at Mile 36 where first closure dam is to be constructed under the approved de-authorization plan (USACE 2007).**



**Figure 3.5 Plan view of Bayou LaLoutre closure dam to be completed by spring, 2009 (http://www.mvn.usace.army.mil).**

### 3.3 U.S. District Court Decision in January, 2008, Subsequent May, 2008 Order, and Corps' Technical Defense

Much has happened since the Congressional de-authorization of the MRGO project. In January 2008, U.S. District Court Judge Stanwood Duval, Jr., issued an opinion calling the "engineering calculation" upon which the LPV hurricane flood protection system was premised "outdated and lacking," with deficiencies "known to the Corps but ignored because of funding concerns." He concluded, however, that an immunity provision of the 1928 Flood Control Act frees the government from liability for flooding due to the poor design, construction and maintenance of LPV floodwalls on the 17th Street and London Avenue Canals. The court has not, however, been willing to grant the same immunity for increased flood damages resulting from the design, construction, operation and maintenance of the separately authorized MRGO navigation canal, an economic development project with no flood control or public safety purpose.

Judge Duval also issued an order governing the further conduct of this case on May 2, 2008. Therein, he noted that the "MRGO was constructed without any consideration of its causing any 'surge'" (Order, 5/2/08, p. 10). He writes:

> "In the case before this Court, there were two projects, with two different funding methods and two different concerns driving each. The LPV sought to prevent flooding; the MRGO sought to promote deep draft shipping." (Order, 5/2/08, p. 35)

Judge Duval continued:

> "There is no proof or any evidence that the Corps in designing the LPV ever took into consideration any of these changes that MRGO had wrought on the area.  As such…the LPV was not designed to prevent the storm surge that occurred." (Order, 5/2/08, p. 36)

The Government continues to assert that the free-flowing surge connection afforded by the MRGO to the interior of the city, and the destruction that the ever-expanding channel caused to the pre-existing wetland wave and surge buffer east of the city, played no role in exacerbating flood damage to New Orleans East, the Lower 9th Ward and St. Bernard Parish during Hurricane Katrina.  Congress has implicitly rejected this benign view of the MRGO by authorizing construction of three barrier dams across the bed of the former navigation channel, the one already mentioned at Bayou LaLoutre for environmental restoration (**Figure 3.5**), a second closure near Bayou Bienvenue as part of the USACE 100-year protection plan (**Figure 3.6**), and another structure in Reach 1 near Paris Road.

The Bayou LaLoutre closure is also the first phase of a jointly funded state-federal restoration program under the Louisiana Coastal Protection and Restoration Authority (LCPRA) Masterplan that also calls for a major river diversion across the de-authorized channel alignment (LCPRA 2007).  The Masterplan that was approved by the Louisiana Legislature in 2007 includes provisions to re-establish the former natural surge and wave protection afforded by swamp forests and marshlands destroyed by the MRGO in the funnel area east of the city (LCPRA 2007).  Any or all of these barriers could have been constructed at any time within the last 50 years, and, in fact, were in other places around the country (See Chapter 6).

The Government has adopted a fall-back position that the surge and waves generated by Hurricane Katrina were so far beyond those anticipated in the LPV design that any incremental added effects that might be attributed to the MRGO were inconsequential to the levels of damage sustained within the populated areas of St. Bernard Parish, the Lower 9th Ward and New Orleans East.  These assertions have drawn on technical analyses conducted by the USACE directly, or by their contractors, that we have examined in considerable detail.  Some of these internal efforts have been publicly documented in reports issued by the USACE Interagency Performance Evaluation Team (IPET 2006, 2007), while we have more recently become aware of others through the litigation discovery process in <u>Robinson v. United States</u>.

Much of the USACE-sponsored post-Katrina work is of very high quality, but we have found the analyses of surge and waves in the funnel area to be cursory and superficial when compared to the more comprehensive analyses performed by the Robinson expert team and discussed in the next four chapters.  This is particularly true of USACE assessments of (1) the amplification of waves caused by loss of vegetated buffers as determinative factors in the early failures of the Reach 2 EBSBs, and (2) the effect of the enlarged MRGO Reach 1 cross-section on the elevation and prolonged duration of surge in Reach 1 and the IHNC.

36

Our own assessment has employed tools and expertise, including some from our colleagues at Svasek and the Delft University of Technology in The Netherlands.  All of the techniques that we have applied were in widespread use throughout the world prior to



**Figure 3.6 Current USACE plan to protect City against Lake Borgne surge expected to recur once in 100 years (100-year protection level) includes dam across the throat of the Lake Borgne funnel between the Central Wetlands and New Orleans East, a navigable flood gate on the GIWW south of New Orleans East, and a closure dam across the de-authorized MRGO canal south of the current Bayou Bienvenue structure(http://www.mvn.usace.army.mil/hps/100yr_design_map.html).**

Hurricane Katrina.  In some cases, we have merely carried some of the same analyses initiated by the USACE to a more logical and instructive endpoint.  Based on everything that I have seen, I conclude that the MRGO project was a substantial contributing factor to the catastrophic flooding of the Robinson plaintiffs' homes and communities.  Put another way, but for the adverse effects of the MRGO (funnel configuration, destruction of wetlands, channel expansion), Hurricane Katrina would not have triggered the catastrophic degree of flooding that destroyed New Orleans East, the Lower 9th Ward and St. Bernard Parish (**Figure 3.7**).

.



**Figure 3.7 View of a flooded city looking west from above the Lower 9th Ward toward the IHNC and the Orleans Metro area four days after Katrina**

# CHAPTER 4
## REVIEW OF EARLIER SURGE STUDIES

Prior to the work described in this report, eight studies have been published that directly or indirectly touched on the potential for the MRGO to exacerbate flooding during the passage of hurricanes. The first of these studies, Bretschneider and Collins (1966), also known as the NESCO investigation, was sponsored by the USACE NOD after Hurricane Betsy. It was mentioned earlier and will be discussed in more detail here. The NESCO study is important because it was the only comprehensive oceanographic analysis of surge published prior to Hurricane Katrina that considered the interaction between levees and channels in the Lake Borgne funnel. A second Betsy analysis published in the National Weather Review in 1968 (Goudeau and Conner 1968) was a data source for the Hsu study that has been quoted previously (Hsu 1973). Hsu (1973) did not provide a comprehensive surge analysis, but a well-reasoned critique of the NESCO report. Together, these might be considered the third MRGO study. Fourth, the USACE-NOD sponsored its first analysis of the MRGO channel employing a modern surge model in 2003, using the S08 ADCIRC version to assess the effects of constricting or closing MRGO Reach 2 at the La Loutre Ridge with a structure similar to the dam now slated for construction as a part of the restoration work associated with MRGO de-authorization (USACE 2003). This study was not focused on storm surge, however, but on reducing salinity intrusion to Lake Pontchartrain during normal tides.

Three relevant investigations have been completed since Hurricane Katrina, and, as might be expected, have been centered around understanding what happened during that event. The sixth study was commissioned by the Louisiana Department of Natural Resources (LDNR) before the storm, but was changed in mid-course to include Katrina simulations. It was an ADCIRC based modeling investigation managed by URS Corporation (2006) that considered the effects on surge of removing both the Reach 2 channel and adjacent LPV berms. The URS investigation used the S08 version of ADCIRC that the LSU Hurricane Center had used for forecasting Hurricanes Katrina and Rita, and was the most comprehensive analysis of all of the elements of the funnel prior to the work of the Robinson expert team reported here. It has gotten little attention, however, because it used an unrealistically powerful wind field for Hurricane Katrina, and did not consider wetland effects. The seventh investigation was undertaken by the USACE IPET and appears as an appendix in both the 2006 and 2007 versions of that report. It was not as comprehensive as the URS study, confining itself to an assessment of the effect of removing only Reach 2 of the MRGO, but it did correct the wind problem and address wetland effects in a cursory manner (IPET 2006, 2007). The IPET study used the SL15 version of ADCIRC that improved the fidelity of the geometry of the MRGO channel. Finally, Team Louisiana conducted an ADCIRC modeling program as part of their forensic investigation that employed the S08 version of ADCIRC, and has been discussed in the three previous expert reports that I have submitted (Kemp Class Certification 2007, Kemp 702c Immunity 2007, Kemp 2008).

Since the filing of the current lawsuit, the Robinson expert team has commissioned its own modeling program, the ninth study, that is more comprehensive than any published

so far, considering the effects of both relevant reaches of MRGO -- Reach 1 and Reach 2 – using the ADCIRC S08 and the TUDelft FINEL models for flow, and integrating these results with an analysis using the SWAN model for waves. We have considered the MRGO in its entirety as an element of the funnel, something not accomplished in the other post-Katrina ADCIRC studies which addressed only Reach 2 of the MRGO and ignored the effects of enlarging Reach 1, a critical shortcoming.

From materials made available in the course of discovery, we are aware that the USACE has continued to work on the same questions that we found unresolved by the IPET investigations. Dr. Bruce Ebersole, an excellent oceanographer and coastal engineer at the USACE Coastal Hydraulic Laboratory in Vicksburg, put together a presentation in May 2007 titled "Hydrodynamic Loadings and Levee/Wall Responses Along the Navigation Channels and Influence of MRGO during Katrina." This provided us with a great deal of relevant information developed by the Corps that significantly augments what was published in IPET (Ebersole Presentation 2007). The long presentation (188 slides) is also styled as an effort to address MRGO issues raised by Team Louisiana (2007). We know from this presentation, for example, that the Corps attempted to address one shortcoming of the IPET report by conducting at least one ADCIRC run in which the cross-section of Reach 1 was reduced by about 50 percent, still far short of the 90 percent reduction that would be required to simulate the pre-MRGO condition. Dr. Ebersole also considers the dynamics of waves breaking on the MRGO EBSBs in a more comprehensive and sophisticated manner than did IPET.

Below we highlight findings from the NESCO, IPET, Team Louisiana and Ebersole investigations that are relevant to the conclusions outlined in the previous chapter, while examining their assumptions, methodologies, conclusions and limitations. Then we will review the logic and assumptions underlying our own investigation, and in this way identify the realities of the MRGO role in hastening the onset and severity of flooding. Because Team Louisiana (2007) reviewed these studies extensively, we incorporate many of their observations in describing these studies.

## 4.1 The NESCO Report (Bretschneider and Collins 1966)

Hurricane Betsy flooded a significant portion of Greater New Orleans (GNO) though generally to a lesser depth than did Hurricane Katrina. The damage caused by Hurricane Betsy led those harmed to blame the MRGO, and lawsuits were filed against the USACE. At this point, the USACE felt compelled to commission the first rigorous analysis of the role of the channel in storm surge conveyance. Consultants Charles Bretschneider and J. Ian Collins of the National Engineering Science Company (NESCO) issued their report in September 1966, a year after Betsy struck (Bretschneider and Collins 1966). They used early one-dimensional computer modeling techniques to evaluate "the effects, in the vicinity of the Inner Harbor Navigation Canal, due to rapidly and slowly rising surge… for four cases." These cases were:

I.     Existing levees with no MRGO
II.    Existing levees with MRGO
III.   Proposed levees with MRGO
IV.    Proposed levees with no MRGO

The LPV was in the first year following authorization, so the hurricane levee on the MRGO spoil bank was still "proposed," though the 6 to 8 feet of spoil had some effect during Betsy.  The GIWW and MRGO were in place, but the "throat" of the funnel was not as constrained as it is today, because the real levee constructed later (hauled clay not hydraulic fill) along the south bank of Reach 1 was just a spoil bank (**Figure 4.1**).  Cypress swamps were experiencing severe salinity stress and trees began dying as soon as the channel was connected to Breton Sound, but much of the land loss that has been documented by other members of the Robinson expert team was still in the future.



Figure 5
Schematic models used for numerical computations

**Figure 4.1 Diagrams showing the geometry used by Bretschneider and Collins (1966) for simulation of surge in the funnel under the four test conditions**.

41

The geometry was highly schematized, and the model was constrained by a number of empirical tuning coefficients that limit the physics in ways that should have been questioned then, and certainly would not be accepted today.  Partly because the set-up was so simple, however, the results, if considered qualitative and representative rather than truly quantitative, can provide important insights into how storm surge propagates through this system.  The first of these, apparent in the choice of cases to be analyzed, is that the enlarged channel and the geometry of the levee system will both produce effects on surge that can be distinguished and treated somewhat separately.  The second was the recognition of the time-dependency of the surge produced by a moving storm.  This means that surge can propagate only a limited distance in a given direction if the winds that are forcing it continually change in direction and magnitude, so a steady-state condition cannot be assumed.  Finally, Bretschneider and Collins (1966) made the first serious effort to integrate wetlands into a surge analysis, and provided an early estimate of the degree of resistance to flow that a marsh might impose, compared to a deep channel.  They concluded that the resistance would be more than three times greater for flow over the marsh than through the channel.

> "It must be expected that a large channel cut through marsh areas will permit more water to arrive at a faster rate in the interior of the marshland, at least in the immediate vicinity of the channel.  In addition, the maximum elevation and the steady state peak will be reached at an earlier time….Without the channel, the water will rise over the marshlands at a slower rate and it will take a longer duration to reach maximum elevation and steady state conditions.  Similarly, after the storm has passed it will take longer for the surge to recede since now there is no channel to act as a drain…*The velocity of flow through the channel will be two to four times as great as that over the marshland*, but the volume of water (velocity times cross-sectional area) determines the total amount of water which will enter…It is this later factor which tends to cause an increase in surge because of the Mississippi River-Gulf Outlet." (*emphasis added*)

Bretschneider and Collins (1966) calculated surge along two traverses through the funnel for Hurricane Betsy (**Figure 4.2**).



**Figure 4.2 Test traverses along which surge was computed by Bretschneider and Collins (1966) for Hurricane Betsy and for the synthetic critical SPH storms.  MRGO 0 and CCL 0 are at the marsh shoreline of Breton Sound, while MRGO -16 is at Shell Beach and CCL – 30 is at the Chef Menteur Pass.**



**Figure 4.3 Predicted surge hydrographs at distances inland from the marsh edge at Breton Sound computed for Hurricane Betsy along Christmas Camp Lake Traverse (left) and Mississippi River – Gulf Outlet Traverse (right) using Bretschneider and Collins (1966) model.  MRGO -6 in the right panel should read MRGO -16 and corresponds to the gage location at Shell Beach (Alluvial City).**

43



**Figure 4.4  Surge hydrographs captured at water level gages in the funnel during Betsy (Bretschneider and Collins 1966).   Computed curves at MRGO -16 and CCL -30 can be compared with gage readings at Alluvial City and Paris Road Bridge, respectively (Figure 5.3). Note the much lower surge at Lake Pontchartrain in the IHNC (Seabrook).**

The model predicted a dramatic increase in moving inland through the funnel along each of these traverses, from a maximum of 10 feet above mean sea level at the coast to about 16 feet in the eastern lobe of Lake Borgne (CCL -30, **Figure 4.3**).  The actual surge was not known at the coast and had to be developed by the model, and may have been somewhat lower than predicted (See **Figure 4.3**).  Computed maxima correlated reasonably well with available gage data at Alluvial City (MRGO -16).  The computed values for Lake Borgne and Chef Menteur Pass, CCL -20 and CCL -30, respectively were, however, significantly higher than what was observed at the Paris Road gage five miles to the west (**Figure 4.4**).  The model also predicted that the surge peak would arrive at the gages about 4 hours earlier than it actually did.

Bretschneider and Collins (1966) attributed the error in the timing of the surge maxima to a lack of consideration of inertia effects in the storm tide equation used.  For the error associated with the level of the maxima, they stated that "no system of equations can really be expected to predict, with a great degree of accuracy, the complex physical phenomenon of flooding over marshland, bayous, houses, trees, etc."  They concluded that "the computation of storm surges over semidry land must be regarded as an art rather than a science."

Bretschneider and Collins (1966) failed to mention far more likely sources of error.  Later surge modelers have found that (1) correct parameterization of the time-dependent forcing wind stresses, and (2) accurate topography and bathymetry are the most critical factors needed for realistic surge simulation (Westerink et al. 2004).  At

the time that this work was done, the dynamics of winds for any particular storm like Betsy were poorly understood and were essentially unknown both offshore and inland in the area of interest.  With respect to the highly schematized geometry employed, Bretschneider and Collins (1966) did not challenge the belief prevalent at the time that mean sea level was equivalent to zero NGVD29, the datum at the few gages operating in the area of interest (**Figure 4.4**).  Further, they state that the "marsh was assumed to have a water depth of -2 feet, mean low water."  As a result, the intertidal marsh surface, normally between 1 and 2 feet above mean sea level, was represented as being well below mean sea level.  Marsh at this elevation would not have retarded surge in the model nearly as much as in the real world.

A modern interpretation of Bretschneider and Collins (1966) results is that the Hurricane Betsy wind fields used to develop the surge were not accurate either over the shelf, over the funnel, or both.  They do say that "in most practical cases of hurricanes, the assumption of constant wind speed and direction over the continental shelf is not justified."  But, instead of challenging the wind and geometry data they were given by the USACE, and pointing out the need for better information to improve results, the consultants assumed that the sketchy information provided was entirely accurate, and then used a statistical curve matching approach, together with empirical "surge adjustment factors" and "planform factors" proposed by the New Orleans District, to bring their model predictions into alignment with the observed values at Paris Road bridge.  They do express some dissatisfaction with this approach, which has the effect of subordinating their elegant physical scheme to empirically derived factors with no physical meaning.  This is the "excellent negative critique" that Dr. Hsu (1973) noted in his assessment of this study quoted earlier (See Chapter 3).  Bretschneider and Collins (1966) state:

> "Confidence in such a prediction scheme could be expected for a hurricane which has a similar traverse and speed to Betsy.  It is apparent that more elaborate prediction schemes can be developed.  Because of their empirical nature, prediction schemes can only be expected to give reliable results for conditions which are almost repetitive.  In particular, for example, any hurricane whose eye passes over one of the traverses will yield too low a storm surge prediction along that particular traverse because the resulting prediction equation is not applicable in this case…For conditions of sparse data and several completely different hurricane tracks the method appears to be impractical, and it was therefore necessary to return to the "surge adjustment factor" based on matching peak surge."

The Bretschneider and Collins (1966) model, when the physics were unconstrained by empirical tuning factors, showed the expected increase in surge due to the "funnel" effect.  They abandoned this approach, however, when the results did not accord with the observed gage readings, and then had to come up with a different way to get an estimate of the relative contribution to the surge of flow through channels and over the marsh during Betsy.  To do this, they retreated to a steady-state assumption that is

45

inherently at odds with actual storm surge dynamics.  The steady-state requires an exact balancing of forces that removes or disregards the spatial and temporal variations in velocity that govern surge generation.  It is not surprising then, that the residual influence of the MRGO channel "had an effect of increasing the storm surge throughout the marshland for Hurricane Betsy by about 0.3 to 0.4 feet maximum."  Although the methodology is suspect, it is important to note that Bretschneider and Collins (1966) conclude that the MRGO did have an effect on surge, albeit a small one during Betsy, which would have contributed to flooding if protective structures were overtopped or breached.

In considering the weight to give this result when it is applied other storms, it should be pointed out that Bretschneider and Collins (1966) used a diminutive 19,000 square foot channel cross-section for the MRGO that corresponds to the "box-cut" dimensions of the maintained navigation channel, rather than the size of the dredged cut (**Figure 4.1**).  That channel now averages 29,000 square feet in Reach 1 and 41,000 square feet in Reach 2 when the water is at mean sea level (**Figure 4.5**).  And of course, the marsh was represented as a large lake with a bed well below the actual elevation, so this would have worked to increase the flow over the marsh at the expense of the channel.  Given that the channel is twice the size modeled, and that the marsh has a higher elevation than modeled, it can be expected that the actual effect of the MRGO on surge during Betsy might have been greater than the consultants reported by a significant factor, perhaps a four-fold increase.  An increase in surge associated with Betsy of 1.2 to 1.6 feet over the elevation without the MRGO should have been of interest to the levee designers and to those whose homes flooded during Betsy, but the conclusions of this report tended to allay rather than raise concern.



**Figure 4.5 Comparison of GIWW and MRGO cross-sections, as designed and post-Katrina, in Reach 1, the connection to the IHNC.  The design cross-section is 23,000 square feet, while the current cross-section averages 29,000 square feet in Reach 1, and 41,000 square feet in Reach 2.**

46

The most intriguing analysis carried out by Bretschneider and Collins (1966), and the part that best withstands modern scrutiny, pertains to the effect of the levee alignments and channel in the vicinity of Reach 1 on surge in the IHNC.  This was a simpler problem than the others that the consultants tackled, because it essentially reduced to one of channel and overbank conveyance in Reach 1.  They presented results for fast-moderately fast- and slow-rising hypothetical storm surges that attained an elevation in Breton Sound of 10 feet for the four cases described earlier (**Figure 4.6**).  Significantly, Bretschneider and Collins (1966) predicted that (1) adopting the proposed levee configuration and (2) including or excluding the MRGO channel would each affect surge transmission to the IHNC for all rates of surge development in the Lake Borgne estuary.

For the most rapidly rising and falling surge at the coast, the IHNC does not rise at all without the MRGO (Cases I and IV), because there is insufficient time for the surge to propagate up the estuary (**Figure 4.6**).  For the moderate rate of rise, the surge that reaches the IHNC without the MRGO has a lower peak elevation and a narrower peak signifying a shorter duration of high water conditions.  For the slow rising surge, the peak elevation in Lake Borgne is attained, or nearly attained, in the IHNC for all cases, after lags of varying duration, but the width of the peak is reduced without the MRGO project (Cases I and IV).  The period above 8 feet, or the 80 percent exceedence interval, in the slow-rise scenario drops from 3.5 to 2.0 hours for the condition with and without the MRGO, respectively, with the new levees in place (Cases III and IV**).  In all cases, the predicted effect of building the "proposed" levee system that now forms the throat of the funnel (Cases III and IV) is to hasten the onset of peak surge and to lengthen the period of highest water.

Given these results, it is disappointing to look at the consultants' summation of the effects of the channel because if there was ever an opportunity to influence the Corps to think about what they were doing, this was it…

> "It is seen that the effect of the Mississippi River-Gulf Outlet is almost negligible for all large hurricanes accompanied by slow rising storm surges.  It may be expected that once in a while a storm may occur which has a somewhat freakish, more rapidly rising surge in which case the Gulf Outlet may have a very marked effect.  However, such a storm will not produce tides as high as the more critical hurricane tracks such as Betsy or the synthetic hurricanes."

The synthetic hurricanes referred to are those based on the 1959 SPH that were used as a basis for design of the LPV.  We now know that Bretschneider and Collins (1966) were generally correct with regard to peak surge height, if not duration.   The surge of Betsy rose in 10 hours and Camille in 8.  Katrina's surge rose in two stages that together lasted 25.5 hours (**Figure 4.7**).  Nearly 17 hours of slow rise from 3 to 6 feet (NAVD88) occurred on August 28, the day before Katrina made landfall.  A rapid rise



**Figure 4.6 Simulated surge in the IHNC for a given input surge in Lake Borgne with a peak elevation of 10 feet (MSL).  The top panel is for a rapidly rising surge that peaks in 3.5 hours, the middle for a moderately fast (7.0 hrs), and the bottom is for a slow rising surge (14 hrs).  Cases tested:  I - Existing levees without MRGO, II - Existing levees with MRGO, III - Proposed levees with MRGO, IV - Proposed levees without MRGO (Bretschneider and Collins 1966).**

48



**Figure 4.7 Katrina surge in the IHNC and on the MRGO/GIWW at Paris Road. The only gage that recorded the peak was at the IHNC Lock (blue diamonds). The USGS gages on the IHNC at the I-10 bridge (purple squares) and on the MRGO/GIWW at Paris Road (red squares) both malfunctioned at about 10 feet, but all three gages recorded a slow initial rise of 3 feet over 17 hours, followed by the a more rapid rise over the first 8.5 hours of August 29. ADCIRC model results give the best estimate for peak elevations in the IHNC at the I-10 bridge (green line) and for MRGO/GIWW at Paris Road (purple line).**

of more than 8 feet occurred over the first 8 to 9 hours of August 29. Surge in the IHNC peaked at about 15 feet, an estimated 2 feet lower than the peak on the MRGO/GIWW at Paris Road (**Figure 4.7**). Peak stage in the IHNC was lowered by the increment of the flow lost over levees and floodwalls and through breaches, as will be discussed in the next chapter. Drainage toward Lake Pontchartrain, which was 3 to 6 feet lower at the time, also lowered surge level in the northern reach of the IHNC.

All three storms that flooded New Orleans through the MRGO 'back door' were accompanied by what Bretschneider and Collins (1966) would classify as slow rising surges. The study could have been interpreted as cautionary with respect to the design of the hurricane protection system then being built. It showed that surge elevations experienced at the apex of the funnel near the Paris Road bridge would be transmitted to the IHNC without diminution, and that levee and floodwall crown elevations throughout this system would have to be essentially the same throughout. Further, it showed that the levee proposed along the south bank of MRGO Reach 2 would enhance the build-up and transmission of surge into the City. What is disturbing is how the

Bretschneider and Collins (1966) study, rather than ringing alarm bells, appeared to lull the USACE back into pre-Betsy complacency.  *The large, free-flowing MRGO ship channel into the LPV clearly posed a hazard to the City, yet the Corps never seriously considered a flood gate that, 40 years later, IPET (2006) and those designing the 100-year protection plan have since found was so obviously indispensable.*

> "The Reach 1 GIWW/MRGO section is very important in determining the magnitude of the storm surge that reaches the IHNC from Lake Borgne and Breton Sound.  If the hydraulic connectivity between Lake Pontchartrain and Lake Borgne is eliminated at a point within this section of channel, tide or surge to the west of this point will become primarily influenced by conditions in Lake Pontchartrain" (IPET 2006, IV-6-2).

Ironically, the gate that was proposed as part of the original LPV "Barrier Plan" at Seabrook, where the IHNC meets Lake Pontchartrain (**Figure 4.8**), would have restricted drainage toward the Lake and increased flood level in the IHNC for any surge originating in the Lake Borgne.  Hurricane Betsy provided a "wake-up call" that should have alerted USACE designers developing the LPV that the plan developed in the 1950s prior to MRGO construction was too exclusively oriented toward a Lake Pontchartrain surge.  Hurricane Camille provided yet another demonstration of the way a Lake Borgne surge would outflank this protection scheme.  Currently, designs are being developed to overcome the shortcomings of this "Maginot Line." The barriers originally proposed for two of the Lake Pontchartrain passes (**Figure 4.8**) are being augmented with a third to address surge arising in the funnel (See **Figure 3.6**).  Most concepts include a levee on the west side of Lake Borgne to break up the funnel geometry, with a gate on the GIWW and possibly a second to accommodate drainage and shallow-draft traffic on a deauthorized MRGO (**Figure 4.9**).  If such a system had been in place during Hurricane Katrina, water levels in the IHNC and MRGO Reach 1 would have experienced only Lake Pontchartrain surge, and flooding of the homes and communities of the Robinson plaintiffs would have been reduced significantly or avoided altogether (**Figure 4.10**).   One of the scenarios tested in Chapter 6 accomplished much the same thing and the FINEL model showed Lake Pontchartrain water entering the IHNC at Seabrook for most of the surge sequence.



**Figure 4.8 Creation of the 'funnel,' as shown in 1966 GDM 3, Supp. 1, for the Chalmette Levee Extension. GNO HPS authorized in 1965 was quite different from what has actually been built.  It included surge barrier gates at the two passes from Lake Borgne into Lake Pontchartrain (Rigolets and Chef Menteur), and one at the mouth of the IHNC (Seabrook).  Neither was constructed.**



**Figure 4.9  An improved flood protection scheme developed by H.S. Mashriqui with the LSU Hurricane Center as part of Team Louisiana (2007) is similar to the plan recently adopted by the USACE for the 100-year protection system (See Figure 3.6)**



**Figure 4.10   Predicted flooding during Hurricane Katrina if the Mashriqui plan (Figure 4.9 above) had been built to close off the funnel (Team Louisiana 2007).**

## 4.2  IPET 2006 and URS 2006

A draft report sponsored by the LDNR appeared in late 2005 shortly after Katrina that used the ADCIRC S08 model to investigate the effect of the MRGO on storm surge (URS 2006).  It was revised to use a newer version of ADCIRC (SL15) and more realistic winds and then reappeared, in part, as an appendix of the second report issued by the USACE IPET (IPET 2006) and appeared again in the final report (IPET 2007, IV-6-1). IPET (2006) cleared up some of the confusion left by the consultant's report but still reached the same conclusion, namely, that the influence of the MRGO on regional surge maxima is very small, generally less than a foot, for a range of storms including Katrina (**Figure 4.11**).



**Figure 4.11  IPET (2006b, IV-6-34) depiction of the difference between the surge maxima surface developed by ADCIRC for Katrina with and without Reach 2 of the MRGO.  Scale at left shows the differences ('With Reach 2' minus 'Without Reach 2') ranged from -0.7 to +1.1 feet.**

It is important to understand that neither of these ADCIRC studies addressed the entirety of the MRGO channel, dealing only with the Reach 2 portion that extends through the marsh southeast of the more "critical" Reach 1 segment that has been discussed as the throat of the funnel.  Both URS and IPET raised the ADCIRC computational nodes that previously were in Reach 2 of the MRGO channel to marsh elevation to simulate a filling of that part of the channel.  At the time that this work was done, a single bed friction value (Manning's 'n') was being used universally in ADCIRC to characterize channels, marsh, bays and the continental shelf.  This was reasonable for a regional surge forecasting model, but has been found to be inappropriate for more detailed work, such as apportioning flows between channels and marsh within estuaries, along the lines of what Bretschneider and Collins (1963) attempted four decades earlier.

Bretschneider and Collins (1963) used a Manning's value for the marsh of 0.08, compared to 0.02 for the channel, while a single value of 0.02 was applied everywhere in the ADCIRC version IPET used for assessment of the influence of MRGO Reach 2.  So the channel bathymetry was eliminated but the differential in friction between the channel and marsh was not addressed.  Each study team ran a version of the model with and without MRGO Reach 2, extracted the maximum surge elevations attained during both runs, and then subtracted the "Without Reach 2" surface from the "With Reach 2" surface.  IPET created a graphic depicting the magnitude of difference throughout the area of interest (**Figure 4.11**).  IPET (2006, 2007) explains what they see as the very

limited influence of MRGO Reach 2 in the vicinity of New Orleans for strong storm events as follows.

> "First, the MRGO does not influence the important preliminary east-west movement of water that drives the significant build up of surge in the early parts of the storm.  Second, the northerly propagation of surge during the later stages of the storm are only minimally influenced by the MRGO because the increased hydraulic conveyance associated with the channel is very limited for large storms due to the large surge magnitude and especially due to the very large lateral extent of the high waters on the Mississippi-Alabama shelf that build up early on from the east.  In addition, the propagation direction of this surge wave does not typically align with the MRGO and furthermore the southeasterly winds which align with the MRGO occur only very briefly" (IPET 2006, IV-6-6).

Some of this rationale is reminiscent of the general conclusions of Bretschneider and Collins (1963), while other aspects are unique to the dynamics of Katrina.  The surge generated by Katrina, in contrast to that of Betsy, reached a maximum along the south side of the funnel rather than in the throat.  But it is worth taking a closer look at what the consultants and the IPET surge modelers actually found (**Figure 4.11**).  First, it is apparent that while the difference in maximum surge elevation anywhere due to MRGO Reach 2 is small (-0.7 to +1.1 feet), the presence of this channel segment has effects that are distributed over a large area.

Effects on surge maxima are generally greater outside the funnel than within it, suggesting that the main effect of the channel is to convey water away from the funnel, both northwest into Reach 1 and southeast beyond the eastern end of the Chalmette hurricane protection levee.  An elongated blue area is shown on the south side of the funnel, indicating a reduction in surge elevation of up to -0.5 feet.  This blue zone corresponds to two key features.  The first is the Katrina surge maximum that stacked up on this portion of the levee along the south bank of MRGO Reach 2 (**Figure 4.12**).  The second is the MRGO Reach 2 channel itself, which was eliminated in the 'Without' run.

Modeled flow direction vectors for the MRGO Reach 2 channel when the surge was highest show flow away from the zone of highest surge at both the northwestern and southeastern ends of this feature (**Figure 4.12**).  The flow direction is towards the entrance of MRGO Reach 1 at the apex of the funnel in both cases, but the mean depth of the MRGO at this stage is more than 50 feet, while the depth over the marsh is about 15 feet.  So the channel acted to distribute water stacked up against the levee, thereby lowering the peak surge in the immediate vicinity of the Reach 2 channel segment.  Flow out of the southeast end moved around the Chalmette levee and contributed to increased elevations over a considerable area, particularly in the Caernarvon area where the increase was more than 1 foot.  Similarly, water evacuated by the channel to the northwest raised the surge elevation in the throat of the funnel in the vicinity of the Paris Road bridge by about +0.5 feet.



**Figure 4.12 Flow direction in the funnel at peak surge in Katrina ADCIRC simulation by H. Mashriqui of the LSU Hurricane Center. The surge reached more than 5 meters (15 ft) on the MRGO hurricane protection levee. Flow converges from all directions toward the throat of the funnel, but some that cannot be accommodated moves east as a return flow in the GIWW. The MRGO conveys flow away from the zone of maximum surge along the LPV EBSB that follows Reach 2 (Team Louisiana 2007).**

Perhaps the most striking feature of the IPET Reach 2 analysis is, however, the effect of the presence of the ship channel on levee overtopping and flooding of developed areas (**Figure 4.13**). As is the case for all ADCIRC simulations including the 'with' and 'without' Reach 2 runs, levees and floodwalls are overtopped when the surge rises above the crown elevation, set in ADCIRC at idealized elevations, where the levee and floodwall crowns were supposed to be. The model does not allow breaching, or accommodate rainfall or pumping. So, water enters the protected areas only for as long as the flood side water level is high enough to flow over the crown level of the protection structure, and overtopping ceases when it drops below this level. Water accumulates inside the protected area and ponds in low spots.

The difference in maximum surge elevation on the flood side for the 'with' and 'without' Reach 2 simulations is small, and in the case of the IHNC, less than 0.1 foot (**Figure 4.13**). Yet the Orleans Metro protected area on the west bank of the IHNC is depicted with extensive areas of light blue and green indicating an increase in floodwater elevations of 0.1 to 0.4 feet due to the presence of MRGO Reach 2. More extensive areas of up to 0.6 feet of increased flooding are apparent in the New Orleans East protected area. Lesser increases are shown for the Lower 9th Ward and the Chalmette area of St. Bernard. Increased flooding of up to 0.5 feet is shown in the northwestern half of the St. Bernard wetlands adjacent to MRGO Reach 1, while there is some lowering to the southeast caused by reduced overtopping of the federal levee in the surge peak zone.



**Figure 4.13 Close up of ADCIRC difference map showing the effects of MRGO Reach 2 on flooding of protected areas. Earlier arrival of surge delivered by MRGO Reach 2 caused overtopping to start earlier and resulted in increased flood elevations in protected areas in New Orleans East, St. Bernard and Orleans Metro.**

The IPET investigators were so intently focused on surge maxima that they appear to have completely missed another effect of MRGO Reach 2 that is important to flooding over the levees and floodwalls. Levee designers are interested only in the maximum water level expected on the flood side of the structure, but when these structures are overtopped or breached, other aspects of the surge become important. The only plausible explanation for the increases in flooding predicted by ADCIRC within the protected areas is that the presence of MRGO Reach 2 increased the period of time that the surge exceeded levee and floodwall crowns. This would occur if the efficient conveyance of the ship channel caused the surge to rise more rapidly in MRGO Reach 1 and the IHNC, so that overtopping began earlier and lasted longer, regardless of the stage ultimately attained. This could occur without any detectable increase in surge maxima.

IPET (2006b, IV-6-4) notes that their study reached a similar conclusion to that of earlier studies going back to Bretschneider and Collins (1963) with regard to the effect of the MRGO channel on relatively low storm surges, or, alternatively, during the early phase of a large storm surge.

> "In these situations, changes induced by MRGO Reach 2 are rather small, 0.5 feet or less, but this amounts to as much as 25% of the peak surge amplitude. When the long wave amplitude is very low, the surge is more limited to propagation via the channels. Once the surge amplitude increases to the point where the wetlands become inundated, this section of the MRGO plays a diminishing role in influencing the amplitude of storm surge that reaches the vicinity of metropolitan New Orleans" (IPET 2006b, IV-6-4).

56

The elevation of the surge in the IHNC at any point in the surge sequence is determined by a balance between flux entering through Reach 1 and that exiting to the Lake.  The IPET analysis suggests that the first few feet of the surge rise at Paris Road and in the IHNC -- representing a volume of many millions of cubic feet of water -- enters initially through the channel.  Later, as the surge rises in the funnel, more of the water enters from across the marsh.  Given that mean velocity in the channel is at least twice that of the flow over the marsh, and that the depth of flow in the channel is three to four times that over the marsh, it is apparent that the 1,000 foot wide channel can deliver as much volume in a given period as flow across a 6,000 to 8,000 foot wide marsh cross-section.  If the surge never rises high enough to cause flooding over levees and floodwalls, then the routing of the surge, whether over wetlands or through the channel, is of little interest, as the accumulated volume drains harmlessly out the north end of the IHNC into the Lake.

During the early stages of the surge rise, when the contribution of the MRGO Reach 2 channel is proportionally more important, flux into the IHNC is not limited by the dimensions of Reach 1.  Later, as surge continues to rise in the funnel, and the relative importance of the MRGO Reach 2 channel contribution is diminished, flux into the IHNC through Reach 1 becomes limited by the conveyance potential of that connecting channel, and any additional surge buildup at the apex of the funnel has little effect on discharge to the IHNC.

The "critical" condition, when Reach 1 conveyance has reached its full potential, is indicated at least qualitatively in ADCIRC simulations by the development of a return flow in the GIWW that conveys rejected surge volume away from the entrance to Reach 1 (**Figure 4.12**).  All water that enters MRGO Reach 1 contributes to the surge elevation along that connection. Some of this water at later stages in the surge was lost as it overtopped the parallel levee system that confines Reach 1, again limiting discharge into the IHNC.

The IPET focus on late stage surge development appears to suggest that the volume introduced early when the flux was not limited by the dimensions of Reach 1, and when the contribution of the Reach 2 channel was proportionally more important, is somehow less consequential to the flooding dynamics than the volume introduced later in the storm sequence.  Late stage surge in MRGO Reach 1 and the IHNC added to a surge volume already present.  Another way to think about this is to attribute the base of the fully developed surge in Reach 1 and the IHNC to volume introduced early through the MRGO Reach 2 channel.  The top of the surge peak is added later by flow across the marsh.  Both sources contribute to the maximum elevation attained by the surge, which is limited by the conveyance of Reach 1.  Because the water from MRGO Reach 2 gets to the critical reach first, however, the surge maximum is attained earlier than if all water came more slowly across the marsh, and flooding over levees and floodwalls in Reach 1 and the IHNC is also initiated earlier.

All of the ADCIRC runs discussed above applied a single bed friction factor everywhere. In a separate analysis, IPET (2006, IV-5-94) investigated the effects of applying a

spatially variable bed friction factor to surge simulations for Katrina. They found that merely increasing the Manning's 'n' value over marsh areas from 0.02 to 0.035 had significant local effects on the shape of the surge maximum envelope (**Figure 4.14**). Unfortunately, this analysis was not sufficiently detailed to allow for differentiation between the MRGO channel and the surrounding marsh. IPET (2006) states that "the extensive network of connecting channels that occur throughout the marshes, cyprus (*sic*) forests and other regions in Southern Louisiana were not considered in these simulations."

Generally, applying a spatially varying bottom friction factor tended to increase surge height in open water and reduce it in wetland areas. This change reduced the predicted peak surge in the Caernarvon area south of the St. Bernard levee system by up to 2 feet (**Figure 4.14**). This estuary is not penetrated by large, deep, dredged channels. On the other hand, applying a greater friction factor for the marsh in the funnel was found to only slightly offset the higher levels generated in the open water to the north. It is possible that much of the surge reduction expected from remaining funnel marshes was diminished by the presence of the ship channel.

The effect of wetlands on surge reduction is an active area of research at present, in part spurred by the availability of high-resolution surge models like ADCIRC that make it possible to accurately trace surge flow-paths and look at varying frictional effects along the way. Hurricane Rita, also a Category 3 storm, struck the southwest coast of Louisiana 26 days after Katrina, as has been discussed. Rita pushed a storm surge in excess of 15 feet across 50 miles of coast fronted by a sparsely settled 20 mile wide band of coastal wetlands, while Katrina came ashore on a part of the deltaic plain near New Orleans where wetlands have been greatly reduced over the past century by natural subsidence and man's activities. We will discuss the lessons from Rita on surge reduction by wetlands in more detail in a later chapter.

Before the MRGO and the Chalmette hurricane protection berms were constructed, and before much of the landloss caused by the MRGO had taken place, the funnel area between Lake Borgne and the IHNC included a 10 mile wide band of wetlands that should have reduced storm surge propagating into the IHNC. We have set up the FINEL surge model to incorporate appropriate wetland friction effects, as well as the very significant effects that dense forests have on the winds that generate the surge, essentially separating the wind, which affects the tree canopies from the water. This work is discussed in Chapter 6.



**Figure 4.14  Difference in IPET ADCIRC surge maxima with spatially varying bed friction factor (0.035 for marsh and 0.02 for open water) and the base run (0.02 everywhere).  Variable less base is shown in feet.  Open water areas generally experienced higher surge (yellower), while surge in marsh areas without major channels like the Caernarvon bight south of the St. Bernard HPS was reduced by up to 2 feet (bluer).  A similar reduction might be expected in the MRGO funnel but does not appear, possibly offset by the presence of the large channel (IPET 2006, IV-5-105).**

While the USACE modelers have claimed that this analysis proves that the MRGO project had no effect on the Katrina surge, we have pointed out in earlier filings that this is an overgeneralization and an inaccurate conclusion.  MRGO Reach 2 is but one element of the funnel, and clearly not the most important one from a surge standpoint. The MRGO project also included other features and impacts that they chose to ignore. These must each be numerically isolated and tested before such a sweeping conclusion is justified.  Additional effects of the MRGO project, separately addressed in this report, address the hydraulic impact of the destruction of the wetland buffer caused by MRGO Reach 2, the interactions resulting from the adjacency of the channel to the flood protection berms, the large effect on structure overtopping volumes developed from apparently small differences in peak surge elevation and timing, as well as the effect of the channel and diminished foreshore protection on wave energy faced by the LPV

earthen berms exposed on its south bank.  None of these were touched on in the limited analysis contained in the referenced IPET appendix (IPET 2007).

URS (2006) used the S08 ADCIRC model to simulate surge dynamics with the LPV berm and MRGO Reach 2 removed, almost as we have done (see Chapter 8) (**Figures 4.15 and 4.16**).  However, URS used much stronger winds than actually occurred during Katrina, and reduced the LPV berm only to the elevation of the underlying material in the spoil disposal area.  We remove it entirely to marsh elevation in our Scenario 2 (Chapter 8).  When URS lowered the LPV berm and removed MRGO Reach 2, this lowered the maximum surge height along the LPV levee alignment at Bayou Dupre (without the levee) by 1.5 feet, which is expected, but the URS simulation showed no reduction in maximum surge elevation across the Central Wetlands.  URS (2006) interpreted the model output to mean that the marshes, and presumably the swamp forest that was there before it was killed by the MRGO, were of no consequence in reducing surge.



**Figure 4.15   ADCIRC S08 levees at idealized levels, including 17.5 feet for the EBSBs along MRGO Reach 2, and 14.0 feet along MRGO Reach 1, and for the IHNC floodwalls.  The 40 Arpent levee varies from 5 to 8 feet high (URS 2006).**



**Figure 4.16 Modified levees in URS (2006) showing EBSBs along the MRGO reduced to the 6.5 foot elevation of the underlying spoil disposal site, and the 40 Arpent levee crown raised to 17.5 feet (NAVD88).**

### 4.3 St. Bernard Flooding Analysis by Team Louisiana (2007)

When Orleans Metro began flooding from Lake Pontchartrain through the drainage canal breaches, the stage was set for a second disastrous inundation of St. Bernard east of Paris Road.   This area had already received some flooding from the west caused by the breaches and overtopping of the IHNC floodwall in the Lower 9th Ward, and from the south across the crown of the Caernarvon to Verret levee along the south side of the HPS (**Figure 4.17**).   The Caernarvon to Verret levee was overtopped briefly for about 1.5 miles where it was less than 13 ft high, and this happened when the water was highest at that point, at about 0800.   This overtopping was relatively brief, and the levee was protected from waves by a vast wetland area to the south (**Figure 4.17**).   Despite overtopping, the levee crown experienced only minor damage (Morris expert report 2008), perhaps also due to a construction design that included a substantial clay cap placed over a core of sand pumped from the Mississippi River (**Figure 4.18**).

61



**Figure 4.17  Different materials and methods used for construction flood control berms and levees around St. Bernard and the Lower 9th Ward (Ebersole Presentation 2007)**



**Figure 4.18  Looking west on the Caernarvon to Verret Levee that protects the south side of St. Bernard drained area east of Chalmette.  This levee was overtopped for about 1.5 miles where it was between 12.5 to 13.0 ft high, but was protected from waves by an extensive marsh to the left.  It suffered little damage.**

62

Team Louisiana (2007) estimated that flooding from overtopping and breaching of the IHNC into the Lower 9th Ward, together with the more limited overtopping of the Caernarvon to Verret Levee, accounted for about 10 percent of the total flooding of the protected area within the St. Bernard HPS.  At around 08:30, the most substantial flooding event in any part of the City began as the 40 Arpent back levee, with a crown elevation of between 7 and 9 ft, experienced massive overtopping from the wetland buffer area to the north (**Figure 4.17**).  This was a very destructive overtopping event that leveled substantial two-story homes in subdivisions in the Meraux area that backed up to the 40 Arpent Canal (**Figure 4.19**).  The water did not enter uniformly over the whole levee but formed rivers that started at several low spots, were joined in the 40 Arpent Canal that was just inside the levee, and raced preferentially through subdivisions and other cleared areas as they flowed toward the Mississippi River levee.  This flooding could only have started after the vast wetland impounded between that levee and the MRGO levee, nearly 32,000 acres, had filled to the elevation of the lowest reaches of the 40 Arpent Canal levee (about 6 feet).



**Figure 4.19  View northwest toward 40 Arpent Canal and Levee in Meraux showing homes destroyed down to the slab by flooding from the MRGO across the back levee.  The levee crown is visible in background.**

The water that filled the impounded St. Bernard wetland and flowed over the 40 Arpent Canal levee into the developed part of St. Bernard Parish came initially through breaches and overtopping of the MRGO berm along MRGO Reach 2.  Filling the impounded wetland to a level of 7 ft required introduction of nearly 9 billion cubic feet of water across the MRGO EBSB within a relatively narrow time window.  That time window is available from the ADCIRC hindcast of surge on the MRGO that has been corroborated

by gage data from the IHNC lock (**Figure 4.7**) and by the high water mark survey inside the protected area.

The surge window on the MRGO can be defined by the time the water level exceeded a specified elevation. If that elevation is defined as 6 feet, then the surge lasted 18 hours, but if it is defined by the time above 10 ft, which is about the height any previous surge had attained on the MRGO EBSBs, the period is reduced to 6 hours, starting at about 0500. Since the problem is to explain water levels in excess of 11 feet within the St. Bernard developed area, we are particularly interested in the exceedence interval for this value.

Water levels in MRGO and the 10 ft exceedence interval define the period during which the St. Bernard EBSB breaches and flooding have taken place, as does the maximum water elevation attained inside the protected communities, about 11 ft (NAVD88). If too much water entered too early, the interior water level would have gotten higher than what was observed, while too little inflow would not fill the protected area high enough. Finally, we know that water did not enter the wetland buffer area uniformly along the entire 12 mile length of the MRGO EBSBs. This structure, like the 40 Arpent Canal levee, was not initially of uniform height but had a crown that ranged from 14 to 18 ft (NAVD88). The maximum surge elevations without the wave component for these EBSBs ranged from 16 to 18 ft, and so were comparable in most places to the pre-Katrina crown elevation (**Figure 4.21**). Post-storm surveys disclosed that about half of the MRGO EBSBs had experienced significant degradation or breaching. If they had not failed and had been at the design grade, general overtopping should have lasted only for about an hour prior to the surge peak at 0830, and this window would not have provided enough water to explain the filling of the St. Bernard developed area.



Figure 14-12. St. Bernard Parish IPET Damage Characterization

**Figure 4.20   IPET damage assessment on St. Bernard HPS showing 30 miles of levees that experienced some overtopping, and 12 miles of breaches along the MRGO (IPET 2006, V-14-15). LOB means levees overtopped and breached, and LONB means levees overtopped but not breached. TF designates transition failures.**



**Figure 4.21 Pre Katrina deviation from design elevation relative to mean sea level for the Chalmette levee loop (source: Morris expert report 2008).**

Team Louisiana (2007) adapted a simple flooding model from IPET to satisfy the constraints discussed, while delivering the requisite water volume across the MRGO EBSBs in the 6 hours available (IPET 2006, IV-240). The authors assume for this model that front side wave breaching of EBSBs with poor foreshore protection (EBSBs closer to channel, little protective vegetation) and overtopping of the lowest areas begins when the surge attains 10 ft. This is the level at which IPET estimates that waves began breaking on the levee face. This surge level occurred on the southern leg of the funnel at about 0500, at least an hour before landfall (**Figure 4.22**).

As the surge rose, the zone of wave-induced overtopping and structure degradation expanded until the peak was attained at 0830. For the model, Team Louisiana (2007) assumed, as Dr. Bea has subsequently proved (Bea expert report 2008) that the crown relatively quickly degraded to its post-Katrina condition once overtopping by waves began for any given reach. Flow over the levee was modeled using the IPET weir flow equations, first for wave overtopping and then for overtopping by waves and surge. Outflow from the inundated areas, both wetlands and developed zones, begins once the

65

MRGO drops below 10 ft at 1030.  We also included overtopping from MRGO Reach 1, the 7 mile reach that connects the funnel with the IHNC.



**Figure 4.22  Surge hydrographs along MRGO Reach 2 from Shell Beach to Paris Road, created by adjusting ADCIRC predicted peaks to match high water mark data.**

Team Louisiana (2007) results for overtopping flow were similar to those calculated by IPET, if flow over the south Reach 1 levee is added (**Figure 4.23**).  The rate of transfer of water across the MRGO alignment peaks at around 0830 at more than 2.0 million cubic feet per second (cfs).  This is an extraordinary volume comparable to a large flood on the Lower Mississippi River.  But the volume of the 32,000 acre wetland buffer that must be filled before the 40 Arpent Canal levee is overtopped is also very large, and the deep MRGO channel provides an efficient conduit for supply of this water.  Team Louisiana (2007) predicted that that filling of the buffer would take nearly 2.5 hours, putting the onset of overtopping of the back levee at 0830 in agreement with eye-witness accounts (**Figure 4.24**).



**Figure 4.23   IPET and Team Louisiana estimates of cumulative water volume introduced by waves and surge across the degrading MRGO levee crown.**



**Figure 4.24   Team Louisiana (2007) flood model prediction of flood hydrograph inside St. Bernard polder compared to surge hydrograph at MRGO EBSBs.**

If the onset of breaching were delayed until the MRGO surge elevation reached 12 ft, then the spreading of levee degradation and failure would have to advance more quickly to attain the required length, and make up the necessary discharge.  Under no realistic scenario, however, is the filling of the buffer wetlands an instantaneous event, but almost certainly required hours.  Similarly, given the degradation mechanisms available – particularly the EBSB "capping" that involves a combination of front and backside wave damage - it is unrealistic to assume that breaching of many miles of the MRGO berm occurred at exactly the same time.



**Figure 4.25   High-resolution oblique Pictometry image of MRGO levee east of Bayou Dupre.  MRGO is at bottom, and protected side at top.  Photo shows several stages of "levee capping" breaching that initiates with wave bench formation on unprotected side, followed by wave overtopping and back side erosion, which enlarges upstream through the levee crown to join the front side bench (Team Louisiana 2007).**

# CHAPTER 5
# OUR METHODS

Following Hurricane Katrina, investigating engineers and scientists noted that levees and floodwalls adjacent to the MRGO project had failed catastrophically while performance was generally better elsewhere except on the New Orleans East Back Levee and the newer Orleans Metro drainage canals (Team Louisiana 2007, ILIT 2006, IPET 2006, 2007). The USACE has consistently maintained that any linkage between the MRGO project and failures of floodwalls and levees constructed under the LPV hurricane protection project is entirely coincidental. To show that it was not, we have been forced to imagine a landscape in which the 1958 MRGO project never existed.

This is a world in which the IHNC is connected to the Gulf solely by the Gulf Intracoastal Waterway (GIWW), a 150 foot wide, 12 foot deep barge canal, instead of by a 2,000 to 3,000 foot wide, 42 foot deep arm of the sea; where the main line of flood defense for St. Bernard is a real levee built on a stable foundation along the 40 Arpent Levee alignment two to three miles south of the MRGO channel of today behind thousands of acres of the surge and wave protection afforded by cypress-tupelo swamp forest and healthy marsh. Using computer models and historic maps and photographs, we have brought that world to life in an effort to determine the incremental augmentation of surge and wave attack that can be reliably attributed to the design, construction, maintenance and operation of the MRGO navigation project, from the Mississippi River lock on the IHNC to the Gulf of Mexico.

The only direct measurements of waves and surge during Hurricane Katrina in the MRGO funnel outside of the flood protection system and even within the various reaches of the MRGO and IHNC boil down to (1) a few dozen high-water marks surveyed after the storm, (2) hourly readings made by the USACE lockmaster on a staff gage at the IHNC lock, (3) partial records from USGS gages at Paris Road and on the IHNC at the I-10 crossing, (4) video and still camera footage from the Entergy Plant at the north end of the Paris Road I-510 bridge, and (5) records from two small wave buoys installed near the south shore of Lake Pontchartrain. This is a meager dataset, even compared with what was available after Hurricane Betsy in 1965, because the damage to electronic gages was so complete.

## 5.1 Direct Observations of Surge and Waves

The high water marks are not unequivocal because they always document surge with some added unknowable surplus due to waves. The amount of wave surplus depends on where the mark is located and particularly on how well protected it is from waves. Through my work with the LSU Hurricane Center, I was personally involved in the identification of many of these marks and understand their limitations as I detailed in my second expert report (Kemp 702c Immunity 2007). The lockmaster recorded stage at hourly intervals, meaning that he may well not have captured the peak, and would certainly have missed any more subtle changes as the floodwalls and levees on each side of the IHNC gave way. Furthermore, neither of the partial gage records available from

69