# Exhibit 27 Part B

terminals and in the landward access facilities to all the present terminal wharves will save ship time in loading and unloading and provide benefits to industrial and commercial tonnage using those facilities estimated at $950,000 annually. Further benefits creditable to the improvement would result from reduced sailing time of coastwise vessels, reduction in hazards to navigation, savings in terminal handling charges and annual charges on wharves, and enhancement in value of water-front property. These additional benefits are estimated to have an annual value of $1,635,000. The sum of the tangible benefits estimated by the Board is $5,835,000, which compared with annual charges of $4,027,000 shows a benefit-cost ratio of 1.45. Additional benefits to industry and employment would accrue throughout the vast tributary area and the improvements would greatly enhance the capacity of the port for emergency war service.

20. The Board concludes that the existing terminal facilities of the port of New Orleans are inadequate to serve the needs of the growing commerce. Possibilities are extremely limited for the development of additional terminal facilities in locations along the present water front which would provide for accessibility and economical operation. The creation of a tidewater harbor with free access to deep water in the Gulf of Mexico is required to provide for the necessary expansion of terminal facilities. The east-bank seaway channel, turning basin, and connecting channel would be adequate for and would best meet the requirements for terminal facility expansion. The estimated benefits to commerce substantially exceed the estimated annual carrying charges for the improvements, therefore, the project is economically justified. The division engineer's plan of improvement to create an east-bank tidewater harbor and outlet, if properly supported by the supplemental development and administration by local interests of modern, efficient terminal facilities will serve adequately the needs of the expanding commerce of the tributary area extending through the Mississippi Valley and into many of the adjoining States. The Board of Commissioners of the Port of New Orleans has signified its willingness and ability to meet the requirements of local cooperation including the construction and operation of terminal facilities sufficient for the needs of commerce.

21. The Board of Engineers for Rivers and Harbors recommends that the existing project for "Mississippi River, Baton Rouge to the Gulf of Mexico," be modified to provide for construction of a seaway canal 36 feet deep and 500 feet wide extending 70 miles as a land and water cut on tangents and easy curves from a point south of the Intracoastal Waterway at Micheaud southeasterly to and along the south shore of Lake Borgne and through the marshes to and across Chandeleur Sound to Chandeleur Islands at or north of Errol Island, thence increasing gradually to a width of 600 feet and depth of 38 feet in the Gulf of Mexico, with protective jetties at the entrance, a permanent retention dike through Chandeleur Sound, and a wing dike along the islands as required; a turning basin at the landward end of the seaway canal, 36 feet deep, 1,000 feet wide, and 2,000 feet long; and a connecting channel 36 feet deep and 500 feet wide extending westerly along the Gulf Intracoastal Waterway from the turning basin to the Industrial Canal; all generally in accordance with the plans of the

Case 2:05-cv-04182-SRD-JCW   Document 16288-13   Filed 11/05/08   Page 3 of 16

division engineer and with such modifications thereof as in the discretion of the Secretary of the Army and the Chief of Engineers may be desirable, at an estimated cost to the United States of $65,000,000 for construction exclusive of aids to navigation, and $1,000,000 annually for maintenance in addition to that now required; provided that, prior to any construction expenditures, local interests furnish free of cost to the United States all lands, easements, rights-of-way, and spoil-disposal areas required for initial construction and subsequent maintenance; make necessary highway, railway, and utility changes; and furnish assurances satisfactory to the Secretary of the Army that they will hold and save the United States free from all claims for damage due to construction, maintenance, and operation of the project, and will construct, maintain, and operate terminal facilities commensurate with requirements of the expanded port, under regulations approved by the Secretary of the Army.

For the Board:

R. C. CRAWFORD,
*Major General,*
*Senior Member.*

## REPORT OF THE DIVISION ENGINEER

### SYLLABUS

The Board of Commissioners of the Port of New Orleans, the State agency for operation of the port, requests Federal construction of an additional deep-draft outlet (seaway) from New Orleans to the Gulf of Mexico east of Chandeleur Islands. West-bank interests, by the Mississippi Valley Seaway Canal Association, request a deep-draft outlet (seaway) from the river at Westwego to the Gulf south of Caminada Bay.

Under uniform postulates, comparison of estimated annual charges and benefits indicates economic justification for proposed east bank but not for proposed west-bank improvements.

The division engineer finds that the proposed outlet and tidewater harbor east and southeast of New Orleans, in conjunction with the river and its improved passes and the Intracoastal Waterway and Industrial Canal, will facilitate expansion and improvement of port facilities to serve all water-borne commerce that may be attracted to the port with resulting benefits to present and prospective seagoing and inland waterway navigation and commerce considerably in excess of charges for construction and operation, and will greatly enhance the capacity of the port for war service by providing for dispersion of terminal facilities.

He recommends that the existing project, "Mississippi River, Baton Rouge to the Gulf of Mexico," be modified to provide for an additional east-bank, deep-draft outlet and tidewater harbor by construction of connecting harbor channel 36 feet deep and 500 feet wide extending from the existing inner harbor canal to a turning basin south of Micheaud; and a channel 36 feet deep and 500 feet wide extending as a land and water cut on tangents and easy curves from this turning basin southeasterly to and along the south shore of Lake Borgne and through the marshes to and through Chandeleur Sound and Islands, at or north of Errol Island, to deep water in the Gulf of Mexico, a distance of approximately 70 miles, with provision for the future construction, when found to be economically justifiable, of an additional lock near Meraux with necessary channels and appurtenances for connections with the turning basin and the Mississippi River, generally as outlined in paragraph 60 hereof, subject to such modifications of location, alinement, and dimensions as may be approved by the Chief of Engineers, at an estimated cost of $53,000,000 for construction and $810,000 annually for maintenance and operation, in addition to that now required; subject to stated conditions of local cooperation.

WAR DEPARTMENT, CORPS OF ENGINEERS,
OFFICE OF THE DIVISION ENGINEER,
LOWER MISSISSIPPI VALLEY DIVISION,
*Vicksburg, Miss., September 30, 1946.*

Subject: Review of reports on Mississippi River-Gulf outlet and the Mobile to New Orleans Intracoastal Waterway.

To: The Chief of Engineers, United States Army.

## I. GENERAL

1. *Authority.*—This report is submitted in compliance with instructions of the Chief of Engineers contained in third endorsement, dated June 22, 1943, and in accordance with congressional authorities as follows:

*Resolved by the Committee on Commerce of the United States Senate,* That the Board of Engineers for Rivers and Harbors, created under section 3 of the River and Harbor Act, approved June 13, 1902, be, and is hereby, requested to review the reports on the Mississippi River-Gulf outlet submitted in Committee on Rivers and Harbors, House of Representatives, Document numbered 46, Seventy-first Congress, second session, and previous reports, and to review the reports on the Mobile, Alabama, to New Orleans Intracoastal Waterway, submitted in the report of the Chief of Engineers dated April 27, 1942, and previous reports, with a view to determining whether any modification of the recommendations contained therein is advisable at this time, particularly with respect to the advisability and cost of providing an emergency outlet from the Mississippi River in the interest of national defense and general commerce by the construction and maintenance of a permanent deep-draft channel 40 feet deep or of such lesser depth as may be determined to be an economical ship channel, from the Industrial Canal, New Orleans, Louisiana, eastward along the authorized route of the Intracoastal Waterway to a point at or near the Mississippi Sound mouth of the Rigolets, thence to the 40-foot contour in the vicinity of the Government light at the northern extremity of the Chandeleur Islands.

Adopted April 19, 1943.

*Resolved by the Committee on Rivers and Harbors of the House of Representatives, United States,* That the Board of Engineers for Rivers and Harbors created under section 3 of the River and Harbor Act, approved June 13, 1902, be, and is hereby, requested to review the reports on Mississippi River-Gulf outlet submitted in Committee on Rivers and Harbors, House of Representatives, Document Numbered 46, Seventy-first Congress, second session, and previous reports; and to review the reports on the Mobile, Alabama, to New Orleans Intracoastal Waterway, submitted in the report of the Chief of Engineers dated April 27, 1942, and previous reports, with a view to determining whether any modification of the recommendations contained therein is advisable at this time, particularly with respect to the advisability and cost of providing an emergency outlet from the Mississippi River in the interest of national defense and general commerce by the construction and maintenance of a permanent deep draft channel 40 feet deep or of such lesser depth as may be determined to be an economical ship channel, from the Industrial Canal, New Orleans, Louisiana, eastward along the authorized route of the Intracoastal Waterway to a point at or near the Mississippi Sound mouth of the Rigolets, thence to the 40-foot contour in the vicinity of the Government light at the northern extremity of the Chandeleur Islands.

Adopted May 5, 1943.

PUBLIC LAW 14, SEVENTY-NINTH CONGRESS, APPROVED MARCH 2, 1945

SEC. 6. The Secretary of War is hereby authorized and directed to cause preliminary examinations and surveys to be made at the following-named localities:

\*     \*     \*     \*     \*     \*     \*

Ship canal to extend from the Mississippi River at a point at or near the city of New Orleans, Louisiana, to the Gulf of Mexico, by way of the best available route or routes.

\*     \*     \*     \*     \*     \*     \*

2. *Reports being reviewed.*—In the first of the reports reviewed, House Document No. 46, Seventy-first Congress, second session, the Chief of Engineers found no necessity for another deep-water outlet from the Mississippi River and no justification for acquisition of the Industrial Canal and lock at New Orleans. In House Document No. 230, Seventy-sixth Congress, first session, the Chief of Engineers recommended modification of the project for the Louisiana and Texas Intracoastal Waterway to provide for a channel 12 feet deep and 125 feet wide from the Mississippi River through Harvey lock, near New Orleans, La., to Corpus Christi, Tex., subject to prescribed conditions of local cooperation. In an unpublished report, dated April 27, 1942, the Chief of Engineers recommended modification of the Intracoastal Waterway project—

to provide for a channel 12 feet deep and 150 feet wide in the Mississippi Sound and Lake Borgne and from the mouth of the Rigolets to the Mississippi River near New Orleans, and for acquisition of control of that part of the inner-harbor navigation canal prism south of a point 3,000 feet north of Florida Avenue, together with the lock and forebay and the St. Claude Avenue and Florida Avenue Bridges.

Modifications recommended were adopted by the act approved 23 July 1942 which authorized—

deepening and enlarging the Intracoastal Waterway from its present eastern terminus to the vicinity of the Mexican border.

## II. DESCRIPTION

3. *General.*—The Mississippi River and its tributaries drain the central valley from the Appalachian to the Rocky Mountains and from Canada to the Gulf of Mexico. The basin comprises about 1,240,000 square miles and includes all or parts of 31 States and 2 Canadian Provinces. Above Baton Rouge (230 miles above Head of Passes), the river is improved for 9-foot navigation to Minneapolis-St. Paul, Minn. Similar channels extend through the Illinois waterway to Chicago and up the Ohio River to Pittsburgh. Between Baton Rouge and New Orleans (miles 100 to 230), the natural channel has a least depth of 35 feet over a minimum width of 500 feet and an average width in excess of 1,000 feet, except at two crossings near Baton Rouge where dredging is occasionally required. Between New Orleans and Head of Passes the natural channel is still larger, with controlling dimensions in excess of 40 feet in depth and 1,400 feet in width.

4. The river, a silt-bearing and delta-forming stream, enters the Gulf through numerous passes, of which the largest three—Pass a Loutre, Southwest Pass, and South Pass—are formed at a trifurcation designated Head of Passes. Above this point minor passes include Cubits Gap on the left bank at mile 3, the Jump, on the right bank at mile 10, and Baptiste Collette on the left bank at mile 11. South and Southwest Passes (lengths 13.5 and 20.2 miles, respectively) have been improved under Federal projects to provide alternate entrance channels for deep-draft traffic with controlling depths of 30 feet in South Pass and 35 feet in Southwest Pass. Unimproved outlets are obstructed by shoals and bars with controlling depths of 6 to 10 feet.

5. An outlet from the east (left) bank of the river at New Orleans may be provided along various routes traversing the marshes and Lake

Borgne, Breton, Chandeleur, or Mississippi Sounds and the Chandeleur Islands. Currents in the sounds are tidal. Where restricted between islands as in Mississippi Sound, reversing currents obtain with velocities up to 2 miles per hour at strength of ebb and flood; elsewhere in the sounds irregular rotary currents prevail with velocities generally less than a mile an hour (fig. 2 [1]). Here currents depend largely on winds which have no dominant directional trend (fig. 3 [1]). A west-bank outlet from the vicinity of New Orleans, sited through the Barataria marshes and Caminada Bay, would be land-locked except at Caminada Bay and the Gulf entrance.

6. Water-surface elevations in the passes depend upon wind, tide, and river stages. Mean tidal variation, about 16 inches at Southwest Pass jetties, is about 9 inches at Head of Passes. Tidal effect is perceptible above Baton Rouge at extreme low river stage. Water surface at the passes may be lowered as much as 2 feet by "northers", generally in winter; and high storm tides, up to 6 feet, have been observed. Fluctuation of water surface due to river stage, insignificant at seaward ends of jetties, is as much as 4 feet at Head of Passes, 20 feet at New Orleans, and 44 feet at Baton Rouge. River-discharge measurements at New Orleans have ranged between 1,560,000 and 50,000 cubic feet per second. Under the existing flood-control project the Bonnet Carre spillway is operated to preclude stages in excess of 20 feet at New Orleans (Carrollton—elevation of gage zero, $-0.13$ mean sea level, extreme readings, $+21.27$ and $-1.60$).

7. There are no tributaries below Baton Rouge. At New Orleans the river is crossed by the Gulf Intracoastal Waterway, which is under improvement by the Federal Government to provide a channel 12 feet deep and 125 feet wide from Apalachee Bay, Fla., to the Mexican border, except between Mobile and New Orleans, where the width is 150 feet. Access from the river to the waterway is provided through the inner-harbor navigation canal (Industrial Canal) lock (640 by 75 by 31.5 feet) at mile 92.7, east bank, and through Harvey lock (425 by 75 by 12 feet) at mile 98.2, west bank. An alternate connection, authorized by the River and Harbor Act approved March 2, 1945, provides for a channel (12 by 125 feet) extending from the river at mile 88 to and through a lock (760 by 75 by 13 feet) and thence to the Intracoastal Waterway 6 miles from Harvey lock, a distance of 9 miles. An additional west-bank connection (9 by 100 feet) is provided through Plaquemine waterway, which extends 56 miles from Plaquemine lock (260 by 55 by 10 feet) at mile 208 to Morgan City, 95 miles from Harvey lock. Modification of the Plaquemine improvement is authorized by the River and Harbor Act approved July 24, 1946, to provide for a channel (12 by 125 feet) extending from the river at the lower limit of the port of Baton Rouge, mile 228.5, to and through a new lock (500 by 56 by 12 feet) and thence to and along the existing Plaquemine waterway to Morgan City, a distance of 65 miles. Reference is made to United States Coast and Geodetic Survey Charts, United States Engineer Department Quadrangles of the area, to accompanying plates 1–5 and figures 1–9.[2]

8. *Tributary area.*—The Mississippi River, between Head of Passes and Baton Rouge, constitutes a major world port which also serves as

---
[1] Not printed.
[2] Only plate 1 printed.

a transhipment terminal for shallow-draft commerce utilizing the network of inland waterways formed by the river, its tributaries and connecting streams, including the Gulf Intracoastal Waterway. The area commercially tributary to the port is not limited by definite bounds. Inland water-borne commerce may originate in or be destined to any of the States between the Appalachian and Rocky Mountains. Ocean commerce is carried by ships which call at all major United States and world ports.

9. New Orleans (population 494,537 in 1940) is the principal port city. Its peacetime industries are allied with shipping and have been developed to utilize raw and semifinished products attracted to the port by its harbor and transportation facilities. Baton Rouge (population 34,719 in 1940) is an important oil-refinery center. Industrial operations of the port cities, expanded prodigiously by war activities, include shipbuilding and aircraft manufacturing at New Orleans; aluminum, synthetic rubber, and chemical plants as well as oil refineries at Baton Rouge. Much, if not most, of the increase in population and industrial activity may be permanent. Along the river between Baton Rouge and New Orleans, five major plants for handling or processing petroleum products and two sugar refineries are located; below New Orleans at Port Sulphur, mile 39, sulfur is produced and shipped.

10. Agricultural lands along the river below Baton Rouge are productive; principal crops being sugarcane, strawberries, tobacco, and garden produce. Below New Orleans, fishing and farming are the chief occupations of rural residents along the river. Garden truck and citrus fruits are principal crops. Shrimping and oyster fleets are based on bayous and canals which connect the river with coastal bays and sounds. Proven Louisiana oil fields have been extended by new discoveries in areas adjoining the Mississippi below New Orleans and continuing expansion of production and distribution of petroleum products along the Gulf coast make this commodity the outstanding item of inland and ocean commerce.

11. The area at and below New Orleans forms part of the Mississippi River Delta, a low alluvial plain of geologically recent deposits. Here the natural banks of the river and bayous vary from 0 to 12 feet in height and general ground elevations are little if any above or below mean sea level. Mississippi River levees, which extend below New Orleans to mile 11.5 left bank (except for Bohemia spillway, mile 33 to mile 44); and to mile 10.5, right bank, protect narrow strips of land from Mississippi River floods. There are numerous lakes, bayous, and sloughs between both river banks and the Gulf. Generally, bays and sounds along the coast are separated from the Gulf by detached islands or chains of islands.

12. The port area of New Orleans is served adequately by improved streets, highways, and railways. Rail service is provided by the Gulf, Mobile, & Ohio; Illinois Central; Southern Railway (New Orleans & Northeastern); Louisiana & Arkansas; Louisiana Southern; Louisville & Nashville; Missouri Pacific; Southern Pacific; and Texas & Pacific Railroads. The New Orleans Public Belt Railroad, the New Orleans Terminal Co., and the Texas Pacific-Missouri Pacific Terminal Railroad of New Orleans, provide switching service and interconnections between main line railroads and wharves.

13. *Bridges.*—Bridges crossing portions of waterways under consideration are listed in table 1.[1]

14. *Prior reports.*—Prior reports are listed in table 2.[1]

### III. EXISTING PROJECTS

15. Prior to 1945, deep-water navigation on the Mississippi River was provided for under projects for "South Pass, Mississippi River," "Southwest Pass, Mississippi River," and "Mississippi River, Baton Rouge to New Orleans."

16. The River and Harbor Act of March 3, 1875, as amended, authorized Mr. James B. Eads and associates to construct jetties and appurtenant works to secure and maintain for 20 years a channel through South Pass, 26 feet deep and 200 feet wide with central depth of 30 feet. The contract was completed and maintenance was assumed by the United States in January 1901. Additional works authorized in connection with the improvement include regulating works at Head of Passes, dredging in the river below Cubits Gap, and jetty extension.

17. The act of June 13, 1902, as amended, provided for a channel through Southwest Pass, 35 feet deep and 1,000 feet wide, to be secured and maintained by means of jetties, contraction works, and dredging. Essentially the plan provides for contracting the pass to a uniform cross section with surface width of about 1,420 feet; channel improvement by dredging, placing dredged material between dikes or behind bulkheads and jetties; dredging a bar channel, inclining left from the jettied channel; construction of revetted openings through narrow banks where required; closure of minor outlets; construction and maintenance of sills, bank revetment and dikes, and dredging in the river at and above Head of Passes for regulation of flow in Pass a Loutre, Cubits Gap, and the Jump.

18. The act of June 20, 1938, authorized improvement of the Mississippi River between Baton Rouge and New Orleans to provide a channel 35 feet deep and 1,500 feet wide within the limits of the port of New Orleans where the board of commissioners of the port has jurisdiction over both banks, and for a channel of the same depth, 500 feet wide, from the port of New Orleans to a line one-half mile downstream from the Mississippi River bridge at Baton Rouge.

19. Costs of the several projects to June 30, 1945, were as follows:

| Project | New work | Maintenance | Annual maintenance [1] |
|---|---|---|---|
| South Pass | $8,765,000.00 | $6,149,200.39 | $150,000 |
| Southwest Pass | 16,170,762.06 | 13,851,001.18 | 680,000 |
| Baton Rouge to New Orleans | 184,320.99 | 703,738.96 | 89,000 |

[1] As approved, June 30, 1944.

20. The River and Harbor Act of March 2, 1945, authorized modification of projects outlined above to form the existing project, "Mississippi River, Baton Rouge to the Gulf of Mexico," providing for channel dimensions listed below, at an estimated cost of $4,200,000 for new work and $250,000 annually for maintenance in addition to that already authorized.

[1] Not printed.

| Location | Depth (mean low Gulf) | Width |
|---|---|---|
| | Feet | Feet |
| Baton Rouge to New Orleans | 35 | 500 |
| Port limits of New Orleans | 35 | 1,500 |
| New Orleans to Head of Passes | 40 | 1,000 |
| Southwest Pass | 40 | 800 |
| Southwest Pass bar channel | 40 | 600 |
| South Pass | 30 | 450 |
| South Pass bar channel | 30 | 600 |

21. The existing project, "Gulf Intracoastal Waterway," provides for a channel 12 feet deep and 125 feet wide from Apalachee Bay, Fla., to the vicinity of the Mexican border, Texas, except between Mobile Bay, Ala., and New Orleans, La., where the width is 150 feet, and for rental of inner-harbor navigation canal (Industrial Canal) facilities at New Orleans. Project dimensions for the waterway across Louisiana were secured in 1942. During the same year, as a war measure, the waterway east of New Orleans was enlarged to provide a channel 17 feet deep and 165 feet wide extending 7.3 miles from the Industrial Canal to the Micheaud Canal, except for a section 0.8 mile long in the vicinity of the Paris Road Bridge (5.3 miles east of the Industrial Canal). Costs under the existing project to June 30, 1945, for the section of the waterway in the lower Mississippi Valley division, i. e., from Lake Borgne, light No. 41, to the Sabine River, were $13,574,734.93 for new work (including $353,541.19 public-works funds), $2,130,510.09 for maintenance, and $1,830,026.99 for operation and care of locks and bridges. In addition, $521,484.91 was expended prior to June 30, 1935, for operation and care of works under provisions of the permanent indefinite appropriation.

The River and Harbor Act of March 2, 1945, authorized modification of the project, "Gulf Intracoastal Waterway," to provide an alternate waterway connection with the river in the vicinity of Algiers to afford a channel 12 feet deep and 125 feet wide extending from the river at mile 88 to and through a lock (760 by 75 by 13 feet) and thence to the intracoastal waterway, a distance of 9 miles, at an estimated cost to the United States of $8,000,000 for construction and $120,000 annually for maintenance in addition to that already authorized. The River and Harbor Act of July 24, 1946, authorized modification of the project to provide for a channel 12 feet deep and 125 feet wide for the—

Plaquemine-Morgan City Route from * * * the vicinity of Morgan City * * * via the present waterway * * * to Indian Village, and thence by way of Bayou Grossetete and a new land cut to and through a new terminal lock (500 by 56 by 12 feet) and entrance channel to the Mississippi River in the vicinity of Port Allen opposite the lower limit of the port of Baton Rouge * * * at an estimated cost of $8,000,000 for construction and $100,000 annually for maintenance in addition to that already authorized. Construction of these improvements will be initiated when funds are available.

IV. LOCAL COOPERATION AND OTHER IMPROVEMENTS

22. *Local cooperation* is not required for the existing project, "Mississippi River, Baton Rouge to the Gulf," except for maintenance for 100 feet adjacent to wharves and structures. The existing

project for the intracoastal waterway provides that local interests furnish, free of cost to the United States, all rights-of-way and spoil-disposal areas required for the improvement and defray the costs of alteration or reconstruction of highway bridges. These conditions have been complied with as required.

23. *Other improvements.*—The inner-harbor navigation canal (industrial canal), constructed by the New Orleans Dock Board, extends 5½ miles from the river to Lake Pontchartrain through the east section of the city. Controlling dimensions are 150 by 20 feet at the lake, the depth increasing to 30 feet at the turning basin, 2 miles from the river. Thence to the river the depth is 32 feet except through the lock, 2,000 feet from the river, where usable dimensions are 75 by 640 feet, with 31.5 feet depth over the sills. Under authority granted in the act approved July 23, 1942, acquisition of control of the Industrial-Canal lock and so much of the canal as is used by Intracoastal Canal traffic was effected by lease dated April 1, 1944, since which date the facility has been operated toll-free on a 24-hour-per-day basis.

24. *Terminal and transfer facilities.*—At Baton Rouge, these comprise a public concrete wharf and appurtenances for barge and deep-draft vessel traffic and private terminals and docks for handling oil and other commodities, located along the river front as far as the Baton Rouge Bridge (reference unpublished report, Survey of Terminals and Landings on the Inland Waterways of the United States, Board of Engineers for Rivers and Harbors, 1941).

25. Port facilities at New Orleans, described in detail in the Port of New Orleans, La., Port Series No. 5, revised 1938, include at least 100 wharves with depths varying from 12 to 40 feet. On the left bank, structures are located on the levee and form an almost continuous quay for 10 miles. Public terminal business is controlled by the Board of Commissioners, Port of New Orleans, with wharves covering about 62 percent of the improved water front. Most of the wharf area is served by modern transit sheds equipped with riverside aprons 20 to 30 feet wide for shipside loading, and with landside streets and railroad tracks, notably the New Orleans Public Belt Railroad, for interchange of commodities between terminals and railroads. On the right bank, railway and private terminal piers and wharves are sited at Westwego, Gretna, and Algiers. At the last-named location are drydocks for deep-draft vessels of which the largest is that of the United States naval installation, which is placed at the service of commercial craft when private docks are not available. Above New Orleans, private terminals for seagoing commerce are operated by five oil companies and two sugar refineries, and below the city at least four oil companies have private terminals; the pier of the Seatrain Line is located at Belle Chasse; and the Freeport Sulphur Co. operates its terminal at Port Sulphur. The inner-harbor navigation canal and lock, which provides access for vessels which can negotiate the sill (i. e., with fresh-water draft not more than 31 feet), affords four lateral slips, marginal wharves, a turning basin 1,000 feet square, and a connecting channel to the Intracoastal Waterway east from the city where industrial sites (including the Higgins Industries) were developed in war years. Here undeveloped terminal sites are available but railway and highway connections are limited. In general, terminal facilities at New Orleans, developed to meet increasing requirements of expanding commerce of a premier river

terminal and transfer port serving both deep- and shallow-draft traffic, have been installed along unstable river banks where stage fluctuation is a restrictive factor. The dock board states that these terminals must soon be augmented to serve further increase in waterborne commerce incident to continuing development of the Mississippi Valley and the Nation. Extension of marginal wharves above or below the city involves attenuation of surface transportation with attendant decreased efficiency of terminal transfer operations. Expansion along the Intracoastal Waterway and development of a tidewater terminal basin on unimproved property is highly desirable if the improvement is located close enough to the city to facilitate continuing development of water-front terminals with highway and railroad connections. Establishment of a free port area for transshipment of foreign commerce of the port without clearance through customs, deferred during war years, has been authorized by the Department of Commerce and presumably will be activated in the early future as a feature of postwar reconstruction.

### V. IMPROVEMENT DESIRED

26. *General.*—A public hearing held at New Orleans, August 5, 1943, was attended by some 500 representatives of Federal, State, city, and parish agencies; financial, commercial, industrial, and shipping interests; and numerous civic and social organizations. Transcript of hearing and exhibits I–LXXXIX,[1] presented at that time or later, are appended. The Board of Commissioners of the Port of New Orleans (the New Orleans Dock Board), and others proposed a deep-draft outlet channel (seaway) from the Industrial Canal to the Gulf, east of the Chandeleur Islands. Jefferson Parish officials, the Mississippi Valley Seaway Canal Association, and other west-bank interests proposed a similar channel on the west bank from Westwego to the Gulf at Grand Isle. The Inland Waterways Corporation and others suggested the advisability of expanding lock facilities for inland-waterway traffic.

27. *East bank outlets.*—The dock board stated (exhibit LVII [1]) that an additional east-bank outlet (seaway) would afford a deep, safe, and dependable tidewater channel from New Orleans to deep water in the Gulf, which would involve no difficult problems in engineering; that its cost would be reasonable in comparison with resulting benefits; that it would not be subject to shoaling by river-borne sediment; and that it would make available large areas of land for future development of a tidewater port. On July 16, 1945, the dock board submitted a second brief (exhibit LVII–A [1]) in which it outlines its status as an agency of the State of Louisiana, recounts addresses and briefs submitted at the public hearing, and presents engineering reports by Col. Elliot J. Dent, United States Army, retired, consulting engineer; Dr. Robert W. French, Louisiana State University; and V. J. Bedell Co., consulting engineers. Later, on June 1, 1946, the dock board submitted a supplementary brief (exhibit LVII–B,[1] report by Knappen Engineering Co.), in which it is pointed out that New Orleans needs to expand its general-cargo-handling facilities and harbor space to provide at least 3,000,000 tons additional annual capacity, and that such expansion may be effected

---

[1] Not printed.

economically by enlargement of the inner harbor and construction of a deep-draft outlet canal, for which channel dimentions of 500 by 36 feet would suffice initially, with estimated cost of $25,000,000 for dredging and $1,380,000 annually for maintenance of the proposed canal, unless provided with a permanent dike for retention of dredged spoil. It is noted that access to the tidewater harbor may be provided by an additional deep-draft lock (40 by 100 by 1,000 feet), with connecting channel to the river, at an estimated cost of $24,200,000. It is stated that the dock board has spent over $30,000,000 in 25 years on inner-harbor improvements and contemplates an additional expenditure of $30,000,000 for further development.

28. *West bank outlets.*—The Seaway Canal Association, in its brief (exhibit LXXIV–A [1]), lists "reasons" and "advantages" in support of a west bank outlet, stating, among other things, that it is the shortest route between New Orleans and deep water in the Gulf, traversing unimproved lands rather than open water, thus involving minimum maintenance costs and facilitating construction of a highway to Grand Isle, to open up the area and enhance values of adjacent lands.

## VI. COMMERCE

29. *Existing commerce.*—Total traffic on the lower river for the period 1936–45, comprising that reported in annual reports of the Chief of Engineers for Mississippi River passes and ports of New Orleans and Baton Rouge, was as follows:

[Thousands of tons]

| Year | Passes | Port of New Orleans | Port of Baton Rouge | Year | Passes | Port of New Orleans | Port of Baton Rouge |
|---|---|---|---|---|---|---|---|
| 1936 | 14,965 | 14,332 | 5,002 | 1941 | 13,533 | 20,007 | 8,150 |
| 1937 | 16,006 | 17,173 | 6,510 | 1942 | 8,200 | 22,637 | 7,744 |
| 1938 | 16,319 | 17,225 | 7,092 | 1943 | 7,025 | 21,329 | 6,862 |
| 1939 | 15,597 | 16,305 | 7,898 | 1944 | 9,053 | 23,949 | 7,844 |
| 1940 | 15,807 | 19,706 | 7,501 | 1945 | 13,387 | 25,205 | 6,967 |

30. Seagoing commerce through the passes, including foreign and coastwise traffic, for the years 1941 and 1945, consisted of commodities classified as follows:

[Thousands of tons]

| Commodity class [1] | 1941 | | 1945 | |
|---|---|---|---|---|
| | Imports | Exports | Imports | Exports |
| Products of agriculture | 2,711 | 531 | 959 | 1,246 |
| Animal products | 101 | 75 | 141 | 87 |
| Products of mines | 400 | 436 | 173 | 2,169 |
| Products of forests | 154 | 557 | 102 | 171 |
| Manufacturing and miscellaneous | 1,114 | 7,445 | 2,672 | 5,667 |
| Total | 13,533 | | 13,387 | |

[1] Imports and exports in table include coastwise receipts and shipments.

31. Distribution of seagoing commerce at points on the river from Head of Passes to Baton Rouge for the years 1941 and 1945 is shown in the following table:

---
[1] Not printed.

[Thousands of tons]

| Points of loading or unloading | Receipts and shipments | | Points of loading or unloading | Receipts and shipments | |
|---|---|---|---|---|---|
| | 1941 | 1945 | | 1941 | 1945 |
| Below New Orleans: | | | Above New Orleans: | | |
| Pilottown | 252 | 234 | Avondale | ------ | 176 |
| Port Sulphur | 323 | 302 | St. Rose | 297 | 294 |
| | | | Destrehan | 159 | 36 |
| Total, lower harbor | 575 | 596 | Good Hope | 186 | 165 |
| | | | Norco | 350 | 493 |
| Within port of New Orleans: | | | Gramercy | 11 | ------ |
| Inner Harbor (Industrial Canal) | 121 | 250 | Total, New Orleans to Baton Rouge | 913 | 1,164 |
| East bank river wharves | 5,538 | 8,113 | | | |
| Total, east bank | 5,659 | 8,363 | Port of Baton Rouge | 4,118 | 2,505 |
| Belle Chasse | 538 | 220 | Grand total | 13,533 | 13,387 |
| Gretna | 175 | 2 | | | |
| Marrero | 946 | 296 | | | |
| Westwego | 609 | 241 | | | |
| Total, west bank | 2,268 | 759 | | | |

82. *Intracoastal waterway traffic.*—That east and west of the Mississippi River for the period 1939-45 was recorded by sections as follows:

[Thousands of tons]

| Year | Mobile Bay to New Orleans | Mississippi River, La., to Atchafalaya River | | Year | Mobile Bay to New Orleans | Mississippi River, La., to Atchafalaya River | |
|---|---|---|---|---|---|---|---|
| | | Harvey Lock | Plaquemine Lock [1] | | | Harvey Lock | Plaquemine Lock [1] |
| 1939 | 1,677 | 2,063 | 301 | 1943 | 4,470 | 9,753 | 3,201 |
| 1940 | 2,051 | 3,389 | 429 | 1944 | 5,807 | 11,441 | 2,362 |
| 1941 | 3,054 | 6,180 | 1,300 | 1945 | 5,172 | 9,253 | 1,606 |
| 1942 | 3,545 | 8,937 | 3,404 | | | | |

[1] Through traffic.

33. Through freight traffic on the Intracoastal Waterway for sections east and west of the Mississippi River for the years 1941 and 1945 consisted of commodities classified as follows:

[Thousands of tons]

| Commodity class | Mobile Bay to New Orleans [1] | | Mississippi River to Atchafalaya River | | | |
|---|---|---|---|---|---|---|
| | | | Harvey Lock | | Plaquemine Lock [1] | |
| | East | West | East | West | East | West |
| 1941—Products of agriculture | 185 | 24 | 37 | 60 | 9 | 12 |
| Animal products | 72 | 11 | 25 | 3 | ------ | ------ |
| Products of mines | 11 | 50 | 94 | 346 | ------ | 9 |
| Products of forests | 70 | 23 | 29 | 17 | 27 | 2 |
| Manufacturing and miscellaneous | 1,629 | 809 | 4,503 | 1,000 | 1,073 | 168 |
| Total | 2,884 | | 6,180 | | 1,300 | |
| 1945—Products of agriculture | 13 | 1 | 14 | 25 | ------ | 2 |
| Animal products | 109 | 6 | 3 | ------ | ------ | ------ |
| Products of mines | 94 | 522 | 2,926 | 149 | 949 | 88 |
| Products of forests | 72 | 1 | 4 | 1 | ------ | 1 |
| Manufacturing and miscellaneous | 4,254 | 106 | 5,620 | 505 | 534 | 32 |
| Total | 5,172 | | 9,253 | | 1,606 | |

[1] Through traffic.

34. *Industrial-canal traffic.*—Statistics relating to Intracoastal Waterway (pars. 32 and 33) do not cover commerce pertinent to the industrial canal and lock. Traffic served by this facility, as recorded by the dock board for fiscal years 1934–43, consisted of vessels and cargoes as follows:

*Traffic through Industrial Canal and lock*

| Fiscal year | Vessels | Cargo | Fiscal year | Vessels | Cargo |
|---|---|---|---|---|---|
|  |  | Thous. tons |  |  | Thous. tons |
| 1934 | 13,382 | 5,353 | 1939 | 16,194 | 5,905 |
| 1935 | 12,566 | 5,595 | 1940 | 17,079 | 6,081 |
| 1936 | 13,451 | 5,151 | 1941 | 19,705 | 7,040 |
| 1937 | 14,491 | 5,625 | 1942 | 21,986 | 7,509 |
| 1938 | 15,499 | 5,902 | 1943 | 25,700 | 9,826 |

35. *Vessel traffic.*—The following tabulation shows trips and drafts of vessels traversing the passes during the years 1941 and 1945:

| Draft (feet) | Steamers | | | | Barges: | |
| | South Pass | | Southwest Pass | | Both passes | |
| | In-bound | Out-bound | In-bound | Out-bound | In-bound | Out-bound |
|---|---|---|---|---|---|---|
| 1941—33 to 34 | | | | 25 | | |
| 32 to 33 | | | 4 | 33 | | |
| 31 to 32 | 3 | 16 | 9 | 76 | | |
| 30 to 31 | 1 | 23 | 5 | 30 | | |
| 28 to 30 | 20 | 198 | 35 | 72 | | |
| 26 to 28 | 62 | 216 | 96 | 47 | | |
| 24 to 26 | 176 | 234 | 116 | 28 | | 2 |
| 22 to 24 | 232 | 174 | 78 | 30 | 2 | |
| 20 to 22 | 235 | 169 | 82 | 47 | | 2 |
| 18 to 20 | 385 | 234 | 97 | 63 | 2 | 1 |
| Under 18 | 718 | 529 | 152 | 265 | 10 | 9 |
| Total | 1,832 | 1,793 | 674 | 716 | 14 | 14 |
| 1945—35 to 36 | | | | 1 | | |
| 33 to 34 | | | | 21 | | |
| 32 to 33 | | 4 | 7 | 46 | | |
| 31 to 32 | | 31 | 1 | 49 | | |
| 30 to 31 | 2 | 12 | 5 | 13 | | |
| 28 to 30 | 36 | 215 | 71 | 90 | | |
| 26 to 28 | 99 | 156 | 78 | 47 | | |
| 24 to 26 | 77 | 146 | 58 | 45 | | 12 |
| 22 to 24 | 144 | 149 | 68 | 35 | | |
| 20 to 22 | 169 | 176 | 70 | 71 | | |
| 18 to 20 | 347 | 248 | 116 | 107 | 1 | |
| Under 18 | 647 | 569 | 338 | 104 | 18 | 16 |
| Total | 1,521 | 1,706 | 812 | 719 | 19 | 28 |

36. Trips and drafts of vessels which moved through sections of the Intracoastal Waterway during 1941 and 1945 are shown in the following tabulation:

| Draft (feet) | 1941 | | | | 1945 | | | |
|---|---|---|---|---|---|---|---|---|
| | East-bound | | West-bound | | East-bound | | West-bound | |
| | Self-propelled | Barges | Self-propelled | Barges | Self-propelled | Barges | Self-propelled | Barges |
| Mobile Bay to New Orleans | | | | | | | | |
| 9 to 12 | | | | | 145 | 22 | 145 | |
| 6 to 9 | 2,661 | 2,331 | 2,321 | 1,367 | 2,340 | 4,161 | 1,878 | 757 |
| 3 to 6 | 6,520 | 544 | 6,824 | 258 | 1,120 | 101 | 1,027 | 29 |
| Under 3 | 597 | 1,158 | 657 | 2,399 | 216 | 211 | 219 | 4,225 |
| Total | 13,811 | | 13,826 | | 8,325 | | 8,280 | |
| Mississippi River, La., to Sabine River, Tex. | | | | | | | | |
| 9 to 12 | | | | | 781 | 745 | 714 | 405 |
| 6 to 9 | 4,630 | 5,548 | 4,598 | 5,634 | 5,295 | 8,865 | 5,397 | 4,684 |
| 3 to 6 | 4,076 | 1,865 | 4,817 | 1,927 | 4,551 | 909 | 4,355 | 1,470 |
| Under 3 | 462 | 7,162 | 637 | 7,029 | 306 | 6,773 | 162 | 10,468 |
| Total [1] | 24,043 | | 24,042 | | 28,315 | | 27,055 | |
| Plaquemine to Morgan City | | | | | | | | |
| 6 to 9 | | 1,071 | | 308 | 488 | 790 | 489 | 157 |
| 3 to 6 | 569 | 85 | 1,112 | 52 | 290 | 64 | 290 | 89 |
| Under 3 | 561 | 392 | 19 | 1,183 | 30 | 269 | 30 | 879 |
| Total | 2,678 | | 2,674 | | 1,040 | | 1,043 | |

[1] East and west through Harvey lock, 13,115 and 13,052 in 1941; 17,755 and 18,053 in 1945.

37. *Prospective seagoing traffic.*—Shipping interests anticipate (exhibit LVII–A[1]) an increase of 50 percent or more in seagoing commerce at New Orleans. Analysis by the United States Maritime Commission (exhibit LXXXVIII [1]) discloses that general-cargo foreign trade of the port did not increase between 1923 and 1940 but that coastwise shipping and internal traffic in the decade ending in 1940 was more than twice that of the decade of the twenties, and that the total general-cargo traffic in foreign, coastwise, and internal trade almost doubled in 17 years ending in 1940. Noting that analysis of trade prospects of New Orleans does not bear out traffic estimates of proponents, the Maritime Commission suggests that New Orleans should share in expansion of general-cargo foreign trade expected by the Department of Commerce and will need the proposed additional channel and port facilities to care for that expansion. Petroleum interests state (exhibit LXXXII [1]) their aversion to side channel outlets and advise that they prefer to use the improved river channel. Terminals for bulk traffic in oil and sulfur are outside the port of New Orleans and these commodities properly may be excluded in estimates of prospective commerce for proposed outlets. Thus seagoing commerce that may be

[1] Not printed.

served by proposed east-bank outlets consists of general cargo which is served by east-bank and inner-harbor terminals (par. 31) and a 50-percent increase in this traffic is a reasonable expectancy; hence, prospective commerce pertinent to this section of the port may be expected to expand to more than 10,000,000 tons, terminal handling of which would be facilitated by a tidewater harbor with a direct outlet to the Gulf, especially if proposed tidewater facilities and existing east bank terminals are operated by a single agency, i. e., the New Orleans Dock Board.

38. Prospective deep-draft commerce, that may be served by the proposed west-bank outlet, consists of general cargo which now uses west-bank terminals between Belle Chasse and Westwego (par. 31), and this traffic also may be expected to increase by 50 percent to more than 3,000,000 tons, handling difficulties for which would be lessened by a tidewater harbor with direct outlet to the Gulf.

39. *Inland-waterway traffic.*—During the period 1939-45, Intracoastal Waterway commerce between Mobile and New Orleans varied between 1,500,000 and 6,000,000 tons, and during the war years (1941-45), averaged nearly 4,500,000 tons. Reasonably, some decline in postwar waterway traffic may be expected, but improvement of the waterway connecting the Tombigbee and Tennessee Rivers, authorized by the River and Harbor Act approved July 24, 1946, presupposes diversion of Mississippi River traffic of 3,000,000 tons or more (H. Doc. No. 486, 79th Cong., 2d sess.). If such diversion is effected, traffic on the Mobile-New Orleans section of the Gulf Intracoastal will be increased correspondingly. Thus prospective Intracoastal Waterway commerce (Mobile-New Orleans section) may be far greater than that reported for war years and may exceed 10,000,000 tons.

40. During the period 1939-45, Intracoastal Waterway commerce through Harvey lock, i. e., west of New Orleans, varied between 2,000,000 and 11,500,000 tons, and in war years (1941-45) averaged more than 9,000,000 tons. Some decline in this great traffic may be expected as a feature of postwar reconversion, especially in view of the recommended enlargement and extension of the Plaquemine alternate route to the Mississippi River opposite Baton Rouge; but some, if not all, of such decline may be offset by expanding oil production in the Gulf area.

### VII. DIFFICULTIES ATTENDING NAVIGATION

41. Usual hazards encountered in restricted channels and outlets therefrom attend navigation of the river and its passes. Fog observations by the New Orleans district for 1941 disclosed that in that year there were 50 occurrences at Burrwood on Southwest Pass, of which those characterized as "moderate" (visibility less than $5/8$ mile) obtained 134 hours; "thick" (visibility less than $5/16$ mile) 48 hours; and "dense" (visibility less than $1/8$ mile) 14 hours, indicating that fog is only a minor navigation hazard for traffic to and from New Orleans. River currents, less than a knot at low stages and more than 6 knots at crest of flood at and below New Orleans, retard up-bound and accelerate down-bound traffic but do not constitute a serious hazard for modern full-powered vessels. A traffic-control-signal system in New Orleans Harbor is operated during high stages. Flood flows up to 3 knots down Southwest Pass and 4 knots down South Pass emerge