# Exhibit 28

Page 1

```
                UNITED STATES DISTRICT COURT

                EASTERN DISTRICT OF LOUISIANA


IN RE: KATRINA CANAL BREACHES      CIVIL ACTION

CONSOLIDATED LITIGATION            NO. 05-4182 K2

                                   JUDGE DUVAL

PERTAINS TO:                       MAG. WILKINSON

Robinson, No. 06-2286
```

        Deposition of G. PAUL KEMP, PH.D.,
given at the offices of Lambert & Nelson,
P.L.C., 701 Magazine Street, New Orleans,
Louisiana 70130, on November 27th, 2007.




    REPORTED BY:

        JOSEPH A. FAIRBANKS, JR., CCR, RPR

        CERTIFIED COURT REPORTER #75005

KEMP, PH D, G. PAUL

11/27/2007

Page 8

1           MR. SMITH:
2               Robin Smith, United States.
3           MS. MACK:
4               Sarah Mack, also present.
5           G. PAUL KEMP, PH.D.
6 633 Magnolia Wood Avenue, Baton Rouge,
7 Louisiana 70808, a witness named in the above
8 stipulation, having been first duly sworn, was
9 examined and testified on his oath as follows:
10           MS. HARRISON:
11               Parker Harrison for Lafarge North
12          America here to observe.
13 EXAMINATION BY MR. SMITH:
14     Q.   Good morning, Dr. Kemp.
15     A.   Good morning.
16     Q.   My name is Robin Smith.  We met just a
17 few moments before the deposition began this
18 morning for the first time.
19     A.   That's right.
20           MR. O'DONNELL:
21               Did we swear the witness?
22           THE COURT REPOTER:
23               Yes.  Usual stipulations, is that
24          correct?
25           MR. SMITH:

KEMP, PH D, G. PAUL

11/27/2007

Page 83

1    A.   I would say that the initial kernel of
2 my understanding of the effect of this channel
3 came out of that experience.  Subsequently, we
4 have looked in much more detail than, um --
5 than is documented in Team Louisiana.
6         MR. O'DONNELL:
7              But it does form one of the
8         bases.
9         THE WITNESS:
10             It forms -- that was how I got
11        started in it.
12        MR. O'DONNELL:
13             Okay.  You've done work since the
14        Team Louisiana report.
15        THE WITNESS:
16             That's right.
17        MR. O'DONNELL:
18             Okay.
19 EXAMINATION BY MR. SMITH:
20   Q.   When you say subsequently you've taken
21 a closer look of --
22   A.   That's right.  That's right.
23   Q.   -- what data have you relied upon
24 after you completed the simulations that are
25 represented in Table 1 on Page 10 of Exhibit

Johns Pendleton Court Reporters              800 562-1285

74e5afb9-993b-4883-b6db-c86ceee423f2

KEMP, PH D, G. PAUL

11/27/2007

Page 84

1   Number 4?
2       A.    Well, I was probably one of the most,
3   um -- consummate consumers of the IPET report,
4   for example.  Probably one of the few people
5   that has read every volume of it.
6              MR. O'DONNELL:
7                   You read it.  You didn't eat it.
8       A.    Well, I'm a consumer.  So -- and I of
9   course was greatly informed by the ILIT team
10  and actually have maintained contact with a
11  number of members of that team.  And, you know,
12  I've -- in the course of this work, after I
13  finished the Team Louisiana report, I was
14  recruited for this effort and have been
15  involved in guiding some of the subsequent
16  analyses that inform this effort.
17  EXAMINATION BY MR. SMITH:
18      Q.    When you say this effort, you are
19  referring to the litigation?
20      A.    That's correct.
21      Q.    Have you performed any ADCIRC modeling
22  since the completion of the final simulation
23  that's set forth in Table Number 1 on Page 10?
24      A.    Yes.  I remained at LSU through
25  February of this year, and during that period

KEMP, PH D, G. PAUL

11/27/2007

Page 197

1  Q. Sure.
2  A. Okay.
3  Q. I guess --
4  MR. O'DONNELL:
5  This is a Corps document, you're
6  saying?
7  THE WITNESS:
8  Yes.
9  EXAMINATION BY MR. SMITH:
10  Q. Storm surge modelers don't rely on
11  this Figure 14 analysis anymore, do they?
12  A. No.
13  Q. And isn't that because it's overly
14  simplistic?
15  A. Yes.
16  Q. It does not consider a number of
17  factors that are presently understood to
18  influence storm surge; isn't that correct?  For
19  instance, it doesn't take wind stress into
20  account, does it?
21  A. Storm surge doesn't take wind
22  stress -- I mean, storm surge is a -- I mean,
23  wind stress causes storm surge, which -- and
24  then storm surge interacts with wetlands to
25  cause, um -- elevation change, dropoff of

1   elevation for the most part.  This does not
2   take into consideration unique characteristics
3   of every storm.  So this is kind of a
4   generalized view.  What it says is that --
5   something that everybody has noticed for a long
6   time, and that is that when you propagate surge
7   over wetlands this surge elevation drops.
8   Okay?
9        Q.   But it's not a reliable indicator of
10  how much, is it?
11       A.   It doesn't tell you -- it doesn't tell
12  you how much it's going to drop for a
13  particular storm.
14       Q.   All right.
15       A.   So it's not a good predictive tool.
16       Q.   All right.  And so you couldn't
17  extrapolate from this table to the impact of
18  wetlands during Hurricane Katrina, could you?
19       A.   No.  Dr. Mashriqui has taken data from
20  Hurricane Rita and tried to extrapolate that,
21  and that's -- I suspect that a lot of folks at
22  the Corps have done that, as well.  And, you
23  know, because they have certainly modified
24  ADCIRC to reflect higher Manning's coefficients
25  for the wetlands.