UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| | * | |
| IN RE:  KATRINA CANAL BREACHES | * | CIVIL ACTION |
| CONSOLIDATED LITIGATION | * | |
| | * | NO. 05-4182 |
| | * | |
| PERTAINS TO:  MRGO | * | SECTION "K" (2) |
| | * | |
| | * | JUDGE DUVAL |
| | * | |
| | * | MAGISTRATE WILKINSON |
| * * * * * * * * * * * * * * * * * * * * * * * * * * | * | |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF WASHINGTON GROUP INTERNATIONAL, INC.'S MOTION FOR SUMMARY JUDGMENT**

William D. Treeby, 12901
Carmelite M. Bertaut, 3054
Heather S. Lonian, 29956
Stone Pigman Walther Wittmann L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Telephone:      (504) 581-3200
Facsimile:      (504) 581-3361

Adrian Wager-Zito
Debra S. Clayman
Jones Day
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
Telephone:      (202) 879-4645
Facsimile:      (202) 626-1700

November 6, 2008                    *Attorneys for Washington Group International, Inc.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

TABLE OF EXHIBITS .................................................................................................... iv

I.      INTRODUCTION ................................................................................. 1

II.     THERE ARE NO PREREQUISITES TO THE APPLICATION OF THE
        THREE- PRONG TEST UNDER BOYLE .......................................................... 3

        A.      Proof of Boyle's Three Conditions Shows The United States' Exercise Of
                Discretion And The Related Need To Displace State Law ................................. 3

III.    WGII SATISFIED ITS BURDEN OF PROVING THE THREE CONDITIONS
        OF  THE GOVERNMENT CONTRACTOR DEFENSE ................................. 6

        A.      Condition 1:  The Corps Approved Reasonably Precise Specifications .............. 6

                1.      The Corps-approved, reasonably precise specifications for the
                        sewer lift station  and wedding cake excavations addressed
                        "backfill" and "compaction" ................................................. 8

                2.      Geotechnical specifications relating to levees and floodwalls were,
                        at the Corps'  discretion, outside WGII's scope of work ....................... 11

        B.      Condition 2:  Conformity to Government-Approved Specifications ................. 13

                1.      Plaintiffs do not genuinely dispute WGII's evidence of conformity
                        to   government-approved specifications for the sewer lift station
                        and wedding cake ................................................................. 13

                2.      WGII's alleged failure to obtain a permit from the O.L.D. is not
                        relevant ............................................................................ 14

        C.      Condition 3:  WGII Did Not Have Any Actual Knowledge of Dangers
                Associated With Its Work That Were Not Otherwise Know to the Corps .......... 16

IV.     CONCLUSION ................................................................................... 18

952284v.1

## TABLE OF AUTHORITIES

### FEDERAL CASES

*In re Agent Orange Product Liab. Litig.*,
   517 F.3d 76 (2d Cir. 2007) ............................................................................. 4

*In re Air Disaster*,
   81 F.3d 570 (5th Cir. 1996) ....................................................................3, 4, 6, 8

*Bailey v. McDonnell Douglas Corp.*,
   989 F.2d 794 (5th Cir. 1993) ..................................................................... 3, 13

*Beaver Valley Power Co. v. Nat'l Eng'g & Contracting Co.*,
   883 F.2d 1210 (3d Cir. 1989) ........................................................................ 14

*Boyle v. United Tech. Corp.*,
   487 U.S. 500 (1988)..............................................................................4, 7, 11

*Guile v. United States*,
   422 F.3d 221 (5th Cir. 2005) .......................................................................... 4

*Harduvel v. Gen. Dynamics Corp.*,
   878 F.2d 1311 (11th Cir. 1989) .................................................................4, 6, 7

*In re Katrina Canal Breaches Consol. Litig.*,
   2007 WL 4219351 (E.D. La. Nov. 27, 2007)...................................................... 3

*Kerstetter v. Pac. Scientific Co.*,
   210 F.3d 431 (5th Cir. 2000).................................................................3, 6, 7, 11, 14

*Kleemann v. McDonnell Douglas Corp.*,
   890 F.2d 698 (4th Cir. 1989) .......................................................................... 6

*Lewis v. Babcock Indus., Inc.*,
   985 F.2d 83 (2d Cir. 1993), *cert. denied*, 509 U.S. 924 (1993) ..................................... 3, 4

*Lujan v. Nat'l Wildlife Fed'n*,
   497 U.S. 871 (1990)...................................................................................... 13

*Miller v. Diamond Shamrock Co.*,
   275 F.3d 414 (5th Cir. 2001) .......................................................................... 3

*Oliver v. Oshkosh Truck Corp.*,
   96 F.3d 992 (7th Cir. 1996), *cert denied*, 520 U.S. 1116 (1997) ................................. 6, 7

*Skyline Air. Serv., Inc. v. G.L. Capps Co.,*
    916 F.2d 977 (5th Cir. 1990) ................................................................... 3, 15

*Smith v. Xerox Corp.,*
    866 F.2d 135 (5th Cir. 1989) ................................................................... 3, 7

*Stout v. Borg-Warner Corp.,*
    933 F.2d 331 (5th Cir. 1991) ...................................................... 3, 6, 7, 8, 11

*Trevino v. Gen. Dynamics Corp.,*
    865 F.2d 1474 (5th Cir. 1989) ...................................................... 3, 6, 7, 16

*United States v. Varig Airlines,*
    467 U.S. 797 (1984) ................................................................................. 4

## FEDERAL RULES

Fed. R. Civ. P. 56(e)(2) ....................................................................................... 14

952284v.1

**TABLE OF EXHIBITS**

Deposition of Lee Guillory, Vol. II, Aug. 22, 2008 ............................................................ Ex. 6

Deposition of Dennis O'Conner, Aug. 13, 2008 ................................................................ Ex. 21

Deposition of James Montegut, Aug. 8, 2008 .................................................................... Ex. 23

WGII Revised – Final Proposal #113 for Excavation and Disposal of
Additional Subsurface Foundations, Sept. 24, 2001 ......................................................... Ex. 29

Deposition of John Grieshaber, Vol. II, Aug. 21, 2008 ...................................................... Ex. 58

Wedding Cake Final Work Plan, Dec. 11, 2001 ................................................................. Ex. 63

Lift Station Removal Plan (Revised), Oct. 19, 2001 .......................................................... Ex. 64

Lift Station Revised Work Plan, Oct. 1, 2001 .................................................................... Ex. 75

Preparatory Phase Inspection Checklist, Sewer Lift Station, Oct. 3, 2001 .......................... Ex. 76

Preparatory Phase Meeting Minutes (Concrete Blocks), Nov. 14, 2001 .............................. Ex. 83

Declaration of Stevan G. Spencer ...................................................................................... Ex. 121

RECAP Submittal Report – Saucer Marine .......................................................................... Ex. 122

RECAP Submittal Report – Boland Marine .......................................................................... Ex. 123

RECAP Comment Submittal – Saucer ................................................................................ Ex. 124

952284v.1

## I.    INTRODUCTION

Despite the breadth of allegations in their Complaint, it is now clear that Plaintiffs challenge WGII's entitlement to summary judgment with respect to only three specific features of work that WGII undertook on behalf of the United States Army Corps of Engineers (the "Corps") pursuant to Task Order 26:  (1) the sewer lift station excavation at Saucer Marine; (2) the "wedding cake" structure excavation at Boland Marine; and (3) WGII's alleged failure to obtain a permit for its excavation activities from the Orleans Levee District ("O.L.D.").  (*See* MRGO PSLC's Opp. to WGII's Mot. for Summ. J., at 2, 18 (Doc. No. 16208-3) ("Pls.' Opp.")).

*First*, with respect to the sewer lift station and wedding cake excavations, Plaintiffs complain that WGII "should have" backfilled these holes with "impermeable material," "should have" compacted the backfill "to a minimum 95 percent Standard Proctor density," and "should have" performed "independent geotechnical investigations" to prevent any alleged underseepage. (*See, e.g.*, Pls.' Opp. at 2, 16).  But as the case law makes clear, what the government-approved specifications for a particular feature of work <u>should have</u> or <u>could have</u> been is irrelevant to the inquiry under the government contractor defense.  (*See infra*, pp. 6-7, 10-11;  Mem. of Law in Supp. of WGII's Mot. for Summ. J., at 47-48, 50-51 (Doc. No. 15861) ("Def.'s Br.")).  Instead, as long as the work conforms with reasonably precise, government-approved specifications, the contractor satisfies the relevant conditions of the government contractor defense.  (*See infra*, pp. 6-7).

Plaintiffs' conclusory allegations that the government-approved specifications for these excavations were too "general," such that WGII was free to direct its subcontractors to backfill with whatever material WGII chose, or to compact the soil in whatever way WGII chose (Pls.' Opp. at 20-22), are soundly contradicted by the undisputed record.  (*See infra*, pp. 8-10).   Indeed,

1

as described in WGII's opening brief and accompanying exhibits, the Corps substantively reviewed, considered, and approved the plans for backfilling and compacting the sewer lift station and wedding cake excavations; and the Corps' inspectors inspected the physical backfill/compaction work on an on-going basis to ensure compliance with the approved plans. (*See infra*, pp. 8-10; Def.'s Br. at 23-29, 53-58; Def.'s Statement of Undisputed Material Facts, ¶¶ 110-139 (Doc. No. 15861-3) ("Def.'s Stmt.")).  Finally, and perhaps most importantly, as every relevant witness in this case testified, the Corps, and not WGII, was responsible for determining (and did in fact determine) whether further geotechnical engineering testing and/or more specific geotechnical specifications relevant to the levees/floodwalls were required for any particular excavation.  (*See infra*, p. 12; Def.'s Br. at 23-29, 37-41; Def.'s Stmt., ¶¶ 110-139, 178-201).  Thus, WGII submits that this evidence undisputedly satisfies the reasonably precise, government-approved-specifications condition of the government contractor defense, and Plaintiffs' unsubstantiated arguments to the contrary are without merit.

*Second*, with respect to the O.L.D. permit, Plaintiffs argue that obtaining this permit "would have provided an additional level of investigation to perhaps insure the integrity of the flood wall."  (Pls.' Opp. at 18) (emphasis added).  However, as set forth in detail below, WGII's alleged failure to obtain a permit from the O.L.D. is a red herring.  Plaintiffs have not, and cannot, point to any credible evidence (other than their own supposition) that WGII's alleged failure to obtain an O.L.D. permit caused or contributed to the levee failures in the Lower Ninth Ward.  (*See infra*, pp. 13-15; Declaration of Stevan G. Spencer, October 27, 2008 [Ex. 121]).  Accordingly, any alleged nonconformity by WGII relating to the permitting issue is irrelevant to WGII's entitlement to the government contractor defense because Plaintiffs failed to set forth

952284v.1

any material facts showing how such nonconformity "caused its damages."  (*See infra*, pp. 13-15; Def.'s Br. at 48-50).

## II.   THERE ARE NO PREREQUISITES TO THE APPLICATION OF THE THREE-PRONG TEST UNDER *BOYLE*

### A.   Proof of *Boyle's* Three Conditions Shows The United States' Exercise Of Discretion And The Related Need To Displace State Law

Plaintiffs argue that the government contractor defense test under *Boyle* is applicable only if WGII first proves:  (1) that the United States enjoys sovereign immunity under the discretionary function exception to the Federal Tort Claims Act ("FTCA") for its role in "administering the EBIA project"; and (2) that the "state-imposed duty of care . . . is precisely contrary to the duty imposed by the government contract."[1]  This is a flat misstatement of the law.  As the Second Circuit explained after considering these exact issues, both "inquiries are part of the *Boyle* test and not prerequisites."  *Lewis v. Babcock Indus., Inc.*, 985 F.2d 83, 86 (2d Cir. 1993), *cert. denied*, 509 U.S. 924 (1993) (emphasis added); *see also Bailey v. McDonnell Douglas Corp.*, 989 F.2d 794, 801-02 (5th Cir. 1993) ("Whether [the government contractor defense] will apply to a particular claim depends only upon whether *Boyle's* three conditions are met with respect to the particular product feature upon which the claim is based") (emphasis in original).[2]

---

[1]  *See* Pls.' Opp. at 5-8.

[2]  The Fifth Circuit has never held otherwise.  *See, e.g., Miller v. Diamond Shamrock Co.*, 275 F.3d 414, 419 (5th Cir. 2001) (holding that "to invoke" the government contractor defense, the contractor must prove *only* the three conditions announced in *Boyle*); *Kerstetter v. Pac. Scientific Co.*, 210 F.3d 431, 435 (5th Cir. 2000) (same); *In re Air Disaster*, 81 F.3d 570, 574 (5th Cir. 1996) (same); *Stout v. Borg-Warner Corp.*, 933 F.2d 331, 334 (5th Cir. 1991) (same); *Skyline Air. Serv., Inc. v. G.L. Capps Co.*, 916 F.2d 977, 979 (5th Cir. 1990) (per curiam) (same); *Trevino v. Gen. Dynamics Corp.*, 865 F.2d 1474, 1479 (5th Cir. 1989) (same); *Smith v. Xerox Corp.*, 866 F.2d 135, 137-39 (5th Cir. 1989) (same); *In re Katrina Canal Breaches Consol. Litig.*, 2007 WL 4219351, at *5 (E.D. La. Nov. 27, 2007) (stating "derivative immunity arises" from the contractor's affirmative showing of the three *Boyle* conditions).

Specifically, the first two *Boyle* conditions "'assur[e] that the suit is within the area where the policy of the 'discretionary function' would be frustrated – *i.e.*, they assure that the design feature in question was considered by a Government officer, and not merely by the contractor itself.'" *Lewis*, 985 F.2d at 87 (quoting *Boyle v. United Tech. Corp.*, 487 U.S. 500, 512 (1988)); *see also In re Air Disaster*, 81 F.3d at 574; *Harduvel v. Gen. Dynamics Corp.*, 878 F.2d 1311, 1316 (11th Cir. 1989) (the defense's "three conditions serve to ensure that the defense operates to immunize the contractor only where the government has actually participated in discretionary design decisions, either by designing a product itself or approving specifications prepared by the contractor.") (citing *Boyle*, 487 U.S. at 509). Moreover, the first condition of *Boyle*—whether the government-approved reasonably precise specifications for the allegedly defective feature—also "necessarily answers the question whether the federal contract conflicts with state law." *Lewis*, 985 F.2d at 87 (a court "necessarily inquires into" the United States' discretion by rejecting the defense when "the Government merely 'rubber stamps' a design"); *see also Boyle*, 487 U.S. at 509 (categorizing the significant conflict as one "between the state law and a federal policy or interest" rather than between state law and a federal contract) (emphasis added); *In re Agent Orange Product Liab. Litig.*, 517 F.3d 76, 96 (2d Cir. 2007) (*Boyle* "did not hold that a conflicting, express contractual duty was required for the contractor defense to preempt state law") (emphasis added).

In sum, this Court has no obligation to analyze Plaintiffs' phantom prerequisites. Standing on its own, the Supreme Court's first two conditions adequately protect the federal interest embodied in the discretionary function exemption. *See Boyle*, 487 U.S. at 512. Thus, by deciding that WGII satisfies the *Boyle* test, the Court necessarily decides if Plaintiffs' state-law

4

claims significantly conflict with well-established federal policy that protects the performance of discretionary functions. *Boyle*, 487 U.S. at 511-13; *Lewis*, 985 F.2d at 86-87.

## B.      Supervision Of A Contractor Is Inherently A "Discretionary Function"

Even if the Court decides that WGII must prove the Corps' immunity under the discretionary function exception as a prerequisite to applying the three conditions of the government contractor defense, WGII has sustained that burden.  It is well-established that the "[s]upervision of a contractor's work, including the degree of oversight to exercise, is inherently a discretionary function." *Guile v. United States*, 422 F.3d 221, 231 (5th Cir. 2005); *United States v. Varig Airlines*, 467 U.S. 797, 819-20 (1984) ("When an agency determines the extent to which it will supervise the safety procedures of private individuals, it is exercising discretionary regulatory authority of the most basic kind.").

In its opening brief, WGII established—and the Plaintiffs failed to refute—that the Corps supervised and inspected every aspect of WGII's work in the EBIA, including its work on the sewer lift station and the wedding cake structure.[3]  Thus, irrespective of whether the Court finds that the United States is entitled to immunity with respect to any other acts of negligence alleged in Plaintiffs' Amended MRGO Complaint,[4] as a matter of law, the United States will be immune

---

[3]  *See* Def.'s Br. at 23-29, 53-55 (setting out specific facts in the record to show the Corps' substantive review, evaluation, and approval of reasonably precise specifications, as well as the Corps' subsequent inspection, supervision, and acceptance of WGII's work on the sewer lift station and the wedding cake structure); Def.'s Stmt., ¶¶ 110-139; *see also infra*, pp. 8-10.

[4]  In their Complaint, the MRGO Plaintiffs allege that the "negligence of the Corps" in the EBIA included, *inter alia*:

(1) allowing the work to proceed; (2) failing to caution the [WGII] about the potential damage to the levee and/or flood wall system by its work; (3) failing to monitor and/or properly inspect the work of the [WGII]; (4) failing to adequately evaluate the potential damage to the levee and/or flood wall structure by the work of [WGII]; (5) failing to correct the damage caused by the actions of the [WGII]; (6) failing to discharge its duty to maintain the integrity of the levee and/or flood wall system of the IHNC [ ]; (7) and other acts of negligence or fault to be shown at trial . . ."

MRGO Amended Compl. (Doc. No. 3415), ¶ 47.

952284v.1

under the discretionary function exception to the FTCA for any alleged negligent failure to supervise its contractor.[5]

## III.   WGII SATISFIED ITS BURDEN OF PROVING THE THREE CONDITIONS OF THE GOVERNMENT CONTRACTOR DEFENSE

### A.   Condition 1:  The Corps Approved Reasonably Precise Specifications

Contrary to Plaintiffs' contention regarding the ambiguity of *Boyle*'s first condition,[6] federal courts have consistently held that the government approves "reasonably precise specifications" by substantively reviewing and evaluating the contractor's proposed plans.[7] Contractors make that showing with precisely the kind of evidence of "a continuous back and forth" between the contractor and the government that WGII submitted, which demonstrates that "the Government did not leave 'the critical design decisions to the private contractor,' but worked closely with the [contractor] every step of the way."  *In re Air Disaster*, 81 F.3d at 575 (quoting *Trevino*, 865 F.2d at 1480); Def.'s Br. at 47-48.  So long as the government substantively reviewed or evaluated the specifications, and those specifications "address, in reasonable detail" the challenged feature of the contractor's work, courts regard the specifications as reasonably precise.  *Kerstetter*, 210 F.3d at 435-36, 438 (holding "[t]he specifications need not address the specific defect alleged" if the government "evaluate[d] the design feature in question").

Whether the government "considered and rejected a safer design alternative proposed by the plaintiff," or whether the government "prospectively limited the discretion of the contractor

---

[5] *See* Mem. of Law in Support of the United States' Mot. to Dismiss Counts Two and Three, June 27, 2008 at 13-14 (Doc. No. 13653-2); Reply Mem. In Support of the United States' Mot. to Dismiss Counts Two and Three, Aug. 13, 2008 at 12-22 (Doc. No. 14444).

[6] *See* Pls.' Opp. at 10.

[7] *See* Def.'s Br. at 47-48 (citing cases); *Oliver v. Oshkosh Truck Corp.*, 96 F.3d 992, 998-999 (7th Cir. 1996) (cert. denied, 520 U.S. 1116 (1997)); *Kleemann v. McDonnell Douglas Corp.*, 890 F.2d 698, 700-701 (4th Cir. 1989); *Harduvel*, 878 F.2d at 1320.

to include a safer alternative," is simply not relevant under the government contractor defense. *See Kerstetter*, 210 F.3d 436-38 (holding that plaintiffs' argument that "a safer design could have been developed" was "contrary to the case law"); *Stout*, 933 F.2d at 334-36 (holding the Corps approved reasonably precise specifications even though the specifications neither provided for, nor prohibited, the installation of a safety device). As the *Boyle* Court made clear in rejecting the Eleventh Circuit's alternative test for the government contractor defense, "should have" formulations do not sufficiently "protect the federal interest embodied in the 'discretionary function' exemption." *See Boyle*, 487 U.S. at 513. Thus, Plaintiffs' allegations relating to choices or judgments that WGII or the Corps could or should have made are simply not material to *Boyle's* first condition when the government substantively reviewed, evaluated, and approved the specifications that Plaintiffs question. *See Kerstetter*, 210 F.3d 436-38; *Stout*, 933 F.2d at 334-36; *Trevino*, 865 F.2d at 1487.

Lastly, the issue Plaintiffs raise about whether the contract is a "performance specifications contract" or a "design specifications contract" (Pls.' Opp. at 10-11) is entirely irrelevant to determining the applicability of the government contractor defense. As Supreme Court Justice Lewis F. Powell, Jr. (sitting by designation on the 11th Circuit) held in *Harduvel v. General Dynamics*, "[t]he defense requires 'only that the government approve reasonably precise specifications,' and is met where, as here, the contractor incorporated government performance specifications into a design that the government subsequently reviewed and approved." 878 F.2d at 1320 (emphasis added) (quoting *Smith v. Xerox Corp.*, 866 F.2d 135, 138 (5th Cir. 1989)); *see also Oliver v. Oshkosh Truck Corp.*, 96 F.3d at 998 (applying government contractor defense to a performance specifications contract). Furthermore, although WGII's contract may have been a performance specifications contract, the contract nevertheless ultimately required the Corps to

7

952284v.1

approve specific design specifications for WGII's work, and then by rigorous oversight, to assure that those design specifications were conformed to in the field.[8]

    1.    <u>The Corps-approved, reasonably precise specifications for the sewer lift station and wedding cake excavations addressed "backfill" and "compaction"</u>

Like the plaintiff in *Stout*,[9] Plaintiffs' only challenge to WGII's abundant evidence for *Boyle's* first condition is that the continuous back-and-forth between the Corps and its contractor did not include design features Plaintiffs claim should have been included, namely undefined "critical design choices."[10] Not surprisingly, Plaintiffs wholly ignore the undisputed evidence of the Corps' substantive review, critique and approval of the actual specifications for WGII's and its subcontractors' work. As WGII described in its opening brief, the Corps' substantive review and evaluation of WGII's proposed plans, as well as the Corps' supervision of WGII's work during performance, shows the Corps approved reasonably precise specifications for WGII's sewer lift station and wedding cake excavation work. *See In re Air Disaster*, 81 F.3d at 574-75; *Stout*, 933 F.2d at 335. More importantly, contrary to Plaintiffs' allegations, those Corps-approved specifications specifically address "backfill" and "compaction" requirements.[11]

The facts summarized below with respect to the sewer lift station and wedding cake structure are not genuinely disputed in Plaintiffs' Opposition:

**<u>Backfill Specifications for Sewer Lift Station</u>:**

- WGII's subcontractor submitted its initial lift station removal plan to the Corps in September 2001.[12] The plan required the subcontractor to backfill "with previously excavated material" and compact the fill "with the bucket of the hydraulic excavator."[13]

---

[8] *See* Def.'s Br. at 8-42.

[9] *See* Def.'s Br. at 47-48.

[10] Pls.' Opp. at 23.

[11] Pls.' Opp. at 2.

[12] Def.'s Br. at 24; Def.'s Stmt., ¶ 116.

- WGII and its subcontractors held a Preparatory Phase meeting with the Corps on October 3, 2001, to discuss the removal plan.[14]  Those in attendance reviewed the specifications for lift station removal, including "Backfill/Compaction."[15]

- The Corps reviewed and commented on the removal plan extensively before approving it on October 19, 2001.[16]  The final removal plan further required the subcontractor to backfill "in 2' lifts," to backfill "to top of sheet piles . . . after whalers are removed," and to "[c]omplete backfilling to grade with material to be provided by WGI."[17]

- The Corps had to review and pre-approve all material (whether it was from the on-site borrow pit or imported from off-site) that WGII intended to use for backfilling excavations in the EBIA.[18]

- During routine inspections of the work site, the Corps ensured that WGII's subcontractors backfilled the excavation "with spoil in approx. 2' lifts" and compacted the fill "to bottom of whalers."[19]

- Ultimately, the Corps accepted all work related to the lift station as complete, including the backfilling of the excavation.[20]

**Backfill Specifications for Wedding Cake Excavation:**

- In September 2001, WGII's submitted a revised proposal in response to the Corps Statement of Work, which provided *inter alia*, that backfill material for the excavation of concrete blocks in Boland Marine would be "placed in lifts and compacted; however, no compaction testing will be required."[21]  The Corps substantively reviewed and accepted WGII's proposal on September 25, 2001.[22]

---

(continued…)

[13] Lift Station Removal Plan (Revised) [Ex. 75 at 5].

[14] Def.'s Br. at 24; Def.'s Stmt., ¶ 116.

[15] Prep. Phase Inspection Min., Lift Station [Ex. 76 at 3].

[16] Def.'s Br. at 25; Def.'s Stmt., ¶¶ 116-17.

[17] Lift Station Removal Plan (Revised) [Ex. 64 at 7-8].

[18] Def.'s Br. at 36-37; Def.'s Stmt., ¶¶ 178-80.

[19] Def.'s Br. at 26; Def.'s Stmt., ¶¶ 123-24.

[20] Def.'s Br. at 26; Def.'s Stmt., ¶ 125.

[21] WGII Revised – Final Proposal #113 [Ex. 29 at 5-6].

[22] Def.'s Br. at 27; Def.'s Stmt., ¶ 130.

952284v.1

- WGII's subcontractor presented its initial work plan for the wedding cake excavation to WGII and the Corps during a Preparatory Phase meeting on November 14, 2001.[23] The plans for backfilling the wedding cake excavation were discussed.[24]

- The Corps approved WGII's subcontractor's final work plan—with a cofferdam design—on December 13, 2001.[25] The work plan required the subcontractor to backfill "with previously excavated soil in 2' lifts," to backfill "to top of sheet piles . . . after whalers are removed," and to "[c]omplete backfilling to grade with material to be provided by WGI."[26]

- During routine inspections throughout this work, the Corps assured that the excavation was "backfilled in 2' lifts and compacted with bucket."[27] All backfill material that WGII provided to its subcontractors was considered and pre-approved by the Corps.[28]

- On March 27, 2002, the Corps signed a Final Acceptance Report, which confirmed that all work relating to the wedding cake, including "[b]ackfill and compact[ion]," was "complete, acceptable and complies with contract requirements."[29]

Given the Corps' extensive involvement and its meticulous supervision during the development of the work plans and performance of the work, Plaintiffs' allegation that WGII had discretion to backfill and compact the excavations of the lift station and wedding cake structure with whatever materials it wanted is simply absurd.[30]

Although irrelevant as a matter of law, Plaintiffs' argument that WGII should have compacted the excavations differently (*i.e.,* to a "minimum 95 percent Standard Proctor density") is incorrect as a matter of fact. Indeed, the Project Engineer for the Corps on Task Order 26 testified that he considered and approved the type of backfill material and method of compaction:

---

[23] Def.'s Br. at 28; Def.'s Stmt., ¶ 131.

[24] Prep. Phase Mtg. Min., Concrete Blocks, Nov. 14, 2001 [Ex. 83 at 2].

[25] Def.'s Br. at 28; Def.'s Stmt., ¶ 133.

[26] Wedding Cake Final Work Plan [Ex. 63 at 7].

[27] Def.'s Br. at 29; Def.'s Stmt., ¶ 137.

[28] Def.'s Br. at 36-37; Def.'s Stmt., ¶ 180.

[29] Def.'s Br. at 29; Def.'s Stmt., ¶ 139.

[30] *See* Pls.' Opp. at 2, 20-22. Indeed, when asked by Plaintiffs' counsel during deposition if the statement in the sewer lift station work plan that WGII would provide the subcontractor backfill material meant "there's no limitation on what WGI can use to put in the hole," the Corps Construction Manager and 30(b)(6) witness unambiguously testified, "I disagree with that." *See* Guillory I at 191:23-192:8 [Pls.' Ex. 8].

10

952284v.1

> [A]s far as the backfill . . . what my thought process was is that a Proctor is good, you know, it proves something, it shows that compaction was achieved. But I didn't need a Proctor [on this project], I had other things in my favor here that didn't make it necessary to spend our taxpayers' money on a Proctor. . . . [I]f we had a problem with any of these backfill operations . . . it would have been quite simple for me to direct them, as contracting officer's representative, to correct . . . .  And it would have been very easy to notice if there was a problem . . . if it was not compacted properly, the area that was excavated would have subsided and there would have been a depression or hole in the ground at that site.  It would have been very simple to notice that and to direct [WGII] to go back and fix it.  So that was my thought process at the time.[31]

Regardless of what Plaintiffs say the Corps should have done, under *Boyle* neither Plaintiffs nor the Court may use a state-law tort suit to second guess the Corps' discretion regarding how "to spend our taxpayers' money," or which specifications to approve.  *See Kerstetter*, 210 F.3d at 436 (rejecting the plaintiff's "should have" argument); *Stout*, 933 F.2d at 334-36 (same); *see also Boyle*, 487 U.S. at 511 (holding "permitting 'second-guessing' of these judgments [about contract specifications] through state tort suits against contractors would produce the same effect sought to be avoided by the FTCA exemption") (internal citation omitted).

       2.    <u>Geotechnical specifications relating to levees and floodwalls were, at the Corps' discretion, outside WGII's scope of work</u>

Plaintiffs' main arguments boil down to whether the specifications that the Corps actually chose to approve "should have" been different.[32]  The case law, as explained above, makes clear that whatever judgments Plaintiffs speculate that the Corps or WGII should have made have absolutely no place in the *Boyle* analysis.  Here, Plaintiffs allege that WGII's failure to provide reasonably precise "geotechnical" specifications somehow is fatal to its motion for summary judgment.[33]  Plaintiffs' argument fails not only as a matter of law, but also because as WGII described in its opening brief and the record plainly reflects, the Corps hired WGII to clear and

---

[31] Montegut at 72:15-77:14 [Ex. 23].

[32] *See* Pls.' Opp. at 17-18, 20-23.

[33] *See* Pls.' Opp. at 11-16.

952284v.1

remediate the EBIA, <u>not</u> to provide geotechnical expertise relating to the levees and floodwalls.[34] Plaintiffs do not (and cannot) genuinely dispute the overwhelming testimony, supported by the Contract documents, that shows the Corps never required or expected WGII to provide this type of expertise as part of its scope of work.[35]

Moreover, the record shows that the Corps <u>did</u> in fact conduct a specific geotechnical evaluation (and did provide WGII with geotechnical specifications relevant to the levees and floodwalls) when the Corps' Construction Manager and COR, Mr. Lee Guillory, in his discretion, deemed necessary.[36]  However, for the excavations of the sewer lift station and the wedding cake, Mr. Guillory specifically determined that any additional geotechnical evaluation of these two excavations relative to the levees and floodwalls was not required.[37]  Mr. Guillory unquestionably had the discretion to make this determination.[38]  Consequently, because the Corps maintained sole responsibility for evaluating any potential geotechnical harm to the flood protection systems on Task Order 26, WGII's alleged failure to provide specifications in this area simply is irrelevant.

---

[34] Def.'s Br. at 5-8, 12-13; Def.'s Stmt., ¶¶ 23-34, 55.  To support their argument, Plaintiffs point to excerpts of documents and deposition testimony out of context that refer to "engineering" or "geotechnical engineering" in connection with WGII's work on Task Order 26.  *See* Pls.' Opp. at 12-14.  But as Mr. Lee Guillory explained, any such geotechnical engineering that WGII was expected to perform in the EBIA related <u>only</u> to HTRW remediation, and not to investigations relative to the stability of (or any potential underseepage of) the nearby levees and floodwalls.  *See* Guillory Dep. II at 23:10-24:13 [Ex. 6]; Def.'s Br. at 12-13.

[35] Def.'s Br. at 12-13 & notes 74-75; Def.'s Stmt., ¶ 55.

[36] *See* Def.'s Br. at 36-41; Def.'s Stmt., ¶¶ 181-190, 197-201 (describing the Corps' geotechnical evaluation of specifications for excavation of the borrow pit and contamination under Surekote Road).  Plaintiffs do not dispute these facts.  *See* Response of the MRGO PSLC to the Statement of Undisputed Material Facts in Support of WGII's Motion for Summ. J. (Doc. No. 16209-3) ("Pls.' Response").  (While Plaintiffs purport to dispute ¶¶ 185 and 200, they cite no specific evidence in support of their dispute).

Notably, Mr. Guillory is a licensed professional engineer with significant experience constructing levees/floodwalls in the New Orleans area.  *See* Def.'s Br. at 8; Def.'s Stmt., ¶¶ 35-37.

[37] Def.'s Br. at 25-26, 28-29; Def.'s Stmt., ¶¶ 120, 135.

[38] Grieshaber II at 8:18-10:1 [Ex. 58].  According to Dr. John Grieshaber, a geotechnical engineer with the Corps and 30(b)(6) witness for the United States on geotechnical issues, it was Mr. Guillory's "call to decide when [he] needed to go and get additional help from the geotechnical community within the district."  *Id.* at 11:16-12:7 (Guillory "[had] that discretion").

952284v.1

**B.    Condition 2:  Conformity to Government-Approved Specifications**

1.    Plaintiffs do not genuinely dispute WGII's evidence of conformity to government-approved specifications for the sewer lift station and wedding cake

With respect to the second condition of the government contractor defense, WGII laid out a detailed record demonstrating its conformity with government-approved specifications in completing the sewer lift station and wedding cake excavations.[39]  Plaintiffs' Opposition offers absolutely no relevant, credible evidence to controvert this record.[40]

Instead, Plaintiffs ask and answer a different and wholly inapposite question:  Are there "substantial questions of material fact concerning whether the actions of WGI caused the harm complained of by the Plaintiffs[?]"[41]  But that is a merits question, and it has no bearing on the issue at hand.  The only pertinent issue with respect to the second condition of the *Boyle* test is whether WGII's work conformed to the Corps-approved specifications.[42]  The plaintiffs have offered no credible evidence to dispute WGII's showing that it did.  *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990) (holding "Rule 56(e) provides that judgment 'shall be entered' against the nonmoving party unless affidavits or other evidence 'set forth specific facts showing that there is a genuine issue for trial.'  The object of this provision is not to replace conclusory allegations of the complaint or answer with [more] conclusory allegations").[43]

---

[39] *See* Def.'s Br. at 26, 29; Def's Stmt., ¶¶ 122-25,137-39.  *See also* Def.'s Br. at 48-50, 54-55 (describing law relevant to second condition of government contractor defense).

[40] *See* Pls.' Opp. at 26-27.

[41] *See* Pls.' Opp. at 27 (stating, *inter alia*, that "Plaintiffs have uncovered evidence that after the remediation of the EBIA and the removal of structures . . . the groundwater flow had been altered to flow away from the IHNC").

[42] *See* Def.'s Br. at 48-50.

[43] Even if the issue of whether WGII used sand or borrow material to backfill the sewer lift station and wedding cake excavation was a relevant inquiry here, see Pls.' Opp. at 27, Plaintiffs failed to show that the use of imported sand for backfilling demonstrates non-conformity with Corps-approved, reasonably precise specifications. To the contrary, the Corps reviewed, considered and approved the backfill material used on the EBIA, and the Corps subsequently monitored and inspected WGII's backfilling operations.  *See supra*, pp. 8-10.  Finally, the Corps subsequently accepted WGII's work on the lift station and wedding cake, including the backfill and compaction, as complete.  *See id.*

13

2.      WGII's alleged failure to obtain a permit from the O.L.D. is not relevant

WGII must show its work conformed with the Corps-approved specifications "with

respect to the particular product feature upon which the claim is based." *Bailey,* 989 F.2d at 801-

02 (emphasis in original).  Plaintiffs assert that WGII failed to meet this burden because,

allegedly, WGII failed to conform with specifications related to obtaining a permit.[44]  However,

Plaintiffs cannot withstand summary judgment by making irrelevant, unsupported allegations.

*See* Fed. R. Civ. P. 56(e)(2).  Instead, Plaintiffs must set forth "specific facts" showing the

allegedly defective feature "resulted from" WGII's departure from the specifications.  *See*

*Kerstetter*, 210 F.3d at 435-36 (harmonizing prior decisions).  Here, that means Plaintiffs must

show the alleged underseepage—what Plaintiffs allege caused their damages—resulted from

WGII's alleged failure to obtain an O.L.D. permit.  *See id*.; *Beaver Valley Power Co. v. Nat'l*

*Eng'g & Contracting Co.*, 883 F.2d 1210, 1219 n.9 (3d Cir. 1989) (partially affirming summary

judgment because the plaintiff never showed how the contractor's alleged nonconformity with a

permitting requirement "caused its damages").  Plaintiffs have not made such a showing.

Rather, Plaintiffs simply conclude that an O.L.D. permit "would have provided an

additional level of investigation to perhaps insure the integrity of the flood wall."[45]  However,

the undisputed testimony from O.L.D. shows Plaintiffs' conjecture is baseless.  Mr. Stevan

Spencer, the Chief Engineer of the O.L.D. throughout the duration of Task Order 26, states in his

attached Declaration that "[t]he O.L.D. does not perform independent engineering investigations

of any kind in connection with an entity's/person's request to perform subsurface work on or

near a flood control structure."[46]  Instead, "[t]he O.L.D. relies wholly on the USACE's and

---

[44] *See* Pls.' Opp. at 18-20.

[45] Pls.' Opp. at 18 (emphasis added).

[46] Spencer Decl., ¶ 4 [Ex. 121].

14

LDOTD's engineering judgment as to whether permission to perform certain works should be granted."[47]  Here, Plaintiffs admit that WGII received letters of no objection to its proposed excavation work from the engineers at the USACE and the LDOTD before beginning excavations in the EBIA.[48]  Accordingly, whatever engineering studies Plaintiffs speculate should have been conducted prior to excavation work commencing in the EBIA were in fact conducted by the USACE and the LDOTD, to the O.L.D.'s satisfaction, as of spring 2001.[49]

Plaintiffs also have not offered a scintilla of evidence beyond self-serving speculation that a finalized O.L.D. permit could have led to the discovery of some otherwise undetected impact that WGII's work allegedly had on the nearby levees and floodwalls.  Instead, Mr. Spencer stated that between January 2001 and August 2005, the O.L.D. "maintain[ed], operate[d] and inspect[ed] the levee and floodwalls along Jourdan Avenue," and its "employees were responsible for reporting any defects or problems encountered while performing their work."[50] But the O.L.D. had no knowledge of any problems reported on or near the levee/floodwalls bordering the EBIA.[51]  Moreover, Mr. Spencer confirmed that even if WGII had received an O.L.D. permit, at the end of the project, "the O.L.D. would <u>not</u> have performed a subsurface investigation of the levees and floodwalls in relation to the work [WGII] performed for the USACE."[52]

Thus, having set forth no material, specific facts showing how WGII's alleged nonconformity with specifications related to an O.L.D. permit caused any of their alleged damages, Plaintiffs' argument cannot be a basis to defeat summary judgment.  *See*, *e.g.*, *Skyline*

---

[47] *Id.*

[48] Pls.' Opp. at 19.

[49] Spencer Decl., ¶ 7 [Ex. 121].

[50] *Id.*, ¶ 9.

[51] *Id.*

[52] Spencer Decl., ¶ 10 (emphasis in original) [Ex. 121].

*Air. Serv.,* 916 F.2d at 980 (upholding summary judgment when the plaintiff could not "present

more than a 'metaphysical doubt' about the material facts") (citation omitted).

    **C.**    <u>**Condition 3**</u>**:  WGII Did Not Have Any Actual Knowledge of Dangers Associated With Its Work That Were Not Otherwise Know to the Corps**

    Plaintiffs' assertion that WGII withheld knowledge from the Corps about the dangers its

work would pose to the nearby flood control system is baseless.  As support for this

manufactured claim, Plaintiffs offer (1) WGII's Site Assessment Drilling Reports for the Saucer

Marine and Boland Marine sites;[53] and (2) Mr. O'Conner's recognition in his deposition of a

<u>hypothetical</u> scenario where underseepage theoretically could occur.[54]

    But the Drilling Reports, which Plaintiffs contend "revealed plant-derived organics

throughout the borehole depth, but increasing after fourteen (14) feet" at Saucer,[55] and the

existence of "plant-derived organics such as roots, grasses, leaves, wood and peat" at Boland,[56]

neither suggest nor imply any threat to stability of the nearby levees and floodwalls.  To be sure,

the Reports do not even address the flood control structures, which every relevant witness in this

case testified were outside WGII's work site and outside WGII's scope of work.[57]  Whether,

upon reviewing or preparing these Drilling Reports, WGII <u>should have</u> known that given the soil

content, WGII's excavations potentially could cause underseepage of the levees and floodwalls,

is completely irrelevant.  The Fifth Circuit soundly rejected the familiar tort rule of "should have

---

[53] The Site Assessment Drilling Reports characterized the pertinent geology of the soil at the two work sites for remediation purposes.  *See, e.g.*, RECAP Submittal Report – Saucer Marine [Ex. 122 at 21]; RECAP Submittal Report – Boland Marine [Ex. 123 at 19].

[54] *See* Pls.' Opp. at 29.

[55] *Id*. at 28.

[56] *Id*. at 29.

[57] *See* Def.'s Br. at 12-13, 16-17; Def.'s Stmt., ¶¶ 55, 56, 72.

952284v.1

known" when discussing *Boyle's* third condition.  *See Trevino*, 865 F.2d at 1487 ("A government contractor is only responsible for warning the government of dangers about which it has actual knowledge," or "dangers of which it has knowledge but the government does not").  Moreover, after years spent evaluating possible sites for the lock replacement project, the Corps undisputedly had superior knowledge of the soil conditions in the area and any potential for harm that those conditions could pose to the levees.[58]

Plaintiffs next assert that in "failing to adequately report the findings of the drilling reports" and in "failing to properly specify the depth of the sheet pile" in the nearby levees, WGII "failed to fully inform the Corps about a hazard relevant to the government's exercise of discretion."[59]  But the evidence shows no such thing.  *First*, Mr. O'Conner (WGII's Project Manager) did <u>not</u> testify that he actually knew that underseepage was a potential problem in the EBIA.  Indeed, quite the contrary, he unambiguously stated in his deposition:  "I do not know nor believe that [underseepage] existed in New Orleans."[60]  In contrast, the deposition excerpt that Plaintiffs selectively quoted, where Mr. O'Conner admitted that he was aware that " 'if you dug a hole that was on the water side of a flood control structure and you filled it with a porous material . . . then that hole <u>might</u> provide a conduit for water . . . and then move laterally underneath the flood control structure,' " is taken completely out of context.[61]  Indeed, in his very next answer, Mr. O'Conner made clear that he had given Plaintiffs' counsel a "hypothetical answer" in response to his "[h]ypothetical question."[62]

---

[58] *See* Def.'s Br. at 1, 4 & n.15, 56-58, 60; Def.'s Stmt., ¶¶ 6, 19, 120, 121, 135, 136, 185.
[59] Pls.' Opp. at 29-30.
[60] O'Connor at 59:3-60:1 [Pls.' Ex. 6].
[61] Pls.' Opp. at 3 (emphasis added) (quoting O'Connor at 77:8-77:17 [Pls.' Ex. 6]).
[62] O'Connor at 78:19-20 [Pls.' Ex. 6].

17

952284v.1

*Second*, Plaintiffs' assertion that WGII failed to adequately report the findings of the Drilling Reports to the Corps[63] is wrong as a matter of fact.  WGII unquestionably provided the RECAP Submittal Reports for Boland and Saucer, which contained the Drilling Reports in their appendices, to the Corps for substantive review and approval.[64]   Indeed, the Corps' final written comments on WGII's RECAP Submittal Report for Saucer Marine specifically evidence the Corps' consideration of the Drilling Report.[65]

Finally, whether WGII or its subcontractor adequately reported the depths of the levee sheet piles to the Corps in a RECAP Criteria Document describing "all the regulatory levels and limits"[66] to be remediated on the site, is irrelevant to this Motion.  Not only did the Corps substantively review and comment on the Criteria Document in draft form before approving it,[67] but also, as Mr. Guillory testified, "the actual depth of the sheet pile was immaterial" to any of his determinations relating to the excavations of the sewer lift station or the wedding cake structure.[68]   Thus, Plaintiffs have failed to provide any credible evidence showing that WGII withheld actual knowledge relevant to the Corps' discretionary decisions on Task Order 26.

## IV.  CONCLUSION

For all of the foregoing reasons, and for all of the reasons cited in WGII's opening brief, WGII respectfully requests that the Court grant its motion for summary judgment.

---

[63] Pls.' Opp. at 29.

[64] *See* RECAP Submittal Report – Boland Marine [Ex. 123 at 14] (approved by L. Guillory on Dec. 4, 2002); RECAP Submittal Report – Saucer Marine [Ex. 122 at 16] (approved by L. Guillory on June 10, 2002); *see also* Def.'s Br. at 32 & n.196; Def.'s Stmt., ¶ 158.

[65] RECAP Comment Submittal – Saucer Marine [Ex. 124 at 1].

[66] Def.'s Br. at 32 (citing Guillory II at 182:5-183:3) [Ex. 6]; Def.'s Stmt., ¶ 156.

[67] Def.'s Br. at 32 (citing Guillory II at 183:4-16) [Ex. 6]; Def.'s Stmt., ¶ 157.

[68] Guillory II at 185:15-22 [Ex. 6].  Moreover, here again, the Corps had far greater knowledge about the design and construction of the levees and floodwalls than WGII.  *See* Def.'s Br. at 56-58, 60; Def.'s Stmt., ¶¶ 120, 121, 135, 136, 185.

18

Dated:  November 6, 2008

Respectfully submitted,

*/s/Heather S. Lonian*
William D. Treeby, 12901
Carmelite M. Bertaut, 3054
Heather S. Lonian, 29956
Stone Pigman Walther Wittmann L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Telephone:      (504) 581-3200
Facsimile:      (504) 581-3361

Adrian Wager-Zito
Debra S. Clayman
Jones Day
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
Telephone:      (202) 879-4645
Facsimile:      (202) 626-1700

Attorneys for
Washington Group International, Inc.

19

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the above and foregoing Reply Memorandum of Law in

Support of Washington Group International, Inc.'s Motion for Summary Judgment have been

served upon all counsel of record through the Court's CM/ECF electronic filing system or by

placing same in the United States mail, postage prepaid and properly addressed, this 6th day of

November, 2008.


                              /s/Heather S. Lonian

20