# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| | * | |
| **IN RE: KATRINA CANAL BREACHES** | * | |
| **CONSOLIDATED LITIGATION** | * | **CIVIL ACTION** |
| | * | |
| | * | **NO. 05-4182** |
| | * | **and consolidated cases** |
| **PERTAINS TO: BARGE** | * | |
| | * | **SECTION "K" (2)** |
| *Boutte v. Lafarge*        05-5531 | * | |
| *Mumford v. Ingram*        05-5724 | * | |
| *Lagarde v. Lafarge*       06-5342 | * | **JUDGE** |
| *Perry v. Ingram*          06-6299 | * | **STANWOOD R. DUVAL, JR.** |
| *Benoit v. Lafarge*        06-7516 | * | |
| *Parfait Family v. USA*    07-3500 | * | **MAGISTRATE** |
| | * | **JOSEPH C. WILKINSON, JR.** |
| | * | |

# LAFARGE NORTH AMERICA INC.'S MEMORANDUM IN OPPOSITION TO

# PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

# TABLE OF CONTENTS

INTRODUCTION.................................................................................................................1

FACTUAL BACKGROUND ................................................................................................2

SUMMARY OF ARGUMENT .............................................................................................6

ARGUMENT .........................................................................................................................9

I.    **Plaintiffs' Motion Does Not Satisfy Three Elements of Rule 23(a)** .........................11

    A.   Plaintiffs' Claims are Not Typical .......................................................................11

    B.   Plaintiffs Are Inadequate Representatives ..........................................................13

    C.   The Class Is Not Ascertainable...........................................................................16

II.   **Plaintiffs Cannot Show That Common Issues Predominate Over Individual Issues** .........................................................................................................................17

    A.   Class Certification is Disfavored in Mass Tort Cases ........................................17

    B.   Individual Issues Exist With Regard to Negligence ...........................................20

    C.   Causation Presents Highly Individualized Issues ...............................................21

        1.   The Relevant Causation Inquiry Involves Plaintiffs' Claimed Injuries, Not Generalized "Flooding".....................................................21

        2.   Causation of Plaintiffs' Claimed Injuries is an Individualized Issue ............................................................................................................22

        3.   Causation of "Flooding" is Also Itself an Individualized Issue.............24

    D.   The Existence and Extent of Damages Presents Highly Individualized Issues ...................................................................................................................28

        1.   Plaintiffs Ignore Many Individualized Categories of Damages.............29

            a.   Physical damage to property.......................................................29
            b.   Demolition and salvage...............................................................30
            c.   Loss of use ..................................................................................31
            d.   Business losses (other than loss of "business value")....................31
            e.   Loss of income............................................................................32
            f.   Inconvenience and loss of lifestyle .............................................32

i

2.      Plaintiffs' "Mass Appraisal" Techniques are Inadequate to Measure Any Damages...................................................................................33

        a.      Diminution of real estate value ......................................................33
        b.      Diminution of business value.........................................................39
        c.      Damage to personal property .........................................................42

3.      Individualized Claims for Emotional Distress, Personal Injury, And Wrongful Death are Significant ........................................................43

E.      Individual Causation and Damages Issues Predominate Over Common Issues ...............................................................................................46

F.      Bifurcation Would Not Render Common Issues Predominant..........................51

III.    **Plaintiffs Cannot Show That Class Action Adjudication Is Superior To Adjudication of Individual Claims** ...............................................................54

A.      Individual Class Members Have a Strong Interest in Controlling Their Claims...............................................................................................55

B.      Other Litigation Demonstrates No Class Action is Needed ..............................56

C.      Concentration of Litigation in a Single Forum is a Neutral Factor ...................57

D.      This Case is Not Manageable as a Class Action................................................57

**CONCLUSION** ..............................................................................................60

## TABLE OF AUTHORITIES

**CASES:**                                                                                           **Page**

*Adams v. Brookshire Grocery Co.*, 1999 U.S. Dist. LEXIS 21907
    (E.D. Tex. Feb. 8, 1999) ...................................................................................53

*Allison v. Citgo Petroleum Corp.*, 151 F.3d 402 (5th Cir. 1998)......................................51, 55, 59

*Amchem Prods., Inc. v. Windsor,* 521 U.S. 591 (1997) .....................................................11, 18, 55

*Ancar v. Murphy Oil USA, Inc.,*
    2008 U.S. Dist. LEXIS 68490 (E.D. La. July 25, 2008)................................. 19-20, 45, 48, 53

*Ardoin v. Stine Lumber Co.,* 220 F.R.D. 459 (W.D. La. 2004) ......................................................15

*Barasich v. Columbia Gulf Transmission Co.*, 467 F. Supp. 2d 676 (E.D. La. 2006)..................21

*Basco v. Wal-Mart Stores,* 216 F. Supp. 2d 592 (E.D. La. 2002)............................................ 42-43

*Bell Atlantic Corp. v. AT&T Corp.*, 339 F.3d 294 (5th Cir. 2003) ........................................ *passim*

*Berger v. Compaq Computer Corp.*, 257 F.3d 475 (5th Cir. 2001)..........................................13, 16

*Berry v. Allstate Ins. Co.*, 2006 WL 2710588 (E.D. La. Sept. 19, 2006) .....................................18

*Boley v. Brown*, 10 F.3d 218 (4th Cir. 1993)................................................................................32

*Bradburn Parent/Teacher Store, Inc. v. 3M,* 2004 U.S. Dist. LEXIS 3347
    (E.D. Pa. Mar. 1, 2004)............................................................................................15

*Burrell v. Crown Central Petroleum, Inc.,* 2000 U.S. Dist. LEXIS 17381
    (E.D. Tex. Nov. 28, 2000) .......................................................................................53

*Calhoun v. Yamaha Motor Corp., U.S.A.,* 350 F.3d 316 (3d Cir. 2003) ......................................22

*Case v. ANPAC Louisiana Ins. Co.,* 466 F. Supp. 2d 781 (E.D. La. 2006) .................2, 12, 19, 26

*Castano v. Amer. Tobacco Co.,* 84 F.3d 734 (5th Cir. 1996) ................................................. *passim*

*Cimino v. Raymark Indus., Inc.*, 151 F.3d 297 (5th Cir. 1998) ....................................11, 22, 43, 59

*Consol. Aluminum Corp. v. C.F. Bean Corp.*, 833 F.2d 65 (5th Cir. 1987) ............................20, 21

*Corley v. Entergy Corp.*, 220 F.R.D. 478 (E.D. Tex. 2004),
    *aff"d mem.,* 152 Fed. Appx. 350 (5th Cir. 2005).......................................................39

*Corley v. Orangefield Indep. Sch. Dist.*, 152 Fed. Appx. 350, 2005 WL 2600177
(5th Cir. 2005)............................................................................................. *passim*

*Danvers Motor Co. v. Ford Motor Co.,* 543 F.3d 141, 2008 U.S. App. LEXIS 19354
(3d Cir. Sept. 12, 2008)......................................................................................15

*Fisher v. Ciba Specialty Chems. Corp.,* 238 F.R.D. 273 (S.D. Ala. 2006) .................................39

*Flint v. Louisiana Farm Bureau Mut. Ins. Co.,* 2006 WL 2375593
(E.D. La. Aug. 15, 2006) ....................................................................................18

*Ford v. Murphy Oil USA, Inc.,* 703 So.2d 542 (La. 1997) ...........................................................50

*Fradella's Collision v. Lafayette Ins. Co.,* 2006 WL 3258332 (E.D. La. Oct. 30, 2006) .............18

*Fulford v. Transport Service Co.*
2004 U.S. Dist. LEXIS 9955 (E.D. La. June 1, 2004)................................................20, 46, 48

*Georgine v. Amchem Prods. Inc.,* 83 F.3d 610 (3d Cir. 1996),
*aff'd*, 521 U.S. 591 (1997) ..................................................................................58

*Guice v. State Farm Fire & Cas. Co.,* 2007 U.S. Dist. LEXIS 34148
(S.D. Miss. Mar. 22, 2007) .........................................................................18, 23, 24

*Henry v. Allstate Ins. Co.*, 2007 U.S. Dist. LEXIS 57822 (E.D. La. Aug. 8, 2007)......................28

*Hilton v. Atlas Roofing Corp.,* 2006 U.S. Dist. LEXIS 88290 (E.D. La. Dec. 5, 2006)...............15

*In re American Commercial Lines, LLC,* 2002 U.S. Dist. LEXIS 10116
(E.D. La. May 28, 2002) ....................................................................16, 20, 48, 57

*In re Fibreboard Corp.*, 893 F.2d 706 (5th Cir. 1990) ...............................................................43

*In re Katrina Canal Breaches Consol. Litig.,* 2007 U.S. Dist. LEXIS 65239
(E.D. La. Aug. 16, 2007) ....................................................................................52

*In re Masonite Corp. Hardboard Siding Prods. Liab. Litig.*, 170 F.R.D. 417
(E.D. La. 1997) ...................................................................................................48

*In re Vioxx Prods. Liab. Litig.*, 239 F.R.D. 450 (E.D. La. 2006) ...........................................11, 53

*Jenkins v. Raymark Indus. Inc.*, 782 F.2d 468 (5th Cir. 1986) .....................................................50

*John G. Mahler Co. v. Klein Karoo Landboukooperasie DPK*, 1995 WL 371037
(5th Cir. Jun. 5, 1995) .......................................................................................14

*Kemp v. Metabolife Int'l Inc.,* 2002 U.S. Dist. LEXIS 2435 (E.D. La. Jan. 25, 2002) ................48

*Kent v. Cobb*, 811 So.2d 1206 (La. App. 2002).........................................................................30

*LaBauve v. Olin Corp.,* 231 F.R.D. 632 (S.D. Ala. 2005).................................................17, 38, 39

*Lambert v. Board of Comm'rs of the Orleans Levee Dist.*, 2008 U.S. Dist. LEXIS 68254
      (E.D. La., Sept. 10, 2008) ..........................................................................................53

*Langbecker v. Electronic Data Sys Corp.,* 476 F.3d 299 (5th Cir. 2007).................................10, 14

*Levitz Furniture Corp. v. Houston Cas. Co.*, 1997 WL 218256 (E.D. La. Apr. 28, 1997) ..........31

*Martin v. Home Depot U.S.A., Inc.,* 225 F.R.D. 198 (W.D. Tex. 2004)..................................14, 15

*McDermott v. AmClyde*, 511 U.S. 202 (1994).............................................................................22

*Moser v. Texas Trailer Corp.*, 623 F.2d 1006 (5th Cir. 1980).......................................................21

*Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620 (5th Cir. 1999) .................................49, 54

*O'Sullivan v. Countrywide Home Loans, Inc.,* 319 F.3d 732 (5th Cir. 2003) .........................11, 22

*Ortiz v. Fibreboard Corp.,* 527 U.S. 815 (1999) ........................................................................10

*Oscar Private Equity Investments v. Allegiance Telecom, Inc.*, 2007 U.S. App. LEXIS
      11525 (5th Cir., May 16, 2007) ...................................................................................36

*Palsgraf v. Long Island R.R. Co.*, 162 N.E. 99 (N.Y. 1928) .......................................................20

*Patterson v. Mobil Oil Corp.*, 241 F.3d 417 (5th Cir. 2001) ........................................................51

*Perez v. Metabolife International, Inc.,* 218 F.R.D. 262 (S.D. Fla. 2003) ....................................17

*Perrin v. Expert Oil & Gas, LLC*, 2008 U.S. Dist. LEXIS 8830
      (E.D. La. Feb. 6, 2008) ....................................................................................20, 28, 53

*Piggly-Wiggly Clarksville, Inc. v. Interstate Brands Corp.,* 100 Fed. Appx. 296,
      2004 U.S. App. LEXIS 11160 (5th Cir. 2004) ............................................................28

*Reeb v. Ohio Department of Rehabilitation and Correction*, 435 F.3d 639 (6th Cir. 2006).........13

*Regents of the University of California v. Credit Suisse First Boston (USA,) Inc.*, 482
      F.3d 372 (5th Cir. 2007) ..............................................................................................10

*Robertson v. Monsanto Co.,* 2008 U.S. App. LEXIS 15468
(5th Cir. July 18, 2008) ..................................................... *passim*

*Robinson v. Texas Auto. Dealers Ass'n*, 387 F.3d 416 (5th Cir. 2004) ................................. *passim*

*Roby v. State Farm Fire & Cas. Co.*, 464 F. Supp. 2d 572 (E.D. La. 2006) ................................18

*Rohr v. Metro. Ins. & Cas. Co.*, 2007 WL 163037 (E.D. La. Jan. 17, 2007) .........................12, 18

*Salvaggio v. Safeco Prop. & Cas. Ins. Co.*, 458 F. Supp. 2d 283 (E.D. La. 2006).......................18

*Shroder v. Suburban Coastal Corp.*, 729 F.2d 1371 (11th Cir. 1984)............................................16

*Sibley v. Lemaire*, 184 F.3d 481 (5th Cir. 1999)............................................................................22

*Snow v. Atofina Chems., Inc.,* 2006 WL 1008002 (E.D. Mich. Mar. 31, 2006)...........................39

*State of Alabama v. Blue Bird Body Co., Inc., 573 F.2d 369 (5th Cir. 1978)* ...............................59

*Steering Committee v. Exxon Mobil Corp.*, 461 F.3d 598 (5th Cir. 2006) ............................ *passim*

*Stirman v. Exxon Corp.*, 280 F.3d 554 (5th Cir. 2002)............................................................14, 19

*Thomas v. FAG Bearing Corp.*, 846 F. Supp. 1400 (W.D. Mo. 1994)........................................31

*T.N.T. Marine Serv., Inc. v. Weaver Shipyards*, 702 F.2d 585 (5th Cir. 1983) ............................55

*Turner v. Murphy Oil USA, Inc.*, 234 F.R.D. 597 (E.D. La. 2006) ....................................... *passim*

*Unger v. Amedisys, Inc.*, 401 F.3d 316 (5th Cir. 2005) ..................................................9, 10, 16, 36

*United States v. Reliable Transfer Co.*, 421 U.S. 397 (1975)........................................................22

*Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227 (9th Cir. 1996)............................................ 12-13

*Watson v. Shell Oil Co.,* 979 F.2d 1014 (5th Cir. 1992)...........................................................49, 54

*Welch v. Atlas Roofing Corp.,* 2007 WL 3245444
(E.D. La. Nov. 2, 2007) ....................................................................................................28, 53

*Wisner v. Ill. Cent. Gulf R.R.*, 537 So.2d 740 (La. App. 1998) .....................................................32

## RULES AND REGULATIONS:

Fed. R. Civ. P. 23(a) ...............................................................................................................6, 9, 11

Fed. R. Civ. P. 23(a)(4)..............................................................................................13

Fed. R. Civ. P. 23(b)(1)(A).........................................................................................10

Fed. R. Civ. P. 23(b)(1)(B).........................................................................................10

Fed. R. Civ. P. 23(b)(3)......................................................................................... *passim*

## INTRODUCTION

Plaintiffs' class certification motion (Doc. 15549) asks the Court to pretend that the most catastrophic natural disaster in United States history amounts to nothing more than a barge accident.  According to plaintiffs' motion and proposed trial plan, the best way for this Court to proceed in the Katrina litigation is (1) to certify a Barge class of more than 40,000 individuals – the vast majority of whom have not sued and will never sue the Barge defendants, and who instead blame the United States for their losses – and then (2) to attempt to manage a single case that would adjudicate, as to each of those 40,000-plus individuals, (a) the amount of his or her damages for sixteen different kinds of individualized harms, and (b) the percentage responsibility for each of those harms that should be attributed to each Barge defendant as well as each other potential cause, including hurricane force winds, heavy rains, flooding from numerous breaches (including the two *separate* IHNC breaches), downed trees, vandalism, and many other causes.

There is no precedent for class action litigation on such a scale, and Fifth Circuit case law squarely rejects it.  Individual issues regarding causation and damages permeate and predominate plaintiffs' claims, making adjudication in a single proceeding completely unmanageable.  Even if LNA were found negligent, and even if the barge were found to have caused any breaches, the only way to adjudicate each person's claims is to individually examine the nature and extent of that person's damages and determine, for each category of harm, the extent to which it was caused by any of the numerous potential sources of damage from this complex event.  Plaintiffs' proposed "trifurcation" of the trial does not reduce or cure the predomination of individual issues or the insuperable manageability problems, and also ignores that this litigation involves claims against the United States by both LNA and the MRGO plaintiffs that this court has repeatedly held must be tried all together.  For these and other reasons, plaintiffs' motion should be denied.

1

# FACTUAL BACKGROUND

*"Needless to say, Hurricane Katrina was a natural event that resulted in massive damage to the metro New Orleans area as well as to much of the Gulf of Mexico region. Because the hurricane set in motion the events leading up to the devastation, however, does not make it appropriate to label the damage as a 'single accident,' as such would be a gross understatement." Case v. ANPAC Louisiana Ins. Co., 466 F. Supp. 2d 781, 791 (E.D. La. 2006) (Duval, J.).*

Hurricane Katrina struck New Orleans on Monday, August 29, 2005. The storm "built up record levels of surge and waves, larger than any previous storm to strike … the North American continent."[1] Hurricane-force winds battered the entire New Orleans area, and the storm brought "record rainfall" totaling over 14 inches.[2] Storm surge overwhelmed and destroyed the levees along the Mississippi River – Gulf Outlet (MRGO), causing massive breaches along its entire length.[3] No fewer than thirteen separate sources of water poured into the Lower Ninth Ward of New Orleans and St. Bernard Parish west of Paris Road.[4] Homes and structures in the area suffered varying degrees of damage from a variety of causes including wind, rainfall, downed trees, floodwaters, and other factors.[5]

Within the Inner Harbor Navigation Canal ("IHNC"), the floodwall protecting the Lower Ninth Ward gave way in two separate locations. The so-called "north breach" formed near Florida Avenue in the early morning hours of August 29, the result of what public investigations

---

[1] Pl. Ex. 1, Report of Melvin Spinks ("Spinks Report") at 7-8; LNA Ex. 1, Interagency Performance Evaluation Team, *Performance Evaluation of the New Orleans and Southeast Louisiana Hurricane Protection System* (March 2007 Final Report) ("IPET Report") at IV-1, 256 (storm produced "the largest storm surges … that have ever been observed within the Gulf of Mexico"). The entire IPET Report is available at https://ipet.wes.army.mil.

[2] Pl. Ex. 1, Spinks Report at 7-8; LNA Ex. 1, IPET Report at IV-48 to IV-50.

[3] See LNA Ex. 2, I. van Heerden et al., *The Failure of the New Orleans Levee System during Hurricane Katrina* ("Team Louisiana Report") at 39; 47, 54, 63, 80; LNA Ex. 1, IPET Report at V-104-05; LNA Ex. 3, R.B. Seed et al., *Investigation of the Performance of the New Orleans Flood Protection Systems in Hurricane Katrina on August 29, 2005* ("ILIT Report") at xx-xxi, 2-7, 2-8.

[4] See LNA Ex. 4, Report of Joseph Suhayda at 7 (thirteen breaches and overtopping locations identified as affecting proposed class area); Doc. 8286-17 at 10, ¶ 4.1 (Report of Lee Wooten identifying 24 sources of water).

[5] LNA Ex. 5, Report of William Thomassie at 5-6; Doc. 8286-28 at 2 (report of Robert Dalrymple).

have found to be engineering failures in the floodwall itself and, possibly, weakness in the underlying soil.[6]  The so-called "south breach" formed later, and for different reasons.[7]  After the storm, a barge – the ING 4727 – was found just inside the south breach.  The public studies performed by IPET, ILIT and Team Louisiana unanimously concluded that the barge had nothing to do with causing either of the breaches, or at least that the breaches occurred for reasons having nothing to do with a barge.[8]

The damage wrought by Hurricane Katrina has in turn generated a flood of litigation. The largest group of claims allege that the United States is liable for having negligently designed and maintained the MRGO, which delivered the storm surge to New Orleans.[9]  Many of these plaintiffs have also sued local entities and/or certain contractors, and their suits are grouped under the "MRGO" umbrella in this consolidated litigation.  Expert opinion submitted by the MRGO plaintiffs concludes that the barge did not cause either of the IHNC floodwall breaches.[10]

There is, however, a smaller group of plaintiffs (see Doc. 7724 at 4), who allege that the Barge ING 4727 is solely responsible for all of the damage sustained by everyone living between the IHNC and Paris Road in St. Bernard Parish.  These "Barge plaintiffs" allege that the barge

---

[6] LNA Ex. 1, IPET Report at V-1, V-67 to 75 (north breach formed due to foundation instability); LNA Ex. 2, Team Louisiana Report at 67 (north breach resulted from under-seepage, loss of levee stability and/or overtopping and loss of soil support); LNA Ex. 3, ILIT Report at 6-20 (north breach mainly due to "underseepage-induced instability").

[7] LNA Ex. 1, IPET Report at V-75, V-100 to 104 (south breach formed due to overtopping and erosion); LNA Ex. 2, Team Louisiana Report at 67, 202-03 (overtopping and underseepage combined to form south breach); LNA Ex. 3, ILIT Report at 6-14 (south breach principally caused by "underseepage-induced instability").

[8] LNA Ex. 1, IPET Report at V-67 to 75 (attributing breaches to causes other than a barge); LNA Ex. 2, Team Louisiana Report at 67 (the barge "clipped the end of the already-formed breach as it was sucked through"); LNA Ex. 3, ILIT Report at 6-7 (barge impact "was not the cause of the breach and failure" but rather, barge was "drawn in through a breach that was already well developed").  See also LNA Ex. 26, R.B. Seed *et al.*, *New Orleans and Hurricane Katrina.  II: The Central Region and the Lower Ninth Ward*, 134 J. Geotech. & Geoenvtl. Eng'g 718, 722-38 (May 2008) (peer-reviewed journal article analyzing IHNC breaches and concluding the barge was "most likely drawn in through a breach that was already open").

[9] See Doc. 7724 at 4 (CMO No. 5); LNA Ex. 6, Defendant United States Response to MRGO Plaintiffs' First Set of Interrogatories at 1, 4, 27, and 29 (government has received over 325,000 SF-95 forms).

[10] See, e.g., Doc. 13845 Exh. 7 (excerpts from Robert Bea declaration concluding barge did not cause breaches).

3

caused the north breach, based on the testimony of a single "eyewitness" who said he saw "what appear[ed] to be a piece of steel, what appeared to be a barge," but who also said he had "fuzzy" long-distance vision, was not wearing his glasses, and "couldn't tell what it was."[11]  These plaintiffs also claim, based on one or two different alleged "eyewitnesses," that the barge separately caused the south breach in the IHNC floodwall.[12]  Plaintiffs' engineering expert admitted that the two breaches are "separate events" that must be "analyzed separately" based on the different physical evidence, timing, weather, and witnesses applicable to each of them.[13]

The "Barge plaintiffs" seek class certification based on the complaint filed by Ethel Mumford, an employee of one of the plaintiffs' law firms,[14] and several other plaintiffs.  These plaintiffs have filed a total of six amended complaints, and were recently denied leave to file a seventh amended complaint.  See Doc. 15902.  The *Mumford* complaint, as amended, itemizes *sixteen* separate categories of compensatory damages sought in this case, as follows:

    a.  Past and future mental pain, suffering and anguish;
    b.  Past and future mental health care expense;
    c.  Wrongful death;
    d.  Past and future loss of love, affection, service, support, society and consortium;
    e.  Past and future loss and destruction of and damage to immovable and movable property;
    f.  Past and future loss of use of immovables and movables;
    g.  Past and future expenses for demolition and salvage of immovable and movable property;
    h.  Diminution of property values;
    i.  Past and future loss and destruction of businesses and business assets;
    j.  Past and future lost profit;
    k.  Past and future lost income;
    l.  Past and future lost earning capacity;
    m.  Past and future lost business opportunity;

---

[11] See Deposition Index ("Dep. Index"), Item 1 (Villavaso).  Relevant deposition excerpts are referenced in the index and included in the exhibits.  The testimony of this particular witness was so equivocal that this Court has upheld a deemed admission that the floodwall was broken before any barge impact.  Doc. 14525 at 8; Doc. 16053.

[12] See Dep. Index, Item 2 (Adams, Murph, and Lentz).

[13] See Dep. Index, Item 3 (Marino).

[14] See Dep. Index, Item 4 (Mumford).

      n.  Past and future loss of enjoyment of lifestyle;
      o.  Inconvenience;
      p.  Any and all others proven.[15]

Plaintiffs assert these claims for themselves and also for "all persons and/or entities who/which, on August 29, 2005, were residents of, or owned properties or businesses in" the proposed class area, which consists of the Lower Ninth Ward of New Orleans plus all of St. Bernard Parish west of Paris Road.  Pl. Mot. at 2; see Doc. 8779 at 13-14.  The complaint does *not* seek damages for personal physical injuries, which none of the proposed representatives claims to have suffered.[16]

The representative plaintiffs include several property owners who assert claims for damage to real property and personal property.  Pl. Mot. at 2-7 (Mumford, Richardson, Harris, Koch).  All of these people owned real property, however; none was a renter.  All of the properties they owned were located at considerable distance from the IHNC floodwall breaches, and none is in the immediate vicinity of either breach.[17]

The representative plaintiffs also include two small businesses owners in St. Bernard Parish – Michael Riche, owner of "Mr. Ribbon," and Jacob Glaser, owner of "Holiday Jewelers."[18]  Together with Mr. and Mrs. Koch, who owned a few rental properties, these individuals seek to represent the owners of every business within the proposed class area, of whatever size and type, for the purpose of seeking "business loss" damages.  Pl. Mot. at 2-7.

In sworn interrogatory responses, the proposed representatives have denied that the actions of the United States government caused or substantially contributed to the flooding in the

---

[15] Sixth Amended Complaint, Rec. Doc. 8779 ¶ VII(a).  See also LNA Ex. 10 (plaintiffs' responses to LNA Interrogatory No. 26, specifying the varying elements of compensatory damages sought by each plaintiff).

[16] LNA Ex. 11 (plaintiffs' response to Interrogatory No. 39).  But see Pl. Mem. at 9 (referring to "personal injury category" of claims for which certification is sought).

[17] LNA Ex. 12, Report of Wade R. Ragas at 30-31 ¶ 95.  Plaintiffs originally named Rico Terrence Sutton, who lived near the north breach, but later withdrew him as a class representative.

[18] See Dep. Index, Item 5 (Riche and Glaser).

proposed class area, asserting instead that the barge is the sole cause.[19] Many of them, however, have also filed SF-95 forms and/or lawsuits asserting that their flood-related damages were caused by the negligence of the United States government and other entities.[20]

LNA has denied any liability to the plaintiffs, and has also filed third-party claims against the United States and certain local government entities (*e.g.,* Doc. 9032). LNA's claims against the United States have survived two motions to dismiss. Doc. 12946; Doc. 587 in 05-4419. Recognizing that adjudicating plaintiffs' claims necessarily will entail apportioning any liability and damages that may be found, this Court has properly refused to sever LNA's third-party claims from the plaintiffs' claims against LNA, and has consolidated the Barge and MRGO tracks. Docs. 618 and 831 in No. 05-4419, Doc. 12935. Thus, while LNA is not participating in the MRGO cases (never having been sued by any MRGO parties), the United States and certain other MRGO defendants will necessarily be involved in any trial of the Barge plaintiffs' claims.

## SUMMARY OF ARGUMENT

1. Plaintiffs bear the burden of showing that all requirements for class certification have been met. The Court must assess how the case will actually be tried, based on the facts and law relevant to the parties' claims and defenses. See pp 9-11 below.

2. As a preliminary matter, plaintiffs cannot satisfy all four requirements of Fed. R. Civ. P. 23(a). First, the representative plaintiffs are not "typical" of class members because every proposed class member was affected by a unique mix of separate injury-causing factors, and because the representatives' claims involve different injuries, different defenses, and different defendants from class members' claims. Second, the proposed representatives cannot show they

---

[19] LNA Ex. 11, Plaintiffs' Response to Interrogatory No. 24 (Dec. 28, 2007). These are the only verified responses plaintiffs have ever served for this interrogatory. See LNA Ex. 15 (unverified Oct. 2008 supplemental response).

[20] See Dep. Index, Item 6 (Harris, Riche, Koch, and Glaser).

6

will fairly and adequately represent the class because their interests conflict with those of class members (including the overwhelming majority who allege the United States is responsible for their damages), and because they have abdicated their oversight role.  Finally, the difficulty of ascertaining property ownership in the class area undermines certification.  See pp. 11-17 below.

3.  The gravest and most fundamental defect in plaintiffs' motion is the predominance of individual issues over common issues, which is fatal to class certification under Rule 23(b)(3).

a.  Class certification is disfavored in mass tort cases precisely because individual issues almost always predominate.  Plaintiffs' argument that an exception exists for "single event" cases is unavailing, both (i) because Katrina-related damage did not result from a "single event," and (ii) because courts refuse to certify classes in "single event" cases when they involve individual issues as to causation and damages, as here.  See pp. 17-20 below.

b.  Plaintiffs' allegations of negligence raise individual issues as to whether LNA owed a duty to each class member, given the expansive proposed class area.  See pp. 20-21 below.

c.  The issue of causation is highly individualized.  The Court must consider all of the causation issues, including the causes of plaintiffs' claimed injuries, not just the causes of the IHNC floodwall breaches.  Plaintiffs' claimed injuries resulted from many factors other than flooding -- including wind, rain, downed trees, etc. -- that do not even arguably involve the barge.  Moreover, even as to the flooding, there were many sources of flooding in the proposed class area, including numerous breaches on the MRGO and two separate breaches on the IHNC. Though plaintiffs attempt to use hydrologic modeling to argue that flooding is a common issue, their model failed to separate the north and south IHNC breaches (as their engineering expert conceded was necessary), and did not produce any results that show actual causation of damage to each plaintiff's property.  See pp. 21-27 below.

d.  The existence and extent of damages is also highly individualized because no mathematical model or formula can calculate any of plaintiffs' sixteen categories of claimed damages, much less all of them.  Various categories of damages, such as physical property damage, demolition and salvage, loss of use, business interruption and lost inventory, loss of income, and inconvenience/loss of lifestyle, can only be ascertained individually.  Damages for diminution of real estate value is likewise an individual issue, despite plaintiffs' attempt to use a "mass valuation" model, both because such a model will not determine "damages" due to the barge and because there are too many variables and too few data for the model to perform.  Damages for diminution of the value of businesses and loss of personal property likewise cannot be shown on a class-wide basis due to the varied nature of the businesses and personal property losses involved.  Damages for personal injury, emotional distress, and wrongful death are clearly individual, and are a "significant part" of putative class members' claims.  See pp. 28-46 below.

e.  This case, which involves complex issues of multiple potential causes and no fewer than sixteen categories of damages, is vastly more complex than the cases in which the Fifth Circuit and other courts have denied class certification.  Plaintiffs' proposed bifurcated trial plan does not overcome their inability to show predominance because the Fifth Circuit requires that common issues predominate the case as a whole, not just the first part of a bifurcated proceeding, and because bifurcation will not support class certification where, as here, damages cannot be established through mathematical or formulaic evidence.  See pp. 46-54 below.

4.  Plaintiffs also cannot show that a class action is superior to adjudication of individual claims as required under Rule 23(b)(3).  First, class members have a strong interest in controlling their own claims. This is shown by the high stakes involved in the individual claims and the fact that thousands of class members have already filed claims of their own, most of them asserting

theories of liability inconsistent with those asserted by the Barge plaintiffs, and focusing instead on other defendants such as the United States government.  Moreover, this case is not manageable as a class action because of the myriad individual causation and damages issues that would have to be adjudicated, and because the plaintiffs' trial plan makes no provision for adjudicating the liability of third-party defendants such as the United States as part of the proceeding, as this Court has already required.  Further, the prospect of class action litigation involving dueling classes  – a "MRGO" class represented by one set of lawyers suing the United States and denying the barge is liable, and an overlapping "Barge" class represented by different lawyers suing the barge and denying the United States is liable – presents additional intractable problems both as to class notice and as to trial management.  Also, certification would create the kind of "*in terrorem*" effect of magnifying unproven claims that the Fifth Circuit has cited as an additional reason to refrain from certifying a class.  In these circumstances, individual adjudication is the superior method to address plaintiffs' claims.  Such individual adjudication will be necessary in any event, given the predominating individual issues, but will involve fewer individual trials if a class is ***not*** certified, given the relatively small number of Barge plaintiffs as compared with the large size of the putative class.  See pp. 54-59 below.

## ARGUMENT

"The party seeking certification bears the burden of establishing that ***all*** requirements of Rule 23 have been satisfied."  *Unger v. Amedisys Inc.*, 401 F.3d 316, 320 (5th Cir. 2005) (emphasis in original).  To obtain class certification, the plaintiff must first satisfy all four requirements set forth in Federal Rule of Civil Procedure 23(a) by showing:  "(1) a class 'so numerous that joinder of all members is impracticable'; (2) 'questions of law or fact common to the class'; (3) named parties' claims or defenses 'typical … of the class'; and (4) representatives

that 'will fairly and adequately protect the interests of the class.'"  *Steering Committee v. Exxon Mobil Corp.*, 461 F.3d 598, 601 (5th Cir. 2006).  In addition, in cases seeking money damages, the plaintiff must satisfy Rule 23(b)(3), which requires that "questions of law or fact common to the class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  See *Unger*, 401 F.3d at 320; *Steering Committee*, 461 F.3d at 601.[21]

In short, as plaintiffs recognize (Pl. Mem. at 7), they bear the burden of establishing six requirements:  numerosity, commonality, typicality, adequacy, predominance, and superiority.  In addition, and as they also recognize (Pl. Mem. at 8), plaintiffs must supply class and subclass definitions that provide "ascertainable" membership.

In determining whether the plaintiff has satisfied these Rule 23 requirements, courts are directed to take a "close look" at the relevant facts and claims.[22]  "The plain text of Rule 23 requires the court to 'find,' not merely assume, the facts favoring class certification."  *Unger*, 401 F.3d at 321.  Thus, courts "can, and in fact must, review the merits … insofar as they also concern issues relevant to class certification."  *Regents of the University of California  v. Credit Suisse First Boston (USA), Inc.*, 482 F.3d 372, 381 (5th Cir. 2007).  Consequently, the court is not "limited to the pleadings when deciding on certification;" rather, "[g]oing beyond the pleadings is necessary, as a court must understand the claims, defenses, relevant facts, and applicable substantive law to make a meaningful determination of the certification issues."  *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 744 (5th Cir. 1996).  Among the factors that the district court must

---

[21] Although plaintiffs' memorandum (at 7) makes clear that Rule 23(b)(3) is the relevant provision here, their motion (at 17-20) cryptically also refers to Rule 23(b)(1)(A) and (b)(1)(B).  These provisions could not support certifying a class here even if plaintiffs had invoked them.  See *Unger*, 401 F.3d at 320; see also *Langbecker v. Electronic Data Sys Corp.*, 476 F.3d 299, 318 (5th Cir. 2007) (monetary claims not cognizable under (b)(1)(A)); *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 843, 845 (1999) (unliquidated tort claims not subject to (b)(1)(B)).

[22] *Unger*, 401 F.3d at 320; see also *Castano v. Amer. Tobacco Co.*, 84 F.3d 734, 740 (5th Cir. 1996) (court "must conduct a rigorous analysis of the rule 23 prerequisites before certifying a class").

consider is "how a trial on the merits would be conducted." *Id.* at 740.[23]  In that connection, the

court must consider **all** issues needed to adjudicate plaintiffs' claims, not just the "common"

ones.  *Id.* at 744-45.  If the plaintiffs' claims present significant issues that require individual

proof from class members, then class certification is not allowed under Rule 23(b)(3).  *Id.*

Furthermore, the class-action procedure may not be used to alter or reduce the substantive

elements of proof needed to establish a claim.  *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591,

612-13 (1997); *Castano*, 84 F.3d at 750-51.  Any attempt to short-circuit the proof requirements

of plaintiffs' tort claims, particularly respecting causation and damages, must be rejected.

*Cimino v. Raymark Indus., Inc.*, 151 F.3d 297, 314, 319 (5th Cir. 1998) (reversing certification

because trial plan would not address causation and damages "as to each individual plaintiff").

## I.      PLAINTIFFS' MOTION DOES NOT SATISFY THREE ELEMENTS OF RULE 23(a).

Plaintiffs' motion cannot succeed unless plaintiffs are able to supply an ascertainable

class definition that meets all of the requirements of Rule 23(a).  Plaintiffs' motion falls short of

the mark as to typicality, adequate representation, and ascertainability.[24]

### A.  Plaintiffs' Claims are Not Typical.

To satisfy the typicality requirement, the representative plaintiffs must "possess the same

interest and suffer the same injury" as the class members.  *Amchem*, 521 U.S. at 625.  The

representative plaintiffs must not be subject to individual defenses on issues such as causation,

damages, and/or comparative fault.  See *In re Vioxx Prods. Liab. Litig.*, 239 F.R.D. 450, 460

(E.D. La. 2006).  Here, plaintiffs argue that the representatives are typical because, supposedly,

---

[23] See also *Robinson v.  Texas Auto. Dealers Ass'n*, 387 F.3d 416, 426 (5th Cir. 2004) (reversing certification for failure to "seriously consider[] the administration of the trial"); *O'Sullivan v. Countrywide Home Loans, Inc.,* 319 F.3d 732, 738 (5th Cir. 2003) (court must "inquire how the case will be tried").

[24] LNA does not contest the "numerosity" criterion in Rule 23(a); and, like the plaintiffs (Pl. Mem. at 14-15), LNA addresses "commonality" through the "more exacting" predominance requirements of Rule 23(b)(3).

they were affected by the "same events" at the "same time" as class members, and "suffered the same spectrum of injuries."  Pl. Mot. at 12.  The record shows that these assertions are incorrect.

First, plaintiffs cannot claim they were affected by the "same events" as all class members because Hurricane Katrina was an exceedingly complex series of ***different*** "events" including hurricane winds, torrential rains, downed trees, multiple separate levee and floodwall breaches, post-storm vandalism, and other conditions all of which affected properties in multiple and different ways.  See, *e.g.*, *Case v. ANPAC Louisiana Ins. Co.*, 466 F. Supp. 2d at 791 ("gross understatement" to call damage a "single accident"); *Rohr v. Metro. Ins. & Cas. Co.*, 2007 WL 163037 at *3 (E.D. La. Jan. 17, 2007) (effects on each property were unique).  Even the two floodwall breaches that plaintiffs cite as the supposed "common event" occurred at different times and different locations, and had different impacts on the areas nearest the breaches versus those observed elsewhere in the class area.[25]  The representative plaintiffs' properties are clustered in areas far from the two floodwall breaches, and all of them have been or can be rebuilt, except for one property that could not be rebuilt due to pre-existing termite damage.[26]  Also, the representatives predominantly owned rental properties, not owner-occupied properties, raising different motives from other class members.  See Dep. Index, Item 7 (Koch and Ragas).

Nor do the representative plaintiffs have the "same injuries" as the absent class members.  For instance, none of the representative plaintiffs asserts a claim for personal physical injury or for what they now call "zone of danger" emotional harm (Pl. Mem. at 9).[27]  In *Valentino v.*

---

[25] LNA Ex. 19, Plaintiffs' Response to Request to Admit No. 7, Rec. Doc. 13738-4 at 6-7 (admitting north breach happened first*)*; LNA Ex. 5, Thomassie Report at 11 (discussing structures in immediate vicinity of breaches).

[26] LNA Ex. 5, Thomassie Report at 11 and Attachment B at 32; LNA Ex. 12, Ragas Report at 30 ¶ 95 (discussing lack of typicality as to representatives' properties).

[27] LNA Ex. 21, Plaintiffs' Response to Interrogatory No. 39, Rec. Doc. 13803-2 ("None of the named plaintiffs other than Josephine Richardson [wrongful death] is asserting a claim for personal injury for anything other than emotional distress"); LNA Ex. 11, Plaintiffs' Response to Interrogatory No. 12 (Mumford, Richardson, Harris, Riche, Glaser, and Koch plaintiffs were all located outside the class area during Katrina).

*Carter-Wallace, Inc.*, 97 F.3d 1227 (9th Cir. 1996), the Ninth Circuit reversed class certification

in a product liability case because "[n]o named plaintiff has experienced aplastic anemia as a

result of taking the drug, even though this condition is one of the most serious of the alleged

adverse consequences." *Id.* at 1234. Here, class members would clearly assert personal physical

injuries and emotional distress, as plaintiffs' motion admits. Pl. Mem. at 9. Thus, the

representatives, who possess no such claims, are not typical of those class members.[28]

There are also individualized defenses and other relevant differences between

representatives and class members. For instance, though Ms. Mumford asserts a property claim

for an automobile, she admits that she left her car behind when she evacuated even though she

expected the area to flood, raising contributory negligence issues.[29] Mr. Riche, a proposed

representative of the "business claim subclass," concedes his business is ***not*** representative of a

giant company like Wal-Mart.[30] Finally, in this case where the plaintiffs have asserted claims

***only*** against the barge even though many other members of the class have sued the United States

and others, it is myopic to deem plaintiffs' limited claims "typical" of class members' claims.[31]

### B. Plaintiffs Are Inadequate Representatives.

Rule 23(a)(4) requires the representatives to show they "will fairly and adequately protect

the interests of the class." The class representatives' adequacy may not be presumed; rather,

"[a]dequacy is for the plaintiffs to demonstrate." *Berger v. Compaq Computer Corp.*, 257 F.3d

475, 481 (5th Cir. 2001). The Fifth Circuit has held that conflicts between class representatives

---

[28] Plaintiffs belatedly attempted to cure this defect in their motion by moving to amend their complaint to add a new
representative plaintiff, Arcola Sutton, who could assert a personal injury and "zone of danger" claim. However, the
Court rejected this amendment as untimely, leaving them with no representative who has such a claim. Doc. 15902.

[29] See Dep. Index, Item 8 (Mumford).

[30] See Dep. Index, Item 9 (Riche).

[31] See *Reeb v. Ohio Dep't of Rehab. & Corr.*, 435 F.3d 639, 644 (6th Cir. 2006) (reversing class certification in
employment discrimination case where the district court "did not adequately examine just what the named plaintiffs
[were] seeking, nor did it review any evidence as to the likely claims that the rest of the class will assert").

and class members as to legal interests, strategy or position may preclude a finding of adequate representation.  See, *e.g.*, *Langbecker v. Electronic Data Systems*, 476 F.3d 299, 312-13, 315 (5th Cir. 2007) (conflicts among shareholders with differing interests had "implications not only for dividing the pie at recovery but also for discovery and preparation for trial"); *Stirman v. Exxon Corp.*, 280 F.3d 554, 563 & n.7 (5th Cir. 2002) (trial court failed to consider representatives' adequacy even though one of them had potentially "forfeited the rights of some class members").

Fundamental conflicts exist here.  By moving for class certification, the Barge plaintiffs seek to impose their idiosyncratic theory that the barge rather than the United States Government was liable for the flooding – a theory contrary to the conclusion of every independent study – on the vastly greater number of residents who have made it clear that they wish to pursue the Government, not LNA, for their injuries.  Certifying such a Barge class would undermine the class members' claims against the Government; indeed, the proposed representatives have already expressly denied, in a sworn interrogatory response, that the United States Government caused or contributed to the flooding.[32]  Such actions jeopardize the interests of class members who have made claims against the United States and who would be bound by the actions of the proposed representatives in the event of class certification.[33]

Nor could the Court possibly certify overlapping MRGO and Barge classes that would advance diametrically opposing factual and legal positions in a joint trial involving the MRGO and Barge defendants.  Though such conflicts among competing legal theories by competing

---

[32] LNA Ex. 21, Plaintiffs' Response to Interrogatory No. 24 (Doc. 13803-2).

[33] See, *e.g.*, *Martin v. Home Depot U.S.A., Inc.*, 225 F.R.D. 198, 203-04 (W.D. Tex. 2004) (representatives' choices would bind class members if class were certified).  Though plaintiffs recently served an unverified supplemental response (LNA Ex. 15) the prior response stands as evidence even after its purported withdrawal.  *John G. Mahler Co. v. Klein Karoo Landboukooperasie DPK*, 1995 WL 371037, *4 n.3 (5th Cir. Jun. 5, 1995) (interrogatories can be used as evidence and contradiction of prior responses can only be done within limits).

groups are relatively rare, when they arise courts have refused to find adequate representation.[34] Indeed, the fact that the MRGO and Barge plaintiffs are proposing competing classes makes it clear that each resident must be afforded control over his or her own individual claim.

There are other conflicts between the proposed representatives and members of the class. Because none of the proposed representatives has suffered a personal physical injury as a result of the flooding, the representatives have no incentive to pursue such claims -- which are, indeed, omitted from the operative Sixth Amended Complaint (Doc. 8779).[35]  Omitting class members' physical injury claims would waive such claims as a matter of law if a class is certified, establishing that plaintiffs are not adequate representatives.[36]  Also, none of the representative plaintiffs is a wage-earner seeking lost wage income, even though members of the class would assert such claims if litigated individually.[37]  Plaintiffs' readiness to sacrifice class members' claims in order to obtain certification undermines their pretensions to adequate representation.

Finally, the proposed class representatives have not shown any inclination or ability to serve as more than a rubber stamp for the decisions of the class action lawyers bringing the case,

---

[34] See *Danvers Motor Co. v. Ford Motor Co.,* 543 F.3d 141, 2008 U.S. App. LEXIS 19354, *23-24 (3d Cir. Sept. 12, 2008) (adequacy of representation lacking where "class members will likely need to pursue different, and possibly conflicting, legal theories to succeed"); *Bradburn Parent/Teacher Store, Inc. v. 3M,* 2004 U.S. Dist. LEXIS 3347, *32 (E.D. Pa. Mar. 1, 2004) ("[B]ecause Plaintiff's theory of damages is antagonistic to an alternative theory that many class members likely wish to pursue, and because Plaintiff is not in a position to pursue this alternative theory itself, Plaintiff's interests are antagonistic to those of other members of the proposed class.").

[35] Plaintiffs belatedly sought to amend their complaint to add such claims and a class representative with such alleged injuries, but their motion was denied.  Doc. 15902.  As we show below (at 43-46), if such claims were added to the case, that would raise separate class certification problems based on predominance of individual issues.

[36] See, *e.g., Hilton v. Atlas Roofing Corp.,* No. 05-4204, 2006 U.S. Dist. LEXIS 88290 (E.D. La. Dec. 5, 2006) (denying class certification on grounds that plaintiffs were waiving claims by seeking only injunctive relief); *Martin v. Home Depot U.S.A., Inc.,* 225 F.R.D. 198, 203-204 (W.D. Tex. 2004) (denying class certification because named plaintiffs had split personal injury from their property damage claims); *Ardoin v. Stine Lumber Co.,* 220 F.R.D. 459, 466 (W.D. La. 2004) (denying class certification where named plaintiffs disavowed and waived tort, personal injury, and property contamination claims, instead focusing on unjust enrichment and UCC claims).

[37] LNA Ex. 21, Plaintiffs' Response to Interrogatory No. 38 ("All named Plaintiffs seek classwide damages for lost income evaluated by expert analysis on a classwide approach, unless a class is not certified, in which event plaintiffs reserve all of their claims for lost income" … but "certain non class representative named plaintiffs will seek individual claims for damages resulting in lost income [and] investigation of such claims is now underway").

contrary to the Fifth Circuit's requirements.  "Class representatives must satisfy the court that

they, and not counsel, are directing the litigation," *Unger*, 401 F.3d at 321, and must "possess a

sufficient level of knowledge and understanding to be capable of 'controlling' or 'prosecuting'

the action."  *Berger*, 257 F.3d at 482-83.[38]  Here, the proposed representatives have exhibited ***no***

direction or supervision over the activities of their counsel during the nearly three years this case

has been pending.[39]  Under the applicable legal standard, the representatives' total lack of

meaningful oversight precludes a finding of adequate representation here.[40]

### C.  The Class Is Not Ascertainable.

Plaintiffs argue that they have supplied the Court with class and subclass definitions that

are "adequately defined and clearly ascertainable," based on ownership of property or businesses

in the class area.  Pl. Mem. at 12.  To support this argument, plaintiffs point to the geographic

boundaries of the class, which they characterize as "objectively ascertainable," "precise," and

"merits neutral."  Pl. Mem. at 11.  But plaintiffs have not demonstrated that class membership

can be readily ascertained.  Experience in the Lower Ninth Ward suggests it is often difficult to

figure out who owns which properties because, among other things, successions have not been

recorded and ownership records are inaccurate or incomplete.[41]  Courts have held that

---

[38] See also *In re American Commercial Lines, LLC*, 2002 U.S. Dist. LEXIS 10116, at *43, 49-50 (E.D. La. May 28, 2002)  (class representatives inadequate where "evidence of their active participation or an intention to become actively engaged in controlling the … litigation is absent").

[39]  In particular, Mr. Harris says he has ***not*** "participated in the direction and control of the lawsuit against the barge entities;" Mr. Riche has "not supervised or directed the litigation in any way;" and none of the others has attended a court hearing, or a deposition other than his or her own, nor consulted in advance about court filings or proceedings. See Dep. Index, Items 12 (Harris), 13 (Riche), 14 (Koch, Mumford, Glaser, and Richardson), and 15 (Koch).

[40] In the case of Ms. Mumford, these concerns are magnified because she is an employee of one of the plaintiffs' law firms.  See *Shroder v. Suburban Coastal Corp.*, 729 F.2d 1371, 1375 (11th Cir. 1984) (upholding denial of class certification because one of the class representatives was an employee of plaintiffs' counsel).

[41] See, *e.g.*, LNA Ex. 22 (city inspection report listing Lois Callum, not Ethel Mumford, as owner of 4829 Burgundy Street property); LNA Ex. 27, Jarvis DeBerry, "The Search for Title," New Orleans Times Picayune, March 28, 2008 (describing title search problems in awarding Road Home grants).  For instance, before the storm, Ethel Mumford engaged in three separate donative transactions regarding her property.  See Dep. Index, Item 16

administrative difficulties in identifying class members can undermine class certification.[42] Here, ascertaining the true ownership of class area properties would involve a "slog" through records that promises to yield more questions than answers, undermining ascertainability.

## II. PLAINTIFFS CANNOT SHOW THAT COMMON ISSUES PREDOMINATE OVER INDIVIDUAL ISSUES.

Rule 23(b)(3) requires plaintiffs to show that common issues predominate over individual issues. The predominance requirement, which is "far more demanding" than merely showing that one or more common issues exist (*Steering Committee*, 461 F.3d at 601-02), is designed to ensure that the court does not certify a class that then "degenerat[es] into a series of individual trials." *Robinson v. Texas Auto. Dealers Ass'n*, 387 F.3d 416, 421 (5th Cir. 2004). Contrary to plaintiffs' arguments, individual issues predominate over any "common" issues that might exist.

### A. Class Certification is Disfavored in Mass Tort Cases.

Two years ago, in *Steering Committee v. Exxon Mobil Corp.*, the Fifth Circuit reaffirmed and endorsed the view of the Rules Advisory Committee that "[a] 'mass accident' resulting in injuries to numerous persons is ordinarily not appropriate for a class action because of the likelihood that significant questions, not only of damages but of liability and defenses to liability, would be present, affecting the individuals in different ways." 461 F.3d at 604 (quoting advisory committee note to Rule 23(b)(3)); *see Castano*, 84 F.3d at 745 n.19 (same). In *Castano*, the Fifth Circuit had also observed that the class action device "magnifies and strengthens the number of unmeritorious claims" and "creates insurmountable pressure on defendants to settle," and added:

---

(Mumford, Koch, and Richardson); see also LNA Ex. 11, Plaintiffs' Response to Interrogatory No. 31 (proposing elaborate steps such as "an advertising program" to identify property owners).

[42] See *Perez v. Metabolife International, Inc.,* 218 F.R.D. 262, 269 (S.D. Fla. 2003) (absence of records meant no reliable means to determine class membership in product liability case); *LaBauve v. Olin Corp.*, 231 F.R.D. 632, 663 n.65 (S.D. Ala. 2005) (finding class membership was ascertainable only after concluding it would be "unnecessary to slog through property ownership records … to determine the identities of" class members).

"It is no surprise, then, that historically, certification of mass tort litigation classes has been disfavored."  84 F.3d at 746.  In *Steering Committee,* the Fifth Circuit rejected certification because the plaintiffs had "not demonstrated that this mass tort has any exceptional features that warrant departing from the general rule and treating it as a class action."  461 F.3d at 604.[43]

According to plaintiffs, this case warrants a departure from the general rule against mass tort class actions because it stems from a "single, identical event," which plaintiffs identify as "the breach of the East wall of the Industrial Canal by … Barge ING 4727."  Pl. Mem. at 3, 5-6. As courts have repeatedly held, however, damage caused during Hurricane Katrina was not the result of a "single event" because the storm involved multiple different damage-causing conditions, including wind, rainfall, pump failures, and many separate levee and floodwall breaches.[44]  Indeed, the MRGO plaintiffs, asserting a "single event" theory on behalf of the same putative class in pursuit of the same damages from different defendants, define the relevant event as "the failure of the levees and floodwalls" including "overtopping and breaches along the full length of the MRGO" as well as the IHNC.  Doc. 7489 at 4, 15.  Clearly, the events giving rise to the damages claimed in this case are broader and more complex than a mere barge accident.

---

[43] Though plaintiffs suggest that the Supreme Court has signaled its acceptance of mass tort class actions, notwithstanding the Advisory Committee's comment, Pl. Mem. at 5, the decision that they cite specifically states that "[t]he Committee's warning … continues to call for caution when individual stakes are high and disparities among class members [are] great."  *Amchem,* 521 U.S. at 625.  Such conditions clearly exist here.

[44] See, *e.g., Rohr v. Metro. Ins. & Cas. Co.,* 2007 WL 163037 at *3 (E.D. La. Jan. 17, 2007) (Katrina-related damage did not arise from a "common transaction or occurrence" because "the effects of the hurricane were unevenly felt"); *Guice v. State Farm Fire & Cas. Co.,* 2007 U.S. Dist. LEXIS 34148 at * 6-7 (S.D. Miss. Mar. 22, 2007) (Katrina involved multiple damage-causing factors that varied from property to property); *Salvaggio v. Safeco Prop. & Cas. Ins. Co.,* 458 F. Supp. 2d 283 (E.D. La. 2006) ("[N]o court has concluded that Hurricane Katrina in and of itself was an accident."); *Roby v. State Farm Fire & Cas. Co.,* 464 F. Supp. 2d 572 (E.D. La. 2006) (same); *Flint v. Louisiana Farm Bureau Mut. Ins. Co.,* 2006 WL 2375593 (E.D. La. Aug. 15, 2006) (Hurricane Katrina was a natural event that culminated in many accidents rather than a single one); *Berry v. Allstate Ins. Co.,* 2006 WL 2710588 (E.D. La. Sept. 19, 2006) (deaths from Hurricane Katrina could not be attributable to a "single incident"); *Fradella's Collision v. Lafayette Ins. Co.,* 2006 WL 3258332 (E.D. La. Oct. 30, 2006) (wind and water damage caused by Hurricane Katrina cannot be considered attributable to the same accident).

Moreover, even as to the IHNC floodwall, this is not a "single accident" case. Rather, there were *two separate breaches* of the floodwall, which plaintiffs' expert admitted were "separate events" that must be "analyzed separately" based on the different circumstances and evidence concerning each of the breaches. See Dep. Index, Item 17 (Marino). In *Case v. ANPAC Louisiana Insurance Co.*, this Court held that separate levee and floodwall breaches constituted *separate events* for purposes of assessing whether breach-related claims for damages should be tried together in the same proceeding. 466 F. Supp. 2d 781 (E.D. La. 2006). "While the breaches occurred at several points along one levee system," this Court observed, "the causes for each of the failures involve separate and distinct factual inquiries, and the causation of individual damages presents unique questions of fact as to each claimant." *Id.* at 793-94. The possibility that the different breaches may have stemmed from different causes was critical to this Court's analysis.[45] Thus, this Court held that "[c]onsolidation of cases where there exist such distinct issues of liability and causation of damages among the plaintiffs would not prevent duplicative litigation … or otherwise foster judicial economy." *Id.* at 794. In short, the existence of separate breaches means this is not a "single event" case even by plaintiffs' own artificially narrow focus.

Even if this were a "single event" case, moreover, the case law would not support class certification. Courts routinely *refuse* to certify classes in "single event" cases, particularly when they present individualized issues concerning causation and/or damages. *Steering Committee,* in which the Fifth Circuit reaffirmed its "general rule" against class certification in mass tort cases, was a "single event" case involving a chemical plant fire. 461 F.3d at 600, 604. Similarly, in *Ancar v. Murphy Oil USA, Inc.*, 2008 U.S. Dist. LEXIS 68490 (E.D. La. July 25, 2008), a "single

---

[45] See *id.* at 794 (distinguishing possible finding of "poor maintenance" at 17th Street Canal from possible "poor construction or design" or flooding that "overtopped the levees" with no negligence at other locations).

event" case involving a single oil refinery fire and a single defendant, the court rejected class certification because it found that the case would ultimately require "mini-trials to resolve issues such as specific causation and damages."  *Id.* at *14, *27-28.  Plaintiffs' contrary argument – that "single event" cases are presumptively appropriate for certification – is simply wrong.[46]

**B.  Individual Issues Exist With Regard to Negligence**.

Plaintiffs' memorandum posits the existence of certain duties that LNA allegedly "owed members of the Class" (Pl. Mem. at 18) and then devotes considerable attention to the supposed "common evidence" that plaintiffs would employ to show that LNA breached those duties in the handling of the barge.  Pl. Mem. at 18-29.  Though plaintiffs rely on an expert report regarding LNA's alleged breaches of allegedly-applicable standards of care (Pl. Ex. 7), that expert does not opine on the scope of LNA's supposed duties and to whom those duties were supposedly owed.

The question of whether LNA owed a duty of care to each class member is not a common issue.  A duty to moor the barge using a certain configuration, for instance, would not extend to the entire universe – rather, it could only extend to those who could foreseeably suffer harm if that duty is breached.[47]  Moreover, as to foreseeability, plaintiffs have admitted they are unaware of any prior instance in which a barge breached a floodwall.[48]  In these circumstances, litigating each class member's claim will require an individualized determination as to whether or not LNA owed him or her a duty based on whether or not it was foreseeable that an individual who

---

[46] For examples of other "single event" cases in which class certification was denied, see also, *e.g.*, *Robertson v. Monsanto Co.*, 2008 U.S. App. LEXIS 15468 (5th Cir. July 18, 2008) (class certification denied in gas leak case); *Fulford v. Transport Service Co.*, 2004 U.S. Dist. LEXIS 9955 (E.D. La. June 1, 2004) (class certification denied in chemical spill case); *In re American Commercial Lines*, 2002 U.S. Dist. LEXIS 10116 (E.D. La. May 28, 2002) (class certification denied for claims from oil spill caused by barge accident); *Perrin v. Expert Oil & Gas, LLC*, 2008 U.S. Dist. LEXIS 8830 (E.D. La. Feb. 6, 2008) (class certification denied in oil spill case).

[47] See *Palsgraf v. Long Island R.R. Co.*, 162 N.E. 99 (N.Y. 1928) (must consider foreseeability of harm to plaintiff); *Consol. Aluminum Corp. v. C.F. Bean Corp.*, 833 F.2d 65, 67 (5th Cir. 1987) (applying *Palsgraf* rule in admiralty).

[48] See LNA Ex. 11, Plaintiffs' Response to Interrogatory No. 7 (answering "unknown" to interrogatory asking them to identify "any past instance in which a barge breakaway caused flooding" from alliding with a floodwall).

lived at the particular address – many of which were miles away from LNA's facility – could be injured if the barge was not moored in a particular way.[49]  As such, even the issue of negligence is not a common issue across the entire proposed class.

### C.  Causation Presents Highly Individualized Issues.

Plaintiffs argue that causation is a common issue, stating they intend to use "common" evidence to show the barge caused or contributed to breaches in the IHNC floodwall (Pl. Mem. at 30-31) and "that the breaches in the East wall of the Industrial Canal was [sic] the cause-in-fact of the flooding of the class area" (Pl. Mem. at 32).  They then assert, based on these arguments, that this case does not present the sort of "individualized causation issues" that prevented class certification in other mass tort cases (Pl. Mem. at 48).  This assertion is false, as we now show, because causation of plaintiffs' ***damages*** is indisputably individualized, and even their artificially narrow inquiry into causation of flooding demands individualized consideration.

### 1.  The Relevant Causation Inquiry Involves Plaintiffs' Claimed Injuries, Not Generalized "Flooding".

Plaintiffs concede that "[a] defendant's actions must be the cause in fact ***of a plaintiff's injuries*** in order for the plaintiff to be able to recover."  Pl. Mem. at 30 n. 15 (quoting *Moser v. Texas Trailer Corp.*, 623 F.2d 1006, 1013 (5th Cir. 1980) (emphasis added)).  Thus, in *Steering Committee*, the Fifth Circuit ruled that "while … the cause of the fire itself is an issue common to the class, each individual plaintiff must meet his or her own burden of medical causation, which in turn will depend on any number of … factors."  461 F.3d at 603.  Similarly, in *Robertson v. Monsanto Co.*, 2008 U.S. App. LEXIS 15468 (5th Cir. July 18, 2008), the Fifth Circuit held that each plaintiff "must show that Monsanto's negligence in causing the gas leak

---

[49]  See, *e.g.*, *Consol. Aluminum Corp.*, 833 F.2d at 68 (failure to follow safe dredging practices would not foreseeably result in physical damage to property several miles away); *Barasich v. Columbia Gulf Transmission Co.*, 467 F. Supp. 2d 676, 693 (E.D. La. 2006) (refusing to find "duty to … hundreds of thousands of plaintiffs to protect them from the results of coastal [wetlands] erosion").

was proximately connected to the specific injuries complained of." *Id*. at *20.  And in *Bell Atlantic Corp. v. AT&T Corp.,* 339 F.3d 294 (5th Cir. 2003), the Fifth Circuit held that "establishing causation … requires the plaintiff to demonstrate a causal connection between the specific … violation at issue and an injury to the [plaintiff's] business or property," and rejected class certification because individual consideration was needed to show the alleged injury was caused by the defendant and not by "factors … other than [its] conduct." *Id.* at 298, 302.[50]

Here, any adjudication of "causation" must focus on whether LNA's alleged conduct caused plaintiffs' claimed ***injuries*** – not a floodwall breach.  In this regard, LNA has an absolute right to raise the issue of whether each plaintiff's claimed injuries were caused by factors other than the barge.  See, *e.g.*, *Cimino v. Raymark Indus., Inc.*, 151 F.3d 297, 314-15 (5th Cir. 1998) (trial plan rejected where it would not adjudicate whether the defendant's conduct caused "each individual's actual damages").  Also, as to each plaintiff's injuries, the factfinder must assess not only whether the barge was a cause, but also the relative contribution of ***all*** causes of those injuries.[51]  This involves not only whether LNA's conduct caused the specific injuries about which the particular plaintiff or class member complains, but also the relative contribution of each other cause of each of those alleged injuries.

2.  Causation of Plaintiffs' Claimed Injuries is an Individualized Issue.

The record in this case conclusively establishes that – even apart from causation of any flooding, which we address in the next section – causation of plaintiffs' alleged injuries requires

---

[50] See also *O'Sullivan,* 319 F.3d at 745 (apportioning mortgage fee between permissible and impermissible practices raised individual issues of causation); *Robinson,* 387 F.3d at 423-24 (individual questions about whether challenged practice caused harm to class members "would destroy any alleged predominance in the proposed class").

[51] The relative contributions of defendants and third-party defendants, as well as entities that plaintiffs chose not to sue, must be assessed regardless of whether maritime substantive law applies or Louisiana substantive law applies. See, *e.g.*, *United States v. Reliable Transfer Co.*, 421 U.S. 397, 409 (1975) (requiring allocation under maritime law); *McDermott v. AmClyde*, 511 U.S. 202, 204 (1994) (requiring allocation to settling parties); *Calhoun v. Yamaha Motor Corp., U.S.A.,* 350 F.3d 316, 325 (3d Cir. 2003) (requiring allocation to parties that plaintiff chose not to sue); *Sibley v. Lemaire*, 184 F.3d 481 (5th Cir. 1999) (requiring allocation under Louisiana law).

numerous individualized determinations.  For instance, property damage in the class area during and after Hurricane Katrina resulted from many and varied causes.  Hurricane force winds caused massive damage to roofs and other structures in the class area.[52]  Rainwater intrusion into structures also caused significant damage within the class area.[53]  Downed trees contributed to the property damage of some or even many homes.[54]  Many homes had significant pre-existing termite damage and other damage that affected their condition.[55]  Still other structures fell victim to fires,[56] or to vandalism.[57]  Accordingly, as structural engineer William Thomassie confirmed after studying property damage within the class area, "each separate building or structure has to be evaluated for its own individual situation and unique set of damages, both with regard to the cause and the extent of the damages."  LNA Ex. 5, Thomassie Report at 6.

In these circumstances, causation of any alleged property damage is an individualized issue for purposes of class certification.  In *Guice v. State Farm Fire & Cas. Co.,* 2007 U.S. Dist. LEXIS 34148 (S.D. Miss. March 22, 2007), the district court observed that "Hurricane Katrina was a catastrophic windstorm" with "destructive forces" including "strong winds, storm surge flooding, wind-driven debris, water-borne debris, and heavy rains."  *Id*. at *7.  As here, the damage to any given home varied according to location, age, quality of construction, and design. *Id*. at *6.  The court held that because only some of these forces were covered under the defendant's insurance policy, the defendant had a due process right to challenge, on a house-by-house basis, the cause of the specific alleged damage.  *Id*. at *8-9.  So here, LNA has a due

---

[52] See Dep. Index, Item 18 (Mumford, Richardson, Harris, Riche, and Koch); LNA Ex. 5, Thomassie Report at 5 and photos 13, 14, 39, 41 (describing wind damage observed in class area and providing photographs of examples).

[53] See Dep, Index, Item 19 (Mumford and Riche); LNA Ex. 5, Thomassie Report at 6 (evidence of rain damage).

[54] See Dep. Index, Item 20 (Harris); LNA Ex. 5, Thomassie Report at 6 and photo 13 (downed trees)

[55] See Dep. Index, Item 21 (Mumford); LNA Ex. 5, Thomassie Report at 6 and photos 22, 37( pre-existing damage).

[56] See Dep. Index, Item 22 (Riche); LNA Ex. 5, Thomassie Report at 6 and photos 31, 34, 36 (fire damage).

[57] See Dep. Index, Item 23 (Richardson, Glaser, and Koch).

process right to challenge plaintiffs' assertion that all of the property damage claimed by them is attributable to LNA, as opposed to the many other factors that caused property damage in the class area.  This issue is, of necessity, an individual and not a common issue.

The need for individual consideration of causation extends to other injuries claimed by the plaintiffs.  For example, Mr. Glaser's claim for business losses includes jewelry store inventory that was stolen by vandals *after* he had returned to the area following the storm.[58] Similarly, Mrs. Mumford's claim for personal property loss includes two automobiles that she left behind in the Lower Ninth Ward, even though the vehicles were operable and even though she expected the neighborhood to flood.[59]  In short, every category of injury alleged by the plaintiffs in this case raises individual questions of causation, including alternative causation.

3.  Causation of "Flooding" is Also Itself an Individualized Issue.

Even apart from the many varying causes other than flooding, determining the cause of flooding at each particular property can only be done on an individualized basis.  First, the breaches on the east side of the Inner Harbor Navigation Canal were not the only sources of water to inundate the proposed class area.  As plaintiffs' hydrology expert stated, "[f]looding of the Lower Ninth Ward and the St. Bernard Parish was caused by several sources including levee/floodwall failures (breaches), overtopping of the levees/ floodwalls due to storm surge, and rainfall."[60]  Multiple sources of water entered the class area during Hurricane Katrina; as noted by Joseph Suhayda, an expert hydrologist and coastal scientist, "[t]here were 13 breaches and overtopping locations identified [in IPET] as affecting St. Bernard Parish and the Lower Ninth

---

[58] See Dep. Index, Item 24 (Glaser).

[59] See Dep. Index, Item 25 (Mumford); see Doc. 479 in No. 05-4419, at 2 (raising contributory negligence defense).

[60] Pl. Ex. 1, Spinks Report, at 6.  When asked at his deposition, "Was Katrina a complicated event?," this same expert answered, "Clearly.  Yes."  See Dep. Index, Item 27 (Spinks).

Ward."[61]  The massive breaches along the MRGO played an important role in the flooding in the

Lower Ninth Ward and St. Bernard Parish; according to plaintiffs' expert, "[f]loodwaters from

MRGO added an additional 4 to 5 feet of flood depth in the Lower Ninth Ward."[62]  In short, the

proposed class area was affected by multiple sources of flooding, including flooding for which

LNA is not even arguably liable and that must be considered in determining the cause of

damages at each property in the proposed class area.

> Moreover, the two IHNC breaches were ***separate*** events.  As Dr. Suhayda wrote:
>
> *[T]hese two breaches were separate events with separate consequences.  For persons living near the northern breach, that breach is the one of significance.  By contrast, the south breach will be more significant to persons living in the immediate vicinity of that breach and subjected to water flowing through it.  The relative contributions of the two breaches varied depending on location within the proposed class area.  Because the two breaches were separate events, the relative contribution of each breach would need to be evaluated in determining causation of damage.*  LNA Ex. 4, Suhayda Report at 7.

Plaintiffs' engineering expert, Gennaro Marino, admitted that the two IHNC breaches are

separate events requiring separate analysis, involving different witnesses and evidence.[63]  He

opined that the two breaches involved different weather conditions and forces allegedly acting on

the barge ("exceptional wave action" at the north breach, and wind at the south breach).[64]  And,

under his analysis, the two breaches occurred at different times.[65]  Thus, the factfinder will

necessarily analyze the two breaches separately.  Moreover, the contribution of these two

---

[61] LNA Ex. 4, Suhayda Report at 7, 17; see Doc. 8286-10 at 17, ¶ 4.1 (Wooten report identifying 24 possible sources of water in St. Bernard Basin).

[62] Pl. Ex. 1, Spinks Report at 26.  See also LNA Ex. 4, Suhayda Report at 12 (MRGO breaches were primarily responsible for "the maximum depth of flooding in the class area").  Also, floodwaters from the MRGO arrived first at some locations in the class area, before waters from the IHNC.  See Dep. Index, Item 28 (Spinks).

[63] See Dep. Index, Items 29 (Marino) and 30 (Marino).

[64] See Dep. Index, Item 31 (Marino); Pl. Ex. 16, Marino Report at 7 (relying on "exceptional wave action" at north breach); see Dep. Index, Item 32 (Marino); Pl. Ex. 16, Marino Report at 5-6 (opining that wind caused barge to be present at south breach).

[65] See Dep. Index, Item 33 (Marino); LNA Ex. 19, Plaintiffs' Response to Request to Admit No. 7, Rec. Doc. 13738-4 at 6-7 (admitting north breach happened first)

breaches "was not uniform or 'common' across the class area," and "their ultimate contribution varied."[66]  Thus causation of "flooding" is not a "common" issue for all class members.

This Court's case law confirms that where allegations of flooding involve multiple sources of water and multiple defendants, as in this case, causation is not a common issue.  In *Case v. ANPAC Louisiana Insurance Co.*, 466 F. Supp. 2d 781 (E.D. La. 2006), this Court specifically held that where breaches occur at several points along one levee system, "the causes for each of the failures involve separate and distinct factual inquiries, and the causation of individual damages presents unique questions of fact as to each claimant."  *Id.* at 794.  This Court further recognized in *Case* that "[c]onsolidation of cases where there exist such distinct issues of liability and causation of damages among the plaintiffs would not prevent duplicative litigation … or otherwise foster judicial economy."  *Id.*  Thus, even if the focus is limited to flooding from the two IHNC breaches – and especially if it is not so limited – the existence of multiple sources of flooding means that causation is not a common issue for all members of the proposed class.

Plaintiffs' assertion that the cause of flooding at each property can be determined through the hydrology modeling performed by their expert, Mr. Spinks (Pl. Mem. at 32 (citing Spinks Report)), is wrong for several reasons.  First, their model ignores that the north and south breaches were separate events with separate causes and separate effects within the class area.  Mr. Spinks admitted that he did not break the two breaches out separately in his model, and that the model does not tell how much water at any given location came from the north as opposed to the south breach.  (See Dep. Index, Item 34 (Spinks)).  He conceded, moreover, that the two

---

[66] LNA Ex. 4, Suhayda Report at 12.

separate breaches may have had different effects on properties within the class area.  (See Dep.

Index, Item 35 (Spinks)).  As Dr. Suhayda opined:

> [T]he Industrial Canal breaches were not identical in their character nor did they
> have a common effect on the flooding and buildings in the class area.  The Spinks
> model fails to take the separate breaches into account, and fails to allow for
> separate consideration of the contribution of each of the two breaches.  This
> failure constitutes another reason why the model cannot possibly assess property
> damage on a 'common' basis across the proposed class.  LNA Ex. 4, Suhayda
> Report at 18.

In short, plaintiffs' attempt to portray flood causation as a "common" issue depends on their

hydrology expert's admittedly flawed characterization of the IHNC breaches as a single event.

Second, other limitations in the Spinks modeling effort further undermine plaintiffs'

attempted reliance on it to portray flooding as a "common" causation issue.  To begin, Mr.

Spinks conceded that his model does not address damage to homes from wind, rain, or any other

physical damage to buildings.  See Dep. Index, Item 36 (Spinks).  Moreover, the model will only

predict flood depths above ground level, without regard to the elevation of the first floor of any

given building (which is the only relevant measure when the issue is damage to property).[67]

However, many of the homes in the class area are raised on piers well above the ground (an

individualized inquiry), and some businesses are located on the second floor of the structures

they occupy.[68]  Thus, Mr. Spinks' model cannot be used to predict property damage, or even the

level of flooding at any given home or property in the Lower Ninth Ward or St. Bernard Parish.[69]

---

[67] See Dep. Index, Item 37 (Spinks); LNA Ex. 4, Suhayda Report at 19 (explaining that level of first floor, not
ground level, is relevant).

[68] See Dep. Index, Item 38 (Harris, Richardson, Koch, and Riche).

[69] There are also many flaws in Mr. Spinks' modeling effort, which represents the first time he has ever used this
particular model (Sobek) despite having performed over 300 interior drainage analyses using different models.  See
Dep. Index, Item 39 (Spinks).  These errors include omitting important processes and geographical features and
overpredicting flood depths when compared to measured levels.  (LNA Ex. 4, Suhayda Report at 5, 13-14, 16).  Mr.
Spinks also used inputs for breach times that disagreed with IPET, ILIT, Team Louisiana, the MRGO plaintiffs'
expert (Kok), and even the Barge plaintiffs' own engineering expert (Marino) who opined about the barge's alleged

**D.  The Existence and Extent of Damages Presents Highly Individualized Issues**.

In *Steering Committee*, the Fifth Circuit held that "where individual damages cannot be determined by reference to a mathematical or formulaic calculation, the damages issue may predominate over any common issues shared by the class," and affirmed the denial of certification because there was no "formulaic calculation" available.  461 F.3d at 602.  The absence of a formulaic or mechanical method to calculate damages is generally fatal to a motion for class certification.[70]

In this case, plaintiffs seek no fewer than ***sixteen*** categories of damages, including loss and destruction of real and personal property, demolition and salvage costs, loss of use, business losses (lost inventory, cleanup/repair, business interruption, etc.), loss of income, inconvenience and loss of lifestyle, diminution of value of property, emotional distress, and wrongful death.[71] Moreover, plaintiffs' motion asserts that they intend to adjudicate class members' personal injury claims in this proceeding.  Pl. Mot. at 3.[72]  Plaintiffs argue, however, that certain "property-related damages" can be calculated through "mass appraisal" techniques and that other individualized categories of damages, such as physical/emotional injury and wrongful death, "will not constitute a significant part of this action" and thus do not count.  Pl. Mem. at 4.  As we now show, however: (1) many of the plaintiffs' 16 categories of damages concededly require

---

arrival at the floodwall.  See Dep. Index, Items 40 (Spinks and Vrijling) and 41 (Marino); LNA Ex. 4, Suhayda Report at 10 ("Plaintiffs' expert Mr. Spinks is alone in concluding that the south breach occurred at 5:30 am.").

[70] See, *e.g.*, *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d at 307; *Corley v. Orangefield Indep. Sch. Dist.*, 152 Fed. Appx. 350, 2005 WL 2600177 (5th Cir. 2005); *Piggly-Wiggly Clarksville, Inc. v. Interstate Brands Corp.*, 100 Fed. Appx. 296, 2004 U.S. App. LEXIS 11160 at *11 (5th Cir. 2004); *Perrin v. Expert Oil & Gas, LLC*, 2008 U.S. Dist. LEXIS 8830 at *15-16 (E.D. La. Feb. 6, 2008); *Welch v. Atlas Roofing Corp.*, 2007 WL 3245444, at *7 (E.D. La. Nov. 2, 2007); *Henry v. Allstate Ins. Co.*, 2007 U.S. Dist. LEXIS 57822, at *8-14 (E.D. La. Aug. 8, 2007).

[71] Complaint, Doc. 8779 ¶ VII(a); LNA Ex. 10, Plaintiffs' Responses to Interrogatory No. 26 (Jan. 24, 2008) (detailing elements of damage claimed by proposed representatives); see Dep. Index, Item 42 (Mumford and Harris).

[72] As explained above, however, plaintiffs were denied leave to belatedly amend their complaint to assert a claim for personal physical injuries and to add a class representative with such an alleged claim.  Doc. 15092.

individualized consideration, though plaintiffs omit mention of them; (2) plaintiffs' proposed "mass appraisal" techniques will not measure the damages allegedly suffered by each plaintiff as a result of the defendants' alleged conduct; and (3) individual damages such as emotional distress, wrongful death, and personal injury are "significant" both in number and importance.

  1. <u>Plaintiffs Ignore Many Individualized Categories of Damages</u>.

    a. <u>Physical damage to property</u>.

  Plaintiffs' complaint seeks damages for the physical "loss and destruction of and damage to" their property (Doc. 8779 ¶ VII(a)).  Such claims necessarily involve individualized consideration of plaintiffs' properties to determine the extent of the damage allegedly caused by defendants' conduct.  Structural engineer William Thomassie found, after painstaking review of physical and photographic evidence, that the performance of structures and extent of damage "was widely varied" throughout the class area.  LNA Ex. 5, Thomassie Report at 1-2.  Not only did Mr. Thomassie observe that damage stemmed from "multiple causes," but he also found that the extent of damage to properties varied depending on age, foundation, type of construction, building size and design, maintenance, and other factors, such that there was no observable pattern of damage outside a very small area in the immediate vicinity of the breaches.  *Id.* at 7-8, 11.  Mr. Thomassie concluded that "[d]amage assessments to individual properties can only be made on a building by building basis" and that "it is not possible to assign a uniform formula to measure damages."  *Id.* at 2.  Plaintiffs' damages expert, John Kilpatrick, demurred that he is "not opining with respect to physical damage" and is not even qualified to do so.[73]

  Clearly, therefore, there is no mathematical or formulaic way to calculate the damages that plaintiffs claim for physical destruction of and damage to their properties.  Such damages

---

[73] See Dep. Index, Item 43 (Kilpatrick).

must be established, if at all, by individualized evidence.[74]  This important element of plaintiffs'

claimed damages, which potentially applies to each of the 16,086 residences and 1,158 business

units allegedly located in the class area (Pl. Mem. at 13), is an individual issue.[75]

b. <u>Demolition and salvage</u>

Plaintiffs' claimed damages also include "expenses for the demolition and salvage" of

their property (Doc. 8779, ¶ VII(a)).  This claim requires individualized proof of the amount of

expenses incurred to demolish or repair plaintiffs' property, together with a showing that such

expenses were, in fact, incurred to remedy damage caused by defendants' conduct rather than for

some other reason.  The representative plaintiffs admitted that this claim requires individualized

proof about their actual costs, whether in the form of a "list of receipts" (Harris), or testimony

about how long it took the plaintiff to "gut" the property (Riche), or a "list" of the particular

items in need of salvage or repair (Glaser).[76]  They further admitted that some of their itemized

costs were ***not*** incurred to restore their property to its pre-storm condition, but rather represented

upgrades such as repair of pre-existing damage (Mumford), granite counters to replace previous

Formica counters (Harris), a high-definition theater system to replace a less advanced system

(Harris), and "nicer" cabinets and counters than the ones damaged in the storm (Richardson).[77]

As to this element of plaintiffs' claimed damages, individualized proof is concededly necessary.

---

[74]  Ms. Mumford and Mr. Riche conceded this common-sense conclusion.  See Dep. Index, Item 44 (Mumford and Riche); see also LNA Ex. 22 (city inspection reports showing varying levels of damage at representatives' properties).

[75] See *Steering Committee,* 461 F.3d at 602 ("separate types of proof would be necessary for the property damage [claim]"); *Kent v. Cobb*, 811 So.2d 1206, 1217 (La. App. 2002) ("There is no formula which can be applied with exactitude in the assessment of property damages.  Each case must rest on its own facts and circumstances ….").

[76] See Dep. Index, Item 45 (Harris, Riche, and Glaser);  LNA Ex. 21, Plaintiffs' Response to Interrogatory No. 37, Doc. 13803-2 at 33-36 (supplying individual, plaintiff-by-plaintiff itemization based on plaintiffs' actual expenditures).

[77] See Dep. Index, Item 46 (Mumford, Harris, and Richardson).

        c.  Loss of use

Plaintiffs' claimed damages include "loss of use" of their property (Doc. 8779, ¶ VII(a)). The case law establishes that this is an individualized rather than a common element, requiring proof of what "use" was "lost" and how much compensation is required.[78]  Plaintiffs have not even bothered to propose another way to calculate this element of damages.

        d.  Business losses (other than loss of "business value")

Leaving aside  for a moment plaintiffs' claim for "diminution of business value"(addressed below at 39-42), the plaintiffs assert several individualized categories of "additional" business-related damages such as "business interruption, moving, clean-up and repair costs, [and] loss of inventory," which will in turn require "documentation of any losses of inventory, moving costs, temporary increased rentals, clean up and repair costs properties may have suffered …." Pl. Ex. 21, Kilpatrick Report ¶¶ 60, 68.  The representative plaintiffs confirmed that assessing inventory loss requires individual consideration of what was lost, why it was lost, and what was its economic value.[79]  Assessing cleanup and repair costs requires individual testimony about the cost and time expended in these efforts.[80]  And business interruption involves "numerous considerations … including past performance, probable future performance and the performance that would have been experienced had no interruption occurred."  *Levitz Furniture Corp. v. Houston Cas. Co.*, 1997 WL 218256, *3 (E.D. La. Apr. 28, 1997).  These concededly individualized questions can only be answered by individualized information from each affected business within the class area, and are not amenable to formulaic or mechanical calculation.

---

[78] See, *e.g.*, *Thomas v. FAG Bearing Corp.*, 846 F. Supp. 1400, 1404 (W.D. Mo. 1994) ("loss of use and enjoyment … would also require individualized proof").

[79] See Dep. Index, Item 47 (Riche and Glaser).

[80] See Dep. Index, Item 48 (Riche).

e.  Loss of income

Plaintiffs' claimed damages include "past and future lost income" and similar elements (Doc. 8779 ¶ VII(a)).  Courts have ruled that claims for lost income or lost profits are inherently individualized in nature and not subject to formulaic calculation.[81]  Here, the representative plaintiffs admitted that claims for lost income involve individualized inquiries.  For instance, lost rental income depends on the location and condition of the property prior to the storm, whether the unit was rented, and whether the rent was collectible, and on whether the property has been rented after the storm, and if so for how much.[82]  Ms. Mumford acknowledged that she owned rental property that was vacant at the time of the storm, while Mr. Koch testified that he is able to charge higher rent for his properties after the storm than before.[83]  Moreover, to the extent class members might claim lost wage income (none of the representatives was a wage-earner), any loss of wage income would have to individually scrutinized.

f.  Inconvenience and loss of lifestyle

Plaintiffs' complaint seeks damages for "inconvenience" and "loss of enjoyment of lifestyle" on behalf of themselves and the class.  Damages for these sorts of "intangible injuries" are precisely the kind that "necessarily implicate[] the subjective difference of each plaintiff's circumstances," and are therefore "an individual, not class-wide, remedy."  *Steering Committee*, 461 F.3d at 602.  Though plaintiffs' motion and memorandum ignore these elements of their

---

[81] See, *e.g.*, *Boley v. Brown*, 10 F.3d 218, 223 (4th Cir. 1993) (calculation of lost profits is too "dependent upon consideration of the unique circumstances pertinent to each class member"); *Wisner v. Ill. Cent. Gulf R.R.*, 537 So.2d 740, 751 (La. App. 1998) ("Awards for loss of future income are inherently speculative and insusceptible of being calculated with mathematical certainty.").

[82] See Dep. Index, Item 49 (Mumford).

[83] See Dep. Index, Item 50 (Mumford and Koch).

claimed damages as apparently beneath consideration, the representative plaintiffs stressed them

in their deposition testimony, even while conceding they require individualized consideration.[84]

    2. <u>Plaintiffs' "Mass Appraisal" Techniques are Inadequate to Measure Any Damages.</u>

    Plaintiffs propose to calculate class-wide damages for three of the sixteen categories of

alleged damages -- diminution of real property value, diminution of business value, and personal

property losses -- through "mass appraisal / valuation techniques."  Pl. Mem. at 35.  In reality,

none of these three types of damages is susceptible to class-wide calculation in this case by any

valid formulaic or mathematical method, and certainly not the methods advanced by plaintiffs.

    a. <u>Diminution of real estate value</u>

    Plaintiffs' claim for damages for diminution of real property value presents an individual

issue, despite their efforts to argue otherwise.  First, testimony from the proposed representatives

supports the individual nature of diminution of property value.[85]  The types of uses to which

properties were put in the class area varied dramatically, including a mix of residential,

municipal, commercial and industrial buildings.[86]  The age and construction of the properties

also varied widely throughout the area, including historic wood-framed homes, more modern

concrete and masonry homes, raised piers, brick facades, two story structures, and other

structures.[87]  These properties were subject to further variation in their pre-storm condition:

some properties were well maintained, while others were in very poor condition due to pre-

---

[84] See Dep. Index, Item 52 (Harris).

[85] Ms. Mumford, a long-time real estate investor in the Lower Ninth Ward, agreed that "determining the value of any given property [is] an individual-type issue," and Mr. Koch testified that there are "different attributes for each location" and that "location, location, location" is critical to how much rent can be charged for a given property. See Dep. Index, Item 53 (Mumford and Koch).

[86] LNA Ex. 5, Thomassie Report at 4; see also LNA Ex.12, Ragas Report at 5 ¶ 25 ("Prior to Hurricane Katrina, the class area as defined by the plaintiffs was a complex geographically diverse mixture of properties.)".

[87] See, *e.g.,* LNA Ex. 5, Thomassie Report at 4-5 ("The residential buildings within the class area vary greatly in age and construction."); *id.* at 7-8 (documenting variations in age of construction, type of foundation, size of building, type of construction, building design, and maintenance).

existing damage or neglect.[88]  The neighborhoods varied dramatically in their character prior to

the storm; whereas the Lower Ninth Ward had "some of the highest rates of violent crime based

on a street oriented drug culture which should affect property values," St. Bernard had "one of

the lowest crime rates in the metro New Orleans area."[89]  These sorts of variations have led

courts to conclude that impacts on property or property values "var[y] in substantial ways

depending on the value, character and location of the property," rendering class certification

inappropriate.  *Corley*, 152 Fed. Appx. 350, 355, 2005 WL 2600177 (5th Cir. 2005).

Nevertheless, plaintiffs contend that diminution of property value can be "established on

a class-wide basis with mass appraisal/valuation techniques" proposed by their expert, John

Kilpatrick.  Pl. Mem. at 35.  According to plaintiffs, this "mass valuation methodology" would

use "assembled data" to create a "valuation formula" that will compare "the value of the property

after the breach and flood event" with "the property value immediately prior to the flooding

event" to determine the "loss in value."  Pl. Mem. at 36.  Stripped of jargon, plaintiffs' proposed

technique will "tak[e] two snapshots of value, before and after," and "the loss is the difference

between them."  LNA Ex. 24, Kilpatrick Dep. 74:15-21.  There are many reasons, however, why

this proposed methodology cannot and will not establish a valid measure of damages here.

To begin, even if a model were available to compare pre- and post-storm property values,

such a comparison would not represent plaintiffs' "damages" against the Barge defendants.  To

the contrary, Mr. Kilpatrick conceded that there are many other potential causes of property

value diminution in the class area, including higher insurance premiums, reduced population,

increased construction costs and a shortage of building contractors, fear of future levee failures,

---

[88] See LNA Ex. 5, Thomassie Report at 6 & App. B at 31-32*; see* Dep. Index, Item 54 (Koch).

[89] LNA Ex. 12, Ragas Report at 5 ¶ 25.  After the storm, certain neighborhoods have rebounded, while others have not.  See Dep. Index, Item 55 (Harris).

and the closing of Holy Cross High School – none of which he is prepared to address at this time.[90]  Moreover, in the MRGO litigation, Mr. Kilpatrick proposed to use mass valuation to attribute the same diminution of the same property values for the same class members to *different defendants* -- *i.e.*, the MRGO defendants, not the barge.[91]  Mr. Kilpatrick admitted that he has no opinion on how to allocate damages between or among the various potential causes and that he considers this question "irrelevant" to his opinions.[92]

LNA's real estate expert, Wade R. Ragas, similarly noted multiple potential causes of effects on property values having nothing to do with the barge, including wind and rainwater intrusion and other causes of physical damage; fear of future levee breaches spurred by publicity about weak levee systems (not barge impacts); higher flood and property insurance costs; imbalances and dislocations in housing demand; and so on.[93]  As Mr. Ragas stated:

> *"The thousands of proposed class area properties were and are exposed to numerous separate positive and negative externalities and not a single, uniform common externality associated with the Hurricane Katrina event.  <u>This is not a case in which a single event attributable to the defendant has caused an impact which is statistically measurable.</u>"[94]*

Thus, plaintiffs' proposed approach of comparing pre-storm to post-storm values cannot possibly yield a valid measure of "damages" in this case because it does not demonstrate the diminution of value (if any) caused by the barge, as opposed to other factors.

---

[90] See Dep. Index, Item 56 (Kilpatrick); Pl. Ex. 21, Kilpatrick Report ¶ 12 (admits a factor includes "awareness of the risk of future levee breaches"); *id.* ¶¶ 24-31 (examples – increased construction costs; fear of levee failure in a future storm; land use regulations; etc.).

[91] See Doc. 8286-12 at 5-6 ¶ 9 (Kilpatrick report in MRGO litigation).

[92] See Dep. Index, Item 57 (Kilpatrick).

[93] LNA Ex. 12, Ragas Report at 19-24 ¶¶ 69-79.  Mr. Ragas is an emeritus professor at the University of New Orleans, where he has served as director of the Real Estate Research Center, and he has twenty-five years of hands-on experience with appraisals and valuations in the Lower Ninth Ward and St. Bernard Parish, including designing valuation methodologies for the Louisiana Tax Commission.  *Id.* at 1-2, 9, ¶¶ 1-9, 40.

[94] LNA Ex. 12, Ragas Report at 12 ¶ 54 (emphasis added); see also Doc. 8286-29 at 18 ¶ 29, 23 ¶ 44 (opinion of Kerry Vandell, expert for MRGO defendants, that mass valuation "cannot disaggregate the effects of a particular event (here, the Breach-of-Duty damages) from a complex series of events (the Katrina events)".

Fifth Circuit case law squarely rejects the attempted use of expert evidence to create "common" damages issues where the methodology fails to separate out other potential causes of the plaintiff's harm.  In *Unger,* the Fifth Circuit reversed an order granting class certification because the district court improperly failed to take account of other potential causes of plaintiff's losses.  401 F.3d at 324.  Likewise, in *Oscar Private Equity Investments v. Allegiance Telecom, Inc.*, 2007 U.S. App. LEXIS 11525 (5th Cir. May 16, 2007), the Fifth Circuit overturned class certification in a securities fraud case because there were other potential "negative items" that may have affected the value of plaintiffs' stock, apart from the defendant's conduct, which the plaintiffs' expert had not separated out using post-event data.  *Id.* at *30-31.  These cases are fatal to plaintiffs' proposed methodology, which merely measures pre- and post-storm values without any allocation or separation of barge-related harm.[95]

Moreover, plaintiffs' proposed class area is too diverse and the data are too sparse to support the use of a "mass valuation" model to measure pre- and post-storm property values.  As Mr. Ragas showed, a model will not perform properly when applied to a diverse housing stock such as exists in the Lower Ninth Ward and St. Bernard Parish because "[t]he diversity of property types, multiple sources of simultaneous damage, diverse pre-storm condition, diverse pre-storm quality of property in the proposed class area and diverse structural designs make the use of a mass appraisal valuation methodology not appropriate and inaccurate within the proposed class area."[96]  The problem with having so many variables is that they dramatically

---

[95] Plaintiffs' proposal to address these questions to the "merits phase"(LNA Ex. 24, Kilpatrick Dep. 149:20 to 150:23) is to no avail.  As the Fifth Circuit held in *Unger*, "[a]t the certification stage, reliance on unverifiable evidence is hardly better than relying on bare allegations."  401 F.3d at 324.

[96] LNA Ex. 12, Ragas Report at 7 ¶ 33; see *id.* at 9-10 ¶ 46 (identifying 20 to 30 "minimum property attributes" that would be needed for a pre-Katrina general model to properly account for variations in properties, including property type, location, condition, neighborhood, physical characteristics, etc.); *id.* at 6 ¶ 28 (identifying numerous causes of damage due to Katrina that are <u>not</u> attributable to the barge, such as wind damage, termite damage, vandalism, etc.);

increase the data requirements of the model regarding housing stock and housing sales before and after the storm.  In this case, however, only a very small amount of data are available – data that are "clearly inadequate for the statistical estimation of an overall value diminishment measure for over 10,000 units in this proposed class geography."[97]  Although Mr. Kilpatrick testified (without support) that he could run the model with only "a few dozen" data points, he did not know how many variables his methods would involve; admitted that mass valuation is inappropriate for "very small data sets;" and could not even say how many home sales records he has collected.[98]  In these conditions, mass valuation methods are doomed to fail.[99]

In addition, mass appraisal techniques have already been tested and found unsuitable to determine property values in this very area.  In particular, the Road Home program tried to use automated valuation methods to determine property values, but these efforts generated massive complaints about inaccurate results, and had to be discontinued in favor of individual appraisals.[100]  Likewise, when Mr. Ragas was asked to appraise over 150 commercial properties within the Murphy oil spill area, he found that an automated valuation process was  "not …

---

*id.* at 17 ¶ 64 ("No general statistical model could begin to provide estimates of these separate causes of damage."); Dep. Index Item 58 (Ragas).

[97] LNA Ex.12, Ragas Report at 13 ¶ 59; see also *id.* at 13-16, 26 ¶¶ 58-63, 83 (reviewing available sales data and concluding Mr. Kilpatrick's data sources "are, in fact, not suitable"); *id.* at 7 ¶ 34 (heterogeneous housing stock requires more data on pre-storm home conditions); Doc. 8286-29 at 16-18 ¶ 35 (Kerry Vandell, real estate expert for MRGO defendants, notes that Kilpatrick methodology offers "no guidance" regarding commercial properties).

[98] See Dep. Index, Item 59 (Kilpatrick).

[99] LNA Ex. 12, Ragas Report at 27 ¶ 88 ("I have designed and implemented rigorous quality control systems in the recent past in Orleans Parish for the analysis of thousands of parcels.  Given that there are few recent sales, no proposed interior inspections or interior data collected and no reliable means in the process to provide test/retest reliability for damage estimates, and an extraordinarily complex valuation problem, I see no feasible means within the Kilpatrick methodology of assuring a reasonable level of accuracy in damage estimates as consistent with fairness for the plaintiffs or defendants.").

[100] LNA Ex. 12, Ragas Report at 25 ¶ 82 (describing Road Home failure of mass valuation methodology, and noting that the failed methods involved a "far simpler task" than the valuation proposed here; see Dep. Index, Item 60 (Ragas); Pl. Ex. 21, Kilpatrick Report ¶ 87 (admitting that Road Home program rejected use of mass valuation).

feasible due to the diversity of property uses and building designs" for these properties.[101]  Thus, actual experience belies plaintiffs' unsubstantiated promises regarding the use of mass valuation methods here.[102]  By contrast, based on his experience in the field, Mr. Ragas showed that individual appraisals may be carried out feasibly and accurately.[103]  Individual consideration of property values is necessary if for no other reason than that certain property owners in the class area have *real* information about their property values, such as actual sales or offers to purchase, which LNA is entitled to explore in defending against claims of diminution of property value.[104]

Courts have rejected the promises of mass valuation experts in circumstances similar to this case.  In *LaBauve v. Olin Corp.,* 231 F.R.D. 632 (S.D. Ala. 2005), the court rejected the plaintiff's attempt to show, through an expert, that harm to property values from alleged mercury contamination could be calculated on a "common, formulaic methodology."  *Id.* at 676.  The court noted that the expert had not actually performed the supposedly-mechanical damage calculation; that the expert's methods would require "separate analyses … for rental and industrial properties," and that the expert had no ready method to "distinguish between

---

[101] LNA Ex. 12, Ragas Report at 6 ¶ 30.

[102] Mr. Kilpatrick provided no data to back up his assertion that mass appraisal would be more economical and more accurate than individual appraisals, and he admitted that, in the end, his proposal will still require an indeterminate number of individual appraisals and will *not* address physical damage or salvation/restoration costs, both of which will require individualized assessment regardless.  Pl. Ex. 21, Kilpatrick Report ¶ 36 (conceding individual appraisals will be needed, but not saying how many); see Dep. Index, Item 61 (Kilpatrick); see also LNA Ex. 5, Thomassie Report at 8, 10 ("damage to structures varied on a structure-by-structure basis"); LNA Ex. 12, Ragas Report at 3-4 ¶ 18 (cost to repair or rebuild is an individual issue).

[103] LNA Ex. 12, Ragas Report at 25 ¶ 81 (describing real-life appraisal process stemming from 5700 tax assessments in Orleans Parish in 2007, and stating that "[i]t is logistically possible and economically affordable to do individual analyses of market value and of damages for large groups of property"); see Dep. Index, Item 62 (Ragas).

[104] See Dep. Index, Item 63 (Koch).  Contrary to plaintiffs' suggestion (Pl. Mem. at 36), the court in *Turner v. Murphy Oil USA, Inc.*, 234 F.R.D. 597 (E.D. La. 2006), did *not* rely on Mr. Kilpatrick's methodology in certifying a class, but rather assumed that damages would be an individual issue, but would be merely "an issue of quantum" that would be relatively simple to establish.  234 F.R.D. at 607.  Nor has this Court endorsed Mr. Kilpatrick's methodology in any prior rulings.  Rather, the Court merely declined to exclude his opinions on *Daubert* grounds from the MRGO case, while reserving judgment on whether the opinions could support class certification.  Doc. 8796 at 22.

diminution of property value resulting from contamination caused by Olin and diminution in property value resulting from contamination caused by other sources," and on that basis, concluded that diminution of value was not amenable to class-wide computation. *Id.* at 677. In this case, Mr. Kilpatrick has not performed any calculations; he agrees that separate analyses are needed for commercial properties; and he has not established that he can distinguish between loss of value caused by the barge (if any) and loss of value due to other factors. Thus, *LaBauve* is on point and calls for rejection of plaintiffs' "mass valuation" methodology here.[105]

      b. <u>Diminution of business value</u>

Plaintiffs also propose to employ Mr. Kilpatrick to determine business losses on a class-wide basis. Pl. Trial Plan at 11. Plaintiffs' memorandum does not cite a single case in which mass appraisal of business losses was accepted as a basis for certification of a class.[106] By contrast, as the Fifth Circuit explained in a case involving business losses, "any adequate estimation of actual damages suffered would require consideration of the variegated nature of the businesses included in … the proposed classes." *Bell Atlantic*, 339 F.3d at 304.

Here, the report of Kenneth Boudreaux, Professor of Economics and Finance at Tulane University, explains that there are "immense potential differences among businesses in all factors that would determine liability and damages" to businesses in this case, including "size, risk,

---

[105] For other cases finding that real property damages raised individualized rather than common issues, see *Corley v. Entergy Corp.*, 220 F.R.D. 478, 485-86 (E.D. Tex. 2004) (damages was individual issue because "the extent of Defendants' trespass on each class member's land is quite variable"), *aff'd mem.,* 152 Fed. Appx. 350, 355 (5th Cir. 2005) (finding that "the injury to the landowners varies in substantial ways, depending on the value, character and location of the property"); *Fisher v. Ciba Specialty Chems. Corp.,* 238 F.R.D. 273, 306-08, 310 (S.D. Ala. 2006) (individualized issues regarding source of contamination and whether it was severe enough to reduce property value); *Snow v. Atofina Chems., Inc.,* 2006 WL 1008002 (E.D. Mich. Mar. 31, 2006) (denying class certification because of inability to show "on a mass basis" that "there was a reduction in their property value; the extent of the reduction; and, that the reduction was caused by the accident, as opposed to a myriad of other potential causes").

[106] At his deposition, Mr. Kilpatrick admitted that he could not identify a single occasion on which he has done a mass appraisal of business losses, nor could he recall ever having seen one outside the context of Real Estate Investment Trusts. See Dep. Index, Item 64 (Kilpatrick).

customer base, product lines, managerial expertise, supply sources, financial strength, access to capital markets, and potential for mitigation."[107]  For instance, the representative plaintiffs' own testimony confirms that they are small operations that have no resemblance to other, larger businesses in the class area, that their businesses' performance has fluctuated from year to year, and that they have relied on business methods that are not (or not necessarily) shared by other class members.[108]  The representative plaintiffs conceded that any assessment of business losses would require information about the actual performance of their individual businesses.[109]  Thus "mass appraisal" cannot avoid the need for individualized consideration of business losses.

Moreover, as was the case with property values, plaintiffs' proposed method to determine business loss is incapable of determining "damages" in this case because it cannot separate out losses caused by the defendants' conduct from losses caused by other factors.  Mr. Boudreaux's report identifies some of the many non-barge factors affecting businesses in the class area, including customer dislocations, supply interruptions, wind damage, vandalism, flooding from other sources, and other business-related disruptions.  LNA Ex. 25, Boudreaux Report at 6.[110] Mr. Kilpatrick's report and deposition testimony provide no clue as to how non-barge impacts could be separated out in a mass valuation exercise.

In addition, the magnitude of class members' business losses depends on individual issues regarding mitigation – specifically, what the class members have or could have done to

---

[107] LNA Ex. 25, Boudreaux Report at 4; see also id. at 6 (noting multitude of industry categories in class area, and distinguishing types of businesses in the factors that generate profits); id. at 7 (noting "large differences in factors that affect profits, such as size, location, organizational nature, expertise and assiduousness of the business owner").

[108] See Dep. Index, Item 65 (Riche, Glaser, and Koch).

[109] See Dep. Index, Item 66 (Glaser, Koch, and Kilpatrick).

[110] The proposed representative plaintiffs acknowledged they suffered business losses apart from the alleged barge-related flooding – for instance, Mr. Riche testified that customers throughout the Gulf Coast are now unable to buy from him because they have less money due to the damage they suffered from the storm.  See Dep. Index, Item 67 (Riche and Koch).

earn money since the storm.[111]  This inquiry, in turn, is highly individualized.  For instance, Mr.

Riche used the entire proceeds from his property insurance policy to pay cash for a new home,

rather than seeking a mortgage so that he could use some of the money to fund his business

inventory; Mr. Glaser rejected a loan from the SBA because he did not want to comply with the

conditions; and Mr. Koch chose to divest his Orleans Parish properties because he "really

[doesn't] like to do business in this here city."[112]  As Mr. Boudreaux noted, "[p]otentials for

mitigation of any business loss would clearly vary widely," and "[i]nvestigation of actual and

potential mitigation would clearly require quite individual analysis and perhaps professional

rehabilitation judgments."  LNA Ex. 25, Boudreaux Report at 13.  Mr. Kilpatrick's model,

however, does not and cannot account for what business owners have done since the storm.[113]

> In sum, as Mr. Boudreaux concluded:
>
> *Because of the great diversity amongst business types, sizes, and success or failure likelihoods, because of the great disparity in available information about such businesses, because of owner-mitigation complexities and diversity post-storm, and because of causality issues that would differ amongst plaintiffs, the only reasonable avenue to proving damages would be to analyze each business on an individual basis, and not as a member of a group.[114]*

Thus the plaintiffs have not shown that business losses are susceptible to class treatment.

The Fifth Circuit's decision in *Bell Atlantic Corp. v. AT&T Corp.*, 339 F.3d 294 (5th Cir.

2003), demonstrates the individualized nature of business loss damages.  That case involved

allegations that the defendant had damaged the plaintiff businesses by blocking "Caller ID"

---

[111] See LNA Ex. 25, Boudreaux Report at 13 ("[A] business owner's economic damage is the difference between the profits that the owner could have earned but for the alleged event, minus any offsetting income that the same owner either did or could have earned given that the event did happen."); see also Dep. Index, Item 68 (Glaser).

[112] See Dep. Index, Item 69 (Riche, Glaser, and Koch).

[113] LNA Ex. 25, Boudreaux Report at 14 (Kilpatrick model does not capture remunerative activities that would have mitigated losses); see Dep. Index, Item 70 (Kilpatrick).  Mr. Kilpatrick's model also relies on inappropriate data concerning "gross profits" (which does not include operating expenses) and state business income data (which is filed only by corporations).  See LNA Ex. 25, Boudreaux Report at 15, 16.

[114] LNA Ex. 25, Boudreaux Report at 16.

services.  The court, however, held that some class members may not have been harmed by the

defendant's conduct, or that the harm was "speculative."  *Id*. at 305.  The court held that an

inquiry into lost profits through comparison of like businesses would require the plaintiff to show

the "reasonable similarity of the businesses used to calculate" the damages – an individual

inquiry.  *Id*. at 306.  The court also noted that "[a]ny reasonable approximation of the damages

actually suffered by the various class members would … require a much tighter inquiry into the

nature of the class member businesses."  *Id*.  In those circumstances, class certification was

improper.  *Id*.  Here, the business loss valuation issues are infinitely more complex than they

were in *Bell Atlantic,* and the absence of any viable method for addressing such losses on a class-

wide basis is even clearer.

c.  <u>Damage to personal property</u>

Plaintiffs propose to calculate class-wide personal property damages through the use of

"individual surveys as a sampling, in order to derive statistical variables which could then be

utilized in a mass appraisal methodology."  Pl. Trial Plan at 12.[115]  In short, plaintiffs envision a

process that involves something other than identifying what personal property each class member

actually lost, what caused the loss of that property, and what compensation ensues from that loss.

Such a methodology is an arbitrary and impermissible short-cut.  In *Basco v. Wal-Mart*

*Stores,* 216 F. Supp. 2d 592 (E.D. La. 2002) (Duval, J.), this Court refused to certify a class in a

wage-and-hours case where plaintiffs proposed to use survey data to show class-wide causation

and damages, holding that "this Court does not approve of any attempt by plaintiffs to employ

statistics to cure the individualized nature of their breach of contract cause of action or the

---

[115]  Mr. Kilpatrick said he would use "a survey" (not of all class members, but rather of a "sample"), and then use a "percentage of the real estate loss," or "a function of the rental paid," or possibly "insurance multipliers," to determine a damage figure. See Dep. Index, Item 71 (Kilpatrick).  Mr. Kilpatrick had no proposal to address personal property loss to tenants, characterizing that as something to be addressed "at the merits phase."  See Dep. Index, Item 72 (Kilpatrick).

42

amount of damages each plaintiff may be entitled to receive by focusing on a 'representational sample' of plaintiffs," as this would deprive defendants "of their right to have a jury determine liability and damages as to each plaintiff." *Id.* at 603-04. Plaintiffs' proposal to measure loss of personal property using a "survey" or "sample" is just what this Court rejected in *Basco.*[116]

Personal property losses are individualized injuries that cannot be addressed on a class-wide basis. To award damages for personal property loss, it is first necessary to identify what personal property was damaged or destroyed, which requires knowledge of its pre-storm condition and value -- a common-sense point that the proposed class representatives readily conceded.[117] With respect to automobiles, for instance, it is necessary to know, in each case, the make and model of the vehicle, its age, and its pre-storm condition.[118] Another consideration is whether the plaintiff was contributorily negligent for failing to move the vehicle out of harm's way, a factor that Mr. Kilpatrick admits his methodology does not accommodate.[119] In the end, Mr. Kilpatrick's proposal to substitute "survey" and "sample" results for real facts regarding personal property damages must be rejected as mere "guesswork or speculation" that "fails to account for … differences among class members that would have affected the amount, if any, of actual economic damages suffered." *Bell Atlantic,* 339 F.3d at 305.

   3. <u>Individualized Claims for Emotional Distress, Personal Injury, and Wrongful Death are Significant</u>.

Plaintiffs concede, as they must, that claims for emotional distress, personal injury and wrongful death all require individual adjudication. Pl. Mem. at 37. The existence and cause of

---

[116] See also *In re Fibreboard Corp.*, 893 F.2d 706, 711-12 (5th Cir. 1990) (rejecting proposed calculation of classwide damages based on extrapolation from selected individuals); *Cimino v. Raymark Indus., Inc.*, 151 F.3d 297, 319 (5th Cir. 1998) (denying use of "extrapolation" to determine damages).

[117] See Dep. Index, Item 73 (Harris, Riche, and Glaser); see also LNA Ex. 12, Ragas Report at 28-29 ¶ 93.

[118] See Dep. Index, Item 74 (Harris); Pl. Ex. 21, Kilpatrick Report ¶ 77 (proposing to use Edmunds or Kelly blue book values, which require individualized information regarding the damaged automobile).

[119] See Dep. Index, Item 75 (Kilpatrick and Mumford).

such injuries is an individual inquiry.[120]  So is the question of contributory fault, which looms as to any plaintiff who failed to evacuate in advance of the hurricane.[121]  Economic aspects of these claimed injuries, such as mental health care expenses, also present individualized issues.[122]

According to plaintiffs, however, these individualized claims are not a "significant part" of this action.  Pl. Mem. at  4, 38.  Plaintiffs contend that damages for emotional distress, personal injury, and wrongful death will only be sought by the "relatively small" number of class members who did not evacuate, estimated to be 4,000 persons and including 683 claims for wrongful death.  *Id.* at 37-38.  These assertions are incorrect.

First, plaintiffs' complaint, discovery responses, and deposition testimony make clear that ***all*** plaintiffs and class members seek damages for emotional distress and other intangible harms, regardless of whether they evacuated prior to the storm.  The complaint asserts claims for "past and future mental pain, suffering and anguish" on behalf of all proposed representatives and class members, including those who did not evacuate (Doc. 8779 ¶ VII(a)).  Plaintiffs' interrogatory responses likewise show that ***every*** named plaintiff seeks to recover emotional distress damages, regardless of whether the plaintiff evacuated or not.[123]  In their deposition testimony, the proposed representatives again affirmed that they are seeking emotional distress damages regardless of whether they evacuated.[124]  Plaintiffs' October 2008 witness list designates all of the proposed representatives, and dozens of other witnesses, to testify about

---

[120] See Dep. Index, Item 76 (Mumford, Riche, and Richardson).

[121] All of the proposed representatives testified that they understood the need to evacuate prior to the storm to avoid the risk of injury or even death.  See Dep. Index, Item 77 (Richardson, Mumford, Harris, Glaser, and Koch).

[122] See Dep. Index, Item 78 (Richardson).

[123] LNA Ex. 10 (responses to LNA Interrogatory No. 26, claiming "past and future mental pain, suffering and anguish" for plaintiffs Mumford, Riche, Koch, Richardson, Harris, and Glaser); LNA Ex. 21 (response to LNA Interrogatory No. 40, Doc. 13803-2, asserting that "[a]ll plaintiffs seek damages for class wide emotional distress").

[124] See Dep. Index, Item 79 (Harris, Riche, Glaser, and Koch).

alleged emotional distress.  See Doc. 15987.  As noted above (at 12), none of the representative plaintiffs remained behind during Katrina; rather, all of them evacuated prior to the storm.

Apparently, plaintiffs have now concluded that nobody who evacuated before the storm has a legally valid claim for emotional distress damages or other intangible harms.  See Pl. Mem. at 37 n.20.  If that is the case, then plaintiffs should dismiss their claims for emotional distress and other intangible damages with prejudice, so that the record is clear.  Until then, so far as the record of this case is concerned, this Court faces potential claims for emotional distress damages from every one of the proposed class members, numbering in excess of 40,000 persons.  The same is true for other intangible elements of damages pled in the complaint, such as "[p]ast and future loss of enjoyment of lifestyle" and "[i]nconvenience" (Doc. 8779 ¶ VII(a)).

In these circumstances, this case is easily distinguished from the case on which plaintiffs rely, and in which the court made clear that "all, or a great majority" of the class members would not have *any* claims for personal injury or emotional damages.  *Turner v. Murphy Oil USA, Inc.*, 234 F.R.D. 597, 607 n.6 (E.D. La. 2006).[125]  The continued pendency of claims for intangible harms by all plaintiffs and class members renders this case much more akin to *Ancar v. Murphy Oil USA, Inc.*, 2008 U.S. Dist. LEXIS 68490 (E.D. La. July 25, 2008), in which the court denied class certification for emotional distress claims arising from an oil refinery fire and asserted by property owners and residents like the plaintiffs in this case.

In addition, plaintiffs have no basis to assert that physical injury claims will be small in number because "[i]t is obvious that persons who evacuated New Orleans prior to Katrina would not have sustained a physical injury by the event in question."  Pl. Mem. 37 n.20.  Indeed, in the

---

[125] Moreover, the *Turner* case involved far fewer claims to begin with (fewer than 1800 properties in the entire class), so that the number of emotional distress and personal injury claims would have been measured in the dozens rather than the hundreds or even thousands posited by the plaintiffs in this case.

MRGO case, one of the representative plaintiffs who evacuated prior to the storm, Jeannie Armstrong, asserts claims for personal physical injuries due to a fungal infection that she contracted when cleaning out her home after the hurricane.  See Doc. 8286 at 19 (describing personal injury claim by Ms. Armstrong).  Clearly, class members who evacuated may assert personal injury claims (however dubious), and the number of such potential claims is ***not*** bounded by the number of people who remained in the class area during the storm.

Finally, plaintiffs assert that wrongful death claims – approximately 683 in number – "will not form a significant portion of the Plaintiffs' claims."  Pl. Mem. at 38 (quoting *Turner*). To those who lost loved ones in the storm, it is hard to imagine a more "significant" claim. Moreover, the conceded need to undertake individual adjudications of hundreds of such claims within a single proceeding presents, at a minimum, an imposing task.  In *Steering Committee*, the Fifth Circuit held that individual issues predominated over common issues because "***many plaintiffs***" alleged, as part of their claim for damages, "emotional and other intangible injuries." 461 F.3d at 602 (emphasis added).  Similarly, in *Fulford v. Transport Service Co.,* 2004 U.S. Dist. LEXIS 9955 (E.D. La. June 1, 2004), the court denied certification because three-hundred individual damages trials would be required.  Plaintiffs' proposal to address hundreds or even thousands of individualized damages claims within a single proceeding cannot be squared with the decisions in *Steering Committee* and *Fulford*.

### E.  Individual Causation and Damages Issues Predominate Over Common Issues.

Because the issues of causation and damages (and even negligence) present numerous highly individualized issues in this case, any class action necessarily would "degenerat[e] into a series of individual trials" (*Robinson*, 387 F.3d at 421), and thus common issues do not predominate.  Indeed, individual issues predominate in this case to a degree that exceeds many

other cases in which class certification has been denied on predominance grounds by the Fifth

Circuit.  For instance, in *Steering Committee*, the plaintiffs alleged that an oil refinery fire had

caused personal injury and economic harm to property and businesses.  461 F.3d at 600.  The

court held, however, that "where individual damages cannot be determined by reference to a

mathematical or formulaic calculation, the damages issue may predominate over any common

issues shared by the class." *Id*. at 602.  The court found that neither the personal injury nor the

property claims were subject to "any sort of formulaic calculation," noting that causation and

damages issues were "vastly more complex" than the "relatively straightforward" negligence

issues.  *Id*. at 602-03.  Therefore, the Fifth Circuit held class certification was properly denied.

The Fifth Circuit took a similar view of the predominance issue in *Corley*, holding that

individual causation and damages issues precluded class certification.  There, as here, a class of

landowners argued that their property had been uniformly harmed by the defendant's conduct –

in that case, installation of fiber-optic cable in violation of an easement granted by the

landowners to the defendant.  The court held that common liability issues did not predominate

because no "mechanical calculation of damages" was available.  2005 WL 2600177, at *3.  The

court specifically rejected an attempt to value damages on a mass basis, holding that "geographic

variations would render some parcels more valuable than others" and thus the damages model

would create a "windfall to some landowners at the expense of others." *Id.*  And in *Robertson v.

Monsanto Co.,* 2008 U.S. App. LEXIS 15468 (5th Cir. July 18, 2008), the Fifth Circuit held that

individual issues predominated in a case arising from a gas leak, even though negligence was a

common issue, because each plaintiff still "must show that Monsanto's negligence in causing the

gas leak was proximately connected with the specific injuries complained of," and because "the

question of damages is similarly ill-suited for class-wide adjudication." *Id*. at *20.

There are many district court cases involving mass accidents in which class certification has been denied due to the predominance of individual causation and damages issues.  For instance, in *Fulford v. Transport Service Co.,* 2004 U.S. Dist. LEXIS 9955 (E.D. La. June 1, 2004), the court denied class certification in a chemical spill case involving three hundred potential class members because "[t]he issues of specific causation and damages will require a huge amount of time and effort by the Court to assess the merits of each individual's claim."  *Id.* at *13.  The court held that "[a]lthough Defendants' conduct is a common issue, its significance to the case is minimized by the highly individualized issues presented by, perhaps, three hundred or more Plaintiffs."  *Id.*  The court in *In re American Commercial Lines*, *LLC,* 2002 U.S. Dist. LEXIS 10116 (E.D. La. May 28, 2002), denied class certification for claims involving an oil spill caused by a barge accident, finding that "[p]roximate cause will necessarily be different for every person in the proposed class" and that "the issue of damages presents individual considerations as well."  *Id.* at *49-50.  And in *Ancar*, 2008 U.S. Dist. LEXIS 68490 (E.D. La. July 25, 2008), the court rejected class certification in a case involving an oil refinery fire, holding that although liability issues might be tried in common, the case would still require "mini-trials to resolve issues such as specific causation and damages."  *Id.* at *27-28.[126]

This case is vastly more complex than the cases cited above in which class certification was denied on predominance grounds.  Cases such as *Steering Committee, Corley, Robertson,* and the others involved a single defendant and a single source of injury – either a refinery fire, or a gas leak, or an improperly-exercised easement.  Here, by contrast, there are concededly multiple causes of the plaintiffs' injuries, including wind, rain, two separate breaches along the

---

[126] See also, *e.g.*, *Kemp v. Metabolife Int'l Inc.,* 2002 U.S. Dist. LEXIS 2435, at *12-13 (E.D. La. Jan. 25, 2002) (class certification denied in product case involving "different kinds of damages and in varying severity" and whether damages were "caused by factors other than use of the product"); *In re Masonite Corp. Hardboard Siding Prods. Liab. Litig.*, 170 F.R.D. 417, 425 (E.D. La. 1997) (differences in causation in construction product defects case barred certification).

IHNC, and multiple other sources of flooding, as well as other generalized factors stemming from the storm's impact throughout the Gulf Region which affected businesses and individuals within the class in a variety of different ways.  Moreover, the plaintiffs here claim over sixteen separate categories of harms, many of which present the most individualized sorts of inquiries to determine causation and damages, and none of which has been shown to be provable by formulaic or mechanical means.  If there has ever been a case that requires a finding that individual issues predominate over common issues, this is that case.

None of the three Fifth Circuit cases on which plaintiffs principally rely (Pl. Mem. at 5-7) supports a finding that common issues predominate in the circumstances of this case:

- *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d  620 (5th Cir. 1999), involved a proposed class of only 100 to 150 members alleging similar injuries from a single "defective ventilation system."  *Id.* at 624, 627.  By contrast, this case involves tens of thousands of plaintiffs asserting a panoply of different and individualized claims, whose individual causation and damages issues will swallow up the litigation, unlike the 100 to 150 claims that were found manageable in *Mullen.*

- *Watson v. Shell Oil Co.,* 979 F.2d 1014 (5th Cir. 1992) "has no precedential weight in this circuit," having settled after the Fifth Circuit granted rehearing en banc. *Castano,* 84 F.3d at 740 n.12.  Also, *Watson* involved injuries from a single refinery explosion alleged to be the result of a single negligent act, 979 F.2d at 1016-17 nn. 3-4, 1022, and the district court there certified only a limited set of "liability issues" regarding "determination of fault."  *Id.* at 1017.  The panel summarily concluded that this limited set of "liability issues" predominated, in part because the plaintiffs' injuries did not derive from "different causal mechanisms."  *Id.* at 1022-23.  Here, by

contrast, multiple causes are in play and plaintiffs seek to certify a broad range of liability, causation and damages issues, including sixteen different types of damages.

- *Jenkins v. Raymark Indus. Inc.*, 782 F.2d 468 (5th Cir. 1986), allowed certification of a class of 893 asbestos plaintiffs to address a single issue (the "state of the art" defense) based on the trial court's "vast amount of experience with asbestos cases" and the need to address this defense as "the most significant contested issue in each case." 84 F.3d at 740 n.12, 742, 745 n.18. *Jenkins* does not support certification of an entire range of liability, causation, and damages issues presenting the sorts of individualized inquires present here.

While plaintiffs also rely heavily on the district court's decision in *Turner*, that decision does not support class certification in this case. *Turner* involved a release of oil from a single facility at a single location during or just after Hurricane Katrina. 234 F.R.D. at 601. The proposed class was much smaller (approximately 1800 properties) and concerned a single cause of damage (oil) from a single facility (the Murphy oil facility). *Id.* at 604. Moreover, the damage in that case was clearly discernible and traceable to the challenged conduct -- "all a plaintiff would have to prove … is that either her person or her property came into contact with Murphy crude oil in the affected area." *Id.* at 607. That is very different from this case, which involves generalized property damage and flood damage from a variety of causes, and in which contact with flood waters does **not** establish liability, causation, or damages.[127]

---

[127] Indeed, the *Turner* court distinguished another more complex case, *Ford v. Murphy Oil USA, Inc.*, 703 So.2d 542 (La. 1997), on the ground that *Ford* involved exposure from multiple sources over a longer period of time and "the exact source of the contaminants" could not be identified. 234 F.R.D. at 604 n.4. The multiple sources of damage alleged here, and the lack of traceability, are important distinctions that make this case much more like *Ford* than *Turner*.

### F.  Bifurcation Would Not Render Common Issues Predominant.

Plaintiffs emphasize their proposal to divide the case into three phases, arguing that bifurcation can overcome "the individualized nature of causation and damages."  Pl. Mem. at 3, 35-36.  In *Castano*, however, the Fifth Circuit squarely held that bifurcation cannot be used to avoid predominating individual issues regarding causation and damages:

> "*A district court cannot manufacture predominance through the nimble use of subdivision (c)(4).  The proper interpretation of the interaction between subdivisions (b)(3) and (c)(4) is that a cause of action, as a whole, must satisfy the predominance requirement of (b)(3) and that (c)(4) is a housekeeping rule that allows courts to sever the common issues for a class trial. ... Reading rule 23(c)(4) as allowing a court to sever issues until the remaining common issue predominates over the remaining individual issues would eviscerate the predominance requirement of rule 23(b)(3); the result would be automatic certification in every case where there is a common issue, a result that could not have been intended.*"  84 F.3d at 745-46 n.21.

Thus, if individual causation and damages issues predominate over common negligence issues in the scheme of the entire litigation, then bifurcation cannot be used to justify class certification.[128]

The decision in *Bell Atlantic Corp. v. AT&T Corp.*, 339 F.3d 294 (5th Cir. 2003), a case relied upon by plaintiffs (*e.g.*, Pl. Trial Plan at 9), explains the limits on using bifurcation in class action litigation.  As plaintiffs observe, the Fifth Circuit in that case noted the possibility of bifurcation and said that "even wide disparity among class members as to the amount of damages" does not necessarily rule out class action adjudication.  *Id.* at 306-07.  But, in passages the plaintiffs omit, the court in *Bell Atlantic* went on to observe that class treatment "may not be suitable where the calculation of damages is not susceptible to a mathematical or formulaic calculation, or where the formula by which the parties propose to calculate individual damages is

---

[128] See also *Corley*, 2005 WL 2600177 (5th Cir. 2005) (predominance must be considered based on cause of action as a whole before bifurcation can be considered); *Patterson v. Mobil Oil Corp.*, 241 F.3d 417, 419 (5th Cir. 2001) (rejecting bifurcated approach in RICO case where trial of common liability issues "would be no more than the trial of an abstraction [for which] bifurcation is no cure," because individual trials would still be required as to reliance); *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 421-22 (5th Cir. 1998) (employer's conduct could not be separated from individualized impact on employees).

clearly inadequate." *Id.* at 307.  In the absence of a mechanical formula to determine damages in

a later phase of a bifurcated proceeding, the Fifth Circuit held, the proceeding can degenerate

into "separate mini-trials" of a large number of individual claims, and in those circumstances

"***the need to calculate individual damages will defeat predominance.***"  *Id.* at 307 (citations

omitted, emphasis added).  Thus, the Fifth Circuit established in *Bell Atlantic* that although

bifurcation may be used to determine disparate damage amounts through the use of a

mathematical or formulaic calculation, it may ***not*** be used in cases where, as here, causation and

damages will require separate mini-trials once the causation or damages phase is reached.

The Fifth Circuit's decision in *Corley* confirms that bifurcation cannot rescue class

certification where the damages issues will ultimately require individual assessment rather than

mechanical or formulaic calculation.[129]  In *Corley,* a putative class of landowners alleged that the

defendant had uniformly violated easements to their property, and asked the trial court to certify

the class to address liability issues while leaving damages for a later phase.  2005 WL 2600177,

at *1.  The Fifth Circuit held, however, that before a bifurcated trial plan can be considered, the

plaintiff "must first show that the cause of action, taken as a whole, satisfies the predominance

requirement of Rule 23(b)(3)."  *Id.* at *3 (citing *Castano,* 84 F.3d at 745 n.21).  The Fifth Circuit

found, however, that there was no formulaic means that would ***accurately*** calculate damages to

the class members.  *Id.*  Thus, the court rejected a bifurcated approach under which the

landowners sought "to excise from the class the very issue that defeats predominance under Rule

23(b)(3) – i.e., the assessment of injury and the calculation of damages."  *Id.* at *3.

---

[129] In an earlier ruling in this case, this Court quoted *Corley* at length to hold that a bifurcated trial plan proposed by
the MRGO plaintiffs would not eliminate the need to consider whether individual damages issues predominate.  *In
re Katrina Canal Breaches Consol. Litig.,* 2007 U.S. Dist. LEXIS 65239 at *245-46 (E.D. La. Aug. 16, 2007)
(Wilkinson, M.J.) (court "must consider plaintiffs' causes of action *as a whole* when considering class certification"
and must thus consider whether "myriad individualized damage issues predominate" regardless of bifurcation).

District courts in this circuit have followed the lead of *Bell Atlantic* and *Corley* by refusing to grant class certification in cases where the bifurcated damages adjudication would require individualized consideration rather than a formulaic or mechanical calculation.  In *Ancar v. Murphy Oil USA, Inc.*, 2008 U.S. Dist. LEXIS 68490 (E.D. La. July 25, 2008), for instance, the court held that a bifurcated trial plan could not save class certification where damages could not be determined without mini-trials on causation and damages.  *Id.* at *27-28.  In *Adams v. Brookshire Grocery Co.*, 1999 U.S. Dist. LEXIS 21907 (E.D. Tex. Feb. 8, 1999), the court rejected a bifurcation proposal and refused to certify a class because of "individual-specific issues that the compensatory and punitive damage claims will necessarily involve."  *Id.* at * 17-18.  And in *Burrell v. Crown Central Petroleum, Inc.*, 2000 U.S. Dist. LEXIS 17381 (E.D. Tex. Nov. 28, 2000), the court rejected a proposed bifurcated trial plan because damages issues would require consideration of individual plaintiffs' circumstances.  *Id.* at *24-26.  There are many other cases in which class certification has been denied due to the absence of a mathematical or formulaic method to calculate damages, whether or not bifurcation was proposed.[130]

The three cases on which plaintiffs rely (Pl. Mem. at 35-36) – *Steering Committee, Turner,* and *Bell Atlantic* – do not help their argument.  While the court in *Steering Committee* said that bifurcation may render it "theoretically possible" to satisfy the predominance and superiority requirements in a mass tort case, it specifically declined to find bifurcation would

---

[130] See also, *e.g., Lambert v. Board of Comm'rs of the Orleans Levee Dist.*, 2008 U.S. Dist. LEXIS 68254, at *28 (E.D. La., Sept. 10, 2008) ("Additionally, plaintiffs have not suggested a single damages model for the case.  With such widely variant claims and facts, the Court would necessarily have to look at the circumstances of each person to make determinations of causation and damages."); *Perrin,* 2008 U.S. Dist. LEXIS 8830, at *15-17 (E.D. La. Feb. 6, 2008) (denying certification where no formulaic damages calculation was available and court would be "inevitably confronted with a series of mini-trials addressing the more involved issues;" declining to examine if bifurcation would be workable); *Welch v. Atlas Roofing Corp.*, 2007 WL 3245444, at *7 (E.D. La. Nov. 2, 2007) (denying class certification when two types of damages existed and only one could be calculated formulaically); *In re Vioxx*, 239 F.R.D. at 462 (denying class certification in part because damages were not subject to formulaic calculations).

"remedy" the difficulties inherent in the case before it.  461 F.3d at 603.[131]  In *Turner*, the court found that determining damages in the second phase of the proceeding would be a relatively simple matter, dependent only on a showing that plaintiff's "person or … property came into contact with Murphy crude oil."  234 F.R.D. at 607.  And in *Bell Atlantic*, as noted above, the court affirmatively held that bifurcation may ***not*** be used for individual damages issues when there is no mathematical or formulaic means to calculate damages.  339 F.3d at 307.[132]

This case clearly runs afoul of the *Bell Atlantic* rule that bifurcation cannot cure the predominance of individual issues when there is no mathematical or formulaic way to calculate damages.  There is no way to take data from class members and plug it into a formula to both calculate each class member's damages and assess the relative responsibility for each category of those damages among the numerous potential causes.  In these circumstances, certifying a class based on a bifurcated trial is precisely what *Castano* and *Bell Atlantic* forbid.

## III.   PLAINTIFFS CANNOT SHOW THAT CLASS ACTION ADJUDICATION IS SUPERIOR TO ADJUDICATION OF INDIVIDUAL CLAIMS.

Under Rule 23(b)(3), plaintiffs must also establish that a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy."  The rule provides four relevant factors: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating

---

[131] The same thing is true of *Robertson*, 2008 U.S. App. LEXIS 15468, in which the court did not endorse bifurcation, but held (at *20) that bifurcation would not aid that case because liability had already been resolved.

[132] Nor can plaintiffs claim support from *Mullen*, which involved only 100 to 150 class members, or from *Watson*, in which the panel made no findings about damages calculation.  *Mullen*, 186 F.3d at 628; *Watson*, 979 F.2d at 1018.

the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a

class action."  When measured by these criteria, plaintiffs' motion falls far short of the mark.[133]

### A.  Individual Class Members Have a Strong Interest in Controlling Their Claims.

The Fifth Circuit has held that courts should exercise "caution" in certifying Rule

23(b)(3) classes "particularly where 'individual stakes are high and disparities among class

members are great.'"  *Bell Atlantic,* 339 F.3d at 301-02 (quoting *Amchem*).  In such cases, the

claims "have a significant impact on the lives of the plaintiffs," and thus class members have "a

significant interest in individually controlling the prosecution of separate actions."  *Amchem*, 521

U.S. at 616.  For instance, in an action involving claims for personal injury and death, "[e]ach

plaintiff … has a significant interest in individually controlling the prosecution of [his case],"

and each "has a substantial stake in making individual decisions on whether and when to settle."

*Id.* at 616-17.  Moreover, when the class members' individual claims are for significant sums of

money, "[t]he most compelling rationale for finding superiority in a class action – the existence

of a negative value suit – is missing."  *Castano*, 84 F.3d at 748; *Allison*, 151 F.3d at 420.

Here, the stakes are high for every putative class member.  Plaintiffs admit the amounts

claimed by putative class members exceed $10,000 per person.[134]  Ms. Richardson, who asserts a

wrongful death claim for the death of her husband, testified that she intends to pursue her claims

---

[133] Before explaining why the class action device is not superior to other forms of adjudication here, LNA notes that it is *not* addressing the additional insuperable Seventh Amendment flaws in plaintiffs' proposal that would arise if they were seeking a jury trial, because plaintiffs have elected to proceed under this Court's admiralty jurisdiction and have thus waived any claim to a jury trial.  See Doc. 15071 at 4 ("Barge Plaintiffs have in fact invoked admiralty and maritime jurisdiction, and … recognize and adopt the incidental effects thereof.") (referring to Sixth Amended Complaint); *T.N.T. Marine Serv., Inc. v. Weaver Shipyards*, 702 F.2d 585, 588 (5th Cir. 1983) (invoking admiralty jurisdiction waives right to jury trial).  Otherwise, the Seventh Amendment would clearly bar plaintiffs' proposed phased trial plan, as that plan would impermissibly require successive juries to revisit such issues as causation and comparative fault.  See, *e.g.*, *Allison*, 151 F.3d at 419-20 (bifurcated proceedings "increased the probability that successive juries would pass on issues decided by prior ones, introducing potential Seventh Amendment problems and decreasing the superiority of the class action device").

[134] LNA Ex. 19, Plaintiffs' Response to Request to Admit No. 23 (Doc. 13738-4 at 13).  The damages claimed by Mr. Koch alone exceed $750,000.  See Dep. Index, Item 80 (Koch).

regardless of whether a class is certified.[135]  Clearly, people asserting claims for the loss of

homes and loved ones have a strong interest in controlling the prosecution of their own claims.

**B.  Other Litigation Demonstrates No Class Action is Needed.**

As the Fifth Circuit observed in *Castano*, the existence of other litigation involving

similar claims provides "reason to believe that individual suits are feasible."  84 F.3d at 748.

Here, many thousands of class members have filed SF-95 forms asserting claims against the

United States, and/or have joined the MRGO litigation against the various defendants in that

case.  The massive volume of claims clearly shows that individual suits are feasible.

The nature of the other litigation already begun counsels strongly against the certification

of any class in this case.  The class proposed in the Barge matter is identical to one of the

subclasses proposed in the MRGO case: the members of the proposed classes in both cases are

residents of the Lower Ninth Ward and St. Bernard Parish west of Paris Road, who seek to

recover damages associated with flooding during Hurricane Katrina.  But these two proposed

classes have different, and conflicting, theories of the case.  The barge plaintiffs assert that LNA

is solely liable for all damages sustained by the members of the class (although, as noted above,

several of the proposed representatives assert in other proceedings that their damages were

caused by the United States and other entities).  The MRGO plaintiffs, by contrast, are suing the

United States and other defendants, and have already submitted expert reports concluding the

barge was ***not*** a cause of the flooding in the class area.[136]  Thus, not only has a massive volume

of litigation been commenced involving the very claims asserted by the plaintiffs in this case, but

that litigation asserts inconsistent theories of liability to recover the same damages.  Not only

---

[135] See Dep. Index, Item 81 (Richardson).

[136] See Doc. 13845 Exh. 7 (excerpts from Robert Bea declaration concluding barge did not cause breaches).

does the existence of other litigation show that individual cases are feasible, but it also reinforces the interest class members have in controlling their own claims, including deciding whom to sue.

### C.  Concentration of Litigation in a Single Forum is a Neutral Factor.

Plaintiffs concede that where litigation has not been commenced in a different forum, as is true in this case, this factor has no practical weight.  Pl. Mem. at 47.

### D.  This Case is Not Manageable as a Class Action.

In *Castano*, the Fifth Circuit held that "[t]he greater the number of individual issues, the less likely superiority can be established."  84 F.3d at 745 n.19.  In arguing that a class action is superior to other forms of adjudication, plaintiffs ask this Court to pretend that this case involves nothing more than a simple barge accident.  See Pl. Mem. at 47-48 (case involves a "single maritime law claim for negligence").  As shown above, however, this case presents numerous intractable individualized issues regarding causation of plaintiffs' alleged property damage, business damage, personal injuries, emotional distress, and wrongful death, and regarding sixteen separate categories of monetary damages sought in plaintiffs' complaint.  Various representative plaintiffs and class members assert various individual categories of damages.  As the court found in *In re American Commercial Lines, LLC*, 2002 U.S. Dist. LEXIS 10116 (E.D. La. May 28, 2002):  "As to manageability, the lack of it is a foregone conclusion.  A finding of fault on the part of one or both of the class action defendants can only be likened to crossing a threshold, or perhaps sticking the proverbial foot in the door."  *Id.* at *51.

Plaintiffs' "manageability" argument also ignores LNA's third-party claims against the United States and others, which must also be managed as part of this proceeding.  Plaintiffs' proposed three-phase trial plan makes ***no provision for the trial of these claims*** – there is no phase when the negligence of the United States and other actors will be considered, or in which

allocation of liability or damages will be carried out for anyone.  This Court, however, has repeatedly and rightfully refused to sever LNA's third-party claims, and instead has ordered that they be tried in the same proceeding in which LNA's liability is established.  See Docs. 618 and 831 in No. 05-4419.  Obviously, then, plaintiffs have not shown that a class action is a proper way to manage all of the claims that have been asserted in this litigation.  See *Robinson v. Texas Auto Dealers Ass'n*, 387 F.3d 416, 425 (5th Cir. 2004) (district court abused its discretion in certifying class without considering how case could be tried as to ***all*** plaintiffs and defendants).

Indeed, the existence of competing claims in the overlapping MRGO cases presents special manageability challenges that the Barge plaintiffs fail to address.  Under the Barge plaintiffs' trial plan, the MRGO plaintiffs would have to sit on the sidelines while the Barge plaintiffs conduct a "Phase One" trial over whether the barge was properly moored, before anyone litigates the liability of the MRGO defendants (several of whom are also third-party defendants in the Barge cases).  Moreover, the overlapping Barge and MRGO classes cannot possibly be adequately represented by either set of named plaintiffs, who assert inconsistent and conflicting theories of liability based on experts who will testify that the other group's theory of liability is wrong.  Furthermore, and in any event, if the classes were certified, there is no way the Court could ever give proper notice, consistent with Rule 23 and due process, to either of these overlapping classes.  Such a notice would have to explain the class members' predicament sufficiently so that class members could seek to exclude themselves from either or both classes – but such an explanation here would be impossibly complex, involving (as it must) the technical merits of each competing theory of liability, and thus not amenable to explanation in terms a layperson could understand and rationally decide whether to remain in the class or opt out.[137]

---

[137] See *Georgine v. Amchem Prods. Inc.,* 83 F.3d 610, 633 (3d Cir. 1996) (notice procedures problematic when class members lack information to make intelligent decision whether to opt out), *aff'd, Amchem,* 521 U.S. at 628.

Another consideration that undermines plaintiffs' claim to superiority is the *in terrorem* effect that class certification would have.  As the Fifth Circuit observed in *Castano*, "[c]lass certification magnifies and strengthens the number of unmeritorious claims" and "creates insurmountable pressure on defendants to settle" rather than face "the risk of facing an all-or-nothing verdict."  84 F.3d at 746.  Such concerns surely apply to this case: plaintiffs ask the Court to aggregate over 40,000 claims, each of them seeking damages in the tens or hundreds of thousands of dollars (if not more), in the hope of coercing a settlement despite the fact that all of the independent investigations have concluded that the barge did not cause any of the levee or floodwall failures, or have attributed the failures to other causes.  See above at 2-3.[138]

The clear alternative to plaintiffs' unwieldy leviathan class action would be to try individual cases to a verdict.  There is no reason to believe that all of the 40,000 potential class members would sue the barge defendants.  Indeed, thousands have, quite sensibly, chosen ***not*** to sue the barge defendants even while asserting claims against others.  Moreover, given that all of the Barge plaintiffs are represented by one small group of lawyers, there is no reason to believe they would continue to press claims forever if met with initial failure.  Also, the individualized causation and damages issues presented by these claims will require an individual adjudication as to each claimant regardless, and individual trials present a workable method for adjudicating such issues.  See, *e.g.*, *Allison,* 151 F.3d at 420 ("series of consolidated actions" would be "more efficient"); *Cimino*, 151 F.3d at 314-15 (trial plan rejected where it would not show that defendant's conduct caused "each individual's actual damages").  As the Fifth Circuit held in *State of Alabama v. Blue Bird Body Co., Inc.*, 573 F.2d 309, 328 (5th Cir. 1978) : "[I]f the effect of class certification is to bring in thousands of possible claimants whose presence will in

---

[138] *Turner* is, again, distinguishable.  There the defendant was already engaged in an  "extensive settlement program" and thus the court found that certification would not be coercive.  234 F.R.D. at 610.

actuality require a multitude of mini-trials (a procedure which will be tremendously time consuming and costly), then the justification for class certification is absent."  These conditions indisputably exist in this case, and there is no justification for class certification here.

## CONCLUSION

Plaintiffs' motion for class certification should be denied.

Respectfully submitted,

Robert B. Fisher, Jr., T.A. (#5587)
Derek A. Walker (#13175)
**CHAFFE MCCALL, L.L.P.**
2300 Energy Centre
1100 Poydras Street
New Orleans, LA 70163-2300
Telephone:  (504) 585-7000
Facsimile:  (504) 585-7075
Fisher@chaffe.com
Walker@chaffe.com

/s/ John D. Aldock
John D. Aldock
Richard M. Wyner
Mark S. Raffman
**GOODWIN PROCTER LLP**
901 New York Avenue, N.W.
Washington, DC 20001
Telephone:  (202) 346-4240

Daniel A. Webb (#13294)
**SUTTERFIELD & WEBB, LLC**
Poydras Center
650 Poydras Street, Suite 2715
New Orleans, LA 70130
Telephone:  (504) 598-2715

***Attorneys for Lafarge North America Inc.***

November 17, 2008

**<u>Certificate of Service</u>**

I hereby certify that I have on this 17th day of November, 2008 served a copy of the foregoing pleading on counsel for all parties to this proceeding, by electronic filing notification.


/s/ John D. Aldock_____

**Index of Exhibits to Lafarge North America Inc.'s**
**Memorandum in Opposition to Plaintiffs' Motion for Class Certification**

| Exhibit | Document |
|---------|----------|
| 1 | Excerpts from Interagency Performance Evaluation Team, *Performance Evaluation of the New Orleans and Southeast Louisiana Hurricane Protection System* (March 2007 Final Report) ("IPET Report") |
| 2 | Excerpts from I. van Heerden et al., *The Failure of the New Orleans Levee System during Hurricane Katrina* ("Team Louisiana Report") |
| 3 | Excerpts from R.B. Seed et al., *Investigation of the Performance of the New Orleans Flood Protection Systems in Hurricane Katrina on August 29, 2005* ("ILIT Report") |
| 4 | Expert Report of Joseph Suhayda |
| 5 | Expert Report of William Thomassie |
| 6 | Defendant United States' Response to MRGO Plaintiffs' First Set of Interrogatories |
| 7 | Excerpts from the Deposition of Stephen Lentz |
| 8 | Excerpts from the Deposition of Gennaro Marino |
| 9 | Excerpts from the Deposition of Ethel Mumford |
| 10 | Plaintiffs' Supplemental Answers to Interrogatories |
| 11 | Plaintiffs' Answers to Interrogatories |
| 12 | Expert Report of Wade Ragas |
| 13 | Excerpts from the Deposition of Michael Riche |
| 14 | Excerpts from the Deposition of Jacob Glaser |
| 15 | October 27, 2008 Supplemental, Amended and Superseding Answers to Interrogatories |
| 16 | Excerpts from the Deposition of Jimmie Harris |
| 17 | Excerpts from the Deposition of Herman Koch |
| 18 | Excerpts from the Deposition of Josephine Richardson |
| 19 | Plaintiffs' Response to Request to Admit (Doc. 13738-4) |
| 20 | Excerpts from the Deposition of Wade Ragas |

| 21 | July 3, 2008 Supplemental, Amended and Superseding Answers to Interrogatories (Doc. 13803-2) |
|----|----|
| 22 | Damage Assessment Reports |
| 23 | Excerpts from the Deposition of Melvin Spinks |
| 24 | Excerpts from the Deposition of John Kilpatrick |
| 25 | Expert Report of Kenneth Boudreaux |
| 26 | R.B. Seed *et al.*, *New Orleans and Hurricane Katrina.  II: The Central Region and the Lower Ninth Ward*, 134 J. Geotech. & Geoenvtl. Eng'g 718 (May 2008) |
| 27 | Jarvis DeBerry, *The Search for Title*, New Orleans Times Picayune, March 28, 2008 |