# EXHIBIT 4

# ANALYSIS OF HYDROLOGIC FACTORS
# AFFECTING PROPERTY DAMAGE
# IN THE PLAINTIFF PROPOSED CLASS
# DURING HURRICANE KATRINA

**In Re. Katrina Canal Breaches Consolidated Litigation (BARGE)**
**United States District Court for the Eastern District of Louisiana**
**Docket No. 05-4182**

Prepared by

*Joseph N. Suhayda*

Joseph N. Suhayda, Ph. D.
Coastal Hydrologist
285 Sunset Blvd.
Baton Rouge, LA 70808

August 27, 2008

2

## TABLE OF CONTENTS

                                                                        Page
1. INTRODUCTION.......................................................................................   3
    1.1. HYDROLOGIC ISSUES RAISED BY PLAINTIFF............................   3
        1.1.1. Melvin Spinks…………………………………………………..   3
        1.1.2. John Kilpatrick…………………………………………………   4
    1.2. CHARACTERISTICS OF CLASS AREA…………………………….   4

2. HURRICANE KATRINA ………………………………..………………….   5
    2.1. WINDS……………………………………………………………….   6
    2.2. RAINFALL.…………………………………………………………..   7
    2.3. SOURCES OF WATERS………………………....................................   7
    2.4. TIMING OF BREACHES…………………………………………….   8
        2.4.1. Eyewitness Reports……………………………………………   8
        2.4.2. Breaches along MRGO levee……………………………………   9
        2.4.3. North Breach………………………………………………….   9
        2.4.4. South breach………………………………………………….   10
        2.4.5. Timing of Breaches – Summary………………………………   10
    2.5. FLOW OF WATER……..……………………………………………   11
    2.6. WAVES………………………………………………………………..   11
    2.7. SUMMARY OF MULTIPLE CAUSES OF DAMAGE TO BUILDINGS…   12

3. LIMITATIONS OF PLAINTIFF'S FLOOD MODELING…………..…………..   12
    3.1. SOBEK COMPUTER MODEL………………………..………………..   13
    3.2. NEGLECTED HYDROLOGIC PROCESSES……………..….…..……...   13
    3.3. INACCURATE TIMING OF BREACHES…………..………………….   14
    3.4. INACCURACY OF CALIBRATION ………………………………….   15
    3.5. UNRELIABILITY OF MODELING RESULTS...………………………...   16

4. ANALYSIS OF CLASS HYDROLOGIC ISSUES…….....………….…………..…   16
    4.1. BUILDING DAMAGE CAUSED BY FLOODING………………………   16
    4.2. FLOODING CAUSED BY BREACHES IN INDUSTRIAL CANAL
        FLOODWALLS……………………………………………………………   17
    4.3. DEPTH OF FLOODING……………………………………………….   18
    4.4. HYDROLOGIC DAMAGE CRITERIA…………………………………..   19

5. SUMMARY OF CONCLUSIONS..............................................................   19

6. REFERENCES..........................................................................................   21

7. APPENDIX................................................................................................   23

8. FIGURES..................................................................................................   25

# 1. INTRODUCTION

The purpose of this report is to present opinions concerning the hydrologic processes that affected property within the plaintiffs' designated class area during Hurricane Katrina. The hydrologic processes causing property damage in the class area are analyzed, and the plaintiffs' expert opinions are reviewed and examined. The analysis focuses on the many factors causing damage to property in the class area, including winds, rainfall, waves, flowing water and rising water, and shows that the statements made by the plaintiffs' experts about the role of the breaches in the Industrial Canal in causing property damage in the class area are incomplete, inconsistent, and inaccurate. These experts' statements do not accurately convey the fact that Hurricane Katrina produced a complex variety of hydrologic processes in the class area that affected property, and that these processes were highly variable over the class area. They also fail to accurately portray the limitations and errors in the computer modeling results which were applied to assessing damage to property. The analysis presented in this report concludes that each property in the class area was affected by a unique set of wind, wave, rainfall, rising water, flowing water, and maximum water depth factors. There is, therefore, no validity to the assertion that the cause or extent of property damage within the class area is a "common" issue for all class members. To the contrary, the cause and extent of property damage, including damage caused by flooding, is an individual issue.

The opinions expressed herein are based upon a careful review and analysis of data and information from many sources, and my experience in working on hydrologic problems in southern Louisiana. The materials examined for technical information included expert reports, technical articles, governmental reports and legal documents. I visited the proposed class area on several occasions, during which time I examined the various hydrologic features of the site. Finally, my opinions are also based upon my 30 years professional experience in analyzing hydrologic processes in southern Louisiana. The various reference materials used for this report are presented in the REFERENCES section of this report.

## 1.1.   HYDROLOGIC ISSUES RAISED BY PLAINTIFF

Plaintiffs' experts have provided statements and opinions on several issues pertaining to the role of the Industrial Canal breaches in causing property damage in the plaintiff designated class area. In this section these statements are briefly reviewed and summarized. Overall it is the opinion of plaintiff that property damage in the class area resulted from flooding caused by two separate breaches in the Industrial Canal (Plaintiffs' Motion, 2008, p 2).

### 1.1.1   Melvin Spinks

Mr. Spinks in his expert report presents results of computer modeling studies to opine on the timing and magnitude of the flooding of St. Bernard Parish and the Lower Ninth Ward. He also references relationships between the depth of flooding and damage to individual buildings.

4

The model included three breaches; along the Mississippi River Gulf Outlet (MRGO), and the north and south breaches along the Industrial Canal. Although the north and south breaches were modeled as separate events, the modeling study considered only their combined impact.

In Mr. Spinks' opinion, the computer modeling produced reliable and accurate results, including the time progression of the flooding (Spinks, 2008, p 29). He based this opinion on the application of the Sobek-1D2D computer model and describes the various features of the model pertaining to the flow of water through urban and rural drainage systems. Model inputs include the simulation period, ground elevation, rainfall, levee overtopping and breaches, and surge hydrographs.

The results of the modeling indicate the time variation of water depth above ground for class area and the influence of the Industrial Canal breaches as opposed to MRGO breaches. He presents maps of the depth of water over ground for class area and presents tables to correlate the damage to various types of buildings.

## 1.1.2.  John Kilpatrick

Mr. Kilpatrick in his affidavit addresses the issue of whether or not, from a real estate analysis and appraisal perspective, this case can best be treated as a class action. He also discusses the damage to personal property with respect to class versus individual assessment of damages. He states that damage from hurricane Katrina and levee failures provide common elements across the class in terms of the types of damage and causes of damage (Kilpatrick Affidavit, p3). Further, Mr. Kilpatrick states that the depth of flooding of the class has been mapped and provides evidence relevant to determining the extent and cause of damages (Kilpatrick Affidavit, p5). He cites a Corps of Engineer report as a rationale for area wide evaluations of flood damage based upon depths of flooding (Kilpatrick Affidavit, p6). Mr. Kilpatrick indicates that he has obtained maps that purport to show the extent of the flooding that was the chief cause of the damages (Kilpatrick Affidavit, p12).

## 1.2.  CHARACTERISTICS OF CLASS AREA

The proposed class area is bounded by the Industrial Canal floodwall on the west, Paris Road on the East, the Mississippi River on the South, and is bounded on the north by the Public Belt or other Railway adjacent to and immediately north of Florida Avenue, and the east-west channel or canal extending from the aforesaid railway to Paris Road (Florida Walk canal and Forty Arpent Canal) (Plaintiff's Motion, 2008, p 2). This is an area roughly 2 miles in the north-south direction by 5 miles in the east-west direction. Important to flow of water in this area are the physical characteristics of the land that control the movement of the water. These characteristics include the land cover, the topography, and the drainage system.

The plaintiff designated class area contains a variety of land use types that affected the flow of flood water. This area contains a mixture of residential, commercial and undeveloped lands of varying elevation. These differences were included in a detailed analysis of the flooding

5

of St. Bernard Parish and the Lower Ninth ward by the Interagency Performance Evaluation Team (IPET) in Volume VI of their report. The IPET analysis indicates that rather that being uniform, the class area is primarily composed of two different land use types: non-vegetated urban and vegetated urban. Therefore different sections of the class areas have distinct hydrologic properties. Buildings, fences and other structures can act as barriers to the flow of water. Where buildings are close together water is channelized to flow between the buildings and this accelerates the velocity of the water and increases its damage potential. Individual buildings and rows of building were scattered throughout the class area creating a complex network of flow paths for flood waters and complex pattern of potential flood damage.

Topographic data for the proposed class area has been based primarily upon LIDAR data. The data show that the ground elevations in the proposed class boundary area range from several feet above sea level to several feet below sea level. The highest ground has an elevation above 6 ft and is located near the Mississippi River. The lowest ground is located in the northern part of the proposed class boundary area and has an elevation below – 6 ft. A major topographic feature of hydrologic significance is a railroad embankment that runs westward from Paris Road along the St. Bernard Highway and then curves northward just to the west of Alexander Avenue until it reaches the 40 Arpent levee. The embankment is very narrow, about 25 ft in width, but it is about 4 to 5 feet above the ground level and continuous. Thus it is a very important topographic feature that limits the movement of water in the east- west direction. Also imposed upon the general topography is elevation difference associated with individual residential lots and streets. It is this topography, the local topography, that controls the runoff of rainwater from individual residential lots and the initial movement of flood waters.

The drainage system in the proposed class area has been described in detail in the IPET report. The class area is composed of the Lower Ninth Ward Basin in Orleans Parish (IPET, p VI-40), and in Pump Drainage Area 1 ) in St. Bernard Parish (IPET, pVI-46). The class area was divided into 26 sub-basins. Sub-basin boundaries correspond to storage areas used in IPET analysis. Four pump stations were included in the analysis for the Lower Ninth Ward and Area 1 (IPET, p VI-4-21). Storm water drainage is through channels that convey rainwater to the pump stations where it is pumped out of the area.

## 2. HURRICANE KATRINA

Katrina was a powerful hurricane that caused widespread damage and loss of life. It was the costliest and one of the five deadliest hurricanes to ever strike the United States. In this section the storm history and meteorological characteristics are briefly reviewed. In order to understand the actual factors causing damage to buildings in the class area, it is necessary to identify all of the factors in the storm that could cause damage to property, in addition to flooding from the Industrial Canal breaches. The storm created factors that affected the buildings in the case area including wind, rainfall, waves, and flowing water. Furthermore the flooding itself

6

resulted from water from several sources, with the breaches along the Industrial Canal playing a minor role in determining maximum height of the flooding.

The modeling of the flooding of St. Bernard Parish and the Lower Ninth Ward has been the subject of several recent studies. The most comprehensive study was performed by IPET and included modeling of Hurricane Katrina and the flooding and damage caused by the storm (IPET, Vol. IV). Kok, et al (2007) provided a separate analysis of the flooding based upon the Sobek model. A review of this modeling was conducted by Dalrymple (2007 ). Finally, an overview of the flooding caused by Katrina has been presented by Wooten ( 2007 ). The studies by Dalrymple and Wooten presented multiple sources of water that impacted the proposed class area in addition to the two breaches along the Industrial Canal.

## 2.1.   WINDS

Katrina became a Category 3 hurricane with 100 kt winds at 0700 CDT in the morning of August 27th, about 365 n mi southeast of the mouth of the Mississippi River. Accompanying the intensification and the subsequent deterioration of the inner eyewall was a significant expansion of the wind field on 27 August. Katrina nearly doubled in size on 27 August, and by the end of that day tropical storm-force winds extended up to about 140 n mi from the center. Katrina strengthened from a low-end Category 3 hurricane to a Category 5 in less than 12 h, reaching an intensity of 145 kt by 0700, on 28 August. Katrina attained its peak intensity of 150 kt at 1300 August about 170 n mi southeast of the mouth of the Mississippi River. The wind field continued to expand on 28 August, and by late that day tropical storm-force winds extended out to about 200 n mi from the center, and hurricane-force winds extended out to about 90 n mi from the center, making Katrina not only extremely intense but also exceptionally large. The hurricane then made landfall, at the upper end of Category 3 intensity with estimated maximum sustained winds of 110 kt, near Buras, Louisiana at 610 on August 29. Katrina continued on a northward track, with its center to the east of the New Orleans area, and made its final landfall near the mouth of the Pearl River at the Louisiana/Mississippi border, still as a Category 3 hurricane with an estimated intensity of 105 kt. Katrina weakened rapidly after moving inland over southern and central Mississippi, becoming a Category 1 hurricane by 1300 on August 29.

The winds over the class area have been reconstructed by analyzing wind observations and using computer models, and are presented in the IPET report. The IPET data shows that at 4:00 AM on August 29, the wind over the class area was from the northeast and was already at a speed of 50 to 55 kts (58 to 63 mph) (IPET, p IV-2-46). This is before any flooding was reported in the class area. By 7:00 AM, the winds over the class area were out of the northeast and had increased to 70 to 75 kts (80 to 86 mph) (IPET, p IV-2-47)). At 10:00 on the 29th, the wind over the class area was 55 to 60 kts (63 to 69 mph) out of the northwest (IPET, p IV-2-48). Thus hurricane strength winds were affecting buildings in the class area before and during the period of the flooding.

7

## 2.2.    RAINFALL

Hurricane rainfall over the class area was substantial.  The total amount of rainfall varied from about 10.5 inches in the eastern side of the proposed class area to about 11.5 inches on the western side (IPET, p VI-4-14).  Rain started falling in the class area in the evening of August 28th, and reached 1 inch per hour in the early morning of the 29th.  The rain continued throughout the morning and afternoon of August 29th, averaging about .8 inches per hour for over 10 hours (IPET, p VI-4-15).

## 2.3.    SOURCES OF WATER

A precise description of the flooding of the plaintiff designated class area is complex because there were multiple sources of the flood waters that entered the area.  No single source is responsible for the flood timing, flow of water or flooding depth.  In the IPET study a detailed analysis of the flooding of  St. Bernard Parish and the Lower Ninth Ward was conducted and provides the best source of information about the flooding of the proposed class area.

Numerous hydraulic elements were included in the IPET analysis. There were 13 breaches and overtopping locations identified as affecting St. Bernard Parish and the Lower Ninth Ward, totaling about 39,000 feet in length (IPET, p VI-4-22).  The analysis indicated that breaches accounted for only about 63% of the inflow of water into St. Bernard Parish, with wave overtopping accounting for about 28% and rainfall about 8%. The analysis also included the operation of nine pump stations.

The modeling by Mr. Spinks indicates that the primary sources of the water that flooded the class area were the breaches in the levee along MRGO.  A similar study by Kok ( 2007) also indicated that the primary source of water was the breaches along MRGO (Kok, p 46).

Another source of water that flooded the class area was wave overtopping of floodwalls and levees (IPET, pVI-4-22) and under-seepage (ILIT, p 6-18).

In this case, the plaintiffs focus on two breaches in the Industrial Canal floodwall.  As just noted, these were not the only sources of water that flooded the class area, nor even the primary sources insofar as maximum water levels were concerned.  Furthermore, these two breaches were separate events with separate consequences.  For persons living near the northern breach, that breach is the one of significance.  By contrast, the south breach will be more significant to persons living in the immediate vicinity of that breach and subjected to water flowing through it.  The relative contributions of the two breaches varied depending on location within the proposed class area.  Because the two breaches were separate events, the relative contribution of each breach would need to be evaluated in determining causation of damage.

The relative contribution of these two sources of water, and of other various sources of water, depends in part on the timing and development of the various breaches.

8

## 2.4.    TIMING OF BREACHES

The timing of the breaches of the levees and floodwalls surrounding St. Bernard Parish and the Lower Ninth Ward is important to accurately describe the initial flooding which occurred in the class area. The timing and development of the breaches affects the relative contributions of sources of water. Furthermore, the timing and development of the breaches affects different locations in the proposed class area differently based on proximity to the breaches and topography affecting water flow inside the area.

Sources of information regarding the timing and development of the breaches include the IPET, ILIT, and Team Louisiana reports, and eyewitness reports.

### 2.4.1.  Eyewitness Reports

Several residents in the Lower Ninth Ward remained during the storm and were eyewitnesses to the flooding. Their reports provide direct observations of many critical aspects of the breaching of the floodwalls along the IHNC. However, due account must be taken for the circumstances under which the observations were made – that is, darkness, hurricane winds, heavy rains, and the exigency of life-threatening flood conditions. Accounts concerning the times at which events occurred are also not all consistent and are subject to interpretation. Civil twilight did not occur until 6:11 a.m. and dawn was not until 6:36 a.m. on August 29, according to the U. S. Naval Observatory. Therefore, eyewitness accounts concerning estimates of times before there was any ambient light may be questionable and it would be incorrect to regard their accounts about the specific times at which particular events occurred as established facts.

Ms. D'Antoinette Marie Johnson lived on Deslonde St, about 3 blocks from the north breach on the IHNC. She reported water in her house when she woke up which she estimated was at about 6:00 a.m. She reported seeing water in the street and water toppling over the wall at 6:08 to 6:10 a.m. The water in the street was higher than her front porch. The water coming over the wall was in waves.

Mr. Kendrick Pounds lived in the back of the building that Ms. Johnson lived in. He said was awakened by Ms. Johnson at 5:50 a.m. and was told there was water in the house. He ran to the house door, looked outside and saw cars floating. He saw two holes in the floodwall. Water started coming over the floodwall about 5:58 a.m. He also got on the roof and saw water coming over the floodwall along the Industrial Canal.

Mr. Andrew Sartin lived on North Roman St., about 7 blocks from the south breach. He reported that before daylight it was raining and blowing hard. After daylight the rains and wind seemed to increase. He heard a noise like a big crash between 6:00 and 6:30 a.m. from the area of Southern Scrap, near the northern breach. He then saw a wave of water coming down the street. About 5 to 15 minutes later he heard a second noise, louder than the first, from the Claiborne Avenue side of his house. Water then came down Roman Street from Jourdan Avenue, carrying cars and houses with it. He estimated this would have been about 6:15 to 6:45 a.m.

Terry Adams lived on Deslonde Street, about 1/2 block from the north breach. He woke up about 5:00 a.m. and noticed that the carpet on the floor of his house was wet. He looked outside and noticed water coming over and under the wall at Jordan Avenue and Law Street, the site of the north breach. He got on his roof between 5:30 and 6:00 a.m. at not quite daylight. From the roof he said he could see the wall at the Claiborne Avenue bridge and saw water coming over and under the wall. But the wall wasn't breached at this time.

William Villavasso was working at Pump Station 5 the morning of August 29th. He started seeing rain intensifying, the winds picking up and water splashing over the levee along the Industrial Canal. He estimated the mount of splashing was from 3 to 5 feet. The splashing water flowed into the street. He heard a sound like an explosion, and then saw the levee walls in sections. He saw a couple sections of the wall tumble over, and then massive amounts of water pouring through the wall, with a lot of street flooding. He advised central control to drop the power to the station. IPET reported that the power was turned off at 5:30 a.m. ( IPET, p IV-194).

### 2.4.2.  Breaches along MRGO Levee

In the IPET report the development of the breaches of the levees along the MRGO considered both waves and still water overtopping (IPET, pp IV-240 to IV-242).  The report describes in detail the breaching at four different locations along the levee. At Location 1, the northern most location, wave overtopping occurred about 6:00 a.m. and persisted for 4 hr, however no still water overtopping occurred at this site. At Location 2, further south, waves began to substantially overtop the levee around 5:30 a. m. and at 6:30 the mean water level began to overtop the levee crest. Considerable erosion of the levees occurred.  At Location, 3 near the mid point along the levee, waves began overtopping at 5:30 and mean water overtopped at 6:00 a.m. At the southern end of the levee, Location 4, wave overtopping occurred between 6:30 to 9:30 a.m., with no overtopping by still water.

Team Louisiana reported waves from Lake Borgne began to break on the levees along MRGO (Team La., p 63).  The Forty Arpent levee protecting the Lower Ninth ward area was overtopped by 0830, according to this report (Team La., p 64).

Kok (2007) in his modeling of the flooding uses 5:00 a.m. to 8:30 a.m. for the development of various breaches along MRGO (Kok, p 38).

### 2.4.3.  North Breach

The IPET report concludes that the north breach was the likely source of the early flooding of the Ninth Ward (IPET, p V-53). This conclusion was based upon an analysis of the stability of the floodwall at that location which indicated the wall failed before it was overtopped.  The water was reported as rising as early as 5:00 a.m. (IPET, p V-53).

10

The ILIT study indicates that the north breach occurred at approximately 7:30 to 7:45 a.m. (ILIT, p 6-6). They also indicate that overtopping and under-seepage occurred at this site and that the under-seepage caused the failure of the floodwall (ILIT, p 6-18). ILIT attributes the early influx of water in the Lower Ninth Ward to underseepage flows. (ILIT, p. 6-16).

Team Louisiana reported that at approximately 6:00 a.m. levees and floodwalls along the IHNC were overtopped, beginning on the south end (Team La., p 66). Water that poured over the floodwalls began to scour trenches on the back side of the walls (Team La., p 66). They report that the north breach occurred about 7:30 a.m. or a little later (Team La., p 67). They concluded that the north breach was caused by under-seepage and overtopping.

Kok (2007) specifies a time for the development of north breach of 7:00 to 7:30 a.m. (Kok, p 38).

2.4.4.  South Breach

The IPET report concluded that the south breach was caused by overtopping and erosion of the soils along the back side of the flood wall (IPET, p V-55). According to IPET, overtopping did not start until about 7:00 a.m. and the peak storm surge in the IHNC was not reached until 9:00 a.m.(IPET, p V-53). Therefore IPET concluded the south breach would have occurred sometime between 7:00 and 9:00 a.m.

The ILIT study indicates that the south breach occurred at approximately 7:30 to 7:45 a.m.(ILIT, p 6-6). They also indicate that overtopping and under-seepage occurred at this site and that the under-seepage caused the failure of the floodwall (ILIT, p 6-18).

Team Louisiana reported that at approximately 6:00 a.m. levees and floodwalls along the IHNC were overtopped, beginning on the south end (Team La., p 66). Water that poured over the floodwalls began to scour trenches on the back side of the walls (Team La., p 66). They report that the south breach occurred at 7:30 a.m. (Team La., p67).

In the Kok (2007) study, the modeling is based upon 7:00 to 7:30 a.m. as the timing for the development of south breach.

2.4.5.  Timing of Breaches - Summary

There is a general consensus that the Industrial Canal north breach occurred before the south breach, and that both breaches were fully developed by 7:45 a.m. on the morning of August 29. The IPET, ILIT and Team Louisiana investigators all concluded that, at least at the south breach site, storm surge waters overtopped the floodwall before or concurrent with the occurrence of the south breach. As discussed above, this conclusion is consistent with eyewitness accounts taken after the investigative reports were prepared. Plaintiffs' expert Mr. Spinks is alone in concluding that the south breach occurred at 5:30 a.m. This was before the storm surge

11

overtopped the floodwall crest elevation and long before dawn or even civil twilight provided light by which any events could have been seen.

For present purposes, it is enough to note that variations in the timing and progression of the various breaches have a differential impact on the contributions of the breaches at different locations in the proposed class area.

## 2.5.   FLOW OF WATER

The flow of flood water creates lateral forces on buildings distinct from the vertical forces associated with inundation. The magnitude of these lateral forces depends on the speed and direction of the flowing water. Thus, lateral forces are largest during the periods of time when flood waters are rising, and not at the time of maximum flood elevation, when the water has stopped rising. The impact of the flowing water on buildings is different from rising water, tending to push the building sideways and damaging vertical surfaces facing the flow. Inundation creates vertical forces on a building and tends to lift the building off its foundation. Whereas the elevation of the flood water at any on time is nearly a constant, the velocity of flow is highly variable over the class area. Factors affecting the velocity of the flood waters include the land roughness, the proximity to breaches (with lateral forces greater in the immediate vicinity of the breaches), and the presence of nearby buildings. Flowing water can also transport debris with can be an additional cause of damage to individual buildings. Thus individual buildings in the class area were subjected to differing degrees of damage caused by flowing water.

## 2.6.   WAVES

The strong winds associated with Hurricane Katrina created storm waves that raised the height of the water, overtopped floodwalls and eroded levees. Waves would also differentially affect buildings in the class area. Once flood and rainwater water inundated a portion of the proposed class area, from whatever source, surface waves would have been generated in these areas and these waves would have increased the height and velocity of the water potentially creating an additional hydrologic cause of damage to buildings that would have varied at different locations. The height of the storm waves depends upon the depth of water, the open water fetch and the wind speed, all of which were changing in the proposed class area throughout the storm period. For the proposed class area the fetch at a site would be the distance from the site to the nearest levee or floodwall in an upwind direction.

To illustrate the variability of the wave heights within the class area a wave hindcast was made for representative wind speeds and fetches. Assuming a water depth above ground of 10 ft , the waves produced by hurricane wind speeds of 65 and 80 mph for various fetches is given in Table 1 based upon the methodology recommended in the Shore Protection Model. (Note that the wave heights for the 80 mph wind vary from 1.1 ft at a fetch distance 500 ft to a wave height of 2.7 ft at a fetch of 400 ft.)

Table 1.  Significant wave heights in the class area during Hurricane Katrina for a water depth of 10 ft.

| Fetch | 65 mph | 80 mph |
|-------|--------|--------|
| 500 ft | .85 ft | 1.1 ft |
| 1000 | 1.1 | 1.5 |
| 2000 | 1.6 | 2.0 |
| 4000 | 2.1 | 2.7 |
| 8000 | 2.7 | 3.5 |
| 16000 | 3.3 | 4.0 |

The waves in the proposed class area would have varied throughout the area as the wind speed, wind direction, and the water depths in the class area changed. Furthermore, buildings located near levees and floodwall would have been subjected to much smaller wave heights than buildings further away.  Also, buildings sheltered by other buildings located upwind would have experienced reduced wave action.  Therefore wave action, a hydrologic cause of damage during hurricanes, would have varied greatly throughout the proposed class area.

## 2.7.    SUMMARY OF MULTIPLE CAUSES OF DAMAGE TO BUILDINGS

Based upon the information presented above, it is evident that during Hurricane Katrina buildings in the proposed class area were subjected to numerous hydrologic related causes of damage. The various causes of damage include winds, rainfall, waves, flowing water, rising water, and debris. Flood waters were only one hydrologic factor associated with the storm.

Although the Industrial Canal breaches were among the sources of water, their contribution to the flooding and damage was not uniform or "common" across the class area.  To begin, it is clear that the maximum depth of flooding in the class area was primarily the result of water entering St. Bernard Parish and the Lower Ninth Ward from breaches in the levees along MRGO, and not from the breaches along the Industrial Canal.  Water from the breaches along the Industrial Canal caused high flow velocities near the breaches, but these effects were localized and not uniform.  The Industrial Canal breaches were two separate events with separate consequences which varied by location within the class area.  Water from the breaches contributed to rising water during the initial stages of the flooding, but again their ultimate contribution varied.

## 3.  LIMITATIONS OF PLAINTIFF'S FLOOD MODELING

The plaintiffs have provided results concerning the flooding in the class area based upon a computer model, as reported by Mr. Spinks (Spinks, 2008). The particular features of this modeling have been described above. According to the Spinks report, the modeling provides critical information for the evaluation of flood damage as a class based upon the spatial

13

distribution of the depth of flooding over the class area. These results, plus the damage assessment methodology referenced in Mr. Spinks report, provide the technical information that is said to be needed for evaluation of damage to buildings in the class area (Kilpatrick report). In this section the limitations of the modeling are reviewed for factors that would affect the accuracy and reliability of the results as a basis evaluating the damage to buildings in the proposed class area.

## 3.1.   SOBEK COMPUTER MODEL

The Sobek-1D2D computer model was used to develop the hindcasts of flood elevation and the depth of flooding for the class area. The model is not a hurricane surge forecasting model. Developed by WL-Delft Hydraulics, it is used to compute the flooding associated with flowing water primarily in rivers. The Delft organization has a separate model that is used for hurricane surge forecasting. The U. S. Army Corps of Engineers uses the ADCIRC hurricane surge simulation model, which analyzes flooding over the large area affected by the hurricane (IPET, p IV-5-1). The Corps modeling includes the effects of the hurricane winds and waves on the flooding. The use of a non-hurricane hydrodynamic model to simulate hurricane flooding is unreliable.

## 3.2.   NEGLECTED HYDROLOGIC PROCESSES

The hydrologic processes ignored in the Sobek modeling are listed below. In light of the actual processes involved in the hurricane storm and their effects on property in the class area, these neglected factors limit the accuracy and reliability of the modeling results. The Sobek modeling fails to include the following factors;

1. The amount of water that entered the class area as a result of overtopping of floodwalls and levees by waves.
2. The effect of the surcharged internal water on the initial spreading of floodwaters in the class area.
3. The influence of buildings that would have altered the flow velocity and direction of flood waters.
4. The effect of surface features such as houses and streets in terms of the model elevation and roughness, on flow velocity in the class area (including surface features such as berms that are not included in the input data but that would have affected the channeling of water).
5. The effect of hurricane winds on the water and property in the proposed class area.
6. The amount of water entering the class area as a result of seepage below or through levees or flood control structures.
7. The magnitude and effect of wind generated storm waves on the velocity and height of water.
8. The elevation and types structures in the class area.
9. Surface wind waves.

The hydrologic processes neglected in the modeling create serious limitations on the ability to treat the complexity of impact of Hurricane Katrina on property in the class area and

14

properly assess the various causes of damage. Not including wave overtopping in the analysis ignores waves as a source of water for flooding, when it clearly was a factor. Neglecting the effects of waves on the velocity and height of water in the class area is a fundamental error. Waves have long been recognized by FEMA as an important cause of damage to buildings. Buildings are important in limiting the flow of flood waters, and also in their ability to redirect and concentrate the flow of flood waters that would affect other buildings. Surface features such as houses and streets control also limit flow by providing friction resistance.

The neglect of hurricane winds in the modeling means that currents in the class area will only be driven by gravity. It also eliminates any ability to assess the effects of hurricane winds on buildings in the class area. Although seepage is a minor source of water in terms of the maximum flooding that occurred, it has been found by at least some investigators to have played an important role in the initial flooding associated with the north breach. Knowledge of the elevation and types of structures in the class area is essential to determining the flood damage, as indicated in Mr. Spinks report and Mr. Kilpatrick's report.

## 3.3.    INACCURATE TIMING OF BREACHES

Mr. Spinks indicates the timing of the IHNC north and south breaches to the floodwall that flooded the Lower Ninth Ward was a major consideration in his study (Spinks, p 16). After reviewing eyewitness reports and the information contained in the IPET, ILIT and Team Louisiana reports, Mr. Spinks presents the timeline of the floodwall breaches his Table 1. Table 1 is reproduced below. The north breach is indicated to start at 4:00 a.m. and the south breach at 5:30 a.m.

**Table 1. Levee Breaches along IHNC and MRGO**

| Location | Description | Type | Failure Width | Before Breach Elevation | After Breach Elevation | Time Breach Start |
|----------|-------------|------|---------------|-------------------------|------------------------|-------------------|
| 1 | IHNC North | I-Wall | 180 ft | 13.1 ft | 1 ft | 4:00 a.m. |
| 2 | IHNC South | I-Wall | 793 ft | 13.1 ft | 1 ft | 5:30 a.m. |
| 3 | MRGO Overtopping / Breach | Levees | Various Sections along MRGO Levee | Varies | Varies | 5:30 a.m. |

Mr. Spinks' timing of the north breach is wrong, or at best not established by the evidence, for several reasons. He incorrectly cites an eyewitness report that is the basis for his early timeline. He says Ms. Johnson reported water in her house when she woke up at 4:15 to 4:45 a.m. In fact Ms. Johnson indicated she woke up about 6:00 a.m. He also incorrectly renders the report of flooding by Mr. Villavasso. He says that Mr. Villavasso heard an explosion and experienced massive flooding after 3:00 a.m. In fact Mr. Villavasso saw water coming over floodwall at 3:00 a.m. He saw the walls tumble and massive amounts of flood water at a later time, as late as

15

shortly before 5:30 a.m. Mr. Spinks indicates Mr. Terry Adams reported that the carpet in his house was wet when he got up at 5:00 a.m., and he did say this. However, Mr. Adams also said that this time he saw water coming over and under the floodwall at Jordan Avenue and Law Street, the site of the north breach. Based on these statements it appears the wall had not failed at this time.

Mr. Spinks incorrectly describes the results present by IPET concerning the north breach. He quotes a statement that from Volume IV of the IPET report that indicates floodwater began entering the Lower Ninth Ward prior to 5:30 a.m. and possibly as early as 4:30 a.m., and that "These early times suggest that the water entered through one or both of the breaches in the IHNC floodwall". However, it is clear in an early section of the report that no definite conclusion had been reached and that more analysis was needed to clarify the sequencing of the two breaches. Early flooding of the Lower Ninth Ward can just as well be explained as a result of water coming under and over the floodwall at the north breach until as late as about 5:30 a.m. Thus the Spinks timing of the north breach of 4:00 a.m. is not correct or at least not established.

The timing of the south breach used in the Spinks modeling is also incorrect in light of all the evidence. A detailed analysis of the failure of the floodwall at the south breach by IPET indicated it failed because overtopping eroded the soil behind the wall. IPET concluded that overtopping did not start until about 7:00 a.m. and the peak storm surge in the IHNC was not reached until about 9:00 a.m. Therefore all of the investigative teams conclude that the south breach occurred no earlier than 7:00 a.m., about 90 minutes to 2 hours later than Spinks assumed.

The water level conditions specified along the boundary of the model were based upon extrapolations of observed hydrographs. The observed hydrographs in the Industrial Canal – which form a part of Spinks' analysis (Figure 7) should correlate to the actual timing of the breaches in the sense that the breaches themselves would affect the water levels in the Industrial Canal, particularly after a catastrophic failure such as the south breach. The hydrograph referenced by Spinks, however, shows that the water in the Industrial Canal continued to rise -- at the same rate -- for at least two hours after 5:30 a.m. This hydrograph does not reflect any sort of catastrophic breach at or around that time, as is assumed in the Spinks modeling approach. To be valid, the modeling must match the actual timing of the breaches. However, as indicated above, the timing of the breaches along the Industrial Canal used in the modeling have no support in the data sources. None of the available analyses place the northern breach as early as 4:00 a.m. on the 29th. Also, none place the southern breach as early as 5:30 a.m. Those breach times are inconsistent with the surge hydrograph observations referenced by Spinks in his report.

## 3.4.   INACCURACY OF CALIBRATION

The accuracy and reliability of the modeling also depends upon the degree to which the model is calibrated. Calibration involves comparing model predictions with observations to assess the success of the model. No direct measurements of the time history of the elevation of flood waters are available for the area modeled. The time history data that do exist are indirect and subjective indications of flooding; stopped clocks and eyewitness observations. These data

16

are compared with the model predictions in Figure 9 of the Spinks report. As shown in the Figure, at sites C1 and C2 differences between the data and the predictions of up to 2.5 feet occur during the early flooding. At the low level of flooding occurring at this time, this represents and error of about 25 %.

A second comparison of data and model predictions is shown in Figure 11 of the report. The data shown are high water marks. Comparing the data and the modeling results shows the model predictions to be consistently too high. For the class area, made up of Areas 1 and 2 in the Figure, the predictions are generally about 2 ft too high. This consistent overprediction of flood depths, when compared to measured levels, is particularly egregious because the measured levels will also take into account wave-driven water that is not included in the model. Where waves were involved in establishing the observed high water marks, the variance between modeled results and actual results would be even more severe.

## 3.5.   UNRELIABILITY OF MODELING RESULTS

Given the neglect of several essential hydrologic processes, the large error contained in the timing of the north and south breaches, and the large errors contained in the calibration, the modeling results provide by Spinks are not a reliable or accurate basis for assessing source or extent of the flooding or damage to buildings in the class area caused by Hurricane Katrina.

## 4. ANALYSIS OF CLASS HYDROLOGIC ISSUES

The existing data, official governmental reports and modeling indicate that properties in the class area were subjected to a variety of hydrologic processes that varied in time during the storm, and, at any one time, varied over the class area. Thus each building in the class area was subjected to a distinct combination of storm winds, rainfall, waves, rising water, flowing water and debris, and maximum flood depth. These separate factors each had an effect on individual buildings that depended upon the location of the building within the class area, its proximity to the various sources of flooding, the local land cover, local drainage, flow paths of water surrounding the building, and the initial elevation of the building.

This section of the report provides a detailed analysis of the hydrologic issues pertaining to the proposed class area.

## 4.1.   BUILDING DAMAGE CAUSED BY FLOODING

Plaintiffs assert that property damage in the class area resulted from flooding caused by breaches in the Industrial Canal (Plaintiffs' Motion, 2008, p 2). This is incorrect. A careful examination of the impact of the Hurricane Katrina on the class area shows that buildings were subject to a variety of storm related factors including winds, rainfall and waves. Winds and rainfall affected the buildings in the class area for hours before any flooding occurred. Wind

17

speeds were of hurricane force before 7:00 AM on the 29th. This is before any significant flooding occurred in the class area. By 9:00 AM on the 29th, before many locations in the class area would have had appreciable flooding, all the buildings in the class would have been subjected to hours of hurricane wind forces. Several residents reported wind damage occurring during the hurricane (Offray, p 73 & 74; Reed, p 20; Jones, p 23; Berryhill, p 37; Mumford, p 89, 90 & 100; Koch, p 126-134 & 149-150; Richardson, p 19, 80 & 135; Harris, p 79).

Rainfall fell onto the wind affected buildings for hours before breaches occurred. This rainfall would have had damaging effects on buildings already damaged by winds. Testimony by class representatives provides examples of this phenomenon (Reed, p 19; Riche, p 86 & 87; Mumford, p 89 & 90).

Storm waves generated within the class area by the storm winds existed and caused lateral force on buildings. These forces would have affected the buildings at a height above the still water elevation at any one location and time.

Flowing water in the class area would affect buildings by causing lateral forces. The flow velocity and forces on a building would be highest near the north and south breaches and would decrease with distance away from the breaches. Water flow would also be concentrated and accelerated by the presence of presence of other buildings surrounding the building. The forces associated with flowing water would occur during the rising of the flood waters, before the maximum flooding occurred. Debris carried by the flowing water would have added to the effect of the flowing water. Again, several eyewitness reported the sideways movement of floating buildings and the presence and effects of floating debris on buildings in the class area (Sartin, p 54 & 55; Adams, p 26 & 29; Villavasso, p 59 & 68; Johnson, p 45, 46 & 52; Jones, p 29 & 30; Williams, p 57-60 & 74-75; Murph, p 49, 64, & 149; Berryhill, p 37; Pounds, p 31, 48, 49, 55 & 116; Harris, p 84).

There were, moreover, multiple sources of flooding, including not only the separate north and south breaches along the Industrial Canal, but also the MRGO breaches, overtopping and seepage, and other sources detailed in the IPET, ILIT, and Team Louisiana reports.

Given the documented occurrence of multiple storm related factors affecting the class area it is clear that flood waters were not the only factor affecting buildings in the class area and that flood damage was not the common cause of damage.

4.2.    FLOODING CAUSED BY BREACHES IN INDUSTRIAL CANAL FLOODWALLS

Plaintiffs assert that damage from Hurricane Katrina and levee failures provide common elements across the class in terms of the types of damage and causes of damage (Kilpatrick Affidavit, p3).  Plaintiffs also identify as common the effects of breach related flooding in the affected area (Kilpatrick Affidavit, p3).

18

The major sources of water that flooded the class area is from breaches along the MRGO and not the breaches in the Industrial Canal floodwalls. In other words, the maximum elevation reached by the flood waters would have been essentially the same as was observed if the Industrial Canal Breaches would not have occurred. The flooding related to the breaches in the Industrial Canal caused some initial flooding in portions of the class area (though much less than Mr. Spinks generates by choosing unsupported early times for the Industrial Canal breaches). But by 10:00 AM the class area was inundated by water from the breaches in the MRGO levees and water continued to rise for several more hours. Maximum water elevation was reached sometime after noon on the 29th.

Plaintiffs' contention that flooding resulting from Industrial Canal breaches was a common effect also fails to acknowledge that the breaches were two separate events. The consensus is that north breach preceded the south breach by several hours. Furthermore there is evidence that the breaches were caused by different mechanisms. Also, the different sizes and locations of the breaches would have had different and distinct hydrologic effects on the buildings in the class area.

Taken together these facts indicate the Industrial Canal breaches were not identical in their character nor did they have a common effect on the flooding and buildings in the class area. The Spinks model fails to take the separate breaches into account, and fails to allow for separate consideration of the contribution of each of the two breaches. This failure constitutes another reason why the model cannot possibly assess property damage on a "common" basis across the proposed class.

## 4.3.    DEPTH OF FLOODING

A key element in the argument for class treatment of the damage occurring in St. Bernard Parish and the Lower Ninth Ward was the availability of maps that purport to show the extent of the flooding that was the chief cause of the damages (Kilpatrick Affidavit, p12). These maps are not specified, but if they are of similar character to the maps provided by Spinks, they portray flood depth above ground. The depth above ground is the difference between the water elevation and the ground elevation. Both of these elevations are subject to large errors associated with the topographic data used in the model and the inaccuracy of the flood elevation hindcasts. The flood depth is not common or uniform over the class area, nor does it represent the various causes of damage affecting buildings in the class area. Flood depth over ground does not account for the damage associated with winds, rainfall, waves and flowing water. And the greatest depth of flooding over ground level is the result of the breaches along MRGO, which were responsible for the maximum depth of water.

In light of the evidence it is clear that the depth of water above ground is not related to all of the damage caused by Hurricane Katrina to the buildings in the class area and the values provided by modeling are subject to large errors.

19

## 4.4.    HYDROLOGIC DAMAGE CRITERIA

A major discrepancy is contained in the plaintiff expert reports regarding the relationship between flooding and property damage. Mr. Kilpatrick states that the depth of flooding of the class has been mapped and provides evidence relevant to determining the extent and cause of damages (Kilpatrick Affidavit, p5). He also cites a Corps of Engineers report as a rationale for area wide evaluations of flood damage based upon depths of flooding (Kilpatrick Affidavit, p6).

The maps provided by Mr. Spinks show the temporal and spatial variations in the flooding in the class area. The parameter provided by Mr. Spinks is the depth of flooding over ground. Variations in this value over the class are provided. Also provided by Mr. Spinks are tables and graphs relating the water depth at a building to the percent damage for 2 different types of buildings; one story and two stories. He indicates, for reference purposes, that damage estimates for homes and businesses in the class can be ascertained using depth damage curves provided by the U. S. Army Corps of Engineers in a 2003 report.

The tables referred to by plaintiffs that relate the water depth and damage are not useable with the data provided by Mr. Spinks nor are they the correct information to be used for hurricane flooding. The depth specified in the Corps report and needed to use the graphs is the depth of flooding over first floor of the building. This definition of the flood depth is indicated in the Spinks report. This depth value is not the same as the depth of water over ground. In order to use the referenced tables, the elevation of the first floor of a particular building would be required. Thus the damage assessment referenced is by its essential feature, building specific, and would require the elevations of the first floor of each building to be assessed for damage.

In a discussion with Mr. David Moser, Chief Economist with the Corps Institute of Water Resources, he indicated the data referenced in the Spinks report was not appropriate for salt water flooding of long duration. The methodology used by the U. S. Army corps of Engineers for calculating flood damage for Hurricane Katrina was also based upon the depth of flooding above the first floor of the building (IPET, pVII-23). Damages from flooding were calculated based upon depth-damage relationships developed by a panel of building and construction experts that related to salt water flooding with a duration greater than 2 days (IPET, p VII-23).

Based upon the methodology referenced by the plaintiff, the proper depth of flooding, i.e. the depth over the first floor, has not been mapped and therefore the referenced methodology does not provide a basis for class area evaluations. Rather the methodology for assessing flood damage is properly based upon the first floor elevation of each individual building being evaluated.

## 5.  SUMMARY OF CONCLUSIONS

Based upon a careful review of existing technical data, reported field observations, the application of standard hydrologic analytical methods, and my personal experience analyzing coastal hydrologic and flooding processes for over 30 years, it is my opinion that:

1) The proposed class area was subjected to a wide variety of storm related processes during Hurricane Katrina including winds, rainfall, waves, and flood water that varied with location and time. The effect of these hydrologic processes on individual buildings in the class area depended upon their proximity to levees and floodwalls, the ground elevation, time during the storm, the rate of rise of water, the velocity of flow, and the maximum elevation of the flood waters.

2) Flood waters were not the only factor affecting buildings in the class area and flood damage was not the common cause of damage to buildings.

3) The north and south breaches on the Industrial Canal breaches were not the primary cause of flooding in the class area nor did they have a common hydrologic effect on the buildings in the class area. The effect of these two breaches, vis-à-vis each other and as compared with the other breaches and sources of water that affected the class area, cannot be evaluated on a common basis across the proposed class.

4) The depth of flood water above ground is not related to many of the causes of damage to buildings in the class area during Hurricane Katrina and it not an adequate hydrologic basis for assessing hydrologic damage to property.

5) Modeling of the depth of the depth of the flood water in the class area was subject to large errors and provided unreliable results.

6) The relationship between flood depth and damage referenced by plaintiff is based upon the depth of flooding above the first floor of the building, and not the depth of water over ground, hence the data needed to assess flood damage has not been mapped.

7) The hydrologic causes of damage to individual buildings in the class area, especially the depth of flooding over the first floor, were site specific, and therefore there was no uniformity or commonality to the causes of flood damage to buildings throughout the class area.

8) I reserve the right to modify my conclusions in the case that new or additional information becomes available in the future.

## 6. REFERENCES

LEGAL DOCUMENTS

Plaintiff's Motion to certify the Class and Subclasses, to appoint class council, and to approve Plaintiff's Proposed Trial Plan, Document 13166, Filed 5/15/2008.

Class Action Complaint, Document 1, Filed 11/14/2005.

Depositions

Andrew Sartin, deposition on April 11, 2008.

Arthur T. Murph, deposition on December 17, 2007.

D'Antoinette Marie Jiohnson, deposition on December 11, 2007.

Daketa Johnson, deposition on April 9, 2008.

Ernest Joseph Offray, deposition on February 19, 2008.

Ethel Mae Coleman Mumford, deposition on August 5, 2008.

Herman Koch, deposition on August 8, 2008.

James R. Reed, deposition on February 28, 2008.

Jimmie Donnell Harris, deposition on August 4, 2008.

Josephine Richardson, deposition August 11, 2008.

Kendrick Ray Pounds, December 11, 2007.

Michael Joseph Riche, deposition on August 6, 2008.

Sally Ann Sheppard Susan Oster Jones, deposition on April 2, 2008.

Sidney Williams, deposition on February 19, 2008.

Terry Mark Adams, deposition on November 13, 2006.

William Joseph Villavasso, deposition on December 18, 2007.

TECHNICAL REPORTS AND DATA

Coastal Engineering Research Center, Shore Protection Manual, Volume I, Department of the Army, 1984.

Google maps website for spatial information

Independent Levee Investigation Team, Investigation of the Performance of the New Orleans Flood Protection Systems, Final Report, July 31, 2006.

Knabb, R., J. Rhome and D. Brown, Tropical Cyclone Report – Hurricane Katrina 23-30 Au8gust 2005, National Hurricane Center, 20 December 2005.

Kok, M., M. Aalberts, B. Maaskant, and L. De Wit, Polder Flood Simulations for Greater New Orleans, Delft University of Technology, July 30, 2007

Team Louisiana, The Failure of the New Orleans Levee System during Hurricane Katrina, Report to Secretary Johnny Bradberry, La. Dept. of Transportation and Development, December 18, 2006.

U. S. Army Corps of Engineers, Performance Evaluation of the New Orleans and Southeast Louisiana, Hurricane Protection System,  Vol. IV – The Storm, March 26, 2007.

U. S. Army Corps of Engineers, Performance Evaluation of the New Orleans and Southeast Louisiana, Hurricane Protection System,  Vol. V – The Performance – Levees and Floodwalls, June 1, 2006.

U. S. Army Corps of Engineers, Performance Evaluation of the New Orleans and Southeast Louisiana, Hurricane Protection System,  Vol. VI – The Performance – Interior Drainage and Pumping, March 26, 2007.

U. S. Army Corps of Engineers, Performance Evaluation of the New Orleans and Southeast Louisiana, Hurricane Protection System,  Vol. VII – The Consequences, March 26, 2007.

U. S. Naval Observatory, Sun and Moon Data for One Day, August 29, 2005.

Wooten, R. Lee, Sources of Water in the St. Bernard and New Orleans East Basins During Hurricane Katrina, Document 8286-17, GEI Consultants, August 29, 2007.

# 7. APPENDIX

## 7.1. PROFESSIONAL QUALIFICATIONS AND PUBLICATIONS

Professional Qualifications

Resume is attached to this report.

List of publications in the past 10 years

Suhayda, J. N. Barrier shoreline feasibility study, Phase 1, Steps A-K and Final Report, Louisiana Department of Natural Resources, March, 1999.

Suhayda, J. N., M. Alawady, and V. Aravamuthan. Hydrologic modeling of the Barataria-Terrebonne estuary, Barataria-Terrebonne National Estuaries Program, July, 2000.

Suhayda, J. N. and C. Willson. Climatological and hydrologic conditions and trends in the upper Pontchartrain basin, Lake Pontchartrain Basin Foundation, August , 2000.

Suhayda, J. N., et al, Wetland Nourishment Module, Louisiana Coastal Area Study, Department of Natural Resources, State of Louisiana, August, 2003.

Suhayda, J. N., et al, Predicting Land Building in the Mississippi Delta, Louisiana Coastal Area Project, Department of Natural Resources, State of Louisiana, June 30, 2004.

Suhayda, J.N., et al, The Direct Impact of the MRGO on Hurricane Storm Surge, URS Report to the La. Department of Natural Resources, February 2006.

Suhayda, J. N., et al, Interaction of Hurricanes and Coastal Landscape features, URS report to the U. S. Army Corps of Engineers, August 7, 2007.

## 7.2. EXPERT TESTIMONY AND DEPOSITIONS DURING THE LAST FOUR YEARS

I was an expert for the defendant in the case of Harry Bourg Corp. v. Exxon Mobil Corp., et al. I was deposed on June 7, 2005.

I was an expert for the defendant in the case of the Harvey Term Litigation, Civil District Court for the Parish of Orleans No. 01-8708. I was deposed in 2005. I did not testify

I was an expert in the case of 4 C's v. Columbia Gulf. I was deposed on August 27, 2006

I was an expert in the case of Turner, et al, vs. Murphy Oil USA, Inc. I was deposed in 2006.

## 7.3. COMPENSATION

Compensation was based upon an hourly rate of $ 300/hr.

## 8. FIGURES

Figure 1.  Shows the ground elevation in the region bounded by the St. Bernard hurricane protection system.



Elevation  -5 ft    0 ft    5 ft    10 ft

Regional Area

Figure 2.  Shows detailed ground elevation in the proposed class area.



Elevation

-5 ft · 0 ft · 5 ft · 10 ft

Local Area Detail

Floodwall Overtopping & Breaches

A

A'

B

B'

Rail Road Embankment

40 Arpent Levee & Wall Overtopping

Paris Road

Figure 3. Shows ground elevation along sections A-A' and B-B'.  Section locations are indicated in Figure 2.

