# EXHIBIT 5
## Part 1



Civil
Structural
Mechanical
Electrical
Marine

P.O. Box 792745    504 304 0548
New Orleans, LA 70179-2745    www.infinityec.com

August 26, 2008

## EXPERT REPORT OF WILLIAM THOMASSIE CONCERNING CLASS CERTIFICATION

Re: Katrina Canal Breaches Consolidated Litigation
    Civil Action No. 05-4182
    Pertains to: BARGE
    Our Project No. 06-169

This document is the expert report of Infinity Engineering Consultants (William Thomassie) regarding the project referenced above, which concerns evaluation from a structural engineering standpoint of plaintiffs' contention that the issue of property damage is a "common" issue for the proposed class. A separate addendum records the results of inspections of the proposed class representatives' properties. Infinity Engineering Consultants provides services in this matter as an independent professional. Findings presented herein are based solely upon the evidence offered, without bias or prejudice to any party or interest in the claim.

### Background

The subject of this report centers upon property damages encountered as a result of the events of August 29, 2005 during and immediately following the passing of Hurricane Katrina. During this event, widespread flooding inundated portions of the Greater New Orleans area. Of particular interest to this study and report is damage to the residential neighborhood commonly referred to as the Lower 9th Ward in Orleans Parish and the surrounding area. This neighborhood is roughly bounded by the Inner Harbor Navigation Canal (IHNC), the Mississippi River, the 40 Arpent Canal along Florida Avenue, and the St. Bernard Parish line. A class certification area has been proposed by the plaintiffs in the case that includes the Lower 9th Ward but extends the eastern limit to Paris Road in Chalmette.

Two flood wall failures were documented along the east side of the IHNC on August 29th. One, referred to as the "north breach" and the smaller of the two, occurred between Florida Avenue and Law Street. A second, referred to as the "south breach", occurred between North Roman and North Johnson Streets. At the south breach, a river barge was found to have entered into the neighborhood through the breach, ultimately coming to rest approximately 1 block inland at Jourdan Avenue and North Roman Street. It has been theorized by others that this barge may have initiated the either one or both breaches. Furthermore, it has been documented that flood waters entered the class certification area from other sources, including the overtopping of the protection levee along the 40 Arpent Canal.

Infinity Engineering Consultants was retained by Chaffe-McCall as counsel for Lafarge North America Inc. to review the property damage documented within the proposed class certification area and to determine whether there is a basis to evaluate the cause and extent of structural damage to buildings in the area on a class-wide basis, particularly with regard to the effects of the IHNC flood wall breaches. The findings of this investigation are presented herein.

### Executive Summary

This report presents an opinion on the common vs. individualized nature of the causation and extent of damages to individual and collective buildings within the class certification area, which is bounded by the IHNC, Mississippi River, 40 Arpent Canal, and Paris Road.

Physical damages were studied through direct inspection, inspection of aerial photographs, inspection of ground level photographs, and inspection of ground level videos.

Katrina Canal Breaches Consolidated Litigation
Civil Action No. 05-4182
Pertains to:  BARGE
Expert Witness Report
Page 2

This report presents and illustrates three key findings:

1.  Through the study, specific damages were observed, each with a different causation.  This
    included damages resulting from wind, rain, impact, rising water, rushing water, and fire.  In some
    instances, the cause of damage is readily evident and is discernable to be primarily due to one
    factor.  In other cases, the damage resulted from several contributing causes such that it is not
    possible to clearly differentiate between each.

2.  The performance of each building structure was an individual variation depending upon the
    unique features of each building.  Among the major variables that influenced performance were
    foundation (concrete slab, raised pier with crawl space, etc.), size (single story, two story, etc.),
    building materials (wood framed, steel structure, masonry cladding, masonry framed, etc.), design
    (craftsman designed, engineered, etc.), age and maintained condition.

3.  The existence and extent of the damages also differed depending upon location within the class
    action area.  Structures located within the immediate vicinity of the two breaches (approximately
    12 square block area at the south breach and an approximately 8 square block area at the north
    breach) were completely demolished with few exceptions.  It is believed that this damage is
    clearly related to rushing water that passed through the breaches.  Beyond this area, the damage
    was widely varied.  Given an exposure to similar environmental conditions (i.e. high winds and
    flood waters), there was no consistent pattern or extent of damage.  Examples of buildings that
    did not remain standing through the event were found near buildings that survived.  Examples of
    buildings that suffered extreme damage to roofing systems were found among many other
    buildings whose roofing system remained relatively intact.  Examples of buildings that suffered
    damage due to fire were found in several areas where the most did not encounter fire.

Damage assessments to individual properties can only be made on a building by building basis.  Based
upon the findings presented within this report, it is not possible to assign a uniform formula to measure
the damages sustained by any building.

Supporting photographic evidence of the above is presented in Attachment "A" to this report.  Inspections
of the 12 representative properties presented for the class are discussed in Attachment "B" to this report.

Limitations of Scope

This report is limited to an evaluation of the physical conditions of building structures in the vicinity of the
Lower 9th Ward that resulted from the effects of August 29, 2005.  This includes the region defined as the
class certification area, which is bounded by the Inner Harbor Navigation Canal, the Mississippi River, the
40 Arpent Canal, and Paris Road in Chalmette.

This report is not intended to address any of the following:

1.  Potential causes of the flood wall and levee failures;
2.  Damages other than to building structures, such as automobiles, utilities, streets, etc.; and
3.  Economic measures of damages; and
4.  Other forms of alleged damages (emotional distress, personal injury, social damages, etc.).

Katrina Canal Breaches Consolidated Litigation
Civil Action No. 05-4182
Pertains to: BARGE
Expert Witness Report
Page 3

## Qualifications

Infinity Engineering Consultants, LLC is a consulting engineering firm that specializes in civil, structural, mechanical and marine engineering. The firm was founded in 2004 by William Thomassie, P.E. and Raoul Chauvin III, P.E. and is based in New Orleans. Mr. Thomassie is registered as a licensed Professional Engineer in the states of Louisiana, Texas, Mississippi, Ohio, Pennsylvania and West Virginia. Mr. Thomassie has over 15 years experience designing and managing construction of projects that include structures such as those involved in this claim. His experience also includes projects that involved providing engineering support for damage resulting from Hurricanes Katrina and Rita involving residential buildings, commercial buildings, industrial facilities and municipal infrastructure. A copy of his resume is attached.

Mr. Thomassie has testified as an expert at trial once within the preceding four years, and has not been published. Mr. Thomassie was retained as an expert witness for engineering matters in two separate cases in the United States District Court, in which he provided deposition testimony. In November 2007, Mr. Thomassie testified in U.S. District Court Section M as an expert witness concerning engineering matters. Mr. Thomassie also submitted an affidavit (approximately 2003) in a FERC proceeding involving Trunkline LNG to discuss and defend the "Ship Traffic Study on the Calcasieu River", a report that was filed following a study performed for Trunkline LNG as it pertained to the expansion of their Lake Charles LNG facility.

## Fee for Services

Our fee for expert witness services is being provided on a time & materials basis. Compensation for Mr. Thomassie's time is at the rate of $**150.00** per hour. Compensation is not contingent on any outcome.

## Information Furnished

The following information was furnished for the purposes of the subject investigation:

   a. DVD videos taken from ground level of the subject area as recorded by Centanni Investigative Agency

   b. CD of aerial photos (Arabi, St. Bernard Parish, 40 Arpent Canal, Bayou Bienvenue, MRGO), photography by Centanni Investigative Agency, 11/15/2005

   c. CD of aerial photos (Arabi, St. Bernard Parish, 40 Arpent Canal, Bayou Bienvenue, MRGO), photography by Centanni Investigative Agency, 5/12/2006

   d. Documents and discovery responses produced by representative plaintiffs

   e. Plaintiffs' complaint and motion for class certification

   f. Depositions of representative plaintiffs

Katrina Canal Breaches Consolidated Litigation
Civil Action No. 05-4182
Pertains to:  BARGE
Expert Witness Report
Page 4

## Description of Geographic Area

The subject area is the proposed class certification area, which is generally described as the Lower 9th Ward and its vicinity up to Paris Road in Chalmette.  This region is geographically bounded by the IHNC to the west, the Mississippi River to the south, Florida Avenue and the 40 Arpent Canal to the north, and Paris Road in Chalmette to the east

This area is generally rectangular in layout, measuring approximately 4.0 miles in length from east to west, 1.6 miles wide from north to south at the IHNC and 2.2 miles wide at Paris Road, encompassing approximately 7.6 square miles.

Within the Lower 9th Ward area, all of the streets are relatively uniformly spaced apart in a grid and are oriented in a general north-south or east-west direction.  From the IHNC to approximately 0.8 miles to the east, the streets are on a grid that parallels the IHNC.  Here, at Alabo Street, the grid changes abruptly by approximately 5 degrees as the street directions are reoriented along a new parallel.  The Lower 9th Ward and the eastern limit of New Orleans is physically separated from St. Bernard Parish by the Jackson Barracks.  The Barracks are on a narrow tract of land that is perpendicular to the Mississippi River and extends to the 40 Arpent Canal.

St. Bernard Parish begins on the opposite side of the Jackson Barracks from the Lower 9th Ward, beginning with Arabi and neighbored by Chalmette.  Approximately 4 blocks from Jackson Barracks, a railroad track running in a north-south direction presents a physical dividing berm, but there are drainage culverts that interconnect the two sides hydraulically.  Arabi is approximately 1.0 mile long and 1.9 miles wide, and then Chalmette is approximately 1.9 miles long up to Paris Road where it is then 2.3 miles wide between the river and the 40 Arpent Canal.

The general topography of the area is such that the highest ground occurs at the river and trends to lower elevations towards Florida Avenue and the 40 Arpent Canal.  In general, the area nearest the river is at approximately 5 feet above sea level, whereas the areas closest to Florida Avenue are at approximately 3 feet below sea level.  This cross section is relatively consistent from the IHNC to Paris Road.  However, the average elevation in Arabi and Chalmette tends to be 1 to 2 feet higher than the average in the Lower 9th Ward.

## Structures

The structures found within the class area vary and include residential, municipal, commercial and industrial buildings.  Much of the area is residential.  Along the major east-west thoroughfares of St. Claude/St. Bernard Highway, North Claiborne/Judge Perez Boulevard, commercial buildings are found, mostly small in size.  Several school campuses are found in the Lower 9th Ward, including Holy Cross High School, Alfred Lawless High School, and Martin Luther King Jr. School.  Jackson Barracks, a military base, includes various commercial and industrial buildings.  Several small church buildings are also found within the Lower 9th Ward, some of which were converted residences.  Many modern commercial buildings are found along Judge Perez and Paris Road in Chalmette.

The residential buildings within the class area vary greatly in age and construction.  The oldest buildings are found nearest the river on the highest ground within the Holy Cross neighborhood, around Jackson Barracks, and into the Friscoville area of Arabi.  Many of these buildings were constructed in the late 19th and early 20th centuries and are typically wood framed on raised pier foundations.  Some of these houses were constructed with a basement at ground level, such that the living area was one floor above ground.

Katrina Canal Breaches Consolidated Litigation
Civil Action No. 05-4182
Pertains to:  BARGE
Expert Witness Report
Page 5

The remainder of the residential buildings was constructed over a wide period of time, from the early 20th century to immediately before August 29th, 2005.  Construction and architecture styles vary greatly throughout.  Most residences are wood framed construction.  In the Lower 9th Ward, a significant number were constructed of concrete and masonry, including some that were "mixed" with masonry lower levels and wood framed upper levels.  Foundations varied from concrete slabs to raised piers.  Architectural styles varied from the traditional "shotgun" house, which is generally one room wide and several rooms long, raised on a pier foundation, and covered with wood siding, to the more modern "ranch" style home which is typically more square in foot-print, single story, on a slab foundation, and often finished with a brick façade.  A number of two-story structures were found throughout the area, but were not as prominent in number as one-story buildings.

Most of the buildings within the Arabi and Chalmette areas were post-World War II era suburban tract homes.  In contrast to the Lower 9th Ward, neighborhoods in Arabi and Chalmette are more uniform in construction type and age.

An exact and complete statistical inventory of the residential buildings was not made as part of this study.

Damage Inspections

Damage sustained in the subject area as a result of Hurricane Katrina was ascertained by several methods, including direct inspection, inspection of aerial photographs, inspection of ground level photographs, and inspection of ground level videos.  The undersigned first visited the area on October 8, 2005, prior to being contracted to perform this study, and then performed several site visits after being contracted.

Photographic evidence was available for periods prior to and following August 29, 2005.  This included photographs taken when the area was flooded, after it was dewatered, and after the majority of the structures had been cleared and debris removed.

In addition to a study of the overall class area, individual property inspections were performed on twelve specific properties that have been declared as representatives in the class action lawsuit.  The purpose of the inspections was to investigate the structural performance of each building as it pertains to the subject matter of this report.  These inspections were performed between July and August, 2008 and the results are presented in Attachment "B" to this report.

Multiple Causes of Structural Damage Observed

The first key finding of this report is that the events of August 29, 2005 present multiple potential causes of damage to structures within the subject area.  A discussion of each follows:

- Wind:  Wind speeds during Hurricane Katrina within the subject area were reported to be in the neighborhood of 80 miles per hour with stronger gusts.  Wind exerts both horizontal and vertical forces on a structure, which will vary depending upon its size and shape.  Horizontal forces are realized on exterior walls and on roof projections.  Vertical forces are realized on roofs, typically in the form of uplift.  High wind speeds typically cause damage to roofing systems, such as the removal of shingles and membranes (Photos 14 and 39).  Wind forces can also cause major damage to structural components, such as the toppling of a wall (Photo 41), or the lifting of a roof from its base (Photo 13, building C).  In extreme cases, an entire building may collapse due to wind.  Objects lifted by wind become projectiles and can cause damage to structures that are struck.

Katrina Canal Breaches Consolidated Litigation
Civil Action No. 05-4182
Pertains to: BARGE
Expert Witness Report
Page 6

- Driven Rain: Rainfall during Hurricane Katrina was propelled by the winds noted above. Rain water can cause damage in several different ways. Primarily, rain water can enter a building from above through roof damage that may have resulted from wind. Driven rain water can also enter a building through unintended routes, such as through cracks in siding, through broken windows, or through other paths that do not protect from water being driven sideways.

- Flooding: Rising water during Hurricane Katrina reached levels that varied from approximately 5' above natural grade near the river at Holy Cross (Photo 14) to approximately 15' above natural grade at the lower lying areas near Florida Avenue (Photos 17, 20 and 21). Flood waters can physically damage a building structure by ruining the architectural finishes, such as wall-board, cabinetry, doors, windows, etc. This damage may include the wetting of dry materials or the blemishing of contacted surfaces. Flood waters can also cause a building to float and may result in it being shifted or completely removed from its foundation (Photos 29 and 30). Further damage can occur once the flood waters have receded by the growth of mold and other biological matter. Flooding damage may have been incurred in connection with Hurricane Rita, which caused water to enter the area in September 2005.

- Moving Water: Water entering the subject area, whether from the north breach, the south breach, or from overtopping the levee along Florida Avenue, resulted in moving water. Moving water exerts horizontal forces on a structure and can cause a structure to shift from its foundation or can cause the structure itself to fail and perhaps collapse (Photos 7 through 11 and Photo 15). Moving water can carry debris into other structures, inflicting further damage and in some instances resulting in the total collapse of the structure being impacted.

- Impact: Structures can be impacted by trees falling (Photo 13) or other buildings being displaced into another (Photo 22).

- Fire: Fires can result when a building is damaged (Photos 31, 34, and 36 ), which may result from electrical failures, gas supply ruptures, and lightning strikes.

- Other Causes: Other sources of damage to a building that may have occurred indirectly as a result of Hurricane Katrina may include damage inflicted during search and rescue operations, such as induced wind from rescue helicopter propellers, damage due to forced entry into a building, arson and looting.

- Pre-existing Damage: Buildings were certainly subject to pre-existing damage, to some degree. This would include damage due to neglect or lack of maintenance, such as roofs that are in poor condition, wood decay and rot, damage due to termites, foundation settlement over time, and other conditions that result in a weakened structure. Buildings differed in condition prior to the storm (Photos 22 and 37). This was found to be a clear contributing cause to the relative performance of one building versus another even given similar circumstances.

There are many causes and sources of damage in the area such that a single cause cannot be assigned to all, nor can an equal and uniform combination of causes be assigned. The potentially damaging environmental factors listed above (wind, rain, flooding, moving water) was not uniform throughout the geographic area of this study (discussed later in this report). Therefore, each separate building or structure has to be evaluated for its own individual situation and unique set of damages, both with regard to the cause and the extent of the damages.

Katrina Canal Breaches Consolidated Litigation
Civil Action No. 05-4182
Pertains to: BARGE
Expert Witness Report
Page 7

Specific Damage Based on Building Structural Features

The second key finding of this report is that the performance of each building structure varied on an individual basis depending upon the unique features of each building. It can be clearly seen from the evidence that the damage to each respective structure was influenced both by the structural features of the building and, in the case of certain locations, by proximity to the two floodwall breaches. Proximity is discussed later in this report. This section will focus on structural features.

The structural performance of residential buildings during the events of August 29, 2005 in many instances was linked to their construction style and overall quality. Through this study the following key factors were noted:

- Age of construction: It was found that newer buildings performed differently than older buildings. Newer homes constructed within the last 15 years would be subject to modern building codes, which include stringent requirements for bracing and interconnection between building components. Such requirements include the use of "hurricane clips" to strap roof framing to the building as well as the anchoring of the building framing to the foundation. Older homes rely solely upon nailed connections and were typically constructed without any physical connection to the foundation. The net result is that newer buildings were inherently stronger than older buildings (Photos 22, 25, 27 and 38).

- Type of foundation: It was found that buildings constructed with slab foundations tended to perform differently than those with raised pier foundations when subject to flooding. Furthermore, buildings with raised pier foundations that had an enclosed crawl space beneath the house (such as would be the case where the façade extends to ground level) fared better than similar buildings with an open crawl space. It is apparent that raised pier buildings were more vulnerable to the effects of both rising water and moving water. However, raised pier buildings with enclosed crawl spaces appeared to be less vulnerable to the effects of moving water (Photos 12, 13 and 15).

- Size of building: It was found that multi-story buildings generally fared better than single story buildings when subject to flooding (Photos 7 and 8). One plausible theory as to why they performed better is that a multi-story home weighs more than a single-story home, which would counter effect the inherent buoyancy of the structure.

- Type of building construction: It was found that buildings that were constructed of masonry blocks and concrete fared better than wood framed buildings (Photos 8, 10, 18, 22 and 23). Typically, buildings constructed of masonry also benefited from other factors noted above, as many were two-story and had slab foundations.

- Building Design: Commercial and municipal buildings within the area performed significantly different from residential buildings. Commercial and municipal buildings typically are designed by professional engineers and architects and are subject to stricter code requirements than residential buildings. In many instances, a residential building is constructed by craftsmen without the aid of an engineer or architect. The net result is that commercial and municipal buildings are inherently stronger than residential buildings and typically performed better than residential buildings (Photos 16, 17, 19 and 20).

- Maintenance: Though the verification of preexisting condition of individual buildings is beyond the scope of this study, it is undeniable that the structural condition of a building in terms of how well

> it was maintained would have played a significant role in how it performed. Structures that were
> damaged by rot, decay, and wood pests would have been inherently weaker than structures that
> were not (Photo 22).

It is important to note that the structural performance was not uniform within any one of the subgroups
listed above. The buildings that are closer to the Mississippi River, such as the Holy Cross area (Photo 8)
represent some of the oldest buildings in the area. Yet, subjected primarily to wind forces, these older
buildings fared better than some of the newer buildings that experienced more extreme flooding
conditions. Similarly, while masonry construction may have proved to be inherently stronger than other
types, and commercial buildings may have typically been better engineered than residential buildings,
exceptions did occur (Photos 41 and 42).

### Specific Damage Based on Building Location

The third key finding of this report is that, in certain limited areas, specific damages to each building
varied depending upon its geographic location.

As described earlier in this report, the subject area of this study begins at the IHNC and extends east to
Paris Road in Chalmette. In the opposite direction, the subject area begins at the Mississippi River and
extends north to the flood protection levee, which is along Florida Avenue in New Orleans and the 40
Arpent Canal in Chalmette and Arabi. The two flood wall breaches along the IHNC occurred at the far
western end of this area.

In the most basic sense geologically, the land in this area was naturally created by the Mississippi River
as it deposited sediment beyond its banks. As such, the highest ground occurs at the river and trends
downward to the northern edge, which is where the flood protection levee runs along Florida Avenue and
the 40 Arpent Canal. In the absence of any drainage, retained flood waters would be shallower towards
the river and deeper towards the flood protection levee.

Flood water entered the area through the two breaches at the western end. It is generally understood
that flood waters also entered the area through the overtopping of the levees along the northern boundary
and from breaches along the MRGO. Rain and wind was relatively uniform throughout the area.

For the purposes of this study, rushing water is considered to be flood water that is flowing horizontally as
a result of differing water levels within an area. Water entering through the two breaches is considered
rushing water as the height of the water within the IHNC was higher than the level within the subject area
during the period of time that the storm surge was present. Water overtopping the flood protection levee
and the IHNC flood wall before the breach is also considered rushing water.

Correlations can be drawn between the structural damage observed throughout the subject area and the
specific location of the structure. From a broad geographic perspective, only two generalities were
observed. First, it is apparent that the rushing water entering the area through the north and south
breaches produced a distinct and localized area where few structures survived (Photos 2 through 11).
This very limited area in the immediate vicinity of the breaches is the only part of the class area where
damage tended not to vary from house to house. Second, areas that were deeply flooded tended to
result in more buildings that were displaced from their foundations. As the deeper water was in the lower
lying areas at the northern limit of the subject area, greater flood damage was found here. This type of
damage dissipates as one moves south toward the higher ground closer to the Mississippi River. Within
this larger area, however, the damage to homes was not uniform and varied on a house-by-house basis
as described above.

The following serves to describe in further detail some of the regions within the subject area:

Katrina Canal Breaches Consolidated Litigation
Civil Action No. 05-4182
Pertains to: BARGE
Expert Witness Report
Page 9

- North Breach:

  The north breach occurred between Florida Avenue and Law Street, and involved the failure of
  over 200 feet of flood wall. An area immediately east of the south breach was totally devastated,
  with the vast majority of the buildings being eradicated and almost all trees uprooted (Photos 5, 6
  and 10). This area of damage totality appeared to exist between Florida Avenue and Law Street
  (one block apart), from Jourdan Avenue to Forstall Street (four blocks apart, across Deslonde,
  Tennessee and Reynes). Within this area, all but perhaps three or four buildings were leveled
  and all trees were uprooted. It is evident that the moving water entering through the north breach
  and moving east demolished the structures and trees in the immediate vicinity. It is not clear to
  what extent the buildings may have been damaged prior to the influence of the moving water.

  To the south and east of this area, buildings remained standing but were severely damaged.
  Some were displaced from their original location by 50 feet or more, apparently towards the
  south, southeast, and east. To the north of Florida Avenue is a flood protection levee, the land
  beyond which was never developed. The damage pattern generally improves east of Forstall, but
  is not uniform. Many houses are found to be displaced while others remain standing. One
  notable anomaly occurs within the square bounded by Florida, Law, Caffin and Lamanche, where
  an island of houses fared better than others that surrounded them. Here, it appears that virtually
  all (twenty) of the buildings at least remained upright and in their original location, while three
  others were totally destroyed. Still further east and further from the north breach, the damage
  varies, in many instances worse than that observed in the anomaly described above.

  To the south of the north breach, the damage is severe but is not total eradication from Law
  Street to North Miro (four blocks, crossing North Dorgenois, North Rocheblave and North Tonti).
  The majority of the houses here were displaced, some by great distance, resulting in several that
  came to rest within the street. South of North Miro, the damage pattern begins to increase in
  severity, apparently due to the influence of the south breach.

- South Breach:

  The south breach occurred between North Johnson and North Roman Streets, and involved the
  failure of approximately 800 feet of flood wall (Photos 2, 3 and 4). At this location, the damage
  pattern to surrounding properties is more pronounced. From aerial photographs, it is evident that
  the damage is most extensive immediately in the vicinity of the south breach, and gradually
  diminishes over increasing radial distance.

  An area immediately near the south breach was totally devastated, with the vast majority of the
  buildings being eradicated and almost all trees uprooted (Photos 7 through 9 and 11). This area
  was found for the first two blocks east (inland) of the breach (from Jourdan Avenue, across
  Deslonde and up to Tennessee), and three blocks along the breach (from North Roman, across
  North Prieur and North Johnson, up to North Galvez.) In all, six square blocks are within this
  area. It is noted that this pattern of eradication appears to have been caused by water flowing
  inward to the east and trending towards the north, following the natural ground level elevations
  which are lower towards the north.

  Beyond the six block area described above, the damage pattern begins to diminish, albeit slightly.
  Perhaps for one additional block inland, from Tennessee to Reynes, and four blocks along the
  breach, from North Derbigny to North Galvez, it appears that half or more of the buildings within
  each block have been eradicated. In all, four square blocks are within this area.

> Beyond the four block area described above, the damage pattern continues to diminish, but is still severe. For one additional block inland, from Reynes to Forstall, and six blocks along the breach, from Claiborne to North Miro, houses remained standing but most were displaced greatly from their foundations. In all, six square blocks are within this area.
>
> Beyond the limits described above, approximately east of Forstall, south of Claiborne, and north of North Miro, the destruction does not appear to follow any specific pattern that can be clearly associated with the south breach.
>
> It appears that buildings fared better nearer the flood wall and further south (the area between Jourdan and Tennessee, south of the breach from North Roman and up to the Claiborne Bridge).
>
> Some significant anomalies were noted in the area near the south breach. Two buildings in particular survived, both on North Roman between Jourdan and Deslonde. These buildings are within the width of the south breach and are between 250 feet and 400 feet inland. They are both two-story buildings, and are of masonry construction on their lower floor. The buildings are both being repaired as of the date of this report.

Outside of the two zones in the vicinity of the north and south breaches described above, damage to structures varied on a structure-by-structure basis. Although a general pattern related to the depth of the water was observed, as noted above, there were marked variations within each area regardless of depth. There are regions where buildings are displaced from their foundations immediately adjacent to areas where this is not the case. In one area at the north east corner of the Lower 9th Ward, a number of buildings in the deepest water were not displaced while the next block to the south had many buildings displaced from their foundations (Photo 24). Just east of the Jackson Barracks in the area of the deepest flooding, most of the buildings remain standing with little structural damage  However, just 1 block west into New Orleans and four blocks west further into Arabi, buildings were displaced. (Photos 25 through 27, and Photos 29 and 30).

In short, within the first several blocks of the north and south breach, the vast majority of buildings were totally destroyed due to rushing water associated with the nearby breach. Beyond these immediate areas, the damage becomes varied such that no uniform pattern is observed.

Summary of Findings & Conclusions

In summary, the purpose of this study was to examine the structural damages within a geographic area that included the Lower 9th Ward of New Orleans, Arabi and Chalmette, from the Inner Harbor Navigation Canal (IHNC) up to Paris Road in Chalmette. These damages resulted from events associated with Hurricane Katrina, which occurred on August 29, 2005. Two floodwall breaches occurred along the IHNC at the western limit of the Lower 9th Ward. This study was tasked with determining any correlations in structural damage to buildings that could be specifically attributed to the affects of the IHNC flood wall breaches.

Through this study, three key points were reached:

1. Specific damages were observed, each with a different causation and extent. This included damages resulting from wind, rain, impact, rising water, rushing water, and fire. In some instances, the cause of damage is readily evident and is discernable to be primarily due to one factor. In other cases, the damage resulted from several contributing causes such that it is not possible to clearly differentiate between each.

2.  The performance of each building structure was an individual variation depending upon the unique features of each building. Among the major variables that influenced performance were foundation (concrete slab, raised pier with crawl space, etc.), size (single story, two story, etc.), building materials (wood framed, steel structure, masonry cladding, masonry framed, etc.), design (craftsman designed, engineered, etc.), age and maintained condition.

3.  The existence and extent of the damages also differed depending upon location within the class action area. Structures located within the immediate vicinity of the two breaches (approximately 12 square block area at the south breach and an approximately 8 square block area at the north breach) were completely demolished with few exceptions. It is believed that this damage is clearly related to rushing water from the breaches. Beyond this area, the damage was widely varied. Given an exposure to similar environmental conditions (i.e. high winds and flood waters), there was no consistent pattern extent of damaged realized. Examples of buildings that did not remain standing through the event were found near buildings that survived. Examples of buildings that suffered extreme damage to roofing systems were found among many other buildings whose roofing system remained relatively intact. Examples of buildings that suffered damage due to fire were found in several areas where most were not affected by fire.

The above findings are confirmed through the inspection of the 12 representative properties (Attachment "B"). This is demonstrated within the three properties inspected in the 6100 block of North Robertson, all within 100 feet of each other and all of similar construction and vintage. One property (6101) had no building on it prior to Katrina, having been demolished because of blight. Immediately next door (6105-07), a residential building was so badly damaged by termites (preexisting) that it likely cannot be repaired. Yet two doors away (6113-15), a similar building is almost completely repaired and is on the verge of being ready for occupancy.

There is also the question as to whether or not 12 representative properties accurately represent the breadth of the structural responses that have been documented throughout the class area. Geographically, the representative properties excluded the area near the breaches as the closest two were approximately 1 mile away. None were completely destroyed as was the case with many buildings near the breach, and none were displaced from their foundation. Most had been rebuilt and only one likely could not be rebuilt, which actually is the result of preexisting damage (termites) unrelated to the storm.

In conclusion, it is our opinion that there is only one very small area, in the immediate vicinity of the breaches, where any clear and uniform pattern of damage can be discerned. Beyond this limited zone, many variables begin to influence the damage sustained by any given building, and each has to be considered individually. Factors such as ground elevation, structure type, condition, construction materials, size, and age of the building all contribute to the specific damages that may occur. These factors are different and unique throughout the subject area.

It is impossible to treat the cause and extent of damage to structures in the proposed class area as a "common" issue. Assessments of the cause and extent of damage to individual properties can only be made on a building by building basis. Based upon the findings presented within this report, it is not possible to assign a uniform formula to measure the damages to any building.

***

Katrina Canal Breaches Consolidated Litigation
Civil Action No. 05-4182
Pertains to: BARGE
Expert Witness Report
Page 12

The opinions expressed in this report are based on the information that was available at the time.  We
reserve the right to revise our findings should new information come available.

Sincerely,

Infinity Engineering Consultants, LLC

William J. Thomassie, P.E.
Principal Partner

Encl.



Civil
Structural
Mechanical
Electrical
Marine

P.O. Box 792745        504 304 0548
New Orleans, LA 70179-2745    www.infinityec.com

## RESUME

### William J. Thomassie, P.E.
Principal Partner

| Personal | Professional Experience | Page 1 |
|---|---|---|

**Discipline:**

Civil/Structural Engineer

**Education:**

University of New Orleans
B.S. Civil Engineering 1992

**Registration:**

Professional Engineer

LA  27421
TX  90808
MS  17667
WV  15980
OH  71129
PA  74568

**Associations:**

American Society of Civil
Engineers

American Concrete Institute

University of New Orleans
Civil Engineering Advisory
Board – 2005 Chairman

### Infinity Engineering Consultants, 2004 to present
**Principal Partner**

Partner and Principal Civil/Structural Engineer responsible for the firm's civil and structural engineering business, project management, project team management, proposals, contracts, and cost estimating. Specific major project experience includes the following:

Storm Property Assessments – Principal and lead engineer for structural engineering inspections, evaluations and assessments for wind and flood related damage following Hurricane Katrina and Hurricane Rita. Property assessments included over 30 residential and commercial buildings located throughout Orleans, St. Bernard, St. Tammany and Plaquemines Parishes.

Plaquemines Parish – Chief Engineer for the rehabilitation of the sewer and wastewater systems for Plaquemines Parish following Hurricane Katrina and Hurricane Rita. Project involved coordination of repairs with F.E.M.A.

Port of New Orleans – Principal for the condition evaluation and assessment of all Industrial Canal Properties for the Port of New Orleans following Hurricane Katrina. Assessments included all structural, electrical and mechanical components of over 40 buildings located on 12 different properties. Project involved coordination of all assessments with F.E.M.A.

Washington Group (URS) – Principal for the design engineering of the new limestone barge offloading facility at Allegheny Energy's Fort Martin Power Station on the Monongahela River in Maidsville, WV. Project included the design of 10 new sheet pile river cells at a total estimated cost of $5.3 million.

Washington Group (URS) – Principal for the design engineering of the new limestone barge offloading facility at Allegheny Energy's Hatfield's Ferry Power Station on the Monongahela River in Masontown, PA. Project included the design of 1000 linear feet of sheet pile bulkhead and rock anchors at a total estimated cost of $7.2 million.

Shaw-Stone & Webster/American Electric Power – Principal for the design engineering of the new limestone barge offloading facility at CLECO's Rodemacher Station on the Red River in New Haven, WV. Project included the design of breasting piles, a new sheet pile river cell, and a steel and concrete dock platform at a total estimated cost of $4.6 million.

Shaw-Stone & Webster/American Electric Power – Principal for the design engineering of the new limestone barge offloading facility at American Electric Power's Mountaineer Station on the Ohio River in New Haven, WV. Project included the design of 20 new sheet pile river cells at a total estimated cost of $6.7 million.

RESUME
William J. Thomassie, P.E.

Professional Experience – cont.                                    Page 2

Black & Veatch/American Electric Power – Principal for the design engineering of the new limestone & gypsum barge facility at American Electric Power's Cardinal Station on the Ohio River in Brilliant, Ohio.  Project included the design of 15 new sheet pile river cells and a vehicular bridge at a total estimated cost of $7.2 million.

GulfLand Cement Terminal – Principal for the design engineering of the new Portland cement receiving and delivery terminal for GulfLand Cement on the Mississippi River in Waggaman, LA.  Project included the design of a new barge unloading facility, storage silos, bulk conveying equipment, and truck loading system.

Venice Port Complex – Principal for the design engineering and regulatory permitting for several sheet pile bulkhead rehabilitation projects on Tiger Pass (Mississippi River) in Venice, LA.  Project included the design of over 3,500 linear feet of sheet pile bulkhead at an estimated construction cost of $10 million.

Entergy – Principal for regulatory permitting assistance associated with the proposed ship and barge offloading facility at Entergy's Little Gypsy power station on the Mississippi River in Laplace, LA.

City of New Orleans – Principal for the structural condition inspection of the Wisner Bridge over Interstate 610 in New Orleans.  Project included documenting and cataloging structural condition and deficiencies for a 3/8 mile long concrete bridge, spanning 6 lanes of Interstate and 2 railroad lines.  Inspection was performed to LADOTD standards.

Plaquemines Parish – Principal for the Ollie Drainage District capacity evaluation project.  Project included the evaluation of runoff characteristics for a 3,000 acre basin and the evaluation of the adequacy of an existing pumping station with 5 pumps.

International Matex Tank Terminals (IMTT) – Principal for the design of a ship dock expansion at the IMTT terminal on the Mississippi River in St. Rose, LA. The project included the expansion of an existing dock platform, product hose tower, and the addition of approximately 8000' of methanol piping and associated manifolds from the dock to the tank terminal.

Retif Oil – Principal for the design engineering of a sheet pile bulkhead extension project for a fuel dock on the Intracoastal Waterway in Houma, LA.  Project was performed "design-build" with construction partner, Gulf South Piling.

Lugenbuhl-Wheaton-Peck – Provided expert witness services associated with a dock allision incident involving a liquid transfer dock on the Mississippi River.

Calcasieu Harbor Safety Committee – Principal for the engineering evaluation of mooring capacity for a proposed LNG ship berth to be constructed on the Calasieu River south of Lake Charles.  The project involved the evaluation of laboratory modeling data with simulation software to measure the effects of passing vessels, current and applied wind on an LNG vessel moored at berth.

Hilcorp Energy – Principal and lead engineer for the design of modifications to an existing oil and gas production platform in Timbalier Bay south of Fourchon, LA.

Stone Oil – Principal for the engineering evaluation and conceptual design for the installation of a hydraulic cargo handling crane on an existing fuel dock on the Mississippi River in Paulina, LA.

<u>RESUME</u>
William J. Thomassie, P.E.

Professional Experience – cont.                                    Page 3

<u>Plaquemines Parish</u> – Principal for the drainage system evaluation for the Lake Park Subdivision in Belle Chasse, LA.   Evaluation included video inspection of underground culverts, collecting topographic survey information, and evaluating the flow characteristics of the drainage basin.

<u>Associated Metal Components</u> – Principal and lead engineer for the structural design certification of various commercial metal building installations.

<u>Dredge America</u> – Principal for the design engineering and hydrographic survey for the maintenance dredging of the U.S. Coast Guard's Bucktown Station in New Orleans, LA.  Project included the GPS survey and layout of 2000 linear feet of channel to be dredged, as well as the design engineering of the fill placement area and dredge discharge.

<u>J.D. Fields & Company</u> – Principal for the sheet pile layout drafting and details for various sheet pile installation projects, including projects for Jefferson Parish, the U.S. Army Corps of Engineers, and the Port of New Orleans.

<u>Port Ship Service</u> – Principal for the design engineering of the new offloading crane to be installed at Port Ship Service's Arabi terminal on the Mississippi River.  Project included modifications to an existing dock platform to receive a 60 ton hydraulic crane used to load and ship stores.

<u>Grand Isle Shipyard</u> – Principal for the structural analysis and certification of various offshore transport modules to be used in the Gulf of Mexico.

<u>Magruder Truck Rentals</u> – Principal for the design engineering of the tenant build-out on a 5,000 sf commercial office/warehouse space.   Project included site modifications, structural additions, HVAC installation, and new power distribution.

<u>Coastal Cargo</u> – Principal for the evaluation and engineering design for the repair of a Port of New Orleans cargo dock on the Mississippi River.

<u>Jefferson Parish Alario Center</u> – Principal and Professional Engineer of Record for the structural and foundation designs required for the 33,000 sf Alario Center Expansion in Westwego, LA.

<u>Lanier and Associates Consulting Engineers, Inc., 1992 to 2004</u>
Senior Project Manager, Senior Civil/Structural Engineer

Senior Project Engineer and Manager responsible for civil and structural design solutions, project management, project team management, proposals, design-build operations, AutoCAD drawing development, specifications, permitting, bid documents, contracts, cost estimating.  Specific major project experience includes the following:

<u>Port of New Orleans</u> – Senior Project Manager and Lead Design Engineer for the Tenant Improvement portion of the Napoleon Container Terminal and Nashville Turnaround facilities within the Port of New Orleans.  This project was performed directly for P&O Ports and Ceres-Gulf as they made preparations for commissioning the Napoleon Avenue Container Terminal.  A multi-faceted project, it involved the permitting and/or design of various improvements, including infrastructure for transponder readers, communication antenna towers, gate access control, marshalling yard striping layout, fiber-optic communication systems, and other items.

RESUME
William J. Thomassie, P.E.

Professional Experience – cont.                                    Page 4

Port of Beaumont – Senior Project Manager for the Lot 10 pavement surfacing project. This was a publicly bid project involving the design and specification of four acres of asphalt paving, lime stabilized base, and associated drainage design.

Shell Chemical Company – Project Manager and Lead Design Engineer for the emergency breasting dolphin replacement project for the Mississippi River ship dock at Shell Chemical, Geismar, Louisiana. This $2,000,000 project was design-build in which Lanier was the prime contractor, responsible for the all construction contracts and material purchases in addition to the engineering. A critical element of this project was that the damage effectively shut-down the only ship berth at the plant. Accordingly, scheduling was crucial, and the project was completed within five months of award.

PetroUnited Terminals – Project Manager and Lead Design Engineer on a $6,000,000 marine terminal expansion project. Project entailed a new ship dock and two new barge docks to be constructed without impacting existing marine operations at the terminal. Project included a deep draft high capacity bulkhead with 40' draft.

Equilon – Project Manager and Lead Design Engineer for the marine portions of Equilon's Two-Rivers Project. The project involved the reconstruction of a dormant floating barge dock on the Ohio River in Mt. Vernon, Indiana, to be utilized as a hub facility for the distribution of gasoline and diesel. A second part of this project involved the modification of an existing floating barge dock on the Ohio River in Cincinnati, Ohio, to add the ability to receive gasoline and diesel.

Statia Terminals – Project Manager and Lead Design Engineer for the emergency structural repairs to the Statia Terminal Jetty on St. Eustatius Island, Netherland Antilles (Caribbean). This international project involved the total replacement of structures that were damaged in an allision involving a crude oil tanker at a cost of $3,000,000. A fast tracked project, the total project duration between the allision and completed repair was under eight months, including assessment, design, bidding, fabrication, and erection.

Mobil Oil Co. – Project Manager and Design Engineer for the new bulk coke shiploading facility in Beaumont, Texas. This was a joint venture "Design-Build" project successfully accomplished together with a local marine contractor. In order to meet the project's limited budget, recycled structures and surplus materials were used where practical, resulting in significant cost savings to the Owner.

CITGO Petroleum – Project Manager and Lead Engineer on a bulkhead replacement project in Linden, New Jersey. Project involved a deep draft design to 32', and required drilled and grouted anchor tendons which were secured to dock. Total construction cost was approximately $10,000,000.

CITGO Petroleum – Project Manager and Lead Engineer on a ship dock replacement project in Linden, New Jersey. Project involved the removal of several steel sheet pile cells, and required the installation of a full service ship dock facility, inclusive of structural, mechanical piping, and electrical power distribution. Total construction cost was approximately $3,500,000.

Bechtel Corp. – Lead Design Engineer for a new multi-dock facility for Mobil Chemical Co. in Beaumont, Texas. Provided conceptual engineering for the layout and final structural design of two dock platforms and control room platform which service barges and medium range chemical tankers. Due to the limited clear land along the plant's waterfront, a steel sheet pile bulkhead was utilized to reclaim approximately 35 feet of land to accommodate piping and vehicular traffic.

## RESUME
William J. Thomassie, P.E.

### Professional Experience – cont.                              Page 5

Trunkline-LNG – Lead coordinator for an extensive traffic and logistic study concerning the transit of Liquefied Natural Gas (LNG) cargo ships into and out of Port in Lake Charles, Louisiana.   The study researched the limitations and capabilities presented by the Calcasieu River corridor and the rules and regulations applicable to LNG transits in order to estimate the ability of the channel to support future traffic growth for LNG vessels considering growth estimates developed for all other industry.  This report was incorporated into Trunkline's FERC filing.

Dynegy – Lead coordinator for an extensive traffic and logistic study concerning the transit of LNG cargo ships into and out of Port in Lake Charles, Louisiana, for Dynegy's proposed Hackberry LNG Terminal.

Exxon-Mobil – Lead coordinator for an extensive traffic and logistic study concerning the transit of LNG cargo ships into and out of Port at Sabine Pass, Texas, for Exxon-Mobil's proposed Golden Pass LNG Terminal.

Horizon Offshore – Project Manager and Lead Design Engineer of the development of a new spooling base in Port Arthur, Texas, for offshore deep water pipelines. Project included the establishment of 2000' of spooling rack, the installation of 500 LF of sheet pile bulkhead, and the improvement of five acres of land with lime stabilized material.

BP-Amoco – Lead Engineer on a condition survey, inspection and report for BP-Amoco's marine docks at the Texas City Refinery in Texas.  The condition inspection included five ship docks and two barge docks.

Global Industries, LTD – Project Manager and Lead Design Engineer of the new marine facilities for the Carlyss Spool Base in Lake Charles, Louisiana.  Beginning with an undeveloped site, this project included the installation of 3300 LF of sheet pile and one million yards of dredging to create two new waterfront slips used to load offshore pipe line onto spooling vessels.  Total construction cost was approximately $15,000,000.

Shell Chemical Co. – Project Manager and Lead Design Engineer of the mooring improvement project for an existing barge dock on the Ohio River in West Virginia. Constructed in a mountainous region, the project included the design and installation of a new large diameter sheet pile cell and multi-level service platforms to provide offloading capabilities for a 45 foot range in river stage.

Neches Industrial Park, Inc. - Project Manager and Structural Design Engineer for a new dock facility in Beaumont, Texas. Provided turnkey engineering from preliminary design concepts through permitting, demolition, dredging and final construction.

Port Ship Service – Project Manager and Structural Design Engineer for a design-build project in which Lanier & Associates was the prime contractor for a new high-capacity hydraulic crane and platform at Port Ship Service's Violet, Louisiana facility on the Mississippi River.  This turn-key project included permitting, surveying, engineering, and construction.

Dearborn Mid-West Conveyor Company – Project Manager and Lead Engineer for a design-build project in which Lanier & Associates was a subcontractor to Dearborn Mid-West Conveyor Company.  Located on the Ohio River in West Virginia, the project included the design of a new marine berth for loading gypsum onto river barges.  The design solution was unique to the area as it utilized steel monopiles which were socketed and grouted into bedrock, at a significant cost savings to the owner when compared to sheet pile cells which are common to the area.

<u>RESUME</u>
**William J. Thomassie, P.E.**

Professional Experience – cont.                                   Page 6

---

<u>T.L. James and Company,  1990 to 1992</u>
**Construction Engineer, Assistant Cost Estimator**

Construction Engineer and Assistant Cost Estimator responsible for monitoring field construction efforts, office plan review, material take-offs, and assiting with the preparation of bid proposals.  Specific project experience includes the following:

<u>Sewerage and Water Board of N.O.</u> - Construction Engineer for the Broad Street Manifold Project, Pumping Station No. 1, New Orleans, Louisiana.   Monitored the structural integrity of a sheet pile cofferdam by utilizing electronic strain gages and slope indicating equipment.

Cost Estimator for bid proposals including the East Approach to the GNO-2 bridge in New Orleans, the Belle Chasse Pumping Station No. 3, the Nashville Avenue Wharf in New Orleans, and the Bayou Segnette Floodwall.

Construction Engineer for bid proposals requiring the conceptual design of construction such as dewatering cofferdams, concrete forms, earth retaining walls, and scaffolding as required for bid proposals.