# EXHIBIT 8

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: KATRINA CANAL BREACHES * CIVIL ACTION
* NO. 05-4182
PERTAINS TO: BARGES * Consolidated
* SECTION "K(2)"

Boutte v. Lafarge 05-5531 *
Mumford v. Ingram 05-5724 * JUDGE DUVAL
Lagarde v. Lafarge 06-5342 *
Perry v. Ingram 06-6299 * MAG. WILKINSON
Benoit v. Lafarge 06-7516 *
Parfait Family v. USA 07-3500 *
Lafarge v. USA 07-5178 *
* * * * * * * * * * *

Deposition of GENNARO G. MARINO, PH.D., P.E., given at Chaffe McCall, L.L.P., 2300 Energy Centre, 1100 Poydras Street, New Orleans, Louisiana 70163-2300, on September 12th, 2008.

REPORTER BY:
JOSEPH A. FAIRBANKS, JR., CCR, RPR
CERTIFIED COURT REPORTER #75005

Page 1

APPEARANCES:
REPRESENTING THE BARGE PSLC:
WIEDEMANN & WIEDEMANN
(BY: LAWRENCE D. WIEDEMANN, ESQUIRE)
821 Baronne Street
New Orleans, Louisiana 70113
504-581-6180
- and -
BRIAN A. GILBERT, P.L.C.
(BY: BRIAN A. GILBERT, ESQUIRE)
821 Baronne Street
New Orleans, Louisiana 70113
504-885-7700

REPRESENTING LAFARGE NORTH AMERICA:
GOODWIN PROCTOR, L.L.P.
(BY: MARK S. RAFFMAN, ESQUIRE)
901 New York Avenue, NW
Washington, D.C. 20001
202-346-4000
- and -

Page 2

LAFARGE NORTH AMERICA, INC. LEGAL DEPARTMENT
(BY: PETER L. KEELEY, ESQUIRE)
12950 Worldgate Drive, Suite 500
Herndon, Virginia 20170
703-956-3437
- and -
CHAFFE, MCCALL, L.L.P.
(BY: DEREK WALKER, ESQUIRE)
2300 Energy Centre
1100 Poydras Street
New Orleans, Louisiana 70163-2300
504-585-7000

ALSO PRESENT:
MARK HANNA, ESQ.
HEATHER LONIAN, ESQ.
WILLIAM J. GUSTE, IV, ESQ.
RICHARD PAVLICK, ESQ.
CONOR KELLS, ESQ.
RONALD J. KITTO, ESQ.

VIDEOGRAPHER:
GILLEY DELORIMIER (DEPO-VUE)

Page 3

E X A M I N A T I O N I N D E X

EXAMINATION BY: PAGE

MR. RAFFMAN ................................8

E X H I B I T I N D E X

EXHIBIT NO. PAGE
Marino Exhibit 1 ...........................12
Marino Exhibit 2 ...........................68
Marino Exhibit 3 ...........................115
Marino Exhibit 4 ...........................166

Page 4

Q. And Mr. Murph 's testimony doesn't relate to your conclusions about the north breach.
A. As far as I remember his testimony, no.
Q. So to the extent that these eyewitness' testimony is germane to your conclusions as one of your inputs, your conclusions about the north breach and about the south breach are using the testimony of different witnesses to support what you're saying in that respect, isn't that right?
A. I think they're consistent with my overall conclusions.
Q. Okay. The witnesses are consistent with your conclusions.
A. Right.
Q. But I guess what I'm trying to ask you is, if one wants to test your conclusions for consistency with the eyewitness accounts that you find germane --
A. Yes.
Q. -- one would be looking at different testimony at the north breach than at the south breach. Right?

A. If I understand the question, yes. I don't remember, Mark, any witness that has talked about both breaches.
Q. Okay. Let me turn now to the paragraph at the top of 2 which says, no observations of seepage at any time along the subject floodwall or relevant areas of the neighborhood prior to floodwall failure.
You see that?
A. Yes.
Q. That is an observation you made about what these fifteen deponents observed or failed to observe; right?
A. Right.
Q. And it's based on your review of fifteen depositions, right?
A. Correct.
Q. And do you take the testimony of those fifteen witnesses to allow you to conclude that there was in fact no seepage prior to the floodwall failure?
A. I would say it's an indication that's consistent with the information that I've reviewed about the ground conditions. Given the ground conditions and the reported

engineering properties of those soils, I wouldn't expect to see seepage.
Q. If a witness were to testify at some future time in this case that they observed seepage in the area near the north breach, would that affect your opinions?
MR. WIEDEMANN:
Object to the form of the question. Speculation.
A. I would -- it would just depend. I would have to hear what that person has to say.
EXAMINATION BY MR. RAFFMAN:
Q. The next section of your report says that witnesses heard one to three booms, which some say was a hollow sound, coming from the direction of breaches within the approximate time span of north and south breaches.
You see that?
A. Yes.
Q. That's an observation that you say emerged from the eyewitness information that became available but did not exist in the ILIT, IPET or Team Louisiana reports. Is that what you wrote?
A. Right. These witness accounts were

not available until their depositions were taken, as far as I'm --
Q. All right. The witness accounts regarding booms, were they the first witness accounts regarding booms that you became aware of?
A. I think there was one or two instances in the IPET report where they talked about eyewitness accounts of booms.
Q. Do you equate the boom or booms with the impact from a barge?
A. Yes.
Q. Does each boom represent a barge impact with the wall?
A. Yes.
Q. Can you think of anything else that might have happened that morning other than a barge hitting the wall that might have caused a sound that people heard as a boom or booms?
A. No.
Q. Have you ever personally heard a barge make impact with a floodwall or a lock wall or any other structure?
A. No.
Q. In your report you say that -- you

A. Right.
Q. You need both of those conditions to make the barge fail the wall.
A. Makes sense, doesn't it?
Q. This is what I'm asking.
A. Yes.
Q. So your answer is yes?
A. Yes.
Q. You need both of those conditions.
A. Yeah. I mean, if the barge is flying in the air and it's not hitting the wall, even if its got velocity it's not going to do anything.
Q. You'd have to launch it with some velocity and you have to make it hit in a way that causes the energy to transfer. Right?
A. Yeah. You have to be able to transfer the energy, yep.
Q. Okay. Let's turn to Page 5 of your report. For the south breach, an analysis was done by MEA using the same approach presented in IPET report Appendix 17 applying drag coefficients identified in Reference 6 but a more realistic impact time was used.
That's part of your report; right?

A. Yes.
Q. An MEA is your firm, right?
A. Yes.
Q. And this was an analysis you did for the south breach only? When I say this --
A. Yes.
Q. Okay. You didn't do this same analysis for the north breach.
A. No, this was for the south breach.
Q. Why did you do it for the south breach only?
A. Because that -- the barge would be going in the direction of the wind for the south breach.
Q. At the north breach was the barge also going in the direction of the wind?
A. No.
Q. But at the north breach the barge was going in a direction other than the direction of the wind.
A. Yes.
Q. Is the analysis that was done by MEA written down somewhere?
A. Yes.
Q. Who did the analysis?

A. Dr. Gamal.
Q. Did you check it?
A. Yes.
Q. Do you have a copy of the analysis with you today?
A. No. If you look at the methodology used by -- in the IPET report, it's the same thing. I mean, any adjustment that we made, I think there was only one adjustment that we made and it was related to the impact time.
Q. Do you have an opinion as to how the barge arrived at the north breach in a manner other than wind-aided?
A. Yes. Wave action.
Q. You referenced IPET Appendix 17, so let's mark Exhibit 3. I've handed you what the court reporter has marked as Marino Exhibit 3.
Do you recognize this as the IPET appendix 17 referenced in your earlier testimony?
(Marino Exhibit 3 was marked for identification and is attached hereto.)
A. Um -- I know there's two versions. I'm not sure if this is the -- is this the final report version?

EXAMINATION BY MR. RAFFMAN:
Q. I will represent for the record that I believe it is.
A. Okay. This would be the one that we're referencing.
Q. And if you look at figure 17-1, which is the definition sketch of the Inner Harbor Navigational Canal of the wind blowing on the barge, is this the approach that you used to do the analysis referenced in 3.2 of your report?
A. Yes. Like I said, we followed the same analysis done in this appendix.
Q. One of the things you wrote is that you used drag coefficients identified in Reference 6, right?
A. Yes.
Q. And reference 6 is called Boundary Layer Theory by H. Schlichting?
A. Yes.
Q. Is that a textbook?
A. Yes.
Q. And do you happen to know where in that textbook I could find the drag coefficients that you reference?
A. Not offhand.

significant body damage if the impact time is 0.5 to 0.6 seconds or less. Right?
A. Right.
Q. And does that refer to the full-scale tests on barges reported in the references listed in Page 14 of your report?
A. Yes.
Q. And it assumes, does it not, that the absence of impact or absence of crushing damage on a barge from a collision with a bridge pier would equate to a similar collision with a floodwall.
A. Yes. That they can be correlated.
Q. Am I correct that if you reduce the impact time you will increase the impact force generated by the calculation?
A. Yes.
Q. In fact, you've already testified to that effect.
A. Yes.
Q. So when you reduce the impact time from ten seconds as reported in IPET to 0.5 seconds, then it will have a dramatic increase in the force that you derive from your calculation.

Page 133

A. Right.
Q. You said you used a wind speed range of 80 to 125 miles an hour, right?
A. Yes.
Q. What was your basis for choosing that wind speed range?
A. I believe it was the wind speed range at the time -- in the time range of when the barge would have hit the wall.
Q. Based on what data?
A. I don't know. There's charts that are given in the IPET report that give wind speed.
Q. What time did the barge hit the wall?
A. Um -- our best estimate is it could have been at 7:00 or earlier.
Q. It wouldn't have been after 7:00, in your analysis; correct?
A. No.
Q. Is that incorrect?
A. No. I think it's probably around 7:00. It could have been 7:30, something like that. I don't think there's a lot of good information on the time of when the barge impacted. I mean, no one was there with a secondhand clock to tell you, you know, when it

Page 134

really happened. It's all, from what I can tell, um -- narrative information.
Q. So the input that you're using is the wind data that exists in the 7:00 a.m. to 7:30 a.m. time frame.
A. In that range, yeah.
Q. And the 7:00 a.m. to 7:30 time frame is your best sense of what time the barge struck at the south breach based on the information that you reviewed.
A. Yes.
Q. My next question is related to what you say on Page 6. Based on available data, however, it is highly probable that the barge initially impacted the wall at an angle.
A. (Witness nods head affirmatively.)
Q. What available data are you referring to there?
A. The direction of the wind being close to north-south, the, um -- way of the initial impact, what I mean way, the configuration of the initial impact on the wall, it gives the impression that it was more of a corner or end-to-end impact -- end-to-wall impact.
Q. Why would the orientation of the wind

Page 135

close to north-south cause the corner of the barge to hit the wall?
A. Because it would be moving in an incline direction to the south.
Q. And based on the information you've reviewed, the direction of the wind in the 7:00 a.m. to 7:30 time frame had a significant north-south component to it?
A. Yes.
Q. Now we're still talking about the south breach with all of these questions and answers, right?
A. Yes.
Q. Hitting the wall on an angle would deliver a more concentrated impact according to your statement?
A. Yes.
Q. And the concentrated impact is delivered by the corner of the barge?
A. Yes.
Q. Can you explain, again treating me as you would a reasonably intelligent high school senior, why the corner of the barge hitting the wall would have a bigger impact than some other configuration?

Page 136

Q. Right? The barge impact cause the sheet pile to rip in two?
A. Yes.
Q. That only happened at the north breach.
A. Yes.
Q. The wall reacted differently there than it did at the south breach.
A. Yes.
Q. There was no crushing depth or barge damage on the barge from this impact; right?
A. Well, there were apparently not, because we didn't see any crushing depth on the -- we have no knowledge of any crushing depth on the barge as it stood in the Ninth Ward.
Q. So based on the review that Hector Pezos and Mr. Bartlett did, there was no crushing depth or barge damage on the barge that would have reflected the barge 's presence at this location at this impact.
MR. WIEDEMANN:
I object. I don't understand the question.
EXAMINATION BY MR. RAFFMAN:

Q. Do you understand the question?
A. Your asking whether or not there was a distinctive barge impact -- a distinctive impact on the barge or dent on the barge that said, aha, that's from the first breach. Right?
Q. That's one question, yes.
A. No.
Q. All right. In fact, one of the conclusions you drew in connection with the south breach is that the impact time must have been shorter because we didn't see any crushing depth or barge damage. Right?
A. Yes.
Q. You wrote that from the pump station manager 's description of the incident it appears the impact force was caused by exceptional wave action.
A. Yes.
Q. So the description here about exceptional wave action is tied to the pump station manager's description, right?
A. Yes.
Q. And that's Mr. Villavaso?
A. Yes.

Q. What was it about the pump station manager 's testimony that gave rise to the conclusion that exceptional wave action was involved?
A. Well, he talked about a large -- he thought from where he was standing, a 20-foot wave that went down the canal, cascading over, and after that wave passed the barge impacted the wall.
Q. Apart from the pump station manager 's description, do you have any evidence that a 20-foot wave of water went down the canal?
A. That's the only evidence that I know of. Currently.
Q. And when you refer to exceptional wave action in the report, is the 20-foot wave described by the pump station manager what you're referring to?
A. Right. It's sort of a general condition that's going on at the time, yes.
Q. Are you aware of any description of a 20-foot wave of water taking place at the time of the south breach?
A. Not at the time.
Q. You didn't consider wind in connection

with the north breach because the wind wasn't blowing in the direction of the wall at that time, right?
A. Right.
Q. Narrate for me your understanding of how the wave brought the barge to the wall.
A. There's wave action behind the barge that caused it to reach the location of the breach and impose a force on the barge that then caused that force from the barge to be -- to be impacted onto the barge. I'm sorry, onto the wall.
Q. And apart from the pump station manager 's description of the wave action, is there any other basis for your conclusion that the wave action caused the barge to impact the wall in this manner?
MR. WIEDEMANN:
Already answered. Objection.
A. That's what I think.
EXAMINATION BY MR. RAFFMAN:
Q. The pump station manager 's description of the wave action is really the beginning and the end of your opinion on the subject, right, as to how the barge got to the

wall?

MR. WIEDEMANN:

Object. Repetition. The third time.

A. At this time, yes.

EXAMINATION BY MR. RAFFMAN:

Q. You wrote in Paragraph 3.5, in addition to the wind effect on the barge a separate analysis was done to evaluate imposed vessel force from periodic wave action.

Are there papers reflecting this separate analysis?

A. Yes. Um -- Number 5.

Q. Number 5 is a reference that you used, right?

A. Right. I'm sorry. I thought Number 5 was related to the barge impact, but it apparently is -- it is related to the wave action.

Q. I just wanted -- I want to understand the separate analysis that was done to evaluate imposed vessel force from periodic wave action.

A. Right.

Q. Somebody in your office sat down and did a calculation.

A. Yes.

Q. Who did that?

A. Dr. Gamal.

Q. And you reviewed it?

A. Yes.

Q. Can you describe for me, again treating me as a reasonably intelligent high school student, how this calculation was done and what it represents?

A. Periodic wave is like a water wave that occurs at a certain frequency. And you can take this wave to have a different speed, and you can have this wave take a different height. And basically, what this analysis does is it determines as this wave impacts the barge how much force it would impose on the barge.

Q. So you are taking as your inputs what?

A. Wave force is a function of -- at the bottom of the page, Page 7 -- wave force is a function of several factors including wave period, water depth, barge dimension and distance from the floodwall. For simplicity, the barge was assumed to be momentarily fixed in a mean position at a given time. So what that means is, in lieu of considering that the

barge is moving, it was considered let's see what the force of that wave on the barge is stationary. Obviously the barge is moving, so it actually has more force. But for this calculation it was assumed that the barge was just sitting in the water and it wasn't near a wall, and the force imposed on the barge was determined based on the wave and the barge dimensions.

Q. The idea is that the wave activates the barge.

A. Yes.

Q. What assumptions did you make about -- well, go back. What input did you use for wave period?

A. I don't remember.

Q. What input did you use for water depth?

A. We have here assuming only a water height of one foot.

Q. It says assume a wave height of one foot.

A. That's the same thing.

Q. Water depth is the same as wave height?

A. Yes, for the wave.

Q. Okay. What did you use for barge dimension?

A. Um -- I don't remember, Mark. It's been like -- when I looked at these calculations it was probably two, three months ago.

Q. What did you use for distance to the floodwall?

A. I think this calculation was done considering that it wasn't next to the floodwall. So it would be a greater impact if it was, but for this calculation it was just assumed to be what the impact would be out in standing water.

Q. What is potential flow theory?

A. Um -- basically, it is the periodic -- the, um -- the wave, the periodic wave that you're considering has a time displacement characteristic of a sawtooth in that there's no irritational velocity.

Q. But the input data that we talked about, wave period, water depth, barge dimension and distance, even if you don't remember what it was do you know where you got

Q. What more do you need to do to complete these analyses to the point where you can say did play a critical role instead of would play a critical relevant?

A. That would occur with the final report. I mean, that's -- you know, we have additional analyses to do, and data reduction and collection to do, and so, you know, in my mind that's our final report that's due in March. I think it's March of the coming year.

Q. What do you plan to do between now and March?

A. Work.

Q. What work do you plan to do?

A. Um -- you know, I think I've said it before, but, you know, basically I want to make sure we have all the available data that we can gather. We have to independently go through that information, we have models that need to be calibrated and set up and then run. Um -- you know, overall, that's basically what we're talking about.

Q. What models do you need to calibrate set up and run?

A. Um -- the ones I was talking about is

like one of the numerical models, you can't just -- I don't know, you probably never had this experience in running numerical models, but when you set up a model system it's almost unheard of that you can run it and it behaves like it's supposed to behave. And you have to play with it to make sure it's giving you realistic numbers and realistic results. Any engineer that works with numerical methods will know that -- will tell you that.

I had one job where we were running six computers -- we burnt out a few computers because we had to make so many runs before we really got it to make sense.

Q. Did the models you're talking about have names?

A. Well, there's a number of -- well, finite element methods. Okay? There could be some close form solution methods or empirical methods that we use. Limit equilibrium methods. Um -- I would say that covers the general types.

Q. Okay. You wrote that it appears the barge came loose at or before 4:30 a.m. and struck the floodwall just south of the Florida

Avenue bridge and then the wall between the streets N. Galvez and N. Prieur. That's parts of your report; right?

A. Yes.

Q. And have we fully -- I'm going to try to save a little time. Apart from what you testified earlier today, is there anything that comes to mind that forms the basis for that conclusion?

A. No.

Q. Because we have gone through it all already, right?

A. Pretty much, yeah. Some things several times. I'm not trying to -- I understand, you know, you got to do that sometimes to get it all out.

Q. I just want to make sure there's nothing I've missed.

A. Right.

Q. And in candor, I don't want to go through it all again. If I think I've exhausted it, that's all I'm going to ask. But the next item in your conclusion is that Lower Ninth Ward survivor accounts of events and damage associated with the floodwall breaches

are reasonably consistent with the collision of the barge with the floodwall. You wrote that, right?

A. Yes.

Q. And have we now exhausted the bases for that conclusion based on the testimony here today?

A. Yes.

Q. The next conclusion is that present analyses and evidentiary data indicate that the impact force of the ING 4727 barge likely reduced the safety factor below 1 and caused failure of the wall at the north and south breach locations. That's another conclusion you've reached.

A. Yes.

Q. Have you done a safety factor analysis of your own to show that the barge impact reduced the factor of safety below 1?

A. Not a safety factor, per se, other than that if you have loads that we have given -- I mean, it's kind of simple. I mean, if you've got loads that are two, three times greater than what the wall hydrostatic pressure is, I mean, there's no safety factor you need

it calculate. These designs are not at a safety factor of 2 or 3.

Q. Well, the analysis you're talking about, then, largely incorporates the finite element with a limit equilibrium analysis.

A. Right.

Q. And the limit equilibrium analysis really is the same thing as the barge impact calculations that are described in your report for wind or for waves that you've testified about earlier.

A. Can you say that again? Because I'm not sure I understood that.

Q. Well, what I'm really trying to get at is that the analyses that we've just described, that give you two or three times higher load --

A. Right.

Q. -- those are the analyses that are reflected in Section 3 of your report --

A. Yes.

Q. -- right?

A. Yes.

Q. There's no analyses apart from those reflected in Section 3 of your report that give you impact loads.

A. No.

Q. Have you concluded with a reasonable degree of engineering certainty that the barge caused the north breach?

A. Yes.

Q. Have you concluded with a reasonable degree of engineering certainty that the barge was the only cause of the north breach?

A. Well, I mean, you had hydrostatic water against it. I mean, you know, there's active forces and there's resisting forces. I mean, to say that the water didn't have an active force is not accurate. So I mean, there are other causes. I mean, in terms of causes there's the water and there's, um -- the barge.

Q. All right. So the water and the barge combined together to cause the north breach.

A. Right. But if it was just the water there, it wouldn't have caused the breach.

Q. And if it was just the barge there it wouldn't have caused the breach either, right?

A. That's the same thing. Except the water -- it's the same thing. Yes. Right.

Q. You need both of them, right?

A. Yes. The barge couldn't get there if

the water wasn't there also. Unless it was an air-filled one.

Q. So you really need both the barge and the water to cause the breach.

A. Yes.

Q. All right. Is the same condition true for the south breach, you need both the barge and the water?

A. Yes.

Q. Do you conclude to a reasonable degree of engineering certainty that the Inner Harbor Navigational Canal east wall would not have failed at any time on August 29th if the barge had not broken away from its mooring?

A. Yes.

Q. What analysis have you done to support that conclusion?

A. I think this is what the report is all about.

Q. The report says, at Paragraph 5.6, that there's other postulated failure mechanisms by other investigators, to paraphrase, they appear to be significantly flawed. Do you see that?

A. Yes.

Q. Did the mechanisms postulated by the other investigators play any role in the IHNC floodwall breaches?

A. Mechanisms. I'm having a hard time answering that. If I don't believe -- I guess no.

Q. When you started this project did you understand that you'd have to do a separate analysis for the north breach and for the south breach?

A. Yes.

Q. And as you went through this project, did you a separate analysis for the north breach and the south breach, right?

A. Yes.

Q. The north breach and the south breach are separate events, right?

A. Yes.

Q. And at the north breach you had a ripped sheet pile at one end of the breach, right?

A. Yes.

Q. Didn't have that sheet pile rip at the south breach, right?

A. No.

Q. At the north breach you had the testimony of the pump station operator Villavaso which is particularly germane to what happened up there, right?
A. Yes.
Q. And at the south breach you have other witnesses such as Mr. Murph whose testimony is particularly germane to what happened there, right?
A. Yes.
Q. The north breach happened at a different time from the south breach, right?
A. Yes.
Q. The north breach happened in your report sometime around 4:30, let's say?
A. Yes.
Q. And the south breach happened, as you've said today, sometime in the 7:00 to 7:30 time frame, right?
A. Yes.
Q. At the north breach there was a different water level from the south breach, right?
A. Yes.
Q. And in fact, the water level was lower

at the time of the north breach, right?
A. Yes.
Q. Higher at the time of the south breach.
A. Yes.
Q. And so the barge ended up just inside the south breach, right?
A. Yes.
Q. And so you've testified the barge sheared the concrete cap and bent the rebar that marked it passage into the neighborhood at the south breach, right?
A. Yes. At the north branch, however, the barge did not end up anywhere that would provide visual evidence it had been there, right?
MR. WIEDEMANN:
Object to the form of the question.
EXAMINATION BY MR. RAFFMAN:
Q. Can you answer?
MR. WIEDEMANN:
As what is visual evidence.
A. I thought he was talking about ended up in the neighborhood.

EXAMINATION BY MR. RAFFMAN:
Q. You can't see anything about the north breach that tells you, aha, the barge was here, right?
A. No.
Q. Is that incorrect?
A. No. That's right.
Q. Okay. And your analysis of the north breach included analysis of exceptional wave action, right?
A. Yes.
Q. You didn't analyze exceptional wave action like a 20-foot wave when you did the south breach, right?
A. No.
Q. Is that incorrect?
A. No. I didn't.
Q. You didn't. Okay.
When you analyzed the south breach you used IPET Appendix 17 based on wind, right?
A. Yes.
Q. So these are two separate analyses that you did for each of these two separate breaches, correct?
A. Well, like I said, I mean, the wind

action -- I mean, sorry, the wave action also applies to the south breach. But the wind action does not apply to the north.
Q. Wind action is only south breach, right?
A. Yes.
Q. Wave action applies in part to both breaches. Right?
A. Yes.
Q. But at the north breach we have exceptional wave action that you've used there and not used to the same degree at the south breach, correct?
A. Yes.
Q. So if a judge or a jury analyzes these two breaches, they're going to have to be analyzed separately, correct?
MR. WIEDEMANN:
Object to the form of the question.
A. Yes.
EXAMINATION BY MR. RAFFMAN:
Q. And earlier there was a discussion about whether it was ludicrous to conclude one thing or another, and maybe it will bring that