# EXHIBIT 9

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:  KATRINA CANAL BREACHES      CIVIL ACTION
CONSOLIDATED LITIGATION
                                    NO. 05-4182
                                        "K" (2)

PERTAINS TO:  BARGE                 JUDGE DUVAL

                                    MAG. WILKINSON

BOUTTE V. LAFARGE         05-5531
MUMFORD V. INGRAM         05-5724
LAGARDE V. LARFARGE       06-5342
PERRY V. INGRAM           06-6299
BENOIT V. LAFARGE         06-7516
PARFAIT FAMILY V. USA     07-3500
LAFARGE V. USA            07-5178

DEPOSITION OF ETHYL MAE COLEMAN MUMFORD,
1423 Feliciana Street, New Orleans, Louisiana,
taken in the offices of Chaffe, McCall, 2500
Energy Centre, 1100 Poydras Street, New
Orleans, Louisiana 70163, on Thursday, August
5, 2008.

Page 1

---

1   APPEARANCES:
2       WIEDEMANN & WIEDEMANN
            (BY: KARL WIEDEMANN, ESQ.)
3       821 Baronne Street
        New Orleans, Louisiana 70113
4           ATTORNEY FOR THE PLAINTIFFS (BARGE)
5
        LAW OFFICES OF BRIAN GILBERT
6           (BY: EDWARD MORENO, ESQ.)
        821 Baronne Street
7       New Orleans, Louisiana 70113
            PLAINTIFFS
8
9       BURGLASS & TANKERSLEY
            (BY: LUCIE THORNTON, ESQ.)
10      5213 Airline Drive
        Metairie, Louisiana 70001
11          ATTORNEYS FOR JEFFERSON PARISH
12
13      MCCRANIE, SISTRUNK
            (BY: DARCEY DECKER, ESQ.)
14      Suite 800
        3445 North Causeway Blvd.
15      Metairie, Louisiana 70002
            ATTORNEYS FOR ORLEANS LEVEE DISTRICT
16
17
18      MONTGOMERY, BARNETT, BROWN, READ, HAMMOND
        & MINTZ
            (BY: RONALD J. KITTO, ESQ.)
19      3200 Energy Center
        New Orleans, Louisiana 70163
20          ATTORNEYS FOR THE AMERICAN CLUB
21
22      CHAFFE, MCCALL LLP
            (BY: CHARLES BLANCHARD, ESQ.)
23      2300 Energy Center
        New Orleans, Louisiana 70163
24          ATTORNEYS FOR LAFARGE NORTH AMERICA
25

Page 2

---

1   APPEARANCES CONTINUED:
2
        GOODWIN PROCTER  LLP
3           (BY: MARK S. RAFFMAN, ESQ.)
        901 New York Avenue NW
4       Washington, D.C. 20001
            ATTORNEYS FOR LAFARGE NORTH AMERICA
5
6
        CHRISTOVICH & KEARNEY
7           (BY: CHRISTOPHER ALFIERI, ESQ.)
        Pan American Life Center
8       Suite 2300
        601 Poydras Street
9       New Orleans, Louisiana 70130
            ATTORNEYS FOR SWB (ALSO PRESENT)
10
11
        DUPLASS, ZWAIN
12          (BY: RYAN MALONE, ESQ.)
        3838 North Causeway Blvd.
13      Suite 2900  Lakeway Three
        Metairie, Louisiana  70002
14          ATTORNEYS FOR EJLD, LBLD (ALSO
            PRESENT)
15
16
17
18
19  REPORTED BY:  ROGER D. JOHNS, RMR, CRR, CSR
            Certified Court Reporter,
20          State of Louisiana
21
22
23
24
25

Page 3

---

1           S T I P U L A T I O N
2
3       It is stipulated and agreed by and between
4   counsel for the parties hereto
5   that the deposition of the aforementioned
6   witness is hereby being taken under the
7   Federal Rules of Civil Procedure, for all
8   purposes, in accordance with law;
9       That the formality of reading and signing
10  is specifically not waived;
11      That the formalities of certification and
12  filing are specifically waived;
13      That all objections, save those as to the
14  form of the question and the responsiveness of
15  the answer, are hereby reserved until such
16  time as this deposition, or any part thereof,
17  may be used or sought to be used in evidence.
18
19           * * * *
20
21      ROGER D. JOHNS, RDR, CRR, Certified Court
22  Reporter for the State of Louisiana,
23  officiated in administering the oath to the
24  witness.
25

Page 4

wind storm.  I didn't have flood.  But I can't
remember whether I got any money or not.  If I
did, it probably wasn't very much.
Q.  How long were you out of your home
at 6107 North Robertson after Betsy?
A.  Not very long.  About a month.
Q.  Did you personally or did your
husband do the repairs on Robertson?
A.  Yes.
Q.  And where did you live during that
one month period that you were out of your
home?
A.  In the St. Bernard Project with my
sister-in-law.
Q.  Let's move forward to Camille.
Where were you living at that time?
A.  6107 North Robertson Street.
Q.  Did you evacuate for that storm?
A.  No.  We didn't have any damage.
Q.  No flooding at that time?
A.  No.
Q.  No wind damage?
A.  No.
Q.  Did you consider evacuating at that
time?

A.  No.
Q.  And is that because the storm was
predicted to go more toward Mississippi?  Is
that right?
A.  Yes.  Yes.
Q.  Let's move forward to some other
hurricanes.  Do you remember Georges in 1998?
A.  I remember that.
Q.  And --
A.  '98.
Q.  You were living in Burgundy Street
at that time; right?
A.  Yes.
Q.  Did you evacuate for that storm?
A.  We left for a night or so and went
up to a building on St. Charles Street and
stayed there where I was working then in that
time.
Q.  And did you evacuate because you
were concerned about flooding?
A.  Yes.  I have been concerned about
flooding ever since Betsy.  Since Betsy I
always leave from the Lower Ninth.
Q.  When there's a storm that's
predicted to come our way?

A.  Yes.
Q.  And so you evacuated for Georges.
A.  Yes.
Q.  And that turns out to be not such a
big deal.
A.  Right.
Q.  But you still evacuate.
A.  Yes.
Q.  All right.  What about Ivan in 2004;
do you remember that?
A.  Yes.
Q.  Did you evacuate for that storm?
A.  Yes.  We went in a hotel right on
Canal Street.
Q.  And the reason you evacuated again
was because you were concerned about flooding
in the Ninth Ward?
A.  Yes.
Q.  And you were concerned about
flooding based on your experience, your
horrible experience during Betsy?
A.  Yes.
Q.  When you evacuated for Georges in
1998, did your children evacuate?
A.  Yes.

Q.  What about for Ivan in 2004; did
your children evacuate for that as well?
A.  Yes.
Q.  Before Katrina, did you have other
family members living in the Ninth Ward other
than your children?
A.  Yes.
Q.  Who would those be?
A.  My brother, my son, my
grandchildren.
Q.  Your brother did evacuate for
Katrina?
A.  Yes.
Q.  Did he evacuate for Ivan?
A.  I am not sure.
Q.  Did he evacuate for Georges?
A.  Yes.
Q.  And was he living in the Ninth Ward
at the time of Betsy?
A.  No.
Q.  Did any of your family members stay
in the Ninth Ward during Katrina?
A.  No.
Q.  Did any of your friends stay in the
Ninth Ward during Katrina?

1     A.   No.
2     Q.   Do you have any videos of the 4829
3  Burgundy Street property?
4     A.   No.
5     Q.   Do you have any videos of the
6  contents of the 4829 Burgundy property?
7     A.   No.  I didn't take any pictures or
8  videos.
9     Q.   Now, when your husband died, did you
10 open up a succession?
11    A.   Yes.
12    Q.   And did your husband have a will?
13    A.   No.
14    Q.   And do you remember the lawyer that
15 you hired for the succession proceeding?
16    A.   The last name Russell.  That's not
17 the last.  The first name is Russell.  I can't
18 think of his last name.
19    Q.   And do you remember that in the
20 succession proceeding that you obtained an
21 interest in the property and your children did
22 as well?  Correct?
23    A.   Yes.  Yes.
24    Q.   Do you know what a usufruct is?
25    A.   Yes.

Page 73

1     Q.   And do you remember that you
2  obtained ownership interest, one-half of the
3  property?
4     A.   Yes.
5     Q.   And your kids, your two children had
6  the ownership of the other half?
7     A.   Yes.
8     Q.   All right.  You had a usufruct over
9  that; is that right?
10    A.   Yes.  I remember the name.  It was
11 Mr. Ballina.  When you said usufruct.  He's
12 passed away now.  He did the succession for
13 me, instead of Russell.  It wasn't Russell.
14    Q.   I want to go ahead and mark as
15 Exhibit 2 a Google map of the property at 4829
16 Burgundy Street and ask you to take a look at
17 that, ma'am.  Now, do you see that red mark
18 with the "A" in it?
19    A.   Yes.
20    Q.   Does that accurately reflect the
21 location of your property at 4829 Burgundy?
22    A.   Yes.
23    Q.   So it's actually on the river side
24 of St. Claude Avenue; correct?
25    A.   Yes.  Yes.

Page 74

1     Q.   Thank you.  Prior to Hurricane
2  Katrina, immediately prior to that, had you
3  planned any other repairs or renovations to
4  your property at 4829 Burgundy?
5     A.   No.
6     Q.   Had you ever had the property at
7  4829 Burgundy inspected for termites?
8     A.   Yes.
9     Q.   Did you ever have a problem with
10 termite infestation in that home?
11    A.   Yes.
12    Q.   When did you discover that?
13    A.   Years ago.  Maybe about ten years
14 ago.
15    Q.   What did you do after you found out
16 you had termites in your house?
17    A.   We repaired the place.  We called
18 this company and they came every year and
19 inspect.
20    Q.   What was the name of that company?
21    A.   I can't remember.  I had Terminix,
22 Terminix, but they didn't do that.  They did
23 Robertson Street.
24    Q.   How did you discover that you had
25 termite damage at Burgundy?

Page 75

1     A.   They had a little hole in the wall.
2  That's how we found them.
3     Q.   What did you have to do to repair
4  the home?
5     A.   We had to tear out sheetrock and
6  redo the sheetrock and maybe one or two
7  two-by-fours.
8     Q.   We'll move forward, Miss Mumford, to
9  the property at 6105-07 North Robertson.  I'm
10 going to show you a sale of property by Dixie
11 Homestead to Mr. and Mrs. Henderson Mumford.
12 I'll go ahead and mark that as Exhibit 3.  Do
13 you recognize this document, Miss Mumford?
14    A.   Yes.
15    Q.   Is that your signature on the last
16 page of that document?
17    A.   Yes, it is.
18    Q.   And this document reflects that you
19 purchased this property on June 26, 1962;
20 correct?
21    A.   That's -- We made a mortgage on it
22 during that time.  We purchased this property
23 -- Oh, this is 6105-07 North Robertson
24 Street?  Which address is it?
25    Q.   6105-07.  I thought you told me

Page 76

19 (Pages 73 to 76)

1  studs in that house at 6105-07 having termite
2  damage?
3      A.  Yes.
4      Q.  In fact, there's termite damage in
5  numerous places in those properties, isn't
6  there?
7      A.  Yeah.
8      Q.  And I didn't see any active termites
9  when I was there.  Is there any active
10  termites in that house now?
11      A.  I don't think so.
12      Q.  So that termite damage that we saw
13  in the walls, that pre-dated the storm;
14  correct?
15      A.  Yes.
16      Q.  And you mentioned that you put a new
17  roof on the property at 6105-07.
18      A.  Yes.
19      Q.  Correct?
20      A.  Yes.
21      Q.  Did you put a new roof on because it
22  had been damaged during Katrina?
23      A.  Yes.
24      Q.  And how was it damaged during
25  Katrina?

                                    Page 89

1      A.  It had wind damage.  It damaged the
2  roof.  It was pretty bad.
3      Q.  Really?  Can you explain to me what
4  you remember seeing on the roof, the type of
5  damage that you saw?
6      A.  Well, it just was tore loose and had
7  holes in it.
8      Q.  The roof had holes in it?
9      A.  Yes.  Spots where the wind blew the
10  roofing off the roof.  And we had to replace
11  it.
12      Q.  If you were looking from above the
13  house, could you actually see holes in the
14  roof into the attic?
15      A.  Yes.
16      Q.  And there were more than one of
17  those, weren't there?
18      A.  Yes.
19      Q.  So during Katrina you had rainwater
20  coming down from the sky into that house?
21  Correct?
22      A.  Yes.
23      Q.  Do you remember ceilings being down
24  in 6107 when you first came back after the
25  storm?

                                    Page 90

1      A.  Yes.  Some of the ceiling was out.
2      Q.  And the flood waters didn't reach
3  the ceiling?
4      A.  No.
5      Q.  So that the damage to the ceiling,
6  the ceilings coming down, that was from the
7  rainwater coming through the holes in the
8  roof?
9      A.  Yes.
10      Q.  All right.  Thank you.  How much did
11  it cost to put a new roof on that house?
12      A.  About 7,000 I think it was.
13      Q.  Have you gotten any estimates on
14  repairs to that property?
15      A.  I got one estimate.
16      Q.  From who?
17      A.  I can't remember the name.  But I
18  think I have it at home.
19      Q.  What was that estimate for?
20      A.  It was to redo the whole -- rebuild
21  the whole house.
22      Q.  And did that include replacing those
23  boards that had the termite damage?
24      A.  Yes, uh-huh.
25      Q.  How much was that estimate for?

                                    Page 91

1      A.  It was about $150,000.  I wasn't
2  going to use him.  I was trying to get
3  something cheaper.
4      Q.  So you are still looking for
5  someone?
6      A.  Yes.
7      Q.  And this was to completely redo both
8  sides?
9      A.  Yes.
10      Q.  Did that involve any changes to the
11  floor plans in either?
12      A.  I don't know.  If I would have asked
13  him to change some of it, he probably would
14  have.
15      Q.  But the quote itself, did that
16  include changing the floor plans?
17      A.  No.
18      Q.  Now, you mentioned the roof damage
19  from the wind at 6105-07 North Robertson.  Did
20  you notice any other wind damage to that home
21  when you first came back after Katrina, such
22  as windows blown out?
23      A.  No.
24      Q.  Did you have an awning at the front
25  of that house?

                                    Page 92

1    A.   Yes.
2    Q.   All right.  And you have been
3  working or the renovations for almost two
4  years?
5    A.   Almost two.
6    Q.   So these photos would have been
7  2006?
8    A.   Yes.
9    Q.   How many photos did you take?
10    A.   I just took maybe about two, the
11  front and the back.  Sent it to the insurance
12  company.  But I may have one at my house or I
13  could get one from them.
14    Q.   Did you take any photos of the
15  inside of the house after the storm?
16    A.   No.
17    Q.   Either side?
18    A.   No.
19    Q.   Do you know how many square feet
20  total that property is?
21    A.   No, I don't know square feet.
22    Q.   That was a double; right?
23    A.   Yes.
24    Q.   Were the sides the same size before
25  the storm, 6113 and 15?

Page 97

1    A.   We made an addition on it, put it on
2  it, made it larger.
3    Q.   Let's go over that then.  Since you
4  bought the property in February of 1968, have
5  you made any additions to that property at
6  6113-15?
7    A.   Yes.
8    Q.   And what did you do and when did you
9  do it?
10    A.   We did some flooring, redid the
11  floors in there.  That was -- That was in the
12  '70s.
13    Q.   Anything else?
14    A.   That's all before the storm that I
15  could -- We put a roof on.
16    Q.   When did you put the roof on it?
17    A.   About the '70s also.
18    Q.   I thought you mentioned a couple of
19  minutes ago an addition to that property.
20    A.   We -- Since the storm.  I'm
21  renovating now.
22    Q.   All right.  So after the storm you
23  actually, as part of your renovation, you have
24  increased the size of the structure; right?
25    A.   Yes.  Yes.

Page 98

1    Q.   And you have added on?
2    A.   Yes.
3    Q.   How much have you added on?
4    A.   I add on a bathroom, a bedroom, a
5  den, and a deck.
6    Q.   The renovations to both sides of
7  that property, 6113 and 15, are they almost
8  complete?
9    A.   Yes.
10    Q.   In fact, they looked almost complete
11  when I was there a couple of weeks ago.
12    A.   Yes.
13    Q.   What else is left to be done, if
14  anything?
15    A.   Well, we had a leak in there and we
16  had to tear the sheetrock out on one side and
17  redo that.  Then on the other side, we had a
18  leak in the cabinet.  We had to take that,
19  destroy it and buy -- replace it with a new
20  cabinet.
21    Q.   Do you know the elevation of that
22  structure before the storm?
23    A.   No.
24    Q.   Do you know how much water was in
25  that structure?

Page 99

1    A.   I don't know exactly, but it was
2  enough to destroy everything on both sides of
3  the house.
4    Q.   It didn't make it up to the
5  ceilings?
6    A.   No.
7    Q.   When was the first time that you saw
8  that property after the storm?
9    A.   As soon as they let us in that
10  area.  It probably was December, 2005.
11    Q.   And when you first got there to that
12  property, did you see damage to the roof?
13    A.   Yes.
14    Q.   What sort of damage did you see to
15  the roof at 6113-15?
16    A.   Saw some of the cover was blown off,
17  the top of the roof.  Some of the roofing was
18  blown off the top.
19    Q.   Some of the shingles?
20    A.   Yes.
21    Q.   Was it a shingle type roof or a tile
22  roof before the storm?
23    A.   It was a tile.
24    Q.   Like a terra-cotta tile?
25    A.   Yes.

Page 100

25 (Pages 97 to 100)

1     Q.  And when you first got back to the
2 property after the storm, you remember those
3 tiles, a lot of those tiles being blown --
4     A.  Some of it was blown off, yes.
5     Q.  Do you remember seeing holes in the
6 roof?
7     A.  No.
8     Q.  Do you remember seeing any other
9 damage to the roof other than the tiles being
10 off?
11     A.  No.
12     Q.  Do you understand that under the
13 tiles there's like black paper?
14     A.  Yes.
15     Q.  Tar paper?
16     A.  Yes.
17     Q.  Do you remember that being torn off
18 when you got --
19     A.  I don't remember seeing it torn
20 off. I saw some of the shingles torn off.
21     Q.  And you have replaced that roof,
22 haven't you?
23     A.  Yes.
24     Q.  When you first entered that
25 structure, either 6113 or 15, after the storm,
                        Page 101

1 $9,000.
2     Q.  What did they give you the money
3 for?
4     A.  What they said was for the roof.
5 No, I'm wrong. That's the wrong house. I'm
6 sorry. They gave me $1,000 on that house.
7 And when they took the deductible, I had $500
8 left.
9     Q.  And that was on the 6113-15?
10     A.  Yes.
11     Q.  I didn't ask you about the other
12 house, the ones with the holes in the roof.
13 Did you have homeowner's insurance on that?
14     A.  Yes, that's the one they give me the
15 9,000.
16     Q.  And that was to repair the roof?
17     A.  Yes.
18     Q.  Have you sought to get more money
19 from your homeowner's insurance company on
20 that property, 6105-07?
21     A.  No.
22     Q.  What about 6113-15?
23     A.  No.
24     Q.  And just comparing -- Well, let's go
25 back to wind damage to 6113-15. You told me
                        Page 103

1 do you remember seeing on the ceiling stains,
2 evidence of water coming through the roof?
3     A.  No.
4     Q.  Do you remember seeing other wind
5 damage to that property when you got back to
6 it in December of 2005?
7     A.  No.
8     Q.  Did that property have an awning as
9 well?
10     A.  No.
11     Q.  Had that property ever been
12 subjected to fire at some point?
13     A.  They had a fire in there before I
14 bought it.
15     Q.  Any fires after you bought it?
16     A.  No.
17     Q.  Did you have homeowner's insurance
18 on 6113-15 North Robertson?
19     A.  Fire and wind storm.
20     Q.  Did you make a claim on that?
21     A.  Yes.
22     Q.  And what sort of damages did you
23 seek from the insurance company on that
24 policy?
25     A.  They sent me -- They gave me
                        Page 102

1 about the tiles off the roof.
2     A.  Uh-huh (affirmatively).
3     Q.  Did you see any other evidence of
4 wind damage to that property when you first
5 came back in December of 2005?
6     A.  No.
7     Q.  All right. But in comparing the
8 6105-07 to the 6113-15 property, all right,
9 the 6105-07 had holes in the roof?
10     A.  Yes.
11     Q.  Right? And that had water damage
12 with ceilings down; correct?
13     A.  Yes.
14     Q.  And the 6113-15, it had wind damage,
15 but it was a little -- it was different;
16 right?
17     A.  Yes.
18     Q.  And the difference there being you
19 had the terra-cotta tiles blown off?
20     A.  Yes.
21     Q.  And with both of those houses, were
22 they built at different times?
23     A.  I think they were all built the same
24 time.
25     Q.  But the one at -- I am no expert on
                        Page 104

1 this, ma'am, but the 6105-07, that looks like
2 that house was built many years ago.  Maybe
3 the '40s or '50s.  Or was it earlier than
4 that?
5     A.  I would say the '40s.
6     Q.  All right.  And the 6113-15, do you
7 think that was built about the same time?
8     A.  About the same time.
9     Q.  But the 6113-15, it had a fire?
10    A.  Yes.
11    Q.  And so they had obviously repaired
12 that house after the fire.
13    A.  Yes.
14    Q.  Okay.  So the construction in the
15 6113-15 was newer than the 6105-07?
16    A.  Where the -- the part they repaired
17 after the fire was newer.
18    Q.  What parts did they repair after the
19 fire?
20    A.  It was the living room at the 6115.
21    Q.  Let's go into the rentals on the
22 6113-15.  Let's start with 6113.
23    A.  Okay.
24    Q.  All right?  Was that rented
25 immediately before the storm?

1     A.  Yes.
2     Q.  All right.  How much was she paying
3 when she was living there?
4     A.  375 I think she was paying.  I am
5 not really sure.  Either 375 or 475.
6     Q.  Who did you rent it to?
7     A.  The first name was Taurus.  I don't
8 know her last name.  She was the last one in
9 there.  Brown -- No, that's her maiden name.
10 She was the last one in there.  The first name
11 was Taurus.  Carson I think collect that rent
12 for me.
13    Q.  Did you have a written lease with
14 her?
15    A.  No.
16    Q.  The same, month-to-month?
17    A.  Month-to-month.
18    Q.  Did you get a deposit from her?
19    A.  Yes.
20    Q.  Did you give the deposit back to
21 her?
22    A.  No, I didn't give but one deposit
23 back.  I didn't give any deposit back since
24 the storm.
25    Q.  No, but she moved out --

1     A.  It wasn't rented during the storm.
2     Q.  So it was vacant at the time of the
3 storm?
4     A.  Yes.
5     Q.  And how long had it been vacant
6 before the storm?
7     A.  Several months I would say.
8     Q.  Had you been trying to rent it
9 during that time period?
10    A.  No.  I had to go in and do a little
11 painting, so I didn't -- hadn't gotten to that
12 yet.
13    Q.  So that side needed some work?
14    A.  Yes.
15    Q.  What sort of work did it need?
16    A.  Just painting.  Painting the walls,
17 redoing the walls.
18    Q.  And the last tenants you had in
19 there was what, maybe eight or nine months
20 before the storm?
21    A.  They probably was in there longer
22 than that.  Probably a couple of years.
23    Q.  No, but she hadn't -- The house --
24 She had moved out several months before the
25 storm?

1     A.  No, when she left.  She left before
2 the storm.  Correct.
3     Q.  Right.
4     A.  I don't think so.  I don't
5 remember.  Because she left owing a large
6 water bill.  She didn't get any deposit back.
7     Q.  Had she damaged the property?
8     A.  No, not much.
9     Q.  Before this person lived there for a
10 couple of years, had you rented it before
11 that?
12    A.  Yes.
13    Q.  What it continuously rented or --
14    A.  No, it was continuously rented until
15 she moved.
16    Q.  Were you actively trying to rent it
17 at the time of the storm?
18    A.  I wasn't really trying because I
19 wanted to go in there and paint before I
20 rented, and I hadn't did that.
21    Q.  You hadn't done that yet?
22    A.  No.
23    Q.  All right.  Let's go to 6115 North
24 Robertson.  I believe you said that was rented
25 to a family member?

1     Q.   How much have you paid the carpenter
2  for that?
3     A.   I pay him about 250, $250.
4     Q.   So total repairs to that house so
5  far, you told me about Diamond Realty, the
6  109,000; right?
7     A.   Yes.
8     Q.   Plus the plumber of 8,100?
9     A.   Yes.
10     Q.   So that's 117,000.  Then you told me
11  about 250 for the carpentry?
12     A.   Yes.
13     Q.   So you're up to about 117,350;
14  right?
15     A.   Okay.
16     Q.   Do you owe anybody else for any
17  repairs on that property, or renovations?
18     A.   No.
19     Q.   Have you had to hire an electrician
20  for that property?
21     A.   Yes.  I got to hire an electrician
22  because there's some electric work that need
23  to be done, completed.
24     Q.   What work needs to be done?
25     A.   On one side they have lights like
                                        Page 117

1  than that.  But like 14 by 14.  And a bathroom
2  and a deck.  I don't know how --
3     Q.   All right.  The bathroom,
4  approximately how big is that?
5     A.   About 9 by -- I don't know.
6     Q.   All right.  So you added a bedroom,
7  the den, the bath?
8     A.   And --
9     Q.   And a deck?
10     A.   Yes.
11     Q.   With this addition of square
12  footage, did you have to add more air
13  conditioning capacity to that property than
14  you had before the storm?
15     A.   Yes.
16     Q.   What did you have before the storm?
17     A.   Before the storm we had units.
18     Q.   Window units?
19     A.   Yes.
20     Q.   And now you're going to have central
21  AC units; right?
22     A.   Yes.  Yes.
23     Q.   How many tons?
24     A.   I don't know.  It's in there
25  already, but I don't know the size of it.
                                        Page 119

1  that (indicating) and there's nothing in
2  there.  That has to be done.  And on the side
3  that's near completed, the lights like that up
4  there, you turn them on and all of a sudden
5  they just click off.
6     Q.   Has the electrician given you an
7  estimate?
8     A.   No, not yet.
9     Q.   So other than that, is there
10  anything else that you need to do to get done
11  at that property before it's ready for
12  occupancy?
13     A.   Just to complete the cabinets.
14  That's all.  Like to finish painting the
15  cabinets.
16     Q.   Who's going to do that?
17     A.   Well, I am going to try to get my
18  son to get some help and do that himself.
19     Q.   You told me earlier that you added
20  on to this property.
21     A.   Yes.
22     Q.   How many square feet did you add on?
23     A.   The bedroom I would say -- I don't
24  know how many square feet it is, but it's
25  about 12 by 12.  And the den might be larger
                                        Page 118

1     Q.   And the property at 6115, does that
2  have granite countertops in the kitchen?
3     A.   It's not granite, but almost like
4  it.  It looks like granite.
5     Q.   What was in that kitchen before the
6  storm?
7     A.   Just the regular cabinets.
8     Q.   Formica?
9     A.   Yes.
10     Q.   Formica?
11     A.   Yes.
12     Q.   And the cabinets, obviously they're
13  new cabinets now; right?
14     A.   I have new cabinets.
15     Q.   And before the storm how old were
16  the cabinets in that kitchen at 6115?
17     A.   They was -- They still looked good.
18  I don't know exactly how old they were.
19     Q.   What are your plans for the 6115
20  side?
21     A.   My granddaughter and her two
22  children are going to live there.
23     Q.   Is this Catrice?
24     A.   Yes.
25     Q.   And are you going to charge her rent
                                        Page 120

1        that.
2    EXAMINATION BY MR. BLANCHARD:
3        Q.   (Counsel hands document to Witness.)
4        That one should have a page 3.
5    You see that bolded paragraph, "Purchaser
6    hereby agrees to repair the above-described
7    property --"
8        A.   Yes.
9        Q.   "-- or to demolish and otherwise
10   remove the blight within 270 days of the date
11   of acquisition".  Right?
12       A.   Uh-huh (affirmatively).
13       Q.   You see that?
14       A.   Yes.
15       Q.   But again, your testimony is this
16   property was already torn down?
17       A.   It was.
18       Q.   Did you have any obligations to do
19   anything with the property when you purchased
20   it?
21       A.   I had wanted to add on to that
22   double house I had on the corner near the
23   lot.
24       Q.   All right.
25       A.   That's what I had planned to do, but

1    I never did anything.  But it was already torn
2    down when I bought it.
3        Q.   So your plan when you bought this
4    property was to increase the size of the
5    property at 6105-07?
6        A.   Yes.
7        Q.   What are your current plans for that
8    property?
9        A.   I probably will try and build
10   something, a house on it in the future.
11       Q.   Do you pay any taxes on that
12   property?
13       A.   Yes.
14       Q.   How much?
15       A.   I can't remember.
16       Q.   Have you had any appraisals done of
17   that property since the storm?
18       A.   Not since the storm.
19       Q.   Have you had any appraisals done of
20   the property at 6113-15 since the storm?
21       A.   No.
22       Q.   Did you have any appraisals of that
23   property before the storm?
24       A.   It was a long time before the
25   storm.  I don't even remember when.

1        Q.   Do you have any post-storm
2    appraisals of 6105-07?
3        A.   No.
4        Q.   How did you pay for the property at
5    6101 North Robertson?
6        A.   I paid cash.
7        Q.   You didn't borrow the money?
8        A.   No.
9        Q.   So there's no mortgage on that
10   property?
11       A.   No.
12       MR. BLANCHARD:
13       Let's go off the record.
14       (Whereupon a discussion was held
15       off the record.)
16   EXAMINATION BY MR. BLANCHARD:
17       Q.   We're ready to go back on?  Miss
18   Mumford, at some point did your daughter Lois
19   Mumford Callum, donate to you her interest in
20   --
21       A.   Yes.
22       Q.   -- the property that she got through
23   your husband's succession?
24       A.   Yes.
25       Q.   And I'll go ahead and mark this as

1    Exhibit 6.  Is this the document whereby Lois
2    Mumford Callum donated to you her interest in
3    certain properties including 4829 Burgundy,
4    6105-07 North Robertson, 6113-15 North
5    Robertson?
6        A.   Uh-huh (affirmatively).
7        Q.   You recognize this document?
8        A.   Yes.  Yes.
9        Q.   And is that your signature on page
10   3?
11       A.   Yes, it is.
12       Q.   And this donation also included her
13   interest in 1423-23 1/2 Feliciana Street;
14   right?
15       A.   Yes.
16       Q.   And that is those four units you
17   talked about earlier?
18       A.   Yes.
19       Q.   Turn to page 3.  There's an estimate
20   on the value of the donated property to be
21   $25,000.  Do you see that?
22       A.   Uh-huh (affirmatively).
23       Q.   Where did you get that number?
24       A.   I don't know.  I don't know.
25       Q.   What lawyer did you hire to handle

1 that? Is that his name down here, Russell
2 Breckenridge?
3     A.   Yes.
4     Q.   That's the Russell you told me about
5 earlier; right?
6     A.   Right. But it wasn't. Mr. Ballina.
7     Q.   A different Russell?
8     A.   He's not a Russell. See, I had
9 thought it was Mr. Russell that did this for
10 me, the question you asked, but it was not
11 him. It was Mr. Ballina.
12     Q.   Now, this donation, which is
13 February 10th, 2000, why did your daughter
14 donate her interest in these properties to you
15 at that time?
16     A.   Well, she -- I think she might have
17 probably thought she was going to die.
18     Q.   Was she sick?
19     A.   Yes. She's still sick.
20     Q.   What's wrong with her?
21     A.   Well, she has all kinds of
22 problems. She have ulcers in her stomach,
23 arthritis from her head to her feet. All
24 kinds of things.
25     Q.   And she had these same problems in

Page 129

1 2000?
2     A.   Well, she didn't have actual serious
3 I don't think in 2000. But she was not well.
4     Q.   So your daughter has been sick for a
5 long time?
6     A.   Yes. Yes.
7     Q.   Does that cause you distress,
8 emotional distress?
9     A.   Well, I'm kind of used to it now.
10 But it does bother me some.
11     Q.   I'm finished with that.
12          Now, at some point after that,
13 then, Miss Mumford, you donated some property
14 back to your daughter; right?
15     A.   She donated back to me. I -- What
16 -- How it went anyway. First, she -- She
17 donated the property to me first. Then I
18 donate it back to her.
19     Q.   Well, I am going to show you this
20 document, which is dated October 26th, 2004.
21 I ask you if you can identify this document
22 which is captioned "Donation Inter Vivos by
23 Ethyl Coleman Mumford to Lois Mumford
24 Callum". Exhibit 7. Do you recognize this
25 document?

Page 130

1     A.   Uh-huh (affirmatively).
2     Q.   Is that your signature on page 3?
3     A.   Yes, it is.
4     Q.   Did you have a chance to read or
5 review this document before you signed it?
6     A.   Part of it. I didn't read it all.
7     Q.   But you understood what you were
8 doing at this time?
9     A.   I thought I did, yes.
10    Q.   Why did you make this donation to
11 her at this time, in 2004?
12    A.   I just wanted to make sure if
13 anything happened to me, she'll have her
14 share.
15    Q.   So by virtue of this it was your
16 intent to donate some property to her?
17    A.   Yes.
18    Q.   Thank you. Let's switch gears a
19 little bit to your experience during Katrina.
20 I know that you told me you evacuated to the
21 Motel 6 in Lafayette.
22    A.   Yes.
23    Q.   Right?
24    A.   Yes.
25    Q.   And when was it that you evacuated?

Page 131

1     A.   That Sunday, it was the 28th of
2 August, 2005.
3     Q.   So what time during that day on
4 Sunday the 28th?
5     A.   It was that morning, maybe like 8:00
6 o'clock in the morning.
7     Q.   And --
8          MR. WIEDEMANN:
9          Excuse me, Counsel. Would you
10         mind showing me that last document
11         that we reviewed?
12         MR. BLANCHARD:
13         Sure.
14         (Counsel hands document to
15         Counsel.)
16         MR. WIEDEMANN:
17         Thank you. Sorry about that.
18 EXAMINATION BY MR. BLANCHARD:
19    Q.   All right. And prior to that time
20 that you evacuated, I assume that you were
21 hearing on the television --
22    A.   Yes.
23    Q.   -- the warnings about Katrina?
24    A.   Yes.
25    Q.   You heard it was a Category 5 storm

Page 132

1 coming?
2    A.  Yes.  Heard all of that.
3    Q.  Did you hear the news reports about
4 how much water they expected to be in the
5 city?
6    A.  Yes.
7    Q.  And did you hear reports that it was
8 expected that areas like the Ninth Ward would
9 flood?
10    A.  Yes.
11    Q.  In fact, it was expected most of the
12 city would flood; right?
13    A.  Yes, uh-huh.
14    Q.  And based on that and based on your
15 experience in Betsy, that flooding, is that
16 the reason that you decided to evacuate?
17    A.  Yes.
18    Q.  And who did you evacuate with, if
19 anyone?
20    A.  My daughter, and my son was with us
21 also.
22    Q.  Anyone else besides your daughter
23 and your son?
24    A.  I had a couple of ladies in there,
25 they were staying with me temporary, mental

Page 133

1 A.  One car.
2    Q.  Was that -- You have a Mercedes;
3 right?
4    A.  Yes.
5    Q.  Was it in the Mercedes?
6    A.  Yes.
7    Q.  What kind of Mercedes is that?
8    A.  An E-320.  1998.
9    Q.  So in the E-320 it was you, your
10 daughter, your son, and these two mentally ill
11 people?
12    A.  Yes.
13    Q.  And that was the extent of the
14 people in the car; right?
15    A.  Yes.
16    Q.  And you took off in the morning, and
17 how long did it take you to get to Lafayette?
18    A.  About midnight.  We were trying to
19 go to Galveston, but we -- the far -- we only
20 got to Lafayette.
21    Q.  That Sunday morning before you left,
22 do you remember there being an evacuation
23 order from the City of New Orleans?
24    A.  Yes.
25    Q.  Do you remember Mayor Nagin saying

Page 135

1 people.  They were with me also.  No, a lady
2 and a man.
3    Q.  And you -- They were staying with
4 you?
5    A.  Yes.
6    Q.  At your house on Burgundy Street?
7    A.  Yes.
8    Q.  Who was that?
9    A.  That was Theresa, and what the other
10 man's name?  I can't thought of his name.
11 They was staying with me temporary, mentally
12 ill people.  They, you know, wasn't bad off,
13 but they were kind of sick.
14    Q.  How did you know these people?
15    A.  I got them from the hospital, from
16 Touro Hospital.
17    Q.  Were these friends of yours?
18    A.  No, not really.
19    Q.  You just made the effort to help
20 some people?
21    A.  Yes.
22    Q.  And you made the effort to get them
23 out of town?
24    A.  Yes.
25    Q.  And did you travel in one car?

Page 134

1 that?
2    A.  Uh-huh (affirmatively).
3    Q.  Other than the Mercedes, did you
4 have any other vehicles --
5    A.  I left two in the yard.
6    Q.  Left two in the yard?
7    A.  Yeah.  One was a Jeep.  I don't know
8 if it was a 19- -- 1903, I believe.  And I had
9 another one, it was a 1906.  It was an
10 Oldsmobile.
11    Q.  Let's go back over those dates
12 again.  The Oldsmobile, what type of car was
13 that?
14    A.  All I can remember, it was an
15 Oldsmobile.  It was a 1905.
16    Q.  You're not talking about the year
17 there, are you?
18    A.  The year.  The year.
19    Q.  It was an old, very old car?
20    A.  No, it was new.  It was a 1905.  I
21 had just bought it.
22    Q.  You mean 2005?
23    A.  I'm going off now.  2005.  Yes.
24    Q.  All right.  I was about to say
25 that's an antique you had back there, ma'am.

Page 136

34 (Pages 133 to 136)

1  You had a 2005 Oldsmobile?
2     A.  Yes.
3     Q.  And this was kept at your --
4     A.  Yes.
5     Q.  -- house at 4829 Burgundy?
6     A.  Yes.  And I had a Jeep also.  It was
7  about a 2002 maybe.
8     Q.  What kind of Jeep vehicle?
9     A.  It just said Jeep.  I don't know.
10    Q.  And did you own those vehicles?
11    A.  Yes.
12    Q.  Why did you have three vehicles,
13 ma'am?
14    A.  I had one, my daughter was driving
15 the Jeep, and I was driving the Mercedes and
16 the Oldsmobile.  I would just park the
17 Mercedes and drive the Oldsmobile.
18    Q.  The Oldsmobile and the Jeep, were
19 those dependable vehicles?
20    A.  Oh, yeah.
21    Q.  They could have been driven out of
22 town?
23    A.  Yes.
24    Q.  But you decided just to take the
25 Mercedes?

Page 137

1     A.  Yes.  I was thinking I would come
2  back.
3     Q.  And your daughter could drive;
4  right?
5     A.  Yes.
6     Q.  She had a driver's license?
7     A.  Yes.
8     Q.  And your son could drive as well?
9     A.  Yes.
10    Q.  What happened when you got to
11 Lafayette?
12    A.  We just went -- Somebody told us how
13 to get to this Motel 6.  And when we went
14 there, they had a line of people, so then the
15 lady said, "Well, we just have three rooms"
16 and everybody left and I stayed.  So finally
17 she got some more vacancies and we were able
18 to get one room.  She said she couldn't let us
19 have two, but she could let us have one.  So
20 all five of us were in one.
21    Q.  How many beds were in that room?
22    A.  One.
23    Q.  You were in that room for how long?
24    A.  From that Sunday night until that
25 Saturday in the daytime, the next Saturday.

Page 138

1     Q.  Were all five of you in the room
2  during that time period?
3     A.  Yes.  Yes.
4     Q.  I know you found the apartment.
5     A.  Yes.
6     Q.  Correct?
7     A.  Yes.
8     Q.  When you left New Orleans that
9  Sunday morning, did you take any of your
10 possessions with you?
11    A.  Very little.  I took my policies,
12 insurance policies, some jewelry, and I left
13 some jewelry I forgot.  And a few pieces of
14 clothes.
15    Q.  Did you take any photos with you?
16    A.  No.  I left all of that.  I lost all
17 of those.
18    Q.  And you mentioned insurance
19 policies.
20    A.  Yes.  I took those with me.
21    Q.  This would have been insurance
22 policies on the Burgundy property and the
23 rental properties as well?
24    A.  Yes.  And life policies I had.
25    Q.  Life insurance?

Page 139

1     A.  Yes.
2     Q.  Other than the property insurance
3  and life insurance policies, did you take any
4  other documents with you?
5     A.  No.
6     Q.  Did your children take any of your
7  documents --
8     A.  No.
9     Q.  -- with them?
10    A.  No.
11    Q.  Did they take any of your
12 possessions with them?
13    A.  Just a little something for them to
14 wear themselves.
15    Q.  When did you first find out that
16 there was flooding in the city?
17    A.  Maybe that Tuesday I found out.  It
18 happened Monday, but I found out Tuesday I
19 think it was.
20    Q.  And how did you find out?
21    A.  Well, a friend of mine called me and
22 told me she saw it on the Internet that her
23 house was flooded up to the second floor, and
24 that was around the corner from Robertson
25 Street.  So I was thinking, well, Robertson

Page 140

1    A.  Yeah.
2    Q.  Just popping in to say hi?
3    A.  Yeah.
4    Q.  Who else did you see during that
5 trip other than go to the funeral and see
6 Karen Wiedemann?
7    A.  Nobody else was there.  Oh, Kendrick
8 and Gloria was there.
9    Q.  Where?
10   A.  They were in the office.
11   Q.  At the Wiedemanns'?
12   A.  Yes.
13   Q.  And you knew all of these people?
14   A.  Yes.
15   Q.  Because they had represented you in
16 prior lawsuits?
17   A.  Not Kendrick and Gloria.  They never
18 represented -- They are not lawyers.
19   Q.  Karen is a lawyer.
20   A.  Yes.
21   Q.  And she had represented you in other
22 lawsuits?
23   A.  Yes.
24   Q.  And those lawsuits included those
25 automobile lawsuits --

Page 161

1    A.  Yes.
2    Q.  -- that we talked about earlier;
3 right?
4    A.  Yes, uh-huh.
5    Q.  Other than Karen, you mentioned two
6 other people, right?  Kendrick?
7    A.  And Gloria.
8    Q.  And who were these people?
9    A.  Well, they were staying in the
10 office because they had nowhere else to go.
11 Their houses washed away.
12   Q.  Had you had prior experiences with
13 either one of those people?
14   A.  Yes.
15   Q.  You knew them?
16   A.  Yes.
17   Q.  And how did you know them?
18   A.  I knew them from -- Kendrick and
19 Gloria from the Wiedemanns' office.
20   Q.  So had they helped in other cases of
21 yours?
22   A.  No.
23   Q.  Well, how did you meet them then at
24 the Wiedemanns' office?
25   A.  I just met them by going there.

Page 162

1    Q.  Before the storm how often did you
2 go to the Wiedemanns' office?
3    A.  I used to go there three times a
4 week.  I was working for them.
5    Q.  You were working for them?
6    A.  Uh-huh (affirmatively).
7    Q.  Okay.  And what were you doing
8 there?
9    A.  Cleaning.
10   Q.  So that was one of the cleaning jobs
11 that --
12   A.  Yeah.
13   Q.  -- you told me about earlier?
14   A.  Uh-huh (affirmatively).
15   Q.  And for how long had you been doing
16 the cleaning work at the Wiedemanns?
17   A.  30-something years.
18   Q.  Well, that explains why you would
19 know them.  Do you still do cleaning work for
20 the Wiedemanns?
21   A.  Yes.
22   Q.  So you have worked for the
23 Wiedemanns now for 35 years.
24   A.  About that.
25   Q.  And so these other lawsuits that we

Page 163

1 talked about you filed, obviously you had
2 already been working for the Wiedemanns at the
3 time; right?
4    A.  Yeah.
5    Q.  And when you first visited them in
6 September or October, obviously you weren't
7 doing any work there?
8    A.  No, I wasn't working there then.
9    Q.  The water that flooded you on
10 Burgundy Street, are you aware that there were
11 breaches of levees along the MRGO?  Are you
12 familiar with the MRGO?
13   A.  No.
14   Q.  But as far as the water that flooded
15 you on Burgundy Street, you don't know where
16 that water came from, do you?
17   A.  The river and Industrial Canal.
18   Q.  You think it also came from the
19 river?
20   A.  Yeah, I think so.  The river runs
21 into the Industrial Canal.
22   Q.  What about the water that flooded
23 you on North Robertson Street?  Do you know
24 where that comes from?
25   A.  It's the same water, I think.

Page 164

41 (Pages 161 to 164)

1  ask you to take a look at that.  Do you recall
2  that document, Miss Mumford?
3      A.  Yes.
4      Q.  And did you read that before you
5  signed it?
6      A.  Yes.
7      Q.  Let me just confirm that that is
8  your signature there.  Correct?
9      A.  Yes.
10     Q.  And in that document you verify that
11 you had read all written discovery responses
12 made on your behalf in this matter and that
13 all the information contained therein is true
14 and correct to the best of your knowledge,
15 information, and belief.  Do you see that?  On
16 the verification?
17     A.  Yes.  Yes.
18     Q.  And so these discovery responses
19 that I put in front of you, you had actually
20 read those and made sure that they were
21 correct before you signed the verification;
22 correct?
23     A.  Yes.
24     Q.  All right, Miss Mumford.  Now I want
25 to draw your attention to your response to
                                    Page 197

1  Interrogatory number 26.  And the question
2  there was "For each Plaintiff, including the
3  class rep, identify every injury or harm for
4  which damages are sought by that person and
5  each element of damage".  You see on page 26
6  there's a reference to your name, Ethyl Mae
7  Coleman Mumford.  Do you see that?
8      A.  Yes.  Yes.
9      Q.  And these are all the items of
10 damage that you seek recovery for in this
11 case?
12     A.  Uh-huh (affirmatively).
13     Q.  Is that correct?
14     A.  Yes.
15     Q.  I'm going to go a little bit out of
16 order here, but I want to draw your attention
17 to the third item, "Past and future loss and
18 destruction of and damage to immovable and
19 movable property".  Do you see that?
20     A.  Yes.
21     Q.  Do you know what immovable property
22 is?
23     A.  Yes.
24     Q.  What is that?
25     A.  It's like the house, the building I
                                    Page 198

1  can't move.
2      Q.  Now, this item of damage relates to
3  the properties that we talked about earlier in
4  the Lower Ninth Ward; right?
5      A.  Yes.
6      Q.  And it excludes the Feliciana
7  property.
8      A.  Yes.
9      Q.  And in this item of damage you are
10 seeking money; correct?
11     A.  Yes.
12     Q.  And how much money you're seeking
13 depends upon how much damage happened to your
14 property; correct?
15     A.  Yes.
16     Q.  That would be how much damage
17 happened to your property because of flooding;
18 correct?
19     A.  Yes.
20     Q.  Specifically concerning some of the
21 properties that we talked about, specifically
22 6113-15 North Robertson, you told me that you
23 had paid Diamond's about 109,000.
24     A.  Yes.
25     Q.  And then you'd paid someone else
                                    Page 199

1  $8,100.
2      A.  Yes.
3      Q.  And then you had a few other bills;
4  right?
5      A.  Yes.
6      Q.  In this lawsuit are you seeking
7  recovery of all of those amounts from
8  Lafarge?
9      A.  Yes.
10     Q.  So that would include the cost of
11 the additions to that property; correct?
12     A.  I didn't have the addition before
13 the storm, so that wouldn't be included.
14     Q.  So you're saying that should not be
15 included.
16     A.  Yes.  I didn't have it before.
17     Q.  Have you made any attempt to
18 determine how much of the expenses you paid in
19 connection with the property at 6113 --
20     A.  Yes, I have.
21     Q.  Hold on.  Let me finish my
22 question.  Have you made any sort of analysis
23 of how much of the amount you have spent on
24 6113-15 North Robertson related to repairs to
25 the property as it existed prior to the
                                    Page 200

1  North Robertson, that was demolished before
2  the storm; right?
3      A.  Yes.
4      Q.  Other than gutting the houses, has
5  there been any other work that would be
6  considered demolition for your property on
7  Burgundy or the properties on Robertson?
8      A.  No.
9      Q.  Diminution of property values.  What
10  do you mean by that?
11      A.  The value of the property.
12      Q.  Have you had any appraisals of any
13  of the properties?
14      A.  No.
15      Q.  The property at 6113-15 North
16  Robertson, that's actually better than it was
17  before the storm; right?
18      A.  Yes.
19      Q.  And the property at 4829 Burgundy,
20  when you finish those repairs, that's going to
21  be better than it was before the storm; right?
22      A.  About the same.
23      Q.  About the same?  Do you have any
24  documents in your possession relating to
25  diminution of property values for any of your

Page 205

1      A.  Uh-huh (affirmatively).
2      Q.  And the Robertson properties are
3  just -- What neighborhood is that in?
4      A.  Well, that's near North Claiborne.
5      Q.  It's part of the Lower Ninth Ward.
6      A.  Yes.
7      Q.  But obviously it's not part of Holy
8  Cross.
9      A.  No.
10      Q.  And in determining values, would you
11  agree that the Holy Cross neighborhood is a
12  nicer neighborhood than the Robertson Street?
13      A.  Yes.
14      Q.  All right.  And the niceness of the
15  neighborhood has an effect on the value of the
16  property; right?
17      A.  Yes.
18      Q.  And so you would agree with me that
19  determining the value of any given property in
20  the Ninth Ward, that's an individual type
21  issue, isn't it?
22      A.  Yes.
23      Q.  You would have to know the
24  neighborhood; right?
25      A.  Yes.

Page 207

1  properties?
2      A.  No.
3      Q.  Miss Mumford, over your lifetime you
4  have been involved in several real estate;
5  properties, correct?
6      A.  Yes.
7      Q.  So you're familiar with managing
8  rental properties?
9      A.  Yes.
10      Q.  And you're familiar with buying and
11  selling properties, aren't you?
12      A.  I never sold any.  I have been
13  buying, but not selling.  We never sold any
14  property.
15      Q.  In considering what your properties
16  are worth now, doesn't that depend on the
17  neighborhood that you're in?
18      A.  Yes, it has a lot to do with it.
19      Q.  All right.  And so when we're
20  talking about Burgundy, that's in a different
21  neighborhood than the Robertson Street
22  properties; right?
23      A.  Yes.
24      Q.  In fact, Burgundy is in Holy Cross;
25  right?

Page 206

1      Q.  You would have to know the condition
2  of the property; right?
3      A.  Yes.
4      Q.  So all of those things are unique to
5  those properties, correct?
6      A.  Yes.
7      Q.  All right.  Thank you.
8      A.  Could -- Would you mind going back
9  or could you go back to this one that says
10  past and future expense for demolition?
11      Q.  Sure.
12      A.  I didn't understand that one too
13  well.
14      Q.  Well, we talked about salvage of
15  movables.  That's to try to recover the
16  movables.
17      A.  Oh, okay.
18      Q.  You didn't do any of that?
19      A.  No, no, no.
20      Q.  And as far as demolition goes, you
21  didn't knock down any of your properties, did
22  you?
23      A.  No, I didn't.
24      Q.  You gutted them?
25      A.  Yeah.

Page 208

52 (Pages 205 to 208)

1    Q.   But you didn't knock any down.
2    A.   Okay.
3    Q.   That's what the questions had to do
4  with.  All right?
5    A.   All right.  Thank you.
6    Q.   Now, you have here as well, past and
7  future loss of enjoyment of lifestyle.  Do you
8  see that?
9    A.   Yes.
10   Q.   And what do you mean by that?
11   A.   Well, it's a different lifestyle now
12 with all the neighbors and church folk and
13 friends all scattered all over that I don't
14 have any more.  That I really enjoyed that,
15 and all of my church folk.  Most of them are
16 all scattered over everywhere.  All of my
17 neighbors, they all practically gone.
18   Q.   You still go to a church?
19   A.   Yes.
20   Q.   And where is that?
21   A.   It's 831 St. Maurice Avenue.
22   Q.   And you said that when you meant
23 lifestyle, some of your friends you had before
24 are not here?
25   A.   Yeah, they're not there any more.

Page 209

1    Q.   These are your friends; right?
2    A.   Yes.
3    Q.   And in determining damages for this,
4  you actually want money for these damages;
5  right?
6    A.   Yes.  Yes.
7    Q.   And when we talk about enjoyment of
8  lifestyle, you're talking about your
9  lifestyle?
10   A.   Yes.
11   Q.   Right?  And wouldn't you agree with
12 me, Miss Mumford, that your lifestyle is
13 different than other people's lifestyles in
14 the Ninth Ward?
15   A.   Yes.  Yes.
16   Q.   Right?
17   A.   Yes.
18   Q.   So when we're talking about losses
19 for enjoyment of lifestyle, that is an
20 individual issue --
21   A.   Uh-huh (affirmatively).
22   Q.   -- for everybody in the Ninth Ward;
23 right?
24   A.   Yes.
25   Q.   And to hear what their damages --

Page 210

1  determine what their damages are for loss of
2  enjoyment of lifestyle, I would have to talk
3  to them?
4    A.   Yeah.
5    Q.   Inconvenience, what do you mean by
6  inconvenience?
7    A.   Well, I mean, I don't have -- It's
8  not the same as it used to be before the
9  storm.  It's just different.  That my house
10 right now, what I am rebuilding is between two
11 blighted houses.  There's no other neighbor in
12 the block right now.  If I would move next
13 month, I'd probably be the only person in the
14 block.  Whereas the whole block was filled.
15 You didn't have no reason to be afraid.
16   Q.   And for this inconvenience you want
17 money; right?
18   A.   Well, I -- I don't know if that's
19 the way you say it or not.
20   Q.   Well, when you file a lawsuit, it's
21 your understanding that one of the reasons
22 you're filing the lawsuit --
23   A.   Yes.
24   Q.   -- or this lawsuit is to get money;
25 right?

Page 211

1    A.   Yes.  Yes.
2    Q.   And as far as your inconvenience
3  goes, your inconvenience is different than
4  other people's inconvenience?
5    A.   Yes.
6    Q.   Inconveniences?  Right?
7    A.   That's right.
8    Q.   So if I want to hear about -- or
9  determine what other people's inconveniences
10 are in the Lower Ninth Ward, I would have to
11 hear that from them?
12   A.   Yes.
13   Q.   You can't speak for what their
14 inconveniences were?
15   A.   Right.
16   Q.   And you can't speak for what their
17 loss of enjoyment of lifestyle was, can you?
18   A.   Correct.
19   Q.   All right.  There's also in here a
20 -- Well, before I get into that, you didn't
21 have any physical injury from the storm, did
22 you?
23   A.   No.
24   Q.   There's a note here "Past and future
25 mental pain, suffering, and anguish."  Do you

Page 212

53 (Pages 209 to 212)

1  see that?
2      A.  Yes.
3      Q.  What do you mean by that?
4      A.  Well, I went through a lot of
5  pressure having lost everything I had and it
6  kind of worked on my nerves some.  At one time
7  I was at the point I couldn't hardly sleep at
8  night.
9      Q.  I'm sorry, one time you were where?
10      A.  At the point where I couldn't sleep
11  well at night.  But it got a little better.
12      Q.  Have you ever sought any medical
13  treatment for that?
14      A.  The only thing I have is nerve
15  pills.
16      Q.  Which you told me earlier you had
17  those nerve pills before the storm?
18      A.  Which I had before.  It's now even
19  worse than it was before the storm.  But it's
20  a little better now.
21      Q.  All right.  Let's go over that.
22  Because what I asked you earlier, I asked you
23  how many of those pills you were taking.
24      A.  Yeah, I told you I had them before
25  the storm.

Page 213

1      Q.  You told me you had them before.
2      A.  Exactly.
3      Q.  You told me you had them after.
4      A.  Yes.
5      Q.  And you told me you were taking
6  about the same amount before and after.
7      A.  Yes.  I don't take too many of them,
8  but I have been more nervous since the storm
9  than I was before.
10      Q.  Have you gone to any doctors and
11  told them this?
12      A.  Well, I told my doctor when he gave
13  me the pills.
14      Q.  And again, these pills, he just
15  renewed your prescription.
16      A.  Yes.
17      Q.  This mental anguish you told me
18  about since the storm, it hasn't prevented you
19  from working, has it?
20      A.  No.
21      Q.  It hasn't caused you any physical
22  problems, has it?
23      A.  No.
24      Q.  You haven't been diagnosed with any
25  mental illnesses, have you?

Page 214

1      A.  No.
2      Q.  Have you ever been treated by a
3  psychiatrist or a psychologist?
4      A.  No.
5      Q.  Do you have any plans to see a
6  psychologist or psychiatrist?
7      A.  No.
8      Q.  Do you have any plans to seek
9  treatment for any mental illnesses?
10      A.  No.
11      Q.  Do you know people whose stress,
12  because of the storm, is worse than yours?
13      A.  Yes.
14      Q.  Do you know people that you believe
15  suffer mental illness as a result of the
16  storm?
17      A.  Some I do.
18      Q.  Their situation obviously is much
19  different than yours; right?
20      A.  Yes.
21      Q.  For those people that have real
22  mental type illnesses that they attribute to
23  the storm, you can't describe what they have
24  gone through, can you?
25      A.  No.

Page 215

1      Q.  And they're going to have to speak
2  for themselves on that; right?
3      A.  Right.
4      Q.  You can't tell me the type of mental
5  problems they have had, can you?
6      A.  No.
7      Q.  There's also one last item -- Let's
8  go over this past and future mental health
9  care expenses.  Do you see that?
10      A.  Yes.
11      Q.  You haven't incurred any of those,
12  have you?
13      A.  No.
14      Q.  So you don't have a claim for that
15  item, do you?
16      A.  No.
17      Q.  And then the last is kind of a
18  catch-all, "Any and all others proven".  Do
19  you know what that means?  Any and all other
20  damages proven.  Do you have any idea what
21  that means?
22      A.  That all the damage I had is already
23  proven.
24      Q.  Well, this would be in addition to
25  the items that we talked about earlier.

Page 216

54 (Pages 213 to 216)

```
 1      A.  Oh.
 2      Q.  Well, let me ask you this.  Do you
 3  have any other damages --
 4      A.  No.
 5      Q.  -- that you're aware of other than
 6  what we talked about?
 7      A.  No.  No.
 8      Q.  Do you understand that you are a
 9  class representative in this case?
10      A.  Yes.
11      Q.  Do you understand that you're a
12  class rep for something called a business loss
13  subclass?  Have you been told that?
14      A.  Business loss?
15      Q.  Right.
16      A.  Yes.
17      Q.  Do you know -- Do you have any
18  business losses?
19      A.  No, no more than the property I
20  lost.
21      Q.  Are you seeking any recovery for
22  lost rents?
23      A.  Yes.
24      Q.  Have you made any claims to your
25  insurance company for lost rents?
                                    Page  217
```

```
 1  factor.  But as far as -- Rents for different
 2  properties, okay, that would depend on where
 3  the property is located; right?
 4      A.  Uh-huh (affirmatively).
 5      Q.  Correct?
 6      A.  Yes.
 7      Q.  And would depend on the condition of
 8  the property; right?
 9      A.  Yes.
10      Q.  And in determining the amount of
11  business losses concerning lost rentals, you
12  would have to actually be renting the
13  property; right?
14      A.  Yes.
15      Q.  And one of your properties
16  specifically wasn't rented before the storm;
17  right?
18      A.  Right.
19      Q.  It hadn't been rented for eight
20  months; right?
21      A.  Yes.
22      Q.  And then another factor in
23  calculating your damages from that would be if
24  you actually can collect the rents; right?
25      A.  Because one property wasn't rented?
                                    Page  219
```

```
 1      A.  No.
 2      Q.  And as far as the amount you're
 3  seeking for lost rents, would you agree that
 4  the amount that you seek in a rental would
 5  depend on where the property is located, what
 6  neighborhood it's in?  Is that one factor?
 7      A.  Yes.
 8      Q.  And would also depend on the
 9  condition of the property?
10      A.  Yes.
11      Q.  How old it is; right?
12      A.  Yes.
13      Q.  How big it is; right?
14      A.  Uh-huh (affirmatively).
15      Q.  So in determining -- That was a
16  "yes"?
17      A.  Yes.
18      Q.  Okay.  So in determining the amount
19  of lost rental income, that would depend
20  necessarily on the unique characteristics of
21  that property; right?
22      A.  Yes.  Would it depend on the rent
23  that I collect monthly?  The amount of rent I
24  collect monthly, would that depend on that?
25      Q.  Well, that certainly could be a
                                    Page  218
```

```
 1  One unit was not rented?
 2      Q.  No, I am on to a different issue
 3  here.  Let me rephrase the question.
 4      A.  Okay.
 5      Q.  Have you in the past had problems
 6  with trying to collect rent from people?
 7      A.  I have had problems.
 8      Q.  And you have had situations where
 9  people have not paid you all the rent that
10  they owed you; right?
11      A.  Yes.
12      Q.  So in determining your damages for
13  lost rentals, obviously whether or not you
14  could collect the rent is an issue.  You
15  agree?
16      A.  Whether I collect it is an issue.
17      Q.  Yes, or whether it's collectable.
18      A.  Yes.
19      Q.  Miss Mumford, are you also aware
20  that you're a class rep for something called
21  the emotional distress class?
22      A.  Yes.
23      Q.  Have you been told that?
24      A.  Yes.
25      Q.  Have you been told that you're a
                                    Page  220
```

1  class rep for the property damage class?
2      A.  Yes.
3      Q.  Have you, in connection with this
4  lawsuit where you're a class representative,
5  have you attended any of the hearings in court
6  in this case?
7      A.  No.
8      Q.  There was a prior trial involving
9  Ingram.  Did you attend that trial?
10     A.  No.
11     Q.  Other than the one we're here for
12 today, have you attended any depositions in
13 this case?
14     A.  No depositions.
15     Q.  Other than the documents that you
16 produced and we talked about today, have you
17 reviewed any other documents of any kind
18 concerning this case?
19     A.  Yes.
20     Q.  What other documents?
21     A.  I can't name them, but they did --
22 the lawyers did talk with me and went over
23 documents with me, but I can't say what they
24 are right now.
25     Q.  You can't remember --

Page 221

1      A.  But it was concerning the case.
2      Q.  But you don't remember what those
3  documents were?
4      A.  No.
5      Q.  Have you ever been contacted about
6  any guidance or input in connection with any
7  of the papers filed in this case?
8      A.  Have I ever been --
9      Q.  Involved, consulted by your lawyers
10 or anyone else in connection with filings that
11 are actually made in court in this case?
12     A.  Well, they went to court and they
13 came back, they told me what happened.  That's
14 all I can remember.
15     Q.  That's all you remember?
16     A.  Yeah.
17     Q.  Do you know what a class action is?
18     A.  Yes.
19     Q.  What is it?
20     A.  A class action is a person like
21 myself just representing a whole group of
22 people that's in the area.  And they all have
23 the same problem I had with the water
24 destroying properties and contents and
25 whatnot.  Some of them lost loss of lives and

Page 222

1  all.
2      Q.  And this would be within an area;
3  right?
4      A.  Yes.
5      Q.  You told me earlier you thought the
6  area ended at Delery Street?
7      A.  Yes.
8      Q.  And that's in the Ninth Ward?
9      A.  That's in the Ninth Ward.
10     Q.  When did you first learn that you
11 were going to be a class representative?
12     A.  Oh, the late part of '05.
13     Q.  How did you learn that you would be
14 a class representative?
15     A.  Well, I just heard people talking
16 and then I went and talked with the lawyers
17 and they explained everything to me.
18     Q.  The lawyers being who?
19     A.  The Wiedemanns.
20     Q.  Have you ever had any conversations
21 with Mr. Brian Gilbert about this case?
22     A.  Yes.
23     Q.  Have you ever had any conversations
24 with the Bruno Law Firm?
25     A.  With this case?

Page 223

1      Q.  With any cases.
2      A.  With this case I think it was the
3  Brunos.  But I never was involved in any other
4  case other than the barge case.  The Brunos
5  had a case also, but someone, different ones
6  called me about this case.
7      Q.  Who called you about this case?
8      A.  It's someone that's working with the
9  case.  I can't remember their name.
10     Q.  With who?
11     A.  With -- Someone that's working with
12 the barge case.
13     Q.  They called you about --
14     A.  Just asking questions like the
15 lawyers does.
16     Q.  And that's how you first became
17 involved in this case?
18     A.  Oh, no, no.  I was already involved
19 in it.
20     Q.  Well, what firm called you about
21 becoming involved that you were just --
22     A.  I can't remember their name.
23     Q.  And do you understand that there's a
24 separate lawsuit against the United States
25 government concerning breaches along the

Page 224

56 (Pages 221 to 224)

1  MRGO?
2      A.  I heard something about it.  I don't
3  really understand.
4      Q.  Have you ever spoken to anyone at
5  the Bruno firm about becoming a party to that
6  lawsuit?
7      A.  No.
8      Q.  Have you ever filed any papers
9  making a claim against the government?
10     A.  No.
11     Q.  There's a form called an SF-95
12 concerning a claim against the government.
13 Did you ever fill out one of those?
14     A.  I don't remember if I did.  I don't
15 think so.
16     Q.  Other than the barge case, have you
17 been approached by anyone else about being a
18 party to another case involving flooding in
19 the Ninth Ward?
20     A.  No.
21     Q.  Well, I am still a little confused,
22 ma'am, and I've got to go back over this,
23 these conversations that you had with this
24 other person about becoming involved --
25     A.  It was someone, they told me who

Page 225

1      Q.  Do you have any estimate of what
2  they will be?
3      A.  No.
4      Q.  Do you have any financial
5  obligations with respect to this lawsuit?
6      A.  No.
7      Q.  Do you know whether you'll ever be
8  responsible for any expenses in connection
9  with this lawsuit?
10     A.  I don't know.
11     Q.  Have you paid any expenses --
12     A.  No.
13     Q.  -- in connection with this lawsuit?
14 No?
15     A.  No.
16     Q.  Have you ever filed for bankruptcy?
17     A.  No.
18     Q.  Have you ever been convicted of a
19 crime?
20     A.  No.
21     Q.  Have you ever been subject to a
22 restraining order?
23     A.  No.
24     Q.  I want to go back over your current
25 work.  You still do housecleanings; right?

Page 227

1  they were and they said it was on the barge
2  case and they told me my name and address and
3  all, that it was someone that was involved
4  with this case, but I can't remember their
5  name.
6      Q.  Was it somebody from the Wiedemann
7  firm?
8      A.  It could have been.
9      Q.  And was this before you had filed
10 the lawsuit?
11     A.  Well, this was recently.
12     Q.  Recently?
13     A.  Yes.  They asked the same questions
14 the Wiedemanns asked.  They were definitely
15 involved in the barge case.  They told me who
16 they were and all.
17     Q.  Do you understand that there are
18 expenses associated with bringing this
19 lawsuit?
20     A.  Yes.
21     Q.  Who's paying those expenses?
22     A.  The lawyers.
23     Q.  Has anyone given you an estimate of
24 what the costs of the lawsuit are?
25     A.  No.

Page 226

1      A.  Not right now.  I'm not doing any
2  housecleaning.
3      Q.  You do office cleanings?
4      A.  Yes.
5      Q.  You're still working for the
6  Wiedemanns; right?
7      A.  Yes.
8      Q.  How much are they paying you?
9      A.  They -- I work part time.  I work
10 three days a week, not so many hours, and they
11 pay me about $500, $600 a month.
12     Q.  Now, before the storm how often were
13 you working for them?
14     A.  Three days.
15     Q.  And how much were you being paid
16 then?
17     A.  About the same.
18     Q.  Now, how long was it after the storm
19 before you started working for the Wiedemanns
20 again?
21     A.  It probably was February, 2006.
22     Q.  Have any of the Wiedemanns referred
23 any other housecleaning clients to you?
24     A.  No.
25     Q.  Have the Wiedemanns ever referred

Page 228

57 (Pages 225 to 228)