# EXHIBIT 12
# Part 1

# REPORT REGARDING INDUSTRIAL CANAL FLOODWALL FAILURE AND REAL ESTATE DAMAGES ASSOCIATED WITH HURRICANE KATRINA EVENT OF AUGUST 29, 2005

## AUGUST 28, 2008

*By*
*Wade R. Ragas, PhD, MAI, SRA*
*Real Property Associates, Inc.*



EXHIBIT

RAGAS 2

PENGAD 800-631-6989

**Table of Contents**

| Items | Topic | Page No. |
|-------|-------|----------|
| 1 to 9 | Qualifications…………………………………………………………………… | 1-2 |
| 10 to 13 | Assignment……………………………………………………………………… | 2 |
| 14 to 16 | Assertions……………………………………………………………………….. | 3 |
| 17 to 20 | Complicating Damage Measurement Issues………………………………….. | 3-4 |
| 21 to 23 | Factual Materials Reviewed and Compensation…………………………….... | 4 |
| 24 to 33 | Analysis Complexity of These Valuation Issues…………………………….. | 5-7 |
| 34 to 52 | Property Non-Homogeneity and Lack of Sales Data Availability…………… | 7-11 |
| 53 to 60 | Limitations of Housing Statistical Models and Data……………………….. | 11-18 |
| 66 to 69 | Negative Externality Events and the Research Literature………………….. | 18-19 |
| 70 to 93 | Observations of Deficiencies in the Report by John A Kilpatrick PhD……… | 19-29 |
| 94 to 97 | Class Representatives Submitted by Plaintiffs Are Not Appropriate………………………………………………………………….. | 29-32 |
|  | Addendum A- Credentials of Analyst, Certification of Independence, Limiting Conditions and Assumptions…………………………………………… | 32-56 |
|  | Addendum B- Materials Reviewed and Relied Upon……………………….. | 56-60 |
|  | Addendum C- Property Stock Characteristics by Census Tract and Zip Code……… | 61-76 |
|  | Addendum D- Externalities and Property Values Research Findings in the Academic Literature and Bibliography…………………………………….. | 77-88 |
|  | Addendum E- Times Picayune High Visibility Articles (Page One) Regarding Levee Weakness and Public Risk Perceptions……………………………. | 89-92 |
|  | Addendum F - First American and eAppraiserIT Description………………… | 93-104 |

## Affidavit of Wade R. Ragas PhD, MAI, SRA

**As of August 28, 2008**

## I. Qualification

1. I, Wade R. Ragas, am a professor emeritus of finance at the University of New Orleans. I held the rank of full professor and a research professorship on behalf of the Louisiana Real Estate Commission. I also directed the Real Estate Market Data Center at the University of New Orleans which specialized in providing timely, accurate market information for Southeast Louisiana.

2. I received a PhD from Ohio State University in Real Estate and Urban Analysis (subset of Finance). My undergraduate degree is in Economics and I have a Masters in Business Administration from the University of New Orleans.

3. I also earned through coursework, testing and performance of reviewed appraisals the appraisal designation of MAI (Master of the Appraisal Institute), SRA (Senior Residential Appraiser) [Appraisal Institute]. I am also a state certified general appraiser in Louisiana (G0043).

4. I have been active in academic research with articles in Land Economics, Appraisal Journal, Journal of Real Estate Research, Economic Development Quarterly, Journal of Real Estate Finance and Economics, Real Estate Review and other professional publications. I was selected as a post-doctoral fellow by the Homes Hoyt Advanced Studies Institute.

5. I have taught graduate and doctoral courses in real estate finance, real estate market analysis and real estate investment. I served as a national instructor for the Society of Real Estate Appraisers and the Appraisal Institute for approximately 18 national course offerings. I authored a text for the Society of Real Estate Appraisers, <u>Applied Residential Property Valuation</u> which was the basis of a mandatory education offering attended by over 30,000 residential appraisers.

6. A curriculum vita describing my various activities, applied research, consulting and valuation activities is presented in Addendum A, along with a list of depositions and court appearances for the past 10 or more years.

7. I have served on the Board of Directors of Mutual Savings, Willswood Foundation, and Providence Community, which are all active in evaluating or developing or managing real estate in the New Orleans area. I chaired the real estate committees which were responsible for the development and management of thousands of units.

8. Annually, as director of the University of New Orleans real estate research center, I authored an analysis of the New Orleans real estate market including single-family, multi-family, commercial properties (office, retail, warehouse, hotels) as well as

Real Property Associates, Inc.   PO Box 74233   Metairie, LA 70033          Page 2

presenting an annual economic forecast from the perspective of real estate investments. I have been qualified as an expert in State and Federal courts in matters involving opinions of market value, real estate damages, market analyses for real estate, going concern business valuation and loss business profits. I authored with Dr. Jay Brinkman a nationally circulated analysis for the Mortgage Bankers of America, an analysis of Hurricane Katrina property damages in 2005. I also prepared a market analysis of the impacts of Hurricane Katrina on the Southeast Louisiana housing market with Dr. James Richardson for the Financial Services Roundtable in 2005/06.

9. I have designed individual valuation methodologies for the Louisiana Tax Commission as the basis for their review in 2003/04 of the Orleans assessors and the Board of Tax Appeals for the City of New Orleans involving thousands of residential and commercial properties in 2007.

## II. Assignment

10. I have been retained by counsel at Goodwin Procter for Lafarge North America Inc. in the Industrial Canal breach litigation. I have been asked to determine whether the share of damages incurred by property subject to storm water flooding from one or two breaches in the east wall of the Industrial Canal can be reasonably separately estimated (using a methodology suitable for class action damages measurement) from the cumulative damages caused by storm water flooding, rain and wind from Hurricane Katrina and other causes. I also have been asked to evaluate the expert report and proposed valuation analysis method as set forth by the plaintiffs' expert, Dr. John A. Kilpatrick as of June 27, 2008.

11. One task was to evaluate the appropriateness, accuracy and reliability of mass appraisal methodologies for use in determining market value before and after the levee breach event in conjunction with other sources of damages for the proposed class properties in this specific matter.

12. Another task was to evaluate the availability of reliable, accurate market data to support the use of a mass valuation methodology.

13. I have also evaluated the named plaintiffs as proposed class representatives as being "typical" of other member of the proposed with respect to the damage allegedly caused by one or two Industrial Canal flood wall breaches.

### III. Assertions

14. Counsel has instructed me that for a plaintiff to recover on a negligence claim, the plaintiff must prove that: 1) a defendant had a duty to the plaintiff, 2) the defendant negligently breached that duty, 3) the defendant's conduct was the cause in fact of the plaintiff's injuries, 4) actual damages resulted to the plaintiff from the defendant's actions and 5) only those damages caused by a defendant's negligent conduct are recovered.

15. Counsel have informed me that the plaintiffs in this action have claimed property damages in the form of diminution of market value; costs of repair, remediation, demolition, or salvage; and damages for loss of use. Where rental properties are concerned, the plaintiffs also claim loss of income or lost earning capacity / business opportunity. Neither the plaintiffs nor their expert, Mr. Kilpatrick, indicate whether such damages are intended to be cumulative or are stated in the alternative. I observe, however, that there is considerable over-counting if the various forms of damages were to be stacked. (For instance, the market value of an income-producing property incorporates expectations about what income the property is capable of generating).

16. Counsel has instructed me that the Court will likely consider three varying methods in establishing the amount of property damages in this matter. The damage specifications should be the one most appropriate to the facts of the case. The alternative damage measurements are: 1) the costs of repair or restoration to former condition if the item damaged can be adequately repaired, 2) the difference in market value prior to and following the damage (which is the most widely used standard), 3) replacement costs new less reasonable depreciation if the value before damage cannot be reasonably determined or the costs of repairs exceeds the market value of the item damaged. The appropriate measure of damages is unlikely to be the same for all properties in the proposed class.

### IV. Complicating Damage Measurement Issues

17. Measurement of physical damages caused by a single source of flood water amidst a confluence of flood water from three or more directions would require: 1) factual knowledge of the timing of each flood event and its duration and impact at the particular location, 2) the ability to measure incremental damage due to small differences in total water depth, 3) the extent of damages which would have occurred from any one of the sources of flood water given sufficient time for that source to reach a water depth equilibrium.

18. It is possible to measure the unique cumulative physical costs to repair or rebuild one housing unit at a time after an onsite inspection of that parcel reveals the quantity, quality and type of building improvements in each room (as well as accessory structure) of a property. Costs to repair will differ substantially for type of foundation, construction, age of property, stories, building use (commercial, single-family residential, industrial, multi-family, office and specialty structures) and condition of improvements pre and post storm. Without individual property inspections the requirements for a supposed existing

Real Property Associates, Inc.    PO Box 74233    Metairie, LA 70033    Page 4

database must be specified and its availability determined. I am unaware of the existence of an appropriate database to estimate physical costs of repair for large groups of individual properties in the proposed class area which would allow class wide damages estimates from a mechanistic or statistical model.

19. The extent of the damage due to the alleged negligent acts in this instance requires a knowledge of all the issues identified in items 16, 17, and 18. Any damages measurement methodology must be able to accurately differentiate between damages caused by a negligent breach of duty by a defendant and those caused independently through Hurricane Katrina and damages caused by those acts of others who are not defendants. Each cause of damage must be separately measurable. This requires differentiation of causes of damage and extent of damage from multiple sources, occurring more or less simultaneously to each parcel with differing absolute and relative amounts of damage. I know of no statistical or mechanistic model able to perform accurately these damage measurements.

20. When there are multiple defendants or other negligent parties, as alleged in the plaintiff's pleadings in this case, the allocation of liability must be specific to each defendant and their acts. Furthermore, I am unaware of any database, collection of databases or generally accepted valuation or damages guidelines which would allow the mass valuation measurement of pre-Katrina and post-Katrina market values for the proposed plaintiff class area or for the measurement of damages at a property specific level.

## V. Factual Materials Reviewed and Compensation

21. I have reviewed a variety of documents, materials, and factual information in formulating my opinions in this matter. Addendum B lists the material reviewed and relied upon. I have inspected the Ninth Ward east and west of the Industrial Canal as well as St. Bernard Parish on many occasions. I inspected the exterior and interior of several of the proposed class representatives' parcels on July 16, 22 and 23, and August 19. I have read the report of Dr. Kilpatrick on June 27, 2008 and a deposition which occurred on August 13 and 14 of 2007.

22. My firm's compensation schedule is $200 per hour for my research time and analysis, $400 an hour for the formulation of opinions and reports as well as for depositions (preparation and conduct) and for trial testimony/court presence time (preparation and testimony). Research associates are $100 per hour and clerical services are $50 per hour plus all costs of document copying and reproductions. Neither my compensation, nor the compensation of my firm, Real Property Associates Inc., is dependent on the outcome in this lawsuit. A certification of independence and a statement of limiting conditions follows the vita in Addendum A.

23. This opinion is preliminary and subject to revision as additional factual and expert report materials are made available to me. I reserve the right to update my analyses and conclusions if materials become available which alter or modify my opinions or conclusions.

## VI. Analysis Complexity of These Valuation Issues

24. Measuring property value before an event and measuring post-event valuation while separately measuring multiple casual and correlated impacts on property valuation levels as well as changes in value over time is among the most complex of valuation analyses. I have found no published research purporting to measure separately diverse simultaneous causes of value diminishment.

25. Prior to Hurricane Katrina, the class area as defined by the plaintiffs was a complex geographically diverse mixture of properties. The area included very old, poorly maintained and abandoned property, historic property in good to poor condition, 1880's to 1990's construction, and suburban one and two story dwellings. The Ninth Ward and in particular the plaintiff proposed class area in Orleans had some of the highest rates of violent crime based on a street oriented drug culture which should affect property values. Conversely, within the St. Bernard proposed class area there were few abandoned houses, a mostly well maintained housing stock, low vacancy rates and one of the lowest crime rates in the metro New Orleans area. Accurately estimating housing values before Katrina for this diverse housing stock within a single mechanistic empirical model is unlikely to be possible. Addendum C describes the diversity of housing in the proposed class area as well as housing price sales trends from 2005 to 2008 by census tract.

26. Hurricane Katrina introduced another even more diverse layer of complexity. Storm surge flood waters destroyed the eastern levees in St. Bernard and overtopped levees along the Mississippi River Gulf outlets' levees in Orleans and St. Bernard. The depth of the flood water at each individual property, extent of accompanying wind damage to the specific property, rain caused damage, duration of the flooding event by property, and individual living area elevations all collectively create a wide range of damage outcomes and costs to repair for each property in addition to the physical variations in building components by property. High velocity moving water surrounding some property would lead to still more complex structural damages measurements. Individual property inspections to measure damages would have to occur rather than any class wide model for measuring individual damages.

27. Public awareness of the lack of hurricane protection after Katrina's damage to locations within this class area would increase household perception of the risk of future repeated losses. Increased risk of future recurring loss will decrease property values due to reduced levels of market demand and an increased supply of houses available for sale. The reality of increased recurring flood risk is a negative externality which could affect the entire proposed class area – with significant differences in its effect depending on the location within the proposed class area -- until levee heights and levee strengths achieve a FEMA certified Category 3 hurricane protection level. Increased awareness of future flooding risk is an element of impairment in addition to actual physical costs to repair each property. I have collected and reviewed published page on articles in the Times Picayune in the October 2005 to August 2007 time period which would be expected to cause major changes in household flood risk perceptions (Addendum E).

Real Property Associates, Inc.   PO Box 74233   Metairie, LA 70033          Page 6

28. Physical damages to property in the plaintiff class area did arise from many simultaneous sources 1) flood water from St. Bernard levee failures, 2) storm surge floodwaters from the MRGO levee breaches/overtopping/failures, 3) high sustained winds and microbursts of Katrina, 4) rainwater interior damage occurring after prior hurricane caused roof/window damage, 5) long exposure to saltwater, 6) flowing high velocity water from the Industrial Canal, 7) falling trees and electrical poles, and 8) water mobilized debris (vehicles, floatables, non-organics and organic items) and 9) interactions among these diverse causes of damage. Termite damage (10) before and after the storm was occurring at a rapid rate. After the flooding events vandalism (11) removed copper wiring, pipes, air conditioning systems and decorative exterior treatments which all caused further property damage (12). Large scale reductions in employment, population and household which impact specific geographies cause market imbalances which affect housing prices. The defendants in this matter are alleged to have caused one of these twelve categories of physical damages. Allocating at the individual property level the share of dollar damages attributable to each cause of damage is a very complex and uncertain task which would require detailed physical inspections by competent experts while the extent of the damages are still evident. Measuring these elements of damages at a level of accuracy for attribution to each cause may not be possible at this time for all properties. Three years after the event, during which time a wide range of demolitions, repairs and new constructions occurred, it is not possible using any existing data set for a mechanistic or statistical modeling methodology to measure house level damages in the proposed class area. Individual property inspections by one or more construction experts would be required of each property as well as a search and collection for all previous inspections by prior experts at each parcel.

29. Substantial increases in costs of Federal flood and property/ casualty insurance have been shown in published research to significantly affect property values. Changes in costs of insurance will need to be known at a property level (this is a 13th cause of property value changes). The payment of Federal flood insurance, Federal Road Home funds, FEMA/Federal property elevation funds, FEMA/Federal property demolition funds, and grants from state of Louisiana public agencies all mitigate the damage costs not recovered by the plaintiff households. These sources of property specific Federal mitigation funds must be collected one property at a time and cannot be measured through a plaintiff class area wide mechanistic modeling methodology. No central database of these payments for damages incurred appears to exist at this time at an individual parcel level.

30. Within the property damage subclass are also commercial, retail, warehouse and multi-family apartment structures as well as income producing duplexes to fourplexes. Each of these properties housed a unique business activity -- unique in services rendered, unique in physical design and with a wide range of ownership forms offering differing compensation environments. This analyst in 2007 appraised over 150 or more commercial properties in St. Bernard Parish within the Murphy oil spill class action area. A general model for a mechanistic valuation process was not found to be empirically feasible due to the diversity of property uses and building designs for these 150 or more properties in a suburban setting.  The proposed class in this case, which is much larger

and more geographically diverse, is not a feasible subject for a mechanistic valuation analysis.

31. The U.S. Census in 2005 identified 1,059 establishments of all types as operating in St. Bernard with employees and 1,109 self-employed establishments without employees. Before Katrina in 2005 the U.S. Census Bureau reported the following zip code level firms and employment in the plaintiff study and control area:

| Zip Code | Firms | Employees |
|----------|-------|-----------|
| 70032 | 136 | 1,507 |
| 70043 | 666 | 8,867 |
| 70075 | 115 | 2,013 |
| **Total** | **917** | **12,387** |

These totals do not cover the self-employed persons who have physical firm locations. All of these firms are widely distributed by NAICS category and firm size. This analyst is not aware of a general model based on available published data which would allow estimation of pre-Katrina or post-Katrina property values for this diverse array of business locations in St. Bernard.

32. Zip code 70117 covering the Ninth Ward is likely to contain 402 businesses with structures specialized by type of business along the major roadways prior to Katrina, according to the 2005 U.S. Census. Within the Industrial Canal or near the Canal numerous larger employers were located before Hurricane Katrina. Many of these firms continued operation after the storm when repairs were completed. These industrial, warehouse, international business, shipping and boat repair operators are each unique, complex business entities which will not be appropriate for evaluation of damages through any general model in a mechanistic empirical structure. These firms are a diverse group of types with every major industry code category having businesses. These firms employed 5,504 persons prior to Katrina. The complexity of estimating before and after Katrina property values, storm related damages and damages alleged to be caused by defendant negligence does not indicate a mechanistic or general hedonic model approach as being plausible methodology to this analyst. Individual property inspections with unique, appropriate comparable sales of property and business property specific income and operating expense information would be required.

33. The diversity of property types, multiple sources of simultaneous damage, diverse pre-storm condition, diverse pre-storm quality of property in the proposed class area and diverse structural designs make the use of a mass appraisal valuation methodology not appropriate and inaccurate within the proposed class area.

## VII. Property Non-Homogeneity and Lack of Sales Data Availability

34. The more heterogeneous a housing stock is in physical and locational characteristics, the more difficult it is to model using a hedonic regression or some variant. Increased statistical complexity requires larger data files of arms length market sales with complete,

verified housing characteristics. Here, the housing stock is not homogenous and the data does not exist to carry out a valid hedonic regression.

35. Within Orleans Parish east of the Industrial Canal and in St. Bernard all sales recorded in the public record between January 2004 and June 2007 can be identified in New Orleans Real Estate transfers. These records are available at a street address level and by subdivision and must be hand downloaded by individual searches.

36. Sales in New Orleans Real Estate Transfers only report the vendor, vendee, price paid, lot width and depth, and recordation citation. Models of housing prices usually require (as a minimum) the property characteristics of at least building living area, stories, interior condition at time of sale, bedrooms, baths, parking type, foundation type, building elevation (to consider flood risk), construction type, quality of interior buildout, type of heating/cooling and other descriptive features with a large impact on housing price. Individual property characteristics as of August 2005 would have to be confirmed through voluntary property inspections with the owner's approval and active participation assuming the property still exists and the owner can be found. Alternatively, sales assisted by realtors are included in the online computer files of the Gulf South Real Estate Information Network.

37. After Katrina between October 2005 and December 2007 a total of 179 transactions occurred east of the Industrial Canal which were arms length single family (one or two unit) properties. Realtor descriptive information may be available for 49 sales based on a search of MLS records. Individual property characteristics after Katrina damages would have to be determined by individual property inspections with voluntary owner approval and assistance on the 130 other sales. The post-Katrina sales are a sample of about 2% of the single and duplex housing stock (179 of over 10,000 units) spread over the 2006, 2007 and 2008 time period. Very few sales assisted by realtors with property characteristic information occurred from November 2005 to December 2007. A realtor assisted sample of 49 sales would be a 0.5% sample of the Orleans proposed class area.

38. The Lower Ninth Ward covers approximately 1,400 acres where housing construction started in the 1880's. Approximately 12,000 housing units existed with 1,825 vacant units in varying stages of disrepair. Addendum C describes the housing stock in 2000 according to the U.S. Census.

39. St. Bernard Parish covers approximately 300,000 acres of dry land with a population of about 68,000 as of 2005 before Katrina. These 27,600 households had a high occupancy rate of 94%, few vacant owner occupancy units and almost no abandoned units. The housing stock from Orleans Parish to Paris Road was 10,819 units with a median age of about 45 years, while the Orleans housing stock median was about 60 years old. St. Bernard units were a mixture of modern slab on grade brick veneer housing and raised cottages in a one and two-story design. Addendum C describes both housing stocks. Based on my past experience, lot sizes, exterior construction, air conditioning/heating configurations, parking and unit maintenance conditions were all dissimilar in the Lower

Ninth to St. Bernard as well as being internally diverse in land use in Orleans as compared to St. Bernard.

40. I have personally performed analyses of property values and commercial property within the Ninth Ward and St. Bernard for over 25 years. I also personally have recurrently performed loss business profits analyses for state and Federal courts.

41. Within the proposed class action area in Orleans Parish, there were 11,955 housing units prior to Hurricane Katrina based on census counts. These units were 8,580 single unit structures, 1,904 duplexes and 1,471 three or more unit buildings (9,524 one and two unit structures). The sales activity prior to the storm in 2004 and 2005 would provide a sample of no more than 4% of the single and duplex units in the Orleans proposed class area. However, only 132 of these sales or a 1.3% sample had improvement descriptions from realtor assisted sales in 2004 and 2005 prior to Katrina.

42. In order to construct an adequate database to measure before storm property value and damages every housing unit in the class area will have to be inspected to ascertain before storm condition and housing characteristics. Every individual property would have to be individually inspected for pre-Katrina characteristics and for post-Katrina damages. Housing ages, condition, sizes and unit construction are not uniform within even small census tracts. Damages vary considerably from one house to the next in the same block.

43. The Holy Cross neighborhood (tracts 7.02, 8.00, and part of tract 9.01) offers a diverse range of building quality, condition, use, building attributes and sizes. About one-third of all the sales before and after Katrina in the proposed Orleans class area are in the small Holy Cross Historic District. Houses in the Historic District are substantially more expensive than north of St. Claude and have a different historic pattern of more rapid appreciation. Applying the same general valuation model to this location as to the area north of St. Claude Avenue is unlikely to yield accurate results for measuring the specific contributory components to value or damages at an individual property level. This is a problem acknowledged by Dr. Kilpatrick in his report.

44. Local tax assessment data in St. Bernard and the Ninth Ward lack accurate living area measurements and usually contains no interior property descriptive information. The Louisiana Tax Commission found in 2004 that the tax rolls of the Third District of Orleans were inaccurate and/or not uniform and required them to be redone which had not occurred at the date of Katrina. I have personal extensive experience dealing with inadequacy of tax assessment files in Orleans and St. Bernard as accurate measures of property value.

45. No accurate mass appraisal statistical model exists for use by the Third District assessor or St. Bernard assessor for the damages period prior to August 2005 or subsequently in 2006 for the proposed class area.

46. The minimum property attributes that would be needed for a pre-Katrina general model of residential property values in the proposed class area as of August 2005 are- 1)

property type (vacant lot, abandoned building, vacant but habitable units, residential rental property, type, condominium), 2) location (distance from breach, road type, locale), 3) neighborhood characteristics (historic area, abandonment level, suburban modern area, high crime rate urban area), 4) physical characteristics of the lot (flood insurance costs, width, depth, area, street condition), 5) physical characteristics of the property (living area, stories, bedrooms, baths, type of parking, condition of interior, quality of interior construction, foundation type, elevation of living area, age of improvements, off-street parking type, other buildings on site), and site improvements (fencing, swimming pool, Jacuzzi, cabanas/ extra buildings). These 20 to 30 attributes are likely to all be needed for each one to two unit property sale to construct a general model and for every property in the class area for which damages are to be deducted from a pre-Katrina property value. Additional items addressed in my item 28 for specific damages must be collected at the property specific level.

47. The list of pre-Katrina property attributes is different for each type of income producing property (duplex, three to fiveplex apartments, office, warehouse, retail, general commercial, hotels/lodging specialty uses and industrial). If these different income producing property types could be modeled they would each require a different non-uniform set of property description attributes and this data would have to be available for every property where a damage is to be measured. Individual business income and operating expenses for several years prior to Katrina and after Katrina would be necessary as part of the data for estimating foregone business profits and any mitigation of damages.

48. No private firm or public agency in the New Orleans area possesses a database with all of the necessary characteristics for all of the various types of individual parcels in the proposed class area or for any similar neighborhood of Orleans or St. Bernard Parishes. Individual inspections of structures for their pre-Katrina attributes would have to be collected to establish pre-storm attributes and valuation. This has not been done thus far.

49. Individual property post-Katrina inspections of each property, collection of insurance adjuster inspections, appraisals and any other physical condition descriptive records would be necessary. No central depository of these records exists. High levels of voluntary participation for each individual property owner in the class area would be necessary to provide property descriptive and damage payment information. Inspection of each property would be necessary, including the interior, to identify the accuracy and completeness of these written descriptions, define the causes of damage (wind, fire, rain, storm surge, flood water, termites, pre-existing damages, other causes of damage) and to identify repairs which have already occurred. The actual costs of repairs and the source of funding which paid for those repairs (household personal funds, Federal SBA loan, private property insurance, Federal flood insurance, Federal elevation mitigation grant, Road Home grant from Federal funds) would have to be identified and matched with the appropriate cause and extent of damage to avoid double payment for damages by Federal or state agencies. SBA and Road Home consider all of their files as confidential and in my experience have not allowed private contractors performing private management oversight tasks to access them directly, let alone plaintiffs in a litigation.

50. Based on the availability of limited factual information, a general model for pre-Katrina residential property values cannot be empirically estimated from the available data. Further, the model would require pre-Katrina inspections of over 20,000 individual properties seeking 20 or more descriptive items. In addition, an assessment of storm damage by cause, demolitions, repairs that have occurred, passage of time caused deterioration (mold, etc.) and vandalism would all have to be measured.

51. To the best of my knowledge no private insurance company, Louisiana Road Home, or flood insurance damages estimation measurements at the individual property level have relied upon a statistical model to measure damages without detailed property inspections to measure individual property specific damages. During the first few months after Katrina when the full extent of flood insurance policy losses had obviously occurred in a few geographies due to the depth of flooding (over 8 feet of water) there were disbursements of flood insurance proceeds made after only an exterior inspection of property with all or parts of some zip codes.

52. Measurement of cumulative damages due to all sources of damage and measurement of damages for the appropriate cause, in a multiple cause of damages environment for each property, will require individual inspections by trained experts and individual analyses for each individual property in the class area. These inspections and assessments would form the basis for expert opinions of the causes, extent and costs to cure individual property level damages. This is an extremely data intensive process which will require separate inspections of every plaintiff housing unit.

## VIII. Limitations of Housing Statistical Models and Data

53. The term "stigma" is used by Dr. Kilpatrick to describe a loss of market value experienced by all class members in excess of the cost to repair the physical property damage (Kilpatrick deposition, Vol. I, August 13, 2007, p. 202-03). Value diminishment in excess of costs to repair after a flooding event could be caused by temporary imbalances between demand and supply for a specific property type in a specific location (which is not uniform across location); a change in market perception of the risk in the future of flooding; and/or the presence of one or more negative externalities which may be of a temporary or long term nature.

The term stigma as defined in the Dictionary of Real Estate Terminology (Appraisal Institute 2002, p. 277) is:

> "**stigma**, an adverse public perception of a property with some type of opprobrium (environmental contamination, a grisly crime), which exacts a penalty on the marketability of the property and hence its value."

This is an ambiguous term with multiple possible causes in the class area that are not uniquely measurable due to an amalgam of simultaneous influences. The term in published articles has been used to refer to not only a constant, permanent reduction in

property value but also to a process of property value loss and recovery to former valuations over time.

Randall Bell, in a text written for the Appraisal Institute on Real Estate Damages (1999), does not find stigma to be a defined term. He refers to market resistance as the risk, if any, associated with the ongoing stage of a detrimental condition analysis (p. 343).

54. The term stigma as used by Dr. Kilpatrick cannot be explicitly linked to specific causes of damages and is instead a catch all amalgam of positive and negative externalities as well as market imbalances and unexplained variances due to other omitted variables in a statistical model. The damages, if any, caused by the defendants in this case cannot be separately measured by the term stigma as defined by Dr. Kilpatrick's vaguely described statistical model. The term externalities is defined as:

> "**externalities** 1. The principle that economies outside a property have a positive effect on its value while diseconomies outside a property have a negative effect upon its value.
>
> 2. Costs or benefits accruing to a property for which compensation or remuneration cannot be handled through normal, contractual procedures" Dictionary of Real Estate Terminology, 2002, p. 106).

The thousands of proposed class area properties were and are exposed to numerous separate positive and negative externalities and not a single uniform, common externality associated with the Hurricane Katrina event. This is not a case in which a single event attributable to the defendant has caused an impact which is statistically measurable.

Furthermore, different neighborhoods and different properties within the proposed class area would be subject to different "stigma" influences depending on public perception and other factors that are not the same across the entire area.

55. The statistical model as proposed in general terms by Dr. Kilpatrick appears to be a variation of a multiple regression, hedonic, statistical model using housing attribute variables which are usually referred to in the urban economics or real estate research literature as hedonic pricing models. In the practitioner literature this type of statistical model in a linear or non-linear multiple regression equation structure is often referred to as an Automated Valuation Model or AVM.

56. Both the Federal National Mortgage Association (FNMA or Fannie Mae) and the Federal Home Loan and Mortgage Corporation (FHLMC or Freddie Mac) have experimented with the use of AVM's in their mortgage underwriting process. Both agencies have concluded AVM estimates of market value are not a replacement for individual appraisals (Garritana, June 2007).

57. FNMA has specifically identified three major limitations on the use of AVM's instead of individual appraisals:

1) AVM's "...are dependent upon the accuracy, comprehensiveness and timeliness of the data they use. Data issues can include incomplete public records, insufficient sales of properties with comparable features within a specified geographic area, and a lag between the time when the market area is current and the AVM uses the data to generate an estimate of value.

2) Second, AVM's cannot be used to determine the physical condition and relative marketability of a property.

3) Third, AVM's can never fully incorporate the breadth of knowledge and judgment of a skilled appraiser" (FNMA, 2007).

58. The public record of sales does not provide any descriptive information on property use, condition, property improvement, physical attributes or damages. The realtor multiple listing service contained a small number of transactions (132) between January 2004 and August 2005 and a still much smaller group of sales between October 2005 and December 2007 (49 sales) for the class area within Orleans Parish immediately east of the Industrial Canal wall breaches.

59. The quantity of sales with some physical descriptive information is inadequate for estimation of approximately 20 or more necessary property attribute characteristics (item 46) for the before Katrina base line valuation analysis. The 49 sales of single-family (1 and 2 unit dwellings) post-Katrina for the 28 months following the storm is clearly inadequate for the statistical estimation of an overall value diminishment measure for over 10,000 units in this proposed class geography.

60. The unit sales are clustered disproportionately in the Holy Cross Historic District before and after Katrina with very few sales in the geography near the canal breaches. The tables below identify the timing and geography of sales in the proposed Orleans class area.

Real Property Associates, Inc.   PO Box 74233   Metairie, LA 70033          Page 14

## TABLE ONE
### PRE-KATRINA SALES
### JANUARY 2004 to AUGUST 2005
### EAST OF INDUSTRIAL CANAL

| Census Tract | # of Total Sales | Sales with Improvement Description | Sales With no Improvement Description | |
|---|---|---|---|---|
| 701 | 69 | 28 | 41 | (Near wall breach) |
| 702 | 73 | 22 | 51 | (Holy Cross neighborhood) |
| 800 | 62 | 23 | 39 | (Holy Cross neighborhood) |
| 901 | 53 | 19 | 34 | (Adjoins St. Bernard) |
| 902 | 52 | 13 | 39 | (Near wall breach) |
| 903 | 55 | 14 | 41 | (Near wall breach) |
| 904 | 42 | 13 | 29 | (Near wall breach) |
| Totals | 406 | 132 | 274 | |

Notes:  1. Sales in the Holy Cross Historic District are 45 of the 132 sales which is over one third of the sales

2. Sales far from the wall breach adjoining St. Bernard are another 19 sales

3. About half the sales or 68 are near the wall breach <u>before</u> Katrina

## TABLE TWO
### POST-KATRINA SALES
### OCTOBER 2005 to DECEMBER 2007
### EAST OF INDUSTRIAL CANAL

| Census Tract | # of Total Sales | Sales with Improvement Description | Sales With no Improvement Description | |
|---|---|---|---|---|
| 701 | 9 | 0 | 9 | (Near wall breach) |
| 702 | 59 | 16 | 43 | (Holy Cross neighborhood) |
| 800 | 59 | 20 | 39 | (Holy Cross neighborhood) |
| 901 | 21 | 5 | 16 | (Adjoins St. Bernard) |
| 902 | 4 | 2 | 2 | (Near wall breach) |
| 903 | 9 | 3 | 6 | (Near wall breach) |
| 904 | 18 | 3 | 15 | (Near wall breach) |
| Totals | 179 | 49 | 130 | |

Notes:

1. Sales in the Holy Cross Historic District are 36 of the 49 sales with improvement descriptions (tracts 702 and 800). Sales near St. Bernard and distant from the are 5 more sales (tract 901)

2. Only 8 sales with improvement descriptions are near the breach after Katrina from October 2005 to December 2007 (north of Claiborne Ave. and west of Tupelo Street in tracts 701, 902, 903 or 904)

Affidavit/LAFARGE NORTH AMERICA INC.

**61.** A search of recorded sales only identified twelve multi-family, retail, commercial and special use sales occurred after Katrina (Table Four) in the proposed class area. The lack of sales in all of these income producing categories makes a statistical general model for these categories impossible to specify from property physical attribute variables. Individual property specific inspections, data collection and analyses by trained professionals will be necessary. Before Katrina in 2004 and 2005, only 1 arms length commercial sales appear to have occurred (Table Three) in the proposed Orleans class area.

**TABLE THREE**
**INCOME PRODUCING PROPERTY SALES**
**JANUARY 2004- AUGUST 2005**
**ORLEANS PROPOSED CLASS AREA**

| Type Property | Sales |
|---|---|
| Commercial | 0 |
| Retail | 0 |
| Church or other business use | 0 |
| Fourplex or larger apartments | 0 |
| Com'l lot | 1 |
| **Total sales** | **1** |

Note: A total of 6 sales on Claiborne, St. Claude and N. Robertson were excluded as buyer or seller was a financial institution or a non-profit

**TABLE FOUR**
**INCOME PRODUCING PROPERTY SALES**
**NOVEMBER 2005 - DECEMBER 2007**
**ORLEANS PROPOSED CLASS AREA**

| Type of Property | Sales |
|---|---|
| Commercial | 0 |
| Retail | 9 |
| Hot house/ nursery | 1 |
| Fourplex or larger apartments | 1 |
| Com'l lot | 1 |
| **Total Sales** | **12** |

**62.** Market demand for purchase of damaged and renovated housing was not uniform within the proposed class area after the event. Differing rates of price decline and appreciation are clearly evident in the class area by small geographic areas such as census tracts. A general model would have to account for differing demand and supply market conditions in many areas as a separate effect from changes in property value from the flooding, wind and rainfall damages events. I am unaware of any hedonic regression model able to accurately measure separately a confluence of collinear (spatially correlated) geographic specific impacts of differing magnitudes and causes with separate accurate measures of damages by cause by property.

Affidavit/LAFARGE NORTH AMERICA INC.

**63.** Table Five shows among the few sales in the Orleans proposed class area (49 total) after Katrina were parcels in widely differing conditions <u>when sold</u> which makes using them in a statistical model much more complex. Some were under repair when sold (13), others were fully repaired (22), some were untouched with flood/storm damage (6) and four were vacant lots. Using these few sales in very diverse condition to estimate an accurate statistical model for over 11,900 housing units is not possible.

Table Six presents sales with no publicly available improvement description. Among these 130 sales were 42 in varying states of partial repair when sold, 42 more which appear to be fully repaired as of December 2007, 21 which appear to be unrepaired and apparently left as damaged, and 24 vacant lots. None of these sales used a Realtor. None of these properties were found to have previously sold using a realtor between 1996 and 2005. These sales would all require voluntary new owner participation (who are not currently claimants in this matter) to allow detailed property inspections. The condition of the house prior to the storm would have to be discovered from the prior owner. The resulting database would have very few sales with adequate improvement descriptions to allow the estimation of a statistical model appropriate to measure the market value of damaged houses in the Orleans Parish proposed class area after Hurricane Katrina.

Real Property Associates, Inc.    PO Box 74233    Metairie, LA 70033    Page 17

**TABLE FIVE**
**IMPROVEMENT DESCRIPTION**
**HOUSING SALES**
**OCT. 2005 to DEC. 2007**

| Census Tract | 701 | 702 | 800 | 901 | 902 | 903 | 904 | Totals |
|---|---|---|---|---|---|---|---|---|
| Abandoned house | 0 | 3 | 1 | 1 | 0 | 0 | 1 | 6 |
| House under repair | 0 | 4 | 4 | 2 | 0 | 1 | 2 | 13 |
| Vacant lot | 0 | 0 | 1 | 1 | 1 | 1 | 0 | 4 |
| Partially repaired | 0 | 2 | 1 | 0 | 0 | 0 | 0 | 3 |
| Repaired | 0 | 7 | 13 | 1 | 1 | 0 | 0 | 22 |
| New construction | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| Totals | 0 | 16 | 20 | 5 | 2 | 3 | 3 | 49 |

**Source:** Deedfax and New Orleans Gulf South Real Estate Information Network

**TABLE SIX**
**HOUSING SALES WITHOUT IMPROVEMENT**
**DESCRIPTION BY CENSUS TRACT**
**OCTOBER 2005 to DECEMBER 2007**

| Census Tract | 701 | 702 | 800 | 901 | 902 | 903 | 904 | Totals |
|---|---|---|---|---|---|---|---|---|
| Abandoned house | 0 | 5 | 4 | 5 | 0 | 1 | 6 | 21 |
| House under repair | 2 | 13 | 9 | 4 | 0 | 0 | 1 | 29 |
| Vacant lot | 5 | 3 | 4 | 3 | 2 | 4 | 3 | 24 |
| Partially repaired | 0 | 5 | 6 | 1 | 0 | 0 | 1 | 13 |
| Repaired | 2 | 16 | 16 | 3 | 0 | 1 | 4 | 42 |
| New construction | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Totals | 9 | 43 | 39 | 16 | 2 | 6 | 15 | 130 |

**Source:** Deedfax and New Orleans Gulf South Real Estate Information Network

64. As FNMA, FEMA, Road Home, FHLMC and private insurance companies have all concluded, damage measurement is a property specific task requiring one or more onsite experts to identify the physical damages, determine the cause of each damage to the property, calculate the costs to cure the damage by causal category and allow for interactions among causes in which more than one cause of damage contributed to the damage of the same component. The differentiation between storm surge from levee topping, breach flooding from the Industrial Canal, long term salt water exposure for weeks from multiple sources, hurricane wind damage and microburst, rain water damage through wind damaged roofs and windows, and vandalism damage after the event (piping, wiring, content thefts), and termite damage can only be done one house at a time with a physical inspection. No general statistical model could begin to provide estimates of these separate causes of damage. No centralized database of inspection, cause of damage and resultant damage amounts is available to the plaintiffs or defendants for these analyses.

65. Persons with a verified competency to identify and measure physical damages such as state certified appraisers, state licensed insurance adjusters and in many cases registered structural engineers or licensed contractors will need to perform detailed individual property inspections to collect the data necessary for a damages assessment to be made. The large amount of structure demolition which has occurred in the plaintiff proposed class area has removed a substantial portion of the housing stock. This analyst is unaware of any public detailed record of the extent and causes of damage to these individual properties after Katrina and before demolition. A determination was made that the property was over 50% damaged and, furthermore, too severely damaged to be rebuilt. Demolitions were often performed by FEMA with the voluntary approval of the owner. The owner was often the Louisiana Road Home who had acquired the house from the private owner. I am unaware of any public records which would be available to the plaintiff to address the item 28 complex components of damage assessments. However, individual property owners should have records of property inspections, damage estimates and costs of repair after Hurricane Katrina.

## IX.   Negative Externality Events and the Research Literature

66. If a negative externality exists due to the non-recurring, one-time failure of the Industrial Canal wall allegedly caused by a barge, the existing research literature on externalities supports the opinion that any impacts would quickly diminish with distance in a non-linear manner. A bibliography and discussion of the negative externality literature is presented in Addendum D.

67. One-time, non-recurring events based on the existing research literature usually result in a diminishment time period limited by the time to remedy the cause and a market adjustment period back to pre-event conditions. Observations by this analyst of renovated housing unit sales at the aggregated zip code level in the proposed class area suggest this price adjustment period for renovated, existing single-family housing appears to have been concluded by June 2008.

**Renovated Existing Single-Family Housing**
**Proposed Class Area**

| Zip Code Area | Jan.-Aug. 2005 | Oct. 2005-Dec. 2006 | Jan.-Dec. 2007 | Jan.-June 2008 | Appreciation 2005 to 2008 |
|---|---|---|---|---|---|
| 70117 | | | | | |
| Avg. Price | $107,283 | $245,508 | $196,429 | $251,126 | 140% |
| Price Per Ft. | $75 | $155 | $123 | $132 | 62% |
| 70032 | | | | | |
| Avg. Price | $116,550 | n.a. | $136,802 | $127,166 | 9.1% |
| Price Per Ft. | $80 | | $90 | $85 | 6.2% |
| 70043 | | | | | |
| Avg. Price | $119,043 | n.a. | $127,092 | $131,916 | 10.8% |
| Price Per Ft. | $81 | | $84 | $83 | 2.5% |

Source: New Orleans Metropolitan Association of Realtors and tabulated by Real Property Associates, as published in the Times Picayune.

68. Aggregate housing price trends for the proposed class area from 2005 before Katrina to June 2008 provide evidence which would support the price adjustment period for a one-time, non-recurring event to have been concluded (supporting tables in Addendum C).

69. A hedonic model as proposed by Dr. Kilpatrick must be able to analyze prices over time at an individual house level while separately estimating for each time period the remaining price diminishment (if any) due to a simultaneous confluence of several externalities- 1) higher perceived risk of flood reoccurrence due to the original design of the flood protection system, 2) higher flood and property insurance costs, 3) risk of levee breaches in areas with long delays in remediation activity before Category 3 levee heights and strengths are constructed, 4) imbalances in housing demand and supply due to household and employment relocations, 5) potential of a future manmade levee or protection wall failure during a hurricane event, and 6) posted levee breaches allegedly caused by negligence of a barge operator.  Furthermore, these various externalities would not be expected to apply uniformly across the entire proposed class area, but rather would be expected to vary within the class area depending on location and possibly other factors.

## X.  Observations of Deficiencies in the Report by John A. Kilpatrick PhD

70. The common element to be proved in this case is flood damage originating from two separate failures of the east wall of the Industrial Canal, each of which is claimed to have resulted from alleged negligence by the barge owner or operator.  This is a far more complex "cause of damages" question than general Katrina-related damages or flooding from multiple sources associated with the hurricane (Kilpatrick item 10).

71. Damages to the electrical wiring, drywall, and due to mold also were caused by extensive wind caused roof and wall/window damage to most properties. The tens of thousands of temporary blue roofs installed (one on nearly every property in the proposed class area) must be considered as a separate wind caused and rainwater based simultaneous Act of God damage not compensable under this claim (Kilpatrick item 11).  That is, even where there was damage to the electrical wiring and drywall/plaster (which has *not* been shown to be the case at every property throughout the entire class area), the cause of such damage is clearly not "common" among all class area properties.

72. Stigma as identified by Dr. Kilpatrick is the effect on market values of perceptions of risk and damage due to buyer awareness of the risk of future levee breaches. Dr. Kilpatrick has grouped together multiple externalities as a single cause of future property diminishment, most of which are not compensable in this case. Increased awareness of the risk of future levee breaches has occurred but the media coverage has focused primarily on the levee system as a whole east of the Industrial Canal and on control of water entry to the MRGO. In fact, the most recent Army Corp. of Engineers plan as published by the Times Picayune in a page 1 article shows the height of the Industrial Canal walls as now being adequate (map appears following next page).

Real Property Associates, Inc.   PO Box 74233   Metairie, LA 70033   Page 20

The focus of new and improved flood prevention levee systems east of the Industrial Canal is along the St. Bernard perimeter and the MRGO. A review of page one Times Picayune articles regarding levee weaknesses reveals 32 separate articles which discuss the Industrial Canal floodwalls in 22 instances as a possible cause for future flood risk. None of these page one articles mention this barge or potential future runaway barge events as a cause of flooding. Thus, public perception "stigma" due to the perceived risk of future flooding is a confounding factor, not a common liability factor in this case. Further, to the extent such "stigma" exists, it is not common or uniform but would vary depending on, among other things, proximity to the perceived sources of future flooding / danger, neighborhood elevation, etc.

Real Property Associates, Inc.    PO Box 74233    Metairie. LA 70033    Page 21

# 100-YEAR RIBBONS OF PROTECTION

The Army Corps of Engineers has decided how high each section of its redesigned levees system will be raised to protect the New Orleans area from storm surges caused by hurricanes with a 1 in 100 chance of occurring in any year. The heights may still be adjusted as levee sections are built, with completion by June 2011. The Mississippi River levees are not affected by the new height requirements.



Affidavit/LAFARGE NORTH AMERICA INC.

Real Property Associates, Inc.    PO Box 74233    Metairie, LA 70033          Page 22

73. Increased consumer concern for sea level rise and more frequent hurricanes due to
warming of the Gulf of Mexico may also cause increased levels of risk of future property
loss by residents who would be living on the edge of a rapidly approaching Gulf of
Mexico. In the long run these increased risks of flooding are likely to affect property
values in any coastal areas.

74. The small return of households throughout St. Bernard (under 40%) and the under 40%
return of households to zip code 70117 along with 50% rates of return for zip codes
70129, 70128, and 70127 is not a common factor related to the alleged barge impact at
issue in this case.  Instead, it is a confounding factor to the extent that it is related, at least
in part, to proximity to the Coast and eroding wetlands in a period of rising concern about
sea level rise, erosion and severe hurricanes due to global warming. There are also many
households waiting for Road Home funds. As of June 2008 only about half the
households in the proposed plaintiff class area had received checks from the Road Home.

75. It is impossible to accurately measure the extent and causes of property damage among
the twelve separate causes of physical damage (my item 28) without physical inspections
of each property. Much more data on each property would be available from individual
inspections and extensive collection of property owner insurance claims and
compensation data. Each property in the proposed class area has already been subject to
multiple prior inspections with subsequent determinations of compensation. The adjuster
and appraisal personnel exist to carry out this task in an efficient, accurate and low cost
manner for each claimant parcel (Kilpatrick items 13 to 15).

76. The entire mortgage industry in the U.S. accepts the reliability and consistency of
appraiser opinions of market value as well as cost of reproduction estimates from state
certified appraisers. Licensed adjusters are routinely relied upon for the discharge of
insurance claims.

Individual property inspections and those attendant costs would be necessary as part of
any objective and accurate methodology for establishing the extent of damages and those
elements compensable due only to the failure(s) of the Industrial Canal east wall and the
negligent actions (if any) of the defendants in this matter. Unless detailed, individual
property level data already exists at the address level, all of the data collection cost must
be incurred to provide accurate just compensation awards at the property level, even in
Dr. Kilpatrick's methodology for damages measurement.

Real Property Associates, Inc.   PO Box 74233   Metairie, LA 70033          Page 23



Affidavit/LAFARGE NORTH AMERICA INC.

77. The fear of a future recurring levee failure is not a damage caused by the one-time event involving the barge company owners and operators in the case at hand (Kilpatrick item 26). The probability of a barge owned or operated by these defendants being involved in a wall failure event in the Industrial Canal at some future date due to a hurricane event is infinitesimally small. By contrast, fears of inadequate levee construction along over 100 miles of levees surrounding St. Bernard and the Lower Ninth Ward may affect household location decisions in the future and the pricing of housing. However, fear of future levee failure from an Act of God or design failure by governmental agencies is not a source of property value impairment relating to the barge owners or operators in this matter.

78. I am a consultant to the Holy Cross Brothers and community regarding the redevelopment of their former high school site. The school is being rebuilt in the nearby Gentilly area. Funds for rebuilding from FEMA required the closure and demolition of the former school buildings except for one historic structure. I have met numerous times with Holy Cross community groups who are not interested in returning a private or public high school. Actual housing price appreciation near the former Holy Cross High School site has been substantial, as has renovation activity. The relocation of Holy Cross High School to Gentilly is not evidence of some form of negative externality limiting redevelopment in the class area (Kilpatrick item 26). To the contrary, the Holy Cross neighborhood is an example of the variability and lack of commonality associated with supposed post-storm "stigma" damage.

79. The closure of businesses, retail, churches and schools is attributable to household relocation decisions after Katrina to other locations less exposed to storm surge risk. No factual information has been presented in the Kilpatrick report or deposition to identify household fears of a barge owned or operated by the defendants causing a breach in the Industrial Canal retaining wall in the future as even a consideration in their decision to not return to the Ninth Ward or St. Bernard.

80. Funding from Road Home for damages not covered by flood insurance had reached only about half of the eligible households as of June 12, 2008. For example, by zip code number of fundings closed as compared to households shows thousands of claims along with millions of dollars in funds to return remained not resolved:

| Zip Code | Total Road Home Closing | Households in 2000 Based on Census | Percent Receiving Road Home Funds |
|----------|-------------------------|-----------------------------------|-----------------------------------|
| 70117 | 4,964 | 18,804 | 26.4% |
| 70032 | 1,579 | 3,473 | 45.5% |
| 70043 | 4,362 | 12,327 | 35.4% |

When only half of the households with severe damage had received Road Home funding, it is counterintuitive to expect more than 50% recovery of population in the Lower Ninth Ward or St. Bernard.

81. I have supervised property tax appeals of over 5,700 tax assessments in Orleans Parish in 2007 using all available property characteristic data, competent real estate professionals and appraisers. Individual hearings and appraisals with property specific information were conducted for each property over a six week time period. Under 1,300 of these review hearing findings were appealed further to the Louisiana Tax Commission. The Tax Commission conducted their own individual appraisals and hearings for these 1,200 parcels. Thus far the Tax Commission review has resulted in less than a 4% change in the property values recommended by the Board of Review process I designed. It is logistically possible and economically affordable to do individual analyses of market value and of damages for large groups of property. The tax appeal process cost was under $300 per property including over 700 commercial properties and many large houses. To insure uniformity in analyses by over 70 separate hearing officers and a dozen appraisers a common database was supplied to all the real estate professionals and common rules of conduct were imposed.  It is therefore incorrect to maintain that individual appraisals are either impossible or infeasible, or run an unacceptable risk of inconsistency.

82. ICF was awarded an over $600 million contract to manage and operate the distribution of various Louisiana Recovery Authority programs in June 2006. They hired First American Title who is one of the largest title insurance, real estate valuation and real estate services providers in the nation. Both ICF and First American were aware of the crucial role pre-Katrina property valuations would play in the funding determination and eligibility process. An existing widely used automated valuation product developed by eAppraiserIT was supplied all the factual information which could be reasonably collected within the various impacted areas. A description of First American and their subsidies in the valuation area appears in Addendum F of this affidavit.

Between July 2006 and December 2006 the initial analyses on over 25,000 properties were conducted with the first groups of those results being supplied to property owners in September 2006. The complaints from property owners about the inaccuracy of the AVM valuation were so extreme and widespread that individual appraisers began to be hired through Hammeman and Gainer, an appraisal management firm starting in January 2007. By the spring of 2007 the AVM Methodology had been completely discontinued in favor of the use of individual appraisers or real estate professionals using a Uniform Appraisal Reporting form performed by state certified appraisers. Clearly, if a mass appraisal methodology was likely to be effective in Orleans and St. Bernard parishes it would have been further pursued by ICF. Their valuation task was much simpler than that proposed by Dr. Kilpatrick. ICF only needed to measure pre-storm individual market value, not damages at a property level and post-storm market values at a property level. Nonetheless, this far simpler task could not be done by AVM on the geographies in this litigation. As Dr. Kilpatrick acknowledges in his item 37 "an automated valuation model (AVM) approach attempted by the Road Home program failed to accurately value many

properties [pre-storm], especially the older properties in New Orleans such as those in the
Lower Ninth Ward".

83. The existing databases available for the pre-Katrina valuations, according to Dr.
Kilpatrick, appear to be identified in his items 38, 39, 40, 41, 44, 46, 47, 48 and 49. The
potentially useful data are: MLS records, Deedfax, assessor property addresses and parcel
descriptions, Sanbourne maps with older building drawings, aerial photos with scaled
building size for first floor foundation, census block level aggregate data, recent
commercial sales in LACBD or Loopnet, water depth estimates at an address level, and
Orleans lot shape file with geocoding. In addition, windshield surveys of stories, property
use, exterior materials, design type and current status in 2009 could be collected through
visits to each parcel in the proposed class area.

I have reviewed the MLS records for the past several years to 2002 and found that the
Orleans proposed Class A area usually had 50 or fewer sales per year. Over a 4 year
period, 2002 to 2005, within the class area fewer than 200 realtor assisted sales are likely
to be available for a statistical model of over 10,000 housing units for pre-storm values.
In St. Bernard within the class area fewer than 600 sales between 2002 and 2005 assisted
by realtors for houses are likely available upon which to build a model of over 10,800
housing units. Although Deedfax online database provides all the sales, it does not
identify the use of any parcel (vacant lot, commercial, house, apartments, etc.) nor does it
provide any physical characteristics except for lot dimensions. Sanbourne maps and aerial
photography may provide approximate first floor only building sizes for some of the
older housing (not 2 story or 1.5 story) in Orleans which through a laborious task of exact
geocoding and analysis of the apparent improvements on each lot could yield some gross
building areas. The site visit would provide exterior property characteristics. All of these
data sources were available to eAppraiserIT and ICF with nearly unlimited financial
resources. Yet, the result was valuation estimates too inaccurate to be useful. I own
copies of the 1979 Redi Data/Sanborn maps and the 1920's Sanborne maps. Usually,
these drawings were scaled 100 or 200 feet per inch which makes accurately estimating
building areas from them not practical. It also ignores construction since 1979 and nearly
all housing in St. Bernard.

Interior property inspections are necessary to establish pre-Katrina market values. Where
there are not available records supplied by the property owner an analysis by a competent
professional will be needed.

In sum, the data sources identified in the Kilpatrick report as being available to carry out
AVM analysis are, in fact, not useful or suitable for that purpose.

84. No information source is listed for damages to a property except for water depth
estimates from a hydrology model. No data for wind damage, rainwater or microburst
damage, surging water, vandalism, theft, interior construction type or quality, falling
trees/telephone poles, water borne debris inside houses and the diverse interactions are
considered. The condition of the property pre-storm is not known – a particularly acute
deficiency in an area with abandonment, high vacancy rates, Formosa termite infestation

and a wide range of age for the housing stock. It appears some form of in-globo estimate of damages to all properties, regardless of the items just listed, would be applied to the pre-storm estimate of house value from the AVM model. The only source for water depth damages listed is a study by the Corps of Engineers not designed to be used for this purpose at all.

85. The use of water depth damages curves for broad cost benefit studies within the Corps of Engineers is not supportive of a single class action model to measure damages. These models produce very rough, not property specific measures of damages for river or rainstorm street flooding. The water depth in these models is street level estimates without regard to storm surge or saltwater extended exposure. The only property types are one story and two story housing without living area elevations in relation to water depth.

86. Discussions with Prof. Joseph Suhayda indicated he had discussed these riverine models with Dr. David Moser, chief economist of the Institute of Water Resources. Dr. Moser agreed with Dr. Suhayda that these simple models were inappropriate for measuring property damages after Katrina. Dr. Moser worked extensively with the IPET team after Katrina on their analyses.

87. My comments in item 57 identify the criteria for an AVM to have any reasonable chance of providing accurate valuations.   Subsequently, items 58 to 77 identify class area specific deficiencies.  The number of pre and post-Katrina sales in the proposed class area is too small for a model to capture the diversity of housing stock in the Lower Ninth Ward. The property description information for interior features, condition and quality are inadequate in both the St. Bernard and Orleans class areas for use of an AVM or hedonic pricing model. An AVM cannot be used to determine physical condition and certainly cannot estimate the variety of damages in a complex, simultaneous, multiple cause of damage environment as is present in the proposed class area. The actual sales data available based on physical inspections is very heterogeneous within even these small samples.

88. I do not find in my professional opinion the methodology recommended by Dr. Kilpatrick for the residential or income producing properties employs recognized techniques in an appropriate manner for measuring damages relevant to the failure of the Industrial Canal east wall and the alleged negligence of the barge owners and operators as claimed in this litigation. I have designed and implemented rigorous quality control systems in the recent past in Orleans Parish for the analysis of thousands of parcels. Given that there are few recent sales, no proposed interior inspections or interior data collected and no reliable means in the process to provide test/retest reliability for damage estimates, and an extraordinarily complex valuation problem, I see no feasible means within the Kilpatrick methodology of assuring a reasonable level of accuracy in damage estimates as consistent with fairness for the plaintiffs or defendants.

89. Items 30, 31, 32, and 33 of this opinion have provided a factual context for the complexity and inappropriateness mechanistic or statistical model to measure pre and post-Katrina income producing property market values as well as damages plus loss business profits. Item 61 also documents the extreme lack of commercial property sales pre and post-Katrina in the Orleans Parish portion of the class area.

90. With respect to business loss and lost rental income, individual analyses of income and expenses for each business before (2002 to 2005) and after (2006-2008) Katrina will be necessary because of the unique nature of each business enterprise. Similarly, the real estate housing the businesses is unique in design, location, condition, size, tenant lease terms, and ownership structure. Appraisals using common comparables for similar land uses, locations and size of asset may be possible but the necessary analyses, particularly in this diverse geography, do not allow the use of a statistical model to measure pre and post business property values. Damages, goodwill, inventory damages, furniture and fixture damages, business disruption, business relocation expense and mitigation due to profits from a relocated ongoing business all require individual, competent professional analyses.

91. I have conducted going concern business valuations for private firms and for use in the courts. I have also measured lost business profits in state and Federal courts.

There are no generally accepted benchmark, market based multipliers available for small, closely held businesses in these isolated neighborhoods that can be applied to their net income for income tax purposes to produce a reasonable estimate of the business value. Each business plaintiff will need an individual opinion of market value before Katrina which considers the value of the tangible assets (land, building, inventory) as well as intangibles (going concern, business values and goodwill). These are mostly small, closely held, illiquid business entities which will not follow national trends on profit before tax per dollar of real GDP for the nation or Orleans. Business values and property values estimates are likely to be very inaccurate using the methodology Dr. Kilpatrick recommends in his items 65 to 73.

92. Individually based valuations of plaintiffs' businesses can be performed in an accurate, timely and efficient manner. There is no generally accepted methodology I have encountered in the Business Valuation literature or Commercial Property Valuation literature for analysis of damages to individual properties or businesses which is consistent with Dr. Kilpatrick's recommendations.

93. Measurement of personal property damage requires individual cost of acquisition, depreciation and replacement costs which would require contacting every one of the plaintiff households and businesses for information on personal property which is identical to my recommendations for immovable property records. Records should be available for nearly all plaintiffs with property insurance since 99% or more of all property insurance and flood insurance claims have now been settled as of July 2008. As of August 22, 2006 the Insurance Information Institute found insurers had settled 658,700 claims or 94.8% of all expected claims. In addition, 99% of damaged vehicle claims had

Real Property Associates, Inc.    PO Box 74233    Metairie, LA 70033    Page 29

claims or 94.8% of all expected claims. In addition, 99% of damaged vehicle claims had been settled by August 2006. Claimants without property insurance (immovable, personal and auto) should be evaluated with proof of items owned and damaged being the responsibility of the plaintiff. This small number of properties could easily be evaluated by individual licensed adjusters. In short, a proper assessment of the extent of damage to personal property can and should be carried out based on actual personal property damage rather than on the basis of an arbitrary "formulaic percentage of house values" as proposed by Dr. Kilpatrick (item 74). Further, the proposed "formulaic percentage of house value" methodology has no application where the class member did not own the home (e.g., renters).

## XI.  Class Representatives Proposed by Plaintiff Are Not Appropriate

94. On July 16, 22 and 23, and August 19, 2008, I inspected 12 properties owned by the named plaintiffs identified as prospective class representatives in this litigation. Listed below are those addresses, the type of land uses and building type. Also, a map accompanies the class representative listing showing the proximity of these properties to the east side of the Industrial Canal. Most properties have been fully renovated and some are partly occupied. Income producing rental properties are nine of the twelve properties, including one business.

| Class Representative | Census Tract | Parish | Address | Type |
|---|---|---|---|---|
| Herman Koch | | St. Bernard | 3409-11 Shangri la | Income producing rental duplex, two-story modern brick veneer renovated |
| Herman Koch | | St. Bernard | 3619 Shangri la | Income producing rental townhouse, two-story modern brick veneer renovated |
| Herman Koch | | St. Bernard | 8547-49 Deerfield | Income producing rental duplex, two-story modern brick veneer renovated, owner-occupied |
| Michael Riche | | St. Bernard | 8825-27 W. Judge Perez | Income producing retail, not renovated |
| Michael Riche | | St. Bernard | 128-30 W. Phillip Ct. | Income producing duplex, two-story modern brick veneer, not renovated |
| Herman Koch | | Orleans | 6035-37 Burgundy | Income producing rental sold to others renovated one-story vinyl siding, raised |
| Herman Koch | | Orleans | 6317-19 Douglas | Income producing rental duplex, one-story not repaired vinyl siding, raised |
| Ethel Mumford | | Orleans | 4829 Burgundy | Renovated |
| Ethel Mumford | | Orleans | 6105-07 N. Robertson | Damaged as is duplex, rental |
| Ethel Mumford | | Orleans | 6113-15 N. Robertson | Rental duplex, repaired and renovated |
| Ethel Mumford | | Orleans | 6101 N. Robertson | Blighted before Katrina, now torn down |
| Jimmie Harris | | Orleans | 924 Lamanche St. | Renovated, owner-occupant |

**95.** The class representatives are not indicative of the physical, locational and use characteristics of the property in the proposed class.

- The proposed Orleans class area is 50% owner occupied single-family and the St. Bernard area is 67% single-family owner occupied. Nine of the 12 class representatives' properties are investor rental properties, including one business. One parcel is a vacant lot.
- The proposed class has one income producing commercial business property to represent 12 NCIS categories. The sole class representative property is a retail land use in St. Bernard not indicative of any of the over 2,000 non-retail businesses in the proposed class area. Further, this one business was primarily a truck route served marketer with little walk in retail consumer trade.
- The Lower Ninth Ward has 8,550 all single unit residential housing units in the class area but only two of the class representatives' properties are single unit residential structures in Orleans Parish- 924 Lamanche St. and 4829 Burgundy.
- Single unit detached residential structures are 8,331 units in St. Bernard within the class but not one of the class representatives is a detached single unit residential structure.
- The class representatives in St. Bernard are clustered in one small area of Chalmette which by zoning rental residential duplex but are not indicative of the owner occupant, single unit detached character of the housing stock. No class representative units are present in Arabi, zip code 70032 which are 3,402 housing units in the proposed class that are closest to the Industrial Canal wall failure in St. Bernard.
- Within Orleans none of the class representatives are located north of Claiborne Avenue in the area most affected by the Industrial Canal wall failure (tracts 701, 902, 903, 904)
- The lack of non-renovated residential properties, except for 6317-19 Douglas and 6105-07 N. Robertson, and 128-30 W. Phillip Ct. prevents any accurate analysis of the damages from the 13 possible sources of damage identified by this analyst from being accurately measured or identified from these class representatives.
- Voluntary, full renovation of investment income producing property would not occur by rational owners unless they believed property values and rents in the future would produce a profitable investment. Their ability to secure tenants at market rents is also indicative of normal market rate of return investments. The renovated condition of 7 of the 12 properties is directly contrary to the stigma value diminishment claims propounded by Dr. Kilpatrick.
- Income producing duplex rentals sell at differing (usually lower) price levels than owner occupant housing. Yet 8 of 12 of the class representatives' properties are rental properties.

**95.** The class representatives are not indicative of the physical, locational and use characteristics of the property in the proposed class.

- The proposed Orleans class area is 50% owner occupied single-family and the St. Bernard area is 67% single-family owner occupied. Nine of the 12 class representatives' properties are investor rental properties, including one business. One parcel is a vacant lot.

- The proposed class has one income producing commercial business property to represent 12 NCIS categories. The sole class representative property is a retail land use in St. Bernard not indicative of any of the over 2,000 non-retail businesses in the proposed class area. Further, this one business was primarily a truck route served marketer with little walk in retail consumer trade.

- The Lower Ninth Ward has 8,550 all single unit residential housing units in the class area but only two of the class representatives' properties are single unit residential structures in Orleans Parish- 924 Lamanche St. and 4829 Burgundy.

- Single unit detached residential structures are 8,331 units in St. Bernard within the class but not one of the class representatives is a detached single unit residential structure.

- The class representatives in St. Bernard are clustered in one small area of Chalmette which by zoning rental residential duplex but are not indicative of the owner occupant, single unit detached character of the housing stock. No class representative units are present in Arabi, zip code 70032 which are 3,402 housing units in the proposed class that are closest to the Industrial Canal wall failure in St. Bernard.

- Within Orleans none of the class representatives are located north of Claiborne Avenue in the area most affected by the Industrial Canal wall failure (tracts 701, 902, 903, 904)

- The lack of non-renovated residential properties, except for 6317-19 Douglas and 6105-07 N. Robertson, prevents any accurate analysis of the damages from the 14 possible sources of damage identified by this analyst from being accurately measured or identified from these class representatives.

- Voluntary, full renovation of investment income producing property would not occur by rational owners unless they believed property values and rents in the future would produce a profitable investment. Their ability to secure tenants at market rents is also indicative of normal market rate of return investments. The renovated condition of 7 of the 12 properties is directly contrary to the stigma value diminishment claims propounded by Dr. Kilpatrick.

- Income producing duplex rentals sell at differing (usually lower) price levels than owner occupant housing. Yet 8 of 11 of the class representatives' properties are rental properties.

Real Property Associates, Inc.    PO Box 74233    Metairie, LA 70033        Page 31



96. The class representatives' properties as proposed by the plaintiffs are not typical of the proposed class properties for measurement of the alleged damages caused by flooding and all other sources of damages in their current conditions. The location of the class representatives systematically ignores and avoids analyses of damages and alleged economic externalities in the geography closest to a breach where the research literature has found the highest likelihood of a negative externality would occur. The restored condition of the class representatives is consistent with a market expectation of a temporary valuation diminishment which would diminish to zero some time after the cause of the Industrial Canal levee failure was cured, rather than as being indicative of a long term, continuing market value diminishment.

In my opinion the class representatives proposed by the plaintiffs are not "typical" of other class members, nor are they appropriate as a sample of properties for measurement of alleged damages as claimed by plaintiffs in this matter.

97. The items described herein through paragraph 96 represent my opinion as of August 28, 2008. Attached are Addendums A to F which provide a portion of the factual supporting documents. Items I relied upon not presented within this report shall be provided in accordance with discovery and document production requests in this matter. A certification of the independence of these opinions as well as limiting conditions and assumptions are stated at the end of Addendum A which includes my statement of credentials.

Certified by

Wade R. Ragas PhD MAI SRA
Louisiana General Certified
Appraiser (G0043)
August 28, 2008