# EXHIBIT 13
# Part 1

### Page 1

```
              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF LOUISIANA

IN RE: KATRINA CANAL BREACHES   * CIVIL ACTION
                                * NO. 05-4182
PERTAINS TO: BARGES             * Consolidated
                                * SECTION "K(2)"
Boutte v. Lafarge       05-5531 *
Mumford v. Ingram       05-5724 * JUDGE DUVAL
Lagarde v. Lafarge      06-5342 *
Perry v. Ingram         06-6299 * MAG. WILKINSON
Benoit v. Lafarge       06-7516 *
Parfait Family v. USA   07-3500 *
Lafarge v. USA          07-5178 *
     *  *  *  *  *  *  *  *  *  *

          Deposition of MICHAEL JOSEPH RICHE,
given at Chaffe McCall, L.L.P., 2300 Energy
Centre, 1100 Poydras Street, New Orleans,
Louisiana 70163-2300, on August 6th, 2008.

REPORTER BY:
     JOSEPH A. FAIRBANKS, JR., CCR, RPR
     CERTIFIED COURT REPORTER #75005
```

### Page 2

1   APPEARANCES:
2   REPRESENTING THE BARGE PSLC:
3       WIEDEMANN & WIEDEMANN
4       (BY: KARL WIEDEMANN, ESQUIRE)
5       (BY: EDWARD MORENO, ESQUIRE)
6       821 Baronne Street
7       New Orleans, Louisiana 70113
8       504-581-6180
9
10  REPRESENTING LAFARGE NORTH AMERICA:
11      GOODWIN PROCTOR, L.L.P.
12      (BY: MARK S. RAFFMAN, ESQUIRE)
13      901 New York Avenue, NW
14      Washington, D.C. 20001
15      202-346-4000
16  - and -
17      CHAFFE, MCCALL, L.L.P.
18      (BY: CHARLES BLANCHARD, ESQUIRE)
19      2300 Energy Centre
20      1100 Poydras Street
21      New Orleans, Louisiana 70163-2300
22      504-585-7000
23
24
25

### Page 3

1   REPRESENTING THE AMERICAN CLUB:
2       MONTGOMERY, BARNETT, BROWN, READ,
3       HAMMOND & MINTZ, L.L.P.
4       (BY: RONALD J. KITTO, ESQUIRE)
5       1100 Poydras Street, Suite 3200
6       New Orleans, Louisiana 70163
7       504-585-3200
8
9   REPRESENTING ORLEANS LEVEE DISTRICT:
10      MCCRANIE, SISTRUNK, ANZELMO, HARDY,
11      MAXWELL & MCDANIEL
12      (BY: KASSIE HARGIS, ESQUIRE)
13      3445 N. Causeway Boulevard, Suite 800
14      Metairie, Louisiana 70002
15      504-831-0946
16
17  REPRESENTING JEFFERSON PARISH:
18      BURGLASS & TANKERSLEY
19      (BY: RICHARD PAVLICK, ESQUIRE)
20      5213 Airline Drive
21      Metairie, Louisiana 70001
22      504-836-2220
23
24
25

### Page 4

1   REPRESENTING LAKE BORGNE LEVEE DISTRICT:
2       DUPLASS, ZWAIN, BOURGEOIS, MORTON,
3       PFISTER & WEINSTOCK
4       (BY: RYAN MALONE, ESQUIRE)
5       Three Lakeway Center, 29th Floor
6       3838 N. Causeway Boulevard
7       Metairie, Louisiana 70002
8       504-832-3700
9
10  REPRESENTING WASHINGTON GROUP INTERNATIONAL:
11      STONE PIGMAN WALTHER WITTMANN, L.L.C.
12      (BY: HEATHER LONIAN, ESQUIRE)
13      546 Carondelet Street
14      New Orleans, Louisiana 70130
15      504-581-3200
16
17
18
19
20
21
22
23
24
25

```
 1  counsel this morning, did you do anything else
 2  to prepare for your deposition?
 3      A.  No.
 4      Q.  When did you first hire a lawyer to
 5  represent you in this case?
 6      A.  I don't remember the date.
 7      Q.  In what year?
 8      A.  It was after Katrina.
 9      Q.  How many months after Katrina?
10      A.  I don't remember.
11      Q.  Was it within a year after Katrina?
12      A.  I can't say for sure.
13      Q.  Tell me how you came to hire a lawyer
14  to represent you in this case.
15      A.  Well, I heard there was a lawsuit
16  because of the barge.
17      Q.  From whom did you hear that?
18      A.  From my neighbor on Charles Drive.
19      Q.  What's your neighbor's name?
20      A.  Fred Keller.
21      Q.  What did your neighbor tell you about
22  the lawsuit?
23      A.  That there was a lawsuit because the
24  barge had come through the Industrial Canal.
25      Q.  When Mr. Keller told you that, what
                                           Page 17
```

```
 1      A.  I haven't hired a lawyer, I have
 2  gotten in on the class action lawsuit against
 3  MRGO.  Oh, that's right, right, Sidney Torres,
 4  yeah, that was the lawyer I had to go to.
 5      Q.  You hired Sidney Torres to represent
 6  you in a class action lawsuit involving the
 7  MRGO; is that correct?
 8      A.  Right.
 9      Q.  Do you know where that lawsuit is
10  pending?
11      A.  I really don't know.
12      Q.  Can you tell me the thrust of your
13  allegations in that lawsuit?
14      A.  Well, I think that MRGO caused my
15  house to be flooded.
16      Q.  Your lawsuit involving the MRGO only
17  seeks damages for the flooding to your house;
18  is that correct?
19      A.  Well, from what I'm understanding now.
20  But at the time when I filed that one I don't
21  remember if I filed it just for the house or
22  for the house and the business and everything.
23      Q.  So as far as you know, your lawsuit
24  involving the MRGO involves both your house and
25  your business, is that correct?
                                           Page 19
```

```
 1  was your -- what actions if any did you take
 2  when you heard that?
 3      A.  Well, they gave me the number to call
 4  for lawyers, and, um -- I called them and told
 5  them that I was interested in getting in on the
 6  class action.
 7      Q.  When you made that phone call who did
 8  you speak to?
 9      A.  I don't remember.
10      Q.  Before you made that phone call what
11  understanding, if any, did you have about what
12  had caused the flooding in your area?
13      A.  I didn't know exactly what had caused
14  the flooding in the area.  So whatever I heard,
15  like with the, um -- MRGO, I had put in for
16  that one and the barge.
17      Q.  What did you mean when you said for
18  the MRGO you put in for that one?
19      A.  Because with the MRGO, I heard that
20  the water had come in from that way, and then I
21  heard from other people that on Judge Perez the
22  water had come from the Industrial Canal.
23      Q.  Have you hired a lawyer to represent
24  you in a lawsuit against the government
25  involving the MRGO?
                                           Page 18
```

```
 1      A.  I don't know.  I don't remember.
 2      Q.  Have you ever asked Mr. Torres to
 3  withdraw any claims from his lawsuit that
 4  relates to your business?
 5      A.  No.
 6      Q.  Did you ever file a claim form against
 7  the United States government?
 8      A.  I think that's the -- I think the form
 9  you're talking about is that S 95 or whatever
10  it is.  Yeah.  Everyone had to do that, yeah.
11      Q.  Did you file an SF 95 --
12      A.  Yes.
13      Q.  -- form?  I'm sorry, we have to try
14  not to interrupt each other.  Let me ask my
15  question.
16          Did you file an SF 95 form against the
17  government?
18      A.  Yes.
19      Q.  Do you have a copy of that form?
20      A.  I should.  Again, I don't know exactly
21  where it's at.
22          THE WITNESS:
23              I don't know if I provided it for
24          y'all.
25          MR. WIEDEMANN:
                                           Page 20
```

5 (Pages 17 to 20)

```
 1    A.  Glenda Susan.
 2    Q.  When did you marry your wife?
 3    A.  1966.
 4    Q.  And have you been married continuously
 5  throughout the entire time between 1966 and
 6  today?
 7    A.  No.  We divorced for like three years
 8  and then we remarried.
 9    Q.  When did you divorce?
10    A.  I don't remember the exact date.  It
11  was, um -- I'm trying to remember now.  I guess
12  about ten years ago, something like that.
13    Q.  When did you and Mrs. Riche remarry?
14    A.  Three years later.
15    Q.  Apart from your two marriages to
16  Glenda Susan Riche, have you ever been married
17  to anybody else?
18    A.  No.
19    Q.  Do you have children?
20    A.  Yes.
21    Q.  What are the names of your children?
22    A.  Kenneth, we had Randy, and Rebecca.
23    Q.  When was Kenneth born?
24    A.  He's 40 now, so --
25    Q.  All right.  And Rebecca, when was she
                                            Page 25

 1  born or how old is she?
 2    A.  Rebecca is 25.
 3    Q.  And if I'm not mistaken, Randy is
 4  deceased.
 5    A.  Yes.
 6    Q.  He was born when?
 7    A.  Um -- '74, I think.
 8    Q.  Randy died in 2005?
 9    A.  Yeah.  Six months before the storm.
10    Q.  And how did Randy die?
11    A.  Overdose.
12    Q.  Overdose of drugs.
13    A.  Yeah.
14    Q.  Mr. Riche, what is the highest level
15  of education that you have attained?
16    A.  College degree.
17    Q.  When did you receive your college
18  degree?
19    A.  In the seventies.
20    Q.  Where did you attend college?
21    A.  Loyola.
22    Q.  Loyola here in New Orleans?
23    A.  Yes.
24    Q.  What was your course of study at
25  Loyola?
                                            Page 26

 1    A.  Psychology.
 2    Q.  And you have a bachelor's degree in
 3  psychology from Loyola.
 4    A.  Yes.
 5    Q.  Do you have any military service?
 6    A.  No.
 7    Q.  What is your wife's highest degree of
 8  education?
 9    A.  High school.
10    Q.  Where did your wife attend high
11  school?
12    A.  Nichols.
13    Q.  Where is that school?
14    A.  St. Claude Avenue, I believe it is.
15    Q.  Here in New Orleans.
16    A.  Right.  New Orleans.
17    Q.  Where did you grow up?
18    A.  I'm originally from Plaucheville,
19  Louisiana, and then we moved to New Orleans for
20  the last time in '58, and then I grew up --
21  stayed in New Orleans.
22    Q.  Can you give me a narrative of your
23  work history since you received your psychology
24  degree at Loyola in the 1970s?
25    A.  Yeah.  Um -- when I went to Loyola, I
                                            Page 27

 1  was also working at Kaiser Aluminum.  And when
 2  Kaiser Aluminum shut down I, um -- went to work
 3  part-time at West Jefferson Hospital, and then,
 4  um -- after that I decided to try to find other
 5  jobs, but I couldn't, because they said I was
 6  too old, and, um -- yeah.  At 37.  So I started
 7  up Mr. Ribbon.
 8    Q.  When did you start Mr. Ribbon?
 9    A.  It was in 1985.
10    Q.  Where were you living when you started
11  that business?
12    A.  3617 Charles Drive in Chalmette.
13    Q.  When did you move to Chalmette?
14    A.  I moved to Chalmette, um -- when I got
15  married in '66.
16    Q.  From 1966 until you and Mrs. Riche
17  were divorced, did you live at 3617 Charles
18  Drive?
19    A.  From the time we were married?  No.
20  We rented.  We lived in a rental property on I
21  think Celestine, and we went to Esteban, then
22  we went the Pakenham, and then we went to
23  Charles.
24    Q.  I'm going to come back to that in a
25  minute.  When you started Mr. Ribbon in 1995,
                                            Page 28
```

7 (Pages 25 to 28)

```
 1  you were married to Glenda and you had three
 2  children; right?
 3      A.  Right.
 4      Q.  Since 1985 -- from 1985 until August
 5  of 2005, did you have any employment other than
 6  Mr. Ribbon?
 7      A.  When I started Mr. Ribbon I was also a
 8  sales rep, but I stopped there I think it was
 9  like '86 or '87.
10      Q.  For whom were you a sales rep in 1985,
11  1986?
12      A.  I was sales rep for Far East Imports,
13  a silk flower company.  And I forget the name,
14  but it was a ribbon company also I was a sales
15  rep for.
16      Q.  How long did you serve as a sales rep
17  for Far East Imports and another flower
18  company?
19      A.  Approximately two or three years.
20      Q.  This was during the time after you had
21  left Kaiser Aluminum and were looking for other
22  employment, right?
23      A.  Right.  It was after Kaiser and after
24  West Jefferson Hospital, and then I went as a
25  sales rep, and then went into Mr. Ribbon.
                                        Page 29
```

```
 1      A.  Yes.
 2      Q.  You purchased it after Katrina.
 3      A.  Yes.
 4      Q.  What was the purchase price?
 5      A.  $190,000.
 6      Q.  You paid $190,000 in cash for that
 7  home.
 8      A.  Yes.
 9      Q.  The money that you used to pay for
10  that home came from where?
11      A.  Most of it from the flood insurance.
12      Q.  The flood insurance that generated the
13  money to purchase your Lacombe home was on what
14  properties?
15      A.  All three of them.
16      Q.  You say all three.  You are referring
17  to the 3617 Charles property as one of them,
18  right?
19      A.  Yes.
20      Q.  And another one is the Judge Perez
21  property that was your business property.
22      A.  Yes.
23      Q.  And the third is the Phillip Court
24  property that was your rental property.
25      A.  Yes.
                                        Page 31
```

```
 1      Q.  Let me go back to your residences for
 2  a little bit and get the narrative on where you
 3  lived.  Starting with your current residence.
 4  You live now in Lacombe, Louisiana; right?
 5      A.  Right.
 6      Q.  How long have you lived there?
 7      A.  Three years I think it is now.
 8      Q.  You moved to Lacombe, Louisiana after
 9  Katrina.
10      A.  Exactly.  When we came back into
11  Louisiana, we moved there.
12      Q.  Do you own your home there?
13      A.  Yes.
14      Q.  Who lives there with you?
15      A.  My wife and my granddaughter.  And in
16  the summertime my other granddaughter.
17  Sometimes.
18      Q.  The granddaughter who lives with you
19  year-round is whose child?
20      A.  Randy's.  The deceased.
21      Q.  Your wife lives there, too; right?
22      A.  Yes.
23      Q.  Is there a mortgage on your home?
24      A.  No.
25      Q.  So you own it outright.
                                        Page 30
```

```
 1      Q.  Did you look into taking out a
 2  mortgage on your Lacombe property rather than
 3  financing it in all cash?
 4      A.  No one would give me a mortgage.  I
 5  was 60 years old with no income.
 6      Q.  How many mortgage companies did you
 7  ask before deciding that you would finance the
 8  entire purchase price with the proceeds of your
 9  flood insurance?
10      A.  I didn't go to any mortgage company, I
11  knew they wouldn't loan me.
12      Q.  What research, if any, did you do into
13  the availability of a sub prime mortgage in
14  2005 for your Lacombe property?
15      A.  I'm sorry.  I don't understand the
16  question.
17      Q.  You told me you didn't go to any
18  mortgage companies.
19      A.  No.
20      Q.  I'm sorry, the transcript is now going
21  to be bad because of the exchange we just had,
22  so let me go back.  Am I right that you did not
23  go to any mortgage companies?
24      A.  Right.
25      Q.  Did you go to anybody else to ask
                                        Page 32
```

8 (Pages 29 to 32)

1  about whether you might get a mortgage for your
2  Lacombe property?
3      A.  No.
4      Q.  Based on your understanding that you
5  would not be favorably received if you asked
6  someone for a mortgage, did you choose to
7  finance the entire purchase price of your
8  Lacombe property with the proceeds of your
9  flood insurance?
10     A.  Yes.
11     Q.  If you had had some of that money
12 available to you to repair your business
13 property, that would have been desirable for
14 your business, wouldn't it?
15     A.  If I had had a place to live.
16     Q.  Assuming you had a place to live, it
17 would also be desirable to have had some money
18 available to repair your business property,
19 right?
20     A.  Yes.
21     Q.  The decision to apply the money to the
22 Lacombe property instead of investing in your
23 business was a decision that you made based on
24 your understanding of the options available to
25 you at the time, right?

Page 33

1      A.  Right.
2      Q.  Before you bought your Lacombe
3  property, where were you living?
4      A.  After Charles Drive?
5      Q.  Yes.
6      A.  In Brandon, Mississippi.
7      Q.  Where were you living in Brandon,
8  Mississippi?
9      A.  The first month we lived by my son's
10 apartment, and then for the other two months I
11 think it was we got ourselves an apartment in
12 the apartment complex.
13     Q.  Was your son living in Brandon,
14 Mississippi, before Katrina?
15     A.  Yes.
16     Q.  This is your son Kenny.
17     A.  Kenny.
18     Q.  Before Brandon, Mississippi, you were
19 living at 3617 Charles drive, right?
20     A.  Right.
21     Q.  And how long had you been living at
22 3617 Charles Drive before the storm?
23     A.  Thirty-two, thirty-three years,
24 something like that.
25     Q.  Since the 1970s.

Page 34

1      A.  Right.
2      Q.  Did you own that property?
3      A.  Yes.
4      Q.  Was there a mortgage on it?
5      A.  No.
6      Q.  Who lived there with you in the year
7  before the storm?
8      A.  The same; my wife, my granddaughter
9  and my son.
10     Q.  Right.  Before your son's death, was
11 your granddaughter living with you?
12     A.  Yes.  Um -- I think she was maybe four
13 weeks when he died, and her mother was in jail.
14 So we had gotten custody of her.
15     Q.  So you had custody of your
16 granddaughter before your son's death.
17     A.  No, after.
18     Q.  Afterwards.  Before your son's death,
19 did he have custody of your granddaughter?
20     A.  No, he was in jail.
21     Q.  Okay.
22     A.  The baby was born while the mother was
23 in jail.
24     Q.  She is how old now, three years?
25     A.  Three.  Three and a half.

Page 35

1      Q.  So during 2005 you had a grandchild
2  who was born to a mother who was incarcerated,
3  is that right?
4      A.  Right.
5      Q.  And you had to deal with the question
6  of who would have custody of this child whose
7  mother was incarcerated, right?
8      A.  Right.
9      Q.  Was the baby born before your son's
10 death?
11     A.  Yes.
12     Q.  How long after the baby was born did
13 your son die?
14     A.  I think she was about maybe two or
15 three months.
16     Q.  Within two or three months of this
17 child's birth, you had then to deal with the
18 death of your son.
19     A.  Right.
20     Q.  And these events took a toll on you,
21 didn't they?
22     A.  Yes, they did.
23     Q.  And even to this day the events take a
24 toll on you, don't they?
25     A.  Yes, they do.

Page 36

9 (Pages 33 to 36)

```
 1    Q.  I'm handing you what I've marked as
 2  Exhibit 3 to your deposition.  Exhibit 3 is a
 3  map that I've printed from Google, and you can
 4  see there there's a little red bubble there.
 5  Do you recognize that red bubble as
 6  representing the location of your home at 3617
 7  Charles Drive?
 8         (Exhibit 3 was marked for
 9  identification and is attached hereto.)
10    A.  Yes.
11  EXAMINATION BY MR. RAFFMAN:
12    Q.  That residence was damaged in the
13  storm; right?
14    A.  Yes.
15    Q.  Is it fair to say, Mr. Riche, that --
16  well, let me ask this question, first:  Was
17  your home destroyed in the storm?
18    A.  Yes.
19    Q.  This is the home that you had lived at
20  for thirty years before the storm.
21    A.  Yes.
22    Q.  And is it fair to say that the
23  destruction of the home in which you lived for
24  thirty years also took a toll on you
25  emotionally?
                                        Page 37
```

```
 1    A.  Yes.
 2    Q.  The Charles Street address is east of
 3  Paris Road; correct?
 4    A.  Yes.
 5    Q.  And it's your understanding, as you
 6  sit here today, that the water that destroyed
 7  your Charles Road Home came from somewhere
 8  other than the Industrial Canal, correct?
 9    A.  Yes.
10    Q.  You are participating in a class
11  action lawsuit to recover for water that came
12  from the MRGO and destroyed your home; correct?
13    A.  Yes.
14    Q.  At the time of Hurricane Katrina you
15  were the owner of Mr. Ribbon; right?
16    A.  Yes.
17    Q.  What is your employment situation
18  today?
19    A.  Today I am -- I've got Mr. Ribbon
20  going again on the wholesale end out of my van,
21  calling on retail florists.
22    Q.  Apart from your wholesale business, do
23  you have other employment?
24    A.  No.
25    Q.  Is your wife employed today?
                                        Page 38
```

```
 1    A.  No.
 2    Q.  Has your wife worked outside the home
 3  since Katrina?
 4    A.  No.
 5    Q.  Before Katrina did your wife work
 6  outside the home?
 7    A.  Yes.
 8    Q.  What was your wife's employment
 9  outside the home before Katrina?
10    A.  Beautician.
11    Q.  Where was your wife employed as a
12  beautician?
13    A.  The Forum in Chalmette.
14    Q.  How long had your wife worked as a
15  beautician at The Forum in Chalmette?
16    A.  At The Forum I think it was maybe a
17  year, because one, The Forum was two beauty
18  shops that combined, and she worked for the
19  other one then.  You know, so then they
20  combined.
21    Q.  She had worked as a beautician for a
22  number of years before the storm?
23    A.  Yes.
24    Q.  When you got custody of your
25  granddaughter did your wife continue to work as
                                        Page 39
```

```
 1  a beautician?
 2    A.  No.
 3    Q.  She had to stop working to care for
 4  your granddaughter.
 5    A.  Right.
 6    Q.  Forgive me if I asked this question
 7  already, and your lawyer may object, but apart
 8  from your work for Mr. Ribbon since the storm
 9  you've had no other employment, correct?
10    A.  Correct.
11    Q.  Have you ever been employed as a truck
12  driver?
13    A.  Yes.
14    Q.  Tell me about that.
15    A.  That was way back, Sun Pacific
16  Trucking Lines.  That was in the sixties I
17  think it was.
18    Q.  In the 1960s.
19    A.  Uh-huh.
20    Q.  What is Tropical Paradise, Inc.?
21    A.  That was a business that we used to
22  have in Chalmette.
23    Q.  When you say we, who are you referring
24  to?
25    A.  My wife and I.
                                        Page 40
```

10 (Pages 37 to 40)

```
 1  to hire someone to do the work that Randy had
 2  been doing?
 3      A.  No.  I didn't replace him.
 4      Q.  Other than members of your family, did
 5  Mr. Ribbon ever have employees?
 6      A.  Yeah.  As subreps, you know.  At one
 7  time I had three trucks on the road.
 8      Q.  When did you have three trucks on the
 9  road?
10      A.  I can't remember those dates.  Um --
11  it was I guess two or three years before the
12  storm.
13      Q.  Did you reduce the number of trucks
14  during the years before the storm?
15      A.  Yes.
16      Q.  Why did you do that?
17      A.  There was no sense in paying insurance
18  and all on trucks and letting them sit in the
19  parking lot.
20      Q.  Why were the trucks sitting in the
21  parking lot?
22      A.  Well, I tried to hire some other
23  people, and they would steal.  So I decided,
24  well, just don't worry about getting somebody
25  else, I'd do it myself.
                                         Page 45
```

```
 1      Q.  The employees that you hired to try to
 2  expand your business proved to be unreliable?
 3      A.  Well, I had one of them that was good,
 4  you know, but then he left.  And then I had
 5  another one that I found out was stealing, so I
 6  let him go and just kept the truck with myself
 7  and my son, and then when my son passed away it
 8  was just me.
 9      Q.  As between the store and the truck,
10  which part of your business generated more
11  income in the year or two before the storm?
12      A.  It's probably the truck.
13      Q.  Where were the businesses that you
14  would visit in your truck before the storm?
15      A.  I went from, um -- Hattiesburg -- all
16  the way to Hattiesburg, and then I used to go
17  all the way to Pascagoula, and then to Morgan
18  City, and then north I'd go to, um -- to, um --
19  Prairieville.
20      Q.  Did you have any retail customers that
21  you'd visit with your truck in the Lower Ninth
22  Ward of New Orleans?
23      A.  You mean as far as to sell wholesale?
24      Q.  Yes, sir.
25      A.  No.  I had retail customers living in
                                         Page 46
```

```
 1  the Ninth Ward coming to the store and buying,
 2  but I didn't go to them with my truck.
 3      Q.  And you had retail customers who would
 4  come to your store from Chalmette, too, right?
 5      A.  Yes.
 6      Q.  Some of your customers would come to
 7  your store from the parts of Chalmette that
 8  were east of Paris Road; right?
 9      A.  Yes.
10      Q.  Can you give me a sense, today, as you
11  sit here, relative percentage of your customers
12  who came from east of Paris Road from those who
13  came from west of Paris Road in the Lower
14  Ninth?
15      A.  Well, I had customers coming from all
16  over, not just those areas.  I had some coming
17  from the west bank -- I never did, you know, a
18  survey as to who came from east of Paris Road.
19  Like I said, they came from all over; New
20  Orleans East, New Orleans, Metairie.
21      Q.  If you could open your store at Judge
22  Perez tomorrow, do you expect that you'd have
23  the same customer base that you had before the
24  storm?
25          MR. WIEDEMANN:
                                         Page 47
```

```
 1              I object to the form of the
 2          question.
 3              Subject to that objection you can
 4          answer it.
 5              It's an improper hypothetical.
 6  EXAMINATION BY MR. RAFFMAN:
 7      Q.  Can you answer?
 8      A.  There's no way.  Nothing's the same.
 9      Q.  One of the reasons that nothing's the
10  same is that large areas of New Orleans were
11  flooded and destroyed; right?
12      A.  Yes.
13      Q.  Not just the Lower Ninth Ward and the
14  area of Chalmette west of Paris Road, but other
15  areas, too, right?
16      A.  Right.
17      Q.  Your business has been affected by
18  flooding that happened in the areas outside the
19  Lower Ninth Ward and the area west of Paris
20  Road, hasn't it?
21      A.  It's been affected by all of it, yeah.
22      Q.  I'm showing you what's been marked as
23  Riche Exhibit Number 4.  Exhibit Number 4 is a
24  Google map with a red bubble.  Do you recognize
25  the red bubble, the letter A, as representing
                                         Page 48
```

Page 85:

1  some water in the store upstairs on the floor
2  towards front and also towards rear.
3      Q.  There were -- the mud on the first
4  floor was three to four feet high?
5      A.  No, not the mud, the merchandise in
6  the mud.  You know, the ceiling had come down,
7  you had insulation, and on the floor was mud
8  and merchandise all mixed in together like a
9  washboard.
10     Q.  Could you tell from anything you saw
11 how high the water had gotten in the store?
12     A.  Up to the second floor.
13     Q.  Up to the second floor.
14     A.  Right.
15     Q.  How high above the floor of the second
16 floor had the water gotten?
17     A.  I don't believe it went above the
18 floor.  I think it got up to the floor, but I
19 think it stopped.  I didn't see any evidence of
20 it going above the second floor.
21     Q.  Well, water had filled the entire
22 first story, right?
23     A.  Correct.
24     Q.  And then risen to the level of the
25 first story's ceiling.

Page 86:

1      A.  Correct.
2      Q.  And then possibly gotten as high as
3  the floor on the second story?
4      A.  Right.
5      Q.  But had not gone higher than the floor
6  of the second story?
7      A.  Right.
8      Q.  On the second story, you said there
9  was some evidence of damage at the roof.
10     A.  Correct.
11     Q.  What did you see there?
12     A.  Ceiling tiles had gotten wet and
13 fallen, and, um -- like I said, towards the
14 front and towards the back, and you could see
15 that some of the boxes had gotten wet.
16     Q.  The boxes had gotten wet because water
17 had come in through the roof?
18     A.  Correct.
19     Q.  The water that came in through the
20 roof would have been rainwater.
21     A.  Right.
22     Q.  The inventory that was in the boxes
23 that got wet, what had happened to that
24 inventory?
25     A.  It was ruined.  It was ruined.

Page 87:

1      Q.  Ruined.
2      A.  Ruined, right.
3      Q.  That inventory had been ruined by the
4  rainwater that came in through the roof.
5      A.  Right.  On the second floor, right.
6      Q.  Did you take pictures of the Judge
7  Perez property when you came back?
8      A.  Yes, we took some pictures of it
9  downstairs, and then outside.
10     Q.  How many pictures did you take?
11     A.  I don't remember how many we took, but
12 I think I gave some to the lawyers.
13     Q.  Whatever you took you gave to your
14 lawyers to be produced in the lawsuit to the
15 defendants; right?
16     A.  Right.
17     Q.  I'm going to hand you Riche Exhibit 8
18 and 9.  Riche Exhibit 8 is a color -- pair of
19 color photographs, I will represent for the
20 record, that same photographs appear to have
21 been produced to us in black and white with the
22 Bates Number Riche 000183.  (Tendering.)  This
23 is Riche 8.
24         Riche 9 is two other photographs that
25 have been produced to us, black and white with

Page 88:

1  a Bates number Riche 000184.  (Tendering.)
2          Directing your attention first to
3  Riche 8, can you identify that document for me?
4          (Exhibit 8 was marked for
5  identification and is attached hereto.)
6      A.  This is the bottom part.  This is the
7  storefront.  And the top picture is the inside
8  shot from the front door looking into the
9  store.
10 EXAMINATION BY MR. RAFFMAN:
11     Q.  Are the photos in Riche 8 among the
12 photos that you took when you returned to your
13 business address?
14     A.  Yes.
15     Q.  The top picture in Riche 8 shows the
16 store as viewed from what vantage point?
17     A.  From the front door looking into the
18 store.
19     Q.  How high is the ceiling in the store?
20     A.  Um -- I'd say it was about ten to
21 twelve feet.
22     Q.  In the middle of the picture, there's
23 a white square.  Do you see that?
24     A.  Yes.
25     Q.  Do you see that it has letters in it

```
 1  that appear to say upstairs?
 2    A.  Correct.
 3    Q.  Tell me, what is that white square in
 4  relation to the property?
 5    A.  Okay.  I had put a sign there to let
 6  people know what kind of merchandise was
 7  upstairs.  It was like silk flower bushes,
 8  foil, film, paint, dried flowers.
 9    Q.  So that sign is on the first floor and
10  visible from the floor of the first floor,
11  right?
12    A.  Right.  You see, you had the first
13  floor and the ceiling, and then you had about a
14  two-foot space with your air conditioning ducts
15  and all, and then at the top there you can see
16  where there was a rail up top, and that was the
17  second floor.
18    Q.  So that rail that appears in the very
19  upper part of this picture is the second floor.
20    A.  Right.
21    Q.  The second floor is visible from the
22  first floor as the property existed before the
23  storm.
24    A.  Right.
25    Q.  I could walk into your store before
                                            Page 89
```

```
 1  the storm and I could see that railing.
 2    A.  Excuse me?
 3    Q.  I could walk into the store before the
 4  storm and I could see that railing from where I
 5  was standing on the first floor?
 6    A.  Right.  Remember the renovations you
 7  asked me that I made?  Well, that's the hole I
 8  had cut in so you could see upstairs.
 9    Q.  Okay.  The lower picture on Riche 8 is
10  the front of your store, right?
11    A.  Correct.
12    Q.  The parking lot at Village Square is
13  to the left of the buildings in this picture?
14    A.  Right.
15    Q.  This picture shows a part of the
16  storefronts in the Village Square mall,
17  correct?
18    A.  Right.
19    Q.  If you look at the bottom part of
20  Riche 8, the storefront, there is an arrow
21  drawn on that.  Do you see that?
22    A.  Yes.
23    Q.  Did you draw that arrow?
24    A.  I don't remember if I did or not.
25    Q.  The arrow is pointing toward a portion
                                            Page 90
```

```
 1  of the roof that's on the top of your property,
 2  right?  Do you see the part of the roof?
 3    A.  Right.
 4    Q.  The underside of the roof has a
 5  segment that's white and then another segment
 6  that's dark.  Do you see that?
 7    A.  Yes.
 8    Q.  Can you tell me what the white and the
 9  dark parts are of the underside of the roof in
10  that photo?
11    A.  Yeah.  That's the plywood, and part of
12  the plywood must have blew off during the
13  storm.
14    Q.  The white part that you see in that
15  photo is the plywood that was there before the
16  storm.
17    A.  Right.
18    Q.  The dark part is the empty space that
19  was left when the plywood blew off during the
20  storm.
21    A.  Exactly.
22    Q.  Water didn't get that high on your
23  building, did it?
24    A.  No.
25    Q.  Riche 9: Can you tell me what is
                                            Page 91
```

```
 1  shown -- before that, the two pictures in Riche
 2  9, did you take those pictures?
 3        (Exhibit 9 was marked for
 4  identification and is attached hereto.)
 5    A.  Yes.
 6  EXAMINATION BY MR. RAFFMAN:
 7    Q.  Did you take those pictures at the
 8  same time you took the pictures in Riche 8?
 9    A.  Yes.
10    Q.  Were the pictures taken the first time
11  you visited the store after the storm?
12    A.  I don't remember if it was the first
13  time.  It probably was, but I don't remember.
14    Q.  Apart from the pictures that are shown
15  in Riche 8 and Riche 9, did you take other
16  pictures of your property after the storm?
17    A.  No.
18    Q.  Okay.  Then tell me what is shown in
19  the Riche 9 pictures.
20    A.  That's again pictures of the store
21  lacking from front to back.
22    Q.  Both of these are the first floor?
23    A.  Right.
24    Q.  The inventory had been piled up on
25  blue shelves?
                                            Page 92
```

23 (Pages 89 to 92)

```
 1    A.  Some were blue, some were other
 2  colors.
 3    Q.  Some of the blue shelves had fallen
 4  over?
 5    A.  Most of them, yes.
 6    Q.  At least one of them hadn't fallen
 7  over; right?
 8    A.  Right.
 9    Q.  Was any inventory on the first floor
10  of your business salvageable after the storm?
11    A.  No.
12    Q.  Was any inventory on second floor of
13  your business salvageable after the storm?
14    A.  Yes.
15    Q.  How much of the second floor inventory
16  were you able to salvage?
17    A.  Um -- I'd say about 80 percent of it
18  so far, but I haven't gone through box by box
19  yet, you know.  Um -- about 80 percent, I'd
20  say, from upstairs.
21    Q.  When you came back to Chalmette after
22  the storm, did you also go to the Phillip Court
23  property?
24    A.  Yes.
25    Q.  What did you see when you visited that
                                         Page 93
```

```
 1  property?
 2    A.  I saw that the front door had -- front
 3  doors had been kicked in, and that, you know,
 4  everything was full of mud, and everything was
 5  in disarray again.  And, um -- I went upstairs
 6  and saw that the water had gotten right up to
 7  the second floor there, also.  In fact, there,
 8  it had gone above the second floor, because I
 9  had to replace all the carpets.  All the
10  carpets and all were wet upstairs.
11    Q.  You said the doors had been kicked in
12  at both the Judge Perez and the Phillip Court
13  properties; right?
14    A.  Correct.
15    Q.  Did you mean to say that someone had
16  actually come to the property and physically
17  broken down the doors?
18    A.  I think so, because they were checking
19  for bodies or survivors or whatever.  That's
20  when they put the X with the date and --
21    Q.  At Phillip Court, did you see any
22  damage to the roof?
23    A.  The roof?  Yes.
24    Q.  What had happened to the roof?
25    A.  Oh, I had a electrical vent up on the
                                         Page 94
```

```
 1  roof, you know, to ventilate the attic, and I
 2  noticed that, um -- I assumed that the tenants
 3  on that side had stayed, because there was
 4  furniture stacked up, because there was no
 5  ceiling, um -- or attic stairs, but they had
 6  stacked up furniture to get up through the
 7  attic, because the little attic door was gone.
 8  And I don't know if it was the wind or if the
 9  tenants kicked out that ventilator to get out,
10  you know, in case they had to get out through
11  the roof, you know.
12    Q.  The vents had been removed or taken
13  out either by the tenants or the storm.
14    A.  Right.
15    Q.  Apart from the loss of that vent, were
16  any of the -- was there any other damage on the
17  roof?
18    A.  There was roof damage.  You could see
19  where the ceilings got wet, you know, leaks.
20    Q.  So the -- portions of the roof had
21  developed leaks during the storm?
22    A.  Apparently so, yeah.
23    Q.  And some of the rain had gotten into
24  the house?
25    A.  Yeah.  Yeah.
                                         Page 95
```

```
 1    Q.  And the rain had damaged the ceiling
 2  on the second floor.
 3    A.  In some areas, yeah.
 4    Q.  Was there any property missing from
 5  your store?
 6    A.  Not to my knowledge.
 7    Q.  Was there any property missing from
 8  your rental home?
 9    A.  Not to my knowledge.
10    Q.  Did you hear about any looting that
11  happened in Chalmette after the storm?
12    A.  Yes.  After I finished gutting out my
13  house they came and cut out all my copper pipes
14  and stole them, busted up the air conditioning
15  unit to get copper out of there.
16    Q.  Copper -- I'm sorry.
17    A.  Go ahead.
18    Q.  Copper pipes were stolen out of your
19  house on Charles Street.
20    A.  Correct.
21    Q.  Nothing was taken from your Phillip
22  Court home.
23    A.  No.
24    Q.  Did you hear about any looting that
25  happened in the Village Square area during or
                                         Page 96
```