# EXHIBIT 13
# Part 2

```
 1   after the storm?
 2      A.  No, I didn't hear anything about it.
 3      Q.  Did you hear about any looting that
 4   happened in greater Chalmette after the storm?
 5      A.  I heard rumors about looting going on,
 6   you know, but --
 7      Q.  Did you see any evidence of houses
 8   that had burned during the storm when you came
 9   back to see the property?
10      A.  I don't recall seeing any evidence of
11   any houses having burned down, but I do
12   remember seeing evidence of some of the stores
13   in Village Square Shopping Center that had
14   burned.  In fact, they showed that on the news,
15   too.  They showed -- it was around by a Super
16   Spuds, Pudgy's Super Spuds that was on fire,
17   and they had showed that on I think I was CNN.
18      Q.  During the storm, some of the stores
19   in Village Square had burned.
20      A.  Right.
21      Q.  You were able to identify those stores
22   as being in Village Square when you saw them
23   burning on the news.
24      A.  Yes.
25      Q.  When you returned to the Chalmette
                                              Page 97
```

```
 1   area, did you see any evidence that trees had
 2   been blown onto houses?
 3      A.  I don't recall seeing any trees.  I
 4   saw cars in trees, but I don't remember seeing
 5   trees blown onto houses, no.  There weren't too
 6   many trees around houses.
 7      Q.  Did any of the properties in the area
 8   of Village Square survive the storm reasonably
 9   intact?
10      A.  Not to my knowledge.
11      Q.  Were there any businesses in Village
12   Square that were located on the second story of
13   the mall?
14      A.  You mean only on the second story?
15      Q.  Yes, sir.
16      A.  Um -- there was an attorney that had
17   an office on the second story I think two units
18   down, and -- let's see.  I don't remember if
19   any other ones just had second floor.  Usually
20   if they did have something on the second floor
21   it would be like an attorney's office or an
22   office, you know, something where the people
23   didn't have to climb the stairs to go up and
24   down.
25      Q.  Sure.  So this attorney had his office
                                              Page 98
```

```
 1   on second floor of a building in which there
 2   was a different business on the first floor.
 3      A.  Right.
 4      Q.  Do you know whether the floodwaters
 5   reached this attorney's office on the second
 6   floor?
 7      A.  I don't know.
 8      Q.  Was the second floor of this
 9   attorney's office the same basic level as the
10   second floor of your building?
11      A.  I would imagine so.
12      Q.  I want to focus on your business
13   inventory, your inventory losses, and ask you
14   some questions about those.
15      A.  Okay.
16      Q.  Have you ever tried to figure out how
17   much money the inventory that you lost is
18   worth?
19      A.  Yes.
20      Q.  Have you created a list of the
21   business inventory that you lost in the storm?
22      A.  Yes.
23      Q.  I'm handing you what's been marked as
24   Riche Exhibit 10.  Can you identify that
25   document for me?
                                              Page 99
```

```
 1         (Exhibit 10 was marked for
 2   identification and is attached hereto.)
 3      A.  Yes.
 4   EXAMINATION BY MR. RAFFMAN:
 5      Q.  Is that the business inventory that
 6   you were just describing in your testimony?
 7      A.  Yes.
 8      Q.  When did you create the business
 9   inventory in Riche 10?
10      A.  I think I did that for trying to get
11   an SBA loan.
12      Q.  Did you create it in or around
13   December of 2005?
14      A.  Right.
15      Q.  Did you receive an SBA loan?
16      A.  No.
17      Q.  Did you receive a letter from the SBA
18   declining your loan?
19      A.  They said -- I didn't receive a letter
20   saying they declined, they said that I
21   withdrew.  And the reason for that was they
22   were requiring me to have insurance on all
23   three properties, with contents, at a cost of
24   ten thousand dollars, which I had no money to
25   get it with.
                                              Page 100
```

25 (Pages 97 to 100)

```
 1  fourth page?
 2      A.  The see how much I had lost in the
 3  storm with the business.
 4      Q.  I guess my question is, for things
 5  like the security system and the television,
 6  does that represent the cost to you of these
 7  items?
 8      A.  Right.
 9      Q.  And the truck, does that represent the
10  cost to you of the truck?
11      A.  Right.  Seems kind of low, only two
12  thousand dollars for the truck.  It was an old
13  one.  No AC.
14      Q.  How long had you had the truck?
15      A.  I guess about five years, six years,
16  something like that.
17      Q.  You had purchased the truck for $2000
18  six years before the storm?
19      A.  Right.
20      Q.  How long had you had the security
21  system?
22      A.  Um -- we had the security system ever
23  since we were in that building, with the second
24  floor part of a showroom and all.
25      Q.  You had purchased the security system
                                         Page 105
```

```
 1  that many years earlier for $4000?
 2      A.  Right.
 3      Q.  How old were the shelves listed in the
 4  top part of this page?
 5      A.  Since I went into business.
 6      Q.  You had purchased the shelves for
 7  $2000?
 8      A.  Right.  Most of the shelves I made, as
 9  you can see in the photographs.
10      Q.  You had -- if you had made the
11  shelves -- how did you assign a value of $2000,
12  then, to the shelves?
13      A.  Lumber.
14      Q.  You had paid $2000 for the lumber that
15  was used to make the shelves that many years
16  before the storm.
17      A.  Right.  Right.
18      Q.  How old was the cash register?
19      A.  The cash register was I guess -- I
20  think it was the only one I bought, you know,
21  since I started the business.  They broke into
22  the store one time, but I think I was able to
23  repair it.  If I'm not mistaken, I didn't have
24  to buy another one, I don't think.
25      Q.  You had purchased the cash register
                                         Page 106
```

```
 1  for $350 many years before the storm.
 2      A.  Right.
 3      Q.  The values that you included in your
 4  inventory are the original purchase prices for
 5  each of those items regardless of how old they
 6  were.
 7      A.  Right.
 8      Q.  The inventory Riche 10 does not
 9  include any of the inventory on the second
10  floor, does it?
11      A.  No.
12      Q.  Why did you not include any of that
13  inventory on this list?
14      A.  Because when I made that list I didn't
15  know I had lost any inventory from upstairs
16  until I started moving boxes that were stacked
17  up by the ceiling and saw that there was some
18  leaks there, too, that had come down in the
19  boxes.
20      Q.  Am I correct, then, that this
21  inventory on Exhibit Riche 10 is only a part of
22  the total inventory that you lost in the storm?
23      A.  Right.
24      Q.  Did you ever come up with a different
25  value for the property that you lost, the
                                         Page 107
```

```
 1  business inventory that you lost at 8827 West
 2  Judge Perez Drive?
 3      A.  No, not that I know of.
 4      Q.  I want to direct your attention back
 5  to Riche Exhibit 1 and focus your attention at
 6  the second page, Paragraph 8.  (Tendering.)
 7  Reading from that paragraph, it says, at this
 8  time petitioner Mike Riche d/b/a Mr. Ribbon
 9  shows that its injuries are under the quantum
10  limit to allow for a jury trial since its
11  reasonable damages are less than fifty thousand
12  dollars.
13          Do you see that?
14      A.  Uh-huh.
15      Q.  Can you explain to me why your claim
16  against Lafayette Insurance Company which
17  included property damage was stated to be less
18  than fifty thousand dollars?
19      A.  Yeah.  Lafayette has the business
20  policy.  See, everything downstairs is supposed
21  to be flood.  Okay?  So they only want to know
22  what damages that was caused upstairs from the
23  wind and the roof damage and the rain.  So
24  that's why that's what the difference is on
25  here.
                                         Page 108
```

```
 1   of your claim in this case; correct?
 2       A.  Correct.
 3       Q.  If rain got in through the roof of
 4   your business and damaged your property, that's
 5   not a part of this case either, is it?
 6       A.  Correct.  That's why I didn't have any
 7   figures for merchandise upstairs on that
 8   inventory list, it was just the downstairs.
 9       Q.  You told me earlier that the reason
10   that was for the downstairs was because you
11   hadn't been upstairs yet when you created it.
12   Right?
13       A.  No.
14       Q.  No, that's incorrect?
15       A.  Right.  That's incorrect.  I didn't
16   tell you that.  I said downstairs was what was
17   damaged from the flood.  Okay?  Upstairs is not
18   included in that because that was from the wind
19   and rain.
20       Q.  So the property that's in Riche
21   Exhibit 10, the downstairs inventory, is that
22   the only inventory you're claiming in this
23   case?
24       A.  Yeah.  I'm not claiming anything else
25   here.
                                          Page 121
```

```
 1       Q.  In order for me or a jury or anyone
 2   else to understand the difference between the
 3   property that was flooded that you're claiming
 4   in this case and the property that was damaged
 5   by wind and rain that you're not claiming in
 6   this case, we have to study what actually
 7   caused the damage to that property, right?
 8       A.  Right.
 9       Q.  We have to understand either from
10   testimony or from inspections what damaged the
11   property; right?
12       A.  Right.
13       Q.  What repairs have you done to the
14   Phillip Court property?
15       A.  I've gutted it.  That's about it right
16   now.  Secured it.
17       Q.  How much if anything have you spent on
18   the repairs to the Phillip Court property?
19       A.  I haven't spent anything other than my
20   time.
21       Q.  Have you -- you haven't sold either
22   Phillip Court or Judge Perez, have you?
23       A.  No.
24       Q.  Have you offered either one for sale?
25       A.  No.
                                          Page 122
```

```
 1       Q.  The truck that you used for your
 2   business in Mr. Ribbon before the storm was
 3   destroyed in the storm.
 4       A.  Right.
 5       Q.  This was the truck that you listed as
 6   $2000 in your inventory.
 7       A.  Right.
 8       Q.  You didn't drive the truck away from
 9   Chalmette before the storm.
10       A.  No.
11       Q.  Didn't see a need to do that.
12       A.  No.
13       Q.  After the storm, did you replace that
14   truck?
15       A.  Yes.
16       Q.  When did you replace the truck?
17       A.  I replaced the truck after we got our
18   flood insurance.  My wife and I sat down and
19   decided that I needed to get another truck that
20   I could pay cash for because no loan and a
21   house.  And that's where our money went to,
22   another truck so that I could start working
23   again and a roof over our heads.
24       Q.  Tell me how you reestablished your
25   business after the storm.
                                          Page 123
```

```
 1       A.  Well, what I could salvage from
 2   upstairs I put in the truck and went around to
 3   my customers, and then once I got the small
 4   business grant, then I could order some
 5   merchandise and start selling the ribbon again.
 6       Q.  How long were you out of business
 7   before you were able to salvage the inventory
 8   and then buy some inventory through the small
 9   business grant?
10       A.  It was a year.
11       Q.  There was a full year where you were
12   unable to conduct your business.
13       A.  Right.
14       Q.  What did you do during that year?
15       A.  Boy, I wish you were with me.  I
16   gutted, hauled out everything that we've worked
17   for all of our lives and threw it out.  Yep.
18       Q.  You were back in Chalmette -- you were
19   coming back from the Northshore to Chalmette to
20   do that.
21       A.  Right.
22       Q.  And you spent a year doing that.
23       A.  Yeah.  I had to clean out a house on
24   Charles, the business, the rental property and
25   my mom's house.
                                          Page 124
```

**Page 125**

1  Q. And after a year, you got back in
2  business.
3  A. Right.
4  Q. You contacted your old customers?
5  A. Right.
6  Q. Told them, I'm back?
7  A. Right.
8  Q. And they were happy to have you back?
9  A. Yeah. Yeah. They were happy to see
10 me.
11 Q. Did they begin to order, buy inventory
12 from you?
13 A. Yes.
14 Q. At pre-storm levels of inventory?
15 A. I'm sorry.
16 Q. At the same amounts they were buying
17 from you before the storm?
18 A. No, because I didn't have the
19 inventory I had before the storm.
20 Q. You were unable to supply the needs of
21 those customers.
22 A. Right.
23 Q. You were unable to get a loan to buy
24 more inventory to supply their needs.
25 A. No. No, I couldn't get it.

**Page 126**

1  Q. You tried to get a loan from who?
2  A. No, I didn't try to get a loan. Who's
3  going to loan me? Would you loan me, sixty
4  years old, no income, no collateral? You know?
5  Would you have loaned me? I don't think so.
6  Q. Well, leaving aside whether I would or
7  not, you didn't ask me or anyone else, did you?
8  A. No. I knew what the answer would be.
9  I've dealt with banks before.
10 Q. Was there anything apart from your
11 inability to get a loan to buy more
12 inventory --
13 A. I'm sorry.
14 Q. I hadn't finished my question. If you
15 don't understand it, bear with me, because I'll
16 make it understandable.
17 A. Okay.
18 Q. Apart from your inability to get a
19 loan, or your perception that a loan would not
20 be available to you, was there anything else
21 that prevented you from supplying your retail
22 customers with the same level of business that
23 you had supplied them before the storm?
24 A. Yes, I didn't have the inventory and I
25 didn't have the means of getting the inventory.

**Page 127**

1  In fact, I'll tell you how bad it was. Okay?
2  There was one particular company that stands
3  out in my mind, I had dealt with them for like
4  twenty years, and they told me -- you know, I
5  called them and told them what had happened, to
6  see if they'd work with me on a net 30 basis --
7  net 30 day basis. And they told me it had been
8  over a year since I ordered from them so I was
9  considered a new customer and had to have the
10 minimum initial order prepaid. So that's how
11 much I got from them.
12 Q. So you were unable to get the same
13 credit from your suppliers after the storm that
14 you had gotten from your suppliers before the
15 storm.
16 A. Correct.
17 Q. Your ability to do business after the
18 storm was affected by your ability to secure
19 credit from your suppliers.
20 A. Correct.
21    (Brief recess.)
22 EXAMINATION BY MR. RAFFMAN:
23 Q. What other obstacles have you faced in
24 your ability to do business from your truck
25 after the storm?

**Page 128**

1  A. Well, quite a few of my customers were
2  destroyed from the storm, also, you know,
3  because I went all along the Gulf Coast. And
4  some of them have reopened and some of them
5  isn't. And the ones that have reopened are
6  like me, they got to watch their pennies, you
7  know.
8  Q. These customers have less demand for
9  your products now because of the storm.
10 A. It's not that they have less demand
11 for it, but they don't have the money to buy it
12 to speculate sales, they basically have to buy
13 as they sell it, you know.
14 Q. These customers who are located all
15 throughout the Gulf Coast have less money
16 available to buy your product?
17 A. Right.
18 Q. Their lack of funds has caused you
19 losses in your business.
20 A. Right.
21 Q. What other obstacles has your business
22 faced in recent -- the last year or two?
23 A. Gas prices. Expenses, you know, as
24 far as as to gas. But, um -- other than not
25 having the inventory, you know --

32 (Pages 125 to 128)

```
 1    A.  Right.
 2    Q.  Where were their parents during the
 3  flood?
 4    A.  In Chalmette.
 5    Q.  On which side of Paris Road?
 6    A.  On the, um -- I think they were on
 7  the, um -- east side of Paris Road.
 8    Q.  Those people who died in the flood on
 9  the east side of Paris Road, they're not even
10  included in the class in this case; right?
11    A.  No. No.
12    Q.  Am I correct that they're not included
13  in the class in this case?
14    A.  Correct.
15    Q.  To your knowledge, however, there are
16  people who were on the west side of Paris Road
17  who suffered physical injuries or even death as
18  a result of flooding from having remained
19  behind during the storm.
20    A.  Yes.
21    Q.  Your mental pain, suffering and
22  anguish relates to something other than
23  physical injuries that you suffered.
24    A.  Right.
25    Q.  And because you didn't remain behind
                                          Page 141
```

```
 1  during the storm, your mental pain, suffering
 2  and anguish relates to something other than
 3  fearing for your life as a result of being put
 4  in any fearful situation during the storm.
 5    A.  Correct.
 6    Q.  Describe for me the mental pain,
 7  suffering and anguish for which you're seeking
 8  compensation in this case.
 9    A.  Well, first of all, our means of
10  income, our means of earning a living has been
11  turned upside-down.  Um -- our friends are
12  scattered all over the place.  Um -- everything
13  that we worked for all of our lives is gone.
14    Q.  And without meaning to diminish any of
15  that, and only because I want to understand
16  everything about this claim, is there anything
17  else besides what you've just mentioned that's
18  a part of the mental pain, suffering and
19  anguish for which you seek compensation in this
20  case?
21    A.  Not that I can think of right now.
22    Q.  The friends that have been scattered,
23  where did they live before the storm?
24    A.  Chalmette.
25    Q.  Did they live in your neighborhood
                                          Page 142
```

```
 1  near Charles Street?
 2    A.  Yeah.  Some of them did and some of
 3  them lived on the east side of Paris Road, some
 4  of them lived on the west side of Paris Road.
 5    Q.  It was both sides of Paris Road;
 6  right?
 7    A.  Right.  Right.
 8    Q.  They weren't all on the west side of
 9  Paris Road.
10    A.  No.
11    Q.  The mental pain and suffering and
12  anguish that you associate with the three items
13  that you've just mentioned, how does that
14  compare with the mental pain and anguish you've
15  described earlier attendant on the loss of your
16  son and the family circumstances that set upon
17  you earlier in that year?
18    A.  How does it compare?  There's no
19  comparison.  If you haven't lost a child you
20  don't know.
21    Q.  Losing the child was harder on you?
22    A.  Yeah.
23    Q.  The mental pain and anguish and
24  suffering that you've -- that you associate
25  with losing your means of living and the
                                          Page 143
```

```
 1  scattering of your friends and the loss of what
 2  you worked for, do you have any physical
 3  symptoms that you associate with that distress?
 4    A.  Forgetting.  It's not as bad now, but
 5  sometimes I don't know where I'm at.  You know,
 6  I'm driving along and I forget where I'm going,
 7  you know.  Stuff like that.
 8    Q.  Do you associate that uniquely with
 9  what happened to you as a result of the storm?
10    A.  I guess it's a combination.
11    Q.  Have you received any mental health
12  care or treatment?
13    A.  No.
14    Q.  You are and have been able to work
15  notwithstanding the suffering and distress
16  you've suffered.
17    A.  Right.
18    Q.  And you are able to enjoy time with
19  your family?
20    A.  Yes.
21    Q.  Do you go to church?
22    A.  Yes.
23    Q.  Have you gone to church after the
24  storm with the same or more or less frequency
25  as before?
                                          Page 144
```

36 (Pages 141 to 144)

**Page 149**

1  A. Yes.
2  Q. Let me ask you about the next item on
3  this list here, mental health care and
4  expenses. Do you see it says past and future
5  mental health care expense? Do you see that
6  item?
7  A. Right.
8  Q. What damages are you seeking for past
9  and future mental health care expenses?
10 A. I don't know.
11 Q. Do you have any past mental health
12 care expenses?
13 A. No.
14 Q. Do you expect to have any future
15 mental health care expenses?
16 A. I don't know.
17 Q. As you sit here today in this
18 deposition, are you planning to consult a
19 mental health care provider?
20 A. No.
21 Q. When you signed the interrogatory
22 response verification, were you planning to
23 consult a mental health care provider?
24 A. No.
25 Q. The next item on your list of

**Page 150**

1  damages -- before I move on, when you say
2  you're seeking damages for past and future
3  mental pain, suffering and anguish, do you have
4  a number in mind?
5  A. No.
6  Q. All right. The next item on the list
7  is the past and future loss and destruction of
8  and damage to immovable and movable property.
9       Apart from the property at Judge Perez
10 and at Phillip Court, is there other immovable
11 and movable property that you have in mind in
12 this item of damages?
13 A. No.
14 Q. The immovable property refers to Judge
15 Perez and West Phillip Court; right?
16 A. Right.
17 Q. The only damages you're seeking in
18 this case are flood damages, not wind or rain
19 damages; right?
20 A. Right.
21 Q. Have you quantified the amount of
22 money that you're seeking for the flood damage
23 to either the Judge Perez or the West Phillip
24 property or both?
25 A. I don't remember, no. No.

**Page 151**

1  Q. Your claim also includes -- well, let
2  me -- for immovable property. Um -- in order
3  to quantify your claim, we're going to have to
4  figure out which damage was due to the flood
5  and which damage was due to the wind and rain,
6  right?
7  A. Right.
8  Q. Let me move to the next item, past and
9  future -- I'm sorry. I need to reload. I
10 wanted to ask you about loss and destruction of
11 movable property. This refers to what
12 property?
13 A. The merchandise, the inventory out at
14 the store.
15 Q. Does it also refer to your truck?
16 A. Yes.
17 Q. Was there also a motor vehicle at the
18 West Phillip property?
19 A. No.
20 Q. The truck is the only motor vehicle
21 for which you're claiming damages in this case?
22 A. Right.
23 Q. Was there any movable property for
24 which you're claiming damages inside the West
25 Phillip house?

**Page 152**

1  A. Washer and drier and stove.
2  Q. How will you quantify the amount of
3  damages that you're entitled to receive for the
4  washer and dryer and stove?
5  A. The approximate cost of it, for a
6  washer and drier and stove.
7  Q. Can you tell me as we sit here today
8  what you think that number would be?
9  A. Probably for a stove, of course that
10 was back then, now the prices are ridiculous,
11 but around four or five hundred dollars for a
12 stove, and washer and dryer I guess around
13 three, four hundred.
14 Q. The inventory that we talked about,
15 you're relying on the inventory list that's
16 Riche Exhibit Number 10?
17 A. Yes.
18 Q. In the process of figuring out how
19 much money you're entitled to involves
20 identifying what the movable property was and
21 then assigning a value to each element of
22 movable property, right?
23 A. Right.
24 Q. And I guess we'd also need to know
25 what kind of shape the property was in to be

**Page 153**

1  fair about the amount of money that you'd be
2  entitled to, right?
3      A.  Right.
4      Q.  There's a separate item here in your
5  interrogatory answer for past and future loss
6  of use of immovables and movables.  Do you see
7  that?
8      A.  Yes.
9      Q.  Can you explain that item to me?
10     A.  Yeah.  That's, um -- the loss of being
11 able to rent out the duplex and to open the
12 business.
13     Q.  This is lost income from the duplex
14 and lost income from the business?
15     A.  Right.
16     Q.  Well, if you look down another few
17 items, do you see there's a separate item there
18 for past and future lost income?
19     A.  Right.
20     Q.  Can you tell me whether that element
21 past and future lost income is different from
22 past and future loss of use?
23     A.  I don't think so.
24     Q.  Okay.  As far as you're concerned,
25 they're the same.

**Page 154**

1      A.  Right.
2      Q.  Next item on the list is past and
3  future expenses for demolition and salvage of
4  immovable and movable property.  Tell me what
5  those expenses are in your case.
6      A.  It was the year that it took me to gut
7  them out, clean them out.
8      Q.  During the year that you spent gutting
9  and cleaning the three properties, what
10 percentage of your time was spent at the
11 Phillip Court and Judge Perez property as
12 opposed to the Charles Street property?
13     A.  Well, actually, there was four
14 properties that I did.  I had to do my mom's
15 house, too.  So 25, 25 and 25, I guess.  I
16 don't know.  I didn't -- of course, the store
17 was harder because of the ribbon.  Trying to
18 shovel ribbon out, you know, every time you
19 take a shovel full, the ribbon would come apart
20 and pull everything off the shovel, so you go
21 with an empty shovel to the wheelbarrow.  You
22 know?  And then later on, I couldn't work as
23 long.  I was getting tired, you know.
24     Q.  So if I understood you right, you
25 spent more time at the business property than

**Page 155**

1  the others?
2      A.  I think so, yeah.
3      Q.  Aside from the time that you spent,
4  are there other expenses for demolition and
5  salvage that you're seeking in this case?
6      A.  Well, my son had come in to help me,
7  and he had hired some Mexicans to help with,
8  um -- my house and my mom's house.  At the end,
9  you know, when they were putting -- the parish
10 was going the put a hundred dollar a day fine,
11 you know, if you didn't have it cleaned up and
12 all that, so he came in and hired some Mexicans
13 that he paid for to try to get me to where I
14 wouldn't be fined.
15     Q.  This was money that your son paid?
16     A.  Right.
17     Q.  Did you pay him back?
18     A.  No.
19     Q.  So you would not have a claim for
20 those expenses, I would have to have your --
21 your son would have to be the plaintiff to get
22 those, wouldn't he?
23     A.  I don't know.
24     Q.  Well, people that did the labor on
25 those homes were paid by your son, right?

**Page 156**

1      A.  Right.
2      Q.  Your son is the person who's out of
3  pocket for those expenses.
4      A.  Right.
5      Q.  Are there other expenses of demolition
6  and salvage that you haven't told me about yet?
7      A.  Not that I know of.
8      Q.  The time that it took you to do the
9  cleanup, I think I heard you say that that's
10 something for which you expect to be
11 compensated in this lawsuit.
12     A.  Yes, I think I should be.
13     Q.  And tell me what the amount of
14 compensation is that you're claiming for that
15 element of your damages.
16     A.  The amount of money?
17     Q.  Yes, sir.
18     A.  I have no idea.
19     Q.  As we sit here today, you can't tell
20 me an amount you think would be fair
21 compensation for the work that you did?
22     A.  No, I haven't tried to figure it out.
23     Q.  In order to figure that out, do I need
24 to know something about the number of hours you
25 spent?

39 (Pages 153 to 156)

**Page 157**

1    A.    I guess so, yeah.
2    Q.    Can you tell me how many hours you
3  spent?
4    A.    Um -- I spent about six hours a day --
5  well, six hours a day working.  That was at the
6  beginning.  And at the end of this year I was
7  working like four hours, you know, because,
8  like I said, I just couldn't go anymore.  But,
9  um -- it was six days a week.
10    Q.    So to figure out how much money you're
11  claiming to be compensated for the work that
12  you did on demolition and salvage, we take the
13  number of hours that you worked and multiply
14  that by an hourly amount that you would tell us
15  later once you've thought about what you think
16  is fair.
17    A.    Right.
18    Q.    The next item on your list is
19  diminution of property values.  Do you see
20  that?
21    A.    Yes.
22    Q.    And this is for the amount that your
23  Judge Perez property went down in value after
24  the storm?
25    A.    Yes.

**Page 158**

1    Q.    Same thing is true for your Phillip
2  Court property?
3    A.    Yeah.
4    Q.    For a business property, does the
5  value before the storm have anything to do with
6  how the business is doing that occupies the
7  property?
8    A.    No, it doesn't have anything to do
9  with it, but if you're going to sell it or turn
10  it over it has something to do with it.
11    Q.    I didn't understand your last answer.
12  If you were going to sell it or turn it over
13  what?
14    A.    Right.  Then the value of the property
15  has something to do with it.  It doesn't affect
16  the business part of it while you're in there
17  doing business, but like, okay, say if I wanted
18  to sell the building now, I couldn't get what I
19  paid for it.
20    Q.    You've been down to Village Square
21  sometime in the past few weeks; right?
22    A.    Yes.
23    Q.    How many businesses are there doing
24  business, open for business now?
25    A.    Now?  I don't know.  I'd have to guess

**Page 159**

1  maybe half a dozen, a dozen at the most, I
2  would say.
3    Q.    How many have opened in the last three
4  weeks?
5    A.    In the last three weeks?
6    Q.    Yes, sir.
7    A.    I don't think -- none that I know of.
8    Q.    The pre-storm value of your business
9  property have anything to do with the location
10  of the property?
11    A.    Yes.
12    Q.    Some locations are more desirable for
13  doing business than others, aren't they?
14    A.    Yes.
15    Q.    In fact, one of the things you hear
16  about every now and then is the three biggest
17  attributes of a business are location,
18  location, location.  Have you ever heard that?
19    A.    Yes.
20    Q.    So the drop in value of your business
21  after the storm is partly a function of the
22  specific shopping center that it's located in,
23  isn't it?
24    A.    Not really.
25    Q.    No?  Why do you say that?

**Page 160**

1    A.    Because all the properties in
2  St. Bernard have dropped since the storm.  Very
3  little businesses have come back.  In fact,
4  that's why you don't see Wal-Mart there now.
5  You know?
6    Q.    Was there a Wal-Mart in St. Bernard
7  before the storm?
8    A.    Yes.  There was a Super Wal-Mart.
9    Q.    Where was that?
10    A.    On Judge Perez right around by the
11  government complex.
12    Q.    Is that east or west of Paris Road?
13    A.    That was, um -- west of Paris Road.
14          (Brief recess.)
15  EXAMINATION BY MR. RAFFMAN:
16    Q.    Mr. Riche, apart from the Phillip
17  Court home and the Judge Perez property, you've
18  not bought or sold any property in the class
19  area, ever, right?
20    A.    No.
21    Q.    You've not bought or sold any property
22  in the class area since the storm; right?
23    A.    No.
24    Q.    And you're not trained in real estate
25  appraisal?

```
 1    A.  No.
 2    Q.  You're not trained in any capacity in
 3  real estate; right?
 4    A.  No, I am not.
 5    Q.  The next item on your interrogatory
 6  list, moving downward, says past and future
 7  loss and destruction of businesses and business
 8  assets.  Does that item include anything that
 9  you've not previously included in the other
10  items on this list that we've talked about
11  already?
12    A.  No.
13    Q.  The next item is past and future lost
14  profits.  Do you see that?
15    A.  Yes.
16    Q.  Explain to me what that element
17  represents.
18    A.  It's the profit I could have made
19  since the storm, in the past, and the future,
20  because I still don't have a building that is
21  accessible to customers to come and do business
22  with me, and I don't have the inventory to do
23  the business either.
24    Q.  Have you figured out what that number
25  ought to be?
                                          Page 161

 1    A.  No.
 2    Q.  Have you thought about how to figure
 3  that out?
 4    A.  Not really.
 5    Q.  Your business has made a certain
 6  amount of income since the storm; right?
 7    A.  Right.
 8    Q.  That income is associated with the
 9  business you do out of your truck.
10    A.  Right.
11    Q.  You've testified that the business you
12  do out of your truck has declined some after
13  the storm; right?
14    A.  Yes.
15    Q.  One of the reasons that's true is
16  because you're unable to get the credit to buy
17  the inventory that you need; right?
18    A.  Right.
19    Q.  Another reason that's true is because
20  your customers up and down the Gulf Coast
21  aren't buying what whey used to.
22    A.  Correct.
23    Q.  In order to figure out the lost profit
24  that you've suffered because of the flooding
25  from the Industrial Canal, we're going to have
                                          Page 162

 1  to separate the lost profit that's from that
 2  flooding from the lost profit because your
 3  customers on the Gulf Coast don't need your
 4  product, won't we?
 5    A.  Now, would you repeat that?
 6    Q.  You understand that the lost profits
 7  you're seeking in this case is the lost profit
 8  from what you say was caused by the barge.
 9  Yes?
10    A.  Yes.
11    Q.  The barge isn't going to pay you for
12  lost profits that you've suffered because your
13  customers on the Gulf Coast don't need your
14  product anymore, do you understand that?
15    A.  Right.
16    Q.  In order to figure out what your lost
17  profits are because of your allegations about
18  the barge, focusing now on business that you do
19  from your truck, some kind of a separation has
20  to be made between the business you lost
21  attributable to the flooding from the
22  Industrial Canal --
23    A.  Right.
24    Q.  -- from the bigger Katrina catastrophe
25  that's got nothing to do with the barge.  Isn't
                                          Page 163

 1  that right?
 2    A.  Right.
 3    Q.  And there's the business that you did
 4  from your store is another part of your lost
 5  profits that's got to be figured out.  Right?
 6    A.  Right.
 7    Q.  And there your claim is that the store
 8  can't do business anymore because of what you
 9  say is flooding from the Industrial Canal.
10    A.  Right.
11    Q.  In order to figure out what those lost
12  profits would be, don't we have to figure out
13  what your business situation would have been if
14  the Industrial Canal breaches never happened?
15    A.  Right.  All the retail sales is gone.
16  So anything that was sold at retail is gone
17  because the store --
18    Q.  I'm sorry.  I didn't mean to
19  interrupt.  Had you finished your answer?
20    A.  Right.  Uh-huh.  I said all the retail
21  sales that we made in the store, that was the
22  only way we sold retail was out of the store,
23  all of that is gone.  And then some wholesale
24  out of the store, also.
25    Q.  And in order to figure out how much
                                          Page 164
```

41 (Pages 161 to 164)

```
 1  pay expenses.
 2     A.  No.
 3     Q.  You're only seeking one recovery for
 4  lost business income or profit.
 5     A.  Yes.
 6     Q.  The next item on your list is past and
 7  future lost earning capacity.  What does that
 8  refer to?
 9     A.  It's my ability to be able to make the
10  sales and to earn income.
11     Q.  Is that the same money as lost profit
12  or lost income?
13     A.  I imagine so.
14     Q.  It's not a separate sum of money.
15     A.  No.
16     Q.  Past and future lost business
17  opportunity is your next item there.  Do you
18  see that?
19     A.  Uh-huh.
20     Q.  Is that a separate item of damages
21  from those other ones we've just discussed?
22     A.  No.
23     Q.  The next two items, past and future
24  loss of enjoyment of lifestyle, do you see
25  that?
                                        Page 169

 1     A.  Yes.
 2     Q.  Is there anything associated with that
 3  item of damages other than what you've
 4  testified about today?
 5     A.  Well, yeah, like we used to be able to
 6  go on vacation every year, which we haven't
 7  gone on vacation since the storm because we
 8  can't afford it.  You know, our lifestyle has
 9  completely changed.
10     Q.  Is part of the change in your
11  lifestyle that you no longer live in your
12  neighborhood with all your neighbors on Charles
13  Drive?
14     A.  That's part of it, yeah.
15     Q.  Inconvenience is the next item on your
16  list.  You see that?
17     A.  Yes.
18     Q.  Is there anything about inconvenience
19  that you want to add to what you've testified
20  about earlier today?
21     A.  No.
22     Q.  The last item on your list there, do
23  you see that it says any and all others proven?
24     A.  Yes.
25     Q.  Are there any other element of damages
                                        Page 170

 1  for which you seek compensation in this
 2  lawsuit?
 3     A.  Not that I know of.
 4     Q.  You understand this is lawsuit is
 5  filed as a class action.
 6     A.  Right.
 7     Q.  And you're being deposed today as a
 8  prospective class representative.  Do you
 9  understand that?
10     A.  Right.
11     Q.  What is a class representative?
12     A.  That's, um -- one who represents --
13  like myself, a small businessman in
14  St. Bernard, I'm representing the other
15  business people in St. Bernard.
16     Q.  So you represent Wal-Mart?
17     A.  No way.
18     Q.  You're not a representative for
19  Wal-Mart.
20     A.  No way.
21     Q.  And you sort of smile and laugh when
22  you say that.  Why do you smile and laugh when
23  you say that?
24     A.  Because we're not in the same
25  ballpark.
                                        Page 171

 1     Q.  And when you say you're not in the
 2  same ballpark, what do you mean by that?
 3     A.  Let's see.  What can I compare that
 4  to?  I guess New York City with Chalmette.
 5     Q.  New York is bigger than Chalmette?
 6     A.  Yeah.  Money and big and all.
 7     Q.  Wal-Mart is bigger than you?
 8     A.  A little bit, yeah.
 9     Q.  You, as a small business person,
10  wouldn't purport to represent the interests of
11  a much larger business such as a Wal-Mart.
12     A.  No.
13     Q.  Are there grocery stores and gas
14  stations in the class area?
15     A.  Um -- there were some, yeah.  Are they
16  now?
17     Q.  Before the storm, were there?
18     A.  Before the storm, yeah.  Yeah.  There
19  were.
20     Q.  These are businesses who are not
21  necessarily subject to the kinds of business
22  upturns and downturns that you've had?
23     A.  Not as extreme as I have, but I'm
24  sure -- you know, my dad used to have a corner
25  grocery store, too, and when times were tough
                                        Page 172
```

43 (Pages 169 to 172)

```
 1  you could feel it even in the grocery store.
 2     Q.  Their experience of an economic
 3  downturn would not be the same as yours; right?
 4     A.  I can't say that.
 5     Q.  You don't know.
 6     A.  No.
 7     Q.  Are there any manufacturing plants or
 8  operations in the class area?
 9     A.  Um -- there may have been.  I can't
10  think of any offhand.  I don't know if you'd
11  call like a sugar refinery and, um -- what is
12  that, Mobil or whatever the refinery is on the
13  east side -- or west side of Paris Road, and,
14  um -- I don't know if that might have been some
15  gutter shops or something like that, you know,
16  T-shirt shops, I don't know if you call that
17  manufacturing, that did the screen printing,
18  you know.
19     Q.  Are those businesses that you as an
20  owner of a small business in Chalmette would
21  represent in a class action?
22     A.  The small ones, yeah.  Again, I
23  couldn't represent the refinery or the -- the
24  sugar refinery or the oil refinery.  But like
25  the T-shirt shops, the silk screening and all,
                                          Page 173

 1  yeah, they'd be a mom and pop type operation.
 2     Q.  So your understanding of being a class
 3  representative is that you're comfortable
 4  representing other mom and pop type operations
 5  in Chalmette.
 6     A.  Yes.  Yes.
 7     Q.  How did you come to be a proposed
 8  class representative; how did that happen?
 9     A.  When I filled out the forms for the
10  lawyers they asked me if I would be willing to
11  be a representative.
12     Q.  And you put down that you would.
13     A.  Yes.
14     Q.  Somebody called you and you had a
15  discussion -- I don't want to hear what you
16  said to and from, because I'm going to get an
17  instruction from Mr. Wiedemann.  But there was
18  a communication between you and someone else in
19  which you confirmed you were willing to do
20  that.
21     A.  Yes.
22     Q.  What's your understanding of your
23  duties as a class representative?
24     A.  To do the things we're doing today.
25     Q.  Giving a deposition?
                                          Page 174

 1     A.  Right.  Giving a deposition, providing
 2  whatever information I can provide to tell them
 3  my story.
 4     Q.  Is there anything else?
 5     A.  No.
 6     Q.  Do you have any understanding about a
 7  duty to supervise and direct the litigation in
 8  any way?
 9     A.  No.
10     Q.  You have not supervised or directed
11  the litigation in any way, have you?
12     A.  No.
13     Q.  Have you attended any of the court
14  hearings in the case?
15     A.  No.
16     Q.  Have you offered comments on any of
17  the court documents that have been filed, apart
18  from your interrogatory answers?
19     A.  No, just my part.
20     Q.  When you say just your part, it's just
21  those answers that pertain specifically to you,
22  Mr. Riche.
23     A.  Right.
24     Q.  If the Court decides that this case
25  cannot proceed as a class action, would you
                                          Page 175

 1  nonetheless continue with your lawsuit to seek
 2  compensation for the losses that you have
 3  identified in your interrogatory responses?
 4     A.  I'd have to consult with the
 5  attorneys.  I'm a ribbon salesman, not an
 6  attorney.
 7     Q.  You might fold up your tents and go
 8  away, but you just don't know?
 9     A.  I don't know.
10     Q.  Have you ever served as a class
11  representative in any other lawsuit?
12     A.  No.
13     Q.  Do you have any understanding about
14  who bears the expenses of this lawsuit?
15     A.  Yes.
16     Q.  Do you understand that you may bear
17  any of those expenses?
18     A.  Yes, that's what I'm told.
19     Q.  What expenses might you bear?
20     A.  I don't know.
21     Q.  Have you borne any expenses so far?
22     A.  No.
23     Q.  Have you ever been convicted of a
24  crime other than a traffic offense?
25     A.  No.
                                          Page 176
```

44 (Pages 173 to 176)