# EXHIBIT 14
# Part 1

```
                UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF LOUISIANA

IN RE: KATRINA CANAL BREACHES   * CIVIL ACTION
                                * NO. 05-4182
PERTAINS TO: BARGES             * Consolidated
                                * SECTION "K(2)"
Boutte v. Lafarge      05-5531  *
Mumford v. Ingram      05-5724  * JUDGE DUVAL
Lagarde v. Lafarge     06-5342  *
Perry v. Ingram        06-6299  * MAG. WILKINSON
Benoit v. Lafarge      06-7516  *
Parfait Family v. USA  07-3500  *
Lafarge v. USA         07-5178  *
  *   *   *   *   *   *   *   *

          Deposition of JACOB ROBERT GLASER,
    given at Chaffe McCall, L.L.P., 2300 Energy
    Centre, 1100 Poydras Street, New Orleans,
    Louisiana 70163-2300, on August 7th, 2008.

REPORTER BY:
     JOSEPH A. FAIRBANKS, JR., CCR, RPR
     CERTIFIED COURT REPORTER #75005
```

Page 1

```
 1  APPEARANCES:
 2  REPRESENTING THE BARGE PSLC:
 3       BRIAN A. GILBERT, APLC
 4       (BY: BRIAN A. GILBERT, ESQUIRE)
 5       821 Baronne Street
 6       New Orleans, Louisiana 70113
 7       504-885-7700
 8  - and -
 9       WIEDEMANN & WIEDEMANN
10       (BY: EDWARD MORENO, ESQUIRE)
11       821 Baronne Street
12       New Orleans, Louisiana 70113
13       504-581-6180
14
15  REPRESENTING LAFARGE NORTH AMERICA:
16       GOODWIN PROCTOR, L.L.P.
17       (BY: MARK S. RAFFMAN, ESQUIRE)
18       (BY: MARIE SCOTT, ESQUIRE)
19       901 New York Avenue, NW
20       Washington, D.C. 20001
21       202-346-4000
22  - and -
23
24
25
```

Page 2

```
 1       CHAFFE, MCCALL, L.L.P.
 2       (BY: CHARLES BLANCHARD, ESQUIRE)
 3       2300 Energy Centre
 4       1100 Poydras Street
 5       New Orleans, Louisiana 70163-2300
 6       504-585-7000
 7
 8  REPRESENTING NEW YORK MARINE & GENERAL
 9  INSURANCE COMPANY:
10       SUTTERFIELD & WEBB, LLC
11       (BY: DANIEL A. WEBB, ESQUIRE)
12       650 Poydras Street, Suite 2715
13       New Orleans, Louisiana 70130
14       504-598-2715
15
16  REPRESENTING THE AMERICAN CLUB:
17       MONTGOMERY, BARNETT, BROWN, READ,
18       HAMMOND & MINTZ, L.L.P.
19       (BY: RONALD J. KITTO, ESQUIRE)
20       1100 Poydras Street, Suite 3200
21       New Orleans, Louisiana 70163
22       504-585-3200
23
24
25
```

Page 3

```
 1  REPRESENTING ORLEANS LEVEE DISTRICT:
 2       MCCRANIE, SISTRUNK, ANZELMO, HARDY,
 3       MAXWELL & MCDANIEL
 4       (BY: MARK E. HANNA, ESQUIRE)
 5       3445 N. Causeway Boulevard, Suite 800
 6       Metairie, Louisiana 70002
 7       504-831-0946
 8
 9  REPRESENTING JEFFERSON PARISH:
10       BURGLASS & TANKERSLEY
11       (BY: RICHARD PAVLICK, ESQUIRE)
12       5213 Airline Drive
13       Metairie, Louisiana 70001
14       504-836-2220
15
16  REPRESENTING LAKE BORGNE LEVEE DISTRICT:
17       DUPLASS, ZWAIN, BOURGEOIS, MORTON,
18       PFISTER & WEINSTOCK
19       (BY: NICOLE BOYER-DUPLASS, ESQUIRE)
20       Three Lakeway Center, 29th Floor
21       3838 N. Causeway Boulevard
22       Metairie, Louisiana 70002
23       504-832-3700
24
25
```

Page 4

1 (Pages 1 to 4)

**Page 29**

1  Q.  What did you do in 1971?
2  A.  Went to work for a costume jewelry
3  manufacturer.
4  Q.  What was the name of the manufacturer?
5  A.  Tammany Jewels.
6  Q.  They were here in New Orleans?
7  A.  No, sir.
8  Q.  Where are they located?
9  A.  Indianapolis, Indiana.
10 Q.  What did you do for Tammany Jewels?
11 A.  Set up stores, managed shipping,
12 multiple tasks.
13 Q.  How long were you employed by Tammany
14 Jewelers?
15 A.  Approximately eighteen months.
16 Q.  When you left their employ, what did
17 you do next?
18 A.  Returned to New Orleans.
19 Q.  When you went into the employ of
20 Tammany Jewelers, did you move away from New
21 Orleans?
22 A.  Yes, sir.
23 Q.  To where did you move?
24 A.  Indianapolis, Indiana.
25 Q.  That move to Indianapolis coincided

**Page 30**

1  with the dates of your first marriage.
2  A.  Yes, sir.
3  Q.  You moved back to New Orleans around
4  the time your first marriage ended.
5  A.  Yes, sir.
6  Q.  When you returned to New Orleans, what
7  employment did you pursue then?
8  A.  Went into the jewelry business.
9  Q.  Okay.  Now, tell me about your first
10 entree into the jewelry business, if you
11 understand what I'm asking you.
12 A.  Opened a location in New Orleans.
13 Q.  Where was your first location?
14 A.  French Quarter.
15 Q.  What was the name of your business?
16 A.  Beaux Bijoux.
17 Q.  Thank you.  Even an out-of-towner can
18 learn to spell.
19     How long did you own Beaux Bijoux?
20 A.  Ten years.
21 Q.  Were you the sole proprietor of Beaux
22 Bijoux?
23 A.  Yes.
24 Q.  What became of Beaux Bijoux at the end
25 of those ten years?

**Page 31**

1  A.  Moved it to Chalmette.
2  Q.  What year did you move your business
3  to Chalmette?
4  A.  1984.
5  Q.  Did you own the building in which
6  Beaux Bijoux operated?
7  A.  No, sir.
8  Q.  Did you rent?
9  A.  Yes, sir.
10 Q.  When you moved your business to
11 Chalmette in 1984, what was the address to
12 which you moved?
13 A.  8400 West Judge Perez Drive.
14 Q.  That address is the address at which
15 you were operating your business at the time
16 Hurricane Katrina struck New Orleans; am I
17 right?
18 A.  Yes, sir.
19 Q.  When you moved your business to
20 Chalmette, did you change the name?
21 A.  Yes, sir.
22 Q.  What was the name of the business?
23 A.  Holiday Jewelers.
24 Q.  When did your business first come to
25 be known by the name Holiday Jewelers?

**Page 32**

1  A.  When we moved.
2  Q.  1984.
3  A.  Yes.
4  Q.  Did you operate your business Holiday
5  Jewelers continuously at the West Judge Perez
6  Drive location from 1984 through the time of
7  Hurricane Katrina?
8  A.  Yes, sir.
9  Q.  I'm handing you what's been marked as
10 Exhibit 6 to your deposition.  Exhibit 6 is a
11 map print from Google with a little red bubble
12 on it.  I ask you, do you recognize the little
13 red bubble on Exhibit 6 as the location of your
14 store at 8400 West Judge Perez?
15     (Glaser Exhibit 6 was marked for
16 identification and is attached hereto.)
17 A.  I would say it's very close but not
18 exactly where it was.
19 EXAMINATION BY MR. RAFFMAN:
20 Q.  If I hand you a pen, would you please
21 mark on the map exactly where your store was.
22 A.  (Witness complies.)
23 MR. RAFFMAN:
24     The witness has placed an X on
25 the map at the location of the store.

8 (Pages 29 to 32)

**Page 33**

1  EXAMINATION BY MR. RAFFMAN:
2      Q.  Does the X on the map represent the
3  location of the store?
4      A.  Yes, as close as I can tell from the
5  map.
6      Q.  Thank you.  Under what form of
7  business did Holiday Jewelers operate?
8      A.  I don't understand the question.
9      Q.  Did your business Holiday Jewelers
10 operate as a corporation?
11     A.  Yes.
12     Q.  When did you incorporate the business?
13     A.  Upon moving to St. Bernard Parish in
14 1984.
15     Q.  Apart from yourself and Mrs. Glaser,
16 have there ever been other owners or
17 shareholders in Holiday Jewelers?
18     A.  No, sir.
19     Q.  Has Mrs. Glaser had an interest in
20 Holiday Jewelers?
21     A.  Define interest.
22     Q.  Well, who were the shareholders of
23 Holiday Jewelers?
24     A.  I was the stockholder.
25     Q.  Just you.

**Page 34**

1      A.  Yes, sir.
2      Q.  Have there been any years since 1984
3  in which Holiday Jewelers did not make a
4  profit?
5          Let me qualify the question.  Between
6  1984 and 2005 before Katrina -- actually,
7  that's bad question, too.  I'm going to reload.
8          Between 1985 and 2004, were there any
9  years in which Holiday Jewelers did not make a
10 profit?
11     A.  I believe so.
12     Q.  How many years were those?
13     A.  I cannot recall.
14     Q.  Between 2000 and 2004, were there any
15 years in which your business Holiday Jewelers
16 did not make a profit?
17     A.  I cannot recall.
18     Q.  Is it fair to say that the performance
19 of your business fluctuated from year to year?
20     A.  Positively.
21     Q.  The building at 8400, you didn't own
22 that building, did you?
23     A.  No, sir.
24     Q.  I'm now referring to a document that's
25 been filed with the court, record document

**Page 35**

1  13166.  This is plaintiff's motion to certify
2  the class.  I will not mark it as an exhibit,
3  but I'm going to show it to you and
4  particularly the part at Page 7 which pertains
5  to Jacob Robert "Bob" Glaser.  Do you see the
6  part of this motion that I'm referring to,
7  Mr. Glaser?
8      A.  Part F, Jacob Robert Glaser.
9      Q.  Turning your attention now to the item
10 marked 4, it says, street addresses of
11 properties for which damages are sought, with
12 detailed information.  Do you see that?
13     A.  Yes, sir.
14     Q.  And do you see that under your name it
15 says none?  Correct?
16     A.  Yes, sir.
17     Q.  Am I right then that you are not
18 seeking damages in this case for damage to real
19 property?
20     A.  Define real property.  Movable
21 property?
22     Q.  Um -- immovable property is
23 specifically what I'm talking about now.
24     A.  Yes, sir, we're not seeking damages
25 for immovable property.

**Page 36**

1      Q.  And just to be clear, you are seeking
2  damages in this case for the loss of your
3  inventory, equipment and fixtures that were in
4  the store.  Right?
5      A.  Yes, sir.
6      Q.  But you're not seeking damages for the
7  building or the lot.
8      A.  No, sir.
9      Q.  Am I correct that you're not seeing
10 damages for the building or the lot?
11     A.  Yes, sir.
12     Q.  Have you ever been a plaintiff in a
13 different lawsuit, Mr. Glaser?
14     A.  Yes, sir.
15     Q.  What lawsuits have you been a
16 plaintiff in?
17     A.  Against Murphy Oil Refinery in
18 Chalmette.  Against our homeowner's insurance
19 American National.  And that's all that I can
20 recall at this time.
21     Q.  Did you ever participate in a case
22 against the State of Louisiana involving
23 pension benefits?
24     A.  No, sir.
25     Q.  Are you at all familiar with a case

9 (Pages 33 to 36)

```
 1  that Murphy Oil had nothing to do with any harm
 2  to your business at Holiday Jewelers?
 3     A.  Yes, sir.
 4     Q.  Is it your contention in this case
 5  that the only source of harm to your business
 6  at Holiday Jewelers is the damage that you
 7  allege was caused by the barge?
 8     A.  Yes, sir.
 9     Q.  All right.  I'm going to hand you back
10  Glaser Exhibit 8 and I'll ask you to turn to
11  Paragraph 66, Mr. Glaser.  Exhibit 8 is the
12  complaint that was filed on your behalf against
13  Murphy Oil; correct?
14     A.  Yes, sir.
15     Q.  Would you read for the record the
16  allegations in your complaint in Paragraph 66
17  of your complaint against Murphy Oil?
18     A.  The crude oil, petroleum and petroleum
19  by-products that spilled into St. Bernard
20  Parish from the Murphy Oil facility delayed the
21  recovery and restoration of the parish and the
22  return of parish residents which adversely
23  affected plaintiff's business Holiday Jewelers.
24     Q.  And that's an allegation you made in
25  your suit against Murphy Oil, correct?
                                         Page 41

 1     A.  Yes, sir.
 2     Q.  I'm handing you what I've marked as
 3  Glaser Exhibit 10.  You recognize Glaser
 4  Exhibit 10 as a copy of the Petition for
 5  Damages and Jury Demand that was filed on your
 6  behalf and your wife's behalf against American
 7  National Property and Casualty Companies?
 8         (Glaser Exhibit 10 was marked for
 9  identification and is attached hereto.)
10     A.  Yes, sir.
11  EXAMINATION BY MR. RAFFMAN:
12     Q.  What was the thrust of that lawsuit?
13     A.  Um -- further damages to our personal
14  home.
15     Q.  Before I go deeper into this lawsuit I
16  want to go back to Murphy Oil for a minute.
17     A.  Yes, sir.
18     Q.  Has the Murphy Oil case, the complaint
19  you filed against Murphy Oil, been resolved?
20     A.  Yes, sir.
21     Q.  How was that resolved?
22     A.  Settled out of court.
23     Q.  Murphy Oil paid you some money?
24     A.  Yes, sir.
25     Q.  How much did they pay you?
                                         Page 42

 1     A.  For which property, sir?
 2     Q.  Total.
 3     A.  Um -- about a hundred and sixty-five
 4  thousand dollars.
 5     Q.  In return for receiving that payment,
 6  you released all your claims against Murphy
 7  Oil, didn't you?
 8     A.  Yes, sir.
 9     Q.  Including any claims you might have
10  had relating to your business Holiday Jewelers.
11     A.  Yes, sir.
12     Q.  Has the case against American National
13  Property and Casualty Company been resolved?
14     A.  Not quite.
15     Q.  What's the status of that case?
16     A.  Waiting for payment from American
17  National to our attorneys.
18     Q.  Has a settlement been reached?
19     A.  Yes, sir.
20     Q.  You didn't give a deposition in the
21  Murphy Oil case, did you?
22     A.  No, sir.
23     Q.  You didn't give a deposition in the
24  American National case either; right?
25     A.  No, sir.
                                         Page 43

 1     Q.  Bad question.  Did you give a
 2  deposition in the American National case?
 3     A.  No, sir.
 4     Q.  That's a better question.
 5         Did you file a lawsuit against a
 6  company called Audubon Enterprises d/b/a
 7  Fahrenheit?
 8     A.  No, sir.
 9     Q.  Did your son file such a lawsuit?
10     A.  That I cannot answer for my son.
11     Q.  What's your son's middle initial?
12     A.  R.
13     Q.  I'm showing you what's been marked as
14  Glaser Exhibit 11.  Glaser 11 is a Petition for
15  Damages filed by Jacob R. Glaser versus 1225
16  Audubon Enterprises, L.L.C. d/b/a Fahrenheit.
17  Mr. Glaser, have you ever seen this document
18  before?
19         (Glaser Exhibit 11 was marked for
20  identification and is attached hereto.)
21     A.  No, sir.
22  EXAMINATION BY MR. RAFFMAN:
23     Q.  Do you have -- having looked at the
24  document, does it refresh your recollection as
25  to whether you or your son have ever filed a
                                         Page 44
```

11 (Pages 41 to 44)

```
 1    A.  I believe.  I would have to contact
 2  Mr. Batt's office to verify that.
 3    Q.  If you contacted Mr. Batt's office,
 4  and if in fact Mr. Batt had filed a form on
 5  your behalf, do you expect that he would
 6  provide you with a copy?
 7    A.  Yes.
 8        MR. RAFFMAN:
 9            We would ask for a copy of that
10        form, as well, and will follow up in
11        writing.
12        (Off the record.)
13  EXAMINATION BY MR. RAFFMAN:
14    Q.  I'll try to clarify.  There is one
15  claim form that you have in your possession
16  that you filled out by yourself, right?
17    A.  Yes, sir.
18    Q.  And there may be another one that
19  Mr. Batt filled out on your behalf, correct?
20    A.  Yes, sir.
21    Q.  As we sit here today, can you testify
22  about the damages that you claimed in the form
23  that you filled out?
24    A.  I can try to recall to the best of my
25  ability.
                                         Page 49
```

```
 1    Q.  What can you tell us about the damages
 2  claimed in the form you filled out?
 3    A.  For my personal home.  That's what
 4  you're asking?  For my personal home?
 5    Q.  Um -- that's one of my questions.
 6    A.  That's the form I filled out.
 7    Q.  So the SF 95 that you filled out is
 8  limited to damage to your personal home.
 9    A.  To my recollection, correct.
10    Q.  As far as you know, you've never filed
11  a form with the Corps of Engineers seeking
12  money for damage to your business inventory?
13    A.  To my knowledge, I have not.  Whether
14  Mr. Batt has on my behalf, I have no idea.
15    Q.  Your current residence is in
16  Madisonville, Louisiana; right?
17    A.  Yes, sir.
18    Q.  308 Sweet Gum Lane, right?
19    A.  Yes, sir.
20    Q.  Do you own that property?
21    A.  Yes, sir.
22    Q.  When did you buy it?
23    A.  June '06.
24    Q.  Who lives there with you?
25    A.  My wife and myself.
                                         Page 50
```

```
 1    Q.  The children do not live at home;
 2  right?
 3    A.  No, sir.  But they occasionally stay.
 4    Q.  Where do your children live?
 5    A.  Our son lives in St. Bernard, and our
 6  daughter lives in Slidell.
 7    Q.  Was your son living in St. Bernard
 8  before the storm?
 9    A.  Yes, sir.
10    Q.  What was his address before the storm?
11    A.  3716 Riverland.
12    Q.  Before the storm, he lived at home
13  with you.
14    A.  Yes, sir.
15    Q.  What is his address now, after the
16  storm?
17    A.  He just bought a house.  I think it's
18  201 W. Girard.
19    Q.  Is there a mortgage on your 308 Sweet
20  Gum Lane property?
21    A.  Not at this time.
22    Q.  When you first purchased the property
23  in 2006, was there a mortgage?
24    A.  No, sir.
25    Q.  Since June of 2006 until today, has
                                         Page 51
```

```
 1  there been a mortgage on the property?
 2    A.  Yes, sir.
 3    Q.  Okay.  Narrate for me the history of
 4  the mortgages on the Sweet Gum property.
 5    A.  SBA dumped $10,000 and recorded a
 6  mortgage.
 7    Q.  The SBA required a mortgage in order
 8  to give you a grant of $10,000, or a loan or --
 9    A.  SBA loan.
10    Q.  Okay.  You received an SBA loan of
11  $10,000; right?
12    A.  That's the amount we received.
13    Q.  In order to receive the SBA loan of
14  ten thousand, you were required to put a
15  mortgage on your property?  It's better if you
16  explain it to me, Mr. Glaser.
17    A.  SBA was going to give us an amount
18  larger than $10,000.  Any amount larger than
19  $10,000 required a mortgage.  They
20  automatically dumped $10,000, which then
21  pursued them to file a mortgage and for us to
22  take additional funding.  But we elected not to
23  do that.  Too many complications and
24  stipulations.
25    Q.  So you elected not to accept an SBA
                                         Page 52
```

13 (Pages 49 to 52)

**Page 53**

1  loan of higher than $10,000, and at that point
2  they removed the mortgage from your home.
3      A.  Yes, sir.
4      Q.  I'm handing you what's been marked as
5  Exhibit 12 to the Glaser deposition.  Is
6  Exhibit 12 the record of the cash sale by which
7  you acquired your property at 308 Sweet Gum
8  Lane?
9          (Glaser Exhibit 12 was marked for
10  identification and is attached hereto.)
11     A.  Yes, sir.
12 EXAMINATION BY MR. RAFFMAN:
13     Q.  What was the purchase price of the
14 Sweet Gum Lane property?
15     A.  Two twenty-five.
16     Q.  Did you pay cash for that property?
17     A.  Yes, sir.
18     Q.  What were the sources or source of
19 cash that you used to purchase the sweet gum
20 property?
21     A.  Insurance proceeds from Riverland and
22 Jacob Drive.
23     Q.  But not insurance proceeds from any
24 recovery from Holiday Jewelers?
25     A.  No, sir.

**Page 54**

1      Q.  I'm handing you Glaser 13.  Glaser 13
2  is a document entitled Multiple Indebtedness
3  Mortgage.  My question for you, Mr. Glaser, is
4  this a copy of the mortgage that was recorded
5  by the SBA and then later removed?
6          (Glaser Exhibit 13 was marked for
7  identification and is attached hereto.)
8      A.  Yes, sir, it looks to be.
9  EXAMINATION BY MR. RAFFMAN:
10     Q.  When did you move into the property on
11 Sweet Gum Lane?
12     A.  July '06.
13     Q.  Before that, where had you been
14 living?
15     A.  In '06?  Covington, Louisiana.
16     Q.  How long were you -- not to make a
17 mystery out of this, I'm going to work backward
18 to the storm.  So before you moved into the
19 Sweet Gum residence, where were you living
20 right before that?
21     A.  An apartment in Covington, Louisiana.
22     Q.  And how long were you in that
23 apartment?
24     A.  Approximately six months.
25     Q.  Before you moved into that apartment,

**Page 55**

1  where were you living?
2      A.  Panama City, Florida.
3      Q.  And were you in an apartment there?
4  In what kind of housing were you?
5      A.  Fourplex, yeah.  A townhouse.
6      Q.  Is that where you went right after the
7  storm?
8      A.  No.
9      Q.  Okay.  There's another piece to the
10 puzzle.
11     A.  Hotel.
12     Q.  When you left St. Bernard Parish you
13 went to a hotel, right?
14     A.  Yes, sir.
15     Q.  And how long were you in the hotel?
16     A.  Approximately two, two and a half
17 weeks.
18     Q.  Where was the hotel?
19     A.  Dauphine, Alabama.
20     Q.  From Dauphine, you went to where?
21     A.  Panama City.
22     Q.  From Panama City to where?
23     A.  Covington.
24     Q.  I'm going to wind the clock way back.
25 I'm going to ask you about Hurricane Betsy.

**Page 56**

1          Where were you during Hurricane Betsy?
2      A.  New Orleans.
3      Q.  Your home was in what neighborhood?
4      A.  Gentilly.
5      Q.  This would have been around the time
6  you were in high school at Holy Cross, right?
7      A.  Yes, sir.
8      Q.  Did your high school flood in
9  Hurricane Betsy?
10     A.  I do not believe, but I cannot recall.
11     Q.  Did you ever see any of the flooding
12 that Hurricane Betsy caused in the Lower Ninth
13 Ward?
14     A.  There was no TV, no electricity, no
15 coverages.  So did I physically go there?  No.
16 But I saw flooding in Gentilly.
17     Q.  What happened in Gentilly during
18 Hurricane Betsy?
19     A.  Much of the area around my home
20 flooded.
21     Q.  Do you know where the water came from
22 that flooded your home in Gentilly during
23 Hurricane Betsy?
24     A.  No, sir.
25     Q.  Did you evacuate during Hurricane

14 (Pages 53 to 56)

```
 1     Q.  You lock things up in vaults or in
 2   cabinets or cases in order to protect them from
 3   somebody breaking in and taking them; right?
 4     A.  Yes, sir.
 5     Q.  So it's important to lock them away in
 6   sturdy vessels.  Fair enough?
 7     A.  That's a fair statement.
 8        MR. GILBERT:
 9            Interesting choice of words.
10   EXAMINATION BY MR. RAFFMAN:
11     Q.  When you evacuated in advance of
12   Hurricane Georges, you put the valuable items
13   in the vaults or the sturdy cases, right?
14     A.  Yes, sir.
15     Q.  And when you evacuated in advance of
16   Hurricane Ivan, you did the same thing.
17     A.  Yes, sir.
18     Q.  And when you evacuated in advance of
19   Hurricane Katrina, you did the same thing.
20     A.  Yes, sir.
21     Q.  Why did you decide to evacuate?
22     A.  Can we say Bob Breck told us to get
23   the hell out of town?
24     Q.  Who is Bob Breck?
25     A.  He's the local weatherman.
                                          Page 61

 1     Q.  You understood that to remain behind
 2   in a hurricane could be dangerous.
 3     A.  Yes.
 4     Q.  That storms can hurt people who
 5   remain.
 6     A.  Yes, sir.
 7     Q.  Maybe even kill them.
 8     A.  Yes, sir.
 9     Q.  What did you take with you when you
10   left?
11     A.  A few days of clothes, some money,
12   things for a three-day evacuation, planning to
13   be back.
14     Q.  You were out of town when the water
15   inundated St. Bernard Parish, right?
16     A.  Yes, sir.
17     Q.  Water inundated your home, right?
18     A.  Yes, sir.
19     Q.  How high did the water get on your
20   home?
21     A.  We believe eleven feet.
22     Q.  Water inundated your business that you
23   rented?
24     A.  Yes, sir.
25     Q.  Apart from what your lawyers have told
                                          Page 62

 1   you, do you know where the water came from that
 2   inundated your home?
 3     A.  I can assume that the levee breach
 4   acted as a funnel which flooded a good portion
 5   of St. Bernard Parish, as well as the lower
 6   lying areas of St. Bernard Parish had some
 7   levee toppings.
 8            You asked me if I knew.  I wasn't
 9   there.  But from living there I can assume the
10   answer I gave.
11     Q.  There were levee breaches that
12   occurred at various places along the hurricane
13   protection system, right?
14     A.  I don't know that yes or no, but I
15   assume that to be true.
16     Q.  Whatever you know about where the
17   water came from, apart from what your lawyers
18   have told you, is inferences you draw from
19   whatever information you have.  Is that fair?
20     A.  That's fair.
21     Q.  You haven't studied where the water
22   came from that inundated your home, have you?
23     A.  No, sir, not in any formal way.
24     Q.  Nor have you studied where the water
25   came from that inundated your business.
                                          Page 63

 1     A.  No, sir.  Not in any formal way.
 2     Q.  Same answer for both your home and
 3   business.
 4     A.  Yes.
 5     Q.  You didn't witness any breach of any
 6   levee, did you?
 7     A.  No, sir.
 8     Q.  Has anybody ever told you they saw
 9   what happened when a levee breached?
10     A.  No, sir.
11     Q.  Has anybody ever told you they saw the
12   barge in the Industrial Canal?
13     A.  No, sir.
14     Q.  Has anybody ever told you they saw the
15   barge enter the Lower Ninth Ward?
16     A.  No, sir.
17        (Off the record.)
18   EXAMINATION BY MR. RAFFMAN:
19     Q.  Apart from what your lawyer has told
20   you, do you have any knowledge about what
21   caused any breach of any levee or floodwall in
22   Lower Ninth Ward or St. Bernard?
23     A.  I personally don't.  Again, except
24   news reports and things of that nature.
25        MR. RAFFMAN:
                                          Page 64

                              16 (Pages 61 to 64)
```

Page 65

```
1        I'm ready to take a break.
2        (Off the record.)
3   EXAMINATION BY MR. RAFFMAN:
4   Q.   Mr. Glaser, I'd like to ask you some
5   questions about your business before the storm.
6        Holiday Jewelers had one location,
7   right?
8   A.   Yes, sir.
9   Q.   Describe the nature of your business.
10  A.   Retail jewelry sales.
11  Q.   What sources of income did your
12  business have?
13  A.   Sales.
14  Q.   Sales that were done out of the store.
15  A.   Yes.
16  Q.   Did you ever do any mail order
17  business?
18  A.   No.
19  Q.   What percentage of your business was
20  made with people who came to your store to buy
21  jewelry?
22  A.   The majority.
23  Q.   Did you ever do any sales over the
24  Internet?
25  A.   No.
```

Page 66

```
1   Q.   Did ever do any sales to people who
2   didn't come to your store to look at and buy
3   jewelry?
4   A.   Can you clarify that question a little
5   bit?
6   Q.   Sure.  When I asked you what
7   percentage of your sales was to people who came
8   into the store, you said the majority, and I
9   want to know about the ones that aren't in that
10  majority.
11  A.   The only possible thing I could think
12  of would be if someone moved away and said send
13  me a present for -- or whatever.  But that
14  would be a small percentage, if that's what
15  you're trying to get at, of the total sales.
16  It was -- there was no Internet or -- but
17  occasionally we would ship something to someone
18  as a sale.
19  Q.   Apart from sales that you made from
20  your store, was there any other source of
21  income for Holiday Jewelers?
22  A.   No.
23  Q.   What were the business expenses of
24  Holiday Jewelers as it operated before the
25  storm?
```

Page 67

```
1   A.   You want me to give you a list of
2   lights, gas, water?  I mean, is that -- the
3   normal expenses that any retail location would
4   have.
5   Q.   Sure.  One of those would be rent,
6   right?
7   A.   Yes.
8   Q.   And utilities.
9   A.   Right.
10  Q.   Inventory?
11  A.   Does that fall under expense or --
12  Q.   No?
13  A.   I'm asking.  You're classifying --
14  yes.  Inventory is part of the things that
15  would go to facilitate any type of retail
16  business.
17  Q.   You had to buy insurance?
18  A.   Yes.
19  Q.   Did you have employees?
20  A.   Not at the time of the storm, except
21  my wife and I.
22  Q.   Was there a different time before the
23  storm that you did have employees in your
24  store?
25  A.   Yes.
```

Page 68

```
1   Q.   When was that?
2   A.   Usually Christmas season, which is the
3   bulk of the business.
4   Q.   You would hire temporary employees
5   around the Christmas season to help you conduct
6   your business?
7   A.   Correct.
8   Q.   So one of the things that some
9   businesses have to pay but you did not at the
10  time of the storm was compensation for
11  employees, wages.
12  A.   Correct.
13  Q.   Your business was a seasonal business?
14  A.   Yes.
15  Q.   Apart from rent, utilities, inventory
16  or costs of goods and insurance, were there any
17  other major expenses borne by your business
18  before the storm?
19  A.   Not that I can recall.  I mean, we
20  could pull up some kind of retail what if list,
21  but that's all I could suggest.
22  Q.   If I wanted to get any more detailed
23  on your expenses I'd have to really look at
24  your business records, wouldn't I?
25  A.   Yes.
```

17 (Pages 65 to 68)

**Page 69**

1  Q. To calculate the profits that you make
2  in your store before the storm, you would take
3  the gross sales and subtract all the expenses,
4  right?
5  A. Yes.
6  Q. In the three years before the storm,
7  were there fluctuations in the amount of your
8  gross sales?
9  A. Yes.
10  Q. Describe for me those fluctuations.
11  A. Some up, some down.
12  Q. In some years you sold more product
13  than others, right?
14  A. Yes.
15  Q. In the three years before the storm,
16  were there fluctuations in your expenses?
17  A. Yes.
18  Q. Describe those fluctuations.
19  A. One month the utility bill may be
20  higher than another; some up, some down.
21  Q. In order to figure out what your
22  profits were before the storm we'd have to go
23  back and figure out what your gross sales were
24  and what your expenses were and then tally that
25  up to get the profits, right?

**Page 70**

1  A. Yes.
2  Q. Can you tell us as you sit here today
3  what your profit for Holiday Jewelers was in
4  2002?
5  A. No, sir.
6  Q. 2003?
7  A. No, sir.
8  Q. 2004?
9  A. No, sir.
10  Q. Can you tell us as you sit here to
11  today what your gross sales were for 2002?
12  A. No, sir.
13  Q. 2003?
14  A. No, sir.
15  Q. 2004?
16  A. No, sir.
17  Q. Can you tell us as you sit here today
18  what your expenses were for 2002?
19  A. No, sir.
20  Q. 2003?
21  A. No, sir.
22  Q. 2004?
23  A. No, sir.
24  Q. What were the terms of your lease?
25  A. Basically we were on a year-to-year.

**Page 71**

1  Q. Your lease expired at the end of 2005?
2  No, let me rephrase. I'll go back. On what
3  date after the storm did your lease expire?
4  A. We got no, really, response from
5  anybody from the shopping center, and no
6  communication, I should say, from us -- to us
7  from them.
8  Q. Before the storm, your lease was on a
9  year-to-year basis, right?
10  A. Uh-huh.
11  Q. What was the anniversary date --
12  A. I believe it was in November.
13  Q. Your lease ran from November, 2002,
14  through 2003 and so on.
15  A. In theory, yes.
16  Q. You renewed your lease each year.
17  A. It was an automatic renewal.
18  Q. The lease would automatically roll
19  over unless either party terminated.
20  A. Yes.
21  Q. Did your rent go up from year to year
22  between two and 2004?
23  A. I think it was fairly consistent.
24  Q. What did you pay in rent per month, if
25  you can remember?

**Page 72**

1  A. Approximately eleven hundred.
2  Q. Who was your landlord?
3  A. The building was in bankruptcy, so
4  someone else took over.
5  Q. Was the building in bankruptcy before
6  Hurricane Katrina?
7  A. Yes.
8  Q. Describe the building.
9  A. It was a retail strip mall.
10  Q. When was the strip mall built, if you
11  know?
12  A. '84.
13  Q. It was new when you moved in?
14  A. Yes.
15  Q. How many stories was it?
16  A. One.
17  Q. Raised up off the ground?
18  A. Small slab.
19  Q. What construction; brick, wood,
20  something else?
21  A. Um -- I'm not a contractor, but it had
22  cinder block and glass store fronts.
23  Q. How many square feet did you occupy?
24  A. Approximately 1000.
25  Q. Describe your store.

```
 1    Q.  Did you provide copies of the pictures
 2  that you took to your lawyers so that they
 3  could be produced to the defendants in this
 4  case?
 5    A.  Yes.
 6    Q.  I'm going to ask you about some of the
 7  pictures.  I'm handing you what's been marked
 8  as Glaser Exhibit 14.  Do you recognize that as
 9  one of the pictures that you took after the
10  storm?
11        (Glaser Exhibit 14 was marked for
12  identification and is attached hereto.)
13    A.  Yes.
14  EXAMINATION BY MR. RAFFMAN:
15    Q.  What is shown in that picture?
16    A.  Um -- front view of the shopping
17  center.
18    Q.  Would you place an X on that by the
19  location of your store Holiday Jewelers, if
20  it's shown in the picture.
21    A.  Yes.  It's right here.
22    Q.  Okay.  Why don't you make an X there
23  so the record will reflect the location of your
24  store in the mall.
25    A.  Okay.
                                          Page 81

 1    Q.  I hand you what I'm marking as Glaser
 2  Exhibit 15 and ask you to identify this as a
 3  picture that you took upon your return to
 4  Chalmette after Hurricane Katrina.
 5        (Glaser Exhibit 15 was marked for
 6  identification and is attached hereto.)
 7    A.  Yes.
 8  EXAMINATION BY MR. RAFFMAN:
 9    Q.  What is shown in that picture?
10    A.  Front of our shopping center, a
11  picture of my wife standing in front of the
12  store, muddy, in boots.
13    Q.  Did you take this picture on that
14  first trip back after Hurricane Katrina?
15    A.  We have several pictures that we've
16  taken, and I cannot attest that this was on the
17  first or second or third trip back, because we
18  made repeated trips trying to collect stuff.
19    Q.  What were the conditions like inside
20  your store when you returned after the storm?
21    A.  Muck and mire and just everything
22  askew.
23    Q.  Before the storm, what fixtures did
24  you have in the store?
25    A.  Display cases, primarily that's, you
                                          Page 82

 1  know -- work benches, desk, computers.  Is that
 2  the kind of answers you're looking for?
 3    Q.  Were there any other fixtures or
 4  equipment that you used in your business apart
 5  from the jewelry inventory itself?
 6    A.  Equipment.  We used a lot of jewelry
 7  equipment, tools and machines and equipment.
 8    Q.  What was the condition of the fixtures
 9  and equipment when you returned?
10    A.  Totally destroyed.
11    Q.  What about the jewelry inventory that
12  you had put in the vault, what was the
13  condition of that inventory when you returned?
14    A.  That was in the vault, so it was full
15  of mud and things of that nature but pretty
16  much intact.
17    Q.  What about the jewelry that you had
18  placed in the cases before you left to
19  evacuate?
20    A.  Um -- that was vandalized at some
21  point after the storm.  Most of that was gone.
22    Q.  When did you discover that your
23  display cases had been vandalized?
24    A.  On the second trip after Hurricane
25  Rita.
                                          Page 83

 1    Q.  On the first trip back did you have
 2  occasion to look in those cases to see whether
 3  the jewelry was there?
 4    A.  Most of the cases were still locked,
 5  although they were askew.  We couldn't find
 6  keys to look for them.  But assuming they were
 7  still locked, we assumed everything was still
 8  intact.
 9    Q.  When you returned on your second visit
10  to the shopping center, what did you see with
11  regard to those cases?
12    A.  Busted locks and inventory gone.
13    Q.  Between the time that you first
14  returned to your store after Katrina and the
15  time you came back to the store the second
16  time, someone had broken into those cases and
17  removed the jewelry that had been there.
18    A.  Yes.  I would assume, because it was
19  gone.
20    Q.  How long passed between the time you
21  first returned to your store after Katrina and
22  the second visit on which you discovered the
23  broken locks?
24    A.  Approximately three weeks.
25    Q.  During those three weeks, what
                                          Page 84
```

21 (Pages 81 to 84)

```
 1   compensation for your flood losses.
 2      A.   Correct.
 3      Q.   That's separate from the non flood
 4   losses for which you were compensated in the
 5   amount of $58,000 by Jewelers Mutual.
 6      A.   Correct.
 7      Q.   Do you know whether your flood
 8   insurance policy had a subrogation clause in
 9   it?
10      A.   No.
11      Q.   Before we leave Glaser Exhibit 19,
12   there is an entry on the second page of Glaser
13   19 that is customer records, $5,500.  Do you
14   see that?
15      A.   Yes.
16      Q.   What was the basis on which you
17   calculated an amount of fifty-five hundred
18   dollars as the value of your customer records?
19      A.   Computer software, things of that
20   nature.
21      Q.   The amount represented the cost of
22   computer software which you used to keep your
23   customer records?
24      A.   Correct.
25      Q.   Did your policy with Jewelers Mutual
                                          Page 101

 1   for your non flood insurance include coverage
 2   for loss of income?
 3      A.   Yes.
 4      Q.   Did a part of the payment from your
 5   business insurer for your non flood losses
 6   include a component for loss of income?
 7      A.   Rephrase that question one more time.
 8           (Whereupon the previous question was
 9   read back.)
10      A.   Yes.
11   EXAMINATION BY MR. RAFFMAN:
12      Q.   Do you know how much that was?
13      A.   I was told it was $750.
14      Q.   Who told you that?
15      A.   I think that came from Jewelers
16   Mutual.
17      Q.   Why so little?
18      A.   You tell me and we'll both know.
19      Q.   You don't know?
20      A.   I don't know.
21      Q.   That's what total value of the movable
22   property that your business lost in the storm?
23      A.   I would guesstimate at $250,000.
24      Q.   How do you arrive at that number?
25      A.   Based on some replacement cost that we
                                          Page 102

 1   estimated, um -- and just general prices of
 2   materials and things that have gone up;
 3   inventory that was lost or damaged.
 4      Q.   I think you used the word guesstimate
 5   when you said 250,000.  Did I hear you
 6   correctly?
 7      A.   Correct.  Correct.
 8      Q.   If you wanted to do more than
 9   guesstimate the amount of your losses for
10   purposes of establishing a damages claim in
11   this case, what would you do as the owner of
12   your business?
13      A.   If I was asked to, I would try to
14   compile some more information.
15      Q.   What kind of information would you
16   compile?
17      A.   Again, look at replacement cost of
18   materials, inventory, things today.
19      Q.   Would you have to know what materials
20   were destroyed in the storm in order to look at
21   the replacement cost?
22      A.   Probably.
23      Q.   What would you use to figure out what
24   was lost in the storm?
25      A.   Unfortunately, we lost all of our
                                          Page 103

 1   records so we would have to rely on some
 2   memory.
 3      Q.   Would Exhibit 19 be useful as a
 4   starting point?
 5      A.   Somewhat.
 6      Q.   Take a look at Exhibit 19.  Study it.
 7   Tell me if there are other major items from
 8   your business that were lost in the storm and
 9   that are not listed on Exhibit 19.
10      A.   I would have to have more time to
11   study this and make a list and compare the two
12   lists.
13      Q.   As you sit here today, you cannot
14   review that list and identify any major items
15   that you lost and that are not included there.
16      A.   The storm was approximately three
17   years ago.  Now, again, as I stated, I would
18   have to sit down and try to go from memory and
19   possibly compare lists with the help of some
20   friends and other jewelers that know things and
21   equipment that they possibly had that I may
22   have overlooked.
23      Q.   As you look down Exhibit 19, is there
24   anything that leaps out at you today that --
25   major item that you missed or that's not
                                          Page 104
```

26 (Pages 101 to 104)

```
 1    Q.  For the loss of your home.
 2    A.  My understanding is this is two
 3  separate cases.  What I did with my home in
 4  Murphy is not what I'm doing here for pain and
 5  anguish, to answer your question.
 6    Q.  The pain and anguish that you're
 7  seeking here is only for the loss of your
 8  business.
 9    A.  Yes.
10    Q.  Do you have any physical symptoms that
11  are associated with the pain and anguish that
12  you've suffered because of the loss of your
13  business?
14    A.  Sometimes I don't sleep too good.
15    Q.  Are you able to separate the insomnia
16  that you have from time to time as between the
17  loss of your business and the loss of your
18  home?
19    A.  Yes.
20    Q.  When you don't sleep well from time to
21  time, what is the cause of your not sleeping
22  well?
23    A.  The loss of our business, loss of our
24  way of life in our business, and our income,
25  and doing the same thing for that amount of
                                         Page 113
```

```
 1  time.
 2    Q.  Apart from occasional inability to
 3  sleep, are there other physical symptoms that
 4  you associate with emotional distress of losing
 5  your business?
 6    A.  Financial pressure, stress, worriment,
 7  starting anew at this age.  It's horrible.
 8    Q.  Is there anything else that you want
 9  to add to that list that stems from the mental
10  anguish and distress of losing your business?
11    A.  Not working with my wife every day
12  since we worked together in our business,
13  having lunch, just general -- I'm using the
14  word camaraderie, but that's more associated
15  with a friend more than a life partner.
16    Q.  Apart from that, is there anything
17  else?
18    A.  Not that I can think of at this time.
19    Q.  Do you know anyone who has been so
20  devastated by the storm and its aftermath that
21  they're really not able to function at any
22  level?
23    A.  Several people.
24    Q.  You would not include yourself among
25  that number, would you?
                                         Page 114
```

```
 1    A.  No.  Not at this time.
 2    Q.  Do you know anyone who has coped
 3  better than you have?
 4    A.  Yes.
 5    Q.  Different people have had different
 6  emotional reactions to the storm and its
 7  aftermath, in your experience.
 8    A.  Correct.
 9    Q.  The next item on your list is past and
10  future mental health care expense.  Do you see
11  that?
12    A.  Yes.
13    Q.  Tell me what that refers to.
14    A.  If in the future I need to see a
15  mental health professional to work through the
16  loss of my business and way of life.
17    Q.  Do you have any past mental health
18  care expenses?
19    A.  No.
20    Q.  And as you sit here today, do you have
21  plans to consult a mental health care provider
22  about the distress you have suffered as a
23  result of the loss of your business?
24    A.  Not today.  But after this deposition,
25  maybe.
                                         Page 115
```

```
 1    Q.  Let the record reflect that Mr. Glaser
 2  smiled when he made that last comment.
 3        The next item on your list is past and
 4  future loss and destruction of and damage to
 5  movable property.  Do you see that?
 6    A.  Yes, sir.
 7    Q.  I note you did not include immovable
 8  property in the list.  Correct?
 9    A.  Correct.
10    Q.  The movable property that is the
11  subject of your claim includes what?
12    A.  All the things and items that were in
13  our store.
14    Q.  Apart from the things and items that
15  were in your store, is there any other movable
16  property that is included in your claim in this
17  case?
18    A.  Not that I can think of at this time.
19    Q.  Your claim does not include a motor
20  vehicle.
21    A.  No.
22    Q.  The things and items that are in the
23  store are those that are listed in Exhibit 19
24  to your deposition plus whatever other items
25  you might subsequently identify?
                                         Page 116
```

```
 1    MR. GILBERT:
 2         I was just going to ask you to
 3         show him Exhibit 19 so we're certain
 4         we're all on the same page.
 5    MR. RAFFMAN:
 6         (Tendering.)
 7    A.   Would you repeat the question?  Or the
 8  reporter?
 9         (Whereupon the previous question was
10  read back.)
11    A.   Again, as I've stated before, I would
12  have to consider other items that may or may
13  not be on this list, as well as things that
14  could not be on this list, as well.
15  EXAMINATION BY MR. RAFFMAN:
16    Q.   Sorry.  I didn't mean to interrupt.
17         As you sit here today, you're not able
18  to shed any more light on the movable property
19  that was lost or destroyed than you have
20  already testified about.  Correct?
21    A.   That's correct.
22    Q.   The next item on your list is for past
23  and future loss of movables.  Do you see that?
24    A.   Yes.
25    Q.   To what does that claim refer?
                                        Page 117

 1    A.   Well, future loss of movables would be
 2  in the event some item that we recovered from
 3  our store over time has deteriorated to a point
 4  that it may not be usable.  And that would be a
 5  future possible loss of a movable.
 6    Q.   In order to understand your claim for
 7  past and future loss of use of movables, we
 8  need to understand what the movables are that
 9  were in your store, right?
10    A.   Inventory and things of that nature,
11  yes.
12    Q.   We can't do that unless we have
13  information from you about what those movables
14  are that you've lost the use of, right?
15    A.   Yes.
16    Q.   That is something you'd also have to
17  study further before you could offer further
18  comment, correct?
19    A.   Correct.
20    Q.   The next item on your list is past and
21  future expenses for salvage of movable
22  property.  What salvage expenses did you incur?
23    A.   Um -- in the event that some of our
24  products were salvaged but needed to be
25  repaired or cleaned and things of that nature.
                                        Page 118

 1    Q.   Can you tell me what products those
 2  were?
 3    A.   Primarily, inventory products.  And
 4  that's again something that we'd have to go
 5  through a list, see what's in need of polishing
 6  or cleaning or restoring.
 7    Q.   The way to figure out your damages for
 8  that item, salvage, would be to identify the
 9  items that need salvaging and then the specific
10  expenses that were incurred to do the salvage,
11  right?
12    A.   I would assume that to be correct.
13    Q.   The next item on your list says
14  diminution of property values.  Do you see
15  that?
16    A.   Yes.
17    Q.   That is not related to immovable
18  property; am I right?
19    A.   Say that again now?
20    Q.   To what does that diminution of
21  property value refer?
22    A.   Property would be an immovable, so
23  that would not apply since -- but if it's a
24  movable, there can be diminished valuable to
25  any movable that we recovered.
                                        Page 119

 1    Q.   That really was my question.  The
 2  diminution of property value in the context of
 3  your claim relates to the diminution of the
 4  value of business inventory or other movable
 5  property.
 6    A.   Yes.  Correct.
 7    Q.   What business inventory or other
 8  movable property was diminished in value after
 9  Katrina?
10    A.   Again, it would require further
11  examination of some of those items that we
12  recovered and to see what diminished value it
13  would be, to what extent, if any.
14    Q.   In order to evaluate that claim, you'd
15  need to do more work to identify the property
16  that was diminished in value and figure out how
17  far in value it had gone down.
18    A.   That's correct.
19    Q.   All right.  The next item is past and
20  future loss and destruction of business and
21  business assets.  To what does that element
22  refer?
23    A.   That would be things, again, that
24  would have been caused by flooding and other
25  damages to our business, whether it be future
                                        Page 120
```

30 (Pages 117 to 120)

```
 1  you pursuing today?
 2     A.  I'm a real estate agent.
 3     Q.  When did you first go into business as
 4  a real estate agent?
 5     A.  In May of '06.
 6     Q.  Why did you decide to become a real
 7  estate agent?
 8     A.  There was nothing to go back to in
 9  St. Bernard Parish.  I was living in Covington.
10  At that time, real estate was busier than it is
11  today.
12     Q.  Did you file an individual tax return
13  for 2006?
14     A.  Yes.
15     Q.  What income did you report on your tax
16  returns for 2006?
17     A.  I cannot remember but it wasn't much.
18     Q.  Would you characterize your new career
19  as a real estate professional as a success?
20     A.  No.
21     Q.  Tell me about your new career as a
22  real estate professional.
23     A.  I like it, but the real estate
24  profession is not doing that great locally, as
25  you may know, much less nationwide.
                                          Page 125

 1     Q.  Is it your claim in this case that if
 2  Hurricane Katrina had never happened you would
 3  have continued to operate Holiday Jewelers?
 4     A.  Positively.
 5     Q.  And had you continued to operate
 6  Holiday Jewelers, you would not have gone into
 7  the real estate profession.
 8     A.  Yes.  Correct.
 9     Q.  In order to figure out how much profit
10  you lost or how much income you lost, we have
11  to compare the amount of profit or income you
12  would have made from continuing to operate
13  Holiday Jewelers and then subtract the amount
14  of money you were able to make as a real estate
15  professional because you are doing that instead
16  of operating Holiday Jewelers.  Is that fair?
17     A.  That's fair.
18     Q.  Do you have a number in mind?
19     A.  No.
20     Q.  Did you also seek lost profit or lost
21  income in your claim against Murphy Oil?
22     A.  Personally?  We did not claim our
23  business against Murphy Oil.
24     Q.  Did your complaint against Murphy Oil
25  also contain a component for lost profit or
                                          Page 126

 1  lost income?
 2     A.  I would have to read what our attorney
 3  sued for.  If that makes sense.
 4     Q.  Give us a second.  Okay, I'll hand you
 5  back what's been marked as Exhibit 8.
 6         Exhibit 8 is your complaint against
 7  Murphy Oil; right?
 8     A.  Yes.
 9     Q.  And in fact, in that complaint you did
10  include a claim for lost profit and for lost
11  income, correct?
12     A.  It states in here loss of income, loss
13  of profit, but that could be from my rental
14  property.
15     Q.  So your testimony is that does not --
16  or does not necessarily involve your business
17  Holiday Jewelers.
18     A.  It could or could not.  I did not type
19  this.
20     Q.  All right.  Well, referring you to
21  Glaser Exhibit 24, which is your 2005 tax
22  return, the page Bates marked Glaser 00009
23  which shows an auto expense for $8,763 -- do
24  you see that?
25     A.  Yes.
                                          Page 127

 1     Q.  What's the basis for the $8,763 auto
 2  expense?
 3     A.  It was something our business -- our
 4  auto was run through our business, to deliver
 5  and pick up parts and pieces and watches and
 6  things of that nature in the repair, to bring
 7  to -- repairs to watch makers and other people
 8  in our industry.
 9     Q.  You took a deduction on the Holiday
10  Jewelers tax return for the personal auto that
11  you used in the business.
12     A.  Yes.
13     Q.  When you applied for an SBA loan, what
14  was the purpose of that application?
15     A.  What was the purpose?  Personally, or
16  business?
17     Q.  Let me try and separate it and see if
18  I understand.
19         Did Holiday Jewelers apply for an SBA
20  loan?
21     A.  Yes.
22     Q.  When did Holiday Jewelers apply for
23  that loan?
24     A.  Shortly after the storm, in a FEMA
25  tent in St. Bernard Parish.
                                          Page 128
```

32 (Pages 125 to 128)

```
 1     Q.  Why did Holiday Jewelers apply for the
 2  loan?
 3     A.  We were in line with everybody else to
 4  sign up for everything.
 5     Q.  Was this the loan that you decided not
 6  to pursue after receiving $10,000?
 7     A.  No.  There was two.
 8     Q.  Two separate SBA loans.
 9     A.  Yes.
10     Q.  What happened to the Holiday Jewelers
11  application for an SBA loan?
12     A.  We decided not to pursue it.
13     Q.  Why did you decide not to pursue that
14  loan?
15     A.  We tried to guesstimate again what it
16  would take to go in business, we got to over
17  two hundred and fifty thousand dollars and we
18  quit, because with we talked to SBA, SBA said
19  no problem, sign here, we'll give you the
20  money, we'll mortgage your house that you're
21  in, your cat, your dog, your kid, your
22  grandkids, and if you don't make it we're going
23  to take everything away from you, and I'll be
24  ninety years old when I pay it off.
25     Q.  Is that the same reason you decided
                                        Page 129
```

```
 1  not to pursue the SBA loan that you applied for
 2  personally?
 3     A.  Somewhat.
 4     Q.  What were the differences in the
 5  reasons for not pursuing either loan?
 6     A.  Our home SBA loan, when they dumped
 7  the $10,000 in our account, that was an
 8  initial -- you apply, they dump the ten.  Then
 9  they wanted to give us more money but our home
10  was paid for.  So there was no real need to
11  pursue an SBA loan for a shelter to live in.
12  And again, they would mortgage it to the hilt,
13  cat, kid, dog, everything else under the sun,
14  and I would be almost ninety years old.  It's
15  another thirty-year mortgage.  With no possible
16  income from Holiday Jewelers to pay for all of
17  this.
18     Q.  Why was there no possible income from
19  Holiday Jewelers?
20     A.  We could not rebuild in our location.
21  It's almost three years since the storm.  It
22  took many months just to clean up, much less
23  get things going.  The water damage was
24  tremendous.  Et cetera, et cetera.  No customer
25  base, no inventory, i.e., two fifty from SBA to
                                        Page 130
```

```
 1  start over?
 2     Q.  What was your income as a real estate
 3  agent in 2007?
 4     A.  About $25,000.
 5     Q.  How much less was that than your
 6  income from Holiday Jewelers in 2004?
 7     A.  I could not tell you.  I'd have to
 8  look at tax records.  But one thing you have to
 9  remember, everything out of that $25,000 as a
10  real estate agent comes out of that $25,000.
11  All expenses is out of the $25,000.
12     Q.  $25,000 is your gross before expenses.
13     A.  Yes.
14     Q.  So in order to figure out what your
15  lost income or lost profit is, we need to take
16  a comparison between the profit you would have
17  made at Holiday Jewelers and the amount of
18  profit you did make as a real estate agent.
19     A.  Plus any other benefits that Holiday
20  Jewelers afforded us.
21     Q.  What other benefits did Holiday
22  Jewelers afford you in the nature of profits
23  and income?
24     A.  Paid my health insurance.
25     Q.  As the sole owner of -- well, all
                                        Page 131
```

```
 1  right.  I understand.
 2         As the sole owner of Holiday Jewelers,
 3  you derived an income from Holiday Jewelers
 4  plus some benefits in the nature of health
 5  insurance.
 6     A.  Plenty benefits above and beyond just
 7  the salary.
 8     Q.  And in order to figure out your lost
 9  profits as the owner of Holiday Jewelers, we
10  need to take the total value of what the
11  business delivered in terms of profits --
12     A.  Correct.
13     Q.  -- plus employment benefits.  That's a
14  starting point, right?
15     A.  Correct.
16     Q.  We need to project that forward after
17  the storm and derive a number that represents
18  what you would have made after the storm --
19  right?
20     A.  Correct.
21     Q.  And then we need to subtract from that
22  the money you actually made as a real estate
23  professional.
24     A.  Net as a real estate professional.
25  Or -- correct.  You're correct.
                                        Page 132
```

```
 1    Q.  That all depends, of course, on your
 2   individual circumstances as a small businessman
 3   and then a real estate professional, right?
 4    A.  Correct.
 5    Q.  Let's go back to your interrogatory
 6   answer and finish that up.  There is an item
 7   there for past and future loss of enjoyment of
 8   lifestyle.  You see that?
 9    A.  Yes, sir.
10    Q.  Is there anything beyond what you've
11   testified about today that you would be seeking
12   in connection with that item of damages?
13    A.  The only thing that I can sum up,
14   enjoyment of lifestyle is just the way of life
15   that we had.  Um -- we were convenient and
16   close to shopping, post office which we had to
17   go to from time to time for our business,
18   things of that nature.  So -- those are the
19   things that we miss.
20    Q.  Where did you do your shopping before
21   the storm?
22    A.  We had Wal-Mart, K-Mart, all -- less
23   than a mile.
24    Q.  Where was the Wal-Mart?
25    A.  Wal-Mart was probably about a mile up
                                         Page 133
```

```
 1   the street from the store.
 2    Q.  West or east of Paris Road?
 3    A.  West.
 4    Q.  Where was the K-Mart?
 5    A.  East.
 6    Q.  So is K-Mart was east of Paris Road.
 7    A.  Yes.
 8    Q.  You shopped at both K-Mart and
 9   Wal-Mart.
10    A.  Yes.
11    Q.  Let's go to the next item,
12   inconvenience.  Do you see that?
13    A.  Yes.
14    Q.  Is there anything about inconvenience
15   that you haven't testified about already that
16   you want to add?
17    A.  Again, I hate to use the paraphrase
18   way of life, but that's it.  And I can't think
19   of anything else that we hadn't possibly
20   touched on at this time.
21    Q.  When you use the term way of life, the
22   meaning that term has to you is what you
23   testified about earlier, the ability to be
24   close to shopping and what else?
25    A.  Family, friends, all the conveniences.
                                         Page 134
```

```
 1    Q.  Family and friends lived in
 2   St. Bernard Parish?
 3    A.  Yes.
 4    Q.  Some of them lived east of Paris Road?
 5    A.  Yes.
 6    Q.  Some of them lived west of Paris Road.
 7    A.  Yes.
 8    Q.  The last item on your list for
 9   Interrogatory 26 says any and all others
10   proven.  Do you see that?
11    A.  Yes.
12    Q.  Is there anything else you have in
13   mind under that catchall category?
14    A.  Not at this time.
15    Q.  Who is your lawyer in this case?
16    A.  Brian Gilbert.
17    Q.  When did you hire Brian Gilbert to be
18   your lawyer?
19    A.  I believe it was in '06.
20    Q.  How did Mr. Gilbert come to be your
21   lawyer?
22    A.  Um -- I think through phone
23   conversations had.
24    Q.  Who called who first?
25    A.  That I can honestly not remember.
                                         Page 135
```

```
 1    Q.  Who contacted whom first?
 2    A.  I cannot remember that either.
 3    Q.  Did Mr. Batt refer you to Mr. Gilbert?
 4    A.  No.
 5    Q.  How did you come to be a proposed
 6   class representative in the case?
 7    A.  I was asked by Mr. Gilbert.
 8    Q.  When did Mr. Gilbert ask you to be a
 9   class representative?
10    A.  Early on in the process.
11    Q.  What's your understanding of your role
12   as a class representative?
13    A.  To honestly state and represent things
14   as I know it and to project all information to
15   the best of my ability for the other members of
16   the class.
17    Q.  Is there anything else?
18    A.  Um -- to just -- I can't think of
19   anything else.  I've never done this before, so
20   I'm -- I can't think of anything else to add at
21   this time.
22    Q.  Apart from Holiday Jewelers, how many
23   other jewelry stores, retail jewelry stores are
24   you aware of in the Lower Ninth Ward in the
25   area west of Paris Road in St. Bernard Parish?
                                         Page 136
```

```
 1    A.  Before the storm?
 2    Q.  Yes.
 3    A.  Five.
 4    Q.  Where were they located?
 5    A.  Two was in Arabi, two was in
 6  St. Bernard and one was in Meraux.
 7    Q.  The two that were in Arabi are --
 8    A.  Gone.
 9    Q.  They're west of Paris Road.  They were
10  west of Paris Road.
11    A.  Yes.
12    Q.  Not operating anymore.
13    A.  No.
14    Q.  The one in Meraux was east of Paris
15  Road.
16    A.  Yes.
17    Q.  Is that one operating?
18    A.  Not to my knowledge.
19    Q.  The other two in St. Bernard, were
20  they east or west of Paris Road?
21    A.  Two in Chalmette were west of Paris
22  Road.
23    Q.  Are either one of them operating?
24    A.  One was myself, and then the other
25  gentleman is working I think two or three days
                                        Page 137
```

```
 1  a week out of a house.
 2    Q.  Do you know anything about the
 3  pre-storm profits of any of those five jewelry
 4  stores?
 5    A.  No.
 6    Q.  Do you know anything about the
 7  post-storm performance of the one that's
 8  operating two or three days a week?
 9    A.  No, but if he's only operating two or
10  three days a week, I don't know what his
11  personal situation is -- he's, I believe, older
12  than us.
13    Q.  How did you first hear about a lawsuit
14  involving a barge?
15    A.  I believe it was on the news.  I
16  believe.
17    Q.  What did you see on the news about
18  that lawsuit?
19    A.  I believe that someone said there was
20  going to be a lawsuit about it.
21    Q.  When you saw that on television, did
22  you react by -- did you react by taking any
23  action at all?
24    A.  No.
25    Q.  Do you remember anything about the
                                        Page 138
```

```
 1  first time you decided that you were going to
 2  participate in a lawsuit involving the barge?
 3    A.  Brian and I briefly talked on the
 4  phone, and he asked where was our business
 5  located, where was our houses located, east or
 6  west of Judge Perez Drive?  And we established
 7  that -- that the business would probably be the
 8  best to pursue -- I hate to use the word best,
 9  but because of the proximity to the Industrial
10  Canal, that that water came that way, so that
11  was closest to the canal.
12    Q.  To be clear, your business is several
13  miles from the canal.
14    A.  I would have to clock it, but I would
15  say yes.
16    Q.  Have you attended any of the hearings
17  in this case?
18    A.  No.
19    Q.  Did you attend the trial of Ingram and
20  Domino?
21    A.  Um -- I'm not familiar with that.
22    Q.  You don't know what --
23    A.  No, I didn't go to any trial.
24    Q.  What if any direction and control have
25  you provided to the conduct of this lawsuit by
                                        Page 139
```

```
 1  your lawyers?
 2    A.  Repeat that again.
 3        (Whereupon the previous question was
 4  read back.)
 5    A.  Just trying to provide as much
 6  information as I have to them to pursue
 7  justification for the flooding from the barge.
 8  EXAMINATION BY MR. RAFFMAN:
 9    Q.  When you are asked for information by
10  your lawyers, you supply it, right?
11    A.  To the best of my ability with what
12  records we have.
13    Q.  And apart from supplying information
14  when you're asked for it, you really don't have
15  any other input into how this case proceeds.
16    A.  No.
17    Q.  Which classes or class are you
18  proposed to represent, do you know?
19    A.  No.
20    Q.  You've never served as a class
21  representative in any other lawsuit; correct?
22    A.  No.
23    Q.  Bad question.  Have you ever served as
24  a class representative in any other lawsuit?
25    A.  No.
                                        Page 140
```