# EXHIBIT 16

```
            UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF LOUISIANA

IN RE: KATRINA CANAL BREACHES  * CIVIL ACTION
                               * NO. 05-4182
PERTAINS TO: BARGES            * Consolidated
                               * SECTION "K(2)"
Boutte v. Lafarge      05-5531 *
Mumford v. Ingram      05-5724 * JUDGE DUVAL
Lagarde v. Lafarge     06-5342 *
Perry v. Ingram        06-6299 * MAG. WILKINSON
Benoit v. Lafarge      06-7516 *
Parfait Family v. USA  07-3500 *
Lafarge v. USA         07-5178 *
* * * * * * * * * * *

        Deposition of JIMMIE DONNELL HARRIS,
given at Chaffe McCall, L.L.P., 2300 Energy
Centre, 1100 Poydras Street, New Orleans,
Louisiana 70163-2300, on August 4th, 2008.

REPORTER BY:
        JOSEPH A. FAIRBANKS, JR., CCR, RPR
        CERTIFIED COURT REPORTER #75005
```

Page 1

```
1  APPEARANCES:
2  REPRESENTING THE PLAINTIFFS:
3      BRIAN A. GILBERT, P.L.C.
4      (BY: BRIAN A. GILBERT, ESQUIRE)
5      821 Baronne Street
6      New Orleans, Louisiana 70113
7      504-885-7700
8
9  REPRESENTING LAFARGE NORTH AMERICA:
10     GOODWIN PROCTOR, L.L.P.
11     (BY: MARK S. RAFFMAN, ESQUIRE)
12     901 New York Avenue, NW
13     Washington, D.C. 20001
14     202-346-4000
15 - and -
16     CHAFFE, MCCALL, L.L.P.
17     (BY: CHARLES BLANCHARD, ESQUIRE)
18     2300 Energy Centre
19     1100 Poydras Street
20     New Orleans, Louisiana 70163-2300
21     504-585-7000
22
23
24
25
```

Page 2

```
1  REPRESENTING THE AMERICAN CLUB:
2      MONTGOMERY, BARNETT, BROWN, READ,
3      HAMMOND & MINTZ, L.L.P.
4      (BY: RONALD J. KITTO, ESQUIRE)
5      1100 Poydras Street, Suite 3200
6      New Orleans, Louisiana 70163
7      504-585-3200
8
9  REPRESENTING NEW YORK MARINE & GENERAL
10 INSURANCE COMPANY:
11     SUTTERFIELD & WEBB
12     (BY: DANIEL A. WEBB, ESQUIRE)
13     650 Poydras Street, Suite 2715
14     New Orleans, Louisiana 70130
15     504-598-2715
16
17 REPRESENTING ORLEANS LEVEE DISTRICT:
18     MCCRANIE, SISTRUNK, ANZELMO, HARDY,
19     MAXWELL & MCDANIEL
20     (BY: KASSIE HARGIS, ESQUIRE)
21     3445 N. Causeway Boulevard, Suite 800
22     Metairie, Louisiana 70002
23     504-831-0946
24
25
```

Page 3

```
1  REPRESENTING JEFFERSON PARISH:
2      BURGLASS & TANKERSLEY
3      (BY: LUCIE THORNTON, ESQUIRE)
4      5213 Airline Drive
5      Metairie, Louisiana 70001
6      504-836-2220
7
8  REPRESENTING BARGE PSLC:
9      WIEDEMANN & WIEDEMANN
10     (BY: EDWARD L. MORENO, ESQUIRE)
11     821 Baronne Street
12     New Orleans, Louisiana 70113
13     504-581-6180
14
15 REPRESENTING LAKE BORGNE LEVEE DISTRICT:
16     DUPLASS, ZWAIN, BOURGEOIS, MORTON,
17     PFISTER & WEINSTOCK
18     (BY: RYAN MALONE, ESQUIRE)
19     Three Lakeway Center, 29th Floor
20     3838 N. Causeway Boulevard
21     Metairie, Louisiana 70002
22     504-832-3700
23
24
25
```

Page 4

```
 1   remain the same in the months after the
 2   storm -- Katrina?
 3       A.  No.
 4       Q.  What happened to your pay from the
 5   fire department in the months after Hurricane
 6   Katrina?
 7       A.  It went haywire.
 8       Q.  When you say it went haywire, what
 9   does that mean?
10       A.  It fluctuated up and down because the
11   pay system was all screwed up.
12       Q.  Are you compensated on an annual basis
13   as a firefighter?
14       A.  Yes.
15       Q.  And did the amount that the fire
16   department owed you change after the storm --
17   in the months after the storm?
18       A.  I personally, um -- can't answer that
19   because I still haven't caught up with the
20   system as of yet.  I don't understand the
21   system clearly.
22       Q.  What was it about the system that --
23   is it fair to say there was something about the
24   system that was confusing for you after the
25   storm?
                                          Page 41
```

```
 1           MR. GILBERT:
 2              You heard that?  I just objected
 3           under my breath.  Object.  Because I
 4           don't even understand the question.
 5       A.  No.
 6   EXAMINATION BY MR. RAFFMAN:
 7       Q.  No?  Okay.  I only ask because I'm
 8   confused.  Explain to me what fluctuated up and
 9   down.
10       A.  Because the way our pay scale goes, we
11   work one day on, two days off, and the hourly
12   rate changes tremendously, week by week.  So
13   the pay changes with the hourly rate.  Um --
14   during the storm, all the system was down so a
15   lot of stuff got erased, scrambled, so they had
16   to play catch up.  So the system -- it took
17   them a while for everything to catch up.
18       Q.  Okay.  Do you know where the New
19   Orleans Fire Department maintains the computers
20   or records that are used to keep track of pay?
21       A.  No.
22       Q.  After Katrina did the number of hours
23   you worked for the fire department change?
24       A.  Yes.
25       Q.  What happened to the number of hours
                                          Page 42
```

```
 1   you worked for the fire department?
 2       A.  We were working longer shifts.
 3       Q.  And when you worked those longer
 4   shifts, you were paid for each hour that you
 5   worked?
 6       A.  Yes.
 7       Q.  Did you receive any overtime pay?
 8       A.  Yes, we always receive overtime pay.
 9       Q.  Do you work out of a particular fire
10   house?
11       A.  Yes.
12       Q.  Which fire house do you work out of?
13       A.  Engine 15, Ladder 5.
14       Q.  Where is that fire house located?
15       A.  1114 Arabella Street.
16       Q.  Pardon my ignorance of New Orleans
17   geography.
18           What neighborhood is that fire house
19   located in?
20       A.  Uptown neighborhood.
21       Q.  How long have you worked at Engine 15,
22   Ladder 5?
23       A.  Somewhere between five and six years.
24       Q.  That is the place where you worked at
25   the time of Katrina, then, right?
                                          Page 43
```

```
 1       A.  Yes.
 2       Q.  That neighborhood is located on the
 3   west side of the Industrial Canal, right?
 4       A.  Yes.
 5           Can I ask a question?  When you asked
 6   the question about my working here during
 7   Katrina, our firehouse was under renovation
 8   during that time so we actually worked off of
 9   Claiborne and Carrollton.
10       Q.  The place you worked at Claiborne and
11   Carrollton, is that in the same neighborhood
12   uptown?
13       A.  Yes, it's uptown.  Yes.
14       Q.  Do you do any self-employed work apart
15   from your job with the fire department?
16       A.  No.
17       Q.  What are your duties as a firefighter?
18       A.  Fight fires.
19           (Off the record.)
20   EXAMINATION BY MR. RAFFMAN:
21       Q.  Are you trained as an emergency
22   medical technician?
23       A.  First responder.
24       Q.  First responder.  What does your
25   training as a first responder enable you to do?
                                          Page 44
```

Page 53

1   Q.  When you say we expected the worst,
2  what do you mean by that?
3   A.  Well, watching the news, it was a
4  Category 3 storm heading directly to New
5  Orleans.  New Orleans is surrounded by water --
6  the worst; flooding damages.
7   Q.  You thought it might be dangerous for
8  your wife and daughter to stay in New Orleans;
9  right?
10   A.  Pretty much, yes.
11   Q.  People could get hurt or even killed
12  if they're in the middle of a hurricane; right?
13   A.  Possibilities.
14   Q.  So you thought it was prudent for your
15  wife and daughter to get out of New Orleans
16  while they could.
17   A.  Ahead of time, yes.
18   Q.  What time on Sunday did your wife and
19  daughter leave?
20   A.  I don't know exact time.  Um -- I gave
21  them an early morning time, because I left at
22  5:30.  I told them to leave right behind me.
23  Because New Orleans is a close network state,
24  my wife mother stay two blocks away.  So she
25  left home and went to retrieve her mother.  In

Page 54

1  the process, she had to persuade her mother to
2  leave with her.  So when she left, she took her
3  mother, her sister -- her two sisters, her
4  nephew, her niece, she took a whole truckload
5  of people with her.
6   Q.  What kind of vehicle was she driving?
7   A.  She was driving my Avalanche and my
8  daughter was driving her Mercedes.
9   Q.  This is your daughter Jameka who --
10   A.  Jameka, yes.
11   Q.  When you say it was a close network,
12  what did you mean by that?
13   A.  Um -- most families in New Orleans
14  stay close -- near one another.  Like my mother
15  and father stay five minutes away from me, my
16  sister and brother stay five minutes away from
17  me.  And the same with her family; all of hers
18  stay in the same general location, ten minutes
19  apart, in the same -- So when we say Katrina
20  destroyed families, it destroyed my family as
21  well as my wife's family.
22   Q.  Is it fair to say that that's
23  something that happened in any part of the city
24  that was devastated by the storm?
25   MR. GILBERT:

Page 55

1   Object.
2   A.  I guess.  Maybe.
3  EXAMINATION BY MR. RAFFMAN:
4   Q.  When your wife and daughter left town
5  they stopped and picked up a number of your
6  relatives; right?
7   A.  Yes.
8   Q.  These include relatives who might
9  otherwise not have left.
10   A.  Yes, sir.
11   Q.  I think I heard you make a
12  generalization about your neighborhood, that a
13  lot of families in your neighborhood have
14  relatives who live nearby.  Right?
15   A.  Yes.
16   Q.  So any person who lives in your
17  neighborhood, even if they don't have a car
18  themselves, they might have friends or family
19  who could give them a ride out of town, right?
20   MR. JOANEN:
21    Objection.
22   MR. GILBERT:
23    Objection, Mark.
24   A.  I guess.
25  EXAMINATION BY MR. RAFFMAN:

Page 56

1   Q.  Well, if I wanted to ask for any given
2  person whether they had a ride out of town that
3  day, I might need to know something about their
4  family to know whether they got a family member
5  living nearby who could give them a ride, isn't
6  that fair?
7   MR. GILBERT:
8    You would be asking this witness
9    to speculate, which is the nature of
10    my objection, but --
11   A.  No, I wouldn't say that.  I don't --
12  no.
13  EXAMINATION BY MR. RAFFMAN:
14   Q.  You don't know one way or the other.
15   A.  I don't.  I couldn't tell you.
16   Q.  But in the case of your family, did
17  each of those relatives that your wife picked
18  up on the way out of town, did each of them
19  have an independent way to get out?
20   A.  No.
21   Q.  So if I asked -- which of the
22  relatives did your wife pick up?
23   A.  Her mother, two sisters, a nephew and
24  her brother who stood in the same home.
25   Q.  Did your wife's mother have a car?

Page 69

```
 1  EXAMINATION BY MR. RAFFMAN:
 2     Q.  And if you'd turn to the second page
 3  of the exhibit, there's a little red bubble
 4  that has the letter A on it.  Do you recognize
 5  that bubble as marking the location of your
 6  home at 924 Lamanche Street?
 7     A.  Yes.
 8     Q.  Did you pay cash for your home when
 9  you bought it?
10     A.  No.
11     Q.  Did you have a mortgage?
12     A.  Yes, I had a mortgage.
13     Q.  And when did you pay off that
14  mortgage?
15     A.  After the storm.
16     Q.  When you bought your home what was the
17  purchase price?
18     A.  41,500, I think, if I'm not mistaken.
19     Q.  How much did you put down?
20     A.  I don't remember, because -- I don't
21  remember.
22     Q.  How much did you borrow?
23     A.  I assume -- I think it's the full
24  amount.  I think the full amount.
25     Q.  Do you remember how much of the
```

Page 70

```
 1  mortgage was remaining outstanding after the
 2  storm?
 3     A.  I think 79,300.  I'm just thinking
 4  79,300, something like that, because I did a
 5  renovation to the home, addition.
 6     Q.  Describe the renovation that you just
 7  mentioned.
 8     A.  I added on a thousand square feet,
 9  which is a living room, bedroom, master
10  bathroom and master closet upstairs.
11     Q.  When did you undertake that
12  renovation?
13     A.  2002.
14     Q.  I'm going to show you what's been
15  marked as Exhibit 2 to your deposition.  This
16  is a document that bears a heading cash sale
17  92-180.  Do you recognize this document,
18  Mr. Harris?
19         (Harris Exhibit 2 was marked for
20  identification and is attached hereto.)
21     A.  Yes.
22  EXAMINATION BY MR. RAFFMAN:
23     Q.  Is this a record of the purchase of
24  the 924 Lamanche Street property by you and
25  your wife in 1992?
```

Page 71

```
 1     A.  Yes.
 2     Q.  If you look at the second page, around
 3  the middle of the page, does it refresh your
 4  recollection that the purchase price of your
 5  home was $42,000?
 6     A.  Yes.
 7     Q.  When you bought your home in 1992, how
 8  many stories of living space were there?
 9     A.  One story.
10     Q.  Was the home raised up off the ground?
11     A.  Yes, a raised lap.
12     Q.  How high off the ground was the home
13  raised?
14     A.  I would say two and a half feet.
15     Q.  What kind of construction was the home
16  when you bought it?
17     A.  It's a cinder block construction,
18  exterior walls, um -- the upstairs portion is
19  wood construction.
20     Q.  The home, when you bought it, was only
21  one story, right?
22     A.  Single story, yes.
23     Q.  The second story is what you added in
24  2002?
25     A.  Yes.
```

Page 72

```
 1     Q.  How many square feet was the home when
 2  you bought it?
 3     A.  1400.
 4     Q.  Was the addition of the second story
 5  in 2002 the first such addition that you did?
 6     A.  Yes.
 7     Q.  You added 1000 square feet of living
 8  space on the second floor?
 9     A.  Partially on the first floor and the
10  rest is on the second floor.
11     Q.  What was the construction of the
12  second floor?  It was made out of what?
13     A.  It's wood constructed, um -- plywooded
14  exterior and vinyl siding on top.
15     Q.  Who did the work?
16     A.  Geo Construction.
17     Q.  Was that a firm that you had worked
18  for in the past?
19     A.  No.  That's a friend of mine who has
20  his own construction company.
21     Q.  How big is the lot that you own at 924
22  Lamanche?
23     A.  I don't know the square footage on it.
24     Q.  Do you know the elevation of the lot,
25  how many feet above or below sea level?
```

```
 1  couple of months -- or a month after the storm,
 2  did you take pictures on that occasion?
 3     A.  No.
 4     Q.  You did take pictures of your home in
 5  its damaged condition at some point; right?
 6     A.  Yes.
 7     Q.  You produced a disk with those
 8  pictures; right?
 9     A.  I produced a disk with numerous
10  pictures, um -- which I would have to go back
11  and redo it and take certain pictures out,
12  because there was pictures of the entire
13  neighborhood.  So it was -- it's pictures of
14  fires -- it's just three or four hundred
15  pictures.
16     Q.  You took pictures of fires.  Is that
17  what you said?
18     A.  Someone took pictures of fires.  My
19  friend and I, we swapped pictures out.  And we
20  just made a slide show out of it.
21     Q.  Where were the fires that were
22  depicted on the --
23     A.  All over the city.  All over.
24     Q.  Were any of the fires in the Lower
25  Ninth Ward?
                                            Page 81

 1     A.  I don't know.  I can't tell you.  I'm
 2  not sure.
 3         MR. GILBERT:
 4             For the record, I don't think
 5         y'all have any fire pictures.  I think
 6         all you have are house pictures.  You
 7         may have other areas in the Lower
 8         Nine, but I believe that the discovery
 9         request to which we were responding
10         is -- I don't know, was something
11         general.  But I don't think there are
12         any pictures of fires on the disk we
13         gave you.  And I don't know, um --
14         MR. MORENO:
15             We had a disk that was all over
16         the city, and it was like a huge slide
17         show.  It didn't pertain to any of
18         this case.  I said I need you to bring
19         me your pictures that you took of your
20         house before and after, and that's
21         what he produced.  Whatever you
22         have -- yeah.
23  EXAMINATION BY MR. RAFFMAN:
24     Q.  Do you have pictures on your disk of
25  fires that happened during or after Katrina?
                                            Page 82

 1     A.  Yes, but I don't think they were in
 2  the Lower Ninth Ward district.  They were all
 3  uptown fires.
 4     Q.  Do you know whether there were any
 5  fire in the Lower Ninth Ward or in St. Bernard
 6  Parish after the storm?
 7     A.  I don't know because I actually work
 8  the uptown district.  I don't work down in that
 9  district.
10     Q.  The area that you talked about having
11  observed was the area bounded by Chartres,
12  Florida, Jourdan and Delery; am I right?
13     A.  Yes.
14     Q.  Inside that area did you see any
15  damage to homes that had been caused by the
16  wind?
17     A.  I can't tell you what --
18         MR. GILBERT:
19             Let me just put an objection on
20         the record.
21             And you can answer.
22     A.  Okay.  I can't tell you if the damages
23  was caused by wind or not.  I don't know.
24  EXAMINATION BY MR. RAFFMAN:
25     Q.  Did you see homes that had lost their
                                            Page 83

 1  roofs?
 2     A.  Yes.
 3     Q.  Some of those homes were more than one
 4  story?
 5     A.  Could be, possibility.
 6     Q.  Did you see any downed trees?
 7     A.  I seen rubble.  Piles of everything;
 8  trees, wood from houses, a lot of stuff.
 9     Q.  Did you see any trees that had come
10  down on top of homes?
11     A.  Yes.
12     Q.  Can you describe the damage that the
13  trees had done to the homes?
14     A.  Well, the homes was flattened, it was
15  a pile of wood.  And the tree was laying on top
16  of the piles of wood.
17     Q.  Did you see any homes that looked to
18  you like they had been burned by a fire?
19     A.  No.
20     Q.  Did you hear about any homes in the
21  Lower Ninth Ward that had been burned by fire?
22     A.  At what point are we speaking of?
23     Q.  During or after Katrina.
24     A.  Plenty of homes been burned by fire
25  after Katrina.  It's ongoing now.
                                            Page 84

                              21 (Pages 81 to 84)
```

```
 1        MR. GILBERT:
 2             It's also asked and answered.
 3   EXAMINATION BY MR. RAFFMAN:
 4     Q.   Any of your neighbors tell you that
 5   the wind had harmed their roofs of their
 6   houses?
 7     A.   No.  Verbally tell me?  No.
 8     Q.   Did you hear about homes in your
 9   neighborhood that had their roofs torn off by
10   wind or some other force of nature?
11     A.   I've seen plenty of roofs covered with
12   blue tarps, which mean it was major roof
13   damage.
14     Q.   There's a lot of homes with blue tarps
15   in your neighborhood that you've seen; right?
16     A.   Yes.
17     Q.   I'm showing you what's been marked as
18   Harris Exhibit 4.  The Bates number on this
19   picture is Number 156.  Is that a picture that
20   you took, Mr. Harris?
21             (Harris Exhibit 4 was marked for
22   identification and is attached hereto.)
23     A.   Yes.
24   EXAMINATION BY MR. RAFFMAN:
25     Q.   Can you tell me what is shown in that
                                          Page 85
```

```
 1   picture?
 2     A.   Yes, broken tree branches on top of my
 3   shed.
 4     Q.   Did the broken tree branch do any
 5   damage to the shed?
 6     A.   Yes.
 7     Q.   Can you describe the damage that the
 8   tree branch did to the shed?
 9     A.   Punctured a hole through the roof of
10   the shed.
11     Q.   Do you know whether any rain got
12   inside the shed?
13     A.   Yes.
14     Q.   Did any rain get inside the shed?
15     A.   Yes, through the hole.
16     Q.   What did you keep inside the shed?
17     A.   Everything that my wife didn't want
18   inside the home.
19     Q.   Can you name one or more of the items
20   that your wife didn't want inside the home that
21   you kept in the shed?
22     A.   Furniture, clothes, dressers, my
23   lawnmower, weed eater, et cetera, et cetera.
24     Q.   I'm handing you what's been marked as
25   Harris Exhibit 5.  I believe the Bates number
                                          Page 86
```

```
 1   on this is Number 294.  Do you recognize this
 2   document, Mr. Harris?
 3             (Harris Exhibit 5 was marked for
 4   identification and is attached hereto.)
 5     A.   Yes.
 6   EXAMINATION BY MR. RAFFMAN:
 7     Q.   What is it?
 8     A.   My home.
 9     Q.   It's a photograph of your home?
10     A.   Yes.
11     Q.   Did you take this photograph?
12     A.   Yes.
13     Q.   When did you take this photograph?
14     A.   After Katrina.
15     Q.   Do you know how long after Katrina?
16     A.   Not an exact time frame.
17     Q.   Was this photo taken before you began
18   to repair your home after the storm?
19     A.   Yes, I would say so.
20     Q.   On the right-hand side of the photo,
21   there's another house.  Do you see that?
22     A.   Yes.
23     Q.   Is that your neighbor's home?
24     A.   Yes.
25     Q.   And on the top of your neighbor's home
                                          Page 87
```

```
 1   there appears to be some red objects or
 2   something red there.  Do you see that?
 3     A.   Yes.
 4     Q.   Do you know what that is?  What is
 5   that?
 6     A.   Ridge tiles.
 7     Q.   Ridge tiles.
 8     A.   Yes.
 9     Q.   Are those ridge tiles shown in the
10   photo where they were before the storm?
11     A.   I would guess not.  No.
12     Q.   What has happened to those ridge
13   tiles?
14     A.   It appears as if they're displaced.
15   They're out of line.
16     Q.   Looking at the roof of your own home,
17   do you see that there is one segment that is
18   brown instead of white?
19     A.   Yes.
20     Q.   What happened to that segment of your
21   home?
22     A.   I don't know.  It's not there.  It's
23   gone.
24     Q.   What was there before it was gone?
25     A.   Vinyl siding.
                                          Page 88
```

Page 101

```
 1            The Bates number on this, for
 2       counsel's benefit, since it didn't
 3       print very well, um -- I believe it's
 4       146, but I, um -- I don't have it
 5       here.
 6   EXAMINATION BY MR. RAFFMAN:
 7       Q.  Did you take this picture, Number 7?
 8       A.  Yes.
 9       Q.  And this shows one of rooms of your
10   home after the storm?
11       A.  Yes.
12       Q.  Which room does it this show?
13       A.  This was the old master bedroom which
14   was my daughter's room which became my fitness
15   room.
16       Q.  What is the piece of furniture that
17   appears to be lying on its side in the middle
18   of the picture?
19       A.  That's a TV.
20       Q.  And the television that's there,
21   that's not the same as the theater system you
22   were talking about, is it?
23       A.  No.  No.  This was in my fitness room.
24       Q.  I'm showing you what's been marked as
25   Harris 8.  Do you recognize this document?
```

Page 102

```
 1            (Harris Exhibit 8 was marked for
 2       identification and is attached hereto.)
 3       A.  Yes.
 4   EXAMINATION BY MR. RAFFMAN:
 5       Q.  This is another photo you took after
 6   the storm?
 7       A.  Yes.
 8       Q.  What room is depicted in this photo?
 9       A.  This is a bedroom across from the
10   bathroom.
11       Q.  When you mentioned earlier that a
12   computer had been destroyed in the storm, is
13   that computer shown in this photo?
14       A.  Yes.
15       Q.  What kind of computer was that?
16       A.  I don't remember the brand.
17       Q.  Do you remember how old the computer
18   was?
19       A.  Um -- it was purchased in '02.
20       Q.  What was the condition of the computer
21   at the time of the storm?
22       A.  It was in great condition.  It was
23   well kept.
24            And I forgot to mention the, um -- if
25   I may, please, the, um -- all of our winter
```

Page 103

```
 1   clothes was kept in this closet.  We lost them
 2   all.
 3       Q.  So the winter clothes would be another
 4   item that you would be claiming as part of this
 5   lawsuit.
 6       A.  Well, I would think everything within
 7   the home would be part of the lawsuit, so -- I
 8   mean --
 9       Q.  Right.  And so in trying to itemize
10   the major items that were inside the home --
11       A.  Yes.
12       Q.  -- you mentioned paintings, theater
13   system, dining room and living room set --
14       A.  Uh-huh.  Yes.
15       Q.  -- kitchen equipment, computer, winter
16   clothes, and one other item that I can't read
17   on my handwriting.
18            Those are all items that you're
19   seeking compensation for in this case, am I
20   right?
21       A.  Everything that was within the home,
22   sir.  I mean -- to me.  And I know most of this
23   stuff is irreplaceable, but, you know, I just
24   have to live with it.
25       Q.  So just to be clear, there are other
```

Page 104

```
 1   thinks you're seeking compensation for besides
 2   that list.  Am I right?
 3       A.  Yes.  Just everything within the home.
 4   Everything I lost.  I lost my home.  I lost my
 5   family.  You can't give me the years back that
 6   I lost with my family.  I know you can't
 7   replace that.  You can't replace the footage
 8   that I lost with my family.  It's
 9   unreplaceable.
10       Q.  I understand what you just said, and I
11   don't mean in any way to diminish what you just
12   said, but I did ask you a question and I do
13   need to have it answered.  And the question I
14   asked was whether or not that list of items
15   that I mentioned is among the things that you
16   are seeking compensation for in this case?  And
17   if the answer to that question is yes, then a
18   simple yes will do.
19       A.  Yes.
20       Q.  Thank you.  I'm showing you what's
21   marked as Harris Exhibit 9.  Have a look at
22   that document and tell me when you've looked it
23   over.
24            (Harris Exhibit 9 was marked for
25       identification and is attached hereto.)
```

**Page 105**

```
 1      A.  I've looked it over.
 2   EXAMINATION BY MR. RAFFMAN:
 3      Q.  All right.  Do you recognize the
 4   document?
 5      A.  Yes.
 6      Q.  What is it?
 7      A.  It was a claim in a suit for the Corps
 8   of Engineers that -- it was aired on
 9   television, and everyone who stood in that grid
10   square was allocated to file this document.
11      Q.  And this document Harris Number 9,
12   it's captioned claim for damage, injury or
13   death.  Do you see that?
14      A.  Yes.
15      Q.  And this is your claim for damage,
16   injury or death that you submitted to the
17   United States of America, correct?
18      A.  Yes.
19      Q.  And the box in Item 2 there, that's
20   your name and address, correct?
21      A.  Yes.
22      Q.  Where it says signature of claimant,
23   in Box 13A, is that your signature?
24      A.  Yes.
25      Q.  Where it says phone number of
```

**Page 106**

```
 1   signatory in Box 13B, is that your phone
 2   number?
 3      A.  Yes.
 4      Q.  Did you sign this form on or around
 5   February 27th of 2007?
 6      A.  Yes.
 7      Q.  You signed this document -- when you
 8   signed this document, had you read the part at
 9   the bottom where it says that there's a penalty
10   for making false statements?
11      A.  Yes.
12      Q.  Did a lawyer prepare this for you?
13      A.  No.
14      Q.  Did you prepare it yourself?
15      A.  Yes.
16      Q.  You see the box in Item 12A, property
17   damage?  What number is in that box?
18      A.  A hundred thousand dollars.
19      Q.  Is that the amount of compensation
20   that you claimed from the United States
21   government for property damage from Hurricane
22   Katrina?
23      A.  Yes.  I read it as if -- speaking of
24   the dwelling, my home, a hundred thousand
25   dollars, yes.
```

**Page 107**

```
 1      Q.  The hundred thousand dollar number
 2   that you put there is only for damage to your
 3   dwelling?  Is that right?
 4      A.  Yes.  That's how I put it there.
 5      Q.  And so you didn't include in that the
 6   kitchen and the other items, the furniture and
 7   other items that we just talked about.
 8      A.  No.
 9      Q.  Now, you wrote under personal injury
10   the letters NA.  Is that your handwriting
11   there?
12      A.  Yes.
13      Q.  And what did you mean to signify by
14   writing NA under personal injury?
15      A.  Non applicable.  No injuries.
16      Q.  Did you understand when you wrote
17   that -- look at the box in Item 10 for a
18   minute.  Do you see that Item 10 includes the
19   words personal injury and mental distress?
20      A.  Yes.
21      Q.  When you wrote NA in Item 12B, did you
22   understand that 12B applied -- what did you
23   understand that Box 12B applied to?
24      A.  My personal injury to me that I
25   sustained.
```

**Page 108**

```
 1      Q.  Including mental distress that you
 2   sustained?
 3      A.  I guess if that falls under the same
 4   category.  And I put NA describing me, none
 5   applicable to me.
 6      Q.  And when you did that, you signed it
 7   under penalty of law.
 8      A.  Yes.
 9      Q.  How did you arrive at the number one
10   hundred thousand for property damage?
11      A.  I went off the amount that the
12   insurance company paid me, and that's why I put
13   that amount there.
14      Q.  So you had already been paid a hundred
15   thousand dollars by the insurance company for
16   your property?
17      A.  Yes.
18      Q.  And you had been paid a separate
19   amount for your contents, right?
20      A.  Yes.  That's correct.
21      Q.  And that separate amount was forty
22   thousand dollars?
23      A.  Yes.
24      Q.  Did anyone help you fill this out?
25      A.  No.
```

```
 1      doing that, and I have no objection.
 2   MR. JOANEN:
 3          I'm just making a record in the
 4      event that there's a trail that
 5      involves both litigations, I think
 6      it's important that the transcript be
 7      complete and documents that are
 8      referred to by the witness that may b
 9      e utilized at trial, if we don't have
10      copies of those it creates a big
11      issue.
12   MR. RAFFMAN:
13          Your remark is noted.  We'll
14      discuss it off the record afterwards.
15      I think it shouldn't be a big issue
16      for us, but.
17   MR. JOANEN:
18          Well, we're not cutting you off.
19 EXAMINATION BY MR. RAFFMAN:
20    Q.  So the fact that a particular document
21 is in that stack doesn't necessarily mean you
22 expect the defendants to pay you for that,
23 right?
24    A.  I don't quite understand the question.
25    Q.  What I'm trying to figure out is, does
                                          Page 125

 1 your claim in this case include all of those
 2 expenses that are in that stack?
 3    A.  And plus some, then some.  It's just
 4 not everything that's there.
 5    Q.  Okay.  Everything that's in that stack
 6 is a part of your claim in this case; correct?
 7    A.  Yes.
 8    Q.  What kind of countertops did your
 9 kitchen have before the storm?
10    A.  Formica.
11    Q.  Look at Page 27.  Is Page 27 a receipt
12 for granite countertops?
13    A.  Yes.
14    Q.  And you spent $3,200 on granite
15 countertops?
16    A.  Yes.
17    Q.  Would you agree with me that granite
18 countertops are an upgrade over Formica?
19    A.  Yes.
20    Q.  Look at Page -- I'm sorry.  What was
21 the cost of the theater system that was in your
22 home when the house flooded, if you remember?
23    A.  I don't remember.
24    Q.  Was it an HD system?
25    A.  No.
                                          Page 126

 1    Q.  Look at Number 31.  Does Number 31
 2 apply to a theater system that you put in your
 3 home after the storm?
 4    A.  Yes.
 5    Q.  And the theater system in this receipt
 6 is an HD system, correct?
 7    A.  Yes.
 8    Q.  Would you agree with me that the HD
 9 system that's in Number 31 is an upgrade over
10 the prior system?
11    A.  Somewhat, yes.
12    Q.  Look at Number 54.  Who is Julian
13 Hamilton?
14    A.  My neighbor.
15    Q.  Does Number 54 reflect the purchase of
16 sheetrock by your neighbor Julian Hamilton?
17    A.  Yes.  He picked it up for me.
18    Q.  So this was -- this was sheetrock that
19 he picked up to put in your house.
20    A.  For my home, yes.
21    Q.  Did you have potted plants or trees in
22 your home before the storm?
23    A.  Potted plants and trees?  No.  Maybe a
24 couple of those deals like that, but -- no.
25   MR. RAFFMAN:
                                          Page 127

 1          The record will reflect he's
 2      pointing to a ficus tree that's here
 3      in the conference room.
 4    A.  I'm just saying similar to that.
 5 EXAMINATION BY MR. RAFFMAN:
 6    Q.  Okay.  So if you turn to Page 91, in
 7 the upper right-hand corner there's a purchase
 8 of two trees from Westheimer Commons.  Do you
 9 see that?
10    A.  Yes.
11    Q.  And these were trees that you
12 purchased to put in your home after the storm?
13    A.  Yes.  My wife purchased them.  They
14 were similar to the trees that were previously
15 there.  Similar to them.
16    Q.  That was my question.
17    A.  Okay.
18    Q.  What I'll do, so the record is
19 complete, I'm going to attach the documents
20 Bates numbered 27, 31, 54 and 91 as exhibits.
21 We'll combine that as Harris 13.
22          (Harris Exhibit 13 was marked for
23 identification and is attached hereto.)
24 EXAMINATION BY MR. RAFFMAN:
25    Q.  What demolition work did you do on the
                                          Page 128

                                  32 (Pages 125 to 128)
```

**Page 129**

1  property?
2     A.  All.  All the sheetrock, walls, doors,
3  windows, everything.
4     Q.  You pulled out the sheetrock.
5     A.  Every bit of it.
6     Q.  Pulled out the doors.
7     A.  Every one of them.
8     Q.  Pulled out the windows.
9     A.  Every one of them.
10    Q.  Pulled out the walls.
11    A.  Yes.
12    Q.  Does the cost of that work get
13 included in the $80,000 figure that you
14 mentioned earlier?
15    A.  It's not even in there.  I did it
16 myself.
17       (Brief recess.)
18 EXAMINATION BY MR. RAFFMAN:
19    Q.  All right.  Harris 14.  (Tendering.)
20 Do you recognize 14?
21       (Harris Exhibit 14 was marked for
22 identification and is attached hereto.)
23    A.  Yes.
24 EXAMINATION BY MR. RAFFMAN:
25    Q.  And 14 is a document that says

**Page 130**

1  verification.  And is Exhibit 14 dated on or
2  around May 23rd, 2008?
3     A.  Yes.
4     Q.  And you signed it?
5     A.  Yes.
6     Q.  And before signing it you reviewed
7  written discovery responses that were made on
8  your behalf, right?
9     A.  Yes.
10    Q.  When you reviewed them you didn't
11 notice anything that caused you to be unable to
12 verify the correctness of what was there,
13 right?
14    A.  Yes.
15    Q.  You thought everything in the
16 documents you read was true and correct as you
17 understood it.
18    A.  Yes.
19    Q.  And when you read the discovery
20 responses did you pay particular attention to
21 the ones that had your name on them?
22    A.  Yes.
23    Q.  Harris 15 is a document that bears the
24 heading Supplemental Answers to Interrogatories
25 Propounded by Barge Entities and dated 24th of

**Page 131**

1  January, 2008.  I'm going to point your
2  attention to the answer to Interrogatory
3  Number 26 which asks for each individual
4  plaintiff, identify every injury or harm for
5  which damages are sought by that person.  And
6  it goes on from there.  And I've tabbed a page
7  for you.  Have a look at that.  (Tendering.)
8        Was this answer one of the answers
9  that you reviewed before you signed the
10 verification?
11    A.  Yes.
12    Q.  The answer to this interrogatory lists
13 a number of elements of damage that you seek
14 damages for; right?
15    A.  Yes.
16    Q.  And when it says seeks damages, do you
17 understand that that means that you're seeking
18 monetary compensation?
19    A.  Explain it to me.
20    Q.  That you would like to be paid an
21 amount of money for the items of damages which
22 are listed here.
23    A.  Okay.  Yes.
24    Q.  So you want to be paid money for past
25 and future mental, pain, suffering and anguish,

**Page 132**

1  correct?
2     A.  Yes.
3     Q.  And you want to be paid money for past
4  and future mental health care expense, right?
5     A.  Yes.
6     Q.  And you want to be paid money for past
7  and future loss and destruction of and damage
8  to immovable and movable property, right?
9     A.  Yes.
10    Q.  And you want to be paid money for past
11 and future loss of immovables and movables.
12    A.  Yes.
13    Q.  Another item is you want to be paid
14 for past and future expenses for demolition and
15 salvage of immovable and movable property;
16 right?
17    A.  Yes.
18    Q.  Another one is that you want to be
19 paid money for diminution of property value.
20    A.  Yes.
21    Q.  Another item of your damages that
22 you're claiming is past and future loss of
23 enjoyment of lifestyle, correct?
24    A.  Yes.
25    Q.  Another item of damage is

```
 1  inconvenience, right?
 2  A.  Yes.
 3  Q.  And then another one here, it says any
 4  and all others proven.  Do you see that item
 5  there?
 6  A.  Yes.
 7  Q.  Do you, as you sit here today, know of
 8  any and all other elements of damage for which
 9  you're seeking compensation in this case?
10  A.  No.
11  Q.  Do you know from whom you are seeking
12  those damages?
13  A.  Not exactly, no.
14  Q.  Tell me as best you can your
15  understanding of from whom you're seeking these
16  damages.
17  A.  From whatever -- whomever had the
18  ownership of the barge.
19  Q.  And you are not seeking damages in
20  this case from anybody other than somebody who
21  is responsible for the barge; right?
22  A.  Yes.
23       MR. WEBB:
24          Objection to the vague and
25          ambiguous nature of the question.
                                        Page 133
```

```
 1       MR. RAFFMAN:
 2          Let me be clearer so I cure the
 3          objection.
 4  EXAMINATION BY MR. RAFFMAN:
 5  Q.  You're not seeking any damages from
 6  the government in this case; right?
 7  A.  No.  I'm not.
 8  Q.  You filed an SF 95 form seeking
 9  compensation from the government.
10  A.  Yes.
11  Q.  The things that you're asking the
12  government to pay you for in your SF 95 form
13  are some of the same things you're claiming in
14  this case; right?
15  A.  I don't know.  I'm not -- I don't
16  know.
17  Q.  Well, in this case you're seeking
18  damage for your damage to your house, right?
19  A.  Yes.
20  Q.  In your SF 95 form you're seeking
21  money for damage to your house, too; right?
22  A.  Yes.
23  Q.  Did you have an E-mail account at the
24  time of Katrina?
25  A.  Yes.
                                        Page 134
```

```
 1  Q.  And who was your E-mail provider?
 2  A.  Yahoo.
 3  Q.  Did you send or receive E-mails about
 4  your damage?
 5  A.  No.
 6  Q.  Your computer was destroyed in the
 7  storm; right?
 8  A.  Yes.
 9  Q.  When is the first time you had access
10  to a computer after the storm to use your
11  E-mail?
12  A.  I don't know.  It was a while.  I
13  don't know.
14  Q.  Do you have E-mails related to your
15  property damage?
16  A.  Not that I can remember, no.
17  Q.  All right.  Let me ask you some
18  questions about these elements of damage that
19  are on this interrogatory.  And I'm going to
20  start with the third item down, past and future
21  loss and destruction of and damage to immovable
22  and movable property.  Do you see that?
23  A.  Yes.
24  Q.  Let's start with immovable property.
25  Do you understand what immovable property is?
                                        Page 135
```

```
 1  A.  Yes.
 2  Q.  What is that?
 3  A.  My home, the structure.
 4       MR. GILBERT:
 5          Let me just make a note on the
 6          record, um -- if Lafarge is in
 7          possession of any E-mail originating,
 8          or to which my client is party, I call
 9          for production of it.
10       MR. RAFFMAN:
11          I'm not.  Lafarge is not in
12          production.
13       MR. GILBERT:
14          Possession.
15       MR. RAFFMAN:
16          Lafarge does not have E-mails
17          from your client.  I was asking
18          because I'm wondering whether they
19          exist.
20       MR. GILBERT:
21          Got you.  It was a conditional
22          request.  If Lafarge --
23       MR. RAFFMAN:
24          Well, I'll withhold further
25          comment.
                                        Page 136
```

34 (Pages 133 to 136)

```
 1  EXAMINATION BY MR. RAFFMAN:
 2    Q.  Damage the immovable property,
 3  Mr. Harris, this is for damage to the home that
 4  you've already testified about.  Right?
 5    A.  Yes.
 6    Q.  And it includes the harm that was done
 7  to the first floor of your house, right?
 8    A.  Yes.
 9    Q.  But it doesn't include the hole in the
10  roof of the shed, does it?
11    A.  No.
12    Q.  The amount of this claim, dollar
13  amount, depends on how much damage was done to
14  your property, doesn't it?
15    A.  I don't know, sir.  I don't -- I don't
16  know.
17    Q.  If your house hadn't flooded to within
18  8 inches of the first floor ceiling, you might
19  damage to your home, you'd expect it to be
20  different from if it flooded to the extent it
21  flooded.  Right?
22    A.  I assume.
23    Q.  All right.  Let me ask you about
24  movable property.  This is the personal
25  property you've testified about earlier, right?
                                        Page 137

 1    A.  Yes.
 2    Q.  There's a list of property, but you'd
 3  have to go look for it.
 4    A.  Yes.
 5    Q.  You haven't figured out how much it's
 6  worth.
 7    A.  No.
 8    Q.  How much it's worth depends on what
 9  was actually in your house and destroyed in the
10  storm, doesn't it?
11        MR. GILBERT:
12            Objection.  It's misleading.
13    A.  I don't know.
14  EXAMINATION BY MR. RAFFMAN:
15    Q.  In order to figure out how much money
16  you're entitled to for your personal property,
17  doesn't there need to be some list of what
18  property was destroyed?
19    A.  I guess, yes.
20    Q.  How much money are you claiming for
21  the Cavalier, the Chevy Cavalier that was
22  harmed in the storm?
23    A.  I didn't claim anything.
24    Q.  Am I right that your daughter --
25        MR. GILBERT:
                                        Page 138

 1            He's asking about this case.
 2  EXAMINATION BY MR. RAFFMAN:
 3    Q.  In this case, sure.  I'm sorry.  Maybe
 4  you didn't understand my question.
 5    A.  Okay.
 6    Q.  The Chevy Cavalier is a part of your
 7  claim in this case; right?
 8    A.  Yes.
 9    Q.  And you want the defendants in this
10  case to write you a check for the damage that
11  was done to that car.
12    A.  Yes.
13    Q.  How badly was the car damaged?
14    A.  It was totally saturated underwater.
15    Q.  Completely totaled.
16    A.  Yes.
17    Q.  The amount of money that would
18  compensate you for the loss of that car is
19  going to depend, won't it, on how old the car
20  was and what kind of shape it was in?  Isn't
21  that relevant?
22    A.  Yes.
23    Q.  Let me ask, then, the next item, past
24  and future loss of use of immovables and
25  movables.  Do you see that?
                                        Page 139

 1    A.  Yes.
 2    Q.  What loss of use of immovables are you
 3  claiming from the defendants in this case?
 4    A.  I'm not sure.
 5    Q.  What past and future loss of use of
 6  movables are you claiming in this case?
 7    A.  I'm not sure.
 8    Q.  When you reviewed this interrogatory
 9  answer before you verified it, did you have an
10  understanding of what was meant by the phrase
11  past and future loss of immovables and
12  movables?
13    A.  Yes.
14    Q.  And what did you understand that to
15  mean?
16        MR. GILBERT:
17            Let me object because it calls
18        for a level of legal expertise that he
19        doesn't have.  I mean, loss of use is
20        not a vernacular phrase.  I mean, it
21        is a legal term.  And subject to that,
22        he can answer.
23    A.  I don't know.
24  EXAMINATION BY MR. RAFFMAN:
25    Q.  The next item on your list is past and
                                        Page 140

                            35 (Pages 137 to 140)
```

```
 1  future expenses for demolition and salvage of
 2  immovable and movable property.  Do you see
 3  that?
 4      A.  Yes.
 5      Q.  This is -- the demolition and salvage
 6  are the costs associated with the work you've
 7  done to get your house back in shape; right?
 8      A.  Yes.
 9      Q.  And in order to understand that claim,
10  we need to go through the list of receipts that
11  you supplied plus whatever expenses you
12  incurred that are not in that list, right?
13      A.  Yes.
14      Q.  And we need to analyze what it was you
15  actually spent for demolition and salvage,
16  right?
17      A.  Somewhat.
18      Q.  What else?
19      A.  Plus the manhours I put in in doing my
20  own demolition.
21      Q.  All right.  Your claim includes your
22  man-hours for doing the work.
23      A.  Yes.
24      Q.  And at what rate are you charging the
25  defendants in this case for the work that you
                                           Page 141

 1  did in fixing your house?
 2      A.  I don't have a number at this time.
 3      Q.  Are there any other expenses of
 4  demolition and salvage, apart from paying you
 5  for your time and apart from the receipts that
 6  you've supplied plus whatever other receipts
 7  exist, are there any other element of
 8  demolition and salvage expense for which you
 9  seek compensation here?
10      A.  No.
11      Q.  How many hours have you spent doing
12  demolition and salvage for which you would like
13  to be compensated?
14      A.  I don't know an exact number.
15      Q.  You haven't kept --
16      A.  I don't have a number.  I don't have
17  an exact number.
18      Q.  And you haven't kept track along the
19  way, have you?
20      A.  No.
21      Q.  The next item is diminution of
22  property values.  Do you have an understanding
23  of what that item means?
24      A.  No, not exactly.
25          MR. GILBERT:
                                           Page 142

 1          Object, because this is the
 2      subject of expert opinion that has
 3      been rendered for the benefit of
 4      Lafarge and will continue to be
 5      rendered for the benefit of Lafarge by
 6      John Kilpatrick.  And again, that's
 7      something that's going to be defined
 8      by the expert, what diminution of
 9      property values means in the context
10      of this lawsuit.  Subject to the
11      objection, he can answer if he knows
12      what that even is.
13          MR. RAFFMAN:
14          I asked him does he have an
15      understanding.
16      A.  No.
17  EXAMINATION BY MR. RAFFMAN:
18      Q.  When you signed the interrogatory
19  answer asserting this was one of your elements
20  of damage, did you undertake to develop an
21  understanding of what that meant by asking
22  anybody?
23      A.  Not a clear understanding.
24      Q.  Without telling me anything your
25  lawyer told you or anything you told your
                                           Page 143

 1  lawyer, I don't want to ask about that, did you
 2  ask the question what does that mean,
 3  diminution of property values?
 4      A.  To whom?
 5      Q.  To anyone.
 6      A.  Yes.
 7      Q.  To whom did you ask that question?
 8      A.  A friend.
 9      Q.  Which friend?
10      A.  A close friend of mine 's.
11      Q.  And what is your friend's name?
12      A.  Troy.
13      Q.  I'm sorry?
14      A.  Troy.
15      Q.  Troy.  And what's his last name?
16      A.  Um -- I don't have the last name right
17  off the top.  I don't know exactly the last
18  name.
19      Q.  Okay.  So your close friend Troy, you
20  asked him what that means, and what -- did you
21  ask him what that meant?
22      A.  Yes.
23      Q.  And what did he tell you?
24      A.  The values of the property being
25  downsized from the value it was at that moment.
                                           Page 144
```

**Page 153**

1  further away from it the city slopes downward.
2     Q.  And the parts of the Holy Cross
3  neighborhood that are closest to the river,
4  um -- how are they doing today?
5     A.  They're growing back slower.  It's
6  just a slow process.  I can't say exactly
7  what's causing it, but it's just a slow
8  process, completely slow.
9     Q.  And in your experience, at least, the
10 progress is different in different
11 neighborhoods over there in the Lower Ninth
12 Ward, right?
13    A.  I would say so.
14    Q.  When did you first hire a lawyer to --
15 before I change the subject, how many homes are
16 there on your block?
17    A.  Maybe eleven.
18    Q.  Now, as you sit here today, how many
19 of those eleven homes have been repaired?
20    A.  Five.
21    Q.  How many of those homes have been
22 demolished?
23    A.  None of them.
24    Q.  How many of them are occupied today?
25    A.  Five.

**Page 154**

1     Q.  When did you first hire a lawyer to
2  sue the barge defendants on your behalf, if you
3  remember?
4     A.  I don't remember.
5     Q.  How did you come to hire a lawyer to
6  sue the barge defendants?
7     A.  I don't remember exactly how I arrived
8  at that position, I don't remember.
9     Q.  Have you attended any of the court
10 hearings in this case?
11    A.  No.
12    Q.  Did you attend a trial of Ingram and
13 Domino?
14    A.  No.  No.
15    Q.  Have you attended any of the
16 depositions of anybody in this case?
17    A.  No.
18    Q.  Apart from the interrogatory answers
19 that you verified, have you reviewed any court
20 documents for the purpose of commenting on
21 them?
22    A.  No.
23    Q.  Describe for me, if you will, your
24 participation, if any, in the direction and
25 control of this litigation.

**Page 155**

1     A.  I don't understand.  I don't --
2     Q.  Do you participate in the direction
3  and control of the lawsuit against the barge
4  entities?
5     A.  I haven't.  No, I haven't.
6     Q.  Do you understand that you've been
7  proposed as a class representative in this
8  case?
9     A.  Yes.
10    Q.  All right.  What is your understanding
11 of what it means to be a class representative?
12    A.  To be one of the representatives to
13 sit forward and explain my losses, what
14 happened to me during the flood.
15    Q.  Do you know which classes or
16 subclasses you're being proposed to represent?
17    A.  No.
18    Q.  Do you want the Court to certify you
19 as a class representative?
20    A.  Yes.
21    Q.  Why do you want the Court to do that?
22    A.  Because someone have to present what
23 happened to the whole community as a whole.
24 Someone have to be what we call a mouthpiece,
25 to speak out.  I'm just one of them.

**Page 156**

1     Q.  If the Court decides that this case
2  cannot be a class action, would you go ahead
3  with your suit on an individual basis?  Would
4  that be your intention?
5     A.  Maybe.
6     Q.  You wouldn't rule it out.
7     A.  No.
8     Q.  Has anybody other than a lawyer asked
9  you to be a class representative in this case?
10    A.  No.
11    Q.  Have you ever served as a class
12 representative in any other lawsuit?
13    A.  No.
14    Q.  What understanding do you have, if
15 any, about how the expenses of this lawsuit for
16 the plaintiffs --
17    A.  I don't have any.
18    Q.  All right.  I need to finish my
19 question because I didn't finish it.  But then
20 I know what your answer is.  What understanding
21 do you have, if any, about how the expenses of
22 this lawsuit for the plaintiffs are being
23 borne?
24    A.  I don't know.
25    Q.  Have you paid any expenses up until

| CLAIM FOR DAMAGE, INJURY, OR DEATH | INSTRUCTIONS: Please read carefully the instructions on the reverse side and supply information requested on both sides of the form. Use additional sheet(s) if necessary. See reverse side for additional instructions. | | FORM APPROVED OMB NO. 1105-0008 |
|---|---|---|---|
| 1. Submit To Appropriate Federal Agency: United States of America, Department of the Army, Corp of Engineers. U.S. Army Engineer District, New Orleans P.O. Box 60267, CEMVN-OC New Orleans, Louisiana 70160-0267 | 2. Name, Address of claimant and claimant's personal representative, if any. (See instructions on reverse.) (Number, street, city, State and Zip Code) JIMMIE D. HARRIS 924 LAMANCHE ST. NEW ORLEANS, LA. 70117 | | |
| 3. TYPE OF EMPLOYMENT  MILITARY ☐ CIVILIAN ☒ USACE NOFD | 4. DATE OF BIRTH 26 DEC 66 | 5. MARITAL STATUS MARRIED | 6. DATE AND DAY OF ACCIDENT Monday, August 29, 2005 | 7. TIME (A.M. or P.M.) unknown |

8 Basis of Claim (State in detail the known facts and circumstances attending the damage, injury, or death, identifying persons and property involved, the place of occurrence and the cause thereof) (Use additional pages if necessary.)

Address:

8a

The hurricane protection levees and hurricane walls which were supposed to protect the New Orleans metropolitan area failed and were breached during the day of August 29, 2005. The breaches and failure of the hurricane protection levees and walls were a result of Corps of Engineers' negligence in the design and construction of these levees and walls and the Mississippi River Gulf Outlet. In addition, the Corps knew or reasonably should have known that the hurricane protection levees and walls were inadequate to protect the area from flooding from a fast moving category three hurricane and despite that knowledge, the Corps failed to disclose these inadequacies, to the material detriment of the claimant.

9. PROPERTY DAMAGE

NAME AND ADDRESS OF OWNER, IF OTHER THAN CLAIMANT (Number, street, city, State, and Zip Code)

SAME AS ABOVE

BRIEFLY DESCRIBE THE PROPERTY, NATURE AND EXTENT OF DAMAGE AND THE LOCATION WHERE PROPERTY MAY BE INSPECTED. (See instructions on reverse side.)

Destruction of real and personal property resulting from water damage; loss of opportunity to purchase a sufficient amount of flood insurance, to modify the property, or to relocate as a result of fraud and/or concealment by the U.S. Army Corps of Engineers.

10. PERSONAL INJURY/WRONGFUL DEATH

STATE NATURE AND EXTENT OF EACH INJURY OR CAUSE OF DEATH, WHICH FORMS THE BASIS OF THE CLAIM. IF OTHER THAN CLAIMANT, STATE NAME OF INJURED PERSON OR DECEDENT.

Personal injury and mental distress

11. WITNESSES

| NAME | ADDRESS (Number, street, city, State, and Zip Code) |
|---|---|
| Claimant is not aware of any witnesses at this time. | |

12. (See instructions on reverse) AMOUNT OF CLAIM (In dollars)

| 12a. PROPERTY DAMAGE | 12b. PERSONAL INJURY | 12c. WRONGFUL DEATH | 12d. TOTAL (Failure to specify may cause forfeiture of your rights.) |
|---|---|---|---|
| $100,000.00 | N/A | | $100,000.00 |

I CERTIFY THAT THE AMOUNT OF CLAIM COVERS ONLY DAMAGES AND INJURIES CAUSED BY THE ACCIDENT ABOVE AND AGREE TO ACCEPT SAID AMOUNT IN FULL SATISFACTION AND FINAL SETTLEMENT OF THIS CLAIM.

| 13a. SIGNATURE OF CLAIMANT (See instructions on reverse side.) | 13b. Phone number of signatory | 14. DATE OF CLAIM |
|---|---|---|
| [signature] | 504-485-1070 | 27 FEB 07 |

CIVIL PENALTY FOR PRESENTING FRAUDULENT CLAIM

The claimant shall forfeit and pay to the United States the sum of $2,000 plus double the amount of damages sustained by the United States. (See 31 U.S.C. 3729.)

CRIMINAL PENALTY FOR PRESENTING FRAUDULENT CLAIM OR MAKING FALSE STATEMENTS

Fine of not more than $10,000 or imprisonment for not more than 5 years or both. (See 18 U.S.C. 287, 1001.)

NSN 7540-00-634-4046

STANDARD FORM 95 (Rev. 7-85) (EG) PRESCRIBED BY DEPT. OF JUSTICE

07N15T
0193181

MAR 0 1 2007

EXHIBIT
HARRIS
4

CONFIDENTIAL PRODUCED PURSUANT TO PROTECTIVE ORDER IN RE: KATRINA CANAL BREACHES CONSOLIDATED LITIGATION CIVIL ACTION NO. 05-4182 "K" (2)        NRL184-1611



CONFIDENTIAL PRODUCED PURSUANT TO PROTECTIVE ORDER IN RE: KATRINA
CANAL BREACHES CONSOLIDATED LITIGATION CIVIL ACTION NO. 05-4182 "K" (2)

NRL184-1612