# EXHIBIT 17
# Part 1

### Page 1

```
        UNITED STATES DISTRICT COURT
        EASTERN DISTRICT OF LOUISIANA


IN RE: KATRINA CANAL BREACHES      CIVIL ACTION
CONSOLIDATED LITIGATION
                                   NO. 05-4182
                                       "K" (2)

PERTAINS TO:  BARGE                JUDGE DUVAL

                                   MAG. WILKINSON


BOUTTE V. LAFARGE         05-5531
MUMFORD V. INGRAM         05-5724
LAGARDE V. LARFARGE       06-5342
PERRY V. INGRAM           06-6299
BENOIT V. LAFARGE         06-7516
PARFAIT FAMILY V. USA     07-3500
LAFARGE V. USA            07-5178




    DEPOSITION OF HERMAN HILTON KOCH,
506 Country Club Drive, Picayune, Mississippi
39466, taken in the offices of Chaffe, McCall,
2500 Energy Centre, 1100 Poydras Street, New
Orleans, Louisiana 70163, on Friday, August 8,
2008.
```

### Page 2

```
 1  APPEARANCES:
 2    WIEDEMANN & WIEDEMANN
        (BY: KARL WIEDEMANN, ESQ.)
 3      821 Baronne Street
        New Orleans, Louisiana 70113
 4          ATTORNEY FOR THE PLAINTIFFS (BARGE)
 5
      LAW OFFICES OF BRIAN GILBERT
 6     (BY: EDWARD MORENO, ESQ.)
       821 Baronne Street
 7     New Orleans, Louisiana 70113
            PLAINTIFFS
 8
 9    BURGLASS & TANKERSLEY
        (BY: LUCIE THORNTON, ESQ.)
10      5213 Airline Drive
        Metairie, Louisiana 70001
11          ATTORNEYS FOR JEFFERSON PARISH
12
13    MCCRANIE, SISTRUNK
        (BY: DARCEY DECKER, ESQ.)
14      Suite 800
        3445 North Causeway Blvd.
15      Metairie, Louisiana 70002
            ATTORNEYS FOR ORLEANS LEVEE DISTRICT
16
17
      MONTGOMERY, BARNETT, BROWN, READ, HAMMOND
18    & MINTZ
        (BY: RONALD J. KITTO, ESQ.)
19      3200 Energy Center
        New Orleans, Louisiana 70163
20          ATTORNEYS FOR THE AMERICAN CLUB
21
22    CHAFFE, MCCALL LLP
        (BY: CHARLES BLANCHARD, ESQ.
23           DEREK WALKER, ESQ.)
        2300 Energy Center
24      New Orleans, Louisiana 70163
            ATTORNEYS FOR LAFARGE NORTH AMERICA
25
```

### Page 3

```
 1  APPEARANCES CONTINUED:
 2    GOODWIN PROCTER
        (BY: MARIE C. SCOTT, ESQ.)
 3      901 New York Avenue, NW
        Washington, D.C. 20001
 4          ATTORNEYS FOR LAFARGE NORTH AMERICA
 5    SUTTERFIELD & WEBB
        (BY: DANIEL A. WEBB, ESQ.)
 6      650 Poydras Street
        Suite 2715
 7      New Orleans, Louisiana 70130
            ATTORNEYS FOR NY MARINE
 8
      CHRISTOVICH & KEARNEY
 9      (BY: CHARLOTTE SAWYER, ESQ.)
        Pan American Life Center
10      Suite 2300
        601 Poydras Street
11      New Orleans, Louisiana 70130
            ATTORNEYS FOR SWB (ALSO PRESENT)
12
13    DUPLASS, ZWAIN
        (BY: NICOLE BOYER, ESQ.)
14      3838 North Causeway Blvd.
        Suite 2900  Lakeway Three
15      Metairie, Louisiana  70002
            ATTORNEYS FOR EJLD, LBLD (ALSO
16          PRESENT)
17
      STONE, PIGMAN
18     (BY: HEATHER LONIAN, ESQ.)
       546 Carondelet Street
19     New Orleans, Louisiana 70130
           ATTORNEYS FOR WASHINGTON GROUP
20         INTERNATIONAL
21
      ALSO PRESENT:
22       AIDA KOCH
23  REPORTED BY:  ROGER D. JOHNS, RMR, CRR, CSR
                  Certified Court Reporter,
24                State of Louisiana
25
```

### Page 4

          S T I P U L A T I O N

    It is stipulated and agreed by and between counsel for the parties hereto that the deposition of the aforementioned witness is hereby being taken under the Federal Rules of Civil Procedure, for all purposes, in accordance with law;
    That the formality of reading and signing is specifically not waived;
    That the formalities of certification and filing are specifically waived;
    That all objections, save those as to the form of the question and the responsiveness of the answer, are hereby reserved until such time as this deposition, or any part thereof, may be used or sought to be used in evidence.

              * * * *

    ROGER D. JOHNS, RDR, CRR, Certified Court Reporter for the State of Louisiana, officiated in administering the oath to the witness.

```
 1     Q.  Have you seen a copy of that
 2  lawsuit?
 3     A.  No, I haven't.
 4     Q.  And you're a Plaintiff in that
 5  lawsuit; is that correct?
 6     A.  Yes.  Yes.  Yes.
 7     Q.  And what is your understanding of
 8  the allegations in that lawsuit concerning
 9  flooding in St. Bernard Parish?
10     A.  The allegations were that the MRGO
11  flooded St. -- St. Bernard Parish and that the
12  levees didn't hold in the Parish.
13     Q.  And it's your understanding that
14  this lawyer from New York represents you in a
15  case against the government involving the
16  MRGO?  Is that correct?
17     A.  Right.
18     Q.  Do you know if any local lawyers,
19  lawyers in the New Orleans area, are involved
20  in that lawsuit?
21     A.  Not that I know of.
22     Q.  How long after Katrina did you see
23  this sign in the Lower Ninth Ward?
24     A.  I guess about two -- two months.  I
25  don't really remember.
                                        Page 13
```

```
 1     Q.  And how long after you saw this sign
 2  did you contact this lawyer in New York?
 3     A.  I don't -- don't recall.
 4     Q.  How long after you first talked to
 5  this lawyer in New York did you become a party
 6  to this lawsuit?
 7     A.  About a week, I guess.  Two weeks.
 8     Q.  Were you involved in that lawsuit
 9  before you became involved in the lawsuit that
10  we're here today for?
11     A.  Please repeat your question again.
12     Q.  All right.  You told me that a
13  couple of months after the storm you called
14  this lawyer in New York; correct?
15     A.  Right.
16     Q.  And this involved flooding from the
17  MRGO; right?
18     A.  Correct.
19     Q.  And you said about a week later you
20  signed up with this lawyer; correct?
21     A.  About a week later, yes.
22     Q.  Now, at some point you became
23  involved in this lawsuit that we're here today
24  for; correct?
25     A.  Uh-huh (affirmatively).
                                        Page 14
```

```
 1     Q.  And that involves the barge;
 2  correct?
 3     A.  Right.
 4     Q.  And did you become involved in the
 5  barge lawsuit before or after you became
 6  involved in the MRGO lawsuit?
 7     A.  After.  After the barge -- First it
 8  was MRGO and then it was the barge.
 9     Q.  Have you ever withdrawn your name as
10  a Plaintiff in the MRGO lawsuit?
11     A.  No.
12     Q.  So in the MRGO lawsuit are you
13  seeking damages for losses to your properties
14  in St. Bernard and Orleans Parish?
15     A.  Yes.
16     Q.  So you're seeking the same damages
17  in the MRGO lawsuit that you're seeking in
18  this lawsuit; isn't that correct?
19     A.  Yes.
20     Q.  Have you had any discussions locally
21  with anyone involved with the MRGO lawsuit?
22     A.  No.
23     Q.  The only conversations you've had
24  are with this lawyer in New York; correct?
25     A.  Yes.
                                        Page 15
```

```
 1     Q.  Have you filled out any papers or
 2  forms in connection with the MRGO lawsuit?
 3     A.  Yes.
 4     Q.  What have you filled out?
 5     A.  He went and he sent me a form and I
 6  filled out the form.  That's all.
 7     Q.  And you sent the form back to him?
 8     A.  And I sent the form back to him.
 9     Q.  Did you keep a copy of that form?
10     A.  I think I got it at the house,
11  yeah.
12     Q.  Was that form something called an
13  SF-95?
14     A.  I think it was.
15     Q.  You said you were involved in more
16  than that lawsuit.  You mentioned two other
17  lawsuits.  One was this lawsuit.  But you said
18  there was another lawsuit involving the
19  Federal government that you're involved in?
20     A.  Yes.
21     Q.  Tell me about that lawsuit.
22     A.  That lawsuit was concerning the
23  levees in the Parish that broke.
24     Q.  In St. Bernard Parish?
25     A.  Yes, in St. -- in St. Bernard
                                        Page 16
```

4 (Pages 13 to 16)

**Page 17**

```
 1  Parish.
 2      Q.  Did that lawsuit also involve the
 3  MRGO?
 4      A.  Yes, uh-huh.  I think it does.  That
 5  lawsuit is concerning the Federal government.
 6      Q.  Let's go back to the first lawsuit
 7  with the lawyer in New York.  Do you know
 8  where that lawyer filed the lawsuit?
 9      A.  I don't know exactly where, no.
10      Q.  The second lawsuit against the
11  Federal government, that's a different
12  lawsuit?
13      A.  That's a different lawsuit.
14      Q.  Who represents you in that lawsuit?
15      A.  I -- I really don't know.  I just
16  filed the papers and they never did get back
17  with me.
18      Q.  So you don't know the name of the
19  lawyer that represents you in that case?
20      A.  Not -- Not really, no.
21      Q.  Have you ever spoken with the lawyer
22  that --
23      A.  No.  No.
24      Q.  Have you ever sent that lawyer any
25  papers in connection with that lawsuit?
```

**Page 18**

```
 1      A.  No.
 2      Q.  But you are a Plaintiff in that
 3  lawsuit?
 4      A.  I am a Plaintiff in that lawsuit.
 5      Q.  And in that lawsuit you're alleging
 6  that your damages to your properties in St.
 7  Bernard and Orleans Parish were the fault of
 8  the United States government?
 9      A.  Yes.
10      Q.  So you have one lawsuit where you're
11  claiming your property damages in Orleans and
12  Jefferson Parish --
13      A.  Not Jefferson.
14      Q.  I'm sorry, Orleans and St. Bernard;
15  you have one lawsuit involving the MRGO with a
16  lawyer in New York; correct?
17      A.  Right.
18      Q.  You have a second lawsuit against
19  the Federal government concerning the levees
20  in St. Bernard Parish?
21      A.  Yeah, right.
22      Q.  And you're claiming in that lawsuit
23  as well that all of your property damages in
24  Orleans and St. Bernard Parish were the result
25  of the Federal government's acts; right?
```

**Page 19**

```
 1      A.  Right.
 2      Q.  In the lawsuit filed by the lawyer
 3  in New York, are you also claiming emotional
 4  distress damages in that lawsuit?
 5      A.  No.  No.
 6      Q.  So it's strictly property damage in
 7  that?
 8      A.  It's property damage as far as I
 9  know, yeah.
10      Q.  And what properties does that relate
11  to?
12      A.  It relates to the properties that I
13  had in St. Bernard and the Lower Ninth Ward.
14      Q.  And can you go through those
15  properties?
16      A.  Okay.  I have my own property, I had
17  8545 and 47; that was a double, it was a
18  duplex.  I got the property at 3619 Shangri
19  La, that's a townhouse.  I have another duplex
20  on 3409 and 11 Shangri La, that's a duplex.
21  And I got my two properties in the Lower Ninth
22  Ward.  One is 6317 and 19 Douglass Street.
23  And the other property was 6035 and 6037
24  Burgundy Street.
25      Q.  The first property you said, 8545
```

**Page 20**

```
 1  and 47, that's Deerfield Avenue?
 2      A.  That's Deerfield Drive.
 3      Q.  Deerfield Drive.  And in the lawsuit
 4  where the New York lawyer represents you,
 5  you're claiming damages in that lawsuit
 6  related to each of these properties; correct?
 7      A.  Right.  Right.
 8      Q.  Are you also claiming damages in
 9  that lawsuit relating to the loss of your
10  personal property, such as your furniture and
11  items in your home?
12      A.  As far as I know of, it's just the
13  properties.
14      Q.  Just the --
15      A.  I mean, that's all that was
16  mentioned as far as I can remember, was just
17  the properties.  Nothing including the
18  contents.
19      Q.  The second lawsuit that you filed
20  against the U.S. government, are you seeking
21  property damages in that lawsuit relating to
22  the five properties you just mentioned?
23      A.  Yes.
24      Q.  Are you seeking damages for
25  emotional distress in that lawsuit?
```

```
 1    Q.  Before you evacuated, did you do
 2  anything to secure your home or any of your
 3  rental properties?
 4    A.  No, I didn't secure any of it.  The
 5  only thing I did, I put my -- my cats inside
 6  and I gave them food and water.  But that's
 7  the only thing I did.  The only thing I did
 8  was help my son go and put some -- some
 9  plywood on his house.  That's about all I
10  did.  Why?  Because it wasn't time.  Because
11  we never had time to do anything.
12    Q.  So you didn't board up any of the
13  windows of any of your rental properties?
14    A.  No, I didn't board them up because
15  we didn't have time to.
16    Q.  Did you first hear news reports on
17  that Friday before the storm that Katrina may
18  be coming our way?
19    A.  Yes.  Friday was the first time I --
20  I heard that the storm was heading to New
21  Orleans, Friday.
22    Q.  All right.
23    A.  Friday night.
24    Q.  So you understood on that Friday
25  night that Katrina was headed to New Orleans?
                                        Page 49
```

```
 1    A.  Right.
 2    Q.  And you understood it was a
 3  dangerous storm; correct?
 4    A.  Right.
 5    Q.  And you evacuated the next day
 6  around noon; correct?
 7    A.  Noon; correct.
 8    Q.  And neither on Friday or that
 9  Saturday morning did you do anything to secure
10  any of your properties, did you?
11    A.  No.
12    Q.  Who evacuated with you?
13    A.  Me and my wife.
14    Q.  You traveled together in a car?
15    A.  Yes.
16    Q.  Did you pack up anything?
17    A.  We packed I think a small bag of
18  clothes and a little food and water.  That's
19  all.
20    Q.  Did you take one of your vehicles?
21    A.  One of them.  That's all.  And I
22  left one there.
23    Q.  Which vehicle did you take?
24    A.  I took my truck.  My truck that's --
25  It's a 2000 Chevrolet.  I took that one.
                                        Page 50
```

```
 1    Q.  You said you had another vehicle as
 2  well?
 3    A.  Yes.
 4    Q.  What kind of vehicle was that?
 5    A.  That was a '94 Chevrolet truck.  I
 6  left that one.
 7    Q.  You left that one at your home on
 8  Deerfield?
 9    A.  Yes.  Well, no, not on Deerfield.
10  At my aunt's house.  I left it at my aunt's
11  house.
12    Q.  And where did your aunt live?
13    A.  My aunt lived on Chalmette Avenue.
14    Q.  Is that on the east or west side of
15  Paris Road?
16    A.  That's on the west side of Paris
17  Road.
18    Q.  Other than clothes, did you take
19  anything with you such as family heirlooms?
20    A.  No, we didn't take anything like
21  family heirlooms or photographs or nothing.
22    Q.  And at the time of Katrina you
23  understood that it could be -- people can get
24  injured, even killed in hurricanes; correct?
25    A.  Right.
                                        Page 51
```

```
 1    Q.  And --
 2    A.  Yes.
 3    Q.  -- that was one of the reasons that
 4  you evacuated; correct?
 5    A.  Yes.
 6    Q.  Where did you evacuate to?
 7    A.  Houston, Texas.
 8    Q.  Where did you stay in Houston?
 9    A.  We stayed with my nephew.
10    Q.  Who's that?
11    A.  His name is Hilton Koch.
12    Q.  How long did you stay with your
13  nephew?
14    A.  We stood there about a week or two
15  weeks, I think.  I'm not sure.
16    Q.  When did you learn that St. Bernard
17  and the Lower Ninth Ward had flooded?
18    A.  Monday morning, on August the 29th.
19  We were watching the television at my nephew's
20  house and they said how New Orleans was
21  flooded, and that's how we learned of the
22  damage that the storm had caused.
23    Q.  You heard New Orleans was flooded;
24  correct?
25    A.  I heard New Orleans and the outlying
                                        Page 52
```

**Page 65**

1  climbed up there and I looked. And the more I
2  looked, the more I seen that he never took the
3  bottom roof off. That he just put the new one
4  on top of the old one.
5      Q.  And you discovered this before
6  Katrina; correct?
7      A.  Before Katrina.
8      Q.  Did you do anything to try to fix
9  the faulty repairs that he had done?
10     A.  Well, I caught up with him and he
11 said he didn't believe that happened and I
12 said, "Well, let me show you." He says, well,
13 the man he must have sent there did it. So we
14 was in the process of getting the roof, as he
15 said, fixed properly, but in the meanwhile the
16 storm came up and nothing was done.
17     Q.  All right. So at the time of the
18 storm, you had an old roof that needed to be
19 replaced. Instead of being replaced, your
20 repairman had just placed additional shingles
21 on top of that?
22     A.  Right.
23     Q.  That was the condition of the roof
24 at the time of Katrina; right?
25     A.  Right.

**Page 66**

1      Q.  That was on both sides, 8545 and 47;
2  correct?
3      A.  Correct.
4      Q.  Did your property at 8545-47
5  Deerfield need any other repairs at the time
6  of the storm?
7      A.  No. No.
8      Q.  Did you ever have any termite damage
9  to that structure?
10     A.  No.
11     Q.  Had you ever had it inspected for
12 termites?
13     A.  Yes.
14     Q.  Did you have it under a termite
15 contract?
16     A.  Yes.
17     Q.  With who?
18     A.  With -- What is the company? It's a
19 local company down in St. Bernard. I can't
20 think of the name right now. His -- The owner
21 of it was Lionel Guillot. But I don't know
22 how he called his company. I don't know how
23 he called his company, but who owned the
24 company was Lionel Guillot, because I went to
25 school and all with him.

**Page 67**

1      Q.  At the time of the storm did you
2  have any mortgages on the property at 8545-47
3  Deerfield?
4      A.  No.
5      Q.  Had you ever had any mortgages on
6  that property?
7      A.  Yes. At first when I first had it
8  built, I had a mortgage with State -- with the
9  State Savings.
10     Q.  At some point you paid off that
11 mortgage?
12     A.  Yes.
13     Q.  When did you fully pay off that
14 mortgage?
15     A.  I don't remember.
16     Q.  Was it before Katrina?
17     A.  Oh, yes.
18     Q.  What was the tax assessed value of
19 that property at 8545-47 Deerfield at the time
20 of Katrina?
21     A.  The tax assessment? I don't
22 remember what they was taxing.
23     Q.  How much did you pay in taxes on
24 that property?
25     A.  I think I was tax-exempt.

**Page 68**

1      Q.  So you paid nothing?
2      A.  Nothing.
3      Q.  Have you ever had that property at
4  8545-47 Deerfield appraised?
5      A.  No.
6          MR. WIEDEMANN:
7          If you should need a break or
8      anything, let him know.
9          THE WITNESS:
10         Let's keep on going.
11 EXAMINATION BY MR. BLANCHARD:
12     Q.  I forgot to tell you that at the
13 beginning, Mr. Koch. If you need a break for
14 any reason, --
15     A.  Okay. I'll tell you.
16     Q.  -- let me know.
17         Mr. Koch, I want to move forward
18 to another property, 3409-11 Shangri La. Is
19 that a property that you owned at the time of
20 Katrina?
21     A.  Yes.
22     Q.  I'm going to mark as Exhibit Koch
23 Number 6 a Google map, again with a red
24 bubble. I want you to take a look at that and
25 let me know whether or not this map accurately

17 (Pages 65 to 68)

```
 1  a cash sale of property, dated October 16,
 2  1984 from Anna Hammel to Herman Koch and your
 3  wife.  I ask you if you can identify this
 4  document.
 5      A.  Okay.  Yeah.  That would seem about
 6  right.  This is spelled wrong (indicating).
 7  To Aida Ochsa.  It's supposed to be Ochoa, O C
 8  H O A.  They got it spelled wrong.  But they
 9  got mine on here.
10      Q.  Do you recognize that document, Mr.
11  Koch?
12      A.  Yes.  I'm trying to find -- I'm
13  trying to find the signature.  Then I can
14  recognize it.  There's no signed --
15  signatures, huh?
16      Q.  Well, Mr. Koch, I'll represent to
17  you that this was a document that you produced
18  to us in connection with this litigation and
19  that's reflected by the Bates stamp numbers on
20  the bottom which are Koch 000012 through 16.
21  Do you see those Bates stamp numbers at the
22  bottom?
23          MR. WIEDEMANN:
24             He is talking about right here
25          (indicating).
                                          Page 85

 1          THE WITNESS:
 2             Yeah.  Yeah.  Yeah.
 3  EXAMINATION BY MR. BLANCHARD:
 4      Q.  Do you remember buying this property
 5  from Anna Hammel?
 6      A.  Yes.  I remember buying this
 7  property from a -- from the daughter of an old
 8  lady that passed away in this house, and I
 9  forget her name.  It was probably Anna
10  Hammel.
11      Q.  And do you see on page 3 an amount
12  of $53,000?  Is that your recollection of the
13  amount you paid for the property at 6317
14  Douglass?
15      A.  Yeah, that sounds about right.
16      Q.  And on page 4 of that document do
17  you see your name referenced on that page?
18      A.  Yes.
19      Q.  And there's a stamp there that says
20  "Original signed".  Do you see that?
21      A.  Yes.
22      Q.  So after your review of this
23  document, Mr. Koch, is this the cash sale
24  relating to your purchase of your property at
25  6317-19 Douglass?
                                          Page 86

 1      A.  As far as I know, it is, yes.
 2      Q.  Describe that property for me, Mr.
 3  Koch.
 4      A.  That property's over 100 years old
 5  and that property's also a duplex.  It's a
 6  shotgun, flat board house.  It's on a narrow
 7  lot.  When I say narrow lot, I say the lot is
 8  about maybe 45 foot wide, but it goes way back
 9  about 200 and something feet.
10      Q.  A wood frame house?
11      A.  It's a wood frame house.  Of course,
12  it's got siding on it now and it's aluminum
13  siding.  It's in the -- what is known as the
14  Holy Cross historical district.  And it's --
15  It's a two-room -- bedroom shotgun double on
16  each side.
17      Q.  Are both sides equally sized?
18      A.  Both sides is equally sized.
19      Q.  Do you know how many total square
20  feet for the entire structure?
21      A.  No, I don't.  If I told you, I would
22  just be guessing.  I don't know.
23      Q.  This house is raised; is that
24  correct?
25      A.  This house is on brick pillars,
                                          Page 87

 1  that's correct.
 2      Q.  How high is it raised?
 3      A.  It's raised about I'd say two and a
 4  half, three foot.  It's rather high.
 5      Q.  Do you know the elevation of the
 6  actual first floor, the floor of that --
 7      A.  No, I do not.
 8      Q.  It's a one-story structure, isn't
 9  it?
10      A.  One-story structure.
11      Q.  Did that property flood during
12  Betsy?
13      A.  Yes, it did.
14      Q.  How deep was the water during Betsy?
15      A.  I'd say that the water came up in
16  the house about two and a half feet to three
17  feet.
18      Q.  You didn't own the property at that
19  time, did you?  Or did you?
20      A.  Yes, I owned the property at that
21  time.  When it flooded you're talking?
22      Q.  Yes, during Betsy.
23      A.  Of course, I owned the property.  I
24  owned the property according to this since
25  1984.  It was sometime in the '80s, but I
                                          Page 88
```

22 (Pages 85 to 88)

**Page 93**

an outside shed. I went and I repaired the two outside sheds because they were falling down, because they were very old. I did that. And I also painted it after I installed the sheetrock. I painted it, and I think I added floor furnaces in that house because they had these old gas heaters, and I installed floor furnaces.
Q. Did you do all of these repairs in the 1980s?
A. Yes.
Q. How old was the roof on that structure at the time of Katrina?
A. I don't have any idea.
Q. Does that property have any termite damage?
A. I haven't checked it since the storm, but before the storm I had it treated every year, you know, for termites. And at that time it didn't have any termites. Right now the house is still not repaired. It's in very bad shape. And I don't know if they got termites in it or not now.
Q. Have you gutted that house?
A. Yes, it's gutted.

**Page 94**

Q. Did you see evidence of termite damage in the studs in the walls?
A. No, I didn't see it, but, of course, when you start to digging deeper, you never know, you know. I mean, I didn't go through the whole house, you know, with a magnifying glass.
Q. Is there a mortgage on that property?
A. No.
Q. Has there ever been a mortgage on that property?
A. Yes.
Q. When did you pay it off?
A. I don't remember when it was paid off.
Q. Was it before or after Katrina?
A. It was before Katrina.
Q. Do you have any pre-Katrina photos of that property?
A. No.
Q. Have you ever had that property appraised?
A. We appraised it before we bought it, but that's the last time, I think. I think it

**Page 95**

was appraised before we bought it.
Q. Do you know the taxed assessed value of the property at the time of Katrina?
A. I think they were charging us something like $385 a year for taxes, you know, the City would charge us that.
Q. And that was on both sides?
A. And that was on both sides.
Q. So the total for the structure was $385?
A. Somewhere in that area. Now, don't quote me on the exact figure, but it was somewhere I think around almost $400 a year.
Q. Since the storm have you tried to sell that property?
A. Yes. I tried to.
Q. When did you put it on the market?
A. I put it on the market, I forget, but it was not quite a year ago, I think.
Q. When you put it on the market, what was your asking price?
A. I think I was asking 55,000 for it.
Q. Did you get any offers?
A. Yes. I got about three or four offers.

**Page 96**

Q. How much were the offers?
A. I think the highest offer was around 52,000.
Q. And your asking price was 55?
A. Yes.
Q. Did you accept any of the offers?
A. No.
Q. Why not?
A. I don't know. I had -- I had it in my mind that if I didn't take 55, I wouldn't take nothing else, I guess, and so I didn't sell it.
Q. Is it still on the market?
A. No, it's not on the market. I pulled it and right now I am debating if I should go and restore it or not.
Q. So you haven't decided whether you're going to restore it?
A. No. No, I haven't.
Q. Did you own at the time of Katrina property at 6035-37 Burgundy Street?
A. Yes, I did.
Q. I'm going to mark as Exhibit Koch Number 12 another one of those Google maps, Mr. Koch, and ask you the same -- ask you the

**Page 101**

1  A. Let me see. Uh-huh (affirmatively).
2  Q. Do you see that?
3  A. Yes. Yes.
4  Q. So is it your recollection that you
5  refinanced this property in 1978 for $19,600?
6  A. Yes.
7  Q. Thank you. How old is that
8  structure?
9  A. This property here?
10 Q. The 6035-37 Burgundy.
11 A. I don't know. I don't know. I have
12 no idea when it was built.
13 Q. But you said you bought it in '68?
14 A. I bought it around '68, '6 -- in
15 that area, from '66, '67 to '68.
16 Q. Was it new when you bought it?
17 A. No, it wasn't new.
18 Q. Describe that property for me.
19 A. That's also a shotgun double and
20 it's got two bedrooms, one bath, a kitchen and
21 a living room on both sides. They're both
22 equal on both sides.
23 Q. How many square feet is the total
24 structure?
25 A. I would say one side must be about

**Page 102**

1  750 square feet. So you got a total of maybe
2  around 1,500 square feet.
3  Q. It's a one-story?
4  A. One-story.
5  Q. Is it raised?
6  A. Yes, it's raised off the ground.
7  Q. How far is it raised off the ground?
8  A. Raised about a foot and a half.
9  Q. Do you know the elevation of the
10 property?
11 A. No, I don't.
12 Q. Prior to Katrina, was that property
13 flooded at any time?
14 A. No.
15 Q. At some point there was a mortgage
16 on that property; correct?
17 A. Yes. Yes, there was.
18 Q. Did you pay off that mortgage before
19 Katrina?
20 A. Yes.
21 Q. You sold that property, right, Mr.
22 Koch?
23 A. Right. Right. We just sold it.
24 Q. And when did you sell it?
25 A. Not too long ago.

**Page 103**

1  Q. It was this year; correct?
2  A. Yes, uh-huh.
3  Q. Prior to the time that you sold it,
4  specifically at the time of Katrina, do you
5  remember the tax assessed value of that
6  property?
7  A. It was about the same tax assessment
8  as the one on Douglass Street. About $350 or
9  380 some-odd dollars, somewhere in that area.
10 Q. So your total tax bill was about
11 that amount?
12 A. Right.
13 Q. From the time you bought it up to
14 the time of Katrina, had you performed any
15 renovations on that property?
16 A. Yes. We -- We went and repainted
17 it. We changed the tiles on the floors. We
18 went in and generally upgraded the two
19 bathrooms. And trying to think. I think, I
20 am not sure, I think we replaced the -- the
21 heaters. We replaced the water heaters. And
22 we also replaced one of the floor furnaces. I
23 do remember we did some renovation on it, a
24 lot of renovation.
25 Q. And you mentioned several items.

**Page 104**

1  For each of those items do you remember when
2  you made those renovations, what year?
3  A. Okay. If we bought it in '68, we
4  had to do that in -- in maybe '69, '70, '71
5  '72, along that path, you know.
6  Q. So that's when you made the
7  renovations you just told me about?
8  A. Right. Right.
9  Q. How old was the roof on that
10 structure at the time of Katrina?
11 A. The roof? I'd say the roof was
12 about three or four years old at the most,
13 because I just replaced that roof.
14 Q. Did that property ever have termite
15 damage?
16 A. No.
17 Q. Do you have any pre-Katrina photos
18 of that property?
19 A. No, I don't.
20 Q. We established you sold the
21 property; correct?
22 A. Correct.
23 Q. When did you first put it on the
24 market?
25 A. Let's see. We're in like August of

```
                                              Page 105
 1  '08?  It had to be sometime in early -- maybe
 2  March, February or March of '08, I think.  I
 3  know it wasn't too, too long ago.
 4      Q.  How long was it on the market before
 5  you sold it?
 6      A.  It wasn't too long.  Maybe about --
 7  Maybe around three to four weeks maybe.
 8      Q.  Why did you decide to put it on the
 9  market?
10      A.  Because the renovation would have
11  cost me too much to justify the cost of the
12  house.  You understand?  I would have put too
13  much into it; that if I wanted to sell it, I
14  probably would have never got my money back
15  out of it.  So I just decided to sell it as
16  is.
17      Q.  Did you do any repairs to that
18  property before you sold it?
19      A.  None whatsoever.
20      Q.  Did you gut it?
21      A.  Oh, that I did do.  I gutted the
22  house.  I gutted the house.
23      Q.  Other than gutting, did you do
24  anything else to it?
25      A.  No, I never did.
```

```
                                              Page 106
 1      Q.  How much did it cost you to gut it?
 2      A.  It cost me about I think anywhere
 3  from $3,000 to $4,000.  I am not sure.  I
 4  would have to get the --
 5      Q.  The receipts?
 6      A.  The receipts, right.
 7      Q.  Who did the gutting?
 8      A.  We paid -- I am trying to think of
 9  this man.  He was from San Salvador or some
10  place.  He had him and four or five guys and
11  they went and they gutted the house.
12      Q.  Was that Mr. Jose Santos?
13      A.  It might have been.  It might have
14  been, yes.
15      Q.  Now, when you put it on the market,
16  what did you ask for the property?
17      A.  I think we was asking 35.
18      Q.  Who did you sell the property to?
19      A.  I don't remember the man's name, but
20  I know he was in construction and he wanted to
21  redo the house.  And we sold it to him.  I
22  don't remember the name.  I don't remember his
23  name.
24      Q.  Did you sell it to Cartier Homes?
25      A.  It must have been.  I can't vouch
```

```
                                              Page 107
 1  for his first name, because I am very bad on
 2  names.
 3      Q.  Let me show you a document you
 4  produced, --
 5      A.  Okay.
 6      Q.  -- which is Koch Number 14, which is
 7  a cash sale by Herman H. Koch and Aida O. Koch
 8  individually and as trustees of the Herman H.
 9  Koch and/or Aida O. Koch Revocable Living
10  Trust --
11      A.  That sounds about right.
12      Q.  -- to Cartier Homes.  Do you see
13  that?
14      A.  That sounds about right.
15      Q.  Do you recognize this document?
16      A.  Yes.  This is my signature.
17      Q.  So that's your signature on page 2
18  of the document; correct?
19      A.  Right.  Right.  Right.  That's me.
20  And it looks like my wife's handwriting, too.
21      Q.  Four pages in, you see a document
22  which is a HUD statement?
23      A.  Four pages in?  Right here?  Yeah.
24      Q.  And you see there "Contract sales
25  price", that appears to me to be $35,200?
```

```
                                              Page 108
 1      A.  Yes.
 2      Q.  Do you see that?
 3      A.  Yes.
 4      Q.  So you sold this property to Cartier
 5  Homes for $35,200; correct?
 6      A.  No.  I don't think I sold it for
 7  that much.  I think I sold it for 32.  I could
 8  be wrong.  I could be wrong.
 9      Q.  Well, you see on the HUD statement
10  the contract sales price under -- at the top
11  of the left-hand side?
12      A.  The top here?  Yes.  Right.
13      Q.  And what's the number next to the
14  contract sales price?
15      A.  It looks like -- It looks like
16  35,000.  Oh, okay.  It's right over here.
17  It's 35,200.
18      Q.  Does that refresh your recollection
19  that you sold that property for $35,200?
20      A.  Yes, it probably was.  Probably was.
21      Q.  That's what the document reflects;
22  right?
23      A.  Right.  Right.  Right.
24      Q.  That's your signature on the
25  document; right?
```

```
 1    A.  Right. Right. Right.
 2    Q.  Mr. Koch, there's a reference here
 3  that the property was actually sold by the
 4  Herman H. Koch and/or Aida O. Koch Revocable
 5  Living Trust.  Do you see that?
 6    A.  Uh-huh (affirmatively).  That's on
 7  what page?
 8    Q.  On the first page.
 9    A.  Okay.
10    Q.  You see that?
11    A.  Living trust?  Yeah. Yeah. Right.
12  Right here in bold print.
13    Q.  So at the time you sold this, this
14  was actually owned by a trust.  Is that
15  correct?
16    A.  Yes.
17    Q.  And when did you form that trust?
18    A.  I think this trust was formed
19  sometime in '06 or '07.  I am not sure.
20    Q.  And who did you have set up that
21  trust?
22    A.  Now you're going into -- I don't --
23  I don't remember.  I don't -- I don't
24  remember.  I got all the files at home, but I
25  don't -- I don't remember.
                                      Page 109
```

```
 1    Q.  Why did you transfer all of your
 2  properties into a trust?
 3    A.  Well, I transferred them into a
 4  trust because I didn't want to pay no taxes or
 5  have my children go through having to pay
 6  taxes after me and my wife went and passed
 7  away.
 8    Q.  You're renting at least one of these
 9  properties now, aren't you?  8547 Deerfield?
10    A.  I am renting 8545 and now I am
11  renting 3409 and 3411.  And I also have people
12  that's going to come in 3619, because I almost
13  got that up.
14    Q.  The proceeds from those rentals, are
15  they going into the trust?
16    A.  No.
17    Q.  So you're keeping those rentals
18  yourself personally?
19    A.  That's right.
20    Q.  Does the trust have a bank account?
21    A.  No.
22    Q.  Have any of the expenses for the
23  repairs to any of your properties been paid by
24  the trust?
25    A.  No.
                                      Page 111
```

```
 1    Q.  Was this trust set up by a lawyer?
 2    A.  Yes.
 3    Q.  Is it a lawyer in Mississippi?
 4    A.  No.  No, these people were from
 5  Louisiana.  These people were from -- But I
 6  had to get a lot of it notarized and all, all
 7  of this property.  That I do remember.  But I
 8  think this lawyer was from Louisiana.  I would
 9  have to bring my trust here and then go
10  through it.
11    Q.  Do you remember the name of the
12  lawyer?
13    A.  No, I don't.  I don't -- I don't
14  remember that.
15    Q.  And prior to the time you sold it to
16  Cartier Homes you had transferred this piece
17  of property into the trust?
18    A.  Right.
19    Q.  Isn't it true that you had
20  transferred all of the properties we talked
21  about today into that trust?
22    A.  Yes.  Yes.
23    Q.  And this was done obviously before
24  you sold this property; correct?
25    A.  Before -- Yes.
                                      Page 110
```

```
 1    Q.  I'm going to go ahead and mark as
 2  Exhibit Koch Number 15 a document entitled
 3  "Inter vivos donation of movable property by
 4  Herman H. Koch and Aida O. Koch to the Herman
 5  H. Koch and/or Aida O. Koch Revocable Living
 6  Trust".  I ask you to take a look at that, Mr.
 7  Koch.
 8    A.  Yeah, this is what this is.
 9    Q.  Do you recognize this document?
10    A.  Yes.  Yes, I do.
11    Q.  And is this document a donation of
12  the properties that we have been discussing
13  here today from you into the trust that you
14  formed?
15    A.  Yes.
16    Q.  And is that consistent with your
17  recollection of you donating or you
18  transferring these properties to the trust?
19  Is that correct?
20    A.  Yes.
21    Q.  All right.  You have got claims in
22  this case that we're here for today against
23  Lafarge North America; correct?
24    A.  Yes.
25    Q.  Those claims that you have, have
                                      Page 112
```

28 (Pages 109 to 112)

```
 1  they been transferred to the trust?
 2     A.  Not -- Not that I know of, no.
 3     Q.  At any time had the claims that you
 4  have in this lawsuit been transferred to the
 5  trust that you formed?
 6     A.  No.
 7     Q.  The property on Burgundy, at the
 8  time that you sold it, was there any mortgage
 9  on that property?
10     A.  No.
11     Q.  At some point there was a mortgage
12  on it?
13     A.  At some time, yes, there was.
14     Q.  When did you pay that off?
15     A.  I don't remember.
16     Q.  Was it paid off before the storm?
17     A.  Yes.
18     Q.  Now, Mr. Koch, after the storm you
19  had several rental properties; correct?
20     A.  Yes.
21     Q.  And you decided to try to sell the
22  Douglass property; correct?
23     A.  Correct.
24     Q.  And you decided to sell and did sell
25  the Burgundy property; correct?
                                        Page 113

 1     A.  Yes.
 2     Q.  But you kept the Shangri La and
 3  Deerfield properties; correct?
 4     A.  Correct.
 5     Q.  Why was it that you decided to sell
 6  the Orleans Parish properties, but retain the
 7  St. Bernard Parish properties?
 8     A.  I really don't like to do business
 9  in this here city.  It's a hard parish to have
10  to crack.  You got to go through a lot of red
11  tape.  It's easier to do business with
12  properties in St. Bernard than it is in
13  Orleans.  Plus the fact these properties in
14  Orleans would take much more money to bring
15  them back to life than they would in Orleans
16  (sic).  They're older properties.  It would
17  take a lot more money.
18     Q.  All right.  So the first thing you
19  said is you don't like doing business in
20  Orleans Parish; correct?
21     A.  Not if I can avoid it.
22     Q.  And you said it would cost more
23  money to repair the ones in Orleans Parish;
24  correct?
25     A.  Exactly.  Exactly.
                                        Page 114

 1     Q.  Because those were older properties;
 2  right?
 3     A.  Exactly.
 4     Q.  The properties in St. Bernard were
 5  newer properties; correct?
 6     A.  Correct.
 7     Q.  So the cost to repair the newer
 8  properties was going to be less to repair than
 9  the older properties; correct?
10     A.  Yes.  Yes.
11     Q.  So that the location of these
12  properties that you had, whether they were in
13  Orleans or St. Bernard Parish, the location of
14  those properties made a difference to you as
15  far as whether or not you wanted to keep them
16  or sell them; correct?
17     A.  Yes.
18     Q.  Because there's differences in those
19  locations; right?
20     A.  Right.
21     Q.  And there's different attributes for
22  each location; right?
23     A.  Yes.
24     Q.  And in your mind it was more
25  advantageous to keep your rental properties in
                                        Page 115

 1  St. Bernard Parish; correct?
 2     A.  Correct.
 3     Q.  Do you believe those properties
 4  would be easier to rent than the ones in
 5  Orleans Parish?
 6     A.  Not necessarily, but as I said
 7  before, it would be a lot less expensive to
 8  put them back in good condition than it would
 9  be to do the ones in Orleans Parish.
10     Q.  Is the cost of doing business in
11  Orleans Parish more than in St. Bernard for
12  your rental properties?
13     A.  You really want to know the truth?
14  Yes.
15     Q.  Insurance is more?
16     A.  Not only that, you got to fight this
17  here City Hall, and it's a nightmare.
18     Q.  Was the level of crime different in
19  St. Bernard versus where you had the
20  properties in Orleans?
21     A.  I never thought about it like that,
22  but you are probably right.
23     Q.  All right.
24        MR. BLANCHARD:
25           It's 3:00 o'clock.  Why don't we
                                        Page 116
```

29 (Pages 113 to 116)

Page 125

1  Q. Had the house -- the property been
2  looted?
3  A. They looted my property after it was
4  gutted, because I had these two front doors
5  that was fancy wood carving and all and they
6  stole the two front doors and they stole my
7  two bathtubs. I had these old-type bathtubs
8  that had the feet on them, what they call
9  them, these lion's feet.
10 Q. Okay.
11 A. They took that and they took the two
12 front doors. And I'm surprised that they
13 never took the mantel pieces, because I had
14 all of these fancy -- well, not fancy, but
15 nice mantel pieces and I thought they might
16 ransack that, too, but they never got to it.
17 Q. So sometime after you gutted that
18 property, --
19 A. After I gutted the property.
20 Q. -- somebody came and took the
21 doors?
22 A. Yes. The two front doors. They
23 were these old-time doors. Oh, man, they must
24 have went back to the turn of the century.
25 They had these figurine glass in it and they

Page 126

1  were hand-carved like all around with
2  gingerbread and all, because the house has got
3  them -- they have eaves like, you know, those
4  old-time houses have? And so the doors
5  matched the top. And so they took the doors
6  and they went into the bathroom and they took
7  the bathtubs.
8  Q. Talking about the clawfoot bathtub?
9  A. Yeah, talking about the clawfoot
10 bathtubs. Man, they took two of those, one
11 out of each side.
12 Q. Did they take anything else?
13 A. Not that I know of, no.
14 Q. At any time other than that, did
15 your property on Douglass experience any
16 looting?
17 A. No.
18 Q. Now, you told me when you got there
19 you saw some evidence of flood damage;
20 correct?
21 A. Yes.
22 Q. What was the condition of your roof
23 when you first got to Douglass?
24 A. I seen about eight or nine, maybe
25 about -- I say not eight or nine. About three

Page 127

1  or four ridge tiles gone. And I seen the top
2  of the gable where the wind had blown out the
3  -- the two windows up on top of the eaves of
4  the roof. That I seen. And as I said, they
5  must have had about three or four or five of
6  the ridge tiles were gone. And the whole
7  awning. I had an awning. I had an aluminum
8  awning. When I went there, I don't know, but
9  they might have went and they might have stole
10 all of the -- all of the aluminum off the
11 awning that I had. Because I know that they
12 were going and stealing aluminum.
13 Q. Well, when you got there right after
14 the storm or when you got there in November or
15 December of 2005, was the awning still there
16 or was --
17 A. No.
18 Q. It was gone?
19 A. It was gone. Now, I don't know if
20 they stole it or if the wind blew it away or
21 what. I can't say.
22 Q. I'm going to mark as Exhibit Koch
23 Number 16 a copy of two photos that we
24 received from your Counsel in response to
25 discovery requests in this case. And I am

Page 128

1  going to ask you about these photos, Mr.
2  Koch.
3  A. Okay. That's the frame --
4  Q. Hold on, Mr. Koch. Let me ask you a
5  question first.
6  A. Okay.
7  Q. Do you recognize this document?
8  A. What, this right here?
9  Q. Yes.
10 A. Yes.
11 Q. These are copies of two photos;
12 correct?
13 A. Right.
14 Q. All right. And at the top is a
15 photo of what property?
16 A. The top is a photo of 3619 Shangri
17 La. That's the townhouse.
18 Q. And the property at the bottom is
19 what?
20 A. 6317 and 19 Douglass.
21 Q. Did you take both of these photos?
22 A. Yes. My wife took them.
23 Q. Your wife took them. When did she
24 take the photo of the Douglass Street
25 property?

32 (Pages 125 to 128)

```
 1    A.  After the storm.
 2    Q.  Was this during the first visit of
 3  yours to Douglass Street after the storm?
 4    A.  No, it wasn't the first visit.  I
 5  think it was later.  Later.
 6    Q.  Do you know approximately when you
 7  took this photo?
 8    A.  It was maybe about four or five
 9  months after, I guess.  I am not sure.
10    Q.  The property as it appears in this
11  photo, is that the same condition that the
12  property was in when you first returned to New
13  Orleans and saw the property in November or
14  December of 2005?
15    A.  Yes.
16    Q.  Now, looking at the photo, there
17  appears to be on the front of the structure
18  some rods that are sticking down.  Is that the
19  awning that you were telling me about?
20    A.  That was the awning that I was
21  telling you.  That was -- In fact, they got on
22  the side -- The side awnings was a replica of
23  the big awning they had in the front.  But the
24  big awning is completely gone now.
25    Q.  All right.  So the awnings on the
                                          Page 129
```

```
 1  side of the house, there are some awnings
 2  sticking from smaller windows.  Do you see
 3  that?
 4    A.  Yes.
 5    Q.  And the awning that you had in the
 6  front was made of the same materials?
 7    A.  Exactly.  Yes.
 8    Q.  And that awning in the front that
 9  spanned the entire front of the house is gone;
10  correct?
11    A.  Yes.  Yes.
12    Q.  And the water did not get that high,
13  did it, Mr. Koch?
14    A.  No.  The water, as I said, inside
15  the house got about three to three and a half
16  foot maybe inside the house.  Maybe just under
17  -- Maybe just under this side of the window.
18  (indicating).  This, about that high inside
19  the house.  I'd say about six to nine inches
20  under the window sills.
21    Q.  So the water didn't get to the place
22  where the awning had been on the front?
23    A.  No.  No.
24    Q.  All right.  So that awning was
25  either destroyed by wind or someone stole it?
                                          Page 130
```

```
 1    A.  Exactly.
 2    Q.  It wasn't damaged by the flood, was
 3  it?
 4    A.  No.  I wouldn't say.  So no.  It was
 5  destroyed by the wind or somebody stole it.
 6    Q.  All right.  Now, above that, you
 7  mentioned two windows that had been blown out?
 8    A.  Yeah.  Right on the top I was
 9  talking about (indicating).
10    Q.  Can you circle on that photo those
11  two windows that you say were blown out?
12    A.  (Writing).
13    Q.  All right.
14        MR. BLANCHARD:
15          So for purposes of the record,
16        the witness has circled two window
17        type structures on this photo.
18  EXAMINATION BY MR. BLANCHARD:
19    Q.  And this is directly above --
20    A.  Of course, --
21    Q.  Hold on, Mr. Koch.
22    A.  Okay.
23    Q.  All right.  Now, on this photo
24  there's an awning and then a portion of roof
25  and then above that, on the V-shaped portion
                                          Page 131
```

```
 1  of the roof there are these two small windows;
 2  correct?
 3    A.  Correct.
 4    Q.  All right.  Well, I say small.  How
 5  big were the windows?
 6    A.  I would say the windows was about --
 7  was about 18 to 20 inches high and about maybe
 8  around -- maybe around 24 to 30 inches wide.
 9    Q.  Was that both or was that each?
10    A.  That's -- That -- I'd say that was
11  both of them.  They were about this big each
12  (indicating).
13    Q.  So what's the combined area of those
14  two windows?
15    A.  The combined area is about -- Okay.
16  You talking about maybe three foot wide and
17  about maybe about 18 to 20 inches high.
18    Q.  And these windows are leading to
19  your attic; correct?
20    A.  Uh-huh (affirmatively).
21    Q.  Is that a "yes"?
22    A.  Yes.
23    Q.  And when you returned after Katrina
24  the first time, these windows were blown out;
25  correct?
                                          Page 132
```

33 (Pages 129 to 132)

```
 1  Koch?
 2      A.  Yes, I do.
 3      Q.  Is that your signature on the page
 4  marked Koch 000391?
 5      A.  Yes, it is.
 6      Q.  And you filled out this form;
 7  correct?
 8      A.  Right.
 9      Q.  And you verified that the
10  information in this form was correct at the
11  time you submitted it?
12      A.  Yes.
13      Q.  Turn to page 388.
14      A.  Okay.
15      Q.  This document relates to 6035-37
16  Burgundy Street; is that correct?
17      A.  Yes.  Correct.
18      Q.  And when you first returned to
19  Burgundy Street after the storm, what do you
20  remember seeing there?
21      A.  I remember seeing the same thing I
22  seen on Douglass Street.  That they had the
23  doors were wide open and that the roof there
24  was -- was damaged and they had water damage
25  inside the house.  A lot of water damage.  In
                                         Page 149
```

```
 1  fact, it came up higher than it did on
 2  Douglass Street.  It came up about a foot from
 3  the ceiling or higher than that.
 4      Q.  How high were the ceilings there?
 5      A.  Eight.  Eight foot.
 6      Q.  And the water line was below the
 7  ceiling?
 8      A.  Yes, right.
 9      Q.  And you remember seeing roof damage
10  there; right?
11      A.  Yes, they had roof that --
12      Q.  What kind of roof damage do you
13  remember seeing?
14      A.  I remember of seeing a lot of tiles
15  were -- I'm talking about the roof tiles and
16  maybe little sections of black tiles off the
17  house.  And, in fact, that day that I went
18  there, I was there about a half hour and they
19  had people coming around putting these blue
20  tarps on the roof and they put one on mine and
21  they put one on the other house on the
22  corner.
23      Q.  And they put the blue tarp on your
24  roof because you had roof damage?
25      A.  And they put the blue tarp on my
                                         Page 150
```

```
 1  roof because it had roof damage on that house.
 2      Q.  You said that the doors were gone
 3  from that property as well?
 4      A.  Well, they -- they had the doors
 5  open wide -- wide open, like somebody came
 6  there.  I think the National Guard came there
 7  and checked for people that might have drowned
 8  in there or something, you know.
 9      Q.  When you first got there, --
10      A.  Uh-huh (affirmatively).
11      Q.  -- did you notice whether anything
12  had been stolen?
13      A.  Not in that house.  They didn't take
14  anything I don't believe in that house.
15      Q.  Had it been vandalized in any way?
16      A.  No.  No.
17      Q.  You told me about the roof damage.
18  When you first got to Burgundy, did you notice
19  other wind damage to that property?
20      A.  Well, they had a lot of wind damage
21  to the back shed and they also had wind damage
22  on the roof and I seen that they had a lot of
23  the ridge tiles gone.  They had a lot of the
24  seal tab tiles gone.  And they had people
25  coming around that was putting blue tarps on
                                         Page 151
```

```
 1  the roofs and they put one on mine because I
 2  know mine was damaged.
 3      Q.  I'm going to show you a copy of a
 4  photo which I am going to mark as Koch Number
 5  19.  This appears to be copies of two photos.
 6  The bottom appears to be 3409-11 Shangri La
 7  and the top appears to be 6035-37 Burgundy
 8  Street.
 9      A.  Uh-huh (affirmatively).
10      Q.  And ask you if you recognize these
11  photos, Mr. Koch.
12      A.  Yes, I do.  I do the top.  The top
13  one is going to be Burgundy and the bottom is
14  going to be 3409 and 11 Shangri La.
15      Q.  Who took these photos?
16      A.  My wife.
17      Q.  When did she take these photos?
18      A.  She took them after the hurricane.
19  The exact date, I don't know when was the
20  exact date.
21      Q.  Had you done any repairs to the
22  6035-37 Burgundy Street property at the time
23  that she took these photos?
24      A.  No, I never.
25      Q.  There's a reference on the side of
                                         Page 152
```

```
 1      Q.  I draw your attention to the section
 2   "If settled, how much for structure?"  Do you
 3   see that?
 4      A.  Yes.  100,000.
 5      Q.  You received $100,000 in flood
 6   insurance on that property?
 7      A.  Yes.
 8      Q.  Have you ever gone back to State
 9   Farm on your wind policy requesting more
10   money?
11      A.  No.
12      Q.  Mr. Koch, did you make a Road Home
13   claim on the 8545-47 Deerfield Drive property?
14      A.  Yes.
15      Q.  Do you have a copy of that at your
16   home?
17      A.  I'm pretty sure I do.  I don't
18   know.  I would have to look.  But I did make a
19   claim on it.
20         MR. BLANCHARD:
21            Now, Karl, I'll represent that we
22         didn't receive a copy of that.  So we
23         request those documents as well.
24         MR. WIEDEMANN:
25            Of the Road Home application for
                                          Page 169

 1   Deerfield?
 2         MR. BLANCHARD:
 3            Correct.
 4         MR. WIEDEMANN:
 5            Of course.
 6   EXAMINATION BY MR. BLANCHARD:
 7      Q.  Did you have homeowner's insurance
 8   on your Deerfield property?
 9      A.  Yes, I did.
10      Q.  When you first got to the Deerfield
11   property after the storm, what sort of damage
12   did you see?
13      A.  I seen monumental damage.  Mainly to
14   downstairs.  It was totally destroyed.  The
15   furniture, the appliances, the air
16   conditioners outside.  In fact, they came and
17   they stole the cores out of the air
18   conditioners.  After I had the house cleaned
19   and all of that and gutted, they stole the
20   tubing.
21      Q.  I'm sorry, can you repeat that?
22   After you had the house what?
23      A.  Okay.  When I went there, the house
24   was, of course, totally destroyed.  The
25   stoves, the dryers, everything.  And the water
                                          Page 170

 1   got up to about two and a half to three feet
 2   on the second floor.  And they had mud in the
 3   house about a foot, a foot high on the first
 4   floor.
 5      Q.  Had either one of the sides of that
 6   property been looted?
 7      A.  Yes.  They looted the air condition
 8   cores.  They steal -- In fact, the whole
 9   block, they stole the air condition cores out
10   of the houses in my block.
11      Q.  Was anything else stolen out of that
12   property?
13      A.  Yes.  They came during the storm and
14   we found where people came up to the second
15   story and was in a boat.  They probably had a
16   party in the house.  We found beer bottles all
17   over the floor.  We found -- We found bags of
18   potato chips.  And they probably had about a
19   foot and a half on the second floor, but they
20   -- they stole a lot of stuff on the second
21   floor.  They stole a lot of my cuff links, my
22   watches.  That, I do remember.  And they went
23   and they -- Of course, they took this jar I
24   had full of pennies.  They took money.  And I
25   can remember things like that they took, you
                                          Page 171

 1   know.
 2      Q.  And this was on your side?
 3      A.  And this was on my side.
 4      Q.  What was your side again?  I'm
 5   sorry.
 6      A.  My side was 8545, the large side.
 7      Q.  Do you remember anything else stolen
 8   from that property other than what you have
 9   just mentioned to me?
10      A.  Let me think.  Okay.  After the
11   house was -- After the house was gutted, they
12   went in and came and stole the copper pipe
13   that I had in the house.  And when I went
14   there, how I happened to see is they had water
15   running into the street.  So whoever stole the
16   copper tubing and the pipe didn't even cut off
17   the main valve.  They just sawed the pipes off
18   and I guess they must have ran out of there.
19   I think --
20      Q.  So you had water running at that
21   time?
22      A.  I had water running.  I still had
23   water in the pipes.  That's what I told my
24   wife.  Said these -- these crazy fools could
25   at least turn off the main valve, you know,
                                          Page 172
```

43 (Pages 169 to 172)

```
 1  instead of fighting that water coming out of
 2  there. But they -- But when I came there, the
 3  water was still running down the driveway
 4  where they went and they took the pipes. All
 5  -- All the copper in the walls that I had
 6  pipes was copper pipes, and they stole that.
 7      Q.  8547 Douglass, was that property
 8  looted?
 9      A.  No, that wasn't looted, but they
10  looted my side. Now, I don't know if they
11  took anything. I really can't say. Because
12  we had to go and gut it and clean it up. But
13  I don't know if they took anything from that
14  side. The only thing I know they took from
15  that side is the core from the air condition.
16  Because I had -- I had one air condition in
17  that side and I had two air conditioners over
18  on my side, and they stole the three of the
19  cores out of my air conditioners. And my next
20  door neighbor on each side, they took her air
21  conditioners and they took the lady's on the
22  other side of me. And then I heard after that
23  they stole every air condition core throughout
24  the whole block.
25      Q.  Who was your wind insurer for that
                                        Page 173
```

```
 1  property?
 2      A.  State Farm.
 3      Q.  Did you make a claim against your
 4  wind insurer?
 5      A.  Yes.
 6      Q.  What sort of items did you seek
 7  recovery for against your wind insurer?
 8      A.  Mainly for the roof. Mainly for
 9  that roof that I had on there that that --
10  that guy that put that new roof over the old
11  roof. I wasn't laughing at the time because I
12  was really PO'd. But anyway, I filed for
13  everything I could get, you know, for wind
14  damage and a man came out there, you know, and
15  -- the adjustor came out there and that's the
16  figure that they gave me.
17      Q.  What did they give you?
18      A.  I don't recall. I would have to go
19  check and see.
20      Q.  Do you have an insurance file for
21  the property at 8545-47?
22      A.  Yes. I have an insurance file for
23  every house I've ever had.
24      Q.  That file would include both your
25  wind insurer and your flood claim; right?
                                        Page 174
```

```
 1      A.  Wind and flood, right.
 2          MR. BLANCHARD:
 3              Karl, I'll represent that we
 4          didn't receive that either, so we will
 5          request those documents as well.
 6          MR. WIEDEMANN:
 7              Certainly.
 8  EXAMINATION BY MR. BLANCHARD:
 9      Q.  Do you remember how much you
10  received on your wind insurance claim?
11      A.  No, I do not.
12      Q.  Mr. Koch, we have got some discovery
13  responses from you. You identified a few of
14  those earlier. And there is a reference there
15  to wind insurance on one of your properties.
16  It didn't specifically identify it, I'll tell
17  you that, but there's a reference to
18  $23,329.10. Does that sound like the amount
19  you received on that Deerfield property?
20      A.  It might have been, but I can't
21  verify that until I check my --
22      Q.  But you know you recovered against
23  your wind insurance on that?
24      A.  I did recover on my wind insurance,
25  I did. I'm almost sure I did.
                                        Page 175
```

```
 1      Q.  And who did you have flood insurance
 2  with on that property?
 3      A.  On what, on 8545 and 47?
 4      Q.  Deerfield, yes.
 5      A.  I went through State Farm I think on
 6  that.
 7      Q.  How much did you receive on your
 8  flood policy on those properties?
 9      A.  I don't remember. I would have to
10  ask my wife. I don't remember.
11      Q.  And that's part of that claim file
12  that you talked about earlier?
13      A.  Yeah. Right. Right. I don't
14  remember.
15      Q.  Mr. Koch, did you have any personal
16  property, movable property in any of your
17  rental properties at the time of the storm?
18      A.  Yes. I had my -- As I said, I had
19  my vehicle at my aunt's house. Her -- Her
20  house was about two blocks away. And I went
21  and parked there because I thought if we would
22  have any water, that her house was a little
23  bit on higher ground than mine, you know.
24      Q.  All right. Let me ask you
25  specifically about the rental properties. Did
                                        Page 176
```

44 (Pages 173 to 176)

```
 1  remember of me doing it.  The only time I did
 2  a personal property -- Well, that's another
 3  property in Slidell I had that wasn't
 4  concerning this.
 5      Q.  So you own other property in
 6  Slidell?
 7      A.  Yes.
 8      Q.  That's not part of this lawsuit, is
 9  it?
10      A.  No.  No.
11      Q.  So for the properties we have talked
12  about previously during this deposition, you
13  haven't put together a list of personal
14  property for those properties, have you?
15      A.  I -- Please repeat the question.
16      Q.  That was an inartful question.  You
17  don't know whether or not you have a list of
18  all of your personal property that was damaged
19  during the storm?
20      A.  No, I don't.
21      Q.  And you think the best person to
22  talk to about that would be your wife?
23      A.  I would say so.  She -- She knows
24  more than me about the insurance aspect of
25  this.
                                       Page 181

 1      Q.  I'm going to mark as Koch Number 23
 2  a document we previously received from you
 3  marked Koch 000003 and 4, which is a Standard
 4  Form 95, "Claim for damage, injury or death."
 5  I ask you to take a look at that, Mr. Koch.
 6  Do you recognize that document?
 7      A.  Yes, I do.
 8      Q.  What is this document?
 9      A.  This document is a claim form
10  against the Corps of Engineers for property
11  that I lost in Katrina and Rita.
12      Q.  Is that your signature on page Koch
13  00003?
14      A.  000003?  Yes, it is.
15      Q.  Did you personally prepare this
16  document?
17      A.  With the help of my wife, yes.
18      Q.  Did anyone else help you with this
19  document other than your wife?
20      A.  No.
21      Q.  Was it your understanding that the
22  purpose of this form was to seek compensation
23  for damages to your property against the Corps
24  of Engineers?
25      A.  Yes.
                                       Page 182

 1      Q.  You understood that when you signed
 2  this; correct?
 3      A.  Yes.
 4      Q.  There's a note on the left-hand side
 5  at the bottom.  See there's a reference to
 6  "Property damage"?
 7      A.  Yes.
 8      Q.  And next to that there's a note and
 9  it says "Note, I lost five houses"?
10      A.  Yes.
11      Q.  Is that correct?
12      A.  Yes.
13      Q.  Is that your handwriting?
14      A.  Yes.
15      Q.  What are the five houses that you're
16  referencing?
17      A.  Okay.  I lost my own at 8545-47
18  Deerfield.  I lost my house at 3619 Shangri
19  La.  I lost my duplex at 3409-11 Shangri La.
20  I lost my double on 6035 and 37 Burgundy.  And
21  I lost a double on 6317 and 19 Douglass
22  Street.  That's the five properties that I am
23  talking about here.
24      Q.  And you're seeking recovery in the
25  lawsuit that we're here for today for those
                                       Page 183

 1  same exact properties, aren't you?
 2      A.  Right.
 3      Q.  Mr. Koch, did you read this document
 4  before you signed it?
 5      A.  Yes, I did.
 6      Q.  And there's a reference in item 12
 7  to property damage of $700,000.  Do you see
 8  that?
 9      A.  Yes, I do.
10      Q.  You inserted that number; correct?
11      A.  Correct.
12      Q.  Is that an accurate amount?
13      A.  As far as my knowledge goes, it is.
14      Q.  How did you arrive at that amount?
15      A.  Well, I kind of figured up what each
16  house was worth before Katrina and Rita and I
17  came to that figure of all five houses.
18      Q.  Did you prepare any worksheets that
19  you attached to this form?
20      A.  No.  I just went on my own and I
21  filled it out.
22      Q.  Do you still have that worksheet?
23      A.  No.  I don't.  I can't -- I probably
24  don't have it.  I don't know if I have it or
25  not.
                                       Page 184
```