# EXHIBIT 17
# Part 2

```
 1  month.  Because if I had any people tearing up
 2  my property, I asked them to leave.
 3     Q.  Did you sometimes have problems with
 4  people tearing up your rental property?
 5     A.  Sometimes, yes.  Sometimes.  Because
 6  that's a common occurrence in rentals.
 7  Sometimes they -- they don't take care of this
 8  stuff like they would their own and they break
 9  stuff.  They don't cut the grass.  They --
10  They put flat tires in the front yard.
11     Q.  And from time to time has any of
12  your rental properties, before the storm, been
13  vacant?
14     A.  Yes.  Some of them have been vacant.
15     Q.  So they all haven't -- they all
16  weren't rented continuously before --
17     A.  Most of the time they were.
18     Q.  Sometimes?
19     A.  But they weren't vacant for long.
20     Q.  Look at the document identified as
21  Koch 000519.
22     A.  519.  Okay.
23     Q.  And this is a rental agreement with
24  a Craig Armond.  Do you see that?
25     A.  Yes.
                                          Page 193
```

```
 1     Q.  Was he residing at 8547 Deerfield at
 2  the time of the storm?
 3     A.  Yes, he was.
 4     Q.  There's a reference here to rent of
 5  $525 a month.
 6     A.  Yes.
 7     Q.  Do you see that?
 8     A.  Yes.
 9     Q.  Is that the rent you were charging
10  him?
11     A.  Yes, it was.
12     Q.  Did he pay you that amount?
13     A.  Yes, he paid me.
14     Q.  Was he behind at the time of the
15  storm?
16     A.  The storm hit on the 29 -- No, he
17  wasn't.  He was not behind.
18     Q.  This lease is dated April 6, 2005.
19  Do you see that?
20     A.  Yeah.  4/6/05.  Right.  Right.
21     Q.  That was a one year rental
22  agreement, wasn't it?
23     A.  Well, I had him to sign these, but
24  we had a verbal agreement if they tore up
25  anything that I was going to ask them to
                                          Page 194
```

```
 1  leave.
 2     Q.  Did you have that verbal agreement
 3  with all of your tenants?
 4     A.  Yes.  Generally, yes, I had it with
 5  all of my tenants.
 6     Q.  So as we're going through these
 7  leases, --
 8     A.  Why --
 9     Q.  Wait until I finish.
10     A.  Okay.
11     Q.  As we go through these leases, we
12  have a written lease, right?  Is that
13  correct?  You have something in writing?
14     A.  Yes.
15     Q.  But then you also had side
16  agreements with these people that you could
17  kick them out basically?
18     A.  Well, I talked to a lawyer one time
19  and he says basically if a lease is not
20  notarized, it's not any good to start with;
21  it's not -- it's not worth the paper it's
22  written on.  So all I did was to give these
23  people an application and keep where they
24  worked, how much they made, and so forth and
25  so on, and I told them, I said, "Look, if you
                                          Page 195
```

```
 1  get into any trouble, can't pay the rent, I am
 2  not going to hold you here anyway, I have to
 3  leave you go, I have to cut you free," so
 4  that's why we had a month-to-month more or
 5  less agreement.  Because if somebody can't pay
 6  the rent, what is a lease going to do me,
 7  saying that they got to stay for six more
 8  months in order to fulfill the lease?
 9     Q.  So it was your understanding,
10  though, that even though you had written lease
11  agreements with these people, the written
12  lease was invalid?
13     A.  Right.
14     Q.  And that was the case for all of
15  your properties; correct?
16     A.  Correct.
17     Q.  Let's move forward, Mr. Koch.  Go to
18  Koch 000526.
19     A.  526.  Okay.  26.
20     Q.  The first document there is an
21  application for an apartment at 6319
22  Douglass.
23     A.  Correct.
24     Q.  That was one of your properties;
25  correct?
                                          Page 196
```

```
 1    A.  Yes, sir.
 2    Q.  The next page is a one year rental
 3  agreement, isn't it?
 4    A.  Yes, it is.
 5    Q.  And who was this rental agreement
 6  with?
 7    A.  Nicole Gilmore.
 8    Q.  And the rental was $400 a month?
 9    A.  Yes.
10    Q.  Did she occupy 6319 Douglass at the
11  time of Katrina?
12    A.  Yes.  She -- She did.  She occupied
13  it.
14    Q.  Was she behind in her rent --
15    A.  No, she was not.
16    Q.  -- at the time of Katrina?
17    A.  No.  No.  No, she was not.
18    Q.  Please go to Koch 000530.
19    A.  Uh-huh (affirmatively).
20    Q.  Is this an application for an
21  apartment concerning 3411 Shangri La?
22    A.  Right.
23    Q.  And this was Mr. Angelo Gonzales,
24  Jr.?
25    A.  Yes.
                                    Page 197
```

```
 1    Q.  And the next page, Bates stamped
 2  Koch 000531 through 533, is this your rental
 3  agreement with Mr. Gonzales?
 4    A.  Yes.  But these were the rules.  As
 5  you see, these people never signed nothing.
 6  And I told them the rules before they rented
 7  the house.  I said, "I don't hold you to no
 8  lease."  I said, "Mainly because if you can't
 9  pay the rent, what is a lease going to do me
10  anyway?"  I said, "I have to let you go if you
11  can't pay the rent."  But I said, "These are
12  my rules if you come into my house.  If you
13  break any of these rules, I am going to tell
14  you to leave.  And if you don't leave, I am
15  going to go and I am going to put a --"  I am
16  trying to think of the term.  "I am going to
17  go and evict you.  I am going to give you an
18  eviction notice."  And so they abide by these
19  rules.  But it was one month at a time.  One
20  month.  One month.
21    Q.  Paragraph one of Koch 531, you see
22  that?
23    A.  Uh-huh (affirmatively).
24    Q.  Concerning the rental, there's a
25  reference to zero.  Do you see that?
                                    Page 198
```

```
 1    A.  Yeah.  Right here?  Right.
 2    Q.  You weren't charging them zero?
 3    A.  No.  No.  No.  No.
 4    Q.  What were you charging them?
 5    A.  If I recall right, I think it was
 6  550 a month.  550 a month.
 7    Q.  Was Mr. Gonzales still at that
 8  property at the time of the storm?
 9    A.  Yes.  He was still there.  I
10  probably put this down in reference that he
11  never paid it when he came in that first --
12  But believe me, I wasn't charging him zero.
13    Q.  Turn to Koch 000534.  You with me,
14  Mr. Koch?
15    A.  Yes, I'm with you.
16    Q.  Is that an application by Adam
17  Peresa for 3409 Shangri La?
18    A.  Right.  That's it.
19    Q.  The next page, Koch 000535 through
20  537, this is a rental agreement that you had
21  with Mr. --
22    A.  Yes.
23    Q.  -- Peresa?
24    A.  Yes.  He paid me 550 a month and he
25  put down a deposit of 550.
                                    Page 199
```

```
 1    Q.  Was he still in this property at the
 2  time of Katrina?
 3    A.  Yes, he was.
 4    Q.  Was he current in his rent?
 5    A.  Yes, he was.
 6    Q.  Turn to page Koch 000538.
 7    A.  Uh-huh (affirmatively).
 8    Q.  Is that an application regarding
 9  property at 6035 Burgundy?
10    A.  Yes.
11    Q.  And the next page, Koch 000539
12  through 541.  This is a one year rental
13  agreement with Mr. Marvil Mentivar?
14    A.  No, it wasn't no one year.  It was a
15  one at a time.  The same -- The same -- I had
16  the same agreement with all of these people,
17  but it was more or less a verbal agreement and
18  these were the rules that you had to go and
19  abide by.
20    Q.  So even though it says one year
21  rental agreement, that's not what it was?
22    A.  As I said before, a lawyer once told
23  me, he says if an agreement is not notarized
24  by a witness and by a notary, it's not worth
25  the paper it's written on.
                                    Page 200
```

```
 1    Q.  There's a reference here to a rental
 2  of $410 a month.  Was that what you charged
 3  Mr. Mentivar?
 4    A.  Yes, I think it was.  Yes, it was.
 5    Q.  Was he still in the property at the
 6  time of Katrina?
 7    A.  Yes, he was in the property at the
 8  time of Katrina.  And I think he was only
 9  there about two or three months and the storm
10  came.
11    Q.  Turn to page Koch 000542.
12    A.  542.  Okay.
13    Q.  This is an application relative to
14  the property at 6037 Burgundy.  Correct?
15    A.  Yes.  Correct.
16    Q.  And the next page, Koch 000543
17  through 545, this purports to be a one year
18  rental agreement with Mrs. Sibil Montrell.
19    A.  Yeah, right.
20    Q.  The reference rent is $400 a month.
21  Is that what you were charging her?
22    A.  Yes.
23    Q.  Was she in this property at Burgundy
24  at the time of the storm?
25    A.  Yes, she was.
                                      Page 201

 1    Q.  Turn to Koch 000546.
 2    A.  Okay.
 3    Q.  Is this an application relative to
 4  3619 Shangri La?
 5    A.  Yes, it is.
 6    Q.  And the next page, Koch 547 through
 7  549, this is a rental agreement with Miss
 8  Letty Nunez?
 9    A.  Yes.  Right.
10    Q.  Were you charging her the $600 a
11  month on that property as referenced in this
12  rental agreement?
13    A.  Yes, I charged 600 a month plus I
14  would cut her grass.  And so that's why the
15  600, because I added on the grass cutting.  I
16  cut the grass.  And she agreed to it.  She
17  says that she didn't want to cut the grass.  I
18  said, "Well, in order to live in my houses,
19  you need to cut your grass."  That's right.
20    Q.  Did she live in the property at the
21  time of the storm?
22    A.  Yes.  Yes, she did.
23    Q.  One more, Mr. Koch.  Go to Koch
24  000550.  Is that an application relative to
25  6317 Douglass?
                                      Page 202

 1    A.  Yes, it is.
 2    Q.  And the next page, Koch 000551
 3  through 553, --
 4    A.  Uh-huh (affirmatively).
 5    Q.  -- is that document referenced as a
 6  rental agreement concerning Douglass Street?
 7    A.  Yes.  Yes, it is.
 8    Q.  And who is the person that signed
 9  that?
10    A.  Frances Collins.
11    Q.  This is dated September 4, 2001;
12  correct?
13    A.  Yes.
14    Q.  Was she still in the property at the
15  time of Katrina?
16    A.  Yes.  Yes, she was.
17    Q.  Was she still paying the $350 a
18  month?
19    A.  Yes.
20    Q.  Have you leased any of your rental
21  properties since Katrina?
22    A.  Well, we were -- we are trying to go
23  through the Road Home, and the Road Home has a
24  lease.  But the Road Home called me up
25  yesterday and said that I didn't abide by
                                      Page 203

 1  things that I checked off on the paper, so
 2  right now I don't know my status, you know,
 3  with the Road Home.  I don't know if they're
 4  going to pay me anything or what.  But I did
 5  go by the Road Home lease.  Now, if they don't
 6  pay me nothing, I don't know if the lease is
 7  any good or not.
 8    Q.  Mr. Koch, you have rented 8547
 9  Deerfield since the storm?
10    A.  Yes.
11    Q.  And when was the first time after
12  the storm that you rented that property?
13    A.  Let's see.  I think that was
14  sometime in '07.  I am not sure of the exact
15  date.  But the people -- I had rented that
16  through an agent in the Prudential Real
17  Estate.  I went through an agent there.  And
18  she was renting the problem -- I mean the
19  property and she rented it through FEMA.  And
20  I think the lady stayed in there about five or
21  six months and after her house was fixed, she
22  left.
23    Q.  How much rent did you receive from
24  her?
25    A.  I think it was 825 a month.  And, of
                                      Page 204
```

51 (Pages 201 to 204)

```
 1  course, I had to pay the agent for her part in
 2  it, too, see.
 3      Q.  Now, before the storm you were
 4  renting that property for 525 a month; right?
 5      A.  Right. Right.
 6      Q.  You said she was in it for five or
 7  six months?
 8      A.  Five or six months. And I don't
 9  think she went and fulfilled her -- her
10  agreement, and she left.
11      Q.  But you rented it to someone else
12  since that time?
13      A.  No, it's still vacant.
14      Q.  Still vacant. Are you trying to
15  rent it now?
16      A.  I am trying to rent it, yes, but so
17  far I haven't had anybody to take it yet.
18      Q.  When did she move out?
19      A.  Let's see. What we in, August? I
20  think she moved out around April.
21      Q.  Mr. Koch, you remember that I came,
22  met you during the site visits last month to
23  your properties?
24      A.  Yes.
25      Q.  You remember we visited 8545
                                      Page 205
```

```
 1  Deerfield; right?
 2      A.  Right.
 3      Q.  And you remember we tried to get in
 4  8547, but you said someone was there?
 5      A.  No. No one was there.
 6      Q.  No one was living at 8547
 7  Deerfield --
 8      A.  No.
 9      Q.  -- when we had this site visit last
10  month?
11      A.  No. No. It was just the opposite
12  way around. You all got in 8547, but I don't
13  know if y'all went in 8545.
14      Q.  Then I have it --
15      A.  Why? Because they had people in
16  8545, but the 8547 was empty.
17      Q.  All right. So since the storm you
18  also rented 8545 Deerfield.
19      A.  No. I have always had 8545 rented.
20  It's just that the people in 8547 stayed in
21  there and left in April.
22      Q.  All right. Well, let's go to 8545
23  Deerfield. That was rented before the storm;
24  right?
25      A.  No. No.
                                      Page 206
```

```
 1      Q.  That's where you lived?
 2      A.  That's where I lived.
 3      Q.  But after the storm you started
 4  renting it?
 5      A.  After the storm I had to rebuild it
 6  and then I rented it through a Prudential
 7  agent.
 8      Q.  Have you rented any other property
 9  since the storm?
10      A.  Yes, I've rented 3409 and 3411, and
11  I am about to rent 3619 Shangri La. All on
12  Shangri La. And as I told you, I sold 6035
13  and 37 Burgundy. And I haven't touched
14  6317-19 Douglass.
15      Q.  How much rent are you getting on
16  3409 Shangri La?
17      A.  3409 Shangri La, I am getting 725 a
18  month.
19      Q.  That's more than you were getting
20  before the storm; correct?
21      A.  That's more than I was getting
22  before the storm.
23      Q.  How long has that been rented?
24      A.  We just rented it last month.
25      Q.  3411 Shangri La, what rent are you
                                      Page 207
```

```
 1  charging on that property?
 2      A.  The same on -- The same amount.
 3  725.
 4      Q.  How long has that been rented?
 5      A.  We just rented it about three or
 6  four days ago.
 7      Q.  And that amount is more than you
 8  received since the storm?
 9      A.  Yes.
10      Q.  I mean before the storm; right?
11      A.  Yeah, right.
12      Q.  And you said you are getting about
13  ready to rent 3619 Shangri La?
14      A.  Yes.
15      Q.  So you have signed a lease with
16  someone?
17      A.  Well, yes, we -- we went and -- we
18  went through a Road Home lease. But as I
19  said, I don't know if the Road Home is going
20  to honor me, because they haven't paid me
21  nothing and they called me up and they said I
22  marked on a paper things that I should have
23  done that I never did and they want me to do
24  them, and I don't know if I am going to do
25  them or not because it's going to take more
                                      Page 208
```

**Page 209**

1  money, which I am running out of money quick.
2  So I just might tell them it's a road to
3  nowhere. You understand?
4      Q. Assuming that this Road Home
5  application goes through, how much rent are
6  you going to receive on that property?
7      A. 725.
8      Q. And if you don't go through the Road
9  Home and you independently try to rent it,
10 what do you plan to charge?
11     A. 725.
12     Q. Again, that's more than you received
13 in rentals before the storm; correct?
14     A. Correct.
15     Q. You want to take another five minute
16 break, Mr. Koch?
17     A. I'm all for rolling through. It's
18 5:00 o'clock. What time do we generally knock
19 off.
20     Q. Let's take a five minute break.
21     A. Okay.
22        MR. BLANCHARD:
23           I think I've got -- Off the
24        record.
25        (Whereupon a discussion was held

**Page 210**

1       off the record.)
2  EXAMINATION BY MR. BLANCHARD:
3      Q. Mr. Koch, over the last several
4  years you have rented a lot of properties,
5  haven't you?
6      A. Yes.
7      Q. And that's part of your income now,
8  is renting these properties; right?
9      A. Yes.
10     Q. You have got experience in buying
11 and selling properties?
12     A. Yes.
13     Q. You've got experience with renting
14 properties; correct?
15     A. Yes.
16     Q. The amount of rent that you can get
17 on any property, that depends on the location
18 of the property, doesn't it?
19     A. Yes.
20     Q. It depends on the condition of the
21 property? Is that correct?
22     A. Yes.
23     Q. All right. So you might have the
24 same property, but it was in two different
25 sections of town, you might get a different

**Page 211**

1  rent for that; correct?
2      A. Yes.
3      Q. So --
4      A. Location, location, location.
5      Q. That's what real estate agents say,
6  location, location, location?
7      A. That's the key.
8      Q. And you agree with that?
9      A. Wholeheartedly.
10     Q. So the address of the property
11 you're seeking to rent plays a big role in how
12 much rent you can receive?
13     A. Yes.
14     Q. Is that correct?
15     A. Yes.
16     Q. And that holds true for your
17 properties in the Lower Ninth Ward and in
18 Chalmette; correct?
19     A. Right.
20     Q. I'm going to show you a series of
21 tax returns, Mr. Koch, and hopefully we can go
22 through this quickly. I'll mark as Koch
23 Number 25 your 2002 tax return. Do you see
24 that?
25     A. Yes.

**Page 212**

1      Q. And on page 2 did you sign that tax
2  return?
3      A. On page 2?
4      Q. Yes.
5      A. Yes, I did.
6      Q. Did you have a preparer do this
7  return, or you did it yourself?
8      A. No, I had a preparer do this.
9      Q. All right. Did you make sure that
10 everything was correct before you signed it?
11     A. I made sure to the best of my
12 ability that everything was correct on here.
13     Q. Turn to Schedule E, which is Bates
14 stamped Koch 001173. Do you see that?
15     A. 1173? Okay. On the side. 1173.
16 Okay. 71 -- Okay. 72. One more.
17     Q. You with me, Mr. Koch?
18     A. Okay. Yeah. 1173. Okay.
19     Q. Right. And this form relates to
20 your rental properties, doesn't it?
21     A. Yes. Uh-huh (affirmatively), as far
22 as I can tell, yeah.
23     Q. And the line 3, "Rents received", is
24 that information accurate, to the best of your
25 information?

```
 1  got flooded.  As I said, I am representing the
 2  people that got flooded in the Lower Ninth
 3  Ward and in St. Bernard Parish.
 4      Q.  Have you been a class representative
 5  in any other lawsuit?
 6      A.  No, I haven't.
 7      Q.  Are you a class representative in
 8  the lawsuit filed by your New York lawyer?
 9      A.  No, I am not.
10      Q.  You told me earlier that you
11  estimated your property damage claim at
12  $700,000; right?
13      A.  Right.
14      Q.  And your personal injury claim at
15  $50,000; right?
16      A.  Yes.
17      Q.  So your total claim you believe is
18  $750,000?
19      A.  Yes.
20      Q.  If the Court in this case decides
21  that this case cannot go forward as a class
22  action, will you be continuing this lawsuit in
23  an individual capacity?
24      A.  That, I don't know.  I haven't made
25  up my mind yet.
                                        Page 221

 1      Q.  Have you spoken to any other class
 2  members in this lawsuit?
 3      A.  No, I haven't.
 4      Q.  Have you talked to any class
 5  representatives in this lawsuit?
 6      A.  No.
 7      Q.  Do you know the names of any other
 8  class representatives?
 9      A.  No, I don't.
10      Q.  Do you know whether or not you're
11  representing different subclasses in this
12  case?
13      A.  Subclasses?  Can you define
14  "subclasses" for me?
15      Q.  What sort of damage claims do you
16  think you are representing the class on in
17  this case?
18      A.  What is -- Yeah, but you never told
19  me what is a subclasses yet.
20      Q.  Well, I changed the question, Mr.
21  Koch.
22      A.  What do you mean by "subclasses"?
23      Q.  Well, --
24      A.  Well, okay, you changed --
25      Q.  I am striking the question and
                                        Page 222

 1  asking you this question.
 2      A.  Okay.
 3      Q.  You understand you're a class rep in
 4  this case; correct?
 5      A.  Yes.  Yes.
 6      Q.  And for what sort of damages or
 7  claims are you representing this class for?
 8      A.  For all that the people lost in the
 9  storm Katrina and Rita such as their houses,
10  their appliances, their automobiles, and all
11  like that.  This is what I am representing
12  these people for.
13      Q.  Do you understand that there will be
14  expenses associated with this lawsuit?
15      A.  Yes, I do.
16      Q.  Who will be paying those expenses?
17      A.  My lawyers.
18      Q.  By your lawyers, you mean Mr.
19  Wiedemann?
20      A.  Mr. Wiedemann, yes, Karl and
21  Edward.  That's part of it.
22      Q.  Has anyone given you an estimate of
23  the cost of this lawsuit?
24      A.  No.
25      Q.  Do you have any estimate of the
                                        Page 223

 1  total costs in this lawsuit?
 2      A.  No, I have not.
 3      Q.  Is it your understanding that you
 4  will have any financial obligations with
 5  respect to the costs associated with this
 6  lawsuit?
 7      A.  No.  I haven't -- As far as them
 8  charging me anything, no, they haven't charged
 9  me anything.
10      Q.  Have you paid any costs in
11  association with this lawsuit?
12      A.  No.
13      Q.  Have you received any bills for
14  costs associated with this lawsuit?
15      A.  No.
16      Q.  Have you ever filed for bankruptcy?
17      A.  No.
18      Q.  Have you ever been convicted of a
19  crime?
20      A.  No.
21      Q.  Have you ever been subject to a
22  restraining order?
23      A.  No.
24      Q.  How did you come about to hire your
25  lawyers in this case?
                                        Page 224
```

```
 1      A.  I seen it advertised in the paper or
 2  some place.  They were advertising for people
 3  that got flooded and -- in the Lower Ninth
 4  Ward and in St. Bernard Parish.
 5      Q.  And what name do you remember seeing
 6  on the ad?
 7      A.  I remember seeing Brian Gilbert's
 8  name.
 9      Q.  What did you do after you saw this
10  ad?
11      A.  Well, he had his name and his -- his
12  phone number and it said to contact him.  So I
13  contacted Brian.  Brian Gilbert.
14      Q.  Have you ever met with Mr. Gilbert?
15      A.  Not prior to that, no.
16      Q.  Well, have you ever met with him at
17  any time?
18      A.  No.
19      Q.  Did you ever meet with Mr. Wiedemann
20  or Mr. Moreno before today?
21      A.  No.
22      Q.  Have you ever had any other
23  conversations over the telephone with Mr.
24  Gilbert other than the first conversation you
25  had?
                                        Page 225
```

```
 1  your lawyers say that those lawyers would
 2  represent you with respect to any claims you
 3  might have against the United States
 4  government?
 5      A.  I don't remember having that
 6  clause.  It might have, but I don't remember
 7  seeing that.  I can't answer that.
 8      Q.  Have you ever attended any of the
 9  hearings in this case?
10      A.  No.
11      Q.  Did you attend the trial involving
12  Ingram and Domino in this case?
13      A.  No.
14      Q.  Have you attended any depositions in
15  this case other than the one we're here for
16  today?
17      A.  No.
18      Q.  Have you reviewed any of the papers
19  that your lawyers have filed in court?
20      A.  No.
21      Q.  Have you ever seen a copy of the
22  Complaint that was filed on your behalf in
23  court?
24      A.  No.
25      Q.  Mr. Koch, I'm going to show you a
                                        Page 227
```

```
 1          MR. WIEDEMANN:
 2              Let me just caution the witness
 3          not to talk about anything you may
 4          have discussed with your attorneys.
 5          Subject to that, you can answer the
 6          question.
 7          THE WITNESS:
 8              Would you repeat the question,
 9          please?
10  EXAMINATION BY MR. BLANCHARD:
11      Q.  Sure.  I am not asking you for the
12  content of the conversation.  You told me
13  earlier that you had a conversation with Mr.
14  Gilbert after you saw the ad in the paper.
15      A.  Right.
16      Q.  Right?
17      A.  Right.
18      Q.  After that time did you have any
19  other conversations with him over the
20  telephone?
21      A.  Not that I can remember, no.
22      Q.  Do you have a written agreement with
23  your lawyers in this lawsuit?
24      A.  Yes, I think.  Yes.
25      Q.  Did the agreement that you have with
                                        Page 226
```

```
 1  document previously marked as Exhibit Koch
 2  Number 2, which is Supplemental Answers to
 3  Interrogatories propounded by Barge Entities.
 4  I ask you to take a quick look at that.
 5          This is a document that you
 6  testified that you reviewed earlier today.  Is
 7  that correct?
 8      A.  Yes.  Yes.  Uh-huh (affirmatively).
 9      Q.  And when you reviewed that document,
10  did you pay particular attention to the
11  portions of it that related to you?
12      A.  Yes, I did.
13      Q.  And when you looked at those
14  particular portions that dealt with you, was
15  the information in those responses accurate?
16      A.  Yes, they were.
17          They have one accusation that, if
18  I can remember right, in one -- it only
19  mentioned that I had one apartment at 8545 and
20  47.  That was the inaccuracy I seen in one of
21  them.  Whereas I had -- it was a duplex and
22  they had it down as a single dwelling.  Now, I
23  don't know which one it was, but I remember
24  one of them --
25      Q.  Other than that, do you remember
                                        Page 228
```

**Page 229**

1  anything else in those responses that was
2  inaccurate?
3      A.  No.  No, I don't.
4      Q.  I'm going to show you an exhibit
5  marked as Koch Number 31, which is a
6  verification form.  Is that your signature on
7  the document marked as Koch Exhibit 31?
8      A.  Yes, that's my signature.
9      Q.  And before you signed that, did you
10 read that verification?
11     A.  Yes, I did.
12     Q.  And when you signed that, did you
13 verify that all of the interrogatory responses
14 that had been provided in this case on your
15 behalf were accurate?
16     A.  Yes.
17     Q.  Mr. Koch, there's a section in that
18 interrogatory related to Interrogatory number
19 26.  Maybe your lawyer can direct that portion
20 to you.
21     A.  26.
22     Q.  You see that, Mr. Koch?
23     A.  Yes.  Yes, I see it.
24     Q.  And that question concerned every
25 item of damages which you seek in this case.

**Page 230**

1  Is that correct?
2      A.  Yes.
3      Q.  And do you see there's a section in
4  that answer that relates to you and your
5  wife?  Do you see that?
6      A.  Me and my wife?  Oh, yes it says on
7  top, it says "Aida and Herman Koch seek
8  damages for".  Is that the part you're talking
9  about right here?
10     Q.  Yes.
11     A.  Uh-huh (affirmatively).
12     Q.  The first item on that list is "Past
13 and future mental pain, suffering, and
14 anguish".  Do you see that?
15     A.  Yes.
16     Q.  What did you mean by that item?
17     A.  Well, my wife had two heart attacks
18 and she was under a lot of stress throughout
19 this whole ordeal.  Plus the fact that I was
20 under a lot of stress, too.  This is what is
21 meant by future mental pain.  And we still are
22 suffering from some of the after-effects of
23 it.
24     Q.  So you blame your wife's heart
25 attacks on the damage from the hurricane?

**Page 231**

1      A.  Well, I think it was a big part of
2  it, yes.  She was under a great mental
3  strain.  And strain is one of the main enemies
4  of your heart, strain.  Especially mental
5  pain.
6      Q.  Are you claiming that you were
7  physically injured in the storm?
8      A.  No, I am not claiming that I was
9  physically injured, no, I wasn't.
10     Q.  So in this item you personally are
11 seeking recovery for your own mental pain?
12     A.  Yes.
13     Q.  And describe for me the mental pain,
14 suffering, and anguish that you are making a
15 claim for.
16     A.  Well, after the storm there were
17 nights when I couldn't even sleep.  I kept
18 thinking about this night after night, all the
19 houses, what I have worked for my whole life
20 was destroyed in one day.  And the more I
21 thought about it, the madder I got.  And it
22 was a strain on me.  It really was.  I felt
23 like punching the walls.  You don't know me.
24 And I know -- I know, man, it took a big toll
25 on me.

**Page 232**

1      Q.  Have you been to a psychiatrist
2  since Hurricane Katrina?
3      A.  No.  No, I haven't.
4      Q.  Have you been to a psychiatrist in
5  any time in your life?
6      A.  No.
7      Q.  Have you been to a psychologist
8  since Katrina?
9      A.  No.
10     Q.  At any time in your life have you
11 been to a psychologist?
12     A.  No, never have.
13     Q.  Have you taken any medications for
14 stress since Katrina?
15     A.  Well, I've had headaches and I took
16 aspirins and Aleve, if that's what you mean by
17 -- by some kind of form of relief for
18 headaches.  Because I know I get mad and I get
19 these pounding headaches.
20     Q.  Have you taken any prescription
21 medications?
22     A.  No.
23     Q.  Did you take any prescription
24 medications for mental pain or suffering at
25 any time before Katrina?

58 (Pages 229 to 232)

```
 1    A.  No.
 2    Q.  You're able to function, though, Mr.
 3  Koch, regardless of your emotional distress;
 4  right?
 5    A.  Yes, because you've got to overcome
 6  this some kind of way.
 7    Q.  Your appetite is okay?
 8    A.  Yes.
 9    Q.  You enjoy time with your wife and
10  your family?
11    A.  Yes.
12    Q.  Your son, one of your sons, Mr.
13  Koch, has he been convicted of a crime?
14    A.  Yes, he has.
15    Q.  Is he in jail?
16    A.  No, he's out on bond.
17    Q.  Is he going to have to serve a
18  prison term?
19    A.  Yes.
20    Q.  For what?  What was the offense?
21    A.  He was accused of going and selling
22  drugs.
23    Q.  That event has caused you quite a
24  bit of mental pain and suffering, hasn't it?
25    A.  I would say so, yes.
                                    Page 233

 1    Q.  And is the mental pain and stress
 2  that you've had because of your son's pending
 3  incarceration, is that more than the stress
 4  that you incurred during Katrina?
 5    A.  I don't know.  It's a toss-up.  You
 6  could take your pick.  They're both hard.
 7    Q.  Have you had any marital problems
 8  since the storm?
 9    A.  No.
10    Q.  What about before the storm?
11    A.  No.
12    Q.  You and your wife ever engage in any
13  counseling before the storm?
14    A.  No.
15    Q.  So the relationship with your wife
16  is good?
17    A.  Yes.
18    Q.  As good now as before the storm?
19    A.  Yes.
20    Q.  Is it better now than before the
21  storm?
22    A.  Well, we seem to be a little bit
23  closer now, because ever -- because since we
24  retired, I am closer with my wife now.  And
25  then after the storm, too, I guess I'm close.
                                    Page 234

 1    Q.  Have you spoken to friends and
 2  acquaintances that lived near you in Chalmette
 3  at the time of the storm?
 4    A.  Yes, I have spoken to them.
 5    Q.  And you mentioned for you
 6  specifically your items of emotional
 7  distress.
 8    A.  Uh-huh (affirmatively).
 9    Q.  For your friends or other people
10  that you know that lived in Chalmette or the
11  Lower Ninth Ward, have any of them reacted
12  differently to Katrina as far as stress goes
13  than you?
14        MR. WIEDEMANN:
15          I object to the form of the
16        question, in that how would he know as
17        a lay person how his friends have
18        reacted to a certain situation?
19          Subject to that, you can answer
20        the question if you can.
21        THE WITNESS:
22          Well, my friends was distressed,
23        too, I know, because they were going
24        and telling me that they would never
25        come back to Chalmette and St. Bernard
                                    Page 235

 1        ever after what happened, because they
 2        also lost everything they had down
 3        there.
 4  EXAMINATION BY MR. BLANCHARD:
 5    Q.  Did anybody that you know living
 6  within Chalmette or the Lower Ninth Ward, and
 7  by Chalmette I mean west of Paris Road, did
 8  any of those persons ever tell you that they
 9  needed to see a psychiatrist or psychologist
10  as a result of the stress they endured during
11  and after the storm?
12    A.  No.
13    Q.  Now, you told me earlier that you
14  blame your wife's heart attacks on the stress
15  from the damage in the storm; right?
16    A.  Yes, I do.
17    Q.  And you personally have not had any
18  physical injuries as a result of the stress
19  from the storm, have you?
20    A.  No, but there were many a nights
21  when I couldn't sleep.
22    Q.  Do you know anyone living in the
23  Lower Ninth or Chalmette west of Paris Road
24  that has been unable to return to work after
25  Katrina?
                                    Page 236
```

59 (Pages 233 to 236)

```
 1  them, I said, "Well, I'll throw it out.  I
 2  have to get rid of it."  They tell me, "Well,
 3  more or less you do what you want to it.  We
 4  can't use it."
 5      Q.  Diminution of property values.  What
 6  did you mean by that?
 7      A.  Okay.  After the storm, is my
 8  property value going to be worth the same
 9  thing it was before Katrina?  I doubt it very
10  much.
11      Q.  Some of your properties -- Well,
12  your properties in Chalmette that have been
13  renovated, --
14      A.  Uh-huh (affirmatively).
15      Q.  -- those properties, now that they're
16  renovated, are nicer than they were before the
17  storm; isn't that true?
18      A.  It might be true, but that doesn't
19  point to the property value if I want to sell
20  it, that I would get more than I would get
21  before the storm, would it?
22      Q.  You're renting those properties;
23  right?
24      A.  I agree with you.  I am renting
25  them.
                                        Page 241
```

```
 1      Q.  You're renting 3409 Shangri La?
 2      A.  Right.  Right.  But it took -- It's
 3  --
 4      Q.  How long did it take you to rent
 5  that property?
 6      A.  Oh, I guess about two to six -- No,
 7  not six weeks.  I guess from two to three
 8  weeks.
 9      Q.  How long did it take you to rent
10  3411 Shangri La?
11      A.  A little bit longer.
12      Q.  So how long?
13      A.  Maybe a week longer.  Or possibly a
14  week and a half.
15      Q.  And this item, past and future loss
16  and destruction of businesses and business
17  assets, you're seeking those same damages
18  against the government, aren't you?
19      A.  Yes.  Yes, I am.
20      Q.  Past and future lost profit and past
21  and future lost income, past and future lost
22  earning capacity, and past and future lost
23  business opportunity, are those any different
24  than the past and future loss of business that
25  you told me about earlier?
                                        Page 243
```

```
 1      Q.  And so far your experience has been
 2  that the rentals you get now are higher than
 3  before the storm; correct?
 4      A.  Well, there's one thing you're
 5  missing.
 6      Q.  Just answer the question, sir.
 7      A.  Yes.  Yes, that's true.
 8      Q.  Thank you.  You're claiming the same
 9  diminution of property values against the
10  government, aren't you?
11      A.  Yes, I am.
12      Q.  The next item, past and future loss
13  and destruction of businesses and business
14  assets, what do you mean by that?
15      A.  Past and future loss and destruction
16  of businesses and business assets.  Well, by
17  that, it might not as easy to rent this
18  property as it was in the past, because it --
19  anyone can tell the population has not come
20  back to St. Bernard.  The population has not
21  come back here.  It's harder to rent
22  properties because people have left.  And
23  after three years, these people, if they're
24  not here in three years, they're not coming
25  back.
                                        Page 242
```

```
 1      A.  Past and future lost business
 2  opportunity.  Yes, you got to realize that
 3  these houses were for almost three years where
 4  I never got a penny out of them due to Katrina
 5  and Rita and flooding from the storm.
 6      Q.  So you --
 7      A.  I lost all of this income for almost
 8  three years now since the storm.
 9      Q.  So your claim for loss of income in
10  this case relates solely to the lost income,
11  rental income on your rental properties; is
12  that correct?
13      A.  Well, it's not only the loss of
14  that.  Look at the stress that my wife and I
15  had to go through from the storm.
16      Q.  I am specifically talking about loss
17  of business or income here.  The only income
18  you lost specifically related to the lost
19  rentals on your rental properties; correct?
20      A.  Yes, plus the fact we had to get
21  people to fix them and you have to fight with
22  contractors constantly night and day.
23      Q.  Well, Mr. Koch, let me ask the
24  question again, because I want to limit it to
25  lost income.
                                        Page 244
```

```
 1     A.   Uh-huh (affirmatively).
 2     Q.   I am not trying to trick you here.
 3  I am just telling you --
 4     A.   Okay.
 5     Q.   -- the lost income that you have
 6  here is the loss of the rentals on your rental
 7  property?
 8     A.   Plus, I think.
 9     Q.   Okay.
10     A.   Yeah.  Yeah, okay.
11     Q.   I mean, you have other expenses, I
12  know.
13     A.   Right.
14     Q.   But when you're talking about lost
15  income, you're talking about loss of rental
16  income; right?
17     A.   Right.  Right.  Right.
18     Q.   And when you look at that loss of
19  rental income, obviously to determine your
20  lost income, you have to look at the gross
21  receipts that you lost on the rentals less
22  your anticipated expenses; correct?
23     A.   Yes.
24     Q.   All right.  These items, past and
25  future lost income, past and future lost
                                      Page 245
```

```
 1  profit, past and future lost earning capacity,
 2  past and future lost business opportunities,
 3  you're claiming those same damages against the
 4  United States government, aren't you?
 5     A.   Yes.
 6     Q.   The next item, past and future loss
 7  of enjoyment of lifestyle, what do you mean by
 8  that?
 9     A.   Well, the storm went and it ruined
10  our whole lifestyle.  Because we lost a lot of
11  friends that never came back.  We have lost
12  the opportunity of having hospitals around our
13  -- our house there.  And we lost the stores
14  that was around there.  And it has put a real
15  crink in our lifestyle because we have lost a
16  lot of friends that will never come back.
17  Plus the fact of the convenience it was to
18  live around there.  This was an ideal
19  location.  It wasn't but 15 or 20 minutes to
20  downtown New Orleans.  It was right around the
21  corner from a hospital.  We were right in a
22  section where they had a lot of stores like
23  Wal-Mart and a lot of restaurants.  And from
24  here to where I am at now in Picayune, it's a
25  big difference.  It's a big difference.
                                      Page 246
```

```
 1     Q.   Why did you decide to relocate to
 2  Picayune?
 3     A.   Well, I -- I had -- After -- I had
 4  no other place to go.  I didn't know if I was
 5  going to sell my properties or if I was going
 6  to rebuild them.  So this is why I went to
 7  Picayune, in order to think a little bit and
 8  to be by myself and with my wife so her and I
 9  could talk this over.
10     Q.   Do you plan to stay in Picayune?
11     A.   I don't know.  I really don't know.
12     Q.   You're also claiming these same
13  damages against the United States government;
14  correct?
15     A.   Yes.
16          MR. WEBB:
17              Can we take a quick break?
18          MR. BLANCHARD:
19              Yes.  I have got about ten or
20          fifteen minutes left.  So let's have
21          one last break.
22          (Recess.)
23  EXAMINATION BY MR. BLANCHARD:
24     Q.   Mr. Koch, you remember earlier that
25  you told me today before your deposition you
                                      Page 247
```

```
 1  reviewed some of your Answers to
 2  Interrogatories?  Do you remember that?
 3     A.   Answers to Interrogatories?  Let's
 4  see.  What is Answers to Interrogatories?  Oh,
 5  yeah.  Yeah.  Okay.
 6     Q.   You remember 1, 2, and 3, we went
 7  over that earlier and you said those were the
 8  documents that you had reviewed in advance of
 9  your deposition here today.
10     A.   Yeah.  Right.
11          MR. WIEDEMANN:
12              Referring to Exhibits 1, 2 and
13          3.
14          THE WITNESS:
15              Oh, okay.  Yeah.  Yeah.
16          MR. WIEDEMANN:
17              That's 2.
18          THE WITNESS:
19              This is 2 here.  Okay.
20  EXAMINATION BY MR. BLANCHARD:
21     Q.   And you told me you went through
22  that, and everything was accurate except for
23  the discrepancy concerning one of your rental
24  properties.
25     A.   They had a part in here about 8545
                                      Page 248
```

U/N151 02863

| CLAIM FOR DAMAGE, INJURY, OR DEATH | INSTRUCTIONS: Please read carefully the instructions on the reverse side and supply information requested on both sides of this form. Use additional sheet(s) if necessary. See reverse side for additional instructions. | FORM APPROVED OMB NO. 1105-0008 |
|---|---|---|

| 1. Submit To Appropriate Federal Agency: United States of America, Dept. of Army Corps of Engineers U.S. Army Engineer District, New Orleans P.O. Box 60267, CEMVN-OC New Orleans, LA 70160-0267 CORPS OF ENGINEERS NEW ORLEANS DISTRICT 2006 OCT 30 P 6:30 OFFICE OF COUNSEL | 2. Name, Address of claimant and claimant's personal representative any. (See instructions on reverse.) (Number, Street, City, State and Code) HERMAN H. KOCH 506 COUNTRY CLUB DR. PICAYUNE, MS. 39466 |
|---|---|

| 3. TYPE OF EMPLOYMENT ☐ MILITARY ☒ CIVILIAN | 4. DATE OF BIRTH NOV 4 1937 | 5. MARITAL STATUS MARRIED | 6. DATE AND DAY OF ACCIDENT August 29, 2005 | 7. TIME (A.M. OR P.M) Unknown at this time |
|---|---|---|---|---|

8. Basis of Claim (State in detail the known facts and circumstances attending the damage, injury, or death, identifying persons and property involved, the place of occurrence and the cause thereof. Use additional pages if necessary.) 8545-47 DEERFIELD DR, CHALMETTE, LA. 70043

8a. The hurricane protection levees, I-walls and flood walls which were supposed to protect the New Orleans metropolitan area failed and were breached during the day of August 29, 2005. The breaches and failure of the hurricane protection levees, I-walls and flood walls were a result of Corps of Engineers' negligence in design and construction of these levees, I-walls and flood walls. Moreover, the Corps were negligent in the design, construction, maintenance the Mississippi River Gulf Outlet. In addition, the Corps knew or reasonably should have known that the hurricane protection levees, I-walls and flood walls were inadequate to protect the area from flooding from a fast moving category-3 hurricane and despite that knowledge, the Corps failed to disclose these inadequacies, to the material detriment of the claimant.

9. PROPERTY DAMAGE

NAME AND ADDRESS OF OWNER, IF OTHER THAN CLAIMANT (Number, Street, City, State, and Zip Code).

BRIEFLY DESCRIBE THE PROPERTY, NATURE AND EXTENT OF DAMAGE AND THE LOCATION WHERE PROPERTY MAY BE INSPECTED. (See instructions on reverse side.)
Destruction of real and personal property resulting from water damage; loss of opportunity to purchase a sufficient amount of flood insurance to modify the property, or to relocate as a result of fraud and/or concealment by the U.S. Corps of Engineers.

10. PERSONAL INJURY/WRONGFUL DEATH

STATE NATURE AND EXTENT OF EACH INJURY OR CAUSE OF DEATH, WHICH FORMS THE BASIS OF THE CLAIM. IF OTHER THAN CLAIMANT, STATE NAME OF INJURED PERSON OR DECEDENT.
Personal injury and mental distress

11. WITNESSES

| NAME | ADDRESS (Number, Street, City, State, and Zip Code) |
|---|---|
| | |

12. (See instructions on reverse.) AMOUNT OF CLAIM (in dollars)

| 12a. PROPERTY DAMAGE $700,000.00 | 12b. PERSONAL INJURY $50,000.00 | 12c. WRONGFUL DEATH | 12d. TOTAL (Failure to specify may cause forfeiture of your rights.) $750,000.00 |
|---|---|---|---|

I CERTIFY THAT THE AMOUNT OF CLAIM COVERS ONLY DAMAGES AND INJURIES CAUSED BY THE INCIDENT ABOVE AND AGREE TO ACCEPT SAID AMOUNT IN FULL SATISFACTION AND FINAL SETTLEMENT OF THIS CLAIM

| 13a. SIGNATURE OF CLAIMANT (See instructions on reverse side.) Herman H. Koch | 13b. Phone number of person signing form 601-798-5026 | 14. DATE OF SIGNATURE Oct 22, 2006 |
|---|---|---|

| CIVIL PENALTY FOR PRESENTING FRAUDULENT CLAIM | CRIMINAL PENALTY FOR PRESENTING FRAUDULENT CLAIM OR MAKING FALSE STATEMENTS |
|---|---|
| The claimant is liable to the United States Government for the civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages sustained by the Government. (See 31 U.S.C. 3729.) | Fine of not more than $10,000 or imprisonment for not more than 5 years or both. (See 18 U.S.C. 287, 1001.) |

95-109   NSN 7540-00-634-4046   STANDARD FORM 95 PRESCRIBED BY DEPT. OF JUSTICE 28 CFR 14.2

Preexisting Claim Number

Koch 000003

KOCH DEPOSITION EXHIBIT 23

NOTE: DST DUE (5) DOSES

## INSURANCE COVERAGE

In order that subrogation claims may be adjudicated, it is essential that the claimant provide the following information regarding the insurance coverage of his vehicle or property.

15. Do you carry accident insurance? ☐ Yes   If yes, give name and address of insurance company (Number, Street, City, State, and Zip Code) and policy number.   ☒ No

N/A

16. Have you filed a claim on your insurance carrier in this instance, and if so, is it full coverage or deductible?   ☐ Yes   ☐ No

Not applicable   N/A

17. If deductible, state amount.

N/A

18. If a claim has been filed with your carrier, what action has your insurer taken or proposed to take with reference to your claim? (It is necessary that you ascertain these facts.)

Not applicable   N/A

19. Do you carry public liability and property damage insurance? ☒ Yes   If yes, give name and address of insurance carrier (Number, Street, City, State, and Zip Code).   ☐ No

## INSTRUCTIONS

Claims presented under the Federal Tort Claims Act should be submitted directly to the "appropriate Federal agency" whose employee(s) was involved in the incident. If the incident involves more than one claimant, each claimant should submit a separate claim form.

Complete all items - Insert the word NONE where applicable.

A CLAIM SHALL BE DEEMED TO HAVE BEEN PRESENTED WHEN A FEDERAL AGENCY RECEIVES FROM A CLAIMANT, HIS DULY AUTHORIZED AGENT, OR LEGAL REPRESENTATIVE, AN EXECUTED STANDARD FORM 95 OR OTHER WRITTEN NOTIFICATION OF AN INCIDENT, ACCOMPANIED BY A CLAIM FOR MONEY DAMAGES IN A SUM CERTAIN FOR INJURY TO OR LOSS OF PROPERTY, PERSONAL INJURY, OR DEATH ALLEGED TO HAVE OCCURRED BY REASON OF THE INCIDENT. THE CLAIM MUST BE PRESENTED TO THE APPROPRIATE FEDERAL AGENCY WITHIN TWO YEARS AFTER THE CLAIM ACCRUES.

Failure to completely execute this form or to supply the requested material within two years from the date the claim accrued may render your claim invalid. A claim is deemed presented when it is received by the appropriate agency, not when it is mailed.

If instruction is needed in completing this form, the agency listed in item #1 on the reverse side may be contacted. Complete regulations pertaining to claims asserted under the Federal Tort Claims Act can be found in Title 28, Code of Federal Regulations, Part 14. Many agencies have published supplementing regulations. If more than one agency is involved, please state each agency.

The claim may be filed by a duly authorized agent or other legal representative, provided evidence satisfactory to the Government is submitted with the claim establishing express authority to act for the claimant. A claim presented by an agent or legal representative must be presented in the name of the claimant. If the claim is signed by the agent or legal representative, it must show the title or legal capacity of the person signing and be accompanied by evidence of his/her authority to present a claim on behalf of the claimant as agent, executor, administrator, parent, guardian or other representative.

If claimant intends to file for both personal injury and property damage, the amount for each must be shown in item #12 of this form.

The amount claimed should be substantiated by competent evidence as follows:

(a) In support of the claim for personal injury or death, the claimant should submit a written report by the attending physician, showing the nature and extent of injury, the nature and extent of treatment, the degree of permanent disability, if any, the prognosis, and the period of hospitalization, or incapacitation, attaching itemized bills for medical, hospital, or burial expenses actually incurred.

(b) In support of claims for damage to property, which has been or can be economically repaired, the claimant should submit at least two itemized signed statements or estimates by reliable, disinterested concerns, or, if payment has been made, the itemized signed receipts evidencing payment.

(c) In support of claims for damage to property which is not economically repairable, or if the property is lost or destroyed, the claimant should submit statements as to the original cost of the property, the date of purchase, and the value of the property, both before and after the accident. Such statements should be by disinterested competent persons, preferably reputable dealers or officials familiar with the type of property damaged, or by two or more competitive bidders, and should be certified as being just and correct.

(d) Failure to specify a sum certain will render your claim invalid and may result in forfeiture of your rights.

## PRIVACY ACT NOTICE

This Notice is provided in accordance with the Privacy Act, 5 U.S.C. 552a(e)(3), and concerns the information requested in the letter to which this Notice is attached.
A. Authority: The requested information is solicited pursuant to one or more of the following: 5 U.S.C. 301, 28 U.S.C. 501 et seq., 28 U.S.C. 2671 et seq., 28 C.F.R. Part 14.

B. Principal Purpose: The information requested is to be used in evaluating claims.
C. Routine Use: See the Notices of Systems of Records for the agency to whom you are submitting this form for this information.
D. Effect of Failure to Respond: Disclosure is voluntary. However, failure to supply the requested information or to execute the form may render your claim "invalid".

## PAPERWORK REDUCTION ACT NOTICE

This notice is solely for the purpose of the Paperwork Reduction Act, 44 U.S.C. 3501. Public reporting burden for this collection of information is estimated to average 6 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Director, Torts Branch, Attention: Paperwork Reduction Staff, Civil Division, U.S. Department of Justice, Washington, D.C. 20530 or to the Office of Management and Budget. Do not mail completed form(s) to these addresses.

SF 95 BACK

Koch 000004