# EXHIBIT 18
# Part 2

1  your heart just jumping out your clothes.  And
2  I had so much stress, they give me eleven pills
3  at one time, I don't know, all different colors
4  and different shapes.  But, that I don't know.
5  My mind just went blank.
6      Q.  How long were you in the hospital the
7  first time you went?
8      A.  Two days.  And they send me back.
9      Q.  Do you remember what month it was when
10  you were in the hospital for two days that
11  first time?
12      A.  What month it was?
13      Q.  Yes, ma'am.
14      A.  Sometime in September.
15      Q.  September of '05.
16      A.  '05, yeah.  But what day of the month,
17  I don't know.
18      Q.  You knew by September of 2005 that
19  your husband had died in the storm?
20      A.  Yeah.  After my son told me.  Jeffrey
21  told me.
22      Q.  How long were you in the hospital the
23  second time you went?
24      A.  Three days, I think.  I'm not sure.
25  I'm not sure.

Page 93

1      Q.  What month were you in the hospital
2  the second time?
3      A.  I had just come home a day or two and
4  I had to go right back.
5      Q.  Go right back.  So it was right around
6  the same time.
7      A.  Around the same time.  I remember that
8  much.
9      Q.  Your son Jeffrey told you about your
10  husband's passing.
11      A.  Yes, he did.
12      Q.  What can you tell us about how it was
13  learned that your husband had perished in the
14  storm?
15      A.  My kids were born and raised in that
16  house.  His best friend, he had been in the
17  service, too.  I had three of my kids been in
18  the service.  He had been in the service, but
19  his good friend live across the street, he was
20  still in the police department.  His brother
21  was in the National Guard, his other best
22  friend was a harbor police.  So he called them
23  all up and asked them to go to make sure that
24  he wasn't in the house, that he was okay.  That
25  at least he wasn't in the house.  They found

Page 94

1  him in the house, the three.  And they called
2  long distance and told my son that he was in
3  the house.  He was still in the house.
4      Q.  So I get the record clear, which son
5  had friends who were in the harbor police, the
6  guard and all the rest of those?
7      A.  Jeffrey.  The one that live in Stone
8  Mountain.
9      Q.  Jeffrey called his friends and asked
10  them to go to the house.
11      A.  Make an appointment with each other
12  and give a date and a time and go in.  And
13  that's what they did.
14      Q.  Do you know when they went to the
15  house?
16      A.  No.  No, I don't.
17      Q.  Do you know the name of the person who
18  found your husband's body in the house?
19      A.  Those three?
20      Q.  Did they all three go together?
21      A.  Yeah.  They went together.
22      Q.  What are the names of the three
23  people?
24      A.  Lawrence Colon.  He works for the
25  Fifth Precinct.  No, wait, Louis.  They're

Page 95

1  twins.  Louis Colon.  They're identical.
2  Warner is his first name.  He works for the
3  harbor police.  And Tyrone Colon, that's Louis
4  brother, he's a National Guard.
5      Q.  They all three went to the house
6  together to look for your husband.
7      A.  They did.  And they found him.
8      Q.  In what room did they find him?
9      A.  In the den they said, I think.  In the
10  den.  He wasn't even in the attic by then.
11      Q.  When you talked to him at 11:30 on
12  Sunday night, did he tell you he was in the
13  attic?
14      A.  He said he was going in the attic.
15      Q.  Based on what you've learned from your
16  son Gregory --
17      A.  Uh-huh.
18      Q.  -- did your husband tell your son
19  Gregory that he was in the attic when the two
20  of them spoke?
21      A.  I don't know that part.  I don't know.
22      Q.  Do you know for a fact one way or the
23  other whether your husband went to the attic
24  that morning?
25      A.  No, I don't know that either.  No.

Page 96

24 (Pages 93 to 96)

1   levee breaking in the supermarket?
2      A.   I remember people saying the barge --
3   and they had it on TV, and it was in the paper,
4   the barge sitting on where it's broke at, on
5   our side of the canal.  It was in the paper.
6   And it was on the news.
7      Q.   What you saw in the paper was the
8   aftermath?
9      A.   Right.  Right.
10     Q.   When I say the aftermath I mean the
11  picture of a barge sitting on --
12     A.   On the levee.  It wasn't even in the
13  water anymore.  It was sitting on the levee
14  where it broke, and you could see the broken
15  spot.
16     Q.   What I'm trying to ask you now is
17  whether anyone has told you they saw how that
18  barge got to where it ended up.
19     A.   Nobody really see it, no.
20     Q.   Did anybody tell you they saw the
21  levee break and the water come in?
22     A.   No.
23     Q.   Did anybody tell you they saw the
24  barge hit the wall?
25     A.   Unh-unh.

Page 117

1      Q.   Did anyone tell you they saw the barge
2   pass through the wall?
3      A.   No.  Because when I left I never came
4   back.
5      Q.   Since you've been back living in the
6   Lower Ninth Ward, has anyone told you that they
7   stayed during the storm?
8      A.   Nobody hardly talks about it.
9      Q.   Do you have any knowledge about what
10  caused the flooding?
11     A.   No, I don't.
12     Q.   You don't know what caused the
13  flooding in the Lower Ninth Ward?
14     A.   I wasn't there.  I had just left.
15  There wasn't no water when I left.
16     Q.   You don't know what caused the
17  flooding at Clermont Street where you rode out
18  the storm.
19     A.   No.  All I know it came in the house.
20     Q.   Apart from your house at 1321 Egania
21  Street, did you own or have an interest in any
22  immovable property in the Lower Ninth Ward?
23     A.   No.  Did I have any other property
24  besides that one?
25     Q.   That's right.

Page 118

1      A.   No.  We had been sold that one from my
2   mother-in-law and them, but they're all dead.
3      Q.   Do you have any pre-storm pictures of
4   your home at 1321 Egania Street?
5      A.   Before the storm or after?
6      Q.   Yes, ma'am.  Before.
7      A.   I may have a few pictures.  I'm not
8   sure.  Oh, no, I don't have them because the
9   water took them.  They were all under the TV in
10  the albums.  No.
11     Q.   So you don't have any pictures.
12     A.   All I got is the one they send me, and
13  that was after the storm.  No.
14     Q.   When was the home built?
15     A.   Five years before we bought it.  We
16  bought it in '54.  It was built five years
17  before that.
18     Q.   So it was built around 1949?
19     A.   Somewhere around there.
20     Q.   How many stories?
21     A.   It was five rooms.  And we added on
22  twice.
23     Q.   Okay.
24     A.   We had nine rooms.
25     Q.   All on the same level?

Page 119

1      A.   All on the same level.
2      Q.   Was the house raised up off the
3   ground?
4      A.   Three pillars.
5      Q.   How high were the pillars?
6      A.   You know, three?  Them stones.  Three
7   of those.  So it was pretty high.  It wasn't
8   flat on the ground.  I got a front porch, come
9   up the steps.
10     Q.   How many steps to get up to the front
11  porch?
12     A.   Four.
13     Q.   The front porch was at the same level
14  as the floors in the house?
15     A.   Uh-huh.  To the house, yeah.  From the
16  porch, when you come up the steps, you got the
17  big porch, and then into the house.
18     Q.   So it was four steps up.
19     A.   I got three steps or four steps in the
20  last room, Number 8 room.  That's where one of
21  the attics, one of the -- yeah, the attic was
22  in one of the rooms.  It used to be my daddy's
23  room.
24     Q.   What's your house made of?
25     A.   Bricks.

Page 120

1    A.   Right.  And this one moved all the way
2  across the door.  Because this was over here.
3  And this one was in the driveway here.
4    Q.   In this picture, in the lower -- the
5  lower picture of this page, there are two
6  vehicles, right?
7    A.   That's right.
8    Q.   One of them is a truck that has no
9  windows in the side panel.  Do you see that
10  truck?
11    A.   Yes.
12    Q.   And one of them is a van that has a
13  couple of windows on the side.  Do you see
14  that?
15    A.   Yes, I do.
16    Q.   Does the van have a ring around it in
17  this picture?
18    A.   A ring around it?
19    Q.   Yes, a ring.  Like a water ring, like
20  a bathtub ring.
21    A.   No.
22       THE WITNESS:
23          Can you see it?  Because my
24       eyes --
25       MR. GILBERT:

Page 133

1          I can't answer.  If you can
2          answer -- if can see it, answer.
3    A.   No, I can't see it.
4  EXAMINATION BY MR. RAFFMAN:
5    Q.   All right.  You said your husband told
6  your son the water had gotten high.  Is that
7  what you said?
8    A.   That's what he told him.
9    Q.   Your husband had told your son that
10  the home was flooding; is that what you heard?
11    A.   That's what I heard.
12    Q.   This is Gregory, your son?
13    A.   That's Gregory, my son.
14    Q.   According to Gregory, your husband
15  told him that the water had gotten how high in
16  the home?
17    A.   Yeah.  He said it was up to the beds.
18    Q.   Did your husband tell your son Gregory
19  that he was in the attic?
20    A.   I don't remember that.  I don't know.
21    Q.   I'm finished with the pictures.
22       When you went back to the
23  neighborhood, did you see any homes that had
24  damaged roofs?
25    A.   Oh, yes.  All of my neighbors.

Page 134

1    Q.   All the neighbors had roof damage?
2    A.   All of us had roof damage.
3    Q.   Shingles had blown off?
4    A.   Sure.
5    Q.   Roofs had holes in them?
6    A.   I don't know about -- next door I saw
7  a big hole in that one, but the other ones,
8  they was all -- they had to put new roofs on
9  all of the houses.  Everybody around there had
10  to put a few roof.
11    Q.   Roofs had blown off in the wind?
12    A.   Uh-huh.  All of us.
13    Q.   Did you see any homes that had trees
14  blown on top of them?
15    A.   No.
16    Q.   Did you see any homes that looked like
17  they had burned?
18    A.   No.
19    Q.   Did you ever hear about any vandalism
20  or looting in your neighborhood after the
21  storm?
22    A.   Oh, yeah.  We always had that.
23    Q.   Any of your neighbors tell you that
24  things had been taken from their homes?
25    A.   Yeah.

Page 135

1    Q.   What did you hear from your neighbors
2  about that?
3    A.   Took the TV out the house, a
4  microwave.
5    Q.   Your neighbors came home and their TV
6  and their microwave were missing?
7    A.   That's what she said.
8    Q.   What was the name of your neighbor?
9    A.   Rita.  She live across the street.
10    Q.   Her last name?
11    A.   Neison.
12    Q.   Spell it for the court reporter,
13  please.
14    A.   Rita Neison.  I don't know how to
15  spell her name.  N-E-I-S-O-N or N-E-S-O-N, I
16  don't know for sure.  They had a lot of looting
17  in the Ninth Ward, though.  A lot of people
18  lost stuff after, taking stuff.  I don't know
19  what they're going do with it.  But they had to
20  steal it.  They took my air condition out my
21  yard, the whole unit out of my yard.
22    Q.   Vandals or looters took your air
23  conditioner.
24    A.   For the copper.  And then when they
25  were working on my house they broke in my house

Page 136

1  while they were working taking the copper out
2  of all the attic.  Before I got in my house I
3  had to pay extra money to get that done.  All
4  the copper.
5      Q.   When you were repairing your house --
6      A.   Right.
7      Q.   -- you had to pay extra money --
8      A.   I sure did.
9      Q.   All right.  When you were repairing
10  your house you had to pay extra money to
11  replace the copper that looters took after the
12  storm.
13      A.   That's right.  The electric man had
14  put the copper in for me.  They took all that
15  out of my house.  It was reported to the
16  police.  The people who worked on it reported
17  it.
18      Q.   Do your claims in this case include
19  compensation for the copper that was taken by
20  looters after the storm?
21      A.   Uh-huh.  Okay.
22      Q.   That's my question to you.
23      A.   So if it claimed for that, too?
24      MR. GILBERT:
25          She just accepted your offer it

Page 137

1      sounded like.
2      A.   I know they stole mine out of my
3  house.  The man who built the house over could
4  tell you.  It's on the police report.
5      MR. GILBERT:
6          Listen to his question.
7  EXAMINATION BY MR. RAFFMAN:
8      Q.   My question is, in his lawsuit -- in
9  this lawsuit you want the defendants in this
10  lawsuit to pay you for repairs to your home,
11  right?
12      A.   Yes.
13      Q.   Do the amounts that you want the
14  defendants to pay you include compensation for
15  the lost copper that was stolen from your home?
16      A.   Please.
17      Q.   Is that a yes?
18      A.   Yes.
19          (Off the record.)
20  EXAMINATION BY MR. RAFFMAN:
21      Q.   Let me mark Exhibit 7 is form SF 95
22  that bears the date June 28th, 2006.
23  Mrs. Richardson, the writing on this document
24  will be impossibly small for you.  I have a
25  question about it, though.

Page 138

1      Ms. Richardson, do you see in the
2  lower right-hand corner there's a signature
3  block?  Do you see that?
4      (Richardson Exhibit 7 was marked for
5  identification and is attached hereto.)
6      MR. GILBERT:
7          The left.
8  EXAMINATION BY MR. RAFFMAN:
9      Q.   Your counsel is right.  It's in the
10  lower left-hand corner.  I apologize.
11          You see the signature block?  Is that
12  your signature?
13      A.   Uh-huh.  That's my signature.
14      Q.   Do you recognize this as a claim form
15  for a claim to the United States Army Corps of
16  Engineers?
17      A.   Yes, I do.
18      Q.   Did you fill out the handwritten parts
19  of this form?
20      A.   No.  My daughter filled this in for
21  me.
22      Q.   Were you present while your daughter
23  filled in this form?
24      A.   Yes, I did.
25      Q.   Was your daughter asking you for the

Page 139

1  information to put in the boxes?
2      A.   Yeah.  She did.
3      Q.   You supplied the information that's in
4  the boxes, right?
5      A.   Yeah.
6      Q.   And then you signed the form.
7      A.   I signed the form.
8      Q.   Did you read the form before signing
9  it?
10      A.   I read most of it.
11      Q.   Did a lawyer help you fill this out?
12      A.   No.
13      Q.   Do you see in the part about wrongful
14  death, the Box Number 12C in the middle of the
15  first page -- do you see that?  There's a box
16  for wrongful death that has the number five
17  million in it.  Do you see that?
18      A.   Yeah.
19      Q.   Did you tell your daughter to put in
20  the $5 million figure in that box?
21      A.   I sure did.
22      Q.   What if anything was the basis for
23  choosing that number?
24      A.   I figured he was worth that much.  He
25  could have been worth more.

Page 140

35 (Pages 137 to 140)

1    Q.   Is there anything else?
2    A.   No.
3    Q.   I'll take that one back.
4    A.   You want this one?
5    Q.   Yes, ma'am.
6    A.   Okay.
7         MR. GILBERT:
8              Counsel, I'd like to ask for the
9         record who produced these?  Because I
10        see that there's a cautionary
11        confidentiality statement referencing
12        the Master Protective Order.  I'm not
13        questioning the authenticity of them,
14        I'm just questioning the origin.
15        MR. RAFFMAN:
16             I believe it was produced by the
17        United States, but I honestly am not
18        sure.
19        MR. GILBERT:
20             Okay.
21   EXAMINATION BY MR. RAFFMAN:
22   Q.   Mrs. Richardson, do you see the
23   document that's been marked as Exhibit 8 to
24   your deposition?
25        (Richardson Exhibit 8 was marked for
                                    Page 141

1    identification and is attached hereto.)
2    A.   Exhibit 8?  Oh, yeah.
3    EXAMINATION BY MR. RAFFMAN:
4    Q.   Is this another Form SF 95 that was
5    submitted to the government on your behalf?
6    A.   Uh-huh.
7    Q.   You need to answer for the court
8    reporter.
9    A.   So what about it?
10   Q.   Is this another Form SF 95 that was
11   submitted to the government by you or on your
12   behalf?
13   A.   You have my handwriting.  So this was
14   for the Corps of Engineers, too?  No.
15   Q.   Why don't I ask another question.
16        Ms. Richardson, in the box on the
17   lower left corner of this document where it
18   says signature, is that your signature in the
19   bottom left?
20   A.   Yes, that's my signature.
21   Q.   Did you fill this form out?
22   A.   No, I didn't.  It's not my
23   handwriting.
24   Q.   Do you know who filled this out?
25   A.   Either my daughter or my
                                    Page 142

1    daughter-in-law.  It been so long I done forgot
2    half of the stuff I filled out.
3    Q.   Were you present with whoever was
4    filling this form out for you?
5    A.   Yeah.  I had to be, I spelled my name
6    out.  That's my handwriting.
7    Q.   Now on this form, under amount of
8    claim, do you see the numbers there under the
9    amount of claim?
10   A.   Yeah.
11   Q.   Now, here, under wrongful death, the
12   amount is $1 million.  You see that?
13   A.   Yeah.  Right here.  Yeah.
14   Q.   Did I read that document correctly, is
15   it $1 million there?
16   A.   I see the $1 million here.
17   Q.   Was it $1 million and zero cents?  Is
18   that what that says, Ms. Richardson?
19   A.   That's what it says.
20   Q.   Do you remember deciding one way or
21   the other how much money to seek for a wrongful
22   death claim involving your husband?
23   A.   No.
24   Q.   Do you see under property damage, the
25   far left -- there's box in 12A, it says a
                                    Page 143

1    $150,000.  Do you see that number?
2    A.   Yeah.  I see that.
3    Q.   Do you remember figuring out what the
4    amount of your property damage claim was to
5    prepare this form?
6    A.   Not really.
7    Q.   When you wrote $150,000 -- or you
8    signed the form that had $150,000 written on
9    it --
10   A.   Yeah.  I did.
11   Q.   -- did you think that was the right
12   amount for your property damage claim?
13   A.   No.  But this was for the damage for
14   the home, huh?  How I understood this was
15   supposed to be for the furniture and all,
16   replacement of everything in the home?
17   Q.   And is that why --
18   A.   That's why I think we put this down.
19   Mostly for the damage for the house, for the
20   property and all our clothes and everything
21   else in the house, the furniture.
22   Q.   As you're looking at the form now, do
23   you remember who helped you fill this out?
24   A.   One of my children.  I can't remember
25   which one did it.  But one of my kids tried to
                                    Page 144

36 (Pages 141 to 144)

**Page 157**

1  to do was replace the countertops.
2      A.  Replaced all that.  My stove --
3      Q.  Did you replace the countertops with
4  the same material that you had before the
5  storm?
6      A.  No.  This was different, from
7  different people, different companies.
8          Is that what you're talking about?
9  But it's marble, but it's a different color and
10  different place that I bought it from.  It
11  wasn't the same place we bought it from before.
12      Q.  Did you upgrade your countertops after
13  the storm?
14      A.  Yes.
15      Q.  The countertops --
16      A.  It's all upgraded.  The cabinets and
17  the countertop is all upgraded.
18      Q.  The cabinets and countertops you
19  bought after the storm are nicer than the ones
20  you had before the storm?
21      A.  Oh, yeah.  They're nicer.  Much nicer.
22  Oh, yes.
23      Q.  And in order to buy nicer cabinets and
24  countertops you had to spend a little more than
25  you would have had to spend simply to replace

**Page 158**

1  what you had before, right?
2      A.  Oh, yes, sir.
3      Q.  And your claims in this case are the
4  claims for the entire cost of putting in the
5  new countertops and cabinets, right?
6      A.  Yes, sir.  Yes, sir.
7      Q.  Did you pay an engineering company
8  named Robert B. Anderson to do a structural
9  observation of your home?
10      A.  Yes, I did.  They were saying you
11  needed all that before they start working.
12  They claimed you had to have all that.  So I
13  did pay him to come over and --
14      Q.  I've marked as Exhibit 12 a document
15  bearing Bates numbers Richardson 000070 through
16  072.  Is this the report from the consulting
17  engineers?
18          (Richardson Exhibit 12 was marked for
19  identification and is attached hereto.)
20      A.  Yes, it is.
21  EXAMINATION BY MR. RAFFMAN:
22      Q.  Did the consulting engineers tell you
23  that it might not be cost effective to repair
24  your home?
25      A.  Yes, he did tell me that.  Because I

**Page 159**

1  had wanted it torn down anyways.  But then this
2  Manson come along and he say it could be saved,
3  and if you'd tear it down it would take twice
4  as long to try and get back in.  And some of
5  the places still torn down, nothing but a lot.
6  They're not fixing them.  So I just decided to
7  go ahead on and try to fix mine all over again.
8      Q.  You went ahead and fixed yours anyway,
9  despite what the consulting engineer told you?
10      A.  I sure did.  It came out nice.  Yeah,
11  he told me that.
12      Q.  He didn't tell you it couldn't be
13  done, did he?
14      A.  No.  He didn't say it couldn't be
15  done.
16      Q.  He just told you it might not be cost
17  effective.
18      A.  Well, he said that it wouldn't make
19  sense to do it, to fix it.  But then that other
20  one came by, Mason, he say that's not true.
21      Q.  So you went ahead and used Manson to
22  repair despite --
23      A.  And he did.  He did.
24      Q.  And you went ahead and used Manson to
25  repair despite what Robert Anderson told you.

**Page 160**

1      A.  I sure did.  And that's who did all
2  the work.
3      Q.  Richardson 13 bears the Bates mark
4  Richardson 000087.  Is Exhibit 13 one of the
5  receipts that you included in the stack you
6  gave your lawyer?
7          (Richardson Exhibit 13 was marked for
8  identification and is attached hereto.)
9      A.  What about it now?
10  EXAMINATION BY MR. RAFFMAN:
11      Q.  Is this one of the receipts that was
12  in the stack you gave your lawyer?
13      A.  Yeah.  I gave you a bunch of them from
14  Wal-Marts and everywhere.  Buying this, you saw
15  that Home Depot and Lowe's and -- this is mine.
16      Q.  This is one of the receipts you gave
17  your lawyer --
18      A.  Yes, sir.
19      Q.  -- to document your damages claims in
20  this case.
21      A.  Right.
22      Q.  Do you see the receipt over on the
23  left side there from Wal-Mart?  Do you see
24  that?
25      A.  Yes.  I see that.

1         extent that she can't possibly know
2         what Rule 23 says.  But subject to the
3         objection.
4    EXAMINATION BY MR. RAFFMAN:
5       Q.  Are you supposed to do anything as a
6    class representative?
7       A.  No.  Not that I know of.
8       Q.  If the Court decides not to certify
9    this case as a class action, would you go ahead
10   with your individual claim for wrongful death
11   of your husband?
12      A.  Yes.  Yes.
13      Q.  And you would also go ahead with an
14   individual claim for property damage?
15      A.  Yes.
16      Q.  Whether or not the court certifies
17   this case as a class action, would you also
18   pursue the complaint and lawsuit you filed
19   against the Army Corps of Engineers?
20      MR. GILBERT:
21          I'm going to object to the
22       question.  She cannot possibly
23       understand the legal ramifications of
24       doing that or possibly render a
25       competent answer.  But subject to
                                    Page 177

1         that, she can answer.
2    EXAMINATION BY MR. RAFFMAN:
3       Q.  Do you intend to pursue your claim
4    against the Corps of Engineers?
5       MR. GILBERT:
6          With advice of counsel.
7       A.  Yeah.  With advice of somebody.
8    Counsel know more but them.  I'm not familiar
9    enough.
10   EXAMINATION BY MR. RAFFMAN:
11      Q.  Mr. Caluda is your lawyer in the claim
12   against the Corps, right?
13      A.  I guess he is.  I don't hear from him.
14      MR. RAFFMAN:
15          Richardson 15.
16      MR. GILBERT:
17          Just for the record, it's not a
18       lawsuit against the Corps.
19      MR. RAFFMAN:
20          All right.  I thought she
21       testified that Caluda had filed a
22       lawsuit against the Corps, but --
23      MR. GILBERT:
24          Well, she actually did.
25      MR. RAFFMAN:
                                    Page 178

1          Well, I don't know if he did or
2       not.
3    EXAMINATION BY MR. RAFFMAN:
4       Q.  Let's ask about 15, because your
5    counsel has correctly observed that the Corps
6    is not one of the defendants that's named in
7    15.  Let me ask the question first.
8          Is Richardson 15 a lawsuit that was
9    filed on your behalf by attorney Robert Caluda
10   against Boh Bros. Construction Company and some
11   other defendants?
12          (Richardson Exhibit 15 was marked for
13   identification and is attached hereto.)
14      A.  Oh.  What about it now?
15          (Whereupon the previous question was
16   read back.)
17      A.  Yeah.
18   EXAMINATION BY MR. RAFFMAN:
19      Q.  Do you intend to pursue your claims
20   against those defendants as you sit here today?
21      MR. GILBERT:
22          Asked and answered.
23      A.  Can you sue both companies?  If
24   that --
25   EXAMINATION BY MR. RAFFMAN:
                                    Page 179

1       Q.  Do you intend to pursue those claims?
2       MR. GILBERT:
3          Asked and answered.
4    EXAMINATION BY MR. RAFFMAN:
5       Q.  With advice of counsel; is that your
6    answer?
7       A.  Yeah.
8       Q.  You haven't dismissed those claims as
9    far as you know, have you?
10      A.  No, I haven't.
11      Q.  The claims in Exhibit 15 are related
12   to the death of your husband Joseph Richardson?
13      A.  Yeah.
14      Q.  In the lawsuit that you filed against
15   Boh Bros. and the other defendants, are you
16   seeking compensation for mental distress?
17      A.  Yes.
18      Q.  Are you seeking compensation for
19   property damage?
20      A.  I'm not sure.
21      Q.  And you are seeking damages for the
22   wrongful death of your husband.
23      A.  That's what I'm supposed to be.
24      Q.  Have you ever attended any of the
25   court hearings in this case?
                                    Page 180

                         45 (Pages 177 to 180)

1  A.  No, I haven't.
2  Q.  Have did you ever attend any of the
3  depositions in this case other than your own?
4  A.  No, I haven't.
5  Q.  Apart from the interrogatory answers
6  that you reviewed before signing your
7  verification, have you ever reviewed any court
8  documents in this case before they were filed?
9  A.  No.
10     (Off the record.)
11  EXAMINATION BY MR. RAFFMAN:
12  Q.  Richardson 16.  Exhibit 16 is another
13  set of interrogatory answers titled
14  Supplemental Answers to Interrogatories
15  Propounded by the Barge Entities.  I'm going to
16  ask you questions about your answer to
17  Number 26.  (Tendering.)
18     Does your answer to this interrogatory
19  set out the damages you're seeking compensation
20  for in this case?
21     (Richardson Exhibit 16 was marked for
22  identification and is attached hereto.)
23  A.  Yeah.  Yes.  Complications?
24  EXAMINATION BY MR. RAFFMAN:
25  Q.  You're seeking damages for past and

Page 181

1  future mental suffering, pain and anguish,
2  right?
3  A.  Yes.
4  Q.  That relates to the death of your
5  husband?
6  A.  Yes, it does.
7  Q.  Does it relate to anything other than
8  the -- well, it also relates to the loss of
9  property?
10  A.  Yes.
11  Q.  Apart from the loss of property and
12  the loss of your husband --
13  A.  Yes.
14  Q.  -- is there anything else, other than
15  those two causes of mental suffering, pain and
16  anguish?
17  A.  I can't think of --
18  Q.  The next item is past and future
19  mental health care expense.  Do you see that on
20  this list, Mrs. Richardson?
21  A.  Yes.
22  Q.  How much money are you seeking for
23  that element of damage?
24  A.  It's not on here.
25  Q.  Past and future mental health care

Page 182

1  expense is not on there under your name?
2  A.  Unh-unh.  I don't see it.
3  Q.  I think it is.  The second item down.
4  Do you see it?  Your lawyer will help you.
5  MR. GILBERT:
6     (Gesturing.)
7     For purposes of the question she
8     accepts that it's there.  You can ask
9     the question.
10  EXAMINATION BY MR. RAFFMAN:
11  Q.  Well, my question is, how much money
12  are you seeking for mental health care expense?
13  MR. GILBERT:
14     And I'm going to object to the
15     question because I think it requires
16     an expert opinion to answer.
17     But you can go ahead and answer
18     subject to that.  If you know the cost
19     of mental health care, you can answer
20     his question.
21  A.  No, I don't know the cost of it, no.
22  EXAMINATION BY MR. RAFFMAN:
23  Q.  Well, I don't mean to have you -- are
24  you seeking compensation for past mental health
25  care expense, Mrs. Richardson?

Page 183

1  A.  From myself or my husband.
2  Q.  For yourself.  Mental health care
3  expense for yourself that you had in the past.
4  A.  Yes.  But how much you want to know?
5  Q.  Yes.  How much?  If you know.
6  MR. GILBERT:
7     Look, I'm going object to the
8     line of questioning.  I mean, this is
9     just an effort to trap her.  She's
10     testified as to what past mental
11     health, um -- treatment she's had.
12     The bills are either available or
13     they're not available.  That's what
14     she's seeking past mental health
15     treatment expense for.
16     You know, you're going to -- she
17     doesn't understand this.
18  A.  No, I don't.
19  MR. RAFFMAN:
20     Mrs. Richardson understands more
21     than you give her credit for,
22     Mr. Gilbert, and the objections to the
23     last two questions were speaking
24     objections that were coaching the
25     witness in her answer.  I understand

Page 184

46 (Pages 181 to 184)

1      the impatience of counsel to terminate
2      the deposition, but I will ask that
3      the coaching objections stop.  If the
4      witness does not understand a
5      question --
6  EXAMINATION BY MR. RAFFMAN:
7      Q.  Mrs. Richardson, if you don't
8  understand my question, tell me you don't
9  understand my question and I'll rephrase it.
10  Do you understand that?
11     A.  Yes, I do.
12     Q.  If you don't know the answer to my
13  question, you don't need to agonize over your
14  answer, just say you don't know the answer and
15  we'll go on.  Do you understand that?
16     A.  Yes, I do.
17     Q.  The third item on your list is
18  wrongful death.  Do you see that?
19     A.  Yes, I do.
20     Q.  Well, actually, before I go back to --
21  I'm sorry.  I didn't finish my line of
22  questions on the past mental health care
23  expense.
24         In order for me to understand how much
25  you want for past mental health care expense I

Page 185

1  would have to look at the receipts of the --
2  the medical bills.  Isn't that right?
3      A.  Yes, you have to.
4      Q.  For wrongful death.  This is for the
5  wrongful death of your husband Joseph
6  Richardson, right?
7      A.  Yes, it is.
8      Q.  As we sit here today, do you have a
9  number that you associate with the damages
10  claimed for your husband Joseph Richardson 's
11  death?
12         MR. GILBERT:
13             Object.
14             You can answer.
15     A.  No.
16  EXAMINATION BY MR. RAFFMAN:
17     Q.  Mrs. Richardson, the next item on your
18  list says past and future loss of love,
19  affection, service, support, society and
20  consortium.  Do you see that?
21     A.  Yes, I do.
22     Q.  Is there anything in that item that's
23  not related to the death of your husband Joseph
24  Richardson?
25     A.  No.

Page 186

1      Q.  That item is, in fact, related to the
2  death of your husband, right?
3      A.  Yes, it is.
4      Q.  Okay.  The next item is for past and
5  future loss and destruction of and damage to
6  immovable and movable property.  Do you see
7  that?
8      A.  Yes, I do.
9      Q.  Apart from what you've testified about
10  earlier today regarding the destruction of your
11  house and the property inside your house and
12  the two vehicles --
13     A.  Okay.
14     Q.  -- is there anything else included in
15  that element of damages that you can think of,
16  that we haven't talked about yet?
17     A.  No.
18     Q.  The next item is past and future loss
19  of use of immovables and movables.  Do you see
20  that?
21     A.  Yes, I do.
22     Q.  Is there anything that you can think
23  of sitting here today involving the loss of use
24  of your property that does not relate to your
25  house or the contents of your house or the two

Page 187

1  vehicles?
2      A.  No, I can't think of anything.
3      Q.  So have we covered everything you can
4  think of in that item?
5      A.  Yes, sir.
6      Q.  The next item is past and future
7  expenses for demolition and salvage of
8  immovable and movable property.  Do you see
9  that?
10     A.  Yes, I do.
11     Q.  And have we also covered that subject
12  in this deposition today?
13     A.  Yes, we have.
14     Q.  The next item is diminution of
15  property value.  Do you see that?
16     A.  Yes, I do.
17     Q.  Does that relate to your -- the value
18  of your home at 1321 Egania Street?
19     A.  Yes, it should.  Yes.
20     Q.  Does it relate to anything other than
21  121 Egania Street?
22     A.  No.
23     Q.  The next item is past and future loss
24  and destruction of businesses and business
25  assets.  Do you see that?

Page 188

47 (Pages 185 to 188)