# EXHIBIT 20

```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA

IN RE: KATRINA CANAL BREACHES   * CIVIL ACTION
                                * NO. 05-4182
PERTAINS TO: BARGES             * Consolidated
                                * SECTION "K(2)"
Boutte v. Lafarge       05-5531 *
Mumford v. Ingram       05-5724 * JUDGE DUVAL
Lagarde v. Lafarge      06-5342 *
Perry v. Ingram         06-6299 * MAG. WILKINSON
Benoit v. Lafarge       06-7516 *
Parfait Family v. USA   07-3500 *
Lafarge v. USA          07-5178 *
    *  *  *  *  *  *  *  *  *

         Deposition of WADE R. RAGAS, PH.D.,
    MAI, given at Chaffe McCall, L.L.P., 2300
    Energy Centre, 1100 Poydras Street, New
    Orleans, Louisiana 70163-2300, on September
    16th, 2008.

    REPORTER BY:
         JOSEPH A. FAIRBANKS, JR., CCR, RPR
         CERTIFIED COURT REPORTER #75005
```

Page 1

1  APPEARANCES:
2  REPRESENTING THE BARGE PSLC:
3       KHORRAMI, POLLARD & ABIR, L.L.P.
4       (BY: H. SCOTT LEVIANT, ESQUIRE)
5       444 South Flower Street, 33rd Floor
6       Los Angeles, California 90071
7       213-596-6000
8  - and -
9       LAW OFFICE OF RICHARD T. SEYMOUR,
10      P.L.L.C.
11      (BY: RICHARD T. SEYMOUR, ESQUIRE)
12      1150 Connecticut Avenue N.W., Suite
13      900
14      Washington, D.C. 20036-4129
15      202-862-4320
16
17 REPRESENTING LAFARGE NORTH AMERICA:
18      GOODWIN PROCTOR, L.L.P.
19      (BY: MARK S. RAFFMAN, ESQUIRE)
20      901 New York Avenue, NW
21      Washington, D.C. 20001
22      202-346-4000
23 - and -
24
25

Page 2

1       CHAFFE MCCALL, L.L.P.
2       (BY: CHARLES BLANCHARD, ESQUIRE)
3       2300 Energy Centre
4       1100 Poydras Street
5       New Orleans, Louisiana 70163-2300
6       504-585-7000
7
8  REPRESENTING NEW YORK MARINE & GENERAL
9  INSURANCE COMPANY:
10      SUTTERFIELD & WEBB, LLC
11      (BY: DANIEL A. WEBB, ESQUIRE)
12      650 Poydras Street, Suite 2715
13      New Orleans, Louisiana 70130
14      504-598-2715
15
16 ALSO PRESENT:
17      BEN RODGERS, ESQ.
18      NICOLE BOYER, ESQ.
19      JOHN EMMETT, ESQ.
20      NICK DIETZEN, ESQ.
21      EUGENE T. RHEE, ESQ.
22
23 VIDEOGRAPHER:
24      GILLEY DELORIMIER (DEPO-VUE)
25

Page 3

1              E X A M I N A T I O N   I N D E X
2
3  EXAMINATION BY:                              PAGE
4
5  MR. LEVIANT ...............................6
6              E X H I B I T   I N D E X
7
8  EXHIBIT NO.                                  PAGE
9  Exhibit Ragas 1 ...........................37
10 Exhibit Ragas 2 ...........................49

Page 4

1 (Pages 1 to 4)

```
 1     A.  To the extent that they mean that they
 2  all have to be measured from the same data set
 3  over the same time period, yes.  And the
 4  thirteen elements of damage that I've raised
 5  all -- that I've identified for you today all
 6  arise more or less at the same time, so they're
 7  all going to be affecting the post-Katrina
 8  sales prices, they're all going to be affecting
 9  the availability of data, they're all going to
10  be affecting interrelationships with one
11  another in measuring the damages.
12     Q.  In Paragraph 25 of your report you
13  mention that the class area is a complex,
14  geographically diverse mixture of properties.
15     A.  Yes.
16     Q.  You'd agree with me that a hedonic
17  mass valuation model is capable of valuing
18  diverse properties; right?
19     A.  A single model, to attempt to
20  simultaneously measure areas with high levels
21  of abandonment and vacancy versus historic
22  districts with low levels of abandonment and
23  vacancy, and very different house prices, and
24  suburban data, over two separate counties,
25  which also must include property abandoned and
                                        Page 69
```

```
 1  poorly maintained before the storm, is fairly
 2  extraordinary.  And actually, when you look in
 3  the literature usually one goes to great
 4  efforts to not try to allege that one model can
 5  do all of that simultaneously.  You would
 6  ordinarily see them attempt to parse that
 7  geography so that it could be dealt with with
 8  several models because there's such
 9  heterogeneity and high variance in the data
10  set.
11     Q.  Do you believe then that a better
12  outcome could result if several different
13  models were specified capturing different
14  geographic regions in this case?
15     A.  I think that that will probably turn
16  out to be necessary if one was going to attempt
17  this in reality.  I don't know whether that
18  will solve the problems.  It magnifies the data
19  requirements.  Each model has to have adequate
20  data.  So when you move from one model to three
21  or four you've increased the magnitude of the
22  data requirements three or four fold.
23         (Lunch break.)
24  EXAMINATION BY MR. LEVIANT:
25     Q.  Were you involved in any way in the
                                        Page 70
```

```
 1  tax assessment process prior to 2004 in the New
 2  Orleans area?
 3     A.  Yes.
 4     Q.  What was your involvement?
 5     A.  I was approached by the director of
 6  the Louisiana Tax Commission and the members of
 7  the commission to suggest a sample methodology
 8  using individual appraisers to review the
 9  reasonableness of the work done by the
10  assessors in Orleans Parish.  I designed for
11  them a sample methodology and suggested the
12  level and standards for the appraisal review
13  and assisted in recruiting for them an initial
14  group of appraisers to be considered along with
15  others some criteria so that they could
16  consider others in an open search for
17  appraisers with state certification.  And then
18  they -- using the methodology I had suggested
19  and the sample I had suggested, I did a brief
20  training program on their behalf for the
21  appraisers they selected and their staff.  And
22  then they administered that program, without my
23  involvement, and that resulted in a finding
24  that the assessors were not in compliance with
25  state law and that all seven had breached their
                                        Page 71
```

```
 1  responsibilities for uniformity and that there
 2  were in fact significant problems in the
 3  consistency of their appraisal assessments.
 4  That finding was then heard.  I was not a
 5  participant in testifying on that matter
 6  because others had done the work, and the
 7  assessors chose to not contest the finding in
 8  court and agreed to a mandatory reassessment of
 9  all of their assets based upon -- all of the
10  residential assets based upon the tax
11  commission 's findings.
12     Q.  When were you first approached by the
13  director of the Louisiana Tax Commission to
14  begin that process?
15     A.  Sometime in late 2002 or early 2003.
16  I was employed at a state agency running a real
17  estate research center, and this was a request
18  from another state agency for assistance.
19     Q.  As best you recall, when did the
20  finding issue that the assessors had not
21  correctly performed their duties?
22     A.  Sometime in 2004, with a requirement
23  for them to update their records in 2005 which
24  was disrupted by Katrina.
25     Q.  Had the process of reappraisal started
                                        Page 72
```

18 (Pages 69 to 72)

```
 1  not available to them just from looking at the
 2  MLS records.  They would have already done
 3  interior inspections on a lot of property in
 4  the geography and know about it from doing past
 5  appraisals.
 6      Q.  So this individual appraisal then is
 7  dependent upon the quality of past appraisal
 8  data.
 9      A.  I think any appraiser is constrained
10  by the cumulative files they have available for
11  a geography in which they're asked to do the
12  work.  And the more they have done work, the
13  more they've accumulated files that are not in
14  the public domain and which represent primary
15  knowledge on their part of properties that
16  otherwise one would know very little about.
17      Q.  Are you referring specifically to
18  information gleaned from the appraiser 's
19  experience appraising other property in the
20  area?
21      A.  I am.  The appraiser, in -- a third or
22  more of the property in most neighborhoods is
23  sold for sale by owner.  Those do not appear in
24  the MLS, and in Deedfax all you see is the
25  price, not the interior description.  But if
                                            Page 89
```

```
 1  I'm doing work in a geography, I know those
 2  interior descriptions because I've been in a
 3  lot of those houses.  And that would also
 4  include houses which wouldn't ordinarily ever
 5  go through the realtors, estate settlements,
 6  dispositions by financial institutions -- so
 7  the appraiser, through their experience, has
 8  gathered enormously wider range of knowledge of
 9  houses that sold and what their conditions were
10  and their descriptive items than could possibly
11  be collected off of just the MLS, which is only
12  the realtor-assisted sales that happened to
13  occur in the recent time period.
14      Q.  Let's assume hypothetically that in
15  our single property appraisal the appraiser
16  concludes there's a pre-Katrina value of the
17  property of a hundred thousand dollars, that he
18  has no information from anybody about damage
19  estimates to the property but based on his
20  experience in the market he concludes that a
21  reasonable sale price of the property is fifty
22  thousand dollars.  How would that appraiser
23  apportion that fifty thousand diminution in
24  value to different causes?
25      A.  Procedurally, you'd first begin by
                                            Page 90
```

```
 1  trying to identify the extent to which the
 2  property flooded, and you would look at,
 3  physically, where water marks appeared in the
 4  property.  And if it's an unrenovated property
 5  and if there's no information, then there is an
 6  excellent chance this is an unrenovated
 7  property.  And even if it has had some
 8  renovation, you can usually ascertain the
 9  actual depth of the water in the property.
10  There's usually remnants that will let you do
11  that.
12          You will then, based upon the extent
13  to which the interior was damaged by water,
14  make a cost analysis of the cost of repair for
15  the portion of the property subject to water
16  damage.  If the property has not yet been
17  repaired, as I think is the basis of your
18  assumption here, you'd look next at roof and
19  ascertain if there seems to be roof damage.
20  Most prudent owners would have secured a blue
21  roof to protect the property from further
22  damage.  So if the property has not been
23  renovated, you would still ordinarily see some
24  effort made to prevent further water damage,
25  particularly at this date three years after the
                                            Page 91
```

```
 1  event.  If there was roof damage, and that's
 2  usually visible to the eye, either from ceiling
 3  falling in, in some locations, or a loss of
 4  part of the roof, the appraiser could then
 5  estimate what he thinks is a likely replacement
 6  number for the roof and for those items of
 7  damage involving the ceiling that are not part
 8  of water damage.
 9          The appraiser could see whether or not
10  there's termite damage to the property.  They
11  could see whether there had been vandalism
12  damage, and those items they have to deal with
13  as part of their normal life anyway.  So they
14  would make estimates of the copper pipe's been
15  ripped out, what will it cost the re plumb part
16  of the property.
17          Or there's extensive termite damage.
18  If the termite damage is very pervasive, they
19  may insist that before they can issue an
20  opinion they'll have to get out someone who can
21  ascertain the extent of the termite damage.
22  Because it may not be visually evident to the
23  eye and it can substantially affect the pre and
24  post value.  Your assumption of a hundred
25  thousand being a given is assuming that they
                                            Page 92
```

23 (Pages 89 to 92)

Page 93

1  have a way to ascertain this termite damage or
2  other damage that would predate the storm.
3       Um -- other items that they might
4  consider, obviously if the house has had roof
5  damage from a tree falling or some item of that
6  kind, that's visually evident, again, and it's
7  a component that can be looked at. And we have
8  the cost to hull away a tree or cut it up, and
9  then the cost of the roof repair. Appraisers
10 have to deal with roof issues. That's just
11 part of life. They've got to be able to do
12 this or they can't stay in the business.
13      So the bulk of the work that they
14 would have to do is all visually evident in an
15 inspection. You need a person who is used to
16 dealing with older properties, conceivably,
17 because many of the properties here are older,
18 but there's a large number of appraisers in New
19 Orleans who have to deal with older properties
20 because that's the bulk of the stock. And it
21 isn't like this is the first time there's been
22 wind or water damage for them to deal with
23 either. That issue, over a twenty-year career,
24 they've confronted it before. It's not brand
25 new item. It's just the quantity of it that's

Page 94

1  different.
2       So those are I think the basic
3  answers. We would be looking for sales
4  comparables, then, which are in distress in
5  terms of the amount of damage where the damage
6  is similar to the subject property. And they
7  may be in the same neighborhood or one the
8  appraiser realizes is equivalent in this case.
9       They will probably need to use some
10 for sale by owner transactional information
11 which they would have access to because they
12 have appraised lots of properties in that area.
13 They could observe the price in the Clerk of
14 Court's record but they would have internal
15 files on those properties because most of those
16 properties to sell had to have an appraisal
17 done.
18      Um -- and appraisers are pretty good
19 at sharing information with one another. So
20 the likelihood is they could secure internal
21 descriptive information on the for sale by
22 owner properties either from their own files or
23 from the files of others, if that was a
24 problem.
25      That I think is a basic answer to your

Page 95

1  question.
2    Q.  I know this is going to be a little
3  bit of a nebulous question. And it's not a
4  knock on the appraisal profession, but in
5  describing this process it sounds to me like
6  appraisal is what I would call a mix of art and
7  science.
8       Is that something that sounds like an
9  accurate description of what appraisers are
10 doing, to you?
11   A.  I think most things in the business
12 world turn out to have a mix of art and
13 science, that I've dealt with. Very little of
14 what I deal with in the business world is done
15 in a mechanistic way where there's one and only
16 way of do it and you plug in a set of things
17 and you get a result. So the appraiser has
18 been trained -- by requirement to be certified
19 they have been trained to deal with physical
20 attribute issues. It's not like that's an
21 alien item or something they weren't supposed
22 to know. They've been required to be trained.
23 And if they've been in the field very long and
24 they represent financial institutions, they're
25 having to deal with cost approach and cost of

Page 96

1  repair items all the time or they can't keep
2  the clients. And they've had those judgments
3  vetted because if they turn out to be routinely
4  wrong and a lender concluded that their numbers
5  are inaccurate, they quit hiring them.
6       And so -- and many appraisers also
7  have sought work as being construction
8  inspectors. Lots of them, you'll discover one
9  of the things they do with financial
10 institutions is inspect draw inspects on
11 construction, which gives them more
12 familiarity. They almost all have to do plans
13 and specs appraisals, meaning all I've got is
14 the drawings and where the land is, and they
15 want to know what it's going to be worth.
16 Again, you can't keep lender clients if you
17 can't did that work.
18      So art and science? It's knowledge,
19 it's experience, it's knowing methodologies to
20 apply, it's having data sources available, but
21 it's judgmental as is an enormous amount of
22 what we call the social sciences and business.
23 There's almost always a judgment component. In
24 this case, they get their judgments checked out
25 with some frequency, and if they aren't very

```
 1   good they're going to lose the clients.  So
 2   that's why you look for appraisers with a lot
 3   of experience, because we've had a lot of
 4   vetting now of what they can and can't do.
 5        Q.  So how in this somewhat unusual
 6   circumstance that we're facing post-Katrina, in
 7   a situation where you contend that there is an
 8   absence of good data, can you have any degree
 9   of assurance that individual appraisers aren't
10   going to inject variation in the apportionment
11   and outcomes of their appraisals?  If you're
12   doing every appraisal as an individual
13   appraisal, how do you deal with those problems
14   that you've identified in your report?
15           MR. RAFFMAN:
16              Objection.
17              You can answer.
18        A.  Well, first, the only experience that
19   the hedonic model will have, it's total
20   experience, will be the small group of data
21   we're able to collect at this moment in time.
22   That is the sum total of the knowledge that's
23   in the hedonic model.  The appraiser will come
24   to the party with all the data that was
25   available in the hedonic model, plus the data
                                            Page 97
```

```
 1   they have for inspections they have done that
 2   are not in the public domain in terms of
 3   property characteristics, and the appraiser
 4   will come to the party with the ability to see
 5   and to make judgments about what is or is not
 6   in the interior of the property that wouldn't
 7   be visible just from an exterior sort of
 8   cursory look that might be there if you're just
 9   using published data, because they've been
10   working the geography and they've actually been
11   in the properties.
12           The vast bulk of what we do day to day
13   successfully as a society depends upon human
14   judgment and upon the ability of those
15   judgments to be reasonably done by
16   professionals.  When you actually look at the
17   standards and requirements, and I've cited
18   those -- Fannie Mae has been quite clear in its
19   desire for first mortgage valuation work to be
20   done by individual appraisers.  When Road Home
21   tried to do AVM models here, they failed
22   horribly and through huge public outcry were
23   discontinued, and instead some hundred thousand
24   properties now have been dealt with by
25   individual appraisals in a satisfactory manner,
                                            Page 98
```

```
 1   and the process has moved forward rather than
 2   not progressing as it was in the first five or
 3   six months of the Road Home process here.
 4           And that was the source of enormous
 5   public discussion, about the inaccuracy of what
 6   they were getting from the AVM models and the
 7   incorrectness of it and the insistence that it
 8   be replaced with individual inspection.  That's
 9   not a conjecture on my part, those are facts on
10   the ground.  That's what happened.
11           So we've had the test of AVM here
12   versus individual appraiser, and it's worked
13   out pretty clearly.  With a budget that was
14   more than adequate to support the AVM work, it
15   was withdrawn and not used, and individual
16   appraisers were recruited instead to be done on
17   a project involving over a hundred thousand
18   properties, and it's working.  So to me that's
19   fairly strong corroboration of my understanding
20   of the general level of professionalism from
21   the appraisal community is reasonably accurate.
22           There are numerous articles that have
23   been done over the years about appraisers and
24   performance.  And in any business there will be
25   some who don't do well.  That will certainly be
                                            Page 99
```

```
 1   true.  But the outcomes have been that Fannie
 2   Mae and Freddie Mac have reverted to requiring
 3   on-the-ground appraisals for any first mortgage
 4   work where the accuracy of the valuation is
 5   important.  Road Home has moved to only
 6   appraisals on all of their work with the
 7   approval of HUD and FEMA.  Property insurance
 8   firms are not doing AVMs to measure the damages
 9   on individual property, they're requiring
10   inspections of the properties one at a time.
11        Q.  You said that there was satisfaction
12   with the individual appraisals done in
13   conjunction with the Road Home project.
14        A.  Yes.
15        Q.  Whose satisfaction were you referring
16   to?
17        A.  Well, first the public became
18   dissatisfied because it was clear the answers
19   were incorrect.
20        Q.  Which answers are incorrect?
21        A.  The valuations that were being placed
22   on the properties pre-storm, which was the
23   simple valuation to do.  The pre-storm value
24   estimate is what Road Home needed.  It met with
25   such public outcry of their inaccuracy that
                                            Page 100
```

```
 1  appraisers individually were recruited and
 2  tried, and then eventually, after a couple of
 3  months of that, the AVM process was simply
 4  discontinued and all work was done then by
 5  individual appraisers.
 6       That transition starts in the latter
 7  part of 2006.  The whole Road Home process
 8  doesn't begin until August 2006.  By November,
 9  December, there is substantial public outcries
10  regarding the process and its inaccuracy.  By
11  January of '07 they're seeking alternatives to
12  how to do this, and by May of '07 they're
13  moving almost exclusively to individual
14  appraisers to do the work rather than the AVM
15  models.  That's my recollection of the time
16  line.
17   Q.  Is it fair to say that the data
18  available as we sit here today is better than
19  it was in 2006 for the New Orleans area?
20   A.  No.  Not at all.  The time period we
21  have to use is the data that was available in
22  the latter part of '05 and '06 to meet a
23  requirement to be looking at values after the
24  storm.  Now, it is true accessing the data is a
25  little easier now, although the MLS files were
                                        Page 101
```

```
 1  fully functional here for October of '05.
 2  Because I dealt with them extensively.
 3       And I do an analysis on the behalf of
 4  the MLS every six months in this market.  By
 5  October, '05, they're back up and working here.
 6  And the Deedfax Online files were back up and
 7  working by November of '05.  So the databases
 8  are there.
 9       That's not the reason this failed.  It
10  fails because the AVMs just turn out to be an
11  inaccurate methodology for dealing with the
12  complexity of these housing markets where we
13  have so many older homes mixed with newer
14  homes, and abandoned next to homes that are
15  being maintained, and areas that, um -- that
16  had long-term termite problems, or diminishment
17  in value from other sources, from failure to
18  maintain.  It's a very complicated housing
19  stock here.  That means the longer you've dealt
20  with it on the ground and the more experience
21  you have, the more likely you are to understand
22  and get it right.  It's much harder to build a
23  statistical model in a complex environment like
24  that.
25       But the model was failing not just in
                                        Page 102
```

```
 1  Orleans, the model was failing in the suburbs,
 2  in Jefferson and in St. Tammany.  Complaints
 3  were emanating from all of those markets, not
 4  just from Orleans Parish.
 5   Q.  How long did they spend working on
 6  that AVM model?
 7   A.  They were hired to begin work on the
 8  model in January, if I recall correctly, of
 9  '06, under a no bid contract with ICF.  ICF
10  went out and hired the most competent personnel
11  they could find, because they had a large
12  budget.  They hired First American Title.
13  First American had been operating AVM models
14  nationwide through their eAPPRAISEIT
15  operations.  They are not a firm that is not
16  we'll regarded, they are well regarded.  They
17  began this effort in early '06.  They were
18  willing to test market it in around July,
19  August '06.  And by January of '07 there's a
20  fire storm of complaint and a transition to a
21  different methodology.  So it wasn't an
22  incompetent group.  It wasn't a group that
23  didn't have data available, it wasn't a group
24  that was underfunded, and it wasn't a complaint
25  that was restricted to some small part of
                                        Page 103
```

```
 1  Orleans Parish.
 2   Q.  And who kept track of the complaints
 3  about individual appraisals?
 4   A.  Road Home.  The Road Home, which was
 5  administered by the Governor 's Office of
 6  Community Development was responsible for
 7  evaluating the contractor and their
 8  performance.  And that became the subject of a
 9  whole series of outside reviews of the Road
10  Home operations, for the ICF, and I have
11  provided those outside reviews to you and they
12  uniformly find severe problems with the AVM
13  methodology.  The result.  I said methodology.
14  The result; that it wasn't an accurate result.
15   Q.  Okay.
16   A.  They're not criticizing the attempt to
17  do an AVM, they're criticizing the result.
18   Q.  Have you examined studies of the
19  results of that model?
20   A.  I have read work done by Brookings,
21  work done by KPMG, work done by -- there is one
22  more major national vendor who's done work.  I
23  read all of their works, I have looked at their
24  critiques, and it is not a criticism that AVMs
25  can't be used anywhere, it's that in this
                                        Page 104
```

```
 1  high vacancy rates, and historic districts with
 2  premiums for locations and high quality
 3  renovations, I have property that sells for
 4  high prices per foot and prices that sell for
 5  terrible low prices per foot, and I have all of
 6  that operating at the same time before the
 7  storm in the class area, and you're claiming
 8  under Dr. Kilpatrick's approach that he can
 9  build a model of 95 percent accuracy is what he
10  said in here, that he could do that, a model
11  that's 95 percent accurate and a model that
12  would have a high R-squared, he used an example
13  in here, well maybe 93 percent -- that's a good
14  strong R-squared -- that he could do that with
15  this highly heterogeneous data set. And in my
16  humble opinion as a person who's worked on
17  this, that's an amazing assertion.
18      Q.  Have you tried to do that yourself?
19      A.  I have worked with many regressions
20  over the years, but I would never think that I
21  could achieve a highly accurate result with
22  that heterogeneous data set. I would think I
23  would have to break that into numerous pieces
24  to begin to get to something useful, let alone
25  something sufficiently accurate that would be
                                         Page 113

 1  an appropriate measure of gross damage, let
 2  alone being able to parse the damage the
 3  individual components. I, have had no success
 4  in a result of the kind he's describing, in my
 5  career at least.
 6      Q.  Have you tried to define a hedonic
 7  model of comparable data set size?
 8      A.  I don't understand what you mean.
 9      Q.  Have you tried making a model for a
10  comparable number of properties?
11      A.  A model for a comparable number of
12  properties. You mean have I tried to model
13  somewhere fifteen thousand properties with one
14  model?
15      Q.  Yes.
16      A.  No. Not in the diversity of what's
17  being proposed here, no.
18      Q.  Have you tried it in any context?
19      A.  Not for a group that size. But the
20  real issue is not the number of houses, the
21  real issue is the diversity of the data set. I
22  have given some thought to what would be the
23  minimum group of variables you'd need to
24  capture. They're quite substantial. So this
25  is a model with a lot of variables in it, I
                                         Page 114

 1  suspect.
 2      Q.  In Paragraph 35 you discuss public
 3  sales records in the New Orleans real estate
 4  transfers.
 5      A.  Yes.
 6      Q.  And the final sentence, um -- he
 7  indicates that the records are available at a
 8  street address level and by subdivision and
 9  must be hand downloaded by individual searches.
10      A.  Yes.
11      Q.  Are you saying that the only source
12  for that real estate transfer data is property
13  by property, individual downloads?
14      A.  There are ways to manipulate the
15  database to bring in all the records on an
16  individual street, and to bound the search by a
17  time period so that you could identify all the
18  sales on a street within an address range even.
19  That may be possible, but the software doesn't
20  lend itself to address range searches. So
21  generally, when I use this database the best I
22  can hope for is a download one street at a time
23  within a given time period. That's not a
24  horrible requirement, it's just fairly labor
25  intensive. It's not a dreadful problem.
                                         Page 115

 1      Q.  Are there any private vendors that
 2  have already pulled all of this data in a way
 3  that can deliver it in different formats from
 4  what's available directly through these
 5  individual searches?
 6      A.  New Orleans Real Estate Transfers is a
 7  monopoly supplier. They're the one and only to
 8  this entire geography, and the assessors do not
 9  have any online access that will let me bring
10  down large amounts of data, if they had it.
11  The assessors don't have it.
12          The clerk of court has the sales
13  records, and the clerk of courts here, and
14  particularly Orleans and in St. Bernard, are
15  not exactly helpful in terms of downloads of
16  their data. As Dr. Kilpatrick testified, he
17  tried repeatedly to get the data on St. Bernard
18  Parish from the assessor even, let alone from
19  the clerk of court, and was unsuccessful in
20  that. So this was a monopoly vendor, they are
21  available, they can be purchased on a
22  subscription basis, one just has to invest the
23  time and effort to build the appropriate data
24  files and then to clean those files into
25  something usable.
                                         Page 116
```

29 (Pages 113 to 116)

```
 1    A.  I think it's important --
 2        MR. RAFFMAN:
 3             Objection.
 4             You can answer.
 5    A.  I think it is important they be
 6  typical and that they be indicative of the
 7  items in question here.  And whenever instead
 8  they are simply a far edge of the stock,
 9  they're not similar locationally, they're not
10  similar by physical design, they're not similar
11  by ownership form, and the owners have
12  different motives than an owner/occupant does,
13  that enormously complicates making statements
14  from these twelve about the class as a whole.
15  EXAMINATION BY MR. LEVIANT:
16    Q.  Are you aware of any statements from
17  any of the class representatives that you can
18  identify as inconsistent with the goals of the
19  class as a whole?
20    A.  I'm not sure what you mean by goals of
21  the class as a whole.
22    Q.  Well, do you understand the class
23  representatives to want something different
24  than the population as a whole in this area?
25    A.  I don't know.
                                        Page 137
```

```
 1        MR. RAFFMAN:
 2             Objection.
 3             You can answer.
 4    A.  I did not question the motives, views,
 5  opinions of the class representatives.  I am
 6  looking at the assets at hand.  And I assume
 7  everyone who's a class representative would
 8  like to get paid something for their damages.
 9  But as far as knowing whether they're similar
10  or dissimilar, I haven't interviewed members of
11  the class as a whole, and I have not
12  interviewed, on these issues, the -- your class
13  representatives.
14  EXAMINATION BY MR. LEVIANT:
15    Q.  When you say that the current
16  collection of proposed class representatives
17  enormously complicate making statements about
18  the class as a whole, is that based upon some
19  principle of property appraisal or your
20  understanding of the law of class actions?
21    A.  It is a real estate commentary that
22  the properties, if they're to be used in any
23  way to be a measure of damages, that they'll be
24  far more difficult to use and to interpret in
25  terms of class damages than others that would
                                        Page 138
```

```
 1  be more typical of the properties at hand.
 2    Q.  Have you seen anything to suggest that
 3  the twelve class representatives will be the
 4  source of data for the preparation of a hedonic
 5  property mass valuation model?
 6    A.  I do not know how that will be pursued
 7  by plaintiffs in this matter.
 8    Q.  So your answer is no, you haven't seen
 9  anything to suggest that.
10    A.  I haven't seen anything in either
11  direction from plaintiffs in this matter about
12  what their plans are, so I don't know.
13    Q.  What makes you believe that these
14  twelve representatives are going to be the
15  benchmark measure for damages for the class?
16        MR. RAFFMAN:
17             Objection.
18    A.  I've answered.  I don't know whether
19  they will or they won't be.  I am telling you
20  if they are, they are not typical, not
21  appropriate.
22  EXAMINATION BY MR. LEVIANT:
23    Q.  And that's the basis of your opinion
24  about their lack of typicality.
25    A.  Yes.  I am commenting on these twelve
                                        Page 139
```

```
 1  specifically, if they are to be viewed as
 2  representative of the class in some ways
 3  involving damages issues, if that's why they're
 4  being brought forth.
 5    Q.  And you've already acknowledged that
 6  they have all suffered damage from flooding,
 7  correct?
 8    A.  Yes.
 9        (Brief recess.)
10  EXAMINATION BY MR. LEVIANT:
11    Q.  Addendum A to your report is the
12  summary of credentials.
13    A.  Yes, sir.
14    Q.  Is the summary of your credentials
15  attached as Addendum A a fairly current version
16  as of the date of this report?
17    A.  Yes.
18    Q.  If I could turn your attention to
19  Page 51, which is the list -- beginning of the
20  list of court testimony --
21    A.  Yes, sir.
22    Q.  -- did the -- could you tell me by
23  item number in this list which of those items
24  involved opining in any way about mass
25  appraisal models?
                                        Page 140
```