# EXHIBIT 24
# Part 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: KATRINA CANAL BREACHES * CIVIL ACTION
* NO. 05-4182
PERTAINS TO: BARGES * Consolidated
* SECTION "K(2)"

Boutte v. Lafarge 05-5531 *
Mumford v. Ingram 05-5724 * JUDGE DUVAL
Lagarde v. Lafarge 06-5342 *
Perry v. Ingram 06-6299 * MAG. WILKINSON
Benoit v. Lafarge 06-7516 *
Parfait Family v. USA 07-3500 *
Lafarge v. USA 07-5178 *
* * * * * * * * * * *

Deposition of JOHN A. KILPATRICK, PH.D., MRICS, given at Chaffe McCall, L.L.P., 2300 Energy Centre, 1100 Poydras Street, New Orleans, Louisiana 70163-2300, on September 11th, 2008.

REPORTER BY:
JOSEPH A. FAIRBANKS, JR., CCR, RPR
CERTIFIED COURT REPORTER #75005



APPEARANCES:
REPRESENTING THE BARGE PSLC:
KHORRAMI, POLLARD & ABIR, L.L.P.
(BY: H. SCOTT LEVIANT, ESQUIRE)
444 South Flower Street, 33rd Floor
Los Angeles, California 90071
213-596-6000
- and -
BRIAN A. GILBERT, P.L.C.
(BY: BRIAN A. GILBERT, ESQUIRE)
821 Baronne Street
New Orleans, Louisiana 70113
504-885-7700

REPRESENTING LAFARGE NORTH AMERICA:
GOODWIN PROCTOR, L.L.P.
(BY: DONALD J. MUNRO, ESQUIRE)
(BY: MARK S. RAFFMAN, ESQUIRE)
901 New York Avenue, NW
Washington, D.C. 20001
202-346-4000
- and -



LAFARGE NORTH AMERICA, INC. LEGAL DEPARTMENT
(BY: PETER L. KEELEY, ESQUIRE)
12950 Worldgate Drive, Suite 500
Herndon, Virginia 20170
703-956-3437
- and -
CHAFFE, MCCALL, L.L.P.
(BY: CHARLES BLANCHARD, ESQUIRE)
2300 Energy Centre
1100 Poydras Street
New Orleans, Louisiana 70163-2300
504-585-7000

ALSO PRESENT:
CHRIS ALFIERI, ESQ.
CRAIG CANIZARO, ESQ.
GREGORY A. KOURY, ESQ.
CARMELITE BERTAUT, ESQ.
RICHARD PAVLICK, ESQ.
GARY ZWAIN, ESQ.

VIDEOGRAPHER:
GILLEY DELORIMIER (DEPO-VUE)



EXAMINATION INDEX

EXAMINATION BY: PAGE

MR. MUNRO ................................6

EXHIBIT INDEX

EXHIBIT NO. PAGE
Kilpatrick Exhibit 1 ........................9
Kilpatrick Exhibit 2 .......................58

Q. But you haven't generated one for this case as of yet.

A. Um -- oh, no. No. We haven't gotten to the point where we've done one yet.

Q. Have you generated the written report called for by Standards Rule 6.8 for any of the other levee cases in which you're involved?

A. No, and by the way, the interpretation of Standards Rule 6-8 is not that it requires a written report but simply that when a written report is done it has to include these things. So one can communicate the findings of a mass appraisal in an oral fashion in identically the same way one could do in an individual appraisal as provided for in Standards Rule 2-4.

Q. If you would follow me over to Page 52, and take a look at Standards Rule 6.9, and among other things this standard provides that an engagement to perform an appraisal cannot be contingent upon be developing a report and predetermined results. Is that correct?

A. Correct.

Q. In this case, however, you've been



specifically asked to support class certification, isn't that right?

A. Well, I don't know that that's the phrasing in our engagement. It's certainly not my interpretation of the phrasing in the engagement. Now, that having been said, of course I have written on the efficacy and efficiency and, frankly, desirability of using mass appraisal in a, um -- in a case such as this one. But my own interpretation of our engagement was that we were to analyze the facts of this case and make a determination if in fact in this case, as with so many other cases, mass appraisal would be efficient, effective and applicable, and that of course is what we've done.

Q. If you have to go forward and do the actual construction of the model, how much is that going to cost?

A. A lot. It's going to be a lot cheaper than doing, um -- individual appraisals. Indeed I would say that my bill will probably be less than the paper would cost in the individual appraisals. But we're talking about fifteen thousand properties here. Now, if you



wanted to do individual appraisals before and after, before the barge and after the barge, let's assume for the moment that you do each one of these properties for a thousand dollars apiece, that means that if you wanted to do individual appraisals this would cost fifteen million dollars. Let's assume each one of those reports generated fifteen pages of documentation. That's thirty pages per property times fifteen thousand properties, we're talk about four hundred and fifty thousand pages of documentation for individual appraisals. So I don't know how much exactly it's going to cost to get to a report for the mass appraisal, but I believe it will be slightly less than fifteen million dollars and I'm pretty sure my report will be slightly shorter than four hundred and fifty thousand pages.

Q. If you concluded that mass appraisal was not appropriate in this case, then you wouldn't be going ahead to do that; correct?

A. That's correct.

Q. So don't you have an incentive to find that mass appraisal is appropriate in this



case?

A. Conversely, I have an incentive to, um -- find the opposite. You know what I could do with fifteen million dollars? I could pay off my wife 's Visa bill, among other things. Well, no, probably. But the point of it is, the fees from an appraisal perspective are enormous if we go with individual appraisals. So as an appraiser, I would have an enormous economic incentive to say, no, let's do fifteen thousand individual appraisals here.

Q. Do you anticipate that if the court were to reject mass appraisal in this case that you would be retained to do individual appraisers of all fifteen thousand properties?

A. I have no anticipation one way or the other.

Q. Is there any reference in USPAP to mass appraisal of business losses?

A. Yes.

Q. Where is it?

A. Um -- Standards Rules 9 and 10, I think. Let me take a look. I hate to take a guess at that. 9 and 10.

Q. Well, as I read those standards that

you just identified, 9 and 10, they pertain to appraisal of businesses. My question was, is there anything in USPAP that relates to mass appraisal of businesses?

A. Intriguing because we know no mass appraisal of business are done. We know that every tax assessor in America does mass appraisal of businesses and uses Standards Rule 6 as the governing standard for that. So I would return us to Standard Rule 6 and say that clearly in all of the jurisdictions in America where business interests are subject to ad valorem taxation, which is probably most of them, then Standards Rule 6 continues to apply.

Q. What about a reference in USPAP to mass appraisal of business losses?

A. Well, I'm not sure that that precise phrasing is contained -- in other words, USPAP doesn't predicate itself on the notion that values are moving up or down over time. Indeed, USPAP is, um -- simply predicated on the determination of a value as of a point in time. Now, USPAP has some advisory opinions, and some comments and some supplemental standards which allow us to do before and after



appraisals with or without appraisals, appraisals under hypothetical conditions, appraisals under extraordinary assumptions, and so those caveats allow us to apply the appropriate standards, be they business value or mass appraisal or individual appraisal, to before and after or with or without kinds of things. That of course is what we would be doing here. So to that extent, the very same USPAP rules that apply to us doing an appraisal of these properties immediately prior to the barge hitting the wall would also allow us to appraise these properties immediately after the barge hit the wall.

Q. And that's in fact what you're talking about doing, right, is taking two snapshots of value, before and after, is that right?

A. That's right.

Q. And the loss is the difference between them.

A. That's correct.

Q. Is there any reference in USPAP to the use of mass appraisals in class actions?

A. Off the top of my head, I can't recall if the word class action was used anywhere in



USPAP. I mean, class action is a legal term -- in other words, it's a, um -- it is a reference to something you lawyers do as opposed to something we appraisers do. And so if you lawyers want to do a class action, you know, that's your business. If you want to know how to appraise property in this sort of thing, then that's our business. And we'll tell you how to did that, but we're not going to tell you how to do a class action, we're simply going to tell you how to do the appraisal.

That having been said, I would want to make reference to the judicial exceptions rule which tells us as appraisers that notwithstanding all of our expertise as appraisers we have to adhere to Court Orders with respect to our appraisal methodology. So we have to be adaptive to the final Court ruling.

Q. Are you aware of any guidance from the Appraisal Standards Board with respect to conducting appraisals in the class action context?

A. No. The Appraisal Standards Board -- and I've met with the Appraisal Standards



Board, I know people on it, we talk about these things on a regular basis. They purposefully distance themselves from practicing law. I don't believe that any of the current members are lawyers.

Q. When you approach a mass appraisal project, you assume, do you not, that there is some difference or variation among individual losses; correct?

A. Among individual losses?

Q. Yes. Let me rephrase the question.

When you approach a mass appraisal project in this sort of a case where you're doing above and after snapshot, you acknowledge, do you not, that there are differences in the amounts of losses suffered by different individuals?

A. Well, that would be something we would empirically determine. We don't come into this with a preconceived notion about that. If in fact that's true, then that would be something that would be an output of the model as opposed to an input of the model.

Q. Right. So the purpose of mass appraisal is to develop a methodology that

which one out of ten? Well, I guess we're going to have to hire an econometrician to tell us, and you're back in my realm again. And as I already testified this morning, once you start doing individual appraisals, by the time you get to the end of the first week you will find yourself in, by effect, a mass appraisal scenario.

Q. Well, isn't that consistent then with what you just said? I mean, either you'd have to do all fifteen thousand and generate the fifteen million dollar project or you wouldn't. I don't follow.

A. Well, if you -- and in fact, if you tried to go down the fifteen million dollar path, first thing, you're not going to hire one sixth of all the appraisers in the United States to come to New Orleans and check into a hotel for a week. So in fact you're going to be doing this with a handful of appraisers who are going to be working day after day, week after week, month after month, and frankly year after year on this project. So at the end of the first wake, these appraisers are going to have to synthesize what they're doing, they're

Page 89

going to have to automate what they're doing, and in fact they will do that because they'll be using the same data over and over again. So the at the end of the day you end up with fifteen thousand individual appraisers but you will have in effect done them in some sort of automated valuation methodology.

Q. Have you investigated the actual cost of performing an individual appraisal in the New Orleans area?

A. Yeah. I had one done. It cost me four hundred bucks. But that was for a simple townhouse that just needed a loan from Gulf Coast Bank. To do one before and after in this sort of scenario, retrospective appraisal, three years ago, I gave you an estimate of a thousand dollars. Let's say it's cut in half so instead of fifteen million it's only seven and a half million. That's still a lot more than I'm going to charge.

Q. Aside from the one appraisal that you've had done at your property, have you investigated the cost of doing multiple individual appraisals in New Orleans?

A. I have, and I don't have those numbers

Page 90

off the top of my head.

(Brief recess.)

EXAMINATION BY MR. MUNRO:

Q. When we took a break, Dr. Kilpatrick, I was asking you about your knowledge of individual appraisals in New Orleans. Have you investigated the extent to which there have been efforts to conduct multiple individual appraisals in the class area?

A. We have done some investigation of that. And we've got some stuff in our files about it but I don't have it committed to memory.

Q. What's your holistic view of it?

A. That there's some consistency issues, and it was terribly, terribly expensive and took a long time.

Q. Would you agree with me that there have been numerous individual appraisals that have been performed since Katrina in the putative class area?

A. I wouldn't disagree with that. Um -- but again, I would return to the notion that my understanding is that there's a lack of statistical consistency and that that's an

Page 91

important component of doing a mass appraisal.

Q. You are proposing your model as an alternative to an individual appraisal of every home in the class area; isn't that right?

A. Well, I want to be careful that I'm not proposing anything. I mean, I've been asked to analyze this and determine what the appropriate method of doing it is. So I'm not trying to propose a specific model but more to, from an academic perspective, simply say this is the model which ought to be done. I guess I'm splitting hairs there, but I want to make sure that I'm not acting as an advocate or an attorney in this case but purely as an empiricist who is familiar with both sides of the coin.

Q. All right. Let's leave aside the word proposing. And let me ask you it this way: Your model is, in your view, an alternative to an individual appraisal of every home; correct?

A. Well, I'm also hesitant to use the word alternative. In other words, that sort of implies that doing an individual appraisal of every home would be, in and of itself, acceptable. Um -- as a real estate empiricist

Page 92

who's familiar with and adheres to accepted econometric methods, I would find it hard to think of fifteen thousand individual appraisals as being a likely alternative in this case. Indeed, some sort of statistically robust and consistent mass appraisal model in a case like this would be really the only acceptable choice from a real estate empiricist 's perspective.

Q. If you need to have assessment of value of all the homes in the class area, right? I mean isn't that a fundamental assumption here?

A. Well, if you need to have an assessment of each individual home or some large subset thereof. And you don't have to do all fifteen thousand. I mean, even if you ask me to appraise a few hundred of them, um -- at the end of the day I'm going to have some kind of mass appraisal model because it's going to be consistently -- internally consistent, robust and statistically characterizable.

Q. What about just one?

A. If it was just one, then I would rely on an individual appraisal model at that point, but again I would point out to you that I would



be using data from the same data sets that would be applicable to a mass appraisal and, therefore, in effect the only difference between the individual appraisal and the mass appraisal at that point becomes one of scope as opposed to one of structure.

Q. I mean, again, I'm having a hard time with this because on the one hand you seem to be saying that at the end of the day individual appraisal and mass appraisal are really the same thing, but on the other hand you seem to be saying that individual appraisal is far less consistent and accurate and acceptable than mass appraisal.

A. Well, certainly if we're dealing with fifteen thousand properties. But at the end of the day you're going to be drawing on the same data sets. So anything that has to be said about mass appraisal data sets is also true about individual appraisal data sets. The difference is when you're only doing one or two or three properties with individual appraisals, or four or five, you lose that individual -- that internal consistency that allows you to do statistical characterization.



Um -- if we're doing with a larger and larger set of properties to be valued, certainly a hundred or two hundred, then we can -- then we're starting to get the numbers sufficient to apply some sort of hedonic model or some longitudinal model or some time series model or something like that that would have statistical characterization and robustness about it.

Q. So mass appraisal techniques don't work if you don't have sufficient data sets, is that right?

A. Nor do individual appraisals. I mean, appraisals don't work period if you don't have sufficient data sets, neither individual nor mass appraisal.

Q. But leaving aside individual appraisals for the moment and just with respect to mass appraisals, you need some minimum number of homes for a mass appraisal technique to work, right?

A. Yes. But it's not a very large number. I think once we get over a few dozen, then we're starting to get into the numbers where normal statistics work. Even if you're



in a small number, let's say we're into a dozen homes, then we can at least use non parametric statistics. That is to say non parametric statistics. But once we get over thirty or forty or fifty, then what we refer to as parametric statistics start kicking in and we can start doing some sort of, um -- robust statistical model.

Q. You said in your report, and this is at Paragraph 17, if you want to refer to it, the creating a single database for the entire class area will be far more efficient and less costly than obtaining data necessary for performing thousands of individual appraisals. You see that? It's at Paragraph 17.

A. I guess we're on two different paragraph 17s here.

(Off the record.)

EXAMINATION BY MR. MUNRO:

Q. Dr. Kilpatrick, you've been handed a remarked Exhibit Number 1. Would you tell me if you can identify that document?

A. Yes. I think we're -- I'm learning to pay more attention to the headings and captions in these things. This is the affidavit which

Guess what? At the end of the first week or two you have a mass appraisal on your hands. You don't have a very consistent one, you don't have a very good one, you don't have a very efficient one, and you certainly have a very expensive one, but in effect you have wandered into a mass appraisal model whether that's what you wanted to start out by doing or not.

Q. Sorry. That was a long answer, so I'm just trying to remember what you've said.

Have you investigated -- and I know you said earlier that you had looked into what you viewed as consistency problems with the individual appraisals performed in the putative class area. Have you looked into how those individual appraisals have actually been performed, what to methods are, how many people are involved, that sort of thing?

A. No.

Q. In what circumstances would use of mass appraisal be inappropriate? I think you've already said it might not be appropriate in cases with very small numbers of houses. Is there anything else?



A. Very small data sets. I think -- I mean, even if you wanted to do a large data set of highly idiosyncratic properties, we would in effect do something that started looking a lot like a mass appraisal. And I'll give you an example. I just finished working on nuclear power plants, you know, the stigma attached to living next door to a nuclear power plant and in fact the value of shut down nuclear power plants as part of the some of the Yucca Mountain negotiations, and in fact we're applying statistically robust techniques to nuclear power plants, which are highly differentiated pieces of real estate. But we have a lot of them, so --

Q. Okay. But -- that's a good example of a situation where mass appraisal was appropriate. And my question was, in what circumstances other than those that you've identified is it inappropriate?

A. Very, very small data sets.

Q. Anything else?

A. Yeah. It's hard to pick one out. I mean, you go to the valuation literature, the peer reviewed, academic literature on real



estate valuation, and it would be nearly impossible -- and I say nearly because I can't think of a circumstance in which you could get something accepted and peer reviewed where you had a reasonably large data set, that is to say more than a few dozen properties, and didn't apply some sort of mass appraisal methodology to it. I mean, they all -- they all do.

Q. And what about a circumstance where you have a large data set but -- where you have a large number of subject properties but the data is unavailable?

A. Well, then you couldn't do individual appraisals either; in other words, you're stumped in both regards. Now, fortunately enough that's not a problem here, because we've investigated the availability of data and it's robust. But in some hypothetical circumstance where data wasn't available, you would still -- and you had a large number of properties, you would still tackle the problem through some sort of mass appraisal but you would have to use some sort of stated preference model as opposed to a revealed preference model. The case in point is the EXXON VALDEZ oil spill.



You pointed out this morning the NOAA article which dated from the 1991-92 era which didn't point out that article was stimulated by the application of contingent valuation to the valuation of properties that had never transacted. And in fact stated preference models were utilized to survey the Native American tribes in Alaska whose property rights had been impacted by the EXXON VALDEZ oil spill. And those people had never traded their properties, they did not dollar denominate their economy, and yet their properties had to be valued for diminution in value purposes regarding the EXXON VALDEZ. As a result, there is an exact example of a situation where data was not available, so we were able to rely on a survey research technique in order to get a stated preference answer to a mass appraisal question.

Q. So you have to use survey research to fill in where data does not otherwise exist.

MR. LEVIANT:

That's not this testimony.

EXAMINATION BY MR. MUNRO:

Q. Well, I'm asking whether that's

of the things and all of the conditions and all of the appropriate things that will be illustrative to the Court in rendering its legal decisions.

Q. I understand that. But are you trying to assess the impact on property values attributable just to the barge or not?

A. Well, that's what -- and I guess the third point in your opening comments this morning was that we would be limiting the Q and A to that, so I'm certainly limiting the A part, and I assume you're limiting the Q part. But that having been said, anytime we want to go into an area where we've got a robust number of properties and make a valuation determination, either a static valuation determination of all the value of these properties as of a point in time, or I might even do a longitudinal model asking the question what's been the change in the value of properties over a period of several years. In any of those cases we're going to do a mass appraisal model because we've got something common that we can test in that regard.

Q. You've referred to your ability to do



mass appraisal in any situation in which there are common factors. Right?

A. Or a large number -- ad robustly large number of properties which are all nearby one another. That might be considered a common factor.

I don't want to put an overly narrow definition on the word common, because as real estate empiricists we use mass appraisal techniques to examine a whole host of different kinds of factors which are held in common by a myriad of properties under a variety of circumstances.

Q. I guess I still don't understand your answer. Are you trying to assess the impact on property values that are attributable solely to the barge or not?

A. In this particular case, as you and I agreed early on, we were going to be limiting the Q and A to the barge, but that doesn't mean that anything here isn't applicable to some other sort of common circumstance. And let me give you an example, counselor. Let's assume for a minute I go do my physician because I got a hangnail, and so he treats my hangnail,



however physicians do that sort of thing. And then I say, well, you're telling me that medical practice can treat a hangnail. And the physician says yes. Well, if I follow your logic, what I would be asking him then is, well, what you're telling me is that medical practice can only treat hangnails.

Q. I'm not suggesting that.

A. That's certainly what it sounds to me like is an appraisal.

Q. Well, let me start it this way then: Take as a predicate to my question that I'm not suggesting that your analysis can only assess the impact on property values attributable to the barge. I'm not challenging that. But given that predicate, given that qualification that is what you're attempting to do in this case.

A. That is what I'm attempting to do, but if this particular patient in my examination I find that he also has an earache or a appendicitis or a something like that, I can treat him, as well.

Q. Yeah. You're challenging the predicate. This patient has a barge. They



don't have appendicitis.

A. I've been deposed before, I want to be careful about how we -- you know, I don't want to narrow myself into too narrow a box here, counselor. These are very, very important techniques which are used in a variety of circumstance and can be applied in a variety of different conditions.

Q. Are you familiar with a project called Road Home?

A. Yes.

Q. Are you familiar with the fact that Road Home rejected an automated valuation model?

A. Yes.

Q. And what's your understanding of why?

A. It wasn't very well done. And in fact, we've done some investigation into that model, and in fact it was, um -- it was just not very well done. Had it been done better they would have saved themselves from what I understand is many millions of dollars in analytical costs later on. And probably would have solved the Road Home problem a lot quicker than they have. But as you know, they're

the tax assessment data post-Katrina is much better than it was pre-Katrina. And so -- as a result of a lot of publicity, a lot of attention that was drawn to that. We have got a 100 percent photographic record of the area, so we're able to drill down on specific addresses, and I have both pre and post-Katrina aerial photographs of each and every one of the fifteen thousand or so affected properties here, so that we can examine, in very good detail, by the way, the structures, what they look like immediately before the barge event. And you could tell whether it was brick or wood, you could tell what condition it was in. And then post-Katrina we could tell whether there was still a dwelling or a structure there, whether it's been set off its foundation, whether it's -- you know, what the condition is.

We've got the beginning of various GIS shape files, that is to say various layers of data which will include but not be limited to all of the econometric -- all the economic data for the area, elevation data, which of course will allow appropriate experts to tell us what



the degree of flooding was in each property. You know, that alone, using the FEMA data we talked about a little earlier, would certainly ascribe to the FEMA system systematic neighborhood-wide model of damages.

We have some other sources of pre-Katrina property specific description data. I can't recall the specifics of that, but certainly I was looking at that prior to coming here in preparation for my deposition.

We also have the MLS data. We have gathered a, um -- a complete set of all sales recorded through MLS in the affected area immediately prior to the barge incident, as well as since the barge incident, that we will be able to examine for pre and post-incident trends in pricing.

Um -- so that's a cross-section of the data we've got. I don't want to suggest to you that that's a 100 percent listing of the data, because I know that there are other data sources that we have, I just can't recall them all offhand.

Q. With respect to the MLS data regarding home sales prior to Katrina, how many were



there?

A. We have gone back for a good bit of time and so it's in the hundreds, but I can't tell you precisely whether it's -- you know, how many hundreds that is. I mean, we have gone back for a fairly extensive period in order to gather a statistically robust data set.

Q. And how far back is fairly extensive?

A. Couple of years. I mean, I can't tell you exactly how long, but certainly long enough -- you go back long enough to get a good data set.

Q. Since Katrina, how many home sales?

A. It's been a fair number, but I can't tell you how many.

Q. More than ten?

A. Oh, yeah. Yeah. Um -- you know, not a thousand, but more than ten, but I can't tell you how many in that range.

Q. How about more than a hundred?

A. You know, I believe so. But I don't have that number in mind. That doesn't seem unreasonable, but I'd have to go back and look.

Q. Is there some minimum number of sales



that you need in the proposed class area in order to conduct your analysis?

A. Just enough to give us a statistically good trend line. In the dozens would give you a beginning statistically valid trend line.

Q. How many variables are there in your model?

A. We haven't developed that yet. I haven't hardened that yet.

Q. Well, what sort of data do you have on what the variables will be?

A. Well, we've got a lot of variables in the raw data set, but the question is how many of those will end up in the valuation model? We haven't determined that yet and I can't list here how many specific variables we have available to us at this point. I know it's not uncommon for us to start out with data sets that have several dozen variables and then hone those down to a mere handful. But we will examine multiple specifications of a model as part of the modeling process in order to determine the subset of variables which most appropriately, most robustly and statistically appropriately describes the properties in

question.

Q. How do you know that your data is sufficiently robust if you haven't identified the variables yet?

A. We can test. You test multiple specifications.

Q. I don't understand that.

A. Well, you know, again, I'm going to use an analogy of going to a doctor. And you call up the doctor and you say, well, what's wrong? You call up the doctor and say, I'm sick. Well, the doctor doesn't on the phone say, well, what's wrong with you? You say, well, I don't know, I'm coming to you to diagnose things. So you then go to the doctor's office, and the doctor may, assisted of course by nurses and nurse practitioners and a whole host of lab people, may look at a hundred different variables about you before determining the four or five variables that explains the ailment which caused you to call him in the first place. So, you know, I may go to the doctor for a hangnail and the first thing they do is check my blood pressure. Now, I'm not a medical professional, but I don't



know that there's a whole lot of connection between blood pressure and hangnail. But they check this whole host of things.

We have a whole host of data available to us, and we will test multiple specifications of the model to be able to find those variables which best explain property values in the affected neighborhood. We haven't done that yet. That's part of the merits phase of our investigation.

Q. Right. I understand that. But you've already testified that your data is robust.

A. Right.

Q. And to use your doctor analogy, I mean, how does the doctor know that any of the data that they have is sufficient until they have done the examination? It seems to me you're saying that, well, we already know our data is robust but we haven't figured out what we're going to do yet.

A. The question is appropriate in this following manner: If I call the physician up and say, I want you to diagnose the ailment, the physician says, well, I need you to come in the office so that we can examine you. And I



say, no, I'd like for you to do it over the phone. The physician says, well, I won't have a robust set of data to examine unless you come in here, because we have to work on you, we can't do this over the phone.

Now, that's the case that we have here. We have hundreds of data points, as I've already indicated, and I don't know precisely how many individual factors we have in each of those data points but I would expect we've got dozens of different variables. Now, at the merits phase we will then determine which of those variables are explanatory. But at this point we can see that we've got a large data set with a lot of data points on each item, and that tells us that we've got a sufficient array of data to work with. We don't have to go in and actually prove the model at this point. What we can do is say, we've got the data, we know what the models will consist of, we know that we have got the sorts of data there that a good econometrician would rely on, at this point it's a matter of going through the process.

Q. Is there any difference in the



robustness of the data between St. Bernard Parish and Orleans Parish?

A. I haven't attempted to do any cross-sectional investigation of that. We will, of course, when we get into the merits phase.

Q. Do you know, without doing any segmentation or a cross-section, whether the data from either parish is more robust than the other?

A. Again, we'll do that when we get to the merits phase. That will be the appropriate point in time to do that.

Q. You haven't done it yet.

A. Of course not. Why would we? As I said, the appropriate point in time will be after the certification of the class when we start getting into the -- the determination of values.

Q. Can you identify for me in your report where you opine that the data is sufficiently robust to conduct your mass appraisal?

A. Let's take a look. It may take me a minute.

Q. That's fine, take your time.

A. We start on Paragraph 41 on Page 11 where we say we plan to combine data from a variety of data sources, and then I go on describing this through Paragraph 49. And then if you go to Page 15, Paragraph 52, and it's the fifth line from the bottom, starting with the word the comment to Rule 6-5, and then including the paragraph afterwards, 53, compares and contrasts how we now have data that we'll be able to utilize for a mass appraisal and how that's superior to the individual approach.

In addition, if you go on to Page 17, Paragraph 58, we then talk about how we will be testing this data. In addition to a valuation team with both local market knowledge and statistical skills we believe the process we use for estimating values will result inaccuracy, reliability and consistency across the proposed class.

And then we go on in Paragraph 58 to talk about how we ensure that, and in Paragraph 59 to contrast it with the inferior individual appraisal model.

Q. In the paragraphs that you've



identified I see a lot about what you plan to do, I don't see anything that suggests an opinion that the data you have gathered is sufficiently robust to perform your analysis.

A. Well, as of the writing of this we had proposed a treatment which methodologically was certainly superior. During the period of time since then, we've gone in and actually proved the model by gathering the data. So in fact, we have continued to work on this thing subsequent to two months ago when I -- or two and half months ago when I sent this in. And the subsequent work has certainly shown that our model -- well, first, this affidavit shows that the model is superior and anticipates that the data would be available. We have now been able to determine conclusively that the data is in fact available and robust.

Q. Have you, yourself, reviewed the various data sets that you described earlier?

A. I've gone through some of it. It's difficult for me to use the word review because that's a term of art in the appraisal process and I haven't formally reviewed that data in the way that we as real estate appraisers would



use the term. But I've certainly looked at the data with my staff.

And I want to stress the fact, as I testified earlier today, that not only is this data robust for use in a mass appraisal, but if there were problems with the data those data problems would also exist for individual appraisals; that is to say anything with respect to data that causes a problem for mass appraisal would cause an even worse problem for individual appraisals.

Q. What's the basis for your statement that this set of data is sufficiently robust?

A. Um -- first, supervision of my staff; second, reports from my staff; third, cursory reviews of the data by myself; fourth, reliance on opinions from, um -- people who are noted authorities in the area like Dr. Kummerow who has personally examined the data. And he's one the of the leading authors in the field on statistical robustness of appraisal methodology. The Appraisal Institute gave him their Swango award a couple of years ago for writing in precisely that area. So in fact, we've -- I've assured myself of this on several



different levels.

Q. But you don't know, as you sit here today, exactly how many home sale records you have, either pre-Katrina or post.

A. Well, I have it in my files, I just don't have it memorized.

Q. Is that information that you turned over as part of your work file?

A. Yes.

Q. Doctor, I believe you said that you've compiled this data since this report -- your affidavit was generated. Isn't that right?

A. Yes.

Q. Are you aware of anything that's been turned over to the defendants since the reported was generated?

A. That's between you and, you know, your colleagues on the other side of the table. I, um -- you know, I work through my clients, and that's between you and them.

Q. All right. Well, let me read to you a list of the things we've received, and you tell me where this data is in your work files, the materials that we've gotten. We've gotten your report, a list of your trial testimony, billing