# EXHIBIT 24
# Part 2

Page 141

1  when we first started examining this area.
2     Q.  In what connection were you examining
3  Orleans Parish tax rolls two or three years
4  ago.
5     A.  Well, as part of our Murphy Oil
6  examination we were also looking into what
7  existed in Orleans Parish.  Admittedly, Murphy
8  Oil was over in St. Bernard Parish, but we,
9  just for compare and contrast purposes, looked
10 at tax assessment data in seven different
11 parishes, not only St. Bernard Parish but also
12 adjacent parishes, in an attempt to gather
13 cross-sectional valuation data in other areas
14 as well as potentially less affected areas.
15    Q.  Do you know how many home sale records
16 you have that have any description of the
17 property?
18    A.  No, I don't.  I think our people told
19 me that the number was somewhat over fifteen
20 thousand in the two parishes, but I'd have to
21 go back and look to get that exact number.
22    Q.  Fifteen thousand home sale records
23 with --
24    A.  No, fifteen thousand home description
25 records.  Home sale records are in the

Page 142

1  hundreds.
2     Q.  Would you agree with me if I said that
3  there were multiple sources of damage to the
4  properties in the class area?
5     A.  By damage, do you mean valuation
6  damage or physical damage?
7     Q.  Um -- well, let's start with physical
8  damage.
9     A.  Well, I'm not opining with respect to
10 physical damage.  I haven't rendered any
11 particular opinion in that regard at this
12 juncture.  I'm not a physical scientist, I'm a
13 valuation expert.
14    Q.  Just based on your own common sense
15 and knowledge of the -- of what's happened in
16 New Orleans.
17    A.  Again, I haven't -- I have some, um --
18 common sense.  I like to think I do.  My wife
19 questions it on occasion.  But notwithstanding
20 that, I haven't rendered any sort of
21 professional opinion one way or the other, and
22 I'm reluctant to do so until I get into the
23 merits phase of my investigation.
24    Q.  Okay.  With respect to valuation
25 damages, would you agree with me that there

Page 143

1  were multiple sources of valuation damage?
2     A.  Well, at this juncture I'm focusing
3  entirely my attention on the flooding
4  precipitated by the barge hitting the wall.
5  You know, that having been said, if there are
6  other issues at hand, I'll certainly
7  investigate those and we'll create some sort of
8  separating equilibrium to take those out.  But
9  that's well beyond the scope of what we've done
10 hear so far.
11    Q.  There were levee failures in
12 St. Bernard Parish, were there not?
13    A.  You know --
14       MR. LEVIANT:
15           Objection.  Beyond the scope of
16       this expert.
17    A.  As I sit here today, I don't have a
18 listing in my mind of where various other
19 events occurred.  My entire focus here today is
20 on a barge hitting the wall and precipitating
21 flooding in this neighborhood.  So, I mean, I'm
22 prepared to talk about that.  If there are
23 other issues at hand that affect the valuation
24 model we'll address those when we get to the
25 merits investigation.

Page 144

1  EXAMINATION BY MR. MUNRO:
2     Q.  Would you agree with me that there was
3  damage to properties in the class area caused
4  by wind?
5       MR. LEVIANT:
6           Objection.  Beyond the scope of
7       this expert's opinion.
8     A.  I'm not going to agree or disagree,
9  because from a valuation perspective that's
10 something I'll investigate at the merits phase.
11 From a physical science perspective, um -- I
12 don't have any opinion, nor probably will I be
13 the source authority of any opinion.
14 EXAMINATION BY MR. MUNRO:
15    Q.  Do you have any opinion, or will you
16 be offering any opinion, on the proper
17 allocation of damage to the barge?
18       MR. LEVIANT:
19           Compound.
20    A.  I don't have any opinion.  I don't
21 know if I will be offering any opinion.
22 EXAMINATION BY MR. MUNRO:
23    Q.  Do you have any opinion on how you
24 would go about allocating damage caused by the
25 barge?

36 (Pages 141 to 144)

Page 149

1    Q.  For example, you mention future
2  flooding risk.  You mention higher insurance
3  premiums.  Right?
4    A.  I may have.  Point out to me where I
5  said that so I can see the context within which
6  I was saying it.
7    Q.  Let me give you another example.  You
8  talk about reduction of population at
9  Paragraphs 24 and 25.  The reduction in
10 population discussion is really contained in
11 Paragraph 24.
12   A.  Sure.
13   Q.  Okay.  In 25 you talk about increased
14 construction costs and a shortage of building
15 contractors.  Right?
16   A.  Right.
17   Q.  26 you talk about this fear of future
18 levee failures; right?
19   A.  Right.
20   Q.  All right.  Is the reduction in
21 population a function of the barge?
22   A.  Well, we haven't gotten to the point
23 of making that analysis yet.  In other words,
24 that's an empirical investigation which we will
25 determine during the merits phase.

Page 150

1    Q.  The increased construction costs or
2  short supply of building contractors, is that
3  attributable to the barge?
4    A.  Again, that's something that we will
5  investigate thoroughly in the merits phase,
6  that is, the damage determination phase of our
7  analysis.
8    Q.  How about the fear of future levee
9  failures; is that attributable to the barge?
10   A.  Again, that's something that we will
11 investigate in future phases of our work.
12   Q.  You talk about the closing of Holy
13 Cross High School.  Is that attributable to the
14 barge?
15   A.  Again, that's something that we will
16 investigate more fully in the merits phase of
17 our arguments.
18   Q.  You talk about the common factor that
19 much of the population left the area and a
20 substantial percentage have not yet returned.
21 Is attributable to the barge?
22   A.  Again, this is something that we will
23 opine about later.
24   Q.  My understanding was that your
25 function, your task, your opinion in this case,

Page 151

1  was to provide a value pre-Katrina and a value
2  post-Katrina.  Is that right?  Isn't that what
3  you testified to earlier?
4    A.  Well, I think pre barge piercing the
5  wall and post barge piercing the wall.
6    Q.  Okay.
7    A.  Certainly the two are contemporaneous,
8  but, you know, that's -- this is -- my specific
9  engagement here is with respect to the barge
10 litigation.  So.
11   Q.  Correct.  So you're giving us a value
12 prior to the levee incident and after the barge
13 incident, however you want to characterize it.
14 Right?
15   A.  Correct.
16   Q.  And so how are you backing out these--
17 or how are you factoring in these other issues?
18   A.  Well, I think you had it right when
19 you said back out; in other words, we don't
20 drive into this garage with those issues, what
21 we do is examine the pre and post-Katrina value
22 impacts and then we may or may not use these,
23 um -- as explanations of the empirical
24 observation.  Oftentimes, in a good peer
25 reviewed article we may talk about why we

Page 152

1  expect that we're going to find something, then
2  we do the empirics, develop the model, gather
3  the data, explain the data, run the tests and
4  come up with conclusions, then only in the last
5  section of that peer reviewed article do we
6  explain why there's a linkage between these
7  things and the empirical findings that we
8  uncovered.
9    Q.  Okay.  But you're not doing a peer
10 reviewed article here, you're doing a report to
11 the Court on class certification now.
12   A.  But certainly I think the Court would
13 expect us to adhere to the same standards that
14 we would adhere to in a peer reviewed article.
15   Q.  All right.  So the output of your
16 report, will it provide a value post-Katrina,
17 past barge, that is attributable to the barge,
18 or will it simply state here is what I find the
19 values were as of this date?
20   A.  I think as part of our empirical
21 investigation we will want to draw a line
22 between that barge and these value conclusions.
23 But again, that's something that we will do at
24 the empirical investigation point of our work.
25   Q.  How?

38 (Pages 149 to 152)

**Page 157**

```
 1  attributable to the barge. Right?
 2       A.  Well, that -- that first implies
 3  something of a legal question. Something
 4  attributable to the barge is something I think
 5  the Court is going to make a decision about at
 6  the end of the day. But the question that I
 7  have been asked is, is mass appraisal a
 8  superior way of looking at this than the
 9  independent appraisal. And in fact, if as an
10  empirical investigator, as an appraiser, I
11  address the valuation component of that linkage
12  that you're talking about, then I'm going to
13  have to evaluate that either by the method I
14  propose or by the method you propose. So even
15  if I were working for you, even if I was your
16  appraiser and I was sitting hear proposing
17  individual appraisals, then I'd have to address
18  any question in that regard similarly to the
19  way I'm doing it. Therefore, that question is
20  not something I needed to address at this
21  point, nor have I addressed it at this point,
22  simply because it's an irrelevant question with
23  respect to the superiority of mass appraisal
24  over individual appraisals.
25       Q.  I think we're saying the same thing.
```

**Page 158**

```
 1       A.  I don't think so, counsel.
 2       Q.  Well, let me try it this way: Let's
 3  say I accept mass appraisal is the way to go
 4  here.
 5       A.  Can we go home now? I mean, I can
 6  catch an early flight.
 7       Q.  So we're going to use mass appraisal,
 8  we're all good with that, we're happy with mass
 9  appraisal. Great.
10       A.  And that's on record.
11       Q.  And you go ahead and you do a mass
12  appraisal. All right?
13       A.  Right.
14       Q.  At that point, we still need to do
15  something to figure out what diminution in
16  value percentage is allocable to the barge.
17  That's not something you're doing. And I think
18  that's what you just said.
19       A.  May or may not be. And in other
20  words, even whether that's a question that I'm
21  going to answer or not is not something that
22  I've considered. But if it's a question that I
23  have to answer as part of mass appraisal
24  process, then it would also be a question I
25  would have to answer as part of an individual
```

**Page 159**

```
 1  appraisal process. Therefore, whether you have
 2  to do this or not is frankly irrelevant.
 3           That's why physicians don't make
 4  funeral arrangements. You know, physicians
 5  want to consider that they're trying to save
 6  the patient, not how we bury the patient.
 7           If in fact you have this versus that,
 8  then that may be a question that we have to
 9  answer down the road, but in order to determine
10  the efficacy of a particular, um -- appraisal
11  methodology, or using the physician example the
12  efficacy of a particular treatment, the
13  question about whether the patient wants to be
14  buried or cremated is irrelevant.
15       Q.  In your report you opine that you can
16  produce a model for estimating business losses
17  on a class-wide basis. Is that right?
18       A.  Yes.
19       Q.  Have you ever done an appraisal of
20  business losses?
21       A.  Sure.
22       Q.  Give me an example.
23       A.  Legionnaires' disease affected
24  Celebrity Cruise Lines. I wasn't the
25  testifying expert, but I was one of the
```

**Page 160**

```
 1  consulting experts to the owners of Celebrity
 2  Cruise Lines on the damages to their business
 3  resulting from legionnaires' disease. And that
 4  was concluded a couple of years ago.
 5       Q.  How did you do it?
 6       A.  Valued the business before and after
 7  legionnaires' disease, looking at changes in
 8  the risk-adjusted discount rate and looking at
 9  changes in anticipated cash flows before and
10  after the event, and I was able to show that,
11  um -- with the -- that as a result of
12  legionnaires's disease the business was worth
13  1.6 billion, had the legionnaires' disease not
14  occurred the business would have been worth
15  1.9 billion.
16       Q.  Have you ever done a mass appraisal of
17  business losses?
18       A.  Um -- I think so. Sure seems like I
19  have. I'd have to go back and look, but that
20  certainly seems like the sort of thing I would
21  have done. I'd just have to go back and look.
22  I'm sorry. Off the top of my head I can't
23  recall it. Not a terribly challenging thing,
24  it's just off the top of my head I can't recall
25  one.
```

```
 1      Q.  Have you ever viewed a mass appraisal
 2  of business losses done by anyone else?
 3      A.  Oh, yeah.  There are a lot of
 4  bankruptcy studies that involve methodologies
 5  not dissimilar to mass appraisal.  I have
 6  reviewed quite a few of those.  Remember, my
 7  Ph.D. is in finance, so I'm naturally very
 8  familiar with the finance literature, and a lot
 9  of the peer reviewed finance literature deals
10  with mass appraisal type analyses of
11  bankruptcies and other business disruptions.
12      Q.  Okay.  Well, let me be a little more
13  specific.  Have you ever reviewed a mass
14  appraisal, not something similar to or
15  literature about or anything like that, but an
16  actual mass appraisal of business losses by
17  multiple businesses?
18      A.  You know, now that I think about it my
19  Ph.D. dissertation was on business losses, was
20  on differential business values of real estate
21  investment trusts, where I had to value, um --
22  real estate investment trusts on a mass
23  appraisal basis immediately after their -- or
24  during the period after their, um -- initial
25  public offerings to show that there's a
                                        Page 161

 1  differential -- or to examine the question of
 2  whether there was a differential valuation
 3  impact associated with anticipation of
 4  diversification.  And I used what are
 5  essentially, you know, mass appraisal models to
 6  opine with respect to forecasted values.
 7      Q.  Other than your dissertation, have you
 8  ever conducted a mass appraisal of business
 9  losses?
10      A.  Counselor, an accepted published
11  dissertation is a pretty strong piece of --
12      Q.  I'm not suggesting that, I'm simply
13  asking whether other than that, other than that
14  very comprehensive and no doubt valuable
15  dissertation --
16      A.  Well, as a result of doing that I
17  examined pretty much every other dissertation
18  on real estate investment trust valuation,
19  which was done during that period of time, and
20  I presently, um -- have been meeting with the
21  National Association of Real Estate Investment
22  Trusts to do valuation models of REITs, and I
23  have a staff member who's about 50 percent
24  assigned to a research task of developing
25  valuation models of the entire universe of
                                        Page 162

 1  publicly traded real estate investment trusts
 2  in order to determine or discern conditions
 3  which will cause losses in value, that is to
 4  say forecast conditions which would cause loss
 5  in stock price of publicly traded real estate
 6  investment trusts.  So, you know, I've got a
 7  pretty active practice going on in that area.
 8          Sorry I didn't think about that
 9  earlier.  I probably could have truncated this
10  line of questioning.
11      Q.  Well, one of the questions that I
12  don't think I have answered there is whether
13  you have ever seen a mass appraisal by anyone
14  else of business losses.
15      A.  Oh, yeah.  When dealing with real
16  estate investment trusts, reviewing the
17  dissertations and reviewing the peer reviewed
18  journal articles which are in effect appraisals
19  of real estate investment trusts, I've -- I
20  reviewed all of those that were produced during
21  the 1990s.
22      Q.  Can you cite to me an example of peer
23  reviewed academic literature on the application
24  of mass appraisal to business losses?
25      A.  I will tell you everything that, um --
                                        Page 163

 1  Will McIntosh has ever written.  Will McIntosh
 2  is the former director of real estate research
 3  at ING, and he just got named Dean of the
 4  School of Business of the University of
 5  Cincinnati.  Will finished his Ph.D. in 1986,
 6  and from 1986 to about 2000 wrote at least
 7  twenty or thirty different valuation articles
 8  about real estate investment trusts where he
 9  looked at gains and losses in values contingent
10  on certain events or certain conditions.  Um --
11  so I would cite all of this work.
12          Um -- let's see here.  Who else has
13  written on that topic?  Ron Donahue writes on
14  that topic.  Um --
15      Q.  Just give me one preeminent citation.
16      A.  Just anything written by Will McIntosh
17  who for quite a few years there was the
18  preeminent author on that subject.
19      Q.  Can you give me an example?
20      A.  Name of one of his articles off the
21  top of my head?
22      Q.  Yeah.  If you can.
23      A.  No, I can't.  I'd have to call Will on
24  the phone.
25      Q.  Have you ever done a mass appraisal of
                                        Page 164
```

41 (Pages 161 to 164)

```
 1       Now with respect to businesses, the
 2   question is do we have a sufficiently large
 3   data set in order to create a valuation model
 4   and then apply it to the businesses in the
 5   area.  Fortunately enough in terms of
 6   businesses we're not restricted locationally
 7   because a plumbing company in St. Bernard
 8   Parish prior to Katrina is probably going to
 9   sell for something not too terribly dissimilar
10   to a plumbing company in Plaquemines Parish or
11   a plumbing company in Orleans Parish or a
12   plumbing company over in Baton Rouge.
13       Now, there may be some regional
14   differences, those regional differences are
15   going to tend to be systematic.  So in terms of
16   using larger regional or national databases in
17   order to be able to value businesses in this
18   affected area, we will be able to do that and
19   systematically apply regional adjustments which
20   we will discern, if they exist, as part of our
21   merits phase.
22       Q.  Is there some measure of accuracy that
23   you commonly use in doing an analysis of this
24   sort?
25       A.  Well, you typically see confidence
                                          Page 173

 1   intervals, you know, we're 95 percent certain
 2   or 99 percent certain.  Typically speaking,
 3   that's the way you want to express the degree
 4   of accuracy.  Under Daubert I think it's called
 5   a known error rate.  So fortunately enough when
 6   we deal with these things on a mass appraisal
 7   class-wide basis, we're able to develop that
 8   known error rate as required under Daubert
 9   which you're unable to develop on an individual
10   appraisal, um -- model.
11       Q.  Have you ever heard of an R-squared
12   test?
13       A.  Yes.
14       Q.  What R-squared do you need to achieve
15   here in this case in order for your methodology
16   to be accurate?  Um -- you know, hedonic models
17   oftentimes don't achieve extremely high
18   R-squareds, although I published an article in
19   Real Estate Issues a few years ago where I had
20   a 93 percent R-squared in a land valuation
21   model.  And that was accepted in a peer
22   reviewed journal.  So I can't tell you offhand
23   what level of R-squared.  As it happens, the
24   normal method for checking the efficacy of a
25   hedonic model is an F test.  And we would
                                          Page 174

 1   typically want an F test with a P value of less
 2   than, say, 5 percent.
 3       (Brief recess.)
 4   EXAMINATION BY MR. MUNRO:
 5       Q.  Dr. Kilpatrick, when we left off we
 6   were talking about business losses and mass
 7   appraisal of business losses.
 8       Would you agree with me that in order
 9   to assess business losses you need to factor in
10   mitigation in some way?
11       A.  I'm not sure what you mean by that.
12       Q.  Let me give you an example.  Suppose
13   you have a business that is disrupted in a
14   class area, unable to continue operation, but
15   they move down the road and set up shop in
16   Baton Rouge and for a year after Katrina
17   they're able to earn a fairly nice living in
18   Baton Rouge.  Do you factor that in, in any
19   way, to your calculation of business loss?
20       A.  My or may not.  I mean, that would be
21   something I need to, um -- analyze as part of
22   modeling when I get to the merits phase.
23       Q.  You testified a few minutes ago that
24   one way to deal with small data sets in the
25   business valuation area is that you can look
                                          Page 175

 1   outside the class area to -- I think the
 2   example you used was other plumbing companies.
 3       You remember that testimony?
 4       A.  Yes.
 5       Q.  That's for assessing business values
 6   prior to the storm; right?
 7       A.  That's correct.
 8       Q.  What about after the event?
 9       A.  Well, that, again, is going to be
10   something that we will analyze when we get to
11   the merits phase.  The nature of those losses,
12   how widespread they are, factors which affect
13   those, all of that will get built into a mass
14   appraisal database after the fact.  But as we
15   sit here today, whether we're dealing with this
16   on an individual basis or a class-wide basis,
17   that's something that's going to have to be
18   addressed.  So the fact that it's something
19   we'll have to address doesn't obviate the
20   superiority of the mass appraisal model to be
21   able to look at these in a comprehensive,
22   Systematic fashion as opposed to the less
23   efficient, individual model which wouldn't look
24   at these in a comprehensive, system-wide
25   fashion.
                                          Page 176
```

```
 1  your client so he died, and his children didn't
 2  get to inherit the barber shop which they could
 3  have sold to somebody?  Well, all we really
 4  need to know is the fact that he had a barber
 5  shop there, and we can in fact impute what his
 6  revenues were.  There are ways that you can
 7  estimate the revenues based on typical hours
 8  worked and on typical gross revenue of a
 9  barber.  You can estimate those things.  So if
10  you've got an up and running barber shop, even
11  if all the records were destroyed there are
12  ways that are well developed in the textbooks
13  for estimating what that barber shop was
14  probably worth.
15          If you owned a Texaco station, we know
16  what sort of requirements Texaco is going to
17  put on gas stations, how many gallons per month
18  you're required to pump, we can estimate what
19  the profits per gallon are going to be, and
20  that gives us a good estimate of what the gross
21  revenue, and then Texaco can tell us what the
22  typical expense ratios for that Texaco station
23  would be, and that let's us know what the net
24  income for that is.  We can develop either a
25  market multiplier benchmark or a CAP rate for
                                         Page 185

 1  that Texaco station, and you apply that, and
 2  that let's us know what the Texaco station was
 3  probably worth.
 4          So in that same fashion we can go
 5  through the barber shops, the plumbing
 6  companies, the daycare centers, and come up
 7  with a consistent, cohesive, systematic, fair,
 8  statistically valid, defensible, peer reviewed,
 9  et cetera, et cetera, methodology that treats
10  everybody in a reasonably fair fashion.
11      Q.  That methodology still requires some
12  individualized information about each one of
13  those businesses, doesn't it?
14      A.  Sure.  But only to the extent that we
15  would also use individualized data for a mass
16  real estate appraisal.  In other words, if I
17  value your brick house as opposed to your
18  shotgun house, I'm going to have different
19  coefficients for the brick house than I am for
20  the shotgun down house, but nonetheless I'm
21  using the same kind of model to deal with these
22  things.  If I want to value your plumbing
23  company versus your barber shop, I'm doing it
24  in a same method in the same mass appraisal
25  model, all within the statement statistical
                                         Page 186

 1  database, but my factors for your barber shop
 2  may be different from your plumbing company.
 3          So this isn't something which obviates
 4  the likelihood of using a mass appraisal model,
 5  it is in fact something that supports the
 6  efficacy of the mass appraisal model.  And the
 7  superiority of the mass appraisal model comes
 8  from the fact that we'll be doing all of these
 9  in a fair and systematic, efficient, lower cost
10  fashion, and in a manner which is going to be
11  acceptable to Courts under Daubert, and in a
12  manner which you know that your barber shop was
13  treated in a manner not dissimilar to the way
14  his plumbing company was treated.
15      Q.  In Paragraph 71 of your report you
16  refer to a method of computing estimates of
17  corporate profits.  Do you see that?
18      A.  Yes.
19      Q.  Would you agree with me that there are
20  superior methods of obtaining statistics on
21  average profitability by private services such
22  as Standard & Poor's?
23      A.  Oh, yeah.  There are, um -- a whole
24  lot of methods.  Some are good, some are bad.
25  We're offering this up as an example, but
                                         Page 187

 1  certainly as part of the follow-on, um --
 2  merits phase of this we will seek out
 3  statistically acceptable methodologies.
 4  Nonetheless, all of that -- your question
 5  itself begs for the use of a widespread mass
 6  appraisal model so that we can apply those in a
 7  systematic fashion, so that we use the same
 8  superior model for all of businesses, we don't
 9  get into the problem of using a superior model
10  for one and an inferior model for the other.
11      Q.  But isn't it true that these various
12  reporting services suggest that there are large
13  variations in profitability and value among
14  individual firms?
15      A.  Yes, of course.  And that's why we
16  want to develop, on a systematic basis, a set
17  of factors which help us explain those.  You
18  know, as it happens, businesses are valued.
19  Those various reporting firms accept those
20  valuations as part of their data sets.
21          And there's a large variation in
22  houses.  We already talked about your two
23  million dollar house in the suburbs of
24  Washington D.C.  Think about some $25,000
25  shotgun house over in St. Bernard Parish.
                                         Page 188

                              47 (Pages 185 to 188)
```

```
 1    Q.  In this case you state that one way to
 2  do it would be to obtain local verification
 3  from individuals.  Right?
 4    A.  Right.  A survey.
 5    Q.  So that's not a survey of everyone,
 6  that's just a survey of a sample?
 7    A.  Sure.  You can sample.
 8    Q.  Well, my question is with respect to
 9  Paragraph 74 where you refer to a direct
10  method, are you referring there to a sample or
11  are you referring to obtaining the information
12  from everyone?
13    A.  No, I think a sample would be more
14  than sufficient.  I think we can build a good
15  database -- you know, people sample all the
16  time to determine all manner of things.  And
17  this would certainly be a trivially simple
18  sample to conduct.
19    Q.  And your sample would tell you what?
20    A.  The sample would allow us to develop
21  factors for measuring property -- personal
22  property losses as functions of other known
23  variables, and would be a sufficiently large
24  sample that we could develop statistical
25  characteristics for that, if in fact we chose
                                    Page 193

 1  to do it that way.
 2    Q.  In other words, it would be a
 3  percentage of the real estate loss.
 4    A.  That might be one way of doing it,
 5  sure.  That's, for renters it could be a
 6  function of the rental paid, you know, somebody
 7  who rents a house for two hundred dollars a
 8  month may have less in personal property who
 9  rents a house for twenty thousand dollars a
10  week, and so if you -- if we examine or sample
11  those folks we may come up with statistically
12  robust set of factors if in fact we choose to
13  do it that way.  We might also rely on
14  insurance multipliers.  There's a robust set of
15  insurance multipliers out there that may be
16  available to us that'll let us know that for a
17  given sized dwelling, either rental or owner
18  occupied, here's the model that the insurance
19  industry has already developed, which is
20  typically localized for -- you know, New
21  Orleans is going to be different from
22  Alexandria, Virginia.
23    Q.  I don't see any reference in your
24  report, or your affidavit, to tenants.  Does it
25  encompass that?
                                    Page 194

 1    A.  If asked to, we have -- you know, we
 2  contemplated in writing this up that it would
 3  include both, but if it only includes one or
 4  the other I think that's something that we
 5  easily deal with at the merits phase.
 6    Q.  Do you have any idea what percentage
 7  of dwellings in the class area were occupied by
 8  tenants?
 9    A.  Oh, I think we have an idea.  I just
10  don't know that is off the top of my head.  I
11  think we already have that data in our
12  neighborhood-wide model, which is of course the
13  sort of think that you gather in formulating
14  either a mass appraisal model or an individual
15  appraisal model.
16    Q.  What's the source of your data on that
17  particular point?
18    A.  You know, I saw it but I can't recall
19  what it was.  Um -- I'd have to go back and
20  look.  It's pretty easy to get that from places
21  like the census bureau.  I mean, that's --
22  these are pretty well publicized numbers that
23  are usually good down to a tenth of a
24  percentage point.
25    Q.  You referred to the methodology of
                                    Page 195

 1  mass appraisal of personal property based on
 2  insurance concepts?
 3    A.  Or other not dissimilar concepts, but
 4  that's certainly a good one.
 5    Q.  And isn't the gist of the insurance
 6  concept and similar concepts that you just
 7  assign a percentage to personal property as a
 8  percentage of the real estate loss?
 9    A.  Right.
10    Q.  Are you aware of any studies that
11  validate that concept?
12    A.  I'm aware they exist.  I don't have
13  any off the top of my head.  But I know that
14  studies like that have been done, I just can't
15  cite any off the top of my head.
16    Q.  In your report you mention a textbook
17  done by Rejda?  Is that the name?  R-E-J-D-A.
18    A.  George Rejda, yes.
19    Q.  But he just discusses the fact that
20  insurance companies use that concept, right?
21  He doesn't discuss any empirical basis for it.
22    A.  That's correct.  I'm sure that at the
23  merits phase, which will be the appropriate
24  phase for us to do this, we can investigate the
25  source of any factors that we choose to use, or
                                    Page 196

                              49 (Pages 193 to 196)
```

```
 1  if in fact we decide to empirically develop our
 2  own factors with a survey we will provide, at
 3  that junction, the supporting documents for our
 4  own empirical research.
 5      Q.  And how do you deal with mitigation
 6  when it comes to personal property on a mass
 7  basis?
 8      A.  Well, what sort of mitigation are you
 9  talking about?
10      Q.  Let's take the example of cars and
11  trucks, which you mention in your report at
12  Paragraph 77.  People could have, in some
13  cases, moved their vehicles to a safe location
14  prior to the storm.
15      A.  So what you're trying to say is that
16  some people may have done one thing but other
17  people may have done something else.
18      Q.  Right.
19      A.  Recognize the fact that, um -- those
20  are issues which will have to be dealt with
21  whether we're dealing with mass appraisal or an
22  individual plaintiff.  The important part of it
23  is, dealing with the mass appraisal we've got a
24  statistically robust basis in which to begin
25  investigating the sort of thing.  That having
                                        Page 197
```

```
 1  been said, you know, that sort of mitigation
 2  becomes a legal issue and not a valuation
 3  issue.
 4      Q.  Well, it sounds to me like what you're
 5  saying, then, is that you don't take that into
 6  account.  You're saying that's separated out
 7  and treated as a legal matter and you're not
 8  going to assess mitigation as part of your
 9  valuation model.
10      A.  Generally not, no.  As I sit here
11  today I don't contemplate doing that.  Now, you
12  know, going forward we may be asked to tackle
13  that, but frankly as I sit here today I don't
14  think that will be part of it.
15      Q.  You testified in the MRGO levee case;
16  correct?
17      A.  I was deposed in the MRGO levee case.
18  Cases.
19      Q.  Do you recall when that testimony was
20  given?
21      A.  Um -- a year ago, something like that.
22  Nine months to a year ago.
23      Q.  Is there anything new in your
24  credentials or education since that deposition?
25      A.  I'm a year smarter.
                                        Page 198
```

```
 1      Q.  Have you done any work on developing
 2  your mass appraisal model since that deposition
 3  testimony?
 4      A.  Um -- well, I wrote several papers on,
 5  um -- various kinds of value issues, one on
 6  foreclosure value, one on distressed value --
 7  excuse me.  I wrote one on foreclosure and
 8  distressed value, another one on market
 9  disruption, that is to say what happens to
10  values immediately after and during a period of
11  market disruption, how prices and values are
12  disconnected with one another.  Those were both
13  subject to the sorts of peer review you would
14  have for scholarly conferences and accepted for
15  presentation at, um -- the, um -- American Real
16  Estate Society conferences.
17          I also did a piece on Brownfields and
18  valuation on Brownfields, which was accepted
19  for publication, presentation at the Asian Real
20  Estate Society conference.
21          I've written a chapter on valuing
22  brownfields for the forthcoming Third Edition
23  of the American Bar Association 's book
24  Brownfields.  Al Gore is going to be writing
25  the follow to that, so now I say Al and I have
                                        Page 199
```

```
 1  written a book together.
 2          I'm sure there's some other things
 3  that are germane to this, but those are the
 4  ones that hit me off the top of my head.
 5      Q.  None of those things sound like actual
 6  work in developing a model that will be
 7  presented to the court, however.
 8      A.  Well, they're peripheral to this
 9  because, you know, when you have disruptions in
10  values -- excuse me, disruptions of the market,
11  you have value disruptions which are part and
12  parcel of the sort of problem that you have
13  after the barge hit the wall and broke it open.
14          With respect to Brownfields, the sort
15  of methodology that you might use before and
16  after a contamination event is certainly
17  applicable to the type of work you do on a mass
18  appraisal basis in a situation like this.  So
19  all of that is linked to and germane to this.
20      Q.  You've said on a number of occasions
21  that the barge hit the wall and broke it open.
22          You are aware, are you not, that
23  that's a disputed issues in this case?
24      A.  Um -- I guess if it wasn't a disputed
25  issue I would be home sipping a Mai Tai next to
                                        Page 200
```

```
 1  property types, I'd simply call them variations
 2  in construction styles.
 3     Q.  Some are rental, some are owner
 4  occupied; right?
 5     A.  Yes.  Of course.
 6     Q.  Some are vacant, some are occupied.
 7     A.  Yes.
 8     Q.  Some are in historic district and some
 9  are not.
10     A.  Maybe.  I haven't investigated the
11  extent of the historic district.
12     Q.  There's variations in crime rates
13  across the putative class area; right?
14     A.  I haven't investigated that.
15     Q.  There have been differences in the
16  rate and degree of gentrification in various
17  parts of the class area; right?
18     A.  I haven't investigated that yet.
19  Certainly may if it turns out to be something
20  that's interesting from a valuation
21  perspective.
22     Q.  Have you done any assessment of
23  differences between particular neighborhoods in
24  the class area?
25     A.  No.  But we will as part of the merits
                                              Page 221
```

```
 1  phase.
 2     Q.  Without telling me what the variables
 3  will be, can you tell me as you sit here today
 4  roughly how many variables you will use in your
 5  model?
 6     A.  No, but I can tell you that if I
 7  developed a model to value the homes in your
 8  neighborhood, you know, outside of D.C., two
 9  million dollar, seven bath house --
10     Q.  I'm sorry to interrupt you.  This is
11  not relevant in this case, but in fact it's in
12  downtown D.C., and it has three bathrooms.
13     A.  Cool.  Well, in that case, your four
14  million dollar, three bath house, in your
15  neighborhood.  Assume I went into your
16  neighborhood and wanted to develop a valuation
17  model, I could develop a robust, strong F test,
18  high R-squared model that would explain house
19  values in your neighborhood as well or better
20  than individual appraisal models which would
21  use as variables the location, that is to say a
22  factor for the neighborhood, square footage of
23  the lot, if it's a single-family detached
24  house, square footage of the structure, age of
25  the structure, condition of the structure,
                                              Page 222
```

```
 1  number of bathrooms, and a factor for certain
 2  amenities like garage, fireplace and swimming
 3  pools, those sort or things -- so I just
 4  rounded off seven variables -- which would give
 5  me a high R-squared, a high degree of
 6  statistical significant and a strong F test.
 7  I've never seen your house, until two minutes
 8  ago I didn't know that you were inside the
 9  beltway versus outside the beltway, but I could
10  use those numbers, those coefficients to get an
11  extremely high R-squared, and do a better job
12  of explaining the value of your property than
13  an individual appraisal model.
14         If I took identically the same seven
15  coefficients and went into St. Bernard Parish I
16  could do identically the same job.
17     Q.  Does it matter, then, to your analysis
18  whether a home with those seven variables which
19  you can measure has had its roof ripped off by
20  a windstorm?  Is that irrelevant?
21     A.  Well, pre-Katrina we picked that up in
22  condition.  Post-Katrina we haven't developed
23  the factors associated with the post-Katrina
24  value yet, but we know that we're going to be
25  able to develop a mass appraisal model of
                                              Page 223
```

```
 1  pre-Katrina values, and then whatever factors
 2  affect value, whatever the transmission is
 3  between the barge and the post-barge values
 4  are, that's going to have to be done in some
 5  sort of systematic, cohesive, comprehensive
 6  fashion, and the mass appraisal model is going
 7  to do a far, far better job of doing that than
 8  the individual model would do.
 9     Q.  But presumably you will have to know
10  some specific facts about each individual
11  property in order to apply your model.
12     A.  Pre or post, and fortunately enough
13  the mass appraisal model is the statistically
14  significant, efficient way of doing that.
15     Q.  Okay, but you will have to know
16  specific -- I'm not challenging you for the
17  moment on whether it's superior or not.  But
18  just simply as a factual matter, in order to
19  apply the model -- not to construct it, but to
20  apply it in this case, you will have to know
21  specific facts about each property; correct?
22     A.  Probably.  And I say probably because
23  I haven't, you know -- it raises some
24  intriguing issues about whether we have to do
25  it in total or not, whether there's some
                                              Page 224
```

56 (Pages 221 to 224)