## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: KATRINA CANAL BREACHES | * | CIVIL ACTION |
| CONSOLIDATED LITIGATION | * | |
| | * | NUMBER: 05-4182 "K"(2) |
| | * | |
| | * | JUDGE DUVAL |
| | * | |
| PERTAINS TO: *MRGO &Robinson* | * | MAG. WILKINSON |
| (No. 06-2268) | * | |

**************************************************************************

## THIRD NOTICE OF CONTINUATION OF
## VIDEO-TAPED FEDERAL RULE 30(b)(6) DEPOSITION

**TO:**    To all Defendants and their respective counsel,

> Through Defense Liaison Attorney of Record:
> Ralph S. Hubbard III
> Lugenbuhl, Wheaton, Peck, Rankin & Hubbard
> 601 Poydras St., Suite 2775
> New Orleans, Louisiana 70130-6041

PLEASE TAKE NOTICE that the MRGO Plaintiffs and Plaintiffs Norman Robinson, Kent Lattimore, Lattimore & Associates, Tanya Smith, Anthony Franz, Jr., and Lucielle Franz, pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, will take the video-taped deposition upon oral examination of the **UNITED STATES OF AMERICA, BY AND THROUGH THE UNITED STATES ARMY CORPS OF ENGINEERS** (hereinafter the "Corps"), concerning the matters as set forth on Exhibit A attached hereto.

The following deposition will take place at the Army Corps's New Orleans District Headquarters, 7400 Leake Ave., New Orleans, LA 70118-3651 on **Tuesday, November 25, 2008** commencing at **9:00 a.m** of the designee **Reed Mosher**.

The deposition will continue from day to day thereafter, weekends and holidays excluded

until complete. The depositions will be taken before a Notary Public or some other officer authorized to administer oaths under the law.  You are invited to attend and examine the witnesses if you so desire.

The **UNITED STATES OF AMERICA, BY AND THROUGH THE UNITED STATES ARMY CORPS OF ENGINEERS** is requested to designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and to set forth, for each person designated, the matters on which the person will testify.

Plaintiffs reserve the right to record the deposition stenographically, as well as by videotape, audiotape, live note, and will be transcribed.  The deposition is being taken for the purposes of discovery, for use at trial, or for such other purposes as are permitted under the Federal Rules of Civil Procedure.

The deposition will be upon oral examination before an officer authorized to administer oaths and will be recorded by videotape, audiotape, stenographic recording, live note and will be transcribed.

## DEFINITIONS

1.   "You" and its various forms such as "your" and "yourself" shall mean the person subject to this notice and/or subpoena and/or request for production and all present and former agents, employees, representatives, attorneys, custodian of records, and all other persons acting on behalf of such person, including, but not limited to, deponent, its divisions, parents, subsidiaries, related companies or corporations, predecessors, successors, and all present and former officers, directors, agents, employees, representatives, and attorneys, and all other persons acting or purporting to act on behalf of deponent.

2.   "Documents" shall mean or refer to all written or graphic matter of every kind of description, however, produced or reproduced, whether draft or final, original or reproduction, and all tangible things within the scope of Federal Rule of Civil Procedure 30(b)(6), specifically including, but not limited to: writings, graphs, charts, photographs, satellite and/or radar imagery, telephone records, data compilations (from which information can be obtained, translated, if necessary, by the respondent through detection devices into reasonably usable form), letters, correspondence, e-

2

mail communications, memoranda, minutes, notes, contracts, agreements, books, diaries, time sheets, laboratory books, logs, bulletins, circular, notices, rules, regulations, prospects, directions, teletype messages, inter-office communications, intra-office communications, reports, company worksheets, credit files, evidence of indebtedness, negotiable instruments, telegrams, mailgrams, books, news releases, newspapers, magazines, advertisements, periodicals, pamphlets, sketches, drawings, statements, reports, articles of incorporation, by-laws, directives, minutes of meetings, balance sheets, income and loss statements, profit and loss statements, inventories, operating budgets, accounting worksheets, financial accounts, bills, vouchers, bank checks, proposals, offers, orders, acknowledgments, receipts, invoices, checks, working papers, telephone messages (whether written or recorded), notebooks, post cards, evaluations, recommendations, annual reports, confirmations, leases, analyses, feasibility or market studies, disbursement requests or orders, charts, graphs, indices, projections, forms, data sheets, data processing discs, or readable computer-produced interpretations thereof, booklets, articles, manuals, speeches, stenographic notes, maps, studies, tests, surveys, cables, tape and disc recordings (both audio and video), blueprints, containers, cartons, package labels, slides, audit reports, tender offers or invitations, personal interviews, and summaries, abstracts, compilations or paraphrases of any of the foregoing, or material similar to any of the foregoing, however denominated, which are in the possession, custody or control of the party upon whom this subpoena and/or request for production of documents is served or to which said party can obtain access.  The subpoena and/or request for production of documents calls for originals, unless otherwise specified, and for all copies when originals are not available.  If a document has been prepared in several copies, or additional copies have been made and the copies are not identified (or by reason of subsequent modification of the copy by additions or notations, or other modifications, are no longer identical), each non-identical copy is a separate "document."

3.    With respect to the production of any documents which are claimed to be privileged, a statement shall be provided by the attorneys for the respondent setting forth as to each such documents (and, where applicable, each attachment thereto):

       a.    the name of the sender, if any, of the documents;

       b.    the name of the author of the document;

       c.    the name of the person, if any, to whom the document and copies were sent;

       d.    the date of the document;

       e.    the date on which the document was received by those having possession of the document;

       f.    a description of the nature and the subject matter of the document;

       g.    the statute, rule or decision which is claimed to give rise to the privilege;

       h.    the last-known custodian of the document and the present location of the document;

       i.      attachments to the document;

       j.      the number of pages comprising the document;

       k.     whether the document is handwritten, typewritten or otherwise prepared; and

       l.      any other information which is useful in identifying or is necessary to identify the document.

4.     Whenever appropriate, the singular form of the word shall be interpreted in the plural and vice versa.

5.     All words and phrases shall be construed as masculine, feminine, or neutral gender according to the context.

6.     "And" as well as "or" shall be construed either disjunctively as necessary to bring within the scope of the subpoena and/or request for production of documents any matters which might otherwise be construed to be outside of the scope of the subpoena and/or request for production of documents.

7.     "Identify" with regard to a natural person, means to provide the name, last known address, last known telephone number; whether ever employed by you, and if so, dates of employment, descriptions and/ or title of each position held, and the reasons for termination; and, current employer and/or last known employer and position held.

"Identify," *with regard to a corporation*, means to provide the name of the entity along with its primary business address and telephone number.

"Identify," *with regard to documents or other inanimate objects*, means to provide the date, author, address, number of pages, subject matter, custodian of the document, and location of the document.

8.     a.     The term "IPET" means Interagency Performance Evaluation Task Force.

     b.     The term "IPET Report" means the Final Report of the Interagency Performance Evaluation Task Force, *Performance Evaluation of the New Orleans and Southeast Louisiana Hurricane Protection System*, all volumes, dated March 26, 2007.

9.     a.     The term "TLA" means Team Louisiana, a team of Louisiana-based academic and private sector experts that was commissioned in October 2005 by the Louisiana Department of Transportation and Development to assemble to "collect forensic data related to the failure of the hurricane protection structure systems around greater New Orleans that occurred during passage of Hurricane Katrina on the morning of 29 August 2005.

b. The term "TLA Report" means the Final Report of Team Louisiana, *The Failure of the New Orleans Hurricane protection structure System during Hurricane Katrina*, dated December 18, 2006.

10. a. The term "ILIT" means Independent Hurricane Protection Structure Investigation Team, a team of experts led by the University of California at Berkeley.

b. The term "ILIT Report" means the Final Report of the Independent Hurricane protection structure Investigation Team, *Investigation of the Performance of the New Orleans Hurricane Protection Systems in Hurricane Katrina on August 29, 2005*, dated July 31, 2006.

11. The terms "IHNC" and "Industrial Canal" mean the Inner Harbor Navigation Canal a/k/a the "Industrial Canal," a deep draft navigation canal which connects Lake Pontchartrain, the Mississippi River, and Reach 1 of the MRGO.

12. The term "GIWW" means the Gulf Intracoastal Waterway. The GIWW is the portion of the Intracoastal Waterway located along the Gulf Coast of the United States. It is a navigable inland waterway that provides a shallow draft channel with a controlling depth of 12 ft, and was primarily designed for barge transportation. For the purposes of this litigation, GIWW means the reach between the Mississippi River to the west and the Pearl River to the east.

13. a. The term "MR-GO" or "MRGO" means the Mississippi River Gulf Outlet Canal, a 76 mile deep draft navigation channel that extends southeast from the Inner Harbor Navigation Canal at the Port of New Orleans to the deep water in the Gulf of Mexico along St. Bernard and Orleans Parishes. The MR-GO has three distinct sections that are described as "Reaches" herein.

b. The term "Reach 1 of the MR-GO" means the east-western trend of the MR-GO between the IHNC and Paris Road, until it splits into the GIWW to the northeast and "Reach 2 of the MR-GO" to the southeast. Reach 1 of the MR-GO runs on the same alignment with the GIWW and is located entirely in Orleans Parish.

c. The term "Reach 1 Extension" means the segment of the MRGO that is located in the IHNC between the IHNC Lock to the south, and Lake Pontchartrain to the north.

d. The term "Reach 2 of the MR-GO" means the southeastern land cut segment of the MRGO from Paris Road to the open waters of the Gulf of Mexico that runs through the marshes of St. Bernard Parish along Lake Borgne.

14. "17th Street Canal," "London Avenue Canal," "Orleans Avenue Canal," and "IHNC"

means the entirety of the canal systems associated with the 17th Street Canal, London Avenue Canal, Orleans Avenue Canal and IHNC, and unless otherwise noted, is not limited to any specific breach location.

15.    The term "LVP" or "LPVHPP" means the Lake Pontchartrain, and Vicinity, Hurricane Protection Project, as authorized by the Flood Control Act of 1965 (P.L. 89-298, 79 Stat. 1073, 1077 (October 27, 1965)), and in accordance with the Recommendations of the Chief of Engineers in House Document 231, 89th Congress.

16.    The term "IHNC Lock Replacement Project" means the project authorized by the River and Harbor Act of 1956 and the Water Resources Development Acts of 1986 and 1996 designed to enlarge and deepen the IHNC Lock that connects the IHNC with the Mississippi River.

17.    The term "Corps" means the United States Department of the Army, the United States Army Corps of Engineers, the Mississippi Valley Division of the United States Army Corps of Engineers, the New Orleans District of the United States Army Corps of Engineers, or any other Division or District of the United States Army Corps of Engineers.

18.    The term "Public Works Project" or "Civil Works Project" means a Congressionally authorized public works project that is designed, constructed, maintained, and/or administered by the U.S. Army Corps of Engineers.

19.    The term "Congressionally authorized" means a Public or Civil Works Project, as administered by the Corps that was authorized by the United States Congress.

20.    The term "Chief of Engineers" means the Chief of Engineers commanding the U.S. Army Corps of Engineers.

21.    The term "TERC" means Total Environmental Remediation Contract, the master contract relative to the site remediation/clearing project on the East Bank Industrial Area pursuant to the IHNC Lock Replacement Project, and any and all related agreements to this master contract.

22.    The term "EBIA" means East Bank Industrial Area, the area on the East Bank of the IHNC between North Claiborne and Florida Avenues in New Orleans that was remediated/cleared pursuant to the IHNC Lock Replacement Project, as defined herein.

23.    The term "Flood Control Project" or "Flood Control Structure" means any structure supposed to withhold water from entering populated areas, whether or not those structures technically present a flood control project or flood control structure

pursuant to the U.S. Army Corps of Engineers engineer regulations and manuals.

24.     The term "Hurricane Protection Project" or "Hurricane Protection Structure" means any structure supposed to withhold water from entering populated areas, whether or not those structures technically present a hurricane protection project or hurricane protection structure pursuant to the U.S. Army Corps of Engineers engineer regulations and manuals.

25.     The term "WGII" means Washington Group International Inc., or Morrison Knudsen Corporation.

**THIS DEPOSITION IS NOT FOR RECORDS ONLY.**

Dated: October 3, 2008

>                    **Respectfully Submitted,**
>
>                    **APPROVED PLAINTIFFS' LIAISON COUNSEL**
>
>                    ___/s/ Joseph M. Bruno_____
>                    JOSEPH M. BRUNO (La. Bar # 3604)
>                    PLAINTIFFS' LIAISON COUNSEL
>                    Law Offices of Joseph M. Bruno
>                    855 Baronne Street
>                    New Orleans, Louisiana 70113
>                    Telephone: (504) 525-1335
>                    Facsimile: (504) 561-6775
>                    Email: jbruno@jbrunolaw.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have served a copy of the above and foregoing Notice of Deposition upon all counsel of record by placing same in the United States mail, properly addressed and with first-class postage, or by facsimile or other electronic transmission this18th day of November, 2008.

_/s/ Joseph M. Bruno_

Joseph M. Bruno

**"EXHIBIT "A""**

Please produce, pursuant to Federal Rule 30(b)(6), the person(s) most knowledgeable of the following areas for the entire time from the development, construction and maintenance of the MRGO:

1. The Army Corps's procedure for obtaining congressional authorization for the MRGO.

   This topic of inquiry necessarily includes the following topic areas:

   (A) decisions on when to advise Congress of damage to the environment or other deleterious effects caused by the design, construction or maintenance of the MRGO, and

   (B) when to advise of the need for capital improvements that will mitigate or stop the damage or deleterious effects.

2. The Army Corps' analyses and/or evaluations of any modifications to the MRGO deemed necessary to address impacts on the health and safety of the human environment, both before the enactment of the National Environmental Policy Act and as defined by the National Environmental Policy Act.

3. The Army Corps' budget, appropriations, proposals, and requests for funding associated with the construction and maintenance of the MR-GO, including all supporting documentation and submissions to Congress.

4. The manner and methods of obtaining and responding to comments received from Federal, State or local agencies and/or the public regarding environmental impact(s) of the MRGO and/or any and all maintenance and operation activities of same; including the funnel effect, surge impact and the effect of bank erosion on the environment.

5. The Army Corps' exploration of alternative actions designed to avoid or minimize actual or potential adverse impacts and to evaluate the long- and short- range implications to the environment surrounding the MRGO and/or any and all maintenance and operation activities relating to same; including the funnel effect, the surge impact and the effect of bank erosion on the safety of the human environment.

6. The Army Corps' consultation(s) with concerned environmental groups, or any other concerned third party, for revisions of Corps' methods and procedures

9

for assessing the environmental impact(s) of the MR-GO and any related opportunities for public comment.

7.       Evaluations by the Corps regarding wetlands or marshland and their relationship to the design, construction, operation, maintenance, dredging of any part or parts of the MR-GO, individually or collectively, including any loss, destruction, diminution or contraction of such wetlands or marshland.

8.       Evaluations by the Corps regarding the alleged potential for the MR-GO to serve as a conduit and/or "funnel" for hurricane-generated storm surge.

9.       Evaluations by the Corps regarding erosion of the banks of the MR-GO from the wave wash of vessels traversing the MR-GO, including the Corps' evaluation of requests for reduction in vessel speed on the MRGO.

10.     Evaluations by the Corps regarding storm surges within the MR-GO, Lake Borgne, Lake Pontchartrain, the IHNC, the GIWW and their relationship to the design, construction, operation and maintenance of part or parts of the MR-GO, individually or collectively.

11.     Measures, actions, analyses, studies, and/or reports commenced and/or undertaken by the Army Corps in response to any claim, assertion, protest, and/or communication by the State of Louisiana and/or St. Bernard Parish and/or any agency or political subdivisions thereof, concerning the MR-GO's deleterious and/or negative impact and effect on the wetlands fronting Greater New Orleans, including the 1957 Tidewater Advisory Committee Report, dated 09/03/1957.

12.     The design, construction, operation, maintenance, or modification of the Inner Harbor Navigation Canal (IHNC), also known as the Industrial Canal as it relates to the development and implementation of the MRGO.

13.     The design, construction, operation and maintenance of the Mississippi River-Gulf Outlet (MR-GO).

This topic of inquiry necessarily includes the following topic areas:

(A)     Any coordination or communication between either the United States Department of the Army, the United States Army Corps of Engineers, or the New Orleans District of the United States Army Corps of Engineers, on the one hand, and either (1) the United States Department of Interior; (2) any subdivision of the United States Department of Interior, including the United States Fish and Wildlife Service; (3) any agency or political subdivision of the State of Louisiana; or (4) any other local interest or political entity, including, but not limited to, any commission associated or connected with the Port of New Orleans, on the other hand, concerning or related to (5) any investigation or reconnaissance conducted in connection with the submission of House Doc. No. 245 to the United States Congress; (6)

the preparation, compilation or drafting of any design memoranda related to the Mississippi River-Gulf Outlet; or (7) the construction of the Mississippi River-Gulf Outlet.

(B)   The design, construction, maintenance, operation and contents of any "spoil bank" constructed during, or in connection with, the construction or operation of the MR-GO.  For purposes of this notice of deposition, the term "spoil bank" shall refer to any location created, designated, demarcated, constructed or otherwise maintained for the receipt or deposit of earthen material "dredged" or otherwise excavated in connection with the construction, operating or maintenance of the MR-GO.

( C)   The dredging methods or techniques used in connection with the construction, operation or maintenance of the Mississippi River-Gulf Outlet.

14.   The design criteria, or other factors, utilized to calculate the still water height and wave runup (including freeboard) as it relates to the development of the Standard Project Hurricane, and the development of the Probable Maximum Hurricane.

15.   The facts, data, or other information, when combined with the design criteria utilized, that resulted in the design for the the MRGO Reach 2, GIWW/MRGO (Reach 1), and IHNC federal flood control structures.

16.   Information and knowledge regarding any changes in the factual assumptions utilized to develop the Standard Project Hurricane and/or the Probable Maximum Hurricane, that may have occurred over time as a result of the construction of the MRGO or the loss and/or destruction of the marsh, swamp, trees and brush, etc. in the vicinity of the MRGO.

17.   Environmental assessments, analyses, studies, reports, impact statements and/or findings of no significant impact with regard to the maintenance, operations, dredging and/or repair of the MRGO.

18.   The Army Corps's compliance with the National Environmental Policy Act and procedures for creating, drafting, filing, and/or reporting Environmental Impact Statements and/or Supplemental Environmental Reports and/or Supplemental Impact Statements for the MRGO and of its operation and maintenance as it relates environmental impacts on the safety of the human environment.

19.   The Army Corps's procedures and methods of subdividing ongoing projects for the purposes of obtaining input on environmental impact and analyses of

11

changes in the conditions of the environment surrounding the MR-GO caused by its maintenance and operation.

20.      The Army Corps's procedures for obtaining coordinated interdisciplinary input for evaluating any environmental impacts of projects and continued maintenance of projects to assess the potential environmental impact for Environmental Assessments and/or Environmental Impact Statements and/or Findings of No Significant Impact.

21.      The Army Corps's internal engineering regulations concerning the MR-GO and its operation and maintenance, including dredging and other operations and the applicable Federal Regulations and any cross reference(s) or "keys" to the corresponding CFR provision(s).

22.      The Army Corps' procedures for congressional authorization of Civil Works Projects, including decisions on when and how to seek approval for modifications in plans that spanned over time.

23.      The Reconnaissance Report.

This topic of inquiry necessarily includes the following:

(A)      the efforts by the US Corps of Engineers to understand the impact of the MRGO on the environment, relative to the Reconnaissance Report,

(B)      the decision to initiate the development of the Reconnaissance Report;

( C)      the drafting of the Reconnaissance Report.

24.      Efforts by the US Corps of Engineers to address the impact of the MRGO on the environment relative to the Reconnaissance Report, including bank erosion, increased salinity, as well as impacts on potential for MRGO to exacerbate storm surge.

25.      Communications with Congress regarding the US Corps of Engineers efforts to understand the impact of the MRGO on the environment in relation to the Reconnaissance Report, and any subsequent communications regarding the scope of work anticipated relative to the Reconnaissance Report, the financial needs of those works, and the results of the works either undertaken or deferred.

26.      The Army Corps's procedure for creating, drafting, filing, and/or reporting Environmental Impact Statements and Supplemental Environmental Reports

12

or Supplemental Impact Statements for the MR-GO, its operation and maintenance.

27.     The drafting, creation, analyses, results, and/or findings of the *Report of the Environmental Sub-Committee to the MRGO Technical Committee*, March 16, 2000. *See* Exhibit "A" at NED-188-000001511-1630.

28.     Any measures, actions, further analyses, studies, reports, recommendations, and/or communications with Congress commenced and/or undertaken by the Army Corps in response to the *Report of the Environmental Sub-Committee to the MRGO Technical Committee*.

29.     The drafting, creation, analyses, results, and/or findings of the *Habitat Impacts of the Construction of the MRGO*, December 1999, prepared by the New Orleans District Corps of Engineers. *See* Exhibit "A" at NED-188-000001556-1591.

30.     Any measures, actions, further analyses, studies, reports, recommendations, and/or communications with Congress commenced or undertaken by the Army Corps in response to the *Habitat Impacts of the Construction of the MRGO*.

31.     The analyses, studies, reports, and decision making concerning the Army Corps's conceptual plan to construct a MR-GO/GIWW surge barrier as detailed in the Army Corps's Greater New Orleans Hurricane and Storm Damage Risk Reduction System 100-Year Design Map downloaded from http://www.mvn.usace.army.mil/hps/100yr_design_map.html.

32.     The analyses, studies, reports, and decision making concerning the Army Corps's conceptual plan to construct flood protection along Reach 2 of the MR-GO ("Upper St. Bernard Levee" and "Lower St. Bernard Levee") ranging in height from 26.5 feet to 29 feet as detailed in the Army Corps's Greater New Orleans Hurricane and Storm Damage Risk Reduction System 100-Year Design Map downloaded from http://www.mvn.usace.army.mil/hps/100yr_design_map.html.

33.     The analyses, studies, reports, and decision making concerning the Army Corps's conceptual plan to construct the "Seabrook Surge Barrier" at the northern end of the IHNC as detailed in the Army Corps's Greater New Orleans Hurricane and Storm Damage Risk Reduction System 100-Year Design Map downloaded from http://www.mvn.usace.army.mil/hps/100yr_design_map.html.

34.     All scientific research and studies relative to the effects of wetlands and/or

13

swamps on hurricane generated waves.

35.     All scientific research and studies relative to the effects of hurricane generated surge, current or waves on earthen levees.

36.     Studies and evaluations regarding the closure of MRGO, who had authority to initiate the studies and subsequent procedures, and the results of these studies.

37.     The performance of the flood control structures along the MRGO, GIWW, and IHNC during Hurricane Katrina.

38.     The four-page report entitled "Mississippi River-Gulf Outlet, PM-R Proposal for Gaining National Environmental Policy Act Compliance for the Operation and Maintenance Program," (NOP-019-000000207), dated April 11, 2005, including all versions and iterations of that report entitled "Mississippi River-Gulf Outlet, PM-R Proposal for Gaining National Environmental Policy Act Compliance for the Operation and Maintenance Program," (NOP-019-000000207), dated April 11, 2005.

39.     All documents commenting on, concerning, or addressing the report entitled "Mississippi River-Gulf Outlet, PM-R Proposal for Gaining National Environmental Policy Act Compliance for the Operation and Maintenance Program," (NOP-019-000000207), dated April 11, 2005.

40.     Measures, actions, analyses, studies, and/or reports commenced and/or undertaken by the Army Corps concerning a change in hydrology associated with and/or caused by the digging and/or dredging of the MR-GO.