# Exhibit 1

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

**IN RE:** KATRINA CANAL BREACHES      CIVIL ACTION
**CONSOL**IDATED LITIGATION

NO. 05-4182
"K" (2)

**PERTAINS TO:** MRGO                JUDGE DUVAL

**FILED IN:** 05-4181, 05-4182,    MAG. WILKINSON
**05-5237,** 05-6073, 05-6314,
05-6324, 05-6327, 05-6359,
06-0225, 06-0886, 06-1885,
06-2152, 06-2278, 06-2287,
06-2824, 06-4024, 06-4065,
06-4066, 06-4389, 06-4634,
06-4931, 06-5032, 06-5155,
06-5159, 06-5161, 06-5162,
06-5260, 06-5771, 06-5786,
06-5937, 07-0206, 07-0621,
07-1073, 07-1271, 07-1285

Videotaped Deposition of

KENNETH PAUL ARMSTRONG, JR.,

28 Park Place Drive, Apartment 601, Covington,

Louisiana  70433, taken in the offices of

Bruno & Bruno, 855 Baronne Street, New

Orleans, Louisiana 70113, on Monday, the 9th

day of July, 2007, beginning at 9:26 A.M.

KENNETH ARMSTRONG (MRGO)                                          7/9/2007

| | Page 6 | | Page 8 |
|---|---|---|---|

**Page 6**

1    for Lake Borgne Basin Levee District.
2        MR. GILBERT ANDRY:
3        And Gilbert Andry, IV for the
4    Plaintiffs.
5    EXAMINATION BY MR. MARPLE:
6        Q.  Have you ever had your deposition
7    taken before?
8        A.  No.
9        Q.  If you need a break at any time, you
10   just let me know or your lawyer know and we'll
11   try to accommodate those.
12       A.  Okay.
13       Q.  Sometimes you just have to take a
14   little break, --
15       A.  Right.
16       Q.  -- a restroom break or whatever.
17   Just let us know.
18       Now, another thing, this is being
19   taken down by the Court Reporter over here and
20   he's going to take down what I ask and your
21   answers.  So if you'll let me finish my
22   question before you answer, and I will try to
23   let you finish your answer before I ask
24   another question, then we'll get a clear
25   question and answer.

**Page 8**

1        Q.  All right.
2        A.  Chalmette.
3        Q.  Okay.  Did you go to school down
4    there?
5        A.  Yes, I did.
6        Q.  What high school did you go to?
7        A.  Chalmette High School.
8        Q.  What year did you graduate?
9        A.  '81.
10       Q.  When did you meet your wife
11   Jeannine?
12       A.  Probably '78, '79.
13       Q.  Did she go to the same high school?
14       A.  No.  She went to an all-girls
15   school.
16       Q.  Catholic school?
17       A.  No, public high school.
18       Q.  What was -- What's it called?
19       A.  Andrew Jackson.
20       Q.  And then did you go to any kind of
21   vocational school or college after high
22   school?
23       A.  No.
24       Q.  Did you go to work?
25       A.  Yes.

**Page 7**

1        A.  Okay.
2        Q.  We'll try not to over-talk each
3    other.
4        A.  All right.
5        Q.  I think you told us you have not
6    been deposed before?
7        A.  Correct.
8        Q.  Have you ever been involved in a
9    lawsuit where you sued somebody or somebody
10   sued you?
11       A.  Not me.  My son was sued when he was
12   on my insurance.
13       Q.  Okay.  Can you give us your date of
14   birth?
15       A.  2/21/63.
16       Q.  And where were you born?
17       A.  In New Orleans.
18       Q.  What part?
19       A.  Shoot.  I think it was Mercy
20   Hospital, which is in I guess the outside of
21   central city.
22       Q.  And what part of New Orleans did you
23   grow up in?
24       A.  I didn't grow up in New Orleans.  I
25   grew up in St. Bernard Parish.

**Page 9**

1        Q.  What did you do?
2        A.  I first started out as a helper on a
3    truck for Anheiser-Busch.
4        Q.  And when you say a helper, I take it
5    you were loading and unloading cases of beer
6    at retailers?
7        A.  Correct.
8        Q.  And when did you and Jeannine get
9    married?
10       A.  '82.
11       Q.  And I understand she's a Registered
12   Nurse?
13       A.  Correct.
14       Q.  And when did she finish up her
15   schooling?
16       A.  I am guessing here.  Maybe 12 years,
17   13 years ago.
18       Q.  Before she was a Registered Nurse,
19   what did she do?
20       A.  She worked for doctors' offices and
21   things like that, if my memory serves me
22   right.
23       Q.  And have you been in the beer
24   business the whole time since you started
25   working?

3  (Pages 6 to 9)

1     A.  Correct.
2     Q.  Where are you employed now?
3     A.  Yes, that same place.  Southern
4  Eagle.  Anheiser-Busch sold out to an
5  individual which is named Southern Eagle now.
6     Q.  But basically it's the same --
7     A.  Correct.
8     Q.  -- outfit?
9     A.  The same responsibilities, the same
10  thing.
11     Q.  And just let me remind you, you are
12  anticipating my questions just a hair --
13     A.  Okay.
14     Q.  -- and answering before I finish.
15     A.  Okay.
16     Q.  And I apologize for doing that.
17     A.  No, no, that's fine.  Okay.
18     Q.  And where is Southern Eagle located?
19     A.  Metairie, Louisiana.
20     Q.  And do you work out of an office
21  there?
22     A.  Yes, I do.
23     Q.  And pre-Katrina, the same place?
24     A.  Yes.
25     Q.  You live in Covington now; right?

Page 10

1  Conference Center, which is a hotel on LSU's
2  campus, and we actually stayed there until --
3  I am not exactly sure, a month, month and a
4  half.
5     Q.  And how long -- Well, let's ask you
6  -- let's just say the storm hit New Orleans
7  about 6:00 A.M., I mean, is that fair enough,
8  on the 29th?  Just roughly.
9     A.  I guess, yeah.
10     Q.  And how long before that did you
11  evacuate?
12     A.  If it hit 6:00 A.M. on Monday
13  morning?
14     Q.  Correct.
15     A.  Maybe 27 to 30 hours.
16     Q.  And who was living with you at the
17  time that evacuated with you?
18     A.  My whole family.  Me and my three
19  children.
20     Q.  Was Kenny living with you at that
21  time?
22     A.  Yes, he was.
23     Q.  And Katie?
24     A.  Yes.  Well, she was actually living
25  still, you know, -- but she was actually up in

Page 12

1     A.  Correct.
2     Q.  In an apartment?
3     A.  Yes.
4     Q.  Anybody besides Jeannine live there
5  with you?
6     A.  My youngest daughter.
7     Q.  Okay.  What's her anme?
8     A.  Renee.
9     Q.  How old is Renee?
10     A.  16.
11     Q.  Let's get the other kids.  I might
12  have missed those.  How many children do you
13  have?
14     A.  I have Kenny, who's 23; Katie, who's
15  20.  She has an apartment in Baton Rouge, but
16  she also stays with us in the summertime and
17  on weekends at times.
18     Q.  And then Renee is 16?
19     A.  Correct.
20     Q.  Can you just tell us generally what
21  your Hurricane Katrina experience was, where
22  you were before, during, and after?
23     A.  We evacuated on Sunday morning about
24  3:00 A.M. before the storm hit.  We evacuated
25  to Baton Rouge, Louisiana at the Lod Cook

Page 11

1  Baton Rouge starting school.  They had just
2  started at LSU.
3     Q.  And since you were in Baton Rouge, I
4  take it you didn't see anything with your own
5  eyes about what the storm did to your house or
6  otherwise in New Orleans?
7     A.  Not at the time of the storm, no.
8     Q.  Then when did you first return to
9  your home at 4016 Hamlet?
10     A.  It would probably have been, I am
11  going to say -- This is almost two years, so I
12  am speculating.  It was probably after Rita
13  hit.  Because they wouldn't allow us back in
14  down there after Rita.
15     Q.  Sometime the end of September,
16  beginning of October, in that range?
17     A.  I would say in that.  Like I said, I
18  am not exactly sure of the date, but it took a
19  while because we live -- where we lived, it
20  took a while to get the streets cleaned for us
21  to be able to get in there.
22     Q.  Mud in the street?
23     A.  Oh, yeah.
24     Q.  When you went back, was there still
25  mud in the street then?

Page 13

Page 14

```
 1      A.  No, it was actually pushed -- pushed
 2  up into the property.
 3      Q.  When you went in, what did you see
 4  there in your house?
 5      A.  I guess, you know, the best thing I
 6  can describe it is that it looked like
 7  somebody threw up.  What I mean, the house was
 8  turned upside down.  There was nothing
 9  salvageable.  Nothing.
10      Q.  During the storm did you go up on
11  any satellite sites or anything like that, try
12  to see your house, see where --
13      A.  We tried to.  We tried to.  We
14  wasn't able to get up, our property up on the
15  satellite at the time.
16      Q.  And so between the time you
17  evacuated and you went back, did you see your
18  property through any photographs or satellite
19  --
20      A.  No.
21      Q.  -- or anything?
22      A.  I wasn't able to.  You can get a
23  general area, but you couldn't actually get a
24  fix on your property.  It was -- Some people
25  did, but it was hard to pinpoint what house
```

Page 15

```
 1  was yours.
 2      Q.  Now, your Counsel produced to us a
 3  DVD.
 4      A.  Correct.
 5      Q.  And can you tell us about that
 6  generally, what the background of that is?
 7      A.  It's basically someone who -- It's a
 8  lot of guys from the fire department who
 9  stayed, they were put in the shelter at the
10  Domino Sugar refinery, and that's where they
11  started out at.  At the beginning of the
12  video, I think in one -- one of them states
13  after some of the weather started and
14  everything that we are getting the back side
15  of the storm.  And then the water appeared.
16  That's what I saw.  And then you see them
17  going through all parts of the community in
18  their boat and trying to retrieve food and see
19  where people were and things like that.  And
20  then they made their way to one of the
21  firemen's home -- mother's home who lives
22  about seven houses from me.  That's how we
23  were able to get that video.
24      Q.  Do you know that lady?
25      A.  Yes.
```

Page 16

```
 1      Q.  What's her name?
 2      A.  Miss Helena and Ron Silver.
 3      Q.  And have you watched that whole DVD?
 4      A.  Pretty much, yeah.
 5      Q.  And there's one part on there where
 6  the fireman that's narrating it says "There's
 7  Kenny Armstrong's house"?
 8      A.  Correct.
 9      Q.  Do you remember that part?
10      A.  Yes, I do.
11      Q.  Could you see your house there?
12      A.  Yes, I could.
13      Q.  And the water was up over the roof
14  line?
15      A.  Over the gutter cans at the time,
16  yes.  Maybe a few feet up above that.
17      Q.  And then does your house appear on
18  there at any other time?
19      A.  No.  No.  Just that one time on me.
20      Q.  There's some people at the end,
21  towards the end where there's a lady out in
22  the yard and then she goes in the house.  Do
23  you know those people?
24      A.  I'd have to see the video, because I
25  have seen a few videos, so I am not sure.  I
```

Page 17

```
 1  would have to see the video to see.
 2      Q.  Do you know those firemen?
 3      A.  I know a few of them.
 4      Q.  Do you know the fellow that was
 5  narrating it?
 6      A.  Yeah.  Byron Silver.
 7      Q.  And then it's his mother that lives
 8  --
 9      A.  Correct.
10      Q.  -- a few houses from you?
11      A.  Correct.
12      Q.  Let's say we stand in your front
13  yard at 4016 Hamlet.
14      A.  Uh-huh (affirmatively).
15      Q.  Which way do you look to find her
16  place?
17      A.  I live in a cul-de-sac.  The street
18  comes straight at me.  If it turns, if I am
19  looking out my front door, his parents would
20  be to my left.
21      Q.  And they're up around the turn?
22      A.  Yeah, it's really one house.  The
23  street starts, I'm off to the side right there
24  and looking down the street.
25      Q.  When you came back, did you bring a
```

1  which ones were which and I knew it wasn't
2  yours.  But I was trying to determine what
3  photos were what.
4      MR. GILBERT ANDRY:
5      My dad grew up with tin cabinets.
6      MR. MARPLE:
7      Those are '50s.  I had them, too,
8  when I was a kid.
9  EXAMINATION BY MR. MARPLE:
10     Q.  All right.  And about when did you
11  get your check from Liberty Mutual for your
12  wind damage?
13     A.  About August.  Somewhere in August.
14  It was a couple of weeks after the agent came
15  out.
16     Q.  Of 2006?
17     A.  Yeah, it was either late July or
18  early August.
19     Q.  And was that the first check you
20  got?
21     A.  No.  We had received the flood
22  insurance check.
23     Q.  And you made a claim for that,
24  obviously?
25     A.  Oh, yeah.

Page 26

1  worth?
2     A.  Hoping more, but I would say yeah.
3     Q.  And if I am doing the math --
4      MR. GILBERT ANDRY:
5      If you just break down the square
6  footage, I think that's how they sold
7  it in St. Bernard before the storm.
8  Pretty much anywhere in New Orleans,
9  if you break down the square footage,
10  you'll be able to see what he would
11  have at least asked for his if he were
12  to sell it.
13     THE WITNESS:
14     If I was asking, I would ask
15  probably 165 range.
16  EXAMINATION BY MR. MARPLE:
17     Q.  Okay.  That's good.  So far I have
18  only added up, I think, and I might have done
19  the math wrong, $87,000 in insurance you got.
20     A.  Right.
21     Q.  And can you explain why you didn't
22  get more than that?  Do you know why?
23     A.  Well, flood was all we had, was
24  52,000, so we got the max.  And wind damage
25  from Liberty Mutual was all -- that's what we

Page 28

1     Q.  Did you fill out a form?
2     A.  I am not sure.  My wife probably --
3  I think we had to call in and, you know,
4  something like that.  I am not sure.
5     Q.  Did they send anybody out?
6     A.  I don't think flood insurance did.
7     Q.  They wrote you a check?
8     A.  Right.
9     Q.  And what was the amount of your
10  flood insurance?
11     A.  Total was 5- -- 52,000.
12     Q.  And then did you get something on
13  the contents?
14     A.  It was the total, 52,000.
15     Q.  What was your house appraised at or
16  about what was it worth at the time of
17  Katrina?
18     A.  We hadn't had an appraisal, but my
19  neighbor, at 1,600 square foot, sold for 147
20  about four months before the storm.
21     Q.  And was that house sort of
22  comparable to yours?
23     A.  Mine's about 1,870.
24     Q.  And somewhere around 140,000,
25  150,000?  Is that what you think yours was

Page 27

1  agreed the damage was.  They pretty much said
2  it was all water, you know.  So --
3     Q.  Did you hire anybody on your side
4  when you were having this dispute with Liberty
5  Mutual to look at your house and make a report
6  and tell them what it was?
7     A.  Yes, I hired an appraiser to come
8  out and give us an appraised value on what it
9  would cost to fix.
10     Q.  And what was that number?
11     A.  I am not sure.
12     Q.  Do you have that report somewhere?
13     A.  If I am not mistaken, we probably
14  have it.
15     Q.  And what about some engineer type to
16  come out and look at the fireplace and
17  different things and say, "Water is coming
18  down here"?  Did you have somebody on your
19  side of this dispute to look at that?
20     A.  No, we didn't.
21     Q.  That was what you observed and what
22  you thought and what you told them?
23     A.  Correct.
24     Q.  Do you have any current disputes
25  going with any insurers that you're aware of?

Page 29

8  (Pages 26 to 29)

KENNETH ARMSTRONG (MRGO)                                    7/9/2007

Page 30

1      A.  No.  No.
2      Q.  And you took part of that insurance
3  money and paid off the mortgage?
4      A.  Correct.
5      Q.  All right.  And then at some point
6  you made a decision --
7      A.  There's one thing.  I haven't filed
8  anything yet.  Could be with Liberty Mutual.
9      Q.  You may sue them to get some more
10  money?
11     A.  I am not sure yet.
12     Q.  You think they owe you more; right?
13     A.  Well, I am not sure.
14     Q.  Well, put it this way.  You think
15  that there was more damage done by this wind
16  and rain than what they paid you for?
17     A.  Well, I think the dispute is going
18  to be the content -- attic content.
19     Q.  When you got paid by Liberty, did
20  they break that out content?
21     A.  No, there was no content at all.
22     Q.  And you think they ought to be
23  liable for some of the contents that were
24  damaged in there?
25     A.  Some portion up in the attic.

Page 31

1      Q.  I might have asked you this a little
2  bit.  Maybe you can tell me a little bit more
3  about it.  Did you have shingles off?
4      A.  Yes, we did.
5      Q.  How many or what percentage?
6      A.  I think y'all have pictures.  It's a
7  decent amount.
8      Q.  Were there parts of the roof that
9  were totally exposed where you could see the
10  under-roof there?
11     A.  No.
12     Q.  Did you ever have a blue tarp up?
13     A.  No.
14     Q.  Now, you made a decision at some
15  point to demolish that house.
16     A.  Correct.
17     Q.  And how did you come to make that
18  decision?
19     A.  Well, the estimated value to fix or
20  replace the home they said was in the 200 and
21  something thousand range.  I think it was
22  274.
23     Q.  Who said that?
24     A.  That was something I got from LRA,
25  estimated value to rebuild or repair was 200

Page 32

1  something thousand.
2      Q.  And do you know why it was so high?
3      A.  I guess due to the storm, the prices
4  to get people to do work and the materials to
5  build a house was going up in price, I would
6  imagine.
7      Q.  Were they going to have to take that
8  slab out and do something different?
9      A.  I guess it depends on what I decided
10  to do there.
11     Q.  Were you going to have to raise the
12  house up?
13     A.  That seems to be the regulations
14  now.
15     Q.  Do you have paperwork where you have
16  got something from LRA that says, gives you
17  this $274,000 figure?
18     A.  Yes.
19     Q.  And when did -- approximately when
20  was it that you got that number from LRA?
21     A.  A few months ago.
22     Q.  Sometime in 2007?
23     A.  I would say yes.
24     Q.  When did you take the house down?
25     A.  I am not sure what date.

Page 33

1      Q.  But it was in 2007?
2      A.  If I am not mistaken, it was.
3      Q.  Do you have paperwork with the
4  contractor that took it down --
5      A.  No.
6      Q.  -- that would tell that?
7      A.  No.
8      Q.  How did you get it taken down?
9      A.  We called -- We contacted the Parish
10  -- You had to sign paperwork at the Parish
11  government to get your house torn down.
12     Q.  You had to go to St. Bernard Parish?
13     A.  Correct.
14     Q.  And you go in some office and get
15  some permit or fill something out, or what?
16     A.  You had to go in and fill out some
17  paperwork agreeing to it.
18     Q.  And then that was the end of it?
19  They -- Somebody else got it taken down and
20  you weren't part of what was going on out
21  there?
22     A.  Correct.
23     Q.  Did you have to pay anything?
24     A.  No.  Not -- I didn't personally have
25  to come out of pocket.  I don't know if my

9  (Pages 30 to 33)

KENNETH ARMSTRONG (MRGO)                                    7/9/2007

1   insurance company's -- something like that was
2   done.  I don't know if it was the Federal
3   government.  I'm not sure.
4        Q.  Before you took it down, were you in
5   contact with the lawyers in this case about
6   that decision?
7        A.  No.
8        Q.  Have you been back out there since
9   it's been taken down?
10       A.  Oh, yeah.  I'm out there every other
11  day.
12       Q.  You were there every other day?
13       A.  No, I go out there every other day.
14  I work out there.
15       Q.  And what do you do out there?
16  Deliver beer?
17       A.  No, I'm the supervisor over the
18  grocery stores.
19       Q.  And so grocery stores buy beer and
20  you go out there and make sure they're happy
21  and everything is going all right and getting
22  what they want?
23       A.  Something like that.
24       Q.  What's your title?
25       A.  District sales manager.

                                     Page 34

1        the place in some neighborhoods; correct?
2        A.  Oh, correct.  Yes, there was.
3        Q.  And tell us what those blue tarps
4   were and where they came from and what they
5   did.
6        A.  It was a program I think set up by
7   FEMA, which a lot of people tried to protect
8   their homes from any further water damage
9   coming through the roof.
10       Q.  Well, what you had in Katrina is you
11  had some wind damage from the storm?
12       A.  Yes.
13       Q.  And shingles were off of various
14  roofs and things?
15       A.  Correct.
16       Q.  And then rain got in through leaks
17  in the roof and damaged some things like it
18  did at your place?
19       A.  I would imagine, yes.
20       Q.  And then, of course, you had
21  flooding in some -- a lot of places.
22       A.  Yes.
23       Q.  There were some places, however,
24  that didn't flood very much or almost not at
25  all; right?

                                     Page 36

1        MR. GILBERT ANDRY:
2            If you want to know his real
3        title, it's the Bud Man.
4   EXAMINATION BY MR. MARPLE:
5        Q.  And the Bud Man's interested in
6   getting shelf space and signs and pricing and
7   all of that, I take it?
8        A.  Compliance with company policy
9   mostly.  Salesman's mostly out there for the
10  other things that you mentioned.
11       Q.  And you don't have a reason,
12  specific reason to go to Hamlet Place?  You
13  just swing around there and see how the
14  neighborhood is doing, I take it?
15       A.  Correct.
16       Q.  And post-Katrina there were at least
17  some blue tarps out in that neighborhood;
18  right?
19       A.  I'm sure there was.  I don't
20  remember specifically, but I'm sure there
21  was.  My neighbor I think had one.
22       Q.  And if you go around New Orleans,
23  greater New Orleans, at least post-Katrina
24  when you could get back in, late '05, early
25  2006, you would see those blue tarps all over

                                     Page 35

1        A.  Correct.  Not in my area, though.
2        Q.  You were living out there next to
3   this big levee; right?
4        A.  A few hundred yards away.
5        Q.  And what's the name of that levee?
6        A.  I am not sure.
7        Q.  Florida Wall?  Did somebody call it
8   that?
9        A.  They call it the Florida Canal or 40
10  Arpent Canal.
11       Q.  All the time you lived out there,
12  did water ever come up over that other than
13  Katrina?
14       A.  I don't -- Not since I have been
15  there, no.
16       Q.  And that area on the other side of
17  that levee or canal is what?
18       A.  More of a marsh, broken marsh with
19  canals and fishing things and stuff like that.
20       Q.  And water high enough up that you
21  could take a boat out on it at least in
22  places, right?
23       MR. GILBERT ANDRY:
24           Objection to the form.
25       THE WITNESS:

                                     Page 37

                              10  (Pages 34 to 37)

KENNETH ARMSTRONG (MRGO)                                    7/9/2007

1          That's -- I object to the form.
2      I'm sure he had to worry about it.
3      But it just wasn't his.
4          THE WITNESS:
5          Yeah.
6      EXAMINATION BY MR. MARPLE:
7      Q.   Financially, that -- and
8  insurance-wise --
9      A.   No, that was not mine.  That was
10 theirs.
11     Q.   That was the company's?
12     A.   Yeah.
13     Q.   And were your three personal
14 automobiles okay?
15     A.   We took them all with us.
16     Q.   Did you have a boat?
17     A.   Yes, I did.
18     Q.   Was it there at the property?
19     A.   Yes, it was.
20     Q.   Did you take it or leave it?
21     A.   No, I left it.
22     Q.   And what kind of boat was that?
23     A.   It was an 18 foot Scout with a 120
24 Evinrude.
25     Q.   And what happened to it?
                                    Page 46

1  the value of our home.
2      Q.   What are they saying?
3      A.   140.
4      Q.   And what are you saying?
5      A.   160s.
6      Q.   Now, if this went the way you wanted
7  it to go, you could get maybe $150,000?
8      A.   No.  They deduct any money -- Any
9  monies you received for structure, they take
10 -- they take off.
11     Q.   So that would be the insurance?
12     A.   A minus.  A minus.  They would take
13 -- If I had -- My content on flood was 42 and
14 they would take that off, and any -- Most of
15 the Liberty Mutual money was structure.  So
16 they take that off.  So that would be 77,000,
17 78,000 deducted from Road Home.  Now, Road
18 Home is a different animal.  Some people are
19 getting a grant to rebuild.  We lose our
20 property.
21     Q.   And explain that to me, how that's
22 going to work for you the way you anticipate
23 it.
24     A.   Well, some people get a grant or
25 money for 150,000 or whatever they deem to fix
                                    Page 48

1      A.   It floated about 10 or 12 houses
2  down with the trailer, and the trailer on it
3  and everything, it was -- Basically when I got
4  it, it was stuck in a tree.  Pulled it out of
5  a tree.
6      Q.   Was it okay, though?
7      A.   No, I still got it, but, I
8  mean, it's -- I moved it to a safer location
9  and -- but it -- it -- I still got it.  I can
10 get you pictures of it if you want it.
11     Q.   Was there any insurance coverage on
12 it?
13     A.   No.  No.
14     Q.   Now, aside from insurance, have you
15 gotten any benefits paid to you through Road
16 Home or anything like that?
17     A.   No.  Not yet.
18     Q.   Have you applied for Road Home?
19     A.   Yes, we did.
20     Q.   When did you do that?
21     A.   I am not sure of the date.
22     Q.   Recently?
23     A.   No.  It's been a while.
24     Q.   Have you heard anything from them?
25     A.   A few times we talked.  We dispute
                                    Page 47

1  or repair their home.  We forfeit our property
2  for the 77,000 or 76,000.
3      Q.   And then you take that money and you
4  go rebuild somewhere else?
5          MR. GILBERT ANDRY:
6          Objection to the form.  It
7      assumes that he would rebuild.
8          THE WITNESS:
9          Right.
10 EXAMINATION BY MR. MARPLE:
11     Q.   What can you do with that money, if
12 you get it?
13     A.   Well, we'll see.  It depends on what
14 SBA, they take, if they take any, because we
15 have a loan in waiting until we make a
16 decision, and we are not sure if they take the
17 money and -- but we got an agreement right now
18 in principle -- just in waiting until we make
19 a decision of I think a 20 or 30 year loan.
20     Q.   But whatever this number is, and I
21 will just say 70,000 approximately that you
22 might get from the Road Home, somewhere in
23 that neighborhood?  Is that about it?  60?
24     A.   No, it's -- Yeah, it's 70-something
25 thousand, right at 70, I think a little bit
                                    Page 49

13  (Pages 46 to 49)

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

1  Q.  Some had even less than four feet --
2      MR. GILBERT ANDRY:
3          Objection to the form.
4  EXAMINATION BY MR. MARPLE:
5      Q.  -- in height up into the house?
6      A.  I don't know.  I mean, I can only go
7  -- Some people -- I think there was only
8  three houses maybe that didn't flood, or three
9  houses that didn't get water.  And that's all
10 speculation.
11     Q.  All right.
12     A.  Hearsay.
13     Q.  And that's because you didn't do an
14 investigation into how high water got into
15 anybody else's house; right?
16     A.  Correct.
17     Q.  Or where the water may have come
18 from?
19     A.  Like I say, only what I saw on TV.
20     Q.  Right.  But you didn't do any
21 investigation of your own?
22     A.  No.
23     Q.  Or have any engineers --
24     A.  No.
25     Q.  -- that gave you a report or

                                          Page 66

1  anything like that?
2      A.  No.  No, sir.
3      Q.  Let me hand you what we have marked
4  as Armstrong Exhibit 1, and I am going to
5  represent to you that this was produced to us
6  by your lawyers providing some information
7  about the Plaintiffs in the lawsuit, including
8  yourself.
9      A.  Okay.
10     Q.  And it lists your occupation as
11 sales supervisor, Southern Eagle.  That's
12 basically correct; right?
13     A.  Right.
14     Q.  Then it says "Current medical
15 condition, no issues".  Is that correct?
16     A.  Nothing physical, no.
17     Q.  And pre-Katrina did you have any
18 physical --
19     A.  No.
20     Q.  -- issues?
21     A.  No.
22     Q.  And then since then have you had any
23 physical issues?
24     A.  No, I would just clarify it as, you
25 know, this is -- it gets emotional at

                                          Page 67

1  sometimes, frustrating.  You live there every
2  day.  You been living this -- this didn't
3  happen two years ago, it seems like it
4  happened yesterday.
5      Q.  And it affects you one way and
6  somebody else another way; is that right?
7      A.  I would agree.
8      Q.  And let me just make sure I have got
9  this.  You have no physical issues for which
10 you're seeing a doctor or have seen a doctor
11 since Katrina?
12         MR. GILBERT ANDRY:
13             Objection to the form.  Asked and
14         answered.
15             You can answer.
16         THE WITNESS:
17             No, no, nothing where -- You
18         know, nothing where I would go see the
19         doctor.
20 EXAMINATION BY MR. MARPLE:
21     Q.  When I say physical, I am talking
22 about a disease of some kind --
23     A.  No.
24     Q.  -- or broken bone --
25     A.  No.

                                          Page 68

1      Q.  -- or where there's some physical
2  impact to you in some way.
3      A.  Not physically, no, I would say no.
4  Mentally maybe, you know.
5      Q.  And we talked about Mrs. Armstrong,
6  the brain tumor and osteomyelitis, I think;
7  right?
8      A.  I think that's what they call it.
9      Q.  Tell us -- Well, let's go back
10 pre-Katrina.  Did you have any mental distress
11 or emotional distress type issues before
12 Katrina?
13     A.  No.
14     Q.  You never have been on
15 antidepressants or anything?
16     A.  No.
17     Q.  Had ever been to a doctor or a
18 shrink for any of that stuff?
19     A.  No.
20     Q.  Now, post-Katrina you described that
21 you have some emotional upset at least or
22 something along those lines?
23     A.  Right.  I would say that's it.
24     Q.  And can you describe for us what
25 that is?

                                          Page 69

18  (Pages 66 to 69)

1    anything with that.  I am not sure,
2    you know.  But, you know, you asking
3    --
4        MR. GILBERT ANDRY:
5        Do you remember those numbers?
6    Like --
7        THE WITNESS:
8        Total?
9        MR. GILBERT ANDRY:
10       What the total was, yes.
11       THE WITNESS:
12       No, I don't.
13       MR. GILBERT ANDRY:
14       We'll get that for you.  And if
15   you don't have it, we'll get it for
16   you.
17       THE WITNESS:
18       What I will --
19       MR. GILBERT ANDRY:
20       And what I will try -- Do you
21   know where it is?
22       THE WITNESS:
23       Well, I would have to ask my
24   wife.  Like I say, she wasn't working
25   so she did a lot of these things.

Page 74

1    I would have asked to get rid of it.  There
2    was nothing wrong with it.  I fished every day
3    that I had a chance.
4        Q.  So are you seeking in this lawsuit
5    some money for the boat?
6        A.  I don't know if specifically we put
7    that down.
8        Q.  And is that what you want out of
9    this lawsuit, is money for --
10       MR. GILBERT ANDRY:
11       Let me just object to the form.
12       Before you ask that, just so you don't
13       lose your train, just trying to help
14       you so we can move it along, you
15       didn't ever get an answer to the after
16       Katrina value I don't think.
17   EXAMINATION BY MR. MARPLE:
18       Q.  What's the after Katrina value of
19   the boat?
20       A.  I don't think anybody would buy it.
21       Q.  It was worth about five grand before
22   and virtually nothing now?
23       A.  Five to six.  I would have to check
24   the book to see, but about 5,000 to 6,000.
25       Q.  And so far we have talked about some

Page 76

1        MR. GILBERT ANDRY:
2        At the next break we'll try to
3    get that for you.  You should have
4    that and I apologize for you not
5    having that.
6        MR. MARPLE:
7        Thanks.
8        MR. GILBERT ANDRY:
9        No problem.
10   EXAMINATION BY MR. MARPLE:
11       Q.  And then did we get a number on the
12   boat, as to how much it was worth then and
13   now?
14       A.  I paid, when I bought the boat in
15   '9- -- It was a '96 boat, '98, something like
16   that.  I paid $14,000 for it used.
17       Q.  And what's it worth now?
18       A.  Now?  Or before the storm?
19       Q.  Well, before the storm.  Let's take
20   -- That's a good one.
21       A.  I don't know.  5,000 or 6,000.  I
22   don't know.  I'd be guessing.
23       Q.  5,000 or 6,000 now or before the
24   storm?
25       A.  Oh, before the storm 5,000 or 6,000

Page 75

1    things, we have got some contents or personal
2    belongings, some damage to the house, maybe
3    the boat, too, and that's what you're seeking
4    in this lawsuit; I mean, among some other
5    things.  You want money for the injury to that
6    property?
7        A.  I would like my life back, but I
8    don't think that's going to happen.  We didn't
9    just lose our home.  We lost our community.
10   We lost everything that we had.  I mean, just
11   like I say, not physically -- I mean, not just
12   your house.  I lost where my wife worked,
13   where my kids went at the school, where you
14   first kissed your girlfriend.  You lost all of
15   that.
16       Q.  And have you put a number on that?
17       A.  No.  I could go back in time, I'd
18   rather it like it was.  Just that everything
19   now is just so much more expensive than it was
20   before, you know.
21       Q.  And when you say "everything", what
22   kind of things are you talking about?
23       A.  If I was to replace my home, look at
24   what it would cost me to replace what I had.
25   I mean, I don't know how much content.  You

Page 77

20  (Pages 74 to 77)

KENNETH ARMSTRONG (MRGO)                                          7/9/2007

EXAMINATION BY MR. MARPLE:
1
2       Q.  How close did your brother live to
3   you?
4       A.  Four miles.
5       Q.  Give me his name again?
6       A.  Brian Armstrong.
7       Q.  And when I say pre-Katrina, were you
8   doing this at the time of Katrina, that is, in
9   the weeks right before that, or was that
10  something a little further back?
11      A.  Correct.  We were in a phase-out
12  mode when Katrina hit.
13      Q.  Getting to be too darn hot and too
14  much darn work?
15      A.  Yeah.
16      Q.  Pardon?
17      A.  You're right.
18      Q.  Now, do you know, did you have any
19  looting or vandalism at your house?
20      A.  Like I say, there wasn't -- You
21  know, we were single stories.  I don't think
22  there was anything worth taking that I know
23  of.
24      Q.  How about people in that -- some of
25  your relatives that you told us about or

                                              Page 102

1   friends you knew that lived in that Buccaneer
2   Villa; did they have looting?
3       A.  I had a neighbor who had a two story
4   house next door, I don't know, I'm not sure
5   about the water they had, but one time I was
6   back there and I seen somebody coming out of
7   the house, but I don't know who they were or,
8   you know -- I really didn't pay a whole lot of
9   attention to it because I just don't think
10  there was anything worth taking.  My brother
11  in Lexington Place, though, his house was --
12  copper was taken out, things like that.  His
13  upstairs at his home was -- a little bit of
14  the carpet on the second floor got wet, but
15  somebody actually looted his house.
16      Q.  Were there any houses there in your
17  immediate neighborhood that you saw that got
18  blown up because of the gas, natural gas lines
19  or gas explosions?
20      A.  I didn't see any.
21      Q.  Now, if I asked this before, I
22  apologize, but do you know whether there were
23  any breaches of the levee that was right a few
24  hundred yards away from your house?
25      A.  Like I say, I never seen -- The only

                                              Page 103

1   -- The closest one to my home was the
2   Intracoastal that I heard of.  I mean that I
3   actually saw.  You know, they said there was
4   some lower -- below the --
5       MR. GILBERT ANDRY:
6           This is what he is actually
7       getting at.  Is that what you saw on
8       the news?
9       THE WITNESS:
10          That was on the news that I
11      actually saw on Monday, on the news.
12  EXAMINATION BY MR. MARPLE:
13      Q.  That was some aerial shot from a
14  helicopter or airplane and they were showing
15  the shot?
16      A.  Correct.
17      Q.  Now, over that -- what I am really
18  getting at is closer to your house, do you
19  know if there was a breach of that levee that
20  we called the 40 Arpent or the canal --
21  Florida Canal or whatever that big levee is
22  that's a few hundred yards from your house?
23      MR. GILBERT ANDRY:
24          And I object to the form, "big".
25      I don't know what that means.

                                              Page 104

1   EXAMINATION BY MR. MARPLE:
2       Q.  Probably a bad question.  Let's try
3   it a little differently.  There's a big levee
4   near your house that we talked about before.
5       MR. GILBERT ANDRY:
6           Objection to form still.  You
7       have to quantify "big" for me.
8   EXAMINATION BY MR. MARPLE:
9       Q.  There's a levee near your house a
10  few hundred yards.  We talked about it
11  earlier.  Right?
12      A.  Right.
13      Q.  With respect to that levee, did it
14  breach anywhere that let water in that came up
15  around your house?
16      A.  To my knowledge, no.
17      Q.  Did it overflow?
18      A.  To my knowledge, no.
19      Q.  And when you say to your knowledge,
20  I think you told us earlier you're not sure
21  one way or the other; right?
22      A.  To my knowledge, no.  You know, if I
23  can answer that, though, I'm going to tell you
24  about the breach, because the metal -- It's
25  got metal girder on top of the levee and it's

                                              Page 105

1      MR. GILBERT ANDRY:
2         I object to the form.
3      THE WITNESS:
4         What I would think is if you look
5      at, based on my opinion only, if those
6      levees were just topped versus breaks
7      in them, we might not be sitting here
8      today. I don't think you would have
9      nowhere near the water we had.
10   EXAMINATION BY MR. MARPLE:
11      Q. Have you done any investigation or
12   learned anything about had levees not
13   breached, what amount of water would have come
14   over from over the tops of the levees or come
15   from rain and how high that water would have
16   gotten?
17      A. No. I just had a conversation with
18   a friend of mine who -- I'm not sure who he
19   works for. He works for the Parish, but I
20   think they do some work for the Corps of
21   Engineers.
22      Q. And what did he say?
23      A. He just don't think the damage would
24   have been nowhere near -- Some parts of the
25   Parish, and that's just his opinion, that he

                                            Page 114

1   don't think they would even have gotten
2   water.
3      Q. Do you have any explanation in your
4   mind of why, for instance, the French Quarter
5   got no water, virtually no water?
6      A. The only thing I would think is the
7   structure, that the Industrial Canal is built
8   on our side, not on their side. Maybe the
9   structure at the lakefront, the 17th Street
10   Canal might have been too far away to get to
11   them. That's strictly a guess.
12      Q. You were too young I guess to
13   remember Hurricane Betsy?
14      A. Correct.
15      Q. Have you heard any stories from your
16   relatives about Betsy and what got flooded in
17   Lower Ninth Ward or St. Bernard?
18      A. I just seen a picture of the Judge
19   Sieber Bridge, which is in the Lower Ninth
20   Ward, when my grandmother lived in the middle
21   of Chalmette had no water. Where I lived at
22   the time in Violet had no water.
23      Q. Do you have any knowledge from
24   reading or studying about what was happening
25   to the wetlands down the road and out St.

                                            Page 115

1   Bernard over the years?
2      A. I mean, I saw the erosion. I fished
3   and hunted down there for years. They started
4   putting the freshwater diversions in, and some
5   sides it helped. It helped on the -- I would
6   say the -- If you going down the road, it
7   helped on the right side of the marsh, but the
8   MRGO, closer to the MRGO, it was still
9   deteriorating out towards Lake Borgne.
10      Q. And describe for me what you saw in
11   terms of it deteriorating. What did you see?
12      A. Well, just land that used to be
13   there is not there any more. This is
14   ongoing. The -- You know, if I am not
15   mistaken, when I was a kid, the buoys that
16   marked the channel for the ships in-going and
17   out-going was actually on land. And now they
18   out in the water, you know, in some places 50
19   yards and stuff like that. I stopped fishing
20   that area.
21      Q. You left 27 hours I think you told
22   us roughly before the storm; did I get that
23   about right?
24      A. Correct.
25      Q. Tell me about what the decision

                                            Page 116

1   process was to evacuate.
2      A. Well, the storm come up on us, you
3   know, all of a sudden. We didn't know nothing
4   about the storm until Friday about 6:00,
5   because the storm, we saw that the storm was
6   supposed to hit Florida. So we actually -- I
7   just picked up some shrimp from down in
8   Plaquemines Parish, brought them home. So we
9   have a place to evacuate to. So that's why we
10   didn't want to get caught up in all the
11   contraflow and all of that. So we had the
12   boiled shrimp. I mean had the shrimp. I
13   didn't want to put them in the freezer, so a
14   good friend of mine who lives out there is a
15   riverboat pilot, in Pilottown, we had a place
16   to stay, we had a place to go. So we stayed
17   Saturday, boiled the shrimp by the hot tub and
18   the swimming pool by his house, and I was
19   leaving the next morning. My boat was
20   supposed to go by his house because he was
21   staying. He lives in almost a three story
22   home, so he was going to stay. Well, we were
23   leaving anyway in the morning. We were going
24   to take Airline Highway the back road. We
25   never had to get caught up in the contraflow.

                                            Page 117

KENNETH ARMSTRONG (MRGO)                                                7/9/2007

THE WITNESS:
It's been -- I am not exactly
sure of the time, but I think that's
when Travelers and all pulled out of
the state.
EXAMINATION BY MR. WEINSTOCK:
Q.  But did you replace your roof as a
result of that?
A.  Yes, we did.
Q.  That's what I believe you said
earlier.
You understand that you're a class
plaintiff, not just a plaintiff in your own
right.  Is that correct?
A.  Correct.
Q.  Do you know what class of people you
represent?
A.  Can you clarify?
Q.  Do you know who you're here for
other than yourself and your family?
A.  Well, I would -- I would think
everybody, a good portion of the people who
live in my community.  We all look the same as
far as the depth of water, ten to whatever,
for the most part.  We all in the same boat.

Page 150

We all lost our -- everything we had.  We all
lost our community.  You know, we all
scattered everywhere.  We probably never get
back what we had.  So I am one of I think
there's 70,000 people in St. Bernard Parish.
You know, IF it's not me, it could be anybody
else who's in that predicament.
Q.  You told us a few minutes ago you
knew of some people who drowned?
A.  Correct.
Q.  Those people chose not to evacuate,
to your knowledge?
A.  Correct.
Q.  You did evacuate?
A.  Correct.
Q.  Are you here representing the people
who lost their life as a result of drowning --
MR. GILBERT ANDRY:
Objection.
EXAMINATION BY MR. WEINSTOCK:
Q.  -- because they did not choose to
evacuate?
MR. GILBERT ANDRY:
Objection to the form of the
question.

Page 151

You can answer
EXAMINATION BY MR. WEINSTOCK:
Q.  You can answer.
A.  I think that -- I would say no.
Q.  Do you understand that there are
certain obligations that come with being a
class representative?
A.  Yes.
Q.  Do you understand one of those
obligationss is to provide notice to the other
class members?
A.  Yes.
Q.  And you just told me that maybe up
to 70,000 people in St. Bernard.  Were you
also aware that your class contains not only
St. Bernard, but the Lower Ninth Ward?
A.  Correct.
Q.  As a class representative you might
have to provide notice to those 70 plus
thousand people.  Is that your understanding?
MR. GILBERT ANDRY:
That's why he has a lawyer.
That's why he has a team of lawyers
from all over the country with more
than enough resources to do that.  So

Page 152

I think that's beyond the pale.  I
object to the form.
EXAMINATION BY MR. WEINSTOCK:
Q.  Do you understand that you may have
that obligation to provide notice to those
70,000 people?
A.  No, I do not.
Q.  Do you understand that unless you
have an agreement with somebody else to pay
for it, you might have to pay for that
notice?
A.  No, I did not.
Q.  Do you understand there's case law
that says you might be personally responsible
for up to $250,000 to provide notice to the
other class members?
A.  No, I did not.
Q.  Are you prepared to do that?
A.  I don't want to, but if I had to, I
guess I could.
Q.  You would take out a loan to get
$250,000?
A.  No.
Q.  Do you understand that there may be
a limited amount of resources to settle or

Page 153

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


**IN RE:** KATRINA CANAL BREACHES      CIVIL ACTION
**CONSOL**IDATED LITIGATION

                                       NO. 05-4182 "K"(2)

 **PERTAINS TO:** MRGO               JUDGE DUVAL

 **FILED IN:** 05-4181, 05-4182,    MAG. WILKINSON
 **05-5237,** 05-6073, 05-6314,
 05-6324, 05-6327, 05-6359,
 06-0225, 06-0886, 06-1885,
 06-2152, 06-2278, 06-2287,
 06-2824, 06-4024, 06-4065,
 06-4066, 06-4389, 06-4634,
 06-4931, 06-5032, 06-5155,
 06-5159, 06-5161, 06-5162,
 06-5260, 06-5771, 06-5786,
 06-5937, 07-0206, 07-0621,
 07-1073, 07-1271, 07-1285




Videotaped deposition of JEANNINE B. ARMSTRONG,
28 Park Place Drive, Apartment 601, Covington,
Louisiana  70433, taken in the offices of Bruno &
Bruno, 855 Baronne Street, New Orleans, Louisiana
70113, on Monday, the 9th day of July, 2007,
beginning at 9:21 a.m.


APPEARANCES:

        LAW OFFICES OF FRANK J. D'AMICO, JR.
        (BY:  RICHARD M. EXNICIOS)
        2nd Floor
        622 Baronne Street
        New Orleans, Louisiana  70113

            ATTORNEYS FOR THE PLAINTIFFS

JEANNINE ARMSTRONG (MRGO)                                    7/9/2007

1   Miss?
2       A.   Whatever's fine.
3       Q.   Okay.  Have you ever been deposed
4   before?
5       A.   No.
6       Q.   I will only explain a couple of
7   things.  I'm sure your counsel has reviewed them.
8   I will ask you questions.  You answer the
9   question.  Please allow me time to finish my
10  question, and if you have any questions that you
11  don't understand, just speak up and let me know
12  and I'll try to rephrase the question so you do.
13      A.   Okay.
14      Q.   Also, whenever you're ready to take
15  a break, just let us know, or your counsel, and
16  we'll take a break.
17          Let me begin by asking you:  What
18  did you do to prepare for this deposition?
19      A.   I read over the documents that we
20  were given by Jon Andry.  We had meetings with
21  the attorneys.
22      Q.   What were the documents that you
23  were given by Jon Andry?
24      A.   It was -- I don't know the name of
25  it -- that -- that -- interrogatories.

                                    Page 6

1       Q.   Yes.
2       A.   That.  I really don't know the
3   formal names of them.
4       Q.   Some discovery responses.  Uh-huh.
5       A.   (Nods head affirmatively.)
6       Q.   And when was that?
7       A.   About three weeks ago.  Two, three
8   weeks ago.
9       Q.   And have you reviewed any other
10  documents in preparation for this meeting that
11  you can recall?
12      A.   No.
13      Q.   And you've had some meetings with
14  your counsel.
15      A.   Yes.
16      Q.   Have you had any meetings with
17  anyone other than your counsel?
18      A.   No.
19      Q.   Have you ever been involved in a
20  lawsuit before?
21      A.   No.
22      Q.   Never been a witness?
23      A.   No.
24      Q.   Never been a party to a lawsuit?
25      A.   No.

                                    Page 7

1       Q.   Never been in a class action?
2       A.   No.
3       Q.   Never been sued?
4       A.   No.
5       Q.   Have you ever filed for bankruptcy?
6       A.   No.
7       Q.   Have you ever been involved in any
8   kind of criminal proceeding?
9       A.   No.
10      Q.   A little just background information
11  on you.  Where were you born?
12      A.   I was born in New Orleans.
13      Q.   Have you lived here all your life?
14      A.   Yes.
15      Q.   And you're currently married to
16  Kenneth Armstrong?
17      A.   Yes.
18      Q.   And when were you married to him,
19  what year?
20      A.   1983 -- 1982.
21      Q.   And had you been married before
22  then?
23      A.   No.
24      Q.   And you are still married today?
25      A.   Yes.

                                    Page 8

1       Q.   What was your maiden name?
2       A.   Broggi, B-R-O-G-G-I.
3       Q.   And do you have children?
4       A.   Yes.
5       Q.   And their names and ages?
6       A.   I have a son, Kenneth, who's 23; a
7   daughter Katie, who's 21; and a daughter Reneé,
8   who's 16.
9       Q.   And were any of those children
10  living with you before -- shortly before
11  Hurricane Katrina?
12      A.   They all were living with us.
13      Q.   Were any other people residing in
14  your house besides you and your husband and your
15  three children?
16      A.   No.
17      Q.   And what is your current address?
18      A.   28 Park Place Drive, Apartment 601,
19  in Covington.
20      Q.   And how long have you been at that
21  address?
22      A.   Last June, we moved in.
23      Q.   I believe I recall seeing that you
24  all evacuated before the storm.
25      A.   Yes.

                                    Page 9

                              3  (Pages 6 to 9)

JEANNINE ARMSTRONG (MRGO)                              7/9/2007

1    Q.    Just very briefly -- we'll come back
2  to the details -- but about what time did you
3  leave and what time did you come back to the
4  area?
5    A.    We left at about 4:00 a.m. on
6  Sunday.
7    Q.    And what day was Sunday?  Was that
8  the day of the storm?
9    A.    That was the day before the storm.
10   Q.    Before.  And where did you go?
11   A.    To Baton Rouge.
12   Q.    And how long were you in Baton
13 Rouge?
14   A.    How long?
15   Q.    Yes.
16   A.    Until June of last year.
17   Q.    And as soon as you returned to the
18 New Orleans area, then you began living in this
19 apartment in Covington, where you still reside.
20   A.    That's where -- yes.
21   Q.    And prior to Hurricane Katrina, you
22 lived at what address?
23   A.    4016 Hamlet Place.
24   Q.    And you had been there since 1985?
25   A.    Yes.

Page 10

1    Q.    And would you describe your
2  educational background, please?
3    A.    I'm a registered nurse, graduated
4  from LSU Nursing School.
5    Q.    In what year?
6    A.    1994.
7    Q.    And would you describe your
8  employment history briefly, please?
9    A.    When I first got out of school, I
10 worked at Charity, Labor and Delivery.  Then, in
11 November of '94, I went to Chalmette Medical
12 Center, worked in the operating room for nine
13 years there.  Then, from the operating room, I
14 transferred to another department, Special
15 Procedures, and worked there till Friday before
16 the hurricane.
17   Q.    How far is that Chalmette hospital
18 from your Hamlet house?
19   A.    Less than a mile.
20   Q.    Can you briefly describe the
21 occasions where there were hurricanes before
22 Hurricane Katrina while you all were living in
23 the Hamlet house, what your experience was with
24 them.
25   A.    We only really evacuated maybe twice

Page 11

1  before.  The last time was for Hurricane Georges.
2    Q.    Do you recall what year that was?
3    A.    No.
4    Q.    What was the level of damage, if
5  any, to your house on Hamlet?
6    A.    Nothing.  Not even water in the
7  street.
8    Q.    And what about the second
9  evacuation?
10   A.    Second evacuation was for Katrina.
11   Q.    We will spend the rest of the day,
12 hopefully not all day, but the rest of the time
13 that we're here talking about the details, but I
14 really don't have a lot of background on you yet.
15 Could you just give me a introductory, brief
16 overview of your experience before, during and
17 after Hurricane Katrina?
18   A.    We were planning on leaving at --
19 early Sunday morning.  Get up in the morning, see
20 exactly where the hurricane was, what it was
21 doing.  Some friends of ours called about 2:00 in
22 the morning, you know, saying it was a
23 hurricane -- it was a Class 5, we got to get out
24 of here.  You know, so we woke up and, you know,
25 started getting our stuff together and woke up --

Page 12

1  my oldest one and my youngest one were home.  My
2  other daughter goes to school in Baton Rouge.
3  She was in Baton Rouge -- and packed up our stuff
4  and left.
5    Q.    What was the reason you chose Baton
6  Rouge?
7    A.    My sister lives in Baton Rouge and
8  she works for a hotel and we had rooms reserved
9  there.
10   Q.    And when did you first return to New
11 Orleans after the hurricane and see your house?
12   A.    October 13th.
13   Q.    And how long were you in town for
14 that visit?
15   A.    Just a day.
16   Q.    And I take it at some point you had
17 the house bulldozed and --
18   A.    Demolished, yeah.
19   Q.    -- taken away, demolished?
20   A.    (Nods head affirmatively.)
21   Q.    When was that, approximately?
22   A.    I don't know the date.
23   Q.    Would it have been towards the end
24 of 2005, or later --
25   A.    Oh, no, later.

Page 13

4  (Pages 10 to 13)

Page 14

```
 1        Q.    -- toward the end of 2006?
 2        A.    In '06.  Maybe even -- I would say
 3   the end of '06, I think.
 4        Q.    And during that time, you were
 5   continuously living in Baton Rouge?
 6        A.    Yes.
 7        Q.    You just came down for a day?
 8        A.    Yes.
 9        Q.    That was probably about as soon as
10   you could get back into the area.
11        A.    That was, yes.
12        Q.    Do you know what a Form 95 is?
13        A.    Not exactly.
14        Q.    The Form 95 is the government form
15   that your attorneys had to submit to Department
16   of Justice to make a claim against the Corps of
17   Engineer and the government.  Are you familiar
18   with that, that your attorney submitted such a
19   claim form for you?
20        A.    Yes.  Yes.
21        Q.    And submitted another claim form for
22   your husband?
23        A.    Yes.
24        Q.    Did you review that form?
25        A.    Yes.
```

Page 15

```
 1        Q.    Before it was submitted?
 2        A.    Yes.
 3        Q.    As I understand from looking at that
 4   form -- and we'll look at it in more detail --
 5   right now, I just want to understand the injuries
 6   or damages that you're alleging in this lawsuit,
 7   and as I understand it from your Form 95 form,
 8   you are claiming three types of damages:  First,
 9   the loss of your house on Hamlet; second, your
10   personal property, we lawyers call it your
11   personal possession, everything other than your
12   house --
13        A.    Uh-huh.
14        Q.    -- and Number 3, mental distress as
15   a result of the storm.  Is that correct?
16        A.    Yes.
17        Q.    And are those the only three types
18   of damages that you're seeking in this lawsuit?
19        A.    I believe so.
20        Q.    Again, in a little while, I intend
21   to go back and discuss in some detail the
22   circumstances of each of these losses, but right
23   now, I just want to try to understand a little
24   bit better the precise injury for each of those
25   three to kind of define the injury, and then
```

Page 16

```
 1   we'll come back and talk about it later for
 2   detail.
 3        Q.    Beginning with the real property,
 4   your house on Hamlet, as I understand, was a
 5   complete loss.
 6        A.    Yes.
 7        Q.    And you had it commercially
 8   destroyed, bulldozed --
 9        A.    Yes.
10        Q.    -- however they do that kind of
11   thing; is that correct?
12        A.    Yes.
13        Q.    So, that was a total loss.
14        A.    Yes.
15        Q.    And then, second, was all of your
16   personal possessions that, I guess, were in the
17   house.  Is it everything you owned other than
18   what you were able to pack up with you when you
19   evacuated?
20        A.    Yes.
21        Q.    All of your house possessions,
22   obviously, minus whatever you were able to fit in
23   the car to go to Baton Rouge?
24        A.    Right.
25        Q.    Did you own other car -- did you
```

Page 17

```
 1   drive your car to Baton Rouge?
 2        A.    Yes.
 3        Q.    Did you have another car besides the
 4   one you drove out of town?
 5        A.    No.
 6        Q.    Did you have a boat?
 7        A.    Yes.
 8        Q.    Was it lost?
 9        A.    Yes.
10        Q.    Was it also a total loss?
11        A.    Yes.
12        Q.    So, pretty much wiped out?
13        A.    Yep.
14        Q.    The house wiped out, everything to
15   your name wiped out --
16        A.    (Nods head affirmatively.)
17        Q.    -- except the automobile, the shirt
18   on your back and, I assume, later, when we get
19   into details, you may have taken a few change of
20   clothes and maybe some photographs and --
21        A.    Exactly.
22        Q.    -- all that, correct?
23        A.    Yes.
24        Q.    Bad time.
25        A.    Yeah.
```

5  (Pages 14 to 17)

JEANNINE ARMSTRONG (MRGO)                                    7/9/2007

1    Q.    Have -- has there ever been an
2    occasion where you prepared a list of all of
3    those items of your personal possessions that
4    were lost --
5    A.    Before the hurricane or after?
6    Q.    After the hurricane.
7    A.    Yes.
8    Q.    What occasion was that?  Why did you
9    prepare such a list?
10   A.    The insurance companies.
11   Q.    And do I understand that you filed a
12   claim for the loss of your personal possessions?
13   A.    Yes.
14   Q.    And did you also file an insurance
15   claim for the loss of your house?
16   A.    Yes.
17   Q.    Again, we'll come back to the
18   details of that.  I just want to understand
19   broadly the injuries here.
20         I guess, why don't you tell me now
21   what were those few items of personal property
22   that you were able to save?  We've identified
23   your car that you drove out on.
24   A.    Uh-huh.
25   Q.    You obviously had some clothes and

Page 18

1    A.    What you want to know?
2    Q.    I'm sure it's terrible.
3    A.    Yeah.  And it's not the house, and
4    it's not the possessions.  That's not it.  If you
5    think that's it, you don't have a clue.  It's
6    your community more than anything.
7    Q.    Tell me about that.
8    A.    It's your own -- where your children
9    went to school, where I went to school, where
10   Kenny went to school, everything.  My parents
11   lived across the street.  You know, we went to
12   church.  We were married at the church.  My
13   children were christened at that church.  Gone.
14   Q.    I apologize for having to go through
15   what's clearly painful testimony.  Obviously, I'm
16   from out of town, but the nation understands in
17   some small part the terrible tragedy that struck
18   this community, but, you know, for purposes of
19   the lawsuit, we do need to talk about the mental
20   distress --
21   A.    That's fine.
22   Q.    -- a little bit.
23         So, as I understand what you're
24   saying, to you, your mental distress is primarily
25   focused on, your words, loss of community and

Page 20

1    luggage.
2    A.    Actually, the clothes was more
3    shorts and tank tops than anything, you know,
4    because we figured, you know, if it was a
5    hurricane and we were going to -- you know, we
6    figured we'd get street flooding water, water in
7    the house.  Mostly shorts and tank tops, because
8    you knew you'd have to get back in there and tear
9    everything out.  One pair of capri pants, not a
10   pair of jeans, not a collared shirt.  That's
11   about it.  We had one box -- a Rubbermaid box of
12   pictures, and that's about it.  Me and my husband
13   shared a suitcase.
14   Q.    Your three children were with you?
15   A.    Yes.  Well, my daughter was in Baton
16   Rouge because she's going to school up there, but
17   the other two were with us.
18   Q.    So, really, other than a small stack
19   of photographs --
20   A.    That's it.
21   Q.    -- everything?
22   A.    Yeah.
23   Q.    Turning to the third type of injury,
24   the mental distress, again, can you just tell me
25   a little bit about that at this point?

Page 19

1    your immediate neighborhood.
2    A.    Uh-huh.
3    MR. EXNICIOS:
4         Just an objection.  I'm not
5    disagreeing with your
6    summarization, but you're saying
7    "your primary," and she didn't say
8    that.  She said "it's more than
9    just."  She didn't say her primary
10   emotional distress was -- she said
11   "it's more than just" -- a
12   mischaracterization of what she
13   said.
14   A.    The hospital where I worked is gone,
15   my job is gone.
16   EXAMINATION BY MR. DOAK:
17   Q.    Do you consider that set of examples
18   that you identified, your parents across the
19   street, the church that you were married in and
20   your children were baptized, the friends in your
21   neighborhood, your nearby job at the hospital, do
22   you consider that to be the primary basis of your
23   mental distress here?
24   A.    The schools.
25   Q.    The schools.

Page 21

6  (Pages 18 to 21)

**anniversary --**
A. (Nods head affirmatively.)
**Q. -- in an apartment, something you haven't lived in for a long time --**
A. Uh-huh. Right.
**Q. -- instead of in the home where you should have been?**
A. Exactly. It would have been paid for, too.
**Q. I think I'm ready to move to another area, but I want to make sure that I understand correctly that you're not seeking any relief in this lawsuit for things other than these three types of categories that we've talked about: First, the loss of your house; second, the loss of all of your personal possessions; and, third, for this extreme mental distress that you described as a result of losing everything, including these neighborhood relationships; is that correct?**
A. I did have other health issues, if that's what you're referring to.
**Q. I have seen a couple of diseases listed. I don't know if the other health issues are related to the lawsuit or not, but that's why**

Page 26

**I'm asking the question, to find out what this group of defendants is being alleged to have been partially responsible for. I mean, that's one of my jobs today.**
A. Right.
**Q. So, that's why I'm trying to -- so, yes, ma'am, if there is something more beyond mental distress in the area of loss that you attribute -- for which you are seeking relief in this lawsuit, yes, please tell me about that.**
A. Yes.
**Q. Okay. And what are -- what are those other things?**
A. I'm sure you know. In November of '05, I was diagnosed with brain tumor. And that would have been there no matter what. That was there before the hurricane. Then, in June of '06, I came down with pneumonia -- with pneumonia, and was sick into July of last year and developed a backache, and in August, went to seek help for the backache. Make a long story short, wind up being an infection in my spine, which was actually a fungal infection, and was hospitalized for a month, had to have two surgeries, removed two vertebrae out of my back,

Page 27

have rods and a cage in my back and was on antibiotics for three months after I was out of the hospital, had to have a blood test every week and --
**Q. And how does that relate to the lawsuit? Do you attribute those things last summer, the pneumonia and then the backache developing into the back --**
A. The pneumonia was a fungal pneumonia, which is rare. You don't just get a fungal pneumonia. It's airborne. We were down at the house cleaning it out, gutting, all that kind of stuff. You know, doctors say it's from the soil, from -- airborne from the soil. Was it from that?
**Q. So, you don't know, but you're suspicious. As a nurse, you're telling me that this is rare?**
A. You don't see that.
**Q. To the limits of I only know briefly what kind of areas you may have worked in as a nurse, but when you say "rare," what kind of percentage --**
A. Usually, you see a bacterial pneumonia, viral pneumonia. You very rarely see

Page 28

a fungal pneumonia.
**Q. Would fungal pneumonias be less than 5 percent of the whole?**
A. I don't know -- I don't know percentages.
**Q. But in your experience, it's --**
A. You don't see it every day.
**Q. -- unusual.**
A. Yes.
**Q. Okay. And because of that and because of your cleanup activities at the site and all of the stay-behind stuff, I guess, following a hurricane, in your mind, you're suspect that that might have been the cause of that fungal pneumonia?**
A. Yes. Yes.
**Q. Similarly, the back infection, I think you said that that was also a fungal inspection (sic)?**
A. Yes. Yes. They think it actually was a pneumonia that went into the bone.
**Q. And your doctors have told you that.**
A. Yes.
**Q. That that was a, in their mind, wherever the fungus came from in the first place,**

Page 29

1     A.   I know he was at the sugar refinery
2   and they were at the sugar refinery and videoed
3   there and, then, after the storm, when they could
4   actually get out in boats, they actually went out
5   into the neighborhoods.
6     Q.   I have heard of the video.  I
7   haven't personally looked at it, but I'm told
8   that somebody who is speaking on the video is
9   reported to say something like there's Kenny
10  Armstrong's house.  So, that would be a reference
11  to your house on Hamlet?
12    A.   Yes.
13    Q.   And it, apparently, depicts very
14  severe devastation.
15    A.   Uh-huh.
16    Q.   Do you have any other eyewitness
17  account kind of documents?
18    A.   Actual -- of the hurricane actually
19  passing?
20    Q.   Yes.
21    A.   Not that I know of.
22    Q.   Did you prepare any statements or
23  documents pertaining to any of these four
24  categories of damages or injuries?  Like your
25  house, other than the insurance claim you

Page 42

1     Q.   And you told your attorneys that?
2     A.   Yes.
3     Q.   I assume that you must have many
4   documents about your two personal injuries, the
5   pneumonia and then the spine infection and the
6   resulting surgeries.
7     A.   I have documents?
8     Q.   Didn't you receive bills for all of
9   that?
10    A.   Oh, yeah.  Oh, yeah.
11    Q.   And perhaps correspondence with
12  medical providers and diagnostic materials?
13    A.   I don't know about diagnostic
14  materials, but I have plenty bills.
15    Q.   Okay.  Have you ever made any
16  statement or prepared notes, logs, journals,
17  diaries about your experience?
18    A.   No.
19    Q.   I want to change topics now and talk
20  more about the detailed circumstances for each of
21  the four types of injuries you're alleging in the
22  case and go through in more detail what happened
23  and your impression of things.  Beginning with
24  the damage to your house on Hamlet, you've
25  obviously testified that you weren't present, but

Page 44

1   submitted -- and we're going to talk about that
2   later -- but are there any other lists or
3   documents where maybe you listed things about the
4   house?
5     MR. EXNICIOS:
6        Yeah --
7     A.   I don't understand.
8     MR. EXNICIOS:
9        I don't understand the
10       question either.
11  EXAMINATION BY MR. DOAK:
12    Q.   Did you have any -- besides this one
13  videotape that was produced, did you have any
14  other photographs, DVD, videotapes or things like
15  that pertaining to anything surrounding Hurricane
16  Katrina?  I thought you referred earlier to some
17  photographs.
18    A.   I had photographs pre-hurricane.  We
19  had photographs when we went back into the house.
20  Not during the hurricane, because we weren't
21  there, but after the hurricane, when we could get
22  back to take photos of the house.
23    Q.   So, you have before-and-after photos
24  of the house on Hamlet?
25    A.   Yes.  Yes.

Page 43

1   do you have a view or understanding of how your
2   house was damaged?
3     A.   Yes.
4     Q.   Okay.  Would you please tell me
5   about that.
6     A.   From the photos I seen, I know the
7   water was almost over the roof.  It seems like
8   that's the --
9     Q.   Describe your house for us.
10    A.   It was a four-bedroom house, two
11  bath, garage, backyard.
12    Q.   One story?
13    A.   One story.
14    Q.   And the water was to the roofline?
15    A.   Yes.
16    MR. EXNICIOS:
17       Just for clarification, the
18       roofline, above the gutters, below
19       the gutters?
20    THE WITNESS:
21       Over the gutters.
22  EXAMINATION BY MR. DOAK:
23    Q.   Okay.  Pretty bad.
24    A.   Yeah.
25    Q.   Describe the location of your house,

Page 45

12 (Pages 42 to 45)

JEANNINE ARMSTRONG (MRGO)                                  7/9/2007

```
 1      A.   We had shingles off.  We had those
 2  silver things that sit on your roof that twirl
 3  around --
 4      Q.   Yes.
 5      A.   -- that was off.
 6      Q.   Yes.  I take it from your Form 95
 7  that you definitely believe that the MRGO had a
 8  role in causing the flooding of your house.
 9      A.   Yes.
10      Q.   Minor role, major role?  How would
11  you --
12      A.   Major role.
13      Q.   And explain that for me, please.
14      A.   I'm not an engineer or anything like
15  that.  I know the water came in and pushed
16  through, which feeds into all of the others,
17  which feeds into the Industrial Canal, which --
18  overtopping and the breaches and everything.
19      Q.   And you do have this lake -- I don't
20  know what it's called --
21      A.   Pontchartrain.
22      Q.   -- but that big pond of water.  No.
23      A.   Lake Borne?
24      Q.   No.  I mean right on the other side
25  of the levee that you can see from your yard,
                                         Page 54
```

```
 1  there's a levee and there's water.
 2      A.   That's the swamp.  I don't know what
 3  that's called.
 4      Q.   There's a swamp.
 5      A.   Yeah.
 6      Q.   I mean standing water.  There's a
 7  large water body there under normal
 8  circumstances.
 9      A.   Yes.  Yes.
10      Q.   And marshland and then the MRGO over
11  there.
12      A.   Yes.
13      Q.   And, I take it, you ascribe to the
14  theory that the MRGO channels water coming into
15  those vicinities and that caused a storm surge
16  that would have, could have caused overtopping
17  and breaches that would affect your neighborhood.
18      A.   Yes.
19      Q.   Do you have any specific knowledge
20  of the overtopping of the St. Bernard back levee
21  along the Florida Walk Canal near your house?
22      A.   I don't know.
23      Q.   Do you have any specific knowledge
24  of overtopping of the St. Bernard back levee
25  along the Forty Arpent Canal, on the other side
                                         Page 55
```

```
 1  of Paris Road?
 2      A.   Yes.
 3      Q.   And what is your knowledge of that,
 4  that there was severe overtopping there?
 5      A.   Yes.
 6      Q.   And that water is how far away?
 7  Mile or two?
 8      A.   To -- yes, to the other side of
 9  Paris Road.
10      Q.   Do you believe that that water made
11  it to your doorstep?
12      A.   Yes.
13      Q.   And you said, I think, that you
14  don't know anything about the pump station
15  backflow nearby.
16      A.   No.
17      Q.   Okay.  Do you know -- back up --
18  lifelong resident of New Orleans, right?
19      A.   Yes.
20      Q.   Heard about hurricanes since you
21  were a little girl.
22      A.   Yes.
23      Q.   Understand that there is an
24  elaborate hurricane protection system of levees
25  and walls and --
                                         Page 56
```

```
 1      A.   Yes.
 2      Q.   -- you name it, all constructed over
 3  50 plus years.
 4      A.   Yes.
 5      Q.   Big, long system, right?
 6      A.   Yes.
 7      Q.   And you understand from watching the
 8  news that with Hurricane Katrina, dozens of
 9  different points along that system failed all
10  around and through town, correct?
11      A.   Yes.
12      Q.   Overtopping, breaches.  It wasn't
13  just one or two places.
14      A.   Yes.
15      Q.   You can go all the way around -- and
16  have you had drawn for you the geographical
17  region that's called the MRGO Group Region, all
18  of New Orleans East on top and St. Bernard and
19  the Lower Ninth on the bottom, going over to the
20  Industrial Canal on the west?  Does that make
21  sense in your mind?
22      A.   Yes.  That makes sense.  Yes.
23      Q.   And all the way around that area,
24  there are levees and walls, right?
25      A.   Yes.
                                         Page 57
```

15  (Pages 54 to 57)

1  infection and all of the surgery and treatment in
2  conjunction with those two personal injuries,
3  just to try to have a, you know, quantifiable
4  number that we can work with to understand the
5  basis of your claims.  Does that help you --
6       A.   Okay.
7       Q.   So, beginning with your house, what
8  do you think was the fair market value of your
9  house at the time it was destroyed on August 29,
10 2005?
11      A.   I would say between 160 -- 160, 175.
12      Q.   Okay.  And what's the basis for that
13 estimate?
14      A.   What other houses sold in the
15 neighborhood for.
16      Q.   Okay.  Had you had any formal
17 appraisal done on your house at any time
18 recently?
19      A.   No.
20      Q.   Had you had any informal appraisal,
21 kind of a write-up like a Realtor will give you?
22      A.   No.
23      Q.   But this is your neighborhood of 40
24 years and --
25      A.   Exactly, and the house across the

Page 62

1  side of Jean Lafitte, which was the main street
2  into the subdivision.
3       Q.   I'm sorry.  I just didn't hear you.
4       A.   The main street into the subdivision
5  was Jean Lafitte.
6       Q.   Yes.
7       A.   And then there was two or three
8  streets on that side, and that was the whole
9  subdivision.
10      Q.   Okay.  And you believe that most of
11 the houses in that subdivision, as you have just
12 described it, were all totalled --
13      A.   Yes.
14      Q.   -- as a result of the storm?
15      A.   Yes.
16      Q.   Okay.  Certainly, though, not all of
17 the houses in St. Bernard Parish were anywhere
18 close to being totalled, though, were they?
19      A.   Some houses got more water than
20 others, yes.
21      Q.   Well, I mean, weren't there
22 significant differences?
23      A.   Yes.
24      Q.   Did you see that article in the
25 Times-Picayune about the couple who came back and

Page 64

1  street sold a few months before the hurricane.  I
2  know what that sold for, and it was smaller than
3  ours.
4       Q.   Right.  Okay.
5       What can you tell me about the
6  degree of damage to other homes in your
7  neighborhood?
8       A.   We all suffered the same loss.  You
9  know, in our neighborhood, Buccaneer Villa,
10 everybody suffered the same -- the water was over
11 everyone's gutters, the whole subdivision.
12      Q.   And how large is that subdivision?
13      A.   From our house to Judge Perez is a
14 mile.  Now, wide, I don't know how wide it was.
15      Q.   Judge Perez would be the street to
16 the south?
17      A.   Yes.
18      Q.   Okay.  Does your neighborhood go to
19 the east, to Paris?
20      A.   No, not to Paris Road.
21      Q.   Something before Paris.
22      A.   To another canal, whatever the other
23 canal is called.
24      Q.   Yes.  I know what you mean.
25      A.   And then it goes to -- on the other

Page 63

1  were surprised to find that they hadn't had any
2  damage at all?
3       A.   I never saw that article.
4       Q.   It was in New Orleans East.
5       A.   Uh-huh.
6       Q.   How would you describe the condition
7  of your property before the storm?
8       A.   It was in excellent condition.
9       Q.   It was obviously a slab house,
10 right?
11      A.   Yes.
12      Q.   When did you last have a roof put
13 on?
14      A.   In the '90s.
15      Q.   What is your description of your
16 house?  You started to do this a little bit
17 earlier, but -- you said it was in excellent
18 condition.
19      A.   It was a single story.  It had two
20 double doors on the front, two French doors and a
21 garage on the front.  Columns.  A big, huge,
22 giant oak tree on the front lawn.  Four bedrooms,
23 two baths, a garage.  Kitchen, dining room.  That
24 was it.
25      Q.   What caused you to replace the roof

Page 65

17 (Pages 62 to 65)

JEANNINE ARMSTRONG (MRGO)                                    7/9/2007

| | |
|---|---|
| 1    A.   Oh. | 1    your pneumonia? |
| 2    **Q.   I'm talking about what were the** | 2    A.   There was Dr. Crosby -- you want |
| 3    **total of all of your medical treatment bills,** | 3    names? |
| 4    **regardless of who paid them?** | 4    **Q.   Yes, please.  Names and specialties.** |
| 5    A.   The hospital bill alone was 282,000. | 5    A.   Dr. Robert Crosby, he's a pulmonary. |
| 6    That was the hospital bill.  That's just the | 6    Dr. Frank Culicchia, he's neuro.  Dr. John Steck, |
| 7    hospital.  That's not the doctors, anesthesia, | 7    he is a neuro -- neuro backs.  There was Dr. |
| 8    the medicine, everything else that went along | 8    Werkman, he's infectious disease.  There was |
| 9    with that.  That was just the month-long hospital | 9    Dr. -- his name is Dr. Thomas.  I don't know his |
| 10    stay. | 10    first name.  He was the -- one of the general |
| 11    **Q.   And all of that was in one hospital,** | 11    surgeons.  There was Dr. Kahn, who was the GI |
| 12    **though?** | 12    doctor, gastrointestinal doctor.  There was a |
| 13    A.   I stayed in one hospital, yes. | 13    group of pulmonary doctors, but I don't remember |
| 14    **Q.   And what hospital was that?** | 14    their names. |
| 15    A.   West Jefferson. | 15    **Q.   And this was generally all in the** |
| 16    **Q.   I'm sorry.  Okay.  Keep going.  You** | 16    **summer of 2006?** |
| 17    **were saying that's just their bill.** | 17    A.   Yes. |
| 18    A.   That's just their bill. | 18    **Q.   And what date did you get out of the** |
| 19    **Q.   Right.  How about the various** | 19    **hospital?** |
| 20    **physicians?** | 20    A.   October 6th. |
| 21    A.   There was the neuro doctor.  There | 21    **Q.   And describe, please, your recovery** |
| 22    was the doctor who did the spinal disk surgery.  There | 22    **after October 6.** |
| 23    was an infection -- infectious disease doctor. | 23    A.   I came home on October 6th.  Because |
| 24    There was a pulmonary doctor. | 24    of the infection and the medicine that I was on, |
| 25    **Q.   All specialists.** | 25    I had to have blood tests twice a week because of |
|                                      Page 78 |                                      Page 80 |

| | |
|---|---|
| 1    A.   Yes.  And then there was a | 1    the effect on your liver.  So, we went to a lab |
| 2    gastrointestinal doctor.  So, it's five doctors. | 2    on the north shore to get that done every week, |
| 3    **Q.   Give me your best estimate.  I don't** | 3    and the results were sent to the infectious |
| 4    **know if we're talking $50,000 or another** | 4    disease doctor.  I had to see the back surgeon, |
| 5    **$200,000.** | 5    Dr. Steck, maybe, like, in November and then |
| 6    A.   Oh, and there was general | 6    December, I seen him again.  I seen him in March. |
| 7    surgeons -- when they did the first -- they had | 7    **Q.   So, you had a regular series of** |
| 8    to bring in general surgeons to get in and move | 8    **ongoing follow-up --** |
| 9    everything around to be able to get to the spine. | 9    A.   Yes. |
| 10    So, that was another set in there.  I have no | 10    **Q.   -- visits with some of those doctors** |
| 11    idea how much that was.  They had doctors that | 11    **through the end of 2006, and some of them even** |
| 12    did biopsies, you know, that -- bone biopsies. | 12    **into 2007?** |
| 13    **Q.   All of them sent you separate bills** | 13    A.   Yes.  Yes. |
| 14    **on top of the hospital?** | 14    **Q.   How has that experience affected** |
| 15    A.   Oh, yeah.  Yeah. | 15    **your daily routine now?  Are you recovered now?** |
| 16    MR. EXNICIOS: | 16    A.   I'm doing a lot better than I was. |
| 17    Can we move on?  I mean, she | 17    **Q.   Sure.** |
| 18    says she has no idea. | 18    A.   Trying to build my strength up to go |
| 19    A.   I really -- I have no idea how much | 19    back to work.  The work I did was pretty |
| 20    all of that is.  We're still paying and insurance | 20    physical, moving patients, pulling patients. |
| 21    is still paying and -- it's an ongoing process. | 21    **Q.   How long were you out of work?** |
| 22    EXAMINATION BY MR. DOAK: | 22    A.   I haven't worked since the |
| 23    **Q.   Would you try, to the best of your** | 23    hurricane. |
| 24    **memory, to provide us with a list of the medical** | 24    **Q.   Now, are you -- that's not on our** |
| 25    **professionals that you have seen beginning with** | 25    list of four.  You're not seeking relief for |
|                                      Page 79 |                                      Page 81 |

21  (Pages 78 to 81)

JEANNINE ARMSTRONG (MRGO)                                    7/9/2007

```
 1        A.   I feel I have a very short fuse.
 2        Q.   General greater feeling of stress?
 3        A.   Yes.
 4        Q.   Constantly?
 5        A.   Yes.
 6        Q.   Given your earlier testimony this
 7   morning about how important your particular
 8   neighborhood was to you, it was really the only
 9   neighborhood you had ever known?
10        A.   Yes.
11        Q.   Coupled with the complete loss of
12   your house and personal possessions, I assume,
13   but want to confirm with you, that your claim for
14   severe mental distress is a very significant
15   component of this lawsuit to you.
16        A.   Yes.
17        Q.   You feel quite strongly about it.
18        A.   Yes.
19        Q.   Because you feel that you have
20   suffered quite badly.
21        A.   Yes.
22        Q.   You understand, everybody wouldn't
23   be in that situation.  In many respects, you've
24   had it worse than a lot of people.
25        A.   I'm --
                                        Page 86
```

```
 1   MR. EXNICIOS:
 2        Objection.  A lot of people
 3   in the United States, of course
 4   not.  But in the greater New
 5   Orleans area, St. Bernard --
 6   EXAMINATION BY MR. DOAK:
 7        Q.   You understand in the MRGO
 8   geographical region of New Orleans East and St.
 9   Bernard Parish that not everyone is going to have
10   experienced mental distress as severe as yours.
11   Not everyone has the same affinity for their home
12   and neighborhood as you do.
13        A.   I don't know what everybody -- I
14   just know what I feel.
15        Q.   Right.  And you don't know that
16   those feelings transfer to anyone else, do you?
17   A person who had moved here from New York and
18   resided in St. Bernard Parish for six months and
19   lost their rented apartment would not normally be
20   expected to suffer the same kind of mental
21   distress that you have suffered for the reasons
22   you stated; would you agree with me?
23        A.   Yes.  Yes.
24        Q.   Don't you know many people in the
25   New Orleans community who have gone through the
                                        Page 87
```

```
 1   storm and you observed some have great mental
 2   distress, some seemingly have none, and probably
 3   a lot are in the middle?  Has that been your
 4   experience?
 5        A.   Yes.
 6        Q.   I assume, as a registered nurse, you
 7   know from professional work that patients in all
 8   kinds of circumstances are going to have
 9   different subjective mental reactions to physical
10   and mental adversities, right?
11        A.   Yes.
12        Q.   That's --
13   MR. EXNICIOS:
14        Objection to the questions.
15   You're giving her your theory or
16   opinion on what the general belief
17   is --
18   MR. DOAK:
19        Do you have an objection,
20   Counsel?
21   MR. EXNICIOS:
22        I have objection to the form
23   of the questions.  You make it so
24   the question stays within the
25   scope of what we're going for so
                                        Page 88
```

```
 1   that's a question, not your
 2   testimony, and "don't you agree."
 3   MR. DOAK:
 4        I would appreciate it if
 5   you'd simply say "objection,
 6   form."  The CMO, as you know, the
 7   magistrate judge made a very
 8   specific reaffirmation about the
 9   scope of objections.  You know,
10   what you just said could be
11   considered as guiding her in the
12   answers.  We don't want that.
13   You're entitled to make the
14   objection.  You're not entitled
15   to --
16   MR. EXNICIOS:
17        Please keep your questions
18   to conform to the CMO.
19   MR. DOAK:
20        All you have to do is say
21   "form" and you will have reserved
22   your objection.
23   MR. EXNICIOS:
24        Thank you.  I will follow
25   the guidelines if you agree to do
                                        Page 89
```

                                        23  (Pages 86 to 89)

JEANNINE ARMSTRONG (MRGO)                                           7/9/2007

1   then?
2        A.    No.  We received a letter in the
3   mail in January.
4        Q.    Oh, okay.  Which said?
5        A.    Which said they had a value of our
6   home, they had a estimated cost to repair, they
7   had an amount that they would pay if you wanted
8   to raise your home and they had an award amount
9   that they called it that you would -- which was
10  the gap.
11       Q.    Okay.  And what was your award
12  amount?
13       A.    Sixty-nine thousand.
14       Q.    And that would be the option that
15  you all would be taking, correct?
16       A.    As of now, no.  We are what they
17  call resolution, which means we're disputing the
18  prestorm value of our home.  We think it's below
19  the market value.  So, we've been in resolution
20  since January.
21       Q.    And what did they identify as the
22  value of your home on August 29, 2005?
23       A.    They said 140,000.
24       Q.    And in this resolution program,
25  you're maintaining that the value is what?

Page 126

1        A.    One sixty to 175.
2        Q.    And do you have any forecast of
3   timing?  You've been in this resolution process
4   since January.
5        A.    (Nods head affirmatively.)  And I
6   called last week and they said you're in
7   resolution.  That's it.
8        Q.    So, nobody knows.
9        A.    No.  No.
10       Q.    Did you offer any additional
11  justification for your 160 to $175,000 proposed
12  value?
13       A.    For what other homes sold in the
14  neighborhood for.
15       Q.    And was there documentation for
16  that?
17       A.    At the courthouse, there is.
18       Q.    Was any presented to Road Home?
19       A.    They don't go by that.  They go by
20  what they say their adjusters found your home was
21  worth.
22       Q.    And how do their adjusters work?
23       A.    I have no idea.
24       Q.    Do they come out individually?
25       A.    I'm assuming so.  I have no idea.

Page 127

1   Because they said that houses on the main
2   boulevard into our subdivision, which is, you
3   know, a boulevard with the neutral ground in the
4   middle, houses on that sold for 80,000, and
5   there's no way -- before the hurricane.  No way.
6        Q.    Did you keep a copy of the
7   application form that you printed off the
8   internet and then turned in at this meeting in
9   November?  Did you keep a copy of that for your
10  files?
11       A.    I'm sure we do.
12       Q.    And as I understand it, that Road
13  Home Program is limited in scope to just houses,
14  not other -- not personal property, not injuries.
15  It's just a program to recover the so-called gap
16  on people who lost their home.  Is that -- do I
17  have that understanding --
18       A.    I believe so, yes.
19       Q.    What is your understanding of your
20  role as a class representative in this case?
21       A.    My understanding is that I'm just
22  like everybody else in the parish.  I lost
23  everything, like everybody else.  You know, a
24  person who was born there, raised there, grew up
25  there, went to school there, worked there.  Just

Page 128

1   a regular --
2        Q.    Do you know anything about the
3   duties of a named plaintiff class representative?
4        A.    Yes.
5        Q.    And what are those duties?
6        A.    Well, I think you need to give a
7   fair, legitimate testimony of what you lost and
8   everything like that.
9        Q.    Have you been told by anyone that by
10  participating in this case as a named
11  representative you would receive any kind of
12  money or thing of value other than what you would
13  receive in satisfaction of your claim?
14       A.    That I would receive additional
15  or --
16       Q.    Yes.
17       A.    No.
18       Q.    Do you know what subclass you're
19  representing?
20       A.    What do you mean by "subclass"?
21       Q.    The class as proposed, and sometimes
22  there is a single class and sometimes the single
23  class is broken up into subclasses.  Do you know
24  any of the details of that?  You may not.
25       A.    I don't know that.

Page 129

33  (Pages 126 to 129)

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


**IN RE:** KATRINA CANAL BREACHES   CIVIL ACTION
**CONSOL**IDATED LITIGATION

NO. 05-4182 "K"(2)

**PERTAINS TO:** MRGO                JUDGE DUVAL

**FILED IN:** 05-4181, 05-4182,   MAG. WILKINSON
**05-5237,** 05-6073, 05-6314,
05-6324, 05-6327, 05-6359,
06-0225, 06-0886, 06-1885,
06-2152, 06-2278, 06-2287,
06-2824, 06-4024, 06-4065,
06-4066, 06-4389, 06-4634,
06-4931, 06-5032, 06-5155,
06-5159, 06-5161, 06-5162,
06-5260, 06-5771, 06-5786,
06-5937, 07-0206, 07-0621,
07-1073, 07-1271, 07-1285




Videotaped deposition of ETHEL COATS, 756
Louisiana Avenue, New Orleans, Louisiana  70115,
taken in the offices of Bruno & Bruno, 855
Baronne Street, New Orleans, Louisiana  70113, on
Tuesday, the 17th day of July, 2007, beginning at
9:28 a.m.


APPEARANCES:

        ARTHUR W. LANDRY AND JEANNE ANDRY LANDRY
        (BY:  ARTHUR W. LANDRY)
        710 Carondelet Street
        New Orleans, Louisiana  70130

            ATTORNEYS FOR THE PLAINTIFFS

1    Q.   Will you spell that as well?
2    A.   L-A-T-R-I-C-E Franklin.  Larry
3  Franklin.
4    Q.   And what years were they born?
5    A.   Oh, my God.  One was born in '72,
6  one's born in '74 and one's born in '76.
7    Q.   In that order that you gave them to
8  me?
9    A.   Uh-huh.
10   Q.   So, they're all in their 30s.  Were
11 any of them living with you before Hurricane
12 Katrina?
13   A.   My daughter was living next door to
14 me.
15   Q.   Latrice was?
16   A.   No.  Lintoi.
17   Q.   Oh, Lintoi.  Is Lintoi still living
18 with you?
19   A.   No, ma'am.  No, ma'am.  No.
20   Q.   And when you say "next door," was
21 she in -- I understand you were in a duplex --
22   A.   The house was a double till I turned
23 it into be a one, single home.
24   Q.   And, so, was Lintoi in 1022, or was
25 she next door in one of the other houses?

Page 10

1    A.   It's right out from Baton Rouge,
2  right before you get to Baton Rouge.
3    Q.   Oh, okay.  And where does Larry live
4  now?
5    A.   Well, Larry live in St. Rose.
6    Q.   And where is --
7    A.   Right out of Metairie.
8    Q.   Can you spell that for me, the
9  name --
10   A.   What?
11   Q.   Where he lives, where Larry lives?
12   A.   St. Rose?  I think it's R-O-S-S --
13 rose -- how do you -- rose.  Yeah -- S-T first, I
14 think.
15   THE WITNESS:
16       Am I right?  S-T and then
17   St. Rose?
18   MR. LANDRY:
19       I'm not supposed to be
20   helping you answer the questions.
21   THE WITNESS:
22       Oh, okay.
23   MS. PAYNE:
24       Oh, I've got it.  St. Rose.
25   Okay.

Page 12

1    A.   She was in 1022.
2    Q.   Okay.  Was she paying you rent?
3    A.   No.
4    Q.   Do you currently have anyone else
5  living with you?
6    A.   No.
7    Q.   Do you have any grandchildren?
8    A.   I have nine.
9    Q.   Where does Lintoi live now?
10   A.   Lintoi live in New Orleans East.
11   Q.   And where does Latrice live right
12 now?
13   A.   Latrice live in Hammond.
14   Q.   You'll have to forgive me.  I'm from
15 out of town.  Where is Hammond?
16   A.   Hammond is right there -- it's in --
17 it's in New Orleans, Louisiana.  It's in
18 Louisiana.
19   Q.   What part of New Orleans?
20   THE WITNESS:
21       Do you know where it at?
22   EXAMINATION BY MS. PAYNE:
23   Q.   Is it in New Orleans East or is it
24 in St. Bernard or is it on the other side of the
25 city?

Page 11

1    MR. LANDRY:
2        St. Rose.
3    MS. PAYNE:
4        Thank you very much.
5    MR. LANDRY:
6        It's up the river, as they
7    say.
8  EXAMINATION BY MS. PAYNE:
9    Q.   Now, the -- what is your current
10 address?
11   A.   756 Louisiana Avenue.
12   Q.   And that's in the uptown area,
13 right?
14   A.   Yes.
15   Q.   And before that, you lived at --
16   A.   1020 Charbonnet Street, in New
17 Orleans.
18   Q.   And then where did you live before
19 that?
20   A.   Metairie -- out in Kenner.
21   Q.   What was that address?
22   A.   9001 Fourth Street.  That was my
23 mother's new home.
24   Q.   And when did you move to the
25 Charbonnet Street address?

Page 13

4  (Pages 10 to 13)

1     A.   When I was 31 years old.
2          Q.   Would that have been -- what year
3     would that have been?  Let's see here.  I may
4     have it in my notes.  1994, does that sound about
5     right?
6     A.   (Nods head affirmatively.)
7          Q.   So, whenever you moved into the
8     house in 1994, was that with your husband, Jimmy
9     Coats?
10    A.   Yes.
11         Q.   And who all was living with you at
12    that time?
13    A.   Just my husband and I.
14         Q.   And when did Lintoi move in with
15    you?
16    A.   When she was about 21.
17         Q.   So, she must have moved in with you
18    shortly after you moved into the house?
19    A.   Uh-huh.
20         Q.   And then at the time of Hurricane
21    Katrina, who else was living there with you
22    besides Lintoi?
23    A.   Nathan Morgan.
24         Q.   Can you spell his last name?
25    A.   M-O-R-G-A-N.

Page 14

1          Q.   And Lintoi?
2     A.   Lintoi Franklin.
3          Q.   And her three children?
4     A.   Yes.
5          Q.   What are their names?
6     A.   One name Lindsay Franklin.
7     MS. BERTAUT:
8          I'm sorry.  I can't
9     understand you.
10    THE WITNESS:
11         Lindsay.
12    MS. BERTAUT:
13         Clancy?
14    THE WITNESS:
15         Lindsay.
16    EXAMINATION BY MS. PAYNE:
17         Q.   Lindsay?
18    A.   Yes.
19    MR. LANDRY:
20         Lindsay, I think.
21    EXAMINATION BY MS. PAYNE:
22         Q.   And who else?
23    A.   Crystal Lin, L-I-N.
24         Q.   And who is the third child?
25    A.   Ronald Alexis.

Page 16

1          Q.   Was this the man who was present
2     during the inspection of the property that took
3     place in mid-June --
4     A.   Yes.
5          Q.   -- I think.  But you said you don't
6     still live with Nathan?
7     A.   Yes, Nathan and I still live
8     together.
9          Q.   Oh, you do?
10    A.   Uh-huh.
11         Q.   So, only Nathan Morgan and Lintoi
12    were the only people living there?
13    A.   That's all.
14         Q.   Does Lintoi have children?
15    A.   Lintoi have three kids.
16         Q.   Where do they live?
17    A.   With her, at New Orleans East.
18         Q.   But they weren't living with you at
19    the time of Hurricane Katrina?
20    A.   Yes.
21         Q.   Oh, they were.  Okay.
22    A.   Uh-huh.
23         Q.   So, Nathan Morgan was living with
24    you?
25    A.   Yes.

Page 15

1          Q.   Ronald Alexis?
2     A.   Uh-huh.
3          Q.   And how old is Lindsay?
4     A.   Lindsay's 12.
5          Q.   Right now, she's 12?
6     A.   Uh-huh.
7          Q.   And how old is Crystal right now?
8     A.   Nine.
9          Q.   And how old is Ronald --
10    A.   Four.
11         Q.   Sorry.
12    A.   Four.
13         Q.   Ronald's four?
14    A.   Uh-huh.
15         Q.   Okay.  So, at the time of Hurricane
16    Katrina, the people who were living with you were
17    Nathan Morgan, Lintoi Franklin, Lindsay Franklin,
18    Crystal Lin, Ronald Alexis?
19    A.   Yes.
20         Q.   And -- anyone else living there?
21    A.   No.
22         Q.   Does Nathan have any children?
23    A.   No.
24         Q.   Mrs. Coats, what is your educational
25    background?

Page 17

5  (Pages 14 to 17)

```
 1     A.  Eleventh grade.
 2     Q.  And where did you go to high school?
 3     A.  Bunche Village.  Bunche Village.
 4     Q.  Will you describe your employment
 5  history briefly?
 6     A.  I was working for the school board;
 7  I was a monitor.  Sitting work with the old
 8  people.
 9     Q.  When did you work for the school
10  board?
11     A.  I think I was, like, about 30 --
12  about 30 years old, I started working for them.
13     Q.  What school board?
14     A.  Adams Junior High School.
15     Q.  Is that in Jefferson Parish?
16     A.  Yes.
17     Q.  And how long did you work for the
18  school board at that junior --
19     A.  About five years.
20     Q.  And what did you do for the school
21  board?
22     A.  Monitor the hallways, make sure the
23  kids stayed in the classroom.  They had a
24  problem, bring them to the office.
25     Q.  And did you do anything during the
                                    Page 18
```

```
 1  time?
 2     A.  I just did it on my own, self-
 3  employed.
 4     Q.  Oh, so did you charge for this, or
 5  was this volunteer work?
 6     A.  It was -- I would charge for it.
 7     Q.  And they just paid you directly, the
 8  people that you worked for?
 9     A.  Right.  Right.
10     Q.  And about what time did you do this
11  work?
12     A.  What do you mean, what time?
13     Q.  What years?  How old were you?  How
14  long ago has it been?
15     A.  That was about -- ooh, I'd say -- my
16  baby -- Lintoi was 31 years old -- that was
17  30-some-odd years ago.
18     Q.  Which jobs did you have first, the
19  monitor --
20     A.  School.  School.
21     Q.  -- at the junior high school?  And
22  then you did the sitting work later?
23     A.  Uh-huh.
24     Q.  Have you had any jobs since then?
25     A.  No.
                                    Page 20
```

```
 1  summer?
 2     A.  No.
 3     Q.  Is that where your -- some of your
 4  children went to school at that time?
 5     A.  No.
 6     Q.  Were you living on Charbonnet Street
 7  when you worked there?
 8     A.  (Nods head affirmatively.)  No.
 9     Q.  That was before you moved to
10  Charbonnet Street, right?
11     A.  Yeah.  Right.
12     Q.  I'm sorry.  Just so I can keep my
13  time frame straight, how old are you now?
14     A.  Fifty-six.
15     Q.  Okay.  And then, besides the work
16  that you did as a monitor at the junior high
17  school, you said sitting work with older people?
18     A.  Uh-huh.
19     Q.  Describe that to me.
20     A.  Well, I would go in their homes, sit
21  with them, till -- maybe about three or four
22  hours, just sit there with them, make sure they
23  had their water, make sure they could go to the
24  bathroom, something like that.
25     Q.  Who were you employed by at that
                                    Page 19
```

```
 1     Q.  Have you looked for work since then?
 2     A.  No.
 3     Q.  Do you have any kind of business on
 4  the side?
 5     A.  No.
 6     Q.  Mrs. Coats, can you describe for me
 7  your experience with past hurricanes besides
 8  Hurricane Katrina?
 9     A.  I was in Betsy.
10     Q.  Hurricane Betsy?
11     A.  Uh-huh.
12     Q.  Where were you living at the time of
13  Hurricane Betsy?
14     A.  On Fourth Street, in Metairie -- in
15  Kenner, I mean.
16     Q.  Kenner.  And that was about 1965,
17  correct?
18     A.  Yes.
19     Q.  Did you have any damage during
20  Hurricane Betsy to your home?
21     A.  My mother and father, I was living
22  with them.  No.
23     Q.  Where exactly is Kenner located?
24     A.  Right out of New Orleans.  Right out
25  of Metairie.
                                    Page 21
```

```
                          6  (Pages 18 to 21)
```

1  damage?
2      A.   Yes.
3      Q.   Who did you know that had damage
4  from --
5      A.   Just different people that was on
6  the news and around, you know.  I didn't know --
7  there wasn't anybody, like, kin to me or close
8  friends or anything like that, no.  I didn't know
9  nobody.
10     Q.   What kind of damage did you hear
11 about on the news?
12     A.   Like, some roofs, maybe, got blown
13 off and stuff, you know, that I can remember.
14     Q.   When Hurricane Georges came, did you
15 do anything to prepare your house for the storm?
16     A.   We boarded up our windows and
17 different stuff like that.
18     Q.   Anything that you did besides board
19 up the windows?
20     A.   Picked up all the furniture --
21 different -- barbecue grills and different things
22 like that that we had around.
23     Q.   Just bring those inside?
24     A.   Yeah.
25     Q.   Any other hurricanes that you

Page 26

1  remember?
2      A.   No.
3      Q.   When did you first hear about
4  Hurricane Katrina moving in the direction of New
5  Orleans?
6      A.   About four days before it hit.
7      Q.   And you were living at the
8  Charbonnet Street address at that time?
9      A.   Yes.  Yes.
10     Q.   At what point did you decide you
11 should evacuate for Hurricane Katrina?
12     A.   When they say it was coming direct
13 hit to New Orleans.
14     Q.   Do you remember when that was, how
15 far in advance?
16     A.   I think it was about two days
17 before.
18     Q.   So, describe for me what you just --
19 how -- the process that you went through getting
20 your house ready for Hurricane Katrina.
21     A.   Well, I boarded up everything, I
22 picked up all the stuff -- I picked up everything
23 out of the yard.  We placed it in the home.  We
24 turned all the water off to the house.  We turned
25 the lights off to the home.  We put some

Page 27

1  furniture and tried to elevate it up off the
2  floors and -- yeah.
3      Q.   What stuff did you try to elevate
4  off the floor?
5      A.   Some of my furniture.  Like, my
6  living room set, I went out and got some cinder
7  blocks and I tried to -- because I never had a
8  idea that the water would get that high in the
9  house.  So, we put it up on cinder blocks and
10 stuff like that.
11     Q.   And what else did you do to prepare?
12     A.   That's about -- took some clothes
13 and -- that's about it.
14     Q.   And did you have a car at the time?
15     A.   No.
16     Q.   How did you evacuate?
17     A.   With my daughter.
18     Q.   Did your daughter have a car at the
19 time?
20     A.   Yes.
21     Q.   Did Nathan have an automobile at the
22 time?
23     A.   No.
24     Q.   So, out of the people that you were
25 living with, Lintoi was the only one with the

Page 28

1  car?
2      A.   Uh-huh.
3      Q.   What kind of a car did she have?
4      A.   I think it was a -- like a little
5  Ford Expedition -- little Ford something, it was.
6  I done forgot what it was.
7      Q.   So, it was a SUV?
8      A.   Yeah, I think.
9      Q.   Where did you evacuate to?
10     A.   Hammond, Louisiana.
11     Q.   Why did you choose Hammond?
12     A.   That's where my sister lived.
13     Q.   So, you stayed with your sister?
14     A.   Uh-huh.
15     Q.   Did Nathan and Lintoi --
16     A.   Yes.
17     Q.   -- and the kids all go --
18     A.   Yes.
19     Q.   -- with you?
20 MR. LANDRY:
21          Be sure to wait till she's
22      finished asking the question.
23 THE WITNESS:
24          Oh.
25 EXAMINATION BY MS. PAYNE:

Page 29

8  (Pages 26 to 29)

1   Q.   We're making it hard here on Miss
2   Slater to take everything down.
3   A.   Oh.
4   Q.   So, did the six of you all go to
5   Hammond in the Expedition?
6   A.   Yes.
7   Q.   And what all were you able to take
8   with you?
9   A.   About two or three days of clothes,
10  and that was it.
11  Q.   Were you able to take any of -- you
12  know, your family photographs or --
13  A.   No.
14  Q.   Just the -- just the clothes and --
15  A.   Yes.
16  Q.   How long had Lintoi been living with
17  you at the time of Hurricane Katrina?
18  A.   About three years.
19  Q.   And all of that time, was she living
20  with you rent-free?
21  A.   Uh-huh.
22  Q.   What did you do with the other part
23  of the house before she moved in?
24  A.   What did I do with it?
25  Q.   Were you using the entire -- both

Page 30

1   sides of the Charbonnet Street address, or was
2   somebody else living there?
3   A.   No.  I just had it -- I was going to
4   do some renovating to it, and when she moved in,
5   we stopped.  She moved out, I finished taking my
6   house, and I renovated it, put it into one big
7   single home.
8   Q.   I'm not sure I'm exactly clear on
9   the timing there.  Had you already started
10  renovating it before Lintoi moved in?
11  A.   Uh-huh.
12  Q.   About what year -- if you moved in
13  in 1994, how long after you moved in did you
14  start renovating it?
15  A.   Oh, that was -- it was just before
16  Katrina, about a year before Katrina, I started
17  renovating the home.
18  Q.   So, you started renovating it after
19  Lintoi had moved in?
20  A.   Right.
21  Q.   Okay.  Who lived in the 1022 side
22  before Lintoi moved in?
23  A.   Nobody.
24  Q.   It was empty?
25  A.   It was empty.

Page 31

1   Q.   What did you use that side for?
2   A.   It just was empty till I got money
3   to redo it.
4   Q.   Okay.  So, you were staying with
5   your sister in Hammond, Louisiana?
6   A.   Yes.
7   Q.   How long did you stay there?
8   A.   Three months.
9   Q.   When was the first time that you
10  tried to go back to New Orleans after Hurricane
11  Katrina?
12  A.   About three weeks after.
13  Q.   So, probably sometime in late
14  September?
15  A.   Uh-huh.
16  Q.   And that first time that you tried
17  to go back, were you able to get to your house?
18  A.   No.
19  Q.   What happened?
20  A.   The house was still flooded.
21  Q.   The area was flooded?
22  A.   Right.
23  Q.   You couldn't get close?
24  A.   Yes.
25  Q.   How far did you get?

Page 32

1   A.   Right by the St. Claude bridge.
2   Q.   And then you had to turn back?
3   A.   Right.  Yes.  Yes.
4   Q.   When did you next try to go to see
5   your house?
6   A.   About -- maybe about four weeks
7   later.
8   Q.   Is that four weeks after the
9   Hurricane Katrina, or four weeks after your
10  first --
11  A.   After the first time.
12  Q.   So, that would have been in mid-
13  October, probably?
14  A.   Yes.
15  Q.   Were you able to get to the house at
16  that time?
17  A.   No.
18  Q.   Why not?
19  A.   It was still flooded with -- and
20  they really wasn't allowing anybody down there.
21  Q.   The third time you tried, were you
22  able to get to the house?
23  A.   No.
24  Q.   No?  When was the next time you
25  tried?

Page 33

9  (Pages 30 to 33)

1  those damages in more detail later, but just
2  before we get into the details, I want to make
3  sure I have the basic understanding of the types.
4  Beginning with your house at -- on Charbonnet
5  Street, can you just describe the location of
6  that house in the Lower Ninth Ward just for the
7  record, geographically where it's located?
8      A.  It's located right off of St. Claude
9  Avenue, across the Industrial Canal.
10     Q.  About how far from the Industrial
11 Canal is it?
12     A.  About six blocks.
13     Q.  And that was a one-level house --
14     A.  Uh-huh.
15     Q.  -- correct?
16     A.  Yes.
17     Q.  About how many square feet was the
18 house or is the house?
19     A.  I really don't know how many.  I
20 can't remember that right now.
21     Q.  Do you have any pictures of the
22 house before the -- of Hurricane Katrina?
23     A.  No.
24     Q.  You don't have any pictures of the
25 house before Hurricane Katrina?

Page 46

1  didn't take the pictures.  My insurance company
2  take the -- the man who came out, he took the
3  pictures.  I didn't take the pictures.
4      Q.  Oh, okay.  So, the insurance company
5  took the pictures.  Did you or did Nathan, your
6  daughter, anyone that you were with take any
7  photos?
8      A.  No, we didn't take any.
9      Q.  And just so I'm correct, you didn't
10 have any pictures of the house before the storm?
11     A.  No, I don't have any of those.  No.
12     Q.  Mrs. Coats, do you own any other
13 property besides the house on Charbonnet Street?
14     A.  No.
15     Q.  Do you know who owns the duplex next
16 door, the 16 -- 1016 and 18?
17     A.  Yes.
18     Q.  Who owns that?
19     A.  Alberta Greff (phonetic).
20     Q.  Can you spell that for us?
21     A.  I don't -- I don't really know how
22 she spell that last name.
23     Q.  Okay.  And how long has Alberta
24 Greff lived there?
25     A.  Since I been living there.

Page 48

1      A.  No.
2      Q.  When you were going in and looking
3  at the house, did you take any pictures or did
4  anyone take any pictures at that time of the
5  damage?
6      A.  Yes.
7      Q.  Do you have those pictures?
8      A.  Not right now.  My insurance company
9  has them, but I don't know -- can't get them
10 right now.
11     Q.  You sent them in to your insurance
12 company?
13     A.  Uh-huh.
14     Q.  Is that Alliance?
15     A.  Uh-huh.  Yes.
16     Q.  And did you keep copies of the
17 pictures that you sent in?
18     A.  No, I didn't.
19     Q.  Do you have the original negatives?
20     A.  No.
21     Q.  Were they taken with a digital
22 camera or a regular camera?
23     A.  A regular camera.
24     Q.  What happened to the negatives?
25     A.  I really don't know, because I

Page 47

1      Q.  She was there when you moved in?
2      A.  No.  She was renting it out then,
3  during that time.  I think that was rental -- it
4  was rental property.
5      Q.  I understand that place next door to
6  you got pretty heavy wind damage.
7      A.  Right.
8      Q.  Do you know who owns the property --
9  another door down from Alberta Greff's property,
10 the 1012 and 14?
11     A.  Arcenio -- they sold that house, and
12 I really don't know -- Arcenio, I think that's
13 his name.
14     Q.  Arcenio.  Do you know a last name?
15     A.  No.
16     Q.  Let's move on to your second kind of
17 injury that we talked about, the damage to your
18 personal property.
19     A.  Uh-huh.
20     Q.  And it sounds like, from what you
21 said earlier, everything that you left in the
22 house was completely destroyed and --
23     A.  Everything.
24     Q.  All you had was a few days' worth of
25 clothes that you took with you to your sister's

Page 49

13  (Pages 46 to 49)

Q.   Who is it that lives in Carrollton?
A.   My aunt.
Q.   Your aunt?
A.   Uh-huh.
Q.   Did your aunt have any damage from Hurricane Katrina?
A.   No, I don't think so.  Not much. Not really.  Not much.
Q.   She wasn't --
A.   She was on rent, I think it was. She was on rent.  She was renting a house.
Q.   Oh, okay.  And who else do you -- what relatives do you have that live in the city?
A.   A couple cousins, and that's about it, but I don't even know where they live at or anything like that.
Q.   Okay.  Do you have any friends who live in St. Bernard Parish?
A.   No, I don't have any friends, but I know a couple people was living there, and that's about it.  I don't know -- I don't have any friends.
Q.   But you said you know a couple of people who live in St. Bernard?

Page 142

A.   Yeah, Mr. Gil -- Gilbert Andry and his wife.  And that's about it.  They was living there.  They not living there anymore.
Q.   Do you know anyone who lives in New Orleans East?
A.   My daughter.
Q.   Was she living with you at the time of Hurricane Katrina?
A.   Yes.
Q.   And then she moved to New Orleans East later?
A.   Yes.  Yes.
Q.   Do you know anyone else who lives in New Orleans East?
A.   No.
Q.   Do you know any people who had a friend or a loved one who drowned as a result of Hurricane Katrina?
A.   They had several people saying their loved ones had passed, but I don't really know.
Q.   Do you know of anyone who actually had their roof blown off during the hurricane?
A.   No.
Q.   Have you heard of that happening to anybody?

Page 143

A.   (Shakes head negatively.)
Q.   Did you hear about any houses that blew up after the storm because of natural gas leaks?
A.   Did I hear about what?  Repeat that.
Q.   Any of the houses, did you hear on the news --
A.   Yeah.
Q.   -- anything about houses blowing up from natural gas leaks?
A.   Yes.
Q.   Did that happen to anybody you know?
A.   No.
Q.   Did you hear on the news about criminal looting?
A.   Yes.
Q.   Did that happen to anyone you know?
A.   No.
Q.   Mrs. Coats, who do you blame for the damages you're seeking in this lawsuit?
MR. LANDRY:
    Object to form.
    Go ahead.
A.   Who I blame?
EXAMINATION BY MS. PAYNE:

Page 144

Q.   Uh-huh.  Yes.
A.   I blames the Corps of Engineer.
Q.   Is there anyone else besides the Corps of Engineers?
A.   No.
Q.   Why do you blame the Army Corps of Engineers?
MR. LANDRY:
    Object to form.
    Go ahead.
A.   Because, from my understanding, they knew that those levees was bad and they needed MRGO down in St. Bernard Parish.  They knew these different things.
EXAMINATION BY MS. PAYNE:
Q.   Is there any other reason why you blame the Corps of Engineers for what happened to you?
A.   No.
Q.   Do you blame FEMA at all for what's happened to you?
A.   Yes.
Q.   Why do you blame FEMA?
A.   Because I think they knowed that was -- what was the problem.  Just like the Corps

Page 145

37  (Pages 142 to 145)

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

**IN RE:** KATRINA CANAL BREACHES      CIVIL ACTION
**CONSOL**IDATED LITIGATION

NO. 05-4182
"K" (2)

**PERTAINS TO:** MRGO                  JUDGE DUVAL

**FILED IN:** 05-4181, 05-4182,    MAG. WILKINSON
**05-5237,** 05-6073, 05-6314,
05-6324, 05-6327, 05-6359,
06-0225, 06-0886, 06-1885,
06-2152, 06-2278, 06-2287,
06-2824, 06-4024, 06-4065,
06-4066, 06-4389, 06-4634,
06-4931, 06-5032, 06-5155,
06-5159, 06-5161, 06-5162,
06-5260, 06-5771, 06-5786,
06-5937, 07-0206, 07-0621,
07-1073, 07-1271, 07-1285

Videotaped Deposition of

HENRY EARL DAVIS,

7650 Morel Street, New Orleans, Louisiana

70128, taken in the offices of Bruno & Bruno,

855 Baronne Street, New Orleans, Louisiana

70113, on Wednesday, the 11th day of July,

2007, beginning at 10:34 A.M.

HENRY DAVIS                                                    7/11/2007

1   were you one of the parties in that lawsuit?
2        A.  I was one of the parties.  I was
3   driving his car.
4        Q.  All right.  And what was the result
5   of the lawsuit?
6        A.  That was years ago.  I don't really
7   remember what came out.  All I know is the
8   other guy was at fault.
9        Q.  Okay.  Tell me about the next
10  lawsuit that you have been involved in that
11  you can recall.
12       A.  I think I was in one where somebody
13  had stole somebody's car and ran into the back
14  of me at Chef and Downman.  All I did then was
15  just to get my car fixed, --
16       Q.  All right.
17       A.  -- you know.
18       Q.  Can you remember any other lawsuits
19  you have been involved in?
20       A.  Not right offhand, no.
21       Q.  Other than those two lawsuits and
22  the lawsuits that you were involved in because
23  of your job as a train operator, have you ever
24  been a witness in any other context?
25       A.  No.
                                        Page 10

1        Q.  Have you ever been in a proposed
2   class action?
3        A.  No.
4        Q.  Have you ever been sued yourself?
5        A.  No.
6        Q.  In the materials I have reviewed, I
7   believe that you were in bankruptcy from 1992
8   to 1995?
9        A.  Yes, sir.  Is that Chapter 11?
10       Q.  I'm not sure.
11       A.  That's what it was.
12       Q.  Do you recall any other times you
13  have declared bankruptcy?
14       A.  No, that's the only time.
15       Q.  And --
16       A.  Now wait.  I got a question,
17  though.  Chapter 11 is when you pay the whole
18  bill yourself and bankruptcy is when you don't
19  pay it; right?
20       Q.  I think they're both bankruptcy
21  proceedings.
22       A.  Okay.
23       Q.  Is there a different kind of
24  bankruptcy that you think you might have been
25  involved in besides the one from 199- --
                                        Page 11

1        A.  No, that's the only one.
2        Q.  Okay.  Have you ever been involved
3   in any kind of criminal proceeding?
4        A.  No.
5        Q.  For the record, please, if you'd
6   state your date of birth.
7        A.  11/6/52.
8        Q.  All right.  And where were you born?
9        A.  Prentiss, Mississippi.
10       Q.  And when did you first come to New
11  Orleans?
12       A.  I came here to live in 1971.
13       Q.  And have you lived here continuously
14  since 1971?
15       A.  Up until the storm.
16       Q.  I'm sorry?
17       A.  Up until the storm and I had to
18  leave then.
19       Q.  All right.  We'll get to that in a
20  minute.  You are currently married to Yolonda
21  Ransom Davis?
22       A.  Yes.
23       Q.  And when did you marry her?
24       A.  That was February 28th -- I don't
25  remember the exact date.
                                        Page 12

1        Q.  Do you remember the year?
2        A.  That's the part I don't remember.  I
3   remember the date, but not the year.
4        Q.  Give me an approximation.  Was it a
5   couple of years ago, five years ago, ten years
6   ago?
7        A.  Maybe -- Maybe -- Maybe sixteen
8   years ago, something like that.
9        Q.  All right.  Have you ever been
10  married except --
11       A.  Yes.
12       Q.  And tell me about the other
13  marriages, when they were.
14       A.  I was married to Loretta Blunt
15  Davis.  I got married in 1971.  We separated
16  in '75.  And then we got a divorce in probably
17  '89 or something like that.
18       Q.  All right.
19       A.  I'm just guessing at that date, too.
20       Q.  Was this Loretta Davis related to
21  Yolonda Davis?
22       A.  No.
23       Q.  Okay.  And have you been married to
24  anyone else?
25       A.  No.
                                        Page 13

4  (Pages 10 to 13)

HENRY DAVIS                                                7/11/2007

1   Q.  And how many children do you have?
2   A.  I got two biological kids.
3   Q.  And their names are?
4   A.  Latonia and Keoka.
5   Q.  Can you spell the second name,
6  please?
7   A.  K E O K A.  She's the oldest.  I
8  just said them in reverse order.
9   Q.  And how old is she?
10  A.  29.
11  Q.  And Latonia is how old?
12  A.  Latonia is eighteen.
13  Q.  And you said those are your two
14  biological children.
15  A.  Right.  And I also raised up Simeon
16  Ransom Kelly and Kedrick Ranelle Bias.
17  Kedrick Bias, B I A S.
18  Q.  How old are they?
19  A.  Kedrick is 32 and Simeon is -- She
20  was born in '81, so, 2001 is 20 years.  26,
21  Simeon is.
22  Q.  Were any of these children living
23  with you immediately before Hurricane
24  Katrina?
25  A.  Latonia was.

                                    Page 14

1   Q.  And is she still living with you?
2   A.  No, she just recently moved to Baton
3  Rouge.
4   Q.  And approximately when was that?
5  How recent?
6   A.  Three weeks ago.
7   Q.  And do you have any other people who
8  are currently dependent on you?
9   A.  No.
10  **Q.  And what is your current address?**
11  **Is that 7650 Morel Street?**
12  **A.  Yes, it is.**
13  **Q.  And how long have you been at that**
14  **address?**
15  **A.  Since December the 15th, 1986.**
16  Q.  And what is your educational
17  background?
18  A.  I graduated from high school.
19  Q.  Any other specialized training?
20  A.  No more than training for my job at
21  RTA.
22  Q.  And tell me about your job at RTA.
23  I understand that you're retired, but I don't
24  know anything else.
25  A.  Well, I started there as a streetcar

                                    Page 15

1  driver.  I ended up as an instructor, training
2  people to drive buses and streetcars.
3   Q.  And when did you begin as a
4  streetcar driver for RTA?
5   A.  January the 17th, 1977.
6   Q.  And when did you retire?
7   A.  August 1st, last year.
8   Q.  2006?
9   A.  Yes.
10  Q.  Do you receive retirement benefits
11  from them?
12  A.  Yes.
13  Q.  And do you have any other employment
14  now in your retirement years?
15  A.  No.
16  Q.  You're fully retired since August of
17  last year?
18  A.  Yes.
19  Q.  Tell me about your experience with
20  past hurricanes, not Hurricane Katrina, but
21  past hurricanes at your house on Morel
22  Street.
23  A.  When -- Now when I know one is
24  coming, I leave town.  My wife was in Betsy as
25  a kid and she is terrified of storms.  So if

                                    Page 16

1  there's a chance we get it, I'm out of here.
2   Q.  In the prior hurricanes, though, was
3  there damage to your house in any of them?
4   A.  One a few years back.  I don't
5  remember the name of it.  We had a little wind
6  damage.
7   Q.  Okay.
8   A.  And that's about it.
9   Q.  Approximately what was the dollar
10  value of that wind damage?
11  A.  I think about $6,000 or something
12  like that.
13  Q.  All right.
14  A.  Had a roof and my shed and stuff
15  like that messed up.  That's about it.
16  Q.  Blown off and covered by your
17  homeowner's insurance?
18  A.  Yes.  Yes.
19  Q.  You used that money to fix the
20  house?
21  A.  That's correct.
22  Q.  On any of the other past hurricanes,
23  was your house ever damaged?
24  A.  No.  We'd leave and be back in two
25  days.

                                    Page 17

                              5  (Pages 14 to 17)

HENRY DAVIS                                                          7/11/2007

1    Q.  Did you ever have water standing in
2    the street as a result of those other --
3    A.  Never.
4    Q.  Water standing in your yard?
5    A.  Never.
6    Q.  So before Hurricane Katrina you
7    believe that your neighborhood was pretty well
8    located and situated as far as risk for
9    hurricane damage?
10   A.  As far as drainage and stuff, yes, I
11   do.  I believe it was.
12   Q.  The hurricane that you had the wind
13   damage in, would that have been Hurricane Ivan
14   in 2004?  Or Hurricane Georges in 1998?
15   A.  Could have been George, I think.
16   I'm not sure which one it was.
17   Q.  Okay.  In the 20 years that you've
18   lived at this house on Morel, other than
19   Hurricane Katrina, you just had this one
20   incident, don't remember which hurricane it
21   was, and the damage there was limited to wind
22   damage, approximately $6,000 that you were
23   paid by your homeowner's insurance?  Is that
24   correct?
25   A.  That's correct.
                                              Page 18

1    Q.  All right.  And would you describe
2    the location of your house just for the record
3    geographically?  You're pretty near the Lake
4    Pontchartrain, aren't you?
5    A.  Yes.  I'm pretty near -- You know
6    where Jazzland is?
7    Q.  I'm from out of town, but I have
8    looked at a map so I know where you are on the
9    map.
10   A.  Okay.  Well, I'll describe it if
11   you're not from here.  Because all I can do is
12   tell you places that's around it.
13   Q.  Sure.  Go ahead.
14   A.  Okay.  Jazzland on one side, Haynes
15   and Morrison intersect.  Haynes -- I'm on
16   Morel between Morrison and, what's that
17   street, Curran.  Morrison and Curran.
18   Q.  To the north of your house up at
19   Lake Pontchartrain there is a levee wall up
20   there, isn't there?
21   A.  Yes, there is.
22   Q.  Approximately how far is that?
23   A.  From my house?  On Haynes, maybe
24   about half a mile.
25   Q.  Half a mile?  We're going to spend
                                              Page 19

1    the rest of the day going through details, --
2    A.  We are?  Well, we better take breaks
3    and put money in that parking meter.
4    Q.  Let us know when you need a break.
5    A.  Okay.
6    Q.  But just give me a brief overview so
7    that I have a little bit of an idea about
8    where were you before; during, I understand
9    you evacuated, after, but could you just give
10   me a brief description so I kind of have an
11   understanding of what we're going to be
12   talking about for the rest of the day.
13   A.  Okay.  The Saturday before the storm
14   I left going to Mississippi.  That Monday, I
15   am looking at television and I see water all
16   over Jazzland so I know I am real close to
17   Jazzland.  At that point I know I am probably
18   under water, too.  Now, I wasn't sure, but
19   then when I tried to come back, I couldn't get
20   in, so then I was sure.
21   Q.  When did you try to come back?
22   A.  I tried to come back I think that
23   Friday after that Monday.
24   Q.  And Monday was the Hurricane
25   Katrina?
                                              Page 20

1    A.  No, Monday was the day of the -- I
2    think Katrina was Sunday.  I think.  Was it?
3    I think.
4    Q.  I am not sure now.  Whichever day it
5    was, Friday of that week --
6    A.  Yeah, whatever day --
7    Q.  -- was when you tried to come back?
8    A.  After the storm on Friday I tried to
9    come back.
10   Q.  All right.  And you say at that time
11   you were blocked by the police, you couldn't
12   get in?
13   A.  Yeah, I couldn't get in.
14   Q.  All right.  So you went back to
15   Mississippi?
16   A.  I went back to Mississippi.
17   Q.  And when was the second time that
18   you returned to New Orleans?
19   A.  It was a couple of months later.
20   Because after that I went to Baton Rouge.  My
21   job called me to go to Baton Rouge to work.
22   And I got off there and I don't know if there
23   was -- it was still kind of blocked off, but
24   nobody was there so I just came and looked.
25   Man, looked like a bomb had hit the place.  I
                                              Page 21

HENRY DAVIS                                                              7/11/2007

1  didn't think I'd be able to get back.
2      Q.  Tell me a little bit more
3  specifically about how your house on Morel
4  looked.
5      A.  All the furniture was in the same
6  spot.  It just had mold coming up the wall.
7  The floors and stuff was still wet --
8      Q.  Yes.
9      A.  -- from the carpet.  A smell out of
10  this world.  It just was horrible looking.
11      Q.  But no standing water?
12      A.  No, the water had gone down, but I
13  still had it in the rugs and stuff on the
14  floor.
15      Q.  Sure.  It was still wet there?
16      A.  Uh-huh (affirmatively).
17      Q.  All right.
18      A.  And the closets, I don't know, it
19  was black stuff all over the place
20  everywhere.
21      Q.  This is a one story house?
22      A.  Yes.
23      Q.  Was there any damage to your roof?
24      A.  Some wind damage, yeah.  I had --
25  Well, where my daughter's room is, there's
                                        Page 22

1  date for that.  They treated the stuff for
2  mold and all of that.  And it was in July of
3  '06 that I started putting it back together.
4  The last two weeks of July I think it was.
5      Q.  And when were you able to move back
6  into the house?
7      A.  I think it was in December.
8      Q.  Okay.  As I said, we're going to
9  come back and talk about all of that.  I just
10  wanted to get a little bit of a preview.
11          Do you know what a Form 95 is?
12      A.  No.
13      Q.  You signed a written authorization
14  to allow your attorney to file a form with --
15      A.  Okay.
16      Q.  -- the government to make your claim
17  against the Corps of Engineers.
18      A.  Okay.
19      Q.  And that was -- the government's got
20  a number for everything, and that piece of
21  paper is called a Form 95.
22      A.  Okay.
23      Q.  You know that your attorney filed
24  that Form 95 on your behalf?
25      A.  Yes.
                                        Page 24

1  some kind of vent pipe that comes out.  The
2  top, it had a plastic boot thing over it.
3  That had split, water poured in; all the
4  ceiling and everything fell down.
5      Q.  Okay.
6      A.  So that room was messed up the
7  worst, my daughter's room.
8      Q.  Did any other ceilings fall in?
9      A.  No.  That's the only ceiling.
10      Q.  No other roof damage you recall?
11      A.  Well, they had -- yeah, I had
12  shingles blown off all around, but I was able
13  to get it patched back up.
14      Q.  And all of this was about two months
15  later, so you're thinking October or so?
16      A.  Somewhere in that neighborhood,
17  yeah.
18      Q.  Maybe November?
19      A.  Could be.
20      Q.  When did you actually come back to
21  New Orleans to begin repairing the house or
22  occupying it?
23      A.  After they let everybody back in, I
24  had somebody come and gut the house, take all
25  the furniture out.  I don't remember the exact
                                        Page 23

1      Q.  And have you seen a copy of that?
2      A.  Yes.
3      Q.  All right.  I want to begin by
4  understanding the injuries that you're
5  claiming in this lawsuit.  I have had produced
6  by your attorneys, of course, that Form 95 and
7  it has three types of injuries, damages that I
8  understand.  The first is your house being
9  severely damaged, and that's one type.  I
10  understand that.  Second was your personal
11  possessions; lawyers call it personal
12  property.
13      A.  Uh-huh (affirmatively).
14      Q.  Your furniture and clothes and car
15  and boat, all of that stuff other than your
16  house and land.
17      A.  Okay.
18      Q.  So that's the second kind of damage
19  you're seeking in the lawsuit.
20      A.  Okay.
21      Q.  And third was severe mental
22  distress.  Do I understand that those are the
23  only three types of damages, types of relief
24  you're seeking in this lawsuit?
25      A.  Yes.
                                        Page 25

                                    7 (Pages 22 to 25)

HENRY DAVIS                                                    7/11/2007

| | |
|---|---|
| 1    Q.  Is that correct? | 1    A.  Right.  Not -- Not Road Home.  The |
| 2    A.  That's correct. | 2  other one. |
| 3    Q.  Not seeking any other relief, | 3    Q.  The Form 95 that we talked about? |
| 4  damages or injuries in this lawsuit? | 4    A.  No. |
| 5    A.  No. | 5    Q.  Your insurance? |
| 6    Q.  And again, I am going to come back | 6    A.  No. |
| 7  and talk about the circumstances of each of | 7    Q.  We'll talk about those -- |
| 8  those types of damages in detail in a minute, | 8    A.  Yeah, I'll think about what it is in |
| 9  but I would like to go through those three | 9  a minute. |
| 10  types just to make sure I understand the | 10    Q.  We'll talk about those in a while |
| 11  particular damage first. | 11  and maybe it'll come back then.  So that was |
| 12    A.  Okay. | 12  the damage to your home that you considered to |
| 13    Q.  Beginning with your house -- And | 13  be pretty major damage. |
| 14  again, this is the house at 7650 Morel that | 14    A.  Right. |
| 15  was damaged in the storm; right? | 15    Q.  Okay.  Let's move to your second |
| 16    A.  Yeah.  Yes. | 16  kind of injury for your personal property.  Of |
| 17    Q.  The house you lived at for 20 years? | 17  all of the possessions that you had in the |
| 18    A.  Yes. | 18  home, were all of them destroyed, some of them |
| 19    Q.  Would you give me a kind of before | 19  destroyed?  Tell me about how much damage you |
| 20  and after description of the house?  One | 20  suffered there. |
| 21  bedroom -- I mean one level house, you said? | 21    A.  Once I came in and saw it, I hired |
| 22    A.  Yes. | 22  somebody else just to -- It looked like it was |
| 23    Q.  I have seen a picture of brick | 23  damaged to me.  Everything, you know, like it |
| 24  walls. | 24  was. |
| 25    A.  Uh-huh (affirmatively). | 25    Q.  Were all of your clothes damaged? |
| Page 26 | Page 28 |
| 1    Q.  About how many square feet? | 1    A.  Oh, yeah.  They had mold all over, |
| 2    A.  That, I don't really remember | 2  up the wall and -- I don't think you could do |
| 3  exactly, -- | 3  anything with that. |
| 4    Q.  Okay. | 4    Q.  All right.  And your furniture? |
| 5    A.  -- the square footage.  It's got | 5    A.  Yeah.  Everything that was on the |
| 6  three bedrooms, a living room, kitchen, and | 6  floor got wet. |
| 7  two baths. | 7    Q.  So it had soaked up the water and |
| 8    Q.  All right. | 8  had mold on it? |
| 9    A.  It was in really great shape before | 9    A.  Uh-huh (affirmatively). |
| 10  the storm because I had did some work to it. | 10    Q.  All right.  What about -- |
| 11    Q.  Yes. | 11    A.  The computer and stuff that -- one |
| 12    A.  And it was, to me, it was just in | 12  part sits right on the floor, so I know that |
| 13  great shape.  It's back in that order now, but | 13  was gone.  The same thing with the surround |
| 14  in the time in between, I didn't think I'd | 14  sound to the TV, it sits on the floor.  A part |
| 15  ever be able to get back in there when I first | 15  of it.  So I didn't check the part that was |
| 16  saw it. | 16  up, but just the whole thing. |
| 17    Q.  Do you have any pictures of the | 17    Q.  Did you submit an insurance claim on |
| 18  house before and after? | 18  any of these items? |
| 19    A.  No, I had some of the storm, but I | 19    A.  Yes. |
| 20  think I gave them to Road Home.  I don't know | 20    Q.  Was it your homeowner's insurance or |
| 21  what I did with them after that or something. | 21  flood insurance or both? |
| 22  I don't know if I got them back or not. | 22    A.  Flood.  Homeowner's didn't pay a |
| 23    Q.  So you think you might have given | 23  dime. |
| 24  that with your application for the Road Home | 24    Q.  All right.  Did you prepare as part |
| 25  Program? | 25  of that insurance claim a list of these items |
| Page 27 | Page 29 |

8 (Pages 26 to 29)

HENRY DAVIS                                                    7/11/2007

1     Q.  And what was their state when you
2  returned to your house?
3     A.  The boat was in good shape because
4  my neighbor across the street didn't leave.
5  He came over and put the plug in the boat.  So
6  the boat kind of floated and damaged the patio
7  poles and stuff just moving back and forth on
8  the trailer.
9     Q.  Okay.  Can you think of any other
10 high dollar items of personal property?
11    A.  That was lost.  My shed.  My shed
12 looked like a bomb hit it.  And homeowner's
13 was supposed to pay for that.  They didn't.  I
14 had the fence just destroyed all the way
15 around.  Homeowner's didn't pay nothing for
16 that either.  The roof damage, homeowner's
17 didn't pay a dime.  So all of that stuff I had
18 to fix myself out of my own pocket.
19    Q.  Let's go back and talk about those.
20 Tell me about your shed.  Where was it?
21    A.  It was in the same location as the
22 new shed I got now.  It just was --
23    Q.  Is this in the backyard?
24    A.  In the backyard, yes.
25    Q.  All right.  And how large was it?
Page 34

1     Q.  Had it been hit by other debris in
2  the storm?  Why would it be gone?
3     A.  Maybe the wind blew it away.  I
4  don't know.  I don't know what happened to it.
5     Q.  Okay.
6     A.  I know it wasn't there.  But with
7  the fence missing, too, it could have been
8  anywhere.  I don't know.  The grass was high
9  all over the place.
10    Q.  Tell me about the fence.  The fence
11 around the yard.
12    A.  It was all gone.  It was just --
13 poles bent.
14    Q.  Chain link fence?
15    A.  It was a wooden fence.
16    Q.  A wooden fence?
17    A.  Uh-huh (affirmatively).
18    Q.  How high?
19    A.  Six foot.
20    Q.  How constructed?
21    A.  It was metal poles and two by fours
22 going across.  All of that was wiped out.
23    Q.  And what do you think on that?  It
24 had to be wind?
25    A.  That's what I say.  Homeowner's said
Page 36

1     A.  This one is an 18 by 12.  That one
2  might have been 14 by 12.
3     Q.  Now, was this a structure you had
4  built or is it one of those metal sheds that
5  you buy at Sears or some place and kind of
6  construct it?
7     A.  No, it was a -- it was a built
8  shed.  Tin.  It was built out of tin.  I had a
9  guy come build it in the backyard.
10    Q.  All right.  What year was it built?
11    A.  That must have been built in about
12 '95 maybe.
13    Q.  And what kind of condition was it in
14 before Hurricane Katrina?
15    A.  It was in good shape before the
16 storm.
17    Q.  Okay.  And when you came a couple of
18 months after Hurricane Katrina, what condition
19 was it in?
20    A.  There was really nothing left but
21 the floor structure.  I don't know where all
22 the tin around it was -- it must have just
23 blew away.  I don't know what happened to it.
24 Had a little bit of it in the yard, but some
25 of it was gone.
Page 35

1  it wasn't.
2     Q.  But you said it was?
3     A.  Yeah, I said it was.
4     Q.  And your roof you said was --
5     A.  Shingles missing.
6     Q.  Tell me about the roof.  You said
7  there were some missing shingles before.
8     A.  Yes.
9     Q.  And you said that the seal around
10 the pipe --
11    A.  Pipe.
12    Q.  -- that came down to your daughter's
13 bedroom --
14    A.  It was all split.
15    Q.  Split?
16    A.  And water came in through that I'm
17 sure.
18    Q.  Okay.  Were there any other items?
19 I mean, I am going the call those two, the
20 shingles missing and the pipe that came down.
21 Was there any other damage to your roof?
22    A.  No, I got some gutters that leaked
23 that I don't think was leaking before.  I
24 can't figure out what could have caused it.
25 Maybe wind.  I don't know.
Page 37

10  (Pages 34 to 37)

HENRY DAVIS                                                    7/11/2007

1  and replace the money.
2      Q.  Okay.  So he's done kind of all of
3  the carpentry, drywall, moldings, wood frames,
4  doors, new cabinets.  Then you had new
5  appliances brought in.
6      A.  Yeah.  Right.
7      Q.  Okay.  What else is being done to
8  the house?
9      A.  That's about it.  I --
10     Q.  Was it about done by then?
11     A.  Pretty much.
12     Q.  All of your brick on the outside was
13  still okay?
14     A.  Yeah.  My brick was all right.
15     Q.  And you had to I guess have a little
16  roof work to fix the shingles that were popped
17  loose?
18     A.  Right.  I had to do that.  I had a
19  guy named Mike, was a little roofing thing
20  done.  It's hard to get other people to do any
21  patch work, you know.  So I got this guy to
22  just patch up.
23     Q.  Those guys were real busy at that
24  time, weren't they?
25     A.  They wasn't doing no patch work.  It

Page 74

1  got a few guys to make the flooring for it.
2  Made the flooring, they came and put it on top
3  of the flooring.  It came out nice.
4      Q.  Okay.  Do you have any invoices and
5  paperwork for that?
6      A.  Yes.  I got the part for the shed
7  itself, but not for the flooring.
8      Q.  Do you have an estimate for what was
9  the total cost of repairing your house?
10     A.  No.
11     Q.  I mean the house part.  We're not to
12  the personal property yet.
13     A.  I would have to look at the
14  paperwork.  Now, I had so much done in
15  different steps, I really don't know until I
16  look at it all together.
17     Q.  So you don't know?
18     A.  No, not right off.
19     Q.  What do you think the value of your
20  house was the day before Hurricane Katrina?
21     A.  Probably about 110.
22     Q.  And what is that based upon?
23     A.  The fact that I hadn't been long
24  refinancing.
25     Q.  As part of that refinancing did you

Page 76

1  was real hard to find somebody to do that.
2  But this guy said he would do it.  He got up
3  there, did a pretty good, reasonable price.
4      Q.  And also fixed the drain pipe?
5      A.  Right.  Right.  He fixed that, too.
6      Q.  Okay.  And what was the name of his
7  company?
8      A.  He got -- He got up there hisself
9  and did that.  His name was Mike.
10     Q.  Do you think you got a bill from
11  him, an invoice telling you what he did?
12     A.  No.  I paid Mike cash.  You couldn't
13  -- You couldn't get a regular company to fool
14  with no patches.  They was doing whole roofs
15  and that's it.  They had plenty of them to
16  do.  But I had to get this done now.  So I had
17  to get who I can.
18     Q.  Right.  And then you also had to --
19  you said you had somebody rebuild your shed?
20     A.  I went to Crowley, Louisiana; you
21  know those things they use as a carport --
22     Q.  Yes.
23     A.  -- on a lot of houses?  Well, I
24  bought one of those, enclosed with a roll-up
25  door, and I had -- I stopped at Home Depot and

Page 75

1  have appraisers come out and appraise the
2  house?
3      A.  They sent somebody out and appraised
4  it.
5      Q.  Right.  And I think your last
6  refinancing was in 2003?  Is that correct?
7  Maybe one in 2000 and another one in 2003?
8      A.  I think it was in 2003, yeah.
9      Q.  Would that have been the last
10  official appraiser who came to your house?
11     A.  Yes.
12     Q.  And you think he appraised the house
13  and lot for 110,000?
14     A.  I think so.
15     Q.  Okay.
16     VIDEO OPERATOR:
17     Excuse me, Counsel.  Go off the
18  record to change tapes?
19     MR. DOAK:
20     Yes, that's a good time to take a
21  break.
22     VIDEO OPERATOR:
23     Now off the record.  That's the
24  conclusion of tape 1.  It's 11:52.
25     (Recess.)

Page 77

20  (Pages 74 to 77)

HENRY DAVIS                                                              7/11/2007

town.
 A.   Chef Menteur Highway is a little bit
higher than the rest of the streets out in
that area.  So if you're right on the corner,
all the water is going to pass you down here
and come back.
 Q.   I see.  Yes, that's the title.  It
says "Katrina left many in Eastern New Orleans
unscathed."
 A.   A lot of people that live right near
Chef or right on the corner of Haynes didn't
-- didn't get much water.
 Q.   Okay.
 A.   Because those are the high areas.
 Q.   Okay.
 A.   So if -- You know, water is not
going to be on this end of this hat
(indicating).  It will be back here
(indicating).  That's just how it is.
 Q.   And New Orleans East, it's a large
area.  Do you have any idea how wide that is?
 A.   All of that's Ninth Ward.  And the
Ninth Ward is the biggest ward in the city.
So it's huge.
 Q.   Do you have relatives that live in

Page 110

East New Orleans.  It's just that in her area
she got more water than us.
 Q.   How many miles is she from you?
 A.   Maybe two or three miles at the
most.  She's back near Crowder.  And I am past
Bullard.
 Q.   Okay.  And what happened on your
street is completely different from what
happened on her street.
 A.   That's correct.
 Q.   Who else do you have as a relative
in New Orleans?
 A.   I got a sister that live across the
river.  And they didn't get no water on that
side.
 Q.   Across the Mississippi River?
 A.   Across the Mississippi River.
 Q.   Which parish?
 A.   Now, I don't know.  I just know
about the vicinity it's in.  I don't know what
parish it is.
 Q.   Okay.  What other relatives do you
have in town?
 A.   That's all I have in town now.
 Q.   How about friends that you have and

Page 112

the city?
 A.   Yes.
 Q.   Where do they live?
 A.   My sister-in-law live on Lemans.
They got about seven feet of water in their
house.
 Q.   What parish?
 A.   That's in Orleans.  That's in
Orleans Parish.
 Q.   Okay.
 A.   It's in Eastern New Orleans.
 Q.   Okay.
 A.   So, you know, certain areas got way
more water than others.
 Q.   So they got a lot more water than
you got at your house?
 A.   That's correct.
 Q.   And that's your sister?
 A.   My sister-in-law.
 Q.   Sister-in-law?
 A.   My wife's sister.  Yes.
 Q.   And what was the particular area
again, the name of it?
 A.   It's Eastern New Orleans.  All of
that East.  I'm in East New Orleans, she's in

Page 111

that you have talked to, or your children's
friends?  I am just wondering.  Tell me about
different people who you know and what their
experience was in Hurricane Katrina.
 A.   I talked to one guy whose sister
lived -- No, whose cousin lived upstairs; him
and his sister went to their house and the
water got all the way upstairs on the top step
and they realized they had something
downstairs and they come and swam under water,
get it, and come back up.  And that was real
deep.  Like ten feet maybe more.
 Q.   Okay.
 A.   You know.  You hear so many
different stories.
 Q.   Do you know any people who had a
friend or loved one who died as a result of
the storm, who drowned?
 A.   Some of my co-workers.  I know of
one that died as a result of the storm.  Him,
his wife, and I think his son drowned in their
house.
 Q.   Where did they live?
 A.   Somewhere in the East.  I don't know
exactly where at.  But somewhere in the East

Page 113

29 (Pages 110 to 113)

GLYNN WADE (MRGO)                                    7/10/2007

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE:  KATRINA CANAL BREACHES      CIVIL ACTION
CONSOLIDATED LITIGATION
                                    NO. 05-4182
                                       "K" (2)
PERTAINS TO:  MRGO                  JUDGE DUVAL

FILED IN:  05-4181, 05-4182,     MAG. WILKINSON
05-5237, 05-6073, 05-6314,
05-6324, 05-6327, 05-6359,
06-0225, 06-0886, 06-1885,
06-2152, 06-2278, 06-2287,
06-2824, 06-4024, 06-4065,
06-4066, 06-4389, 06-4634,
06-4931, 06-5032, 06-5155,
06-5159, 06-5161, 06-5162,
06-5260, 06-5771, 06-5786,
06-5937, 07-0206, 07-0621,
07-1073, 07-1271, 07-1285



          Videotaped Deposition of

               GLYNN WADE,

4719 Bundy Road, New Orleans, Louisiana 70127,

taken in the offices of Bruno & Bruno, 855

Baronne Street, New Orleans, Louisiana 70113,

on Tuesday, the 10th day of July, 2007,

beginning at 9:09 A.M.

GLYNN WADE (MRGO)                                           7/10/2007

Page 6

1         VIDEO OPERATOR:
2              This is the videotaped deposition
3    of Glynn Wade.  This deposition is
4    being held today at 855 Baronne
5    Street, New Orleans, Louisiana, on
6    July the 10th, 2007 at approximately
7    9:09 A.M.
8              Would the Court Reporter please
9    now swear in the witness.
10             GLYNN WADE,
11   4719 Bundy Road, New Orleans, Louisiana 70127,
12   after having been duly sworn by the
13   before-mentioned court reporter, did testify
14   as follows:
15   EXAMINATION BY MR. MARPLE:
16        Q.  Mrs. Wade, have you ever been
17   deposed before?  Given a deposition like this
18   before?
19        A.  No.
20        Q.  We said off the record, but I'll say
21   it on, if you need a break at any time, you
22   just let us know, we'll be happy to
23   accommodate you.  One other thing is, this
24   gentleman, the Court Reporter, is taking down
25   everything we say, questions and answers, so

Page 7

1    if you'll let me finish my question before you
2    start your answer, I'll try to not interrupt
3    you or start another question before you're
4    finished.  He'll have a question and answer,
5    so that the answer doesn't appear in the
6    middle of my question in the transcript.  Is
7    that okay to try to do that?
8         A.  Yes, it is.
9         Q.  I hate to ask you this, but can you
10   tell us your date of birth?
11        A.  October 19th, 1945.
12        Q.  We're about the same age.  I'm a
13   year or two behind you.  Where were you born?
14        A.  New Orleans, Louisiana.
15        Q.  What part?
16        A.  Orleans Parish.
17        Q.  And was it a particular neighborhood
18   where you grew up?
19        A.  An area in New Orleans called Zion
20   City, around North Broad Street.
21        Q.  And did you go to school in New
22   Orleans?
23        A.  Yes, sir, I did.
24        Q.  What high school did you go to?
25        A.  Walter L. Cohen Senior High School,

Page 8

1    C O H E N.
2         Q.  And what year did you graduate from
3    high school?
4         A.  1963.
5         Q.  Was that a public school?
6         A.  Yes, sir, it is.
7         Q.  I'm taking in those days it was
8    probably all black?
9         A.  Yes, it was.
10        Q.  And then did you go to college?
11        A.  Yes, sir, I did.
12        Q.  Where did you go?
13        A.  Dillard University.
14        Q.  And what years approximately were
15   you at Dillard?
16        A.  From 1963 to 1967.
17        Q.  And you got a degree there?
18        A.  Yes, sir, I did.
19        Q.  In what?
20        A.  Sociology.
21        Q.  And then did you have any further
22   education after college?
23        A.  Yes, sir, I did.
24        Q.  And what's that?
25        A.  I have a Master's degree in social

Page 9

1    work.
2         Q.  And where did you obtain that?
3         A.  Tulane University of School of
4    Social Work.
5         Q.  And approximately what year was
6    that?
7         A.  1985.
8         Q.  And as I understand it, you worked
9    as a social worker for several years?  Is that
10   correct?
11        A.  Yes, sir.
12        Q.  Have you worked at anything other
13   than in social work?
14        A.  Well, in between when I first moved
15   from Cleveland, Ohio, I worked with retarded
16   adults as an instructor they called it, but
17   really just working and teaching them a trade
18   for the Association of Retarded Citizens of
19   Greater New Orleans.
20        Q.  Now, after you graduated, did you
21   still live -- the first time from college, did
22   you still live in New Orleans then?
23        A.  No, sir.
24        Q.  Tell me where Dillard is.
25        A.  Dillard University is in New Orleans

                                3  (Pages 6 to 9)

GLYNN WADE (MRGO)                                          7/10/2007

Page 10

1  in the Gentilly area.
2      Q.  And then after college you moved
3  away to Ohio?
4      A.  Yes, sir.
5      Q.  And how long did you live in Ohio?
6      A.  From 1967 to 1972.
7      Q.  And then you came back to New
8  Orleans in '72?
9      A.  Yes, sir.
10     Q.  And have you lived in New Orleans or
11  the New Orleans area since then?
12     A.  Ever since then.
13     Q.  Do you remember Hurricane Betsy?
14     A.  Very well.
15     Q.  And tell us what you remember about
16  Betsy.
17     A.  Well, I remember that I was about 19
18  years old, a student at Dillard.  I was living
19  with my parents and I remember that it was a
20  very bad hurricane and a lot of people lost
21  their homes and lives.
22     Q.  And where were you living?  What
23  area of town were you living in then?
24     A.  The area called, referred to as Zion
25  City off of North Broad Street with my

Page 11

1  parents.
2      Q.  All right.  I wasn't sure if you
3  were still living there.  Did your area get
4  flooded?
5      A.  No, sir, it didn't.
6      Q.  The Lower Ninth got hit pretty hard;
7  right?
8      A.  Yes, it did.
9      Q.  Did you have occasion to see the
10  aftermath of Betsy in the Ninth Ward or other
11  places?
12     A.  Yes, sir, I did.
13     Q.  Did you have friends or
14  acquaintances that lived in the Lower Ninth?
15     A.  No, sir, I did not.
16     Q.  Now, you mentioned there was a lot
17  of homes lost and lives lost.  Did you know
18  people who had lost homes in Betsy?
19     A.  No, I got that information from the
20  news.
21     Q.  And the loss of life, that came from
22  the news as well?
23     A.  Yes, sir.
24     Q.  When you came back to -- Well, let
25  me back up just a second.  On Betsy, do you

Page 12

1  have any thoughts on what went wrong or what
2  caused the flooding with regard to Betsy?
3      A.  I have no idea, sir.
4      Q.  Now, when you came back in '72,
5  where did you live then?
6      A.  I first moved in the Lower Ninth
7  Ward with my mother and step-father, my two
8  year old baby and I.  And eventually, several
9  months later, I moved in the Gentilly area
10  with my great aunt who was well up in age and
11  asked me to move in with her to assist her.
12     Q.  And the home that you were living in
13  in the Lower Ninth, had it been flooded during
14  Betsy?
15     A.  I'm told by my step-father, my
16  mother that remarried, that yes, that house
17  had been flooded.
18     Q.  And do you know to what extent?  I
19  mean, what did they tell you about how bad it
20  was or anything?
21     A.  All I know is it had been flooded.
22     Q.  And then after you left with your
23  great aunt, where did you live next?
24     A.  Well, 13 years ago I was able to
25  move into New Orleans East.  My husband and

Page 13

1  I.
2      Q.  All right.  And I may not have --
3  Well, maybe we have.  But between about 1993
4  or 1994 when you moved to where you live now,
5  right?
6      A.  Yes, sir.
7      Q.  Have we covered the basic places you
8  have lived before that?
9      A.  Yes, sir, because my aunt left me
10  that house.
11     Q.  Give us the address of the house
12  where you live now.
13     A.  4719 Bundy Road.
14     Q.  And --
15     A.  New Orleans, Louisiana.
16     Q.  When you bought that house, do you
17  know how old it was?  In other words, when it
18  was built?
19     A.  Not really.  No.
20     Q.  And what kind of condition was it in
21  when you bought it?
22     A.  Excellent condition.
23     Q.  And then did you do any remodeling
24  between the time you bought it and Hurricane
25  Katrina?

                              4 (Pages 10 to 13)

GLYNN WADE (MRGO)                                               7/10/2007

Page 18

1    A.  None.
2    Q.  I'm sorry, were you wanting to say
3  something else?
4    A.  No, sir.
5    Q.  Now, coming up to Hurricane Katrina,
6  can you just tell us generally your experience
7  with Katrina, if you left and when you came
8  back, where you went to, that sort of thing?
9    A.  Okay.  First of all, I need to tell
10  you that I am a State worker.  I'm a State
11  social worker.  Therefore, when there's a
12  hurricane, State workers, if they are called
13  to go and work a shelter, be it any part of
14  Louisiana, have to go.  If not, we're told
15  that we won't have a job after the hurricane.
16  So on Saturday, August 27th, 2005, about 8:00
17  A.M., I was notified by the State, saying to
18  get prepared and to pack clothes for three
19  days, get my family situated, and be ready to
20  move out with them later that day.  So I
21  called my daughter immediately, she was in the
22  Reserve living in New Orleans, and I told her
23  to contact her daddy's people right away and
24  leave New Orleans.  Leave New Orleans.  She's
25  an only child, as I am.  For my husband, I

Page 19

1  tried to get him to go with my step-children,
2  who are all adults.  Well, he is 13 years
3  older than me and very ornery and hard headed,
4  too.  So, therefore, I still got food for my
5  daughter and granddaughter and left food,
6  water, and juice for my husband, and I asked
7  my younger neighbors to please look out for
8  him and talk him into leaving with them.  I
9  had to be at City Hall that day for 3:00 and I
10  -- I didn't -- I didn't pack.  I was very
11  upset that I had to leave my family to go and
12  help other families.  I had to leave mine
13  behind.  So I took my clothes and put them in
14  a garbage bag, which is not me, because I had
15  just come from Hot Springs and my husband
16  bought me a brand new set of luggage that May,
17  but I figured if I have to go, at least I can
18  do it the way I want to do it.  So I put three
19  days of clothing in a garbage bag and I got to
20  City Hall about 3:00 that evening.  My
21  colleagues asked me had I gone crazy coming
22  with a garbage bag, but I told them, "Just
23  don't say anything to me.  I have to go, I'll
24  go the way I want to go."
25    But we stayed in City Hall from

Page 20

1  3:00 that evening until about 8:00 P.M. and
2  the head nurse of the -- the health head nurse
3  drove two other public health nurses and I,
4  the social worker, to Baton Rouge.  We got
5  there I think about 11:00.  So much happened
6  that day, but it was about 11:00 that night we
7  got to LSU campus.  It was the gymnasium on
8  that campus.  I am not sure, I think it's the
9  Pete Montz, something of that nature.  I had
10  never been there before.  And when we got
11  there, they were setting up, moving the
12  bleachers and setting up, putting, not beds,
13  but cots up.  We had to sign in and all of us
14  State workers that had just come in about
15  11:00, they told us to go sit in the bleachers
16  and rest for a while, because in a couple of
17  hours it would be our turn to receive the
18  people as they come in.
19    And there were, oh, even at 11:00
20  when we walked in, people coming in.  I recall
21  some people were coming in from Chalmette,
22  Louisiana and other areas of Louisiana.  I
23  remember Chalmette, because my mother lived on
24  Delery in Ninth Ward near Chalmette.  So I
25  remember it.  Some people from New Orleans,

Page 21

1  Lower Ninth Ward.  I could not sleep because
2  it was so -- it was so much excitement and I
3  was so nervous.  I had never experienced
4  that.  But I think I sat in the bleachers with
5  my co-workers maybe three or four hours and
6  then it was our turn to get up and start
7  working the shelters.  And when I say work,
8  that means that, of course, the nurses, public
9  health nurses were triaging and I as the
10  social worker were receiving the people and
11  was counseling them.  Because this apparently
12  was new to some of the people that were coming
13  in.
14    You see, I worked a -- they call
15  it a special needs shelter.  So that was
16  either disabled people, regardless of their
17  ages, or elderly people.  And that was an
18  experience for them, too, to have to leave
19  home.  And we prepared to work for three
20  days.  And it was okay going and receiving the
21  people, but I can recall about that Monday
22  more people start coming in and by that time
23  my husband had gotten lost from the neighbor,
24  but he wound up in a very nice shelter near
25  Tallulah, Louisiana and he called me and he

GLYNN WADE (MRGO)                                    7/10/2007

**Page 22**

1  told me, he said, "Now, we are hearing that
2  the --" That was Monday, "-- East New Orleans
3  is flooded and so be prepared, because they
4  said that a lot of the houses were under
5  water." I don't know, because I was in the
6  middle of the shelter working and we were not
7  allowed to look at TV, which was way to the
8  side for the people that came in and living in
9  the shelter were able to do, but I remember
10 some of the people that came into the shelter
11 that Saturday, they remembered where we'd say
12 we were from and they came -- I remember some
13 of them took me by the hand and they said,
14  "You're helping us and you're counseling, but
15 you have lost your home. Because if you lived
16 in East New Orleans, you have lost everything
17 you own." I didn't believe it. But I walked
18 to the TV and CNN, I think it was, was showing
19 all the time, showed the condition of New
20 Orleans all over, Lower Ninth, the East,
21 everywhere. And I still didn't believe my
22 house was damaged. Because it had never been
23 damaged before. But my husband called me and
24 he said, "Prepare, come into the real world."
25 He says, "You have lost -- we have lost

**Page 23**

1  everything we own."
2       So I can't say I accepted it, but
3  I had to make the best of working. I was
4  still on my job working and I decided to do
5  all I could to stay busy. And with me helping
6  others helped me to keep my sanity.
7       And that night, that Monday night,
8  I remember helicopters -- to this day I cannot
9  stand to hear helicopters or planes over my
10 head, because, oh, for about several days, but
11 starting that night, that Monday night,
12 helicopters were coming in bringing people
13 into the shelter. And as we accepted the
14 people, they start telling their stories to us
15 because we were counseling them. And I
16 remember many came from Chalmette, Louisiana.
17 And some of the families stated that they were
18 blessed by relatives to be able to get put on
19 the roof, some way that relatives, the men
20 relatives were able to bust holes in the roof,
21 and I remember one lady, she said her husband
22 and mother put -- helped her to
23 get up to the roof and then helped their
24 disabled son to get up on the roof. And when
25 she tried to lean down to get her mom, she

**Page 24**

1  said the water came so fast that she couldn't
2  help her mother or her husband and she
3  actually, she stated, saw them floating around
4  the house drowned. And there were many other
5  stories that people had to tell us.
6  Meanwhile, I'm in shock about my situation,
7  but it wasn't like seeing relatives die. So I
8  was able to -- to listen, and one of the
9  things that we as social workers were able to
10 do is start getting names, phone numbers, and
11 addresses of relatives in other states,
12 because the doctors stated to us that once the
13 patients were triaged and stabilized, the ones
14 that were on the insulin or had heart
15 conditions or whatever, if we social workers
16 could contact relatives out of Louisiana and
17 talk with them and let them talk to them and
18 they would accept them on their end, then we
19 can get them ready for the helicopter and they
20 would fly the people all over the United
21 States. And that was what I was doing.
22      Q. And if I could just interrupt a
23 little bit, we can come back to this, if I
24 could pick up a little bit on when your
25 husband left, do you know what means of

**Page 25**

1  transportation he took out of New Orleans?
2       A. Yes, sir, I do.
3       Q. What was that?
4       A. He took our old green truck, pickup
5  truck.
6       Q. And he drove himself?
7       A. Yes.
8       Q. Did he have anybody else with him?
9       A. No.
10      Q. And I heard you mention I think a
11 granddaughter. Was there anybody else living
12 there in that house with you besides your
13 husband?
14      A. Just my husband and me. My daughter
15 and her daughter, who's 13, my granddaughter,
16 they had their own house.
17      Q. And you had tried to make some
18 provisions for them before you went to work on
19 that Saturday?
20      A. I did.
21      Q. Right?
22      A. I did.
23      Q. And then where did they live in
24 relationship to where you lived?
25      A. My daughter owned a home in

7 (Pages 22 to 25)

GLYNN WADE (MRGO)                                           7/10/2007

---

Page 26

1    Gentilly.
2        Q.   And then did they evacuate?  Do you
3    know when they evacuated?
4        A.   She finally told me she had
5    evacuated that Sunday evening with her
6    boyfriend.
7        Q.   And your husband called you, was it
8    on Monday?  Is that when you got the call from
9    him?
10       A.   It was about Monday -- If I recall,
11   it was about Monday evening, Monday night.
12       Q.   And what kind of telephone access
13   did you have and did he have?  Was it on a
14   land line or a cell phone or what?
15       A.   I had my cell phone and my husband
16   had his cell phone.  My daughter had her cell
17   phone.
18       Q.   And you were able to talk to your
19   husband on the cell phone?
20       A.   Yes, sir.
21       Q.   And then were you able to talk to
22   your daughter on her cell phone?
23       A.   Yes, sir.
24       Q.   And you obviously had electricity up
25   at LSU in Baton Rouge.

---

Page 27

1        A.   Yes, sir.
2        Q.   And the shelter where your husband
3    had gotten to had power, I guess, as well?
4        A.   Yes, sir.
5        Q.   And your daughter and granddaughter,
6    where did they go?
7        A.   The only place she could get
8    reservations was in San Antonio, Texas, on I
9    think it's an Air Force base.  She was still
10   in the Navy Reserve and they -- they took
11   her.
12       Q.   And then when was it that you and
13   your husband were able to get back together in
14   person?
15       A.   October 1st, 2005.
16       Q.   And where was that?
17       A.   I was still in Baton Rouge working
18   and he came down from Tallulah, Louisiana and
19   picked me up in the -- He had his truck.  He
20   took his truck.
21       Q.   And did you come back to New Orleans
22   then?
23       A.   I came back to Destrehan,
24   Louisiana.
25       Q.   And you stayed there for a few days

---

Page 28

1    or a while?
2        A.   Destrehan?
3        Q.   Yes.
4        A.   I stayed there for -- Well, back
5    up.  My administrator was trying to help us
6    State workers to get apartments.  Because we
7    all had lost our homes.  And I was blessed to
8    get a one room apartment -- one bedroom
9    apartment in Destrehan September of 2005 and I
10   immediately paid the rent and deposit.  So,
11   therefore, when my husband picked me up
12   October 1st, 2005 in Baton Rouge, we had our
13   apartment waiting for us.
14       Q.   And I have been to Destrehan and,
15   what, I am going to guess wrong if I try to
16   remember where it is, but it's out west on the
17   other side of the lake; right?
18       A.   Destrehan is near LaPlace.
19   Destrehan -- First Baton Rouge, Hammond,
20   LaPlace, Destrehan.
21       Q.   And you took up residence then in
22   that apartment for quite some time?
23       A.   From October 1st, 2005 to March
24   17th, 2007.
25       Q.   And when was it that you first came

---

Page 29

1    back to New Orleans and saw your house?
2        A.   October 1st, 2005.
3        Q.   All right.  I'm sorry, I might have
4    missed it.  You all drove all the way to New
5    Orleans?
6        A.   From Baton Rouge.
7        Q.   And --
8        A.   We went to our apartment.  My
9    husband could -- My husband had never seen
10   it.  I was the one that found it with my
11   co-workers and administrator.  So we went to
12   look at them for him to see the apartment and
13   then we had some -- a little cash money and
14   our landlord told us where we could go and get
15   a mattress and box spring, portable TV, a
16   little TV.  And we went and bought -- We got a
17   bed frame.  We set it up and before it got
18   dark October 1st, we went to look at our
19   house.
20       Q.   And what did you see when you went
21   to your house?  I mean, what condition was it
22   in?
23       A.   Well, before we went in, some of the
24   -- a lot of the bricks had been knocked off
25   the front of our house.  The picture window,

---

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

GLYNN WADE (MRGO)                                          7/10/2007

Page 30

1  of course, was broken into, but they had to do
2  that to -- whomever, to search for bodies.  We
3  went through that window and the water had
4  receded or gone down, but we could tell before
5  we went in the house the water line of our
6  house.  Now, I can't say for sure, but it
7  looked like it was about four feet of water or
8  more.  So when we got inside of the house, we
9  looked around.  All of the furniture was wet.
10  The floor was slippery, wet and slippery.  I
11  don't know what that black slippery was, but
12  we had boots on and we had held each other's
13  hand, but it was slippery, black sludge.  But
14  the furniture, my living room furniture was
15  turned upside down.  And then the kitchen was
16  next to the living room.  Our refrigerator was
17  turned upside down.  It's amazing.  I have
18  never seen anything like that.
19        Some of the furniture that was in
20  the master bedroom was in the kitchen.  Some
21  of the kitchen stuff was in the master bedroom
22  and the other two bedrooms.  But everything
23  was just turned upside down.  Damp, moldy,
24  stinky.  Some of the pictures on our walls
25  that were hanging a little low were ruined.

Page 31

1  There was nothing in the house salvageable
2  except my mother's and daddy's portrait, and I
3  -- it was full of mold and sludge and I said,
4  "Just leave it alone.  Just -- I won't try to
5  take it."  But my husband took them down and
6  wiped them.  And that was salvageable.
7        Q.  What about things on top of the
8  counters?  Had it reached the kitchen
9  countertops in the house?
10        A.  Yes, sir.
11        Q.  Now, did you do any -- Well, just
12  tell me what you did generally after that
13  time.  Did you board anything up?  Did you
14  leave it alone?  I mean, what did you do?
15        A.  Well, that evening we left because
16  it was getting dark and there was a curfew,
17  especially in the East.  So we really weren't
18  supposed to even be there, but we did October
19  1st.  But a couple of days later my husband
20  came back and he boarded up the window, the
21  window of our living room, but we didn't
22  really have to worry about anything because
23  everything was ruined.  So nobody could steal
24  anything because it was stinky, dirty,
25  ruined.

Page 32

1        And we talked to friends and
2  neighbors and they start telling us about
3  having the house gutted out and taking all of
4  the debris out of the house.  So we hired some
5  people to first take the debris out of the
6  house and then we hired people to -- men to
7  gut out the entire house.
8        Q.  And was that -- had you contacted
9  your insurance agents at that point or made a
10  claim for flood on your homeowner's?
11        A.  Yes, sir, I did that when I was at
12  Baton Rouge.
13        Q.  And you had a flood policy on the
14  house?
15        A.  Yes, sir, I did.
16        Q.  And had you had that entire time
17  you lived there?
18        A.  Yes, sir.
19        Q.  Was that part of the requirement on
20  the mortgage, that you have flood insurance?
21        A.  Yes.
22        Q.  And you also then had a regular
23  homeowner's policy as well; right?
24        A.  Yes, sir.
25        Q.  Did you make claims under both of

Page 33

1  those policies?
2        A.  Yes, I did.
3        Q.  Were both of those with Allstate?
4        A.  Yes, they were.
5        Q.  Did you get -- Well, I'll just ask
6  you what the history was of -- Let's start
7  with the one on the homeowner's policy.  What
8  did you claim under the homeowner's policy?
9  And did you fill out some forms to do that?
10        A.  I filled out forms, but Allstate
11  stated for the homeowner's insurance that we
12  had very little wind damage and -- on our
13  roof.  So, therefore, the deductible was far
14  more than what they claimed wind damage, so we
15  paid for the roof damage ourselves.
16        Q.  Did you ever -- Did you contest that
17  or go any further with Allstate?
18        A.  For wind damage?
19        Q.  Yes.
20        A.  No, sir.  It didn't make sense.
21        Q.  So Allstate said there's some wind
22  damage there to the roof and shingles off and
23  tile maybe or something there?
24        A.  Uh-huh (affirmatively).
25        Q.  Is that right?

JOHNS PENDLETON COURT REPORTERS                      800 562-1285

GLYNN WADE (MRGO)                                          7/10/2007

|  | Page 34 |
|---|---|

1     A.   Uh-huh (affirmatively).  Yes, sir.
2     Q.   But it was below what the deductible
3 on the policy was; right?
4     A.   That's correct.
5     Q.   And do you remember what the
6 deductible was?
7     A.   I can't remember if it was about --
8 maybe about $200.  I am not sure, but --
9     Q.   And you had that roof repaired then
10 on your own sometime fairly soon --
11     A.   Yes, sir.
12     Q.   -- after that?  And what did it cost
13 to repair that roof?
14     A.   About $200.
15     Q.   And was that somebody you -- some
16 roof people you knew that you hired or got
17 their name somewhere and hired them to do
18 that?
19     A.   Just a roofer that had put the roof
20 on a couple of years before Katrina.  He did
21 the repairs for us.
22     Q.   All right.  And when your roof
23 needed repairing a couple of years before, was
24 that --
25     A.   No, we bought a brand new roof.

|  | Page 35 |
|---|---|

1     Q.   You bought a new one?
2     A.   Yes.
3     Q.   Was it because the other one had
4 gotten damaged by hail or it was old, or what
5 was the reason?
6     A.   Old.
7     Q.   Was it leaking at all?
8     A.   When?  After Katrina or what?
9     Q.   No, the old roof before you had it
10 repaired or replaced a couple --
11     A.   Every now and then we would have the
12 spots, water spouts -- spots showing and we
13 would pay our neighbor, a roofer.  And finally
14 my husband and I figured at our age we may as
15 well get a brand new roof rather than nickel
16 and dime and what have you.  We got a brand
17 new roof.
18     Q.   And now the roof that's on the house
19 now, that is same roof, but it's been repaired
20 after Katrina; right?
21     A.   That's correct.
22     Q.   When you came back to that house on
23 October 1st, did you take any photographs of
24 the inside of the house or outside?
25     A.   Not that day, but shortly after that

|  | Page 36 |
|---|---|

1 my husband took pictures of the outside.  But
2 he did not take pictures of the inside as it
3 was with the debris and the furniture.  But he
4 took pictures of the house after it was gutted
5 out.
6     Q.   And that would have just been -- you
7 could have seen the studs and everything in
8 there; right?
9     A.   Yes, you can see that.
10     Q.   But no sheetrock or ceilings?
11     A.   It had all -- it had -- had all of
12 that gutted out.
13     Q.   And was that something you did on
14 your own to have that gutted, or by that time
15 had you gotten money from the flood policy or
16 something that you used for that?
17     A.   No, sir, we hadn't gotten money from
18 the flood policy.  But we knew that -- Well,
19 we were told mold was growing in the house,
20 the houses, so we got it gutted out.  We used
21 some of our life savings.
22     Q.   And you made a claim on the flood
23 policy about the same time you made one on the
24 homeowner's policy; right?
25     A.   Yes, sir, I did.

|  | Page 37 |
|---|---|

1     Q.   And that also was with Allstate?
2     A.   Yes, sir.
3     Q.   Were you dealing with the same
4 people or different people at Allstate?
5     A.   The same people.
6     Q.   And where were they and who were
7 they, if you know?
8     A.   Okay.  I was blessed to be able to
9 -- my co-workers brought me to Allstate in
10 Baton Rouge when I was working, but I was able
11 to also get in touch with my agent in New
12 Orleans.
13     Q.   Who was that?
14     A.   John Elliott.
15     Q.   And on the flood policy, tell us
16 what happened on that claim.
17     A.   On the flood policy, they gave us
18 what we were insured for.
19     Q.   And what was that amount?
20     A.   If I recall, it was 84,900.
21     Q.   And about when did you get that
22 check?
23     A.   About February of 2006.
24     Q.   All right.  And was that for
25 contents and house or what?  I mean --

GLYNN WADE (MRGO)                                                7/10/2007

---

Page 38

1      A.  It was for the house.
2      Q.  And then did they pay anything on
3  the contents?
4      A.  Yes, they paid 38,000.
5      Q.  Another 38,000 for the contents?
6      A.  Uh-huh (affirmatively).
7      Q.  Do you have a file somewhere that
8  has your flood policy in it and your claim and
9  copies of these checks and so forth?
10     A.  I'm sure I have it in my red box at
11  home.
12     Q.  And would you also have in there the
13  -- well, was there correspondence with
14  Allstate on the homeowner's policy for the
15  roof damage?  Do you have anything --
16     A.  Oh, I never kept that, because after
17  we had to pay, it was no need.  And I was not
18  going to appeal it.
19     Q.  Do you have an idea of what your
20  house was worth before Katrina had you put it
21  on the market?  I mean, do you know what
22  houses around you were selling for, have an
23  idea of what your house was worth?
24     A.  The houses in my neighborhood before
25  Katrina were being sold for about $180,000.

---

Page 39

1      Q.  180?
2      A.  Yes.
3      Q.  That were comparable to yours in
4  size and everything?
5      A.  Yes, sir.
6      Q.  I take it, though, you have never
7  put your house on the market or had it
8  appraised; right?
9      A.  No, we didn't.
10     Q.  And sometime in -- Well, you had to
11  get a building permit then to redo the house;
12  right?
13     A.  Uh-huh (affirmatively).
14     Q.  Is that right?
15     A.  Yes, sir.
16     Q.  And you got that in 2007?  Am I
17  correct?
18     A.  Uh-uh (negatively).  I got it in --
19  yeah, about 200-- No, -- Yeah, about 2007.
20     Q.  Earlier this year?
21     A.  To be honest, it was probably about
22  somewhere in the middle of 2006.
23     Q.  And then you hired the contractors
24  yourselves to redo the house?
25     A.  Yes, sir, we did.

---

Page 40

1      Q.  And who did the work?
2      A.  Well, there was a Jamaican man that
3  was working on my co-worker's house in the
4  East and we got him to do some of the work.
5  We understand he's gone back to his homeland.
6  And there was also a Caucasian man that was
7  working on the house behind our house, and my
8  husband walked over to see his work and we
9  also hired him to do some of the work.
10     Q.  And at the end of the day, just with
11  respect to the house, not the furniture or any
12  contents, how much approximately did it cost
13  to have your house redone?
14     A.  Oh, with material and labor, about a
15  hundred some thousand.
16     Q.  And do you have receipts for all of
17  that somewhere, a file on what that cost?
18     A.  I didn't keep all of the receipts,
19  but what I -- what -- and a lot -- most of our
20  money came from, as I said, the flood policy
21  and then I was holding onto some money; my
22  parents had been dead in 2001, I inherited
23  their home.  I'm an only child.  And I used my
24  inheritance money, and my husband retired from
25  his welding company, MetFab, in 1997, but up

---

Page 41

1  until Katrina he still worked part time and he
2  had shares of 11,000 and I would not let him
3  draw the money out because I knew as long as
4  the company kept the shares we couldn't touch
5  them.  But since then, when we needed money to
6  add on to the 84,900, along with my -- my --
7  my inheritance and some little savings we were
8  able to do, we used it.
9      Q.  And do you have -- did you pay for
10  that by personal check?  I am just trying to
11  understand if you have a record somehow --
12     A.  You want to know the truth, these
13  men wanted cash money.
14     Q.  So you paid them in cash some and
15  would not -- you know what you paid, as you're
16  telling us, but you don't have a paper trail
17  on that?
18     A.  No.
19     Q.  Is that right?
20     A.  I didn't think I needed it.
21     Q.  Now, then you got mostly, or I would
22  -- You know I have been in your house,
23  Richard and I were out there with the
24  inspectors a couple of weeks ago, so I have
25  seen it.

---

11 (Pages 38 to 41)

Page 42

1      A.   Uh-huh (affirmatively).
2      Q.   So it would appear to be all new
3  furniture in the house everywhere.  Is that
4  right?
5      A.   Every bit of it.
6      Q.   And all the countertops are new;
7  correct?
8      A.   Everything in the house is brand
9  new.
10      Q.   And what about the air conditioning
11  unit on the outside?  You know, what we call
12  the compressor?
13      A.   All of that is new because it -- the
14  old one was ruined.
15      Q.   What about wiring?
16      A.   We paid an electrician to do that
17  first.
18      Q.   And was it completely rewired, or
19  did you just --
20      A.   Completely rewired.
21      Q.   And --
22      A.   Plumbing, too.
23      Q.   -- had anybody come in and taken the
24  old wiring, the copper or the pipes or
25  anything out of there before they got in there

Page 43

1  to gut the house, or afterwards?
2      A.   No.
3      Q.   You didn't have any vandalism or
4  theft in all of this?
5      A.   We did not have anything.
6      Q.   Let me back up a little bit to when
7  you bought that house.  You bought that with
8  your husband; right?
9      A.   Sure did.  GI Bill.
10      Q.   All right.  And it's in both of your
11  names?
12      A.   Yes, sir, it is.
13      Q.   Now, did there come a time when you
14  entered into a relationship with lawyers with
15  respect to Hurricane Katrina and possible
16  damages or claims that you might have?
17      A.   I didn't meet lawyers, but on my
18  job, when we returned to New Orleans October
19  1st, or shortly after that -- we say October
20  1st was on a Saturday if I recall.  When we
21  returned to work that Monday, several of my
22  co-worker social workers start giving
23  information about lawsuits.  Wrote it down so
24  we could get -- get it correct.  One of my
25  co-workers, I will not call her name, lost her

Page 44

1  home, a young white girl, lady, lost her --
2  lost everything she owns.  A social worker in
3  Chalmette.  She had just bought a home about
4  two or three years before Katrina.  She lost
5  everything.  Her home and everything inside.
6  She was one that gave us the information.  And
7  there were others, co-workers who had found
8  out about the Andry Law Firm and Bruno and
9  wrote the information down for us.  And I
10  immediately called for myself and for my
11  daughter, because my daughter lost her home.
12  Her home is demolished and she is still
13  waiting for Road Home money and she's been
14  diagnosed within a year with multiple
15  sclerosis.  So she's in bad health and has
16  lost everything she owned.  So I was inquiring
17  about everything and I signed up and I signed
18  her up.
19      Q.   And what's her name?
20      A.   Shelita Michelle Breland is her
21  maiden name, Smith, and on June 8th, last
22  month, she got married to Ray, Brian Ray, so
23  she's Shelita Michelle Breland Smith Ray, R A
24  Y.
25      Q.   And what was the street address of

Page 45

1  her home?
2      A.   St. Anthony.
3      Q.   And I thought -- I may not have
4  remembered right --
5      A.   It's the Gentilly area.  She's near
6  also UNO.
7      Q.   And when you say she lost her house,
8  how much water or what was the damage?  Water
9  or wind, how --
10      A.   The water went to the roof.
11      Q.   Right.
12      A.   And they demolished her house.
13      Q.   She had water up in the house, I
14  take it?
15      A.   Yes.
16      Q.   Do you know approximately how high?
17      A.   Well, I didn't go in.  She couldn't
18  go in with the multiple sclerosis, but we
19  stood on the outside while her boyfriend went
20  in.  He's now her husband.  And we could see
21  the water line.  It was to the ceiling.  And
22  we didn't go in, nor did we let our
23  granddaughter go in.  But I remember the face
24  on my granddaughter when she peeped through
25  the window to see all of her trophies, a

GLYNN WADE (MRGO)                                         7/10/2007

---

Page 50

1   some social workers you knew had already
2   learned something about potential lawsuits and
3   the Andry firm and the Bruno firm, did you
4   then tell other people about that other than
5   your daughter, about getting involved in it or
6   calling those firms?
7       A.  Yes, I did.  I told my neighbors
8   that were coming and looking at their homes
9   and gutting them out.  Yes, I told them.
10      Q.  Was there any part of the social
11  work you were doing or others were doing,
12  where you were doing social work where they
13  were handing out --
14      A.  Oh, no.
15      Q.  -- information or anything like
16  that?
17      A.  Oh, no.  That wasn't a part of the
18  social work work.  We as colleagues decided
19  since we're always dedicating our life to
20  helping others, we decided to help each other
21  this time because we were all in the same
22  boat.
23      Q.  And who were -- I think you
24  mentioned there might have been more than one
25  of these people that had learned about the law

---

Page 51

1   firms.  Who were these, what were these
2   people's names?
3       A.  No, I cannot give my colleagues'
4   names.  Because that had -- that is something
5   private between us as friends.
6       Q.  And do you know if any of them have
7   become actively involved in any of this
8   Katrina litigation of any kind, where their
9   name is, you know, on a pleading where they're
10  suing somebody?
11      A.  They haven't said anything and I
12  never mentioned anything to them.
13      Q.  Whereabouts did these -- Well, let's
14  identify how many of them.  How many were
15  there?
16      A.  How many what?
17      Q.  Of these social workers that had
18  somehow learned about the Andry and Bruno law
19  firm?
20      A.  About three.
21      Q.  And let's just call them A, B and C
22  for right now.  And give me where they lived.
23  I am not asking a street address at this
24  point, but what areas of town did they live
25  in?

---

Page 52

1       A.  As I said, one is a white one about
2   40 years old who had just purchased a house
3   two or three years before Katrina, they lost
4   everything.  She lived in Chalmette.
5       Q.  And the other two?
6       A.  The other one lives in Carrollton
7   area.  Another one lived in Gentilly area.
8       Q.  Now, did there come a time when you
9   retired as a social worker?
10      A.  Sir, I am still working.  I cannot
11  -- I am 6- -- I'll be 62 October 19th.  I
12  can't afford to even think about retiring.  We
13  have used -- We have spent all of our life
14  savings.  I can't live off of fixed income
15  with what they pay social workers.
16      Q.  Now, we talked about the Road Home
17  and insurance that you got.  Is there any
18  other source of funds, let's say, above $2,000
19  that you've gotten?
20      A.  No, sir.
21      Q.  Have you told us about the major
22  sources of aid or assistance or funds that you
23  have received already?
24      A.  What I got from Allstate, the flood
25  insurance, the Road Home, my husband's shares,

---

Page 53

1   which he earned that after --
2       Q.  I was really asking you about other
3   than your own funds that you had, have you
4   told us about most of those?
5       A.  We did not have any other.  That's
6   why we have exhausted our own personal nest
7   egg.
8       Q.  In terms of injury for which you're
9   seeking money in this lawsuit, can you tell us
10  what kinds of injury you have?
11      A.  Now, when you say -- I'm sorry.
12      Q.  I'll ask it a little differently.
13  Are you seeking money in the lawsuit for
14  damage to your home, to that structure?
15      A.  Yes, sir.
16      Q.  And are you seeking damage for the
17  contents of the home?
18      A.  Yes, sir.
19      Q.  And that would be furniture and
20  appliances and personal effects; correct?
21      A.  Yes, sir.
22      Q.  Were you able to salvage any of
23  those personal effects at all?
24      A.  No, sir.
25      Q.  Did your husband or you get any, or

---

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

GLYNN WADE (MRGO)                                              7/10/2007

---

Page 58

1    Q.  All right.  And do you have copies
2  of those at home?
3    A.  I think I have a copy of the most
4  recent one that I filled out, which was last
5  year.  And it was from the Corps of Engineers
6  and what have you.  I got one and I said, "I
7  already sent one, but I better fill this one
8  out, too."  But I have copies of those and the
9  other ones.  In the process of moving from
10 Destrehan to back home and what have you, to
11 be honest, I don't think I have the old
12 copies.
13   Q.  When did they start the redo of your
14 house?  I mean, when did that start and when
15 did it get finished up?
16   A.  It got started around -- Let's see.
17 I got the money in about January, February of
18 2006.  Around March we proceeded on getting
19 people to do our repairs.  And I want to say
20 around May of 2006 my house was completed.
21   Q.  And you moved back in?
22   A.  No, sir.  Because I had -- we had
23 signed a lease because -- a year's lease
24 because the landlord was going up 70 dollars
25 every six months, so I thought I was going to

---

Page 59

1  save some money and I and my husband, which he
2  says it was me, locked ourselves in for
3  another year.  So we were not able to move
4  into our home in the East until March 17th of
5  2007.
6    Q.  And what, did somebody else live in
7  it during that time?
8    A.  No.  My husband would sleep at night
9  with me in Destrehan, but on or about 4:00 in
10 the morning he would get to our home on Bundy
11 Road because he said he did not want the
12 construction workers were working on the
13 other houses thinking no one lived in that
14 house, because he said a lot of times they
15 would steal material or vandalize, or steal
16 material off the houses or what have you, so
17 he would be there 4:00 in the morning until
18 maybe 8:00 or 9:00 at night to watch our
19 house.
20   Q.  I want to go back to that flood
21 policy for just a minute.  Did you get all of
22 the coverage you had?  In other words, they
23 paid you the full amount for what you had it
24 insured for?
25   A.  What we could afford to have it

---

Page 60

1  insured.
2    Q.  And at the time of Katrina did you
3  still have a mortgage on that house?
4    A.  Sure did.
5    Q.  And what was the approximate balance
6  on the mortgage at that time?
7    A.  About 48,000.
8    Q.  And do you still have that same
9  mortgage?
10   A.  We paid the mortgage out first.  In
11 the event that we could not afford to get our
12 house repaired, we wanted to own our land.
13   Q.  So you paid off the mortgage?
14   A.  Yes, sir.
15   Q.  And so at this point have you
16 refinanced or gotten another mortgage or
17 anything like a home equity loan or anything
18 like that?
19   A.  No, sir.
20   Q.  You own it lock, stock and barrel
21 now?
22   A.  Yes.
23     MR. MARPLE:
24       Why don't we take just a little
25     break.  We have been going quite a

---

Page 61

1    while.
2      MR. EXNICIOS:
3        That's fine.
4      MR. MARPLE:
5        We'll take however long you all
6      need, five, ten, fifteen minutes.
7      VIDEO OPERATOR:
8        We're going off the record now.
9    It's 10:27.
10     (Recess.)
11     VIDEO OPERATOR:
12       Now returning to the record.
13   It's 10:28.  This is the start of tape
14   2.
15 EXAMINATION BY MR. MARPLE:
16   Q.  You were working for the State of
17 Louisiana as a social worker before Katrina?
18   A.  Yes, sir.
19   Q.  And what was your job description at
20 that time?
21   A.  Social worker.
22   Q.  What were you doing?
23   A.  Making referrals to persons that
24 walked off the street who needed resources.  I
25 also worked with the nurses into -- in the

---

GLYNN WADE (MRGO)                                    7/10/2007

Page 82

1      Q.  Now, in the next item down, in 10,
2  it's got "mental distress" with a couple of
3  little stars there.  Do you see that?
4      A.  Yes, sir.
5      Q.  And that's your handwriting; right?
6      A.  Yes, it is.
7      Q.  And you have circled "Personal
8  injury" and it says "Personal injury and
9  mental distress", you have circled "mental
10  distress"?
11      A.  That's what I circled.
12      Q.  And you didn't have any personal
13  injury, but on this one you have got mental
14  distress.  Correct?
15      A.  Yes, sir.
16      Q.  And this one mentions Mr. Wade,
17  Adolph Wade, Sr.; right?
18      A.  Yes, sir.
19      Q.  That's your husband?
20      A.  Yes, it is.
21      Q.  And you.
22      A.  Yes, sir.
23      Q.  And you are mentally distressed
24  because you had about five feet of water in
25  the home and the flood water knocked the

Page 83

1  bricks off the front of the home and the house
2  was severely damaged and "We lost everything
3  we owned in our home."  Right?
4      A.  Yes, sir.
5      Q.  Can you describe for me the mental
6  distress that you have as a result of that?
7      A.  Well, at the time I wrote this, I
8  did have mental distress.  It's -- I'll have
9  mental distress until I die as a result of the
10  trauma we experienced.  But each day gets
11  better.  But to work for years, to try to
12  accomplish material goods, try to save a
13  little money in the bank, and to lose
14  everything you own can be mentally distressful
15  as well as physical, but somehow it just kept
16  me for a long time, but I did not go to a
17  psychiatrist.  For about a year I didn't sleep
18  hardly at night except maybe one or two hours
19  thinking about all that I have lost and my
20  husband and I trying to figure out how would
21  we try to gain some of it back.  Because we
22  will never, ever get what we lost.  All of the
23  heirlooms, family heirlooms from my
24  grandparents and my parents, they're not
25  replaceable.  They're not replaceable.  What

Page 84

1  monies we had that we had put aside to live
2  off of for a rainy day, I don't think we'll
3  ever get that back, to be honest.
4      Q.  Now, the heirlooms from your
5  grandparents, I take it that's something very
6  personal to you?
7      A.  Very personal.
8      Q.  And the value of that is not what
9  somebody -- to you is not what somebody might
10  have paid you for it.  It's personal and
11  individual to you.  Is that correct?
12      A.  It certainly is.
13      Q.  And to your neighbor, those
14  heirlooms might not have any value at all;
15  right?
16      A.  Probably so.
17      Q.  And vice versa.  If they had some,
18  you might empathize with them about the loss,
19  but personally that wouldn't have value to you
20  if they lost some of their heirlooms; right?
21      A.  That's right.
22      Q.  Can you tell us what those -- some
23  of those heirlooms that you lost were?
24      A.  China, our --
25      Q.  I'm sorry.  I apologize for

Page 85

1  interrupting, but China, did you salvage any
2  China?
3      A.  No.
4      Q.  Of yours or anybody's?
5      A.  No.
6      Q.  And is there a reason for that?  I
7  mean, I am -- just from a lay person's
8  standpoint, if it weren't broken, I would have
9  thought you could have cleaned China up.
10      A.  Everything that was in -- my China
11  was in the cabinets in the kitchen at the
12  bottom.  It was all broken.  Broken.
13      Q.  Were you able to salvage even one
14  dish or saucer or cup or anything of that --
15      A.  No, sir.
16      Q.  -- China?  And I am sorry I
17  interrupted you.  What else?
18      A.  Then I had a, what you call I guess
19  a place setting with knives and forks and what
20  have you that also belonged to my mom.  Then I
21  had pots and pans that belonged to my
22  grandmother that were not salvageable.  I had
23  linen, towels, pillow cases that had been in
24  the family for years.  When I said family, my
25  grandmother when she passed away, my mother

GLYNN WADE (MRGO)                                    7/10/2007

Page 138

1   He retired in 1997.
2       Q.  I thought I understood, and I may
3   have gotten this wrong, and I thought he
4   continues or continued --
5       A.  Part time.  He was working part time
6   before Katrina.  About four hours, five days a
7   week before Katrina.
8       Q.  And he's not worked as a welder
9   since then?
10      A.  No, sir.  They haven't opened the
11  shop back yet completely.
12      Q.  And tell us how old your husband is?
13      A.  He is 75 years old.
14      Q.  And he gets Social Security, I take
15  it?
16      A.  Yes, sir.
17      Q.  Does he have any other kind of
18  pension or --
19      A.  We had the shares.
20      Q.  -- military retirement?
21      A.  No, sir.  But we had the shares of
22  which, since Katrina he pulled it out to help
23  to get that house together.
24      Q.  Who do you blame for the damages
25  that you're seeking in this lawsuit?

Page 139

1       A.  I blame no one.
2       Q.  And how is that?
3       A.  How can you blame someone?
4       Q.  Because the hurricane is an act of
5   God?
6       A.  That's what I am told it is.
7       Q.  Was there any -- Were there any
8   requirements when you redid that home or as
9   part of the Road Home money or anything that
10  you raise your house up or do anything like
11  that?
12      A.  They didn't require us to do that.
13      Q.  Have you ever looked at the
14  floodplain or flood risk of your house to know
15  if it's a category 1, 2, 3, 4, something else,
16  whether it's high or low or anything like
17  that?
18      A.  I don't understand that question.
19  Rephrase that, please.
20      Q.  Sure.  It wasn't a very good
21  question.  At least for determining flood
22  insurance premiums --
23      A.  Uh-huh (affirmatively).
24      Q.  -- there's categories of risk for
25  homes.  So if you're a high risk area, you may

Page 140

1   have to pay a higher flood insurance premium.
2   Did you understand that at all?
3       A.  My insurance, my Allstate Insurance
4   person did not say that, but I know since
5   Katrina flood insurance and homeowner's
6   insurance has gone up tremendously and since I
7   had to pay so much, I just told them to, for
8   flood insurance, let me have at least $100,000
9   worth.
10      Q.  And --
11      A.  Even without that, it's gone up.
12  Homeowner's and flood insurance.
13      Q.  Is there any kind of subsidy or
14  assistance that you're getting with respect to
15  paying any flood insurance premiums or
16  homeowner's premium?
17      A.  No more than my salary and his
18  retirement.
19      Q.  Have you talked about or thought
20  about the risk or likelihood of your house
21  flooding again?
22      A.  Yes, sir.
23      Q.  And what are your thoughts on
24  whether -- on how likely that is?
25      A.  I know it's a very high chance that

Page 141

1   it can happen.  It can happen this year.
2   Because they preparing us State workers now,
3   training us so that if and when it happens and
4   we have to evacuate, we go back to shelters
5   again to work.
6       Q.  And the State's trying to prepare
7   better than they did the first time around, or
8   at least during Katrina so that they will be
9   better prepared the next time; right?
10      A.  Well, prepare State workers to be
11  more -- to know more about how to service
12  people in the shelters.
13      Q.  And even though you know that that
14  risk of flooding again is there, you have
15  nevertheless chosen to redo that house and
16  still live in the same house that flooded
17  during Katrina; right?
18      A.  Sir, we can't afford to move.
19      Q.  Do you not want to live where you're
20  living?
21      A.  I want to live where I am living.
22      Q.  I mean, is there some other area or
23  house that you have identified that you'd
24  rather be living in right now than the one
25  you're living in?

                                36 (Pages 138 to 141)

JOHNS PENDLETON COURT REPORTERS             800 562-1285

GLYNN WADE (MRGO)                                                    7/10/2007

---

**Page 142**

1     A. I haven't even looked because I know
2  I cannot afford another house.
3     Q. I may have asked you this. I
4  apologize if I repeat it. Did you ever have
5  problems with the pumps not pumping the water
6  out other than Katrina in your neighborhood?
7     A. No, sir. Never.
8     Q. You heard about that around town
9  sometimes that it rained too much or the pumps
10  didn't work, the water would build up in the
11  streets and flood?
12     A. We never had that in our
13  neighborhood.
14     Q. Do you have any photos or videos or
15  anything that were taken during Katrina?
16     A. No, sir.
17     Q. Or any photos of any of the breaches
18  of levees around the New Orleans area?
19     A. No, sir.
20     Q. Did you have any of the soil tested
21  in your yard or otherwise to know if you got
22  any kind of contamination there?
23     A. No, sir.
24     Q. Do you have any suspicion that any
25  of your soil is contaminated with anything?

---

**Page 143**

1     A. I have never -- I have no idea.
2     Q. Nobody has suggested to you that it
3  is, I take it, then? Is that right?
4     A. No, sir.
5     Q. You have told us about things that
6  you're seeking money for in this lawsuit
7  today. We have talked about that quite a
8  bit. I wondered, is there anything else that
9  we haven't talked about, something that you
10  feel like you should be compensated for in
11  this lawsuit for some injury or damage that
12  you have that we haven't already talked about?
13     A. No injury. No injury. But I would
14  like to be able to get some more -- some of
15  the things that I had in the past that I don't
16  think I would ever be able to afford again.
17  And one thing is like my husband loved his
18  rifles and his fishing equipment. One thing I
19  owned with pride from working so many years
20  was a full length mink coat. I will never be
21  able to afford that any more or get another
22  one.
23     Q. You lost your mink coat in that
24  flood?
25     A. Yes, sir, I did. Besides a lot of

---

**Page 144**

1  beautiful gowns I bought throughout the years,
2  because we go to a lot of carnival balls.
3  Beautiful cocktail dresses and what have you.
4  But this was accumulated through years. And
5  of which I took good care of my clothes.
6     Q. In connection with the Allstate
7  payment on your flood policy, do you know if
8  you signed any papers where it says you are
9  assigning any right you had to sue somebody to
10  them, subrogation papers? Do you know if you
11  did that or not?
12     A. I don't think so.
13     Q. Do you remember that coming up at
14  all in any discussions --
15     A. No, sir.
16     Q. -- where they subrogated, meaning
17  since they paid you for some damage, they want
18  to be able to turn around and sue the
19  Defendants in this lawsuit or somebody else
20  that they think might be responsible?
21     A. I know nothing about that.
22     Q. Now, you understand that you have
23  been designated in the lawsuit as a named
24  representative or class representative of
25  other members of a class of people. Do you

---

**Page 145**

1  have any understanding of what that entails or
2  if that's the case?
3     A. Well, I have been told that I was.
4     Q. Do you have any understanding of
5  what your duties are, what all that entails?
6     A. Well, to my knowledge, I am to share
7  my experiences with Katrina.
8     Q. Do you know who it is or what the
9  definition is of the people, other people that
10  you're representing in this lawsuit?
11     A. I think it's persons in the
12  community that suffered the same damages that
13  I have, and my husband.
14     Q. Do you know what geographical area
15  it encompasses?
16     A. No. I think it's New Orleans East.
17     Q. Do you have any understanding of any
18  costs that you might be responsible for to
19  pay, notice to class members or if you lose
20  the case that there might be costs assessed
21  against you, costs of the lawsuit which might
22  include the cost of depositions and
23  transcripts and some other things?
24     A. No, but I know I can't afford it.
25  So they could charge me, but I don't have the

---

JOHNS PENDLETON COURT REPORTERS                          800 562-1285

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


**IN RE:** KATRINA CANAL        CIVIL ACTION
**BREACH**ES CONSOLIDATED
LITIGATION                  NO. 05-4182 "K" (2)

                            JUDGE DUVAL

PERTAINS TO: LEVEE

                            MAG. WILKINSON

FILED IN:

05-4181, 05-4182, 05-4191,
05-4568, 05-5237, 05-6073,
05-6314, 05-6324, 05-6327,
05-6359, 06-0020, 06-1885,
06-0225, 06-0886, 06-11208,
06-2278, 06-2287, 06-2346,
06-2545, 06-3529, 06-4065,
06-4389, 06-4634, 06-4931,
06-5032, 06-5042, 06-5159,
06-5163, 06-5367, 06-5471,
06-5771, 06-5786, 06-5937,
06-7682, 07-0206, 07-0647,
07-0993, 07-1284, 07-1286,
07-1288, 07-1289



        Deposition of DONNA M. AUGUSTINE,
2230 Sherwood Meadow Drive, Apt. A, Baton
Rouge, Louisiana 70816, taken in the offices
of Bruno & Bruno, 855 Baronne St., Second
Floor, New Orleans, Louisiana on Friday, the
13th day of July, 2007 at 9:24 a.m.

```
 1        S T I P U L A T I O N
 2        It is stipulated and agreed by and
 3   between counsel for the parties hereto that
 4   the deposition of the aforementioned witness
 5   is hereby being taken under the Federal Rules
 6   of Civil Procedure, for all purposes, in
 7   accordance with law;
 8        That the formalities of reading and
 9   signing are specifically not waived;
10   That the formalities of sealing,
11   certification and filing are specifically
12   waived;
13        That all objections, save those as to
14   the form of the question and the
15   responsiveness of the answer, are hereby
16   reserved until such time as this deposition,
17   or any part thereof, may be used or sought to
18   be used in evidence.
19
20             *   *   *   *   *
21
22        MARGARET MCKENZIE, Certified Court
23   Reporter, in and for the Parish of Orleans,
24   State of Louisiana, officiated in
25   administering the oath to the witness.
                                        Page 6
```

```
 1   verbal answers?
 2     A.  Correct.
 3     Q.  You understand that if you don't
 4   understand a question that I ask you, you
 5   have the right to ask me to rephrase it.
 6     A.  Okay.
 7     Q.  If you answer the question, I'm
 8   going to assume you understood it.  Is that
 9   fair?
10     A.  Yes, it is.
11     Q.  My questions aren't designed to
12   make you, to trick you or to make you guess
13   about an answer.  We want to know, we're just
14   here to find out what you know, so if you can
15   tell me you don't know, that's a perfectly
16   fine answer.  If you have to guess, we don't
17   want you to guess, but if you have to guess,
18   please tell us you are guessing, otherwise we
19   are going to assume you answered it from your
20   knowledge.  Okay?
21     A.  Okay.
22     Q.  You're not on any medication,
23   alcohol or anything that would affect your
24   ability to answer questions today, are you?
25     A.  No, it wouldn't.
                                        Page 8
```

```
 1   VIDEOGRAPHER:
 2   This is a videotaped deposition of
 3   Donna Augustine.  This deposition
 4   is being held today at 855 Baronne
 5   Street in New Orleans, Louisiana,
 6   on July 13, 2007.  The time is 9:24
 7   A.M.
 8   Would the court reporter now,
 9   please, swear in the witness.
10        DONNA M. AUGUSTINE,
11   2230 Sherwood Meadow Drive, Baton
12   Rouge, Louisiana 70816, after
13   having been first duly sworn by the
14   above-mentioned court reporter, did
15   testify as follows:
16   EXAMINATION BY MR. KIRSCH:
17     Q.  Good morning, Miss Augustine.  My
18   name is Kyle Kirsch.  I represent the Orleans
19   Levee District.  I introduced myself to you
20   this morning.
21     A.  Okay.
22     Q.  I am here to take your deposition.
23   Have you ever given a deposition before?
24     A.  Yes, I have.
25     Q.  You understand you have to give
                                        Page 7
```

```
 1     Q.  Also, this isn't a marathon.  If
 2   you need to take a break at any moment to get
 3   a drink or to use the restroom or for any
 4   other reason, just let me know and we can
 5   take a break as long as the question is not
 6   pending.  If a question is pending I may ask
 7   you to answer the question and then we can
 8   take a break.  Okay?
 9     A.  Okay.
10     Q.  Could you state your full name and
11   address for the record.
12     A.  Donna Marie Augustine.  2230
13   Sherwood Meadows Drive, Apartment A, Baton
14   Rouge, Louisiana, 70816.
15     Q.  Now, Miss Augustine, I will show
16   you what I will mark as Exhibit 1, the Notice
17   of Video Deposition.  And I'm going to turn
18   it to page 6, which is Exhibit A to the
19   Notice of Deposition (indicating).  Have you
20   ever seen that?
21     A.  Yes.
22     Q.  When did you see it?
23     A.  I saw it this morning.
24     Q.  Okay.  You hadn't seen it before
25   this morning?
                                        Page 9
```

                                    3  (Pages 6 to 9)

DONNA M. AUGUSTINE (LEVEE)                                    7/13/2007

1      A.  Some of them I have and some I
2  submitted to them.
3      Q.  Okay.  We're going to go into more
4  detail, but you said some you have, some your
5  attorney has.  Does your attorney have the
6  same photographs you have or do you have some
7  photographs that your attorney does not have?
8      A.  Yes.  They have the same copies
9  that I have.  When I had my filmed developed,
10  they were double copies, so I shared what I
11  had with my attorney.
12      Q.  So if I get what your attorney has,
13  then I'll have all the photographs you took
14  post-Katrina of the damages you sustained?
15      A.  Correct.
16      MR. KIRSCH:
17      Lexie, do you have a copy of those?
18      MS. BEVIS:
19      These, I'm going to ask her to take
20      a look at them to make sure they
21      were put into the right file.
22      MR. KIRSCH:
23      Sure.
24      MS. BEVIS:
25      Miss Augustine, are these the

Page 18

1      entirety of the photographs
2      (indicating)?  We just want to make
3      sure we're not missing anything.
4      THE WITNESS:
5      Yes.
6  EXAMINATION BY MR. KIRSCH:
7      Q.  So those are the photographs you
8  provided to your attorney?
9      A.  Yes.
10      Q.  And you would have taken those
11  photographs yourself?
12      A.  Yes.
13      Q.  Okay.  We'll attach those as
14  Exhibit 2 to the deposition.  Did you take
15  any video?
16      A.  No.  My video camera was damaged.
17      Q.  Okay.  Do you have any -- well, are
18  you making a claim for lost earnings?
19      A.  No.
20      Q.  Are you making a claim for any type
21  of economic damages?
22      A.  No.
23      Q.  Did you evacuate for the storm?
24      A.  Yes, I did.
25      Q.  Okay.  Do you have any documents

Page 19

1  covering the expenses you incurred from the
2  evacuation?
3      A.  No, I don't.
4      Q.  This is a similar document request,
5  but with -- do you have any statements or
6  recorded, recordings of anyone discussing the
7  evacuation or anything pre-Katrina?
8      A.  No, I don't.
9      Q.  Do you have any -- well, did you
10  seek medical attention?
11      A.  Yes, I did.
12      Q.  Okay.  Do you have any medical
13  records in your possession regarding the
14  treatment you sought as a result of the
15  hurricane?
16      A.  No, I don't.
17      Q.  Okay.  Did you apply for any type
18  of loans, SBA loans or anything, after
19  Hurricane Katrina?
20      A.  No, I did not.
21      Q.  Okay.  Do you -- you understand
22  that you are being put up as a class
23  representative?
24      A.  Yes, I'm aware.
25      Q.  Okay.  Do you have a copy of the

Page 20

1  complaint?
2      A.  What complaint?
3      Q.  The complaint filed by your
4  attorney.
5      A.  No.  I don't have that.
6      Q.  Okay.  Do you have a -- if I
7  remember correctly, you rented your house?
8      A.  Yes.
9      Q.  Do you have -- did you sign a lease
10  agreement?
11      A.  Yes, I did.
12      Q.  Do you have a copy of that?
13      A.  Not with me, but I do have a copy
14  of it.
15      Q.  Okay.  Were you ever evicted after
16  Katrina from the property you were staying
17  at?
18      A.  No.
19      Q.  Okay.  And do you have any
20  documents indicating, I don't want you to
21  tell me anything you communicated with your
22  attorney, but do you have any documents
23  indicating that what your role is as a class
24  representative or needing to protect the
25  interests of the class?

Page 21

6  (Pages 18 to 21)

DONNA M. AUGUSTINE (LEVEE)                                          7/13/2007

1      A.  Well, I figure my role is what the,
2   how can I put it, my role is to speak and
3   represent renters that's in the same
4   situation that I'm in.
5      Q.  Okay.  And my question was a little
6   more narrow.  I was just asking if you had
7   any documentation.
8      A.  No.
9      Q.  Okay.  What did you do to prepare
10  for the deposition?  Did you review any
11  documents?
12     A.  No, I did not.
13     Q.  Did you talk with any family
14  members?
15     A.  No, I did not.
16     Q.  Okay.  Did you talk with any
17  friends?
18     A.  No, I did not.
19     Q.  Okay.  Did you -- you met with your
20  lawyer?
21     A.  Yes, I did.
22     Q.  Okay.  Did you do anything other
23  than meet with your lawyer?
24     A.  That was it.
25     Q.  Okay.  Well, did you review any
                                          Page 22

1      A.  Correct.
2      Q.  And how long have you lived there?
3      A.  Five years.
4      MS. BEVIS:
5      Excuse me.  You said currently
6      living at?
7      MR. KIRSCH:
8      Yeah.
9   EXAMINATION BY MR. KIRSCH:
10     Q.  Oh, I'm sorry.  You are not -- I
11  may have misheard her.  You are no longer
12  living at 2126 North Broad Street, are you?
13     A.  No, I'm not living there.
14     Q.  Okay.  You are living in Baton
15  Rouge now?
16     A.  Yes, I am.
17     Q.  Okay.  How long had you lived at
18  North Broad Street?
19     A.  For five years.
20     Q.  Okay.  Had you -- have you lived at
21  the North Broad Street address since
22  Hurricane Katrina?
23     A.  No, I haven't.
24     Q.  Okay.  When you were living at 2126
25  North Broad, who lived with you?
                                          Page 24

1   documents when you met with your lawyer?
2      A.  I really can't remember.
3      Q.  Okay.  At the end of the deposition
4   you are going to have a right to read and
5   sign the deposition.  Your lawyer may want to
6   weigh in on this.
7      MS. BEVIS:
8      We will read and sign.
9      MR. KIRSCH:
10     Okay.
11  EXAMINATION BY MR. KIRSCH:
12     Q.  You gave me your full name at the
13  beginning of the deposition.  Has that name
14  ever changed?
15     A.  No, it haven't.
16     Q.  Okay.  Did you have any maiden
17  names ---
18     A.  No.
19     Q.  -- or nicknames that you've gone
20  by?
21     A.  No.
22     Q.  Okay.  What's your date of birth?
23     A.  May 9, 1950.
24     Q.  And you are currently living at
25  2126 North Broad Street, is that right?
                                          Page 23

1      A.  My daughter and my granddaughter.
2      Q.  Okay.  What's your daughter's name?
3      A.  Shawana Brown.
4      Q.  And how old is she?
5      A.  Thirty.
6      Q.  And you said you had a
7   granddaughter?
8      A.  Yes.
9      Q.  What's your granddaughter's name?
10     A.  Taylor Horn.
11     Q.  And how old is Taylor?
12     A.  She is four.
13     Q.  And if I recall correctly, you were
14  renting the property, is that right?
15     A.  Yes.
16     Q.  Okay.  Did you have a yearly lease,
17  a month-to-month lease, or do you remember?
18     A.  A yearly lease.
19     Q.  Okay.  And do you remember how much
20  you paid per month?
21     A.  I'm not sure, but I do know it was
22  in the two hundred bracket.
23     Q.  You said two hundred bracket?
24     A.  Yes.
25     Q.  So somewhere between two and 299 a
                                          Page 25

                                    7 (Pages 22 to 25)

1  month?
2      A.  Within that area, correct.
3      Q.  Okay.  Can you give me your Social
4  Security number.
5      A.  436-76-770.
6      Q.  That's a number short.  436-76 --
7      A.  76-7770.
8      Q.  Three 7s?
9      A.  Three 7s and a zero.
10     Q.  Thank you.  Do you have a driver's
11  license?
12     A.  Yes, I do.
13     Q.  Do you have it with you?
14     A.  Yes, I do (indicating).
15     Q.  Thank you.
16         MR. KIRSCH:
17         What I would like to do, Lexie, is
18         just copy it and attach it as
19         Exhibit 3.
20         MS. BEVIS:
21         Do you want to read the number into
22         the record?
23  EXAMINATION BY MR. KIRSCH:
24     Q.  Yes.  Your driver's license number
25  is -- why don't you read it for me into the

1  record (indicating).
2      A.  003694455.
3          MS. BEVIS:
4          We'll just get a copy of that at
5          the break.
6  EXAMINATION BY MR. KIRSCH:
7      Q.  Other than your daughter living
8  with you and your granddaughter, did you have
9  any other dependents at the time of Hurricane
10  Katrina?
11     A.  No, I did not.
12     Q.  Okay.  I want to get a brief
13  educational history.  Did you go to high
14  school?
15     A.  Yes, I did.
16     Q.  You graduated?
17     A.  Yes, I did.
18     Q.  What year?
19     A.  '69.
20     Q.  Okay.  Did you go to any schooling
21  after high school?
22     A.  Yes, I did.
23     Q.  Okay.  Where did you go?
24     A.  Delgado Community College.
25     Q.  How long did you go to Delgado for?

1      A.  Two and a half years until I
2  received my degree.
3      Q.  And what did you receive a degree
4  in?
5      A.  Early childhood development.
6      Q.  Any other schooling after that?
7      A.  No.
8      Q.  Did you have any other type of
9  training?
10     A.  Yes, I did.
11     Q.  And what was that?
12     A.  Nursing assistant's training and
13  skilled labor training.
14     Q.  Where did you have your nursing
15  assistant training at?
16     A.  At the International Trade Mart on
17  Canal Street.
18     Q.  And how long ago was that?
19     A.  Oh, I can't begin to remember.  It
20  was quite a few years.  However it was.  It
21  was right after I graduated out of high
22  school.
23     Q.  And you said skilled labor
24  training.  What type of skilled labor?
25     A.  Being able to operate electrical

1  equipment, like a jackhammer, anything in the
2  line of labor experience.
3      Q.  Okay.  And where would you have
4  gotten that training at?
5      A.  From -- well, I worked out of Local
6  689 and they sent me to a school in Livonia,
7  Louisiana and Connecticut.
8      Q.  Did you get any certificates or
9  degrees from either the nursing assistant or
10  skilled labor courses?
11     A.  Yes, I did.
12     Q.  Okay.  For both?
13     A.  Yes.
14     Q.  Any other type of vocational or
15  technical training?
16     A.  No.
17     Q.  What was the last job you held?
18     A.  Mercy Hospital.
19     Q.  And how long ago was that?
20     A.  '93.  '93.
21     Q.  Okay.  Have you ever been in the
22  military?
23     A.  No, I haven't.
24     Q.  Had you ever had any accidents or
25  injuries prior to Hurricane Katrina?

DONNA M. AUGUSTINE (LEVEE)                                    7/13/2007

1    A.  The ligament is already torn in my
2  knee, yes.
3    Q.  Right.  That's the one you had
4  scope surgery for, correct?
5    A.  Right.
6    Q.  But other than that one injury we
7  already talked about, nothing else?
8    A.  No.
9    Q.  Okay.  Is -- you told me earlier
10  you were disabled.  Is the reason you are
11  disabled because of your knees?
12    A.  Yes.
13    Q.  When did you become disabled?
14    A.  2000.
15    Q.  Did you --
16    A.  Excuse me.  I've been disabled
17  since the surgery that was performed on my
18  knee, but I was only compensated in 2000.
19    Q.  Okay.  So in 2000, that's when the
20  Social Security Administration officially
21  said you were disabled?
22    A.  Correct.
23    Q.  Okay.  Did you -- I'm assuming you
24  had to go through a long drawn out process
25  for that?

                                    Page 38

1  personal injury lawsuit?
2    A.  To my knowledge I think it was, um,
3  workmen's comp lawsuit.
4    Q.  Okay.  So the lawsuit would have
5  been against the hospital?
6    A.  Correct.
7    Q.  Okay.  Do you remember who your
8  attorney was?
9    A.  Robert Sharp.
10    Q.  And you didn't file a lawsuit
11  against the individual who actually kicked
12  you, right?
13    A.  No, I did not.
14    Q.  Okay.  Now, I want to shift -- go
15  ahead.
16    A.  I know the doctor's name.  Dr.
17  Martin, my orthopedic doctor.  Dr. Martin.
18    Q.  The last name is Martin?
19    A.  Yes.
20    Q.  Do you remember his first name by
21  any chance?
22    A.  No.
23    Q.  Okay.  Thank you.  Did -- now I
24  want to shift gears to after Hurricane
25  Katrina.  Did you have any injuries after

                                    Page 40

1    A.  Yes.
2    Q.  You probably went to the Social
3  Security Administration office in New
4  Orleans?
5    A.  Correct.
6    Q.  Okay.  Did they have to have a
7  hearing and all that?
8    A.  Yes.
9    Q.  Okay.  When did you initially, what
10  year did you initially apply for the Social
11  Security benefits?
12    A.  In '93.
13    Q.  And it took until 2000 for you to
14  actually get them?
15    A.  Yes.
16    Q.  Were you working between '93 and
17  2000?
18    A.  No, I was not.
19    Q.  Did you receive worker's comp
20  benefits from Mercy?
21    A.  Yes, I did.
22    Q.  Okay.  We had talked about you
23  filing a lawsuit earlier, if you recall that.
24  Was the lawsuit a worker's comp lawsuit or
25  did you file both a worker's comp claim and a

                                    Page 39

1  Hurricane Katrina that you sought medical
2  attention for?
3    A.  After Katrina.  Just the crying,
4  the sadness, depressed.
5    Q.  The stress essentially?
6    A.  Yes.
7    Q.  And who did you see for that?
8    A.  Dr. Derek Anderson in Baton Rouge,
9  Louisiana.
10    Q.  Had you ever saw -- well, what type
11  of doctor is Dr. Anderson?
12    A.  A primary care doctor.
13    Q.  Did you have a primary care doctor
14  in New Orleans?
15    A.  Yes.  Dr. Stephanie Sarrat.
16    Q.  S-A-R-R-A-T?
17    A.  Correct.
18    Q.  And where is Dr. Sarrat's office?
19    A.  On Napoleon directly across from
20  Baptist Hospital.
21    Q.  Had you ever -- I want to go back
22  to pre-Katrina.  Had you ever sought any type
23  of counseling or any type of mental health
24  treatment before Katrina?
25    A.  Yes.

                                    Page 41

                              11  (Pages 38 to 41)

1      A.  Well, the church that I was
2  attending was New Orleans Bible Fellowship.
3  We were leasing this church monthly.  It was
4  a Seventh Day Adventist church.  We didn't
5  have our own church, so we were leasing that
6  church, but it's still there, but my pastor
7  since then has expired.
8      Q.  Sorry to hear that.  Do you attend
9  a church in Baton Rouge now?
10     A.  No.  I come down to New Orleans on
11 a Friday, I'm sorry, on a Saturday and
12 Sunday.  Saturday we have bible study and
13 Sunday we have church.
14     Q.  Okay.  So you still go to New
15 Orleans Bible Fellowship?
16     A.  Correct.
17     Q.  Okay.  It is just in a different
18 location?
19     A.  Well, we are leasing another church
20 on Claiborne and Bienville.
21     Q.  Okay.  But it is still the same
22 community --
23     A.  Correct, yes.  Yes.  And I was a
24 board member.
25     Q.  Are you a registered voter?
                                    Page 54

1  the board because it was just too stressful
2  to have to come down every weekend.  And
3  sometimes it was impossible for me to make
4  some of the board meetings due to the
5  weather, but I'm still a member of New
6  Orleans Bible Fellowship, but I'm no longer a
7  board member as of May is when I resigned my
8  position.
9      Q.  May of this year?
10     A.  Correct.
11     Q.  What was -- I want to shift gears
12 now to the hurricane, Hurricane Katrina.
13 When did you first get notice that it may
14 impact New Orleans?
15     A.  Friday.  That Friday before the
16 hurricane.
17     Q.  And how did you find that out?
18     A.  The media, looking at the news.
19     Q.  What was your initial response to
20 it?
21     A.  I just said I ain't leaving because
22 I left the following year and nothing
23 happened, so I had made up my mind I wasn't
24 leaving.
25     Q.  You had left for Ivan?
                                    Page 56

1      A.  Yes, I am.
2      Q.  Okay.  And you regularly voted?
3      A.  Yes, I do.
4      Q.  Did you vote in the most recent
5  elections?
6      A.  Yes, I did.
7      Q.  Other than the church, do you
8  belong to any other type of civic or social
9  organizations?
10     A.  No.
11     Q.  Any type of business or trade
12 organizations?
13     A.  No.
14     Q.  What about any type of
15 philanthropic organizations?
16     A.  No.
17     Q.  Okay.  Did you have any type of
18 participation in any City Council meetings or
19 any other type of governmental entity
20 meetings in the New Orleans area?
21     A.  No, I do not.
22     Q.  Okay.  Do you still come down -- it
23 sounds like you still come down to New
24 Orleans every week?
25     A.  Well, I've resigned my position on
                                    Page 55

1      A.  Yes.
2      Q.  Okay.  What made you change your
3  mind?
4      A.  My sister that lives in Houston.
5      Q.  What did she do, she called you?
6      A.  Yes.
7      Q.  And she convinced you to leave?
8      A.  She indicated, "Donna, this is a
9  category 4, you know Betsy was a 3, what are
10 you waiting on to leave?  Leave."  So 1:30
11 Sunday I left.
12     Q.  1:30 in the afternoon?
13     A.  1:30 A.M., that morning.
14     Q.  Did anybody evacuate with you?
15     A.  My brother, my daughter and my
16 granddaughter and my nieces.
17     Q.  Did y'all ride in one car or --
18     A.  No.  My daughter and my
19 granddaughter, they rode in the van with me.
20 My brother and his grandchildren, they rode
21 in his Ram truck.
22     Q.  Okay.  So you drove or your
23 daughter?
24     A.  Yes, I did, I drove.
25     Q.  And the van was yours?
                                    Page 57

                                    15  (Pages 54 to 57)

DONNA M. AUGUSTINE (LEVEE)                                    7/13/2007

1      A.  No.  It's my son's.
2      Q.  Okay.  Do you have a car?
3      A.  No.
4      Q.  Did you have a car before Katrina?
5      A.  No.
6      Q.  Okay.  So you drove your son's
7  vehicle?
8      A.  Right, which was for my grandson,
9  but now I have it.
10     Q.  And your brother drove another
11  vehicle with his grandkids you said?
12     A.  Correct.  Yes.
13     Q.  And y'all went to Baton Rouge, if I
14  remember correctly?
15     A.  Correct.
16     Q.  Okay.  Did you do anything to
17  prepare for the storm?  Board up windows,
18  raise furniture, anything in that regard?
19     A.  No.
20     Q.  Okay.  What did you take with you?
21     A.  Two pair of jeans, three bras,
22  about four pair of panties, my purse, my
23  medicine, my cane, and that was pretty much
24  it.
25     Q.  Your -- strike that.  Where did you

Page 58

1  stay in Baton Rouge?
2      A.  By my niece in Baker.
3      Q.  So you stayed with relatives?
4      A.  Correct.
5      Q.  How long did you live with your
6  niece?
7      A.  Until -- until November of 2005.
8      Q.  And then where did you go?
9      A.  From there I went to an apartment
10  complex on Baker Boulevard.
11     Q.  When you moved -- well, before
12  November 2005 had you received some of your
13  FEMA aid?
14     A.  Yes, I did.
15     Q.  Okay.  What type of aid did you
16  receive?
17     A.  I received 2,000 and I received
18  10,000.
19     Q.  This was all before November of
20  '05?
21     A.  Yes.
22     Q.  Okay.  Do you remember what the
23  $10,000 was for?
24     A.  I would imagine my personal
25  property.

Page 59

1      Q.  Other than the 2,000 and 10,000 you
2  received before November of 2005, any other
3  aid you received from FEMA?
4      A.  That's pretty much it from FEMA.
5      Q.  Okay.  The apartment in -- on Baker
6  Boulevard that you talked about --
7      A.  Yes.
8      Q.  -- who was paying for that?
9      A.  Myself.
10     Q.  Okay.  Did you ever stay in a hotel
11  room or anything that was paid by FEMA?
12     A.  No, I didn't.
13     Q.  Okay.  Could the $10,000 have been
14  to pay for a place to live or anything or do
15  you know?
16     A.  Well, I did use it for somewhere to
17  live and to buy furniture.
18     Q.  Okay.  But it didn't say, when you
19  got the $10,000 check, it didn't say what you
20  got it for?
21     A.  I think personal -- I'm not sure,
22  but it did indicate what it was for, but
23  right offhand I couldn't tell you right now.
24     Q.  Okay.  Did you keep a copy of that
25  check?

Page 60

1      A.  Did I make a copy?  No.  It wasn't
2  on my mind.
3      Q.  Okay.  Do you remember if the check
4  came by itself or with a letter or anything?
5      A.  With a letter.
6      Q.  Okay.  And the letter may have been
7  what told you what it was for?
8      A.  Correct.
9      Q.  Would you have kept that letter?
10     A.  Oh, I have that letter.
11     Q.  Okay.  After -- so how long did you
12  live on Baker Boulevard?
13     A.  A month.  A month and a half.  I'm
14  sorry.
15     Q.  So that basically got you to
16  January of '06?
17     A.  No.  January '06 I was living on
18  Old Hammond Highway.  I'm on the program,
19  Section 8 program, and they would not pay for
20  me to live on Baker Boulevard, so I had to
21  leave Baker Boulevard to go to a, an
22  apartment that covered Section 8.  So I left
23  there in December.
24     Q.  Okay.  What is -- could you tell me
25  what Section 8 is?

Page 61

16  (Pages 58 to 61)

1    A.   Section 8 is a voucher program that
2  helps pay your rent for you under HUD.
3    Q.   So how much rent do you pay per
4  month after the voucher is expended?
5    A.   Well, it depend on my income.  As
6  of today, I don't pay no rent.
7    Q.   You said it depended on your
8  income.  Did you pay -- did at any point
9  post-Katrina did you pay rent?
10   A.   Yes, I did.
11   Q.   Okay.  What did you pay and for how
12 long did you pay it?
13   A.   It was -- I don't know exactly.  I
14 know it was two something.  It wasn't three
15 hundred.  It was 280, somewhere along up in
16 there, 290, something.
17   Q.   Okay.  So roughly the same amount
18 you were paying in New Orleans?
19   A.   This is for Baton Rouge, what I pay
20 in Baton Rouge, that's what you are talking
21 about?
22   Q.   Uh-huh.
23   A.   I don't pay no rent in Baton Rouge,
24 but prior to me moving I was paying rent.
25 Then Section 8 picked up in December.  So

Page 62

1  lessor in New Orleans while you were
2  evacuated?
3    A.   No.
4    Q.   Okay.  Have you paid him anything
5  since Katrina?
6    A.   No.
7    Q.   And when you moved into the
8  property on Old Hammond Highway in December,
9  now that you are not paying any rent, where
10 you are not paying any rent, have you stayed
11 there since?
12   A.   I stood there until July of last
13 year.
14   Q.   And what was your reason for moving
15 in July?
16   A.   The apartment was the pits.  The
17 landlord said he was going to clean it and he
18 didn't do it, so I had to leave.
19   Q.   And you've got a new apartment?
20   A.   Correct.
21   Q.   Okay.  And you're still not paying
22 rent?
23   A.   Still not paying rent, correct.
24   Q.   Okay.  Where is the new apartment?
25   A.   2230 Sherwood Meadows Drive,

Page 64

1  December of 2005, I haven't paid rent since
2  then.
3    Q.   Okay.  And what I'm trying to find
4  out -- thank you for the clarification -- all
5  I'm trying to find out is how much were you
6  paying from, I guess you said you moved to
7  the Baker Boulevard address in November?
8    A.   Correct.
9    Q.   So you had about a month where you
10 paid rent, right?
11   A.   Right.  Altogether --
12   Q.   How much did you pay --
13   A.   -- I paid $600.  Two hundred
14 deposit and four for the rent.
15   Q.   Did you get your deposit back?
16   A.   No.
17   Q.   Okay.  And you paid basically one
18 month of rent?
19   A.   Correct.
20   Q.   Okay.  And had you been living
21 in -- were you paying any rent while you
22 were, to the lessor in New Orleans while you
23 were evacuated?
24   A.   Repeat the question.
25   Q.   Were you paying any rent to the

Page 63

1  Apartment A, Baton Rouge, 70816.
2    Q.   This apartment is a better
3  apartment, I take it?
4    A.   Yes.  Extremely.
5    Q.   Did you work at all after Katrina?
6    A.   No.  I'm not able to work.
7    Q.   Okay.  What were you doing while
8  you were living in Baker with your niece?
9    A.   Just crying my heart out.
10   Q.   Okay.
11   A.   Reminiscing about all what I lost
12 and all what I don't have.
13   Q.   You pretty much have stayed at home
14 since you moved to Baton Rouge?
15   A.   Correct.
16   Q.   Do you have any -- do you do any
17 activities outside the home?
18   A.   Well, it's pretty hard because
19 Baton Rouge, they don't have a sidewalk.  I
20 have to encounter those animals with the
21 black around their eyes, I forgot what they
22 are, but however it is, no.
23       MR. KOURY:
24            Raccoons?
25 EXAMINATION BY MR. KIRSCH:

Page 65

17  (Pages 62 to 65)

DONNA M. AUGUSTINE (LEVEE)                                    7/13/2007

1    Q.  What did you go to Tulane for?
2    A.  My stomach.
3    Q.  And this was pre-Katrina, right?
4    A.  Correct.
5    Q.  Any other hospitals?
6    A.  That's it.
7    Q.  Okay.  Had you ever had any --
8    strike that.  You said you were seeing Dr.
9    Kloor for the issues you were having with
10   your knee, correct?
11   A.  No.  Dr. Kloor was the
12   psychiatrist.
13   Q.  Right.  And you were having -- and
14   that was as a result of problems you were
15   having because of your knee problems?
16   A.  Correct.
17   Q.  Okay.  And you would have liked to
18   have continued to see him?
19   A.  Yes.
20   Q.  Okay.  Have you ever tried to see
21   anyone else, any other type of mental health
22   professional?
23   A.  No.
24   Q.  Okay.  Do you recall seeing any
25   other doctors other than the ones we've
                                        Page 70

1    A.  There was no doctor.
2    Q.  Did you have to submit medical
3    records or anything?
4    A.  Well, they were able to get my
5    medical records, but it wasn't no doctor.  It
6    was just me.
7    Q.  It was just you?
8    A.  Uh-huh.
9    Q.  Okay.  And the medical records they
10   would have gotten would have been from Dr.
11   Martin, I guess, for your knees?
12   A.  No.  It would have been from
13   Charity.
14   Q.  What medical records would have
15   come from Charity?
16   A.  Everything pertaining from my knee
17   to my acid reflux disease.  And that was
18   pretty much it.
19   Q.  Other than the -- well, how much do
20   you receive in Social Security benefits every
21   month?
22   A.  $648 a month.
23   Q.  And I'm assuming those benefits
24   would have continued to have been paid to you
25   even after the storm?
                                        Page 72

1    already talked about for any type of
2    illnesses or injuries?
3    A.  No.
4    Q.  And other than the surgery on your
5    knee, you've undergone no other surgeries?
6    A.  Yes, I've had other surgeries.
7    Q.  Okay.
8    A.  Prior to my knee.
9    Q.  What other surgeries have you had?
10   A.  I had a hysterectomy.
11   Q.  And where was that?
12   A.  Methodist Hospital in New Orleans
13   East.  And I had surgery done under both of
14   my eyes.
15   Q.  And where were those?
16   A.  On Napoleon Street at my
17   dermatologist's office, Dr. Scott Wilhelmus.
18   Q.  Both of those surgeries were
19   pre-Katrina?
20   A.  Yes.
21   Q.  Okay.  Any other surgeries?
22   A.  That's it.
23   Q.  Okay.  What doctor testified for
24   you at the disability hearing with the Social
25   Security Administration?
                                        Page 71

1    A.  Correct.
2    Q.  Okay.  So you continued to receive
3    your monthly income?
4    A.  Correct.
5    Q.  There's been no interruption in
6    that?
7    A.  No.
8    Q.  As a result of Hurricane Katrina,
9    correct?
10   A.  Correct.
11   Q.  Do you receive any other type of
12   benefits?
13   A.  No.  No more than food stamps, but
14   that's it.
15   Q.  Okay.  What happened with your --
16   you were paid worker's compensation benefits?
17   A.  Yes.
18   Q.  And what happened, did you settle
19   that for a lump sum or do you remember?
20   A.  There was no lump sum.  I had a
21   deposition.  The attorney say that workmen's
22   comp is going to pay my lawyer a thousand
23   dollars.  My lawyer wasn't injured, but
24   that's who got a thousand dollars, the
25   lawyer.  I didn't get nothing.
                                        Page 73

                        19  (Pages 70 to 73)

DONNA M. AUGUSTINE (LEVEE)                              7/13/2007

1     Q.  So --
2     A.  So --
3     Q.  After, after a certain amount of
4  time they cut you off of benefits?
5     A.  Correct.
6     Q.  How long did they pay your benefits
7  for?
8     A.  Two years.
9     Q.  So you would have gotten benefits
10  basically through 1995?
11    A.  Correct.
12    Q.  Did you have any trial or anything?
13    A.  No.  There was no trial.
14    Q.  Okay.  And I know you told me at
15  the beginning of this deposition that you had
16  given a deposition before.  That was a
17  worker's comp deposition?
18    A.  Correct.
19    Q.  Okay.  You haven't given any other
20  depositions other than the one we're here
21  doing today, right?
22    A.  Correct.
23    Q.  Thank you.  We talked a little bit
24  about, ==as I understand it, you are making a==
25  ==claim for stress-related problems as a result==

                                     Page 74

1  ==of Hurricane Katrina?==
2     ==A.  Yes.==
3     Q.  Okay.  Are you making any other
4  type of personal injury claim?
5     A.  Yes.
6     Q.  What?
7     A.  No, that's pretty much it.  That's
8  it.
9     Q.  Just your stress-related?
10    A.  My stress.  Yes.
11    Q.  From dealing with the loss of
12  items --
13    A.  The loss.
14    Q.  -- and having to evacuate and
15  things in that regard, right?
16    A.  Yes.
17    Q.  Okay.  ==And the only doctors that==
18  ==you would have seen related to that would==
19  ==have been Dr. Sarrat and Dr. Anderson,==
20  ==correct?==
21    ==A.  Correct.==
22    Q.  Okay.  Do you have any idea of the
23  amount of medical expenses you've incurred
24  seeing those doctors related to the stress
25  only?

                                     Page 75

1     A.  No, I sure don't.
2     Q.  Okay.  Do you actually pay the
3  doctors or does Medicaid or Medicare cover
4  that?
5     A.  Medicaid and Medicare pay for it.
6  I have a co-pay where I pay three dollars or
7  five dollars.  Five dollars.  I'm sorry.
8     Q.  So the medical expenses you would
9  have come out of pocket for would have been
10  five dollars per visit?
11    A.  Correct.
12    Q.  Okay.  When you went on each visit,
13  did you see him for stress-related problems
14  only or were you seeing him also for your
15  knee problems and your other health issues?
16    A.  Correct.  For a total physical I
17  saw Dr. Derek Anderson, took my blood
18  pressure, x-ray.
19    Q.  Okay.  So each time you saw him you
20  would have been seeing him for the variety of
21  issues that you have?
22    A.  Correct.  Correct.
23    Q.  Did you ever actually go and see
24  either Dr. Anderson or Dr. Sarrat only for
25  your stress-related problems?

                                     Page 76

1     A.  No.
2     Q.  Okay.  I'm just making sure it came
3  out right because we had a lot of double
4  negatives there.
5     VIDEOGRAPHER:
6     Excuse me, counsel.  I have to
7     change tapes.
8     MR. KIRSCH:
9     Let's take a five-minute break.
10    VIDEOGRAPHER:
11    We're now off the record.  It is
12    the conclusion of tape one.  It is
13    10:46.
14    (OFF THE RECORD)
15    VIDEOGRAPHER:
16    We're now returning to the record.
17    It is 10:56.  This is the start of
18    tape 2.
19  EXAMINATION BY MR. KIRSCH:
20    Q.  Miss Augustine --
21    A.  Yes.
22    Q.  I want to go back.  I know you told
23  me you evacuated earlier and you went with
24  your daughter and your granddaughter.  Other
25  than the gas it would have taken to get to

                                     Page 77

                                     20  (Pages 74 to 77)

DONNA M. AUGUSTINE (LEVEE)                                      7/13/2007

1    Baton Rouge, did you incur any other
2    evacuation expenses?
3        A.  No.
4        Q.  And I think you told me earlier you
5    had no receipts or anything of what you would
6    have paid for gas to evacuate or any other
7    type of expenses that were associated with
8    evacuating, is that right?
9        A.  Correct.  I don't have no receipts
10   for gas.
11           MS. BEVIS:
12           Are you just asking her about
13           transportation or the money that it
14           would have cost her to buy items to
15           replace?
16           MR. KIRSCH:
17           Well, I hadn't gotten to the
18           personal property or real property.
19           MS. BEVIS:
20           Okay.  Just transportation?
21           MR. KIRSCH:
22           I was talking about relocation
23           expenses.
24   EXAMINATION BY MR. KIRSCH:
25       Q.  You stayed with your daughter, I
                                            Page 78

1    would have been in November?
2        A.  Correct.
3        Q.  And then you paid $600 in November,
4    is that right?
5        A.  Correct.
6        Q.  And as of December you weren't
7    paying any rent?
8        A.  Yes.  I had to pay my deposit on
9    Sherwood Meadows Drive.
10       Q.  Okay.  And how much was that?
11       A.  Two hundred.
12       Q.  But you aren't paying any rent at
13   this point in time?
14       A.  No rent, correct.
15       Q.  Okay.  And when you were living in
16   New Orleans you were paying somewhere between
17   two and three hundred dollars a month?
18       A.  Correct.
19       Q.  Okay.  And so since December
20   through the present time you haven't had to
21   pay the two hundred plus a month, two hundred
22   plus amount a month that you had to pay in
23   New Orleans?
24       A.  Correct.
25       Q.  Okay.  Other than your brother and
                                            Page 80

1    believe you told me.  I mean your niece.
2        A.  My niece.
3        Q.  So you didn't --
4        A.  I had to pay her.
5        Q.  So you paid your niece?
6        A.  Yes, I did pay her.
7        Q.  Okay.  How much did you pay your
8    niece?
9        A.  Twenty-five -- I mean, $125 every
10   week.  And before they sent the money I was
11   adding up the weeks.  She deserved it.  I ate
12   swell.
13       Q.  Okay.  So your niece, your niece
14   fed you and everything and you paid her 125 a
15   week?
16       A.  Correct.
17       Q.  Did she ask you for that or you
18   feel that you needed to pay it to her?
19       A.  No, she didn't ask for anything.  I
20   just felt like, you know, she deserved it.
21   If I had more, I would have gave her more.
22       Q.  Okay.  And so you would have paid
23   her 125 a week until you moved into the --
24       A.  Baker Boulevard.
25       Q.  -- Baker Boulevard home.  And that
                                            Page 79

1    the people in the two cars that evacuated
2    together, did y'all -- do you know any
3    neighbors who evacuated?
4        A.  Well, each side of my house, both
5    of my neighbors evacuated.
6        Q.  Okay.  Did you see them leave?
7        A.  No.
8        Q.  Okay.  Have you spoken with them
9    since the storm?
10       A.  Yes, I have.
11       Q.  Okay.  Where did you see them?
12       A.  When the mayor made the
13   announcement, the area that I lived in was
14   able to go back and check the property of
15   your home, and that's when I saw one of my
16   neighbors.
17       Q.  Okay.  So you saw one of your
18   neighbors when you went back into town?
19       A.  Correct.
20       Q.  Okay.  When was the first time you
21   came back into New Orleans after the storm?
22       A.  Like I said, I don't know what date
23   it was, but the mayor was indicating if you
24   live in, whatever zip code that it was get,
25   this would be yours this week and maybe 70119
                                            Page 81

                                      21  (Pages 78 to 81)

DONNA M. AUGUSTINE (LEVEE)                                    7/13/2007

---

1    was the following week.  So whatever time my
2    zip code was indicated, that's when I was
3    able to go back and check my house.
4         Q.  Do you remember the month, if you
5    do?
6         A.  February, January.  Maybe February.
7    However it was it was a ghost town.  Wasn't
8    nobody there.
9         Q.  Okay.  But you think it would have
10   been probably sometime in 2006?
11        A.  Correct.  Correct.
12        Q.  And when you went back into town
13   I'm assuming the water had already receded?
14        A.  Correct.
15        Q.  Okay.  You had never been out to
16   your rental unit while the water was still
17   up?
18        A.  No.
19        Q.  Okay.  When you got there, did you
20   see a water line?
21        A.  Yes, I did.
22        Q.  Okay.  And where was the water
23   line?
24        A.  Outside of my house past my top
25   porch.

                                    Page 82

---

1         Q.  Let me do it this way.  You had
2    stairs going up on to the porch?
3         A.  Correct.
4         Q.  Okay.  Had it gotten to the top
5    stairs?
6         A.  It had exceeded the top stairs.  It
7    was on the porch.
8         Q.  Okay.  Did it go above the door,
9    the door entrance?
10        A.  Yes.
11        Q.  Okay.  Could you see a water line
12   on -- did you have a wood siding house or a
13   brick house?
14        A.  Wood.
15        Q.  Okay.  Could you see any water line
16   on the wood?
17        A.  Not like talking about it.
18        Q.  Okay.  So you couldn't, if I
19   understood that answer, you couldn't see a
20   water line on the wood?
21        A.  Not on my wood.
22        Q.  Okay.  And the way the house is
23   laid out, I'm assuming it's a raised house
24   from what you described to me, right?
25        A.  Correct.

                                    Page 83

---

1         Q.  It is what, about three or four
2    feet up in the air?
3         A.  About that, correct.
4         Q.  Okay.  How many steps do you have
5    to go up?
6         A.  Four.
7         Q.  Okay.  And the floor of your house
8    is about even with the porch or a little bit
9    above the porch?
10        A.  Correct.  Even with the porch.
11        Q.  Okay.  Did it have a basement or
12   anything?
13        A.  My house?
14        Q.  Yeah.
15        A.  No.  No basement.
16        Q.  Okay.  So the bottom floor would
17   have been somewhere even with the porch?
18        A.  Correct.
19        Q.  Okay.  And something I forgot to
20   ask you, and I don't want to forget about it.
21   You plan to permanently stay in Baton Rouge?
22        A.  No.
23        Q.  Okay.  You plan on moving back to
24   New Orleans?
25        A.  Yes.

                                    Page 84

---

1         Q.  Okay.  What are your plans in that
2    regard?
3         A.  Well, before I can come back to New
4    Orleans, the levee, everything have to be up
5    to par.  I watch the news religiously.  I'm
6    dying to get back, but I can't come back
7    until certain modifications has been made.
8         Q.  And what are those, what are you
9    looking to hear on the news?
10        A.  That the levees meet the standards
11   and that I am completely safe when it rain.
12   And the news is not indicating that it's safe
13   as of today for me to come back.
14        Q.  Okay.  Is anybody living with you
15   at the Baton Rouge address?
16        A.  I have a caregiver lives with me.
17        Q.  Where does your daughter and
18   granddaughter live?
19        A.  They have their own apartment in
20   Baker.
21        Q.  Is there a reason you moved out of
22   Baker to Baton Rouge?
23        A.  Well, the apartment that I -- yes,
24   there is a reason.  The apartment I had in
25   Baker, HUD was not going to pay for it, so I

                                    Page 85

---

                              22  (Pages 82 to 85)

DONNA M. AUGUSTINE (LEVEE)                                    7/13/2007

1  had to find an apartment that HUD was going
2  to subsidize, and that was in Baton Rouge.
3      Q.  Okay.  You couldn't find a HUD
4  subsidized --
5      A.  Correct.
6      Q.  Apartment in Baker?  Is that right?
7      A.  Correct.
8      Q.  Thank you.  And we've already
9  covered you're not making a loss of earnings
10 claim, right?
11     A.  Repeat --
12     Q.  Loss of earnings claim because you
13 are disabled?
14     A.  Correct.
15     Q.  Okay.  And you're not making any
16 type of loss of business income?
17     A.  Correct.
18     Q.  You're not making any type of loss
19 of rental income?
20     A.  Yeah.  I had to pay rent.
21     Q.  Loss of rental income --
22     A.  No, no, no, no.
23     Q.  -- meaning somebody paid you rent?
24     A.  No, I'm sorry.
25     Q.  You would agree with me you are not
                                          Page 86

1  EXAMINATION BY MR. KIRSCH:
2      Q.  Real property means you owned a
3  home.
4      A.  Yes.  He did say land.  No, I'm not
5  making a claim for that.  Okay.  I'm sorry.
6      Q.  So you didn't own any home or
7  property in New Orleans?
8      A.  No.  No, I don't.
9      Q.  Okay.  And as I understand it, the
10 property that you would have owned in New
11 Orleans would have been what I call personal
12 property, which would have been things you
13 would have had in your apartment or your
14 rental unit?
15     A.  Correct.
16     Q.  Okay.  Let's first -- I want to
17 make sure I understand the complete layout of
18 the house you were in.  We already talked
19 about you had to go up four stairs, go on a
20 porch and go into the home, right?
21     A.  Correct.
22     Q.  And it was a wood or siding type
23 home?
24     A.  Correct.
25     Q.  And it was raised about three to
                                          Page 88

1  making a loss of rental income, right?
2      A.  Correct.  That's Katrina.  My mind
3  is gone.
4      Q.  With the -- have you filed income
5  tax returns?
6      A.  No.  I haven't worked.
7      Q.  And I think you told me you've been
8  disabled since 2000, right?
9      A.  Well, I've been compensated since
10 2000.  I've been disabled since my injury.
11     Q.  In '93?
12     A.  Correct.
13     Q.  Okay.  I'm going to ask you some
14 questions about real property.  When I say
15 real property, I'm talking about like homes,
16 immovable type, land, things in that regard,
17 okay?
18     A.  Okay.
19     Q.  Are you making any claim for any
20 real property damage?
21     A.  Yes.
22     Q.  Okay.
23         MS. BEVIS:
24         Wait.  Do you understand what real
25         property is?
                                          Page 87

1  four feet off the ground?
2      A.  Correct.
3      Q.  Okay.  Could you give me kind of a
4  picture of what the rooms look like when you
5  walk in did you enter into a living room?
6      A.  Correct.
7      Q.  Okay.  Was it a shotgun type house?
8      A.  Correct.
9      Q.  All right.  How many rooms did it
10 have?
11     A.  Five.
12     Q.  Okay.  When you first walk in the
13 front door you hit the living room, is that
14 the only room right there?
15     A.  Correct.
16     Q.  Okay.  When you go through the
17 living room what's the next room?
18     A.  A bedroom.
19     Q.  Okay.  Is it just one bedroom?
20     A.  Correct.
21     Q.  Okay.  And then you, as shotgun
22 houses are, you walk through the bedroom,
23 right?
24     A.  Correct.
25     Q.  What's the next room?
                                          Page 89

                                    23  (Pages 86 to 89)

DONNA M. AUGUSTINE (LEVEE)                           7/13/2007

| | |
|---|---|
| 1    A. Bathroom. | 1    Q. And, if I remember, the structure, |
| 2    Q. Okay. And is the bathroom the only | 2   it was a duplex? |
| 3   next room or is it kind of set to the side? | 3    A. Correct. |
| 4    A. Set to the side. | 4    Q. And you would have, if you are |
| 5    Q. Okay. What's adjacent to the | 5   facing it, you would have been to the left? |
| 6   bedroom? | 6   Your door would have been to the left if you |
| 7    A. The bedroom? | 7   are facing the house from the street? |
| 8    Q. Yeah. I mean the bathroom. | 8    A. Okay. Yes. |
| 9    A. A closet. | 9    Q. Is that right? |
| 10    Q. Okay. And then there is a hallway | 10    A. Uh-huh. No, I'm sorry. My door |
| 11   running -- | 11   would have been to the right. |
| 12    A. Correct. | 12    Q. Your door would have been to the |
| 13    Q. -- in between the bathroom and the | 13   right if you're looking at it? |
| 14   closet? | 14    A. If my house is where this gentleman |
| 15    A. Correct. | 15   is standing (indicating), my house would have |
| 16    Q. Okay. And what's the room after | 16   been to the right. |
| 17   that? | 17    Q. Okay. What was the -- what did the |
| 18    A. Another bedroom. | 18   neighbor's house look like so I can make sure |
| 19    Q. Are there any other rooms? | 19   we're talking about the same one? |
| 20    A. A kitchen. | 20    A. My next-door neighbor? |
| 21    Q. And the kitchen is behind that | 21    Q. Yes. That was closest to your |
| 22   other bedroom? | 22   door? |
| 23    A. Correct. | 23    A. The same as mine. |
| 24    Q. Okay. So it's two-bedroom, one | 24    Q. It was a white house? |
| 25   bath? | 25    A. White house, correct. |
|           Page 90 |           Page 92 |

| | |
|---|---|
| 1    A. Correct. | 1    Q. And then the other neighbor was, |
| 2    Q. And it has one closet in that | 2   what, a pink or peach house, is that right? |
| 3   hallway, right? | 3    A. The neighbor to my right has a blue |
| 4    A. Correct. | 4   house. |
| 5    Q. On the -- is there a door going out | 5    Q. So the neighbor you are closest to |
| 6   the back? | 6   has a blue house? |
| 7    A. Yes, there is, in the kitchen. | 7    A. Correct. |
| 8    Q. Okay. And how many stairs is it to | 8    Q. Okay. And the neighbor that the |
| 9   go down the back? | 9   other rental unit is close to has a pink or |
| 10    A. Four. | 10   peach, a pink house, is that right? |
| 11    Q. Okay. What type of floors are | 11    A. Next to my unit? Correct. |
| 12   there? | 12    Q. Okay. You came back in town, did |
| 13    A. Hardwood floors. | 13   anybody come in town with you or was it just |
| 14    Q. Throughout the whole house? | 14   you? |
| 15    A. Correct. | 15    A. My daughter. |
| 16    Q. Okay. Even in the kitchen? | 16    MS. BEVIS: |
| 17    A. No. I'm sorry. The kitchen had | 17    Do you mean the first time she came |
| 18   tile. | 18    back? |
| 19    Q. Okay. I'm assuming you had one | 19    MR. KIRSCH: |
| 20   bedroom and your daughter and granddaughter | 20    Yeah, the first time. |
| 21   had the other bedroom? | 21    THE WITNESS: |
| 22    A. Correct. | 22    Me, my daughter and my grandbaby. |
| 23    Q. Okay. And the address was 2126 | 23    All three of us. |
| 24   North Broad, right? | 24   EXAMINATION BY MR. KIRSCH: |
| 25    A. Correct. | 25    Q. And y'all came in town in the van? |
|           Page 91 |           Page 93 |

         24   (Pages 90 to 93)

DONNA M. AUGUSTINE (LEVEE)                                    7/13/2007

| | |
|---|---|
| 1    A.  In the SUV, yes. | 1    A.  Okay.  No problem. |
| 2    **Q.  And you were under a yearly lease,** | 2    **Q.  When you got to the property were** |
| 3    **right?** | 3    **you able to get down the streets and** |
| 4    A.  Correct. | 4    **everything or were the streets blocked off?** |
| 5    **Q.  When did your lease run?** | 5    A.  I would have been able to if I |
| 6    A.  From January -- no.  Wait a minute. | 6    wanted to. |
| 7    From November to November. | 7    **Q.  So you drove up and you parked in** |
| 8    (OFF THE RECORD) | 8    **your driveway?** |
| 9    VIDEOGRAPHER: | 9    A.  I park on the street, on Broad |
| 10    Return to the record.  It is 11:15. | 10    Street.  I didn't have a driveway.  I had a |
| 11    EXAMINATION BY MR. KIRSCH: | 11    garage on the back part of the house. |
| 12    **Q.  And I think when we were talking** | 12    **Q.  And when we talked about the** |
| 13    **early on in the deposition you said you had** | 13    **structure, the garage was separate from the** |
| 14    **lived at this property in New Orleans for** | 14    **structure?** |
| 15    **five years before Katrina, right?** | 15    A.  Correct. |
| 16    A.  Correct. | 16    **Q.  Was it a slab garage or --** |
| 17    **Q.  Okay.  And your lease would have** | 17    A.  An aluminum-shed type garage. |
| 18    **ran in November of '05?** | 18    **Q.  Okay.  One of like those Morgan** |
| 19    A.  Correct. | 19    **building-type garages?  Do you know what I'm** |
| 20    **Q.  And you would have had to sign a** | 20    **talking about?** |
| 21    **new lease?** | 21    A.  I'm not familiar with a Morgan -- |
| 22    A.  Correct. | 22    **Q.  It had like an aluminum roof,** |
| 23    **Q.  Okay.  Was there a reason you** | 23    **aluminum all around the side?** |
| 24    **picked that property to lease it?** | 24    A.  Correct.  Yes. |
| 25    A.  Because it was nice. | 25    **Q.  Okay.  And that was just in the** |
| Page 94 | Page 96 |

| | |
|---|---|
| 1    **Q.  Okay.** | 1    backyard? |
| 2    A.  A nice area. | 2    A.  More or less, yes. |
| 3    **Q.  Did you make any improvements to it** | 3    **Q.  Okay.  Do you know if it was on a** |
| 4    **yourself?** | 4    **concrete slab or was it just sitting on the** |
| 5    A.  No. | 5    **grass?** |
| 6    **Q.  Okay.  And you told me, I believe,** | 6    A.  It was on a concrete slab. |
| 7    **that you didn't have any type of renter's** | 7    **Q.  Any other structures for the rental** |
| 8    **insurance to cover your property inside,** | 8    **unit you were renting?** |
| 9    **right?** | 9    A.  No. |
| 10    A.  No, I did not have any renter's | 10    **Q.  What was the first thing you** |
| 11    insurance. | 11    **noticed when you got to the house?** |
| 12    **Q.  Okay.  Did you ever make any type** | 12    A.  The insects. |
| 13    **of list of what you lost?** | 13    **Q.  Did you see any damage on the house** |
| 14    A.  Yes, I did. | 14    **when you were, when you had just driven up?** |
| 15    **Q.  And who did you make that for?** | 15    A.  No, I didn't see any. |
| 16    A.  My personal use. | 16    **Q.  Okay.  Did you have any trouble** |
| 17    **Q.  Do you have a copy of that?** | 17    **getting in the front door?** |
| 18    A.  Not with me. | 18    A.  No.  I just had to cross over a rat |
| 19    **Q.  But do you have that in your** | 19    that was on the porch, but no. |
| 20    **possession?** | 20    **Q.  So you were able to walk up the** |
| 21    A.  Yes, I do. | 21    **stairs, walk through the porch, walk on the** |
| 22    **Q.  Just like all the other documents** | 22    **porch and open the door?** |
| 23    **that we talked about before, I'm just going** | 23    A.  Correct. |
| 24    **to ask that you give them to your lawyer so** | 24    **Q.  Okay.  The front door hadn't gotten** |
| 25    **she can get them to me.  Okay?** | 25    **swollen or anything preventing you from** |
| Page 95 | Page 97 |

25  (Pages 94 to 97)

DONNA M. AUGUSTINE (LEVEE)                                    7/13/2007

1    opening it?
2       A.  No.
3       Q.  Okay.  When you walk in the house
4    what do you see?
5       A.  My dead fish.
6       Q.  Anything else?
7       A.  Yes.  My oriental rug was sopping
8    wet.
9       Q.  Anything else you noticed in the
10   living room?
11      A.  I was able to see the water mark
12   line from inside.
13      Q.  In the photographs that your
14   attorney handed me that we showed you at the
15   beginning of the deposition, the photographs
16   at least of the damage, was that taken that
17   day when you walked in?
18      A.  No, it wasn't taken that day.
19   Maybe two weeks after.
20      Q.  You returned?
21      A.  Yes.
22      Q.  Okay.
23         MS. BEVIS:
24         Are all of the photographs after
25      Katrina?

                                     Page 98

1          MR. KIRSCH:
2          No.  That's why I specifically said
3          the ones that were after.
4          MS. BEVIS:
5          Okay.  I'm sorry.  I didn't catch
6          that.
7          THE WITNESS:
8          Oh, well --
9    EXAMINATION BY MR. KIRSCH:
10      Q.  Do you want to see it (indicating)?
11      A.  These here are before Katrina.
12   This is the fish tank I was talking about.
13   This is my appearance and all that before
14   Katrina.  This is my bookshelf.
15      Q.  Well, let's do this.
16      A.  This is after Katrina (indicating).
17   This is an after Katrina picture, this, that
18   (indicating).
19      Q.  Why don't we create two piles.  Put
20   the after Katrina pictures in one pile for me
21   and the pre-Katrina pictures in another pile.
22      A.  There is two on here (indicating).
23   This is after Katrina and this is before
24   Katrina, so if you cut it in half.
25      Q.  Okay.  I got you.  Hand me those

                                     Page 99

1    because we're going to go over those in a
2    second.
3       A.  (Witness indicating).
4       Q.  Thank you.  I want to go back to
5    you just walked in the home.  You saw -- we
6    talked about some of the damage you saw and
7    you said you saw a water mark, correct?
8       A.  Right.
9       Q.  The -- where did you see a water
10   mark?
11      A.  Where my stereo system was in the
12   corner, once you opened the door you was able
13   to see the brownish line.
14      Q.  Okay.  And how high up was it?
15      A.  I'd say about one and a half to two
16   feet approximately.
17      Q.  Did you notice any mold or mildew
18   or anything?
19      A.  Yes.
20      Q.  Okay.  How high had that gotten?
21      A.  It was higher than the water mark.
22      Q.  Okay.  And you said the water mark
23   was about one and a half to two feet?
24      A.  Correct.
25      Q.  So maybe it was about halfway up

                                     Page 100

1    the wall?
2       A.  Pretty much, yes.
3       Q.  Which would have been about four
4    feet?
5       A.  No, it wasn't that high.
6       Q.  Okay.  So the mold had started
7    creeping up about two or three feet?
8       A.  Correct, from the water line.
9       Q.  Okay.  Do you have eight foot
10   ceilings or bigger in your house?
11      A.  No.  Lower.
12      Q.  Lower than eight feet?
13      A.  I would say so, yes.
14      Q.  Are they like a regular home
15   ceiling height?
16      A.  Yes.  Yes.
17      Q.  Okay.  So if I were to tell you
18   that a regular home ceiling heights are about
19   eight feet --
20      A.  Okay.  Hypothetically speaking,
21   just as high as this ceiling here.
22      Q.  But it wasn't a big tall ceilings
23   that you see --
24      A.  No.  I could get on a six-foot
25   ladder and do what I had to do if I had to do

                                     Page 101

                              26  (Pages 98 to 101)

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

DONNA M. AUGUSTINE (LEVEE)                                      7/13/2007

Page 138

```
 1        photographs?
 2        MR. KIRSCH:
 3        I don't know.
 4        MS. BEVIS:
 5        Do you know where you got them
 6        from?
 7        MR. KIRSCH:
 8        They were in my packet of stuff.
 9        MS. BEVIS:
10        Okay.  I would ask that any
11        photographs be provided to counsel
12        for plaintiffs --
13        MR. KIRSCH:
14        Okay.
15        MS. BEVIS:
16        -- at such time as they need to be
17        given over.  I assume that they
18        might be attached to your expert
19        reports.
20        MR. KIRSCH:
21        That should be the same ones
22        (indicating).
23   EXAMINATION BY MR. KIRSCH:
24        Q.  The pink house that we're looking
25   at there, is that how it looked before the
```

Page 140

```
 1        A.  No, I didn't add them up.
 2        Q.  Okay.  You just kind of wrote it
 3   and kind of looked at it and got a rough
 4   number?
 5        A.  Correct.
 6        Q.  Okay.  But if we got that list from
 7   you that you said you still have, that would
 8   have dollar amounts?
 9        A.  Correct.
10        Q.  Okay.  And if I remember correctly,
11   you told me you thought you got the 10,000
12   from FEMA --
13        A.  Correct.
14        Q.  -- for the personal property that
15   you lost.
16        A.  Correct.
17        Q.  Okay.  Have you gotten any other
18   type of disaster relief payments from any
19   other entities?
20        A.  Red Cross.
21        Q.  Okay.  And what did they give you
22   money for?
23        A.  I guess because I was a victim of
24   the Katrina catastrophe.
25        Q.  Okay.  How much did you get from
```

Page 139

```
 1   storm?
 2        A.  Yes.
 3        Q.  Okay.  Did you ever place a dollar
 4   amount on the personal property you lost in
 5   the storm?
 6        A.  Yes, I did.
 7        Q.  And what was that?
 8        A.  Well, within the time when I did
 9   it, I put 30,000, but it soon went up to
10   80,000 when I realized all what I lost.  And
11   I come up with the amount of 30,000, I guess,
12   I don't know, I just thought it should be
13   about 30,000, and the more I get into it and
14   was able to investigate everything that was
15   in the back shed, I couldn't put an amount on
16   it.
17        Q.  Okay.  When you were trying to come
18   up with a number, were you -- you were making
19   the list that we talked about earlier?
20        A.  Correct.  Yes.
21        Q.  And were you writing dollar numbers
22   to the side on what it cost you?
23        A.  To a degree, yes.
24        Q.  Okay.  And then you added all those
25   up?
```

Page 141

```
 1   Red Cross?
 2        A.  Nine hundred.
 3        Q.  Around roughly what month did you
 4   get that?
 5        A.  Maybe the beginning of October.
 6        Q.  Okay.  And you would have had to
 7   fill out some paperwork for that?
 8        A.  Yes.
 9        Q.  Do you have that paperwork?
10        A.  No.
11        Q.  Did you get any other type of
12   disaster relief payments?
13        A.  Red Cross.  I think that's about --
14   United Way?  I think that's pretty much it.
15   I'm not sure.
16        Q.  But you think you got the two
17   payments from FEMA and --
18        A.  I know FEMA and I know the Red
19   Cross for sure.  Now, other agencies I got
20   vouchers to buy different little things that
21   I didn't have.
22        Q.  Okay.  Tell me about the vouchers
23   that you got.
24        A.  The Salvation Army gave a voucher
25   for I think 130.  Half was for clothing.  The
```

36 (Pages 138 to 141)

DONNA M. AUGUSTINE (LEVEE)                                    7/13/2007

---

1  other half was for food.  Yes.
2      Q.  Okay.  Any other vouchers?
3      A.  As a matter of fact, I just
4  received a voucher, I wouldn't say it was a
5  voucher, but Catholic Charities just bought a
6  mattress for my bed for me.  Catholic
7  Charities gave a $50 gas card.  That's pretty
8  much it for now I can think of.
9      Q.  Okay.  Other than the personal
10 property that we went through in detail when
11 we went through your house, any other types
12 of damages that you are seeking?
13     A.  No, no more than what I had on the
14 paper.
15     Q.  Okay.  But from what you remember,
16 we've covered all that when we went through
17 your house?
18     A.  Pretty much, yes.
19     Q.  Okay.  Are you seeking any other
20 type of relief other than monetary damages?
21     A.  No.
22     Q.  I'm going to go through -- we just
23 covered some of the relief, disaster relief
24 stuff you got, but I'm just going to go
25 through some others to make sure we didn't
                                        Page 142

1      Q.  Okay.  And did you just continue to
2  get them or did you have to go reapply?
3      A.  I had to apply for emergency
4  stamps.
5      Q.  Okay.  And what did you get in food
6  stamps?
7      A.  Maybe 150 or sixty.  About that
8  amount.
9      Q.  Okay.  Is that just one lump sum or
10 did you get that per week or --
11     A.  I got that every month until they
12 discontinued them.  And then put me on my
13 regular amount, which is 20 now, $20 of
14 stamps now.
15     Q.  Okay.  So before you regularly got
16 $20 a month in food stamps?
17     A.  I'm getting $20 a month now.  In
18 New Orleans I had 50, before Katrina, I was
19 getting like maybe $60 of stamps.
20     Q.  Okay.
21     A.  Then after Katrina I was getting
22 the 60 plus an emergency add-on, that brought
23 my stamps to about a hundred and something.
24     Q.  Okay.  And why did they eventually
25 go down to twenty?
                                        Page 144

---

1  miss any.
2      A.  Okay.
3      Q.  So you got 2,000 and 10,000 from
4  FEMA, right?
5      A.  Correct.
6      Q.  Did you get any type of SBA loan?
7      A.  No.
8      Q.  Okay.  You said you did fill out a
9  Form 95, right?
10     A.  Correct.
11     Q.  Okay.  But you haven't gotten
12 anything from the Corps?
13     A.  No, I haven't.
14     Q.  Did you apply for any LRA or Road
15 Home grants?
16     A.  No.
17     Q.  Okay.  We covered the $900 you got
18 from Red Cross, right?
19     A.  Correct.
20     Q.  I think you did tell me you got
21 some food stamps?
22     A.  Correct.  Food stamps, yes.
23     Q.  Did you -- were you getting food
24 stamps before the storm?
25     A.  Yes, I was.
                                        Page 143

1      A.  Well, I guess the emergency system
2  that was giving us that amount ceased.
3      Q.  Okay.
4      A.  And since I don't pay any rent --
5      Q.  It went down to 20.
6      A.  Right, 20, but I pay utilities and
7  stuff, but no rent.
8      Q.  Did you pay utilities at the other
9  rental unit?
10     A.  Yes, I did.
11     Q.  Okay.  And have you received any
12 gifts or private donations or anything other
13 than the Catholic Charities stuff we just
14 talked about?
15     A.  No, I haven't.
16     Q.  Okay.  Do you have any other type
17 of relief, disaster relief applications out
18 standing where you are waiting to get a
19 response?
20     A.  No.
21     Q.  Okay.  So you haven't applied for
22 Road Home money or anything and just haven't
23 gotten it yet?
24     A.  Well, I thought Road Home was for
25 people that owned their own home.  I didn't
                                        Page 145

---

                                    37  (Pages 142 to 145)

DONNA M. AUGUSTINE (LEVEE)                                    7/13/2007

1    Q.  Okay.  It looks like you have a 225
2   phone number and then a 504 number.
3    A.  Correct.
4    Q.  Is the 504 number your old number?
5    A.  No.  The 504 number is my cell
6   number.
7    Q.  Okay.  And the 225 number is --
8    A.  My Baton Rouge --
9    Q.  The Sherwood, Baton Rouge number?
10   A.  Correct.
11   Q.  Okay.  Can I switch?  I think I
12  gave you my copy.  I'm sorry (indicating).
13  The -- you see where your address says 2126
14  North Broad?
15   A.  Correct.
16   Q.  Underneath there's a
17  typewritten statement.  Do you see that, the
18  hurricane protection levees, do you see that?
19   A.  Yes, I do.
20   Q.  Did -- was that preprinted when you
21  got this form?
22   A.  This was already printed when I got
23  the form, yes.
24   Q.  Okay.  So --
25   A.  I think.  I'm not sure.  Yes.

Page 154

1    A.  Yes.
2    Q.  You wrote PTSD.
3    A.  Yes.
4    Q.  Who told you you had PTSD?
5    A.  My Dr. Sarrat and the changes I was
6   going through, being I was a nursing
7   assistant and an ER tech, I fit the mold for
8   PTS.  PTSD, post-traumatic stress syndrome.
9    Q.  Okay.  But your recollection is Dr.
10  Sarrat told you you had PTSD?
11   A.  Yes.
12   Q.  Okay.  And if I remember, Dr.
13  Sarrat is just a primary care physician or a
14  general practitioner, not a psychiatrist or
15  psychologist, correct?
16   A.  Correct.
17   Q.  Who is Shawana Brown?
18   A.  Shawana.
19   Q.  Shawana.  I'm sorry.
20   A.  My daughter.
21   Q.  Okay.  So she was -- your daughter
22  Shawana was living with you at the time?
23   A.  Correct.
24   Q.  And that's her new address in
25  Baker?

Page 156

1    Q.  I'm sorry?
2    A.  I think, yes.  This was pretty much
3   on here when I got it.
4    Q.  Okay.  You didn't type that in, did
5   you?
6    A.  Oh, no.
7    Q.  Okay.  The only stuff you put in
8   was the handwritten notes?
9    A.  Correct.
10   Q.  And I think underneath, you see 9,
11  Property Damage?
12   A.  Yes.
13   Q.  And underneath there there are some
14  handwritten notes where you say water damage,
15  all my belongs, mildew and mold everywhere,
16  shoes, stereo, blanket, sweater, clothes,
17  furniture, all that?
18   A.  Correct.
19   Q.  We pretty much covered all of that
20  when we went through your house, is that
21  right?
22   A.  Yes.  Yes.
23   Q.  Under number 10, the personal
24  injury/wrongful death section, do you see
25  that?

Page 155

1    A.  Correct.
2    Q.  Okay.  And I think under Property
3   Damage you wrote 30,000, and Personal Injury
4   2,000?
5    A.  Correct.
6    Q.  And the 2,000 was for the stress we
7   discussed?
8    A.  Yes.
9    Q.  Okay.  And the property damage you
10  valued at that time for thirty grand?
11   A.  Correct.
12   Q.  Okay.  I want to take you back to
13  number 10, Miss Augustine.  You see the
14  section where you say:  "Pain in both of my
15  knees?"
16   A.  Yes.
17   Q.  Are you attributing any of your
18  knee pain to this incident?
19   A.  Yes.
20   Q.  Okay.  Because when we talked
21  earlier you had indicated that your knees
22  were bothering you --
23   A.  Yes.
24   Q.  -- since '93 all the way through
25  the present, right?

Page 157

40  (Pages 154 to 157)

GLADYS LaBEAUD (LEVEE)                                    7/16/2007

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


IN RE:  KATRINA CANAL        CIVIL ACTION
BREACHES CONSOLIDATED
LITIGATION                   NO. 05-4182 "K" (2)

                             JUDGE DUVAL
PERTAINS TO:  LEVEE
                             MAG. WILKINSON

FILED IN:

05-4181, 05-4182, 05-4191,
05-4568, 05-5237, 05-6073,
05-6314, 05-6324, 05-6327,
05-6359, 06-0020, 06-1885,
06-0225, 06-0886, 06-11208,
06-2278, 06-2287, 06-2346,
06-2545, 06-3529, 06-4065,
06-4389, 06-4634, 06-4931,
06-5032, 06-5042, 06-5159,
06-5163, 06-5367, 06-5471,
06-5771, 06-5786, 06-5937,
06-7682, 07-0206, 07-0647,
07-0993, 07-1284, 07-1286,
07-1288, 07-1289




        Deposition of GLADYS R. LaBEAUD,
500 S. Jefferson Davis Parkway, Apt. 1, New
Orleans, Louisiana 70119, taken in the
offices of Bruno & Bruno, 855 Baronne St.,
Second Floor, New Orleans, Louisiana on
Monday, the 16th day of July, 2007 at 9:16
a.m.

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

GLADYS LaBEAUD (LEVEE)                                    7/16/2007

---

Page 6

1    VIDEOGRAPHER:
2        This is the videotape deposition of
3    Gladys R. LaBeaud. This deposition
4    is being taken in the matter of In
5    Re: Katrina Canal Breaches
6    Consolidated Litigation being taken
7    for the United States District for
8    the Eastern District of Louisiana.
9    We're at the Law Offices of Bruno
10   located at 855 Baronne Street,
11   Second Floor, in New Orleans,
12   Louisiana. Today's date is July
13   16, 2007. My name is Ken Hart.
14   I'm a certified legal video
15   specialist with Hart Video of
16   Louisiana. The court reporter is
17   Margaret McKenzie.
18       Margaret, would you, please, swear
19   in the witness.
20           GLADYS R. LaBEAUD,
21   500 S. Jefferson Davis Parkway, Apt. 1, New
22   Orleans, Louisiana 70119, after having been
23   first duly sworn by the above-mentioned court
24   reporter, did testify as follows:
25   EXAMINATION BY MR. GARDNER:

---

Page 7

1        Q. Miss LaBeaud, I'm Warren Gardner,
2    and I represent one of the defendants in the
3    lawsuit that you filed. We're here today,
4    Miss LaBeaud, to take your deposition. Have
5    you ever had your deposition taken before?
6        A. No.
7        Q. Okay. Well, your deposition is my
8    opportunity and the opportunity for the other
9    attorneys in this room to ask you some
10   questions about the claims that you've made
11   in this lawsuit as an individual and as a
12   potential class representative and other
13   matters related to that. If you don't
14   understand any of my questions, Miss LaBeaud,
15   just ask me to rephrase them and I'll do so.
16   Otherwise, I'll assume that when you've
17   answered the question you've understood it.
18   Is that clear?
19       A. Yes.
20       Q. Okay. And I would also ask, Miss
21   LaBeaud, that in response to my questions and
22   to all of the questions, that you give us a
23   verbal response. If the answer, for
24   instance, is yes, that you say yes rather
25   than just nod your head.

---

Page 8

1        A. Yes.
2        Q. Okay? Miss LaBeaud, in connection
3    with your deposition a Notice of Deposition
4    was filed in this matter, which has an
5    exhibit attached to it requesting the
6    production of certain documents. I'm going
7    to go through this with you and ask you if
8    you have brought any documents today with you
9    that are responsive to each of these 23
10   categories of documents. Number 1 -- and
11   we're going to go ahead and attach the Notice
12   of Deposition to the deposition as Exhibit 1.
13       MR. JOANEN:
14       Before we go any further, let me be
15       sure, you have number one right
16       there which is the -- oh, I'm
17       sorry. Okay.
18   MR. GARDNER:
19       Number 1 is going to be Notice of
20       Deposition.
21   MR. JOANEN:
22       Okay.
23   MR. GARDNER:
24       Okay.
25   EXAMINATION BY MR. GARDNER:

---

Page 9

1        Q. And No. 1 attached to Exhibit A
2    requests a copy of each Standard Form 95
3    submitted to the Army Corps of Engineers as
4    well as any drafts thereof by the deponent,
5    which in this case is you, Miss LaBeaud, from
6    August of 2005 to the present. Your attorney
7    has presented me with a copy of a Form 95 and
8    I'm going to show it to you and ask you if
9    you have any other documents that are
10   responsive to No. 1 other than that document
11   (indicating).
12       A. No, I don't have -- I don't have
13   today any of --
14       Q. Anything else other than this?
15       A. Yeah.
16       Q. Okay. You don't have any drafts or
17   other drafts of this document?
18       A. No.
19       Q. Okay. We're going to go ahead and
20   label the Form 95 as Exhibit 2.
21       MR. PATE:
22       How many pages is that, Warren?
23       MR. GARDNER:
24       That is one -- it is four pages.
25       Okay. One thing, though, we forgot

---

                          3 (Pages 6 to 9)

GLADYS LaBEAUD  (LEVEE)                          7/16/2007

Page 18

1  paid to the deponent and/or on his or her
2  behalf related to Hurricane Katrina or its
3  aftermath.
4      A.  Yes.
5      Q.  Do you have those at home?
6      A.  Yes.
7      Q.  And what documents would those be?
8      A.  Insurance proceeds.
9      Q.  Okay.  Have you received any money
10  from FEMA?
11      A.  Yes.  And --
12      Q.  And do you have any records of
13  that?
14      A.  Yes.
15      Q.  Yes, ma'am?
16      A.  Uh-huh.
17      Q.  All demonstrative evidence or
18  exhibits that the deponent and his or her
19  attorneys may refer to at the class
20  certification hearing and all documents that
21  refer or relate to such demonstrative
22  evidence or exhibits.
23      A.  No.
24      Q.  All computer models that the
25  deponent or his or her attorneys may refer to

Page 19

1  at the class certification hearing or in
2  support of class certification and all
3  documents that refer or relate to such
4  computer models.
5      A.  No.
6      Q.  Number 20 asks for a copy of the
7  complaint or petition in any prior litigation
8  in which the deponent has been a party.
9      A.  No.
10      Q.  Have you ever been involved in
11  another lawsuit?
12      A.  No.
13      Q.  This is the first lawsuit you've
14  ever been involved in?
15      A.  Yes.
16      Q.  Okay.  You've never been a
17  plaintiff in a lawsuit?
18      A.  No.
19      Q.  Okay.  Number 21 requests a copy of
20  any lease agreement entered into between the
21  deponent and any proposed class member.
22      A.  No.
23      Q.  Number 21 refers to all documents
24  that relate to eviction proceeding instituted
25  by or against the deponent after Hurricane

Page 20

1  Katrina.
2      A.  Eviction proceedings.  No.
3      Q.  You weren't evicted from your
4  residence and you didn't have to evict
5  anybody?
6      A.  Wait a minute now.  I'm not sure I
7  understand the question very well.  Well, if
8  you -- I had to leave, but if you call that
9  eviction --
10      Q.  No.  I mean an eviction would be a
11  legal proceeding where --
12      A.  No, no, no.  No.
13      Q.  All right.  Number 23 asks for all
14  documents in the deponent's possession
15  indicating that the deponent will protect the
16  interests of the proposed class.
17      A.  No.
18      Q.  Okay.  Miss LaBeaud, would you give
19  me your full name, please.
20      A.  Gladys R. LaBeaud.
21      Q.  R?
22      A.  Yes.
23      Q.  And what does the stand for?
24      A.  My maiden name.  R-O-W-A-N.  Rowan.
25      Q.  And Miss LaBeaud, what is your date

Page 21

1  of birth?
2      A.  December 29, 1930.
3      Q.  Were you born in New Orleans?
4      A.  No.
5      Q.  Where were you born?
6      A.  Natchez, Mississippi.
7      Q.  Okay.  And how long have you lived
8  in New Orleans?
9      A.  Approximately since '51.
10      Q.  Okay.  Are you on any medication
11  this morning?
12      A.  Yes.
13      Q.  And what kind of medication is
14  that?
15      A.  Ultracet.
16      Q.  Ultracet?
17      A.  Yes.
18      Q.  And what does that medication
19  address?
20      A.  Arthritis pain.
21      Q.  Does that medication in any way
22  affect your ability to give a deposition
23  today and answer questions?
24      A.  No.
25      Q.  Miss LaBeaud, what did you do in

6  (Pages 18 to 21)

| Page 22 | Page 24 |
|---|---|

**Page 22**

1   preparation for this deposition?
2       A.  Well, talked with my lawyer, just
3   advised me whatever questions were asked me
4   just tell the truth.  That's it.
5       Q.  Well, other than -- well, how long
6   did you meet with your lawyer?
7       A.  A few minutes this morning.
8       Q.  Okay.  Did you review any
9   documents?
10      A.  No.
11      Q.  Had you met with your lawyer before
12  this morning?
13      A.  Yes.
14      Q.  And how long ago was that and for
15  how long did you meet with him?
16      A.  I think June 6.  I'm not sure about
17  the date, but maybe about 15, 20 minutes,
18  something like that.
19      Q.  Was that here, was that in this
20  office?
21      A.  In the building.  In the building.
22      Q.  And you didn't review any documents
23  in preparation for your deposition?
24      A.  No.
25      Q.  Okay.  Are you married?

**Page 23**

1       A.  Widow.
2       Q.  And how long have you been a widow?
3       A.  Since '79.
4       Q.  What was your late husband's name?
5       A.  Alton John LaBeaud.
6       Q.  Do you have any children?
7       A.  Yes.
8       Q.  And how many children do you have?
9       A.  Three.
10      Q.  And what are their names and ages?
11      A.  Darryl Keith.
12      Q.  Approximate ages.
13      A.  Forty-eight.
14      Q.  Darryl is forty-eight?
15      A.  Yes.  Pierre Francois.  He will be
16  45.  Faith Monique, 33.
17      Q.  Where do you presently reside?
18      A.  500 South Jefferson Davis Parkway,
19  Apartment 1.
20      Q.  And how long have you lived there?
21      A.  June 23, '07.
22      Q.  Of this year?
23      A.  Yes.
24      Q.  And where were you living before
25  that?

**Page 24**

1       A.  Richmond, Texas.
2       Q.  In Richmond, Texas?
3       A.  Yes.
4       Q.  And where were you living in
5   Richmond, Texas?
6       A.  Wait a minute.  What was the
7   address.  The riverside -- wait a minute.
8   River Park West.  It was 221, apartment 221
9   River Park West in Richmond, Texas.
10      Q.  Okay.
11      A.  77469.
12      Q.  Okay.  Are you presently living
13  alone?
14      A.  No.
15      Q.  Who do you live with?
16      A.  My daughter Faith and her daughter
17  Jasmine.
18      Q.  Where were you living at the time
19  of Hurricane Katrina?
20      A.  1708 Industry Street, New Orleans.
21      Q.  Okay.  And prior to Hurricane
22  Katrina how long had you lived at 1708
23  Industry Street?
24      A.  Since April of 1981.
25      Q.  And you purchased the house?

**Page 25**

1       A.  Yes.
2       Q.  Okay.  Now, did you own that house
3   or did you purchase that house with your
4   husband?  Or had he already passed away?
5       A.  He had already passed.
6       Q.  Did you purchase the house with any
7   of your children?
8       A.  Yes.
9       Q.  And which children?
10      A.  Darryl and Pierre.
11      Q.  They bought it with you in 1981?
12  They purchased it with you in 1981?
13      A.  Yes.
14      Q.  Do you know how much you purchased
15  it for?
16      A.  Forty-four thousand five hundred.
17      Q.  And do you know who you purchased
18  it from?
19      A.  A Mrs. Marian P. O'Brien.
20      Q.  And did you have to finance that
21  purchase with a mortgage or did you buy it
22  with cash?
23      A.  Neither one.
24      Q.  Okay.  How did you purchase it?
25      A.  With a down payment.

GLADYS LaBEAUD (LEVEE)                                           7/16/2007

Page 26

1    Q.  Okay.  And then after you made the
2  down payment did you have monthly notes to
3  make?
4    A.  Yes.
5    Q.  Did you make those to a bank?
6    A.  Yes.
7    Q.  Do you know what bank that was?
8    A.  At that time Security Homestead.
9    Q.  And what were those monthly
10  payments, do you remember?
11   A.  $346.85 per month.
12   Q.  And have you paid that loan off?
13   A.  Well, I can't answer that question
14  yes or no.
15   Q.  Okay.  And why is that?
16   A.  Because I got Regions to pay that
17  off, and then I have an equity loan with
18  Regions.
19   Q.  Okay.  So you had another loan with
20  Regions to pay off the first loan?
21   A.  Yes.
22   Q.  Okay.  And do you still owe money
23  on the Regions loan?
24   A.  Yes.
25   Q.  Okay.  And how much are you paying

Page 27

1  on that?
2    A.  Approximately two eighty something
3  a month.
4    Q.  And when does that, when will that
5  note be paid off?
6    A.  I don't know.
7    Q.  Okay.  Do you remember
8  approximately when you entered into the loan
9  agreement with Regions?
10   A.  1986.
11   Q.  Okay.  Now, you said you bought the
12  home with your two sons.  Do they pay for
13  part of the mortgage?
14   A.  Actually now, no.
15   Q.  Now no?
16   A.  (Witness shakes head.)
17   Q.  And why is that?
18   A.  Because neither one of them lives
19  with me.
20   Q.  Okay.  Did they at one point pay
21  for part of the mortgage?
22   A.  Yes.
23   Q.  All right.  What type of a building
24  is 1708 Industry?
25   A.  A duplex.

Page 28

1    Q.  When you say duplex, is it one
2  house on top of another or is it side by
3  side?
4    A.  No.  Side by side.
5    Q.  Is it what is sometimes referred to
6  as a shotgun double?
7    A.  Yes.
8    Q.  Okay.  All right.  When you
9  purchased -- and it is 17 -- is it 1708 to
10  1710 Industry, is that -- are those the two
11  numbers of the two --
12   A.  Yes.
13   Q.  -- parts?  Okay.  Do you know how
14  old 1708-1710 Industry was when you purchased
15  it?
16   A.  No.
17   Q.  What would your best estimate be?
18   A.  1950.
19   Q.  That it was built around 1950?
20   A.  Yes.
21   Q.  And was it a wooden home?
22   A.  Yes.
23   Q.  Was it built on piers?
24   A.  Um --
25   Q.  You know what I mean by that?  Is

Page 29

1  it raised off the ground or --
2    A.  Yeah.
3    Q.  -- sit on a slab?
4    A.  Raised off the ground.
5    Q.  Okay.  And how many steps do you
6  have to go up to get to the front door?
7    A.  Four.
8    Q.  And it's one apartment next to the
9  other?
10   A.  Yes.
11   Q.  Okay.  Did your sons live with you
12  or did they live on one side and you on the
13  other?
14   A.  Before --
15   Q.  When you first bought it.
16   A.  Let me see now.  No.  No.  Neither
17  one.
18   Q.  Neither one?
19   A.  No.
20   Q.  Well, where did they live?  Did
21  they live in the same house or in the same
22  building or did they live in another house?
23   A.  Another house.
24   Q.  Okay.  So, did they ever live in
25  the duplex?

8 (Pages 26 to 29)

Page 30

1     A.  Darryl has since then, but not at
2  first.
3     Q.  Wait.  I didn't follow you.
4     A.  Darryl has since then, but not at
5  first.
6     Q.  Okay.  Well, have you always lived
7  there in one side?
8     A.  Yes.
9     Q.  So since you purchased 1708
10 Industry you've always lived in that side of
11 the double?
12    A.  Yes.
13    Q.  Okay.  Did you rent out the other
14 side of the double?
15    A.  Yes.
16    Q.  Okay.  And how much rent did you
17 initially get for 1710 Industry?
18    A.  Initially about 265 at first.
19    Q.  Okay.  Now, did you continue to
20 rent that the whole time you owned the
21 property up to Hurricane Katrina?
22    A.  Yes.
23    Q.  Okay.  Now, I think you said at
24 some point Darryl lived in the house.  Did he
25 live with you or did he live in 1710?

Page 31

1     A.  1710.
2     Q.  Okay.  When he lived in 1710 did he
3  pay rent?
4     A.  Yes.
5     Q.  Okay.  Did the rent change from the
6  time you purchased the house until Hurricane
7  Katrina?
8     A.  Yes.
9     Q.  Okay.  What was the rent at the
10 time of Hurricane Katrina?
11    A.  $450.
12    Q.  Do you remember who was renting it
13 before Hurricane Katrina?
14    A.  Darryl.
15    Q.  Darryl was?
16    A.  Yes.
17    Q.  And Darryl would pay you $450 a
18 month?
19    A.  Yes.
20    Q.  Did Darryl have a written lease
21 with you?
22    A.  No.
23    Q.  It was just a verbal oral
24 agreement?
25    A.  Yes.

Page 32

1     Q.  Okay.  And how long before
2  Hurricane Katrina had Darryl lived at 1710
3  Industry approximately?
4     A.  Sixteen, eighteen months, something
5  like that.
6     Q.  And the whole time in those sixteen
7  to eighteen months he was paying you the $450
8  a month rent?
9     A.  Yes.
10    Q.  Would he write a check to you in
11 that amount?
12    A.  Sometimes.  Most times cash.
13    Q.  Did Darryl live there by himself or
14 did he have a family?
15    A.  He had a wife.
16    Q.  Did Darryl pay any utilities?
17    A.  Yeah.
18    Q.  Did he pay for his own water or did
19 you pay that?
20    A.  Water was included.
21    Q.  Included in the $450 a month?
22    A.  Uh-huh.
23    Q.  Had -- who had lived in the
24 apartment before Darryl?
25    A.  A person Charles Butler.

Page 33

1     Q.  Charles Butler?
2     A.  Yeah.
3     Q.  And how long had Mr. Butler lived
4  at 1710 Industry?
5     A.  Maybe about four or five years.  I
6  don't really know.
7     Q.  Okay.  So he was a long-term
8  tenant?
9     A.  Uh-huh.
10    Q.  And how much rent did he pay?
11    A.  Four twenty-five.
12    Q.  Okay.  And did he have a written
13 lease agreement with you?
14    A.  No.
15    Q.  And he would pay his own utilities?
16    A.  Yes.
17    Q.  Okay.  But you would pay the water
18 for his side?
19    A.  Yes.
20    Q.  And did he have any other expenses
21 other than the utilities in renting 1710
22 Industry?
23    A.  No.
24    Q.  Okay.  Was there any kind of yard
25 expense?

9 (Pages 30 to 33)

GLADYS LaBEAUD (LEVEE)                                    7/16/2007

|  | Page 34 |
|---|---|

1       A.  I beg your pardon?  I didn't
2   understand you.
3       Q.  Was there any expenses in keeping
4   up the yard?
5       A.  What you mean, on the tenant's
6   part?
7       Q.  Yes.
8       A.  No.
9       Q.  I mean, did you pay to have the
10  grass cut?
11      A.  Yes.
12      Q.  Why did Mr. Butler move out?
13      A.  He passed.
14      Q.  Okay.  And he had rented the
15  property for approximately five years
16  straight before Darryl moved in?
17      A.  Uh-huh.
18      Q.  Okay.  Yes?
19      A.  Yes.  I'm sorry.  Yes.
20      Q.  Darryl and Pierre, are they still
21  co-owners of the property?
22      A.  Darryl is.
23      Q.  Okay.
24      A.  Pierre is not.
25      Q.  Before Hurricane Katrina were

|  | Page 35 |
|---|---|

1   Darryl and Pierre both co-owners of the
2   property or just Darryl?
3       A.  Darryl.
4       Q.  Okay.  And what happened to
5   Pierre's interests?
6       A.  He got out of it because he wanted
7   to go in business for himself and he didn't
8   want a lot of credit.  So that's what he did.
9       Q.  Okay.  Did you and Darryl buy
10  Pierre out?
11      A.  No.  No.
12      Q.  Okay.  Do you know if the property
13  is still in Pierre's name?
14      A.  It isn't.
15      Q.  It isn't?
16      A.  No.
17      Q.  Okay.  The property is in your name
18  and Darryl's name?
19      A.  Yes.
20      Q.  And do you know how or why Pierre's
21  name is no longer -- Pierre is no longer
22  listed as owner of the property?
23      A.  He had the bank to did that.  He
24  wanted to go in business by himself and he
25  didn't want all of that credit, so some way

|  | Page 36 |
|---|---|

1   or another they removed his name from the
2   property.
3       Q.  So the bank did that?
4       A.  Yes.
5       Q.  And which bank is that, is that
6   Regions?
7       A.  Regions.
8       Q.  Okay.  At the time of Hurricane
9   Katrina then the owners of the property were
10  you and your son Darryl?
11      A.  Yes.
12      Q.  Okay.  Before Darryl moved into the
13  property did he share the rent, the rental
14  income that the property generated with you?
15      A.  No.
16      Q.  Okay.  So, in other words, when Mr.
17  Butler was paying rent you wouldn't give any
18  of the rent to Darryl?
19      A.  No.
20      Q.  You kept it?  You kept it?
21      A.  (Witness nods head.)
22      Q.  And did Darryl ever pay any of the
23  notes?
24      A.  No.
25      Q.  Either to Regions or to Security?

|  | Page 37 |
|---|---|

1       A.  (Witness shakes head.)
2       Q.  No?
3       A.  (Witness shakes head.)
4       Q.  Okay.  Was your property under a
5   termite contract?
6       A.  Yes.
7       Q.  Were both sides?
8       A.  Yes.
9       Q.  And who was that contract with?
10      A.  I don't remember.
11      Q.  Had you ever had any problems with
12  termites?
13      A.  No.
14      Q.  All right.  From the time you
15  bought the property until the time of
16  Hurricane Katrina did you make any
17  substantial improvements to the property?
18      A.  Yes.
19      Q.  Okay.  And what did you do with it?
20      A.  Added a utility room on the back
21  and enlarged the kitchen, the kitchen area.
22      Q.  Was that on the back of 1708 or was
23  it on the back of both?
24      A.  1708 mostly and partially on 1710.
25  And the roof.  I forgot about that.  Yeah.

10  (Pages 34 to 37)

GLADYS LaBEAUD (LEVEE)                                    7/16/2007

Page 38

1    Q.  Put a new roof on?
2    A.  (Witness nods head.)
3    Q.  All right.  Well, let me ask you --
4    A.  And added central air and heat.
5    Q.  Added central air and heat?
6    A.  Yes.
7    Q.  Was that to 1708 or was that to
8  both sides?
9    A.  1708.
10    Q.  Did 1710 just have window units?
11    A.  Yes.
12    Q.  And what type of heat did it have?
13    A.  Regular floor heating.
14    Q.  Floor furnaces?
15    A.  Yeah, floor furnaces, too.
16    Q.  Was the property on Industry Avenue
17  the only property you owned?
18    A.  Yes.
19    Q.  Okay.  Now, you said you added a
20  utility room?
21    A.  Yes.
22    Q.  And that was at the back of the
23  kitchen?
24    A.  Yes.  And you said you enlarged
25    Q.  Okay.  And you said you enlarged

Page 39

1  the kitchen?
2    A.  Yes.
3    Q.  And how much did you enlarge the
4  kitchen?
5    A.  About four feet deep.
6    Q.  And the utility room was on the
7  other side of the kitchen?
8    A.  Well, on the back of the kitchen.
9    Q.  It was on the back of the kitchen?
10    A.  (Witness nods head.)
11    Q.  Did it extend into 1710, into the
12  1710 side?
13    A.  No.  No.  No.
14    Q.  It just went on the back?
15    A.  Uh-huh.
16    Q.  Okay.  On the back of the kitchen?
17    A.  (Witness nods head.)
18    Q.  So it was the last room in 1708?
19    A.  The last room would be the kitchen,
20  but then after that is the utility room.
21  Okay.
22    Q.  Right.  So it would be behind the
23  kitchen?
24    A.  Yeah.
25    Q.  Okay.  And do you know when you

Page 40

1  added on the utility room and enlarged the
2  kitchen?
3    A.  Not exactly.
4    Q.  Do you remember how much that cost?
5    A.  No.
6    Q.  Did you hire a contractor to do it,
7  to do the work?
8    A.  My son did it.
9    Q.  And that's Darryl?
10    A.  Yeah.
11    Q.  Did he charge you for the work?
12    A.  No.
13    Q.  Did you have to pay anything for
14  the improvements?
15    A.  No.
16    Q.  All right.  Now, what about central
17  air and heat, when was that added?
18    A.  I don't know exactly.  Within the
19  last I'd say seven, eight years.
20    Q.  Okay.  And do you remember who
21  added it, who the --
22    A.  No.
23    Q.  -- contractor was?
24    A.  No.
25    Q.  Was the air conditioning system

Page 41

1  under a maintenance contract?
2    A.  No.
3    Q.  All right.  And you also indicated
4  that you added a new roof?
5    A.  Yeah.
6    Q.  And when was that approximately?
7    A.  Maybe about five, six years ago.
8  Something like that.  I don't remember
9  exactly.
10    Q.  And do you remember who installed
11  the roof?
12    A.  No.
13    Q.  Do you remember how much it cost?
14    A.  No.
15    Q.  Do you have any records that would
16  show that?
17    A.  Not other than what got messed up
18  with Katrina.
19    Q.  Okay.  Had you ever had any
20  problems with the house, with roof leaks in
21  the house before Hurricane Katrina?
22    A.  No.
23    Q.  Okay.  Had you ever had any
24  problems with any water getting into the
25  house for any reason before Hurricane

                                    11 (Pages 38 to 41)

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

GLADYS LaBEAUD (LEVEE)                                    7/16/2007

| Page 42 | Page 44 |
|---------|---------|

**Page 42**

1  Katrina?
2      A.  No.
3      Q.  Had there ever been any flooding to
4  the house?
5      A.  No.
6      Q.  Okay.  Had you ever had any fire
7  damage to the house?
8      A.  No.
9      Q.  Had the house ever had any other
10  damage from any other hurricane?
11      A.  No.
12      Q.  Had you ever had to make any
13  emergency repairs to the house?
14      A.  No.
15      Q.  Do you remember the name of any
16  contractor whoever performed any work on the
17  house before Hurricane Katrina?
18      A.  No.
19      Q.  And you can't tell us how much
20  money you spent improving the property before
21  Hurricane Katrina?
22      A.  No.
23      Q.  All right.  Now, did the house have
24  any insurance on it before Hurricane Katrina?
25      A.  Yes.

**Page 43**

1      Q.  And what kind of insurance?
2      A.  I had flood insurance.
3      Q.  And who was that written through?
4      A.  State Farm.
5      Q.  And do you know what the limits of
6  that coverage was?
7      A.  $120,100.
8      Q.  One hundred twenty thousand?
9      A.  And one hundred dollars, yeah.
10      Q.  $120, 100?
11      A.  Yeah.
12      Q.  That was the amount of insurance
13  that you had?
14      A.  Yes.
15      Q.  And was that for the structure and
16  contents or was that just for the structure?
17  Let me ask you this.  Did you have a separate
18  amount for structure and -- did you have a
19  separate amount for structure and for
20  contents?  Do you understand my question?
21      A.  I think so.  I may be a little bit
22  confused.  I wouldn't answer that yes or no,
23  but -- to tell you the truth, I really don't
24  know right now.
25      Q.  Okay.  Well, the $120,100, what did

**Page 44**

1  that represent?
2      A.  I think that was -- I know it was
3  flood and personal property may have been
4  included.  I don't really know.
5      Q.  Okay.  Did you have a homeowner's
6  policy --
7      A.  Yes.
8      Q.  -- on the property?
9      A.  Yes.
10      Q.  And what -- who had written that
11  policy?
12      A.  State Farm.
13      Q.  Okay.  Do you know what the
14  homeowner's was?
15      A.  Ten thousand.
16      Q.  Ten thousand?
17      A.  Yeah.
18      Q.  Okay.  Did you have any other kind
19  of insurance on the property?
20      A.  No.
21      Q.  Okay.  Did you own an automobile
22  before Hurricane Katrina?
23      A.  Yes.
24      Q.  Okay.  Was that damaged in the
25  storm?

**Page 45**

1      A.  Yes.
2      Q.  Okay.  Did you have insurance on
3  the automobile?
4      A.  Yes.
5      Q.  And what type of automobile was it?
6      A.  '93 Toyota Corolla.
7      Q.  And do you know how much insurance
8  you had on the vehicle?
9      A.  How much insurance?  No.  I can --
10  I can tell you what they paid.  I don't
11  remember.
12      Q.  What did they pay?
13      A.  Three thousand five hundred.
14      Q.  Okay.  How would you describe the
15  condition of your house prior to Katrina?
16      A.  Good.
17      Q.  Good?
18      A.  Yes.
19      Q.  Did it have any -- were there any
20  parts of the house that were unlevel?
21      A.  No.
22      Q.  Were there any -- there was no
23  indication that there were any leaks in the
24  roof?
25      A.  (Witness shakes head.)

GLADYS LaBEAUD (LEVEE)                                    7/16/2007

Page 46

1    Q.  No?
2    A.  (Witness shakes head.)
3    Q.  What type of electrical system did
4  you have in the house?  Was it the original
5  system or had that been changed?
6    A.  Some had been changed because, as I
7  said, when they put the addition on the back,
8  naturally they had to change some stuff.
9    Q.  Okay.  That was just for your side,
10  for the 1710 side?
11   A.  Yes.
12   Q.  Okay.
13   A.  Yes.  I would say yes.
14   Q.  Was the plumbing in the house the
15  original plumbing?
16   A.  Some of it had been changed.
17   Q.  Okay.  Was it changed on both sides
18  or just your side?
19   A.  Both sides.
20   Q.  And when was it changed?
21   A.  I don't remember.
22   Q.  How do you know it was changed?
23   A.  Because we had to install new bath
24  on 170 -- 1710 and 1718.
25   Q.  When did you put the new baths in?

Page 47

1    A.  I don't remember.
2    Q.  Did Darryl do that or did you hire
3  a contractor?
4    A.  No.  A plumber.
5    Q.  A plumber.  Did the house have wood
6  siding or vinyl siding?
7    A.  Vinyl.
8    Q.  Okay.  And when did you place the
9  vinyl -- did you install the vinyl siding or
10  did the house, did the house have vinyl
11  siding on it when you purchased it?
12   A.  It had vinyl siding.  And we had to
13  replace some at one time.
14   Q.  So when you purchased the house it
15  had the vinyl siding on it?
16   A.  Yes.
17   Q.  And you said you had to replace
18  some of it.  Why did you have to replace some
19  of it?
20   A.  Because it needed replacing.
21   Q.  Okay.  Did you ever look at the
22  wood siding underneath the vinyl?
23   A.  I don't know about those kind of
24  things really.
25   Q.  Okay.  Now, let me go back for a

Page 48

1  moment.  Miss LaBeaud, what is the highest
2  level of education that you've obtained?
3    A.  CNA.
4    Q.  Okay.  Did you go to school for
5  that?
6    A.  Yes.
7    Q.  Okay.  Did you graduate from high
8  school?
9    A.  Yes.
10   Q.  And what high school was that?
11   A.  Brumfield.
12   Q.  Brumfield?
13   A.  Yes.
14   Q.  And was that in Natchez?
15   A.  Yes.
16   Q.  Brumfield High School?
17   A.  Yes.
18   Q.  And when did you go there?  When
19  did you graduate?
20   A.  1948.
21   Q.  Now, did you have any -- did
22  you go to any kind of college after that?
23   A.  Vocational college.
24   Q.  Okay.  Where did you go to
25  vocational college?

Page 49

1    A.  Sidney Collier.
2    Q.  And where is that?
3    A.  On Louisa Street in New Orleans.
4    Q.  Okay.  And what did you study?
5    A.  Nursing aide.
6    Q.  Nursing aide?
7    A.  Yes.
8    Q.  And you are a CNA?
9    A.  I beg your pardon?
10   Q.  You are a CNA?
11   A.  Yes.  Yeah.
12   Q.  Okay.  And that's certified nursing
13  assistant?
14   A.  Yes.
15   Q.  After going to Sidney Collier did
16  you have any other training?
17   A.  The CNA was after Sidney.
18   Q.  Okay.  When -- how did you get your
19  CNA?
20   A.  American Rehab.
21   Q.  You went to American Rehab?
22   A.  Yes.
23   Q.  And is that a vocational school?
24   A.  Yes.
25   Q.  And approximately when did you go

GLADYS LaBEAUD  (LEVEE)                                    7/16/2007

Page 50

```
 1   there?
 2       A.  '96.  1996.  I think that's right.
 3       Q.  Okay.  And -- well, let me ask you
 4   this.  At the time of Hurricane Katrina were
 5   you working?
 6       A.  No.
 7       Q.  Were you retired?
 8       A.  Yes.
 9       Q.  Okay.  When was the last time prior
10   to Hurricane Katrina that you had been
11   employed?
12       A.  That I did what?
13       Q.  That you were employed.
14   Approximately.
15       A.  Let me see.  I'm trying to get the
16   years straight here.  I know I was 69 years
17   old when I retired, so subtract that from --
18       Q.  That's around 1999?
19       A.  Yeah.  That should be about right.
20       Q.  Okay.
21       A.  That should be about right, I
22   think.
23       Q.  So for the five years before
24   Hurricane Katrina you had been retired?
25       A.  Yes.
```

Page 51

```
 1       Q.  Okay.  When you were last working
 2   as a CNA where were you working?
 3       A.  Mercy Baptist hospital.
 4       Q.  And approximately how long had you
 5   worked there?
 6       A.  About five years.
 7       Q.  Okay.  And was it always as a CNA?
 8       A.  Yes.
 9       Q.  Okay.  Now, you said your husband
10   passed away in 1979?
11       A.  Yes.
12       Q.  Okay.  And your husband's name was
13   Alton LaBeaud?
14       A.  Excuse me.  Yes.
15       Q.  Okay.  And how old was your husband
16   when he passed away?
17       A.  I think about 62.  About 62.
18       Q.  And was he employed at the time?
19       A.  No.
20       Q.  Where was the last place he had
21   been employed prior to his death?
22       A.  United Van Lines.
23       Q.  And when was his job?
24       A.  Long distance truck driver.
25       Q.  Was he retired at the time of his
```

Page 52

```
 1   death?
 2       A.  Well, no.  He was sick.  He hadn't
 3   retired.
 4       Q.  What illness did he have?
 5       A.  Carcinoma of the liver.  Of the --
 6       Q.  He had cancer?
 7       A.  Yeah.
 8       Q.  And you and Mr. LaBeaud had three
 9   children?
10       A.  Yes.
11       Q.  And you told us a little bit about
12   them.  Do they all live in New Orleans right
13   now?
14       A.  Yes.
15       Q.  All right.  Is Darryl married?
16       A.  Yes.
17       Q.  And where does he live?
18       A.  42nd Street in Kenner.
19       Q.  And does Darryl have any children?
20       A.  No.
21       Q.  And where does Darryl work?
22       A.  Harrah's Casino.
23       Q.  Harrah's?
24       A.  Yes.
25       Q.  Okay.  And Pierre, is Pierre living
```

Page 53

```
 1   in New Orleans?
 2       A.  Yes.
 3       Q.  And where does Pierre live?
 4       A.  141 Torrey Pines.
 5       Q.  Torrey Pines?
 6       A.  Yes.
 7       Q.  Is that across the river?
 8       A.  No.  That's Eastover.
 9       Q.  101 --
10       A.  No.  I said 141.
11       Q.  141 Torrey Pines?
12       A.  Yes.
13       Q.  In Eastover.  And did -- how is
14   Pierre employed?
15       A.  Self employed.
16       Q.  And what type of work does he do?
17       A.  Tile, marble, that sort of thing.
18       Q.  He's a flooring contractor?
19       A.  (Witness nods head.)
20       Q.  And is he married?
21       A.  Yes.
22       Q.  And does he have children?
23       A.  Three.
24       Q.  And Faith Monique lives with you?
25       A.  Yes.
```

                                    14  (Pages 50 to 53)

GLADYS LaBEAUD (LEVEE)                                    7/16/2007

---

Page 54

1    Q.  And is she married?
2    A.  No.
3    Q.  And does she have children?
4    A.  Yes.
5    Q.  How many?
6    A.  One.
7    Q.  And how old is that child?
8    A.  Six.
9    Q.  And what is the child's name?
10   A.  Jasmine.
11   Q.  What is Jasmine's last name?
12   A.  Glass.
13   Q.  Bless?
14   A.  Glass (indicating). G-L-A-S-S.
15   Q.  Okay.  Was Mr. LaBeaud your only
16   marriage?
17   A.  Yes.
18   Q.  And these three children are your
19   only children?
20   A.  Yes.
21   Q.  What is your Social Security
22   number?
23   A.  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.
24   Q.  And do you have a Louisiana
25   driver's license?

Page 55

1    A.  Yes.
2    Q.  Could I see it, please?
3    A.  Yes.  (Indicating).
4    Q.  All right.  Let the record reflect
5    that Miss LaBeaud has provided me with a copy
6    of her Louisiana driver's license bearing
7    number 002544863 with an expiration date
8    12-29-09.  And it was issued on 5-15-2006.
9    Now, Miss LaBeaud, when was your first notice
10   that Hurricane Katrina might strike the New
11   Orleans area?
12   A.  I think it was the Thursday before
13   the storm, I think it was.
14   Q.  All right.  What were your initial
15   actions in response to learning that?
16   A.  Scared.  Thinking what would we do.
17   Q.  And what did you do?
18   A.  We made preparations to -- started
19   making preparations to leave.
20   Q.  When you say we, who are you
21   referring to?
22   A.  Me and my children.
23   Q.  All three of your children?
24   A.  Yeah.
25   Q.  Had you ever left before when a

Page 56

1    hurricane was threatening to hit New Orleans?
2    A.  Yes.
3    Q.  Okay.  And what occasions were
4    that?
5    A.  I think one was Ivan.  I think it
6    was Ivan.  I believe that's right.
7    Q.  Did -- where did you leave when
8    Ivan was threatening to hit New Orleans?
9    A.  We went to Texas.
10   Q.  Went to Texas.  All right.  Now, in
11   the case of Hurricane Katrina did you -- you
12   said you made preparations to leave.
13   A.  Yes.
14   Q.  What type of preparations were
15   those?
16   A.  Started getting clothes, medicine,
17   things that we would -- could take that we
18   would actually need.  And called relatives in
19   Mississippi, so --
20   Q.  You called relatives in
21   Mississippi?
22   A.  Yeah.
23   Q.  And where were those relatives
24   living?
25   A.  Well, a niece in Magnolia,

Page 57

1    Mississippi.  Her house was closer.
2    Q.  That's who you called?
3    A.  Yes.
4    Q.  And did you plan on going to
5    Magnolia, Mississippi?
6    A.  Yes.
7    Q.  And how far is Magnolia from New
8    Orleans?
9    A.  About an hour and a half drive.  I
10   don't know mileage exactly.
11   Q.  Okay.  It is right over the state
12   line?
13   A.  Right over the state line?  I don't
14   really know how far it is over the state
15   line.
16   Q.  Okay.  Did you do anything to your
17   house to secure it?
18   A.  Darryl did whatever he could.  I
19   don't even remember what that was.
20   Q.  Do you know if he boarded it up?
21   A.  I think so.  I don't know.
22   Q.  All right.  And did you leave New
23   Orleans?
24   A.  Yes.
25   Q.  And where did you go?

---

JOHNS PENDLETON COURT REPORTERS                          800 562-1285

Page 58

```
 1      A.  Magnolia, Mississippi.
 2      Q.  You went to Magnolia.  Did all of
 3  your children go with you?
 4      A.  Yes.  Pierre and his family left at
 5  different times, but Darryl and Faith and me
 6  and the baby, we all left together.
 7      Q.  Okay.  So you left with Darryl,
 8  Faith --
 9      A.  And Faith.
10      Q.  -- and your granddaughter.
11      A.  Uh-huh.
12      Q.  Did Darryl's wife go with you?
13      A.  Yes.
14      Q.  Okay.  And what is her name?
15      A.  Patricia.
16      Q.  Patricia?
17      A.  (Witness nods head.)
18      Q.  And you all went to Magnolia,
19  Mississippi?
20      A.  Yes.
21      Q.  And who lived in Magnolia?  You
22  said it was a niece?
23      A.  A niece.
24      Q.  What was her name?
25      A.  Wait a minute.  I'll tell you what
```

Page 59

```
 1  the child's name is.  Felicia.
 2      Q.  Felicia?
 3      A.  Felicia Scott.
 4      Q.  All right.  And did Pierre meet you
 5  afterwards?  Did he go to Magnolia?
 6      A.  I really don't remember.
 7      Q.  Okay.
 8      A.  Where did Pierre went.
 9      Q.  How long did you stay in Magnolia,
10  Mississippi?
11      A.  Two days.
12      Q.  And which two days were those?
13      A.  That was Saturday and -- I think
14  Saturday and Sunday.  I think that's right.
15      Q.  Okay.  And where did you go once
16  you left Magnolia?
17      A.  Natchez, Mississippi.
18      Q.  And why did you leave Magnolia?
19      A.  She had all electric house.  The
20  electricity went out and they didn't have any
21  water.
22      Q.  Was this before the hurricane or
23  was this --
24      A.  It had to -- I would say it was
25  after or during the storm or something.  I
```

Page 60

```
 1  don't know.  When we first went there she had
 2  those things, but then after everything went
 3  out.
 4      Q.  Okay.  And because they went out
 5  and she didn't have water you all went to
 6  Natchez?
 7      A.  Uh-huh.
 8      Q.  Were you in one car?
 9      A.  Yes.
10      Q.  And whose car were you in?
11      A.  Me, Faith and the baby was in her
12  car.
13      Q.  And was --
14      A.  Darryl and his wife was in his
15  truck.
16      Q.  Okay.  And how long did you stay in
17  Natchez?
18      A.  Approximately maybe a month.
19      Q.  A month?
20      A.  Probably something like that.
21      Q.  And where did you stay in Natchez?
22      A.  1234 Martin Luther King Drive.
23      Q.  1234 Martin Luther King Drive?
24      A.  Yes.
25      Q.  And what is that?
```

Page 61

```
 1      A.  It is my sister's home.
 2      Q.  And what type of residence is that?
 3      A.  It's a house.
 4      Q.  It's a house?
 5      A.  Uh-huh.
 6      Q.  Now, was there anybody there --
 7  well, how many people were living in that
 8  house?
 9      A.  Two.
10      Q.  Two?
11      A.  Yes.
12      Q.  Before you all arrived?
13      A.  Her and her husband.
14      Q.  Okay.  So that was where you, your
15  daughter and your granddaughter and Darryl
16  and his wife stayed?
17      A.  No.  Darryl and his wife went to a
18  hotel.
19      Q.  Okay.  Now, you stayed in Natchez
20  approximately a month?
21      A.  Yes.
22      Q.  Okay.  Did you have to pay any
23  rooming expenses while you were in Natchez?
24      A.  No.
25      Q.  Okay.  How were the living
```

GLADYS LaBEAUD (LEVEE)                                      7/16/2007

---

Page 62

1    arrangements in Natchez?
2        A.  Well, she had three bedrooms and
3    we, you know, we were welcome to use those
4    and stuff.
5        Q.  Were you comfortable?
6        A.  Not really.
7        Q.  And when you say not really, what
8    do you mean?
9        A.  Well, it wasn't home, for one
10   thing, and with all the other stuff going on,
11   it was just -- it is hard to explain.
12       Q.  Okay.  How long did it take you to
13   get from Magnolia to Natchez?
14       A.  Between I guess an hour and a half,
15   maybe two hours, something like that.
16       Q.  You didn't have any problems with
17   the traffic?
18       A.  No.
19       Q.  Now, after you left Natchez where
20   did you go?
21       A.  Texas.
22       Q.  Why did you leave Natchez?
23       A.  It was difficulty living with my
24   sister.
25       Q.  Okay.  And what was the difficulty?

---

Page 63

1        A.  Well, some of the habits that she
2    had and things, I really didn't even feel
3    welcome.  Even under the circumstances.  I
4    knew we couldn't stay there indefinitely, so
5    Darryl made some arrangements for us to go to
6    Texas, so we went.
7        Q.  Okay.  And where in Texas did you
8    go?
9        A.  Well, first we stayed at a hotel,
10   one of the Drury Inns.
11       Q.  And what city in Texas was that?
12       A.  Rosenberg.
13       Q.  Did you pick Rosenberg, Texas for
14   any particular reason?
15       A.  No.  He did.  Pierre did.
16       Q.  Pierre did?
17       A.  Yes.
18       Q.  Okay.  Now, had Pierre gone to
19   Texas?
20       A.  Had he gone?
21       Q.  Yes.
22       A.  Yes.
23       Q.  Okay.  Did Pierre ever go to
24   Natchez?
25       A.  I don't know.  I don't remember.

---

Page 64

1        Q.  Okay.  But it was Pierre's decision
2    that the family would go to Rosenberg, Texas?
3        A.  Yeah.
4        Q.  And did Darryl go also?
5        A.  Yes.
6        Q.  Okay.  And you said initially you
7    had a room in a Drury Inn?
8        A.  Yes.
9        Q.  And how long were you there?
10       A.  About a month.
11       Q.  A month?
12       A.  (Witness nods head.)
13       Q.  Did you have to pay for the room?
14       A.  No.
15       Q.  Okay.  Who paid for it?
16       A.  I think the Red Cross did.
17       Q.  All right.  Were you in the room by
18   yourself?
19       A.  No.  I just shared with my daughter
20   and the grandchild.
21       Q.  And did your son stay at the same
22   hotel?
23       A.  Yes.
24       Q.  Okay.  Were there other people from
25   the New Orleans area that were at the hotel?

---

Page 65

1        A.  Yes.
2        Q.  And you said you were in the Drury
3    Inn for approximately one month?
4        A.  Yes.
5        Q.  And how was your stay there, were
6    you comfortable?
7        A.  It was okay under the
8    circumstances.
9        Q.  All right.  And after one month did
10   you leave the Drury Inn?
11       A.  Yes.
12       Q.  And where did you go from there?
13       A.  It was an apartment, an apartment
14   building.  What was the name of the place?
15       Q.  Was that in Richmond, Texas?
16       A.  Yes.
17       Q.  So you went from the Drury Inn to
18   an apartment in Richmond, Texas?
19       A.  Yes.
20       Q.  And who paid for that apartment?
21       A.  Well, actually, I paid for it out
22   of my pocket.  They weren't -- they wouldn't
23   accept FEMA's help, so -- and that's about,
24   at that time, that was the only decent thing
25   we could find, so --

---

GLADYS LaBEAUD (LEVEE)                                    7/16/2007

Page 70

1    Q.  And why is that?
2    A.  They said they didn't want to get
3  involved in the government's affairs because
4  they would have to take, probably take in a
5  group of people that they didn't want in the
6  building.  So that was their policy.
7    Q.  Okay.  Okay.  Now, did your other
8  two or did your two sons also stay at that
9  apartment complex?
10   A.  Pierre did.
11   Q.  Okay.  And what about Darryl?
12   A.  Darryl, he had another apartment in
13 another place in the city.
14   Q.  Okay.  And when you say the city,
15 you are referring to Houston?
16   A.  No.  Rosenberg.
17   Q.  Okay.  And where is Rosenberg,
18 Texas?
19   A.  About -- excuse me -- twenty miles
20 south of Houston.
21   Q.  Okay.  All right.  Now, how would
22 you describe the life in the apartment?
23   A.  Well, it was comfortable.  It was
24 quiet.
25   Q.  Was the apartment nice?

Page 71

1    A.  Yes.
2    Q.  How would you compare it to your
3  house on Industry Street?
4    A.  No comparison.
5    Q.  No comparison?
6    A.  No place like home.
7    Q.  Okay.  All right.  And you stayed
8  in the apartment for six months?
9    A.  From some part of October in 2005
10 until the 23rd of June, 2007.
11   Q.  So you stayed from October 2005
12 until June of 2007?
13   A.  Yes.
14   Q.  And then you moved back to New
15 Orleans?
16   A.  Yes.
17   Q.  Okay.  And you moved into the
18 apartment on South Jeff Davis?
19   A.  Yes.
20   Q.  Okay.  And during that time, from
21 October 2005 to June 2007 you were living in
22 the apartment with your daughter and your
23 granddaughter?
24   A.  Yes.
25   Q.  Okay.  Did your granddaughter

Page 72

1  attend school in, was it in Rosenberg or
2  Richmond?  In Richmond, Texas?
3    A.  Yeah.
4    Q.  Okay.  Did she enjoy the school in
5  Richmond?
6    A.  Yes.
7    Q.  How did you find that the school
8  compared to the schools in New Orleans?
9    A.  Better.
10   Q.  The school in Richmond was better?
11   A.  (Witness nods head.)
12     MR. JOANEN:
13       You have to answer yes.  The court
14       reporter has to take it down.
15     THE WITNESS:
16       Yes.
17 EXAMINATION BY MR. GARDNER:
18   Q.  Now, when you were living in
19 Richmond, Texas did you attend church in
20 Texas?
21   A.  Yes.
22   Q.  And which church did you attend?
23   A.  Most times Joel Osteen.
24   Q.  Joel Osteen?
25   A.  Yes.

Page 73

1    Q.  What kind of --
2    A.  Lakewood Church.
3  Interdenominational.
4    Q.  That has a large congregation?
5    A.  One of the largest.
6    Q.  Yes.  Did you like that church?
7    A.  Yes.
8    Q.  Okay.  Did you celebrate your
9  holidays in Richmond or someplace else?
10   A.  Richmond.
11   Q.  Okay.  Was your whole family there
12 for the holiday?  For Christmas, for
13 instance?  Let me ask you this.  Where did
14 you celebrate Christmas in 2005?
15   A.  At my daughter-in-law's relatives
16 we had dinner.
17   Q.  And where was that?
18   A.  At her house in Richmond.
19   Q.  Is this daughter-in-law, this is
20 Pierre's wife?
21   A.  Yes.
22   Q.  And how was that celebration?
23   A.  Good.  It was nice.
24   Q.  And did you celebrate Christmas in
25 2006 in Richmond?

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

GLADYS LaBEAUD (LEVEE)                                        7/16/2007

Page 74

1      A.  Yes.
2      Q.  And where was that?
3      A.  We went out to dinner.
4      Q.  And how was that?
5      A.  It was okay.
6      Q.  Prior -- well, prior to June 2007
7   had you come back to New Orleans to visit?
8      A.  Yes.
9      Q.  Okay.  When was the first time you
10  came back?
11     A.  I don't remember exactly.  About,
12  maybe about three, between three, two and
13  three months, something like that.
14     Q.  Two and three months after the
15  storm?
16     A.  I think so.  Something.
17     Q.  And why did you come back?
18     A.  Well, I wanted to see what kind of
19  shape the house was in.
20     Q.  Okay.  Had you spoken to anybody
21  who had seen the house --
22     A.  Yeah.
23     Q.  -- before you went back?
24     A.  (Witness nods head.)
25     Q.  Who had seen the house?

Page 75

1      A.  Both of my sons.
2      Q.  Okay.  And what did they tell you?
3      A.  What condition it was in.  They
4   were -- they were hesitant about me coming
5   down to see it because they didn't know how I
6   was going to take it, so that's why it took
7   me so long to come back, but eventually I
8   did, so --
9      Q.  Okay.  And so you said two to three
10  months after the storm you came back?
11     A.  Something like that, yeah.
12     Q.  And how did you come back?  Did you
13  drive?
14     A.  No.  They -- let me see.  The first
15  time I came back Darryl drove me.  Yeah.
16     Q.  Okay.  And were you living in Texas
17  when you came back?
18     A.  Yeah.
19     Q.  All right.  And when you came back
20  to New Orleans you went to visit your house?
21     A.  Yes.
22     Q.  And where did you stay in New
23  Orleans when you came back to visit?
24     A.  We stayed at a hotel somewhere
25  around Canal Street.

Page 76

1      Q.  Okay.  And you went to visit your
2   house?
3      A.  Yes.
4      Q.  Okay.  And what was the condition?
5      A.  Terrible.
6      Q.  What was the condition of the
7   street, of Industry Street?
8      A.  Deplorable.
9      Q.  When you say deplorable, what do
10  you mean?
11     A.  It just -- it just looked like a
12  different color.  Debris and -- it just
13  looked like you are in another place or
14  something.
15     Q.  There was debris in the streets?
16     A.  Yeah.
17     Q.  Did you have any trouble driving
18  down the streets?
19     A.  Some.
20     Q.  Okay.
21     A.  Stop sign every corner.
22     Q.  What about the stop signs?
23     A.  Stop sign every corner.
24     Q.  Stop signs at every corner?
25     A.  Yeah.

Page 77

1      Q.  All right.  The 1700 block of
2   Industry Street, what are the streets that
3   form the boundary of that block?
4      A.  North Broad, Bruxelles.  The
5   streets there sort of, they went kind of
6   crazy.  If -- you, you, you --
7      Q.  It runs at an angle?
8      A.  You could say that.
9      Q.  Which street runs at an angle,
10  North Broad or Bruxelles?
11     A.  Okay.  Let me see if I can -- if
12  this -- (indicating).  My house would be say
13  about here, two blocks off of North Broad.
14     Q.  Okay.
15     A.  So I'm bounded by Broad on one side
16  and Republic on the other.
17     Q.  Okay.  Why don't you draw a line
18  showing where Broad is, where Broad
19  intersects with Industry.
20     A.  Okay.  Like I said, this is Broad
21  right here and this is Republic and this is
22  Industry here (indicating).  This street is
23  coming back toward Canal Street here,
24  Republic.
25     Q.  Okay.

                              20  (Pages 74 to 77)

GLADYS LaBEAUD (LEVEE)                                    7/16/2007

Page 78

1     A.  And Industry runs into it, you see
2  (indicating).
3     Q.  Oh, Industry intersects North Broad
4  and Republic?
5     A.  Right.
6     Q.  Okay.  And you live in between
7  those two streets?
8     A.  Yes.
9     Q.  And you are about two blocks off of
10  North Broad?
11     A.  No.  I'm two houses from North
12  Broad.
13     Q.  All right.  So you are in the block
14  between Republic and North Broad?
15     A.  Yes.
16     Q.  On --
17     A.  On Industry.
18     Q.  Okay.
19     MR. JOANEN:
20     Do you want to attach this?
21     MR. GARDNER:
22     That's fine.
23     MR. JOANEN:
24     D?
25     MR. GARDNER:

Page 79

1     Four.  The photographs are 3.
2  EXAMINATION BY MR. GARDNER:
3     Q.  And when you first went to the
4  house did you take any photographs?
5     A.  No.
6     Q.  You produced some photographs here
7  this morning.  Were those taken at the time
8  of your first visit?
9     A.  Darryl had already taken those.
10     Q.  Okay.  So those picture --
11     A.  Before I went back.
12     Q.  So those pictures had been taken
13  before you arrived?
14     A.  (Witness nods head.)
15     Q.  Alll right.  When you saw your
16  house was there any indication from the
17  outside that it had been damaged?
18     A.  You could see a water line on the
19  outside of the house.  Evidently the water
20  must have sat there for quite awhile.
21     Q.  Okay.  Was there any damage to the
22  roof?
23     A.  Not that I could see.
24     Q.  Did your house have any gutters on
25  it?

Page 80

1     A.  Yes.
2     Q.  Were the gutters blown off?
3     A.  One -- two had fallen off some kind
4  of way.
5     Q.  Was there any damage to the vinyl
6  siding?
7     A.  Not that I could see.
8     Q.  Were -- what type of roofing
9  material was on your roof?
10     A.  I really don't know.
11     Q.  Okay.  Did you see any pieces of
12  roof on the ground, roof material on the
13  ground?
14     A.  No.
15     Q.  Okay.  Was any of the debris that
16  was in front of your house, was it any, was
17  it any -- part of your, the building of your
18  house, in other words, were there any pieces
19  of your house that had been blown off?
20     A.  I couldn't tell.
21     Q.  Did your house have a chimney?
22     A.  Yes.
23     Q.  Was the chimney intact or had it
24  had any damage?
25     A.  I don't know.

Page 81

1     Q.  Were there any trees on your
2  property?
3     A.  Yes.
4     Q.  Were those trees still standing?
5     A.  Yeah.  It fell down later.  Yes.
6     Q.  Okay.  Was there any tree branches
7  that were on your house?
8     A.  I don't know.
9     Q.  Was there any indication that any
10  tree branches had hit your house or damaged
11  it?
12     A.  I don't -- I don't know.
13     Q.  Was there any indication that any
14  flying debris had hit your house or damaged
15  your house?
16     A.  No.
17     Q.  Were there any large pieces of
18  debris on your property that had been, you
19  know, had been left there after the storm?
20     A.  I don't remember.
21     Q.  Okay.  Was the front door of your
22  house opened?
23     A.  I don't think so.
24     Q.  Was your house marked by the
25  National Guard?

21 (Pages 78 to 81)

GLADYS LaBEAUD (LEVEE)                                    7/16/2007

Page 82

1     A.  I don't remember if it was marked
2  then or the second time I went back.  I
3  really don't remember.
4     Q.  Okay.  Now, you said there was a
5  water line on the side of the house?
6     A.  Uh-huh.
7     Q.  And about how high off the ground
8  was the water line?
9     A.  I'd say about four feet.  Maybe
10 five.  I don't know.
11    Q.  Okay.  And how far off the ground
12 did your house sit?
13    A.  I think three feet something.  I'm
14 not sure.
15    Q.  Okay.  Did you go inside the house?
16    A.  Yes.
17    Q.  Okay.  And what was the condition
18 inside the house?
19    A.  The odor was terrible.  The carpet,
20 the sofa was a different color.  I remember I
21 had taken a Hoover and sit it up on the sofa.
22 I don't know what I was thinking, to keep
23 from getting wet or something, but anyway,
24 all the bedding was a different color.
25 Everything -- it sort of reminded you of

Page 83

1  this, tabletop and chairs.
2        VIDEOGRAPHER:
3        Excuse me.  Why don't we go off the
4        record to change tapes.
5     MR. GARDNER:
6        Okay.  Why don't we take a break.
7        (OFF THE RECORD)
8        (RECESS TAKEN AT 10:49 A.M.)
9     VIDEOGRAPHER:
10       We're now back on the record.
11       (ON THE RECORD AT 11:00 A.M.)
12 EXAMINATION BY MR. GARDNER:
13    Q.  Miss LaBeaud, did you tell me there
14 were or were not trees on your lot?
15    A.  I think you asked me if I had seen
16 any fallen trees, right?
17    Q.  Yeah, but let me ask you the
18 question again.  Were there any trees on your
19 lot before Hurricane Katrina?
20    A.  Yes.
21    Q.  Okay.  And how big were those
22 trees?
23    A.  Maybe three feet in diameter.  Very
24 tall.  I don't know how tall.
25    Q.  Okay.  And after the storm were

Page 84

1  there branches of the trees on your house?
2     A.  I don't know.
3     Q.  Okay.  Were there branches of the
4  trees -- I mean, did the trees appear that
5  they had been damaged in the storm?
6     A.  Not then.
7     Q.  Okay.  Not then?  Did they at a
8  later date?
9     A.  (Witness nods head.)  Yes.
10    Q.  And when was that?
11    A.  I don't know exactly.
12    Q.  Okay.
13    A.  Sometime later.
14    Q.  Now, the pictures that we
15 identified as Exhibit 3, these pictures were
16 taken before you visited the house?
17    A.  I think so.
18    Q.  Was -- did the house appear
19 to you to be in a different condition when
20 you saw it than it was in these pictures?
21    A.  Um --
22    Q.  Let me rephrase the question.  Do
23 these pictures show how the house looked when
24 you first saw it?
25    A.  Yeah.

Page 85

1     Q.  Okay.  Let me see if I could ask
2  you if you could find a photograph that shows
3  the water line that you talked about.
4     A.  Well, this is what seems to be a
5  water line here (indicating).
6     Q.  Okay.  And why don't we go ahead
7  and mark this photograph that you're
8  referring to as 3A.
9        MR. GARDNER:
10       Can I do that?
11       MR. JOANEN:
12       3.
13       MR. GARDNER:
14       I'm going to call it 3A.
15       MR. JOANEN:
16       Okay.
17 EXAMINATION BY MR. GARDNER:
18    Q.  Right there (indicating).  Did you
19 see any photograph that showed the water line
20 inside the house?
21    A.  Not that I could really see.
22    Q.  Well, let me show you one I saw.
23 Does this photograph show a water line as far
24 as you're concerned inside the house
25 (indicating)?

22 (Pages 82 to 85)

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

GLADYS LaBEAUD  (LEVEE)                                    7/16/2007

Page 94

```
 1   television?
 2       A.  No.
 3       Q.  Now, did you ever have the house
 4   gutted after Hurricane Katrina?
 5       A.  Yes.
 6       Q.  Is the house, is it presently being
 7   repaired?
 8       A.  We -- no.  We're waiting on
 9   somebody to do elevation.
10       Q.  Okay.  Somebody to do flood
11   elevation?
12       A.  Elevation.
13       Q.  All right.  Now, you said you went
14   back to the house a second time?
15       A.  Yes.
16       Q.  How often do you go back to the
17   house?  Before you returned to New Orleans
18   how often did you go back to the house?
19       A.  Three times.
20       Q.  Three times.  Was there any change
21   in the condition in the different times you
22   went back?
23       A.  Not really.
24       Q.  Was there ever -- was there ever
25   any indication that your house had been
```

Page 95

```
 1   looted?
 2       A.  No.  No more than, I guess, you
 3   could say people used the water until I had
 4   that cut off.
 5       Q.  Okay.  What about Darryl's
 6   apartment, did anyone loot Darryl's
 7   apartment?
 8       A.  No.
 9       Q.  Okay.  When you went back the first
10   time did you see any of your neighbors?
11       A.  The first time.  Yes.  Yes.
12       Q.  Were any of your neighbors living
13   in their houses?
14       A.  No.
15       Q.  What were they doing when you saw
16   them?
17       A.  Some of them had the trailers.
18       Q.  Moving furniture?
19       A.  No.  They, you know, the white
20   trailers.
21       Q.  Oh, the FEMA trailers?
22       A.  The FEMA trailers.
23       Q.  Okay.  All right.  So you had
24   neighbors that were living on the property.
25       A.  Uh-huh.
```

Page 96

```
 1       Q.  Okay.  When you went back the first
 2   time were there any blue roofs on the houses
 3   in your neighborhood?
 4       A.  Not that I recall.
 5       Q.  Do you know what I mean when I saw
 6   blue roof?
 7       A.  I think so.  Repairing the roof.
 8       Q.  Yeah.  What were the conditions of
 9   the other houses on your block?  Was it the
10   same as yours?
11       A.  I don't really know.  I don't
12   really know.
13       Q.  Okay.  And you said a moment ago
14   that you all had gutted your house?
15       A.  Yes.
16       Q.  Did you gut the whole house?
17       A.  Yes.
18       Q.  Okay.  And when was the gutting
19   done?
20       A.  Sometime last -- was it July?  I
21   think it was sometime last year.  I think so.
22       Q.  July of 2006?
23       A.  I think it was later than that.
24   I'm not certain about the dates.
25       Q.  Okay.  Who -- did you hire someone
```

Page 97

```
 1   to do the gutting?
 2       A.  My son Pierre did.  He hired
 3   someone to do it.
 4       Q.  Okay.  Do you know how much it cost
 5   to gut your house?
 6       A.  No.
 7       Q.  Okay.  Did they -- how much -- did
 8   you have Sheetrock or did you have plaster in
 9   your house?  Were the walls Sheetrock or
10   plaster?
11       A.  Excuse me.  That's my daughter.
12       MR. GARDNER:
13       Miss LaBeaud is taking a phone
14       call.
15       MR. JOANEN:
16       Off the record.
17       VIDEOGRAPHER:
18       Off the record.
19       (TIME IS NOW 11:40 A.M.)
20       VIDEOGRAPHER:
21       We're back on the record.
22       (TIME IS NOW 11:41 A.M.)
23   EXAMINATION BY MR. GARDNER:
24       Q.  Miss LaBeaud, you said your son
25   Pierre hired someone to gut the house?
```

25  (Pages 94 to 97)

GLADYS LaBEAUD (LEVEE)                                    7/16/2007

Page 98

1    A.  Yes.
2    Q.  And did you pay for the gutting?
3    A.  No.
4    Q.  Do you know how much it cost?
5    A.  No.
6    Q.  And I asked you if there was
7    Sheetrock or plaster on the walls in your
8    house.  Do you know the answer to that?
9    A.  Sheetrock.
10    Q.  Okay.  Do you know how high off the
11   floor the Sheetrock was removed or was it the
12   entire wall removed?
13    A.  The entire wall.
14    Q.  All the way to the ceiling?
15    A.  Yes.
16    Q.  Okay.  Were the ceilings removed?
17    A.  Yes.
18    Q.  Okay.  Before the ceilings were
19   removed did you see any water spots on them?
20    A.  No.  No.
21    Q.  I mean, do you remember one way or
22   the other if there were water spots?
23    A.  No, I don't remember.
24    Q.  Okay.  Had any of the ceilings
25   collapsed?

Page 99

1    A.  Yes.
2    Q.  Okay.  And in which rooms had the
3   ceilings collapsed?
4    A.  Both the living rooms.
5    Q.  Both the living rooms on your side
6   and on Darryl's side?
7    A.  Yeah.
8    Q.  And is that the first room when you
9   open the front door?
10    A.  Yes.
11    Q.  Okay.  And when the ceilings had
12   collapsed could you see daylight through the
13   ceiling?
14    A.  No.
15    Q.  Okay.  Could you see water dripping
16   out of the ceiling?
17    A.  No.
18    Q.  How big of an area of the ceiling
19   collapsed?
20    A.  Some of the -- I don't know, some
21   of the big boards up there, I don't know what
22   you call them, but it looked like --
23    Q.  You could see them?
24    A.  -- about three or four different
25   areas though.

Page 100

1    Q.  Okay.  You could see the joists in
2   the ceiling?
3    MR. JOANEN:
4    If I could just object.  When you
5    said the area that had collapsed, I
6    thought she said there was falling
7    down in both sides.
8    MR. GARDNER:
9    Right.
10    MR. JOANEN:
11    So I'm kind of confused now whether
12    she is talking about her side or
13    her son's side.
14   EXAMINATION BY MR. GARDNER:
15    Q.  All right.  Let's talk about your
16   side for a second.  The area in the living
17   room that had collapsed, how big was it?  In
18   the ceiling?
19    MR. JOANEN:
20    The living room in her side?
21    MR. GARDNER:
22    In her side.
23    THE WITNESS:
24    It looked like some of the boards
25    up there had fallen down.  I don't

Page 101

1    really remember.
2   EXAMINATION BY MR. GARDNER:
3    Q.  Okay.  But you could -- part of the
4   ceiling were missing?
5    A.  I could see the boards where they
6   had fallen.
7    Q.  Okay.  Okay.  And what about in
8   Darryl's apartment, was the situation the
9   same?
10    A.  About.
11    Q.  Now, other than gutting the house,
12   have there been any steps to repair it as of
13   today?
14    A.  Well, my son Pierre gotten permits.
15    Q.  Has any work begun?
16    A.  No.
17    Q.  Have you all received an estimate
18   on the amount of money it's going to cost to
19   repair the damage?
20    A.  Yes.
21    Q.  And what -- who performed that
22   estimate or who prepared the estimate?
23    A.  The insurance company.
24    Q.  Okay.  So the insurance company
25   sent an appraiser out to do an appraisal?

26 (Pages 98 to 101)

GLADYS LaBEAUD (LEVEE)                                    7/16/2007

Page 102

```
 1      A.  No.  This was -- this was one of
 2 the people that worked for the insurance.  It
 3 was an estimate about what it would cost to
 4 repair the house.
 5      Q.  All right.  And what -- how much
 6 did that estimate show?
 7      A.  Approximately 161,000 some odd.
 8      Q.  One hundred sixty-one thousand?
 9      A.  Yes.
10      Q.  And that's just to repair the
11 house?
12      A.  Yes.
13      Q.  Okay.  And did you -- do you have a
14 copy of that estimate?
15      A.  Yes.
16      Q.  And that's at your house?
17      A.  Yes.
18      Q.  And who prepared it?
19      A.  A State Farm agent.
20      Q.  Okay.  And State Farm was your
21 insurance carrier?
22      A.  Yes.
23      Q.  Did you make a claim with State
24 Farm for flood damages?
25      A.  Yes.
```

Page 103

```
 1      Q.  Okay.  And did you receive any
 2 money from State Farm?
 3      A.  Yes.
 4      Q.  And how much was that?
 5      A.  $120,100.
 6      Q.  Okay.  And you have a record of
 7 what you received from State Farm in your
 8 records at your home?
 9      A.  Okay.  Now, did you make a claim
10      Q.  Okay.  Now, did you make a claim
11 for damages to the contents of your
12 apartment?  When I say apartment, I'm
13 referring to your house, too.
14      A.  That -- wait a minute.  Let me see.
15 I was trying to think if that included the
16 contents.  I'm not exactly sure.  I would
17 have to look at that again.
18      Q.  Okay.  Did you ever have an
19 estimate done on the contents that you lost,
20 an estimate of the value?
21      A.  Yeah.  Yes.
22      Q.  Okay.  Did you -- and who prepared
23 that estimate?
24      A.  State Farm.
25      Q.  Okay.  And did they place a value
```

Page 104

```
 1 on the contents that was damaged?
 2      A.  Well, as I said, they made an
 3 estimate of what it would cost to repair the
 4 house.
 5      Q.  Okay.  But what about the items
 6 inside the house?
 7      A.  No.
 8      Q.  Okay.  Did you ever prepare a list
 9 of all the items inside your house that were
10 damaged?
11      A.  No.
12      Q.  Okay.  Did you ever make a claim
13 for the items inside your house that were
14 damaged?
15      A.  No.
16      Q.  Okay.  Do you have an opinion as to
17 the value of the items inside your house that
18 were damaged?
19      A.  I have an opinion, yes.
20      Q.  Okay.  And what is that?
21      A.  I'd say approximately about a
22 hundred thousand dollars.
23      Q.  Okay.  And that's just the
24 contents?
25      A.  Yes.
```

Page 105

```
 1      Q.  Okay.  Do you know if Darryl had
 2 any insurance on the contents of his
 3 apartment?
 4      A.  I don't know.
 5      Q.  Okay.  Do you know if Darryl made a
 6 claim with any insurer for the contents of
 7 his apartment?
 8      A.  I don't know.
 9      Q.  Okay.  But the total amount you
10 received from State Farm was $120,100?
11      A.  (Witness nods head.)
12      Q.  Yes?
13      A.  Yes.
14      Q.  Okay.  And did you receive any
15 other insurance payments?
16      A.  Homeowner's.
17      Q.  You did get some money from the
18 homeowner's?
19      A.  Yes.
20      Q.  And State Farm was the homeowner's?
21      A.  Yes.
22      Q.  And how much money did you get from
23 State Farm?
24      A.  That was a little better than ten
25 thousand.
```

27 (Pages 102 to 105)

GLADYS LaBEAUD (LEVEE)                                    7/16/2007

Page 106

1    MR. PATE:
2    What was the number again?
3    MR. JOANEN:
4    Ten thousand.
5    EXAMINATION BY MR. GARDNER:
6    Q.  And do you know what the
7    homeowner's payment was for, what part of the
8    damage?
9    A.  They claim, I think, wind.  I
10   believe that's right.
11   Q.  Okay.  Do you -- what wind damage
12   are you aware of that you had to your house?
13   A.  Some of the shingles came off in
14   the back.
15   Q.  Okay.  And those are shingles on
16   the roof?
17   A.  Yes.
18   Q.  Did you have a garage --
19   A.  No.
20   Q.  -- on your property?  Did you have
21   a utility shed?
22   A.  Yes.
23   Q.  Okay.  And was it in the backyard?
24   A.  Yes.
25   Q.  Okay.  And what was its condition

Page 107

1    after the hurricane?
2    A.  It seemed to be okay.
3    Q.  How big was the utility shed?
4    A.  A little smaller than half the size
5    of this room I would say.
6    Q.  Half the width or the length?
7    A.  I'd say the width probably.
8    Q.  Okay.  All right.  Are there any
9    pictures of the utility shed in your
10   pictures?
11   A.  I think so.  I think I saw one.
12   Q.  All right.  Could you see if I
13   could find one for me.
14   A.  I don't see it now.
15   Q.  Okay.  Do you remember seeing it
16   when you looked the first time?
17   A.  I think I did.
18   Q.  All right.  We'll come back to
19   that.  But the utility shed appeared to be in
20   good shape after the storm?
21   A.  Yes.
22   Q.  Okay.  Did you have any broken
23   windows in your house?
24   A.  No.  No.
25   Q.  And I'm talking about when you saw

Page 108

1    it after the storm.
2    A.  No.
3    Q.  Other than the estimate that you
4    referred to that you thought State Farm had
5    performed regarding the damages to your
6    house, did you or any of your sons get an
7    estimate on the repairs to the house?
8    A.  No.
9    Q.  Okay.  Do you plan on moving back
10   into the house?
11   A.  I'd like to.
12   Q.  Okay.  Did you ever form an opinion
13   as to where the water came from that flooded
14   your house?
15   A.  Form an -- no.
16   Q.  Okay.  Do you have any idea how
17   long the water was in your house?
18   A.  About two weeks.
19   Q.  Okay.  Why do you say that?
20   A.  Well, I was told by some of the
21   neighbors that, you know, they would come
22   around looking and they could see where the
23   water had just come to a standstill in
24   certain places.
25   Q.  Okay.  And which neighbors were

Page 109

1    those?
2    A.  Some of the people that lived in
3    the area.
4    Q.  Okay.  Do you remember their names?
5    A.  Not really.
6    Q.  Okay.  Did you ever see any
7    pictures of the water in the neighborhood?
8    A.  No.
9    Q.  Okay.  And when you went out to
10   your house on later visits did you take any
11   additional photographs?
12   A.  No.
13   Q.  Okay.  Did your neighbors ever tell
14   you how high the water got in your
15   neighborhood?
16   A.  No.
17   Q.  Okay.  And you never -- did you
18   ever form an opinion as to how high the water
19   got?
20   A.  Well, from some of the houses I
21   could see some was higher, you know, the line
22   on the outside because a lot of the houses
23   around there are painted white.  You know,
24   you could see that streak around the house,
25   so evidently it was high in some places than

28 (Pages 106 to 109)

GLADYS LaBEAUD (LEVEE)                                          7/16/2007

Page 114

1    A.  No.
2    Q.  All right.  Now, let's look at the
3  Form 95 (indicating).  Miss LaBeaud, that,
4  I'm going to ask you to look at Exhibit 1,
5  which is a copy of the Form 95 which you
6  produced this morning.  Do you recognize
7  that?
8    A.  This, yes.
9    Q.  Okay.  Is the handwriting on the
10  form, is that your handwriting?
11    A.  Yes.
12    Q.  Okay.  Did you complete it?  Did
13  you fill out the form?
14    A.  Yes.
15    Q.  Okay.  You filled out the
16  handwritten portions of the form?
17    A.  Yes.
18    Q.  All right.  Do you know who filled
19  out the typewritten portions of the form?
20    A.  No.
21    Q.  When you completed this form were
22  you living in Texas?
23    A.  Yes.
24    Q.  How did you get the form?
25    A.  Through the mail.

Page 115

1    Q.  Do you know who sent it to you?
2    A.  Bruno & Bruno attorneys.
3    Q.  Okay.  Do you know if they
4  completed the typed portion of the form?
5    A.  I don't know it.  I believe it.
6    Q.  Okay.  On -- under property damage,
7  section 12 A, it has $100,000.
8    A.  Yeah.
9    Q.  Okay.  Did you complete that?
10    A.  Yes.
11    Q.  Okay.  And did you indicate that
12  your property damage claim was $100,000?
13    A.  Yes.
14    Q.  Okay.  And do you think that's
15  correct?
16    A.  Approximately, yes.
17    Q.  Okay.  Now, you didn't indicate any
18  amount under personal injury.
19    A.  Yes.
20    Q.  Okay.  Are you making a personal
21  injury claim in this case?
22    A.  No.
23    Q.  The phone number that's there, the
24  281 number, is that your number in Richmond,
25  Texas?

Page 116

1    A.  It was.
2    Q.  And on the second page, the
3  insurance information, is that the State Farm
4  policy that we were just referring to?
5    A.  Second page.
6    MR. JOANEN:
7    It is this one right here
8    (indicating).
9    THE WITNESS:
10    Yes.
11  EXAMINATION BY MR. GARDNER:
12    Q.  Okay.  Is this the only form you've
13  completed for the Corps of Engineers?
14    A.  I believe so.
15    Q.  Okay.  Do you know if Darryl made a
16  claim with the Corps of Engineers?
17    A.  I don't know.
18    Q.  Okay.  Have you made a, any claims
19  with FEMA?
20    A.  No.
21    Q.  Did you receive any money from
22  FEMA?
23    A.  Yes.
24    Q.  Okay.  And what did you receive?
25    A.  Twenty -- about -- I think about

Page 117

1  25,000.
2    Q.  Okay.  And did you receive any
3  money from the Red Cross?
4    A.  Some, yes.
5    Q.  You said you received twenty-five
6  thousand from FEMA?
7    A.  Yes.
8    Q.  And how much did you receive from
9  the Red Cross?
10    A.  I don't remember.
11    Q.  Okay.  And what was the $25,000
12  that you received from FEMA for?
13    A.  Housing and -- housing and I think
14  it was clothing that was for me and the two
15  children that lived with me.
16    Q.  Okay.  Did the $25,000 cover all of
17  your rental expenses in Texas?
18    A.  Yes.
19    Q.  So it covered all of your rental
20  expenses, and plus it allowed you and your
21  daughter and granddaughter to buy some new
22  clothes?
23    A.  Yeah.
24    Q.  And have you made a claim with the
25  Road Home program?

JOHNS PENDLETON COURT REPORTERS                          800 562-1285

Page 118

```
 1      A.  Yes.
 2      Q.  Okay.  Have you gotten a response?
 3      A.  Yes.
 4      Q.  And what was the response?
 5      A.  They said we were -- I was
 6  eligible.
 7      Q.  Okay.  Did you -- have you received
 8  any money from the Road Home program?
 9      A.  Yes.
10      Q.  How much have you received?
11      A.  Seventy thousand eight hundred and
12  ninety-nine dollars and I think six cents.
13         MR. PATE:
14             What was the number?
15  EXAMINATION BY MR. GARDNER:
16      Q.  I think Miss LaBeaud has it
17  memorized.  What's the number?
18      A.  $70,899.06.
19      Q.  Have you made -- and is that the
20  entire amount you are eligible to receive
21  from the Road Home program?
22      A.  Is that the entire amount I was
23  eligible to receive?
24      Q.  Yes.
25      A.  No.
```

Page 119

```
 1      Q.  Okay.  But do you anticipate
 2  getting anymore?
 3      A.  Anticipate, yes.
 4      Q.  Have you received the $70,899.06?
 5      A.  Yes.
 6      Q.  And how much more do you anticipate
 7  getting?
 8      A.  Thirty thousand.
 9      Q.  And why -- why do you anticipate
10  getting the thirty thousand?
11      A.  Because for the total grant that I
12  was eligible for came to the seventy that I
13  just mentioned plus the thirty for elevation.
14  And that came to that particular amount.
15      Q.  And the thirty thousand dollars is
16  to raise your house?
17      A.  Yes.
18      Q.  Okay.  Do you plan on doing that?
19      A.  Yes.  They said it is compulsory.
20      Q.  And the $70,899.06 is for what?
21      A.  The correct word I don't remember
22  right now, but --
23      Q.  Okay.  But is that for repairs to
24  your home?
25      A.  As I say, I really -- I'm not sure
```

Page 120

```
 1  about --
 2      Q.  Okay.  Well, do you plan on using
 3  that to repair your home?
 4      A.  Yes.
 5      Q.  Okay.  And you plan on elevating
 6  your home?
 7      A.  Yes.
 8      Q.  And throughout this deposition I've
 9  referred to 1708 Industry as your home and
10  your apartment, and you realize I was talking
11  about the same thing?
12      A.  Yes.
13      Q.  Okay.  Have you applied for an SBA
14  loan?
15      A.  No.
16      Q.  All right.  Have you completely
17  resolved your flood insurance claim with your
18  insurer?
19      A.  Yes.
20      Q.  I mean, do you believe you are owed
21  any additional sums?
22      A.  No.
23      Q.  Okay.  Now, are all of your
24  children back in New Orleans?
25      A.  Yes.
```

Page 121

```
 1      Q.  Okay.  Do you have any other
 2  brothers or sisters who live in New Orleans?
 3      A.  No.
 4      Q.  Did Mr. LaBeaud have any other
 5  siblings here?
 6      A.  Yes.
 7      Q.  Okay.  Do you have contact with
 8  them?
 9      A.  She's passed, too.  One sister.
10      Q.  Just one sister?
11      A.  Yes.
12      Q.  Okay.  So all of your immediate
13  relatives are back in New Orleans following
14  the storm?
15      A.  Yes.
16      Q.  Okay.  Prior to Hurricane Katrina
17  did you attend church at a particular
18  congregation?
19      A.  Yes.
20      Q.  And what was that?
21      A.  Mount Hermon Baptist Church.
22      Q.  And where was that located?
23      A.  1833 North Broad, right across the
24  street from my house.
25      Q.  Is that congregation still meeting?
```

GLADYS LaBEAUD (LEVEE)                                  7/16/2007

Page 130

1    Q.  Do you know when the Sheetrock was
2   removed, when the walls and ceilings were
3   removed?
4    A.  No.
5    Q.  Okay.  Was it shortly after you
6   first visited the house in October of 2005?
7    A.  It was -- it was a little while.  I
8   don't remember exactly when.
9    Q.  But do you think it was sometime in
10  2005?
11   A.  I think it was more or less 2006.
12   Q.  2006.  Okay.  Do you know when?
13   A.  No.
14   Q.  Okay.  Do you remember when you
15  added on to the back of the house, what year?
16   A.  No.
17   Q.  Okay.  Do you remember -- do you
18  know approximately when that was?
19   A.  No.
20   Q.  Okay.  Well, was it more than ten
21  years before Hurricane Katrina?
22   A.  No.  I would -- I don't really
23  know.
24   Q.  Okay.  And the vinyl siding was on
25  the house when you bought it originally?

Page 131

1    A.  Yes.
2    Q.  And I don't know if I asked you
3   this, but how much did you pay for the house
4   when you bought it?
5    A.  Forty-four thousand five hundred.
6    Q.  Was there an appraisal done at the
7   time you purchased?
8    A.  I -- I don't really know now.  It
9   has been such a long time ago.
10   Q.  Okay.
11   MR. GARDNER:
12   I think I'm pretty close to being
13   finished.
14   MR. JOANEN:
15   Okay.
16   MR. GARDNER:
17   We can take a few minutes.  Is
18   lunch here, do you know?
19   MR. JOANEN:
20   I just checked.  It was not yet.
21   VIDEOGRAPHER:
22   Off the record.
23   (THE TIME IS NOW 12:22 P.M.)
24   (OFF THE RECORD)
25   VIDEOGRAPHER:

Page 132

1        We're now back on the record.
2        (THE TIME IS NOW 1:03 P.M.)
3   EXAMINATION BY MR. GARDNER:
4    Q.  We're back.  Miss LaBeaud, on the
5   Form 95, under section 10 where it has
6   personal injury/wrongful death, do you see
7   that?
8    A.  Yes.
9    Q.  There is a typed in portion that
10  says state name of injury or decedent and
11  underneath it it says personal injury and
12  mental distress.
13   A.  Uh-huh.
14   Q.  Do you see that?
15   A.  Yes.
16   Q.  Do you see what I'm talking about?
17   A.  Yes.
18   Q.  All right.  Are you making a claim
19  for mental distress?
20   A.  Not really.
21   Q.  Okay.  So the only claim you're
22  making in this litigation is for the property
23  damage to the property at 1708-1710 Industry
24  Streets?
25   A.  Yes.

Page 133

1    Q.  Okay.  All right.  And following
2   Hurricane Katrina, you didn't see a doctor
3   for anything that you relate to Hurricane
4   Katrina?
5    A.  No.
6    Q.  Okay.  And you didn't see a
7   counselor for anything you relate to
8   Hurricane Katrina?
9    A.  No.
10   Q.  Okay.  And you didn't incur any
11  medical expenses for anything you relate to
12  Hurricane Katrina?
13   A.  No.
14   Q.  Okay.  How much -- prior to
15  Hurricane Katrina how much was your -- the
16  insurances that you paid on your house, do
17  you remember?
18   A.  No, not exactly.
19   Q.  Okay.  Do you know how much you
20  paid in taxes?
21   A.  Fifty-six dollars and some cents
22  per year.  Property tax you mean, huh?
23   Q.  Yes.
24   A.  Yes.  Fifty-six dollars and some
25  cents a year.

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

GLADYS LaBEAUD  (LEVEE)                                    7/16/2007

Page 134

1    Q.  A year?
2    A.  Yes.
3    Q.  Okay.  Let me ask you something
4  else.  I know you had indicated you had taken
5  a loan out in 1996 and that it was secured by
6  the property.
7    A.  Uh-huh.
8    Q.  Was there a mortgage on the
9  property at the time of Hurricane Katrina?
10   A.  Yes.
11   Q.  Okay.  And that's the one that was
12 in favor of Regions Bank?
13   A.  Yes.
14   Q.  Okay.  We talked about that
15 earlier.
16   A.  Yes.
17   Q.  Okay.  That's the one.  There was
18 only one mortgage?
19   A.  Yes.
20   Q.  Okay.  Do you know how much your
21 property taxes are today?
22   A.  The total taxes right now, let me
23 see, about -- they should be about three
24 hundred and something dollars.
25   Q.  A year?

Page 135

1    A.  No.  I -- I can't give you a figure
2  for a year.  I don't -- I don't understand
3  how they did the property tax and this kind
4  of stuff.  I need to go to City Hall and talk
5  to somebody about that because it don't look
6  like to me it was right.  I was supposed to
7  be exempt, but it's some kind of -- something
8  just doesn't add up to me.  I don't know.
9    Q.  Okay.  Do you know how much you are
10 paying for the flood insurance and the
11 homeowner's insurance on your house?
12   A.  Flood is less than $500 for, from
13 August 1, '07 to -- no, I'm wrong.  August 7,
14 '07 to August 7, '08.
15   Q.  Okay.  So it is approximately $500
16 a year?
17   A.  Well, you could say a little less
18 than that.
19   Q.  Okay.
20   A.  And for homeowner's for a year,
21 fourteen hundred and I think eighty-two
22 dollars.
23   Q.  Okay.  Do you know if the
24 homeowner's has gone up since Hurricane
25 Katrina?

Page 136

1    A.  Yes.
2    Q.  Okay.  Has Darryl purchased his own
3  house?
4    A.  No.
5    Q.  Is he renting?
6    A.  Yes.
7    Q.  Okay.  Do you know if Darryl plans
8  to move back into 1710 Industry?
9    A.  I don't know.
10   Q.  Okay.  Do you plan on changing the
11 house at 1708-1710 Industry when you renovate
12 it?
13   A.  What you mean change?
14   Q.  I mean, are you going to make it
15 into one house or are you going to keep it as
16 it is, the floor plan?
17   A.  Right now I don't know.
18   Q.  Okay.  Are you even certain if
19 you're going to move back in?
20   A.  I want to.
21   Q.  Okay.
22   A.  It is my desire.
23   Q.  All right.  Now, you've provided
24 for us today some photographs.  And those are
25 the only photographs that you have of your

Page 137

1  property, right?
2    A.  Yeah.  I think that's right.
3    Q.  Have you ever been asked in this
4  litigation to provide any answers to any
5  questions called interrogatories?
6    A.  No.
7    Q.  Okay.  Have you ever been asked to
8  respond to any requests for production of
9  documents?
10   A.  No.
11   Q.  Okay.  Have you ever seen any
12 documents called interrogatories?
13   A.  Nope.
14   Q.  Okay.  Have you ever seen any
15 documents called request for production of
16 documents?
17   A.  What?
18   Q.  Have you seen a document called a
19 request for production of documents?
20   A.  No.
21   Q.  Okay.  You were never in the
22 military, were you?
23   A.  No.
24   Q.  Okay.  And you've never had a
25 problem with drugs or alcohol, have you?

DAISY MAE INNIS (LEVEE)                              7/16/2007

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE: KATRINA CANAL BREACHES       CIVIL ACTION

CONSOLIDATED LITIGATION             NO. 05-4182 K2

                                    JUDGE DUVAL

PERTAINS TO LEVEE                   MAG. WILKINSON


FILED IN 05-4181, 05-4182, 05-4191, 05-4568,
         05-5237, 05-6073, 05-6314, 05-6324,
         05,6327, 05-6359, 06-0020, 06-1885,
         06-0225, 06-0886, 06-11208, 06-2278,
         06,2287, 06-2346, 06-2545, 06-3529,
         06-4065, 06-4389, 06-4634, 06-4931,
         06-5032, 06-5042, 06-5159, 06-5163,
         06-5367, 06-5471, 06-5771, 06-5786,
         06-5937, 06-7682, 07-0206, 07-0647,
         07-0993, 07-1284, 07-1286, 07-1288,
         07-1289


     Deposition of DAISY MAE INNIS, given

at the offices of Bruno & Bruno, 855 Baronne

Street, New Orleans, Louisiana 70113, on July

16th, 2007.




REPORTED BY:

     JOSEPH A. FAIRBANKS, JR., CCR, RPR

     CERTIFIED COURT REPORTER #75005

DAISY MAE INNIS (LEVEE)                                    7/16/2007

                                                        Page 6

```
 1            DAISY MAE INNIS
 2   4024 Stutz Street, New Orleans, Louisiana
 3   70126, a witness named in the above
 4   stipulation, having been first duly sworn, was
 5   examined and testified on her oath as follows:
 6       MR. REBENNACK:
 7            Usual stipulations, except with
 8       regard to the objections that have
 9       been made by the plaintiffs regarding
10       the scope of the depositions and the
11       Order of the Magistrate.  We adopt
12       those objections of the plaintiff's
13       steering committee for this
14       deposition, as well.
15       MR. SUTTON:
16            For the record, my name is
17       Charles Sutton.  I represent Orleans
18       Levee District.  I'd like to note that
19       this deposition was noticed in
20       accordance with Federal Rule of Civil
21       Procedure 30, Case Management Order
22       Number 4, and Magistrate Wilkinson's
23       July 3rd, 2007 Order.
24   EXAMINATION BY MR. SUTTON:
25       Q.  Ms. Innis, again, my name is Charles
```

                                                        Page 7

```
 1   Sutton.  I met you very briefly before your
 2   deposition began this morning.
 3       For the record, ma'am, would you
 4   please provide me with your full name?
 5       A.  Daisy Mae Innis.
 6       Q.  Okay.  And what is your address,
 7   Ms. Innis?
 8       A.  4024 Stutz Street, New Orleans,
 9   Louisiana.
10       Q.  Ms. Innis, have you ever had the
11   occasion to give a deposition before?
12       A.  I don't remember.
13       Q.  As you sit here today, you just -- you
14   can't recall?
15       A.  I can't recall.
16       Q.  Okay.  Well, let me briefly explain
17   some of the ground rules.  I'm simply going to
18   be asking you a series of questions here today.
19   Some of these other attorneys, after I get
20   through with my questions, they may ask you
21   some questions as well.  For my questions,
22   first of all, none of my questions are intended
23   to trick or mislead you, so I would ask that if
24   for any reason you don't understand my question
25   that you please let me know.
```

                                                        Page 8

```
 1       A.  Yes.
 2       Q.  Otherwise, if I ask you a question and
 3   you answer it, I'll assume that you understood
 4   my question.
 5            Fair enough?
 6       A.  Fair.
 7       Q.  I would also ask that you answer
 8   verbally, yes or no, instead of shaking or
 9   nodding your head or saying unh-unh or uh-huh
10   so that the court reporter can take it down
11   appropriately.
12       A.  Yes.
13       Q.  Okay?  Certainly if you need to
14   explain your answer at any time you're more
15   than welcome to do so.  If I ask you a question
16   and you don't know or you don't remember,
17   please tell me that.  I don't want you here
18   guessing, so if I ask you a question and you
19   answer it, I'll assume that that answer is
20   based on your own personal knowledge.
21            Fair enough?
22       A.  Fair.
23       Q.  We may be here for some time, but this
24   is not an endurance contest.  If you need to
25   take a break for any reason, if you need to
```

                                                        Page 9

```
 1   make a phone call, receive a phone call, go to
 2   the restroom, get a drink of water, whatever,
 3   let me know --
 4       A.  Yes.
 5       Q.  -- and I'll be happy to accommodate
 6   you, we'll take a recess.  I would only ask
 7   that if there's a question on the table that
 8   you answer the question and then we take the
 9   break.
10       A.  Yes.
11       Q.  Okay?  If at any time during the
12   deposition you think that you need to clarify
13   or change an answer that you've previously
14   given in the deposition, that it comes to you
15   that, you know, an answer that I gave a while
16   back was wrong or incomplete, please let me
17   know, and you're free to do so.  Okay?
18       A.  Yes.
19       Q.  Let me ask you before we get started,
20   are you currently on any medications?
21       A.  No.
22       Q.  Is there any reason as you sit here
23   right now why you think that you would be
24   physically, mentally, emotionally or otherwise
25   unable to understand my questions and fairly
```

                                          3  (Pages 6 to 9)

DAISY MAE INNIS (LEVEE)                                    7/16/2007

Page 10

1  and truthfully answer my questions?
2      A.  No.
3      Q.  Any reason?
4      A.  No.
5      Q.  Okay.  I'm going to hand you,
6  Ms. Innis, what I have marked as Exhibit Innis
7  1, and I'll ask that Exhibit Innis 1 be
8  attached to the transcript of the deposition.
9          And for the record, I am handing
10  Ms. Innis a copy of the Notice of Videotape
11  Deposition of her deposition along with
12  attached Exhibit A to Notice of Deposition.
13  (Tendering.)
14          Ms. Innis, have you seen Exhibit 1
15  before?  And that's simply the notice of your
16  deposition, for your deposition here today.
17          (Innis Exhibit 1 was marked for
18  identification and is attached hereto.)
19      A.  No.
20  EXAMINATION BY MR. SUTTON:
21      Q.  Okay.  I would ask you, ma'am, if you
22  don't mind, to flip over to the sixth page of
23  Exhibit 1.  And if you want to look at mine,
24  it's titled Exhibit A to Notice of Deposition.
25  It's actually the sixth page in.

Page 11

1      A.  Okay.
2      Q.  Ms. Innis, as you will note, Exhibit A
3  is a three-paged document, and identified in
4  Exhibit A are twenty-three different items of
5  documents that the defendants have requested to
6  be produced in connection with your deposition
7  her today.
8          First of all, I would like to ask you,
9  ma'am, have you ever seen Exhibit A before?
10      A.  I don't recall.
11      Q.  Okay.  I would suggest to your
12  counsel, as we've done with the other
13  depositions, that at this time that we go off
14  the record and that we allow Ms. Innis,
15  together with her counsel, to perhaps just
16  review for a few minutes Exhibit A, and then
17  we'll come back on the record and I can go
18  through Exhibit A, and since it's attached I
19  won't have to read verbatim each and every
20  item.
21      MR. REBENNACK:
22          Sure.
23      MR. SUTTON:
24          Okay.  At this time why don't we
25          go off the record.

Page 12

1          (Off the record.)
2  EXAMINATION BY MR. SUTTON:
3      Q.  Ms. Innis, I'd like, at this time, to
4  review with you the list of requested documents
5  as identified in Exhibit A.  And Item Number 1
6  requests that you produce any Standard Form 95
7  that you submitted with the Army.
8          Did you, in fact, submit a Form 95
9  with the Army?
10      A.  Yes.
11      Q.  Okay.  I'm going to hand you what I've
12  marked as Exhibit Innis 2.  Would you take a
13  look at that.  (Tendering.)
14          Ma'am, you would agree with me that
15  Exhibit Innis 2 is a cover letter dated
16  September 13th, 2006, from the department Of
17  the Army to you.
18          (Innis Exhibit 2 was marked for
19  identification and is attached hereto.)
20      A.  Yes.
21  EXAMINATION BY MR. SUTTON:
22      Q.  And in that letter, if you'll notice
23  in the first paragraph, you would agree that in
24  the letter the Army acknowledges that it
25  received, on September 5, 2006, your Form

Page 13

1  '95 --
2      A.  Yes.
3      Q.  -- is that correct?
4          And if you'll flip over to the second
5  page of Exhibit 2, there is a second letter
6  from the Department of the Army.
7          This is dated September 30, 2006,
8  correct?
9      A.  Yes.
10      Q.  And it again acknowledges that it
11  received on September 5, 2006, your Form 95.
12      A.  Uh-huh.
13      Q.  Correct?
14      A.  Yes.  Sorry.
15      Q.  And if you'll flip over to the third
16  and fourth pages of Exhibit 2, that is, in
17  fact, your Form 95.
18      A.  Yes.
19      Q.  Okay.  And that form contains your
20  signature, correct?
21      A.  Yes.
22      Q.  And you completed and signed and dated
23  the form on August 31, 2006, correct?
24      A.  Right.
25      Q.  Ms. Innis, at this time I'm going to

4  (Pages 10 to 13)

DAISY MAE INNIS (LEVEE)                                    7/16/2007

Page 14

1   hand you what I've marked as Exhibit Innis
2   Number 3 and ask you if you could take a look
3   at that exhibit.  You would agree with me that
4   Exhibit 3 -- the first page of Exhibit 3 is a
5   February 5, 2007 letter from the Army to you
6   acknowledging that it received your claim on
7   January 11th, 2007, correct?
8          (Innis Exhibit 3 was marked for
9   identification and is attached hereto.)
10      A.  Yes.
11  EXAMINATION BY MR. SUTTON:
12      Q.  Okay.  And if you'll flip over to the
13  third page of Exhibit 3, this is a Form 95 that
14  you submitted with the Army.  Correct?
15      A.  Yes.
16      Q.  Okay.  And this is slightly different
17  than the Form 95 that we discussed and that's
18  been marked as Exhibit 2; correct?
19      A.  Yes.
20      Q.  And you can compare them, but I'll
21  note on this one, one difference is it's not
22  dated.  You'd agree that Exhibit 3 is not
23  dated, your Form 95; is that correct?  At the
24  bottom, you didn't date this form as you did
25  with the other form.

Page 15

1       A.  No.
2       Q.  That's correct?
3       A.  Yes.
4       Q.  Okay.  Other than Exhibits 2 and 3,
5   Ms. Innis, are you in possession of any Form
6   95s submitted by you or on your behalf to the
7   Department of the Army?
8       A.  (Shakes head negatively.)
9       Q.  Are you aware of any other Forms 95
10  that you submitted to the Army?
11      A.  No.
12      Q.  Item Number 2, Ms. Innis, requests
13  production of documents pertaining to any
14  administrative claims that you've submitted to
15  any governmental body or agency in connection
16  with Hurricane Katrina.  And let me just sort
17  of list some of those out with you.
18          Did you make a claim with FEMA?
19      A.  Yes.
20      Q.  Okay.  Did you apply for an SBA loan?
21      A.  Yes.
22      Q.  Did you make any claim for Red Cross
23  benefits?
24      A.  Yes.
25      Q.  Did you make a claim with the Road

Page 16

1   Home Program?
2       A.  Yes.
3       Q.  Did you make a claim for food stamps?
4       A.  Yes.
5       Q.  Did you make a claim with any other
6   government -- Red Cross isn't a government
7   body, but did you make a claim with any other
8   entity that I haven't discussed with you?
9       A.  No.  No.
10      Q.  And I'm going to discuss each of these
11  with you in more detail later on, but let me
12  ask you this:  As to any of these claims, FEMA,
13  SBA, Red Cross, Road Home Program, food stamps,
14  are you in possession of any documents
15  regarding either your applications for such
16  benefits or your receipt of benefits?
17      A.  Um -- documents for FEMA.
18      Q.  You do have documents for FEMA.
19      A.  Yes.
20      Q.  Do you have documents in connection
21  with your SBA application?
22      A.  Yes.
23      Q.  Do you have any documents in
24  connection with Red Cross benefits?  Applied
25  for or received?

Page 17

1       A.  I don't -- can't recall.
2       Q.  Okay.  What about Road Home Program?
3       A.  Yes.
4       Q.  And what about food stamps?
5       A.  No.
6       Q.  Okay.  Item Number 3, Ms. Innis,
7   requests documents relating to insurance claims
8   that you've filed in connection or as a result
9   of Hurricane Katrina.  Have you filed any
10  insurance claims?
11      A.  Yes.
12      Q.  Okay.  What type of insurance claims
13  have you filed?  For example, homeowner's
14  insurance?
15      A.  Homeowner's.
16      Q.  What about flood insurance?
17      A.  No.
18      Q.  Okay.  Did you have flood insurance at
19  the time of the storm?
20      A.  No.
21      Q.  You had homeowner's insurance.
22      A.  Yes.
23      Q.  And who is your homeowner's -- or who
24  was your homeowner's insurer at the time of the
25  hurricane?

5 (Pages 14 to 17)

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

DAISY MAE INNIS (LEVEE)                                    7/16/2007

Page 18

1    A.  Allstate.
2    Q.  And do you maintain documents in
3  connection with your application for and/or
4  receipt of homeowner's insurance benefits?
5    A.  Do I have --
6    Q.  Do you still have documents regarding
7  your insurance claim?
8    A.  Yes.  Yes.
9    Q.  Did you make any other insurance
10  claims as a result of the hurricane in addition
11  to your claim with Allstate?
12    A.  Yes, I did.
13    Q.  Okay.  What other insurance claims did
14  you make?
15    A.  With Allstate?
16    Q.  Or anybody.
17    A.  Oh, no.  No.
18    Q.  Okay.  Let me make sure you understand
19  my question.  You made -- as far as insurance
20  goes, you made a homeowner's claim with
21  Allstate.  Correct?
22    A.  Yes.
23    Q.  Okay.  Did you have any other
24  coverages with Allstate for which you made a
25  claim?

Page 19

1    A.  No.
2    Q.  Okay.  Did you make an insurance claim
3  with anybody else?
4    A.  No.
5    Q.  No?
6    A.  No.
7    Q.  Okay.  I'm going to ask you to speak
8  up just a bit to make sure we get it on the
9  audio.
10    A.  All right.
11    Q.  Okay?  Item Number 4, Ms. Innis,
12  requests documents in your possession that
13  refer to any eyewitness accounts of Hurricane
14  Katrina.
15    Do you have any documents responsive
16  to this request?
17    A.  No.
18    Q.  Okay.  Item Number 5 requests
19  documents relating to matters alleged in the
20  complaint this was filed in this litigation,
21  the complaint that was filed by the lawyers on
22  behalf of the class.
23    Do you have any documents that relate
24  to the matters contained in the complaint?
25  Other than what we've gone over, your Forms 95

Page 20

1  and the photographs that you've produced.
2    A.  I don't remember.
3    Q.  Okay.  Ms. Innis, Item Number 6
4  requests statements that have been taken in
5  connection with this litigation.
6    Are you in possession of any type of
7  record recorded or transcribed statements given
8  by anyone?
9    MR. REBENNACK:
10    And I don't want to be overly
11    academic about this, I'm sure you'll
12    appreciate this, but anything that the
13    lawyers have done is work product, and
14    I just object for the record.
15    But you can answer his question.
16    Do you have any of those items, any
17    recordings or anything regarding
18    Hurricane Katrina?
19    THE WITNESS:
20    No.
21  EXAMINATION BY MR. SUTTON:
22    Q.  Item Number 7 requests photographs,
23  videotapes pertaining to the hurricane.  And
24  your counsel has provided me with copies of
25  photographs.

Page 21

1    A.  Yes.
2    Q.  And we'll go over those a little bit
3  later, but those are photographs, it looks like
4  probably -- I haven't counted them yet, but it
5  looks like perhaps about thirty or forty
6  photographs that your counsel has provided me
7  with.
8    Were all of these photographs taken by
9  you?
10    A.  Yes.
11    Q.  Are all of these photographs taken of
12  your property?
13    A.  Yes.
14    Q.  Okay.  And were they all taken after
15  Hurricane Katrina?
16    A.  Yes.
17    Q.  Okay.  Your attorney has --
18    MR. REBENNACK:
19    I'm sorry.  She may have wanted
20    to clarify that.  There may be some
21    photographs of a place where she went,
22    I think, after the hurricane.
23    THE WITNESS:
24    Yeah.  In the shelter, yes.
25    MR. REBENNACK:

DAISY MAE INNIS (LEVEE)                                    7/16/2007

Page 26

1  asserting for lost earnings, lost business
2  income and similar types of damages.
3       Let me just ask you, are you making
4  any type of economic claim in this litigation;
5  are you making any claim for lost earnings,
6  lost business income, anything of that nature?
7       A.  Lost earnings.
8       Q.  That's my question.  Are you making a
9  claim for lost earnings?
10      A.  Yes.
11      Q.  Okay.  Were you working at the time of
12  Hurricane Katrina?
13      A.  Before, yes.
14      Q.  No, at the time of Hurricane Katrina,
15  were you working?  Not before, but at the time
16  of the storm.
17      MR. REBENNACK:
18          Let me just object to the form.
19      I appreciate what you're -- but I
20      think she's misunderstanding your
21      question.
22          He's not talking about the very
23      day of, or the day before, but in the
24      immediate future, a week before, two
25      weeks before, a month before, were you

Page 27

1       working?
2       A.  Yes.
3  EXAMINATION BY MR. SUTTON:
4       Q.  Let me put it this way:  You were
5  employed at the time of Hurricane Katrina?
6       A.  Yes.
7       Q.  Who were you employed by?
8       A.  Kay 's Sitting Service.
9       Q.  And have you gone back to work since
10 the storm?
11      A.  Yes.
12      Q.  And I'll discuss that with you later,
13 but let's go back the Item Number 9.
14          Since you're making a claim for lost
15 earnings, what if any documents are you in
16 possession of that would refer or relate to
17 such a claim?
18      A.  I don't have any documents.
19      Q.  Okay.  Well, for example, do you have
20 copies of your income tax returns for the past
21 few years?
22      A.  Oh, I could get -- yes.
23      Q.  Do you have copies of any of your
24 payroll or earnings, either before or after
25 Katrina?  Do you maintain copies of your

Page 28

1  payroll stubs, anything of that nature?
2       A.  No.
3       Q.  Okay.  Just income tax returns.
4       A.  Just income tax, yes.
5       Q.  Okay.  Ms. Innis, if you don't mind,
6  flip the page over to the next item which is
7  Number 10.  And that requests documents which
8  pertain to your claim for, quote, economic and
9  compensatory damages.  I think this would be
10 akin, actually, to Item No. 9.  And you've told
11 me you're in possession of income tax returns.
12      A.  Uh-huh.
13      Q.  Are you making a claim -- are you
14 making a claim for any type of personal injury
15 as a result of Hurricane Katrina?
16      A.  Yes.
17      Q.  Okay.  I'll cover that with you in a
18 little bit later item.
19          Item Number 11 requests any
20 mathematical or formulaic calculations or
21 models that may be in your possession that
22 relate to your injury.
23          Are you in possession of any documents
24 responsive to this item?
25      A.  No.

Page 29

1       Q.  Item Number 12, Ms. Innis, requests
2  all mathematical or formulaic calculations
3  regarding the calculation of your damages.
4          Are you in possession of any documents
5  responsive to this request?
6       A.  No.
7       Q.  Okay.  Item Number 13, Ms. Innis,
8  requests documents relating to your evacuation.
9          Are you in possession of any documents
10 relating to any evacuation that you may have
11 made as a result of Hurricane Katrina?
12      A.  Yes.
13      Q.  Okay.  And what type of documents are
14 you in possession of?
15      A.  A lease.
16      Q.  I'm sorry?  A what?
17      A.  A lease.
18      Q.  A lease?
19      A.  That's a document, isn't it?
20      Q.  Yeah.  I understand.  What kind of
21 lease?
22      A.  A rent lease.
23      Q.  A rent lease.  Okay.  And actually,
24 one of the subsequent items discusses leases.
25 I think what this is really more looking at are

8  (Pages 26 to 29)

DAISY MAE INNIS (LEVEE)                                    7/16/2007

---

Page 38

1    A. Yes.
2    Q. And what name was Evans, was that a
3  maiden name or --
4    A. You could say a maiden name. Given at
5  birth.
6    Q. Okay. When you were growing up, your
7  name was Daisy Mae Evans?
8    A. No.
9    Q. Okay. What was it?
10   A. Given name at birth, Daisy Mae Evans.
11 Adopted name Innis. Married name Everett.
12   Q. And I'm not -- I mean, just to make it
13 clear, I'm not directing these questions solely
14 at you, these are questions that we ask all
15 witnesses just to obtain background
16 information.
17   A. That's it.
18   Q. And what is your date of birth, ma'am?
19   A. 12/4/42.
20   Q. And you told me your current
21 address --
22   A. Yes.
23   Q. -- a little bit -- or a little while
24 ago. Was that the same address that you had at
25 the time of the hurricane?

---

Page 39

1    A. Yes.
2    Q. And how long had you lived at the
3  Stutz Street address?
4    A. About twenty years.
5    Q. And other than the time after the
6  hurricane, the time period that you were not
7  living there, had you consistently lived at
8  that address?
9    A. Before the hurricane?
10   Q. Yes, ma'am.
11   A. Yes.
12   Q. Okay. Ms. Innis, at the time of the
13 hurricane, who was living with you?
14   A. My daughter.
15   Q. And what's her name?
16   A. Eleanor Elizabeth Everett.
17   Q. And was anyone else living with you?
18   A. No.
19   Q. How old is your daughter?
20   A. 42.
21   Q. Do you know if your daughter is a
22 plaintiff in this litigation?
23   A. I think so.
24   Q. And at the time of the hurricane, you
25 owned the property on Stutz Street?

---

Page 40

1    A. Yes.
2    Q. Okay. Did anyone else own the
3  property with you or were you the sole owner?
4    A. Sole owner.
5    Q. Okay. And do you have a Louisiana
6  Driver's License --
7    A. Yes.
8    Q. -- or Louisiana identification number?
9       Driver's license?
10   A. (Nods affirmatively.)
11   Q. Do you know the number of it?
12   A. Not offhand.
13   Q. Do you have it with you?
14   A. Yes.
15   Q. Can I see it for a second?
16   A. (Tendering.)
17   Q. Thank you.
18       MR. SUTTON:
19          Let the record reflect that
20       Ms. Innis has handed me her Louisiana
21       Driver's License bearing numbers
22       004786239, expiring 12/4/09.
23 EXAMINATION BY MR. SUTTON:
24   Q. Ms. Innis, I note the restriction on
25 it is 01. Do you have any idea what

---

Page 41

1  restriction that is?
2    A. Glasses.
3    Q. Glasses? Thank you, ma'am.
4  (Tendering.)
5       And what's your Social Security
6  number?
7    A. 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.
8    Q. Have you ever held a driver's license
9  in any other state?
10   A. No. I don't remember that.
11   Q. Ms. Innis, what is your current
12 marital status?
13   A. Divorced.
14   Q. And your husband -- your former
15 husband was Mr. Everett; is that correct?
16   A. Yes.
17   Q. And what's his name?
18   A. Clarence Everett.
19   Q. And approximately when were you
20 divorced?
21   A. That's thirty-five years ago.
22   Q. When you were divorced?
23   A. Thirty-six, thirty-seven. Yeah.
24 About thirty-seven years ago.
25   Q. And you haven't remarried since.

---

11 (Pages 38 to 41)

DAISY MAE INNIS (LEVEE)                                    7/16/2007

Page 42

1    A.  No.
2    Q.  That's correct?
3    A.  Right.
4    Q.  Do you have any other children other
5    than the daughter who was living with you?
6    A.  No.
7    Q.  Do you have anyone who is a dependent
8    upon you?
9    A.  No.
10   Q.  Is your daughter living with you at
11   the present time?
12   A.  No.
13   Q.  Is anyone living with you at the
14   present time?
15   A.  No.
16   Q.  How far did you get in school?
17   A.  10th.
18   Q.  Did you complete the 10th grade?
19   A.  Drop out.
20   Q.  And where were you going at the time?
21   Where were you going at the time of the 10th
22   grade?
23   A.  John H. Martin High School.
24   Q.  That's in New Orleans?
25   A.  Jefferson Parish.

Page 43

1    Q.  Have you -- since leaving high school,
2    have you had any type of formal education,
3    vocational training, anything since?
4    A.  No.
5    Q.  Let me go over with you, ma'am,
6    briefly, your employment history.  And you told
7    me at the time of Hurricane Katrina you were
8    employed -- was it Kay 's Sitting Service?
9    A.  Kay 's Sitting Service.
10   Q.  Okay.
11   A.  But then -- okay.
12   Q.  No, do you need to -- do you need to
13   finish your answer?
14   A.  Um -- they say you're self-employed
15   once they get the job.  After you've been there
16   with them for a year you're self-employed.
17   Q.  Okay.  Well, let's talk about that.
18   When did you begin working for Kay's?
19   A.  I don't remember.
20   Q.  I mean, was it several years before
21   the hurricane?
22   A.  Yeah.  Several years before the storm.
23   Q.  Where is Kay 's Sitting Service
24   located?
25   A.  1942 Williams Boulevard.

Page 44

1    Q.  Okay.  Do you know if they're still in
2    business?
3    A.  Yes.  They are.
4    Q.  And what was your job position with
5    Kay's?
6    A.  A sitter.
7    Q.  Okay.  And as a sitter, just generally
8    what were your duties, what would you do?
9    A.  Oh, take care of the sick, their
10   needs, whatever they needed.
11   Q.  Would you normally go to private homes
12   to do that?
13   A.  Private homes, yes.
14   Q.  Okay.  What types -- generally, you
15   know, at the time of the hurricane, what types
16   of hours would you work at that job?
17   A.  Twelve hours.
18   Q.  Twelve hours --
19   A.  Yes.
20   Q.  -- at a time?
21   A.  Yes.
22   Q.  Okay.  And approximately how many days
23   a week would you work?
24   A.  Five.
25   Q.  So you were putting in some long

Page 45

1    hours.
2    A.  Yes.
3    Q.  That's about what, sixty hours a week.
4    Is that right?
5    A.  Correct.
6    Q.  So you would typically work five
7    days --
8    A.  Five days.
9    Q.  -- and be off two days each week.
10   A.  Right.
11   Q.  Did you have a supervisor, a specific
12   supervisor?
13   A.  No.
14   Q.  Now, you said you had worked there for
15   several years at the time of the hurricane.
16   Were you paid by the hour or were you on a
17   salary or what?
18   A.  Paid by the hour.
19   Q.  Okay.  And what was your hourly wage
20   with Kay's?
21   A.  Oh, $7, $7.50, it depends.
22   Q.  $7 to $7.50, depending on the time of
23   day that you were working or something?
24   A.  Yes.
25   Q.  Were you paid overtime or was it just

12  (Pages 42 to 45)

DAISY MAE INNIS (LEVEE)                                    7/16/2007

<table>
<tr><td colspan="2">Page 50</td></tr>
</table>

1  businesses and so forth?
2      A.  Yes.
3      Q.  So you would go around to the
4  different businesses and perform that work.
5      A.  Yes.
6      Q.  Were you employed full-time,
7  part-time?
8      A.  Part-time.
9      Q.  About how many hours would you work a
10 week?
11     A.  Fifteen.
12     Q.  Okay.  You were paid by the hour?
13     A.  Yes.
14     Q.  Okay.  And what was your hourly rate?
15     A.  About $7.50.
16     Q.  About the same hourly rate that you
17 had with Kay's?
18     A.  Uh-huh.  Yes.
19     Q.  When you were working with Midsouth,
20 were you holding any other jobs?
21     A.  Um -- during that time -- no.  I don't
22 think so.
23     Q.  Okay.  Is there a reason why you were
24 working part-time fifteen hours a week as
25 opposed to full-time?  Was it just because they

**Page 52**

1      Q.  Okay.  About March or so?
2      A.  Yeah.  Yes.
3      Q.  And how long did you work there?
4      A.  A couple of months.
5      Q.  And what did you do at Island View?
6      A.  Housekeeping.
7      Q.  And about how many hours a week did
8  you work there?
9      A.  Eight hours a day.
10     Q.  Eight hours a day?
11     A.  Yes.
12     Q.  Five days?
13     A.  Yes.
14     Q.  Forty hours a week?
15     A.  Right.
16     Q.  And what was your pay with Island
17 View?
18     A.  Eight dollars, I think.
19     Q.  An hour?
20     A.  Yes.  I think eight dollars.  I'm not
21 sure.
22     Q.  Okay.  Approximately $8 an hour.
23     A.  Yes.
24     Q.  And that would certainly be reflected
25 in your pay records from the employer.

**Page 51**

1  didn't offer it, or you had other things that
2  you had to take care of, or --
3      A.  That's all we worked, four hours.  You
4  know, those hours.
5      Q.  Okay.
6      A.  It was only part-time.
7      Q.  And you said you worked there until
8  about May of this year, a couple of months ago?
9      A.  Yes.
10     Q.  And at that time, I believe you told
11 me, you moved back to New Orleans.
12     A.  Yes.
13     Q.  Have you worked since moving back to
14 New Orleans?
15     A.  No.
16     Q.  After the storm, just to make sure I'm
17 clear on this, after the storm, the only job
18 that you've held is that with Midsouth?
19     A.  Island View Casino.
20     Q.  Where is that?
21     A.  I had just started that a couple of
22 months.  Island View Casino in Gulfport,
23 Mississippi.
24     Q.  And about when did you begin there?
25     A.  A couple of months before I left.

**Page 53**

1      A.  Yes.
2      Q.  Did you -- I take it you voluntarily
3  quit both Midsouth and Island View.
4      A.  Yes.  I resigned.
5      Q.  Okay.  And you resigned because you
6  were moving back to New Orleans?
7      A.  Yes.
8      Q.  Okay.  Are you currently looking for
9  work?
10     A.  Somewhat.
11     Q.  Okay.  Have I covered all of your
12 employment and other work after the hurricane?
13     A.  There was a school, and I can't
14 remember the name of that school, in Gulfport.
15 I can't remember the name of the school.  I
16 worked at a school in the cafeteria, after the
17 storm.  I can't remember the name.
18     Q.  That's fine.  Well, let me see if I
19 can get some information.
20     A.  You all can find that out.
21     Q.  Do you know if it was an elementary
22 school?
23     A.  Elementary school, sir.
24     Q.  Do you know what street it was on?
25     A.  No.  I can find out for you.

                                    14  (Pages 50 to 53)

DAISY MAE INNIS (LEVEE)                                      7/16/2007

Page 58

1    Someone filed suit.
2        A.  Uh-huh.
3        Q.  Correct?
4        A.  Yes.
5        Q.  Other than the divorce lawsuit and the
6    lawsuits regarding the automobile accidents,
7    which you've told me occurred several years
8    ago, have you been involved in any other
9    lawsuits?
10       A.  No.
11       Q.  Have you suffered any accidents after
12   Hurricane Katrina?  Whether it's an automobile
13   accident, accident at work, anything of that
14   nature.
15       A.  No, nothing like that.
16       Q.  Have you made any type of claims after
17   Hurricane Katrina unrelated to the hurricane,
18   like a workers' comp claim?
19       A.  No.
20       Q.  Lawsuit, anything like that?
21       A.  No.
22       Q.  I'm asking this, I ask every witness
23   this, and every plaintiff in this litigation
24   has been asked this:  Do you have any criminal
25   record?

Page 59

1        A.  No.
2        Q.  Have you ever been treated for alcohol
3    or drug abuse?
4        A.  No.
5        Q.  At the time of the hurricane, you told
6    me, your daughter was living with you.  And she
7    was grown at the time?
8        A.  Yes.
9        Q.  She was not attending any school at
10   the time?
11       A.  No.
12       Q.  Did you regularly participate in any
13   church before Hurricane Katrina?
14       A.  Yes.
15       Q.  Okay.  And what church was that?
16       A.  Franklin Avenue Baptist Church.
17       Q.  That's that church reopened since the
18   hurricane?
19       A.  At another -- no.
20       Q.  Okay.  It hadn't reopened at all,
21   whether it that location or a different
22   location?
23       A.  It's a different location.
24       Q.  Okay.  That preacher and the
25   congregation have gone physically to a

Page 60

1    different location?
2        A.  Yes.
3        Q.  Is it still referred to as Franklin
4    Avenue Baptist church?
5        A.  No.  It's under another name until our
6    church is fixed.
7        Q.  Okay.  Now, I know you've just been
8    back a couple of months now, but have you
9    returned to go to that church or another church
10   or --
11       A.  No.
12       Q.  Did you -- prior to the hurricane, did
13   you belong to any type of neighborhood
14   association?
15       A.  No.
16       Q.  Did you know many of your neighbors,
17   say the neighbors on your block?
18       A.  A few, not too many.
19       Q.  Okay.  Do you know if any of the few
20   neighbors that you knew, if any of those have
21   returned to the neighborhoods yet?
22       A.  Yes.
23       Q.  They have?
24       A.  Yes.
25       Q.  Are they actually living in their

Page 61

1    homes or --
2        A.  Yes.  Getting theirs repaired.
3        Q.  Okay.  So your block is becoming --
4    beginning to get back to where it was,
5    somewhat --
6        A.  Somewhat.
7        Q.  -- before the hurricane.
8        A.  Yes.
9        Q.  In the sense at least that people are
10   moving back into their houses.
11       A.  Right.  Yes.
12       Q.  And I'd like to -- I just want to ask
13   you about some of your activities before the
14   storm.  Did you go to Mardi Gras?  Did you go
15   to the parades?
16       A.  I worked.
17       Q.  Okay.  You didn't go to the parades.
18       A.  Unh-unh.  Years ago I did.
19       Q.  Okay.  But in the several years
20   leading up to the storm, you weren't going to
21   the parades?
22       A.  No.
23       Q.  And you said because you were working.
24       A.  Yes.
25       Q.  And your answer may be the same to all

16  (Pages 58 to 61)

DAISY MAE INNIS (LEVEE)                                          7/16/2007

Page 66

1  about the hurricane itself.
2       About when was your first notice of
3  the hurricane?
4       A.  On the news.
5       Q.  Okay.  Was it -- you know about how
6  long before the hurricane actually made
7  landfall that you began hearing about it on the
8  news?
9       A.  No.
10      Q.  Just don't recall?
11      A.  I was on vacation.
12      Q.  Okay.  Were you on vacation and out of
13  town?
14      A.  Yes.  That's why I'm trying -- I was
15  trying to get it together some kind of way.  I
16  weren't here.
17      Q.  Okay.  Where were you?
18      A.  California.
19      Q.  Okay.  Did you remain in California
20  through the hurricane?
21      A.  I was due back the Sunday before the
22  storm.
23      Q.  The day before it made landfall --
24      A.  Yes.
25      Q.  -- you were due back, but you didn't

Page 67

1  come back.
2       A.  No.
3       Q.  Okay.  You stayed in California.
4       A.  Yes.
5       Q.  So while you were out in California,
6  you picked it up on the news.
7       A.  Yes.
8       Q.  Okay.  Obviously, you're a long way
9  away, but what were your initial actions that
10  you took; I mean, did you have family here that
11  you started calling or, to try to get things
12  taken care of on your house or, you know, what
13  did you do?
14      A.  I didn't have very much family here.
15  I did have a friend here, because I had my two
16  pets.
17      Q.  At your house?
18      A.  At my house.  They were taking care of
19  them and I wanted to make sure that my pets
20  were taken care of.
21      Q.  What kind of pets did you have?
22      A.  I had two dogs.
23      Q.  A friend came and got those for you?
24      A.  At the time -- how can I put this?  He
25  was supposed to have been going to get my pets.

Page 68

1       Q.  Okay.
2       A.  He said the water was rising and he
3  had to get his family out.
4       Q.  Okay.  Was your daughter here at the
5  time?
6       A.  My daughter and I was in California
7  together.  We was on vacation, sir.
8       Q.  Okay.  So you didn't really have
9  family here when you were gone?
10      A.  Right.
11      Q.  Okay.  The only thing -- I don't want
12  to say the same thing, but what you did have
13  here were your two dogs at your house.
14      A.  Right.  Yes.
15      Q.  Was someone taking care of the dogs at
16  your house?
17      A.  Yes.
18      Q.  Is it the same friend that you called?
19      A.  Yes.
20      Q.  Okay.  And what was your friend's
21  name?
22      A.  Joseph Bell.
23      Q.  Okay.  Was he a neighbor?
24      A.  Yes.
25      Q.  Okay.  And during that time period, he

Page 69

1  would come by and feed --
2       A.  Feed them.
3       Q.  -- and water them daily?
4       A.  Yes.
5       Q.  Were they staying inside your house?
6       A.  Yes.
7       Q.  So he'd let them go out and --
8       A.  Yes.
9       Q.  Okay.  You were scheduled to come back
10  the day before, you said?
11      A.  The Sunday before.
12      Q.  But did not come back.
13      A.  (Shakes head negatively.)
14      Q.  Were you visiting relatives in
15  California?
16      A.  Friends and family.
17      Q.  Okay.  Who were you staying with out
18  there?
19      A.  A friend of my daughter's.
20      Q.  Okay.
21      A.  I don't remember the names.  I
22  don't --
23      Q.  Okay.  And obviously they cancelled
24  your flight, I take it.
25      A.  Yes.  They cancelled.  My daughter was

18  (Pages 66 to 69)

DAISY MAE INNIS (LEVEE)                                    7/16/2007

Page 70

1   trying -- yes.
2       Q.  Okay.  How long did you and your
3   daughter remain in California?
4       A.  Three weeks.
5       Q.  Okay.  Did you continue to stay with
6   her friend?
7       A.  Yes.
8       Q.  And I take it you weren't in a
9   situation where you had to pay rent or
10  anything.
11      A.  No.
12      Q.  Okay.  After the three weeks, what
13  happened?
14      A.  We got a flight into Jackson.
15      Q.  Okay.  Where in California were you?
16      A.  Los Angeles.
17      Q.  All right.  So you're in Jackson now,
18  when you first come back, or you come to
19  Jackson about three weeks after the storm?
20      A.  After the storm.  Because, as you
21  know, you couldn't get a flight into New
22  Orleans.
23      Q.  Sure.  And when you got to Jackson,
24  what did you do?
25      A.  A relative picked us up.

Page 71

1       Q.  Okay.  And who was that?
2       A.  Angela Watson.
3       Q.  Okay.  And how is she related to you?
4       A.  Niece.
5       Q.  Okay.  Does she live in Jackson?
6       A.  No.
7       Q.  Okay.  Where does she live?
8       A.  Gulfport.
9       Q.  Okay.  Did you go with her to
10  Gulfport?
11      A.  Yes.
12      Q.  And is that when you started living in
13  Gulfport?
14      A.  Yes.
15      Q.  Okay.  And you lived there until just
16  about May of this year?
17      A.  Yes.
18      Q.  When you went to Gulfport -- well, let
19  me ask you this:  During the time that you were
20  in Gulfport, from what, about the end of
21  September of '05 until May of 07 '-- right?
22      A.  Yes.
23      Q.  Almost two years.
24      A.  Yes.
25      Q.  Okay.  Did you live in various places?

Page 72

1   Or did you live in the same place the entire
2   time?
3       A.  Do I have to name all of them?
4       Q.  Well, let's just start and see how it
5   goes.  When you first went, where did you stay,
6   with your niece?
7       A.  Temporarily, yes.
8       Q.  Okay.  Well, just generally, what are
9   some of the places that you lived in Gulfport?
10      A.  West Elementary, West Elementary
11  School shelter and Good Deed shelter.
12      Q.  How long did you live in those
13  shelters?
14      A.  I stayed in Good Deed maybe a month.
15  West Elementary, we had to leave out of there
16  because school was getting ready to open.
17      Q.  Okay.  And how long did you stay
18  there?
19      A.  So they sent us to Good Deed.
20      Q.  How long -- you first stayed at West
21  Elementary?
22      A.  Yes.
23      Q.  And how long did you stay there?
24      A.  Maybe about two, three weeks.
25      Q.  Okay.

Page 73

1       A.  I really don't remember.
2       Q.  Okay.  And that's fine.  If you don't
3   know, please tell me.  I'm just trying to get
4   an idea of where you've been while you were in
5   Gulfport.
6           So you stayed at West Elementary a few
7   weeks and then you went to, you say, good deed.
8       A.  Good Deed.  Yes.
9       Q.  For about a month.
10      A.  Right.
11      Q.  And what about after that?
12      A.  We was trying to get a trailer.
13      Q.  Okay.  A FEMA trailer?
14      A.  A FEMA trailer.
15      Q.  Were you able to the get one?
16      A.  Yes.
17      Q.  And about when did you get the FEMA
18  trailer, do you recall?
19      A.  No.
20      Q.  Was it still in '05 or are we now into
21  '06?
22      A.  Oh, God, I don't remember.
23      Q.  Okay.  Well, regardless --
24      A.  I don't remember.
25      Q.  When you got the FEMA trailer, were

DAISY MAE INNIS (LEVEE)                                    7/16/2007

---

Page 78

1   I'm going to -- do you have Exhibit 2 in front
2   of you, ma'am?
3          MR. REBENNACK:
4              Yeah.  This is your Form 95.
5          This is one of them.
6   EXAMINATION BY MR. SUTTON:
7      Q.  Okay.  Are you looking on the Form 95
8   that is actually dated at the bottom 8/31/06?
9      A.  Yes.
10     Q.  Okay.  And the handwriting on the Form
11  95, is all of that handwriting yours?
12     A.  Yes.
13     Q.  Let's just go through the different
14  boxes.  Box Number 1, the typed portion that's
15  in that box, United States of America,
16  Department of the Army, et cetera, did you type
17  that in or was that already typed for you when
18  you got it?
19     A.  Already typed in.
20     Q.  Okay.  And in Box Number 2, you told
21  me you wrote that in.
22     A.  You.
23     Q.  Your name and address.
24     A.  Right.  Yes.
25     Q.  Box Number 3, where it's typed in Type

---

Page 79

1   of Employment and it looks like maybe civilian
2   is typed in, did you type in that?
3      A.  No.
4      Q.  This was already typed in for you?
5      A.  Yes.
6      Q.  Okay.  The Date of Birth, box
7   Number 4, that's your handwriting.
8      A.  Yes.
9      Q.  And Box Number 4, the Marital Status,
10  that handwriting is yours.
11     A.  Yes.
12     Q.  Okay.  Box Number 6, Date and Day of
13  Accident, the answer that's typed in, again,
14  you didn't type that in.
15     A.  No.
16     Q.  That was already typed in when you got
17  the form.
18     A.  Yes.
19     Q.  Okay.  Box Number 7, Time, unknown,
20  the word unknown that's typed in, again that
21  was typed in when you got the form.
22     A.  Yes.
23     Q.  Box Number 8, Basis of Claim, the
24  written in address, again that's your
25  handwriting, correct?

---

Page 80

1      A.  Yes.
2      Q.  If you'll look immediately below that,
3   Box 8A, the entire answer that's typed in which
4   begins the hurricane protection levees and
5   hurricane walls, et cetera, all of that type,
6   this was already typed in when you received
7   this form?
8      A.  Yes.
9      Q.  Okay.  And the word flood, that's the
10  single handwritten word flood in Box 8A,
11  that is your handwriting.
12     A.  Yes.
13     Q.  If you'll look next, ma'am, at Box
14  Number 9 which is entitled Property Damage, you
15  see that?
16     A.  Yes.
17     Q.  Okay.  The first part of that, Name
18  and Address of Owner, and your name and address
19  is handwritten in, that's your handwriting,
20  correct?
21     A.  Yes.
22     Q.  Okay.  The next portion of Box
23  Number 9 which begins Briefly Describe the
24  Property, the typed answer in that box again
25  was already in the box when you received the

---

Page 81

1   form, correct?
2      A.  Yes.
3      Q.  Box Number 10 which is entitled
4   Personal Injury/Wrongful Death, the typed
5   answer in that box was again already in the
6   form when you received it, correct?
7      A.  Yes.
8      Q.  Okay.  Box Number 11, Witnesses, under
9   Name the answer that's typed in is "claimant is
10  not aware of any witnesses at this time."
11  Again, that answer was already typed in for
12  you.
13     A.  Yes.
14     Q.  Let look at Box Number 12, now, which
15  is entitled Amount of Claim.  Under 12a is
16  entitled Property Damage.  And the amount of
17  $85,000 is written in.  Do you see that?
18     A.  Yes.
19     Q.  Is that what you have claimed with the
20  Department of the Army and that you're claiming
21  in this lawsuit that you have suffered as a
22  result of Hurricane Katrina?
23     A.  Yes.
24     Q.  Okay.  And it's your testimony here
25  today, consistent with the signed form that you

---

21 (Pages 78 to 81)

DAISY MAE INNIS (LEVEE)                                        7/16/2007

Page 82

1  submitted with the government, that you have
2  sustained $85,000 in property damage.
3      A.  Yes.
4      Q.  Okay.  Now, Box 12b, Personal Injury,
5  a line is drawn through that.  Did you draw
6  that line through there?
7      A.  Yes.
8      Q.  Okay.  And I take it that by doing so,
9  and by filing this form with the government,
10 you are not claiming any personal injury in
11 connection with Hurricane Katrina.
12     MR. REBENNACK:
13        Object to the form of the
14        question.
15 EXAMINATION BY MR. SUTTON:
16     Q.  Well, let me ask this:  On the Form
17 95, under the box Personal Injury, you
18 indicated that you had no claim for personal
19 injury, is that correct?
20     A.  Right.  Other than pain and suffering.
21     Q.  I'm sorry?  I didn't hear you.
22     A.  Pain and suffering.
23     Q.  No pain and suffering?
24     A.  Pain and suffering.
25     Q.  Okay.  Do you differentiate pain and

Page 83

1  suffering from personal injury?
2      A.  Well, I didn't know -- I didn't know
3  if I could put -- I thought when they said
4  property damage I could put it with pain and
5  suffering, so I didn't know.  Personal
6  injuries, I thought maybe something had to be
7  broke or --
8      Q.  Okay.  When you say personal injury,
9  are you referring to emotional distress?
10     A.  Yes.
11     Q.  You're not claiming any type of
12 physical injury or illness or disease.
13     A.  No.
14     Q.  Okay.  Your claim is limited to
15 emotional distress.
16     A.  Right.  Yes.
17     Q.  Okay.  Fair enough.  Under Box 12C,
18 Wrongful Death, you have a line through it, and
19 you're not making a claim for wrongful death.
20     A.  No.
21     Q.  Okay.  And Box 12d is a total, you
22 simply bought over the $85,000 from Box 12a and
23 put that as your total.
24     A.  Yes.
25     Q.  If you would, Ms. Innis, flip over to

Page 84

1  the next page.  About halfway down, you see
2  where it indicates insurance coverage?  About
3  halfway down the form?
4      A.  Yes.
5      Q.  Okay.  And there are several boxes
6  under insurance coverage.  Box Number 15 asks
7  if you carry accident insurance.  And the typed
8  answer is none that would cover this claim.
9        You see that?
10     A.  Yes.
11     Q.  Now, again, that typed answer was
12 already in the form when you received it,
13 correct?
14     A.  Yes.
15     Q.  And likewise, the typed answers
16 in response to the subsequent boxes, 16, 17
17 and/or 18, were also already included in the
18 form when you received it.
19     A.  Yes.
20     Q.  Okay.  And you told me earlier, and
21 we'll get into it later, that you had no flood
22 insurance.  Correct?
23     A.  No insurance.  No flood insurance.
24     Q.  You had homeowner's insurance.
25     A.  Homeowner's.

Page 85

1      Q.  All right.  Now, do you know who
2  provided the typed answers to the Form 95 that
3  you received?  Do you know if it was your
4  lawyer's office that did that?
5      A.  I'm sure.  I picked it up from the
6  lawyer's office.
7      Q.  You picked up the Form 95 from the
8  lawyer's office?
9      A.  Yes.
10     Q.  Do you know why you have two Form 95s?
11 You have one that's dated and one that's
12 undated that we've gone over.
13     A.  I don't know.
14     Q.  You just don't know?
15     A.  Maybe I forgot a file, trying to get
16 it filed, and I forgot to.
17     Q.  Okay.  As you sit here today, do you
18 recall, though, completing a Form 95 on two
19 separate occasions?
20     A.  Unh-unh.
21     Q.  You just don't recall?
22     A.  No.
23     Q.  Okay.  You'd agree that both, though,
24 claim property damage of $85,000?
25     A.  Yes.

22  (Pages 82 to 85)

DAISY MAE INNIS (LEVEE)                                    7/16/2007

Page 98

1  have incurred --
2      A.  If it had not been for the --
3      Q.  Exactly.  Like you would have incurred
4  utilities if you would have stayed here.
5      A.  Right.
6      Q.  But I'm looking for expenses that you
7  incurred during your evacuation or relocation
8  that you would not have incurred.
9      A.  I had to buy furniture.
10     Q.  Okay.  Fair enough.  You had to --
11     A.  I had to buy clothes.
12     Q.  Okay.
13     A.  Shoes.
14     Q.  While you were gone.  Okay.  Because
15  you lost your personal property in the storm.
16     A.  Right.
17     Q.  Okay.  What about, did you have to buy
18  a car?
19     A.  Yes.
20     Q.  Did you have a car at the time of the
21  hurricane?
22     A.  I had two.  My daughter had a car and
23  I had two cars.  I had one Cavalier and I had a
24  DeVille.  It was lost in the water.
25     Q.  Okay.  All of those were lost?

Page 99

1      A.  In the water, yes.
2      Q.  Okay.  What about did you take one of
3  them, did you take a car to the airport?
4      A.  No.  I had someone to bring me to the
5  airport.
6      Q.  Okay.  You told me earlier that you're
7  making a claim for lost earnings.
8      A.  Uh-huh.  Yes.
9      Q.  Okay.  And you told me that you were
10  working at the time of the hurricane about
11  sixty hours a week.
12     A.  Yes.
13     Q.  Earning about --
14     A.  I hadn't retired yet.
15     Q.  Earning about $7 to $7.50 an hour.
16     A.  Yes.
17     Q.  After the hurricane, and you've told
18  me about the three jobs that you had after the
19  hurricane in Mississippi, in Gulfport --
20     A.  Yes.
21     Q.  -- is it your testimony that you
22  attempted to find full-time jobs but was unable
23  to find --
24     A.  Unable.
25     Q.  -- full-time jobs in Mississippi?

Page 100

1      A.  Yes.
2      Q.  They just had no jobs available.  Is
3  that your testimony?
4      A.  No.  They had jobs.
5      Q.  Okay.
6      A.  But not the type of jobs that I was
7  looking for.  I was looking for my sitting
8  work.
9      Q.  Okay.  Well, you didn't do any sitting
10  work jobs, though, right, in Mississippi?  You
11  worked at a casino, you worked at a school, and
12  you worked for a janitorial service.
13     A.  Right.
14     Q.  Okay.  Is it your testimony that over
15  the eighteen months or twenty months that you
16  were in Mississippi that you were unable to
17  find a full-time job?
18     A.  I found a full-time job at the casino.
19     Q.  The last couple of months.
20     A.  Yes.
21     Q.  But until that last couple of months,
22  is it your testimony that you were unable to
23  find any type of full-time job that you could
24  work in?
25     A.  Yes.

Page 101

1      Q.  That's right.  That's your testimony.
2      A.  Yes.
3      Q.  Okay.  And that's the basis for your
4  claim for lost earnings.
5      A.  Yes.
6      Q.  Is that you were only able to find
7  part-time work --
8      A.  Part-time work.
9      Q.  -- until approximately March of '07.
10     A.  Right.
11     Q.  That simply there were no full-time
12  jobs available in Gulfport.
13     A.  If they'd them, I couldn't find them.
14     Q.  Okay.  And what is the amount of lost
15  earnings that you're claiming to have sustained
16  as a result of the hurricane?
17     A.  I don't know.
18     Q.  Have you ever tried to make a
19  determination of an approximation as to how
20  much you're claiming in the -- as far as last
21  earnings are concerned?
22     A.  No.
23     Q.  Now, you moved back to New Orleans two
24  months ago, correct?
25     A.  Yes.

26  (Pages 98 to 101)

DAISY MAE INNIS (LEVEE)                                    7/16/2007

Page 102

1    Q.  Are you continuing to claim that you
2  are unable to find employment here?
3    A.  No.
4    Q.  Are you simply not looking for work at
5  this time?
6    A.  Not at this time.  Not until they
7  finish with my home.
8    Q.  Okay.  And your home is currently
9  being repaired right now.
10   A.  Yes.
11   Q.  Are you contracting that work?
12   A.  I have someone else contracting the
13  work.
14   Q.  You have a contractor.
15   A.  Yes.
16   Q.  Well, why can't you work if you have a
17  contractor repairing your home?
18   A.  Because I want to be there and make
19  sure they do what I want them to do.
20   Q.  You want to be there 24 hours a day?
21   A.  Not 24 hours because they're not there
22  24 hours.
23   Q.  They're there in the daytime.
24   A.  Yes.
25   Q.  Okay.  But until your home is

Page 103

1  complete, you simply don't want to work.
2    A.  Not right now.
3    Q.  Okay.  Have you looked for any future
4  work at this time?
5    A.  Yes.
6    Q.  Okay.  And have you found that there
7  are jobs available out there?
8    A.  They have, yes.
9    Q.  Okay.  And you feel confident that
10  once you are ready to go back to work you'll be
11  able to find a job?
12   A.  Yes.
13   Q.  Have you discussed with your prior
14  employer Kay as far as whether or not you could
15  return there to work?
16   A.  Yes.  I have been there.
17   Q.  And have they offered you a job?  Have
18  they told you yes, when you're ready the come
19  back --
20   A.  When I'm ready.  Yes.
21   Q.  So essentially you have a job waiting
22  for you.
23   A.  Yeah.  Whenever I get ready to go
24  back.
25   Q.  Okay.  And that would be similar to

Page 104

1  the job that you had before the storm.
2    A.  Right.
3    Q.  Okay.
4    A.  Yes.
5    Q.  Same type of hours, same type of pay.
6    A.  Maybe.
7    Q.  Okay.  Well, they haven't told you
8  anything different yet.
9    A.  No.
10   Q.  Have you, since the storm, Ms. Innis,
11  have you applied for any unemployment benefits?
12   A.  No.  Since the storm?
13   Q.  Yes, ma'am.  At any time after the
14  storm.
15   A.  After the storm.
16   Q.  Well, since the storm.
17   A.  Since the storm, yes.
18   Q.  You have applied for unemployment
19  benefits.
20   A.  Yes.
21   Q.  Okay.  Who did you apply for, in
22  Louisiana or in Mississippi?
23   A.  Well, I was in Mississippi, living in
24  Mississippi, so it had to come from here.
25   Q.  From here Louisiana?

Page 105

1    A.  Louisiana.  I'm sorry.
2    Q.  So you came back over here and applied
3  in Louisiana?
4    A.  On the phone.
5    Q.  On the phone.  Okay.  When did you
6  apply for unemployment benefits?
7    A.  I don't remember that either.
8    Q.  Did you ever receive unemployment
9  benefits?
10   A.  I think I did.  A couple of times.
11   Q.  And you would receive those what, you
12  would get a check every week, correct?
13   A.  No, it didn't come in a check.  I
14  don't remember how I got it.  But it wasn't --
15  no, not a weekly check.
16   Q.  Would it be directly deposited into an
17  account?
18   A.  They gave me -- sent me like a card.
19  Like a credit card.
20   Q.  Okay.  That you could essentially use
21  anywhere?
22   A.  Yes.
23   Q.  Over approximately what period of time
24  did you receive unemployment benefits?
25   A.  I think about twice.

DAISY MAE INNIS (LEVEE)                                           7/16/2007

Page 106

1      Q.  When you say like -- just two cards?
2  Or two periods of time?
3      A.  Two periods of time.
4      Q.  Okay.  Over how many months, though,
5  did that encompass, are we talking about a year
6  or more than a year?  I know often they go up
7  to like six months at a time.  Did you --
8      A.  No, it didn't go up to six months.
9  No.
10     Q.  Okay.
11     A.  It wasn't that long.
12     Q.  You just don't recall?
13     A.  No, I don't recall that.
14     Q.  Do you recall at about what rate your
15  benefits were?
16     A.  No.
17     Q.  Okay.  Have you received any monies or
18  benefits for lost wages from any other source,
19  other than unemployment benefits?
20     A.  No.
21     Q.  That would be the only one.
22     A.  The only thing, yes.
23     Q.  Did you file income tax returns for
24  2005, the year of the storm?
25     A.  No.

Page 107

1      Q.  Okay.  What about this past year,
2  2006, did you file income tax returns?
3      A.  Yes.
4      Q.  Okay.
5      A.  '06, yes.
6      Q.  You didn't for '05, but you did for
7  '06?
8      A.  Yes.
9      Q.  Have you got any kind of notice from
10  the IRS telling you that you need to file them
11  for '05 yet or not?
12     A.  I don't remember.
13     Q.  Do you prepare your own income tax
14  returns or did you have a service?
15     A.  I have a service.
16     Q.  Okay.  Who prepares your income tax
17  returns?
18     A.  Who did my taxes?  I'm trying to think
19  now.  What's that person's name?  I had -- I
20  can bring all that information if they need it.
21     Q.  It's a local preparer, someone in New
22  Orleans?
23     A.  Yes.  No.  It was in Mississippi.
24     Q.  It was in Mississippi.
25     A.  Yeah.  But the company is -- it's not

Page 108

1  H&R Block, it's another company.
2      Q.  It's like a national company?
3      A.  Yeah.  I think.
4      Q.  You didn't own a business or anything
5  at the time of Hurricane Katrina, your own
6  business.
7      A.  No.
8      Q.  You're not claiming any kind of loss
9  of business or rental income, anything like
10  that.
11     A.  No.
12     Q.  Did you regularly file income tax
13  returns before Hurricane Katrina?
14     A.  Yes.
15     Q.  What type would you file, just regular
16  1040?
17     A.  Yes.
18     Q.  I would like to shift gears a little
19  bit here and talk about your real property,
20  your home.  Okay?
21     A.  Okay.
22     Q.  You owned one piece of property in
23  Orleans Parish.
24     A.  Yes.
25     Q.  4024 Stutz Street.

Page 109

1      A.  Yes.
2      Q.  Do you know what if any designated
3  flood zone that property is located?
4      A.  I don't know what that be, Zone 4?
5      Q.  I'm not talking about the class zone,
6  I'm talking about flood zones for insurance
7  purposes, like Flood Zone A, Flood Zone B.
8         Do you know?  If you don't --
9      A.  B, I think it is.
10     Q.  You think it's B?
11     A.  I think it's B.  I think they told me
12  it was B.
13     Q.  And you told me you have 100 percent
14  ownership of this property.
15     A.  Oh, yes.
16     Q.  Can you tell me about when you
17  purchased the house?
18     A.  It had to have been '87 or '88.  1987
19  or 1988.  I'm not sure.
20     Q.  And do you recall approximately how
21  much you paid for the house when you bought it?
22     A.  Thirty-two.
23     Q.  Thirty-two thousand dollars?
24     A.  Yes, sir.
25     Q.  Was there any particular reason or

DAISY MAE INNIS (LEVEE)                                    7/16/2007

Page 114

1    A.  This was after I bought the house I
2   did that.
3    Q.  That's what I'm asking for.  What have
4   you had done to the house?
5    A.  Rewired.
6    Q.  Do you know about how much it cost to
7   have the house rewired?
8    A.  At that time, $1,500.
9    Q.  And you said you put new floors in it.
10  What did it have in it when you bought it?
11   A.  Carpet.
12   Q.  You got the carpet ripped out?
13   A.  Yes.
14   Q.  Did you put new carpet in or did
15  you --
16   A.  No.  Hardwood floors.
17   Q.  Throughout the house?
18   A.  Throughout the house.
19   Q.  And what was the approximate cost of
20  having that done?
21   A.  I don't remember.
22   Q.  Several thousand dollars, though?
23   A.  Oh, no.  No.  Maybe about four.  Maybe
24  about four.
25   Q.  Four --

Page 115

1    A.  Thousand.
2    Q.  Four thousand?
3    A.  Yes.  Maybe.  I don't know.
4    Q.  Okay.  That's fine.  And what else --
5   you said one other thing, though.
6    A.  Had it painted, in and out.
7    Q.  In and out.  Okay.  And do you know
8   the approximate cost of having all the painting
9   work done?
10   A.  I don't remember.
11   Q.  Okay.  Have I covered everything with
12  you as far as what you would consider to have
13  been substantial improvements that you made to
14  the house?
15   A.  A roof.
16   Q.  You got a new roof put on?
17   A.  I had a new roof at that time put on.
18   Q.  Okay.
19   A.  Before -- way before the storm.
20   Q.  About when did you have the new roof
21  put on?
22   A.  Maybe about ten years, maybe ten,
23  fifteen years ago.
24   Q.  So it's been some time.
25   A.  Yes.

Page 116

1    Q.  Do you know how much that cost?
2    A.  No, not right offhand.
3    Q.  Okay.  Any other substantial
4   improvements?
5    A.  That's about it.
6    Q.  This house is -- it's on wood beams,
7   wood piers?  It's off the ground, right?
8    A.  Yes.
9    Q.  Do you know about how high off the
10  ground it is?
11   A.  No, I don't.  Not offhand, no, I
12  don't.
13   Q.  Okay.  It is a single-family
14  residence, correct?
15   A.  Yes.
16   Q.  And just -- just generally, what are
17  there inside, like how many bedrooms, et
18  cetera?
19   A.  Two bedrooms.  It's a living room,
20  dining room, two bedrooms, bath and a kitchen.
21   Q.  Okay.  Do you know the approximate
22  living square footage of the house?
23   A.  No.
24   Q.  Okay.  And it's a wood house, correct?
25   A.  With aluminum siding.

Page 117

1    Q.  With aluminum siding.  And just a
2   regular asphalt type of roof?
3    A.  Yes.
4    Q.  The finishes on the inside of the
5   house, is that sheetrock or is it plaster?
6    A.  Sheetrock.
7    Q.  It had plaster at one time, or?
8    A.  No.
9    Q.  Always?
10   A.  Always, since I've been there.
11   Q.  It had sheetrock?
12   A.  Sheetrock.  And with the construction
13  people, when they tore it out, it was
14  sheetrock.
15   Q.  Okay.  So when they took out the
16  sheetrock you were immediately at the wood
17  studs.
18   A.  Yes.
19   Q.  Do you know, Ms. Innis, when the house
20  was originally constructed?
21   A.  No, I don't.
22   Q.  Okay.  Are there any structures on
23  your lot other than the house?  Was there --
24  and I'm talking about at the time of the
25  hurricane.  Was there an attached garage or

DAISY MAE INNIS (LEVEE)                                    7/16/2007

Page 118

1  shed or carport or anything like that?
2      A.  There was a lil -- a lil, um -- it was
3  a shed, and I turned it into like a lil den
4  back there in the back.
5      Q.  Okay.  Was it attached?
6      A.  No, it wasn't attached to the house.
7      Q.  It was in the backyard.
8      A.  In the back, yes.
9      Q.  But it wasn't a conditioned room.
10 There's no air conditioning or heating or
11 anything to it.
12     A.  No.
13     Q.  Okay.  Was that shed built off the
14 ground or was it on the ground?
15     A.  It's on the ground.
16     Q.  You have a picture of it?
17     A.  (Tendering.)  That's it right there.
18     Q.  Okay.  Thank you.
19     A.  That was did before the storm.  Just
20 before the storm I had it fixed.
21     Q.  You had a window AC, though, in it.
22     A.  We put that in there.
23     Q.  Before the storm?
24     A.  Before the storm, yes.
25     Q.  Okay.  And is this shed -- you said

Page 119

1  you turned it into a den?
2      A.  Like a lil den, yes.
3      Q.  Kind of like you can go out there and
4  just have a quiet sitting area?
5      A.  Sitting area, yes.
6      Q.  How big is that shed, do you know?
7  It's hard to tell in a photograph.
8      A.  It's a nice lil size.
9      Q.  Is the shed built on -- like on wood
10 piers or is it on a slab?
11     A.  It's on a slab.
12     Q.  It's on a concrete slab?
13     A.  Concrete slab.
14     Q.  And it's wood exterior.
15     A.  Yes.
16     Q.  Is it finished on the inside or is it
17 unfinished on the inside?
18     A.  It's finished.
19     Q.  With sheetrock?
20     A.  Yes.  Before the storm.
21     Q.  Okay.  And it had a similar roof to
22 the house, and just a typical asphalt type of
23 roof?
24     A.  Yes.
25     Q.  That shed was there when you bought

Page 120

1  the property?
2      A.  Yes.
3      Q.  But you fixed it up.
4      A.  Yes.
5      Q.  What kind of flooring did you have in
6  the shed?
7      A.  We didn't have -- started on the
8  flooring.
9      Q.  It was still concrete?
10     A.  Still concrete, yes.
11     Q.  Were the sheetrock walls painted yet,
12 or was it just --
13     A.  Painted.
14     Q.  And it had electricity inside of it?
15     A.  Yes.
16     Q.  What did you have, like a light
17 fixture or something?
18     A.  No, it had regular outlets.
19     Q.  Okay.  Thank you.  (Tendering.)
20     That shed wasn't up off the ground,
21 though, except for being on the slab.
22     A.  On the slab.
23     Q.  As opposed to your house which was --
24     A.  Off the ground.
25     Q.  -- off the ground.

Page 121

1      And you don't know how old that shed
2  was, do you?
3      A.  No.  When I bought the house the shed
4  was there.
5      Q.  Okay.  Do you know if either the house
6  or the shed had ever flooded before Hurricane
7  Katrina?
8      A.  No.  Not that I -- no.
9      Q.  What about in the May 1999 flood, did
10 the -- the shed didn't get any water in it in
11 that flood?
12     A.  No.
13     Q.  Okay.  So to your knowledge --
14     A.  To my knowledge it didn't.
15     Q.  And when you bought the house, the
16 people who sold it to you never told you that
17 it had flooded before?
18     A.  That it flood, right.
19     Q.  So to the best of your knowledge, the
20 house had never flooded.
21     A.  Never flood.
22     Q.  Now, you told me about you had put on
23 the new roof about ten years before the storm,
24 and you had put in new electrical wiring
25 throughout the house.

DAISY MAE INNIS (LEVEE)                                        7/16/2007

Page 122

1  A.  Yes.
2  Q.  And you had painted the walls.
3       What about -- had you changed out any
4  of the plumbing throughout the house before the
5  storm?
6  A.  When I had the plumbing -- the
7  plumbing was okay.
8  Q.  Okay.  So you didn't make any major
9  renovations involving the plumbing.
10  A.  No.
11  Q.  Was the home, for cooling and -- for
12  cooling, did you have window units?
13  A.  Window units.
14  Q.  And what about heating, did you have
15  furnaces?
16  A.  Floor furnace.
17  Q.  Floor furnace.
18  A.  Floor furnace.
19  Q.  The siding, the aluminum siding on the
20  house, was that already on the house when you
21  bought it?
22  A.  Yes.
23  Q.  Do you have any idea what the fair
24  market value of your property was at the time
25  of Hurricane Katrina?

Page 123

1  A.  No.
2  Q.  Now, you had never put your house up
3  for sale, correct?
4  A.  No.
5  Q.  I'm just curious if you had seen any
6  of your neighbors put their houses up for sale
7  and what they were asking for them.
8  A.  I have one neighbor, he have a
9  house -- of his own house up for sale.  I think
10  he's asking up in the nineties for it.  I don't
11  know.  I didn't get that from him.
12  Q.  Was that before the storm?
13  A.  Before the storm.  It's still up for
14  sale.
15  Q.  Okay.  But before the storm he was
16  asking somewhere around ninety thousand for it?
17  A.  Yes.
18  Q.  Was his house comparable to yours as
19  far as size and so forth, or was it smaller,
20  bigger?
21  A.  Oh, I don't know.
22  Q.  You don't know?
23  A.  (Shakes head negatively.)
24  Q.  Okay.  So really, as you sit here
25  today just don't know what the fair market

Page 124

1  value of your home was at the time of the
2  hurricane.
3  A.  No.
4  Q.  That's correct?
5  A.  Correct.  I don't know.
6  Q.  And you don't know what would have
7  been the fair market value of the property,
8  just the property itself, at the time of the
9  hurricane.  Forgetting about the house for a
10  second, just the land.
11  A.  Just the land?
12  Q.  Yeah.
13  A.  No.
14  Q.  You had told me earlier you had
15  homeowner's insurance through I think Allstate?
16  Did you say Allstate?
17  A.  Yes.
18  Q.  Do you know what the limit of your
19  coverages were for both -- for the real and the
20  personal property, for your homeowner's?
21  A.  I don't know.
22  Q.  I'm sure at one point after the flood
23  you learned of that, though, when you were
24  dealing with them, how much you had in
25  coverage.

Page 125

1  A.  Yes.
2  Q.  Okay.  You just, as you sit here
3  today, you just don't recall what the coverage
4  was.
5  A.  I don't recall.  I don't recall.
6  Q.  Have you ever applied for insurance
7  coverage on the property and been denied for
8  any reason?
9  A.  No.
10  Q.  When is the first time after the storm
11  that you came back and saw your property?
12  A.  When the man gave us the okay.
13  Because they were going by ZIP codes.
14  Q.  Do you know about when that was?
15  A.  No.  I don't.
16  Q.  Okay.  Do you know whether it was
17  sometime, though, before the end of '05?
18  A.  I don't recall.  Right offhand I don't
19  recall.
20  Q.  When you came, did you come with your
21  daughter?
22  A.  Yes.
23  Q.  And when you first came back to your
24  property, Ms. Innis, when you came with your
25  daughter, what did you see in the way of

DAISY MAE INNIS (LEVEE)                                    7/16/2007

---

Page 126

1  damages?
2      A.  The front door was open, just like
3  this in this picture.  The door was open, and
4  we walked in.
5      Q.  The door was still on the hinges?
6      A.  Yes.  But everything -- you know,
7  security, they had to go in to check to see if
8  anybody was in there or, or about the pets was
9  in there.  And the front door was open.  And,
10  um -- my daughter went in first because I was
11  out speaking with two of the neighbors.  And
12  they said we shouldn't have been back there by
13  ourself.
14      Q.  Who were you talking to?
15      A.  A neighbor.  I don't know his name
16  right offhand.
17      Q.  Were they already moving back in or --
18      A.  No.  They were checking on his rental
19  property.
20      Q.  Okay.
21      A.  And when I went in, when I did go in
22  the house, everything had been like moved
23  around.  Stuff was wet.
24      Q.  All the furniture and everything?
25      A.  Yeah.  Things had been moved around

---

Page 127

1  like somebody had just come in there and moved
2  stuff around.
3      Q.  Okay.
4      A.  Wet, damp, smelly.
5      Q.  Did you notice --
6      A.  The mold and stuff.
7      Q.  Could you see -- were you able to see
8  any type of waterline on the inside of your
9  house to get an idea of how high the water had
10  got in it?
11      A.  It's in the pictures.
12      Q.  Okay.  In those pictures?
13      A.  Yes.
14      Q.  Okay.  And I'll look through those
15  pictures, but as you recall, do you recall
16  about how high that waterline was in the house?
17      A.  Yes.
18      Q.  Okay.  About how high was it?
19      A.  From the floor, I can't -- I can't
20  say.  I can just show you on that picture.
21      Q.  Okay.  Why don't we go off the record
22  for a second.
23          (Off the record.)
24  EXAMINATION BY MR. SUTTON:
25      Q.  Ms. Innis, I want to refer you back to

---

Page 128

1  Exhibit Innis Number 4 which is a picture taken
2  of the front exterior of your home.
3      A.  Yes.
4      Q.  And you would agree that there are two
5  steps plus another step up to your porch?
6      A.  Right.  Yes.
7      Q.  And just looking at the picture, it
8  looks like, as a ballpark estimate, your home
9  is approximately maybe two and a half feet off
10  the ground?  Is that -- would you agree
11  somewhere in that neighborhood?
12      A.  Somewhere, yes.
13      Q.  You've also chosen from the pictures
14  that you've produced today a few pictures which
15  would indicate how high the water got inside
16  your house.
17      A.  It's a raised house.
18      Q.  And I've looked at these pictures
19  along with you and your counsel, and would you
20  agree with me that it looks like the water got
21  somewhere between approximately a foot to a
22  foot and a half inside your house?  Up off the
23  floor?  Does that sound approximately right?
24  And I'm not trying to state an exact
25  measurement.  Does that sound about right,

---

Page 129

1  based on your own visual observations?
2      A.  I don't know because I didn't measure
3  that.
4      Q.  Okay.  You just don't know?
5      A.  I don't know.
6      Q.  Did any of your -- any of the windows
7  break in your house as a result of the
8  hurricane?
9      A.  No.
10      Q.  Was your roof -- did your roof suffer
11  any damage?
12      A.  Yes.
13      Q.  Okay.  What type of damage did your
14  roof suffer?
15      A.  Water damage.
16      Q.  Okay.  Did any trees strike the roof,
17  or do you know what caused the roof to leak?
18      A.  No.
19      Q.  Had the roof leaked at any time before
20  the hurricane?
21      A.  No.
22      Q.  So this was the first time.
23      A.  Yes.
24      Q.  Okay.  Could you visually see roof
25  damage?

---

JOHNS PENDLETON COURT REPORTERS                      800 562-1285

DAISY MAE INNIS (LEVEE)                                    7/16/2007

Page 134

1   your damages.
2       A.  (Nods affirmatively.)
3       Q.  And you just told me about the
4   emotional distress, the real property -- right?
5       A.  Yes.
6       Q.  -- the personal property --
7       A.  Yes.
8       Q.  -- the evacuation --
9       A.  Yes.
10      Q.  -- any damage that you incurred.
11      A.  Yes.
12      Q.  Okay.  And we've talked about some of
13  the other damages, but now I just want to focus
14  on the damage to your house.  Okay?
15          Do you have -- well, first of all, you
16  have a contractor who started working on your
17  house, right?
18      A.  Yes.
19      Q.  Has he given you a -- obviously he has
20  given you a written proposal as to the cost of
21  repairing your home.
22      A.  Yes.
23      Q.  Okay.  And you have a copy of that
24  that you can --
25      A.  No, I don't have a copy of it.

Page 135

1       Q.  Not with you, but you have a copy of
2   it.
3       A.  Oh, yes.
4       Q.  And that's -- did you sign a contract
5   with the contractor?
6       A.  No, I didn't sign a contract with him.
7       Q.  Okay.  What do you have in terms of
8   writing, do you have a proposal from him?
9       A.  Yes.
10      Q.  What's the name of your contractor?
11      A.  A2Z.  Not T-W-O, the number 2.
12      Q.  Are they a local company?
13      A.  Yes.
14      Q.  And what has been the proposed charges
15  for repairing your home to pre-Katrina state by
16  the contractor; what's he told you it's going
17  to cost?
18      A.  Well, I had three estimates, and that
19  was -- this one was the lowest one.  He said
20  fifty-five thousand.
21      Q.  Fifty-five thousand?
22      A.  Yes.
23      Q.  And that's who you're going with.
24      A.  Yes.
25      Q.  And he's the one -- he's currently

Page 136

1   doing the work on your home.
2       A.  Yes.
3       Q.  And at least as of right now, you
4   would defer to him that that's going to be the
5   amount that it's going to cost you just to make
6   the repairs to your home.
7       A.  Yes.
8       Q.  Fifty-five thousand dollars?
9       A.  Yes.
10      Q.  And you expect that once he gets
11  through your home is going to be at least as
12  good as it was before the hurricane.
13      A.  Or better.  A little better.
14      Q.  Yeah.  Some things are going to be new
15  in it, obviously.
16      A.  Yes.
17      Q.  And as he purchases things and works,
18  does he give you any kind of documentation the
19  charges?  What does he give to you?  Your
20  contractor.
21      A.  He don't give me anything.
22      Q.  The only thing you've gotten from him
23  is a written proposal?
24      A.  Yes.  And whatever I want or
25  whatever -- you know, when we get ready to get

Page 137

1   something, I'll go along with him.
2       Q.  Okay.  Now --
3       A.  Windows, doors, and stuff like that.
4       Q.  To pay him, are you using funds
5   provided by or from your insurance carrier or
6   what?
7       A.  Road Home.
8       Q.  Road Home.
9       A.  Road Home.  Road Home.
10      Q.  Well, you made a homeowner's claim
11  with Allstate.  What was the response by
12  Allstate to your claim?
13      A.  Well, that's turned over to Mr. Bruno.
14      Q.  I'm sorry?  Turned over to who?  Your
15  attorney?
16      A.  My attorney.  Yes.
17      Q.  Well, do you know, though, has
18  Allstate paid any benefits under the
19  homeowner's policy?
20      A.  Yeah.  They did.
21      Q.  Okay.  What did they pay you?
22      A.  Two thousand.  Just two thousand three
23  hundred, I think.  I have the papers on that.
24      Q.  You have the papers.
25      A.  I have the paperwork on that.

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

DAISY MAE INNIS (LEVEE)                                          7/16/2007

---

**Page 138**

1    Q.  But that's all they've paid you for
2  the damages to your home.
3    A.  Yes.
4    Q.  Okay.  They have contended that the
5  great majority of your damage is caused by
6  flood?  Is that right?
7    A.  Yes.
8    Q.  Okay.  And that's why they've only
9  paid you $2,300?
10   A.  Yes.
11   Q.  Okay.  And currently, then, you're in
12 litigation with Allstate?  You've hired an
13 attorney?
14   A.  Yes.
15   Q.  Do you know if a suit has been filed
16 on your behalf against Allstate?
17   A.  I don't know.
18   Q.  Okay.  Have there been any further
19 settlement negotiations or discussions?
20   A.  (Shakes negatively.)
21   Q.  None to your knowledge?
22   A.  Not to my knowledge, I'm sorry.
23   Q.  And you don't have any claim against
24 any other insurance company.
25   A.  No, sir.

---

**Page 139**

1    Q.  Allstate sent an adjuster out to take
2  look at your property?
3    A.  Yes.
4    Q.  And they give you a report based on
5  what the adjuster found?  Did they give you
6  some kind of letter where they showed why they
7  were paying the $2,300?
8    A.  Yes.  I think it was.  I think so.  I
9  think.
10   Q.  And you still have that?
11   A.  I think -- yes.
12   Q.  Now, let's talk about other payments
13 you've gotten.  Just for damages to your home.
14 Okay?  Allstate paid you $2,300.
15   A.  Yes.
16   Q.  And were you about to tell me about
17 the Road Home?
18       Have you actually received your funds
19 from the Road Home?
20   A.  Yes.
21   Q.  Okay.  And how much did the Road Home
22 pay you?
23   A.  $88,000.
24   Q.  $88,000.  Okay.  Is that currently,
25 though, in some type of account right now?

---

**Page 140**

1    A.  Yes.  We're using that to buy --
2  purchase the merchandise for the repairs of the
3  house.
4    Q.  And you have to use that money to
5  repair the house.
6    A.  That's right.  That's what I'm using
7  it for.  Only.
8    Q.  Okay.  Now, are you limited on what
9  you can do with the difference?  If it only
10 costs $55,000 to repair your house and they've
11 paid you $88,000, what options do you have to
12 use whatever difference there may be that's
13 left over?  Can you spend that like on
14 furniture and things like that, or --
15   A.  Yeah.  Probably will.
16   Q.  Or do you have an understanding on
17 that?
18   A.  Probably furniture.  Getting things
19 for the house.  Furniture.
20   Q.  Do you know if the -- in connection
21 with the Road Home Program, do you know if some
22 type of appraisal was made on your property in
23 order to determine how much they would pay you?
24   A.  I don't know.
25   Q.  Okay.

---

**Page 141**

1    A.  I don't know what the Road Home did.
2    Q.  Okay.  Did you have legal assistance
3  on the Road Home Program or did you do
4  everything yourself?
5    A.  Everything myself.
6    Q.  And you made an application and so
7  forth.
8    A.  Yes.
9    Q.  And you have maintained a copy of
10 that?
11   A.  Yes.
12   Q.  How far along is the contractor with
13 your house; A2Z?
14   A.  I'd say about the end of the month.
15 I'm hoping by the end of the month.
16   Q.  So they are almost done.
17   A.  They just have to put in sheetrock.
18 Sheetrock and then paint it.
19   Q.  Okay.  But they have done all the
20 wiring and plumbing and all that stuff?
21   A.  Yeah.  All that.
22   Q.  Basically, just finishing off at this
23 point.
24   A.  Yes.
25   Q.  You had to have your house gutted

---

DAISY MAE INNIS (LEVEE)                                    7/16/2007

Page 142

```
 1   before A2Z came in?
 2       A.  I did some of it -- I did some, and
 3   then before -- when they start looking, because
 4   they had that mold and stuff, and so they said
 5   I had to have it gutted all the way because the
 6   mold was growing up -- going up.
 7       Q.  So you gutted it floor to ceiling.
 8       A.  Yes.
 9       Q.  How much did you have to pay for the
10   gutting of the house?
11       A.  I don't know what they.  That's all
12   into the contract.
13       Q.  Oh.  That was part of A2Z.
14       A.  Yes.
15       Q.  So they directed the gutting, that's
16   included in the fifty-five thousand?
17       A.  Yes.  That's into that contract.
18       Q.  It wasn't a separate charge.
19       A.  No.
20       Q.  And as far as documentary evidence
21   regarding the repairs, you really don't have
22   any, all that would be with A2Z, is that
23   correct?
24       A.  Yes.  I could get all that for you.
25       Q.  But you would get it from A2Z.
```

Page 143

```
 1       A.  Yes.
 2       Q.  And I may have asked you this, and I
 3   apologize if I did:  I know you told me you
 4   moved back here a couple of months ago in May.
 5   Where are you living right now?
 6       A.  The trailer.
 7       Q.  Okay.  On your property?
 8       A.  Yes.
 9       Q.  Is it a FEMA trailer?
10       A.  Yes.
11       Q.  Okay.  Is it similar to the FEMA
12   trailer you were living in in Mississippi?
13       A.  No.  This is a cottage.  My daughter
14   got that.  That's her trailer.
15       Q.  Your daughter got the one in
16   Mississippi?
17       A.  No, sir.  The one we're living in in
18   New Orleans, here.
19       Q.  Okay.
20       A.  The one that I had in Mississippi was
21   my trailer through FEMA.
22       Q.  Okay.  This is a little bit --
23       A.  It was a little mobile home.  It
24   wasn't a trailer.  Just a little -- one of them
25   little portable mobile homes.
```

Page 144

```
 1       Q.  This one is nicer?
 2       A.  Yes.
 3       Q.  Okay.  And you're not having any of
 4   the ill effects that you were having from the
 5   other one.
 6       A.  No.  I was afraid of that, but then
 7   after a while I stayed in there I didn't have
 8   no effects from it.
 9       Q.  Okay.  And FEMA is paying for this
10   trailer that you all are staying in right now?
11       A.  Yes.  I'm sure they are.
12       Q.  You're not paying anything for it.
13       A.  No.
14       Q.  And you told me up to Hurricane
15   Katrina the only appraisal that you know of
16   that was done on house was when you initially
17   bought it back in 1987.
18       A.  Yes.
19       Q.  And since Katrina, you don't know OF
20   any appraisals that have been done on your
21   house at any time after the hurricane.
22       A.  No.  I'm not sure.  I'm not sure.
23          (Lunch break.)
24   EXAMINATION BY MR. SUTTON:
25       Q.  Ms. Innis, as you know, we're just
```

Page 145

```
 1   coming back from lunch, but I understand that
 2   there's something that you feel that you may
 3   note to clarify on the record before we get
 4   started.
 5       A.  Yes.
 6       Q.  And at this time, please let us know
 7   what that is.
 8       A.  That, um -- I receive Social Security.
 9       Q.  Okay.  You receive Social Security.
10   Is it disability or supplemental security
11   income?
12       A.  Income.
13       Q.  SSI?
14       A.  No.
15       Q.  Just Social Security income.
16       A.  Yes.
17       Q.  And what is the reason that you
18   receive that?
19       A.  I had retired.
20       Q.  You're retired?
21       A.  After Katrina.  After the storm.
22       Q.  Okay.  You consider yourself to be
23   retired now?
24       A.  Semi, yes.
25       Q.  And is that another reason why you're
```

37  (Pages 142 to 145)

DAISY MAE INNIS (LEVEE)                                    7/16/2007

Page 166

1   you lost some electronic goods --
2       A.  Yes.
3       Q.  -- um -- personal documents, things of
4   that nature?
5       A.  Yes.
6       Q.  You lost some furniture, I take it?
7       A.  Yes.
8       Q.  Okay.  Your house is one story.
9       A.  Yes.
10      Q.  All right.  And a lot of that -- a lot
11  of the personal property that you lost you lost
12  it because it was flooded --
13      A.  Yes.
14      Q.  -- I take it.  Now, you mentioned
15  water coming through the roof into your
16  bedroom.
17      A.  Yes.
18      Q.  Because of holes or whatever in the
19  room.  Rainwater was coming in.
20      A.  Yes.
21      Q.  Did you lose any personal property or
22  was any property damaged because of --
23      A.  The bed.
24      Q.  -- the water coming through?
25      A.  The dresser.  The top -- you know.

Page 167

1       Q.  Okay.  Like the top of the dresser was
2   ruined and things of that nature?
3       A.  Yes.  Mattress and --
4       Q.  Okay.  And you could tell that was
5   from the water coming through the roof.
6       A.  Yes, sir.
7       Q.  So you lost personal property both as
8   a result of the flooding and as a result of the
9   rainwater.
10      A.  Yes.
11      Q.  Okay.  And as a result of the
12  subsequent looting.
13      A.  Yes.
14      Q.  Now, you told me about the approximate
15  value of the property that was stolen from you.
16      A.  Yes.
17      Q.  You said about ten to fifteen thousand
18  dollars.
19      A.  Yes.
20      Q.  Do you have any idea as to about how
21  much the value of the property was that was
22  lost as a direct result of the storm?  You
23  know, the property was that in your house that
24  was damaged beyond repair.
25      A.  Oh, the living room, bed, dining room,

Page 168

1   two bedrooms, everything in the kitchen.
2       Q.  My question is, do you have any idea
3   as to the approximate value of your lost
4   belongings?  As a result of the storm.  I'm not
5   talking about the looting, the items that were
6   stolen from you.
7           You understand my question?
8       A.  From the water?
9       Q.  I'm sorry?  From the water.  Whether
10  it was floodwater or the items in your bedroom
11  that were destroyed as a result of the rain
12  coming in.  Just the total value of those
13  belongings.
14      A.  Let's see.  Maybe about thirty,
15  thirty-five thousand dollars worth of stuff.
16      Q.  Do you have any documentary evidence
17  which would support your claim in that regard?
18  Did you keep any kind of receipts or anything
19  like that?
20      A.  Everything was destroyed with the
21  water.
22      Q.  Okay.  So the answer would be no, you
23  don't have any documentary evidence?
24      A.  Right.
25      Q.  Okay.  You didn't have any type of

Page 169

1   personal property insurance coverage, insurance
2   on personal property as opposed to your house.
3   Or did you, through your homeowner's -- I guess
4   that covered personal property?
5       A.  Yes.  Homeowner's.
6       Q.  But again, that $2,300 that was paid
7   by Allstate, they didn't make a separate
8   payment for personal property to you.
9       A.  No.
10      Q.  And that's part of your claim right
11  now I take it.
12      A.  Yes.
13      Q.  Were you paid any other benefits or
14  received any money in connection with your lost
15  or damaged personal property?  From any other
16  source?
17      A.  FEMA did.
18      Q.  Okay.  What -- and I'm going to get to
19  the different relief in a little while, but
20  FEMA did make some payments to you.
21      A.  Yes.
22      Q.  Ms. Innis, you told me about your
23  different claims that you're making, your claim
24  for real property loss --
25      A.  Yes.

DAISY MAE INNIS (LEVEE)                                              7/16/2007

Page 170

1   Q.  -- your claim for personal property
2   loss --
3   A.  Yes.
4   Q.  -- your evacuation expenses --
5   A.  Yes.
6   Q.  -- and your emotional distress.
7   A.  Yes.
8   Q.  Okay.  Is there -- you know, as you
9   sit here today, can you think of any other
10  claim for any other type of damages that you're
11  making?
12  A.  My car.
13  Q.  Okay.  Well, and that's fair.
14  Technically, that would come under personal
15  property.
16  A.  Okay.
17  Q.  But you are making a claim for your
18  cars that were lost in the hurricane?
19  A.  (Nods affirmatively.)
20  Q.  One of which is a 1994 --
21  A.  Cavalier.  Chevy Cavalier.
22  Q.  Which you did not have any insurance
23  on?
24  A.  No.
25  Q.  And which, in all fairness, you just

Page 171

1   don't know what the value of the car was.
2   A.  No, sir.
3   Q.  And the other car, the 2000 to 2002
4   Cadillac, which you did have insurance on?
5   A.  Yes, sir.
6   Q.  The loan was paid out?
7   A.  Yes.
8   Q.  Which you believe was a fair
9   settlement.
10  A.  Yes.
11  Q.  Okay.  Have you gotten a new car, you
12  said?
13  A.  Yes.
14  Q.  Okay.  What kind of car do you have
15  now?
16  A.  An '07 Cadillac.
17  Q.  Okay.  Is that car paid for or do you
18  have a note on that car?
19  A.  I have a note.
20  Q.  You have a note on the car?
21  A.  Yes, sir.
22  Q.  So you just got a car.
23  A.  Yes, sir.
24  Q.  You got it new?
25  A.  Yes, sir.

Page 172

1   Q.  Brand new.  Okay.  Well, let's
2   consider that the claim for the cars fall
3   within personal property.
4   A.  Okay.
5   Q.  So you've told me about the real
6   property, personal property, emotional distress
7   and evacuation expenses.
8   A.  Yes.
9   Q.  With that in mind, with that
10  understanding, can you think of any other claim
11  for damages that you're making?  Any other type
12  of claim that you're making?
13  A.  No, not right -- no, sir, not right
14  offhand.
15  Q.  Okay.  Are you seeking any type of
16  damages in this litigation other than monetary
17  damages?
18  A.  What is monetary?
19  Q.  Money.  In exchange for -- are you
20  seeking any other type of relief other than
21  monetary damages?
22  A.  No.
23  Q.  You're not seeking any type of
24  injunctive relief, trying to order a party to
25  do or not do something.

Page 173

1   A.  No.
2   Q.  Okay.  Let's talk about the claims
3   that you've made and/or received following
4   Hurricane Katrina.  The first one is FEMA.  You
5   told me that you had applied with FEMA for some
6   relief.
7   A.  Yes.
8   Q.  And I think you told me earlier -- if
9   I'm misstating you, let me know -- that you di
10  receive a payment from FEMA of about $2300?  Is
11  that correct?
12  A.  No.  That was the insurance.
13  Q.  That's right.  What have you received
14  from FEMA?
15  A.  Right offhand, I don't know.  I'd have
16  to bring all that in.
17  Q.  Okay.  Well, FEMA did pay for certain,
18  I guess, rental expenses or living expenses?
19  They provided you a trailer.
20  A.  A trailer, yes.
21  Q.  Okay.  Um -- but you've said, I think,
22  when you rented the house they didn't pay for
23  any of that, the house in Gulfport.
24  A.  No.
25  Q.  Okay.  But they've paid for the

DAISY MAE INNIS (LEVEE)                                    7/16/2007

Page 174

1   trailer, or letting you use the trailer?
2       A.  Yes.
3       Q.  And as far as just money that FEMA has
4   given you, just don't know how much that you've
5   received from FEMA?
6       A.  No, but I do have the documents of
7   that.
8       Q.  Have you received more than one, you
9   know, particular benefit -- monetary benefit
10  from FEMA?
11      A.  Yes, sir.  It's been -- yes.
12      Q.  Okay.  And do you know what those
13  represented, what those payments were for by
14  FEMA?
15      A.  At that time, I think it was to help
16  me pay the rent for where the trailer was.
17      Q.  The two hundred dollars a month that
18  you're talking about?
19      A.  Yes, sir.  Yes.
20      Q.  Because you were living in a FEMA
21  trailer and they knew you had to have a place
22  to put it.
23      A.  Right.
24      Q.  So they paid for the rent.
25      A.  Yes.

Page 175

1       Q.  Okay.  But just to make it clear, you
2   just don't know how much you've received from
3   FEMA?
4       A.  Not right -- not today, no, sir.
5       Q.  All right.  Now, I think you told me
6   you applied for an SBA loan.
7       A.  Yes.
8       Q.  About when did you make that
9   application?
10      A.  Oh, God, it was in '06.
11      Q.  Sometime in 2006.
12      A.  Yes.  After the storm.
13      Q.  Did you apply for a certain amount?
14      A.  No.  I don't remember.  But I was
15  denied.
16      Q.  You were denied.
17      A.  Yes.
18      Q.  Okay.  Do you know why you were
19  denied?
20      A.  No.
21      Q.  Okay.  You have kept, though,
22  paperwork regarding that application?
23      A.  Yes.
24      Q.  Did you also keep the denial letter?
25      A.  Yes.

Page 176

1       Q.  Okay.  So you have all that.
2       A.  Yes.
3       Q.  Okay.  What was your reason or reasons
4   for seeking an SBA loan; what did you intend to
5   use the money for?
6       A.  Well, that was before I knew about the
7   Road Home, to try to get my house repaired so I
8   could go back home.  Come back home.
9       Q.  Would it be fair to say that now in
10  light of your receipt of the Road Home benefits
11  that you don't need an SBA loan?
12      A.  Yes.
13      Q.  That's correct?
14      A.  Correct.
15      Q.  We've talked about your Form 95 that
16  you filed with the government.
17      A.  Yes.
18      Q.  We've talked about the Road Home
19  application, you applied for Road Home funds
20  and you've received I think you told me
21  $88,000?
22      A.  Yes.
23      Q.  And is that an amount that you were
24  satisfied with, or were you requesting and
25  wanting more, or --

Page 177

1       A.  Um --
2       Q.  Did you think that was a fair payment?
3       A.  Well, I think so.
4       Q.  Okay.
5       A.  Yes.
6       Q.  Okay.  Did you -- when you applied,
7   though, did you ask for a specific amount?
8       A.  No, sir.  No.
9       Q.  And the Road Home, you went and sat
10  down with them and --
11      A.  Talked with them.
12      Q.  -- met with them and so forth?
13      A.  Yes.
14      Q.  But again, you don't know if they came
15  out to inspect your property or do anything
16  like that?
17      A.  I don't know.  I'm sure they did.
18      Q.  We talked about Red Cross, and I think
19  you said you received was it one payment from
20  Red Cross?
21      A.  One payment, yes.
22      Q.  And you said about what, about six
23  hundred?  I can't remember if you told me how
24  much.
25      A.  No, I can't remember.

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

DAISY MAE INNIS (LEVEE)                                           7/16/2007

---

Page 178

1    Q.  You can't remember how much you got
2  from Red Cross?
3    A.  But I know I did receive a check from
4  Red Cross, yes.
5    Q.  What about you applied for the
6  Louisiana Purchase, the food stamp program?
7    A.  Yes.
8    Q.  Did you receive those benefits?
9    A.  Once, yes.
10   Q.  Like a one-month period?
11   A.  Yes.
12   Q.  Do you recall about how much you
13  received in the way of food stamps?
14   A.  I don't know.
15   Q.  Okay.  Have you received any gifts or
16  private donations?
17   A.  No, sir.
18   Q.  Have you received any other type of
19  funds as a result of Hurricane Katrina?
20   A.  No, sir.
21   Q.  We've covered the all here today.
22   A.  Okay.
23   Q.  I wanted to ask you just a few
24  questions about your house.  It will just take
25  a couple of minutes.  I forgot to ask you

Page 179

1  earlier.  You told me that the house was
2  sheetrock and not plaster, correct?  Because
3  when they removed it that was all there.
4    A.  That's what it was, sheetrock.
5    Q.  And that was removed under -- this was
6  removed at your direction by A2Z.
7    A.  Yes.
8    Q.  Do you know when that sheetrock was
9  removed from the house?
10   A.  Early May they started.
11   Q.  Of this year?
12   A.  Of this year, yes.
13   Q.  And your house had not been gutted
14  before that time?
15   A.  No.
16   Q.  Okay.  You told me that you had the
17  additional bedroom added onto your house, when
18  you look at your house it's to your left?
19   A.  Yes.
20   Q.  And I apologize if I asked you this,
21  but can you tell me when that addition was put
22  on?  Approximately what year?
23   A.  It must have been the nineties,
24  somewhere up in the nineties, I can't --
25   Q.  Sometime in the nineties?

Page 180

1    A.  Somewhere up in the nineties, yes.
2    Q.  Okay.  And you said A2Z started doing
3  the repair work in mid May -- or May of this
4  year?
5    A.  May, the day after Mother 's Day.
6    Q.  Around May 20th, something like that?
7    A.  No.
8    Q.  It's earlier in the month, isn't it?
9    A.  That was May 13th when they started.
10   Q.  Oh.  I'm off a week.  Before they
11  started, there had not been any substantial
12  repair work done to your house?
13   A.  No.
14   Q.  Okay.  Do you know if in connection
15  with the work done by A2Z they had to repair
16  any of the floor joists in the house?
17   A.  We haven't checked that yet.
18   Q.  They haven't checked that?
19   A.  No.
20   Q.  Are they going to, do you know?
21   A.  Yes.
22   Q.  And they'll go underneath the house to
23  check that?
24   A.  Yes.
25   Q.  And they've discussed that with you?

Page 181

1    A.  Yes.
2    Q.  And they've told you that they may
3  need to make some repairs to the floor joists?
4    A.  They haven't said anything to me yet.
5    Q.  Okay.  Was the aluminum siding on the
6  house when you bought it?
7    A.  Yes.
8    Q.  Do you know when that was installed?
9  The aluminum siding?
10   A.  No.
11     (Brief recess.)
12  EXAMINATION BY MR. SUTTON:
13   Q.  Ms. Innis, you told me earlier that
14  when you purchased your home in approximately
15  1987 you took out a mortgage of I think you
16  said about thirty-two thousand dollars?
17   A.  Yes.
18   Q.  And then when you made the addition to
19  the home in the 1990s, you took out a loan of
20  about $10,000 --
21   A.  $10,000.
22   Q.  -- you told me.
23   A.  Yes.
24   Q.  At the time of Hurricane Katrina, were
25  you paying on both the original mortgage and

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE:  KATRINA CANAL BREACHES     CIVIL ACTION
CONSOLIDATED LITIGATION
                                   NO. 05-4182 "K"(2)

 PERTAINS TO:  LEVEE              JUDGE DUVAL

 FILED IN:  05-4181, 05-4182,     MAG. WILKINSON
 05-5237, 05-6073, 05-6314,
 05-6324, 05-6327, 05-6359,
 06-0225, 06-0886, 06-1885,
 06-2152, 06-2278, 06-2287,
 06-2824, 06-4024, 06-4065,
 06-4066, 06-4389, 06-4634,
 06-4931, 06-5032, 06-5155,
 06-5159, 06-5161, 06-5162,
 06-5260, 06-5771, 06-5786,
 06-5937, 07-0206, 07-0621,
 07-1073, 07-1271, 07-1285




Videotaped deposition of BETTE J. JONES, 2111
Clouet Street, New Orleans, Louisiana  70117,
taken in the offices of Bruno & Bruno, 855
Baronne Street, New Orleans, Louisiana  70113, on
Monday, the 16th day of July, 2007, beginning at
9:16 a.m.



APPEARANCES:

        DEGRAVELLES, PALMINTIER, HOLTHAUS & FRUGÉ
        (BY:  JOSHUA M. PALMINTIER)
        618 Main street
        Baton Rouge, Louisiana  70801-1910

        ATTORNEYS FOR THE PLAINTIFFS

Page 6

1  verbal answers, "Yes" or "Nos."  Nods of the
2  heads don't work well because the court reporter
3  has to take this down in a question-and-answer
4  format.  So, if you can give me a verbal answer,
5  I'd appreciate it.  And if I prompt you, is that
6  a "Yes" or is that a "No," I'm not trying to be
7  difficult.  I'm just trying to make sure the
8  record is clear.  Okay?
9       A.   All right.
10      Q.   You understand you're under oath
11  just as if you were testifying in a court of law?
12      A.   Right.
13      Q.   Another rule is you can ask me to
14  rephrase a question if you don't understand it at
15  any time, but if you answer the question, I'm
16  going to assume you understood it.  Is that fair?
17      A.   Right.
18      Q.   You can -- you can always, if you
19  think of something you want to add, you can
20  always let me know, Mr. Kirsch, I remembered
21  something, you know, I need to add this to my
22  answer, I need to change my answer at any time in
23  the deposition.  Okay?
24      A.   Okay.
25      Q.   Thank you.  Not -- not a marathon.

Page 7

1  We'll probably take a break or two, but if you
2  need to take a break to use the restroom or to
3  get some water or anything, just let me know.  As
4  long as a question isn't pending, I'll be happy
5  to let you take a break.  Okay?
6       A.   Okay.
7       Q.   You're not on any medication,
8  alcohol or any other type of drugs that would
9  affect your ability to answer questions today,
10  are you?
11      A.   No, I'm not.
12      Q.   Okay.  I am going to attach as
13  Exhibit 1 the Notice of Deposition, and I'm going
14  to flip to Exhibit A of the Notice of Deposition.
15          (Whereupon, Jones Exhibit
16      Number 1 was marked for
17      identification.)
18      MR. PALMINTIER:
19          Kyle, can we go off the
20      record real quick?
21      MR. KIRSCH:
22          Sure.
23      THE VIDEOGRAPHER:
24          We're going off the record.
25      It is 9:18.

Page 8

1          (Whereupon, a discussion was
2       held off the record.)
3       THE VIDEOGRAPHER:
4           Returning to record.  It's
5       9:28.
6       EXAMINATION BY MR. KIRSCH:
7           Q.   Miss Jones, you went and reviewed
8       Exhibit A to the Notice of Deposition; is that
9       right?
10      A.   Yes.
11      Q.   And that was the first time you saw
12  that; is that correct?
13      A.   Right.
14      Q.   Okay.  I'm going to ask you -- I'm
15  going to go through them very quickly to see if
16  you -- did you -- first of all, did you bring
17  anything with you to the deposition today?
18      A.   No.
19      Q.   Okay.  You filled out a Form 95; is
20  that right?
21      A.   Yes.
22      Q.   Okay.  I do have a copy of that.
23  What about other type of administrative claims,
24  Number 2, do you have any -- have you made any
25  other type of administrative claims?

Page 9

1       A.   Yes.
2       Q.   You have?  Do you have that
3  documentation?
4       A.   My attorneys have, I guess.
5       Q.   You've given it to your attorneys?
6       A.   Uh-huh.
7       Q.   Is that a "Yes"?
8       A.   Yes.
9       Q.   Thank you.
10          You have -- do you have any
11  documents that refer or relate to any type of
12  insurance claim you made as a result of damages
13  or injuries that you sustained at -- on August
14  29th, 2005?
15      A.   Yes.
16      Q.   Okay.  Do you have that
17  documentation at home or have you given that to
18  your attorneys?
19      A.   My attorney.
20      Q.   Okay.  So, all that's with your
21  attorney?
22      A.   Yes.
23      Q.   Okay.  Do you have any of those
24  documents at your house?
25      A.   No.

(504)525-1753      HUFFMAN & ROBINSON, INC.      (800)749-1753
ONE SHELL SQUARE,#250 CERTIFIED COURT REPORTERS NEW ORLEANS, LA 70139

Page 10

1    Q.   Okay.  What about any documents
2  indicating eyewitness accounts of Hurricane
3  Katrina?
4    A.   No.
5    Q.   Okay.  Do you have any documents
6  regarding the class action complaint that's been
7  filed in this case?
8    A.   No.
9    Q.   Okay.  Have you ever seen the class
10  action complaint?
11    A.   Yes.
12    Q.   Okay.  Do you have that at home?
13    A.   Yes.
14    Q.   Okay.  That's the only document you
15  have at home, though?
16    A.   Right.
17    Q.   Okay.  Do you have any statements,
18  transcripts of, a description or -- explaining
19  the damages or injuries you may have sustained as
20  a result of Hurricane Katrina?
21    A.   No.
22    Q.   Okay.  Do you have any photographs
23  or videotapes of the damage that you may have
24  sustained as a result of Hurricane Katrina?
25    A.   I have photos.

Page 11

1    Q.   Okay.  You took photos of your home?
2    A.   Uh-huh.
3    Q.   Okay.  Did you take any video of
4  your home?
5    A.   No.
6    Q.   Okay.  So, are those photographs
7  with your attorney or at home?
8    A.   With my attorney.
9    Q.   Okay.  So, you've given those over
10  to your attorney?
11    A.   Right.
12    Q.   Okay.  And what attorney did you
13  turn all this over to?
14    A.   Mr. Bruno.
15    Q.   Mr. Bruno.  Okay.
16    MR. PALMINTIER:
17      Let the record reflect that
18    it's Joseph Bruno.
19    MR. KIRSCH:
20      Thank you.
21  EXAMINATION BY MR. KIRSCH:
22    Q.   Let's see.  Do you have any
23  documents relating to any claim for loss of
24  earnings, business income or anything in that
25  regard?

Page 12

1    A.   No.  Uh-uh.
2    Q.   Let's go to Number 10, if you can
3  flip the page.  Are you making a claim for loss
4  of earnings or loss of income?
5    A.   No.  I was retired.
6    Q.   Okay.  And you're not seeking any
7  other type of economic loss, business income or
8  anything in that regard --
9    A.   No.
10    Q.   -- is that correct?
11    A.   No.
12    Q.   You are seeking some or you are --
13    A.   What question you asking me?
14    Q.   I'm asking you if you're seeking any
15  type of economic damages.
16    A.   Is that 12?
17    Q.   Well, this is more in general.  I'm
18  trying to skip a lot of them.
19    A.   Oh.  Yes.
20    Q.   You are?
21    A.   (Nods head affirmatively.)
22    Q.   What type of economic damages are
23  you seeking?
24    A.   Well, my house.
25    Q.   And we're going to get to your

Page 13

1  property damage.
2    A.   Uh-huh.
3    Q.   When I refer to economic damage,
4  what I'm referring to is, like, loss of wages,
5  loss of business income, loss of rental income.
6    A.   No.
7    Q.   So, you're not seeking any of that?
8    A.   No.
9    Q.   Okay.  Do you have any journals or
10  diaries or other writings that you may have taken
11  notes in during Hurricane Katrina?
12    A.   No.
13    Q.   Okay.  Do you have any medical
14  records reflecting any injuries you may have
15  sustained as a result of Hurricane Katrina?
16    A.   Yes.
17    Q.   Okay.  Who has those medical
18  records?
19    A.   Baptist Hospital, in Mississippi.
20    Q.   What city in Mississippi?
21    A.   Jackson.
22    Q.   Okay.  Do you have any medical
23  records in your possession?
24    A.   No.
25    Q.   Okay.  Does your lawyer have any of

4  (Pages 10 to 13)

Page 14

```
 1  your medical records?  Did you turn any of them
 2  over to your lawyer, like the other documents?
 3       A.   No.
 4       Q.   Okay.  So, the only place they would
 5  be would be in Mississippi --
 6       A.   In Mississippi.
 7       Q.   -- at Baptist Hospital?
 8       A.   Yeah.
 9       Q.   Okay.  Do you have any documents
10  relating to receiving payments from insurance
11  companies as a result of damage you may have
12  sustained due to Hurricane Katrina?
13       A.   Yes.
14       Q.   Okay.  Have you turned those all
15  over to your lawyer, also?
16       A.   Yes.
17       Q.   Okay.  You are not leasing; is that
18  right?  You owned the home you lived in?
19       A.   Yes.
20       Q.   Okay.  And you don't own any rental
21  property; is that correct?
22       A.   No.
23       Q.   That didn't come out right.  Am I
24  correct in saying that you have no rental
25  property?
```

Page 15

```
 1       A.   Right.
 2       Q.   All right.  Did you do anything to
 3  prepare for this deposition?
 4       A.   No.
 5       Q.   Okay.  You didn't review any
 6  photographs or anything like that?
 7       A.   No.
 8       Q.   All right.  The only thing you did
 9  would have been met with your lawyer?
10       A.   Right.
11       Q.   Okay.  Did you -- did you discuss it
12  with your --
13       MR. KIRSCH:
14            You're a son or a brother?
15       MR. HILL:
16            Son.
17       A.   That's my son.
18  EXAMINATION BY MR. KIRSCH:
19       Q.   Your son.  Did you discuss it with
20  your son?
21       A.   Yes.
22       Q.   What did y'all discuss, if it wasn't
23  in the presence of your lawyer?
24       A.   I just told him that we would have
25  to come here for the deposition and we have to
```

Page 16

```
 1  find out what was going on with our community.
 2       Q.   Okay.  And that -- that's the extent
 3  of the discussion?
 4       A.   Right.
 5       Q.   Okay.  You have a right to read and
 6  sign your deposition.  Your lawyer may want to
 7  answer this.  If you choose, you can get a copy
 8  of the deposition back and review it for -- you
 9  know, typographical errors or things in that
10  regard and, so, I'm going to ask you if you'd
11  want to read and sign?
12       MR. PALMINTIER:
13            And I'll answer that
14            question.  We will be reading and
15            signing.
16       MR. KIRSCH:
17            Okay.
18  EXAMINATION BY MR. KIRSCH:
19       Q.   Could you -- could you state your
20  full name for the record?
21       A.   Bette June Jones.
22       Q.   Okay.  And your current date of
23  birth?
24       A.   3/18/39.
25       Q.   What's your current address, where
```

Page 17

```
 1  you live right now?
 2       A.   2111 Clouet, C-L-O-U-E-T.
 3       Q.   Okay.  And that's in New Orleans?
 4       A.   Yes.
 5       Q.   Okay.  And how long -- have you
 6  lived there for over five years?
 7       A.   Thirty-eight.
 8       Q.   Does anyone live with you at the
 9  Clouet address?
10       A.   My son.
11       Q.   Is that it?
12       A.   Yes.
13       Q.   And you own that home; am I correct?
14       A.   Yes.
15       Q.   Could you give me your Social
16  Security number?
17       A.   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.
18       Q.   Do you have a driver's license or an
19  ID card?
20       A.   Yes.
21       Q.   Do you have that with you?
22       A.   Yes.
23       Q.   May I see it?
24       THE WITNESS:
25            Give me my purse, Keith.
```

5 (Pages 14 to 17)

Page 18

1        Pass that to him, please.
2   EXAMINATION BY MR. KIRSCH:
3       Q.   Thank you.  Okay.  You've handed me
4   a driver's license, and the license Number is
5   003158572.
6   MR. KIRSCH:
7       What I'd like to do, Josh,
8   is just attach this as Exhibit 2
9   to the deposition.
10  MR. PALMINTIER:
11      No objection.
12  MR. KIRSCH:
13      We can make a copy at the
14  next break.
15  MR. PALMINTIER:
16      Okay.
17      (Whereupon, Jones Exhibit
18  Number 2 was marked for
19  identification.)
20  EXAMINATION BY MR. KIRSCH:
21      Q.   Have you ever used a different name
22  or a Social Security number or anything other
23  than what we've already been provided?
24      A.   No.
25      Q.   Okay.  So, you've always been Bette

Page 19

1   June Jones?
2       A.   No.  I was Bette June Jones Hill,
3   but my husband died.
4       Q.   Okay.  Any other names?
5       A.   No.
6       Q.   Okay.  So, Jones is your maiden
7   name?
8       A.   Yes.
9       Q.   Okay.  Have you lived in the New
10  Orleans metro area your whole life?
11      A.   All my life.
12      Q.   Okay.  You said that you were
13  married to Mr. Hill; is that right?
14      A.   Yes.
15      Q.   And he is now since passed away?
16      A.   In '64.
17      Q.   Okay.  Ever -- any other marriages?
18      A.   No.
19      Q.   Okay.  And I know Keith is sitting
20  right here.  Do you have any other children?
21      A.   A daughter.
22      Q.   Okay.  What's your daughter's name?
23      A.   Karen Ann Hill.
24      Q.   How old is Karen?
25      A.   Karen will be making 50 in

Page 20

1   September.  9/28/57 and he's 45.  He'll be making
2   46 Halloween.
3       Q.   Okay.  And you said "he."  You're
4   referring to Keith.
5       A.   Keith.  Oh, yes.
6       Q.   Okay.  Do you have any dependents?
7       A.   No.
8       Q.   The only person that was living with
9   you at the time Hurricane Katrina arrived was
10  Keith?
11      A.   Yes.
12      Q.   Okay.  I want to get a quick
13  educational background on you.  Did you go to
14  high school?
15      A.   Yes.
16      Q.   Did you graduate?
17      A.   Yes.
18      Q.   Okay.  Did you -- after high school,
19  did you go to college?
20      A.   Yes.
21      Q.   Where did you go to college?
22      A.   Dillard.
23      Q.   Dillard?
24      A.   (Nods head affirmatively.)
25      Q.   Did you get a degree from Dillard?

Page 21

1       A.   Yeah, a B.S.
2       Q.   Okay.  What was your degree in?
3       A.   Nursing.
4       Q.   Any other -- any other post-high
5   school schooling or training?
6       A.   Uh-uh.
7       Q.   Is that a "No"?
8       A.   No.
9       Q.   Thank you.
10      No type of vo-tech or technical
11  training, correct?
12      A.   No.
13      Q.   Okay.  And you said you retired.
14  How long have you been retired?
15      A.   Since '92.
16      Q.   And I assume you're receiving some
17  type of Social Security benefits?
18      A.   Yes.
19      Q.   Okay.  Do you have any other type of
20  income other than your Social Security benefits?
21      A.   No.
22      Q.   Have you ever been in the military?
23      A.   No.
24      Q.   Have you ever been involved in any
25  accidents where you've injured yourself before

6  (Pages 18 to 21)

(504)525-1753        HUFFMAN & ROBINSON, INC.        (800)749-1753
ONE SHELL SQUARE,#250 CERTIFIED COURT REPORTERS NEW ORLEANS, LA 70139

Page 26

1     A.   Oh, yes, indeed.  They better be.
2     Q.   What about -- what about church, did
3  you go to church?
4     A.   Yeah, I go to church.
5     Q.   Okay.  What church did you go to?
6     A.   Corpus Christi, on St. Bernard and
7  Galvez.
8     Q.   You still go there?
9     A.   Yes.
10    Q.   And there's still a community that
11  goes to church at Corpus Christi?
12    A.   Uh-huh.
13    Q.   Is that a "Yes"?
14    A.   Yes.
15    Q.   Thank you.
16         Any -- any type of neighborhood
17  associations that you belong to?
18    A.   Well, I volunteer twice a week at
19  the church.  We give away food.
20    Q.   That -- that would be at Corpus
21  Christi?
22    A.   Right.
23    Q.   Okay.  Any other type of
24  organizations that you belong to?
25    A.   No.

Page 27

1     Q.   Okay.  Another good rule I didn't
2  talk about is let me finish my question before
3  you answer, and I'm going to try to do the same,
4  because while you did anticipate my question
5  correctly this time, it may not be the question
6  you think I'm asking.  Okay?
7     A.   Okay.
8     Q.   Thank you.
9         Did -- you said you lived at your
10  house for 38 years; is that right?
11    A.   Yes.
12    Q.   You knew most of the people on your
13  block?
14    A.   Oh, yes.
15    Q.   Okay.  Where are all your neighbors
16  living now?
17    A.   They only have three of us back in
18  the block.
19    Q.   Okay.  Do you know where the other
20  people are?
21    A.   No.
22    Q.   Okay.  Did you ever go to any Mardi
23  Gras parades, Jazz Fests, Essence Festival, any
24  of that?
25    A.   No.

Page 28

1     Q.   Okay.  Did you ever go to the zoo or
2  the park?
3     A.   Yes.
4     Q.   Okay.  You registered to vote in
5  Orleans Parish?
6     A.   Yes.
7     Q.   Did you regularly vote?
8     A.   Yes.
9     Q.   Okay.  The -- and if I remember
10  correctly, the thing you did, kind of the civic
11  organization that you did before Katrina was
12  Corpus Christi Church, right?
13    A.   Right.
14    Q.   And you're still participating in
15  the church, correct?
16    A.   Right.
17    Q.   Did you belong to any business or
18  trade organizations?
19    A.   No.
20    Q.   Okay.  Did you ever go to any city
21  council or other type of governmental meetings?
22    A.   No.
23    Q.   What was your first notice of
24  Hurricane Katrina?
25    A.   Well, we kept watching the

Page 29

1  television, listening, you know, whatever the
2  mayor and different people in Jefferson would
3  say.
4     Q.   Okay.  So, you -- the first notice
5  you had was from the news?
6     A.   Yes.
7     Q.   Okay.  About how -- how long before
8  August 29th?
9     A.   Well, that was that Saturday, and we
10  packed some stuff and put in the car, me and my
11  daughter and my granddaughter.
12    Q.   Okay.
13    A.   And --
14    Q.   I'm sorry.
15    A.   And we made reservations for
16  Mississippi, because we called the state
17  troopers, and they say go 55 south.
18    Q.   55 north?
19    A.   South.
20    Q.   You went up to Jackson, right --
21    A.   Uh-huh.
22    Q.   -- Mississippi?  Okay.  So, Saturday
23  was the first time you really noticed that
24  Katrina was maybe headed toward New Orleans?
25    A.   Right.

8  (Pages 26 to 29)

Page 30

1     Q.   Okay.  And you packed up and got
2  reservations and left that day?
3     A.   Yeah.
4     Q.   Okay.  Who went with you?
5     A.   My daughter, my granddaughter and
6  myself.
7     Q.   Where was your son?
8     A.   He didn't want to come.
9     Q.   Okay.  So, your son stayed?
10    A.   Yeah.
11    Q.   We had talked earlier -- was your
12 daughter and granddaughter living with you at the
13 time?
14    A.   No.
15    Q.   They just happened to be visiting
16 that day?
17    A.   No.  They live around the corner.
18    Q.   Okay.  Did you do anything to
19 prepare your property for the hurricane?  Did you
20 put, you know --
21    A.   We boarded -- boarded it up.
22    Q.   Okay.  So, you boarded up the
23 windows?
24    A.   Yeah, and that was it.
25    Q.   Okay.  What did you take with you?

Page 31

1     A.   Clothes, money.
2     Q.   Anything else?
3     A.   Some jewelry.
4     Q.   Anything else?
5     A.   That's it.
6     Q.   Who drove?
7     A.   My daughter drove.
8     Q.   Okay.  Whose car did y'all take?
9     A.   Mine.
10    Q.   Okay.  Did your daughter have a car?
11    A.   Yes.  She left it.
12    Q.   Did you have any other cars other
13 than the one you took?
14    A.   No.  My -- yeah -- didn't have --
15 no.  I just had my car.
16    Q.   Okay.  Did you do anything else
17 other than boarding up the house, packing up and
18 leaving with your daughter and granddaughter?
19    A.   No.
20    Q.   Okay.  Y'all left that morning, that
21 afternoon or that evening, on Saturday?
22    A.   That morning.
23    Q.   Okay.  How early in the morning?
24    A.   About 10:00.
25    Q.   And you went to stay in Jackson,

Page 32

1  Mississippi, right?
2     A.   Yes.
3     Q.   Okay.  Where did you stay in
4  Jackson?
5     A.   Hampton Inn.
6     Q.   How long did you stay at Hampton?
7     A.   Two months.
8     Q.   Did -- other than your daughter and
9  your granddaughter, did anyone else stay with
10 you?
11    A.   No.
12    Q.   Okay.  Y'all all stayed in one room?
13    A.   Yeah, with double beds.
14    Q.   Okay.  Did -- who paid for the room
15 for those two months?
16    A.   Me.
17    Q.   Okay.  Did -- did FEMA pay for it at
18 all?
19    A.   No.
20    Q.   Okay.  During the -- even after,
21 post-Katrina, I'm assuming that you continued to
22 get your Social Security benefits?
23    A.   Oh, that was tied up, so, it took
24 months before I could get that.
25    Q.   Okay.  So, what did they do?  They

Page 33

1  gave you, like, back benefits?  How did that
2  happen?
3     A.   When I start getting it back, yeah.
4  I got it in Mississippi, I think, two months, and
5  then we came back to New Orleans.
6     Q.   Okay.  So, for the two months you
7  were in Mississippi, you got your check in
8  Mississippi from Social Security?
9     A.   No.  No.  It stood in Mississippi
10 for about two or three months.  We came back to
11 New Orleans.  We went back to Mississippi.  And a
12 couple of more months, then, we got it.
13    Q.   And I'm just -- because I'm a little
14 confused by the answer.  I'm not trying to be
15 difficult.  So, you didn't -- you tried to get
16 them to move it to your Mississippi address --
17    A.   Right.
18    Q.   -- but they couldn't do it; is that
19 right?
20    A.   Right.
21    Q.   Okay.  And then after two months,
22 you were able to return to New Orleans?
23    A.   Right.
24    Q.   And it took about another month?
25    A.   Two -- about two or three months.

(504)525-1753        HUFFMAN & ROBINSON, INC.        (800)749-1753
ONE SHELL SQUARE,#250 CERTIFIED COURT REPORTERS NEW ORLEANS, LA 70139

Page 34

1    Q.   Another two to three months.
2    A.   And when we went back to Mississippi
3  to Social Security, that's when I got the checks.
4    Q.   Okay.  So, you came back to New
5  Orleans for two to three months, and then you
6  moved back to New Orleans -- strike that.
7        You stayed in Mississippi for two
8  months, you returned to New Orleans for another
9  two to three months, and then you went back to
10 Mississippi?
11   A.   Right.
12   Q.   Okay.  And it wasn't until you went
13 back to Mississippi that you actually got your
14 Social Security --
15   A.   Right.
16   Q.   -- benefits?
17   A.   Right.
18   Q.   And when you got them after that,
19 roughly, five months, you got a big check for all
20 the back pay?
21   A.   Right.
22   Q.   Okay.  Where did you stay for the
23 two to three months in New Orleans?
24   A.   I stayed by a cousin of mine's house
25 out there in Kenner.

Page 35

1    Q.   Okay.  Who was that?
2    A.   Ammerite Moore.
3    Q.   And where does she live in Kenner?
4    A.   On North Claiborne Drive, right off
5  Jefferson Highway.
6    Q.   Did she charge you any rent?
7    A.   No.  Because I was coming mostly to
8  see the adjuster, you know, and see what I could
9  do about the house and tried to get a carpenter
10 and, you know, different stuff like that.
11   Q.   Okay.  So, when you came back after
12 that two months, it was to handle the insurance
13 claim that you made; is that right?
14   A.   Right.
15   Q.   Okay.  When you moved back to
16 Jackson, where did you go?
17   A.   With my daughter.
18   Q.   Your daughter now lives in Jackson?
19   A.   Yes.
20   Q.   Okay.  Your daughter had taken up
21 permanent residence at that time, when you
22 returned?
23   A.   Yes.
24   Q.   Okay.  So, the two to three months
25 that you came back into New Orleans, your

Page 36

1  daughter had stayed in Jackson, Mississippi?
2    A.   Yes.
3    Q.   Okay.  She had gotten a job and
4  started working?
5    A.   Yes.
6    Q.   Okay.  And, so, she decided to live
7  in Jackson?
8    A.   Yes.
9    Q.   Okay.  Did she come back with you
10 initially to check on her home?
11   A.   Yes.
12   Q.   Okay.  Was she renting or did she
13 own it?
14   A.   No.  She wasn't renting.  It was my
15 house.
16   Q.   Okay.  Oh, you owned a couple
17 houses?
18   A.   What happened is I bought the house,
19 but I put it in my son name.  I gave it to my
20 son, and my son was staying with me.  And he --
21 she was staying in his house.
22   Q.   Okay.  So, I just want to be clear
23 on this.  As of August 29th of 2005, you only
24 owned one property; is that right?
25   A.   Right.

Page 37

1    Q.   And Keith owned the other
2  property --
3    A.   Right.
4    Q.   -- that your daughter lived in?
5    A.   Right.
6    Q.   Okay.  So, your daughter just stayed
7  in Mississippi and never came back?
8    A.   No.  She hasn't came -- she come
9  back to see how I am or, you know, to visit, but
10 she didn't come back to stay.
11   Q.   Right.  Okay.  While you were in
12 Jackson for the two months, what did you do?
13   A.   What you mean, what did I do?
14   Q.   Did you just stay in the hotel?
15 What were you doing for those two months?
16   A.   Well, we would stay in the hotel, go
17 out and eat and see what was going on on the
18 television for the news.
19   Q.   Did you go to any of the shelters to
20 get any type of assistance or anything?
21   A.   No.
22   Q.   Okay.  Did you go apply for any type
23 of benefits, food stamps or anything like that?
24   A.   The Red Cross gave us -- gave me
25 $182 and FEMA gave me that 2,300, and I did get,

Page 38

1    I think, $200 of food stamps.
2       Q.   But they never -- they never paid
3   for the hotel room?
4       A.   No.  I wish they would have.
5       Q.   Did -- did you go to any churches or
6   do any other type of recreational activities?
7       A.   No.
8       Q.   Okay.  Were you injured physically,
9   you know, hurt your arm or leg or anything?
10      A.   Depress.
11      Q.   Depressed.  Okay.  Well, I'm going
12  to talk about the stress that you experienced
13  from Hurricane Katrina, but what I want to know
14  first is:  Did you have any physical injuries or
15  illnesses as a result of Hurricane Katrina?
16      A.   No.
17      Q.   Okay.  The injury claim you're
18  making is related to the stress you experienced?
19      A.   Yes.
20      Q.   Okay.  And did you seek any type of
21  medical treatment for the stress?
22      A.   Yes.
23      Q.   Okay.  Where?
24      A.   Baptist Hospital, in Jackson.
25      Q.   Anywhere else?

Page 39

1       A.   No.
2       Q.   Okay.  Did you just go to the
3   emergency room or what did you do?
4       A.   I was referred to a specialist, Dr.
5   Douglas Wolf.
6       Q.   Who referred you to Dr. Wolf?
7       A.   The man at the hotel.
8       Q.   So, you went to Baptist Hospital
9   specifically to see Dr. Wolf?
10      A.   Yes.
11      Q.   What type of doctor is Dr. Wolf?
12      A.   Cardiologist.
13      Q.   Had you had previous problems with
14  your heart?
15      A.   Yes.
16      Q.   Okay.  You hypertensive -- or what
17  were the problems you had with your heart?
18      A.   I had had open-heart surgery in
19  1980.
20      Q.   You had a bypass?
21      A.   Yes.
22      Q.   Quadruple, or do you know?
23      A.   No.  Just my left aorta.
24      Q.   Okay.  So, one?
25      A.   Yeah.

Page 40

1       Q.   Were you -- did you have high blood
2   pressure before Katrina?
3       A.   Yes.
4       Q.   Did -- you took medicine, I assume,
5   for your high blood pressure before Katrina?
6       A.   No.
7       Q.   No?  You weren't on any medications?
8       A.   Before Katrina?
9       Q.   Yeah.
10      A.   Yeah, I was on a heart pill --
11      Q.   Okay.
12      A.   -- every other day.
13      Q.   What was that for?
14      A.   Digitalis, for my heart -- digoxin,
15  I mean.
16      Q.   Do you know what it does other than
17  just being for your heart?
18      A.   It helps the heartbeat regular.
19      Q.   Okay.  Any other type of medications
20  that you were on before Katrina?
21      A.   No.
22      Q.   Okay.  Where did you get your
23  prescriptions filled?
24      A.   Walgreens.
25      Q.   And that would have been in New

Page 41

1   Orleans?
2       A.   And in Jackson.
3       Q.   Okay.  Did you ever go to any other
4   pharmacies in either New Orleans or Jackson for
5   prescriptions?
6       A.   No.
7       Q.   Okay.  So, if we got the Walgreens
8   records, we'd know what prescriptions you were
9   getting --
10      A.   Right.
11      Q.   -- both before and after Katrina; is
12  that right?
13      A.   Right.
14      Q.   Thank you.
15           Who is your cardiologist in New
16  Orleans?
17      A.   Dr. Pappas, Nicholas Pappas.
18      Q.   Where did he work out of?
19      A.   East Jefferson.
20      Q.   Did you have your heart surgery or
21  your bypass surgery at East Jefferson?
22      A.   No.
23      Q.   Where was that?
24      A.   Tulane Medical Center.
25      Q.   Had you been to any of the other

11  (Pages 38 to 41)

(504)525-1753      HUFFMAN & ROBINSON, INC.      (800)749-1753
ONE SHELL SQUARE,#250 CERTIFIED COURT REPORTERS NEW ORLEANS, LA 70139

Page 58

```
1   cousin, Stacy.
2       Q.   Okay.
3       A.   I stayed with her about a month.
4   They gave me a FEMA trailer, and that's what we
5   staying in now, a FEMA trailer.
6       Q.   Okay.  So, for you, you would have
7   paid two months of hotel, two months of an
8   apartment, and then you would have been back in
9   New Orleans in your FEMA trailer the rest of the
10  time.
11      A.   No.  I stayed by my niece over in
12  Algiers for two months, until I got the FEMA
13  trailer.
14      Q.   Okay.  Okay.  I just want to make
15  sure I have all the amounts you paid for lodging,
16  and that -- up in Mississippi.  And that would
17  have been two months at the hotel?
18      A.   Right.
19      Q.   And then two months at the
20  apartment.
21      A.   Right.
22      Q.   And after that, you would have
23  either been staying with friends, relatives or in
24  the FEMA trailer.
25      A.   Right.  Right.
```

Page 59

```
1       Q.   Okay.  And the FEMA trailer was put
2   on the Clouet address?
3       A.   Yes.
4       Q.   Did you keep receipts for the hotel
5   room?
6       A.   No.  I don't think so.
7       Q.   Okay.  How did you pay for the hotel
8   room?  Did you pay with a credit card?
9       A.   Yes.
10      Q.   Okay.  You have a Visa, a
11  MasterCard?  What do you have?
12      A.   Visa.
13      Q.   What about the apartment, how did
14  you pay for the apartment?
15      A.   Money, check.
16      Q.   A check?
17      A.   Yes.
18      Q.   Okay.  Where do you bank at?
19      A.   Well, I had to open a account in
20  Regions, but I had a account at Whitney here.
21      Q.   Okay.  What would you have paid -- I
22  just want the account that you would have paid
23  the money for the apartment out of.  Would that
24  have been Regions?
25      A.   Yes.
```

Page 60

```
1       Q.   Did you keep your credit card
2   statements from the time that you stayed in the
3   hotel that would have those charges on it?
4       A.   To be honest with you, I been going
5   from pillar to post for two and a half years.  I
6   really couldn't just put my hands on none of that
7   stuff.
8       Q.   Okay.  So, you don't know whether or
9   not you have that or not?
10      A.   Right.
11      Q.   Okay.  Can you think of any other
12  type of expenses that you would have incurred
13  that we haven't covered?
14      A.   Well, when we was in the hotel, we
15  had to go out and eat.
16      Q.   Right.
17      A.   We couldn't cook in the hotel.
18      Q.   Did you pay with your credit card
19  for that, also?
20      A.   And money out my pocket.
21      Q.   Okay.  So, you may have paid some
22  cash?
23      A.   Yes.
24      Q.   Okay.  What did you use the FEMA
25  money for?
```

Page 61

```
1       A.   I did that for some of the rent,
2   some of the food we was buying out in the street,
3   clothes.
4       Q.   How much were you getting in food
5   stamps?
6       A.   I was -- by myself, I was getting
7   $105.
8       Q.   Is that a week?
9       A.   Month.
10      Q.   A month.
11      A.   I wish I did have somebody give me
12  $105 for food every week.
13      Q.   And then your daughter was getting
14  food stamps, also?
15      A.   No.  She -- excuse me -- she hadn't
16  applied then.
17      Q.   Okay.  When you say "then," that was
18  during the four to five months you were up in
19  Jackson?
20      A.   Right.  Uh-huh.
21      Q.   Okay.
22      A.   So, the food stamps I had, it was
23  all of us.
24      Q.   Okay.
25      A.   You understand?
```

Page 62

1    Q.   Was your son getting any food
2  stamps?
3    A.   No.
4    Q.   Okay.
5    A.   He was planning on going back to
6  work.
7    Q.   Was -- was he working at all in
8  Jackson, like your daughter?
9    A.   No.  He was working at Tulane.
10    Q.   So, he -- he continued to work for a
11  New Orleans-based business?
12    A.   Uh-huh.
13    Q.   Is that a "Yes"?
14    A.   Yes.
15    Q.   Okay.  Other than your son, do you
16  know of any other neighbors that didn't evacuate?
17    A.   No.
18    Q.   And you're currently residing in the
19  FEMA trailer at the Clouet address?
20    A.   Right.
21    Q.   Okay.  And you plan to, I'm
22  assuming, stay at the Clouet address?
23    A.   Oh, yes.
24    Q.   Okay.  You started your repairs on
25  the house?

Page 63

1    A.   I'm trying to rebuild.
2    Q.   Have you started doing the work on
3  it?
4    A.   No.  Trying to wait on Road Home.
5    Q.   Okay.  And your son's returned to
6  New Orleans, also?
7    A.   Yes.
8    Q.   Is he living at the house where your
9  daughter lived?
10    A.   No.  We haven't fix -- he hasn't
11  fixed that yet.
12    Q.   Okay.  Where is he living?
13    A.   With me.
14    Q.   Okay.  In the trailer --
15    A.   Uh-huh.
16    Q.   -- on the Clouet address?
17    A.   Right.
18    Q.   Okay.  But you plan on -- he plans
19  on fixing the other home, also?
20    A.   Yes.
21    Q.   Okay.  And you're not making -- just
22  so we can skip this, you're not making a lost
23  earnings claim?
24    A.   No.
25    Q.   That was a double negative.  So, let

Page 64

1  me get it right.  Am I correct in saying you are
2  not making a lost wage claim?
3    A.   Right.
4    Q.   Thank you.
5    And I'm also correct in saying that
6  you are not making a loss of income -- a loss of
7  rental income claim.
8    A.   Right.
9    Q.   Okay.  And I'm correct in saying
10  you're not making a loss of business income
11  claim.
12    A.   Right.
13    Q.   And since you're retired, I'm
14  assuming you haven't had to file taxes in the
15  last five years --
16    A.   No.
17    Q.   -- is that right?
18    A.   Right.
19    Q.   I want to talk about the damages you
20  sustained to real property, and real property, my
21  definition, is essentially a home or other type
22  of rental unit that you may own that you rent
23  out.  Okay?
24    A.   (Nods head affirmatively.)
25    Q.   As I understand it, the only real

Page 65

1  property claim you're making is for the damage to
2  the house on Clouet Street; is that right?
3    A.   Yes.
4    Q.   Okay.  Could you give me -- the
5  address is 2111; is that right?
6    A.   Right.
7    Q.   Clouet?
8    A.   (Nods head affirmatively.)
9    Q.   Do you know if it's in a flood zone?
10    A.   It's not supposed to be in a flood
11  zone, but it is.
12    Q.   Do you know what flood zone it is
13  in?
14    A.   Four.
15    MR. PALMINTIER:
16        I think she's confusing the
17    subclassification with the flood
18    zone.
19    MR. KIRSCH:
20        Right.  I do, too.
21  EXAMINATION BY MR. KIRSCH:
22    Q.   Generally, it's, like, Flood Zone A.
23  Have you ever heard of that or not?
24    A.   Yes.
25    Q.   Okay.  Do you know if you're in a

                    17 (Pages 62 to 65)

Page 70

```
 1        Q.   How long was that?
 2        A.   Oh, that was the last year -- year
 3   before -- no -- about three years ago, because
 4   the hurricane been two and a half.
 5        Q.   Okay.  So, it was about a year
 6   before Hurricane Katrina?
 7        A.   Right.
 8        Q.   You recall doing any other types of
 9   improvements?
10        A.   No.
11        Q.   Do you remember any of those
12   improvements requiring any type of building
13   permits or anything?
14        A.   No.
15        Q.   And you have -- after all of that
16   was done, you had an appraisal, but you don't
17   remember what it appraised for, correct?
18        A.   No.
19        Q.   Is that correct?
20        A.   That's correct, but Hurricane
21   Katrina took all that.
22        Q.   Okay.  I'm just -- I'm just trying
23   to find out if you know that because we don't --
24   do you know who the appraiser was?
25        A.   No, I don't, because I had a file
```

Page 71

```
 1   cabinet, and in the file cabinet, all that was
 2   there, and after we came back, all that was
 3   soaking wet.  You couldn't find nothing.
 4        Q.   Right.  I understand.  I'm just --
 5   I'm trying to find out if there's any way we can
 6   get that information, which is why I keep asking
 7   you different questions about the same thing.
 8        A.   Yeah.  Well, I don't know how I
 9   could get it because it's been so long ago.
10        Q.   Right.  Okay.  Could you -- the --
11   give me a general description of what your house
12   looks like?
13        A.   It was a living room, dining room,
14   two bedrooms, kitchen, bath, and in the shed,
15   they had a wash area, dryer; and then the garage,
16   we used to store different stuff in it.
17        Q.   Was -- was it a brick home?  Was it
18   a raised home that was kind of wood or siding?
19        A.   It was wood.
20        Q.   Okay.  So, it was wood all around?
21        A.   Yeah.
22        Q.   Okay.  Was it a -- was it a shotgun
23   house, a duplex?
24        A.   No.  It was a duplex, but it had --
25   I had put awnings all the way around the house.
```

Page 72

```
 1        Q.   Okay.  Did you -- you said it was a
 2   duplex.  What did you do with the other side?
 3        A.   It was a single house, but not no
 4   shotgun house.
 5        Q.   Okay.  It was just a regular single
 6   house with a front door?
 7        A.   Uh-huh.  Right.
 8        Q.   Okay.
 9        A.   And a porch.
10        Q.   When you -- when you walk in the
11   front door --
12        A.   That was the living room.
13        Q.   Okay.  The living room covered the
14   whole first section of the house?
15        A.   Living, dining room.
16        Q.   Okay.  It was one big room or did it
17   have walls in it?
18        A.   It was one big room, and then the
19   kitchen.
20        Q.   The kitchen followed the living
21   room?
22        A.   Yeah.  And on the right-hand side
23   was the two bedrooms.
24        Q.   Okay.  So, you walk in the front
25   door, you hit the living room.
```

Page 73

```
 1        A.   And in the middle was the bath.
 2        Q.   You hit the living room, right?
 3        A.   (Nods head affirmatively.)
 4        Q.   Is that correct?
 5        A.   Yes.
 6        Q.   And then you -- is there a hallway,
 7   or what takes you to the kitchen?
 8        A.   You just keep walking straight to
 9   the kitchen.
10        Q.   Okay.  So, there's no door or
11   anything?
12        A.   No.
13        Q.   Just the living room goes straight
14   into the kitchen?
15        A.   Right.
16        Q.   And the kitchen is set off to the --
17   if you're facing it, to the right?
18        A.   No.  When you walk in, this is the
19   living room -- like, living, dining room, then
20   the kitchen.  On this side is two bedrooms and a
21   bath.
22        Q.   Okay.  Was it a square house, an
23   L-shaped house?
24        A.   Yes, square.
25        Q.   Square.  When -- what was in the
```

Page 74

```
1   living room?
2        A.   Living room furniture.
3        Q.   Okay.
4        A.   Sofa, love seat, pictures, lamps.
5        Q.   Do you remember how many square feet
6   the house was?
7        A.   It's a 40 front and 131 deep.
8        Q.   Is that your lot size?
9        A.   Uh-huh.
10       Q.   Okay.  What about the house, the
11  actual house?
12       A.   Oh, I don't know.
13       Q.   Okay.  You never heard 1,500, 1,800
14  square feet, or anything like that?
15       A.   No, I sure don't.
16       Q.   Do you have any documentation that
17  would reflect that?
18       A.   I guess it's on the deed.
19       Q.   Okay.  You have a copy of the deed?
20       A.   Yes.
21       Q.   Okay.  And you still have that?
22       A.   It's in the safety deposit box.
23       Q.   Okay.  I'm going to ask you if you
24  could get a copy to your lawyer of the deed.
25       A.   All right.
```

Page 75

```
1        Q.   Do you have anything else that would
2   have a description of the property, of the home?
3        A.   Pictures.
4        Q.   Okay.  And you've given those to
5   your lawyer?
6        A.   Yes.
7        Q.   Had that house ever flooded before?
8        A.   No.
9        Q.   And you have no idea what the value
10  of the house was before Katrina.
11       A.   No.
12       Q.   Have you gotten any appraisals or
13  any idea how much the house is worth after
14  Katrina?
15       A.   No.
16       Q.   Did you have insurance on the house?
17       A.   Yes.
18       Q.   Okay.  What type of insurance?
19       A.   I had flood and homeowner's.
20       Q.   How much did you have in flood
21  insurance?
22       A.   Ninety.
23       Q.   Ninety thousand?
24       A.   Yes.
25       Q.   And was that all structure?
```

Page 76

```
1        A.   Yes.
2        Q.   Did you have any contents coverage?
3        A.   Well, that was included in the
4   90,000.
5        Q.   Okay.  So, the 90,000 would have
6   been combined contents and structure?
7        A.   Right.
8        Q.   Okay.  And who was that with, if you
9   remember?
10       A.   Allstate.
11       Q.   And you said you had a homeowner's
12  policy, also?
13       A.   Yes.
14       Q.   Okay.  How much did you have in
15  homeowner's, if you recall?
16       A.   A hundred, but they didn't give me
17  nothing.
18       Q.   Okay.  You had 100,000 in structure
19  coverage?
20       A.   Right.
21       Q.   And do you know how much you had in
22  contents coverage under your homeowner's
23  property -- policy?
24       A.   All that was included.
25       Q.   Okay.  So, the 100, again, would
```

Page 77

```
1   have been a combined limit?
2        A.   Yes.
3        Q.   Okay.  Was that also with Allstate?
4        A.   Yes.
5        Q.   Did you -- did you make a claim to
6   Allstate as a result of the damages?
7        A.   Yes.
8        Q.   You made a claim on both your flood
9   and homeowner's policy?
10       A.   Yes.
11       Q.   Okay.  How much were you paid from
12  your flood insurance?
13       A.   Ninety thousand.
14       Q.   Okay.  Did they come out and adjust
15  it, or did they just send you a check?
16       A.   They sent me a check.
17       Q.   Okay.  So, you didn't meet an
18  adjuster out there before you got your flood --
19       A.   Oh, yeah, I met a adjuster.
20       Q.   Okay.  What I'm trying to find out
21  is did you meet a flood adjuster from Allstate
22  or, you know, working for Allstate, before you
23  got the check for the flood?
24       A.   Oh, yes.  I met the Allstate
25  adjuster and me and him talked, and he adjusted
```

20  (Pages 74 to 77)

(504)525-1753         HUFFMAN & ROBINSON, INC.         (800)749-1753
ONE SHELL SQUARE,#250 CERTIFIED COURT REPORTERS NEW ORLEANS, LA 70139

Page 78

```
 1   it, and about two weeks later, I got the check.
 2       Q.   Okay.  And did another adjuster come
 3   out for the homeowner's claim?
 4       A.   Yes.
 5       Q.   Okay.  And same guy or a different
 6   person?
 7       A.   Different person.
 8       Q.   Okay.  But he was also with Allstate
 9   in some capacity.
10       A.   Right.
11       Q.   And how long after the flood
12   adjuster?
13       A.   Oh, about two months.
14       Q.   Did you -- after he met you at the
15   house, do you remember your discussions with him?
16       A.   Two of the pillars had -- the house
17   had shift where the pillars had come off, where
18   they had come off the pillars, and he said
19   Allstate wasn't responsible for that because it
20   wasn't wind and some kind of damage.
21       Q.   Okay.
22       A.   So, I got -- I talked to Mr. Bruno
23   about that.
24       Q.   Okay.  Do you have another lawsuit
25   against Allstate pending?
```

Page 79

```
 1       A.   You have to ask Mr. Bruno.
 2       Q.   Okay.  I don't want to hear anything
 3   you told Mr. Bruno.  Okay?
 4       A.   (Nods head affirmatively.)
 5       Q.   So, you don't know if you have a
 6   lawsuit against Allstate pending or not --
 7       A.   No.
 8       Q.   -- is that right?
 9       A.   No.
10       Q.   Let me -- when I asked you if you
11   had a lawsuit against Allstate, you told me you
12   didn't know, ask Mr. Bruno; is that right?
13       A.   Right.
14       Q.   Okay.  Did you have any problems
15   with your flood adjuster?
16       A.   No.
17       Q.   Who came in town with you when you
18   showed up at the house the first time?
19       A.   Keith.
20       Q.   Okay.  How long after the storm was
21   that?
22       A.   Oh, about two months.
23       Q.   Okay.  When you drove up, what is
24   the first thing you noticed on the house?
25       A.   Leaning.
```

Page 80

```
 1       Q.   Okay.  That was the pillars that you
 2   talked about earlier?
 3       A.   Yeah.
 4       Q.   Were you -- was it safe to walk in
 5   and everything?
 6       A.   Well, you could get on the porch,
 7   but you couldn't open the doors.  You had to
 8   force your way in.
 9       Q.   Okay.  So, you had trouble opening
10   the front door?
11       A.   Yeah.
12       Q.   Did you -- did you notice a
13   waterline on the property?
14       A.   Oh, I had about a good six feet.
15       Q.   Okay.  It was six feet up on the --
16   on the wood?
17       A.   Yes.
18       Q.   Okay.  Because your house is raised?
19       A.   Yeah.
20       Q.   How high is it?
21       A.   Oh, it was, like, a normal house.
22   Like, about this high.
23       Q.   Okay.  So, about two or three feet?
24       A.   Yeah.
25       Q.   Okay.  And how many steps did you
```

Page 81

```
 1   have to walk up to go onto the porch?
 2       A.   Four.
 3       Q.   Four steps.  And, so, the waterline
 4   would have been six feet, though, above the three
 5   feet off the ground; is that right?
 6       A.   Right.
 7       Q.   Okay.  Where did you see that
 8   waterline?
 9       A.   At my house.
10       Q.   Okay.  On the wood or did you have
11   to --
12       A.   On the Sheetrock.
13       Q.   Okay.  So, you had to go inside to
14   see the waterline --
15       A.   Uh-huh.
16       Q.   -- is that right?
17       A.   Yes.
18       Q.   Okay.  Did you notice any other
19   damage on the outside of the house other than it
20   had shifted?
21       A.   No, nothing other than it being
22   shift.
23       Q.   Okay.  Did you see the roof?
24       A.   Yeah, I seen the roof.
25       Q.   Uh-huh.
```

21  (Pages 78 to 81)

(504)525-1753        HUFFMAN & ROBINSON, INC.        (800)749-1753
ONE SHELL SQUARE,#250 CERTIFIED COURT REPORTERS NEW ORLEANS, LA 70139

Page 106

1  missing?
2      A.   Uh-huh.
3      Q.   Okay.  Had it been moved off its
4  piers?
5      A.   No.
6      Q.   Okay.  So, it was sitting all right?
7      A.   Uh-huh.
8      Q.   Has that one been torn down?
9      A.   No.
10     Q.   Okay.  You just gutted that one?
11     A.   Right.
12     Q.   Did that one have similar issues
13  with the ceiling like you had in your living
14  room?
15     A.   No.
16     Q.   Okay.  Did you have any trees on
17  your property?
18     A.   No.
19     Q.   Have you gotten any type of
20  estimates to replace your home?
21     A.   Yeah.  Two hundred thirty thousand,
22  260,000.
23     Q.   Who did you get those from?
24     A.   Different individuals.
25     Q.   Do you remember who those

Page 107

1  individuals were?
2      A.   Golden Hammer Construction and Josh
3  somebody.
4      Q.   You said Josh?
5      A.   Uh-huh.
6      THE WITNESS:
7          That man live over the
8          river, Keith, what's that man
9          stay --
10  EXAMINATION BY MR. KIRSCH:
11     Q.   You can't ask your son.
12     A.   Oh, I'm sorry.
13     Q.   If you don't remember, it's okay,
14  you can tell me you don't remember.
15     A.   Well, I don't remember.
16     Q.   Okay.  If it comes to you, just let
17  me know later on.
18     A.   Okay.
19     Q.   Other than the property listing, the
20  personal property listing that you gave to your
21  adjuster, did you make any other type of
22  documentary evidence or anything that would show
23  what you lost?
24     A.   No.
25     Q.   Okay.  Did you take photographs of

Page 108

1  what it looked like on the inside?
2      A.   When we could get in there, we took
3  some.
4      Q.   And it was still with all the stuff
5  inside the house, right?
6      A.   Right.
7      Q.   Okay.  Do you have any photographs
8  of the -- of the Clouet property pre-Katrina?
9      A.   I don't know.
10     Q.   You haven't seen any, though?
11     A.   I might have.  The pictures I had, I
12  gave to Mr. Bruno.
13     Q.   Okay.  So, he may have some
14  pre-Katrina; you're just not sure?
15     A.   Uh-huh.  Right.
16     Q.   When the -- when the homeowner
17  adjuster came out, other than him telling you he
18  wasn't going to cover the pillars, did he tell
19  you anything else?
20     A.   He said he could only offer me 1,100
21  and something dollars.
22     Q.   Were there any other houses in your
23  neighborhood that had gotten shifted off the
24  pillars like yours?
25     A.   I don't know.

Page 109

1      Q.   But you told me that the homeowner's
2  end didn't pay you anything; is that right?
3      A.   Right.
4      Q.   Did you agree with them?
5      A.   No.
6      Q.   Okay.  Why -- why didn't you agree
7  with them?
8      A.   Because I was insured.  I paid my
9  insurance policy, and I expected them to give me
10  what I had paid for.
11     Q.   Right.  And you felt that the wind
12  had moved the house off the pillars?
13     A.   Right.
14     Q.   I know you told me you had -- you
15  were waiting on Road Home money, right?
16     A.   Right.
17     Q.   And you told me that you had gotten
18  Red Cross, $182, right?
19     A.   Right.
20     Q.   FEMA gave you $2,300.
21     A.   Right.
22     Q.   And you got food stamps of 105 a
23  month.
24     A.   Yes.
25     Q.   I also have you -- something written

28  (Pages 106 to 109)

Page 110

1   down where you got $200.  Did you get that
2   initially or --
3        A.   I got that from one church we went
4   to and they gave me $100 worth of clothes and
5   $100 Wal-Mart card.
6        Q.   Okay.  So, that wasn't food stamps.
7   That was actually --
8        A.   That was $200.
9        Q.   Okay.  That actually came from a
10  church?
11       A.   Yes.
12       Q.   Okay.  Do you remember the name of
13  the church?
14       A.   Oh, no.  That was in Jackson,
15  Mississippi.
16       Q.   Okay.  Did you get any other type of
17  assistance from any of the governmental or, you
18  know, Red Cross-type organizations?
19       A.   No.
20       Q.   Okay.  And have you applied for any
21  other type of assistance other than The Road
22  Home?
23       A.   No.  I haven't applied for anything
24  but Road Home.
25       Q.   What did you have to do to apply for

Page 111

1   Road Home?
2        A.   Well, I went on Poydras Street and
3   applied.
4        Q.   Okay.  Did you keep copies of those
5   documents that you had to fill out?
6        A.   Yes.  Uh-huh.
7        Q.   Have you given them to your lawyer
8   yet?
9        A.   No.
10       Q.   Okay.  Can you get a copy of that to
11  your lawyer for us?
12       A.   Yes.
13       Q.   Thank you.
14            And have you gotten any response
15  back from Road Home?
16       A.   No.
17       Q.   Okay.  So, the only thing -- the
18  only documents you would have from Road Home
19  would be the application that you filled out --
20       A.   Right.
21       Q.   -- is that right?
22       A.   Right.
23       Q.   Who -- who tore the structure down
24  on Clouet Street?
25       A.   Aaron Joseph.

Page 112

1        Q.   Does he work for a company?
2        A.   He had his own little company after
3   the flood.
4        Q.   Okay.  So, he was kind of doing
5   business as himself?
6        A.   Uh-huh.
7        Q.   Where does Aaron live?
8        A.   He live about two blocks from me, on
9   Prieur Street.
10       Q.   Purvis?
11       A.   Prieur.
12       Q.   Can you spell that for me?
13       A.   P-R-I-E-R-E.
14       Q.   Is that his business address, too,
15  the Prieur Street?
16       A.   Well, that's his mother's address.
17       Q.   Okay.  How did you -- how did you
18  contact him to come do -- to come take your
19  house?
20       A.   I seen him when we drove up.  And he
21  say, Miss Bette, he say, anything -- you want me
22  to gut your house, I'll gut it out.  Give me
23  $400.  I'll gut it out now.  I said, no, indeed.
24  I say, the house is off the pillars.  I say, I
25  would really need somebody to tear it down, but

Page 113

1   we start taking pictures and stuff, and after we
2   took pictures and we went back to Mississippi and
3   came back here, and I saw him again, and I asked
4   him would he tear it down, and he tore it down
5   for $3,000.
6        Q.   Did you see any of it being torn
7   down or anything?
8        A.   Yes.
9        Q.   You were out there when they did it?
10       A.   No, but when I came from
11  Mississippi, I saw it.
12       Q.   Okay.  Was it gone when you came
13  back?
14       A.   Yeah.
15       Q.   Okay.  So, you didn't actually see
16  the process occur?
17       A.   No.
18       Q.   Do you know if there are any
19  photographs of that?
20       A.   No.
21       Q.   There are none --
22       A.   (Shakes head negatively.)
23       Q.   -- is that right?
24       A.   No.
25       Q.   That's not right?

29 (Pages 110 to 113)

Page 118

1    Q.   Had you ever -- did you apply for
2  any type of SBA loan?
3    A.   No.
4    Q.   Did you ever receive any types of
5  gifts or donations?
6    A.   No.
7    MR. PALMINTIER:
8       Other than that -- what
9  she's already stated?
10   MR. KIRSCH:
11      Other than what we've
12  already talked about.
13  EXAMINATION BY MR. KIRSCH:
14   Q.   Have you been contacted by anyone
15  doing any type of research or investigation of
16  the storm?  You know, a media outlet or somebody
17  writing a book?
18   A.   No.
19   Q.   What about the newspaper?
20   A.   No.
21   Q.   Okay.  You understand, I represent
22  the Orleans Levee District, and there are other
23  governmental entities in here, like, the Corps,
24  the East Jefferson Levee District.  Have you ever
25  spoken with any of those governmental entities?

Page 119

1    A.   No.
2    Q.   Okay.  So, you haven't talked to any
3  of their employees?
4    A.   No.
5    Q.   Do you know why you were chosen as a
6  class representative?
7    A.   Well, I guess, because the people in
8  our community really need somebody to speak up
9  for us so we can get our stuff together and see
10  why these levees, you know, breached.
11   Q.   And your understanding of the
12  litigation is -- is what?  What is it trying to
13  do?
14   A.   What I'm trying to do?
15   Q.   The litigation, the lawsuit.
16   A.   Well, the lawsuit is to help get the
17  levees together and get New Orleans back into
18  good condition.
19   Q.   Did you participate in any way in
20  drafting the complaint that you have at your
21  house?
22   A.   No.
23   Q.   Okay.  Have you ever read it?
24   A.   I've read it, yeah.
25   Q.   Okay.  Have you ever discussed what

Page 120

1  was in it with anyone other than your lawyers?
2    A.   No.
3    Q.   Have you ever read any of the
4  answers filed by the defendants in the lawsuit?
5    A.   No.
6    Q.   Do you know why the Port of New
7  Orleans was sued?
8    A.   No.
9    Q.   Do you know why the Sewerage and
10  Water Board was sued?
11   A.   No.
12   Q.   Do you know why the levee district
13  was sued, the Orleans Levee District?
14   A.   No.
15   Q.   Do you know why the East Jefferson
16  Levee District was sued?
17   A.   No.
18   Q.   Okay.  Do you know why the Corps was
19  sued?
20   A.   Because of the levee breach.
21   Q.   Do you know why any of the
22  engineers, architects or contractors have been
23  sued?
24   A.   Because of the levee breach.
25   Q.   Do you know who's in -- who are the

Page 121

1  people that are going to make up the proposed
2  class?
3    A.   No, not really.
4    Q.   What's your understanding of your
5  duty and responsibility as a class rep?
6    A.   Well, to go in my community and let
7  the people know what's going on and see if we
8  could get these levees together right.
9    Q.   Do you know what subclass you've
10  been proposed as a class rep for?
11   A.   I don't understand the question.
12   Q.   Okay.  You understand you're being
13  put up as a class representative.
14   A.   Uh-huh.
15   Q.   Yes?  Is that a "Yes"?
16   A.   Yes.
17   Q.   Thank you.
18      Do you know what group you're going
19  to be representing as a class rep?
20   A.   Four.
21   Q.   Okay.  And what is your
22  understanding of the boundaries of Class 4, if
23  you know?
24   A.   Well, to try to help the community
25  so the levees, like, the London Avenue Canal,

31  (Pages 118 to 121)

(504)525-1753       HUFFMAN & ROBINSON, INC.       (800)749-1753
ONE SHELL SQUARE,#250 CERTIFIED COURT REPORTERS NEW ORLEANS, LA 70139

Page 130

```
1    you from modifying the property that's at issue
2    on Clouet Street?
3         A.  It was in deplorable conditions.  I
4    had to have it torn down.
5         Q.  Right.  No.  I meant before.
6         A.  Oh, no.  It was in pretty nice shape
7    before the hurricane.
8         Q.  Okay.  Okay.  Okay.  And then under
9    the "Personal Injury/Wrongful Death" section, you
10   see Number 10?
11        A.  Uh-huh.
12        Q.  You say:  "I had to tear my house
13   down."
14        A.  Right.
15        Q.  That has nothing to do with the
16   personal injury claim, right?  That's your
17   property damage claim.
18        A.  Right.
19        Q.  Okay.  There is, if you look down
20   there, some preprinted -- "personal injury and
21   mental distress."
22        A.  Uh-huh.
23        Q.  You see that?
24        A.  Yes.
25        Q.  Okay.  Is -- is that referring to
```

Page 131

```
1    the stress we talked about earlier?
2         A.  Yes.  That's why I put the $167,000
3    down.
4         Q.  Okay.  And the $167,000 you're
5    referring to is in Section 12b, right?
6         A.  Right.
7         Q.  And that's under "Personal Injury"?
8         A.  Yeah.  And then I -- after -- I
9    didn't realize what I had did, and I called Mr.
10   Bruno and asked him could I come get another
11   copy, and I filled that one out.
12        Q.  Okay.
13        A.  And when I filled it out, I filled
14   it out --
15        MR. PALMINTIER:
16             Just answer the question.
17   EXAMINATION BY MR. KIRSCH:
18        Q.  Is this -- is this the first one
19   that you filled out?
20        A.  I think so.
21        Q.  Okay.  Did you fill -- did you
22   submit any other Form 95s to the Army Corps?
23        A.  Yeah.
24        Q.  Okay.  Do you have copies of those?
25        A.  Yes.
```

Page 132

```
1         Q.  Okay.  What would you have done with
2    the Form 95s?  Would you have sent them straight
3    to the Army Corps?
4         A.  Yes.
5         Q.  Okay.  And you remember sending two
6    different Form 95s to the Army Corps of
7    Engineers?
8         A.  Yes.  Yes.
9    MR. KIRSCH:
10             Do y'all have a copy of the
11   other one?
12   MR. PALMINTIER:
13             Yes.
14   MR. KIRSCH:
15             Can I see it?
16   MR. PALMINTIER:
17             Sure.
18   MR. KIRSCH:
19             Thank you.  Is there any way
20   we can make a copy of this and
21   attach it?
22   MR. PALMINTIER:
23             Uh-huh.
24   EXAMINATION BY MR. KIRSCH:
25        Q.  If we're down in Section 12 again,
```

Page 133

```
1    you put 12d, the total of your damages is "My
2    House."  You were really seeking damages for the
3    loss of your house, right?
4         A.  Right.
5         Q.  Okay.
6         A.  And for myself, too.
7         Q.  Okay.  Flip to the last page for me.
8    I just want to make sure I'm reading your
9    handwriting.
10        A.  Uh-huh.
11        Q.  You see the second set of
12   handwriting, it looks like:  "My insurance
13   company don't want to pay my" --
14        A.  -- "insurance at all."
15        Q.  At all.
16        A.  "Allstate Insurance Company."
17        Q.  Okay.  So, it says -- so, the
18   section beginning with:  "My insurance
19   company..." says:  "My insurance company don't
20   want to pay my insurance at all."
21        A.  Right.
22        Q.  Okay.  And then you identified
23   Allstate as your carrier?
24        A.  Right.
25        Q.  Okay.  Do you have copies of your
```

34  (Pages 130 to 133)

(504)525-1753        HUFFMAN & ROBINSON, INC.        (800)749-1753
ONE SHELL SQUARE,#250 CERTIFIED COURT REPORTERS NEW ORLEANS, LA 70139

Page 134

```
 1   insurance policies or premium notices or
 2   anything?
 3       A.   Yeah.
 4       Q.   You have all that?
 5       A.   Yes.
 6       Q.   Have you given that to your
 7   attorneys?
 8       A.   Yes.
 9       Q.   Okay.  So, we should be able to get
10   that information from them?
11       A.   Right.
12       Q.   Okay.  And we're going to attach as
13   Exhibit 6 -- can I put a sticker on it?
14       MS. DECKER:
15            5.
16   EXAMINATION BY MR. KIRSCH:
17       Q.   Oh, I'm sorry, Exhibit 5 -- the
18   second Form 95 you filled out, and I'm going to
19   attach it to you -- the letter from the Army
20   Corps' dated October 19th of 2006; is that right?
21       (Whereupon, Jones Exhibit
22       Number 5 was marked for
23       identification.)
24       A.   Uh-huh.
25   EXAMINATION BY MR. KIRSCH:
```

Page 135

```
 1       Q.   You remember receiving that letter?
 2       A.   Yes.
 3       Q.   Okay.  And if you flip to the next
 4   page, that's the form that you filled out?
 5       A.   Right.
 6       Q.   Okay.  Now, if I remember correctly,
 7   and since we only have one copy, I'm going to
 8   have to lean over a little, this time, the
 9   preprinted language remained the same, right?
10       A.   Uh-huh.
11       Q.   And that's in Section 8 and Section
12   9, right?
13       A.   Right.
14       Q.   Okay.  And then you wrote in -- you
15   changed the number to 150,000, right?
16       A.   Uh-huh.
17       Q.   Is that a "Yes"?
18       A.   Yes.
19       Q.   Thank you.
20            And then on the Section 12a, you put
21   property damage of 150,000, correct?
22       A.   Right.  Right.
23       Q.   Under "Personal Injury," you put
24   "None," right?
25       A.   Right.
```

Page 136

```
 1       Q.   And "Wrongful Death," "None,"
 2   correct?
 3       A.   Right.
 4       Q.   Okay.  And, so, your total damages,
 5   according to this form, would have been 150,000?
 6       A.   Right.
 7       Q.   Okay.  Let's see.  When we flip the
 8   page, it looks like you listed Allstate Insurance
 9   as your company, right?
10       A.   Uh-huh.  Yes.
11       Q.   Says:  "Allstate paid me only 3,000
12   and took my deductible."
13            Did you get paid $3,000, or what
14   happened there?
15       A.   They offered Mr. Bruno 3,000, and he
16   refused it.  So, what's going on now, I don't
17   know.
18       Q.   Okay.  But you never actually got a
19   check from Allstate?
20       A.   I haven't gotten nothing from
21   Allstate other than the flood.
22       Q.   Okay.
23       A.   Now, I do have the flood money.
24       Q.   Right.  You got 90,000?
25       A.   Right.
```

Page 137

```
 1       Q.   Okay.  Okay.  So, where it says they
 2   only paid me 3,000, it actually should be --
 3   should say they only offered me 3,000?
 4       A.   Right.
 5       Q.   Okay.  You never got an actual check
 6   from Allstate?
 7       A.   No.  I haven't gotten anything other
 8   than the flood.
 9       Q.   Okay.  Just to make sure, on Page 2,
10   where it says Betty J. Jones, you signed that?
11       A.   Yes.
12       Q.   Okay.  And that's your signature?
13       A.   Yes, that's my handwriting.
14       Q.   Okay.  And just like the other one,
15   you reviewed all the information in this to make
16   sure it was correct?
17       A.   Yes.
18   MR. KIRSCH:
19            Let's take a five-minute
20       break.  I may not have anything
21       left.
22   MR. PALMINTIER:
23            Okay.
24   THE VIDEOGRAPHER:
25            Going off the record.  It's
```

35  (Pages 134 to 137)

(504)525-1753        HUFFMAN & ROBINSON, INC.        (800)749-1753
ONE SHELL SQUARE,#250 CERTIFIED COURT REPORTERS NEW ORLEANS, LA 70139

Page 138

```
1      12:01.
2          (Whereupon, a discussion was
3    held off the record.)
4      THE VIDEOGRAPHER:
5          Returning to record.  It's
6    12:07.
7    EXAMINATION BY MR. KIRSCH:
8      Q.  Miss Jones, something we didn't go
9    over when we went through your house.  I think
10   you told me that you had a shed or a -- and a
11   garage?
12     A.  Yeah.
13     Q.  We didn't -- we didn't talk about
14   what was in those and what was damaged or not
15   damaged.
16     A.  Well, they had three of my
17   grandchildren's bicycles.  Three bicycles.  They
18   had some material in that corner with stuff.
19   They had paint, ladders, barbecue grill, chafing
20   dishes and other miscellaneous stuff.
21     Q.  Okay.  Now, was that in the garage
22   or the shed?
23     A.  The garage.
24     Q.  Okay.  Is the garage attached to the
25   home or is it a separate structure?
```

Page 139

```
1      A.  No.  It's a separate structure.
2      Q.  Okay.  What type of structure was
3    it?  Was it on a slab?
4      A.  Yeah.
5      Q.  Okay.  Was it built with studs in
6    the ground?
7      A.  Yes.
8      Q.  Two-by-fours and everything?
9      A.  Uh-huh.
10     Q.  It was wood on the outside?
11     A.  No, tin on the outside.
12     Q.  A tin roof?
13     A.  Uh-huh.  Yes.
14     Q.  Did it have any roofing damage or
15   was there any damage to the tin?
16     A.  Yeah.  They had two or three of them
17   had blown off.
18     Q.  Is that two or three of the sections
19   on the roof?
20     A.  Yes, and somebody had -- well, not
21   somebody, but I guess the hurricane had blown a
22   freezer in the yard -- in the driveway part.
23     Q.  A freezer was in the garage, too?
24     A.  No.  It was in the driveway.  I
25   don't know who the freezer was for, but it was
```

Page 140

```
1    blown in my yard.
2      Q.  So, there was somebody else's
3    freezer in your yard --
4      A.  Yeah.
5      Q.  -- is that right?
6      A.  Right.
7      Q.  Okay.  So, we covered -- that's what
8    you called the garage, right?
9      A.  Right.
10     Q.  Anything else in the garage?
11     A.  No.
12     Q.  Okay.  Other than the two or three
13   sections of the tin that got ripped off of the
14   roof, any other damage to the tin?
15     A.  No.
16     Q.  Okay.  Where is the shed that you
17   were talking about, or is that the same thing?
18     A.  That's the same thing.
19     Q.  Okay.  So, you had one garage/shed?
20     A.  Uh-huh.
21     Q.  Any other structures that I'm
22   missing at your home that we haven't discussed
23   already?
24     A.  No.  No.
25     Q.  Okay.  Is there anything you want to
```

Page 141

```
1    add that you can think of that we haven't
2    discussed as to how you were damaged?
3      A.  No.
4      Q.  Okay.  And I'm assuming you haven't
5    thought of anything you want to clarify, any
6    answers or anything?
7      A.  No.
8      Q.  Okay.
9      MR. KIRSCH:
10         We just need to do the
11     authorizations, and we can do
12     those off the record, if that's
13     okay with you.
14     MR. PALMINTIER:
15         That's definitely okay with
16     me, and I have no questions.
17     MR. KIRSCH:
18         Thank you very much.  Y'all
19     don't have anything, huh?
20     MS. BOYER:
21         No.  No.
22     THE VIDEOGRAPHER:
23         This concludes this
24     deposition.  It is 12:11.
25
```

36  (Pages 138 to 141)

(504)525-1753        HUFFMAN & ROBINSON, INC.        (800)749-1753
ONE SHELL SQUARE,#250 CERTIFIED COURT REPORTERS NEW ORLEANS, LA 70139

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE:  KATRINA CANAL BREACHES      CIVIL ACTION
CONSOLIDATED LITIGATION

NO. 05-4182 "K"(2)

 PERTAINS TO:  LEVEE               JUDGE DUVAL

FILED IN:  05-4181, 05-4182,      MAG. WILKINSON
05-5237, 05-6073, 05-6314,
05-6324, 05-6327, 05-6359,
06-0225, 06-0886, 06-1885,
06-2152, 06-2278, 06-2287,
06-2824, 06-4024, 06-4065,
06-4066, 06-4389, 06-4634,
06-4931, 06-5032, 06-5155,
06-5159, 06-5161, 06-5162,
06-5260, 06-5771, 06-5786,
06-5937, 07-0206, 07-0621,
07-1073, 07-1271, 07-1285




Videotaped deposition of JOSÉ LUIS RODRIGUEZ,
2223 Prentiss Avenue, New Orleans, Louisiana
70122, taken in the offices of Bruno & Bruno, 855
Baronne Street, New Orleans, Louisiana  70113, on
Saturday, the 14th day of July, 2007, beginning
at 9:17 a.m.



APPEARANCES:

        THE LAW OFFICE OF JOSEPH M. BRUNO
        (BY:  L. SCOTT JOANEN)
        855 Baronne Street
        New Orleans, Louisiana  70113


            ATTORNEYS FOR THE PLAINTIFFS

JOSE LUIS RODRIGUEZ (LEVEE)                                    7/14/2007

---

**Page 2**

1  APPEARANCES CONTINUED:
2       DUPLASS, ZWAIN, BOURGEOIS, MORTON, PFISTER
        & WEINSTOCK
3       (BY: JENNIFER M. MORRIS)
        Suite 2900
4       3838 North Causeway Boulevard
        Metairie, Louisiana 70002
5
        ATTORNEYS FOR THE BOARD OF
6       COMMISSIONERS FOR THE LAKE BORGNE
        BASIN LEVEE DISTRICT
7
        McCRANIE, SISTRUNK, ANZELMO, HARDY,
8       MAXWELL & McDANIEL
        (BY: ANDRÉ J. LAGARDE)
9       Suite 800
        3445 North Causeway Boulevard
10      Metairie, Louisiana 70002
11      ATTORNEYS FOR THE ORLEANS
        LEVEE DISTRICT
12
        CHRISTOVICH & KEARNEY
13      (BY: J. WARREN GARDNER, JR.)
        Suite 2300
14      601 Poydras Street
        New Orleans, Louisiana 70130
15
        ATTORNEYS FOR THE SEWERAGE AND
16      WATER BOARD OF NEW ORLEANS
17
18  VIDEOTAPED BY:
19      JOHN WADSWORTH
        Legal Video Specialist
20      HART VIDEO
        Bay 5
21      1185 Robert Boulevard
        Slidell, Louisiana 70458
22
23
24  REPORTED BY:
25      CAROL VALLETTE SLATER
        Certified Court Reporter
        Registered Professional Reporter

---

**Page 3**

1              I N D E X
2
3   EXAMINATION BY:                    PAGE
4   MR. GARDNER                         6
5
6
7
8
9
10  EXHIBITS:
11  Rodriguez Exhibit Number 1A         22
        Document entitled "Notice of
12      Videotape Deposition"
13  Rodriguez Exhibit Number 2          91
        Photograph
14
    Rodriguez Exhibit Number 3          91
15      Photograph
16
17
18
19
20
21
22
23
24
25

---

**Page 4**

1             S T I P U L A T I O N
2        IT IS STIPULATED AND AGREED by and
3   between counsel for the parties hereto that the
4   deposition of the aforementioned witness is
5   hereby being taken under the Federal Rules of
6   Civil Procedure, for all purposes, in accordance
7   with law;
8        That the formalities of reading and
9   signing are specifically not waived;
10       That the formalities of sealing,
11  certification and filing are specifically waived;
12       That all objections, save those as
13  to the form of the question and the responsiveness
14  of the answer, are hereby reserved until such
15  time as this deposition, or any part thereof, may
16  be used or sought to be used in evidence.
17
18               *  *  *  *
19
20       CAROL VALLETTE SLATER, Certified
21  Court Reporter, Registered Professional Reporter,
22  in and for the Parish of Orleans, State of
23  Louisiana, officiated in administering the oath
24  to the witness.
25

---

**Page 5**

1   THE VIDEOGRAPHER:
2        We're on the record.  This
3   is the videotape of José Luis
4   Rodriguez, being held at 855
5   Baronne Street, New Orleans,
6   Louisiana, on July 14th, 2007, on
7   the indicated time on the
8   videotape of 9:17.
9        My name is John Wadsworth, a
10  certified video specialist, with
11  Hart Video of Louisiana.  The
12  court reporter is Carol Slater, of
13  Huffman & Robinson.
14       Would you please swear in
15  the witness.
16       JOSÉ LUIS RODRIGUEZ,
17  after being first duly sworn in the cause,
18  testified as follows:
19  MR. GARDNER:
20       Are we going to identify
21  ourselves?
22  MR. JOANEN:
23       Scott Joanen, on behalf of
24  the Levee PSLC.
25  MR. GARDNER:

---

2  (Pages 2 to 5)

JOSE LUIS RODRIGUEZ (LEVEE)                                    7/14/2007

Page 18

1   deponent's medical records from August, 2000 to
2   the present.
3        A.   Yeah, I have those.
4        Q.   Okay.  What medical records -- I
5   realize you didn't bring any here today, but what
6   medical records do you have at your home?
7        A.   The one when I went to Fort Myers,
8   Florida, when I went to the hospital over there,
9   for having fungus.
10       Q.   Okay.  All right.  Number 17 is all
11  documents evidencing the application for or
12  receipt of any benefit, payment, insurance
13  proceed, settlement, loan disbursement or other
14  funds paid to the deponent or on his behalf
15  related to Hurricane Katrina or its aftermath.
16       A.   Yes.
17       Q.   Okay.  And what documents would
18  those be?
19       A.   The -- like, the FEMA and the Red
20  Cross, that stuff.
21       Q.   And the insurance proceeds?
22       A.   Yeah.
23       Q.   All right.  And you have those at
24  your house?
25       A.   Yes, sir.

Page 19

1        Q.   Okay.  All demonstrative -- Number
2   18 is all demonstrative evidence or exhibits that
3   the deponent or his or her attorneys may refer to
4   at the class action hearing and all documents
5   that refer or relate to such demonstrative
6   evidence or exhibits.
7        A.   No.
8        Q.   Number 19 is all computer models
9   that the deponent or his or her attorneys may
10  refer to at the class certification hearing or in
11  support of class certification and all documents
12  that refer or relate to such computer models.
13       A.   Could you -- I didn't understand.
14       Q.   It's Number 19, if you could read
15  it.
16       A.   Okay.  No.
17       Q.   Okay.  Number 20 is a copy of the
18  complaint or petition in any prior litigation in
19  which the deponent has been a party.  And it's my
20  understanding that you have never been a party to
21  another litigation.
22       A.   No.
23       Q.   So, you wouldn't have a document
24  that's --
25       A.   No.

Page 20

1        Q.   Okay.  A copy of any lease agreement
2   entered into between the deponent and any
3   proposed class member.
4        A.   Uh-uh.  Say that again.
5        Q.   You have to answer verbally.
6        A.   Okay.  No.
7        Q.   All right.  Number 22 is all
8   documents that relate to any eviction proceeding
9   instituted by or against the deponent after
10  Hurricane Katrina.
11       A.   Yeah.
12       Q.   Okay.  You were evicted?
13       A.   Was I evicted?  Well, I couldn't
14  move in the house.
15       Q.   Okay.
16       A.   It was -- they have to repair it.
17  I'm not living in the same house --
18       Q.   All right.
19       A.   -- that I was living in.
20       Q.   But you weren't evicted.  You just
21  can't live there.
22       A.   Right.
23       Q.   But do you have documents that
24  relate to that?
25       A.   No.

Page 21

1        Q.   Do you have -- at the time of
2   Hurricane Katrina, were you living in a residence
3   that you leased?
4        A.   I rented, yeah.
5        Q.   Okay.  Did you have a written rental
6   agreement?
7        A.   No.
8        Q.   Did you have any insurance on --
9        A.   No.
10       Q.   -- on the place that you rented?
11       A.   No.
12       Q.   Okay.  Did you have any insurance on
13  the contents?
14       A.   No.
15       Q.   Any and all documents in the
16  deponent's possession indicating that the
17  deponent will protect the interests of the
18  proposed class.
19       A.   Yes.
20       Q.   What documents are those?
21       A.   The -- all the stuff that I just
22  told you I had earlier, huh?
23       Q.   Okay.  Do you believe those are
24  responsive to Number 23?
25       A.   Yeah.

JOHNS PENDLETON COURT REPORTERS                      800 562-1285

JOSE LUIS RODRIGUEZ (LEVEE)                                    7/14/2007

Page 22

1    Q.  Okay.  All righty.  And let's go
2  ahead and attach the Notice of Deposition --
3  notice of videotape deposition, Mr. Rodriguez, as
4  Exhibit 1 to the deposition.  However, let's use
5  a different copy.  Could we use that copy?  I
6  wrote all over this one.
7        (Whereupon, Rodriguez
8    Exhibit Number 1A was marked for
9    identification.)
10 EXAMINATION BY MR. GARDNER:
11   Q.  All right.  Mr. Rodriguez, what did
12 you do in preparation of this deposition this
13 morning, if anything?
14   A.  Nothing.
15   Q.  Nothing?
16   A.  I didn't do nothing.  No.
17   Q.  Okay.  Did you meet with any of your
18 attorneys prior to the deposition?
19   A.  No, sir.  Oh, yeah, yeah.  I did.
20   Q.  Okay.  You met with Mr. Joanen?
21   A.  I was thinking before today.  Yeah.
22   Q.  Okay.  Before today, have you met
23 with any attorneys?
24   A.  Yes.
25   Q.  And when was that?

Page 23

1    A.  I don't remember the date.
2    Q.  Approximately how long --
3    A.  About two, three weeks ago.
4    Q.  Okay.  And how long did that meeting
5  last?
6    A.  Maybe 15, 20 minutes, something like
7  that.
8    Q.  And was that the only meeting you
9  had relative to this litigation?
10   A.  Yes, sir.
11   Q.  And how long did you meet with Mr.
12 Joanen this morning?
13   A.  About ten, 15 minutes.
14   Q.  And you didn't review any
15 documents -- or did you review any documents
16 prior to your deposition?
17   A.  No, sir.
18 MR. JOANEN:
19      You just have to answer what
20   your recollection is.
21 THE WITNESS:
22   Yeah.
23 EXAMINATION BY MR. GARDNER:
24   Q.  All right.  Mr. Rodriguez, are you
25 on any medication this morning?

Page 24

1    A.  No, sir.
2    Q.  And you realize you're under oath?
3    A.  Yes, sir.
4    Q.  And you realize the significance of
5  that?
6    A.  Yes, sir.
7    Q.  Okay.  What is your full name, sir?
8    A.  José L. Rodriguez.  Luis.
9    Q.  And what is your date of birth?
10   A.  7/22/66.
11   Q.  And where were you born?
12   A.  Cuba.
13   Q.  Are you a United States citizen?
14   A.  No, sir.
15   Q.  How long have you lived in New
16 Orleans?
17   A.  About 38 years.
18   Q.  And how old are you?
19   A.  Forty.
20   Q.  What are your parents' names?
21   A.  My father's name is José Rodriguez,
22 and my mother's name is Lourdes Rodriguez.
23   Q.  And are your parents still living?
24   A.  No.  My father died because of the
25 storm.

Page 25

1    Q.  And your mother?
2    A.  She's alive.
3    Q.  Okay.  And where does your mother
4  live?
5    A.  She lives on Prentiss, 2223 Prentiss
6  Avenue.
7    Q.  I'm sorry.  That's your present
8  address?
9    A.  That's my mailing address.
10   Q.  Okay.  Is that where you reside?
11   A.  What --
12   Q.  Is that where you sleep?
13   A.  No.  No, it's not.
14   Q.  All right.  Do you have any brothers
15 or sisters?
16   A.  Yes, I do.
17   Q.  And what are their names and ages?
18   A.  Maria Rodriguez is my sister.  She's
19 three, four years older than me.  So, that'll
20 make her 44.
21   Q.  And where does she live?
22   A.  She lives with my mother, 2223
23 Prentiss.
24   Q.  Okay.  Any others?
25   A.  Armando.

7 (Pages 22 to 25)

JOSE LUIS RODRIGUEZ (LEVEE)                                    7/14/2007

---

Page 26

1    Q.   Armando?
2    A.   Armando Rodriguez.  He lives in
3  Slidell.
4    Q.   Okay.  And how old is Armando?
5    A.   Armando is three --
6    Q.   About.
7    A.   Thirty-eight.
8    Q.   Any others?
9    A.   Richard.  Richard Rodriguez.  And
10  he's about 33.
11    Q.   And does he live --
12    A.   He lives in New Orleans, Louisiana,
13  on Bruxelles.
14    Q.   On Bruxelles.  Okay.  Any others?
15    A.   Douglas Rodriguez, my younger
16  brother, he's in Houston.
17    Q.   And how old is he?
18    A.   He's about 29.
19    Q.   Okay.  Are you married?
20    A.   No, sir.
21    Q.   Do you have any children?
22    A.   I had a child.  I don't have any --
23    Q.   How old is your child?
24    A.   He was 12.
25    Q.   Is he alive?

Page 27

1    A.   No.
2    Q.   Okay.  And when did he pass away?
3    A.   He passed, like, three years before.
4    Q.   Okay.
5    A.   About two years before the storm.
6    Q.   And what was his name?
7    A.   Christopher.
8    Q.   Rodriguez?
9    A.   Yes, sir.
10    Q.   Do you have any dependents at this
11  point?
12    A.   No, sir.
13    Q.   All right.  Where -- you told me a
14  moment ago that your mailing address is 2223 --
15    A.   Prentiss Avenue.
16    Q.   2223 Prentiss.  All right.  And who
17  lives at that address?
18    A.   My mother and my sister.
19    Q.   Okay.  And that's Lourdes and Maria?
20    A.   And Maria, yes.
21    Q.   And is that an apartment?
22    A.   No.  It's a house.
23    Q.   It's a house.
24    A.   (Nods head affirmatively.)
25    Q.   Do they own the house or do you own

Page 28

1  the house?
2    A.   They own the house.
3    Q.   Now, when you say they own the
4  house, who --
5    A.   Well, my mom.  My mom owns the
6  house.  They both -- I guess they both went in on
7  it.  I don't know.
8    Q.   Did they buy the house after
9  Hurricane Katrina?
10    A.   Before.
11    Q.   Before?
12    A.   Uh-huh.
13    Q.   So, before Hurricane Katrina, who
14  bought the house?  Let me just make sure I'm
15  clear on this.
16    A.   My mom.
17    Q.   Did your dad?
18    A.   No.  He didn't -- they split up.  He
19  stayed living on Bruxelles, she went and bought a
20  house.  He was stuck on staying where he was at.
21  She wanted to move on.
22    Q.   Okay.  So, prior to Hurricane
23  Katrina, your parents got divorced?
24    A.   No.  They were separated.
25    Q.   Separated?

Page 29

1    A.   Right.
2    Q.   And your mother and sister purchased
3  the house that they're living in now on Prentiss?
4    A.   Right.
5    Q.   And that's your mailing address?
6    A.   Right.
7    Q.   Okay.  And do you know approximately
8  when they purchased the house?
9    A.   I'd say -- they might have had the
10  house maybe six, seven years, I think.
11    Q.   From --
12    A.   I don't know what day they bought
13  it.
14    Q.   I'm just asking approximately.
15    A.   About five, six years, I would say,
16  from now back.
17    Q.   Okay.  All right.  Now, your mailing
18  address is on Prentiss.
19    A.   Uh-huh.
20    Q.   Where are you actually living?
21    A.   I live on -- I be living --
22  sometimes I go by my brother in Slidell.  I been
23  kind of not stable, you know, because of a lot of
24  things I been going through, but, right now, I'm
25  at -- on Bruxelles at a house -- friend of mine's

---

8  (Pages 26 to 29)

JOSE LUIS RODRIGUEZ (LEVEE)                                    7/14/2007

---

Page 30

```
 1    house.
 2         Q.   Okay.
 3         A.   28 -- let me see.  No.  2928
 4    Bruxelles.
 5         Q.   2928 Bruxelles?
 6         A.   2928 Bruxelles.  That's right across
 7    the street from where my dad's living.
 8         Q.   Okay.  And who -- is this an
 9    apartment?
10         A.   It's a house.
11         Q.   Okay.  And whose house is that?
12         A.   Angelo.
13         Q.   Angelo?
14         A.   Yeah.
15         Q.   And what's Angelo's last name?
16         A.   Sarter.
17         Q.   Sarter?
18         A.   Yeah.
19         Q.   S-A-R-T-E-R?
20         A.   Yeah, I believe.
21         Q.   Do you pay rent to Mr. Sarter?
22         A.   No.
23         Q.   Okay.  How long have you been living
24    at 2829 Bruxelles?
25         A.   About a month.
```

Page 31

```
 1         Q.   And prior to that time, where were
 2    you living?
 3         A.   By Richard.
 4         Q.   Excuse me?
 5         A.   Richard, my other brother.
 6    Bruxelles.
 7         Q.   Okay.  And where does Richard live?
 8         A.   He lives on Bruxelles.
 9         Q.   Okay.  But what number?
10         A.   I don't remember the -- the address.
11    Let me see.  It was 2913 Bruxelles was the house
12    next door that I was renting before the storm.
13         Q.   Okay.
14         A.   And he lives on the other side.
15         Q.   So, 2915?
16         A.   No.  29 -- no.  2915 is another
17    house next door.  I don't remember that address.
18         Q.   Okay.  All right.  Let me ask you
19    this:  At the time of Hurricane Katrina, where
20    were you living?
21         A.   At that house.
22         Q.   29 --
23         A.   2913.
24         Q.   Bruxelles?
25         A.   Yeah.
```

Page 32

```
 1         Q.   Okay.  Were you living there alone?
 2         A.   Yes, sir.
 3         Q.   Okay.  Is that -- what type of a
 4    structure is that?
 5         A.   It's a double, shotgun.
 6         Q.   Is it a wood frame shotgun?
 7         A.   Yes, sir.
 8         Q.   Approximately how old was it?
 9         A.   I don't know.  I would say --
10         Q.   What's your best estimate?
11         A.   Sixty years, maybe.
12         Q.   Did it have central air and heat?
13         A.   No, sir.
14         Q.   How high off the ground was it
15    raised?
16         A.   About three --
17         Q.   Three feet?
18         A.   Maybe three feet.
19         Q.   So, it wasn't built on a slab?
20         A.   No, not on a slab.
21         Q.   What kind of condition was it in
22    prior to Hurricane Katrina?
23         A.   It was in pretty good shape.
24         Q.   Had you ever had any problems with
25    any roof leaks?
```

Page 33

```
 1         A.   No.  Before Hurricane Katrina?  No.
 2         Q.   Right.  Before Hurricane Katrina?
 3         A.   No.
 4         Q.   Any problems with any mold?
 5         A.   No.
 6         Q.   Any problems with any termites?
 7         A.   No.
 8         Q.   Was there -- did you make -- how
 9    long prior to Hurricane Katrina did you live at
10    2913 Bruxelles?
11         A.   About eight months.
12         Q.   Eight months?
13         A.   Uh-huh.
14         Q.   Did you make any improvements to
15    the -- to the unit?
16         A.   Some, in the bathroom.  I started in
17    the bathroom and then that -- everything went.
18         Q.   Okay.  What improvements did you
19    make in the bathroom?
20         A.   The tile.  Tile work.
21         Q.   Did you make any others?
22         A.   No.
23         Q.   Okay.  Did you have any insurance on
24    2913 Bruxelles?
25         A.   No.
```

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

JOSE LUIS RODRIGUEZ (LEVEE)                                    7/14/2007

Page 34

1    Q.   Okay.  How big was that double --
2    was your side of the double?
3    A.   It's two bedroom -- you could make
4    it three.  Let me see.  They had one, two,
5    three -- six rooms all together, all the way
6    across.  You know, that's including the living
7    room, dining room, bathroom, six rooms.
8    Q.   There were six rooms on each side?
9    A.   Yeah.
10   Q.   Okay.  So, your side had six rooms?
11   A.   Yeah.
12   Q.   Okay.  And how many bathrooms did it
13   have?
14   A.   One.
15   Q.   One.  And how much rent did you pay?
16   A.   I was paying, like, $300.
17   Q.   And did you have a written
18   agreement?
19   A.   No.  That was my brother's house.
20   Q.   Okay.
21   A.   I was renting from him and fixing
22   the house and working out a deal with him.
23   Q.   And your brother was living on the
24   other side?
25   A.   Yes, sir.

Page 35

1    Q.   Okay.  This is which brother?
2    A.   Richard.  The one on Bruxelles.
3    Q.   And when you would pay him rent,
4    would you pay it with a check?
5    A.   Cash.
6    Q.   Cash.  Would you get a receipt?
7    A.   No.
8    Q.   Do you have any documents that, you
9    know, would indicate how much rent you were
10   paying?
11   A.   No, sir.
12   Q.   Now, you indicated you didn't have
13   any insurance on the structure at 2913 Bruxelles.
14   A.   Uh-huh.
15   Q.   Did you have any insurance on the
16   contents?
17   A.   No, sir.
18   Q.   Prior to Hurricane Katrina, what was
19   the value you would place on the -- on your
20   contents in the -- in the Bruxelles Street
21   apartment?
22   A.   I would say maybe 20 or 30,000,
23   something like that.
24   Q.   Okay.  Did you ever do an itemized
25   list of what was in the apartment prior to the

Page 36

1    storm?
2    A.   No.  No, I didn't.
3    Q.   How do you reach the figure 20 to
4    30,000?
5    A.   I'm just -- off the top of the head,
6    just thinking what I've lost.
7    Q.   Okay.
8    A.   You know, my TVs and everything that
9    I lost.  I just figured about that.
10   Q.   Okay.
11   A.   I'm not sure.
12   Q.   Did you -- did you ever take a
13   casualty loss on your income tax return for the
14   contents of your apartment?
15   A.   Yeah.
16   Q.   Okay.  Do you know what number was
17   placed on the casualty loss on your income tax
18   returns?
19   A.   I think it was ten -- 10,000, I
20   think.  I don't --
21   Q.   Okay.  Well, let me ask you this:
22   If you thought it was 20 to 30,000 why did you
23   take a $10,000 casualty loss?
24   A.   Well, you take whatever comes,
25   whatever they tell you, this is what it was

Page 37

1    worth, you know, and who am I to fight it, you
2    know.
3    Q.   Did somebody appraise your contents
4    loss at $10,000?
5    A.   No.  When we went -- when I went
6    down there and was -- you talking about the tax
7    paper?  That's what you talking about?  Well,
8    yeah, they asked me what did I have, and I told
9    them, and they figured it out theirself and they
10   told me that's what it came out to be.
11   Q.   This was your tax preparer who
12   figured it out?
13   A.   Yeah.
14   Q.   Who was that?
15   A.   I don't recall.  I just went
16   somewhere out in the east that they told me to go
17   and I just did it there.
18   Q.   Just so I'm clear on this, your tax
19   preparer estimated your casualty loss at $10,000?
20   A.   Uh-huh.
21   Q.   Did the apartment come furnished or
22   did you furnish it?
23   A.   I furnished it.
24   Q.   Okay.  Did you have to supply the
25   kitchen, or was the kitchen furnished?

10  (Pages 34 to 37)

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

JOSE LUIS RODRIGUEZ (LEVEE)                                          7/14/2007

Page 38

1    A.   It had -- he had a stove in there.
2    Q.   Did you buy a refrigerator?
3    A.   Yes, sir.
4    Q.   Did you buy any other kitchen
5  facilities?
6    A.   Microwave.  Yeah.
7    Q.   Other than the microwave?
8    A.   Yeah, dishes.
9    Q.   Did you buy a dishwasher?
10   A.   No.
11   Q.   Did it have a dishwasher?
12   A.   No.
13   Q.   Okay.  What type of electronic
14  equipment did you have in the house?
15   A.   Just TVs and PlayStation, Xbox.
16   Q.   Okay.  Other than your -- your
17  clothing, your furniture, the electronic
18  equipment and the kitchen equipment, did you have
19  anything -- any other category of items in your
20  apartment?
21   A.   No.
22   Q.   Now, did you -- did you have an
23  automobile at the time?
24   A.   Yeah.
25   Q.   Okay.  And what type of automobile?

Page 39

1    A.   A Maxima.
2    Q.   And as I understand it, that had
3  insurance on it?
4    A.   Yeah.
5    Q.   And that had insurance that covered
6  damage from Katrina?
7    A.   Well, no, I didn't have full
8  coverage.  I had just had insurance, and when I
9  applied for it, they said that you qualify for,
10  like, 35 for the car.
11   Q.   Okay.  And that's $3,500 for damages
12  to the car?
13   A.   Yeah.
14   Q.   Okay.  And that was a claim you made
15  after Katrina?
16   A.   Yeah.
17   Q.   Okay.  And that claim was made with
18  your auto insurance carrier?
19   A.   Yeah.
20   Q.   And who was that?  What carrier was
21  that?
22   A.   Dunns & Son was the one that insured
23  it.  Dunns & Son.  I don't even know if they're
24  still --
25   Q.   Dunns & Son was the agent?

Page 40

1    A.   Yeah.  Imperial, I think, was the
2  actual insurance.
3    Q.   Just so I'm clear on this, Imperial,
4  which was your auto carrier, was the only
5  insurance that you owned at the time -- that you
6  had purchased at the time of Hurricane Katrina?
7    A.   Yeah.
8    Q.   All right.  Now, prior to 2913
9  Bruxelles Street, where did you live?
10   A.   2223 Prentiss.  And before that --
11  yeah, on Bruxelles.  I was back on Bruxelles
12  before that.
13   Q.   How long did you live on Prentiss
14  before you lived at 2913 Bruxelles?
15   A.   About a year and a half, two years,
16  something like that.
17   Q.   Okay.  And you were living with your
18  mother and sister?
19   A.   Yeah.
20   Q.   Okay.  And were you paying any rent?
21   A.   No.
22   Q.   All right.  And before that, where
23  did you live?
24   A.   2913 Bruxelles.
25   Q.   Okay.  And that was your brother's?

Page 41

1    A.   No.  That was -- that was another
2  house I was living in.  After my son passed away,
3  I moved out the house and moved in with my mom.
4    Q.   Okay.  Before -- at the time of the
5  storm, you were living at 2913 Bruxelles?
6    A.   Wait.  No.  2915 was where I lived
7  before I moved in with my mom.  It was upstairs
8  house next to 2913.
9    Q.   All right.  All right.  So, before
10  you lived with your mother and sister at 2223
11  Prentiss, you lived at 2915 Bruxelles?
12   A.   Bruxelles.  I had a family there.
13   Q.   You said you had a family there?
14   A.   I had a family.
15   Q.   Okay.  And how long did you live
16  there?
17   A.   About eight years.
18   Q.   Okay.  And that's where your son was
19  living?
20   A.   Yes.
21   Q.   Okay.  And you had only one child?
22   A.   Yes, sir.
23   Q.   Okay.  And what was your -- what was
24  his mother's name?
25   A.   Donna.

11 (Pages 38 to 41)

JOHNS PENDLETON COURT REPORTERS                          800 562-1285

JOSE LUIS RODRIGUEZ (LEVEE)                          7/14/2007

Page 42

1     Q.   And what was Donna's last name?
2     A.   Smith.
3     Q.   All right.  Was it just you, Donna
4  Smith and your son in the house?
5     A.   Yeah.  Well, she had -- she had a
6  son prior, before, you know.
7     Q.   And how old was he?
8     A.   Brian -- at the time, Brian was --
9     Q.   About.
10    A.   Brian must have been about 15, I
11 think.  Okay.
12    Q.   Okay.  Now, when you were living at
13 2913 Bruxelles, did you pay the utilities on your
14 side of the double?
15    A.   No.
16    Q.   Your brother did?
17    A.   Uh-huh.
18    Q.   Did you pay the water?
19    A.   No.  He paid all the bill -- all of
20 that.  I just was paying him, you know, the rent.
21 He took care of that.
22    Q.   All right.  So, the total expenses
23 to stay at 2913 Bruxelles was $300 a month?
24    A.   (Nods head affirmatively.)
25    Q.   Yes?

Page 43

1     A.   Yes.  Yes.
2     Q.   All right.  Let me go back for a
3  moment.  What's your Social Security number, Mr.
4  Rodriguez?
5     A.   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.
6     Q.   Is that the only Social Security
7  number you've ever had?
8     A.   Uh-huh.
9     Q.   Okay.  Do you have a -- a Louisiana
10 driver's license?
11    A.   Yes, sir.
12    Q.   Could I see that?
13    A.   Let me get it out.
14    Q.   I can just look at it through there.
15 All right.  Let the record reflect that Mr.
16 Rodriguez has presented me with his driver's
17 license, which indicates license Number --
18 Louisiana Driver's License Number 002976361, and
19 a residence address of 2223 Prentiss Avenue, in
20 New Orleans, and an expiration date of 7/22/09.
21       Mr. Rodriguez, did you attend high
22 school in New Orleans?
23    A.   Yes, sir.
24    Q.   And where was that?
25    A.   McDonogh 35.

Page 44

1     Q.   Did you graduate?
2     A.   Yes, sir.
3     Q.   In what year?
4     A.   '85.
5     Q.   And did you attend any college?
6     A.   No, sir.
7     Q.   Okay.  Is high school your highest
8  level of education?
9     A.   Yes, sir.
10    Q.   Did you attend any vocational
11 school?
12    A.   No, sir.
13    Q.   Okay.  Now, you indicated -- I think
14 you indicated to me that you were -- you had done
15 some tile work.
16    A.   Yeah.
17    Q.   Okay.  And is that trade referred
18 to --
19    MR. GARDNER:
20        You want me to --
21    MR. JOANEN:
22        No.
23 EXAMINATION BY MR. GARDNER:
24    Q.   Okay.  Is that trade referred to as
25 a tile installer?

Page 45

1     A.   Yeah.
2     Q.   Is there another way --
3     A.   No.  Tile installer.  That's it.
4     Q.   Okay.  How long have you been a tile
5  installer?
6     A.   Seven years.
7     Q.   Seven years from today, going back?
8     A.   No.  No.  I did it for seven years
9  before Katrina.  After Katrina, I haven't done
10 it.  The company kind of went under and --
11    Q.   Okay.  Before you were a tile
12 installer, what type of occupations were you
13 involved with?
14    A.   Insulation, and I worked in chemical
15 plants.
16    Q.   All right.  Let me ask you this:
17 When you got out of high school, where did you go
18 to work?
19    A.   Hard Rock Café.
20    Q.   Okay.  And how long did you work
21 there?
22    A.   About five years.
23    Q.   Okay.  And after -- what was your
24 job there?
25    A.   Maintenance.

                          12  (Pages 42 to 45)

JOSE LUIS RODRIGUEZ (LEVEE)                                      7/14/2007

Page 50

```
 1        A.   No.
 2        Q.   All right.  When did you -- when did
 3   you first hear that Hurricane Katrina was going
 4   to hit the Gulf Coast?
 5        A.   I don't recall.  Maybe a day before,
 6   something like that.
 7        Q.   What -- what actions did you take
 8   when you heard about it?
 9        A.   Vertical.  I went to the J.W.
10   Marriott.
11        Q.   And that's the one downtown?
12        A.   Yes, sir.
13        Q.   Did you go with anyone else?
14        A.   My dad and my mom and my sister and
15   my dog.
16        Q.   And did you get a room there?
17        A.   Yes, sir.
18        Q.   Okay.  And did you -- you have
19   receipts for those -- the room that you --
20        A.   No.  I could probably get it.
21        Q.   I mean, did you pay with a credit
22   card?
23        A.   No.  My mom works there, so, she
24   already got it.
25        Q.   So, your mother had a connection to
```

Page 51

```
 1   the room?
 2        A.   Yes.
 3        Q.   What's your mom's job there?
 4        A.   She's a supervisor for the -- what
 5   they -- the women who come clean up the rooms or
 6   whatever that is.  She's the supervisor for that.
 7        Q.   All right.  And how long had she
 8   worked there prior to Hurricane Katrina, about?
 9        A.   Ten years, I guess.
10        Q.   Okay.  And when did you, your
11   mother, sister and your dog check into the
12   Marriott?
13        A.   The day before.
14        Q.   That would have been Sunday, or
15   Saturday?
16        A.   The day before the 29th.  I don't
17   recall what day it was.
18        Q.   All right.  So, it would have been
19   August 28th.  And how long were you in the
20   Marriott?
21        A.   Like -- let me see -- three days.
22        Q.   All right.  And, so, you were in the
23   Marriott when Hurricane Katrina struck?
24        A.   Yes, sir.
25        Q.   And what were the conditions like in
```

Page 52

```
 1   the Marriott?
 2        A.   They were fine, nice.  Everything
 3   was -- was okay.
 4        Q.   Okay.  And where did you go after
 5   you left the Marriott?
 6        A.   We went towards -- when we evacuated
 7   out the city?
 8        Q.   Uh-huh.
 9        A.   We went towards Texas, ended up in
10   Florida, though.
11        Q.   You went toward Texas but ended up
12   in Florida?
13        A.   Yeah.  Couldn't find no rooms.
14        Q.   Okay.  All right.  So, and how did
15   you get to Texas?  You drove?
16        A.   Drove.
17        Q.   And who had brought the car to the
18   Marriott?
19        A.   My sister.
20        Q.   Okay.  And, so, three days -- three
21   days after you entered the Marriott, you all
22   attempted to leave and drove toward Texas?
23        A.   Right.
24        Q.   And you couldn't find any rooms?
25        A.   Uh-huh.
```

Page 53

```
 1        Q.   How far did you get in Texas?
 2        A.   Beaumont, all the way to -- we went
 3   to Beaumont, Houston, and then from there then we
 4   took off and went towards Florida, because I had
 5   a friend lived in Florida.
 6        Q.   Okay.  Did you drive to Florida?
 7        A.   Yes, sir.
 8        Q.   So, you drove back through
 9   Louisiana?
10        A.   No.  We had to go -- we was taking
11   all kind of other routes because the interstate
12   was closed, the I-10, so, we was going just --
13   making our way there.  I didn't even know half of
14   the places I went through.
15        Q.   Okay.  Did you drive through
16   Louisiana at all?
17        A.   No.
18        Q.   Okay.  And how long did it take you
19   to get to Florida?
20        A.   Three days.
21        Q.   And where did you end up in Florida?
22        A.   Fort Myers.
23        Q.   All right.  And why did you choose
24   Fort Myers?
25        A.   Friend.  Friend.
```

14  (Pages 50 to 53)

JOSE LUIS RODRIGUEZ (LEVEE)                                    7/14/2007

Page 54

1      Q.   Was it your friend or was it a
2   friend of --
3      A.   My friend.  Friend of mine.
4      Q.   And who was that?
5      A.   Angel Grenado.
6      Q.   And did all -- did you say with
7   Angel Grenado?
8      A.   Yes, sir.
9      Q.   Did all of you stay with Angel
10  Grenado?
11     A.   Yes.
12     Q.   So, that's your mother --
13     A.   Me, my mother, my sister and my dog.
14     Q.   Okay.  And what happened to your
15  father?
16     A.   My father died after he left -- see,
17  well, the next day after the hurricane,
18  everything looked fine.  And he says, well, I'm
19  going home and check on my dog.  And I say, well,
20  let's eat breakfast first and I'm going to take
21  you.  He was stubborn.  He left.  So, when he
22  left, I looked outside and I seen water a little
23  bit.  I told my sister, let's go down there and
24  let's see if we can catch up with him in the car.
25  Went to go get him in the car.  Water was getting

Page 55

1   closer and closer.  So, we turned back around.
2   Since I couldn't get through with the car, I went
3   walking, looking for my dad.  It took me till the
4   next day to get back to the hotel on the jet ski
5   with my brother.  I walked to his house thinking
6   he, you know, made it there.  And he wasn't
7   there.  And then I stayed there because it got
8   dark.  And then, the next morning, my brother
9   brought me back to the hotel on the jet ski so I
10  could get my mom and them out because they were
11  saying they was evacuating the hotels.  So, we
12  left from there.
13     Q.   Okay.  Well, we need to go over
14  that.  The day after the storm, you, your mother
15  and sister planned on leaving.
16     A.   No.  We stay -- we was going to go
17  back home.  We thought everything was fine.  We
18  was going to go back home.
19     Q.   Okay.
20     A.   We say we was going to eat breakfast
21  and go back home.  We still haven't heard
22  anything because we had no radios or nothing.
23  So, my dad got up that morning and says, well,
24  I'm going to go.  I'm not going to eat breakfast.
25  I'm going to go ahead home and check on my dog

Page 56

1   and see if everything is all right.  I said,
2   well, wait a minute.  I'm coming with you.  Let
3   me eat breakfast first.  He left.
4      Q.   All right.  Now, how did he get to
5   his house?
6      A.   He didn't make it.
7      Q.   No.  But how did he -- how was he
8   going to get there?
9      A.   Walking.
10     Q.   He was going to walk from the
11  Marriott to his house?
12     A.   Yeah, which was maybe a 35-minute
13  walk, 40-minute walk.
14     Q.   Okay.  Where was his house?
15     A.   On Bruxelles.
16     Q.   Okay.  And that's --
17     A.   That's 2923 Bruxelles.
18     Q.   All right.  And what -- let me ask
19  you something.  What are the blocks that -- I
20  mean, the streets that form the boundaries of
21  that block?
22     A.   St. Bernard and Broad.
23     Q.   So, he is on Bruxelles between St.
24  Bernard and Broad?
25     A.   Yes, sir.

Page 57

1      Q.   And, so, the morning after the
2   storm, your father left the group.
3      A.   Uh-huh.
4      Q.   And attempted to walk back to his
5   house?
6      A.   Uh-huh.
7      Q.   And was that the last time you spoke
8   with him?
9      A.   Yes, sir.
10     Q.   Okay.  And when you saw him, which
11  direction was he walking?
12     A.   Towards the house.  He was going
13  towards Claiborne.
14     Q.   Okay.  Was he walking on Canal
15  Street?
16     A.   Yeah.
17     Q.   Okay.  So, he was walking from the
18  Marriott on Canal Street toward --
19     A.   Going up Canal Street, towards
20  Claiborne, to make that --
21     Q.   Okay.  And you asked him to stop?
22     A.   I asked him -- I said, well, wait
23  for me.  I'm going to, you know, get you home.
24  Let's just eat breakfast.  You know, everything
25  looks fine.  I'll bring you.  And he left.

15 (Pages 54 to 57)

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

JOSE LUIS RODRIGUEZ (LEVEE)                              7/14/2007

Page 58

1    Q.   All right.  And then what did you
2  do?
3    A.   Then, I left walking.  After I
4  left -- after I couldn't make it with the car, I
5  went walking.
6    Q.   All right.  Now, why couldn't you
7  make it with the car?
8    A.   Because the water was rising.  It
9  started rising more.  You know, it was coming in
10 a little fast.
11   Q.   All right.  So, after your dad left,
12 you attempted to follow him in your car?
13   A.   Uh-huh.
14   Q.   And that was your car, the Maxima?
15   A.   No.  No.  That was my sister car.
16 The Maxima, I left at the house.
17   Q.   Okay.  All right.  And your dad had
18 already been walking?
19   A.   Yeah.
20   Q.   Okay.  And you attempted to drive up
21 Canal Street?
22   A.   Uh-huh.
23   Q.   Yes?
24   A.   Yes.
25   Q.   Okay.  And how far did you --

Page 59

1    A.   Okay.
2    Q.   And how far did you get up Canal
3  Street?
4    A.   I got all the way up Canal Street to
5  Rampart.  Rampart was as far as I got.
6    Q.   All right.  Now, when you got up to
7  Rampart, what did you see?
8    A.   Water and people coming, you know,
9  towards Canal Street.
10   Q.   Okay.  When you say "water," can you
11 give me a better description?
12   A.   Well, when I got to Rampart, the
13 water was, like, about maybe to the ankles.
14   Q.   All right.
15   A.   And then as you see -- as you look
16 further down from Rampart down St. Bernard,
17 because St. Bernard runs down across Rampart --
18   Q.   So, you were at the corner of Canal
19 and Rampart?
20   A.   Rampart and St. Bernard.
21   Q.   Okay.  So, you went up to Canal and
22 you turned down Rampart?
23   A.   On Rampart, yeah.
24   Q.   You left the Marriott, you drove up
25 Canal Street -- or you drove on Canal Street

Page 60

1  toward Rampart?
2    A.   To Rampart.
3    Q.   And then you took a right on
4  Rampart?
5    A.   Yes, sir.
6    Q.   And then you went down Rampart to
7  St. Bernard?
8    A.   Yeah, and that's as far as I could
9  go.
10   Q.   And you couldn't get any further
11 there.
12   A.   Uh-uh.
13   Q.   When you got to Rampart and St.
14 Bernard, you said you thought the water was about
15 ankle deep?
16   A.   Yeah, on Rampart.  Yeah.
17   Q.   Okay.  Then, what did you do?
18   A.   Then, I went back -- I took my
19 sister in the car back to the hotel.
20   Q.   Your sister was with you when you
21 went?
22   A.   Uh-huh.  Yeah.
23   Q.   Your mother was at the hotel?
24   A.   Yeah, she stayed at the hotel.
25   Q.   So, you got to Rampart and St.

Page 61

1  Bernard and you turned around and went back to
2  the Marriott?
3    A.   Uh-huh.
4    Q.   And what time of day was this?
5    A.   Around 10:30, 11:00, something like
6  that.
7    Q.   Okay.  All right.  Now, when you got
8  to the corner of Rampart and St. Bernard, what
9  did you see?
10   A.   Water and people.
11   Q.   Okay.  Were the people walking --
12 what direction were the people walking?
13   A.   They was coming towards Canal
14 Street, like, towards the Superdome.  They was
15 trying to make it to the high ground.
16   Q.   Okay.  So, they were walking from
17 St. Bernard toward Canal Street?
18   A.   Uh-huh.
19   Q.   Yes?
20   A.   Yes.
21   Q.   Okay.  When you were driving down
22 Canal Street, before you made the turn onto
23 Rampart, did you see any water --
24   A.   No.
25   Q.   -- any water sitting in the street?

16  (Pages 58 to 61)

JOSE LUIS RODRIGUEZ (LEVEE)                              7/14/2007

Page 74

1      A.   Well, it varied, you know, up to --
2  it varied, like, on the houses, up to the knee
3  maybe at the most if you standing on the porch.
4      Q.   Most of those are raised homes?
5      A.   Yeah.
6      Q.   I mean raised that they're on piers?
7      A.   Yeah.  Yeah.
8      Q.   All right.  So, when you saw your
9  brother on the jet ski, then, what did you do?
10     A.   I whistled for him.
11     Q.   Okay.  And what did he do?
12     A.   He came got me.
13     Q.   Okay.  And did you get on the jet
14 ski?
15     A.   Yeah.  He ran out of gas soon as I
16 got on it.
17     Q.   Okay.  And then what did you do?
18     A.   Well, we went to the house.  He
19 pushed the boat to the house.
20     Q.   And that's your father's house?
21     A.   No.  His house.
22     Q.   Okay.
23     A.   And I asked him did he see my dad.
24 He says no.  You know, what are you doing over
25 here?  I told him I was looking for my dad.

Page 75

1      Q.   All right.  Now, he took you back --
2  you went back to his house?
3      A.   Yeah.
4      Q.   And you were living on the other
5  side?
6      A.   On the other side, yeah.
7      Q.   So, you went back to both houses?
8      A.   Both houses.
9      Q.   All right.  And how far was your
10 house from the point that he picked you up on the
11 jet ski?
12     A.   About a block and a half.
13     Q.   Okay.  And when you got to your
14 house, what was the -- what did you all do?
15     A.   Just sat around and just freaking
16 about what was going on.
17     Q.   All right.  Was there water inside
18 your apartment?
19     A.   Yes, sir.
20     Q.   All right.  I know you said this
21 before, but you all lived in a shotgun double
22 that was side by side.
23     A.   Uh-huh.
24     Q.   One apartment wasn't on top of the
25 other?

Page 76

1      A.   No.
2      Q.   They were both --
3      A.   Yeah, even.  They were both even.
4      Q.   Okay.  And they were both raised --
5  and they were both raised on piers?
6      A.   Right.
7      Q.   Was there water in your apartment?
8      A.   Yeah.
9      Q.   And how much water was there?
10     A.   When I was -- about ankle.  About
11 ankle when I walked up into it.
12     Q.   All right.  Did you attempt to move
13 any furniture?
14     A.   No.  It was kind of moved around a
15 little bit.  Everything was moved around.  He
16 said -- he said it was higher than that.  I
17 didn't -- I didn't see that, but he said it was
18 higher than that and then it went down.
19     Q.   Okay.  Was there any waterline on
20 your walls?
21     A.   Yeah.  Uh-huh.
22     Q.   How --
23     A.   On the baseboard -- about -- about
24 the same height as that.
25     Q.   So, and that's about a foot?

Page 77

1      A.   Yeah, about that.
2      Q.   What about you're electronic
3  equipment, did you move that?
4      A.   All of that was -- it topped over.
5  You know, the tables, that floated, it knocked
6  them over.
7      Q.   When you got back to your apartment,
8  was there anything you could salvage?
9      A.   Some clothes, but nothing I could
10 take.  I couldn't take anything.  So, you know,
11 when -- when we came back after, you know, it
12 was, like, somebody been through all your stuff
13 and, you know.  After you evacuated, you know,
14 some of your stuff was just -- somebody been
15 through it.
16     Q.   All right.  But that was after you
17 came back.
18     A.   Yeah.
19     Q.   Okay.  So, after you came back, you
20 realized your house had been looted?
21     A.   Vandal -- yeah.
22     Q.   All right.  Was there any -- was
23 there any water coming through the ceiling?
24     A.   Yes, sir.
25     Q.   Had there been any damage to the

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

JOSE LUIS RODRIGUEZ (LEVEE)                                    7/14/2007

Page 82

1     A.   Yeah.
2     Q.   Okay.  How long did you stay there?
3     A.   Overnight.  I stayed there --
4  because it started getting dark, so, we -- I
5  spent the night, and then the next morning, he
6  brought me -- we stayed till about 11:00,
7  watching the choppers go in and out, and then he
8  brought me back to Rampart on the jet ski.
9     Q.   Okay.  Where did you sleep?
10    A.   On the -- on the sofa.
11    Q.   Okay.  And how much water was in
12 your apartment while you were sleeping there?
13 Was it still ankle deep?
14    A.   It was like -- you know, it was a
15 little lower than ankle.  It looked like it was
16 dropping, it was coming down, but as you walked
17 in the house, the whole time you was splashing.
18    Q.   All right.  But the water seemed
19 like it came down a little?
20    A.   Yeah.  The next morning, it did go
21 down.  It was down by the next morning a little
22 bit.
23    Q.   Was it raining any time you were
24 there?
25    A.   No.

Page 83

1     Q.   All right.  Did you ever determine
2  where the water had come from?
3     A.   No.  I still -- I didn't know at
4  that point still.
5     Q.   Okay.  Did you ever have an
6  understanding why the water went down the next
7  morning, the morning after you arrived there?
8     A.   No.
9     Q.   Did -- did your brother ever tell
10 you what he thought about it or where the water
11 had come from or why the water went down the next
12 morning?
13    A.   No.  It looked like -- to me, it
14 looked like it was just settling.  It was
15 starting to settle at that time, because it was
16 still in motion -- when I -- when I got there in
17 the morning -- I mean, that day, it was still --
18 the water was still like -- you know, I didn't
19 know if it was from the boats and everything that
20 was coming through, but the water was still
21 moving.
22    Q.   Okay.  In which direction was it
23 moving?
24    A.   Like, in all directions.  It was,
25 like, just swirling, you know.

Page 84

1     Q.   So, it wasn't moving, like, either
2  up Bruxelles towards North Broad or away from
3  Bruxelles?
4     A.   Well, when you come up Broad, it
5  looked like it was coming from one end, and then
6  coming from St. Bernard, it looked like it was
7  coming up -- it looked like all of it, it was
8  just going towards Canal Street, like, that way,
9  but it didn't get all the way that far.
10    Q.   All right.  So, when you said it
11 looked like it was coming toward Canal Street,
12 you mean when you were on North Broad, it looked
13 like it was coming toward Canal Street?
14    A.   Yeah.
15    Q.   And when you were on Bruxelles,
16 which direction did it look like it was moving?
17    A.   Coming towards Broad.  The same --
18 you know, like, Canal Street.  The same way.
19    Q.   Okay.  So, when you were on
20 Bruxelles, the water looked like it was moving
21 toward Broad?
22    A.   Uh-huh.
23    Q.   Yes?
24    A.   Yes.
25    Q.   Yes.  And that was when you -- on

Page 85

1  the 30th, when you went to your house?
2     A.   Uh-huh.
3     Q.   Yes?
4     A.   Yes, sir.  Well, on the 30th, that's
5  when I left to go to -- let me see.  The 29th.
6  Yeah, the 30th is when I went to go to the
7  house -- to see if my dad made it to the house.
8     Q.   All right.  But when you were
9  talking about the direction of the water, were
10 you talking about your trip to the house or your
11 trip --
12    A.   My trip to the house, the water was
13 fighting me.
14    Q.   Okay.
15    A.   It was like, you know --
16    Q.   But was it moving towards you or was
17 it just rising?
18    A.   It was like -- it was like a push.
19 It was just, you know, like moving, swirling.  It
20 was like a swirl.
21    Q.   Okay.  But could you detect the
22 water moving in any direction?
23    A.   Yeah.  It was coming from -- from
24 Paris Avenue and all of that back -- from the
25 lakefront, looked like.

Page 86

1     Q.   It was coming from the lakefront and
2   moving toward --
3     A.   Towards -- towards Canal Street,
4   like.
5     Q.   Okay.  Now, you said you spent the
6   night in the apartment?
7     A.   Yes, sir.
8     Q.   And you got up the next morning?
9     A.   Uh-huh.
10    Q.   And you waited till 11:00 and then
11  your brother took you back to the Marriott?
12    A.   Yes, sir.
13    Q.   Okay.  And when you woke up the next
14  morning, what were the conditions like outside?
15    A.   It was weird, you know.  It was a
16  lot of choppers, a lot of Coast Guard people on
17  boats, you know.  It was just a weird scene, you
18  know, with the choppers coming in, picking up
19  people.  It was crazy.
20    Q.   Did you see any other people on your
21  street, on Bruxelles?
22    A.   Yeah.  They had a good bit of
23  people.  They had the upstairs house where I used
24  to live at.
25    Q.   Which house was that?

Page 87

1     A.   2915.  That one.  They had people up
2   there.  You know, that was a high, high ground up
3   there.  So, they had people up there.  And they
4   was trying to -- debating on whether to stay,
5   thinking the water was going to go down.  Those
6   were neighbors we been knowing for years.
7     Q.   All right.  Who were they?
8     A.   Miss Elaine, Keyana, her boyfriend
9   and Miss Elaine's sister.
10    Q.   Okay.  And that was a duplex where
11  the top apartment -- one apartment was on top of
12  the other?
13    A.   Yeah.  Yeah.
14    Q.   Okay.  So, the top apartment didn't
15  get any water?
16    A.   No.  Just roof.
17    Q.   Just roof damage?
18    A.   Yeah.
19    Q.   Okay.  Did you go into that
20  apartment?
21    A.   Well, I went up there to see what
22  they were doing, you know, how they was making
23  out.
24    Q.   Did they have roof damage?
25    A.   Yeah.

Page 88

1     Q.   I mean, was there water coming
2   through the ceiling?
3     A.   Uh-huh.  They had a tree came
4   through the house, in the back part of the house.
5   The front had leakage, too, but, you know --
6     Q.   Were there spots in their roof where
7   you could see daylight?
8     A.   Yeah.
9     Q.   All right.  And to get from your
10  house to Miss Elaine's house, you waded through
11  the water?
12    A.   Yeah.  You had to -- it's like, a
13  driveway apart.
14    Q.   Okay.  And how deep was the water
15  when you waded into it?
16    A.   About -- about right here, by my
17  stomach.
18    Q.   It appeared to have gone down a
19  little?
20    A.   Uh-huh.
21    Q.   Okay.  The reason I say that is
22  before you said it was chest high.
23    A.   Chest high.  Certain areas, like, by
24  Broad and St. Bernard, it was chest high.
25  Bruxelles, some parts of Bruxelles got up to my

Page 89

1   chin.  Some parts, I had to, you know, like, stay
2   afloat to stay up.  Then, some parts was real
3   low.  When we was on the jet ski, we was hitting
4   car rooftops, and I didn't know it was cars that
5   we was hitting.  It was the tops of cars.  In
6   some areas, you would scrape the bottom.  It
7   was -- the water was, like, up and down.
8     Q.   All right.  But let me ask you this:
9   On the morning that you woke up after sleeping
10  the night in your home, could you tell if the
11  water had -- the water outside had gone up or
12  gone down?
13    A.   It was slick.  It just stayed -- it
14  was still.  It was still at that time.
15    Q.   It wasn't moving?
16    A.   It wasn't moving.  It was, like,
17  glass.
18    Q.   Now, your attorney has shown me two
19  photographs that you took or that someone took --
20    A.   Uh-huh.
21    Q.   -- of a jet ski operator and someone
22  on the back of the jet ski.
23    A.   Uh-huh.
24    Q.   Do you know who took those pictures?
25    A.   Richard told me the neighbor -- the

JOSE LUIS RODRIGUEZ (LEVEE)                                      7/14/2007

Page 94

1  Marriott?
2      A.  Uh-huh.
3      Q.  Yes?
4      A.  Yes, sir.
5      Q.  All right.  And you went on the jet
6  ski?
7      A.  Uh-huh.  Yes, sir.
8      Q.  And how far did you get before you
9  had to walk?
10     A.  Like, a block before Rampart.
11     Q.  Okay.  So, you would not have
12 reached the French Quarter yet?
13     A.  No.
14     Q.  In other words, you got out of the
15 jet ski before you reached the French Quarter?
16     A.  Yeah.  Yeah.  Right around Circle
17 Food Store.  St. Bernard runs up into Rampart.
18 About a block before that.
19     Q.  Right.  And from that point, you
20 walked to the Marriott?
21     A.  Yeah.
22     Q.  Could you see whether there were any
23 other people walking?
24     A.  Looting was going on by that time,
25 so, I was just trying to get to the hotel.

Page 95

1      Q.  You were wet?
2      A.  Yeah.
3      Q.  How deep was the water?
4      A.  Where?  On Canal Street?
5      Q.  Well, how deep was the water when
6  you reached the Circle Food Store?
7      A.  Well, it was still high at Circle
8  Food Store.  The jet ski was still riding.  I
9  didn't see -- I saw some people, it looked like
10 it might have hit them about their rib cage.
11 When I got back to Rampart, it was back to around
12 ankle.
13     Q.  And that's Rampart and St. Bernard?
14     A.  St. Bernard, yeah.
15     Q.  Okay.  And then you walked up --
16     A.  I walked all the way up Rampart.
17     Q.  To Canal?
18     A.  Uh-huh.
19     Q.  And then you walked down Canal
20 toward the Marriott?
21     A.  Yeah.
22     Q.  And as you walked toward the
23 Marriott, did the water get shallower?
24     A.  No.  It looked like it got higher.
25 It reached the hotel.  Like, the back part of the

Page 96

1  hotel we come out, it reached all the way to the
2  hotel.
3      Q.  How high was the water?  How deep
4  was the water at the hotel?
5      A.  About maybe to your calf.
6      Q.  Okay.  So, was it over a foot deep?
7      A.  Yeah.
8      Q.  And were your mother and sister --
9      A.  They were still there.  Yeah, my mom
10 was a wreck, and they was wondering if I was
11 coming back.  They was getting ready to put them
12 on buses because they was evacuating the hotels.
13     Q.  Okay.  We have to slow down and go
14 over that.  Was your dog with your mother?
15     A.  Yeah.
16     Q.  What kind of dog is it?
17     A.  A German Shepherd.
18     Q.  Now, you got back to the hotel and
19 you had not spoken with your mother between the
20 time you left and the between the time you
21 returned?
22     A.  Right.
23     Q.  Okay.  And what was going on at the
24 hotel when you arrived?
25     A.  Everybody was, you know, packing

Page 97

1  their clothes, you know, just getting ready to
2  leave because, you know, they had a lot of
3  police, a lot of Army people was breaking into
4  breaking into stores and then they had riots that
5  was breaking out.  So, they was trying to get
6  everybody that wasn't involved out -- you know,
7  out of harm's way.
8      Q.  Okay.  And you weren't involved in
9  any of the riots --
10     A.  No.
11     Q.  -- or the breaking in?
12     A.  No.
13     Q.  And what did you do when you got
14 back to the hotel?
15     A.  I told my Mom I didn't -- I couldn't
16 find my dad.  Richard didn't see him.  And, you
17 know, and they was telling me, we got to hurry up
18 and go because they telling everybody we got to
19 evacuate.  Let's get on this bus.  I said, I
20 don't want to get on the bus.  I said, let's get
21 the car and try get out of here in the car.  That
22 way we would have our own, you know, way of
23 getting around.  So, we got in the car and headed
24 to Texas.
25     Q.  All right.  Did you change your

25  (Pages 94 to 97)

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

JOSE LUIS RODRIGUEZ (LEVEE)                                    7/14/2007

---

Page 98

1   clothes?
2        A.   No.
3        Q.   Why is that?
4        A.   They didn't have any water.  All I
5   had was what I had on.
6        Q.   Okay.  Did you and your brother ever
7   attempt to go to your father's house?
8        A.   Yeah.
9        Q.   That day?
10       A.   Yeah.  His house was -- let me see.
11  One, two, three -- he's four houses from
12  Richard's house.
13       Q.   All right.  So, after you got to
14  Richard's house, which is your house --
15       A.   Yeah.  Right.
16       Q.   Did you go to your father's house?
17       A.   Yeah, went over there.
18       Q.   Was your father there?
19       A.   No.
20       Q.   And did you do that the day you
21  arrived at Richard's house?
22       A.   Yes.
23       Q.   Your house?
24       A.   The same day.
25       Q.   All right.  So, you did that, you

---

Page 99

1   went back to the house, went to bed and woke up
2   the next morning and left?
3        A.   Right.  His dog was still there, you
4   know.  His dog was still fine on the porch.
5        Q.   Did you do anything with the dog?
6        A.   Yeah.  Fed him and gave him some
7   water.  He didn't want to get off the porch
8   because the water was still deep.  So, just
9   stayed up there.  I just brought him some water
10  and food.  And the next day, I don't know where
11  he went.
12       Q.   What kind of house did your father
13  live in?  Was it a double?
14       A.   Double shotgun.
15       Q.   And it was built on piers?
16       A.   Yeah.
17       Q.   And was there water inside the
18  apartment?
19       A.   He didn't get any.
20       Q.   Okay.  Did his double appear to be
21  higher than yours?
22       A.   Yeah.  For some reason, yeah, it
23  seemed to be higher, because he didn't get as
24  much water as we got.  His floor may have gotten
25  wet, but that's it.  You know, like, if you threw

---

Page 100

1   water on the floor, that's all that was --
2        Q.   Well, was there some reason why you
3   didn't spend the night in his apartment?
4        A.   No.  I don't know.  I just didn't.
5   I didn't.
6        Q.   All right.  Did he -- did his double
7   appear to have any roof damage?
8        A.   No.  In the back room, he did
9   have -- he did have roof damage.  I'm sorry.
10       Q.   Was there any indication when you
11  went into your father's apartment that he had
12  gotten there?
13       A.   No.
14       Q.   And did your dad live alone?
15       A.   Yes, sir.
16       Q.   All right.  Now, you said you got
17  back to the Marriott and you said you saw your
18  mother and your mother was a wreck?
19       A.   Uh-huh.
20       Q.   What did you mean by that?
21       A.   She was just like I didn't know what
22  would have happened to you.  She started hearing
23  all these stories about what was going on out
24  there and then seeing what was going on with the
25  looting and everybody -- she didn't know what

---

Page 101

1   was -- so, I didn't have no means of calling her
2   and telling her I was all right and I made it
3   there.  So, she didn't know.  She was going
4   haywire --
5        Q.   Okay.
6        A.   -- till she saw me, she was better
7   off, you know.
8        Q.   All right.  And how long did you
9   stay at the Marriott before you left?
10       A.   Maybe -- maybe an hour.
11       Q.   Okay.  And how did you leave the
12  Marriott?
13       A.   In the car.
14       Q.   Okay.  In your sister's car?
15       A.   Yeah, my sister's car.
16       Q.   And that was when you began your
17  trip to Texas?
18       A.   Yeah.  Right.
19       Q.   Did you have to pay for the room at
20  the Marriott?
21       A.   No, sir.
22       Q.   Okay.  And when you left, it was
23  you, your dog, your sister and your mother?
24       A.   Yes, sir.
25       Q.   Okay.  Did you call your brother?

---

                                      26 (Pages 98 to 101)

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

JOSE LUIS RODRIGUEZ (LEVEE)                                7/14/2007

Page 102

1     A.   I tried.  We still -- I couldn't get
2   in touch with him.
3     Q.   Okay.  Did your father have a cell
4   phone?
5     A.   No, he didn't.
6     Q.   All right.  How long --
7   MR. GARDNER:
8         He needs to take a break.
9   THE VIDEOGRAPHER:
10        Let's go off the record to
11   change the video.
12        (Whereupon, a discussion was
13   held off the record.)
14   THE VIDEOGRAPHER:
15        On the record.
16   MR. GARDNER:
17        We're back on?
18   THE VIDEOGRAPHER:
19        Yes, sir.
20   EXAMINATION BY MR. GARDNER:
21     Q.   All right.  Now, you said you
22   were -- the three of you and your dog went to
23   Texas, but you couldn't find a place to stay?
24     A.   Right.  I had two brothers over
25   there, and I couldn't get in touch with neither

Page 103

1   one of them neither.
2     Q.   Okay.  And they were people who had
3   evacuated?
4     A.   Yeah.
5     Q.   And that was Armando?
6     A.   Armando and Douglas.
7     Q.   And Douglas lives in Texas?
8     A.   Well, yeah, after the storm, he
9   stayed up there.
10     Q.   Okay.  So, you went from Texas, you
11   drove to --
12     A.   I went over the -- I don't even know
13   where I was going.  My sister was navigating, but
14   she said we got to go that way, and we couldn't
15   go I-10.  It was closed.  So, we had to go
16   through all kind of other towns.  It took -- took
17   three days to get -- in the car without sleeping.
18     Q.   All right.  So, you went from
19   Beaumont to Fort Myers, Florida, and that took
20   three days?
21     A.   Yeah.
22     Q.   Did you stop anywhere?
23     A.   We tried.  Everybody was booked.
24   Everything was booked, hotels and everything.
25     Q.   So, you didn't have a hotel room

Page 104

1   between the time you left Houston until the time
2   you got to Florida?
3     A.   Right.
4     Q.   Did y'all sleep in the car?
5     A.   Yeah.
6     Q.   All right.  And when you got to Fort
7   Myers, you stayed with a friend?
8     A.   Yes.
9     Q.   And that was Angel --
10     A.   Angel Grenado.
11     Q.   -- Grenado and how long did you stay
12   with -- is it Mr. Grenado?
13     A.   Yeah.  I stayed with him about two
14   weeks, and then the Red Cross got us a room at
15   Suburban -- Suburban Inn, I think, is the name of
16   the place.
17     Q.   All right.  When you stayed with
18   Angel Grenado, was your mother and sister and the
19   dog with you?
20     A.   Yeah.
21     Q.   And then after two weeks, the Red
22   Cross found you all a room?
23     A.   A Suburban Inn, I think it was, the
24   name of it.
25     Q.   Did the Red Cross pay for that

Page 105

1   hotel?
2     A.   Yeah.
3     Q.   How long did you stay at the
4   Suburban Inn?
5     A.   About -- about two weeks, and then
6   they transferred us to a -- I can't think --
7     Q.   The Suburban Inn took your dog?
8     A.   Huh?
9     Q.   They took your dog?
10     A.   Yeah.  Yeah.  I can't think.  Some
11   other fancy hotel they sent us to at -- it was in
12   Cape Coral.  I can't think of the name.
13     Q.   Cape Coral?
14     A.   Yeah.
15     Q.   Did the Red Cross pay for that room?
16     A.   Yes, sir.
17     Q.   Okay.  How long were you there?
18     A.   I would say about a month, I think.
19     Q.   And you were, again, with your
20   mother, your sister and your dog?
21     A.   Yeah.  And, I think, by that time --
22   no, Richard didn't make it then.  He didn't make
23   it there yet.  Then, the Red Cross had got us a
24   house.  They put us in a house after that.
25     Q.   Okay.  And was that in Cape Coral?

JOHNS PENDLETON COURT REPORTERS                      800 562-1285

JOSE LUIS RODRIGUEZ (LEVEE)                                    7/14/2007

|  | Page 114 |
|---|---|

1    was -- like, that was in the closet up high that
2    didn't move was salvageable.
3        Q.   All right.  Did you have anything
4    like that?
5        A.   No.  Like, most of my stuff, like,
6    was on little dressers or little tables, and when
7    the water kind of lift that up, they was down on
8    the ground.  They was just --
9        Q.   All right.  How long did you stay
10   at -- how long did you stay at your house?
11       A.   For that day?
12       Q.   Yeah.
13       A.   When we came back, you talking
14   about?  About maybe an hour.
15       Q.   Okay.  Where had you planned to stay
16   when you got to New Orleans?
17       A.   At the hotel.
18       Q.   At the Marriott?
19       A.   Yeah.
20       Q.   Had your mom gone back?
21       A.   Huh?  Yeah, did she go back to work?
22   Yeah.  She went back to work.
23       Q.   When did your mother go back to
24   work, approximately?  In other words, your mother
25   went back to work at the Marriott before went

|  | Page 115 |
|---|---|

1    back to New Orleans, or did she?
2        A.   No.  No.  She stayed out of work the
3    whole time we was up there.
4        Q.   In Cape Coral?
5        A.   In Cape Coral.
6        Q.   Okay.  But she had the ability to
7    get you a room at the Marriott?
8        A.   Yeah.
9        Q.   Did Richard have any insurance on
10   his contents?
11       A.   I believe he did.  I'm not sure.
12       Q.   Did he have any flood insurance on
13   the structure?
14       A.   I'm not sure about that.
15       Q.   Do you know if he had any insurance
16   on the structure?
17       A.   I'm pretty sure he had insurance,
18   but on what and -- I know he had insurance
19   because he was talking about paying his
20   insurance, but --
21       Q.   He had insurance.  You're just not
22   exactly sure what it covered?
23       A.   Right.  Right.
24       Q.   So, you stayed at the Marriott?
25       A.   Yeah.

|  | Page 116 |
|---|---|

1        Q.   Okay.  Now, how long were you in New
2    Orleans the first time you went back?
3        A.   When I came -- about two days.
4        Q.   Okay.  Did you know what had
5    happened to your father?
6        A.   No.  We still didn't know and -- I
7    had a gut feeling, but didn't want to see it, but
8    we put him on the internet, you know, like, to
9    search people, and that's how they contacted us.
10       Q.   Okay.  And who contacted you?
11       A.   Some lady.  They had him at a morgue
12   or something they told us about.
13       Q.   Did you ever learn as to how he
14   died?
15       A.   They told us they picked him up on
16   St. Bernard, where I was walking through, you
17   know, and it was, like, I walked right past my
18   dad, you know.  I'm thinking I passed right by
19   him.  Because, I mean, if he went before me and
20   that's where they say they picked him up from,
21   you know --
22       Q.   But did they say when they found
23   him?
24       A.   I don't -- my sister probably has
25   all of that on paper.

|  | Page 117 |
|---|---|

1        Q.   Okay.  Okay.  Do you know what your
2    dad's cause of death was?
3        A.   Not sure.  Drowning, I guess.  I
4    don't know.
5        Q.   But do you know that one way or
6    another?
7        A.   I don't know.  It's probably on the
8    paper, too.
9        Q.   Okay.  But you don't know that for
10   certain?
11       A.   I'm pretty sure, yeah.
12       Q.   Did your dad know how to swim?
13       A.   He knew how to swim, but he was a
14   old man, and the water --
15       Q.   How old was your dad at the time of
16   Hurricane Katrina?
17       A.   He was 71, I think.
18       Q.   Okay.  So, after you stayed in New
19   Orleans for two days at the Marriott, you went
20   back to Florida?
21       A.   Uh-huh.
22       Q.   All right.  When you stayed at the
23   Marriott, was there any -- did you have to pay
24   for that?
25       A.   No.

30 (Pages 114 to 117)

JOSE LUIS RODRIGUEZ (LEVEE)                              7/14/2007

Page 118

1      Q.   And when you went back to Florida,
2  how long did you stay there?
3      A.   I went back to Florida for about
4  three weeks, and then I brought my mom back.  She
5  wanted to come see it, so --
6      Q.   And had anything changed in the
7  condition of her house?
8      A.   No.  Everything was just stink, bad
9  smell.  You know, it was a bad smell.
10     Q.   Was there any indication that her
11 house had been looted between the time you went
12 there the first time and the time you brought her
13 there?
14     A.   No.
15     Q.   Okay.  Did you go back to your house
16 again?
17     A.   No, I didn't go back into town.
18     Q.   How long did you stay in New Orleans
19 when you brought your mama back?
20     A.   When we came back, maybe another
21 week or two.
22     Q.   And you stayed at the Marriott?
23     A.   Yeah.
24     Q.   And you weren't charged for that
25 room?

Page 119

1      A.   No.
2      Q.   And that's because the Marriott paid
3  for it?
4      A.   Right.  With my mom being employed
5  there.
6      Q.   Right.  In other words, she wasn't
7  charged either?
8      A.   Right.  Right.
9      Q.   And then you all went back to
10 Florida again?
11     A.   Right.  And then when we -- we came
12 back and started, like, straightening Richard's
13 house up a little bit so we could sleep there
14 every now and then and try and start getting it
15 so we could move back.
16     Q.   Okay.  And did you gut your
17 apartment?
18     A.   Huh?
19     Q.   Did you gut your house?
20     A.   Yeah.  Yeah.  He's still in the
21 process of doing that.  My mom and them was
22 staying there.  So, we fixed it up good enough so
23 that she could stay there with my sister while
24 she got her other house fixed.
25     Q.   All right.  So, did you have to

Page 120

1  remove all the Sheetrock in your house?
2      A.   Yeah.  Well, only so high.  We only
3  did it so high because it didn't go all the way
4  to the roof.
5      Q.   All right.  How high was that?
6  Three feet, four feet?
7      A.   Yeah.  A little past the sockets
8  like that.  A little bit past the sockets.
9      Q.   So, that's about three feet, maybe?
10     A.   Uh-huh.
11     Q.   Yes?
12     A.   Yes, sir.
13     Q.   All right.  Did you have to remove
14 the ceilings?
15     A.   Yeah.
16     Q.   Did you have to fix the roof?
17     A.   Yeah.
18     Q.   Did you pay for any of those
19 repairs?
20     A.   No.
21     Q.   Richard paid for them?
22     A.   Richard paid for them.
23     Q.   So, you fixed up the building where
24 you were living -- you and Richard were living so
25 your mother could live there?

Page 121

1      A.   Yeah.
2      Q.   How long was it before your mother
3  could live there?
4      A.   Maybe a year, I would say, because
5  he took -- he took -- what he did is he took the
6  walls down in the middle to make it one big
7  house.
8      Q.   Okay.
9      A.   You know, that's when he did certain
10 rooms -- like, the kitchen, he made that bigger
11 and he wanted to make another bedroom bigger.
12 So, he just made it, like -- instead of it being
13 like a double, right now, it's like a single,
14 pretty much.
15     Q.   But it's a bigger single?
16     A.   A bigger single.
17     Q.   Is your mother and sister still
18 living there?
19     A.   No.  They just -- as a matter of
20 fact, they just moved -- we in the process of
21 moving all the stuff to the new house.
22     Q.   To the new house, meaning on
23 Prentiss?
24     A.   On Prentiss, yeah.
25     Q.   All right.  So, when did you move

31 (Pages 118 to 121)

JOHNS PENDLETON COURT REPORTERS                 800 562-1285

JOSE LUIS RODRIGUEZ (LEVEE)                                    7/14/2007

Page 122

```
 1  back to New Orleans full time?
 2        A.   I don't recall exactly.  It was,
 3  like -- I have all of that on paper from the time
 4  when we -- the lease was over at the other house
 5  in Florida.
 6        Q.   Okay.
 7        A.   So, I know it was a year there, but
 8  I don't remember the days.
 9        Q.   All right.  Have you been back to
10  New Orleans all of 2007?
11        A.   Yeah.
12        Q.   Okay.  And where are you presently
13  living?
14        A.   At 2928 Bruxelles.  I don't know
15  where I'm going to be a week from now, but that's
16  where I'm at now.
17        Q.   What's happening in a week?
18        A.   I don't know.  I just haven't
19  been --
20        Q.   Oh, that's right.
21        A.   I bounce around.
22        Q.   That's right.  You're not living
23  next to your brother because your brother's made
24  his double one house?
25        A.   One house, right.  He's thinking
```

Page 123

```
 1  about going -- making -- closing it back up again
 2  now that my mom's gone, but he's not sure neither
 3  what he's going to do.
 4        Q.   All right.  Is your brother married?
 5        A.   No.
 6        Q.   Does he have any dependents?
 7        A.   Yeah.  He got three -- three girls.
 8        Q.   Do they live with him?
 9        A.   No.
10        Q.   Okay.  Now, you said that since you
11  came back to New Orleans, you've been kind of
12  bouncing around from one apartment to another.
13        A.   Uh-huh.
14        MR. JOANEN:
15             You have to say "Yes."
16        A.   Yes.  Yes.  I'm sorry.
17  EXAMINATION BY MR. GARDNER:
18        Q.   I mean, is that a bad way to
19  describe it?
20        A.   What, bouncing?  No.  No.  You could
21  say living from pillar to post.  You know, I
22  just -- I don't know.  I just -- I'm not -- I
23  don't -- like, I haven't been able to -- to,
24  like, settle at a job or -- you know, just -- I
25  don't know.  I haven't been thinking right
```

Page 124

```
 1  lately.
 2        Q.   All right.  And why do you think
 3  that is?
 4        A.   I don't know.
 5        Q.   All right.  Since you've come back
 6  to New Orleans, have you paid rent to anyone?
 7        A.   No.
 8        Q.   Okay.  During the entire time you
 9  evacuated from New Orleans, did you have to pay
10  any of your rooming expenses?
11        A.   No.
12        Q.   Now, are you presently employed now?
13        A.   No, sir.  I still do marble and
14  tile.  That's how I kind of been maintaining, you
15  know, doing that.
16        Q.   Who do you work for?
17        A.   Myself.
18        Q.   Okay.  How many hours a week do you
19  work?
20        A.   It depends.  It's like I just do it
21  as I finish it.  I do a job -- if I finish it --
22  or I might put eight hours one week -- I mean,
23  one day, and I be finished it in, like, two days,
24  maybe.  So, I don't have, like, a full week that
25  I would do, you know -- like, to make 40 hours.
```

Page 125

```
 1        Q.   Do you support anyone other than
 2  yourself?
 3        A.   No, sir.
 4        Q.   In the year 2005, do you remember
 5  what your gross income was?
 6        A.   I think it was 30.  Thirty thousand.
 7        Q.   In 2004, do you remember what it
 8  was?
 9        A.   No.  Probably about the same.  It
10  didn't -- it didn't move much.  Didn't fluctuate.
11        Q.   Okay.  But in 2005, you only worked
12  through September.  2004 -- did you work the
13  entire year of 2004?
14        A.   I don't remember the total year.
15        Q.   All right.  Did you file an income
16  tax return in 2004 and 2005?
17        A.   I filed one in 2004.  2005 was -- it
18  was not a full -- I was working -- I worked at
19  different places.  So, I had, like, three forms I
20  did.  So, I remember that.
21        Q.   Okay.  What were the three places
22  you worked?
23        A.   I did some for Gulf South.
24        Q.   Okay.
25        A.   I did some for Prestige.
```

JOSE LUIS RODRIGUEZ (LEVEE)                                    7/14/2007

Page 126

1    Q.   Prestige Flooring?
2    A.   Yeah.  And I can't think of the
3  marble -- it's the same people who own -- Gulf
4  South Marble & Tile had, like, a separate
5  building to do countertops and everything, and I
6  did some work for him.  I don't remember --
7    Q.   Okay.  That was before Hurricane
8  Katrina?
9    A.   Before.  (Nods head affirmatively.)
10   Q.   So, before Hurricane Katrina, you
11  were working for three different people?
12   A.   Yeah.
13   Q.   Okay.  Let me ask you this:  Did you
14  complete -- did you file income tax -- did you
15  prepare an income tax return in 2004?
16   A.   I believe I did, yeah.
17   Q.   And did you do one in 2005?
18   A.   2005, I don't think I did.  I don't
19  think I did one.
20   Q.   What about 2006?
21   A.   No.  Definitely no.
22   Q.   Did you have any earnings in 2006?
23   A.   The same thing that I been doing,
24  like, the tile, certain -- you know, just trying
25  maintain myself.

Page 127

1    Q.   And how much money do you think
2  you've made in 2006?
3    A.   I don't know.  Maybe 15.
4    Q.   Fifteen thousand?  What about 2007,
5  how much money did you make the first half of the
6  year?
7    A.   Probably about the same, ten or
8  15,000.  I don't -- I don't remember.  I don't
9  recall that.
10   Q.   Do you plan on filing an income tax
11  return this year?
12   A.   I got to talk to somebody and find
13  out how to do that.  I don't know how to do that.
14   Q.   All right.  Before Hurricane
15  Katrina, did you prepare your own income tax
16  returns --
17   A.   No.
18   Q.   -- or did somebody else?
19   A.   No.  Somebody else did that.
20   Q.   Okay.  Since Hurricane Katrina, have
21  you attempted to look for work as a tile
22  installer?
23   A.   Somewhat.  I did, but not with want,
24  you know.
25   Q.   But not what?

Page 128

1    A.   Not with want.  Not with, you know
2  wanting to do it.
3    Q.   Okay.  And, again, why is that?
4    A.   I haven't -- it's like I can't --
5  it's hard for me to, like, take certain orders,
6  like shit -- stuff like that since the storm and
7  people talking to you in a certain way.  And I
8  haven't been able to take it, so, I get either,
9  you know, bad attitude with people sometimes.  I
10  don't know.  That's not me, though.
11   Q.   Had you ever had any kind of
12  problems with that before Hurricane Katrina?
13   A.   No, sir.
14   Q.   Have you seen a counselor or talked
15  to anyone about it?
16   A.   No, sir.
17   Q.   Now, you said when we began the
18  deposition that you were treated in Fort Myers,
19  Florida, for exposure to something.
20   A.   Yeah.
21   Q.   And what --
22   A.   He told me it was a fungus.
23   Q.   All right.  Now, why did you happen
24  to go to the doctor there?
25   A.   Why?  Because I -- the fungus -- it

Page 129

1  was, like -- you know, it was like a itch.  It
2  was all over my body, and I had to go find out
3  what it was.
4    Q.   Okay.  Had you ever had that itch
5  before?
6    A.   No, sir.
7    Q.   And when did that itch begin?
8    A.   After I got out the water, like --
9  when I was on the road, on the highway.
10   Q.   Okay.  And did it -- did your skin
11  change colors?
12   A.   Yeah.  It was like -- like red --
13  little, round circles with a bunch -- it was
14  itching and it got hard in the middle.  It was --
15  it was -- didn't look right.
16   Q.   And did you see any doctor before
17  you saw the doctor in Fort Myers?
18   A.   No.
19   Q.   Okay.  Do you know who the doctor
20  was that you saw?
21   A.   No.
22   Q.   Was he at an emergency room?
23   A.   Yeah, it was at an emergency room.
24   Q.   Do you remember the name of the
25  hospital?

                              33 (Pages 126 to 129)

JOSE LUIS RODRIGUEZ (LEVEE)                                    7/14/2007

Page 130

1        A.   No.  Gulf Coast, I think.  I have
2   that, too, the paperwork and stuff like that.
3        Q.   Okay.  And that was in Fort Myers?
4        A.   Yes, sir.
5        Q.   Did you see him more than once?
6        A.   No, just that one time.
7        Q.   Okay.  And what did he prescribe for
8   your itch?
9        A.   I forgot the name of the lotion.  It
10  was a -- some ointment that he told me to just
11  get.  You can get it over the counter.  He said
12  just put it on for a couple of days and see if it
13  goes away.  It should go away, and it did.
14       Q.   Was it cortisone?
15       A.   Cortisone.  That's it.
16       Q.   And did it go away?
17       A.   Yeah.
18       Q.   All right.  Do you know how much
19  that doctor's visit cost?
20       A.   I -- almost -- I think it was, like,
21  300 -- 200 and something, $300.
22       Q.   All right.  And the cortisone was
23  over-the-counter medication --
24       A.   Yeah.
25       Q.   -- that cost about $10?

Page 131

1        A.   Uh-huh.
2        Q.   Yes?
3        A.   Yes.
4        Q.   And did you see any other doctors
5   for anything that you believe was related to
6   Hurricane Katrina after the storm?
7        A.   No.
8        Q.   Okay.  Did you buy any other
9   medication?
10       A.   No.
11       Q.   Did one tube of the cortisone take
12  care of the problem?
13       A.   No.  No.  It took, like, about two
14  or three tubes.  It didn't go away, like, three
15  days, like he told me, but it went away.
16       Q.   Okay.  How long did it take it to go
17  away?
18       A.   About a week and a half, almost two
19  weeks.
20       Q.   And was it on both your arms?
21       A.   It was on my arms -- on this arm and
22  both my legs.
23       Q.   All right.  Now, when you say "this
24  arm," which arm are you talking about?
25       A.   My right.

Page 132

1        Q.   Right arm?
2        A.   Right arm and both legs.
3        Q.   Now, have you -- you indicated that
4   since the storm, you thought you weren't feeling
5   right or you weren't thinking right.
6        A.   Yeah.
7        Q.   Okay.  Had you ever had a period in
8   your life when you weren't thinking right?
9        A.   Yeah, when my son passed away.
10       Q.   Okay.  And what -- what was the
11  cause of your son's death?
12       A.   M.S., muscular dystrophy he had.
13       Q.   Did you see any -- any sort of a
14  counselor or a doctor or a psychologist or a
15  psychiatrist?
16       A.   No.
17       Q.   No one?
18       A.   No.
19       Q.   You didn't have any medical
20  treatment at all after your son's death?
21       A.   No.
22       Q.   Okay.  Have you -- and you haven't
23  had any -- you haven't seen any kind of a
24  psychologist or a psychiatrist after Hurricane
25  Katrina?

Page 133

1        A.   No.
2        Q.   Have you thought about seeing one?
3        A.   No, not really.
4        Q.   And do you attribute that not
5   feeling right to Hurricane Katrina?
6        A.   It's a big -- yeah.  Yeah.  I would
7   say yeah.
8        Q.   I mean, has it gotten better as time
9   goes on?
10       A.   No.  No, because it's basically the
11  same because -- it's like the feeling that I had
12  when I lost my son, and then, like, two years
13  later, you know, I'm not even over that, and then
14  this comes up.  You know, it's like it's not --
15  nothing's falling into place for me right now.
16       Q.   Okay.  So, at the time of Hurricane
17  Katrina, you were still having some personal
18  problems related to your son's death --
19       A.   Right.
20       Q.   -- correct?
21       A.   Yeah, correct.
22       Q.   Okay.  Did those personal problems
23  seem worse today than they did before Hurricane
24  Katrina, or are they about the same?
25       A.   I would say about the same.  It's

34  (Pages 130 to 133)

JOSE LUIS RODRIGUEZ (LEVEE)                                                    7/14/2007

Page 142

1   they told me I didn't, you know, so, I left it
2   alone.  I didn't pursue it.
3       Q.   Had you ever received unemployment
4   benefits in the past?
5       A.   No, sir.
6       Q.   Had you ever received any workers'
7   compensation benefits?
8       A.   No, sir.
9       Q.   When you were working with Richard,
10  you weren't working as a company.  You were just
11  working as yourself?
12      A.   Yeah, just both of us just trying to
13  make a little money.
14      Q.   Okay.  How is Richard employed?
15      A.   Richard, he cuts grass and he
16  works -- he drives buses for the school board.
17      Q.   For the Orleans Parish School Board?
18      A.   Yes, sir.
19      Q.   All right.  Have you tried to find a
20  tile installation company to work for, or do you
21  want to work for yourself?
22      A.   No, I haven't tried.  I kind of
23  rather do it myself.
24      Q.   How do you get work?
25      A.   It's been word-of-mouth, like, some

Page 143

1   of the houses that I've already done, you know,
2   somebody told them about it, and it's going about
3   that.  And it stopped because nobody has no
4   money, like, right now, but, I think, since Road
5   Home, they starting to call, you know, little by
6   little.  That's what I want to do, is try and do
7   my own thing.
8       Q.   How many houses have you done --
9   have you worked on?  How many days have you
10  worked in the last month?
11      A.   In the last month, say, about two
12  weeks.
13      Q.   Could you have worked more if you
14  wanted to?
15      A.   Maybe, yeah.  Yeah.
16      Q.   Are you working only two weeks in
17  the last month by choice or because there wasn't
18  enough work?
19      A.   Well, sometimes I would -- you know,
20  I don't feel like it, so, I won't.  But, mainly,
21  it's been people aren't ready yet.  It's wait for
22  this -- I got calls, but it's wait until this guy
23  gets finished with this and the painting.  It's a
24  waiting game.
25      Q.   So, when you work for people, do you

Page 144

1   do it on a time and labor -- time-and-material
2   basis, or do you give them estimates?
3       A.   A estimate.
4       Q.   Okay.  And does anybody else work
5   with you or do you work by yourself?
6       A.   I work by myself.
7       Q.   Do you have any stationery or
8   business forms?
9       A.   No, sir.
10      Q.   Okay.  When you give them an
11  estimate, it's just a handwritten estimate?
12      A.   Yeah.
13      Q.   Do you have any kind of --
14      A.   Or verbally.  You just tell them
15  this is what it is.
16      Q.   Do you have any kind of an
17  occupational business license?
18      A.   No, sir.
19      Q.   Do you believe that you've lost any
20  wages or income because of Hurricane Katrina?
21      A.   Well, I would probably still be
22  working, you know, for the other company, but
23  ever since that, I just haven't been feeling
24  that, you know, to try and do that again.  Like,
25  for the -- a company.

Page 145

1       Q.   Okay.  So, if the company was still
2   there, would you have gone back to work for it?
3       A.   Probably not.  I would have probably
4   tried to look for something else.
5       Q.   And that's just because you don't
6   feel up to working for a company?
7       A.   Yeah.  Yeah.  Yeah.
8       Q.   Okay.  Had you ever been terminated
9   from any of your prior employments?
10      A.   No, sir.
11      Q.   Have you ever received any kind of
12  disability benefits?
13      A.   No, sir.
14      Q.   Are you making a claim, Mr.
15  Rodriguez, for any nonphysical injury as a result
16  of Hurricane Katrina?
17      A.   Nonphysical?
18      Q.   Mental distress, emotional distress?
19      A.   No.  No.
20      MR. JOANEN:
21          Just for clarification on
22      that, he is being presented as the
23      class rep.  I don't know whether
24      it's in the class -- but the
25      class -- the master administrative

JOSE LUIS RODRIGUEZ (LEVEE)                                    7/14/2007

Page 146

1  complaint is going to read that
2  Mr. Luis Rodriguez is representing
3  the claim of his father, Luis
4  Rodriguez, for his death.
5  MR GARDNER:
6      I'm going to ask him about
7  that in a second.
8  MR. JOANEN:
9      I don't know if he
10  understands that when you say
11  mental distress, that's kind of
12  hard to identify.
13  MR. GARDNER:
14      All right.  Is that the old
15  one or the new one?
16  MR. JOANEN:
17      I think it's the one we're
18  working on.
19  MR. LAGARDE:
20      It's the one we're going to
21  substitute, move to substitute.
22  MR. JOANEN:
23      He was substituted.
24  MR. GARDNER:
25      Well, wait.  Am I supposed

Page 147

1  to be seeing this?
2  MR. JOANEN:
3      We don't have any secrets.
4  MR. GARDNER:
5      Okay.  I just don't want
6  to --
7  MR. JOANEN:
8      I appreciate it.  I just
9  personally don't know what the
10  stages are, whether they filed it
11  yet or --
12  MR. GARDNER:
13      Okay.
14  MR. JOANEN:
15      I think we are substituting
16  two people, so -- because of the
17  Greers.
18  MR. GARDNER:
19      All right.  So, Mr.
20  Rodriguez is making a claim
21  related to the death of his father
22  in this litigation?
23  MR. JOANEN:
24      For this subclass, I believe
25  so.

Page 148

1  MR. GARDNER:
2      Is that -- let me just see
3  that.  Let me look at it again.
4  Let's go off the record for a
5  second.
6  THE VIDEOGRAPHER:
7      Off record.
8      (Whereupon, a discussion was
9  held off the record.)
10  EXAMINATION BY MR. GARDNER:
11  Q.  Mr. Rodriguez, you're making a claim
12  for the wrongful death of your father?
13  A.  Uh-huh.
14  Q.  And that's for the reasons that
15  we've stated before --
16  A.  Yes, sir.
17  Q.  -- or the reasons you stated before?
18  A.  Right.
19  Q.  And the only property damage claim
20  you're making is a claim for the damage to the
21  contents of your apartment and the damage to your
22  automobile?
23  A.  Right.
24  Q.  Okay.  You didn't own any real
25  estate at the time of Hurricane Katrina?

Page 149

1  A.  No, sir.  No, sir.
2  Q.  And you didn't own any other
3  property --
4  A.  No, sir.
5  Q.  -- other than what was in your
6  apartment and your car?
7  A.  Right.
8      (Whereupon, a discussion was
9  held off the record.)
10  THE VIDEOGRAPHER:
11      On the record.
12  MR. GARDNER:
13      Just so we're clear on this,
14  Mr. Rodriguez is going to reserve
15  the right to read and sign his
16  deposition.  And I usually say
17  this at the beginning, but it's
18  agreed we're taking this
19  deposition pursuant to Federal
20  Rule of Civil Rule of Procedure
21  30, the Case Management Order
22  Number 4 and the Court's order of
23  July 3rd, 2007, which is Document
24  Number 6222.
25  MR. JOANEN:

                                    38 (Pages 146 to 149)

JOSE LUIS RODRIGUEZ (LEVEE)                                    7/14/2007

Page 150

1        Yes, and I believe I'm
2   maintaining a standing objection
3   on behalf of the PSLC regarding
4   the ruling.
5        MR. GARDNER:
6          The ruling.
7   EXAMINATION BY MR. GARDNER:
8        Q.   Okay.  Mr. Rodriguez, are you making
9   any claim for any kind of nonmonetary relief?
10       A.   I don't understand that.
11       Q.   Okay.  Any relief other than
12  something that could be determined in dollar --
13  dollars?
14       A.   Say that again.
15       Q.   Are you -- are you seeking any kind
16  of relief that would ask someone to do something
17  as opposed to awarding damages in money?
18       A.   Yeah.
19       Q.   You are?
20       A.   Well, say that again because I
21  really don't understand what you just said,
22  really.
23       Q.   Okay.
24       A.   Am I doing what?
25       Q.   Do you know what nonmonetary relief

Page 151

1   is?
2        A.   No.
3        Q.   Do you know what injunctive relief
4   is?
5        A.   No.
6        Q.   Okay.  Do you know if you're seeking
7   either one of those?
8        A.   I don't know what neither one of
9   those are.
10       Q.   Okay.  All right.  Well, are you
11  making any claims in this litigation other than
12  the ones we've discussed?
13       A.   No.
14       Q.   Okay.  Did you participate in any
15  church activities before the storm?
16       A.   Yes, I did.
17       Q.   Did you belong to a congregation?
18       A.   Yeah.
19       Q.   And what church was that?
20       A.   St. Raphael.
21       Q.   St. Raphael?
22       A.   (Nods head affirmatively.)
23       Q.   And how often did you participate?
24       A.   Every Sunday.
25       Q.   Okay.  Have you done that since

Page 152

1   Hurricane Katrina?
2        A.   Yeah, since --
3        Q.   Is that church, is that congregation
4   still ongoing?
5        A.   No.
6        Q.   Has it been --
7        A.   It's not there.  I'm at St. Leo now.
8        Q.   Okay.  St. Leo the Great?
9        A.   Yes, sir.
10       Q.   Were those two congregations merged?
11       A.   Yeah, they have some people there,
12  yeah, from there.
13       Q.   Okay.  Do you go to St. Leo every
14  week?
15       A.   Every Sunday, yeah.
16       Q.   Okay.  Are there members of the
17  congregation from St. Raphael at the St. Leo's
18  church?
19       A.   I've seen one guy.
20       Q.   Do you know what happened to other
21  members of the church?
22       A.   No, sir.
23       Q.   Do you know if they're still in New
24  Orleans or --
25       A.   No, sir.

Page 153

1        Q.   You don't know or --
2        A.   I don't know.  I don't know.
3        Q.   Are any of your family members --
4   are all of your family members in New Orleans
5   after Hurricane Katrina?
6        A.   No.
7        Q.   Okay.  Which ones are not?
8        A.   My brother Douglas and -- well,
9   Douglas, he's the only one.
10       Q.   And Douglas is in Houston?
11       A.   He's in Houston, yeah.
12       Q.   And is Douglas planning on
13  returning?
14       A.   No, sir.
15       Q.   Okay.  And why is that?
16       A.   He says he's going to stay up there.
17  Everything is easier going, some things, he says.
18  Better life up there.
19       Q.   Okay.  Better life in what sense?
20       A.   In -- well, the crime and, you know,
21  jobs and all of that's -- it's abundant up there,
22  he said.
23       Q.   Okay.  What type of an occupation
24  does he hold?
25       A.   He drives trucks.

                                      39 (Pages 150 to 153)

JOSE LUIS RODRIGUEZ (LEVEE)                                    7/14/2007

Page 154

```
 1        Q.   For what kind of company?
 2        A.   I don't know what kind of company.
 3   I think it's a food company that he drives from
 4   store to store, you know, drives a 18-wheeler and
 5   brings the food, whatever they need.
 6        Q.   And your mother and sister and your
 7   other two brothers are in the greater New Orleans
 8   area?
 9        A.   Yeah.  Uh-huh.  Armando is in
10   Slidell, but his job is, like, out of town.  So,
11   he's, like always -- like, he's in Guam right
12   now.  So, he'll be going maybe to Hawaii next
13   month.  He's like that.
14        Q.   And I'm sorry.  What line of work is
15   he in?
16        A.   Chemical spill, I believe.  He
17   monitors chemical spills.
18        Q.   Okay.  Do you know what company he
19   works for?
20        A.   No, sir.  I don't know the name of
21   the company, but the company was working down
22   here when -- after Katrina -- they was doing the
23   cleaning up.
24        Q.   Did you have any contact with your
25   neighbors when you were living on Bruxelles
```

Page 155

```
 1   Street?
 2        A.   Uh-huh.  Yes.
 3        Q.   Are most of those neighbors back?
 4        A.   No.  Some of them are.  Like, Miss
 5   Elaine and them, they're staying in Houston.
 6   She's not coming back.  The one I was telling you
 7   about, Miss Elaine and Keyana.
 8        Q.   Is she not coming back ever?
 9        A.   That's what she say.
10        Q.   And who else?
11        A.   Her daughter Keyana.
12        Q.   But what other neighbors?  Are there
13   any neighbors that are back?
14        A.   Yeah, they got neighbors that are
15   back.  Most of the ones, like, the older people,
16   most of them are back.  The younger folks didn't
17   come back.
18        Q.   Was there any reason for that that
19   you know of?
20        A.   No, not that I know of, no.
21        Q.   What percentage of the people that
22   were living on Bruxelles Street before the storm
23   are back now?
24        A.   I'd say about -- I'd say about 60.
25        Q.   60 percent?
```

Page 156

```
 1        A.   Yeah.
 2        Q.   All right.  Are you registered to
 3   vote in Orleans Parish?
 4        A.   No, sir.
 5        Q.   Okay.  Have you ever been
 6   registered?
 7        A.   Yeah.  Well, I mean, I did -- when I
 8   was in high school, I did, but I haven't done
 9   anything else because they tell me since you
10   don't have your citizenship, you shouldn't, you
11   know, do that, so, I never did.  Because I always
12   thought I was because I came when I was four and
13   I graduated and everything.  So, I always had it
14   in my mind I'm a citizen.  I did the same tests
15   and everything.  So, that's what I always
16   thought.
17        Q.   But are you registered to vote?
18        A.   I did register, yeah.
19        Q.   But you just haven't voted?
20        A.   I haven't voted.
21        Q.   You weren't voting before Hurricane
22   Katrina?
23        A.   Before, when I was in high school,
24   yeah.  Right after I got out of high school, I
25   did register to vote.  But then they told me
```

Page 157

```
 1   shouldn't do that, I'm going to get in trouble
 2   because I'm not a citizen, so, I kind of laid
 3   off.
 4        Q.   All right.  So, it was many years
 5   before Hurricane Katrina that you stopped voting?
 6        A.   Yes, sir.
 7        Q.   When you got out of high school?
 8        A.   Uh-huh.
 9        Q.   When did you get out of high school?
10        A.   '85.
11        Q.   Okay.  So, you voted for a little
12   time after high school and then you stopped?
13        A.   That's it.
14        Q.   Are you a member of any civic
15   organizations?
16        A.   No, sir.
17        Q.   Any social organizations?
18        A.   No, sir.
19        Q.   Any business or trade organizations?
20        A.   No, sir.
21        Q.   Any philanthropic organizations?
22        A.   Uh-huh.
23        Q.   No?
24        A.   No organizations.
25        Q.   All right.  Are you involved with
```

JOSE LUIS RODRIGUEZ (LEVEE)                                    7/14/2007

---

Page 158

1  any organizations at your church?
2      A.   No.
3      Q.   Do you attend Mardi Gras parades?
4      A.   Yes.
5      Q.   You did that before the storm?
6      A.   Yeah.
7      Q.   And you do that after the storm?
8      A.   Not as much, but I have gone.
9      Q.   All right.  What about the Jazz
10  Fest, did you attend that before Hurricane
11  Katrina?
12      A.   Yeah.
13      Q.   Did you attend it after Hurricane
14  Katrina?
15      A.   Yeah.
16      Q.   What about the Essence Festival, did
17  you attend that before Hurricane Katrina?
18      A.   No, sir.
19      Q.   Okay.  Did you attend it afterwards?
20      A.   No, sir.
21      Q.   What about Saints games, did you
22  attend those before Hurricane Katrina?
23      A.   No, sir.
24      Q.   Did you attend them after?
25      A.   No, sir.

---

Page 159

1      Q.   What about Hornets games, did you
2  attend them before Hurricane Katrina?
3      A.   Yes, sir.
4      Q.   Did you attend them after?
5      A.   No, sir.
6      Q.   What about Bayou Classic?
7      A.   No, sir.
8      Q.   You've never been to that?
9      A.   No.
10      Q.   What about City Park, did you ever
11  use City Park before Hurricane Katrina?
12      A.   Yeah.  Yes, sir.
13      Q.   Did you use it after?
14      A.   No, sir.
15      Q.   Why is that?  Just you didn't have
16  the need to?
17      A.   Yeah, that, and it's not the same
18  yet.  It's not --
19      Q.   Okay.  Did you ever participate in
20  any meetings at the city council regarding
21  Hurricane Katrina?
22      A.   No, sir.
23      Q.   All right.  Did you ever participate
24  in any community planning efforts regarding post-
25  Hurricane Katrina planning?

---

Page 160

1      A.   No, sir.
2      Q.   All right.  Did you receive any
3  money from FEMA after Hurricane Katrina?
4      A.   Yes, sir.
5      Q.   And what was that?
6      A.   Ten thousand.
7      Q.   Ten thousand?
8      A.   Yes, sir.
9      Q.   Let me ask you:  When you were
10  living on Bruxelles Street, did you get any sort
11  of rental assistance from the government?
12      A.   No.
13      Q.   Okay.  The $300 a month you paid in
14  rent was money that you actually paid to your
15  brother?
16      A.   Yeah.  Right.
17      Q.   Did you apply for an SBA loan
18  following Hurricane Katrina?
19      A.   Yes, sir.
20      Q.   And what was the purpose of the
21  loan?
22      A.   To get what I had -- what I've lost,
23  you know.  They came out and everything and they
24  took pictures and he -- you know, he says I was
25  approved, but I didn't have a job, so, you know,

---

Page 161

1  I couldn't -- you know, I had to take care of --
2  you know, leave all of that out, and I have never
3  done it.
4      Q.   And the purpose of the loan was to
5  cover your lost contents?
6      A.   Yes, sir.
7      Q.   Okay.  Did he tell you -- did you
8  know how much of a loan you were approved for?
9      A.   Forty-five.
10      Q.   Forty-five?
11      A.   Uh-huh.
12      Q.   And what was that supposed to cover?
13      A.   He went through the house.  He says
14  everything that was in there, the refrigerator,
15  the washer and dryer, my Xbox games, all the
16  games that I had.  You know, everything that I
17  had in the house.
18      Q.   But it was just the contents of the
19  house?
20      A.   Yeah.
21      Q.   And when you say he went through it,
22  who is "he"?
23      A.   Some SBA guy.  He the one came, met
24  me out there.
25      Q.   And did you prepare a Form 95?

---

                                    41  (Pages 158 to 161)

JOHNS PENDLETON COURT REPORTERS                          800 562-1285

JOSE LUIS RODRIGUEZ (LEVEE)                                    7/14/2007

Page 162

1     A.   Yeah.
2     Q.   Okay.  And that's the one you
3   referred to earlier that you have at your house?
4     A.   Yeah.
5     Q.   Okay.  And did you prepare that or
6   did someone else prepare it for you?
7     A.   Someone else.
8     Q.   And who was the someone else?
9     A.   My sister.
10    Q.   Your sister?
11    A.   Uh-huh.
12    Q.   But you signed it?
13    A.   Yes, sir.
14    Q.   All right.  Did you -- did you apply
15  for a Road Home grant?
16    A.   No, sir.
17    Q.   Did you -- you received money from
18  the Red Cross, or did you just receive rental
19  assistance?
20    A.   Well, no.  Well, my mom and them was
21  getting it, so, I just told them do it all
22  together.  We was going to be staying in the same
23  house.  What she got was, like, maybe some gift
24  cards, stuff like that.
25    Q.   Okay.  So, the money from the Red

Page 163

1   Cross basically went to the group?
2     A.   Yes.  Yeah.
3     Q.   And did you get any donations or
4   gifts from any other organizations?
5     A.   Yeah.  I received a car.
6     Q.   You got a car?
7     A.   Yeah.
8     Q.   Okay.  Who gave you the car?
9     A.   The church.
10    Q.   Which church?
11    A.   I can't remember the name of the
12  church.
13    Q.   Was it a church in Florida?
14    A.   Yes, sir.
15    Q.   What kind of a car did you get?
16    A.   A Dodge van.
17    Q.   Was this the same church that gave
18  you all the house?
19    A.   Yes, sir.
20    Q.   Okay.  Have you ever spoken with
21  anyone with any news media regarding Hurricane
22  Katrina?
23    A.   I did, but I don't remember who, but
24  I did talk to some people when we was at the Red
25  Cross.

Page 164

1     Q.   Okay.  Were you ever interviewed by
2   anyone?
3     A.   I'm not sure.  I was talking to this
4   lady.  I didn't see no camera or anything.  She
5   was just asking questions.
6     Q.   What did the questions relate to?
7     A.   Like, you know, how everything went
8   about.  You know, what -- you know, what did we
9   do to get out.  Were we they there.  They just
10  wanted to know.
11    Q.   The type of things we've been
12  talking about today?
13    A.   Yes, sir.  Yes.
14    Q.   Okay.  When you submitted your Form
15  95, did it have any attachments or was it just
16  like a one --
17    A.   I think it had some other
18  attachments.  My sister, like I said, she had --
19  she took care of all of that.  But I think it had
20  something -- it wasn't just one piece of paper.
21    Q.   Do you know what those attachments
22  were?
23    A.   No, sir.
24    Q.   Have you ever spoken with anyone or
25  has anyone ever contacted you that was doing

Page 165

1   research or an investigation regarding Hurricane
2   Katrina?
3     A.   No, sir.
4     Q.   Okay.  Do you understand that you
5   have been identified as a class representative in
6   this matter?
7     A.   Yes, sir.
8     Q.   And do you know why you were chosen
9   as a class representative?
10    A.   No, sir.
11    Q.   What is your understanding, if any,
12  of the general nature of the litigation?
13    A.   What is my understanding of it?
14    Q.   Yep.
15    A.   Wrongful death and everything that
16  was lost -- that you lost during the hurricane.
17    Q.   Okay.  Did you -- have you ever read
18  the complaint?
19    A.   No, sir.
20    Q.   Okay.  And you didn't participate in
21  formulating the complaint?
22    A.   No.
23    Q.   Okay.  Do you know who the parties
24  are to the litigation?
25    A.   All the -- no.

JOHNS PENDLETON COURT REPORTERS                        800 562-1285

JOSE LUIS RODRIGUEZ (LEVEE)                                    7/14/2007

Page 166

1      Q.   I mean the defendants.  Do you know
2  who the defendants are in the litigation?
3      A.   Not all, no.
4      Q.   Do you know who any of them are?
5      THE WITNESS:
6          Would that be you?
7  EXAMINATION BY MR. GARDNER:
8      Q.   No.  No.
9      A.   No, I don't know anybody.
10     Q.   Okay.  What is your understanding of
11 who is -- who -- what is included in the proposed
12 class?
13     A.   I don't know.  I don't know.
14     Q.   Okay.  Do you know what your duties
15 and responsibilities are as a class
16 representative?
17     A.   Yeah, to come tell it like it is,
18 huh.
19     Q.   Okay.  Anything else?
20     A.   No.  That's it.
21     Q.   Do you know which subclass you
22 represent?
23     A.   Gentilly.
24     Q.   I mean, that's what you understand?
25     A.   Yeah.

Page 167

1      Q.   Okay.  Do you know any other
2  individuals that have been identified as class
3  representatives?
4      A.   No, sir.
5      Q.   Have you ever spoken with any
6  individuals that have been identified as class
7  representatives?
8      A.   No, sir.
9      Q.   Okay.  Have you ever -- at the
10 beginning of the deposition, we talked about the
11 Exhibit A to the Notice of Deposition, the
12 categories of documents there, and you identified
13 some that you have at your house, correct?
14     A.   Yes.
15     Q.   Okay.  Have you ever received
16 interrogatories or written questions regarding
17 this case?
18     A.   No.
19     Q.   Have you ever received any requests
20 for production of documents regarding this case?
21     A.   No.
22     Q.   Okay.  Other than these pictures
23 that you've brought here this morning, have you
24 ever provided any other documents of any kind to
25 your attorneys in this case?

Page 168

1      A.   No.
2      MR. GARDNER:
3          Let me just take about a
4  five-minute break.
5      MR. JOANEN:
6          Take your time.
7      THE VIDEOGRAPHER:
8          Off the record.
9          (Whereupon, a discussion was
10 held off the record.)
11     THE VIDEOGRAPHER:
12         On the record.
13 EXAMINATION BY MR. GARDNER:
14     Q.   All right.  Mr. Rodriguez, was a
15 succession opened when your dad -- after your dad
16 died?
17     A.   I don't think so.
18     Q.   Okay.  Was there -- did he have --
19 did he have any belongings that --
20     A.   He didn't have -- no.  No.  He was
21 renting.  So, no.
22     Q.   Okay.
23     A.   And everything -- like, his cars and
24 everything else that he did have, like, you know,
25 mechanical equipment and all of that, all of that

Page 169

1  was lost in the flood because it was in the
2  garage.
3      Q.   Okay.  Was there any documents
4  prepared that indicate who is the representative
5  of his succession --
6      A.   No.
7      Q.   -- or the executor of his estate
8  that you know of?
9      A.   No, I don't.
10     Q.   Okay.  And do you know if there was
11 a succession opened?
12     A.   No, I don't know.
13     Q.   Okay.  All right.  Now, have you
14 ever had any problems with drug or alcohol abuse?
15     A.   I did drink when -- after -- you
16 know, I started drinking after my son passed
17 away, but I wouldn't say alcoholic like --
18     Q.   All right.  Have you ever been
19 treated for alcohol abuse?
20     A.   No, sir.  No, sir.
21     Q.   Have you ever been treated for drug
22 abuse?
23     A.   No, sir.
24     Q.   Okay.  Have you ever been in any
25 sort of treatment facility?

43  (Pages 166 to 169)