UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE KATRINA CANAL BREACHES
CONSOLIDATED LITIGATION

CIVIL ACTION NO. 05-4182

SECTION K; MAG. 2

JUDGE DUVAL

PERTAINS TO:  MRGO

MAGISTRATE JUDGE WILKINSON

---

**MRGO PLAINTIFFS' AMENDED AND RESTATED BRIEF IN SUPPORT OF THEIR
AMENDED AND RESTATED MOTION FOR CLASS CERTIFICATION**

---

PLAINTIFFS identified herein, individually and as putative Class Representatives,
pursuant to Fed. R. Civ. P. 23 and § III (A) of this Court's Case Management Order No. 4,
respectfully move this Court to certify this action as a class action with sub-classes of Plaintiffs
who suffered damages as a result of the inundation of Greater New Orleans that occurred during
and immediately after Hurricane Katrina's landfall—inundation that would not have occurred
but for the Defendants' respective acts and omissions.


**I.**

## INTRODUCTION & OVERVIEW

It is difficult to comprehend, but it is true: a major modern American city was devastated in a single day because of human error—the Defendants' error. When Hurricane Katrina struck on August 29, 2005, New Orleans/St. Bernard hurricane protection system tragically failed, inundating 80% of the metropolitan area and causing unprecedented damage and destruction to 180,000 residences and businesses. The damage is of biblical proportions; not just city blocks, but entire neighborhoods, were destroyed. Thousands of residents scattered across the United States and, even today, fewer than half have been able to return. Thousands of businesses remain closed. Whole portions of the city and parish remain much as they were in the days following the storm—uninhabitable and deserted. Those whose properties were damaged or destroyed seek recompense. Class treatment is the most efficient method, and really the only workable method, to address these wrongs.

Only class treatment can resolve the numerous and fundamental factual and legal issues common to everyone who suffered at Defendants' hands. If every putative class member brought an individual action, each would need to establish where the water came from, where it went, how and when it went there, in what proportions, to what ultimate depth, and why (that is, due to whose fault). Every one of those questions can and should be answered at a class trial. The facts that answer these questions are just that—facts. No matter how many individual damage claims might ultimately be brought, the fundamental facts of what happened and why will not change. Proving those facts by a class action is not only the proper legal course, but the only practicable one.

- Defendants caused damage to thousands of class members during and after the hurricane. The proposed classes and sub-classes are so numerous that joinder of all

members would be impracticable (as several Defendants concede).

• Common questions of law and fact exist and predominate. They include the nature of the Defendants' respective legal duties; whether and how Defendants' breached those duties; how breach of those duties resulted in multiple failures of the hurricane protection system; and which failures caused inundation to given geographical sub-classes, including how and when the water arrived, in what proportions, and in what depth. That is to say, every question, except a given class member's actual resulting physical property damage, is common to the class; and even with respect to damages, certain property value diminution losses are susceptible to determination by mass appraisal.

• Because each Class Representative shares a common interest in the answers to these questions given each Class Representative's own property loss, each brings a claim typical of the claims of each respective class and sub-class member.

• The Class Representatives will fairly and adequately protect the interests of the class and sub-classes (a fact also conceded by several Defendants).

• Common issues of law and fact concerning, *inter alia*, the duties of Defendants and how their many breaches of those duties caused the levees to fail predominate over any questions affecting only individual class members. For this reason and others, maintenance of this litigation as a class action is superior to other available methods.

## II.
## PRELIMINARY STATEMENT OF FACTS

Hurricane Katrina landed at Buras, Louisiana, at 6:10 a.m. on August 29, 2005. The storm tracked north across the Mississippi River to a final landfall near the mouth of the Pearl River at the Louisiana/Mississippi border at about 9:45 a.m. The center of Katrina's eye passed about 40 miles east of downtown New Orleans, sparing the city all but the weakest of its winds; New Orleans experienced Category 1 or weak Category 2 winds (under 100 mph). Overtopping and breaches along the IHNC/Industrial Canal destroyed virtually every home, business, and structure located in the Upper Ninth Ward of the City of New Orleans as well as the area east of the IHNC/Industrial Canal in both Orleans and St. Bernard Parishes. The first breach occurred along the IHNC immediately south of Interstate 10. A steel storm gate had been damaged

several months previously, and the sandbag bulwark in its place washed away. At the same site, an earthen wall of roadway fill (comprised of shell sand fill—a material not suitable for levee fill), and lacking sheet piles, also breached and caused extensive inundation.

St. Bernard, New Orleans East, and both the Upper and Lower Ninth Wards were devastated by the Mississippi River Gulf Outlet ("MRGO"). The Court is thoroughly versed in the Plaintiffs' allegations regarding the wetlands devastation and the substandard design, construction, and maintenance of the MRGO. The combined negligence of the MRGO Defendants resulted in overtopping and breaches along the full length of the MRGO, flooding both St. Bernard and New Orleans East, as well as the amplified surge that burst through the east side of the IHNC floodwalls, resulting in the devastation of the Upper and Lower Ninth Wards and St. Bernard.

The Defendants' misconduct resulted in the most costly failure of an engineered system in history. Current damage estimates exceed $100 billion in the Greater New Orleans area. The destruction has greatly disrupted the lives and livelihoods of the New Orleans population. Once unleashed, the waters swept away lives, destroyed property, and devastated the city's economy, dramatically altering New Orleans's physical, cultural, social, and political character. The effects will continue to ripple from generation to generation.

Not surprisingly, the litigation resulting from these catastrophic events is likewise enormous. Class certification represents the best way—perhaps the only way—to rein in the thousands of individual claims engendered by the Defendants' negligence.

### III.
### CLASS ARCHITECTURE:  PROPOSED CLASS AND SUB-CLASSES

Plaintiffs propose a class for all claimants damaged or injured by the MR-GO. The MRGO

class encompasses the portion of Orleans Parish located in the Upper Ninth Ward, the Lower Ninth Ward, New Orleans East and all of St. Bernard Parish-[hereinafter referred to as "Greater New Orleans"].  It is suggested that at least three subclasses, the Lower Ninth Ward & St. Bernard Sub-Class,  the New Orleans East Sub-Class, and the Upper Ninth Ward Sub-Class[1] may be established.  (See Ex. A, Area & Sub-Class Maps).

Because the various sub-classes correspond to the topography of the relevant land area, they also correspond to the source(s) of water in a given footprint.  Discovery will demonstrate the adequacy and accuracy of the class and sub-class definitions.

The overarching MRGO class includes and may be defined as:

All individuals and entities (both private and public, both natural and juridical) in "GREATER NEW ORLEANS" (defined as that area bounded to the north by Gentilly Boulevard/Gentilly Road to North Broad Street (Gentilly Ridge), to the south by the Mississippi River, to the east by the IHNC, and to the west by Esplanade Avenue as well as that area east of the IHNC/Industrial Canal including the Lower Ninth Ward and New Orleans East areas of the Parish of Orleans and also the Parish of St. Bernard, in the State of Louisiana)  who/which sustained damages as a result of inundation/flooding in this area which occurred during and immediately following the landfall of Hurricane Katrina on or about August 29, 2005, and—as to the Defendant Corps only—have, or by a date to be determined by the Court will have, fulfilled whatever administrative claim filing requirements this Court deems applicable in this matter.

---

[1]   As per the Court's Order dated January 30, 2008, the Levee Upper Ninth Ward Sub-Class was included in the MR-GO Class, (Doc. No. 10984).

Exhibits B presents detailed definitions of the proposed class, sub-classes, and class representatives for the MRGO Class.[1]

# IV.
# ARGUMENT

### A.    The Governing Standard.

The following must be true to certify any class:

(1)    the class is so numerous that joinder of all members is impracticable,

(2)    there are questions of law or fact common to the class,

(3)    the claims or defenses of the representative parties are typical of the claims or defenses of the class, and

(4)    the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

This action may be maintained as a common-question class action if these four prerequisites are satisfied, and:

> the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.  The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate

---

[1] Should a need arise to re-define any of the class or any sub-class, Fed. R. Civ. P. 23(c)(4) confers that power upon the Court. *See generally* 3 Newberg & Conte, *Newberg on Class Actions* § 7:33 (4th ed. 2003) (noting that under Rule 23(c)(4), "classes have been certified in cases in which the class was redefined to limit the number of absent members, to create subclasses, or to confine the class action nature of the suit to specified common issues").

actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in a particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Fed. R. Civ. P. 23(b).

**B.    The Proposed Class and Sub-Classes Satisfy the Numerosity Requirement of Fed. R. Civ. P. 23(a)(1).**

B.1.    <u>The class and sub-classes are epic.</u>

There can be no serious dispute that members of the proposed class and subclasses are "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1).   Several Defendants will concede as much in response if they stay true to their discovery answers.

The Fifth Circuit has noted that as few as 100 to 150 people will satisfy the numerosity requirement. *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 624 (5th Cir. 1999).   The Class Representatives need only demonstrate some evidence or reasonable estimate of the number of purported MRGO Class and sub-class members to satisfy the requirement. *James v. City of Dallas*, 254 F.3d 551, 570 (5th Cir. 2001).

Hurricane Katrina affected everyone living in the Greater New Orleans area at the time of the storm.   As early as April 2007, the United States Army Corps of Engineers ("Corps") estimated that it had received 325,000 administrative claims related to Hurricane Katrina. (Ex. C), Def. U.S.A.'s Resp. to MRGO Pltfs. 1st Set of Interrogs., Gen. Objection 9 at 4.)   As this Court knows, hundreds of lawsuits involving tens of thousands of plaintiffs from Greater New Orleans have been filed against the Corps and other Defendants.

The class and sub-classes proposed by the Class Representatives plainly satisfy the Rule 23 numerosity requirement.   While the Fifth Circuit has held that 100-150 may be sufficiently

numerous, in *Watson v. Shell Oil Co.* it approved certification of a class of 18,000, describing the "massive proportions" of the case and the "nearly insurmountable problems of balancing procedural fairness with judicial efficiency" under such circumstances. 979 F.2d 1014, 1023 (5th Cir. 1992).  If 18,000 class members present a case of "massive proportions," then each proposed class and sub-class here is gargantuan, presenting an even more compelling showing on numerosity.

Likewise, the Fifth Circuit left untouched this Court's determination that the numerosity requirement was "clearly met" by a class of persons who sued Murphy Oil Company in connection with Hurricane Katrina. *Turner v. Murphy Oil Co.*, 234 F.R.D. 597, 604 (E.D. La. 2006).  That class comprised only a fraction of the Lower Ninth Ward & St. Bernard Sub-class in this action.  Perforce the sub-class, and the larger overarching MRGO class, also satisfies the numerosity requirement.

B.2.  <u>The classes and sub-classes are so widely dispersed that joinder is impossible.</u>

This Court also may consider whether the dispersal of potential class members following Katrina would make joinder impossible. *Watson*, 979 F.2d at 1022 (citing the "practicability of joining all members of the class individually" as a component of the numerosity analysis).  The *Mullen* court affirmed the district court's reasoning that, given the class members' profession as workers aboard a riverboat casino, one might infer that some members were geographically dispersed and that joinder would be difficult. *See Mullen*, 186 F.3d at 624-25.  This Court need not rely on inference.  The geographic dispersion of residents of the affected areas has been well documented in the 24 months following Katrina.  Joinder of each individual claimant as a plaintiff in this action would be difficult, if not impossible.  The numerosity requirement is thus

established.

**C. The Proposed Classes and Sub-Classes Satisfy the Commonality Requirement of Fed. R. Civ. P. 23(a)(2).**

Rule 23(a)(2) requires only a threshold showing that there are "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). The test for 23(a)(2) commonality is not demanding; it merely requires that there be "at least <u>one issue</u>, the resolution of which will affect all or a significant number of the putative class members." *Mullen*, 186 F.3d at 625 (quoting *Lightbourn v. County of El Paso, Tex.*, 118 F.3d 421, 426 (5th Cir. 1997)) (emphasis added). The Fifth Circuit recognizes that the "threshold of 'commonality' is not high." *Bertulli v. Independent Ass'n of Continental Pilots*, 242 F.2d 290, 296-97 (5th Cir. 2001) (quoting *Jenkins v. Raymark Indus.*, 782 F.2d 468, 472 (5th Cir. 1986)).

Every member here shares a claim identical to each of his or her fellow class and/or sub-class members. Each has a negligence claim against the Corps. Each potential sub-class is characterized by virtually identical claims against various other Defendants, or all of them. Each class member's claims arise from a common set of operative facts. Because rights and liabilities are determined by applying existing law to existing facts, common questions of law abound, from governmental immunities to apportionment of fault. Indeed, every class member has a common interest in whether this matter is handled as a class action to begin with. It is difficult to imagine how any class member's individual complaint against the Corps might differ from another's. This is no surprise; facts are indeed stubborn things. A finite and knowable set of facts gives rise to each class member's individual claims while shaping each class member's legal rights and each Defendant's corresponding liabilities. The class action procedure was devised precisely for such situations.

Exhibit D contains detailed class and sub-class listings of common legal and factual issues for the MRGO class and proposed sub-classes. A truncated "big picture" list includes the following questions, which would apply to the MRGO class members (that is to say, although the facts or legal determinations hold true for all they are common to all within the class or sub-classes).

1.  What legal duties did each Defendant owe to all class members?

2.  What causes of action might class members bring (or, more pointedly, might they all bring the causes of action stated in the governing complaints)?

3.  What immunities, if any, does each Defendant enjoy as a matter of law, and based upon what universal set of facts?

4.  What historical facts (from past acts to legislative mandates and the like) are materials to the case?

5.  Whose acts and omissions proximately caused the failures of the floodwalls of the IHNC (east) and along the MRGO?

6.  How might fault be allocated among the Defendants based upon the ultimate fact determinations concerning their conduct? What legal principles are implicated, such as solidary obligation, master and servant, shared immunity, etc.?

7.  Where and at what times did water begin to enter the relevant class areas? How many sources contributed within a given area? In short, where did the water come from; where did it go; how did it get where it went; how deep was it once there; and when?

8.  How might the answers to the above questions have differed had Defendants acted differently?

9.  What classwide damages were suffered?

Each of these questions encompasses constituent questions. Each such question would have to be answered in every case were each class member to bring an individual action. Yet the answer to each applies to all within a given class or sub-class. And those answers come at a heavy price, with hundreds of thousands of dollars having been spent to date by the parties

merely to answer the certification question, and hundreds of thousands more likely to be spent by the time trial is completed.  These considerations are explored further with respect to superiority, but they weigh heavily here as well because they underscore the importance of the 23(a)(2) commonality requirement, for virtually every legal and factual question is common save the question of individual damages.

### D. The Class Representatives' Claims Are Typical of Those of their Respective Class and Sub-Class Members as Contemplated by Rule 23(a)(3).

Rule 23(a)(3) demands that "the claims <u>or</u> defenses of the representative parties [be] typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3) (emphasis added).  As with commonality, the test for typicality "is not demanding." *Lightbourn*, 118 F.3d at 426.  The Court thus should examine the requirement in the "light most favorable to the plaintiffs." *Basco v. Wal-Mart Stores, Inc.*, 216 F. Supp. 2d 592, 600 (E.D. La. 2002).

Typicality "focuses on the similarity between the named plaintiffs' legal and remedial theories and the theories of those whom they purport to represent." *Id.*  Simply put, a plaintiff's claim is typical "if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory." *In re Ford Motor Co. Vehicle Paint Litig.*, 182 F.R.D. 214, 218 (E.D. La. 1998) (quoting 1 Newberg & Conte, *Newberg on Class Actions* § 3-13, at 3-76 (3d ed. 1992)).  That is self-evident here.

The Class Representatives' claims, relative to the class and proposed sub-classes, arise from a single set of operative facts—facts that yield a monolithic set of legal issues to be decided literally once and for all.  The Class Representatives and their respective class members seek the same legal relief based upon common legal theories because each suffered harm resulting from a

single course of misconduct by each Defendant.  Though Defendants will offer red herrings based upon the unique combination of forces that damaged each Class Representative's property—an issue Plaintiffs do not even seek to certify—they cannot in good faith argue that each Class Representative's claim arises from anything other than "the same event or practice or course of conduct that gives rise to the claims of other class members." *In re Ford Motor Co. Vehicle Paint Litig.*, 182 F.R.D. at 218.

### E.   The Class Representatives Will Fairly and Adequately Protect the Interests of their Respective Class and Sub-Class Members as Required by Rule 23(a)(4).

The Class Representatives must prove that they "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).  The adequacy requirement encompasses the Class Representatives, their counsel, and the relationship between the two. *Berger v. Compaq Computer Corp.*, 257 F.3d 475 (5th Cir. 2001).  A court must examine the "zeal and competence of the representatives' counsel and the willingness and ability of the representatives to take an active role in and control the litigation and to protect the interests of absentees." *Id.* at 479.[2]  The purpose behind the adequacy requirement is twofold—it helps to "uncover conflicts of interest" between the named plaintiffs and other potential class members and to ensure that the due process rights of all potential class members, especially absentee members, are protected. *Id.* at 479-80.

---

[2] Although the Class Representatives must demonstrate their adequacy as such, the Fifth Circuit approves taking judicial notice of the competence of class counsel. *Falcon v. Gen. Tel. Co.*, 626 F.2d 369 (5th Cir. 1980), *vacated on other grounds*, 450 U.S. 1036 (1981).  Four Defendants have conceded the competence of class counsel. (Ex E)., Composite of Def. Resp. to Req. for Admissions, Nos. 34 (MRGO) & 43 (Levee).)

-12-

The Class Representatives are able and willing to take an active role in the litigation to protect the class and proposed sub-class members.  There are no hidden conflicts of interest. Their counsel is as competent and experienced as any in handling class actions.

The United States Supreme Court acknowledges the adequacy requirement "'tends to merge with the commonality and typicality criteria of Rule 23(a), which 'serve as guideposts for determining whether . . . maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.'" *Amchem Prods. v. Windsor*, 521 U.S. 591, 626 n.20, 117 S. Ct. 2231, 2251 n.20 (1997) (quoting *Gen. Tel. Co. of S.W. v. Falcon*, 457 U.S. 147, 102 S. Ct. 2364 (1982)).  Defendants cannot dispute that the Class Representatives' claims are "interrelated" with those of the class members.  They are virtually identical. Adequacy is established.

### F.    The Proposed Classes and Sub-Classes Are Proper Under Rule 23(b)(3).

Rule 23(b)(3) requires that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). Unlike Rule 23(a)(2) commonality, here "common issues must constitute a significant part of the individual cases." *Jenkins v. Raymark Indus., Inc.*, 782 F.2d 468, 472 (5th Cir. 1986).  Although this commonality requirement is more demanding, the above discussion of that rule illustrates that common issues not only exist, they predominate.

The better part of any individual class member's trial would mirror a class trial on the merits.  Claims, affirmative defenses, motions to dismiss, summary judgment motions, trial briefs, trial evidence and argument—all would be virtually identical in every individual case and

in a class trial before this Court.  The sole difference in each individual case would be the contribution to total damages of water intrusion and the dollar value of those damages.

This case is like *Watson*, in which the Fifth Circuit affirmed a Rule 23(b)(3) certification. *Watson* involved an explosion caused by the failure of a pipe elbow, fabricated and installed by Brown & Root at Shell Oil's facility in Norco, Louisiana. 979 F.2d at 1016.  The class included more than 18,000 people asserting claims under different theories against Shell and Brown & Root.  In analyzing the predominance requirement, the Fifth Circuit recognized that Rule 23(b)(3) requires that "resolution of the common questions affect all or a substantial number of the class members." *Id.* at 1022 (internal quotations and emphasis omitted).  It observed further that "a class issue predominates if it constitutes a significant part of the individual cases." *Id.* Applying these standards, the court emphasized that "the claims of all plaintiffs require resolution of Shell's liability for punitive damages and of Brown & Root's liability for negligence, <u>both arising out of the same event</u>." *Id.* (emphasis added).  The court held that these common liability issues predominated and thus satisfied Rule 23(b)(3). *Id.* at 1022-23; s*ee also Mullen*, 186 F.3d at 626 (affirming a Rule 23(b)(3) certification where liability issues of negligence and seaworthiness were common to all class members).

Here the Defendants' respective liabilities arise from a single catastrophic event culminating from a single course of conduct.  Like the liabilities resulting from the Shell explosion, the liabilities resulting from the failure of the levees and floodwalls during Hurricane Katrina are common to all class and sub-class members.  Every one of the issues identified in Exhibits D will arise in individual cases.  Together they comprise the vast majority of all such issues.  Clearly, common issues predominate over individualized ones.

-14-

Even certain damages—specifically, diminution of real property values—are suited for class treatment. (See Exhibit F)  The Class Representatives propose using the well-established mass appraisal methodology for valuing class members' real property damages.  They plan to call Dr. John Kilpatrick to render expert testimony on the application of the mass appraisal valuation method in this case.  Dr. Kilpatrick's testimony will clearly establish that the question of damaged property values can best be analyzed on a class-wide basis using mass appraisal methodology, as recently was done by Dr. Kilpatrick himself in the *Murphy Oil* case.  Mass appraisal offers efficiencies that far outweigh, and thus are superior to, the chaos of individualized damage computations.

The mass appraisal valuation methodology measures property damages by coupling objective factors with common facts.  The result is a practical, economic approach to addressing property damage claims that arise from a single event and on an unprecedented level.  Real property losses must be computed in this action or in the thousands of alternate actions that failure to certify would engender.  The question now is whether to compute those damages on an individual or an aggregate basis.  Whether considered legally, statistically, or economically, the most efficient method is valuation by aggregate, mass appraisal

Dr. Kilpatrick is a renowned expert who has opined in similar cases on the appropriateness of mass appraisals when wide-spread property damage has occurred.  This Court already has recognized and validated Dr. Kilpatrick's role as an expert in the *Murphy Oil* litigation. *Turner v. Murphy Oil USA,* 2006 WL 91364 (E.D. La. Jan. 12, 2006).  Judge Fallon not only denied Defendant Murphy Oil's motion in limine to exclude Dr. Kilpatrick, but his opinion discussed Dr. Kilpatrick's qualifications, his methodology, and its sound application to valuing class

members' property damage claims. *See id.* at *4-5.  Judge Fallon acknowledged the availability

of objective criteria—public records—and the scientific validity of Dr. Kilpatrick's mass

appraisal methodology, including its acceptance in the community of his peers as a recognized

standard under Rule 6 of the Uniform Standards of Professional Appraisal Practice (USPAP).

*Id.*

The USPAP are "the governing rules of real estate appraisal in Louisiana." *Id.* at *5; *see

also Vela v. Plaquemines Parish Government,* 97-2608, 97-2609, 97-2610 (La. App. 4th Cir.

Mar. 10, 1999); 729 So. 2d 178, *writ denied*, 99-1417 (La. Sep. 3, 1999); 747 So. 2d 551

(recognizing reasonableness of utilizing mass appraisal methodology in a class action hurricane

levee protection appropriation suit).  Louisiana courts also have applied the mass appraisal

methodology in class actions to assess the value of class members' property damage claims.  For

instance, in *Guillory v. Union Pacific Corp.*, the Louisiana Third Circuit, Court of Appeal,

reversed a trial court's refusal to certify an action. *Guillory*, 2001-0960 (La. App. 3rd Cir. May

15, 2002); 817 So. 2d 1234, *writ denied*, 2002-2086 (La. Nov. 1, 2002); 828 So. 2d 575.  In

reviewing the trial court's refusal to certify, the Court of Appeal noted the expert testimony

relating to valuation of class members' property damage claims through a mass appraisal

technique.  The court acknowledged the expert testimony opining that use of a mass appraisal

technique "would be the simplest and most cost-efficient method" for computing damages. *Id.* at

1238.  Moreover, even though the court recognized individual proof might be required of class

members to ascertain their damages, the court still deemed the trial court's refusal to certify a

class, which purported to value damages on a mass appraisal basis, to be reversible error. *Id.* at

1238-39.

Statistically speaking, the greatest confidence level is obtained through an aggregate view of the property.  Consideration of damages on an aggregate scale permits a proper reliance on objective criteria together with the importation of common facts—especially facts relating to liability.  Similar approaches and mass appraisal techniques are regularly used by tax assessors and insurance companies for valuation of property; there is nothing novel or unique about the use of mass appraisal methodology in this action.  Utilization of objective criteria, such as location, neighborhood, etc., with common facts (e.g., cause of levee breaches), form a solid valuation methodology for evaluating class property damages.  This approach is also far superior to any individualized methodology from an economic standpoint.

While the defendants may argue for individual calculation of property damages, mass appraisal is the only sensible methodology for valuing damages in this context.  Individualized calculation of damages is economically unfeasible and unworkable.  As with so many other issues discussed here, economies of scale support the valuation of claims on a mass appraisal level.  Class members' rights will best be protected and advanced through an aggregate approach to valuation.  It would be completely unmanageable and inefficient to attempt to value property damages on over 100,000 damaged structures on a structure-by-structure basis.  Not only would such an approach (if even possible) be exhaustively time consuming; the cost of individual property valuation would be unfathomable.  Assuming a conservative per-property appraisal cost of $150.00 and assuming 100,000 properties, the cost would be $15,000,000.00.  These economics, like legal and statistical considerations, favor a class-based mass appraisal.

Even if this Court decides against the efficiencies of mass appraisal, the classes still should be certified and the predominating issues severed for trial, as Rule 23 contemplates.  The Fifth

Circuit endorses use of Rule 23(c)(4) to sever common issues for a class trial where "the cause of action, as a whole . . . satisf[ies] the predominance requirement of (b)(3) . . . ." as is the case here. *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 745 n.21 (5th Cir. 1996).  This Court need not "sever issues until the remaining common issue predominates over the remaining individual issues," *id.*, because the common legal and fact questions here overwhelm individual damage issues. *See also Bertulli*, 242 F.3d at 295; *Mullen* 186 F.3d at 624 (each certifying liability-focused classes).

### G. Maintenance of This Litigation as a Class Action Is Superior to Other Available Methods.

Rule 23(b)(3) requires that "a class action [be] superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3).  In making this determination the Court may consider (1) the interest of the class members in controlling the prosecution of separate actions, (2) the extent and nature of any litigation already commenced, (3) the desirability of concentrating the litigation in one forum, and (4) the potential difficulties in managing a class action. *Id.*

Of course all claims arising from the negligent design, construction, and maintenance of the MRGO already are consolidated for management before this Court.  A class action is the logical next step.  A class action would be no more difficult to manage than the massive consolidated litigation already on this Court's docket—it would be far simpler.

The four Rule 23(b)(3) discretionary factors do not counsel against certification.  No class member would have any discernable special interest in controlling this litigation.  In fact, this consideration ordinarily concerns litigants who have "special issues which require separate litigation," such as an issue of reliance in a case of misrepresentation. 7A Wright, Kane &

Miller, *Fed. Practice & Procedure* § 1780.  That is not so here.  The extent and nature of the litigation already commenced and the desirability of concentrating litigation in a single forum are manifest.

Equally plain is that class adjudication of common legal and fact questions would prove more efficient than piecemeal treatment of these recurring issues.  The fourth and final discretionary factor concerns the potential difficulties in managing a class action.  As discussed at length here, management difficulties abound regardless of whether a class is certified; but there is no question that adjudication of all common issues by way of a single proceeding is the most efficient route to final judgment.  It is difficult to imagine any aspect of this case that would become less manageable were a class certified.  On the other hand, it is easy to imagine either a lifetime of redundant, piecemeal litigation or the denial of access to courts for thousands, or both, should certification be denied.

For the same reasons the Fifth Circuit deemed class litigation superior in *Watson*, a class is superior here.  The *Watson* Court distinguished prior personal injury cases and focused on common liability issues, noting "the great import of the class issues to the claims of each plaintiff." *Watson*, 979 F.2d at 1023.  The court determined that, "[i]n light of the massive proportions of this litigation, and the need to reduce the systemic burden it will impose," class litigation was superior, and it affirmed a class exceeding 18,000 members. *Id.*

This case presents even more compelling reasons why class treatment is superior. *Watson* certified a class that shared the predominantly common issue of liability only (leaving separate determinations of causation and damages).   The class members here share

predominantly common issues of liability as well as what might be called general causation.[3]
The only remaining issue would be specific causation, i.e., the amount of damage the
Defendants' pre-determined liabilities caused to a particular property.

This is important. To appreciate the benefits of a class proceeding, consider what issues
would be resolved once and for all in a single proceeding versus the issues that would remain for
individual adjudication (issues, it should be pointed out, that would be adjudicated in any event).
A mere glance at the list of legal and factual questions common to all class members reveals the
choices here. The first choice is to certify a class and definitively answer all common questions
for all parties, leaving specific causation questions for individual determination. The second is
to entertain every common issue repeatedly in every full-blown individual action. The preferred
course is obvious.

The commonality of legal questions is clear: What causes of action lie against a given
Defendant? What duties did each Defendant owe? Does the Defendant enjoy immunity? Are
there solidary obligations? Because every class member suffered a similar loss due to a single
course of conduct, their actions will be identical and will raise identical legal issues.

Less obvious is the great extent to which this Court can use a single class proceeding to
establish every fact of common interest to each class member—the so-called "general causation"
questions, which range from the historical fact of what a Defendant did or did not do to the
results of their various activities, including all pertinent aspects of the flooding.

---

[3] Here we must distinguish between what have been termed general and specific causation. General
causation, which undoubtedly can be proven in this class action, would involve questions such as whether
the negligence of the Corps vis-a-vis the MRGO caused the presence of water at a given address and in
what proportion to other sources of water. Specific causation would go to the extent (dollar value) of
property damage the water caused at that location, a question at least partially susceptible to class
treatment by mass appraisal of the class members' real property (discussed *infra*), but which presents

The latter is possible due to the efforts of a team of engineers and mathematicians from Delft University in the Netherlands, headed by Professor Johannes Vrijling.  This team re-created by computer model the flooding of New Orleans, an effort that Defendants' own expert engineer Robert Dalrymple described in his report as "state-of-the-art and done well." (Ex. G, Delft Team Report, Attached as Ex. 14 to Vrijling Dep.)[4] The flood simulation assesses "the relative contribution of the main causes of flooding (breaches, overtopping, and rainfall) in the three polders utilizing water depth graphs for selected locations." (*Id.* at 1.)  This is accomplished by inputting data from terrain elevations to breach sizes to rainfall amounts and relying on the "state-of-the-art" program to illustrate the resulting flow of water over time and terrain.  The model is divided into 50x50 meter grids—a resolution deemed more than adequate for present purposes. (Ex. H, Vrijling Dep. Vol. 1 at 82:2–83:23.)  Professor Vrijling described the model's capabilities in his deposition:

Q.   Okay.  So it would be possible given any, given an x-y coordinate for you to model –

A.   To produce such graphs.

Q.   -- 50 by 50 meter valuation for any address in New Orleans.

A.   If you give us an x-y coordinate and you would like to have such a graph as depicted in 3.6 [at page 19 of the Delft Team Report] --

Q.   Yes.

A.   -- we could provide you with one.

(*Id.* at 85:12–85:21; *see also* continuing discussion at 86-87).

The reference to the graph in 3.6 is to a hydrograph—a "graphical depiction of the various flood water contributions to the maximum flood level" at the pinpointed location. (*Id.* at 61:4–

---

more challenges from a class perspective.

61:6.)  The "various flood water contributions" include overtopping, breach water, rain assuming

operable pumps, and rain assuming inoperable pumps. (Ex. F at 19, fig. 3.6.)  The model can

depict maximum flood depths due to any one of these causes and any combination of the causes,

including a combination of all, and including the relative timing of each.  It can do so for any

location within the class or any sub-class area. (Ex. G at 86-87.)

What does this mean?  It means that although no one could resolve on a classwide basis the

question of what damage water intrusion caused to a given structure, we can answer every

question up to that point for every class member.  Validation of the flood simulation model

generally would validate it for every class member, allowing determination for any given x-y

coordinate:  how much water was present at maximum depth; where that water came from; the

relative contribution of the various sources; and the timing of its arrival and departure.  Legal

liability will be established for each source of water by way of merits discovery and trial,

meaning that at the end of a merits trial any class member's address can be converted to an x-y

coordinate (latitude/longitude), which can then be used to generate a hydrograph for that location

reflecting all of the information described above as illustrated in the Delft Team Report.

Liability for each of the water sources will have been determined as a matter of law via the class

action.  Remaining issues would be limited to determining the contribution of water damage to

the class member's overall damage profile.[5]

The  model  affords  this  Court  an  opportunity  to  address  the  predominating  "general

---

[5] Plaintiffs anticipate a recitation of "individualized" issues such as whether wind or vandalism or what-have-you damaged a particular property.  The discussion is unnecessary.  If the mere existence of those issues—which all acknowledge exist—defeated class certification, then the Court ought to deny certification.  But that is not the law.  Rather, Defendants should explain how that set of acknowledged circumstances could possibly outweigh the overwhelming—that is, predominant—common fact issues relating to the flood and the predominate common legal issues those facts create.

causation" issues on a classwide basis.  Indeed, the very existence in this context of such an extraordinary tool highlights the superiority of class treatment.  In certifying a complex national class action, Judge Gold of the Southern District of Florida observed:

> In light of the overwhelming commonality and typicality of the issues and equitable concerns, the Court cannot "permit [Exxon] to contest the liability with each claimant in a single separate suit, [which] would, in many cases give [Exxon] an advantage which would be almost equivalent to closing the door of justice to all small claimants. This is what . . . the class suit practice was to prevent."

*Allapattah Servs v. Exxon Corp.*, 188 F.R.D. 667, 675 (S.D. Fla. 1999), *aff'd*, 333 F.3d  1248 (11th Cir. 2003).

Here, the average recovery a class member might seek through individual trial, even if significant in property damage terms, could never outweigh the cost of excavating the mountain of legal and factual information necessary to bring a claim of this magnitude—a mountain whose contours this Court knows well.  Put plainly, individual litigants could only dream of having Dutch experts create high-end computer models on such a scale.  Here of course, the computer model, despite its elegant functionality, merely symbolizes an entire order of costly litigation that would thwart any average individual litigant.  Without the res judicata benefit of the class findings that would be reached following a class trial here and now, few if any claimants would ever realize any recovery because the transaction costs would scare off both lawyers and litigants.  In short, the individual class members' claims are "negative value" suits that demand certification. *See, e.g.*, *Phillips Pet. Co. v. Shutts*, 472 U.S. 797, 809, 105 S. Ct. 2565, 2973

(1985) (noting the class procedure permits "claims which would be uneconomical to litigate individually [where] most of the plaintiffs would have no realistic day in court if a class action were not available"); *Castano*, 84 F.3d at 748 (describing "the existence of a negative value suit" as "[t]he most compelling rationale for finding superiority in a class action . . . ."). Should the Defendants deny these circumstances exist—that individual litigants would be unable and unwilling to pursue individual negative value suits—they cannot deny that proceeding on the common questions in a single action is superior to the chaos and unpredictability of countless individual proceedings.

## V.
## CONCLUSION

The vast majority of legal and factual issues that might arise in an individual's case present themselves here. Where did the water come from, where did it go, and why? Every individual class member will have to prove just that at trial? And once proven, fault will have to be allocated for the water intrusion, whatever its contribution to total damages. All of these questions and more could and should be decided in this class action. As this Court knows, this litigation has involved many talented and dedicated lawyers on both sides dealing creatively with esoteric as well as practical and logistical issues that involve questions of the highest legal and social importance. This does not happen every day and could not be replicated in any other setting. Certification of these classes means answering the many common questions presented here with timely, definitive rulings based upon a well-developed record. Failing to certify means, at best, repeating this scenario thousands of times over or, more likely, simply admitting that the forces now arrayed before this Court can never be reassembled.

The Defendants oppose class treatment for a simple reason: it presents the only possibility

-24-

that tens of thousands of unwitting citizens might hold them accountable for their misdeeds, or at least have that opportunity.  Whatever the outcome on the merits, there is no question that class treatment is the superior method, and probably the only hope, for reaching a full, fair, and final decision on a question of truly monumental importance.

Accordingly, for the foregoing reasons, and for those previously advanced, the Plaintiffs respectfully request this Honorable Court grant their Amended and Restated Motion for Class Certification.

Respectfully submitted,

**APPROVED PLAINTIFFS LIAISON COUNSEL**

/s/ Joseph M. Bruno
JOSEPH M. BRUNO (La. Bar # 3604)
PLAINTIFFS LIAISON COUNSEL
Law Offices of Joseph M. Bruno
855 Baronne Street
New Orleans, Louisiana 70113
Telephone: (504) 525-1335
Facsimile: (504) 561-6775
jbruno@jbrunolaw.com

MR-GO    PLAINTIFFS    SUB-GROUP    LITIGATION
COMMITTEE

s/ James Parkerson Roy
JAMES PARKERSON ROY
MR-GO PSLC Liaison Counsel
LA. Bar Roll Number: 11511
Domengeaux Wright Roy & Edwards LLC
P.O. Box 3668
Lafayette, LA. 70502
Telephone: (337) 593-4190 or (337) 233-3033
Facsimile: 337-233-2796
jimr@wrightroy.com

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that I have served a copy of this Brief upon all known counsel

for all parties via the Court's CM/ECF system, or by placing same in the United

States mail, properly addressed and with first class postage prepaid, or by facsimile,

e-mail, or other electronic transmission this 20th day of November, 2008.


<u>/s/   Joseph M. Bruno</u>
**JOSEPH M. BRUNO**

-26-