# Exhibit F
# Part 1

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

IN RE: KATRINA CANAL BREACHES
CONSOLIDATED LITIGATION

CIVIL ACTION

NO: 05-4182

SECTION "K" (2)

### PERTAINS TO: ALL LEVEE AND MR-GO CASES

---

### AFFIDAVIT OF JOHN A. KILPATRICK, PH.D., MRICS
### RE: HURRICANE KATRINA LITIGATION

**BEFORE ME,** the undersigned authority personally came and appeared:

### JOHN A. KILPATRICK, PH.D., MRICS

who after being duly sworn by me, did depose and say that:

1. I am Dr. John A. Kilpatrick. I hold a Ph.D. degree in Real Estate Finance, and am a state-certified (general) real estate appraiser in Louisiana and many other states. I am the President of Greenfield Advisors, formerly Mundy Associates, LLC, a real estate appraisal and consulting firm headquartered in Seattle, Washington. For more than two decades, our firm has been a leading authority on difficult real estate appraisal problems, specializing in particular in the valuation of contaminated sites. We are unusual, if not unique in the high level of educational and professional qualifications of our staff, including several PhDs, the rigor of our quantitative techniques and our published articles in both academic and professional journals on appraisal techniques.

2. I am the author or editor of four books on real estate, most recently Subdivision Development (1998), published by the Realtors Land Institute of the National Association of Realtors. I am presently a consultant on environmentally impaired property to many organizations. At the invitation of the Japan Real Estate Institute, I co-authored the authoritative guide on the appraisal of environmentally impaired properties for appraisers in that nation, published in the October, 2003, issue of the Journal of the Japan Real Estate Institute. I am a member of the Publications Review Board of the U.S. Appraisal Institute, which publishes The Appraisal of Real Estate, currently in its 12th edition, and which is universally regarded as the leading authoritative guide on the subject in the world today. In 2004, I am became one of a handful of appraisers in the

United States designated as a nationally certified appraisal standards instructor by the Appraisal Standards Board in Washington, D.C. Also, in 2004, I was honored by my peers in the industry by being nominated for a seat on the Appraisal Qualifications Board and by being named a Member of the Faculty of Valuation of the British Royal Institution of Chartered Surveyors. I have been professionally engaged in real estate finance, appraisal, development, and teaching for the past twenty-five years. I have been accepted as an expert witness in various state and federal courts throughout the U.S. on matters relating to real estate valuation, contaminated or otherwise impaired property values, construction defects, and statistical analysis. A more complete and current set of my Professional Qualifications is attached to this affidavit, along with a listing of my trial testimony for the past four years.

3. I am the lead author of "The Aftermath of Katrina: Recommendations for Real Estate Research", a peer-reviewed article written at the invitation of the Journal of Real Estate Literature (Kilpatrick and Dermisi, 2007) to provide authoritative guidance to academics and real estate practitioners conducting scholarly research into the real estate impacts in New Orleans following the 2005 Hurricane. The article recognizes that holistic, market-wide analytical methods are necessary to understand the economic and property value issues in the affected areas. A copy of that article is attached to this affidavit.

4. Since Hurricane Katrina, I have made extensive examinations of the New Orleans market. Our firm was engaged by attorneys representing property owners in the Murphy Oil Spill matter, and we are presently engaged in a number of projects in various parts of Louisiana. Since the conclusion of the Murphy Oil Spill matter, we have continued to gather data about the New Orleans market and I continue to conduct personal inspections of neighborhoods affected by the flooding.

5. I have been asked to opine on behalf of the plaintiffs in the above referenced case on the question of whether or not, from a real estate analysis and appraisal perspective, the matters at hand in this case can be best analyzed as a class action. While my main focus will be on the elements of appraisal methodology that argue for class treatment of valuation issues in cases of this nature, it may be useful to begin with a brief summary of general principles related to class certification and a non-technical summary of relevant appraisal issues in relation to those principles.

6. I understand that the Plaintiffs have filed two separate class actions. The first proposes two subclasses to the east of the Industrial Canal. The second proposes five subclasses to the west of the Industrial Canal. I believe that individuals who owned property within each of these subclasses sustained a damage to the value of their property. I further

believe that the amount of the damage can be determined on a "subclass by subclass" basis expressed as a percentage loss of pre-Katrina property value.

## Summary of Findings

7. With respect to cases involving damages to real estate property values, use and enjoyment, we can paraphrase the salient issues regarding class treatment as follows:

-   Is the number of affected properties large enough to result in efficiencies for the courts and the parties in treating the plaintiffs as a class, the so called numerosity criterion?

-   Do appraisal standards and best practices of the valuation profession indicate that the real estate value issues litigated are best analyzed on a class-wide basis or on an individual property basis, that is, for the issues litigated with respect to property values, do the common factors between properties affected outweigh the differing factors?

-   A related question is whether the class can be unambiguously defined, that is, can the class of properties damaged by the issues at hand in this case be distinguished from unaffected properties?

-   Can plaintiffs be found who are representative of the class and adequately represented so as to protect the interests of the class, should the issue be resolved through a class action?

-   Is there sufficient reason to believe, given previous experience, available data, salient literature, expert analysis, and preliminary examination of evidence in the case, that the common issues affecting property values constitute factors whose effects can be measured in such a way as to result in a reasonable and fair estimate of damages and just apportionment of damages among the members of the class? Does class treatment and use of mass appraisal methods allow for a scientifically valid assessment of damages consistent with the requirements of *Daubert*? Further, will technical aspects of valuation or appraisal methods make class treatment a better way to estimate and apportion damages in comparison to individual valuations of each property? Would individual valuations that did not treat the affected properties as a class be more likely to result in arbitrary variations in damage assessments? Therefore, in addition to increasing costs and adding delays through individual treatment of cases, would the likely result of

individual litigation of damages on a property by property basis be less consistent and less fair apportionment of damages?    Most of the following affidavit comprises a summary of real estate appraisal literature and methodology to establish the feasibility and superiority of class treatment of the valuation issues.

8. In my opinion, answers to all of the above questions strongly favor class certification in this case. In particular, estimates of damages would almost certainly be more fair and reflective of actual damages if the appraisal problem is approached through mass appraisal approaches rather than via individual valuations where damage estimates would be more capricious and difficult to assess in a fair and consistent manner. For a fair and consistent apportionment of damages, the same class wide valuation issues and comparisons would have to be revisited for each property. Every property's value must be related to the common factors, flooding and its effect on the class. To ensure a fair allocation of damages, individual treatment of each property would for each individual case require the same broader analysis of effects of common factors on the class of affected properties, requiring the appraiser(s) to revisit the same issues again and again with similar appraisal issues in each case.

9. The list of common factors in this case is among the most clear and compelling we have observed in our broad and long term experience with such cases. The list of common factors includes, but is not limited to:

   - Hurricane Katrina—this storm affected all of the properties in the proposed class, a common cause or initiating factor that undeniably had common effects on many properties.

   - Floodwaters—similar flooding occurred throughout the proposed class. Further, the extent of the flooding is easily ascertainable.

   - Economic effects—The regional economy and real estate markets in particular suffered common effects due to the storm and flooding. These effects impact on all properties in the proposed class.

   - Stigma and perception of risk—The real estate markets are affected by a common factor of increased perception of risks, including potential risk of future flooding that continues to depress prices[1].

   - Higher insurance premiums and other changes affecting property owners ability to purchase and finance homes—Properties throughout the class (and beyond)

---

[1] USA Today July 25, 2007 p. 1-2b "New Orleans home sellers high and dry"

> are affected by common factors such as higher insurance premiums. Since
> insurance coverage is required by lenders, these premiums affect purchasers
> ability to afford home purchases throughout the affected class.

This extensive, albeit incomplete, list of common factors affecting the entire class of
properties and in ways that lead to large effects on property values throughout the class
argue very strongly for class treatment. In our professional experience, we have seldom
if ever seen a stronger and clearer set of common factors affecting a class of real
properties. This matter, with the common factors of Hurricane Katrina and flooding of
entire low lying sectors of the city and surrounding areas, and the identifiable
responsibility for the flooding, strikes us as a strong candidate to become literally a
textbook example of common issues of fact cited by future authors in real estate
appraisal.

10. From an appraisal standpoint, the argument for class treatment exactly parallels the
    argument from a legal standpoint—a class treatment will save costs, expedite resolution
    and reduce demands on the court's time and resources. With respect to appraisals,
    there are not only great efficiencies in treating the plaintiffs as a class, but also
    advantages in terms of consistency, fairness and justice in allocation of the damage
    estimates among properties to be gained by examining the pattern of price effects
    across the class through mass appraisal methods.

11. **Numerosity.** Preliminary indications, and our own research into the post-Katrina market
    in New Orleans, demonstrate that tens of thousands of individual properties have been
    similarly affected by the flooding. There can be no reasonable doubt that so many
    properties are involved that individual treatment of these cases would be not only
    expensive and time consuming, but practically impossible. As with the common factors,
    the numerosity of the properties affected is at the upper end of our experience. Class
    treatment has frequently been chosen by the courts in cases with far fewer properties
    affected than in the present instance.

12. When we combine this evidence with the common-sense notion that wide-spread
    economic impacts are reflected in property values, it is reasonable to examine the merits
    of a case for property damages and the similarity of damages across properties. The
    common factor of flooding argues for class treatment. This view is reinforced by
    publications in the academic and professional literatures that have indeed documented
    this. Regrettably, these issues are not new. Widespread impacts to property values have
    been documented in similar disaster situations, both man-made and otherwise, in other
    parts of the U.S.

13. Moreover, analysis of real estate markets has found indirect, secondary, and even tertiary value damage to property due to stigma from nearby affected properties. In this case, therefore, it will be far more efficient for Plaintiffs, Defendants and the Courts to handle these cases as a class action. Where there are numerous cases with common issues, class actions benefit all parties and particularly the court system through the savings of time and cost of hearing a case once rather than repeating the same issues of law and fact thousands of times.

14. **Common factors.** This question goes to the heart of the class certification question from a real estate valuation perspective. Do the systematic impacts of the flooding predominate over the individual property aspects from a valuation perspective? The issue for us as appraisers, when the case comes to the merits phase, will be measuring the effects of flooding on property values. Undoubtedly, there are both similarities and differences in the affected properties, although all have the common factor of values that may be reduced because of flooding. It would be far more difficult to assess damages to property values if they were appraised individually on a property by property basis, rather than in the context of price variations across the affected area and in comparison to comparable unaffected properties nearby. Individual property valuations would be more subject to variations arising from both data and appraisal methods. Consistency of treatment across this large class of properties argues for valuing damages as a single mass appraisal exercise carefully designed to detect the value impact of the flooding and consequent damages.

15. The reduction in transactions in the market since Katrina makes it problematic to approach valuations strictly on a case by case basis. Individual property valuation methods typically rely on small samples of comparable sales (e.g. 3 in the case of the widely used Uniform Residential Appraisal Report, URAR, Fannie Mae Form 1004). Estimates from small samples are subject to random statistical variation. A mass appraisal method that looks at the broader geographical pattern and incorporates spatial analysis techniques will result in more stable, accurate, unbiased and scientifically-valid estimates of value impacts due to flooding. Moreover, these estimates will be more consistent and fair in revealing an overall pattern of price effects and apportioning damages among members of the class.

16. At issue is whether the common flooding factor can be evaluated in the context of other varying property features. A mass appraisal model can do that more validly than individual property appraisals, because more data on both the price effects of the common factor (flooding) and other common and varying property characteristics can be

incorporated into the estimates. In a single case, random variation can obscure or mask the effects of the factor being studied. Considering the cases as a class, the pattern of price effects will be more reliably revealed. Mass appraisal is better suited to sorting out the "signal" from the "noise" while accounting for the effects of other property characteristics. These methods will be further discussed in more detail below.

17. An additional "common factor" in this case would be "the local market" and in particular a degree of "stigma" in market perceptions of the affected properties. Buyers and sellers will have common perceptions, to a degree, of the flooding issue and its effects on property supply and demand in the area. Real estate markets are segmented, of course, by property types and by neighborhoods and properties are heterogeneous in many of their characteristics. However, it is likely that any buyer of property in the affected area would or should have some awareness of the issues of this case. The physical facts of flooding, one common factor, are mediated through common market perceptions into a change in demand and prices. The market perceptions and price effects are additional common factors consequent to the common factor of area wide flooding. "Stigma," that is, the effect on market values of perceptions of risk and damage, has been well documented as a common factor in the peer reviewed real estate literature. (Mundy, 1992, Kilpatrick & Kummerow, 2006)

18. **Unambiguous identification of the class.** Modeling experts engaged in this case are able to identify the properties affected by the flooding. Our research thus far indicates that the extent of the flooding has been well documented. Additionally, Greenfield has extensive experience and in-house technology to work with two- and three-dimensional spatial models. Indeed, mass appraisal models are uniquely suited to integrate geographic information systems (GIS) models into the valuation process. In short, the use of geographic modeling will allow for unambiguous identification of the affected properties when approached on a mass basis.

19. Generally accepted economic theory of consumer demand understands demand (and hence prices paid) for complex goods such as real estate, to be related to the characteristics of the good. (Lancaster, 1966, Rosen, 1974) Prices can therefore be represented and explained through "hedonic" models in the form: *Price = Sum of value of property characteristics.* Thus, for example, size of a house has an influence on price, larger houses tend to sell for higher prices. Hedonic models of house prices often include characteristics such as house size, age of the structure, location variables, house features such as garages, and so on, that consumers consider in their pricing decisions. Hundreds of academic and professional journal papers have been published

reporting statistically significant estimates of the price effects of a wide variety of hedonic characteristics. Not all property characteristics affect prices positively. Negative characteristics, such as age or physical deterioration, show negative price effects in hedonic model estimates and the size of these price effects can be estimated by statistical analysis of sales price/property characteristics data. These mass appraisal techniques can provide scientifically valid and unbiased estimates of the property value damages due to flooding by comparison of prices in flooded and non-flooded areas, while controlling for the effects on prices of other factors.

20. Unambiguous identification of the class of properties in a market affected by a particular phenomenon can be achieved by a) Identifying the geographical location of properties, b) Associating the extent of the event with these geographical locations, c) Estimating the hedonic price effects due to the varying degrees of flooding and proximity to flooded areas, and d) Incorporating economic variables into a class-wide equation. These effects can also be measured by the same methods in areas not affected by the flooding, and thus unaffected areas can be used as controls for model testing.

21. Hedonic variables in an appropriate pricing model essentially account for the price effects of other variables, allowing us to identify effects of the flooding and compute statistically valid estimates of the price impact of various degrees of flooding, proximity to flooded areas, and other economic variables (systematic decline in the market) based on market evidence or other empirically valid data. The class, defined as "properties within an affected area," can be unambiguously defined by the price/flooding relationship as revealed by empirical estimates of a pricing model. Identifying all such properties within such an area, of course, can be unambiguously done using well defined and accepted geographic information system (GIS) tools.

22. Additionally, the impact of the flooding has been felt throughout the market as a result of well-documented macroeconomic factors (e.g. – loss of base employment, loss of infrastructure, disruption of the supply/demand, etc.). Mass appraisal models are superior to individual appraisal models in this respect, and allow for the inclusion of such macroeconomic factors, particularly when those have changed over time or been disrupted by an exogenous event. Further, a mass appraisal model allows for consideration of the impact of these economic factors in a wide-spread area, even when properties may have suffered indirect, secondary, or tertiary effects from the flooding.

23. **Fair and consistent estimates of the allocation of damages among class members.** Our firm has a unique and longstanding record as analysts who model value effects of various complex situations on individual properties within classes of affected properties.

Our staff includes several PhD's with extensive price modeling experience and we have been pioneers in developing new methods for more fairly and accurately assessing damages to property values in such cases. We have in many cases produced results deemed by courts to be fair, equitable and the best that can reasonably be achieved to reflect a standard of justice between the parties within the limits of human knowledge and abilities. We aim to approach "best practice" or state of the art methods for estimating fair and reasonable damages and apportioning damages among affected parties. If better methods can be discovered or developed given the facts and data of this case, we will adopt them. Our methodology reflects continuous improvement as we adapt progress in appraisal methods from the academic and professional literatures and incorporate our own experience into improving data and pricing models.

## Literature review and comments

24. The extant peer-reviewed appraisal literature is almost unanimous on the issue that mass-appraisal techniques are preferable when similarly characterizable phenomenon impact a statistically large number of individual properties. The governing paradigm for real estate valuation in Louisiana and other states is the Uniform Standards of Professional Appraisal Practice (USPAP), which we have consistently cited in our work on cases such as this one. Kilpatrick, Throupe, Mundy, and Spiess (2005)[2] summarize these methodologies as they are used in the appraisal of affected property and as they are applicable under USPAP. Kilpatrick (2004, 2005)[3,4] specifically applies the use of these techniques in class-action matters.

25. As I will demonstrate in the remainder of this Affidavit, the class action model is not only the best way to manage the estimation of losses in this case, the overwhelming weight of prevailing valuation methodology and the Uniform Standards of Professional Appraisal Practice make it difficult, if not impossible, to consider this valuation problem *without* resorting, at least *de facto*, to a mass-appraisal model. As I will demonstrate in this model, the prevailing thought among academic researchers is that large-scale valuation issues can be best described using large-scale statistical models, and in fact, from a real estate analysis perspective, only those models meet the criteria outlined in *Daubert*[5].

[2] Kilpatrick, John A., Ron Throupe, Bill Mundy, and Will Spiess, "Valuation of Impaired Property", Chapter 6 in Simons, Robert, ed., When Bad Things Happen to Good Property (Washington, DC: Environmental Law Center, 2005 forthcoming)
[3] Kilpatrick, John A., "Real Estate Issues in Class Certification", Class Action Litigation Report, October 8, 2004
[4] Kilpatrick, John A., "Appraising Real Estate in Complex Environmental Class Actions: An Expert's View", Toxic Law Reporter, January 13, 2005.
[5] For an authoritative view of the real estate analysis perspective on appropriate methods under Daubert, see McLean, Dave, Bill Mundy, and John A. Kilpatrick, "Summation of Evidentiary Rules for Real Estate Experts Mandated by Daubert v. Merrell Dow Pharmaceuticals, Inc.", Real Estate Issues, Fall, 1999

The Uniform Standards of Professional Appraisal Practice have long recognized this, and the provisions therein are fully applicable to a class action model. Quoting from the USPAP Standard Rule 6-1 (a), "Comment: Mass appraisal provides for a systematic approach and uniform application of appraisal methods and techniques to obtain estimates of value that allow for statistical review and analysis of results."

26. As implied by the "systematic approach and uniform application of appraisal methods" USPAP standards comment quoted above, a key test of "common factors" from the appraiser's point of view is whether it is appropriate to use a common pricing model across a class of properties. This is the key to uniform assessment of price impacts in the affected areas. Price modeling begins by determining a market or submarket where the pricing factors would be uniform enough so that, to a reasonable degree of accuracy, buyers' thinking with respect to price is "captured" or well represented by the variables in the model. This requirement is certainly met in the case of residential properties within a contiguous or near contiguous area of a particular community. Literally hundreds of papers in the academic literature have represented prices in an area by a common model according to this logic consistent with class treatment. Again, this expresses the close relationship between existence of a class of properties and mass appraisal methods. We believe a common model, or small number of models reflecting sub-classes of properties, will suffice to determine flood damages, stigma, and other effects on property prices in this case and that this will be the best possible way to determine damages in a consistent fashion across the class and/or subclass.

27. Appraisal methods hinge on the appraisal principle of *substitution*, which holds that the value of an individual parcel of property is a function of the cost of finding another property with comparable utility, and on the basic economic theory that prices are revealed by arms length transactions in markets. Fundamentally, values of unsold properties are inferred from transactions involving similar assets where a realized price reveals how forces of supply and demand are crystallized in buyer behavior. Under this principle, idiosyncratic, individual characteristics of a given property have value *only to the extent those characteristics provide utility and relative to the values of other properties*. In short, even an individual property appraisal, most often performed for financing purposes, requires that the appraiser consider the values of neighboring and comparable properties and subordinate the individual property value to those values which are common and prevailing in the salient market.

28. Because variation is possible in prices, possible prices that might be realized for a particular property are best thought of as a random variable or probability distribution of

possible prices. This means that individual sales may vary from the most probable price. This in turn implies that it is best to examine a number of sales to determine average prices through the statistical law of large numbers in order to gain understanding of the possible price distribution. This fact argues for the superiority of methods that examine larger data sets within a defined class of properties to extract the most relevant pricing factors and sales evidence. (Kummerow, 2002)[6]

29. The "law of large numbers" is a basic statistical principle stating that variation in results decreases and hence accuracy of estimates improves as sample size increases. This occurs because with large samples, the effects of positive and negative random variations tend to cancel out resulting in an unbiased estimate. In the case of complex goods, such as houses or other real estate assets, economic theorists have shown that the prices buyers are willing to pay can be thought of as the sum of what they are willing to pay for particular property characteristics. (Lancaster, 1968, Rosen, 1974)[7][8]. These are called "hedonic characteristics" or variables, from a Greek word meaning "pertaining to pleasure or to hedonism" or "relating to like or dislike." A hedonic pricing model, representing the buyer's willingness to pay for a property, can be written as: $P_s = \Sigma b_x$, where $P_s$ is the price the buyer will pay, and the right hand side of the equation is the sum of the price per unit (a multiplier or coefficient, b, representing the price per unit of each characteristic) times a set of hedonic characteristics (x's). Econometricians use a statistical method called regression model estimation to find the best fitting coefficients (b's) to multiply by the amounts of each characteristic in order to derive a price estimate. The coefficients are estimated from the data by minimizing the total of squared errors in the prediction of price from the hedonic variables. It is important to point out that this is a relatively objective method involving mathematical algorithms. Thus, given the same data and model, every econometrician will estimate the same coefficients. In comparison to conventional appraisal methods based on ad hoc "judgment and experience" for estimating price impacts of property coefficients, this statistical estimation technique offers far more reliability and objectivity. This consistency is an extremely desirable property of a valuation method whose purpose is to assess damages fairly across a large sample of property values.

30. Note that while other hedonic characteristics (such as house size, number of rooms, etc.) may vary between houses, the flooding or water damages and stigma variables

---

[6] Kummerow, Max, "A Statistical Definition of Value", The Appraisal Journal, October, 2002, 407-416.
[7] Lancaster, K.J.A., "A New Approach to Consumer Theory", Journal of Political Economy 1966, 132-57.
[8] Rosen, S., "Hedonic Prices and Implicit Markets: Price Differentiation in Pure Competition", Journal of Political Economy, 1974, 34-35.

appear in all of the affected properties pricing equations. This is another way of restating the point that a class action approach is appropriate because of the common factors affecting all of the properties. Professor Kelly Pace of Louisiana State University, a specialist in spatial statistical methods, has noted the courts' acceptance of hedonic pricing models in complex litigation such as this[9].

31. The task in the present case is to evaluate the effect of common hedonic variables — the negative effects of flooding, stigma and other common economic effects — on the entire set of properties in the class. The price estimation mass appraisal model will include the common flooding variable in the case of all affected properties. Although comparison between affected and unaffected properties could be made on a case by case, single property basis, a superior methodology and logic for this valuation problem considers a set of properties where the effects of individual variation in transactions prices can be "averaged away" by "the law of large numbers." Then the effects of the common factors can be estimated more reliably by the mass appraisal, pricing model approach.

32. In the next section, I will present examples of Mass Appraisal Techniques, governed under USPAP Standard 6. However, it is important to note that the individual property appraisals performed under Standards 1 and 2 of USPAP require that the appraiser gather comparable data on surrounding properties. **Hence, if the appraiser was to perform individual appraisals on a large number of neighboring properties, each individual appraisal would be extraordinarily inefficient since the same data would be gathered and re-analyzed repeatedly under a set of rules which were never designed for this type of problem.**

---

[9] http://www.finance.lsu.edu/academics/finance/re/newpage11.htm , retrieved 7/20/06

## Authoritative Support for Mass Appraisal

33. Outside of the class action problem, appraisers are frequently called upon to value large numbers of properties where the common, systematic factor or factors exceed the individual or idiosyncratic element or elements. Two of the most common examples are *ad valorum* taxation and highway right-of-way condemnation. The latter is of particular interest to real estate appraisers when faced with the environmentally impaired property question, since some of the earliest writings about appraisal of such properties appeared in the eminent domain literature[10]. County tax assessors, treasurers, auditors, or other public officials filling similar roles throughout the United States are required to continuously maintain data bases of real estate values throughout their jurisdictions. As discussed in the foregoing section, individual affected property appraisals conducted under USPAP Standards 1 and 2, following the sales comparison approach typically performed for individual property mortgage financing, would be unnecessarily inefficient, time consuming, and duplicative. Fortunately, USPAP provides for Mass Appraisals under Standard 6. Given that every property in the United States is currently valued by a local tax assessor or other official, and given that most states have laws requiring reappraisal for assessment purposes on regular, periodic, often annual, basis, it goes almost without saying that the frequency and volume of Rule 6 mass appraisals in the United States are at least one or two orders of magnitude more common than are Rules 1 and 2 individual appraisals.

34. The mass appraisal rule allows the appraiser to develop an Automated Valuation Model which provides for the more important and significant common factors plus variation on a per-property basis for other hedonic factors. For example, all of the homes in a given neighborhood will have a fairly common valuation function – say, a base-line "dollars per square foot" value. Above and beyond this, there will be a small variation for homes certain amenities, such as larger-than-average lots, corner lots, larger garages, or other amenities. The appraiser uses statistically valid and unbiased data to determine the valuation model in a given neighborhood and then applies that model to all of the properties in question. Similar models are developed and used for non-residential properties, again with common factors predominating.

35. Note that it is not important for there to be a statistically significant number of properties or transactions of a given type within the class area itself, only that the valuation model

---

[10] For example, see Johnson, J.L., "Public Concerns and Issues: Siting Hazardous Waste Facilities," Right-of-Way, February, 1990, 8-14; and Pestinger, J., and R. Gambill, "Home Values Stabilized after Landfill Gas Scare," Right-of-Way, December, 1990, 4-6.

for that area can be developed using a significantly large sampling of comparable properties. Hence, unimpaired data developed outside the class area (e.g. – a control area with comparable characteristics) allows validation of a useful pricing model. Price modeling can occur even where the properties within the class area are not homogeneous. For ad valorum tax purposes the county tax assessor is almost always faced with the problem of heterogeneous property types. As long as each of the property types can be categorized and a valuation model developed and described, then Rule 6 is the preferred method for valuing a large number of properties together under USPAP.

36. Greenfield Advisors has examined available data on sales in the affected area and nearby. We recognize that there are problems associated with data in the New Orleans market due to damage from Hurricane Katrina. Much of the records base depended upon by appraisers was destroyed and has not yet been restored. However, this data problem is solvable in the context of a large-scale mass appraisal project, and our research in the recent Murphy Oil Spill litigation as well as our subsequent ongoing studies of the New Orleans market have demonstrated the feasibility of tackling a large-scale problem in this market with the tools and techniques of mass appraisal.

37. Colwell, Cannady and Wu (1983) showed that in the traditional sales comparison approach with only a few comparable sales analyzed, appraisers choices of weighting of certain comparables or adjustments is largely a subjective choice rather than an objective one[11]. Vandell (1991) pointed out that where appraisers use "ad hoc" techniques to estimate price differences due to hedonic variables, "bias can enter."[12] Traditional "one property at a time" appraisal methods based mainly on "judgment and experience" have difficulty rising to the standard of empirical verification demanded by Daubert.

38. Lipscomb and Gray's (1990) work illustrates the commonly recognized problem that Standard 1 appraisals and Standard 2 reports are heavily influenced by appraisers experience and subjective judgment, rather than empirical data, when developing adjustments in the sales comparison approach[13]. It is the sales comparison approach which is typically given the most reliance in individual residential property appraisals under USPAP Standard 1.

[11] Colwell, P. F., R.E. Cannaday, and C. Wu, "The Analytical Foundations of Adjustment-Grid Methods, Journal of the American Real Estate and Urban Economics Association, 1983, 11-29.
[12] Vandell, Kerry D., "Optimal Comparable Selection and Weighting", Journal of the American Real Estate and Urban Economics Association, 19(2), 1991, 213-231.
[13] Lipscomb, J.B, and J.B. Gray, "An Empirical Investigation of Four Market-Derived Adjustment Methods, Journal of Real Estate Research, 1990, 53-66. Lipscomb and Grey's findings are also discussed in Lentz, G.H. and K. Wang, "Residential Appraisal and the Lending Process: A Survey of Issues", Journal of Real Estate Research, 1998, 11-40.

39. Kershaw & Rossini (1999) assemble evidence reviewing the accuracy of conventional real estate appraisals[14]. In summary, conventional appraisal techniques result in rather large errors. Crosby and Murdoch data on commercial property appraisals revealed that about 1/3 of the appraisals (three different data sets were examined) were "off" by more than 10% in comparison to sale prices.

40. Consistent with USPAP Rule 6, academics find that multivariate statistical methods, such as the hedonic pricing model, overcome the shortcomings in "one at a time" appraisals. Hedonic models have been widely used in the valuation field for at least two decades. Bruce and Sundell (1977) show that such models were used as early as 1924 for appraising rural land and in 1935 for appraising forest land in New Hampshire[15]. Lentz and Wang (1998) stated that "Most appraisal textbooks advocate this method as an essential tool for mass appraisal.[16]" Advances made in since the 1990's improve these statistical properties. Today, a substantial and growing number of home loans are made with values derived from mass appraisal models[17]. Progress has been rapid in recent years in spatial modeling and this has further improved the accuracy of mass valuation methods.

41. The application of such models to the appraisal process in cases such this one has strong foundations in the peer-reviewed economics and real estate literature. The early development of theory and methods includes studies by Tiebout (1956)[18], Lancaster (1966)[19], Muth (1966)[20], Oates (1969)[21], and Rosen (1974)[22]. More advanced development work has been presented by Randolph (1988) who reviewed the statistical properties of residuals, Durbin (1988)[23] who examined spatial autocorrelation; Halvorsen and Palmquist (1981)[24], Durbin and Sung (1990)[25], and Burgess and Harmon (1991)[26]

[14] Kershaw, Paul, and Peter Rossini, "Using Neural Networks to Estimate Constant Quality House Price Indices", University of South Australia working paper, 1999

[15] Bruce, R.W., and P.J. Sundell, "Multiple Regression Analysis: History and Applications in the Appraisal Profession", Real Estate Appraisal and Analyst, 1977, 37-44.

[16] Lentz and Wang, op. cit.

[17] For example, reportedly over 50% of home loans made in Oregon in 2002 used an automated valuation model.

[18] Tiebout, C.M., "A Pure Theory of Local Expenditure", Journal of Political Economy, 1956, 416-24.

[19] Lancaster, op. cit.

[20] Muth, R.F., "Household Production and Consumer Demand Functions", Econometrica, 1966, 699-08.

[21] Oates, W.E., "The Effects of property Taxes and local Public Spending on Property Values: An Empirical Study of Tax Capitalization and the Tiebout Hypothesis," Journal of Political Economy, 1969, 957-71.

[22] Rosen, op. cit.

[23] Durbin, R.A., "Estimation of Regression Coefficients in the Presence of Spatially Autocorrelated Error Terms", Review of Economics and Statistics 1988, 466-474.

[24] Halverson, R., and R. Palmquist, "Choice of Functional Form for Hedonic Price Equations", Journal of Urban Economics, 1981, 37-49.

[25] Durbin , R.A., and C. Sung, "Specifications of Hedonic Regressions: Non-nested Tests on Measures of Neighborhood Quality", Journal of Urban Economics 1990, 97-110.

[26] Burgess, J.F., and O.R. Harmon, "Specification Tests in Hedonic Models", Journal of Real Estate Finance and Economics, 1991, 375-93.

discussing functional form of the valuation model; and Gau and Kohlhepp (1978)[27] who examined colinearity among the variables in the valuation model used in a mass appraisal.

42. Both Butler (1980)[28] and Bajic (1985)[29] discuss the market homogeneity issues. Mark (1983)[30] looks at the time-stability of the coefficients in a mass appraisal model. Parsons (1990)[31] and Smith and Huang (1994)[32] examine market conditions within a mass appraisal model. Atkinson and Crocker (1987)[33] investigate the optimum number of variables in a model.

43. Flower and Ragas (1994) examine property values in St. Bernard Parish, Louisiana, using mass-appraisal-type models to determine the stigma impact on residential property values of nearby oil refineries. Their models, which incorporate proximity to the refineries, explain between 69.3% and 77.6% of the variation in house prices in the affected neighborhood. Further, their models support a proximity-distance variable relating price effects to the distance from the sources of contamination.[34] We anticipate in this case developing a three dimensional spatial pricing model relating not only location to price effects but also elevation, that is the depth of water that occurred following the flooding. The fact that "water seeks its own level" has created a means of ascertaining water depths and hence a data relevant to ascertaining the common factor of water damage throughout the proposed class.

44. A rather important trend currently underway in real estate finance provides practical "real world" market evidence demonstrating the accuracy and cost effectiveness of mass appraisal methods. In the past decade or so, so called AVM (automated valuation methods) have made considerable inroads in the real estate finance markets as support in loan underwriting. Many major real estate lenders are using AVMs as support for their lending decisions, without any requirements for conventional appraisals in the case of refinancings and home equity lending transactions. Lenders may also classify loans and

[27] Gau, G.W., and D.B. Kohlhepp, "Multicollinearity and Reduced-Form Price Equations for Residential Markets: AN Evaluation of Alternative Estimation Methods", Journal of the American Real Estate and Urban Economics Association, 1978, 50-69.

[28] Butler, R.V., "Cross-Sectional Variation in the Hedonic Relationship for Urban Housing Markets, Journal of Regional Science, 1980, 439-54.

[29] Bajic, V., "Housing Market Segmentation and Demand for Housing Attributes: Some Empirical Findings", Journal of the American Real Estate and Urban Economics Association, 1985, 58-75.

[30] Mark, J.H., "An Empirical Examination of the Stability of Price Equations over Time", Journal of the American Real Estate and Urban Economics Association, 1983, 397-415.

[31] Parsons, G.R., "Hedonic Prices and Public goods: An Argument for Weighting Locational Attributes in Hedonic Regressions by Lot Size", Journal of Urban Economics, 1990, 308-21.

[32] Smith, V.K., and J. Huang, "Can Markets Value Air Quality? A Meta-Analysis of Hedonic Property Value Models," Journal of Political Economy, 1994, 209-227.

[33] Atkinson, S.E., and T.D. Crocker, "A Bayesan Approach to Assessing the robustness of Hedonic Property," Journal of Applied Econometrics, 1987, 27-45.

[34] Flower and Ragas, 1994, op, cit.

rely on AVM appraisals for low loan to value loans or simple tract homes where AVMs give satisfactory results. They may still delegate appraisals of unique properties whose features may not be well represented in AVM pricing models to conventional appraisals.

45. Moreover, AVMs have come to be routinely used by lenders in both the primary and secondary mortgage markets as a check method to detect fraud, incompetence or bias in conventional appraisals. As real estate databases and AVM techniques improve, it seems likely that mass appraisal methods will come to be standard operating procedure as support for most residential lending decisions. This major change in underwriting methods provides strong evidence that lenders believe AVM accuracy is sufficiently good so that they can improve their risk/return results by relying on mass appraisal methods as their primary means for documenting property values. Our firm is currently completing an evaluation study of an AVM product used by lenders as support for commercial property lending decisions. So even in the case of commercial properties, AVM methods are becoming more accepted and accurate.

46. As a result of these developments, on the order of more than a dozen AVM valuation products are now available for purchase from private firms by lenders. These important developments prove that those who rely on appraisals as part of their fiduciary responsibilities in real estate lending businesses have chosen in many cases to rely on AVMs in preference to conventional appraisals. This is market evidence of the growing competitiveness and accuracy of mass appraisal methods.

47. In short, both market decisions by real estate lenders and the academic, peer-reviewed provide support for a Standard 6 Mass Appraisal. These conclusions are well developed, empirically demonstrated and robust and supported by the trend of markets to choose mass appraisal methods over conventional methods. It is clear that this is the preferred model, when dealing with a class treatment of a large number of contiguous properties. It allows for efficient development of unimpaired values, it leverages off of existing public-sector developed and publicly available data, and it provides a more statistically well-defined set of methods, consistent with *Daubert*, for characterization of property values. The statistically based, objective methods move appraisal practice towards a more scientific approach based on objective inference from empirical data as *Daubert* requires.

48. In summary, large-scale mass appraisal techniques are well established in the valuation literature. These methods and techniques are incorporated in the Uniform Standards, specifically in Rule 6, and are employed regularly by practicing appraisers throughout the United States in a variety of day-to-day situations, such ad valorem taxation. It is

probably reasonable to say that more properties are appraised using mass appraisal techniques each year than by Rule 1 and Rule 2 techniques. With specific respect to the impacts of the damages, the use of Rule 1 and Rule 2 techniques has been called into question in the appraisal literature, and are not widely used in the peer-reviewed academic literature specifically because of these shortcomings.

49. Attachments:  Professional Qualifications, recent trial testimony, and <u>Journal of Real Estate Literature</u> article.

JOHN A. KILPATRICK, PH.D., MRICS

Sworn to and subscribed
Before me, this 30th day of July, 2007.

Lisa Mc Sherry, notary


(seal)

# The Aftermath of Katrina: Recommendations for Real Estate Research

John A. Kilpatrick* and Sofia Dermisi**

## Abstract

*This paper provides an overview of government and independent research conducted in the wake of Hurricane Katrina in an effort to highlight additional areas in need of study. In addition to the overview of natural disasters and their impact on the United States, the aftermath of the San Francisco earthquake and the actions taken by the government, the local and private sector is also highlighted as providing some lessons learned but maybe forgotten in the wake of Hurricane Katrina.*

The literature is replete with studies on the impacts of natural disasters on real estate markets. Baen and Dermisi (2006) reviewed many of these in their study of federal policies and programs. Montz and Tobin (1998) examine property market disequibrium following a flood event. Brookshire, Thayer, Tschirhart, and Schulze (1985) and Bernknopf, Brookshire, and Thayer (1990) examined the real estate market implications of natural disaster risks, and Murdoch, Singh, and Thayer (1993) discussed the real estate impacts of the actualization of such a risk following California's Loma Prieta Earthquake. Geotechnical risks also motivated Sanders (1996) and Kinnard and Dickey (1995).

In many perspectives, including economic, the Hurricane Katrina disaster in 2005 is thought to be the worst natural disaster to hit the United States in modern times. The Insurance Information Institute estimates the property coverage alone for Katrina topped $38.1 billion, although as of this writing that was not finalized. Current thinking puts the total damage estimate, insured and uninsured, at between $200 billion and $300 billion. To put this in perspective, the next most severe natural disaster, Hurricane Andrew, generated $15.5 billion in insurance claims in 1992. The combined 9/11 attacks totaled $18.8 billion in insurance claims in 2001 dollars and an estimated $67.3 billion in total costs.[1] The Great San Francisco Earthquake and Fire of 1906 caused an estimated $500 million in property damages at the time, of which $235 million was insured.

The purpose of this paper is twofold. First, the government's reevaluation strategies, the non-governmental agencies and researchers' suggestions for redevelopment of New Orleans, and the lessons learned from the San Francisco Earthquake and Fire are discussed. Second, and perhaps more importantly for the real estate research community, this paper hopes to offer suggestions for future research.

*Greenfield Advisors LLC, Seattle, WA 98109 or john@greenfieldadvisors.com.
**Roosevelt University, Chicago, IL 60605 or sdermisi@roosevelt.edu.

214    Journal of Real Estate Literature

## Hurricane Background and the Generation of Katrina

Hoyos, Agudelo, Webster, and Curry (2006) opined that global warming will lead to a significant increase in both the frequency and intensity of Category 4 and 5 hurricanes. If this is indeed true, and coupled with the estimate that roughly 60% of the population in the United States lives in coastal areas, then a significant revisit of public policies with respect to building, financing, and insuring properties in these areas may be in order. The areas for future research include, but are not limited to, policies for building on flood plain land, federal flood protection programs (levees, dams, and channelization), and public expenses for rebuilding in sensitive areas.

### *Hurricanes and the U.S. Mainland*

According to the National Oceanic and Atmospheric Administration (NOAA), hurricanes are rated on the Saffir-Simpson scale in Categories 1–5 (Exhibit 1). The official Atlantic hurricane season lasts from June 1 to November 30, with peak activity usually found between mid-August and mid-October. Typically, ten tropical storms develop annually in the Gulf of Mexico, the Caribbean, or the Atlantic, and six of these become hurricanes. The U.S. mainland is usually hit by about five hurricanes during a three-year span, of which two will be major hurricanes (Category 3, 4, or 5). Exhibit 2 identifies the worst hurricanes in U.S. history from 1900 through 2005 in terms of deaths and damages and how they measure in comparison to other natural disasters. From the seventeen worst natural disasters in the U.S., included in Exhibit 3, 82% are hurricanes. This indicates the need for additional research and examination of urbanization policies in high-risk areas. As Exhibit 3 suggests, there is significant fluctuation in the number of hurricanes on a decade basis but there is a clear and continuing increase in the damage sustained by the various areas impacted by a hurricane. Not all U.S. coastal states have suffered the direct impact of hurricanes. Florida, Texas, North Carolina, and Louisiana are the states most likely to be hit (Exhibit 4).[2]

### *The Hurricane Season of 2005 and Katrina Chronology*

On May 16, 2005, NOAA and the National Weather Service (NWS) released the 2005 Atlantic Hurricane Outlook.[3] NOAA estimated a 70% chance of an above-average

**Exhibit 1**
**Saffir-Simpson Hurricane Scale**

| Category | Wind Velocity (mph) |
|---|---|
| Tropical Storm | 39–73 |
| 1 | 74–85 |
| 2 | 96–110 |
| 3 | 111–130 |
| 4 | 131–155 |
| 5 | > 155 |

**Exhibit 2**
**U.S. Natural Disasters that Caused the Most Death and Damage to Property in Each Decade, 1900–2005, with 2004 Major Hurricanes Added Damage in Third Quarter 2005 Dollars**



The source is White House (2006).

**Exhibit 3**
**Number and Cost Distribution of Hurricanes: 1851–2004**



The source is NOAA.

216    Journal of Real Estate Literature

**Exhibit 4**
**Hurricane Direct Hits on the Mainland U.S. Coastline and for Individual States: 1851–2004**



The source is NOAA.

hurricane season and predicted twelve to fifteen tropical storms, with seven to nine becoming hurricanes, and three to five of those being major storms. June and July confirmed NOAA's prediction, with a record seven Atlantic tropical storms and two hurricanes. One of these, Dennis, prompted mandatory evacuations in the lower Florida Keys and major disaster declarations in Alabama, Florida, and Mississippi. Louisiana's Governor Blanco declared a State of Emergency, and although the brunt of the storm hit Cuba, the U.S. did sustain an estimated \$2 billion in damage.[4] On August 2, 2005, NOAA released the Updated 2005 Atlantic Hurricane Outlook that projected an additional eleven to fourteen tropical storms in the remainder of the season, with seven to nine of those potentially turning into hurricanes.[5]

Hurricane Katrina initiated in the Bahamas on August 23 and was initially named Tropical Depression Twelve in the first of sixty-one advisories to be issued over the next seven days by the National Hurricane Center (NHC). On August 24, the depression strengthened and was named Tropical Storm Katrina, the eleventh named storm of the season, and on August 25 it became a Category 1 hurricane. The NWS and the NHC forecasted that Katrina would make landfall in Florida and enter the Gulf of New Mexico and head toward the Alabama–Florida panhandle. On August 26, Katrina weakened to a Tropical Storm as it passed over Florida, but was shortly re-upgraded to a hurricane. That afternoon, the NHC upgraded the hurricane to a Category 2 and released a forecast track projecting an August 29 landfall east of New Orleans. This forecast projected that Katrina would be a Category 4 or 5 by the time it reached this second landfall. On August 27, Katrina strengthened to a Category 3 storm, and the NHC predicted it would become a Category 4 before landfall. Also, during the day, the storm nearly doubled in size. On August 28, Katrina strengthened from a Category 4 to a 5 over a six-hour period but on August 29, Katrina made landfall in Plaquemines Parish, Louisiana as a Category 3 hurricane (Exhibit 5).

**Exhibit 5**
**Hurricane Katrina Track**



The source is Bryan Woods, http://thestormtrack.com/archives/2005/12/hurricane_katri_1.html.

## Katrina Urban Environmental Impacts

### Katrina Events—Aftermath and Government Strategy Reevaluation

Hurricane Katrina generated a massive storm surge as it hit the coastline, estimated as high as twenty-seven feet in some places and reaching six to twelve miles inland. As far east as Mobile Bay, Alabama, the storm surge was over eleven feet.[6] The storm surge, rain, and wind overwhelmed the New Orleans pumping stations and caused multiple breaches within the 350-mile levee system. About 228,000 housing units were flooded (45% of the area total), including 120,000 owner-occupied units (39%), and 108,000 rental units (56%). Minorities made up 58% of the flooded neighborhoods in the metropolitan area, and 80% of the neighborhoods within New Orleans itself. Thirty-eight of the area's forty-nine "extreme poverty" neighborhoods were flooded (The Brookings Institution, 2005).

### Aftermath Strategy Re-evaluation

*Urban Land Institute Study.* Soon after Hurricane Katrina, the Urban Land Institute (ULI) assembled an advisory panel working with the New Orleans government leadership to develop an agenda for redevelopment. Their initial findings, published