UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:  KATRINA CANAL BREACHES CONSOLIDATED LITIGATION | CIVIL ACTION NUMBER:  05-4182 "K"(2) JUDGE DUVAL MAG. WILKINSON |
| PERTAINS TO:  *Robinson* (No. 06-2268) | |

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT
ON DISCRETIONARY FUNCTION EXCEPTION**

# TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................................................1

II.    LEGAL STANDARDS .........................................................................................2

      A.    Summary Judgment Is Proper Where The Record Demonstrates That The
             Government Violated Federal Law...................................................................2

      B.    The Government Has The Burden of Proof To Demonstrate That It Did Not
             Violate Federal Laws Prescribing Specific Actions With Respect to the MR-GO ............4

III.    THE ARMY CORPS VIOLATED THE FISH AND WILDLIFE COORDINATION
       ACT BY NOT CONSULTING WITH FEDERAL AND STATE
       ENVIRONMENTAL AGENCIES AND BY NOT REPORTING THEIR
       CONCERNS TO CONGRESS .................................................................................5

      A.    Federal Law Imposed Mandatory Consultation And Reporting Requirements On
             The Army Corps ...........................................................................................5

      B.    The Army Corps Failed To Consult With The FWS And Louisiana Department
             of Wildlife And To Report These Agencies' Concerns to Congress In The 1951
             MR-GO Report ..............................................................................................7

      C.    Under the FWCA, The Army Corps Had A Continuing, Ongoing Obligation To
             Coordinate and Consult with the FWS and Louisiana Department of Wildlife
             And Report These Agencies' Concerns To Congress...........................................9

      D.    The Army Corps Failed To Communicate To Congress the FWS and Louisiana
             Department of Wildlife's Concerns About The Deleterious   Effects of the MR-
             GO..............................................................................................................11

IV.    THE ARMY CORPS VIOLATED THE NATIONAL ENVIRONMENTAL POLICY
       ACT BY DREDGING FOR DECADES WITHOUT AN ADEQUATE
       ENVIRONMENTAL IMPACT STATEMENT .......................................................13

      A.    The Army Corps Dredged The MR-GO For Thirty Years Without Preparing An
             Environmental Impact Statement...................................................................13

      B.    An Environmental Impact Statement Is Required If A Project May Have A
             Significant Adverse Effect On The Environment.............................................16

      C.    An EIS Must Discuss Cumulative Impacts And Alternatives ...........................18

D.     An Agency's Decision Not To Prepare An EIS Is Justifiable Only If The
       Agency Can Establish No Reasonable Possibility Of Any Significant
       Environmental Impacts ................................................................................................... 19

E.     Dredging And Sediment Disposal Require Preparation Of An EIS ................................. 20

F.     The Army Corps' History Of Environmental Defiance...................................................... 22

V.     THE ARMY CORPS VIOLATED POLICIES MANDATING WETLANDS
       PROTECTION ......................................................................................................................... 24

VI.    CONCLUSION ......................................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*Adams v. United States*
　　2006 WL 3314571 (D. Idaho 2006)...................................................................... 4, 18

*Ashford v. United States*
　　511 F.3d 501 (5th Cir. 2007) .............................................................................. 4

*Atchison, T. & S.F. Ry. Co. v. Callaway*
　　382 F. Supp. 610 (D. D.C. 1974)........................................................................... 18

*Baltimore Gas & Elec. Co. v. Natural Resources Defense Council*
　　462 U.S. 87 (1983)................................................................................................ 16

*Berkovitz v. United States*
　　486 U.S. 531 (1988)............................................................................................. 3, 4

*Calvert Cliffs' Coordinating Comm. v. United States A.E.C.*
　　449 F.2d 1109 (D.C. Cir. 1971) ............................................................................ 20

*Citizens to Preserve Overton Park, Inc. v. Volpe*
　　335 F. Supp. 873 (W.D. Tenn. 1972)..................................................................... 20

*Collins v. United States*
　　783 F.2d 1225 (5th Cir. 1986) ............................................................................ 4

*Ely v. Velde*
　　451 F.2d 1130 (4th Cir. 1971) .............................................................................. 20

*Galapagos Corporacion Turistica, S.A. v. Panama Canal Com'n*
　　205 F. Supp. 2d 573 (E.D. La. 2002)..................................................................... 3

*Harlow v. Fitzgerald*
　　457 U.S. 800 (1982).............................................................................................. 3

*Holy Cross v. Unites States Army Corps of Engineers*
　　455 F. Supp.2d 532 (E.D. La. 2006) ..................................................................... 23

*Illinois Cent. R.R. Co. v. Mayeux*
　　301 F.3d 359 (5th Cir. 2002) ................................................................................ 3

*In re Katrina Canal Breaches Consol. Litig.*
　　2008 WL 1989672 (E.D. La. May 2, 2008) ........................................................... 2

*In Re Katrina Canal Breaches Consol. Litig.*
   471 F. Supp. 2d 684 (E.D. La. 2007)................................................................. 2

*Johnson v. United States*
   2000 WL 1528078 (E.D. La. 2000) .................................................................. 3

*Kleppe v. Sierra Club*
   427 U.S. 390 (1976)........................................................................................ 19

*Marlys Bear Medicine v. United States*
   241 F.3d 1208 (9th Cir. 2001) ......................................................................... 4

*Marsh v. Oregon Resources Council*
   490 U.S. 360 (1989)....................................................................................... 19

*Moor v. Marsh*
   710 F.Supp. 1488 (S. D. Miss. 1989)............................................................. 18

*Named Individual Members of the San Antonio Conservation Soc'y v. Texas Highway Dept.*
   446 F.2d 1013 (5th Cir. 1971) ....................................................................... 19

*Nat'l Wildlife Fed.  v. Andrus*
   440 F. Supp. 1245 (D. D.C. 1977).............................................................. 6, 12

*Norton v. Southern Utah Wilderness Alliance*
   542 U.S. 55 (2004)......................................................................................... 17

*O'Reilly v. U.S. Army Corps of Engineers*
   477 F.3d 225 (5th Cir. 2007) ......................................................................... 18

*Robertson v. Methow Valley Citizens Council*
   490 U.S. 332 (1989)................................................................................. 16, 17

*Sabine River Auth. v. United States Dep't of Interior*
   951 F.2d 669, 676 (5th Cir. 1992) .............................................................. 17, 23

*Save Our Ten Acres v. Kreger*
   472 F.2d 463 (5th Cir. 1973) ......................................................................... 19

*Save Our Wetlands v. Rush*
   Civil Nos. 75-3719 ......................................................................................... 22

*Sierra Club v. Alexander*
   484 F. Supp. 455 (N.D.N.Y. 1980)................................................................. 11

*Sierra Club v. Morton*
    510 F.2d 813 (5th Cir. 1975) ............................................................................ 18, 19

*Sierra Club v. Peterson*
    185 F.3d 349 (5th Cir. 1999) ............................................................................ 17

*Smith v. United States*
    375 F.2d 243 (5th Cir. 1967) ............................................................................ 5

*State of Louisiana v. Lee*
    758 F.2d 1081 (5th Cir. 1985) ............................................................. 17, 19, 20, 22

*Thomas v. Peterson*
    753 F.2d 754 (9th Cir. 1985) ............................................................................ 19

*Udall v. Federal Power Commission*
    387 U.S. 428 (1967) .......................................................................................... 10

*United States v. Gaubert*
    499 U.S. 315 (1991) .......................................................................................... 4

*United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*
    467 U.S. 797 (1984) .......................................................................................... 3

*Whisnant v. United States*
    400 F.3d 1177 (9th Cir. 2005) ........................................................................... 5

**Statutes**

28 U.S.C. § 2680(a) ................................................................................................ 1

33 CFR § 230.13 ..................................................................................................... 18

40 CFR § 1508.4 ..................................................................................................... 17

40 CFR § 1508.7 ..................................................................................................... 18

40 CFR. §1508.13 ................................................................................................... 17

40 CFR § 1508.14 ................................................................................................... 16

42 U.SC. § 4321 ..................................................................................................... 16

42 U.S.C. § 4332(C) ............................................................................................... 17, 19

Fed. R. Civ. P. 56 (c) .............................................................................................. 2

**Other Authorities**

S. Rep. No. 1981, 85th Cong., 2d Sess. 7 (1958) .......................................................................... 12

## I.        INTRODUCTION

> No more lawless or irresponsible Federal group than the Corps of Army
> Engineers has ever attempted to operate in the United States, either outside
> of or within the law.
>
>                    --Harold L. Ickes[1]

More than a half century after this trenchant assessment of the Army Corps' disregard for

the rule of law by the highly-respected Secretary of Interior for Presidents Roosevelt and

Truman, nothing has changed.  Indeed, as the evidence shows, the Army Corps for five decades

has continued to disobey clear legal mandates whose purpose is to protect people, property, and

the environment put at risk by its projects.  Nowhere is this indefensible conduct more evident

than the Army Corps' admitted violations of federal law relating to the Mississippi River-Gulf

Outlet ("MR-GO").

        In the face of compelling evidence that the MR-GO's destruction of wetlands and

channel widening was a substantial factor in the catastrophic flooding of New Orleans East, St.

Bernard Parish, and the Lower 9th Ward, the Government seeks  to avoid a trial on the merits by

asserting that *all* of its conduct for 50 years with regard to this navigation channel—from the

earliest planning, design, and construction to ongoing operation and maintenance—is immunized

by the discretionary function exception to the broad waiver of sovereign immunity in the Federal

Tort Claims Act ("Discretionary Function Exception" or "DFE").  *See* 28 U.S.C. § 2680(a).

Plaintiffs maintain that the Government's position is untenable for two reasons:

        (1) the Government cannot carry its burden to establish that the Army Corps had

discretion to ignore specific legal mandates prescribed in federal statutes, regulations, policy; and

---

[1] Foreword, Arthur Maas, *Muddy Waters: The Army Engineers and The Nation's Rivers* (Da
Capo Press, New York, 1951), p. xiv.

(2) the Government cannot carry its burden that those decisions were grounded in political, social, or economic policy because they were not discretionary policy choices made in the implementation of the original decision to build the MRGO but were ordinary non-policy decisions concerning technical, engineering and professional judgments about safety.

In this Motion for Partial Summary Judgment on the Discretionary Function Exception, Plaintiffs focus only on the first prong, demonstrating that the Army Corps violated (1) the Fish and Wildlife Coordination Act ("FWCA") by not consulting with federal and state wildlife and fisheries agencies and reporting to Congress their concerns about the MR-GO's negative ecological impact; (2) the National Environmental Policy Act ("NEPA") by not preparing an adequate Environmental Impact Statement for the MR-GO project and its over 30-year history of operations and maintenance activities; and (3) national and Army Corps policies by not protecting wetlands. Under controlling precedent, if any one of these mandatory legal requirements was violated, that is the end of the inquiry, and the Government is not entitled to avail itself of the Discretionary Function Exception. *See In Re Katrina Canal Breaches Consol. Litig.*, 471 F. Supp. 2d 684, 697, 699 (E.D. La. 2007).

## II.    LEGAL STANDARDS

### A.    Summary Judgment Is Proper Where The Record Demonstrates That The Government Violated Federal Law

The Court is well versed in the applicable legal standards for summary judgment in a Federal Tort Claims Act ("FTCA") case. *See In re Katrina Canal Breaches Consol. Litig., 2008 WL* 1989672, at *12 (E.D. La. May 2, 2008). The issue of the applicability of the first DFE prong is ripe for resolution now because there is no genuine issue as to any material fact, and Plaintiffs are entitled to judgment as a matter of law. Fed. R. Civ. P. 56 (c). This is particularly true where, as here, the Court as trier-of-fact is presented with a question of law involving an

2

immunity whose resolution depends on facts clearly established in the record, and no credibility issues are presented.  *E.g., Harlow v. Fitzgerald,* 457 U.S. 800, 817-18 (1982) (qualified immunity in civil rights action); *Illinois Cent. R.R. Co. v. Mayeux*, 301 F.3d 359, 362 n.1 (5th Cir. 2002) (District Court in a bench trial affirmed where court granted summary judgment "based on inferences drawn from incontrovertibly proven facts, so long as there is no issue of witness credibility.").

The issue of the Government's duties under federal law is amenable to determination on a motion for partial summary judgment, particularly where the dispositive facts are not in dispute. *See, e.g., United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797 (1984) (summary judgment was appropriate because FAA's inspection program for certificating aircraft for use in commercial litigation was discretionary.); *Johnson v. United States*, 2000 WL 1528078 at *2-4 (E.D. La. 2000) (Duval, J.) (granting Government's summary judgment, finding Coast Guard's decision to place navigation markers that assisted safe navigation was discretionary because it involved element of judgment or choice satisfying DFE's first prong); *Galapagos Corporacion Turistica, S.A. v. Panama Canal Com'n*, 205 F. Supp. 2d 573, 579-580 (E.D. La. 2002) (Barbier, J.) (denying summary judgment because firefighters' manual mandated certain conduct that was not followed and thus failed to satisfy *Berkovitz*'s first prong, and as a result, court did not analyze second prong).  Similarly, Plaintiffs here argue that it is indisputable the Army Corps failed to take actions—reporting to Congress, preparing environmental disclosure documents, and protecting wetlands—unambiguously required by federal law.

**B.   The Government Has The Burden of Proof To Demonstrate That It Did Not Violate Federal Laws Prescribing Specific Actions With Respect to the MR-GO**

Where a specific statute, regulation, or policy constrains an agency's decision-making ability, or mandates compliance with procedural requirements before making a decision, the DFE is not available if these rules are violated.  *See United States v. Gaubert,* 499 U.S. 315, 324 (1991) ("If the employee violates the mandatory regulation, there will be no shelter from liability because there is no room for choice and the action will be contrary to policy.")  *Berkovitz v. United States*, 486 U.S. 531, 536 (1988) ("The discretionary function will not apply where a federal statute, regulation, or policy specifically prescribes a course of action to follow."); *Ashford v. United States,* 511 F.3d 501, 505 (5th Cir. 2007) (summary judgment reversed on first prong because "a specific policy in place constrained the decision-making ability of the prison officials.")  There is never room for choice in compliance with statutes like FWCA and NEPA. *See Collins v. United States¸* 783 F.2d 1225, 1230 (5th Cir. 1986).  ("An official charged with enforcing [a regulation] had no room for policy judgment or decision" and "disobedience of official directions" is not immunized.)

The Government shoulders the burden to establish that it complied with the FWCA, NEPA, and national policy (and its own regulations) to maximize wetlands protection.  *See Ashford*, *supra,* 511 F.3d at 505 (". . . the Government needs to establish there was 'room for choice' in making the allegedly negligent decision. . . .  [T]he Government cannot show that step one of the test has been met as a matter of law."); *Marlys Bear Medicine v. United States*, 241 F.3d 1208, 1213 (9th Cir. 2001) ("The burden of proving the applicability of the discretionary function exception is on the United States.").  Imposing the burden of proof on the Government to establish full compliance with federal law is essential to the just determination of DFE applicability.  *See Adams v. United States*, 2006 WL 3314571 at *2 (D. Idaho 2006) (agency

cannot proceed until NEPA compliant and agency [not plaintiffs] has burden of proof to show

that NEPA analysis would not have made any difference).[2]  As demonstrated below, the

Government cannot satisfy its burden.

III.   **THE ARMY CORPS VIOLATED THE FISH AND WILDLIFE COORDINATION ACT BY NOT CONSULTING WITH FEDERAL AND STATE ENVIRONMENTAL AGENCIES AND BY NOT REPORTING THEIR CONCERNS TO CONGRESS**

   A.   **Federal Law Imposed Mandatory Consultation And Reporting Requirements On The Army Corps**

Congress first passed the FWCA on March 10, 1934.  Plaintiffs' Statement of

Uncontested Facts ("PUF") 1.  Alarmed by the escalating environmental damage to wildlife, fish,

and their habitat inflicted by federal construction projects, Congress substantially amended the

FWCA in 1946 in order to "promote effectual planning, development, maintenance, and

coordination of wildlife conservation and rehabilitation . . . " and to require "coordination"

between any federal agency proposing to "impound," "divert," or "control" a waterway, or body

of water and both the United States Department of Interior Fish and Wildlife Service ("FWS")

and the State agency with jurisdiction over wildlife resources.  PUF 2.  Congress expressed a

sense of urgency to protect the natural environment with a new law that "would place in effect *a*

*much-needed program and facilities for* the effectual planning, maintenance, and coordination of

*wildlife conservation*, management, and rehabilitation."  PUF 3.

Specifically, the 1946 version of the FWCA required that federal agencies "*first shall*

*consult* with the Fish and Wildlife Service and the head of the agency exercising administration

---

[2] In evaluating the Government's DFE claim, the Court should be guided by the fact that "the FTCA, as a remedial statute, should be construed liberally, and *its exceptions should be read narrowly.*"  *Whisnant v. United States*, 400 F.3d 1177, 1184 (9th Cir. 2005) (emphasis added). Otherwise, an expansive application of the DFE would destroy the FTCA's "corpuscular vitality."  *Smith v. United States*, 375 F.2d 243, 246 (5th Cir. 1967).

over the wildlife resources of the State wherein the [water] impoundment, diversion or other control facility is to be constructed with a view of preventing the loss of and damage to wildlife resources . . . ."  PUF 4 (emphasis added).  The statute also mandated that following such consultation and any "surveys and investigations" conducted by the federal and state agencies, their "reports . . . *shall be made* an integral part of any report submitted [to Congress] by an agency of the Federal government responsible for engineering surveys and construction of such projects."  PUF 5 (emphasis added).  Federal courts have insisted that "strict compliance with FWCA should be required."  *Nat'l Wildlife Fed. v. Andrus*, 440 F. Supp. 1245, 1255 (D. D.C. 1977) (finding construction of power plant on San Juan River violated FWCA because no report was ever submitted to Congress).

At the time of planning for the MR-GO, the Army Corps was "an agency of the Federal government responsible for engineering surveys and construction of such projects," and the MR-GO was a federal water development project subject to the FWCA's consultation and reporting requirements.  PUF 6.  The state counterpart to the FWS was the former Louisiana Department of Wild Life and Fisheries ("Louisiana Department of Wildlife").  PUF 7.  The MR-GO's planning process was not completed until the Army Corps submitted its recommendation to Congress in House Doc. No. 245 (September 25, 1951) ("1951 MR-GO Report").  PUF 8.

The FWCA's plain language mandated that the Army Corps consult and coordinate with the FWS and Louisiana Department of Wildlife with regard to the MR-GO's investigation, planning, and design.  PUF 9.  This mandatory consultation had to occur *before* the Army Corps submitted its recommendation to Congress.  PUF 9.  In addition, the FWCA unambiguously mandated that the Army Corps report to Congress the concerns of the FWS and Louisiana Department of Wildlife with regard to the MR-GO's investigation, planning and design. PUF 10.

These twin duties imposed on the Army Corps by the FWCA—consultation with environmental agencies and reporting to Congress—go to the very heart of the statute's purposes.  The FWCA's legislative history makes plain Congress's intent that the Army Corps must communicate with FWS and Louisiana Department of Wildlife during the MR-GO's initial planning *before construction commenced*.  PUF 11.

> As drafted, these two sections *require* coordination between constructing and operating agencies of both the Federal and State Governments *not alone after flood control, irrigation or impoundment projects have been started but also in conjunction with the initial planning for such projects.* This type of coordination is extremely important from the standpoint of economic planning and construction as well as from the standpoint of effectuating conservation of wildlife.

PUF 11 (emphasis added).

Congress clearly wanted the state and federal agencies with expertise to have a meaningful opportunity—before irretrievable environmental damage—to influence the plans for major federal projects that would have a harmful impact on fish and wildlife habitat.  PUF 11.

### B.   The Army Corps Failed To Consult With The FWS And Louisiana Department of Wildlife And To Report These Agencies' Concerns to Congress In The 1951 MR-GO Report

The undisputed evidence demonstrates that the Army Corps did not consult or coordinate with FWS or Louisiana Department of Wildlife before it submitted the 1951 MR-GO Report to Congress.  PUF 12.  The Government's own documents conclusively establish this fact. Secretary of the Department of Interior Fred A. Seaton detailed this clear statutory violation in a letter to Secretary of the Army Wilber M. Bruckner in 1957, protesting that "the project plans have not been investigated by the fish and wildlife conservation agencies as contemplated by the Wildlife Coordination Act of 1946 [60 Stat. 1080]."  PUF 12.  This violation was reconfirmed by a Department of the Interior official reviewing the record.  PUF 12.

The Government's citation to a 1943 public hearing about the MR-GO held in New Orleans—at which the FWS and Louisiana Governor Jones supposedly attended along with hundreds of others—is unresponsive.  PUF 13.  First, there is no evidence that any Department of Interior or FWS representative attended nor is there evidence that an FWS official is even included on the list of invitees.  PUF 14.  Second, even if someone from FWS did attend, there is no evidence of any oral exchange of views between the Army Corps and the FWS—much less the meaningful, memorialized "consultation" required by law.  PUF 15.  Third, in discovery responses, the Government did not cite any pre-1951 contacts with the state and federal agencies as an attempt to comply with the FWCA.  PUF 16-18.

Not only did the Army Corps fail to consult with FWS and the Louisiana Department of Wildlife, the Army Corps did not communicate these agencies' concerns about the MR-GO to Congress in its 1951 MR-GO Report.  PUF 12.  The report is devoid of any mention of either agency, much less their strong criticisms of the project.  PUF 12.  Indeed, in the section dealing with "Coordination with other agencies," they are not identified, and the only reference is to "the director of the Louisiana Department of Public Works" who is not by law "the head of the agency exercising administration over the wildlife resources of the State . . . ."  PUF 12.  In any event, there is no evidence—and there is nothing in the 1951 MR-GO Report—that the appropriate state official ever commented on the project's environmental impacts.  PUF 12, 16-18.

Not surprisingly, after submitting the 1951 MR-GO Report, the Army Corps did not forward to Congress the substantial information that the FWS and Louisiana Department of Wildlife had communicated to the agency about the destruction of the wetlands from saltwater intrusion.  PUF 19.  The record is replete with detailed scientific reports, studies,

correspondence, and other documents over two decades in which the FWS and the Louisiana

Department of Wildlife expressed their concerns about the MR-GO's inevitable devastation of

fish and wildlife and their habitat.  PUF 19, 20.  Indeed, both agencies pleaded with the Army

Corps to delay construction to allow studies about the MR-GO's impacts, mitigation measures,

and alternative routes.  PUF 20.  These requests were denied.  PUF 20.  And tragically, these

environmental agencies' predictions came true when the MR-GO destroyed tens of thousand of

acres of surge buffering wetlands—a substantial factor in the catastrophic flooding of Plaintiffs'

property.  PUF 21.

### C.    Under the FWCA, The Army Corps Had A Continuing, Ongoing Obligation To Coordinate and Consult with the FWS and Louisiana Department of Wildlife And Report These Agencies' Concerns To Congress

In 1958, while the MR-GO was still being designed and constructed, Congress amended

the FWCA.  PUF 22.  The 1958 amendments made even more explicit that federal construction

agencies like the Army Corps were required to formulate a plan to mitigate any adverse

environmental effects of any proposed water resource project like the MR-GO.[3]  Specifically, §

2(b) stated:

> The reporting officers in project reports of the Federal agencies *shall give full consideration to the report and recommendations of the Secretary of the Interior and to any report of the State agency on wildlife aspects of such projects*, and the project plan *shall include* such justifiable means and measures for wildlife purposes as the reporting agency finds should be adopted to obtain maximum overall project benefits.

PUF 23 (emphasis added).

Under the FWCA, the Army Corps, *after* submitting to Congress the 1951 MR-GO

Report, had a continuing mandate to consult and coordinate with FWS and Louisiana

---

[3] The Act retained the previous requirements of the 1946 version of the law requiring consultation and coordination with the FWS (§ 2 (a)), the incorporation of any FWS concerns into the planning and design of any proposed water resource project (§ 2 (b)), and inclusion of any FWS findings into any report to Congress (§ 2 (b)).  PUF 24.

Department of Wildlife with regard to the MR-GO's investigation, planning, design and construction *and* to report to Congress their concerns about the project.  PUF 25.  The legislative history confirms that the 1958 Amendments required the Army Corps "to consult with the Fish and Wildlife Service *before and during* the building of federal water development projects." PUF 26 (emphasis added).  This consultation and reporting obligation was not intended to be a perfunctory process, but rather an extended dialogue between agencies "such as the Corps of Engineers" and the FWS envisioning "considerable study . . . in some cases, with suggested changes in construction plans to the great advantage of our wildlife resource." PUF 27.

The 1958 Amendments also sought to "provide that wildlife conservation shall receive equal consideration with other features of the planning of federal water resource development programs *[with] the effect of putting fish and wildlife on the basis of equality with . . . navigation* . . . in our water resource programs, which is highly desirable and proper, and represents an objective long sought by conservationists of the nation."  PUF 28 (emphasis added). Thereafter, fish and wildlife issues were entitled to the same amount of serious consideration and deference as the project's objectives, design, and construction.  PUF 28.  Failure to accord this "highly desirable and proper" equality of treatment violates the FWCA.  *See Udall v. Federal Power Commission*, 387 U.S. 428, 443-44 (1967) ("'wildlife conservation shall receive equal consideration and be coordinated with other features of water-resource development programs...' Certainly the wildlife conservation aspect of the project must be explored and evaluated.") (internal citation omitted).

These mandatory consultation and reporting requirements under the FWCA were designed to serve the critical purpose of informing Congress—the ultimate decision maker—

about the environmental impacts of an Army Corps project.  PUF 29, 31.  As the Senate

Committee on Interstate and Foreign Commerce explained:

> Under the bill, suggestions regarding changes could be made previous to the commencement of construction.  Such plans, or recommendations [by FWS], whether accepted or rejected by the construction agency, *would be submitted to Congress at the time of authorization of the legislation for the project under consideration.*

PUF 29 (emphasis added).

### D.   The Army Corps Failed To Communicate To Congress the FWS and Louisiana Department of Wildlife's Concerns About The Deleterious Effects of the MR-GO

Any communication between the Army Corps and the state and federal environmental

agencies cannot satisfy the mandatory "consultation" requirement under the FWCA unless the

Army Corps gave those agencies' recommendations "serious consideration" and "great weight."

*Sierra Club v. Alexander*, 484 F. Supp. 455, 469-70 (N.D.N.Y. 1980).  Plaintiffs realize that for

purposes of partial summary judgment, the Court could find that there is a material issue of

disputed fact concerning whether the Army Corps "seriously considered" and gave "great

weight" to the concerns of the FWS and Louisiana Department of Wildlife.  For purpose of this

motion for partial summary judgment, Plaintiffs therefore contend that even assuming *arguendo*

that the Army Corps did consult properly with the FWS and the Louisiana Department of

Wildlife after the 1951 MR-GO Report, it nevertheless failed to report these agencies' concerns

to Congress as mandated under the FWCA.  PUF 19.

It is indisputable that Congress remained in the dark as the Army Corps was bombarded

with these agencies' communications in the 1950s and 1960s about the ecological disaster

caused by the MR-GO.  PUF 19.  Agency reporting of these environmental issues to Congress

lies at the core of the FWCA regulatory scheme.  PUF 3, 4, 11, 23, 27, 28.  While an obvious

purpose of the statute is to force agencies to consider the environmental consequences of their

projects, another primary objective is to inform Congress of those consequences *to enable Congress to consider conservation measures.*  PUF 29, 31.  The legislative history underscores this purpose:

> Unquestionably, the bill, if enacted, would result in the Congress having better information on the effects of water Projects on fish and wildlife resources while considering project-authorizing legislation.  *It will then, of course, be for the Congress to decide what conservation measures should be incorporated in any project.*

PUF 31 (emphasis added); *see also Nat'l Wildlife Fed. v. Andrus,* 440 F. Supp. 1245, 1255 (D. D.C. 1977) (emphasis added) (quoting same).

The Army Corps' failure to inform Congress about the MR-GO's lethal impact on the environment deprived Congress of "the opportunity clearly to approve or disapprove [the MR-GO] as currently planned" and thereby prevent or mitigate the devastation of the wetlands and resulting drowning of Greater New Orleans.  *Nat'l Wildlife Fed.*, 440 F. Supp. at 1255.  Like NEPA noncompliance discussed below, this FWCA violation of law—covering up the escalating environmental disaster (PUF 103-04)—had a direct causal connection to Plaintiffs' preventable losses.  Indeed, in 2007, Congress—after becoming more informed about the environmental and safety problems created by the MR-GO—voted to deauthorize (close) the MR-GO to deep-draft vessels.  PUF 52, 128.

In sum, the Army Corps violated the FWCA (1) by not consulting with the FWS and the Louisiana Department of Wildlife and reporting these agencies' concerns in its 1951 MR-GO Report to Congress and (2) by failing in its mandate during the design and construction of the MR-GO to engage in ongoing consultation with these same agencies and to report their concerns to Congress.  These clear violations of federal law—confirmed by the Department of Interior—negate any DFE immunity defense here.  PUF 12.

IV.    **THE ARMY CORPS VIOLATED THE NATIONAL ENVIRONMENTAL POLICY ACT BY DREDGING FOR DECADES WITHOUT AN ADEQUATE ENVIRONMENTAL IMPACT STATEMENT**

A.    **The Army Corps Dredged The MR-GO For Thirty Years Without Preparing An Environmental Impact Statement**

On January 31, 1975, the senior Army Corps officer in Mobile wrote to his counterpart in New Orleans.  It was five years after NEPA's enactment, and the Army Corps was legally obligated to prepare comprehensive environmental reviews of major activities like the continuous dredging component of the MR-GO's Operations and Maintenance ("O&M").  Colonel Drake Wilson advised Colonel E.R. Heiberg, III that "[t]he secret for planning a 3-week vacation is to *bypass NEPA and 404 contacts . . . ."*  PUF 115 (emphasis added).

Thirty years later on the eve of Hurricane Katrina, another Army Corps official, after reviewing the agency's MR-GO environmental disclosure history, concluded that the agency had heeded Colonel Wilson's advice.[4]  PUF 117.  While conducting 147 dredging missions and removing and disposing more cubic yards of spoil than originally excavated in constructing either the MR-GO or the Panama Canal, the Army Corps had "bypassed" NEPA by myopically segmenting its environmental review, issuing periodic Findings of No Significant Impact ("FONSI"), and not preparing a comprehensive evaluation of the significant and cumulative environmental impacts on the environment from O&M dredging and bank erosion that had occurred since its 1976 Environmental Impact Statement ("EIS").  PUF 32, 117, 118.

> [T]he dredged material disposal sites and methods that have been used along the inland reach since the mid-1980s *bear little resemblance to those described in the environmental impact statement (EIS) prepared in 1976 for the O&M of the MR-GO.*  All of the changes that have occurred in the dredging and disposal plan since preparation of the original EIS have been addressed in environmental assessments (EAs) and associated findings of no significant impact (FONSIs).  . . . *The cumulative impact of all the changes that have already occurred since*

---

[4] Not surprisingly, it was the same Colonel (later Brigadier General) Heiberg, New Orleans District Engineer, who approved the 1976 FEIS for the MR-GO dredging.  PUF 116.

> *preparation of the 1976 EIS alone constitutes a significant impact on the environment, compared to the O&M plan described in the EIS, although there has been no supplemental EIS (SEIS) prepared.  In summary, both the existing O&M of the channel and the proposed changes to the O&M of the channel require preparation of an SEIS.*

PUF 119 (emphasis added); *see also* PUF 120.

The record fully supports this candid self-assessment of the Army Corps' failure to comply with NEPA by continuing to dredge the MR-GO—and not prepare an SEIS—while the deterioration of the wetlands and channel banks continued unabated and the risk of catastrophic storm surge escalated.  As demonstrated in the Amicus Curiae Brief Concerning The National Environmental Policy Act ("NEPA Amicus Brief")[5]:

*The Final Environmental Impact Statement prepared in 1976 ("1976 FEIS") was legally inadequate for numerous reasons, including (1) its failure to discuss such significant adverse effects as wetlands destruction, channel erosion and widening, and increased risk of flooding during hurricanes; (2) its failure to include any mention of cumulative impacts, mitigation measures, and alternatives such as closure; (3) its omission of any discussion of the Army Corps's own "high priority" Wetlands Resources Policy and its relationship to the O&M dredging; and (4) its unresponsive, dismissive responses to sharply critical comments— submitted by the Environmental Protection Agency, Department of Commerce, Department of the Interior, and Louisiana Wildlife and Fisheries Commission—about the Army Corps' inadequate environmental analysis.  PUF 48, 54-82; *see also* NEPA Amicus Brief, pp. 7-12, 17-20, 22-24.

*The 26 EAs prepared by the Army Corps unreasonably found no significant impact on the environment and omitted any discussion of the relationship between the need for dredging

---

[5] In the interest of avoiding repetition, Plaintiffs adopt and incorporate by reference the NEPA Amicus Brief.

and the continuing loss of wetlands and unmitigated bank stabilization, cumulative impacts, mitigation measures, or alternatives such as closure.  PUF 49-50, 92-96; *see also* NEPA Amicus Brief, pp. 12-15.

　　　　*The Army Corps admitted in 1993 that a comprehensive EIS would alert Congress to the escalating, environmental problems caused by the MR-GO and might prompt Congressional consideration of closing the MR-GO—the very action taken by an informed Congress after Hurricane Katrina.  PUF 51, 103-04, 110, 128; *see also* NEPA Amicus Brief, pp. 13-14.

　　　　*The Army Corps never prepared an SEIS to discuss the mounting, cumulative environmental devastation wrought by the MR-GO over three decades, mitigation measures, and alternatives.  PUF 53, 93; *see also* NEPA Amicus Brief, pp. 14-16, 20-21.

　　　　While the Army Corps was deliberately "bypassing" NEPA and covering up its environmental nightmare from Congress, it was fully apprised of the MR-GO's significant adverse effects.  *See* NEPA Amicus Brief, pp. 5-6.  Among other things, the agency knew that the MR-GO had the potential to serve as a "hurricane highway" facilitating storm surge from the Gulf of Mexico and Lake Borgne into the heart of Greater New Orleans (PUF 34-41); featured a "funnel" between GIWW/Reach 1 and Reach 2 of the MR-GO which could enhance surge, waves, and currents during hurricanes and cause catastrophic flooding (PUF 42-44); was destroying tens of thousands of acres of storm surge buffering wetlands functioning as a natural barrier and sponge for storm surge (PUF 33, 45, 46, 85); and had widened three to four times its authorized 650 feet top width and increased the risk of flooding nearby communities (PUF 47, 84, 97-110).  In addition, the Army Corps knew of the dangers of its dredging operations and their adverse effect on the wetlands.  *See In re Dredging Limit. Actions Consol. Litig.*, Case No. 08-8676, Order Granting Motion to Dismiss (June 12, 2008), p. 8, note 8.

At the same time, the agency was aware of feasible bank protection measures (such as armoring with rocks) and marshland restoration practices (such as fresh water introduction and a saltwater intrusion barrier), but it never discussed them in any comprehensive environmental evaluation of significant adverse effects and potential solutions.  PUF 66, 101, 106.  Moreover, the agency had internally discussed the need to evaluate the alternative of completely closing the MR-GO in order to "reduce the possibility of catastrophic damage to urban areas by a hurricane surge coming up this waterway . . . ."  PUF 35; *see also* PUF 86.

None of these significant issues were ever adequately discussed by the Army Corps in any environmental document.  PUF 114, 121-27.  As demonstrated below, the Army Corps flagrantly violated—or, in its own words, "bypassed"—NEPA.

**B.    An Environmental Impact Statement Is Required If A Project May Have A Significant Adverse Effect On The Environment**

In enacting NEPA, Congress stressed that its purpose is "[t]o declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent damage to the environment and biosphere and stimulate the health and welfare of man . . . ."  42 U.S.C. §4321.[6]  NEPA mandates that federal agencies "carefully consider detailed information concerning significant environmental impacts," thereby "guarantee[ing] that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision."  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).  As the Fifth Circuit has explained:

> [NEPA] is a procedural statute that demands that the decision to go forward with a federal project which significantly affects the environment be an

---

[6] The "quality of the human environment" is defined broadly to include the natural and physical environment and the relationship of people to that environment.  40 CFR § 1508.14; *see also Baltimore Gas & Elec. Co. v. Natural Resources Defense Council*, 462 U.S. 87, 106-07 (1983).

> *environmentally conscious* one. . . . [The agency can only] make its decision to
> proceed with the action after taking a "hard look at environmental consequences."

*Sabine River Auth. v. United States Dep't of Interior*, 951 F.2d 669, 676 (5th Cir. 1992)

(emphasis added) quoting *Robertson*, 490 U.S. at 350.

To implement this mandate, NEPA requires a federal agency to prepare an environmental

impact statement ("EIS") as part of any "major Federal actions significantly affecting the quality

of the human environment." 42 U.S.C. §4332(C); *see also Norton v. Southern Utah Wilderness*

*Alliance*, 542 U.S. 55, 72 (2004). In lieu of an EIS, an agency may prepare what is called an

environmental assessment ("EA") containing a finding of no significant impact on the

environment ("FONSI"). As discussed below, EAs may not supplant an EIS when the evidence

demonstrates that "the Corps was unreasonable in concluding there was *no reasonable possibility*

that the proposed action would significantly degrade *any* environmental factor." *State of*

*Louisiana v. Lee*, 758 F.2d 1081, 1085 (5th Cir. 1985) (emphasis added); *see also* 40 CFR

§1508.13 ("'Finding of no significant impact' means a document by a Federal agency briefly

presenting the reasons why an action, not otherwise excluded (§1508.4), *will not* have a

significant effect on the human environment and for which an environmental impact statement

therefore will not be prepared.") (emphasis added).

A legally adequate EIS must address in detail, among other things, (1) the environmental

impacts of the proposed action (including any cumulative impacts), (2) any adverse

environmental impacts which cannot be avoided if the proposal is implemented, (3) feasible

mitigation measures, and (4) alternatives to the proposed action. 42 U.S.C. § 4332(C). The

agency's duty of full environmental disclosure is mandatory. *See Sierra Club v. Peterson*, 185

F.3d 349, 370 (5th Cir. 1999) (". . . NEPA imposes a duty on federal agencies to compile a

comprehensive analysis of the potential impacts of its proposed action . . . ."). And since NEPA

leaves no room for discretion, the Army Corps' decision to proceed with dredging, but without preparing an adequate EIS (or SEIS), is not entitled to DFE immunity. *Adams, supra* 2006 WL 3314571, (Bureau of Land Management's violation of NEPA defeated DFE).

    **C.**    **An EIS Must Discuss Cumulative Impacts And Alternatives**

    Consistent with NEPA's mandate that a detailed EIS serve "'as an environmental full disclosure law,'" (*Sierra Club v. Morton*, 510 F.2d 813, 820 (5th Cir. 1975)), an essential component of an adequate EIS is a comprehensive discussion of a project's cumulative impacts. This analysis must include "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions …" 40 CFR §1508.7 (Council on Environmental Quality Guidelines; *see also* 33 CFR §230.13 (Army Corps regulations). Various federal guidelines, regulations, and court decisions "all require that federal agencies consider the cumulative effect of similar actions in making determinations under section 102(2)(C)." *Sierra Club, supra,* 510 F.2d at 824-25.  Discussion of only isolated aspects of a particular project or only its immediate impacts renders a project "not authorized" under NEPA. *Atchison, T. & S.F. Ry. Co. v. Callaway*, 382 F. Supp. 610, 621-22 (D. D.C. 1974).  Indeed, the Army Corps has acknowledged that even where a single environmental impact in isolation may be minor, when it is considered in its historical context, its "cumulative effects 'may become major.'"  *O'Reilly v. U.S. Army Corps of Engineers*, 477 F.3d 225, 235 (5th Cir. 2007) (citation omitted) (dredging and filling of wetlands by a residential subdivision developer enjoined because of  the Army Corps' flawed cumulative impacts analysis); *see also State of Mississippi ex. rel. Moor v. Marsh*, 710 F.Supp. 1488, 1505 (S. D. Miss. 1989) (Army Corps' dredging and bank clearing operation on the Yalobusha River was enjoined because the

District Court found the agency's FONSI to be unreasonable and the EA inadequately discussed cumulative impacts "from dredging of this scale.")

Similarly, segmentation of a project into less significant portions does not allow an agency to avoid preparing an EIS. *Named Individual Members of the San Antonio Conservation Soc'y v. Texas Highway Dept.*, 446 F.2d 1013, 1022-23 (5th Cir. 1971). Thus, an agency cannot dissect the project into "multiple 'actions', each of which individually has an insignificant environmental impact, but which collectively have a substantial impact." *Thomas v. Peterson*, 753 F.2d 754, 758 (9th Cir. 1985); *see also Kleppe v. Sierra Club*, 427 U.S. 390, 409-10 (1976); NEPA Amicus Brief at pp.18-20.  As the 2005 Army Corps internal analysis concedes, this is precisely what the Army Corps did with its EAs for dredging for over 30 years.[7]  PUF 119.

**D.     An Agency's Decision Not To Prepare An EIS Is Justifiable Only If The Agency Can Establish No Reasonable Possibility Of Any Significant Environmental Impacts**

In cases where, as here, the agency finds that the project will not significantly affect the quality of the human environment and fails to prepare an EIS, a reviewing court must determine if the decision was "arbitrary and capricious." *Marsh v. Oregon Resources Council*, 490 U.S. 360, 378 (1989).[8]  "'The standard of judicial review is whether the agency decision not to develop an impact statement is reasonable [*i.e.,* arbitrary and capricious] and made objectively and made in good faith on a reviewable environmental record.'"  *State of Louisiana v. Lee*, 758

---

[7] NEPA also mandates that an EIS discuss alternatives to the proposed action.  42 U.S.C. §4332(C)(iii); *see also Sierra Club*, *supra*, 510 F.2d at 825. The analysis must include a discussion of "the alternative of no action."  42 CFR §1502.14(d)

[8] Several appellate decisions before *Marsh* had applied the "reasonableness" standard.  *See, e.g., Save Our Ten Acres v. Kreger,* 472 F.2d 463, 467 (5th Cir. 1973).  In *Marsh*, however, the Supreme Court adopted the "arbitrary and capricious" review standard, while noting that "the difference between the 'arbitrary and capricious' and 'reasonableness' standards is not of great practical consequence."   490 U.S. at 377, n.23.  Whatever formulation is applied here, the Corps admittedly violated NEPA.

F.2d 1081, 1083-84 (5th Cir. 1985) (citations omitted).[9]  NEPA must be followed "to the fullest extent possible;" the procedural requirements of NEPA are *not* "discretionary"—rather, NEPA is "*an injunction* to all federal agencies *to exert utmost efforts to apply NEPA* to their own operations."  *Ely v. Velde*, 451 F.2d 1130, 1138 (4th Cir. 1971) (emphasis added); *Calvert Cliffs' Coordinating Comm. v. United States A.E.C.*, 449 F.2d 1109, 1113 (D.C. Cir. 1971).[10]

On this record, the Army Corps cannot satisfy its burden that it was not arbitrary and capricious (unreasonable) when it concluded that the massive dredging and disposal of over 492,000,000 cubic yards of spoil—and the more than three times widening of the channel and the destruction of tens of thousands acres of wetlands—had *no* significant adverse effects on environmental quality.  PUF 118.

**E.    Dredging And Sediment Disposal Require Preparation Of An EIS**

In a holding dispositive here, the Fifth Circuit invalidated the Army Corps' decision not to prepare an EIS—and to compile only EAs—before renewing six permits for continuation of long-time shell dredging in Louisiana waters.  *See State of Louisiana v. Lee*,  *supra*.  The court first noted that "[a]ll parties agree that unrestricted dredging would have a significant environmental effect."  758 F.2d at 1083; *see also id.* at 1085 (discussing environmental effects of the dredging, including a vast affected area of "ecologically fragile water and wetland,"  "[b]y

---

[9] Where there is an inadequate administrative record, supplemental affidavits, depositions, and other proof concerning the environmental impact of the project may be considered by this Court in determining the lawfulness of the agency's determination to dispense with an EIS.  *See, e.g., Citizens to Preserve Overton Park, Inc. v. Volpe*, 335 F. Supp. 873, 876-77 (W.D. Tenn. 1972)(on remand).

[10] By placing the burden of justification on the agency, "[t]his ensures that the environmental effects of a proposal are considered `to the fullest extent possible.' . . . An environmental impact statement . . . *ensures that the decisionmaker gives serious weight to environmental factors in making discretionary choices.*"  *State of Louisiana v. Lee, supra*, 758 F.2d at 1084 (internal citations omitted; emphasis added).

its very nature dredging is environmentally disruptive," and use of "cutter-head" dredge with "hydraulic suction").[11]

The Fifth Circuit then stressed the presumptive inadequacy of truncated environmental assessments because it "places a given decision beyond the purview of NEPA" and "the agency's decision that an impact statement is not required pretermits the fact-gathering process designed by Congress . . . ." *Id.* at 1084, 1085.  "Any decision based on an environmental assessment alone is necessarily more speculative than one made after the preparation and full consideration required by an impact statement."  *Id.* at 1084.

The Fifth Circuit also addressed defendants' argument that no EIS was required because there had already been decades of dredging, any environmental damage had been completed in the 1950s, "and so the effects of further dredging cannot be considered significant."  *Id.* at 1085-86.  In language directly applicable to our case, the court flatly rejected any "no harm, no foul" rule for preparing an EIS where there have already been years of environmental degradation caused by the very challenged activity.

> The renewal of these permits will not maintain a status quo, but rather *will continue a course of environmental disruption begun years ago.*  The fact that much damage to the benthic life occurred years ago does not automatically render the effect of the continued dredging insignificant.  Such a conclusion would ignore *the realities that even a badly damaged body of water may restore itself to ecological health if disruptive activity is halted and that continued dredging may expand the areas of damage.*  In deciding this case on remand, the trial court should compare the projected ecological status of the affected areas if the dredging is continued for another five years with the projected condition if the dredging is halted now.

*Id.* at 1086 (emphasis added).

---

[11] As early as 1976, the Army Corps acknowledged that MR-GO dredging and sediment disposal in wetlands by their very nature cause a significant adverse environmental impact.  *See* 1976 FEIS (Exh. 68), pp. IV-1 to IV-12].

Like the illegal dredging in *State of Louisiana v. Lee*, the Army Corps' issuance of 26 FONSIs for continued MR-GO dredging—over more than three decades—was unlawful because it ignored the vast information that it possessed about continuing loss of the wetlands, channel widening, and the risk of hurricane flooding.  PUF 33-47, 84-85, 97-110.  A comprehensive EIS was required so that the public and Congress could be fully informed about these deleterious effects, potential mitigation measures to slow down the loss of (and restore) wetlands, and possible alternatives, including closure of the MR-GO.  PUF 52, 128.  Instead, the Army Engineers—as its own internal  memorandum finally admitted in 2005—proceeded in violation of NEPA, paving the way for the catastrophic flooding of Greater New Orleans.  PUF 32, 117-20.

### F.    The Army Corps' History Of Environmental Defiance

The Army Corps' environmental record here is not an aberration.  For decades, the Army Corps has systematically "bypassed" federal environmental laws.  A survey has revealed at least 54 *reported* federal court decisions finding that the Army Corps violated NEPA, the Clean Water Act ("CWA"), or both in approving projects.  *See* Matrix of Reported Decisions Finding Army Corps Violations of Federal Environmental Laws attached as Appendix "A".

The Army Corps' abysmal NEPA compliance track record is illustrated by the decisions of two local federal judges—30 years apart—finding that the New Orleans District failed to comply with NEPA with respect to the LPV and MR-GO IHNC Lock Replacement Project.  In 1977, Judge Schwartz enjoined the Barrier Plan, ruling that the EIS was "legally deficient."  In *Save Our Wetlands v. Rush*, Civil Nos. 75-3719, 77-976 (December 30, 1977),  the court found that the FEIS was seriously flawed because it inadequately addressed possible adverse effects,

failed to reflect required close consultation with FWS, overstated the project's benefits versus costs, and failed to discuss possible alternatives.  PUF 148.

More recently, Judge Fallon enjoined the IHNC Lock modernization plan, concluding that the EIS was defective and must be supplemented in light of "significant new circumstances relevant to environmental concerns that have arisen since Hurricane Katrina."  *Holy Cross v. Unites States Army Corps of Engineers,* 455 F. Supp.2d 532, 540, n.4 (E.D. La. 2006).  Judge Fallon's reasoning applies with equal force to the admitted deficiencies with the Army Corps' EAs—and its unlawful decision not to prepare a comprehensive EIS or SEIS—for the MR-GO:

> [T]he effects of Hurricane Katrina have exposed the inadequacy of the Corps' planning and analysis. . . . [P]ost-Katrina developments expose the insufficiency of the present EIS.  *To ignore these facts is to ignore reality.  For the law to have any credibility or respect, it must be grounded in reality.* . . . [T]he EIS does not adequately address the risks of flooding and hurricanes in general. . . . Apparently, even the Corps is now questioning the conclusions it reached in its 1997 EIS. . . . The Court finds that the Corps failed to take a "hard look" at the environmental impacts and consequences of dredging and disposing of the canal's contaminated sediment and should revisit the Project in light of recent catastrophic events.

455 F.Supp. 2d at 539-40 (internal citations omitted; emphasis added).

At least the same can be said about the Army Corps' putative environmental evaluations of its continuous dredging of the MR-GO for more than three decades.  Indeed, the Army Corps failed to take any look, let alone the "hard look" mandated by NEPA, "at the environmental consequences of dredging and disposing of the canal's . . . sediment . . . ."  As the Army Corps' own Katrina eve memorandum frankly admits, the agency ignored the "reality" of cumulative impacts of dredging and channel bank erosion by illegally segmenting its environmental assessments.  PUF 117-20.  The record here leads to the inescapable conclusion that the MR-GO is the antithesis of an "environmentally conscious" project.  *Sabine River Auth. v. United States Dep't of Interior*, *supra,* 951 F.2d at 676.  Accordingly, these clear, continuing, and multiple violations of NEPA negate any DFE defense here.

23

V.     **THE ARMY CORPS VIOLATED POLICIES MANDATING WETLANDS PROTECTION**

During the three decades of unlawful dredging of the MR-GO, the Nation had a clear policy to maximize protection of vulnerable wetlands from further degradation.  This mandatory policy of preventing wetlands loss found expression in statutes, regulations, and policy statements issued by the President and federal agencies.  PUF 129.  One of the primary purposes of this major federal initiative was preserving wetlands for flood control protection benefits.  PUF 130.  Congress recognized that "wetlands provide a natural means of flood and erosion control by retaining water during periods of high runoff, thereby protecting against loss of life and property."  PUF 131-33.[12]

In 1977, President Jimmy Carter issued Executive Order No. 11990—"Protection of Wetlands."  PUF 137.  This landmark policy declaration ordered every federal agency "to minimize the destruction, loss or degradation of wetlands and to preserve and enhance the natural and beneficial values of wetlands in carrying out the agency's responsibilities for acquiring, managing, and disposing of Federal lands and facilities."[13]  PUF 137-38; *see also* PUF 133.  Thus, the Army Corps was directed that it "*shall consider* factors relevant to a proposal's effect on the survival and quality of the wetlands . . . such as flood and storm hazards."  PUF 141 (emphasis added).

--------

[12] There is no doubt that there has been a long-time federal policy to maximize protection of wetlands from further destruction.  In 2006, President George W. Bush announced "a *new national policy on wetlands to achieve an overall increase of U.S. wetlands* each year . . . ."  PUF 134 (emphasis added).  This new federal policy was expressly distinguished from "*[t]he old policy of wetlands . . . to limit the loss of wetlands*. . . . Instead of just limiting our losses, we will expand the wetlands of America." PUF 135 (emphasis added).  President Bush stressed that wetlands "provide a protective buffer for our towns and cities against floods and storm surges . . . ."  PUF 136.

[13] The directive applied to every agency like the Army Corps "conducting Federal activities and programs affecting land use, including but not limited to water and related land resources planning, regulating, and licensing activities," and it expressly covered dredging.  PUF 139-40.

Consistent with this federal policy to maximize wetlands preservation (and minimize their loss), the Army Corps issued a policy statement in 1972 articulating the agency's "high priority" commitment to preserve wetlands.

> 19-1. Wetlands Policy.
> The Corps *will* ensure that work contemplated in or on wetlands is planned, designed, constructed, operated and maintained as to *minimize adverse effects*. Mitigation measures shall be included insofar as practicable.
>
> 19-3. Evaluation of proposed Alterations.
> A single proposed alteration of wetlands may, in itself, constitute a minor change. However, the cumulative effect of numerous small changes can effectually impair the wetlands ecology of large areas.  A specific proposal in or on a wetland *should be evaluated* in recognition of the complete and interrelated wetland area of which it is a part.  Studies relevant to environmental impacts apply.

PUF 142 (emphasis added); *see also* PUF 143 (MR-GO O&M is subject to this policy.).

Two years later, the Army Corps promulgated regulations recognizing wetlands as "[e]nvironmentally vital areas" whose "unnecessary alteration or destruction . . . *should be discouraged* as contrary to the public interest."  PUF 149 (emphasis added).

The record demonstrates that the Army Engineers was derelict in its duty by taking no steps to "minimize adverse effects" or arrest the decimation of cypress forests, marshes, and swamps that its O&M activities were causing.  PUF 144-49.  Instead, the agency destroyed 100 square miles of once thriving wetlands that had protected Greater New Orleans from hurricane surge and waves—an area five times the size of Manhattan.  PUF 147.  Of all of the Army Corps' myriad environmentally hostile acts, this was surely "the most unkindest cut of all." William Shakespeare, *Julius Caesar*, Act III, Sc. 2, l. 183.

**VI.    CONCLUSION**

For the foregoing reasons, Plaintiffs' Motion for Partial Summary Judgment should be granted.

Dated: November 20, 2008                    Respectfully submitted,


**O'Donnell & Associates P.C.**

By: s/ Pierce O'Donnell

Pierce O'Donnell (*pro hac vice*)
550 S. Hope St., Suite 1000
Los Angeles, California 90071
Phone:  (213) 347-0290
Fax:  (213) 347-0298


**Law Offices of Joseph M. Bruno**
By: s/ Joseph M. Bruno
Joseph M. Bruno (LSBA No. 3604)
855 Baronne Street
New Orleans, Louisiana 70133
Telephone: (504) 525-1335
Facsimile:  (504) 581-1493

**The Andry Law Firm, LLC**                 **Domengeaux Wright Roy & Edwards LLC**
By: s/ Jonathan B. Andry                     Bob F. Wright (LSBA No. 13691)
Jonathan B. Andry (LSBA No. 20081)           James P. Roy (LSBA No. 11511)
610 Baronne Street                           556 Jefferson Street, Suite 500
New Orleans, Louisiana 70113                 P.O. Box 3668
Telephone: (504) 586-8899                    Lafayette, Louisiana 70502-3668
Facsimile:  (504) 585-1788                   Telephone: (337) 233-3033
                                             Facsimile:  (337) 233-2796


**Fayard & Honeycutt**                       **Girardi & Keese**
Calvin C. Fayard, Jr. (LSBA No. 5486)        Thomas V. Girardi (*pro hac vice*)
Blayne Honeycutt (LSBA No. 18264)            1126 Wilshire Boulevard
519 Florida Avenue, S.W.                     Los Angeles, CA 90017
Denham Springs, Louisiana 70726              Telephone: (213) 489-5330
Telephone: (225) 664-4193                    Facsimile:  (213) 481-1554
Facsimile:  (225) 664-6925

**Ranier, Gayle & Elliot, LLC**             **Levin, Papantonio, Thomas, Mitchell**
N. Frank Elliot III                          **Echsner & Proctor, P.A.**
1419 Ryan Street                             Clay Mitchell (*pro hac vice*)
Lake Charles, LA 70601                       Matt Schultz (*pro hac vice*)
Telephone: (337) 494-7171                    316 S. Baylen Street, Suite 600
Facsimile: (337).494.7218                    Pensacola, Florida 32502-5996
                                             Telephone: (850) 435-7140

Facsimile:  (850) 436-6123

**McKernan Law Firm**
Joseph Jerry McKernan (LSBA No 10027)
John Smith (LSBA No. 23308)
8710 Jefferson Highway
Baton Rouge, Louisiana 70809
Telephone: (225) 926-1234
Facsimile:  (225) 926-1202

**Gainsburgh, Benjamin, David, Meunier & Warshauer, LLC**
Gerald E. Meunier  (LSBA 9471)
2800 Energy Centre
1100 Poydras Street
New Orleans, Louisiana 70163
Telephone: (504) 522-2304
Facsimile:  (504) 528-9973

**Law Office of Elwood C. Stevens, Jr., a Professional Law Corporation**
Elwood C. Stevens, Jr.  (LSBA No. 12459)
1205 Victor II Boulevard
P.O. Box 2626
Morgan City, Louisiana 70381
Telephone: (985) 384-8611
Facsimile:  (985) 385-4861

**Cotchett, Pitre, Simon & McCarthy**
Joseph W. Cotchett  (*pro hac vice*)
840 Malcolm Road, Suite 200
Burlingame, California 94010
Telephone:  (650) 697-6000
Facsimile:  (650) 697-0577

**Law Office of Frank J. D'Amico, Jr. APLC**
Frank J. D'Amico, Jr. (LSBA No. 17519)
Richard M. Exnicios, Esq. (LSBA No. 25666)
622 Baronne Street
New Orleans, LA 70113
Telephone: (504) 525-9561
Fax: 504-525-9522

**Robinson, Calcagnie & Robinson, Inc.**
Mark Robinson (Cal State Bar No. 54426
620 Newport Center Drive – 7th Floor
Newport Beach, CA 92660
1-888-701-1288

## <u>CERTIFICATE OF SERVICE</u>

I, Pierce O'Donnell, hereby certify that on November 20, 2008, I caused to be served

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**

**MOTION FOR PARTIAL SUMMARY JUDGMENT ON DISCRETIONARY**

**FUNCTION EXCEPTION** , upon Defendants' counsel, Robin D. Smith, George Carter, Keith

Liddle, and Richard Stone by ECF and email at robin.doyle.smith@usdoj.gov;

george.carter@usdoj.gov, keith.liddle@usdoj.gov, and richard.stone@usdoj.gov.

<u>/s/ Pierce O'Donnell</u>