ment Association also concurs, but favors construction [...] and the outlet channel in preference to the lock and access chan[nel]. [...] New chief engineer of the Board of Commissioners for the [...] Orleans advises that the plan is substantially that proposed by that agency.

## XV. CONCLUSION AND RECOMMENDATION

81. *Conclusion.*—Taking cognizance of the favorable economic aspect of the proposed additional deep-draft outlet from New Orleans to the Gulf of Mexico seaward of the Chandeleur Islands if developed comprehensively as a tidewater harbor, with access to the river, and the Intracoastal and Industrial Canals, and implemented by superior port terminals and facilities; the division engineer considers it advisable to adopt a long-range development program for the port of New Orleans as a major feature of existing projects for "Mississippi River, Baton Rouge to the Gulf of Mexico," and "Gulf Intracoastal Waterway," to be prosecuted in cooperation with the local port authority, the Board of Commissioners of the port of New Orleans, as agent for the State of Louisiana. He finds that the proposed outlet and tidewater harbor east and southeast of New Orleans, in conjunction with the river and its improved passes, will permit expansion and improvement of port facilities to serve all water-borne commerce that may be attracted to the port as the gateway to the Mississippi Valley and its improved inland waterways, with resulting benefits to present and prospective seagoing and inland-waterway navigation and commerce considerably in excess of charges for construction and operation. He also considers that the proposed improvement will greatly enhance the capacity of the port for emergency war service, since it provides for wide dispersion of terminal facilities for embarkation of personnel, material, and supplies in the interest of national defense.

82. *Recommendation.*—The division engineer recommends that the existing project, "Mississippi River, Baton Rouge to the Gulf of Mexico," be modified to provide for an additional east bank deep-draft outlet and tidewater harbor by construction of a connecting harbor channel 36 feet deep and 500 feet wide extending from the existing inner harbor canal to a turning basin south of Michaud, and a channel 36 feet deep and 500 feet wide extending as a land and water cut on tangents and easy curves from a turning basin south of Michaud southeasterly to and along the south shore of Lake Borgne and through the marshes to and through Chandeleur Sound and Islands, at or north of Errol Island, to deep water in the Gulf of Mexico, a distance of approximately 70 miles; with provision for the future construction of an additional lock near Meraux and connecting channels and appurtenances between the turning basin and the Mississippi when such is found to be economically justifiable, generally as outlined in paragraph 60 hereof, subject to such modifications of location, alinement, and dimensions as may be approved by the Chief of Engineers, at an estimated initial cost of $53,000,000 for construction and $810,000 annually for maintenance and operation, in addition to that now required; subject to the provision that, prior to any construction expenditures, local interests furnish, free of cost to the United States, all lands, easements, rights-of-way; and spoil-

76. Although future technical developments of warfare can be foreseen clearly, the basic principle of dispersion undoubtedly will continue to apply to protection of important installations, such as national ports of embarkation. The recent war demonstrated that harbor facilities should be provided for in any plan for comprehensive port development. New Orleans riverside wharves, of timber construction on long wood piles, cannot be expected to resist destruction by bombing as practiced in the recent war, and attack by atomic bombing is now possible. These terminals, sited on unstable banks subject to shoaling and scour by a river with a 20-foot range of stage, cannot be developed for efficiency and permanence to the degree possible on constant level harbors, so preferably additional installations in the interest of national defense should be located off the river with unrestricted outlet to the sea and access to the river through locks which, from a security standpoint, can be considered as alternate entrances. Locks are attractive targets for aerial bombing and are subject to sabotage unless well guarded. However, recent war experience disclosed that massive lock structures resist bombing attacks and damaged gates can be repaired or replaced, so locked harbors are not easily rendered inoperative by aerial attack. Recourse to alternate locks and access channels ensures the availability of part if not all of a dispersed harbor.

77. No expression as to possible use of proposed port improvements by the United States Navy has been received. Naval officers advise (exhibit III¹) that the Navy would not construct a base without unobstructed outlet to the sea, but that any aid to shipping would be of value (exhibit XLI¹).

78. National defense not only involves military installations, but also complete systems of transportation by air, land, and water to facilitate mobilization and deployment of personnel, materials, and supplies. Due to the unpredictable nature of future wars, the hazards inherent in industrial concentrations at coastal ports, and the possibility of attack without warning, it well may be necessary to use national ports of embarkation such as New Orleans to an unprecedented degree, so port-development plans should include provision for potential sites for new facilities required by new emergencies.

79. The improvement outlined in paragraph 60 will provide a tidewater outlet and harbor sufficiently spacious for dispersion of docks and cargo-handling facilities, thus permitting flexible operation of inland and seagoing commerce utilizing the river and passes, the tidewater harbor and outlet, and the Intracoastal Waterway. Provision of such facilities in time of peace so that they may be available for adaptation to the requirements of any emergency is patently in the national interest.

80. *Coordination with other agencies.*—After perusal of the report, the director of the Louisiana Department of Public Works, designee for the Governor of Louisiana, expressed full concurrence with findings presented; the president of the New Orleans Tidewater Develop-

¹ Not printed.



Prod. # MRGOY00059

MISSISSIPPI RIVER-GULF OUTLET

disposal areas required for initial construction and subsequent maintenance; and furnish assurances, satisfactory to the Secretary of War, that they will hold and save the United States free from claims for damage incident to construction, maintenance, and operation of the improvement; and will construct, maintain, and operate terminal facilities commensurate with requirements of the expanded port, under regulations approved by the Secretary of War, to ensure its equitable operation in the public interest.

R. W. CRAWFORD,
*Major General, United States Army,*
*Division Engineer.*

LIST OF ILLUSTRATIONS MADE IN CONNECTION WITH THE REPORT OF THE DIVISION ENGINEER

(only plate 2 printed)

Plate 1—Index.
Plate 2—Plan of Improvement.
Plate 3—Hydrographic bar surveys and advance of contours, Southwest Pass.
Plate 4—Physical data and tentative sections.
Plate 5—Ship canal termini and locks.

OVERSIZE FOLDOUT(S) FOUND HERE IN THE PRINTED EDITION OF THIS VOLUME ARE FOUND FOLLOWING THE LAST PAGE OF TEXT IN THIS MICROFICHE EDITION.

SEE FOLDOUT NO. 24

Prod. # MRGOY00060



Prod. # MRGOY00061



Prod. # MRGOY00062



Prod. # MRGOY00063



Prod. # MRGOY00064