U. S. ARMY, CORPS OF ENGINEERS

MISSISSIPPI RIVER-GULF OUTLET
LOUISIANA

DESIGN MEMORANDUM NO. 2

GENERAL DESIGN

PREPARED IN THE OFFICE OF THE DISTRICT ENGINEER
U. S. ARMY ENGINEER DISTRICT, NEW ORLEANS
NEW ORLEANS, LA.

JUNE 1959



Orleans, New Orleans Harbor, and New Orleans to Head of Passes were completed in 1940 and maintenance dredging is required at river crossings above New Orleans and in the New Orleans Harbor. The deepening of the Southwest Pass and the bar channel from 35 feet to 40 feet m.l.g. together with construction of contraction works has not been initiated. The 35 ft. channel in South Pass is completed. No local cooperation is required by the existing project. The uncompleted features of the existing project do not affect the current plans for the Gulf Outlet since the Outlet is a complete and separate entity not dependent upon the existing project in any way.

5.  **Percent Completion.** The Gulf Outlet Project, considered separately was 4.7% complete as of June 1959. The reach between the Inner Harbor Navigation  Canal and Highway 47 (Paris Road) is 100% complete and the work is in progress on the reach between Highway 47 (Paris Road) and Bayou Dupre.

## INVESTIGATIONS

6.  **Investigations Made in Connection with the Project Document.** The project document (H.D. 245/82/1) reviewed reports on the Mississippi River-Gulf Outlet (H.D. 46/71/2) and previous reports; and reports on Intracoastal Waterway from Mobile to New Orleans (H.D. 96/79/1) and previous reports, to determine if any modification of the recommendations contained therein was advisable. In the first of the reports reviewed (H.D. 46/71/2) the Chief of Engineers had originally found no necessity for another deep-water outlet from the Mississippi River and no justification for the acquisition of the Inner Harbor Navigation Canal and lock at New Orleans. In the second report (H.D. 96/79/1) the Chief of Engineers recommended, among other items, a 12 ft. x 150 ft. channel in Mississippi Sound and Lake Borgne and from the mouth of the Rigolets to the Mississippi River at New Orleans, and for the acquisition of control of part of the Inner Harbor Navigation Canal and lock. These modifications were adopted by the Act approved 23 July 1942. A public hearing was held in New Orleans on 5 August 1943 in connection with preparation of referenced H. D. 245 to determine the character and extent of improvements desired by interested parties and the reasons therefor. Numerous routes and data supporting the routes were submitted by interested Civic Organizations and individuals. Studies were made of the waterway traffic using the Port of New Orleans facilities and the prospective traffic that would use the proposed outlet and the expanded Port Facilities. Various routes were investigated as to their suitability and cost including several routes on both the east and west banks of the Mississippi River. Data accumulated in previous surveys as well as wind, tide and current observations and soil borings in various locations were made and analyzed. The project report concluded that the proposed outlet on the east bank of the Mississippi was economically feasible.

7.  **Board of Engineers' Review.** Interested parties were notified of the plan  of improvement proposed and afforded an opportunity to

present additional information to the Board of Engineers for Rivers and Harbors.  At the request of local interests the Board of Engineers held a public hearing in New Orleans on 5 and 6 March 1947 to further develop the views of the interested parties.  In general the opinions expressed at the hearing were that an outlet was necessary for the expansion of port facilities and for relief of congestion at the public terminals and to provide for efficient and economical trans-shipment of the expanding commerce.  They pointed out the obsolescence and difficulty of maintenance of some of the existing river terminals and the lack of suitable space on the river front for necessary expansion. They claimed that the development of new water-front areas was necessary to encourage industrial expansion at New Orleans.  There were divergent views, however, as to whether the Outlet should be located on the east bank or west bank of the river.  The Board of Commissioners of the Port of New Orleans reiterated its willingness and ability to provide the necessary local cooperation in the project as recommended by the Division Engineer.  No definite offer of local cooperation on the west bank improvement was received.  The Board recommended the adoption of the east bank route, with the following provision...."the exact location of the Outlet to the Gulf and the alignment of the seaway should be determined after more complete studies of sand movement, wave action, and local currents are made in cooperation with the Beach Erosion Board.  Hence, if the improvement is authorized, ample provision should be made for modifications of the location and alignment of the canal should further studies show that a more suitable location is available."

8.  <u>Investigations Made Subsequent to Project Authorization.</u> Engineering studies leading to the preparation of this design memorandum were begun with the initial allotment of planning funds for the project in Fiscal Year 1957.  The investigations included:

      a.  Aerial and topographic surveys of the proposed channel alignment.

      b.  Soil borings along channel alignment and over a large reconnaissance area in Chandeleur Sound and Gulf.

      c.  Geological investigation of area.

      d.  Test pits for determination of shoaling rates in Chandeleur Sound and Gulf.

      e.  Current direction and velocity and tide studies in Chandeleur Sound and Gulf.

      f.  Visual observations of wave height and direction in Chandeleur Sound.

      g.  Salinity and suspended sediment sampling and testing.

      h.  Fish and Wildlife studies for documentation of existing conditions and mitigation of possible losses to resources.

      i.  Investigations and studies of similar channels in the area and in other districts.

      j.  Studies for bridge clearances.

      k.  Cost studies and economic studies.

Further details of these investigations and studies are given in other sections of this design memorandum and the appendices.

## LOCAL COOPERATION

9.  **Local Cooperation Requirements.**  The items of local cooperation specified in the project document and listed in detail in paragraph 2 above include the furnishing of all lands and easements, constructing all relocations excepting the Highway 47 bridge, maintenance of the relocated facilities including the Highway 47 bridge to be built by the Government, and providing for expanded port facilities.

10.  **Designation of Local Interests.**  The Board of Commissioners of the Port of New Orleans was designated by the Governor of the State of Louisiana on 10 December 1956 as the State agency to furnish assurances of local cooperation on the project.  The Governor, in his Act of Designation stated "by virtue of the authority vested in me by Section 81, Title 38, Louisiana Revised Statues of 1950, I do hereby designate the Board of Commissioners of the Port of New Orleans to the extent to which they are lawfully empowered to acquire and furnish to the United States of America as required such lands, servitudes and rights-of-way as are or may become necessary to the construction and mainten-ance of the Mississippi River-Gulf Outlet and to furnish to the United States the assurances of local participation required by said Public Law 455, 84th Congress."  The responsible officials of the designated agency are as follows:

              Board of Commissioners of the
                Port of New Orleans
              No. 2 Canal Street
              P. O. Box 46
              New Orleans 6, La.

              President:  Mr. Terrence J. Smith
              Secretary:  Mr. Robert E. Elliott
              Executive Director:  Dr. Robert W. French

11.  **Local Interests Coordination.**  Early in the initial planning stages the Board of Commissioners of the Port of New Orleans set up an engineering committee of all known interested parties to assist and aid in the planning and to make recommendation as to their particular needs.  The committee was headed by Col. Marcel Garsaud, General Chair-man and included representatives from the City of New Orleans - Depart-ment of Streets, Sewerage and Water Board, Planning Commission, Depart-ment of Health, the Public Belt Railroad, the following agencies of the State of Louisiana - Department of Health, Department of Highways,

Orleans Levee Board, and the Department of Public Works; the U. S.
Army Engineer District, New Orleans and the New Orleans Public
Service.  To consider various items evolved by the construction of
the project, the committee set up the following sub-committees:  Loca-
tion of levees; Vehicle Crossings of Channel; Relocation of Bayou
Bienvenue; Power and Gas; Roads and Streets; Sewerage, water and
drainage; Laying out of industrial sites; Filling of land; Laterals
and turning basins; Railroad service; and Coordination with St.
Bernard and Plaquemine Parishes.

      The Board of Commissioners and its engineering committee
were informed of various features of the project and were furnished
survey, soil and other technical data, as the planning progressed. The
Board at an early stage of the planning signified approval of the
general plans for the project and furnished the necessary local support
as required by the authorizing act.  No public hearings were held sub-
sequent to authorization.

    12.  Views of Local Interests.  Since its inception, the Mississippi
River-Gulf Outlet project has received the active support of the
responsible citizens in the affected area.  Local opinion has pre-
vailed at all times that the project would prove of enormous benefit
to the New Orleans area, to the Mississippi Valley, and to the nation
as a whole.  The wording of the project document, and preliminary cost
studies referred to in paragraph 8-k and included in Appendix IV
provided conclusive evidence that the route skirting the south shore
of Lake Borgne to the vicinity of Bayou La Loutre crossing was most
feasible and economical.  However, some question as to the best possible
route across Chandeleur Sound arose in post-authorization planning.
Three routes, designated "B", "D" and "E-6" constituting minor depart-
ures from the document alignment seaward of Bayou La Loutre (see Plate
2 - Location Map), were developed and presented to the Board of
Commissioners of the Port of New Orleans for comment.  In a letter
report dated 5 March 1959, the Board of Commissioners, acting as
coordinating agency of the views of interested parties, reported as
follows: ...."Various aspects of this problem have been considered,
including those pertaining to acquisition of rights-of-way, navigation,
steamship operations, fish and wildlife values, development of terminal
facilities and industrial sites, as well as engineering features.  A
number of other planning groups and interests have been consulted in-
cluding experienced pilots, steamship organizations, fish and wildlife
interests, civic organizations, and other state agencies.  The facts
and opinions obtained from these sources unanimously and strongly favor
the selection of Route "D"."  The Board considers that Route "D"
represents the least hazardous channel approach from the open sea,
offers a reasonable sailing distance to the focal points of the major
navigation routes, results in lowest real estate costs to local in-
terests, and in the least damage to fish and wildlife values.  The
Board registers opposition to the selection of Routes "B" or "E-6"
for the following reasons:  Route "E-6" represents greater sailing
distances than either of the other routes or the existing South Pass and
Southwest Pass channels, with associated increased cost to navigation;
Route "E-6" passes through a multiple ownership, partially developed

section that will cause real estate acquisition to be difficult and costly; Route "B", while somewhat shorter to major traffic lanes, is considered the most hazardous to navigation of the three proposed routes because of the sand bar formations in Breton Sound; the lights of the drilling rigs associated with the extensive oil and gas activity in Breton Sound along Route "B" alignment will prove confusing to pilots and introduce an additional navigational hazard; Route "B" will cause serious damage to seed oyster beds and will interfere with the oil and gas production in the Breton Sound area.

Accompanying the report of the Board of Commissioners of the Port of New Orleans were letters from other interested parties. In a letter dated 17 February 1959, from the Special Port Captains Committee of the New Orleans Steamship Association the following views were expressed....."In the unanimous opinion of this Committee, Route "D" is by far the most preferable of the three shown on the aforementioned map. Proposed Route "D", our Committee feels, has much safer approaches from sea than the other two. The anchorage areas at this Route are good beyond the ten fathom curve, thus providing vessels with more sea room. In connection with this Route it will be noted that shallow water lies close in to Curlew Island and it is, in addition, a more direct route to the Gulf than the other two routes. Moreover, our Committee believes that less fog should develop along Route "D" than would exist at the more southerly Route "B" due to the latter's closer proximity to the river passes and the cold water being discharged into the Gulf from the Mississippi River."

In a letter dated 20 February 1959, the American Merchant Marine Institute, Inc., New York, N.Y., stated...."As a result of consultation with our member companies which plan to operate ocean going vessels through the Mississippi River-Gulf Outlet Channel from New Orleans to the Gulf of Mexico when it is completed, the Institute strongly urges that Route "D" be recommended for selection by the District Engineer."

A letter dated 16 February 1959 from the New Orleans Tidewater Development Association reads in part ...."In our opinion, Route "B" should be discarded from further consideration. It is probably the most objectionable to Fish and Wild Life interests. Its distance through open water in the Sound is the greatest and its entrance to the Gulf of Mexico north of Breton Island makes it the least desirable. There is much to be said in favor of Route "E-6". That route entering the Gulf at deep water might obviate the necessity for jetties. In my opinion, the decision between Route "D" and Route "E-6" is one to be determined by engineering analyses, and also the consideration of Fish and Wild Life interests."

The St. Bernard Council, St. Bernard Parish, La., stated in a letter dated 19 February 1959...."Attached hereto is a copy of the third interim report of the Subcommittee of the Executive Committee of the St. Bernard Council, on the Mississippi River-Gulf Outlet."....."it would appear that Route "D" is to be preferred because the route crosses more continuous land area than the others, thereby affording

more land for possible industrial development. We are not equipped
to review the desirability of this route from an engineering stand-
point as to problems of construction and of maintenance, nor from
the standpoint of its relationship to trade routes."

The complete text of the Board of Commissioners report,
including exhibits, appears in Appendix II.

13. Status of Local Cooperation. Assurances of local coopera-
tion dated 4 April 1957 furnished by the Board of Commissioners,
Port of New Orleans, were approved by the Chief of Engineers on 29
August 1957. The assurances have been partially complied with. At
this time rights of way have been furnished by the local agency from
the Industrial Canal to Bayou Yscloskey. The Port Commission pro-
poses to furnish rights of way between Bayou Yscloskey and Bayou La
Loutre by 1 October 1959, and to Chandeleur Island by 1 January 1960.
The Commission will begin furnishing title evidence and deeds convey-
ing easements to the United States in Fiscal Year 1960.

14. Estimated Cost to Local Interests. The estimated cost to
local interests based on current price levels is $7,150,000, of which
approximately $2,800,000 is for rights-of-way and the remainder
$4,350,000 represents costs for relocation of existing facilities.
In addition, $62,000 annually will be required for operation and
maintenance of the relocated facilities.

## LOCATION OF PROJECT AND TRIBUTARY AREA

15. Location. The authorized project as described in para-
graph 1 and shown on Plate 1 is located in the southeastern portion
of the State of Louisiana, east of the Mississippi River and ex-
tends southeasterly from the City of New Orleans to the Gulf of
Mexico, a distance of approximately 75.0 miles. The proposed ship
channel commences at the Inner Harbor Navigation Canal in New
Orleans, follows the Gulf Intracoastal Waterway for approximately
5 miles to a point 1/2 mile east of State Highway 47, thence via
land and water cuts on long tangents and easy curves, it extends
70.0 miles in a southeasterly direction along the south shore of
Lake Borgne and through the marshes to and across Chandeleur Sound
in the vicinity of Breton Island to deep water (-38' contour) in
the Gulf of Mexico.

16. Tributary Area. The immediate area traversed by the
project is comprised of swampland, shallow lakes and bays, and
Chandeleur Sound, extending from the suburbs of the City of New
Orleans to the Gulf of Mexico. New Orleans, with a metropolitan
population of 685,405 (1950 Census) because of its location near
the mouth of the Mississippi River, is the natural gateway to the
entire Mississippi Valley. The Port of New Orleans as well as the
rapidly expanding developments along the Mississippi River between
the Head of Passes and Baton Rouge serves as a transhipment terminal
for shallow draft commerce utilizing the vast network of inland
waterways formed by the river, its tributaries, and connecting
streams including the Gulf Intracoastal Waterway. Inland water-

8

borne commerce may originate in or be destined for any of the States between the Appalachian and Rocky Mountains.  Ocean commerce is carried by ships which call at all major United States and World ports.

The industries in the vicinity are closely allied with shipping and have been developed to utilize raw and semi-finished products attracted by the harbor and transportation facilities.  It is an important petroleum center, being in the area of rapidly developing oil and gas activity.  Numerous important oil refineries are expanding to meet increasing demands.  Aluminum, synthetic rubber and chemical plants have shown similar growth patterns.  Sulphur is produced in large quantities and several sugar refineries are located in the vicinity.

## PROJECT PLAN

17.  Project Works.  The project, as shown on Plate 1, consists of a tidewater ship channel 36 feet deep and 500 feet wide extending from the City of New Orleans to the Gulf of Mexico, a total distance of about 75 miles.  The outer five miles  gradually increases in dimensions to 600 feet in width and 38 feet in depth.  Retention dikes extending from the shoreline to the -6 ft. depth contour on both sides of the channel are included.  A dike on the north side of the channel from the -6 ft. contour to the -20 ft. contour is included in the project, but its construction will be deferred until justified by actual channel maintenance experience.  A turning basin 1000 ft. wide and 2000 ft. long is to be located in the vicinity of Bayou Dupre, about 7 miles from the Gulf Intracoastal Waterway.  A semi-high level 4-lane highway bridge will be constructed to carry the vehicular traffic of Highway 47 (Paris Road) over the ship channel. The project authorization also includes an additional lock and connecting channel with the Mississippi River in the vicinity of Meraux, La., when justified by additional traffic or obsolence of the existing Inner Harbor Navigation Lock.  This feature is not covered in this Design Memorandum.

## DEPARTURES FROM PROJECT DOCUMENT PLAN

18.  Changes in Alignment.  The proposed channel alignment as shown on Plates 1 and 2 follows the project document alignment from its New Orleans terminus, to its junction with Bayou La Loutre.  At this point the proposed channel alignment deviates slightly from the document alignment to the southwest so as to enter the Gulf of Mexico north of Breton Island and south of Grand Gosier Island.  This minor deviation from the document alignment resulted from extensive studies that showed an economic advantage for this route over all others considered.

## HYDROLOGY

19.  General.  The proposed improvement is a tidewater channel whose water surface elevation will vary with the tides and other variation of the Gulf of Mexico.  The upper terminus of the channel is

at the Inner Harbor Navigation Canal, also a tidewater channel, which canal connects to the Gulf of Mexico through the existing Gulf Intracoastal Waterway and also via Lake Pontchartrain and Lake Borgne. The proposed channel traverses approximately 32.6 miles of open water in the Gulf of Mexico and Chandeleur Sound and 43 miles of marsh and swampland between Chandeleur Sound and the City of New Orleans. A relatively small area of land lying on the north side of the existing Gulf Intracoastal Waterway and within the limits of the City of New Orleans is leveed and drained. Disposal of initial dredge spoil is planned in general accordance with the desires of local interests and Fish and Wildlife agencies to preserve existing drainage patterns to the extent practicable.

20. **Tides.** Normal tides in the gulf range from 1 to 2 feet. Wind and storm tides reach levels of 6 to 8 feet above sea level, and infrequent hurricane surges produce heights of 12 feet or more along the coast line.

a. Inner Harbor Navigation Canal. Gage records are available on the Inner Harbor Navigation Canal since it was excavated in 1922. These records provide a good indication of the water elevations that may be expected in the proposed channel. Hydrographs showing the annual highwater and annual low water for the Inner Harbor Navigation Canal are shown on Plate 4. An all-time high of 7.2 ft. m.l.g. at this gage occurred during the passing of Hurricane "Flossy" in 1956. The low for the period of record was -0.7 ft. m.l.g. during 1939.

b. Vicinity Highway No. 47 (Paris Road). For the 10-year period, 1948 to 1958, tide gage records on the Gulf Intracoastal Waterway at a location in the vicinity of Highway 47 (Paris Road) are available and the annual high water and low water stages appear in the hydrograph shown on Plate 4. The highest stage, 8.35 m.l.g. was recorded in 1956 during the passing of Hurricane "Flossy" and the lowest stage, -0.5 m.l.g., was recorded in 1954.

c. Bayou Yscloskey. From 1948 to 1958 records are also available from a gage located in Bayou Yscloskey at Shell Beach, La. The annual high water and low water stages are presented in the hydrograph on Plate 4. The highest stage, 11.32 m.l.g., occurred in 1956 during the passing of Hurricane "Flossy" and low stage, -0.84 m.l.g., was also recorded in 1956.

d. North Pass and Breton Island. Also shown on Plate 4 is the tidal variation at North Pass from 1942 to 1953 and at Breton Island for 1956 and 1957. This hydrograph shows, in addition, the high and low stage recordings which occurred during the 1957-1958 period in the Breton Sound area.

The locations of the above gages are shown on Plate 1.

21. **Currents.** A network of hydrologic data collection stations was established in January 1957 and operated through December 1958

to supplement existing meager hydrological data. These are shown on Plate 5. Continuous recording meters were set at Towers A, B and C in Chandeleur Sound and weekly measurements were taken by boat at 7 stations in the Sound. Records from these observations show that currents are small (less than one half foot per second) most of the time and exceed this velocity only 10-15 percent of the time. Current directions range throughout 360 degrees, but are in a southerly direction about 60 percent of the time.

22. Water Sampling. Water sampling was initiated at some 30 odd stations in the Sound and scattered through the affected marsh area. These were analyzed for salt content, and after September 1957 five of the stations were also analyzed for silt content. The water samples were taken at mid-depth after it had been established by measurements that there was no pronounced change of salinity with depth. Salinity inside Chandeleur Sound varies from 10,000-15,000 p.p.m. of chlorine. There is a steep salinity gradient from the edge of the marsh to Yscloskey, the latter station being 30 to 50 percent of the former. Variations of salinity in the marsh are pronounced. Suspended sediment concentrations generally are between 50 and 150 p.p.m., occasionally being as much as 500 p.p.m. in the Sound due to storm disturbances. Beginning in May 1957 water temperature was taken in conjunction with the suspended sediment sampling. The indicated temperature range is 40 to 90 degrees F.

23. Waves. A wave gage is operated at Battledore Reef in Breton Sound. Maximum waves are normally 1 to 2 feet, infrequently 3 to 5 feet, and waves of greater height are estimated to occur under severe storm and hurricane conditions.

## GEOLOGY

24. General Geology of the Area. The Mississippi River-Gulf Outlet traverses an area completely within a former deltaic complex of the Mississippi River abandoned an estimated 1,000 years ago. This deltaic complex consists of Recent marine deposits which were accumulated as sea level rose during the waning of the late Wisconsin Glacial Stage and since sea level reached its present stand. Distribution of surficial depositional types in the area are shown on Plate 6. The proposed project cuts through the lowlands between Lake Borgne and the natural levee ridge of the Mississippi River, extends across an ancient Mississippi River course, and its distributary courses, and continues through the bay bottom deposits of Chandeleur Sound. The top of the Pleistocene varies from about 60 feet below ground surface at the upper end of the project to about 200 feet below sea level at Chandeleur Islands. The Recent deposits in the lowlands are predominantly clay with a highly organic layer about 10 feet thick at the surface and silty and sandy soils at the base. Where minor distributaries of the ancient Mississippi River course are crossed, the Recent deposits are predominantly silty and sandy, but organic layers at the surface are also present. The deposits in Chandeleur Sound are predominantly fat clay (see Plate 7 for generalized geologic section).

11

A more detailed geology treatise on the area appears in Miscellaneous
Paper No. 3-259, dated February 1958, "Geological Investigation of
the Mississippi River-Gulf Outlet Channel," prepared by the U. S.
Army Engineers Waterways Experiment Station.

## SOILS

25. **General.** Design Memoranda 1-A approved 11 September 1957
and 1-B approved 27 January 1959 cover the detail soil report for the
portion of the Mississippi River-Gulf Outlet Channel Project from the
Inner Harbor Navigation Canal to Bayou La Loutre. The preliminary
soil report for the extension of this project below Bayou La Loutre
across Chandeleur Sound is presented in the following paragraphs.

26. **Field Exploration.** Exploratory general type soil borings
extending to depths of 50 to 150 feet were made in Chandeleur Sound at
locations shown on Plate 8 - "Reconnaissance Soil Borings in Chandeleur
Sound - Location Map."

27. **Laboratory Tests.** Visual classification and water content
determinations were made on all soil samples obtained from these
general type borings. Logs of these borings are shown on Plates 9
through 13 - Logs of Borings.

28. **Soil Conditions.** The exploratory borings indicate that the
subsurface seaward from Bayou La Loutre consist predominantly of very
soft organic fat clay. From Bayou La Loutre to Chandeleur Sound,
there is generally a surface layer of peat and matted vegetation
about 10 feet thick overlying this fat clay. In areas where the
Channel crosses ancient distributaries of the Mississippi River, there
are old Channel fillings consisting of interspersed layers and lenses
of silt, sand, and clay.

29. **Selection of Route below Bayou La Loutre.** Based on sub-
surface conditions, there is no appreciable difference in any possible
route across Chandeleur Sound below Bayou La Loutre.

30. **Stability Analysis.** The stability analysis shown in Design
Memoranda 1-A and 1-B, previously mentioned, is applicable where land
and marsh areas are at or above water surface. In Chandeleur Sound
and other areas where the marsh is not near or above the water surface,
the spoil will be placed a minimum of 2,000 feet away from the channel
to minimize the possibility of this spoil being washed back into the
Channel.

## OTHER PLANS INVESTIGATED

31. **Alignment Deviations.** Subsequent to project authorization
four deviations from the alignment prescribed in House Document No.
245 were investigated in some detail. These alignments are identi-
fied as Routes B, D, E-6, and Alternate E-6 on Plate 2. All of the
routes begin at a common point in the vicinity of Bayou La Loutre and

extend across Chandeleur Sound.  Channel profiles from Bayou La
Loutre to the -38 ft. contour for routes B, D and E-6 are shown on
Plate 3.  These investigations were conducted pursuant to the views
expressed by the Board of Engineers for Rivers and Harbors in House
Document No. 245...."that the exact location of the outlet to the
Gulf and the alignment of the seaway should be determined after more
complete studies of sand movement, wave action, and local currents are
made in cooperation with the Beach Erosion Board..."

32.  Beach Erosion Board Studies.  At the inception of the design
memorandum studies, the views of the Beach Erosion Board were re-
quested pursuant to the provisions in House Document 245.  The Board
agreed to participate in the studies to determine the best route across
Chandeleur Sound, to determine the design of dikes to protect the
channel if required, and to determine the possible effects of hurricane
wind waves propagated up the Channel toward New Orleans.  The Board
submitted on 11 March 1957 a letter report covering its preliminary
analysis of available data on geomorphology, sedimentation, shore
line and offshore depth changes, and waves.  At this time the Board
stated that characteristics of subsurface material throughout
Chandeleur Sound were substantially the same, that changes in bottom
hydrography and conditions throughout the Chandeleur Sound have been
minor over the period of record, and that intensity of wave action
is not significantly different in any part of Chandeleur Sound.
The Board concluded that any alignment would be subject to about the
same degree of prospective shoaling.  The Board was also of the
opinion that any route that cut across the Chandeleur Island chain
would require jetties and recommended that routes north and south of
the island chain be considered due to the expensive jetty cost in
crossing the island chain.  The Board further reported that hurricane
waves developed in Chandeleur Sound could be transmitted up the
channel to New Orleans, but that these waves would be reduced in
transit by friction and refraction so as to be of minor significance
at New Orleans.

Upon the recommendations of the Board, five test pits were
excavated, 3 in Chandeleur Sound and 2 in the Gulf of Mexico, to
determine shoaling rates and behavior of the spoil.  The location and
details of the pits are shown on Plate 14.  Comparative cross sections
of the pits taken over a period of approximately 1 year are shown on
Plate 15.  The character of the material and behavior of the spoil
deposited from the excavation of the pits in Chandeleur Sound are
shown on Plate 16.

The Board, upon conclusion of the test pit program, presented
its findings in a report dated 29 April 1959, attached as Appendix
1, which recommended as follows:

a.  Route E-6 is first and Route B is second in order of
preference of the three routes considered.

b.  Consideration should be given to minor realignment of
Route E-6 to avoid open water areas.

c.  Retention dikes should be initially provided landward of approximately 6 feet depth in Chandeleur Sound.

d.  Dredge spoil should be deposited north of the channel in Chandeleur Sound at the maximum distance practicable without increase in cost by loss of dredge production (probably about 4,000 feet).

e.  Consideration should be given to utilizing an "overboard disposal" dredge of the "Sealanes" type for channel maintenance in Chandeleur Sound.

33. Fish and Wildlife Studies and Recommendations.  When planning on the project was initiated, representatives of the State and Federal Fish and Wildlife Agencies and other local groups expressed concern over the potential damage to fish and wildlife resources. Funds were made available from the project to U. S. Fish and Wildlife Service for initiation of a comprehensive study of the project and the surrounding areas.  This study is under way but completion is not anticipated for several years.  In the meanwhile the advice and assistance of the Service is utilized to the extent practicable in the development of detail plans, particularly with regard to disposal of spoil and marsh drainage, and in documenting existing ecological conditions.  By teletype dated 5 June 1959 the U. S. Fish and Wildlife Service stated...."Studies to date indicate Route D would be significantly less detrimental to fish resources within marsh area than Routes B or E-6 provided....(1) spoil is placed on north side of alignment from Bayou La Loutre to Chandeleur Sound and (2) reasonable features to reduce silting effect and maintain present water circulation patterns are included in your contract specifications....".  In November 1957 the Louisiana Wildlife and Fisheries Commission expressed a preference for Route D, which was reiterated by letter dated 2 March 1959.

The views of the Fish and Wildlife agencies as well as the report by Dr. Gordon Gunter, a consultant biologist engaged by this office to prepare a report on the possible biological effects of the various proposed routes, are presented in Appendix III, "Views of Fish and Wildlife Agencies."

34.  Route Preference of Local Interests.  Since local cooperation is required by the project, the Board of Commissioners of the Port of New Orleans, the assuring agency, was requested to determine a preference for one of the routes.  The replies to the Board were unanimous in favor of Route "D".  The views of local interests are reproduced in Appendix II.

35.  Federal Project Cost Studies.  In order to evaluate the merits of Routes B, D, E-6 and Alternate E-6, a detail cost estimate for each route was prepared.  A summary of the Federal cost for the various routes are given in Table 1.  The shoaling rates for maintenance purposes are shown, using both the Beach Erosion Board's estimated

rates and the rates considered by this District to be applicable, based upon experience in maintaining other projects in this District and information received from other Districts which have comparable channels along the Gulf of Mexico. This table indicates that the first cost of Route B is the least of the routes considered with Routes E-6, Alternate E-6 and D, following in order. The annual Federal cost of Route E-6 is the least with routes Alternate E-6, B and D, following in order. The table also indicates the cost of the various routes with a deferred retention dike (-6 ft. to -20 ft. contours in Chandeleur Sound) included as a project feature. Similar to the above, the cost of Route B is the least with Routes E-6, Alternate E-6 and D following in order. The deferred retention dike is included as an item in order that it may be constructed at a future date if, from actual maintenance experience, it is demonstrated that the channel cannot be maintained by dredging alone or that it is more economical to construct the dikes.

36. Non-Federal Project Cost Studies. A non-Federal cost comparison for the various routes is given in Table 2. This table reveals that there is no significant difference in the cost of the various routes; however, the cost of Route B is least and Routes D, E-6 and Alternate E-6 follow in order.

37. Navigation Cost Studies. As indicated on Plate 17, the distances to the two focal points of the foreign shipping lanes (Dry Tortugas and Cape San Antonio) differ with the various routes selected. This difference in distances results in different travel time between the focal points and the City of New Orleans. A comparison of the costs of ship operation over the various routes shows that Route B will effect an annual saving of $162,750 over Route D, $1,169,010 over Route E-6 and $1,313,005 over Alternate Route E-6. Details are given in Appendix VI.

38. Comparative Federal Costs. Table 3 shows the overall economic comparison of the various routes on an annual basis. Route B is indicated to be the lowest in total annual cost by more than $400,000 over the next lower alignment, Route D. The non-Federal charges shown in Table 2 make no significant change in the indicated differences in favor of Route B.

39. Project Route Selection. On the basis of these cost data Routes E-6 and Alternate E-6 may be discarded from further consideration. Route B is clearly indicated to be the most economical overall on the basis of tangible costs alone. Route B has the disadvantage however of being near Main Pass of the Mississippi River as shown on Plate 18. The shore line has built out to the east approximately 12.1 miles in the last 96 years. Encroachment of the Pass may become a factor adversely affecting the maintenance of the project toward the end of its 50 year economic life. This effect cannot be evaluated at this time. The unanimous preference for Route D of all of the local interests including the assuring agency and the Fish and Wildlife agencies, both Federal and State, constitutes a further serious disadvantage to Route B. On the other hand Route D which is favored

```
Spoil disposal distance in Chandeleur Sound-------2000 to 4000 ft.
                                                  from channel
Spoil disposal in Gulf----------------------------In deep water by
                                                  hopper dredge
Bridge Design-------------------------------------AASHO-1957
Live Loading--------------------------------------H20-S16-44 Modified
   Roadways----------------------------------------2-28 ft. roadways
   Design Speed-----------------------------------50 MPH, 350' SSD
   Clearances-------------------------------------400 ft. horizontal
                                                  156 ft. vertical
                                                  (open)
                                                  50 ft. vertical
                                                  (closed)
```

47.  **Channel Protection.**  Stability analyses of general type
and undisturbed borings showed that the toe of the spoil should be
not closer than 420 feet from the channel centerline and that the
channel slopes should be cut not steeper than 1 on 2.  The channel
will be excavated generally with a berm of approximately 630 ft.,
thus providing an adequate factor of safety for surface widening due
to erosion.  Bank protection works to prevent this anticipated
erosion is not recommended as a project feature, nor included in the
costs.

48.  **Channel Overdepth.**  It is proposed to excavate the channel
2 feet below the authorized project depth for advance maintenance.
An allowance overdepth up to a maximum of 2 feet will also be permitted
in order to care for inaccuracies in dredging operations and tidal
fluctuations.

49.  **Spoil disposal.**  Excavated material will be deposited in
leveed disposal areas south and west of the channel.  Below Bayou
La Loutre the spoil disposal areas may be shifted to north and west
of the channel if warranted by Fish and Wildlife studies now under
way.

## SOURCES OF CONSTRUCTION MATERIALS

50.  **Concrete Aggregate and Stone.**  Approved sources of sand
and gravel for concrete are located in Baton Rouge, Alexandria,
Turkey Creek, and Minden, all in Louisiana and within economical
shipping distance of the project.  The nearest known supply of accept-
able stone for riprap is in southwestern Arkansas, Alabama and Ken-
tucky.

51.  **Cement.**  Portland cement, conforming to Federal Specifica-
tions SS-C-192b may be obtained from plants in New Orleans and
Baton Rouge, La., and Birmingham, Ala.

52.  **Steel.**  Fabricated steel will be obtained from local
jobbers or mills in Alabama and Texas.  Reinforcing steel is avail-
able in large quantities from warehouses in New Orleans.

22

53.  Piling.  Timber piling, both untreated and creosoted is available in New Orleans and many surrounding communities.

54.  Shell.  Necessary shell will be dredged from shell reefs in the vicinity of the project by local supplier.

55.  Other Materials.  Other materials for construction including machinery, machine parts, electrical equipment, castings, lumber and other building materials, are available from commercial establishments and suppliers in New Orleans.

## COORDINATION WITH OTHER AGENCIES

56.  Board of Commissioners of the Port of New Orleans.  This Board was designated as the State agency to provide the assurances and local cooperation by an Act of Designation of the Governor of the State of Louisiana dated 10 December 1956.  A copy of the Act of Designation and the letter of acceptance by the Board dated 17 December 1956 are included in Appendix II.

57.  St. Bernard Parish.  Since most of the landlocked portion of the channel traverses the Parish of St. Bernard, the St. Bernard Parish Police Jury and the St. Bernard Parish Council of the Chamber of Commerce of the New Orleans Area have maintained an active interest in project planning.  Liaison is being maintained with these groups as the planning progresses.

58.  State of Louisiana, Department of Highways.  The project provides for construction of a suitable bridge for the Highway 47 crossing of the waterway and requires that local interests accept, maintain and operate the structure.  By letter dated 18 March 1957, the Director, Department of Highways has agreed to accept, maintain and operate the structure as required.

59.  State of Louisiana, Department of Public Works.  The Governor of the State of Louisiana designated the Board of Commissioners of the Port of New Orleans as State assuring agency, and requested that the Board of Commissioners of the Port of New Orleans in coordinating the project with the Corps of Engineers, cooperate with Director of the Department of Public Works and his staff to insure that all interests were being given due consideration.  The Director is being kept informed as the studies and planning on the project progress.

60.1.  Bureau of Public Roads.  The Bureau of Public Roads, U. S. Department of Commerce has been informed and has participated in conferences regarding type of crossings for Highway No. 47 (Paris Road).  The Bureau of Public Roads concurs in the construction of the 4-lane semi-high level bridge as proposed in this design memorandum.

60.2.  U. S. Public Health Service.  The Public Health Service by letter dated 14 May 1957 was informed of several projects, including the Mississippi River-Gulf Outlet in which they might participate or express their views.  No reply to this communication has been received.  No problems involving the Health Service have been identified to date.

61.  **Fish and Wildlife Agencies.**  When it became known that
initial planning funds for the Gulf Outlet would be made available
in Fiscal Year 1957, the Federal and State Fish and Wildlife agencies
were promptly notified by letter.  Intense public interest in the
project followed initial press releases showing the proposed alignment,
and many objections to the alignment were registered with the Fish
and Wildlife agencies.  In a conference in August 1957, the U. S. Fish
and Wildlife Service and the Louisiana Wildlife and Fisheries Com-
mission were fully appraised of the status of planning.  An initial
sum of $5,000 was allocated to the Service for Fiscal Year 1958 and
in April 1958 a preliminary report was submitted by the U. S. Fish
and Wildlife Service.  The report made certain general recommendations
for mitigation of losses to fish and wildlife values and proposed
an extensive regional study to fully document existing values over a
wide area of the Gulf of Mexico.  As a result of a number of conferences
the scope of the studies was curtailed to permit completion within a
reasonable period that would permit utilization of the study data and
recommendation in the detail project planning.  On this basis the
additional amount of $64,400 was made available to the U. S. Fish and
Wildlife Service for Fiscal Year 1959.  By letter dated 5 January 1959,
the U. S. Fish and Wildlife Service furnished an interim report on the
reach between Highway 47 (Paris Road) and Bayou Dupre.  The recommenda-
tions are listed in Design Memorandum No. 1-B previously submitted and
were essentially complied with in the plan for construction.  Studies
are continuing and it is anticipated that additional recommendations
for mitigating losses, if any, will be incorporated in future project
plans.  Both the Federal and State agencies have advocated Route "D"
as the preferable crossing of the marsh land and Chandeleur Sound.
Details of their views are given in Appendix III, "Views of Fish and
Wildlife Agencies."

62.  **City Planning Commission of New Orleans.**  The City Planning
Commission of New Orleans submitted a report in September of 1958
concerning the proposed channel crossing at Highway 47 (Paris Road).
The report contained detailed vehicular traffic predictions extending
to the year 1995.  This report indicated that the Planning Commission
was strongly in favor of a channel crossing that would provide
uninterrupted vehicular movement along Paris Road.

63.  **Mineral Board, State of Louisiana.**  The Mineral Board of
the State of Louisiana was informed of the status of project plann-
ing in a letter dated 10 October 1957 and was asked to comment on
the proposed routes.  To date no reply to this letter has been re-
ceived.

## REAL ESTATE REQUIREMENTS

64.  **General.**  Under the provisions of the authorizing Act,
local interests are responsible for providing all lands, easements,
and rights of way necessary for the project.  Local interests have
furnished satisfactory assurances that they will provide the necessary
rights of way and other items of local cooperation as required.  To
date, rights of way from the Inner Harbor Navigation Canal to Bayou

24

29 April 1959

## BEACH EROSION BOARD STAFF STUDY
## ON LOCATION OF MISSISSIPPI GULF OUTLET CHANNEL

1.  This report is the result of a study by the staff of the Beach Erosion Board for the purpose of aiding in a determination of the most favorable route through Chandeleur Sound to 38-foot depth in the Gulf of Mexico for the authorized Mississippi River-Gulf Outlet Channel.  It is a supplement to a letter report with three Appendices from the Executive, Beach Erosion Board to the Division Engineer, Lower Mississippi Division dated 11 March 1957.

2.  At a conference held 12-13 September 1957 available data were reviewed and agreement was reached between representatives of the Division Engineer, the Waterways Experiment Station, the Beach Erosion Board, and the District Engineer at New Orleans on a program for obtaining supplemental data designed primarily to permit evaluation of Routes B and D as shown on Inclosure 1.  The program provided for excavation of 5 test pits along the two routes; periodic surveys at the test pits and adjoining spoil areas; borings and surface samples along the two routes and in the test pits; current observations near Route D at 3 points; and a geological study of the Chandeleur Sound area to be made by the Waterways Experiment Station.  At a subsequent conference held 2 February 1959, it was determined that consideration would also be given to Route E-6 as shown on Inclosure 1, with additional data for that route to consist only of borings and airphoto coverage.  Following is a summary and analysis of the data obtained subsequent to the report referred to in paragraph 1.

3.  _Test Pits._  Locations of the 5 test pits are shown on the insert map on Inclosure 2.  Each pit was dredged to an approximate depth of 30 feet MLW, with dimensions of approximately 100 by 500 feet alined along the axes of Routes B and D.  Dredge spoil was deposited approximately 2,000 feet north of pits D and E, 2,000 feet south of pit C, and in deep water in the Gulf in the case of pits A and B.  Pits A and B were excavated with a hopper dredge in December 1957 and pits C, D and E with a pipeline dredge in February 1958.  Inclosure 2 is also a graph of the percent of shoaling in terms of original pit capacity plotted against time.  Since the shoaling rate would be influenced to some extent by and slopes of  these relatively short pits, shoaling volumes were computed for the central 300-foot length of each pit.  Inclosure 3 is a graph of the shoaling volume thus computed for each pit plotted against time.  The following tabulations list progressive shoaling rates between successive surveys for each pit.

Appendix I