NEW ORLEANS STEAMSHIP ASSOCIATION
308 Marine Building
New Orleans 12, La.

March 5, 1959

Mr. William H. Lewis
Planning Coordinator
Board of Commissioners of
    the Port of New Orleans
Post Office Box 46
New Orleans 6, Louisiana

Dear Mr. Lewis:

This will refer to our previous exchange of correspond-
ence dealing with the three proposed alternate crossings of
Chandeleur Sound and entrances to the Mississippi River-Gulf
Outlet channel.

Under date of February 17, 1959, we wrote you at length
furnishing the views, opinions and recommendations of our Special
Port Captains Committee to the end that proposed outlet "D" is by
far the most preferable of the three proposed routes.

Captain C. E. Biggers, Chairman of our Special Port
Captains Committee, was present at the regular Association's meeting
yesterday afternoon and reported fully to the Association on the
Committee's activities in connection with this matter, and I am pleased
to advise you that the recommendations of this Committee were fully
concurred in and unanimously approved by the Members at the afore-
mentioned meeting.

Thus, you may consider our letter of February 17 as now
embracing the official views of the Association on these three pro-
posed alternate outlets.

Yours very truly,


McVFW/wnf
cc:  Mr. Frank G. Strachan
     Capt. C. E. Biggers
     Mr. O. B. Cloudman
     Mr. O. Lincoln Cone,
        AMMI, New York

McVey F. Ward
Executive Secretary


13                                    APPENDIX II

NEW ORLEANS STEAMSHIP ASSOCIATION
308 Marine Building
New Orleans 12, La.

June 10, 1959

Major General William A. Carter
Division Engineer
Lower Mississippi Valley Division
Vicksburg, Mississippi

Dear Sir:

We are advised that the District Engineer at New Orleans
either has reported or shortly will submit to you his recommendations
for the alignment of the Mississippi River-Gulf Outlet Channel from
its intersection with Bayou la Loutre, across Chandeleur Sound, to
the Gulf of Mexico.

It is understood that three proposed crossings of Chandeleur
Sound are being studied.  These three routes are identified as Routes
"B", "D", and "E-6" on the map of U. S. Corps of Engineers, dated
February 1959, File No. J-15-21423.

In February of this year this Association was asked by the Board
of Commissioners of the Port of New Orleans to study the three proposed
routes from the standpoint of deep sea navigation and ship operations and
to furnish the Board with our views and recommendations as to which of the
three proposed routes would be preferable.  This Association placed the
problem before its Technical Committee of Port Captains for study and
recommendation.  The report of this Committee, approving Route "D" and
the reasons for this selection, was embraced in a letter dated February
17, 1959 addressed to Mr. William H. Lewis, Planning Coordinator for the
Dock Board.  The views and recommendations of the Committee were unanimous-
ly endorsed by the full Association at its regular monthly meeting on
March 4, 1959 and the Dock Board was so advised by means of a second
letter to Mr. Lewis, dated March 5, 1959.  Copies of both of these letters
are enclosed for your information.

In addition, the Association was represented at a conference
on this subject held on February 25, 1959 in the District Engineer's
office, which was also attended by representatives of the Dock Board and
various other State agencies concerned with the project.  In our opinion,
it was the unanimous conclusion of all those attending this conference
that proposed Route "D" was by far the most preferable of the three shown
on the aforementioned map.

Since the formulation of this position by the Association earlier
in the year, we are now informed that certain interests are advocating the

APPENDIX II

Major General William A. Carter

selection of Route "E-6".  This favoring of Route "E-6", which is most
difficult for practical shipping men to understand, has also had the
recent attention of the Association's Port Captains Committee, with the
result that they feel that the selection of Route "E-6" would completely
negate any time and distance advantages the Gulf Outlet might have over
the natural Mississippi River route.

This Gulf Outlet has long been considered as a shortcut to the
Gulf, but the selection of Route "E-6" would simply nullify most if not
all shortcut features, thus destroying to a large extent any incentive
for vessels to use the canal.  As a matter of fact, should Route "E-6" be
selected, it would be shorter for vessels coming up through the Yucatan
Channel or around the Forida Straits to use either South or Southwest Pass.
"E-6" would be of advantage only to those vessels proceeding to or from
the Gulf Ports located to the East of New Orleans -- and this is about
the only point we can think of in favor of its selection.

The approaches from sea to either "E-6" or "D" are about on a par
insofar as the depths and underwater contours are concerned.  Thus, it is
doubtful whether any entrance construction or maintenance features or
advantages would inherently exist at one entrance to the exclusion of the
other.

We are informed that Route "E-6" presents substantial difficulties
in terms of acquisition of channel right-of-way as multi-owner problems
are involved at one point along this route, and, as indicated above, it
is the longest of the three routes.  Moreover, we understand that damage
to seed oyster beds and to other forms of fish and wild life will probably
be more extensive if Route"E-6" were selected than would be the case along
either  of the other two routes.

Undoubtedly, the District Engineer in his report to you will
discuss in detail all of the points touched on in this letter and others
as well, including those contained in our earlier letter.  By no means
are we attempting in this letter to present complete arguments favoring
the selection of Route "D" over the other two.  We are merely mentioning
some additional points not covered in our earlier letters.

We would, however, submit that from the standpoint of navigation
and ship operation, there can be only one correct answer to the question
of which of the three routes is best -- and this is Route "D".  We
sincerely trust you will arrive at the same conclusion following completion
of your study of the problem.

We are sending copies of this letter to Senators Ellender and
Long and Representatives Boggs and Hebert so that they may know the views
of this Association on this vitally important matter.

                                        Yours very truly,

                                        NEW ORLEANS STEAMSHIP ASSOCIATION
                                        McVey F. Ward
                                        Executive Secretary

BOARD OF COMMISSIONERS OF THE PORT OF NEW ORLEANS
(An Agency of the State of Louisiana)

2 Canal Street

William H. Lewis                                     Post Office Box 46
Planning Coordinator                                 New Orleans (6), La.

June 10, 1959

District Engineer
U. S. Army Engineer District, New Orleans
P. O. Box 267
New Orleans, Louisiana.

Dear Sir:

Reference is made to letter dated March 5, 1959 from
the Director of the Port to you regarding the proposed routes
of the Mississippi River-Gulf Outlet from Bayou la Loutre to
the Gulf of Mexico.

Supplementing other information previously furnished
to you by the above referenced letter, there is furnished here-
with a letter received from the New Orleans Tidewater Develop-
ment Assn. dated May 26, 1959. It is requested that this letter
be considered in connection with all other data received by you
on this matter.

In addition to the above, this Board has received and
noted a copy of a letter from the St. Bernard Council, Chamber
of Commerce of the New Orleans Area, addressed to Major General
William A. Carter dated May 25, 1959. A copy of this letter also
is furnished herewith for your records.

It may be noted that these attached letters reinforce
the recommendations previously submitted by this Board concerning
the selection of Route "D". The preponderance of information re-
ceived by this Board from the "user interests" favors the selection
of Route "D" and indicates the unsuitability of Routes "B" and
"E-6".

Based upon all information now available, it is strongly
indicated that the selection of Route "D" would best serve the
over-all purposes of this important project and we confidently
anticipate that your recommendations will favor the selection of
Route "D".

Sincerely yours,

William H. Lewis
Planning Coordinator

att. 2

16                                          Appendix II

NEW ORLEANS TIDEWATER DEVELOPMENT ASSN.
P. O. Box 340
New Orleans, Louisiana

———

Sponsoring "Mississippi River - Gulf Outlet"

May 26, 1959

Colonel William H. Lewis
Planning Coordinator
Board of Commissioners of the Port of New Orleans
P. O. Box 46
New Orleans 6, Louisiana

Dear Colonel Lewis:

We have given careful thought to your letter of May 13,1959, in which you discuss the merits and demerits of Route "D" and Route "E-6" for the Mississippi River-Gulf Outlet. We also considered your report to the District Engineer dated March 5, 1959, in which the various items leading to the selection of one of the two routes are discussed.

It is pertinent to recall that the Tidewater Association has been active in obtaining the authorization for the initial studies as well as in considering the various aspects of those studies and in testifying before the Congress to obtain the basic authorization and subsequent appropriation. Our interest has continued through the appointment by the Governor, of the Dock Board as the assuring agency for the State of Louisiana, the various site considerations and now the construction.

Through this long and sometimes tedious process, we have always leaned heavily upon the basic knowledge that the Corps of Engineers is the best qualified agency dealing with matters of navigation. The obvious fact that the Mississippi River has been changed from a source of annual destruction to a tremendous asset probably makes us more constantly aware of the abilities of the Corps of Engineers than others who do not have this daily reminder.

We agreed with the selection made in the Corps of Engineers report as published in House Document 245. That route was selected after many possibilities had been examined. We again agreed with the selection of that route in the recent reconsideration. We feel that Route "D" with some small local adjustments, as stated in the basic report, is the route for which the Governor appointed the Dock Board to act as the assuring agency, and is the route which has been presented to the Bureau of the Budget and the Congress.

Based upon the foregoing, we recommend and urge that Route "D" remain the route on which the channel will be constructed.

Sincerely,

G. S. Dinwiddie
Acting President

GSD/hma

Appendix II

ST. BERNARD COUNCIL
CHAMBER OF COMMERCE OF THE NEW ORLEANS AREA

315 Camp Street      P. O. Box 1400      New Orleans 5, La.

Tel. Tulane 1131

May 25, 1959

Major General William A. Carter
Division Engineer
Lower Mississippi Valley Division
Vicksburg, Mississippi

Dear General Carter:

In your consideration of the three proposed routes of the Mississippi River Gulf Outlets from Bayou LaLoutre to the Gulf, we urge you to approve Route D.

Route D is a few miles farther north than the route described on the map attached as an exhibit to House Document No. 245, which was the basis for the Act of Congress approved 29 March 1956, Public Law No. 455, 84th Congress, 2nd session. The St. Bernard Council considers this deviation justified because Route D crosses a more continuous land area than either of the other proposed routes thereby affording more land for industrial development.

Route "E-6" would increase the distance to be travelled by ocean going ships to and from the Port of New Orleans to such an extent as to nullify the intended advantage in distance of the Gulf Outlet over the Mississippi River. It would destroy the opportunity for industrial development along its banks in St. Bernard Parish contemplated by the Act.

Sincerely,


Glenn Weekley
Chairman
ST. BERNARD COUNCIL


GW/ja

    CC:  Mr. William H. Lewis


18                                          Appendix II

MISSISSIPPI RIVER-GULF OUTLET, LOUISIANA

GENERAL DESIGN MEMORANDUM NO. 2, GENERAL DESIGN

APPENDIX III

VIEWS OF FISH AND WILDLIFE AGENCIES

### Table of Contents

| Description | Page Number |
|---|---|
| Letter to U. S. Fish and Wildlife Service dated 2/3/59 | 1 |
| Letter to State of La. Wildlife and Fisheries Commission dated 2/3/59 | 2 |
| Letter from State of La. Wildlife and Fisheries Commission dated 3/2/59 | 3 |
| Teletype from U. S. Fish and Wildlife Service dated 6/5/59 | 4 |
| Report on the Possible Biological Effects of Various Routes of the Mississippi River-Gulf Outlet | 5 |

U. S. ARMY ENGINEER DISTRICT, NEW ORLEANS
CORPS OF ENGINEERS
Foot of Prytania Street
New Orleans 9, Louisiana

LMNGY                                              3 February 1959


Regional Director
United States Department of the Interior
Fish and Wildlife Service
Peachtree-Seventh Building
Atlanta 23, Georgia


Dear Sir:

    Reference is made to letter of 22 October 1957 from this
District requesting a review of Routes "B" and "D" on the Missis-
sippi River Gulf Outlet, and your views or preference for one of
the routes.

    Route "E-6" on the inclosed map, File No. J-15-21423, has now
been determined to have merit and is being considered for the
channel alignment.

    It is requested that you inform this District if you know of
any impediments to this route, as well as your views or preference
for one of the routes from a fish and wildlife point of view.

                                    Sincerely yours,



1 Incl.                             DUANE W. ACKERSON
  Map, File J-15-21423              Lt. Col., CE
                                    Acting District Engineer




APPENDIX III



U. S. ARMY ENGINEER DISTRICT, NEW ORLEANS
CORPS OF ENGINEERS
Foot of Prytania Street
New Orleans 9, Louisiana

LMNGY                                                3 February 1959

The Director
State of Louisiana
Wild Life and Fisheries Commission
Civil Courts Bldg.
New Orleans, Louisiana

Dear Sir:

    Reference is made to letter of 22 October 1957 from this
District requesting a review of Routes "B" and "D" on the Missis-
sippi River Gulf Outlet, and your views or preference for one of
the routes and your reply dated 13 November 1957 in which you
expressed the opinion that Route "D" would be less detrimental
than Route "B".

    Route "E-6" on the inclosed map, File No. J-15-21423, has
now been determined to have merit and is being considered for
the channel alignment.

    It is requested that you inform this District if you know
of any impediments to this route, as well as your views or
preference for one of the routes from a fish and wildlife point
of view.

                                        Sincerely yours,

1 Incl.
   Map, File J-15-21423                 DUANE W. ACKERSON
                                        Lt. Col., CE
                                        Acting District Engineer

2                                              APPENDIX III

STATE OF LOUISIANA

WILD LIFE AND FISHERIES COMMISSION
126 Civil Courts Bldg.
New Orleans 16, La.

March 2, 1959

Colonel G.M. Cookson
District Engineer, U.S. Army
Engineer District, New Orleans
P.O. Box 267
New Orleans, La.

Dear Colonel Cookson:

Reference is made to your letter of February 3, 1959 relative
to the Mississippi River-Gulf Outlet Project.

In this letter you requested that we inform your office of any
impediments to route "E-6", as well as our views or preference for
one of the routes described on the attached location map, Mississippi
River-Gulf Outlet, Louisiana, February 1959, File No. J-15-21423,
specifically routes "B", "D" and "E-6" from a fish and wildlife point
of view.

These proposed routes have been considered as was done previously
in our letter to you dated November 13, 1957. It is our opinion, based
on the fish and wildlife resources of the overall area and without the
benefit of biological studies or general engineering data, that route
"D" would be the best alignment of the three alignments suggested.
Previously, it has been established that the area south of route "D"
which would be crossed by route "B", is an important oyster-seed ground
area, and that the area north of Route "D", which would be crossed by
route "E-6, is an important oyster bedding ground area. Thus, it is the
consensus of opinion of our staff that the advantages offered by route
"D" generally following the Bayou La Loutre Channel and its natural
levees geologically derived as a distributary of the Mississippi River,
would provide the most suitable materials for confining the anticipated
salt water intrusion.

It is requested that your office furnish us with engineering data
concerning route "E-6" when additional consideration is given for the
channel alignment.

Sincerely yours,

FLC:iw                                    F. L. CLEMENT
cc:  Regional Director Bureau of Sport    Director
     Fisheries & Wildlife
     Regional Director, Bureau of Commercial Fisheries
     Director, La. Dept. of Public Works

3

APPENDIX III

TELETYPE

NO AT 14 I-SFW

ATLANTA GA 6-5-59 0950R

DIST ENGINEER U S ARMY ENGINEER DIST NEW ORLEANS

FOOT OF PRYTANIA ST  NO

REUR INQUIRY OUR PREFERENCE OF ROUTES B' D' AND E-6' MISSISSIPPI
RIVER-GULF OUTLET PROJECT.  STUDIES TO DATE INDICATE ROUTE D WOULD BE
SIGNIFICANTLY LESS DETRIMENTAL TO FISH RESOURCES WITHIN MARSH AREA
THAN ROUTES B OR E-6' PROVIDED../1/ SPOIL IS PLACED ON NORTH SIDE
OF ALIGNMENT FROM BAYOU LA LOUTRE TO CHANDELEUR SOUND' AND /2/
REASONABLE FEATURES TO REDUCE SILTING EFFECT AND MAINTAIN PRESENT
WATER CIRCULATION PATTERNS ARE INCLUDED IN YOUR CONTRACT SPECIFICATIONS
IN CONSEQUENCE' WE PREFER ROUTE D' WITH CONSTRUCTION AS GENERALLY
QUALIFIED ABOVE.  THE REGIONAL DIRECTOR' BUREAU OF COMMERCIAL FISHERIES'
ST PETERSBURG BEACH' FLORIDA' CONCURS IN THIS STATEMENT.  PLEASE ADVISE
IMMEDIATELY IF YOU ARE UNABLE TO RECOMMEND ROUTE D WITH NORTH SIDE
SPOIL BANK

W L TOWNS' ACTG REGL DIR BUREAU OF SPORT FISHERIES AND WILDLIFE
FJ 0953R

4

APPENDIX III

A REPORT TO THE U. S. ARMY ENGINEER DISTRICT, NEW ORLEANS
ON THE POSSIBLE BIOLOGICAL EFFECTS OF VARIOUS PROPOSED
ROUTES OF THE MISSISSIPPI RIVER-GULF OUTLET

BY

GORDON GUNTER

## INTRODUCTION

The proposed canal starts at a point where it connects with the
Inner Harbor Navigation Canal of New Orleans, the "Industrial Canal"
of the New Orleanian. From there it runs almost due east for about
5 miles following the Intracoastal Waterway. From this point on to
where the channel will connect with waters of the open Gulf, several
alternate routes have been considered and proposed by various groups
and interests along the Mississippi and Louisiana coasts, as well as one
State Government and one branch of the Federal Government.

A dozen or so individual routes have been suggested and appraised,
at least in part, from the engineering standpoint. Various statements
have been made with regard to the biological effects. By and large
these are bald assertions or opinions backed by little supporting data or
information. This is due to the intrinsic nature of the problem, namely,
that no one knows precisely what will happen to the hydrographic and
sedimentary regime of the region when the channel is dug, and no one
can know until after the fact. The writer's ideas are subject to the
same limitations. My general knowledge and acquaintance with the area
involved are set forth in Appendix I.

### The Area Involved

In shortest possible terms the areas which will be affected may be
described as a tongue of marshy islands and interconnecting waters, of
indescribable cartographic complexity, extending northwestward from the
lower east bank of the Mississippi River, and the waters on either side.
This area of some few thousand islands and interconnecting waters is
known as the "Louisiana" marsh. Lying generally northwestward, between
this marsh and the mainland shores of Louisiana and Mississippi are Lake
Borgne with Mississippi Sound connecting on the east. To the south
and east of the marsh are Breton and Chandeleur sounds, which extend
from the lower river, in a slight arc, northeastward, and connecting
with Mississippi Sound, and the open Gulf to the north. This is actually
one large sound, with no geographic separation. It is partially separated
from the Gulf of Mexico to the east by a chain of islands running in a
gentle arc northward, known as the Chandeleur Islands.

In general the waters of Lake Borgne and the western part of
Mississippi Sound are brackish or low salinity, and on rare occasions they

5                                              APPENDIX III

may be fresh, Cf. Gunter (1953) and Butler (1952).  Data in the New
Orleans office taken from seven stations in the eastern part of Lake
Borgne in 1957 and 1958 show that the salinity ranged from less than
2 to less than 11 parts per thousand.

Similar stations in the inner marsh, south of Lake Borgne, show
a range of salinity from 0.5 (fresh water) to 14.5 per mille.  In
the outer marsh, east of Lake Borgne, the salinity ranges were 2.3
to 26.0.  Nine stations in Chandeleur and Breton Sounds showed a
salinity range of 9.5 to 35.0 (sea water).  In eastern Mississippi
Sound the salinities are roughly equivalent to those of Chandeleur
and Breton.

Lake Borgne and similar low salinity areas are prime nursery
grounds for small white shrimp, blue crabs, croakers, menhaden, and
several other common Gulf fishes.  In general the salinity is too low
for oysters.  In west Mississippi Sound the salinity is higher and
oyster reefs are present.

In Breton and Chandeleur Sounds the salinities are too high
generally for oysters, probably because it is optimum for their
enemies such as the oyster borer.  In general, shrimp and fishes migrate
into this area as they grow up, from the marsh and such low salinity
waters as Lake Borgne.  Thus, it is an excellent fishing area for men-
haden and trash fish boats and for shrimp.

The Louisiana marsh is the primary seed oyster area of the State
of Louisiana and it is also the chief producer of oyster canning stock
for the Mississippi plants.  It has some trapping value for muskrat
and other fur producers.  It also contains some 50,000 to 60,000 acres
of so-called fresh water marsh along the southern shores of Lake Borgne.
This is a prime hunting ground for several types of ducks (Cf. Resolution
of Louisiana Wild Life and Fisheries Commission, May 29, 1957).

### Appraisal of the Routes Suggested

a.  Introductory remarks concerning evaluations.

Fishery production for the areas involved are given in Appendix
II.  They are not sharply separated by areas and it is impossible to
say what percentage would be directly involved in the basic mile wide
strip of the channel, resultant spoil, retaining dykes, etc.  Further-
more, the matter is of little importance in comparison to hydrographic
and sedimentary changes which could conceivably have both good and bad
effects over a much wider area, or a predominance of one or the other.
Here again we bump into the basic consideration that no one can prog-
nosticate with much surety concerning hydrographic and sedimentary
changes which will be brought about by the new channel.

In this connection, one general criticism of the channel should

6                                              APPENDIX III

be discussed.  It has been stated by some officials of the Louisiana
Wild Life and Fisheries Commission that the deep channel will permit
and enhance the encroachment of high salinity water into normally low
salinity areas where it will cause considerable damage, such as killing
out the fresh water marsh, the oysters, etc.  However, no one else seems
to be greatly disturbed by this possibility and neither am I, because
the chances seem to be rather remote.  The salinity of Chandeleur
Sound is now as high as sea water at times.  High salinity water would
encroach as a tongue along the bottom of the channel and would not
become mixed with the lighter surface water except by heavy storms such
as hurricanes, which force in much larger volumes of high salinity water
over the marsh.  Furthermore, any alignment of the channel which would
lead to deep (high salinity) water would have the same general effect except
that the longer routes would permit less encroachment and would possibly
be more desirable from the wildlife and fisheries standpoint.  Thus, we are
not involved with this question in evaluating the different alignments
proposed.

An examination of the map will show that none of the marsh area
south of Bayou Terre aux Boeufs ridge would be affected by any proposed
alignment of the channel.  This comprises about one third of the total
marsh area.

All of the several routes alternately proposed or considered for
various reasons may be divided roughly into three and treated under those
headings, because they coincide in general features and differ in only
three ways so far as known probable biological effects are concerned.

### b.  The proposed outlet

This route skirts the southwestern shore of Lake Borgne to Bayou
la Loutre.  From there two or three alternate routes are under considera-
tion.  One would traverse the Bayou la Loutre ridge, as suggested by the
Louisiana Wild Life and Fisheries Commission.  One would go to the south
of this and the other would go across the marsh to the northward to end
south of Cat Island.  Since the chief effect of these routes would be in
bisecting the sound with spoil banks or retaining dykes, and the differ-
ences between an effect in one part of the sound as compared to another
is unknown, there seems to be little to choose from with regard to the
three outlets.

The first part of the channel, skirting Lake Borgne, is a different
matter.  The Louisiana Commission has pointed out that it will cut through
60,000 acres of the finest fresh water duck marsh in the State.  At a
minimum the mile wide channel and dyke, twenty miles long, will destroy
about 13,000 acres of this marsh and ensuing industrial development
will take some more.  On the other hand, it has been pointed out that
the growth of New Orleans will encroach upon this area within the next
fifteen years or so.

7                                              APPENDIX III

Some minimization of damages may be effected by the judicious selection of cuts through the dykes, as recommended by the State biologists, to permit as normal flow of water as possible. Similarly, fresh water locked out of the river through the Industrial Canal may tend to prevent salt water encroachment. In addition, it should be feasible to pump large amounts of fresh water out at this point, as has already been suggested for other points along the lower river.

c.  The Louisiana Wild Life and Fisheries Commission proposal.

With the hope of avoiding damage to the above mentioned duck marsh, the Commission Biologists suggested a channel differing from the proposed one as follows:  The channel would continue eastward a few miles on the Intracoastal Waterway and then turn southward across the southwestern part of Lake Borgne, across Proctor Point and connecting with the proposed channel along the Bayou la Loutre ridge.  Secretary of the Interior Fred H. Seaton, in letters dated 30 July 1958 and 13 October 1958, to Secretary of the Army Wilbur M. Brucker indicated his approval of the State of Louisiana proposal, and requested that this route be adopted.  This proposal has the disadvantage that it traverses water in an area of soupy, uncompacted sediments and will be very hard to hold without virtually complete retaining dykes along both sides.  This would cut off fresh water flow from Lake Pontchartrain and the Pearl River, which are very important influences on the salinity of Lake Borgne and the marshes to the south.  If such an eventuality develops then the duck marsh as well as the remainder of the marsh to the south may be seriously damaged rather than helped.  On the other hand, if construction and maintenance costs are not prohibitive and if suitable openings can be maintained consonant with channel maintenance, the proposal is worth consideration.  The question is closely related to engineering problems, outside of my purview.  In any case, this proposal is not the simple answer to the problem that it might at first appear to be.

d.  The Mississippi proposal

Various private interests in Mississippi have proposed various northerly routes for the channel.  These would entail the utilization of the Intracoastal Waterway eastward to Shell Point or the Rigolets and thence eastward by various routes across Lake Borgne or Mississippi Sound to deep water north of Chandeleur Sound.

This has nothing biologically to recommend it so far as I can see. The spoil or silt from the channel would endanger, if not destroy, Half Moon and Grand Bank reefs in Louisiana and St. Joe reef in Mississippi, the last producing reef in the State but one.

The channel would cross water for a large portion of its length and the spoil or dykes would materially affect the present hydrography, most probably by shunting the Pontchartrain and Pearl River flows to the eastward.  This would doubtless benefit the reefs off Pass Christian,

8                                                          APPENDIX III

but it would certainly harm the "Louisiana Marsh" oysters from which most Mississippi production has come for years.  It would have similar effects on the shrimp and menhaden producing areas in the marsh, as well as the duck marsh, and in the long run the State of Mississippi would be harmed.

The so-called E-6 route of the Engineers would satisfy other aims of the Mississippians without running the chance of great damage and biologically, it is much to be preferred.

Respectfully submitted,

January 8, 1959

Gordon Gunter
Consultant

APPENDIX III

APPENDIX I

The writer began work on the Gulf of Mexico with the Shrimp Investigations of the former U. S. Bureau of Fisheries in July 1931, and has more or less been at it ever since.  The attached sheets outline the general professional activities.

My present position is director of the Gulf Coast Research Laboratory. I also carry nominal appointments as Professor of Biology in Mississippi Southern College, Professor of Zoology in Mississippi State University, and Professor of Biology in the University of Mississippi.

I am currently a member of the Committee on Marine Mammals of the American Society of Mammalogists, a member of the Committee on Water Pollution of the American Fisheries Society, and a member of the Board of Governors of the American Society of Ichthyologists and Herpetologists. With Dr. J. E. McKee, Professor of Sanitary Engineering in the California Institute of Technology, I am a member of a two-man board appointed by the Water Pollution Control Commission of the State of Washington to set up a water use standard with relation to the oyster and pulp mill industries.  I am also a member of various committees of the Gulf States Marine Fisheries Commission.

The writer has kept up with the general situation regarding the Mississippi-Gulf Outlet through discussions at the meetings of the Gulf States Marine Fisheries Commission.  In addition, I have recently discussed all phases of the biological situation with almost all of the State and Federal biologists now involved.  In general they are of the same mind as the writer.  They do not know precisely what will happen, but they are collecting basic data to compare with future, so that they can determine with some precision what does take place.  This is a matter of considerable importance and this biological work should be continued during the time and after the outlet is dug.

APPENDIX III

## APPENDIX II

Due to the short period of time involved, we have not been able to collect fishery statistics from all of the areas involved. However, as the writer has stated above, these figures are not as important as they might at first appear because the influences that cause them to vary may be considerably restricted, or by the same token, widely extended, in ways that are completely unknown.

The following figures are furnished by the New Orleans office of the U. S. Fish and Wildlife Service and they constitute the best available information. These are the heads off or tail weight of shrimp. For conversion to heads on weight these figures should be multiplied by 1.68.

| Area | 1956 | 1957 | Jan-Jun, 1958 |
|------|------|------|---------------|
| Inside Chandeleur Island | 59,402 | 16,261 | - |
| Chandeleur & Breton Sounds | 2,469,632 | 1,279,126 | 95,305 |
| Mississippi Sound, Western Area | 523,889 | 638,211 | 202,875 |
| Lake Borgne | 8,492 | 202,875 | 141,861 |

12                                             APPENDIX III