APPENDIX E

REPORT ON CONTROLLING ELEVATION OF SEABROOK LOCK

APPENDIX E

1507-03 (Lake Pontchartrain)   18 Jan 67

LMVED-TD (NOD 19 Oct 66)          3d Ind
SUBJECT:  Lake Pontchartrain, La. and Vicinity - Report on Controlling
          Elevation of Seabrook Lock

DA, Lower Miss. Valley Div, CE, Vicksburg, Miss.  39180  18 Jan 67

TO:  District Engineer, New Orleans District, ATTN:  LMNED-PP

     Referred to note approval of controlling elevation of 7.2 feet
msl for Seabrook, unless modified by studies now underway.

     FOR THE DIVISION ENGINEER:

                         A. J. DAVIS
                         Chief, Engineering Division



**DEPARTMENT OF THE ARMY**

NEW ORLEANS DISTRICT, CORPS OF ENGINEERS
P. O. BOX 60267
NEW ORLEANS, LOUISIANA

IN REPLY REFER TO
LMNED-PP                                                    19 October 1966

SUBJECT:   Lake Pontchartrain, La. and Vicinity - Report on Controlling
           Elevation of Seabrook Lock


TO:        Acting Division Engineer, Lower Mississippi Valley
           ATTN:  LMVED-TD


    1.   <u>Authority and scope</u>.  This report is prepared in accordance
with instructions contained in LMVED-TD 1st Indorsement dated 8
December 1965 to LMNED-PP letter dated 5 November 1965, subject
"Revised Outline of Planning Procedure for 'Lake Pontchartrain, La. &
Vicinity,' project," and in paragraph 9.b. of EM 1110-2-1150 dated
1 July 1966, for the purpose of establishing the bases for changing
the controlling elevation of the authorized Seabrook Lock from that
specified in the project document.

    2.   <u>Project authorization</u>.  The "Lake Pontchartrain, La. and
Vicinity," project was authorized by the Flood Control Act of 1965
(Public Law 89-298, approved 27 October 1965), substantially in
accordance with the recommendations of the Chief of Engineers in his
report printed as House Document No. 231, 89th Congress.

    3.   <u>Project description</u>.  The project consists of two independent
features:  the Lake Pontchartrain Barrier Plan and the Chalmette Area
Plan.  Only the former is pertinent to this report.  The Lake Pontchartrain
Barrier Plan will serve to protect areas contiguous to the shores of
Lake Pontchartrain from flooding by hurricane surges.  The keystone around
which the plan is built is the Lake Pontchartrain barrier--a system of
levees and control structures, the purpose of which is to limit uncon-
trolled entry of hurricane tides into Lake Pontchartrain, while pre-
serving navigation access.  The barrier would comprise enlarged
embankments along the existing seaward levee system, new embankment
extending to high ground on the north side of the Rigolets with regu-
lating tidal and navigation structures in the Rigolets and Chef
Menteur Pass, and a dual-purpose navigation lock in the Inner Harbor
Navigation Canal (IHNC) at Seabrook.  In addition to the barrier, addi-
tional protective works consisting of new lakeshore levees in St.
Charles Parish and the Citrus and New Orleans East areas of Orleans
Parish, and enlargement or strengthening of existing protective works in
Jefferson and Orleans Parishes and at Mandeville will be provided (see
incl 1).

LMNED-PP                                    19 October 1966
SUBJECT: Lake Pontchartrain, La. and Vicinity - Report on Controlling
         Elevation of Seabrook Lock

    4.   Need for Seabrook Lock. Prior to construction of the
Mississippi River-Gulf Outlet (MR-GO), the salinity regimen in Lake
Pontchartrain was largely controlled by the interaction between
surface runoff entering it, and tidal inflows from Lake Borgne via
the Rigolets and Chef Menteur Pass. The 30-foot deep IHNC channel
(see incl 2) was connected to Lake Borgne by the Gulf Intracoastal
Waterway (GIWW) through the Rigolets and Chef Menteur Pass (see incl 1),
but, because of the relatively small, shallow cross section (12' by
125') of the Waterway, this connection exerted little influence on
salinities in Lake Pontchartrain. Construction of the MR-GO
established a large, deep (36' by 500') direct connection with the
highly saline waters of Breton Sound. Tidal flow in the MR-GO reaches
Lake Pontchartrain via the IHNC, and salinities in the lake and in the
marsh adjacent to the MR-GO have increased significantly since its
completion. Unless means are provided to restore a favorable salinity
regimen, major damage to marine life in the lake and in the marsh
traversed by the MR-GO may be anticipated.

    5.   A related problem deriving from the construction of the
MR-GO is the generation of excessive tidal currents in the IHNC.
These increased currents produce navigation difficulties and aggravate
scour problems at bridges and along harbor developments.

    6.   The problems described above relate to normal tidal condi-
tions, and even in the absence of hurricane effects, control works in
mitigation are warranted.

    7.   As alluded to previously, the Lake Pontchartrain Barrier
Plan is based upon limiting the entry of hurricane-driven waters into
Lake Pontchartrain. In order that this may be accomplished, the MR-GO -
IHNC link must be controlled. Further, some means for controlling flow
from Lake Pontchartrain into the IHNC during hurricanes which produce
conditions critical to the south shore of Lake Pontchartrain is
essential.

    8.   Study of various alternatives leads to the conclusion that
control of salinity in Lake Pontchartrain, management of excessive
currents in the IHNC, and control of flow from the canal to Lake
Pontchartrain and vice versa during hurricane periods can be best
achieved by a control structure at Seabrook. Inasmuch as navigation
between Lake Pontchartrain and the IHNC must be preserved, a lock is
essential.

LMNED-PP                                     19 October 1966
SUBJECT:  Lake Pontchartrain, La. and Vicinity - Report on Controlling
          Elevation of Seabrook Lock

    9.  <u>Description of Seabrook Lock (as authorized)</u>.  The lock as
authorized would have a concrete chamber 800 feet long and 84 feet
wide with sill elevation at -15.8 feet m.s.l.  Gates would be of the 60°
radial type.  The landward gate bay structure would be connected to
shore by a rockfill embankment.  The top elevations of the rockfill
embankment and the landward gate bay and radial gates would be 13.2 feet
m.s.l.

    10.  <u>Considerations involved in selecting the controlling elevation
of Seabrook Lock</u>.  The term "controlling elevation" as used herein
refers to the elevation at which uncontrolled overflow of the Seabrook
structure will commence.  The structure may be thought of as having two
distinct parts--the lock structure proper, consisting of the gate bays,
gates and lock chamber, and the rock dike.  In considering uncontrolled
overflow of the structure, only the rock dike should be considered
inasmuch as the required elevations of the chamber walls, gates, and gate
bays must be based on considerations relating to the safe and efficient
operation of the lock under various conditions, whereas the elevation
of the rock dike may be determined on the basis of how well it will
serve hurricane flood control objectives.  As will be shown later herein,
factors relating to the safe and efficient operation of the lock will
require top elevations for the walls, gates, and gate bay which are
essentially confining insofar as design hurricane surges are con-
cerned.  Thus uncontrolled overflow will involve the rock dike only and,
as a practical matter, the controlling elevation of the structure will
be equal to the crest elevation of the rock dike.  This report will
be limited in scope to fixing the crest elevation of the rock dike;
elevations relating to the lock proper and the bases therefor will be
established in the general design memorandum for the lock.

    11.  In the studies which led to authorization of the Seabrook Lock,
it was considered that, irrespective of any requirements imposed by
considerations of hurricane control, the lock, in order to be operable
for navigation on a full-time basis (exclusive of major storms and
hurricanes), would require a controlling elevation of 8.0 feet m.l.g.
(7.2 feet m.s.l.).  This elevation was based on the assumption that the
lock should be usable for any combination of tides up to three feet and
winds up to 25 m.p.h.  Based on the conclusion that any interchange of
flow between Lake Pontchartrain and the IHNC during a hurricane should
be prevented, the controlling elevation was set at 13.2 feet m.s.l.--
the elevation required to prevent overtopping of the rock dike and lock
by a tidal surge resulting from passage of the standard project hurricane
(SPH) critical to the IHNC; i.e., overtopping from the Canal side.  The
probable crest elevation on the Lake Pontchartrain side, resulting from
passage of the SPH on a track critical to the south shore, including wind
setup and wave runup, would be some two feet lower.

3

LMNED-PP                                              19 October 1966
SUBJECT:  Lake Pontchartrain, La. and Vicinity - Report on Controlling
          Elevation of Seabrook Lock

12.  The passage of hurricane "Betsy" in September 1965 demonstrated
that, under certain conditions, permitting flow to enter Lake
Pontchartrain from the IHNC is advantageous.  "Betsy's" surge crested
at approximately 11 feet m.s.l. at the junction of the Canal and the
MR-GO, while at Seabrook the crest stage was about 6 feet m.s.l.

13.  Flow computations in the IHNC for passage of the SPH (using
latest U. S. Weather Bureau hurricane parameters) on a path critical to
the IHNC, assuming that the Seabrook structure is built so that the
rock dike overtops at elevation 7.2 feet m.s.l., indicate that a
discharge of 27,000 c.f.s. would flow from the IHNC into Lake Pontchartrain
at the crest of the hurricane surge.  The water surface elevations at the
MR-GO junction and at Seabrook (canal end of the lock) would be 14.0
feet m.s.l. and 11.5 feet m.s.l., respectively.  The profiles of the
water surface between these two points for both a confining structure
at Seabrook and one which would overtop at elevation 7.2 feet m.s.l. are
shown on incl 3.  In addition to reducing the required levee grades
on the IHNC, the overtopping structure would reduce flood damages to
industrial plants along the Canal which are located outside the levee
system.

14.  With a controlling elevation of 7.2 feet m.s.l. for the
Seabrook structure, water will flow from the IHNC into the lake for a
period of about 15 hours during the passage of the SPH as described
in paragraph 13 above.  This inflow would raise the average lake
level by about 0.05 foot.  The increase would have no significant
effect on grade requirements for the lakefront levee systems.

15.  Storm paths other than that critical to the IHNC can produce
higher stages in the lake than in the canal.  With the barrier in place,
however, the peak stillwater elevation lakeward of Seabrook for the SPH
critical to the south shore of Lake Pontchartrain would be about 7 feet
m.s.l.  Thus overtopping from the lake into the canal would be limited
to wave action only.  Inasmuch as this overtopping would occur at a
time when the winds would be tending to reduce stages in the canal, it
would be of little significance.

16.  Lowering the controlling elevation below 7.2 feet m.s.l.
would further reduce the stage in the canal at Seabrook.  The point
of diminishing returns in this regard is largely reached, however, at
the crest elevation of 7.2 feet m.s.l., since, to achieve significant
lowerings in the water surface at the lakeward end of the canal, a
substantial additional lowering of the dike would be required.  On
the other hand, any substantial reduction in the crest of the rock dike
below elevation 7.2 feet m.s.l. would be undesirable for a number of

LMNED-PP                                        19 October 1966
SUBJECT:  Lake Pontchartrain, La. and Vicinity - Report on Controlling
          Elevation of Seabrook Lock

    12. The passage of hurricane "Betsy" in September 1965 demonstrated
that, under certain conditions, permitting flow to enter Lake
Pontchartrain from the IHNC is advantageous. "Betsy's" surge crested
at approximately 11 feet m.s.l. at the junction of the Canal and the
MR-GO, while at Seabrook the crest stage was about 6 feet m.s.l.

    13. Flow computations in the IHNC for passage of the SPH (using
latest U. S. Weather Bureau hurricane parameters) on a path critical to
the IHNC, assuming that the Seabrook structure is built so that the
rock dike overtops at elevation 7.2 feet m.s.l., indicate that a
discharge of 27,000 c.f.s. would flow from the IHNC into Lake Pontchartrain
at the crest of the hurricane surge. The water surface elevations at the
MR-GO junction and at Seabrook (canal end of the lock) would be 14.0
feet m.s.l. and 11.5 feet m.s.l., respectively. The profiles of the
water surface between these two points for both a confining structure
at Seabrook and one which would overtop at elevation 7.2 feet m.s.l. are
shown on incl 3. In addition to reducing the required levee grades
on the IHNC, the overtopping structure would reduce flood damages to
industrial plants along the Canal which are located outside the levee
system.

    14. With a controlling elevation of 7.2 feet m.s.l. for the
Seabrook structure, water will flow from the IHNC into the lake for a
period of about 15 hours during the passage of the SPH as described
in paragraph 13 above. This inflow would raise the average lake
level by about 0.05 foot. The increase would have no significant
effect on grade requirements for the lakefront levee systems.

    15. Storm paths other than that critical to the IHNC can produce
higher stages in the lake than in the canal. With the barrier in place,
however, the peak stillwater elevation lakeward of Seabrook for the SPH
critical to the south shore of Lake Pontchartrain would be about 7 feet
m.s.l. Thus overtopping from the lake into the canal would be limited
to wave action only. Inasmuch as this overtopping would occur at a
time when the winds would be tending to reduce stages in the canal, it
would be of little significance.

    16. Lowering the controlling elevation below 7.2 feet m.s.l.
would further reduce the stage in the canal at Seabrook. The point
of diminishing returns in this regard is largely reached, however, at
the crest elevation of 7.2 feet m.s.l., since, to achieve significant
lowerings in the water surface at the lakeward end of the canal, a
substantial additional lowering of the dike would be required. On
the other hand, any substantial reduction in the crest of the rock dike
below elevation 7.2 feet m.s.l. would be undesirable for a number of

4

LMNED-PP
SUBJECT:  Lake Pontchartrain, La. and Vicinity - Report on Controlling
          Elevation of Seabrook Lock

19 October 1966

reasons.  First, it would result in a measurable increase in the
design levels of Lake Pontchartrain with a corresponding increase
in the grades for the lakefront levee systems.  Because of the length
of levees involved in these systems, the costs for effecting even a
small increase in grade would be excessive when compared to the benefits
which would result in the IHNC.  Second, it would place the crown of the
rock dike below the maximum stillwater level in Lake Pontchartrain
for major hurricanes on tracks critical to the south shore of the lake
and permit direct overflow of the dike to the detriment of conditions
in the IHNC.  Third, it would subject the dike to overtopping by
waves for a number of combinations of non-hurricane winds and tides.
Normal access to the lock for operating personnel will be along the
crown of the dike and such overtopping would be most undesirable.
Finally, the dike would have little or no freeboard over tidal ele-
vations which are experienced outside of the hurricane season every year:
sustained east and southeast winds of moderate velocity may be
expected to generate tidal stages between 4 and 5 feet m.s.l. at least
once each year.

17.  Inasmuch as the above considerations rule out a controlling
elevation lower than 7.2 feet m.s.l. and since a higher controlling
elevation would result in higher stages on the IHNC lakeward of the
MR-GO without offering advantages elsewhere, a controlling elevation of
7.2 feet m.s.l. is optimum insofar as limitation of hurricane-
generated flows in the IHNC is concerned.

18.  Insofar as the requirements of navigation are concerned, con-
sideration must be given to needs arising out of lock operation under
normal or average conditions as well as those from combinations of
abnormal winds and/or tides.  The top of the lockwalls and gates
should be at least 10 feet above the normal high tides to facilitate
mooring of light-loaded barges in day-to-day operations.  Further, the
lockwalls should be high enough to permit personnel to work thereon
under the most extreme conditions of wind and tide for which the lock is
likely to be used; similarly, the gates should be high enough to permit
use of the gate walkways under such conditions.  The above considera-
tions require that the tops of the lockwalls and gates be well above
7.2 feet m.s.l.  They relate to the lock structure only, however, and
impose no limitation on the elevation of the rock dike.  Overtopping of
the rock dike with crest at elevation 7.2 feet m.s.l. would occur
infrequently, and would not seriously impede navigation when it does
occur.

5

LMNED-PP                                      19 October 1966
SUBJECT:  Lake Pontchartrain, La. and Vicinity - Report on Controlling
          Elevation of Seabrook Lock

19.  With the crown of the rock dike at elevation 7.2 feet m.s.l.
maximum velocities in the IHNC for passage of the SPH on the track
critical to the Canal would range from about 1.5 f.p.s. in the Canal
proper to 5 f.p.s. at the bridges.  Considering the short interval of
time during which these velocities would obtain, major scour problems
are not anticipated.

20.  Implications to local cooperation involved in lowering the
controlling elevation of Seabrook Lock.  In the survey report on which
project authorization is based, the provision of a navigation lock at
Seabrook for mitigation of undesirable effects resulting from the
construction of the MR-GO was recognized to be a Federal responsibility,
and a cost estimate for a lock with a controlling elevation of 7.2 feet
m.s.l. (which elevation was considered adequate to meet the needs of
navigation) was prepared to establish the basic Federal responsibility
under the navigation function.  A second cost estimate for a lock with
a controlling elevation of 13.2 feet m.s.l. (which elevation was
considered necessary to meet the needs of hurricane flood control)
also was prepared.  The difference between these two estimated costs
was then taken to be the added cost for hurricane flood control.  The
survey report recommended construction of the Lake Pontchartrain
Barrier Plan subject to the condition, inter alia, that local interests
contribute not less than 30% of the first cost of the project including
the hurricane flood control increment of the cost of the Seabrook Lock
as computed above.  The local interest share of the increment, based on
survey report estimates, was $120,000.

21.  The recommendations relative to Seabrook Lock contained in
the survey report were approved by the Division Engineer, Lower
Mississippi Valley, the Board of Engineers for Rivers and Harbors, and
the Chief of Engineers.  The Bureau of the Budget, however, questioned
the allocated cost, noted that standard methods of cost allocation
appeared to be inapplicable, and recommended that the cost be allocated
equally between the navigation and hurricane flood control functions.
Under these cost-sharing arrangements, local interests are required to
contribute 30% of half of the total construction cost for the lock with
controlling elevation of 13.2 feet m.s.l., rather than 30% of the added
cost for such a lock over a similar lock with controlling elevation 6
feet lower.  Based on survey report estimates, this results in addi-
tional costs to local interests of $687,000.  In transmitting the
report of the Chief of Engineers to Congress, the Secretary of the
Army concurred in the view of the Bureau of the Budget with "...the
understanding that this apportionment of costs would not unduly delay
construction...."  Authorization of the project by Public Law 89-298
specified that the recommendations of the Secretary of the Army with
respect to Seabrook Lock would apply.

6

LMNED-PP                                      19 October 1966
SUBJECT: Lake Pontchartrain, La. and Vicinity - Report on Controlling
         Elevation of Seabrook Lock

22. <u>Views of local interests</u>. By letter dated 13 April 1966,
the State of Louisiana, Department of Public Works, the agency
appointed by the Governor of Louisiana to coordinate the local coopera-
tion on the project, informed the District Engineer, U. S. Army
Engineer District, New Orleans, that local interests favored a
reduction in the controlling elevation of the Seabrook Lock, and were
opposed to the local cooperation requirements for the lock as
authorized. A copy of the letter is inclosed (see incl 4). Despite
this opposition, the Orleans Levee District, the agency appointed by
the Governor of Louisiana to furnish the local cooperation required for
the project, on 28 July 1966 adopted an acceptable act of assurance
covering the local cooperation for the entire Lake Pontchartrain
Barrier Plan. The act of assurance was accepted by and for the United
States on 10 October 1966.

23. <u>Discussion</u>. The approaches of the reporting officers and the
Bureau of the Budget in determining the local cooperation for the
Seabrook Lock were radically different. The reporting officers hold,
in effect, that the needs for mitigation of MR-GO effects, which are
assignable to the navigation function, are prior to those of hurricane
flood control and should be assumed to have been met before hurricane
flood control requirements are considered. This is essentially
equivalent to assuming that a lock capable of meeting the needs for
mitigation is in place before hurricane flood control requirements are
considered and that the cost for meeting these requirements is limited
to the cost of any modifications to the basic lock which are necessary
to provide for the hurricane flood control requirements (except, of
course, that the cost advantage of concurrent construction is enjoyed).
The Bureau of the Budget takes a contrary view, concluding that the lock
is needed as much for one function as the other and rejecting the reporting
officers' incremental approach to providing for hurricane flood control
requirements.

24. In transmitting the survey report to Congress, the Secretary
of the Army concurred in the views of the Bureau of the Budget in regard
to the requirements of local cooperation for Seabrook Lock with the
proviso that "...this apportionment of costs would not unduly delay
construction,...." Accordingly, it would appear that an opportunity
for modifying the authorized requirements of local cooperation for
the lock, without further Congressional action, would arise only in the
event that local interests refused to provide the required assurances of
local cooperation for the project and cited as the reason therefor their
dissatisfaction with the cost-sharing arrangements for Seabrook Lock.
Inasmuch as local interests have provided the requisite assurances of
local cooperation for the entire barrier plan, the requirements
authorized for the Seabrook Lock will have to remain in force unless and
until they are modified by the Congress.

7

LMNED-PP                                         19 October 1966
SUBJECT:  Lake Pontchartrain, La. and Vicinity - Report on Controlling
          Elevation of Seabrook Lock

25.  The question has been raised as to whether lowering the
controlling elevation of the Seabrook Lock involves a modification of
the authorized local cooperation which is beyond the discretionary
authority of the Chief of Engineers (see LMVED-TD letter to OCE dated
8 December 1965 subject "Lake Pontchartrain and Vicinity, Louisiana,"
copy of which is inclosed, incl 5).  This concern would appear to be
without foundation.  In effect, the authorizing law directs that a lock
capable of serving both the needs of hurricane flood control and
mitigation of MR-GO effects be designed and constructed and that the
costs for the lock be shared equally by the navigation and hurricane
flood control functions.  Thus, the requirements of local cooperation
for the lock are clearly independent of its physical configuration and
controlling elevation.

26.  Inasmuch as the requirements of local cooperation for the
Seabrook Lock as authorized are independent of the controlling eleva-
tion of the lock, selection of the controlling elevation may be based
on purely technical considerations.  A departure from the project
document plan based on such considerations is clearly within the dis-
cretionary authority of the Chief of Engineers.

27.  <u>Conclusions</u>.  Based on the material presented herein, it is
concluded that:

a.  A change in the controlling elevation of Seabrook Lock
from the authorized elevation of 13.2 feet m.s.l. to elevation 7.2
feet m.s.l. is both feasible and desirable.  The reduction in con-
trolling elevation will lower the required levee grades on the IHNC
north of its junction with the MR-GO and reduce flood damages to
industries located outside the levee system on the banks of the canal
for hurricanes on tracks critical to the canal.  It will not result in
any significant increase in average lake levels during hurricanes, and
thus will have no practical effect on levee grade requirements for the
lakefront levee systems.

b.  A controlling elevation of 7.2 feet m.s.l. is optimum.
A higher controlling elevation would increase the levee grade require-
ments on the IHNC and damage riparian industries outside the levee
system without producing any compensating advantage.  A materially lower
controlling elevation would be clearly undesirable.  It would
significantly raise average lake levels during hurricanes and thus
require upward revision of the grades of all the lakefront protective
systems, while producing little additional reduction of stages in the
IHNC.

LMNED-PP

19 October 1966

SUBJECT: Lake Pontchartrain, La. and Vicinity - Report on Controlling Elevation of Seabrook Lock

c.   The requirements of local cooperation for the Seabrook Lock as contained in the authorizing law are fixed and can only be changed by further action on the part of the Congress.

d.   The authorized requirements of local cooperation for the Seabrook Lock are independent of the controlling elevation of the lock.

e.   The selection of a controlling elevation for the Seabrook Lock involves technical considerations only, and a change in controlling elevation from that contained in the survey report on which authorization is based may be treated as a departure from the project document plan within the discretionary authority of the Chief of Engineers.

28.   Recommendations.  It is recommended that the Seabrook Lock be designed with a controlling elevation of 7.2 feet m.s.l.; that the change in controlling elevation be covered as a departure from the project document plan in the general design memoranda for the Lake Pontchartrain Barrier Plan and the Seabrook Lock; and that this report be included as an appendix to both memoranda.

5 Incl (quint)
  1. General map, file No.
       H-2-24040/plate 1
  2. Map IHNC, file No.H-2-24040/plate 2
  3. Profile, IHNC, file No. H-2-24040/plate 3
  4. DPW ltr dtd 13 Apr 66
  5. LMVED-TD ltr dtd 8 Dec 66

THOMAS J. BOWEN
Colonel, CE
District Engineer

9

① Engin'g
② Real Estate

LMVED-TD (NOD 19 Oct 66)          1st Ind
SUBJECT:  Lake Pontchartrain, La. and Vicinity - Report on Controlling
          Elevation of Seabrook Lock

DA, Lower Miss. Valley Div, CE, Vicksburg, Miss. 39180  9 Nov 66

TO:  Chief of Engineers, ATTN: ENGCW-V/ENGCW-EH/ENGCW-EZ/ENGRE-AP

    1.  Subject report is forwarded for review and approval pursuant
to para 9, ER 1110-2-1150.  The recommendations of the District Engineer
in para 28 are concurred in.

    2.  The location of Seabrook Lock with adjoining rock dike is shown
on Plate 4 of Interim Survey Report dated 21 Nov 62 and forwarded by
our 1st Ind, LMVGN, dated 18 Jan 63.  The Survey Report was printed as
HD No. 231, 89th Congress, 1st Session.  Plate 4 was not included in
the printed document.

    3.  The correspondence referred to in para 1, basic communication,
instructed the District to make a study to determine the controlling
elevation for Seabrook Lock and to prepare a letter report, discussing
their findings, for submission to your office.

        FOR THE ACTING DIVISION ENGINEER:


5 Incl (quad)
   wd 1 cy ea                          A. J. DAVIS
                                       Chief, Engineering Division
Copy furnished:
  New Orleans District
  ATTN:  LMNED-PP


                              10

ENGCW-EZ (19 Oct 66)                    2nd Ind
SUBJECT:  Lake Pontchartrain, La. and Vicinity - Report on Controlling
          Elevation of Seabrook Lock

DA, CofEngrs, Washington, D. C., 20315, 12 January 1967

TO:  Division Engineer, Lower Mississippi Valley Division

     The controlling elevation of 7.2 feet m.s.l. for the proposed
Seabrook Lock appears reasonable and is approved, subject to consideration
of such modifications as may be indicated by the results of surge studies
now under way on the effects of the Mississippi River - Gulf Outlet and
surge studies for south shore Lake Pontchartrain.  These studies are
referred to in paragraph 8d(7) of Design Memorandum No. 1, Hydrology and
Hydraulic Analysis, Part I, Chalmette and paragraph 13 of Design Memorandum
No. 3, Chalmette Area Plan, General Design.

       FOR THE CHIEF OF ENGINEERS:

wd Incl                                 WENDELL E. JOHNSON
                                        Chief, Engineering Division
                                        Civil Works

11



PLATE I



REPORT ON
CONTROLLING ELEVATION OF
SEABROOK LOCK

PLAN MAP
INNER HARBOR NAVIGATION CANAL

TO ACCOMPANY LETTER
REPORT DATED: 19 OCT. 1966

FILE NO. H-2-24040

PLATE 2





**LEON GARY**
DIRECTOR

**STATE OF LOUISIANA**

DEPARTMENT OF PUBLIC WORKS

BATON ROUGE

April 13, 1966

Colonel Thomas J. Bowen
District Engineer
New Orleans District
Corps of Engineers, U.S. Army
P. O. Box 60267
New Orleans, Louisiana   70160

Dear Colonel Bowen:

As you know, the interim survey report for Lake Pontchartrain,
Louisiana and Vicinity, recommended construction of a lock in
Lake Pontchartrain near the terminus of the Inner Harbor Naviga-
tion Canal (Seabrook). The purposes of this lock are to alleviate
undesirable current conditions in the canal generated by the
Mississippi River-Gulf Outlet; provide for the preservation of a
favorable salinity regimen in Lake Pontchartrain by permitting
control of a tendency for the Mississippi River-Gulf Outlet to
produce higher salinities in the lake; and for control of hurricane
inflow. The interim survey report called for a lock with a con-
trolling elevation of 13.2 feet above mean sea level, which eleva-
tion would not be exceeded by the stages expected to result from
the passage of the design hurricane. The report further recom-
mended that the costs of this feature chargeable to the hurricane
project be limited to the differential in cost between the recom-
mended lock and one with a controlling elevation based on
Mississippi River-Gulf Outlet requirements alone (then estimated
to be 7.2 above mean sea level). On the above basis, the costs
chargeable to the hurricane protection project would have been
$400,000 and the local cooperation would have amounted to $120,000.

In reviewing the interim survey report, the Bureau of the Budget
recommended a change in the cost sharing specified in the report
to provide for allocation of the costs equally between the naviga-
tion and hurricane protection functions. The Secretary of the Army
agreed to the change with "... the understanding that this appor-
tionment of costs would not unduly delay construction ..." The
project, "Lake Pontchartrain, Louisiana and Vicinity," was ulti-
mately authorized in accordance with this recommendation of the
Secretary of the Army, resulting in an estimated additional cost
to local interests of $687,000.

We understand that consideration is now being given, on technical
grounds, to a reduction in the controlling elevation of the Seabrook
Lock. We are of the opinion that such reduction is desirable.
Hurricane "Betsy" demonstrated the advantages of having some outflow
from the canal under certain conditions, in that stages at the lake

Colonel Thomas J. Bowen
District Engineer
New Orleans District
Corps of Engineers, U.S. Army
April 13, 1966
Page 2

end of the canal were some 3 to 4 feet lower than those at the
Inner Harbor Navigation Canal Lock as a result of outflow from
the canal.

We are opposed to the local cooperation requirements for the
Seabrook Lock as recommended by the Bureau of the Budget. We
are of the opinion that the construction of a lock adequate to
serve adequately the needs of navigation, lake ecology, and current
regulation will also provide the degree of control of hurricane
inflow required. The Mississippi River-Gulf Outlet project pre-
ceded the hurricane protection project. The need for current
and salinity control was generated by the Mississippi River-Gulf
Outlet, not by the hurricane protection project. It is only
proper, therefore, that these needs be satisfied entirely under
the Mississippi River-Gulf Outlet project, and that the question
of assignment of some costs to the hurricane protection project
be considered only if the facilities required to fulfill such
needs fail to meet the requirements of the hurricane protection
project. In the event that the latter should prove to be the case,
we consider that the cost sharing should be along the lines speci-
fied in the interim survey report rather than those recommended by
the Bureau of the Budget.

In view of the above, we consider that the cost sharing on the
Seabrook feature as recommended by the Bureau of the Budget is
improper, and we recommend that consideration be given to deleting
or modifying, as appropriate, the present requirement for a local
contribution toward the cost of construction of this feature.

Sincerely yours,

CALVIN T. WATTS
Assistant Director

/an

LMVED-TD                                         8 December 1965

SUBJECT:   Lake Pontchartrain and Vicinity, Louisiana

TO:        Chief of Engineers
           ATTN:   ENGCW-V/ENGCW-EH/ENGCW-EZ


1.  The project for Lake Pontchartrain and Vicinity, Louisiana
(hurricane protection) was authorized by the Flood Control Act of 1965
(PL 89-298) at an estimated Federal cost of $56,235,000 substantially
in accordance with the recommendation of the Chief of Engineers in
House Document 231, 89th Congress, except that the recommendation of
the Secretary of the Army in that document shall apply with respect to
the Seabrook Lock feature of the project.  The Secretary of the Army
recommended that the cost of the Seabrook Lock feature be allocated
equally between navigation and hurricane protection purposes.  The
basis for this allocation of cost was that the lock would serve a dual
purpose - mitigating anticipated adverse effects of the Mississippi
River-Gulf Outlet navigation project, and serving as an element in the
hurricane surge control project.

2.  In view of hurricane Betsy's experience, the District Engineer
recognized the possibility that some benefits might be derived along the
Inner Harbor Navigation Canal connecting the Mississippi River-Gulf
Outlet and Lake Pontchartrain by reducing the controlling elevation of
Seabrook Lock.  By letter dated 19 October 1965, the District Engineer
proposed to reduce the controlling elevation of Seabrook Lock from
elevation 13.2 feet msl to 7.2 feet msl.  His proposal was approved by
our 1st indorsement dated 17 November 1965.  Copies of basic letter and
1st indorsement are inclosed herewith for ready reference, copies having
been previously furnished OCE to the attention of ENGCW-EH/ENGCW-EZ.

3.  Construction of Seabrook Lock to elevation 7.2 feet msl would be
a departure from the project document plan.  Inasmuch as the lock would
be a single-purpose structure for mitigation of effects caused by the
Mississippi River-Gulf Outlet project its cost would be charged to that
project and the allocation of costs recommended by the Secretary of the
Army would be modified.  This has raised the question as to whether


Incl 5   NOD, ATTN:   LMNED-PP

LMVED-TD                                                    8 December 1965
SUBJECT:  Lake Pontchartrain and Vicinity, Louisiana

authority exists for modifying the project to the extent proposed in
inclosed NOD letter of 19 October 1965 in light of the language contained
in the Flood Control Act of 1965.  In view of this uncertainty, and in
the absence of more concrete support for the proposed modification, the
District Engineer is being instructed to prepare a letter report taking
into consideration all factors involving the modification, including
technical data, the views of local interests, and the apportionment of
costs between Federal and non-Federal interests.  In compliance with
paragraph 10, EM 1110-2-1150, the letter report will be forwarded to you
with our recommendations for review and approval.

             FOR THE DIVISION ENGINEER:


1 Incl (dupe)                        GEORGE B. DAVIS
   Cy ltr, LMNED-PP, NOD,            Acting Chief, Engineering Division
   19 Oct 65 w/1st Ind,
   LMVED-PH/LMVED-TD, LMVD,
   17 Nov 65

Copy furnished:
   NOD, ATTN:  LMNED-PP


2