1                 UNITED STATES DISTRICT COURT

2                 EASTERN DISTRICT OF LOUISIANA

3      - - - - - - - - - - - - - - - x

4      IN RE: KATRINA CANAL BREACHES : CIVIL ACTION

       CONSOLIDATED LITIGATION      : NUMBER: 05-4182 "K" (2)

5                                    :

                                     : JUDGE DUVAL

6                                    :

       PERTAINS TO: MRGO, Robinson   :  MAG. WILKINSON

7      (No. 06-2268)                 :

       - - - - - - - - - - - - - - - x

8

9      Videotaped Deposition of ZOLTAN MONTVAI

10                     VOLUME I

11                  Washington, D.C.

12               Tuesday, October 7, 2008

13                    8:59 a.m.

14

15                  *    *    *    *

16

17

18

19

20     Reported by:  Okeemah S. Henderson, LSR

21

22

MONTVAI, ZOLTAN

1    Department of Army digestive Water Resources

2    Policy and activities, civil works, office of the

3    chief engineers.  It has the code or

4    classification capital EP 1165-2-1, December,

5    1972.

6              BY MR. O'DONNELL:

7         Q.    Can you identify that for me?

8         A.    Yes.

9         Q.    Can you identify that Exhibit 4 for

10   us, sir?

11        A.    Sure.  It's the digestive water

12   resources policies and activities for the

13   Department of the Army, Civil Works dated

14   December, 1972.

15        Q.    And you're familiar with that

16   document?

17        A.    I am.

18        Q.    You refer to it from time to time?

19        A.    We use it on and off.

20        Q.    What was the purpose of that document?

21        A.    It establishes very broadly the

22   policies of the Corps of Engineers working on the

MONTVAI, ZOLTAN

10/7/2008

Page 21

1    Department of the Army in implementing civil

2    works-related projects.

3         Q.    And MRGO would fall under that

4    category?

5         A.    Well, it would be MRGO is a project

6    that would have been developed by similar policies

7    but understanding many years ago prior to this

8    policy being established.

9         Q.    But to the extent that MRGO is an

10   ongoing project that post dated December, 1972,

11   would it be covered in those policies?

12        A.    It's operation and maintenance.  Yes.

13        Q.    We'll get to that in a minute.  So

14   that digest has procedures for decision making?

15        A.    I believe it does.

16        Q.    Reporting?

17        A.    I believe it does.

18        Q.    And chain of command?

19        A.    But again, this is a document that's

20   really not an ideal document.  There are other

21   documents that are more appropriate in those

22   terms.

1 it or even prevent it, would the money have been

2 proposed to be appropriated out of the O&M budget?

3       A.    If it's shown to be that there's

4 certain cost savings realized as a result of that

5 measure in maintaining that navigation channel.

6 In other words, the Corps just couldn't go out

7 there and they decide I want to use half of that

8 money and just put some stone there because I like

9 stone there, no, that's not the process.

10      Q.    What if the Corps was aware of

11 information that said if we put stone or other

12 kind of armoring along the banks we'll save, we'll

13 stop the widening process and also protect

14 wetlands.  Would that have been a justification

15 under O&M?

16      A.    No.  Because that's not a project

17 purpose, then the Corps would have had to look at

18 a document, would have to look at like a

19 reconnaissance, the study process that we just

20 talked about and recommend to Congress another

21 project purpose.

22      Q.    It has been the Corps interpretation

1 over the years of MRGO that the project purpose

2 was navigation and the O&M activity was restricted

3 to dredging and other operations to maintain the

4 waterway as navigable?

5        A.    Yes.

6        Q.    But whether there was impact say from

7 wetlands that would require separate study and

8 separate appropriated funds?

9        A.    Correct.  And authorization to add

10 that as a second project purpose.

11       Q.    Okay.  So activities other than

12 dredging and related activities to keep the

13 waterway at the authorized depth for shipping

14 would have to be separately studied?

15       A.    Correct.

16       Q.    Congress would have to determine that

17 funds needed to be used for separate purpose like

18 wetlands preservation, right?

19       A.    Yes.

20       Q.    And therefore, there would have to be

21 appropriate congressional action --

22       A.    That's correct.

1      Q.      -- of authorization on the one hand

2 and then appropriation, correct?

3      A.      Yes.

4      Q.      Are you aware of whether the Corps

5 ever from 1958 to the present went to Congress and

6 asked that the purpose of the MRGO be modified to

7 include wetlands preservation and appropriate

8 funding for wetlands preservation along the MRGO?

9      A.      That's a long question there.

10      Q.      Do you want me to break it down?

11      A.      If you would.

12      Q.      Please, go ahead?

13      A.      There were investigations under way to

14 deal with that problem.  That investigation,

15 however, did not proceed and get provided to

16 Congress.

17      Q.      Was not submitted to Congress, right?

18      A.      It wasn't completed.

19      Q.      Does that mean by the time of Katrina?

20      A.      Even as of now that I'm aware of.

21      Q.      What was -- I'm sorry.  Forgive me --

22      A.      There was a reconnaissance

1 investigation done in the '80s time frame.  I

2 don't recall exactly, may have been like '88, '92.

3      Q.    Was that the bank erosion report?

4      A.    I believe it may have been focussed on

5 that.

6      Q.    And that was not completed to the

7 point where the Corps made a recommendation?

8      A.    Correct.

9      Q.    Recommendation to Congress?

10      A.    Yes.  It was not because of the lack

11 of a cost share sponsor to sponsor the feasibility

12 study.  The 1986 Act, the Water Resources

13 Development Act of 1986 required cost sharing of

14 activities the Corps undertakes.

15      Q.    Let me probe that.  You said earlier

16 and I don't think there's much of a dispute, that

17 MRGO is a federal project, correct?

18      A.    Correct.

19      Q.    And any responsibilities for operation

20 and maintenance are a federal responsibility?

21      A.    Correct.

22      Q.    So if a federal project is a federal

1 responsibility and a consequence of that project

2 is wetlands loss, are you telling me that it's the

3 Corps position that the remediation of that

4 problem caused by the federal project it has to be

5 cost shared with local sponsors?

6       A.    No.  You have to look at the project

7 purpose involved.  The project purpose of MRGO is

8 navigation.  The O&M responsibility for navigation

9 projects is federal, but if you're looking at

10 ecosystem restoration or looking at other

11 restoring coastal wetlands, different cost sharing

12 and it's a nonfederal responsibility for operation

13 and maintenance.

14       Q.    Has it been the Corps position since

15 the construction of MRGO that to the extent there

16 might be a need to remedy the destruction or loss

17 of coastal wetlands or ecosystem caused by the

18 MRGO, it was not an exclusive federal

19 responsibility to pay for that?

20       A.    I think you're presuming Congress what

21 they might do on that but the Corps has not -- I

22 mean, right now we have laws that we go by, the

1 Water Resources Development Act of 1986.

2       When it says you are looking at purpose of

3 coastal restoration and we've done investigations

4 other than just specific to MRGO, Louisiana

5 coastal area is an ecosystem restoration effort on

6 a large scale, that requires 65 percent federal,

7 35 percent nonfederal cost share and the act

8 itself requires that the operation maintenance is

9 a nonfederal responsibility.  Congress defines

10 those.

11      Q.    Are you telling me that WRDA, the 1986

12 Water Resources Development Act has a specific

13 provision with regard to the MRGO?

14      A.    I didn't say that.  I don't know.

15      Q.    You don't know one way or another?

16      A.    I don't recall.  I mean, that Act has

17 thousands of provisions in it.

18      Q.    Okay.  The Army Corps went to Congress

19 and got some funds for foreshore protection in the

20 upper part of Reach 2 of the MRGO, did it not?

21      A.    I believe it did.

22      Q.    What was the purpose of that foreshore

1 protection?

2       A.    I believe it was to protect the bank

3 of the MRGO.

4       Q.    From what?

5       A.    From continued erosion.

6       Q.    So it didn't have any ecosystem

7 protection purpose?

8       A.    That wasn't the purpose.  No.

9       Q.    Now, at any time over the life of the

10 MRGO, the Corps could have gone to Congress and

11 recommended an amendment to the purpose of the

12 MRGO to include remediating adverse effects of the

13 MRGO, correct?

14      A.    Yes.

15      Q.    It did not do so, correct?

16      A.    I believe I said earlier that we

17 didn't have a feasibility cost sharing partner

18 that was willing, financially able to complete

19 that feasibility investigations.

20      Q.    I'd like you to assume hypothetically

21 with me what I believe is a fact but you can

22 assume it that prior to the Water Resources

1 Development Act of 1986 the Corps had identified

2 the continuing widening of the MRGO banks and

3 destruction of the wetlands as a problem related

4 to the existence of the MRGO.  Will you assume

5 that?

6      A.    I believe there were widening

7 certainly did occur following construction of MRGO

8 and those conditions were known many years back.

9      Q.    Right.  Including the wetlands loss,

10 correct?

11     A.    Of course.  The widening resulted in

12 loss of wetlands.

13     Q.    So before the 1986 Water Resource

14 Development Act, this problem had been identified

15 by the Corps, correct?

16     A.    I'm sure it was.

17     Q.    But the Corps did not go to Congress

18 prior to 1986 to ask for an amendment for the

19 purpose of MRGO and any funds be appropriated for

20 remediation of the widening of the channel or loss

21 of wetlands, correct?

22     A.    I'm not aware of a specific document

1 that would have been sent to Congress.  I can't

2 answer the question if there were documents sent

3 to Congress to notify them of that.

4      Q.    Well, sending a document to Congress

5 to notify Congress of a situation is not the same

6 as recommending to Congress that money be

7 appropriated for, correct?

8      A.    The only time you would ask for money

9 is once Congress gives us an authority to study

10 that problem.

11      Q.    The way the procedure works in your

12 experience is the Corps would go to Congress and

13 say we have a situation here that we think needs

14 funding, would you please fund it, correct?

15      A.    That's one process.  Another process

16 could very well be that local interest go to their

17 members and make them aware of a certain situation

18 and request that Congress ask the Corps to study

19 that problem.

20      Q.    To your knowledge, did that happen

21 with regard to MRGO?

22      A.    I believe there was a study resolution

1 about in the early '80s, '82 or so time frame that

2 investigated or asked the Corps of Engineers to

3 investigate the erosion problem along the canal.

4     Q.    Is that what led to the soil

5 reconnaissance study?

6     A.    I'm not familiar with that.

7     Q.    But based on input from local

8 interests in the greater New Orleans area you're

9 referring to?

10     A.    I'm presuming, yes.

11     Q.    Congress authorized some money to

12 study what?

13     A.    Congress authorized the authority

14 itself asking for the Corps to look at the

15 condition that existed at that time.

16     Q.    Which conditions?

17     A.    The erosion of the banks.

18     Q.    Was that study -- that study was never

19 completed?

20     A.    There was a reconnaissance study that

21 was done in response to that resolution.  In fact,

22 there were, I believe, two reconnaissance studies.

1       Q.      One in 1988 and one in 1984?

2       A.      That would be about right.

3       Q.      But they didn't come to a conclusion

4 or recommend anything to Congress, correct?

5       A.      I think the '94 reconnaissance being

6 the more recent one did not identify a sponsor

7 that I was referring to earlier to go into more

8 detailed investigations that could have resulted

9 in an action presuming there is federal interest

10 determined to send it to Congress.  Yes.

11      Q.      If you assume for purposes of my

12 discussion hypothetically that the problems caused

13 by the widening of the MRGO and the attendant loss

14 of wetlands was caused by a federal project of

15 MRGO, wouldn't that be a federal responsibility to

16 fund that 100 percent, the study of that problem?

17      A.      If you're looking at restoring coastal

18 wetlands as I described that requires a 65, 35

19 cost share.

20      Q.      I didn't ask you that question.  I

21 asked you was it the Corps position that if a

22 adverse effect such as widening of the channel and

1 loss of wetlands is attributable to the MRGO, that

2 there never the less still has to be a local

3 sponsor to pay for 35 percent of the study?

4       A.    That's what the '86 SEC requires.

5       Q.    It would be fair to say that's at

6 least the Corps interpretation of the act?

7       A.    Yes.  And I may add there's amendments

8 to that act or certain previsions if you're

9 looking for that may be in subsequent Water

10 Resources Development Act.

11      Q.    To your knowledge after 1986, did the

12 Corps ever go out and seek a nonfederal local

13 sponsor to study the problems caused by the MRGO

14 including widening of the banks and loss of

15 wetlands?

16      A.    The '94 recon did specifically just

17 that.

18      Q.    And what was the conclusion?

19      A.    They were not able to find that

20 nonfederal sponsor.

21      Q.    Did they inform Congress of that fact?

22      A.    I'm sure they were, Congress was

1 notified, they were part of the mailing list, it

2 was almost a normal process but that, was there a

3 formal letter sent or a final chief report sent to

4 Congress?  I'm not aware of that.

5        Q.    To your knowledge, there is not one,

6 correct?

7        A.    I'm not aware of it.  No.

8        Q.    Well, if anybody was in the Corps to

9 speak today about whether there was one, it would

10 be you, right?

11        A.    Well, I wasn't in the position at that

12 time and it's possible that --

13        Q.    Your designation includes the process

14 by which the Corps over the years of MRGO went to

15 Congress to deal with any deleterious or harmful

16 effects of the MRGO.  Have you studied that issue?

17        A.    We have studied in a general sense and

18 in fact, right now, the Corps is looking at an EXO

19 system restoration for MRGO.

20        Q.    To be exclusively federally funded?

21        A.    I don't believe there would be because

22 that's again goes back to the project that you're

1 looking at ecosystem restoration and the cost

2 sharing requirements reflected by the Water

3 Resources Act.

4        Q.    So with regard to the 1994

5 reconnaissance report, it's your understanding

6 that the Chief of Engineers did not send that

7 report to Congress with the recommendation for any

8 appropriations or authorization for funding,

9 correct?

10       A.    Correct.  You don't send

11 reconnaissance records to Congress because you

12 have to follow that up with a more detailed

13 investigation, that's the basis for the chiefs.

14       Q.    But it wasn't sent to Congress, to

15 your knowledge, by the Chief of Engineers?

16       A.    Correct.

17       Q.    If the Corps decided it needed to take

18 further actions because of the problems it

19 identified with regard to the widening of the

20 channel and the loss of the wetlands, what would

21 have been the next step after the 1984

22 reconnaissance report?

1      That was the coastal restoration, the LCA,

2 Louisiana Coastal Area ecosystem restoration

3 report stemming from the coast 20/50 concept

4 because there have been many other man-made and

5 natural affects that have resulted in the loss of

6 coastal wetlands.

7      The Corps did finish a feasibility study for

8 that and provided that to Congress for

9 authorization as an authorized project to restore

10 costal wetlands in Louisiana including the

11 vicinity of MRGO.

12     Q.   That study, however, is a broad

13 federal study dealing with impacts on the coastal

14 wetlands other than Army Corps impacts such as

15 MRGO, for example, oil and gas pipelines, correct?

16     A.   You said other than Army includes?  It

17 never made the distinction of where the impacts

18 came from but recognizing there have been both

19 man-made and Army Corps was part of that man-made

20 as well as other projects, and I'm not even

21 talking about projects in Louisiana.

22     Well, there were projects, navigation

1 projects, the flood control projects, the levies

2 themselves that were built along the Mississippi

3 River themselves were part of the reasons why

4 coastal subsidence, wetlands as you've stopped the

5 natural flow of the sediment.

6        So it looked at that without placing blame

7 on any one organization or activity or whether it

8 was natural or man-made process, the objective was

9 to identify a large scale restoration measure for

10 coastal Louisiana recognizing that the wetlands

11 were being eroded and were being lost.

12       Q.    What's the name of that study?

13       A.    Louisiana Coastal Area.

14       Q.    LCA?

15       A.    Yes.

16       Q.    When did it start?

17       A.    The reconnaissance report had to have

18 been in early 2000 maybe even late 1998 or so time

19 frame.  It resulted in a feasibility report of

20 2004 or so.  We had a chief report, January, 2005

21 that was formally sent to Congress recommending a

22 large scale restoration, that became authorized in

1 the Water Resources Development Act of 2007.  It's

2 an authorized project as we speak right now.

3       Q.    Was the reconnaissance report done by

4 the Army Corps of Engineers?

5       A.    Yes.

6       Q.    Funded by the Army Corps of Engineers?

7       A.    Yes.

8       Q.    No nonlocal sponsor?

9       A.    No, not on national.

10       Q.    On the feasibility report there was a

11 completion in 2004, who paid for that?

12       A.    That was one half the Army Corps while

13 the federal government, the other half of it was

14 paid for by the State of Louisiana.

15       Q.    Did the am back (phonetic) pay for it?

16       A.    Yes.

17       Q.    How about the chief's report of

18 January, 2005 who paid for that?

19       A.    Well, that's, there's no payment

20 involved that comes out of folks producing it for

21 the Chief of Engineers like myself that are paid

22 from our general expense accounts.

  1       Q.     When the Corps does a cost benefit

  2 analysis an a reconnaissance report, does it take

  3 into consideration nonmonetary environmental

  4 benefits or only actual cost savings such as

  5 dredging?

  6       A.     You have to look at the project

  7 purpose for navigation.  What you would look at

  8 was what's the monetary, so you're looking at

  9 purely economics flood control similarly.  When

 10 you're looking at ecosystem restoration and

 11 benefit cost ratio is not computed but the outputs

 12 of that effort is restoration of X number of acres

 13 of wetland and described with a benefit cost ratio

 14 is not produced for that.

 15       Q.     So the answer is that nonmonetary

 16 benefits such as environmental benefits and

 17 preserving wetlands from further loss and

 18 restoring loss wetlands is not calculated in the

 19 cost benefit equation?

 20       A.     That's correct.

 21       Q.     And why not?

 22       A.     Because it's not an appropriate --

1 there's no way to put a dollar value on wetlands.

2       Q.    Well, are you aware of the Corps

3 studies and other studies that indicate wetlands

4 have a surge-buffering effect during hurricanes?

5       A.    Yes.

6       Q.    So could you monetite that a little

7 bit?

8       A.    Well, there's been a number of studies

9 done to try to put a dollar value on ecosystem and

10 again, then you have to look at well, what is

11 ecosystem?  How rare?  How significant that is?

12 And but we have not placed a benefit cost ratio in

13 our hurricane protection studies, for example, on

14 the value of wetlands.

15       But we do acknowledge and recognize that

16 they do have a tendency of, they have a surge

17 reduction and protection of the wave foundation so

18 we have not shown a benefit cost ratio, no.

19       Q.    For example, if we had healthy

20 wetlands in a certain place, you would have a

21 surge and wave reduction effect which could save a

22 billion dollars in potential property damage

1 that's not done?

2      A.     No, it's not done.

3      Q.     And that's because it's not a

4 navigation purpose?

5      A.     No, because the science and the

6 modelling that would have been associated with

7 that to show that while there has been some rough

8 rule of thumbs, there has not been any defendable

9 or science done on that to exactly show how much a

10 mile worth of wetlands will reduce that surge as

11 well as depending upon the condition of that

12 wetland could be quite different.

13      A wetland could be also different when you

14 have different search conditions.

15      Q.     I understand that.  So what you're

16 saying is the Corps made a decision or choice not

17 to try to monetize the benefits that would come

18 from protecting wetlands from further destruction

19 and preserving wetlands.

20      A.     I'm not sure that's accurate.  I think

21 what has been is that we have not had done

22 sufficient studies on that to defend that benefit

Page 80

1 category.  Keep in mind when the Corps says that

2 if you have say 10 acres or whatever number of

3 wetlands it's going to reduce damages to an area,

4 we need to defend that.

5      And right now, the science and the models at

6 our Vicksburg research facility have not been

7 comfortable in being able to show that number.

8      Q.   Has the Corps asked Congress for any

9 funds to be appropriated to do such further

10 studies and modeling?

11     A.   I'm sure we have.

12     Q.   No.  I want to know in fact has the

13 Corps done it?

14     A.   I'm not aware of that but a lot of our

15 research and development funds that have been

16 provided to the Corps have been asked in that

17 area.

18     Q.   Can you site one specific request?

19     A.   You have to look at the research and

20 development program and I'm not involved in that

21 program.

22     Q.   So you're not competent or --

1      A.     I'm not aware of specifically.

2      Q.     I mean, you're competent but it's not

3 your bailiwick?

4      A.     It's not my area of responsibility

5 that I would be all that intimately involved in

6 that to know what they actually have in there but

7 I know they have had a number of investigations in

8 this area.

9      Q.     But you speculated to whether they've

10 asked Congress for funding to do modeling and cost

11 benefit analysis to what a mile or an achor of

12 healthy wetlands would be in terms of a benefit in

13 storm protection for property and people?

14      A.     We have, the only way I could answer

15 that question if I looked at the research and

16 development program and I don't know.

17      Q.     Are you aware that in the 1994

18 reconnaissance report, Exhibit 6, the Corps

19 actually said that a case could be made that

20 100 percent of the next feasibility phase study,

21 project construction and operation and maintenance

22 of bank stabilization features could be

1 deauthorization.  That issue was not a significant

2 information in that context.

3        Q.    Has the Corps undertaken any study

4 with a view toward making a recommendation to

5 Congress what to do about the fact that MRGO while

6 it's close in navigation still has a width of 2000

7 in some places 3000 feet?

8        A.    What would be a purpose for that?

9        Q.    Well, protecting property and

10 population from wave run up, surge, further

11 erosion of the banks into nonfederal property,

12 there could be a bunch of possible reasons for

13 that.  Are you aware of any such study under way?

14       A.    Yes.  The Corps has a current

15 investigation called Louisiana Coastal Area

16 Protection and Restoration, LCAPR, that's a study

17 currently under way funded by Congress following

18 Katrina, Hurricane Katrina in August of 2005

19 that's a study that is 100 percent federally

20 funded, looking at providing increased hurricane

21 and storm damage risk reduction to coastal

22 Louisiana.

MONTVAI, ZOLTAN

10/7/2008

Page 119

1          Q.     The act of Congress authorizing the

2    MRGO I read to you some of the language said that

3    it was authorizing the project substantially in

4    accordance with the recommendation of the Chief of

5    Engineers contained in house document 245.  Do you

6    recall that?

7          A.     I believe so.  Yes.

8          Q.     What is your understanding of the

9    latitude or discretion that the Chief of Engineers

10   has to deviate from the plans that are set forth

11   in house document 245?

12         A.     The chief has some discretion and the

13   reason for that is to allow fine-tuning and

14   implementation of the project so that it's a

15   better project than what may have been identified

16   in the house document from the less detailed

17   engineering.

18         So that gives the Chief flexibility to shift

19   some location, modify some features but it's a

20   limited discretion.  Clearly the Chief could not

21   go ahead, you know, if Congress authorized, for

22   example, a 50 foot bottom channel, the Chief using

MONTVAI, ZOLTAN

10/7/2008

Page 120

1    that discretion couldn't build a 250 foot bottom.

2    So it's a limited discretion.

3         Q.    If Congress approved a recommendation

4    for a project that said it's going to go from

5    point A to point C, the Chief wouldn't have the

6    authority to change it from point A to point Z,

7    which would be a significant change?

8         A.    He can reduce the duration to the

9    extent of it but typically you would not extend

10   upon it, that would require additional studies and

11   authorization by Congress.

12        Q.    Or just relocate it?  I'll give you a

13   hypothetical.  If MRGO was authorized essentially

14   to go from the, I'll make it very simple, from the

15   port of New Orleans through 40 something miles of

16   marshland out into to Gulf, correct?  If the Chief

17   decided he was going to take it out through Lake

18   Borgne and down another direction, he wouldn't be

19   authorized to do that?

20        A.    He would not.

21        Q.    If Congress said you shall armor or

22   protect the banks of the MRGO, he wouldn't have