1              UNITED STATES DISTRICT COURT

2              EASTERN DISTRICT OF LOUISIANA

3

4    IN RE: KATRINA CANAL BREACHES      CIVIL ACTION

5    CONSOLIDATED LITIGATION            NO. 05-4182 K2

6                                       JUDGE DUVAL

7    PERTAINS TO:  MRGO AND ROBINSON

8                   (No. 06-2268)

9

10               (V O L U M E   II)

11            Rule 30(b)(6) deposition of THE UNITED

12   STATES OF AMERICA, BY AND THROUGH THE UNITED

13   STATES ARMY CORPS OF ENGINEERS' DESIGNEE THOMAS

14   PODANY, given at the U.S. Army Corps of

15   Engineers New Orleans District offices, 7400

16   Leake Avenue, New Orleans, Louisiana

17   70118-3651, on October 9th, 2008.

18

19

20

21

22

23   REPORTED BY:

24            JOSEPH A. FAIRBANKS, JR., CCR, RPR

25            CERTIFIED COURT REPORTER #75005

PODANY, THOMAS

10/8/2008

Page 10

```
 1   different because now we're asking for the
 2   institutional response to a question.  So it's
 3   really -- it really gets into what is the
 4   position of the institution as well as what it
 5   may or may not know.
 6       A.   Uh-huh.
 7       Q.   So it's not necessary that you know
 8   these facts yourself, you can talk about things
 9   that you've learned through conversations with
10   others and through positions taken by the
11   institution.  You understand that?
12       A.   Yes.
13       Q.   Okay.  All right.  And here are the
14   rules:  If you don't understand my question,
15   please tell me.  I'll try to rephrase it as
16   best I can.  You know more about the subject
17   than I do since you live here and I don't.
18       A.   Uh-huh.
19       Q.   If something is confusing, tell me.
20   If you don't tell me I'm going to assume that
21   you understand my question.
22            When it comes to the need for you to
23   take a break, anytime you want one, you just
24   hold up your hand and ask for a break and we'll
25   stop.  Okay?  We have to get off the record
```

PODANY, THOMAS

1    separate division that did planning work.

2        Q.   Okay.

3        A.   So.

4        Q.   All right.  Thank you.  What is the

5    principal work of your current section, the

6    protection and restoration section?

7        A.   My office is responsible for the New

8    Orleans District portion of the hurricane

9    recovery work, which is the West Bank and

10   Vicinity Hurricane Protection Project, the Lake

11   Pontchartrain and Vicinity Project, and

12   Jefferson and St. Charles Parishes.  The

13   Louisiana Coastal Protection and Restoration

14   Act Technical Evaluation, the Louisiana Coastal

15   Area Feasibility Study and Authorization, the

16   CWPPRA program, also known as the Coastal

17   Wetlands Planning Protection and Restoration

18   Act, um -- also have -- involved in tree

19   removal for various aspects of the system.  The

20   Southeast Louisiana Urban Flood Control

21   Project, um -- and Mississippi River Gulf

22   Outlet Closure Project is under my office.

23   Mississippi River Gulf Outlet Ecosystem

24   Restoration Study, the Violet Diversion Study,

25   um -- let's see if I'm missing anything.

PODANY, THOMAS

10/8/2008

Page 34

1   accepted fact in the Corps?

2            MR. SMITH:

3                 Objection.  Vague.

4      A.    Well, I can answer it this way:  Um --

5   within coastal Louisiana there are channels of

6   various types that have been dredged through

7   marsh, and when that occurs and vessels move

8   through those channels erosion occurs along the

9   banks.  So that's something that happens in

10  the, you know, across coastal Louisiana.

11  EXAMINATION BY MR. BRUNO:

12     Q.    Right.  So the answer is that the

13  Corps accepts as a fact the existence of a

14  dredged channel will cause erosion of the

15  shore.  Right?

16           MR. SMITH:

17                Objection.  Vague.

18  EXAMINATION BY MR. BRUNO:

19     Q.    Based upon what you've just told me.

20     A.    Well, I can say that, you know, the

21  Corps would say that if you dredge a channel

22  through marsh areas and vessels transit that

23  channel there's likely to be bank erosion.

24     Q.    All right.  Now, for how long have you

25  been with the Corps?

PODANY, THOMAS

10/8/2008

Page 35

```
 1      A.   Since 1982.

 2      Q.   All right.  And for how long have you

 3  been -- well, let's see.  You became the chief

 4  in July of '06.  What was your entry level

 5  position when you joined the Corps?

 6      A.   I was a GS-7 civil engineer.

 7      Q.   Okay.  Do you have any particular

 8  specialization in any of the disciplines within

 9  engineering, like geotechnical engineering

10  or --

11          MR. SMITH:

12              I'm directing him not to answer

13          this question.  He's designated as a

14          fact witness.  He's not here to

15          testify as an expert and his

16          background and training are

17          irrelevant.  He is here to testify as

18          to facts and information known by the

19          Corps of Engineers on designated

20          topics.  He will address those

21          questions.

22          MR. BRUNO:

23              Fine, Robin.  We'll deal with

24          that with a motion.

25  EXAMINATION BY MR. BRUNO:
```

PODANY, THOMAS

10/8/2008

Page 74

1    Mississippi River Gulf Outlet canal?

2       A.   No, that would be something that you

3    would need to have a legal interpretation on.

4    But I would say that because it points

5    specifically to the extensive erosion along the

6    unleveed banks that that's where the focus is

7    of this authority.

8       Q.   All right.  Let me show you a document

9    which we will mark as Exhibit Number 41.  It is

10   Design Memorandum Number 1A.  And I'll just

11   show you the pertinent parts which is Page 7.

12   I'd like to just add the pertinent pages.

13            Have you seen this design memorandum,

14   first?  (Tendering.)

15            (Exhibit 41 was marked for

16   identification and is attached hereto.)

17      A.   No, I have not seen this one.

18   EXAMINATION BY MR. BRUNO:

19      Q.   All right.  You'll see I've got it

20   highlighted there, and I'm just going to read

21   it into the record, if you don't mind.

22      A.   Okay.  Sure.

23      Q.   It says, Channel Protection:  No

24   channel protection is recommended initially;

25   however, erosion due to wave wash in open areas

PODANY, THOMAS

Page 75

1    can be expected in the upper part of the

2    channel slope where the peat and highly organic

3    clays are exposed.  Protection for this area

4    can be provided if and when the need for it

5    becomes necessary.

6              Now, doesn't that imply that the

7    original authorization allowed the Army Corps

8    of Engineers, if it felt the need to provide

9    foreshore protection, that it could have

10   installed foreshore protection provided the

11   Congress gave them the money to do it?

12       A.   Yeah, it implies that.

13       Q.   Okay.  Let's look at 1B, which I'm

14   going to mark 42.  And by the way, for the

15   record, 1A regarded Mile 63.77 to Mile 68.85,

16   and 1B regarded Mile 31.1 to Mile 63.77.

17              1B says channel protection again, at

18   Page 5.  No channel protection is recommended

19   initially; however, erosion due to wave wash in

20   open areas can be expected in the upper part of

21   the channel slope where the peat and highly

22   organic clays are exposed.  Protection for this

23   area can be provided if and when the need for

24   it becomes necessary.

25              (Exhibit 42 was marked for

PODANY, THOMAS

10/8/2008

Page 76

```
 1   identification and is attached hereto.)

 2        A.   Page 7 says no channel protection is

 3   included in the overall cost of the project.

 4   EXAMINATION BY MR. BRUNO:

 5        Q.   Right.  But you didn't you make the

 6   point to me many times today that there's a big

 7   difference between authorization and funding?

 8        A.   Yes.

 9        Q.   And my only question was about

10   authorization.

11        A.   Yes.  But when we do an authorization,

12   a document like a recon or a feasibility

13   report, there is a cost in the recommended plan

14   presented to Congress.  And if there's features

15   in that plan that, or if there's costs not

16   included in there for features that are not

17   included, then those features and costs are not

18   part of the project, generally speaking.

19        Q.   All right.  So the problem I'm having

20   is the design memorandum comes after the

21   authorization, doesn't it?

22        A.   Yeah.  But it's a design document.

23   It's saying what could be done.

24        Q.   Right.

25        A.   It doesn't say, from a feasibility
```

Johns Pendleton Court Reporters                    800 562-1285

PODANY, THOMAS

10/8/2008

Page 77

1   standpoint, that this is part of the project.

2   Or it doesn't provide necessarily the

3   authorization to do it.

4        Q.   Well, it certainly does, though,

5   suggest that the United States Army Corps of

6   Engineers at the time that the Design

7   Memorandum 1A and 1B were drafted understood

8   and expected erosion due to wave wash resulting

9   from the ships that used the channel, right?

10        A.   Yes.  It certainly does.

11        Q.   They knew that from the beginning.

12        A.   Yes.

13        Q.   And your further testimony is that the

14   Corps decided not to make a recommendation to

15   protect those areas, right?

16        A.   Right.

17        Q.   And the Corps chose to use these

18   words, protection can be provided if and when

19   it becomes necessary.  Right?  Those are the

20   words it chose to use.

21        A.   In a design document, yes.  Not in an

22   authorization document.

23        Q.   No, I understand that.  So I guess

24   we'll allow some third party to determine

25   whether or not that sentence means that the

PODANY, THOMAS

10/8/2008

Page 113

```
 1      A.   Right.
 2      Q.   Okay.
 3      A.   That's correct.
 4      Q.   All right.  So we're talking about,
 5  then, some distance from the center line of the
 6  MRGO into the, I guess depending upon where you
 7  are, north or south of that center line.
 8  Right?
 9      A.   Right.
10      Q.   Okay.  Now, let's now talk about
11  erosion related problems.  The erosion related
12  problems, would they have included saltwater
13  intrusion?
14      A.   Could be.
15      Q.   Would they have included the death of
16  cypress trees?
17      A.   Could be.
18      Q.   All right.  Or the death of other
19  trees that before the construction of the MRGO
20  existed thin study area?
21      A.   It could be, but I think it was more
22  focused than that.  I can tell you what I think
23  it is.
24      Q.   Sure.
25      A.   Um -- first of all, it is the bank
```

PODANY, THOMAS

10/8/2008

Page 114

1    erosion itself that we would be looking at.

2    But also, the material that falls into the

3    channel because of the bank erosion and causes

4    increased maintenance costs.  So the fact that

5    you have silt falling into the channel as the

6    banks erode, and that is an issue maintaining

7    the channel so that issue would be looked at.

8        Q.    Right.

9        A.    And then you have the marsh itself

10   which is eroding and has -- you know, um --

11   quantifying that to the extent you can, and

12   then looking at the quality of that and

13   addressing -- you know, addressing that from an

14   environmental quality -- or environmental loss.

15       Q.    Was there any intent to quantify the

16   amount of environmental damage that these

17   erosion related problems may have been causing

18   in the study area?

19           MR. SMITH:

20               Objection.  Calls for

21               speculation.

22       A.    Well, there is an estimate of what the

23   original construction footprint did to the

24   marsh --

25   EXAMINATION BY MR. BRUNO:

PODANY, THOMAS

10/8/2008

Page 115

1        Q.    Right.

2        A.    -- and how many acres were destroyed

3    of the marsh when the original project was

4    constructed.  And there is an estimate of what

5    the average erosion rate is, the bank erosion

6    rate is, and that is directly, you know,

7    directly -- it's all marsh that's eroding, in

8    this study area anyway.

9        Q.    Okay.  Now, it says the reconnaissance

10   study involved using available data.

11       A.    Uh-huh.

12       Q.    Meaning, I guess, that the Corps had

13   data available to it already.  Right?

14       A.    Right.  That's correct.

15       Q.    Well, how could it have data available

16   to it already if it didn't have the authority

17   to study the issue before now?

18       A.    Well, there was information available

19   like aerial photography that you already have.

20       Q.    Okay.

21       A.    Surveys that were done for another

22   purpose, potentially, like surveys of the

23   channel and the channel widths may have been

24   done as part of the navigation project for

25   operation and maintenance purposes.

PODANY, THOMAS

10/8/2008

Page 116

1    Q.    Okay.

2    A.    Um -- there's just other information

3    that others can provide -- the reports that are

4    listed here, in fact would have been used as a

5    source of information.

6    Q.    Now, you talked about the fact that

7    when the shore erodes, necessarily the bank

8    needs to go somewhere, it's going into the

9    channel.

10    A.    Uh-huh.

11    Q.    So it goes into the channel which

12    necessitates that the channel be dredged.

13            As I understand it, the Corps is

14    already spending money dredging the channel to

15    keep it open for navigation.  Right?

16    A.    Correct.

17    Q.    And as I understand it, because there

18    was no channel when the MRGO was contemplated,

19    that it was dredging that created the channel

20    in the first instance.

21    A.    Uh-huh.

22    Q.    Right?  So how does the Corps make the

23    distinction between the dredging that it did to

24    build the channel and the dredging that it does

25    to keep the channel open?

Johns Pendleton Court Reporters                    800 562-1285

PODANY, THOMAS

10/8/2008

Page 126

```
 1    analyses provide the focus required to define

 2    the magnitude and extent of problems.  Problems

 3    once well defined lead to identification of

 4    water and related land resources needs.

 5              Is that what this reconnaisance

 6    project is doing, you're trying to figure

 7    out --

 8        A.   Yeah.  That's a standard language that

 9    we use in recon reports to focus people on how

10    we're trying to identify problems not only

11    looking at existing conditions but trying to

12    forecast future conditions.

13        Q.   All right.  The next section is

14    entitled Climate, and there's a big discussion

15    about hurricanes.  Do you have any idea why on

16    earth there would be a discussion of hurricanes

17    in the context of this study of bank erosion

18    and erosion-related problems?

19        A.   There's, um -- it's fairly standard

20    practice to put in, in a description of

21    existing conditions, the hydrology and

22    climatology for that area as a background for

23    any water resource project you're looking at.

24    So whether you're looking at a navigation

25    project or hurricane protection project or
```

PODANY, THOMAS

10/8/2008

Page 127

1    flood control, you may see a similar write-up.

2        Q.   Okay.  At Page 10, bottom paragraph,

3    it says, the marsh along the north bank of the

4    MRGO have been especially heart hit by these

5    forces and are disappearing at an alarming

6    rate.  Because erosion is steadily widening the

7    MRGO, the east bank along Lake Borgne is

8    dangerously close to being breached.  Once the

9    bank is breached the following will happen:

10   Sediment from Lake Borgne will flow into the

11   channel resulting in large increases in

12   dredging costs to maintain the channel.

13   Development to the southwest will be exposed to

14   direct hurricane attacks from Lake Borgne.  The

15   rich habitat around the area will be converted

16   to open water and more marsh will be exposed to

17   higher salinity water.

18         Now, can you explain to me what

19   they're saying when they say development to the

20   southwest would be exposed to direct hurricane

21   attacks from Lake Borgne?

22       A.   Well, I refer you to that Plate 1 --

23       Q.   Okay.  Give me a second to catch up

24   with you.

25       A.   -- in Exhibit 37.

PODANY, THOMAS

10/8/2008

Page 128

```
 1      Q.   Plate 1, okay.
 2      A.   And if you look at where the MRGO
 3   channel is within the study area --
 4      Q.   Yes, sir.
 5      A.   -- to the north you see Lake Borgne
 6   there.  And what they're discussing is that
 7   narrow ribbon of land between Lake Borgne and
 8   the MRGO.
 9      Q.   Right.
10      A.   Should that disappear, then the Lake
11   Borgne, um -- would be -- you know, there would
12   be nothing between the levees and Lake Borgne
13   is what they're saying.
14      Q.   Okay.
15      A.   There's no land or marsh between it.
16      Q.   All right.  Well, I mean, but the
17   Corps has built levees along lakes before,
18   right?
19      A.   I suspect -- yeah, we have.  Lake
20   Pontchartrain.
21      Q.   Sure.  So there must be something
22   about the nature of the levee -- the levee that
23   was built along the MRGO was intended to be an
24   inland levee as opposed to an open water levee.
25      A.   Well, I'm not sure about that, but I
```

PODANY, THOMAS

10/8/2008

Page 129

```
 1    mean anything that you can do to place distance
 2    between water and a levee is a good idea.  And
 3    when you see -- in Louisiana, it happens a lot,
 4    that the land is disappearing around -- or in
 5    front of the levees, that's a cause of concern.
 6    It's happening everywhere.
 7         Q.   Do you know why there's a cause for
 8    concern?
 9         A.   Well, as you get closer to the Gulf of
10    Mexico -- really, I guess the way people look
11    at it is that you have a levee system, then you
12    have sort of the last line of defense.  Before
13    that, though, you have barrier islands, you
14    have marshes and ridges that serve as a line of
15    defense and help reduce the impact of the surge
16    before it gets to the levee.  If that's not
17    there, then you don't have that occurring.
18         Q.   Okay.  And this last line of defense
19    not only is a line of defense for surge but
20    it's also a line of defense for waves --
21         A.   Correct.
22         Q.   -- isn't that true?  Yes.
23         A.   Yes.
24         Q.   All right.  Now, Page 13 is where we
25    talk about the MRGO project, and so we can --
```

PODANY, THOMAS

10/8/2008

                                                        Page 140

1    so restrictive.  And later on in this document

2    there's a reference to how large vessels move

3    through a fairly confined channel and how that

4    produces a pretty large wave.

5        Q.   Oh, I see.

6        A.   That's really what they're talking

7    about.

8        Q.   So the wider the channel the less wave

9    wash you have.

10       A.   Yeah.  That's really what they're

11   getting at.

12       Q.   I understand.

13       A.   But for a lot of reasons that's not an

14   alternative I think people would be interested

15   in knowing about.

16       Q.   Okay.  Now they talk about the

17   structural components which are identified at

18   Page 31.

19       A.   Right.

20       Q.   Can you tell me just generally what

21   the structural bank protection options are?

22       A.   Yes.  I mean, in many cases it's just

23   a matter of putting rock dikes along the

24   channel.

25       Q.   Okay.

PODANY, THOMAS

10/8/2008

Page 141

```
 1       A.   Um -- in other cases they actually
 2   looked at constructing disposal areas that
 3   would serve as also a way to reduce bank
 4   erosion.  You'd have a disposal area could be
 5   leveed or rocked, place maintenance material in
 6   there periodically, but that rock area would
 7   serve as a way of reducing erosion.  And they
 8   may have had different -- I believe we looked
 9   at different ways of constructing a rock dike
10   to, um -- to reduce erosion.  But those are
11   just engineering variations --
12       Q.   Right.
13       A.   -- of an alternative.
14       Q.   In sum, it's basically two options;
15   one, you line the banks with some material that
16   will prevent the wave wash from eroding it --
17       A.   Right.
18       Q.   -- or B, you dump the material that
19   you dredge from the bottom onto the banks in
20   order to replace what you've lost.
21       A.   Right.
22       Q.   Okay.
23       A.   And they looked at concrete blocks and
24   timber piles.  Those are all somewhat standard
25   ways of trying to address erosion.  Stone
```

PODANY, THOMAS

10/8/2008

Page 142

1    armoring, shell core dike.  So those -- on Page

2    35 they show those designs that were looked at.

3         Q.   Right.  Did they consider some kind of

4    structural option which would deal with the

5    salinity problem?

6         A.   Not in this report.  There was no -- I

7    don't think there was a way in this particular

8    report that we addressed any kind of a

9    navigable gate.  There was none of that in this

10   particular -- when you go back to the original

11   report, while that might have been something we

12   identified as a potential problem need or

13   opportunity --

14        Q.   Right.

15        A.   -- it wasn't specifically in the

16   original authority as something to look at.

17   Bank erosion was the deal.

18        Q.   Well, the Seabrook lock was always

19   considered to be a potential feature of the

20   MRGO project, wasn't it?  In fact, that was

21   supposed to be a saltwater barrier.

22        A.   Yes, and at one time they were going

23   to have a lock -- an original lock replacement

24   for the IHNC was part of this project.

25        Q.   Right.

PODANY, THOMAS

10/8/2008

Page 143

1        A.    In Violet.  But the focus here is

2    clearly just on bank erosion.

3        Q.    Okay.  So it sounds to me like we're

4    not really interested, in this report, in

5    dealing with the problems that we have created,

6    we're dealing with stopping the problem from

7    getting worse.  Is that accurate?

8        A.    Well, I think going back to the

9    authorization, we're trying to address the

10   authorization, and we're trying to really focus

11   in on what they're saying.  And where they're

12   pointing us to, Congress is saying, in light of

13   the extensive erosion, so to me, that suggests

14   measures to modify the project to reduce that

15   erosion.

16       Q.    Right.

17       A.    And that's where the focus was.

18       Q.    Right.

19       A.    This wasn't -- this report didn't look

20   at ecosystem restoration projects that could be

21   done in the study area, diversion projects from

22   the Mississippi River or barrier island

23   restoration projects, it was far more focused

24   than that.

25       Q.    Okay.

PODANY, THOMAS

10/8/2008

Page 144

```
 1          (Brief recess.)

 2     EXAMINATION BY MR. BRUNO:

 3     Q.   Okay.  Mr. Podany, now we're in the

 4     management measures and I think we've pretty

 5     much discussed the management options.  Right?

 6     A.   Yes.

 7     Q.   The next section regards the money

 8     part, right?

 9     A.   Okay.

10     Q.   And I'm just not sure that I

11     understand not so much the relevance of the

12     money but how they're going about plugging into

13     this analysis the money issues.  Because it

14     goes from -- the last thing it talks about is,

15     you know, the bank protection structure

16     options, and then it goes right into the costs.

17          Can you help me understand, how does

18     it make that bridge between these options and

19     the cost?

20     A.   Okay.

21     Q.   I'm looking at Page 38, the first time

22     I see these tables.

23     A.   Yeah.  You know, you've got the

24     alternatives identified, and then we tried to

25     identify how they're going to perform over
```

PODANY, THOMAS

Page 145

1    time.  And that's what you see on Page 38.

2        Q.   Okay.  Let's see.  So we say -- first

3    it talks about the reach, then the distance.

4        A.   Yeah.

5        Q.   Now, what makes something critical or

6    not critical?

7        A.   Definition of critical -- let's see if

8    I can find it -- generally, if it was going to

9    break through to Lake Borgne, that's what they

10   designated as a critical reach.

11       Q.   Oh.  I see.

12       A.   So then, um -- it's based on -- Page

13   34, in the middle, it says they were designated

14   critical based on the potential for imminent

15   loss of the buffering marsh between MRGO and

16   Lake Borgne.  So that little narrow strip, if

17   that is at risk, then that's a critical reach.

18       Q.   I see, middle of Page 34.  I see that.

19   Okay.  All right.  Okay.  So then the next

20   column says present -- oh, present means today.

21       A.   Uh-huh.

22       Q.   Without bank protection, future

23   without bank protection --

24       A.   Right.

25       Q.   All right.  These are just dredging

PODANY, THOMAS

10/8/2008

Page 146

1    quantities.

2         A.    Yes.

3         Q.    Okay.  All right.  So at the end of

4    the day, what are we -- what conclusions do we

5    draw from this document?

6         A.    Well, for this table, each of the

7    alternatives are compared a little bit to the

8    without project condition and what they do.

9    And, um -- and also, they have the speed limit,

10   how much reduction in bank erosion is expected.

11   And the way they quantify the bank erosion is

12   in cubic yards per year.

13            This is also the way it's affecting

14   the maintenance dredging.  So that material is

15   soon to go into the channel and be deposited in

16   the channel for removal by an annual

17   maintenance or a regular maintenance event --

18   dredging event.  So they're looking at the

19   impact of the alternatives on dredging at this

20   point, dredging quantities.

21        Q.    All right.

22        A.    So those alternatives that reduce the

23   dredge quantities the most would be better than

24   those that don't.

25        Q.    Right.  Because you're actually

Johns Pendleton Court Reporters                    800 562-1285

PODANY, THOMAS

10/8/2008

Page 157

 1   authority --

 2        Q.    Right.

 3        A.    -- to do that.  And, um -- you know,

 4   it wasn't part of this analysis.

 5        Q.    Well, it was part of the study

 6   authority because it says, in light of

 7   extensive erosion it's generally what

 8   recommendations are advisable.  Wouldn't you

 9   agree with me that if you're violating a law --

10   and I'm not saying you are, but if you were

11   violating a law, wouldn't you advise that you

12   not violate the law?

13        A.    Well, the key word here, and this is

14   just because of the planning side of this, is

15   that what you're looking at is the feasibility

16   of bank protection measures.  So that means

17   applying ER1105-2-100 and the process of

18   evaluating a project for feasibility, that

19   means looking at economic justification, net

20   average annual benefits have to exceed -- well,

21   you have to have average annual benefits that

22   exceed average annual costs, benefit-cost ratio

23   greater than 1, there's got to be an

24   environmentally acceptable solution.  So that's

25   where it keys you right into that.

PODANY, THOMAS

10/8/2008

Page 158

1      Q.   All right.  So let's talk about

2    whether or not these solutions are

3    environmentally acceptable.  Where in this

4    report does it evaluate the -- let's see, where

5    are we?  Lost my page again, please forgive

6    me -- each of the scenarios for compliance

7    with, for example, NEPA?

8      A.   Well, because this is a preliminary

9    document, it's not an environmental assessment

10   or an EIS, but it's the beginning of one -- on

11   Page 51, you'll see the beginning of the

12   analysis of the impact of the alternatives, or

13   evaluation of environmental effects of

14   alternative plans.

15     Q.   Right.

16     A.   And this follows pretty closely, like

17   a basic -- if you were to start out doing an

18   environmental assessment it would look a little

19   bit like this.  So it's the beginnings of that.

20   And the purpose of doing this is to

21   demonstrate, well, do you have to mitigate

22   before constructing this project?  Are you

23   damaging the environment?  Potentially, you

24   could be placing the rock dikes on marsh and

25   destroying the marsh.  Would there be a

PODANY, THOMAS

10/8/2008

Page 159

1    requirement to mitigate for that loss?

2         Q.   That would go into the cost.

3         A.   Yes.

4         Q.   All right.  Well, we're not doing that

5    yet.

6         A.   Well, yeah.  And I think most people

7    would -- because this is a project viewed to be

8    friendly to the environment, they will not

9    necessarily push hard that you mitigate for

10   that, but that's the kind of thing that you

11   would look at.  You know, in a typical project

12   you would look at, first, the impacts to

13   significant resources, some of which are listed

14   there, you know, the effects on water quality,

15   marsh, biological resources, cultural

16   resources, recreational resources, those

17   impacts are addressed in general.  And then if

18   you can find that the alternatives that are

19   being evaluated appear to be environmentally

20   acceptable and you have the economic piece in

21   the previous section, then you have a plan that

22   would be potentially feasible.

23        Q.   Got you.

24        A.   And it's only potential, because this

25   is preliminary, it's reconnaissance, it's not