SAIA (VOL I), JOHN

9/30/2008

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE: KATRINA CANAL BREACHES     CIVIL ACTION

CONSOLIDATED LITIGATION           NO. 05-4182 K2

                                  JUDGE DUVAL

PERTAINS TO:  MRGO AND ROBINSON

                  (No. 06-2268)


              (V O L U M E   I)

        Rule 30(b)(6) deposition of THE UNITED

STATES OF AMERICA, BY AND THROUGH THE UNITED

STATES ARMY CORPS OF ENGINEERS' DESIGNEE JOHN

SAIA, given at the U.S. Army Corps of Engineers

New Orleans District offices, 7400 Leake

Avenue, New Orleans, Louisiana 70118-3651, on

September 30th, 2008.




REPORTED BY:

        JOSEPH A. FAIRBANKS, JR., CCR, RPR

        CERTIFIED COURT REPORTER #75005

Johns Pendleton Court Reporters                   800 562-1285

1 to -- even if you know what the end of the

2 question is going to be, you have to allow me

3 to finish the question so that he can write it

4 down before you begin answering.  And I'll try

5 and do the same and not ask a question before

6 you finish speaking.  It makes for an easier

7 record.

8            Also, if there is any time during the

9 deposition that you would like to take a break

10 for any reason, please just say so and we'll

11 take a break.  Those are just normal ground

12 rules.

13            And on occasion your counsel will want

14 to state an objection.  Allow your counsel to

15 make the objection on the record, again allow

16 him to finish the sentence and, then we'll

17 either proceed with an answer or we'll correct

18 the question.

19            Do you understand those rules?

20      A.   (Nods affirmatively.)

21      Q.   One last rule:  You have to use your

22 voice.  You can't nod your head or tip your

23 hand, because the court reporter can't take

24 that down.

25      A.   Yes.  Okay.

1    Q.    Thanks.   Okay.   Now you mentioned that

2 you have some understanding of EISs.

3    A.    Uh-huh.   Yes.

4    Q.    What is the Corps' understanding of

5 the purpose of an EIS?

6    A.    The purpose of an EIS is to assess

7 environmental impact, look at long-term

8 effects, it's the basis for the decision makers

9 for a action taken by the government -- funding

10 by the government to consider the environmental

11 aspects of a project.

12    Q.    Who are the decision makers, in your

13 understanding?

14    A.    Well, depending upon the types of

15 documents, you have decision makers in the

16 district would be the colonel, or the district

17 engineer, or the district commander, whatever.

18 And then up at the Washington level there are

19 also people involved.   Well, there are people

20 involved from the -- you know, from the

21 district to the division and to the

22 headquarters of the Corps of Engineers to the

23 Assistant Secretary of the Army, and ultimately

24 Congress to make the final decision in a Bill

25 or an Act to be passed by the Congress, and

1 then signed by the President.  So there are a

2 series of decision makers, depending on what

3 you're talking about.  You have the division

4 commander, you have the chief of engineers, you

5 have the Assistant Secretary of the Army, all

6 the way up to the President.

7      Q.   Okay.  And in your estimation -- or

8 does the Corps understand that the purpose of

9 the EIS to ask to give Congress an inform

10 perspective on the environmental impact of the

11 proposed project?

12      A.   Yes.

13      Q.   And does the Corps understand that

14 NEPA mandates that Congress decides

15 environmental policy?

16      A.   Yes.

17      Q.   So ultimately, the objective of the

18 environmental impact statement is to provide

19 Congress with an informed perspective on the

20 impacts of whatever action is proposed.

21      A.   Yes.

22      Q.   Okay.  And is it your understanding or

23 the Corps' understanding that NEPA mandates

24 that they have a duty to report to Congress

25 every action and the impacts of the action?

1 It's a mandated duty?

2     A.    It is required by law.

3     Q.    What actions do you understand have to

4 be reported to Congress, what types of actions?

5     A.    Well, normally, in the Corps you have

6 feasibility reports that you execute if you're

7 making a recommendation for a federal action,

8 then you need to report that to -- all the way

9 to Congress for certain size projects.  The

10 larger projects that are, um -- authorized for

11 action.

12     Q.    And is the objective to report on

13 conditions that affect the natural and physical

14 environment and the relationship with people in

15 that environment?

16     A.    All of that.

17     Q.    Are you familiar with the EISs that

18 were drafted for the MRGO?

19     A.    Um -- somewhat, yes.

20     Q.    Is it your understanding that the EISs

21 that are relevant to the MRGO should have

22 discussed the interrelated effects of the

23 natural and physical environment as it applies

24 to man and the human environment?

25     A.    They should have a full discussion of

1 what is necessary to be provided in an EIS per

2 law and regulation.

3     Q.   And does the Corps understand that

4 that includes the interrelated effects of the

5 action on the human environment?

6     A.   Yes.

7     Q.   What is the Corps' understanding of

8 the human environment?

9     A.   The human environment would include

10 the socioeconomic impacts on the area that

11 you're dealing with, primarily.  You will cover

12 that type of information in a EIS, and also you

13 will be covering at the same time the

14 environmental impact.

15     Q.   And what about safety and welfare of

16 the human inhabitants?

17     A.   Safety and welfare is another area

18 that's covered.  Health safety.

19     Q.   Is it fair to say that the MRGO human

20 environment included areas that were impacted

21 by land changes?

22     A.   You could say that.  You know, you'd

23 have to define it as related to the project.

24     Q.   How about -- Sorry.  Were you done

25 with your answer?

1     A.    Yes.

2     Q.    How about land changes as they pertain

3 to the surface area of land?  Or the loss of

4 surface area of land?

5     A.    You should discuss impacts that might

6 come about as part of the project.

7     Q.    Okay.  So if the MRGO had an effect on

8 reducing the surface area of land, would that

9 be an impact that you believe that should have

10 been discussed in the EIS?

11     A.    Land loss should be discussed as one

12 of the areas.

13     Q.    As an impact on the human environment.

14     A.    Yes.

15     Q.    And what about land changes as they

16 relate to converting land from forested

17 environment to grassy marsh environment?

18     A.    That type of thing is discussed in

19 EISs.

20          MR. SMITH:

21               Let me caution him again.  Make

22          sure she gets a chance to finish her

23          question before you answer.

24          THE WITNESS:

25               Oh.  Sorry.

1 EXAMINATION BY MS. GILBERT:

2    Q.   I've done it to you already.  Sorry.

3 I've cut you off on your answer a couple of

4 times already.

5    A.   We'll slow down a little bit.

6    Q.   So with regard to the MRGO, if the

7 MRGO had an impact on a conversion of land from

8 forested area to grassy marsh area, that should

9 have been included on the EIS.

10    A.   That's normally included.

11    Q.   Do you happen to know whether the EISs

12 that were drafted associated the MRGO discussed

13 those land changes?

14    A.   Um -- no, I don't.  I'd have to look

15 at the EIS.  We started preparing EISs back in

16 the, you know, early 70s, and, you know, as you

17 transition from then to the current time the

18 procedures are different also.  So just take

19 that into consideration.

20    Q.   One last -- beyond the plant

21 characteristics of land changes from like

22 forested to grassy marsh, would it be necessary

23 to include a change of land to open water in an

24 EIS relating to the MRGO?

25    A.   You would be looking at the different

1 types of changes that would occur, yes.

2    Q.   Okay.  I'm going to -- we're missing,

3 at the moment, they I'm hoping that it's going

4 to materialize -- I've marked as Exhibit 2 a

5 draft environmental statement, Mississippi

6 River Gulf Outlet, Louisiana, Maintenance,

7 Associated Water Features, Gulf of Mexico,

8 Chandeleur Sound, Breton Sound, Lake Borgne,

9 Lake Pontchartrain, Gulf Intracoastal Waterway,

10 prepared by the U.S. Army Engineer District New

11 Orleans, dated October 30th, 1972.  And I'm

12 going to ask you if you have had an opportunity

13 to review this document.

14         (EXHIBIT 2 was marked for

15 identification and is attached hereto.)

16         MR. SMITH:

17            Do you have an extra copy, Elisa?

18         (Off the record.)

19 EXAMINATION BY MS. GILBERT:

20    Q.   I've given the witness also a document

21 that is titled Draft Environmental Statement --

22 Composite Draft Environmental Statement for

23 Operation and Maintenance Work on Three

24 Navigation Channels in the Lake Borgne

25 Vicinity, Louisiana, review draft prepared for

SAIA (VOL I), JOHN

1  certain things that need to be covered, the

2  extent of how they cover vary from project to

3  project based on the information available,

4  based on studies that have been done.  What I'm

5  saying is each one is unique in itself.

6      Q.   So if the information is available and

7  the studies have been done and an environmental

8  impact has been determined to exist, it should

9  be reported in the document.

10     A.   If action is going to be taken, we

11 discuss it in a document.  Now, in this

12 particular case it did indicate that, um --

13 there was, in the 1972 document, at 197, the

14 last three numbers on the first page here, it

15 says that a -- that the project has not been

16 commenced.  This aspect of the project.

17     Q.   But if there's --

18     A.   So it identifies it.  Now, as to a

19 decision to proceed, there's no indication even

20 in '74, later on, that any action was taken to

21 construct that as indicated on, um -- the

22 fourth page I referred to previously.

23     Q.   Now, if there was a known impact on

24 the wetlands by the operation and maintenance

25 of the MRGO project, should that have been

SAIA (VOL I), JOHN

9/30/2008

Page 83

1    included in the EIS?

2         A.   If there was information, known

3    impact, I would, um -- imagine that there would

4    be some discussion at that time.

5         Q.   But you don't know as you sit here

6    today whether or not there was a discussion as

7    to wetlands impact, the impacts of the MRGO?

8         A.   I'd have to go through and look at

9    this document more thoroughly and go through

10   and -- if you have a place you want to

11   reference, I mean, I'd be happy to go over it.

12        Q.   It's your understanding that it should

13   be there if there is an impact on the wetlands.

14        A.   If there's an impact on the

15   environment, um -- that should be disclosed.

16   That's the intent of the EIS, that you disclose

17   that information.  If there are any studies

18   that had been done that are available, you

19   would basically discuss those.

20        Q.   Is it your understanding that the 1974

21   draft environmental impact statement

22   substituted for the 1972 draft environmental

23   impact statement?

24        A.   From what I see here, the information

25   that I have available, the 1972 one is when

1 a supplement.  Or if there is a significant

2 change.

3      Q.    A significant change in what?

4      A.    Um -- I can give you a for instance.

5 If you change the, um -- upon a hypothetical

6 project, if you increase the -- and these are

7 only hypothetical -- if you increase the

8 channel length by three, four miles, whatever,

9 that could require, or it could not, it depends

10 on input from a number of people to make that

11 determination whether a supplement needs to be

12 prepared.

13     Q.    Would a change in the environment

14 around the project be significant to report to

15 Congress?

16     A.    I think a lot of factors go into

17 determining whether something is significant.

18 It's not limited to any one factor.  Um --

19     Q.    Is there a time -- if there's an

20 ongoing project that is, say, going on for

21 twenty years, would the environmental impact of

22 that project over time have to be Congress

23 advised of the changes in that environment?

24     A.    Again, determination of -- has to be

25 whether something is significant, that is,

1 changed significantly, to require a supplement

2 to an EIS.

3    Q.   What are the factors that go into what

4 constitutes significant?

5    A.   In general, it depends upon comments

6 you might receive, it depends on the situation,

7 it depends on a lot of different factors.

8    Q.   Are there any set factors?

9    A.   You know, if you go back to the

10 regulation, um -- I don't believe there are any

11 set factors, but it's more discretionary to

12 make the determination.

13    Q.   Did the Corps undergo any evaluation

14 of the cumulative effect of changes and the

15 impact on the environment with regard to the

16 MRGO?

17    A.   I don't recall.  Um -- I don't recall

18 that.

19    Q.   Did the Corps evaluate the impact of

20 the MRGO on other federal projects that were in

21 the vicinity of the MRGO?

22    A.   There was a discussion of other

23 projects in the EIS.

24    Q.   The final EIS?

25    A.   The final EIS that I looked through.

1    Q.    And what were the other projects that

2 were discussed?

3    A.    I'd have to go back and refer to it.

4    Q.    Okay.  I think that one right there is

5 3.  (Indicating.)  I'm sorry.  4, whichever the

6 final one is.

7    A.    Okay, interrelation and compatibility

8 of projects with existing or proposed Corps or

9 other agency projects.  It's in Paragraph 106.

10 It's on Page i11, 12, 13.

11    Q.    Is that the totality of the discussion

12 of interrelationships between the MRGO project

13 and other federal projects in the vicinity, as

14 far as you understand?

15    A.    I'm not sure.  They may be referred to

16 in other parts of the report.

17    Q.    Do you know if the final environmental

18 impact statement that was submitted to Congress

19 makes any references to the impact of the MRGO

20 on the hurricane protection system?  Let me

21 rephrase that.

22         Do you know if the final environmental

23 impact statement that was submitted to Congress

24 in 1976 makes any references to the

25 interrelationship of the MRGO project and the

1 hurricane -- the Lake Pontchartrain vicinity

2 hurricane protection program?

3    A.   To verify that I would have to spend a

4 little bit more time looking at this.  If you

5 want to break, I'm happy to look.

6    Q.   No, that's fine.  If you don't know

7 whether it does or it -- you don't know whether

8 it does or it doesn't; is that correct?

9    A.   Um -- explicitly, no.

10    Q.   If it's not in the document, you can't

11 add anything to the issue of why it would have

12 been removed or not included, correct?

13    A.   No.

14    Q.   No, you cannot --

15    A.   Correct.

16    Q.   Okay.  Thank you.

17         And now is it your understanding of

18 this process that that 1974 draft environmental

19 impact statement is what became the 1976 --

20 actually, I think I've asked you this question.

21    A.   Yes.

22         MR. SMITH:

23              You have asked it.

24 EXAMINATION BY MS. GILBERT:

25    Q.   Was the 1974 draft environmental

SAIA (VOL I), JOHN

9/30/2008

Page 131

```
 1    issues.
 2         Q.    So is the process, then, that after
 3    the comments come back the draft is changed and
 4    those comments are incorporated into the draft
 5    and then it becomes the final?
 6         A.    Yes.
 7         Q.    The body of the document will have
 8    changes to reflect comments that have been
 9    made; is that correct?
10         A.    Possibly.
11         Q.    Okay.  Does the Corps have a specific
12    policy with regard to the significance of
13    wetlands on the environment?
14         A.    You know, I'm not aware of -- there's
15    a lot of this on wetland, but I'm not
16    specifically aware of what you're indicating.
17         Q.    Does the Corps have any position on
18    the impact -- an environmental impact on
19    wetlands and that they're significant to report
20    to Congress?
21         A.    I think that the wetlands are
22    significant according to the Clean Water Act as
23    specified there, which the Corps responds to.
24         Q.    Is that your only understanding of the
25    significance of the wetland and an impact on
```

SAIA (VOL I), JOHN

9/30/2008

Page 132

1    the wetlands, if a project has an impact on the

2    wetland?

3        A.   I'm not clear what you're saying.  I'm

4    not --

5        Q.   If the MRGO project has an impact on

6    the wetlands, an environmental impact on the

7    wetlands, would the Corps consider that to be

8    significant?

9        A.   If it is determined to be significant,

10   it would be discussed.  Yes.

11       Q.   Does the Corps have a specific

12   evaluation process with regard to the

13   significance of an impact on the wetland?

14       A.   I'm not aware of a specific one that

15   you're indicating.

16       Q.   Does the Corps have a process of

17   evaluating cumulative effects on the wetlands?

18       A.   The Corps has a process of analyzing

19   the impacts, not the impacts, the -- analyzing

20   wetland, yes.

21       Q.   What is that process?

22       A.   Um -- normally, there's a -- you know,

23   if I'm talking about some of the EISs, now,

24   they have a determination of wetland values.

25   Also there's a valuation by the, um -- U.S.

SAIA (VOL I), JOHN

9/30/2008

Page 133

```
 1    Fish and Wildlife Service in providing comments
 2    to the Corps, they provide information on
 3    habitat valuation.  So there are a number of
 4    different ways to evaluate, um -- the wetlands
 5    and the effects on wetlands.
 6         Q.   And that's today?  What's the time
 7    frame that you're referring to when you gave me
 8    that answer?
 9         A.   Um -- I'm talking about in recent
10    times.
11         Q.   Are you aware --
12         A.   If you go way back when, you know, as
13    we went through history of the environmental,
14    um -- application of environmental, it's
15    changed over time.
16         Q.   What was the Corps' position on the
17    effects on -- the environmental impacts on the
18    wetlands of a project in 1972?
19         A.   They responded to the various laws
20    that were in effect at that time.  In 1972 it
21    would be NEPA, and what the practices were at
22    that time to respond to NEPA.  '72 is about the
23    time Clean Water Act, what was necessary for
24    that act, and any other legislation, um -- I
25    can't specifically say what the specifics of
```

SAIA (VOL I), JOHN

9/30/2008

Page 134

1    the evaluations at that time were, but they

2    were responsive to the appropriate and relevant

3    laws at that time.

4        Q.   If the operation and maintenance of

5    the MRGO had an impact on the wetlands, should

6    it have been included in the final

7    environmental impact statement presented to

8    Congress pursuant to NEPA?

9            MR. SMITH:

10               Objection.  Asked and answered.

11       A.   Um -- it depends upon the significance

12   if it was included.  And the determination at

13   that time.

14   EXAMINATION BY MS. GILBERT:

15       Q.   Now, when you say significance, are

16   you referring to the significance of -- what

17   are you referring to when you say it depends on

18   the significance if it was included?

19       A.   The determination made by the people

20   at that time that were working on the project.

21       Q.   What was the significance, though?

22   I'm asking you specifically when you say

23   significance, the significance of what?

24       A.   Of the impact, if there was an impact.

25       Q.   The significance of the impact if

SAIA (VOL I), JOHN

9/30/2008

Page 135

1    there was an impact.

2            Are you aware of any regulations

3    within the Corps to evaluate the cumulative

4    nature of small but apparently insignificant

5    impacts when it comes to the wetlands?

6        A.    They're addressed in I believe the

7    1988 regulation that I indicated, ER 200.

8        Q.    I'm sorry?

9        A.    ER 200.

10       Q.    Do you have any knowledge of the

11   Corps' position with regard to the wetlands and

12   the cumulative effect of small and apparently

13   insignificant effects on the wetlands as they

14   existed in 1972?

15       A.    No.

16       Q.    If there was a regulation that

17   required the evaluation of the cumulative

18   effect of the impact of a project on the

19   wetlands in 1972, should the impact of the

20   wetlands have been included in the final

21   environmental impact statement that was

22   submitted to Congress in 1976?

23       A.    What I could say is basically that you

24   had a regulation to be responded to.  At that

25   time the people that were working on it would

SAIA (VOL I), JOHN

9/30/2008

Page 136

1    have responded accordingly based on their -- I

2    can't speak for them.

3        Q.   Well, you're supposed to be speaking

4    for the Corps.  I thought you knew that.

5        A.   Okay.

6        Q.   So in a way you are supposed to be

7    speaking for them.

8            MR. SMITH:

9                I'm going to object to that.

10           That's argumentative.  He can't speak

11           to the individual decision makers and

12           what they decided thirty years ago.

13           MS. GILBERT:

14               No.  I'm asking him about what

15           the Corps' process was, and if there

16           was an impact on the wetland should it

17           have been included in the impact

18           statement.

19           MR. SMITH:

20               Yes, but you went on to argue

21           with him about whether he could know

22           what those people would have been

23           thinking and asserted that he should

24           have known.

25           MS. GILBERT:

Johns Pendleton Court Reporters                    800 562-1285

SAIA (VOL I), JOHN

9/30/2008

Page 137

```
 1                  No, I did not say he should have
 2           known.  I said he was answering on
 3           behalf of the Corps.
 4  EXAMINATION BY MS. GILBERT:
 5      Q.   Okay.  You know what?  Are you
 6  familiar with ER 1105-2-507?
 7      A.   This one?
 8      Q.   Yeah.  Is that -- let me see that?
 9      A.   (Tendering.)
10      Q.   Right.  Yeah.
11           MR. SMITH:
12                Which is --
13           MS. GILBERT:
14                Exhibit 7.
15      A.   As I indicated before, you know, I may
16  have read this many, many years ago.  Um -- if
17  you have questions on a specific question, I
18  might have to --
19  EXAMINATION BY MS. GILBERT:
20      Q.   Would that have been the guiding
21  regulation for the Corps to prepare the
22  environmental impact statement that was
23  submitted to Congress in 1976?
24           MR. SMITH:
25                Objection.  You asked exactly
```

SAIA (VOL I), JOHN

9/30/2008

Page 138

```
 1              that question.  It's already been
 2              answered.
 3              MR. TREEBY:
 4                  That's right.
 5              MR. SMITH:
 6                  Can we have that read back?  Can
 7              we go back to that prior question?
 8                  (Off the record.)
 9    EXAMINATION BY MS. GILBERT:
10      Q.   Would this regulation guide how the
11    environmental impact statement was drafted, the
12    1976 environmental impact statement was
13    drafted?
14              MR. SMITH:
15                  Objection.  Asked and answered.
16    EXAMINATION BY MS. GILBERT:
17      Q.   Do you know the answer to that
18    question?
19      A.   State it again.
20      Q.   Is this the guiding document from
21    within the Corps for how an environmental
22    impact statement in 1976 would have been
23    prepared?
24      A.   This is dated 15 April 1974 and signed
25    by the chief of engineers office, so it's
```

SAIA (VOL I), JOHN

9/30/2008

Page 139

1    applicable at that time.

2       Q.   Okay.  Now I'm going to give you a

3    document that's been marked Exhibit 6.  And

4    it's EP 1165-2-1, and it's December 28th, 1972,

5    and it's Chapter 19, A-135, and it's Bates

6    stamp Number AFW 180-000002387.  Are.

7            you at all familiar with that

8    document?

9            (EXHIBIT 6 was marked for

10   identification and is attached hereto.)

11      A.   It's an engineering pamphlet.  Am I --

12   no, I have not read it before.

13   EXAMINATION BY MS. GILBERT:

14      Q.   And the last paragraph of that

15   document says evaluation of proposed

16   alterations, a single proposed alterations of

17   wetlands may in and of itself constitute a

18   minor change, however the cumulative effect of

19   numerous small changes can eventually impair

20   the wetland ecology of large areas.  A specific

21   proposal in or on a wetland should be evaluated

22   in recognition of the complete and interrelated

23   wetland area of which it is a part.  Studies

24   relevant to the environmental impacts apply.

25           Do you see that portion?

SAIA (VOL I), JOHN

9/30/2008

Page 140

1        A.    Yes.

2        Q.    Were studies done of the environmental

3    impacts of the wetland included in the

4    environmental impact statement submitted to

5    Congress in 1976?

6              MR. SMITH:

7                    I'm going to object because I

8              think the record reflects that these

9              environmental impact statements were

10             not submitted to Congress.

11             MS. GILBERT:

12                   The final environmental impact

13             statement was submitted to the CEQ,

14             ultimately submitted to Congress.

15             MR. O'DONNELL:

16                   Can we confirm that?  Did the

17             witness say that?

18             MR. SMITH:

19                   I tell you what.  I think I'd

20             like to take a break, because I

21             believe that's contrary to the

22             procedure here.

23   EXAMINATION BY MS. GILBERT:

24        Q.    All right.  Then just -- we'll get to

25   whether it was submitted to Congress later,

SAIA (VOL I), JOHN

9/30/2008

Page 141

1    then.

2             The question is just answer the

3    question with regard to the document, then.

4        A.    Restate the question, please.

5             (Whereupon the previous question was

6    read back.)

7    EXAMINATION BY MS. GILBERT:

8        Q.    And you can take out the portion with

9    regard to submitted to Congress.

10       A.    Um -- I would need to relook at the,

11   um -- EIS.

12       Q.    So you don't know whether there

13   were --

14       A.    No.   I indicated that before.

15       Q.    If there were such studies, should

16   they have been in the final environmental

17   impact statement dated 1976?

18       A.    Again, it's a function of

19   significance.

20       Q.    Based on that guideline, if there were

21   studies that described -- that evaluated the

22   cumulative effects, should they have been

23   included in the environmental impact

24   statement -- the final environmental impact

25   statement?

SAIA (VOL I), JOHN

9/30/2008

Page 142

1      A.    Again, the application of this is a

2    discretionary thing as part of your overall

3    view of the project and related wetlands and

4    items such as that, or other factors.

5      Q.    So if there were studies done -- so,

6    do you know the answer?  Is there an answer or

7    not that you can give me?

8          MR. SMITH:

9              He answered your question.  You

10          want the answer read back?

11          MS. GILBERT:

12              Yeah.  Could you read me back the

13          answer, please?

14          (Whereupon the previous answer was

15    read back.)

16    EXAMINATION BY MS. GILBERT:

17      Q.    So if studies existed of the wetland

18    and the cumulative effects of the MRGO on the

19    wetlands, if these existed they may not have

20    been necessary to include in the environmental

21    impact statement, is that your testimony?

22      A.    That's what I stated.

23      Q.    Do you know if the Corps analyzed the

24    environmental impacts of salinity on the

25    wetlands from the MRGO project?

1     A.    There were studies on salinity.

2     Q.    And were those done -- and when were

3 these studies done?

4     A.    I don't recall the date, but there

5 were a number of different studies, whether

6 they be done by the Corps or others.

7     Q.    Do you know if the impacts of salinity

8 on the wetlands were included in the final

9 environmental impact statement in 1976?

10     A.    I recall the salinity.  I think there

11 was a discussion of wetlands.  I don't know the

12 year.

13     Q.    In the final environmental impact

14 statement, the salinity on the wetlands?

15     A.    I don't recall.  I need to look at it.

16          MR. SMITH:

17               Go ahead.  Take a chance.

18     A.    In the final?

19 EXAMINATION BY MS. GILBERT:

20     Q.    In the final.

21          (Brief recess.)

22 EXAMINATION BY MS. GILBERT:

23     Q.    Have you had a chance to review that?

24     A.    Yes.  I didn't read every word, but

25 there is a discussion of salinity in the

1 overall discussion of the environment.

2    Q.   But not as it pertains to changes in

3 the wetlands.

4    A.   Um -- it talks about salinities in the

5 wetlands areas.  There are tables in here.

6 Now, as far as in Section 4, the probable

7 impacts, that issue, um -- I don't see much

8 mention of salinity except on Page 4-2.  And

9 relative to salinity and water increases,

10 that's just in general relative to salinity.

11 It doesn't say specific to wetlands.

12          And they do discuss water quality and

13 things like that in more general as you go

14 through the impacts section.  So other than

15 that --

16    Q.   So if there was a change in

17 environment or a conversion in the environment

18 of the wetlands because of salinity, should it

19 have been included in the final environmental

20 impact statement?

21    A.   If they determined at that time, the

22 people that were doing this, based on

23 information available on salinity, they

24 addressed it here in this section, I guess,

25 under IV.

1    Q.    What's the title of that number?

2    A.    Section IV, the probable impacts of

3 the proposed action on the environment.

4    Q.    And it's your testimony that there is

5 no discussion of the changes in the wetlands as

6 it pertains to salinity in that section.

7    A.    I did not see any.

8    Q.    Okay.  Is there any analysis or study

9 that the Corps was aware of that would suggest

10 that the introduction of freshwater to the

11 wetlands would have an impact on the wetlands

12 environment around the MRGO?

13    A.    Um -- state that again, please.

14         (Whereupon the previous question was

15 read back.)

16    A.    They referenced a number of studies.

17 I don't know specifically if they're dealing

18 with the issue that you indicated.

19 EXAMINATION BY MS. GILBERT:

20    Q.    A number of studies about what?

21    A.    Salinity.  The salinity issue or

22 other -- they reference a number of studies.

23    Q.    The question was a study about what?

24 The question is, the introduction of freshwater

25 to the environment.

Page 146

1     A.    Oak.  It may have been covered but I'm

2  not sure based on -- there were a number of

3  studies listed.

4     Q.    If there is any study that would

5  suggest that any introduction of freshwater to

6  the wetlands area would have an impact on the

7  wetland around the MRGO, should it have been

8  included in the final environmental impact

9  statement dated 1976?

10     A.    I can't make that determination.

11     Q.    What information would you need to

12  determine -- is there any information that you

13  could draw upon to determine whether or not

14  that consideration of freshwater introduction

15  to the wetland was significant?

16     A.    This EIS covers impacts of the

17  proposed action, so you have to know is it

18  related to the project?  And the significance

19  of it.  You know, I really couldn't answer --

20     Q.    So you don't know whether the

21  continued operation of the MRGO had any effect

22  on salinity in the vicinity of the MRGO.

23     A.    Not based on what I've read so far.  I

24  didn't have that information.

25          (Off the record.)

1 EXAMINATION BY MS. GILBERT:

2    Q.   Would you agree that if there was a

3 study that suggested that the introduction of

4 freshwater into the area around the MRGO, the

5 wetland around the MRGO would have an impact on

6 those wetlands it should have been included in

7 the EIS, the final environmental impact

8 statement?

9         MR. SMITH:

10             Objection.  Asked and answered.

11        MS. GILBERT:

12             What's the answer to that?

13        MR. SMITH:

14             It was the third question before

15        the break.

16             (Off the record.)

17 EXAMINATION BY MS. GILBERT:

18    Q.   So is it fair to say that if the EIS

19 does not contain -- if it's not in the final

20 environmental impact statement and there was a

21 study of the changes incident to the proposed

22 action, changes of salinity in the proposed

23 action, that it's not there because the Corps

24 determined it wasn't significant?

25    A.   I can't make an assessment of their

1 determination back then, what information they

2 might have available, um --

3    Q.   The question is, if there was a study

4 and it's not included in this final

5 environmental impact statement, is the reason

6 why it wouldn't be there because the Corps

7 would have determined that it is not

8 significant?

9         MR. SMITH:

10            Object.  You're asking him for

11         his opinion.  He's not an expert and

12         his opinion isn't at issue here.  This

13         is a fact deposition concerning what

14         occurred with respect to this topic.

15 EXAMINATION BY MS. GILBERT:

16    Q.   Okay.  What occurred with this respect

17 to this topic; what occurred with respect to if

18 there's a study with the studies of salinity?

19         MR. SMITH:

20            You've asked that.

21         MS. GILBERT:

22            Robin, it's not a fact

23         deposition.  It's a 30(b)(6)

24         deposition, and this witness is here

25         to testify about the Corps' conduct

SAIA (VOL I), JOHN

9/30/2008

Page 181

```
 1          MS. GILBERT:

 2              You know, it doesn't matter

 3          because I didn't ask the question.

 4     A.   Okay.  No.

 5  EXAMINATION BY MS. GILBERT:

 6     Q.   No, you can't.  Okay.

 7     A.   No.

 8     Q.   Thank you.

 9          Looking at the 1976 final

10  environmental impact statement, can you turn to

11  the -- in response to the 1974 draft

12  environmental impact statement, the EPA

13  responded, and the response is contained in the

14  1976 final environmental impact statement.

15  It's on Page IX-11.  My question is, Mr. Saia,

16  is it your understanding that the Corps is

17  obligated pursuant to NEPA to respond in

18  substance to the comments raised by the agency

19  that reviewed the document?

20     A.   Um -- they're responsible for

21  responding to those comments that they receive

22  on the draft EIS, those things that are

23  substantial, significant maybe you could say,

24  need to be responded to and added as an

25  appendix.
```

SAIA (VOL I), JOHN

9/30/2008

Page 182

1        Q.    Now, is there any guideline or

2   criteria for what the bright line for

3   substantial and significant is?

4        A.    That's left up to the parties that are

5   preparing the document to determine what the

6   significant -- what is a non, you know,

7   substantial issue.

8        Q.    So is that purely within their

9   discretion, or are there any guidelines that

10  the Corps has to determine what would be

11  considered significant and substantial?

12       A.    As far as I know, it's left up to the

13  team in coordination with agencies -- agencies,

14  stakeholders, et cetera.

15       Q.    So at this point, if the agencies are

16  raising what they believe is significant by

17  commenting on the EIS as it was presented to

18  them, they're telling the Corps what they

19  believe is significant.  Is there some document

20  that the Corps relies upon to determine whether

21  or not those comments are really significant

22  then they have to respond to them or they're

23  insignificant and don't have to respond to

24  them?

25       A.    It's done by a team of people who

SAIA (VOL I), JOHN

9/30/2008

Page 183

1    are -- normally, it would be done by a team of

2    people that are working on the project and,

3    um -- the ultimate responsibility resides with

4    the district engineer, commander of the

5    district, to issue the report or the draft

6    review.

7         Q.   But you don't know of any guideline

8    that he can rely on that he -- a written

9    guideline or a regulation that he can rely on

10   to say, no, that's not significant based on

11   these guidelines.

12        A.   I think there's discretion as to what

13   is considered to be significant, and those

14   things that are considered to be non issues in

15   some cases.

16        Q.   And that's purely within the

17   discretion of the district engineer?

18        A.   Of the district engineer and the

19   overall team that the district engineer has

20   putting together the EIS.

21        Q.   Okay.  So the EPA can raise a subject

22   that they believe is significant, and the

23   district engineer has the authority to veto the

24   perspective of that EPA reviewing agency?

25             MR. SMITH:

SAIA (VOL I), JOHN

9/30/2008

Page 184

```
 1              Objection.  Asked and answered.
 2              You just asked him that question.  You
 3              just asked him that question and he
 4              answered you.
 5  EXAMINATION BY MS. GILBERT:
 6      Q.   If the EPA deems it significant, the
 7  district engineer can say it's not.
 8      A.   The district engineer, with the
 9  consultation of lot of other people.
10      Q.   But ultimately the district engineer
11  can say it's not?
12      A.   The district engineer makes the
13  ultimate determination before it goes out for
14  review.
15      Q.   Okay.  Is there any regulation or law
16  that says -- that sets forth that the final
17  decision on significance rests with the
18  district engineer?
19      A.   It's discussed in the regulation, the
20  one I referred to, the newer regulation, 200.
21  Um -- the whole decision process is also -- you
22  do -- when you have documents, they are
23  reviewed by the division office or others that
24  participate in giving the district engineer
25  input.  So it's the overall Corps team, in
```