

*Reference:* mitigation means
cumulative impacts
no proj alternative

FINAL

ENVIRONMENTAL STATEMENT

FINAL COMPOSITE ENVIRONMENTAL
STATEMENT FOR OPERATION AND
MAINTENANCE WORK ON THREE
NAVIGATION PROJECTS IN
THE LAKE BORGNE VICINITY
LOUISIANA

U. S. ARMY ENGINEER DISTRICT, NEW ORLEANS
NEW ORLEANS, LOUISIANA

MARCH 1976

(b) <u>Bayou St. Malo</u>. Bayou St. Malo was constructed in May, 1956. Dredged material disposal areas are strips 500-1,000 feet wide on both sides of the Bayou. At the time of construction, two areas (Mile 3.4 to Mile 4.8 and 5,000 feet into the open water of Lake Borgne) were dredged, requiring 271 acres of the disposal areas. The Bayou has not been redredged.

(c) <u>Bayou Yscloskey</u>. Bayou Yscloskey is reported to have been maintenance dredged in the 1930's by local interests, but is not currently dredged. The Corps of Engineers once considered maintenance of the approach channel in Lake Borgne as part of a local-Federal maintenance program. Establishment of oyster beds has virtually confined any probabilities of maintenance dredging.

(d) <u>Bayou Dupre</u>. Bayou Dupre was constructed in 1939. Dredged material is deposited in a 500-foot wide strip on the west side of the Bayou and a 1,000-foot wide strip on the east side of the bayou. Two areas were dredged in 1967 (Mile 6.0 to Mile 6.5 and Mile 2.3 to Mile 5.3). The 153,200 cubic yards of dredged material required 297 acres of the disposal area. Ideally, lacking constraints, if funding were available, the land cut would be dredged every eight years and the bar channel would be dredged every four years.

(7) <u>Timing of operation</u>. Hopper dredging (Mile 0 to Mile -9.38) is done in January or June of each year, depending upon hopper dredge availability. Dredging in the outer Gulf section is done during spring and summer months, weather permitting, if a cutterhead pipeline dredge is used. The inland section is dredged at anytime throughout the year, depending upon shoaling conditions. The channel between Mile 0 and the inner end of the jetties is usually dredged in April and September when winds are calm.

(8) <u>Illustrations</u>. Figure I-3 shows typical channel cross-sections of the MR-GO. Figures I-4 through I-8 show aerial overviews of the MR-GO south of the junction with Bayou La Loutre. Note the containment dikes and the drainage channel provided on the west bank of the disposal area on Figure I-5.

1.06 INTERRELATIONSHIP AND COMPATIBILITY OF PROJECT WITH EXISTING OR PROPOSED CORPS OR OTHER AGENCY PROJECTS

a. <u>Relationship to area development</u>

(1) <u>Local economic functions</u>. The MR-GO and associated bayous are an integral part of the local and regional navigation system. The system serves three local economic

I-11

functions: 1) movement of locally derived commodities (petroleum, fish, shellfish, and fur pelts) to collection/distribution points, 2) movement of commodities to points of consumption (delivery of equipment, fuel, and other durable and nondurable goods to industrial installations and commercial establishments and residences), and 3) provision of access for local recreation craft operation.

(2) <u>Regional and national economic functions</u>. The system serves three regional functions: 1) provision of access to the Tidewater Port Facilities for large vessels carrying both foreign and domestic goods to public facilities operated under lease from the Board of Commissioners of the Port of New Orleans (Dock Board), 2) provision of shipping access for industries located on the Gulf Intracoastal Waterway (GIWW) and for delivery of coal to the electric power generating station, and 3) provision for east-west GIWW traffic. Transfer and distribution of the goods coming into the Dock Board facilities and into the local industries have subsequent impact on the statewide and nationwide economic base. Details of the nature and extent of impact on the economy are discussed in Section 2.09.

(3) <u>System reliability</u>. The MR-GO serves as an alternative route to the New Orleans port, and provides navigation system reliability in case of emergency closure of navigation on the Mississippi River. Replacement of the obsolete lock on the Inner Harbor Navigation Canal (IHNC) will facilitate this function.

(4) <u>The future</u>. The MR-GO provides navigation access for future development and expansion of the Tidewater Port Area. To accommodate new shipping technology, new facilities have been constructed in the Tidewater Port Area for handling transfer of bulk commodities and of containerized cargo and sea-going barge/mother ship handling. The MR-GO serves the Tidewater Port Area which has more land area for cargo storage and transfer and has better access to both railway and interstate systems than river-associated facilities. This has produced greater efficiency in cargo handling. Until lock facilities are provided for a deep draft lock to the Mississippi River, the Tidewater Port Area is dependent upon maintenance of the entire length of the MR-GO. Details of these economic/navigation aspects of MR-GO operation are discussed further in Section 2.09.

b. <u>Compatibility</u>. O&M work on the MR-GO and associated bayous is not in conflict with proposed land use development in the MR-GO area. Future adjustment of O&M practices may be required in conjunction with planned hurricane protection levees on the disposal areas. The issue of wise use of the delta-estuary area for natural, renewable resource/preservation functions or for economic/navigation/resource extraction functions will be a part of coastal zone planning and management deliberations and decisions. O&M work is compatible with federal, state, and local agency decisions made at the time of initial MR-GO construction.

(3) <u>Present utilization of the MR-GO and navigation restraints</u>. Present utilization of the MR-GO is on the order of three vessels per day average. Considerable limitations presently inhibit maximum development of Port facilities in this area. These include the following (Port of New Orleans, 1974):

1. Limited navigation aids in the MR-GO channel inhibit traffic, especially nighttime passages. The Coast Guard is presently working on a program to improve the navigational aids situation.

2. The rate of shoaling in the MR-GO has previously been cited as a major operation and maintenance expense item. It is anticipated that the shoaling rate will decrease in the future as a result of stabilization of the channel side slopes. However, the future rate of shoaling is difficult to project at present.

3. The obsolete and limiting locks in the IHNC are carrying the maximum traffic volume possible. Increased development in the Tidewater Port Area will rely on ocean-going turnaround traffic into and out of the Tidewater Port, improvement of the existing locks, or construction of a new channel and lock to the Mississippi River as outlined in the master plan development.

g. <u>Water resources development</u>. Surface waters are utilized for navigation, resource extraction, recreation, and wastewater disposal as described in Section 2.03f. Use for navigation is dependent upon periodic dredging of channels when they fill with sediment. Use for recreation and for extraction of biotic resources is dependent upon maintenance of good water quality. Use for wastewater disposal without decrease in water quality depends on adequate treatment and sufficient flow for dispersion of pollutants. Protection from wind induced tides associated with storms is accomplished by levee construction. Flood gates and provisions for internal drainage are required. Traditional methods of marshland drainage are employed to drain land and make it available for urban development. All of these uses of water resources or methods for minimizing hazards from presence of water affect the hydrologic regime. Salinity of groundwater limits the availability of water for human consumption in the majority of the land area in St. Bernard Parish. Intrusion of salt water into fresh groundwater sources is a concern in the New Orleans SMSA. Changes in both fishing and shellfishing harvest areas in Lake Pontchartrain and Lake Borgne and changes in the vegetational communities in the area reflect changing salinity of waters. Hurricane protection will be provided by the Lake Pontchartrain, Louisiana and Vicinity project. This project will include a lock and control structure at the Rigolets, a navigation structure and control structure at

Chef Menteur Pass, and a lock and control structure at Seabrook. The structures at Seabrook can be operated to modify salinities in Lake Pontchartrain. The structures at the Rigolets and Chef Menteur will be designed and operated to maintain existing hydrologic conditions in Lake Pontchartrain.

h. <u>Transportation and communication system development</u>.

(1) <u>Highways and airports</u>. Existing and proposed highways are shown on Figure 2-19. Most noted are Routes 46 and 47, which are in the immediate MR-GO area. Route 46 provides access to land as far west as Hopedale and is the principal traffic artery for St. Bernard Parish. The three civilian airports are shown on Figure 2-19. There is one naval airport near New Orleans. Scheduled commercial flights utilize New Orleans International Airport (Moisant Field). The other civilian facilities serve only general aviation.

(2) <u>Railroads</u>. Existing railroads are shown on Figure 2-20. The MR-GO area is served by the six following major railways: Southern Pacific, Gulf Central, Louisville and Nashville, Southern, Missouri Pacific-Texas and Pacific, and Kansas City Southern. The only railroad lines within two miles of the MR-GO are Louisville and Nashville Line and a spur of the New Orleans Public Belt Line, which serves the Tidewater Port.

(3) <u>Pipelines</u>. With the extensive gas and petroleum extraction and refining in the New Orleans area, a complex network of pipelines has been established. Major gas and oil pipelines are shown on Figure 2-21. Table 2-32 indicates those pipelines which traverse the MR-GO.

(4) <u>Transmission lines</u>. Transmission lines in the MR-GO area are shown on Figure 2-22. Operators in the area shown are the Louisiana Power and Light Company and New Orleans Public Service, Inc. Crossings of the MR-GO are shown in Table 2-32.

(5) <u>Communications</u>. The only major communications facility that crosses the MR-GO is the underground cable maintained by South Central Bell Telephone Company at Mile 41.6 near Shell Beach.

i. <u>Sociological elements</u>. With the exception of settlements at Yscloskey, the areas adjacent to the MR-GO are largely uninhabited. Data pertaining to racial, ethnic, and economic characteristics for the few inhabitants of the area are unavailable. Operation and maintenance of the MR-GO will likely have no effect on the sociological composition of the area.

# SECTION 9

## COORDINATION AND COMMENT AND RESPONSE

### 9.01 GOVERNMENT AGENCIES

Copies of the draft environmental impact statement were sent to all Federal and state agencies listed in paragraph 5 of the Summary. The agencies were requested to submit their views and comments. Comments received are summarized or quoted below and copies of the replies are included in Section 9.

#### a. Environmental Protection Agency, Region VI

Comment: We suggest that the final statement include an analysis of the benefits and costs of the three proposed operation and maintenance projects. This analysis should contain sufficient information in order to compare and weigh equally the cost of project implementation with the beneficial and adverse impacts of each action. Inclusion of a benefit/cost ratio would be helpful in better understanding the economic benefits of continued operation and maintenance on the project channels and the environmental trade-offs that could occur.

Response: To assure that the average tax dollar is invested in worthy water resource ventures, an overall analysis of the project justification is a pre-requisite to authorization and subsequent construction. Determination of the B/C ratio entails an extensive investigation into all aspects of first-round benefits and costs expected to result from installation of the project. Operation and maintenance charges usually represent but a small portion of the total annual project's costs which include, among other things, the interest and amortization charges on the initial investment. Thus, operation and maintenance costs normally are not the over-riding factor in the B/C ratio computation and are meaningless when used alone for this purpose. Because these economic studies frequently are lengthy as well as costly, and due to the relatively minor role of operation and maintenance charges, it is not considered practicable to conduct current economic analysis on operation and maintenance projects.

Comment: We suggest that additional information be provided on Bayous La Loutre, St. Malo, Dupre, and Yscloskey. Specifically, it appears that the dredged material disposal acreage figure given in the statement applies to the MR-GO project alone. If this is the case, we suggest that disposal acreage figures for the additional project channels be given in the final statement.

IX-1

Response: Data for Bayous La Loutre, St. Malo, Dupre, and Yscloskey have been included in Section I.

Comment: While it is clear that gated effluent release structures will be used at the MR-GO on-land disposal sites, it is not clear if similar structures will be employed at the other sites. This should be clarified in the final statement.

Response: Dredged materials will be disposed of in diked areas with effluent spillgate controls except in those locations where the fishery and wildlife and water quality agencies determine that localized areas of marsh vegetation can be better preserved or favorably enhanced by omission of confining dikes.

Comment: We are particularly concerned with the possible resuspension of heavy metals (lead, mercury, zinc, arsenic, and cadmium) and their unknown effects on the aquatic community. . . We would recommend that in order to determine the effects of dredging on the resuspension and resolubilization of pollutants (particularly heavy metals) in the water column during maintenance activities, a monitoring program be implemented which would, at a minimum, record dissolved oxygen, total suspended solids, Total Kjeldahl Nitrogen, and heavy metal concentrations, before, during, and after dredging operations.

Response: A monitoring program is being developed to determine the effects of pollutants and operation and maintenance work on the aquatic community. Additional investigations include the elutriate test results, reported in Appendix D, which has been added to this EIS. A continuing monitoring program is in effect prior to, during, and after dredging operations to determine whether or not operations can continue without modification of the project.

Comment: We suggest that the elutriate test be conducted for the parameters which were exceeded in the sediment analysis and the results included in the final statement. This information would be helpful in evaluating the impacts of the proposed dredging operations.

Response: The elutriate test was conducted in the spring and early summer of 1975. Compliance guidelines and results are summarized in Appendix D.

Comment: The draft statement should discuss the associated long-term project induced impacts resulting from the construction of the Mississippi River-Gulf Outlet system in more detail. Secondary impacts include modified water regime in the system, alteration of the hydrology and water chemistry of adjacent estuarine and wetland areas, and salt water intrusion and increased salinity levels.

Response: Construction of the MR-GO resulted in certain recognized socio-economic and environmental changes. Secondary impacts are still underway and will continue until a state of equilibrium on natural dynamics is obtained. This environmental statement concerns only actions necessary to operation and maintenance of the MR-GO and associated bayous, and is not intended to address impacts of original construction.

Comment: Subsequent maintenance operations will result in degraded water quality during the dredging cycle and perpetrate the increased salinity levels in the Borgne-Pontchartrain Lake Systems. In order to minimize the existing adverse and future long-term (secondary) impacts of the MR-GO, we recommend that mitigative measures that could reduce salinity levels in the Lake Borgne-Pontchartrain System be incorporated into the operation and maintenance of the MR-GO project.

Response: This statement recognizes the temporary water quality problem inherent in all dredging operations. Completion of the Seabrook Lock Complex as covered in the Lake Pontchartrain, Louisiana and Vicinity Hurricane Protection project will reduce salinity levels in Lake Pontchartrain. The proposals for salinity control measures in the MR-GO system would require authorization for new construction features. Such new construction features would require environmental and socio-economic investigation and impact analysis. Consideration of these measures in this assessment of the impacts of the project operation and maintenance is not appropriate.

Comment: The statement should contain additional information in order to allow for complete assessment of the interrelated impacts of MR-GO and other local, state, and Federal projects in southern Louisiana. An environmental evaluation of the adverse and beneficial effects of the interrelated projects in the vicinity of MR-GO should be included in the final statement (GIWW, Lake Pontchartrain, and Vicinity Hurricane Protection, MR-GO, Michoud Canal).

Response: The MR-GO, from Mile 23 out, is the only project of those mentioned requiring annual dredging operations. Maintenance dredging of the other projects is less frequent. Lack of

IX-3

availability of dredging equipment and contractors tends to limit activity during any one season or year. Dredged material from the GIWW and MR-GO is used for the Hurricane Protection System. Environmental impact statements have been or will be completed for all interrelated Corps of Engineers projects listed in Section III.

b. U. S. Department of Commerce, the Assistant Secretary for Science and Technology

Comment: Another possible sediment source that should be included in Section I is the marsh material released by marsh deterioration in the project area as a result of saltwater intrusion. This material may be transported to the MR-GO by tidal action, storms, and hurricanes.

Response: This information has been incorporated into the text, Section I, 1.05 a. (3).

Comment: Numerous geodetic control survey monuments and tidal bench marks are located within the proposed project area. If there is any planned activity which will disturb or destroy these monuments, the Department of Commerce, National Ocean Survey (NOS, of which the National Geodetic Survey is a part) requires not less than 90 days notification in advance of such activity in order to plan their relocation. NOS recommends that funding for this project include the cost of any relocation required for NOS monuments.

Response: The New Orleans District of the Corps of Engineers uses the NOS survey markers and will take appropriate action to protect these markers, including advance notification if relocation of any markers is necessary.

Comment: Page IV-13. Retention of the existing on-land disposal areas for their continued use would also greatly reduce any need to utilize adjacent marshes as disposal areas in the future.

Response: This statement confirms information that was included in the draft EIS. It is now included in paragraph 4.03 of this EIS.

Comment: Section VI - Alternatives, should contain a discussion of possible economic use of the dredge soil.

IX-4

Response: The quality, location, and cost of transportation is a limiting factor in use of this material. Large volumes of dredged materials are being used for hurricane levee construction. The New Orleans Port Commission is considering use of this dredged material for development of their future port facilities.

c. U. S. Department of Transportation, Federal Highway Administration

Comment: We have reviewed the draft environmental statement for the above project and have no comments. The project should not have any significant effect on any existing highway facilities, and we do not know of any proposed highway projects in this area.

Response: We concur with the statement.

d. U. S. Department of Health, Education, and Welfare, Public Health Service, Center for Disease Control

Comment: HEW's letter expresses concern regarding the possibility of increase in the vector habitat. With limitations on the application of chemicals, an engineering approach involving environmental manipulation is becoming increasingly important in vector control.

Response: Research concerning vector control and dredged material disposal is being conducted by the Waterways Experiment Station and other agencies. We have cited research being done on Table IV-3. This research is being done as a result of the need to investigate problems encountered in dredged material deposition.

e. Advisory Council on Historic Preservation

Comment: Results of the survey of historic, architectural, and archeological properties under Federal agency control or jurisdiction, required by Section 2 (a) of Executive Order 11593 should be included in the environmental statement as evidence of compliance. The environmental statement should contain a determination as to whether or not the proposed undertaking will result in the transfer, sale, demolition, or substantial alteration of eligible National Register properties under Federal jurisdiction.

Response: There are no Federally owned or controlled properties on this project.

IX-5

Comment: Federal agencies are required to establish procedures regarding the preservation and enhancement of non-Federally owned historic, architectural, and archeological properties in the execution of the plans and programs. The environmental statement should contain a determination as to whether or not the proposed undertaking will contribute to the preservation and enhancement of non-Federally owned districts, sites, buildings, structures, and objects of historical, architectural, or archeological significance.

Response: The project will not contribute to either the degradation or the preservation and enhancement of non-Federally owned districts, sites, buildings, structures, and objects of historical, architectural, or archeological significance.

Comment: The Federal agency is required to consult with the appropriate State Historic Preservation Officer.

Response: The Louisiana State Historic Preservation Officer was send a copy of the draft environmental impact statement. He was also sent a copy of the survey referenced in paragraph 2.08 of this environmental impact statement.

f. U. S. Department of the Interior, Office of the Secretary, Southwest Region

Comment: Pages I-6 through I-10, Subsection 1.05 - This section should be expanded to include a discussion of the location of shoaling, anticipated volume of material to be removed, method and timing of dredge operations for Bayous La Loutre, St. Malo, Yscloskey, and Dupre.

Response: Data for Bayous La Loutre, St. Malo, Yscloskey, and Dupre have been included in Section I.

Comment: The list of causes of subsidence in Section II should include that subsidence also results from the withdrawal of fluids, especially water and petroleum.

Response: The text has been changed to include this cause.

Comment: 2.08 a. (3) - The procedures for investigation and identification of archeological sites should be available for review by the Advisory Council on Historic Preservation and the National Park Service when such procedures are further defined.

Response: The paragraph has been revised to specifically reference the Federal Register source for the procedures.

Comment: Paragraph 2 on page IV-10 states that the elevated spoil disposal areas constrain the westward erosion of the MR-GO channel bank. We do not believe this is correct.

Response: We do not agree with the comment because:

1. The banks in their natural state are composed of highly organic soils with a very high water content which conditions cause the banks to be highly susceptible to erosion.

2. The elevated areas, or dredged materials deposited and remaining at a level above natural ground, were formed by material excavated from depths as great as 40 feet and are composed of finer grained soils (lean and fat clays) mixed with some sand, silt, humus, etc. which material composition is heavier and has greater cohesive characteristics. The surface materials in these areas have dried and the underlying materials as well as the foundation on which these materials were deposited have become compressed or consolidated and have thereby substantially gained in strength and resistance to erosion.

Comment: Page IV-12, paragraph 3: A brief synopsis of the published results of the effects of heavy metals on the biota in other areas could be referenced and discussed in this section as they may relate to this project area.

Response: Information on the effects of heavy metals on biota is referenced in <u>Annotated Bibliography on Biological Effects of Metals in Aquatic Environments</u>, Ecological Research Studies, National Environmental Research Center, U. S. Environmental Protection Agency, February, 1973. The effects in the project area would probably be similar to those documented for areas that are characteristically similar.

Comment: Four corrections in the zoological species list.

Response: The corrections have been made on the reference copy in the New Orleans District Office.

g. <u>Louisiana Department of Public Works</u>

Comment: Page II-116, paragraph g, last sentence: Expand to a more meaningful and factual statement the reference to the locks

IX-7

at Rigolets and Seabrook. A more full explanation is needed to understand that the two structures mentioned do not themselves provide hurricane protection nor control salinity changes.

Response: Hurricane protection will be provided by the Lake Pontchartrain, Louisiana and Vicinity project. This project will include a lock and control structure at the Rigolets, a navigation structure and control structure at Chef Menteur Pass, and a lock and control structure at Seabrook. The structures at Seabrook can be operated to modify salinities in Lake Pontchartrain. The structures at the Rigolets and Chef Menteur will be designed and operated to maintain existing hydrologic conditions in Lake Pontchartrain.

Comment: On Page V-1, paragraph (b), the discussion on turbidity resulting from dredging should reflect that increases in local water turbidity is for short, temporary periods. Readers could assume that the turbidity is long-term in its effects.

Response: The text on Page V-1 has been revised to read: "Turbidity is generally local, temporary, and . . . ."

h. Louisiana Wild Life and Fisheries Commission

Comment: Dredging can produce multiple adverse effects in marsh and estuarine environments: turbidity, siltation, silt accumulation on channel bottom unsuitable for most bottom dwelling species, and resuspension of pollutants.

Response: The adverse impacts of dredging are recognized and are included in Section IV of this EIS.

Comment: Adverse effects may be heightened during storms which can flush out large volumes of anaerobic and polluted sediment layers from dredged channels into adjacent waters causing a precipitous decline in water quality. The Waters of Breton Sound of Lake Borgne could well be affected in this manner by stormwater from the MR-GO and associated bayous following dredging in these channels.

Response: We recognize the potential of hurricane derived forces to redistribute large volumes of material which affect water quality.

Comment: Saltwater intrusion into normally brackish or freshwater areas is a problem of considerable magnitude which is causing significant ecological changes in the marshlands and estuaries of south Louisiana. The MR-GO has contributed to this process and

IX-8

implementation of the proposed project would enhance the adverse effects of this channel and result in further deterioration of high quality marsh and water bottoms.

Response: This EIS recognizes the continual changes resulting from previous actions. We know of no definitive evidence which indicates that discontinuation of dredging operations would restore the salinity levels to pre-1960 conditions. Salinity control measures would require new construction features necessitating environmental and socio-economic investigation and impact analysis. Consideration of these measures in this assessment of the impacts of project operation and maintenance is not appropriate.

Comment: Of the spoil deposition alternatives presented, soil deposition in large contained areas in land appears to be the least environmentally damaging. In that this, in fact, has been past practice along the southwest side of the MR-GO, further deposition, if adequately contained, would be confined to an area that has already been effectively removed as a productive unit of the marsh ecosystem. Presently undisturbed marshland would be spared, although secondary growth of plants and shrubs would be destroyed in the disposal area along with terrestrial animal species unable to escape during spoil deposition operations.

Response: The comment is noted and concurred in. See Section IV.

i. Louisiana State Soil and Water Conservation Committee

Comment: Requests correction on Page iii of the listing of the agency, which, although housed on the Louisiana State University Campus, is a separate and distinct agency of the State Government.

Response: The list has been corrected.

9.02   LOCAL, ENVIRONMENTAL, AND OTHER GROUPS

Copies of the draft environmental impact statement were sent to all local, environmental, and other groups listed in paragraph 5 of the Summary. The groups were requested to submit their views and comments. No comments were received from these groups.

9.03   PUBLIC PARTICIPATION

The draft statement was made available to the general public. The following persons, organizations, and agencies requested copies of the statement, but did not comment.

IX-9