Dr. John Day
Center for Wetland Resources
LSU
Baton Rouge, Louisiana 70803

Office of Public Affairs
Environmental Defense Fund
Washington, D. C. 20036

H. Paul Friesena
Center for Urban Affairs
Evanston, Illinois 60201

Cornelia Carriere
Environmental Reporter
The Times-Picayune
New Orleans, Louisiana 70125

9.04 LETTERS RECEIVED BY THE DISTRICT ENGINEER ON THE DRAFT ENVIRONMENTAL STATEMENT


| Agency | Page |
|---|---|
| Environmental Protection Agency, Region VI | IX-11 |
| U. S. Department of Commerce, The Assistant Secretary for Science and Technology | IX-14 |
| U. S. Department of Agriculture, Soil Conservation Service | IX-16 |
| U. S. Department of Transportation, Federal Highway Administration | IX-17 |
| U. S. Department of Health, Education, and Welfare, Regional Office | IX-17 |
| U. S. Department of Health, Education, and Welfare, Public Health Service, Center for Disease Control | IX-18 |
| Advisory Council on Historic Preservation | IX-19 |
| U. S. Department of the Interior, Office of the Secretary, Southwest Region | IX-20 |
| Louisiana Department of Public Works | IX-21 |
| Louisiana Wild Life and Fisheries Commission | IX-22 |
| Louisiana Commission on Intergovernmental Relations | IX-23 |
| Louisiana State Soil and Water Conservation Committee | IX-23 |
| Port of New Orleans, Centroport, U.S.A. | IX-24 |

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
REGION VI
1600 PATTERSON
DALLAS, TEXAS 75201

July 14, 1975

Colonel E. R. Heiberg, III
District Engineer
New Orleans District
Corps of Engineers
P.O. Box 60267
New Orleans, Louisiana 70160

Dear Colonel Heiberg:

The Environmental Protection Agency has received the Composite Draft Environmental Impact Statement for Operation and Maintenance Work on Three Navigation Projects in the Lake Borgne Vicinity, Louisiana.

A failure in our telecommunication system which transmits the Council on Environmental Quality (CEQ) due dates to our office has caused a delay in responding to the statement. We expect to respond no later than July 28, 1975.

Please accept our apologies for this delay.

Sincerely yours,

Clinton B. Spotts
Regional EIS Coordinator

ENVIRONMENTAL PROTECTION AGENCY
REGION VI
1600 PATTERSON, SUITE 1100
DALLAS, TEXAS 75201

July 24, 1975

OFFICE OF THE
REGIONAL ADMINISTRATOR

Colonel E. R. Heiberg, III
District Engineer
New Orleans District
Corps of Engineers
P. O. Box 60267
New Orleans, Louisiana 70160

Dear Colonel Heiberg:

We have reviewed the Composite Draft Environmental Impact Statement for Operation and Maintenance work on three navigation projects in the Lake Borgne Vicinity, Louisiana.

We are submitting the following comments for your consideration in preparing the final statement:

1. We suggest that the final statement include an analysis of the benefits and costs of the three proposed operation and maintenance projects. This analysis should contain sufficient information in order to compare and weigh equally the costs of project implementation with the beneficial and adverse impacts of each action. Inclusion of a benefit/ cost ratio would be helpful in better understanding the economic benefits of continued operation and maintenance on the project channels and the environmental trade-offs that could occur.

2. The composite statement addresses three navigation projects; however, the majority of the information provided relates specifically to the MR-GO project. In order to strengthen the statement, we suggest that additional information be provided on Bayous La Loutre, St. Malo, Dupre and Yscloskey. Specifically, it appears that the dredged material disposal acreage figure given in the statement applies to the MR-GO project alone. If this is the case, we suggest that disposal acreage figures for the additional project channels be given in the final statement.

Also, while it is clear that gated effluent release structures will be used at the MR-GO on-land disposal sites, it is not clear if similar structures will be employed at the other sites. This should be clarified in the final statement.

3. It appears from the sediment quality data provided in the statement that the resuspension and resolubilization of certain pollutants could occur in the project streams. We are particularly concerned with the possible resuspension of heavy metals (lead, mercury, zinc, arsenic and cadmium) and their unknown effects on the aquatic community. We agree that additional sediment sampling should be undertaken prior to dredging operations, as stated on page II-61 of the statement. We would recommend that in order to determine the effects of dredging on the resuspension and resolubilization of pollutants (particularly heavy metals) in the water column during maintenance activities, a monitoring program be implemented which would,at a minimum, record dissolved oxygen, total suspended solids, Total Kjeldahl Nitrogen and heavy metal concentrations before, during and after dredging operations. If pollutant concentrations exceed existing background levels or if dissolved oxygen concentrations fall below levels necessary to support aquatic life as a result of dredging, we recommend that temporary suspension, reduction or other modification of the operation be considered until such time that the concentrations of these parameters return to previous background levels. Also, if it is determined that the dredged material is polluted, consideration should be given to monitoring the supernatant effluent at the point of discharge from the land disposal sites. Release of the supernatant to the receiving streams should be controlled in a manner which would minimize the pollutant concentration increases for the above mentioned parameters. Finally, we suggest that the elutriate test be conducted for the parameters which were exceeded in the sediment analysis and the results included in the final statement. This information would be helpful in evaluating the impacts of the proposed dredging operations.

The draft statement should discuss the associated long term project induced impacts resulting from the construction of the Mississippi River-Gulf Outlet System in more detail. While construction of the project has resulted in serious primary environmental impacts (e.g., loss of approximately 23,000 acres of marsh), severe secondary impacts have also occurred. For example, construction of the MR-GO has resulted in a modified water regime in the Lake Borgne-Pontchartrain system thereby disrupting extremely productive biological communities. Specifically, channel construction and dredged material placement have altered the hydrology and water chemistry of adjacent estuarine and wetland areas. At present, the MR-GO provides an open channel for the ingress and egress of tidal water. Saltwater intrusion and associated increases in salinity levels have been well documented and are in part responsible for wetland and estuary deterioration in the project area. For instance, average surface salinity levels in Lake Borgne, at certain sampling stations, have ranged from 3.0 ppt (1959-1961) to 10.4 ppt (1962-1964). Furthermore, the poorly consolidated sediments through



which the channel was excavated is extremely unstable and requires frequent maintenance dredging. Subsequent maintenance operations will result in degraded water quality during the dredging cycle and perpetuate the increased salinity levels in the Borgne-Pontchartrain Lake Systems.

EPA's Policy Statement on the protection of our nation's wetlands (F.R. 2 May 1973) requires us to give particular cognizance and consideration to any proposal that has the potential to damage wetlands and to protect and preserve them from misuse. It is also this agency's policy to minimize alterations in the quantity or quality of the natural flow of water that nourishes wetlands.

Under Section 404 of P.L. 92-500, our agency is authorized to deny or restrict the use of any area as a disposal site when it is evident that such activity will have an adverse impact on shellfish needs, fishery areas, wildlife, recreational areas or water supplies. Furthermore, recent proposed regulations (F.R. 6 May 1975) state that EPA should avoid approving disposal sites that significantly disrupt the chemical, physical and biological integrity of the aquatic ecosystem.

The Army Corps of Engineers, in regulations published on July 22, 1974 has also recognized the unique qualities of wetland areas and the need for their preservation. The Corps in discussing wetlands states, "As environmentally vital areas, they constitute a productive and valuable public resource, the unnecessary alteration or destruction of which should be discouraged as contrary to the public interest."

Therefore, in order to minimize the existing adverse and future long-term (secondary) impacts of the MR-GO, we recommend that mitigative measures that could reduce salinity levels in the Lake Borgne-Pontchartrain System be incorporated into the operation and maintenance of the MR-GO project. For example, such measures could include the completion of the Seabrook Lock in the Inner Harbor Navigation Canal System, controlled releases of freshwater from the Mississippi River, and saltwater intrusion barriers. Without control measures, salt water intrusion and water quality degradation will continue to be a major problem in the project area.

4. Finally, the statement should contain additional information in order to allow for complete assessment of the interrelated impacts of MR-GO and other local, state and Federal projects in southern Louisiana. An environmental evaluation of the adverse and beneficial effects of the interrelated projects in the vicinity of MR-GO should be included in the final statement (e.g., GIWW, Lake Ponchartrain and Vicinity Hurricane Protection, MR-GO, Michoud Canal).

These comments classify your Draft Environmental Impact Statement as ER-2. Specifically, we have environmental reservations concerning potential adverse water quality impacts resulting from the dredging operations. We are also requesting that additional information be included in the final statement. The classification and the date of our comments will be published in the Federal Register in accordance with our responsibility to inform the public of our views on proposed Federal actions, under Section 309 of the Clean Air Act.

Definitions of the categories are provided on the attachment. Our procedure is to categorize our comments on both the environmental consequences of the proposed action and on the adequacy of the impact statement at the draft stage, whenever possible.

We appreciate the opportunity to review the Draft Environmental Impact Statement. Please send us two copies of the Final Environmental Impact Statement at the same time it is sent to the Council on Environmental Quality.

Sincerely yours,

John C. White
Regional Administrator

Enclosures

ENVIRONMENTAL IMPACT OF THE ACTION

LO - Lack of Objections

EPA has no objections to the proposed action as described in the draft impact statement; or suggests only minor changes in the proposed action.

ER - Environmental Reservations

EPA has reservations concerning the environmental effects of certain aspects of the proposed action. EPA believes that further study of suggested alternatives or modifications is required and has asked the originating Federal agency to re-assess these aspects.

EU - Environmentally Unsatisfactory

EPA believes that the proposed action is unsatisfactory because of its potentially harmful effect on the environment. Furthermore, the Agency believes that the potential safeguards which might be utilized may not adequately protect the environment from hazards arising from this action. The Agency recommends that alternatives to the action be analyzed further (including the possibility of no action at all).

ADEQUACY OF THE IMPACT STATEMENT

Category 1 - Adequate

The draft impact statement adequately sets forth the environmental impact of the proposed project or action as well as alternatives reasonably available to the project or action.

Category 2 - Insufficient Information

EPA believes the draft impact statement does not contain sufficient information to assess fully the environmental impact of the proposed project or action. However, from the information submitted, the Agency is able to make a preliminary determination of the impact on the environment. EPA has requested that the originator provide the information that was not included in the draft statement.

Category 3 - Inadequate

EPA believes that the draft impact statement does not adequately assess the environmental impact of the proposed project or action, or that the statement inadequately analyzes reasonably available alternatives. The Agency has requested more information and analysis concerning the potential environmental hazards and has asked that substantial revision be made to the impact statement. If a draft statement is assigned a Category 3, no rating will be made of the project or action, since a basis does not generally exist on which to make such a determination.

UNITED STATES DEPARTMENT OF COMMERCE
The Assistant Secretary for Science and Technology
Washington, D.C. 20230

July 3, 1975

Colonel E. R. Heiberg III
District Engineer-New Orleans District
Corps of Engineers
U. S. Department of the Army
P. O. Box 60267
New Orleans, Louisiana 70160

Dear Colonel Heiberg:

The composite draft environmental statement for Operation and Maintenance work on three Navigation Projects in the Lake Borgne Vicinity, Louisiana, "The Mississipi River - Gulf Outlet, Bayous La Loutre, St. Malo, and Yscloskey Bayou Dupre," which accompanied your letter of April 30, 1975, has been received by the Department of Commerce for review and comment.

The statement has been reviewed and the following comments are offered for your consideration.

GENERAL COMMENTS

Discussion of Mississippi River - Gulf Outlet (MR-GO) operation and maintenance work dwarfed that of the associated navigation projects. More detailed information should be included on the size and status of the dredged material disposal sites and the frequency of maintenance dredging for Bayous La Loutre, St. Malo, Yscloskey, and Dupre.

SPECIFIC COMMENTS

SECTION 1 - PROJECT DESCRIPTION
1.05 OPERATION AND MAINTENANCE
a. GENERAL
(3) OTHER SEDIMENT SOURCES



Page I-6, paragraph 5. Another possible sediment source that should be included in this section is the marsh material released by marsh deterioration in the project area as a result of saltwater intrusion. This material may be transported to the MR-GO by tidal action, storms, and hurricanes.

SECTION 2 - ENVIRONMENTAL SETTING

Numerous geodetic control survey monuments and tidal bench marks are located within the proposed project area. If there is any planned activity which will disturb or destroy these monuments, the Department of Commerce, National Ocean Survey (NOS), of which the National Geodetic Survey is a part, requires not less than 90 days notification in advance of such activity in order to plan their relocation. NOS recommends that funding for this project include the cost of any relocation required for NOS monuments.

2.03 GEOLOGICAL ELEMENTS
(2) IMMEDIATE MR-GO VICINITY
(d) PROCESSES AFFECTING LAND FORM

Page II-22, paragraph 1. Another process that should be included in this section is marsh deterioration resulting from saltwater intrusion. A study on the MR-GO (Anon., 1973) cited studies by Chabreck (1970) and Palmisano (1970) which reported that saltwater intrusion into fresh and brackish marshes results in maximum loss of marsh. The MR-GO study (Anon., 1973), in discussing saltwater intrusion, stated "...when salinity is increased in areas underlain by thick organic sequences, instead of being replaced by saline grasses, the marshes simply break up and revert to open ponds and lakes."

SECTION 4 - THE PROBABLE IMPACTS OF THE PROPOSED ACTION ON THE ENVIRONMENT
4.01 GENERAL NATURE OF IMPACTS
b. EFFECTS RELATED TO OTHER ACTIONS AND CHANGES
TABLE 4-1 SUMMARY OF SOME OF THE EVENTS AND ACTIONS WHICH AFFECT THE ENVIRONMENTAL SETTING (CONSTRUCTION OF THE MR-GO)



<u>Page IV-2</u>. The statement, "Change toward more salt-tolerant vegetation and zoological resources of immediate and adjacent areas in response to changes in system hydrology and salinity," should be documented. This statement is in conflict with the studies cited in our above comments on Section 2 - Processes Affecting Land Form, regarding information on marsh deterioration as a result of saltwater intrusion. Such information should be included in this table.

4.02 <u>BENEFICIAL AND ADVERSE IMPACTS</u>
a. <u>GENERAL</u>
TABLE 4-2 <u>CLASSIFICATION OF IMPACT</u>

<u>Pages IV-12, paragraph 4</u>. Under the topic of heavy metals in the sediment, it is stated "If effects of suspended sediment are not adverse for local biota, effects on biota affected by long distance drift from the dredge would not be expected to be significant." This statement should be qualified and documented, because the long distance drift may extend into an ecosystem with biota having more sensitive tolerances to heavy metals than those of the local biota.

4.03 <u>REMEDIAL, PROTECTIVE, AND MITIGATION MEASURES</u>
c.

<u>Page IV-13, paragraph 3</u>. Retention of the existing on-land disposal areas for their continued use would also greatly reduce any need to utilize adjacent marshes as disposal areas in the future.

SECTION 6 - <u>ALTERNATIVES TO THE PROPOSED ACTION</u>

This section should contain a discussion of possible economic use of the dredge spoil.

Thank you for giving us an opportunity to provide these comments, which we hope will be of assistance to you. We would appreciate receiving eight copies of the final statement.

Sincerely,

Sidney R. Galler
Deputy Assistant Secretary
for Environmental Affairs

Attachment



LITERATURE CITED

Anon. 1973. Environmental Considerations of an expanded Mississippi River - Gulf Outlet. Report prepared for St. Bernard Parish Police Jury by Coastal Environments, Inc., Baton Rouge, Louisiana. 58p.

Chabreck, R. H. 1970. Marsh zones and vegetation types in the Louisiana coastal marshes. Ph.D. Dissertation, Department of Botany and Plant Pathology, Louisiana State University, Baton Rouge, Louisiana.

Palmisano, A. W. 1970. Plant community - soil relationships in Louisiana coastal marshes. Ph.D Dissertation, Department of Botany and Plant Pathology, Louisiana State University, Baton Rouge, Louisiana.

UNITED STATES DEPARTMENT OF AGRICULTURE
SOIL CONSERVATION SERVICE
Post Office Box 1630 - Alexandria, La. 71301

May 12, 1975

Colonel E. R. Heiberg, III, CE
District Engineer
U.S. Army Corps of Engineers
P.O. Box 60267
New Orleans, Louisiana 70160

Dear Colonel Heiberg:

RE: LMNPL-RR Composite Draft Environmental Statement for Operation and Maintenance Work on Three Navigation Projects in the Lake Borgne Vicinity Louisiana

We have reviewed the draft environmental impact statement for the above project and have no comments to offer.

We appreciate the opportunity to review this document.

Very truly yours,

Alton Mangum
State Conservationist

cc: Kenneth E. Grant
Administrator, SCS
Washington, D.C. 20250

Council on Environmental Quality (5 copies)
722 Jackson Place, N.W.
Washington, D.C. 20006
Att: General Counsel

Office of the Coordinator of
Environmental Quality Activities
Office of the Secretary, USDA
Washington, D.C. 20250

UNITED STATES DEPARTMENT OF AGRICULTURE
SOIL CONSERVATION SERVICE
Post Office Box 1630 - Alexandria, Louisiana 71301

May 12, 1975

Colonel E. R. Heiberg, III, CE
District Engineer
U.S. Army Corps of Engineers
P.O. Box 60267
New Orleans, Louisiana 70160

Dear Colonel Heiberg:

RE: LMNPL-RR DRAFT, Environmental Statement for Operation and Maintenance dredging of four projects located south of the Gulf intracoastal waterway in Terrebonne Parish, Louisiana

We have reviewed the draft environmental statement and have no comments to offer. We appreciate the opportunity to review this document.

Very truly yours,

Alton Mangum
State Conservationist

cc: Kenneth E. Grant
Administrator, SCS
Washington, D.C. 20250

Council on Environmental Quality (5)
722 Jackson Place, N.W.
Washington, D.C. 20006
Attention: General Counsel

Office of the Coordinator of
Environmental Quality Activities
Office of the Secretary, USDA
Washington, D.C. 20250



U.S. DEPARTMENT OF TRANSPORTATION
FEDERAL HIGHWAY ADMINISTRATION
REGION SIX
750 Florida Boulevard
Baton Rouge, Louisiana 70801

June 23, 1975

IN REPLY REFER TO

Draft EIS for Maintenance of Mississipi River-Gulf Outlet, Bayou LaLoutre and Bayou Dupre

Colonel E. R. Heiberg III, CE
District Engineer
New Orleans District, Corps of Engineers
P. O. Box 60267
New Orleans, Louisiana 70160

Dear Colonel Heiberg:

We have reviewed the draft environmental statement for the above project and have no comments. The project should not have any significant effect on any existing highway facilities, and we do not know of any proposed highway projects in this area.

We appreciate the opportunity for review of this statement.

Sincerely yours,

for M. C. Reinhardt
Division Engineer

DEPARTMENT OF HEALTH, EDUCATION, AND WELFARE
REGIONAL OFFICE
1114 COMMERCE STREET
DALLAS, TEXAS 75202

OFFICE OF
THE REGIONAL DIRECTOR

May 13, 1975

Our Reference: EI# 1275-536 (LMNPL-RR)

Colonel E. R. Heiberg
Department of the Army
New Orleans District, Corps of Engineers
P. O. Box 60267
New Orleans, Louisiana 70160

Dear Colonel Heiberg:

RE: Mississippi River - Gulf outlet
Bayour La Loutre

Pursuant to your request, we have reviewed the Environmental Impact Statement for the above project proposal in accordance with Section 102(2) (c) of P. L. 91-190, and the Council on Environmental Quality Guidelines of April 23, 1971.

Environmental health program responsibilities and standards of the Department of Health, Education, and Welfare include those vested with the United States Public Health Service and the Facilities Engineering and Construction Agency. The U. S. Public Health Service has those programs of the Federal Food and Drug Administration, which include the National Institute of Occupational Safety and Health and the Bureau of Community Environmental Management (housing, injury control, recreational health and insect and rodent control).

Accordingly, our review of the Draft Environmental Statement for the project discerns no adverse effects that might be of significance where our program responsibilities and standards pertain, provided that appropriate guides are followed in concert with State, County, and local environmental laws and regulations.

We, therefore, have no objection to the authorization of this project insofar as our interests and responsibilities are concerned.

Very truly yours,

William F. Crawford
Regional Environmental Officer



DEPARTMENT OF HEALTH, EDUCATION, AND WELFARE
PUBLIC HEALTH SERVICE
CENTER FOR DISEASE CONTROL

BUREAU OF LABORATORIES
VECTOR-BORNE DISEASES DIVISION
POST OFFICE BOX 2087
FORT COLLINS, COLORADO 80521

May 28, 1975

Colonel E. R. Heiberg, III
District Engineer
New Orleans District
U.S. Army Corps of Engineers
Post Office Box 60267
New Orleans, Louisiana 70160

Re: LMNPL-RR

Dear Colonel Heiberg:

In response to your request for review of the composite draft environmental statement on Operation and Maintenance Work on Three Navigation Projects in the Lake Borgne Vicinity, Louisiana (The Mississippi River - Gulf Outlet; Bayous La Loutre, St. Malo, and Yscloskey; Bayou Dupre), we are forwarding our comments in regard to vector-borne disease problems associated with this project.

Earlier this month, we submitted comments to your office on vector-borne disease problems related to dredging and spoil deposition. Remarks submitted in this review are similar to those made previously. Our concern regards diseases transmitted to man and other animals by insects and other arthropods. Almost of equal importance is the serious discomfort caused by these biting pests.

Impacts upon the environmental quality and man's well-being, in respect to the possibility that mosquito and other vector-producing habitats may be created by the terrestrial deposition of dredged spoil material, are not mentioned in the statement. In the Classification of Impacts (Table 4-2, pages IV-8 through IV-12), no consideration is given to the possibility that the project will produce an impact upon man's health or well-being. The deposition of millions of cubic yards of spoil material will cover over 10,000 acres, some of which is shown in Plate 2 to be within a mile of the City of New Orleans. Creation of mosquito-producing habitats so near a heavily populated area is an adverse environmental impact that must be considered in your assessment.

The climate and topography of southern Louisiana favor mosquito production, and man-made habitats should not be created. Serious mosquito problems in coastal areas are caused by spoil deposition, loading procedures, and poor dewatering and drainage characteristics of spoils. These result in creation





of extensive habitats for the production of salt marsh mosquitoes (*Aedes sollicitans* and *Aedes taeniorhynchus*). Further, as the spoil ages, ecological conditions change and the southern house mosquito (*Culex quinquefasciatus*) or the malaria mosquito (*Anopheles quadrimaculatus*) may be produced in waters impounded by spoils or dikes. All of these mosquitoes are common and abundant in Orleans and St. Bernard Parishes. *Psorophora confinnis*, *Culiseta inornata*, tabanids, and other biting flies also are common, frequently in large numbers. These species exhibit wide choices of habitat-types as well. This information is taken from "Distribution and Relative Abundance of Mosquito Species in Louisiana," E. B. Johnson, 1959, Louisiana Mosquito Control Association, Technical Bulletin No. 1, New Orleans, Louisiana.

Table 4-3 (pp. IV-14 and IV-15) states the Corps of Engineers "Dredged Material Research Program as of July, 1974." Project 2A, Upland and Marsh Disposal Impacts, has as its objective: "Identification, evaluation, and monitoring of specific short-term effects and more general long-term effects of confined and unconfined disposal of dredged material on uplands, marsh, and other wet lands." Entomological research, in particular mosquito and mosquito habitat study on spoil disposal sites, could easily fall within the scope of this project. We would like to know if such research has been considered as an effect produced by spoil deposition.

Our staff has not had the opportunity to visit spoil deposition sites in Louisiana, and thus we are unable to make specific recommendations regarding the prevention of vector production or vector-borne disease problems there. However, Mr. Roy Hayes, Chief, Solid Waste and Vector Control Section, Louisiana State Department of Health, should be able to provide consultation regarding engineering procedures for the prevention of vector habitats in the areas described in the environmental impact statement. With limitations on the application of chemicals, an engineering approach involving environmental manipulation is becoming increasingly important in vector control.

We appreciate the opportunity to cooperate with your office in reviewing this statement. If we can further clarify any point or furnish any other information relative to vector-borne disease control, please let us know.

Sincerely yours,

Richard O. Hayes

Richard O. Hayes, Ph.D., M.P.H.
Chief, Water Resources Branch

cc:
Mr. Roy Hayes

Advisory Council
On Historic Preservation
1522 K Street N.W. Suite 430
Washington D.C. 20005

MAY 1 3 1975

Colonel E. R. Heiberg, III
District Engineer
Corps of Engineers, New Orleans District
Department of the Army
P. O. Box 60267
New Orleans, Louisiana 70160

Dear Colonel Heiberg:

This is in response to your request of April 30, 1975 for comments on the environmental statement for operation and maintenance work on three navigation projects in the Lake Borgne vicinity, Louisiana: the Mississippi River-Gulf Outlet, Bayous La Loutre, St. Malo and Yscloskey, and Bayou Dupre. Pursuant to its responsibilities under Section 102(2)(C) of the National Environmental Policy Act of 1969, the Advisory Council on Historic Preservation has determined that while you have discussed the historical, architectural, and archeological aspects related to the undertaking, the Advisory Council needs additional information to adequately evaluate the effects on these cultural resources. Please furnish additional data indicating:

I. <u>Compliance with Executive Order 11593 "Protection and Enhancement of the Cultural Environment" of May 13, 1971.</u>

A. Under Section 2(a) of the Executive Order, Federal agencies are required to locate, inventory, and nominate eligible historic, architectural and archeological properties under their control or jurisdiction to the National Register of Historic Places. The results of this survey should be included in the environmental statement as evidence of compliance with Section 2(a).

B. Until the inventory required by Section 2(a) is complete, Federal agencies are required by Section 2(b) of the Order to submit proposals for the transfer, sale, demolition, or substantial alteration of federally owned properties eligible for inclusion in the National Register to the Council for review and comment. Federal agencies must continue to comply with Section 2(b) review requirements even after the initial inventory is complete, when they obtain jurisdiction or control over additional properties which are eligible for inclusion in the National Register or when properties under their jurisdiction or control are found to be eligible for inclusion in the National Register subsequent to the initial inventory.

The environmental statement should contain a determination as to whether or not the proposed undertaking will result in the transfer, sale, demolition or substantial alteration of eligible National Register properties under Federal jurisdiction. If such is the case, the nature of the effect should be clearly indicated as well as an account of the steps taken in compliance with Section 2(b). (36 C.F.R. Part 800 details compliance procedures.)

C. Under Section 1(3), Federal agencies are required to establish procedures regarding the preservation and enhancement of non-federally owned historic, architectural, and archeological properties in the execution of their plans and programs.

The environmental statement should contain a determination as to whether or not the proposed undertaking will contribute to the preservation and enhancement of non-federally owned districts, sites, buildings, structures and objects of historical, architectural or archeological significance.

II. <u>Contact with the State Historic Preservation Officer.</u>

The procedures for compliance with Section 106 of the National Historic Preservation Act of 1966 and the Executive Order 11593 require the Federal agency to consult with the appropriate State Historic Preservation Officer. The State Historic Preservation Officer for Louisiana is Jay R. Broussard, Director, Department of Art, Historical and Cultural Preservation, Old State Capitol, North Boulevard, Baton Rouge, Louisiana 70801.

Should you have any questions or require any additional assistance, please contact Michael H. Bureman of the Advisory Council staff at P. O. Box 25085, Denver, Colorado 80225, telephone number (303) 234-4946.

Sincerely yours,

John D. McDermott
Director, Office of Review
and Compliance

United States Department of the Interior
OFFICE OF THE SECRETARY
SOUTHWEST REGION
Room 4030, 517 Gold Avenue SW.
Albuquerque, New Mexico 87101

ER-75/474

June 26, 1975

District Engineer
U.S. Army Corps of Engineers
P.O. Box 60267
New Orleans, Louisiana 70160

Dear Sir:

This is in response to your request for the Department of the Interior's review and comment on the draft environmental impact statement for the proposed Operation and Maintenance Work on Three Navigation Projects in the Lake Borgne Vicinity, Louisiana.

We offer the following comments for your consideration:

General Comments

In general, the statement is comprehensive and well written. However, we believe the statement could be improved in certain areas.

Specific Comments

Project Description

Pages I-6-10, subsection 1.05 - This section should be expanded to include a discussion of the location of shoaling, anticipated volume of material to be removed, method and timing of dredge operations for Bayous La Loutre, St. Malo, Yscloskey, and Dupre.

Pages II-6 and II-6, b.5 - The statement appears to be adequate in most respects in its treatment of geology and water resources. However, one change is needed in the list of causes of subsidence. Subsidence also results from the withdrawal of fluids, especially water and petroleum. 1/

1/ Poland, J.F. and Davis, G.H., 1969, Land subsidence due to withdrawal of fluids: Geological Society of America Reviews in Engineering Geology II.




*Save Energy and You Serve America!*

Page II-97, (3) - The procedures for investigation and identification of archeological sites should be available for review by the Advisory Council on Historic Preservation and the National Park Service when such procedures are further defined.

The Probable Impacts of the Proposed Action on the Environment

Pave IV-10, paragraph 2 - It is stated that the elevated spoil disposal areas constrain the westward erosion of the MR-GO channel bank. We do not believe this is correct. The channel bank-water interface along the elevated disposal areas is far below the vegetated surface of these disposal areas. Undercutting of wave action will be facilitated because the soil-binding roots of plants growing on the disposal areas are located above the zone of wave erosion. Similar situations exist along portions of the Gulf Intracoastal Waterway in Louisiana. The statement should be revised to reflect this situation.

Page IV-12, paragraph 3 - We agree that additional research is needed regarding the effects of heavy metals on aquatic life in the project area. However, a brief synopsis of the published results of the effects of heavy metals on the biota in other areas could be referenced and discussed in this section as they may relate to this project area.

Zoological Species List

Page B-19 - The fulvous tree duck is considered to be common in summer and uncommon in winter in coastal Louisiana.

Page B-23 - The occurrence of the American coot in the project area should be listed as common in winter and rare in summer.

Page B-38 - The Canada goose and white-fronted goose are believed to be rare and unlikely in southeastern Louisiana.

Page B-39 - The gadwall is considered common in the project area.

We hope these comments will be helpful in preparing the final statement.

Sincerely yours,

Willard Lewis

Willard Lewis
Special Assistant to the Secretary



ROY AGUILLARD
DIRECTOR

**State of Louisiana**
DEPARTMENT OF PUBLIC WORKS
P. O. BOX 44155, CAPITOL STATION
BATON ROUGE, LOUISIANA 70804

BOARD OF PUBLIC WORKS
GEORGE CHANEY, CHAIRMAN
EMMETT A. EYMARD
P. P. VERRETT, SR.
RICHARD P. GIBSON
ROLAND CARTER

May 30, 1975

Col. Elvin R. Heiberg III
U. S. Army Corps of Engineers
New Orleans District
P. O. Box 60267
New Orleans, Louisiana 70160

Re: LMNPL-RR

Dear Col. Heiberg:

Your letter dated April 30, 1975, transmitted a Composite Draft Environmental Statement (EIS) for the continued operation and maintenance of three projects including: (1) Mississippi River-Gulf Outlet, (2) Bayous LaLoutre, St. Malo, and Yscloskey, and (3) Bayou Dupre. You requested review and comment on this composite draft EIS.

The Louisiana Department of Public Works has been designated by Governor Edwin Edwards of Louisiana as his representative in the review and coordination of water resources projects, studies, and reports affecting the State. The Department is the State agency responsible for planning, coordination, and orderly development of the State's vast water resources. We are, therefore, pleased to submit these comments on behalf of the Governor of Louisiana and for the Department of Public Works:

(a) On Page II-116, Paragraph (g), the last sentence should be expanded to provide a more meaningful and factual statement. The persons who are vaguely or less familiar with the purposes and functions of the locks at Rigolets and Seabrook will not understand the full association and purpose in the overall project and will probably conclude that that two structures mentioned do not themselves provide hurricane protection nor would they control salinity changes. A more full explanation is needed.

(b) On Page V-1, Paragraph (b), there is a discussion presented referring to turbidity resulting from dredging. Under Paragraph (b), Items 1 and 3 should reflect that increases in local water turbidity is for short, temporary periods. This could be significant since some readers could assume that the turbidity was long-term in its effects.

It is very evident that careful and comprehensive considerations have been utilized in the preparation of this Composite Draft EIS. We compliment the New Orleans District for a job well done and urge its final acceptance and approval.



On behalf of the Governor and the State of Louisiana, the Department of Public Works sincerely appreciates this opportunity to comment on this Composite Draft EIS.

Sincerely yours,

Roy Aguillard
ROY AGUILLARD
Director

GRD/cjh

State of Louisiana

WILD LIFE AND FISHERIES COMMISSION
400 ROYAL STREET
NEW ORLEANS 70130

J BURTON ANGELLE
DIRECTOR

EDWIN EDWARDS
GOVERNOR

July 11, 1975

Colonel E.R. Heiberg III
District Engineer
United States Army Corps of Engineers
P.O. Box 60267
New Orleans, Louisiana

Dear Colonel Heiberg:

Personnel of the Louisiana Wildlife and Fisheries Commission have reviewed the Draft Composite Environmental Impact Statement for operation and maintenance work on three navigation projects in the Lake Borgne vicinity, Louisiana.

This Draft Environmental Statement describes proposed operation and maintenance projects involving the Mississippi River-Gulf Outlet (MR-GO) and Bayous La Loutre, St. Malo, Yscloskey and Dupre. The projects include dredging operations, dredge spoil disposal and maintenance of spoil containment dikes. The immediate effects of dredging and spoil deposition operations of this kind are habitat destruction and loss of aquatic and terrestrial organisms in the project area and areas proximate to these operations.

Dredging can produce multiple adverse effects in marsh and estuarine environments. High turbidity levels and siltation are effects which may extend a considerable distance from the immediate project site. Silt deposits can accumulate in dredged channels and form a soft, unstable, anaerobic bottom which is unsuitable for most bottom dwelling species. Dredging operations may also resuspend pollutants that are absorbed onto sediments with detrimental results to local aquatic and terrestrial biota.



Colonel E.R. Heiberg III
Page 2
July 14, 1975

These effects may be heightened during storms which can flush out large volumes of anaerobic and polluted sediment layers from dredged channels into adjacent waters causing a precipitous decline in water quality. The waters of Breton Sound or Lake Borgne could well be affected in this manner by stormwater from the MR-GO and associated bayous following dredging in these channels.

Salt water intrusion into normally brackish or fresh water areas is a problem of considerable magnitude which is causing significant ecological changes in the marsh lands and estuaries of South Louisiana. The MR-GO has contributed to this process and implementation of the proposed project would enhance the adverse effects of this channel and result in further deterioration of high quality marsh and water bottoms.

Of the spoil disposition alternatives presented, spoil deposition in large contained areas on land appears to be the least environmentally damaging. In that this, in fact, has been past practice along the southwest side of the MR-GO, further deposition, if adequately contained, would be confined to an area that has already been effectively removed as a productive unit of the marsh ecosystem. Presently undisturbed marshland would be spared, although secondary growth of plants and shrubs would be destroyed in the disposal area along with terrestrial animal species unable to escape during spoil deposition operations.

We appreciate having the opportunity to comment on this environmental impact statement.

Sincerely yours,

J. Burton Angelle
Director

JBA:CK/sd

EDWIN EDWARDS
GOVERNOR
SENATOR MICHAEL H O'KEEFE
CHAIRMAN
LEON TARVER
EXECUTIVE DIRECTOR

**STATE OF LOUISIANA**
COMMISSION ON INTERGOVERNMENTAL RELATIONS

P O BOX 44455
BATON ROUGE, LOUISIANA 70804
389-5664

May 28, 1975

Colonel E. R. Heiberg, III
District Engineer
New Orleans District, Corps of Engineers
P. O. Box 60267
New Orleans, Louisiana 70160

Re: LMNPL-RR

Dear Colonel Heiberg:

We have reviewed the Draft Composite Environmental Statement for Operation and Maintenance Work on Three Navigation Projects in the Lake Borgne Vicinity, with respect to agency impact and responsibility.

We find the list of state agencies from which comments were requested to be sufficient.

Sincerely,

DeWitt H. Braud, Jr.
Environmental Coordinator

DHB:amb

HOUSE COMMITTEE
Richard Breaux
Robert Freeman
I W Humphries
Alphonse Jackson Jr
Richard Thompson

GOVERNOR'S COMMITTEE
Kenneth Bowen
John A Cox
Gordon Flory
J A Haynes
Edward Stagg

SENATE COMMITTEE
William D Brown
Frederick Eagan
K D Kilpatrick
Edgar G Mouton
Donald W Williamson

STATE SOIL AND WATER CONSERVATION COMMITTEE

LOUISIANA STATE UNIVERSITY
P. O. DRAWER CS
Telephone 388-5017
BATON ROUGE, LOUISIANA

CHAIRMAN
RICHARD S THOMPSON

VICE CHAIRMAN
DR J N. EFFERSON
Center for Agricultural Sciences and Rural Development
Louisiana State University
Baton Rouge

SECRETARY TREASURER
ANDREW YERGER

MEMBERS
DAVE L. PEARCE
Commissioner of Agriculture
Baton Rouge

MARK RICHARD

GEORGE L. GAYDEN, JR

RALPH WOMACK

CHARLEY S. STAPLES
Executive Director

May 30, 1975

U. S. Army Engineer District
Corps of Engineers
Post Office Box 60267
New Orleans, LA 70160

Gentlemen:

We have reviewed the Composite Draft Environmental Statement for Operation and Maintenance Work on three navigation projects in the Lake Borgne Vicinity Louisiana.

We would like to call your attention to Page iii. Even though this agency is housed on the Louisiana State University Campus, it is a separate and distinct agency of the State Government. The way this agency is listed on Page iii should be corrected.

We have no other comments to make at this time.

Sincerely,

Charley S. Staples
Executive Director

CSS;p

PORT OF NEW ORLEANS CENTROPORT U.S.A.

August 6, 1975

Brigadier General E. R. Heiberg, III
District Engineer
Department of the Army
New Orleans District
Corps of Engineers
P. O. Box 60267
New Orleans, Louisiana 70160

Subject: Composite Draft Environmental Statement for Operation and Maintenance Work on Three Navigation Projects in the Lake Borgne Vicinity, La.

Dear General Heiberg:

The Board of Commissioners of the Port of New Orleans has reviewed the above referenced draft environmental impact statement. We find no significant detrimental effects which will result from the project on the quality of the human environment.

Very truly yours,

Herbert R. Haar, Jr
Associate Port Director

BOARD OF COMMISSIONERS OF THE PORT OF NEW ORLEANS • POST OFFICE BOX 60046 • NEW ORLEANS, LOUISIANA 70160
Tel: 504-522-2551
An Agency of the State of Louisiana
Cable: CENTROPORT