## DECLARATION OF DR. G. PAUL KEMP

G. Paul Kemp, under penalty of perjury, states as follows:

1.   This Declaration is submitted on behalf of the Plaintiffs in *Robinson v. United States*. This Declaration addresses the Defendant United States Memorandum of Law in Support of Defendant's Motion for Partial Summary Judgment (Case 2:05-cv-04182-SRD-JCW Document 15317-2 Filed 09/24/2008, Pertains to MRGO, Robinson 06-2268) ("Memorandum" or "Defendant's Memorandum").   The purpose of this Declaration is to correct misstatements, mischaracterizations, and omissions made by Defendant in its Memorandum about the analyses and conclusions in the various Declarations and Technical Reports filed in this case by Plaintiffs' experts and myself.  In this Declaration, I do not set forth any new analyses and conclusions that are not contained in my earlier reports, but I focus on the misstatements and omissions that the Defendant has made about Plaintiffs' evidence, and also discuss FINEL and SWAN model output for Scenarios 1, 3 and 2c referenced by the Defendant.

2.   Plaintiffs' expert team undertook an extensive interdisciplinary study of the extent to which the MRGO had any effect on the flooding of New Orleans and St. Bernard Parish ("Greater New Orleans") during Hurricane Katrina.   This analysis confirmed our hypothesis that the MRGO was a substantial factor in causing catastrophic flooding of Plaintiff's homes and businesses due to four primary adverse effects created by the MRGO's design, construction, operation, and maintenance.  These four conditions were: (a) the creation of a previously non-existent direct, efficient conduit for storm surge between the Gulf of Mexico and the heart of Greater New Orleans; (b) the convergent channel geometry connecting Reach 2 and the GIWW/Reach 1 at the Golden Triangle which funnels a large volume of water into a smaller channel cross-section during hurricanes (the "funnel effect"); (c) destruction of tens of thousands of acres of storm surge buffering wetlands; and (d) substantial widening of the MRGO channel from its authorized 650' (top width) to more than 1,000' in Reach 1, and up to 3,000' in Reach 2.

3.   The evidence for this conclusion is set forth in the expert reports filed by the Plaintiffs and documents produced by the Army Corps.   Among other things, the evidence includes measurements of high water marks and partial gage records during Hurricane Katrina, eyewitness accounts, analysis of the causes of the failures and overtopping of flood protection structures, historical Army Corps documents acknowledging the "funnel effect" and the possibility of catastrophic flooding caused by the MRGO, the IPET findings on the "critical" nature of Reach 1, the Army Corp's decision this year to construct a massive IHNC Storm Reduction Barrier across the funnel, historical Army Corps data on storm surge attenuation by healthy wetlands, records of surge attenuation by wetlands acquired by the USGS during Hurricane Rita, the testimony of Army Corps expert Dr. Robert Dalrymple regarding surge reduction at the Reach 2 earthen berms if the wetlands had not been destroyed by the MRGO, data from the Bretschneider and Collins (1966) study of Hurricane Betsy, and the findings and conclusions of IPET, ILIT, and Team Louisiana, among other things.  Based on this evidence alone, the Plaintiff's expert team could conclude that the MRGO was a

substantial contributing factor to the catastrophic flooding in New Orleans East, Lower Ninth Ward, and St. Bernard Parish.

4.   As scientists, Plaintiffs' experts wanted to test their conclusions about  the major contribution of the MRGO on the flooding during Hurricane Katrina by conducting extensive modeling of different scenarios, each with an explicitly stated set of assumed conditions, using state-of-the art techniques similar to those used by other scientists in the field, including the Army Corps and its consultants.  The results of this modeling—performed by our distinguished colleagues at Delft University and Svasek Hydraulics in Holland who are among the most renowned scientists in this field—is set forth in three expert reports (de Wit et al 2008. Flow Modeling New Orleans -Mississippi River Gulf Outlet, Hurricane Katrina August 2005 - FINAL REPORT Scenario 1, 2A, 2B, 2C, 2D, 3; Gautier et al 2008 a. Wave Modeling New Orleans - Mississippi River Gulf Outlet, Hurricane Katrina August 2005 - FINAL REPORT; Gautier et al 2008 b. Wave Modeling New Orleans - Mississippi River Gulf Outlet, Hurricane Katrina August 2005 – APPENDICES) . The results of this modeling confirmed our conclusions, and they have been relied upon by Professor Bea and myself in forming our opinions.   As reported in de Wit et al 2008, these scenarios assumed and tested the following conditions:

| | |
|---|---|
| Scenario 1: | "Katrina Real Run"—surge that engulfed the land and coastal areas, and man-made features as they actually existed on August , 2005, with no surge reduction/prevention safeguards; degraded wetlands |
| Scenario 2a: | No MRGO channels or LPV flood protection works except at the 40 Arpent location; pristine wetlands |
| Scenario 2b: | No MRGO channels or LPV flood protection works; pristine wetlands |
| Scenario 2c: | "Hurricane Neutral MRGO":  No MRGO channels, full pre-Katrina complement of LPV flood protection works; pristine wetlands |
| Scenario 2d: | No MRGO channels or LPV flood protection works; pristine wetlands except MRGO spoil piles; |
| Scenario 3: | MRGO as authorized with 650'top width and full pre-Katrina complement of LPV flood protection works; pristine wetlands but no surge reduction/prevention safeguards |

5.  Scenario 2c is Plaintiffs' "no negligence" scenario, to use Defendant's terminology, because it assumes the MRGO is "hurricane neutral," *i.e*., the navigation channel has no effect, with surge buffering wetlands as they existed before 1958, and no surge conduit or funneling of water.  Scenario 2c reflects the Plaintiffs' position that the Government had a legal duty to design, construct, operate, and maintain the MRGO so

that it did not create any added risk of flooding the neighborhood. As set forth in the three above-referenced Dutch modeling reports and analyzed in Dr. Bea's reports and my most recent expert report, Scenario 2c—the Hurricane Neutral MRGO—did not result in catastrophic flooding of Plaintiffs' properties, thereby confirming our conclusion that it was the MRGO's very existence in its defective condition that was the determinative factor in causing the catastrophic flooding of New Orleans East. Lower 9th Ward, and St. Bernard Parish.

6. Contrary to the Defendant's assertion, Scenario 3 is not the "no negligence" set of conditions but was used to assess sensitivity to the incremental effects of channel expansion and wetland loss. Based on this misperception, Defendant narrowly focuses only on the impact of wetlands and channel width while totally ignoring the cumulative impact of two other adverse effects, namely unimpeded surge and the "funnel effect.". Defendant ignores Plaintiffs' expert analyses of both the *additive* impact of the two other defects (no surge barrier and "funnel effect") *and* the *cumulative* impact of all four defects (no surge barriers, "funnel effect," loss of wetlands, and channel widening.) Indeed, our studies demonstrate that the cumulative impact of all four defects is synergistic, *i.e.,* acting in combination, they not only significantly increased surge and waves but also materially influenced additional indicators of the MRGO's impact such as time of onset, duration, channel discharge and rate of overtopping by surge, all more sensitive than surge height alone. Therefore, Scenario 2 is an incomplete expression of the relevant conditions, and any comparison of the modeling results for Scenario 3 with Scenario 1 (what actually happened during Hurricane Katrina) is incomplete.

### Defendant's Mischaracterization of the "No Negligence" Scenario

7. Defendant states the following in the opening paragraph of the Memorandum:

The United States has moved for a summary judgment on Plaintiffs' claim that the negligent "operation and maintenance" of the Mississippi River-Gulf Outlet caused Plaintiffs' alleged damage. Plaintiffs allege that the dredging of the MRGO and the absence of adequate bank stabilization caused the flooding of their properties. They theorize that those acts and omissions allowed the channel to widen, weakening the levees and causing wetlands to deteriorate. First Amended Complaint ¶¶ 53, 84 (Record Doc. 13527-2) [hereinafter FAC]. They assert that the widening of the channel and the loss of wetlands "intensified" and "accelerated" storm surge, "triggering the collapse of so much of the levee system." Id. ¶¶ 1, 80.

Defendant's Memorandum, p. 1.

8. This restatement by the Government of the technical basis for the Plaintiffs' claim is not a complete or accurate representation. For comparison, I include the statement from the first page of my report that gives a more complete and accurate statement of Plaintiffs' causation theory, which includes substantial enlargement of

MRGO channel and destruction of wetlands reaches as contributing factors in all of the enumerated points below:

1. created a funnel, the dangerous convergence of channels and spoil disposal areas, later augmented by addition of the Lake Pontchartrain & Vicinity (LPV) berms east of New Orleans, and by the subtraction of buffering wetlands, that foreseeably amplified the threat posed by hurricane surge to the Greater New Orleans area; and

2. greatly enlarged the original Gulf Intracoastal Waterway (GIWW) connection between the throat of the funnel and the IHNC (MRGO Reach 1), which foreseeably increased surge transmission into the city earlier, adding to the height and duration of surge experienced in the IHNC during Katrina and contributing to the early failure of floodwalls and levees adjacent to the IHNC; and

3. created a Reach 2 channel with unstable side slopes that caused it to predictably expand over time, reducing the natural marsh buffer that previously separated it from Lake Borgne and from the adjacent LPV berms, thereby compromising foreshore protection fort the man-made surge protection elements and hastening the onset of damaging wave action on these delicate structures (EBSBs) so that they breached earlier in the storm sequence; and

4. created a channel in Reach 2 that predictably exposed freshwater swamps and marshes within the Lake Borgne funnel to increased salinity, accelerating their conversion to open water and thereby reducing the wetland surge and wave buffer between Lake Borgne and populated areas; and

5. was a substantial contributing factor to the catastrophic flooding of the Robinson plaintiffs' homes and communities.

Expert Report (July 11, 2008) of Dr. G. Paul Kemp ("Kemp Expert Report"), pp. 2 and 3.

9. The Government's motion seeks to separate out the MRGO's "operation and maintenance" effects from the hydraulic influence and damage that started with project construction but has grown since. From a technical standpoint, the rigorous (and arbitrary) separation along the line that the Defendant seeks to draw (widened banks and wetlands loss only) is not possible since we are dealing with linked system responses throughout the artificial funnel; isolating only these two factors is an artificial construct that ignores the reality on the ground.

a. For example, changes (primarily widening) in the connected channels of the funnel over time (Point 1), may be directly caused by dredging for maintenance or other purposes (Points 2 and 3), or a result of natural processes accelerated by dredging (Point 4), but all of these changes cumulatively contribute to the catastrophic flooding that occurred (Point 5).

b. Accordingly, Defendant's restatement of the Plaintiffs' causation theory without this systemic view—ignoring the MRGO's dynamic hydraulic influences caused by creating a direct surge conduit between the city and Gulf of Mexico and the "funnel effect"—cannot substitute for the Plaintiffs' actual theory.  In short, Plaintiffs' do not sever operation and maintenance from design and construction.

10. Parts of Defendant's opening paragraph are true, however.  I would agree that Plaintiffs allege that the "dredging of the MRGO and the absence of adequate bank stabilization caused the flooding of their properties."  But it might be more accurately stated that flaws were "baked into" the Lake Pontchartrain & Vicinity hurricane protection project (LPV) design that were not corrected over time.  These were brought to light as a consequence of excess stresses generated in the MRGO channels during Katrina.  The LPV project managers, like those managing the MRGO, were always blind to the threat posed to the hurricane protection structures by the MRGO project.  This institutional "blind spot" (Kemp Expert Report at p. 31) ensured that any increase in surge-induced oceanographic stresses caused by the MRGO would go unnoticed and unmitigated.  These stressors, in the form of waves and overtopping flows, were exacerbated when the MRGO banklines were not stabilized, and when no effort was made to counteract the ruinous effect of the channel on buffering wetlands or, ultimately, on the more rapid propagation of surge leading to earlier and more catastrophic flooding of developed areas.

11. The term "acts and omissions" used in the first paragraph of the Defendant's motion is a lawyer's term that may or may not be appropriate here from a scientific standpoint.  It is undisputed that the channels widened in an uncontrolled fashion while under a USACE management regime.  The cumulative effect of the management of the channel on wetland loss and conversion is also uncontroverted, though experts might disagree on exactly how many thousands of acres were affected.  Finally, there is no dispute that Defendant's management of the MRGO project consisted almost exclusively of dredging without regard to bank stability, wetlands preservation and inhibiting storm surge from Lake Borgne and the Gulf of Mexico.  The dredging used to maintain the channel is essentially the same technique used originally to construct it.

12. The Defendant reaches too far, however, when it restates the Plaintiffs' claim to assert that acts and omissions of the USACE "weakened the levees."  This is not accurate.

a. First, in some places along MRGO Reach 2, for example, Dr. Bea (July 14 Expert Report at p. 8) has proven that the LPV berms never met USACE standards applicable at the time for engineered "levees," and so were always too "weak" to be used for coastal defense.

b. More importantly, however, the widening of the adjacent channel did not "weaken" these structures, but instead increased the levels of oceanographic stresses impinging on them, including those resulting from earlier onset and

more prolonged duration of surge above a critical elevation, as well as from the waves that reformed and grew as they crossed the greatly expanded channel.

c.   As was true in my expert report, I continue to focus on the predictable oceanographic stresses caused by the MRGO project and experienced by the LPV structures -- rather than on the structures themselves -- and on whether these stresses contributed to earlier and thus more catastrophic flooding of developed areas.

13.   The Defendant states the following in the second paragraph of the Memorandum.

The Court should grant a summary judgment on this part of Plaintiffs' claim because they have failed to identify sufficient facts to sustain their allegation that the collapse of the levees and the flood that followed were caused by the negligent "operation and maintenance" of the MRGO. Plaintiffs' experts used computers to simulate the surge that the hurricane would have produced if the MRGO had been perfectly maintained and "operated" throughout its 50 year existence, with no impact whatsoever on neighboring wetlands. They also simulated the surge produced by the hurricane. By comparing the two, they ironically discovered that perfect "operation and maintenance" of the MRGO would have increased surge by an inch or two at the critical MRGO Reach 2 levee.

Defendant's Memorandum, p. 2.

14. This is not an accurate characterization of Plaintiffs' experts' analysis on causation.   (See Appendix "A" attached hereto for further analysis of Plaintiffs' methods).

a.   We have found no evidence in any of the thousands of documents unearthed during discovery that the original USACE LPV oceanographic investigation -- concluded in the mid-1950s well before construction of the MRGO -- was ever revised to rigorously assess the incremental augmentation of stresses that the new channel would cause on LPV structures.  Judge Duval has reached the same conclusion.  *See In Re Katrina Canal Breaches Consolidated Litigation*, Order Denying Motion for Summary Judgment (May 2, 2008), pp. 8, 9, 20-21, 36.

b.   Such augmentation is expected whenever a levee exposed to waves is placed inboard of a wide, deep channel, particularly if the dimensions of the channel increase over time at the expense of foreshore protection.  (Kemp Expert Report at p. 31)

c.   If the MRGO project was effectively invisible to those at the Corps responsible for the LPV project, and the LPV flood protection works were similarly missing from the ken of the Corps MRGO managers, then the proper starting point for this analysis is the "no MRGO" condition that formed the original oceanographic basis for developing the

LPV design criteria. Following this logic, a "no negligence" maintenance regime for the MRGO would have to ensure that the channel at no time imposed stresses on LPV structures in the funnel greater than would have occurred if the MRGO project had never been built.

15. Accordingly, we simulated the oceanographic regime for three cases or scenarios (FINEL & SWAN Scenarios 1, 2c, 3) which differ only with respect to the MRGO project, including its effect on wetlands. Everything about the LPV flood control structures in the pre-Katrina condition was retained as constant. Our computer modeling addresses the "no MRGO" condition in Scenario 2c, as well as the two scenarios referenced by the Defendant in the second paragraph of the motion. These are Scenario 1 (Katrina-as-is) and Scenario 3, (with the MRGO at its authorized dimensions).

16. In this same second paragraph, Defendant has nominated the "as authorized" MRGO simulation (Scenario 3) as representative of "perfect operation and maintenance"—what it terms the "no negligence scenario"—and, therefore, the hydraulic standard to which the USACE should be held. That is not the Plaintiffs' "non negligence" scenario. Instead, Plaintiffs maintain that to be "perfectly operated and maintained," such a MRGO project would also include features like the much discussed (and technically feasible 50 years ago) surge gates that are only now being constructed to avoid increasing surge discharge and high rates of overtopping of LPV structures along the MR-GO (the IHNC Storm Surge Reduction Barrier). (Kemp Expert Report, 104-42) This is not the case for the "as authorized" channel (Scenario 3) that Defendant would like the Court to find "perfectly operated and maintained." Plaintiffs' expert reports (Bea, deWit, et al., and mine) show that the MRGO "as authorized" channel is still a major conveyer of surge and a major source of overtopping flows, just not as substantial as the "Katrina-as-is" channel. The "no MRGO" scenario (Scenario 2c) is a more appropriate benchmark for MRGO conditions that do not increase the risk of catastrophic flooding as I understand is required by Louisiana law.

17. The Defendant seeks to apply a similar false "no negligence" scenario with respect to the SWAN and DYNA wave analyses which the Defendant references in the next paragraph of the motion as follows:

> Plaintiffs' experts went on to report that perfect "operation and maintenance" (defined as keeping the waterway at its design dimensions, with no impact on wetlands) would have reduced the largest significant waves at the Reach 2 levee from about seven feet to six. Crucially, however, Plaintiffs' experts did not analyze whether the smaller waves would have resulted in less breaching or flooding than occurred during the storm. Because they did not analyze the flooding that would have occurred in a "no negligence" scenario—i.e., what would have happened "but for" the alleged negligence—Plaintiffs cannot identify sufficient facts to sustain their claim that the negligent "operation and maintenance" of the MRGO caused their alleged damage.

Defendant's Memorandum, p. 2.

18. So here we see exposed the reason that the Defendant has made this argument. The Court is being asked to throw out the whole case and all the rest of the analyses made in thousands of pages of expert reports because Dr. Bea allegedly does not subject the "as authorized" MRGO Scenario 3 to the same level of scrutiny as for Scenarios 1 and 2c.

a.   This seems presumptuous for a Defendant who has not yet brought a single shred of expert analysis to the table.  But Dr. Bea has patiently shown -- in his own Declaration in response to the Defendant's motion -- that all the information for Scenario 3 is set forth in his technical reports and could be pulled out and assembled in the same way as he has done for Scenarios 1 and 2c if this were thought useful.  The analyses of Scenarios 1 and 2c define the sides of an envelope that contains the intermediate—and to Plaintiffs' less pertinent—scenario 3.

b.   Defendant ignores the fact that I give Scenario 3 substantial attention in my own report.  (*See* Kemp Expert Report, Table 6.2, p. 142, for example).  In fact, my expert report is not mentioned at all in the Defendant's Memorandum.

## Surge Discussion

19. Unlike the Defendant, Plaintiffs have not limited their assessment of relevant surge dynamics in the funnel to changes in maximum surge elevation, but have also considered other surge characteristics affected by the MRGO project and the funnel geometry.  We have found that time of onset, duration and rate of structure overtopping by surge are more sensitive indicators of MRGO effects—and better predictors of flooding potential—than maximum surge elevation.  Kemp Expert Report, pp. 133-147. This is like a bathtub being filled with water—once the water level reaches the top of the bathtub, it rises no higher but overflows and continues to overflow until the water level recedes.  Catastrophic flooding is likewise a function of when the levee (bathtub) overflows, how long it overflows, and the rate (intensity) at which it overflows. Thus, the height of the water is not the most predictive or sensitive factor, just an indicator of the mean crown elevation of the flood protection works (assuming that they do not breach).

20. The widening of the channel and loss of wetlands are, to some extent, two sides of the same coin, because the channel widens at the expense of the wetlands. Plaintiffs' experts have shown that this is not the whole story on wetland loss and conversion, but this is one very direct and obvious way in which loss of wetlands affects the "intensification" and "acceleration" of storm surge referenced in the first paragraph of the memo.  de Wit et al. (2008) and I (Kemp Expert Report 4, 2008) quantified this "intensification" in terms of surge discharge through MRGO Reach 1 (Figure 1) for the three runs in which we investigated the role of the MRGO project separately from the effect of the LPV flood control works (Table 1).



*Figure 1: Cross-sections used to calculate discharge (black lines) (From deWit et al 2008).*

**Table 1.  Surge intensity indicated by MRGO Reach 1 discharge, velocity and water level**

| Time | Discharge CFS | | | Velocity FPS | | | Elevation Ft (NAVD) | | |
|---|---|---|---|---|---|---|---|---|---|
| | Sc 1 | Sc 3 | Sc 2c | Sc 1 | Sc 3 | Sc 2c | Sc 1 | Sc 3 | Sc 2c |
| 4:00 | 173,000 | 141,000 | 44,000 | 2.9 | 3.0 | 1.5 | 8.9 | 8.3 | 7.3 |
| 5:00 | 202,000 | 174,000 | 63,000 | 3.3 | 3.6 | 2.0 | 10.5 | 10.0 | 8.9 |
| 6:00 | 236,000 | 209,000 | 86,000 | 3.7 | 4.1 | 2.6 | 12.3 | 12.0 | 10.9 |
| 7:00 | 293,000 | 255,000 | 117,000 | 4.5 | 4.8 | 3.3 | 14.4 | 14.0 | 13.0 |
| 8:00 | 430,000 | 354,000 | 157,000 | 6.4 | 6.5 | 4.2 | 16.0 | 15.8 | 15.2 |
| 9:00 | 234,000 | 213,000 | 114,000 | 3.5 | 3.9 | 3.1 | 15.0 | 15.0 | 15.0 |
| **Mean** | **261,333** | **224,333** | **96,833** | **2.9** | **3.0** | **1.5** | **12.9** | **12.5** | **11.7** |

21.  Surge discharge, measured at the cross-section between the LPV levees flanking MRGO Reach 1 (Figure 1), is an integrated measure of surge intensity (Figure 2).  A property of the funnel is that if we increase the discharge for a given section of channel, then more surge water becomes available for overtopping and flooding. Mean discharge over 6 hours more than doubles from 97,000 to 224,000 cubic feet per second (cfs) when the MRGO project is added at its authorized footprint (Scenario 3) to a landscape that already includes the LPV structures (Table 1, last row).  Mean discharge increases again by about 40,000 cfs (6 hr average) to 261,000 (Scenario 1) when both MRGO reaches are allowed to expand to pre-Katrina size (Table 1).  Velocity ranges from a mean (6-hr) of 1.5 feet per second (fps) for scenario 2c where the surge is flowing primarily over wetlands to double that in the two scenarios where a deep MRGO channel is present (Table 1).  Those who have read my most recent expert report (Kemp Expert Report) will not be surprised to note that surge water level shows little change among the scenarios, and is therefore a relatively insensitive indicator of surge discharge or intensity (Table 1).  At 08:00, near the surge peak, the water levels at the Paris Road cross-section differ by less than 1 foot among the different scenarios (Figure 2), while the discharge ranges from 114,000 cfs for the "no channel" alternative (Scenario 2c) to 430,000 cfs for

the "Katrina as-is" condition (Scenario 1).  The water level for the "as authorized" channel is only 0.2 ft below the elevation in the expanded channel, yet the expanded channel (Scenario 1) is conveying nearly 80,000 cfs more surge into the IHNC where it runs over the crowns of the floodwalls and causes flooding. These are significant increases that played a substantial role in the catastrophic flooding and LPV structure failures.

22.  This example given above explains the problem that confounds the Defendant, and the USACE IPET more generally, namely that peak surge elevation is a relatively poor or insensitive predictor of overtopping flood volume.  *The role of the MRGO project in increasing that volume by increasing the duration and amount of destructive overtopping is fundamentally what is at issue in this case.*  I quote here from p. 146 of my expert report (July 11, 2008).

"It has taken some time, but we have finally discovered the reason why when IPET removed only MRGO Reach 2 from their ADCIRC model, it reduced flooding of the developed polders even though the drop in peak surge elevation that this produced appeared trivial to the IPET researchers at the time. We tested a scenario in which the MRGO was missing, but the LPV berms were present and allowed to survive throughout the Katrina simulation.  This is the 'Neutral MRGO' condition [Scenario 2c].  We found that surge elevation was reduced slightly and the rise was delayed almost everywhere around the margins of the funnel, but more so toward the west.  We made use of a rigorous approach for predicting overtopping of structures developed by our colleagues in the Netherlands that was normalized to prevent biasing due to model inaccuracies.  This analysis showed that even slight reductions in peak surge elevation or delays in peak onset could combine to significantly reduce overtopping of the LPV flood protection structures throughout the funnel.  When both reaches of the MRGO were removed, overtopping was reduced by about 80 percent for all of the three developed polders that experienced catastrophic flood damage on August 29, 2005."





**Figure 2.  Effect on water level (top) and surge discharge (bottom) in MRGO Reach 1 (Sc 2c) of adding the MRGO channel at its authorized dimensions (Sc 3), or allowing it to expand to the dimensions attained by August 29, 2005 (Sc 1).**

23. Few would dispute, I think, that the combination of surge and waves "triggered the collapse of so much of the levee system," and that overtopping also played a role in many locations as Dr. Bea has shown.  If the bathtub-like funnel is filled to the top of the LPV structures, then the surplus rate at which additional water is introduced to Reach 1—over the rate at which it can drain to Lake Pontchartrain through the IHNC—determines the discharge over the crowns of the adjacent LPV structures that are assumed to remain intact in this analysis.  This surplus contributes to flooding of the developed areas in which the Robinson plaintiffs had their homes and businesses.  As was shown above, the addition of the MRGO channel, whether at its authorized dimensions or at the greater cross-section that existed during Katrina, significantly increased the rate of surge water introduction into MRGO Reach 1 and the IHNC (Table 1) and thereby caused more water to inundate Plaintiffs' neighborhoods.

24. De Wit et al. (2008 a and b) and I looked at overtopping rates for the three scenarios discussed above.  Comparisons of overtopping rates among Scenarios 1, 2c and 3 are presented for the IHNC floodwall protecting the Lower 9th Ward (Figure 3), the levee in the MRGO Reach 1 on the south side of the Paris Road Bridge (Figure 4), and the Bayou Bienvenue water control structure on MRGO Reach 2 (Figure 5).



**Figure 3.   Levee overtopping rates Scenarios 1, 2A, 2B, 2C, 2D and 3 at Lower 9th Ward Floodwall site. (From De Wit et al 2008   Page  104 ).**



**Figure 4: Levee overtopping rates Scenarios 1, 2A, 2B, 2C and 3 Chalmette west of Paris Road..(From de Wit et al 2008, page 105).**

25.   At the Lower 9th Ward floodwall, it is apparent that least overtopping occurs for the three scenarios being considered here (1, 2c, 3) when the MRGO channel is not present at all (Scenario 2c).  For this condition, a total volume for the entire surge event of only 34,700 cubic feet of water is predicted to overtop each linear foot of the floodwall at this important location (Figure 3).  This overtopping -- indicated by the grey dashed line -- starts much later than for Scenarios 1 and 2c and attains a maximum rate of less than 8 cubic feet per foot.  The overtopping volume translates directly into flooding, which for this scenario is trivial.  It increases, however, to a more substantial 182,700 cubic ft per linear foot for Scenario 3 when the MRGO channel is placed into the funnel landscape at its originally authorized dimensions (Figure 3).  The overtopping rate for this scenario, shown by the red dotted line, reaches a maximum of about 26 cubic feet per foot, which has significant implications for the safety of flood protection structures that were not designed to withstand such overtopping.  Finally, in the Katrina-as-is scenario (Scenario 1) shown by the blue line, overtopping starts earlier than for all other scenarios and attains a maximum rate of about 32 cubic feet per foot.  The total volume of overtopping-induced flooding for this scenario is predicted at 230,200 cubic feet per foot, about 50,000 cubic feet per foot higher than for the MRGO channel at authorized dimensions.

26.   Least overtopping into the Central Wetlands unit (the area between Reach 2 and the 40 Arpent Canal Levee) for the three scenarios being considered here (1, 2c, 3) occurs at the south end of the Paris Road Bridge (Figure 4) when the MRGO channel is not present at all (Scenario 2c).  For this condition, a total volume for the entire surge event of only 76,500 cubic feet of water is predicted to overtop each linear foot of the levee crown (Figure 4).  This overtopping -- indicated by the grey dashed line -- starts much later than for Scenarios 1 and 3 and attains a maximum rate of less than 15 cubic feet per foot.  The overtopping volume here translates into flooding of the impounded Central Wetlands storage area.  Overtopping volume increases to 206,400 cubic ft per linear foot for Scenario 3 when the MRGO channel is placed into the funnel landscape at its originally authorized dimensions (Figure 4).  The maximum overtopping rate for this scenario, shown by the red dotted line, reaches a maximum of about 28 cubic feet per foot, which has significant implications for the safety of flood protection structures that were not designed to withstand such overtopping.  Finally, in the Katrina-as-is scenario (Scenario 1) shown by the blue line, overtopping starts earlier than for all other scenarios and attains a maximum rate of about 33 cubic feet per foot.  The total volume of overtopping-induced flooding for this scenario is predicted at 252,200 cubic feet per foot—about 50,000 cubic feet per foot higher than for the MRGO channel at authorized dimensions.



**Figure 5: Levee overtopping rates Scenarios 1, 2A, 2B, 2C and 3 at the Bayou Bienvenue water control structure on the south side of MRGO Reach 2. From de Wit et al 2008, p. 106).**

27. Because the levee is relatively high adjacent to the Bayou Bienvenue control structure, overtopping was limited for all scenarios, and there was little difference among them, ranging from a surge event total volume of 33,200 cfs for Scenario 3 with the "as

authorized" channel to a minimum of 26,800 cfs for scenario 2c with no channel at all. This gives a sense of overtopping dynamics in the artificial funnel created by the USACE with converging channels and parallel flood control embankments. The maximum surge elevation is a more sensitive indicator of the average elevation of the flood protection features, like measuring the sides of a bathtub, than of surge intensity. Overflow of these embankments is proportional to surge discharge or intensity. So these three examples show that MRGO channel size, when it comes to levee overtopping rates, matters more in Reach 1 than Reach 2. The gradual channel enlargement overseen by the USACE during operations and maintenance is important to both overtopping and the potential for structure failure. This analysis demonstrates that the potential for flooding of developed areas through overtopping and breaching was increased by the enlargement of the channel as it was operated and maintained by the USACE during the post-construction period.

## **Waves Discussion**

28. I turn now to the questions raised by the Defendant in the third paragraph of the motion (excerpted above) about effects of MRGO channel widening on enhancing the wave energy experienced by the adjacent MRGO berms along Reach 2. We rely here (as was the case in my latest expert report) primarily on the work of Caroline Gautier and her colleagues at the Delft hydraulic lab, who are expert with the SWAN numerical wave model invented there (Gautier et al. 2008 a and b).

29. We compare the same three scenarios as above, substituting SWAN for FINEL results. Dr. Bea has addressed the potential for wave erosion and overtopping in his expert reports and his Declaration submitted in connection with the Defendant's motion for partial summary judgment. I focus here (as I did in my expert report) only on the waves that reform in the channel in front of the Reach 2 berms, showing the effect of loss of the marshes, first, between Lake Borgne and the north bank of the channel, and, second, loss of the vegetated foreshore between the channel and the toe of the embankments. Wave characteristics were typically reported at three locations associated with the LPV structures designated by 'L', 'T', and 'D', corresponding to levee face, levee toe and deep channel, respectively (See Tables 2, 3, 4). I showed in my last expert report the dramatic increase in wave height, period, and erosive power due the presence and proximity of the MRGO navigation channel, but here I will focus more intently on the channel expansion that the Defendant has erroneously depicted as having little significance to the wave forces impinging on the LPV berms along MRGO Reach 2.

30. To simplify the discussion, I will focus on Bayou Bienvenue (output location 1 and ray 1); Bayou Dupre (output location 6 and ray 6); and a point on the Reach 2 berm halfway in-between the water control structures (output location 3 and ray 3). I discuss below the wave parameters for all time steps between 06:00 and 08:00 for Scenario 1 (Table 2), Scenario 3 (Table 3) and Scenario 2c (Table 4); and the respective wave ray diagrams (Figures 6, 7, and 8). All of this information was developed by Gautier et al. (2008) and referenced in my expert report:

a. All through the Katrina storm, significant wave heights, Hs, are lower for the 'as authorized' (Scenario 3) compared to the larger Katrina 'as is' channel (Scenario 1). For instance, at the peak of storm at 08:00 CDT the significant wave height in the MRGO channel for Katrina 'as is' ranges from 8.7 to 9.4 ft compared to 4.4 to 6.9 ft for the "as authorized" scenario (Tables 2 and 3). The direction changes only slightly. When the MRGO navigation channel is taken out of the picture for Scenario 2c, the waves are much smaller, ranging from 2.3 to 5.4 ft at the three ray locations (Table 4). Channel width and depth clearly matters for waves, so operation or maintenance that facilitated expansion like dredging or ship wakes also make a difference.

b. Wave period, Tp, is also influenced by the MRGO channel, starting at from 5.1 to 5.6 seconds for Katrina as is (Scenario 1, Table 2); dropping to 3.8 to 4.2 seconds for the channel at authorized dimensions (Scenario 3, Table 3), and finally diminishing to 3.2 to 3.8 seconds for the no channel scenario (Scenario 2c, Table 4).   Wave run-up is proportional with period, so the potential for overtopping is increased as the adjacent channel is first created and then expanded by operation and maintenance activities.

c. The erosive energy exerted by waves is proportional to the square of the wave height, Hs. So, when the waves increase from 5.4 to 9.4 feet, it is a 3 fold increase (300%) in wave energy impacting the LPV levees along Reach 2 of the MRGO as a result of the construction and subsequent expansion of the MRGO channel. Expansion of the channel, considered separately, contributed more than a third of the increase in wave energy due to the MRGO channel at the time that Katrina struck.

**Table 2.  SWAN generated wave characteristics for Scenario 1, Katrina-as-is, at Locations 1, 3 and 6 on the earthen berm paralleling MRGO Reach 2 from 06:00 to 08:00 CDT (Gautier et al. 2008)**
**Hs-Significant Wave Height, dir-from deg. N, Tp-Wave period**

| Hs [ft] | 6am (local) | | | 7am (local) | | | 8am (local) | | |
|---|---|---|---|---|---|---|---|---|---|
| loc | L | T | D | L | T | D | L | T | D |
| 1 | 4.5 | 6.8 | 6.9 | 5.7 | 8.3 | 8.4 | 6.8 | 9.1 | 9.4 |
| 3 | 3.3 | 6 | 7.1 | 4.9 | 7.4 | 8.6 | 6 | 8.4 | 9.6 |
| 6 | 5.5 | 6.9 | 6.8 | 6.8 | 8.5 | 8.3 | 7.3 | 8.8 | 8.7 |
| dir come from [°N] | 6am (local) | | | 7am (local) | | | 8am (local) | | |
| loc | L | T | D | L | T | D | L | T | D |
| 1 | 45 | 51 | 56 | 45 | 51 | 56 | 47 | 51 | 57 |
| 3 | 51 | 50 | 56 | 51 | 50 | 56 | 52 | 52 | 59 |
| 6 | 46 | 46 | 47 | 47 | 48 | 49 | 49 | 54 | 55 |
| Tp [s] | 6am (local) | | | 7am (local) | | | 8am (local) | | |
| loc | L | T | D | L | T | D | L | T | D |
| 1 | 4.7 | 4.7 | 4.2 | 4.7 | 4.7 | 4.7 | 5.1 | 5.1 | 5.1 |
| 3 | 4.7 | 4.7 | 4.2 | 5.1 | 5.1 | 4.7 | 5.6 | 5.6 | 5.1 |
| 6 | 4.2 | 4.2 | 4.2 | 4.7 | 4.7 | 4.7 | 5.1 | 4.7 | 4.7 |

**Table 3.  SWAN generated wave characteristics for Scenario 3, MRGO-as-authorized, at Locations 1, 3 and 6 on the earthen berm paralleling MRGO Reach 2 from 06:00 to 08:00 CDT (Gautier et al. 2008)**
**Hs-Significant Wave Height, dir-from deg. N, Tp-Wave period**

| Hs [ft] | 6am (local) | | | 7am (local) | | | 8am (local) | | |
|---|---|---|---|---|---|---|---|---|---|
| Loc | L | T | D | L | T | D | L | T | D |
| 1 | - | 4.3 | 4.7 | - | 5.5 | 6 | 6 | 6.4 | 6.9 |
| 3 | 2.9 | 4 | 3.1 | 4.1 | 5 | 3.9 | 5 | 5.7 | 4.4 |
| 6 | 3.6 | 4.2 | 4.7 | 4.7 | 5.4 | 6 | 5.2 | 5.9 | 6.4 |
| Dir [°N] | 6am (local) | | | 7am (local) | | | 8am (local) | | |
| Loc | L | T | D | L | T | D | L | T | D |
| 1 | - | 41 | 38 | - | 39 | 35 | 38 | 39 | 36 |
| 3 | 46 | 45 | 47 | 42 | 43 | 43 | 43 | 45 | 46 |
| 6 | 44 | 45 | 47 | 44 | 45 | 47 | 46 | 49 | 51 |
| Tp [s] | 6am (local) | | | 7am (local) | | | 8am (local) | | |
| Loc | L | T | D | L | T | D | L | T | D |
| 1 | - | 3.5 | 3.5 | - | 3.8 | 3.8 | 4.2 | 4.2 | 4.2 |
| 3 | 3.2 | 3.2 | 2.6 | 3.5 | 3.5 | 3.2 | 3.8 | 3.8 | 3.2 |
| 6 | 3.5 | 3.2 | 3.5 | 3.8 | 3.8 | 3.8 | 4.2 | 3.8 | 3.8 |

Table 4.  SWAN generated wave characteristics for Scenario 2c, MRGO-as-authorized, at Locations 1, 3 and 6 on the earthen berm paralleling MRGO Reach 2 from 06:00 to 08:00 CDT (Gautier et al. 2008)
Hs-Significant Wave Height, dir-from deg. N, Tp-Wave period

| Hs [ft] | 6am (local) | | | 7am (local) | | | 8am (local) | | |
|---|---|---|---|---|---|---|---|---|---|
| Loc | L | T | D | L | T | D | L | T | D |
| 1 | 3.5 | 3.9 | 3.8 | 4.6 | 4.9 | 4.9 | 5.4 | 5.8 | 5.7 |
| 3 | 1.4 | 1.8 | 1.9 | 2 | 2.3 | 2.4 | 2.4 | 2.7 | 2.8 |
| 6 | 1.6 | 2 | 2.1 | 2.2 | 2.6 | 2.7 | 2.3 | 2.8 | 2.9 |
| Dir [°N] | 6am (local) | | | 7am (local) | | | 8am (local) | | |
| Loc | L | T | D | L | T | D | L | T | D |
| 1 | 37 | 41 | 41 | 37 | 39 | 39 | 37 | 39 | 39 |
| 3 | 50 | 54 | 54 | 50 | 52 | 51 | 52 | 53 | 52 |
| 6 | 45 | 46 | 46 | 44 | 46 | 46 | 49 | 51 | 52 |
| Tp [s] | 6am (local) | | | 7am (local) | | | 8am (local) | | |
| Loc | L | T | D | L | T | D | L | T | D |
| 1 | 3.2 | 3.2 | 3.2 | 3.5 | 3.5 | 3.5 | 3.8 | 3.8 | 3.8 |
| 3 | 2.6 | 2.6 | 2.6 | 2.9 | 2.9 | 2.9 | 3.2 | 3.2 | 3.2 |
| 6 | 2.6 | 2.6 | 2.6 | 2.9 | 2.9 | 2.9 | 3.2 | 3.2 | 3.2 |

**Figure 6. Ray 1 comparison of Katrina as is (Scenario 1, top) with as authorized MRGO (Scenario 3, middle) and virgin no MRGO (Scenario2c, bottom). Difference in channel width (fetch) for the Scenario 3 vs. 1 is quite marked. This compilation figure incorporates data from Gautier et al. (2008)**



**Figure 7. Ray 3 comparison of Katrina as is (Scenario 1, top) with as authorized MRGO (Scenario 3, middle) and virgin no MRGO (Scenario2c, bottom). Difference in channel width (fetch) for the Scenario 3 vs. 1 is quite marked. This compilation figure incorporates data from Gautier et al. (2008)**



**Figure 8. Ray 6 comparison of Katrina as is (Scenario 1, top) with as authorized MRGO (Scenario 3, middle) and virgin no MRGO (Scenario2c, bottom). Difference in channel width (fetch) for the Scenario 3 vs. 1 is quite marked. This compilation figure incorporates data from Gautier et al. (2008)**



31. Comparing wave ray diagrams for the same scenarios shows how wave energy at the toe of the MRGO berms was affected by construction of the channel at its authorized dimensions, and then allowing it to expand at the expense of the wetlands (Figures 6, 7, 8). Furthermore, the distribution of wetlands in front of the same MRGO Reach 2 berm locations changes with scenario and affects the spatial distribution of wave energy. In all of these diagrams as in the previous tables, Hs is significant wave height; dir is the direction of the waves; and Tp is wave period. It is evident that the waves crossing the MRGO for scenarios 1 and 3 grow due to the depth of the channel and its fetch, more so for the MRGO as-is scenario than for the smaller authorized channel. Waves generated by Katrina winds in Lake Borgne would have traversed wetlands and been greatly diminished before striking the LPV embankments if the MRGO navigation channel had not been built and destroyed tens of thousands of acres of wetlands due to construction, bank erosion, and saltwater intrusion.

## **Conclusion**

32.    The presence of the MRGO channel as it existed on 29 August 2005—considerably deeper and wider than authorized, denuded of adjacent surge buffering wetlands, and without any in-channel surge inhibitors—increased the wave energy impinging on the MRGO Reach 2 levees and led to greater surge discharges in the funnel, particularly in Reach 1 and the IHNC, than would have occurred if the authorized dimensions had been maintained or the project had not been built, *i.e.*, the MRGO did not introduce surge directly from the Gulf of Mexico, funnel surge into MRGO/GIWW Reach 1 and the IHNC or destroy wave and surge reducing wetlands. Modeled overtopping of floodwalls and levees showed volumes proportional to discharge in Reach 1. This discharge is an integrator of funnel effects and a more appropriate indicator of the potential to flood developed areas (Figure 2). MRGO channel size matters to flooding. The operations and maintenance program executed by the USACE, consisting primarily of channel dredging, increased the total oceanographic stresses to which the LPV structures were exposed during Katrina, and significantly increased the likelihood of breaching and catastrophic flooding of Plaintiffs' properties.

33. I do not find Defendant's technical critique of Plaintiffs' causation evidence and expert opinions in the Motion for Partial Summary Judgment to be correct or compelling for the reasons stated above, including a fundamental mischaracterization of Plaintiff's actual causation theory and a misinterpretation of our modeling data. My analyses, evaluations, assessments and conclusions have been based on the background information and documentation cited in this Declaration and the Expert Reports and Declarations previously submitted by the other Plaintiffs' experts and myself. I reserve the right to modify my analyses, evaluations, assessments, and conclusions in the case that new or additional information becomes available in the future. I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 19, 2008 in Baton Rouge, Louisiana.


_____
G. Paul Kemp, Ph.D.

# REFERENCES

Bea 2008.  Engineering Forensic Studies of Performance of the Man-Made Features Bordering the Reach 2 of the Mississippi River-Gulf Outlet (MR-GO) during Hurricane Katrina.  Declaration 1, July 11, 2008

Bea 2008.  Declaration of Dr. Robert G. Bea (in response to defense Motion for Summary Judgment) October 7, 2008

de Wit et al 2008. Flow Modeling New Orleans -Mississippi River Gulf Outlet, Hurricane Katrina August 2005 - FINAL REPORT Scenario 1, 2A, 2B, 2C, 2D, 3

Gautier et al 2008 a. Wave Modeling New Orleans - Mississippi River Gulf Outlet, Hurricane Katrina August 2005 - FINAL REPORT.

Gautier etal 2008 b. Wave Modeling New Orleans - Mississippi River Gulf Outlet, Hurricane Katrina August 2005 - APPENDICES

Kemp 2008.  Mississippi River Gulf Outlet Effects on Storm Surge, Waves and Flooding during Hurricane Katrina.  Expert Report 4, July 11, 2008.

## KEMP APPENDIX "A"

### Overview of Plaintiffs' Modeling Analysis

In order to fully understand the dynamics of flooding during Hurricane Katrina, Plaintiffs undertook a systematic approach to evaluating the causes of the various hydrologic ingressions, making the MR-GO a variable, and then continued that analysis to include an evaluation of the role of the MR-GO , to ultimately reach an incontrovertible conclusion. These conclusions are set forth in Plaintiffs' expert reports.

To understand the Plaintiffs' experts' conclusions based on the modeling results, it is important to understand the inputs and the different computer models. The first step in this analysis began with the origination of the waters that entered each of the three polders: Upper Ninth Ward, New Orleans East, and the Lower Ninth Ward/ St. Bernard. Once the experts identified the cause of each failure, the next task was to determine the connection between the MR-GO and these failures.

Wind, wind direction, waves and wave set up, topography of the land mass, all influence **surge**, which is the change in elevation of water that results from the movement of a hurricane on shore. Surge can be simulated on a computer using a computer model with the acronym FINEL. FINEL allowed the flexibility necessary to incrementally examine the effects of adding, removing or modifying channels, wetlands, and flood protection elements within the landscape to gain a greater understanding of how each contributed to surge dynamics.

The experts then utilized a different program referenced as SWAN, the most widely used **wave** model today, to evaluate wave generation and dissipation in near shore, inshore and inter-tidal areas. Once the parameters of this program were established, another computer program, SOBEK, was utilized to simulate the flooding resultant from the outputs of the previous computer programs.

With these programs in place, the experts were able to run a scenario that simulated the

1

actual events that occurred during Hurricane Katrina (Scenario 1).   Then to set the inverse parameter, a scenario was run that showed the results if the MR-GO had never been built, with the environment as it would have been without the channel and its resultant deleterious effects (Scenario 2).   These two scenarios were the end member conditions or, if you will, the outsides of the envelope.  With these outer parameters established, other intermediate scenarios could be utilized to characterize the effects of differing characteristics for the MR-GO.

The incontrovertible modeling results are as follows:

1.     The MR-GO caused or substantially contributed to the exacerbation of hurricane **waves** such that those waves became powerful enough to erode the front side of the MR-GO Reach 2 EBSBs.  (The Corps's Interagency Performance Evaluation Task Force (IPET) observed that wave heights during Katrina were typically similar to those assumed for the design of the structures, **but the wave periods were three times longer than the design assumptions**; IPET failed to evaluate the effect  this had on the structures).

2.     The MR-GO caused or substantially contributed to the exacerbation of hurricane storm surge.  If this dynamic had not occurred, there would have been no (or substantially less) overtopping at the southern border of New Orleans East (north side of  Reach 1/GIWW), the western wall of the Inner Harbor Navigational Canal (IHNC), the eastern wall of the IHNC, and the 40 Arpent Canal levee of St. Bernard Parish.  In turn, these results allowed Plaintiffs' experts to opine as to whether the levees would have failed had the MRGO been designed constructed and maintained to the hurricane surge neutral.