SAIA (VOL II), JOHN

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

IN RE: KATRINA CANAL BREACHES     CIVIL ACTION
CONSOLIDATED LITIGATION           NO. 05-4182  K2
                                  JUDGE DUVAL
PERTAINS TO:  MRGO AND ROBINSON
                 (No. 06-2268)

(V O L U M E   2)

Rule 30(b)(6) deposition of THE

UNITED STATES OF AMERICA, BY AND THROUGH THE

UNITED STATES ARMY CORPS OF ENGINEERS'

DESIGNEE JOHN SAIA, given at the U.S. Army

Corps of Engineers New Orleans District

offices, 7400 Leake Avenue, New Orleans,

Louisiana 70118-3651, on Wednesday, October 1,

2008.

SAIA (VOL II), JOHN

1          Q.   When the District Engineer receives

2     the comments after he submits his -- the Draft

3     Environmental Impact Statement to these

4     agencies and reviewing authorities, what is

5     his -- what is the scope of his responsibility

6     with regard to what to do with those

7     comments?

8          A.   Give me that again.

9          Q.   When he receives -- When the

10    District Engineer receives the comments after

11    review from the reviewing agencies, what is

12    the scope of his obligation with regard to

13    reviewing those comments?

14         A.   Okay.  When the District Engineer

15    receives comments from agencies, he's

16    responsible for looking at them and making a

17    determination of what -- if the EIS needs to

18    be changed and make appropriate changes if he

19    deems it as appropriate.

20         Q.   Does he have an obligation to

21    answer?

22         A.   Yes, he does.

23         Q.   And in the Final Environmental

24    Impact Statement does he have an obligation to

25    discuss in detail the comments that he has

SAIA (VOL II), JOHN

10/1/2008

Page 33

1    deemed are unadopted that he -- Withdrawn.

2    Let me rephrase the question so that -- I need

3    to see the question.

4              Okay.  The question, I am going to

5    rephrase the question, Mr. Saia.

6              In the final impact statement,

7    does the District Engineer have an obligation

8    and a duty to discuss and comment in detail

9    his analysis of the reviewing agencies'

10   comments?

11             MR. SMITH:

12             Objection.  Vague.  This is all

13         comments of every agency?  Is that --

14   EXAMINATION BY MS. GILBERT:

15        Q.  The commenting agencies.  The

16   agencies that have commented on -- that he

17   submitted the reports to and they have made

18   comments, does he have an obligation to

19   discuss and analyze in detail his rationale

20   for adopting or rejecting their comments.

21             MR. SMITH:

22             Also object as to vagueness in

23         detail.

24             THE WITNESS:

25             Give me a couple of minutes --

SAIA (VOL II), JOHN

10/1/2008

Page 34

1    EXAMINATION BY MS. GILBERT:

2         Q.   Sure.

3         A.   -- and I'll find the paragraph that

4    relates.

5         Q.   Can I direct your attention, Mr.

6    Saia, to the paragraph?  Would you like me to?

7         A.   Okay.

8         Q.   On page 11, paragraph 4 -- G-4.

9         A.   Yeah, they're -- This is one.  And

10   there are a number of other places in here

11   discusses the coordination.  Yeah.  This says

12    "Comments received in response to the draft

13   statement are to be included in the final

14   environmental statement", as I had indicated.

15   It says "See appendix C, paragraph 4-K-4,"

16   "Comments can be summarized by topic with

17   appropriate responses.  All comments received

18   must be given consideration --"

19        Q.   "Full consideration".

20        A.   "Full consideration".

21        Q.   "And analysis"?

22        A.   "And analysis".

23        Q.   "And irreconcilable or opposing

24   views must be included in the final

25   environmental statement and fully addressed"?

SAIA (VOL II), JOHN

10/1/2008

Page 35

1        A.    Yes.

2        Q.    Okay.

3        A.    It's included as an appendix to the

4    environmental statement as I had indicated.

5        Q.    Does that suggest that the District

6    Engineer has the ability or the discretion to

7    omit comments and analysis of the discretion

8     -- of the reviewing agencies?

9        A.    No.

10       Q.    Just give me one second.  Mr. Saia,

11   to the extent that the Corps determines that

12   some impacts are not significant, does the

13   Corps have an obligation to include a

14   statement of finding regarding its

15   determination of "significant"?

16       A.    To write a statement of findings?

17       Q.    Yes.

18       A.    Or what are you --

19       Q.    To include a statement of findings

20   of significance in the Environmental Impact

21   Statement.

22       A.    Okay.  There is a discussion of

23   statement of finding in here.  Let me see if I

24   can find it here.

25       Q.    I'll direct your attention to

SAIA (VOL II), JOHN

10/1/2008

Page 60

 1    do have another paragraph that discusses

 2    operation and maintenance.

 3         Q.   So you do not believe that it

 4    applies.  Is that your answer?

 5         A.   I don't believe it applies.

 6         Q.   Okay.  So let's discuss the second

 7    paragraph, C, operation and maintenance.  Does

 8    the Corps -- Is the Corps obligated to

 9    consider all significant effects on the

10    environment and comply with all legal

11    requirements in preparing an EIS that deals

12    with the operation and maintenance of the

13    MRGO?

14         A.   That's what it says here.  It says

15     "In development of plans for operation,

16    maintenance and management activities,

17    consider all significant effects on the

18    environment and comply with all legal

19    requirements."

20         Q.   Does it also say that "The Corps is

21    obligated to include alternative uses,

22    available resources when the proposed O&M

23    activity will change the quality of the

24    environment, modify the beneficial uses of the

25    environment, or serve some purposes to the

SAIA (VOL II), JOHN

10/1/2008

Page 61

1    disadvantage of other environmental goals"?

2        A.    Assume you read it properly.

3        Q.    Okay.

4        A.    It says "Such considerations

5    different from those for a project in planning

6    status and discussion should be addressed.

7    Only the environmental effects of operation of

8    the project, and ongoing O&M programs include

9    alternative uses of available resources when

10   the proposed O&M activity will change the

11   quality of the environment, modify the

12   beneficial uses of the environment, or serve

13   some purpose to the disadvantage of other

14   environmental goals."

15       Q.    So in the Environmental Impact

16   Statement, the Final Environmental Impact

17   Statement for operation and maintenance that

18   was prepared in 1976, the Corps was obligated

19   to include alternative uses of available

20   resources when the proposed O&M activity will

21   change the quality of the environment, modify

22   the beneficial uses of the environment, or

23   serve some purposes to the disadvantage of

24   other environmental goals; correct?

25       A.    It says what it says.

SAIA (VOL II), JOHN

10/1/2008

Page 62

1        Q.   And that would apply to the 1976

2   MRGO Final Environmental Impact Statement for

3   operation and maintenance; correct?

4        A.   This ER was in effect in 15 April of

5   '74.  The environmental impact final was

6   March, 1976.

7        Q.   So it would apply?

8        A.   Assume it would apply.

9        Q.   Okay.  In that, referring your

10  attention back to the MRGO, the Final

11  Environmental Impact Statement, the 1976, the

12  EPA's comments sent to the Corps --

13        A.   The letter?

14        Q.   Yes.

15        A.   Okay.

16        Q.   Turning your attention to page 3,

17  the second paragraph from the bottom, above

18  paragraph number 4, the last paragraph in

19  section 3.  On page 9 -- section 9, page 12.

20  The Corps -- The EPA notes --

21        A.   Section 9, page 12.

22        Q.   Correct.

23        A.   Okay.

24        Q.   You there?  The EPA notes in its

25  comments, after review of the Draft

SAIA (VOL II), JOHN

10/1/2008

Page 63

```
 1   Environmental Impact Statement --
 2        A.   Wait.  Wait.  Wait.
 3             MR. SMITH:
 4                Which paragraph are we beginning
 5        with?  What's the beginning of the
 6        paragraph?
 7             MS. GILBERT:
 8                It's the paragraph that says
 9         "Therefore," but we're at the point
10        in the paragraph where --
11             THE WITNESS:
12                The second to the last --
13             MS. GILBERT:
14                "In order to minimize --"
15             THE WITNESS:
16                Before -- The last paragraph --
17        sub-paragraph of 3?
18             MS. GILBERT:
19                That's not where we're at.
20   EXAMINATION BY MS. GILBERT:
21        Q.   I'm sorry.  Hold on one second.
22                The paragraph above that.  "The
23   Army Corps of Engineers, in regulations
24   published on July 22nd, 1974, has also
25   recognized the unique qualities of the
```

SAIA (VOL II), JOHN

10/1/2008

Page 64

```
 1   wetlands area and the need for their

 2   preservation.  The Corps, in discussing

 3   wetlands, states, quote, 'As environmentally

 4   vital areas, they constitute a productive and

 5   valuable public resource, the unnecessary

 6   alteration or destruction of which should be

 7   discouraged as contrary to the public

 8   interest'."  And it continues, "Therefore, in

 9   order to minimize the existing adverse and

10   future long-term secondary impacts of the

11   MRGO, we recommend that mitigation measures --

12   mitigative measures that could reduce salinity

13   levels in the Lake Borgne Pontchartrain system

14   be incorporated into the operation and

15   maintenance of the MRGO project.  For example,

16   such measures could include the completion of

17   the Seabrook lock in the Inner Harbor

18   Navigational Canal system, control releases of

19   fresh water from the Mississippi River and

20   saltwater intrusion barriers.  Without

21   controlled measures, saltwater intrusion and

22   water quality degradation will continue to be

23   a major problem in the project area."  Do you

24   see that?

25        A.   Uh-huh (affirmatively).
```

SAIA (VOL II), JOHN

```
 1        Q.    And pursuant to the regulation that
 2   we have just gone over on paragraph 13-C --
 3   1-C of page 17 of the reg, those would --
 4   would those not be alternative uses of
 5   available resources when the proposed O&M
 6   activity will change the quality of the
 7   environment, modify the beneficial uses of the
 8   environment, or serve some purpose to the
 9   disadvantage of the other environmental
10   goals?
11            MR. SMITH:
12                Object to the form of the
13            question.
14            THE WITNESS:
15                Again, there's a distinction
16            between the operation and
17            construction.  The things that are
18            being talked about in the comment that
19            you read from the EPA's letter relate
20            to the construction of the project and
21            things that should be done in
22            relationship to that.  Not the
23            operations.  That's the way --
24   EXAMINATION BY MS. GILBERT:
25        Q.    You understand that?
```

SAIA (VOL II), JOHN

10/1/2008

Page 66

```
 1        A.   That's the way I understand it.
 2        Q.   So, in your opinion, the Corps had
 3   no obligation pursuant to this section of the
 4   regulation to address that portion of the
 5   EPA's comment?
 6        A.   What I am saying is the -- this
 7   particular comment is not applicable to
 8   operation and maintenance.  It's applicable to
 9   the constructive project.  The things that may
10   have happened as a result of the constructive
11   project, not the operation and maintenance.
12        Q.   So it's your position that the Corps
13   would not be obligated to respond to these
14   comments pursuant to this section of the
15   regulation because this is an O&M project?
16        A.   That's correct.
17        Q.   Would the Corps have a obligation to
18   fully analyze and address their rationale for
19   not addressing this comment in the Final
20   Environmental Impact Statement?
21        A.   They -- They had a comment.  They
22   responded to the comments of EPA in the
23   earlier part of this section, which they were
24   required to do.  So they did respond as far as
25   I could see.
```

SAIA (VOL II), JOHN

10/1/2008

Page 67

```
 1        Q.    And --
 2        A.    Page 3.
 3        Q.    As far as you --
 4        A.    Okay.
 5        Q.    And in your opinion, the Corps'
 6   response was a full analysis of the -- get the
 7   phrase here -- in your opinion, it was an
 8   adequate response?
 9        A.    Yes.  I -- I don't have -- You know,
10   I can't go back and see what all the
11   discussion was at that time relative to
12   responding to comments.  So I wasn't there at
13   the time.  Other than that, it appears to be
14   an appropriate response.
15        Q.    So you have no documentation
16   regarding this fight that could enlighten us
17   as to how they reached the conclusion that it
18   was not appropriate to address these measures
19   in the Final Environmental Impact Statement?
20        A.    I can only state what I see in the
21   regulation that relates to this comment.  You
22   have an operation and maintenance document.
23   This is not a construction document.
24        Q.    Did the EPA conclude that the Final
25   Environmental Impact Statement was adequate as
```

SAIA (VOL II), JOHN

10/1/2008

Page 68

1    it was presented -- the Draft Environmental

2    Impact Statement was adequate as it was

3    presented to -- as it was presented for

4    review?

5        A.   Again, --

6             MR. SMITH:

7                Objection.  It calls for

8        speculation.

9             MS. GILBERT:

10               No, it's in the EPA.  It's in the

11       Final Environmental Impact Statement

12       what their conclusion was.

13   EXAMINATION BY MS. GILBERT:

14       Q.   Okay.  I'll rephrase the question.

15               Did the EPA conclude that the

16   Draft Environmental Impact Statement that was

17   submitted for review was adequate?

18             MR. SMITH:

19                Objection.  Calls for

20        speculation.

21             THE WITNESS:

22                What they said was, on page 13,

23        Roman numeral IX-13, the third-to-last

24        paragraph of their letter, "These

25        comments classify your Draft

SAIA (VOL II), JOHN

10/1/2008

Page 69

1         Environmental Impact Statement as

2         ER-2."

3    EXAMINATION BY MS. GILBERT:

4         Q.   And as you sit here today, you don't

5    know what "ER-2" means?

6         A.   It -- They provided as part of their

7    comments an explanation of their ratings and

8    they have three ratings.

9         Q.   And what is ER-2?

10        A.   ER-2?  EPA has -- "This is relative

11   to the environmental impact of the action.

12   Environmental reservations, EPA has

13   reservations concerning the environmental

14   effects of certain aspects of the proposed

15   action."

16        Q.   Okay.  Continue.

17        A.   "EPA believes that further study of

18   suggested alternatives or modifications is

19   required and has asked the originating Federal

20   agency to reassess these aspects."  The other

21   part is, it's a category 2.  "Adequacy of the

22   impact statement".  "EPA believes the draft

23   impact statement does not contain sufficient

24   information to assess fully the environmental

25   impact of the proposed project or action.

SAIA (VOL II), JOHN

10/1/2008

Page 70

1    However, from the information submitted, the

2    Agency is able to make preliminary

3    determinations that -- determinations of the

4    impact on the environment.  EPA has requested

5    that the originator provide the information

6    that was not included in the draft statement."

7        Q.   And does the EPA qualify that

8    category 2 as an insufficient -- as

9    insufficient information?

10       A.   They indicate it as insufficient

11   information.  They have three categories under

12   both.  And the last category is

13   "Environmentally unsatisfactory" for an EU

14   rating in category 3, an inadequate

15   classification.  These, as I understand, were

16   their definitions, whether it be for the Corps

17   or any other agency.

18       Q.   Do you believe that the Corps

19   reassessed the aspects of the suggested

20   alternatives and modifications that the EPA

21   had requested further review on?

22       A.   The response was put in the final

23   EIS, so it has been responded to.

24       Q.   Okay.

25       A.   This is before response.  You know,

SAIA (VOL II), JOHN

10/1/2008

Page 71

1    I don't know what the ultimate response was.

2         Q.   Isn't this a Final Environmental

3    Impact Statement?

4         A.   Yes, it is.  This is the final

5    response.  Correct.

6         Q.   So that is the final response;

7    correct?

8         A.   Yes, final response from the

9    District Engineer, correct.

10        Q.   Was that it was not appropriate for

11   it to evaluate and develop that information?

12        A.   Whatever it said in page 3.

13        Q.   Okay.  Now, you had pointed out in

14   the regulations to us that the Corps District

15   Engineer was charged with the responsibility

16   of revising or supplementing statements in

17   paragraph 7 on page 8 of Exhibit 7.  And in

18   paragraph 7-A, under "Revising or

19   supplementing statements", the regulations

20   require that "If the Final Environmental

21   Impact Statement previously filed clearly

22   fails to comply with the requirements of NEPA,

23   e.g., failed to discuss alternatives or failed

24   to disclose the environmental impacts of the

25   proposed action, or if there has been a major

SAIA (VOL II), JOHN

10/1/2008

Page 79

1    the Corps took with regard to the EPA's

2    recommendations concerning further study of

3    the suggested alternatives and modifications?

4         A.   No, I am not.  It's what respond- --

5    what was responded to in the draft.

6         Q.   Is the only information you know

7    about the actions taken?

8         A.   That's what we're addressing here --

9         Q.   Okay.

10        A.   -- between the draft and the final.

11        Q.   I direct your attention to the

12   United States Department of Commerce,

13   Assistant Secretary for Science and

14   Technologies' --

15        A.   Page?

16        Q.   -- comment on the 1974 EIS.

17             On page 9-14, the Department of

18   Commerce indicated in its response to the 1974

19   DEIS on July 3rd, 1975 that the Draft

20   Environmental Impact Statement failed to

21   identify land loss process of marsh

22   deterioration resulting from saltwater

23   intrusion.  Is it true that -- Are you at that

24   point?

25        A.   I have the letter.  Page 9-14.  But

SAIA (VOL II), JOHN

10/1/2008

Page 80

1    do you have a specific paragraph?

2        Q.    "The Department of Commerce also

3    commented to the Corps that it failed to

4    address marsh deterioration resulting from

5    saltwater intrusion as a significant impact on

6    its -- of the operation and maintenance of the

7    MRGO in this draft."

8        A.    Could you refer to a paragraph

9    number or --

10       Q.    It's the page 2.

11       A.    Page 2.

12       Q.    Under 2.03.

13       A.    2.03.

14       Q.    Commenting on pages Roman numeral

15   II-22, paragraph 1 of the Corps' DEIS.

16       A.    Uh-huh (affirmatively).  Yes.

17       Q.    "The Department of Commerce also

18   felt that the Corps failed to address the

19   deterioration of marsh from saltwater

20   intrusion as a significant impact."

21            MR. SMITH:

22                Objection.  Calls for

23          speculation.

24   EXAMINATION BY MS. GILBERT:

25       Q.    Is that their comment?

SAIA (VOL II), JOHN

10/1/2008

Page 81

```
 1          MR. SMITH:
 2             Object to the form of the
 3       question.
 4          THE WITNESS:
 5             Well, the process that is -- What
 6       it states here in this paragraph,
 7       you're referring to page Roman numeral
 8       II-22 paragraph 1.  It's another
 9       process that should be included in
10       this section is marsh deterioration
11       resulting from saltwater intrusion.
12  EXAMINATION BY MS. GILBERT:
13       Q.  Are you aware of whether the Corps
14  took any action with regard to that comment?
15       A.  Let me look in the responses.  I
16  assume you have looked there already.  Which
17  page is it?
18          MR. SMITH:
19             Roman numeral IX-4.
20          THE WITNESS:
21             Why don't we take a break for a
22       couple of minutes?
23  EXAMINATION BY MS. GILBERT:
24       Q.  Actually, I have a pending
25  question.  And I am going to actually add
```

SAIA (VOL II), JOHN

Page 82

```
 1   another question, Mr. Saia.  Have you found a

 2   response to that comment in your review?

 3        A.   No.  And that's why I want to take a

 4   break.  I want to go through it thoroughly.

 5        Q.   Okay.  Go ahead and try and find

 6   it.

 7        A.   Okay.  Let's take a break and I'll

 8   be back.

 9             MS. GILBERT:

10                We'll take a break.

11             VIDEO OPERATOR:

12                Off the record at 10:47.

13             (Recess.)

14             VIDEO OPERATOR:

15                Returning to the record, it's

16          11:39.

17   EXAMINATION BY MS. GILBERT:

18        Q.   Mr. Saia, we have taken -- We're

19   back on the record.  We have taken a break now

20   for an opportunity to review the Final

21   Environmental Impact Statement to determine if

22   the Corps ever responded to the comment made

23   by the Department of Commerce.  Did you find

24    --

25        A.   The Department of Commerce's --
```

SAIA (VOL II), JOHN

10/1/2008

Page 83

```
 1        Q.    The specific comment that I
 2   highlighted to you, was it ever responded to
 3   in the Final Environmental Impact Statement?
 4        A.    I believe it was.
 5        Q.    And where is it?
 6        A.    This is -- We had a long discussion
 7   of it earlier relative to questions relative
 8   to the construction versus operation and
 9   maintenance.  And a similar question was asked
10   by EPA and they responded that this is not --
11   basically not impacts of the operation and
12   maintenance.  That was a constructive
13   project.  The comment of Commerce on salinity,
14   whatever that you indicated, also was relative
15   to the construction of the original project.
16   I refer you to -- also to that regulation.
17        Q.    Actually, that answer is sufficient
18   with regard to the question that was pending.
19        A.    Okay.  Fine.
20        Q.    Is it the Corps' position that the
21   Corps was not obligated to discuss salinity
22   and the effects on the wetlands in the Final
23   Environmental Impact Statement?
24        A.    I believe salinity was discussed in
25   this EIS.  I can point out things relative to
```

SAIA (VOL II), JOHN

10/1/2008

Page 84

1    the salinity.

2         Q.   And its effect on the wetlands as

3    the comments have --

4         A.   As a result of the construction --

5              MR. SMITH:

6                 Let her finish her question.

7              THE WITNESS:

8                 Oh, sorry.

9    EXAMINATION BY MS. GILBERT:

10        Q.   Because just between -- I just want

11    --

12             MR. SMITH:

13                Just ask the question.  He needs

14          to let you finish your question.  And

15          so I am just telling him to wait.

16             THE WITNESS:

17                Okay.

18   EXAMINATION BY MS. GILBERT:

19        Q.   Is it the Corps' position that

20   regardless of whatever agency may have raised

21   the subject in their responses to the review,

22   or their -- Let me rephrase that.

23                Is it the Corps' position that

24   regardless of which agency's comment addressed

25   the question of salinity in the wetlands, the

SAIA (VOL II), JOHN

10/1/2008

Page 85

1   Corps did not interpret it had an obligation

2   to analyze that environmental impact in the

3   context of this Final Environmental Impact

4   Statement?

5        A.   I believe that in this, EIS salinity

6   was discussed to the extent it needed to be

7   for the operation and maintenance of the

8   project.

9        Q.   Okay.  So to the extent that this

10  Final Environmental Impact Statement does not

11  analyze the effect of salinity on the wetlands

12  and saltwater intrusion's effect on the

13  wetlands, it's the Corps' position that the

14  Corps did not have to present that information

15  or analyze that information in the context of

16  this Final Environmental Impact Statement?

17       A.   For operation and maintenance.

18       Q.   Are you aware of any other

19  environmental statement in which the Corps did

20  raise these issues and analyze salinity in the

21  wetlands for Congress' review?

22           MR. SMITH:

23              I am going to object again.  The

24           phrase "for Congress' review", which

25           is contrary to his testimony yesterday.

SAIA (VOL II), JOHN

10/1/2008

Page 90

```
 1    every one of the comments and then have you

 2    just take a half an hour to go, or ten minutes

 3    or however long it takes to go look at the

 4    Final Environmental Impact Statement to see if

 5    there was an exact response within the

 6    contents of the document.  We have already

 7    discussed the fact that you believe that marsh

 8    deterioration and saltwater -- land loss

 9    processes and marsh deterioration were a

10    result of construction; correct?

11        A.   That's what was indicated in the

12    EIS.

13        Q.   Okay.

14        A.   The final one.

15        Q.   So my question to you is, to the

16    extent that any of the reviewing agencies

17    commented on the Draft Environmental Impact

18    Statement that they believed that the Corps

19    should have added an analysis of that

20    environmental impact, --

21        A.   Yes.

22        Q.   -- is it the Corps' position that

23    that was unnecessary to present to the CEQ in

24    the context of this Final Environmental Impact

25    Statement?
```

SAIA (VOL II), JOHN

```
 1       A.   It states that in the comment

 2   response to EPA.  That it's construction

 3   versus operation.  That we're looking at the

 4   environmental impacts of not what was

 5   constructed, but what's being done with

 6   operation and maintenance in the context of

 7   operation and maintenance, that anything

 8   related to that would apply.

 9       Q.   Okay.  And to the extent that any

10   other reviewing agencies had the same comment

11   or a similar comment with regard to that, your

12   answer would be the same?  Is that correct?

13       A.   Yes.

14       Q.   Okay.  And are you aware of any

15   other document which the Corps submitted for

16   other Environmental Impact Statement or

17   documents submitted to Congress, to the CEQ in

18   which the Corps analyzed land loss process of

19   marsh deterioration subsequent to this

20   document?  In the MRGO vicinity.  I'm sorry.

21       A.   As I indicated --

22            MR. SMITH:

23              I object to the form of the

24          question.  It's vague.  Go on.

25            THE WITNESS:
```

SAIA (VOL II), JOHN

10/1/2008

Page 92

```
 1              As I indicated to the previous
 2         question, Louisiana Coastal Area, LCA
 3         document went to Congress.
 4   EXAMINATION BY MS. GILBERT:
 5         Q.   Okay.
 6         A.   Not Congress.  The document, the
 7   feasibility report went to Congress.
 8         Q.   And is that the only document that
 9   you know of that would have potentially
10   addressed land loss processes in the vicinity
11   of the MRGO?
12         A.   It addressed coastal Louisiana
13   throughout the whole coast land loss.  That's
14   the only one that -- yes, that I am aware of
15   or could recall.
16         Q.   Do you recall when the Louisiana
17   coastal document that you're referring to was
18   drafted?
19         A.   The District Engineer's report was
20   like November, 2004.  The Chief of Engineer's
21   report I believe was February, 2005.
22         Q.   So between the 1976 and that
23   document, there is no other document that you
24   know of?
25         A.   You know, that I know of.
```

SAIA (VOL II), JOHN

10/1/2008

Page 93

1      Q.   Okay.  That's fine.

2      A.   And I would qualify that, that was

3   submitted to CEQ.  I don't know of any others,

4   either.  But you know, you have indicated CEQ.

5      Q.   Okay.

6           MS. GILBERT:

7              Can we just leave a blank?  We're

8         going to request the production of

9         that document just to be added as an

10        exhibit at this time.  Not to -- Do

11        you have a copy of that?

12        MR. SMITH:

13           You have got a copy of that.

14        MS. GILBERT:

15           Yes, just do you have that in

16        there? .

17        MR. SMITH:

18           I said you have a copy of that.

19        MS. GILBERT:

20           I know, but we don't have a

21        physical copy to put as an exhibit.

22        MR. SMITH:

23           Oh, here.

24        MS. GILBERT:

25           Yes.  And we don't need to ask --

SAIA (VOL II), JOHN

10/1/2008

Page 96

1              identify it by Bates numbers.

2          MS. GILBERT:

3              We'd leave a blank for that.

4          MR. SMITH:

5              I know the Court Reporter would

6          like to have more exhibits.

7     EXAMINATION BY MS. GILBERT:

8          Q.   Now, would it be true then, Mr.

9     Saia, that to the extent that any agency had a

10    comment about the Draft Environmental Impact

11    Statement for operation and maintenance that

12    related to the environmental impacts of storm

13    surge caused by the MRGO, that it would be the

14    Corps' position that an analysis of storm

15    surge would not be necessary to include in the

16    1976 Draft Environmental Impact Statement?

17         A.   If it wasn't related to the

18    operation and maintenance.  This is an EIS for

19    operation and maintenance.

20         Q.   Okay.  And as sit here today, are

21    you aware of any other analysis or study for

22    an Environmental Impact Statement that the

23    Corps prepared relating to storm surge in the

24    vicinity of the MRGO that was submitted to the

25    CEQ subsequent to the 1976 document having

SAIA (VOL II), JOHN

1   been submitted?

2       A.   Am not aware.

3            MR. SMITH:

4                Whenever's a good time to take a

5            lunch break, just let us know.

6            MS. GILBERT:

7                I'm going to defer to you guys.

8            MR. SMITH:

9                He's ready.  So whenever is a

10           good time for you.  I don't want to

11           break your line of questioning.

12   EXAMINATION BY MS. GILBERT:

13      Q.   Okay.  By 1976, did the Corps have

14   any knowledge of the potential hazards of

15   storm surge in the vicinity of the MRGO?

16           MR. SMITH:

17               Yes, you know, we have witnesses

18           that are going to address that topic.

19           That's one of the topics that's been

20           designated, storm surge.

21           MS. GILBERT:

22               For --

23           MR. SMITH:

24               For this 30 (b)(6), and he's not

25           the designated witness on that topic.

SAIA (VOL II), JOHN

10/1/2008

Page 98

```
 1            MS. GILBERT:
 2                That's fine.  I'll withdraw the
 3        question.
 4                We can break now, because we're
 5        going to move on to another --
 6            MR. SMITH:
 7                Can we just clean one thing up
 8        from yesterday?  I think he would like
 9        to recant, maybe I should say revise
10        his testimony.  You asked him about
11        operation and maintenance yesterday
12        and he said --
13            MS. GILBERT:
14                Oh, right.  I promised to do
15        this.
16            MR. SMITH:
17                -- maybe he had those confused
18        and he wanted to see if he could
19        confirm his views.
20            MS. GILBERT:
21                Robin, I did agree that I would
22        go over it.
23    EXAMINATION BY MS. GILBERT:
24        Q.   Can you describe the Corps'
25    understanding of the process of operation of
```

SAIA (VOL II), JOHN

10/1/2008

Page 99

1    the MRGO?

2         A.   Okay.   The operation would entail

3    the physical operation of equipment, et

4    cetera.   There's in essence no equipment to

5    operate.   You don't have gates and so forth.

6    The maintenance is the dredging of the

7    channel.

8         Q.   Would the operation of the MRGO

9    include the traversing, the allowing of the

10   traversing of ships, navigable ships?

11        A.   For this particular project, I said

12   the maintenance is the dredging.   There are no

13   equipment to operate.   I have discussed that

14   with others in Operations.   And really there's

15   no distinction made in the budget between

16   operation and maintenance.   It is one category

17   of funding you receive to expend on the

18   project, and it's operation and maintenance

19   appropriation.   Operation and maintenance

20   general.

21        Q.   So from the Corps' perspective,

22   operation and maintenance of the MRGO only has

23   to do with the maintenance of the MRGO?

24        A.   From what I could see in the -- I

25   believe in the EIS it refers to the dredging

SAIA (VOL II), JOHN

10/1/2008

Page 118

 1          does.  The question was whether it has

 2          to.

 3             MS. GILBERT:

 4                Oh, yes, he did.  He said it

 5          does.

 6             MR. SMITH:

 7                I thought he was -- I'm sorry.

 8             MS. GILBERT:

 9                He looked at the reg and said it

10          does.

11             MR. SMITH:

12                Okay.  I apologize.  That's fine.

13             MS. GILBERT:

14                Don't worry.

15    EXAMINATION BY MS. GILBERT:

16        Q.   Okay.  Now, the next question is,

17    Mr. Saia, does this Supplemental Information

18    Report discuss any of the impacts of widening

19    the channel caused by over-depth dredging of

20    the MRGO?

21        A.   Restate that again, please?

22             (Requested question read back.)

23             THE WITNESS:

24                It discusses over-depth dredging

25          and anything that relates to that that

SAIA (VOL II), JOHN

10/1/2008

Page 119

1          there's an impact on.

2     EXAMINATION BY MS. GILBERT:

3          Q.   And in the impacts discussed by

4     over-depth dredging, does this information,

5     Supplemental Information Statement discuss or

6     analyze widening of the channel with respect

7      -- as an impact of over-depth dredging?

8          A.   See that it talks about the depth of

9     the -- of the channel.  It discusses that.

10         Q.   But does -- I'm sorry.

11         A.   I don't see -- I see channel depth.

12    I don't see channel -- anything about channel

13    widening in here.

14         Q.   Okay.  So that is not included among

15    the impacts discussed by over-depth dredging?

16         A.   I don't see a discussion of it.  I

17    just see a discussion of the depth related.

18              MS. GILBERT:

19                 Okay.  Before we go on to Exhibit

20              9, I'm going to hand over the

21              deposition to Mr. Pierce O'Donnell to

22              complete.

23    EXAMINATION BY MR. O'DONNELL:

24         Q.   I finally get a chance?

25                 Mr. Saia, how should I pronounce

SAIA (VOL II), JOHN

10/1/2008

Page 155

1   documents associated with the MRGO project?

2        A.   No.

3        Q.   Have you ever seen a document like

4   this associated with any other project?

5        A.   Not like this, no.  I have seen

6   listings of, in time, of different projects,

7   different actions, but not -- not something

8   like this.

9        Q.   Have you had an opportunity to look

10  at the environmental assessments itemized in

11  this document?

12       A.   No.

13       Q.   Because you have testified already

14  that there were no other final environmental

15  impact statements filed with the CEQ relating

16  to the MRGO project, would it be safe to say

17  that all of the environmental assessments

18  conducted associated with the MRGO resulted in

19  a finding of no significant impact?

20       A.   For those that are listed -- what I

21  have in front of me, there -- I would have to

22  look.  It looks like they're all FONSIs.

23       Q.   If there was an environmental

24  assessments that resulted in something other

25  than a FONSI, would that have been an

SAIA (VOL II), JOHN

10/1/2008

Page 156

1    Environmental Impact Statement that had to be

2    submitted to the CEQ?

3         A.   According to the regulation, there

4    are two options.  Either proceed with a FONSI

5    or proceed with a supplemental EIS.

6         Q.   Because -- And since we have already

7    determined that there have never been any

8    supplemental EISs filed with regard to the

9    MRGO project, if there had been any

10   environmental assessments conducted with

11   regard to any aspects of the MRGO project,

12   then by necessity they would have had to have

13   resulted in a finding of no significant

14   impact?

15        A.   I would assume so.

16        Q.   Okay.  This document outlines

17   environmental assessments that had been

18   conducted associated with the MRGO project

19   relating to two discrete actions.  If you look

20   at the bottom paragraph of the first page,

21   there are a series of environmental

22   assessments listed relating to the impact of

23   construction of foreshore protection measures

24   along portions of the MRGO and Lake Borgne.

25        A.   You're referring to the first page

1      Q.    Okay.

2      A.    -- that would require you to put out

3 a supplement.  You would -- could either do an

4 EA to determine whether it needs to be changed

5 or need a supplemental EIS, or you could

6 proceed to an EIS.  Or, you know, if you had a

7 modification to the project, an authorization

8 to add something, then you would need to make

9 that determination to whether you do a FONSI

10 or a supplemental EIS.  So that's -- Again,

11 that's a determination of the District

12 Engineer in consultation with many other

13 people.

14      Q.    I am just going to mark one more

15 document and then we are done.

16              (Whereupon a discussion was held

17 off the record.)

18          MS. GILBERT:

19              The last document we have to

20          mark.  We designated this document,

21          and I don't know when we made copies

22          of it.  We don't have complete

23          versions of it.  It would be NOP-019,

24          six zeroes, 852 through 865.

25          MR. SMITH:

Page 178

1           You gave it to us yesterday or

2      today?

3        MS. GILBERT:

4           No, no, no.  We gave it to you in

5      the documents.

6        MR. SMITH:

7           Oh, previously.

8           (Whereupon a discussion was held

9      off the record.)

10        MS. GILBERT:

11           We're going to mark as Exhibit

12      Number 13 -- Let's go back on the

13      record.

14        VIDEO OPERATOR:

15           Returning to the record, it is

16      3:47.

17        MS. GILBERT:

18           Okay.  I am going to show the

19      witness a document that's been marked

20      as Exhibit 13.  It's Bates stamped

21      number NOP-019, six zeroes, 862

22      through 865.

23 EXAMINATION BY MS. GILBERT:

24    Q.  I ask you if you reviewed that

25 document in preparation for today's

1 deposition.

2             (Whereupon a discussion was held

3      off the record.)

4          THE WITNESS:

5             I'd seen it before, yes.

6 EXAMINATION BY MS. GILBERT:

7      Q.   Oh, you have?  Okay.

8      A.   I just needed to look at it again.

9             (Whereupon a discussion was held

10 off the record.)

11 EXAMINATION BY MS. GILBERT:

12     Q.   Let's go back on.  Back on the

13 record.  Okay.  We're back on the record.

14 Have you reviewed this document?

15     A.   Yes.

16     Q.   Do you have any -- Do you know who

17 prepared this document?

18     A.   Yes.

19     Q.   Who prepared this document?

20     A.   Richard Bow.

21     Q.   Who is Richard Bow?

22     A.   Richard Bow is a Section Chief in

23 Environmental Branch of Planning Programs and

24 Project Management Division of New Orleans

25 District.

 1      Q.   And do you know why he prepared this

 2 document?

 3      A.   Because he thought there --

 4           MR. SMITH:

 5              The answer is do you know.  The

 6         question is, excuse me, do you know.

 7           THE WITNESS:

 8              No, I don't.

 9 EXAMINATION BY MS. GILBERT:

10      Q.   Do you know what this document was

11 intended to be used for?

12      A.   He has a recommendation on page 3

13 and 4 that goes on to discuss what he is

14 recommending.

15      Q.   All right.  Does Mr. Bow acknowledge

16 that the disposal sites and methods that had

17 been used along the inland reach since the

18 '80s were significantly changed from the time

19 that the original Environmental Impact

20 Statement had been prepared in 1976?

21      A.   He just discusses a series of

22 changes over time and environmental

23 assessments that were done.

24      Q.   And does he conclude that despite

25 the fact that several environmental

1 assessments had been prepared, in each

2 instance a finding of no significant impact

3 was generated?

4          MR. SMITH:

5             Objection, calls for

6         speculation.

7 EXAMINATION BY MS. GILBERT:

8     Q.   Does he conclude in this document

9 that despite the fact that assessments,

10 environmental assessments had been prepared

11 and the findings of no significant impact had

12 accompanied those environmental assessments,

13 that the cumulative effect was significant?

14          MR. SMITH:

15             Objection, calls for

16         speculation.

17 EXAMINATION BY MS. GILBERT:

18     Q.   Does it say that in the document?

19     A.   It says here on the first page, he

20 addresses FONSIs, "All of the changes that

21 have occurred in the dredging and disposal

22 plan since preparation originally have been

23 addressed in environmental assessments and

24 associated findings of no significant impact."

25     Q.   But does he also conclude -- Does he

Page 182

1 start that paragraph by saying -- by pointing

2 out that the disposal sites and methods that

3 had been used along the inland reach since the

4 mid 1980s bear little resemblance to those

5 described in the Environmental Impact

6 Statement of 1976 for operation and

7 maintenance of the MRGO?

8              MR. SMITH:

9                Objection, calls for

10        speculation.

11 EXAMINATION BY MS. GILBERT:

12      Q.   Doesn't it state that in the

13 letter?

14      A.   It states --

15              MR. SMITH:

16                Objection.

17              THE WITNESS:

18                It states in the -- in this

19        draft, whatever document that it is,

20        NEPA compliance is complete for all

21        existing O&M activities, and then he

22        goes on to however it's stated.  I

23        believe you read it, so I don't need

24        to read it again.

25 EXAMINATION BY MS. GILBERT:

Page 183

1     Q.   And does he conclude --

2          MR. SMITH:

3             We're going to have to finish

4       this up here.  I have got a conference

5       with the Judge in about two minutes.

6          MS. GILBERT:

7             Okay.  But --

8          MR. SMITH:

9             We can continue tomorrow.

10         MS. GILBERT:

11            No, I'll ask him a couple of more

12      questions.

13 EXAMINATION BY MS. GILBERT:

14     Q.   Does Mr. Bow conclude that the

15 reason that supplemental impact statements

16 should have been prepared?

17         MR. SMITH:

18            Objection, calls for

19      speculation.

20 EXAMINATION BY MS. GILBERT:

21     Q.   You can answer it if you believe

22 that that's what he is saying.

23     A.   He's recommending --

24         MR. SMITH:

25            Objection, argumentative.  He --

Page 184

1          THE WITNESS:

2              This, his comments, page 4, he

3       discusses the major points.

4 EXAMINATION BY MS. GILBERT:

5      Q.   Which are?  Does he discuss that

6 Supplemental Environmental Impact Statements

7 need to be prepared for the O&M program of the

8 MRGO?

9      A.   That's what he indicates, SEIS.

10     Q.   And in the very first paragraph

11 doesn't he say that -- on page 1, the very

12 first page, doesn't he say that the main

13 reason why Supplemental Environmental Impact

14 Statements had not been prepared is that each

15 change has been discrete and not associated

16 with other changes?

17     A.   Could you direct me to where you're

18 reading?

19     Q.   I am reading --

20     A.   On page 1?

21     Q.   I am reading the second-to-last

22 sentence on the first page.

23     A.   The second-to-last sentence on the

24 first page.  "The main reason".  Okay.  Got

25 it.  That's what he says.

Page 185

1     Q.   So he concludes that each individual

2  -- that there was no analysis of the

3  cumulative effect of this conduct?

4     A.   That's his statement.

5          MR. SMITH:

6              Objection.  Calls for

7        speculation.

8  EXAMINATION BY MS. GILBERT:

9     Q.   Is that what the document says?

10          MR. SMITH:

11              The draft document?

12          THE WITNESS:

13              That's what he says in the

14        document.

15  EXAMINATION BY MS. GILBERT:

16     Q.   On the second page at the end of the

17  third full paragraph --

18     A.   The second page, the third full --

19     Q.   The second page, the end of the

20  third full paragraph -- no, I'm sorry.

21  Withdrawn.

22              What was the gentleman, Mr. Bow's

23  position at the time this document was

24  drafted?

25          MR. SMITH:

Page 186

1              Objection, asked and answered.

2 EXAMINATION BY MS. GILBERT:

3     Q.   What was his title?

4        MR. SMITH:

5              I'm going to ask that this be

6        adjourned at this time so I can go

7        talk to the Judge.

8        MS. GILBERT:

9              All right.  Well, we can wait.

10        MR. STEVENS:

11              How long are you guys going to

12        be?

13        MR. SMITH:

14              I don't know.

15        MR. BRUNO:

16              Very short.

17        MS. GILBERT:

18              Okay.  Great.

19        MR. STEVENS:

20              We'll stand by.

21        MR. SMITH:

22              I'm not going to be any longer

23        than you were.

24        VIDEO OPERATOR:

25              Off the record.  It is 3:58.