

Figure 36.     Swamp shoreline at station 870.

4-48

The stumps provide the greatest degree of erosional protection. Cypress is noted for its ability to resist rot, particularly if it has been covered with water and sediment. Even though many of the stumps along the shore may be as old as 500 years, the root systems are firmly attached in the substrate. Transverse waves have attempted in earnest to remove the stumps, but most remain intact in their growth positions (Figure 37). The net effect is for the stumps to reduce current flow, both during drawdown and return flow. Water level fluctuations are reduced and the shore is protected from severe erosion.

4-49



Figure 37.    Transverse wave drawdown on swamp shoreline as large
displacement vessel passes.   Old stumps firmly implanted in
adjacent shallow waters are providing a firm barrier to wave
activity, thus shoreline erosion rate is relatively low in this area.

NED-188-000001892

# CHAPTER 5: SHORELINE PROTECTION MEASURES

## Design Considerations

### Ship Waves

The MRGO shoreline is subject to erosion from several physical processes which occur with the passage of ship waves. The tidal fluctuations on the MRGO contribute to the problem by allowing erosion to occur at various water levels. Ship waves are composed primarily of two parts: transverse and diverging. The transverse wave can be further divided into its principle components, the drawdown and return flow. It should be noted that wind-generated waves also occur on the MRGO, although these do not appear to cause significant erosion when compared to ship-related processes.

Shoreline erosion on the MRGO can be divided into two layers. The first of these is an erosion of the lower shoreline, or bench area, which becomes exposed during drawdown. The second is an erosion of the upper shoreline, which is the area from around mean water level to the marsh elevation. Since water levels fluctuate, it is difficult to define elevations of the upper and lower shore, and as such these are used as generalized terms.

During the passage of a large ship the lower shoreline is attacked first by the drawdown and return flow. As the drawdown occurs, water flows from the lower shoreline towards the center of the MRGO channel, causing erosion. Depending on tide level, water may also be drawn out of the marsh towards the channel. This can be a very turbulent and erosive process because of the head differential set up between the marsh and the channel. A similar differential causes hydrostatic pressures to be built up in the exposed bank, forcing water to leave the soil.

After the drawdown phase has been completed the return flow begins. From this point the water level along the shoreline will continue to rise until the original water level is exceeded. The return flow, being a flow of water back towards the shoreline, directly impacts both the lower shoreline and the exposed marsh bank. The diverging waves then begin to reach the shore as water elevation is at a maximum or mean level, continuing the attack on the upper shoreline.

NED-188-000001893

5-2

Both the upper and lower shorelines must be considered in shoreline protection. Failure to protect the lower bank from erosion will eventually cause any upper bank protection to fail by undermining. In the Corps' test sections (to be discussed in detail) aprons were placed at the toe of the slope to prevent undermining. The use of a flexible apron allows settlement to occur without failure. The materials used for armoring the lower bank must have sufficient permeability and weight to prevent the hydrostatic uplift effect of the drawdown which can lead to failure.

Obviously the upper bank must also be protected to prevent the retreat of the shoreline. The protective works here are especially subject to impact forces of the return flow and diverging waves. Loosely placed materials must be large enough to resist these forces; otherwise materials used must be restrained from washout. A continuous structure would prevent the rapid movement of water from the marsh during drawdowns; however, the resulting pressure increase on the structure must be recognized.

## Water Levels

Water-level variations on the MRGO must be considered to determine the range of elevations at which erosion will occur on the shoreline. Figure 4 shows that water levels can range from -1 ft to +5 ft NGVD. These levels are monthly minimums and maximums. Using the maximum size wave described earlier (4 ft drawdown, 2 ft return flow) the shoreline would need to be protected from -5 ft to +7 ft NGVD based on these water levels.

The placement of protection to the lower limit of -5 ft NGVD will be necessary to assure against failure. A flexible apron can be used on the lower shoreline to achieve this goal. In design, the apron would be placed above -5 ft NGVD and would be allowed to settle into place. The placement of protection to the upper limit of +7 ft NGVD must be considered in terms of its practicality. More description of soils and problems anticipated in building on these soils will be discussed in the foundation section; however, it is apparent that the higher a structure is built, the more construction and performance problems will be encountered. Likewise, the higher a structure is built the greater the amount and costs of materials.

5-3

The most serious water-level consideration is whether wave overtopping of the structure will cause failure. The greater the height of the structure, the lesser the frequency at which it will be overtopped. It is impractical to build a structure to an elevation of +7 ft NGVD to assure against this occurrence, yet a lower level structure that is frequently overtopped will allow the marsh behind it to erode, subsequently causing the failure of the structure. The most logical procedure is to build the structure to an intermediate elevation between the marsh level and +7 ft NGVD (that is, +3 or +4 NGVD) and design against the erosive effects of the overtopping. Included would be protection on the back side to prevent against washout. It should be remembered that most ships are expected to cause return flows not exceeding 1 ft above still water level. To obtain a water level as high as +7 ft NGVD would require that a very large ship pass at extremely high water. The probability of these two events occurring simultaneously is low since there are typically only three or four oceangoing vessels per day using the MRGO and few of these are of very large displacement. Controls could also be placed on the passage of ships during extremely high water levels. The height to which structures are placed along the shoreline may ultimately be determined by what is feasible when actual field construction is begun.

**Foundation Conditions**

The soil characteristics of the northeast shoreline present serious complications in construction of shoreline protection. The uppermost layer is predominantly "marsh" soil and averages about 10 ft in depth. Marsh soils are composed largely of organic material with very high water contents and low cohesive strengths. These soils are subject to rapid compaction when loaded. Based on these descriptions it is apparent that the weight of any type of shoreline protection will be a controlling factor in application to this environment.

The major difference in characteristics of the northeast and southwest shorelines has resulted from the spoil deposition on the southwest side. The deposition of spoil on the southwest shoreline had several effects:

(1) The dredged material placed on the shoreline was more resistive to the wave action than the erosive marsh soil; so erosion was reduced.

(2) The weight of the dredged material caused the underlying marsh soils to be compacted.

5-4

(3)   The dredged material increased the southwest shoreline elevations which decreased erosion.

These facts must be taken into consideration when evaluating the applic
southwest shore Corps test sections on the northeast shoreline. The settlements c
Corps stone sections ranged around 1 ft on spoil deposits above precompr
foundations. It is obvious that settlements of such a section would be massive o
northeast shoreline. In addition, the elevations on the southwest shoreline are h
and there was simply better material available for the Corps to use in constructio
contrast, on the northeast shoreline the elevations are low and the only ma
immediately available is marsh soil.

Underlying the marsh soil in the region are the "interdistributary" and "intro
complex" layers. These soils contain 80% clay with sand and silt deposits distri
throughout. Since the marsh soil has such poor characteristics, these lower ge
layers may prove to be useful in stabilization of structures on the surface.
stabilization would be accomplished by using pilings to reach through the 10
marsh into the lower layers.

**Shoreline Discontinuity**

When the MRGO was first cut there was at least an approximation of a straight
even though it was intersected with bayous and lakes. But now, after some 20 ye
erosion, the northeast shore is extremely irregular in nature with only a few se
remaining as straight. The shore is now typified by coves, cuts, lakes, major b
minor bayous and islands. This discontinuity provides a major engineering challe
structural measures of erosion control are to be undertaken.

Clearly, some major intersecting waterways, such as Bayou La Loutre,
Yscloskey, and Bayou Dupre, will have to be left open for navigation int
Smaller bayous, creeks, and entrances into lakes should, however, be perma
closed. Doing so will reduce both saltwater intrusion and wave penetratic
interior areas. More importantly, closing minor waterways will allow for struct
span greater reaches. In this regard, structures must be built across areas of v
topography and bathymetry. Designs of measures must incorporate these variat
Some areas may require dredging while some areas may require fill.

## Critical Areas

As described in Chapter 4, the northeast shoreline within the study area is variable in character with differing degrees of erosion potential, ranging from 6 to 36 ft/year. Within this framework of erosion potential there have been three basic shoreline types identified: (1) soft marsh, 11.8 mi; (2) firm marsh, 6.0 mi; and (3) swamp, 4.7 mi. Swamp areas have proven to be the least vulnerable to erosion. The shore in these locales has held up remarkably well, given the intensity of the wave erosion process. Stumps and logs provide the presently observed relative shoreline stability, and the emplacement of a protective measure in these locales would probably harm the natural protection that the stumps and logs afford. Swamp areas should, for the most part, be left as is.

Firm marsh areas also provide some natural stability to the erosion process. It is debatable whether structural measures should be emplaced in these locales. Constructing erosional barriers would not, however, detract from the shore's natural ability to retard erosion. Selecting to protect the firm marsh areas will have to be based on cost/benefit relationships.

Soft marsh areas provide little resistance to the wave erosion process. Erosion rates in some locales are as high as 36 ft/year. There is no doubt that these areas need protection desperately.

### U. S. Army Corps of Engineers MRGO Test Sections

## Design and Cost

The USACE recently constructed and evaluated the performance of six erosion control test sections on the MRGO. The sections were located between stations 475 and 501 on the spoil bank side (southwest shoreline). The Corps conducted surveys both before and after construction to measure movements and settlements. Observations were made periodically to check for structural failures as well as causes of these failures. Two of the sections showed satisfactory results while others failed completely (USACE 1983b).

Case 2:05-cv-04182-SRD-JCW   Document 16510-94   Filed 11/20/08   Page 9 of 39

5-6

The construction plans called for following the alignment of the shoreline. How
during construction a straight alignment was maintained by cutting high area
filling low areas with shell. The first two sections consisted of a 36-in layer of g
stone on 6 in of shell bedding and a 36-in layer of this same stone on filter cloth.
average weight of each stone is 900 lbs, which was appropriately sized to resist f
from a 4-ft wave. The sections were each constructed with a 20-ft-wide
extending from approximately –4 ft NGVD to –1.0 or –0.5 ft NGVD (Figure 38).
purpose of the apron is to prevent the waves from undermining the embankment,
was constructed with a 1:4 slope up to a crest elevation of +5 ft NGVD. A
elevation, overtopping by the waves is unlikely, although some did occur. The
was concerned about this condition causing failure on the back side; how
observations have indicated that the overwash has built up the low areas in back
structure by depositing sediments.

Figure 39 shows a very large flat rock used with diameters as large as 3 ft. Fig
shows the straighter alignment with the apron slightly exposed at low tide. The
cloth used in the tests had an equivalent opening size (EOS) of 50 and less than 1
open area (this was the only fabric used in the testing). The Corps estimated the
of materials and construction for the rocked shell and filter cloth sections at $2
$279/linear ft, respectively.

The third section tested by the Corps consisted of 4-in-thick interlocking co
blocks called "Trilock" placed on filter fabric (Figure 41). The 12-ft-wide apr
constructed at elevation –4.0 ft NGVD with a 1:4 embankment slope and a cr
+4.0 ft NGVD. The estimated cost of this protection was $372/linear ft.

The forth and fifth test sections consisted of 18 in of grade "C" stone on 6 in c
and on filter cloth (Figure 42). The average weight of the stone is 100 lbs.
sections were constructed similarly to sections 1 and 2. The cost of these ar
shell and filter cloth sections were estimated at $135 and $147/linear ft, respect

The sixth type of protection tested was government furnished, articulated co
mat on filter cloth constructed very similarly to the concrete block
(Figure 43). The mats were approximately 3 in thick, 4 ft long, and 14 in wi
were tied together by wires passing through the concrete. The estimated cost
articulated concrete mat was $233/linear ft.

5-7



Figure 38.    Design of test sections 1 and 2, MRGO foreshore protection project (USACE 1982b).

5-8



Figure 39.    Photograph taken 27 March 1984 of test sections 1 and 2, MRGO
foreshore protection project.



**Figure 40.** Photograph taken 27 March 1984 of test sections 1 and 2, MRGO foreshore protection project.

NED-188-000001901

5-10



Figure 41.    Design of test section 3, MRGO foreshore protection project (USACE 1982b).

5-11



Figure 42.    Design of test sections 4 and 5, MRGO foreshore protection project (USACE 1982b).

5-12



Figure 43.   Design of test section 6, MRGO foreshore protection project (USACE 1982b).

5-13

## Effectiveness

Six test sections were evaluated and only the 36-in layer of large stone was proven to be structurally successful. The foundation settlements of the stone sections ranged from 0.5 ft to 1.2 ft with the heaviest section having the smallest settlement. This is an indication of the variation of the materials on which the sections were built and does not allow for a comparison of the filter cloth and shell bedding. Sections 3 and 4, which utilized an 18-in layer of smaller class "C" stone, did not survive the conditions on the MRGO. The Corps estimated that 30% of the stone was displaced from the shell section. Portions of the filter cloth section were left completely void of stone. The Corps speculated that the filter cloth used was too impermeable and contributed to failure of the one section. Since the stone was displaced on both sections, it was apparently too small to resist the wave forces when placed loosely on the shoreline.

The two sections of light weight materials, interlocking concrete blocks on filter cloth, and articulated concrete mat on filter cloth, were both destroyed by ship waves. These two sections apparently failed in the same mode which is related to the hydrostatic pressures resulting from drawdown and the turbulence of the return flow. The Corps has speculated that the filter fabric used in the tests was too impermeable and did not allow relief of the back pressure, causing uplifting forces and eventual failure. Figure 44 shows the displacement and undermining which occurred on the failed mat section. The Corps also felt that neither the mats nor the blocks were heavy enough to hold down the filter fabric; however, no mention was made of the permeability of the armor materials contributing to failure. Upon observing the design of the mats it appears that this contributed greatly to the failure of the section. These mats are built from impermeable concrete which is 14 in wide and 4 ft long. When placed on top of the filter cloth, they greatly reduce the area of the filter through which water can flow, thus increasing the back pressures. Although the Corps did not furnish details of the interlocking block design, it is likely that this same effect led to failure.

Upon analyzing the Corps data it is apparent that none of the test sections would be suitable for use on the northeast shoreline. The 36-in layers of stone that were successful on the southwest shore would show massive settlements on the compressible marsh soils of the northeast shoreline. Construction would be extremely difficult since the shoreline is low and discontinuous. Finally, the cost of this type of

5-14



Figure 44.    Photograph taken 27 March 1984 of failed test section 6, MRGO foreshore protection project.

5-15

protection is almost \$300/ft (\$1.5 million/mi). The 18-in layer of the smaller class "C" stone was more reasonable at about \$150/ft, but it failed structurally and apparently cannot withstand the wave action. The interlocking block section was the most expensive of all and showed the worst performance. The cost of the concrete mats was intermediate; however, this section also failed.

## Suggested Shoreline Protection Measures

### Measure 1: Heavy Duty Plastic Membrane Bulkhead

#### Design

The first control measure proposes that a bulkhead be constructed using heavy duty plastic membrane, pilings, and fill material. Cross-sectional and front views of Measure 1 are shown in Figures 45 and 46, respectively. In addition, cellular concrete mat is proposed to protect the lower shoreline adjacent to the structure. On the landward side, rock would be placed along the base of the structure.

The plastic membrane which is being proposed is a black material which does not destruct under sunlight and is of sufficient rigidity to support backfill. Two rows of treated timber pilings will be driven along the shoreline approximately 4 ft apart, and the timbers themselves would be spaced approximately 4 ft apart in each row. It appears that 20-ft-long pilings would be sufficient in most areas although the stability would need to be checked in the field. It is recommended that the pilings be driven until the top is at approximately +3.5 ft NGVD. These two rows would be cross-tied with cable for additional support.

The plastic membrane is installed vertically along the inside of the two rows of pilings and is held in place by timber planks which are nailed across the top of the pilings. A fill material would be placed between the two layers of plastic membrane, forming the interior of the structure. Several possibilities exist for fill materials. The most available material would be dredged spoil from near the shoreline; however, this type of material may cause serious problems in construction for several reasons. First, the dredged material would have a high water content which prevents compaction. Second, because of the water contained in the dredged material, the construction process is likely to be much slower because the material would need to be placed,

5-16



Figure 45.   Cross-sectional design of suggested shoreline protection Measure 1:   heavy duty plastic membrane bulkhead.

NED-188-000001908

5-17



Figure 46.   Front view design of suggested shoreline protection Measure 1: heavy duty plastic membrane bulkhead.

NED 188 000001000

5-18

allowed to consolidate, and then more material added.  Finally, the soils in
immediate area are marsh-type soils, which are generally inappropriate for backfill
The best material to use would be clamshell, because it will not undergo a la
amount of compaction after placement, and it is light-weight and readily available
rock material could also be used, but it must be fairly small so that large void spa
are not formed.  If earth material is used it is best if it is dry, coarse-grained soil.

The structure has a section of cellular concrete mat across the crest, which
prevent washout of the fill material.  (Rocks could be used as an alternative.)
cellular concrete mat is also proposed to protect the lower shoreline in front of
structure.  This material consists of precast concrete blocks which are approxima
1 ft square and weigh from 30 to 50 lbs.  The blocks are held together by polye
cables (for marine applications) which allow the mat to shift and settle when in pl
and prevent the blocks from being dislodged.  Also, the blocks have up to 25% c
area, which allows water movement and prevents hydrostatic pressures from buil
up.

On the landward side of the structure, rock would be placed along the base to prev
the wave overwash from eroding under the structure.  A high-strength filter fabri
proposed to be used between the marsh soil and the construction materials.
fabric performs several important functions.  First, it separates the marsh soil f
the construction materials, preventing the movement of materials down into
compressive marsh soil and thus preventing the excessive use of materials.  Sec
the fabric causes a uniform pressure distribution over the soil, limiting the amoun
consolidation; so the filter fabric must be strong to prevent ripping and tear
Finally, the filter fabric prevents the soil underneath from being washed out f
below the construction materials.

### Cost

The estimated cost of Control Measure 1 has been computed based on the approxir
amounts and expenses of the construction materials.  A breakdown of these cos
shown in Table 8.  Items such as hardware, which are not of significant cost, have l
ignored.  It should be realized that these are very rough estimates of the amounts
costs of materials compiled to indicate the amount of funding which would be requ
in a shoreline stabilization project on the MRGO.  The largest variable in this

5-19

| Table 8.  Estimated Cost for Control Measure 1. | |
| --- | --- |
| Treated Timber Pilings<br>at $37.50 each on 4-ft centers | $ 19 |
| Heavy Duty Plastic Membrane<br>12 ft$^2$ at $1/ft$^2$ | $ 12 |
| Cabled Armored Mat<br>15 ft$^2$ at $2.50/ft$^2$ | $ 38 |
| Clamshell<br>0.6 yd$^3$ at $13/yd$^3$ | $ 8 |
| Treated Planks<br>at $11.50 each | $ 4 |
| High strength filter fabric<br>20 ft$^2$ at $25/ft$^2$ | $ 5 |
| Total Materials | $ 86  /linear ft |
| Estimated Labor and Equipment | $ 60 |
| **Total** | **$146**  /linear ft |
| | ($770,880/linear mi) |

NED-188-000001044

5-20

analysis is labor and equipment. These costs vary according to the type and amoun
equipment and labor used, as well as the speed at which construction proceeds.
variable estimate of $60/linear ft is presented based on completion of 50 ft per
The material costs have also been presented as cost/linear ft so that they might
compared to other stabilization projects. The total cost of $146/linear ft is equiva
to approximately $0.75 million/mi.

### Benefits

### Light-Weight Materials

The materials used in Control Measure 1 were carefully selected to avoid exces
weight yet still have the rigidity to avoid washout. These types of materials
essential to having a structure which will survive for an extended time. If he
materials are used, settlements will occur over time and the structure can be dama
and fail. Of further benefit is the fact that less settlement occurs and theref
fewer materials are needed in construction. Using high-strength filter fabric
underlie the materials will reduce settlements even further.

### Minimal Excavation

Since much of the structure will be built in front of the shoreline, only mini
excavation will be necessary. The concrete mat can be laid on the lower shorel
without any preparation except removal of debris. The construction can therefore
performed from the MRGO without traveling on the marsh, preventing the further l
of marsh since heavy equipment movement would undoubtedly cause land loss.

### Use of Cabled Mat

The cellular concrete mat proposed to be used has advantages over compara
materials. First, the mats are easily transported, as they can be placed on a flat ba
and taken to the study area. Secondly, the installation requires only a hoist to lift
mats from the barge and lay them into position on the submerged shorel
Installation is therefore quick as well as easy. Furthermore, the mats are flexible
will adjust to the shoreline contours and to any settlements which may occur.

5-21

### Marsh Building

This control measure has an added attractiveness in that possibilities exist for the building of marsh. Most of the length of the structure will be built in front of the existing shoreline, resulting in enclosed, shallow water areas. At a future time dredged material can be placed in this area and marsh created. In some areas along the MRGO where the bench is shallow, it may be possible to reclaim significant amounts of marsh.

### Stabilization of Pilings

The pilings which are used in the structure provide stabilization because they are embedded into a more stable layer that exists at approximately -10 ft NGVD. These pilings will prevent the structure from being dislodged laterally. Without stabilization from the lower soil layer, serious structural problems can occur with differential settlement. The pilings serve the additional function of holding the concrete mat in place.

### Minimal Amount of Bulk Materials

This control measure utilizes only 0.6 yd$^3$ of bulk material/linear ft. This measure is extremely beneficial when transportation costs are considered, and advantageous because fewer materials must be placed, and labor and equipment time are saved.

### Problems

### Foundation Settlements

Although excessively heavy materials have been avoided in this control measure, some settlement will occur; the largest amount will be under the fill material (shell or earth). Foundation settlement does not occur entirely at once but rather over months or years. Since the amount of fill being used is not large, the settlements should not be large, probably not greater than 1 ft. The result of this settlement should not harm the structure; it will only cause the top of the fill to be lower than the pilings. But more fill material may eventually need to be added.

5-22

### Structure Height

The plastic membrane which is being used is limited to approximately a 5-ft vertic
height when used with the pilings. If the crest elevation is +3.5 ft NGVD, then t
base must be no lower than -1.5 ft NGVD. This may require that the structure
placed at the shoreline in areas where the water is deep. However, field observatio
have indicated that in most areas there is a very shallow bench area in front of t
marsh. More extensive surveys are required to determine the profiles along t
shoreline and to identify areas where water depth may cause problems.

## Measure 2: Armored Spoil Bank

### Design

The second control measure proposes that an armored bank be constructed near t
shoreline (Figure 47). The exact placement of structures in proximity to the shoreli
for either Control Measure 1 or 2 would be determined on the basis of more extensi
shoreline surveys. Structure placement will be limited largely by the depth of wat
and will also be controlled by the alignment of the shoreline and how much land m
be desired for reclamation. Measure 2 is an alternative to Measure 1; however, mar
of the same construction materials are being used since these materials are mo
suited for this environmental application.

This second measure varies from the first in the that an inclined bank is bein
established rather than a vertical bulkhead. As in the first plan, treated timber pilin
would be driven in a row along the shoreline with approximately 5 ft of spacing. A
additional row of pilings installed landward would serve as anchors for support cabl
to reinforce the structure against water pressures built up during drawdown.

The heavy duty plastic membrane would be placed on the inside of the pilings ar
secured in place with wooden planks as before, forming the back side of the armore
bank. The plastic membrane and pilings are being used to conserve materials an
lower costs. Alternatively, the armored bank could be built symmetrically with a bac
slope identical to the front. However, the pilings should be installed regardles
because cellular concrete mat will be tied to the pilings to prevent the mat fro
sliding out of place.

Case 2:05-cv-04182-SRD-JCW   Document 16510-94   Filed 11/20/08   Page 26 of 39



Figure 47.    Cross-sectional design of suggested shoreline protection Measure 2:  armored spoil bank.

NED 188 000001015

5-24

High strength filter fabric will be used, as in the first control measure, to underlie the construction materials. It is very important that this be used in this particular control measure to limit settlements and avoid excessive amounts of materials because more weight and larger amounts of materials are inherent in this design. As in the first measure, the best fill material would be clamshell. Any type of dredged spoil other than course material, such as sand, would be unacceptable because it cannot be contained to consolidate. On top of the fill material would be the cellular concrete mat which was described previously. Between the mat and the fill there would be filter fabric to prevent washout of the fill material. It is estimated that the mat would need to be 20 ft long based on a slope no flatter than 3:1. This mat would be tied to the pilings at the crest of the structure and extend past the toe of slope. As with the previous plan, rock would be placed on the landward side to prevent erosion from wave overwash.

### Cost

The cost of Measure 2 has been estimated on the same basis as Measure 1 and is shown in Table 9. The labor and equipment costs are again estimated to be $60/linear ft. There would undoubtedly be differences in these costs between the two measures, but for this analysis they are assumed equal since the rate of construction and the type of equipment and labor to be used are unknown.

### Benefits

#### Minimal Excavation

The structure would be built primarily in front of the shoreline as was the case in Measure 1, thus eliminating the need for land forming. The pilings and plastic membrane would be put into place to form the back of the structure, the high-strength filter fabric would be laid on the submerged shoreline, and fill would be dumped up to the necessary grade. Then, the only excavation that would be required would be removal of debris such as stumps or brush which would prevent the filter fabric from laying flat.

5-25

| Table 9. Estimated Cost for Control Measure 2. | |
| --- | --- |
| Treated Timber Pilings<br>at $37.50 each on 5-ft centers | $ 15 |
| Heavy Duty Plastic Membrane<br>6 ft$^2$ at $1/ft$^2$ | $ 6 |
| Cabled Armored Mat<br>20 ft$^2$ at $1 ft$^2$ | $ 50 |
| High Strength Filter Fabric<br>20 ft$^2$ at $.25/ft$^2$ | $ 5 |
| Clamshell<br>1.2 yd$^3$ at $13/yd$^3$ | $ 15 |
| Treated Planks<br>at $11.50 | $ 2 |
| Total Materials | $ 93 /linear ft |
| Estimated Labor and Equipment | $ 60 |
| Total | $153 /linear ft |
| | ($807,840/linear mi) |

NED-188-000001917

5-26

### Use of Cabled Mat

The same advantages described previously apply to this control measure. Because a larger width of mat is being used in this measure, the ease of transportation and placement becomes even more attractive.

### Marsh Building

The same possibilities exist for creation of marsh as were mentioned previously. The structure would be placed at some distance from the shoreline and then this enclosed area could later be made into marsh.

### Stabilization of Pilings

In this structure the pilings again are an advantage because of the support against lateral movement. Thus the structure will remain stationary and not dislodge by movement. As the foundation settles, the pilings will prevent the concrete mat from sliding out of place.

### Problems

### Foundation Settlements

Control Measure 2 is more subject to the settlement of the foundation because of the greater weight of the fill materials. The effects of this settlement on the structure are difficult to determine. As the fill material becomes lower in elevation, the cabled mat will settle accordingly, except near the crest of the structure where the mat is tied to the pilings. At this point, space may develop between the fill and the mat because the tieback to the pilings will prevent the mat from completely settling on top of the fill. A possible solution would be to tie the mat loosely to the pilings to allow settlement. However, if the mat moves too far away from the pilings the fill material may wash out from wave overtopping. Field tests would be the best solution to determining the settlement problems and how to best build the structure.

5-27

### Bulk Materials and Placement

One major disadvantage with control Measure 2 is the greater amount of bulk materials that will be required. Both transportation costs and construction costs will increase as a result of using this amount of bulk material. It should be realized, however, that clamshell is being recommended. Additionally, the quantity of shell to be used is much less than the amount of rock the Corps used. The placement of the clamshell fill may, however, cause problems. It is proposed that the clamshell be dumped along the pilings so that a smooth slope will exist for placement of the mats. The clamshell may not form a slope as well as is expected, particularly since part of the slope will be submerged. Some forming may be required after placement to assure a uniform slope so that the mats may be laid as flat as possible.

### Structure Height

The same problems exist with the allowable height of the structure as were presented for measure 1; the height is limited to approximately 5 ft because of the plastic membrane material being used on the backside. Surveys will be required along the bench area to determine the location of the structure.

### Measure 3:  Vessel Speed Limits

#### Design

There is no speed limit on the MRGO. The present speeds of oceangoing vessels range from 12 to 17 mi/hour, with an average speed of 14 mi/hour (data from Vessel Traffic Service, U.S. Coast Guard). These typical vessel speeds fall within the range of significant wave height, whereby the damaging transverse waves increase geometrically in proportion to vessel speed (see Chapter 4). If vessels on the MRGO reduce their speed, say to 10 mi/hour, the transverse wave phenomenon could be substantially reduced in magnitude, and thus erosion would be reduced.

There is a shared myth among laymen and some governmental agencies that large displacement vessels must travel at oceangoing speeds in order to maintain steerage. The United States Coast Pilot states: "it is understood, however, that ships must maintain sufficient headway [in the MRGO] at all times in order that the vessel

can be controlled" (U.S. Dept. of Commerce 1983). In reality, ships on the MRGO do at times go "dead slow" and sometimes even come to "full stop." Dead slow is commonly selected in danger situations and when vulnerable shore facilities are passed (Hoobler 1984). Full stop conditions are sometimes met when a pilot is exchanged. It is true that steerage generally is improved with faster speeds, but it is entirely incorrect to suggest that oceangoing vessels cannot go "dead slow." Money is the overriding reason that ships travel as fast as possible: the faster they go, the quicker they get there. In fact, a vessel speed limit of 10 mi/hour has been imposed in at least one commercial channel situation, the Great Lakes connecting channels (USACE 1983a).

All oceangoing vessels have four forward engine speeds: Full Ahead, Half Ahead, Slow Ahead, and Dead Slow. The actual ship speed associated with each engine speed depends on vessel design and environmental conditions. Ships in the MRGO commonly travel at Full Ahead and Half Ahead, resulting in the common range of 14 to 17 mi/hour. Dead Slow is typically 5 mi/hour for bulk carriers and 10 mi/hour for large displacement container ships (Hoobler 1984). Large displacement container ships could not be forced to travel slower than 10 mi/hour. Bulk carriers could travel below 10 mi/hour, but given that they are smaller displacement vessels and thus producers of smaller waves, it may be prudent to suggest that they also abide by a 10 mi/hour speed limit. It is expected that the overall 10 mi/hour limit would effectively reduce wave heights to half their present average. Thus a 10 mi/hour speed limit would reduce shoreline erosion by approximately one half.

### Cost

The cost of the speed-limit protective measure would fall squarely on shipping concerns. Typical oceangoing commercial vessels cost approximately $3,000/hour to operate (New Orleans Dock Board 1984). The typical transit through the study area (22.5 mi from Bayou Bienvenue to Bayou La Loutre) at the average speed of 14 mi/hour takes 1.6 hours to complete. In other words, it typically costs shipping $4,800 for each transit. If a 10 mi/hour speed limit were imposed, it would take 2.3 hours for a transit, and thus a cost of $6,900; the cost difference per ship is $2,100. Assuming an average of three oceangoing vessels a day (see Chapter 3), the daily increased shipping cost would be $6,300. In conclusion, the annual cost of a 10 mi/hour

5-29

speed limit through the study area is $2,300,000. This cost could be reduced if the speed limit was imposed only in selected areas, such as in the soft marsh zones only.

### Benefits

The direct benefit of a speed limit would be reduced wave activity and thus reduced shoreline erosion. It is expected that such a measure would reduce erosion by one half. A corollary benefit would be increased safety to small boats.

### Problems

Erosion will not be completely checked; it will only be reduced. Further, the impact on shipping concerns may be significant, to the point that shipping companies may select to transit in other locations. Thus the MRGO, which is already a waterway fraught with economic problems, may be reduced to a totally uneconomical shipping channel.

## Measure 4:  Channel Enlargement

### Design

Much of the extreme ship wave activity experienced on the MRGO is attributed to the design of the channel itself. The MRGO is a "restricted" waterway, given that the channel is only 500 ft wide and 36 ft deep. The restricted nature generates an exaggerated displacement effect during ship passage, causing transverse waves to be greatly enlarged (see Chapter 4). If the channel were deepened and widened (say to a 50-ft depth and a 750-ft width), the channel would be less of a restricted waterway and wave size would be proportionally reduced. In short, enlarging the channel reduces the erosive forces.

### Cost

To be a viable measure, the whole MRGO would have to be enlarged. The MRGO canal, as it exists now, has cost the Federal government $406 million and the non-federal concerns $151 million (1979 dollars as defined by USACE 1981). Therefore, the total cost of the MRGO has thus far been $557 million. It is expected that an equal

5-30

amount of money would be necessary if any sizeable channel enlargement were constructed.

### Benefits

Erosion along the new shoreline after dredging would decrease, possibly by one half. Reduced maintenance dredging would be a corollary benefit, because with less erosion, less material would find its way to the channel bottom. A major boom to the shipping industry might also occur. Deeper draft vessels could make passage, and large ships could pass one another in safety.

### Problems

This shoreline protection measure is, in a sense, contradictory to the goals of marsh preservation. In order to gain the advantage of reduced erosion rates, marsh must be excavated in order to build the channel. In the short term, heavy land loss will occur through dredging. Furthermore, erosion rates would only be reduced, not halted. Finally, the ecological disaster that occurred from saltwater intrusion caused by the present MRGO channel could only be enhanced by channel enlargement. In short, channel enlargement should not be seriously considered if the sole objective is to mitigate shoreline erosion.

# CHAPTER 6: CONCLUSIONS AND RECOMMENDATIONS

This study has reviewed and researched numerous environmental parameters that affect the erosion on the northeast shore of the MRGO. The goal has been first to understand all causal factors affecting erosion, and second, to develop viable means for protecting the shore from future loss. The environmental analysis has involved such diverse subjects as geology, subsidence, salinity, water levels, tidal currents, vegetation, dredging, ship waves, and soils. Of the above, it has been determined that ship waves and soils are by far the most important factors in erosion of the shore.

Ship waves are variable according to size, speed, and design of ships. Marsh substrate, the dominant soil type along the MRGO, is extremely weak in nature and is, therefore, highly subject to erosion by the ship waves. Variations in soil types do exist though, and as such, erosion potential varies from 6 to 36 ft/year. Of the three soil types discussed—soft marsh, firm marsh, and swamp—soft marsh has proven to be the most extensive and most vulnerable to erosion. Firm marsh is intermediate in its ability to resist erosion, and swamp soil proves to be the least vulnerable to erosion.

Four protective measures have been developed for specific use on the MRGO. Measure 1, the heavy duty plastic membrane bulkhead and Measure 2, the armored spoil bank, are specific structural measures recommended for possible use. These measures were uniquely designed for the environmental conditions on the MRGO. They both incorporate deep seated pilings for a firm, suspended foundation and light weight materials for wave protection. These two measures are very similar in design. It is suspected that Measure 1 will be better suited because it incorporates less fill material, and thus less foundation-related problems. In reality, Measures 1 and 2 serve best as basic models from which other generically related measures can be formulated. In fact, a variety of measures should be designed and tested on the MRGO shore. Keep in mind that the Corps had six test sections on the southwest shore, and that four of these were judged to be complete failures.

With enough field testing, eventually a single structural measure will prove to be effective in erosion control. Then plans can be made to protect large sections of the MRGO. Soft marsh areas should be given high priority; firm marsh areas should be given secondary priority; and swamp shorelines, which are naturally stable, need not be protected at all.

6-2

Once large sections are emplaced, attention can then be given to the possibility of marsh restoration in the interior areas. Fill can be placed to marsh elevation in open bodies of water. The shoreline structure will allow fill material to be free from washout. Also, because the structures will retard saltwater intrusion, newly filled areas, as well as marshes that had not yet succumbed to land loss, will probably revert to less saline conditions.

Two nonstructural control measures have also been presented in this report. A vessel speed limit of 10 mi/hour (Measure 3) has been proposed as a viable method of reducing ship wave heights. Channel enlargement (Measure 4) is presented as a possible technique for reducing wave heights by altering the hydraulic properties of the present MRGO. It is not known whether either of these measures can be implemented given that they are very dependent on political and economic factors. Further, neither of these measures provides a complete solution, for shoreline erosion could only be reduced, not halted. The greatest value these measures present is realized only in concert with specific application of structural measures. For example, a vessel speed limit would be most successful if applied with a structural measure, thereby relaxing the design criteria for the structural measure and reducing its cost.

On a final note, it is conceivable that channel enlargement, if appropriately applied, could be used to the benefit of many concerns. The obvious shipping benefits are increased safety and greater economic viability. Erosion control could be enhanced in a variety of ways: (1) wave activity for each ship would be lessened; (2) the newly cut shore would be straighter, thus allowing for a more easily constructed shoreline control measure; and (3) dredge material would become available for marsh reclamation use.

The goals of this report have been both to define the causal factors of land loss in the region and to propose viable protective measures that would reduce land loss. The time has now come to select a measure (or measures), acquire funding for implementation, and proceed to protect the wetlands that remain.

# REFERENCES

Adams, R.D., B.B. Barrett, J.H. Blackman, B.W. Gane, and W.G. McIntire
1976    Barataria Basin:  Geologic processes and framework.  Center for Wetland
Resources, Louisiana State University, Baton Rouge.  Sea Grant Publication
No. LSU-T-76-006.  117 pp.

Brebner, A., P.C. Helwig, and J. Carruthers
1966    Waves produced by oceangoing vessels:    a laboratory field study.
Proceedings, Tenth Conference of Coastal Engineering, Vol. 1, pp 445–459.

Chatry, F.M.
1984    Letter to J.A. Stephens.  12 January 1984.  U.S. Army Corps of Engineers,
New Orleans District.

Coastal Environments, Inc.
1972    Environmental baseline study, St. Bernard Parish, Louisiana.  Baton Rouge,
La.  148 pp.

1976    Resource management: the St. Bernard Parish wetlands, Louisiana.  Baton
Rouge, La.  67 pp.

Frazier, D.E.
1967    Recent deltaic deposits of the Mississippi River:  their development and
chronology.  Transactions, Gulf Coast Association of Geological Societies,
Vol. 17, pp 287–311.

Froude, W.
1877    Experiments upon the effect produced on the wave making resistance of
ships by length of parallel middle body.  Transactions, Institute of Naval
Architects, vol. 18, pp 77–87.

Gagliano, S.M., and J.L. van Beek
1970    Geologic and geomorphic aspects of deltaic processes, Mississippi delta
system.  Louisiana State University Center for Wetland Resources, Baton
Rouge.  Hydrologic and Geologic Studies of Coastal Louisiana, Report No. 1.

Havelock, T.H.
1908    The propogation of groups of waves in dispersive media, with applications to
waves on water produced by a travelling disturbance.  Proceedings, Royal
Society of London, Vol. A, pp 398–430.

Hay, D.
1968    Ship waves in navigable waterways.  Proceedings, Eleventh Conference of
Coastal Engineering, Vol. 2, pp 1472–1487.

Hoobler, Capt. D.
1984    Personal communication.  Cresent River Port Pilots Association.

Hunt, Col. R.L.
1972    Letter to A. Neff, 20 April 1972.  U.S. Army Corps of Engineers, New
Orleans District.

R-2

Johnson, B.M.
    1966   Shoaling problems on the Mississippi River Gulf Outlet. U.S. Army Corps of Engineers, New Orleans District. 11 pp and 6 plates.

Johnson, J.W.
    1958   Ship waves in navigation channels.  Proceedings, Sixth Conference of Coastal Engineering, Vol. 40, pp 666-690.

————   1968   Ship waves in shoaling waters. Proceedings, Eleventh Conference of Coastal Engineering, pp 1488-1498.

Kelvin, L.
    1887   On ship waves.  Proceedings, Institute of Mechanical Engineers, London, pp. 409-433.

Kolb, C.R.
    1958   Geological investigation of the Mississippi River Gulf Outlet Channel, U.S. Army Corps of Engineers, Waterways Experiment Station, Vicksburg, Mississippi. Misc. paper 3-259. 22 pp.

Kolb, C.R. and J.R. van Lopik
    1958   Geology of the Mississippi River deltaic plain, Southeast Louisiana. U.S. Army Corps of Engineers, Waterways Experiment Station, Vicksburg Mississippi. Technical Report 3-483. In two volumes.

Lee, Lt. Col. W.E., Jr.
    1972   Letter to A. Neff, 5 July 1972. U.S. Army Corps of Engineers, New Orleans District.

New Orleans Dock Board
    1984   Personal Communication.

Rounsefell, G.
    1964   Preconstruction study of the fisheries of the estuarine areas traversed by the Mississippi River Gulf Outlet project.  U.S. Fish and Wildlife Service Fisheries Bulletin 63(2):373-393.

Saucier, R.T.
    1963   Recent geomorphic history of the Pontchartrain basin.  Louisiana State University Studies, Coastal Studies Service No. 9.  114 pp.

Sorenson, R.M.
    1969   Waves generated by a model ship hull.  Journal of the Waterways and Harbors Division, American Society of Civil Engineers 95:513-538.

U.S. Army Corps of Engineers
    1960-  Waterborne Commerce of the United States, calender year (1960-1981), Part
    1981   2, Waterways and Harbors, Gulf Coast, Mississippi River System and Antilles. Fort Belvoir, Virginia. In 21 volumes.

————   1961   Mississippi River Gulf Outlet. Pamphlet, September.

R-3

U.S. Army Corps of Engineers

1970- Stages and discharges of the Mississippi River and tributaries and other
1979  watersheds in the New Orleans District for (1970-1979) Mississippi River
      Commission, Vicksburg, Mississippi. In 10 volumes.

1972  Hurricane study, history of hurricane occurrences along coastal Louisiana.
      New Orleans District. 43 pp with plates.

1981a Water resources development in Louisiana, 1981. Lower Mississippi Valley
      Division, Vicksburg, Mississippi. 142 pp.

1981b Deep draft access to the ports of New Orleans and Baton Rouge, Louisiana,
      Vol. 3, Technical Appendices. New Orleans District.

1982a Mississippi River Gulf Outlet hydrographic survey July 2-27, 1982. New
      Orleans District, File No. J-15-29481. In 29 sheets.

1982b MRGO Foreshore Protection Test Section plans. New Orleans District, File
      No. H-8-29439. 10 plates.

1983a Effect of vessel size on shore structure damage along the Great Lakes
      connecting channels. Detroit District, Special Report 83-11. 62 pp.

1983b Interim evaluation report, MRGO test sections. New Orleans District.
      17 pp.

1984  Notice of findings, Louisiana coastal area, shore and barrier erosion, Initial
      Evaluation Study. New Orleans District. 12 pp.

U.S. Department of Commerce
1983  United States Coast Pilot, Atlantic Coast: Gulf of Mexico, Puerto Rico, and
      Virgin Islands. National Oceanic and Atmospheric Administration, National
      Ocean Service, Washington, D.C.

1984  Tide tables, east coast of North and South America. National Oceanic and
      Atmospheric Administration, National Ocean Service, Rockville, Maryland.
      285 pp.

Watson, C.C.
1982  An assessment of the lower Mississippi River below Natchez, Mississippi.
      Ph.D. Dissertation. Department of Civil Engineering, Colorado State
      University, Fort Collins, Colorado. 162 pp.

R-4

Wicker, K.M., G.J. Castille, III, D.J. Davis, S.M. Gagliano, D.W. Roberts, D.S. Sabins, and R.A. Weinstein
    1982   St. Bernard Parish:  A study in wetland management.  Coastal Environments, Inc., Baton Rouge, Louisiana.  132 pp.