UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

In Re:  KATRINA CANAL BREACHES          §          CIVIL ACTION
   CONSOLIDATED LITIGATION          §          NO. 05-4182 "K" (2)
               §          JUDGE DUVAL
_____§          MAG. WILKINSON
               §
PERTAINS TO: MRGO, Robinson (06-2268)   §
_____§


DEFENDANT UNITED STATES' MEMORANDUM OF LAW IN SUPPORT
OF DEFENDANT'S RENEWED MOTION TO DISMISS FOR
LACK OF SUBJECT MATTER JURISDICTION OR, IN
THE ALTERNATIVE, FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

PAGE

STATEMENT OF MATERIAL FACTS AS TO WHICH
THERE IS NO GENUINE DISPUTE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

I.   THE DISCRETIONARY FUNCTION EXCEPTION PROTECTS THE CORPS' DESIGN,
     CONSTRUCTION, OPERATION, REPAIR, AND MAINTENANCE OF THE MRGO. . . . . . . . . . . . . 14

     A.   APPLICATION OF THE DFE IS DETERMINED BY A TWO-PART TEST. . . . . . . . . . . . . 14

     B.   THE SECOND PART OF THE DFE TEST REQUIRES AN ABSTRACT
          ANALYSIS OF THE CONDUCT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

     C.   THE DFE APPLIES TO ACTS THAT ARE OPERATIONAL AND THAT
          IMPLEMENT AGENCY PROGRAMS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

     D.   NEGLIGENCE IS IRRELEVANT TO THE DFE TEST. . . . . . . . . . . . . . . . . . . . . . . . . 26

     E.   BOTH PRONGS OF THE DFE TEST ARE SATISFIED. . . . . . . . . . . . . . . . . . . . . . . 27

     F.   DECIDING HOW TO ADDRESS PROBLEMS REQUIRED THE EXERCISE OF
          POLICY-BASED DISCRETION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

II.  THE FTCA'S DUE CARE EXCEPTION ALSO BARS PLAINTIFFS' CHALLENGE
     TO THE CORPS' DESIGN, CONSTRUCTION, OPERATION, REPAIR, AND
     MAINTENANCE OF THE MRGO BECAUSE THOSE ACTIVITIES WERE
     "SUBSTANTIALLY IN ACCORDANCE WITH THE RECOMMENDATION OF
     THE CHIEF OF ENGINEERS" AND WERE THEREFORE IN ACCORDANCE
     WITH PUBLIC LAW 84-455. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

i

# TABLE OF AUTHORITIES

## FEDERAL CASES

*ALX El Dorado, Inc., v. Southwest Savings & Loan Association*, 36 F.3d 409
(5th Cir. 1994) ........................................................................................... 15

*Andrade v. Chojnacki*, 338 F.3d 448 (5th Cir. 2003), *cert. denied,* 541 U.S. 935 (2004) .......... 14

*Autery v. United States*, 992 F.2d 1523 (11th Cir. 1993) ..................................... 25, 27

*Baldassaro v. United States*, 64 F.3d 206 (5th Cir. 1995), *cert. denied,* 517
U.S. 1207 (1996) ........................................................................................ 14, 15

*Bean Horizon Corp. v. Tenn. Gas Pipeline Co.*, 1998 WL 113935 (E.D. La. 1998) ................ 28

*Berkovitz v. United States*, 486 U.S. 531 (1988) ....................................................... 15

*Boston Edison Co. v. Great Lakes Dredge & Dock Co.*, 423 F.2d 891 (2d Cir. 1970) ............. 27

*Buchanan v. United States*, 915 F.2d 969 (5th Cir. 1990) .................................... 35, 44

*Butler v. United States*, 726 F.2d 1057 (5th Cir. 1984) ............................................ 20

*City of Bangor v. Citizens Commc'n Co.*, 2004 WL 483202 (D.Me.Mar. 11, 2004) ............... 28

*Dalehite v. United States*, 346 U.S. 15 (1953) ................................................. *passim*

*Denham v. United States*, 834 F.2d 518 (5th Cir. 1987) ...................................... 16, 20

*E. Ritter & Co. v. Department of the Army*, 874 F.2d 1236 (8th Cir. 1989) ...................... *passim*

*Eazor Express, Inc. v. United States*, 611 F. Supp. 197 (E.D.N.Y. 1985) ..................... 28, 31

*F. & M. Schaefer Breweing Co. v. United States*, 121 F. Supp. 322 (E.D.N.Y. 1954)................ 28

*Fisher Brothers Sales, Inc. v. United States*, 46 F.3d 279 (3d Cir. 1995)....................................18

*Gaubert v. United States*, 885 F.2d 1284 (5th Cir. 1989), *rev'd,* 499 U.S. 326 (1991) ..........20, 21

*Harrell v. United States*, 443 F.3d 1231 (10th Cir. 2006)............................................................17

*Indian Towing Co. v. United States*, 350 U.S. 61 (1955) ............................................. 19

*In re Lloyd's Leasing, Ltd.,* 764 F. Supp. 1114, 1137-38 (S.D. Tex. 1990) .................................28

*Kennewick Irrigation District v. United States*, 880 F.2d 1018 (9th Cir. 1989) ........17, 23, 24, 25

*Kiehn v. United States*, 984 F.2d 1100 (10th Cir. 1993) ........................................................ 17

*Lesoeur v. United States*, 21 F.3d 965 (9th Cir. 1994) ............................................................ 17

*Lively v. United States*, 870 F.2d 296 (5th Cir. 1989) .......................................................... 16, 26

*Logue v. United States*, 412 U.S. 521 (1973) ........................................................................ 31

*Lopez v. United States*, 376 F.3d 1055 (10th Cir. 2004) ........................................................ 17

*Macharia v. United States*, 334 F.3d 61 (D.C. Cir. 2003) ...................................................... 17

*Montijo-Reyes v. United States*, 436 F.3d 19 (1st Cir. 2006) ................................................ 28

*National Union Fire Ins. v. United States*, 115 F.3d 1415 (9th Cir. 1997), *cert. denied,* 522 U.S. 1116 (1998) ........................................................................................................ 32, 33

*Northlight Harbor, LLC v. United States*, Civ. A. No. 06-3171, 2008 WL 2516452 (D.N.J. June 25, 2008) .................................................................................................... 28

*Payton v. United States*, 679 F.2d 475 (5th Cir. 1982) .......................................................... 20

*Rayonier, Inc. v. United States*, 352 U.S. 315 (1957) ............................................................ 19

*Rich v. United States*, 119 F.3d 447 (6th Cir. 1997), *cert. denied,* 523 U.S. 1047 (1998) ......... 15

*Richardson v. United States*, 943 F.2d 1107 (9th Cir. 1991) .................................................... 17

*Rosebush v. United States*, 119 F.3d 438 (6th Cir. 1997) ........................................................ 26

*Seaboard Coast Line R.R. Co. v. United States*, 473 F.2d 714 (5th Cir. 1973) ........................ 19

*Smith v. Johns-Manville Corp.*, 795 F.2d 301 (3d Cir. 1986) .................................................. 17

*United States v. Gaubert*, 499 U.S. 315 (1991) ................................................................ *passim*

<u>*United States v. Orleans*</u>, 425 U.S. 807 (1976) .......................................................... 31

*United States v. Ure*, 225 F.2d 709 (9th Cir. 1955) ................................................................ 23

*United States v. Varig Airlines*, 467 U.S. 797 (1984) ...................................................... 15, 16, 26

iii

*Welch v. United States*, 409 F.3d 646 (4th Cir. 2005), *cert. denied,* 546 U.S. 1214 (2006) ........................................................................................ *passim*

*Williams v. United States*, 2007 WL 2261559 (D.N.J. Aug. 2, 2007) ....................................... 28

*Wiggins v. United States*, 799 F.2d 962 (5th Cir. 1986) ........................................... 20

*Wysinger v. United States*, 784 F.2d 1252 (5th Cir. 1986) ......................................... 20

## FEDERAL STATUTES

33 U.S.C. § 426i ............................................................................................... 14

33 U.S.C. § 541 ................................................................................................ 33

33 U.S.C. § 702 ................................................................................................ 21

28 U.S.C. § 2671 .............................................................................................. 31

28 U.S.C. §2680. ...................................................................................... *passim*

Public Law Number 84-455, 70 Stat. 65 (1956) ........ ..............................................*passim*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: KATRINA CANAL BREACHES | § | CIVIL ACTION |
| CONSOLIDATED LITIGATION | § | NO. 05-4182 "K" (2) |
| | § | JUDGE DUVAL |
| _____ | § | MAG. WILKINSON |
| | § | |
| PERTAINS TO: MRGO, *Robinson* (06-2268) | § | |
| _____ | § | |

**DEFENDANT UNITED STATES' MEMORANDUM OF LAW IN SUPPORT
OF DEFENDANT'S RENEWED MOTION TO DISMISS FOR
LACK OF SUBJECT MATTER JURISDICTION OR, IN
THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

In this negligence action, Plaintiffs seek to impose liability on the United States for

damage allegedly caused by the Mississippi River-Gulf Outlet. Plaintiffs complain that the

Army Corps of Engineers, through its design, construction, operation, repair, and

maintenance of this deep-draft shipping channel, created and perpetuated two "defective

conditions": "(1) the destruction of the marshlands surrounding the MR-GO that intensified

a huge east-west storm surge" during Hurricane Katrina and (2) "the funnel effect . . . that

accelerated the force and strength of the [hurricane-induced] storm surge . . . ." First Am.

1

Compl. ¶¶ 1, 102 [hereinafter FAC].   Plaintiffs have not, however, been able to adduce any

evidence that this channel could have been designed, built, and maintained *as the law*

*required—i.e.,* "substantially in accordance with the recommendation of the Chief of

Engineers," Pub. L. No. 84-455, 70 Stat. 65 (1956) (Ex. 1)—*without producing the effects of*

*which they complain.*   Indeed, their entire case depends on computer-assisted numerical

analyses of a hypothetical scenario in which the forces of Hurricane Katrina were imposed

*on a land and seascape from which the MRGO had been eliminated entirely*.   Plaintiffs were

forced to eliminate the channel because the "destruction of the marshlands" and the "funnel

effect" could not be eliminated in any other way.   These so-called "defective conditions"

were ineradicable results of the Chief's choice of what he considered to be the best route

from New Orleans to the Gulf of Mexico.

The Division Engineer's report, which formed the basis of the Chief's

recommendation and described the proposed channel in some detail, noted that the

waterway would "*necessarily* traverse[] marshlands."  H.R. Doc. No. 82-245 at 33 (¶ 49)

(1951) (Chief of Engineers Report to Congress) (Ex. 2) (emphasis added) [hereinafter Chief's

Report].  The so-called "funnel" resulted from the Chief's decision to expand the existing

Gulf Intracoastal Waterway from the Inner Harbor Navigation Channel to a point near

Michoud and then have the deep-draft channel strike off in a southeasterly direction "to and

along the south shore of Lake Borgne and through the marshes" to the Gulf of Mexico.

*Id.* at 5.  Further, the features that Plaintiffs say were necessary to eliminate the supposedly

harmful hydraulic effects, namely, surge barriers and bank protection, not only were not mentioned in the Chief's report or any of the accompanying letters and memoranda submitted to Congress but were positively excluded.  The Division Engineer's report informed Congress that "[c]onstruction and maintenance of inland sections of such a channel involve *only* routine dredging operations."  *Id.* at 33 (emphasis added).

In sum, the channel that Plaintiffs contend should have been designed, constructed, and maintained—the *only* channel, in Plaintiffs' view, that would have comported with the exercise of "due care"—was a different channel from the one that the Chief of Engineers recommended and that Congress directed the Corps to construct.  A shipping channel designed and constructed with surge barriers and "armored" banks would not have been either the channel described in the Chief's report or one that could fairly be characterized as "substantially in accordance with" it.

Two considerations militated against changing the project after authorization to add surge barriers and bank protection.  First, neither feature would have furthered the purpose of the project.  The project was authorized as an aid to navigation, on the view that an additional shipping channel between the Port and the Gulf would yield commercial benefits and facilitate the national defense.  *See id.* at 4, 17.  Second, and more important, the addition of these features would have invalidated the cost-benefit calculations that were an

3

essential underpinning of the Chief's recommendation that construction be authorized.[1]
*See id.* at 41; *cf. id.* at 2-3 (comments of Bureau of the Budget).

By contending that "due care" required that the shipping channel be constructed and maintained with "armored" banks and surge barriers, and by asserting that the Chief's choice of the best route was one that entailed the creation of "defective conditions," Plaintiffs are effectively challenging the validity of Public Law 84-455, which required the Corps to implement the recommended plan.  But these claims are barred by both parts of 28 U.S.C. § 2680(a), the due care exception and the discretionary function exception of the Federal Tort Claims Act.

The discretionary function exception also bars Plaintiffs' claims that improper dredging contributed to the widening of the channel and that the Corps abused its discretion by choosing to install bank protection only where doing so was considered to be a more economical method of maintaining the channel's prescribed depth and width than dredging alone.  How to maintain the channel's depth and width to ensure that ships could continue to carry goods and materials to and from domestic and international markets was assuredly a matter of judgment and choice within the Corps's ken.

_____

[1]The massive gated barrier that is about to be constructed (in the very location that Plaintiffs contend it ought to have been constructed to counteract the MRGO) is a component of the new and improved hurricane protection system that was authorized after Katrina, as a result of the failure of the previously authorized inadequate and underfunded Lake Pontchartrain and Vicinity Hurricane Protection Project [hereinafter LPVHPP]. Remarkably, this single structure, with a present price tag exceeding $1,000,000,000 (far more than was spent on the entire LPVHPP and the MRGO combined) is considered necessary even though the MRGO is now defunct.

The "destruction" of wetlands did not result from ignorance or indifference.  The Corps long recognized the value of wetlands and sought to preserve them insofar as it could do so under the legal authorities that directed its activities.  Had "armoring" both banks of the entire inland reach of the MRGO been, in the Corps's estimation, the most economical means of maintaining the channel at its authorized dimensions, or had "armoring" the MRGO been authorized by any other law, the Corps would not have hesitated to do so.  But in the Corps's judgment, there was no authority, much less funding, for the construction and maintenance of bank protection unless such an undertaking would be the most economical method of maintaining the MRGO.

There is no evidence that this was an error in judgment.  But even if there were such an error, the Corps's judgment in this regard would not be actionable under the FTCA.  No statute or regulation proscribed the use of dredging for channel construction or maintenance, nor did any legal authority prescribe the methods, locations, and times of dredging.  Likewise, no statute or regulation mandated bank protection.  Such decisions were within the discretion afforded the Corps in carrying out Public Law 84-455.  And it is surely true that the maintenance of the MRGO, no less than its design and construction, was driven by the congressional conviction that a deep-draft shipping channel from the Port of New Orleans to the Gulf of Mexico would be a boon to commerce and a benefit to the national defense.  Decisions about how to create the deep-draft channel and keep it open furthered those ends.

For all of these reasons, this action should be dismissed for lack of subject-matter jurisdiction, pursuant to Rule 12(b)(1) or, alternatively, a summary judgment in favor of defendant should be entered under Rule 56, Fed. R. Civ. P.

## STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE DISPUTE

The construction of the Mississippi River-Gulf Outlet was authorized by Public Law Number 84-455. 70 Stat. 65 (1956) (Ex. 1). The law required that construction "be prosecuted under the direction of the Secretary of the Army and supervision of the Chief of Engineers, substantially in accordance with the recommendation of the Chief of Engineers contained in House Document Numbered 245, Eighty-second Congress." *Id.* Congress had asked for a report as to the "advisability and cost of providing an emergency outlet from the Mississippi River in the interest of national defense and general commerce", and the Chief in response recommended that construction be authorized to serve those ends. H.R. Doc. No. 82-245 at 4 (1951) (Ex. 2); *see also id.* at 12 (report of Board of Engineers for Rivers and Harbors), 17, 39-43 (report of Division Engineer); *cf.* H.R. Doc. No. 71-46, at 1-3, 25 (1930) (Ex. 3) (letter of Chief of Engineers transmitting and concurring in recommendation of Board of Rivers and Harbors against acquisition of Industrial Canal and construction of MRGO, on the view that an additional emergency Port entrance was unnecessary and commerce could be adequately served "for the next 50 years" by maintaining and improving Mississippi River passes).

According to the plan approved by Congress in 1956, the MRGO would extend eastward along the Intracoastal Waterway to a point near Michoud (referred to the the statute as "Micheaud") before striking a southeasterly course "to and along the south shore of Lake Borgne and through the marshes to and across Chandeleur Sound" before entering into the Gulf of Mexico.  H.R. Doc. No. 82-245 at 5 (Ex. 2); *see also id.* at 38, 43.  By approving construction pursuant to the plan recommended by the Chief, the statute effectively mandated the creation of a hydraulic "funnel," in which water borne by the southeastern reach of the MRGO (identified, for purposes of this litigation as "Reach 2") would join with water from the GIWW at a point near Michoud and commingle as the two channels continued as one from that point westward to the IHNC (identified, for purposes of this litigation as "Reach 1").  *Compare* Pub. L. No. 84-455, 70 Stat. 65 (1956) (Ex. 1) (authorizing construction "substantially in accordance with the recommendation of the Chief of Engineers") *with* H.R. Doc. No. 82-245 at 5 (1951) (Ex. 2) (describing recommended route).[2]

After authorization, a series of designs were created to put flesh on the bones previously assembled by the Division Engineer in 1946.  *See* MRGO Design Mem. No. 1-A: Channels Mile 63.77 - Mile 68.85 (Apr. 1957 (rev. Jul. 1957)) (Ex. 25) [hereinafter DM 1-A];

_____

[2]That the configuration of the two waterways, one already in existence and the other prospective, resembled a funnel can be seen quite clearly on Plate 2 (MRGO "Plan of Improvement"), which depicts both the recommended route of the prospective MRGO and the existing GIWW with dark lines that converge near Michoud, just west of Lake Borgne. *See* H.R. Doc. No. 82-245, at 45 (Ex. 2) (not paginated) (Plate 2, MRGO "Plan of Improvement").

MRGO Design Mem. No. 1-B:  Channels Mile 39.01 - Mile 63.77 (Sept. 1958 (rev. May 1959)) (Ex. 26) [hereinafter DM 1-B]; MRGO Design Mem. No. 1-C: Channels Mile 0 to Mile 36.43 (Bayou La Loutre); Mile 0 to Mile -9.75 (38 ft. contour) (Nov. 1959) (Ex. 27) [hereinafter DM 1-C]; MRGO Design Mem. No. 2: Gen'l Design (June 1959) (Ex. 28) [hereinafter DM 2]; *cf.* H.R. Doc. No. 82-245, at 18 (Ex. 2) (Division Engineer's report dated Sept. 30, 1946).  In keeping with the Division Engineer's report that "[c]onstruction . . . of inland sections" would " involve only routine dredging operations," H.R. Doc. No. 82-245 at 33 (Ex. 2), the designs did not call for the installation of any bank protection.  Even though "erosion due to wave wash in open areas [was] expected in the upper part of the channel slope where the peat and highly organic clays are exposed," protection was considered unnecessary because "[i]t [wa]s presumed that sufficient rights of way w[ould] be furnished by local interest to preclude use of channel protection or that additional rights of way w[ould] be furnished when the need ar[ose]."  DM 1-A ¶ 16, at 7 (Ex. 4); *accord* DM 1-B ¶ 19, at 5 (Ex. 5); *see also* DM 2 ¶ 47, at 22 (Ex. 7) (noting that "surface widening due to erosion" was "anticipated" because "[b]ank protection works to prevent this anticipated erosion [had] not [been] recommended as a project feature, nor included in the costs").  The design memoranda included no barriers to impede the flow of water through the channel. *See* DM 1-A, at 2-9 & Plate 2 (Ex. 4); DM 1-B, at 3 (Ex. 5) & Plates 2-9 (Ex. 26).  In addition, the project designers believed that channel protection could "be provided if and when the need for it becomes necessary."  DM 1-A ¶ 16, at 7 (Ex. 4); *accord* DM 1-B ¶ 19, at 5 (Ex. 5).

Construction began in March of 1958.  MRGO Reconnaissance Report on Channel Bank Erosion at 14 (Feb. 1988) (Ex. 8) [hereinafter 1988 Recon. Rep.].  By mid-1961, the project was 20 percent complete.  H.R. Doc. No. 89-231 at 53 (1965) (Ex. 9).  The channel was opened to traffic in 1963 and reached full project dimensions five years later. 1988 Recon Rep. at 14.

After Congress passed the authorizing legislation, the Corps designed the MRGO to have a trapezoidal shape.  The 36-foot depth would be created and maintained across a 500-foot span, and the sides would extend up to the surface on a 1:2 slope.  *See* DM No. 1-A ¶ 7, at 3-4 (Ex. 4); DM No. 1-B ¶ 7, at 2 (Ex. 5).  By angling the sides at a "1 on 2" slope (one foot of rise for every two feet of horizontal increase), DM. 1-A ¶ 7, at 3-4; DM. 1-B ¶ 7, at 2, the Corps's design reflected that, as the Chief had advised Congress, the canal was being dug "through the marshes," H.R. Doc. No. 82-245 at 5 (Ex. 2), making the creation and maintenance of vertical sides impracticable.  By 1959, after a year of experience in dredging through the marsh, the channel was described in the third design memorandum as "hav[ing] *theoretical* side slopes of 1 on 2 and hav[ing] a bottom width of 500 feet."  DM 1-C ¶ 5(a) at 1 (Ex. 6); *cf.* DM 2 ¶ 47, at 22 (Ex. 7) (stating that the "channel slopes should be cut not steeper that 1 on 2").

After the MRGO was constructed, dredging was necessary to maintain the depth of the channel at 36 feet across the entire 500 foot width.  The depth was diminished by the deposition of soils and vegetation that were deposited in the channel by winds, waves, and

currents that eroded the adjacent marsh and carried materials into the channel from more distant places. *See* Nov. 14, 2007 30(b)(6) Dep. of Keith O'Cain at 498:8-499:17 (Ex. 10). This erosion and deposition occurred for a number of reasons, including: (1) natural subsidence and sea level rise; (2) wind-driven waves; (3) wave wash caused by vessel activity; and (4) dredging activities. *See* May 21, 2008 Dep. of Edmond Russo at 42:1-43:18 (Ex. 11); Apr. 4, 2008 Dep. of Chris Accardo at 27:14-22 (Ex. 12); *cf.* Sept. 16, 2007 Kemp Report ¶ 50, at 38 (Ex. 13) ("The reason for this dramatic increase is the erosion effect of ship traffic and waves in [sic] the unstable banks and the MR-GO's delivery of saltwater to Greater New Orleans' wetlands."). As marsh at the shoreline of the MRGO was broken up by these forces and slid into the channel, the top of the MRGO expanded. *E.g.*, Apr. 22, 2008 Dep. of Keith O'Cain at 86:24-87:8 (Ex. 14). The Corps repeatedly dredged the MRGO to restore the waterway to the prescribed depth. Nov. 14, 2007 30(b)(6) O'Cain Dep. at 498:8-499:17 (Ex. 10). Without repeated dredging, the ongoing shoaling would have prevented ships from using the channel. *Id.* at 494:13-20; 498:8-499:17.

The Corps approved three techniques for use in maintaining the MRGO at its prescribed depth: (1) box cutting, (2) allowable overdepth dredging, and (3) advance maintenance dredging. Contractors were authorized to use a box cut in which dredging to a depth of 36 feet (or more if overdepth or advance maintenance dredging was also occurring) continues beyond the 500-foot channel width and then proceeds vertically from the bottom to the top. *See* Mar. 31, 2008 Dep. of Richard Broussard at 54:21-55:16 (Ex. 15);

Apr. 22, 2008 O'Cain Dep. at 29:17-30:6 (Ex. 14).  As the dredge cuts vertically, the loose

material immediately adjacent to the cut sloughs off and slides to the bottom, filling in the

extra width and leaving a 500-foot wide expanse of water at least 36 feet deep.  *See*

Mar. 31, 2008 Broussard Dep. at 55:15-22, 57:17 – 58:6; Apr. 22, 2008 O'Cain Dep. at

32:24-25.  If the sloughing off occurs as anticipated, what results is a 36-foot by 500-foot

shipping channel with sloping sides "not steeper than 1 on 2."  DM No. 2, ¶ 47, at 22 (Ex. 7).

Box cutting was approved because it was expected to yield a 1 on 2 slope and was less costly

than stepping cuts up gradually along the diagonal.  *See* Apr. 22, 2008, O'Cain Dep. at

31:20-21; 57:10-15; 58:24 – 60:8; *cf.* USACE Engineer Reg. 1130-2-520 ch. 8-2a(10) (allowing

box cutting on navigable waterways) (Ex. 16) [hereinafter ER]; Ex. 17 (illustration of typical

box cut design section).

The Corps authorized "allowable overdepth (inaccuracies in dredging)" of the MRGO

to a depth slightly greater than 36 feet.  DM 1-A ¶ 7, at 3-4 (Ex. 4); DM 1-B ¶ 7, at 2 (Ex. 5);

DM 1-C ¶ 5(a), at 1 (Ex. 6); DM 2 ¶ 46-48, at 21-22 (Ex. 7); *cf.* ER-1130-2-520 ch. 8-2a(10)

(allowing overdepth dredging on navigable waterways) (Ex. 16); ER-1130-2-307 ¶ 9 (Ex. 18).

Recognizing that dredging to an exact depth is impracticable, the Corps allowed and

prescribed overdraft dredging to provide a working tolerance for dredgers and to ensure that

the resulting depth is not less than that needed or desired.  ER 1130-2-307 ¶ 9(a); DM 1-A

¶ 22, at 9; DM 1-B ¶ 39, at 10; *see also* Mar. 31, 2008 Broussard Dep. at 23:25-24:11 (Ex. 15).

In addition, the Corps authorized advance maintenance dredging in certain areas. Allowing the contractor to dredge deeper and wider reduces costs by lengthening the time it will take for the channel to be filled back in to the authorized dimensions, at which time dredging will be repeated:

9. <u>Channel Dimensions to be Provided</u>.

a. To avoid frequent redredging in order to maintain full project depths, "overdepth dredging" should be performed in critical, fast shoaling areas to the extent that it results in the least over-all cost. Such additional dredging is exclusive of and beyond the allowable overdepth to compensate for dredging inaccuracies.

b. The foregoing pertains not only to projects on which dredging operations are relatively continuous throughout the year, but also to those projects on which dredging is performed periodically and by application of this additional dredging principle dredging intervals could be extended with attendant savings or justified needs of commerce can be satisfied.

c. In the accomplishment of new work dredging, additional overdepth should be performed in those areas in which it is planned to provide additional maintenance dredging depth in accordance with a and b above.

d. Division Engineers are hereby authorized to approve additional overdepth for new work and subsequent maintenance in conformance with the above stated policy.

ER 1130-2-307 ¶ 9 (Ex. 18); *see also* Apr. 22, 2008 O'Cain Dep. at 10:8 – 11:2 (Ex. 14); ER 1130-2-520 ch. 8-2a(7) (Ex. 16). Initially the advance maintenance dredging depth was two feet. DM No. 1-A, ¶ 7, at 4 (Ex. 4); DM 1-B, ¶ 7 (Ex. 5), at 2; DM 1-C, ¶ 5(a), at 1 (Ex. 6). It was eventually increased to four feet. *See* Apr. 22, 2008 O'Cain Dep. at 10:17 – 11:2 (Ex. 14).

Dredged spoils were disposed of in various ways.  Some spoils were deposited in "upland" disposal areas near the waterway.  *See* Final Environmental Impact Statement at I-9, 10 (Ex. 19); *see also* May 21, 2008 Russo Dep. at 59:3-61:4; 143:20-144:21 (Ex. 11).  Some were deposited in open water.  *See* Final Environmental Impact Statement at I-9, 10 (Ex. 19).  And some were deposited in locations where they would promote the growth of wetlands.  *See* May 21, 2008 Russo Dep. at 59:3-61:4; 143:20 – 144:21.

Over the years, waves generated by ships and other vessels caused the expected erosion of MR-GO's banks.  Between 1968 and 1987, the top width of the 41-mile-long land cut increased from 650 feet to an average of 1,500 feet.  1988 Recon. Rep. at 26 (Ex. 8).  "Passage of [large] vessels cause[d] very large quantities of water to be displaced from the channel into the adjacent marsh, followed by rapid return flow into the channel.  The tremendous forces exerted by these rapid and extreme fluctuations cause[d] the relatively soft marsh adjacent to the channel to break up and be swept into the waterway."  *Id.*  Between 1968 and 1993, bank erosion caused a loss of 4,200 acres of marsh adjacent to the channel.  MRGO Reconnaissance Report on Channel Bank Erosion at 1 (Jan. 1994) (Ex. 20) [hereinafter 1994 Recon. Rep.].  The Corps recognized that this loss had made the "developed areas adjacent to [ the MRGO] . . . more susceptible to flooding."  *See id.* at 28.  The Corps studied various alternatives for stabilizing the banks.  *See id.* at 35-71; 1988 Recon. Rep. at 30-62 (Ex. 29).  Some shore stabilization plans were disfavored because they were "prohibitively expensive."  *Id.* at 34.  Others lacked the necessary local support.

*See* 1994 Recon. Rep. at 1-2, 70-71; *cf.* 33 U.S.C. § 426i(a) (authorization to "implement . . .

measures for the prevention or mitigation of shore damages attributable to Federal

navigation works" is contingent upon "a non-Federal public body['s] agree[ing] to operate

and maintain such measures").

**ARGUMENT**

I. THE DISCRETIONARY FUNCTION EXCEPTION PROTECTS THE CORPS' DESIGN, CONSTRUCTION,
   OPERATION, REPAIR, AND MAINTENANCE OF THE MRGO.

A. Application of the DFE is determined by a two-part test.

The Federal Tort Claims Act does not apply to claims that challenge conduct that is

(1) discretionary and (2) "susceptible to policy analysis." *United States v. Gaubert,* 499 U.S.

315, 325 (1991) (construing 28 U.S.C. § 2680(a)); *Andrade v. Chojnacki,* 338 F.3d 448, 457

(5th Cir. 2003), *cert. denied,* 541 U.S. 935 (2004); *Baldassaro v. United States,* 64 F.3d 206,

208, 211 (5th Cir. 1995), *cert. denied,* 517 U.S. 1207 (1996).[3]  Conduct is considered

---

[3]Section 2680 provides as follows:

>    The provisions of this chapter and section 1346(b) of this title shall not
> apply to—
>
> >    (a) Any claim based upon an act or omission of an employee of the
> > Government, exercising due care, in the execution of a statute or
> > regulation, whether or not such statute or regulation be valid, or
> > based upon the exercise or performance or the failure to exercise
> > or perform a discretionary function or duty on the part of a federal
> > agency or an employee of the Government, whether or not the
> > discretion involved be abused.

(continued...)

discretionary if it ""involve[s]  an element of judgment and choice."  *Gaubert,* 499 U.S. at 322

(original alteration omitted) (quoting *Berkovitz v. United States,* 486 U.S. 531, 536 (1988),

and citing *Dalehite v. United States,* 346 U.S. 15, (1953)); *accord Baldassaro,* 64 F.3d at 208.

A Government employee necessarily exercises discretion, uses judgment, and makes choices

when he acts pursuant to a federal statute, regulation, or policy that does not direct a specific

course of conduct.  Unless the statute, regulation or policy specifies a "specific direction" for

the employee to take, his conduct is discretionary.  *Guile v. United States,* 422 F.3d 221, 231

(5th Cir. 2005); *see also Gaubert,* 499 U.S. at 322; *Rich v. United States,* 119 F.3d 447, 450

(6th Cir. 1997), *cert. denied,* 523 U.S. 1047 (1998); *ALX El Dorado, Inc., v. Southwest Sav. &

Loan Ass'n,* 36 F.3d 409, 411-12 (5th Cir. 1994).  Discretion is removed only by "a 'federal

statute, regulation, or policy [that] specifically prescribes a course of action for an employee

to follow,'" because in that circumstance the employee must follow the prescribed course.

*Gaubert,* 499 U.S. at 322 (quoting *Berkovitz,* 486 U.S. at 536).

     The second characteristic of protected conduct is that it is *"susceptible to policy

analysis."  Gaubert,* 499 U.S. at 325; *accord Baldassaro,* 64 F.3d at 211 (emphasis added by

Court of Appeals).  This is implicit in the text of § 2680(a) because the discretionary function

exception was drafted "to prevent judicial 'second-guessing' of legislative and administrative

_____

[3](...continued)

     The Supreme Court's construction of the discretionary function exception is principally
set forth in four cases:  *United States v. Gaubert,* 499 U.S. 315 (1991); *Berkovitz v. United
States,* 486 U.S. 531, 536 (1988); *United States v. Varig Airlines*, 467 U.S. 797, 814 (1984); and
*Dalehite v. United States,* 346 U.S. 15 (1953).

decisions grounded in social, economic, and political policy through the medium of an action in tort." *Id.* at 323 (quoting *Varig Airlines,* 467 U.S. at 814).  Conduct is susceptible to policy analysis if it is "the kind of conduct that can be said to be grounded in the policy of the regulatory regime." *Gaubert*, 499 U.S. at 325.  Decisions that "implicate social, economic, or political policies" or that "were undertaken for policy reasons of primary concern" to a Government agency are protected.  *See id.* at 332.  When agency policies, coupled with relevant statutory provisions, establish governmental policy, that policy "is presumed to have been furthered when" Government employees "exercised their discretion to choose from various courses of action" in response to the policy.  *See id.*  "[W]hen established government policy allows a government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when he exercises that discretion." *Baldassaro,* 64 F.3d at 211 (citing *Gaubert,* 499 U.S. at 324).[4]

---

[4]Prior to the Supreme Court's decision in *Gaubert,* the Fifth Circuit had rejected this interpretation of the discretionary function exception.  *See Lively v. United States,* 870 F.2d 296, 299 (5th Cir. 1989) ("[W]e reject the Government's offered interpretation of that exception:  that if Government activit[ies] . . . are rooted in policy, the discretionary function exception bars a cause of action based on that conduct unless the Government employee violated a mandatory regulation that restricts his discretion or judgment").  Although *Lively* was rightly decided, the court's understanding of the discretionary function exception was distorted by circuit case law holding that the exception categorically did not apply to operational activities.  *See id.* ("The court [in *Denham v. United States,* 834 F.2d 518 (5th Cir. 1987)] did not rely on the lack of policy considerations; rather the court held that the Government was 'performing an operational function and it did not have the discretion to do so negligently'").  The Fifth Circuit's erroneous construction of the exception prior to *Gaubert* is discussed below, at 17-20.

B.  <u>The second part of the DFE test requires an abstract analysis of the conduct.</u>

Whether an act is susceptible to policy analysis is determined by the nature of the conduct, not the actor's motivation or  intent.  *Gaubert,* 499 U.S. at 325.  Indeed, whether the actor actually considered any policies is irrelevant, because the challenged conduct is analyzed abstractly and its character is not affected by the considerations on which the actor based his conduct in any given instance.  *See id.; Macharia v. United States,* 334 F.3d 61, 67 (D.C. Cir. 2003);  *Lesoeur v. United States,* 21 F.3d 965, 968-69 (9th Cir. 1994); *Smith v. Johns-Manville Corp.,* 795 F.2d 301, 308-09 (3d Cir. 1986).   There need not even be an actual decision to review.  "The discretionary function exception may apply 'in the absence of a conscious decision.'" *Richardson v. United States,* 943 F.2d 1107, 1111 (9th Cir. 1991) (quoting *Kennewick  Irrig. Dist. v. United States,* 880 F.2d 1018, 1028 (9th Cir. 1989); *accord Harrell v. United States,* 443 F.3d 1231, 1236 (10th Cir. 2006); *see also Lopez v. United States,* 376 F.3d 1055, 1057 (10th Cir. 2004); *Kiehn v. United States,* 984 F.2d 1100, 1105 (10th Cir. 1993).  If the nature of the challenged conduct reveals that a decision, if one had been made, *could* have involved a consideration of policy, then the exception applies.  *See Andrade,* 338 F.3d at 457 (district judge "had no need to examine the evidence supporting this claim, because the applicability of the discretionary function exception does not turn on evidence of the actual decisions made by the defendants, but, rather, on whether the decision is or is not 'susceptible to policy analysis'"), *cert. denied,* 541 U.S. 935 (2004).

17

C. <u>The DFE applies to acts that are operational and that implement agency programs.</u>

The exception protects more than just "the initiation of programs and activities." *Dalehite,* 346 U.S. at 35. "It also includes determinations made by executives or administrators in establishing plans, specifications or schedules of operations." *Id.* (footnote omitted).

> Where there is room for policy judgment and decision there is discretion. It necessarily follows that acts of subordinates in carrying out the operations of government in accordance with official directions cannot be actionable. If it were not so, the protection of § 2680(a) would fail at the time it would be needed, that is, when a subordinate performs or fails to perform a causal step, each action or nonaction being directed by the superior, exercising, perhaps abusing, discretion.

*Id.* at 36 (footnote omitted); *cf. Fisher Bros. Sales, Inc. v. United States,* 46 F.3d 279, 282 (3d Cir. 1995) (exception cannot be circumvented by "looking behind" protected decision to challenge antecedent conduct).

Over time, this teaching of *Dalehite* was neglected.  Some courts began to restrict the application of the discretionary function exception to decisions that initiated programs and projects, categorically excluding from the exception's purview the "operational  level" undertaken by Government employees to effectuate the goals and purposes of the initial "policy decisions."  *See Gaubert,* 499 U.S. at 321.  The Court of Appeals for the Fifth Circuit, was among the courts that fell into this error.  *Gaubert* brought about a substantial change in the law of this circuit insofar as the discretionary function exception is concerned.

One of the earliest cases drawing a distinction between protected "policy decisions" and unprotected "operational actions" was *Seaboard Coast Line Railroad Co. v. United States,* 473 F.2d 714 (5th Cir. 1973).  The railroad alleged that a drainage ditch designed by the Army Corps of Engineers had diverted floodwaters which undermined the railroad's right of way.  Finding that the right of way had been damaged as a result of the negligent design of the drainage ditch, the district court entered judgment in favor of the plaintiff.  *Id.* at 715.  In so ruling, the court rejected application of the discretionary function exception to the Army's design of the ditch.  The court decided that the protection afforded by 28 U.S.C.       §       2680(a) extended only to the decision to undertake the project and no further:  "'the United States exercised its discretion by attempting the job, and once having done so, the United States was under a duty to perform with due care.'"  *Id.* at 716.  Agreeing with this conclusion of law, the Court of Appeals affirmed.  Citing *Indian Towing Co. v. United States,* 350 U.S. 61 (1955), and *Rayonier, Inc. v. United States,* 352 U.S. 315 (1957), the Court of Appeals echoed the opinion of the district court as to the reach of the discretionary function exception:

> The discretionary function . . . was the government's policy decision to construct an aircraft maintenance facility . . . and to build a drainage system in furtherance of that goal.  Once the government decided to build a drainage ditch, it was no longer exercising a discretionary policy-making function and it was required to perform the operational function of building the drainage ditch in a non-negligent manner.

473 F.2d at 716.

This "nonexistent dichotomy between discretionary functions and operational activities," *Gaubert,* 499 U.S. at 326, was drawn ever more distinctly in a series of cases decided in the 1980s.  *See, e.g., Gaubert v. United States*, 885 F.2d 1284, 1287 (5th Cir. 1989) ("[*Indian Towing*] did . . . establish the principled distinction between policy decisions and operational actions; this distinction still retains its force today and is dispositive of this case."), *rev'd,* 499 U.S. 326 (1991); *Denham v. United States*, 834 F.2d 518, 520 (5th Cir. 1987) ("Once the government does undertake to supply a service, then it must be held responsible for negligent acts in supplying the service.  This means that the discretionary function exception only reaches the discretionary decision as to whether to supply the service or not."); *Wiggins v. United States,* 799 F.2d 962, 967 (5th Cir. 1986) ("[T]he *Indian Towing* rule does not apply because the government did not act in any way negligently toward appellant after the original discretionary decision not to remove the pilings had been made"); *Wysinger v. United States,* 784 F.2d 1252, 1253 (5th Cir. 1986) (*Indian Towing* and *Rayonier* "stand . . . for the proposition that once the government has made a decision to act the government is responsible for acts negligently carried out even though discretionary decisions are constantly made as to how those acts are carried out."); *Butler v. United States,* 726 F.2d 1057, 1063 (5th Cir. 1984) (once Corps decided to repair seawall and to dredge, it "was no longer exercising a discretionary function and was required to perform the related operational functions with reasonable care"); *Payton v. United States,* 679 F.2d 475, 479-80 (5th Cir. 1982) (*Dalehite* unsuccessfully "attempted to distinguish decisions made at the

planning level (discretionary) from those at the operational level (non-discretionary)," but *Indian Towing* and *Rayonier* subsequently "narrowed the *Dalehite* guidelines," and it is now established in this circuit that "[d]iscretionary decision-making . . . is accompanied by nondiscretionary acts of execution, whether termed operational, ministerial, or clerical.").

As noted, the Fifth Circuit was not alone in its apprehension of a "nonexistent dichotomy between discretionary functions and operational activities." *Id.* at 326.  The Eighth Circuit applied the dichotomy in *E. Ritter & Co. v. Dep't of the Army,* 874 F.2d 1236 (8th Cir. 1989).  The plaintiff company sought to recover for damage to its land caused by erosion.  The erosion allegedly occurred as a result of a flood control ditch designed by the Corps of Engineers.  The United States urged two defenses:  Flood Control Act immunity, under 33 U.S.C. § 702c and discretionary function immunity, under 28 U.S.C. § 2680(a).  The district court rejected the Flood Control Act defense because it was stipulated that normal rainfall had caused the erosion and the court did not think "'the plain meanings of the words 'flood' and 'floodwaters' [could] be stretched far enough' to include the flow of water from normal rainfall." *Id.* at 1238.  The court then considered the discretionary function defense. Viewing the Corps's "decision not to stabilize or maintain the banks of the ROD [Riverdale Outlet Ditch]" through planning/operational bifocals, the court ruled that the discretionary function exception did not apply because the Corps's "inaction . . . was ministerial, not analytical, in nature and thus . . . was 'clearly' operational." *Id.* (citation omitted).  Based on

its finding that "the sole reason for the erosion was the Corps' excavation of the ditch," the district court entered a judgment for the plaintiff and awarded damages.  *Id.*

Agreeing that § 702c cannot be read "so broadly as to include normal rainfall which has not yet come in contact with a flood control project," the court of appeals examined the discretionary function exception defense in the light of "consistent[]" circuit case law holding "'that the FTCA applies to decisions by federal agencies at the "operational" level, whereas decisions or omissions on the "policy or planning" level are exempt under the statute's discretionary function exception.'"  *Id.* at 1240-1241 (citation omitted).   The court reprised the United States' argument this way:

> Naturally, the government argues that the Corps' activity falls into the "planning" category.  The government claims that the evidence shows that the design of the ditch was based on social, economic, and political factors, such as (1) cost-benefit studies of placing spoil from the ditch only on the opposite bank instead of on both sides, (2) the fact that the project was designed with input from public hearings and the local drainage district, and (3) the fact that the drainage district may levy taxes and thus is a "political and social creature." The government also bases this argument on their "cost-sharing policy.

*Id.*

The court of appeals was not persuaded that the policies that were relevant to the design and construction of the ditch (*i.e.,* "planning" decisions) were pertinent to the maintenance (*i.e.,* "operational") decisions that were at issue:

> The policy considerations which the government cites refer to the initial decision to build the ROD and the subsequent decisions as to where the ROD and the spoil would be located. These considerations go to the design and construction of the ditch, which we agree were planning level decisions.
> As

22

> such, the design and construction of the ROD are governmental actions which
> fall within the perimeter of the discretionary function exception and are not
> actionable.

*Id.* The bottom line was this:  "Once construction was completed, policy decisions ended."

*Id.* As far as the court was concerned, the Corps's failure to inform the company of the

Corps's cost-sharing policy and the agency's repeated reassurances that the problem would

be fixed were "acts and omissions, which constitute maintenance and operation . . . after

construction [and therefore did] not involve policy concerns of the type which Congress

intended to protect.  Rather, they involve[d] the most basic form of operational, ministerial

conduct."  *Id.*  "Although the district court made no specific findings as to negligent

maintenance," the court of appeals affirmed on the basis that the district court's finding that

"the Corps' failure to operate the ROD correctly" and to maintain it adequately caused the

erosion."  *Id.* at 1242-43 (citation omitted).

Similarly, the Ninth Circuit, in *Kennewick Irrigation District v. United States,* 880

F.2d 1018 (9th Cir. 1989), held that the discretionary function exception barred the plaintiffs'

claim of negligence in the design of an irrigation canal but did not bar the claim of negligent

construction.  The United States contended that the case was controlled by *United States v.*

*Ure,* 225 F.2d 709 (9th Cir. 1955), in which it was alleged that plaintiffs' land had been

flooded because of negligence by the Bureau of Reclamation in deciding not to line a canal

with concrete along its entire length "but only in locations where particular conditions

obtained."  225 F.2d at 713, *cited in Kennewick*, 880 F.2d at 1025.  The discretionary

function exception was held by the district court to bar the claim because the feasibility of the project depended on "'the vital item of cost,'" and it was this "practical consideration[]" that informed the Bureau's decision not to line the entire canal.  *Kennewick*, 880 F.2d at 1025.

Kennewick argued that *Ure* was distinguishable because in its case "the government failed to follow objective engineering standards, including the Bureau's own standards. Essentially, Kennewick [was] arguing that in designing the canal, Bureau officials had *no discretion* to violate certain engineering standards."  *Id.* (internal citation omitted).  The court rejected that distinction as a basis for determining the application of the discretionary function exception.  The court held that a safety or engineering standard does not remove discretion unless "it is embodied in a *specific* and *mandatory* regulation or statute which creates clear duties incumbent upon the governmental actors."  *Id.* at 1026.  Inasmuch as "Kennnewick ha[d] pointed to no mandatory, specific statute, regulation, or policy which required the Bureau to include in its design" concrete lining and other appurtenances, the court "conclude[d] that the Bureau had discretion to make design decisions regarding the Kennewick canal."  *Id.* at 1027.

Particularly pertinent here, however, is the influence of the planning/operational dichotomy, which led the court to apply the exception to Kennewick's negligent design claim but withhold it from the negligent construction claim:

Once the government, having balanced economic, social and political policy considerations, adopts safety standards in the form of specific and mandatory regulations or policy, employees do not have any discretion to violate these standards.  Indeed, to insulate such violations from liability would undermine the prior exercise of a discretionary function involved in formulating and adopting the binding standards.

. . . .

Here, as in *Ure,* the decision not to line the entire canal with 'concrete or other impervious material' was a design decision. . . . Concrete lining is a major factor affecting the cost of a canal. . . . [D]esign decisions such as those involved in this case are discretionary functions.  For construction of these projects to occur, water users must agree to repay the Bureau for construction costs.  This system inherently calls for the use of discretion by Bureau officials to consider construction costs and the water users' ability to repay those costs.  It . . . is within the purview of section 2680(a) because the engineers' decision not to line fully the canal was rooted in economic policy judgments.

*Id.* at 1026-28 (internal citations omitted).

Even though the United States pointed out that considerations of cost were a policy basis of the Bureau's construction decisions no less than its design decisions, the court held that costs could not be considered a policy consideration during the operational phase of the project:  "[V]irtually all government actions affect costs since action itself requires resources. . . . The contracting officer's on-site decisions were not 'of the nature and quality that Congress intended to shield from tort liability.'  They were not based on public policy and they are not entitled to immunity . . . ."  *Id.* at 1031 (internal citation omitted).

The reasoning that unites all of these planning/operational dichotomy cases was "squarely rejected" by the Supreme Court in *Gaubert.  Autery v. United States,* 992 F.2d 1523, 1527  (11th Cir. 1993).  The Court expressed its emphatic disapproval in certain terms:

> [T]he Court of Appeals erred in holding that the exception does not reach decisions made at the operational or management level . . . . A discretionary act is one that involves choice or judgment; there is nothing in that description that refers exclusively to policymaking or planning functions. . . . Discretionary conduct is not confined to the policy or planning level. "[I]t is the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function applies in a given case."

499 U.S. at 325 (quoting *Varig Airlines,* 467 U.S. at 813).

D.  Negligence is irrelevant to the DFE test.

The Corps's alleged noncompliance with "professional standards of reasonableness and due care" does not preclude application of the discretionary function exception.  Pls. Opp'n to Def. Mot. Dismiss at 66 (Doc 1003).  Whether the Corps complied with "professional standards," acted reasonably or unreasonably, or acted with or without due care is irrelevant to the discretionary function inquiry.  *See Lively,* 870 F.2d at 297-98.  Plaintiffs focus on the Corps's early knowledge of erosion along the waterway as a basis for holding the United States liable.  *See* FAC ¶¶ 56, 61, 84, 86.  But what the Corps knew and when it knew it is irrelevant to the discretionary function inquiry.  The relevant inquiry is whether the controlling statutes, regulations, and administrative policies eliminated the Corps's discretion with respect to the design, construction, operation, repair, and maintenance of the MRGO. *See Rosebush v. United States,* 119 F.3d 438, 442 (6th Cir. 1997).  It is the governing statutes, regulations, and policies, not the Corps's knowledge of danger or harm, "that determines whether certain conduct is mandatory for purposes of the discretionary function exception." *Id.*

Imposing a "reasonableness" requirement on the Corps based on what it knew would collapse the question of whether § 2680(a) protects the Corps's conduct into a negligence inquiry. *See id.*; *Autery*, 992 F.2d at 1528. Questions of negligence and culpability must be kept separate from the discretionary function inquiry. Allowing them to intrude would be contrary to the very language that Congress used to express the scope of the exception. It applies "whether of not the discretion involved be abused." 28 U.S.C. § 2680(a). Inasmuch as "[t]he exercise of discretion could not be abused without negligence or a wrongful act," a consideration of negligence or culpability at this stage of the litigation would be improper and would undermine the very purpose of the exception. *Dalehite,* 346 U.S. at 33. The exception exists to prevent liability from being imposed on account of negligent or wrongful conduct that (1) involves an element of judgment or choice and (2) is susceptible to policy analysis.

E. <u>Both prongs of the DFE test are satisfied.</u>

Decisions by the Army Corps of Engineers as to the design, construction, operation, repair, and maintenance of the MRGO are protected by the discretionary function exception because no statute or regulation prescribed the manner, methods, times, places, or extent of these functions. The MRGO was constructed, repaired, and maintained by dredging, as designed. Decisions as to the dredging of the MRGO were matters of judgment and choice grounded in the policies that led to the authorization of the waterway and are therefore not actionable under the FTCA. *See Boston Edison Co. v. Great Lakes Dredge & Dock Co.,*

423 F.2d 891, 896 (2d Cir. 1970); *Northlight Harbor, LLC v. United States*, 561 F. Supp. 2d

517, 526-27 (D.N.J. 2008); *Bean Horizon Corp. v. Tenn. Gas Pipeline Co.,* 1998 WL 113935

(E.D. La. 1998) (Clement, J.); *In re Lloyd's Leasing, Ltd.*, 764 F. Supp. 1114, 1137-38 (S.D.

Tex. 1990); *Eazor Express, Inc. v. United States*, 611 F. Supp. 197, 202 (E.D.N.Y. 1985); *F. &

M. Schaefer Breweing Co. v. United States*, 121 F. Supp. 322 (E.D.N.Y. 1954).  As the Court

explained in *In re Lloyd's Leasing* with respect to the dredging at issue there:

> Determinations that the Corps made regarding the frequency and location of
> maintenance dredging and surveying in the Bar Channel are . . . decisions
> based on policy considerations properly left to the discretion of the Corps.  In
> particular, the types of dredging equipment and surveying equipment used,
> the method of dredging utilized, both new work and maintenance, the
> frequency and duration of dredging and surveying, as well as the types of
> surveys performed and the coverage of such surveys are all discretionary
> decisions shielded from tort liability.  They are decisions made at the policy
> level for reasons related to balancing the cost effectiveness to the government
> against benefit to the material interest.

764 F. Supp. at 1137-38 (citing *Dalehite v. United States*, 346 U.S. 15 (1953)) (internal

citation omitted).[5]

Despite these well-reasoned holdings, Plaintiffs attempt to hold the United States

liable for flood damage that they contend was exacerbated by the dredging of the MRGO.

_____

[5] The disposal of spoils from maintenance dredging is also protected under the
discretionary function exception.  "[T]he Corps's decisions about where to dump dredging
spoils must be understood as policy-based because they were integral to the expansion and
maintenance of a navigable waterway." *City of Bangor v. Citizens Commc'n Co.*, No. Civ.
02-183-B-S, 2004 Wl 483202, at *9 (D. Me. Mar. 11, 2004); *see also Montijo-Reyes v. United
States*, 436 F.3d 19, 25-26 (1st Cir. 2006) (method and location of disposal are protected by
discretionary function exception); *Williams v. United States*, Civ. A. No. 06-cv-834, at *6
(D.N.J. Aug. 2, 2007) (design and maintenance of disposal area protected).

*See* FAC ¶¶ 52-54.  Plaintiffs theorize that the dredging of the MRGO enlarged and

prolonged the storm surge created by Hurricane Katrina, causing the surge to overtop and

wash away the flood control structures that surrounded their properties.  They contend that

the manner and extent of dredging enlarged the MRGO beyond its authorized dimensions

and that the dredging was therefore not protected by the discretionary function because the

Corps had no discretion to allow the MRGO to exceed its authorized dimensions.

Plaintiffs' argument fails because (1) the Corps did have discretion to allow

contractors to dredge beyond the prescribed dimensions of the waterway in order to

maintain the waterway at its authorized dimensions and (2) this discretion was provided in

furtherance of Corps policy:

> It is the policy with respect to authorized navigation projects to have full
> project dimensions maintained where feasible and justified.  To avoid frequent
> redredging in order to maintain full project depths, "overdepth dredging"
> should be performed in critical, fast shoaling areas to the extent that it results
> in the least over-all cost.  Such additional dredging is exclusive of and beyond
> the allowable overdepth to compensate for dredging inaccuracies.

Engineer Reg. 1130-2-307 ¶ 9(a) (1968) (Ex. 18); *see also id.* ¶ 6(c) ("The actual requirements

of existing commerce and the economics which may be obtained by a reduction in the

frequency of dredging operations will govern the extent of the maintenance work to be

undertaken. (see para. 9)"); *cf. id.* ¶ 9(d) ("Division Engineers are hereby authorized to

approve additional overdepth for new work and subsequent maintenance in conformance

with the above stated policy.").

Because the banks of the MRGO were composed of marsh, they sloughed off during and after dredging.  Had the dredging not exceeded the authorized width of 500 feet, the waterway would not have been as wide at the bottom as authorized because the soils from the sides would have reduced the bottom width as they sloughed off and settled to the bottom.  It was the bottom width that mattered, as this was the usable width.  *See id.* ¶ 4(d) ("Where a width of channel is specified it will be understood to mean width of bottom at project depth.").  To take this anticipated sloughing off into account and keep the channel at its authorized width and depth, the Corps allowed its contractors to make a "box cut"—that is, a vertical side cut at 90 degrees from the bottom cut—beyond the desired 500-foot width because doing so was, in the Corps's judgment, the most economical way to create and maintain the 500-foot width.

Plaintiffs contend that this practice was impermissible because it allowed the banks of the MRGO to widen at the top.  This argument fails to recognize that the prescribed width was a reference to the bottom width, not the top width.  *See id.*  Moreover, dredging beyond the prescribed width for the purpose of maintaining the channel at its authorized width was just as permissible as dredging below the authorized depth of 36 feet, which was also a routine practice adopted for reasons of economy.  *See id.* ¶ 9(g) ("[I]n the fast shoaling areas, additional dredging should be performed to avoid frequent redredging. . . ."); *cf. id.* ¶ 6(c) (extent of maintenance dredging is to be determined by "[t]he actual requirements of existing commerce and the economies which may be obtained by a reduction in the

frequency of dredging operations"). Contractors were required to dredge slightly deeper than the authorized depth in a practice known as "advance maintenance dredging." And because of the difficulty of dredging exactly to a precise depth, contractors were allowed to exceed the 36-foot depth by four feet, a practice known as "allowable overdepth dredging," to ensure that the maintenance operation did not inadvertently yield a depth less than the desired 36 feet. All three of these practices—box cutting, advance maintenance dredging, and allowable overdraft dredging—were permissible methods of maintaining the channel at its authorized width and depth.

No statute, regulation, or policy proscribed them or prescribed a different method or methods of creating and maintaining the MRGO. As the case law uniformly recognizes, the Corps's choice of these methods was grounded in the policies that led Congress to authorize the construction and maintenance of the waterway, and Plaintiffs' dredging claims are therefore beyond the purview of the FTCA and must be dismissed for lack of subject matter jurisdiction.[6]

---

[6]Inasmuch as the dredging operations and spoils disposal were performed by contractors, the United States cannot be held liable for those actions. *See* 28 U.S.C. § 2671. To the extent Plaintiffs contend that the maintenance dredging and subsequent spoil disposal themselves—as opposed to discretionary decisions made about the frequency, extent, manner, and location of maintenance dredging and spoil disposal—were negligently performed, that is a claim that is not cognizable under the FTCA. *See United States v. Orleans*, 425 U.S. 807 (1976); *Logue v. United States*, 412 U.S. 521 (1973); *Eazor Express, Inc. v. United States*, 611 F. Supp. 197, 202-03 (E.D.N.Y. 1985).

F.  Deciding how to address problems required the exercise of policy-based discretion.

In many ways this case is like *National Union Fire Insurance v. United States,* 115

F.3d 1415 (9th Cir. 1997), *cert. denied,* 522 U.S. 1116 (1998). "For about half a century, the

Army Corps of Engineers . . . developed and improved King Harbor, in Redondo Beach,

California[,] . . . by building a fourteen foot breakwater, which was completed in 1958." *Id.*

at 1417.  This breakwater was not high enough to protect boats in the harbor during storms,

so portions of it were raised to 22 feet in the 1960s. *Id.*  Meanwhile, the city of Redondo

Beach was developing the harbor into an entertainment, recreation, and residential

destination that raised rents for the city.  Property losses to storm damage continued even

after portions of the breakwater had been raised, prompting the Corps to study the benefits

of raising the entire breakwater to the higher level. *Id.*  As a result of these studies, the

Corps decided to raise the entire breakwater to 22 feet.  But before those improvements had

begun, the Corps discovered that the lower portions of the breakwater were only 12 feet in

elevation, not 14 as had been thought.  The cause of the subsidence was oil extraction, which

was causing the seabed to subside.  The Corps had failed to discover the discrepancy sooner

because its measuring devices were obsolete and the potential for subsidence had not been

considered. *See id.*

The Corps was faced with a choice: do nothing, raise the 12-foot sections back to 14

feet, or wait for the results of an on-going study to determine whether to raise the entire

breakwater to 22 feet. *Id.*  "Raising the breakwater a couple of feet was a major, not a trivial,

engineering project.  The Corps decided to leave the breakwater as it was, while proceeding with studies directed toward more substantial improvement."  *Id.*

As it happened, this was the wrong decision:  "A huge storm, the kind that hits Redondo Beach only once every sixty or seventy years, caused waves [that] . . . swept over the breakwater and caused" millions of dollars of damage.  *Id.*  After a bench trial, the district court found liability and awarded damages in the amount of the plaintiff's administrative claim.  On appeal, the controlling issue was whether the discretionary function exception barred jurisdiction.  *Id.*

The court of appeals assumed that the "decision to put off the small improvement which would have raised the breakwater to design specifications, while it studied a much larger improvement, was a mistake in judgment and a failure to exercise reasonable care."  *Id.* at 1418.    As a practical matter, the court recognized that the issue for the Corps "was what if anything to do about" a potential problem, "and when."  *Id.*  Repairing to 33 U.S.C. § 541 (which the court identified as "[t]he Corps' statute"), the court observed that the statute requires the Corps to make a judgment balancing a handful of "sometimes conflicting considerations:  (1) how much commerce benefits from the project; (2) what kind of commerce; (3) how much the project will cost; (4) how necessary is the work; (5) should the work be built, continued or maintained by the federal government, or some other entity."  115 F.3d at 1419.  Even though the Corps was under a duty to maintain the breakwater in a safe condition, the court recognized that dismissal was required.  *Id.* at 1422.  No statute,

33

regulation, or policy required the Corps to begin raising the breakwater to the design elevation.  On the contrary, Congress had given the Corps discretion to address the situation according to its own judgment.  *See id.*

The factual and legal contexts in the present case parallel those described above.  The law that authorized the MRGO did not specify every detail but instead left considerable room for the Army to weigh numerous considerations in deciding how to design, build, operate, repair, and maintain the channel.  Deciding whether, how, and when to modify the MRGO to combat erosion and to remedy other conditions that the plaintiffs contend should have been abated before Hurricane Katrina were matters of judgment and choice for the Corps.  In addition, the challenged acts and omissions—failure to "armor" both banks of the MRGO in their entirety, failure to design and construct surge barriers, and failure to dredge more precisely or using a different method—are by nature readily susceptible to policy analysis.  These activities are innately connected to the purposes of the project itself:  the promotion of commerce and improvement of the national defense.

Making the changes that the plaintiffs say should have been made—building armored levees extending for many miles on both banks of the channel, constructing a retractable barrier across a 500-foot-wide deepwater channel—would have been major undertakings that would have required the weighing of costs, benefits, and alternatives.  Whether to address erosion by dredging or by stabilizing banks was within the Corps's ken.  Indeed, the complaint does not even allege that the Corps violated a statute or regulation in designing,

constructing, operating, and maintaining the MRGO.  The complaint merely alleges

*negligence—i.e.,* an abuse of discretion in deciding how to prosecute the Chiefs'

recommended plan, which Congress approved.  Inasmuch as Congress left the weighing of

these matters to the discretion of the Secretary of the Army and the Army's Chief of

Engineers, Plaintiffs' claims are barred by the discretionary function exception and must be

dismissed for lack of subject matter jurisdiction.

II.  THE FTCA'S DUE CARE EXCEPTION ALSO BARS PLAINTIFFS' CHALLENGE TO THE CORPS' DESIGN,
     CONSTRUCTION, OPERATION, REPAIR, AND MAINTENANCE OF THE MRGO BECAUSE THOSE
     ACTIVITIES WERE "SUBSTANTIALLY IN ACCORDANCE WITH THE RECOMMENDATION OF THE
     CHIEF OF ENGINEERS" AND WERE THEREFORE IN ACCORDANCE WITH PUBLIC LAW 84-455.

The first exception to the Federal Tort Claims Act's waiver of sovereign immunity is

the due care exception, which is set forth in the first part of section 2680(a) of Title 28.  This

part of the subsection "exempt[s] actions mandated by statute or regulation." *Buchanan v.*

*United States,* 915 F.2d 969, 970 -971 (5th Cir. 1990); *see also Dalehite,* 346 U.S. at 33.  This

exception applies only if the Government employees whose conduct is in question have

exercised due care.  *Id.*  The purpose of this provision is to prevent the FTCA from being

used to challenge the legality of statutes and regulations.  *Dalehite,* 346 U.S. at 33.  It

therefore applies to tort actions in which no "deviation from the statute's mandate is

alleged," because if no such deviation is alleged then "it cannot be said that the [Government

employees] acted with anything other than due care."  *Welch v. United States,* 409 F.3d 646,

652 (4th Cir. 2005), *cert. denied,* 546 U.S. 1214 (2006).

The due care exception applies to this case because Plaintiffs have neither alleged nor adduced evidence that the Corps deviated from the mandate that authorized the construction of the Mississippi River-Gulf Outlet "substantially in accordance with the recommendation of the Chief of Engineers," Pub. L. No. 84-455, 70 Stat. 65 (1956) (Ex. 1).  The Chief of Engineers recommended that the MRGO be constructed "generally in accordance with *the plans of the division engineer* and with such modifications thereof as in the discretion of the Secretary of the Army and the Chief of Engineers may be desirable, at an estimated cost to the United Sates of $67,000,000 for construction exclusive of aids to navigation, and $1,000,000 annually for maintenance in addition to that now required . . . ."  H.R. Doc. No. 82-245 at 5 (Ex. 2) (Chief's Report) (emphasis added).[7]  The Division Engineer's plan included neither bank protection nor surge barriers.  The Division Engineer calculated the cost of the project and the benefit/cost ratio based on his judgment that "[c]onstruction and maintenance of inland sections of the channel would involve only routine dredging operations."  *Id.* at 33.  As the designers noted soon after Congress authorized construction, "[n]o channel protection is included in the overall cost of the project.  It is presumed that sufficient rights of way will be furnished by local interests to preclude use of channel protection or that additional rights of way will be furnished when the need arises."  DM 1-A ¶ 16, at 7 (Ex. 4); *accora* DM 1-B ¶ 19, at 5 (Ex. 5).  Because "[b]ank protection works" were

---

[7]The Chief's recommendation was also conditioned, *inter alia,* on the furnishing by "local interests . . . free of cost to the United States all lands, easements, rights-of-way, and spoil-disposal areas for the initial construction, and when and as required for subsequent maintenance."  H.R. Doc. No. 82-245 at 5.

not part of the authorized plan and had not been included in the costs of the project, the designers dealt with "anticipated erosion" and "surface widening due to erosion" by conducting stability analyses and soil borings to determine how far away from the channel spoils would need to be deposited in order to provide an adequate factor of safety.  DM 2 ¶ 47, at 22 (Ex. 7).

As the report of the Division Engineer and the design memoranda make clear, the Corps made a conscious decision at the outset (even before authorization) to keep federal costs low by designing the channel in such a way that it could be maintained without the construction of costly bank protection works.  If the anticipated "surface widening due to erosion," eventually exceeded the initial rights of way furnished by local interests, then local interests could be required to furnish additional rights of way at no cost to the United States.[8]

---

[8]Surface widening was expected because "the upper part of the channel slope" consisted of "peat and highly organic clays."  DM 1-A ¶ 16, at 7 (Ex. 4); *accora* DM 1-B ¶ 19, at 5 (Ex. 5).  To minimize maintenance requirements, the designs therefore called for "slopes of the channel cut not deeper than 1 on 2" because steeper cuts would result in excessive sloughing of the unstable, highly erodible banks.  DM 1-A, ¶ 15, at 7; *see also* DM 1-B ¶ 18, at 5 ("slopes on the channel cut not steeper than 1 on 2"); DM 2 ¶ 47, at 22 (Ex. 7) (same); *cf.* DM 1-B Endorsement of Div. Eng'r (Oct. 23, 1958) (commenting that box cutting the channel would "probably" result in "slopes of about 1 on 2" and recommending that "consideration . . . be given to excavating the final flatter slopes by a series of step cuts to reduce maintenance dredging," depending on the results of additional testing of soil strengths); DM 1-B Plate 12 (depicting the 1-on-2 channel side slope and labeling it "Theoretical Cut").  Notwithstanding the plan's exclusion of bank protection and the absence of authorization for them, the designers noted that bank protection works were technically feasible if in the future such features were considered necessary.  *See* DM 1-A ¶ 16, at 7; DM 1-B ¶ 19.

The Chief based his recommendation on the Division Engineer's report.  That report calculated the benefits and costs of building the MRGO, and the benefit/cost ratio.  That ratio reflected the Division Engineer's omission of bank protection and surge barriers.  Consequently, the premising of the Chief's recommendation on the Division Engineer's report removed any discretion to add those improvements later, unless those improvements could have been added without increasing costs.  *See* H.R. Doc. No. 82-245, at 12  (Ex.2) (division engineer took costs and benefits of alternate routes into account in preparing recommendation), 39 (division engineer compared east-bank and west-bank costs); *cf. id.* at 2-3 (Bureau of Budget "no objection" letter, comparing costs and benefits), 33 (considering necessity of protective works in comparing relative "advantage" of west-bank route).

Edmond Russo, the MRGO operations manager prior to and at the time of Hurricane Katrina, testified that he had the authority to install foreshore protection "where it's more economically viable."  May 21, 2008 Russo Dep. at 126:15-17 (Ex.11); *cf. id.* at 136:11-17 (operations manager relied on cost estimates to identify reaches in which foreshore protection would be more economical than dredging), 151:1-23 (miles of rock were placed along the north shore of the channel in discontinuous reaches where foreshore protection was more economical than dredging).

Surge barriers could not be added to the project for one very fundamental reason: they would not advance the policies that underlay the project's authorization and funding. Congress authorized the project to serve commercial and national security ends.  Funds were

appropriated to advance those purposes, and using those funds for some other purpose, however worthy, would be a misuse of taxpayer dollars.  Fundamentally, this limitation on use of funds was the reason why bank protection could be constructed only insofar as it was the best (*i.e.,* the most economical) method of channel maintenance.  Bank protection, like surge barriers, could serve very worthy ends unrelated to those that underlay the MRGO project.  But however worthy other ends might be, federal funds appropriated for the MRGO, to  advance commerce and promote the national defense, could not be diverted to serve them.

Edmond Russo, the MRGO's operations manager, understood this limitation well. Even though he subscribed to the general engineering principle that a product or device or structure ought to be designed to do no harm, he also understood that his application of that principle was limited by the legal authorities that governed the project.  *See* May 21, 2008 Russo Dep.  at 106:7 –107:11 (Ex. 11).  Because his authority to expend public funds was circumscribed, he could not install foreshore protection wherever it would serve the goal of protecting persons or property but could do so only "[i]n locations and in instances where it would reduce the rate of sedimentation into the channel."  *Id.* at 107:12-17.  Russo testified that he "had the capability to install anything, [even] red balloons" if doing so would help keep the channel open for shipping.  *Id.* at 107:17-18.  His facetious answer led to this fanciful yet illuminating colloquy with Plaintiffs' counsel:

Q.   Okay.  So if you called it in aid of navigation you could do it.  Fair enough?

A.   Yeah.

Q.   But if you called it wetlands mitigation loss, you couldn't do it.

A.   Absolutely not.

Q.   And if you called it mitigation of hurricane surge you couldn't do it.

A.   No.  Not under the navigation project authority.

*Id.* at 107:20 – 108:4.  In response to further questioning, Mr. Russo made it perfectly clear

that his discretion was cabined by the scope of the MRGO authorization:

Q.   Before we get heavy into this, let me finish up a few thoughts with regard to your limitations.  Would you agree that the limitations that are put upon you as the operations manager of the MRGO are engineering and technical standards, that you don't really have any discretion other than the discretion that's allowed by appropriate technical and engineering standards?

     . . . .

A.   No.  Not at all.  You have to understand, there's a tremendous amount of uncertainty in management and technical decisions.

Q.   Right.

A.   And there's undefined bounds of discretion because of uncertainty.

Q.   All right.  Well, we can conclude this, can we not:  That the United States Army Corps of Engineers did not exercise its discretion to fail to take the necessary steps to protect the wetlands that were being damaged by the MRGO?  Isn't that correct?

A.   I wouldn't say that.

40

Q.     Well, I thought you just told me that you didn't have the discretion to protect the wetlands.  You told me, in your prior testimony, that we're required to make certain that the channel was good for navigation. Right?

A.     Correct.

. . . .

Q.     You didn't have any discretion to go protects [sic] the wetlands.  Right?

A.     Not under this authority.

. . . .

Q.     Well, then, I'm totally confused. You said to me, we could not install bank protection if it was to preserve the bank. You said, the only way that we could install bank protection is if it had a navigation purpose.  Did I—

A.     That's right.

Q.     —get that wrong?

A.     You got it right.

Q.     Okay.  So that means, then, you did not have the discretion to do bank protecting.

A.     Under that project.

Q.     Exactly.  So my point is, and I'm asking you if you will confirm based upon what you've told me today, the Corps was never in a position, within the confines of the authorization to build the MRGO, to decide to or decide not to protect the banks from erosion for any other purpose other than navigation?

. . . .

A.     If I understand the question, for the purpose of navigation, um—our only discretion was to limit the rate of sedimentation into the channel.

41

Q.   Which means you did not have the discretion, nor did you ever
exercise any discretion, not to protect those banks or to save the
wetlands or to prevent marsh erosion and the like.

A.   Under that authority.

*Id.* at 111:4 – 114:20.

Plaintiffs are not challenging Mr. Russo's exercise of discretion.  They do not contend

that Mr. Russo or his predecessors erred in identifying the specific locations in which

channel maintenance would be best served (*i.e.,* accomplished most economically) by

installing channel protection to retard sedimentation instead of depending entirely on

cyclical dredging to keep the channel at its prescribed dimensions.  There is no evidence that

maintenance costs would have been reduced by the installation of more bank protection

than the Corps's operations managers chose to install.  No.  Plaintiffs' claim is that the

Corps's negligence arose from its failure to install sufficient bank protection to protect

Plaintiffs' properties from hurricane-induced storm surge.  But as Mr. Russo's testimony

makes clear, this is a challenge to the statute, for it was the statute that cabined his discretion

and prevented him from taking Plaintiffs' interests into consideration in deciding how to

maintain the MRGO.  Notwithstanding Plaintiffs' use of the term *negligence* to characterize

these maintenance decisions, the FTCA's due care exception bars Plaintiffs' claims because

they are nothing more than tests of the validity of the statute that mandated the construction

of the channel without surge barriers or bank protection, "substantially in accordance with

the recommendation of the Chief of Engineers."  Pub. L. No. 84-455, 70 Stat. 65 (Ex. 1).  The

confirmation of this lies in Plaintiffs' failure to allege any deviation from the statute's

mandate.  In the absence of any deviation from the statute, it cannot rightly be said that Mr.

Russo and his predecessors acted with anything other than due care.  *See Welch,* 409 F.3d at

652.

Welch is instructive.  The plaintiff had been detained under an immigration statute

that was eventually held to be unconstitutional as applied to him.  After his release, he sued

the United States, claiming that his detention violated Maryland law and therefore provided

grounds for bringing an FTCA action for false imprisonment.  *Welch*, 409 F.3d at 648-49.

Concluding that it lacked subject matter jurisdiction, the district court dismissed the action

under Rule 12(b)(1), Fed. R. Civ. P., and the plaintiff appealed.  Plaintiff raised two

arguments.  First, he asserted that 28 U.S.C. § 2680(a) does not apply to intentional torts.

Second, he argued that even if § 2680(a) does apply to intentional torts, it did not apply to his

particular claim.  *See id.* at 651-52.  The Court of Appeals rejected both arguments.

Pertinent here is the court's explanation of its conclusion that the due care exception applied

to his claim:

> Welch does not claim that the INS officers carried out their responsibilities
> in an inappropriate manner, or in any way deviated from the statute's
> requirements.  Rather, his complaint is with the officers' decision to detain
> him in the first instance.  However, this is a complaint regarding the statute
> itself, not with any of the particular officers' alleged deviation from its
> mandate.  Absent any allegation of such a deviation it cannot be said
> that the officers acted with anything other than due care.

*Id.* at 652.

Welch argued, however, that the court's analysis was wrong inasmuch as it focused on the particular officers' conduct.  Doing so was fundamentally mistaken because the officers' conduct, regardless of its particulars, had been authorized by an unconstitutional regulation.  "Put simply, Welch contend[ed] that an unconstitutional regulation can never be said to have been executed with 'due care.'"  *Id.*  Recognizing this for what it was, an attempt to use an action under the FTCA to challenge the validity of the law that had authorized and mandated the INS officers' actions, the Court of Appeals rejected the plaintiff's argument and affirmed the district court's dismissal.  *See id.* at 652-53.

Plaintiffs here allege that the acts and omissions of the Corps employees who designed, constructed, operated, and maintained the MRGO caused them harm.  Plaintiffs are attempting to use the FTCA as a vehicle to recover for this harm even though there is no allegation (and certainly no evidence) that any employee ever did anything other than what he was required by law to do.  Plaintiffs contend that the United States should be held liable for the bad result that they say came from the Corps' compliance with Public Law No. 84-455 (Ex. 1).[9]

Like Welch, Plaintiffs make two unavailing arguments to avoid application of the due care exception.  First, they point out that no single allegation in the Complaint objects to the

---

[9]The due care exception operates hand-in-glove with the discretionary function exception, allowing the Court to enter a judgment of dismissal without regard to whether the Corps employees whose conduct is in question did or did not exercise due care.  *See Buchanan,* 915 F.2d at 971 ("Yet, even if we assume, *arguendo,* that prison officials failed to exercise due care, the second clause of the subsection could still provide the government with immunity against suit.").

statute.  Second, they assert that the statute did not tell the Army Corps where and how to

build the MR-GO.  The first argument fails because application does not depend on a direct,

explicit attack on the statute.  The second argument fails because the statute told the Corps to

build the channel "substantially in accordance with" the Chief's recommendation.      Pub. L.

No. 84-455, 70 Stat. 65 (1956) (Ex. 1).  Accordingly, the "where" was depicted on Plate 2

("Plan of Improvement") and the "how" was by "routine dredging operations."

H.R. Doc. No. 82-245, at 33, 45 (unpaginated Plate 2) (Ex. 2).

As in *Welch,* the due care exception applies because the plaintiffs' are attacking the

*implementation* of the statute.  Plaintiffs here, like the plaintiff in *Welch,* are challenging the

*actions of the Government employees who executed the statute.*  Characterizing those

actions as "negligent" is not a basis of distinction.  The challenged actions in *Welch,* though

intentional, were characterized as wrongful.  The key point of similarity is that Plaintiffs

here, like the plaintiff in *Welch,*  have not alleged any way in which the employees of the

Government deviated from the statute.  The attack by Plaintiffs on the Corps employees'

conduct is no less an attack on the statute than the attack that the court in *Welch* held to be

barred by 28 U.S.C. § 2680(a).

That this is the true nature of this action can be seen in the evidence on which

Plaintiffs rely.  Plaintiffs have adduced no evidence that any particular employee negligently

dredged the MRGO or negligently installed bank protection.  There is no evidence that on

any given day between March of 1958 and August of 2005 an employee of the United States

operated a dredge negligently or misplaced stones along the channel.  Plaintiffs have not

adduced any evidence that Mr. Russo or any of his predecessors incorrectly determined that

dredging was the more economical means of maintaining the waterway than bank protection

in some discontinuous reaches between Violet and the GIWW ("Reach 2") but not in others.

Instead, Plaintiffs rely entirely on their experts' numerical modeling of a theoretical

construct in which the forces of Hurricane Katrina are imposed on a land and seascape that

supposedly represents the Lake Borgne area in 1958, *before the first spade of dirt was turned*

to dig the MRGO (but with the LPV levees in place as they existed in 2005). *See* Pls. Opp. to

Def. Mo. Sum. J. at 1-2 (causation) (Doc. 16063).

Because of the nature of the evidence on which their case is founded, Plaintiffs are

forced to admit that a half century of decisions about when and where to dredge and where

to install bank protection cannot be shown to have been a substantial factor in causing the

flooding of which they complain.

> At no time have Plaintiffs asserted that operation and maintenance, standing
> alone, was a substantial factor in causing the catastrophic destruction of their
> properties. . . . Plaintiffs' causation theory is predicated on the claim that the
> cumulative effect of the MR-GO's negligent design, construction, operation,
> and maintenance . . . was a substantial factor in causing the flooding of
> Plaintiffs' properties.  Accordingly, Plaintiffs' experts analyzed the cumulative
> impact of all four dangerous conditions on the catastrophic flooding, properly
> not detaching the effects of operation and maintenance from the effects of
> design and construction.

*Id.* at 11-12; *see also id.* at 12-13 (arguing that any attempt to analyze effects of MRGO's

operation and maintenance would be arbitrary, implausible, and unscientific).

What ultimately confirms that this action is a thinly veiled attack on the statute is Plaintiffs' commentary on their Dutch experts' computer simulation of the "MR-GO as Designed" scenario.  *Pls. Wave Report* App. E, at 33 (Ex. 21).  This scenario "represents the situation if the MRGO had been [constructed and] maintained at authorized dimensions." *Pls. Surge Report* at 4 (Ex. 22); *see also id.* at 5.  The "MRGO as Designed" scenario was designed to isolate and quantify the hydraulic effects "of a MRGO channel maintained at its design dimensions with the levees along the MRGO at their actual pre-Katrina heights and the Katrina storm."  *Id.* at 64.  Relevant here, however, are not the results of that simulation but rather Plaintiffs' comment that the "MRGO as Designed" scenario "is not Plaintiffs' 'no negligence' scenario."  Pls. Opp. to Def. Mot. Sum. J. at 15 (Doc. 16063).  Plaintiffs contend that the term "no negligence" cannot properly be applied to a channel constructed and maintained at its authorized depth and width:

> [The term "no negligence"] should not be attributed to the Plaintiffs' expert Declarations or Technical Reports because none of Plaintiffs' experts use this term to describe Scenario 3 (MR-GO at authorized width and pristine wetlands) because *that is not a set of conditions that would constitute "no fault" on the part of the Defendant* with regard to the design, construction, operation, and maintenance of the MR-GO over its half century life cycle. For example, Scenario 3 does not take into account the fact that Reach 2 of the MR-GO is a potential conduit of storm surge from the Gulf of Mexico and from Lake Borgne and that there is a potential for "funneling" of surge down Reach 1/GIWW and into the IHNC, thereby omitting any provision for surge barriers.

*Id.* n.12 (emphasis added) (citations omitted).

As this commentary reveals, Plaintiffs contend that merely building and maintaining the MRGO "at authorized width and pristine wetlands," *id.*, was wrongful because doing so created the two "defective conditions" that constitute Plaintiffs' cause of action.  FAC ¶ 1. As in *Welch*, there is no allegation of any departure or deviation from the conduct that was authorized by the statute.  Plaintiffs' case is premised on the contention that the mere act of fulfilling the statute's mandate is actionable under the FTCA because the construction and maintenance mandated by Public Law No. 82-455 resulted in  "defective conditions" that allegedly caused harm to Plaintiffs when Katrina struck.  This attempt to hold the United States liable for doing nothing more than what was required by Public Law No. 82-455 constitutes an attack on that law.  The FTCA's due care exception therefore bars this action and requires its dismissal for lack of subject matter jurisdiction.

CONCLUSION

For these reasons, the United States' motion to dismiss for lack of subject matter

jurisdiction or, alternatively, for summary judgment should be granted.

Respectfully Submitted,

GREGORY G. KATSAS
Assistant Attorney General

THOMAS DUPREE
Principal Deputy Assistant Attorney General

PHYLLIS J. PYLES
Director, Torts Branch

JAMES G. TOUHEY, JR
Assistant Director, Torts Branch

  s/ Robin D. Smith
ROBIN D. SMITH
Senior Trial Counsel
PAUL LEVINE
Trial Attorney
Torts Branch, Civil Division
U.S. Department of Justice
Benjamin Franklin Station, P.O. Box 888
Washington, D.C.  20044
(202) 616-4289 / (202) 616-5200 (Fax)
Attorneys for the Defendant United States