UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re:  KATRINA CANAL BREACHES | § | CIVIL ACTION |
| CONSOLIDATED LITIGATION | § | NO. 05-4182 "K" (2) |
| | § | JUDGE DUVAL |
| | § | MAG. WILKINSON |
| | § | |
| PERTAINS TO: MRGO, Robinson (06-2268) | § | |
| | § | |

DEFENDANT UNITED STATES' STATEMENT OF MATERIAL
FACTS AS TO WHICH THERE IS NO GENUINE DISPUTE

1. The construction of the Mississippi River-Gulf Outlet was authorized by Public Law Number 84-455.  70 Stat. 65 (1956) (Ex. 1).  This law required that construction "be prosecuted under the direction of the Secretary of the Army and supervision of the Chief of Engineers, substantially in accordance with the recommendation of the Chief of Engineers contained in House Document Numbered 245, Eighty-second Congress."  Id.

2. In response to a request from Congress for a report as to the "advisability and cost of providing an emergency outlet from the Mississippi River in the interest of national defense and general commerce," the Chief of Engineers recommended construction of a deep-draft channel on the east side of the Mississippi River.  H.R. Doc. No. 82-245 at 4 (1951) (Ex. 2); see also id. at 12, 17, 39-43; cf. H.R. Doc. No. 71-46, at 1-3, 25 (1930) (Ex. 3).

3. The Chief's Report informed Congress that the recommended route ran from the Inner Harbor Navigation Canal eastward along the Intracoastal Waterway to a point near Micheaud before striking a southeasterly course "to and along the south shore of Lake

Borgne and through the marshes to and across Chandeleur Sound" to the Gulf of Mexico. H.R. Doc. No. 82-245 at 5 (Ex. 2); see also id. at 38, 43.

4. The Chief's Report stated that the recommended channel would being dug "through the marshes."  Id. at 5.

5. The Division Engineer's plan for the MRGO included neither bank protection nor surge barriers.  See generally H.R. Doc. No. 82-245 (Ex. 2).

6. The estimated cost for construction of the MRGO was $67,000,000 "exclusive of aids to navigation, and $1,000,000 annually for maintenance in addition to that now required . . . ."  Id. at 5.

7. The Division Engineer calculated the cost of the project and the benefit/cost ratio based on his judgment that construction and maintenance of inland sections of the channel would involve only routine dredging operations.  Id. at 33.

8. The Division Engineer also compared multiple routes in determining where to construct the MRGO.  Id. at 12 (comparing costs and benefits of alternate routes into account in preparing recommendation), 39 (comparing east-bank and west-bank costs); cf. id. at 2-3 (Bureau of Budget "no objection" letter, comparing costs and benefits), 33 (considering necessity of protective works in comparing relative "advantage" of west-bank route).

9. The Chief's recommendation was conditioned, inter alia, on the furnishing by "local interests . . . free of cost to the United States all lands, easements, rights-of-way, and

spoil-disposal areas for the initial construction, and when as required for subsequent maintenance." Id. at 5.

10. After authorization, the Corps prepared a series of designs for the MRGO. See MRGO Design Mem. No. 1-A:  Channels Mile 63.77 - Mile 68.85 (Apr. 1957 (rev. Jul. 1957)) (Ex. 25) [hereinafter DM 1-A]; MRGO Design Mem. No. 1-B:  Channels Mile 39.01 - Mile 63.77 (Sept. 1958 (rev. May 1959)) (Ex. 26) [hereinafter DM 1-B]; MRGO Design Mem. No. 1-C: Channels Mile 0 to Mile 36.43 (Bayou La Loutre); Mile 0 to Mile -9.75 (38 ft. contour) (Nov. 1959) (Ex. 27) [hereinafter DM 1-C]; MRGO Design Mem. No. 2: Gen'l Design (June 1959) (Ex. 28) [hereinafter DM 2].

11. "[E]rosion due to wave wash in open areas [was] expected in the upper part of the channel slope where the peat and highly organic clays are exposed." DM 1-A ¶ 16, at 7 (Ex. 4); accord DM 1-B ¶ 19, at 5 (Ex. 5). Channel protection was considered unnecessary and was not designed because the District Engineer "presumed that sufficient rights of way w[ould] be furnished by local interests to preclude use of channel protection or that additional rights of way w[ould] be furnished when the need ar[ose]." DM 1-A ¶ 16, at 7; accord DM 1-B ¶ 19, at 5; see also DM 2 ¶ 47, at 22 (noting that "surface widening due to erosion" was "anticipated" because "[b]ank protection works to prevent this anticipated erosion [had] not [been] recommended as a project feature, nor included in the costs") (Ex. 7).

3

12. The design memoranda included no barriers to impede the flow of water through the channel. See DM 1-A, at 2-9 & Plate 2 (Ex. 4); DM 1-B, at 3 (Ex. 5) & Plates 2-9 (Ex. 26).

13. The design memoranda stated that channel protection could "be provided if and when the need for it becomes necessary." DM 1-A ¶ 16, at 7 (Ex. 5); accord DM 1-B ¶ 19, at 5 (Ex. 5).

14. Construction on the MRGO began in 1958. MRGO Reconnaissance Report on Channel Bank Erosion at 14 (Feb. 1988) (Ex. 8) [hereinafter 1988 Recon. Rep.].

16. By mid-1961, the project was 20 percent complete. H.R. Doc. No. 89-231 at 53 (1965) (Ex. 9).

15. The channel was opened to traffic in 1963 and reached full project dimensions five years later. 1988 Recon Rep. at 14 (Ex. 8).

16. The Corps designed the MRGO with a 36-foot depth that would be created and maintained across a 500-foot span by "box cutting" that would result in "theoretical" side slopes not steeper than 1:2. DM No. 1-A ¶ 7, at 3-4 (Ex. 4); DM No. 1-B ¶ 7, at 2, Endorsement of Div. Eng'r (Oct. 23, 1958) (Ex. 5).

17. Design Memorandum No. 1-C stated that the channel would "have theoretical side slopes of 1 on 2 and have a bottom width of 500 feet." DM 1-C ¶ 5(a) at 1 (Ex. 6); accord DM 2 ¶ 47, at 22 (Ex. 7) (stating that the "channel slopes should be cut not steeper that 1 on 2").

18. The depth of the channel was diminished by soils and vegetation carried by winds, waves, and currents from the adjacent marsh and more distant places.  See Nov. 14, 2007 30(b)(6) Dep. of Keith O'Cain at 498:8-499:17 (Ex. 10).

19. Erosion and deposition occurred for a number of reasons, including: (1) natural subsidence and sea level rise; (2) wind-driven waves; (3) wave wash caused by vessel activity; and (4) dredging activities.  See May 21, 2008 Dep. of Edmond Russo at 42:1-43:18 (Ex. 11); Apr. 4, 2008 Dep. of Chris Accardo at 27:14-22 (Ex. 12); cf. Sept. 16, 2007 Kemp Report ¶ 50, at 38 ("The reason for this dramatic increase is the erosion effect of ship traffic and waves in [sic] the unstable banks and the MR-GO's delivery of saltwater to Greater New Orleans' wetlands.") (Ex. 13).

20. The top width of the MRGO expanded as a result of these processes.  E.g., Apr. 22, 2008 Dep. of Keith O'Cain at 86:24-87:8 (Ex. 14).

21. The Corps repeatedly dredged the MRGO to restore the waterway to the prescribed depth.  Nov. 14, 2007 30(b)(6) O'Cain Dep. at 498:8-499:17 (Ex. 10).

22. Without repeated dredging, the ongoing shoaling would have prevented ships from using the channel.  Id. at 494:13-20; 498:8-499:17.

23. Contractors were authorized to use a box cut method of dredging.  See Mar. 31, 2008 Dep. of Richard Broussard at 54:21-55:16 (Ex. 15); Apr. 22, 2008 O'Cain Dep. at 29:17-30:6 (Ex. 14).

24. Box cutting was approved because it was expected to yield a 1 on 2 slope and was less costly than stepping cuts up gradually along the diagonal.  See Apr. 22, 2008, O'Cain Dep. at 31:20-21; 57:10-15; 58:24 – 60:8 (Ex. 14); cf. USACE Engineer Reg. 1130-2-520 ch. 8-2a(10) (allowing box cutting on navigable waterways) [hereinafter ER] (Ex. 16); Ex. 17 (illustration of typical box cut design section).

25. As a matter of policy, the Corps authorized overdepth dredging to account for inaccuracies in dredging.  ER 1130-2-307 ¶ 9 [hereinafter ER] (Ex. 18);  see also DM 1-A ¶ 7, at 3-4 (Ex. 4); DM 1-B ¶ 7, at 2 (Ex. 5); DM 1-C ¶ 5(a), at 1 (Ex. 6); DM 2 ¶ 46-48, at 21-22 (Ex. 7); cf. ER-1130-2-520 ch. 8-2a(10) (allowing overdepth dredging on navigable waterways) (Ex. 16); ER-1130-2-307 ¶ 9a, at F-3 (1968); Mar. 31, 2008 Broussard Dep. at 23:25-24:11 (Ex. 15) (overdepth dredging provides a working tolerance); Apr. 22, 2008 O'Cain Dep. at 10:25 – 11:1 (Ex. 14) (allowable MRGO overdepth was two feet).

26. The Corps authorized advance maintenance dredging.  ER 1130-2-520 ch. 8-2a(7) (Ex. 16); ER 1130-2-307 ¶ 9(g) (Ex. 18); see also Apr. 22, 2008 O'Cain Dep. at 10:8–11:2 (Ex. 14); cf. DM No. 1-A, ¶ 7, at 4 (advance maintenance depth was initially two feet) (Ex. 4); DM 1-B, ¶ 7 (Ex. 5), at 2; DM 1-C, ¶ 5(a), at 1 (Ex. 6); Apr. 22, 2008 O'Cain Dep. at 10:17 – 11:2 (advance maintenance depth was increased to four feet).

27. Wave wash from ships traveling on the MRGO caused bank erosion, diminishing the depth of the channel, widening the top, and eroding adjacent marsh. See 1988 Recon.

Rep. at 26 (Ex. 8); MRGO Reconnaissance Report on Channel Bank Erosion at 1 (Jan. 1994) (Ex. 20) [hereinafter 1994 Recon. Rep.].

28.  The Corps studied various alternatives for stabilizing the banks and found that some methods were "prohibitively expensive" and others lacked the necessary support of a non-federal public body.  See id. at 35-71; 1988 Recon. Rep. at 30-62 (Ex. 29); 1994 Recon. Rep. at 1-2, 70-71 (Ex. 20); cf. 33 U.S.C. § 426i(a) (authorization to "implement . . . measures for the prevention or mitigation of shore damages attributable to Federal navigation works" is contingent upon "a non-Federal public body['s] agree[ing] to operate and maintain such measures").

This Statement of Undisputed Facts is respectfully submitted,

>GREGORY G. KATSAS
>Assistant Attorney General
>
>THOMAS DUPREE
>Principal Deputy Assistant Attorney General
>
>PHYLLIS J. PYLES
>Director, Torts Branch
>
>JAMES G. TOUHEY, JR
>Assistant Director, Torts Branch
>
> s/ Robin D. Smith
>ROBIN D. SMITH
>Senior Trial Counsel
>PAUL LEVINE
>Trial Attorney
>Torts Branch, Civil Division
>U.S. Department of Justice
>Benjamin Franklin Station, P.O. Box 888
>Washington, D.C.  20044
>(202) 616-4289 / (202) 616-5200 (Fax)
>Attorneys for the Defendant United States