# EXHIBIT 3

| 71st Congress 2d Session | COMMITTEE ON RIVERS AND HARBORS, HOUSE OF REPRESENTATIVES U. S. | DOCUMENT No. 46 |
|---|---|---|

# MISSISSIPPI RIVER—GULF OUTLET

## LETTER

FROM

# THE CHIEF OF ENGINEERS, UNITED STATES ARMY

TRANSMITTING

REPORT OF THE BOARD OF ENGINEERS FOR RIVERS AND HARBORS ON REVIEW OF REPORTS HERETOFORE SUBMITTED ON MISSISSIPPI RIVER—GULF OUTLET AND NEW ORLEANS INDUSTRIAL CANAL

WAR DEPARTMENT,
OFFICE OF THE CHIEF OF ENGINEERS,
*Washington, June 11, 1930.*

Hon. S. WALLACE DEMPSEY,
  *Chairman Committee on Rivers and Harbors,*
    *House of Representatives, Washington, D. C.*

MY DEAR MR. DEMPSEY: 1. Referring to letter of the chairman of the Committee on Rivers and Harbors of the House of Representatives, dated February 27, 1929, inclosing a copy of a resolution of the committee of the same date, requesting the Board of Engineers for Rivers and Harbors to review the reports on Mississippi River, La., with a view to securing an outlet to deep water in the Gulf of Mexico by the most practicable route for a permanent channel of a depth not exceeding 35 feet, submitted in response to a provision in the river and harbor act approved June 5, 1920, with a view to determining the advisability of constructing an outlet of this nature at this time, and for the purpose particularly of ascertaining the desirability and advisability of the United States reimbursing local interests for the expenditures made in constructing the industrial canal and finding its importance as a part of the inland waterways, I inclose herewith the report of the board in response thereto.

2. Recommendation was made in the reports under review that no modification be made of the existing projects, since adequate facilities were already provided for deep-draft vessels between New Orleans and the Gulf of Mexico. The particular improvement now desired is that the Federal Government take over the New Orleans Industrial

118819—R. and H. Doc. 46, 71-2——1

INCL. 3

MGP-003-000015941



Canal for use in connection with an additional outlet to the Gulf or provide a toll-free route for the intracoastal canal.

3. A large commerce moves through the passes of the Mississippi River, the tonnage in 1928 having been 17,107,959 tons, exclusive of cargoes in transit, amounting to 2,384,788. The foreign commerce amounted to 11,738,614 tons. The total number of ocean vessels arriving at and departing from New Orleans was 6,228, the maximum draft being about 32 feet.

4. An artificial waterway between New Orleans and the Gulf would have to be not less than 500 feet wide and 35 feet deep. Duplicate locks would be necessary to overcome the difference in the elevation of the water in the Mississippi and in the Gulf and to facilitate shipping. Nine possible routes for such a waterway have been given consideration, the estimated costs ranging from about $19,400,000 to about $41,000,000. Some of these routes would be exceedingly difficult to maintain. The most advantageous is probably one passing through Barataria Bay, which is somewhat shorter to western points than the routes via the passes. Allowing 50 minutes for passing through the lock, however, the sailing time would be about the same by way of Southwest Pass and by way of Barataria Bay. Vessels bound from New Orleans to eastern points would find the route via South Pass more advantageous than any of those considered.

5. The industrial canal is already part of the existing intracoastal route between the Mississippi River and New Orleans. The commerce on this route is increasing and the district engineer believes that the industrial canal has some prospective value as part of the inland waterway system. Reimbursement of the owners for the cost of the canal is not considered advisable by him, since the improvement has been carried out on a much more extensive scale than is required for the intracoastal service. The owner might be reimbursed, in the opinion of the district engineer, in an amount equivalent to the cost of constructing a 9 by 100 foot canal with a suitable lock, the estimated cost of which is $2,270,000, assuming that all rights of way and highway bridges were furnished at local expense. Since the question of improving the inland waterway from New Orleans to Columbus, Ga., is now being studied, the district engineer considers it preferable to consider the question of the industrial canal in connection with that report. He finds no necessity for an auxiliary route between the Mississippi River at New Orleans and the Gulf, as the continued maintenance of reliable channels in the two passes is now assured. He therefore recommends that no further steps be taken toward providing such a route or toward the acquisition of the industrial canal at the present time.

6. The division engineer concurs in the opinion of the district engineer. He points out that the toll charge for the movement of inland waterway traffic through the industrial canal is 5 cents per gross ton, and that the total payments made by the Federal barge line average less than $10,000 annually. The cost to the United States, in interest charges alone, of providing a toll-free canal, should such be possible by the payment of $2,270,000 to the owners, would be nearly 10 times the toll charges now paid by the Federal barge line.

7. The board finds that the improvement of the mouths of the Mississippi has now reached a point where dependable channels can be assured indefinitely. The cost of maintaining these channels,

MRGOX5606

including the extension of the jetties, which may be necessary within 50 years, is less than the annual carrying charges on any of the auxiliary channels considered. While there are some dangers and hazards to navigation through the passes, it is not to be expected that any more favorable conditions would be found in the restricted side channels which have been considered. The two improved passes have a capacity of several times the present commerce of New Orleans, and there is no necessity for another deep-water outlet, either for emergencies or to provide for increasing commerce. The question of making the industrial canal an integral part of the intracoastal waterway extending eastward from New Orleans has been given consideration in connection with recent studies, on which was based the recommendation of the department for channel improvement between New Orleans and Mississippi Sound. The traffic moving over this route is small and there appears to be no justification for the United States to take over the industrial canal, reimbursing the owners for its cost. That privately owned waterway is a much more extensive improvement than is considered necessary for an inland waterway; and, should further consideration be given in the future to its acquisition by the Federal Government, it would not appear equitable for the United States to assume the total expense. The board recommends that the expenditures made in constructing the industrial canal be not reimbursed to local interests by the United States, and that no additional outlet to deep water in the Gulf of Mexico be provided at the present time.

8. After due consideration of the above mentioned reports, I concur in the recommendation of the board.

Very truly yours,

LYTLE BROWN,
*Major General, Chief of Engineers.*

---

REPORT OF THE BOARD OF ENGINEERS FOR RIVERS AND HARBORS

WAR DEPARTMENT,
THE BOARD OF ENGINEERS FOR RIVERS AND HARBORS,
*Washington, D. C., May 27, 1930.*

Subject: Mississippi River outlets to the Gulf of Mexico.
To: The Chief of Engineers, United States Army.

1. This report is submitted in response to the following resolution, adopted February 27, 1929:

*Resolved by the Committee on Rivers and Harbors of the House of Representatives, United States, That the Board of Engineers for Rivers and Harbors created under section 3 of the rivers and harbors act approved June 13, 1902, be, and is hereby, requested to review the reports on Mississippi River, Louisiana, with a view to securing an outlet to deep water in the Gulf of Mexico by the most practicable route for a permanent channel of a depth not exceeding 35 feet, submitted in response to provision in the river and harbor act approved June 5, 1920, with a view to determining the advisability of constructing an outlet of this nature at this time, and for the purpose particularly of ascertaining the desirability and advisability of the United States reimbursing local interests for the expenditures made in constructing the industrial canal and finding its importance as a part of the inland waterways.*

2. In the reports under review it was recommended that no modification be made in the existing projects, which provide adequately

MRGOX5607

MISSISSIPPI RIVER—GULF OUTLET 25

paragraph 88, exceeds the previous 54-year average by 50 per cent, which is a reasonable assumption, the above noted period of 57 years would be reduced to 38 years.

92. Without going into refinements in attempting predictions obviously disproportionate to the accuracy and reliability of the method of analysis and the degree to which the comparison is applicable, it would appear from the foregoing and other general considerations that an estimate providing for a 7,000 foot extension to the South Pass jetties during the next 50-year period, would be conservative.

93. Whether such extension becomes necessary in the thirtieth, or the fiftieth year, will not substantially affect the average annual maintenance cost during the coming 50 years. For purposes of estimate, such extension will be provided for in the forty-first year.

94. Up to the time the jetties are extended a gradually increasing program of dredging will probably be necessary for maintenance of the bar channel. Vigorous dredging will be needed while the extension is in progress in order to assist the natural forces in establishing the new and deeper section through the bar and prevent a "heading up" of the water surface above the contraction works with consequent danger of diversion of flow to the other outlets. Following the lengthening of the jetties the amount of maintenance dredging necessary should rapidly decrease to a negligible quantity within about 10 years.

95. If the above assumptions are correct, the maintenance of the South Pass Channel during the next 50 years will require, besides the maintenance of the existing works, an extension about 7,000 feet long to the jetties, say in or about the forty-first year, the annual dredging required increasing gradually from practically nothing at present, to the equivalent of the continuous operation of one standard hopper dredge during the forty-first and forty-second years, while the jetty extension is being built, with rapid reduction in the final decade of the 50-year term. Including the cost of the extension of the jetties as maintenance, the average annual cost for the maintenance of South Pass is estimated at $256,250.

96. The above is based on the existing authorized depth of 30 feet. This depth could easily be increased to 35 feet for a least width of between 300 and 400 feet, and maintained at the latter dimensions with a relatively small additional amount of dredging.

97. At Southwest Pass the bar advance has been much more rapid than at South Pass, due to the greater volume of discharge. Since 1909 the advance of the 35-foot contour (project depth) has been as follows:

| Year | Distance of 35-foot curve from face of jetties | | Advance | | Average annual advance | |
|---|---|---|---|---|---|---|
| | Left sector | Right sector | Left sector | Right sector | Left sector | Right sector |
| | Feet | Feet | Feet | Feet | Feet | Feet |
| 1909 | −1,200 | −800 | | | | |
| 1921 | 1,740 | 3,500 | 2,940 | 4,300 | 245 | 360 |
| 1924 | 1,940 | 4,200 | 200 | 700 | 67 | 234 |
| 1929 | 2,040 | 5,300 | 100 | 1,100 | 20 | 220 |