EXHIBIT 11

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE: KATRINA CANAL BREACHES        CIVIL ACTION

CONSOLIDATED LITIGATION              NO. 05-4182 K2

                                     JUDGE DUVAL

PERTAINS TO                          MAG. WILKINSON

(Robinson, No. 06-2268)


          Deposition of EDMOND JOSEPH RUSSO,

JR., given at the U.S. Army Corps of Engineers,

ERDC, 3909 Halls Ferry Road, Vicksburg,

Mississippi 39180, on May 21st, 2008.


REPORTED BY:

          JOSEPH A. FAIRBANKS, JR., CCR, RPR

          CERTIFIED COURT REPORTER #75005

EDMOND JOSEPH RUSSO                                      May 21, 2008

 1   oath to the witness.

 2            EDMOND JOSEPH RUSSO, JR.

 3   3909 Halls Ferry Road, Vicksburg, Mississippi

 4   39180, a witness named in the above

 5   stipulation, having been first duly sworn, was

 6   examined and testified on his oath as follows:

 7   EXAMINATION BY MR. BRUNO:

 8      Q.   Mr. Russo, as I told you before we

 9   started my name is Joseph Bruno.  I'm an

10   attorney for the plaintiffs side of the case.

11            Would you, for this record, please

12   state your full name and your employment

13   address.

14      A.   Edmond Joseph Russo, Jr., 3909 Halls

15   Ferry Road, Vicksburg, Mississippi 39180.

16      Q.   Okay.  And I would like to mark and

17   attach as Exhibit Number 1 your vitae which

18   you've been kind enough to supply us this

19   morning.  I'm just going to mark mine.  And I'm

20   going to indicate it as Russo Number 1.

21            (Exhibit 1 was marked for

22   identification and is attached hereto.)

23   EXAMINATION BY MR. BRUNO:

24      Q.   And on Page -- not numbered pages, but

25   there's a page which describes your education.

EDMOND JOSEPH RUSSO                                    May 21, 2008

```
                                              Page 8
 1   Let's start with that.
 2           You're currently pursuing a Ph.D.?
 3   A.    Yes.
 4   Q.    And that's at Louisiana State
 5   University?
 6   A.    Yes.
 7   Q.    An it says that you expect to graduate
 8   12 of '08, this year.  Right?
 9   A.    It may -- that may be in May of '09.
10   So it's approximate.
11   Q.    Okay.  Let's see.  You also have a
12   Master's degree?
13   A.    Yes.
14   Q.    Is that from Tulane?
15   A.    NO.  University of New Orleans.
16   Q.    And that's 1999?
17   A.    Um -- '97, I think.
18   Q.    Look at the fourth line.  Am I reading
19   this right?
20   A.    MSCE, 1997, civil engineering,
21   University of New Orleans.
22           1999 is the Army Management Staff
23   College.
24   Q.    All right.  You just have to help me
25   in understanding how you have written this.  It
```

EDMOND JOSEPH RUSSO                                    May 21, 2008

 1      Q.   All right.  So the first thing you

 2   have is a channel, which the Corps dug.

 3      A.   Right.

 4      Q.   And once you have a channel, you got

 5   water in it.  And once you had water in it then

 6   you have boats in it.  So if you take away the

 7   channel you don't have land loss.  Fair enough?

 8      A.   That's not true either, no.

 9      Q.   Why?

10      A.   There's lots of different ways that

11   land is being lost in the area.  There's

12   natural subsidence, there's sea level rise that

13   coastal wetlands are very sensitive to and will

14   break up under, and we know the rates those are

15   occurring.  We know the rates of the land

16   subsidence, to some degree.

17      Q.   Uh-huh.

18      A.   There is also edge erosion of those

19   wetlands that occur on a constant basis under

20   the patterns of tidal fluctuation, wave

21   activity and circulation patterns.

22      Q.   Right.

23      A.   There is also significant land loss

24   due to minerals extraction that is heavily done

25   in the coast which stems from oil and gas canal

```
 1    dredging, pipeline dredging, um -- the collapse

 2    of the coastal marsh platform due to minerals

 3    extraction which you can clearly see in many of

 4    these locations occurring and can be easily

 5    connected to documented activities in those

 6    areas.

 7         Q.   Okay.

 8         A.   Also, there's wind-driven fetch that

 9    causes wave action in interior marsh areas

10    which cause them to unravel and open up all by

11    themselves which cause a problem.  So there's

12    lots of contributing factors to the coastal

13    land loss issue.

14         Q.   Uh-huh.  All right.  But you would

15    agree with me that at least one of those

16    contributors is the wave wash caused by vessel

17    activity on the MRGO.

18         A.   Yes.

19         Q.   And so my question to you is, does

20    CWPPRA include considerations of how to address

21    the loss of the banks due to -- I'm sorry.  Not

22    does it.  Could CWPPRA include projects to

23    address the loss of bank as the result of

24    navigation activity on the MRGO?

25              MR. WOODCOCK:
```

EDMOND JOSEPH RUSSO                                    May 21, 2008

1       A.    While I was there, I'm pretty sure

2    those were the channels I had.

3       Q.    All right.  So you had MRGO and eight

4    other channels?

5       A.    Correct.

6       Q.    Okay.  All right.  Let's see.  It says

7    you had the Caernarvon hydraulic river

8    diversion structure, and you ensured safe,

9    reliable project conditions by scheduling,

10   monitoring hydrographic channels and surveys.

11           Now, it doesn't get to you or your

12   jurisdiction until it's a finished project,

13   right?

14      A.    Um -- well, those nine projects were,

15   or are, in the operations and maintenance

16   phase.  So activities associated with that were

17   under that position.

18      Q.    All right.  It says you ensured safe,

19   reliable project conditions by scheduling,

20   monitoring hydrographic channel surveys, you

21   planned and executed, prioritized channel

22   maintenance, with beneficial use of dredge

23   materials for wetland creation and barrier

24   island restoration -- right?

25      A.    Correct.

EDMOND JOSEPH RUSSO                                            May 21, 2008

Page 60

1       Q.   Now, does that mean that when you
2   conducted dredging that one of the goals was to
3   create some wetlands?
4       A.   It wasn't a goal, um -- it was done
5   opportunistically under the authorities
6   provided.
7       Q.   All right.  And barrier island
8   restoration?
9       A.   Likewise.
10      Q.   All right.  What barrier island was
11  that?
12      A.   Breton Island.
13      Q.   Okay.  Any the idea was to take the
14  dredge spoils and put them on the island in
15  order to preserve that island?
16      A.   We opportunistically would convey and
17  place maintenance dredge materials in the surf
18  zone of the island, and natural processes would
19  rework it and move it onto the island.
20      Q.   Can you help me understand your use of
21  the word opportunistically?
22      A.   Yes.
23      Q.   What does it mean?
24      A.   That means reviewing alternatives when
25  we're planning a maintenance dredging event of

EDMOND JOSEPH RUSSO                                    May 21, 2008

Page 61

1    the channel that might include locations other

2    than the designated upland disposal area under

3    the various guidelines and authorities, to

4    include the federal standard.

5        Q.   Okay.  All right.  It says you also

6    led managed construction maintenance on

7    jetties, foreshore rock dike bank protection,

8    dredged materials retention structures and

9    revetment bank stabilization structures.

10            Okay.  Now, with regard to the

11   foreshore rock dike bank protection, were you,

12   as the manager of operations for the MRGO, in a

13   position that you could determine whether or

14   not foreshore rock dike bank protection was

15   necessary?

16       A.   Yes.

17       Q.   What were the criteria that you used

18   to determine whether or not foreshore rock dike

19   bank protection was necessary?

20       A.   It would be a life cycle alternatives

21   comparison to similar -- or I should say

22   options or engineering measures to accomplish

23   the levels of service required on the waterway,

24   whether that be for preventing the material

25   from going in or removing the material that was

EDMOND JOSEPH RUSSO                                    May 21, 2008

Page 106

1    down and say my role is to, um -- reduce as

2    much as possible the rate of sedimentation into

3    the channel.

4         Q.   All right.  Well, you've taken a lot

5    of engineering courses, haven't you?

6         A.   Uh-huh.

7         Q.   And do you agree with me that there is

8    an engineering principle to which most

9    engineers subscribe that one ought to design a

10   product or a device or a structure or a canal

11   in such a way that it does the least amount of

12   harm to persons or property, considering the

13   costs and the feasibility of the design?

14        Do you subscribe -- first of all, have

15   you ever heard of something like that before?

16   Am I just making that up?

17        A.   No.  Those are general principles.

18        Q.   Those are general engineering

19   standards, are they not?

20        A.   (Nods affirmatively.)

21        Q.   Do you subscribe to those standards?

22        A.   Well, sure.

23        Q.   Does the Corps subscribe to those

24   standards?

25        A.   Um -- you know, I don't know the

EDMOND JOSEPH RUSSO                                    May 21, 2008

Page 107

1    particular guidance or policy.  There's

2    certainly a policy out there somewhere that

3    states the Corps' position.

4        Q.   All right.  Well, let's leave that

5    alone.  Let's just talk about you as the

6    operation manager for the MRGO.

7             Did you subscribe to that engineering

8    precept or philosophy when you were acting in

9    that role?

10       A.   Yes, to the extent of the authority of

11   that project.

12       Q.   All right.  Did you have authority, in

13   your mind, to install foreshore protection

14   along the banks of the MRGO?

15       A.   In locations and in instances where it

16   would reduce the rate of sedimentation into the

17   channel, we -- I had the capability to install

18   anything, if it was red balloons.  You know?

19   So.

20       Q.   Okay.  So if you called it in aid of

21   navigation you could do it.  Fair enough?

22       A.   Yeah.

23       Q.   But if you called it wetlands

24   mitigation loss, you couldn't do it.

25       A.   Absolutely not.

Page 108

1      Q.   And if you called it mitigation of

2   hurricane surge you couldn't do it.

3      A.   No.  Not under the navigation project

4   authority.

5      Q.   All right.  Now, you wrote a paper

6   when you were at Tulane called Independent

7   Study Evaluation of Bank Line Revetment

8   Alternatives to Abate Ship Wake Erosion,

9   Mississippi River Gulf Outlet, Louisiana, in

10   July of 2003, right?  You recall the paper.

11      A.   Uh-huh.

12      Q.   You recall the first sentence of your

13   executive summary?

14      A.   No.

15      Q.   Well, here it is:  The existing

16   conditions of the MRGO bank lines are

17   unsustainable from economic, social and

18   environmental perspectives.

19           You remember that?

20      A.   Yeah.

21      Q.   All right.  Do you believe that now?

22      A.   Sure.

23      Q.   Okay.  Now, if you're the Congress and

24   you've authorized the United States Army Corps

25   of Engineers to build this channel, don't you

EDMOND JOSEPH RUSSO                                    May 21, 2008

Page 111

1      that's the protocol.

2          Q.   The non-federal sponsor.

3          A.   I think.

4          Q.   Before we get heavy into this, let me
5      finish up a few thoughts with regard to your
6      limitations.

7               Would you agree that the limitations
8      that are put upon you as the operations manager
9      of the MRGO are engineering and technical
10     standards, that you don't really have any
11     discretion other than the discretion that's
12     allowed by appropriate technical and
13     engineering standards?

14              MR. WOODCOCK:

15                  Objection.   Vague.

16         A.   No.   Not at all.   You have to
17     understand, there's a tremendous amount of
18     uncertainty in management and technical
19     decisions.

20     EXAMINATION BY MR. BRUNO:

21         Q.   Right.

22         A.   And there's undefined bounds of
23     discretion because of uncertainty.

24         Q.   All right.   Well, we can conclude
25     this, can we not:   That the United States Army

EDMOND JOSEPH RUSSO                                          May 21, 2008

Page 112

1    Corps of Engineers did not exercise its

2    discretion to fail to take the necessary steps

3    to protect the wetlands that were being damaged

4    by the MRGO?  Isn't that correct?

5         A.    I wouldn't say that.

6         Q.    Well, I thought you just told me that

7    you didn't have the discretion to protect the

8    wetlands.  You told me, in your prior

9    testimony, that we're required to make certain

10   that the channel was good for navigation.

11   Right?

12        A.    Correct.

13        Q.    Okay.

14        A.    Yeah.

15        Q.    You didn't have any discretion to go

16   protects the wetlands.  Right?

17        A.    Not under this authority.

18        Q.    I understand.  Under this authority --

19   what I'm trying to say to you is, doesn't it

20   logically follow, then, that the Corps was not

21   sitting at a table deciding to itself, we're

22   not going to protect the wetlands because we

23   have the discretion not to protect the

24   wetlands; on the contrary, the Corps takes the

25   position we did not have the discretion to

1    protect the wet lands?

2             Isn't that what you're saying?

3             MR. WOODCOCK:

4                  Objection.  Vague.

5        A.   Absolutely not.

6    EXAMINATION BY MR. BRUNO:

7        Q.   Well, then, I'm totally confused.  You

8    said to me, we could not install bank

9    protection if it was to preserve the bank.  You

10   said, the only way that we could install bank

11   protection is if it had a navigation purpose.

12           Did I --

13       A.   That's right.

14       Q.   -- get that wrong?

15       A.   You got it right.

16       Q.   Okay.  So that means, then, you did

17   not have the discretion to do bank protecting.

18       A.   Under that project.

19       Q.   Exactly.  So my point is, and I'm

20   asking you if you will confirm based upon what

21   you've told me today, the Corps was never in a

22   position, within the confines of the

23   authorization to build the MRGO, to decide to

24   or decide not to protect the banks from erosion

25   for any other purpose other than navigation?

Page 114

```
 1            MR. WOODCOCK:

 2                 Objection.  Speculation.

 3      A.   Um -- say it again.

 4            MR. BRUNO:

 5                 Can you read that back, Joe?

 6            (Whereupon the previous question was

 7      read back.)

 8      A.   If I understand the question, for the

 9      purpose of navigation, um -- our only

10      discretion was to limit the rate of

11      sedimentation into the channel.

12      EXAMINATION BY MR. BRUNO:

13      Q.   Which means you did not have the

14      discretion, nor did you ever exercise any

15      discretion, not to protect those banks or to

16      save the wetlands or to prevent marsh erosion

17      and the like.

18      A.   Under that authority.

19      Q.   Exactly.  Okay.  That's all I'm

20      saying.

21                 There are those who would say, well,

22      you know, the Corps had the authority to

23      protect and save those wetlands and it chose

24      not to.

25                 That didn't happen, did it?
```

EDMOND JOSEPH RUSSO                                    May 21, 2008

Page 126

1    letter memo to it -- again that's before my

2    time, but it probably, under memo, was

3    submitted the higher authority.

4        Q.   Okay.

5        A.   Um -- and the next step traditionally

6    is to do a feasibility study.

7        Q.   All right.  Well, to this date, has a

8    feasibility study ever been undertaken that you

9    know of?

10       A.   Um -- I don't think so.  I think that

11   just based on that alone, in the early

12   nineties, um -- they started -- they went ahead

13   and started doing -- as I mentioned, looking at

14   what under the federal standard can we -- and

15   we don't even need an additional study to do --

16   to begin placing, um -- foreshore protection

17   where it's more economically viable and

18   environmentally acceptable to prevent the flow

19   of the sediment into the channel.  So through

20   the nineties, I believe to the extent the

21   meager budget would allow and those criteria

22   were met, bank protection was put down.

23   There's a record of that.

24       Q.   Of bank protection that was done

25   within the limits of the, um --

EDMOND JOSEPH RUSSO                                      May 21, 2008

Page 136

```
 1       A.    Uh-huh.
 2       Q.    No St. Bernard, no nobody, just you
 3    talking to your boss.
 4       A.    I actually even Office of Management
 5    and Budget representatives out on the waterway
 6    to show them the problems and explain the story
 7    and tell how if extra money were put in the
 8    budget what we could do to, um -- increase our
 9    ability to maintain the channel, but chip away
10    at the long laundry list of maintenance items
11    that we had.  And we knew, you know, from
12    estimates which reaches, if we could do
13    maintenance, would lean towards being a
14    foreshore protection or which one would lend
15    itself more to --
16       Q.    Right.
17       A.    -- dredging.
18       Q.    But we're still talking about that
19    June trip.  On that June trip was the
20    interaction trip.
21       A.    Uh-huh.
22       Q.    I thought you told me that you had had
23    opportunities o make presentations to your
24    superiors.  I'm think about a room like this.
25    I'm think about you standing in front of this
```

Page 143

```
 1    United States Army Corps of Engineers ever
 2    communicated your thinking as reflected in your
 3    study that you did, the paper that you did, to
 4    the Congress?
 5         A.   Um -- most likely in that ongoing
 6    re-evaluation study that information was
 7    considered.  I can't be sure because I wasn't
 8    managing that study, but as we had new
 9    information they were surely interested to have
10    and use that.  As I said before, anytime
11    planning studies were done we would provide
12    them any information that we had that they
13    could use.
14         Q.   Well, you're listed as the contact
15    person for the '94 study, right?
16         A.   The '94 study?
17         Q.   Yeah.  Or was it the '88?  Let me see.
18         A.   Yeah.  But I was not in the position
19    at those times, so.
20         Q.   Let me show you that reference so I'll
21    know.  In this newspaper article that talks
22    about your trip in the summer of '05, they
23    quote you as saying the Corps spent 9.3 million
24    in fiscal year 2004 to create 543 acres of
25    wetland and to bolster another 846 acres said
```

Page 144

1    Edmond Russo, the Corps' operations manager for

2    the Gulf Outlet.  This comes from

3    Times-Picayune dated January 15, 2005, Metro

4    section.

5         A.    Uh-huh.

6         Q.    Is it an accurate quote?

7         A.    Um -- probably, yeah.

8         Q.    All right.  What does that 9.3 million

9    refer to?

10        A.    Um -- the best I can recall, during

11   that time period of the 13 million we had,

12   let's say, that we identified, um -- under the

13   federal standard, um -- an alternative to place

14   the dredge materials for beneficial use such as

15   that wetland creation --

16        Q.    Okay.

17        A.    -- as opposed to disposing in the

18   upper disposal areas.  So of that -- while

19   dredging the channel, we were simultaneously

20   rebuilding wetlands, um -- within the federal

21   standard.

22             MR. WOODCOCK:

23                 Hugh, can you put a sticker on

24        that?  6.

25             (Exhibit 6 was marked for

EDMOND JOSEPH RUSSO                                      May 21, 2008

Page 151

1      Q.   Is it your testimony then that if we

2   went out there -- if we had gone out there in

3   August, before Katrina, we would have seen rock

4   in the banks of the MRGO from its intersection

5   with the Intracoastal Waterway on the northeast

6   shore all the way down past Violet?

7      A.   Um -- we had miles of rock between

8   those two locations and most likely beyond in

9   some of the reaches that were better, um --

10  maintaining the channel by putting those in

11  place than dredging.  So I don't remember how

12  many miles, but all along there, in different

13  discontinuous reaches, we had rock.

14     Q.   Okay.  Well, I'm sorry, I

15  misunderstood.  I thought you said it was

16  continuous.  So it's not continuous rock.

17     A.   No.  Only, you know, reach by reach

18  where we would do the analysis of where, you

19  know, we could identify limits of where it

20  would be more effective, you know, economically

21  and environmentally acceptable to put that

22  rather than to do cyclic dredging in just

23  different discontinuous locations.

24     Q.   Well, I'm no scientist, nor am I an

25  engineer, but it just doesn't seem like it