# EXHIBIT 14

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

IN RE: KATRINA CANAL BREACHES      CIVIL ACTION

CONSOLIDATED LITIGATION            NO. 05-4182 K2

                                   JUDGE DUVAL

PERTAINS TO                        MAG. WILKINSON

(Robinson, No. 06-2268)


        Deposition of KEITH O'CAIN, given at the U.S. Army Corps of Engineers New Orleans District offices, 7400 Leake Avenue, New Orleans, Louisiana 70118-3651, on April 22nd, 2008.


    REPORTED BY:

        JOSEPH A. FAIRBANKS, JR., CCR, RPR

        CERTIFIED COURT REPORTER #75005

Page 6

```
 1                S T I P U L A T I O N
 2              IT IS STIPULATED AND AGREED by and
 3    among counsel for the parties hereto that the
 4    deposition of the aforementioned witness may be
 5    taken for all purposes permitted within the
 6    Federal Rules of Civil Procedure, in accordance
 7    with law, pursuant to notice;
 8              That all formalities, save reading
 9    and signing of the original transcript by the
10    deponent, are hereby specifically waived;
11              That all objections, save those as to
12    the form of the question and the responsiveness
13    of the answer, are reserved until such time as
14    this deposition, or any part thereof, is used
15    or sought to be used in evidence.
16
17
18                       *   *   *
19
20
21
22            JOSEPH A. FAIRBANKS, JR., CCR, RPR,
23    Certified Court Reporter in and for the State
24    of Louisiana, officiated in administering the
25    oath to the witness.
```

Page 7

```
 1                     KEITH O'CAIN
 2   43 Oak Alley Boulevard, Marrero, Louisiana
 3   70072, a witness named in the above
 4   stipulation, having been first duly sworn, was
 5   examined and testified on his oath as follows:
 6             MS. SOJA:
 7                 Under the Federal Rules, yes.
 8          MR. LAMBERT:
 9                 And that rule includes reserving
10          objections except to the form of the
11          question until the time when the
12          testimony is used.
13           MS. SOJA:
14                 Correct.
15          MR. LAMBERT:
16                 Good.  Just wanted to make sure
17          we were reading the same rule.
18   EXAMINATION BY MR. LAMBERT:
19      Q.   Mr. O'Cain, my name is Hugh Lambert
20   and I represent plaintiffs in this matter.
21   I've reviewed two depositions that you've given
22   in Katrina, one I think you were questioned by
23   Mr. O'Donnell and another one by Mr. Wiles --
24   steven Wiles.
25      A.   Yes, sir.
```

```
 1   maintenance dredging?
 2        A.   Post maintenance dredging.
 3        Q.   Well, I mean, in other words, here, we
 4   want you to dredge it to look like this?
 5        A.   Yes, sir.  Depending on the reach of
 6   channel we're dredging, there's a defined
 7   template.
 8        Q.   Okay.  And is there a defined template
 9   for Reach 2 between the intersection of the
10   Intracoastal Waterway and, let's say, down to
11   Bayou La Loutre, through the marsh?
12        A.   The project dimensions for that reach
13   are 500-foot bottom width by a 36-foot depth,
14   however, our dredging template, we're allowed
15   4-foot of advance maintenance, so we dredge
16   500-foot by a 40-foot channel.
17        Q.   Okay.  And I understand that that's
18   the channel, and it's 500 feet wide, it was
19   36 feet deep, and then you had a plus or minus,
20   I don't know, I guess it's a plus 2 tolerance,
21   so that's 38 feet.  Then I understood there was
22   advance maintenance dredging for two more feet,
23   that's 40 feet.  And what's your current --
24        A.   The current template we use is a
25   project depth of 36, the advance maintenance is
```

KEITH O'CAIN                                                    4/22/2008

Page 11

```
 1    4-foot, the allowable over depth on top of that
 2    is 2-foot.
 3         Q.   Okay.  And is there piece of paper
 4    about 4 feet advance maintenance?
 5         A.   Um -- I would have to say yes, there
 6    is.  I don't know where it is.  It would be in
 7    an environmental clearance that says we're
 8    allowed to go to 4-foot.
 9         Q.   Okay.  Who would you ask for to see if
10    we could find the document that reflects the
11    4 feet?
12         A.   The 4 foot advance maintenance.
13         Q.   Uh-huh.
14         A.   The best choice would be Ed Creef,
15    operations division.
16         Q.   Now, the section of Reach 2 that I've
17    asked you to focus on is through what I was
18    referring to in the beginning as a land cut.
19    In other words, it's through the marsh area --
20         A.   Yes.
21         Q.   -- as opposed to being out in Lake
22    Borgne.  Correct?
23         A.   As opposed to being out in Breton
24    Sound, yes.
25         Q.   That's what I meant, Breton Sound.
```

```
 1      Q.    No.  I think this is this line.
 2      A.    Oh.  Right here.
 3      Q.    Yeah.
 4      A.    So --
 5      Q.    Here, let me make it a little clearer.
 6      A.    I see what you have now.
 7      Q.    Yeah.  This is 20, 20, and 40 and 40.
 8      A.    So at a 40-foot depth, 1 on 2, you're
 9   saying 80-foot total is the additional width.
10      Q.    Right.
11      A.    Which is correct if you were digging
12   all the way back up to zero --
13      Q.    Right.
14      A.    -- in maintenance dredging, yes.
15      Q.    Right.  So let's go back to Exhibit 1.
16      A.    Okay.
17      Q.    So what I'm looking at here is W is
18   going to be 40.  Correct?
19      A.    In our maintenance dredging contracts?
20      Q.    Yes, sir.
21      A.    Again, if we were dredging all the way
22   up to an elevation of zero, that would be
23   correct.  However, as you know, the channel has
24   widened.  We don't daylight at zero.
25      Q.    Okay.  So now that it's widened, that
```

Page 30

```
 1   W must be a hell of a lot bigger.
 2        A.    It's a lot less.
 3        Q.    Really.
 4        A.    Because this dimension here is no
 5   longer up at zero.  It may be down at whatever
 6   this depth is that we intersect.
 7        Q.    Well, how wide are you when you get
 8   started?  500?
 9        A.    500.
10        Q.    So you're 250 on the side.
11        A.    Correct.
12        Q.    Okay.
13        A.    But as you come up, this line is not
14   going to intersect all the way up to zero.
15   It's going to stop sooner.
16        Q.    Underwater.
17        A.    Underwater.  Which brings your W down.
18        Q.    Okay.  That's because the thing has
19   gotten a whole lot wider.
20        A.    Because it's gotten wider, yes.
21        Q.    Okay.  Let's do the W from when it
22   didn't get wider, back in the old days when it
23   was actually around 660 at the top width.
24              The W would be 40, correct?
25        A.    Theoretically, yes, sir, if it was a
```

```
 1   total box cut.
 2       Q.   Okay.  So in the beginning, when the
 3   dredging was -- when the maintenance dredging
 4   contracts were let, and we can go back and find
 5   some old ones, I'm sure they exist, instead of
 6   250 feet on each side of center line, the Corps
 7   would allow a box cut width of 290 feet, which
 8   could be 250 plus 40.
 9       A.   If indeed they allowed a box cut back
10   in those days, and if the channel had not
11   eroded, yes, sir.
12       Q.   Okay.  Now, do you agree with me that
13   allowing a full 40-foot additional width, in
14   other words 290 on each side of center line
15   instead of 250, would actually promote erosion?
16           MS. SOJA:
17                I'll object to form.
18   EXAMINATION BY MR. LAMBERT:
19       Q.   Go ahead and answer it.
20       A.   I will state that the intent of the
21   box cut was to achieve that 1 on 2 slope.  So.
22       Q.   Okay.  And that would promote erosion.
23           MS. SOJA:
24                Same objection.
25       A.   It would promote the required dredging
```

```
 1   material on top of the box cut to fall into
 2   that hole, which is --
 3   EXAMINATION BY MR. LAMBERT:
 4        Q.   Okay.  But what really happened was,
 5   because of a lot of factors, one huge factor
 6   being what do they call it down -- what is it
 7   when the vessel starts coming?
 8        A.   Drawdown?
 9        Q.   Drawdown.
10        A.   Yes, sir.
11        Q.   And then a six foot wave.  So wave --
12   the action of the ship wake played a big part
13   in erosion.  You know that, right?
14        A.   Yes, sir, it did.
15        Q.   Okay.  But also, we know that a
16   40-foot wide original bottom depth, counting on
17   the slope falling into the triangle on the
18   bottom, that also promotes erosion.  Doesn't
19   it?
20             MS. SOJA:
21                  I'll object to form.
22   EXAMINATION BY MR. LAMBERT:
23        Q.   By design.
24        A.   It promotes sloughing of the bank,
25   purposeful sloughing of the bank, yes.
```

Page 57

```
 1              MS. SOJA:
 2                  Objection to form.
 3              MR. LAMBERT:
 4                  Sure.
 5         A.   I've never directly talked to a
 6   contractor concerning that.  Once we design we
 7   turn it over to the construction division to
 8   administer.
 9   EXAMINATION BY MR. LAMBERT:
10         Q.   Okay.  Well, I'm trying to figure
11   out -- I know the Corps, in other depositions,
12   and maybe even in yours, as well, says, we
13   don't say they can't box cut but we don't tell
14   them to box cut.  Talking about the dredgers.
15         A.   That's correct.  It's allowable.
16         Q.   Allowable.  That's the point.
17              Now, what I'm getting at is, I'm
18   assuming that it's allowable because the Corps
19   expects that its design profile or template is
20   going to be complied with in connection with
21   the contract.
22              MS. SOJA:
23                  Objection to form.
24         A.   If they elect to use the box cut, yes.
25   EXAMINATION BY MR. LAMBERT:
```

```
 1      Q.   In other words, that the parts at the
 2   top are going to fall into the extra parts
 3   created at the bottom.  Right?
 4      A.   That they would meet the template that
 5   we require, yes.
 6      Q.   Okay.  Now, what I'm trying to get at
 7   is if the dredgers don't do that, in other
 8   words, the box -- it doesn't work out the way
 9   it's supposed to, in your view is that the
10   fault of the dredger?  In other words, if he
11   can't accomplish it, he could do the cut where
12   they do the -- (Indicating.)
13      A.   Steps.
14      Q.   -- the steps, yeah.  So what I'm
15   saying is is that if they choose to box cut and
16   it doesn't accomplish the 1 on 2 side slopes,
17   then they haven't complied with the contract.
18   Is that fair?
19           MS. SOJA:
20              Objection to form.
21      A.   I guess in general.  They are expected
22   to meet the template we provide, yes.
23   EXAMINATION BY MR. LAMBERT:
24      Q.   Okay.  So the way that it goes is is
25   that they can choose to box cut as long as the
```

1   end product is the desired design template that
2   was contracted for by the Corps with them,
3   correct?
4       A.  Yes, that's correct.
5       Q.  Right.
6       A.  And accepted by the construction
7   division who, like I said, administers the
8   contracts.
9       Q.  Okay.  I understand that.  But you're
10  the guy that designs it.  You're the engineer.
11      A.  Right.
12      Q.  And so that's the person I'm
13  interested in right now.
14      A.  Uh-huh.
15      Q.  And so -- but as I understand it, and
16  I want to get your -- see if you're looking at
17  it the same way, that the dredger could choose
18  to do step cutting if the box cutting doesn't
19  accomplish the template, correct?
20      A.  Yes, he can.
21      Q.  Okay.
22      A.  It is a tool that he's allowed to use
23  is what the box cut amounts to.
24      Q.  Now, you know, I think, that box
25  cutting is more cost efficient for the dredger.

Page 60

1      A.   In general it's probably more
2   expedient, which would be cost efficient, yes.
3      Q.   Right.  Because he can just go over --
4   the lever man can just go over to the edge and
5   come up instead of going over and then doing
6   those little step things.
7      A.   As opposed to the multiple passes,
8   correct.
9      Q.   Yes.  Okay.  Now, as I understand the
10  dredging contracts, they also include the
11  surveying.  Is that correct?
12     A.   That's correct.
13     Q.   So the guy that does the dredging
14  provides the survey which proves that he did it
15  the way he's supposed to.  Correct?
16     A.   That's correct.
17          MS. SOJA:
18              Object to form.
19  EXAMINATION BY MR. LAMBERT:
20     Q.   And that same survey is the basis on
21  which he gets paid, correct?
22     A.   That's correct.
23     Q.   Okay.  And I'm going to ask you, in
24  addition to -- I guess Rick Broussard 's index
25  of those boxes would also include an index of

```
 1   have no idea.
 2       Q.   Okay.  Good.  So the general answer
 3   is, you know as an engineer that it's likely,
 4   just a general concept, that a swamp and/or
 5   marshland combined is a better situation than a
 6   thousand foot plus or minus wide 40 feet deep
 7   navigational channel.  Right?
 8            MS. SOJA:
 9                 Objection to form.
10   EXAMINATION BY MR. LAMBERT:
11       Q.   As far as storm goes.
12       A.   Once again, in general, there was
13   existing marsh so the small channel
14   cross-section, how much that that improves
15   storm surge, um -- you know, effect, I don't
16   know.  In other words, you still have existing
17   marsh out there even when you deduct the
18   channel so the impact of that small sliver on
19   the storm surge I don't know.
20       Q.   I understand.  And let's get that
21   small sliver into concept because, you see, if
22   we go back to scale here --
23       A.   Uh-huh.
24       Q.   You've been in the cafeteria.
25       A.   Yes.
```

```
 1      Q.    Okay.  And you looked out the window.
 2      A.    (Nods affirmatively.)
 3      Q.    How wide is the river right there?
 4      A.    Oh, in general, probably half a mile.
 5      Q.    Okay.
 6      A.    A couple thousand feet.
 7      Q.    Two thousand feet.
 8      A.    I would think.
 9      Q.    Okay.  There are places in the MRGO
10   that are just as wide as that river, aren't
11   there, in the land cut?
12            MS. SOJA:
13                 Objection to form.
14      A.    Yes.
15   EXAMINATION BY MR. LAMBERT:
16      Q.    Okay.  Now --
17      A.    Maybe in conjunction with what was
18   existing open water at the time, but yeah, some
19   type of way from bank the bank could be that
20   wide.
21      Q.    Exactly.  Now, if you're standing in
22   that cafeteria and there's a hurricane coming,
23   what would you rather, would you rather have
24   the body of water that you're looking at
25   between you and the storm as it comes towards
```