```
 1                  UNITED STATES DISTRICT COURT

 2                  EASTERN DISTRICT OF LOUISIANA

 3

 4

 5   IN RE:  KATRINA CANAL BREACHES   *    Docket 05-CV-4182-K
                 CONSOLIDATED LITIGATION  *
 6                                    *    New Orleans, Louisiana
     * * * * * * * * * * * * * * * *  *
 7                                    *    November 13, 2008
     PERTAINS TO:  MRGO               *
 8                                    *    10:00 a.m.
     * * * * * * * * * * * * * * * *  *
 9

10

11            MOTION FOR SUMMARY JUDGMENT BEFORE THE
                 HONORABLE STANWOOD R. DUVAL JR.
12                UNITED STATES DISTRICT JUDGE

13

14   APPEARANCES:

15

16   For the Plaintiffs:           Law Offices of Joseph M. Bruno
                                    BY:  JOSEPH M. BRUNO, ESQ.
17                                  855 Baronne Street
                                    New Orleans, Louisiana 70113

18

19   For Washington Group          Stone Pigman Walther Wittmann
     International, Inc.:           BY:  WILLIAM D. TREEBY, ESQ.
20                                       HEATHER S. LONIAN, ESQ.
                                    546 Carondelet Street
21                                  New Orleans, Louisiana 70130

22   For Washington Group          Jones Day
     International, Inc.:           BY:  ADRIAN WAGER-ZITO, ESQ.
23                                       DEBRA S. CLAYMAN, ESQ.
                                    51 Washington Avenue N.W.
24                                  Washington, DC 20001

25
```

1    Official Court Reporter:        Toni Doyle Tusa, CCR, FCRR
                                     500 Poydras Street, B-406
2                                    New Orleans, Louisiana 70130
                                     (504) 589-7778
3

4

5

6

7
     Proceedings recorded by mechanical stenography, transcript
8    produced by computer.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              **I N D E X**

2                                                                Page

3  Oral Argument

4        William D. Treeby, Esq.                          7

5        Joseph M. Bruno, Esq.                           71

6        William D. Treeby, Esq.                         106

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>**PROCEEDINGS**</u>

**(November 13, 2008)**

1

2

3       **THE DEPUTY CLERK:**  All rise.

4               Please be seated.  This is Civil Action 05-4182,

5    Section K, In Re: Katrina Canal Breaches Consolidated

6    Litigation, pertains to MRGO, here on a Motion for Summary

7    Judgment filed by Washington Group International,

8    Document 15861.

9               **THE COURT:**  Good morning.  Make your appearances.

10              **MR. TREEBY:**  William Treeby for Washington Group

11   International.

12              **MR. BRUNO:**  Joseph Bruno for the plaintiffs,

13   Your Honor.

14              **THE COURT:**  Thank you.  Again, before we start, I

15   know you have made your prepared arguments.  Just to let you

16   know, as sort of a disjointed soliloquy, where I see the

17   issues, and then you can enlighten me:

18              It looks like this has boiled down to, in this

19   vast remediation project, two specific parts of the project.

20   I'll call them the sewer lift station excavation and the

21   wedding cake excavation at the Boland site.  It appears that

22   the allegations are that, as a result of the excavations,

23   permeable material was placed in the void, allowing the

24   migration of water to ultimately undermine the floodwall.  That

25   seems to be, in a simplistic way, what I understand the

1  plaintiffs' claim to be.

2            Surrounding that is what geotechnical

3  engineering should have been done.  There's reference in the

4  RECAP report of the floodwall going down 25 feet, what bearing

5  does that have.  I've looked at a lot of these documents, and

6  I've got some specific questions about the documents I've

7  marked as we go along.

8            I'm not listing all, but then there's the permit

9  issue from the OLD; what, if any, effect does that have on this

10  matter.  There is, then, the backfilling.  And, of course, we

11  have all of that juxtaposed with the government contractor

12  defense, *Boyle* and its progeny, and how these issues fit in

13  with that.  I think there's some intimation there may be an

14  independent duty separate and apart from the contract.  Then,

15  of course, we go into the deposition testimony.

16            Also, there's this 300-foot thing.  I've looked

17  at Exhibit 4 and I don't see 300 feet there.  I don't know

18  where that comes from specifically, what is it, and whose

19  obligation is it; that is, when you're 300-foot from a flood

20  control project, you're supposed to do something or another.  I

21  saw Plaintiffs' Exhibit 4, which I think comes from Dr. Bea,

22  allegedly something that comes from the Corps, but I'm not sure

23  I understand all the ramifications of that, if there are any.

24            I have more specific questions as we go along.

25  Obviously, in a project like this, there's lots of material.

1   With the government contractor defense in mind, I've looked at

2   the specifications as they were developed, as I understand

3   them, and I have questions about them vis-à-vis these two

4   excavations.  Are the specifications basically precise?  Did

5   the contractor comply with the specifications?  Was there

6   something they should have warned about the government didn't

7   know about and that they knew about or should have known?

8   That's the defense in a nutshell, although there are many

9   permutations.

10            The law I think I understand pretty well.  The

11  facts I've made a great effort to understand.  I have some

12  questions about the facts.  That's how I see this thing is

13  distilled.  I'm sure there are permutations to that.  I'm

14  interested in facts relating to those issues and, of course,

15  anything else you want to enlighten me with.  Of course, this

16  doesn't count to your hour.

17            **MR. TREEBY:**  I didn't know I only had an hour.

18            **THE COURT:**  Yes.  An hour is going to be it.  I mean

19  an hour each.  You have an hour each.  The bottom line is

20  everything can be reduced.  There's a reduction sauce in all of

21  this.  The Court has spent a lot of time reducing this and

22  looking at all of the documents.  I have some specific

23  questions.

24            That's it.  It's not esoteric.  There's specs,

25  there's now a theory that's more defined than to two

1   excavations, and are they reasonably precise, and the backfill

2   issues, and then the overarching issues -- and I didn't mention

3   the soil borings.  I'm not sure what that has to do with

4   anything vis-à-vis the flood control.

5              I might point out it seems to me the only

6   mention of the flood control project in all of these documents

7   is something about the perimeter is 15 feet from the project.

8   Now, there's a definition of the perimeter which I don't

9   understand, which probably doesn't mean anything.  I'm just

10  curious about it and I'm going to ask you about it.  There's a

11  definition in one of the documents that seems to indicate it's

12  15 feet from the centerline of the canal.

13             It's probably a misreading on my part, but it's

14  cumbersome English.  That's the only mention of the flood

15  control project that I could see that was even envisioned in

16  these documents, in all of this stuff.  Okay.

17        **MR. TREEBY:**  You have given me a daunting task,

18  Your Honor, but here is a paper copy of our slide presentation.

19        **THE COURT:**  Okay.  Thank you.

20        **MR. TREEBY:**  We will do our best to probably jump

21  over some of these because there really are a lot of facts.  We

22  think they are all undisputed, but there are a lot of facts.

23             William B. Treeby representing Washington Group

24  International.  Adrian Wager-Zito and Debbie Clayman from

25  Jones Day are helping me.  Ms. Julia Cronin, who has probably

1   read more documents in this case than anybody -- and Mr. Bruno

2   will agree with that -- is manning the slide control and I

3   appreciate her efforts.

4             **THE COURT:**  Okay.

5             **MR. TREEBY:**  I have a few introductory remarks.  They

6   will be short and to the point.  I believe the Court has a

7   significant amount of general background material to understand

8   the issues of this case.  The briefing has been extensive.

9                  Insofar as the case against Washington Group is

10  concerned, the evidence relating to the application of the

11  government contractor defense we believe is undisputed, the

12  relevant facts to the application of that defense.

13                 Washington Group was hired to demolish six

14  industrial sites on the east bank of the Industrial Canal,

15  32 acres between North Claiborne and Florida Avenue, and to

16  make sure that all of the debris and toxic and hazardous waste

17  generated over the 80-some-years those sites were used was

18  removed, all as part of preparing that site for another phase

19  of work that would enable the continued use of this important

20  waterway while a larger modern lock could be built to enhance

21  waterborne commerce on the Mississippi River and the Gulf

22  Intracoastal Waterway.  This Court is very familiar with the

23  Lock Replacement Project, of which Washington Group's work was

24  a small part.

25            **THE COURT:**  There's something in the paper today

1   about it.  It will never go away.  It will be here when I'm

2   not.

3                    **MR. TREEBY:**  I always read the paper, Your Honor,

4   before I come this way.  I saw that this morning.

5                         Washington Group's contract with the

6   United States Army Corps of Engineers, as it related to the

7   work at the East Bank Industrial Area, consisted of a total

8   environmental restoration contract.  Under that contract, over

9   several years there were many task orders.  One of those task

10  orders was Task Order 26, also called Delivery Order 26.

11                        Under that contract, then, there were eight

12  major work plans containing specifications and numerous

13  detailed specifications consisting of work plans that were

14  formulated in what we believe the evidence shows was an

15  extremely substantive process of give-and-take, back-and-forth,

16  between numerous engineers at the Corps and the environmental

17  contract personnel working for Washington Group.  As the Court

18  knows, we have already briefed and argued the legal issues

19  involved when we had the Motion to Dismiss.

20                    **THE COURT:**  Yes.

21                    **MR. TREEBY:**  The Court has been the recipient of a

22  lot of briefing.  I'm not going to spend a lot of time

23  specifically addressing the several dozen cases cited on both

24  sides and in this Court's prior opinions, frankly, most of

25  which are cases in which courts have granted summary judgment

1    based on the government contractor defense.

2                 The legal principles are relatively simple.

3    This Court has previously used the government contractor

4    defense formulation of the Fifth Circuit case of *Kerstetter*,

5    written by Judge Robert Parker, affirming Judge Head's summary

6    judgment to Beech Aircraft and other defendants based on the

7    defense.  This slide sets out that formulation:

8                 (1)  The government must have approved

9    "reasonably precise" specifications;

10                (2)  The work -- and we substitute there "work"

11   for "equipment," which *Kerstetter* involved equipment -- must

12   have conformed to those specifications;

13                (3)  The supplier/contractor must have warned of

14   the work-related dangers that were known to the

15   supplier/contractor but not to the government.

16                The Court has already this morning indicated

17   it's fully aware of that test.

18                Before I get into it, I must describe two -- by

19   the way, Your Honor's prefatory remarks are exactly where I'm

20   going to head.  I'm going to try to talk about everything

21   Your Honor talked about, and I'm sure some of the questions I

22   may stumble over.  We will see.  In any case, there are two

23   significant smokescreens that we know will be raised based on

24   plaintiffs' opposition memorandum.

25                First, there's a legal smokescreen that somehow

1   there are prerequisites to applying the *Boyle* government

2   contractor defense here, that Washington Group has to begin by

3   proving the government itself is immune.

4           **THE COURT:**  I'm going to let you talk about that, but

5   I think they are two different tests.  For instance, the

6   government may not have a discretionary function exception, may

7   not prevail, but you still may have the benefit of it because

8   the discretionary function test is different -- and I

9   understand that if the government puts its stamp on something

10  within the contract that that's where your immunity flows.  I

11  understand that.  At the same time, there may be a mandate that

12  the government didn't follow.

13          **MR. TREEBY:**  Exactly.

14          **THE COURT:**  I don't agree with that argument.  You

15  certainly can get it on the record.  I tend to agree with your

16  approach on that, but you can certainly articulate it.

17          **MR. TREEBY:**  This slide does it better than I can.

18  *Lewis v. Babcock*, the Second Circuit case, "We agree with the

19  district court's approach that these inquiries are part of the

20  *Boyle* test and not prerequisites to it."

21           In *Boyle* itself it said, "The first two

22  conditions assure that the suit is within the area where the

23  policy of the 'discretionary function' would be frustrated...."

24           *In re Air Disaster*, a Fifth Circuit case, "The

25  first two elements of the test ensure that the government and

1    not the contractor is exercising discretion...."

2                    We are not here -- I'm glad to hear Your Honor

3    say that -- to try to prove that the government -- that's not

4    our burden of proof.  That's the government's burden when that

5    time comes.  Second, there's a factual smokescreen raised by

6    the plaintiffs that occupies page after page of their

7    opposition.  Your Honor alluded to it.  It's a smokescreen that

8    attempts to obscure the Court's view of what Washington Group

9    was contracted to do.

10                   One statement we can agree on with plaintiffs in

11   their opposition is -- and I'm quoting -- "The Court must first

12   understand the nature of the relationship between the Corps and

13   Washington Group, as well as the nature of the contract

14   itself."  Washington Group could not/would not have been

15   allowed to provide the Corps with or charge the Corps for

16   geotechnical engineering services to the Corps related to the

17   flood control structures under its contract for Task Order 26.

18                   This is from the TERC, which is the general

19   contract, of which then Task Order 26 was later entered into:

20                   "Contractor Personnel:  The requirements for

21   on-site and off-site personnel will differ for each project and

22   shall be specifically identified in individual delivery

23   orders."

24           THE COURT:  When you talk about the TERC, if you have

25   the exhibit number for the record, it might be a good idea.

 1          **MR. TREEBY:**  Yes.  It's Exhibit 15 --

 2          **THE COURT:**  In WGI --

 3          **MR. TREEBY:**  -- in our summary judgment submission.

 4          **THE COURT:**  Thank you.  It just helps us --

 5          **MR. TREEBY:**  Mr. Guillory --

 6          **THE COURT:**  -- and the court of appeal.  Go ahead.

 7          **MR. TREEBY:**  Mr. Guillory, in his testimony, who was

 8  a 30(b)(6) Corps witness, a very experienced engineer, he was

 9  asked:

10          "Question:  Okay.  Was there anything in the delivery

11      order for Task Order 26 which required Washington Group to

12      have a geotechnical engineer on-site at the EBIA?

13          "Answer:  No.

14          "Question:  Did the delivery order require Washington

15      Group to have a geotechnical engineer familiar with levees

16      and floodwalls in its home office in Denver?

17          "Answer:  No."

18              That's a smokescreen.  We weren't required.  We

19  could not/would not have been allowed to do that.  We could

20  not, under our contract for Task Order 26, bring geotechnical

21  engineers to work on the project.  In fact, we could not, on

22  this time and materials contract, provide any engineering

23  services related to the levees and floodwalls.

24          **THE COURT:**  Did you understand your geotechnical

25  engineering was primarily related to the environmental

1  concerns?

2       **MR. TREEBY:**  Exactly.  Contaminants in the

3  groundwater, that kind of thing.

4            This is from Exhibit 25 in Washington Group's

5  summary judgment submission.  The plaintiffs quote this, so I

6  want to deal with it:

7            "Project Requirements:  The contractor shall

8  furnish all engineering services, materials, supplies, labor,

9  as required, in connection with the technical review of site

10 documents, attendance at site meetings, and travel necessary

11 for the period of approximately 21 June '99 through

12 30 September '99 associated with the demolition."

13           This is a preliminary assessment and had nothing

14 to do with the floodwalls.  Mr. Guillory, when he was asked

15 that question, testified:

16           "Question:  Under Section 3, Project Requirements,

17      were you asking the contractor to provide any engineering

18      services relative to the levee and floodwalls in the

19      East Bank Industrial Area?

20           "Answer:  Not specifically to the levees and

21      floodwalls but to the 32 acres of the EBIA.

22           "Question:  Why not the levees and floodwalls?

23           "Answer:  The Jourdan Avenue levee and floodwall

24      served mainly as a perimeter of our 32-acre site.  It did

25      not include any physical work on that particular -- those

1    particular flood control works."

2              And then they talk about data gaps.  They make a

3    big deal about data gaps.  Washington Group could not, under

4    its contract, explore so-called data gaps that may or may not

5    have existed in connection with the flood control structures

6    adjacent to the East Bank Industrial Area.

7              Under the same paragraph, actually, it says,

8    "The contractor shall prepare a comprehensive report

9    recommending the scope and duration of the remediation and

10   demolition that will be required, including any data gaps that

11   may need to be filled by sampling or other investigations."

12             Mr. Guillory, when asked, "What kind of data

13   gaps did you expect them to identify" -- I won't read the whole

14   answer, but it's clear in his deposition, at pages 47 through

15   49, that he was talking about what I talked about earlier.

16   This is:  Grid sampling analysis; geophysical surveys to find

17   unknown debris and gaps and holes and contaminated waste in

18   drums underground; a subsurface trenching program on a grid

19   system to find any underground storage tanks, pipelines,

20   utilities.  That's what we were to do in terms of data gaps,

21   not so-called data gaps that related to the stability of the

22   floodwall.

23             One has to read somewhat carefully -- and I

24   believe Your Honor has -- to see through the smoke that

25   plaintiffs have propagated on the geotechnical front as it

1    relates to floodwalls and levees.  There were geotechnical

2    issues that Washington Group might encounter in fulfilling

3    Task Order 26, but they did not include levees or floodwalls

4    and they did not include underseepage.

5              When Mr. Guillory was asked about this, he

6    answered a question that -- he was asked what did he expect of

7    people on an HTRW site to be looking at in terms of

8    geotechnical matters and here was his answer:

9         "Answer:  ...contaminants of concern and how they

10        migrate through various types of soil, various layers and

11        lenses of soil, how they affect water table and get

12        trapped within certain water tables and aquifers and that

13        kind of thing, what's the mode of transport in that

14        contaminant, whether it's through water or through soil

15        contamination, that kind of thing.

16        "Question:  Did any aspects...cover levees and

17        floodwalls?

18        "Answer:  No.

19        "Question:  What about general underseepage issues

20        relating to structures?

21        "Answer:  No."

22             That was not Washington Group's job.  The bottom

23    line:  Washington Group had no geotechnical responsibility

24    related to levees and floodwalls.

25             When the plaintiffs quote from Mr. Guillory, who

1    was the construction manager on the site, his testimony, when

2    taken completely out of context, might be misunderstood.  I

3    understand that to be the reason why both sides can ask

4    witnesses questions, so you can clear up those kind of things.

5    Here's the entirety of his testimony on that subject.

6              The plaintiffs claim in their opposition that,

7    "The TERC required Washington Group to have available a

8    geotechnical engineer and expected Washington Group to advise

9    it of geotechnical issues it encountered."  As support they

10   cite this testimony of Mr. Guillory:

11             "Question:  Well, do you know whether or not the

12        basic TERC contract required the...TERC contractor to have

13        available a geotechnical engineer for any particular

14        project work?

15             "Answer:  Sounds reasonable.

16             "Question:  Did you have any expectation that

17        Washington Group would advise you -- as the person on the

18        site and encountering the site itself and the

19        peculiarities and particular nuances of the site, that

20        they would advise you of any geotechnical issues that they

21        encountered?

22             "Answer:  Yes.  In fact, they did in our corrective

23        action plans that we did for the six individual sites.

24        They designed the geotechnical excavations, depths, and

25        slopes for each one of those contamination holes that had

1     to be excavated."

2                This testimony, in context, has nothing to do

3     with geotechnical engineering with respect to levees and

4     floodwalls.  Simply stated, the Corps, exercising its

5     discretion, determined to use this existing TERC so that it

6     could, in its discretion, manage the costs of this portion of a

7     much larger project.  In this portion of the work, under

8     Task Order 26, Washington Group was not hired to provide

9     services related to levees and floodwalls and Washington Group

10    did not work on levees and floodwalls.

11               Here was the rest of the story about the

12    testimony.  Mr. Staggs, who was our on-site representative for

13    most of the job -- if Washington Group had the need to obtain

14    engineering support with regard to geotechnical issues, he

15    said, "We would have presented it to the Corps of Engineers

16    because...they were responsible for geotechnical issues."

17               Mr. Grieshaber, who is the 30(b)(6) expert,

18    geotechnical expert from the Corps' New Orleans District

19    Office, he testified the evaluation of Washington Group's work

20    on the floodwall "...is not something that the guy who's

21    digging or building the thing could do.  That's something the

22    Corps of Engineers has to do."  As construction manager

23    Mr. Guillory "had authority to" or "had discretion to"

24    determine whether there were geotechnical concerns.  Then

25    Mr. Guillory said the Corps did not expect Washington Group to

 1   perform any of its geotechnical engineering on the borrow pit

 2   other than to "implement what the Corps recommended."

 3                    That's the way this job was done.  That's what

 4   Washington Group was required to do.  In fact, when the Corps,

 5   in its discretion, thought they needed geotechnical expertise

 6   or evaluation of the effect of Washington Group's work on the

 7   levees and floodwalls, they reached out to their own expertise

 8   within the geotechnical branch of the New Orleans District

 9   Office.

10                    I'm going to go quickly over these just because

11   of time.  Exhibit 110 to Washington Group's summary judgment

12   brief and testimony of Mr. Guillory speaks to this issue.  They

13   had an issue where Mr. Guillory, in his discretion that

14   Mr. Grieshaber said he had, decided he needed to reach out to

15   get some geotechnical expertise to determine impact on

16   floodwalls and levees and he did so.  That's this slide -- go

17   to the next one -- and this slide, Exhibit 110.  This is where

18   they came back and gave him their description.

19                    I just want to speak to this one little piece

20   here.  This was having to do with another excavation, not one

21   of the two they are complaining about.  The way they said the

22   backfill for that borrow pit -- which was, frankly, much closer

23   to the floodwall than any of the two excavations they are

24   talking about.

25                    THE COURT:  As I recall, the two excavations here

1    were -- it's in the bench memo.  One was approximately 30 feet
2    and one 80 to 90 feet?
3              **MR. TREEBY:**  No.  It's much more than that.
4              **THE COURT:**  That's what's in the briefing.
5              **MR. TREEBY:**  30 feet?  Not ours.  None of --
6              **THE COURT:**  I mean in some of the briefing.
7              **MR. TREEBY:**  Maybe the borrow pit, but not the
8    others.
9              **THE COURT:**  No.  We have information from -- we have
10   a lot of stuff, so we may need to look at that.
11             **MR. TREEBY:**  We will come to that.  We have some
12   slides, actually, that demonstrate the location.
13             **THE COURT:**  Okay, because that could be significant.
14             **MR. TREEBY:**  Anyway, 12-inch lifts of 90 percent
15   proctor compacted, they gave this very detailed compact because
16   of their evaluation of that particular excavation, not the ones
17   that we are involved with here.
18             Now, at least we have identified the smokescreen
19   about geotechnical.  We may not have dispelled it but hope to
20   do it by the end of the argument.  I want to proceed with the
21   application of these government contractor defense principles
22   and conditions to the particular features of the work that
23   plaintiffs claim to be defective.
24             **THE COURT:**  I'm trying to think of the appropriate
25   time for me to point out -- maybe now is the time to do it.

1    I'm going to go through some of the exhibits that I have made

2    notes on and then maybe we can go into more detail later.  I'm

3    just going to note them for you now.  Some of them are not

4    really significant.  Some of them are just my curiosity.

5                     Exhibit 44, the Recommendation Report, on

6    page 35 of that report it describes -- this is probably just my

7    confusion -- "The western boundary of the project area will be

8    defined as that area that extends 15 feet toward the canal

9    centerline from the shoreline."  It just threw me off.  I may

10   be misreading --

11        **MR. TREEBY:**  15 feet into the water.  That's what

12   that's talking about.

13        **THE COURT:**  Right.  I had always thought that there

14   was 15 feet from the water towards the shore.

15        **MR. TREEBY:**  No.  That's the western side.  Now,

16   that's the side headed towards where we're at right now, headed

17   this way.

18        **THE COURT:**  Okay.  What you're saying is that the

19   western boundary of the project -- so that does not encompass

20   the floodwall, then?

21        **MR. TREEBY:**  No, no.  That's into the canal.  The

22   reason for that was all of the wharves that were along there

23   and the piling supporting it.

24        **THE COURT:**  That's the other side.  I see.  All

25   right.  I knew that I was off base on that.  I just was trying

1   to figure out why.

2              I have a general question.  There's a lot of

3   talk about cofferdams here.  Eventually -- not now -- we want

4   to make sure we come back to this:  What do the cofferdams have

5   to do, if anything, with the floodwalls?  I know they were done

6   in conjunction with the excavation, but what, if anything, did

7   the cofferdams themselves have to do with the floodwalls?  It

8   seems to me the floodwalls weren't in mind, my impression, at

9   all with reference to cofferdams.

10             **MR. TREEBY:**  I think that's dealt with later, but I

11  will just briefly state at this point that these were brace

12  cofferdams.  I remember in one of them they drove the sheet

13  pile down into a rectangular box, if you will, had bracing,

14  walers, and struts to support that and keep it very rigid.

15  They were driven down 55, 60 feet.

16             The witnesses always testified their main

17  purpose was to protect the personnel working in that

18  excavation.  They had to get all that, whatever was down there,

19  out.  They didn't excavate to 55 feet.  They excavated to

20  22 feet, 23 feet at most.  They put all that down there to

21  protect the soils, to keep the soils from moving, until they

22  were backfilled and then the sheet piles extracted.  That's

23  brief, but I'll get a little bit more into detail.

24             **THE COURT:**  It's my understanding that it wasn't

25  contemplating any prophylactic measure that referenced a

1    floodwall or the impairment of the floodwall or underseepage to

2    the floodwall.  That's my understanding.

3          MR. TREEBY:  That was not the primary -- now, whether

4    in the Corps engineers' minds it had something to do with that,

5    I'm not sure.  That's up to the government.  As far as our work

6    was concerned and as far as the witnesses testified, it was

7    primarily to let the excavation take place and keep soil from

8    collapsing into the hole and keep personnel working there from

9    being adversely affected --

10         THE COURT:  We'll go into that further if we have to.

11               On page 5 of what I call Exhibit 75, the Lift

12   Station Revised Work Plan, I'm reading from the second to last

13   paragraph:

14               "The excavation created to remove the lift

15   station, wet well, and associated support structures will be

16   backfilled with previously excavated material.  Due to the

17   depth of the excavation, Hamp's will tamp the backfill material

18   with the bucket of the hydraulic excavator in an effort to

19   compact the backfill material.  During the course of backfill

20   operations, previously installed walers will be removed.

21   Additional fill material necessary to complete backfill

22   operations will be provided by WGI."

23               I'm coming to a point on this, so I'll move on.

24   Exhibit 64, the Lift Station Removal Plan (Revised), it says,

25   "The excavation created to remove the lift station, wet well,

1   and associated support structures will be backfilled with

2   previously excavated material.  Due to the depth of the

3   excavation, Hamp's will tamp the backfill material with the

4   bucket of the hydraulic excavator in an effort to compact the

5   backfill material.  During the course of the backfill

6   operations, previously installed walers will be removed.

7   Additional filled material necessary to complete backfill

8   operations will be provided by WGI."  It looks like the same

9   thing.

10          **MR. TREEBY:**  Yes.  In fact, these are certainly

11   pieces we are going to get into.

12          **THE COURT:**  Then on that same exhibit, Exhibit 64,

13   page 7, this is under the "Sequence of Operations for Lift

14   Station Removal, Cofferdam Backfilling."  It says, "Backfill

15   excavation of previously excavated soil in two-foot lifts.

16   Initial backfill operations will be to the bottom of the walers

17   inside the cofferdam.  Complete backfilling to top sheet piles

18   to be provided by WGI after walers are removed."  I point out

19   it mentions "previously excavated soil."

20                Now I move to the Final Proposal 113, which is

21   Exhibit 29.  It states under 2.1 on page 4 of that exhibit,

22   "There are 'discovered' subsurface concrete foundations located

23   at the Boland Marine site.  Seven of the concrete foundations

24   average 22 cubic yards (33 tons) per foundation.  An eighth

25   foundation is estimated to be at a minimum 510 cubic yards

1    (765 tons) with a potential for an additional 200 cubic yards

2    of volume (305 tons).  The eighth foundation measures 25 feet

3    by 22 feet to a depth greater than 25 feet below mean sea

4    level."  It goes on to say, "The construction of the eighth

5    foundation includes a steel exterior framework that appears to

6    consist of..."

7              The point I wanted to make -- I'm not reading it

8    all -- "Exploratory excavation indicates there's a potential

9    for groundwater to inundate the excavation cavity of the eighth

10   foundation."  I don't know if that has anything to do with the

11   floodwall seepage, flood control project.  I simply --

12             **MR. TREEBY:**  Well, if Your Honor please, certainly

13   any hole one digs in New Orleans below about five or six feet

14   is going to -- I'll just divert for a second.  One of the first

15   cases that I worked on years ago was when they were building

16   the Royal Sonesta Hotel.  They started an excavation and it

17   started -- they were pumping water like crazy, but they hadn't

18   taken adequate measures to sheet-pile around the site.

19             As a result, some of the old historic buildings

20   on Royal Street started falling toward the hole.  Actually, it

21   produced the bankruptcy of a company.  They ended up, finally,

22   quickly stabilizing it, but a lot of damage had been done.

23   That's what happens in New Orleans when you dig a hole.  So you

24   drive sheet pile down very deeply and then, to the extent there

25   is a dewatering problem, you pump the water out.

1          **THE COURT:**  I understand that.  The regular water

2     table there, with the eighth structure, I didn't quite know

3     what it meant.

4          **MR. TREEBY:**  It's a groundwater situation.

5          **THE COURT:**  Why the eighth structure and not the

6     other ones?  I didn't know what it was referring to.

7               Page 14 of that same exhibit, Exhibit 29.  I'm

8     sorry.  On page 15, No. 7, under 2.1.  "The excavations

9     resulting from concrete foundation removal will be backfilled

10    with borrow material obtained from an off-site source.  An

11    estimated 900 cubic yards will be needed.  The material will be

12    placed in lifts and compacted.  However, no compaction testing

13    will be required."

14         **MR. TREEBY:**  That's a specification.

15         **THE COURT:**  Right.  I'll tell you my questions after

16    I'm through going over this, and then we can maybe figure the

17    best time to talk about it.

18              On page 16, No. 6, under "Technical Assumptions"

19    of the same exhibit, "The excavation is expected to be shallow.

20    However, some imported fill will be necessary to backfill the

21    excavations.  Surrounding soil will be pushed into the

22    excavations or on-site fill will be used to facilitate grading

23    of the area to the extent necessary for proper drainage."

24              Then we go to page 5 of Exhibit 63, which is the

25    final specs on what I call the wedding cake.  Under "Backfill

1   Excavations" on that page, "Immediately following pile

2   extraction operations, the excavation will be backfilled with

3   either import sand or on-site borrow back to original grade."

4           **MR. TREEBY:**  That's another piece we are going to be

5   looking at.

6           **THE COURT:**  I figured you would be.  Then on page 7

7   of that same exhibit, under "Cofferdam Backfilling," it says,

8   "Backfill excavation with previously excavated soil in two-foot

9   lifts."

10          I'll tell you the bottom-line is, reading this

11  and not being as familiar with it as you are, it doesn't seem

12  like the word *sand* is mentioned in any document in the sewer

13  lift station that I can see.  *Import sand* is used in that one

14  instance as to the wedding cake structure.  There seems to be

15  inconsistencies -- and I'm trying to figure out what the final

16  word is -- it looks like in both.  There are intimations that

17  you use the material on-site.  Why not the same material on one

18  and not the other?  Why use *import sand* in one part and then

19  *previously excavated material* in another part when they are

20  talking about the backfilling?

21          I've gone through these fairly meticulously and

22  tried to understand the inconsistencies and what really was --

23  to the extent it has any relevance, which I'm sure you will

24  talk about, and I'm sure Mr. Bruno as well.  I'm trying to

25  figure out what they mean.  I see a metamorphosis, but it looks

1    like generally you want to use the same material, but then

2    import sand makes it in one of them and I'm not sure why.  It's

3    not specifically listed in the other part I read.  It just says

4    backfill with the same material.

5              So those are some of the questions I have.  I

6    may be a little more specific about it as we go on, but I

7    thought it was fair to tell you now that those are some things

8    that are not real clear to me.  Okay.

9         MR. TREEBY:  I'll just say, as a general matter, and

10   then we'll get into it --

11        THE COURT:  Yes.

12        MR. TREEBY:  As a general matter, all of those

13   instances that Your Honor has pointed out are reasonably

14   precise -- maybe they are different from one location to

15   another, as you pointed out.  They are reasonably precise

16   specifications for what Washington Group was to do.

17             I'm almost ready to get to these sites, the

18   design features in question, but I think it's important for me

19   to point out, particularly based on some discussion that we had

20   based on the Motion to Dismiss and some things in your reasons

21   on the Motion to Dismiss, and that had do with this -- and

22   maybe this is no longer bothering Your Honor.  It seemed to be

23   at the time.

24             The specifications, I believe, in this case are

25   both performance specifications and design specifications.

1    Performance specifications simply would say:

2                When you finish your work, the soils in the East

3    Bank Industrial Area must satisfy the Department of

4    Environmental Quality standards to not contain more than

5    background levels of 32 hazardous substances identified on the

6    site.  When you finish, this site can't have any aboveground or

7    underground concrete foundations, debris, etc., pilings that

8    will get in the way of our bypass channel.  It has to all be

9    done.  That's a performance specification.

10               In addition, however, there were in this job

11   detailed design specifications developed, substantively

12   reviewed and vetted, and finally approved, in connection with

13   Washington Group's work on the East Bank Industrial Area, to

14   tell Washington Group specifically and precisely how Washington

15   Group was to do the work.  They were told by those

16   specifications in reasonably precise terms, including the ones

17   Your Honor has just gone through, what equipment to use, what

18   personnel to use, what procedure would be done, first, next,

19   and last, and a lot more.

20               These design specifications were developed,

21   presented to experienced Corps engineers, then revised,

22   resubmitted, revised, resubmitted, with substantive changes.

23   The process, we gave you some sampling of it to, we believe,

24   prove -- and there's not been anything to the contrary

25   presented by the plaintiffs -- that these were reasonably

1    precise specifications.  All of the document production has
2    been done.
3            Let me deal with the sewer lift station.  Let me
4    go to Slide 12.  This is an overall view of the area.
5    Your Honor is familiar with this.
6            Let's go to the next slide.  This aerial
7    photograph shows the East Bank Industrial Area divided into six
8    sites that were the most prominent.  That's why they were used.
9    Boland is at the top.  Saucer Marine is second from the bottom.
10   The two excavations we are talking about here, the sewer lift
11   station excavation is located right here at the very north end
12   of the Saucer site.  The wedding cake structure is located here
13   near the south part of the Boland site.  If you will notice
14   these yellow lines, those are the LiDAR location of the
15   breaches.  Now, I just want Your Honor to keep that in mind for
16   a minute.  That has to do with merits, really, but I just want
17   Your Honor to keep that in mind.
18           **THE COURT:**  I see.
19           **MR. TREEBY:**  Actually, these are scaled.  The
20   citations on these slides will tell you where in the record to
21   find those.
22           **THE COURT:**  Am I correct that whatever the distance
23   is, the sewer lift station was closer to the --
24           **MR. TREEBY:**  It's about 250 feet or so feet away from
25   the north end of the south breach.

1          **THE COURT:**  Vis-à-vis the floodwall --

2          **MR. TREEBY:**  The blue line is the floodwall.

3          **THE COURT:**  I don't know the distance, but it's --

4          **MR. TREEBY:**  Well, right there's the scale.

5    Your Honor can put a scale on it.

6          **THE COURT:**  It's closer that the wedding cake?

7          **MR. TREEBY:**  A little bit closer to the floodwall

8    than the wedding case.

9          **THE COURT:**  Okay.

10         **MR. TREEBY:**  Now, let's do the sewer lift station

11   site.  We are going to kind of move in on this.

12         **THE COURT:**  Mr. Treeby, if you need to get to some

13   things -- this is a significant case.  I did the hour just so

14   we can focus on the important things, but I'm not going to --

15         **MR. TREEBY:**  If I get off track, just tell me.  I

16   don't want to talk about that --

17         **THE COURT:**  You're not in the Fifth Circuit with 20

18   minutes.  If you need to go a little longer, I will let you do

19   that.

20         **MR. TREEBY:**  Thank you, Your Honor.  Been there, done

21   that.

22              This moves in on the sewer lift station.

23   There's also a scale at the bottom, and we give the citations

24   to the record here to show how these were located.

25              Let me say this, and I'm going to come back to

1    this again.  This wasn't adjacent.  That's what the plaintiffs

2    say.  This is adjacent to this breach site?  I don't think so,

3    not in my definition of the word *adjacent*, but I digress.

4                    Slide 15.  This is a picture of the sewer lift

5    station.  It's Guillory Deposition Exhibit 51.  This is the

6    cofferdam.  This is the sewer lift station.  Mr. Montegut gave

7    a pretty good description of the lift station.  He was out

8    there every day.  He is a 32-year experienced civil engineer

9    with the Corps.

10                   "The lift station is basically a pipe.  It's a

11   large diameter pipe with pumps in it, valves and ladders to get

12   down into it, all encased in...metal pipe.  Over the years,

13   being exposed to...brackish water in the Industrial Canal, that

14   thing was deteriorated substantially."

15                   This is what had to be removed because the

16   bypass channel needed to go right through here.  As with each

17   definable feature of work on the East Bank Industrial Area

18   site, after the scope of work was defined, there was a

19   preparatory phase meeting attended and participated in by the

20   Corps and by Washington Group personnel and by its independent

21   subcontractors, by the way, who did most of this work.

22                   This reflects who was there:  Mr. Montegut,

23   Mr. Clouatre, and another Corps representative; we had WGI

24   personnel; we had some of the WGI subcontractors' personnel

25   there as well.

1          This meeting reflects there had been an earlier

2   meetings on the same topic on October 1.  Following that

3   meeting, the Corps reviewed and critiqued the specifications

4   represented by a Revised Lift Station Removal Plan on

5   October 10.  This is a transmittal form that transmits the

6   revised lift station, and it's returned disapproved.  Why?

7   Because we have to have some more detail.  This is the Corps

8   interacting with Washington Group to substantively comment on

9   the specifications.  So this wasn't a rubber stamp is the point

10  here.

11          In *Trevino*, which is a case that understandably

12  the plaintiffs cite a great deal, this language is contained on

13  page 1486:

14          "The government delegated its design discretion

15  to the contractor and allowed the contractor to develop the

16  design.  The government's approval was not based on substantive

17  review and evaluation of the contractor's design choices and

18  is, thus, a mere rubber stamp by a federal procurement

19  officer."

20          These experienced Corps engineers were not

21  federal procurement officers with little or no experience in

22  what they were dealing with, as was in *Trevino*.  They were

23  substantively commenting on, looking at, revising, making more

24  comments on, revising, and finally approving the

25  specifications.

1          So, similarly, the resubmitted specifications,

2    representing further review and revision of the work plan, was

3    submitted by Washington Group to the Corps and signed for by

4    the Corps on October 12, 2001.  That's Exhibit 78.  "Resubmit

5    revised plan to include addendum items plus a sequence of

6    work."  So there were more comments.  That's Slide 19.

7          In response, as part of the back-and-forth of

8    the design process, Washington Group provided the revised specs

9    for the excavation of the sewer lift station on October 19.

10   This is the specifications.  I don't remember how many pages

11   they were.  I think they are in the record.  It's a lengthy set

12   of specifications.

13         Exhibit 64, which Your Honor has already

14   mentioned, had details about a cofferdam-type shoring system

15   that had to be stamped by a professional engineer licensed in

16   Louisiana; an engineer over in Lafayette, actually.  Excavation

17   bottom will be an elevation.  It had what kind of excavators to

18   use, how the piles were to be extracted, what kind of equipment

19   would be used, and a lot more details in it.  It details such

20   things as we have outlined there in more examples.

21         Let me look at the next slide.  I think this is

22   some of the language Your Honor had actually mentioned.  This

23   is from the Revised Lift Station Removal Plan, October 19,

24   which was finally the approved plan:  "Backfill excavation with

25   previously excavated soil in two-foot lifts."

1          Seemingly, as I have looked at the record,
2   that's what they did.  Their first choice was to take the very
3   soil that had been there and had served well, put it back in
4   the hole, tamp it down, compact it with a large excavator.
5   Then, in order to fill up the hole, they would either in some
6   instances call upon the borrow pit -- there was a borrow pit on
7   this site that had been selected because of the soils in it --
8   use those soils; and if you don't have those soils, at least on
9   the wedding cake structure, they said you could import sand.
10  We are going to get to that in just a minute.
11          **THE COURT:**  Is there an allegation by the plaintiffs,
12  to your knowledge, that imported sand was utilized on the lift
13  station site?
14          **MR. TREEBY:**  I don't think so.  I don't believe so.
15  Frankly, as I think Your Honor will see when we finish with
16  some of the testimony that's in the record and undisputed -- I
17  hate to jump ahead of myself because it will put this young
18  lady to a lot of trouble, but I'm going to get to the sand
19  issue in just a minute.
20          **THE COURT:**  All right.  One, you might argue that,
21  whether they used sand or not, the specifications were
22  sufficiently precise and you don't just pick one aspect; let
23  the design speak for itself.  That's one aspect, is that
24  reasonably precise.  I guess the threshold question, factual
25  question, is:  Is there any disputed evidence that a permeable

1  material was used and that would have been negligence on the
2  part of your client?

3          MR. TREEBY:  There's a whole range, by the way, of
4  permeability of all kinds of soils, which we will talk a little
5  bit about.  Although, again, I think that's merits rather than
6  the government contractor defense, but I do want to address it.

7          THE COURT:  The only reason I talk about it is that:
8  One, is it reasonably precise; and, two, if the government
9  didn't place its imprimatur on it in some way or another, other
10 than a rubber stamp, is it negligence?  It reduces down to that
11 issue.

12         MR. TREEBY:  Well, if Your Honor please, the state
13 standard of care is if we satisfy the two prongs I think
14 Your Honor --

15         THE COURT:  Yes.  That's the first question, is it
16 reasonably precise.

17         MR. TREEBY:  Right.  Exactly.

18         THE COURT:  In other words, if it says, "Put what you
19 want in it," but the design itself is precise, that's the
20 question.

21         MR. TREEBY:  We are going to get there in a moment.

22         THE COURT:  All right.

23         MR. TREEBY:  This process, however -- I just wanted
24 to describe the process -- epitomizes the development of what
25 we think are detailed design specifications for exactly how to

1   do the work Washington Group was required to do under the

2   contract.  When the Corps 30(b)(6) witnesses were questioned

3   about this process as it related to flood control structures,

4   for which they were responsible, they uniformly testified they

5   were not concerned.  Lee Guillory, the construction manager for

6   the Corps, this is some of his testimony:

7         "Question:  Did you see, in anything that Washington

8      Group provided to you, that the cofferdam was not going to

9      damage the flood protection structure?

10        "Answer:  No, we were not concerned the lift station

11     excavation was going to damage the flood control

12     structures.

13        "Question:  Why not?

14        "Answer:  Location, proximity...the rigidity...of the

15     design, the depth of the design, the bracing and the waler

16     system.  I felt confident that that was not going to

17     adversely affect any of the adjacent soils or site."

18           Now, this goes to one of your questions earlier.

19   This was something the Corps was concerned about and that's why

20   they wanted to protect -- when you read all the testimony, they

21   wanted to protect the personnel.  They had, as part of their

22   responsibility, making sure that they felt comfortable with

23   this.  And this man had, according to the chief geotechnical

24   man in the New Orleans District, the discretion to make that

25   call and whether or not he could make the call, he had the

1   discretion, or whether he needed to get the geotechnical branch
2   involved to make the call, which he did when he thought it was
3   needed.  That's all within the government's discretion, and we
4   were simply following our contractual requirements.
5        "Question:  Did you have any concerns about the
6        potential effect or damage to the floodwall from the
7        excavation of the lift station?
8        "Answer:  No.
9        "Question:  Why not?
10       "Answer:  Because the design and installation of a
11       braced cofferdam system does not allow soil movement to
12       occur that would adversely affect a flood control
13       structure.  And this cofferdam...was designed by a
14       professional engineer, licensed in the state of Louisiana,
15       and installed by professional contractors with full
16       quality control and quality assurance during the entire
17       process."
18       **THE COURT:**  Let me ask you a question now, which you
19   may be getting to later.  There's a mention in here of the
20   report -- it was in relationship to the RECAP issue, but that
21   the floodwall extended down 25 feet when, in fact, it was
22   eight.
23       **MR. TREEBY:**  I do want to talk about that.
24       **THE COURT:**  I'm wondering did that misinformation --
25   assuming it was -- set up a domino effect which would have

1   altered the design of any of this had they had that domino

2   effect?

3            **MR. TREEBY:**  Well, the Corps witnesses answered that

4   question and I'll get to it in just a minute.

5                     Similarly, Mr. Montegut, who is again an

6   experienced civil engineer, contracting officer

7   representative -- next slide, if you will -- testified.  By the

8   way, I would commend to the Court to read Mr. Montegut's

9   deposition from about page 73 to page 77.  This is an

10  experienced man, engineer in Louisiana, working on the flood

11  control --

12           **THE COURT:**  I've read a lot of depositions.

13           **MR. TREEBY:**  Those four pages.

14           **THE COURT:**  Anything that was pointed out to me has

15  been read.

16           **MR. TREEBY:**  Okay.  Well, this is just a piece of it.

17  He said:

18                     "As far as backfill I'm talking about, what my

19  thought process was is that a proctor is good, you know.  It

20  proves something.  It shows that compaction was achieved, but I

21  didn't need a proctor.  I had other things in my favor here

22  that didn't make it necessary to spend our taxpayers' money on

23  a proctor."

24                     This is the height of government discretionary

25  function.  By the way, he goes on in this ellipsis -- we just

1    couldn't put it all on here, but one of the things I remember
2    him clearly saying -- and Your Honor can confirm it in reading
3    his testimony, if you wish to.  He went on to say, "I had a lot
4    of things in my advantage," and he mentioned some of them.  One
5    of the things he said was:
6                     "This is 2001, 2002.  I knew this contractor was
7    going to be here until 2005.  By the way, there was a hurricane
8    in between, in which there was huge quantities of water in Ivan
9    up on the floodwalls, well up on the floodwalls.  I would have
10   seen if there was subsidence.  I would have seen if there was a
11   problem, and you better believe this contractor would have been
12   happy to come back and charge us to do whatever needed to be
13   done."  He had a lot going in his favor.
14                    "And if we had a problem with any of these
15   backfill operations...it would have been quite simple for me to
16   direct them, as contracting officer's representative, to
17   correct deficient work and to go in and to do whatever it took,
18   probably just add fill material...had it -- if it were not
19   compacted properly, the area that was excavated would have
20   subsided and there would have been a hole in the ground at that
21   site."
22                    One of the things he said after what's on this
23   slide, in those pages I referenced, was, "At the very worst
24   what we put back was every bit as good as what was there.  When
25   we left that site, it was better than when we drove up on it."

1          The Corps' decision, in approving these
2     reasonably precise specifications -- and I must say, when you
3     look at the cases and what the courts have found in the
4     Fifth Circuit to be reasonably precise, these specifications,
5     were far more precise than those in many instances, in my
6     opinion.
7          **THE COURT:**  Unfortunately, there's not enough cases
8     involving if you are a contractor.  They are mainly products
9     liability cases.  This whole thing was spawned from products
10    liability.
11         **MR. TREEBY:**  There is a case very much like this, if
12    Your Honor please, that I would commend the Court to read.
13    It's a district court case.  We cited to it.  It's the
14    *Richland-Lexington Airport* case.
15         **THE COURT:**  I love district court cases.
16         **MR. TREEBY:**  What?
17         **THE COURT:**  I love district court cases.
18         **MR. TREEBY:**  It involved an environmental
19    remediation, and those specifications that were found to be
20    reasonably precise were far less reasonably precise than ours.
21         The Corps' decisions in approving these
22    specifications were directly related to the discretionary
23    function the government should and must bring to their work.
24    Here was the result.  That plan, after all the back-and-forth,
25    give-and-take, was finally approved.  That's what Mr. Guillory

1    said.  That's what that letter stands for, it was approved.

2                  Plaintiffs' arguments, frankly, here are not

3    that they were not reasonably precise specifications; rather,

4    that they think there should have been other and different

5    specifications.  Be that as it may, we are not here on the

6    merits of what specifications the Corps should have approved.

7    That would be a merits inquiry or be something the Corps deals

8    with.

9                  We are here contending that Washington Group did

10   exactly what many of its subcontractors did, which was to draft

11   detailed work plans, submit those plans in writing, meetings

12   with the Corps, have a back-and-forth substantive discussion,

13   changes made by the Corps to those plans, and only when this

14   very thorough vetting and editing process was finished secure

15   final approval for reasonably precise and detailed

16   specifications for their work.

17                  Plaintiffs may argue with the efficacy of those

18   specifications, but they have no legitimate argument that there

19   were no reasonably specific, precise specifications, or that it

20   was rubber-stamped by the Corps.

21                  We believe Condition 2 is satisfied.  We believe

22   that our work conformed.  I'm going to have to fly through

23   this.  Basically, there was an initial phase -- let me just

24   walk through this, and she'll just have to flip through the

25   slides because I'm going to hurry through this and commend it

1   to Your Honor.

2             Slide 26, there was an initial phase.  What the

3   initial phase inspection was, when the work was set up to

4   start, Mr. Clouatre, or one of his other inspectors who was on

5   the site at all times, would go see that it was set up and all

6   of the equipment, all the personnel, and everything they were

7   starting to do was in conformance with those specifications.

8   That's what he signed off on, the initial phase inspection.

9   Thereafter, while that definable feature of work was being

10  done -- and that's what they called these, definable features

11  of work.  Thereafter --

12            **THE COURT:**  I've read the acronyms.  Don't worry.

13            **MR. TREEBY:**  There were daily follow-up inspections.

14  Daily follow-up inspections.  One of them is right here.  It's

15  Exhibit 70, "Follow-up Lift Station Removal."  He told what he

16  observed.  All the debris and piling had been removed.

17  "Excavator began backfilling with spoil in approximately

18  two-foot lifts and compacting to bottom of walers...no

19  deficiencies observed."  There were daily records.  We didn't,

20  certainly, on these slides put them all in.  Some of them are

21  in the record.  That was the process.

22            Then let's go to Slide 28.  The final result of

23  that, after all those daily inspections, Mr. Guillory was

24  asked:

25            "Question:  Do you know whether the Corps ultimately

1     accepted that the excavation and backfilling of the sewer

2     lift station was in accordance with the scope of the work

3     you issued?

4          "Answer:  Yes."

5          To summarize, the undisputed evidence shows that

6     the Corps approved reasonably precise specifications for the

7     sewer lift station work and the work done by Washington Group

8     conformed.  That satisfies the first two conditions of the

9     government contractor defense.  They can argue for different

10    specifications, but their charge that these were not reasonably

11    precise or that we did not conform to them is simply without

12    basis in the record.

13         I'm not going to deal with Condition 3.  I'm

14    going to deal with it at the end because their allegations

15    about Condition 3, knowing things we didn't tell people about,

16    it really doesn't relate specifically to any of this.

17         Let me talk about the wedding cake structure,

18    Slide 29.  This is the location of the wedding cake structure.

19    Again, we give the citation to how this was located, the basis

20    for locating it.  It's not just locating it; we attempt to

21    also, based on the record, provide the dimensions of the

22    excavation.

23         Now, this map shows the location.  Perhaps the

24    first thing that has to be noted, even more so than the lack of

25    proximity between the sewer lift station and the south breach

1    of the floodwall adjacent to the East Bank Industrial Area, is

2    the distance between the wedding cake structure and either

3    breach in floodwall.

4              The opposition on page 25 states, and I quote:

5    "The northern breach likewise occurred adjacent to a deep

6    excavation of the wedding cake structure at the Boland Marine

7    site."  That is representative of plaintiffs' hyperbole, a

8    stretching, and even a misstatement of the facts.  That's

9    merits, but I'm constrained to point it out.  I think it's a

10   lack of merit of the plaintiffs' causation theories.  We are

11   not here for that.  We're here to discuss the government

12   contractor defense.

13             Slide 30, here's a photo of the wedding cake

14   structure and Mr. Guillory's related testimony.  This large

15   concrete block was directly in the path of the bypass channel

16   that the Corps had determined, in the exercise of its

17   discretion, after years of study, was necessary for the

18   furtherance of the Lock Replacement Project authorized by

19   Congress.  It had to be removed.  We believe, again, that

20   Condition 1 is satisfied with respect to this structure.

21             On November 14, long after the general scope of

22   work had been reviewed, edited, and approved by the Corps and

23   as part of the development of the detailed specifications,

24   there was a preparatory meeting to address the definable

25   feature of work involving this concrete and steel model that

1    was located according to the best evidence -- we can go back.

2    You can look at Slide 13 and do a tracing of it.  The best

3    evidence is it was located well over 500 feet south of the

4    south end of the north breach and well over 1,500 feet north of

5    the north end of the south breach.

6              Let's go to Slide 32.  A new Statement of Work

7    was issued.  Why was a new Statement of Work necessary?

8    Because this was not identified before the job began.  This was

9    one of those things that they had to identify and they did

10   identify, so the Corps issued a new Statement of Work and here

11   was the Statement of Work.  It's a combination, but it's

12   somewhat performance specs.  "All concrete, steel, and pilings

13   shall be removed in their entirety and disposed of off-site as

14   appropriate."  We want salvage value of the steel, make some

15   technical assumptions.

16             This Statement of Work, by the way, what

17   followed, then, after this was a development and detailed

18   approval by the Corps of design specifications of this part of

19   the work.  Again, there's a preparatory phase meeting.

20   Mr. Montegut and Mr. Clouatre were there.  Washington Group was

21   there.  They said -- this is November 14 -- get some submittals

22   in for a review by the 19th through the 20th of November.

23             Then there was all kinds of back-and-forth,

24   which certainly is in the record, but Exhibit 63 was what ended

25   up.  On December 6, after a lot of back-and-forth, there

1    were -- I think it's 101 pages of these, and there's actually

2    some drawings we didn't even attach to that that were

3    related -- 101 pages, which I think is in the record,

4    Exhibit 63, with all kinds of detail exactly how they were to

5    do the work.

6             **THE COURT:**  I have looked at that exhibit.

7             **MR. TREEBY:**  Let me just deal with the wedding cake

8    backfill and compaction specifications.  The backfill with

9    previously excavated soil, two-foot lifts, this is what

10   Your Honor was reading.

11            **THE COURT:**  It is.

12            **MR. TREEBY:**  "Immediately following pile extraction,

13   the excavations will be backfilled with either import sand or

14   on-site borrow back to original grade."

15            **THE COURT:**  Those are in two separate -- it says

16   "with previously excavated soil" in one and then backfill

17   excavations, it talks about "import sand or on-site borrow

18   back."  Why are they different?

19            **MR. TREEBY:**  They always started with the preference

20   to use what came out of the hole.  And then, if they had enough

21   on-site borrow material from the borrow pit, they would use

22   that.  If they didn't, they could go outside and import

23   material.  I will talk about this word *sand* at this point to

24   clear some blowing sand from the air.

25                   Plaintiffs have used the word *sand* as a

1    euphemism over and over in their opposition.  Very interesting.

2    The specification here uses the words *import sand* as a

3    potential source of material after the excavated soil was used

4    to finish the backfill.  For those familiar with what was used

5    routinely as fill material and to build levees in Louisiana,

6    that word is clear.  For anyone who rides along the

7    Mississippi River, like Mr. Joanen does on the bike path, we

8    know what the term means.  It means pumped river sand, the most

9    common fill material in the New Orleans area.

10             This is not beach sand.  It has far too much

11    clay and silt to be found on any beach.  The Corps, their

12    expert, their geotechnical 30(b)(6) expert witness,

13    Mr. Grieshaber, knew what it meant.  Here's his testimony about

14    it:

15          "Question:  Is *river sand*, as the term is used in the

16          New Orleans area, typically sand that was pumped from

17          dredging in the Mississippi River?

18          "Answer:  Traditionally, it's material that was

19          either pumped from the river or it was deposited at point

20          bar deposits.  That's where the river actually builds up

21          sandbars.  And it's traditionally a very silty sand, fine

22          grain sand.

23          "Question:  Is it typical that *river sand*, as that

24          term is used in the New Orleans area at least

25          colloquially, is far less permeable than beach sand?

1          "Answer:  That's correct.

2          "Question:  And is that the kind of sand that is

3     commonly used for fill in the New Orleans area?

4          "Answer:  That is what we normally use, that's

5     correct."

6               One of plaintiffs' counsel -- you know, one of

7     those typical things, I've had those moments -- asks the next

8     question.  It's very telling.

9          "Question:  My last question was the Corps doesn't

10    use river sand to build its flood control structures, does

11    it?

12         "Answer:  It depends what aspect.  We'll use it for

13    structural backfill on the back side of the structures."

14              This is not beach sand.  This is appropriate

15    fill material.  Now, they wanted them to use what was there in

16    the East Bank Industrial Area first from the hole --

17         **THE COURT:**  Are there disputed issues of fact, in

18    your mind, as to whether that was used or whether sand was

19    used -- I'm using the generic term *sand* -- in either of the

20    excavations?

21              It seemed to be, from reading all of this

22    material, there was ostensibly some dispute as to whether sand

23    was used.  Mr. O'Conner said something.  I will give you a

24    chance to rebut.  I'm sure the plaintiffs are going to talk

25    about that.

1        **MR. TREEBY:**  I understand.  Is that cloudy, about

2   what actually was used on each particular site?  Perhaps.  That

3   doesn't deal with the government contractor defense.  We had

4   reasonably precise specifications.  It included import sand to

5   finish off a fill, as we just looked at the --

6        **THE COURT:**  Certainly as to the wedding cake

7   structure.

8        **MR. TREEBY:**  Right.  As to the wedding cake

9   structure, not the other one.  And we had Corps inspectors.

10  All the evidence is that they looked at it every day and

11  confirmed that what was done was in conformity with those

12  specifications and signed off that it was in conformity with

13  those specifications.  So, to me, that answers the question.

14           Now, is there some fuzziness?  If the case

15  depended upon whether sand was used -- this defense doesn't.

16  But if the merits depended on that, there would be a lot of

17  testimony at the end of day there was import sand used.

18       **THE COURT:**  I think I understand, but are you arguing

19  that you think the specifications for both excavations, as to

20  fill material, are reasonably precise?  You're arguing that?

21       **MR. TREEBY:**  Yes.

22       **THE COURT:**  It says backfill material or other

23  material from the site on one.  The other, in two different

24  places, one it says use the material previously excavated or

25  from the borrow pit; and if you don't have that, then -- this

1   is the wedding cake -- it says import sand.

2          **MR. TREEBY:**  Right.  Despite plaintiffs' arguments to

3   the contrary, the undisputed testimony is that this

4   specification did not mean that Washington Group could use

5   whatever it wanted to use to backfill these excavations.

6   That's the way they have argued it.

7          **THE COURT:**  Insofar as the compacting of the sand, I

8   think your first argument is that you look at the whole design

9   itself, was it reasonably precise; and then I think your

10  argument is that certain aspects of the design components don't

11  necessarily have to be as precise as the design itself.

12         **MR. TREEBY:**  I think they are reasonably precise.

13  Again, if they put river sand, the compaction was still the

14  same specification.  They still had to do the same thing.

15         **THE COURT:**  There was nothing about the 95 percent

16  proctor?

17         **MR. TREEBY:**  No.  That was a specification that could

18  have been.  We saw the testimony about it.  "Yes, we could have

19  done a proctor.  It would have cost the government a lot of

20  money.  We made the decision it wasn't necessary, in our

21  opinion," and that's what Washington Group had to go by.

22  That's what their responsibility was to do and that's what they

23  did.

24         **THE COURT:**  Okay.

25         **MR. TREEBY:**  The Corps considered and approved the

1   material used for the backfilling.  This is plaintiffs asking

2   the question:

3           "Question:  Any areas requiring backfill may obtain

4       it from a borrow pit established at the McDonough project

5       site.  It looks like a carat, and then you have written in

6       the words *or imported material*.  What did you mean by

7       *imported material*?

8           "Answer:  If there was not sufficient material,

9       borrow material, available from the McDonough Marine

10      on-site borrow area, we could have the option of importing

11      or having Washington Group purchase additional material to

12      be truck hauled into the site for use as backfill."

13          By the way, if they had told us to do that, we

14  would have been delighted to do that.  It just added to our

15  profit.  There was no reason for us not to do it, if that was

16  what was required.

17          "Question:  Did you have to approve the material they

18      chose to import into the site?

19          "Answer:  Yes."

20          That was Guillory.  This is plaintiffs asking

21  the questions.  Then later he said:

22          "Question:  The plan says additional fill material

23      necessary to complete backfill operations will be provided

24      by WGI...now, that means there's no limitation on what WGI

25      can use to put in the hole.  Right?

1        "Answer:  I disagree with that."

2              That's not what it meant.  They approved every

3   bit of import material.  They had to.  That was the way the job

4   went.

5        **THE COURT:**  "They" being the Corps?

6        **MR. TREEBY:**  The Corps.

7              Essentially, plaintiffs' real objection was, as

8   evidenced in that question:  Shouldn't you have had more and

9   different specifications?  Mr. Guillory's response was no, and

10  here's why.

11       "Question:  Why didn't you request a geotechnical

12       engineering analysis from the Corps in the context of the

13       Boland Marine excavation and backfill?

14       "Answer:  Two reasons:  The location and proximity of

15       those concrete foundations with respect to the floodwall

16       and the levee were quite a bit far away....  Also, where

17       those concrete block foundations were located within the

18       footprint of where the future bypass channels were to be

19       dredged" -- which was going to go down to 22 and 33

20       feet -- "and those concrete foundations and their

21       cofferdams fit within those footprints.  Those braced

22       structural excavations were designed by a professional

23       engineer...hired by WGI and their subcontractors,

24       professionally reviewed by all parties, and constructed,

25       and intense quality control and quality assurance

1      inspection followed on how those were installed and
2      removed."
3              That's why.  He wasn't concerned about it.  Now,
4   was that a bad decision?  It wasn't Washington Group's bad
5   decision.  I don't think it was a bad decision, but it was what
6   we were required to do.  Let me quickly go on.
7          "Question:  And I believe you testified...that you
8      reviewed this plan before it was approved?"
9              Speaking of the final cofferdam installation and
10  concrete foundation work plan.
11         "Answer:  Yes.
12         "Question:  And commented on various drafts?
13         "Answer:  Yes.  It went through several drafts."
14             This was not a rubber stamp.  Condition 2 is
15  satisfied because we conformed to those specifications.  We had
16  the inspection on December 13, the beginning of the work,
17  "Follow-up:  Excavation and Demolition of Concrete
18  Foundations."  This is just one day of the daily inspection
19  reports.
20         **THE COURT:**  Right.
21         **MR. TREEBY:**  Here's what we did.  "No deficiencies
22  observed."  From December into late March 2002, daily
23  follow-ups.  Then there's a Pre-Final Inspection Report by the
24  Corps, interestingly, Slide 42:  "All work is complete,
25  acceptable, and complies with contract?  No."

1          Why not?  The subcontractor left some trailers

2     on and they needed to be washed and deconned prior to

3     demobilizing.  So they are looking at it, really, in

4     conformance with the very details of the specifications.  After

5     that was done and the deficiencies were corrected, on March 27

6     we see Mr. Clouatre signed off all work is in compliance,

7     Exhibit 86 to our Motion for Summary Judgment.

8          Frankly, instead of dealing with the issues properly

9     presented, in our opinion, by the government contractor defense

10    facts, plaintiffs have attempted to divert attention from the

11    simple issues.  Were there reasonably precise specifications

12    for the work that were substantively reviewed and approved by

13    the Corps?  The answer is yes.  There's also uncontroverted

14    evidence that those approved specifications for the work were

15    conformed to and again the answer is yes.

16         The questions aren't for this Court to

17    determine, as plaintiffs would have it:  Should there have been

18    more specifications?  Should there have been more detail to the

19    specifications?  Should Washington Group have been tasked to do

20    other work?  Should Washington Group have had other personnel

21    on this job?  Personnel, by the way, the Corps had not agreed

22    to pay for on this time and materials job.

23         The only proper questions are:  Were there

24    reasonably precise specifications?  Yes.  Did Washington

25    Group's work conform to those specifications?  Yes.

1                    Here the Corps, in the exercise of its

2       discretion as to how to man this job, how to pay for the work,

3       decided to use its vastly superior knowledge and expertise to

4       evaluate what effect, if any, the work Washington Group was

5       commissioned to do to remediate the East Bank Industrial Area

6       would have or could have on the floodwalls and levees.  This is

7       clearly something within the Corps' discretion, as the correct

8       answer to the two *Boyle* conditions or questions illustrates.

9       They have been fully satisfied in connection with these two

10      challenged excavations.

11                   I want to deal with Condition 3 briefly.

12                   **THE COURT:**  You might just briefly touch upon the

13      25-foot issue.

14                   **MR. TREEBY:**  That's in this.

15                   **THE COURT:**  Good.  And the permit issue.

16                   **MR. TREEBY:**  I'm actually dealing with that right

17      after.

18                   **THE COURT:**  The soil boring issue.

19                   **MR. TREEBY:**  Yes.

20                   **THE COURT:**  Oh, heck.  There's one other one.  I'll

21      remember.  Go ahead.

22                   **MR. TREEBY:**  Condition 3 is satisfied.  Washington

23      Group had no actual knowledge not known to the Corps of why the

24      application of the Corps-approved specs was unsafe or

25      unreasonable.  Plaintiffs assert, with no factual support

1   whatsoever, that Washington Group knew of some danger that they

2   did not warn the Corps about, danger that the Corps did not

3   already know about.

4            THE COURT:  Oh, and the 300-foot.  That's the other

5   one.

6            MR. TREEBY:  That's in the permit stuff.  It's not in

7   my notes, but I will address it.

8            THE COURT:  Right.

9            MR. TREEBY:  The plaintiffs' feeble attempt to deny

10  the application of Condition 3 is without substance.  First, we

11  have to take issue with the implications of plaintiffs'

12  statement on page 28 of their opposition.  This is subtle, but

13  I think it's important.

14            In the opposition they say the Court must decide

15  what constitutes knowledge of a danger.  To the extent

16  plaintiffs contend, as they here subtly do and elsewhere do,

17  that Washington Group should have known something and believe

18  they have shown that Washington Group should have known

19  something, that's outside of Condition 3's requirements, as

20  Your Honor has stated.  The Court simply needs to determine if

21  there's any evidence that Washington Group actually knew of

22  some danger not known to the Corps that was hidden or

23  undisclosed.

24            In *Kerstetter* -- Your Honor knows the law.

25  Basically, there's a very pertinent quote from *Kerstetter*

1    citing *Trevino*, actually.  "After *Boyle* a government contractor

2    is only responsible for warning the government of dangers about

3    which it has actual knowledge."

4              **THE COURT:**  No question.

5              **MR. TREEBY:**  Two things should be absolutely clear

6    and undisputed I think by now.  Washington Group didn't hide

7    anything.  The second is the Corps knew far more about the

8    issues that plaintiffs complain about than did Washington

9    Group.  This alone should satisfy Condition 3.

10             Plaintiffs' use of the drilling reports

11   furnished to the Corps by Washington Group -- furnished to the

12   Corps by Washington Group, by the way -- as a small piece of

13   the site assessments to attempt to make an argument that

14   Washington Group knew something they didn't tell the Corps

15   about is laughable on its face.  Plaintiffs gloss over this

16   fatal flaw in their argument with a statement on page 29 of

17   their opposition, and I quote:

18             "By failing to adequately report the findings of

19   the drilling reports to the Corps" -- and I'm going to stop and

20   come back to it.  Notice there's no citation for that supposed

21   failure to adequately report the drilling reports to the Corps.

22   More about that in a minute.  Then they continue in that same

23   sentence.  "Along with failing to properly specify the depth of

24   the sheet pile depth" -- I assume they mean tip -- "that would

25   cut off potential underseepage, WGI failed to fully inform the

1    government about a hazard...."  Again, that statement was made
2    without citation.
3              Just, logically, they are saying, "You told the
4    government something, so you failed to tell them about it."
5    I'm missing the point.  They are saying, "You misinformed the
6    Corps."  Well, we will see about that.
7              **THE COURT:**  The misinformed --
8              **MR. TREEBY:**  Sheet pile tip depth.
9              **THE COURT:**  And then the soil boring --
10             **MR. TREEBY:**  We gave it to them, but we are going to
11   come to that.
12             **THE COURT:**  Okay.
13             **MR. TREEBY:**  No citation, again, for that latter
14   statement.  However, even if the blatant misrepresentation of
15   the undisputed facts is taken at face value, there's something
16   very important missing.  There is no allegation that these
17   facts claimed to be known by Washington Group or represented by
18   Washington Group were not also -- the truth about them were not
19   also known to the Corps of Engineers.  That's not there.
20   That's required to defeat Condition 3.
21             It's a fatal flaw in any denial of the
22   satisfaction of Condition 3 of the government contractor
23   defense because all the evidence is the Corps knew infinitely
24   more than Washington Group about the floodwalls and levees
25   adjacent to the East Bank Industrial Area -- that were not in

1    the scope of our work -- than did the Washington Group.

2    Now, let me put this allegation about drilling

3    reports in some context.  Washington Group did, as was required

4    by its contract, undertake to contract others to do exploratory

5    boring at the Saucer Marine site.  That's what they first focus

6    on, and I'm quoting from their opposition, "to characterize the

7    geology of the soils by drilling 99 boreholes of up to depths

8    of 22 feet around the site."  However, that quote is incomplete

9    and thus misleading.  It comes from a drilling report produced

10   by Washington Group in discovery.

11   The incomplete, misleading quote is found again

12   at plaintiffs' opposition, page 28.  In fact, systematic

13   borings of up to 22 feet in depth were done throughout the East

14   Bank Industrial Area on every site as part of the remediation

15   obligations that Washington Group was responsible for in

16   Task Order 26.  These borings were done not simply "to

17   characterize the geology of the soils," as plaintiffs would

18   like the Court to think.  Rather, the borings were done

19   throughout the East Bank to determine the scope and extent, the

20   constituents of concern, the COCs, the approximately 32 foreign

21   substances that were hazardous or toxic.

22   In fact, that terminology, taken out of context,

23   comes from the opening paragraph of the introduction to

24   MMG's -- which is a Washington Group subcontractor -- drilling

25   report.  This is right here.  Here's what it comes from and

1    here's the whole quote:

2                    "Boland Marine Site Assessment.  Introduction.

3    The purpose of this site assessment is to characterize the

4    geology of the site" -- they stop there -- "obtain chemical

5    data of potential and known contamination, and to delineate

6    areas of known contamination."  That tells us what the purpose

7    of these borings was.  The borings were done for that purpose.

8    More importantly, none of the information was hidden from the

9    Corps.  It was, in fact, given to the Corps.

10                   Of course, the Corps, having been responsible

11   for levees and floodwalls and for the assessment of the

12   feasibility of the bypass channel -- which was done, by the

13   way, before we even started.  They assessed the feasibility,

14   with respect to the floodwalls, before we ever started.  We

15   didn't have anything to do with this.  Washington Group did not

16   need to know about flood control structures to fulfill their

17   contracts to remediate this site.

18                   In any case, we gave the Corps these lengthy

19   drilling reports with all of their attachments and appendices,

20   including the ones that they quote from.  Here's evidence that

21   the Corps considered it.  I would refer you to Exhibit 124.

22   Not only did the Corps get it, they looked at it line by line

23   and considered it.  This happens to be with respect to the

24   Saucer Marine site.  They reviewed it.  I think there's a date

25   in here.  I can hardly read it, but you can go to Exhibit 24

1   and find this.

2           **THE COURT:**  Exhibit 124; right?

3           **MR. TREEBY:**  124.  I'm sorry.  Exhibit 124.  It was

4   reviewed and line by line commented on and back and forth, so

5   they knew about these.  This wasn't something they were given

6   and they just put it in a file.  They looked at this stuff

7   carefully.  If it had some impact for them in determining, "Oh,

8   here's the geology," "Oh, let's think about what floodwalls and

9   levees" -- that wasn't what we were doing.  That was the Corps'

10  responsibility, not ours.

11          This document, it's a comment submittal

12  document, is what it's called, reflecting the Corps'

13  line-by-line review of the Saucer Marine RECAP.  I always have

14  to go back, "What does that one mean?"  We gave you the

15  acronyms in our brief.  It's the Risk Evaluation and Corrective

16  Action Program Submittal Report is what it is.

17          They were reviewed in detail and approved on

18  June 10, 2002.  It wasn't for the purpose of evaluating

19  floodwall or levee stability.  The Corps might have used it for

20  anything they wanted to use it for.  It was for the purpose of

21  determining what needed to be done to remediate the site of

22  toxic and hazardous constituents.

23          The same thing is true -- we have a different

24  kind of a document illustrating the same thing for Boland

25  Marine.  This was from Exhibit 123.  It's another type of

1   document that evidences the next step in the approval process

2   that involves the drilling reports, which is the final approval

3   of the RECAP Submittal Report.  It shows that the drilling

4   reports were reviewed and approved by the Corps.  It is

5   undisputed, contrary to plaintiffs' bald assertion without

6   citation in the record, that the Corps received, evaluated, and

7   approved this information.  They make the same argument, Saucer

8   Marine and Boland, on this.  I will pass through this because

9   we have covered it.

10                   The plaintiffs attempt to use -- and I'm going

11  to get to the sheet pile tip depths, talk about that for a

12  second -- a passing reference to sheet pile tip depths, as it

13  might relate to the migration of contaminants in the

14  groundwater, in the RECAP Submittal Report to prove that

15  Washington Group had actual knowledge of the danger to the

16  stability of the floodwall.  Frankly, I think that's a

17  ludicrous argument.  The plaintiffs' source for that is Summary

18  Judgment Exhibit 13, the RECAP Submittal Report criteria

19  document.

20                   When Mr. Guillory was asked if he relied on this

21  information about existing sheet pile tip depths in the

22  floodwall -- again, contained in a RECAP criteria document

23  relating to the migration of groundwater contaminants -- to any

24  of his determinations about the effect of Washington Group's

25  work excavating the wedding cake and lift station on the

1   stability of floodwalls, he said it had no effect.  He was

2   asked:

3           "Question:  Did you base any of your determinations

4       or approvals of the excavations of the sewer lift station

5       or the braced excavation at Boland Marine on this

6       statement in the RECAP Submittal Report criteria document

7       that the depth of the sheet pile was 25 feet down?

8           "Answer:  No.  The actual depth of the sheet pile was

9       immaterial to the project."

10          That's what the Corps witness said.  The

11  evidence is undisputed -- and, again, that really goes to

12  merits, but the evidence is undisputed that Washington Group

13  didn't have knowledge of any danger to the levee and floodwall

14  posed by the geology of the soils at the East Bank Industrial

15  Area.

16          This is Mr. O'Conner.  He didn't testify he knew

17  that -- there was a hypothetical question that Mr. Bruno was

18  asking.  I'm sure he will repeat it again, just as long as it's

19  taken -- this is the culmination of Mr. O'Conner's testimony:

20          "I do not know nor believe that underseepage

21  existed in New Orleans."

22          "No, I did not believe it was possible," that

23  underseepage resulted from those excavations.

24          Again, he wasn't a civil engineer.  We weren't

25  working on floodwalls and levees.  It's clear that Washington

1   Group can only be shown to have failed to satisfy Condition 3

2   if we actually knew of a danger or hazard.  We did not.

3            I want to talk briefly about the OLD permit

4   issue.  It's very simple, and I'm almost finished.  Even if it

5   were determined that Washington Group did not secure a required

6   permit from the Orleans Levee District, it does not raise a

7   meaningful objection to the application of the government

8   contractor defense.  Plaintiffs contend that an allegedly

9   nonconforming feature -- this would be Condition 2 -- failure

10  to get the OLD signature on a permit that was allegedly

11  required, is a defense to the application of the government

12  contractor defense.

13           Let me put this in some perspective by raising

14  another possible specification under Washington Group's

15  contract with the Corps to remediate the East Bank Industrial

16  Area.  Assume that this specification required Washington Group

17  to obey all the traffic laws in the city of New Orleans and the

18  state of Louisiana.  Assume, for sake of argument, that

19  Washington Group's trucks routinely broke that law while it was

20  working on the contract.  That could not be a reason plaintiffs

21  could use to avoid the application of the government contractor

22  defense based on the allegations in their complaint.

23           Why?  Because under the cases that have

24  formulated the government contractor defense, it is clear that

25  a plaintiff must show that a nonconforming feature of the

1    contractor's work actually caused the damage.  They must show

2    that their damages resulted from the contractor's departure

3    from reasonably precise specifications rather than adherence to

4    those same specifications.  That's part of the holding of the

5    Fifth Circuit in the *Kerstetter* case at pages 435 and 436.

6              Plaintiffs' argument here is almost identical to

7    an argument in an early case after *Boyle* in the Third Circuit,

8    the *Beaver Valley Power Company* case cited in our memorandum.

9    That case correctly found it immaterial that the contractor

10   failed to even apply for a permit as required by contract

11   specifications.  This was so since the plaintiff there did not

12   attempt to explain how that failure caused plaintiffs' damages.

13             Now, here we have the same thing with one slight

14   wrinkle that I'm going to discuss.  Plaintiffs have not

15   explained how failure to secure a required OLD permit, if that

16   happened, caused their damages.

17             While I'm thinking of it -- Your Honor may be

18   too -- this 300-foot thing, it's a mystery, frankly.  It's a

19   mystery.

20             **THE COURT:**  I'm glad it's not only a mystery to me.

21             **MR. TREEBY:**  It's a mystery.  Some documents that we

22   have reviewed say 250 feet.  Some statements say 300 feet.

23   Some say less.

24             **THE COURT:**  I found Exhibit 4, which doesn't mention

25   feet.  The Exhibit 4 that I have -- I guess that's the

1    plaintiffs' Exhibit 4 --

2            **MR. TREEBY:**  There's even a state statute on this

3    that I have looked at.  To some extent, it's very vague.  I

4    don't think we cited it, but I will be happy to give it to the

5    Court.  There are two things about it.  And I'm doing this to

6    answer the Court's question, not that I think it's relevant,

7    because it was a mystery to me that I explored somewhat.

8            The issue is if somebody failed to get an OLD

9    permit -- let me just talk about what you do to get an OLD

10   permit for work when you do an excavation within some distance

11   of a floodwall or a flood control structure.  You go to them

12   and they say if it's on any body of water, like this body of

13   water, "You go get the engineers at the Corps of Engineers to

14   look at this and tell us they have no objection.  You go to the

15   LDOTD and get their engineers.  You send that back to us."

16           **THE COURT:**  DOTD?

17           **MR. TREEBY:**  Louisiana Department of Transportation

18   and Development.

19           **THE COURT:**  Okay.

20           **MR. TREEBY:**  "You then bring those to us, and we then

21   will send you a piece of paper.  If it's not a government job,

22   we will charge you $25.  If it is a government job, we won't

23   charge you," like this one, "and we'll send you a permit."

24   That's the process.

25           Okay.  What triggers the requirement for that

1   process is some proximity maybe, although there's -- we had all

2   kind of Corps people telling Washington Group -- we didn't put

3   this in the evidence because, frankly, we think it's

4   irrelevant.  We could provide it if the Court is interested.

5           We had all kinds of people telling us, "You

6   know, that's a government job.  You don't have to get this,"

7   and other people saying, "Well, you might," so we had our

8   people call up.  We are told, "No.  You don't have to get."  We

9   have telephone memos to that effect.

10          That could be a disputed issue of fact.  We are

11  not sure.  Actually, the key witness on it in his declaration,

12  Mr. Spencer, said, "I don't remember them calling me and asking

13  me and me telling them that."  That's all he says, "I don't

14  remember that."  We didn't need to go there.  The Court doesn't

15  need to go there.  In the first place, there's no private right

16  of action for failing to get that permit.  That's an issue the

17  government has to bring up.

18          More importantly for purposes of the government

19  contractor defense, there's no plausible explanation even,

20  never mind evidence, as to how that connects to causing their

21  damage.  No plausible explanation.  In fact, understandably, to

22  my way of thinking, the plaintiffs seem embarrassed, even, to

23  make this argument.  It can be seen on page 18.  I commend

24  Mr. Joanen or whoever wrote it for their candor when they say

25  this, and I quote:  "This permitting requirement would have

1   provided an additional level of investigation to" --

2          **THE COURT:**  The word *perhaps* is in there as well.

3          **MR. TREEBY:**  Right.  "Perhaps ensure the integrity of

4   the floodwall."  At most, what plaintiffs are raising is a weak

5   metaphysical doubt that should not prevent summary judgment

6   according to *Matsushita Electric.*

7                 In fact, the declarations of Mr. Spencer, the

8   former chief engineer of the OLD, taken as a whole, clearly

9   show that if this failure occurred, failure to get a required

10  permit, it had no bearing on the failure of the floodwalls.

11  The OLD doesn't perform independent engineering investigations

12  of any kind when entities request to perform subsurface work.

13  The OLD relies wholly on the Corps' and the LDOTD's engineering

14  judgment.  Both the Corps and the DOTD had no engineering

15  objection to the work.

16                 While we did all this work, the OLD did what

17  they do in the form of inspections that's been complained

18  about.  I'm not here to comment on it.  They mowed and their

19  guys were supposed to look to see if there was any problem with

20  the floodwall.  No objection came.  All those reports were

21  looked at.  There was never any objection when they looked at

22  it.

23                 The OLD would never, Mr. Spencer has declared,

24  have done a subsurface investigation of the levees and

25  floodwalls like Dr. Bea would have wanted.  Never would have

1  done that.  He says, in fact -- the fact -- the Corps would

2  have been responsible for such an investigation.  This is a

3  nonissue.  We believe it should not operate in any way to

4  prevent the application of the government contractor defense.

5            Now, I'm just going to mention this in passing.

6  I could have started off with this, but frankly I think it

7  belongs here, and I'm going to say two or three words.  We

8  submitted a detailed statement of undisputed facts with

9  citations to the record, in every one of them.  You can look in

10  vain in the plaintiffs so-called response to find any citation

11  to any testimony to the contrary.

12            In any of the statements that are relevant to

13  this defense, the best they do is say, "Look at our brief."

14  That's not sufficient.  Your Honor has so held in the *Robinson*

15  case.  We believe our Motion for Summary Judgment on the

16  government contractor defense should be granted.  Thank you.

17        **THE COURT:**  We are going to take a five-minute recess

18  so you can get set up.

19        **THE DEPUTY CLERK:**  All rise.

20        (WHEREUPON the Court took a brief recess.)

21        **THE DEPUTY CLERK:**  All rise, please.

22            Court is in session.  Please be seated.

23        **THE COURT:**  I understand we have some technical

24  difficulties.

25        **MR. BRUNO:**  We do, Judge, but I'm not going to hold

1   you up.

2          **THE COURT:**  If it's something critical --

3          **MR. BRUNO:**  No.  I had the depo pages of the video

4   for us to listen to, but --

5          **THE COURT:**  Whenever you are ready.

6          **MR. BRUNO:**  Thank you, Your Honor.  First of all,

7   thank you for your usual thorough evaluation of all the briefs.

8   We will do everything we can to get this thing done as quickly

9   as possible.  We do deeply appreciate the fact that you see how

10  important this is.  We have a $3.5 billion company with a half

11  a billion dollars worth of insurance on the one hand and

12  150,000 claimants on the other hand whose lives were destroyed

13  as a result of the failure of the levee walls in the Lower

14  Ninth Ward.

15          I find it remarkable, in the context of a Motion

16  for Summary Judgment, that counsel, who is the proponent of the

17  motion, has to get up here and argue that his interpretation of

18  the facts are correct.  I think that's just amazing.  More

19  remarkable, of course, is the fact that they even have a hard

20  time understanding what *Boyle* --

21          **THE COURT:**  Go ahead.

22          **MR. BRUNO:**  The fundamental precept of *Boyle*.  They

23  would have the Court believe that if you had a specification

24  that required all their employees wear blue shirts that that's

25  sufficient to make them immune as a government contractor.  Not

1    quite the case.

2              *Boyle* cites the example of the air-conditioning

3    unit, you'll remember.  There may be a specification that says

4    it has to have so many BTUs, has to cool a certain way, turns

5    on and off a certain way, but that does not preclude a claim

6    against the manufacturer of the product for failing to guard if

7    a child sticks his finger in the fan.

8              What WGI fails to understand -- because they are

9    trying to get out of jail free -- is that we are not talking

10   about anything that they discussed over the past hour and 20

11   minutes.  They just don't understand the case.  First, the

12   issue is policy:  What is the policy of the United States of

13   America, and how does that policy conflict with a policy or a

14   cause of action under state law?

15             We had the clips of Mr. Gerald Colletti, who is

16   an employee of the U.S. Army Corps of Engineers.  He is a

17   geotechnical engineer.  By the way, Your Honor, the defendants

18   like to use the word *engineer* to mean lots of different things.

19   You know and I know *engineer* means a broad number of

20   disciplines.

21             The discipline at issue here is geotechnical

22   engineering, which regards soils and the ability of water to

23   move through those soils.  A structural engineer, a contractor

24   engineer, a project engineer, those guys don't know anything

25   about this subject.  Through the course of the depositions we

1  took, they told us they didn't know anything about this
2  subject.
3          Now, Mr. Jerry Colletti, we were going to
4  present his video testimony to demonstrate, frankly, a response
5  to the first question you had, which is the 300 feet.  The
6  Corps of Engineers in this New Orleans District has established
7  a line between the centerline of a levee and 300 feet, within
8  which there may be some proposed work, as an area in which
9  there has to be an engineering evaluation of any excavation
10  proposed to be done by anybody.  That's a local Corps policy,
11  practice, and procedure.
12          Now, next slide.  Mr. Colletti would have told
13  you that the reason for this is -- and you already have it --
14  in this city, if you dig a hole, water comes up.  That's
15  because the water moves below the surface.  Now, the reason the
16  water moves up is because the material that held it down has
17  been removed.  The height that the water goes up in the hole is
18  dependent upon the pressure on that water underneath the
19  ground.  So that if you put permeable material in the hole and
20  you increase the pressure on that water below, the water will
21  rise up through the hole; or, conversely, the water can go down
22  through the hole, find that permeable layer and travel across
23  underground and damage the foundation of a levee.
24          So what does the Corps do about this?  Next
25  slide.  The United States Army Corps of Engineers has a levee

1    FAQ program, and they have some questions and answers which

2    will allow anybody -- even WGI, the largest private contracting

3    firm in the country -- to understand.  What gives the Corps of

4    Engineers and the state levee districts authority to permit

5    work?  Why do we bother to do this?  Well, they point to

6    Title 33, Section 208.10, of the Code of Federal Regulations.

7    So we start with a codified policy which says we must protect

8    the levees.

9                Next slide.  Next question.  What's the primary

10   purpose of the levee districts?  Why do you need this permit?

11   Why is it so important?  Because they own the levee and they

12   are the guys who are charged with the responsibility of making

13   certain that no one breaks their levee.

14               Next question.  Well, why is the Corps involved?

15   Well, because the Corps doesn't have any engineering personnel,

16   so they ask the levee boards to accept the permit and send the

17   material to them for review.

18               Next slide.  §208.10 again gives them the

19   authority, but here's the key.  All work -- *all work* -- within

20   300 feet of the levee centerline for projects, the Corps policy

21   is to measure distance from the levee centerline to determine

22   if a permit or a letter of no objection is required from the

23   levee district or local sponsor.  So here's your 300 feet,

24   Judge.  Here's where it comes from.  It is a policy and

25   procedure.

1          Next slide.  There's your code, 33 C.F.R.

2    §208.10.  This, Judge, is the policy of the United States of

3    America, which isn't trumped by anything.

4          Next slide.  This gives the power to the local

5    levee boards to figure out what to do.  So the question, then,

6    is when is a permit necessary.  "As a special note, the permit

7    applicants are notified that any proposed work within 250 feet

8    of the hurricane protection system on the three outfall canals

9    and two navigational canals listed below require OLD permits."

10         **THE COURT:**  That would apply to the Corps itself if

11   it were doing the work?

12         **MR. BRUNO:**  No.  It applies to WGI.  Now, the first

13   question we have is do they comply with the contract, so the

14   question is was a permit required.  Mr. Jerry Colletti says a

15   permit was required.

16         Next slide.  Guillory, the 30(b)(6) witness for

17   the United States of America, says WGI was expected to apply

18   for a permit.

19         Grieshaber, "People who do this type of work

20   know you need a permit."

21         Next, Roe, who was the 30(b)(6) witness of WGI,

22   says the TERC itself required WGI to get all permits.

23         Here's where it gets a little funny.  Here it

24   gets funny.  Here's the big billion-dollar company who says --

25         **THE COURT:**  Wait a minute.  I know they are big.

1   Okay.  That doesn't mean they are liable.

2           **MR. BRUNO:**  It's a little bit annoying to say that,

3   you know, "We didn't get a permit" -- but here's their excuse.

4   "We didn't get a permit because the Corps told us via e-mail

5   that no permit was required."  That was their first excuse.

6           Next slide.  Then Guillory, from the Corps,

7   says, "No, no, no, no.  That e-mail did not apply to this

8   contract.  That applied to the arsenic background investigation

9   study, not this work."

10          Well, so O'Conner was directed -- O'Conner, by

11  the way, is the local project manager.

12          **THE COURT:**  I know exactly who he is.

13          **MR. BRUNO:**  He was directed to obtain every permit

14  necessary.

15          Next slide.  Now, O'Conner says that the OLD

16  said no permit was required.  The Stevan affidavit says they

17  don't have any such recollection that he said something like

18  that.

19          So what did they do?  Well, did they fail to

20  comply with the requirement?  Well, the fact of the matter is

21  that WGI sent a letter to the OLD requesting a permit.  Isn't

22  that amazing?  There it is.  Once the levee board got this

23  request for a permit by fax, the OLD said, "Listen, take that

24  same letter with all of your attachments and send it to the

25  Corps and send it to the state Department of Transportation.

1          Both of those folks reviewed the material

2    submitted and said, interestingly enough, in the case of the

3    state, any damage to the levee/floodwall caused by the

4    construction, operation, and maintenance of the facility has to

5    be repaired by the applicant at their expense.  The Corps, what

6    do they say?  Any damage to the levee/floodwall resulting from

7    the applicant's activities is repaired at the applicant's

8    expense.  It seems to me that somebody is interested in the

9    levee.

10          Next slide.  Now, Judge here's the key.  Here's

11   the key and here's the answer to the question of -- and why it

12   is that WGI is so anxious to avoid any discussion about the

13   permit.  Here it is.  Because what the levee board requires

14   that you do when you submit a request for a permit is the

15   following:

16          "Your permit request should include a letter of

17   request accompanied by a scope of work, full-size construction

18   drawings, and pertinent specifications of all work that is

19   done" -- very important here, Judge -- "relative to excavation,

20   pile driving, or drilling."

21          Now, Judge, there's general knowledge.  The

22   Corps knows that if you dig holes you can damage a levee.

23   You'll see in a minute.  WGI knows if you dig holes you can

24   damage a levee.

25          **THE COURT:**  I have read the depositions too.

1          **MR. BRUNO:**  Here's what's important, though, and

2    here's why WGI has liability in this case.  WGI was hired to go

3    out to the site, evaluate the site, and locate these

4    underground items or things.  When they first got the contract,

5    they didn't even know that the wedding cake structure existed.

6    They didn't know it.  They knew that the lift station existed,

7    but there was no indication as to precisely where it was.

8               So the knowledge that we are talking about here

9    is not the general knowledge about the fact that if you have a

10   hole and you don't properly protect the hole from underseepage

11   you can cause damage.  The knowledge is that these guys, being

12   on the ground on the EBIA, they know where the holes are.  They

13   know whether or not those holes are in a proximity to the

14   levee, which would require investigation.

15        **THE COURT:**  Well, let me ask you this.  What do you

16   contend is the distance, for whatever purpose it has, of each

17   of the excavations from the centerline of the levee?

18        **MR. BRUNO:**  Both, the testimony reveals, are within

19   250 feet.  Guillory and Grieshaber both affirmatively establish

20   that.  That's not even an issue.

21              Once again, Mr. Treeby likes to talk about

22   smoke?  Did you notice that in his discussion he didn't talk

23   about how close they were to the levee?  He talked about how

24   close they were to the break.

25        **THE COURT:**  I understand.

1    **MR. BRUNO:**  Big difference.  Big difference.  Judge,
2    they are both within 250 feet.  More importantly, if you read
3    the Spencer affidavit, he says an evaluation of the work
4    today -- because he has no memory -- indicates to him that a
5    permit would have been required.
6                Now, what's crucial here is that, you know, a
7    permit not only has as its purpose an evaluation to determine
8    whether someone does or not does something, it also educates
9    you as to what the requirements are, what you're supposed to be
10   thinking about.  This document explains to WGI and to the
11   person requesting the permit that, "You have to understand
12   excavations have impact.  So, therefore, we want you to give us
13   the location of the hole, this distance from the centerline,
14   how deep it's going to be, so we can evaluate it."
15               Now, here's the 30-dollar question.  Right?  Did
16   they do that?  No.  I repeat.  They did it as a part of this
17   letter.  Call it a notification if you want to satisfy
18   Mr. Treeby.  Call it a permit if you want to satisfy the
19   plaintiffs.  Did they tell the levee board that they were going
20   to dig a hole 22 feet deep to remove this lift station?  Did
21   they tell the OLD that they were going to dig a hole to remove
22   the wedding cake structure?  Answer:  No.  Or, at the very
23   least, there certainly is a conflict of fact on that point.
24   The attachments are in the record and the attachments reflect
25   nothing whatsoever about the holes.  Zero.  So they never were

1    evaluated.

2              So what happens next?  It gets better.  The OLD

3    issues a permit, which of course is expected because the

4    information that they supplied doesn't say anything about the

5    holes.  Even so, it says the work must be done in accordance

6    with the referenced letters.  All provisions of the letter of

7    no objection from the Corps, as well as the Department of

8    Transportation, must be followed, meaning don't break the levee

9    because that's a crucial and important government policy.

10             So did they get this permit?  Well, O'Conner

11   says he never got the permit.  Now, WGI, the 30(b)(6) witness,

12   he says, "Well, yeah, we did get the permit."  It's remarkable.

13   It's remarkable.  The reason why they didn't get a permit is

14   because their law department wouldn't let them sign it.  Their

15   law department wouldn't let them sign the permit.  So one has

16   to wonder:  What's that all about?  What is the import of all

17   this?

18             The fact of the matter is, Judge, that they

19   tried to bury this thing under -- if they had done just the

20   basics, if they had complied with the requirements of the

21   permit, if they had understood, listen, excavations have to be

22   permitted -- which means, one, you have to locate them, you

23   have to give drawings -- maybe somebody else would have

24   evaluated those holes, but that's not the end of the story.

25             THE COURT:  I'm sure you're going to get to

1  Mr. Treeby's causation argument.

2          **MR. BRUNO:**  Absolutely.  Absolutely.  So now we get

3  to this issue of these specifications because, you know,

4  Mr. Treeby says, Well, there's a specification that's

5  reasonably precise and we go home."  Well, here's the

6  specification.  It says fill it with "import sand or on-site

7  borrow back to original grade."

8          **THE COURT:**  That's the specification as to the

9  wedding cake.

10          **MR. BRUNO:**  Yes, sir.  Now, what Mr. Treeby fails to

11  address is the Boland [sic] logic.  And that is, this

12  specification, does it relate to some governmental policy which

13  thwarts the state law?

14          **THE COURT:**  You're talking about the *Boyle* logic?

15          **MR. BRUNO:**  *Boyle*.

16          **THE COURT:**  You said "Boland."

17          **MR. BRUNO:**  I'm sorry.  You're right.

18          **THE COURT:**  Boland is where the structure was

19  located.

20          **MR. BRUNO:**  Right.  *Boyle* says that there has to be

21  some connexity between these so-called specifications, and

22  these are not specifications.  These are general.  They are not

23  specific specifications, as I will show you in a moment.

24              What's key here, Judge, is in order to address

25  the public policy issue, the negligence issue, you have to put

1  backfill material, which is properly compacted with a proper

2  material that keeps the water that comes in during a flood from

3  going through the hole, under the ground, and undermining the

4  levee.  The fact of the matter is, Judge, that this

5  specification didn't address that issue.  It was never

6  discussed.  It wasn't on the table.  There was no

7  back-and-forth.  There's nothing.

8          **THE COURT:**  You mean the issue of compaction?  What

9  issue do you mean?

10          **MR. BRUNO:**  The issue of whether or not this

11  specification addresses the policy issue of not damaging the

12  levee.  It didn't go there.  It wasn't discussed.

13          **THE COURT:**  I'm not quite sure what your argument is.

14  If we assume Mr. Treeby is right and there's back-and-forth and

15  there is a specification as to how this excavation would be

16  performed -- the Corps is an ostensible expert in levees -- and

17  the excavation is to remove all this concrete, I'm not quite

18  sure why WGI doesn't get the benefit of the government

19  contractor defense.  I'm not quite sure where your argument is

20  coming from under *Boyle*.

21          **MR. BRUNO:**  Because, Judge, remember, there has to be

22  a connection between the specification and the complained

23  conduct.  In other words, the logic of it is, "Well, I had to

24  do this.  I couldn't do anything else.  Even though there's a

25  state law negligence claim and that state law negligence claim

1    demands that I do something else, I could only do this."

2              This specification is broad enough that you

3    could have complied with your state law negligence

4    responsibility and you could have at the same time complied

5    with this specification and you would not break the levee.  The

6    point is that the fundamental precept of *reasonably precise*

7    requires that it's so narrow that following the specification

8    precludes you from discharging your state law obligation not to

9    be negligent.  That's what WGI misses completely here.

10             This specification doesn't say "clay."  It

11   doesn't say "sand."  It doesn't say anything.  It says fill up

12   the hole.  Judge, this is not a jet airplane.  This is not even

13   an air-conditioning unit.  In all of those cases, there are

14   pages of discussion about the back-and-forth relative to the

15   specification because there was a specific governmental policy

16   at issue.  They wanted the planes to get to the front as

17   quickly as possible, and so they chose to use this material

18   versus that material.  The parties both knew what was at issue,

19   what was at stake, and they made a policy decision based upon

20   the policy.  Nobody even thought about whether or not this

21   backfill would have any impact on underseepage.  It wasn't on

22   the table.

23             **THE COURT:**  If the government says you can put

24   whatever you want in the hole, if WGI follows it, why is it

25   liable?  Tell me why the government contractor defense doesn't

1     apply.

2          **MR. BRUNO:**  We have already done this.  We see that

3     additional fill provided by WGI.  We know that.

4                    Next slide.  Same thing.  We know they put sand.

5     There was no doubt about it.

6          **THE COURT:**  Wait, wait, wait.

7          **MR. BRUNO:**  By the way, I love Mr. Treeby.  He says

8     I'm smoke?  He uses the convenient phrase *river sand* when this

9     says *sand*.  Remember, this is reasonably precise.  Well, river

10    sand and sand are not the same.

11         **THE COURT:**  The only time sand is mentioned is the

12    words *import sand*.

13         **MR. BRUNO:**  Right.  I don't see river sand.  The

14    point is that's not precise, Judge.  You can put anything you

15    want in here.  Next slide.

16         **THE COURT:**  Well, what was put in?  What is your

17    contention?

18         **MR. BRUNO:**  Sand.  Permeable sand.  Permeable

19    material.  It let the water go through.

20                    Next slide.  Next slide.  All right.  Specific?

21    Well, Guillory says it's general.  Guillory says it's a general

22    specification.

23                    O'Conner says there were no specifications of

24    backfill of the two deep holes.  None.  He doesn't even regard

25    them as a specification.

1          **THE COURT:**  You're saying that, as to backfill, the
2     specifications were not reasonably precise under the law?
3          **MR. BRUNO:**  They are not even a specification.  Next
4     slide.
5          **THE COURT:**  Let me ask you, while you're talking
6     about that, under the *Kerstetter* case -- I'll read you a line.
7     I know you are familiar with it.  It's a 2000 Fifth Circuit
8     case.  There's one line -- and I won't burden you with all that
9     comes before it.  "The specifications need not address the
10    specific defect alleged; the government need only evaluate the
11    design feature in question."
12         **MR. BRUNO:**  That's right, Judge.
13         **THE COURT:**  I'm not quite sure what that means, but
14    one could argue that the design feature is the excavation and
15    the cofferdam not --
16         **MR. BRUNO:**  Well, I think that what that case stands
17    for is the proposition that they have to evaluate the design
18    feature in the context of the claimed misconduct.  It's not
19    simply that somebody looked at it; it's about whether or not
20    somebody looked at it with an eye toward assessing whether this
21    design would impact or not impact the flood structure.
22              And, of course, imagine, if you will -- because
23    if you take their argument to its logical conclusion, they're
24    trying to tell this Court and the world the Corps approved a
25    specification that would destroy the levee.  Based on what

1   policy consideration?  I'm sorry?  What is the policy

2   consideration which allowed the Corps and WGI to embrace --

3            **THE COURT:**  But if the Corps puts its finger on it,

4   the contractor doesn't pay.  The Corps might if the Corps

5   violated a mandate.  You can't conflate the discretionary

6   function exception precisely with the government contractor

7   defense.  Clearly, the government contractor defense has its

8   origins in the discretionary function exception, but it's not

9   one and the same.  It's not.

10           **MR. BRUNO:**  No question, Judge, but there has to be a

11  relationship between the conduct and the complained conduct.

12  You can't just say that there's been an approval, there's a

13  stamp, there's an acceptance, if it has nothing to do -- that's

14  the point about the air-conditioning unit.  *Boyle*, the

15  originator -- the case which starts it all -- says, wait a

16  minute, guys.  The fact that they approved the design has

17  nothing to do with the claim -- I'm sorry, nothing to do with

18  immunity if the claim has nothing to do with what they

19  approved.  The government didn't approve specifically one type

20  of backfill versus another type of backfill.  The testimony is

21  crystal clear.

22           In fact, Judge, here's what real specifications

23  look like.  This is Kansas City because, you know, our local

24  district office is a little weak in this regard, so you have to

25  go to Kansas City to find real specifications for backfill.

1    Here's what they should have looked like.

2                  Next slide.  Backfill and compaction

3    requirements.  There's ten different specifications that should

4    have been used, not that I'm suggesting that's the cause of

5    action.  This is by example, Your Honor.

6             **THE COURT:**  I understand.

7             **MR. BRUNO:**  Just by example.

8                  Next one.  It talks about -- there's that

9    proctor you were talking about.  Proctor is really important

10   when you're trying to keep a hole from damaging a levee.  By

11   the way, it talks about a six-inch lift, not a 12-inch lift or

12   a two-foot lift.  It talks about how you have to compact it.

13   It talks about how you have to use a certain kind of material.

14   It's not just fill it with anything you can.

15            **THE COURT:**  Let me ask you a fundamental question,

16   Mr. Bruno.  Let's assume there's give-and-take and the Corps

17   has some interplay and the Corps is involved with and approves

18   bad specs -- bad specs, terribly bad specs -- but the Corps has

19   put its hand upon it, thereby immunizing the contractor, one

20   could argue, under the cases.

21            **MR. BRUNO:**  They didn't do that.  Here's what they

22   did.

23                  Next slide.  First of all, there's two potential

24   sources of backfill on the site.

25                  Next slide.  They could take it from the borrow

1   pit.  They could pull it from somewhere else.  The difference,
2   the testimony is, they are the same.

3            **THE COURT:**  Or the same stuff that came out it.

4            **MR. BRUNO:**  Well, obviously, Mr. Treeby says it was
5   good as it was.  Once again, you talk about I'm the smoke?

6            **THE COURT:**  I'm talking specs.

7            **MR. BRUNO:**  You have a concrete structure, okay,
8   that's blocking water.  He is going to tell this Court that the
9   stuff they put in the hole blocks water the same way a concrete
10  structure does?

11           **THE COURT:**  I'm not sure that's what he is telling
12  me.  He said the specs said you could do that.

13           **MR. BRUNO:**  He said, "What we put in there was as
14  good as what was there."  Absolutely false.

15           **THE COURT:**  That gets into the merits, in my mind.
16  What the specs say is you can put it in there, the specs
17  ostensibly approved and went back and forth with the Corps, but
18  go ahead.

19           **MR. BRUNO:**  Keep going.  Well, Judge, here's where
20  the rubber hits the road.  Roe knew -- now, that's the WGI
21  30(b)(6) witness.  He knew that excavations near a floodwall
22  may damage the floodwall.  He knew that.

23                Staggs, the second 30(b)(6) witness, he knew it
24  as well.

25                Next.  Montegut.  Now, here's where you have to

really focus the analysis.  Who are the people involved in the back-and-forth?  There's no back-and-forth, in my view, but who is there?  Montegut and Guillory.  Neither of these guys are geotechnical experts.  They have no clue.  Montegut says, "I'm not an expert."

Now, when I asked Guillory why if you believe -- Mr. Grieshaber testified on Friday.  His deposition was on Monday.  Grieshaber was on a Friday.  I asked Mr. Grieshaber was it mandatory -- and you saw this in our brief in opposition to the discretionary function in the previous motion.  Was it mandatory for the Corps to do an evaluation of these holes?  Mr. Grieshaber said absolutely, it was mandatory.

So I asked Mr. Guillory, "If it was mandatory for you to evaluate these holes, why didn't you evaluate the holes?"  Mr. Guillory says right there, page 161, "The Corps expected WGI to hire an engineer to make certain that the hole did not damage the flood protection structure."

So, Judge, we have a fundamental disagreement of fact on a whole variety of issues, starting with:  One, who was the responsible party to draft the specs; and, two, was there this back-and-forth.

All the cases, when they talk about back-and-forth, Judge, they are not talking about talking to a clerk.  They are not talking about a Katie Couric-Sarah Palin kind of dialogue.  They are talking about a substantive

1    discussion about engineering principles.

2                     You made the point yourself.  The cofferdam has

3    only one purpose, to make sure that you don't kill people.  It

4    had nothing whatsoever to do with regard to preventing

5    underseepage from damaging that floodwall.

6                     Guillory:  The Corps had an expectation that WGI

7    would hire licensed engineers in order to evaluate what?  Any

8    potential effects or damage to the floodwall.

9                     It's crystal clear that the government expected

10   WGI to do it and that's why the government didn't do it.

11                    Here's where the permit comes back in.

12         **THE COURT:**  Okay.  Don't forget that point, permit.

13   I'm reading something from the bench memo that I have:

14                    "Ostensibly, Guillory testified that the

15   engineering service did not include, and the Corps did not

16   expect WGI to perform, engineering services related to the

17   nearby levees and floodwalls, which were outside of the work

18   site."

19                    "Guillory opines that the Corps never requested

20   or expected any geotechnical engineering support from WGI

21   related to these levees or floodwalls."

22         **MR. BRUNO:**  Mr. Treeby likes to criticize people for

23   context?  You need to read that because what the question

24   regarded was the levee on top of the surface.  The question had

25   nothing to do with what was going on below the surface.

1          This brings me back to the permit.  Yeah, the

2     levee was, in fact, outside the perimeter.  So when Mr. Treeby

3     asked Mr. Guillory, "Were you supposed to do something to the

4     levee?"  He says, "Of course not.  No.  It was outside the

5     perimeter."  But that's not the question.

6          THE COURT:  So you're saying Guillory has testified

7     that in the excavation process that he expected WGI to -- I'm

8     talking about the two holes.

9          MR. BRUNO:  Yes.

10         THE COURT:  That he expected WGI to have someone

11    evaluate the geotechnical aspects of the --

12         MR. BRUNO:  Of the holes.  Judge, I invite you to

13    read it yourself.  The question was very specific.  I said,

14    "Mr. Guillory" --

15         THE COURT:  I have read it.  I have read it, but I'll

16    read it again.

17         MR. BRUNO:  I said, "On Friday Mr. Grieshaber, who is

18    the geotechnical expert, you're not" -- because he said, "I'm

19    not a geotechnical expert."

20         I said, "Mr. Grieshaber told us on Friday that

21    you were supposed to do it.  Did you do it?"

22         He says, "No."

23         "Did you do it?"

24         "No."

25         "Why didn't you do it?"

1          "Because I expected WGI to do it."

2          Judge, here's where the permit comes back, loops

3    around back at us --

4          **THE COURT:**  Permit.

5          **MR. BRUNO:**  -- because the permit demonstrates and

6    corroborates what Mr. Guillory and what the plaintiffs are

7    saying.  The permit process, if you do it the way they tell you

8    to do it, would have necessarily gotten that evaluation done

9    because the first thing that would have occurred -- now,

10   remember, the Corps hires these guys to go and evaluate this

11   big ol' site.  The Corps doesn't evaluate the site.

12         The Corps doesn't know how deep or where the

13   chemicals or the contaminants are.  They don't know that.

14   Their job.

15         The Corps doesn't know where the piling are.

16   Their job.

17         The Corps doesn't know where the subsurface

18   structures are.  Their job.

19         That's why they have the knowledge and the

20   Corps, even though they have this general knowledge, doesn't

21   have the specific knowledge.  The Corps was relying on these

22   guys for their $3 million or $4 million contract -- forgive me

23   for saying that.  I can't help it.  I'm a taxpayer.  The Corps

24   relied on these guys to determine when an engineering

25   evaluation wasn't necessary.

1     **THE COURT:**  I have to believe this contract was more

2  than $3 million or $4 million.

3     **MR. BRUNO:**  Well, I was being nice.

4     **THE COURT:**  Go ahead.  You have spent more than that

5  in legal fees.

6     **MR. BRUNO:**  Actually, I spent more than that in

7  costs, Judge.

8     **THE COURT:**  Go ahead.

9     **MR. BRUNO:**  Judge, I understand, and it's what

10  troubles me about -- especially when Mr. Treeby says smoke

11  because everything I heard was smoke.  It doesn't really

12  address what really occurred and that's problematic because

13  O'Conner was there on-site and his job was to assess

14  remediation.  His job was to help the Corps understand what

15  needed to be done.

16     If the Corps was going to accept that

17  responsibility, then the Corps would have put a geotech guy on

18  the site.  No.  The Corps said, "This is what we want you to

19  do.  We want you to get a permit."  Why?  Because the policy

20  has in place a procedure which, if you follow the procedure, is

21  going to get the holes evaluated.  Because it says, "Guys, when

22  you find a hole, you do a drawing.  You tell everybody how

23  close it is to the levee, and then we will send it to the right

24  people and they will evaluate it."

25     They didn't do that and that's why it never got

1   done.

2          Next slide.  Judge, if it is a *coup de grace*,

3   it's here.  This is the United States of America's Reply

4   Memorandum in Support of Motion to Dismiss Counts 2 and 3.  I

5   know you read this.  This is the government's position about

6   all the stuff that Mr. Treeby said.  Mr. Treeby says, "We were

7   the slaves of the Corps.  We couldn't breathe without their

8   approval."

9          "For the United States to lose immunity for the

10   Corps' supervision of WGI, the Corps would have had to control

11   WGI's work, not merely inspect it."

12          Next slide.  Who do they cite?  You can't point

13   at me for blowing smoke.  I guess this is the government now

14   blowing smoke.  Here's what the testimony reveals.  This is

15   Mr. Clouatre.  This is the guy that they say was on-site.  He

16   says:

17          "As a project inspector on that project, I was

18   to ensure that the contractor performed the work according to

19   the work plan requirements" -- by the way, drawn by them --

20   "performed the work safely according to the Corps' safety

21   requirements, and also because it was a...I think it was a

22   cost-plus type of project...we just ensured that...the

23   contractor was working efficiently with their equipment and

24   personnel on hand" -- I love this -- "we just make sure that

25   they're not milking it."

 1                 Now, that's not Bruno's view of this --

 2           **THE COURT:**  I understand that.

 3           **MR. BRUNO:**  -- relationship.  That's the Corps' view.

 4           **THE COURT:**  I understand that, but there's a lot of

 5      evidence cited about the back-and-forth.  That guy was

 6      inspecting, but there is a lot of evidence --

 7           **MR. BRUNO:**  Judge, the back-and-forth has to have

 8      some silk connection/thread between what it is that's being

 9      complained about and what's been evaluated.  There was none.

10      There was no engineering evaluation of the hole by WGI.  There

11      was no engineering evaluation of the hole by the Corps.  It

12      didn't occur.  The back-and-forth -- and there was no

13      back-and-forth.  Judge, there is not a scintilla of evidence in

14      this record that there was a back-and-forth about what to put

15      in the hole.  There was nothing.  Think about it.  You have a

16      hole, fill it up.  All we want to make sure of --

17           **THE COURT:**  Speaking of the rubber meets the road,

18      that's when I have to determine if the specification, one, is

19      reasonably precise.  That means, though, not only reasonably

20      precise, but that it's not simply an ex parte specification

21      drafted by WGI and not reviewed with some input from the Corps

22      reference the backfill.  And, one, is the backfill then a

23      sufficient design component to overcome the language in the

24      *Kerstetter* case.  Those are interesting points.

25           **MR. BRUNO:**  Judge, I'm reading what you wrote.  "The

1    government must supervise and control" -- *supervise and*
2    *control* -- "the contractor's actions, for if it does not, or if
3    it fails to exercise" --

4              **THE COURT:**  That's on a removal case; correct?

5              **MR. BRUNO:**  No, no.  This is *In re Katrina*.  You say
6    that "...if it fails to exercise supervisory judgment as to the
7    particularities of the project, state law allowing lawsuits for
8    negligence and federal policy providing immunity are not in
9    conflict."  The issue is whether or not there's a conflict
10   between the state law obligation not to be negligent and the
11   federal policy in making certain that this --

12             **THE COURT:**  What was the context?  What case is that?

13             **MR. BRUNO:**  This is your decision in denying the WGI
14   Motion to Dismiss.  That's this one.  I take this from you,
15   Judge.  If it's so simple that all you have to have is a
16   specification and you go home, then the plaintiffs would never
17   win.

18             **THE COURT:**  I agree it's not that simple.

19             **MR. BRUNO:**  So there has to be more.  The question is
20   how much more must there be.  I put it to you that it takes a
21   stretch -- it really takes a stretch -- to suggest that you
22   have to have a lot of discussion about what to fill up a hole
23   with when the only requirement -- and Mr. Treeby didn't read
24   the rest of the quote either.  The only requirement for filling
25   up the hole was that you couldn't put wood in it and you

 1    couldn't put any contaminated material in it.  Those were the

 2    only requirements.  Nothing else.  There was nothing about this

 3    back-and-forth, nothing which related to the --

 4                    Judge, we have to not forget the extraordinary

 5    important and powerful governmental interest in not destroying

 6    the levee.  If you grant a Motion to Dismiss on contractor's

 7    immunity, you are necessarily finding as a matter of law that

 8    our government sanctioned through specification the destruction

 9    of the levee.  There's no way to get around it.

10              **THE COURT:**  Or lack thereof.

11              **MR. BRUNO:**  Well, there is -- then you get into the

12    question of -- because if there's a lack thereof, if there's no

13    specification, then you're out of the specification arena and

14    now you are in the arena of whether or not there should have

15    been specifications, and then you get into the arena of who by

16    contract was obligated to write the specifications.  The TERC

17    says they are supposed to write the specifications.  Guillory

18    says they are supposed to do the engineering analysis.  The two

19    are separate analyses.

20              **THE COURT:**  Let me say this.  If you put in the hole

21    what was already in the hole, are you contending that would be

22    negligent; putting the same stuff that was in there, you put it

23    back?  I'm just asking.

24              **MR. BRUNO:**  Judge, I know, but you're forgetting.

25    There is a --

1          **THE COURT:**  I'm asking you to answer that question

2    first.

3          **MR. BRUNO:**  Well, you have to put the wedding cake

4    structure back in the hole.  You have to put the pipe back in

5    the hole, which is metal.  If you put back in the hole what was

6    there, you have to put the concrete, not sand.  That's where

7    Mr. Treeby is playing a little game with the Court because

8    there was a concrete structure, which I assure you blocks

9    water.  There was a metal pipe, which I can assure you blocks

10   water.

11          That's why the Kansas City specifications say,

12   you know what, when you have a hole like this, what you have to

13   do is you have to have six-inch lifts, meaning you don't put

14   the stuff in at two feet because when you try to compact two

15   feet you don't get as good a compaction as you get with a

16   six-inch compaction.  It's as obvious as the nose on anybody's

17   face.

18          The problem is that the Corps relied on WGI to

19   do it and WGI dropped the ball.  Mr. Guillory, Mr. Montegut --

20   he could name everybody from the Corps who was on that site.

21   Not one of those guys is a geotechnical engineer.  Not one of

22   those guys was charged --

23          **THE COURT:**  Why didn't Guillory call in a

24   geotechnical engineer?

25          **MR. BRUNO:**  I asked him.  He said, "Because I assumed

1   that WGI had done a thorough engineering evaluation."  That's

2   what he said.  "I thought it was already done."  Because the

3   issue is whether you do or not do something.  The issue is not

4   whether or not the specifications --

5           THE COURT:  Engineering evaluation, but all we are

6   talking about is the stuff you put back in the hole.  That's

7   it.  That's what this case is about.  Isn't it what it's about,

8   when you boil it down, what was the stuff that was put in the

9   hole?

10          MR. BRUNO:  With respect, no.  Two issues.  The stuff

11  you put in the hole and the way you put it in the hole are

12  critical.

13          THE COURT:  Exactly.  The stuff you put in the hole

14  and the way, that's this case; right?

15          MR. BRUNO:  That's this case, Judge.  What I'm

16  telling you is that WGI cannot point to any back-and-forth that

17  regarded a policy consideration that mandated that you had to

18  put this versus that.  The way you get contractor immunity is

19  when you follow the spec, and if you violate the spec you

20  violate the contract.

21          THE COURT:  Assuming that the government has put in

22  some way it's imprimatur on the spec, which is not necessarily

23  a bright line rule but a factual situation.  Assuming that the

24  government has done enough to put its imprimatur on it, then

25  the government, once it does -- *once it does* -- then that's

1  what invokes the government contractor defense.

2          **MR. BRUNO:**  It didn't do that, Judge.  You, yourself,

3  said it.  What they did was, when they got the plan, they said

4  to themselves, "Okay.  Here's this hole.  Is it going to cave

5  in and hurt somebody?"  That's what they did.  They didn't look

6  at the hole and say, "Well, wait a minute.  Let's evaluate

7  whether or not what we put in this hole is going to have some

8  impact on the levee."

9          **THE COURT:**  I understand.

10          **MR. BRUNO:**  There's the back-and-forth.  The

11  back-and-forth was, "You know what, guys, the cofferdam

12  construction, you're going to kill somebody."  Here's what's so

13  ironic about it.  The soil is so bad that you need to have some

14  extra consideration with regard to the cofferdam so you don't

15  kill somebody.  There was never a back-and-forth.  There was

16  never any discussion.  There was never any thought to whether

17  or not backfill, or the type of backfill, or the method of

18  backfill would have some impact on the potential for

19  underseepage.

20          Again, forgive me for repeating myself, but it

21  must be said over and over and over:  Guillory is the guy

22  on-site.  Guillory says, "Look, I didn't do it because I

23  expected WGI to do it for me."  That's what he says.

24          The permit becomes -- I don't really care what

25  the defendants say.  The permit is so critically important

 1    because the permit's requirements say -- and remember:

 2                    "What were you supposed to do?"

 3                    "I was supposed to call the Orleans Levee

 4    District and ask them if I was supposed to get a permit."

 5                    What do you think those guys -- they have a form

 6    letter that says, "Here's what you do," and that's the form

 7    letter.  It was attached not to the plaintiffs' motion,

 8    attached to their motion, the form letter which says, "This is

 9    what you do.  You're supposed to give us these detailed plans

10    and specifications."

11            THE COURT:  I notice in your submissions, whatever

12    purpose we have that they were mentioned, the office of the

13    Corps at Kansas City.

14            MR. BRUNO:  Judge, we would move to introduce

15    everything, our entire slides.

16            MR. TREEBY:  If Your Honor please, we will object to

17    that.  That's not in the record on this motion.  I was going to

18    save that, but you raised it, so I'll bring it up.  Those

19    specs, which have no application to this, from the Kansas City

20    District, were I think mentioned in the *Robinson* case, attached

21    to a *Robinson* deposition.  We weren't involved in it, and he

22    has not put them in the record on this motion.  He would have

23    to do that -- we would have to have a witness talking about

24    whether they even apply, which we don't believe they do.

25            MR. BRUNO:  I disagree, Judge.  I think they are

1   self-proving.  They say what they say they are.

2           **THE COURT:**  I just don't know the context, where were

3   you, what kind of hole was it, what was the deal.  I don't know

4   enough about it, so I understand your objection.

5           **MR. BRUNO:**  From a fundamental reading, it says

6   guidelines for excavations near a levee.  It's as simple as

7   that.

8           **THE COURT:**  I don't know if the levee was in --

9           **MR. BRUNO:**  It doesn't matter, Judge.  Judge, the

10  whole point --

11          **THE COURT:**  You mean it's a standard material which

12  you put in every hole near every levee in the world?

13          **MR. BRUNO:**  Judge, yes.  That's why the Colletti

14  testimony was -- we couldn't air it for you.  Yes, yes, and

15  yes.  First of all, a levee is there to keep water out, which

16  means there's water nearby.

17              Two, think about it.  The reason why we are so

18  concerned about holes -- remember this year, when the river was

19  real high and the news media reported that the Corps was

20  ordering anybody who was doing any work anywhere near a levee

21  to stop doing the work, and you think to yourself:  Why?

22  Because they were concerned that the vibrations on the house or

23  the construction activity would cause the soil to move beneath

24  the levee and would cause the levee to fail.

25              Now, if you have a levee -- just think about

1    it -- the levee is there to keep water out.  The only time we

2    have a concern is when you have this high water, which the

3    levee is there to keep from getting the people wet.  So when I

4    tell you it's any levee, I'm telling you the absolute God's

5    truth because when you have high water and you have a hole near

6    a levee, you have necessarily increased what's called the head

7    pressure of the water that's being forced into this permeable

8    material.  So the fact of the matter is that the reason why

9    it's called guidelines next to a levee and the reason why it's

10   250 feet or 300 --

11            **THE COURT:**  The Corps doesn't have, to your

12   knowledge, any standard protocol that this is the stuff you put

13   in a hole within X feet of a levee?

14            **MR. BRUNO:**  First of all, Mr. Treeby is

15   misrepresenting the truth because the deposition -- now you

16   remind me.  I asked the Corps employee who I was deposing the

17   very question.

18            I said, "You know, I found these guidelines in

19   Kansas City.  What's wrong with you guys?  There's a checklist.

20   This is what you're supposed to do.  A, B, C, D, E."

21            He says, "We have nothing in writing at the

22   New Orleans office," which, by the way, corroborates the

23   plaintiffs' position that the Corps contracted with WGI to do

24   it for them because they didn't have -- they have no written

25   procedure or guidelines.  They don't have it.

1          **THE COURT:**  Now, the 250 feet, we talked about it.

2     First it was 300, then 250.  Is that in a regulation?  Is it

3     simply a state law requirement from the OLD?

4          **MR. BRUNO:**  As best that I can fathom --

5          **THE COURT:**  I'm trying to understand.

6          **MR. BRUNO:**  Right.  As best as I can fathom, first of

7     all, it is a policy of the New Orleans District office.  It is

8     a policy of the Kansas City District office.  Why do I know

9     that?  Because I read it in the specifications and I took the

10    deposition of Mr. Colletti.  By the way, Mr. Colletti's

11    deposition is the guy that I asked the question about -- you

12    saw him, that Mr. Treeby says there's no evidence.  I asked the

13    very question.

14         The second point is that it is a policy

15    determination based upon the potential for harm that holes

16    cause.  There are engineering manuals that are produced by the

17    Corps which discuss varying distances, and you can imagine that

18    there's a little bit of leeway there.  In the case of the

19    river, for example, it's 1,500 feet.

20         Now, the Vicksburg piece which I have offered

21    into evidence, Vicksburg is the division office, which includes

22    New Orleans.  Vicksburg says 300 feet, but all this I think --

23         **THE COURT:**  What exhibit number is that?

24         **MR. BRUNO:**  Vicksburg is in my slide presentation,

25    Your Honor.  It's not an exhibit to our motion or opposition,

1   but I move to introduce it.

2            **MR. TREEBY:**  Exactly.

3            **MR. BRUNO:**  Exactly what's the problem?

4            **THE COURT:**  Well, the problem is he hasn't had a

5   chance to see it, Joe.  He hasn't had a chance to respond to it

6   in his memorandum, so it is a legitimate objection.  If it's

7   not attached to your doggone papers, he has a right to gripe.

8            **MR. BRUNO:**  He dumps an affidavit on me a week ago.

9            **THE COURT:**  I understand, but the problem is evident

10  to the Court, if not to anyone else.

11           **MR. BRUNO:**  Well, I agree, Judge.  The problem is he

12  dumps affidavits on me.  I responded.  For some reason I'm able

13  to respond and they're not able to respond, but that's a

14  different subject all together.

15           **THE COURT:**  I'm not getting into any "who can respond

16  best."  It's the way you do these things when you have this

17  much --

18           **MR. BRUNO:**  Right.  Judge, at the very least -- *at*

19  *the very least* -- there is a substantial question of fact.

20  There is not under any circumstances uncontroverted facts which

21  would allow the Court to enter a judgment removing forever the

22  rights of these 300,000 people to at least have an opportunity

23  to demonstrate to Your Honor or to a jury that this company

24  broke the levees at the Lower Ninth Ward.  We deeply appreciate

25  your attention and ask the motion be denied.

1      **THE COURT:**  Thank you very much.

2              Mr. Treeby, I guaranteed you ten minutes and you

3  have it.

4      **MR. TREEBY:**  Thank you, Your Honor.  In the first

5  place, we do object to the consideration of any material

6  appended to this slide presentation which was not part of their

7  moving papers.  If the Court decides to let them do it, we are

8  going to have to respond to it, but we think the Court should

9  not allow it.

10      **THE COURT:**  I agree that, if I do allow it, you

11  should have a chance to respond.

12      **MR. TREEBY:**  That begins with Mr. Colletti.  All that

13  stuff of Mr. Colletti, that was a deposition taken in the

14  *Robinson* case and was not attached to anything that was in

15  response to our Motion for Summary Judgment.

16              Let me just take umbrage, slight umbrage at

17  least, with Mr. Bruno's last comment that, "Just a week ago we

18  got an affidavit and we had to respond."  In fact, he got it

19  two weeks ago tomorrow, one week before we were required to

20  give it to him and the first day we had it.  I'll try to keep

21  the heat down.

22              I thought it laughable --

23      **THE COURT:**  Our profession tests us in that regard.

24      **MR. TREEBY:**  It does test us, Your Honor.  I

25  sometimes fail.

1    **THE COURT:**  In my former profession, I certainly

2    failed many times and must admit it.  Go ahead.  And sometimes

3    in my current one.  Go ahead.

4         **MR. TREEBY:**  If Your Honor please, you haven't shown

5    that propensity since I have been in this courtroom in this

6    case.

7         **THE COURT:**  I hope not.

8         **MR. TREEBY:**  Sometimes under great stress, I might

9    add.

10        The *Boyle* case.  I thought this was interesting:

11   Mr. Bruno citing to the air-conditioning exception that was

12   cited in the *Boyle* case?  Very interesting.

13        I commend for his reading the *Stout* case in the

14   Fifth Circuit, which commented on the air conditioning in a

15   case that used exactly the example that Mr. Bruno used.  It was

16   a case in which a serviceman was on a Hawk missile station, a

17   huge air-conditioning unit, and he got his fingers in there and

18   got them chopped off.  Exactly what he said, "A child getting

19   his hand cut off, it doesn't protect him from that."  *Stout*

20   says it does because the government looked at those

21   specifications.  They looked at those specifications and

22   approved them and, therefore, the plaintiffs were dismissed on

23   the government contractor defense.  That's *Stout*, pages 47 and

24   48.

25        This thing about the distance from the

1  floodwalls -- and, again, we did attach as Exhibit 8 to

2  Mr. Spencer's declaration a letter dated March 30, 2005, in

3  which the OLD says, "The OLD monitors all subsurface

4  construction within 1,500 feet of river control structures,

5  250 feet of hurricane control structures," which this was.

6  This is a letter dated March 30, 2005, addressed to somebody

7  else.  There is nothing in the evidence to say we ever got such

8  a letter.

9              Again, we think that's merits because -- well,

10  we think that, in fact, there would have to be some causal link

11  shown between the failure to get a permit -- particularly in a

12  case when they're relying on the Corps of Engineers to say no

13  objection and the Corps of Engineers was watching over every

14  step we took.  Not controlling us.  Supervising us.

15              Not controlling us.  Supervising.  Inspecting.

16  Making sure that we conformed to the reasonably precise

17  specifications they had previously approved.

18              I just commend Mr. O'Conner's letter, which is

19  in the record, to the OLD.  He didn't request a permit.  He did

20  what he thought -- again, I don't think this is relevant

21  because there's no causal link, but just so Your Honor will be

22  apprised of this, read the letter.  He didn't ask for a permit.

23  He did what he thought was required, which was to give them the

24  information.  They then sent it back saying, "Give this

25  information to the Corps.  Make sure they don't object.  Give

it to the Louisiana Department of Transportation. Make sure they don't object. He did that."

There's an issue because the Corps guy says, "We normally send a letter out, which is the permit. We send it out unsigned. We normally do that." There's no evidence it was mailed to us. There's no evidence of that. But be that as it may, it is smoke. I'm sorry that Mr. Bruno is affected by my use of the term *smokescreen*, but I think that's what's been going on.

That's exactly what this is here because there's no causal link between a failure to get the signature of OLD, who doesn't do a subsurface investigation, doesn't do their own engineering investigation on this job -- and the OLD did, in fact, look at this flood control structure every time they came out with their inspector/mower. There was no visible damage. The OLD inspected. The Corps of Engineers inspected during the job, post Hurricane Ivan, and they did a final inspection in May of 2005, but the OLD does not do subsurface investigation.

This air-conditioning case which I found -- and I pulled it up because I thought I remembered something good, the one I cited to the Court, and it's in our briefs. This man lost four of his fingers. Let me find the right page here. Okay. Fairchild was the defendant in that case. Here we go.

"Stout's claim to the defective design" -- this is on page -- it's in the case. I can't find the page number

1    at the moment.  He argues the plaintiffs did not preclude

2    Fairchild from installing a protective device.  In other words,

3    the specification wasn't broad enough to prohibit it, so state

4    law would let you put a protective device.  Here's what the

5    court said:

6                   "Thus because Fairchild could have complied with

7    both its duty pursuant to the government contractor's design

8    specs and with its own duty under state tort law to design a

9    reasonably safe product, no significant conflict between state

10   law and federal law exists."  The government contractor defense

11   there does not apply according to Stout.  The court says, "Oh,

12   yes, it does.  They looked at it.  They told you what to do.

13   They are protected because they had reasonably precise

14   specifications and they conformed to those specifications."

15            THE COURT:  Do you want to talk about Guillory and

16   saying he thought that WGI was going to provide geotechnical

17   support?

18            MR. TREEBY:  Yes.

19            THE COURT:  Engineering, I should say, for the

20   excavations.

21            MR. TREEBY:  Again, this is one of those occasions

22   where both sides get to ask questions.  Mr. Bruno asked his

23   questions.  I don't know if I asked my questions.  Debbie asked

24   the questions.  Here's what transpired at pages 140 and 141,

25   examination by Ms. Clement:

1        "Question:  My question is does this testimony relate
2    to the lift station excavation?
3        "Answer:  Correct.  It does address the sewer lift
4    station.
5        "Question:  Okay.  And the question from Mr. Bruno
6    was, 'I understand.  So that your expectation was that, if
7    there was going to be any potential effect or damage to
8    the floodwall, you would have expected the licensed
9    engineers that WGI hired to address those issues;
10    correct?'  And you answered, 'Correct.'  All I want to ask
11    you is on this project, Task Order 26, did you have any
12    concerns about the potential effect or damage to the
13    floodwall from the excavation; and, if no, why not?
14        "Answer:  Because the design and installation of a
15    braced cofferdam system does not allow soil movement to
16    occur that would adversely affect a flood control
17    structure.  And this cofferdam and the other two at Boland
18    Marine was designed by a professional, licensed in the
19    state of Louisiana, and installed by professional
20    contractors with full quality control and quality
21    assurance during the entire process."
22        What he was talking about, when he was saying he
23    expected WGI to do it, we did on that hole, which was what we
24    were supposed to do because we had to excavate that to demolish
25    that structure.  On that hole we had our subcontractor, who

1   hired another independent contractor, a licensed Louisiana
2   engineer, to design that cofferdam.
3             Now, in Mr. Guillory's mind, as you see, he
4   thought that protected the floodwall.  That was his job.  That
5   wasn't our job.  But did we have a responsibility to hire the
6   engineer to make sure that because they required it, as part of
7   their requirements on our job, that that cofferdam sufficiently
8   protected the floodwall as well as the people working in the
9   hole?  Yes, and we did that.  But we weren't responsible for a
10  determination of how the effect on the floodwall was.  I think
11  that testimony clarified that, and clearly the contract
12  clarifies that.
13            Kansas City, I have already said it's not in
14  evidence in this case.  If it's going to be allowed --
15            **THE COURT:**  Was there any back-and-forth, Mr. Treeby,
16  reference the fill material?
17            **MR. TREEBY:**  Specifically referencing fill material?
18            **THE COURT:**  Yes.
19            **MR. TREEBY:**  We believe that the evidence that we
20  show indicates that.  In other words, the rubber stamp of
21  *Trevino*, that's what Your Honor is talking about, as I
22  appreciate it.
23            **THE COURT:**  I'm not saying that the overall design
24  maybe subsumes that, but let's assume it does.  In other words,
25  the overall design of the excavation is what we are looking at.

1   I guess if I say, well, is it -- was the backfill reasonably

2   precise, that's what I'm asking about the back-and-forth.

3         **MR. TREEBY:**  Right.  I understand.

4         **THE COURT:**  What do we put back in the hole?

5         **MR. TREEBY:**  If Your Honor please, I think that the

6   law requires that the government have looked at that

7   specification carefully, substantively reviewed it.  That's the

8   purpose of the evidence that we have shown.  They substantively

9   reviewed it.  We can look to see, but I don't know if there was

10   some line-item comment that they made a comment, "We don't want

11   to do it this way.  We would rather do it this way."  There

12   very well could be.  That would be what Your Honor is asking

13   about.

14         Whether or not they did, they looked clearly at

15   those specifications, made comments on them.  It wasn't just a

16   rubber stamp.  They seriously looked at them substantively.

17         **THE COURT:**  Whether they commented on the --

18         **MR. TREEBY:**  They might not have commented because

19   they thought it was fine.

20         **THE COURT:**  -- backfill or not, the fact is they did

21   look at the specifications and comment on some of them.

22         **MR. TREEBY:**  Right.

23         **THE COURT:**  It implies, you're saying, certainly the

24   imprimatur on the backfill was given?

25         **MR. TREEBY:**  Exactly.  It wasn't a rubber stamp, and

1   it was people who had the ability to evaluate it.  It wasn't

2   somebody just like the federal procurement officer in *Trevino*,

3   who knew far less about these subjects than did the people who

4   were giving them the design specs.

5                   Mr. Montegut was asked -- to go to the sand

6   issue briefly again, James Montegut -- by the way, he was the

7   one on the site every day, not Mr. Guillory.  It was

8   Mr. Montegut who was the civil engineer on the site every day.

9   Mr. Guillory mainly was back at the New Orleans District

10  Office.  He would come back sometimes once a week, sometimes --

11  at the most twice a week for meetings, but he was back at the

12  office.

13                  Mr. Montegut -- again, I commend this.  I think

14  it's what I commended the Court to read.  I'll just say on

15  pages 73, 74, 75, and 76 he deals a lot with this issue of the

16  sand because they were pressing him on the issue.  He said,

17  look, what was in there on these structures -- I have some

18  background in this subject, so it rang a bell with me and I

19  remember it.  It's laid out clearly in his testimony.

20                  When you're laying down utility lines, when

21  you're laying a tank in the ground, when you're laying anything

22  like that in the ground, typically what you do is take pure

23  sand -- *pure sand* -- and use it as a foundation because you

24  don't -- particularly if it's a vessel of some kind or a

25  utility line of some kind, you want a soft, conformable pad for

1   that to lay in.  That is more pervious, more permeable, than

2   the soil around it.  You want that because if you have lumps of

3   clay there you're liable to puncture a tank or puncture a

4   utility line, which you don't want to do, and he made that

5   point.

6                He said, when we stripped all that stuff out of

7   there, what went back in was far better, and he makes that

8   point in great detail on those pages.  So what came out, when

9   it was put back with the backfill material that was authorized

10  and then topped off, at times with import sand or with other

11  imported material, that's better -- and that's the point he

12  makes -- than what was there in terms of permeability, the

13  point that is at issue here.

14               Again, that's the merits, but I think it's

15  important to address it because this is an important case.  I

16  don't like hyperbole.  When I use it, I don't mind people

17  pointing it out because I'm prone to use it at times.

18  Mr. Bruno said "300,000 people."  How many people lived in the

19  Lower Ninth Ward or St. Bernard down to the parish line?  It

20  wasn't 300,000 people.  He has exaggerated by probably --

21               THE COURT:  To me, it doesn't make any difference if

22  it's 10 million or one.  My ruling will be the same.

23               MR. TREEBY:  Right.  I appreciate that, but it

24  just -- hyperbole is hyperbole.

25               Your Honor, please, as far as the application of

1    the government contractor defense, the unrefuted evidence is

2    that we had reasonably precise specifications that we followed

3    and that we did not know of any danger that was not known to

4    the Corps.

5               This thing about underseepage, they knew far

6    more.  They went to classes on this stuff.  They knew all that

7    stuff.  Our people were environmental remediators.  That's what

8    they were hired to do.  That's what they did.

9               When Mr. Roe was asked -- I did want to quote

10   this because it was interesting where Mr. Bruno cut off

11   Mr. Roe's testimony.  It's on page 169 of his testimony.  This

12   is, I'm pretty sure, what Mr. Bruno read:

13          "Question:  All right.  Do you have an understanding

14       as to whether or not excavations near a floodwall may, in

15       fact, damage the floodwall?  Does WGI know that?"

16              His answer was yes, and that's where Mr. Bruno

17   stopped.  The question was yes.  The answer was, "Does WGI know

18   that?"  Mr. Bruno's question, he repeats it and he says, "Yes,

19   that's essentially what I'm asking."  Here was the real answer:

20          "Answer:  I'm sure there are individuals within the

21       company with that expertise who would have that knowledge,

22       yes."

23              The analogy that comes to me, if I'm out riding

24   on my bicycle, as I have been prone to do, and I fall and break

25   the fifth metacarpal in my right hand and I go to Ochsner

1    Clinic -- you know, it's pretty clear I have a broken hand

2    right here.  I go in and see an orthopedic surgeon or a

3    physician's assistant -- which normally you see there -- and

4    they fix that up.  Now, it just so happens I go in there

5    dressed.  Down on my lower left leg I have a lesion, and it

6    turns out that lesion is a melanoma.  Is Ochsner Clinic

7    responsible for that because they have people in Ochsner Clinic

8    who know all about melanoma and, if they saw it, could easily

9    diagnose it?  The answer is no.

10                   Similarly, Washington Group was hired to

11   remediate this site, not to provide advice about the stability

12   of the floodwalls and levees, and that's why we should be

13   dismissed on a government contractor defense.  Thank you.

14             **THE COURT:**  Thank you very much.  I appreciate

15   this --

16             **MR. TREEBY:**  Excuse me just a minute.

17                   Your Honor, I'm glad I have able people working

18   with me.  I don't remember all this stuff.  Your specific

19   question, was there back-and-forth on import or fill material

20   shown, in our Exhibit 61 on page 13, which was produced from

21   the government -- and this is part of the general description

22   of the work, scope of the work.  It's the government's copy

23   with all their little handwritten notes on it.  This can be

24   seen by looking at page 13.  The Bates number is

25   NCS007000001398.

1              Mr. Guillory wrote in "or imported material,"

2     but it had to be approved by Guillory.  That's what he wrote in

3     in in Section 3.0, Site Maintenance.  This is the full

4     sentence:

5              "Any areas requiring backfill may obtain it from

6     a borrow pit established at the McDonough project site or

7     imported material."

8              But it had to be approved by Guillory.  In his

9     testimony on page 104 -- this was beginning on page 103,

10    line 12:

11         "Question:  At the very bottom, the bottom sections,

12         3.0, Site Maintenance, it says -- I guess in the fifth

13         line from the bottom -- 'any areas requiring backfill may

14         obtain it from the borrow pit established at the McDonough

15         project site,' it looks like a carat, and then you have

16         written in the words" -- you know, one of these little

17         squigglies to write something in -- "*or imported*

18         *materials*, that's your handwriting?

19         "Answer:  Yes.

20         "Question:  What did you mean by *imported material*?

21         "Answer:  If there was not sufficient material,

22         borrow material, available from the McDonough on-site

23         borrow area, we could have the option of importing or

24         having Washington Group purchase additional material to be

25         truck hauled into the site for use as backfill.

1          "Question:  Did you have to approve the material that

2        Washington Group chose to import into the site?

3          "Answer:  Yes, we had.  If that situation ever came

4        up, they proposed it to the COR, the contracting officer's

5        representative, Jim Montegut, gave him an estimate on

6        where the material would come from, what type of material

7        it would be, the cost associated with purchasing and

8        trucking the material on-site.

9          "Question:  Okay.  And so he would have to approve it

10      before Washington Group would be allowed to actually bring

11      it onto the site?

12          "Answer:  Correct."

13          So, yes, there is some specific evidence that

14  they did have back-and-forth and edits by the Corps on this

15  very point of what fill material could be used.  Thank you.

16      **THE COURT:**  All right.

17         Mr. Bruno, on the items that were not part of

18  your motion, if you want me to consider them, why don't you

19  file a brief two-page motion.  I'll let Mr. Treeby reply to it.

20      **MR. BRUNO:**  When would you like it, Your Honor?

21      **THE COURT:**  Let me ask you:  What would be reasonable

22  for you?

23      **MR. BRUNO:**  Monday.

24      **THE COURT:**  Monday.

25         Mr. Treeby, what would be a reasonable time for

1    you to reply?

2        **MR. TREEBY:**  By the end of the week, next week.

3        **THE COURT:**  Friday.

4        **MR. BRUNO:**  I'm trying to be brief and they are

5    taking five days?

6        **THE COURT:**  Let's do it the same amount of time.

7        **MR. BRUNO:**  Yes.  That would be reasonable.  If he

8    wants five days, I'll take five days.

9        **THE COURT:**  I'll tell you what.

10        **MR. BRUNO:**  We are good on Monday, Judge.

11        **THE COURT:**  Why don't we do it Tuesday and Friday.

12    How about that?

13        **MR. BRUNO:**  That's fine.

14        **MR. TREEBY:**  I'll accept that, Your Honor.

15        **THE COURT:**  Tuesday and Friday.

16        **MR. TREEBY:**  However, he has known about this and he

17    has it in his argument.  We haven't --

18        **THE COURT:**  I know.  I know.  Tuesday and Friday

19    because I have other stuff coming up.

20        **MR. BRUNO:**  Judge, thank you very much for your time

21    and patience.

22        **THE COURT:**  Thank you.  It was very good argument by

23    both of you.  We're adjourned for the day.

24        **THE DEPUTY CLERK:**  All rise.

25        (WHEREUPON the Court was in recess.)

1          **<u>CERTIFICATE</u>**

2                I, Toni Doyle Tusa, CCR, FCRR, Official Court

3     Reporter for the United States District Court, Eastern District

4     of Louisiana, do hereby certify that the foregoing is a true

5     and correct transcript, to the best of my ability and

6     understanding, from the record of the proceedings in the

7     above-entitled and numbered matter.

8

9

10                                    s/ Toni Doyle Tusa
                                      Toni Doyle Tusa, CCR, FCRR
11                                    Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25