# EXHIBIT C

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE: KATRINA CANAL BREACHES     CIVIL ACTION

CONSOLIDATED LITIGATION           NO. 05-4182 K2

                                  JUDGE DUVAL

PERTAINS TO                       MAG. WILKINSON

(Robinson, No. 06-2268)


      Deposition of RICHARD JAMES VARUSO, given at the U.S. Army Corps of Engineers New Orleans District offices, 7400 Leake Avenue, New Orleans, Louisiana 70118-3651, on April 1st, 2008.


REPORTED BY:

      JOSEPH A. FAIRBANKS, JR., CCR, RPR

      CERTIFIED COURT REPORTER #75005

Page 154

1   other issues which we'll talk about in a
2   moment.
3       North breach:  I believe the
4   suggestion is that the mechanism of failure is
5   similar to that experienced at 17.
6     A.  Yes.
7     Q.  That is, separation between the earth
8   berm and the I-wall, water filling, and then
9   some subsequent failure.
10    A.  (Nods affirmatively.)
11    Q.  But I want to clarify.  There was
12  overtopping after that, not before.
13    A.  According to the IPET report.
14    Q.  I'm going to place this in front of
15  you.  Let me just place this in front of you.
16  I will tell you that we got it off of the
17  website of the Kansas City District office, and
18  my questions will be focused on the third page.
19    A.  This is from the Kansas City District
20  office?
21    Q.  Yes.  We can go online and verify all
22  that if we need to, but please trust me on
23  that.
24    A.  Okay.  Did you need me to read the
25  highlighted --

Page 155

1     Q.  No.  I just wanted you to just --
2   okay.  Now, you will see that the title of this
3   document is Guidance for Work Proposed Near or
4   Within a Federally Constructed Flood Control
5   Project.  Right?  There it is.  That's what you
6   and I were talking about a little bit ago.
7       So my first question to you is, have
8   you ever seen anything like that?
9     A.  No.
10    Q.  Okay.
11    A.  I mean, not with this specific title
12  on it.
13    Q.  All right.  Well, can I as a layman,
14  non military guy, non Corps guy, assume that
15  those guidelines are something that I would
16  read in order to ascertain the potential impact
17  of some excavation that I might be doing near a
18  federal flood control project?
19    A.  I would have to read through the
20  guides and see what it's referring to.
21    Q.  Okay.  Well, then, I'll let you go
22  ahead and do that.  In fact, we can get off the
23  record because I really need to understand this
24  to see if you all have one here in New Orleans.
25    A.  Okay.

Page 156

1     Q.  So if it will take you a little time,
2   let's go off the record and you just do that.
3       (Off the record.)
4   EXAMINATION BY MR. BRUNO:
5     Q.  Okay.  Mr. Varuso, you have had a
6   chance to look at what I've represented to you
7   is off of the web side of the Kansas City
8   District.
9       Make any sense out of what we've given
10  you?
11    A.  Well, I'm not sure what you mean by
12  make any sense.
13    Q.  In other words, does it look like what
14  it purports to be, guidelines?
15    A.  Guidelines.
16    Q.  All right.  And does it appear to you
17  to be something that comes specifically and
18  only out of Kansas City, or is this a Corps
19  document that's accessible by all of the
20  district offices?
21    A.  It's accessible if you're saying it's
22  on the Internet.  But it doesn't appear to be
23  an official Corps of Engineers document.  It
24  doesn't have an official em, etl, er, what have
25  you, designation to it.

Page 157

1     Q.  Okay.  Now, may I have that back,
2   please?
3     A.  Sure.  (Tendering.)
4     Q.  Does the New Orleans office have such
5   a guideline?  And by such a guideline, I'm
6   referring to the something called -- does the
7   New Orleans office have a written guideline
8   which would have given information about
9   guidance for work proposed near or within a
10  federally constructed flood control project?
11    A.  I'm not sure.
12    Q.  Okay.  All right.  Now -- now, let me
13  just show you --
14      MR. BRUNO:
15          And again, it's hard for me to
16      reference this but I'll give counsel
17      an opportunity to make a photocopy of
18      this thing.  And perhaps we should
19      attach it, Richard, and I'm just going
20      to mark it as Varuso Number 1 because
21      it's a document that you're not
22      familiar with.
23      MR. STONE:
24          Yes.
25  EXAMINATION BY MR. BRUNO:

Page 158

1   Q.  And I'll ask you to look at the pages
2   entitled excavation and backfill, the
3   paragraphs that we've highlighted, which are 1,
4   2, 3 and 3.1.  (Tendering.)  Just quickly read
5   those -- or read them.  Take whatever time you
6   need, I'm sorry, to digest them.
7   A.  Okay.
8   Q.  All right.  First question to you is
9   whether or not the subject excavation and
10  backfill falls within your area of expertise
11  and knowledge.
12  A.  Yes.
13  Q.  Okay.  All right.  Now, let me have it
14  back so I can ask you some --
15  A.  All right.
16  Q.  We had chatted earlier a little bit
17  about the necessity of getting Corps approval
18  on projects that were near or around hurricane
19  protection structures, and we referred, really,
20  to I guess what would be called capital
21  projects.  Here there is a discussion about
22  excavations.
23      So my first question to you is, is it
24  necessary for the Corps to evaluate excavations
25  that may be, using the words as outlined here,

Page 159

1   in the critical area of a flood control
2   project?
3   A.  Well, let's get to the definition of
4   what they're defining the critical area to be.
5   They're very specific in the beginning of this
6   document that it's 300 feet on the river side
7   and 500 feet on the landward side.  That's
8   obviously been established based on, um --
9   various site specific information about a
10  typical levee, say, or a typical structure for
11  their district.  So that critical area is going
12  to change depending on where you are and the
13  type of structure it is.  The critical area in
14  New Orleans might be smaller than that, in
15  Sacramento it might be bigger than that.  So we
16  need to get into the definition of what they're
17  defining as critical because it may not apply
18  everywhere.
19  Q.  I need to slow you down, because if
20  New Orleans doesn't even have this, how are you
21  able to say that in New Orleans criteria could
22  be larger or smaller?
23  A.  They're defining their critical area
24  based on what zone -- I mean, they probably
25  looked at a worst case scenario --

Page 160

1   Q.  Right.
2   A.  -- and said, okay, for this worst case
3   levee section, if I dig within this 800-foot
4   zone, 300 feet on one side and 500 on the other
5   side, I may have a problem.
6   Q.  I understand that, Mr. Varauso, but my
7   problem is this.  Would you agree with me,
8   based upon all that you know about the soils in
9   this area --
10  A.  Uh-huh.
11  Q.  -- that if anything, excavating around
12  a flood control project in New Orleans is far
13  more hazardous than excavating around a flood
14  control project in Kansas City?  Based upon
15  your knowledge of the soil structures alone?
16      MR. BAEZA:
17          Objection.  Argumentative.
18  A.  I wouldn't use the term more
19  hazardous.
20  EXAMINATION BY MR. BRUNO:
21  Q.  Would you pick any term?
22  A.  I would say that, um -- it's -- I
23  mean, they even mentioned in one of the
24  paragraphs in there that each structure has to
25  be looked at on a case-by-case basis.  So it's

Page 161

1   a case-by-case situation.  If I'm going to dig
2   within -- and I'm just throwing an example out
3   there -- if I'm going to dig within 200 feet of
4   a levee, you know, and it's all compact clay
5   and the foundation is all clay and, um --
6   foundation of the material is all Pleistocene
7   and they're very strong, my factors for safety
8   for that particular levee are 3 or more, then I
9   don't care.
10  Q.  All right.
11  A.  But, so it's -- it's very difficult to
12  generalize.
13  Q.  Well, do you often, in New Orleans,
14  come in contact with a large layer of clay
15  strata?
16  A.  Sure.
17  Q.  All the time?
18  A.  Not all the time.
19  Q.  No.  Rarely.
20  A.  Um -- what do you mean by large layers
21  of --
22  Q.  All right.  Let's get the cases.
23  Lower Nine.  Okay?  Water side.
24  A.  Okay.
25  Q.  There ain't no clay there, is there?

Page 162

1  A. Sure there's clay there.
2  Q. How much clay is there?
3  A. In the Lower Ninth Ward.
4  Q. No. In the water side of the Lower
5  Nine breach, north and south, there is not a
6  lot of clay there.
7      MR. BAEZA:
8          Objection. Vague. What do you
9      mean by not a lot?
10 A. There isn't sand until around
11 elevation minus 60.
12 EXAMINATION BY MR. BRUNO:
13 Q. Okay.
14 A. It's all clay. From the ground
15 surface down to elevation minus 60 is
16 predominantly clay.
17 Q. No peat, no --
18 A. Well --
19 Q. You're including within the definition
20 of the clay, peat, humus, wood, logs, all that
21 stuff?
22 A. No, I'm not defining peat as clay.
23 Q. I didn't think so.
24 A. Okay.
25 Q. I mean, you know --

Page 163

1  A. Yes, there are some inconsistent zones
2  of peat that do exist in some of the borings
3  along IHNC.
4  Q. Well, we know, do we not, that along
5  the IHNC, particularly there, of all places --
6  that's where there was a breach in Betsy,
7  right?
8  A. From what I've heard.
9  Q. From what you heard. And we know that
10 the breach in Betsy gave us some instruction
11 about the soils at that location, and they were
12 not typically strong, um -- maybe I'm using the
13 wrong words and I shouldn't use strong, but
14 soils, um -- that were the best to underlay a
15 flood protection structure.
16     MR. BAEZA:
17         Objection. Argumentative.
18 A. Let's talk about the use of the word
19 best in this -- and I'm only saying that
20 because I think I understand what you're trying
21 to ask me, and let's see if I can iron it out.
22 EXAMINATION BY MR. BRUNO:
23 Q. All right.
24 A. Um -- every foundation is going to
25 have its own challenges. Okay? Whether -- a

Page 164

1  sand strata, for example. The foundation is
2  completely made of sand. It's a lot stronger
3  than clay. But now I have seepage problems. A
4  real weak clay would have no seepage problems,
5  but maybe I have a strength problem. So
6  difficult to define any one type of foundation
7  as good, bad or what have you.
8  Q. Right.
9  A. There's different challenges. But let
10 me finish, if I may. And that's the job of the
11 geotechnical engineer, is to find out what does
12 exist and to design accordingly. So however --
13 whatever the case may have been for the
14 existing foundation along the Lower Ninth Ward
15 walls, a geotechnical engineer's responsibility
16 is to analyze that and to make recommendations
17 and designs accordingly. Nothing is
18 unexpected, or nothing was unexpected about
19 what was seen in the foundations in that
20 particular area given the soil conditions that
21 we typically see in southern Louisiana.
22 Q. All right. Well, then, let's do it
23 this way: Let's see if you agree with me, as
24 an expert in the field. Excavation and
25 backfill in the critical area of a flood

Page 165

1  control project could have a direct impact on
2  the stability of the flood control project. Do
3  you agree with that or not?
4  A. It could.
5  Q. And do you agree with me that at the
6  Lower Nine, north and south breach -- let's use
7  300 feet. Okay? Based upon your knowledge of
8  that soil, the sand, the whole nine yards, if
9  you will --
10 A. Okay.
11 Q. -- would you agree with me that that's
12 a critical area of a flood control project?
13 A. I'm not trying to get into the details
14 of words, but I have to make sure I understand
15 the question.
16 Q. All right.
17 A. What do you mean by a critical area?
18 Are you meaning critical area based on what's
19 in this document or critical area using it as a
20 general term? This document from Kansas City
21 gives a very specific definition of what a
22 critical area is.
23 Q. No.
24 A. And I do not think that definition
25 applies to the Lower Ninth Ward.

Page 166

1    Q.  I thought that you told us that this
2  document defined the critical area in terms of
3  distance from the flood control project center
4  line.  Are you now suggesting --
5    A.  No.  In Kansas City.
6    Q.  I understand that.
7    A.  Okay.
8    Q.  But I'm telling you, it doesn't matter
9  to me where you are, it's a space, it's a
10 distance, and according to this it's 500 land
11 side, 300 river side.  Are you using some other
12 measure other than feet?
13   A.  No.  What I'm saying is that when the
14 Kansas City District put this document
15 together --
16   Q.  Right.
17   A.   -- they did that with their levees
18 and their structures in mind.
19   Q.  Exactly.
20   A.  Okay?  So for -- they may have -- I
21 can't tell you what they based those numbers
22 on.
23   Q.  I'm not talking about them.  I asked
24 you, based upon what you know about --
25   A.  Okay.

Page 167

1    Q.  -- one, the hurricane protection
2  structure on the IHNC --
3    A.  Yes.
4    Q.  -- at the location where there was
5  overtopping and a breach --
6    A.  Yes.
7    Q.  -- on the south, and at the location
8  where there was a breach on the north, at those
9  precise locations, and I'm asking you to assume
10 an area 300 feet to the water side of the
11 center line of those two points.  Okay?
12        Now, and I'm suggesting, and maybe you
13 need to do some further study, and if you do,
14 that's fine, but if you can, as you sit here
15 talking to me today, based upon what you know
16 about the soils in that area, whether you can
17 tell me whether that is a critical area of a
18 flood control project.  And if you can't, it's
19 okay.
20       MR. BAEZA:
21           Objection.  It's a misleading and
22       incomplete hypothetical.
23       MR. BRUNO:
24           Why is it misleading?
25       MR. BAEZA:

Page 168

1           Because you're creating facts
2       here.  We're not talking about
3       particular facts that are within this
4       witness' knowledge.
5       MR. BRUNO:
6           Which facts?  On the contrary,
7       I'm asking him if he has those facts.
8       So how can that be incomplete if I'm
9       trying to find out what facts he's
10      got?
11   A.  I don't mind answering the question.
12 EXAMINATION BY MR. BRUNO:
13   Q.  I know, but I need to satisfy his
14 objection first because he's saying it's
15 incomplete.
16       I'm asking if you have the facts, and
17 if you don't you don't, that's fine, but I
18 can't find out if you got the facts without
19 asking you the facts, which makes it somewhat
20 difficult for me.
21       MR. BRUNO:
22           And in terms of incomplete, what
23       am I missing?
24   A.  I usually define critical area.
25 EXAMINATION BY MR. BRUNO:

Page 169

1    Q.  Well, do they define critical area?
2    A.  For the Kansas City District.  I'm not
3  sure why this isn't clear.
4    Q.  I'm not sure why it's not clear
5  either, because it says here the critical area
6  is generally considered the area from 300 feet
7  to 500 feet.
8    A.  For the structures in the Kansas City
9  District.
10   Q.  Okay.  And I'm asking you the question
11 would 300 feet be appropriate for this area at
12 the Lower Ninth, given your knowledge, if you
13 have any, of the soils, the sands, the clay,
14 the peat, the marsh, the buried logs underlying
15 that 300 feet -- together with your knowledge
16 of the hurricane protection structure, is that
17 enough for you to be able to tell us whether in
18 fact that is a critical area?
19       (Brief interruption.)
20 EXAMINATION BY MR. BRUNO:
21   Q.  I also have East Bank IHNC Geological
22 Section to the South Breach and North Breach,
23 if you want to take a quick peek.  It's from
24 IPET.
25   A.  I'm familiar with it.

RICHARD JAMES VARUSO                                          April 1, 2008

Page 170

1  Q. I thought you were, that's why I asked
2  the question.
3  A. Okay.
4  Q. Maybe I'm wrong.
5  A. Maybe we're not on the same page with
6  the question and what you're looking for for an
7  answer, but let's --
8  Q. Well, then, let me explore it then.
9  A. Let's do this: Let me read the first
10 paragraph and tell you how I'm interpreting the
11 use of the word critical area.
12 Q. All right.
13 A. Okay? It says, the information has
14 been provided general guidance regarding
15 engineering operation and maintenance aspects
16 of construction within the critical area of
17 flood control projects constructed by the Corps
18 of Engineers. The critical area is generally
19 considered the area from 300 feet riverward to
20 500 feet landward of flood control project
21 center line. Okay. So they're defining an
22 area that says if you do anything within these
23 two -- the limites of this, 300 feet on one
24 side, 500 feet on the other --
25 Q. Right.

Page 171

1  A. -- if you do anything within there we
2  want to know about it because there might be an
3  issue.
4  Q. Right.
5  A. Okay. Might be. Right?
6  Q. Can I press the pause button?
7  A. Sure.
8  Q. The reason why they might be
9  interested is because they have some -- it's
10 about excavation, it's about digging holes,
11 it's about all that stuff.
12 A. Sure.
13 Q. And there's a whole bunch of stuff
14 about underseepage and undermining the slope of
15 the levee, et cetera. Maybe I'm stupid, dut
16 I'm thinking to myself, if you're digging a
17 hole within a critical area there must be the
18 potential to impact the hurricane protection
19 structure.
20 A. Right.
21 Q. And these guys in Kansas City figured
22 out 300 feet, for them, is the area of concern
23 based upon their knowledge of the soils and the
24 hurricane protection structure.
25    Is that insane?

Page 172

1  A. No.
2  Q. Okay. Now, so, if that's not insane,
3  and if it has any reasonable logic to it at
4  all, then one might conclude, well, if I go to
5  New Orleans and I know something about the
6  flood control structure and I know something
7  about the soils, maybe -- maybe --
8  A. Yes.
9  Q. -- I might be able to ascertain what a
10 critical area would be for that location in the
11 Industrial Canal near the breach.
12    Am I making any sense?
13 A. Yes.
14 Q. Okay.
15    MR. BAEZA:
16       I going to have to object again.
17    You're arguing with the witness.
18    You've asked about the Kansas City
19    District. He has told you it only
20    applies to the Kansas City District,
21    and now you're asking him, though, to
22    take judgments made by the folks in
23    Kansas City and impart them into
24    southeastern Louisiana.
25    MR. BRUNO:

Page 173

1       No, I'm not.
2  EXAMINATION BY MR. BRUNO:
3  Q. Let's go back to where we were.
4     MR. BAEZA:
5        I'm just going to keep on
6     objecting then.
7     MR. BRUNO:
8        I will graciously agree to make
9     your objection continuing as to form
10    because I don't know how to better ask
11    the question. Because I've thought
12    about it a great deal.
13 EXAMINATION BY MR. BRUNO:
14 Q. So anyway, back to where we were.
15 A. I'm sure you have.
16 Q. Mr. Varuso, based upon that analysis,
17 do you think, based upon your knowledge -- and
18 you have knowledge of the soils there.
19 A. (Nods affirmatively.)
20 Q. This is your -- you're the man.
21 Right? Are you the man?
22 A. I'm not answering that question.
23    MR. BAEZA:
24       You can answer. You can answer.
25 EXAMINATION BY MR. BRUNO:

44 (Pages 170 to 173)

JOHNS PENDLETON COURT REPORTERS                               800  562-1285

dc98ccc8-e631-4b72-ba9d-65c3789f0a81

RICHARD JAMES VARUSO                                       April 1, 2008

Page 194

```
 1    Q.  All right.  Well, it's either the WGI
 2  or the Corps, right?
 3    A.  That made an assessment?
 4    Q.  No, that's the designer.
 5    A.  It says, make an assessment.
 6    Q.  It says, the designer should.  I'm
 7  trying to define the designer.  It's either the
 8  WGI in the instance of this TERC, or it's the
 9  Corps.
10    A.  Right.
11    Q.  One of the two.
12    A.  Okay.
13    Q.  So either the Corps or WGI should have
14  done the assessment.
15    A.  Done the assessment.  Okay.  Fair
16  enough.
17    Q.  Do you know if the assessment was
18  done?
19    A.  I'm not familiar enough with that
20  project.
21    Q.  Who should I ask?
22    A.  Can I get back with you with that name
23  also?
24    Q.  Yes, sir.  All right, now, I told you
25  I was going to talk about excavation.  It says,
```

Page 195

```
 1  again at Page 1 -- I'll give you the whole
 2  copy.  It says, excavation and backfill - 1.
 3  That's the only page it has with it.  It says,
 4  at Paragraph 1, general, excavation and
 5  backfill in the critical area of a flood
 6  control project could have a direct impact on
 7  the stability of the flood control project.
 8        Do you agree with that?
 9    A.  Let me ask another question.  I know
10  I'm supposed to be being deposed here, but let
11  me ask a question.
12    Q.  I'm cool man, you know that.
13    A.  I know.  You're the man.
14    Q.  Thank you.  I was waiting for that.
15    A.  We're continuing to keep addressing
16  this document that was put together by Kansas
17  City District --
18    Q.  Right.
19    A.  -- which is not something that is a
20  directive of the Corps of Engineers.
21    Q.  I know that.
22    A.  This is guidelines.
23    Q.  I know.
24    A.  That they felt like they needed to put
25  together for one reason or another.
```

Page 196

```
 1    Q.  Sure.  Right.
 2    A.  So I'm not really following why we
 3  have to keep referring to this document.  If
 4  you have some specific questions for me about
 5  the IHNC and how it was analyzed for this
 6  particular contract, why don't we just focus on
 7  that and stop referring to this document that
 8  is not a Corps of Engineers document?
 9    Q.  Well, because there seems to be -- and
10  I could be wrong, and I want to make sure that
11  I'm wrong and not you -- there seems to be some
12  inconsistency between the guidelines
13  promulgated by the Kansas City office and what
14  you're testifying to today.  Because you said,
15  um -- you got a hole, you just fill it with
16  sand, don't worry about it.  That doesn't sound
17  very consistent with what these guys are
18  saying.  These guys are saying, hold the phone.
19    A.  No.  What I said, I never used -- you
20  just put words in my mouth, and I don't
21  think --
22    Q.  No, I said --
23    A.  You said I said don't worry about it.
24  I never said that.
25    Q.  I said what should you put?  And you
```

Page 197

```
 1  said sand.
 2    A.  You asked me, off the cuff, what
 3  should I -- and I'm thinking, you know, if I'm
 4  placing fill underwater, then that's, that
 5  might be a reasonable alternative.
 6        MR. BAEZA:
 7            Joe, this has been asked and
 8        answered.  Let's talk about what the
 9        New Orleans District requires, if
10        there are any requirement for
11        excavation and fill, and if these
12        standards or regulations or principles
13        are applied to the IHNC.
14  EXAMINATION BY MR. BRUNO:
15    Q.  What you're really telling us, Mr.
16  Varuso is before you backfill any hole you need
17  to make an evaluation and an assessment as to
18  whether or not there's a potential for
19  underseepage because that might dictate that
20  you use something other than sand or other fill
21  material.  Right?
22    A.  Yes.
23    Q.  Okay.  I mean, what we're really
24  saying here is you got to do your homework, you
25  don't just dig a hole and put anything in it
```

50 (Pages 194 to 197)

JOHNS PENDLETON COURT REPORTERS                            800  562-1285

dc98ccc8-e631-4b72-ba9d-65c3789f0a81