UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:  KATRINA CANAL BREACHES CONSOLIDATED LITIGATION | CIVIL ACTION NUMBER:  05-4182 "K"(2) JUDGE DUVAL MAG. WILKINSON |
| PERTAINS TO:  *Robinson* (No. 06-2268) | |

**AMICUS CURIAE BRIEF OF**
**THE STATE OF LOUISIANA, ST. BERNARD PARISH GOVERNMENT,**
**ENTERGY CORPORATION, ENTERGY NEW ORLEANS, INC.,**
**ENTERGY LOUISIANA, L.L.C., AND HARTFORD STEAM BOILER**
**INSPECTION AND INSURANCE COMPANY (hereinafter: Amici)**
**CONCERNING THE NATIONAL ENVIRONMENTAL POLICY ACT IN**
**SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY**
**ADJUDICATION ON DISCRETIONARY FUNCTION**

**Amici,**  jointly submit this *amicus curiae* brief in support of Plaintiffs' Motion for

Summary Adjudication on the Discretionary Function Exception ("DFE") to the Federal

Tort Claims Act (28 U.S.C. § 2680(a) ("FTCA").  The DFE does not grant the United

States immunity in relation to torts associated with the United States Army Corps of

Engineers ("Corps") operation and maintenance ("O&M") of the Mississippi River Gulf

Outlet ("MRGO") where the challenged conduct was committed in violation of the

National Environmental Policy Act ("NEPA") 42U.S.C.§ 4321 et seq.

In preparing adequate environmental documentation regarding MRGO the Corps

was bound by the mandates of NEPA and had no "room for choice" in compliance.

*United States v. Gaubert*, 499 U.S. 315, 323 (1991).  *Dalehite v United States*, 346 U.S.

15, 34 (1953). *Berkovitz v. United States*, 486 U.S. 531, 536 (1988).   The Government

cannot meet its burden of proving that it complied with mandatory statutory requirements

of NEPA; therefore, the Corps can not avail itself of immunity under the DFE.  *See In re*

*Katrina Canal Breaches Consol. Litig.,* 471 F. Supp. 684, 697, 699, 705 (E.D. La 2007).

In *Holy Cross et al. vs. USACE,* 4557. Supp. 2d  532, 537-538 (EDLA, 2006) this

Court held that NEPA's purpose is to ensure careful consideration of environmental

impacts and guarantee that relevant information will be made available in both the

decision making process and during the implementation of decisions.  That decision

echoed the Fifth Circuit in *Robertson v. Methow Valley Citizens Counsel*, 490 U.S. 332,

349, 350 (1989) for the proposition that:

> NEPA is a procedural statute that demands an environmentally conscious
> decision… which commands that the agency make its decision to proceed
> with the action after taking a "hard look at the environmental
> consequences.

*Robertson v Methow Valley Citizens Counsel, 490 V.S.333,* see also: *Sabine River*

*Authority v. U.S.D.O.I*, 951 F.2d 669 (5th Cir. 1992).

The Corps admits that in violation of NEPA it failed to supplement its EIS:

> the ongoing Operation and Maintenance (O&M) of the MRGO "bore
> little resemblance" to what it reported in its 1976 Environmental
> Impact Statement (EIS); the Corps Environmental Assessments
> (EAs) "ignored the cumulative effects of its conduct to conclude that
> each change was individually determined to not have a significant
> impact", and "the cumulative impact of all the changes since
> preparation of the 1976 EIS alone constituted a significant impact on
> the environment compared to the O&M plan described in the
> EIS."(PUF 119)

As more comprehensively addressed in the accompanying Declaration of

Nicholas C. Yost, Esq. former General Counsel of the President's Council on

Environmental Quality (CEQ),  the Corps violated its mandatory legal obligations under

NEPA to examine environmental impacts of its actions; prepare supplemental NEPA

documents; prepare legislative EIS's; and evaluate cumulative impacts of it's conduct.

(Declaration of Nicholas C. Yost dated November 20, 2008 at, ¶¶ 6, 12, 13,14,15,16
hereinafter Yost Decl. at which is incorporated herein by reference.

     As further outlined in the Declaration of Nicholas Yost, Esq., the EIS process is as
equally mandatory on projects initiated prior to the statutes' enactment as on requests for
appropriations, and on legislative actions involving construction.  (See Yost Dec. at ¶5, 6,
7).  Between the years of 1970 and 1979 the Corps sought annual appropriations for both
new work and maintenance work on the MRGO, these requests were not accompanied by
an environmental impact statement. (PUF 111,112,113) NEPA mandates that: "Agencies
have continuing obligations to reassess ongoing projects to avoid or minimize adverse
environmental effects." 40 CFR §1500.13; (see Yost Dec at ¶6 (c), 13, 15 see *O'Reilly v
U.S.A.C.E*, 477 43.d 225, 238 (5th Cir. 2007).  Ongoing maintenance dredging operations
of the MRGO included approximately 147 dredging events along the channel. (PUF 100,
111, 118)  Each one of these dredging events constituted "significant circumstances" that
required the Corps to take a "hard look" and assess the need to supplement the existing
EIS.  *See Louisiana v. Lee*, 758 F.2d 1081 (5th Cir. 1985) (dredging events permitted by the
Corps were found to constitute Federal action for NEPA). See Yost Decl. at ¶6(a), 12, 13,
14, 15, 16.

     Further, this statutorily mandated "hard look" necessitated that the Corps also
assess the cumulative effects of its ongoing conduct *O'Reilly, supra*, at 238, *Norton v.
Southern Utah Wilderness Alliance et. al.,* 542 U.S. 55, 73 (2004) citing *Marsh v. Oregon
Natural Resources Council*, 490 U.S. 360,370-374 (1989). On remand, the trial Court in
*O.N.R.C v. Marsh*, 52 F.3d 1485 (9th Cir. 1995) concluded: "The Corps' duty to discuss
cumulative impacts is mandatory and not within the agency's discretion.  *See* 40 CFR
1502.16, 1508.7-8".  (*Marsh* at p. 1491-1492), *O'Reilly* at 227 see Yost Decl. at ¶¶ 6(e),
12(b), 13.

     Here, despite this mandatory duty, the Corps neglected to evaluate the
environmental effects of these dredging events or to address at any time the cumulative

impact of 38 years of continuous dredging on the environment. In addition, the Corps did not assess measures that might mitigate those effects. See Yost Decl. at ¶ 12,(d), 16.

The decision to proceed with this relentless dredging regime and to allow unmitigated channel widening and wetlands destruction, a substantial factor in the catastrophic flooding of the greater New Orleans areas—without informed Congressional approval is not entitled to DFE immunity. *Adams v. United States,* Slip Copy, 2006 WL 3314571 (D. Idaho, Nov. 2006) (Bureau of Land Management's failure to comply with NEPA in using a potentially toxic pesticide defeated DFE); see also *Collins v U.S.,* 783 F. 2d 1225, 1230-1231 (5th Cir 1986)

## **FACTS**

The Corps' history of purported NEPA compliance with regard to the MRGO and its ongoing O&M involved preparation of two draft environmental impact statements ("DEIS") in 1972 (PUF 54) and 1974 (PUF 55) one Final Environmental Impact Statement ("FEIS") in 1976 (PUF 58); one Supplemental Information Report ("SIR") in 1985 (PUF 87-91); and twenty-six (26) Environmental Assessments ("EAs")(PUF 92-95) each with an accompanying "Finding Of No Significant Impact" ("FONSI")(PUF 96,50). See Yost Decl. at ¶¶ 8(b)(c )(d)(e)(f)(g)(h)(i)(j)(m)(n)(o)(p)(q)(t)(u)(v)(w). As discussed below, among the shortcomings of these NEPA documents are the Corps' failure to address significant environmental impacts inherent in the MRGO. See Yost Decl. at ¶¶ 6(a),12,13, failure to consider cumulative effects of the MRGO, See Yost Decl. at ¶ 6(e),12(d),16, failure to propose mitigation alternatives and failure to consider closure of the MRGO.

By the time the Corps published the 1976 FEIS, it possessed an ever increasing awareness of the channel's significant adverse effects, including that:

> the MRGO was a direct, efficient route for hurricane surge into the heart of Greater New Orleans, and created undesirable effects of high velocity and erosive currents in the Inner Harbor Navigational Canal (IHNC) with the potential to deliver storm surge that could cause

catastrophic property damage and loss of human life.  (PUF 34, 37.);

the MRGO's design created a "funnel" that would create enhanced surge, waves, and currents during hurricanes.  (PUF 41, 42.) In slow, moderate, and rapidly rising surges during hurricanes, the MRGO funnel would hasten the onset of peak surge and to lengthen the period of highest water.  (PUF 43.);

construction of floodgates and hurricane surge barriers along Reach 2 of the MRGO and at the mouth of the "funnel" could prevent hurricane surge from Lake Borgne and the Gulf of Mexico. (PUF 37, 39.);

the introduction of Gulf salt water to the vicinity was destroying cypress forests, grasses, marshes, swamps, trees, shrubs, and other wetlands ("wetlands") that provided a natural barrier from storm surge for New Orleans and St. Bernard Parish.  (PUF 45.);

the erosion of the banks of the MRGO had vastly widened the Reach 2 channel beyond its authorized 650' top width, caused large breaches in the marsh buffer between the channel and the open waters of Lake Borgne and Breton Sound, and exposed neighboring people and property to significantly increased risks from hurricanes. (PUF 47);

continuous O & M of Reach 2, by use of cutter head pipeline dredge exacerbated the erosion of the fragile channel banks, causing the banks to widen and destroy adjacent wetlands at an average rate of 15 feet per year. (PUF 55,114.) and;

bank protection measures and marshland restoration measures could have ameliorated the deteriorated conditions of the channel.  None of these environmental impacts or mitigation measures was brought to Congress' attention.  PUF (82, 97-99, 104-108).

## **1972 DEIS**

On October 30, 1972, the Corps prepared what it termed a "Draft Environmental Impact Statement Mississippi River Gulf Outlet" (PUF 54), ("1972 DEIS").

Despite evidence that, by 1972, the Corps knew that the MRGO increased a risk of flooding during hurricanes (PUF 43,44) the environmental impact of storm hazards created by the MRGO is conspicuously absent.(PUF 34, 36-42, 54, 56) See Yost Decl. at ¶¶ 12(a), 13.

Although the 1972 DEIS briefly acknowledged the impact of increased salinity in

the area caused by the "project", no analysis of the increased salinity's effects on storm buffering vegetation is mentioned, (PUF 64,65) See Yost Decl. at ¶¶ 12(a), 13, there is no analysis of the consequences of this loss of vegetation on the human environment, (PUF 122,126) See Yost Decl. at ¶¶ 12(a), 13 and there is no discussion of mitigation measures and alternatives related to these impacts. (PUF123) See Yost Decl. at ¶¶ 12(a), 13.

While the 1972 DEIS acknowledged that "local interests" voiced serious concerns that the MRGO's very existence exacerbated the flooding in St. Bernard Parish during Hurricane Betsy, (PUF 48) the Corps dismissed these concerns by use of a misleading reference to the conclusion of the 1966 Bretschneider & Collins Report that the MRGO at **650 feet top width**, had "very little effect on maximum storm surges from hurricanes." (PUF 44, 48, 56)  The Corps however failed to mention that the same study concluded that under certain storm conditions the MRGO could have a marked effect on storm surge.  PUF  43. See Yost Decl. at ¶¶ 12(a), 13. Likewise, the Corps neglected to note that it had already so extensively dredged and "over dredged" the channel, that by 1972 the channel was no longer within its original "authorized" 650 foot surface width.  See Yost Decl. at ¶¶ 12(b)(d), 14, 16. Rather, known and observable erosion was causing the width to expand an average of 15 feet a year. (PUF 114) See Yost Decl. at ¶¶ 12(a)(b), 13, 14.

## 1974 DEIS

In December 1974, the Corps produced a "Review Draft" entitled "Composite Draft Statement for Operation and Maintenance Work on Three Navigation Channels in the Lake Borgne Vicinity Louisiana" ("1974 DEIS"). (PUF 55)  The 1974 DEIS describes the action for review as:

> [O]peration and maintenance of the following projects in the vicinity of Lake Borgne Louisiana:  The Mississppi River Gulf Outlet….Operation and Maintenance …consist[ing] primarily of periodic dredging and subsequent material deposition along the total of 111.3 miles. Maintenance dredging is accomplished by a cutter head pipeline dredge. (PUF 55)

Although the 1974 DEIS at 373 pages is approximately six times the length of the 57 page 1972 DEIS, it is not more comprehensive.  The 1974 DEIS *omits* the 1972 DEIS' references (albeit superficial) to the storm hazard implications of the MRGO O&M on channel widening and salt water intrusion on the wetlands. (PUF 56) Rather, the Corps restricts its focus in the 1974 DEIS to the impact of spoil dredge placement, concluding that the only adverse impact of the "project" related to the turbidity of the dredge areas and the resolubilization of the resuspended pollutants.(PUF 55 at ii, 56, 57)

The 1974 DEIS's complete omission of the known significant adverse consequences of its activities on the wetlands was also a violation of the Corps' own policy and regulatory scheme that in 1972 designated the wetlands a "high priority" for the analysis of the environmental impact of any project:

> 19-1. <u>Wetlands Policy.</u>
> The Corps *will* ensure that work contemplated in or on wetlands is planned, designed, constructed, operated and maintained as to minimize adverse effects.  Mitigation measures shall be included insofar as practicable.
>
> 19-3. <u>Evaluation of proposed Alterations.</u>
> A single proposed alteration of wetlands may, in itself, constitute a minor change.  However, the cumulative effect of numerous small changes can effectually impair the wetlands ecology of large areas.  A specific proposal in or on a wetland *should be evaluated* in recognition of the complete and interrelated wetland area of which it is a part.  Studies relevant to environmental impacts apply. (emphasis added)(PUF 48, 67) See also, See Yost Decl. at ¶ 7.

Indeed, the Corps, in its 1974 DEIS, its 1976 FEIS and all subsequent EAs of the MRGO up to Katrina simply ignored its own Wetland Resources Policy, utterly failing to consider the cumulative effects of its actions on the wetlands around the MRGO. (PUF 48, 53, 81) See Yost Decl. at ¶¶ 12(a)(d), 13, 16.  This disregard for both Corps policy and mandatory legal duties to report environmental impacts permitted the Corps to

jeopardize the health and safety of the citizens and the environment, without an informed Congressional review.

### CORPS' RESPONSE TO COMMENTS ON 1974 DEIS

Per NEPA's requirements, the 1974 DEIS was published for interagency review and comment.(PUF 48,57)  See Yost Decl. at ¶ 6(a), 13 The Corps was required to incorporate both the Agency comments and the Corps' responses in a Final Environmental Impact Statement ("FEIS") which was submitted to the Council of Environmental Quality (CEQ) (for ultimate availability to Congress) in March of 1976.(PUF 58) See Yost Decl. at ¶¶ 6(a)(i) & 6(a)(iv) 8(d) its 1976 FEIS, the Corps fails to substantively address the pertinent issues raised in the inter-agency comments received during this review process. (PUF 48, 65-80) See Yost Decl. at ¶ 6(a) (i).

Where reviewing Agencies requested the Corps' elaboration on subjects of major environmental concern regarding the adverse effects of the MRGO O & M on environmental conditions, the Corps, without explanation, analysis, or support, unilaterally dismissed the comment. (PUF 48, 67, 69, 70).

For example, the Environmental Protection Agency ("EPA") voiced its concern over the existing adverse long-term and future impacts of increased water salinity in the vicinity caused by the MRGO dredging action and recommended the Corps' consideration of mitigation measures for the operation and maintenance of the MRGO project. (PUF 59-66) The Corps disregarded this EPA comment asserting: "…**Consideration** of these measures in this assessment of the impacts of the project operation and maintenance **is not appropriate**."(PUF 48,67) (Emphasis supplied).

The Ninth Circuit has held that similarly dismissive responses by the Corps to comments by the EPA regarding inappropriate consideration of "synergistic impacts" were inadequate to satisfy the Corps' statutory obligation under NEPA.  See O.N.R.C. v *Marsh* 52 F3d at 1489;  see also *Marsh II*, 832 F.2d at 1497-1498).

With regard to the Corps obligation to evaluate mitigation measures, the Supreme

Court explained in *Robertson,* 490 U.S. 332 at 350-352:

> The requirement that an EIS contain a detailed discussion of possible
> mitigation measures flows both from the language of the Act and, more
> expressly, from CEQ's implementing regulations. Implicit in NEPA's
> demand that an agency prepare a detailed statement on "any adverse
> environmental effects which cannot be avoided should the proposal be
> implemented," 42 U.S.C. § 4332(C)(ii), is an understanding that the EIS
> will discuss the extent to which adverse effects can be avoided. See D.
> Mandelker, NEPA Law and Litigation § 10:38 (1984). More generally,
> omission of a reasonably complete discussion of possible mitigation
> measures would undermine the "action-forcing" function of NEPA.
> Without such a discussion, neither the agency nor other interested groups
> and individuals can properly evaluate the severity of the adverse effects.
> … § 1502.14(f), and consequences of that action, § 1502.16(h), and in
> explaining its ultimate decision, § 1505.2(c).

Here, the EPA also requested a "complete assessment of the interrelated impacts
of the MRGO and other local, State and Federal projects" as well as "an evaluation of
the adverse and beneficial effects of the interrelated projects in the vicinity."(PUF
48,61,62,66)  Again, the Corps dismissively responded that the impacts of the MRGO
on interrelated projects would be the subject of other documents. (PUF 67)  No
complete assessment of the MRGO as it pertained to interrelated projects in the vicinity
was ever created. See Yost Decl. at ¶¶ 12(a), 13, 14, 15, 16.

The Department of the Interior ("DOI") likewise brought to the Corps' attention
certain perceived deficiencies in the DEIS, and sharply disputed the Corps' conclusion
that spoil disposal would "constrain erosion of the channel bank" which was contributing
to the widening of the surface of the MRGO.( PUF 48,70)  Without analysis, the Corps
merely rejected the DOI's comment. (PUF 71)

The Louisiana Wildlife and Fisheries Commission ("LWFC") also objected to the
Corps' conspicuous failure to analyze the MRGO's "significant" contribution to
ecological changes of "considerable magnitude" caused by saltwater intrusion into the
marshlands and estuaries of South Louisiana, and protested the proposed O&M dredging

because it would "enhance the adverse effects of this channel and result in further deterioration of high quality marsh." (PUF 48,78,79)

In lieu of addressing the LWFC's concerns, the Corps took a "spilled milk" approach to ecological havoc that had already been caused by the MRGO, and concluded that it was "inappropriate" to now assess these impacts:

> This EIS recognizes the continual changes resulting from previous actions. We know of no definitive evidence which indicates that discontinuation of dredging operations would restore the salinity levels to pre-1960 conditions. Salinity control measures would require new construction features necessitating environmental and socio-economic investigation and impact analysis. ***Consideration of these measures in this assessment of the impact of project operations and maintenance is not appropriate.*** ( emphasis added) (PUF 80)

Significantly, the Fifth Circuit has expressly rejected this approach to evaluating the continuation of ongoing damage initially caused before the enactment of NEPA.  In *Louisiana v. Lee*, the Court noted that it is not acceptable:

> to continue a course of environmental disruption begun years ago. The fact that much damage to the benthic life occurred years ago does not automatically render the effect of the continued dredging insignificant. Such a conclusion would ignore the realities that even a badly damaged body of water may restore itself to ecological health if a disruptive activity is halted and that continued dredging may expand the areas of damage. 758 F.2d 1081, 1086 (5th Cir. 1985).

NEPA mandated that the Corps present an evaluation of the interrelated environmental effects of the MRGO project, including those of its ongoing extensive dredging activities. See Yost Decl. at ¶¶ 12(a), 13.

## ENVIRONMENTAL ASSESSMENTS

During its ongoing O&M of the MRGO, between 1980 and 2008, the Corps prepared 26 separate EAs. (PUF 49,92)  These EAs generally related to two discrete topics; (1) analysis of specific locations of spoil disposal and (2) examination of the

impacts of alternative techniques for bank stabilization of small sections of the channel.(PUF 93,95)  *At no time* did the Corps' EAs ever consider the cumulative impacts of the continuous dredging that necessitated both the concern over spoil disposal placement and bank stabilization. (PUF 50,100) Indeed, the Corps has testified that it knows of no study in which the Corps explored the cumulative environmental effects of the impacts of the MRGO; (PUF 48,81g 117, 126)

Nonetheless, without exception, for every EA it prepared, the Corps formulaically concluded that its proposed conduct, in isolation, would have no significant impact on the environment.  Based upon this self-serving conclusion, the Corps performed no additional environmental impact statement for Congressional consideration based upon any of the 26 EA's. (PUF 92,96,119)  Indeed the Corps so segmented its analysis of the MRGO O&M in its EA's that it often examined specific sub-sections of the project by "mile marker" without considering its contribution to the deleterious condition that operation and maintenance of the MRGO as a whole created. (PUF 93) See Yost Decl. at ¶¶ 12(a)(b), 13, 16.

Nonetheless, the Corps fully appreciated the cumulative nature of the impacts on the environment.  As early as 1983 the Corps participated in the St Bernard Parish Louisiana Coastal Area, Shore and Barrier Erosion, Initial Evaluation Study, (PUF 98) which examined the effects of bank erosion on the area around the MRGO.  In the mid-eighties, the Corps performed the first of several of its own Bank Erosion Reconnaissance Studies which concluded that bank erosion would expose the areas southwest of the MRGO to direct hurricane attacks from Lake Borgne.   (PUF 98)

Associated with the Corps' Bank Erosion Study, in 1987, the Corps again considered the need to evaluate bank stabilization measures along the MRGO specifically for *hurricane protection impacts*. (PUF 99) Indeed, although the 1988 Bank Erosion Reconnaissance Study rejected closure of the MRGO as a means of mitigating the bank erosion problem that the channel created, the Corps acknowledged that:

> In addition to solving the aforementioned problems, [closure] will also
> reduce the possibility of catastrophic damage to urban areas by a hurricane
> surge coming up the waterway.(PUF 35, 99,102)

Significantly, with disregard for the mandates of NEPA, the corps determined that shore erosion and mitigation should not have been the subject of an environmental impact statement. See Yost Decl. at ¶¶ 12(b), 14(a)

Indeed, the Corps continued to disregard this obligation to prepare an EIS even when, in 1988, the Corps' own staff described the MRGO as creating "the possibility of catastrophic damage to urban areas by a hurricane surge coming up this waterway."(PUF 35.)

The Corps, in 1993, conducted another Bank Erosion Reconnaissance Report, where it again considered shore protection along a short stretch in the upper portion of Reach 2 of the MRGO. In an internal memorandum, dated October 6, 1993, the Corps observed that any activity with regard to shore protection measures would require alerting Congress of the environmental concerns inherent in the MRGO via a full EIS. (PUF103) See Yost Decl. at ¶¶ 12(b), 14. The Corps accurately noted that a full EIS would necessitate public comment that would in turn result in both challenges to the limited scale of the Corps proposed action (in light of the public desire for more extensive remedy), and appropriately prompt Congressional consideration of closing the MRGO (PUF 104, 110).  Specifically, the Corps wrote:

> The locals don't want a small scale bank protection project—they want
> something more than a few miles that are being considered critical
> reaches.  When environmental organizations (LPBF) see how much this
> project is gong to cost, they will probably ask why we didn't evaluate the
> closure of the MRGO. (PUF 103  )

Under NEPA, the Corps had an ongoing duty to alert Congress of environmental impacts of bank erosions along the MRGO, and changes in the environment caused by Federal Action such as the MRGO O&M.  The Corps duty to report environmental impacts was triggered regardless of the Corps election to forego its studied bank protection efforts.  A duty it failed to heed.  Significantly, during the more than thirty years since NEPA's enactment, the Corps undertook a multitude of actions that required a supplement to its 1976 EIS. See Yost Decl. at ¶¶ 12, 13, 15, 16.

Well before the 1976 FEIS was prepared, the Corps was aware that under certain hurricane conditions the MRGO could have "a marked effect" on storm surge and wave action in its vicinity. (PUF 43,44) Nonetheless, without alerting Congress to the MRGO's role as a hurricane hazard, the Corps sought and obtained annual appropriations for approximately 147 dredging events, and removed approximately 492,422,925 million cubic yards of sediment actively contributing to the vast widening of the channel. (PUF 48,111).  See Yost Decl. at ¶¶ 12, 15, 16.  The Corps similarly failed to provide an adequate EIS when it sought reauthorization for the channel in 1976 and again in1986 under the Water Resources Development Act. See Yost Decl. at ¶¶ 12, 15.

Indeed, it was not until after Katrina in 2005 that the Corps considered the MRGO in terms of its impact on the safety of the human environment.(PUF 126)  Rather, by conducting segmented EA's of seemingly innocuous discrete actions, the Corps erroneously concluded that it had no statutory obligation to take a "hard look" at the cumulative effects of dredging on the environment for public and Congressional scrutiny.

## THE CORPS ADMITS ITS NEPA COMPLIANCE WAS INADEQUATE AND MISLEADING

Four months before Katrina, the Corps reviewed its NEPA compliance with regard to the MRGO project and concluded that it had been deficient in its reporting and short-sighted in its analysis of the impacts of the MRGO.(PUF 117,119)  In what appears

to have been a refreshing moment of candor, the Corps reported that *"the cumulative impact of all the changes that have already occurred, since preparation of the 1976 EIS, alone constituted a significant impact on the environment, compared to the O&M plan described in the EIS, although there has been no supplemental EIS (SEIS) prepared.*" (PUF 119) See Yost Decl. at ¶¶ 12(a)(d), 13,16. As a matter of law, failure to comply with NEPA means the agency has no immunity under the DFE. *Adams, supra* at p3.

In this April 11, 2005 memorandum, the Corps acknowledged that its O&M of the MRGO *bore little resemblance* to what it had reported to Congress in the 1976 FEIS. (PUF119) The Corps further admitted that its practice of conducting discrete, segmented environmental assessments (EAs) of its conduct had incorrectly *"ignored their cumulative effects to conclude that each change was individually determined to not have a significant impact on the environment."* Upon reflection, the Corps conceded that it had not proposed or implemented preferred bank stabilization mitigation measures for channel stability of the MRGO, and that the 1976 FEIS had not considered alternative, preferential methods of dredging that were known, but still only under consideration as of 2005.(PUF 120)  In sum, shortly before Katrina, the Corps fully admitted that its environmental disclosure regime had been deficient, inadequate and misleading. See Yost Decl. at ¶¶ 12, 13, 14, 15, 16.

The Corps' studied failure to provide Congress with an informed perspective on the known significant adverse impacts of this project negates any permissive grant of discretion from Congress.  The Corps, as a matter of law, cannot argue that Congress would have extended its discretion had it been fully informed. (*See Adams, opinion supra at p.3, more fully discussed herein at page 22.*)

## ARGUMENT

### A.  The Corps' Conduct with Regard to the MRGO is Actionable Under the Federal Tort Claims Act.

The FTCA is not intended to create inconsistent liabilities between private and government employees performing identical acts." *Bear Medicine v. United States ex rel. Sec'y of Dept. of Interior*, 241 F.3d 1208, 1213 (9th Cir. 2001). "The burden of proving the applicability of the discretionary function exception is on the United States." *Id*. To meet its burden, the Corps must prove that the challenged conduct is *both* (a) "a matter of choice for the acting employee," *i.e.*, discretionary rather than mandatory, and (b) "based on considerations of public policy." *Berkovitz*, 486 U.S. at 536, 537. In this case, the Corps cannot establish that NEPA compliance was a matter of choice, therefore, its ongoing failure to obtain the mandatory informed Congressional authorization to proceed with the project precludes immunity for its negligence.

### B.  The Corps Violated Its Mandatory Duties Under NEPA By Failing Perform Adequate Mandatory Comprehensive EIS's For Approval of the MRGO O&M.

As noted, the Corps' obligation to furnish  EIS's over the history of the MRGO project was mandatory. See Yost Decl. at ¶¶ 5, 6(a)(vi), 6(c ). "[C]onduct cannot be discretionary unless it involves an element of judgment or choice." *Berkovitz*, 486 U.S. at 536 (citing *Dalehite*, 346 U.S. at 34).  "The requirement of judgment or choice is not satisfied if a 'federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow,' because 'the employee has no rightful option but to adhere to the directive.'" *United States v. Gaubert*, 499 U.S. 315, 322 (1991) (quoting *Berkovitz*, 486 U.S. at 536); See also *Collins v U.S.*783 F.2d 1225 at (5ᵗʰ Cir.1986). Nor does the government actor have a choice where Federal law or policy does not authorize, or prohibits, particular conduct. *See*, *e.g.*, *Berkovitz*, 486 U.S. at 542-43; *Starrett v. United*

15

*States*, 847 F.2d 539, 541-42 (9th Cir. 1988).

As explained in *O'Reilly v. United States Army Corps of Engineers,* 477 F.3d 225 (5th

Cir. 2007),

> NEPA's central requirement is that federal agencies must, except in
> certain qualifying situations, complete a detailed environmental impact
> statement ("EIS") for any major federal action significantly affecting the
> quality of the human environment. 42 U.S.C. § 4332(2). To assist these
> agencies in determining whether an EIS must be prepared, NEPA
> authorized the Council on Environmental Quality ("CEQ") to promulgate
> guidelines in the form of regulations.   *See* 40 C.F.R. § 1500.3; *see also*
>  *Coliseum Square,* 465 F.3d at 224. . . .
>
> The CEQ regulations allow an agency to prepare a more limited
> document, an Environmental Assessment (EA), if the agency's proposed
> action neither is categorically excluded from the requirement to produce
> an EIS nor would clearly require the production of an EIS."   *Pub. Citizen,*
> 541 U.S. at 757, 124 S.Ct. 2204 (citing 40 C.F.R. §§ 1501.4(a),(b)). An
> EA should be a "concise public document ... that serves to ... [b]riefly
> provide sufficient evidence and analysis for determining whether to
> prepare an [EIS]."   40 C.F.R. § 1508.9(a). In some cases, an agency may
> find that it must complete a full EIS. Where an EA results in a
> determination that an EIS is not required, however, the agency must issue
> a Finding of No Significant Impact ("FONSI"). *Coliseum Square,* 465
> F.3d at 224 (quoting *Pub. Citizen,* 541 U.S. at 757, 124 S.Ct. 2204).   The
> FONSI must briefly state "the reasons why the proposed agency action
> will not have a significant impact on the human environment.   *Coliseum
> Square,* 465 F.3d at 224 (citing 40 C.F.R. §§ 1501.4(e), 1508.13).   *Id.* at
> 228.

The Corps does not dispute that NEPA regulates the MRGO project as a "major

Federal action significantly affecting the quality of the human environment". *42 U.S.C. §*

*4332(2)(C).* The quality of human environment is defined comprehensively to include the

natural and physical environment and the relationship of people with that environment.

40 CFR 1508*; see also Baltimore Gas & Elec. Co. v. Natural Resources Defense*

*Council,* 462 U.S.87, 107(1983); *Metropolitan Edison Co. v. People Against Nuclear*

*Energy*, 460 U.S. 766 (1983); *Kleppe v. Sierra Club*, 427 U.S., at 410; 40 CFR 1508.7,

1508.8 (1982). As noted, although the Corps conducted 147 dredging events excavating over *492 million cubic yards* of sediment from the environment in the vicinity of the channel, it neither performed a Supplemental Environmental Impact Statement addressing this conduct, nor evaluated the cumulative impacts of its conduct. (PUF 111). See Yost Decl. at ¶¶ 12, 13, 14, 15, 16.

An adequate FEIS cannot be performed where the agency has divided the project into "multiple actions, each of which individually has an insignificant environmental impact, but which collectively have a substantial/synergistic impact." *Kleppe v. Sierra Club,* 427 U.S. 390, 410 (1976); *Great Basin Mine Watch v. Hankins,* 456 F.3d 955, 969 (9th Cir.2006) (citations omitted). *PEACH v. U.S. Army Corps,* 87 F.3d 1242, 1247 (11th Cir.1996); *Natural Resources Defense Council v. Hodel,* 865 F.2d 288, 297-98 (D.C.Cir.1988)(quoting *Thomas v. Peterson,* 753 F.2d 754, 758 (9th Cir.1985)).  In short, segmentation of a major project into less significant portions does not allow an agency to avoid the mandated EIS process.  *San Antonio Conservation Society v. The Texas Highway Dept. et al*. 446 F.2d 1013, 1024 (5th Cir, 1971) Cert den 420 U.S. 926 (1975); see also *O'Reilly,* 477 F.3d at 236 ( "general rule under NEPA [that] segmentation …is improper for purposes of preparing environmental impact statements, and standard for evaluation").

In *Environmental Defense Fund v. Marsh*, the Fifth Circuit noted that the United States Supreme Court decision *Kleppe v Sierra Club* **requires** "a court to prohibit segmentation or require a comprehensive EIS" of actions that have "cumulative or synergistic environmental impact".  651 F. 2d 983, 999 (Fifth Circuit 1981) (citing *Kleppe*) 427 U.S. at 410). Writing for the Court in *Marsh,* Judge Reavley also concluded with specific regard to actions affecting wetlands:

> Although a particular alteration of a wetland may constitute a minor
> change; the cumulative effect of numerous piecemeal changes can result in
> a major impairment of wetland resources.  Thus, the particularly

> interrelated wetland site for which an application is made *will be evaluated* with the recognition that it may be part of a complete and interrelated wetland area.

*Id.* at 410 (citing 33 CFR § 320.4(b) (3) (emphasis added); *see also O'Reilly*, 477 F.3d at 277,235 (Corps acted arbitrarily in issuing FONSI based on an EA that failed to consider the cumulative effects of the project); *Florida Wildlife Federation v. U.S. Army Corps of Engineers*, 401 F.Supp. 2d 1298, (S.D. Fla 2005).

From its inception, to its relentless dredging, subsequent studies of bank erosion and piecemeal attempts at mitigation measures through bank protection, all aspects of the MRGO project triggered the Corps' mandatory duty to take a "hard look" at the effects of its conduct and prepare EISs regarding the known significant adverse impacts on the human environment. *Great Basin Mine Watch v. Hankins,* 456 F.3d 955, 69 970 (9th Cir.2006) (citations omitted).  See also 40 CFR 1508.25 1508.7 ("general statements about possible effects and some risk do not constitute a hard look") *State of Louisiana v. Lee*, 758 F.2d 1081 1089,1086,  (5th Cir 1985).  *Sabine River Authority v. U.S. DOI*, 745 F. Supp. 388, 392 (ED, Tex. 1990); and *Sierra Club v. Hassell*, 6367 F.2d 1095, 1099 (5th Cir. 1981). See Yost Decl. 6,7,12,13,14,15,16. Here, an EIS should have included an analysis of the full spectrum of the environmental impacts of the MRGO project, as opposed to the Corps' choice of creating EA's focused on limited piecemeal portions of the project, or a particular type of impact. 40 C.F.R. 1502 *et. seq.,* (formerly 40 C.F.R. 1500.8 (8)(c)). See Yost Decl. at ¶¶ 12(a), 13

The 1976 FEIS failed to furnish a comprehensive appreciation of the project's impacts and nothing the Corps did after the 1976 FEIS remedied its oversight.  Omission of detail regarding the possible effects of conduct taken, examining only isolated aspects of a project, or the immediate impact of actions despite substantial changes in the character of the project and the environment in the vicinity, render the project "not authorized", because legislators voting on appropriations have the right to assume that the

agency had been following, and was following, the law. *Atchison, T. & S. F. Ry, Co. v. Callaway*, 382 F.Supp. 610, 619 (D.C.D.C. 1974); *See, e.g.*, *League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Forsgren*, 309 F.3d 1181, 1191 (9th Cir. 2002) ("approving only the project evaluated and considered in an EIS and a final decision to proceed with a project, *as analyzed in the EIS*.) (emphasis added); 40 C.F.R. § 1505.1(e); ("The EIS and a related record . . . links the manager's decision to the analysis presented in the EIS."). See Yost Decl. at ¶¶ 12, 13, 15, 16.  The Corps did *no analysis* of the environmental effects of storm hazards created, wetlands loss, and bank widening created by either the 147 dredging events or the ongoing O & M.   Therefore, as a matter of law, conduct that was not presented, studied, or approved an FEIS could not have been a legally authorized action. *Id.*

Similarly, as noted, although the Corps, over the history of the MRGO, had long known, repeatedly studied, and fully appreciated the problems of bank erosion, and been aware of potential mitigation measures, it likewise failed to present these problems and options in an EIS.  See Yost Decl. at ¶ 12. As noted by the Supreme Court in *Robertson v Methow Valley Citizens Council*, 490 U.S. 332 at 351-352 (1989).

> [O]ne important ingredient of an EIS is the discussion of steps that can be taken to mitigate adverse environmental consequences"… "[O]mission of a reasonably complete discussion of possible mitigation measures would undermine the "action-forcing" function of NEPA. Without such a discussion, neither the agency nor other interested groups and individuals can properly evaluate the severity of the adverse effects… Recognizing the importance of such a discussion in guaranteeing that the agency has taken a "hard look" at the environmental consequences of proposed federal action, CEQ regulations require that the agency discuss possible mitigation measures in defining the scope of the EIS, *40 CFR § 1508.25(b) (1987)*, in discussing alternatives to the proposed action, § 1502.14(f), and consequences of that action, *§ 1502.16(h)*, and in explaining its ultimate decision *§ 1505.2(c). Id at 351-52(1989).*

Further, while proposed mitigation measures:

> Need not be laid out to the finest detail…we have still required that
> an EIS involving mitigation must include a serious and thorough
> evaluation of environmental mitigation option for [a] Project to
> allow its analysis to fulfill NEPA's process-oriented requirements[.]

*O'Reilly*, 477 F. 3d at 231 (quoting *Miss. River Basin Alliance*) 230 F. 3d at 178.

A fully disclosing EIS maximizes the prospects that the decision makers give serious weight to environmental factors in making discretionary choices. *State of Louisiana v. Lee*, 758 F.2d 1981 at p.1990 (5th Cir 1985); *citing Sierra Club v. Morton,* 510 F.2d 813, 819 (5th Cir.1975)*, see Sierra Club v. Sigler,* 695 F.2d 957, 964-65 (5th Cir.1983). In short, discretion cannot be properly exercised on an inadequate environmental record. *Adams Supra at p. 4  Marsh VII* 5273d 1485, 1492; *Holy Cross v. USACE* 455 4 Supp.2d532; *Sierra Club v. Peterson* 18573d 349,370 (Fifth Circuit, 1999), The CEQ Regulations implementing NEPA 40CF R § 1502.9 (c ) 1502.16, 1508.7-8, 40 CFR § 1502.9(c ) provide that an agency shall prepare a supplement to either a draft or final EIS if there are significant new circumstances. See Yost Decl. at ¶¶ 6, 12(b), 14. Thus, in addition to a first EIS, the Agency shall prepare supplement or final EIS's if there are significant new circumstances or information relevant to environmental concerns bearing on the proposed action or its impacts. See also *Sabine River Authority, at* 951 F.2d at 676. also, see Yost Decl. at ¶¶ 6,12(b), 14.

As the Corps itself noted, the environmental conditions surrounding the MRGO had been so significantly altered during the long history of the project that those changes in conditions alone warranted a supplemental EIS to Congress which the Corps admittedly did not do. (PUF 117) *Southern Natural Gas Co. v. Pontchartrain Mat*, 711F.2d 1251, 1257, n.8 (5th Cir 1983) (Corps has a 'continuing duty' to use due care) as cited in *Beam Horizon Corp v. Tenn. Gas Pipeline Co*., U.S. Dist. LEXIS 3341, 1998 WL 113935 (E.D. La March 10**,** 1998); see also this Court's opinion on the U.S.'s Motion to

Dismiss, *In re: Katrina*, 471 F. Supp. 2d 684, 703-704 (February 2, 2007);  *Florida Wildlife Federation v. U.S.A.C.,* 401 F. Supp 2d 1298 (S.D. Fla., 2005) see also, Yost Decl. at ¶¶ 12, 13, 14, 16.

### C.  The Discretionary Function Exception to the FTCA Does Not Apply When The Corps Has Not Adequately Complied With NEPA

As Judge B. Lynn Winmill concluded in *Adams, 2006* WL 3314571 the failure to perform an adequate and mandatory FEIS excludes a governmental agency's conduct from immunity as a discretionary function.  The court held that because the Bureau of Land Management ("BLM") failed to adequately evaluate the environmental impacts of the use of a particular herbicide program, any ensuing harm caused could not be immune under the FTCA:

> The BLM's failure to comply with NEPA meant that the agency had no discretion—it could not proceed until it complied with NEPA. The BLM argues, however, that NEPA is merely a procedural statute, and that the BLM retains full discretion to proceed with the project "even if the NEPA analysis identifies possible environmental impacts."  The BLM is essentially saying that the NEPA analysis would have made no difference.

> But there is no way to know. While a bad NEPA report does not automatically block a project, it could lead to that result, or to significant modifications. It is impossible to say what the result would be. And that means that the BLM loses because it has the burden of proof. *Bear Medicine,* 241 F.3d at 1210 (9th Cir.2001)(government bears the burden of proving that the discretionary function exception is applicable). *The burden is on the BLM to show that the NEPA analysis would make no difference-a showing it cannot make because the analysis **might** have made a difference.* The BLM appears to be arguing that plaintiffs have failed to show that the NEPA analysis would have made a difference, but plaintiffs bear no such burden.

Finally, the BLM argues that NEPA provides no private right of action. *This misperceives plaintiffs' use of NEPA. They use it not to recover any remedy but to argue that the BLM **was under a mandatory duty***. That is not an improper use of NEPA.

**The Court therefore *refuses to find that the BLM's decision to use [the herbicide] is immune from challenge under the discretionary function exception to the FTCA.  Adams*, at 3 (emphasis added);**

The 1976 FEIS neglected to incorporate the impacts of the MRGO on the ecosystem that impacted the safety of the human environment.  Similarly, the Corps practice of evaluating discrete conduct in individual EA's by use of unlawfully segmented review of the O&M conduct deprived Congress of the opportunity to consider the cumulative effects of the MRGO.  (PUF 92, 93, 94, 95) As noted, the Corps' own internal review found that the agency had failed to comply with NEPA and concluded, in particular that the Corps' conduct with regard to the MRGO created severe environmental impacts that required supplemental EISs which were never performed. (PUF 117,119,127)

As demonstrated above, the environmental impacts of continued MRGO O&M were known to the Corps before the 1976 FEIS.  They were initially being incorporated in the 1972 DEIS and then intentionally removed from NEPA reporting starting with the 1974 FEIS.  After 1976, the agency's awareness and knowledge about potential environmental devastation and hurricane destruction grew. Yet its NEPA reporting did not.  Accordingly, those decisions regarding the MRGO that resulted in harm to the people and property in the vicinity of the channel cannot be immune from challenges under the discretionary function exception to the FTCA. *Adams, supra*,. 3.

In its 1976 FEIS, the Corps improperly segmented its analysis of the project into a single evaluation of the location of spoil placement, with no consideration of the environmental impact of the dredging on enhancing storm hazards.  In addition to neglecting to evaluate storm hazards inherent in the MRGO O&M, the Corps' 1976 FEIS failed to consider statutorily-mandated alternatives and mitigating measures that might

have neutralized the impact of storm driven water from the Gulf. See Yost Decl. at ¶¶ 12(a), 13.

When the Corps did consider mitigation measures it concluded a full EIS was warranted for NEPA compliance regarding bank erosion. ("Mitigation . . . and other conditions established in the environmental impact statement or during its review and committed as part of the decision <u>shall</u> be implemented by the lead agency" ); *see*, *e.g.*, *Tyler v. Cisneros*, 136 F.3d 603, 608 (9th Cir. 1998) (any mitigation measures established in the EIS "'<u>shall</u> be implemented'") (quoting 40 C.F.R. § 1505.3) (emphasis in decision)*; Lee v. United States,* 220 F. Supp. 2d 1229, 1236 (D.N.M. 2002) (citing 40 C.F.R. § 1505.3)*, aff'd,* 354 F.3d 1229 (10th Cir. 2004)*; McDaniel v. United States,* 899 F. Supp. 305 (E.D. Tex. 1995) (analyzing ROD and EA to determine government agency's mandatory duties for purposes of discretionary function exception), *aff'd*, 102 F.3d 551 (5th Cir. 1996). Nonetheless, after evaluating the need for MRGO bank stabilization mitigation measures and the mandatory obligation to prepare an EIS, the Corps never proposed the mitigation efforts in an EIS for fear that closure would have been the preferred alternative. As the Corps admitted in 2005, the MRGO project, as implemented, was not what had been proposed and authorized, and therefore the Corps' conduct cannot be immune.

As in *Adams,* because the Corps failed to satisfy its NEPA obligations, it cannot now retroactively demonstrate, that if Congress had been advised with a proper NEPA analysis of the risks to human health and safety created by the O&M and presence of the MRGO, Congress would have made no different decisions regarding the MRGO project. The burden is squarely on the Corps to make an affirmative showing that a full NEPA analysis was in fact conducted *and* actually made no difference to the decision making process.  A full NEPA analysis *may have* made a difference in Congressional decision

23

making regarding MRGO,  as the post-Katrina decision to close MRGO demonstrates. The Corps may not speculate in its favor what effect the proper NEPA analysis would have had.

## **CONCLUSION**

For the foregoing reasons and authority, the Corps' conduct in creating this hazard and risk of harm to the people and property in the vicinity of the MRGO can not be immune under the DFE and Plaintiffs Motion for Summary Adjudication should be granted.

<div style="margin-left:40%">

The Honorable James D. "Buddy" Caldwell (No. 2211)
**ATTORNEY GENERAL,**
**STATE OF LOUISIANA**
James Trey Phillips (No.19978)
ASSISTANT ATTORNEY GENERAL,
STATE OF LOUISIANA
Sallie J. Sanders (No. 11703)
ASSISTANT ATTORNEY GENERAL,
STATE OF LOUISIANA
1885 North Third Street, 6th Floor
Baton Rouge, LA 70802
Telephone: (225)326-6040
Telefax: (225)326-6097
**By: /s/ *James D. "Buddy" Caldwell***
**Attorney for Amicus, THE STATE OF LOUISIANA**

Craig P. Taffaro, Jr., St. Bernard Parish President
Wayne J. Landry, Chairman of the St. Bernard Parish Council
RICHARD A. TONRY (LSB #12859)
MICHAEL C. GINART, JR. (LSB#18910)
CULLEN A. TONRY (LSB#29457
**LAW OFFICES OF TONRY & GINART**
2114 Paris Road
P.O. Box 32
Chalmette, Louisiana 70044-0032
Telephone: 504-271-0471
Facsimile: 504-271-6293
*By: /s/ RICHARD A. TONRY, Esq*
**Attorney for Amicus, St. Bernard Parish Government**

</div>

O.H. Storey (Arkansas Bar No. 69078)
Marcus V. Brown (La. Bar No. 18817)
Leila A. D'Aquin (La. Bar No. 18884)
Entergy Services, Inc.
639 Loyola Avenue, Suite 2600
New Orleans, LA  70113
Tel:  504-576-2765
Fax:  504-294-5302
and
Ewell E. Eagan Jr. (La. Bar No. 5239), T.A.
A. Gregory Grimsal (La. Bar No. 6332)
Wendy Hickok Robinson (La. Bar No. 25225)
Gordon, Arata, McCollam, Duplantis & Eagan, L.L.P.
201 St. Charles Avenue, 40th Floor
New Orleans, Louisiana  70170-4000
Telephone: (504) 582-1111
Fax: (504) 582-1121

**By**: /s/ Ewell Eagan, Jr Esq.,
**Attorneys for Amicus, Entergy New
Orleans, Inc., Entergy Louisiana, L.L.C.,
Entergy Services, Inc., and Entergy
Corporation**

Elisa T. Gilbert, Esq (ETG 5713), T.A.
Brendan R. O'Brien (BO 9033)
The Gilbert Firm, LLC
325 East 57th Street
New York, NY 10022
Telephone (212) 286-8524
Fax: (212) 286-8522
and
Ernest Svenson, Esq. (17164)
The Svenson Law Firm, LLC
432 Henry Clay Avenue
New Orleans, LA 70118-5724
504-208-5199

**By**: /s/ Elisa T. Gilbert, Esq.
**Elisa T. Gilbert, Esq.
Attorneys for Amicus, Hartford Steam Boiler
Inspection and Insurance Company a/s/o Entergy New
Orleans, Inc., Entergy Louisiana, L.L.C.,
Entergy Services, Inc., and Entergy Corporation**