1

2            IN THE UNITED STATES DISTRICT COURT

3              EASTERN DISTRICT OF LOUISIANA

4

5   IN RE:  KATRINA CANAL BREACHES           CIVIL ACTION
    CONSOLIDATED LITIGATION
6                                            NUMBER:  05-4182 "K"(2)
7                                            JUDGE DUVAL
                                             MAG. WILKINSON
8   PERTAINS TO: *Robinson*
9   (No. 06-2268)
                                             DECLARATION OF NICHOLAS C. YOST
10

11

12       I, Nicholas C. Yost, declare as follows:

13       1.    I have practiced environmental law for almost forty years.  During that time I

14  have served as General Counsel of the President's Council on Environmental Quality (CEQ)

15  (1977-1981) and earlier as Deputy Attorney General in Charge of the Environmental Unit of

16  the California Department of Justice (1971-1977) as well as practicing as a public interest

17  lawyer and, for the past twenty-three years, as a lawyer in private practice.  CEQ is the agency,

18  created by the National Environmental Policy Act (NEPA), which oversees implementation of

19  that Act throughout the Federal Government.  CEQ adopts the Government-wide regulations

20  which implement NEPA.  For the past fourteen years I have been a partner in the San

21  Francisco office of Sonnenschein Nath & Rosenthal LLP with a nationwide practice of

22  environmental and natural resources law, focusing on NEPA.  I have chaired the American Bar

23  Association's Standing Committee on Environmental Law and the California State Bar's

24  Committee on the Environment and have co-chaired the District of Columbia Bar's Section on

25  Environment, Energy, and Natural Resources.

26

27                              - 1 -
                        Declaration of Nicholas C. Yost
28

1    Implementation of NEPA has been central to my practice for more than 30 years.  As

2    General Counsel of CEQ, I was the lead draftsperson of the Federal Government's regulations

3    implementing NEPA, the CEQ NEPA Regulations, 40 CFR Parts 1500-1508, which the United

4    States Supreme Court has characterized as mandatory regulations applicable to every Federal

5    agency.  Those regulations have remained in effect since their adoption in 1979 with only one

6    amendment to one section.

7        In my practice I have represented Federal agencies in implementing NEPA; State

8    Governments (including the State of Louisiana) in litigating under NEPA; private, public, and

9    Indian Tribal applicants in going through the NEPA process (both administratively and in

10   litigation); environmental groups and other entities involved in litigating under NEPA; and

11   environmental consulting firms in assisting them insure the legal adequacy of the NEPA

12   documents on which they worked.

13       I have written widely on NEPA, and the publications include *NEPA Deskbook*

14   (Environmental Law Institute, 3rd Ed. 2003); *The Environmental Impact Statement Process*

15   (Bureau of National Affairs, Corporate Practice Series, 3rd Ed. 2002); "The Background and

16   History of NEPA," in Sheldon and Squillace, eds.; *The NEPA Litigation Guide*, (American Bar

17   Association, 1998 (new edition to be published in 2009)); "Administrative Implementation of

18   and Judicial Review Under the National Environmental Policy Act," in Novick, ed.; *Law of*

19   *Environmental Protection* (ELI, Clark-Boardman-Callaghan, 1987), and in Stever, ed.,

20   *Environmental Law and Practice* (ELI, Clark-Boardman-Callaghan, 1992).  I have also spoken

21   widely on NEPA before the ABA and in other fora.  By way of example, I gave two

22   presentations at the ALI-ABA Course of Study on NEPA in 2006 as well as making

23   presentations at CLE International NEPA Courses in 2008.  In 2005, I was asked by the United

24   States House of Representatives Task Force on NEPA to testify as a committee witness on how

25   best to implement the Act and otherwise shape its future and did so testify.

26       2.    I have been asked:

27                                              - 2 -

28                                   Declaration of Nicholas C. Yost

(a) To review the United States Army Corps of Engineers' (Corps) actions and inactions under NEPA with respect to the Mississippi River Gulf Outlet (MRGO) project which are a basis for the Corps' alleged negligence in this case.

(b) To identify the specific and mandatory actions that are prescribed for, and required of, the Corps in making and carrying out those decisions by NEPA, the CEQ NEPA Regulations (and the predecessor CEQ Guidelines), Corps policies and handbooks, and relevant NEPA documents issued by Corps;

(c) To determine whether or not Corps complied with those specific and mandatory instructions.

3.   Except as set out above, I have not been asked to offer, and have not reached any conclusions or opinions regarding either the actions of plaintiffs, the Corps, or other entities on the many disputed issues regarding injury, causation, or damages in this action.

4.   In determining how to apply NEPA to a Federal Government action, the agency must go through a three-stage process:

(a) Determining whether a "categorical exclusion" applies. 40 CFR §§ 1501.4(a)(2), 1508.8. A categorical exclusion (Cat Ex) is a category of actions which the agency has found in its adopted procedures not to have either individually or cumulatively significant effects on the human environment. 40 CFR §§ 1507.3(b)(2)(ii), 1508.4. If a categorical exclusion applies, no further action under NEPA is required.

(b) If no categorical exclusion applies and unless the agency has in its procedures provided that a given category of actions automatically requires an environmental assessment statement (EIS), 40 CFR §§ 1501.4(a)(1), 1507.3(b)(2)(i), the agency must prepare an environmental assessment (EA). 40 CFR §§ 1501.4(b), 1508.9.

Declaration of Nicholas C. Yost

1   (c) Based on the EA, the agency must decide whether to prepare an EIS or a finding

2         of no significant impact (FONSI).  40 CFR §§ 1501.4(a)(2)(c) and (e), 1508.9,

3         1508.13.

4       5.    The CEQ NEPA Regulations provide that "NEPA shall continue to be applicable

5   to actions begun before January 1, 1970 [the effective date of NEPA], to the fullest extent

6   possible."  40 CFR § 1506.12(b).  That provision reflects case law.

7       6.    An EIS or EA is prepared and distributed as follows:

8       (a) Environmental impact statements.  NEPA § 102(2)(C), 42 USC § 4332(2)(C),

9         requires EISs for "proposals for legislation and other major Federal actions

10        significantly affecting the quality of the human environment, . . ."  More EISs are

11        prepared on "other major Federal actions" than on "proposals for legislation."

12        Given the necessity of integrating the latter type of EIS with what another branch

13        of government -- Congress -- is doing, there are separate rules for the processing

14        of such "legislative EISs."

15        (i)    With respect to EISs on "other major Federal actions" a draft EIS is

16            circulated to Federal agencies with jurisdiction by law or special

17            expertise and to state and local agencies authorized to develop and

18            enforce environmental standards, Indian Tribes, any agency which

19            requests a copy, an applicant (if any), and the public.  40 CFR §

20            1503.1; see NEPA § 102(2)(C), 42 USC § 4332 (2)(C).

21        (ii)    The agency must then respond to those comments in the final EIS.

22            40 CFR § 1503.4.

23        (iii)    Both draft and final EISs are filed with the U.S. Environmental

24            Protection Agency.  40 CFR §§ 1506.9, 1506.10.  See Clean Air Act

25            § 309, 42 USC § 7609.

26

27

28  Declaration of Nicholas C. Yost

(iv)   Ordinarily an EIS is not circulated to Congress, but there is case law to the effect that EISs are addressed to, among others, ultimate decisionmakers such as the President and Congress, who have the power to make dispositive decisions.

(v)   EISs on "proposals for legislation" follow in part the same procedures as "other major Federal action" EISs, but the circulation processes are geared to mesh with Congressional procedures. 40 CFR §§ 1506.8, 1508.17. A legislative EIS must be included in a recommendation or report on a legislative proposal to Congress. 40 CFR § 1506.8(a). It must be submitted to Congress. Id. With certain exceptions only a draft (i.e., not a final) EIS is to be prepared. 40 CFR § 1506.8(b).

(vi)   From early in NEPA's history, including in the CEQ "Guidelines" which were the non-mandatory predecessors of the CEQ NEPA Regulations, EISs were required for "requests for appropriations." CEQ, Preparation of Environmental Impact Statements: Guidelines, § 1500.5(a)(i), 138 Fed.Reg. 20550-20562 (1973). Case law supported the CEQ interpretation. Those Guidelines were in effect from 1973 until July 30, 1979, when the new, binding CEQ NEPA Regulations, 40 CFR Parts 1500-1508, came into effect. 40 CFR §1506.12. Those Regulations reversed the prior CEQ Guidelines and provided that EIS were not required for "requests for appropriations." 40 CFR § 1508.17. The United States Supreme Court essentially contemporaneously relied on the new CEQ Regulations' provisions to hold that EIS were not required for requests for appropriations. Andrus v. Sierra Club, 442 U.S. 347 (1979). In short, EISs were required for requests for appropriations from 1973 until 1979, when

Declaration of Nicholas C. Yost

1    they ceased to be so required.  Requests for authorizations or other

2    legislation have at all times required legislative EISs.

3    (b) Environmental assessments.  EAs are prepared, sometimes but not necessarily in

4    draft and final form.  40 CFR § 1508.9; see 40 CFR §§ 1501.3, 1501.4; see NEPA

5    § 102(2)(E), 42 USC § 4332(2)(E).  Agencies are to involve the public in the

6    preparation of EAs to the extent practicable.  40 CFR § 1501.4(b).  An EA results

7    in either a decision to prepare an EIS or in a Finding of No Significant Impact

8    (FONSI).  40 CFR §§ 1501.4, 1508.9, 1508.13.  A FONSI shall be made available

9    to the public.  40 CFR § 1501.4(e)(1).

10   (c) Agencies are required to prepare Supplemental EISs when (a) the agency makes

11   substantial changes in the proposed action that are relevant to environmental

12   concerns or when (b) there are significant new circumstances or information

13   relevant to environmental concerns and bearing on the proposed action or its

14   impact.  40 CFR § 1502.9(c).

15   (d) Both EISs and EAs are to examine environmental impacts or effects.  NEPA

16   §§ 102(2)(C) and (E), 42 USC §§ 4332(2)(C) and (E); 40 CFR §§ 1506.16,

17   1508.9.  Those effects include both direct effects, which are caused by the action

18   and occur at the same time and place, and indirect effects, which are caused by

19   the action and are later in time or further removed in distance, but are still

20   reasonably foreseeable.  40 CFR § 1508.8.

21   (e) The impacts or effects to be studied in EISs and EAs include cumulative impacts,

22   which are those which result from the incremental impact when added to other

23   "past, present, and reasonably foreseeable future actions."  40 CFR § 1508.7.

24   "Cumulative impacts can result from individually minor but collectively

25   significant actions taking place over a period of time."  Id.

26

27                                    - 6 -

28

7.     As directed by the CEQ NEPA Regulations each agency must adopt its own procedures to supplement the CEQ Regulations. 40 CFR § 1507.3. The Corps' implementing procedures for its Civil Works Program, which are in the form of regulations, appear at 33 CFR Part 230. Among the relevant provisions are:

   (a) The requirement for "Actions normally requiring an EIS," which include:

      (i)      Feasibility report for authorization and construction of major projects. 33 CFR § 230.6(a).

      (ii)      Proposed changes in projects which increase size substantially. 33 CFR § 230.6(b).

      (iii)      Proposed major changes in the operation and/or maintenance of completed projects. 33 CFR §230.6.(c).

   (b) The requirement for "Actions normally requiring an Environmental Assessment (EA) but not necessarily an EIS," which include:

      (i)      Mitigation of Shore Damage Attributable to Navigation Projects. 33 CFR § 230.7 (c)(5).

      (ii)      Construction and Operations and Maintenance. Changes in environmental impacts which were not considered in the project EIS or EA. 33 CFR § 230.7(d).

8.     I examined the following documents (in chronological order) in assessing the Corps' NEPA compliance:

   (a) After Hurricane Betsy the Corps commissioned a study by National Engineering Science entitled Storm Surge Effects of the Mississippi River Gulf Outlet prepared by Dr. Charles L. Bretschneider (Department of the Army, New Orleans District, Corps of Engineers, New Orleans, LA, Sept. 9, 1966). While the report concluded that the effect of MRGO is almost negligible for all large hurricanes accompanied by slow rising storm surges, the report explicitly warned:

> "It may be expected that once in a while a storm may occur
> which has a somewhat freakish, more rapidly rising surge
> in which case the Gulf Outlet channel may have a very
> marked effect."

(b) In 1972 the Corps prepared a "Draft Environmental Statement" for "Mississippi River - Gulf Outlet, Louisiana (Maintenance)." Apparently that document did not lead to a FEIS. Among the statements made in this DEIS were:

> (i) "Maintenance of the MR-GO through disposal of spoil has resulted in a loss of marsh vegetation with a decrease of producer organisms which are the basis of the food chain for an ecosystem. Id. at 33.

> (ii) "Dredged material is placed on approximately 10,400 acres of spoil extending from mile 66 to mile 23." Id. at 35.

> (iii) This draft document referenced the Bretschneider study (para. 8(a) above), and its discussion of "the effects, if any, of the MR-GO on storm surges." Id. at 13. The report concluded that MRGO has "very little effect on maximum storm surges for hurricanes that produce slow-rising tides, the normal type of hurricane occurring along the Gulf of Mexico coast . . . ." Id.

(c) In 1974 the Corps had prepared a "Draft Environmental Statement" entitled "Composite Draft Environmental Statement for Operation and Maintenance Work on Three Navigation Channels in the Lake Borgne Vicinity Louisiana." Review Draft Prepared for U.S. Army Engineer District, New Orleans by Stanley Consultants, Inc., Mascatine, Iowa (Dec. 1974).

> (i) The document does not discuss storm surges.

> (ii) The section on "Probable Adverse Impacts Which Cannot Be Avoided" did not include any impacts related to hurricane surges or to erosion of marshlands adjacent to the channel. Id. at V-1 to V-2.

- 8 -

Declaration of Nicholas C. Yost

(iii)   U.S. EPA's comment concerning alteration of the hydrology and water chemistry of adjacent estuarine and wetland areas and saltwater intrusion and increased salinity elicited a response from the Corps, which stated that secondary impacts are still under way and "will continue until a state of equilibrium on natural dynamics is obtained." Id. at IX-3.  The response also stated that the EIS "concerns only actions necessary to operation and maintenance" and does not address impacts of "original construction."

(d) In 1974 in its Final Environmental [Impact] Statement, Lake Pontchatrain, Louisiana, and Vicinity Hurricane Protection Project (U.S. Army Engineer District, New Orleans, August 1974), the Corps described the hurricane protections measures for Lake Pontchatrain and vicinity.  Id. at 14.  The EIS noted that MRGO connected to the Inner Harbor Navigation Canal (IHNC) and to the Intracoastal Waterway, and that MRGO connects the Intracoastal Waterway to the Gulf of Mexico.  Id. at 1-2 to 1-5.  The EIS found that "[p]rolonged inundation could cause enormous damage to private and public property, create serious damage to life and health, disrupt business and community life, and require immense expenditure of public and private funds for evacuation and subsequent rehabilitation."  Id. at 1-2 to 1-3.  In a Response to Comments on the EIS the Corps stated (in arguing for further flood protection measures):

> "Flood damage data from experienced hurricanes are of little value in estimating future probable damages from major hurricanes approaching or exceeding the SPH [Standard Project Hurricane] for several reasons.  Rapid development makes obsolete all but the most recent data. . . . Thus, hurricanes of magnitude somewhat larger than those of recent experience and exceeding the SPH occuring under present conditions of protection and development would cause damage of catastrophic proportions."

- 9 -

Declaration of Nicholas C. Yost

(e) In 1976 the Corps prepared its "Final Composite Environmental Statement for
Operation and Maintenance Work on Three Navigation Projects in the Lake
Borgne Vicinity Louisiana."

    (i)    Other than noting that hurricane surges produce heights of 12 feet or
more along the coast line (<u>id</u>. at II-58), the EIS did not analyze the
effects of storm surge. *See* II-69 (shoaling).

    (ii)    The EIS also referred to the Construction of MR-GO in the context of
"Alteration of marshland for economic benefit." <u>Id</u>. at IV-2. It
referred to the operation of vessels in MR-GO as causing "Resultant
turbidity and shoreline erosion." <u>Id</u>. at IV-3.

(f) In or about 1982 the Corps prepared an EA to obtain borrow material from the
south bank of MRGO for use in construction of the Lake Pontchartrain and
Vicinity Hurricane Protection Project.

(g) In or about 1983 the Corps prepared EA #47 on the Mississippi River - Gulf
Outlet Foreshore Protection. The project involved approximately 475,000 tons of
graded stone and 253,000 cubic yards of shell to protect the bank of MRGO.

    (i)    The Corps found that "Impacts resulting from maintenance activities
are not expected to be as severe as those due to initial construction."
<u>Id</u>. at 3.

(h) In 1983 the Corps prepared its "Mississippi River - Gulf Outlet Foreshore
Protection Test Section Environmental Assessment #38." The EA was also
supplemented. Approximately 24,000 cubic yards of material would be removed.
The FONSI described this project as involving six additional foreshore protection
test sections. (FONSI dated August 15, 1983.)

(i) In 1984 the Corps documented the destructive effects of hurricanes in the New
Orleans vicinity. *See* Corps, <u>Lake Pontchartrain, Louisiana, and Vicinity</u>

Declaration of Nicholas C. Yost

Hurricane Protection Project, Reevaluation Study, Main Report and Final
Supplement 1 to the Environmental Impact Statement, Vol. 1, (July, 1984).
Hurricane Betsy (1965) was described as the "most destructive storm of record on
the Louisiana coast, and one of the great hurricanes of the century, . . ." Id. at 23.
The eastern portion of New Orleans was among the areas which "suffered severe
damage from floodwaters and winds." Id.  Hurricane Camille in 1969 was
described as "one of the most intense and destructive hurricanes ever recorded."
Id. at 24.  In the Corps' words, "The geographical location of the low terrain and
nearby bodies of water, make this densely populated section of the state highly
susceptible to hurricane induced damages." Id.

(j)  In 1985 the Corps prepared EA #47 "Mississippi River - Gulf Outlet Foreshore
Protection Test Section (Supplement)."  Approximately 8,000 cubic yards of
material would be removed.  (The FONSI was dated January 23, 1985.)

(k)  In 1985 the Corps released a "Supplemental Information Report (SIR)" to
"complement" the Final Composite Environmental Impact Statement for
Operation and Maintenance Work on Three Navigation Projects in the Lake
Borgne Vicinity, Louisiana (which had been filed in 1976).  The document
explains that the projected depth from MRGO is 36 feet deep and 500 feet wide
from Michund through the Chandelier Sound and 38 feet deep by 600 feet wide
from the Chandelier Islands to the 38-foot contour of the Gulf of Mexico.  The
purpose of the SIR is stated to be to reevaluate the ongoing removal of "allowable
overdepth" and "advanced maintenance" during routine maintenance dredging.
These are described as having been "inadvertently omitted" from the 1976 EIS.
The document allows dredging to -40 and to -42 feet for specified sections plus
either 1 or 2 feet allowable overdepth.

Declaration of Nicholas C. Yost

(l) In 1988 the Corps prepared its Mississippi River - Gulf Outlet St. Bernard Parish, La., Bank Erosion Reconnaissance Report.  The Corps found that "Severe bank erosion is occurring on the MR-GO navigation channel."  Syllabus.  The Corps found that approximately 41 miles of the 66 mile long channel consists of land "cut through unstable marsh and shallow water areas."  Id.  Since completion of MRGO in 1968, the top width of the channel increased from 650 feet to an average of 1,500 feet in 1987, principally due to erosion.  Id.  During that period approximately 4,200 acres of "highly productive marsh" were lost.  Id.  Once the buffering marshes are lost, dredging frequency will increase significantly.  Id.  The study was authorized in 1982 by the House of Representatives Committee on Public Works and Transportation.  Id. at 2.  The study details other Corps documents which preceded it, included a Corps recommendation for an additional outlet channel from New Orleans to the Gulf of Mexico which was published as a House of Representatives document.  Id. at 3-4.  The report describes the hurricanes which have affected the Louisiana coast, noting that Hurricane Juan in 1985 "broke records along the MR-GO."  Id. at 7.  The report also notes "no erosion protection measures exist along the MR-GO north bank" and that "erosion there is significant."  Id. at 24.  The report goes on to say that "Conversion of the majority of the marsh on the north bank and MR-GO to open water is anticipated during the 1990 to 2040 period."  Id.  The report continues to say that three reaches of the north banck have "critical erosion trends" and that without corrective action "loss of the buffering marsh would allow the open water areas of Lake Borgne and Breton Sound and the MR-GO to merge."  Id.

(m) At a date which I cannot determine, but on or about 1990, the Corps prepared its EA 355 and a FONSI "Mississippi River - Gulf Outlet Louisiana Designation of Disposal Are for Emergency Hopper Dredging, Miles 27.0 to 0."

Declaration of Nicholas C. Yost

1    (n) In or about 1991 the Corps prepared its Environmental Impact Assessment

2         Amendment Mississippi River - Gulf Outlet Dredging of St. Bernard Drainage

3         Canal St. Bernard Parish, Louisiana.  EA #143-A.

4    (o) On a date which I cannot determine but in or about 1991 the Corps prepared its

5         EA #152 on "Mississippi River - Gulf Outlet St. Bernard Parish, Louisiana, Bank

6         Stabilization, Miles 50.5 to 55.0."

7    (p) In or about 1992 the Corps prepared its FONSI on EA 162, "Mississippi River -

8         Gulf Outlet St. Bernard Parish, Louisiana, Marsh Enhancement/Creation."

9    (q) In 1996 the Corps prepared its EA #247, "Mississippi River - Gulf Outlet St.

10        Bernard Parish, Louisiana, Bank Stabilization, Miles 55.0 to 56.1."

11    (r) In 1996 the Corps prepared its "Mississippi River - Gulf Outlet North Bank

12        Foreshore Protection Evaluation Report."  The Report listed the Congressional

13        authorizations for its preparation, including (Id. at 1-3):

14        (i)     The 1956 Public Law authorizing MRGO.

15        (ii)    1976 amendment modifying the terms of MRGO.

16        (iii)   A 1986 amendment further modifying the terms of MRGO.

17        (iv)   A 1996 "Guidance from Congress" consisting of direction contained in

18             the 1996 Appropriations Bill.

19    The report explains that the MRGO ship channel was designed for "a relatively

20    small general cargo vessel (freighter)."  Id. at 9.  "However," the report continues,

21    "ship sizes have increased and larger container vessels move over the MR-GO to

22    and from several container facilities located in New Orleans."  Id.  The wave-

23    wash and drawdown caused by these larger vessels has eroded the banks beyond

24    the limits of the channel in some areas.  Id. at 9-10.  Passage of these vessels

25    causes "very large quantities of water to be displaced from the channel and into

26    the adjacent marsh, followed by rapid return flow to the channel."  Id. at 10.  "The

27

28

Declaration of Nicholas C. Yost

tremendous forces exerted by these rapid and extreme water level fluctuations cause the relatively soft marsh adjacent to the channel to break up and be swept into the waterway." Id. The buffering marsh between MRGO and Lake Borgne was found to be eroding at approximately 15 feet per year and the reach of the MR-GO north bank was found to be "very close to being breached." Id. at 26. Since completion of MRGO in 1968 the top width of the 41 mile long land cut increased from 650 feet to an average of 1,500 feet due to erosion. Id. at 29.

(s) In 1997 the Corps prepared its "Feasibility Report Wetlands Creation and Protection Project Mississippi River - Gulf Outlet, Mile 14 to Mile 11, Marsh Creation, St. Bernard and Plaquemines Parishes, Louisiana." The report noted that approximately 4,200 acres of "highly productive marsh" adjacent to the channel had been lost due to erosion occasioned by the passage of "large displacement vessel traffic." Id. at 2. The Corps' EA #255, Wetlands Creation, Miles 15.0 to 23.0 was attached. A FONSI dated 1997 was attached.

(t) In or about 1999 the Corps prepared its EA #294 on the "Beneficial Use of Dredged Material for Restoration of Breton Island" in which the use of dredged material removed from the MR-GO channel was evaluated for placement on Breton Island.

(u) On or about 2002 the Corps prepared its EA #361 on "Mississippi River - Gulf Outlet, Louisiana, Test Installation of Articulated Concrete Mattressing Mile 39.0 to 38.0 St. Bernard Parish, Louisiana. That EA detailed the EAs and FONSIs which had preceded it. Id. at 2-3.

(v) In 2004 the Corps prepared its FONSI on "Lake Borgne - MRGO Shoreline Protection Project St. Bernard Parish," EA #402.

- 14 -

1   (w) In or after 2003 the Corps prepared its EA #403 on "Mississippi River Gulf Outlet

2        Use of Alternative Dredging Equipment Hopper and Bucket Dredges Miles 27.0

3        to 66.0."

4   (x) In 2004 the Corps prepared its "Lake Borgne and MRGO Shoreline Protection

5        (Project Number : PO-32) St. Bernard Parish Louisiana Construction Solicitation

6        and Specifications."

7   (y) On April 11, 2005, the Corps prepared an internal draft document entitled

8        "Mississippi River - Gulf Outlet PM-R Proposal for Gaining National

9        Environmental Policy Act Compliance for the Operation and Maintenance

10       Program."  That document stated:

11              Status of National Environmental Policy Act (NEPA)
                Compliance
12

13              NEPA compliance is complete for all existing
        O&M activities.  However, the dredged material disposal
14      sites and methods that have been used along the inland
        reach since the mid-1980s bear little resemblance to those
15      described in the environmental impact statement (EIS)
        prepared in 1976 for the O&M of the MR-GO.  All of the
16      changes that have occurred in the dredging and disposal
        plan since preparation of the original EIS have been
17      addressed in environmental assessments (EAs) and
        associated finding of no significant impact (FONSIs).  The
18      main reason why a supplemental EIS has not been prepared
        is that each change has been discrete and not associated
19      with other changes.  In other word, each change was
        planned and executed separately over time and while each
20      change was being evaluated through preparation of an EA,
        there was no knowledge of subsequent changes that would
21      be implemented afterward.  Each of the changes was
        individually determined to not have a significant impact on
22      the environment.

23

24      9.    The documents labeled EIS or EAs in the listing in paragraph 8 above represent

25  the Corps NEPA documents concerning or bearing upon the environmental impacts of MRGO.

26

27                                    - 15 -
                              Declaration of Nicholas C. Yost
28

The other documents listed in paragraph 8 do not represent NEPA compliance but do establish the Corps' awareness of pertinent environmental impacts.

10.   As best I can determine the original MRGO authorization legislation, An Act to authorize construction of the Mississippi River - Gulf Outlet, 70 Stat. 65 (1956), was amended on three occasions prior to deauthorization in 2007:

(a) Public Law 94-587 (1976), "An Act Authorizing the construction, repair, and preservation of certain public works on rivers and harbors for navigation, flood control, and for other purposes."

(b) Water Resources Development Act § 844 (1986), "Mississippi River - Gulf Outlet."

(c) Water Resources Development Act § 326 (1996), "Mississippi River - Gulf Outlet, Louisiana."

In addition, funds were appropriated from time to time for MR-GO.

11.   The Annual Reports of the Chief of Engineers, U.S. Army Civil Work Activities, list the projects undertaken by the Corps with respect to MRGO, including the funds required for new work. In the years between NEPA's effective date (1970) and the year during which EISs ceased to be required for approriations (1979), the Federal (Corps) costs included:

(a) 1970 - $191,000,000 + $1,680,000 = $192,680.000.

(b) 1971 - $34,337,000 + $262,000,000 = $296,337,000.

(c) 1972 - $262,000,000[1] + $294,000,000 = $556,000,000.

(d) 1974[2] - $294,000,000.

(e) 1975 - $320,000,000 + $3,670,000 = $323,670,000.

(f) 1976 - $330,000,000 + $3,670,000 - $333,670,000

(g) 1977 - $366,000,000 + $5,600,000 = $371,600,000.

[1] Certain of these costs may appear duplicative, presumably because not completed in one year.
[2] I do not have a record for 1973.

- 16 -

Declaration of Nicholas C. Yost

1        (h) 1978 - $384,000,000 + $10,500,000 = $394,500,000.

2        (i) 1979 - $406,000,000 + $10,500,000 = $416,500,000.

3     12.  In my opinion the Corps violated its mandatory legal obligations under NEPA in

4 the following ways:

5      (a) Failure to examine environmental impacts (paragraph 13 below).

6      (b) Failure to prepare supplemental NEPA documents (paragraph 14 below).

7      (c) Failure to prepare legislative EISs (paragraph 15 below).

8      (d) Failure to evaluate cumulative impacts (paragraph 16 below).

9    In all, I would describe the Corps actions with respect to NEPA and MRGO as

10 characterized by a massive inattention to NEPA's mandatory obligations continuing from the

11 1970s until the date of Katrina.

12     13.  The Omitted impacts.

13      (a) Most basically, NEPA and the CEQ NEPA Regulations (both § 102(2)(C), 42

14        USC § 4332(2)(C) (the environmental impact statement (EIS) provision -- see

15        40 CFR §§ 1502.10, 1502.16, 1508.8), and 40 CFR § 1508.9(b)(the

16        environmental assessment (EA) provision -- see NEPA § 102(2)(E), 42 USC §

17        4332(2)(E)) require study of the "environmental impact" of a Federal action.

18        Such "impacts" (or "effects") may include both direct and indirect impacts,

19        "which are caused by the action and are later in time or further removed in

20        distance, but are still reasonably foreseeable." 40 CFR § 1508.8(b).  The Corps

21        documents, taken as a whole, simply missed a pervasive, potentially significant,

22        and foreseeable impact -- the effect of the MRGO on hurricane-caused storm

23        surges.  In my opinion, that omission (combined with that discussed in

24        paragraph 13(b) below) is the single most pervasive and blatant violation of

25        NEPA and its implementing regulations.  The impact which in fact occurred is a

26        subject of this litigation.  This significant impact was reasonably foreseeable, as

27

28

- 17 -

Declaration of Nicholas C. Yost

illustrated by the Corps own Report on "Storm Surge Effects of the Mississippi River Gulf Outlet" (1966) (paragraph 8(a) above) and even if in watered down form -- the Corps Draft Environmental Statement of 1972 (paragraph 8(b) above).  The only MRGO Final EIS, that in 1976, did not analyze storm surge (paragraph 8(e) above).

(b) Corps documents, including the 1976 EIS (paragraph (8(e) above) -- the last EIS the Corps prepared on MRGO prior to deauthorization -- missed the impact of MRGO on marshes adjacent to the channel encompassing channel widening due to bank erosion and a resulting loss of wetlands.  Eventually Corps documents recognized this omission (paragraphs 8(l), 8(r), 8(y) above), but no EIS was ever prepared analyzing these impacts.

14.   Upon the occurrence of certain stated developments there arises a mandatory duty to supplement earlier NEPA analyses.  *See* paragraph 6(c) above.  Specifically, 40 CFR § 1502.9(c) states that agencies "shall prepare supplements" to EISs if the agency "makes substantial changes in the proposed action that are relevant to environmental concerns" (§ 1502.9(c)(i)) or there are "significant new circumstances or information" relevant to environmental concerns and bearing on the proposed action or its impact (§ 1502.9(c)(ii)).  The same duty to supplement has been held by courts to apply to EAs.

(a) The Corps made incremental "changes" to MRGO which are cumulatively "substantial" and require supplementation which are set out in paragraphs 8(f), 8(g), 8(h), 8(j), 8(k), 8(m), 8(n), 8(o), 8(p), 8(q), 8(t), 8(u), 8(v), 8(w), and 8(x) above.  While there is an element of discretion as to just when a supplemental document is due, there is no discretion as to whether one was due, as recognized by the Corps in it own internal documentation in 2005 (paragraph 8(y)).  In my opinion a supplemental EIS was required not later than the 1988 Bank Erosion Reconnaissance Report (paragraph 8(l)) which recognized that impacts were

- 18 -

1  substantially greater than had been foreseen, or at the very latest by the time of the

2  Corps' 1996 Foreshore Protection Evaluation Report (paragraph 8(r)) which

3  explicitly recognized the causes of the erosion and disappearance of marsh.

4     (b) In its "Mississippi River Gulf Outlet, North Bank Foreshore Protection Evaluation

5  Report" (paragraph 8(r)) and its "Feasibility Report Wetlands Creation and

6  Protection Project Mississippi River-Gulf Outlet" (paragraph 8(s)) the Corps

7  recognized that larger than anticipated vessels were causing impacts on the

8  marshes adjacent to the channel far greater than had been earlier envisioned.  That

9  is a "significant new circumstance or information" requiring a supplemental EIS.

10     15.   The Corps never prepared legislative EISs (paragraphs 6(a) and 10 above) as

11  required by law.

12     (a) At minimum such legislative EISs should have been prepared for the 1976, 1986,

13  and 1996 amendments to MRGO's authorizing legislation.

14     (b) During the period 1970 until 1979 EISs were required on requests for

15  appropriations.  As set out in paragraphs 10 and 11, the Corps requested

16  appropriations but did not accompany the MRGO requests with EISs.

17     16.   The Corps failed to evaluate the cumulative impacts of its many actions as

18  required by 40 CFR §§ 1508.7 and 1508.8.  *See* paragraph 6(e) above.  Instead, from 1976 on

19  the Corps segmented its analyses, preparing EAs on discrete segments of MRGO without ever

20  examining the cumulative impacts of MRGO as a whole.  In preparing its multiple NEPA

21  documents (paragraph 8 above) the Corps recognized that it was taking "actions" which

22  implicate NEPA, but subsequent to its 1976 EIS, which was itself inadequate, it never

23  examined the whole of the impacts -- the cumulative impacts -- of all its actions with respect to

24  MRGO (*see* paragraphs 8(f), 8(g), 8(h), 8(j), 8(m), 8(n), 8(o), 8(p), 8(q), 8(t), 8(u), 8(v), 8(w),

25  and 8(x)), never stepping back to examine the impacts as a whole, despite having learned that

Declaration of Nicholas C. Yost

such cumulative impacts had in fact occurred (*see* paragraphs 8(l) and 8(r) above).  *See* paragraph 14(a) above and paragraphs cited.

I declare under penalty of perjury that the above is true and correct.

Dated:  November 20, 2008

/s/ Nicholas C. Yost, Esq
Nicholas C. Yost

Declaration of Nicholas C. Yost