# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **In re:  KATRINA CANAL BREACHES CONSOLIDATED LITIGATION** | CIVIL ACTION |
| | Case No.:  05-4182 and consolidated cases |
| **PERTAINS TO:  BARGE** | SECTION "K" (2) |
| | |
| *Boutte v. Lafarge*          05-5531 | Hon. Stanwood R. Duval, Jr. |
| *Mumford v. Ingram*     05-5724 | Magistrate Judge Joseph C. Wilkinson, Jr. |
| *Lagarde v. Lafarge*     06-5342 | |
| *Perry v. Ingram*          06-6299 | |
| *Benoit v. Lafarge*        06-7516 | |
| *Parfait Family v. USA*  07-3500 | |
| *Lafarge v. USA*           07-5178 | |

# PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF MOTION TO CERTIFY A CLASS AND POTENTIAL SUBCLASSES, TO APPOINT CLASS COUNSEL, AND TO PRELIMINARILY APPROVE PLAINTIFFS' PROPOSED TRIAL PLAN

## <u>TABLE OF CONTENTS</u>

I.    INTRODUCTION ................................................................................................. 1

ARGUMENT ........................................................................................................... 4

II.    Defendants' Efforts to Recast Plaintiffs' action as arising from a multiplicity of events fails on Multiple levels ........................................................................................ 4

    A.    Defendants' Assertion That the Instant Action Arises From A Multiplicity Of Events Contradicts The Gravamen Alleged In Plaintiffs Operative Complaint ... 5

    B.    Damages caused by other forces are Completely Excluded From This Action .... 6

    C.    to the extent that defendants seek to claim that Such Damages are indivisible, This still Would Not provide a basis to deny Certification ................................... 8

    D.    Defendants' Assertion That Plaintiffs' Claim Involves Multiple Flooding Events Lacks merit ........................................................................................................ 10

        1.    Damages Caused By Flooding Are "Indivisible" Injuries for Purposes of Joint and Several Liability ..................................................................... 10

        2.    The Record Reflects That Initial Flooding of the Class Area Occurred From Breaches to the East Wall of the Industrial Canal ..................................... 11

        3.    Contrary to Defendants' Assertion, this Court's Analysis in *Case v. ANPAC La. Ins. Co.* Does Not Preclude Plaintiffs' Action From Being Characterized as a "Single Accident" Case ............................................... 14

III.    Plaintiffs Have Satisfied The Requisite Elements for Class Certification ................. 15

    A.    The named Plaintiffs' claims are typical within the meaning of Rule 23(a)(3) .. 15

    B.    Plaintiffs are adequate representatives ............................................................ 17

        1.    The Barge Plaintiffs' Action Itself (in Relation to the MRGO/Levee Action) Does Not Pose a Material Conflict Between the Named Plaintiffs and Putative Class Members ...................................................................... 17

        2.    The Named Plaintiffs Have Not Waived Claims On Behalf Of The Class 19



3.  The Named Plaintiffs Are Not Subject to the Heightened Adequacy Requirements Required In Securities Litigation ........................................ 19

C.  Plaintiffs have defined an ascertainable class .................................................. 21

D.  Common Issues Of Law And Fact Predominate Over Individual Issues ............ 23

1.  As Issues Relating To Defendants' Liability Are Common Issues That May Be Adjudicated As To The Class As A Whole, This Case Is Precisely The Type Of Case Approved By The Fifth Circuit As Worthy Of Class Adjudication ............................................................................................ 27

2.  Contrary to Defendants' Various Arguments, Issues relating to Causation and Damages Are Manageable, and therefore, Do Not Destroy Predominance ............................................................................................ 30

    a)  As The Instant Action Will Not Entail Consideration of a Multiplicity of Issues Relating To Causation, Individualized Adjudication Of Causation Is Manageable ........................................ 30

    b)  Adjudication of Issues Relating to Damages Is Manageable ............ 32

        (1)  Damage issues relating to valuation of property and business loss can be adjudicated by way of a common valuation formula .................................................................... 32

        (2)  Individualized issues relating to personal injuries, wrongful death and emotional harm are limited ...................... 36

        (3)  Individualized issues relating to loss of income are limited ..... 37

E.  Class Action Treatment Is also Superior .......................................................... 39

IV.  CONCLUSION ...................................................................................................... 40



## TABLE OF AUTHORITIES

**Cases**:

*Anselmi v. Penrod Drilling Corp.*,

    813 F. Supp. 436, 443 (E.D. La. 1993). …………………………………………………37

*Armstrong v. Davis,*

    275 F.3d 849, 869 (9th Cir., 2001)……………………………………………............15

*Baby Neal for & by Kanter v. Casey,*

    43 F.3d 48, 58 (3d Cir., 1994)……………………………………………………………15

*Bell Atl. Corp. v. AT&T Corp.*,

    339 F.3d 294 (5th Cir. Tex. 2003) …………………………………………………….32

*Berger v. Compaq Computer Corp.*,

    257 F.3d 475 (5th Cir., 2001) …………………………………………….................20

*Bd. of Comm'rs of the Orleans Levee Dist. v. M/V Belle of Orleans*,

    535 F.3d 1299, 1313 (11th Cir.,2008)…………………………………………………...9

*Canal Barge Co. v. Torco Oil Co.*,

    220 F.3d 370, 376-377 (5th Cir. La. 2000) …………………………………………28

*Case v. ANPAC La. Ins. Co.*,

    466 F. Supp. 2d 781, 794 (E.D. La. 2006)…………………………………………...10

*Chaz Concrete Co. v. Codell*,

    2006 U.S. Dist. LEXIS 60013  (E.D. Ky. Aug. 23, 2006) ……………………………22

*Coats v. Penrod Drilling Corp.*,

    61 F.3d 1113 (5th Cir. Miss. 1995) ……………………………………………….9, 31

*Cook v. Rockwell Int'l Corp.*,

    151 F.R.D. 378 (D. Colo. 1993) ……………………………………………………..28

*Crayton v. Sentry Ins. Co.*,

    612 So. 2d 767, 769, 772 (La.App. 1 Cir. 1992) ………………………………………33

*Davis v. Am. Home Prod. Corp*,

    844 So. 2d 242 (La.App., 2003) ……………………………………………………..29



*Edmonds v. Compagnie Generale Transatlantique*,

    443 U.S. 256 (1979) …………………………………………………………..PASSIM

*Foulk v. Donjon Marine Co.*,

    963 F. Supp. 427, 430 (D.N.J. 1997) …………………………………………………..10

*Fulford v. Transp. Serv. Co.*,

    2004 U.S. Dist. LEXIS 9955 (E.D. La. May 27, 2004) ………………………………..28

*Gunnells v. Healthplan Servs.*,

    348 F.3d 417 (4th Cir., 2003) …………………………………………...17, 20, 23, 32

*In re Catfish Antitrust Litig.*,

    826 F. Supp. 1019, 1037 (N.D. Miss. 1993) …………………………………………..20

*In re Methyl Tertiary Butyl Ether (MBTE) Products Liability Litig.*,

    241 F.R.D. 185, 196 (S.D.N.Y. 2007) ………………………………………………..22

*In re OSB Antitrust Litig.*,

    2007 U.S. Dist. LEXIS 56617 (E.D. Pa. Aug. 3, 2007) ………………………………22

*In re Complaint of Clearsky Shipping Corp.*,

    1998 U.S. Dist. LEXIS 13842 (E.D. La. Aug. 27, 1998) ……………………………..37

*In re Ingram Barge*,

    435 F. Supp. 2d 524 (E.D. La. 2006) …………………………………………………9

*In re Train Derailment near Amite La.*,

    2006 U.S. Dist. LEXIS 32839(E.D. La. May 23, 2006) ………………………………20

*In re Polypropylene Carpet Antitrust Litig.*,

    996 F. Supp. 18 (N.D. Ga. 1997) …………………………………………26, 34, 26

*James v. City of Dallas*,

    254 F.3d 551 (5th Cir., 2001) …………………………………………………..3, 15

*Jenkins v. Raymark Indus.*,

    782 F.2d 468, 471 (5th Cir., 1986) …………………………………………...1, 24, 25

*Jerome B. Grubart v. Great Lakes Dredge & Dock Co.*,

    513 U.S. 527, 534 (1995) ……………………………………………........................9

iv



*Kirksey v. P&O Ports Tex., Inc.*,

    488 F. Supp. 2d 579, 591 (S.D. Tex. 2007)……………………………………………10

*LaHaye v. Allstate Ins. Co.*,

    570 So. 2d 460, 466 (La.App. 3 Cir. 1990) …………………………………………33

*Latulas v. Montco Offshore, Inc.*,

    2006 U.S. Dist. LEXIS 20066 (E.D. La. Mar. 29, 2006)………………………………9

*Mullen v. Treasure Chest Casino,*

    186 F.3d 620 (5th Cir., 1999) ………………………………………………… 1, 17, 24

*Nicholson v. United States*,

    77 Fed. Cl. 605, 607 (Fed. Cl. 2007) …………………………………………………29

*Osgood v. Harrah's Entm't, Inc.*,

    202 F.R.D. 115, 124 (D.N.J. 2001)……………………………………………………16

*Perez v. Metabolife Int'l, Inc.*,

    218 F.R.D. 262, 269 (S.D. Fla. 2003) …………………………………………………23

*Richard v. State Farm Fire & Cas. Co.*,

    2006 U.S. Dist. LEXIS 87610 (W.D. La., Dec. 1,  2006) …..…………………………6

*Robertson v. Monsanto Co.,*

    2008 U.S. App. LEXIS 15468 (5th Cir., 2008) …………………………………1, 24, 25

*S. C. Loveland, Inc. v. East West Towing, Inc.*,

    608 F.2d 160, 165-166 (5th Cir. 1979)……………………………………………………38

*Simeon v. T. Smith & Son, Inc.,*

    852 F.2d 1421, 1429 (5th Cir, 1988) …………………………………………………..38

*St. Paul Fire & Marine Ins. Co. v. Nolen Group, Inc.*,

    2007 U.S. Dist. LEXIS 64603 (E.D. Pa. Aug. 31, 2007)………………………10, 11, 31

*Todd v. State ex rel. Department of Social Servs., Office of Community Servs.*,

    699 So. 2d 35, 39 (La., 1997) ……………………………………………………………28

*Tolbird v. Southern Ins. Co.*,

    130 So. 2d 535, 538 (La.App. 2 Cir. 1961) …………………………………………...33



*Turner v. Murphy Oil USA, Inc.,*

    234 F.R.D. 597, 607 (E.D. La. 2006) …………………………………………...PASSIM

*Transamerican Natural Gas Corp. v. Finkelstein,*

    933 S.W.2d 591 (Tex. App. San Antonio, 1996) …………………………………….36

*Vanderbrook v. Unitrin Preferred Ins. Co. (In re Katrina Canal Breaches Litig.),*

    495 F.3d 191, 223 (5th Cir. La. 2007) …………………………………….11, 29, 31

*Walker v. Bankers Life & Cas. Co.,*

    2007 U.S. Dist. LEXIS 73502 (N.D. Ill. Oct. 1, 2007)………………………………...32

*Watson v. Shell Oil Co.,*

    979 F.2d 1014 (5th Cir. 1992) ………………………………………....1, 24, 25

*Wm. G. Roe & Co. v. Armour & Co.,*

    414 F.2d 862, 869 (5th Cir., 1969) ………………………………………………...9

## **Federal Rules:**

Fed. R. Civ. P. 23(a) ……………………………………………………………………..2

Fed. R. Civ. P.  23(a)(2) …………………………………………………………………8

Fed. R. Civ. P.  23(a)(3) …………………………………………………………15, 17

Fed. R. Civ. P. 23(a)(4) ……………………………………………………………………3

Fed. R. Civ. P. 23(b)(3) ……………………………………………………1, 3, 39, 40

Fed. R. Civ. P.  23(c)(2) ……………………………………………………...............22

Fed. R Civ. Proc. 23(c)(2)(B) ……………………………………………………………22

Fed. R. Civ. P.  23(g) ……………………………………………………...............40

## **Secondary Sources:**

*Manual for Complex Litigation,* § 21.222, at 270 (4th ed.)………………………………22

*Newberg on Class Actions,* § 3.24, 3-134 (3rd ed., 1992) ……………………………….20

*Newberg,* § 3:25 (4th ed. 2008)…………………………………………………...........21

*Newberg  § 17.12* (3rd ed. 1992)………………………………………………………18



*Newberg*, § 17:17, 17-51 (3rd ed. 1992)……………………………………………...…39

*Newberg,* § 4:30, 4-121 (3th ed. 1992)……………………………………………...39

Restat 2d of Torts, § 433A……………………………………………………………...10



## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION

The decision as to whether to certify the claims of the more than 40,000 persons and entities that comprise the putative Barge class is one that goes to the very core of the usefulness of the class action device to effectively manage a "mass tort" case.  Without class treatment of these claims, this case will put an impossible strain on this Court, and justice for the injured parties will never come (certainly not in a reasonable amount of time).  The Fifth Circuit affords District Courts broad discretion to use the class mechanism in "mass tort" cases so as to avail itself of the efficiencies of common adjudication of issues, such as liability, on a class wide basis.  *See Jenkins v. Raymark Indus.*, 782 F.2d 468, 471 (5th Cir., 1986);  *Mullen v. Treasure Chest Casino*, L.L.C., 186 F.3d 620 (5th Cir., 1999); *Watson v. Shell Oil Co*., 979 F.2d 1014 (5th Cir. 1992); *Robertson v. Monsanto Co.*, 2008 U.S. App. LEXIS 15468 (5th Cir., 2008); *Turner v. Murphy Oil USA, Inc.*, 234 F.R.D. 597, 607 (E.D. La. 2006).  This is true notwithstanding the fact that issues relating to causation and damage will always be individualized in the mass tort context.

Against this backdrop, the central issue this Court must confront now is whether the class mechanism would permit this Court to achieve a net gain in efficiency in managing its *In Re Katrina* docket.  In Plaintiffs' view, utilization of the class device in this Action provides the only workable framework for this Court to efficiently manage the thousands of claims presently comprising the *In re Katrina* Litigation without breaking the wheels of justice, or at a minimum, without slowing them to an unreasonable and unworkable crawl.  Moreover, notwithstanding Defendants' spurious arguments to the contrary, this case fits squarely within the efficiency model set forth by the Fifth Circuit.

Crucial to this point, Plaintiffs satisfy the predominance and superiority requirements of Rule 23(b)(3).  On the one hand, issues relating to Defendants' liability and causation concerning  breaches to the Eastern wall of the IHNC will all be adjudicated upon identical evidence common to the class as a whole.  On the other hand, individualized issues relating to causation and damages are limited and manageable, and thereon, do not destroy predominance.

Defendants' spurious claim that adjudication of causation will require an examination



and separation of a multiplicity of injuries caused by a multiplicity of causal forces is simply incorrect.  Once the common issue concerning causation regarding the breaches to the Eastern wall of the IHNC are established, the remaining individualized issues of causation will turn only on whether damages were caused by the "singular" event of flooding, regardless of issues as to source.  *See Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256 (1979) ("the general rule is that a person whose negligence is a substantial factor in the plaintiff's indivisible injury is entirely liable even if other factors concurred in causing the injury.").

The same is true as to damages – the bulk of which will be adjudicated by way of mass appraisal modeling.  While Defendants go to great efforts to obfuscate the purpose of this model, and offer only speculative criticisms as to whether the model can be applied in this case, in reality, mass appraisal provides the best method of consistently valuing property damage across class lines.  Additionally, notwithstanding Defendants' various arguments, damages pertaining to personal injuries, wrongful death, emotional harm and loss of income are necessarily limited in number, and as such, "will not form a significant portion of the Plaintiffs' claims, which further supports a finding of predominance…."  *See Turner*, 234 F.R.D. at 607 n. 6.

The instant action is also superior to individual actions.  Were each case to be tried individually, this Court would be required to conduct tens of thousands[1] of individual bench trials based largely on identical evidence concerning issues of Defendants liability and issues of causation relating to the breach of the Eastern wall of the IHNC.  It goes without mention that such effort would be a tremendous waste of judicial resources.

In addition to the forgoing, Plaintiffs also satisfy the requirements of Rule 23(a).  The claims of each of the seven named Plaintiffs are typical of the more than 40,000 persons and entities that comprise the putative class.  They, like the class as a whole, (1) owned property, a business and/or resided within the region west of Paris Road, and (2) sustained damage as a

---

[1] As it presently stands, the Barge Plaintiffs have retained approximately 6,301 putative class members, a 2000 increase since Plaintiffs filed their Motion.  As the proposed class area overlaps with the MRGO/Levee track – there are presumably several thousand more persons that have been retained in that action who also would be a member of the Barge class.



result of the same singular flooding event.  Contrary to Defendants' claim, the named Plaintiffs need not have sustained identical injuries.  *See James v. City of Dallas*, 254 F.3d 551, 571 (5th Cir., 2001) ("Typicality does not require a complete identity of claims…. If the claims arise from a similar course of conduct and share the same legal theory, factual differences will not defeat typicality.").

Moreover, Plaintiffs meet the adequacy requirements of Rule 23(a)(4).  Importantly, Defendants do not challenge the fact that Plaintiffs have retained adequate counsel, and as such, this point is conceded.  While Defendants attempt to raise various arguments challenging the adequacy of the named Plaintiffs, including Plaintiffs' litigation decision to sue Defendants rather than the government, none of these arguments demonstrate a conflict with members of the putative class – let alone a material conflict which would render the named Plaintiffs inadequate.  As the record is clear that the named Plaintiffs have a basic understanding of the case, and have demonstrated a willingness to actively and zealously participate in the prosecution of the litigation on behalf of members of the proposed class, the named Plaintiffs are unquestionably adequate under the standards of Rule 23(a)(4).

Further, there is no reasonable dispute that the class defined by Plaintiffs is both numerous and ascertainable.  Defendants tacitly concede that Plaintiffs have established numerosity.  However, Defendants' claim that ascertainability is lacking based on speculation that a handful of properties within the class area may not have been adequately recorded is without merit.  Ascertainability does not require that Plaintiffs identify class members in the first instance.  Even if it did, class members are easily identified by other means, such as tax records or insurance records.

In short, the standardization of the Class' claims due to the "singular" nature of the event upon which this action is based renders the instant action a prime candidate for class adjudication.  Based thereon, Plaintiffs respectfully request that the Court grant certification of the proposed class under Fed. R. Civ. P. 23(b)(3).



**ARGUMENT**

II.  **DEFENDANTS' EFFORTS TO RECAST PLAINTIFFS' ACTION AS ARISING FROM A MULTIPLICITY OF EVENTS FAILS ON MULTIPLE LEVELS**

In an effort to convince this Court that certification of the instant action is untenable, Defendants employ an overarching strategy that seeks to ignore the case **actually** brought against them, recasting the Plaintiffs' action as one which Defendants **wish** Plaintiffs had brought – an action seeking recovery for damages caused by a complex series of *different* "events", including hurricane winds, torrential rains, downed trees, multiple separate levee and floodwall breaches, post-storm vandalism, and other conditions.  Significantly, Defendants' efforts to recast Plaintiffs' action as one requiring an examination and separation of a multiplicity of damage causing events fails on multiple levels.

As an initial point, Defendants' assertion that the instant action arises from a multiplicity of events contradicts the gravamen alleged in Plaintiffs' operative complaint limiting the damages sought to those resulting from the flooding that occurred from breach to the East wall of the Industrial Canal.  However, forms of damages unrelated to flooding are not only irrelevant to the theory of liability in this action, they are completely irrelevant to Plaintiffs' proposed "mass appraisal" valuation damage model which focuses strictly on damages attributable to flooding across class lines.  Yet, even if Defendants were to attack the Plaintiffs' litigation theory by claiming that damages caused by flooding were indivisible from damages caused by other forces, this could not undermine the basis for certification of this action.  Under this scenario, applicable law relating to maritime joint and several liability would foreclose the particularized examination of the multiplicity of irrelevant causal issues Defendants seek to inject to defeat certification.

Significantly, even Defendants' efforts to characterize Plaintiffs' Action as involving multiple "flooding" events lacks merit, as damages caused by flooding are "indivisible" injuries for purposes of joint and several liability. Based thereon, litigation of Defendants' liability for flood related damage does not require an examination and separation of a multiplicity of causal issues.  To the contrary, under principles of joint and several liability, Defendants may be held liable on a class wide basis if *__any__* degree of flooding of the class area

4

KP&A
KHORRAMI POLLARD & ABIR LLP

is attributable to **_any_** negligence on the part of Defendants in precipitating the breaches to East wall of the Industrial Canal. *See Edmonds*, 443 U.S. at 260 n.8, 273 n.30 ("the general rule is that a person whose negligence is a substantial factor in the plaintiff's indivisible injury is entirely liable even if other factors concurred in causing the injury.").

In short, Defendants' assertion that the instant action requires an examination and separation of a multiplicity of causal events is untenable. No matter how it is sliced, the action brought by the Barge Plaintiffs involves the claims of more than 40,000 individuals and entities alleging injury caused by a "single" event – the breach of the East wall of the Industrial caused Canal by the breakaway of Barge ING 4727.

## A. DEFENDANTS' ASSERTION THAT THE INSTANT ACTION ARISES FROM A MULTIPLICITY OF EVENTS CONTRADICTS THE GRAVAMEN ALLEGED IN PLAINTIFFS OPERATIVE COMPLAINT

Defendants' efforts to recast Plaintiffs' Action as arising from a multiplicity of events relating to Hurricane Katrina and its aftermath must be rejected, as it conflicts with the factual gravamen of Plaintiffs' lawsuit as pled in Plaintiffs' operative complaint. As set forth therein, Plaintiffs' claim is clearly limited to damages resulting from the flooding that occurred from the breach to the East wall of the Industrial Canal, which Plaintiffs allege were caused by the breakaway of Barge ING 4727:

> The aforesaid unmanned and unsupervised barge, abandoned by defendants to the elements, broke loose from its inadequate moorings and crashed through the East side wall of the Industrial Canal taking out a large section of the flood wall causing a huge amount of water from Lake Ponchatrain, the Industrial Canal, and the Mississippi Gulf Outlet to flow into the Ninth Ward of the City of New Orleans, New Orleans East and Arabi and Chalmette in St. Bernard Parish, causing catastrophic property damage, death, and personal injury, to the class members and the representative of the class.

*See Third Supplemental and Amended Complaint, Dkt. No.* 129, in C.A. 05-4419, at 2 (amending paragraph VII of Plaintiffs' original Complaint).[2]

As Plaintiffs' Complaint clearly limits damages sought to those resulting from the

---

[2] Amendments to paragraph VII made in Plaintiffs *Third Supplemental and Amended Complaint* continue to be the operative allegations relating to the gravamen of Plaintiffs' claims. None of Plaintiffs' subsequent amendments to their operative complaint have in any way retracted that allegation.



flooding that occurred from the breach to the East wall of the Industrial Canal, Defendants'
claim that Plaintiffs are seeking recovery for damages caused by a complex series of ***different***
"events" is unquestionably false.  As Plaintiffs are the masters of their complaint under
applicable law, Defendants cannot alter Plaintiffs' complaint to serve their own purposes.  *See
Richard v. State Farm Fire & Cas. Co.*, 2006 U.S. Dist. LEXIS 87610 (W.D. La., 2006)
(rejecting defendant's efforts to mischaracterize gravamen of plaintiff's complaint relating to
flooding to obtain dismissal).

Based on the forgoing, this Court must reject Defendants' efforts to recast Plaintiffs'
action as seeking recovery for damages caused by a complex series of ***different*** "events."

## B.    DAMAGES CAUSED BY OTHER FORCES ARE COMPLETELY EXCLUDED FROM THIS ACTION

In addition to the fact that damages caused by non-flooding events are irrelevant to
Plaintiffs' theory of liability in this action, they are also completely irrelevant to Plaintiffs'
theory of damage.  In fact, as Plaintiffs' proposed mass appraisal model only evaluates flood
related damage, other forms of damage are by necessity completely excluded.

Consistent with Plaintiffs' theory, the mass appraisal property valuation model
proposed by Plaintiffs' expert, John Kilpatrick (Ph.D., MRICS, Real Estate Appraiser and
Consultant), is expressly designed to evaluate the damage to property values caused solely by
flooding, not damages caused by other forces:

> Levee breaches occurred early on August 29, 2005 on the east side of the Inner
> Harbor Navigation Canal (IHNC). Plaintiffs' complain that the levee breaches in
> question were caused by a 200-foot long barge (ING-4727) that escaped its moorings
> and ended up perched on a house in the Lower Ninth Ward. Common issues of fact
> and law to be adjudicated include the extent of flood damage to property values
> caused by the breaches.  Our testimony here concerns the measurement of damages to
> real estate, business values and personal property in the proposed class area and
> whether these damages are best estimated across the proposed class or in individual
> cases respecting each of the affected properties.

*See  Kilpatrick Report*, at 2(¶5) ( attached as Exh.21 to *Khorrami Dec.*).

As explained in Dr. Kilpatrick's report, the mass appraisal valuation model is based
upon the reality that "[d]amage from hurricane Katrina and levee failures provide common



elements across the class in terms of types of damages and causes of damage" [*See id.* at 3 (¶10)], and that from a valuation perspective, "[t]he patterns of damage to affected properties are best assessed by considering the affected area as a whole." *See id.* at 4 (¶14), 5(¶18).[3]  The patterns which Dr. Kilpatrick's model will utilize will focus solely on damage patterns attributable to flooding.  By way of example, Dr. Kilpatrick's Report cites that "[c]ommon effects of flooding in the affected area include corrosion of electrical wiring, which requires extensive or complete rewiring of affected properties, damage to drywall or plaster requiring gutting of interior walls..." [*See id.* at 3 (¶11)], and stigma damages relating to the fear of future levee breaches.  *See id.* at 4 (¶12) ("It is likely that buyers of property in the proposed class area would or should have some awareness of the risk of future levee breaches.").

Thus, while Defendants seek to inject issues relating to damages caused by wind, fire and/or vandalism into the mix, these types of damages are completely irrelevant, as the only damages that will be evaluated are those damages caused by flooding.  However, even if a situation were to arise where such damages became an issue, Dr. Kilpatrick has testified that such damages could be factored out:

> Q.     Okay.  With respect to valuation damages, would you agree with me that there were multiple sources of valuation damage?
>
> A.     Well, at this juncture I'm focusing entirely my attention on the flooding precipitated by the barge hitting the wall. You know, that having been said, if there are other issues at hand, I'll certainly investigate those and we'll create some sort of separating equilibrium to take those out.  But that's well beyond the scope of what we've done hear [sic] so far."

*See Kilpatrick Depo*, at 142:24 to 143:1 (Supp. Khorrami Dec., Exh. 28),

It bears noting that Defendants' argument that the instant case involves a multiplicity of events each causing a multiplicity of individualized damages was made and rejected in *Turner v. Murphy Oil USA,*, 234 F.R.D. 597 (E.D. La. 2006).  In that case, Judge Fallon concluded that notwithstanding the hurricane and related damage, the defendant's conduct at issue

---

[3] As Dr. Kilpatrick points out, "[c]onclusions regarding causation of damages would be more difficult if properties were considered individually without reference to the overall spatial patterns of flooding and observed damages to properties." *Kilpatrick Report*, at 6 (¶21).


KP&A
KHORRAMI POLLARD & ABIR LLP

concerned the "single accident" relating to the subsequent oil spill, and that damages relating to the spill could be adjudicated separate from other hurricane related damage:

> Defendant argues that, particularly from the standpoint of damages, Plaintiffs' claims do not meet the Rule 23 commonality requirement. ***According to Defendant, Plaintiffs' homes and businesses received varying degrees of damage from the hurricane, and received different amounts of oil contamination***. In addition, Defendant argues that the proof required for Plaintiffs' personal injury and mental anguish claims is such that their claims do not share common issues of law or fact: each Plaintiff learned of the damage at different times, returned to the area at different times, and suffered different levels of exposure to the crude oil. Murphy Oil argues that these differences compel the Court to find that the commonality requirement has not been met.
>
> The Court disagrees with Defendant.  Rule 23(a)(2) only requires that one issue's resolution will affect all or most of the potential class members.  That requirement is clearly met in this case, **which involves <u>a single accident</u>**.  These are just a few of the central issues that will affect all or most of the class members: whether Murphy Oil failed to properly maintain Tank 250-2, whether Murphy Oil had adequate hurricane safety plans and whether those plans were carried out during Hurricane Katrina, and whether the affected area will experience any long-term contamination.  While Plaintiffs' claims will involve some individualized determinations regarding the amount of damage suffered, if any, there are enough common issues regarding Defendant's liability that class treatment would be appropriate under Rule 23.

*See Turner*, 234 F.R.D. at 604.

Based on the forgoing, Defendants' efforts to inject irrelevant issues relating to damages to property caused by various forces not at issue here (such as hurricane winds, torrential rains, downed trees, and post-storm vandalism) must be rejected.  As Plaintiffs' are not suing Defendants for such damages, and as such damages are not and will not be included in Plaintiffs proposed valuation model, they are not relevant to the instant action.

## C.    TO THE EXTENT THAT DEFENDANTS SEEK TO CLAIM THAT SUCH DAMAGES ARE INDIVISIBLE, THIS STILL WOULD NOT PROVIDE A BASIS TO DENY CERTIFICATION

To the extent that Defendants claim that hurricane related damages are not divisible from flood related damage, this would not aid Defendants' Opposition here – under the applicable maritime rule of joint and several liability, a defendant may be held accountable for the entirety of indivisible harm regardless of their degree of fault.  *See Edmonds*, 443 U.S. 256,



260 n.8, 273 n.30 ("the general rule is that a person whose negligence is a substantial factor in the plaintiff's indivisible injury is entirely liable even if other factors concurred in causing the injury.").  Joint and several liability applies even where the other causal factor is an "act of God."  *See Wm. G. Roe & Co. v. Armour & Co.*, 414 F.2d 862, 869 (5th Cir., 1969) ("There is little doubt that the concurrence of a human act and an act of God may in appropriate circumstances give rise to the principle of joint and several liability to the end that the wrongdoer may be held entirely liable." ).

Significantly, the rule of joint and several liability articulated in *Edmonds* eliminates any requirement by Plaintiffs to prove Defendants' degree of fault for an indivisible harm. "The plaintiff can collect his entire judgment from a single defendant, leaving to the defendants allocation of fault among themselves." *See Coats v. Penrod Drilling Corp.*, 61 F.3d 1113, 1116 (5th Cir. Miss. 1995).  In fact, a plaintiff who carries his burden of proving **<u>any</u>** negligence on the part of the defendant, even if the defendant is only 1% at fault, is liable for 100% of the damages sustained by the plaintiff.  *See e.g. Latulas v. Montco Offshore, Inc.*, 2006 U.S. Dist. LEXIS 20066, at 10 (E.D. La. Mar. 29, 2006) (" If the plaintiff in an action brought pursuant to § 905(b) carries his burden of proving any negligence on the part of the vessel owner, the vessel owner cannot reduce the plaintiff's recovery by the contributory negligence of the plaintiff's employer. If an employer is found to be 99% at fault for an injury

---

[4] Maritime jurisdiction necessarily governs here.  Putting aside the fact that Section 1 of Plaintiff's operative Complaint specifically alleges maritime jurisdiction under 28 USC §1333, maritime jurisdiction necessarily applies insofar as the facts of this case implicate both the "locations" and "connections" tests set forth in *Jerome B. Grubart v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534 (1995).  Significantly, the Court in *In re Ingram Barge*, 435 F. Supp. 2d 524 (E.D. La. 2006) has already concluded that the facts of this case implicates maritime law.  *See In re Ingram Barge Co.*, 435 F. Supp. 2d at 528 (reasoning that "[t]he barge-related claims are similar to those of Grubart itself where jurisdiction was found arising under the AEA[,]" but that "claimants have alleged the classic situation to which the AEA was intended to apply: a vessel that collides with a land-based structure causing damage on land."). The Courts' determination is consistent with the conclusions of other cases involving identical facts.  *See e.g. Bd. of Comm'rs of the Orleans Levee Dist. v. M/V Belle of Orleans*, 535 F.3d 1299, 1313 (11th Cir.,2008) (reasoning that "[t]he Belle of Orleans was a vessel; she was operating in South Shore Harbor, a navigable waterway; she broke free from imperfect moorings; she had the potential to and actually did disturb commercial activity; and she is alleged to have caused damage when she struck property alongside a navigable waterway" and as such "the district court improperly concluded that there was no admiralty jurisdiction over the Board's tort claim.").



to a longshoreman, and a vessel owner 1% at fault, the vessel becomes liable for 100% of the damages sustained by the plaintiff."); *Foulk v. Donjon Marine Co.*, 963 F. Supp. 427, 430 (D.N.J. 1997) ("To avoid any liability to Mr. Foulk, Donjon must thus convince a jury that Donjon was not at all at fault in causing Mr. Foulk's injuries. If the jury concludes otherwise, for example finding Donjon one percent at fault, joint and several liability will require that Donjon compensate Mr. Foulk for its role in the accident and for Breakwaters' role in the accident, however large that may be.").[5]

Thus, based on the forgoing, any finding that hurricane related damages are not divisible from flood related damages would not splinter the instant action into a multiplicity of individualized issues relating to causation and damage. In such event, all Plaintiffs would be required to prove is Defendants' culpability in bringing about a fraction of that alleged harm, and Plaintiffs may then obtain full recovery.

### D.   DEFENDANTS' ASSERTION THAT PLAINTIFFS' CLAIM INVOLVES MULTIPLE FLOODING EVENTS LACKS MERIT

#### 1.   Damages Caused By Flooding Are "Indivisible" Injuries for Purposes of Joint and Several Liability

Defendants' assertion that the instant action involves multiple levee breaches that must be parsed out into multiple distinct flooding events is not only factually incorrect, it is incorrect as a matter of law, as damages caused by flooding are "indivisible" injuries for purposes of joint and several liability.

In evaluating whether a harm is divisible for purposes of joint and several liability, "it is the indivisibility of the injury, rather than of culpability, that triggers joint liability." *See St. Paul Fire & Marine Ins. Co. v. Nolen Group, Inc.*, 2007 U.S. Dist. LEXIS 64603, 45-46 (E.D. Pa. Aug. 31, 2007). It goes without saying that damage resulting from a flood are inseparable.[6]

---

[5] *See also Kirksey v. P&O Ports Tex., Inc.*, 488 F. Supp. 2d 579, 591 (S.D. Tex. 2007) ("Even if Tonghai was negligent partly as a vessel owner and Plaintiff's employer was partly negligent as well, Tonghai's negligence as vessel owner -- even if 1% - supports a judgment against it for all of Patrick Kirksey's damages"), rev'd on other grounds in *Kirksey v. Tonghai Mar.*, 535 F.3d 388 (5th Cir. Tex. 2008).

[6] Restat 2d of Torts, § 433A (comment i) provides the following as to the divisibility of harm: "Certain kinds of harm, by their very nature, are normally incapable of any logical,



KHORRAMI POLLARD & ABIR LLP

*See St. Paul Fire & Marine Ins. Co. v. Nolen Group, Inc.*, 2007 U.S. Dist. LEXIS 64603, 46 (E.D. Pa. Aug. 31, 2007) ("The flood damage suffered in this case, much like many personal injuries, is incapable of division.").  In fact, the Fifth Circuit has concluded that damages caused by flooding relating to Hurricane Katrina are indivisible:

> But here, on these pleadings, there are not two independent causes of the plaintiffs' damages at play; the only force that damaged the plaintiffs' properties was flood. To the extent that negligent design, construction, or maintenance of the levees contributed to the plaintiffs' losses, it was only one factor in bringing about the flood; the peril of negligence did not act, apart from flood, to bring about damage to the insureds' properties.

*See Vanderbrook v. Unitrin Preferred Ins. Co.* , 495 F.3d 191, 223 (5th Cir., 2007).

Thus, as flood related damages are not divisible, litigation of Defendants' liability for flood related damage does not require examination of the multiplicity of causal issues Defendants raise.  To the contrary, under principles of joint and several liability, Defendants may be held liable on a class wide basis if ***any*** degree of flooding of the class area is attributable to ***any*** negligence on the part of Defendants in precipitating the breaches to the East wall of the Industrial Canal.

> 2. <u>The Record Reflects That Initial Flooding of the Class Area Occurred From Breaches to the East Wall of the Industrial Canal</u>

Defendants' assertion that the instant case involves multiple flooding events is also factually incorrect, as the evidence before the Court uniformly reflects that initial flooding of the class area occurred as the result of breaches to the East wall of the Industrial Canal, thereafter merging with flood waters from the MRGO breaches outside of the class area.

This is supported by Plaintiffs' hydrology expert, Melvin G. Spinks, P.E., who

---

reasonable, or practical division. Death is that kind of harm, since it is impossible, except upon a purely arbitrary basis for the purpose of accomplishing the result, to say that one man has caused half of it and another the rest. The same is true of a broken leg, or any single wound, or the destruction of a house by fire, or the sinking of a barge. Such harms can be apportioned, if it all, only upon the basis of a prior reduction in value of what has been destroyed. By far the greater number of personal injuries, and of harms to tangible property, are thus normally single and indivisible. Where two or more causes combine to produce such a single result, incapable of division on any logical or reasonable basis, and each is a substantial factor in bringing about the harm, the courts have refused to make an arbitrary apportionment for its own sake, and each of the causes is charged with responsibility for the entire harm."



concludes that the flooding of the proposed class area resulting from the North and South breaches in the East wall of the Industrial Canal had already occurred prior to the time that flood waters from the MRGO levee breaches had reached the proposed class area. *See Spinks Report*, at 22-23, 26, 29 (*Khorrami Dec.¸* Exh. 1) (concluding that, based on numerous factors: **(1)** the IHNC north breach occurred at or before 4:00 a.m. and the IHNC south breach occurred at or before 5:30 a.m. on Monday, August 29, 2005, prior to the storm surge overtopping the IHNC floodwall crest elevation, **(2)** that the Lower Ninth Ward began flooding before 4:30 a.m., moving east into the St. Bernard Parish, eventually merging with the waters from the Chalmette area East of Paris Road at about 9:10 a.m., and **(3)** that the flooded areas in the Lower Ninth Ward and St. Bernard Parish were from the floodwaters of the IHNC and eventually merged with the floodwaters from MRGO East of Paris Road).

Mr. Spinks' findings are consistent with the findings of the report conducted by the Interagency Performance Evaluation Task Force, U.S. Army Corps of Engineers ("IPET"), which also concluded that the proposed class area had already flooded due to the breaches in the East wall of the Industrial Canal before said water merged with the floodwaters resulting from the MRGO levee breaches:

> "In summary for the Lower Ninth Ward, it appears that flooding began early on Monday morning. Eyewitness accounts and stopped-clock data indicate that floodwaters began entering the Lower Ninth Ward prior to 1030 UTC (5:30 a.m. CDT) and possibly as early as 0930 UTC (4:30 a.m. CDT). These early times suggest that the water entered through one or both of the breaches in the IHNC Floodwall. The floodwall was overtopped later at about 1230 UTC (7:30 a.m. CDT). Time-stamped photographs confirm that flooding had occurred by about 1300 UTC (8:00 a.m. CDT) near the Jackson Barracks along the southern end of this area near the St. Bernard Parish line. The floodwaters from the IHNC moved east, eventually merging with the waters from the Chalmette area near Paris Road in the midmorning timeframe."

*See Spinks Report*, Appendix B, at 9 (*Khorrami Dec.¸* Exh. 1).

The flood analyses performed by Melvin G. Spinks, P.E. and IPET provide the only descriptions of the path of floodwaters through the Ninth Ward and St. Bernard Parish, including timelines for when flooding from the Industrial Canal merged with other


KHORRAMI POLLARD & ABIR LLP

floodwaters.[7]  While other reports submitted by Defendants provide an estimated time for breaches in the Industrial Canal, they fail to analyze flooding and make no finding of when or where floodwaters merged.[8]

Defendants' proposed hydrology expert, Dr. Joseph Suhayda did not undertake his own independent hydrology modeling, but rather, was retained solely to critique existing flood models by various experts. *See Suhayda Report*, at 3 (attached as Lafarge Exh. 4); *See also Suhayda Depo*, at 13:12 to 13:21 (*Supp. Dec. of Khorrami*, Exh.29).

Significantly, Dr. Suhayda does not provide his own independent timeline concerning when flooding due to the breaches in the East wall of the Industrial Canal occurred in the class area relative to flooding resulting from the MRGO levee breaches [*See Suhayda Report*, at 9-11, 20], and in fact, testified at deposition that he had no basis to determine who would be right or wrong in terms of the timing of flooding.  *See Suhyda Depo*, at 84:12 to 84:17 ("I think there are different sources of information about timing that place them much later than what Spinks assumed, and that was really what I was trying to point out. *I have no basis for deciding who would be right or wrong about the processes or the timing* …."").  While Dr. Suhayda concludes that the breaches in the East wall of the Industrial Canal were not the primary source of the flooding, [*See Suhayda Report,* at 20], this opinion relates to the "degree" of ultimate flooding, and does not alter the conclusions of the above referenced findings that the flooding of the proposed class area by the North and South breaches in the East wall of the Industrial Canal had already occurred by the time flood waters from the MRGO levee reached the

---

[7] *See also Spinks Report*, at 29 (The floodwaters from the IHNC moved east into the St. Bernard Parish, eventually merging with the waters from the Chalmette area near Paris Road at about 9:10 a.m. CDT.; *see also Spinks Report*, at 26 ("The stage hydrographs…show that the north and south floodwall breaches along the IHNC caused flood depths between 8 feet and 10 feet in the north Lower Ninth Ward before merging with floodwaters from MRGO.").

[8] *See Independent Levee Investigation Team Report*, at 6-6, attached as Exhibit 3, Part 1 to LaFarage North America Inc.'s Memorandum in Opposition to Plaintiffs' Motion for Class Certification (estimating timing of the North and South breaches); *see also Team Louisiana Report*, at 67, attached as Exhibit 2 to LaFarage North America Inc.'s Memorandum in Opposition to Plaintiffs' Motion for Class Certification (estimating timing of the North and South breaches).



proposed class area.

3.     Contrary to Defendants' Assertion, this Court's Analysis in *Case v.*
       *ANPAC La. Ins. Co.* Does Not Preclude Plaintiffs' Action From Being
       Characterized as a "Single Accident" Case

Defendant wrongly cites this Court's jurisdictional analysis in *Case v. ANPAC La. Ins. Co.*, 466 F. Supp. 2d 781, 794 (E.D. La. 2006) as supporting the proposition that the dual levee breaches to the East floodwall of the IHNC at issue is this action preclude Plaintiffs' action from being characterized as a "single accident" case. This argument disregards the fact that the theory of Plaintiffs' case is that ***both*** the North and South breaches in the East wall of the Industrial Canal were caused by Defendants' negligence relating to the breakaway of Barge ING 4727. In *Case*, this Court's determination was based on an exact opposite scenario – different breaches that occurred by way of different causal forces:

> While the breaches occurred at several points along one levee system as the *Case* Defendant suggests, the causes for each of the failures involve separate and distinct factual inquiries, and the causation of individual damages presents unique questions of fact as to each claimant. *For example, the breach at the 17th Street Canal could have been a result of poor maintenance, while a breach elsewhere could have been because of poor construction or design. Further still, there might be a finding that the flooding overtopped the levees at a particular point and there was no negligence involved. Consolidation of cases where there exist such distinct issues of liability and causation of damages among the plaintiffs would not prevent duplicative litigation in State and federal court or otherwise foster judicial economy.* ***In this way, the questions of fact presented by the multiple levee breaches are not identical***, *which justifies narrowly construing section 1369 so as to preclude labeling multiple levee breaches as a "single accident" for purposes of the MMTJA*.

*See Case*, 466 F. Supp. 2d at 794.

Thus, as Plaintiffs' allege that both the North and South breaches in the East wall of the Industrial Canal were caused by Defendants' negligence relating to the breakaway of Barge ING 4727 – factual questions that are common to all members of the proposed class – this Court's analysis in *Case* actually supports the proposition that the dual breaches in question involve a singular event.



## III.   PLAINTIFFS HAVE SATISFIED THE REQUISITE ELEMENTS FOR CLASS CERTIFICATION

### A.   THE NAMED PLAINTIFFS' CLAIMS ARE TYPICAL WITHIN THE MEANING OF RULE 23(a)(3)

The named Plaintiffs' claims, which arise from a similar course of conduct by Defendants and share the same legal theory, are typical of members of the putative class. Defendants' assertion that Plaintiffs' claims are not typical of the class is without merit.

**First**, contrary to Defendants' assertion, typicality does not impose the onerous requirement of demonstrating a complete "identity" of injury.   As held by the Fifth Circuit:

> "Like commonality, the test for typicality is not demanding. It focuses on the similarity between the named plaintiffs' legal and remedial theories and the theories of those whom they purport to represent." Mullen, 186 F.3d at 625 (citations omitted); Forbush, 994 F.2d at 1106. "**Typicality does not require a complete identity of claims**. Rather, the critical inquiry is whether the class representative's claims have the same essential characteristics of those of the putative class. **If the claims arise from a similar course of conduct and share the same legal theory, factual differences will not defeat typicality**.

See *James v. City of Dallas*, 254 F.3d 551, 571 (5th Cir., 2001)

Thus, as "typical" does not mean "identical" under the low threshold of Rule 23(a)(3), typicality does _**not**_ require the representative plaintiff to have suffered "identical" injuries as Defendants maintain.   As the requirement of typicality focuses on whether a proposed class representative has been injured by the same kind of conduct alleged against the defendant as other members of the proposed class, a class representative may represent class members sustaining different forms of injury, so long as all of the alleged injuries arise from the same conduct of the defendant. [9]

---

[9] This point is well established.  *See e.g. Baby Neal for & by Kanter v. Casey*, 43 F.3d 48, 58 (3d Cir., 1994) ("Where an action challenges a policy or practice, the named plaintiffs suffering one specific injury from the practice can represent a class suffering other injuries, so long as all the injuries are shown to result from the practice."); *Armstrong v. Davis*, 275 F.3d 849, 869 (9th Cir., 2001) ("We do not insist that the named plaintiffs' injuries be identical with those of the other class members, only that the unnamed class members have injuries similar to those of the named plaintiffs and that the injuries result from the same, injurious course of



KHORRAMI POLLARD & ABIR LLP

That complete identity of injury is not required may be gleaned from the Court's analysis in *Turner*, wherein typicality was deemed present notwithstanding variations in the "types" of damage alleged by class members as a result of the defendants' conduct:

> Upon reviewing the various complaints in these consolidated cases, it is clear that the class representatives' claims and *alleged damages are <u>fairly similar</u>*, if not identical, to the claims of other plaintiffs. The theories of liability among property owners in the affected area are alike: they are suing for negligence, strict liability, and absolute liability under the Louisiana Civil Code, among other claims. In addition, the claims of the class representatives share essential characteristics in this case because they are based upon the same series of events -- the natural disaster that befell St. Bernard Parish, the alleged negligence of the Defendant that led to the oil spill, and the remediation that has occurred since the spill. *There may be differences in the <u>types</u> of damages, depending on the degree of contamination and depending upon whether the property was used as a residence or business. However, these differences do not relate to the Plaintiffs' legal theories regarding liability and causation*. Again, the consolidated cases involve a single accident, and central issues of fact and law are shared among the group of Plaintiffs in the affected area. Because the class representatives share legal theories and the same course of conduct with other plaintiffs, the Court finds that the typicality requirement of Rule 23(a) is met.

*See Turner*, 234 F.R.D. at 605.

Here, the named Plaintiffs easily satisfy the minimal burden necessary to establish typicality, as they, like the class as a whole, (1) owned property, a business and/or resided within the region east of Paris Road, and (2) sustained damage as a result of the same singular event affecting the class region – flooding from the breach of the East wall of the Industrial Canal caused by Defendants' negligence relating to the breakaway of Barge ING 4727.  That different types or degrees of injury occurred as a result of Defendants' conduct does not render the named Plaintiffs' claims atypical under applicable precedent.[10]

The above notwithstanding, the Defendants' criticism that the named Plaintiffs evacuated prior to Katrina, and as such, have not themselves sustained compensable physical

---

conduct."); *Osgood v. Harrah's Entm't, Inc.*, 202 F.R.D. 115, 124 (D.N.J. 2001) ( "the test of typicality 'is whether other members have the same *<u>or similar injury</u>*, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same conduct.'").

[10] As complete identity of injury is not the standard, Defendants' claim that factual differences between small businesses and large businesses like Walmart is not material.  In fact, actual valuation of damages to large businesses is to be evaluated separately under Plaintiffs' proposed "mass appraisal" model. *Kilpatrick Report*, at 10 (¶36); 17 (¶57); 20 (¶69).


KHORRAMI POLLARD & ABIR LLP

or emotional injuries does not render their claims atypical.  If anything, this fact renders them typical, as the overwhelming majority of class members evacuated prior to Katrina, and as such, the number of "potential" class members claiming personal injury and/or generalized emotional damages as a result of the breach necessarily will be small.  Even then, however, this argument necessarily fails insofar as issues relating to physical and/or emotional injuries are individualized damage issues that will not be tried on a common basis. Rather, under Plaintiffs' proposed trial plan, adjudication of these issues will be guided by those individuals claiming such damages.

Finally, contrary to Defendants' claim, the named Plaintiffs are not subject to unique defenses that would undermine typicality. Indeed, Defendants' example relating to Ms. Mumford's purported contributory negligence relating to her failure evacuate items of personal property is a common issue that exists as to all class members that evacuated prior to Katrina.

Thus, based on the foregoing (as well as the reasons set forth in Plaintiffs' Moving Papers), the named Plaintiffs meet the minimal threshold of establishing that their claims are typical within the meaning of Rule 23(a)(3).

### B.     PLAINTIFFS ARE ADEQUATE REPRESENTATIVES

Defendants' various arguments challenging the adequacy of the named Plaintiffs are also without merit, as none of the differences identified by Defendants between Plaintiff and the putative class are capable of justifying a denial of certification.  "Differences between named plaintiffs and class members render the named plaintiffs inadequate representatives only if those differences create conflicts between the named plaintiffs' interests and the class members' interests."  *See Mullen*, 186 F.3d at 625-626.  Even then, "[f]or a conflict of interest to prevent plaintiffs from meeting the requirement of Rule 23(a), that conflict 'must be fundamental'" in that "[i]t must go to the heart of the litigation.'"  *See Gunnells v. Healthplan Servs.*, 348 F.3d 417, 430-431 (4th Cir., 2003), *citing* 6 Newberg  § 18:14 (4th ed. 2002).

1.     <u>The Barge Plaintiffs' Action Itself (in Relation to the MRGO/Levee Action) Does Not Pose a Material Conflict Between the Named Plaintiffs and Putative Class Members</u>

For several reasons, Defendants' claim that the Barge Plaintiffs' theory of liability



focusing on Defendants as the culpable party responsible for their damage, as opposed to the governmental entities as alleged in the MRGO litigation, does not create a material conflict.[11]

**First**, as discussed above, Plaintiffs are entitled to pursue liability against Defendants for 100% of the class' harm under established rules relating to joint and several liability. *See Edmonds*, 443 U.S. at 273 n.30 ("[T]he general rule is that a person whose negligence is a substantial factor in the plaintiff's indivisible injury is entirely liable even if other factors concurred in causing the injury."); *Coats*, 61 F.3d 1113, 1116 (5th Cir., 1995) ("The plaintiff can collect his entire judgment from a single defendant, leaving to the defendants allocation of fault among themselves."). Based thereon, Plaintiffs do not in any way limit the potential recovery of the class by not pursuing liability against the government in the instant action.

**Second**, the decision of the Plaintiffs not to assert claims against the U.S. Government in the Barge action in no way limits relief that proposed class members may have against that entity, and therefore, is incapable of creating a conflict. As Defendants properly note, a concurrent proposed class action currently exists against the U.S. Government in the MRGO/Levee tract that overlaps with the Barge Plaintiffs' proposed class area. In that action the MRGO/Levee plaintiffs assert claims against a different set of defendants for flooding of the class area caused by different breaches. As members of the Barge class are not precluded from participation in the MRGO/Levee litigation by virtue of certification of the proposed Barge class, Defendants' claim of a purported conflict is nonsensical.

**Third**, contrary to Defendants' claim, the named Plaintiffs' denial that the U.S. Government is responsible for the proposed damages in this action does not in any way impair the claims of putative class members. Such a proposition is facially illogical, as Defendant Lafarge asserts that the United States Government was the cause the flooding as its Sixth Affirmative Defense in this action. *See Dkt. No. 9032*, at 3 (*Lafarge Answer to Sixth Amended Complaint*). As Plaintiffs are asserting that Lafarge is responsible for the proposed class' damages in the Action, the named Plaintiffs' denial that the U.S. Government is liable is

---

[11] As noted by the leading treatise on class action, the "[f]ailure to join all defendants, however, is a strategy choice and, except for a showing of unique circumstances, probably would not be ground for claiming inadequacy." *See Newberg* § 17:12, 17-32(3rd ed. 1992).



consistent with their theory of liability, and as such, does not create a material conflict between the named Plaintiffs and members of the proposed class. To the contrary, all putative class members in the instant Action equally share an interest in establishing claims against Lafarge for alleged injury resulting from the breaches alleged herein.

      2.    <u>The Named Plaintiffs Have Not Waived Claims On Behalf Of The Class</u>

Moreover, contrary to Defendants' assertion, the named Plaintiffs have not waived claims on behalf of the class. Defendants' sole basis for this claim rests upon the erroneous claim that Plaintiffs' operative complaint lacks a physical injury allegation – an assertion proven false by paragraph VII of Plaintiffs' *Complaint* which in fact does contain a personal injury allegation. *See Dkt. No. 1*, in C.A. 05-5724, at 3 (alleging "[t]he aforesaid barge … broke loose from its inadequate moorings and crashed through the eastern  floodwall of the Industrial Canal … causing … ***personal injury*** … to the nominal plaintiff and the class she seeks to represent."). Aside from Plaintiffs' *Third Supplemental and Amended Complaint*, which amended Paragraph VII without materially altering this allegation [*See Dkt. No. 129*, *in* C.A. 05-4419, at 2], none of Plaintiffs' subsequent amendments to their operative complaint have in any way retracted that allegation.

Furthermore, Defendants' criticism that the named Plaintiffs have not sustained compensable physical injuries does not create a "conflict" among class members that would render the named Plaintiffs inadequate for purposes of Rule 23(a)(4). As discussed in detail above, the named Plaintiffs need not prove complete identity of damages. But even if they were, physical injuries are necessarily a type of damage that will be adjudicated individually by the few persons having sustained such injuries (as opposed to common damages, which the named Plaintiffs will be adjudicating on the behalf of the class as a whole).[12]

      3.    <u>The Named Plaintiffs Are Not Subject to the Heightened Adequacy Requirements Required In Securities Litigation</u>

Finally, Defendants' assertion that Plaintiffs must directly control the litigation to

---

[12] This also applies to lost wages, which can only be sought by persons who both (1) lived within the class area, and (2) were employed by a business located within the class area.



satisfy adequacy requirements is inapplicable to the instant litigation, as the authority on which

Defendants rely pertains solely to the heightened adequacy requirement imposed by the

PSLRA in securities litigation.  Indeed, this distinction is identified in the very authority

Defendants cite in their Brief:

> Any lingering uncertainty, with respect to the adequacy standard in securities
> fraud class actions, has been conclusively resolved by the PSLRA's requirement
> that securities class actions be managed by active, able class representatives
> who are informed and can demonstrate they are directing the litigation. In this
> way, ***the PSLRA <u>raises</u> the standard adequacy threshold***.

*See Berger v. Compaq Computer Corp.*, 257 F.3d 475, 483 (5th Cir., 2001).

In the context of non-securities litigation, it is sufficient that the named Plaintiffs do not

possess any material conflicts and have demonstrated a willingness to actively and zealously

participate in the prosecution of the litigation on behalf of members of the proposed class:

> [A] federal court considering class certification must inquire … into the putative
> class representatives' willingness to undertake an active role in the litigation for
> the protection of the interests of the non-representative absentees. []
>
> In the present action, the class representatives make claims that are
> "representative" of the claims of the "non-representative" absent class members,
> and there is no indication of any conflict between their interests and the non-
> representative class members' interests. Further, the class representatives have,
> in this action, vigorously prosecuted the claims on behalf of the proposed class,
> making themselves available for deposition and executing affidavits attesting to
> their support of the settlement. Therefore, the Court finds that the class
> representatives have fairly and adequately represented the class.

*See In re Train Derailment near Amite La.*, 2006 U.S. Dist. LEXIS 32839, 45-46 (E.D.

La. May 23, 2006) (citations omitted).[13]

---

[13] The burden Defendants seek to impose belies the weight of authority.  *See Newberg on Class Actions*, § 3.24, 3-134 (3th ed., 1992) ("Because plaintiffs are laypeople generally, they are not expected actually to prosecute their own action or that of the class.");  *In re Catfish Antitrust Litig.*, 826 F. Supp. 1019, 1037 (N.D. Miss. 1993) ("[t]o require the class representative to be sophisticated and knowledgeable enough to help counsel in this quest would reduce the class action device, especially in complicated … cases, to an impotent tool."); *Gunnells v. Healthplan Servs.*, 348 F.3d at 430 ("[i]t is hornbook law … that 'in a complex lawsuit, such as one in which the defendant's liability can be established only after a great deal of investigation and discovery by counsel against a background of legal knowledge, the representative need not have extensive knowledge of the facts of the case in order to be an adequate representative.'").



KHORRAMI POLLARD & ABIR LLP

As set forth herein, the named Plaintiffs do not possess any material conflicts.

Moreover, the record is clear that the named Plaintiffs have a basic understanding of the

case,[14] and have demonstrated a willingness to actively and zealously participate in the

prosecution of the litigation on behalf of members of the proposed class.[15]

In sum, for the reasons set forth in Plaintiffs' Moving Papers, the named Plaintiffs meet

the requisite standards of adequacy.  However, in the event that the Court is inclined to find

any representative inadequate, the proper course would be to have Plaintiffs replace the

representative, not deny certification as Defendants maintain.[16] *See Newberg*, § 3:25, (4th ed.

2008)  ("conflicts can be remedied by replacing the class representative.").[17]

### C.    PLAINTIFFS HAVE DEFINED AN ASCERTAINABLE CLASS

There is no reasonable dispute that the class proposed by Plaintiffs is ascertainable, and

that the members thereof are so numerous that joinder is impracticable.  While Defendants

tacitly concede that Plaintiffs have established numerosity, Defendants contend that Plaintiffs

have not met their burden as to ascertainability. Defendants rest their argument solely upon an

---

[14] *See Jacob Glaser Depo*, at 136:11-136:16; 139:25-141:11 (Supp. Khorrami Depo., Exh. 30); *Jimmie Harris Depo*, at 17:25-18:14; 133:14-133:18; 155:6-155:25 (Supp. Khorrami Depo., Exh. 31); *Michael Riche Depo, at* 171:11-171:15; 174:22-175:3 (Supp. Khorrami Depo., Exh. 32); *Herman Koch Depo*, at 220:2-227:17 (Supp. Khorrami Depo., Exh. 33); *Josephine Richardson Depo*, at 175:12-177:7; 193:13-193:19 (Supp. Khorrami Depo., Exh. 34); *Ethyl Mumford Depo*, at 155:9-155:25; 221:3-227:15 (Supp. Khorrami Depo., Exh. 35).

[15] The willingness of the named Plaintiffs to actively and zealously participate in this litigation has been demonstrated thus far by the fact each named Plaintiff has sat for a deposition in this action, responded to discovery propounded by Defendants, and participated in the instant Motion by way of submission of supporting affidavits.

[16] As of the date of the instant Reply, Plaintiffs counsel have approximately 6,301 putative class members retained.  To that end, Plaintiffs may easily provide a suitable replacement representative if the Court deems that such a substitution is warranted.

[17] Defendants have raised issue with the fact that Plaintiff Mumford has provided cleaning services to one of the firms representing Plaintiffs.  To the extent that the Court believes this presents a material conflict, the proper course of action would be to exclude Ms. Mumford from the role of class representative, as opposed to denying Plaintiffs' Motion.  As the nature of damages alleged by Ms. Mumford are also shared by other existing named Plaintiffs [*See Memorandum In Support Of Plaintiffs' Motion To Certify A Class*, at 38-40], the presence of Ms. Mumford is not necessary to certification of the proposed class.  In such an event, Ms. Mumford would still enjoy status as a member of the proposed class.

21



KP&A
KHORRAMI POLLARD & ABIR LLP

unsupported speculative claim that public records concerning property ownership records may in some instances be inaccurate or incomplete.  For several reasons, this argument lacks merit.

**First**, Defendants' assertion that Plaintiffs must affirmatively prove that class members will be readily identified by public records reflects a fundamental misunderstanding of this element. As explained in the Manual for Complex Litigation, the objective of ascertainability is not to ensure the actual identification of each individual class member, but rather, to construct "a **class definition** that will permit identification of individual class members" when identification becomes important:

> Although the identity of individual class members need not be ascertained before class certification, the membership of the class must be ascertainable. Because individual class members must receive the best notice practicable and have an opportunity to opt out, and because individual damage claims are likely, *Rule 23(b)(3) actions require a class definition that will permit identification of individual class members*, while Rule 23(b)(1) or (b)(2) actions may not. *An identifiable class exists if its members can be ascertained by reference to objective criteria*. The order defining the class should avoid subjective standards (e.g., a plaintiff's state of mind) or terms that depend on resolution of the merits (e.g., persons who were discriminated against).

*See Manual for Complex Litigation*, § 21.222, at 270 (4th ed.).[18]

Indeed, Defendants' flawed interpretation of ascertainabilty is apparent by reference to Rule 23 itself, as Rule 23(c)(2) expressly contemplates that class members may **not** be individually identifiable through records for purposes of class notice.  *See Fed. R Civ. Proc. 23(c)(2)(B)* ("For any class certified under Rule 23(b)(3), the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort.").

---

[18] It is well established that the requirement of establishing an ascertainable class does not saddle the moving plaintiff with the burden of identifying proposed class members.  *See In re OSB Antitrust Litig.*, 2007 U.S. Dist. LEXIS 56617 (E.D. Pa. Aug. 3, 2007) ("At the class certification stage, the proposed class need only be ascertainable by some objective criteria; I need not actually ascertain it.");  *In re Methyl Tertiary Butyl Ether (MBTE) Products Liability Litig.*, 241 F.R.D. 185, 196 (S.D.N.Y. 2007) ("[I]t is the class, not each member, that must be ascertained … the ascertainability of a class depends on whether there will be a definitive membership in the class once judgment is rendered.");  *Chaz Concrete Co. v. Codell*, 2006 U.S. Dist. LEXIS 60013, 2006 WL 2453302, at *5 (E.D. Ky. Aug. 23, 2006 ("The identities of the class members do not need to be specified for certification, but the proposed class must be sufficiently definite in order to demonstrate that a class actually exists").



KHORRAMI POLLARD & ABIR LLP

**Second**, even if Defendants' claim that a handful of properties within the class area were not adequately recorded – a claim which Defendants offer absolutely no evidence to support – class members could easily identify their interest in properties by other means, including tax records, insurance records, and other similar means. Indeed, the ability of individual class members to establish they resided within the class area during the relevant period by objectively verifiable proof distinguishes this case from the authority on which Defendants rely. *See Perez v. Metabolife Int'l, Inc.*, 218 F.R.D. 262, 269 (S.D. Fla. 2003) ("unlike in many mass torts or toxic exposure cases, where passenger lists, employment records, or public records can be used to confirm class membership, it is unlikely that many of these putative class members will be able to produce objectively verifiable proof that they ingested the relevant amounts of Metabolife 356 for the relevant period of time.").[19]

Bottom line, Plaintiffs have unquestionably satisfied the element of ascertainability. Plaintiffs' proposed class definition – which mirrors the class that was defined by Judge Fallon in *Turner v. Murphy Oil USA, Inc.*, 234 F.R.D. 597, 611-616 (E.D. La. 2006) – permits all class members who comprise the plaintiff class to be identified by the fact they either resided, owned property, or owned businesses within the distinct geographic area on August 29, 2005.

### D.    COMMON ISSUES OF LAW AND FACT PREDOMINATE OVER INDIVIDUAL ISSUES

Defendants' argument – consistent with the strategy of every defendant who opposes class certification in the mass tort context – is to claim that individualized issues will predominate concerning causation and damages. *See e.g. Gunnells* , 348 F.3d at 429 ("to the extent that TPCM's causation argument is that individual inquiry is necessary to establish whether the collapse of the Plan caused Plaintiffs any damages, this is precisely the same argument made by almost all defendants in mass tort cases").

However, in making this argument Defendants disregard the fact that the Fifth Circuit assumes issues pertaining to causation and damage will be individualized in the mass tort

---

[19] Defendants' reliance on *LaBauve v. Olin Corp.*, 231 F.R.D. 632 (S.D. Ala. 2005) is misplaced, as the Court actually held that a class defined by property ownership in a given geographic region was ascertainable. *See id*. at 663.



context.  This renders the existence of such individualized issues, standing alone, an

insufficient basis to defeat predominance in the mass tort context.  Indeed, as explained by the

Court in *Mullen*, 186 F.3d 620, mass tort cases which the Fifth Circuit has upheld have

involved a trial plan wherein the trial court adjudicates common issues of liability on a class-

wide basis in the initial trial phase, while reserving adjudication of individual questions

relating to causation and damages for separate bifurcated trial phases:

> [U]nlike the "Frankenstein's monster" feared in *Castano*, 84 F.3d at 745 n.19,
> this class is akin to other bifurcated class actions this Court has approved. *See
> Watson v. Shell Oil Co.*, 979 F.2d 1014 (5th Cir. 1992) (finding no abuse in the
> district court's certification of a bifurcated class action arising from an oil
> refinery explosion where liability and punitive damages would be resolved
> commonly and injury, causation, and actual damages would be resolved
> individually); *Jenkins*, 782 F.2d 468 (finding no abuse of discretion in district
> court's certification of a bifurcated class action where asbestos producers' "state
> of the art defense" as well as product identification, product defectiveness,
> negligence, and punitive damages would be resolved commonly and causation,
> actual damages, and comparative fault would tried individually); *Hernandez v.
> Motor Vessel Skyward*, 61 F.R.D. 558 (S.D. Fla. 1973), aff'd, 507 F.2d 1278,
> 1279 (5th Cir. 1975) (unpublished) (certifying bifurcated class action on behalf
> of 350 passengers who were fed contaminated food aboard cruise ship where
> negligence would be tried commonly and causation and damages would be tried
> individually).

*See Mullen*, 186 F.3d at 628.[20]

Significantly, in *Robertson v. Monsanto Co.*, 2008 U.S. App. LEXIS 15468 (5th Cir.,

2008), the Fifth Circuit recently reaffirmed the principle that the "usual" method of

adjudicating mass tort actions using the class device involves adjudication of common issues

of liability in the initial trial phase, reserving trial of individualized issues pertaining to

causation and damages in subsequent bifurcated phases.  In that case, however, the Court held

that certification of a class was not warranted insofar as common issues of liability had already

been resolved by way of a motion for summary judgment:

---

[20] In *Watson*, the Court noted that the district court's certification of a class
accompanied by a four-phase trial plan, wherein liability was to be determined under the first
phase, was a "previously approved … mass tort case procedure in *Jenkins v. Raymark Inds.,
Inc*, 782 F.2d 468 (5th Cir. 1986)."  In *Turner v. Murphy Oil USA, Inc.,* 234 F.R.D. 597, 607
(E.D. La. 2006), the district court reasoned that "Murphy's liability would be appropriate for
class treatment" as "[t]he presence or degree of injury or damage is an issue of quantum that
may be dealt with individually in a bifurcated proceeding, if necessary."


KHORRAMI POLLARD & ABIR LLP

> Indeed, *if a class action were to be used in accordance with the "usual" class action method of resolving mass-tort claims of this type* (absent the unique combination of circumstances present here regarding the class definition and the district court's use of summary judgment), *the proceedings would most likely be bifurcated to try the common issue of liability on a class-wide basis, and then to allow for the presentment of individualized proof on the questions of proximate causation and damages*. See 5 Conte & Newberg, supra, § 17:6, at 313-14 (using class action limited to liability issues for "toxic tort" cases); 7AA Wright, Miller, & Cane, supra, § 1783, at 328 ("limit the class suit to the question of liability and reserve the damage issues for individual treatment"). Again, though, since the issue of liability has already been resolved for every class member, there is no need for a class action here.

*See Robertson v. Monsanto Co.*, 2008 U.S. App. LEXIS 15468, 19-22 (5th Cir., 2008).

As the Fifth Circuit has explained, the purposes of utilizing the class mechanism in this form is to achieve a "gain in efficiency" in adjudicating the claims of thousands of persons impacted by a common harm. *See Jenkins*, 782 F.2d at 471; *Watson*, 979 F.2d at 1022 ; *Robertson*, 2008 U.S. App. LEXIS 15468, at 19 (reasoning that because "the issue of Monsanto 's liability has already been resolved on a class-wide basis … as far as the issue of liability is concerned, there simply is no gain to be had from using the class action form."). As set forth herein, this case fits squarely within the model set forth by the Fifth Circuit.

At the outset, there can be no reasonable dispute that issues pertaining to each Defendant's negligence liability (i.e. duty, breach, and legal cause) can be adjudicated commonly among the class.  In fact, Defendants essentially concede this point, only mounting a half hearted challenge to this Court's ability to adjudicate the issue of legal cause (i.e. the scope which Defendants' duties to maintain and secure the Barge extended) as to the class as a whole (all of whom resided in a known flood plain which the levees were intended to protect).

Moreover, issues relating to causation and damages are both limited and manageable, and therefore, do not destroy predominance.

Defendants' spurious claim that adjudication of causation will require an examination and separation of a multiplicity of injuries caused by a multiplicity of causal forces is simply incorrect.  Once Plaintiffs establish that breaches to the Eastern wall of the IHNC were caused by breakaway Barge ING 4727 – which will be established by identical evidence common to the class as a whole – Plaintiffs' remaining burden as to causation will turn only on damages



pertaining to a "singular" event of flooding, regardless of issues as to the source. To that end, any individualized issues as to causation will unquestionably be manageable.

The same is true as to damages – the bulk of which will be adjudicated by way of mass appraisal modeling. While Defendants go to great efforts to obfuscate the purpose of this model, and question whether the model can be applied to a case of this scale, it is important to note that Defendants' own appraisal expert – who himself has used such modeling in a prior case [*See Kilpatrick Depo*, at 242:14-243:10] – was unwilling to take the position that use of mass appraisal would be impossible in this context. *See Ragas Depo*, at 28:14-30:11; 131:2-131:15 (attached as Ex. 36 to *Supp Khorrami Dec.*).[21] This fact conclusively undermines the claim by Defendants that such modeling be rejected. *See In re Polypropylene Carpet Antitrust Litig.*, 996 F. Supp. 18, 27 (N.D. Ga. 1997) ("the Court cannot rely simply on inference and speculation to reject Dr. Asher's proposed methodology. Rather, Defendants must proffer evidence to support their claims that Dr. Asher's regression analysis is doomed to fail.").

Additionally, notwithstanding Defendants' various arguments, damages pertaining to personal injuries, wrongful death, emotional harm and loss of income are necessarily limited in number. As such, adjudication of the issues "will not form a significant portion of the Plaintiffs' claims, which further supports a finding of predominance…." *See Turner*, 234 F.R.D. at 607 n. 6.

In short, as adjudication of Defendants' liability (and issues of causation relating to the breach of Eastern wall of the IHNC) may be litigated on a common basis using identical evidence, and as individualized issues of causation and damage are limited (and manageable by way of bifurcated proceedings), litigation of the instant case using the class mechanism will unquestionably present massive gains in efficiency that will assist this Court in managing its *In Re Katrina* docket.

---

[21] Even then, it is important to note that the substance of Mr. Ragas' criticism concerning difficulty was itself erroneous, as it was based on the assumption that 13 different causal forces were at play (such as wind, fallen trees, termites, etc..). *See id.*, at 25:9-30:11. However, as discussed above, the only damages at issue in this action relate to flooding.



1.      As Issues Relating To Defendants' Liability Are Common Issues That
        May Be Adjudicated As To The Class As A Whole, This Case Is
        Precisely The Type Of Case Approved By The Fifth Circuit As Worthy
        Of Class Adjudication

As demonstrated in Plaintiffs' Motion at pages 17 through 33, there is no reasonable dispute that the numerous issues of Defendants' liability – i.e. issues pertaining to Defendants' breach of duties of care relating to Barge ING 4727 – are all common issues that must be adjudicated to the class as a whole.

Indeed, Defendants do not mount a significant challenge to this fact, as they cannot. While Defendants make sweeping statements that all issues relating to liability will necessitate individualized inquiry, it is important to note that the overwhelming bulk of issues delineated in Plaintiffs' Motion are not disputed as being issues common to the proposed class.  These issues include **(1)** the numerous issues of law relating generalized duties of care concerning Barge ING 4727 [set forth in *Plaintiffs' Motion* at page 18], **(2)** that the numerous factual issues concerning whether each Defendant's conduct relating to Barge ING 4727 constituted a "breach" of the duty of care [set forth in *Plaintiffs' Motion* at pages 18 through 29], and **(3)** legal issues as to whether various maritime legal presumptions apply regarding Defendants' negligence [set forth in *Plaintiffs' Motion*, at 29 through 30].[22]  In fact, Defendants' only argument in support its contention that liability cannot be adjudicated on a common basis pertains to legal causation [set forth in *Plaintiffs' Motion*, at 32 through 33], which Defendants summarily claim must be proven by each class member on an individual basis.   For numerous reasons, Defendants' assertion as to this proposition is incorrect.

**First**, Defendants' statement that legal causation must be considered individually is not only unsupported by any authority, it contradicts established law that the scope of a defendant's duty may be adjudicated on a class wide basis.  *See Turner*, 234 F.R.D. at 607 ("the predominant issues in the negligence inquiry will be centered on the scope of Murphy's

---

[22] Defendants silence on these issues is a tacit admission on Defendants' part that these issues are issues common to the class.



duty, if any, to the Plaintiffs."); *Fulford v. Transp. Serv. Co.*, 2004 U.S. Dist. LEXIS 9955 (E.D. La. May 27, 2004) ("the existence of duty should be readily ascertainable on a class wide basis" and "[t]he Court could easily dismiss the claims of those individuals to whom Defendants owe no duty and proceed to trial without the need to resort to individualized attention."); *Cook v. Rockwell Int'l Corp.*, 151 F.R.D. 378, 388-389 (D. Colo. 1993) ("On the other hand, plaintiffs have demonstrated that this case presents many common issues of law and fact, including … whether the geographic dispersion of the releases in the surrounding environment was reasonably foreseeable").

Indeed, as reflected by the Court's analysis in *Turner*, 234 F.R.D. at 607, all issues pertaining to negligence liability (including legal cause) are issues that can be resolved commonly as to the entire class:

> Under this framework, the Court must determine whether individual trials would be required to prove any or all of the above elements. *The majority of these elements focus solely on Murphy Oil's alleged conduct -- whether Murphy owed a duty to Plaintiffs, whether that duty was breached, and whether Murphy's duty encompassed the risk of harm to the Plaintiffs (elements 1, 2, and 4).* There will be some individualized inquiry regarding whether there is oil on a particular plaintiff's property, and whether that oil is crude oil from Murphy's refinery (elements 3 and 5). *However, the predominant issues in the negligence inquiry will be centered on the scope of Murphy's duty, if any, to the Plaintiffs.* The remaining issues of whether there is crude oil on a plaintiff's property, and how much oil, do not require the type of extensive individualized proof that would preclude class treatment of the negligence claim. Under the negligence inquiry, all a plaintiff would have to prove to satisfy the elements is that either her person or her property came into contact with Murphy crude oil in the affected area.

*See Turner*, 234 F.R.D. at 607.

**Second**, as the issue of legal cause is a legal determination made by the Court as to the "scope" of Defendants' duties of care,[23] the Court's resolution of this issue would not entail consideration of each class member's physical address in relation to the Barge in isolation as

---

[23]   *See Todd v. State ex rel. Department of Social Servs., Office of Community Servs.*, 699 So. 2d 35, 39 (La., 1997) ("whereas the question of cause-in-fact involves a factual determination, the determination of legal cause involves a purely legal question."); *Canal Barge Co. v. Torco Oil Co.*, 220 F.3d 370, 376-377 (5th Cir. La. 2000) ("Whether a defendant owes a plaintiff a legal duty is a question of law" and "[d]uty ... is measured by the scope of the risk that negligent conduct foreseeably entails.").



KHORRAMI POLLARD & ABIR LLP

Defendants suggest, but rather, would make a categorical determination as to a definite demarcation point as to all class members based on common factors.

Thus, putting aside Defendants' various merits based argument that the alleged flooding was not foreseeable – arguments which this Court may not indulge in the confines of this Motion – the record is replete with common factors on which the issue of foreseeability of flooding may be resolved. *See Spinks Report*, (*Khorrami Dec.*, Exh. 1). Indeed, the very existence of the levee system surrounding the class area is common proof, in and of itself, that flooding of the class area was a known risk.[24] The purpose of this system is to protect residents based on the fact the class area is below sea level. *See Nicholson v. United States*, 77 Fed. Cl. 605, 607 (Fed. Cl. 2007) ("New Orleans has always been susceptible to flooding due to its proximity to the Gulf of Mexico and the fact that the entirety of the city rests below sea level. Aggressive flood management dates back to the 19th century.").

**Finally**, insofar as adjudication of the scope of Defendants' duty hinges on common factors applicable to the class as a whole, Defendants cannot claim that individualized adjudication of this issue is the superior approach. Indeed, "[i]nconsistent adjudications would send mixed messages to the defendants regarding the propriety of their conduct and the extent of the duty owed." *Davis v. Am. Home Prod. Corp*, 844 So. 2d 242, 260 (La.App., 2003).

In short, as issues relating to Defendants' negligence concerning breaches to the Eastern wall of the IHNC by breakaway Barge ING 4727 are by necessity common issues impacting the class as a whole, this case is one that fits within the model approved by the Fifth Circuit as being appropriate for class adjudication.

---

[24] This was explained by the Court in *Vanderbrook v. Unitrin Preferred Ins. Co. (In re Katrina Canal Breaches Litig.)*, 495 F.3d 191, 214 (5th Cir. La. 2007): "[A] levee is a flood-control structure; its very purpose is to prevent the floodwaters of a watercourse from overflowing onto certain land areas, i.e., to prevent floods from becoming more widespread. See 50 Am. Jur. 2d Levees and Flood Control § 1 (2006) (defining "levee" as "an embankment constructed along the edge of a river to prevent flooding" and describing levees as one of three principal means of flood prevention and control); *Webster's Third New International Dictionary* 1300 (2002) (defining "levee" as "an embankment designed to prevent flooding")."



2.   <u>Contrary to Defendants' Various Arguments, Issues relating to Causation and Damages Are Manageable, and therefore, Do Not Destroy Predominance</u>

a)   ***As The Instant Action Will Not Entail Consideration of a Multiplicity of Issues Relating To Causation, Individualized Adjudication Of Causation Is Manageable***

As issues of causation will turn only on damages pertaining to a "singular" event of flooding, regardless of issues as to the source of flooding, any individualized issues as to causation will be manageable.  While Defendants claim that adjudication of causation will require an examination and separation of a multiplicity of injuries caused by a multiplicity of causal forces, Defendants' arguments as to this proposition (as discussed in detail above) are rendered untenable on multiple independent grounds.

**First**, not only does Defendants' argument in this regard contradict the gravamen alleged in Plaintiffs' operative complaint seeking relief solely for flood related damages [*See Third Supplemental and Amended Complaint*, *Dkt. No. 129, in C.A. 05-4419*, at 2 (limiting the damages sought in this action to those resulting from the flooding that occurred from breach to the East wall of the Industrial Canal)], forms of damages caused by forces other than flooding are completely irrelevant to Plaintiffs' proposed "mass appraisal" valuation damage model. *See Report Killpartick*, attached as Plaintiffs' Exh. 21 at ¶5-42 (explaining that damages can and will be assessed by focusing strictly on damages attributable exclusively to flooding, such as damage to drywall, corrosion of wiring, etc.).[25]

However, to the extent that Defendants claim that hurricane related damages are not divisible from flood related damage, this would not aid Defendants' Opposition here – under

---

[25] Significantly, Dr. KilpatrickDr. Kilpatrick has testified that to the extent damages relating other causal forces became an issue,  his proposed model permits such damages to be factored out. *See Kilpatrick Depo,* 142:24 to 143:1 (*See Supp. Khorrami Dec.*, Exh. 28) ("at this juncture I'm focusing entirely my attention on the flooding precipitated by the barge hitting the wall. You know, that having been said, if there are other issues at hand, I'll certainly investigate those and we'll create some sort of separating equilibrium to take those out.  But that's well beyond the scope of what we've done hear so far.").



KP&A
KHORRAMI POLLARD & ABIR LLP

the applicable maritime rule of joint and several liability, a defendant may be held accountable for the entirety of indivisible harm regardless of their degree of fault.  *See Edmonds*, 443 U.S. at 260 n.8, 273 n.30 ("the general rule is that a person whose negligence is a substantial factor in the plaintiff's indivisible injury is entirely liable even if other factors concurred in causing the injury.").  As the rule of joint and several liability articulated in *Edmonds* eliminates any requirement by Plaintiffs to prove Defendants' degree of fault for an indivisible harm, but rather, shifts the burden on Defendants to sort this issue out among themselves and other tortfeasers [*Coats*, 61 F.3d at 1116 ("The plaintiff can collect his entire judgment from a single defendant, leaving to the defendants allocation of fault among themselves.")], any finding that hurricane related damages are not divisible from flood related damage would not splinter the instant action into a multiplicity of individualized issues relating to causation and damage.  In such event, all Plaintiffs would be required to prove is Defendants' culpability in bringing about a fraction of that alleged harm to obtain full recovery.

Significantly, even Defendants' contention that the multiple levee breaches must be parsed out into multiple distinct flooding events is incorrect.  As damages caused by flooding are "indivisible" injuries for purposes of joint and several liability [*St. Paul Fire & Marine Ins. Co.*, 2007 U.S. Dist. LEXIS 64603, at 46 ("The flood damage suffered in this case, much like many personal injuries, is incapable of division."); *See Vanderbrook*, 495 F.3d at 223; Restat. 2d of Torts, § 433A (comment i) ("Certain kinds of harm, by their very nature, are normally incapable of any logical, reasonable, or practical division.")], Defendants' liability for flood related damage does not require examination of the various sources of flooding.  To the contrary, as even Defendants' expert concedes that other sources of flooding only pertain to the "degree" of ultimate flooding of the class area [*Suhayda Report*, at 20], Defendants may be held liable on a class wide basis if Plaintiffs establish that ***any*** degree of flooding of the class area is attributable to ***any*** negligence on the part of Defendants in precipitating the breaches to East wall of the Industrial Canal.

In short, Defendants' assertion that the instant action requires an examination and separation of a multiplicity of causal events is simply incorrect.  No matter how it is sliced,



issues of causation will pertain solely to flooding damages caused by a "single" event – the breach of the East wall of the Industrial Canal by the breakaway of Barge ING 4727.

> **b)** **Adjudication of Issues Relating to Damages Is Manageable**
>
> (1) **Damage issues relating to valuation of property and business loss can be adjudicated by way of a common valuation formula**

Contrary to Defendants' arguments, adjudication of class wide damages to property loss (both real and personal), as well as business loss, are manageable.

As an initial point, Defendants' contention that Dr. Kilpatrick's "mass appraisal" model is based on speculation unrelated to the damages actually sustained by class members is misplaced, as Defendants conflate the requirement of individual class members to prove the existence of property alleged to have been damaged by flooding on the one hand, with use of the mass appraisal to assess the value of such damaged property on the other.  For purposes of predominance, there is a distinction between a class member justifying their individual claim and valuing that claim by way of a mathematical formula.[26] *See Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 306-307 (5th Cir., 2003) (reasoning that "[e]ven wide disparity among class members as to the amount of damages suffered does not necessarily mean that class certification is inappropriate" but "[c]lass treatment, however, may not be suitable where the calculation of damages is not susceptible to a mathematical or formulaic calculation….")

Contrary to Defendants' claim, Plaintiffs do **_not_** envision a process that involves something other than identifying what personal property each class member actually lost. In most cases, proof of property alleged to have been damaged will be established by records,

---

[26] That members of the putative class must come forward with proof to justify their claim does not stand as a bar to a finding of predominance.  *See Walker v. Bankers Life & Cas. Co.*, 2007 U.S. Dist. LEXIS 73502 (N.D. Ill. Oct. 1, 2007) ("because each class member might be 'required ultimately to justify an individual claim does not necessarily preclude maintenance of a class action,' and 'individual issues do not render class certification inappropriate so long as such issues may effectively be managed'"); *Gunnells v. Healthplan Servs.*, 348 F.3d 417, 429 (4th Cir., 2003) ("Courts have routinely rejected this argument, concluding, as we have in previous cases, that the need for individualized proof of damages alone will not defeat class certification.").



such as property tax records, IRS filings, DMV records, and insurance records.  In instances where such records are absent, persons may establish destroyed property by testimony.[27]

This is to be distinguished from the "mass appraisal" valuation process, wherein damages to specific types of property are valued across class lines.  The "mass appraisal" model is consistent with class adjudication itself, in that it seeks to value damage based on common elements that flow across class lines. *See Kilpatrick Report*, at 3-4 (¶10-14) (attached as Exh. 21 to *Khorrami Dec.*).  Under the "mass appraisal" rubric proposed by Dr. Kilpatrick, damages are categorized into three subgroups: damages to real estate, damages to business values, and damages to personal property.  Under each, Dr. Kilpatrick proposes alternative methods of valuation – each of which involves the identification of objective criteria that is both representative and common to damages sustained across lines.[28]  In this vein, the mass appraisal methodology adheres to the guidelines set forth in the Uniform Standards of Professional Appraisal Practice,[29] and as such, presents the only method of valuation capable

---

[27] In situations where the records relating to the contents of a home, courts permit an individual to establish the existence of what is destroyed based solely on uncorroborated testimony. *Crayton v. Sentry Ins. Co.*, 612 So. 2d 767, 769, 772 (La.App. 1 Cir. 1992) ("award for loss of contents … based on plaintiff's uncorroborated testimony" upheld because "[w]here a home and its contents are completely destroyed the insured is not required to secure original receipts or vouchers from the stores where the items were purchased" and imposing such a requirement "would place an almost impossible burden on the claimant…"); *Tolbird v. Southern Ins. Co.*, 130 So. 2d 535, 538 (La.App. 2 Cir. 1961) (upholding plaintiff's testimony as sufficient to prove property destroyed by fire); *LaHaye v. Allstate Ins. Co.*, 570 So. 2d 460, 466 (La.App. 3 Cir. 1990) ("In a situation, such as the one present, where fire totally destroys an insured's house and contents, the insured is not required to secure original receipts or supporting vouchers from the stores where specific items were purchased.").

[28] By way of example, Dr. Kilpatrick proposes valuation of business damages by either the asset, market, or income approach.  These separate approaches would base losses on assets versus liabilities, comparisons to prices paid for similar businesses, or a discounting method of net incomes , respectively.  Similarly, personal property values may be obtained from either local verification through sampling or a formulaic percentage of house values using insurance multipliers.

[29] The "Uniform Standards of Professional Appraisal Practice" is explained as follows in Dr. Kilpatrick's Report at ¶50: "The Uniform Standards of Professional Appraisal Practice ("USPAP") defines a MASS APPRAISAL as 'the process of valuing a universe of properties as of a given date using standard methodology, employing common data, and allowing for statistical testing.' In addition USPAP Standards Rule 6-1 comments: 'Mass appraisal provides for a systematic approach and uniform application of appraisal methods and techniques to obtain estimates of value that allow for statistical review and analysis of results.' This uniformity of approach in ascertaining damages to multiple properties is consistent with the objectives of fairness in allocation of damages in litigation. Obviously this mass appraisal approach is far more efficiently applied in a class treatment and is highly consistent with the



KHORRAMI POLLARD & ABIR LLP

of efficiently achieving fair, consistent and statistically significant damage valuations. *See Kilpatrick Depo,* at 225:7-225:19.  Conversely, Defendants' proposal – evaluating property damage on an individual basis without reference to the patterns of damages across the proposed class area – would either necessarily collapse into a de facto mass appraisal model, or would result in haphazard and inconsistent damages estimates.  *See id.,* at 4 (¶13), 4 (¶14), 6 (¶21), 9 (¶34-¶35) 11, (¶42),  15( ¶53), 16 (¶55), 18 (¶59), 22 (¶80)*; See also Kilpatrick Depo,* at 15:24-19:13; 35:14-36:14.

While Defendants present various arguments questioning the sufficiency of the mass appraisal approach – including (1) that the data is too diverse to construct a reliable regression model, (2) that all variables that will be in the formula have not been presented, and (3) that the variables proposed for inclusion will entail the use of data that varies widely among the proposed class members, thus preventing the use of common evidence when performing the regression analysis – it is important to note that each of these criticisms have been rejected as a basis to reject a valuation model in the confines of a motion for certification. *See In re Polypropylene Carpet Antitrust Litig.*, 996 F. Supp. 18, 26-29 (N.D. Ga. 1997).  As reasoned by the Court in that case:

> The question whether Dr. Asher's study is admissible under Daubert, however, is not presently before the Court. At the class certification stage, the Court simply examines whether Dr. Asher's methodology, as proposed, will comport with the basic principles of econometric theory, will have any probative value, and will primarily use evidence that is common to all members of the proposed class. …
>
> The Court realizes that, at this stage of the litigation, the data underlying Dr. Asher's proposed regression analysis is not fully developed, and neither party can establish with absolute certainty whether the study eventually will provide reliable results.

*See In re Polypropylene Carpet Antitrust Litig.*, 996 F. Supp. at 26-29.

In any event, Defendants' various criticisms of the mass appraisal approach are simply without merit.

---

objectives of class treatment. A mass appraisal approach provides a means for ensuring consistency of treatment across a large group of affected properties."



For example, Defendants' contention that insufficient data exists on which to value property is itself disputed by Dr. Kilpatrick [*Kilpatrick Depo*, at 14:23-15:13; 80:18-81:7]. Even Defendants' appraisal expert concedes that sufficient data may exist as to St. Bernard Parish. *See Ragas Depo*, at 11:11-11:13 (*Supp Khorrami Dec*, Ex. 36). However, even if Defendants' criticisms were true in this regard, such a problem would also pose the same problems to efforts to value property on an individualized basis. *See Kilpatrick Depo*, at 135:-135:8; 177:5-177:10; 224:9-225:19

Additionally, Defendants' criticism that mass appraisal is unworkable due to the number of "variables" is misplaced for several reasons, including Defendants' erroneous belief that (1) the model includes valuation of non-flooding related damages, and (2) that the model must parse out damages caused by alternative sources of flooding. Moreover, not only does Dr. Kilpatrick dispute that the number of factors is unwieldy [*Kilpatrick Report*, at 17; *Kilpatrick Depo,* at 220:3-220:11]; the strength of Defendants' argument in this regard is belied by Defendants' own expert, who admits that this problem may be cured by breaking the mass appraisal model apart into various sub-models. *See Ragas Depo*, at 69:16 to 70:22.[30]

Moreover, Defendants' criticism that Dr. Kilpatrick's model ignores various damage components is equally unfounded. Contrary to Defendants' criticisms, loss of use (i.e. rental values, costs for temporary housing), loss of inventory, moving costs and costs associated cleanup and repair are all factors that can be incorporated into the mass appraisal model. *See Kilpatrick Report*, at 3-4 (¶10-11), 7 (¶25), 18 (¶60), 20(¶68), 21 (¶74). That said, this criticism is also undermined by the fact that Dr. Kilpatrick has not identified all of the various factors that his model will include, and cannot do so until all of the data is compiled and analyzed. *See Kilpatrick Depo*, at 32:22 -33:1, 128:12 -129:1, 131:7-131:13, 196:22 - 197:3; *Kilpatrick Report*, at 16 (¶57), 24 (¶86). While Defendants claim this fact as undermining the validity of the proposed model, this argument – which has been rejected in similar cases – is

---

[30] This distinction was deemed significant by the Court in *In re Polypropylene Carpet Antitrust Litig.*, 996 F. Supp. 18, 29 (N.D. Ga. 1997) ("If these fluctuations cannot be controlled in a manner that allows the use of common evidence, Dr. Asher intends to break the data down into subgroups and perform regression analyses of these subgroups.").


KHORRAMI POLLARD & ABIR LLP

based on a fundamental misunderstanding of the process in creating this type of valuation model. *See In re Polypropylene,* 996 F. Supp. at 29 ("a reluctance to specify all the potential variables to be included in the formula *ex ante* is by no means irrational, as economists often withhold a final determination of which variables to be included in a regression analysis until all the relevant data has been compiled and various models have been tested.").

Bottom line, Defendants' argument neglects the fact that "courts distinguish between uncertainty as to the fact of damages, which may preclude recovery, and uncertainty as to the amount of damages, which 'will not defeat recovery.'" *See Transamerican Natural Gas Corp. v. Finkelstein*, 933 S.W.2d 591, 610 (Tex. App. San Antonio, 1996). That Defendants believe that mass valuation will not value damage with sufficient exactitude is not a sufficient basis to reject Plaintiffs' proposed model as a sufficient means to assess damage value.

> ### (2)   Individualized issues relating to personal injuries, wrongful death and emotional harm are limited

Despite Defendants' efforts to obfuscate, individualized issues relating to personal injuries, wrongful death and emotional harm are limited.

As set forth in Plaintiffs' Motion, adjudication of claims for physical injuries and/or emotional damages caused as a result of the breach in the East wall of the Industrial Canal will be manageable, as the number of persons who may claim such injuries is necessarily limited to those who failed to evacuate prior to Katrina. *See Plaintiffs' Motion*, at 37-38, fn. 20. Claims for wrongful death are even more limited, as this group of persons is limited to persons who are both (1) members of the Class, and (2) have a claim for the wrongful death of a loved one related to the flooding that began on Monday, August 29, 2005. Even then, such injuries will be similar insofar as they all derive from the same flooding event, and as such, can be grouped for litigation by injury type.

Defendants assert that this will not be the case, as they believe that the allegations of non-compensable injuries by some class members – no matter how dubious – will cause the instant action to spiral into an abyss of individualized inquiry. This assertion is false. Dubious claims for damages themselves present common issues that can be adjudicated on behalf of the class as a whole. For example, to the extent that the law limits recovery for emotional injuries



to persons within the "zone of danger",[31] such a limitation presents a common issue as to whether persons who evacuated are entitled to recover such damages in the first instance.[32]

Thus, like *Turner*, "personal injury and mental anguish damages will not form a significant portion of the Plaintiffs' claims, which further supports a finding of predominance…." *See Turner*, 234 F.R.D. at 607 n. 6.

(3)    **Individualized issues relating to loss of income are limited**

Defendants' claim that individualized issues relating to loss of income destroys predominance is also incorrect. Insofar as a class members who may claim such damage is limited to persons who are ***both*** (1) members of the Class, and (2) worked at a business located in the class area, persons who may claim such damage will necessarily be limited in number, and will share common characteristics that will permit adjudication by grouping.

*c)*    *Adjudication of Issues Relating to Defendants' Purported Contributory Negligence Defense Is Manageable*

Even Defendants' proposed theory of contributory negligence presents issues that are manageable from a class perspective. Specifically, under Defendants' theory, members of the class who failed to evacuate their personal property prior to the subsequent flooding should be foreclosed from recovering the resulting loss of that property attributable to the flooding.

As an initial point, Defendants' proposed theory of "contributory negligence" fails on a class wide basis, as the defense of contributory negligence does not exist under maritime law

---

[31] As discussed in Plaintiffs' Motion at fn. 20, recovery of emotional damages in the absence of an accompanying physical injury requires the claimant establish a physical and temporal "proximity" to the injury causing event. While "[t]raditionally, neither the general maritime law nor the Jones Act recognized a right to recover damages for negligent infliction of emotional distress unaccompanied by some physical contact or injury [,] … [m]ore recently, courts have broadened the rule to permit recovery by an individual who was in the 'zone of danger' of a physical impact and suffered emotional trauma as a result." *See In re Complaint of Clearsky Shipping Corp.*, 1998 U.S. Dist. LEXIS 13842, at 10 (E.D. La. Aug. 27, 1998) "The zone of danger theory preserves traditional tort doctrines of negligence, legal causation, and forseeable risks and, by doing so, it sustains the common law's ability to deal with frivolous claims." *See Anselmi v. Penrod Drilling Corp.*, 813 F. Supp. 436, 443 (E.D. La. 1993).

[32] Such legal limitations on recovery for emotional harm also would present a common legal issue concerning the right to recover "past and future loss of enjoyment of lifestyle" and "inconvenience."


KHORRAMI POLLARD & ABIR LLP

[*Simeon v. T. Smith & Son, Inc.*, 852 F.2d 1421, 1429 (5th Cir, 1988) ("The harsh rule of the common law under which contributory negligence wholly barred an injured person from recovery is completely incompatible with modern admiralty policy and practice.")], and as such "under maritime law concurrent tort-feasors are jointly liable, even when plaintiff is contributorily negligent." *See Simeon*, 852 F.2d at 1430.

That said, even if the Court were inclined to permit Defendants to recast their defense as "comparative negligence," adjudication of this defense would still be manageable. Under maritime law, comparative negligence is adjudged based on whether the plaintiff's failure to safeguard their person or property was objectively reasonable under the circumstances:

> A plaintiff is contributorily negligent when his conduct falls below the standard to which he is required to conform for his own protection. The standard is that of a reasonable person under like circumstances. Plaintiff's negligence is "disregard for his own safety and not necessarily such as threatens to invade any of defendant's legal rights." Nesbit v. Everette, 243 F.2d 59 (5th Cir. 1957). Contributory negligence does not involve breach of any duty owed others but, rather, a failure reasonably to safeguard one's own person or property. Failure to act as one should may constitute contributory negligence.

*See S. C. Loveland, Inc.*, 608 F.2d at 165-166 (5th Cir. 1979).

Thus, consideration of Defendants' purported affirmative defense will consider whether a class member's failure to evacuate their person or property prior to the flooding was objectively reasonable. Resolution of this issue will turn on facts that are common across class lines, including the inherent reasonableness (or unreasonableness) of an evacuation policy that would seemingly require the uniform evacuation of all property by every family from the entire New Orleans area. Indeed, Defendants' oft-cited example of Ms. Mumford failing to evacuate all three cars contravenes New Orleans "General Evacuation Guidelines" in place prior to Katrina advising residents to "use only one vehicle for your family" and "[i]f you have room, assist any neighbors that may need a ride." *See Supp. Khorrami Dec.*, Exh. 37.



E.      CLASS ACTION TREATMENT IS ALSO SUPERIOR

For the reasons stated in Plaintiffs' Motion, Plaintiffs satisfy the requirement of "superiority" under Rule 23(b)(3).  Significantly, none of the reasons detailed in Defendants' Opposition provide a legitimate basis to find otherwise.

**First**, Defendants' criticism that the instant action will include persons with high value claims is an insufficient basis to defeat superiority.  Indeed, numerous mass tort actions have been certified where damages to the class were substantial.  *See e.g. Watson*, 979 F.2d 1014; *Turner*, 234 F.R.D. 597.  On a related note, Defendants' criticism that some putative class members may desire to control their individual case is equally unavailing.  *See Newburg*, §17.17, 17-51 (3rd ed. 1992) ("The rule 23(b)(3) opt out provision protects those class members with large claims who prefer to have individual control, no matter how elusive it may really be.").

**Second**, Defendants' assertion that the proposed class in the MRGO/Levee litigation somehow effects the superiority of Plaintiffs' instant action is misplaced.  The MRGO/Levee litigation, which is brought against a complete different entity under a completely different theory of liability, has no rational relationship to whether putative class members can proceed against Defendants for their injuries in the instant action.

**Third**, that each putative class member could theoretically file an individual action against Defendants also does not mitigate against a finding of superiority, as "[a] class action will ordinarily be superior to repetitive individual suits."  *See Newberg, § 4:30, 4-121* (3th ed. 1992).  Indeed, were Defendants to have their wish, this Court would be inundated with individual lawsuits arising from the Barge track alone.  As it presently stands, the Barge Plaintiffs have retained approximately 6,301 putative class members, a 2,000 increase since Plaintiffs filed their Motion. Insofar as the proposed class area overlaps with the MRGO/Levee track – which presumably includes retention of thousands more persons within the proposed class area – this Court would be required to adjudicate tens of thousands of trials based largely on identical evidence of Defendants' liability and issues of causation relating to the breach of Eastern wall of the IHNC.  It goes without mention that such effort would be a tremendous



waist of judicial resources.   This is especially true considering the fact that under Maritime law, this Court would personally have to adjudicate such claims as the trier of fact.

**Fourth**, as discussed herein (as well as in Plaintiffs' Moving Papers), individualized issues pertaining to causation and damages are sufficiently limited, and may be managed by way of bifurcated trial tracks.

**Finally**, any issue as to Plaintiffs' proposed the trial plan, including integration with the MRGO/Levee class, are within this Court's discretion to correct to ensure that efficiencies are maximized. *See e.g. Turner*, 234 F.R.D. at 606 ("As will be discussed, this trial plan will need revision in light of the instant ruling. However, the Court believes that the existence of a trial plan, and the potential for bifurcation of the issues of liability and damages, will address the Defendant's concern that individualized inquiries will be needed to determine damage amounts in these cases.").

In sum, the benefits that Rule 23(b)(3) certification will provide to both the litigants and the Court in the management of this litigation are significant, providing the necessary framework for this Court to efficiently manage the thousands of claims of members of proposed Class.

## IV.   <u>CONCLUSION</u>

Based on the foregoing, as each of the four (4) elements of Rule 23(a) and both of the elements of Rule 23(b)(3) have been met, the instant action presents a prime candidate for class adjudication.  Plaintiffs respectfully request that the Court grant certification of the proposed class under Rule 23(b)(3).  Plaintiffs further request that the Court, pursuant to its authority under Rule 23(g), appoint Khorrami, Pollard & Abir LLP, the Law Office of Brian A. Gilbert P.L.C., Wiedemann & Wiedemann, the Law Office of Richard T. Seymour, P.L.L.C., and  Patrick J. Sanders, Esq. as Class Counsel.  Plaintiffs further request that the Court approve Plaintiffs' Proposed Trial Plan.

KP&A
KHORRAMI POLLARD & ABIR LLP

Dated: December 1, 2008                    Respectfully submitted

By: _____

SHAWN KHORRAMI  (CA Bar #180411)
DYLAN POLLARD  (CA Bar #180306)
MATT BAILEY  (CA Bar #218685)
444 S. Flower St., Thirty-Third Floor
Los Angeles, California 90071
Telephone:    (213) 596-6000
Facsimile:     (213) 596-6010
skhorrami@kpalawyers.com
dpollard@kpalawyers.com
hsleviant@kpalawyers.com
mbailey@kpalawyers.com


/s/  Brian Gilbert
Brian A. Gilbert, Esq.(21297)
LAW OFFICE OF BRIAN A. GILBERT, P.L.C.
821 Baronne Street
New Orleans, Louisiana 70113
Telephone: (504) 885-7700
Telephone: (504) 581-6180
Facsimile: (504) 581-4336
bgilbert@briangilbertlaw.com


/s/  Lawrence D. Wiedemann
Lawrence D. Wiedemann.(13457)
Karl Wiedemann (18502)
Karen Wiedemann (21151)
WIEDEMANN & WIEDEMANN
821 Baronne Street
New Orleans, Louisiana 70113
Telephone: (504) 581-6180
Facsimile: (504) 581-4336
lawrence@wiedemannlaw.com
karl@wiedemannlaw.com
karen@wiedemannlaw.com


/s/  Patrick J. Sanders
Patrick J. Sanders (18741)
3316 Ridgelake Drive
Suite 100
Metairie, LA 70002
Telephone: 504-834-0646
pistols42@aol.com


KP&A
KHORRAMI, POLLARD & ABIR LLP

/s/  Richard T. Seymour
_____
Richard T. Seymour (D.C. Bar #28100)
Law Office of Richard T. Seymour, P.L.L.C.
1150 Connecticut Avenue N.W., Suite 900
Washington, D.C.  20036-4129
Voice: 202-862-4320
Cell:   202-549-1454
Facsimile:  800-805-1065 and 202-828-4130
rick@rickseymourlaw.net

*Attorneys for Barge Plaintiffs*

**<u>CERTIFICATE OF SERVICE</u>**

I do hereby certify that I have on this 1st day of December, 2008 served a copy of the foregoing

pleading on counsel for all parties to this proceeding, by electronic filing notification.


<u>/s/ Matt Bailey, Esq.</u>

KP&A

KHORRAMI POLLARD & ABIR LLP