# Exhibit 28

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

IN RE: KATRINA CANAL BREACHES    * CIVIL ACTION
                                 * NO. 05-4182
PERTAINS TO: BARGES              * Consolidated
                                 * SECTION "K(2)"

Boutte v. Lafarge          05-5531 *

Mumford v. Ingram          05-5724 * JUDGE DUVAL

Lagarde v. Lafarge         06-5342 *

Perry v. Ingram            06-6299 * MAG. WILKINSON

Benoit v. Lafarge          06-7516 *

Parfait Family v. USA      07-3500 *

Lafarge v. USA             07-5178 *

   *  *  *  *  *  *  *  *  *  *  *


     Deposition of JOHN A. KILPATRICK,

PH.D., MRICS, given at Chaffe McCall, L.L.P.,

2300 Energy Centre, 1100 Poydras Street, New

Orleans, Louisiana 70163-2300, on September

11th, 2008.


REPORTER BY:

     JOSEPH A. FAIRBANKS, JR., CCR, RPR

     CERTIFIED COURT REPORTER #75005

Page 14

1           Calls for speculation.
2      A.   Again, I usually work from more formal
3  work plans than that, and so as I sit here
4  today, having not given it any thought with
5  respect to this affidavit, I frankly couldn't
6  say.
7  EXAMINATION BY MR. MUNRO:
8      Q.   So one thing then you'd have to do is
9  develop a formal work plan?
10     A.   Well, continue the formal work plan
11 that we have in existence.  That is to say we
12 already have a formal work plan.  I just don't
13 have it committed to memory as I sit here.
14     Q.   Have you produced that formal work
15 plan in response to any requests for
16 information from the defendants in this case?
17     A.   You know, I've provided all of this to
18 my clients.  Um -- that's between you and them.
19     Q.   Did you turn over the formal work
20 plan, then, to the attorneys?
21     A.   Our entire work file has been turned
22 over to the attorneys.
23     Q.   Okay.  Do you anticipate that you're
24 going to do further data gathering between now
25 and the class certification hearing?

Page 15

1      A.   Um -- I'd have to go back and look.
2  As I already indicated in a prior question here
3  this morning, we have already gathered a great
4  deal of data, and in fact in a meeting in my
5  office a couple of days ago, may even have been
6  Monday of this week, I think one of our staff
7  characterized that to me verbally as so nearly
8  complete that we could already begin doing
9  analytics on the data.  So again, that's
10 something I would have to go back and look, but
11 I don't want to discount the fact that we have
12 already gathered a highly robust body of
13 empirical data on the affected neighborhood.
14     Q.   What your current billing rate?
15     A.   For whom?  I mean, we have a variety
16 of analysts at the firm, and we bill different
17 rates for different people.
18     Q.   Your, personally.
19     A.   Oh.  The firm bills my rate at $750 an
20 hour.
21     Q.   Is your compensation in this matter in
22 any way contingent on the outcome?
23     A.   Oh, no.
24     Q.   Based on the work that you've done to
25 date, describe for me in broad terms what

Page 16

1  opinions you have formed.
2      A.   In broad terms, a mass appraisal model
3  is highly compelling in this case.  Indeed, as
4  Dr. Kummerow put it to me in conversation a
5  couple of weeks ago, he doesn't think he's ever
6  seen a case that -- for which a mass appraisal
7  model was as compelling as this one.  As real
8  estate researchers and academics, it's hard to
9  envision a set of circumstances more compelling
10 than this one, because quite frankly that's how
11 real estate researchers, empirical researchers,
12 look at the world.  And so number one, my
13 opinion is that a class certification would
14 allow the use of those kinds of models which
15 are highly called for from a real estate
16 research perspective.
17          Number two, that the opposite, that is
18 to say a non certification which would call for
19 individual appraisal models, would be a non
20 starter.  And that again is from a real estate
21 research perspective.  And let me tell you why.
22 Because if you went about the task of
23 appraising, on an individual basis, fourteen or
24 fifteen thousand separate properties, after you
25 got the tenth or fifteenth or twentieth one,

Page 17

1  you would in fact have a de facto mass
2  appraisal model.  You'd be using the same data,
3  the same locational information, the same time
4  of a triggering event, the same sort of
5  analytical processes.  By about the third or
6  fourth day into that process you would have
7  worked your way into a mass appraisal model.
8  So from our perspective as real estate
9  researchers, we're either going to start out
10 with a mass appraisal model or we're going to
11 get to one by the end of the first week.  So --
12 and frankly, it's hard to imagine doing it any
13 other way.
14          Third, the data is available.
15 Remember, we've been working here in New
16 Orleans for about three years, since
17 immediately after Katrina.  And we've been
18 examining data, but other people have been
19 working on these data sets as well.  So there
20 is extraordinarily good data here, we've
21 managed to get access to a lot of it, we have
22 available to us photographs, both pre and
23 post-Katrina, of every single property in the
24 area, we have research data on those
25 neighborhoods.  As my staff and I have put it,

Page 18

1  we're ready to pull the trigger on this thing.
2      So I guess I could sum it up in three
3  points. Number one, a mass appraisal model is
4  what you use here; number two, any attempt to
5  use anything other than a mass appraisal model
6  will cause you to end up de facto in a mass
7  appraisal model; and number three, the data is
8  certainly available and robust for carrying out
9  that sort of mass appraisal model.
10     Q.  Are all three of those -- do you have
11 any other opinions?
12     A.  Not that I can think of off the top of
13 my head.
14     Q.  Are all three of those opinions to
15 your recollection in the affidavit that you've
16 prepared in this case?
17     A.  Well, they're certainly described and
18 alluded to, but as I'd already said in a prior
19 question, since the date of this affidavit
20 we've continued to do research in the area and
21 continued to harden our data set, so to speak,
22 to demonstrate to us as researchers that this
23 data is real and available and applicable to
24 the case at hand.
25     Q.  Have your opinions changed in any

Page 19

1  other respect since you prepared the affidavit
2  that's in front of you?
3         MR. LEVIANT:
4            Objection. Mischaracterizes
5         prior testimony.
6     A.  I mean, to the extent my opinions are
7  stronger -- in other words, the affidavit
8  certainly stands on its own. None of my
9  opinions today negate anything in the
10 affidavit. But to the extent that my research
11 findings over the course of the last several
12 weeks have strengthened the opinions here, then
13 that might be characterized as a change.
14 EXAMINATION BY MR. MUNRO:
15     Q.  You said you've been at this process
16 of gathering data for about three years now; is
17 that right?
18     A.  Well, I have been researching the New
19 Orleans market off and on for almost three
20 years. I think I first came here in November,
21 after Katrina. And so -- and it's not just me,
22 but, you know, since the water receded other
23 people have been researching and gathering the
24 kinds of data that would go into a mass
25 appraisal model here. So it's not just John

Page 20

1  Kilpatrick and Greenfield Advisors, it's, you
2  know, a major focus of real estate research in
3  a mass appraisal type paradigm has been
4  directed at this part of the world since these
5  waters receded.
6     Q.  Well, how long have you been at the
7  process of gathering data specifically for the
8  purpose of building the model that you're
9  talking about for this case?
10     A.  Oh, for this case. Well, I mean, we
11 didn't focus our attention on this case until
12 we were engaged in this case, which was earlier
13 this year. But recognize the fact that our
14 engagement in this case is in no small part
15 based on the fact that we've built a
16 significant amount of data and methodological
17 research pertinent to New Orleans with respect
18 to post-Katrina.
19        Remember, I'm the guy who was invited
20 by the Journal of Real Estate Literature to
21 write an article about this stuff. I mean,
22 quite frankly, there are other people who have
23 our level of expertise, but we have indeed been
24 gathering a substantive amount of data even
25 prior to our engagement in this case.

Page 21

1     Q.  Is there any reason why you couldn't
2  have completed the data gathering process prior
3  to preparing your June 2008 affidavit?
4     A.  Well, I don't want to say I'm complete
5  in gathering data yet. I mean, we are pretty
6  close, but the fact of the matter is we are
7  empiricists. Gathering data is what we do. So
8  we're always doing it.
9     Q.  Well, was there some impediment that
10 prevented you from doing it earlier?
11        MR. LEVIANT:
12            Misstates prior testimony.
13    A.  I not altogether sure that we're
14 talking apples and apples here. We were
15 engaged not long before this, and we already
16 had a host of data. But recognize the fact
17 that this particular case deals with a very
18 specific swath of the New Orleans Metro area,
19 and so during the period of our engagement
20 prior to writing this affidavit we had to do a
21 couple of things: Number one, determine what
22 that swath of area was; and then number two,
23 determine, of the variety of data sources
24 available to us, which ones were, for lack of a
25 better phrase, germane to this swath of area.

Page 30

1  the development of either an individual
2  appraisal versus mass appraisal is the
3  principal difference than this use of
4  statistical tools?
5      A.  I wouldn't call it a principal
6  difference.  It's certainly one of the
7  differences.
8      Q.  Anything else that comes to mind in
9  terms of the process?
10     A.  Oh, yeah.  Efficiency.  Number two is
11 the, um -- gosh, I'm trying to think of the
12 right words to use here.  The mass appraisal
13 is -- and the various kinds of techniques one
14 would use in a mass appraisal, automated
15 valuation models, hedonic models, contingent
16 valuation and all of those kinds of things,
17 they are well steeped in the academic, peer
18 reviewed literature.  In other words, there is
19 a far more -- far stronger base in the peer
20 reviewed methodology for the tools and
21 techniques of mass appraisal, and as a result,
22 as an academic, if I wanted to write a journal
23 article for Journal of Real Estate Research or
24 something like that, I would almost certainly
25 have to use some variant of a mass appraisal

Page 31

1  model in order to get that past peer review.
2  So, you've got that going for you.  You have
3  sort of the data gathering paradigm.
4          In the individual appraisal, because
5  of the efficiency issues, while the individual
6  appraiser is going to be looking at the same
7  kinds of data, he or she is going to be
8  constrained by the scope of work from gathering
9  a statistically robust data set.  In other
10 words, an individual form appraisal for a
11 single-family detached residence might only use
12 three data points called comparables.  Well,
13 you can't give me a mean or a standard
14 deviation on three comparables.  I mean, you
15 can't begin to do any sort of statistical
16 characterization of that.  Whereas, if we know
17 we're going to be doing fifty or a hundred or a
18 thousand, or in this case fifteen thousand
19 appraisals, then we start out with the notion
20 that we're going to gather a robust data set.
21 So our whole data gathering paradigm is more
22 robust from the get go.
23     Q.  What's the purpose of a mass
24 appraisal?
25     A.  To value the properties in question.

Page 32

1      Q.  So the output of a mass appraisal is
2  simply a valuation of what, all of the
3  individual properties in the data set?
4      A.  Of the individual properties in the
5  data set, yes.
6      Q.  Does it tell us anything else other
7  than the values of those properties?
8      A.  Sure.
9      Q.  Such as what?
10     A.  Well, again, it tells us that the
11 confidence with which we have for that -- in
12 other words, the mass appraisal model will give
13 you a, um -- kind of statistical output
14 necessary to say what your known error rate is,
15 what the -- what sort of confidence we put in
16 the data, what sort of unexplained variance
17 there is in the data, how robust the model is,
18 how statistically robust the individual factors
19 are.  In other words, we may have a model where
20 some factors are economically explanatory but
21 perhaps not statistically robust.  It will tell
22 us that.  By using a mass appraisal model we
23 can iteratively work our way through a number
24 of different valuation models to find that set
25 of coefficients which does the best job of

Page 33

1  explaining value in this circumstance.
2          In an individual appraisal model not
3  only do you not have that, but all you can
4  really rely on is the heuristic rules of thumb
5  of the individual appraiser.  In other words,
6  whatever mood he or she is in that day tells
7  you what data the appraiser is going to pick.
8          So a mass appraisal model is so very
9  much more statistically robust that if we're
10 looking at a circumstance like this one it's
11 inconceivable to an empirical researcher that
12 you'd want to do anything else.
13     Q.  Does a mass appraisal tell us anything
14 other than value and confidence level?
15     A.  Well, sure.  I mean, it not only gives
16 you an aggregate value, but it also tells you
17 what individual components are valued at, with
18 a confidence level.  In other words, if I
19 produced an individual appraisal on your house,
20 I might be able to tell you that -- you know,
21 you're a successful attorney in the burbs of
22 Washington, D.C., so let's assume your house is
23 worth two million dollars.  So I might be able
24 to tell your house is worth two million
25 dollars, but then you come back to me and you

Page 34

 1  say, well, you know, I'm a successful lawyer in
 2  the burbs of Washington, D.C., my house has
 3  seven bathrooms, how much more is it going to
 4  be worth if I add an eighth bathrooms?  I'll
 5  say, well, I can't tell you that because
 6  individual appraisal doesn't tell you that.
 7  Well, with respect to a mass appraisal, if I'd
 8  appraised all of the houses in this
 9  neighborhood with a statistically robust mass
10  appraisal model, I could go in and tell you
11  what the value of the eighth bathroom would be.
12  Or if you inconceivably wanted to take one of
13  your seven bathrooms and turn it into a coat
14  closet, I could tell you what the difference in
15  value would be for that.
16       So in fact, the mass appraisal model
17  not only allows us to come up with aggregate
18  values for individual properties, it also
19  allows us to parse those values among various
20  issues.  We can tell you what the difference of
21  value is in the affected neighborhood, for
22  example, between a wood frame house and a brick
23  house.  We could tell you what the difference
24  is going to be between an old house and a new
25  house.  We can tell you what the difference in

Page 35

 1  value is going to be between a house with one
 2  bathroom and a house with two bathrooms.  We
 3  can talk tell you what the difference in value
 4  is going to be between a house that's in good
 5  condition or one that's run down.  We can tell
 6  you what the difference in value is between a
 7  house that's over on this side of the
 8  neighborhood as opposed to one that's over on
 9  the other side of the neighborhood.  So these
10  are all important factors that we can glean
11  from a mass appraisal model that would be
12  problematic with respect to a non mass
13  appraisal model.
14     Q.  Are you suggesting that individual
15  appraisal methodology is in some way
16  fundamentally flawed or inadequate?
17     A.  Well, when we're dealing with this
18  sort of case where we've got fifteen thousand
19  properties and we have two alternative models,
20  one is to use a mass appraisal model and one is
21  to use fifteen thousand individual properties,
22  I don't think any academic in the country who
23  would give you an honest answer would disagree
24  that the mass appraisal model is certainly the
25  de facto standard we're going to start out

Page 36

 1  with.  Second, we know from what we're reading
 2  regarding all this subprime mortgage meltdown
 3  that in fact the regulatory agencies are
 4  recognizing that there's severe problems with
 5  individual appraisals as conducted here in the
 6  United States and that in fact going forward
 7  the benchmark against which we measure the
 8  efficacy of these individual appraisals are the
 9  mass appraisal models.  So indeed the mass
10  appraisal models are now accepted as the
11  standard of value here in the United States,
12  and we're recognizing that the individual
13  appraisal models are in fact, um --
14  problematic.  Let's put it that way.
15     Q.  Isn't it true that both Fannie Mae and
16  Freddie Mac have rejected automated valuation
17  models as a substitute for individual
18  appraisals?
19     A.  You're talking about the two agencies
20  that both just collapsed and had to be taken
21  over by the federal government in part and
22  parcel because of their failure to rely on
23  automated valuation models?  Yeah, those two
24  agencies?  I'm not sure that I would go on
25  record in saying that Fannie Mae and Freddie

Page 37

 1  Mac 's judgment in this area is unflawed.
 2     Q.  Well, I'm not asking you to opine on
 3  their judgment but simply to tell he whether
 4  it's accurate that they've taken that position.
 5     A.  Which of those two bankrupt agencies
 6  are we trying to rely on here, Fannie Mae or
 7  Freddie Mac?
 8     Q.  Well, let's start with Fannie Mae.
 9     A.  Fannie Mae.  While Fannie Mae and
10  Freddie Mac have allowed the use of individual
11  form appraisals for valuing properties which
12  they would finance, even Fannie Mae and Freddie
13  Mac, and that is to say prior to the current
14  problems that they're going through, even
15  Fannie Mae and Freddie Mac were using automated
16  valuation models to check those individual
17  appraisals.  So if you go into the research
18  departments at Fannie Mae and Freddie Mac, you
19  would find that they've been running their own
20  internal automated valuation models as a
21  benchmark, as a check, so to speak, for the
22  form appraisals that come in the door.  So
23  while indeed Fannie Mae and Freddie Mac have
24  allowed the use of individual form appraisals,
25  they internally have used hedonic models and

Page 78

1  Q. So it doesn't matter to you as a mass
2  appraiser, really, whether there is extreme
3  variation in individual damages.
4  A. It would be something that we would
5  empirically measure as a mass appraiser. If
6  there is OR isn't, we could still tackle the
7  problem. Again, it's something that would be
8  part of the empirical investigation.
9  Q. Right. So in terms of your ability to
10 do your job, it doesn't matter one way or the
11 other.
12 A. Well, I always hate to say something
13 doesn't matter. You know, as an empiricist
14 everything matters. We study of these things.
15 So I'm not altogether sure that the phrase it
16 doesn't matter is something I would like to see
17 ascribed to my work.
18 Q. Well, I'm really asking a question
19 about the power of your methodology. And what
20 you're saying is that we can do this regardless
21 of whether we have wide variation in damages,
22 individual damages, or whether the damages are
23 all within a very narrow range. Isn't that
24 right?
25 A. Hmm. Well, part of that phrase is

Page 79

1  certainly correct. We can do it. But the
2  other part of that phrase seems to imply some
3  precedent condition. And again, we don't
4  approach this with respect to the variation in
5  damages being a precedent condition. Any
6  variation in economic damages -- and again, I'm
7  making reference to value damages because those
8  are the things that are part of my study -- any
9  variation in value issues across properties
10 would be something that would be empirically
11 determined. And in fact, any notion that
12 there's a variation in damages going into the
13 process would be empirically inappropriate. In
14 short, we don't bias our thinking in that
15 regard as empiricists, we begin with a clean
16 slate and then go in and, um -- and find the
17 truth.
18 Q. So you don't have any opinion, then,
19 about whether damages among this putative class
20 are similar or not.
21 A. I'm not sure that I would say I don't
22 have any opinion. I know that they're
23 consistently modelable. I know, and certainly
24 I think any reasonable, um -- real estate
25 empirical researcher would go into this knowing

Page 80

1  that, um -- these are certainly all modelable
2  in a consistent, cohesive fashion. Um -- now,
3  whether two houses next door to each other have
4  identically the same dollar figure of
5  difference in value before and after, that's
6  something to be empirically determined. But I
7  think what we do know going into this, and what
8  is certainly clear and evident going into this,
9  is that all of these properties in this
10 neighborhood are consistently modelable.
11 Q. Right. I think we're on the same
12 page. I mean, you're saying they're
13 consistently modelable, but to use your phrase
14 from earlier, to have any opinion on variation
15 in damages going into it would be empirically
16 inappropriate.
17    Do I understand you correctly?
18 A. I think I'll go back to my earlier
19 answer, which is that we don't go into this
20 with preconceived notions other than the fact
21 that, as we've determined already, and indeed
22 this was something that had to be determined
23 prior to my submitting the affidavit, we have
24 determined already that there is sufficient
25 data, there's sufficient commonality of time,

Page 81

1  certainly sufficient commonality of cause here
2  from a real estate empiricist 's perspective,
3  to say look, the events and the issues at hand
4  here are all sufficiently common to be able to
5  model, you know, with a robust mass appraisal
6  model. I don't think I want to deviate from
7  that any.
8  Q. That's fine. You're not offering any
9  opinion, are you, that commonalities -- you're
10 not offering any opinion at this point that
11 commonalities in damages among the putative
12 class members predominate over individual
13 differences in their respective situations, the
14 respective losses.
15 A. Well, I think I just did.
16    MR. LEVIANT:
17       Calls for a legal opinion.
18 A. I mean, I not an attorney and I'm
19 certainly not rendering an opinion of law here,
20 but with respect to real estate analysis we
21 have a common date, a common event, a common
22 transmission of potential, um -- economic
23 losses, we have a factor which is robust for
24 empirical study. I don't think there's a real
25 estate academic who does real estate

Page 126

1   the degree of flooding was in each property.
2   You know, that alone, using the FEMA data we
3   talked about a little earlier, would certainly
4   ascribe to the FEMA system systematic
5   neighborhood-wide model of damages.
6        We have some other sources of
7   pre-Katrina property specific description data.
8   I can't recall the specifics of that, but
9   certainly I was looking at that prior to coming
10  here in preparation for my deposition.
11       We also have the MLS data.  We have
12  gathered a, um -- a complete set of all sales
13  recorded through MLS in the affected area
14  immediately prior to the barge incident, as
15  well as since the barge incident, that we will
16  be able to examine for pre and post-incident
17  trends in pricing.
18       Um -- so that's a cross-section of the
19  data we've got.  I don't want to suggest to you
20  that that's a 100 percent listing of the data,
21  because I know that there are other data
22  sources that we have, I just can't recall them
23  all offhand.
24       Q.  With respect to the MLS data regarding
25  home sales prior to Katrina, how many were

Page 127

1   there?
2        A.  We have gone back for a good bit of
3   time and so it's in the hundreds, but I can't
4   tell you precisely whether it's -- you know,
5   how many hundreds that is.  I mean, we have
6   gone back for a fairly extensive period in
7   order to gather a statistically robust data
8   set.
9        Q.  And how far back is fairly extensive?
10       A.  Couple of years.  I mean, I can't tell
11  you exactly how long, but certainly long
12  enough -- you go back long enough to get a good
13  data set.
14       Q.  Since Katrina, how many home sales?
15       A.  It's been a fair number, but I can't
16  tell you how many.
17       Q.  More than ten?
18       A.  Oh, yeah.  Yeah.  Um -- you know, not
19  a thousand, but more than ten, but I can't tell
20  you how many in that range.
21       Q.  How about more than a hundred?
22       A.  You know, I believe so.  But I don't
23  have that number in mind.  That doesn't seem
24  unreasonable, but I'd have to go back and look.
25       Q.  Is there some minimum number of sales

Page 128

1   that you need in the proposed class area in
2   order to conduct your analysis?
3        A.  Just enough to give us a statistically
4   good trend line.  In the dozens would give you
5   a beginning statistically valid trend line.
6        Q.  How many variables are there in your
7   model?
8        A.  We haven't developed that yet.  I
9   haven't hardened that yet.
10       Q.  Well, what sort of data do you have on
11  what the variables will be?
12       A.  Well, we've got a lot of variables in
13  the raw data set, but the question is how many
14  of those will end up in the valuation model?
15  We haven't determined that yet and I can't list
16  here how many specific variables we have
17  available to us at this point.  I know it's not
18  uncommon for us to start out with data sets
19  that have several dozen variables and then hone
20  those down to a mere handful.  But we will
21  examine multiple specifications of a model as
22  part of the modeling process in order to
23  determine the subset of variables which most
24  appropriately, most robustly and statistically
25  appropriately describes the properties in

Page 129

1   question.
2        Q.  How do you know that your data is
3   sufficiently robust if you haven't identified
4   the variables yet?
5        A.  We can test.  You test multiple
6   specifications.
7        Q.  I don't understand that.
8        A.  Well, you know, again, I'm going to
9   use an analogy of going a doctor.  And you
10  call up the doctor and you say, well, what's
11  wrong?  You call up the doctor and say, I'm
12  sick.  Well, the doctor doesn't on the phone
13  say, well, what's wrong with you?  You say,
14  well, I don't know, I'm coming to you to
15  diagnose things.  So you then go to the
16  doctor's office, and the doctor may, assisted
17  of course by nurses and nurse practitioners and
18  a whole host of lab people, may look at a
19  hundred different variables about you before
20  determining the four or five variables that
21  explains the ailment which caused you to call
22  him in the first place.  So, you know, I may go
23  to the doctor for a hangnail and the first
24  thing they do is check my blood pressure.  Now,
25  I'm not a medical professional, but I don't

Page 130

 1  know that there's a whole lot of connection
 2  between blood pressure and hangnail. But they
 3  check this whole host of things.
 4       We have a whole host of data available
 5  to us, and we will test multiple specifications
 6  of the model to be able to find those variables
 7  which best explain property values in the
 8  affected neighborhood. We haven't done that
 9  yet. That's part of the merits phase of our
10  investigation.
11     Q. Right. I understand that. But you've
12  already testified that your data is robust.
13     A. Right.
14     Q. And to use your doctor analogy, I
15  mean, how does the doctor know that any of the
16  data that they have is sufficient until they
17  have done the examination? It seems to me
18  you're saying that, well, we already know our
19  data is robust but we haven't figured out what
20  we're going to do yet.
21     A. The question is appropriate in this
22  following manner: If I call the physician up
23  and say, I want you to diagnose the ailment,
24  the physician says, well, I need you to come in
25  the office so that we can examine you. And I

Page 131

 1  say, no, I'd like for you to do it over the
 2  phone. The physician says, well, I won't have
 3  a robust set of data to examine unless you come
 4  in here, because we have to work on you, we
 5  can't do this over the phone.
 6       Now, that's the case that we have
 7  here. We have hundreds of data points, as I've
 8  already indicated, and I don't know precisely
 9  how many individual factors we have in each of
10  those data points but I would expect we've got
11  dozens of different variables. Now, at the
12  merits phase we will then determine which of
13  those variables are explanatory. But at this
14  point we can see that we've got a large data
15  set with a lot of data points on each item, and
16  that tells us that we've got a sufficient array
17  of data to work with. We don't have to go in
18  and actually prove the model at this point.
19  What we can do is say, we've got the data, we
20  know what the models will consist of, we know
21  that we have got the sorts of data there that a
22  good econometrician would rely on, at this
23  point it's a matter of going through the
24  process.
25     Q. Is there any difference in the

Page 132

 1  robustness of the data between St. Bernard
 2  Parish and Orleans Parish?
 3     A. I haven't attempted to do any
 4  cross-sectional investigation of that. We
 5  will, of course, when we get into the merits
 6  phase.
 7     Q. Do you know, without doing any
 8  segmentation or a cross-section, whether the
 9  data from either parish is more robust than the
10  other?
11     A. Again, we'll do that when we get to
12  the merits phase. That will be the appropriate
13  point in time to do that.
14     Q. You haven't done it yet.
15     A. Of course not. Why would we? As I
16  said, the appropriate point in time will be
17  after the certification of the class when we
18  start getting into the -- the determination of
19  values.
20     Q. Can you identify for me in your report
21  where you opine that the data is sufficiently
22  robust to conduct your mass appraisal?
23     A. Let's take a look. It may take me a
24  minute.
25     Q. That's fine, take your time.

Page 133

 1     A. We start on Paragraph 41 on Page 11
 2  where we say we plan to combine data from a
 3  variety of data sources, and then I go on
 4  describing this through Paragraph 49. And then
 5  if you go to Page 15, Paragraph 52, and it's
 6  the fifth line from the bottom, starting with
 7  the word the comment to Rule 6-5, and then
 8  including the paragraph afterwards, 53,
 9  compares and contrasts how we now have data
10  that we'll be able to utilize for a mass
11  appraisal and how that's superior to the
12  individual approach.
13       In addition, if you go on to Page 17,
14  Paragraph 58, we then talk about how we will be
15  testing this data. In addition to a valuation
16  team with both local market knowledge and
17  statistical skills we believe the process we
18  use for estimating values will result
19  inaccuracy, reliability and consistency across
20  the proposed class.
21       And then we go on in Paragraph 58 to
22  talk about how we ensure that, and in
23  Paragraph 59 to contrast it with the inferior
24  individual appraisal model.
25     Q. In the paragraphs that you've

KILPATRICK, JOHN

9/11/2008

Page 134

1  identified I see a lot about what you plan to
2  do, I don't see anything that suggests an
3  opinion that the data you have gathered is
4  sufficiently robust to perform your analysis.
5      A.  Well, as of the writing of this we had
6  proposed a treatment which methodologically was
7  certainly superior.  During the period of time
8  since then, we've gone in and actually proved
9  the model by gathering the data.  So in fact,
10 we have continued to work on this thing
11 subsequent to two months ago when I -- or two
12 and half months ago when I sent this in.  And
13 the subsequent work has certainly shown that
14 our model -- well, first, this affidavit shows
15 that the model is superior and anticipates that
16 the data would be available.  We have now been
17 able to determine conclusively that the data is
18 in fact available and robust.
19     Q.  Have you, yourself, reviewed the
20 various data sets that you described earlier?
21     A.  I've gone through some of it.  It's
22 difficult for me to use the word review because
23 that's a term of art in the appraisal process
24 and I haven't formally reviewed that data in
25 the way that we as real estate appraisers would

Page 135

1  use the term.  But I've certainly looked at the
2  data with my staff.
3          And I want to stress the fact, as I
4  testified earlier today, that not only is this
5  data robust for use in a mass appraisal, but if
6  there were problems with the data those data
7  problems would also exist for individual
8  appraisals; that is to say anything with
9  respect to data that causes a problem for mass
10 appraisal would cause an even worse problem for
11 individual appraisals.
12     Q.  What's the basis for your statement
13 that this set of data is sufficiently robust?
14     A.  Um -- first, supervision of my staff;
15 second, reports from my staff; third, cursory
16 reviews of the data by myself; fourth, reliance
17 on opinions from, um -- people who are noted
18 authorities in the area like Dr. Kummerow who
19 has personally examined the data.  And he's one
20 the of the leading authors in the field on
21 statistical robustness of appraisal
22 methodology.  The Appraisal Institute gave him
23 their Swango award a couple of years ago for
24 writing in precisely that area.  So in fact,
25 we've -- I've assured myself of this on several

Page 136

1  different levels.
2      Q.  But you don't know, as you sit here
3  today, exactly how many home sale records you
4  have, either pre-Katrina or post.
5      A.  Well, I have it in my files, I just
6  don't have it memorized.
7      Q.  Is that information that you turned
8  over as part of your work file?
9      A.  Yes.
10     Q.  Doctor, I believe you said that you've
11 compiled this data since this report -- your
12 affidavit was generated.  Isn't that right?
13     A.  Yes.
14     Q.  Are you aware of anything that's been
15 turned over to the defendants since the
16 reported was generated?
17     A.  That's between you and, you know, your
18 colleagues on the other side of the table.  I,
19 um -- you know, I work through my clients, and
20 that's between you and them.
21     Q.  All right.  Well, let me read to you a
22 list of the things we've received, and you tell
23 me where this data is in your work files, the
24 materials that we've gotten.  We've gotten your
25 report, a list of your trial testimony, billing

Page 137

1  information and qualifications, a disk that
2  contains the Army Corps of Engineers depth
3  damage curves, tax roll data in Orleans, and
4  Orleans Parish lot files.
5      A.  Yeah.  Seems to me there's more than
6  that.  I'd have to go back and look.
7      Q.  Okay.
8          MR. MUNRO:
9              Well, I'll ask that any
10         additional material be turned over as
11         soon as possible.
12 EXAMINATION BY MR. MUNRO:
13     Q.  You mentioned earlier a journal
14 article that you've produced called the
15 "Aftermath of Katrina."  Do you recall that?
16     A.  Yes.
17     Q.  Do you recall in that article that you
18 made the statement that after Hurricane Katrina
19 real estate appraisers in the area found that
20 widespread loss of normally dependable public
21 databases and other research sources were
22 destroyed or otherwise rendered undependable?
23     A.  Yes.
24     Q.  Do you continue to believe that that's
25 so?

Page 142

1  hundreds.
2      Q.  Would you agree with me if I said that
3  there were multiple sources of damage to the
4  properties in the class area?
5      A.  By damage, do you mean valuation
6  damage or physical damage?
7      Q.  Um -- well, let's start with physical
8  damage.
9      A.  Well, I'm not opining with respect to
10 physical damage.  I haven't rendered any
11 particular opinion in that regard at this
12 juncture.  I'm not a physical scientist, I'm a
13 valuation expert.
14     Q.  Just based on your own common sense
15 and knowledge of the -- of what's happened in
16 New Orleans.
17     A.  Again, I haven't -- I have some, um --
18 common sense.  I like to think I do.  My wife
19 questions it on occasion.  But notwithstanding
20 that, I haven't rendered any sort of
21 professional opinion one way or the other, and
22 I'm reluctant to do so until I get into the
23 merits phase of my investigation.
24     Q.  Okay.  With respect to valuation
25 damages, would you agree with me that there

Page 143

1  were multiple sources of valuation damage?
2      A.  Well, at this juncture I'm focusing
3  entirely my attention on the flooding
4  precipitated by the barge hitting the wall.
5  You know, that having been said, if there are
6  other issues at hand, I'll certainly
7  investigate those and we'll create some sort of
8  separating equilibrium to take those out.  But
9  that's well beyond the scope of what we've done
10 hear so far.
11     Q.  There were levee failures in
12 St. Bernard Parish, were there not?
13     A.  You know --
14        MR. LEVIANT:
15            Objection.  Beyond the scope of
16        this expert.
17     A.  As I sit here today, I don't have a
18 listing in my mind of where various other
19 events occurred.  My entire focus here today is
20 on a barge hitting the wall and precipitating
21 flooding in this neighborhood.  So, I mean, I'm
22 prepared to talk about that.  If there are
23 other issues at hand that affect the valuation
24 model we'll address those when we get to the
25 merits investigation.

Page 144

1  EXAMINATION BY MR. MUNRO:
2      Q.  Would you agree with me that there was
3  damage to properties in the class area caused
4  by wind?
5        MR. LEVIANT:
6            Objection.  Beyond the scope of
7        this expert's opinion.
8      A.  I'm not going to agree or disagree,
9  because from a valuation perspective that's
10 something I'll investigate at the merits phase.
11 From a physical science perspective, um -- I
12 don't have any opinion, nor probably will I be
13 the source authority of any opinion.
14 EXAMINATION BY MR. MUNRO:
15     Q.  Do you have any opinion, or will you
16 be offering any opinion, on the proper
17 allocation of damage to the barge?
18        MR. LEVIANT:
19            Compound.
20     A.  I don't have any opinion.  I don't
21 know if I will be offering any opinion.
22 EXAMINATION BY MR. MUNRO:
23     Q.  Do you have any opinion on how you
24 would go about allocating damage caused by the
25 barge?

Page 145

1      A.  Not as I sit here today.  I mean, if
2  asked to investigate that, and if I determine
3  that to be something that's within the scope of
4  my expertise to investigate, um -- you know,
5  then I'll deal with that at the appropriate
6  time.  But as see sit here today I don't have
7  any opinion on that yet.
8      Q.  In your report, at Paragraph 14, you
9  say that considering damages, quote, without
10 reference to the patterns of damages across the
11 proposed area would potentially result in
12 haphazard and inconsistent damages estimates.
13 Do you see that?
14     A.  Yes.
15     Q.  And doesn't that assume that there
16 were some patterns of damages in the proposed
17 class area?
18     A.  I don't know that there is any
19 assumption inherent in that, we're simply
20 taking into account something, one of the fact
21 of the empirical investigation.
22     Q.  Well, you seem to be saying that there
23 were patterns of damages in the proposed class
24 area.
25     A.  And again, we're talking about

Page 174

1  intervals, you know, we're 95 percent certain
2  or 99 percent certain.  Typically speaking,
3  that's the way you want to express the degree
4  of accuracy.  Under Daubert I think it's called
5  a known error rate.  So fortunately enough when
6  we deal with these things on a mass appraisal
7  class-wide basis, we're able to develop that
8  known error rate as required under Daubert
9  which you're unable to develop on an individual
10 appraisal, um -- model.
11    Q.  Have you ever heard of an R-squared
12 test?
13    A.  Yes.
14    Q.  What R-squared do you need to achieve
15 here in this case in order for your methodology
16 to be accurate?  Um -- you know, hedonic models
17 oftentimes don't achieve extremely high
18 R-squareds, although I published an article in
19 Real Estate Issues a few years ago where I had
20 a 93 percent R-squared in a land valuation
21 model.  And that was accepted in a peer
22 reviewed journal.  So I can't tell you offhand
23 what level of R-squared.  As it happens, the
24 normal method for checking the efficacy of a
25 hedonic model is an F test.  And we would

Page 175

1  typically want an F test with a P value of less
2  than, say, 5 percent.
3        (Brief recess.)
4  EXAMINATION BY MR. MUNRO:
5    Q.  Dr. Kilpatrick, when we left off we
6  were talking about business losses and mass
7  appraisal of business losses.
8        Would you agree with me that in order
9  to assess business losses you need to factor in
10 mitigation in some way?
11    A.  I'm not sure what you mean by that.
12    Q.  Let me give you an example.  Suppose
13 you have a business that is disrupted in a
14 class area, unable to continue operation, but
15 they move down the road and set up shop in
16 Baton Rouge and for a year after Katrina
17 they're able to earn a fairly nice living in
18 Baton Rouge.  Do you factor that in, in any
19 way, to your calculation of business loss?
20    A.  My or may not.  I mean, that would be
21 something I need to, um -- analyze as part of
22 modeling when I get to the merits phase.
23    Q.  You testified a few minutes ago that
24 one way to deal with small data sets in the
25 business valuation area is that you can look

Page 176

1  outside the class area to -- I think the
2  example you used was other plumbing companies.
3        You remember that testimony?
4    A.  Yes.
5    Q.  That's for assessing business values
6  prior to the storm; right?
7    A.  That's correct.
8    Q.  What about after the event?
9    A.  Well, that, again, is going to be
10 something that we will analyze when we get to
11 the merits phase.  The nature of those losses,
12 how widespread they are, factors which affect
13 those, all of that will get built into a mass
14 appraisal database after the fact.  But as we
15 sit here today, whether we're dealing with this
16 on an individual basis or a class-wide basis,
17 that's something that's going to have to be
18 addressed.  So the fact that it's something
19 we'll have to address doesn't obviate the
20 superiority of the mass appraisal model to be
21 able to look at these in a comprehensive,
22 Systematic fashion as opposed to the less
23 efficient, individual model which wouldn't look
24 at these in a comprehensive, system-wide
25 fashion.

Page 177

1    Q.  I thought you said that you had to
2  have some minimum number in order to do this on
3  a mass basis.  And so what I'm suggesting is
4  that if you're talking about post-storm
5  valuation of businesses, you don't know whether
6  you have a sufficient number.
7    A.  Well, actually you do know that you
8  have a sufficient number because remember,
9  valuation, we need to have a sufficient number
10 of comparables.  And we know that we have a
11 sufficient number of comparables because we can
12 look outside the neighborhood and into the
13 affected region or the unaffected portions of
14 the region, or nationally indeed.  So -- and as
15 long as we know what regional or localized
16 adjustments are available to us, we can look --
17 we could value a plumbing company in
18 St. Bernard Parish, um -- using the data from
19 the value of a plumbing down the road from your
20 house in the burbs of D.C. as long as we know
21 what the regional adjustments are.  So in fact
22 we already know that we have reliable,
23 statistically valid valuation data for
24 businesses because that's subject to regional
25 adjustments that's a nationwide issue.  And in

KILPATRICK, JOHN

9/11/2008

Page 218

1   control several years later; in other words,
2   your clients ought to be bailed out,
3   hypothetically speaking, as a result of
4   dragging their feet long enough to wait for
5   some good luck to happen.
6       Q.  What about the fact that at least some
7   people in the class area have received
8   insurance payments or Road Home payments or
9   other funds?
10      A.  My issue here is focused on valuation,
11  so those are outside of the scope of my
12  purview.
13      Q.  You don't take them into account at
14  all.
15      A.  Not as part of the valuation.  That's
16  a separate issue for the Court to determine, in
17  my opinion.
18          (Brief recess.)
19  EXAMINATION BY MR. MUNRO:
20      Q.  Dr. Kilpatrick, you mentioned earlier
21  a Kansas case in which you had done mass
22  appraisal of business loss.  Do you recall
23  that?
24      A.  Yes.
25      Q.  Let me give you a name of a case and

Page 219

1   see if that is the one that you're talking
2   about.  Neodesha v. Amoco/BP?
3       A.  Neodesha is the way it's pronounced,
4   but that's the case.
5       Q.  That's it?  And what stage is that
6   case at today?
7       A.  Oh, it's on appeal.  It's -- it was a
8   defense verdict.  I understand it's currently
9   on appeal.
10      Q.  You said you offered an opinion on
11  business loss?
12      A.  Yes.
13      Q.  And it was accepted by the Court?
14      A.  Yes.
15      Q.  And did you testify in the merits
16  phase?
17      A.  Yes.
18      Q.  Do you know if your report in that
19  case was turned over to the defendants in this
20  case?
21      A.  Yes.  In this case?
22      Q.  Yes.
23      A.  No, I don't -- I don't know whether it
24  has been or not.
25      Q.  You would agree with me that there's

Page 220

1   substantial variations in the housing stock in
2   the putative class area; correct?
3       A.  Well, it really depends on our
4   definition of substantial.  From a valuation
5   perspective, I would say that all of the
6   housing stock in the putative class area is
7   going to be valuable by a cohesive, consistent
8   statistically robust model.  So in that context
9   we don't have such a degree of variation that
10  we couldn't come up with a highly predictive
11  model.
12      Q.  All right.  Let me try to carve out
13  and leave aside for a moment whether any
14  particular variations affect your ability to
15  apply your methodology or not.  I just want to
16  get your assessment of what the housing stock
17  looks like, what sort of variations exist.
18          So with that caveat, would you agree
19  with me that there are a variety of different
20  property types within the class area?
21      A.  If by property times you mean some are
22  houses and some are commercial and some are
23  vacant lots, then I would agree with that.
24      Q.  And some are raised and some are slab.
25      A.  I wouldn't call those variations in

Page 221

1   property types, I'd simply call them variations
2   in construction styles.
3       Q.  Some are rental, some are owner
4   occupied; right?
5       A.  Yes.  Of course.
6       Q.  Some are vacant, some are occupied.
7       A.  Yes.
8       Q.  Some are in historic district and some
9   are not.
10      A.  Maybe.  I haven't investigated the
11  extent of the historic district.
12      Q.  There's variations in crime rates
13  across the putative class area; right?
14      A.  I haven't investigated that.
15      Q.  There have been differences in the
16  rate and degree of gentrification in various
17  parts of the class area; right?
18      A.  I haven't investigated that yet.
19  Certainly may if it turns out to be something
20  that's interesting from a valuation
21  perspective.
22      Q.  Have you done any assessment of
23  differences between particular neighborhoods in
24  the class area?
25      A.  No.  But we will as part of the merits

56 (Pages 218 to 221)

Page 222

1  phase.
2     Q.  Without telling me what the variables
3  will be, can you tell me as you sit here today
4  roughly how many variables you will use in your
5  model?
6     A.  No, but I can tell you that if I
7  developed a model to value the homes in your
8  neighborhood, you know, outside of D.C., two
9  million dollar, seven bath house --
10    Q.  I'm sorry to interrupt you.  This is
11  not relevant in this case, but in fact it's in
12  downtown D.C., and it has three bathrooms.
13    A.  Cool.  Well, in that case, your four
14  million dollar, three bath house, in your
15  neighborhood.  Assume I went into your
16  neighborhood and wanted to develop a valuation
17  model, I could develop a robust, strong F test,
18  high R-squared model that would explain house
19  values in your neighborhood as well or better
20  than individual appraisal models which would
21  use as variables the location, that is to say a
22  factor for the neighborhood, square footage of
23  the lot, if it's a single-family detached
24  house, square footage of the structure, age of
25  the structure, condition of the structure,

Page 223

1  number of bathrooms, and a factor for certain
2  amenities like garage, fireplace and swimming
3  pools, those sort or things -- so I just
4  rounded off seven variables -- which would give
5  me a high R-squared, a high degree of
6  statistical significant and a strong F test.
7  I've never seen your house, until two minutes
8  ago I didn't know that you were inside the
9  beltway versus outside the beltway, but I could
10 use those numbers, those coefficients to get an
11 extremely high R-squared, and do a better job
12 of explaining the value of your property than
13 an individual appraisal model.
14      If I took identically the same seven
15 coefficients and went into St. Bernard Parish I
16 could do identically the same job.
17    Q.  Does it matter, then, to your analysis
18 whether a home with those seven variables which
19 you can measure has had its roof ripped off by
20 a windstorm?  Is that irrelevant?
21    A.  Well, pre-Katrina we picked that up in
22 condition.  Post-Katrina we haven't developed
23 the factors associated with the post-Katrina
24 value yet, but we know that we're going to be
25 able to develop a mass appraisal model of

Page 224

1  pre-Katrina values, and then whatever factors
2  affect value, whatever the transmission is
3  between the barge and the post-barge values
4  are, that's going to have to be done in some
5  sort of systematic, cohesive, comprehensive
6  fashion, and the mass appraisal model is going
7  to do a far, far better job of doing that than
8  the individual model would do.
9     Q.  But presumably you will have to know
10 some specific facts about each individual
11 property in order to apply your model.
12    A.  Pre or post, and fortunately enough
13 the mass appraisal model is the statistically
14 significant, efficient way of doing that.
15    Q.  Okay, but you will have to know
16 specific -- I'm not challenging you for the
17 moment on whether it's superior or not.  But
18 just simply as a factual matter, in order to
19 apply the model -- not to construct it, but to
20 apply it in this case, you will have to know
21 specific facts about each property; correct?
22    A.  Probably.  And I say probably because
23 I haven't, you know -- it raises some
24 intriguing issues about whether we have to do
25 it in total or not, whether there's some

Page 225

1  sampling issues or what have you.  But having
2  said that, the facts with respect to individual
3  properties, you know, the things which
4  contribute to value individual properties
5  aren't different, class action or not class
6  action.  I mean, those are all the same.  The
7  data sets are all the same.  The question is
8  what's the fairer, statistically significant,
9  comprehensive, systematic, efficient and
10 effective way of picking up all these things in
11 valuing these properties.  It's the mass
12 appraisal model.  If you don't do it that way,
13 you lose all those efficiencies, you lose that
14 systemization, you lose that fairness, you lose
15 all of that if you try to do it the way you
16 propose.  So what I'm trying to do is show you
17 that methodologically, this is so far superior
18 that from an empirical investigation
19 perspective it's not even a debate.
20    Q.  Assuming that you need to value a
21 large number of properties -- suppose this
22 wasn't a class action and it was just one
23 individual suing Lafarge North America.  We
24 wouldn't be talking about mass appraisal;
25 right?  Your approach assumes the need to do

KILPATRICK, JOHN
9/11/2008

Page 242

1   damages by cause by property.
2       A.  Well, just because he's not aware of
3   it doesn't mean they don't exist.
4       Q.  Well, let's assume for the moment that
5   he's saying that a hedonic regression model
6   cannot do that.  What's wrong with that
7   conclusion?
8       A.  Because he did one in 1992 in
9   St. Bernard Parish.
10      Q.  Did it measure a confluence of
11  colinear, spatially correlated, geographic
12  specific impacts of differing magnitudes and
13  causes?
14      A.  Yeah, he measured two different
15  refineries and showed that -- you know, the
16  fact that both of these were in the same
17  neighborhood and affected property values but
18  affected property values in a spatially, um --
19  differentiable way.
20      Q.  Are those colinear geographic specific
21  impacts?
22      A.  Yeah.  They both moved in the same
23  direction and both had negative impacts on
24  property value but were -- and in fact were
25  colinear and separable.

Page 243

1       Q.  And did his conclusion separately
2   measure the damages by cause by property?
3       A.  Yeah.  You ought to read it.  It does
4   precisely what he says you can't do.
5       Q.  He disagrees that a mass appraisal is
6   appropriate in this case; correct?
7       A.  And he did one.  And in fact, you
8   know, I don't know why he did one thing in 1992
9   and then says something else today, but I mean
10  I'll just let that speak for itself.
11      Q.  Well, you're assuming by that answer
12  that what he did in 1992 is the same as what
13  you're proposing to do here, isn't that right?
14      A.  Not very different.  I mean, quite
15  frankly, I've read his 1992 paper, and while
16  it's not precisely what I would do because in
17  the seventeen years since we've certainly made
18  improvements in the methodology, we know a lot
19  more than we did in 1992, nonetheless, I think
20  its quite telling that seventeen years ago he
21  was able to do something that he now seems to
22  forget he did.
23      Q.  He argues that -- contrary to your
24  opinion that individual appraisals are both
25  doable and efficient in this case.  What's

Page 244

1   wrong with that?
2       A.  Because he's wrong.  I mean -- well,
3   he's wrong on the fact that they're efficient.
4   I mean, I already said that we're going to
5   produce hundreds of thousands of pages at a
6   cost of millions of dollars.  Now, if Mr. Ragas
7   thinks that's efficient, then, you know, I
8   don't want him keeping my books.
9       Q.  Well, you're assuming that individual
10  appraisals would require the generation of a
11  separate report for each property at the cost
12  of I think you said a thousand dollars a pop.
13  Right?
14      A.  Well, if you're going to do individual
15  appraisals but they're then you're going to
16  produce a mass report, you're in fact that
17  moving well toward a mass appraisal report,
18  aren't you?  I mean, in fact, if you're going
19  to do fifteen thousand individual appraisals
20  but you're going summarize all of these in one
21  big comprehensive, cohesive, statistically
22  valid report, haven't you in fact done what I
23  said you were going to do, which is after
24  you've done the tenth or eleventh or twelfth
25  one moved yourself into a mass appraisal model?

Page 245

1       Mr. Ragas has painted himself in a
2   corner here if he wants to say that you can my
3   cake and eat it, too.  If he wants to do
4   fifteen thousand individual appraisals but do
5   them in a manner that looks like, smells like
6   and tastes like a mass appraisal, quite frankly
7   he's doing a mass appraisal.  He's just not
8   calling it that because you're not letting him
9   call it that.  But if you'd let him call it
10  that, that's what it would be.
11      Q.  Well, it sounds to me like what you're
12  saying is that it would not end up being
13  thousand of pages, that by definition, you're
14  saying, it turns into what you term a mass
15  appraisal and so there is not this massive
16  inefficiency as a consequence of doing this on
17  a property-by-property basis.
18      A.  No.  What I'm saying is what he's
19  describing to you is a mass appraisal, he's
20  just not calling it that.
21      Q.  How about the defendant's expert on
22  business loss?
23      A.  Dr. Boudreaux?
24      Q.  Yes.
25      A.  I've read his report.

Johns Pendleton Court Reporters                                800 562-1285