# Exhibit 29

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

IN RE: KATRINA CANAL BREACHES    * CIVIL ACTION
                                 * NO. 05-4182
PERTAINS TO: BARGES              * Consolidated
                                 * SECTION "K(2)"

| Boutte v. Lafarge       | 05-5531 | * |
| Mumford v. Ingram       | 05-5724 | * JUDGE DUVAL |
| Lagarde v. Lafarge      | 06-5342 | * |
| Perry v. Ingram         | 06-6299 | * MAG. WILKINSON |
| Benoit v. Lafarge       | 06-7516 | * |
| Parfait Family v. USA   | 07-3500 | * |
| Lafarge v. USA          | 07-5178 | * |

   *   *   *   *   *   *   *   *   *   *   *

Deposition of JOSEPH N. SUHAYDA, PH.D., given at Chaffe McCall, L.L.P., 2300 Energy Centre, 1100 Poydras Street, New Orleans, Louisiana 70163-2300, on September 26th, 2008.


REPORTER BY:

    JOSEPH A. FAIRBANKS, JR., CCR, RPR

    CERTIFIED COURT REPORTER #75005

SUHAYDA, PH.D., JOSEPH

9/26/2008

Page 10

1    (Exhibit 1 was marked for
2  identification and is attached hereto.)
3  EXAMINATION BY MR. LEVIANT:
4    Q.  Could you look over the document that
5  you have that has the reporter's Exhibit 1
6  mark and satisfy yourself that it is complete
7  as to the body of the report.
8    A.  Yes.  It appears to be complete.
9    Q.  Have you reached any expert opinions
10 that you are prepared to render in this case?
11   A.  As reflected in my report, yes.
12   Q.  Does the report contain all of the
13 opinions that you presently intend to render in
14 this case?
15   A.  That is correct, with the reservation
16 that if I was asked to do something after this
17 point then I would address that.
18   Q.  Can you summarize for me what you
19 believe to be the main conclusions that you
20 reach in your report?
21   A.  Well, those are enumerated in my
22 summary of conclusions, and there are several.
23 They're all important as to relate to the
24 general task that I was assigned in terms of
25 dealing with analyzing the hydrologic

Page 11

1  processes, and then reviewing materials
2  provided by the plaintiff, and then commenting
3  on this issue in general of the class.
4    Q.  When were you first retained in this
5  case?
6    A.  Well, the very first contact was in
7  September of 2005.
8    Q.  When did you agree to work in any
9  capacity for the defendant Lafarge in this
10 case?
11   A.  Shortly after that.  That was a
12 preliminary meeting, and then sometime by the
13 end of the year I think we had reached an
14 agreement.
15   Q.  When did you first perform any work as
16 an expert in this case?
17   A.  I think I really got started in the
18 early part of 2006.
19   Q.  And about how many hours have you
20 invested as an expert in this matter?
21   A.  Overall?
22   Q.  Yes.
23   A.  I really couldn't give you -- I have,
24 of course, the billing information that we
25 could get that specifically from.  It's been an

Page 12

1  involvement that has varied considerably over
2  time.  I would say I probably never exceeded
3  maybe 40 hours in any month, and that would be
4  rare.  Most of the time it was averaging ten to
5  twenty hours.
6    Q.  About how much have you billed in
7  total in this case?
8    A.  I don't have a figure.  I haven't
9  totaled it up.
10   Q.  You think it's over fifty thousand
11 dollars?
12   A.  Yes.
13   Q.  Could it be over a hundred thousand?
14   A.  It perhaps might be, but I would
15 expect or estimate that it's probably not a lot
16 over that.
17   Q.  In your report, at Pages 21 and 22,
18 you have a section entitled References.
19   A.  Yes.
20   Q.  And these two pages list a number of
21 different materials that include technical
22 reports, depositions and other documents.  Is
23 that the full list of material that you
24 reviewed to create this report?
25   A.  It's a full list of the materials I

Page 13

1  used in preparing -- in reaching and preparing
2  a report, reaching my conclusions.  There are
3  other things I looked at during the course of
4  the involvement with this case that weren't
5  relevant to this particular report.
6    Q.  So those are the materials that you
7  actually rely on as opposed to the things you
8  considered, which is a larger group.
9    A.  Correct.
10   Q.  What was your assignment that you were
11 given as an expert in this case?
12   A.  It was to look into the hydrologic
13 factors that would affect property damage.  So
14 it was a collection of information that
15 pertained to the variety of factors that were
16 involved with the storm; second was to review
17 plaintiff materials; and then third was, in
18 light of both of those sets of information,
19 reach some conclusions about this issue of
20 commonality or uniformity associated with a
21 class issue.
22   Q.  Were you asked to render an opinion
23 about the commonality of the class in this
24 case?
25      MR. RAFFMAN:

4 (Pages 10 to 13)

Johns Pendleton Court Reporters                          800 562-1285

Page 82

1  saying that the existing drainage system might
2  be able to accommodate enough water to impact
3  the flood modeling?
4      A.  Um -- no, I don't think I gave any
5  opinion about that.
6      Q.  You're just -- you're noting that the
7  start condition of the drain system is not an
8  element of the model, that's all you're saying,
9  right?
10     A.  It's the starting condition that's
11 really at issue here in terms of where do you
12 start your model?  And they're saying that the
13 model does not -- or their use of it does not
14 acknowledge whether there was some initial
15 flooding that took place.
16     Q.  What initial flooding are you talking
17 about, rainwater flooding?
18     A.  Could be rainwater, yes.
19     Q.  You said that the model did
20 incorporate the effect of rain on water depth,
21 right?  In this case?
22     A.  I don't know how that -- it's part of
23 the mass balance that was described, but I
24 don't know how they put the rain into the model
25 to know whether they spread it uniformly or

Page 83

1  they, you know, concentrated it in certain
2  areas.  They did account for the amount of rain
3  I think that was falling in the area.
4      Q.  On Page 14, talking about seepage in
5  the second paragraph, you say although seepage
6  is a minor source of water in terms of the
7  maximum flooding that occurred it has been
8  found by at least some investigators to have
9  played an important role in the initial
10 flooding associated with the north breach.
11         What investigators were you referring
12 to?
13     A.  Well, there was one analysis that
14 indicates that seepage occurred initially, and
15 hence some of the earlier reports of water in
16 the area, flooding, would be reflective of the
17 seepage process.
18     Q.  What investigator said that?
19     A.  I think it was ILIT.  I'd have to look
20 back and check.
21     Q.  Is there anyone else you can think of
22 that would have said that?
23     A.  The Corps had a different explanation,
24 I would think, so it would not have been IPET.
25 And I don't honestly remember what Team

Page 84

1  Louisiana 's position was.
2      Q.  Is it fair to say that the
3  investigators you're referring to there are
4  limited to ILIT and Team Louisiana?
5      A.  That's correct.  That's correct.
6      Q.  ILIT didn't do any flood timing
7  studies in their report, did they?
8      A.  Not to the extent that Spinks did, no.
9      Q.  And in general, is it fair to say that
10 you concur with Team Louisiana 's time reports?
11     A.  There's a slightly different way to
12 approach it.  I think there are different
13 sources of information about timing that place
14 them much later than what Spinks assumed, and
15 that was really what I was trying to point out.
16 I have no basis for deciding who would be right
17 or wrong about the processes or the timing, but
18 that there were a variety of opinions, and my
19 evaluation of them, of the various sources of
20 other people's work, was that the times that
21 were imposed on the model by Mr. Spinks were
22 inconsistent with the work of the others who
23 did look into that.
24     Q.  Have you gone out to the class area
25 yourself?

Page 85

1      A.  Yes.
2      Q.  At the times that you've gone out
3  there, have you observed any physical effects
4  that you attribute specifically to wave action?
5      A.  Well, the time -- various times I went
6  out there was right after the storm, and
7  then -- actually up to several years after, and
8  hence the property that might have demonstrated
9  the effect of waves in most of my visits the
10 buildings were not there.
11         I'm trying to think of my very first
12 visit in terms of wave action.  Um -- well, the
13 effects of wave action we dealt with, I was
14 working for URS doing high water marks, was
15 that outside of buildings there were water
16 marks -- high water marks that were higher than
17 on the inside of the buildings.  And our job
18 was to avoid contaminating the high water mark
19 designation, avoid that by going to areas where
20 waves didn't affect the high water mark.  And
21 hence we would go into, for example, a bathroom
22 of a building and look in there for a scum or
23 high water mark, believing that that was a
24 better representation of still water than the
25 same type of mark that would be found on the