# Exhibit 30

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: KATRINA CANAL BREACHES | * | CIVIL ACTION |
| | * | NO. 05-4182 |
| PERTAINS TO: BARGES | * | Consolidated |
| | * | SECTION "K(2)" |
| Boutte v. Lafarge     05-5531 | * | |
| Mumford v. Ingram    05-5724 | * | JUDGE DUVAL |
| Lagarde v. Lafarge    06-5342 | * | |
| Perry v. Ingram      06-6299 | * | MAG. WILKINSON |
| Benoit v. Lafarge     06-7516 | * | |
| Parfait Family v. USA  07-3500 | * | |
| Lafarge v. USA       07-5178 | * | |

   *   *   *   *   *   *   *   *   *   *   *

      Deposition of JACOB ROBERT GLASER, given at Chaffe McCall, L.L.P., 2300 Energy Centre, 1100 Poydras Street, New Orleans, Louisiana 70163-2300, on August 7th, 2008.


REPORTER BY:

      JOSEPH A. FAIRBANKS, JR., CCR, RPR

      CERTIFIED COURT REPORTER #75005

GLASER, JACOB

8/7/2008

Page 134

1  the street from the store.
2  Q. West or east of Paris Road?
3  A. West.
4  Q. Where was the K-Mart?
5  A. East.
6  Q. So is K-Mart was east of Paris Road.
7  A. Yes.
8  Q. You shopped at both K-Mart and
9  Wal-Mart.
10  A. Yes.
11  Q. Let's go to the next item,
12  inconvenience. Do you see that?
13  A. Yes.
14  Q. Is there anything about inconvenience
15  that you haven't testified about already that
16  you want to add?
17  A. Again, I hate to use the paraphrase
18  way of life, but that's it. And I can't think
19  of anything else that we hadn't possibly
20  touched on at this time.
21  Q. When you use the term way of life, the
22  meaning that term has to you is what you
23  testified about earlier, the ability to be
24  close to shopping and what else?
25  A. Family, friends, all the conveniences.

Page 135

1  Q. Family and friends lived in
2  St. Bernard Parish?
3  A. Yes.
4  Q. Some of them lived east of Paris Road?
5  A. Yes.
6  Q. Some of them lived west of Paris Road.
7  A. Yes.
8  Q. The last item on your list for
9  Interrogatory 26 says any and all others
10  proven. Do you see that?
11  A. Yes.
12  Q. Is there anything else you have in
13  mind under that catchall category?
14  A. Not at this time.
15  Q. Who is your lawyer in this case?
16  A. Brian Gilbert.
17  Q. When did you hire Brian Gilbert to be
18  your lawyer?
19  A. I believe it was in '06.
20  Q. How did Mr. Gilbert come to be your
21  lawyer?
22  A. Um -- I think through phone
23  conversations had.
24  Q. Who called who first?
25  A. That I can honestly not remember.

Page 136

1  Q. Who contacted whom first?
2  A. I cannot remember that either.
3  Q. Did Mr. Batt refer you to Mr. Gilbert?
4  A. No.
5  Q. How did you come to be a proposed
6  class representative in the case?
7  A. I was asked by Mr. Gilbert.
8  Q. When did Mr. Gilbert ask you to be a
9  class representative?
10  A. Early on in the process.
11  Q. What's your understanding of your role
12  as a class representative?
13  A. To honestly state and represent things
14  as I know it and to project all information to
15  the best of my ability for the other members of
16  the class.
17  Q. Is there anything else?
18  A. Um -- to just -- I can't think of
19  anything else. I've never done this before, so
20  I'm -- I can't think of anything else to add at
21  this time.
22  Q. Apart from Holiday Jewelers, how many
23  other jewelry stores, retail jewelry stores are
24  you aware of in the Lower Ninth Ward in the
25  area west of Paris Road in St. Bernard Parish?

Page 137

1  A. Before the storm?
2  Q. Yes.
3  A. Five.
4  Q. Where were they located?
5  A. Two was in Arabi, two was in
6  St. Bernard and one was in Meraux.
7  Q. The two that were in Arabi are --
8  A. Gone.
9  Q. They're west of Paris Road. They were
10  west of Paris Road.
11  A. Yes.
12  Q. Not operating anymore.
13  A. No.
14  Q. The one in Meraux was east of Paris
15  Road.
16  A. Yes.
17  Q. Is that one operating?
18  A. Not to my knowledge.
19  Q. The other two in St. Bernard, were
20  they east or west of Paris Road?
21  A. Two in Chalmette were west of Paris
22  Road.
23  Q. Are either one of them operating?
24  A. One was myself, and then the other
25  gentleman is working I think two or three days

35 (Pages 134 to 137)

GLASER, JACOB

8/7/2008

Page 138

1  a week out of a house.
2     Q.  Do you know anything about the
3  pre-storm profits of any of those five jewelry
4  stores?
5     A.  No.
6     Q.  Do you know anything about the
7  post-storm performance of the one that's
8  operating two or three days a week?
9     A.  No, but if he's only operating two or
10 three days a week, I don't know what his
11 personal situation is -- he's, I believe, older
12 than us.
13    Q.  How did you first hear about a lawsuit
14 involving a barge?
15    A.  I believe it was on the news.  I
16 believe.
17    Q.  What did you see on the news about
18 that lawsuit?
19    A.  I believe that someone said there was
20 going to be a lawsuit about it.
21    Q.  When you saw that on television, did
22 you react by -- did you react by taking any
23 action at all?
24    A.  No.
25    Q.  Do you remember anything about the

Page 139

1  first time you decided that you were going to
2  participate in a lawsuit involving the barge?
3     A.  Brian and I briefly talked on the
4  phone, and he asked where was our business
5  located, where was our houses located, east or
6  west of Judge Perez Drive?  And we established
7  that -- that the business would probably be the
8  best to pursue -- I hate to use the word best,
9  but because of the proximity to the Industrial
10 Canal, that that water came that way, so that
11 was closest to the canal.
12    Q.  To be clear, your business is several
13 miles from the canal.
14    A.  I would have to clock it, but I would
15 say yes.
16    Q.  Have you attended any of the hearings
17 in this case?
18    A.  No.
19    Q.  Did you attend the trial of Ingram and
20 Domino?
21    A.  Um -- I'm not familiar with that.
22    Q.  You don't know what --
23    A.  No, I didn't go to any trial.
24    Q.  What if any direction and control have
25 you provided to the conduct of this lawsuit by

Page 140

1  your lawyers?
2     A.  Repeat that again.
3        (Whereupon the previous question was
4  read back.)
5     A.  Just trying to provide as much
6  information as I have to them to pursue
7  justification for the flooding from the barge.
8  EXAMINATION BY MR. RAFFMAN:
9     Q.  When you are asked for information by
10 your lawyers, you supply it, right?
11    A.  To the best of my ability with what
12 records we have.
13    Q.  And apart from supplying information
14 when you're asked for it, you really don't have
15 any other input into how this case proceeds.
16    A.  No.
17    Q.  Which classes or class are you
18 proposed to represent, do you know?
19    A.  No.
20    Q.  You've never served as a class
21 representative in any other lawsuit; correct?
22    A.  No.
23    Q.  Bad question.  Have you ever served as
24 a class representative in any other lawsuit?
25    A.  No.

Page 141

1     Q.  What understanding do you have, if
2  any, about who will bear the expenses
3  associated with bringing this lawsuit?
4     A.  Um -- the attorney firm of Mr. Gilbert
5  will bear the expenses.
6     Q.  Do you understand that you've been
7  designated as a representative for a business
8  loss subclass?
9     A.  Um -- I believe that's the category
10 that I fit in, being a business owner, and only
11 in this case, um -- doing this for my business.
12    Q.  What businesses do you represent as a
13 representative for the business loss subclass?
14    A.  I do not know the other parties that
15 are involved.  I thought that was private
16 information.
17    Q.  Is it fair to say that some businesses
18 in the Lower Ninth Ward in the area of
19 St. Bernard west of Paris Road are bigger than
20 your business?
21    A.  Positively.
22    Q.  Some of them have many employees.
23    A.  Yes.
24    Q.  Some of them are manufacturing
25 operations.