# **Exhibit 35**

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

IN RE:  KATRINA CANAL BREACHES    CIVIL ACTION
CONSOLIDATED LITIGATION
                                          NO. 05-4182
                                            "K" (2)

PERTAINS TO:  BARGE              JUDGE DUVAL

                                        MAG. WILKINSON

BOUTTE V. LAFARGE          05-5531
MUMFORD V. INGRAM          05-5724
LAGARDE V. LARFARGE        06-5342
PERRY V. INGRAM            06-6299
BENOIT V. LAFARGE          06-7516
PARFAIT FAMILY V. USA      07-3500
LAFARGE V. USA             07-5178

   DEPOSITION OF ETHYL MAE COLEMAN MUMFORD,
1423 Feliciana Street, New Orleans, Louisiana,
taken in the offices of Chaffe, McCall, 2500
Energy Centre, 1100 Poydras Street, New
Orleans, Louisiana 70163, on Thursday, August
5, 2008.

Page 154

1  after you filed the lawsuit?
2  A.  Oh, before.  Way before.
3  Q.  Well, do you know when the lawsuit
4  was filed?
5  A.  Let's see.  It was filed in 2006.  I
6  can't remember the exact date.
7  Q.  Now, this document is dated November
8  10th, 2005; right?
9  A.  Yes.
10 Q.  And was this mailed to you?
11 A.  They don't have my correct address
12 on there.
13 Q.  I was going to ask you about.
14 They've got P.O. Box 151, Arabi, Louisiana.
15 A.  That was before the storm.  But I
16 think he mailed it to me in Lafayette.
17 Q.  Well, before the storm you had a
18 P.O. Box in Arabi?
19 A.  Yes.
20 Q.  So you think that this person
21 eventually mailed this to you in Lafayette?
22 A.  In Lafayette, yes.
23 Q.  Do you know how long it took to get
24 to you in Lafayette?
25 A.  It didn't take very long, because he

Page 155

1  was in some part of Louisiana himself.
2  Q.  Do you remember the date that you
3  received this?
4  A.  No.
5  Q.  Now, you said you believed that you
6  redacted this information before you filed the
7  lawsuit.  Is that right?
8  A.  Yes.
9  Q.  Have you ever seen a copy of the
10 lawsuit in this case?
11 A.  Yes.
12 Q.  And were you shown a copy of the
13 lawsuit before it was filed on your behalf?
14 A.  Yes.
15 Q.  And how did you obtain a copy of the
16 lawsuit?
17 A.  I didn't get a copy of it, but they
18 did show it to me.
19 Q.  Who showed it to you?
20 A.  The Wiedemanns.
21 Q.  When did they first show it to you?
22 A.  Well, just before they filed it, I
23 think they showed it to me.
24 Q.  Where did they show it to you?
25 A.  In the office.

Page 156

1  Q.  So you came back to New Orleans for
2  the first time in December of 2005.
3  A.  Yes.
4  Q.  That's the first time you ever set
5  foot in New Orleans after the storm; right?
6  A.  Yes.  The storm was August -- I
7  think I was back before then.  I came back
8  before December, but I just was in and out.
9  Q.  You didn't meet with the Wiedemanns
10 when you were just in and out?
11 A.  Yeah, I went in the office when I
12 was in and out.
13 Q.  When was that?
14 A.  It was about 2005.
15 Q.  What month in 2005?
16 A.  Let's see.  The storm was August.
17 About September, October.
18 Q.  All right.  So I am just trying to
19 clarify, because my notes -- You told me
20 earlier the first time you came was December
21 of 2005.
22 A.  That's when I was allowed to go in
23 the Lower Ninth Ward.
24 Q.  But you actually came back to New
25 Orleans before then?

Page 157

1  A.  Yeah, before this -- They wouldn't
2  let us in the Lower Ninth Ward until a certain
3  time, and that was December.  December.
4  Q.  The first time that you came back,
5  can you give me an approximate date when it
6  was?
7  A.  I can't tell you the exact date, but
8  it was somewhere like September, October.
9  Q.  And when you came in that time in
10 September or October, where did you stay?
11 A.  I stayed with my sister-in-law.  And
12 one time I stayed with my niece.
13 Q.  Your sister-in-law was on Daneel
14 Street?
15 A.  Daneel.
16 Q.  Daneel Street?
17 A.  Yeah.
18 Q.  The first time that you came to New
19 Orleans, I know you didn't go to the Ninth
20 Ward, but the first time you came in, how long
21 were you in town?
22 A.  A couple of days.  I was on
23 Josephine Street that time with my niece.
24 Q.  What did you do on that first trip
25 when you came back to New Orleans?

Page 218

 1      A.  No.
 2      Q.  And as far as the amount you're
 3  seeking for lost rents, would you agree that
 4  the amount that you seek in a rental would
 5  depend on where the property is located, what
 6  neighborhood it's in?  Is that one factor?
 7      A.  Yes.
 8      Q.  And would also depend on the
 9  condition of the property?
10      A.  Yes.
11      Q.  How old it is; right?
12      A.  Yes.
13      Q.  How big it is; right?
14      A.  Uh-huh (affirmatively).
15      Q.  So in determining -- That was a
16  "yes"?
17      A.  Yes.
18      Q.  Okay.  So in determining the amount
19  of lost rental income, that would depend
20  necessarily on the unique characteristics of
21  that property; right?
22      A.  Yes.  Would it depend on the rent
23  that I collect monthly?  The amount of rent I
24  collect monthly, would that depend on that?
25      Q.  Well, that certainly could be a

Page 219

 1  factor.  But as far as -- Rents for different
 2  properties, okay, that would depend on where
 3  the property is located; right?
 4      A.  Uh-huh (affirmatively).
 5      Q.  Correct?
 6      A.  Yes.
 7      Q.  And would depend on the condition of
 8  the property; right?
 9      A.  Yes.
10      Q.  And in determining the amount of
11  business losses concerning lost rentals, you
12  would have to actually be renting the
13  property; right?
14      A.  Yes.
15      Q.  And one of your properties
16  specifically wasn't rented before the storm;
17  right?
18      A.  Right.
19      Q.  It hadn't been rented for eight
20  months; right?
21      A.  Yes.
22      Q.  And then another factor in
23  calculating your damages from that would be if
24  you actually can collect the rents; right?
25      A.  Because one property wasn't rented?

Page 220

 1  One unit was not rented?
 2      Q.  No, I am on to a different issue
 3  here.  Let me rephrase the question.
 4      A.  Okay.
 5      Q.  Have you in the past had problems
 6  with trying to collect rent from people?
 7      A.  I have had problems.
 8      Q.  And you have had situations where
 9  people have not paid you all the rent that
10  they owed you; right?
11      A.  Yes.
12      Q.  So in determining your damages for
13  lost rentals, obviously whether or not you
14  could collect the rent is an issue.  You
15  agree?
16      A.  Whether I collect it is an issue.
17      Q.  Yes, or whether it's collectable.
18      A.  Yes.
19      Q.  Miss Mumford, are you also aware
20  that you're a class rep for something called
21  the emotional distress class?
22      A.  Yes.
23      Q.  Have you been told that?
24      A.  Yes.
25      Q.  Have you been told that you're a

Page 221

 1  class rep for the property damage class?
 2      A.  Yes.
 3      Q.  Have you, in connection with this
 4  lawsuit where you're a class representative,
 5  have you attended any of the hearings in court
 6  in this case?
 7      A.  No.
 8      Q.  There was a prior trial involving
 9  Ingram.  Did you attend that trial?
10      A.  No.
11      Q.  Other than the one we're here for
12  today, have you attended any depositions in
13  this case?
14      A.  No depositions.
15      Q.  Other than the documents that you
16  produced and we talked about today, have you
17  reviewed any other documents of any kind
18  concerning this case?
19      A.  Yes.
20      Q.  What other documents?
21      A.  I can't name them, but they did --
22  the lawyers did talk with me and went over
23  documents with me, but I can't say what they
24  are right now.
25      Q.  You can't remember --

MUMFORD, ETHEL

8/5/2008

Page 222

1  A. But it was concerning the case.
2  Q. But you don't remember what those
3  documents were?
4  A. No.
5  Q. Have you ever been contacted about
6  any guidance or input in connection with any
7  of the papers filed in this case?
8  A. Have I ever been --
9  Q. Involved, consulted by your lawyers
10 or anyone else in connection with filings that
11 are actually made in court in this case?
12 A. Well, they went to court and they
13 came back, they told me what happened. That's
14 all I can remember.
15 Q. That's all you remember?
16 A. Yeah.
17 Q. Do you know what a class action is?
18 A. Yes.
19 Q. What is it?
20 A. A class action is a person like
21 myself just representing a whole group of
22 people that's in the area. And they all have
23 the same problem I had with the water
24 destroying properties and contents and
25 whatnot. Some of them lost loss of lives and

Page 223

1  all.
2  Q. And this would be within an area;
3  right?
4  A. Yes.
5  Q. You told me earlier you thought the
6  area ended at Delery Street?
7  A. Yes.
8  Q. And that's in the Ninth Ward?
9  A. That's in the Ninth Ward.
10 Q. When did you first learn that you
11 were going to be a class representative?
12 A. Oh, the late part of '05.
13 Q. How did you learn that you would be
14 a class representative?
15 A. Well, I just heard people talking
16 and then I went and talked with the lawyers
17 and they explained everything to me.
18 Q. The lawyers being who?
19 A. The Wiedemanns.
20 Q. Have you ever had any conversations
21 with Mr. Brian Gilbert about this case?
22 A. Yes.
23 Q. Have you ever had any conversations
24 with the Bruno Law Firm?
25 A. With this case?

Page 224

1  Q. With any cases.
2  A. With this case I think it was the
3  Brunos. But I never was involved in any other
4  case other than the barge case. The Brunos
5  had a case also, but someone, different ones
6  called me about this case.
7  Q. Who called you about this case?
8  A. It's someone that's working with the
9  case. I can't remember their name.
10 Q. With who?
11 A. With -- Someone that's working with
12 the barge case.
13 Q. They called you about --
14 A. Just asking questions like the
15 lawyers does.
16 Q. And that's how you first became
17 involved in this case?
18 A. Oh, no, no. I was already involved
19 in it.
20 Q. Well, what firm called you about
21 becoming involved that you were just --
22 A. I can't remember their name.
23 Q. And do you understand that there's a
24 separate lawsuit against the United States
25 government concerning breaches along the

Page 225

1  MRGO?
2  A. I heard something about it. I don't
3  really understand.
4  Q. Have you ever spoken to anyone at
5  the Bruno firm about becoming a party to that
6  lawsuit?
7  A. No.
8  Q. Have you ever filed any papers
9  making a claim against the government?
10 A. No.
11 Q. There's a form called an SF-95
12 concerning a claim against the government.
13 Did you ever fill out one of those?
14 A. I don't remember if I did. I don't
15 think so.
16 Q. Other than the barge case, have you
17 been approached by anyone else about being a
18 party to another case involving flooding in
19 the Ninth Ward?
20 A. No.
21 Q. Well, I am still a little confused,
22 ma'am, and I've got to go back over this,
23 these conversations that you had with this
24 other person about becoming involved --
25 A. It was someone, they told me who

57 (Pages 222 to 225)

MUMFORD, ETHEL

8/5/2008

Page 226

1  they were and they said it was on the barge
2  case and they told me my name and address and
3  all, that it was someone that was involved
4  with this case, but I can't remember their
5  name.
6      Q.  Was it somebody from the Wiedemann
7  firm?
8      A.  It could have been.
9      Q.  And was this before you had filed
10 the lawsuit?
11     A.  Well, this was recently.
12     Q.  Recently?
13     A.  Yes.  They asked the same questions
14 the Wiedemanns asked.  They were definitely
15 involved in the barge case.  They told me who
16 they were and all.
17     Q.  Do you understand that there are
18 expenses associated with bringing this
19 lawsuit?
20     A.  Yes.
21     Q.  Who's paying those expenses?
22     A.  The lawyers.
23     Q.  Has anyone given you an estimate of
24 what the costs of the lawsuit are?
25     A.  No.

Page 227

1      Q.  Do you have any estimate of what
2  they will be?
3      A.  No.
4      Q.  Do you have any financial
5  obligations with respect to this lawsuit?
6      A.  No.
7      Q.  Do you know whether you'll ever be
8  responsible for any expenses in connection
9  with this lawsuit?
10     A.  I don't know.
11     Q.  Have you paid any expenses --
12     A.  No.
13     Q.  -- in connection with this lawsuit?
14 No?
15     A.  No.
16     Q.  Have you ever filed for bankruptcy?
17     A.  No.
18     Q.  Have you ever been convicted of a
19 crime?
20     A.  No.
21     Q.  Have you ever been subject to a
22 restraining order?
23     A.  No.
24     Q.  I want to go back over your current
25 work.  You still do housecleanings; right?

Page 228

1      A.  Not right now.  I'm not doing any
2  housecleaning.
3      Q.  You do office cleanings?
4      A.  Yes.
5      Q.  You're still working for the
6  Wiedemanns; right?
7      A.  Yes.
8      Q.  How much are they paying you?
9      A.  They -- I work part time.  I work
10 three days a week, not so many hours, and they
11 pay me about $500, $600 a month.
12     Q.  Now, before the storm how often were
13 you working for them?
14     A.  Three days.
15     Q.  And how much were you being paid
16 then?
17     A.  About the same.
18     Q.  Now, how long was it after the storm
19 before you started working for the Wiedemanns
20 again?
21     A.  It probably was February, 2006.
22     Q.  Have any of the Wiedemanns referred
23 any other housecleaning clients to you?
24     A.  No.
25     Q.  Have the Wiedemanns ever referred

Page 229

1  you to any other persons that you do office
2  cleaning for?
3      A.  No.
4      Q.  Have the Wiedemanns ever referred
5  you to any persons that you do nursing type
6  services for?
7      A.  No.
8      Q.  You told me what the Wiedemanns pay
9  you now.  Have you received any bonuses from
10 the Wiedemanns since the storm?
11     A.  Yes.  They give us Christmas bonus.
12     Q.  Did you receive a Christmas bonus in
13 December, 2005?
14     A.  No.
15     Q.  Did you receive one in December,
16 2004?
17     A.  Yes.
18     Q.  How much?
19     A.  $150.
20     Q.  Did you receive a Christmas bonus
21 from the Wiedemanns in December of 2006?
22     A.  Yes.
23     Q.  How much?
24     A.  150.
25     Q.  Did you receive a bonus from,

58 (Pages 226 to 229)