# **Exhibit 36**

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

IN RE: KATRINA CANAL BREACHES  * CIVIL ACTION
                               * NO. 05-4182
PERTAINS TO: BARGES            * Consolidated
                               * SECTION "K(2)"

Boutte v. Lafarge        05-5531 *
Mumford v. Ingram        05-5724 * JUDGE DUVAL
Lagarde v. Lafarge       06-5342 *
Perry v. Ingram          06-6299 * MAG. WILKINSON
Benoit v. Lafarge        06-7516 *
Parfait Family v. USA    07-3500 *
Lafarge v. USA           07-5178 *
   *  *  *  *  *  *  *  *  *  *  *

           Deposition of WADE R. RAGAS, PH.D.,
MAI, given at Chaffe McCall, L.L.P., 2300
Energy Centre, 1100 Poydras Street, New
Orleans, Louisiana 70163-2300, on September
16th, 2008.


REPORTER BY:

        JOSEPH A. FAIRBANKS, JR., CCR, RPR
        CERTIFIED COURT REPORTER #75005

Page 10

1   A.  I don't know what their determination
2   was about why.  I just know that I identified
3   quite a wide array of data that I felt was
4   necessary to begin to undertake the analyses
5   they suggested, and at that point we parted
6   ways.
7   Q.  Dr. Ragas, in this particular action
8   do you actually believe that it is impossible
9   for anybody to create a hedonic property
10  valuation model that provides reasonably
11  accurate property diminution calculations?
12      MR. RAFFMAN:
13          Objection to form.
14          You can answer.
15  A.  I have done an initial look at what
16  data is available post-Katrina for the
17  geography particularly within the Orleans
18  Parish portion of the plaintiffs' proposed
19  class area, and I find there are egregious
20  deficiencies with the data that is present
21  there to use a hedonic modeling approach.  I am
22  unaware of any hedonic modeling approach that
23  would allow me to accurately estimate damages
24  at a property level for individual properties.
25  And I have searched diligently to see an

Page 11

1   example of that, and I have listened to
2   Dr. Kilpatrick 's testimony and heard none in
3   the way of an example.
4       So I don't think that it's possible at
5   this time, within the specific area designated
6   by plaintiffs of the class area in Orleans
7   Parish post-Katrina, to do a hedonic model to
8   measure either the damages that have occurred
9   or the diminishment in value in an accurate
10  way.
11      Within St. Bernard Parish, there is a
12  greater possibility of being able to assemble
13  the necessary data.  I have not done an
14  exhaustive look at St. Bernard Parish.  I still
15  see no way to apply a hedonic model to measure
16  damages at a property level within St. Bernard
17  Parish.
18  Q.  Are you basing all of this on an
19  initial look at what data is available
20  post-Katrina?
21  A.  Well, I have tried to be fairly
22  thorough in my initial look before I would
23  render such an opinion, and I have presented
24  documentation of that in my report, and I have
25  done extensive --

Page 12

1   Q.  Excuse me for interrupting but I asked
2   you a yes or no question.  Are you basing all
3   of this on an initial look at what data is
4   available post-Katrina?
5   A.  And sir, I'll notify you that I don't
6   believe I'll bound to a yes or no response as
7   an expert, and that if I feel the question
8   requires qualification I will do so and not
9   render a simple yes or no.  And in this
10  instance I didn't feel that I could render a
11  yes or no.
12      You may restate the question and then
13  I'll be happy to continue.
14  Q.  You're basing your opinion that you
15  have just explained to me on the fact that
16  you've done an initial look at what data is
17  available post-Katrina.  That was your prior
18  testimony; right?
19  A.  Yes.  I am basing my opinion on the
20  look I have done of the data availability.
21  Yes.
22  Q.  And what constitutes an initial look
23  as opposed to a thorough or rigorous or
24  exhaustive look at data?
25      MR. RAFFMAN:

Page 13

1           Objection to form.
2   A.  The initial look within the Orleans
3   Parish portion of the class area included
4   looking at all sales that went through the
5   Multiple Listing Service, inspecting those
6   sales that I thought were likely candidates to
7   be acceptable as data for this work, all
8   transactions that went through Deedfax, which
9   is a listing of the publicly recorded
10  transactions, a look at the appropriateness of
11  those sales for use in this matter, and the
12  information that was available on them.
13      I have looked at the census track
14  level files of the U.S. Census to see what they
15  might tell me about the requirements of the
16  number of properties we're discussing in this
17  matter that would have to be modeled, and the
18  requirements because of the count of properties
19  that would have to be modeled for whether it's
20  reasonable to do those with a hedonic
21  regression approach in terms of damages issues.
22      I have also done extensive work in
23  St. Bernard Parish in other matters, and so I
24  have more than a passing familiarity with what
25  data is available on St. Bernard, and

Page 26

1   of any negligence against them, was the cause
2   of all thirteen of these, when the issue at
3   hand is the extent of damage caused by two
4   levee wall breaches in which their barge was
5   involved, in which they may or may not have
6   been the cause of the breach.  So otherwise,
7   one would be opining about cumulative damages
8   for issues completely unrelated to damages they
9   could have possibly caused.
10      Q.  Is it your testimony, then, that when
11  doing a mass appraisal specification all the
12  properties in the model have to be identical?
13      A.  No.
14      Q.  So the properties can vary and still
15  result in a valid hedonic valuation model?
16      A.  There must be variation in the
17  properties to be able to model it at all.
18      Q.  Explain for me, then, why a properly
19  specified model can't isolate flooding damage
20  from all other types of damage when determining
21  that property value diminution?
22      A.  Well, first, to begin to do that I'll
23  need a lot of transactions because I need
24  transactions who have present each of those
25  sources of damage, and in sufficient quantity

Page 27

1   that I can do a statistically reliable
2   measurement of the element of damage.  So I'm
3   going to need a large enough data set to deal
4   with thirteen elements of damage to begin with,
5   apart from the model that can deal with all the
6   other issues necessary to specify hedonic
7   regression.
8          Second, to collect this data I'm going
9   to need to go to every property in the class
10  area and collect, on the ground, one at a time,
11  to what degree these elements of damage are
12  present on each property.  I can't model it
13  from an hedonic model if I don't know to what
14  degree each one of the properties in the class
15  is subject to these damages; otherwise, I'll
16  measure a damage in globo that will commingle
17  all of this.
18          Then, I will have to try to avoid a
19  multi colinearity problem between the damage
20  measurements; in other words, some of the
21  damages will be correlated with one another and
22  it will be complicated statistically to make
23  them independent measures one from the other in
24  a hedonic model.  It would be easier to do that
25  on the ground and more accurate using

Page 28

1   specialists who know what they're looking at
2   and using the records that may exist already
3   for each and every one of these properties
4   about the nature of damages they suffered.
5          And at the end of the day the hedonic
6   model then will have to be capable of saying
7   this is the value before the storm, this is the
8   value after the storm, and here is how I parse
9   these thirteen elements of damage to the
10  portion that's relevant to the case at hand,
11  which is only the damage caused by the running
12  water from the levee breach under the
13  litigation that we're hearing on this matter.
14      Q.  But you would agree with me that you
15  can generate an accurate model using a subset
16  of the entire class area.
17      A.  I have never seen any published model
18  that attempts to simultaneously measure even
19  four elements of damage simultaneously, let
20  alone thirteen.  I have looked for some
21  evidence in the literature, and in the
22  literature we are usually measuring one element
23  of damage at a time, using thousands of
24  properties, to get an accurate of measure of
25  one element.  And that damage is usually in the

Page 29

1   literature referred to as a negative
2   externality, to measure negative externalities.
3          You have been supplied by me a summary
4   of the negative externality literature and a
5   selection of major articles.  It is a big
6   literature.  I am familiar to some degree with
7   that literature, and I am not aware of anyone
8   who has ever claimed they could simultaneously
9   statistically measure twelve interrelated items
10  of negative externality simultaneously.
11  Frankly, I'm not aware of anyone that's ever
12  claimed they can measure more than one or two
13  at a time, particularly if we're going to meet
14  a peer review standard as Dr. Kilpatrick said
15  in his deposition.
16      Q.  Move to strike as nonresponse.
17          Can you generate a model using a
18  subset of the entire class area; yes or no?
19      A.  To do what purpose?  A model -- I
20  thought we were talking about a model to
21  measure these damages.
22      Q.  Correct.
23      A.  And I just responded.  The answer is
24  no.  I have not seen any example of a model
25  that can begin to measure thirteen interrelated

Page 30

1  elements of damage simultaneously with unique
2  measures for each one. No, I've never seen
3  that done, and I don't believe statistically
4  it's likely to be doable.
5     Q.  So your testimony is it's unlikely to
6  be possible rather than it's impossible to do.
7     A.  Impossible I have learned through my
8  career is a very strong word, it implies
9  100 percent certainty. I would tell you I
10 think the probability of being able to do this
11 in a reasonable way is extremely low.
12    Q.  What does your second factor, storm
13 surge floodwater from MRGO levee breaches, have
14 to do with the damages to the properties in
15 this case?
16    A.  Well, um -- within the St. Bernard
17 class area certainly there are multiple
18 examples of the breaching of the 40 Arpent
19 Canal and the overtopping of that canal by
20 floodwaters that emanated from the MRGO.
21        Within the Orleans Parish area, I
22 would be surprised if there were not similar
23 overtoppings that happened and erosion of
24 levees that allowed waters to flow from the
25 MRGO across the levees that protect at Florida

Page 31

1  Avenue into the Lower Ninth Ward. I believe --
2  and water doesn't tend to simply flow and stay
3  put, it tends to flow and spread out. So a
4  breach -- an overtopping event in St. Bernard
5  would almost certainly lead to water flows that
6  could emanate across the class area. The
7  extent to which that's an issue, though, will
8  become a matter of fact or opinion as various
9  hydrologists express their views about sources
10 of water and extent of where it went in this
11 case. I'm not saying I know exactly where, I
12 just think it is likely to turn up as an
13 element of damage, particularly given the
14 plaintiffs' posture in this particular matter
15 in the case that's being heard simultaneously
16 involving the MRGO.
17    Q.  To the extent, however, that it's
18 established in this case that the Industrial
19 Canal levee wall breaches occurred before any
20 other significant levee breach and resulted in
21 the flooding of the defined class area, you'd
22 agree that floodwater from other sources is a
23 superfluous element in your list, then, right?
24        MR. RAFFMAN:
25           Objection.

Page 32

1     A.  I don't know that. That will be a
2  matter for trier of fact to decide whether --
3  or what waters are relevant and whose damages
4  those are attributable to.
5  EXAMINATION BY MR. LEVIANT:
6     Q.  So then it's fair to say that this
7  list of thirteen different types of damage may
8  not all be relevant to the ultimate hedonic
9  model that plaintiffs are proposing be
10 developed.
11    A.  I think we just discussed an item in
12 which you're raising an issue, and I indicated
13 that one item was an item to be determined
14 between hydrology experts and the trier of
15 fact. I have not in any way suggested that
16 these other items are not relevant.
17    Q.  But certainly the one we just
18 discussed, your opinion is completely dependent
19 upon other experts and findings in the case,
20 correct?
21    A.  In that specific instance about the
22 MRGO, I think that is a correct statement.
23    Q.  A little while ago this morning you
24 said that you would need I believe you used the
25 words a lot of data to attempt to differentiate

Page 33

1  between various contributing sources of damage
2  that devalued property. What do you mean by a
3  lot of data in this particular case?
4     A.  There are no exact standards on the
5  quantity of data to address a research problem
6  when the research problem proposed has not been
7  done previously elsewhere in the literature as
8  is true here. I have provided samples of what
9  peer reviewed work looks like in the literature
10 over a long period of time rather than focusing
11 on just recent literature, and I've summarized
12 those on Page 82 of my report. And, um --
13 there, in models with far fewer total variables
14 than are going to be needed here, the typical
15 minimum amount of data was 612 records, and
16 what was looking at Three Mile Island issues by
17 Nelson in 1981 in which he finds, by the way,
18 that Three Mile Island doesn't produce stigma
19 damages and he only had six variables. So this
20 is at the very infancy of this work beginning
21 twenty-five years ago.
22        As you move forward, you find the data
23 sets get progressively bigger and bigger, and
24 they generally are measured in thousands. One
25 thousand plus type record models. Work I did

Page 66

1  my mind a hour count of my time versus each
2  other person who may have done this.  But I
3  have expended substantial amounts of my time on
4  this project.
5     Q.  What proportion of the time you spent
6  was time spent on the formulation of opinions
7  and reports?
8     A.  Again, I didn't bring the bills with
9  me and so I don't really have an accurate
10 way -- I don't want to misstate, and I'll be
11 happy to produce the bills in response to your
12 question, but I don't right now have a number
13 in my mind over -- this has been going on now
14 for a while.  I've been working on this for
15 quite a while, along with at any given time
16 twenty or thirty other projects.  So I don't
17 have an exact answer for you.
18    Q.  Do you have a best estimate?
19    A.  No, sir, I really don't want to render
20 a judgment and then be found that I seemingly
21 have misstated something.  And I will produce
22 the bills for you in a timely manner.  I'll
23 make it an issue to get at tomorrow morning, to
24 get those to you.  Or counsel could produce
25 those bills.

Page 67

1     Q.  So as you sit here today you are
2  incapable of estimating how much of your time
3  was billed at four hundred an hour versus how
4  much is billed at two hundred an hour.
5     A.  I don't know that I've billed any at
6  four hundred an hour at this point.  I'm sure
7  I've billed most of it at two hundred an hour.
8  Could there be some component that I've billed
9  at four hundred an hour?  There may well be,
10 but I don't recall.
11    Q.  Did the creation of the report which
12 has been identified as Exhibit Number 2, does
13 that fall within the category of work that you
14 call formulation of opinions and reports?
15    A.  It does, but I believe in this
16 instance I billed the bulk of that work at two
17 hundred dollars an hour and not at the four
18 hundred dollar rate.  And that was my decision
19 in terms of billing.
20    Q.  What was the motivation for that
21 decision?
22    A.  Um -- it was difficult at times to
23 separate out research collection, research data
24 analysis, um -- drafts of reports, and so,
25 um -- at any rate, the bulk of my billings in

Page 68

1  this matter for me personally I believe are at
2  two hundred dollars per hour.
3     Q.  Do you perceive this to be one of the
4  more complicate projects you've ever
5  undertaken?
6     A.  It is a complex project in the sense
7  of understanding all the issues at hand.  I
8  have dealt with many large and complicated
9  projects, though, through my career.  So I
10 haven't tried to think of where I might place
11 this in terms of complexity.
12         Now, I'm talking about what I've done
13 to date.  I'm not categorizing what would be
14 necessary to do what Dr. Kilpatrick has
15 proposed.  I view what he's proposed as
16 extraordinarily complicated, but -- in terms of
17 operationalizing what he's claiming can be
18 done.  But you're asking me about this work
19 product and how I categorize it.
20    Q.  In Paragraph 19 of your report you
21 discuss the need to differentiate between
22 causes of damage that occurred more or less
23 simultaneously.  Is simultaneity a cause
24 significant to any of your conclusions in this
25 report?

Page 69

1     A.  To the extent that they mean that they
2  all have to be measured from the same data set
3  over the same time period, yes.  And the
4  thirteen elements of damage that I've raised
5  all -- that I've identified for you today all
6  arise more or less at the same time, so they're
7  all going to be affecting the post-Katrina
8  sales prices, they're all going to be affecting
9  the availability of data, they're all going to
10 be affecting interrelationships with one
11 another in measuring the damages.
12    Q.  In Paragraph 25 of your report you
13 mention that the class area is a complex,
14 geographically diverse mixture of properties.
15    A.  Yes.
16    Q.  You'd agree with me that a hedonic
17 mass valuation model is capable of valuing
18 diverse properties; right?
19    A.  A single model, to attempt to
20 simultaneously measure areas with high levels
21 of abandonment and vacancy versus historic
22 districts with low levels of abandonment and
23 vacancy, and very different house prices, and
24 suburban data, over two separate counties,
25 which also must include property abandoned and

Page 70

1   poorly maintained before the storm, is fairly
2   extraordinary. And actually, when you look in
3   the literature usually one goes to great
4   efforts to not try to allege that one model can
5   do all of that simultaneously. You would
6   ordinarily see them attempt to parse that
7   geography so that it could be dealt with with
8   several models because there's such
9   heterogeneity and high variance in the data
10  set.
11       Q.   Do you believe then that a better
12  outcome could result if several different
13  models were specified capturing different
14  geographic regions in this case?
15       A.   I think that that will probably turn
16  out to be necessary if one was going to attempt
17  this in reality. I don't know whether that
18  will solve the problems. It magnifies the data
19  requirements. Each model has to have adequate
20  data. So when you move from one model to three
21  or four you've increased the magnitude of the
22  data requirements three or four fold.
23            (Lunch break.)
24  EXAMINATION BY MR. LEVIANT:
25       Q.   Were you involved in any way in the

Page 71

1   tax assessment process prior to 2004 in the New
2   Orleans area?
3        A.   Yes.
4        Q.   What was your involvement?
5        A.   I was approached by the director of
6   the Louisiana Tax Commission and the members of
7   the commission to suggest a sample methodology
8   using individual appraisers to review the
9   reasonableness of the work done by the
10  assessors in Orleans Parish. I designed for
11  them a sample methodology and suggested the
12  level and standards for the appraisal review
13  and assisted in recruiting for them an initial
14  group of appraisers to be considered along with
15  others some criteria so that they could
16  consider others in an open search for
17  appraisers with state certification. And then
18  they -- using the methodology I had suggested
19  and the sample I had suggested, I did a brief
20  training program on their behalf for the
21  appraisers they selected and their staff. And
22  then they administered that program, without my
23  involvement, and that resulted in a finding
24  that the assessors were not in compliance with
25  state law and that all seven had breached their

Page 72

1   responsibilities for uniformity and that there
2   were in fact significant problems in the
3   consistency of their appraisal assessments.
4   That finding was then heard. I was not a
5   participant in testifying on that matter
6   because others had done the work, and the
7   assessors chose to not contest the finding in
8   court and agreed to a mandatory reassessment of
9   all of their assets based upon -- all of the
10  residential assets based upon the tax
11  commission 's findings.
12       Q.   When were you first approached by the
13  director of the Louisiana Tax Commission to
14  begin that process?
15       A.   Sometime in late 2002 or early 2003.
16  I was employed at a state agency running a real
17  estate research center, and this was a request
18  from another state agency for assistance.
19       Q.   As best you recall, when did the
20  finding issue that the assessors had not
21  correctly performed their duties?
22       A.   Sometime in 2004, with a requirement
23  for them to update their records in 2005 which
24  was disrupted by Katrina.
25       Q.   Had the process of reappraisal started

Page 73

1   before Katrina?
2        A.   Um -- I am not privy to what progress
3   they had made. I subsequently also provided
4   real estate services for the city council, in
5   2007, and at that time there were still
6   significant deficiencies in some of the
7   assessment processes.
8        Q.   What were those deficiencies?
9        A.   I only looked at five thousand seven
10  hundred properties, through a team that I
11  assembled on behalf of the city council where
12  they had reviewed the assets. The board of
13  review is legally the city council in this
14  particular county, or parish, and they employed
15  a law firm here Frilot L.L.C. who employed me
16  to put together databases and methodology and
17  train personnel so that there could be
18  valuations done in hearings on fifty-seven
19  hundred property, residential and commercial.
20  We did those in the August-September period of
21  '07, and had to revise about 40 percent of the
22  assessments in a significant way. In some
23  instances much higher percentage of an
24  assessor 's records were revised.
25            Then, those were subject to a

Page 130

1  pressure in present years on the appraisal
2  industry to keep the housing market going by
3  escalating appraised values of properties for
4  people trying to borrow to purchase them.
5      A.  I'm sure there has been.  I'm sure
6  there has been.  And I'm also sure that when
7  you look at the issues that are there in the
8  current level of failures, I believe what you
9  will find is the dominant issue involves the
10 overborrowing by buyers of those
11 mortgage-backed securities with minimal equity
12 positions and the use of reliance upon credit
13 scores as a guide to creditworthiness at very
14 high total obligation ratios.  Whether you'll
15 find that the appraisal community is a
16 significant contributor to fault is certainly a
17 question that can be asked, but it by no means
18 is a question to which there are any clear
19 answers at this time, let alone that somehow
20 AVM models will be less likely to create that
21 problem or were not a major contributor to that
22 problem.
23      Much of the subprime lending also
24 involves the home equity mortgage area.  It is
25 in the home equity mortgage area that AVMs were

Page 131

1  most heavily used.
2      Q.  Has there ever been any systematic
3  efforts in the research literature in recent
4  years to compare the output of major AVM models
5  with individual appraisals?
6      A.  There have been some efforts.  Um -- I
7  am not here saying that it's impossible to have
8  an AVM model in the right set of data and in
9  the right circumstances be able to produce a
10 creditable result.  There are instances in
11 which it can produce a creditable result.  But
12 we are in the infancy of the period of
13 understanding the success and accuracy of the
14 individual appraiser versus the use in a broad
15 sense of those automated valuation models.
16     Q.  In Paragraph 86 of your report you
17 relate discussions between Professor Joseph
18 Suhayda and a Dr. David Moser.  Were you
19 present for those discussions?
20     A.  No, I had firsthand discussions with
21 Dr. Suhayda but I was not a party to the
22 discussion he had with Dr. Moser.  I suspect
23 that you could ask Dr. Suhayda about those
24 discussions when you depose him, though.
25     Q.  Looking at Paragraph 95 on Page 30 --

Page 132

1      A.  Yes, sir.
2      Q.  -- what do you mean when you say the
3  class representatives are not indicative of the
4  physical locational and use characteristics of
5  property in the proposed class?
6      A.  I supply on Page 31 a mapping of the
7  twelve class representatives.  They're
8  clustered south of Claiborne Avenue, which is
9  the area of the Orleans Parish portion of the
10 class that is furthest removed from the source
11 of the two breaches under discussion here.
12 When I inspected the properties, there is no
13 evidence of any running water type of damages
14 that is ascertainable at any of the properties
15 I saw in Orleans at these seven locations.
16     Then, the properties in St. Bernard
17 are literally clustered in an area of duplexes,
18 which is a very minor property use in
19 St. Bernard, relatively close to the downriver
20 or southeast end of the class area, more than
21 two miles removed from the area in which the
22 alleged damages ensued from the defendants in
23 this matter.  Within the area in which damages
24 are most likely to have been caused by a
25 breach, regardless of how the breach happened,

Page 133

1  without casting conclusions of how the breach
2  occurred, there are no class representatives in
3  that geography at all.
4      Then I looked at property ownership
5  type I find that these properties are mostly
6  not owner occupied dwellings.  Owner occupancy
7  sells as a premium to rental use.  Rental
8  properties sell for less per foot, usually, in
9  this market.  And when one looks at property
10 type, Paragraph 94, you find that nine of the
11 twelve are rental units whose primary purpose
12 is income-producing duplexes for renters.  So
13 we have automatically property which would be
14 less valuable than the same square footage in
15 an owner-occupancy setting.  At least in my
16 experience that would certainly be true.
17     The bulk of the properties in the
18 class area are single unit detached.  The bulk
19 of those properties are duplexes or larger
20 properties.
21     In the business area, we basically
22 have two representatives and only one of which
23 is really a property issue, and that one is a
24 occupant in a business where a substantial part
25 of his activity has been through a van in which

34 (Pages 130 to 133)