LEXSEE 2006 U.S. DIST. LEXIS 32839

**IN RE: TRAIN DERAILMENT NEAR AMITE LOUISIANA, ON OCTOBER, 12, 2002; THIS DOCUMENT RELATES TO: All Actions**

**CIVIL ACTION MDL NO. 1531 SECTION "A"**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF LOUISIANA**

*2006 U.S. Dist. LEXIS 32839*

**May 23, 2006, Decided**
**May 24, 2006, Filed**

**SUBSEQUENT HISTORY:** Later proceeding at *In re Train Derailment near Amite, 2007 U.S. Dist. LEXIS 13319 (E.D. La., Feb. 22, 2007)*

**PRIOR HISTORY:** *In re Train Derailment near Amite, 2004 U.S. Dist. LEXIS 13397 (E.D. La., July 15, 2004)*

**COUNSEL:** [*1] For Susan Blades, 02-3121, Consol Plaintiff: Frederick A. Stolzle, Jr., Stolzle Law Firm, Baton Rouge, LA; Henry T. Dart, Henry Dart, Attorneys at Law, Covington, LA US; Thomas Allen Usry, Usry, Weeks & Matthews, New Orleans, LA.

For Rosa Burton, 02-3121, Marissa Spitzer, 02-3121, Consol Plaintiffs: Frederick A. Stolzle, Jr., Stolzle Law Firm, Baton Rouge, LA.

For Gloria Brown, 02-3123, Shandra Brown, 02-3123, Lashanda Brown, 02-3123, Lionel Crooks, 02-3123, Consol Plaintiffs: Joseph H. Simpson, Simpson & Simpson, Amite, LA; David Blayne Honeycutt, Fayard & Honeycutt, Denham Springs, LA; Eric L. Pittman, Pittman, Miers & Dykes, Denham Springs, LA; Gordon Wright Matheny, Matheny Law Firm, Hammond, LA; John B. Edwards, Edwards & Associates Law Firm, LLC, Amite, LA; Rick A. Caballero, Rick A. Caballero, Attorney at Law, Baton Rouge, LA; Robert Johnston Carter, Robert J. Carter, PLC, Greensburg, LA.

For LaShawn Brown, 02-3123, Consol Plaintiff: Joseph H. Simpson, Simpson & Simpson, Amite, LA; David Blayne Honeycutt, Fayard & Honeycutt, Denham Springs, LA; Donald Wayne Price, Due', Price, Guidry,

Piedrahita & Andrews, Baton Rouge, LA; Eric L. Pittman, Pittman, Miers & Dykes, [*2] Denham Springs, LA; Gordon Wright Matheny, Matheny Law Firm, Hammond, LA; Robert Johnston Carter, Robert J. Carter, PLC, Greensburg, LA; Sherman Q. Mack, Sherman Q. Mack, Attorney at Law, Albany, LA.

For Matthew Brown, 02-3124, Consol Plaintiff: Calvin Clifford Fayard, Jr., Fayard & Honeycutt, Denham Springs, LA.

For Illinois Central Railroad Company, 02-3121, Consol Defendant: David Stuart Kelly, Nicole M. Duarte, Robert S. Emmett, Timothy Farrow Daniels, Lemle & Kelleher, LLP, New Orleans, LA.

For William Hugh Sibley, 02-3121, Consol Movant: William Hugh Sibley, Sibley Law Firm, Greensburg, LA.

For T Allen Usry, 02-3121, Consol Movant: Thomas Allen Usry, Usry, Weeks & Matthews, New Orleans, LA.

Michael J Beck, unknown, Pro se, Washington, DC.

**JUDGES:** Jay C Zainey, JUDGE. MAGISTRATE SHUSHAN.

**OPINION BY:** Jay C Zainey

**OPINION**

FINDINGS OF FACT AND CONCLUSIONS OF LAW

In connection with the Court's consideration of the

fairness, reasonableness and adequacy of the proposed compromise settlement of the class action to the class as a whole, the Court enters the following findings of Fact and Conclusions of Law, as jointly proposed by the parties and adopted by the Court [*3] *in toto* at the fairness hearing held on May 17, 5006.

## I. FINDINGS OF FACT

HISTORY AND PROCEDURAL STATUS OF THE LITIGATION

1. The present class action, along with dozens of other actions, was filed as a consequence of the October 12, 2002 derailment of a north bound Illinois Central Railroad Company (IC) freight train at or near Mile Post 844.4 (the Dykes Spur) which is located approximately 1/4 mile south of the southern boundary of Amite City, Louisiana, and the consequent spill and release of liquid fertilizer, plastic pellets, hydrochloric acid and styrene monomer, which resulted in evacuation of the area surrounding the derailment and spill site.

2. In the aftermath of the derailment, some fifty-nine (59) lawsuits (including twenty-seven (27) putative class actions) seeking damages as a consequence of the incident were initiated against IC (and in some cases against one or more of its employees and/or affiliated companies as well) by hundreds of named individuals and businesses. Most of the damage actions were filed in or removed by IC to the United States District Court for the Eastern District of Louisiana; however, several non-class action lawsuits [*4] either facially not removable or removed and thereafter remanded on plaintiffs' motion after contradictory hearing, remain pending in the 21st Judicial District Court for the Parish of Tangipahoa, State of Louisiana, where they have been consolidated for pretrial and trial purposes in Division C of that court.

3. The incident-related actions pending in this district were ultimately transferred to and consolidated in this Court for pretrial and trial purposes, and were thereafter consolidated by order of the Judicial Panel on Multi-District Litigation for pretrial purposes with a handful of related civil actions that had been initiated in another federal judicial district under MDL Civil Action No. 1531.

4. By order dated January 9, 2004, this Court certified a class pursuant to *Rule 23(b)(3) of the Federal Rules of Civil Procedure* and confirmed the appointment of fourteen (14) individuals to serve as designated Class Representatives. The class was defined by the Court as:

All persons, firms, and/or legal entities: (1): residing, maintaining a place of business, owning property, employed, or present within the geographic boundary described below . . . between October 12, 2002 and [*5] October 17, 2002, and (2) who claim to have sustained legally cognizable damages arising or resulting from the train derailment that occurred on October 12, 2002, in or near the Town of Amite, Parish of Tangipahoa, State of Louisiana.

The geographic boundaries of the Class were established by the Court as follows:

Beginning at a point where the westward extension of the south right-of-way line of Brickyard Road intersects the east right-of-way line of Interstate 55, proceed north along the east side of the right-of-way line of Interstate 55 to its intersection with the north right-of-way of La. Hwy. 16; then proceed east along the north side of the right-of-way line of La. Hwy. 16 to the west right-of-way line of the corporate limits of the Town of Amite; then proceed north along the east side of the corporate limit line; then proceed east along the south side of the corporate limit line; then proceed north along the east side of the

corporate limit line; then proceed east along the south side of the corporate limit line to the west right-of-way of U.S. Hwy. 51; then proceed north along the west side of the right-of-way of U.S. Hwy. 51 to that point above Foulks Lane which [*6] is the northern corporate limit line of Amite; then proceed east along the south side of the corporate limit line to a point which represents the northeast point of the corporate limit line of the Town of Amite; then proceed south on the west side of the corporate limit line, parallel to North Duncan Avenue to a point which intersects the north right-of-way line of La. Hwy. 16; then proceed in an easterly direction along the north side of the right-of-way of La. Hwy. 16 to the west bank of the Tangipahoa River; then proceed in a southerly direction along the west bank of the Tangipahoa River to a point being the extension of a parallel line of the south edge of the Brickyard Road right-of-way; then proceed west on the north side of a line parallel to the southern right-of-way of Brickyard Road to a point on the east right-of-way line of Interstate 55 which is the point of beginning.

5. By separate order also entered on January 9, 2004, this Court (i) appointed Class Counsel and (ii) directed Class Counsel to promulgate a Court-approved notice of class certification, informing the members of the class of the Court's certification order, of the procedures applicable to the assertion [*7] of damage claims within the Class Action, and of their right to opt out of the class if desired.

6. Pursuant to these Court orders and as evidenced by Class Counsels' "Certification of Class Notice" (filed on June 14, 2004) notice (a) of the Court's class certification order, (b) of the opt-out procedures that the Court approved and (c) of the claim submission procedures that the Court ordered, was promulgated as follows: The notice was mailed to all known plaintiffs at their last known addresses *via* first class U. S. mail, postage prepaid; the notice was published *verbatim* in the Amite-Tangi Digest on February 18, 2004, and again on February 25, 2004; the notice was likewise published *verbatim* in the Hammond Daily Star on February 18, 2004, and again on February 25, 2004; news articles were published in the Amite-Tangi Digest on April 7, 2004 and on April 14, 2004, notifying the public of the claims office address and of the Court-imposed deadline for the submission of claims; a complete and legible copy of the Court-approved notice and attachments was publicly posted from February 13, 2004, through April 30, 2004, in the office of the Clerk of Court for the United [*8] States District Court for the Eastern District of Louisiana, and was publicly posted as well, beginning on February 18, 2004 and continuing until after expiration of the opt-out and claim submission deadlines, in the office of the Clerk of the Twenty-First Judicial District Court for the Parish of Tangipahoa, State of Louisiana.

7. After ordering promulgation of notice of certification (including notification of the claims assertion and opt-out procedures approved by the Court and established for the class action certified), more specifically on April 14, 2004, the Court adopted the parties' jointly submitted *Post-Certification Case Management Plan and Scheduling Order* (CMO) which, *inter alia,* directed Class Counsel to prepare and file a Master Class Action Complaint to supersede and displace the myriad individual petitions and complaints that had initially been filed on behalf of hundreds of plaintiffs in the thirty-one (31) different actions whose claims had, by virtue of the Court's certification ruling, become subsumed within the Class. The Master Class Action Complaint was filed on May 28, 2004, and answered by defendant IC on June 10, 2004.

8. In response to [*9] promulgation of the Court's class certification notice, some 561 persons opted out of the class by timely submitting signed opt-out forms to the Clerk of the United States District Court for the Eastern District of Louisiana.

9. In response to promulgation of the Court's class certification notice, some 5949 *Submission of Claim* forms were timely completed and submitted by and on behalf of persons within the definitional and geographic limits of the Class as certified; pursuant to the then-applicable case management orders, copies of the claim forms, with all schedules and attachments were delivered to IC's counsel. In short, both sides had access to the class members' *Submission of Claim Forms* for review and analysis before commencing their settlement discussions.

10. On June 14, 2004, Class Counsel certified their compliance with the Court's orders respecting promulgation of notice of certification, and of the claims submission and opt-out procedures applicable to the class action.

11. Thereafter, on June 16, 2004, in accordance with the provisions of the applicable post-certification CMO, the Court entered an order staying prosecution of the claims of the named [*10] plaintiffs in the thirty-one pending federal actions subsumed within the class (and of nine individual plaintiffs in one additional action who likewise did not opt out of the class).

12. Concurrently with and following completion of the claims submission process described in P9, above, the parties to the class action conducted extensive liability, causation, and damage-related discovery, both documentary and testimonial. The fourteen named class representatives were deposed and their claims and medical information have been gathered and analyzed. Twenty-two other personal injury claimants--most of whom

are opt out claimants pursuing "fear and fright" and inconvenience claims similar to the claims asserted by the class representatives in the class action in the state court system--have been deposed by IC's counsel and their medical and claims information has also been gathered and analyzed. Additionally, IC propounded comprehensive discovery interrogatories and production requests to the opt out plaintiffs addressing the claims they are pursuing (some in federal court and some in state court) and their responses to this damage-related discovery have been reviewed and analyzed by [*11] IC's counsel as well. Moreover, ten different health care providers and six emergency responders have been deposed, and the mayor of the Town of Amite, who happens to be a medical doctor, has likewise been deposed. Class Counsel took IC's corporate deposition pursuant to a comprehensive *Rule 30(b)(6)* notice; this corporate deposition took several days to complete and involved testimony by three separate corporate designees. Additionally, Class Counsel deposed seven other IC employees (including the train crew and representatives of IC's maintenance of way department charged with inspecting and maintaining the track and roadbed at the derailment site). And, Class Counsel served, concurrently with their comprehensive *Rule 30(b)(6)* deposition notice to IC, an equally comprehensive set of production requests (as allowed by *Rule 30(b)(5) of the Federal Rules of Civil Procedure*) and in response to those requests IC has to date produced for review and analysis by Class Counsel and their experts and consultants more than twelve thousand four hundred bates-numbered pages of materials, including detailed track inspection and maintenance records, Federal Railroad Administration records regarding [*12] its track inspections in the derailment area, scene photographs, emergency response data, available meteorological data, train event recorder data, train consist and train

product information, and air and surface and groundwater analytical data and test results and Louisiana Department of Environmental Quality records. And, in addition to the above described discovery activities, pursuant to this Court's *ex propria motu* order in October of 2002 (modified in November 2002), IC preserved for inspection by both side's expert engineering and metallurgical consultants the rail pieces and switch components and the HCI and styrene tank car components salvaged from the derailment site.

13. Concurrently with the aforesaid claim gathering and discovery activities, the parties through their counsel, at the direction and encouragement of the Court and with the assistance of Magistrate Judge Sally Shushan engaged in ongoing discussions regarding the possibility of compromising and settling the class action and the related "opt-out litigation" on a "global" or "near-global" basis. Between November 8, 2004 and November 15, 2005, representatives of the parties met to discuss the possibility [*13] of settling the class action no fewer than a dozen times--at least six of which meetings were overseen and conducted by Magistrate Judge Shushan.

14. After protracted, comprehensive and often intense negotiations, and with considerable assistance provided by the Magistrate Judge, the parties reached a tentative settlement in mid-November 2005--almost twelve months to the day after formal settlement negotiations had begun in earnest. The parties' tentative settlement was reduced to writing (styled *"Confidential Memorandum of Understanding"*), reviewed by the Court and filed in the record herein under seal on December 7, 2005. The Court then stayed further proceedings and suspended the deadlines fixed by the then-applicable case management order (CMO # 4) to allow the parties time to finalize their tentative compromise agreement. In due course, the parties' tentative agreement was incorporated into a superceding comprehensive Final Settlement Agreement (FSA) dated December 30, 2005, which agreement was jointly submitted by the parties to the Court on January 27, 2006 for preliminary and ultimately, after hearing in accordance with *Rule 23(e) of the Federal Rules of Civil Procedure,* [*14] for final approval. With the exception of two claims specifically identified in the FSA, all of the opt-out plaintiffs with claims pending in federal and in state court have bound themselves to participate in the settlement on parity with the class members.

15. Broadly speaking, the FSA provided for the payment by IC of $ 8,275,000.00 (United States Dollars) into a fund to pay for claims, litigation expenses, and fees recoverable by class members as a result of the October 12, 2002 freight train derailment and ensuing chemical release. The agreement further provided for an additional payment by IC of $ 340,000.00 to defray the costs and expenses that had been and would thereafter be incurred in the administration of the settlement. The property damage claims of the owners of the property on which the derailment occurred and the property immediately adjacent to the derailment site was specifically excepted from the settlement fund and has, with the assistance of Magistrate Judge Sally Shushan, been compromised separately, as set forth in the FSA. In addition, two claimed wrongful deaths supposedly arising out of the derailment were specifically excepted from the compromise reflected [*15] in the FSA and will be litigated or compromised separately. As provided by the FSA, IC funded the settlement on or before January 6, 2006 and the proceeds are on deposit under the parties' escrow and trust agreement, which this Court has previously reviewed and approved.

Case 2:05-cv-04182-SRD-JCW   Document 16571-18   Filed 12/01/08   Page 6 of 24

Page 6
2006 U.S. Dist. LEXIS 32839, *15

16. By order dated January 27, 2006, this Court preliminarily approved the FSA and ordered Class Counsel to promulgate a Court-approved notice to the class members of, among other things: (a) the proposed settlement, (b) the means by which they could obtain more specific information regarding the proposed settlement and its terms and conditions, (c) the date of the Fairness Hearing, and (d) the procedures they were to follow to lodge (and preserve) any objection they might have to the fairness of the proposed settlement.

17. As demonstrated by the affidavits submitted by Class Counsel at the Fairness Hearing (exhibits FH-CC-14, 15, 21, 25-27), the Court-ordered notice of the proposed settlement was promulgated to the class members by mail, by publication in the *Hammond Daily Star* and *Amite-Tangi Digest* on February 1 and 8, 2006, and by posting in the offices of the clerk of court for both the United [*16] States District Court for the Eastern District of Louisiana and the 21st Judicial District Court in Amite, Louisiana.

18. Following notice to the class members of the proposed class action settlement and after expiration of the deadline fixed by the Court for the assertion in writing of any objections that the class members might have to the proposed settlement, the Fairness Hearing requested by the parties and required by *Rule 23(e) of the Federal Rules of Civil Procedure* was convened on April 26, 2006 by United States Magistrate Judge Sally Shushan; following receipt of certain evidence offered by Class Counsel, the hearing was adjourned by Magistrate Shushan until May 17, 2006 and then reconvened by the Court for receipt of additional evidence relevant to the fairness of the proposed settlement, for submission by the parties of memoranda in support of their earlier-filed joint motion for approval of the proposed class action settlement,

and for argument on the motion, at which time the Fairness Hearing was concluded before this Court.

19. As verified in the formal certification issued under the auspices of the Clerk of the United States District Court for the Eastern [*17] District of Louisiana, on April 26, 2006, no written objection to the proposed class action settlement was filed with the Clerk's office by any class member. Further, no one appeared at the Fairness Hearing to attempt to voice any objection to the proposed settlement.

20. This matter is now before the Court on the joint motion of parties asking the Court (a) to reaffirm its prior certification of this class action and (b) to approve the compromise settlement thereof as fair, reasonable and adequate for the class as a whole, and thereupon to enter herein the Final Order and Judgment as heretofore submitted by the parties, finally, forever and completely disposing of all claims of the class representatives and the class members against IC, and against any and all of its shareholders, directors, officers, agents, servants, employees, *predecessors, affiliates, parents, successors, insurers, excess insurers* and reinsurers, and each of their administrators, heirs and assigns, with prejudice.

FACTS PERTAINING TO THE MERITS OF THE PLAINTIFFS' CLAIMS

21. The present class action, along with the other actions described above, arises out of a train derailment and resulting [*18] chemical release involving styrene (and a constituent chemical, ethylbenzene), hydrochloric acid, and nitrates (from the spilled liquid fertilizer).

22. As a result of the chemical release, numerous persons in the vicinity of the derailment and release were

required, initially by local emergency responders and ultimately by the emergency response unit of the Louisiana State Police, to evacuate their residences and/or businesses for a period of up to four days.

23. In their Master Class Action Complaint, the plaintiffs contend, through one or more of the class representatives named by this Court, that the chemical release continued for several months, resulting in the continuous toxic exposure through the air, water, and soil to residents, livestock, pets, wildlife, homes, businesses, and other property, causing widespread fear and fright and compensable inconvenience, in addition to property damages and personal injuries.

24. The plaintiffs through the class representatives contend that the derailment and chemical release were caused by the negligence of IC in conjunction with its operation of the train and railroad tracks, or alternatively that IC is "strictly liable" [*19] for the derailment and for all legally recoverable damages that flow from it.

25. The plaintiffs through the class representatives contend that they sustained legally recognized and recoverable damages for which IC is liable, including but not limited to personal injury, loss of consortium, service, and society, emotional and mental damages, lost income, lost profits, economic damages, business interruption, property damage, property value diminution, evacuation and/or inconvenience, future crop loss, loss of animal and pet life, environmental and ecological loss.

26. In marked contrast to plaintiffs' allegations, in IC's Answer to the Master Class Action Complaint--as in its answers to the underlying petitions and complaints in the actions subsumed within and/or consolidated with the class action--it denies any and all liability to the plaintiffs in the class action (and to the plaintiffs in

any of the other derailment related cases for or in consequence of the October 12, 2002 derailment), contending that its conduct relating both to the operation of the train in question and to the inspection and maintenance of its railroad tracks and roadbed was at all material times [*20] and in all material respects in conformity with all duties of care imposed on it by applicable federal and state law and regulation--its actionable breach of duty causative of plaintiffs' alleged damages being an essential prerequisite to the imposition of civil liability in this action or any other stemming from the incident. In further response to the Master Class Action Complaint, IC expressly denies application of the doctrine of *res ipsa loquitur,* and suggests that the Louisiana legislature abrogated strict liability principles in 1996, several years before the occurrence of the derailment at issue, rendering meritless the "strict liability" claims asserted by the plaintiffs.

27. IC further contends that plaintiffs' right of recovery for many of the claims made herein is preempted under the *Supremacy Clause of the United States Constitution* by and through the Federal Railroad Safety Act (FRSA), *49 U.S.C. § 20101 et seq.,* the Hazardous Materials Transportation Act (HMTA), *49 U.S.C. § 5101 et seq.* and the pervasive federal regulation of train operations, track installation, track inspection and track maintenance procedures [*21] set out in the Title 49 of the Code of Federal Regulations, which together preemptively displace Louisiana state law in the establishment of the standard of care applicable to IC's conduct.

28. IC alternatively contends that the derailment resulted from an Act of God or *force majeure* for which IC is not liable.

29. Besides denying any liability to the class or to any of the plaintiffs in the related actions, IC denies that the chemical

release exposed plaintiffs to noxious or harmful chemicals *at* levels sufficient to cause them actual physical harm or even to increase their risk of contracting any illness or disease in the future.

30. With respect to potential airborne exposures resulting from the derailment, the declaration of IC's expert environmental engineer, Dr. Gregory A. Holton, states that based upon his modeling work, no person more than a short distance outside of the derailment site was likely exposed to any airborne concentration of styrene that equaled or exceeded any Acute Exposure Guideline Level (AEGL) or Emergency Response Planning Guideline (ERPG) level. Dr. Holton's declaration also states that no person more than a few feet from the tank car [*22] leaking hydrochloric acid was likely exposed to any airborne concentration of hydrochloric acid that equaled or exceeded any AEGL or ERPG level.

31. The declaration of IC's expert toxicologist, Dr. Glenn C. Millner, supports Dr. Holton's conclusions, stating that it is highly unlikely that anyone more than a very short distance outside of the derailment site was exposed to any airborne concentration of styrene or hydrochloric acid that equaled or exceeded any AEGL or ERPG. The Court notes that Dr. Millner's company, CTEH, actually measured the meteorological conditions and the concentrations of airborne styrene and hydrochloric acid at various stations along the perimeter of the derailment site and in other locations in the Amite area from shortly after the derailment until several days thereafter.

32. As Dr. Millner explains, the most protective of the levels discussed above is the AEGL-1, which constitutes the lowest level at which the science indicates that members of the general population, including susceptible individuals, could

experience transient and reversible discomfort, irritation, or certain asymptomatic nonsensory effects. According to Dr. Millner, it is very [*23] unlikely that anyone whose exposures to styrene and/or hydrochloric acid were below the lowest applicable AEGL or ERPG levels would have experienced symptoms or health effects from such exposures. Further, Dr. Millner opined that it is very unlikely that anyone at all experienced more than minor and temporary health effects or symptoms as a result of exposure from this incident.

33. Finally, Dr. Millner reviewed the medical records and deposition testimony of the class representatives, along with the deposition testimony of their healthcare providers, and opined that none of the class representatives had medically-proven symptoms of styrene and/or hydrochloric acid exposure, and that only one of the representatives had medically-proven symptoms for which styrene and/or hydrochloric acid had even a reasonable possibility of being exposure-related.

34. With respect to potential soil and/or groundwater contamination and exposures, the declaration of IC's Manager of Environmental Operations, Robert A. Strong, states that, under the supervision and with the approval of the Louisiana Department of Environmental Quality (LDEQ), IC has been remediating the soils and groundwater at [*24] the derailment site since the date of the derailment. IC removed all surface and potential surface soils that were impacted to levels exceeding the Louisiana Risk Evaluation/Corrective Action Plan (RECAP) Screening Standards, and IC has conducted a program of groundwater monitoring and remediation involving free product removal and biosparging, among other techniques.

35. Mr. Strong further states that at no point during the monthly and/or quarterly

monitoring of the dozens of wells and borings at the site has styrene or its constituent ethylbenzene been detected off-site or in any of the deep wells located on-site. Further, with the exception of a few temporary, localized concentration increases attributable to soil excavation activities that were conducted on-site, styrene and ethylbenzene concentrations have declined over time across the site.

36. Finally, Mr. Strong states that the impact to soil and groundwater resulting from the derailment was localized and does not, nor did it ever, pose a risk to the public via off-site impact, and, based on the foregoing and on its course of dealings with the LDEQ, IC believes that it is likely that the site will obtain "No Further [*25] Action" status by the end of this calendar year.

37. At commencement of the Fairness Hearing on April 26, 2006, Class Counsel confirmed that plaintiffs' experts had determined that widespread significant chemical exposures leading to physical injury did not occur in this case, and that the case was therefore one involving claims primarily for "fear and fright" and evacuation/inconvenience.

38. Based upon the aforesaid declarations of Dr. Holton, Dr. Millner, and Mr. Strong, along with the statements of Class Counsel at the hearing, the Court finds that the evidence in this matter does not demonstrate any community-wide exposure to chemicals in quantities sufficient to cause physical harm and, therefore, the vast majority of the claims of the class members involve fear and fright and/or evacuation/inconvenience rather than actual physical injury or property damage.

FACTS RELATING TO SUBJECT MATTER JURISDICTION

39. This Court has subject matter jurisdiction over the claims asserted in the Class Action Master Complaint.

40. Complete diversity of citizenship exists between the designated Class Representatives on the one hand and IC on the other, and the amount-in-controversy [*26] requirement of *28 U.S.C § 1332* is undeniably satisfied. *See Grant v. Chevron Phillips Chem. Co., 309 F.3d 864, 868 (5th Cir. 2002)*; *In re Abbott Labs, 51 F.3d 524, 529 (5th Cir. 1995)*. Further, supplemental jurisdiction over the claims of the absent class members exists pursuant to *28 U.S.C. § 1367. See id.*

FACTS RELATING TO THE REQUIREMENTS SET FORTH IN *RULE 23, FEDERAL RULES OF CIVIL PROCEDURE*

*NUMEROSITY*

41. As a result of the publication and mailing of the required notices, approximately 5900 *Submission of Claim* forms were timely completed and submitted by and on behalf of persons within the definitional and geographic limits of the class as certified by this Court.

*COMMONALITY*

42. As plaintiffs alleged in their original motion to certify, and as IC acknowledged in its briefing in response thereto, the factual issues presented in the action relating to defendant IC's conduct, liability, and defenses, are common to all members of the class, as are issues relating to the areas affected by the chemical release and the resulting evacuation orders.

*TYPICALITY*

43. [*27] All of the injury and damage claims presented in the action arise from a single discrete event: the derailment of an IC freight train at about 3:00 p.m. on October 12, 2002 near the

Town of Amite, Louisiana, and the ensuing spill and release of liquid fertilizer containing nitrates, inert plastic pellets, hydrochloric acid and styrene monomer (and a constituent chemical, ethylbenzene), and the post-derailment evacuation of the area surrounding the derailment and spill site.

44. The deposition testimony of numerous class members and the affidavit of Interim Plaintiffs Steering Committee member W. Hugh Sibley that were introduced at the class certification hearing in this action establish that the representative plaintiffs seek damages for the same categories of injuries alleged by the claimants in their claim forms--psychological injury (including fear and fright), inconvenience and evacuation damages, work-related economic damages, and physical injury damages.

45. While most class members claimed in their submission of claim forms that they had suffered physical injuries as a consequence of the derailment and its *sequella,* the declarations of IC's experts, Dr. Holton, [*28] Dr. Millner, and Mr. Strong, along with the statements of Class Counsel at the Fairness Hearing, establish that this action does not involve a community-wide exposure to chemicals in quantities sufficient to cause physical harm and, instead, the vast majority of the claims of the class members are for fear and fright and/or for evacuation/inconvenience, rather than for actual physical injury.

*ADEQUACY OF REPRESENTATION*

46. As set forth above, the Class Representatives and class members are seeking the same types of relief as the result of a single, discrete event.

47. This matter presents tort claims arising under the laws of the State of Louisiana, not under the competing laws of several states. No issues of competing laws from multiple jurisdictions, overlapping and/or conflicting laws or legal doctrines, or significant potential conflicts exist as between present and future claimants. This Court has already determined that Louisiana law applies to the disposition of plaintiffs' claims in this action, even with respect to class members who may reside in other states. *See* 2004 WL 15964634 (E.D. La. 7/15/04); 2004 WL 169805 (E.D. La. 1/26/04); [*29] 2003 WL 22384962 (E.D. La. 10/16/03).

48. The class representatives are, as they informed the Court through Class Counsel at the Fairness Hearing, unable to offer reliable evidence establishing a causal connection between the chemicals released in and after the derailment and the widespread physical injuries that the class members claimed in their submission of claim forms and otherwise to have suffered, nor have the Class Representatives developed evidence of any widespread off-site property contamination caused by the derailment.

49. Thus, the widespread physical injuries supposedly suffered by class members are more conjectural and anecdotal than substantive, and there is little to no possibility of significant future claims. Consequently, there are no significant potential conflicts between present and future claimants and there is no need in this class action for the creation of any separate subclasses or subgroups, whether separately represented or not.

50. The class representatives designated by the Court have vigorously prosecuted this action through, experienced, able and qualified counsel appointed by the Court.

51. Class Counsel have prosecuted [*30] this litigation zealously on behalf of all members of the class, at considerable personal expense.

52. Class Counsel are highly experienced, savvy and capable attorneys with particular knowledge and expertise in the area of toxic tort class actions and complex litigation.

53. Class Counsel had no conflicts with the class representatives or with any of the members of the class.

54. Class Counsel vigorously represented the interests of the class members throughout the litigation and settlement process. As alluded to above, Class Counsel, with additional assistance from counsel for a number of the named plaintiffs in related opt-out actions, have conducted a thorough investigation into defendant IC's possible liability for the October 12, 2002 derailment and into the impact of the event to those persons and entities in the vicinity of the derailment when it occurred and those persons and entities affected by its aftermath, and engaged and conferred with several experts from around the country to assist in proving the elements of the plaintiffs' claims.

*PREDOMINANCE AND SUPERIORITY*

55. As set forth above, factual and legal issues relating to defendant IC's conduct, [*31] liability, and defenses with respect to the derailment, along with factual and legal issues relating to the scope of the chemical release and resulting evacuation orders, are common with respect to all class members, and all claims arise out of a single event.

56. In light of the class representatives' inability to establish a causal connection between the widespread physical injuries that so many of the class members claimed in their submission of claim forms and the chemicals released as a result of the derailment, the vast majority of the class members' claims are essentially of the same type--fear and

fright and evacuation/inconvenience.

57. The substantive law applicable to the resolution of plaintiffs' claims against IC is the same with respect to all plaintiffs.

58. Given the commonality of the legal and factual issues discussed above, and considering that the vast majority of the claims presented in this class action are for fear and fright and evacuation/inconvenience, it would be a monumental waste of judicial and private resources to require the 5900 or more class members to file individual lawsuits for the recovery of their claimed damages.

59. Given [*32] the nature and number of the claims presented in this action, it would be economically unreasonable for most class members to adjudicate their claims separately. For the same reason, the "interest of members of the class in individually controlling the prosecution . . . of separate actions" is minimal because the cost of pursuing separate actions would, for the vast majority of class members, grossly exceed any recovery that they could obtain outside of the class action process.

60. The settlement of this class action as proposed by the parties and embodied in the afore-described FSA would resolve all but one of the fifty-nine separately initiated actions that were filed as a result of the derailment, because all of the persons who opted out of the class--whether pursuing their opt out claims in federal court or in state court--have agreed to participate in the proposed settlement on parity with the class members. In fact, only two individual claims--the wrongful death claims asserted by the survivors of Messrs. Jarrell and Gilly--will remain for resolution after the proposed settlement is consummated and final.

61. In light of the proposed settlement of the class action, [*33] there are plainly

no case "management" issues that would militate against class certification; the action will not be tried on the merits if the Court approves the settlement memorialized in the parties' FSA and authorizes them to consummate it.

ADDITIONAL FACTS RELATING TO FAIRNESS OF THE PROPOSED SETTLEMENT

62. But for amicable resolution of this class action by compromise, and pretermitting the possibility of a defense verdict on the liability issues in the Phase One Trial described in the "Revised Post-Certification Case Management Plan and Scheduling Order (CMO # 4)" of April 8, 2005, its disposition would almost certainly have been a complicated, lengthy, and exceedingly expensive enterprise, as reference to CMO # 4 makes abundantly clear--as the individual exposure, apprehension and inconvenience claims of some 5900 or more class members would potentially have to be discovered and tried in manageable flights or groupings.

63. Given the evidence discussed above--which demonstrates a lack of widespread serious physical injuries and property damages and confirms that the vast majority of the claims in this action involve only fear and fright and evacuation/inconvenience--this   [*34] Court finds that the compromise settlement embodied in the parties' FSA is more than reasonable, adequate and fair to the class as a whole.

64. At the Fairness Hearing, counsel for the parties introduced evidence establishing, to the satisfaction of the Court that the proposed settlement is for an amount that is both fair and reasonable, and that adequately approximates the value of the case, considering the possible outcome at trial.

65. In particular, Class Counsel

Calvin C. Fayard, Jr., who has handled numerous other cases similar to this litigation, along with other similarly-experienced Class Counsel, represented that the amount of the proposed settlement in this action is within the reasonable range of recovery for the claims made under the facts of the case as they are known.

66. Similarly, IC's counsel David S. Kelly stated that, based upon his own experience in similar actions, he too believes that the dollar amount of the settlement is within the reasonable range of recovery for the claims made under the facts of the case as they are known.

67. Based upon the evidence presented by both parties, the Court finds that the proceeds of the proposed settlement [*35] that will be available for the resolution of the class members' claims and demands in this class action are within the reasonable range of recovery for a case of this nature under the facts presented, and accordingly are fair, reasonable and adequate. The Court notes that the most serious property damage claims, *i.e.,* those of the claimants owning the property on which or immediately adjacent to the property on which the derailment occurred, were settled separately from the "common class fund," and two potentially serious physical injury claims arising out of the derailment, *i.e.,* "wrongful death" claims relating to Messrs. Gilly and Jarrell are federal "opt out claims" that are not included within the scope of the settlement currently under consideration.

68. The Court finds, in light of the substantial discovery and motion practice had in the class action and in the related derailment actions to date, that the parties were, when they negotiated for the settlement of this class action, and particularly when their agreement was reached, in a position adequately to assess their respective positions respecting the

liability, causation and damages issues involved and to make [*36] reasonable and informed decisions regarding settlement, as well as to appreciate the strengths and the weaknesses of their respective positions at this point in the litigation.

69. The class representatives have affirmed under oath that they believe the proposed settlement to be fair, reasonable and adequate, not only for themselves, but also for the class considered as a whole, and they have urged the Court to approve the settlement.

70. Counsel for the class, counsel for the defendant, and several counsel representing certain of the opt-out claimants who have contractually obligated themselves to participate in the proposed settlement on parity with the members of the class--who are among the most experienced and highly skilled litigators in the nation--have similarly affirmed under oath and/or in representations made in open court at the Fairness Hearing that they consider the proposed settlement to be fair, reasonable and adequate and they have urged its approval by the Court.

71. None of the class members objected to the fairness of the proposed settlement or urged its disapproval, either in a writing filed with the Clerk of Court in advance of the Fairness Hearing, [*37] as this Court ordered, or by appearing to be heard in opposition to the settlement at the Fairness Hearing.

72. Based upon all of the evidence received by the Court as discussed above relating to the number of claims, the nature of the claims, the evidence concerning the likely impact of the chemical releases at issue, including the sworn opinions of several experts, and the opinions of counsel for both sides, the class representatives, and the class members, this Court finds that the

proposed settlement provides an adequate and fair estimation of the settlement value of the case considering the possible outcomes of the trial in this matter.

## II. CONCLUSIONS OF LAW

### SUBJECT MATTER JURISDICTION

73. This Court has subject matter jurisdiction over this class action pursuant to *28 U.S.C § 1332* (diversity of citizenship) in that the citizenship of all of the class representatives is diverse from that of the defendant railroad, IC, and the amount fairly in controversy, exclusive of interest and costs, exceeds the requisite sum of $ 75,000 based upon the class representatives' claims for attorneys' fees under *Louisiana Code of Civil Procedure* [*38] *article 595. See Grant, 309 F.3d at 868.*

74. This Court has supplemental jurisdiction over the remainder of the claims asserted in this action pursuant to *28 U.S.C. § 1367. See Grant, 309 F.3d at 868*; *In re Abbott Labs, 51 F.3d at 529.*

### CLASS CERTIFICATION

75. *Rule 23(a) of the Federal Rule of Civil Procedure* provides that "[o]ne or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." *Rule 23(b)(3)* requires that "the court find[] that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the

fair and efficient adjudication of the controversy."

76. Read together, [*39] *Rules 23(a)* and *23(b)(3)* establish six requirements for an action to be certified as a class action: numerosity, commonality, typicality, adequacy of representation, predominance, and superiority.

77. To certify an action as a class action, a federal district court must find that the proposed class satisfies the requirements of *Rule 23*, whether the class proposed is for trial or for settlement. *In re Lease Oil Antitrust Litigation, 186 F.R.D. 403, 418 (S.D. Tex. 1999)*. However, where the action in which certification is sought is being settled rather than tried, the court need not consider the difficulties likely to be encountered in the management of the trial of the action in determining whether a class action is the superior method for adjudicating the action. *Amchem Products, Inc. v. Windsor, 521 U.S. 591, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997)*.

78. In addition to the foregoing requirements, a federal court considering whether to certify a class action must ensure that the class is adequately defined, since the class definition identifies the persons (a) who will be entitled to relief in the event of a judgment in favor of the class, (b) who will be [*40] bound by a final judgment rendered in the action (unless they opt out of the class), and (c) who are entitled as a matter of due process of law to notice of certification and of certain interlocutory and final rulings, etc. in the action. To serve these functions, the definition should be "precise, objective, and presently ascertainable." Manual for Complex Litigation (Fourth) § 21.222.

79. Federal district courts are accorded great discretion in deciding whether to certify a class action. *Mullen v. Treasure Chest Casino, LLC, 186 F.3d 620, 624 (5th Cir. 1999)*.

*Class Definition*

80. The class definition approved and adopted by the Court in the present action serves the functions outlined in the Manual for Complex Litigation. The class definition, reproduced verbatim in P4 above, sets out specific geographic limitations, is precise and objective, and makes readily ascertainable the determination whether someone is within or without the class. As illustrated by the affidavit of Hugh Sibley, offered by plaintiffs in support of their December 2004 motion to certify some thirty-five consolidated civil actions pending in this court as a class action, the proposed [*41] and approved geographic boundaries encompass the vast majority of the persons making personal injury claims arising out of the October 12, 2002 derailment. Further, as established by the declaration of Dr. Millner, submitted by IC in support of the parties' joint motion for approval of the proposed class action settlement, it is *highly* unlikely that any person located outside the geographic boundaries of the class was exposed to any concentrations of styrene or hydrochloric acid that exceeded any AEGL or ERPG, and *extremely* unlikely that any such person, if exposed, would have experienced any symptoms or other health effects from that derailment-related exposure.

81. Membership in the class is clearly ascertainable and, pretermitting those who subsequently opted out of the class, has been fixed since this Court certified the class on January 9, 2005.

*Numerosity*

82. To demonstrate numerosity sufficient to support the certification of a *Rule 23(b)* class, the proponents must establish that the number of persons renders their joinder as co-parties impracticable by providing "some evidence or reasonable estimate of the number of purported class

members." *Pederson v. Louisiana State Univ., 213 F.3d 858, 868 (5th Cir. 2000).* [*42] Although no particular number is recognized as determinative, the United States Fifth Circuit Court of Appeals has held that 100 to 150 members is sufficient to satisfy the numerosity requirement. *See Mullen, 186 F.3d at 624.*

83. In the present action, some 5949 persons and entities situated within the definitional and geographic boundaries of the class filed submission of claim forms. The existence of that many claimants clearly shows the *Rule 23(a)* numerosity requirement is satisfied.

*Commonality*

84. *Rule 23(a)* requires, for class certification, that the action present issues of fact or law common to the class. The commonality requirement is "not demanding" and is deemed satisfied "where there is at least one issue, the resolution of which will affect all or a significant number of the putative class." *Mullen, 186 F.3d at 625. See also James v. City of Dallas, 254 F.3d 551, 570 (5th Cir. 2001).*

85. In the present action, the factual and legal issues relating to defendant IC's conduct, liability, and defenses with respect to the derailment are common to the class. Therefore, the "low threshold" of the commonality [*43] requirement is satisfied in this case. *See James, 254 F.3d at 570.*

*Typicality*

86. Like commonality, the class proponents' threshold of persuasion for typicality is not a demanding one. *Mullen, 186 F.3d at 625.* To satisfy the typicality requirement, the class representatives must show a similarity between their own legal and remedial theories and the legal and remedial theories applicable to the

remainder of the proposed class. *Id.* Typicality does not require that the claims of the class members be *identical,* but only that they share the same essential characteristics--*i.e., involve* a similar course of conduct or present the same legal theory. *James, 254 F.3d at 571; Mullen, 186 F.3d at 625.*

87. In the present action, the circumstances surrounding IC's conduct, liability and defenses (regarding both the pre-derailment operation of its train and its track and right of way inspection and maintenance procedures), as well as the determination of the extent of the derailment-related chemical release and the scope and duration of the resulting evacuation, are essentially the same with respect to [*44] the claims of the class representatives on the one hand and the remaining class members on the other, as are the legal theories upon which IC's liability is predicated (*i.e.,* negligence and strict liability).

88. Further, because the evidence developed in this case, as presented to the Court with the parties' submissions in support of the class action settlement they propose, establishes that the vast majority of the claims at issue in this action involve fear and fright and evacuation/inconvenience rather than physical injury and/or property damage, there is also typicality between the types of claims brought by the class representatives and the rest of the class.

89. Thus, in light of the fact that all of the claims relate to a single incident, involve similar issues of fact and law, and the vast majority involve the same types of damages, the typicality requirement is satisfied in the present action.

*Adequate Representation*

90. The adequate representation requirement for class certification has two

components. First, "the interests of the named plaintiffs must be sufficiently aligned with those of the absentees." *Georgine v. Amchem Prods, Inc., 83 F.3d 610, 630 (3d Cir. 1996).* [*45] Thus, a court assessing the adequacy of class representation must first evaluate whether the class representatives have a sufficient stake in the outcome of the litigation and whether they have interests antagonistic to the unnamed class members. *Mullen, 186 F.3d at 626.* The goal is to ensure that there are no "conflicts between the named plaintiffs' interests and the class members' interests." *Id.* Second, counsel representing the class must be qualified and capable and must advance the interests of the *entire class,* not just one group or another. *Georgine, 83 F.3d at 630.* Thus, a federal court considering class certification must inquire into the skill and competence of the class counsel and into the putative class representatives' willingness to undertake an active role in the litigation for the protection of the interests of the non-representative absentees. *Berger v. Compaq Computer Corp., 257 F.3d 475, 479 (5th Cir. 2001)*; *Turner v. Murphy Oil USA, Inc., 234 F.R.D. 597, 2006 U.S. Dist. LEXIS 3422, 05-4206, 2006 WL 267333, at *5 (E.D. La. 1/30/06).*

91. In the present action, the class representatives make claims that are "representative" of [*46] the claims of the "non-representative" absent class members, and there is no indication of any conflict between their interests and the non-representative class members' interests. Further, the class representatives have, in this action, vigorously prosecuted the claims on behalf of the proposed class, making themselves available for deposition and executing affidavits attesting to their support of the settlement. Therefore, the Court finds that the class representatives have fairly and adequately represented the class.

92. The Court also has no trouble concluding that Class Counsel, who include some of the most experienced and able class action and complex litigation attorneys in the nation, have prosecuted this action on behalf of the class zealously and with consummate professionalism, in-court, in the conduct of pretrial discovery, and at the negotiating table.

93. Thus, the Court expressly finds that both components of the "adequacy of representation" requirement of *Rule 23* are amply satisfied in the present action.

*Predominance*

94. The predominance requirement of *Rule 23(b)(3)* mandates that the legal or factual issues asserted by the representatives replicate [*47] in significant part those claims and demands asserted for and on behalf of the class. *Mullen, 186 F.3d at 626.* The Fifth Circuit has recognized that complete or perfect identity of claims is not required for predominance to exist. For example, in *Mullen, 186 F.3d 620*, the Fifth Circuit upheld certification of a class action for damages arising out of a defective ventilation system aboard a casino boat despite the fact that the specific injuries of the putative class members varied significantly. In upholding class certification, the Fifth Circuit emphasized that but for certification every plaintiff would have to produce extensive and duplicative evidence regarding the casino's air ventilation system and the common cause of their complaints, noting that the issues relating to the defendant's liability (*i.e.,* negligence and unseaworthiness of the vessel) were common issues that could be tried to a single jury. *186 F.3d at 626.* The appellate court further noted that all class members' injuries were already manifest and there were no individual choice-of-law issues at play because federal law governed all of the claims. *Id. at 627.* [*48]

2006 U.S. Dist. LEXIS 32839, *48

95. In the present action, the predominance requirement is similarly satisfied. Short of certification, all plaintiffs--as many as 5900 of them--would have to produce extensive evidence relating to IC's liability for the derailment, the temporal and geographic extent and the dispersion quantification of the chemicals released as a result of the derailment, and the scope and duration of the evacuation and other actions taken by government officials after the derailment. Further, given the evidence adduced by the parties in connection with their joint motion for approval of their proposed class action settlement, including the declarations of IC's experts and the statements of Class Counsel to the effect that the vast majority of the claims of the class members in this action involve fear and fright and evacuation/inconvenience rather than actual physical injury and property damage, there is even greater substantial factual overlap in the class members' claims.

96. Finally, the same substantive law--*i.e.,* Louisiana law--will apply to the resolution of all the class members' claims in this action; thus, this is not a case involving varying laws of different jurisdictions [*49] that would necessitate the creation of subclasses and/or require individual trials.

*Superiority*

97. *Rule 23(b)(3)* requires a federal court considering class certification to evaluate four factors in weighing whether class action procedure is superior to other methods of adjudication that might be available to dispose of the case: (a) the class members' interest in individually controlling their separate actions, (b) the extent and nature of existing litigation by class members concerning the same claims, (c) the desirability of concentrating the litigation in the particular forum, and

(d) the likely difficulties in managing the action as a class action.

98. Where the action in which certification is sought is being compromised rather than tried on the merits, the court need not consider the difficulties likely to be encountered in the management of the trial in determining whether class certification is the superior method for adjudicating the action. *Amchem Products, Inc. v. Windsor, 521 U.S. 591, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997).*

99. The superiority requirement of *Rule 23(b)(3)* is satisfied in the present case. Given the identity of the legal and factual [*50] issues discussed above and considering that this action involves claims for fear and fright and evacuation/inconvenience rather than for widespread, serious physical injuries and/or property damage, to require some 5900 class members to file individual actions and adjudicate their claims separately would constitute a monumental waste of judicial and private resources. Moreover, it would be economically unreasonable for most, if not all, class members to adjudicate their claims separately given the complexity of the legal issues and the relatively modest nature of the damages at issue for plaintiffs.

100. Additionally, the post-certification course of this action has validated the Court's initial assessment of the class members' interests in controlling their claims individually and the desirability of concentrating the litigation into this action. After the Court certified this class and notice of its certification was duly promulgated, only 561 people (out of approximately 6500 putative class members) opted out of the class, and all but two of these opt-out claimants have since elected to participate in the proposed settlement on parity with the class members. Similarly, the [*51] very fact

that this action was certified as a class action has, in the Court's view, contributed significantly to the parties' ability to negotiate a resolution of the claims presented both within and without the action on a "global" or "near-global" basis.

101. Finally, considering that this action--though initially certified as a litigation class--is now before the Court on a motion for approval of a proposed settlement, the Court need not concern itself with questions respecting the manageability of the action at trial. Even if manageability were at issue, however, the Court believes, in light of the evidence before it which suggests the absence of any causal link between the derailment event and ensuing chemical release and the claims of widespread physical injuries and property damage suggested by an uncritical review of the submission of claims forms, manageability would be less of an issue even if the action were to proceed to trial because of the greater factual overlap of the class members' claims for fear and fright and evacuation/inconvenience, which claims comprise the vast majority of claims at issue in this class action.

102. In sum, the Court finds that the [*52] requirements of *Rule 23 of the Federal Rule of Civil Procedure* are satisfied in the present action, which is essentially an action seeking damages under Louisiana law for fear and fright, evacuation, and inconvenience as the result of a single, discrete event. Therefore, the Court affirms its prior ruling on January 9, 2004 certifying this action as a class action pursuant to *Rule 23(b)(3)*.

*Class Notices*

103. The Court also finds and holds that the notice promulgated to the class members referable to the Court's January 9, 2004 order of certification fully complied with the requirements of *Rule 23*

*of the Federal Rule of Civil Procedure* and the due process clause of the United States Constitution. In particular, the Court finds that the mailing of notice of class certification, claim submission and opt-out procedures to all known plaintiffs, the multiple publications of the Court's notices in the newspapers serving the Amite, Louisiana, area, and the posting of notices at the federal and local Amite courthouses was "reasonably calculated, under all of the circumstances, to apprise the interested parties of the pendency of the action" and to afford them the opportunity [*53] to opt out if they so desired. *Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314, 70 S. Ct. 652, 657, 94 L. Ed. 865 (1950). See also Fed. R. Civ. P. 23(c)(2); Eisen v. Carlisle and Jacquelin, 417 U.S. 156, 173, 94 S. Ct. 2140, 2150, 40 L. Ed. 2d 732 (1974); In re Nissan Motor Corp. Antitrust Litig., 552 F.2d 1088, 1098-99 (5th Cir. 1977).*

104. The Court also finds and holds that the notice of the proposed settlement, which notified class members of the essential terms of the proposed settlement and of the procedures applicable for obtaining more information regarding and/or objecting to same, along with the method of promulgation of that notice by mailing, multiple newspaper publications, and posting at the relevant courthouses, fully complied with the requirements of *Rule 23 of the Federal Rule of Civil Procedure* and the due process clause of the United States Constitution.

FAIRNESS OF THE SETTLEMENT

105. *Rule 23(e) of the Federal Rule of Civil Procedure* provides that the "court must approve any settlement, voluntary dismissal, or compromise of the claims, issues, or defenses of a certified [*54] class" and that the court, in considering whether to approve a proposed compromise settlement, must determine whether the proposed "settlement,

voluntary dismissal, or compromise is fair, reasonable, and adequate" to the class. This Rule expressly requires the court to "independently and objectively analyze the evidence and circumstances before it in order to determine whether the settlement is in the best interest of those whose claims will be extinguished."

106. It has long been held that "[c]ompromises of disputed claims are favored by the courts." *Williams v. First Nat'l Bank, 216 U.S. 582, 595, 30 S. Ct. 441, 54 L. Ed. 625 (1910)*. This is particularly true in the context of class actions. *See, e.g., Cotton v. Hinton, 559 F.2d 1326, 1330 (5th Cir. 1977)*; *Class Plaintiffs v. City of Seattle, 955 F.2d 1268, 1276 (9th Cir. 1992)*.

107. The fact that a class action settlement is reached after arms' length negotiations by experienced counsel generally gives rise to a presumption that the settlement is fair, reasonable, and adequate. *See, e.g., Duhaime v. John Hancock Mut. Life Ins. Co., 177 F.R.D. 54, 68 (D. Mass. 1997)*; 2 Newberg & Conte, [*55] *Newberg on Class Actions* § 11.41 (3d ed. 1998); Manual for Complex Litigation, Third § 30.42 (1995).

108. In determining whether to approve a proposed settlement under *Rule 23(e)*, a federal court should take into account the compromise process, in which both sides make substantial concessions in order to reach a fair, reasonable and adequate settlement that provides maximum benefit to *both sides,* taking into account the risks they face in pursuing the litigation. *In re General Motors Corp. Pick-up Truck Fuel Tank Prods. Litig., 55 F.3d 768, 806 (3d Cir. 1995)*. In so doing, the court can establish a "range of reasonableness" for the settlement and should "guard against demanding too large a settlement based on its view of the merits of the litigation." *Id.*

109. The United States Fifth Circuit Court

of Appeals has identified six factors, commonly called *Reed* factors, that a district court must examine in deciding whether to approve a proposed class action settlement agreement: (a) the existence or not of fraud or collusion behind the proposed settlement; (b) the complexity, expense, and likely duration of the litigation should the settlement [*56] be rejected; (c) the stage of the proceedings and the amount of discovery that has been completed; (d) the probability of plaintiffs' success on the merits; (e) the range of possible recovery for and for the class; and (f) the opinions of the class counsel, class representatives, and absent class members. *Ayers v. Thompson, 358 F.3d 356, 369 (5th Cir. 2004)*; *Reed v. General Motors Corp., 703 F.2d 170, 172 (5th Cir. 1983)*.

*Fraud or Collusion*

110. The possibility of collusion exists in class actions; defendants in tort litigation typically have an interest in avoiding liability and in minimizing the financial consequences that flow from it, while class counsel typically have an undeniable interest in the maximization of their attorneys' fee. *Bowling v. Pfizer, Inc., 143 F.R.D. 141, 152 (S.D. Ohio 1992)*.

111. In the present case, the Court has seen and is aware of *no evidence whatsoever* that suggests fraud and/or collusion played any part in the confection of the proposed settlement under consideration. United States Magistrate Judge Sally Shushan, at the instance of the Court, oversaw and monitored the parties' year-long [*57] settlement negotiations, negotiations conducted at arm' length, adversarially, but in good faith--without the slightest hint or suggestion of collusion or fraud--and the Court is informed and believes counsel for both parties vigorously, zealously and ethically represented their clients' respective interests throughout the litigation and the settlement process.

112. Further, both Class Counsel and counsel for defendant IC have confirmed under oath the protracted, difficult, and occasionally frustrating, but undeniably arms-length nature of the settlement negotiations.

113. Finally, the Court specifically notes that the sensitive issue of "attorneys' fees for Class Counsel" was purposefully left for the Court to address at a later stage of the proceeding, and a specific amount of attorneys' fees was neither suggested nor recommended in the parties' initial memorandum of understanding nor in their detailed and superceding FSA. *See In re Combustion, Inc., 968 F. Supp. at 1127.*

114. Thus, the Court finds that there was no fraud or collusion in the negotiation or confection of the proposed settlement agreement.

*Complexity, Expense, and Likely Duration of the* [*58] *Suit*

115. With respect to the "complexity, expense, and likely duration of suit" assessment the Fifth Circuit requires district courts to make before approving proposed class action settlements, district courts are entitled to consider the time and money the litigants will save, and the savings the judicial system will realize, if the settlement is approved--evaluating whether settling avoids the "risks and burdens of potentially protracted litigation." *Ayers, 358 F.3d at 369.*

116. In the present action, but for the compromise settlement proposed by the parties, the liability and damages trials of the class action (not to mention the related opt-out actions that will also be resolved if the settlement is approved) would have been extraordinarily complicated, time-consuming and costly, as perusal of "Revised Post-Certification Case Management Plan and Scheduling Order

(CMO # 4)" dated April 8, 2005 makes abundantly clear. This is so principally because of the large number of claimants seeking recovery (almost 6000 individuals--persons whose individual damages would, but for the settlement, have to be tried in manageable clusters of twenty or so claimants [*59] at a time) as well as the complex factual issues involved in determining the cause of the derailment itself.

117. Additionally, while it might have been possible for the Court to determine the quantity of each chemical released to the soil, air, and water, the duration of the release, and the air and groundwater dispersion pattern of each such chemical on a "one time for all basis" in this action, determining claimed exposure *dosages and duration* for all chemical exposures claimed by several thousand persons, and assessing the health and risk consequences of those exposures are necessarily individualized, and evidence on those issues would have to be repeatedly re-offered in trial after trial after trial, all at extraordinary expense to the parties and at immeasurable, albeit non-pecuniary, cost to the court system itself. Even so, given the evidence set forth in IC's experts' declarations and the statements of Class Counsel at the Fairness Hearing to the effect that this case does not involve widespread physical injuries or property damage, it would still be necessary to assess each individual class member's damages and expenses with respect to fear and fright and evacuation/inconvenience--a [*60] daunting proposition, at best.

118. In light of the foregoing, the Court concludes that continued litigation of this action, including the litigated quantification of the individual causation and damages claims of virtually every single class member, would involve an enormous investment in terms of time and money by the parties and would clearly

tax the parties' resources and those of the court as well. Thus, this *Reed* factor weighs heavily in favor of the Court's approving the proposed settlement.

*Stage of Proceedings and Amount of Discovery Completed*

119. In assessing the fairness, reasonableness and adequacy of a proposed class action settlement, a district court must determine whether the parties are in a position to assess their respective cases and to make reasonable decisions with respect to settlement, considering the information to which they are privy and the stage of the proceedings when the tentative deal is struck. *See In re Combustion, 968 F. Supp. at 1127.* Both sides must have an "adequate appreciation of the merits" of the case when the negotiations are had and particularly before any compromise agreement is reached. *See In re Orthopedic Bone Screw Prod. Liab. Litig., 176 F.R.D. 158, 185 (E.D. Pa. 1997).* [*61]

120. In *In re Combustion,* the district court, in finding that this *Reed* factor militated in favor of settlement, noted that at the time the settlement was negotiated, "[l]iaison counsel testified that all parties were fully aware of the strengths and weaknesses of each side's case," the litigation had been proceeding for seven years, and the parties had engaged in extensive discovery and motion practice. *968 F. Supp. at 1127.* Under these facts, the court concluded that "[a]ll parties were in an excellent position to assess their respective positions, and this Court has a sound basis to judge whether the settlement was fair and reasonable." *Id.*

121. Like the court in *In re Combustion,* this Court finds that counsel for both sides to this tort action were in an excellent position to assess the strength and weaknesses of their own and their adversary's positions, factually and legally. First, this action has been pending for more than three and one-half years, and the parties have conducted substantial liability, causation and damage discovery both in the class action and in the related cases pending in state court in Tangipahoa Parish, Louisiana, [*62] including the discovery alluded to in P12, above.

122. Further, defendant IC has submitted for the Court's consideration in connection with the parties' joint motion for approval of their proposed settlement agreement, the declarations under penalty of perjury of several experts who have evaluated various aspects of the class members' claims in this action, and both Class Counsel *and* counsel for plaintiffs in some of the related opt-out actions have described for the Court their consultations with various experts from around the country.

123. It is also clear from the record in this litigation that the parties are intimately familiar with substance and merits of their and their opponent's respective positions. For example, early in the action, the parties opposed one another in a series of remand motions which, because they involved allegations of "fraudulent joinder," required a marshalling and detailed analysis of evidence regarding the actions of several IC employees insofar as that conduct may have caused or contributed to the derailment. *See* 2004 WL 32915 (E.D. La. 1/6/04); 2003 WL 21715000 (E.D. La. 7/18/03). Similarly, the parties [*63] engaged in fairly extensive motion practice stemming from plaintiffs' allegations they were entitled to recover punitive damages under the facts of the case and the law applicable; again, this motion practice required a detailed analysis not only of the legal issues involved in punitive damages claims, but also of the facts and details surrounding IC's alleged culpable conduct in this action. *See* 2004 WL 15964634 (E.D. La.

7/15/04); 2004 WL 169805 (E.D. La. 1/26/04); 2003 WL 22384962 (E.D. La. 10/16/03).

124. In sum, the record before the Court clearly demonstrates that Class Counsel and defendant's counsel possessed the required "adequate appreciation of the merits" of the action before they sat down together, at the instance of the Court and under the guidance of the Magistrate Judge, to negotiate the settlement currently under consideration.

*Probability of Plaintiffs' Success on the Merits*

125. The "probability of success" *Reed* factor directs the district court's attention to the determination whether the "relief" provided to the class in the compromise agreement being considered is "adequate" in light of the strengths [*64] and weaknesses of the plaintiffs' case. If rejection of the proposed settlement and resort further litigation is unlikely to lead to a *far greater relief* for the class than the relief provided in the proposed compromise agreement, then this *Reed* factor weighs in favor of the proposed settlement. *Ayers, 358 F.3d at 373.*

126. Some courts have suggested it is "pure speculation" to attempt to predict with certainty the probability of the class representatives' success at trial, primarily because of the extreme volatility, individuality and complexity of the issues typically presented in toxic tort cases. *See In re Combustion, 968 F. Supp. at 1127-28.*

127. In the present action, while it is impossible to predict with certainty what ruling a jury would actually make on liability and on the causation and damages claims presented in the "Phase One Trial" contemplated by *Revised Post-Certification Case Management Plan*

*and Scheduling Order (CMO # 4),* dated April 8, 2005, the Court concludes in this case that the "probability of success on the merits" factor weighs in favor of the proposed settlement. As set forth in more detail above, IC's [*65] experts' declarations and the statements of Class Counsel in open court at the Fairness Hearing establish that the class representatives would likely be unable to prove that the chemicals released as a consequence of the derailment caused any widespread physical injuries and/or property damage to the members of the class, so the class claims are primarily for "fear and fright" and for evacuation/inconvenience, rather than for significant injury.

128. Further, as demonstrated by the various submissions of the parties in conjunction with the motions to remand and motions for partial summary judgment on the punitive damage claims in the class action and related actions, IC has substantial defenses to liability that it has asserted in the case and will no doubt continue vigorously to assert if the action were to proceed to trial; in particular, IC has offered some evidence, in the depositions submitted at the Fairness Hearing suggesting that the derailment was a sudden, catastrophic, and unforeseeable event that could not have been prevented even by the exercise of due care. IC has also raised other potential defenses to the class members' claims, such as federal preemption.

129. [*66] Given the foregoing, the Court finds there is no way to predict accurately which side would be successful on the merits, and the hurdles faced by the class members are sufficient to justify the settlement proposed. Stated differently, the Court concludes there exists no reason to believe that the class members would receive far greater relief if the action were to go to trial than they will receive under the terms of the proposed compromise

settlement.

### Range of Possible Recovery

130. With respect to the "range of possible recovery for the plaintiffs' claims" *Reed* factor that the Fifth Circuit directs trial judges to consider when deciding whether to approve a proposed class actions settlement, the Court notes that proposed settlement need only reflect a fair, reasonable, and adequate estimation of the value of the case considering what might or could happen at trial. *In re Combustion, 968 F. Supp. at 1129.* This is so because "settlement is a compromise, a yielding of the highest hopes in exchange for certainty and resolution." *GM Trucks, 55 F.3d at 806.*

131. In the present action, counsel for both sides--all of whom are litigators [*67] well-versed in the arena of toxic tort class actions like the present one--have represented under oath that the proposed settlement represents a fair, reasonable, and adequate estimation of the "value of this action" in light of what could happen at trial.

132. Given the number of class members whose claims are presented, the fact that the most serious claims at issue have either been separately settled (*i.e.,* the property damage claims relating to property on which the derailment occurred and immediately adjacent thereto) or excepted from the proposed settlement (*i.e.,* the wrongful death claims related to Messrs. Gilly and Jarrell), and the undisputed evidence demonstrating the lack of any widespread physical injury and property damage claims, the Court has no trouble concluding that the settlement amount is fair and adequate for the class as a whole and well within the reasonable range of recovery for a case of this nature.

### Opinions of Class Counsel, Class Representatives, and Absent Class

### Members

133. Over the three and one-half year history of this litigation, Class Counsel and defendant's counsel have developed a thorough understanding of the litigation, [*68] factually and legally, respecting the liability, causation and damages issues it presents, and, based upon their in-depth understanding of the respective strengths and weaknesses of each side's position, they have recommended settlement. As the district court noted in *In re Combustion, 968 F. Supp. at 1128,* it was

> not lost on the Court that counsel for the compromising parties, some of the most able attorneys in the country, when armed with extensive knowledge of the facts, decided that settlement rather than a jury trial was in the best interests of their clients. This Court must accord due respect to the judgment of counsel.

The identical statement could be made about the attorneys in this case and their opinions.

134. Further, the class representatives testified *via* affidavit that they are in favor of the proposed settlement.

135. As required by order of this Court, *Rule 23* and due process complaint notice of the proposed settlement was provided to the class members, who were given adequate information as to the terms and conditions of the proposed settlement and fairly apprised of their rights to object to any or all terms of the settlement [*69] and to be heard in opposition to it at the Fairness Hearing conducted by the Court. As confirmed by the April 26, 2006 certification from the office of the Clerk of

Court, not one person filed any written objection, whether timely or untimely, to the proposed class action settlement, nor did anyone appear at the Fairness Hearing to assert any such objection.

136. Thus, this *Reed* factor also weighs heavily in favor of the proposed settlement.

*Conclusion Regarding Fairness, Adequacy, and Reasonableness of the Proposed Settlement*

137. After considering all of the testimony and evidence introduced at the Fairness Hearing, together with the entire record of this class action and of the related derailment actions pending in this district, the Court finds that the proposed settlement embodied in the parties' FSA is fair, adequate and reasonable in light of the history of this litigation and the significant hurdles faced by the class members. The Court further finds, taking into account the claims asserted in the class and the claims of the participating opt out claimants to be resolved under the parties proposed compromise, that the settlement amount of Eight Million [*70]

Two Hundred Seventy-Five Thousand ($ 8,275,000.00) Dollars as particularized in § V.A.1(c) of the parties' December 30, 2005 FSA provides adequate compensation for every eligible class member who complied with the Court's prior orders and completed and turned in a *Submission of Claim Form*. The proposed settlement eliminates the complexity, expense, and risk involved in litigating the class members' claims and is intended expeditiously to provide relief to class members. As a result of the settlement, the parties will avoid substantial costs, delay, and the uncertainties inherent in continued litigation and, secondarily, a considerable burden on the court system will have been avoided. In light of these factors, the Court unequivocally finds that the proposed settlement is fair, reasonable and adequate to the class as a whole.

May 23, 2006

Jay C Zainey

JUDGE