LEXSEE 2006 U.S. DIST. LEXIS 20066

**DEXTER LATULAS VERSUS MONTCO OFFSHORE, INC., and MAGNOLIA INDUSTRIAL FABRICATORS, INC.**

CIVIL ACTION NO. 03-3544, SECTION "T" (5)

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF LOUISIANA

*2006 U.S. Dist. LEXIS 20066*

**March 29, 2006, Decided**

**SUBSEQUENT HISTORY:** As Amended April 17, 2006.

**COUNSEL:** [*1] For Dexter Latulas, Plaintiff: John Gilbert Munoz, Garner & Munoz, New Orleans, LA; Christopher K. Johns, Joseph S. Jaworski, The Buzzbee Law Firm, Galveston, TX.

For Montco Offshore Inc, Defendant: John F. Emmett, James A. Cobb, Jr., Matthew F. Popp, Emmett, Cobb, Waits & Henning, New Orleans, LA; Michael William McMahon, Daigle Fisse, PLC, Covington, LA.

**JUDGES:** G. THOMAS PORTEOUS, JR., UNITED STATES DISTRICT JUDGE.

**OPINION BY:** G. THOMAS PORTEOUS, JR.

**OPINION**

**AMENDED ORDER AND REASONS**

The Court signed a previously prepared and docketed Order and Reasons in the above captioned matter which was incorrectly dated. The following Amended Order and Reasons was changed only in that respect and now reflects the correct signing date.

The above-captioned matter was heard on February 23, 2005, before this Court, without a jury. The Court, having considered the record, the evidence, the applicable law, and the memoranda submitted by the parties, now makes the following findings of fact and conclusions of law as required by *Rule 52 of the Federal Rules of Civil Procedure.* To the extent that any conclusion of law is deemed to be a finding of fact, it is adopted as such; and likewise, any finding of fact that is deemed to be a conclusion of law is so adopted.

**FINDINGS OF FACT**

With regard to the Court's findings, if no exhibit is specifically [*2] referenced, that particular finding is based upon the testimony given by various witnesses at trial.

1. This is an action for personal injury filed by Dexter Latulas, a resident of New Iberia, Louisiana, against Montco Offshore, Inc., a Louisiana corporation, having its principal place of business in Golden Meadow, Louisiana, which at all times pertinent was the owner and operator of the L/B TAMMY.

2. This Court's jurisdiction arises pursuant to *28 U.S.C. § 1333* as a claim filed under *33 U.S.C. § 905(b)* which occurred on a vessel in navigable waters. This is an admiralty and maritime claim within the meaning of *Rule 9(h) of the Federal Rules of Civil Procedure.*3. On November 4, 2003, Mr. Latulas was employed by Magnolia Industrial Fabricators, Inc. as a rigger. In his suit, he alleges that he was hit in the right cheek with a crane hook which was attached to the crane mounted on the L/B TAMMY. At the time of the incident, both Montco Offshore and Magnolia Industrial Fabricators had been hired by Hunt Petroleum to work in connection with the installation of a compressor aboard Hunt's [*3] South Marsh Island 40JA offshore platform. A third contracting company, Emerson Carter Contracting Company ("EECO") had been retained to perform the electrical

work in connection with the installation.

4. The L/B TAMMY had been jacked up adjacent to the fixed platform for approximately one week and was serving as a cafeteria, dormitory and work platform in connection with the operation. On November 4, 2003, the vessel was under the command of Captain Malcom Greenleaf.

5. At the time of the incident, approximately 9:00 a.m. on November 4, 2003, Captain Case Greenleaf was operating the crane on board the vessel, offloading equipment from a supply boat on to the deck of the vessel.

6. Mr. Latulas had been assigned by his supervisor, Keith Rhodes, to sling and unsling the cargo as it was placed aboard the L/B TAMMY. Mr. Latulas was being assisted by his co-employee, Lynn Callaghan, who was also employed by Magnolia Industrial as a rigger.

7. At approximately 9:30 a.m., Capt. Greenleaf hoisted a pallet, which was approximately 6 feet high and weighed 200 pounds, from the deck of the supply boat and moved it over the deck of the L/B TAMMY. An eight foot steel cable which is [*4] known as a "stinger" had been attached to the main cargo hook of the crane, which itself is physically attached to the large headache ball at the end of the fast line leading from the boom tip of the crane. A stinger is commonly used in the offshore oil industry so that riggers do not have to work in close proximity to the large headache ball and large cargo hook of the crane, particularly when small loads are being moved.

8. Captain Greenleaf was positioned some 14 feet off the deck of the L/B TAMMY in the crane operator's cab, and had an unobstructed view of the operations taking place on deck. In addition, the Vice President of ECCO, Gary Carter, was standing on the deck at the time and was an eyewitness to the incident.

9. When the load was moved by Captain Greenleaf over the deck of the L/B TAMMY, Mr. Callaghan used a hand signal to direct him to lower the pallet toward the deck of the vessel. When the pallet was approximately 2 feet off the deck, Mr. Callaghan signaled to Captain Greenleaf to stop the load.

10. Mr. Callaghan then gave a hand signal to Capt. Greenleaf to begin lowering the pallet to the deck. As he gave that signal, and as the pallet was being lowered, [*5] Mr. Callaghan without warning began to physically push on the pallet. Mr. Callaghan pushed the pallet the lateral distance of approximately 4 feet.

11. It was undisputed at trial by all of the witnesses that it is improper for a rigger to physically push on a load. The method for laterally moving a load is to have the rigger request that the crane operator use the boom of the crane to move the load. Mr. Callaghan admitted he should not have pushed on the load.

12. Mr. Callaghan's unilateral decision to physically push on the load caused the stinger leading from the headache ball to be at an angel that was not perpendicular to the boom tip of the crane. When the load was placed on deck, Captain Greenleaf introduced slack to prevent the load from toppling over onto Mr. Callaghan.

13. While these events were transpiring, Mr. Latulas was removing a tag line, which is a smaller rope used in the offshore industry to allow riggers to manipulate a load without physically touching it. Mr. Latulas testified that as he turned and raised up, he was suddenly struck on the right cheek by some object which he later was told was the cargo hook attached to the stinger that had been used [*6] to move the pallet onto the deck of the TAMMY. Mr. Latulas testified that he did not see the cargo hook before it struck him.

14. Both Captain Greenleaf and Gary L. Carter witnessed the events leading up to Mr. Latulas' incident. Captain Greenleaf testified that immediately after he placed the load on the deck, Mr. Callaghan unhooked the cargo hook from the slings. Mr. Callaghan did not follow the Case basic rigger techniques to hold the hook above his head, then signal to the crane operator to take the hook up and away from men working on board the deck of the L/B TAMMY. Rather, Callaghan released the hook, without looking over his shoulder and warning Mr. Latulas, or considering Mr. Latulas' position. Since Mr. Callaghan had pushed on the pallet, causing an angle in the stinger line, the stinger and attached cargo hook swung toward Mr. Latulas in a pendulum-like motion. Mr. Latulas admitted Mr. Callaghan was taller than he and had Mr. Callaghan held the hook over his head then released the hook with the correct hand signal, this incident would not have happened. Captain Greenleaf did not see the cargo hook actually strike Mr. Latulas.

15. Gary L. Carter, who is not affiliated [*7] with

any party to this action, confirmed this testimony, stating that the actions of Mr. Callaghan had "everything to do with this accident." He testified that at no time did the crane operator engage the controls or pull up on the fast line of the crane. Mr. Carter stated that the cargo hook swung toward the plaintiff and struck him solely because Mr. Callaghan released it, and that Mr. Callaghan should have maintained control of the hook. The Court finds Mr. Carter's testimony credible.

16. It was uncontroverted at trial that the established practice offshore when releasing a cargo hook is to hold that hook overhead then signal the crane operator to take it away. If this recognized procedure is followed, it is impossible for the hook to strike anyone since the hook will be overhead of all personnel working on the deck. Mr. Callaghan clearly violated the recognized and established practice in releasing cargo hook without holding it overhead and without signaling the crane operator.

17. Mr. Latulas alleged at trial that Captain Greenleaf should have taken some actions to prevent Mr. Callaghan from physically pushing the load. He also alleged that Captain Greenleaf should [*8] have stopped the operation once he observed Mr. Callaghan pushing on the load.

18. This Court accepts Captain Greenleaf's testimony that at the time Mr. Callaghan released the cargo hook, Captain Greenleaf was attempting to move his hand over to the boom to move the boom to remove the angle from the stinger. Captain Greenleaf stated that he did not have the opportunity to move the boom in the 1 1/2 - 2 seconds between the time the load landed on the deck and the time Mr. Callaghan released the cargo hook.

19. Captain Greenleaf acted properly in continuing to place the load on the deck even though he was aware Mr. Callaghan was pushing on it. Had he elected to stop the operation at this point with the load in mid-air, the load could have swung back in the direction of Mr. Callaghan and would have created a clear danger for Mr. Callaghan. Moreover, it was appropriate for Captain Greenleaf to introduce slack to the line once the load was on deck because if tension had remained on the cable, the load would have toppled over onto Mr. Callaghan.

20. The Court does not accept Mr. Latulas' testimony that Captain Greenleaf apologized to him following the incident, or that Captain [*9] Greenleaf told Mr. Latulas that he had pulled up on the fast line of the crane. Captain Greenleaf emphatically denied making these statements. Moreover, Mr. Carter did not observe the crane operator pull up on the fast line as the plaintiff alleged.

21. The Court does not find credible the testimony of Commander Don Green, plaintiff's liability expert, who opined that Captain Greenleaf was negligent.

22. Finally, the Court credits the testimony of the supervisor of Magnolia Industrial, Keith Rhodes. Mr. Rhodes testified that shortly following the incident, he interviewed both Mr. Callaghan and Mr. Latulas and both told him that the accident occurred because Mr. Callaghan released the cargo hook. Neither mentioned to the supervisor that the crane operator had any involvement in the incident.

**CONCLUSIONS OF LAW**

1. Plaintiff's claims arise under *33 U.S.C. § 905(b)*, under which plaintiff has the burden of proving negligence on the part of the vessel owner in the order to recover damages. *Randall v. Chevron USA, Inc., 13 F.3d 888, 895 (5th Cir.)*, modified on other grounds on denial of rehearing, [*10] *22 F.3d 560 (5th Cir.)*, cert denied, *513 U.S. 994, 115 S. Ct. 498, 130 L. Ed. 2d 408 (1984)*.

2. If the plaintiff in an action brought pursuant to *§ 905(b)* carries his burden of proving any negligence on the part of the vessel owner, the vessel owner cannot reduce the plaintiff's recovery by the contributory negligence of the plaintiff's employer. If an employer is found to be 99% at fault for an injury to a longshoreman, and a vessel owner 1% at fault, the vessel becomes liable for 100% of the damages sustained by the plaintiff. *Edmonds v. Compagnie Generale Transatlantique, 443 U.S. 256, 99 S. Ct. 2753, 61 L. Ed. 2d 521, 1979 A.M.C. 1167 (1979)*.

3. In *Scindia Steam Navigation Company, Ltd. v. De Los Santos, 451 U.S. 156, 101 S. Ct. 614, 68 L. Ed. 2d 1 (1981)*, the Supreme Court found that generally the shipowner may rely on the stevedore to avoid exposing the longshoreman to unreasonable hazards and that the primary responsibility for the safety of the longshoreman rests on the stevedore. *Singleton v. Guangzhou Ocean Shipping Company, 79 F.3d 26, 28 (5th Cir. 1996)*, citing *Scindia, 451 U.S. at 172, 101 S. Ct. at 1624*. However, in *Scindia,* the Supreme [*11] Court described three limited exceptions where the shipowner may be liable. The three

*Scindia* exceptions have been summarized as follows:

> 1. If the vessel owner fails to warn on turning over the ship of hidden defects of which he should have known.
>
> 2. For injury caused by hazards under the control of the ship.
>
> 3. If the vessel owner fails to intervene in the stevedore's operations when he has actual knowledge of both the hazard and that the stevedore, in the exercise of "obviously improvident" judgment, means to work on in the fact of it and therefore cannot be relied on to remedy it. *Singleton, 79 F.3d at 28*.

4. The Court finds that the *Scindia* duties were not violated by the vessel in this case.

5. There was no evidence presented to the Court that he cause of Mr. Latulas' injury was a result of a hidden defect. Therefore, the first *Scindia* exception was not violated; the only *Scindia* duties implicated by this case are the "active involvement" and "duty to intervene" aspects of the duty owed by a vessel to a longshoreman.

6. Under the second *Scindia* exception, the vessel is liable "if it actively involves itself [*12] in a cargo operation and negligently injures a longshoreman." *Scindia, supra.* Under this principle, liability is imposed if there was active negligence, or if the shipowner participates or takes control of cargo operations. A corollary to the "active involvement" aspect *Scindia's* second exception is the "active control duty" which is violated where the vessel owner "fails to exercise due care to avoid exposing longshoremen to harm from hazards they may encounter in the areas, or from equipment, under the active control of the vessel during the stevedoring operation." *Scindia, supra.* However, to give rise to liability for a breach of the active control duty, the vessel owner must exercise control over the actual methods of work used by the indepdent contractor and the operative details. *See 1 T. Schoenbaum Admiralty and Maritime Law, Section 7-10 at 445-446, 2nd Ed. 1994.*

7. In this case, the Magnolia crew had control over the cargo hook. Captain Greenleaf, as the crane operator, was merely responding to hand signals given to him by the riggers and was not exercising active control over the manner and method of the riggers' work. As [*13] found by Judge Duval in *Breaux v. United States, 1996 U.S. Dist. LEXIS 16318, 1996 WL 626328 (E.D. La. 1996)*, "the crane operator is at the mercy of the people giving him signals." *1996 U.S. Dist. LEXIS 16318, [WL] at *4*.

8. There is no evidence that Captain Greenleaf assumed active control over the work being performed by Mr. Latulas and Mr. Callaghan. Mr. Callaghan did not push on the load because he was instructed to do so by Captain Greenleaf. Mr. Callaghan did not release the cargo hook, in violation of a recognized industry practice, because he was directed to do so by Captain Greenleaf; he did so on his own, without warning. Every witness, including Callaghan, and plaintiff's expert, Commander Green, admitted Callaghan should not have pushed the load. Accordingly, the plaintiff has failed to prove any violation of the active involvement and active control duties imposed by *Scindia.*

9. The United States Fifth Circuit Court of Appeals has made it clear that the shipowner's duty to intervene under *Scindia's* third exception is narrow and requires "something more" than mere shipowner knowledge of a dangerous condition.

> To impose a duty to intervene on the shipowner, respecting dangers not created [*14] by it which are obvious to the stevedore's employees and arise during and in the area of the stevedore's operations, something more is required than the mere shipboard location of the dangerous situation and the shipowner's knowledge of it.

*Futo v. Lykes Bros. Steamship Co., 742 F.2d 209, 215 (5th Cir. 1984).* The court finds that the improper cargo handling procedures exercised by Magnolia's riggers created the dangerous condition that in turn resulted in Mr. Latulas' injury. Magnolia and, in particular, Mr. Callaghan, did not follow proper procedure of moving the pallet and placing it on the deck under the boom lip. Instead, Callaghan pushed the load which set up the pendulum effect on the hook and then released the hook so that it swung in the direction of his co-worker, the plaintiff. The duty of the shipowner to intervene under *Scindia* cannot be established simply by proving the shipowner knew of dangerous shipboard condition created by the stevedore in its loading and unloading

operations. Proof of something more is required. *Singleton v. Guangzhou Ocean Shipping, 79 F.3d 26 (5th Cir. 1996)*. Captain Greenlead was entitled to assume [*15] that Mr. Callaghan and Mr. Latulas, as experienced stevedores, would follow standard rigging procedures.

10. Even if the Court were to assume that Captain Greenleaf had a duty to intervene under these circumstances, in the 1 1/2 to 2 seconds that Captain Greenleaf had between the time he saw Callaghan push on the load to the time Callaghan released the cargo hook, Captain Greenleaf did not have sufficient time to intervene. Plaintiff alleged that Captain Greenleaf should have either shut down the operation or used the public announcement system in the crane cab to instruct Callaghan not to push on the load. There was insufficient time for Greenleaf to shut the operation down, and had he done so, he may have imperiled Mr. Callaghan as the load, which was still suspended above the deck, would have swung toward him. There was insufficient time for Captain Greenleaf to turn around and pick up the microphone of the public address system, and in any event, as Greenleaf testified, this would have been imprudent as it would have forced Greenleaf to take his eyes off of the men working on the deck. Therefore, the Court rejects plaintiffs claim that Captain Greenleaf violated his duty [*16] to intervene imposed by *Scindia.*

11. In view of the Court's finding that Mr. Callaghan was 100% responsible for the incident, the Court need not reach the issue of plaintiff's contributory fault.

12. The Court is not addressing the medical issues, as it has found no liability on the part of the defendant.

13. The plaintiff's sole remedy in this case is worker's compensation. A stipulation has been previously filed in this action by the plaintiff and his employer under which Magnolia has agreed to initiate compensation payments. Judgment is to be issued in favor of the defendant, and against the plaintiff.

14. In consideration of the above, the plaintiff, Dexter Latulas, has failed to meet his burden of proof.

15. Accordingly, judgment is entered in favor of the defendant, Montco Offshore, Inc, and against the plaintiffs, Dexter Latulas, dismissing the plaintiffs claims with prejudice.

New Orleans, Louisiana, this 17th day of April, 2006.

G. THOMAS PORTEOUS, JR.

UNITED STATES DISTRICT JUDGE

**AMENDED FINAL JUDGMENT**

The Court signed a previously prepared and docketed Judgment in the above captioned matter which was incorrectly [*17] dated. The following Amended Judgment was changed only in that respect and now reflects the correct signing date.

The Court having tried the issues in this case and having reached a conclusion on the merits, it is the decision of this Court that judgment will be entered in favor of the defendant, Montco Offshore, Inc., and against the plaintiff, Dexter Latulas.

Accordingly,

**IT IS ORDERED, ADJUDGED, AND DECREED** that, in conforming with the Order and Reasons in the above-captioned matter, there be judgment entered in favor of the defendant, Montco Offshore, Inc., and against the plaintiff, Dexter Latulas, dismissing plaintiff's claims, with each party to bear their own costs.

New Orleans, Louisiana, this 17th day of April, 2006

G. THOMAS PORTEOUS, JR.

UNITED STATES DISTRICT COURT