LEXSEE 2007 U.S. DIST. LEXIS 64603



Analysis
As of: Dec 01, 2008

**THE ST. PAUL FIRE AND MARINE INSURANCE COMPANY, Plaintiff v. THE NOLEN GROUP, INC., et al., Defendants. ZURICH AMERICAN INSURANCE COMPANY, Plaintiff v. THE NOLEN GROUP, INC., et al., Defendants. FEDERAL INSURANCE COMPANY, et al., Plaintiffs v. THE NOLEN GROUP, INC., et al., Defendants.**

**CIVIL ACTION NO. 02-8601 (lead consolidated case), CIVIL ACTION NO. 03-3192 (consolidated case), CIVIL ACTION NO. 03-3651 (consolidated case)**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

*2007 U.S. Dist. LEXIS 64603; 74 Fed. R. Evid. Serv. (Callaghan) 461*

**August 31, 2007, Decided**
**August 31, 2007, Filed**

**SUBSEQUENT HISTORY:** Summary judgment denied by, Motion granted by *St. Paul Fire & Marine Ins. Co. v. Nolen Group, Inc., 2007 U.S. Dist. LEXIS 88025 (E.D. Pa., Nov. 30, 2007)*

**PRIOR HISTORY:** *St. Paul Fire & Marine Ins. Co. v. Nolen Group, Inc., 2007 U.S. Dist. LEXIS 17157 (E.D. Pa., Mar. 12, 2007)*

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Consolidated subrogation actions were filed by plaintiff insurers to recover monies paid to their various insureds as a result of flood damage. Defendants, various parties involved in a construction project, were found liable in various proportions by a jury. The only defendant who then did not settle with the insurers, a subcontractor found 1 percent responsible, filed motions for post-trial relief.

**OVERVIEW:** This case arose after certain insured businesses experienced flood damage. The insurers alleged that parties involved in a nearby construction

project were negligent and caused the damage. The primary allegation was that those parties failed to adhere to a requirement to construct a detention basin prior to removal of vegetation and that, as a result, the increased runoff caused a bridge to collapse and ultimately caused the flood damage to their insureds. A jury found in favor of the insurers and apportioned liability among the defendants. Only one defendant, a subcontractor found to be one percent liable, did not then enter into a settlement with the insurers. That subcontractor sought post-trial relief based on numerous arguments. Among other things, the subcontractor argued that it owed no duty to the insureds and that the flood damage was not a foreseeable risk of its conduct. The court denied relief, noting that the subcontractor's duty not to cause excessive storm water runoff arose from a variety of sources, including the Storm Water Management Act, 32 Pa. Stat. Ann. § 680 et seq., and the evidence was sufficient to conclude that the subcontractor breached that duty.

**OUTCOME:** The court denied the subcontractor's motions for post-trial relief.

2007 U.S. Dist. LEXIS 64603, *; 74 Fed. R. Evid. Serv. (Callaghan) 461

**LexisNexis(R) Headnotes**

*Civil Procedure > Trials > Judgment as Matter of Law > General Overview*
[HN1] A motion for judgment as a matter of law should be granted only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability. In determining whether the evidence is sufficient to sustain liability, the court may not weigh the evidence, determine the credibility of witnesses, or substitute its version of the facts for the jury's version. The court may only enter judgment as a matter of law following return of a verdict by a jury if, as a matter of law, the record is critically deficient of that minimum quantity of evidence from which a jury might reasonably afford relief.

*Torts > Negligence > Proof > Elements*
[HN2] To assert a cause of action for negligence, a plaintiff must present sufficient evidence to prove the following: (1) the defendant had a duty to conform to a certain standard of conduct; (2) the defendant breached that duty; (3) such breach caused the injury in question; and (4) the plaintiff suffered actual loss or damage.

*Torts > Negligence > Duty > General Overview*
*Torts > Premises Liability & Property > General Premises Liability > Duties of Care > General Overview*
[HN3] In Pennsylvania, those who undertake an activity pursuant to a contract have a self-imposed duty, as well as a social duty arising from the obligation and imposed by the law, to act without negligence. It is not the contract per se which creates the duty; it is the law which imposes the duty because of the nature of the undertaking in the contract. In connection with contracts to develop land, courts have imposed a duty on any person who on behalf of the possessor of land negligently creates an artificial condition resulting in injury to others.

*Torts > Negligence > Duty > General Overview*
*Torts > Premises Liability & Property > General Premises Liability > Duties of Care > General Overview*
[HN4] Mere knowledge of a dangerous situation, even by one who has the ability to intervene, is not sufficient to create a duty to act. However, the law does not recognize subcontractors in general to be passive instruments blindly following the orders of others.

*Real Property Law > Zoning & Land Use > General Overview*
*Torts > Premises Liability & Property > General Premises Liability > General Overview*
[HN5] The Storm Water Management Act (SWMA), *32 Pa. Stat. Ann. § 680.13*, provides that any landowner and any person engaged in the alteration or development of land which may affect storm water runoff characteristics shall implement such measures consistent with the provisions of the applicable watershed storm water plan as are reasonably necessary to prevent injury to health, safety or other property. With regard to the rate of storm water runoff, the Act requires persons to take such actions as are required (1) to assure that the maximum rate of storm water runoff is no greater after development than prior to development activities; or (2) to manage the quality, velocity and direction of resulting storm water runoff in a manner which otherwise adequately protects health and property from possible injury.

*Real Property Law > Zoning & Land Use > General Overview*
*Torts > Premises Liability & Property > General Premises Liability > General Overview*
[HN6] The Storm Water Management Act (SWMA), *32 Pa. Stat. Ann. § 680.4*, defines "persons" to include individuals, as well as other corporate and municipal entities. The state legislature chose to subject persons, and not merely developers or landowners, to the requirements of the Act. The Statement of Legislative Findings accompanying the Act supports this conclusion and demonstrates that the intent of the Act was expansive, not restrictive. The General Assembly provided that the passage of the Act was intended to create a comprehensive program of storm water management, including reasonable regulation of development and activities causing accelerated runoff. *32 Pa. Stat. Ann. § 680.2*. Construction contractors must adhere to the applicable storm water management plan when undertaking alteration activities in order to ensure that the SWMA's intentionally broad mandates are administered. Moreover, a contractor or subcontractor need not bear sole and over-arching responsibility for implementation of the watershed plan in order to have a duty to act in compliance with that plan.

***Real Property Law > Zoning & Land Use > General Overview***

[HN7] There is no indication in the text of the Storm Water Management Act (SWMA), 32 Pa. Stat. Ann. § 680 et seq., or otherwise, that the terms "alteration or development", were intended to exclude land clearing or other structural removal activities.

***Real Property Law > Zoning & Land Use > Building & Housing Codes***

[HN8] The Whitemarsh Township of Pennsylvania adopted Chapter 58 of its municipal code in order to regulate development, and control storm water runoff, consistent with the Storm Water Management Act (SWMA), 32 Pa. Stat. Ann. § 680 et seq., and the applicable storm watershed plan. Whitemarsh Township, Pa., Code Ch. 58-1. Chapter 58-3 of the Code provides that no person shall commence or perform any earth disturbance activity as herein defined without first having obtained a grading permit from the Township Engineer. Whitemarsh Township, Pa., Code Ch. 58-3. The term "person" is broadly defined to include individuals, firms, associations and corporations, and "earth disturbance" includes any grading, stripping, excavation, digging or earth moving activities. Whitemarsh Township, Pa., Code Ch. 58-2. The Code also prohibits any alteration or grading of land contrary to the provisions of Chapter 58 or in violation of any permit granted thereunder. Whitemarsh Township, Pa., Code Ch. 58-14(A).

***Evidence > Judicial Admissions > Admissions During Trials***
***Evidence > Testimony > Experts > General Overview***

[HN9] Expert testimony cannot be characterized as an admission of a party opponent where the expert is not an agent of the party opponent because *Fed. R. Evid. 801(d)(2)(C)* requires that the declarant be an agent of the party opponent against whom the admission is offered. Therefore, where, as is the usual circumstance, the expert has not agreed to be subject to the client's control in giving his or her testimony, his testimony is not an admission.

***Civil Procedure > Trials > Jury Trials > Province of Court & Jury***
***Evidence > Testimony > Experts > General Overview***

[HN10] Expert evidence is not necessary if all the primary facts can be accurately and intelligibly described

to the jury, and if they, as people of common understanding, are as capable of comprehending the primary facts and of drawing correct conclusions from them as are witnesses possessed of special or peculiar training, experience, or observation in respect of the subject under investigation. Therefore, even if an expert's testimony is considered to be in conflict with his own testimony, or with other testimony from the same party, it is the function of the jury, and not the court, to resolve the conflict.

***Civil Procedure > Trials > Judgment as Matter of Law > General Overview***

[HN11] For purposes of a motion under *Fed. R. Civ. P. 50(a)*, the question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury could properly find for that party.

***Civil Procedure > Trials > Jury Trials > Province of Court & Jury***
***Evidence > Testimony > Credibility > General Overview***

[HN12] A court may not determine the credibility of witnesses and it may not substitute its choice for that of the jury between conflicting elements of the evidence.

***Torts > Negligence > Causation > Proximate Cause > General Overview***

[HN13] Proximate cause is a term of art, and may be established by evidence that a defendant's negligent act or failure to act was a substantial factor in bringing about the harm inflicted upon a plaintiff. A defendant is not relieved from liability because another concurring cause is also responsible for producing the injury. Likewise, an intervening cause is merely one that arises after the negligence of the defendant, and does not relieve the defendant of liability unless it supersedes the defendant's negligent conduct by rendering it too remote from the plaintiff's injuries.

***Torts > Negligence > Causation > Proximate Cause > Intervening Causation***

[HN14] The test to determine whether an intervening force supersedes antecedent negligent conduct is whether the intervening conduct was so extraordinary as not to have been reasonably foreseeable. This determination, unless it is one upon which no rational jurors could

2007 U.S. Dist. LEXIS 64603, *; 74 Fed. R. Evid. Serv. (Callaghan) 461

disagree, is to be made by the jury. The courts in Pennsylvania have previously found that tropical storms and hurricanes, though infrequent, are foreseeable events. Where a defendant's negligent conduct concurs with a vis major, the rule of law is that, although an act of God entails no injury upon anyone in contemplation of law, yet if man contributes towards it, it is man alone that is responsible.

### Torts > Negligence > Causation > Proximate Cause > Concurrent Causation

[HN15] The law does not operate to relieve a defendant from his liability where a concurring cause is easily anticipated. That is, where the jury could reasonably believe that a defendant's actions were a substantial factor in bringing about the harm, the fact that there is a concurring cause does not relieve the defendant of liability.

### Civil Procedure > Judgments > Relief From Judgment > Extraordinary Circumstances

[HN16] *Fed. R. Civ. P. 60(b)(6)* is a catch-all provision that enables the court, at its discretion, to afford a party relief from an order for any justifiable reason. *Rule 60(b)(6)* relief is available to ensure that judgments are based on the true merits of the case. However, it is well-settled that *Rule 60(b)(6)* is a mechanism to afford only extraordinary relief, and may only be invoked upon a showing of exceptional circumstances.

### Torts > Negligence > Defenses > Comparative Negligence > General Overview

[HN17] See *42 Pa. Cons. Stat. § 7102(b)* (2000).

### Civil Procedure > Judgments > Relief From Judgment > Extraordinary Circumstances

[HN18] *Fed. R. Civ. P. 60(b)(5)* permits the court to relieve a party from judgment, if, inter alia, it is no longer equitable that the judgment should have prospective application. *Fed. R. Civ. P. 60(b)(5)*. A judgment for damages for past wrongs is inherently final and not prospective.

### Civil Procedure > Judgments > Relief From Judgment > Motions to Alter & Amend

[HN19] A motion made under *Fed. R. Civ. P. 59(e)* shall be filed no later than 10 days after entry of the judgment.

Judgment is entered pursuant to *Fed. R. Civ. P. 58*, which provides that every judgment and amended judgment must be set forth on a separate document. *Fed. R. Civ. P. 58*.

### Civil Procedure > Pleading & Practice > Motion Practice > Time Limitations
### Civil Procedure > Appeals > Reviewability > Time Limitations

[HN20] *Fed. R. Civ. P. 58* should be interpreted to prevent loss of the right of appeal, not to facilitate loss.

### Torts > Procedure > Multiple Defendants > Joint & Several Liability

[HN21] Joint tortfeasor status is a legal determination made by the court. In order for parties to be joint tortfeasors they must either act together in committing the wrong, or their acts, if independent of each other, must unite in causing a single injury. Pennsylvania tort law also maintains that multiple substantial factors may cooperate to produce an injury and that concurrent causation will give rise to joint liability.

### Torts > Procedure > Multiple Defendants > Joint & Several Liability

[HN22] Although joint and several liability requires an indivisible injury for which two or more parties are partially responsible, it is the indivisibility of the injury, rather than of culpability, that triggers joint liability. Further, apportionment of liability among joint tortfeasors not only is permissible and familiar but indeed it is ultimately necessary in the event of a contribution action brought by one joint tortfeasor against another upon satisfaction of the judgment by the party seeking contribution. Thus, apportionment of liability is not incongruent with the indivisible nature of a particular injury.

### Torts > Procedure > Multiple Defendants > Contribution > General Overview
### Torts > Procedure > Multiple Defendants > Contribution > Uniform Contribution Among Tortfeasors Act

[HN23] Pro tanto settlement agreements, unlike pro rata agreements, do not extinguish the right of the non-settling tortfeasor to recover contribution. *42 Pa. Cons. Stat. § 8327*. However, according to the plain language of the

2007 U.S. Dist. LEXIS 64603, *; 74 Fed. R. Evid. Serv. (Callaghan) 461

Pennsylvania Uniform Contribution Among Tortfeasors Act (UCATA), a joint tort-feasor is not entitled to a money judgment for contribution until he has by payment discharged the common liability or has paid more than his pro rata share thereof. *42 Pa. Cons. Stat. § 8324.*

*Torts > Procedure > Multiple Defendants > Contribution > Uniform Contribution Among Tortfeasors Act*
[HN24] See *42 Pa. Cons. Stat. § 8327.*

*Civil Procedure > Judgments > Relief From Judgment > Motions for New Trials*
[HN25] *Fed. R. Civ. P. 59* provides that when a case has been tried to a jury, a new trial may be granted for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States. *Fed. R. Civ. P. 59(a).* The U.S. Supreme Court has added color to this grant in finding that a motion for a new trial may be bottomed on the claim that the verdict is against the weight of the evidence or that, for other reasons, the trial was not fair to the party moving; and it may raise questions of law arising out of alleged substantial errors in admission or rejection of evidence or instructions to the jury.

*Civil Procedure > Judgments > Relief From Judgment > Motions for New Trials*
[HN26] In deciding a *Fed. R. Civ. P. 59* motion, a trial court undertakes a two-step inquiry. First, the court determines whether there was error. Second, the court looks to *Fed. R. Civ. P. 61* and decides whether any error was so prejudicial as to be inconsistent with substantial justice. The burden to show harmful error rests on the movant.

*Civil Procedure > Judgments > Relief From Judgment > Motions for New Trials*
[HN27] When a motion for a new trial is based on an alleged error involving a matter within the sound discretion of the trial court, such as the court's evidentiary rulings or points of charge to the jury, the trial court has wide discretion in ruling on the motion. However, a trial court has only limited discretion in ruling on a motion for a new trial based on the argument that the verdict is against the weight of the evidence.

*Civil Procedure > Trials > Jury Trials > Jury Instructions > General Overview*
[HN28] It is well-settled that in consideration and review of jury instructions for error the court must review the instructions in their entirety, and avoid extracting partial words or instructions from their context. When the issue is whether the instructions misstated the law courts must consider whether the charge taken as a whole, properly apprised the jury of the issues and the applicable law.

*Evidence > Testimony > Experts > Qualifications*
[HN29] *Fed. R. Evid. 702* provides that expert testimony is admissible as long as an expert is qualified to testify on the subject matter. *Rule 702* sets a liberal standard, and the basis of this specialized knowledge can be practical experience as well as academic training and credentials.

*Evidence > Testimony > Experts > Daubert Standard*
[HN30] The inquiry into the reliability of an expert opinion involves the review of discrete factors elucidated by Daubert. These factors are: (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*Evidence > Testimony > Experts > Daubert Standard*
[HN31] A trial judge is granted a certain degree of latitude to determine whether, and which, Daubert factors, or any other set of reasonable reliability criteria, are appropriate measures of reliability of an expert witness in a particular case. Depending on the facts of each particular case, the factors do not have to be weighed equally. The factors merely guide the judge's determination of the admissibility of evidence, a determination to which we afford great deference.

*Evidence > Scientific Evidence > General Overview*
[HN32] Experimental evidence may be admitted even if conditions do not perfectly correspond to the conditions at issue in litigation; dissimilarities may affect the weight

2007 U.S. Dist. LEXIS 64603, *; 74 Fed. R. Evid. Serv. (Callaghan) 461

of the evidence, but not its admissibility.

*Evidence > Testimony > Experts > Daubert Standard*
[HN33] The Daubert requirement that expert testimony fit the factual issues in a case embodies the concept that scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes. Thus, to fit the factual issues in the case, there must be good grounds to connect the work of the expert to the particular case.

*Civil Procedure > Trials > Jury Trials > General Overview*
[HN34] Granting or denying a motion for a jury viewing of a particular site is a discretionary matter. In making its decision on a motion to view, a district court weighs a variety of factors involving the fair and efficient conduct of a trial. A judge generally acts within his or her discretion in denying a motion for a jury view when there is sufficient evidence describing the scene in the form of testimony, diagrams, or photographs.

*Evidence > Testimony > Credibility > General Overview*
[HN35] Testimony at trial regarding a lack of recollection of the subject matter is not inconsistent if the forgetfulness is genuine.

*Evidence > Hearsay > Credibility of Declarants > Impeachment Evidence*
*Evidence > Testimony > Credibility > One's Own Witnesses > General Overview*
[HN36] *Fed. R. Evid. 607* does not afford parties an end run around the hearsay rule. A party can attack a witness's credibility using otherwise inadmissible evidence, but cannot pretend that inadmissible hearsay evidence is being used to impeach a witness so that the jury will hear its substance.

*Civil Procedure > Pretrial Matters > Motions in Limine > Appeals*
*Evidence > Procedural Considerations > Objections & Offers of Proof > Objections*
[HN37] While normally an objection to the admission of evidence must be raised at trial to be preserved, a court will sometimes permit evidentiary question to be preserved by a motion in limine. The issue of preservation depends upon the extent of the briefing on

the motion in limine, and the definitiveness of the district court's ruling on the motion. A pretrial motion will suffice only if it can be concluded that requiring an objection at trial would have been in the nature of a formal exception under *Fed. R. Civ. P. 46*.

*Evidence > Relevance > Compromise & Settlement Negotiations*
[HN38] *Fed. R. Evid. 408* bars the admission of settlement agreements to prove liability. However, evidence of settlement may be admissible where it is beyond the scope of the rule of exclusion, such as where the evidence is used to show that a witness is biased.

*Evidence > Relevance > Compromise & Settlement Negotiations*
[HN39] Where a settlement agreement creates a clear potential for bias by providing a financial interest for the settling defendants in the outcome of a plaintiff's case against the remaining defendants, it may be admissible pursuant to *Fed. R. Evid. 408.*

*Civil Procedure > Judgments > Relief From Judgment > Motions for New Trials*
[HN40] A moving party may be granted a new trial where the verdict is against the weight of the evidence, even when the court determines that entry of judgment as a matter of law in that party's favor is not appropriate. While a decision to grant a new trial because the verdict is against the weight of the evidence is a discretionary matter, the discretion of the court is limited. New trials because the verdict is against the weight of the evidence are proper only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience.

*Real Property Law > Zoning & Land Use > Building & Housing Codes*
*Real Property Law > Zoning & Land Use > State & Regional Planning*
[HN41] The Storm Water Management Act (SWMA), *32 Pa. Stat. Ann. § 680.5*, directs each county in Pennsylvania to prepare and adopt a watershed storm water plan. The SWMA describes the contents of a watershed plan, and requires that the counties devise criteria and standards for the control of storm water

runoff from existing and new development which are necessary to minimize dangers to property and life and carry out the purposes of this act. *32 Pa. Stat. Ann. § 680.5(b)(11).* The SWMA mandates the following compliance by the municipalities with the watershed storm water plan: Within six months following adoption and approval of the watershed storm water plan, each municipality shall adopt or amend, and shall implement such ordinances and regulations, including zoning, subdivision and development, building code, and erosion and sedimentation ordinances, as are necessary to regulate development within the municipality in a manner consistent with the applicable watershed storm water plan and the provisions of this act. *32 Pa. Stat. Ann. § 680.11(b).*

**COUNSEL:** [*1] For THE ST. PAUL FIRE AND MARINE INSURANCE COMPANY, AS SUBROGEE OF NCO GROUP, AS SUBROGEE OF NCO GROUP, INC. AND NCO FINANCIAL SYSTEMS, INC., Plaintiff (2:02-cv-08601-GP): PATRICK J. KEENAN, THOMAS J. DUFFY, LEAD ATTORNEYS, DUFFY & KEENAN, PHILADELPHIA, PA.

For THE NOLEN GROUP, INC., Defendant (2:02-cv-08601-GP): JOSEPH F. VAN HORN, LEAD ATTORNEY, BODELL BOVE GRACE & VAN HORN, PHILADELPHIA, PA.

For MICHAEL ANTHONY HOMES, INC, Defendant (2:02-cv-08601-GP): HOLLY L. MCREYNOLDS, JOSEPH F. VAN HORN, LEAD ATTORNEYS, BODELL, BOVE, GRACE & VAN HORN, PHILADELPHIA, PA.

For BRUBACHER EXCAVATION, INC., Defendant (2:02-cv-08601-GP): EDWARD J. TUITE, LEAD ATTORNEY, MARSHALL DENNEHEY WARNER COLEMAN AND GOGGIN, PHILADELPHIA, PA.

For GARRISON GREENE ASSOCIATES, L.P., Defendant (2:02-cv-08601-GP): JOSEPH F. VAN HORN, BODELL BOVE GRACE & VAN HORN, PHILADELPHIA, PA.

For WARREN W. BARINGER, JR., INDIVIDUALLY AND trading as BARINGER LAND CLEARERS trading as BARINGER LAND CLEARING, Defendant (2:02-cv-08601-GP): EDWARD M. KOCH, WILLIAM J. SCHMIDT, WHITE AND WILLIAMS LLP, PHILADELPHIA, PA.

For SELECTIVE WAY INSURANCE CO., Garnishee (2:02-cv-08601-GP): MARK C. CAWLEY, PAUL M. HUMMER, LEAD ATTORNEYS, SAUL EWING, [*2] LLP, PHILADELPHIA, PA.

For ZURICH-AMERICAN INSURANCE COMPANY, Movant (2:02-cv-08601-GP): PATRICK J. KEENAN, THOMAS J. DUFFY, LEAD ATTORNEYS, DUFFY & KEENAN, PHILADELPHIA, PA.

For WARREN W. BARINGER, trading as BARINGER LAND CLEARERS trailing as BARINGER LAND CLEARING, ThirdParty Defendant (2:02-cv-08601-GP): EDWARD M. KOCH, WILLIAM J. SCHMIDT, WHITE AND WILLIAMS LLP, PHILADELPHIA, PA.

For MICHAEL ANTHONY HOMES, INC., THE NOLEN GROUP, INC., ThirdParty Plaintiffs (2:02-cv-08601-GP): HOLLY L. MCREYNOLDS, JOSEPH F. VAN HORN, LEAD ATTORNEYS, BODELL, BOVE, GRACE & VAN HORN, PHILADELPHIA, PA.

For BRUBACHER EXCAVATING, INC., ThirdParty Defendant (2:02-cv-08601-GP): EDWARD M. KOCH, LEAD ATTORNEY, WHITE AND WILLIAMS LLP, PHILADELPHIA, PA.

For BRUBACHER EXCAVATING, INC, Counter Claimant (2:02-cv-08601-GP): EDWARD M. KOCH, LEAD ATTORNEY, WHITE AND WILLIAMS LLP, PHILADELPHIA, PA.

For MICHAEL ANTHONY HOMES, INC, THE NOLEN GROUP, INC., Counter Defendants (2:02-cv-08601-GP): HOLLY L. MCREYNOLDS, LEAD ATTORNEY, BODELL, BOVE, GRACE & VAN HORN, PHILADELPHIA, PA.

For WARREN W. BARINGER, JR., INDIVIDUALLY AND, Cross Claimant (2:02-cv-08601-GP): EDWARD M. KOCH, WHITE AND WILLIAMS LLP, PHILADELPHIA, PA.

For MICHAEL [*3] ANTHONY HOMES, INC., THE NOLEN GROUP, INC., Cross Defendants (2:02-cv-08601-GP): HOLLY L. MCREYNOLDS, LEAD ATTORNEY, BODELL, BOVE, GRACE & VAN HORN, PHILADELPHIA, PA.

For WARREN W. BARINGER, JR., INDIVIDUALLY AND, Cross Defendant (2:02-cv-08601-GP): EDWARD

2007 U.S. Dist. LEXIS 64603, *3; 74 Fed. R. Evid. Serv. (Callaghan) 461

M. KOCH, WHITE AND WILLIAMS LLP, PHILADELPHIA, PA.

For ZURICH AMERICAN INSURANCE COMPANY, Plaintiff (2:03-cv-03192-GP): PATRICK J. KEENAN, THOMAS J. DUFFY, LEAD ATTORNEYS, DUFFY & KEENAN, PHILADELPHIA, PA.

For ST. PAUL FIRE AND MARINE INSURANCE COMPANY, Plaintiff (2:03-cv-03192-GP): THOMAS J. DUFFY, LEAD ATTORNEY, PATRICK J. KEENAN, DUFFY & KEENAN, PHILADELPHIA, PA.

For THE NOLEN GROUP, INC., MICHAEL ANTHONY HOMES, INC., GARRISON GREENE ASSOCIATES, L.P., Defendants (2:03-cv-03192-GP): HOLLY L. MCREYNOLDS, JOSEPH F. VAN HORN, LEAD ATTORNEYS, BODELL, BOVE, GRACE & VAN HORN, PHILADELPHIA, PA.

For BRUBACHER EXCAVATION, INC., Defendant (2:03-cv-03192-GP): EDWARD J. TUITE, LEAD ATTORNEY, MARSHALL DENNEHEY WARNER COLEMAN AND GOGGIN, PHILADELPHIA, PA.

For WARREN W. BARINGER, JR., INDIVIDUALLY AND trading as BARINGER LAND CLEARERS trading as BARINGER LAND CLEARING, Defendant (2:03-cv-03192-GP): EDWARD M. KOCH, WILLIAM J. SCHMIDT, WHITE AND WILLIAMS [*4] LLP, PHILADELPHIA, PA.

For SELECTIVE WAY INSURANCE CO., Garnishee (2:03-cv-03192-GP): MARK C. CAWLEY, PAUL M. HUMMER, LEAD ATTORNEYS, SAUL EWING, LLP, PHILADELPHIA, PA.

For WARREN W. BARINGER, JR., INDIVIDUALLY AND, Cross Defendant (2:03-cv-03192-GP): EDWARD M. KOCH, WILLIAM J. SCHMIDT, WHITE AND WILLIAMS LLP, PHILADELPHIA, PA.

For BRUBACHER EXCAVATION, INC., Cross Defendant (2:03-cv-03192-GP): EDWARD J. TUITE, MARSHALL DENNEHEY WARNER COLEMAN AND GOGGIN, PHILADELPHIA, PA.

For FEDERAL INSURANCE COMPANY, a/s/o HRPT PROPERTIES TRUST, HUB LLC, M& P PARTNERS REIT MANAGEMENT AND RESEARCH, GREAT NORTHERN INSURANCE COMPANY, a/s/o BISYS GROUP, INC., Plaintiffs (2:03-cv-03651-GP): PETER

G. ROSSI, LEAD ATTORNEY, HAYES A. HUNT, COZEN O'CONNOR, PHILADELPHIA, PA; THOMAS J. DUFFY, DUFFY & KEENAN, PHILADELPHIA, PA.

For THE NOLEN GROUP, MICHAEL ANTHONY HOMES, INC., GARRISON GREENE ASSOCIATES, L.P., Defendants (2:03-cv-03651-GP): HOLLY L. MCREYNOLDS, JOSEPH F. VAN HORN, LEAD ATTORNEYS, BODELL, BOVE, GRACE & VAN HORN, PHILADELPHIA, PA.

For BRUBACHER EXCAVATION, INC., Defendant (2:03-cv-03651-GP): EDWARD J. TUITE, LEAD ATTORNEY, MARSHALL DENNEHEY WARNER COLEMAN AND GOGGIN, PHILADELPHIA, PA.

For WARREN W. BARINGER, [*5] JR., INDIVIDUALLY AND trading as BARINGER LAND CLEARERS trading as BARINGER LAND CLEARING, Defendant (2:03-cv-03651-GP): EDWARD M. KOCH, WILLIAM J. SCHMIDT, WHITE AND WILLIAMS LLP, PHILADELPHIA, PA.

For SELECTIVE WAY INSURANCE CO., Garnishee (2:03-cv-03651-GP): MARK C. CAWLEY, PAUL M. HUMMER, LEAD ATTORNEYS, SAUL EWING, LLP, PHILADELPHIA, PA.

For THE ST. PAUL FIRE AND MARINE INSURANCE COMPANY, ZURICH-AMERICAN INSURANCE COMPANY, Movants (2:03-cv-03651-GP): PATRICK J. KEENAN, THOMAS J. DUFFY, LEAD ATTORNEYS, DUFFY & KEENAN, PHILADELPHIA, PA.

**JUDGES:** GENE E.K. PRATTER, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** GENE E.K. PRATTER

**OPINION**

**MEMORANDUM AND ORDER**

   **GENE E.K. PRATTER, J.**

   AUGUST 31, 2007

**I. BACKGROUND**

   Tropical Storm Allison struck the Whitemarsh Township area of Southeastern Pennsylvania on June 16,

2001. Several buildings in office complexes in the Township experienced severe flooding during the storm, including those that housed Teleflex, Inc., the NCO Group, Inc. and NCO Financial Systems, Inc. (collectively "NCO"), HRPT Properties Trust, HUB LLC, M&P Partners REIT Management and Research, and BISYS Group, Inc.

These consolidated subrogation actions were filed by St. Paul Fire and Marine Insurance Company, Zurich [*6] American Insurance Company, Federal Insurance Company and Great Northern Insurance Company to recover monies paid to their various insureds as a result of the flood damage. St. Paul insured and provided coverage to NCO. Zurich insured and provided coverage to Teleflex, Inc. Federal insured and provided coverage to HRPT Properties Trust, HUB LLC, and M&P Partners REIT Management and Research. Finally, Great Northern insured and provided coverage to BISYS Group, Inc.

The Defendants in this case are various parties involved in the development, site preparation and construction of Garrison Greene, a project that called for the construction of 90 townhouses on a formerly wooded hillside adjacent to the Fort Washington Bridge and the Sandy Run Creek. Plaintiffs alleged that each of the Defendants were negligent in their respective roles -- The Nolen Group, Inc., Michael Anthony Homes, Inc., and Garrison Greene Associates, L.P. (the "Nolen Defendants") are the owners and developers of the Garrison Greene site, and Brubacher Excavation, Inc. and Warren W. Baringer, Jr., t/a Baringer Land Clearing, are the subcontractors who cleared and excavated the site -- and that their negligence caused [*7] the flood damages. 1 Because the development of Garrison Greene was determined to have an impact upon the discharge of storm water from the site, the development was subject to the requirements of Pennsylvania's Storm Water Management Act, *32 Pa. C.S. § 680.1, et seq.*, ("SWMA") and Chapter 58 of the Whitemarsh Township Municipal Code, governing such discharges. Pursuant to the SWMA and the Code, the Montgomery County Conservation District issued an Erosion & Sedimentation Control Plan, which set forth the approved "construction sequence" for Garrison Greene. Because Garrison Greene was situated on a steep grade, the approved construction sequence required that the Nolen Defendants construct a detention basin at the bottom of the slope prior to the removal of the vegetation covering the land. The purpose of the detention basin was to prevent an increase in the

quantity and velocity of storm water runoff from the site and to restrict the storm water runoff to pre-developed levels. The Nolen Defendants hired Andersen Engineering to design the basin, and Brubacher to construct the basin. Baringer was hired to clear and grub the wooded land.

> 1  The Plaintiffs additionally pursued claims against [*8] Andersen Engineering Associates, Inc., the firm responsible for design of the development plans for Garrison Greene, and against the Southeastern Pennsylvania Transportation Authority ("SEPTA"), the owner of the Fort Washington Bridge. The Court issued an Order on March 16, 2005 granting summary judgment and dismissing the claims against Andersen Engineering. (Docket No. 116.) By the agreement of all parties, all claims and cross-claims against SEPTA were dismissed on September 19, 2005. (Docket No. 231.)

Despite the approved construction sequence, the Nolen Defendants proceeded according to their own schedule. Prior to the construction of the detention basin, in November 2000, the Nolen Defendants requested that Baringer clear the trees from the land. Then, in March 2001, Baringer was told to "grub," or remove the brush and vegetation, from within the limits of the construction site. By the time Baringer had stripped the land down to the dirt in March 2001, the detention basin was still not in place, nor was it put into place prior to the onslaught of Tropical Storm Allison on June 16, 2001.

On the night of the storm the rainfall was significant, and the lateral flow down the naked [*9] slope of Garrison Greene was increased. The water flowed down the slope, and into the Sandy Run Creek. As it turned out, the abutments supporting the culverts of the Fort Washington Bridge were made of mud. The Plaintiffs claimed that the increased rate and quantity of water flowing down the Garrison Greene site caused the water level in the Creek to rise and erode the abutment of the north culvert of the bridge. The Bridge collapsed, damming the Creek up to its embankment and causing the water to reverse course and flow upstream behind the Bridge, directly into the buildings occupied by the subrogated insureds. As much as four to five feet of water flooded the properties and caused extensive damage.

Suit was commenced in November 2002. In August 2004, the Nolen Defendants and the Plaintiffs entered

Case 2:05-cv-04182-SRD-JCW   Document 16571-23   Filed 12/01/08   Page 10 of 30

Page 10

2007 U.S. Dist. LEXIS 64603, *9; 74 Fed. R. Evid. Serv. (Callaghan) 461

into a self-described pro tanto settlement whereby the consideration to be paid for the release of those Defendants amounted to $ 20 million. Thereafter, shortly before trial in July 2005, the parties agreed to bifurcate the trial as to liability and damages. On July 28, 2005, at the conclusion of the jury trial on liability, the jury decided in favor of the Plaintiffs, and determined that [*10] evidence showed that the increased storm water runoff from the Garrison Greene site caused erosion to the soil supporting SEPTA's Fort Washington Bridge, which in turn caused the Bridge to collapse and ultimately cause the flood damage. The jury determined that the combined negligence of the Defendants was the source of the injury, and apportioned liability as follows: The Nolen Defendants were 97% liable, Brubacher was 2% liable, and Baringer was 1% liable. Brubacher entered into a pro rata settlement with the Plaintiffs shortly after trial.

Upon the agreement of the parties to waive a jury trial as to damages, the Court appointed a Special Master who calculated the monetary value of the damages sustained by the Plaintiffs. With some adjustments as to specific items of damages, the Court adopted the Report and Recommendation issued by the Special Master in August 2006, and the Plaintiffs thereafter moved for delay damages against Baringer, the only non-settling Defendant, pursuant to *Rule 238* of the Pennsylvania Rules of Civil Procedure. The Court granted certain delay damages and entered a judgment against Baringer in the amount of approximately $ 8.9 million in November 2006.

The [*11] parties have engaged in extensive and lengthy negotiations in an effort to resolve the remaining open issues in this matter, but those efforts ultimately proved unsuccessful. Baringer now moves for post-trial relief from the verdict and from the judgment. For the reasons stated herein, the Court will deny Baringer's motions.

## II. MOTION FOR JUDGMENT AS A MATTER OF LAW

Baringer first moves pursuant to Federal *Rule 50(b)* for judgment as a matter of law, arguing that the jury's "fundamental misunderstanding of the evidence" cannot support its verdict. Specifically, Baringer argues that there was insufficient evidence to establish the required elements of the negligence claim levied by the Plaintiffs against Baringer.

## A. LEGAL STANDARD

[HN1] A motion for judgment as a matter of law "should be granted only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability." *Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1166 (3d Cir. 1993)*. "In determining whether the evidence is sufficient to sustain liability, the court may not weigh the evidence, [*12] determine the credibility of witnesses, or substitute its version of the facts for the jury's version." Id. (citing *Fineman v. Armstrong World Indus., 980 F.2d 171, 190 (3d Cir. 1992)*, cert. denied, *507 U.S. 921, 113 S. Ct. 1285, 122 L. Ed. 2d 677 (1993))*. The Court may only enter judgment as a matter of law following return of a verdict by a jury "'if, as a matter of law, the record is critically deficient of that minimum quantity of evidence from which a jury might reasonably afford relief.'" *Trabal v. Wells Fargo Armored Serv. Corp., 269 F.3d 243, 249 (3d Cir. 2001)* (quoting *Powell v. J.T. Posey Co., 766 F.2d 131, 133-4 (3d Cir. 1985))*.

## B. DISCUSSION

[HN2] To assert a cause of action for negligence, a plaintiff must present sufficient evidence to prove the following: (1) the defendant had a duty to conform to a certain standard of conduct; (2) the defendant breached that duty; (3) such breach caused the injury in question; and (4) the plaintiff suffered actual loss or damage. *Phillips v. Cricket Lighters, 576 Pa. 644, 841 A.2d 1000, 1008 (Pa. 2003)*. Baringer argues that Plaintiffs have produced enough evidence only to show that the negligence of his co-Defendants, and the Tropical Storm *vis major,* caused the flood damage. The Court [*13] disagrees.

### i. Duty of Care

Baringer claims that he owed no "amorphous social duty" to the subrogated insureds because they were not foreseeable plaintiffs, nor was the flood damage they suffered a foreseeable risk of his conduct. Baringer's argument can be summarized by his own choice of words: that he was "merely a subcontractor," charged only with a duty to Michael Anthony Homes to perform his services non-negligently.

Baringer incorrectly obfuscates his statutory and

Case 2:05-cv-04182-SRD-JCW   Document 16571-23   Filed 12/01/08   Page 11 of 30

Page 11

2007 U.S. Dist. LEXIS 64603, *13; 74 Fed. R. Evid. Serv. (Callaghan) 461

common law duties to refrain from causing an increase in the volume and velocity of destructive storm water by adhering to approved construction plans and permits, and mischaracterizes both the law, and the evidence submitted to the jury during the trial, as tending to confine the insureds (and, by extension, their subrogees) to their status as beneficiaries of his duty to Michael Anthony Homes. Baringer's duty not to cause excessive storm water runoff arose from common law, state statute, the Storm Water Management Act, *32 P.S. § 680, et seq.*, and local ordinance, Chapter 58 of the Whitemarsh Township Code.

[HN3] In Pennsylvania, those who undertake an activity pursuant to a contract have a self-imposed duty, as well as a "social" [*14] duty arising from the obligation and imposed by the law, to act without negligence. *St. Clair v. B&L Paving Co., 270 Pa. Super. 277, 411 A.2d 525, 526-27 (Pa. Super. 1979)*. "It is not the contract per se which creates the duty; it is the law which imposes the duty because of the nature of the undertaking in the contract." *Hawthorne v. Dravo Corp., 313 Pa. Super. 436, 460 A.2d 266, 269 (Pa. Super. 1983)*. In connection with contracts to develop land, courts have imposed a duty "on any person who on behalf of the possessor of land negligently creates an artificial condition resulting in injury to others." *St. Clair, 411 A.2d at 526*.

Baringer attempts to reposition himself as a dutiless, passive observer of Michael Anthony Homes's negligent conduct, instead of an actor with an affirmative duty. Of course, as Baringer correctly contends, [HN4] "mere knowledge of a dangerous situation, even by one who has the ability to intervene, is not sufficient to create a duty to act." *Wenrick v. Schloemann-Siemag Aktiengesellschaft, 523 Pa. 1, 564 A.2d 1244, 1248 (Pa. 1989)*. However, Baringer is not, nor does the law recognize subcontractors in general, to be passive instruments blindly following the orders of others. Baringer undertook to clear and grub [*15] Garrison Greene. Such is the creation of an artificial condition, not passive observation, and the common law charges Baringer with a duty to act non-negligently where his own conduct places others in peril. Id.

Beyond general common law principles, the applicable state statutes and municipal ordinances are evidence of Baringer's duty to refrain from causing excessive storm water runoff. [HN5] *Section 680.13* of the SWMA provides that "[a]ny landowner and any **person** engaged in the alteration or development of land which may affect storm water runoff characteristics shall implement such measures consistent with the provisions of the applicable watershed storm water plan as are reasonably necessary to prevent injury to health, safety or other property." *32 Pa. C.S. § 680.13*. (emphasis added). With regard to the rate of storm water runoff, the Act requires persons to take "such actions as are required . . . (1) to assure that the maximum rate of storm water runoff is no greater after development than prior to development activities; or (2) to manage the quality, velocity and direction of resulting storm water runoff in a manner which otherwise adequately protects health and property from possible [*16] injury." Id.

Baringer argues that the SWMA is inapplicable to him on multiple grounds. Without support of case law or legislative findings, Baringer submits that he is not a "person," [2] within the purview of the SWMA because the Act was not intended to require compliance of subcontractors. He argues that because subcontractors, including himself, are unable to "implement such measures consistent with the provisions of the applicable watershed storm water plan," as required by the SWMA, the Act was not intended to apply to entities other than general contractors who exercise exclusive control over the implementation.

> 2  [HN6] *Section 680.4* of the SWMA defines "persons" to include "individuals," as well as other corporate and municipal entities.

Baringer's restrictive and narrow reading of the SWMA is not persuasive. The plain language of *section 680.13* would not encourage such a reading, as the state legislature chose to subject "persons," and not merely "developers" or "landowners," to the requirements of the Act. The Statement of Legislative Findings accompanying the Act supports this conclusion and demonstrates that the intent of the Act was expansive, not restrictive. The General Assembly [*17] provided that the passage of the Act was intended to create "[a] **comprehensive** program of storm water management, including reasonable regulation of development **and activities** causing accelerated runoff." *32 Pa. C.S. § 680.2*. (emphasis added). Baringer and other subcontractors must adhere to the applicable storm water management plan when undertaking "alteration activities" in order to ensure that the SWM A's

Case 2:05-cv-04182-SRD-JCW   Document 16571-23   Filed 12/01/08   Page 12 of 30

Page 12
2007 U.S. Dist. LEXIS 64603, *17; 74 Fed. R. Evid. Serv. (Callaghan) 461

intentionally broad mandates are administered. Moreover, Baringer need not bear sole and overarching responsibility for implementation of the watershed plan in order to have a duty to act in compliance with that plan. [3]

3    Baringer touches briefly on whether land grubbing and clearing is an "alteration" to land under the SWMA. [HN7] There is no indication in the text of the Act, or otherwise, that the terms "alteration *or* development", were intended to exclude land clearing or other structural removal activities.

Another potential source of Baringer's duty to refrain from causing excessive storm water runoff is the Whitemarsh Township municipal code. *Gravlin v. Fredavid Builders and Developers, 450 Pa. Super. 655, 677 A.2d 1235, 1239 (Pa. Super. 1996)* (citing *Jinks v. Currie, 324 Pa. 532, 188 A. 356, 358 (Pa. 1936))* (finding [*18] that a violation of a municipal ordinance is evidence of negligence). [HN8] In 1990, Whitemarsh Township adopted Chapter 58 of its municipal code in order to regulate development, and control stormwater runoff, consistent with the SWMA and the applicable storm watershed plan. [4] Whitemarsh Twp. Code Ch. 58-1. Chapter 58-3 of the Code provides that "[n]o **person** shall commence or perform any **earth disturbance activity** as herein defined without first having obtained a grading permit from the Township Engineer." (emphasis added). The term "person" is broadly defined to include individuals, firms, associations and corporations, and "earth disturbance" includes any grading, stripping, excavation, digging or earth moving activities. Id. at Ch. 58-2. The Code also prohibits any alteration or grading of land contrary to the provisions of Chapter 58 or in violation of any permit granted thereunder. Id. at Ch. 58-14(A).

4    Chapter 58 of the Whitemarsh Code was amended by Ordinance 798 on February 26, 2004. Chapter 58 no longer makes direct reference to the SWMA. At the time of the events giving rise to liability in this trial, Ch. 58-1 D. provided that one of the purposes of the Ordinance was to "[i]mplement [*19] and/or satisfy the Pennsylvania Stormwater Management Act . . . ."

At trial of this matter, Thomas Zarko, who was the township engineer for Whitemarsh Township at the time of the property damage, testified to the obligation under Chapter 58 to comply with permits and plans that extends to subcontractors, such as Baringer, who perform the actual site work. (Tr. 7/21/05 188:25-189:3; 189:16-18; 200:15-201: 1.) This is consistent with Baringer's contract with Michael Anthony Homes, which required Baringer to "comply with all notices and . . . with all laws, ordinances, building codes, rules regulations, orders." (Tr. 7/27/05 114:17-23.)

Thus, it is apparent that there was sufficient evidence of record for the jury to rationally conclude that Baringer had a duty to the subrogated insureds, whether arising from the common law, the SWMA, or the Municipal Code.

**ii. Breach of Duty**

Viewed in the light most favorable to the Plaintiffs as verdict winners, the evidence produced at trial is sufficient to establish that Baringer breached the duty he owed to the subrogated insureds to acquaint himself with the applicable construction plans, permits and work sequence, and to perform his work in compliance [*20] with all of them as applicable, so as to avoid an increase in the volume and velocity of storm water runoff from Garrison Greene.

The record contains evidence including the construction plans approved by Whitemarsh Township, (Exhibit P-1), which set forth the required construction sequence for the Garrison Green project. (Tr. 7/20/05 30:19-24; Tr. 7/25/05 71:18-21.). [5] Plaintiffs' construction management expert, Rocco Vespe, P.E., explained the construction sequence to the jury. He testified that the sequence required that a temporary detention basin be built before Baringer cleared and grubbed any part of the land other than a small access path to a pre-existing sanitary pipe that needed to be moved in order to construct the detention basin. (Tr. 7/20/05 40:3-41:16; 53:1-5; Tr. 7/18/05 134:18-135:4.) Plaintiffs demonstrated that the function and purpose of the basin was to detain storm water runoff so that post-development, the runoff from the construction site would not exceed pre-developed levels. (Tr. 7/18/05 122:14-123:24.) Mr. Vespe also testified that by clearing and grubbing in disregard to the mandated construction sequence, Baringer acted contrary to accepted construction [*21] practices. (Tr. 7/20/05 41-42.)

5    This same sequence was approved by the Montgomery County Conservation District and

set forth in an Erosion & Sedimentation Control Plan. (Ex. P-23.)

The record also reflects evidence of Baringer's violation of the Whitemarsh Township grading permit. On March 13, 2001, the Township issued a grading permit for the limited removal of stumps at Garrison Greene only from the areas necessary to remove and replace the pre-existing sewer line. (Exs. P-26, P-27; Tr. 7/21/05 194:9-21; Tr. 7/22/05 61:18-62:3.) The permit required compliance with the approved construction plans and sequence, and required that all erosion and sedimentation controls had to be installed before any earth disturbance. (Ex. P-26; Tr. 7/22/05 at 61:18-62:3; Tr. 7/20/05 39:6-9.) Nevertheless, Baringer cleared and grubbed the entirety of the construction site despite and in violation of the permit restrictions. (Tr. 7/27/05 91:2-93:7; Tr. 7/22/05 65:21-62:3; Tr. 7/20/05 17:7-24; 18:2-7; 93:4-14; Tr. 7/25/05 142:1010; Tr. 7/18/05 191:9-22; 12-18.)

Plaintiffs also presented evidence that Baringer's actions were not in accordance with accepted construction practices. According to Township Engineer [*22] Zarko, subcontractors were to review and abide by the terms of grading permits and the plans incorporated therein. (Tr. 7/21/05 188:25-189:3; 189:16-18; 194:9-21; 195:17-23; 200:15-201:1.) Mr. Vespe testified that Baringer deviated from the usual standard of care by failing at the pre-construction planning meeting for Garrison Greene to review the construction plans. (Tr. 7/20/05 36-38.) The evidence showed, and Baringer admits, that he failed to review the construction plans, (Tr. 7/27/05 89:22-24; 102:1-18; Br. 14, n. 4), and that he completed the clearing and grubbing 'of Garrison Green prior to the installment of a detention basin. (Tr. 7/20/05 16:16-22; Tr. 7/27/05 91:2-93:7; Tr. 7/22/05 65:21-62:3; Tr. 7/20/05 17:7-24; 18:2-7; 93:4-14; Tr. 7/25/05 142:1-10; Tr. 7/18/05 191:9-22; 12-18.)

Furthermore, there was evidence that Baringer's clearing and grubbing activities increased the storm water runoff from Garrison Greene. The Plaintiffs presented expert testimony regarding the measurements of the water runoff, slope and forestation of the land prior to Baringer's work, as compared with the increased rate of water flow after Baringer cleared and grubbed the Garrison Greene site. [*23] (Tr. 7/18/05 127:23-128:25, 181:13-183:13; Tr. 7/19/05 71:24-72:4.) Specifically, Dr. Roger Ruggles, Plaintiffs' hydrology expert, testified that

the rate of storm water runoff at pre-developed Garrison Greene was approximately 22 feet per second (cfs). By comparison, on the night of Tropical Storm Allison, the cleared land had a peak runoff rate between 70-90 cfs. (Tr. 7/18/05 165:19-166:12; 168:25-169:7.)

Despite the ample evidence that Baringer acted without due care in clearing and grubbing Garrison Greene, Baringer argues that an isolated remark made by Mr. Vespe during trial is an admission that Baringer breached no duty.

Consistent with his expert report, at trial Mr. Vespe testified that Baringer deviated from the standards of a reasonable contractor by clearing and grubbing Garrison Greene out of sequence. (Tr. 7/20/05 41:22-42:3; 42:9-18; 99:16-20; 102:8-13; 104:7-12; 108:8-10; 148:13-19.) During cross-examination, however, Mr. Vespe testified as follows:

> Q: So, [Baringer] should have given notice to the customer [Michael Anthony Homes] who told him to do the work?
>
> A: I'm doing it but I want you to know that it's in violation of the sequence.
>
> Q: Should he have gone so far as to [*24] tell [Michael Anthony Homes] I will not do the work until the basin is built?
>
> A: No, he's directed to do it, he should do it.
>
> ***
>
> Q: So, [Baringer] should have told [Michael Anthony Homes], hey, you told me to clear the limits but you should build that basin?
>
> A: No, I'm doing it but I need to let you know that it doesn't match the construction sequence.

(Tr. 7/20/05 107:9-109:4.) According to Baringer, Mr. Vespe's testimony is an admission on the part of the Plaintiffs that Baringer's only duty was to inform Michael Anthony Honies that his actions were out of sequence, but not to decline to clear and grub the land out of sequence.

Case 2:05-cv-04182-SRD-JCW   Document 16571-23   Filed 12/01/08   Page 14 of 30

Page 14

2007 U.S. Dist. LEXIS 64603, *24; 74 Fed. R. Evid. Serv. (Callaghan) 461

Mr. Vespe's testimony is not a binding admission and does not confine the duty, nor the breach of this duty, to Baringer's failure to give notice of the improper sequence to Michael Anthony Homes. In *Kirk v. Raymark Indus., Inc., 61 F.3d 147, 164 (3d Cir. 1995),* cert. denied, *516 U.S. 1145, 116 S. Ct. 1015, 134 L. Ed. 2d 95 (1996),* our court of appeals considered the issue of whether expert testimony may be a party admission in the context of *Federal Rule of Evidence 801(d)(2)(C).* The court found that [HN9] expert testimony could not be characterized as an admission of a party opponent because *Rule 801(d)(2)(C)* [*25] requires that the declarant be an agent of the party opponent against whom the admission is offered. Therefore, where, as is the usual circumstance, "the expert has not agreed to be subject to the client's control in giving his or her testimony," his testimony is not an admission. *Id.* (citing *Sabel v. Mead Johnson & Co., 737 F. Supp. 135, 138 (D. Mass. 1990)).* 6 Mr. Vespe was not an agent of the Plaintiffs in this matter.

6 Baringer encourages the Court to rely instead upon *Dean v. Watson, 1996 U.S. Dist. LEXIS 2243, 1996 WL 88861, at *5 (N.D. Ill. Feb. 28, 1996).* In Dean, the court concluded, contrary to Kirk, that where an expert is authorized by a party to testify, the expert's testimony may be admissible as an admission pursuant to *Rule 801(d)(2)(C).* Dean specifically relied on a case from the Fifth Circuit Court of Appeals, *Collins v. Wayne Corp., 621 F.2d 777, 782 (5th Cir. 1980),* employing reasoning that was directly rejected by our court of appeals in Kirk, as well as by other courts. See, e.g., *Koch v. Koch Indus., Inc., 37 F. Supp. 2d 1231, 1245 (D. Kan. 1998),* reversed on other grounds, *203 F.3d 1202 (10th Cir. 2000).* Although Dean distinguished Kirk on the basis that Kirk dealt with expert testimony [*26] provided in a prior litigation, rather than in the same litigation, the distinction is unavailing. The critical distinction is whether an expert is, on the record, an agent of a party. See *Bostick v. ITT Hartford Group, Inc., 82 F. Supp. 2d 376, 379 (E.D. Pa. 2000).*

Moreover, even if, as Baringer submits, Mr. Vespe's testimony may be characterized as equivocal, this does not require the conclusion that the jury's verdict was based on conjecture. Whether Baringer should have proceeded to clear and grub Garrison Greene contrary to the approved plans and in violation of the grading permit was within the ordinary knowledge of the jury and did not require expert testimony. [HN10] "Expert evidence is not necessary . . . 'if all the primary facts can be accurately and intelligibly described to the jury, and if they, as men of common understanding, are as capable of comprehending the primary facts and of drawing correct conclusions from them as are witnesses possessed of special or peculiar training, experience, or observation in respect of the subject under investigation.'" *Padillas v. Stork-Gamco, Inc., 186 F.3d 412, 415-16 (3d Cir. 1999)* (quoting *Salem v. United States Lines Co., 370 U.S. 31, 35, 82 S. Ct. 1119, 8 L. Ed. 2d 313 (1962)).* Therefore, [*27] even if Mr. Vespe's remark is considered to be in conflict with the remainder of his own testimony, or the testimony of other of Plaintiffs' witnesses, "it is the function of the jury, and not the court, to resolve the conflict." *O'Neill v. Reading Co., 306 F.2d 204, 205 (3d Cir. 1962).* See also *Cassidy Podell Lynch, Inc. v. SnyderGeneral Corp., 944 F.2d 1131, 1138 (3d Cir. 1991).* Compare, *Brannan v. Lankenau Hospital, 490 Pa. 588, 417 A.2d 196, 200 (Pa. 1980); Mudano v. Phila. Rapid Transit Co., 289 Pa. 51, 137 A. 104, 107-08 (Pa. 1927)* (finding that absolute equivocation in expert testimony may undermine the jury's conclusion where the testimony was necessary to establish an element of a claim).

Baringer was permitted to make as much as he could from the expert's testimony in his argument to the jury. The verdict rendered by the jury demonstrates that the jury did not find those arguments significant enough to relieve Baringer from all liability. The evidence of record was of a sufficient quantity to enable the jury to rationally conclude that Baringer breached his duty to comply with the construction plans and sequence so as to avoid increased storm water runoff from Garrison Greene.

### iii. Causation

Baringer next [*28] argues that his failure to perform his "single" duty -- to notify Michael Anthony Homes that its performance of the grubbing work without a detention basin violated the construction sequence -- was not the actual or proximate cause of the flooding damage suffered by the subrogated insureds.

Baringer's argument is largely inapposite. Plaintiffs submitted evidence that Baringer's duty was not merely to notify Michael Anthony Homes, but instead to review and adhere to the construction sequence and applicable

2007 U.S. Dist. LEXIS 64603, *28; 74 Fed. R. Evid. Serv. (Callaghan) 461

permits in performing his work. Plaintiffs have submitted sufficient evidence to show both that the flooding damage was a foreseeable result of Baringer's conduct, and that Baringer's conduct was a substantial factor in causing the flood damage. Dr. Ruggles testified to the impact of Baringer's premature clearing and grubbing work on the Sandy Run Creek. He described to the jury the natural runoff characteristics of Garrison Greene, and explained that prior to development work, the water runoff rate into the creek was measured at 22 feet per second (cfs). Dr. Ruggles opined that in clearing and grubbing the land, Baringer caused the storm water runoff rate to rise. He testified to [*29] his calculations that the peak runoff rate during Tropical Storm Allison was in the range of 70-90 cfs. (Tr. 7/18/05 168:25-169:7.) According to Dr. Ruggles, while the pre-developed runoff rate had no adverse impact upon the Fort Washington Bridge, the increased runoff rate inhibited the flow of water through the South culvert of the Bridge, and increased the flow through the North culvert. (Tr. 7/18/05 121:14-122:7) [7] In turn, Dr. Ruggles explained that the water surface levels and the velocity flows within the North culvert were elevated, and eroded the soil under the abutment of the Bridge, causing it to collapse. Dr. Ruggles was decisive in his opinion that the Bridge would not have collapsed if Baringer had not cleared and grubbed Garrison Greene out of sequence. (Tr. 719/05 32:18-20).

> [7]   By comparison, in Garrison Greene's post-developed condition, the detention basin was designed to reduce the peak Storm water runoff rate to 18 cfs. (Tr. 7/18/05 165:5-18.)

Dr. Ruggles also testified that the collapse of the Fort Washington Bridge caused the flooding in the buildings of subrogated insureds. (Tr. 7/19/05 22:9-13; 33:2-8.) He explained that the storm water runoff from the insureds' [*30] properties normally flowed directly into Sandy Run Creek by way of its passage through the Bridge downstream. (Tr. 7/19/05 9:2-7.) However, when the Bridge partially collapsed, the storm water runoff from the upstream buildings was impounded behind the Bridge and railway embankment up to the height of the embankment. The damming of the Creek caused the buildings to flood with approximately four to five feet of water. (Tr. 7/18/05 117:10-118:12; Tr. 7/19/05 31:15-25; 32:5-10; 10:11-11:12; 111:5-112:11.)

Baringer contends that Dr. Ruggles's conclusions as to factual causation are flawed, and therefore that his opinion is insufficient evidence of causation. Baringer submits that Dr. Ruggles "overlooked" the reports and the testimony of Heath Lahr, of the Montgomery County Conservation Department, who inspected Garrison Greene on at least two occasions prior to the storm. After citing the Defendants for failure to follow the proper construction sequence, Mr. Lahr found that Garrison Greene had been "temporarily stabilized" with straw mulch and growing grass as of May 16, 2001. (Tr. 7/22/05 77:18.) The parties questioned Mr. Lahr during trial with regard to his observations of Garrison Greene [*31] in April and May 2001. The jury had opportunity to consider Mr. Lahr's testimony alongside that of Dr. Ruggles and assign it whatever weight it so determined. [8] The jury was free to accept or reject the evidence of Mr. Lahr's observations. As a matter of law, Mr. Lahr's testimony in no way negated that of Dr. Ruggles.

> [8]   Notably, during cross examination, Mr. Lahr testified that the growing grass was perhaps nothing more than patches of "fuzz" on the hillside.

Baringer also argues that it is a "quantum leap" for the jury to conclude that his activities were the actual cause of the flooding of the buildings, when the Fort Washington Industrial Park, which is built on a marsh, is predisposed, and frequently plagued, by flooding. Several witnesses at trial testified to their observations of flooding in the area of the NCO and Teleflex buildings on the night of Tropical Storm Allison. At least one witness testified that he observed significant flooding on the roadways in close proximity to the insureds' properties prior to the collapse of the Bridge. However, the Plaintiffs presented evidence that despite the predisposition of the area to flooding, the insureds' properties had only flooded [*32] once before, during Hurricane Floyd. Though the Plaintiffs experienced only a few inches of flooding during that Hurricane, Floyd was a bigger and stronger storm, with more significant rainfall and higher peak storm water flow rates. Moreover, Dr. Ruggles acknowledged that other "localized flooding" occurred in the area on the night of the storm, but nevertheless concluded that the collapse of the Bridge caused the extensive flood damage to the Plaintiffs.

Mindful of the fact that the Court may rethink the jury's conclusion as to the actual cause of the flooding, and enter judgment as a matter of law, only if "there is no legally sufficient evidentiary basis for a reasonable jury"

Case 2:05-cv-04182-SRD-JCW   Document 16571-23   Filed 12/01/08   Page 16 of 30

Page 16

2007 U.S. Dist. LEXIS 64603, *32; 74 Fed. R. Evid. Serv. (Callaghan) 461

to find in favor of the non-moving party, the Court concludes that this is not such a case. *Fed. R. Civ. P. 50(a)*. [HN11] "The question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury could properly find for that party." *Walter v. Holiday Inns, Inc., 985 F.2d 1232, 1238 (3d Cir. 1993)* (quoting *Patzig v. O'Neil, 577 F.2d 841, 846 (3d Cir. 1978))*. There is sufficient evidence in this regard that Baringer's actions [*33] were a factual cause of the Plaintiffs' injuries. [9]

> 9 [HN12] The Court may not determine the credibility of witnesses and it may not "substitute its choice for that of the jury between conflicting elements of the evidence." *Perkin-Elmer Corp. v. Computervision Corp., 732 F.2d 888, 893 (Fed.Cir.)*, cert. denied, *469 U.S. 857, 105 S. Ct. 187, 83 L. Ed. 2d 120 (1984)*.

Finally, Baringer argues that clearing and grubbing Garrison Greene was not the proximate cause of Plaintiffs' damages because Tropical Storm Allison, and the failure of the Nolen Defendants to complete the detention basin before the storm, were superseding causes of Plaintiffs' injuries that vitiated any liability on the part of Baringer.

[HN13] "Proximate cause is a term of art, and may be established by evidence that a defendant's negligent act or failure to act was a substantial factor in bringing about the harm inflicted upon a plaintiff." *Powell v. Drumheller, 539 Pa. 484, 653 A.2d 619, 622 (Pa. 1995)*. A defendant is not relieved from liability because another concurring cause is also responsible for producing the injury. Id. Likewise, an intervening cause is merely one that arises after the negligence of the defendant, and does not relieve the defendant of liability unless it supercedes [*34] the defendant's negligent conduct by rendering it too remote from the plaintiff's injuries. *Vattimo v. Lower Bucks Hosp., Inc., 502 Pa. 241, 465 A.2d 1231, 1237 n. 4 (Pa. 1983)*.

[HN14] The test to determine whether an intervening force supercedes antecedent negligent conduct is whether "the intervening conduct was so extraordinary as not to have been reasonably foreseeable." *Powell, 653 A.2d at 623*. This determination, unless it is one upon which no rational jurors could disagree, is to be made by the jury. *Id. at 624*; *Huddleston v. Infertility Center of Am., Inc., 700 A.2d 453, 460 (Pa. Super. 1997)*. The courts in

Pennsylvania have previously found that tropical storms and hurricanes, though infrequent, are foreseeable events. In *Shamnoski v. PG Energy, 579 Pa. 652, 858 A.2d 589, 605 (Pa. 2004)*, the Supreme Court of Pennsylvania held that a dam owner must design, maintain and operate its dams in a fashion that ensured structural integrity would be safely maintained "even in a storm of the predictable (if rare) intensity of Hurricane Gloria." Where a defendant's negligent conduct concurs with a *vis major*, "[t]he rule of law is that, although an act of God entails no injury upon anyone in contemplation of law, yet if [*35] man contributes towards it, it is man alone that is responsible." *Carlson v. A. & P. Corrugated Box Corp., 364 Pa. 216, 72 A.2d 290, 293 (Pa. 1950)* (finding that the rule "is only an application of the general principle that the fact that some other cause concurs with the negligence of the defendant in producing an injury does not relieve the defendant from liability unless he can show that such other cause would have produced the injury independently of his negligence.") (citations omitted).

Likewise, the negligence of the Nolen Defendants and Brubacher in failing to build the detention basin prior to Baringer's work is a concurring, substantial factor in Plaintiffs' damages, and is not a superceding cause that relieves Baringer of liability. It is quite clear that at the time Baringer cleared the trees, brush and grass from Garrison Greene, it was not only foreseeable, but it was then reality that there was no detention basin in place. [HN15] The law does not operate to relieve a defendant from his liability where a concurring cause is easily anticipated. *Powell, 653 A.2d at 622*. ("[w]here the jury could reasonably believe that a defendant's actions were a substantial factor in bringing about the harm, [*36] the fact that there is a concurring cause does not relieve the defendant of liability."). The failure of Baringer's co-defendants to conduct themselves according to the approved construction sequence and plans by building the basin does not relieve Baringer from liability for failing to adhere to the proper standard of care by reviewing and proceeding in accordance with the construction sequence.

Having found that there was sufficient evidence to enable the jury to conclude that Baringer was comparatively negligent alongside his co-defendants, and that his conduct was a factual and legal cause of the flood damage suffered by the subrogated insureds, the Court will deny Baringer's motion for judgment as a matter of law.

### III. MOTION FOR RELIEF FROM JUDGMENT

Baringer next moves pursuant to *Rule 60(b)(6) of the Federal Rules of Civil Procedure* for relief from the judgment. He seeks to invoke the discretion of the Court to reduce the judgment to reflect only his pro rata 1 % share of the liability apportioned by the jury against him on the grounds that the enforcement of the judgment of over $ 8 million amounts to a "grave injustice."

[HN16] *Rule 60(b)(6)* is a catch-all provision that enables the [*37] Court, at its discretion, to afford a party relief from an order for any justifiable reason. *Rule 60(b)(6)* relief is available "to ensure that judgments are based on the true merits of the case." *Bachman Co. v. McGonigle, 855 F. Supp. 759, 763 (E.D. Pa. 1994).* However, it is well-settled that *Rule 60(b)(6)* is a mechanism to afford only extraordinary relief, and may only be invoked upon a showing of exceptional circumstances. *Coltec Indus., Inc. v. Hobgood, 280 F.3d 262, 273 (3d Cir. 2002)* (citing *In re Fine Paper Antitrust Litig., 840 F.2d 188 (3d Cir. 1988)).*

The Court finds that Baringer has not set forth extraordinary circumstances that justify relief from judgment. Although the jury found Baringer individually to be only 1% liable for the damage sustained by the subrogated insureds, the allocation reflects the percentage of responsibility attributable to Baringer's negligence in light of the multiple substantial factors that caused the losses suffered by the subrogated insureds. Though Baringer believes this result inequitable, at the time of this litigation, under Pennsylvania law, Plaintiffs had a statutory right to recover the full amount of the judgment from each of the Defendant-tortfeasors. [*38] *Section 7102(b)* of the Comparative Negligence Act, applicable to the joint tortfeasors of this case, provided:

> [HN17] Where recovery is allowed against more than one defendant, each defendant shall be liable for that proportion of the total dollar amount awarded as damages in the ratio of the amount of his causal negligence to the amount of causal negligence attributed to all defendants against whom recovery is allowed. The plaintiff may recover the full amount of the allowed recovery from any defendant against whom the plaintiff is not barred from recovery. Any defendant who

is so compelled to pay more than his percentage share may seek contribution.

*42 Pa. C.S. § 7102(b) (2000).* The policy behind joint and several liability is to allocate risk of default among defendants, rather than innocent plaintiffs, whose breach of some duty has caused injury for which compensation is due. *Estate of Harsh, 584 Pa. 606, 887 A.2d 209, 217 (Pa. 2005).*

Baringer points to no authority, nor will the Court accept the proposition, that Pennsylvania's Comparative Negligence statute applying joint and several liability among tortfeasors is itself the exceptional circumstance justifying departure from the judgment. Thus, the [*39] Court will deny Baringer's Motion for Relief pursuant to *Rule 60(b)(6).*

### IV. MOTION TO MOLD THE JUDGMENT TO REFLECT BARINGER'S CONTRIBUTION CLAIM AGAINST THE NOLEN DEFENDANTS PURSUANT TO *RULES 59(e)* AND *60(b)(5)*

Baringer also moves pursuant to *Rule 59(e)*, or alternatively pursuant to *Rule 60(b)(5)* [10] *of the Federal Rules of Civil Procedure*, to amend the judgment to reflect the right of contribution lie pleaded in his cross-claim against the Nolen Defendants. Specifically, Baringer now requests that the Court enter a "conditional judgment" to reflect his right of contribution in the amount of $ 8,656,325.09 against the Nolen Defendants.

> 10   [HN18] *Rule 60(b)(5)* permits the court to relieve a party from judgment, if, *inter alia,* "it is no longer equitable that the judgment should have prospective application." *Fed. R. Civ. P. 60(b)(5).* The Court determines that relief is not warranted under this Rule. A judgment for damages for past wrongs is "inherently final" and not prospective. *Marshall v. Bd. of Ed., Bergenfield, N.J., 575 F.2d 417, 425 (3d Cir. 1978)* (quoting *Ryan v. U.S. Lines Co., 303 F.2d 430, 434 (2d Cir. 1962)* ("*Rule 60(b)(5)* does not cover the case of a judgment for money damages.")).

As [*40] a threshold matter, the Nolen Defendants contend that Baringer has untimely moved for *Rule 59(e)* relief. [11] [HN19] A motion made under Federal *Rule 59(e)* "shall be filed no later than 10 days after entry of the judgment." Judgment is entered pursuant to Federal *Rule 58*, which provides that "[e]very judgment and

amended judgment must be set forth on a separate document." *Fed. R. Civ. P. 58*. The Nolen Defendants assert that the entry of judgment occurred by way of the Court's Memorandum and Order dated August 21, 2006, and thus, that the present motion, filed on December 4, 2006, is time-barred. Baringer, in turn, submits that the Court did not enter judgment against him until November 22, 2006, when the Court issued an Order, jointly drafted and submitted by the parties, and entitled "Final Order of Judgment." (Docket No. 251.)

> 11   The Plaintiffs did not join in the argument as to the untimeliness of Baringer's *Rule 59(e)* motion.

The Court concludes that judgment was entered against Baringer on November 22, 2006, and that Baringer's motion is timely. Perhaps when viewed out of the context of this particular litigation under the "separate document" rule, the August 2006 Memorandum and Order can [*41] arguably be seen as a final judgment. See *In re Cendant Corp. Securities Litig., 454 F.3d 235, 241 (3d Cir. 2006)* (finding that "an order will be treated as a separate document if it meets three criteria: first, the order must be self-contained and separate from the opinion; second, the order must note the relief granted; and third, the order must omit (or at least substantially omit) the District Court's reasons for disposing of the parties' claims") (citations omitted). However, when viewed in the context of the procedural history and posture of this case, and in light of the ongoing settlement negotiations led by the Magistrate Judge (specifically requested by the parties) among the parties between August and November of 2006, the parties cannot reasonably be in doubt as to the date of the entry of judgment as a function of the actual conclusion of on-going substantive discussions with the Court.

The jury trial to determine the liability of the Defendants concluded on July 28, 2005. Thereafter, on August 3, 2005, the Court denied the various trial motions of both Plaintiffs and Defendants for Judgment as a Matter of Law. (Docket No. 219.) The matter was promptly referred to a Special [*42] Master to determine the specific damages incurred by each of the Plaintiffs, and the parties continued settlement discussions while the Special Master drafted his Report and Recommendation. On or about April 19, 2006, the Court received the Report and Recommendation, and, after a review of the Report, as well as the objections and responses thereto, the Court

issued a Memorandum and Order on August 21, 2006, adopting in large measure the Special Master's calculation of damages. (Docket No. 241.)

The Plaintiffs duly and timely moved for delay damages pursuant to Pennsylvania Rule of Civil Procedure 238, which requires that motions for such relief are due "[n]ot later than ten days after the verdict or notice of the decision" and must include the computation of delay damages. Of course, this computation could not be completed until the Special Master performed his duties and determined the monetary value of the damages suffered by the Plaintiffs. The Court awarded delay damages, molded the *verdict* to reflect such an award, and, significantly, ordered that the parties meet and prepare a proposed form of final order to enter judgment, including compensatory and delay damages, as well as [*43] interest, against the lone non-settling Defendant, Baringer. (Docket Nos. 247, 250.) Plaintiffs and Baringer obliged the Court's Order and submitted an agreed-upon, proposed "Final Order of Judgment," which the Court entered on November 22, 2006. The Memorandum and Order of August 21, 2006 adopted the Report of the Special Master as a starting point for the calculation of the damages to be entered in judgment against Baringer. It was quite clear to the Court, and presumably to the parties, that there was more to do after the issuance of the August 21, 2006 Memorandum before judgment could be entered.

The purpose of the separate document rule is to clarify for the parties the precise time at which their entitlements and obligations with regard to post-trial activities arise. As such, [HN20] *Rule 58* "should be interpreted to prevent loss of the right of appeal, not to facilitate loss." *In re Cendant Corp. Securities Litig., 454 F.3d at 245* (quoting *Bankers Trust Co. v. Mallis, 435 U.S. 381, 386, 98 S. Ct. 1117, 55 L. Ed. 2d 357 (1978))*. The time bar sought by the Nolen Defendants would contort the rule to act as a punitive tool, rather than a tool to protect against prejudice.

However, although Baringer's motion is timely, it [*44] is not ultimately meritorious. Contribution actions are actions to enforce the equitable duty to share liability for a wrong done. *Zurzola v. General Motors Corp., 503 F.2d 403, 410 (3d Cir. 1974)*. Pennsylvania has adopted the Uniform Contribution Among Tortfeasors Act ("UCATA"), codified at *42 Pa. C.S. § 8321, et seq.*, which provides for a right of contribution among joint

tortfeasors. The UCATA defines joint tortfeasors to be "two or more persons jointly or severally liable in tort for the same injury to persons or property, whether or not judgment has been recovered against all or some of them." *42 Pa. C.S. § 8322.*

Though the Nolen Defendants argue that Baringer was adjudged solely and independently liable, and not jointly liable for the Plaintiffs' injuries, [12] [HN21] joint tortfeasor status is a legal determination made by the Court, *Capone v. Donovan, 332 Pa. Super. 185, 480 A.2d 1249, 1251 (Pa. Super. 1984)*, and the Court concludes that such status is apparent here. In order for parties to be joint tortfeasors they "must either act together in committing the wrong, or their acts, if independent of each other, must unite in causing a single injury." *David Jeffrey, Ltd. v. Jewelers Mut. Ins. Co., 1987 U.S. Dist. LEXIS 8072, 1987 WL 16664, at *1 (E.D. Pa. 1987)* [*45] (citations omitted). "Pennsylvania tort law also maintains that multiple substantial factors may cooperate to produce an injury . . . and that concurrent causation will give rise to joint liability." *Harsh v. Petroll, 584 Pa. 606, 887 A.2d 209, 218 (Pa. 2005).*

> 12    The Nolen Defendants suggest, without explanation, that the jury interrogatories were somehow crafted to support a finding of independent, rather than joint, liability. The Court presumes that this is due to the misconception discussed, *infra*, but notes here that the instructions were based on, and closely resemble, § 3.20 (formerly referenced at § 3.03) of the Pennsylvania Model Civil Jury Instructions for apportioning liability among joint tortfeasors for comparative negligence.

As was the case in *Carrozza v. Greenbaum, 591 Pa. 196, 916 A.2d 553, 566 (Pa. 2007)*, the Nolen Defendants contend that the jury verdict apportioning liability among the Defendants is irreconcilable with the joint and several nature of the judgment. In *Carrozza, 916 A.2d at 566*, the Pennsylvania Supreme Court explained the misconception embodied within this argument: [HN22] "Although joint and several liability requires an indivisible injury for which two or more parties are partially [*46] responsible, it is the indivisibility of the injury, rather than of culpability, that triggers joint liability." Further, the court found that "apportionment of liability among joint tortfeasors not only is permissible and familiar . . . but indeed it is ultimately necessary in

the event of a contribution action brought by one joint tortfeasor against another upon satisfaction of the judgment by the party seeking contribution." Id. (citations omitted). Thus, apportionment of liability is not incongruent with the indivisible nature of a particular injury and does not indicate that the jury determined the Defendants to be solely and severally liable. The flood damage suffered in this case, much like many personal injuries, is incapable of division. The Plaintiffs in this case vigorously pursued and proved a theory of causation based on the fact that the conduct of each of the Defendants was a substantial factor contributing to the harm.

Nonetheless, while Baringer and his co-Defendants were joint tortfeasors, at this juncture, Baringer is not entitled to an amendment of the judgment to reflect his right to contribution. To be sure, under the UCATA, Baringer's right was not extinguished [*47] by the pro, tanto settlement agreement among the Plaintiffs and the Nolen Defendants. [HN23] Pro tanto settlement agreements, unlike pro rata agreements, do not extinguish the right of the non-settling tortfeasor to recover contribution. *42 Pa. C.S. § 8327;* [13] *CNA Ins. Group v. Nationwide Mut. Ins. Co., 2000 U.S. Dist. LEXIS 3094, 2000 WL 288241, at *2, n. 1 (E.D. Pa. Mar. 8, 2000).* However, according to the plain language of the UCATA, "[a] joint tort-feasor is not entitled to a money judgment for contribution until lie has by payment discharged the common liability or has paid more than his pro rata share thereof." *42 Pa. C.S. § 8324; Resolution Trust Corp. v. Gross, 1996 U.S. Dist. LEXIS 2293, 1996 WL 89380, at *2 (E.D. Pa. 1996)* ("[i]t has been frequently laid down that no right to contribution in favor of a joint debtor exists until actual payment by him of more than the share of the whole debt which, as between himself and those from whom he seeks contribution, he ought to pay.") (citing 2 Williston on Contracts § 345 at 772 (3d ed. 1959)). Baringer has not made payment to discharge the common liability, and thus, he has not met a condition precedent to the accrual of his claim for right of contribution. [14]

> 13    *Section 8327* of the UCATA provides:
>
> > [HN24] A [*48] release by the injured person of one joint tort-feasor does not relieve him from liability to make contribution to another tort-feasor, unless the

Case 2:05-cv-04182-SRD-JCW   Document 16571-23   Filed 12/01/08   Page 20 of 30

Page 20

2007 U.S. Dist. LEXIS 64603, *48; 74 Fed. R. Evid. Serv. (Callaghan) 461

release is given before the right of the other tort-feasor to secure a money judgment for contribution has accrued and provides for a reduction to the extent of the pro rata share of the released tort-feasor of the injured person's damages recoverable against all the other tort-feasors.

*42 Pa. C.S. § 8327.*

14   Baringer cites various cases for the accurate proposition that the Court may mold and mark the judgment for contribution. *Weinstein v. Stryker, 267 F. Supp. 34, 37 (E.D. Pa. 1967)*; *Pennsylvania Nat'l Mut. Casualty Ins. Co. v. Nicholson Constr. Co., 374 Pa. Super. 13, 542 A.2d 123,125-26 (Pa. Super. 1988)* (finding that "[a] joint tortfeasor has the option of pursuing his or her right for contribution either by maintaining a separate and independent action or by having the plaintiff's judgment marked to the use of the party seeking contribution"); *Puller v. Puller, 380 Pa. 219, 110 A.2d 175, 176 n. 1 (Pa. 1955)*. However, none of the cases cited by Baringer eradicates the precondition that a defendant has paid more than his pro rata share of the total damages prior to the entry [*49] of judgment for contribution. In *Smith v. Whitmore, 270 F.2d 741 (3d Cir. 1959)*, our court of appeals permitted the entry of a "conditional judgment" to reflect the right of contribution. However, Baringer has not pointed to authority commanding such a result, nor has he provided authority or constructive argument suggesting a rationale for entry of such a judgment that would ameliorate the plain mandate that a judgment must be paid prior to an entry of judgment for contribution. The Court understands the fiscal basis for Baringer's efforts in this regard and is not unappreciative of the probable procedural efficiencies to be gained by what Baringer seeks. Nonetheless, in this case, with its somewhat tangled history, the Court sees no compelling reason to "short circuit" the conventional legal process.

For this reason, the Court will deny Baringer's motion for relief from judgment.

## V.  MOTION FOR A NEW TRIAL AS TO

LIABILITY

### A. STANDARD OF REVIEW

[HN25] *Rule 59* provides that when a case has been tried to a jury, a new trial may be granted "for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." *Fed. R. Civ. P. 59(a)*. The Supreme [*50] Court has added color to this grant in finding that a motion for a new trial may be "bottomed on the claim that the verdict is against the weight of the evidence . . . or that, for other reasons, the trial was not fair to the party moving; and [it] may raise questions of law arising out of alleged substantial errors in admission or rejection of evidence or instructions to the jury." *Montgomery Ward & Co. v. Duncan, 311 U.S. 243, 251, 61 S. Ct. 189, 85 L. Ed. 147 (1940)*; see also Wright & Miller, Federal Practice and Procedure § 2805 (1995) (enumerating several grounds for a new trial).

[HN26] In deciding a *Rule 59* motion, a trial court undertakes a two-step inquiry. First, the Court determines whether there was error. Second, the Court looks to *Rule 61 of the Federal Rules of Civil Procedure* and decides whether any error was so prejudicial as to be "inconsistent with substantial justice." *Alicea v. Ralston, 2006 U.S. Dist. LEXIS 74693, at *2-4 (E.D. Pa. Oct. 13, 2006)* (citing *Goodman v. Pa. Turnpike Comm'n, 293 F.3d 655, 676 (3d Cir. 2002)*; *Farra v. Stanley-Bostitch, Inc., 838 F. Supp. 1021, 1026 (E.D. Pa. 1993))*. The burden to show harmful error rests on the movant. Id. (citing Wright & Miller § 2803, at 47.)

[HN27] When a motion [*51] for a new trial is based on an alleged error involving a matter within the sound discretion of the trial court, such as the court's evidentiary rulings or points of charge to the jury, the trial court has wide discretion in ruling on the motion. *Griffiths v. Cigna Corp., 857 F. Supp. 399, 410 (E.D. Pa. 1994)*. However, a trial court has only limited discretion in ruling on a motion for a new trial based on the argument that the verdict is against the weight of the evidence. *Mullins v. City of Philadelphia, 2007 U.S. Dist. LEXIS 16114, 2007 WL 712418, at *2 (E.D. Pa. Mar. 6, 2007)* (citing *Greenleaf v. Garlock, Inc., 174 F.3d 352, 366 (3d Cir. 1999))*.

### B.  JURY INSTRUCTIONS REGARDING THE STORM WATER MANAGEMENT ACT

2007 U.S. Dist. LEXIS 64603, *51; 74 Fed. R. Evid. Serv. (Callaghan) 461

Baringer first argues that he is entitled to a new trial because the Court improperly instructed the jury regarding the Storm Water Management Act. Specifically, Baringer contends that the Court erroneously instructed the jury that the applicable standard of care for a violation of the Act is one of negligence *per se.*

[HN28] It is well-settled that in consideration and review of jury instructions for error the Court must review the instructions in their entirety, and avoid extracting partial words or instructions [*52] from their context. To accept Baringer's claim of error would require just such semantic surgery. The Court instructed the jury as to the chain of determinations it would have to make regarding the applicability of the SWMA to Baringer, and to whether Baringer had violated the Act. Regarding to the applicability of the Act, the Court instructed the jury as follows:

To determine whether a Defendant has violated the Act, you must first decide whether he was subject to the Act. To be subject to the Act, a person or business must have engaged in the alteration or development of land, which may affect storm water runoff characteristics, [and] have been able to implement measures consistent with the applicable watershed storm water plan as are reasonably necessary to prevent injury to health, safety, or other property, including actions to insure that maximum runoff rate is no greater after the development than before.

So to find the defendants subject to the Storm Water Management Act, you must find that each Defendant was engaged in the alteration or development of land. If you find any of the defendants [was] a person engaged in the alteration and development of land, you must then determine [*53] whether this alteration affected storm water runoff characteristics.

If you find that it did, you then must determine whether that Defendant was able to implement measures consistent with the applicable watershed storm water plan as are reasonably necessary to

prevent injury to health, safety, or other property, including actions to insure the maximum runoff rate is no greater after development than before. If you determine that the Defendant under consideration was not, then he was not subject to the provision of the Act.

(Tr. 7/28/05 37:25-38:23.)

After instructing the jury as to the factors to consider in determining whether each defendant was subject to the SWMA, the Court instructed the jury as to the standard of care derived from a violation of the statute:

I previously instructed you on the provisions of the Pennsylvania Storm Water Management Act. This law dictates the duty of care normally required of a person in the same situation as the defendant. Ordinarily, an unexplained violation of this state law would constitute negligence. However, in this case the Defendants claim there was an excuse or justification for an alleged violation.

Under these types of circumstances, the person [*54] claiming such an excuse has the burden of proof with respect to proving that excuse or justification. Therefore, if you find that there was a violation of the Storm Water Management Act, that violation would only be evidence of negligence that you could consider along with all of the other evidence presented on the question of whether or not the Defendants were negligent and caused the damage here.

(Tr. 7/28/05 39:22-40:11.) Baringer extracts only the portion of the instruction by which the Court informed the jury that "[t]his law dictates the duty of care normally required of a person in the same situation as the defendant," and argues that this wording confers to the jury the belief that a violation of the statute warrants a finding of negligence per se.

Viewed as a whole, the SWMA instructions clearly apprised the jury of the issues and the applicable law and standards. See *Armstrong v. Burdette Tomlin Mem.*

2007 U.S. Dist. LEXIS 64603, *54; 74 Fed. R. Evid. Serv. (Callaghan) 461

*Hosp., 438 F.3d 240, 245-46 (3d Cir. 2006)* (finding that "when the issue is whether the instructions misstated the law" courts must consider "'whether the charge taken as a whole, properly appraised the jury of the issues and the applicable law . . . '") (citations omitted). [*55] The instruction is unambiguous that while the SWMA "normally" sets the standard of care owed to a particular plaintiff by particular defendants, in this case the Court had determined that it did not. As the Court explained to the jury, in the context of this case, the SWMA provided evidence, for the jury to consider or dismiss, in determining the proper standard of care applicable to Baringer. [15]

> 15  Baringer also argues that the proximity of the instruction regarding to the SWMA to the Court's instructions regarding common law negligence somehow confused the jury. Having found no error in the SWMA instruction, as a whole, the arrangement of the instructions in the particular order in which they were given is also not in error.

Moreover, even if this particular instruction could be thought to be erroneous as a whole, the error was not prejudicial because the jury could logically and reasonably have based its verdict on the instructions relating to common law negligence.

## C. ADMISSION OF THE TESTIMONY OF ROGER RUGGLES, P.E. UNDER FEDERAL *RULE 702*

Baringer next argues that the Court committed reversible error by allowing Dr. Ruggles to offer expert testimony with respect to "meteorology-related [*56] issues." (Def.'s Br. 35.) Dr. Ruggles testified at trial regarding the measure of precipitation and the flow of water from the Garrison Greene site, and the impact of these factors on the Fort Washington Bridge. Baringer challenges the qualification of Dr. Ruggles as an expert, the reliability of his opinion, and the "fit" of his testimony with the issues presented by this case.

Baringer's arguments as to the error in admitting Dr. Ruggles's testimony are nearly identical to those raised before trial by Brubacher in its motion in limine. Baringer points to no testimony by Dr. Ruggles during the trial, nor any other occurrence or consideration which would warrant the Court to reconsider its previous qualification and admission of Dr. Ruggles's testimony.

Despite Baringer's argument that Dr. Ruggles was unqualified to opine as to the quantification of precipitation, the Court remains convinced that Dr. Ruggles was sufficiently experienced and qualified to render an opinion on such matters. Baringer bases his argument upon the difference between the Webster's Dictionary definition of "meterology" and Dr. Ruggles's brief description of his specialty, hydrology. However, in confining his [*57] argument to dictionary definitions, Baringer ignores the evidence submitted by Dr. Ruggles that he was specifically trained in measuring, rainfall. *St. Paul Fire & Marine Ins. Co. v. Nolen Group, Inc., 2005 U.S. Dist. LEXIS 9303, 2005 WL 1168380, at *6 (E.D. Pa. May 13, 2005).*

As recited previously, [HN29] *Rule 702* provides that expert testimony is admissible so long as, *inter alia,* an expert is qualified to testify on the subject matter. The Rule sets a liberal standard, and "[t]he basis of this specialized knowledge 'can be practical experience as well as academic training and credentials.'" *Waldorf v. Shuta, 142 F.3d 601, 625 (3d Cir. 1998)* (quoting *Am. Tech. Resources v. U.S., 893 F.2d 651, 656 (3d Cir. 1990)).* Though Baringer argues that the Court should have excluded Dr. Ruggles's testimony due to his qualification in an "adjacent" field, the Court need not struggle to distinguish the line of cases precluding testimony from "adjacently trained" experts from the present scenario. Unlike the experts trained in a field closely related to that relevant for the purposes of rendering a legal opinion, Dr. Ruggles has academic training directly in calculating precipitation. This Court will not impose an overly rigorous [*58] requirement for qualification by substituting its judgment of the degree or kind of training that is most appropriate for a scientist such as this witness. See *In re Paoli Railroad Yard PCB Litigation, 35 F.3d 717, 741 (3d Cir. 1994).*

Baringer also challenges the reliability of Dr. Ruggles's methodologies for determining the total rainfall over the Sandy Run drainage basin during Hurricane Floyd and Tropical Storm Allison, as well as the peak water runoff from Garrison Greene. In particular, Baringer claims that Dr. Ruggles (1) used an incorrect formula to determine the peak runoff flow from Garrison Greene, (2) failed to use Doppler radar in his rainfall calculations, therefore incorrectly grounding his calculations on less accurate interpolation methods, and (3) employed a model that was not "substantially similar" to the actual conditions of Garrison Greene at the time of

Case 2:05-cv-04182-SRD-JCW   Document 16571-23   Filed 12/01/08   Page 23 of 30

Page 23

2007 U.S. Dist. LEXIS 64603, *58; 74 Fed. R. Evid. Serv. (Callaghan) 461

the flooding in formulating his opinion.

Again, Baringer misconstrues the gatekeeping function of the Court with regard to prohibiting or permitting the jury to consider expert opinion. The Court may not exclude expert testimony based on its judgment of accuracy or credibility, nor may the Court resolve questions [*59] of competing expert methodologies.

Instead, [HN30] the inquiry into the reliability of an expert opinion involves the review of discrete factors elucidated by *Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 590, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)*. These factors are: (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put." *U.S. v. Williams, 235 Fed. Appx. 925, 2007 U.S. App. LEXIS 13429, at *6 (3d Cir. June 7, 2007)* (citing *In re Paoli R.R. Yard PCB Litig., 35 F.3d at, 742 (3d Cir. 1994))*.

Baringer's only challenge to the reliability of Dr. Ruggles's formula is that Brubacher's expert, Christopher Wallen, employed a different formula to calculate peak runoff flow. As the Court recounted at length in its May 13, 2005 Memorandum, Dr. Ruggles used a method to calculate [*60] peak runoff developed by the U.S. Department of Agriculture and released as a software program entitled Technical Release 55 ("TR-55"). The engineering firm that designed the detention basin proposed for Garrison Greene also used TR-55 to calculate runoff, as did one of the opposing expert witnesses for the Defendants. Under these circumstances, it is hardly a difficult proposition to conclude that there is general acceptance of the methodology used by Dr. Ruggles, and Baringer has provided no evidence or argument as to any other reason to doubt the reliability of TR-55.

Baringer ventures a similar challenge to Dr. Ruggles's calculation of rainfall without use of Doppler radar. In Baringer's own words, the use of Dopper radar is "more efficient and accepted." (Def.'s Br. 38.) This assessment is based on the preference for the expert testimony of friendly experts Wistar and Smith, and particularly their opinions as to the lesser efficacy of interpolation of rainfall by collection of rain gauge measurements, as compared to the collection of readings from ground Doppler radar. Prior to trial, however, Plaintiffs submitted evidence that Dr. Ruggles's interpolation methodology was one regularly [*61] employed and respected in the field. (Pl.'s Resp. to Brubacher Mot. in Limine, Docket No. 113, at 12.)

[HN31] The trial judge is granted "a certain degree of latitude" to determine whether, and which, Daubert factors, or any other set of reasonable reliability criteria, are appropriate measures of reliability in a particular case. *Williams, 235 Fed. Appx. 925, 2007 U.S. App. LEXIS 13429, at *7* (citing *Daubert, 509 U.S. at 593)*. "[D]epending on the facts of each particular case, the factors do not have to be weighed equally . . . the factors merely guide the judge's determination of the admissibility of evidence, a determination to which we afford great deference." *Id. at *7-8*. Thus, under the liberal Daubert standard, which demands reliability rather than certainty or correctness, the Court finds that Dr. Ruggles's calculation of peak runoff, and use of interpolation techniques, was based on scientific procedure, or "good grounds . . . rather than on subjective belief or unsupported speculation. *Id. at *8* (citing *Daubert, 509 U.S. at 590)*.

Baringer next calls into question the models created and used by Dr. Ruggles to formulate his opinion. Dr. Ruggles conducted a model study to determine whether there was a significant [*62] and detrimental impact on the hydraulics of the North culvert of the Fort Washington Bridge due to the non-detained lateral flow from the Garrison Greene construction site entering the stream from the downstream side of the culvert. Baringer challenges whether the physical model Dr. Ruggles constructed to simulate flood-related events which occurred in this case assimilated conditions "substantially similar" to the actual conditions during Tropical Storm Allison. Specifically, Baringer finds fault in the model because it does not incorporate the variable of Bodenstein Creek, a source of lateral water flow upstream from the Fort Washington Bridge. Baringer also argues that the model is unreliable because Dr. Ruggles failed to produce physical measurements of the model dimensions and flows he used, or the relationship between depth and flow in his model to the Defendants. (Def.'s Br. 38.)

2007 U.S. Dist. LEXIS 64603, *62; 74 Fed. R. Evid. Serv. (Callaghan) 461

The Court previously found that Dr. Ruggles had considerable experience in the construction and use of models like the one he has used in this case, and that his models have received approval from peer review. *St. Paul Fire and Marine Ins. Co., 2005 U.S. Dist. LEXIS 9303, 2005 WL 1168380, at *7.* The failure of Dr. Ruggles's model [*63] to take into account specific factors was an appropriate subject for cross-examination and conflicting expert evidence, but does not command a finding of error for admission of Dr. Ruggles's opinion based on the models.

In *Stecyk v. Bell Helicopter Textron, Inc., 295 F.3d 408, 412 (3d Cir. 2002),* our court of appeals held that [HN32] "[e]xperimental evidence may be admitted even if conditions do not perfectly correspond to the conditions at issue in litigation; dissimilarities may affect the weight of the evidence, but not its admissibility." (citations omitted). Dr. Ruggles needed only to make a showing of "substantial similarity" between his experimental model and the conditions of Garrison Greene to show its reliability. *See id.* The Court concluded prior to trial that Dr. Ruggles had made this showing, by submitting evidence in the form a declaration, that the dimensions and topography for the model were taken from the original drawings of the stream and culvert produced by SEPTA and from his own surveying measurements taken in the field. (Pl.'s Resp. to Mot. in Limine, Docket No. 113 at 19.)

Without any further support of case law, or any citation to Dr. Ruggles's testimony in the record, [*64] the Court sees no grounds to conclude that Dr. Ruggles's opinions based on his models were erroneously admitted as evidence during trial. Baringer was permitted, and exercised this permission, to present testimony opposing Dr. Ruggles's exclusion of Bodenstein Creek as a factor in his model. [16] (Tr. 7/26/05 199.) Moreover, the Court previously dismissed Brubacher's identical argument that Dr. Ruggles failed to provide the measurements of the dimensions to the Defendants, noting that Dr. Ruggles had in fact provided this information in his expert report, and in the investigation file produced to the Defendants. *St. Paul Fire and Marine Ins. Co., 2005 U.S. Dist. LEXIS 9303, 2005 WL 1168380, at *7;* (Pl.'s Resp. to Mot. in Limine, Docket No. 113 at 19-20.).

16   Dr. Ruggles testified that he did not include Bodenstein Creek as a factor because Bodenstein Creek was too far away from the Bridge to be a

factor in the flooding. (Tr. 7/18/05 158:8; 7/19/05 101:24.)

Baringer additionally reiterates the argument that the Court erroneously permitted Dr. Ruggles to testify on causation without having undertaken a critical calculation, namely, the maximum rate of lateral flow that would not have resulted in damage to the Bridge. Baringer [*65] contends that without this calculation, Dr. Ruggles should have been precluded from offering any testimony that excessive runoff caused the collapse of the Bridge and the flooding.

Again, the Court previously found that Dr. Ruggles's calculations relied upon figures that are a type that an expert in hydrology would reasonably rely upon. *St. Paul Fire and Marine Ins. Co., 2005 U.S. Dist. LEXIS 9303, 2005 WL 1168380, at *8.* Further, the Court sees no merit to Baringer's logic. It is unnecessary that Dr. Ruggles calculate the maximum sustainable runoff in order to testify that a particular level of runoff was excessive and caused certain damage. Dr. Ruggles testified that he calculated the runoff rates at their peak to be somewhere between 70-120 cfs, and that a rate at the very bottom range of his calculations was enough to cause the collapse of the Bridge. The Court will refrain from determining whether also calculating the maximum sustainable runoff would have somehow been a *more* reliable methodology.

Finally, Baringer briefly argues that for all of the same reasons that Dr. Ruggles's testimony was unreliable, it also did not "fit" the disputed factual issues in the case. The Court sees no merit to this argument. [*66] [HN33] The Daubert requirement that expert testimony "fit" the factual issues in a case embodies the concept that "scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes." *In re Paoli R.R. Yard Pcb Litig., 35 F.3d at 743* (citing *Daubert, 113 S. Ct. at 2796*) ("*Rule 702*'s 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility.") Thus, as our court of appeals held in Paoli, to "fit" the factual issues in the case, there must be "good grounds" to "connect the work of the expert to the particular case." Id. The use of modeling in this case does not present the same type of "fit" issues as does, for example, the extrapolation of the results of animal tests to human subjects. Dr. Ruggles designed the models specifically for the purposes of replicating the conditions of Garrison

Case 2:05-cv-04182-SRD-JCW   Document 16571-23   Filed 12/01/08   Page 25 of 30

Page 25

2007 U.S. Dist. LEXIS 64603, *66; 74 Fed. R. Evid. Serv. (Callaghan) 461

Greene. While to some extent all models inherently require extrapolation to reality, Dr. Ruggles's model did not require the kind of repurposing that poses dangers to the reliability of opinion based on models constructed for one specific purpose, and used for another.

The Court concludes that Dr. Ruggles's [*67] models and calculations were reliable, that they conform to the issues in dispute in this matter, and that there was no error in the admission of Dr. Ruggles's opinion testimony.

## D. FAILURE TO PERMIT A JURY VIEW OF THE SCENE OF THE FLOODING

Baringer next argues that the Court abused its discretion and erred by declining to allow the jurors to view the scene of the flooding. [HN34] Granting or denying a motion to view is a discretionary matter. *United States v. Sanford, 173 F. App'x 943, 947 (3d Cir. 2006)* (citations omitted). "In making its decision on a motion to view, a district court weighs 'a variety of factors involving the fair and efficient conduct of a trial.'" Id. (quotation omitted).

In *Kelley v. Wegman's Food Mkts., Inc., 2003 U.S. Dist. LEXIS 8066, at *13 (E.D. Pa. May 15, 2003)*, aff'd, *98 F. App'x 102 (3d Cir. 2004)*, the court found that "a judge generally acts within his or her discretion in denying a motion for a jury view when there is sufficient evidence describing the scene in the form of testimony, diagrams, or photographs." (citation omitted). Here, Baringer contends that he was entitled to a jury view because there were no photographs depicting the localized flooding that occurred [*68] prior to the Bridge collapse, as described by multiple witnesses at trial. Baringer argues that the jury could not appreciate the severity of the flooding prior to the Bridge collapse without a trip to the scene of the events.

As the Court previously concluded when Baringer first raised this issue, the jury in this case would not have been able to appreciate the extent of the localized flooding by visiting the scene of the events four years after Tropical Storm Allison and after extensive changes to the environs brought about by land development and landscaping. Moreover, there were numerous photographs and maps admitted into evidence demonstrating the distances, and spatial relationships among the "critical locations" and landmarks to the jury. Baringer's argument that the maps and photographs were

insufficient due to their "one-dimensional" nature is unconvincing, particularly in light of the multitude of factors counseling against a jury view.

Specifically, the substantial changes to the area, and its topography, [17] that had taken place between the time of Tropical Storm Allison and the trial were persuasive factors weighing against granting a jury view. Garrison Greene was no longer [*69] a bare plot of land. Instead, it was fully completed development with 90 townhouses. The Fort Washington Bridge was no longer a partially collapsed twin barrel culvert built in 1912. By the time of trial, a much larger, new, steel Bridge spanned Sandy Run Creek. Sandy Run Creek itself was altered to accommodate the new Bridge. Moreover, Teleflex's building had been demolished in toto. These dramatic changes created a significant risk of confusing or misleading the jury, and supported the denial of Baringer's request.

> 17   Even if the topography of the land thought of in terms of the slope and grade of the terrain, as opposed to its surface related features, had not changed, there was no lack of demonstrative evidence on this point presented to the jury.

## E.   CROSS-EXAMINATION OF MICHAEL BARRIST

Baringer next argues that the Court erroneously and prejudicially limited the recross-examination of Defendant Brubacher's witness, Chief Executive Officer of NCO, Michael Barrist.

Brubacher called Mr. Barrist to testify at trial regarding the events that took place on the night of the flooding of the NCO building. Mr. Barrist testified that on the night of the flood, he communicated several times with [*70] Michael Custer, the NCO maintenance supervisor, regarding the condition of the building. He recalled that Mr. Custer first called him while he was at a wedding reception, to alert him that "there was flooding in the area and he [Custer] was concerned that the building could take on water." (Tr. 7/22/05 11:13-15.) When asked whether he understood there to be any flooding in the NCO building at the time that Mr. Custer first called him at 9:55 p.m., Mr. Barrist replied: "I don't believe there was at that point in time, but I don't recall, you know, the exact, whether it was starting to come in or it hadn't come in yet. But he was just alerting me that he was concerned it might." (Tr. 7/22/-5 13:18-20.)

Case 2:05-cv-04182-SRD-JCW    Document 16571-23    Filed 12/01/08    Page 26 of 30

Page 26

2007 U.S. Dist. LEXIS 64603, *70; 74 Fed. R. Evid. Serv. (Callaghan) 461

Prior to trial, Mr. Barrist testified at his deposition that Mr. Custer informed him during the first telephone call that two feet of water had already entered the building and that the water level was up to the windows. (Baringer Br. 45-46.) At trial, Brubacher sought to re-cross examine Mr. Barrist regarding his prior deposition testimony, however, the Court declined to permit the re-cross examination because it exceeded the scope of the preceding re-direct and cross-examinations. (Tr. [*71] 7/22/05 20:1-9.) Thereafter, Brubacher moved for reconsideration of the decision and requested that the Court re-call Mr. Barrist and allow questions regarding the deposition testimony on the grounds that Mr. Barrist's prior inconsistent statements were not hearsay under *Federal Rule of Evidence 801(d)(1)* and that the purpose of the testimony was to impeach Mr. Barrist's credibility under *Rule 607*.

The Court denied Brubacher's motion. (Docket No. 211.) In so doing, the Court found that Brubacher sought to offer Mr. Barrist's deposition testimony to prove the truth of Mr. Custer's statements, namely, that at the time of the first telephone call, prior to, or simultaneous with the collapse of the SEPTA Bridge, there was already two feet of water flooding NCO, rather than to impeach the credibility of Mr. Barrist.

Baringer's reassertion here of Brubacher's prior argument remains unavailing. Mr. Barrist's testimony at trial clearly indicated that he could not precisely recall what Mr. Custer told him, at what time, and during what conversation. *United States v. Mornan, 413 F.3d 372, 379 (3d Cir. 2005)* (finding that [HN35] testimony at trial regarding a lack of recollection of the subject matter is not inconsistent [*72] if the forgetfulness is genuine); *United States v. Palumbo, 639 F.2d 123, 128 (3d Cir. 1981)* ("Several courts have recognized that lack of memory as to the substance of a prior statement may not be inconsistent in certain circumstances with the prior statement.") (citations omitted).

Moreover, it is well established that [HN36] *Rule 607* does not afford parties an end run around the hearsay rule. *United States v. Sebetich, 776 F.2d 412, 429 (3d Cir. 1985)*. "A party can attack a witness's credibility using otherwise inadmissible evidence, but cannot pretend that inadmissible hearsay evidence is being used to impeach a witness so that the jury will hear its substance." *Goodman, 293 F.3d at 666*. Though ostensibly offered for the purpose of attacking Mr.

Barrist's credibility, the probative value of the statements to Baringer resides in their truth, that is, the corroboration of Baringer's theory that Tropical Storm Allison by itself caused the flooding of the insureds' properties, and that there was no causal link between Baringer's activities and the flood damage.

Even if *Rule 607* provided an avenue for admission of Mr. Barrist's deposition testimony, the exclusion of such information is not a prejudicial error [*73] warranting a new trial as there was significant and extensive evidence linking Baringer's actions in clearing and grubbing Garrison Greene to excess water flow which caused the collapse of the SEPTA Bridge and the flooding of Plaintiffs' properties. [18]

> [18]   Baringer also argues that the deposition testimony was admissible as a "present sense impression" under *Federal Rule of Evidence 803(1)*. Because Baringer did not present these grounds to support his argument as to the admissibility of the evidence at trial, pursuant to Federal *Rule 46*, the Court will not consider the "present sense impression" exception to the prohibition against hearsay as a basis for admission of the deposition testimony. *MaGill v. Westinghouse Electric Corp., 464 F.2d 294, 297 (3d Cir. 1972)*; *Mack v. Schneider Nat'l Carriers, 1994 U.S. Dist. LEXIS 10162, 1994 WL 388494, at *4 (E.D. Pa. Jul. 26, 1994)*. Even if the Court were to have admitted the testimony on this basis, it is quite clear, given the ambiguity with which Mr. Barrist testified at his deposition, and the testimony of Mr. Custer himself that no water entered the building until 10:08 p.m. that night, (Tr. 7/18/05 77:13-78:1), that the admitted evidence would not have altered the jury's [*74] verdict.

## F.   EXCLUSION OF THE SETTLEMENT AGREEMENT

Baringer moved in limine to admit the settlement agreement among Plaintiffs and the Nolen Defendants into evidence. The Court denied the Motion, but declined to preclude Baringer from making reference to the fact of the settlement and to the settlement agreement with respect to issues of witness credibility at trial. (Docket No. 190.) Baringer argues that the Court erred in declining to admit the settlement agreement into evidence, and that a new trial is deserved on these

Case 2:05-cv-04182-SRD-JCW   Document 16571-23   Filed 12/01/08   Page 27 of 30

Page 27

2007 U.S. Dist. LEXIS 64603, *74; 74 Fed. R. Evid. Serv. (Callaghan) 461

grounds.

During the trial, the parties argued at sidebar regarding the extent and purpose for which Baringer could use the evidence of settlement. Baringer sought to question Michael Nolen and Clifford Weller, the Vice President of the Nolen Group, about the release. The Court informed the parties that pursuant to *Rule 408*, reference to the settlement agreement could be made for the limited purpose to address bias or credibility, but requested briefing as to whether the settlement agreement was relevant for either of these purposes. (Tr. 7/20/06 193:5-11.) Baringer declined to provide such briefing. Instead, the next day at trial, Baringer's counsel informed the Court [*75] that the parties reached an agreement as to how "we're going to use or not use [the evidence of settlement] with the witnesses that are going to be here today." (Tr. 7/21/05 13:10-15.) The topic of the admissibility of the settlement agreement did not arise again at trial.

Plaintiffs argue that Baringer has waived the right to complain of this evidentiary error by failing to object to the error and preserve the matter at trial. Baringer argues that he did not need to preserve the matter through objection at trial, and relies on the Court's ruling on Plaintiffs' motion in limine to assert trial error. [HN37] "While normally an objection to the admission of evidence must be raised at trial to be preserved, this court will sometimes permit evidentiary question to be preserved by a motion in limine." *Bruno v. W.B. Saunders Co., 882 F.2d 760, 767-68 (3d Cir. 1989)* (citing *Am.Home Assurance Co. v. Sunshine Supermarket, 753 F.2d 321 (3d Cir. 1985)*). In Bruno the court of appeals held that the issue of preservation depends upon "the extent of the briefing on the motion in limine, and the definitiveness of the district court's ruling on the motion." Id. The court found that a pretrial motion "will [*76] suffice only if we conclude that requiring an objection at trial 'would have been in the nature of a formal exception [under *Rule 46 of the Federal Rules of Civil Procedure*].'" Id. (quoting *American Home Assurance Co., at 324-25*).

In this case, Baringer's reliance on the Court's pretrial ruling to preserve his objection is questionable. The motion in limine was filed by the Plaintiffs, not by Baringer, and Baringer did not file a brief in response to the motion. Although some of the evidentiary issues raised by Baringer were discussed in his pretrial motion

for realignment of the Nolen Defendants with the Plaintiffs, Baringer declined to illuminate, until now, the alleged probative value and relevance the admission of the settlement agreement.

However, even assuming that Baringer preserved the issue of the admissibility of the settlement agreement, the agreement was properly excluded pursuant to *Rules 408* and *403* of the [HN38] *Federal Rules of Evidence. Rule 408* bars the admission of settlement agreements to prove liability. Though evidence of settlement may be admissible where it is beyond the scope of the rule of exclusion, such as where the evidence is used to show that a witness is biased, [*77] *Fed. R. Evid. 408*, Baringer has failed to show that the evidence was relevant even for this purpose.

Baringer first argues that the terms of the settlement agreement evince the bias of the Nolen Defendants. Specifically, Baringer points to the following language in the agreement which he contends is proof that the Nolen Defendants were biased against Baringer:

C. Assignment of all Available Insurance and Duty to Cooperate

Nolen Defendants herein fully and irrevocably assign to Plaintiffs any and all rights in and to any and all insurance, types of insurance, insurance policies, primary insurance policies, excess insurance policies, policies in which any Nolen Defendant is an insured and/or additional insured, and/or umbrella insurance policies, whether first-party and/or third-party in nature, that may provide any form or type of coverage to Nolen Defendants (individually and/or collectively) for the causes of actions and/or claims alleged and/or asserted by Plaintiffs (individually and/or collectively) against Nolen Defendants in the Lawsuits (referred to herein as the, "Assigned insurance Policies") . . . This assignment includes but is not limited to any and/or all insurance that in [*78] any way provides coverage to Nolen Defendants (individually and/or collectively) for any and/or all causes of action and/or claims alleged and/or asserted, either explicitly or

implicitly, in any pleading', written discovery, documentary discovery, deposition, and/or expert report.

\*\*\*

Nolen Defendants further agree, represent and warrant to fully and completely cooperate with Plaintiffs in Plaintiffs' efforts, whether through negotiation and/or litigation, to recover any and all proceeds available under the Assigned Insurance Policies and/or through the Assigned Insurance Claims. Nolen Defendants agree that this is a material condition of this release agreement, and the failure to satisfy this condition will constitute a material breach of this release agreement. Nolen Defendants' cooperation shall include but not be limited to using their best efforts to confer with Plaintiffs' counsel, sign pleadings, produce documents, assist in answering discovery, attend depositions, attend trial, and provide sword [sic] testimony.

(Pl.'s Resp., Ex. 2, 4-5.) Though this clause requires the Nolen Defendants to cooperate with Plaintiffs in some capacity, this clause does not create an incentive or [*79] a requirement that the Nolen Defendants cooperate with Plaintiffs in this litigation. As the Plaintiffs suggest, the duty to cooperate extended only to recovery under the "Assigned Insurance Policies" and not to this litigation. Under any interpretation, of course, the clause does not require or encourage the Nolen Defendants to obfuscate, ignore or manipulate the truth.

Baringer argues that although the settlement did not explicitly tie the Nolen Defendants' pecuniary interest to that of the Plaintiffs, the Nolen Defendants mistakenly believed that the pro tanto settlement extinguished their liability to Baringer's cross claim for contribution, and in this mistaken belief, the Nolen Defendants were biased in favor of the Plaintiffs. [19] Baringer contends that this bias manifested itself not in the specific testimony of any witness, but in the failure of the Nolen Defendants to mount an aggressive defense at trial. In essence, Baringer believes that by comparison to the lethargic and complacent performance at trial by the Nolen Defendants

due to their improper motives, he appeared more culpable.

[19] Analytically, however, the belief that the agreement extinguished risk of liability to Baringer [*80] should have "released" the Nolen parties to be more -- not less -- candid vis a vis Baringer.

[HN39] Where a settlement agreement creates a "clear potential for bias" by providing a financial interest for the settling defendants in the outcome of a plaintiffs case against the remaining defendants, it may be admissible pursuant to *Rule 408*. [20] Such was the case in *Jabbour v. Shestak, 1987 U.S. Dist. LEXIS 312, 1987 WL 5729, at *1 (E.D. Pa. 1987)* (finding that a release agreement was admissible where it included a provision for direct reimbursement of one defendant in proportion to the amount plaintiffs recovered in excess of a specified amount in damages). However, the settlement agreement among the Plaintiffs and the Nolen Defendants, by contrast, did not necessarily directly tie Nolen's financial outcome to that of Baringer. Indeed, it did not extinguish Baringer's contribution claims against the Nolen Defendants. Thus, without a real and pecuniary interest created by the terms of the settlement, and in the absence of any evidence of this "mistaken belief," Baringer has failed to show that the settlement agreement has any probative value for an acceptable purpose under *Rule 408*. Moreover, the Court concludes that under [*81] *Rule 403*, any probative value of the settlement was substantially outweighed by the oft-cited risks of admission of settlement agreements, namely, the danger that the jury would unfairly attribute liability in excess or in toto to the settling Defendants.

[20] The type of bias Baringer describes is commonly associated with so-called "Mary Carter" agreements. The term derives from *Booth v. Mary Carter Paint Co., 202 So.2d 8 (Fla. App. 1967)*, and "now is used rather generally to apply to any agreement between the plaintiff and some, but less than all, defendants whereby the parties place limitations on the financial responsibility of the agreeing defendants, the amount of which is variable and usually in some inverse ratio to the amount of recovery which the plaintiff is able to make against the nonagreeing defendant or defendants." *Langer v. Monarch Life Ins. Co., 966 F.2d 786, 792 (3d Cir. 1992)* (citing Black's Law

2007 U.S. Dist. LEXIS 64603, *81; 74 Fed. R. Evid. Serv. (Callaghan) 461

Dictionary 974 (6th ed. 1990)).

## G. WHETHER THE VERDICT WAS AGAINST THE WEIGHT OF THE EVIDENCE

Lastly, Baringer argues that the jury verdict by which he was found to be 1% liable for the Plaintiffs' damages was against the weight of the evidence.

[HN40] A moving party may be granted a [*82] new trial where the verdict is against the weight of the evidence, even when the court determines that entry of judgment as a matter of law in that party's favor is not appropriate. *Roebuck v. Drexel. Univ., 852 F.2d 715, 735-36 (3d Cir. 1988).* While a decision to grant a new trial because the verdict is against the weight of the evidence is a discretionary matter, *Blancha v. Raymark Indus., 972 F.2d 507, 512 (3d Cir. 1992),* the discretion of the Court is limited. *Mullins, 2007 U.S. Dist. LEXIS 16114, 2007 WL 712418, at *2* (citing *Greenleaf, 174 F.3d at 366).* "[N]ew trials because the verdict is against the weight of the evidence are proper only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience." *Williamson v. CONRAIL, 926 F.2d 1344, 1353 (3d Cir. 1991).*

Baringer's argument that the weight of the evidence did not support the jury verdict is nearly identical to his previous argument for Judgment as a Matter of Law. He argues that the evidence at trial was sufficient to prove that his duty was confined to the single obligation to inform Michael Anthony Homes of the improper construction [*83] sequence. Baringer contends that there was no evidence of a causal connection between his failure to inform, and the flooding damage suffered by the Plaintiffs, because Michael Anthony Homes already knew of the violation of the sequence, and deliberately proceeded out of sequence.

As discussed above, there was ample evidence supporting the jury's verdict that Baringer acted negligently by clearing and grubbing the entirety of Garrison Greene before the construction of the detention basin, in violation of the construction sequence, plans and grading permit, and that his actions constituted a substantial contributing factor in causing the partial collapse of the Fort Washington Bridge and the resulting flood damage suffered by the subrogated insureds.

Baringer also argues that the weight of the evidence at trial established that Tropical Storm Allison, alone, caused the flooding damage to the insureds' properties. He points to the testimony of various witnesses describing incidents of flooding in locations in proximity to the properties, as well as the testimony of Teleflex maintenance supervisor Mike Tarantella, that at approximately 8:00 p.m. on the night of the Storm, there was already [*84] one inch of water in the Teleflex building, even though Plaintiffs' own expert testified that the Fort Washington Bridge did not collapse until sometime between 9:30 p.m. and 12:00 a.m. on the night of June 16, 2001.

Again, as discussed in Section II, *supra,* the various events of flooding in the area of the insureds' properties was explained by Dr. Ruggles to be "localized flooding." Furthermore, the incidents of localized flooding observed by various witnesses in the case are consistent with the testimony that this area was susceptible to flooding. Baringer did not submit conclusive evidence that the excessive four to five foot flood waters experienced by the Plaintiffs were unquestioningly present prior to the collapse of the Bridge. There was ample evidence, however, as discussed above, that the negligent activities of the Defendants, including Baringer, caused damage to the Plaintiffs that they would not have suffered but for the chain of events set into motion by these negligent acts.

Baringer additionally argues that the Plaintiffs did not prove that he violated the SWMA because they submitted no evidence of an applicable watershed storm water plan. [HN41] *Section 680.5* of the SWMA directs [*85] each county in Pennsylvania to prepare and adopt a watershed storm water plan. The Act describes the contents of a watershed plan, and requires that the counties devise, *inter alia,* "criteria and standards for the control of storm water runoff from existing and new development which are necessary to minimize dangers to property and life and carry out the purposes of this act." *32 Pa. C.S. § 680.5(b)(11).* The SWMA mandates the following compliance by the municipalities with the watershed storm water plan:

> Within six months following adoption and approval of the watershed storm water plan, each municipality shall adopt or amend, and shall implement such ordinances and regulations, including zoning, subdivision and development,

2007 U.S. Dist. LEXIS 64603, *85; 74 Fed. R. Evid. Serv. (Callaghan) 461

building code, and erosion and sedimentation ordinances, as are necessary to regulate development within the municipality in a manner consistent with the applicable watershed storm water plan and the provisions of this act.

*32 Pa. C.S. § 680.11(b).* Mr. Zarko testified at trial that approved permits and construction plans are the standard by which contractors and subcontractors are ultimately judged to be in compliance with the SWMA, because the permits and plans must [*86] be in conformity with the local ordinances that, in turn, are adopted pursuant to the watershed management plan. (Tr. 7/20/05 33:13-20; 34:4-6; Tr. 7/21/05 173:6-15; 174:10-24; 176:15-25.) In turn, the Court properly permitted the jury to determine whether the evidence of violation of the plans and permits amounted to a violation of a watershed storm water plan under the SWMA. (Tr. 7/28/05 38-39.)

Moreover, again, even if the evidence weighed heavily against a finding that Baringer violated the SW MA, the jury concluded that Baringer was liable for negligence, which may properly have been grounded in a finding of common law negligence.

## VI. CONCLUSION

For the reasons set forth herein, the Court will not afford Baringer relief in any of the forms he has presently pursued. An appropriate order follows consistent with this Memorandum.

BY THE COURT:

S/ Gene E.K. Pratter

UNITED STATES DISTRICT JUDGE

**ORDER**

**AND NOW** this 31<st> day of August 2007, after consideration of the post trial motions for relief filed by Warren W. Barringer, Jr., t/a Baringer Land Clearers, and the Responses and Replies of the parties thereto (Docket Nos. 267, 269, 270, 271), **IT IS HEREBY ORDERED** that:

(1) Baringer's Motion [*87] for Judgment As a Matter of Law (Docket No. 256) is **DENIED;**

(2) Baringer's Motion for Relief from the Judgment Pursuant to *Rule 60(b)(6)* (Docket No. 256) is **DENIED;**

(3) Baringer's Motion to Alter or Amend the Judgment Pursuant to *Rules 59(e)* and *60(b)(5)* (Docket No. 256) is **DENIED;** and

(4) Baringer's Motion for a New Trial Pursuant to *Rule 59* (Docket No. 256) is **DENIED.**

The Clerk of the Court shall mark this case **CLOSED** for statistical and all other purposes.

BY THE COURT:

S/ Gene E.K. Pratter

UNITED STATES DISTRICT JUDGE