UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

In Re:  KATRINA CANAL BREACHES          *          CIVIL ACTION
        CONSOLIDATED LITIGATION          *
                                         *          NO. 05-4182 "K" (2)
                                         *
                                         *          JUDGE DUVAL
PERTAINS TO:      MRGO                    *
                                         *          MAG. WILKINSON
* * * * * * * * * * * * * * * * * * * * * * * * * * * *

REPLY BRIEF TO THE MRGO DEFENDANT'S JOINT MEMORANDUM IN
OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

NOW INTO COURT, through undersigned counsel, comes the MRGO PSLC, which in

reply to the MRGO Defendants' Joint Memorandum in Opposition to Plaintiffs' Motions for

Class Certification, do state as follows:

I.

FACTS

The MRGO Defendant's Joint Memorandum in Opposition to Plaintiffs' Motion for

Class Certification, despite grandiose efforts at cultivating confusion and obfuscation, fails to

address the single salient purpose for which the *In Re: Katrina Canal Breaches Consolidated*

*Litigation* umbrella was established: to provide aggregated treatment of hundreds of thousands of

claims through special judicial management.  Defendants go so far as to cite a dubious report

whose validity has been heavily criticized, a report that claimed that "[e]ven without any levee

breaches, Hurricane Katrina's rainfall and levee overtopping would have caused the worst

property loss ever experienced by New Orleanians. (See ASCE Report at 39)." [1] (Opposition, Doc. 8286. p. 5).  This comment, developed at the behest of the Corps of Engineers, might only be true **IF NONE** of the pumps worked **AT ALL** during the rain event of Katrina.  However, the Sewerage and Water Board had already testified that the pumps were not shut down until flood waters from breaches inundated the pump stations. (See Exhibit Pls. Tr. Ex. 29 - Rule 30(b)(6) Deposition of the Sewerage & Water Board (John Heurkamp), p. 180, l. 7-25).

The MRGO PSLC's Reply addresses the falsehoods and/or absurd conclusions advanced by the MRGO defendants such as shown above.

## II.

### <u>THE LOGIC OF THE MRGO DEFENDANTS OPPOSITION CONTAINS TWO FUNDAMENTAL FLAWS</u>

The MRGO Defendants' Joint Memorandum in Opposition to Plaintiffs' Motion for Class Certification is fundamentally flawed on two primary levels.  First, the MRGO Defendants' brief advocates for an overly strict application of the adequacy requirements relating to an individual's ability to represent a class under Rule 23(a)(4).  Secondly, the MRGO Defendants are misplaced in their suggestion that the propriety of class certification in this matter should be governed from a micro rather than a macro analysis.

First and foremost, the MRGO Plaintiffs would suggest that the Defendants have completely failed to demonstrate at any reasonable level or sound legal basis why the named

---

[1] Public excoriation of this report revealed that the Corps paid ASCE $1.1 million in federal funds to conduct a peer review of the Corps after the Katrina levee failures, and the resultant report contained at least 10 apparent falsehoods, four significant omissions and numerous misrepresentations.  ASCE national president Dr. William Marcuson, who also serves as Director Emeritus of the Geotechnical Laboratory at the U.S. Army Engineer Research and Development Center (ERDC) in Vicksburg, Miss., refused to print a formal retraction despite its removal from the ASCE website.

An independent task force reviewing how the professional organization participates in reviews of national significance such as the failure of levees and flood walls during Hurricane Katrina concluded that the ASCE should immediately take steps to remove the potential for conflict of interest in its participation in post-disaster engineering studies.

plaintiffs will not fairly and adequately represent and protect the interest of the class.  The

Defendants' opposition brief is replete with statements and citations taken completely out of

context in an effort to totally misrepresent the facts and the law governing the issue of "adequacy

of class representation."  Essentially, the Defendants spend page after page of mudding up what

is truly clear water.

        The tests regarding the adequacy of an individual to be a class representative is well-

settled.  As addressed in detail in the MRGO Plaintiffs' memorandum in support of their

Amended and Restated Motion Class Certification, Rule 23(a)(4)  provides that a class action can

be maintained only if "the representative parties *will fairly and adequately* protect the interests of

the class.  F.R.C.P. 24(a)(4) (emphasis added).  The key language of this Rule is "will fairly and

adequately" represent.  There is nothing in the rules or in the case law to suggest that a

representative be the "best" possible representative.[2]  Thus, the test of adequacy is no where near

as arduous as the Defendants seek to impose in this matter.

        In determining whether a named plaintiff is an adequate representative, the Court should

be mindful of the fact that there are no underlying Due Process concerns presented by this case

going forward as a class action.  There is complete absence of any competing factions or

meaningful intervenors.  Stated otherwise, there is no competition or posturing for class

representation status in this matter.  On the contrary, the MRGO PSLC would suggest that the

putative class members are highly aware of the status of this case and the efforts to certify this

action as a class action.  Support for this action is overwhelming.  To the extent any putative

class members wish to pursue their own claims, they will be afforded that opportunity following

certification, notice and scheduling opt-out procedures.

---

[2] The MRGO Plaintiffs counsel respectfully suggest that the named plaintiffs in this action are among the best possible choices for class representatives that may exist.

Furthermore, there is nothing in the record to suggest that the named plaintiffs are not passionate about pursuing this action.  There is certainly no credible suggestion of antagonism between the class representatives and the putative class members.  To the contrary, the MRGO Plaintiffs are all passionate about holding the Defendants liable for their losses.  There are probably few, if any, better examples of a community in outrage and bound together on firm common grounds against a series of culpable defendants.  The named plaintiffs have demonstrated that they will vigorously pursue the claims in this action against the defendants and they have each sustained great losses.

Moreover, the interests of the named plaintiffs are "coextensive" with the interests of the putative class.  The concept of "coextensiveness of interest" has been thoroughly examined and explained by Professors Wright, Miller and Kane, and is reproduced here for the Court's consideration:

> Courts often have stated that the interests of the representatives must be coextensive with those of the class in order to satisfy Rule 23(a)(4). This does not mean that their positions have to be identical. Rather, what seems to be intended by these judicial statements is that the representatives and the class members must share common objectives and legal or factual positions to establish adequacy of representation. If they do not, then Rule 23(a)(4) will not be satisfied. Generally, if the representatives' interests are coextensive with those of the rest of the class, they will not be viewed as antagonistic, a key factor in determining the adequacy of the representation. Thus, if the interests of the representative coincide with those of the class members, Rule 23(a)(4) may be satisfied.
>
> Coextensiveness also has been viewed as part of the requirement in Rule 23(a)(3) that the claims of the representatives be typical of those of the absent class members. Thus, courts have noted that coextensiveness is a common thread binding Rule 23(a)(3) and Rule 23(a)(4) together. As described by Judge Weinstein in *Rosado v. Wyman*,
>
> > Development of Rule 23 suggests that the typical representative element in Rule 23(a)(3) is designed to buttress the fair representation requirement in Rule 23(a)(4). The theory is that if the claims and defenses are typical then there will be every reason

for the representatives to support their own claims and so advance the claims of others in a like position. The phrase in original Rule 23, "one or more, as will fairly insure the representation of all," was expanded into clauses (3) and (4) of new Rule 23(a) when it was amended in 1966.

Furthermore, because of the similarity between the standards under subdivision (a)(3) and subdivision (a)(4), some courts have suggested that "typicalness" means that the representatives have no interests that are antagonistic to or in conflict with those of the class. Following this analysis, language that coextensiveness is an aspect of "typicalness" and functions as a further demonstration of a lack of adversity or antagonism between the named and unnamed members of the class for purposes of testing the adequacy of the representation, is an appropriate construction of the rule.

Wright, Miller & Kane, &A Federal Practice and Procedure § 1769 (3d ed. 2008) (citations omitted) (footnotes omitted).

It is indisputable that the named plaintiffs' interest are coextensive with those of the other class members. The Defendants' efforts to paint the named plaintiffs as having overly individualized interests is without merit. The Defendants go through great lengths to demonstrate that the named plaintiffs are not businesses, churches, schools or other entities, and further, to highlight individual health issues; however, these efforts are in vain. The reality is that these named plaintiffs have the same common interests in seeking redress of their claims against the Defendants. More importantly, the underlying claims are truly the same.

The simple fact of the matter is that the geographic areas involved in this action were inundated with water allegedly stemming from the MRGO. At the end of the day, in considering the propriety of class certification, it makes no difference whether the cause of the innundation was the fault of the Defendant Washington Group, the Levee Boards or the Government. One or more of the Defendants will be adjudicated liable and their liability will have caused the principal overriding damages to the class members–the loss of property. It is clear from the evidence established to date and the evidence obtained though public sources that these geographic areas were drowned, not merely flooded. Most of the neighborhoods at issue had water up to the eaves

of the roofs.  Everyone knows there was limited mass wind damage to most of the properties in these geographical bounds.[3]  It is for that reasons that so many insurance claims were resolved following the Louisiana Supreme Court's decision in the *Sher v. Lafayette Insurance Company* case.

Of utmost importance, a case presenting nearly identical class certification issues stemming from events surrounding Hurricane Katrina was certified and resolved.  That case is *Turner v. Murphy Oil USA, Inc.*, 234 F.R.D. 597 (Ed. La. 2006).   Not surprisingly, the Defendants brush over the importance and relationship between the *Turner* case and the case at bar, and make reference to this case only in a footnote.  (Opposition, Doc. 8286,  at p. 66, footnote no. 44).

The defendants in the *Turner* case made similar allegations against certification as the MRGO Defendants now assert in this matter.  In particular, the *Turner* defendants attempted to distinguish between homeowners and businesses.  *Id.* at 604.  Additionally, those defendants attempted to make issue with what they perceived as varying degrees of mental anguish and personal injuries.  *Id.*  In his opinion certifying the class, Judge Fallon disagreed with the defendants.  Judge Fallon found that "enough common issues regarding Defendants' liability" existed to warrant class treatment.  *Id.*  The MRGO PSLC will further suggest to this Court that issues of comparative fault were raised in the *Turner* case.  Those issues involved allegations of third-party fault encompassing the actions or inactions of the Defendants in the case at bar, and the Act of God defense.  Nevertheless, the *Turner* case was certified and ultimately resolved as a class action.

---

[3]  To the extent any individual received extensive wind damage and the Defendants are entitled to any form of an offset or credit, those calculations can be made, as they are generally handled, at the claims administration phase.

As the noted federal civil procedure treatise authors have found, the predominance test for judging the propriety of class certification does not require disposition of the entire controversy or all issues presented in a case.  *See* 1 Alba Conte & Herbert B. Newberg,  *Newberg on Class Actions* § 4:25 (4th ed. 2006).  The focus should be placed upon the common overriding issues to be resolved in the case.  *Id.*  Professors Wright, Miller and Kane have added:

> When common questions represent a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is a clear justification for handling the dispute on a representative rather than on an individual basis. . .

> Therefore, when one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.

7AA Wright, Miller & Kane, Federal Practice and Procedure § 1778, at 120-34 (3d ed. 2005).  Accordingly, the Defendants in this action have failed to demonstrate why this action may not be certified as a class action.  There is simply no credible impediment to class certification.

Moreover, there is clearly no other means of adjudicating the common central issues presented in this case absent class certification and hence, certification is the superior means of adjudicating the tens of thousands of claims of the MRGO putative class members.  Any suggestion to the contrary would be forcing the Court to focus on the trees, rather than the forest.  It is for this very reason that class actions were developed in the federal rules and are employed by federal courts to resolve situations such as the one presented by this case.

## III.

## PLAINTIFFS' EXPERTS PROVIDE A USEFUL DETERMINATION OF COMMON ISSUES THAT WILL BE REVISITED INNUMERABLE TIMES INDIVIDUALLY

The Court is no doubt aware that over 80 % of the Greater New Orleans metropolitan

area was inundated as a result of Hurricane Katrina.  The question then becomes, where did all the water come from?

To better understand the processes upon which the end result is known, the MRGO PSLC retained the services of Dutch engineers utilizing a proprietary software program[4] that predicts the flow of water in a shallow area and how it will progress by taking into account the degree of friction that the flowing water encounters (See Exhibit Pls. Tr. Ex. 28 - Vriling II, p. 55, 86-90).  Once this process is properly honed by engineering calculations, it becomes possible to "model" where, how much, and at what rate the water from a particular source will flow.  With this analysis, the Court can understand the issues that citizens from particular neighborhoods or polders have in common.

The MRGO defendants attempt to raise the specter of confusion by arguing that the "output quality" is flawed because the input data is insufficient. (Opposition, Doc. 8286. p. 35).  First, defendants assert that the information provided to the Dutch by various Plaintiffs experts resulted in limited accuracy; however, defendants fail to specify in what sense this can be true. (Opposition, Doc. 8286, p. 34-39 & 68-73).  As in any expert report, the expert relies upon and incorporates data from other specialized fields to reach his conclusion.  Defendants fail to establish that any conclusions relied upon by the Dutch were erroneous.  This falsehood was negated by Professor Johannes Vrijling of the Dutch University TU Delft when he explained to counsel for the MRGO defendants that the input data was independently checked against the reports generated by outside agencies such as ASCE and the ILIT report. (See Exhibit Pls. Tr. Ex. 28 - Vrijling Dep., Volume II, p.26-28).

Secondly, the defendants reference fields that "the Delft group simply did not input at all:

---

[4]  The Sobek software program used to generate flood simulation has been used hundreds of times to study Dutch systems. (Vriling, p. 48).

(1) wind; (2) underseepage; (3) flooding from sewers, ditches, and small waterways; and (4) backflow from pumping stations."  As deftly explained by Professor Vriling in his deposition, once the breaching of the levees occurs it becomes "impossible to pump water out" because if simply comes right back in through the breach.  (See Exhibit Pls. Tr. Ex. 28 - Vrijling Dep., Volume II, p.34-35).  And of course at that point the contribution of water from any other source is immaterial; New Orleans being a bowl, with the breaches "the end is simple, full is full." (See Exhibit Pls. Tr. Ex. 28 - Vrijling Dep., Volume II, p.88).   Therefore, "going into too much detail and about rainfall and about the flow of the rain through the streets is a waste of money" in Professor Vriling's opinion. That is why the Dutch "did it simple." (See Exhibit Pls. Tr. Ex. 28 - Vrijling Dep., Volume II, p.121).

The MRGO defendants present Dr. Robert A Dalrymple's expert opinion that "plaintiffs' model "does not and cannot show the actual nature or sequence of property damage during Hurricane Katrina as not all possible causes of damage are included in the model and there were significant uncertainties in the input data."  In so doing, defendants' expert has avoided addressing the very nature of the Dutch model: to calculate the "final depth of the water, primarily," and to calculate the "flood progression through the polders."  (See Exhibit Pls. Tr. Ex. 28 -Vrijling Dep., Volume II, p.80-81). No system is perfect, and science is not necessarily tailored to meet litigation needs.  The inverse is true, various disciplines can be utilized to provide insight and understanding to the processes of failure to determine fault.  Obviously the Dutch model was not designed to resolve hundreds of thousands damage claims; instead, it is a useful tool to understand how numerous claims (by sub-class) have common elements that if presented individually would have the same evidence presented thousands of times over.

Likewise, Dr. John Kilpatrick provides a real damages property model that assesses diminution in property value across the class area.  In their Opposition, the MRGO defendants

impugn the reliability of the mass appraisal approach undertaken by Dr. Kilpatrick. (Opposition, Doc. 8286. p. 40-47 & 73-79)  However, this Court is already well versed in the methodology to perform a mass appraisal model evaluating the diminution of property value as a result of the MRGO Defendants Motion to Exclude Plaintiffs' Putative Expert John A. Kilpatrick. (Record Doc. 7992).

As the Court appropriately reasoned in ruling against the Defendants' Motion, and as is made clear from the submitted testimony of the experts, mass appraisal techniques are well-accepted and reliably applied in cases such as this. (See Record Doc. 8796).  In the post-certification merits trial of the common issue of how Katrina flooding has resulted in a classwide diminution of property value, the specific model(s) for application these techniques can be determined.

## IV.

## CONCLUSION

For the foregoing reasons, the Plaintiffs' Motion for Class certification should be granted.


**Respectfully Submitted,**

**APPROVED PLAINTIFFS LIAISON COUNSEL**

_____/s/ Joseph M. Bruno_____
JOSEPH M. BRUNO (La. Bar # 3604)
The Law Offices of Joseph M. Bruno,
855 Baronne Street
New Orleans, Louisiana 70113
Telephone: (504) 525-1335
Facsimile: (504) 561-6775
Email: jbruno@jbrunolaw.com

**MR-GO PLAINTIFFS SUB-GROUP LITIGATION COMMITTEE**

/s/ James Parkerson Roy
JAMES PARKERSON ROY (La. Bar # 11511)
MR-GO PSLC LIAISON COUNSEL
Domengeaux Wright Roy & Edwards LLC
P.O.Box 3668
Lafayette, LA. 70502
Telephone: (337) 593-4190 or (337) 233-3033
Facsimile: (337) 233-2796
Email: jimr@wrightroy.com

**LEVEE PLAINTIFFS' SUB-GROUP LITIGATION COMMITTEE**

/s/Gerald E. Meunier
GERALD E. MEUNIER (La. Bar #9471)
LEVEE PSLC LIAISON COUNSEL
Gainsburgh, Benjamin, David, Meunier & Warshauer, L.L.C.
2800 Energy Centre
1100 Poydras Street
New Orleans, Louisiana 70163-2800
Telephone: (504) 522-2304
Facsimile: (504) 528-9973
Email: gmeunier@gainsben.com

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the above and foregoing upon all counsel of record by placing same in the United States mail, properly addressed and with first-class postage, or by facsimile or other electronic transmission this 3rd day of December, 2008.

/s/ Joseph M. Bruno
Joseph M. Bruno