# PLAINTIFFS TRIAL EXHIBIT

# 21

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


**IN RE:** KATRINA CANAL BREACHES    CIVIL ACTION
**CONSOL**IDATED LITIGATION

                                     NO. 05-4182 "K"(2)

**PERTAINS TO:** MRGO              JUDGE DUVAL

**FILED IN:** 05-4181, 05-4182,   MAG. WILKINSON
**05-5237,** 05-6073, 05-6314,
05-6324, 05-6327, 05-6359,
06-0225, 06-0886, 06-1885,
06-2152, 06-2278, 06-2287,
06-2824, 06-4024, 06-4065,
06-4066, 06-4389, 06-4634,
06-4931, 06-5032, 06-5155,
06-5159, 06-5161, 06-5162,
06-5260, 06-5771, 06-5786,
06-5937, 07-0206, 07-0621,
07-1073, 07-1271, 07-1285




Videotaped deposition of JEANNINE B. ARMSTRONG,
28 Park Place Drive, Apartment 601, Covington,
Louisiana  70433, taken in the offices of Bruno &
Bruno, 855 Baronne Street, New Orleans, Louisiana
70113, on Monday, the 9th day of July, 2007,
beginning at 9:21 a.m.


APPEARANCES:

        LAW OFFICES OF FRANK J. D'AMICO, JR.
        (BY:  RICHARD M. EXNICIOS)
        2nd Floor
        622 Baronne Street
        New Orleans, Louisiana  70113

            ATTORNEYS FOR THE PLAINTIFFS

Page 2

1   APPEARANCES CONTINUED:
2   LABORDE & NEUNER
       (BY:  GREGORY A. KOURY)
3      Suite 200
       One Petroleum Center
4      1001 West Pinhook Road
       Lafayette, Louisiana  70503
5
       ATTORNEYS FOR THE BOARD OF
6      COMMISSIONERS FOR THE
       ORLEANS LEVEE DISTRICT
7
8   DUPLASS, ZWAIN, BOURGEOIS, MORTON, PFISTER
       & WEINSTOCK
9      (BY:  JOSEPH E. BEARDEN, III)
       Suite 2900
10     3838 North Causeway Boulevard
       Metairie, Louisiana  70002
11
       ATTORNEYS FOR THE BOARD OF
12     COMMISSIONERS FOR THE LAKE BORGNE
       BASIN LEVEE DISTRICT
13
14  STONE PIGMAN WALTHER WITTMANN
       (BY:  CARMELITE M. BERTAUT)
15     546 Carondelet Street
       New Orleans, Louisiana  70130-3588
16
17           AND
18  JONES DAY
       (BY:  JEROME R. DOAK)
19     2727 North Harwood Street
       Dallas, Texas  75201-1515
20
       ATTORNEYS FOR WASHINGTON GROUP
21     INTERNATIONAL, INC.
22
23
24
25

Page 4

1                I N D E X
2
3   EXAMINATION BY:                          PAGE
4   MR. DOAK                                   5
5   MR. BEARDEN                              131
6
7
8   EXHIBITS:
9   Jeannine Armstrong Exhibit Number 1      37
       Document entitled "Plaintiffs'
10     Response to MRGO Defendants' First
       Set of Joint Class-Certification
11     Requests for Admission,
       Interrogatories, and Requests for
12     Production of Documents"
13  Jeannine Armstrong Exhibit Number 2      37
       Document entitled "Plaintiffs'
14     Response to MRGO Defendants' First
       Set of Joint Interrogatories,
15     Requests for Production of
       Documents and Requests for
16     Admissions to Plaintiffs Regarding
       Common Liability Issues"
17
    Jeannine Armstrong Exhibit Number 3     104
18     July 1, 2006, Department of the
       Army Corps of Engineers letter and
19     Standard Form 95
20  Jeannine Armstrong Exhibit Number 4     134
       Photocopied driver's license
21     (Not provided for attachment to
       transcript)
22
    Jeannine Armstrong Exhibit Number 5     134
23     Handwritten Social Security number
24
25

Page 3

1   APPEARANCES CONTINUED:
2   VIDEOTAPED BY:
3      TODD MEAUX
       Depo-Vue, Inc.
4      Suite 205
       3200 Ridgelake Drive
5      Metairie, Louisiana  70002
       (504) 828-8856 or (888) 337-6883
6
7
    REPORTED BY:
8
       CAROL VALLETTE SLATER
9      Certified Court Reporter
       Registered Professional Reporter
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1        THE VIDEOGRAPHER:
2            This is the videotaped
3   deposition of Jeannine Armstrong,
4   being held at 855 Baronne Street,
5   New Orleans, Louisiana, on July
6   9th, 2007.  We're on the record at
7   9:21 a.m.  My name is Todd Meaux.
8   I'm a Certified Legal Video
9   Specialist.  The court reporter is
10  Carol Slater.
11           Would you please swear the
12  witness?
13           JEANNINE B. ARMSTRONG,
14  after being first duly sworn in the cause,
15  testified as follows:
16  EXAMINATION BY MR. DOAK:
17       Q.   Mrs. Armstrong, my name's Jerry Doak
18  again.  We met as you came in.
19           For the record, would you please
20  state your name?
21       A.   Jeannine Armstrong.
22       Q.   How would you like for me to address
23  you, Miss Armstrong?
24       A.   Jeannine's fine.
25       Q.   I'll stay with last name.  Mrs. or

JEANNINE ARMSTRONG (MRGO)                                        7/9/2007

1  Miss?
2       A.   Whatever's fine.
3       Q.   Okay.  Have you ever been deposed
4  before?
5       A.   No.
6       Q.   I will only explain a couple of
7  things.  I'm sure your counsel has reviewed them.
8  I will ask you questions.  You answer the
9  question.  Please allow me time to finish my
10 question, and if you have any questions that you
11 don't understand, just speak up and let me know
12 and I'll try to rephrase the question so you do.
13      A.   Okay.
14      Q.   Also, whenever you're ready to take
15 a break, just let us know, or your counsel, and
16 we'll take a break.
17           Let me begin by asking you:  What
18 did you do to prepare for this deposition?
19      A.   I read over the documents that we
20 were given by Jon Andry.  We had meetings with
21 the attorneys.
22      Q.   What were the documents that you
23 were given by Jon Andry?
24      A.   It was -- I don't know the name of
25 it -- that -- that -- interrogatories.
                                          Page  6

1       Q.   Never been in a class action?
2       A.   No.
3       Q.   Never been sued?
4       A.   No.
5       Q.   Have you ever filed for bankruptcy?
6       A.   No.
7       Q.   Have you ever been involved in any
8  kind of criminal proceeding?
9       A.   No.
10      Q.   A little just background information
11 on you.  Where were you born?
12      A.   I was born in New Orleans.
13      Q.   Have you lived here all your life?
14      A.   Yes.
15      Q.   And you're currently married to
16 Kenneth Armstrong?
17      A.   Yes.
18      Q.   And when were you married to him,
19 what year?
20      A.   1983 -- 1982.
21      Q.   And had you been married before
22 then?
23      A.   No.
24      Q.   And you are still married today?
25      A.   Yes.
                                          Page  8

1       Q.   Yes.
2       A.   That.  I really don't know the
3  formal names of them.
4       Q.   Some discovery responses.  Uh-huh.
5       A.   (Nods head affirmatively.)
6       Q.   And when was that?
7       A.   About three weeks ago.  Two, three
8  weeks ago.
9       Q.   And have you reviewed any other
10 documents in preparation for this meeting that
11 you can recall?
12      A.   No.
13      Q.   And you've had some meetings with
14 your counsel.
15      A.   Yes.
16      Q.   Have you had any meetings with
17 anyone other than your counsel?
18      A.   No.
19      Q.   Have you ever been involved in a
20 lawsuit before?
21      A.   No.
22      Q.   Never been a witness?
23      A.   No.
24      Q.   Never been a party to a lawsuit?
25      A.   No.
                                          Page  7

1       Q.   What was your maiden name?
2       A.   Broggi, B-R-O-G-G-I.
3       Q.   And do you have children?
4       A.   Yes.
5       Q.   And their names and ages?
6       A.   I have a son, Kenneth, who's 23; a
7  daughter Katie, who's 21; and a daughter Reneé,
8  who's 16.
9       Q.   And were any of those children
10 living with you before -- shortly before
11 Hurricane Katrina?
12      A.   They all were living with us.
13      Q.   Were any other people residing in
14 your house besides you and your husband and your
15 three children?
16      A.   No.
17      Q.   And what is your current address?
18      A.   28 Park Place Drive, Apartment 601,
19 in Covington.
20      Q.   And how long have you been at that
21 address?
22      A.   Last June, we moved in.
23      Q.   I believe I recall seeing that you
24 all evacuated before the storm.
25      A.   Yes.
                                          Page  9

                                    3  (Pages  6 to 9)

JEANNINE ARMSTRONG (MRGO)                                    7/9/2007

1    Q.   Just very briefly -- we'll come back
2    to the details -- but about what time did you
3    leave and what time did you come back to the
4    area?
5    A.   We left at about 4:00 a.m. on
6    Sunday.
7    Q.   And what day was Sunday?  Was that
8    the day of the storm?
9    A.   That was the day before the storm.
10   Q.   Before.  And where did you go?
11   A.   To Baton Rouge.
12   Q.   And how long were you in Baton
13   Rouge?
14   A.   How long?
15   Q.   Yes.
16   A.   Until June of last year.
17   Q.   And as soon as you returned to the
18   New Orleans area, then you began living in this
19   apartment in Covington, where you still reside.
20   A.   That's where -- yes.
21   Q.   And prior to Hurricane Katrina, you
22   lived at what address?
23   A.   4016 Hamlet Place.
24   Q.   And you had been there since 1985?
25   A.   Yes.

                                          Page 10

1    Q.   And would you describe your
2    educational background, please?
3    A.   I'm a registered nurse, graduated
4    from LSU Nursing School.
5    Q.   In what year?
6    A.   1994.
7    Q.   And would you describe your
8    employment history briefly, please?
9    A.   When I first got out of school, I
10   worked at Charity, Labor and Delivery.  Then, in
11   November of '94, I went to Chalmette Medical
12   Center, worked in the operating room for nine
13   years there.  Then, from the operating room, I
14   transferred to another department, Special
15   Procedures, and worked there till Friday before
16   the hurricane.
17   Q.   How far is that Chalmette hospital
18   from your Hamlet house?
19   A.   Less than a mile.
20   Q.   Can you briefly describe the
21   occasions where there were hurricanes before
22   Hurricane Katrina while you all were living in
23   the Hamlet house, what your experience was with
24   them.
25   A.   We only really evacuated maybe twice

                                          Page 11

1    before.  The last time was for Hurricane Georges.
2    Q.   Do you recall what year that was?
3    A.   No.
4    Q.   What was the level of damage, if
5    any, to your house on Hamlet?
6    A.   Nothing.  Not even water in the
7    street.
8    Q.   And what about the second
9    evacuation?
10   A.   Second evacuation was for Katrina.
11   Q.   We will spend the rest of the day,
12   hopefully not all day, but the rest of the time
13   that we're here talking about the details, but I
14   really don't have a lot of background on you yet.
15   Could you just give me a introductory, brief
16   overview of your experience before, during and
17   after Hurricane Katrina?
18   A.   We were planning on leaving at --
19   early Sunday morning.  Get up in the morning, see
20   exactly where the hurricane was, what it was
21   doing.  Some friends of ours called about 2:00 in
22   the morning, you know, saying it was a
23   hurricane -- it was a Class 5, we got to get out
24   of here.  You know, so, we woke up and, you know,
25   started getting our stuff together and woke up --

                                          Page 12

1    my oldest one and my youngest one were home.  My
2    other daughter goes to school in Baton Rouge.
3    She was in Baton Rouge -- and packed up our stuff
4    and left.
5    Q.   What was the reason you chose Baton
6    Rouge?
7    A.   My sister lives in Baton Rouge and
8    she works for a hotel and we had rooms reserved
9    there.
10   Q.   And when did you first return to New
11   Orleans after the hurricane and see your house?
12   A.   October 13th.
13   Q.   And how long were you in town for
14   that visit?
15   A.   Just a day.
16   Q.   And I take it at some point you had
17   the house bulldozed and --
18   A.   Demolished, yeah.
19   Q.   -- taken away, demolished?
20   A.   (Nods head affirmatively.)
21   Q.   When was that, approximately?
22   A.   I don't know the date.
23   Q.   Would it have been towards the end
24   of 2005, or later --
25   A.   Oh, no, later.

                                          Page 13

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

1    Q.   -- toward the end of 2006?
2    A.   In '06.  Maybe even -- I would say
3 the end of '06, I think.
4    Q.   And during that time, you were
5 continuously living in Baton Rouge?
6    A.   Yes.
7    Q.   You just came down for a day?
8    A.   Yes.
9    Q.   That was probably about as soon as
10 you could get back into the area.
11    A.   That was, yes.
12    Q.   Do you know what a Form 95 is?
13    A.   Not exactly.
14    Q.   The Form 95 is the government form
15 that your attorneys had to submit to Department
16 of Justice to make a claim against the Corps of
17 Engineer and the government.  Are you familiar
18 with that, that your attorney submitted such a
19 claim form for you?
20    A.   Yes.  Yes.
21    Q.   And submitted another claim form for
22 your husband?
23    A.   Yes.
24    Q.   Did you review that form?
25    A.   Yes.

Page 14

1    Q.   Before it was submitted?
2    A.   Yes.
3    Q.   As I understand from looking at that
4 form -- and we'll look at it in more detail --
5 right now, I just want to understand the injuries
6 or damages that you're alleging in this lawsuit,
7 and as I understand it from your Form 95 form,
8 you are claiming three types of damages:  First,
9 the loss of your house on Hamlet; second, your
10 personal property, we lawyers call it your
11 personal possession, everything other than your
12 house --
13    A.   Uh-huh.
14    Q.   -- and Number 3, mental distress as
15 a result of the storm.  Is that correct?
16    A.   Yes.
17    Q.   And are those the only three types
18 of damages that you're seeking in this lawsuit?
19    A.   I believe so.
20    Q.   Again, in a little while, I intend
21 to go back and discuss in some detail the
22 circumstances of each of these losses, but right
23 now, I just want to try to understand a little
24 bit better the precise injury for each of those
25 three to kind of define the injury, and then

Page 15

1 we'll come back and talk about it later for
2 detail.
3    Beginning with the real property,
4 your house on Hamlet, as I understand, was a
5 complete loss.
6    A.   Yes.
7    Q.   And you had it commercially
8 destroyed, bulldozed --
9    A.   Yes.
10    Q.   -- however they do that kind of
11 thing; is that correct?
12    A.   Yes.
13    Q.   So, that was a total loss.
14    A.   Yes.
15    Q.   And then, second, was all of your
16 personal possessions that, I guess, were in the
17 house.  Is it everything you owned other than
18 what you were able to pack up with you when you
19 evacuated?
20    A.   Yes.
21    Q.   All of your house possessions,
22 obviously, minus whatever you were able to fit in
23 the car to go to Baton Rouge?
24    A.   Right.
25    Q.   Did you own other car -- did you

Page 16

1 drive your car to Baton Rouge?
2    A.   Yes.
3    Q.   Did you have another car besides the
4 one you drove out of town?
5    A.   No.
6    Q.   Did you have a boat?
7    A.   Yes.
8    Q.   Was it lost?
9    A.   Yes.
10    Q.   Was it also a total loss?
11    A.   Yes.
12    Q.   So, pretty much wiped out?
13    A.   Yep.
14    Q.   The house wiped out, everything to
15 your name wiped out --
16    A.   (Nods head affirmatively.)
17    Q.   -- except the automobile, the shirt
18 on your back and, I assume, later, when we get
19 into details, you may have taken a few change of
20 clothes and maybe some photographs and --
21    A.   Exactly.
22    Q.   -- all that, correct?
23    A.   Yes.
24    Q.   Bad time.
25    A.   Yeah.

Page 17

5  (Pages 14 to 17)

JEANNINE ARMSTRONG (MRGO)                                    7/9/2007

**Page 18**

1    Q.   Have -- has there ever been an
2    occasion where you prepared a list of all of
3    those items of your personal possessions that
4    were lost --
5        A.   Before the hurricane or after?
6        Q.   After the hurricane.
7        A.   Yes.
8        Q.   What occasion was that?  Why did you
9    prepare such a list?
10       A.   The insurance companies.
11       Q.   And do I understand that you filed a
12   claim for the loss of your personal possessions?
13       A.   Yes.
14       Q.   And did you also file an insurance
15   claim for the loss of your house?
16       A.   Yes.
17       Q.   Again, we'll come back to the
18   details of that.  I just want to understand
19   broadly the injuries here.
20           I guess, why don't you tell me now
21   what were those few items of personal property
22   that you were able to save?  We've identified
23   your car that you drove out on.
24       A.   Uh-huh.
25       Q.   You obviously had some clothes and

**Page 19**

1    luggage.
2        A.   Actually, the clothes was more
3    shorts and tank tops than anything, you know,
4    because we figured, you know, if it was a
5    hurricane and we were going to -- you know, we
6    figured we'd get street flooding water, water in
7    the house.  Mostly shorts and tank tops, because
8    you knew you'd have to get back in there and tear
9    everything out.  One pair of capri pants, not a
10   pair of jeans, not a collared shirt.  That's
11   about it.  We had one box -- a Rubbermaid box of
12   pictures, and that's about it.  Me and my husband
13   shared a suitcase.
14       Q.   Your three children were with you?
15       A.   Yes.  Well, my daughter was in Baton
16   Rouge because she's going to school up there, but
17   the other two were with us.
18       Q.   So, really, other than a small stack
19   of photographs --
20       A.   That's it.
21       Q.   -- everything?
22       A.   Yeah.
23       Q.   Turning to the third type of injury,
24   the mental distress, again, can you just tell me
25   a little bit about that at this point?

**Page 20**

1        A.   What you want to know?
2        Q.   I'm sure it's terrible.
3        A.   Yeah.  And it's not the house, and
4    it's not the possessions.  That's not it.  If you
5    think that's it, you don't have a clue.  It's
6    your community more than anything.
7        Q.   Tell me about that.
8        A.   It's your own -- where your children
9    went to school, where I went to school, where
10   Kenny went to school, everything.  My parents
11   lived across the street.  You know, we went to
12   church.  We were married at the church.  My
13   children were christened at that church.  Gone.
14       Q.   I apologize for having to go through
15   what's clearly painful testimony.  Obviously, I'm
16   from out of town, but the nation understands in
17   some small part the terrible tragedy that struck
18   this community, but, you know, for purposes of
19   the lawsuit, we do need to talk about the mental
20   distress --
21       A.   That's fine.
22       Q.   -- a little bit.
23           So, as I understand what you're
24   saying, to you, your mental distress is primarily
25   focused on, your words, loss of community and

**Page 21**

1    your immediate neighborhood.
2        A.   Uh-huh.
3        MR. EXNICIOS:
4            Just an objection.  I'm not
5    disagreeing with your
6    summarization, but you're saying
7    "your primary," and she didn't say
8    that.  She said "it's more than
9    just."  She didn't say her primary
10   emotional distress was -- she said
11   "it's more than just" -- a
12   mischaracterization of what she
13   said.
14       A.   The hospital where I worked is gone,
15   my job is gone.
16   EXAMINATION BY MR. DOAK:
17       Q.   Do you consider that set of examples
18   that you identified, your parents across the
19   street, the church that you were married in and
20   your children were baptized, the friends in your
21   neighborhood, your nearby job at the hospital, do
22   you consider that to be the primary basis of your
23   mental distress here?
24       A.   The schools.
25       Q.   The schools.

6  (Pages 18 to 21)

1      A.   You know, had to pull your
2  children -- you know, put them in schools.  They
3  don't know anybody.
4      Q.   Right.  Right.  I'm not trying to
5  quibble.  I wasn't trying to restate your
6  testimony.  I just thought that since you told me
7  those things, I thought that you were saying that
8  it wasn't the house, it wasn't the possession,
9  but, rather, this list of neighborhood, community
10  issues that you articulated for me that was the
11  primary basis for your mental distress, and I
12  just wanted to find out if I understood that
13  correctly or incorrectly.
14      A.   That's correct.
15      Q.   Did I understand it correctly?
16      A.   Yes.
17      Q.   How long did your parents live
18  across the street?
19      A.   We moved there when I was in fifth
20  grade.
21      Q.   So, this wasn't only your home for,
22  really, your entire marriage --
23      A.   Right.
24      Q.   -- you raised your children there,
25  you were in the house from the early years all

Page 22

1      Q.   Very important to you.
2      A.   Yes.
3      Q.   You did a very good job of giving us
4  more than a half dozen examples.  I'm just
5  wondering, as we've talked here for a couple of
6  moments, are there any other examples of why your
7  community, neighborhood were so important to you
8  and has caused you this mental distress beyond
9  the kind of examples you gave me?
10      A.   That's where you grew up.  That's
11  where you knew everybody.  You know, you could go
12  in -- you know, to a grocery store, to the -- to
13  the bank -- you know, working at the hospital,
14  just people in the community, you knew this one
15  or you knew that one, you know, was related to
16  this one.  It was a very, very close-knit
17  community that you don't have anymore.
18      Q.   Everything interrelated.
19      A.   Uh-huh.
20      Q.   The hospital, the neighbors --
21      A.   Right.
22      Q.   -- the schools, parents, children?
23      A.   Yep.
24      Q.   Again, we will talk about
25  circumstances some more, but have you sought any

Page 24

1  the way to the present.
2      A.   (Nods head affirmatively.)
3      Q.   There was all of that, but on top of
4  that, this neighborhood, to you, goes all the way
5  back to being a five-year-old?
6      A.   Right.
7      Q.   I assume this was a strong reason
8  that you bought the house in 1985.
9      A.   Exactly.
10      Q.   And that pattern of community
11  involvement, that had begun in your youth,
12  continued as an adult as you went through the
13  stages of adulthood, of getting married and kids
14  being christened and having a job and working at
15  a nearby hospital and your children in those
16  schools, if not the same schools that you went
17  to, at least the same school system, I assume?
18      A.   Right.  Yes.
19      Q.   And all of those relationships that
20  your parents had when you were a child, now
21  you were continuing those relationships.  Very,
22  very close --
23      A.   Yes.
24      Q.   -- relationships to you.
25      A.   Yes.

Page 23

1  professional medical assistance with respect to
2  this mental distress?
3      A.   No.
4      Q.   No healthcare provider of any kind?
5      A.   Not for mental stress, no.
6      Q.   Okay.  And how about did you require
7  any medications for the mental distress?
8      A.   No.
9      Q.   Can you put a -- in time on the
10  mental distress?  Was this something that peaked
11  and has subsided over the past two years --
12      A.   Oh, no.
13      Q.   -- or it's still very much alive
14  with you today, it would seem, by looking at you
15  and hearing you.
16      A.   (Nods head affirmatively.)
17      Q.   Please, if you can --
18      A.   That's okay.
19      Q.   -- give a verbal answer for the
20  reporter.
21      A.   Well, we live in an apartment.  You
22  know, I never lived in an apartment when I first
23  got married.  You know, last week, we were
24  married 25 years.  I'm in an apartment.
25      Q.   So, you celebrated your 25th

Page 25

7 (Pages 22 to 25)

**Page 26**

1  anniversary --
2      A.   (Nods head affirmatively.)
3      Q.   -- in an apartment, something you
4  haven't lived in for a long time --
5      A.   Uh-huh.  Right.
6      Q.   -- instead of in the home where you
7  should have been?
8      A.   Exactly.  It would have been paid
9  for, too.
10     Q.   I think I'm ready to move to another
11  area, but I want to make sure that I understand
12  correctly that you're not seeking any relief in
13  this lawsuit for things other than these three
14  types of categories that we've talked about:
15  First, the loss of your house; second, the loss
16  of all of your personal possessions; and, third,
17  for this extreme mental distress that you
18  described as a result of losing everything,
19  including these neighborhood relationships; is
20  that correct?
21     A.   I did have other health issues, if
22  that's what you're referring to.
23     Q.   I have seen a couple of diseases
24  listed.  I don't know if the other health issues
25  are related to the lawsuit or not, but that's why

**Page 27**

1  I'm asking the question, to find out what this
2  group of defendants is being alleged to have been
3  partially responsible for.  I mean, that's one of
4  my jobs today.
5      A.   Right.
6      Q.   So, that's why I'm trying to -- so,
7  yes, ma'am, if there is something more beyond
8  mental distress in the area of loss that you
9  attribute -- for which you are seeking relief in
10  this lawsuit, yes, please tell me about that.
11     A.   Yes.
12     Q.   Okay.  And what are -- what are
13  those other things?
14     A.   I'm sure you know.  In November of
15  '05, I was diagnosed with brain tumor.  And that
16  would have been there no matter what.  That was
17  there before the hurricane.  Then, in June of
18  '06, I came down with pneumonia -- with
19  pneumonia, and was sick into July of last year
20  and developed a backache, and in August, went to
21  seek help for the backache.  Make a long story
22  short, wind up being an infection in my spine,
23  which was actually a fungal infection, and was
24  hospitalized for a month, had to have two
25  surgeries, removed two vertebrae out of my back,

**Page 28**

1  have rods and a cage in my back and was on
2  antibiotics for three months after I was out of
3  the hospital, had to have a blood test every week
4  and --
5      Q.   And how does that relate to the
6  lawsuit?  Do you attribute those things last
7  summer, the pneumonia and then the backache
8  developing into the back --
9      A.   The pneumonia was a fungal
10  pneumonia, which is rare.  You don't just get a
11  fungal pneumonia.  It's airborne.  We were down
12  at the house cleaning it out, gutting, all that
13  kind of stuff.  You know, doctors say it's from
14  the soil, from -- airborne from the soil.  Was it
15  from that?
16     Q.   So, you don't know, but you're
17  suspicious.  As a nurse, you're telling me that
18  this is rare?
19     A.   You don't see that.
20     Q.   To the limits of I only know briefly
21  what kind of areas you may have worked in as a
22  nurse, but when you say "rare," what kind of
23  percentage --
24     A.   Usually, you see a bacterial
25  pneumonia, viral pneumonia.  You very rarely see

**Page 29**

1  a fungal pneumonia.
2      Q.   Would fungal pneumonias be less than
3  5 percent of the whole?
4      A.   I don't know -- I don't know
5  percentages.
6      Q.   But in your experience, it's --
7      A.   You don't see it every day.
8      Q.   -- unusual.
9      A.   Yes.
10     Q.   Okay.  And because of that and
11  because of your cleanup activities at the site
12  and all of the stay-behind stuff, I guess,
13  following a hurricane, in your mind, you're
14  suspect that that might have been the cause of
15  that fungal pneumonia?
16     A.   Yes.  Yes.
17     Q.   Similarly, the back infection, I
18  think you said that that was also a fungal
19  inspection (sic)?
20     A.   Yes.  Yes.  They think it actually
21  was a pneumonia that went into the bone.
22     Q.   And your doctors have told you that.
23     A.   Yes.
24     Q.   That that was a, in their mind,
25  wherever the fungus came from in the first place,

1     they thought there was a link between what was
2     started as the pneumonia and then moved to your
3     spine as a fungal inspection (sic); is that
4     correct?
5         A.   Infection, yes.
6         Q.   And that sounds like that was pretty
7     unhappy.  A month -- full month in the hospital?
8         A.   Yes.
9         Q.   And where was that, in Baton Rouge?
10        A.   At West Jeff.
11        Q.   I'm sorry?
12        A.   West Jefferson, on the west bank.
13        Q.   And two surgeries, again, you said?
14        A.   Yes.
15        Q.   Would you give me a little bit more
16    detail on those surgeries?
17        A.   The first surgery, it's called a
18    thoracotomy, where you cut from here all along
19    the side and your back, where they had to go
20    in and remove two of the vertebrae that were
21    infected, clean everything out.  Then went back
22    the next week straight down my back and put two
23    rods in, bolts, like, through six or seven
24    vertebrae in my back, and then put a cage in,
25    which they call a cage, which actually is in that

Page 30

1         A.   I'd say a few -- every time we went,
2     it was for a few hours.
3         Q.   Let's divert and talk about that for
4     a while.  You went -- your first time back was
5     the date in October, you said.
6         A.   (Nods head affirmatively.)
7         Q.   Summarize, please, the various trips
8     you made back to your house and what happened in
9     those trips, what you were doing.
10        A.   When we first went in, there was at
11    least -- at least two feet of mud and water still
12    in the house.  You know, when you would step
13    down, the mud and water would come over your
14    boots.  So, you were just trying to like -- like,
15    I forgot all my jewelry.  So, we tried to -- you
16    know, you got to find your dresser because the
17    ceiling had fallen.  So, there's no light -- you
18    got to realize, there's no light.  The windows
19    all -- it's hot as hell.  You know, in -- it
20    might be October, but it's hot.  You got long
21    sleeves on.  You have gloves on.  You're sweating
22    constantly.  You're trying to get in there.
23    You're trying to break apart stuff, trying to dig
24    through, trying to find, you know, just any piece
25    of trinket that you could find, you know, because

Page 32

1     space where they took out the two vertebrae.
2         Q.   Have you ever discussed with any of
3     your physicians the possibility that this fungal
4     infection may have been caused by fungal
5     contamination at -- following the hurricane?
6         A.   Their biggest question was:  How
7     often were you down there?  You know, you were
8     down there cleaning your house out, you know.
9     It's odd.
10        Q.   What I'm trying to get at is whether
11    or not this is your personal theory as,
12    certainly, more informed than me, you're a nurse
13    and you've explained your relationship idea of
14    the fungus.  I'm trying to find out, though, is
15    this your theory or did some of your doctors also
16    agree with your theory, that the fungal infection
17    might have come from Hurricane Katrina and your
18    cleanup activities after it?
19        A.   I would say it was both.  You know,
20    when we went into the house, you know, there's
21    mold all over everything.  There's mold on the
22    studs.  There's mold on the rafters.  It was
23    everywhere.
24        Q.   How long were you in the house doing
25    the cleanup?

Page 31

1     it was a maze.  It was a maze as in -- because
2     nothing was where you left it.  Everything was
3     jumbled because everything had been floating
4     around and tossed around.  And you spend most of
5     your time digging because you didn't really know
6     what you were digging through.
7         Q.   How soon in the process did you and
8     your husband think that the house was probably
9     going to be a complete loss and would need to be
10    demolished?
11        A.   When we first saw it.
12        Q.   Immediately?
13        A.   Yes.
14        Q.   So, these follow-up trips after your
15    first return in October were aimed at trying to
16    find what precious items you could retrieve; is
17    that correct?
18        A.   Yes.  Yes.
19        Q.   Using your spinal infection
20    difficulties in July of '06, was the house on
21    Hamlet -- had it been demolished by that time, do
22    you recall?
23        A.   I don't think so.  I think it was
24    closer to November.
25        Q.   You think it was after that?

Page 33

9  (Pages 30 to 33)

1      A.  I think so.
2      Q.  Let's go back to -- you said that
3   you'd been diagnosed with a brain tumor, and that
4   diagnosis was in November of '05?
5      A.  '05.
6      Q.  And you indicated that you had been
7   told or believed that the tumor had to have been
8   in existence before Hurricane Katrina.
9      A.  Yes.
10      Q.  Tell me about that.
11      A.  It's a slow-growing tumor, the type
12   that it is.  It's not a fast-growing tumor.
13      Q.  And is there a connection in your
14   mind to that tumor being worsened in some way as
15   a result of your terrible experience with
16   Hurricane Katrina?
17      A.  The tumor?
18      Q.  Yes.
19      A.  No.
20      Q.  Okay.  So, you're not seeking relief
21   in this lawsuit for anything having to do with
22   the brain tumor.
23      A.  The tumor was there.
24      Q.  Is it correct then that you're not
25   seeking anything in this lawsuit for the brain

Page 34

1   tumor?  Is that a correct statement?
2      A.  Do I think the brain tumor had
3   anything -- was a result of the hurricane or --
4   no.  No.
5      Q.  Okay.
6      A.  The tumor was there.
7      Q.  Okay.  But, as I understand it, you
8   are seeking relief in this lawsuit for the fungal
9   pneumonia and the fungal spinal infection --
10      A.  Yes.
11      Q.  -- because of your theory of where
12   that fungus infection came from; is that correct?
13      A.  Yes.
14      Q.  Now, let me go back to the question
15   again because I need to confirm --
16      A.  That's okay.
17      Q.  -- that we understand all of the
18   injuries, damages, any other loss that you
19   believe that you're asserting in this lawsuit.  I
20   want to make sure that I have a complete list of
21   those before we move on.  We now have, I'll call
22   it, four types of injury, the real property, your
23   house on Hamlet, that's Number 1; Number 2 is
24   your personal possessions; Number 3 is your
25   severe mental distress; and Number 4 is personal

Page 35

1   injury in two forms, first, the fungal pneumonia,
2   and then, second, the fungal infection in your
3   spine.  Is that a complete list now?
4      A.  Yes.
5      Q.  And there's nothing else for which
6   you're seeking relief in this lawsuit; is that
7   correct?
8      A.  Yes.
9      Q.  On June 12, your attorneys provided
10   responses to some class certification discovery
11   that the defendants had given them, and that
12   discovery is some words that you're probably not
13   accustomed to, but there were requests for
14   admissions, interrogatories and document
15   requests, those three kinds, and plaintiffs'
16   counsel gave us responses to that class
17   certification discovery on June 12, and I was
18   wondering if you recalled seeing that.  Based
19   upon what you mentioned and what you did to
20   prepare for the deposition, this may have been
21   what you were referring to.  So, I hand to you
22   what's been marked as Jeannine Armstrong Exhibit
23   1 and ask for you to examine that document.
24      MR. EXNICIOS:
25         You got a copy of it?

Page 36

1      MR. DOAK:
2         I don't.
3         (Whereupon, Jeannine
4         Armstrong Exhibit Number 1 was
5         marked for identification.)
6   EXAMINATION BY MR. DOAK:
7      Q.  I'm not going to quiz you on the
8   details.  I'm just trying to find out if, you
9   believe, this was a document that you've seen
10   before?
11      A.  Believe so, yes.  I believe so.
12      Q.  And, similarly, I hand to you what's
13   been marked Jeannine Armstrong Exhibit Number 2.
14   This is a similar set of your plaintiffs' counsel
15   responses to what were called common liability
16   issue discovery that were served back to the
17   defendants on June 14.  I ask that you examine
18   that document, again, briefly, to determine
19   whether or not you think you have seen that
20   before.
21         (Whereupon, Jeannine
22         Armstrong Exhibit Number 2 was
23         marked for identification.)
24      MR. EXNICIOS:
25         This one.  This is the one

Page 37

10  (Pages 34 to 37)

JEANNINE ARMSTRONG (MRGO)                                    7/9/2007

```
 1      he's talking about.
 2      THE WITNESS:
 3          Okay.
 4      A.   Yes.
 5   EXAMINATION BY MR. DOAK:
 6      Q.   Do you think that you saw Exhibits 1
 7   and 2 at the same time?  I thought you had said
 8   in preparing for this deposition you remembered
 9   at one time reviewing some documents that
10   Jonathan Andry had shown to you.
11      A.   Uh-huh.
12      Q.   And are these two of those
13   documents?
14      A.   I believe so, yes.
15      Q.   And do you have a basic recollection
16   of when that might have been?
17      A.   We received one on the 26th, when we
18   went to their office, June 26, and the other one
19   was the week before, I believe, when I had to
20   drop something off.
21      Q.   Okay.  And these were just being
22   furnished to you by way of information?
23      A.   Yes.  Yes.
24      Q.   Speak up.
25          Were you ever asked any questions by
                                           Page 38
```

```
 1   Program?
 2      A.   Yes.
 3      Q.   Do you remember participating in any
 4   other government-sponsored program?
 5      A.   Like FEMA?
 6      Q.   Yes.
 7      A.   Yes.
 8      Q.   And did you fill out a form for it?
 9      A.   Yes.
10      Q.   Did you keep copies of the claim
11   forms that you submitted to FEMA?
12      A.   I believe so.  The application --
13      Q.   Yes.
14      A.   -- in the very beginning?
15      Q.   Yes.
16      A.   Yes.
17      Q.   And did you keep a copy of the claim
18   form you submitted for The Road Home Program?
19      A.   If I don't have a -- whatever -- you
20   had to bring your stuff to them.  They fill it
21   out.  They put it on a disk for you.  We still
22   have that, yes.
23      Q.   Okay.  Do you have a copy of the
24   insurance claim that you submitted?
25      A.   I don't know if I have a copy of
                                           Page 40
```

```
 1   your attorneys with respect to particular
 2   questions in these discovery requests?
 3      A.   What do you mean?
 4      Q.   For example, there were document
 5   requests that asked if you had any documents,
 6   notes, photographs, anything of that type about
 7   Hurricane Katrina.  Did your attorney ever sit
 8   down with you and go through a list of questions
 9   about either factual matters or about what
10   documents or photographs you might have had?
11      A.   Yes.  Yes.
12      Q.   And when was that?
13      A.   We spoke to him a few times.  You
14   know, we furnished pictures, a video.  I don't
15   know a timetable.
16      Q.   Did you or your husband any -- ever
17   produce -- strike that.  Let me start over.
18          Did you or your husband ever submit
19   any administrative claim forms to any government
20   entity other than this Form 95 that we talked
21   about earlier?
22      A.   Like what?  Like --
23      Q.   The Road Home Program.
24      A.   Yes.  Yes.
25      Q.   Did you participate in The Road Home
                                           Page 39
```

```
 1   that.
 2      Q.   Did you have any documents that
 3   reflect any eyewitness account --
 4      A.   Yes.
 5      Q.   -- of Hurricane Katrina?
 6      A.   Yes.
 7      Q.   What were those documents?
 8      A.   It was a video.
 9      Q.   Was this the one --
10      A.   A DVD.
11      Q.   -- done by the St. Bernard fireman?
12      A.   Uh-huh.
13      Q.   I was going to ask about that later.
14   Is that -- who was that gentleman?
15      A.   He was a neighbor of ours who grew
16   up on the street.  His parents still lived on the
17   street.
18      Q.   Do you recall his name?
19      A.   Ronald Silva.
20      Q.   Silver?
21      A.   Silva, S-I-L-V-A.
22      Q.   And he is a fireman where?
23      A.   St. Bernard Parish.
24      Q.   And what do you know about him
25   preparing this video?
                                           Page 41
```

11 (Pages 38 to 41)

1      A.   I know he was at the sugar refinery
2   and they were at the sugar refinery and videoed
3   there and, then, after the storm, when they could
4   actually get out in boats, they actually went out
5   into the neighborhoods.
6      **Q.   I have heard of the video.  I**
7   **haven't personally looked at it, but I'm told**
8   **that somebody who is speaking on the video is**
9   **reported to say something like there's Kenny**
10  **Armstrong's house.  So, that would be a reference**
11  **to your house on Hamlet?**
12     A.   Yes.
13     **Q.   And it, apparently, depicts very**
14  **severe devastation.**
15     A.   Uh-huh.
16     **Q.   Do you have any other eyewitness**
17  **account kind of documents?**
18     A.   Actual -- of the hurricane actually
19  passing?
20     **Q.   Yes.**
21     A.   Not that I know of.
22     **Q.   Did you prepare any statements or**
23  **documents pertaining to any of these four**
24  **categories of damages or injuries?  Like your**
25  **house, other than the insurance claim you**

                                           Page 42

1      **Q.   And you told your attorneys that?**
2      A.   Yes.
3      **Q.   I assume that you must have many**
4   **documents about your two personal injuries, the**
5   **pneumonia and then the spine infection and the**
6   **resulting surgeries.**
7      A.   I have documents?
8      **Q.   Didn't you receive bills for all of**
9   **that?**
10     A.   Oh, yeah.  Oh, yeah.
11     **Q.   And perhaps correspondence with**
12  **medical providers and diagnostic materials?**
13     A.   I don't know about diagnostic
14  materials, but I have plenty bills.
15     **Q.   Okay.  Have you ever made any**
16  **statement or prepared notes, logs, journals,**
17  **diaries about your experience?**
18     A.   No.
19     **Q.   I want to change topics now and talk**
20  **more about the detailed circumstances for each of**
21  **the four types of injuries you're alleging in the**
22  **case and go through in more detail what happened**
23  **and your impression of things.  Beginning with**
24  **the damage to your house on Hamlet, you've**
25  **obviously testified that you weren't present, but**

                                           Page 44

1   submitted -- and we're going to talk about that
2   later -- but are there any other lists or
3   documents where maybe you listed things about the
4   house?
5      MR. EXNICIOS:
6         Yeah --
7      A.   I don't understand.
8      MR. EXNICIOS:
9         I don't understand the
10     question either.
11  EXAMINATION BY MR. DOAK:
12     **Q.   Did you have any -- besides this one**
13  **videotape that was produced, did you have any**
14  **other photographs, DVD, videotapes or things like**
15  **that pertaining to anything surrounding Hurricane**
16  **Katrina?  I thought you referred earlier to some**
17  **photographs.**
18     A.   I had photographs pre-hurricane.  We
19  had photographs when we went back into the house.
20  Not during the hurricane, because we weren't
21  there, but after the hurricane, when we could get
22  back to take photos of the house.
23     **Q.   So, you have before-and-after photos**
24  **of the house on Hamlet?**
25     A.   Yes.  Yes.

                                           Page 43

1   do you have a view or understanding of how your
2   house was damaged?
3      A.   Yes.
4      **Q.   Okay.  Would you please tell me**
5   **about that.**
6      A.   From the photos I seen, I know the
7   water was almost over the roof.  It seems like
8   that's the --
9      **Q.   Describe your house for us.**
10     **A.   It was a four-bedroom house, two**
11  **bath, garage, backyard.**
12     **Q.   One story?**
13     A.   One story.
14     **Q.   And the water was to the roofline?**
15     A.   Yes.
16     MR. EXNICIOS:
17        Just for clarification, the
18     roofline, above the gutters, below
19     the gutters?
20     THE WITNESS:
21        Over the gutters.
22  EXAMINATION BY MR. DOAK:
23     **Q.   Okay.  Pretty bad.**
24     A.   Yeah.
25     **Q.   Describe the location of your house,**

                                           Page 45

                                    12  (Pages 42 to 45)

JEANNINE ARMSTRONG (MRGO)                                    7/9/2007

1    also, on Hamlet.
2         A.   We lived in Buccaneer Villa North,
3    which was the north side of Judge Perez,
4    basically on the Forty Arpent Canal.
5         Q.   Yes.  And on your side of Paris
6    Road, I think, the Forty Arpent is called the
7    Florida Walk.
8         A.   I have no idea.
9         Q.   There -- well, immediately to the
10   north of you, there's a levee --
11        A.   Yes.
12        Q.   -- that goes up, and then there's
13   water right on the other side of that.
14        A.   Yes.  Yes.
15        Q.   And how far was that levee from you?
16   Hundred, 200 yards?
17        A.   I have no idea.  Put it this way.
18   We were two houses off.
19        Q.   You could see it from your --
20        A.   Oh, yeah.  Oh, yeah.
21        Q.   Very near this levee?
22        A.   Yes.
23        Q.   Do you know if -- there was
24   overtopping of that levee, wasn't there, water
25   coming over the top of the levee and coming into

Page 46

1    from Georges, there wasn't water in the street,
2    no.
3         Q.   How about as a girl, living at your
4    parents' home in that same neighborhood, did you
5    ever have problem with standing water just in
6    rain and stuff, or was this neighborhood largely
7    free of that problem?
8         A.   I would say over the past -- our
9    house had never flooded before the -- we have
10   never had water in my house.  Never.
11        Q.   Was there ever water on the streets
12   in any of these prior storms?
13        A.   No.
14        Q.   You said there wasn't water in the
15   house.
16        A.   No.
17        Q.   Not in the street, any --
18        A.   No.
19        Q.   Okay.  What, if anything, do you
20   know about the causes of this severe damage to
21   your house?  I mean, it was water.
22        A.   (Nods head affirmatively.)
23        Q.   But what do you know -- let me start
24   there.  What do you know about -- was that an act
25   of God?  Was that overtopping of the levee?  Was

Page 48

1    your neighborhood?
2         A.   I'm assuming so.
3         Q.   And I know that there is a backwash
4    station very nearby.
5         A.   What's that?  A pumping station?
6         Q.   Pumping station.
7         A.   Yes.
8         Q.   How far away is that from your
9    house?
10        A.   Maybe half a mile.
11        Q.   Okay.  My understanding, that there
12   were problems with that pumping station.
13        A.   Prior to the hurricane?
14        Q.   Were there prior to the hurricane?
15        A.   I don't know.  I -- I don't know.
16        Q.   So, you don't know if that pumping
17   station had failure in connection with Hurricane
18   Katrina or not?
19        A.   Oh, I have no idea.  When we left,
20   there was no -- it wasn't even raining.  There
21   was no water anywhere.
22        Q.   And in the 20 preceding years, had
23   you ever really had standing water in your
24   neighborhood from any of the prior storms?
25        A.   No.  No.  Like, when we came back

Page 47

1    there a breach -- I don't think near you -- was
2    it this back pump?  What do you know about the
3    cause for the water that actually made it to your
4    property in such volume that it was all the way
5    up to the roof of your house?
6         A.   I know it wasn't that much rain.  I
7    know that.  The only thing I know is what I saw
8    on TV, the breach at the Industrial Canal in the
9    Ninth Ward.  That was free-flowing south into St.
10   Bernard, and then I -- I wasn't there.  I don't
11   know if the water came over the top of the -- in
12   the back of the Forty Arpent.  I don't know.  I
13   never saw any, you know, actual coming over of
14   that.
15        Q.   But you're not south of the
16   Industrial Canal.  You're far east of there, and
17   north, aren't you?
18        A.   I'm down from the Industrial Canal.
19   You have to go through the Ninth Ward to get into
20   St. Bernard.
21        Q.   Right.  So, you think that water
22   from the Industrial Canal --
23        A.   Yes.
24        Q.   -- may have reached your
25   neighborhood.

Page 49

13 (Pages 46 to 49)

JOHNS PENDLETON COURT REPORTERS                          800 562-1285

JEANNINE ARMSTRONG (MRGO)                                        7/9/2007

1        A.   Yes.
2        Q.   How much water do you think came
3   from there as opposed to the levee --
4        A.   I have no idea.
5        Q.   -- that was nearby?
6        A.   I have no idea.
7        Q.   Was there any sign of looting or
8   vandalism to your house?
9        A.   No.
10       Q.   I understand that the house next
11  door and many others, though, did survive.  They
12  were not demolished.
13       A.   Right.  That's a personal choice.
14       Q.   Explain that to me.
15       A.   You could board your house up -- as
16  long as you secured it, it could stay standing.
17  That's up to you if you want to have it torn down
18  or not.  The house next door to us is a
19  two-story, so --
20       Q.   Well, it may be up to you in some
21  circumstances.  I mean, there are some houses
22  that are standing because they didn't suffer as
23  much damage as your house, right?
24       A.   I guess.
25       MR. EXNICIOS:

                                    Page 50

1       Objection.  If we can
2   clarify where.  I mean, some
3   houses in St. Bernard or some
4   houses in New Orleans?
5   EXAMINATION BY MR. DOAK:
6        Q.   There are some houses in St. Bernard
7   standing that did not have as much damage as your
8   house.
9        A.   I would say yes.
10       Q.   And there are houses in Chalmette
11  that didn't have as much damage as your house.
12       A.   I would say yes.
13       Q.   You took some of the worst of it for
14  either of those areas, Chalmette or all of St.
15  Bernard Parish, right?
16       A.   Yes.
17       Q.   Yours was worse than most.
18       A.   Yes.
19       Q.   Okay.  Was there any indication of
20  looting or vandalism?  Did I ask you that?
21       A.   Yeah.  Not -- not at our house.
22       Q.   Okay.  Were you -- did you have
23  friends or people that you had heard of in your
24  area, any area near you that had looting and
25  vandalism?

                                    Page 51

1        A.   Not -- pretty much not in Buccaneer
2   Villa North.  There's nothing to vandalize.
3   There's nothing to loot.
4        Q.   How about in St. Bernard?
5        A.   I've heard of that.
6        Q.   Have you heard of it in New Orleans
7   East?
8        MR. EXNICIOS:
9            Objection.  You're asking if
10       she's heard of looting in other
11       areas.  What's the relevance of
12       this?
13  MR. DOAK:
14           You've stated your relevance
15       objection.
16  EXAMINATION BY MR. DOAK:
17       Q.   Have you heard of looting in New
18  Orleans East?
19       A.   I've seen it on the news.
20       Q.   Okay.  What about wind and rain
21  damage in your neighborhood?  As I understand it,
22  your house immediately next doors to yours had
23  wind and rain damage on the roof that was clearly
24  visible.  Do you remember seeing that?
25       A.   I have no idea what they had.

                                    Page 52

1        Q.   Okay.  Are you aware of other houses
2   in your immediate neighborhood of a half mile
3   having wind and rain damage of some kind?  I'm
4   not saying predominantly, but that part of the
5   damage to their home was caused by wind and rain?
6        A.   I don't know.
7        Q.   So, you're not saying that it didn't
8   happen.  You just don't know?
9        A.   I don't know.
10       Q.   Okay.  I guess, according to the
11  video that you produced, you know that there
12  clearly were some houses in your immediate
13  neighborhood that blew up as a result of ruptured
14  natural gas lines.
15       A.   I -- I don't know.  I have no idea.
16       Q.   Did you see the video that was
17  produced?
18       A.   Yes.
19       Q.   I think there's a reference on there
20  to that.
21       A.   I don't think it's a house being
22  blown up.  I think it's bubbling in the water.
23       Q.   Did you have any roof damage?
24       A.   Yes.
25       Q.   And would you describe it, please?

                                    Page 53

                                    14  (Pages 50 to 53)

JEANNINE ARMSTRONG (MRGO)                                    7/9/2007

**Page 54**

```
 1        A.    We had shingles off.  We had those
 2  silver things that sit on your roof that twirl
 3  around --
 4        Q.    Yes.
 5        A.    -- that was off.
 6        Q.    Yes.  I take it from your Form 95
 7  that you definitely believe that the MRGO had a
 8  role in causing the flooding of your house.
 9        A.    Yes.
10        Q.    Minor role, major role?  How would
11  you --
12        A.    Major role.
13        Q.    And explain that for me, please.
14        A.    I'm not an engineer or anything like
15  that.  I know the water came in and pushed
16  through, which feeds into all of the others,
17  which feeds into the Industrial Canal, which --
18  overtopping and the breaches and everything.
19        Q.    And you do have this lake -- I don't
20  know what it's called --
21        A.    Pontchartrain.
22        Q.    -- but that big pond of water.  No.
23        A.    Lake Borne?
24        Q.    No.  I mean right on the other side
25  of the levee that you can see from your yard,
```

**Page 55**

```
 1  there's a levee and there's water.
 2        A.    That's the swamp.  I don't know what
 3  that's called.
 4        Q.    There's a swamp.
 5        A.    Yeah.
 6        Q.    I mean standing water.  There's a
 7  large water body there under normal
 8  circumstances.
 9        A.    Yes.  Yes.
10        Q.    And marshland and then the MRGO over
11  there.
12        A.    Yes.
13        Q.    And, I take it, you ascribe to the
14  theory that the MRGO channels water coming into
15  those vicinities and that caused a storm surge
16  that would have, could have caused overtopping
17  and breaches that would affect your neighborhood.
18        A.    Yes.
19        Q.    Do you have any specific knowledge
20  of the overtopping of the St. Bernard back levee
21  along the Florida Walk Canal near your house?
22        A.    I don't know.
23        Q.    Do you have any specific knowledge
24  of overtopping of the St. Bernard back levee
25  along the Forty Arpent Canal, on the other side
```

**Page 56**

```
 1  of Paris Road?
 2        A.    Yes.
 3        Q.    And what is your knowledge of that,
 4  that there was severe overtopping there?
 5        A.    Yes.
 6        Q.    And that water is how far away?
 7  Mile or two?
 8        A.    To -- yes, to the other side of
 9  Paris Road.
10        Q.    Do you believe that that water made
11  it to your doorstep?
12        A.    Yes.
13        Q.    And you said, I think, that you
14  don't know anything about the pump station
15  backflow nearby.
16        A.    No.
17        Q.    Okay.  Do you know -- back up --
18  lifelong resident of New Orleans, right?
19        A.    Yes.
20        Q.    Heard about hurricanes since you
21  were a little girl.
22        A.    Yes.
23        Q.    Understand that there is an
24  elaborate hurricane protection system of levees
25  and walls and --
```

**Page 57**

```
 1        A.    Yes.
 2        Q.    -- you name it, all constructed over
 3  50 plus years.
 4        A.    Yes.
 5        Q.    Big, long system, right?
 6        A.    Yes.
 7        Q.    And you understand from watching the
 8  news that with Hurricane Katrina, dozens of
 9  different points along that system failed all
10  around and through town, correct?
11        A.    Yes.
12        Q.    Overtopping, breaches.  It wasn't
13  just one or two places.
14        A.    Yes.
15        Q.    You can go all the way around -- and
16  have you had drawn for you the geographical
17  region that's called the MRGO Group Region, all
18  of New Orleans East on top and St. Bernard and
19  the Lower Ninth on the bottom, going over to the
20  Industrial Canal on the west?  Does that make
21  sense in your mind?
22        A.    Yes.  That makes sense.  Yes.
23        Q.    And all the way around that area,
24  there are levees and walls, right?
25        A.    Yes.
```

15  (Pages 54 to 57)

1      Q.   And through the middle of that area
2  is the Intracoastal Waterway.
3      A.   Yes.
4      Q.   And there are levees, walls even
5  near your house and a lot of other people.
6      A.   (Nods head affirmatively.)
7      Q.   Would it surprise you to find that
8  the defendants' experts, looking at the three big
9  reports, Team Louisiana, IPET -- and I forgot the
10  name of the other one -- I think, have already
11  identified, like, 45 sites of overtopping and
12  breaches.  Does that sound in the ballpark, with
13  your knowledge from the news?
14      MR. EXNICIOS:
15          Can I -- are we asking if
16      that matches what she's heard on
17      the news or does that match her
18      personal experience?
19  EXAMINATION BY MR. DOAK:
20      Q.   I'm asking if that matches your
21  personal experience, your knowledge.
22      A.   I don't know a number, but I know
23  there was many.
24      Q.   Okay.  So, I'll accept "many."  So,
25  there were lots.

                                    Page 58

1      A.   (Nods head affirmatively.)
2      Q.   My point is:  Not all of those
3  sources of water made it to your house at Hamlet,
4  did they?
5      A.   No.
6      Q.   It was some of them, not all of
7  them.
8      A.   Yes.
9      Q.   Do you have any knowledge of which
10  of those sources of water reached your house on
11  Hamlet?
12      A.   I have a good idea.
13      Q.   I'm going to ask you two questions.
14      A.   Okay.
15      Q.   The first is do you have any
16  knowledge, and the second one is do you have a
17  theory.  Do you have any knowledge?
18      A.   Knowledge as in I've seen photos.
19  I've seen, you know, breaches on the news.  You
20  saw all of that during that time.
21      Q.   Yes.
22      A.   And then do I have an idea?  Yes.
23      Q.   Okay.  And what's your idea of the
24  sources of water that reached your house on
25  Hamlet?

                                    Page 59

1      A.   From the backside, which would be
2  from the MRGO, to the Industrial -- to the --
3  water under Paris Road -- the Intracoastal.
4      Q.   Yes.
5      A.   There.  From that side there.  And
6  from the breach in the Ninth Ward.
7      Q.   And the Intracoastal Waterway is
8  above you -- north of your house?
9      A.   Yes.  Yes.
10      Q.   Running east to west?
11      A.   Yes.
12      Q.   And the Intracoastal Canal is west
13  of your house, running north to south.
14      A.   Is that the Industrial Canal?
15      Q.   Or the industrial --
16      A.   Yes.
17      Q.   -- wherever the Industrial Canal is.
18      A.   Yes.
19      Q.   Okay.  You think water from those
20  two general locations were the ones that reached
21  your house?
22      A.   Yes.
23      Q.   And water overtopping and breaches
24  at other locations did not reach your house; is
25  that correct?

                                    Page 60

1      A.   I would say yes.
2      Q.   Okay.  Such as Lake Pontchartrain.
3  Lake Pontchartrain water didn't get down to you,
4  did it?
5      A.   No.
6      Q.   Okay.  What amount of money are you
7  seeking in this lawsuit to compensate you for the
8  loss of your house?
9      A.   A dollar value?  Just on my home?
10      Q.   Just for the home, yes, ma'am.
11      A.   I don't know.  I don't know.
12      Q.   Could you give me an approximate
13  range?
14      A.   Do you want me to account for
15  everything that was lost in it?
16      Q.   I'm going to ask you the same
17  question for all four of your types of damages.
18  I'm not trying to trick you in any way.  You
19  know, this is what we need to do today.  I'll ask
20  you first what you think the fair market value of
21  your house was.  Then, I'm going to ask you,
22  second, the same question for all of your
23  personal possessions and then, Number 3, your
24  mental distress and, Number 4, your personal
25  injury, both the pneumonia and the spinal

                                    Page 61

16  (Pages 58 to 61)

JEANNINE ARMSTRONG (MRGO)                                        7/9/2007

1   infection and all of the surgery and treatment in
2   conjunction with those two personal injuries,
3   just to try to have a, you know, quantifiable
4   number that we can work with to understand the
5   basis of your claims.  Does that help you --
6       A.   Okay.
7       Q.   So, beginning with your house, what
8   do you think was the fair market value of your
9   house at the time it was destroyed on August 29,
10  2005?
11      A.   I would say between 160 -- 160, 175.
12      Q.   Okay.  And what's the basis for that
13  estimate?
14      A.   What other houses sold in the
15  neighborhood for.
16      Q.   Okay.  Had you had any formal
17  appraisal done on your house at any time
18  recently?
19      A.   No.
20      Q.   Had you had any informal appraisal,
21  kind of a write-up like a Realtor will give you?
22      A.   No.
23      Q.   But this is your neighborhood of 40
24  years and --
25      A.   Exactly, and the house across the

Page 62

1   side of Jean Lafitte, which was the main street
2   into the subdivision.
3       Q.   I'm sorry.  I just didn't hear you.
4       A.   The main street into the subdivision
5   was Jean Lafitte.
6       Q.   Yes.
7       A.   And then there was two or three
8   streets on that side, and that was the whole
9   subdivision.
10      Q.   Okay.  And you believe that most of
11  the houses in that subdivision, as you have just
12  described it, were all totalled --
13      A.   Yes.
14      Q.   -- as a result of the storm?
15      A.   Yes.
16      Q.   Okay.  Certainly, though, not all of
17  the houses in St. Bernard Parish were anywhere
18  close to being totalled, though, were they?
19      A.   Some houses got more water than
20  others, yes.
21      Q.   Well, I mean, weren't there
22  significant differences?
23      A.   Yes.
24      Q.   Did you see that article in the
25  Times-Picayune about the couple who came back and

Page 64

1   street sold a few months before the hurricane.  I
2   know what that sold for, and it was smaller than
3   ours.
4       Q.   Right.  Okay.
5            What can you tell me about the
6   degree of damage to other homes in your
7   neighborhood?
8       A.   We all suffered the same loss.  You
9   know, in our neighborhood, Buccaneer Villa,
10  everybody suffered the same -- the water was over
11  everyone's gutters, the whole subdivision.
12      Q.   And how large is that subdivision?
13      A.   From our house to Judge Perez is a
14  mile.  Now, wide, I don't know how wide it was.
15      Q.   Judge Perez would be the street to
16  the south?
17      A.   Yes.
18      Q.   Okay.  Does your neighborhood go to
19  the east, to Paris?
20      A.   No, not to Paris Road.
21      Q.   Something before Paris.
22      A.   To another canal, whatever the other
23  canal is called.
24      Q.   Yes.  I know what you mean.
25      A.   And then it goes to -- on the other

Page 63

1   were surprised to find that they hadn't had any
2   damage at all?
3       A.   I never saw that article.
4       Q.   It was in New Orleans East.
5       A.   Uh-huh.
6       Q.   How would you describe the condition
7   of your property before the storm?
8       A.   It was in excellent condition.
9       Q.   It was obviously a slab house,
10  right?
11      A.   Yes.
12      Q.   When did you last have a roof put
13  on?
14      A.   In the '90s.
15      Q.   What is your description of your
16  house?  You started to do this a little bit
17  earlier, but -- you said it was in excellent
18  condition.
19      A.   It was a single story.  It had two
20  double doors on the front, two French doors and a
21  garage on the front.  Columns.  A big, huge,
22  giant oak tree on the front lawn.  Four bedrooms,
23  two baths, a garage.  Kitchen, dining room.  That
24  was it.
25      Q.   What caused you to replace the roof

Page 65

17 (Pages 62 to 65)

JEANNINE ARMSTRONG (MRGO)                                      7/9/2007

1  in the 1990s?
2      A.   Age.
3      Q.   Just --
4      A.   (Nods head affirmatively.)
5      Q.   Were you receiving any financial
6  housing assistance from the government or
7  anyplace -- anybody else on August 29, 2005?
8      A.   No.
9      Q.   And the title, I take it, is in your
10  name and your husband's name?
11      A.   Title for the house?
12      Q.   Yes.
13      A.   Yes.
14      Q.   And what was the purchase price in
15  1985?
16      A.   Seventy-three something, 74.
17      Q.   And how did you know the house was
18  worth that much when you bought it in 1985?
19      A.   By what other houses sold for in the
20  neighborhood.
21      Q.   Did you have a formal appraisal done
22  in conjunction with buying your house?
23      A.   I didn't have it done.  It was done.
24  It was presented to us.  I didn't pay for that.
25      Q.   But it was part of a transaction?

Page 66

1  courthouse, and you filled out and signed a
2  paper, and that's how you had it demolished.
3      Q.   I'm going to come back on the
4  details, but I assume that by the time you did
5  that, you probably had resolved your insurance
6  claim and your --
7      A.   I believe so.
8      Q.   And your regular home insurance was
9  Liberty Mutual?
10      A.   Yes.
11      Q.   And Allstate for the flood
12  insurance?
13      A.   Yes.
14      Q.   Do you think you had resolved both
15  of those claims by the time you bulldozed the
16  house?
17      A.   I think so.
18      Q.   And where were you in the process of
19  making a claim for The Road Home Program?  Was it
20  also completed by that time?
21      A.   The Road Home process still isn't
22  complete.
23      Q.   Okay.  But the --
24      A.   We had filed a application with The
25  Road Home.

Page 68

1      A.   Yes.  Yes.
2      Q.   Had to be, right?
3      A.   Yes.
4      Q.   Oh, yeah.  How old was it when you
5  bought it?
6      A.   I think it was seven years old.  I
7  believe.  I'm not sure exactly.
8      Q.   So, built sometime in the '70s?
9      A.   Yes.  Yes.
10      Q.   Tell me the -- when you say you have
11  before-and-after pictures of the house that you
12  took and have preserved --
13      A.   Uh-huh.
14      Q.   -- I haven't seen those yet --
15      A.   Yes.
16      Q.   -- but you have them.  Describe the
17  process by which you had the house bulldozed.
18      A.   It was an option.  You could have it
19  bulldozed or you had to maintain your property,
20  as in put in windows to secure it, put in, like,
21  doors or just construction doors to secure it,
22  and it didn't seem it was worth doing that, you
23  know, putting expense into that to secure the
24  house.  So, we opted to have it bulldozed, which
25  went to the -- the courthouse, parish

Page 67

1      Q.   Filed the application.  Okay.  But
2  you had completed the two insurance claims, the
3  regular homeowner's insurance and the flood
4  insurance claim?
5      A.   I believe so, yes.
6      Q.   Okay.  You would think so before you
7  bulldozed the house, right?
8      A.   I mean, dates, I'm not -- right.
9      Q.   And what are your current plans, if
10  any, for rebuilding or resituating?
11      A.   We don't have a plan.  We are in an
12  apartment because my husband and I cannot agree
13  on location, where we want to be.  I have -- my
14  youngest one's still in high school.  She has two
15  more years of high school.  She's in school on
16  the north shore.  So, I'd like to get her out of
17  school first before we make a decision on exactly
18  where to go.  He has to make the commute every
19  day, which is pretty rough.
20      Q.   So, you're taking what I call a
21  time-out.
22      A.   Yes.
23      Q.   I've been there, done that.
24      A.   Yes.
25      Q.   Trying to figure out what to do.

Page 69

18  (Pages 66 to 69)

Case 2:05-cv-04182-SRD-JCW   Document 16598-2   Filed 12/03/08   Page 20 of 252

JEANNINE ARMSTRONG (MRGO)                                        7/9/2007

**Page 70**

1  A.  Yes.
2  Q.  Okay.  Have your money from the
3  insurance proceeds in a bank?
4  A.  Yes.
5  Q.  Waiting to decide.
6  Returning to this idea about what
7  are the circumstances surrounding each of your
8  types of loss, anything else come to your mind
9  about the circumstances surrounding the loss of
10 the house on Hamlet that we haven't covered?
11 We're going to talk about the claim forms and all
12 of that, but about the circumstances or the
13 causes?
14 A.  Not that I know of.  No.
15 Q.  Okay.  Did you pay to have the house
16 demolished?
17 A.  No.
18 Q.  You said you went down to the
19 courthouse.
20 A.  No.
21 Q.  This was just a local or
22 governmental program?
23 A.  I think -- I guess it's a
24 governmental thing.
25 Q.  They just said come and sign and

**Page 72**

1  A.  Structure and content, is that what
2  you're asking?  Structure and content for flood,
3  we had -- I believe it was 52,000.
4  Q.  Paid under your flood insurance?
5  A.  Yeah, minus deductibles.
6  Q.  Right.  And that was with Allstate?
7  A.  Yes.
8  Q.  And was the 52,000 limited by
9  coverage issues or that is simply the sum of all
10 of the dollar value losses that you could
11 remember to submit?
12 A.  No.  That was what our policy was
13 for.
14 Q.  Okay.
15 A.  We were severely underinsured.
16 Q.  Okay.  So, you got policy limits?
17 A.  No.  That's just what the price was,
18 if that's what you're asking.  That was the
19 dollar amount that we were insured for.
20 Q.  Yes.
21 A.  Yes.
22 Q.  That's what I meant.
23 A.  Yes.
24 Q.  Okay.  And what about on your
25 homeowner's policy, did you receive payment for

**Page 71**

1  that was it?
2  A.  Sign up for it.  Both of you had to
3  sign.  That was it.
4  Q.  Okay.  Personal property loss, I
5  guess, in terms of cause and circumstance, you're
6  going to tell me whatever happened to the house
7  happened to the personal property because it was
8  all together.
9  A.  Right.
10 Q.  Wherever the water came from,
11 everything that we talked about that you knew or
12 didn't know, or theory, whatever we said before,
13 is all true to your personal property loss,
14 right?
15 A.  Yes.
16 Q.  Do -- did you make a claim for that
17 personal property loss on your insurance?
18 A.  Content?
19 Q.  Yes.
20 A.  Yes.
21 Q.  And how much did you receive on your
22 insurance for the house?
23 A.  Flood?
24 Q.  The flood and the homeowner's
25 separated.

**Page 73**

1  the structure of the house on it?
2  A.  In homeowner's?
3  Q.  Yes.
4  A.  I'm not exactly sure how it was
5  broken down, if it was structure, content,
6  whatever, but I know we received -- I think it
7  was 32,000 from homeowner's.
8  Q.  Liberty Mutual, was that the name of
9  your homeowner's?
10 A.  Yes, homeowner's.
11 Q.  And you don't know what portion of
12 that was attributable to the house versus the
13 contents?
14 A.  Not in homeowner's, no.
15 Q.  Okay.  Do you have any documents
16 about the payments you've received either --
17 well, from Liberty Mutual?  Didn't they have to
18 send you a check and some kind of paperwork --
19 A.  Yes.  Yes.  Yes.
20 Q.  -- to reconcile your claim and what
21 they're paying and explain what they're doing and
22 why?
23 A.  Yes.  Yes.
24 Q.  Do you still have those documents?
25 A.  I'm sure we do.

19 (Pages 70 to 73)

JOHNS PENDLETON COURT REPORTERS                          800 562-1285

JEANNINE ARMSTRONG (MRGO)                                    7/9/2007

1    Q.    Who is your Liberty Mutual agent?
2    A.    His name is Bill Bubrig.
3    Q.    Spell it, please.
4    A.    B-U-B-R-I-G.
5    Q.    And where is his office?
6    A.    He's on the west bank.
7    Q.    And what's the name of his insurance
8    agency?
9    A.    I'm not sure.
10   MR. DOAK:
11        Well, I'm being passed notes
12   that we've got five minutes left
13   on the tape and it's quarter of
14   11:00.  So, that's probably a good
15   hint that people are ready for a
16   break.  Would that be convenient
17   for you?
18   THE WITNESS:
19        Yes.
20   MR. DOAK:
21        Okay.  Take a break.  Thank
22   you.
23   THE VIDEOGRAPHER:
24        We're going off the record
25   at 10:45.  This is the end of Tape

Page 74

1    Q.    Okay.  Do you know why you didn't
2    recover more insurance proceeds than 32,000 for
3    the house and contents from Liberty Mutual?
4    A.    They claimed it was flood.
5    Q.    And the reason you didn't recover
6    more than $52,000 on the flood insurance was that
7    was simply the maximum amount of insurance that
8    you had for flood.
9    A.    Yes.  Yes.
10   Q.    How much insurance could you have
11   had for flood?
12   A.    I believe the max is 250.
13   Q.    What -- moving to this second
14   category of personal possessions, what do you
15   believe is the fair market value for all of the
16   possessions that were lost, personal possessions,
17   not the house, you know, but what's the dollar
18   value of that claim for personal possessions that
19   you're asserting in this lawsuit?
20   A.    I don't know if you can put a fair
21   market value on all your -- everything you've
22   lost, you know.  I -- I have no idea.  I have no
23   idea.  From your children's christening gowns --
24   how can you put a value on that?
25   Q.    You can't.  You can't.  There's no

Page 76

1    1.
2        (Whereupon, a discussion was
3    held off the record.)
4    THE VIDEOGRAPHER:
5        We're back on the record at
6    10:59.  This is the beginning of
7    Tape 2.
8    EXAMINATION BY MR. DOAK:
9    Q.    When you previously estimated that
10   the fair market value of your house was
11   approximately 160 to $175,000 on the date of the
12   storm, are you referring just to the structure or
13   the structure and the land?
14   A.    The structure and the land.
15   Q.    The whole thing?
16   A.    The -- what you would buy at an act
17   of sale.  Exactly.
18   Q.    Okay.  Do you know any of the
19   details about the Liberty Mutual claim and why
20   you didn't receive more than 32,000?  Do you know
21   how much the house was insured for?
22   A.    I had -- total, I don't know exactly
23   how it breaks down, but I think it was, like,
24   150/300, but I don't exactly know exactly what
25   that entails.

Page 75

1    way you can put a dollar value on those
2    sentimental --
3    A.    No.
4    Q.    -- priceless things.  The law,
5    however, would put a fair market value on things
6    simply as material things.  Could you give us an
7    estimate of what you believe that total aggregate
8    value of the material things was?  I'm sure it'll
9    be a range, an approximate.  I'm just trying to
10   get a rough idea of what you think all of those
11   possessions were worth as material things,
12   segregating out the sentimental value they had.
13   A.    A million dollars.  I have no idea.
14   Q.    Let's talk about the -- I'm going to
15   skip to your fourth category, the personal
16   injury.  Do -- could you estimate the dollar
17   value you are seeking for your out-of-pocket
18   expenses for all of the medical problems you had
19   with the fungus, pneumonia, and then the fungal
20   spine infection?
21   A.    What I've paid out of pocket or an
22   estimate -- or what I think?
23   Q.    An estimate of all of those bills.
24   I'm not talking about what insurance paid or you
25   paid.

Page 77

20   (Pages 74 to 77)

JEANNINE ARMSTRONG (MRGO)                                    7/9/2007

1      A.   Oh.
2      Q.   I'm talking about what were the
3  total of all of your medical treatment bills,
4  regardless of who paid them?
5      A.   The hospital bill alone was 282,000.
6  That was the hospital bill.  That's just the
7  hospital.  That's not the doctors, anesthesia,
8  the medicine, everything else that went along
9  with that.  That was just the month-long hospital
10  stay.
11      Q.   And all of that was in one hospital,
12  though?
13      A.   I stayed in one hospital, yes.
14      Q.   And what hospital was that?
15      A.   West Jefferson.
16      Q.   I'm sorry.  Okay.  Keep going.  You
17  were saying that's just their bill.
18      A.   That's just their bill.
19      Q.   Right.  How about the various
20  physicians?
21      A.   There was the neuro doctor.  There
22  was the doctor who did the spinal surgery.  There
23  was an infection -- infectious disease doctor.
24  There was a pulmonary doctor.
25      Q.   All specialists.

                                              Page 78

1      A.   Yes.  And then there was a
2  gastrointestinal doctor.  So, it's five doctors.
3      Q.   Give me your best estimate.  I don't
4  know if we're talking $50,000 or another
5  $200,000.
6      A.   Oh, and there was general
7  surgeons -- when they did the first -- they had
8  to bring in general surgeons to get in and move
9  everything around to be able to get to the spine.
10  So, that was another set in there.  I have no
11  idea how much that was.  They had doctors that
12  did biopsies, you know, that -- bone biopsies.
13      Q.   All of them sent you separate bills
14  on top of the hospital?
15      A.   Oh, yeah.  Yeah.
16      MR. EXNICIOS:
17          Can we move on?  I mean, she
18      says she has no idea.
19      A.   I really -- I have no idea how much
20  all of that is.  We're still paying and insurance
21  is still paying and -- it's an ongoing process.
22  EXAMINATION BY MR. DOAK:
23      Q.   Would you try, to the best of your
24  memory, to provide us with a list of the medical
25  professionals that you have seen beginning with

                                              Page 79

1  your pneumonia?
2      A.   There was Dr. Crosby -- you want
3  names?
4      Q.   Yes, please.  Names and specialties.
5      A.   Dr. Robert Crosby, he's a pulmonary.
6  Dr. Frank Culicchia, he's neuro.  Dr. John Steck,
7  he is a neuro -- neuro backs.  There was Dr.
8  Werkman, he's infectious disease.  There was
9  Dr. -- his name is Dr. Thomas.  I don't know his
10  first name.  He was the -- one of the general
11  surgeons.  There was Dr. Kahn, who was the GI
12  doctor, gastrointestinal doctor.  There was a
13  group of pulmonary doctors, but I don't remember
14  their names.
15      Q.   And this was generally all in the
16  summer of 2006?
17      A.   Yes.
18      Q.   And what date did you get out of the
19  hospital?
20      A.   October 6th.
21      Q.   And describe, please, your recovery
22  after October 6.
23      A.   I came home on October 6th.  Because
24  of the infection and the medicine that I was on,
25  I had to have blood tests twice a week because of

                                              Page 80

1  the effect on your liver.  So, we went to a lab
2  on the north shore to get that done every week,
3  and the results were sent to the infectious
4  disease doctor.  I had to see the back surgeon,
5  Dr. Steck, maybe, like, in November and then
6  December, I seen him again.  I seen him in March.
7      Q.   So, you had a regular series of
8  ongoing follow-up --
9      A.   Yes.
10      Q.   -- visits with some of those doctors
11  through the end of 2006, and some of them even
12  into 2007?
13      A.   Yes.  Yes.
14      Q.   How has that experience affected
15  your daily routine now?  Are you recovered now?
16      A.   I'm doing a lot better than I was.
17      Q.   Sure.
18      A.   Trying to build my strength up to go
19  back to work.  The work I did was pretty
20  physical, moving patients, pulling patients.
21      Q.   How long were you out of work?
22      A.   I haven't worked since the
23  hurricane.
24      Q.   Now, are you -- that's not on our
25  list of four.  You're not seeking relief for

                                              Page 81

                                  21  (Pages 78 to 81)

JOHNS PENDLETON COURT REPORTERS                      800 562-1285

JEANNINE ARMSTRONG (MRGO)                                      7/9/2007

1    being out of work as part of this lawsuit?
2         A.   As in loss of wages?
3         Q.   Yes.  I'm asking you.  I'm not
4    trying to put things on your work, I'm not trying
5    to trick you, but I want to be real clear --
6         A.   Well, the hospital I used to work
7    at's not there any longer.
8         Q.   All right.
9         A.   So, you know, that doesn't exist
10   anymore.
11        Q.   I'm just asking you a question:  Are
12   you seeking any type of relief in this lawsuit
13   because you've been out of work?
14        A.   I don't know how to answer that.
15        Q.   Okay.  Not clear to you that you are
16   seeking relief for that.
17        MR. EXNICIOS:
18             It's been asked and
19   answered.
20   EXAMINATION BY MR. DOAK:
21        Q.   Other than those follow-on visits
22   that you described through 2006, some into 2007,
23   have there been any additional surgeries or
24   procedures as a result of the pneumonia or
25   infected spine?

                                            Page 82

1    you know, constantly, you know, still.  I
2    don't -- I don't like to go to the doctor.
3    Basically, nurses are the worst patients.
4         Q.   You didn't believe that they could
5    do anything for you that you couldn't do for
6    yourself?
7         A.   I think you have to deal with it.
8    Everybody has to deal with it.  And everybody's
9    dealing with it the best way they can.  I don't
10   think somebody telling me, you know, you've lost
11   everything, you've got to get over it -- I know
12   that.
13        Q.   Did you have any friends or family
14   who were seriously injured, bodily injury, died
15   or serious bodily injury as a result of Hurricane
16   Katrina?
17        A.   No.
18        Q.   Have you ever, before this mental
19   distress arising from Hurricane Katrina, had any
20   mental health issues?
21        A.   No.
22        Q.   Have you ever sought medical
23   treatment by a psychologist or psychiatrist?
24        A.   No.
25        Q.   How does your mental distress

                                            Page 84

1         A.   I have x-ray -- like, when I go to
2    the doctor, they x-ray me, if that's what you
3    meant.
4         Q.   Are you still on medications?
5         A.   No.
6         Q.   Let's switch now to the detailed
7    circumstances surrounding the mental distress
8    that we discussed some earlier.  Why didn't you
9    ever seek professional assistance, go to
10   psychiatrists, a counselor, a psychologist,
11   someone to help you?  Did you not feel that it
12   would be worthwhile?
13        A.   Everybody's going through the same
14   thing.
15        Q.   Well, perhaps, though, not everybody
16   has submitted a Form 95 saying that they were
17   making a claim for $500,000 on mental distress.
18   I understand it's hard to value mental distress,
19   but that's also a lot of money.
20        A.   Right.
21        Q.   So, I'm trying to see why you, as a
22   registered nurse, would not have gone and sought
23   professional medical care to assist with mental
24   distress, is my question to you.
25        A.   I go to enough medical doctors now,

                                            Page 83

1    manifest itself?
2         A.   Crying, angry.
3         Q.   How frequently would you say you
4    cry?
5         A.   I don't know.
6         Q.   Still sometimes?
7         A.   Yes.
8         Q.   Do you cry most days?
9         A.   No.
10        Q.   Were you crying most days in 2005?
11        A.   Yes.
12        Q.   Were you crying most days in 2006?
13        A.   Yes.
14        Q.   Are there any other physical
15   manifestations to you besides crying?  Are you
16   sleeping okay or the same as you did before
17   Hurricane Katrina?
18        A.   Sleeping okay.  Usually, don't eat
19   very much.
20        Q.   You feel that's been a change
21   associated with this?
22        A.   Yeah.
23        Q.   Are there other things like that
24   that you think are a change associated with your
25   mental distress?

                                            Page 85

                              22  (Pages 82 to 85)

JEANNINE ARMSTRONG (MRGO)                                    7/9/2007

1    A.   I feel I have a very short fuse.
2    Q.   General greater feeling of stress?
3    A.   Yes.
4    Q.   Constantly?
5    A.   Yes.
6    Q.   Given your earlier testimony this
7 morning about how important your particular
8 neighborhood was to you, it was really the only
9 neighborhood you had ever known?
10   A.   Yes.
11   Q.   Coupled with the complete loss of
12 your house and personal possessions, I assume,
13 but want to confirm with you, that your claim for
14 severe mental distress is a very significant
15 component of this lawsuit to you.
16   A.   Yes.
17   Q.   You feel quite strongly about it.
18   A.   Yes.
19   Q.   Because you feel that you have
20 suffered quite badly.
21   A.   Yes.
22   Q.   You understand, everybody wouldn't
23 be in that situation.  In many respects, you've
24 had it worse than a lot of people.
25   A.   I'm --

                                    Page 86

1 storm and you observed some have great mental
2 distress, some seemingly have none, and probably
3 a lot are in the middle?  Has that been your
4 experience?
5    A.   Yes.
6    Q.   I assume, as a registered nurse, you
7 know from professional work that patients in all
8 kinds of circumstances are going to have
9 different subjective mental reactions to physical
10 and mental adversities, right?
11   A.   Yes.
12   Q.   That's --
13 MR. EXNICIOS:
14      Objection to the questions.
15 You're giving her your theory or
16 opinion on what the general belief
17 is --
18 MR. DOAK:
19      Do you have an objection,
20 Counsel?
21 MR. EXNICIOS:
22      I have objection to the form
23 of the questions.  You make it so
24 the question stays within the
25 scope of what we're going to for so

                                    Page 88

1 MR. EXNICIOS:
2      Objection.  A lot of people
3 in the United States, of course
4 not.  But in the greater New
5 Orleans area, St. Bernard --
6 EXAMINATION BY MR. DOAK:
7    Q.   You understand in the MRGO
8 geographical region of New Orleans East and St.
9 Bernard Parish that not everyone is going to have
10 experienced mental distress as severe as yours.
11 Not everyone has the same affinity for their home
12 and neighborhood as you do.
13   A.   I don't know what everybody -- I
14 just know what I feel.
15   Q.   Right.  And you don't know that
16 those feelings transfer to anyone else, do you?
17 A person who had moved here from New York and
18 resided in St. Bernard Parish for six months and
19 lost their rented apartment would not normally be
20 expected to suffer the same kind of mental
21 distress that you have suffered for the reasons
22 you stated; would you agree with me?
23   A.   Yes.  Yes.
24   Q.   Don't you know many people in the
25 New Orleans community who have gone through the

                                    Page 87

1 that's a question, not your
2 testimony, and "don't you agree."
3 MR. DOAK:
4      I would appreciate it if
5 you'd simply say "objection,
6 form."  The CMO, as you know, the
7 magistrate judge made a very
8 specific reaffirmation about the
9 scope of objections.  You know,
10 what you just said could be
11 considered as guiding her in the
12 answers.  We don't want that.
13 You're entitled to make the
14 objection.  You're not entitled
15 to --
16 MR. EXNICIOS:
17      Please keep your questions
18 to conform to the CMO.
19 MR. DOAK:
20      All you have to do is say
21 "form" and you will have reserved
22 your objection.
23 MR. EXNICIOS:
24      Thank you.  I will follow
25 the guidelines if you agree to do

                                    Page 89

                                    23  (Pages 86 to 89)

| | |
|---|---|
| 1 the same.  So, please keep your | 1 my job is to ask to see. |
| 2 questions to conforming to the | 2      A.   I don't know.  I don't know. |
| 3 CMO. | 3      Q.   Okay.  That's a fair answer. |
| 4 EXAMINATION BY MR. DOAK: | 4           What portion of all of this do you |
| 5      Q.   In your view as a registered nurse, | 5 attribute to an act of God that wasn't |
| 6 you've observed different people have different | 6 anybody's -- |
| 7 mental reactions to things, don't they? | 7      A.   I attribute the hurricane as an act |
| 8      A.   Yes. | 8 of God, and what happened because of the |
| 9      Q.   Mental distress is, as a matter of | 9 hurricane, I don't necessarily consider that an |
| 10 medicine, a highly subjective medical condition, | 10 act of God, no. |
| 11 isn't it? | 11      Q.   Okay.  You consider any of the |
| 12      A.   It can be physical. | 12 consequences that happened from the hurricane as |
| 13      Q.   Yes.  But both the mental side and | 13 unavoidable, just that they were bound to happen |
| 14 the physical side are highly subjective to the | 14 given the severity and intensity of this |
| 15 individual patient, aren't they? | 15 hurricane? |
| 16      A.   Yes. | 16      A.   I'm not exactly sure. |
| 17      Q.   Okay.  And one last time, because | 17      Q.   Okay.  Do you think that the local |
| 18 we've talked about all these things, probably the | 18 levee boards were responsible? |
| 19 last time today I'm going to ask the question, | 19      A.   I don't know what their |
| 20 but I want to confirm before leaving the | 20 responsibility is in maintaining -- I don't know. |
| 21 circumstance and causation questions that there | 21      Q.   Okay.  Do you think that FEMA was |
| 22 aren't any other categories of damages, relief of | 22 responsible for any of your alleged injuries? |
| 23 any kind that you're seeking.  You lost your | 23      A.   FEMA? |
| 24 house entirely, you lost your personal | 24      Q.   Uh-huh. |
| 25 possessions entirely, you have severe mental | 25      A.   No. |
| Page 90 | Page 92 |
| 1 distress and you've had these injuries, pneumonia | 1      Q.   What about the City of New Orleans, |
| 2 and spine and all of the problems that came with | 2 do you think that the City of New Orleans is |
| 3 it as a result of this fungus infection.  Is | 3 responsible in part for some of your injuries? |
| 4 there any other relief than those items, anything | 4      A.   I don't know. |
| 5 in addition to those items that you're seeking | 5      Q.   Might they be?  Are they involved in |
| 6 relief for in this lawsuit? | 6 the levee protection system? |
| 7      A.   Not that I know of. | 7      A.   Are they?  I don't know. |
| 8      Q.   Okay.  Who do you blame for those | 8      Q.   Okay.  State of Louisiana, do you |
| 9 four categories of damages?  Who do you think's | 9 have any sense of blame there? |
| 10 responsible? | 10      A.   I don't know. |
| 11      A.   Who do I think is responsible? | 11      Q.   My client, Washington Group |
| 12      Q.   Uh-huh. | 12 International, do you have any knowledge of |
| 13      A.   People who were supposed to be | 13 anything that you think that Washington Group did |
| 14 maintaining the levee system that we were | 14 that caused your harm? |
| 15 supposedly protected by. | 15      A.   I don't know. |
| 16      Q.   Do you have any more specific detail | 16      Q.   Do you ascribe to the theory that -- |
| 17 than that? | 17 you know, there are articles about this -- some |
| 18      A.   I guess that would be the Corps of | 18 people in New Orleans apparently think that some |
| 19 Engineers. | 19 of the breaches were set by bombs that were |
| 20      Q.   Corps of Engineers.  And other than, | 20 deliberately set? |
| 21 you just said, maintaining the levee system and | 21      A.   Do I believe that? |
| 22 you referred earlier to the consequences of the | 22      Q.   Yes, ma'am. |
| 23 MRGO channel, any other reason you attribute | 23      A.   No. |
| 24 responsibility to the Army Corps of Engineer? | 24      Q.   When did you first start thinking |
| 25 You may not know any of these.  I just -- part of | 25 about filing a lawsuit as a result of your |
| Page 91 | Page 93 |

24  (Pages 90 to 93)

JEANNINE ARMSTRONG (MRGO)                                7/9/2007

1   losses?
2       A.   I guess when we started hearing
3   that, you know, some of the breaches could have
4   been from negligence or not maintaining.
5       Q.   I am going to ask some questions
6   about you and your attorneys.  I'll warn you, so
7   that your own lawyer won't have to, I'm not going
8   to ask questions to invade on the attorney-client
9   privilege.  So, I'm going to try to be careful of
10  where I'm going around the edges of that.  If I
11  make a mistake, I'm sure your counsel will, but
12  I'll just alert you that I'm going to ask some
13  questions in that area that I don't think are
14  privileged.
15          Did you know any of plaintiffs'
16  counsel before Hurricane Katrina?
17      A.   Yes.
18      Q.   I'm sorry?
19      A.   Yes.
20      Q.   Which ones?
21      A.   I know Gibby -- Gibby Andry and Jon
22  Andry.
23      Q.   Okay.  And they're brothers?
24      A.   Yes.
25      Q.   Okay.  Go back to the time when you

Page 94

1       Q.   -- and developed an attorney-client
2   relationship with respect to this litigation.
3       A.   Yes.
4       Q.   Okay.  How was it that you knew
5   Gibby before?
6       A.   We all lived in Chalmette.
7       Q.   So, you knew him from long, long
8   ago?
9       A.   From a kid.
10      Q.   You said earlier that you obviously
11  knew a lot of people in your particular
12  subdivision, but I'm sure that you know a wider
13  assortment of people in St. Bernard Parish, New
14  Orleans East, Lower Ninth, this whole vicinity.
15  Go through with me in your memory people in that
16  geographical area and tell me about their
17  different experiences.  Did you know some other
18  people who had a complete loss of their house and
19  possession like you?
20      A.   Yes.
21      Q.   Do you know people who got off
22  fairly light, maybe just had a few inches of
23  water in their house?
24      A.   I don't know anybody who had a few
25  inches.

Page 96

1   were beginning to think of maybe you would want
2   to be involved in a lawsuit as you began to read
3   and learn about possible negligence and things
4   like that.  What became the precipitating event,
5   if you will, that then took you into a lawyer's
6   office?  Did you pick up the phone and call a
7   lawyer, or did a lawyer post an advertisement or
8   something that you responded to?  What was that
9   first contact?
10      A.   It wasn't advertisement.  We had
11  heard from other people that, you know, there was
12  a movement to, you know, I guess, pursue
13  negligence or -- you know, in the breaches, in
14  the overtopping, in the flooding, in the MRGO and
15  all of that.
16      Q.   Okay.  And as a result of hearing
17  from people that some people in the community
18  were talking more and more --
19      A.   Yes.
20      Q.   -- movement, your word --
21      A.   Yes.  And my husband called Gibby.
22      Q.   Okay.  And then as a result of that
23  telephone call, you went and saw the one or both
24  of the Andry brothers --
25      A.   Yes.

Page 95

1       Q.   What's the lightest that -- of
2   someone you've ever heard of?
3       A.   Four to five feet.
4       Q.   Okay.  And how far away was that
5   from your house?
6       A.   Five miles.
7       Q.   For people that you don't know,
8   aren't you aware that there are people in New
9   Orleans East and St. Bernard Parish who, in fact,
10  had no damage to their house or just a few inches
11  of water?  Don't you know that those people
12  exist, or not?
13      A.   I don't know that those people
14  exist.
15      Q.   Okay.  Do you know people who have
16  suffered severe personal injury as a result of
17  the storm?
18      A.   Yes.
19      Q.   And what were some of their severe
20  personal injuries?
21      A.   A friend of ours' neighbor, not in
22  our neighborhood, in Meraux, a lady -- she
23  drowned.  A lady I worked with, her sister's
24  husband drowned in his attic.
25      Q.   So, two different people drowned?

Page 97

25  (Pages 94 to 97)

1    A.   Yes.
2    Q.   Two deaths.
3    A.   Yes.
4    Q.   Okay.  How about serious personal
5  injury who lived?
6    A.   I can't recall anyone right now.
7    Q.   Did the people in your immediate
8  subdivision largely evacuate?
9    A.   Yes.
10    Q.   What happened to the hospital,
11  Chalmette hospital, nearby?
12    A.   What -- during the storm or after?
13    Q.   During and after the storm.  I mean,
14  was it demolished?
15    A.   Yeah.  The whole first floor was
16  underwater.
17    Q.   Uh-huh.
18    A.   They had to move patients,
19  everything up to the second floor.  Basically,
20  pulled mattresses out, slept on the roof because
21  it was so hot inside.  And the building was
22  condemned.  It's torn down.  It's not there
23  anymore.
24    Q.   What happened to your parents'
25  house?

Page 98

1    A.   It was destroyed.  It's been
2  demolished.
3    Q.   But this home-destruction policy in
4  your area was something that a homeowner could
5  have done for free?
6    A.   Yes.
7    Q.   And, really, avoid paying a big
8  expense if you had to do it yourself?
9    A.   Yes.
10    Q.   But you couldn't do that without
11  your insurance company signing on, I assume, or
12  at least you wouldn't want to until you had your
13  claim resolved, or not?
14    A.   I don't know.  I don't know.  We
15  never okayed it with them, if that's what you're
16  asking, before we had it done.
17    Q.   What do you know about -- do you
18  know of other people in St. Bernard Parish and
19  New Orleans East who went through the storm but
20  who did not incur any personal injury?
21    A.   No.
22    Q.   No?  Everybody you know was injured?
23    A.   Everybody -- mentally, yes,
24  absolutely.
25    Q.   Okay.  So, everybody is --

Page 99

1    A.   Is suffering.
2    Q.   -- suffering mental distress --
3    A.   Absolutely.
4    Q.   -- of some variety, some more than
5  others?
6    A.   Yes.
7    Q.   I'm talking about personal injury as
8  opposed to mental distress.  Do you know people
9  who, although they may have mental distress,
10  weren't injured in their body otherwise?
11    A.   Yes.
12    Q.   And you already said you know some
13  who are injured seriously, some who died, and
14  some who weren't injured at all?
15    A.   Yes.
16    Q.   Do you know some people in the
17  broader area who did not evacuate?  You said
18  everybody in your immediate area did evacuate,
19  you thought.
20    A.   Right.
21    Q.   But, certainly, some people in New
22  Orleans East and St. Bernard did not evacuate,
23  correct?
24    A.   Right.  Yes.  Yes.
25    Q.   And did you know some of them?

Page 100

1    A.   Yes.
2    Q.   And what were their experiences?
3    A.   A friend of ours evacuated to
4  Chalmette High School.  My father had to stay in
5  the city.  He worked at Xavier University.  He
6  was there the entire time and got stuck there.
7    Q.   What happened to the firemen who
8  took the video?
9    A.   They were at the sugar refinery,
10  which is in Arabi, close to the river.  They
11  stayed the entire time, till weeks and weeks
12  after.
13    Q.   What happened to their house?
14    A.   Oh, it was destroyed.
15    Q.   Do you know that many of your
16  neighbors, like you, submitted insurance claims
17  on their homeowner's insurance both for the house
18  itself and for their personal possessions and
19  were paid money on those claims?
20    A.   I would assume they made a claim.
21  If they were paid, I have no idea.
22    Q.   You just don't know?
23    A.   I don't know.
24    Q.   Okay.  You don't read in the
25  newspaper -- I mean, don't you have general

Page 101

26  (Pages 98 to 101)

1  understanding that lots of people have submitted
2  claims and homeowner's have -- insurance
3  companies have paid billions of dollars --
4      A.   I don't know about homeowner's
5  paying billions.
6      Q.   Okay.
7      A.   They -- they -- they haven't paid
8  much.
9      Q.   And why is that?  Because they want
10 to claim everything was due to flooding.
11     A.   Yes.
12     Q.   And homeowners want to claim
13 everything's due to wind and rain in order to
14 maximize the insurance?
15     MR. EXNICIOS:
16         Objection as to form.
17         Go ahead and answer as best
18     you can.  I don't understand the
19     question.
20     A.   Flood -- flood agencies saying it's
21 wind and water, homeowners -- they're just
22 splitting hairs.
23 EXAMINATION BY MR. DOAK:
24     Q.   Do you, by chance, happen to know a
25 Mr. James Bates who lives in Chalmette --

Page 102

1  authorize him to submit it, just say you take
2  care of it, he took care of it and then sent you
3  an informational copy or gave it to you the next
4  time he saw you after it was done?
5      A.   I believe we filled that out.
6      Q.   You believe you filled that out?
7      A.   I believe so.
8      Q.   Okay.  Describe that.  You filled it
9  out at home?
10     A.   Yes.
11     Q.   In handwriting?
12     A.   Yes, I believe.
13     Q.   And maybe gave it to him then?
14     A.   I believe so, if it's what I'm
15 thinking of.
16     Q.   Let me show one to you.  I know I
17 had one for you.
18     MR. EXNICIOS:
19         It may be here.
20     MR. DOAK:
21         You want to put a sticker on
22     that?
23         (Whereupon, Jeannine
24     Armstrong Exhibit Number 3 was
25     marked for identification.)

Page 104

1      A.   No.
2      Q.   -- at 3429 Karen Drive.  Do you know
3  approximately where that is?
4      A.   I know that area.  I don't know that
5  person.
6      Q.   Couple of miles from you?
7      A.   Yeah.
8      Q.   They, apparently, were paid for wind
9  and rain damage on their house.  I just wondered,
10 since it was in Chalmette, if you happened to
11 know those persons?
12     A.   I don't know those people.
13     Q.   Okay.  Let's talk about the Form 95
14 that Mr. Andry submitted to the government for
15 you --
16     A.   Okay.
17     Q.   -- in some detail.  You said that
18 you had seen that form.  I didn't know if you saw
19 it before it was submitted or after it was
20 submitted.  You know, did you go to his office
21 and talk to him and he said, I'm ready to submit
22 this, is this all correct, and he showed it to
23 you like that and you said, yes, and then he sent
24 it in, or did you just delegate it to him and
25 said, you're my lawyer, I have the form, will you

Page 103

1  EXAMINATION BY MR. DOAK:
2      Q.   Ms. Armstrong, I hand you what's
3  been marked Jeannine Armstrong Exhibit Number 3
4  and ask that you examine that document.
5      MR. EXNICIOS:
6         She's really going to
7      examine it.
8         Is that for me or you need
9      this back?
10     MR. DOAK:
11         That's for you.
12 EXAMINATION BY MR. DOAK:
13     Q.   Can you confirm that this is the
14 Form 95 that Mr. Landry (sic) submitted on your
15 behalf to the government?  Near his signature,
16 the date is June 23, 2006?
17     MS. BERTAUT:
18         It's Andry.
19     MR. EXNICIOS:
20         Just for clarification, it's
21     Andry.
22     MR. DOAK:
23         Andry?
24     MR. EXNICIOS:
25         Yeah, Andry.  Landry is

Page 105

27  (Pages 102 to 105)

JEANNINE ARMSTRONG (MRGO)                                    7/9/2007

1    actually his brother-in-law.
2        MS. BERTAUT:
3        That's right.
4    MR. EXNICIOS:
5        Yeah.
6    THE WITNESS:
7        What was the question?  I'm
8    sorry.  What was the question?
9    EXAMINATION BY MR. DOAK:
10       Q.   I was just asking if you now
11   recognize this as the claim form that Mr. Landry
12   submitted to the government on your behalf?
13       A.   Yes.
14   MR. EXNICIOS:
15       Andry.
16   MS. BERTAUT:
17       Jonathan Andry.
18   MR. DOAK:
19       I have a special talent with
20   words sometimes.  When I say
21   "Landry," I mean "Andry."
22   MR. EXNICIOS:
23       The problem is there's
24   another lawyer on the case who is
25   Landry.
                                    Page 106

1    wrote, is it?
2        A.   No.
3        Q.   Okay.  Do you know what became of
4    the language that you wrote?
5        A.   I don't know.
6        Q.   Do you recall what kind of words you
7    used to answer this question?  What -- what did
8    you say when you wrote it out in hand what was
9    the basis of the claim?
10       A.   I don't remember exactly what we
11   wrote.  I know it was basically that our house
12   flooded and we were saying that it -- you know,
13   it was from -- from the MRGO, from the breaches
14   in the levee, from the not properly maintaining,
15   not properly taking care of.
16       Q.   From your earlier testimony today, I
17   would have thought that you would have also
18   mentioned the Industrial Canal.
19       A.   Exactly.
20       Q.   And what else do you recall that you
21   might have written when you completed this form
22   in handwriting?
23       A.   What else?
24       Q.   Do you recall any other details of
25   what else you might have said when you completed
                                    Page 108

1    MR. DOAK:
2        I wish I could claim that
3    was my problem, but it's nothing
4    so benign.
5    EXAMINATION BY MR. DOAK:
6        Q.   So, this is the Form 95 that your
7    lawyer submitted to the government for you; is
8    that correct?
9        A.   Yes.
10       Q.   And it's dated June 23 of 2006?
11       A.   Yes.
12       Q.   Look at the top of the second page.
13   In Box Number 8, there's a place to state the
14   basis of the claim.  It states to state in detail
15   the known facts and circumstances attending the
16   damage, injury or death.  I'll give you a moment
17   to read the couple of sentences that are typed in
18   there.
19       A.   Okay.
20       Q.   Now, your recollection a moment ago
21   was that you thought you had completed one of
22   these forms at home in handwriting and then given
23   that to your attorney.
24       A.   Uh-huh.
25       Q.   But this isn't the language that you
                                    Page 107

1    this Item 8 of the form in handwriting?
2        MR. EXNICIOS:
3        Can I object just for
4        clarification, make sure we're not
5        going to communications between
6        her and Jon or Gibby.  Strictly on
7        what she may have put in that box,
8        correct?
9        MR. DOAK:
10       Yes.
11   EXAMINATION BY MR. DOAK:
12       Q.   I'm going to start over a little
13   bit.
14       A.   Okay.
15       Q.   When you said "we had prepared
16   this," I assumed that you were referring to that
17   your husband and you worked together to prepare a
18   blank Form 95.
19       A.   Yes.  Yes.
20       Q.   And you worked together to write in
21   by hand what you thought would be the content for
22   the various boxes on this preprinted form.
23       A.   Yes.
24       Q.   And when you were done with that,
25   you mailed it or delivered it to one of your
                                    Page 109

28  (Pages 106 to 109)

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

1   attorneys; is that correct?
2       A.   Yes.
3       Q.   Okay.  So, I just want to talk about
4   what happened at home when you and your husband
5   were at the table filling out one of these forms.
6   Do you recall any more detail about what you all
7   wrote in this Box 8?  You already told me some
8   things about from MRGO, which is included here,
9   but you also mentioned the breaches in the
10  levees, that they were not maintained right, that
11  your description would have included a reference
12  to the Industrial Canal.
13      A.   Yes.
14      Q.   I'm wondering if your handwritten
15  version would have contained any other detail
16  that you can remember today.
17      A.   Not that I remember.
18      Q.   Okay.  Let's move down to in Box 9,
19  you see Property Damage and in the second half of
20  that, it says:  Briefly describe, and there's a
21  sentence that reads:  The damage was a complete
22  loss of structure and contents located at -- is
23  this the language that you recall writing?
24      A.   Yes.
25      Q.   Okay.  And is this language

                                        Page 110

1   identified in the form to your lawyer?
2       MR. EXNICIOS:
3           Objection.  That's
4       privileged.  You're talking about
5       what she identified between her
6       and her lawyer.
7       MR. DOAK:
8           No, the underlying fact, in
9       fact, is not privileged.
10      MR. EXNICIOS:
11          Rephrase your question.
12  EXAMINATION BY MR. DOAK:
13      Q.   How does this typed version of Item
14  10 compare to that language that you and your
15  husband wrote at home in handwriting?
16      A.   Negligence as in the Corps of
17  Engineers, is that what you're referring to?
18      Q.   Yes.
19      A.   Yes.  Yes.  Do we feel it's a
20  negligence?
21      Q.   Uh-huh.
22      A.   Yes.  Absolutely.  Yes.
23      Q.   And I take it that your pneumonia
24  and back injury were not listed because they had
25  not yet developed on this date.

                                        Page 112

1   accurate?
2       A.   Yes, 4016 Hamlet.  Yes.
3       Q.   And this comports with your
4   testimony today.
5       A.   Yes.
6       Q.   Complete loss of the structure and
7   the contents in your house.
8       A.   Yes.
9       Q.   Okay.  And then in Item Number 10,
10  you are asked to identify personal injury and to
11  state the nature and extent of any injury which
12  you are claiming, and I'll give you a minute to
13  read the typed in description.
14      A.   Okay.
15      Q.   This is not the description you
16  wrote at home with your husband, is it?
17      A.   Loss of property, all possessions,
18  yes.  Mental distress, yes.
19      Q.   But in Box Number 10, when you're
20  asked to state the nature and extent of each
21  injury, not property damage, now, the losses
22  above there, I understand, the loss of the
23  structure and the contents, that's right, but for
24  your injury, is this language what you wrote in
25  handwriting -- is this the only thing you

                                        Page 111

1       A.   I was being treated for the
2   pneumonia at that time.
3       Q.   Okay.
4       A.   I was diagnosed during June.
5       Q.   On the handwritten form of this form
6   that you prepared at home, would you have listed
7   that pneumonia at that time?
8       A.   No.  I didn't know I was in
9   pneumonia at that time.
10      Q.   Okay.  And is that why you didn't
11  list it, that you didn't correlate it to
12  Hurricane Katrina?
13      A.   Right.  Right.
14      Q.   Okay.  When you prepared this at
15  home, directing your attention on further down to
16  Box 12a, there is a box for property damage, and
17  12b for personal injury, now, I will refer you --
18  the way this form, up in 9 above, property
19  damage, they're combining your house, contents
20  and your possessions, all of that together.
21      A.   Okay.
22      Q.   So, that's what 12a is for in
23  property damage.  On this typed form, it says
24  $500,000.  Do you know what dollar number you and
25  your husband wrote in the form that you did in

                                        Page 113

                        29  (Pages 110 to 113)

1  handwriting?
2        A.   I would believe it was that.
3        Q.   So, you believe your house was 160,
4  $170,000 and your possessions were $330,000?
5        A.   Yeah.  You take a count of
6  everything in your house, it adds up quickly.
7        Q.   Okay.
8        A.   From any -- from a spoon to a shirt
9  to your furniture to your appliance -- it adds
10 up.
11       Q.   So, you think the 500,000 number is
12 one you provided?
13       A.   Yes.
14       Q.   And the personal injury, do you
15 believe $500,000 is the number that you provided
16 for your emotional distress --
17       A.   Yes.
18       Q.   -- claim?  Okay.  So, you basically
19 agree with the form as submitted except for
20 Paragraph 8, the basis of the claim.  You had
21 described more broadly in your handwritten
22 version than the description in this typed
23 version.
24       A.   I would say yes.
25       Q.   And your husband was doing this at

                                            Page 114

1  intention, or was it 500,000?
2        A.   I'm not sure.
3        Q.   Well, as you sit here today, are you
4  seeking in this lawsuit for your house and your
5  personal possessions $500,000 or $1 million?
6        A.   I guess together, as a family --
7        Q.   Yes.
8        A.   -- the million.
9        Q.   Okay.  And your personal injury
10 claim was 500,000.  We couldn't ever determine
11 what the other doctors were, but if you have
12 500,000 here plus your hospital bill of 280,
13 we're up to 780,000.  So, it sounds like your
14 total injury claim now is approximately a million
15 dollars --
16       A.   Yes.
17       Q.   -- subject to looking at all of
18 those bills which we have requested in
19 discovery --
20       A.   Yes.
21       Q.   -- but would that be a fair estimate
22 as we sit here today?
23       A.   I'd say yes.
24 MR. DOAK:
25       I think that is a good place

                                            Page 116

1  the same time.
2        A.   Yes.
3        Q.   Do you know that your lawyer
4  submitted a identical form on behalf of your
5  husband?
6        A.   Yes.
7        Q.   Okay.  Did your -- has your husband
8  also suffered emotional distress?
9        A.   Yes.
10       Q.   Do you believe that it is as severe
11 as your emotional distress?
12       A.   Yes.  He just handles it
13 differently.
14       Q.   I'm sorry?
15       A.   He handles it differently than I do.
16       Q.   Did he also grow up in this
17 neighborhood?
18       A.   Yes.
19       Q.   So, the stories are pretty much the
20 same?
21       A.   Yes.
22       Q.   Okay.  Did you all intend to submit
23 two claims for $500,000 each for property damage?
24 That would mean that your house and contents,
25 you're claiming $1 million for?  Was that your

                                            Page 115

1  to end that subject and take our
2  lunch break.
3  THE VIDEOGRAPHER:
4        We're going off the record
5  at 12:01.
6        (Whereupon, a discussion was
7  held off the record.)
8  THE VIDEOGRAPHER:
9        We're back on the record at
10 1:23.  This is beginning of Tape
11 3.
12 MR. DOAK:
13       I have one housekeeping
14 matter to take up with Counsel,
15 just that I had forgotten to do
16 this morning, and that is in our
17 Notice of Deposition, we attached
18 as Exhibit A a document request
19 which was largely redundant of the
20 document request that we had
21 propounded as separate document
22 request and which is currently the
23 subject of a Motion to Compel.
24 Defendants' counsel agreed that
25 plaintiffs did not need to file a

                                            Page 117

JEANNINE ARMSTRONG (MRGO)                                    7/9/2007

1       Motion For Protective Order in
2       advance of this deposition and
3       both sides would simply await the
4       Court's ruling on the Motion to
5       Compel which has been filed and is
6       scheduled for hearing, I guess,
7       next week.  So, I just wanted to
8       ask Mr. --
9       MR. EXNICIOS:
10          Exnicios.
11      MR. DOAK:
12          -- Exnicios to confirm that
13      the plaintiffs will not be
14      producing any documents in
15      response to this document request
16      today, but withholding that until
17      we resolve the matter with the
18      judge next week at the motion to
19      compel.
20      MR. EXNICIOS:
21          That is correct.  The
22      parties have agreed to not produce
23      documents today in light of the
24      pending arguments in front of the
25      judge and the magistrate.
                                    Page 118

1   of, you know, this was a hole, that was a hole,
2   stuff like that.
3       Q.   I really don't think I have anything
4   else on that insurance claim form.
5           Similar question with respect to the
6   flood insurance claim against Allstate.  Who was
7   your Allstate agent to whom you submitted the
8   claim?
9       A.   His name is Jim Turlington.
10      Q.   And where does he work?
11      A.   I believe he's also on the west
12  bank.
13      Q.   Do you know the name of his company?
14      A.   I don't.
15      Q.   And do you know what documents, if
16  any, you all have at home in your possession
17  about the process -- submission of that claim or
18  the processing of that claim or the amount of
19  proceeds paid?
20      A.   I believe the amount -- I know we
21  were insured for 52, minus deductibles.  That's
22  what we received.
23      Q.   Do you know, though, what documents
24  you might have about that at home?
25      A.   Like?
                                    Page 120

1   EXAMINATION BY MR. DOAK:
2       Q.   Okay.  Continuing on, we were
3   talking about various kinds of claims that you
4   may have submitted for money or assistance of any
5   kind, and we, I think, had finished the Form 95
6   that was submitted to the government.
7           Next, I wanted to turn to the
8   homeowner's insurance and the flood insurance.  I
9   think we've largely covered this earlier in our
10  discussion.  The homeowner's, you said you
11  submitted to Liberty Mutual, and I believe that
12  you gave me the name of your agent.
13      A.   Yes.
14      Q.   And do you know what documents, if
15  any, you might have in your possession with
16  respect to either the submission of this claim or
17  the results of that claim?
18      A.   I know we have, like, the -- the --
19  the check stub, the bottom part of the check that
20  we received.
21      Q.   Yes.
22      A.   I believe we have some papers from
23  Liberty Mutual that when the guy came in and did
24  the adjustment -- the adjuster -- it's like a
25  description of the house and it's like a diagram
                                    Page 119

1       Q.   Either the claim form itself or --
2       A.   We did it over the telephone.
3       Q.   Okay.
4       A.   Strictly over the telephone.
5       Q.   Okay.
6       A.   They called up and basically wanted
7   a description of what was in your home, what you
8   had in your home, type of flooring, type of
9   lighting, just down -- you know -- and that was
10  it, and then they called up and said okay.
11      Q.   But this was all covered because
12  most of your damage was flood damage.
13      A.   Yes.
14      Q.   So, this was easy.
15      A.   Fifty-two thousand was absolutely
16  easy.
17      Q.   Did you make any claims in
18  connection with the Murphy Oil spill?
19      A.   No.
20      Q.   I know that we still have to talk
21  about The Road Home Program, but besides that,
22  we've got the Form 95, the homeowner's insurance,
23  the flood insurance, The Road Home Program.  Are
24  there any other sources of help for Hurricane
25  Katrina that you all contacted, made claims for?
                                    Page 121

                                    31  (Pages 118 to 121)

JOHNS PENDLETON COURT REPORTERS                          800 562-1285

JEANNINE ARMSTRONG (MRGO)                                              7/9/2007

Page 122

1   Red Cross, state government, federal government,
2   city program, anything at all?
3        A.   We contacted Red Cross -- we were
4   still in a hotel -- so, soon after the storm.
5   And you had to call and tell them how many people
6   lived in your home and their Social Security
7   number, their ages and that, and I think they
8   sent -- I know it was $1,500 that we got from Red
9   Cross, and it was so much per head, like that.
10       Q.   And that was merely a payment for
11  temporary living expenses?
12       A.   Exactly, yes.
13       Q.   Okay.  Any other forms of assistance
14  that you --
15       A.   We received housing assistance from
16  FEMA.
17       Q.   Yes.
18       A.   Rental assistance.
19       Q.   Tell me about that.
20       A.   We received rental assistance until
21  June of last year, and that was it.
22       Q.   What was the amount of that per
23  month?
24       A.   I think it was, like -- we received,
25  like, $2,200 for a three-month period.

Page 123

1        Q.   Okay.  Any other programs besides
2   Road Home that you applied for?
3        A.   No.
4        Q.   Okay.  Tell me about The Road Home
5   Program.
6        A.   Road Home Program is supposed to
7   be -- I would guess -- this is only my
8   interpretation of it -- a gap to fill in of what
9   you had in insurance, what your home was worth,
10  and then if there was a gap in between that.
11  They give you a prestorm estimate of your home to
12  repair your home, back to get it up in order, and
13  then they -- prestorm value, estimated cost to
14  repair, and you have an option -- minus -- the
15  maximum you can receive from Road Home is
16  150,000.  Okay.  So, they come up with all these
17  figures, minus what you receive from insurance,
18  minus if you received any FEMA money, and if that
19  comes within that gap, you would be awarded X
20  amount of dollars.  And when you're awarded that
21  money, you're basically signing over your home to
22  the state.  You're basically selling your house
23  to them for that amount.
24       Q.   And what was the claims process for
25  that?  You said this morning that you had filled

Page 124

1   out some papers.
2        A.   You filled out an application
3   online.  Then, you received a postcard in the
4   mail.  You had to go meet with them.  Basically,
5   met with them, brought all your paperwork with
6   you, your W-2 forms, your insurance policies, all
7   of that kind of stuff.  Then, months later, you
8   were called back to go over anything else, if
9   there was any holes in it.  Then you received --
10  it's called the Golden Letter.  It's a letter on
11  yellow paper, and they come up -- that's where it
12  has all of the figures of what they say your
13  house was worth, repairing your home, if you want
14  to elevate your home and all that kind of stuff.
15       Q.   And when did you -- you said that
16  process for you began with going online to
17  complete the form.  Approximately when would that
18  have been?
19       A.   I would say early 2006.
20       Q.   And approximately when did you have
21  this meeting?
22       A.   It was in November of '06.
23       Q.   And by the end of that meeting with
24  The Road Home people, had you reconciled any
25  omissions or questions they had?

Page 125

1        A.   No.  The only thing at that meeting
2   was basically you were giving them your
3   information, and then it goes away, and then they
4   communicate with you through the mail.
5   Basically, all you're doing is giving your
6   information at that meeting.  There's no discuss
7   of figures or anything like that until you get
8   that letter in the mail.
9        Q.   I thought that the information was
10  provided on a homeowner application that you
11  committed online.
12       A.   You do, but you have to physically
13  bring it with you.  They made copies.  They put
14  it onto a DVD for you.
15       Q.   Okay.  I see.  So, you just print
16  the form out from online and then you print it
17  out and bring the supporting documentation, and
18  that's the first time you actually turned the
19  package over to them?
20       A.   Yes.
21       Q.   So, that submission, if you will, of
22  your Road Home application and supporting papers
23  wasn't done until November of '06?
24       A.   Yes.
25       Q.   And you have heard nothing since

32  (Pages 122 to 125)

JEANNINE ARMSTRONG (MRGO)                                              7/9/2007

1  then?
2      A.    No.  We received a letter in the
3  mail in January.
4      Q.    Oh, okay.  Which said?
5      A.    Which said they had a value of our
6  home, they had a estimated cost to repair, they
7  had an amount that they would pay if you wanted
8  to raise your home and they had an award amount
9  that they called it that you would -- which was
10  the gap.
11      Q.    Okay.  And what was your award
12  amount?
13      A.    Sixty-nine thousand.
14      Q.    And that would be the option that
15  you all would be taking, correct?
16      A.    As of now, no.  We are what they
17  call resolution, which means we're disputing the
18  prestorm value of our home.  We think it's below
19  the market value.  So, we've been in resolution
20  since January.
21      Q.    And what did they identify as the
22  value of your home on August 29, 2005?
23      A.    They said 140,000.
24      Q.    And in this resolution program,
25  you're maintaining that the value is what?

Page 126

1  Because they said that houses on the main
2  boulevard into our subdivision, which is, you
3  know, a boulevard with the neutral ground in the
4  middle, houses on that sold for 80,000, and
5  there's no way -- before the hurricane.  No way.
6      Q.    Did you keep a copy of the
7  application form that you printed off the
8  internet and then turned in at this meeting in
9  November?  Did you keep a copy of that for your
10  files?
11      A.    I'm sure we do.
12      Q.    And as I understand it, that Road
13  Home Program is limited in scope to just houses,
14  not other -- not personal property, not injuries.
15  It's just a program to recover the so-called gap
16  on people who lost their home.  Is that -- do I
17  have that understanding --
18      A.    I believe so, yes.
19      Q.    What is your understanding of your
20  role as a class representative in this case?
21      A.    My understanding is that I'm just
22  like everybody else in the parish.  I lost
23  everything, like everybody else.  You know, a
24  person who was born there, raised there, grew up
25  there, went to school there, worked there.  Just

Page 128

1      A.    One sixty to 175.
2      Q.    And do you have any forecast of
3  timing?  You've been in this resolution process
4  since January.
5      A.    (Nods head affirmatively.)  And I
6  called last week and they said you're in
7  resolution.  That's it.
8      Q.    So, nobody knows.
9      A.    No.  No.
10      Q.    Did you offer any additional
11  justification for your 160 to $175,000 proposed
12  value?
13      A.    For what other homes sold in the
14  neighborhood for.
15      Q.    And was there documentation for
16  that?
17      A.    At the courthouse, there is.
18      Q.    Was any presented to Road Home?
19      A.    They don't go by that.  They go by
20  what they say their adjusters found your home was
21  worth.
22      Q.    And how do their adjusters work?
23      A.    I have no idea.
24      Q.    Do they come out individually?
25      A.    I'm assuming so.  I have no idea.

Page 127

1  a regular --
2      Q.    Do you know anything about the
3  duties of a named plaintiff class representative?
4      A.    Yes.
5      Q.    And what are those duties?
6      A.    Well, I think you need to give a
7  fair, legitimate testimony of what you lost and
8  everything like that.
9      Q.    Have you been told by anyone that by
10  participating in this case as a named
11  representative you would receive any kind of
12  money or thing of value other than what you would
13  receive in satisfaction of your claim?
14      A.    That I would receive additional
15  or --
16      Q.    Yes.
17      A.    No.
18      Q.    Do you know what subclass you're
19  representing?
20      A.    What do you mean by "subclass"?
21      Q.    The class as proposed, and sometimes
22  there is a single class and sometimes the single
23  class is broken up into subclasses.  Do you know
24  any of the details of that?  You may not.
25      A.    I don't know that.

Page 129

33  (Pages 126 to 129)

JEANNINE ARMSTRONG (MRGO)                                    7/9/2007

| | |
|---|---|
| 1  Q.   Do you know anything about | 1  Q.   My name's Jay Bearden.  I represent |
| 2  individuals who were named plaintiffs in earlier | 2  the Lake Borgne Levee District.  I'm just going |
| 3  filed proposed class actions -- | 3  to have a few quick questions for you.  I hope to |
| 4  A.   No. | 4  get finished with this real fast. |
| 5  Q.   -- but who no longer are named | 5  Some of this information, you may |
| 6  plaintiffs? | 6  have already provided to your lawyers.  I just |
| 7  A.   No. | 7  want it to have it on the record so we have a |
| 8  Q.   Do you know any of the other named | 8  clean transcript. |
| 9  plaintiffs in this class action? | 9  Q.   What's your date of birth? |
| 10  A.   My husband. | 10  A.   November 8th, 1962. |
| 11  Q.   Yeah.  Besides him. | 11  Q.   You have a driver's license? |
| 12  A.   No. | 12  A.   Yes. |
| 13  Q.   Okay.  What is your understanding of | 13  Q.   Can we get a copy of your driver's |
| 14  what group of people you're representing in this | 14  license and attach it as an exhibit to the |
| 15  case? | 15  deposition?  I think we're on 4, I believe.  You |
| 16  A.   St. Bernard area. | 16  have your driver's license with you? |
| 17  Q.   And what?  Who went through the | 17  A.   No. |
| 18  hurricane?  Who had any damage?  Who had a total | 18  Q.   No, you don't. |
| 19  loss?  What? | 19  A.   I don't.  I didn't put my wallet in |
| 20  A.   I think it was anybody who suffered | 20  my purse. |
| 21  damage. | 21  MR. BEARDEN: |
| 22  Q.   Any kind of damage.  Property | 22  All right.  I'm going to |
| 23  damage, personal injury -- | 23  specifically ask your lawyer.  I |
| 24  A.   Yes. | 24  know it's already been produced in |
| 25  Q.   Mental distress -- | 25  discovery.  I just wanted it to |
| Page 130 | Page 132 |

| | |
|---|---|
| 1  A.   Yes. | 1  attach to the deposition. |
| 2  Q.   -- lost profits? | 2  MR. EXNICIOS: |
| 3  A.   Yes. | 3  We can send it.  Not a |
| 4  MR. DOAK: | 4  problem. |
| 5  You want to either take a | 5  EXAMINATION BY MR. BEARDEN: |
| 6  five-minute break in place or we | 6  Q.   Your Social Security number? |
| 7  can take a formal break and let me | 7  A.   438 -- no -- |
| 8  confer with my colleagues for a | 8  MR. EXNICIOS: |
| 9  few minutes. | 9  Can we pause for a second? |
| 10  MR. EXNICIOS: | 10  How secure is all this |
| 11  Why don't we take about five | 11  transmission and so forth? |
| 12  minutes.  I can go to the | 12  MR. BEARDEN: |
| 13  bathroom. | 13  I'm not online at all.  I |
| 14  THE VIDEOGRAPHER: | 14  don't know. |
| 15  We're going off the record | 15  MS. BERTAUT: |
| 16  at 1:42. | 16  I don't think I'm online. |
| 17  (Whereupon, a discussion was | 17  MR. BEARDEN: |
| 18  held off the record.) | 18  It's just Social Security |
| 19  THE VIDEOGRAPHER: | 19  numbers are -- |
| 20  We're back on the record at | 20  MR. BEARDEN: |
| 21  1:55. | 21  I don't know whether they're |
| 22  MR. DOAK: | 22  streaming or not.  I have no idea. |
| 23  I am done with my | 23  MR. EXNICIOS: |
| 24  questioning. | 24  That's what I'm asking. |
| 25  EXAMINATION BY MR. BEARDEN: | 25  THE VIDEOGRAPHER: |
| Page 131 | Page 133 |

34  (Pages 130 to 133)

JEANNINE ARMSTRONG (MRGO)                                          7/9/2007

```
 1        It is streaming online.
 2   MR. EXNICIOS:
 3        Is it secure?  Can we write
 4   it down and slide it to you?  I
 5   know it sounds ridiculous, but in
 6   this day and age --
 7   MR. BEARDEN:
 8        Will you write your Social
 9   Security number down and we'll
10   attach it as an exhibit to the
11   deposition.  The driver's license
12   we're going to make, in
13   abstention, 4, I think; the Social
14   Security number with the piece of
15   paper on it will be 5.
16        (Whereupon, Jeannine
17   Armstrong Exhibit Number 4 and
18   Jeannine Armstrong Exhibit Number
19   5 were marked for identification.)
20   EXAMINATION BY MR. BEARDEN:
21   Q.   Do you have any criminal history?
22   A.   No.
23   Q.   Never been arrested?
24   A.   No.
25   MR. EXNICIOS:
                              Page 134
```

```
 1   Q.   Apologize for the delay.  I'm just
 2   running through some of my notes here.  These are
 3   going to be sort of off-the-wall questions
 4   because most of the stuff, everything was covered
 5   very well before.
 6        Did you keep any kind of diary or
 7   journal in any way relating to Hurricane Katrina?
 8   A.   No.
 9   Q.   Do you have any receipts or other
10   documents to evidence expenses associated with
11   your evacuation and relocation because of
12   Hurricane Katrina?
13   A.   I have receipt from the hotel we
14   stayed in.  I have rental receipts where we
15   stayed in Baton Rouge and then from where we're
16   staying in Covington.
17   Q.   Do you have any sort of spreadsheet
18   or itemization of all of the expenses that you
19   had because of your evacuation?
20   A.   No.
21   Q.   Have you provided those receipts to
22   your attorneys --
23   A.   No.
24   Q.   -- from your hotel?
25   A.   No.
                              Page 136
```

```
 1        I should have objected to
 2   that, but I think she answered
 3   already.
 4   EXAMINATION BY MR. BEARDEN:
 5   Q.   Arrested in the last five or ten
 6   years.
 7   A.   Never.
 8   Q.   You were never in the military, were
 9   you?
10   A.   No.
11   Q.   Was your husband in the military?
12   A.   No.
13   Q.   You ever been treated for drug
14   abuse?
15   A.   No.
16   Q.   Alcohol abuse?
17   A.   No.
18   Q.   You ever had a history of
19   depression?
20   A.   No.
21   Q.   Other than what you've already
22   talked about here today?
23   A.   No.
24   Q.   Prior to Katrina?
25   A.   No.
                              Page 135
```

```
 1   Q.   How much were you making as a nurse
 2   before Hurricane Katrina?
 3   A.   Hourly?
 4   Q.   Yeah.  Is that how you were paid,
 5   hourly?
 6   A.   We were paid hourly, and in my
 7   department, we took call.  So, you had call
 8   during the week, you had call on weekends.  I
 9   think it was, like, 26 an hour.
10   Q.   Did you have benefits?
11   A.   Yes.
12   Q.   Okay.  What were they?
13   A.   I had medical benefits.  I had
14   disability benefits.
15   Q.   Did you have a 401(k)?
16   A.   Yes.
17   Q.   I don't know if this was asked to
18   you before; if it was, I apologize.  Do you have
19   any plans to return to work?
20   A.   Yes.
21   Q.   Have you started looking for a job?
22   A.   Not yet.
23   Q.   Okay.  You said you're an RN.  What
24   was your specialty?  What unit did you work in?
25   A.   At the time of the hurricane, I
                              Page 137
```

                                        35  (Pages 134 to 137)

JEANNINE ARMSTRONG (MRGO)                                    7/9/2007

1  worked in Special Procedures.
2       Q.   Which is what?
3       A.   Which we did endoscopy and special
4  procedures, as in lung biopsies, liver biopsies,
5  bronchoscopies, colonoscopies, gastro, into the
6  stomach.
7       Q.   When do you plan on -- or do you
8  have a date by which you plan on starting to look
9  for a job again?
10      A.   I go back to the doctor in
11 September, and I hope then.
12      Q.   For -- which doctor is that?
13      A.   That's Dr. Steck, who did the
14 surgery on my back.
15      Q.   On your back.  Is that the reason
16 why you're out of work right now, is because of
17 the back surgery?
18      A.   Yeah.  Physically, I just --
19      Q.   That's what I'm asking.
20      A.   Yes.
21      Q.   So, if Dr. Steck releases you to
22 return to work, you plan on going back?
23      A.   Yes.
24      Q.   Have you and your husband filed
25 income tax returns?

                                  Page 138

1       A.   Yes.
2       Q.   Every year?
3       A.   Yeah.
4       Q.   So, for 2000 through 2006?
5       A.   Yes.
6       Q.   Okay.  Did y'all own any type of
7  business?
8       A.   No.
9       Q.   No home businesses or anything like
10 that?
11      A.   Nope.
12      Q.   Did you prepare your own tax returns
13 or did you have them done by a -- a --
14      A.   Someone prepared them.
15      Q.   Do you know who?
16      A.   For what years?
17      Q.   Say, 2000 through 2006.
18      A.   2006 was Steve Kissee, and then
19 Frank Aurderer (phonetic) did them, but I'm not
20 sure which year -- he did them first and then
21 Steve Kissee's done the past few years.
22      Q.   Are those both CPAs?
23      A.   Steve Kissee is.
24      Q.   Are they local?
25      A.   Yes.

                                  Page 139

1       Q.   Where are they?
2       A.   In Metairie.
3       Q.   Do they have a name of a business or
4  is that just a name of the CPA that you know of?
5       A.   I think it's Cheramie & Kissee or
6  Kissee & Cheramie.
7       Q.   Did you have a mortgage on your
8  house?
9       A.   Yes.
10      Q.   Has that mortgage been paid off?
11      A.   Yes.
12      Q.   You paid that with the proceeds of
13 your insurance?
14      A.   Yes.
15      Q.   How much was your mortgage for?
16 When you paid it off, what was the payoff value
17 of your mortgage?
18      A.   Eighteen thousand.
19      Q.   How much more do you hope to get out
20 of LRA, or The Road Home?
21      A.   How much more?  I haven't gotten a
22 penny from them.
23      Q.   You said there's a dispute, I think,
24 between your resolution --
25      A.   Right.  Right.

                                  Page 140

1       Q.   -- between what they've offered you
2  and what you think you're entitled to.  How much
3  more do you think you're entitled to?
4       A.   I'd hope to get the fair market
5  value for my house, which would be -- they
6  offered us 140 -- say 160.  Twenty thousand.
7       Q.   So, you think -- you're in
8  resolution for another $20,000 from LRA?
9       A.   Yes.
10      Q.   Did you have any kind of SBA loan?
11      A.   Do we now?
12      Q.   Did you have an SBA loan?
13      A.   No, not before.  No.
14      Q.   Before what?
15      A.   Not before the hurricane.
16      Q.   That's a bad question on my part.
17           Do you -- at any point in time
18 subsequent to Hurricane Katrina, have you applied
19 for and/or received an SBA loan?
20      A.   Prior to Katrina, no.
21      Q.   Post-Katrina.
22      A.   Yes.
23      Q.   How much was your SBA loan for?
24      A.   We don't have an SBA loan yet.
25      Q.   You've applied for?

                                  Page 141

                              36  (Pages 138 to 141)

JEANNINE ARMSTRONG (MRGO)                                          7/9/2007

| | |
|---|---|
| 1    A.   We've applied. | 1              WITNESS' CERTIFICATE |
| 2    Q.   Okay.  How much have you requested? | 2 |
| 3    A.   You don't request. | 3 |
| 4    Q.   Okay.  Fill me in.  I'm ignorant in | 4 |
| 5  terms of how this works.  You have to educate me. | 5        I, JEANNINE B. ARMSTRONG, read or |
| 6    A.   Basically, you have to find a home | 6  have had the foregoing testimony read to me and |
| 7  that you want, and then you apply for that | 7  hereby certify that it is a true and correct |
| 8  amount.  And the maximum amount, from what I | 8  transcription of my testimony, with the exception |
| 9  understood it, for an SBA loan is 250 -- 250,000. | 9  of any attached corrections or changes. |
| 10   Q.   Is that what you're hoping to get, | 10 |
| 11  250,000? | 11 |
| 12   A.   It depends on how expensive a house | 12 |
| 13  I buy. | 13 |
| 14   Q.   Okay.  Is that what you're hoping to | 14 |
| 15  use the money for, is to buy a house? | 15          (Witness' Signature) |
| 16   A.   Yes. | 16 |
| 17   Q.   Have you been contacted or contacted | 17 |
| 18  anyone regarding television interviews or | 18 |
| 19  newspaper interviews or other media outlets | 19 |
| 20  regarding Hurricane Katrina? | 20 |
| 21   A.   No. | 21 |
| 22   Q.   Have you given any interviews at all | 22 |
| 23  to the media about your experiences with | 23 |
| 24  Hurricane Katrina? | 24 |
| 25   A.   No. | 25 |
| Page 142 | Page 144 |

| | |
|---|---|
| 1    Q.   Did you file a lawsuit for Hurricane | 1            REPORTER'S CERTIFICATE |
| 2  Katrina about -- related to your homeowner's | 2 |
| 3  insurance?  The payment that you received from | 3 |
| 4  your homeowner's insurance, did you file any kind | 4        I, CAROL VALLETTE SLATER, Certified |
| 5  of lawsuit suing them? | 5  Court Reporter, Registered Professional Reporter, |
| 6    A.   No. | 6  in and for the State of Louisiana, as the officer |
| 7    Q.   No.  Other than the lawsuit that | 7  before whom this testimony was taken, do hereby |
| 8  we're here today to talk about, have you been | 8  certify that JEANNINE B. ARMSTRONG, after having |
| 9  involved in any other litigation? | 9  been duly sworn by me upon authority of R.S. |
| 10   A.   No. | 10  37:2554, did testify as hereinbefore set forth in |
| 11   Q.   At all in the past? | 11  the foregoing pages; that this testimony was |
| 12   A.   No. | 12  reported by me in the stenotype reporting method, |
| 13  MR. BEARDEN: | 13  was prepared and transcribed by me or under my |
| 14       That's all the questions I | 14  personal direction and supervision, and is a true |
| 15  have.  Thank you. | 15  and correct transcript to the best of my ability |
| 16  THE VIDEOGRAPHER: | 16  and understanding; that I am not related to |
| 17       This concludes this | 17  counsel or the parties herein, nor am I otherwise |
| 18  videotaped deposition.  We're | 18  interested in the outcome of this matter. |
| 19  going off the record at 2:07. | 19 |
| 20       (Whereupon, the testimony of | 20 |
| 21  the witness was concluded.) | 21     CAROL VALLETTE SLATER (CCR 78020) |
| 22 | CERTIFIED COURT REPORTER |
| 22 | REGISTERED PROFESSIONAL REPORTER |
| 23 | 23 |
| 24 | 24 |
| 25 | 25 |
| Page 143 | Page 145 |

                                        37 (Pages 142 to 145)

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

**IN RE:**  KATRINA CANAL BREACHES      CIVIL ACTION
**CONSOL**IDATED LITIGATION

                                   NO. 05-4182
                                     "K" (2)
**PERTAINS TO:**  MRGO              JUDGE DUVAL

**FILED IN:**  05-4181, 05-4182,    MAG. WILKINSON
**05-5237,** 05-6073, 05-6314,
05-6324, 05-6327, 05-6359,
06-0225, 06-0886, 06-1885,
06-2152, 06-2278, 06-2287,
06-2824, 06-4024, 06-4065,
06-4066, 06-4389, 06-4634,
06-4931, 06-5032, 06-5155,
06-5159, 06-5161, 06-5162,
06-5260, 06-5771, 06-5786,
06-5937, 07-0206, 07-0621,
07-1073, 07-1271, 07-1285

Videotaped Deposition of

KENNETH PAUL ARMSTRONG, JR.,

28 Park Place Drive, Apartment 601, Covington,

Louisiana 70433, taken in the offices of

Bruno & Bruno, 855 Baronne Street, New

Orleans, Louisiana 70113, on Monday, the 9th

day of July, 2007, beginning at 9:26 A.M.

APPEARANCES:

ANDRY LAW FIRM
    (BY:  GILBERT V. ANDRY, IV, ESQ.)
    2nd Floor
    622 Baronne Street
    New Orleans, Louisiana  70113
        ATTORNEYS FOR THE PLAINTIFFS

LABORDE & NEUNER
    (BY:  GREGORY A. KOURY)
    Suite 200
    One Petroleum Center
    1001 West Pinhook Road
    Lafayette, Louisiana  70503
        ATTORNEYS FOR THE BOARD OF
        COMMISSIONERS FOR THE
        ORLEANS LEVEE DISTRICT
        (NOT PRESENT)

DUPLASS, ZWAIN, BOURGEOIS, MORTON,
PFISTER & WEINSTOCK
    (BY:  ANDREW D. WEINSTOCK, ESQ.)
    Suite 2900
    3838 North Causeway Boulevard
    Metairie, Louisiana  70002
        ATTORNEYS FOR THE BOARD OF
        COMMISSIONERS FOR THE LAKE BORGNE
        BASIN LEVEE DISTRICT

STONE PIGMAN WALTHER WITTMANN
    (BY:  JAMES C. GULOTTA, JR., ESQ.)
    546 Carondelet Street
    New Orleans, Louisiana  70130-3588
        AND
JONES DAY
    (BY:  WILLIAM E. MARPLE, ESQ.)
    2727 North Harwood Street
    Dallas, Texas  75201-1515
        ATTORNEYS FOR WASHINGTON GROUP
        INTERNATIONAL, INC.

Page 2

I N D E X

                    PAGE
Armstrong Exhibit 1........................ 67
Exhibit 2.................................. 87
Exhibit 2.................................. 96
Exhibit 3.................................. 98
Exhibit 4.................................. 98
Exhibit 5................................. 119
Exhibit 6................................. 124
Exhibit 7................................. 124
8........................................ 124
Exhibit 10............................... 131
Exhibit 9................................ 132
Exhibit 11............................... 139
Exhibit 12............................... 139
Armstrong 13............................. 140
Exhibit 14............................... 141

EXAMINATION BY MR. MARPLE:................. 6
EXAMINATION BY MR. WEINSTOCK:............. 145
EXAMINATION BY MR. MARPLE:............... 159

Page 4

APPEARANCES CONTINUED:

VIDEOTAPED BY:
    Gilly Delorimier
    Depo-Vue, Inc.

REPORTED BY:
    ROGER D. JOHNS, RMR, CRR, RDR, CSR
    Certified Court Reporter
    State of Louisiana

Page 3

VIDEO OPERATOR:
    This is the videotaped deposition
of Kenneth Armstrong.  This deposition
is being held today at 855 Baronne
Street in New Orleans, Louisiana, on
July the 9th, 2007.  The time is
approximately 9:26 A.M.
    Would the Court Reporter please
now swear in the witness.
    KENNETH PAUL ARMSTRONG, JR.,
28 Park Place Drive, Apartment 601, Covington,
Louisiana 70443, after having been duly sworn
by the Court Reporter, did testify as follows:
    MR. MARPLE:
    And for the record, Counsel here,
    let's now announce for the Court
    Reporter, I am Bill Marple for
    defendant Washington Group
    International, Inc.
    MR. GULOTTA:
    Jay Gulotta, Stone, Pigman; also
    for Washington Group International,
    Inc.
    MR. WEINSTOCK:
    Andy Weinstock, Duplass, Zwain;

Page 5

2  (Pages 2 to 5)

KENNETH ARMSTRONG (MRGO)                                    7/9/2007

**Page 6**

1    for Lake Borgne Basin Levee District.
2        MR. GILBERT ANDRY:
3        And Gilbert Andry, IV for the
4    Plaintiffs.
5    EXAMINATION BY MR. MARPLE:
6        Q.  Have you ever had your deposition
7    taken before?
8        A.  No.
9        Q.  If you need a break at any time, you
10   just let me know or your lawyer know and we'll
11   try to accommodate those.
12       A.  Okay.
13       Q.  Sometimes you just have to take a
14   little break, --
15       A.  Right.
16       Q.  -- a restroom break or whatever.
17   Just let us know.
18        Now, another thing, this is being
19   taken down by the Court Reporter over here and
20   he's going to take down what I ask and your
21   answers.  So if you'll let me finish my
22   question before you answer, and I will try to
23   let you finish your answer before I ask
24   another question, then we'll get a clear
25   question and answer.

**Page 7**

1        A.  Okay.
2        Q.  We'll try not to over-talk each
3    over.
4        A.  All right.
5        Q.  I think you told us you have not
6    been deposed before?
7        A.  Correct.
8        Q.  Have you ever been involved in a
9    lawsuit where you sued somebody or somebody
10   sued you?
11       A.  Not me.  My son was sued when he was
12   on my insurance.
13       Q.  Okay.  Can you give us your date of
14   birth?
15       A.  2/21/63.
16       Q.  And where were you born?
17       A.  In New Orleans.
18       Q.  What part?
19       A.  Shoot.  I think it was Mercy
20   Hospital, which is in I guess the outside of
21   central city.
22       Q.  And what part of New Orleans did you
23   grow up in?
24       A.  I didn't grow up in New Orleans.  I
25   grew up in St. Bernard Parish.

**Page 8**

1        Q.  All right.
2        A.  Chalmette.
3        Q.  Okay.  Did you go to school down
4    there?
5        A.  Yes, I did.
6        Q.  What high school did you go to?
7        A.  Chalmette High School.
8        Q.  What year did you graduate?
9        A.  '81.
10       Q.  When did you meet your wife
11   Jeannine?
12       A.  Probably '78, '79.
13       Q.  Did she go to the same high school?
14       A.  No.  She went to an all-girls
15   school.
16       Q.  Catholic school?
17       A.  No, public high school.
18       Q.  What was -- What's it called?
19       A.  Andrew Jackson.
20       Q.  And then did you go to any kind of
21   vocational school or college after high
22   school?
23       A.  No.
24       Q.  Did you go to work?
25       A.  Yes.

**Page 9**

1        Q.  What did you do?
2        A.  I first started out as a helper on a
3    truck for Anheiser-Busch.
4        Q.  And when you say a helper, I take it
5    you were loading and unloading cases of beer
6    at retailers?
7        A.  Correct.
8        Q.  And when did you and Jeannine get
9    married?
10       A.  '82.
11       Q.  And I understand she's a Registered
12   Nurse?
13       A.  Correct.
14       Q.  And when did she finish up her
15   schooling?
16       A.  I am guessing here.  Maybe 12 years,
17   13 years ago.
18       Q.  Before she was a Registered Nurse,
19   what did she do?
20       A.  She worked for doctors' offices and
21   things like that, if my memory serves me
22   right.
23       Q.  And have you been in the beer
24   business the whole time since you started
25   working?

3  (Pages 6 to 9)

```
 1      A.  Correct.
 2      Q.  Where are you employed now?
 3      A.  Yes, that same place.  Southern
 4  Eagle.  Anheiser-Busch sold out to an
 5  individual which is named Southern Eagle now.
 6      Q.  But basically it's the same --
 7      A.  Correct.
 8      Q.  -- outfit?
 9      A.  The same responsibilities, the same
10  thing.
11      Q.  And just let me remind you, you are
12  anticipating my questions just a hair --
13      A.  Okay.
14      Q.  -- and answering before I finish.
15      A.  Okay.
16      Q.  And I apologize for doing that.
17      A.  No, no, that's fine.  Okay.
18      Q.  And where is Southern Eagle located?
19      A.  Metairie, Louisiana.
20      Q.  And do you work out of an office
21  there?
22      A.  Yes, I do.
23      Q.  And pre-Katrina, the same place?
24      A.  Yes.
25      Q.  You live in Covington now; right?
                                        Page 10
```

```
 1  Conference Center, which is a hotel on LSU's
 2  campus, and we actually stayed there until --
 3  I am not exactly sure, a month, month and a
 4  half.
 5      Q.  And how long -- Well, let's ask you
 6  -- let's just say the storm hit New Orleans
 7  about 6:00 A.M., I mean, is that fair enough,
 8  on the 29th?  Just roughly.
 9      A.  I guess, yeah.
10      Q.  And how long before that did you
11  evacuate?
12      A.  If it hit 6:00 A.M. on Monday
13  morning?
14      Q.  Correct.
15      A.  Maybe 27 to 30 hours.
16      Q.  And who was living with you at the
17  time that evacuated with you?
18      A.  My whole family.  Me and my three
19  children.
20      Q.  Was Kenny living with you at that
21  time?
22      A.  Yes, he was.
23      Q.  And Katie?
24      A.  Yes.  Well, she was actually living
25  still, you know, -- but she was actually up in
                                        Page 12
```

```
 1      A.  Correct.
 2      Q.  In an apartment?
 3      A.  Yes.
 4      Q.  Anybody besides Jeannine live there
 5  with you?
 6      A.  My youngest daughter.
 7      Q.  Okay.  What's her anme?
 8      A.  Renee.
 9      Q.  How old is Renee?
10      A.  16.
11      Q.  Let's get the other kids.  I might
12  have missed those.  How many children do you
13  have?
14      A.  I have Kenny, who's 23; Katie, who's
15  20.  She has an apartment in Baton Rouge, but
16  she also stays with us in the summertime and
17  on weekends at times.
18      Q.  And then Renee is 16?
19      A.  Correct.
20      Q.  Can you just tell us generally what
21  your Hurricane Katrina experience was, where
22  you were before, during, and after?
23      A.  We evacuated on Sunday morning about
24  3:00 A.M. before the storm hit.  We evacuated
25  to Baton Rouge, Louisiana at the Lod Cook
                                        Page 11
```

```
 1  Baton Rouge starting school.  They had just
 2  started at LSU.
 3      Q.  And since you were in Baton Rouge, I
 4  take it you didn't see anything with your own
 5  eyes about what the storm did to your house or
 6  otherwise in New Orleans?
 7      A.  Not at the time of the storm, no.
 8      Q.  Then when did you first return to
 9  your home at 4016 Hamlet?
10      A.  It would probably have been, I am
11  going to say -- This is almost two years, so I
12  am speculating.  It was probably after Rita
13  hit.  Because they wouldn't allow us back in
14  down there after Rita.
15      Q.  Sometime the end of September,
16  beginning of October, in that range?
17      A.  I would say in that.  Like I said, I
18  am not exactly sure of the date, but it took a
19  while because we live -- where we lived, it
20  took a while to get the streets cleaned for us
21  to be able to get in there.
22      Q.  Mud in the street?
23      A.  Oh, yeah.
24      Q.  When you went back, was there still
25  mud in the street then?
                                        Page 13
```

4  (Pages 10 to 13)

KENNETH ARMSTRONG (MRGO)                                    7/9/2007

| | |
|---|---|
| 1    A.  No, it was actually pushed -- pushed | 1    Q.  What's her name? |

1     A.  No, it was actually pushed -- pushed
2  up into the property.
3     Q.  When you went in, what did you see
4  there in your house?
5     A.  I guess, you know, the best thing I
6  can describe it is that it looked like
7  somebody threw up.  What I mean, the house was
8  turned upside down.  There was nothing
9  salvageable.  Nothing.
10     Q.  During the storm did you go up on
11  any satellite sites or anything like that, try
12  to see your house, see where --
13     A.  We tried to.  We tried to.  We
14  wasn't able to get up, our property up on the
15  satellite at the time.
16     Q.  And so between the time you
17  evacuated and you went back, did you see your
18  property through any photographs or satellite
19  --
20     A.  No.
21     Q.  -- or anything?
22     A.  I wasn't able to.  You can get a
23  general area, but you couldn't actually get a
24  fix on your property.  It was -- Some people
25  did, but it was hard to pinpoint what house

Page 14

1     Q.  What's her name?
2     A.  Miss Helena and Ron Silver.
3     Q.  And have you watched that whole DVD?
4     A.  Pretty much, yeah.
5     Q.  And there's one part on there where
6  the fireman that's narrating it says "There's
7  Kenny Armstrong's house"?
8     A.  Correct.
9     Q.  Do you remember that part?
10     A.  Yes, I do.
11     Q.  Could you see your house there?
12     A.  Yes, I could.
13     Q.  And the water was up over the roof
14  line?
15     A.  Over the gutter cans at the time,
16  yes.  Maybe a few feet up above that.
17     Q.  And then does your house appear on
18  there at any other time?
19     A.  No.  No.  Just that one time on me.
20     Q.  There's some people at the end,
21  towards the end where there's a lady out in
22  the yard and then she goes in the house.  Do
23  you know those people?
24     A.  I'd have to see the video, because I
25  have seen a few videos, so I am not sure.  I

Page 16

1  was yours.
2     Q.  Now, your Counsel produced to us a
3  DVD.
4     A.  Correct.
5     Q.  And can you tell us about that
6  generally, what the background of that is?
7     A.  It's basically someone who -- It's a
8  lot of guys from the fire department who
9  stayed, they were put in the shelter at the
10  Domino Sugar refinery, and that's where they
11  started out at.  At the beginning of the
12  video, I think in one -- one of them states
13  after some of the weather started and
14  everything that we are getting the back side
15  of the storm.  And then the water appeared.
16  That's what I saw.  And then you see them
17  going through all parts of the community in
18  their boat and trying to retrieve food and see
19  where people were and things like that.  And
20  then they made their way to one of the
21  firemen's home -- mother's home who lives
22  about seven houses from me.  That's how we
23  were able to get that video.
24     Q.  Do you know that lady?
25     A.  Yes.

Page 15

1  would have to see the video to see.
2     Q.  Do you know those firemen?
3     A.  I know a few of them.
4     Q.  Do you know the fellow that was
5  narrating it?
6     A.  Yeah.  Byron Silver.
7     Q.  And then it's his mother that lives
8  --
9     A.  Correct.
10     Q.  -- a few houses from you?
11     A.  Correct.
12     Q.  Let's say we stand in your front
13  yard at 4016 Hamlet.
14     A.  Uh-huh (affirmatively).
15     Q.  Which way do you look to find her
16  place?
17     A.  I live in a cul-de-sac.  The street
18  comes straight at me.  If it turns, if I am
19  looking out my front door, his parents would
20  be to my left.
21     Q.  And they're up around the turn?
22     A.  Yeah, it's really one house.  The
23  street starts, I'm off to the side right there
24  and looking down the street.
25     Q.  When you came back, did you bring a

Page 17

5  (Pages 14 to 17)

KENNETH ARMSTRONG (MRGO)                                    7/9/2007

| | |
|---|---|
| 1    video camera, a camera with you or anything? | 1    Let me just tell you one thing. |
| 2    A.  Yes.  My wife took some pictures. | 2    Nobody in this room wants you to |
| 3    Q.  And did you give those to your | 3    guess.  You either know or you don't |
| 4    lawyers? | 4    know. |
| 5    A.  Yes.  If I am not mistaken, yes, we | 5    THE WITNESS: |
| 6    did. | 6    I don't know. |
| 7    Q.  I may have them.  I looked.  I can't | 7    EXAMINATION BY MR. MARPLE: |
| 8    tell what's what, you know, -- | 8    Q.  And did you have flood insurance |
| 9    A.  Right. | 9    from the beginning? |
| 10    Q.  -- because it's pretty trashed out. | 10    A.  Yes, I did. |
| 11    But we'll look a little bit and see if those | 11    Q.  And you had flood insurance then at |
| 12    are the ones.  And let's just back up when you | 12    the time of Katrina? |
| 13    bought that place; about 1985? | 13    A.  Correct. |
| 14    A.  Let's see.  Katie was born there. | 14    Q.  Had you ever made any claims on that |
| 15    She's 21.  So I'd say in that time frame. | 15    flood policy prior to Katrina? |
| 16    Q.  And you and Jeannine have been | 16    A.  It never flooded.  It never did. |
| 17    married a couple, three years by that time? | 17    Q.  Did you ever get water up in the |
| 18    A.  Married in '82.  Yeah. | 18    street from rain when the pumps wouldn't pump |
| 19    Q.  And had you all owned a house | 19    it out or anything like that? |
| 20    anywhere else? | 20    A.  Sometimes, yes. |
| 21    A.  Oh, no.  No.  I was only 19 or 20 | 21    Q.  Did it ever come up in the yard? |
| 22    years old at the time. | 22    A.  A few times. |
| 23    Q.  And we have got some real estate | 23    Q.  Did it ever make it into the house? |
| 24    records, you know, they're publicly available, | 24    A.  Never did. |
| 25    and it looked like it was about a $73,000 | 25    Q.  Now, also Rita hit before you got |
| Page 18 | Page 20 |

| | |
|---|---|
| 1    purchase price? | 1    back to look at your house; right? |
| 2    A.  That's what I thought, yeah. | 2    A.  Correct. |
| 3    Q.  And about 66,000 on the mortgage? | 3    Q.  Do you know what damage Rita did to |
| 4    A.  When we bought it?  I guess. | 4    your house? |
| 5    Q.  Okay.  And you had had it for 20 | 5    A.  No. |
| 6    years then when Katrina hit? | 6    Q.  Did you have shingles off? |
| 7    A.  Yes. | 7    A.  Oh, yeah. |
| 8    Q.  Was your mortgage pretty well paid | 8    Q.  And do you know, was that wind |
| 9    down? | 9    damage or flood damage?  Do you have any |
| 10    A.  Yes. | 10    idea? |
| 11    Q.  Was it paid off? | 11    A.  No. |
| 12    A.  After the storm I paid it off. | 12    Q.  Did you make a claim under your |
| 13    $18,000. | 13    homeowner's policy for wind type damage? |
| 14    Q.  So about the time the storm hit you | 14    A.  Yes, I did. |
| 15    owed about 18,000? | 15    Q.  And was that Allstate? |
| 16    A.  That's what my payoff was when I | 16    A.  No. |
| 17    paid it off. | 17    Q.  Liberty? |
| 18    Q.  Do you know what the elevation | 18    A.  Yes. |
| 19    relative to sea level is where your house is | 19    Q.  Liberty Mutual? |
| 20    at 4016 Hamlet? | 20    A.  Yes. |
| 21    A.  No, I don't. | 21    Q.  And did they send anybody out to |
| 22    Q.  Below sea level? | 22    look at the place? |
| 23    A.  I am making a guess here.  I would | 23    A.  Sent somebody out twice. |
| 24    say. | 24    Q.  Did they do a report? |
| 25    MR. GILBERT ANDRY: | 25    A.  The first time they did it and we |
| Page 19 | Page 21 |

6  (Pages 18 to 21)

```
 1   disagreed and they they sent somebody out in
 2   July if I am not mistaken, the following
 3   July.
 4        Q.  That's July, '06?
 5        A.  Correct.
 6        Q.  So they came out earlier than July,
 7   2006 and looked at it?
 8        A.  Right.
 9        Q.  Somebody made a report?
10        A.  Correct.
11        Q.  And then they said it was all flood
12   damage, I take it?
13        A.  Correct.
14        Q.  And you said, "No, we got some wind
15   damage"?
16        A.  Correct.
17        Q.  And then how did that get resolved?
18        A.  When the first report came, I think
19   they offered me strictly roof replacement and
20   then we disputed it.  They came out in July
21   and they paid us I think 35,000 for some hard
22   deck, a few other things that were -- some
23   decking that they thought was cracks in it.
24   Also had a fireplace that was -- you could see
25   where there was a leak in there, too.
                                        Page 22
```

```
 1        Q.  Now, this report, maybe there's two,
 2   I don't know, but however many there are on
 3   the insurance coming out and looking, do you
 4   have those?
 5        A.  We could produce them, yes.
 6        Q.  And then you had flood insurance
 7   with Allstate?
 8        A.  Yes.
 9        Q.  I am just curious.  Is there any
10   reason you had them with different companies?
11        A.  We had switched insurance companies
12   at the time, and at the time we were going to
13   go to Liberty Mutual to get it all on one, but
14   when we bought the house versus when our car
15   insurance expired, it was two different time
16   frames.  So we were waiting to get the flood
17   insurance moved to one agent at the time.
18        Q.  And do you know -- Well, tell me
19   what your approximate premium was for your
20   flood insurance.
21        MR. GILBERT ANDRY:
22           If you know.
23        THE WITNESS:
24           I am not exactly sure.  I can
25        give you an around about, but I am not
                                        Page 23
```

```
 1   exactly sure.
 2   EXAMINATION BY MR. MARPLE:
 3        Q.  Around about would be fine.
 4        A.  I thought it was about $700.
 5   Because some of this was paid for through the
 6   mortgage.
 7        Q.  And as a condition to your mortgage,
 8   you had to carry homeowner's insurance and
 9   flood insurance; correct?
10        A.  Correct.
11        Q.  Do you know what risk level you
12   were?
13        A.  No, I didn't.
14        Q.  Did you ever undertake to look at
15   that?
16        A.  What I will tell you is when we
17   bought the policy and -- I guess that was
18   about, you know -- that we ever needed,
19   however much we needed.
20        Q.  You understand that the premium you
21   pay for flood insurance is related in some way
22   to the degree of the flood risk where you
23   are?
24        A.  One more time?
25        Q.  Some people pay more for flood
                                        Page 24
```

```
 1   insurance than other people.
 2        A.  Correct.
 3        Q.  And the variable, at least one of
 4   them is how likely is that property to flood.
 5        A.  Right.
 6        Q.  And some pay more, some pay less.
 7        A.  Right.
 8        Q.  It depends on I guess past flooding
 9   and all of that.
10        A.  Correct.
11        Q.  Do you know how old your house is?
12   In other words, when it was built?
13        A.  I think in the '70s, the early
14   '70s.
15        Q.  And do you have wood cabinets in the
16   kitchen?
17        A.  Yes.
18        Q.  You didn't have any tin cabinets?
19        A.  Oh, no.
20        Q.  And --
21        MR. GILBERT ANDRY:
22           That would have been the Ninth
23        Ward, a little bit further up.
24   EXAMINATION BY MR. MARPLE:
25        Q.  I was trying figure out on my photos
                                        Page 25
```

7 (Pages 22 to 25)

1   which ones were which and I knew it wasn't
2   yours.  But I was trying to determine what
3   photos were what.
4        MR. GILBERT ANDRY:
5           My dad grew up with tin cabinets.
6        MR. MARPLE:
7           Those are '50s.  I had them, too,
8        when I was a kid.
9   EXAMINATION BY MR. MARPLE:
10       Q.  All right.  And about when did you
11   get your check from Liberty Mutual for your
12   wind damage?
13       A.  About August.  Somewhere in August.
14   It was a couple of weeks after the agent came
15   out.
16       Q.  Of 2006?
17       A.  Yeah, it was either late July or
18   early August.
19       Q.  And was that the first check you
20   got?
21       A.  No.  We had received the flood
22   insurance check.
23       Q.  And you made a claim for that,
24   obviously?
25       A.  Oh, yeah.

Page 26

1   worth?
2       A.  Hoping more, but I would say yeah.
3       Q.  And if I am doing the math --
4        MR. GILBERT ANDRY:
5           If you just break down the square
6        footage, I think that's how they sold
7        it in St. Bernard before the storm.
8        Pretty much anywhere in New Orleans,
9        if you break down the square footage,
10       you'll be able to see what he would
11       have at least asked for his if he were
12       to sell it.
13       THE WITNESS:
14          If I was asking, I would ask
15       probably 165 range.
16   EXAMINATION BY MR. MARPLE:
17       Q.  Okay.  That's good.  So far I have
18   only added up, I think, and I might have done
19   the math wrong, $87,000 in insurance you got.
20       A.  Right.
21       Q.  And can you explain why you didn't
22   get more than that?  Do you know why?
23       A.  Well, flood was all we had, was
24   52,000, so we got the max.  And wind damage
25   from Liberty Mutual was all -- that's what we

Page 28

1       Q.  Did you fill out a form?
2       A.  I am not sure.  My wife probably --
3   I think we had to call in and, you know,
4   something like that.  I am not sure.
5       Q.  Did they send anybody out?
6       A.  I don't think flood insurance did.
7       Q.  They wrote you a check?
8       A.  Right.
9       Q.  And what was the amount of your
10   flood insurance?
11       A.  Total was 5- -- 52,000.
12       Q.  And then did you get something on
13   the contents?
14       A.  It was the total, 52,000.
15       Q.  What was your house appraised at or
16   about what was it worth at the time of
17   Katrina?
18       A.  We hadn't had an appraisal, but my
19   neighbor, at 1,600 square foot, sold for 147
20   about four months before the storm.
21       Q.  And was that house sort of
22   comparable to yours?
23       A.  Mine's about 1,870.
24       Q.  And somewhere around 140,000,
25   150,000?  Is that what you think yours was

Page 27

1   agreed the damage was.  They pretty much said
2   it was all water, you know.  So --
3       Q.  Did you hire anybody on your side
4   when you were having this dispute with Liberty
5   Mutual to look at your house and make a report
6   and tell them what it was?
7       A.  Yes, I hired an appraiser to come
8   out and give us an appraised value on what it
9   would cost to fix.
10       Q.  And what was that number?
11       A.  I am not sure.
12       Q.  Do you have that report somewhere?
13       A.  If I am not mistaken, we probably
14   have it.
15       Q.  And what about some engineer type to
16   come out and look at the fireplace and
17   different things and say, "Water is coming
18   down here"?  Did you have somebody on your
19   side of this dispute to look at that?
20       A.  No, we didn't.
21       Q.  That was what you observed and what
22   you thought and what you told them?
23       A.  Correct.
24       Q.  Do you have any current disputes
25   going with any insurers that you're aware of?

Page 29

8  (Pages 26 to 29)

1        A.  No.  No.
2        Q.  And you took part of that insurance
3    money and paid off the mortgage?
4        A.  Correct.
5        Q.  All right.  And then at some point
6    you made a decision --
7        A.  There's one thing.  I haven't filed
8    anything yet.  Could be with Liberty Mutual.
9        Q.  You may sue them to get some more
10   money?
11       A.  I am not sure yet.
12       Q.  You think they owe you more; right?
13       A.  Well, I am not sure.
14       Q.  Well, put it this way.  You think
15   that there was more damage done by this wind
16   and rain than what they paid you for?
17       A.  Well, I think the dispute is going
18   to be the content -- attic content.
19       Q.  When you got paid by Liberty, did
20   they break that out content?
21       A.  No, there was no content at all.
22       Q.  And you think they ought to be
23   liable for some of the contents that were
24   damaged in there?
25       A.  Some portion up in the attic.

                                    Page 30

1    something thousand.
2        Q.  And do you know why it was so high?
3        A.  I guess due to the storm, the prices
4    to get people to do work and the materials to
5    build a house was going up in price, I would
6    imagine.
7        Q.  Were they going to have to take that
8    slab out and do something different?
9        A.  I guess it depends on what I decided
10   to do there.
11       Q.  Were you going to have to raise the
12   house up?
13       A.  That seems to be the regulations
14   now.
15       Q.  Do you have paperwork where you have
16   got something from LRA that says, gives you
17   this $274,000 figure?
18       A.  Yes.
19       Q.  And when did -- approximately when
20   was it that you got that number from LRA?
21       A.  A few months ago.
22       Q.  Sometime in 2007?
23       A.  I would say yes.
24       Q.  When did you take the house down?
25       A.  I am not sure what date.

                                    Page 32

1        Q.  I might have asked you this a little
2    bit.  Maybe you can tell me a little bit more
3    about it.  Did you have shingles off?
4        A.  Yes, we did.
5        Q.  How many or what percentage?
6        A.  I think y'all have pictures.  It's a
7    decent amount.
8        Q.  Were there parts of the roof that
9    were totally exposed where you could see the
10   under-roof there?
11       A.  No.
12       Q.  Did you ever have a blue tarp up?
13       A.  No.
14       Q.  Now, you made a decision at some
15   point to demolish that house.
16       A.  Correct.
17       Q.  And how did you come to make that
18   decision?
19       A.  Well, the estimated value to fix or
20   replace the home they said was in the 200 and
21   something thousand range.  I think it was
22   274.
23       Q.  Who said that?
24       A.  That was something I got from LRA,
25   estimated value to rebuild or repair was 200

                                    Page 31

1        Q.  But it was in 2007?
2        A.  If I am not mistaken, it was.
3        Q.  Do you have paperwork with the
4    contractor that took it down --
5        A.  No.
6        Q.  -- that would tell that?
7        A.  No.
8        Q.  How did you get it taken down?
9        A.  We called -- We contacted the Parish
10   -- You had to sign paperwork at the Parish
11   government to get your house torn down.
12       Q.  You had to go to St. Bernard Parish?
13       A.  Correct.
14       Q.  And you go in some office and get
15   some permit or fill something out, or what?
16       A.  You had to go in and fill out some
17   paperwork agreeing to it.
18       Q.  And then that was the end of it?
19   They -- Somebody else got it taken down and
20   you weren't part of what was going on out
21   there?
22       A.  Correct.
23       Q.  Did you have to pay anything?
24       A.  No.  Not -- I didn't personally have
25   to come out of pocket.  I don't know if my

                                    Page 33

9 (Pages 30 to 33)

1  insurance company's -- something like that was
2  done.  I don't know if it was the Federal
3  government.  I'm not sure.
4       Q.  Before you took it down, were you in
5  contact with the lawyers in this case about
6  that decision?
7       A.  No.
8       Q.  Have you been back out there since
9  it's been taken down?
10      A.  Oh, yeah.  I'm out there every other
11 day.
12      Q.  You were there every other day?
13      A.  No, I go out there every other day.
14 I work out there.
15      Q.  And what do you do out there?
16 Deliver beer?
17      A.  No, I'm the supervisor over the
18 grocery stores.
19      Q.  And so grocery stores buy beer and
20 you go out there and make sure they're happy
21 and everything is going all right and getting
22 what they want?
23      A.  Something like that.
24      Q.  What's your title?
25      A.  District sales manager.

*Page 34*

1       MR. GILBERT ANDRY:
2           If you want to know his real
3  title, it's the Bud Man.
4  EXAMINATION BY MR. MARPLE:
5       Q.  And the Bud Man's interested in
6  getting shelf space and signs and pricing and
7  all of that, I take it?
8       A.  Compliance with company policy
9  mostly.  Salesman's mostly out there for the
10 other things that you mentioned.
11      Q.  And you don't have a reason,
12 specific reason to go to Hamlet Place?  You
13 just swing around there and see how the
14 neighborhood is doing, I take it?
15      A.  Correct.
16      Q.  And post-Katrina there were at least
17 some blue tarps out in that neighborhood;
18 right?
19      A.  I'm sure there was.  I don't
20 remember specifically, but I'm sure there
21 was.  My neighbor I think had one.
22      Q.  And if you go around New Orleans,
23 greater New Orleans, at least post-Katrina
24 when you could get back in, late '05, early
25 2006, you would see those blue tarps all over

*Page 35*

1  the place in some neighborhoods; correct?
2       A.  Oh, correct.  Yes, there was.
3       Q.  And tell us what those blue tarps
4  were and where they came from and what they
5  did.
6       A.  It was a program I think set up by
7  FEMA, which a lot of people tried to protect
8  their homes from any further water damage
9  coming through the roof.
10      Q.  Well, what you had in Katrina is you
11 had some wind damage from the storm?
12      A.  Yes.
13      Q.  And shingles were off of various
14 roofs and things?
15      A.  Correct.
16      Q.  And then rain got in through leaks
17 in the roof and damaged some things like it
18 did at your place?
19      A.  I would imagine, yes.
20      Q.  And then, of course, you had
21 flooding in some -- a lot of places.
22      A.  Yes.
23      Q.  There were some places, however,
24 that didn't flood very much or almost not at
25 all; right?

*Page 36*

1       A.  Correct.  Not in my area, though.
2       Q.  You were living out there next to
3  this big levee; right?
4       A.  A few hundred yards away.
5       Q.  And what's the name of that levee?
6       A.  I am not sure.
7       Q.  Florida Wall?  Did somebody call it
8  that?
9       A.  They call it the Florida Canal or 40
10 Arpent Canal.
11      Q.  All the time you lived out there,
12 did water ever come up over that other than
13 Katrina?
14      A.  I don't -- Not since I have been
15 there, no.
16      Q.  And that area on the other side of
17 that levee or canal is what?
18      A.  More of a marsh, broken marsh with
19 canals and fishing things and stuff like that.
20      Q.  And water high enough up that you
21 could take a boat out on it at least in
22 places; right?
23      MR. GILBERT ANDRY:
24          Objection to the form.
25      THE WITNESS:

*Page 37*

10  (Pages 34 to 37)

KENNETH ARMSTRONG (MRGO)                                          7/9/2007

```
 1        Yeah, it's --
 2        MR. GILBERT ANDRY:
 3          What do you mean "in places"?  Do
 4       you mean like from the back of his
 5       house all the way to the Mississippi
 6       coast were there canals back there?
 7        MR. MARPLE:
 8          I don't know what you mean by
 9       that.
10   EXAMINATION BY MR. MARPLE:
11       Q.  He's got a pretty good objection
12    there.  I'll try to be a little more
13    specific.  On the immediate side, on the other
14    side of that levee, was it water or marshy?
15       A.  Marshy.
16       Q.  And then as you went out further,
17    were there places that were actually like
18    water?
19       A.  I mean, you can't really see it
20    unless you come around over there.  It was
21    bayous that you can, you know -- I mean, one
22    of them -- There's a pumping station right
23    there.  And that pumping station went out into
24    -- that was the most visible thing.
25       Q.  And that pumping station pumped
                                        Page 38
```

```
 1   EXAMINATION BY MR. MARPLE:
 2       Q.  All right.  I am leaving the Corps
 3    out of this.  I am talking about just anybody,
 4    whether -- whoever was having a meeting about
 5    levees, to talk about them.  Did you ever go
 6    to any of those kinds of meetings?
 7       A.  No, I did not.
 8       Q.  Did it concern you that you were
 9    living that close to that marsh area and what
10    might happen during a hurricane?
11       A.  No.  Not at all.
12       Q.  It never occurred to you at any time
13    you lived there --
14       A.  No.
15       Q.  -- pre-Katrina?
16       A.  No.
17       Q.  You never then, I take it, did any
18    investigation of looking into the adequacy of
19    that levee or any other levee in case of a
20    hurricane?
21       A.  No.  No, I did not.
22       Q.  Since Katrina have you done any of
23    that?
24       A.  No.
25       Q.  Have you looked at any of the
                                        Page 40
```

```
 1    surface water over the levee or through it
 2    into that marshy area when it rained?
 3       A.  Correct.
 4       Q.  Did that pump ever go out?
 5       A.  Not to my knowledge.
 6       Q.  Never had a problem where the pump
 7    didn't work and the water just starts backing
 8    up on you in the streets?
 9       A.  Not to my knowledge.
10       Q.  Did you ever go to any meetings,
11    public meetings or anything about what the
12    Levee Boards or anybody else ought to be doing
13    with levees in your neighborhood?
14        MR. GILBERT ANDRY:
15          Objection to the form.  When you
16       say "Levee Boards", do you mean
17       cutting grass?
18   EXAMINATION BY MR. MARPLE:
19       Q.  I am talking about in terms of
20    structures, whether they're high enough, wide
21    enough, sufficient enough to stop water.
22        MR. GILBERT ANDRY:
23          Well, that would be the Corps
24       then.  So I object to the form of your
25       question.
                                        Page 39
```

```
 1    various reports from the Army Corps of
 2    Engineers or anybody like that on what
 3    happened to the levees?
 4       A.  No.  I could -- There's so much in
 5    the papers now, looking at stuff, you -- it's,
 6    you know, that much (indicating).  So -- And
 7    you can only hear what you heard on the news
 8    and things like that.  So that's my
 9    knowledge.  I might have had some paperwork on
10    it or something, but I never read -- what I
11    saw in the paper, it's so long, I never -- I
12    never got in detail with it.
13       Q.  Do you have any belief about where
14    the water came from that got up over the
15    gutters around your house?
16        MR. GILBERT ANDRY:
17          Objection to the form.  "Belief".
18   EXAMINATION BY MR. MARPLE:
19       Q.  You can go ahead and answer, but let
20    me just -- I'll try to ask a little different
21    question.  Do you have any information that
22    you have learned about of where the water came
23    from that got up over the gutters in your
24    house?
25       A.  I have a belief.
                                        Page 41
```

11 (Pages 38 to 41)

KENNETH ARMSTRONG (MRGO)                                    7/9/2007

| | |
|---|---|
| 1      Q.  What's that? | 1      Q.  And we'll just -- Just to clear that |
| 2      A.  When we were in the Lod Cook | 2  up, it's a Federal program, it gets sold or |
| 3  Conference Center and -- on TV, the | 3  brokered by various insurance companies? |
| 4  helicopters flew over the Industrial Canal. | 4      MR. GILBERT ANDRY: |
| 5  They really didn't venture too much into St. | 5          Administered.  Administered. |
| 6  Bernard, so we couldn't see.  But that | 6  EXAMINATION BY MR. MARPLE: |
| 7  morning, Monday morning, I am not exactly sure | 7      Q.  Administered, right? |
| 8  of the time, the structure, levee, whatever | 8      A.  Correct. |
| 9  it's called there, was -- had fallen over. | 9      Q.  And do you have any idea why you |
| 10  You could see that plain as day on the TV | 10  only got $52,000 worth of flood insurance? |
| 11  camera. | 11      A.  Well, when we bought the house, the |
| 12      Q.  And in terms of whether water came | 12  original policy I had when I bought the house |
| 13  over the levee near your house or somewhere | 13  was 52,000. |
| 14  else out there further south, east, you don't | 14      Q.  Could you have upped the amount of |
| 15  know? | 15  coverage over the years?  Do you know? |
| 16      A.  Correct. | 16      A.  Oh, I'm sure -- Oh, I guess anybody |
| 17      Q.  I'm going to back up to that DVD for | 17  can up their coverage. |
| 18  just a second.  How did you get ahold of that | 18      Q.  Now, when you evacuated the house, |
| 19  from I believe it was Mr. Silver? | 19  did you do anything to the house itself to try |
| 20      A.  Just a friend we saw after the | 20  to hurricane-proof it or anything like that? |
| 21  storm, you know, and he told me he videoed | 21      A.  Yeah, we put up some -- boarded up |
| 22  back by the house and I asked him if I can get | 22  the back door.  We have French doors.  Well, |
| 23  a copy. | 23  we boarded that up.  We boarded up some of the |
| 24      Q.  When you made claims with either | 24  front and back windows due to where the house |
| 25  Liberty Mutual or Allstate, did you submit any | 25  was.  We -- You know, in between, it's eight |
| Page 42 | Page 44 |
| 1  photos along with any -- either of those | 1  feet in between the houses.  We didn't board |
| 2  claims? | 2  up the side windows, but we boarded up all the |
| 3      A.  Well, no, both of them came out. | 3  back and front and we picked up as much stuff |
| 4  They both came -- other than -- other than | 4  as -- you know, we put stuff up on top of |
| 5  Allstate.  I don't know if they sent anybody | 5  counters and on top of tables and things like |
| 6  out there or not.  We talked to them on the | 6  that.  We didn't anticipate, you know -- We |
| 7  phone, they basically said they were going to | 7  have never flooded before, so we didn't |
| 8  send us our whole check. | 8  anticipate this. |
| 9      Q.  So Allstate, you got the full value | 9      Q.  And how many vehicles did you have |
| 10  of the policy? | 10  at that time? |
| 11      A.  Correct. | 11      A.  We had three personal.  I had a |
| 12      Q.  So you don't have any current | 12  company vehicle. |
| 13  dispute with Allstate? | 13      Q.  There were four total? |
| 14      A.  Correct. | 14      A.  Correct. |
| 15      Q.  I guess maybe I don't know exactly | 15      Q.  And did you take all four of them? |
| 16  how flood insurance works. | 16      A.  Took the three personal vehicles. |
| 17      MR. GILBERT ANDRY: | 17  Left the company car at Wal-Mart. |
| 18          You keep on referring to it as | 18      Q.  And do you know what happened to it? |
| 19      Allstate's.  It's actually the Federal | 19      A.  Yeah.  Flooded out. |
| 20      government.  Allstate is just a third | 20      Q.  It was totaled? |
| 21      party claims administrator.  So it's | 21      A.  Oh, yeah. |
| 22      not Allstate's money. | 22      Q.  But that wasn't anything you had to |
| 23      MR. MARPLE: | 23  worry about?  That was the company's deal; |
| 24          I understand. | 24  right? |
| 25  EXAMINATION BY MR. MARPLE: | 25      MR. GILBERT ANDRY: |
| Page 43 | Page 45 |

12  (Pages 42 to 45)

KENNETH ARMSTRONG (MRGO)                                              7/9/2007

| | |
|---|---|
| 1       That's -- I object to the form. | 1 the value of our home. |
| 2       I'm sure he had to worry about it. | 2     Q.  What are they saying? |
| 3       But it just wasn't his. | 3     A.  140. |
| 4       THE WITNESS: | 4     Q.  And what are you saying? |
| 5       Yeah. | 5     A.  160s. |
| 6  EXAMINATION BY MR. MARPLE: | 6     Q.  Now, if this went the way you wanted |
| 7      Q.  Financially, that -- and | 7 it to go, you could get maybe $150,000? |
| 8  insurance-wise -- | 8     A.  No.  They deduct any money -- Any |
| 9      A.  No, that was not mine.  That was | 9 monies you received for structure, they take |
| 10  theirs. | 10 -- they take off. |
| 11      Q.  That was the company's? | 11     Q.  So that would be the insurance? |
| 12      A.  Yeah. | 12     A.  A minus.  A minus.  They would take |
| 13      Q.  And were your three personal | 13 -- If I had -- My content on flood was 42 and |
| 14  automobiles okay? | 14 they would take that off, and any -- Most of |
| 15      A.  We took them all with us. | 15 the Liberty Mutual money was structure.  So |
| 16      Q.  Did you have a boat? | 16 they take that off.  So that would be 77,000, |
| 17      A.  Yes, I did. | 17 78,000 deducted from Road Home.  Now, Road |
| 18      Q.  Was it there at the property? | 18 Home is a different animal.  Some people are |
| 19      A.  Yes, it was. | 19 getting a grant to rebuild.  We lose our |
| 20      Q.  Did you take it or leave it? | 20 property. |
| 21      A.  No, I left it. | 21     Q.  And explain that to me, how that's |
| 22      Q.  And what kind of boat was that? | 22 going to work for you the way you anticipate |
| 23      A.  It was an 18 foot Scout with a 120 | 23 it. |
| 24  Evinrude. | 24     A.  Well, some people get a grant or |
| 25      Q.  And what happened to it? | 25 money for 150,000 or whatever they deem to fix |
|                            Page 46 |                            Page 48 |
| 1      A.  It floated about 10 or 12 houses | 1 or repair their home.  We forfeit our property |
| 2  down with the trailer, and the trailer on it | 2 for the 77,000 or 76,000. |
| 3  and everything, it was -- Basically when I got | 3     Q.  And then you take that money and you |
| 4  it, it was stuck in a tree.  Pulled it out of | 4 go rebuild somewhere else? |
| 5  a tree. | 5     MR. GILBERT ANDRY: |
| 6      Q.  Was it okay, though? | 6     Objection to the form.  It |
| 7      A.  No, I still got it, but, I | 7 assumes that he would rebuild. |
| 8  mean, it's -- I moved it to a safer location | 8     THE WITNESS: |
| 9  and -- but it -- it -- I still got it.  I can | 9     Right. |
| 10  get you pictures of it if you want it. | 10 EXAMINATION BY MR. MARPLE: |
| 11      Q.  Was there any insurance coverage on | 11     Q.  What can you do with that money, if |
| 12  it? | 12 you get it? |
| 13      A.  No.  No. | 13     A.  Well, we'll see.  It depends on what |
| 14      Q.  Now, aside from insurance, have you | 14 SBA, they take, if they take any, because we |
| 15  gotten any benefits paid to you through Road | 15 have a loan in waiting until we make a |
| 16  Home or anything like that? | 16 decision, and we are not sure if they take the |
| 17      A.  No.  Not yet. | 17 money and -- but we got an agreement right now |
| 18      Q.  Have you applied for Road Home? | 18 in principle -- just in waiting until we make |
| 19      A.  Yes, we did. | 19 a decision of I think a 20 or 30 year loan. |
| 20      Q.  When did you do that? | 20     Q.  But whatever this number is, and I |
| 21      A.  I am not sure of the date. | 21 will just say 70,000 approximately that you |
| 22      Q.  Recently? | 22 might get from the Road Home, somewhere in |
| 23      A.  No.  It's been a while. | 23 that neighborhood?  Is that about it?  60? |
| 24      Q.  Have you heard anything from them? | 24     A.  No, it's -- Yeah, it's 70-something |
| 25      A.  A few times we talked.  We dispute | 25 thousand, right at 70, I think a little bit |
|                            Page 47 |                            Page 49 |

13  (Pages 46 to 49)

1   less, they're offering us.
2       Q.  And you can use that to build a new
3   home?
4       A.  Supposed to.  Yeah.
5       Q.  And that's what you are at least
6   contemplating now; right?
7       A.  Correct.
8       Q.  And where are you contemplating
9   building?
10      A.  We're not sure.  We in a family
11  dispute over that.
12      Q.  And tell me what the various choices
13  are.
14      A.  Either back in St. Bernard, with
15  Metairie, Louisiana, Belle Chasse, Louisiana,
16  or Covington where we're at now.
17      Q.  And I think Belle Chasse is across
18  the lake, isn't it?
19      A.  Across the river.  It's on the west
20  bank.
21      Q.  All right.  And then is your
22  daughter Renee going to school up there in
23  Covington?
24      A.  Yeah.  Her school is demolished from
25  the storm, so it moved to Covington,

                                        Page 50

1   school.
2       Q.  All right.  And then your son, is he
3   out of school?
4       A.  Yes.
5       Q.  What's he do?
6       A.  He's an air conditioning
7   technician.
8       Q.  Now, Covington's not St. Bernard
9   Parish obviously.
10      A.  No.
11      Q.  It does have some virtues, though;
12  right?
13      A.  If you live -- If you live and work
14  over there -- I mean, if you work over there,
15  you do.
16      Q.  Some disadvantage is you have to
17  cross over that Causeway 25 miles to get back
18  over here to work; right?
19      A.  Correct.
20      Q.  And things roll along there unless
21  there's fog or an accident?
22      A.  An accident this morning.
23      Q.  All right.  Is your wife working
24  over on that side?
25      A.  No.  Not at this time.

                                        Page 52

1   Louisiana.
2       Q.  The one she was going to moved
3   across the lake?
4       A.  Archibishop Hannon High School is
5   relocated to Covington.
6       Q.  And is she involved in school
7   activities up there?
8       A.  Uh-huh (affirmatively).
9       Q.  Cheerleader?
10      A.  Cheerleader.  Student council.
11  Takes after her mama.
12      Q.  Did they build a new building or
13  move into a building?
14      A.  They anticipate starting a new
15  building.  They in trailers right now.
16      Q.  And then you had a daughter up at
17  LSU, I take it?
18      A.  Correct.
19      Q.  And she is still at LSU?
20      A.  Yes.
21      Q.  Probably getting close to finishing?
22      A.  Her fourth year.
23      Q.  Is that necessarily close to
24  finishing these days?
25      A.  No, she's trying to get in nursing

                                        Page 51

1       Q.  Is she working at all?
2       A.  Not at all.
3       Q.  Now, I understand she has some
4   medical problems based on some information
5   that your Counsel has provided to us.
6       A.  Correct.
7       Q.  Can you tell us about those?
8       A.  November she was diagnosed with
9   brain -- 2005, she was diagnosed with brain
10  tumor.  Non-cancerous.  But it was at the base
11  of her brain stem, somewhere up in there.
12  Lost her hearing.  And they have a new
13  procedure that they have, cyberknife, that was
14  at West Jefferson Hospital that they performed
15  on her in January a few times after that.
16      Q.  So how is she doing right now?
17      A.  She's doing okay.
18      Q.  And was it -- You say it was
19  surgery?
20      A.  No.  No.  Cyberknife is a form of
21  radiation that's given in low doses -- low
22  doses from each -- every different angle
23  possible.  Not like gamma radiation, which is
24  a high dose, one stream of radiation.
25      Q.  And do you think this brain tumor is

                                        Page 53

                                    14  (Pages 50 to 53)

1  **connected to Katrina in any way?**
2      A.  No.  No, she -- They told her she
3  had that for probably for a while.
4      **Q.  And then I understand, I don't know**
5  **the technical name, but she had a bone**
6  **infection or something like that?**
7      A.  She had a fungus settled in her --
8  Again, I am not sure -- the vertebrae in her
9  spine, and an airborne fungus they told us
10 that's generated through soil she got.  I am
11 not sure of the date, but it was hurting her
12 maybe in July of '06.  Was it '06?  Yeah, July
13 of '06.
14     **Q.  This was after the storm?**
15     A.  Correct.
16     **Q.  And is that related to Katrina?**
17     A.  Airborne fungus in the soil.  You
18 know, when you back in your house.  You know,
19 we had, geez, I don't know, three foot of mud
20 in our yard you had to go through to get into
21 the house.  And then once you got in your
22 house, we had at least a foot, foot and a
23 little bit of mud in our house.
24     **Q.  And she spent some time inside the**
25 **house?**

                                      Page 54

1      A.  Well, you know, tried to salvage
2  something, and just come to a realization that
3  you couldn't salvage anything.  There were
4  some keepsakes, you know, that were hanging in
5  a closet that didn't collapse in the mud.
6  Maybe two closets that didn't collapse, and
7  one being some of the kids' christening and
8  stuff like that, gowns that were still up that
9  she was able to salvage.  Our wedding ring,
10 her diamond ring, had to rush out of there to
11 evacuate, that was one of the things she
12 forgot.  So she went digging around, because
13 everything had collapsed down on the ground,
14 the beds fell, the ceiling was on top of it,
15 so just trying to get in a general area and
16 she wound up finding the box with her rings
17 and all of that in it.  So I guess we went
18 back to the house several times.
19     **Q.  Did she find her rings?**
20     A.  Yes.
21     **Q.  And then she went to a doctor, I**
22 **take it, for this infection?**
23     A.  Well, she went and we had gone on
24 vacation to Florida and thought from sitting
25 in one of the beach chairs, her back was

                                      Page 55

1  hurting her, just discomfort, so being a nurse
2  she went to one of the doctors that she knew
3  relocated to the North Shore from St. Bernard
4  and they were treating it more as a muscle.
5  They thought it was more of a muscle problem.
6  And so after a couple of weeks, it didn't go
7  away, they ordered an MRI which found a mass
8  on her spine.  So --
9      **Q.  And do you know if any doctor told**
10 **her that this was related to being in that**
11 **house or anything?**
12     A.  No.  No, nobody told her.  Like I
13 say, they said it was an airborne fungus that
14 you catch from soil and everything else.  And
15 I don't remember the last time she was playing
16 in the mud other than the house.
17     **Q.  Do you know anybody else that has**
18 **that particular problem post-Katrina?**
19     A.  If I am not mistaken, somebody had
20 mentioned it in -- one of the doctors that
21 there was a case going on, the same thing at
22 Ochsner.
23     **Q.  And had your wife ever heard of this**
24 **condition before?**
25     A.  No.  Not to my knowledge.

                                      Page 56

1      **Q.  And tell me, at the time of Katrina**
2  **was she working as an RN?**
3      A.  Yes.
4      **Q.  Whereabouts?**
5      A.  She was working for Chalmette
6  Hospital, which I think is owned by Uni- --
7  Universal.  I think it's UHS, I think it's
8  called, and she was a nurse -- she worked in
9  Special Procedures, which is I think more
10 gastro.  She was working at the time, the
11 hospital was about half a mile from our house,
12 and the hospital now is leveled now.  It's
13 knocked down.
14     **Q.  Has she thought about going back to**
15 **work?**
16     A.  Well, she's trying to go back right
17 now, but physically after the surgery they
18 removed the two disks in her -- vertebrae in
19 her back and put titanium, like a cage over
20 that spot with two rods running through her
21 back.  So my wife's only about 110 pounds, so
22 physically, you know -- you know, they require
23 some lifting and things like that, so she
24 don't feel like right now that she is
25 physically strong enough to go back.  But she

                                      Page 57

```
 1   anticipates trying to get back at the
 2   beginning of the summer.
 3       Q.  And you may have answered this, but
 4   did she work as an RN anywhere after Katrina?
 5       A.  No, not at all.
 6       Q.  I take it if she wanted to work over
 7   around Covington somewhere she'd probably find
 8   a job over there?
 9       A.  Nursing, yes, probably so.
10       Q.  Do you recall that you filed a form
11   or a claim with the United States government
12   related to the Army Corps of Engineers?
13       A.  We filled out a few documents.  I am
14   not exactly sure what they were or if they
15   sent it to me or you got ahold of it and you
16   filled it out.
17       Q.  Let me just ask, and I don't want to
18   know anything that was said, I just want to
19   know the time frame.  When was it that you
20   contacted the lawyers that are representing
21   you in this lawsuit?
22       A.  I am -- They might have the date.
23   I'm not sure of the date.  I'm not exactly
24   sure.
25       Q.  Can you give me -- It was after
```
Page 58

```
 1       A.  Gibby and his brother John.
 2       Q.  Did you go to school with them?
 3       A.  No, I did not.
 4       Q.  How is it you knew them?
 5       A.  We lived in the same community and
 6   we met each other at the playground.
 7       Q.  And played ball and stuff?
 8       A.  Yes, we did.
 9       Q.  And you stayed in contact throughout
10   the years?
11       A.  On and off through the years.
12       Q.  And then when the storm struck, you
13   had occasion to talk to Gibby about what was
14   going on with post-Katrina?
15       A.  Well, me and Gibbs was together July
16   the 28th and 29th right before the storm on a
17   fishing trip, so we were always in contact.
18   Played golf together a little bit and all.  So
19   -- But after the storm, we -- I had seen John
20   one day and while I was back -- When we were
21   able to get back to work, one of the stores
22   had opened up and me and John had a
23   conversation.
24       Q.  And John or Gibby, were they
25   involved in any of your insurance disputes?
```
Page 60

```
 1   Katrina obviously?
 2       A.  Obviously.
 3       Q.  Was it in 2005, between Katrina and
 4   the end of the year?
 5       A.  I'd be guessing if I told you.
 6           MR. GILBERT ANDRY:
 7               Let me -- I object to the form
 8           only to this extent.  That we have
 9           known each other for a very long time
10           and we spoke after the storm almost
11           immediately to make sure that we each
12           other were alive.  So I don't know, if
13           you could just be a little more
14           particular, you might get what you're
15           looking for.
16           MR. MARPLE:
17               All right.
18   EXAMINATION BY MR. MARPLE:
19       Q.  I'll just ask you, again, I don't
20   want to know what was said, but have you known
21   some of the lawyers that are representing you
22   in this case for a while?
23       A.  Probably since I'm ten to twelve
24   years old.
25       Q.  And who did you know?
```
Page 59

```
 1       A.  I didn't need nobody.  I didn't need
 2   a lawyer.
 3       Q.  And are they handling anything else
 4   for you besides this litigation that we're
 5   here today in?
 6       A.  No.
 7       Q.  Is Gibby any good at golf?
 8       A.  At the time he was a little better
 9   than me.
10           MR. WEINSTOCK:
11               But he told you he was a lot
12           better; right?
13           THE WITNESS:
14               I'm a good listener.
15   EXAMINATION BY MR. MARPLE:
16       Q.  And back pre-Katrina where did you
17   play golf?  Public courses?
18       A.  Oh, yeah.  Yeah.  Yeah.  My
19   brother's brother-in-law owned a golf course,
20   too.  So we played there a little bit.  Or he
21   leased a golf course from the Parish.
22       Q.  You still play some?
23       A.  Probably four times since the storm,
24   five times since the storm.
25       Q.  Over on the North Shore somewhere?
```
Page 61

16  (Pages 58 to 61)

1    A.  Twice over here and maybe three to
2    four times on the North Shore.
3    Q.  Now, do you have any personal
4    injuries yourself, and let's include
5    everything we can think of for a second,
6    emotional distress, mental distress, any
7    diseases or anything you --
8        MR. GILBERT ANDRY:
9        Let me suggest before you finish
10    your question, that way, one, it's not
11    on the table officially; we have been
12    going about an hour now.  Let's take a
13    five minute --
14        MR. MARPLE:
15        A break?
16        MR. GILBERT ANDRY:
17        Yes, take a break and let him
18    stretch or whatever.
19        VIDEO OPERATOR:
20        We're now off the record at
21    10:22.
22        (Recess.)
23        VIDEO OPERATOR:
24        Returning to the record.  It's
25    10:41.  This is the start of tape 2.

Page 62

1        Call it "down the road".
2        THE WITNESS:
3        I'm sorry.  I am west of Paris
4    Road.  He's east of Paris Road.  So
5    west of Paris Road, seemed like it had
6    more water than east of Paris Road;
7    along Florida Avenue where my brother
8    lived.
9    EXAMINATION BY MR. MARPLE:
10    Q.  Were there some areas out there
11    along Judge Perez or some of those roads that
12    run out through St. Bernard where they didn't
13    get as much water up into the buildings?
14        MR. GILBERT ANDRY:
15        Objection to the form.
16    EXAMINATION BY MR. MARPLE:
17    Q.  If you know.
18    A.  Man, I got friends of mine who
19    lived, you know, along that, you know, the --
20    the whole parish, you know.  Some of them, you
21    know, 10 foot of water, some 12 foot of
22    water.  You had to be closer to St. Bernard
23    Highway and the Mississippi River to get less
24    water.
25    Q.  And that's, common sense would tell

Page 64

1    EXAMINATION BY MR. MARPLE:
2    Q.  Do you know of any neighborhood that
3    got more water than yours did in terms of
4    height?
5    A.  I don't know the -- I don't know all
6    the heights, you know.  Carolyn Park,
7    Buccaneer where I live, all down, seemed like
8    ours, the -- Let's see.  That would be east of
9    Paris Road, along that Florida Avenue had more
10    water than -- than what my brother did in
11    Lexington, which is west -- which is west of
12    Paris Road.
13    Q.  Did you get any oil or anything from
14    the Murphy Oil plant?
15    A.  No, we did not.
16    Q.  Were there other contaminants that
17    you identified that you made some claim
18    against anybody for for depositing onto your
19    yard or anything like that?
20    A.  No.  No, we didn't.
21    Q.  Where did your brother live?
22    A.  He lived in Lexington Place.
23    Q.  And that was west of you?
24    A.  We --
25        MR. GILBERT ANDRY:

Page 63

1    you, because it's at a higher elevation?
2    A.  Right.
3    Q.  The closer you get to the river, the
4    higher the elevation?
5    A.  But some people did have, you know,
6    eight foot of water closer to St. Bernard
7    Highway also.
8    Q.  And some had a lot less than that?
9    A.  Correct.
10    Q.  Over the years there has been stuff
11    in the newspaper about the --
12        MR. GILBERT ANDRY:
13        Let me just object to the form
14        when you say "a lot less".  That kind
15        of strikes me a little bit.  Four
16        feet, five feet.  I just object to the
17        quantification.
18        MR. MARPLE:
19        All right.  Well, we'll try to
20        quantify that a little more.
21    EXAMINATION BY MR. MARPLE:
22    Q.  Some had less than ten feet?
23    A.  Correct.
24    Q.  Less than eight feet?
25    A.  Yes.

Page 65

17 (Pages 62 to 65)

```
 1      Q.   Some had even less than four feet --
 2      MR. GILBERT ANDRY:
 3          Objection to the form.
 4  EXAMINATION BY MR. MARPLE:
 5      Q.   -- in height up into the house?
 6      A.   I don't know.  I mean, I can only go
 7  -- Some people -- I think there was only
 8  three houses maybe that didn't flood, or three
 9  houses that didn't get water.  And that's all
10  speculation.
11      Q.   All right.
12      A.   Hearsay.
13      Q.   And that's because you didn't do an
14  investigation into how high water got into
15  anybody else's house; right?
16      A.   Correct.
17      Q.   Or where the water may have come
18  from?
19      A.   Like I say, only what I saw on TV.
20      Q.   Right.  But you didn't do any
21  investigation of your own?
22      A.   No.
23      Q.   Or have any engineers --
24      A.   No.
25      Q.   -- that gave you a report or
                                        Page 66
```

```
 1  sometimes, frustrating.  You live there every
 2  day.  You been living this -- this didn't
 3  happen two years ago, it seems like it
 4  happened yesterday.
 5      Q.   And it affects you one way and
 6  somebody else another way; is that right?
 7      A.   I would agree.
 8      Q.   And let me just make sure I have got
 9  this.  You have no physical issues for which
10  you're seeing a doctor or have seen a doctor
11  since Katrina?
12      MR. GILBERT ANDRY:
13          Objection to the form.  Asked and
14  answered.
15          You can answer.
16      THE WITNESS:
17          No, no, nothing where -- You
18          know, nothing where I would go see the
19          doctor.
20  EXAMINATION BY MR. MARPLE:
21      Q.   When I say physical, I am talking
22  about a disease of some kind --
23      A.   No.
24      Q.   -- or broken bone --
25      A.   No.
                                        Page 68
```

```
 1  anything like that?
 2      A.   No.  No, sir.
 3      Q.   Let me hand you what we have marked
 4  as Armstrong Exhibit 1, and I am going to
 5  represent to you that this was produced to us
 6  by your lawyers providing some information
 7  about the Plaintiffs in the lawsuit, including
 8  yourself.
 9      A.   Okay.
10      Q.   And it lists your occupation as
11  sales supervisor, Southern Eagle.  That's
12  basically correct; right?
13      A.   Right.
14      Q.   Then it says "Current medical
15  condition, no issues".  Is that correct?
16      A.   Nothing physical, no.
17      Q.   And pre-Katrina did you have any
18  physical --
19      A.   No.
20      Q.   -- issues?
21      A.   No.
22      Q.   And then since then have you had any
23  physical issues?
24      A.   No, I would just clarify it as, you
25  know, this is -- it gets emotional at
                                        Page 67
```

```
 1      Q.   -- or where there's some physical
 2  impact to you in some way.
 3      A.   Not physically, no, I would say no.
 4  Mentally maybe, you know.
 5      Q.   And we talked about Mrs. Armstrong,
 6  the brain tumor and osteomyelitis, I think;
 7  right?
 8      A.   I think that's what they call it.
 9      Q.   Tell us -- Well, let's go back
10  pre-Katrina.  Did you have any mental distress
11  or emotional distress type issues before
12  Katrina?
13      A.   No.
14      Q.   You never have been on
15  antidepressants or anything?
16      A.   No.
17      Q.   Had ever been to a doctor or a
18  shrink for any of that stuff?
19      A.   No.
20      Q.   Now, post-Katrina you described that
21  you have some emotional upset at least or
22  something along those lines?
23      A.   Right.  I would say that's it.
24      Q.   And can you describe for us what
25  that is?
                                        Page 69
```

18  (Pages 66 to 69)

KENNETH ARMSTRONG (MRGO)                                         7/9/2007

1     A.  Well, I don't know about -- It's --
It's one of them things you dwell on.  You
know, it's not knowing what your next home is
going to be, the decision, are you going to
make the right decision.  I mean, there's a
lot of that.  There's -- You know, it's
frustrating to be on top of the world, you
know, to be knocked down within a few hours,
you know.
10    Q.  Have you been on any kind of
medication for any --
12    A.  No.
13    Q.  -- emotional problem?
14    A.  No.
15    Q.  Have you been to a doctor?
16    A.  No.  No.
17    Q.  When did you first go back to work
after Katrina?
19    A.  They called back a small percentage
of us maybe, oh, let's see, I would probably
say -- and this -- we hit on this -- maybe a
little bit into September, early September we
went back.  It's like three or four, five
weeks afterwards.
25    Q.  And in the meantime were you getting

Page 70

1  it's something you got to put aside and keep
2  on going, you know.  It's knowing what you had
3  and what you lost.
4     Q.  I wanted to go back a little bit,
5  and we may have exhausted this, but I just
6  wanted to be sure.  You were thinking your
7  house, if you would have put it on the market,
8  if you wanted to sell it pre-Katrina for about
9  165,000?
10    A.  Yeah.
11    Q.  And we talked about what you have
12 gotten from insurance and what the difference
13 of that is.  And then what about the
14 belongings?  Did we get a number?
15    A.  Only content you talking about?
16    Q.  Yes.
17    A.  The only content money I got was
18 about 14,000.
19    Q.  And that was part of what you got
20 from the wind and rain?
21    A.  No.
22    Q.  Flood?
23    A.  Correct.
24    Q.  And have you done any listing of the
25 belongings, made a list of what you had and

Page 72

1  paid?
2     A.  We got paid our sal- -- Well, we got
paid our salary, yes.
4     Q.  And has your salary gone up or down
since Katrina?
6     A.  Went up slightly due to the fact
that we were doing other -- I was delivering
product after the storm, so I went up slightly
after that.  Now I'm back to normal salary.
10    Q.  Is your compensation salary and some
bonus?
12    A.  Salary and incentive based.
13    Q.  And since Katrina have you stayed on
track with your salary and your incentives?
15    A.  My salary has gone up a little bit,
you know, in the course of normal inflation
and things like that and performance.
18    Q.  And from the emotional side of it,
you have been able to perform your
responsibilities at work despite the upset you
have over the storm?  Is that right?
22    A.  Yeah, I mean, it's something you got
to put aside, you know.  You got to go to
work.  I got three kids at home; my wife, you
know, can't physically work at this time; so

Page 71

1  valued it for the insurance company or anybody
2  else?
3     A.  We, well, like I say, come back
4  again, that wasn't necessary, because they
5  gave us our -- I mean, everybody's got more
6  than $14,000 in contents in their house so
7  they just, like I say, wrote us out our total
8  policy, 42,000 for structure and 14 for
9  content.
10    Q.  That's on the flood?
11    A.  Correct.
12    Q.  All right.  What I am trying to get
13 at is, what haven't you gotten compensated for
14 by somebody, through insurance or whatever,
15 for the belongings?  How much do you think
16 your belongings were worth?
17       MR. GILBERT ANDRY:
18         This is the question.  Did y'all
19         quantify and itemize and quantify what
20         you lost in contents?
21       THE WITNESS:
22         Well, we -- we had a list, there
23         was a list put out for something with
24         some tax deal that my wife did.  I
25         don't know if we ever received

Page 73

19 (Pages 70 to 73)

```
 1      anything with that.  I am not sure,
 2   you know.  But, you know, you asking
 3   --
 4      MR. GILBERT ANDRY:
 5         Do you remember those numbers?
 6   Like --
 7      THE WITNESS:
 8         Total?
 9      MR. GILBERT ANDRY:
10         What the total was, yes.
11      THE WITNESS:
12         No, I don't.
13      MR. GILBERT ANDRY:
14         We'll get that for you.  And if
15   you don't have it, we'll get it for
16   you.
17      THE WITNESS:
18         What I will --
19      MR. GILBERT ANDRY:
20         And what I will try -- Do you
21   know where it is?
22      THE WITNESS:
23         Well, I would have to ask my
24   wife.  Like I say, she wasn't working
25   so she did a lot of these things.
                                  Page 74
```

```
 1   I would have asked to get rid of it.  There
 2   was nothing wrong with it.  I fished every day
 3   that I had a chance.
 4      Q.  So are you seeking in this lawsuit
 5   some money for the boat?
 6      A.  I don't know if specifically we put
 7   that down.
 8      Q.  And is that what you want out of
 9   this lawsuit, is money for --
10      MR. GILBERT ANDRY:
11         Let me just object to the form.
12      Before you ask that, just so you don't
13      lose your train, just trying to help
14      you so we can move it along, you
15      didn't ever get an answer to the after
16      Katrina value I don't think.
17   EXAMINATION BY MR. MARPLE:
18      Q.  What's the after Katrina value of
19   the boat?
20      A.  I don't think anybody would buy it.
21      Q.  It was worth about five grand before
22   and virtually nothing now?
23      A.  Five to six.  I would have to check
24   the book to see, but about 5,000 to 6,000.
25      Q.  And so far we have talked about some
                                  Page 76
```

```
 1      MR. GILBERT ANDRY:
 2         At the next break we'll try to
 3      get that for you.  You should have
 4      that and I apologize for you not
 5      having that.
 6      MR. MARPLE:
 7         Thanks.
 8      MR. GILBERT ANDRY:
 9         No problem.
10   EXAMINATION BY MR. MARPLE:
11      Q.  And then did we get a number on the
12   boat, as to how much it was worth then and
13   now?
14      A.  I paid, when I bought the boat in
15   '9- -- It was a '96 boat, '98, something like
16   that.  I paid $14,000 for it used.
17      Q.  And what's it worth now?
18      A.  Now?  Or before the storm?
19      Q.  Well, before the storm.  Let's take
20   -- That's a good one.
21      A.  I don't know.  5,000 or 6,000.  I
22   don't know.  I'd be guessing.
23      Q.  5,000 or 6,000 now or before the
24   storm?
25      A.  Oh, before the storm 5,000 or 6,000
                                  Page 75
```

```
 1   things, we have got some contents or personal
 2   belongings, some damage to the house, maybe
 3   the boat, too, and that's what you're seeking
 4   in this lawsuit; I mean, among some other
 5   things.  You want money for the injury to that
 6   property?
 7      A.  I would like my life back, but I
 8   don't think that's going to happen.  We didn't
 9   just lose our home.  We lost our community.
10   We lost everything that we had.  I mean, just
11   like I say, not physically -- I mean, not just
12   your house.  I lost where my wife worked,
13   where my kids went at the school, where you
14   first kissed your girlfriend.  You lost all of
15   that.
16      Q.  And have you put a number on that?
17      A.  No.  I could go back in time, I'd
18   rather it like it was.  Just that everything
19   now is just so much more expensive than it was
20   before, you know.
21      Q.  And when you say "everything", what
22   kind of things are you talking about?
23      A.  If I was to replace my home, look at
24   what it would cost me to replace what I had.
25   I mean, I don't know how much content.  You
                                  Page 77
```

1 could put that on paper, but then you don't
2 remember everything what -- What you build up
3 in a lifetime in your home is, you know,
4 astronomical in cost.
5   Q.  And did you ever go through
6 pre-Katrina and take photographs of everything
7 in the house that was in there?
8   A.  Through birthday parties or through
9 things that we took pictures for the kids or
10 things like that, did I do that specifically?
11 Yeah.  But where is all of that at?  It's
12 under water.
13   Q.  Now, does your wife have emotional
14 distress injuries as well?
15   A.  I would -- It's more frustrating
16 with her.  You know, it's like anything.  I
17 was -- My savior was actually trying to get
18 ready to go back to work so, you know, for
19 that ten hours a day you never had to focus on
20 any -- you were able to get away from it.
21 Like I say, she hasn't been able to work so
22 she's had to deal with this a lot more than
23 me.  It's been more frustrating for her.  And
24 more frustrating for her because she was
25 cooped up in an apartment.  And before that we

Page 78

1 lived with my sister-in-law.  She had to deal
2 with insurance companies more than I had to.
3 So she dealt with a lot more than me.  She
4 took it a lot harder than I did.
5   Q.  And has she seen a doctor or anybody
6 for any of those types of problems?
7   A.  No, I don't think so.  No.  It's
8 just hard to explain that you're not -- you're
9 not -- It's not something that, you know,
10 where -- It's just something you accept
11 happened and you try to get by, you know.
12 Like I say, it's something you live every day.
13   Q.  And her mental distress or emotional
14 distress is more serious than yours, you
15 think?
16   A.  Like I say, we were able to get
17 through -- You know, we were able to get
18 through this -- I guess let me put it we were
19 able to get through this with my family
20 living, nobody died, nobody nothing, but now
21 she's dealing with her parents.  Now her daddy
22 -- her daddy -- her daddy lived four or five
23 houses from us; they took it a lot harder.  My
24 wife is off work.  Her two sisters work, so
25 she's dealing with that more -- Like I say,

Page 79

1 it's the whole family.  You know, we were a
2 couple of miles from each other.  Now they're
3 everywhere, you know.
4   Q.  And where do her parents live now?
5   A.  They live probably, maybe seven,
6 eight miles from us.
7   Q.  Over on the North Shore, too?
8   A.  North Shore.
9   Q.  And let's -- I am not sure we
10 identified them.  Let's identify the people
11 that lived down there in St. Bernard or the
12 general neighborhood that were relatives of
13 yours pre-Katrina.
14   A.  Okay.
15   Q.  Can you tell me who those were?
16   A.  The John Bruggi, B R U G G I,
17 Jocelyn Bruggi, and Joy Bruggi.  That was my
18 -- The first two were my mother-in-law and
19 father-in-law.  The second, sister-in-law.  My
20 mother lived maybe three-quarters of a mile,
21 Frances Armstrong.  My brother lived about
22 three and a half miles from me.  He's Brian
23 Armstrong.  Wife is Celeste Armstrong.
24 Daughter, Ashley Armstrong.  Christy
25 Armstrong.  And has a daughter Callie

Page 80

1 Bordelon.  My other grandmother lived maybe
2 three miles from me, Claire Armstrong.  The --
3 My grandmother lived with my daddy's sister,
4 which was Frances Cochran, and my uncle's name
5 is Walter Cochran, and has a daughter Shawn
6 and a younger son named Walter.  My Aunt Rose,
7 my daddy's other sister, lived about a mile
8 from me.  Rose Mistretta.  I am not sure of
9 the spelling.  Her and my -- lived with my
10 cousin Rhonda Mistretta.  My first cousin, Sue
11 Mistretta, lived in close proximity to my
12 grandmother, which was maybe three miles.  Was
13 Mike and Sue -- Sue was my -- I can't remember
14 my cousin's first name -- I mean last name at
15 the time.
16     Let's see who else lived out
17 there.  Shoo.  I had a brother-in-law -- my
18 daddy's brother, Robert Armstrong, lived out
19 there.  He lived in an apartment close to the
20 house.  Let's see.
21     That's it as far as my family that
22 I know of that lived out there.
23     I'm sorry, I had a cousin that
24 lived -- my first -- Geez.  Lived right about
25 two minutes from my house.  My cousin Pam.

Page 81

21 (Pages 78 to 81)

1        Q.  And have any of those -- do any of
2   them live out there now?
3        A.  The only ones who live out there now
4   is my grandmother Claire and Aunt Frances and
5   my cousin -- I mean my Uncle Robby lives I
6   think in a FEMA trailer still.  And my --
7   Let's see.  I think that's it.  That's the
8   only ones that live out there now.
9        Q.  And your grandmother and great aunt
10  or whoever, I might get them a little confused
11  here, Claire and Frances --
12       A.  That's Claire's daughter, Frances.
13       Q.  Okay.  And where are they living?
14       A.  They live -- Actually, they live
15  closer to Murphy Oil.  If you know -- If you
16  familiar with that.
17       Q.  Yes.  Are they --
18           MR. GILBERT ANDRY:
19            We call that "down the road" --
20           THE WITNESS:
21            Yeah.
22           MR. GILBERT ANDRY:
23            -- from where he is.
24  EXAMINATION BY MR. MARPLE:
25       Q.  Down the road, are they living in a
                                          Page 82

1   house?
2        A.  They back in their house.
3        Q.  How did -- How much water did they
4   get, about?
5        A.  I am not sure.  I am not sure.  They
6   on the -- the -- They further -- They not as
7   far as away from the levee as I am, but they
8   are further -- they on -- I guess that would
9   be the north side of Judge Perez.
10           MR. GILBERT ANDRY:
11            North side is 40 Arpent.
12           THE WITNESS:
13            Yeah.  Yeah.  I live right on the
14  40 Arpent.  They live probably 25, 30
15  houses off.
16           MR. GILBERT ANDRY:
17            We call that "the back".
18           THE WITNESS:
19            The back.
20  EXAMINATION BY MR. MARPLE:
21       Q.  Okay.  They were able to rebuild
22  their house or redo it, right?
23       A.  Yes.
24       Q.  Do you know what they had to do?
25  Did they strip it down to all the sheetrock
                                          Page 83

1   out?  Do you know?
2        A.  I am guessing.  I would say they had
3   to take everything out.
4        Q.  And then some of the rest of the
5   family members you talked about, how many --
6   which ones are over in Covington or over on
7   the North Shore somewhere not too far from
8   you?
9        A.  The North Shore, my mother, she
10  lives in Ponchatoula, which is maybe 30, 35
11  minutes away.  My -- My brother Brian and his
12  wife live in Mandeville, and my in-laws.
13  That's it.
14       Q.  And then the others, and I am not
15  sure how many that leaves, we could look, but
16  where are the rest of them that don't live on
17  the North Shore and the ones you have told us
18  about that were able to get back into their
19  house, where are the rest of them?
20       A.  My Aunt Rose, I am not sure where
21  she's at.  She's with her daughter.  They live
22  on the other side of the lake.  I think they
23  live toward Ponchatoula.  Not as far as --
24  They live past Mandeville somewhere.  My --
25  Let's see who else I got on there.  Pam, my
                                          Page 84

1   cousin Pam, the one that lived right around
2   the corner from me, she lives in Tennessee.
3   My mother, like I say, Ponchatoula.  My
4   in-laws are ten miles away, whatever it is.
5   Whoever else I left out.
6        Q.  Your lawyer here has done a little
7   sketch for us.
8            MR. GILBERT ANDRY:
9             Just so you'll have the local
10  lingo so you'll understand, because
11  that's the way everybody else refers
12  to it.
13           MR. MARPLE:
14            Right.  And I don't know all the
15  local lingo even though I lived here
16  for about three years.
17  EXAMINATION BY MR. MARPLE:
18       Q.  If we look at this pie plate that he
19  has done, can you point just generally where
20  your house at 4016 Hamlet was?
21           MR. GILBERT ANDRY:
22            It would be up the road from
23  there.
24           THE WITNESS:
25            It would be over here somewhere
                                          Page 85

1     (indicating).
2  EXAMINATION BY MR. MARPLE:
3     Q.  In the top right-hand, I'm going to
4  put a little X right there.  And then I
5  believe it was your grandmother that's back in
6  her house or --
7     A.  Correct.
8     Q.  And put a little X where she is.
9     A.  This would be Murphy Oil I guess
10 (indicating).
11    Q.  Okay.
12    A.  She would be right up in here.
13 There's Judge -- Well, --
14    MR. GILBERT ANDRY:
15       I did it from my mama and daddy's
16 house, basically, looking back.
17 EXAMINATION BY MR. MARPLE:
18    Q.  And did you go to her house after
19 Katrina to look at --
20    A.  Only in the front.  I passed there
21 and nobody was home.
22    Q.  Did you go inside?
23    A.  Oh, nobody was home.
24    Q.  And now what's the house now that
25 it's been redone?  Have you been in it?

Page 86

1     A.  If I am not mistaken, my wife filled
2  out some forms.  The video.
3     Q.  Now, if you see the basis of the
4  claim there in the middle of the page, it
5  looks like it's a number 8 on the second
6  page.  Do you see that?  The basis of claim?
7     A.  All right.
8     Q.  Is that correct in terms of the
9  basis for your claim against the Army Corps of
10 Engineers?
11    A.  Yes.
12    Q.  And then down below there, look at
13 number 10 and it asks for the nature and
14 extent of each injury and it says "I have been
15 injured to the extent that I have experienced
16 severe emotional distress and mental anguish
17 due to the loss of my property and almost all
18 of my possessions."  Is that correct?
19    A.  I would say.
20    Q.  And then Renee Armstrong is
21 mentioned as a minor child there.
22    A.  Uh-huh (affirmatively).
23    Q.  Do you see that?  Do you know why
24 she's mentioned here on this?
25    A.  My kids suffered, too.  We're not

Page 88

1     A.  No.
2     Q.  Let me show you what we have marked
3  as Exhibit 2.  I'll ask you to look through
4  that and tell me if you recognize any of the
5  paper there.
6     MR. GILBERT ANDRY:
7        And just for the record, Exhibit
8  Number 2 consists of a letter from the
9  Department of Army Corp of Engineers
10 dated July 1st, 2006 as well as I
11 believe the Form 95 that's attached to
12 it.  Is that fair, Counsel?
13    MR. MARPLE:
14       Yes.  And an authorization on the
15 back page.
16    MR. GILBERT ANDRY:
17       Correct.
18 EXAMINATION BY MR. MARPLE:
19    Q.  You go ahead and look at it there.
20 Do you understand that it appears on your
21 behalf that your lawyers filed a claim against
22 the United States Army Corps of Engineers?
23    A.  Yes.
24    Q.  And did you provide any information
25 in connection with this claim to your lawyers?

Page 87

1  the only ones that suffered.  They also
2  suffered, too.  You know, they just didn't put
3  -- You know, we didn't just move over the
4  lake and say we're moving, you know.
5     Q.  And --
6     A.  I mean, you ever get taken out of
7  high school?  Just on one day you're in high
8  school and the next day you're not.  That's
9  something, you know.  To have to go to a new
10 school up in Baton Rouge for, you know, for
11 the rest of that year, you know?  I mean -- I
12 mean, what kid wouldn't be affected by it?
13    Q.  And so what I am getting at is you
14 are making a claim here on her behalf as well
15 as yours for this severe emotional and mental
16 distress?
17    A.  Correct.
18    Q.  Now, I guess technically she didn't
19 lose the house.  That would have been you and
20 your wife that would have done that; right?
21    A.  Correct.  She lost -- She had a
22 room.  She had her own stuff in there, too,
23 you know.
24    Q.  She had possessions that she lost.
25    A.  Correct.

Page 89

23  (Pages 86 to 89)

KENNETH ARMSTRONG (MRGO)                                      7/9/2007

1      Q.   And I take it they were unique to
2  her in terms of what they meant to her?
3      A.   I would agree.
4      Q.   Does she, Renee, have any physical
5  type injuries, a disease or broken bones or
6  anything like that?
7      A.   No.
8      Q.   Has she been to a doctor?
9      A.   No.
10     Q.   And not taking any medication for
11 any kind of mental distress?
12     A.   No.
13     Q.   And how about the other two kids; do
14 you know, are they on any antidepressants or
15 anything like that?
16     A.   No, none of them.
17     Q.   Or under a doctor or some medical
18 provider's care for mental distress or
19 emotional distress?
20     A.   No.
21     Q.   Now, you look down there on that
22 form at 12-A, as you move down towards the
23 bottom, you see the figure for property
24 damage, 500,000?
25     A.   Uh-huh (affirmatively).

                                        Page 90

1      A.   Well, --
2           MR. GILBERT ANDRY:
3             Objection to the form.
4             But you can answer.
5           THE WITNESS:
6             I don't know.  There's a lot of
7  things, you know, that you -- you
8  can't replace.  I can't -- I guess
9  pictures of my daddy, who is deceased;
10 there's, you know, our wedding album.
11 You can't replace that.  I mean, what
12 value is that?  My wife's diamond
13 ring, even though she found it, it's
14 pitted, it's ruined.  There's other
15 things.  I don't know.  Pictures of
16 your kids.  You know, I don't think
17 anybody in here would want to lose any
18 of that.  You know, how do you put a
19 value on that?
20 EXAMINATION BY MR. MARPLE:
21     Q.   And what you're saying is that it's
22 an individualized value to you; correct?
23          MR. GILBERT ANDRY:
24            Objection to the form.
25 EXAMINATION BY MR. MARPLE:

                                        Page 92

1      Q.   And that's a "yes", I take it?
2      A.   Yes.  Yes.
3      Q.   Do you know where that number came
4  from?
5      A.   I guess it was just something we
6  maybe put together.
7      Q.   All right.  And as you sit here
8  today, you can't come up with $500,000 in
9  property damage; correct?
10     A.   No, I wouldn't think.
11     Q.   We talked about the numbers for the
12 house and the boat and the belongings --
13     A.   Right.
14     Q.   -- where we have got at least
15 ballpark figures and it doesn't come up to
16 500,000; correct?
17     A.   It depends on what you have to do to
18 replace what you got.  I wouldn't know until
19 we have to go out and replace what we had.  I
20 don't know if it meets $500,000.
21     Q.   And to replace what you had in terms
22 of those belongings, that's going to be an
23 individual situation with you and your wife
24 and kids to add all of that up and look at it
25 and see what it was; right?

                                        Page 91

1      Q.   Is that right?
2      A.   I would say yes.  On top of other
3  things.
4      Q.   Then on personal injury, the next
5  one, 12-B, is 500,000 --
6      A.   Right.
7      Q.   -- dollars?  Do you see that?
8      A.   Yes.
9      Q.   And do you know where that came from
10 or what that consists of?
11     A.   No, I think we maybe just -- there
12 was five of us in the house, so every one of
13 us, you know, even though you don't see a
14 doctor, you know, you -- Like I told you, my
15 family lives this every day, not just -- The
16 whole community does.  So I think that was a
17 value.  Some people put more, some people put
18 less.  I don't -- You know, like say, I have
19 -- I have never been in this situation to
20 have to answer these type of questions or put
21 down what was a personal injury.
22     Q.   And the 500,000 includes Renee and
23 you; right?
24     A.   And my -- my wife.
25     Q.   Your wife and the other two kids?

                                        Page 93

                                24  (Pages 90 to 93)

JOHNS PENDLETON COURT REPORTERS                          800 562-1285

KENNETH ARMSTRONG (MRGO)                                    7/9/2007

1    A. Correct.
2       Q. And that would be $100,000 apiece?
3    A. I would say. Yes.
4       Q. There's a letter -- Let me back up
5    just a second. This is dated June 23rd,
6    2006. Is that correct? If you look at it?
7    A. Okay.
8       Q. Is that right?
9    A. Yes.
10      Q. Is that your signature there on
11   13-A?
12   A. That is mine.
13      Q. It is?
14   A. Yes.
15      Q. And then on the last page. Oh, I'm
16   sorry. We may have been looking at a
17   different page. That's your signature on the
18   very last page; right?
19   A. Right.
20      Q. Let's look back on the form itself
21   at the bottom there where it's dated, under
22   number 14, June 23rd, 2006. Do you see it on
23   the bottom here?
24   A. Uh-huh (affirmatively).
25      Q. Do you see that? I am only asking

Page 94

1       Q. Do you remember signing this?
2    A. I'm sure I did. It was two years.
3    18 months, whatever it is, 19 months.
4       MR. MARPLE:
5          And if we haven't identified
6       that, I think we identified that as
7       deposition Exhibit 2. Is that right?
8       MR. GILBERT ANDRY:
9          2 in globo, and I tried to
10      identify with particularity, I think
11      you and I both did, the documents that
12      made up Exhibit 2.
13   EXAMINATION BY MR. MARPLE:
14      Q. We put a little sticker on that page
15   that says Exhibit 2. Right?
16   A. Exhibit 2, yes.
17      Q. Look at Exhibit 1 there for a
18   second. Do you know any of the other people
19   on there besides your wife Jeannine?
20   A. I met Miss -- That's not her. I
21   think it's Glynn -- Glenda Wade. I met her
22   maybe a week ago.
23      Q. All right. And without telling me
24   anything anybody said, did you and some of the
25   other Plaintiffs in this lawsuit get together

Page 96

1    for a "yes" or "no" out loud for the Court
2    Reporter.
3    A. Right.
4       Q. Now, the signature over there, 13-A,
5    that's not yours, is it?
6    A. No.
7       Q. Do you know whose it is?
8    A. I can't make it out at this time.
9       Q. But by then you were working with
10   the Andry Law Firm?
11      MR. GILBERT ANDRY:
12         I object to the form. But you
13      can --
14   EXAMINATION BY MR. MARPLE:
15      Q. You were represented by the Andry
16   Law Firm at that time; is that correct?
17   A. That paper says it, yes.
18      Q. And as a matter of fact, on the last
19   page it says October 28, 2005.
20   A. Right.
21      Q. So by then you were represented by
22   the Andry Law Firm in a claim against the
23   United States Army Corps of Engineers and
24   other parties; right?
25   A. Right. I would say yes.

Page 95

1    with the lawyers in some way?
2    A. Well, we were leaving and she was
3    coming in.
4       Q. And so in meeting -- in connection
5    with meeting with your lawyers, you passed and
6    made her acquaintance?
7    A. No, we was actually sitting down and
8    I guess we -- me and my wife, my wife was
9    coming from treatment for her brain tumor and
10   we actually had run late getting there and I
11   think she was scheduled to come in after we
12   were finished, but we were actually late
13   getting to the thing so we ran over a little
14   bit and she actually came in a little early.
15      Q. And that was in connection with the
16   lawsuit as opposed to just out on the street
17   somewhere?
18   A. Correct.
19      Q. And did you know Ms. Wade before
20   that?
21   A. No.
22      Q. And are there other persons that are
23   involved in this lawsuit as Plaintiffs besides
24   those? And I can show you a list in a minute,
25   but I just wondered. Do you know anybody else

Page 97

25  (Pages 94 to 97)

1   that's involved in the lawsuit?
2       A.  Of these people here?
3       Q.  Right.
4       A.  No, I know none of them.
5       Q.  I'm going to show you a little
6   longer list and we'll mark it maybe if you
7   know somebody.  Well, we'll mark it.  I'll
8   show you what we have marked as Exhibit 3,
9   which is a three-page document.  And again,
10  I'll represent that this is some information
11  provided by your lawyers to us.  These are
12  some other people involved in an aspect of
13  this litigation.  I just wondered if you could
14  look through that and tell us whether you know
15  any of those people.
16      A.  No, I do not.
17      Q.  All right.
18      A.  Not by name.
19      Q.  Let me show you what we have marked
20  as Exhibit 4, and that's a four-page
21  document.  Is that correct?
22      A.  Yes.
23      Q.  All right.  And this is a claim, if
24  you look at the top, against the -- submitted
25  to the United States Army Corps of Engineers
                                          Page 98

1   connection with the submission of this form to
2   the Army Corps of Engineers?
3       A.  Me and my wife filled out some
4   papers.  You know, we signed it, I'm sure we
5   did this.  We signed these papers.
6       Q.  Let's just try to get it clear.  You
7   don't remember what you might have done, or
8   you think your wife did it?
9       A.  My wife might have did it and I
10  might have signed it, you know.  I have been
11  giving her my whole life so I trust her, you
12  know, what we needed to fill out.
13      Q.  And do you remember during that time
14  frame, which would have been -- Well, let's
15  say in October of 2005, October 28th when she
16  signed this, and you signed one just like it,
17  --
18      A.  Okay.
19      Q.  -- did you go into the lawyer's
20  office to do that?
21      A.  My wife might have brought some
22  papers home to me.  She might have went
23  because I know she visited maybe in St.
24  Bernard one time.  And I don't know if this
25  was the document she got.  I am not sure.  I
                                         Page 100

1   on behalf of Jeannine B. Armstrong.
2       A.  Okay.
3       Q.  Right?
4       A.  Yes.
5       Q.  And if you look at the information
6   there -- Well, I'll just ask.  That's not your
7   wife's signature down there at the bottom of
8   the first page; correct?
9       A.  Don't look like it.
10      Q.  Do you know whose it is?
11      A.  No, I do not.
12      Q.  If you look on the third page,
13  there's a form similar to the one that was on
14  yours that's got her name printed and then
15  signed above; right?
16      A.  Right.
17      Q.  Is that her signature?
18      A.  That looks like hers.
19      Q.  And did you provide any information
20  to anyone in connection with your wife
21  submitting this form to the Army Corps of
22  Engineers?
23      A.  What's that one more time?
24      Q.  Did you provide any of the
25  information to anyone that you know of in
                                          Page 99

1   don't know if we called and maybe they mailed
2   it to us.  I am not sure.
3       Q.  Now, with respect to your job, we
4   touched on this, but is there any loss of
5   income that you have from your job as a result
6   of Katrina?
7       A.  No.
8       Q.  Did you have any side businesses or
9   anything like that that you were involved in?
10      A.  Me and my brother used to cut grass
11  before the storm.
12      Q.  Before Katrina?
13      A.  Yes.
14      Q.  Did you have the lawnmowers or did
15  he have them or both of you have them or what?
16      A.  Just depends on where we were that
17  day, where we finished up.  Because we lived
18  -- It depends on where we had to go to the
19  next time we went out.
20      Q.  How close did your brother --
21      MR. GILBERT ANDRY:
22          So the answer is both of you had
23      them?
24      THE WITNESS:
25          Correct.
                                         Page 101

KENNETH ARMSTRONG (MRGO)                                    7/9/2007

| | |
|---|---|
| 1  EXAMINATION BY MR. MARPLE: | 1  -- The closest one to my home was the |
| 2  **Q.  How close did your brother live to** | 2  Intracoastal that I heard of.  I mean that I |
| 3  **you?** | 3  actually saw.  You know, they said there was |
| 4  A.  Four miles. | 4  some lower -- below the -- |
| 5  **Q.  Give me his name again?** | 5  MR. GILBERT ANDRY: |
| 6  A.  Brian Armstrong. | 6  This is what he is actually |
| 7  **Q.  And when I say pre-Katrina, were you** | 7  getting at.  Is that what you saw on |
| 8  **doing this at the time of Katrina, that is, in** | 8  the news? |
| 9  **the weeks right before that, or was that** | 9  THE WITNESS: |
| 10  **something a little further back?** | 10  That was on the news that I |
| 11  A.  Correct.  We were in a phase-out | 11  actually saw on Monday, on the news. |
| 12  mode when Katrina hit. | 12  EXAMINATION BY MR. MARPLE: |
| 13  **Q.  Getting to be too darn hot and too** | 13  **Q.  That was some aerial shot from a** |
| 14  **much darn work?** | 14  **helicopter or airplane and they were showing** |
| 15  A.  Yeah. | 15  **the shot?** |
| 16  **Q.  Pardon?** | 16  A.  Correct. |
| 17  A.  You're right. | 17  **Q.  Now, over that -- what I am really** |
| 18  **Q.  Now, do you know, did you have any** | 18  **getting at is closer to your house, do you** |
| 19  **looting or vandalism at your house?** | 19  **know if there was a breach of that levee that** |
| 20  A.  Like I say, there wasn't -- You | 20  **we called the 40 Arpent or the canal --** |
| 21  know, we were single stories.  I don't think | 21  **Florida Canal or whatever that big levee is** |
| 22  there was anything worth taking that I know | 22  **that's a few hundred yards from your house?** |
| 23  of. | 23  MR. GILBERT ANDRY: |
| 24  **Q.  How about people in that -- some of** | 24  And I object to the form, "big". |
| 25  **your relatives that you told us about or** | 25  I don't know what that means. |
| Page 102 | Page 104 |

| | |
|---|---|
| 1  friends you knew that lived in that Buccaneer | 1  EXAMINATION BY MR. MARPLE: |
| 2  Villa; did they have looting? | 2  **Q.  Probably a bad question.  Let's try** |
| 3  A.  I had a neighbor who had a two story | 3  **it a little differently.  There's a big levee** |
| 4  house next door, I don't know, I'm not sure | 4  **near your house that we talked about before.** |
| 5  about the water they had, but one time I was | 5  MR. GILBERT ANDRY: |
| 6  back there and I seen somebody coming out of | 6  Objection to form still.  You |
| 7  the house, but I don't know who they were or, | 7  have to quantify "big" for me. |
| 8  you know -- I really didn't pay a whole lot of | 8  EXAMINATION BY MR. MARPLE: |
| 9  attention to it because I just don't think | 9  **Q.  There's a levee near your house a** |
| 10  there was anything worth taking.  My brother | 10  **few hundred yards.  We talked about it** |
| 11  in Lexington Place, though, his house was -- | 11  **earlier.  Right?** |
| 12  copper was taken out, things like that.  His | 12  A.  Right. |
| 13  upstairs at his home was -- a little bit of | 13  **Q.  With respect to that levee, did it** |
| 14  the carpet on the second floor got wet, but | 14  **breach anywhere that let water in that came up** |
| 15  somebody actually looted his house. | 15  **around your house?** |
| 16  **Q.  Were there any houses there in your** | 16  A.  To my knowledge, no. |
| 17  **immediate neighborhood that you saw that got** | 17  **Q.  Did it overflow?** |
| 18  **blown up because of the gas, natural gas lines** | 18  A.  To my knowledge, no. |
| 19  **or gas explosions?** | 19  **Q.  And when you say to your knowledge,** |
| 20  A.  I didn't see any. | 20  **I think you told us earlier you're not sure** |
| 21  **Q.  Now, if I asked this before, I** | 21  **one way or the other; right?** |
| 22  **apologize, but do you know whether there were** | 22  A.  To my knowledge, no.  You know, if I |
| 23  **any breaches of the levee that was right a few** | 23  can answer that, though, I'm going to tell you |
| 24  **hundred yards away from your house?** | 24  about the breach, because the metal -- It's |
| 25  A.  Like I say, I never seen -- The only | 25  got metal girder on top of the levee and it's |
| Page 103 | Page 105 |

27  (Pages 102 to 105)

KENNETH ARMSTRONG (MRGO)                                    7/9/2007

---

1   all still there.  So if there was a breach, it
2   would have -- you know, you would see evidence
3   of it from my house.
4       Q.  And there's a pumping station not
5   too far from your house; right?
6       A.  Correct.
7       Q.  And gates there at that pumping
8   station around the levee?  Am I wrong or
9   right?
10      A.  Not just -- Riding by and turning
11  and coming to my subdivision, well, the
12  pumping station is up with the levee.  It's up
13  on -- you know, up high like the levee.
14      Q.  Do you know -- I am just going to
15  ask you some -- was your house anchored on
16  that slab?  Do you know?
17      A.  Oh, yes.
18      Q.  And did you look at any --
19      A.  When you mean "anchored", you mean
20  was it nailed down to the concrete and studs
21  bolted down?
22      Q.  Bolted down.
23      A.  I'm not sure because I wasn't there
24  when they tore the house down.  So -- But as
25  far as was it nailed into the concrete or
                                        Page 106

1   after we were there, four or five years after
2   we were there, six years, something like that,
3   and then that was the second time.
4       Q.  All right.  And when you had it
5   replaced the second time, which just ballpark
6   was five or six or seven years before
7   Katrina?
8       A.  I'd say yeah.  I'd say anywhere from
9   six to eight years.
10      Q.  And at that time was it replaced
11  because it was worn out or had you had some
12  hail damage or what?
13      A.  You know, that's probably a good --
14  It was -- We had a hail storm come through and
15  we had filed a claim and they paid us and we
16  replaced the roof.  I am not exactly sure of
17  the year that was.
18      Q.  And at the time just before Katrina,
19  was that roof okay?
20      A.  Yeah.  It was acceptable for the
21  insurance company.
22      Q.  Was it leaking in any way?
23      A.  No.
24      Q.  Before Katrina what were your
25  approximate taxes, real estate taxes that you
                                        Page 108

1   something?  I would imagine they had to do
2   that.
3       Q.  It was fastened to the concrete
4   slab, but what it was fastened with you don't
5   know?
6       A.  Correct.
7       Q.  Do you know if you had hurricane
8   joints up on the roof?
9       A.  I got pictures we could see.  I am
10  not sure.
11      Q.  And what was your roof made out of?
12  Tin, shingle, tile?
13      A.  Shingles.
14      Q.  And how long had it been on that
15  house?
16      A.  Trying to remember, because I had
17  just -- When I went with Liberty Mutual I had
18  to show a receipt.  I don't know, seven years,
19  six years, eight years.  Seven.  Something
20  like that.
21      Q.  Was that the only time you replaced
22  it after you bought it?
23      A.  No, that was the second time.
24      Q.  And so --
25      A.  I replaced it maybe a few years
                                        Page 107

1   were paying?
2       A.  For the house?
3       Q.  Yes.
4       A.  To be honest with you, we were -- I
5   was tax-exempt up until -- I think we paid
6   300, $300 to $400.
7       Q.  A year for some period of time
8   before Katrina?
9       A.  Correct.  It was $300 or $400.
10      Q.  And before that you were exempt
11  because you had a homestead exemption?
12      A.  At the time of the period of 75 -- I
13  think it was $75,000.
14      Q.  And then since Katrina your taxes
15  are zero, real estate taxes?
16      A.  Correct.  Well, no.  No, no.  No,
17  no.  Because I got to pay taxes on the
18  property because there is no house there.
19  Houses were deemed --
20      MR. GILBERT ANDRY:
21      Exempt.
22      THE WITNESS:
23      Exempt.  But now I got to pay
24  taxes.  There's no house, I got to pay
25  taxes on property.
                                        Page 109

---

28  (Pages 106 to 109)

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

EXAMINATION BY MR. MARPLE:

Q. How much are you paying?

A. My first -- My note is going to be -- I mean my -- I think it's in October I got to pay 250 or 350. I am not sure what it is.

Q. $250 or $350 --

A. Right.

Q. -- per year just on that slab sitting there?

A. Correct.

Q. What's the value of that slab right now?

A. Oh, I am not sure.

Q. I mean the lot.

A. I mean, who would pay for it?

Q. Not too much?

A. Right.

Q. And do you know of anybody that's sold one out in that area?

A. The property?

Q. Yes.

A. No. Other than with a home on it of some sort.

Q. Now, I think you mentioned at some point there was some tax benefit you got on

Page 110

your Federal income tax because of the disaster loss and so forth? Is that --

A. It was -- There was a tax on the -- The sales tax, there was something. I don't know if my wife ever -- but there was -- there was some type of tax -- tax break on the losses.

Q. Then have you gotten money -- Well, let's back up. Did you get any FEMA money right after Katrina?

A. They gave us some type of rental assistance right after.

Q. How long did that last?

A. It stopped for me last June maybe.

Q. In June of 2006?

A. Right.

Q. So seven, eight, nine months, whatever it was?

A. Correct. Something like that.

Q. How much was it?

A. I think they gave you maybe 800 a month. Whatever the -- I think up to a certain point because the rent had jumped up so much, they basically either paid if it was under that or subsidized, you know, $800, 824,

Page 111

something, something like that.

Q. And how much is the rent over there at that apartment in Covington?

A. About 1,050, 1,075, 1,080, something like that.

Q. Any other FEMA relocation money or anything like that you can think of?

A. No. No, they said we made too much money.

Q. All right. And have I -- We're talking about the Road Home that you have applied for. Are there others?

A. That's it.

Q. Do you have any grandchildren?

A. No. Thank goodness, no.

MR. GILBERT ANDRY:

You should say not yet.

THE WITNESS:

Well, not one yet.

EXAMINATION BY MR. MARPLE:

Q. Did you get any kind of unemployment benefits or anything like that at any time?

A. No.

Q. What about your wife?

A. No. Wait up on that. I'm -- My

Page 112

wife might have gotten unemployment. She might have got it.

Q. Do you know if she is getting it now?

A. No. She hasn't -- She -- No.

Q. I may have asked this, but over the years did you follow at all what was going on with various levees around New Orleans and their progress in terms of whether they were being updated or dredged or widened or heightened or anything like that?

A. Did I follow it?

Q. Did you follow that, the progress of any of that?

A. No. No, I didn't.

Q. What entities or persons were responsible for the water that came up around your house?

A. I am not sure. I would -- You know, I don't know who -- I don't actually know who maintains the levees, the structures. I don't actually know who all the people are who built them. I can only guess, you know.

Q. And do you include an act of God as part of what happened to your house?

Page 113

```
 1        MR. GILBERT ANDRY:
 2            I object to the form.
 3        THE WITNESS:
 4            What I would think is if you look
 5    at, based on my opinion only, if those
 6    levees were just topped versus breaks
 7    in them, we might not be sitting here
 8    today.  I don't think you would have
 9    nowhere near the water we had.
10    EXAMINATION BY MR. MARPLE:
11        Q.  Have you done any investigation or
12    learned anything about had levees not
13    breached, what amount of water would have come
14    over from over the tops of the levees or come
15    from rain and how high that water would have
16    gotten?
17        A.  No.  I just had a conversation with
18    a friend of mine who -- I'm not sure who he
19    works for.  He works for the Parish, but I
20    think they do some work for the Corps of
21    Engineers.
22        Q.  And what did he say?
23        A.  He just don't think the damage would
24    have been nowhere near -- Some parts of the
25    Parish, and that's just his opinion, that he
                                          Page 114
```

```
 1    Bernard over the years?
 2        A.  I mean, I saw the erosion.  I fished
 3    and hunted down there for years.  They started
 4    putting the freshwater diversions in, and some
 5    sides it helped.  It helped on the -- I would
 6    say the -- If you going down the road, it
 7    helped on the right side of the marsh, but the
 8    MRGO, closer to the MRGO, it was still
 9    deteriorating out towards Lake Borgne.
10        Q.  And describe for me what you saw in
11    terms of it deteriorating.  What did you see?
12        A.  Well, just land that used to be
13    there is not there any more.  This is
14    ongoing.  The -- You know, if I am not
15    mistaken, when I was a kid, the buoys that
16    marked the channel for the ships in-going and
17    out-going was actually on land.  And now they
18    out in the water, you know, in some places 50
19    yards and stuff like that.  I stopped fishing
20    that area.
21        Q.  You left 27 hours I think you told
22    us roughly before the storm; did I get that
23    about right?
24        A.  Correct.
25        Q.  Tell me about what the decision
                                          Page 116
```

```
 1    don't think they would even have gotten
 2    water.
 3        Q.  Do you have any explanation in your
 4    mind of why, for instance, the French Quarter
 5    got no water, virtually no water?
 6        A.  The only thing I would think is the
 7    structure, that the Industrial Canal is built
 8    on our side, not on their side.  Maybe the
 9    structure at the lakefront, the 17th Street
10    Canal might have been too far away to get to
11    them.  That's strictly a guess.
12        Q.  You were too young I guess to
13    remember Hurricane Betsy?
14        A.  Correct.
15        Q.  Have you heard any stories from your
16    relatives about Betsy and what got flooded in
17    Lower Ninth Ward or St. Bernard?
18        A.  I just seen a picture of the Judge
19    Sieber Bridge, which is in the Lower Ninth
20    Ward, when my grandmother lived in the middle
21    of Chalmette had no water.  Where I lived at
22    the time in Violet had no water.
23        Q.  Do you have any knowledge from
24    reading or studying about what was happening
25    to the wetlands down the road and out St.
                                          Page 115
```

```
 1    process was to evacuate.
 2        A.  Well, the storm come up on us, you
 3    know, all of a sudden.  We didn't know nothing
 4    about the storm until Friday about 6:00,
 5    because the storm, we saw that the storm was
 6    supposed to hit Florida.  So we actually -- I
 7    just picked up some shrimp from down in
 8    Plaquemines Parish, brought them home.  So we
 9    have a place to evacuate to.  So that's why we
10    didn't want to get caught up in all the
11    contraflow and all of that.  So we had the
12    boiled shrimp.  I mean had the shrimp.  I
13    didn't want to put them in the freezer, so a
14    good friend of mine who lives out there is a
15    riverboat pilot, in Pilottown, we had a place
16    to stay, we had a place to go.  So we stayed
17    Saturday, boiled the shrimp by the hot tub and
18    the swimming pool by his house, and I was
19    leaving the next morning.  My boat was
20    supposed to go by his house because he was
21    staying.  He lives in almost a three story
22    home, so he was going to stay.  Well, we were
23    leaving anyway in the morning.  We were going
24    to take Airline Highway the back road.  We
25    never had to get caught up in the contraflow.
                                          Page 117
```

                                        30  (Pages 114 to 117)

1  And say about 2:00 in the morning he called
2  and for whatever reason he thinks he's a
3  better weatherman than most people and he
4  think he gets better data because he's a
5  pilot. Anyway, he said, "You better head out
6  of there." So he needed a place to stay. So
7  anyway, he got me and my wife out of bed and
8  we left, we took Airline Highway, and it was a
9  little traffic, but no stop and go like on --
10  That was why -- But we were leaving anyway
11  that morning to go to my sister-in-law's house
12  in Baton Rouge.
13     Q.  And how far out can you go on
14  Airline Highway?
15     A.  How far out?
16     Q.  Can you go all the way to Baton
17  Rouge on Airline Highway?
18     A.  Oh, yeah. You can go all the way to
19  Houma if I am not mistaken.
20     VIDEO OPERATOR:
21        Off the record. It is 11:43.
22     (Recess.)
23     VIDEO OPERATOR:
24        Returning to the record. It's
25     11:48.
                                    Page 118

1  my destroyed house on the block, so I went and
2  talked to them and they said, "No, sir, you
3  are tax-exempt." I said, "Okay." I said,
4  "They tore my house down." She said. "Oh,
5  wait. They tore your house down?" I said,
6  "Yes, it was damamged." She said, "Since
7  there's no house, it's not exempt." That's
8  what they told me.
9     Q.  As I think you had told us sometime
10  in maybe -- it was sometime in 2007 when they
11  actually took the house down? You're not
12  sure?
13     A.  I would say yes, early 2000.
14     Q.  2007?
15     A.  '7. That's my guess.
16     Q.  And before that you didn't have to
17  pay any taxes because you had a homestead
18  exemption?
19     A.  No, we had just started paying taxes
20  on the property back then. I don't know if it
21  was two to three years we started paying
22  taxes.
23     Q.  But once they took it down, then
24  this homestead exemption or something goes
25  away, at least that's your understanding, so
                                    Page 120

1  EXAMINATION BY MR. MARPLE:
2     Q.  Let me hand you what we have marked
3  as Exhibit 5 and I'll represent to you that
4  that's the property tax inquiry that you get
5  online.
6     A.  Okay.
7     Q.  And I want to ask if this is
8  consistent with your understanding of the
9  assessment of the slab at 4016 Hamlet as that
10  lot in Chalmette. It says "$4,128 total
11  assessment". Is that consistent with what you
12  think the assessment is?
13     A.  Is that what they saying the
14  property is worth now?
15     Q.  I think so. But I am just asking.
16     A.  I am not familiar with this
17  document.
18     Q.  All right. Then it says the "Total
19  taxable" and it says zero, and I just wondered
20  if --
21     A.  No. Well, what happened was, when I
22  went in there to talk to them about -- because
23  the time of when the storm hit, I didn't want
24  to pay -- to make sure -- I wanted to check on
25  taxes on my house. I didn't want them to sell
                                    Page 119

1  you have got to pay some tax on that lot?
2     A.  Correct.
3     Q.  I am not going to mark these to
4  start with. I just want to ask you if this is
5  your house (indicating).
6     A.  That's the back of it.
7     Q.  Pre-Katrina?
8     A.  Pre-Katrina.
9     Q.  And there's a trampoline out there
10  for the kids, I guess?
11     A.  Yes.
12     Q.  And I am not sure, it looks like a
13  bucket of tar sitting there. Were you doing
14  the driveway or the roof, or do you know?
15     A.  No, that's just a bucket.
16     Q.  Just a bucket. And then is this,
17  the next one I am showing you, also your
18  house?
19     A.  Yes.
20     Q.  Pre-Katrina?
21     A.  Yes.
22     Q.  And was that garage finished out a
23  little bit in some way?
24     A.  You mean as far as another bedroom
25  or something?
                                    Page 121

31 (Pages 118 to 121)

KENNETH ARMSTRONG (MRGO)                                    7/9/2007

1       Q.  Yes.
2       A.  No.
3       Q.  Did it have -- It was used as a
4   garage or storage area as opposed to a room?
5       A.  Storage and laundromat.
6       Q.  And then post-Katrina, let me show
7   you one, is that what the lot looks like more
8   or less today?
9       A.  The one to the left, yes.
10      Q.  The slab sitting there?
11      A.  That's my slab yes.
12      Q.  And then there's this big two story
13  house next door; right?
14      A.  Right.
15      Q.  Who lived there?
16      A.  Carl Gaines.  He's a computer genius
17  for the Parish.
18      Q.  And was he the one you were telling
19  me that you saw somebody come out of there, it
20  was a two story house and you didn't know if
21  there was anything in there worth anything or
22  not?
23      A.  Correct.  I didn't know what his
24  business was there.  He was parked in front
25  and, like I say, I pulled up in front of my
                                        Page 122

1       Q.  -- Exhibit 6.  And the house we have
2   just been talking about, your neighbor there,
3   is shown in Exhibit 6.  Is that right?
4       A.  Correct.
5       MR. GILBERT ANDRY:
6          I'll tell you what.  Just so the
7       record is complete, why don't we
8       attach it and refer to the two
9       photographs of his house as 7 and 8.
10      MR. MARPLE:
11         We'll do that.
12  EXAMINATION BY MR. MARPLE:
13      Q.  I believe the first one we talked
14  about was Exhibit 7.  Is that right?
15      A.  Correct.
16      Q.  And that's your house pre-Katrina?
17      A.  Correct.
18      Q.  And then 8 shows two photos of it
19  also pre-Katrina; right?
20      A.  Correct.
21      Q.  Do you know when, about when 7 and 8
22  were taken?  I mean, what year about?
23      A.  I was thinking for insurance
24  purposes, but I don't think it is.  Because of
25  the -- that trampoline.  Most insurance
                                        Page 124

1   house and that was it.
2       Q.  Looked suspicious to you, though?
3       A.  You saw a lot of different people
4   back in those areas.  I don't know if it could
5   have been an adjustor.  Could have been -- I'm
6   not sure, you know.
7       Q.  Do you know anything about where he
8   stands on any claims for wind or rain damage
9   with his insurer?  Have you talked to him
10  about it?
11      A.  I just talking to him, he actually
12  did okay with the wind and rain.
13      Q.  And if you look at that picture, you
14  see that roof --
15      A.  Right.
16      Q.  -- is kind of torn up.
17      A.  Correct.
18      Q.  Because it's two story so he's --
19  he's got a different set of circumstances than
20  yours because of it being a two story house.
21      A.  Correct.
22      Q.  Why don't we mark that one as --
23      MR. GILBERT ANDRY:
24         6.
25  EXAMINATION BY MR. MARPLE:
                                        Page 123

1   companies don't want to see a trampoline in
2   the yard.
3       Q.  So if you were trying to get
4   something insured, you wouldn't have included
5   that trampoline in the photo; right?
6       A.  Correct.
7       Q.  Do you know why they were taken?
8   There's people in them, so it looks like to me
9   you were taking them for some purpose to do
10  something with, or some business reason not
11  with respect to insurance or something like
12  that.
13      A.  I am not sure.  I would be lying if
14  I told you.
15      Q.  And these are ones you found after
16  Katrina.  Is that correct?
17      A.  Well, what we did, we had a bunch of
18  our photos from maybe George in a plastic --
19  We had all our pictures still in there from
20  the previous evacuation.  So we were able to
21  take a tub of pictures and throw them into the
22  truck, into the Suburban to take.
23      Q.  And so these are --
24      A.  These are actually ones we found in
25  the tub of pictures.
                                        Page 125

32  (Pages 122 to 125)

1     Q.  That tub of pictures is something
2  you took with you --
3     A.  Correct.
4     Q.  -- when you went to Baton Rouge?
5     A.  Correct.
6     Q.  And you said that was the second
7  evacuation.  When was the other one?
8     A.  I don't know, Hurricane George, what
9  was it -- I don't know when it was.
10     Q.  Hurricane George?
11     A.  I think, if I am not mistaken, that
12  was the last time I evacuated.
13     Q.  And did you sustain any damage
14  during that storm?
15     A.  No.
16     Q.  And were there other times you
17  evacuated besides George?
18     A.  Maybe one other time.
19     Q.  And when was that?  Before or after
20  George?
21     A.  I am not sure.  I would have to see
22  the hurricanes to see which ones I evacuated
23  from.
24     Q.  And am I correct -- Well, let me ask
25  it.  Any other time you have evacuated did you

                                        Page 126

1     Q.  If it had fallen on the house that
2  would have helped you with the homeowner's
3  insurance, because you'd have had a wind
4  damage falling into the house or something.
5  Is that why you would like it to have fallen
6  into the house?
7     A.  I guess.
8     Q.  I mean, it would help you on your
9  homeowner's; right?
10     A.  Well, it would have took away the
11  wind versus water.
12     Q.  And there were some trees that fell
13  into houses where people then did get to
14  collect on the homeowner's wind, rain policy;
15  right?
16     A.  My in-laws, which lived -- If you
17  came out of my house and looked to your left,
18  we lived -- the two story is a cul-de-sac.
19  Where the cul-de-sac is, my in-laws lived
20  right there and they had a pine tree fall on
21  their house, and they denied it.
22     Q.  They had a pine tree fall on the
23  house?
24     A.  Yeah.
25     Q.  And they then -- that was wind

                                        Page 128

1  come back to any damage?
2     A.  No.  Just from the oak tree, I
3  mean.  I saw it, that's a hell of a clean-up.
4  For the yard.  For leaves.  You know,
5  branches, stuff like that that fell.
6     Q.  Wind damage?
7     A.  No wind damage.
8     Q.  And you had a great big old tree in
9  the front yard; right?
10     A.  Yes, I did.
11     Q.  What happened to it?
12     A.  It's still there.  It's still there.
13     Q.  It's still there?
14     A.  Well, no.  After the storm, I mean.
15  You should have pictures of it.  I thought you
16  had pictures of it.  Actually, the branch that
17  breaks off that comes away from the house that
18  comes -- You can't see it in this picture.
19  Here a little bit here it comes out, it fell.
20     Q.  A part of the tree fell?
21     A.  Correct.
22     Q.  Did it fall onto the house?
23     A.  No.  That's what I am saying.  The
24  branch that came away from the house fell.  I
25  was hoping it fell on the house.

                                        Page 127

1  damage, right?
2     A.  Right.
3     Q.  Some of these didn't even hit
4  Louisiana or they were in the vicinity, but I
5  will just ask them.  Camille, you were too
6  young.  You didn't evacuate; right?
7     A.  My family, we -- we went into a
8  school.  The Palmer School.
9     Q.  And then did your family's house
10  have any damage that you remember?
11     A.  No.
12     Q.  Andrew?
13     A.  I don't think so.
14     Q.  Betsy, you were too young to
15  remember; right?
16     A.  Yes.
17     MR. GILBERT ANDRY:
18         I remember -- I remember Betsy so
19     you have got to remember Betsy.
20     THE WITNESS:
21         Two years old.
22     MR. GILBERT ANDRY:
23         I know.  I remember one day.
24     THE WITNESS:
25         That's why you're a lawyer and

                                        Page 129

| | |
|---|---|
| 1    I'm a beer man. | 1    much, right? |
| 2  EXAMINATION BY MR. MARPLE: | 2        Let me show you what I have marked |
| 3      Q.  Let me show you a Google map here. | 3  as Exhibit 9.  And that is some big document |
| 4  The arrow there is kind of sitting right on | 4  that's entitled "Plaintiff's response to MRGO |
| 5  top of Hamlet as it goes around the turn. | 5  Defendants' First Set of Joint Class |
| 6  Right? | 6  Certification Requests For Admissions, |
| 7      A.  Right. | 7  Interrogatories and Requests For Production of |
| 8      Q.  And the in-law you were talking | 8  Documents."  Correct? |
| 9  about lived, if you look at this map, it would | 9      A.  Yeah, I guess so. |
| 10  have been right around the corner on the one | 10      Q.  Have you ever seen that document |
| 11  that runs the same direction as Benjamin and | 11  before? |
| 12  Hermitage Drive, right? | 12      A.  I think we have seen it.  I think |
| 13      A.  No, what it is, you don't see Hamlet | 13  it's something we had. |
| 14  actually bent -- Hamlet starts right here | 14        MR. GILBERT ANDRY: |
| 15  (indicating). | 15        We don't want you to think.  Have |
| 16      Q.  Right. | 16  you ever seen it? |
| 17      A.  I lived last -- I lived the last | 17        THE WITNESS: |
| 18  house before the cul-de-sac starts.  There's | 18        Well, I saw a big document like |
| 19  one, two, three houses and my in-laws are the | 19  this. |
| 20  first house after the cul-de-sac.  So it's | 20        MR. GILBERT ANDRY: |
| 21  actually three houses away. | 21        But you don't know if that was it |
| 22      Q.  All right.  Three houses away from | 22  or not? |
| 23  you. | 23        THE WITNESS: |
| 24      A.  Correct. | 24        Correct. |
| 25      Q.  From what you were talking about | 25        MR. GILBERT ANDRY: |
| Page 130 | Page 132 |
| 1  where the pine tree fell. | 1        Okay. |
| 2      A.  Right. | 2  EXAMINATION BY MR. MARPLE: |
| 3      Q.  That's good.  You have a commercial | 3      Q.  Look over on page 21.  You see that |
| 4  driver's license? | 4  where it says Interrogatory number 15? |
| 5      A.  Yes, I do. | 5      A.  Uh-huh (affirmatively). |
| 6      Q.  And is there a reason you have | 6      Q.  Yes? |
| 7  that?  Driving beer trucks? | 7      A.  Yes. |
| 8      A.  It's a requirement for everybody at | 8      Q.  Can you look at that question and |
| 9  the company.  If you physically can go on a | 9  tell me, not what you did provide, but if you |
| 10  truck, it's a requirement for the company. | 10  provided any information to your lawyers along |
| 11      Q.  Let me show you -- | 11  the lines to answer that question. |
| 12        MR. MARPLE: | 12      A.  The only thing we provided was my |
| 13        Which one are we ready for? | 13  wife, any kind of substantiated information. |
| 14        MR. GULOTTA: | 14      Q.  And that includes the medical |
| 15        9. | 15  records? |
| 16        MR. GILBERT ANDRY: | 16      A.  Well, for her back maybe.  But |
| 17        9. | 17  nothing for -- That's about it. |
| 18        MR. WEINSTOCK: | 18      Q.  She's got the back problem and then |
| 19        I'm sorry, are you going to mark | 19  she's got the brain tumor problem; right? |
| 20  that map you were showing him? | 20  Those are two kind of separate issues; right? |
| 21        MR. MARPLE: | 21      A.  Correct. |
| 22        We'll mark it as 10. | 22      Q.  Did you provide information in terms |
| 23  EXAMINATION BY MR. MARPLE: | 23  of medical records on those to the lawyers, do |
| 24      Q.  What we have marked as Exhibit 10 is | 24  you think? |
| 25  that little Google map that didn't help us | 25      A.  Yes, we did. |
| Page 131 | Page 133 |

34  (Pages 130 to 133)

KENNETH ARMSTRONG (MRGO)                                    7/9/2007

| | |
|---|---|
| 1     Q.  And you don't have any; right? | 1          MR. MARPLE: |
| 2     A.  Not with me. | 2          Okay. |
| 3     Q.  No, you don't have any related to | 3       VIDEO OPERATOR: |
| 4  yourself? | 4          Off the record.  It's 12:07. |
| 5     A.  No physical. | 5       (Recess.) |
| 6     Q.  Do you have any medical records of | 6       VIDEO OPERATOR: |
| 7  -- | 7          Returning to the record.  It is |
| 8     A.  No. | 8       1:29. |
| 9     Q.  There's none for any of your three | 9  EXAMINATION BY MR. MARPLE: |
| 10  kids, either; right? | 10     Q.  We talked earlier about the |
| 11     A.  No. | 11  categories of damages that you were seeking |
| 12     Q.  Is that right? | 12  for emotional or mental distress; right? |
| 13     A.  Correct. | 13     A.  Yes. |
| 14     Q.  Now, in terms of photographs of your | 14     Q.  And damage to your home, the |
| 15  house, we looked at the before pictures; | 15  structure; correct? |
| 16  right? | 16     A.  Yes. |
| 17     A.  Right. | 17     Q.  And belongings in the house; right? |
| 18     Q.  Are there any after photographs? | 18     A.  Yes. |
| 19     A.  Yeah, you should have some. | 19     Q.  And then that included the boat out |
| 20          (Mrs. Armstrong enters conference | 20  there. |
| 21  room.) | 21     A.  Yeah. |
| 22     Q.  I don't want to mark these yet | 22     Q.  Now, are there any other categories |
| 23  because I'm not sure they're your house.  I | 23  or types of things that you're seeking damage |
| 24  don't think they are.  Are these your house? | 24  for beyond what we have already talked about |
| 25     A.  Yes. | 25  today? |
| Page 134 | Page 136 |

| | |
|---|---|
| 1     Q.  It is?  Do you know what room we're | 1     A.  No, not that I can think of. |
| 2  looking at there? | 2     Q.  We look back at Exhibit 9 and let's |
| 3          MR. GILBERT ANDRY: | 3  go into -- Look back at about page 30.  Let's |
| 4          Unless it's more than one. | 4  back up a little bit.  Beginning on page 27, |
| 5       THE WITNESS: | 5  there's some requests for production of |
| 6          It is. | 6  documents.  If we look at number 5 on page 28, |
| 7  EXAMINATION BY MR. MARPLE: | 7  request for production number 5 on 28, do you |
| 8     Q.  Well, what rooms? | 8  see that? |
| 9     A.  This top is my garage, laundromat. | 9     A.  Okay. |
| 10  And this right here is a picture of my | 10     Q.  Documents that relate to any |
| 11  refrigerator, my countertop gone, looking into | 11  eyewitness account of Hurricane Katrina.  Do |
| 12  the kitchen. | 12  you have any of those type of documents? |
| 13     Q.  I'm going to show you another one. | 13     A.  The eyewitness document?  No. |
| 14  Is that one of your house, too? | 14     Q.  That relate to an eyewitness account |
| 15     A.  Yes. | 15  where -- |
| 16     Q.  And what room is that? | 16     A.  No. |
| 17     A.  That's the kitchen.  And the living | 17     Q.  We talked about number 8, |
| 18  room is on top, too. | 18  photographs, digital video disks, and I |
| 19     Q.  It looks like tin cabinets there, | 19  believe you said you produced photographs and |
| 20  but maybe that is not correct. | 20  that video to your lawyers, they looked at |
| 21     A.  No, that's not tin. | 21  some of those photos today.  Right? |
| 22     Q.  Okay. | 22     A.  Correct. |
| 23       VIDEO OPERATOR: | 23     Q.  Do you know of any other set of |
| 24          Excuse me, Counsel.  I have to go | 24  photos or anything that has anything to do |
| 25          off the record to change tapes. | 25  with your Katrina loss or your house or |
| Page 135 | Page 137 |

35  (Pages 134 to 137)

1   anything like that?
2       A.   None that I have, other than the
3   video and the pictures I produced.
4       Q.   Okay.  Did you keep any kind of
5   diary or record of what you were doing during
6   Katrina or immediately thereafter?
7       A.   No, I didn't.
8       Q.   Do you have a Katrina file at home
9   that's got insurance and everything else in
10  it?
11      A.   Yes, we have some -- some papers and
12  some documentation.
13      Q.   And we talked about some of those
14  insurance papers, the Road Home stuff, maybe
15  things back and forth with your lawyers in
16  this case.  Any other categories of documents
17  related --
18      A.   Not at all.
19      Q.   And if you don't mind, let me just
20  finish my question --
21      A.   Okay.
22      Q.   -- before you answer.  I again
23  apologize for that.  Have you looked at any of
24  the reports, something called the IPET report,
25  the Team Louisiana Report, Independent Levee
                                        Page 138

1   Correct?
2       A.   Yes.
3       Q.   Have you ever seen that document
4   before?
5       A.   Like I say, it looks a lot like the
6   first two you gave me.
7       Q.   Right.  And you weren't -- You're
8   not the filter in the Armstrong household.  If
9   any of these came across -- Let me phrase that
10  differently.  You don't know if any of these
11  came across in front of you before they were
12  filed or not.  Is that right?
13      A.   They might have.  Like I say, I
14  remember seeing, you know, some of these
15  documents, it could have been one, it could
16  have been three, --
17      Q.   Right.
18      A.   -- at different times.  Not sure.
19      Q.   All right.  I show you another one
20  we'll mark as Armstrong 13 that's called
21  Plaintiff's Motion For Class Certification.
22  Have you ever seen that one?
23      A.   Like I say, I am not sure.
24      Q.   Look on page 5 of the last document
25  I showed you.  You see where it mentions
                                        Page 140

1   Investigation Team Report or any of these
2   types of documents that looked at what
3   happened as a result of Katrina and whether
4   the levees were designed correctly or
5   overtopped or breached or whatever?
6       A.   No, I didn't.
7       Q.   Let me show you what we have marked
8   as Exhibit 11, which is another set of
9   responses to discovery in this case, and tell
10  me if you think you have ever seen Exhibit
11  11.
12      A.   It looks a lot like the other one
13  you showed me earlier.
14      Q.   I grant you it does on the front
15  page.
16      A.   This could be the first one I saw.
17  You know what I am saying?  I don't know.
18      Q.   Okay.  So you don't know if you have
19  seen that one or not?
20      A.   Right.  It looks a lot like
21  something I have saw, so it looks a lot like
22  the first one.
23      Q.   I'll show you what we have marked as
24  Exhibit 12, and that's something that's called
25  a Consolidated Class Action Complaint.
                                        Page 139

1   Kenneth Paul Armstrong, Sr. and Jeannine B.
2   Armstrong --
3       A.   Okay.
4       Q.   -- at the top?  And can you look at
5   that paragraph and tell me if the information
6   in it is correct or you have anything to add
7   or change to what's set forth there?  Is it
8   correct?
9       A.   I'd say yes, it is.
10           MR. WEINSTOCK:
11           Can I see Exhibit 13?
12           THE WITNESS:
13           I don't know who the lady is on
14       the bottom there unless that's a lady
15       I met in New Orleans East.
16  EXAMINATION BY MR. MARPLE:
17      Q.   The information that's set forth
18  about you --
19      A.   Pretty accurate, yes.
20      Q.   Let me show you what we have marked
21  as Exhibit 14.  It's actually two pieces
22  there, but it's all one doc.  And that's a
23  notice of deposition, notice of videotaped
24  deposition to you for today.
25      A.   Okay.
                                        Page 141

36  (Pages 138 to 141)

1    Q.  Have you seen that one before?
2    A.  So many things came across, I don't
3  -- I mean, it's possible.
4    Q.  In terms of learning about today's
5  dep, did you just get a call from the lawyers
6  and they said be here on the 9th at 9:00
7  o'clock?  Is that basically what happened?
8    A.  No.  We met -- We met with Jon Andry
9  once before.
10    Q.  Once before today?
11    A.  Correct.
12    Q.  And you told us about that; you --
13    A.  Yes.
14    Q.  -- you passed one of the other
15  Plaintiffs coming in or out of the office;
16  correct?
17    A.  Correct.
18    Q.  If we look at Exhibit A, it's the
19  sort of separate document that's attached?
20    A.  This (indicating).
21    Q.  Yes.  By the way, do you see on the
22  second page of 14, on the notice, it says that
23  we asked you to produce the documents set
24  forth on Exhibit A?  Do you see that?  You see
25  where it asks --

Page 142

1    Q.  By the way, I wanted to ask you, do
2  you know, did you have any friends or
3  relatives that died as a result of Katrina?
4    A.  I only -- Other people who passed
5  away, thinking back, I knew two of them.
6    Q.  And where were they?
7    A.  One was located on the street where
8  I grew up, which is Munster Boulevard, and one
9  was -- stayed at his home off of Paris Road on
10  LaPlace Street.
11    Q.  And do you know how they died?
12    A.  I'd be guessing.  I think they
13  drowned.
14    Q.  And out in St. Bernard Parish out
15  near where you lived there were some deaths;
16  right?
17    A.  Correct.
18    Q.  And the cause of those deaths varied
19  from drowning to electrocution to different
20  things; right?
21    A.  That's what I heard, yes.
22    Q.  Did your wife keep any kind of diary
23  or journal related to Katrina?
24    A.  No.
25    Q.  Or the kids?

Page 144

1    A.  I see that, yeah.
2    Q.  Now, the first question is, did you
3  bring any documents with you today when you
4  came in?
5    A.  No, I have no documents.
6    Q.  You have none with you?  You might
7  have some at home; right?
8    A.  Depending on what you're looking
9  for.
10    Q.  Look at number 3.  We talked about
11  that earlier.  There's documents that relate
12  to insurance claims that you have.  Right?  On
13  Exhibit A, number 3?
14    A.  Okay.
15    Q.  Is that right?  You do have some of
16  those or you or your wife do somewhere;
17  right?
18    A.  Pertaining to her with her back and
19  stuff, yes, we do.  I'm sure we have them.
20    Q.  All right.  But also insurance
21  claims that relate to what you filed with
22  Liberty and -- Liberty Mutual and Allstate,
23  you have got files on those you told me?
24    A.  I'm sure we have documentation on
25  that.

Page 143

1    A.  She -- No.  Not my kids.  My wife, I
2  don't know what she has document-wise, other
3  than maybe taking notes to call back somebody
4  or something like that.
5    Q.  But not a diary or daily log?
6    A.  Not a diary or journal, no.
7        MR. MARPLE:
8        I believe that's all I have.
9        MR. GILBERT ANDRY:
10        And I want to say for the record
11    I appreciate you going right at it.
12        MR. MARPLE:
13        All right.  Thank you.  I
14    appreciate the courtesy that you have
15    shown us and that your witness has
16    shown us so far.  Mr. Armstrong, thank
17    you.
18        THE WITNESS:
19        You're welcome.
20  EXAMINATION BY MR. WEINSTOCK:
21    Q.  Andy Weinstock.  I represent the
22  Lake Borgne Basin Levee District.  I don't
23  believe I'll have that many questions for
24  you.
25        You had indicated that you made

Page 145

37  (Pages 142 to 145)

KENNETH ARMSTRONG (MRGO)                                    7/9/2007

Page 146

1    claims with Liberty Mutual and Allstate for
2    your homeowner's insurance and your flood
3    insurance.  Is that right?
4        A.  Correct.
5        Q.  Did you ever make any kind of claim
6    in writing or send any letters to those
7    insurers?
8        A.  I don't think we did for the flood,
9    but I think we had to do that for
10   homeowner's.  Because we didn't agree with the
11   first document.  We had to prove from a
12   contractor what was the damages and things
13   like that.
14       Q.  Do you have that documentation
15   still?
16       A.  I think we have some of it.
17       Q.  And you would have naturally sent a
18   copy to Liberty Mutual?
19       A.  Correct.
20       Q.  Do you know if you sent a copy to
21   your agent?
22       A.  Bill, I could -- Well, I think what
23   he told us is that we had to send everything
24   to the claims department.  He might have gave
25   us the information on what we had to do.  Or

Page 148

1        Q.  Is it your belief that you were
2    under-insured on your flood?
3        A.  After the fact, yes.
4        Q.  Do you hold your agent accountable
5    for that in any way?
6        A.  I would hope that they would have
7    contacted me, you know, ahead of time, you
8    know.  But the belief, my belief was that
9    50-something thousand dollars to replace -- I
10   never dreamed this would happen.
11       Q.  You haven't filed any kind of claim
12   against your flood agent?
13       A.  Correct.
14       Q.  Do you intend to file such a claim
15   before August 29th, 2007?
16       A.  I never intended TO.
17       Q.  Do you know Bob Turner?
18       A.  I heard the name before.
19       Q.  How about Dan Caluda?
20       A.  Yes.
21       Q.  What, if anything, do you believe
22   the Lake Borgne Basin Levee District should
23   have done differently to prevent you from
24   having your loss and suing them?
25       A.  I just don't know their specific

Page 147

1    phone number to call.
2        Q.  Who was your a little?
3        A.  Bill Bubrig.
4        Q.  Where is his office located?
5        A.  Belle Chasse, Louisiana.
6        Q.  Where in Belle Chasse?
7        MR. GILBERT ANDRY:
8           Belle Chasse Highway.
9        THE WITNESS:
10          It's on Belle Chasse Highway.
11   EXAMINATION BY MR. WEINSTOCK:
12       Q.  So his office is fine; right?
13       A.  Correct.
14       Q.  He's still there basically?
15       A.  Correct.
16       Q.  Was he your agent for both the
17   homeowner's and the flood?
18       A.  No.
19       Q.  Who was your agent for the flood?
20       A.  Trying to think of the guy's name.
21   It was Allstate.  His name was -- I can't
22   think of it off the top of my head.  It was a
23   guy -- My first insurance agent retired and
24   this guy picked up the work.  So I am not
25   sure.

Page 149

1    duties, to answer that question, so -- or what
2    their responsibilities were.
3        Q.  "I don't know" is a correct answer
4    to any question you don't know the answer to.
5        A.  Okay.
6        MR. GILBERT ANDRY:
7           See, I told you.
8    EXAMINATION BY MR. WEINSTOCK:
9        Q.  You applied for Road Home benefits?
10       A.  Yes, I did.
11       Q.  And was there -- there was an
12   application there as well?
13       A.  Correct.
14       Q.  And that's in writing?
15       A.  Yes.
16       Q.  A written application?
17       A.  Yes.
18       Q.  Do you have copies of that?
19       A.  I'm sure we do.
20       Q.  I know you answered this, but I did
21   not catch it.  We had a hail storm, I don't
22   know, five, six, seven years ago?  Yes.
23       A.  Yes.
24       MR. GILBERT ANDRY:
25          Longer than that now.

38  (Pages 146 to 149)

KENNETH ARMSTRONG (MRGO)                                          7/9/2007

1          THE WITNESS:
2             It's been -- I am not exactly
3       sure of the time, but I think that's
4       when Travelers and all pulled out of
5       the state.
6    EXAMINATION BY MR. WEINSTOCK:
7       Q.  But did you replace your roof as a
8    result of that?
9       A.  Yes, we did.
10      Q.  That's what I believe you said
11   earlier.
12          You understand that you're a class
13   plaintiff, not just a plaintiff in your own
14   right.  Is that correct?
15      A.  Correct.
16      Q.  Do you know what class of people you
17   represent?
18      A.  Can you clarify?
19      Q.  Do you know who you're here for
20   other than yourself and your family?
21      A.  Well, I would -- I would think
22   everybody, a good portion of the people who
23   live in my community.  We all look the same as
24   far as the depth of water, ten to whatever,
25   for the most part.  We all in the same boat.
                                    Page 150

1       You can answer
2    EXAMINATION BY MR. WEINSTOCK:
3       Q.  You can answer.
4       A.  I think that -- I would say no.
5       Q.  Do you understand that there are
6    certain obligations that come with being a
7    class representative?
8       A.  Yes.
9       Q.  Do you understand one of those
10   obligationss is to provide notice to the other
11   class members?
12      A.  Yes.
13      Q.  And you just told me that maybe up
14   to 70,000 people in St. Bernard.  Were you
15   also aware that your class contains not only
16   St. Bernard, but the Lower Ninth Ward?
17      A.  Correct.
18      Q.  As a class representative you might
19   have to provide notice to those 70 plus
20   thousand people.  Is that your understanding?
21          MR. GILBERT ANDRY:
22             That's why he has a lawyer.
23          That's why he has a team of lawyers
24          from all over the country with more
25          than enough resources to do that.  So
                                    Page 152

1    We all lost our -- everything we had.  We all
2    lost our community.  You know, we all
3    scattered everywhere.  We probably never get
4    back what we had.  So I am one of I think
5    there's 70,000 people in St. Bernard Parish.
6    You know, IF it's not me, it could be anybody
7    else who's in that predicament.
8       Q.  You told us a few minutes ago you
9    knew of some people who drowned?
10      A.  Correct.
11      Q.  Those people chose not to evacuate,
12   to your knowledge?
13      A.  Correct.
14      Q.  You did evacuate?
15      A.  Correct.
16      Q.  Are you here representing the people
17   who lost their life as a result of drowning --
18          MR. GILBERT ANDRY:
19             Objection.
20   EXAMINATION BY MR. WEINSTOCK:
21      Q.  -- because they did not choose to
22   evacuate?
23          MR. GILBERT ANDRY:
24             Objection to the form of the
25          question.
                                    Page 151

1       I think that's beyond the pale.  I
2       object to the form.
3    EXAMINATION BY MR. WEINSTOCK:
4       Q.  Do you understand that you may have
5    that obligation to provide notice to those
6    70,000 people?
7       A.  No, I do not.
8       Q.  Do you understand that unless you
9    have an agreement with somebody else to pay
10   for it, you might have to pay for that
11   notice?
12      A.  No, I did not.
13      Q.  Do you understand there's case law
14   that says you might be personally responsible
15   for up to $250,000 to provide notice to the
16   other class members?
17      A.  No, I did not.
18      Q.  Are you prepared to do that?
19      A.  I don't want to, but if I had to, I
20   guess I could.
21      Q.  You would take out a loan to get
22   $250,000?
23      A.  No.
24      Q.  Do you understand that there may be
25   a limited amount of resources to settle or
                                    Page 153

                                    39 (Pages 150 to 153)

KENNETH ARMSTRONG (MRGO)                                      7/9/2007

1  resolve all the claims of the people that have
2  filed them in the class action?
3        MR. GILBERT ANDRY:
4           Objection to the form.  Are these
5     legal questions that you're asking
6     him?  You're asking him what his
7     understanding of the law is?
8        MR. WEINSTOCK:
9           I'm absolutely am asking him what
10    he understands and what he's prepared
11    to do as a class representative in
12    this case.  And yes, there are
13    probably some legal implications to
14    those questions.
15       MR. GILBERT ANDRY:
16          I object to the form to the
17    extent that you're asking him if he, a
18    layman, knows what the law is.
19 EXAMINATION BY MR. WEINSTOCK:
20    Q.  Do you understand there may be a
21 limited amount of money to settle or resolve
22 all of these claims?
23       MR. GILBERT ANDRY:
24          And I object to the form.  I
25    don't know that that's the case.  Do
Page 154

1        object to the form that I think that
2        that's no foundation and any other
3        number of things.
4  EXAMINATION BY MR. WEINSTOCK:
5     Q.  Let'S just say it differently.
6  Let's say there's $1 million to settle these
7  claims and that, and I don't know the number,
8  150 people have filed a lawsuit.  On that
9  math, you're a businessman, $1 million
10 potentially divided by 150 people.  But you
11 now potentially represent 70,000 people.  Do
12 you understand the number gets smaller by
13 dividing it by 70,000 instead of 150?
14    A.  Right.
15    Q.  And are you prepared as one of the
16 150 who have filed suit to take less by
17 representing the 70,000?
18    A.  Well, I think that's the way it's
19 going to have to go anyway no matter what we
20 do, so I'd say yes.
21    Q.  One of the parties you have sued is
22 the Orleans Levee District.  And I don't
23 believe Mr. Andry, but I believe some of your
24 other Counsel has filed suit against the
25 Orleans Levee District in East Jefferson Levee
Page 156

1     you have -- form and foundation.
2     Because you have given no predicate to
3     indicate that that is the case.  So
4     form and foundation.
5  EXAMINATION BY MR. WEINSTOCK:
6     Q.  Nevertheless, you can answer.
7     A.  I don't know.
8     Q.  Just assume for me one minute that
9  there is $100 to settle all the cases.  Do you
10 understand that you represent not only the
11 people who have chosen to file suit like you
12 did, but those who have not chosen to file
13 suit?
14    A.  (Witness nods head affirmatively.)
15    Q.  Yes?
16    A.  I didn't understand that.
17    Q.  And that, therefore, that, whatever
18 I said, that hundred dollars is going to be
19 split up now not just amongst the people who
20 have chosen to file suit, but by all the
21 people you represent?
22       MR. GILBERT ANDRY:
23          I object to the form to the
24    extent that I am sure that you have
25    more than $100 in your pocket.  So I
Page 155

1  litigation.  Were you aware of that?
2     A.  They showed me some documentation
3  and it might have been on there.
4     Q.  Is it a problem for you that some of
5  these other lawyers, not Mr. Andry or his
6  firm, but some of these other lawyers are
7  representing a whole different group of people
8  and they're suing somebody you're suing as
9  well, splitting the pot even further?
10    A.  I knew there was another lawsuit out
11 there. I wasn't exactly sure who they were
12 suing and stuff.
13    Q.  Does that concern you at all?
14    A.  I never gave it much thought, to be
15 honest.
16    Q.  Previously you had said in your LRA
17 award, your Road Home award that they offered
18 you I think somewhere around $70,000.  And
19 what was to happen with the property?
20    A.  Well, we basically selling our
21 property. We selling to the LRA.
22    Q.  So if you would rebuild, it would
23 not be on your existing site?
24    A.  Correct.
25    Q.  Unless you somehow repurchased that
Page 157

40  (Pages 154 to 157)

1    from LRA?
2        A.  If I did go through with the selling
3    to the LRA, correct.  The property is still
4    mine at this time.
5        Q.  You had a family dispute as to
6    whether or not to go through with the LRA; is
7    that right?
8        A.  No, a dispute on where to move next.
9        Q.  When do you have to decide whether
10   you're going to sell your property to the LRA
11   or not?
12       A.  We meet with them in a couple of
13   weeks again.  Dispute is not the -- to sell.
14   The dispute is where we want to live.
15   Permanent residence.
16       Q.  So you have made a family decision
17   to sell the property to the LRA?
18       A.  Correct.
19       Q.  You would like more than they are
20   currently offering you?
21       A.  Correct.
22       Q.  Is there an appeal process you're
23   going through?
24       A.  There will be.
25           MR. WEINSTOCK:
                                        Page 158

1            I believe that's all the
2        questions I have.
3    EXAMINATION BY MR. MARPLE:
4        Q.  I just wanted to ask a few more.  Do
5    you know or have you heard of an entity called
6    Washington Group International, Inc.?
7        A.  Yes, I do.
8        Q.  And how have you heard of that
9    entity?
10       A.  When I talked to my lawyer.
11       Q.  And do you know how they fit into
12   this lawsuit in any way?
13       A.  Well, when I asked -- when we talked
14   about that, they -- they would be representing
15   -- the lawyers would be representing that
16   company.
17       Q.  And do you know what Washington
18   Group International, Inc. did that led to harm
19   to your property or to your mental distress or
20   to your belongings?
21       A.  I thought they did some work along
22   the Industrial Canal.
23       Q.  Do you know what they did along
24   there?
25       A.  Not specifically, no, I don't.
                                        Page 159

1        Q.  And is it fair to say that you
2    yourself did not have any information prior to
3    bringing suit and really don't have any
4    factual information yourself about what
5    Washington Group International, Inc. did wrong
6    specifically?
7        A.  Not at that time, no.
8        Q.  So you agree with me that you don't
9    have that information; right?
10       A.  You said at the time, though;
11   right?
12       Q.  Before you filed suit you didn't
13   have any information?
14       A.  No, I don't know who they -- if they
15   worked on the levees or what, I don't know who
16   built the levees years ago, no.
17       Q.  Sitting here today, you told me you
18   thought they did some work on the Industrial
19   Canal, but do you know anything more as to
20   what they may have done?
21       A.  I thought they did, if I am not
22   mistaken, they did some work on the section
23   over there by the Industrial Canal.
24       Q.  Do you know what it is they did down
25   there that caused them to fall over?
                                        Page 160

1        A.  Not really.  No, I don't.
2        Q.  With your insurance company, either
3    Liberty Mutual or Allstate, do you know if you
4    signed any papers that said they get to sue
5    somebody instead of you?  In other words, they
6    asked you to sign over your rights to go
7    against somebody else since they were paying
8    you?
9        A.  I don't recall that.
10       Q.  Do you know -- That would be in the
11   file probably that you have on insurance,
12   right, if you did?
13       A.  If I signed something to let the
14   insurance company sue somebody else is what
15   you're asking me?
16       Q.  Yes.
17       A.  No, I don't recall that.
18       Q.  But if you signed it, you would have
19   kept a copy of it probably; right?
20       A.  Probably so.
21       Q.  So that would be in your insurance
22   file at home?
23       A.  Correct.
24       Q.  You understand the concept generally
25   of subrogation?  When an insurance company
                                        Page 161

41  (Pages 158 to 161)

1    pays you, that sometimes they want you to sign
2    and say, "Well, somebody did some harm to you,
3    you have got to sign that right over to us" so
4    they may have a chance of getting some of
5    their money back somehow?
6        A.   If that was the case, I don't recall
7    my agent, you know, asking me to do anything
8    like that.
9        Q.   Do you all go to church now across
10   the lake?
11       A.   My wife does.
12       Q.   Did the church move over there, too?
13       A.   No.
14       Q.   A different parish church?
15       A.   (Witness nods head affirmatively.)
16            MR. MARPLE:
17              I believe that's it.
18            MR. WEINSTOCK:
19              No more for me.
20            MR. GILBERT ANDRY:
21              None for me.
22            VIDEO OPERATOR:
23              This concludes the deposition.
24   It is 1:58.  We're now off the
25   record.

                                        Page 162

1                    *    *    *
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

                                        Page 163

1
2                   WITNESS'S CERTIFICATE
3
4        I, KENNETH PAUL ARMSTRONG, JR., read
5    or have had the preceding testimony read to
6    me, and hereby certify that it is a true and
7    correct transcription of my testimony, with
8    the exception of any attached corrections or
9    changes.
10
11
                _____
12              (Witness' Signature)
13   _____
     DATE SIGNED
14
15   DEPONENT PLEASE INITIAL ONE:
16
     _____ Read with no corrections
17
18   _____ Read and correction sheet attached
19
20
     DATE TAKEN:  July 9, 2007
21
22
23
24
25

                                        Page 164

1
2
3                   REPORTER'S CERTIFICATE
4
5        I, ROGER D. JOHNS, RMR, RDR, CRR,
6    Certified Court Reporter, do hereby certify
7    that the above-named witness, after having
8    been first duly sworn by me to testify to the
9    truth, did testify as hereinabove set forth;
10   that the testimony was reported by me in
11   shorthand and transcribed under my personal
12   direction and supervision, and is a true and
13   correct transcript, to the best of my ability
14   and understanding; that I am not of counsel,
15   not related to counsel or the parties hereto,
16   and not in any way interested in the outcome
17   of this matter.
18
19
20
21              ROGER D. JOHNS
22          CERTIFIED COURT REPORTER
23             STATE OF LOUISIANA
24
25

                                        Page 165

                              42  (Pages 162 to 165)

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


**IN RE:** KATRINA CANAL        CIVIL ACTION
**BREACH**ES CONSOLIDATED
LITIGATION                   NO. 05-4182 "K" (2)

                             JUDGE DUVAL

PERTAINS TO:  LEVEE

                             MAG. WILKINSON

FILED IN:

05-4181, 05-4182, 05-4191,
05-4568, 05-5237, 05-6073,
05-6314, 05-6324, 05-6327,
05-6359, 06-0020, 06-1885,
06-0225, 06-0886, 06-11208,
06-2278, 06-2287, 06-2346,
06-2545, 06-3529, 06-4065,
06-4389, 06-4634, 06-4931,
06-5032, 06-5042, 06-5159,
06-5163, 06-5367, 06-5471,
06-5771, 06-5786, 06-5937,
06-7682, 07-0206, 07-0647,
07-0993, 07-1284, 07-1286,
07-1288, 07-1289




     Deposition of DONNA M. AUGUSTINE,
2230 Sherwood Meadow Drive, Apt. A, Baton
Rouge, Louisiana 70816, taken in the offices
of Bruno & Bruno, 855 Baronne St., Second
Floor, New Orleans, Louisiana on Friday, the
13th day of July, 2007 at 9:24 a.m.

DONNA M. AUGUSTINE (LEVEE)                                                    7/13/2007

APPEARANCES (continued):

    LAMBERT & NELSON
    (By: E. Alexis Bevis, Esquire)
    (By: Farris deBoard, Law Clerk)
    701 Magazine St.
    New Orleans, Louisiana  70130
    (504) 581-1750
        Attorneys for Plaintiffs

    McCRANIE, SISTRUNK, ANZELMO, HARDY,
    MAXWELL & McDANIEL
    (By: Kyle P. Kirsch, Esquire)
    3445 N. Causeway Blvd., Suite 800
    Metairie, Louisiana  70002
    (504) 831-0946
        Attorneys for Defendant,
        Orleans Levee District

    LABORDE & NEUNER
    (By: Gregory A. Koury, Esquire)
    One Petroleum Center, Suite 200
    1001 West Pinhook Road
    Lafayette, Louisiana  70503
    (337) 237-7000
        Attorneys for Defendant,
        Orleans Levee District

Page 2

APPEARANCES (continued):

ALSO PRESENT:

    Gilley DeLorimier, CLVS
    Depo-Vue, Inc.
    (504) 828-8856

REPORTED BY:
    MARGARET MCKENZIE, CCR, RPR, CMR, CRR
    Certified Court Reporter

Page 4

APPEARANCES (continued):

    DAIGLE, FISSE & KESSENICH, PLC
    (By: Kirk N. Aurandt, Esquire)
    227 Hwy. 21
    Madisonville, Louisiana  70447
    (985) 871-0800
        Attorneys for Defendant,
        Board of Commissioners for the
        Port of New Orleans
        (Present by Internet I-DEP)

    DUPLASS, ZWAIN, BOURGEOIS, MORTON,
    PFISTER & WEINSTOCK
    (By: Nicole Boyer, Esquire)
    3838 N. Causeway Blvd., Suite 2900
    Metairie, Louisiana  70002
    (504) 832-3700
        Attorneys for Defendant,
        Board of Commissioners for the
        East Jefferson Levee District

Page 3

# I N D E X

EXAMINATION BY:

MR. KIRSCH.............................7

MR. KOURY.............................162

EXHIBITS:

Exhibit 1.............................9

Exhibit 2.............................19

Exhibit 3.............................26

Exhibit 4.............................130

Exhibit 5.............................135

Exhibit 6.............................153

Page 5

2  (Pages 2 to 5)

```
 1          S T I P U L A T I O N
 2        It is stipulated and agreed by and
 3   between counsel for the parties hereto that
 4   the deposition of the aforementioned witness
 5   is hereby being taken under the Federal Rules
 6   of Civil Procedure, for all purposes, in
 7   accordance with law;
 8        That the formalities of reading and
 9   signing are specifically not waived;
10   That the formalities of sealing,
11   certification and filing are specifically
12   waived;
13        That all objections, save those as to
14   the form of the question and the
15   responsiveness of the answer, are hereby
16   reserved until such time as this deposition,
17   or any part thereof, may be used or sought to
18   be used in evidence.
19
20             *   *   *   *   *
21
22        MARGARET MCKENZIE, Certified Court
23   Reporter, in and for the Parish of Orleans,
24   State of Louisiana, officiated in
25   administering the oath to the witness.
                                      Page 6
```

```
 1   verbal answers?
 2     A.  Correct.
 3     Q.  You understand that if you don't
 4   understand a question that I ask you, you
 5   have the right to ask me to rephrase it.
 6     A.  Okay.
 7     Q.  If you answer the question, I'm
 8   going to assume you understood it.  Is that
 9   fair?
10     A.  Yes, it is.
11     Q.  My questions aren't designed to
12   make you, to trick you or to make you guess
13   about an answer.  We want to know, we're just
14   here to find out what you know, so if you can
15   tell me you don't know, that's a perfectly
16   fine answer.  If you have to guess, we don't
17   want you to guess, but if you have to guess,
18   please tell us you are guessing, otherwise we
19   are going to assume you answered it from your
20   knowledge.  Okay?
21     A.  Okay.
22     Q.  You're not on any medication,
23   alcohol or anything that would affect your
24   ability to answer questions today, are you?
25     A.  No, it wouldn't.
                                      Page 8
```

```
 1      VIDEOGRAPHER:
 2      This is a videotaped deposition of
 3      Donna Augustine.  This deposition
 4      is being held today at 855 Baronne
 5      Street in New Orleans, Louisiana,
 6      on July 13, 2007.  The time is 9:24
 7      A.M.
 8      Would the court reporter now,
 9      please, swear in the witness.
10          DONNA M. AUGUSTINE,
11      2230 Sherwood Meadow Drive, Baton
12      Rouge, Louisiana 70816, after
13      having been first duly sworn by the
14      above-mentioned court reporter, did
15      testify as follows:
16   EXAMINATION BY MR. KIRSCH:
17     Q.  Good morning, Miss Augustine.  My
18   name is Kyle Kirsch.  I represent the Orleans
19   Levee District.  I introduced myself to you
20   this morning.
21     A.  Okay.
22     Q.  I am here to take your deposition.
23   Have you ever given a deposition before?
24     A.  Yes, I have.
25     Q.  You understand you have to give
                                      Page 7
```

```
 1     Q.  Also, this isn't a marathon.  If
 2   you need to take a break at any moment to get
 3   a drink or to use the restroom or for any
 4   other reason, just let me know and we can
 5   take a break as long as the question is not
 6   pending.  If a question is pending I may ask
 7   you to answer the question and then we can
 8   take a break.  Okay?
 9     A.  Okay.
10     Q.  Could you state your full name and
11   address for the record.
12     A.  Donna Marie Augustine.  2230
13   Sherwood Meadows Drive, Apartment A, Baton
14   Rouge, Louisiana, 70816.
15     Q.  Now, Miss Augustine, I will show
16   you what I will mark as Exhibit 1, the Notice
17   of Video Deposition.  And I'm going to turn
18   it to page 6, which is Exhibit A to the
19   Notice of Deposition (indicating).  Have you
20   ever seen that?
21     A.  Yes.
22     Q.  When did you see it?
23     A.  I saw it this morning.
24     Q.  Okay.  You hadn't seen it before
25   this morning?
                                      Page 9
```

3  (Pages 6 to 9)

DONNA M. AUGUSTINE (LEVEE)                                    7/13/2007

| | |
|---|---|
| 1      A.  No, I haven't. | 1     Authority, anything in that regard? |

1      A.  No, I haven't.
2      Q.  What I'm going to ask you to do, if
3  it is all right with counsel, we will take a
4  break, I want to make sure you don't, before
5  I go through all of that, that you have a
6  chance to review it.
7      A.  Okay.
8      Q.  I want to know if you have any
9  documents responsive to those requests.
10  Okay?
11      A.  Okay.
12      Q.  Let's go off.
13      MS. BEVIS:
14          We don't need to.  We went through
15          this this morning so that we could
16          hurry this process along, the only
17          thing is that we object to the
18          production of the documents because
19          we're still within the 30-day
20          period, but she's going to answer
21          as to whether or not she has them
22          and we'll produce them later if she
23          has them and she hasn't brought
24          them.
25      EXAMINATION BY MR. KIRSCH:

Page 10

1     Authority, anything in that regard?
2      A.  Would you explain it again for me.
3      Q.  Sure.  Let's take it one at a time.
4  Did you apply for any FEMA money?
5      A.  Yes, I did.
6      Q.  Do you have any of that
7  documentation?
8      A.  No, I don't.
9      Q.  Okay.  Do you know if you applied
10  in writing or on line or over the phone?
11      A.  Over the telephone.
12      Q.  Okay.  So did you -- would you have
13  ever had any writing with regard to your
14  applications from FEMA?
15      A.  No.
16      Q.  Okay.  So it would have been
17  strictly verbal?
18      A.  Correct.
19      Q.  Okay.  And did you receive any
20  documentation back from FEMA in the mail?
21      A.  Yes, I did.
22      Q.  Okay.  Do you have that
23  documentation?
24      A.  Not with me.
25      Q.  Okay.  But do you have it --

Page 12

1      Q.  But as of today you have none of
2  the documents in Exhibit A?
3      A.  No, I don't have any of them.
4      Q.  Okay.  Let's go through each one of
5  the document requests.  Do you have a copy of
6  your Form 95?
7      A.  Not with me.
8      Q.  Okay.  Have you reviewed it
9  recently?
10      A.  No, I haven't.
11      Q.  Okay.  You remember creating a Form
12  95 document?
13      A.  Yes, I do.
14      Q.  Okay.  Do you -- did you have any
15  other drafts of it or did you just do one
16  draft of that Form 95?
17      A.  Just one draft of it.
18      Q.  So if we had a copy of that, that
19  would be the only thing?
20      A.  Correct.
21      Q.  Thank you.  Do you have any
22  documents relating to administrative claims
23  that you may have made as a result of
24  Hurricane Katrina such as to FEMA, to the
25  Road Home program, Louisiana Recovery

Page 11

1      A.  Yes.
2      Q.  -- at home?
3      A.  Yes.
4      Q.  And we would obviously call for
5  production of that and reserve our rights in
6  regard to those documents.  Let's talk about
7  did you apply for any administrative help or
8  assistance from the Louisiana Road Home
9  program?
10      A.  No, I did not.
11      Q.  Okay.  What about from the
12  Louisiana Recovery Authority?
13      A.  No, I did not.
14      Q.  Okay.  What about from the Red
15  Cross?
16      A.  Yes, I did.
17      Q.  Okay.  How did you make that
18  application to Red Cross?
19      A.  I went to their site.
20      Q.  Okay.  Did you have to fill out any
21  documentation there?
22      A.  Yes, I did.
23      Q.  Okay.  Did you get a copy of that?
24      A.  If I did, I don't have it with me.
25      Q.  Okay.  When you say you don't have

Page 13

| | |
|---|---|
| 1  it with you, you wouldn't have it at home? | 1  A.  Correct. |
| 2  A.  I would have it at home, yes.  I | 2  Q.  Another good rule of depositions is |
| 3  would. | 3  let me finish my question.  I know you are |
| 4  Q.  Okay.  So you may have | 4  anticipating it and most of the time you are |
| 5  documentation in that regard? | 5  going to be right, but my question may be |
| 6  A.  Correct. | 6  something a little different from what you |
| 7  Q.  Okay.  Would you have applied for | 7  think I'm asking, so I'm going to ask you to |
| 8  any other type of assistance as a result of | 8  let me finish the question before you answer. |
| 9  the storm? | 9  And I'm going to do my best to let you finish |
| 10  A.  No. | 10  your answer before I ask you a question. |
| 11  Q.  No -- any type of unemployment, | 11  A.  Okay. |
| 12  food stamps or anything like that? | 12  Q.  Okay? |
| 13  A.  Yes, I received food stamps. | 13  A.  Okay. |
| 14  Q.  Did you have to apply for that | 14  Q.  Thank you.  Do you have any |
| 15  shortly after the storm? | 15  documentation regarding insurance claims you |
| 16  A.  Correct.  Yes, I did. | 16  may have made as a result of the storm? |
| 17  Q.  Okay.  What about documentation in | 17  A.  Can you rephrase the question? |
| 18  regard to that? | 18  Q.  Sure.  Did you have insurance at |
| 19  A.  Yes, I have that. | 19  the time of Hurricane Katrina? |
| 20  Q.  Okay.  So that would be at your | 20  A.  No. I didn't have any insurance. |
| 21  house also? | 21  Q.  Okay.  So you wouldn't have applied |
| 22  A.  Correct. | 22  for any type of insurance benefits as a |
| 23  Q.  Okay.  Unemployment compensation? | 23  result of losses you may have had from |
| 24  A.  No. | 24  Hurricane Katrina? |
| 25  Q.  Okay.  You didn't apply for it? | 25  A.  No. |
| Page 14 | Page 16 |
| 1  A.  No.  I didn't apply for it because | 1  Q.  Do you have any documents relating |
| 2  I'm disabled. | 2  to any eyewitness accounts of what happened |
| 3  Q.  Okay.  Can you think of any other | 3  during Hurricane Katrina, whether it be |
| 4  type of assistance you may have applied for | 4  statements, recordings of people telling you |
| 5  through the government or other type of | 5  what they saw? |
| 6  agencies that provide assistance? | 6  A.  More or less people telling me what |
| 7  A.  The United Way, Salvation Army. | 7  they saw. |
| 8  And that's pretty much it. | 8  Q.  But is that memorialized in a |
| 9  Q.  Okay.  Do you have any | 9  document or is that just something that you |
| 10  documentation in regard to your application | 10  remember? |
| 11  for assistance from the United Way? | 11  A.  Just something that I remembered. |
| 12  A.  No, I don't. | 12  Q.  Okay.  You don't have any |
| 13  Q.  Okay.  What about in regard to your | 13  documentation kind of where somebody -- |
| 14  application for assistance to the Salvation | 14  A.  No. |
| 15  Army? | 15  Q.  -- wrote out what happened? |
| 16  A.  No, I don't. | 16  A.  No. |
| 17  Q.  Okay.  So would you have filled out | 17  Q.  Do you have any photographs, videos |
| 18  any documents for either United Way or | 18  or anything showing any of the damages you |
| 19  Salvation Army? | 19  are alleging you sustained as a result of the |
| 20  A.  I did fill out documents, but I | 20  Hurricane Katrina? |
| 21  don't recall them giving me any material | 21  A.  Yes, I do. |
| 22  back.  Just a matter of me signing my name | 22  Q.  Okay.  Where are those? |
| 23  indicating that I received what they gave me. | 23  A.  I submitted them to my attorney. |
| 24  Q.  Okay.  And then you would have | 24  Q.  Okay.  You don't have them -- they |
| 25  handed that documentation to them? | 25  aren't in your possession anymore? |
| Page 15 | Page 17 |

5  (Pages 14 to 17)

DONNA M. AUGUSTINE (LEVEE)                                          7/13/2007

1      A.   Some of them I have and some I
2    submitted to them.
3      Q.   Okay.  We're going to go into more
4    detail, but you said some you have, some your
5    attorney has.  Does your attorney have the
6    same photographs you have or do you have some
7    photographs that your attorney does not have?
8      A.   Yes.  They have the same copies
9    that I have.  When I had my filmed developed,
10   they were double copies, so I shared what I
11   had with my attorney.
12     Q.   So if I get what your attorney has,
13   then I'll have all the photographs you took
14   post-Katrina of the damages you sustained?
15     A.   Correct.
16         MR. KIRSCH:
17         Lexie, do you have a copy of those?
18         MS. BEVIS:
19         These, I'm going to ask her to take
20         a look at them to make sure they
21         were put into the right file.
22         MR. KIRSCH:
23         Sure.
24         MS. BEVIS:
25         Miss Augustine, are these the

                                        Page 18

1    covering the expenses you incurred from the
2    evacuation?
3      A.   No, I don't.
4      Q.   This is a similar document request,
5    but with -- do you have any statements or
6    recorded, recordings of anyone discussing the
7    evacuation or anything pre-Katrina?
8      A.   No, I don't.
9      Q.   Do you have any -- well, did you
10   seek medical attention?
11     A.   Yes, I did.
12     Q.   Okay.  Do you have any medical
13   records in your possession regarding the
14   treatment you sought as a result of the
15   hurricane?
16     A.   No, I don't.
17     Q.   Okay.  Did you apply for any type
18   of loans, SBA loans or anything, after
19   Hurricane Katrina?
20     A.   No, I did not.
21     Q.   Okay.  Do you -- you understand
22   that you are being put up as a class
23   representative?
24     A.   Yes, I'm aware.
25     Q.   Okay.  Do you have a copy of the

                                        Page 20

1         entirety of the photographs
2         (indicating)?  We just want to make
3         sure we're not missing anything.
4         THE WITNESS:
5         Yes.
6    EXAMINATION BY MR. KIRSCH:
7      Q.   So those are the photographs you
8    provided to your attorney?
9      A.   Yes.
10     Q.   And you would have taken those
11   photographs yourself?
12     A.   Yes.
13     Q.   Okay.  We'll attach those as
14   Exhibit 2 to the deposition.  Did you take
15   any video?
16     A.   No.  My video camera was damaged.
17     Q.   Okay.  Do you have any -- well, are
18   you making a claim for lost earnings?
19     A.   No.
20     Q.   Are you making a claim for any type
21   of economic damages?
22     A.   No.
23     Q.   Did you evacuate for the storm?
24     A.   Yes, I did.
25     Q.   Okay.  Do you have any documents

                                        Page 19

1    complaint?
2      A.   What complaint?
3      Q.   The complaint filed by your
4    attorney.
5      A.   No.  I don't have that.
6      Q.   Okay.  Do you have a -- if I
7    remember correctly, you rented your house?
8      A.   Yes.
9      Q.   Do you have -- did you sign a lease
10   agreement?
11     A.   Yes, I did.
12     Q.   Do you have a copy of that?
13     A.   Not with me, but I do have a copy
14   of it.
15     Q.   Okay.  Were you ever evicted after
16   Katrina from the property you were staying
17   at?
18     A.   No.
19     Q.   Okay.  And do you have any
20   documents indicating, I don't want you to
21   tell me anything you communicated with your
22   attorney, but do you have any documents
23   indicating that what your role is as a class
24   representative or needing to protect the
25   interests of the class?

                                        Page 21

                                    6  (Pages 18 to 21)

JOHNS PENDLETON COURT REPORTERS                         800 562-1285

DONNA M. AUGUSTINE (LEVEE)                                      7/13/2007

**Page 22**

1    A.  Well, I figure my role is what the,
2    how can I put it, my role is to speak and
3    represent renters that's in the same
4    situation that I'm in.
5        Q.  Okay.  And my question was a little
6    more narrow.  I was just asking if you had
7    any documentation.
8        A.  No.
9        Q.  Okay.  What did you do to prepare
10   for the deposition?  Did you review any
11   documents?
12       A.  No, I did not.
13       Q.  Did you talk with any family
14   members?
15       A.  No, I did not.
16       Q.  Okay.  Did you talk with any
17   friends?
18       A.  No, I did not.
19       Q.  Okay.  Did you -- you met with your
20   lawyer?
21       A.  Yes, I did.
22       Q.  Okay.  Did you do anything other
23   than meet with your lawyer?
24       A.  That was it.
25       Q.  Okay.  Well, did you review any

**Page 23**

1    documents when you met with your lawyer?
2        A.  I really can't remember.
3        Q.  Okay.  At the end of the deposition
4    you are going to have a right to read and
5    sign the deposition.  Your lawyer may want to
6    weigh in on this.
7        MS. BEVIS:
8        We will read and sign.
9        MR. KIRSCH:
10       Okay.
11   EXAMINATION BY MR. KIRSCH:
12       Q.  You gave me your full name at the
13   beginning of the deposition.  Has that name
14   ever changed?
15       A.  No, it haven't.
16       Q.  Okay.  Did you have any maiden
17   names ---
18       A.  No.
19       Q.  -- or nicknames that you've gone
20   by?
21       A.  No.
22       Q.  Okay.  What's your date of birth?
23       A.  May 9, 1950.
24       Q.  And you are currently living at
25   2126 North Broad Street, is that right?

**Page 24**

1    A.  Correct.
2        Q.  And how long have you lived there?
3        A.  Five years.
4        MS. BEVIS:
5        Excuse me.  You said currently
6        living at?
7        MR. KIRSCH:
8        Yeah.
9    EXAMINATION BY MR. KIRSCH:
10       Q.  Oh, I'm sorry.  You are not -- I
11   may have misheard her.  You are no longer
12   living at 2126 North Broad Street, are you?
13       A.  No, I'm not living there.
14       Q.  Okay.  You are living in Baton
15   Rouge now?
16       A.  Yes, I am.
17       Q.  Okay.  How long had you lived at
18   North Broad Street?
19       A.  For five years.
20       Q.  Okay.  Had you -- have you lived at
21   the North Broad Street address since
22   Hurricane Katrina?
23       A.  No, I haven't.
24       Q.  Okay.  When you were living at 2126
25   North Broad, who lived with you?

**Page 25**

1    A.  My daughter and my granddaughter.
2        Q.  Okay.  What's your daughter's name?
3        A.  Shawana Brown.
4        Q.  And how old is she?
5        A.  Thirty.
6        Q.  And you said you had a
7    granddaughter?
8        A.  Yes.
9        Q.  What's your granddaughter's name?
10       A.  Taylor Horn.
11       Q.  And how old is Taylor?
12       A.  She is four.
13       Q.  And if I recall correctly, you were
14   renting the property, is that right?
15       A.  Yes.
16       Q.  Okay.  Did you have a yearly lease,
17   a month-to-month lease, or do you remember?
18       A.  A yearly lease.
19       Q.  Okay.  And do you remember how much
20   you paid per month?
21       A.  I'm not sure, but I do know it was
22   in the two hundred bracket.
23       Q.  You said two hundred bracket?
24       A.  Yes.
25       Q.  So somewhere between two and 299 a

7 (Pages 22 to 25)

1  month?
2      A.  Within that area, correct.
3      Q.  Okay.  Can you give me your Social
4  Security number.
5      A.  436-76-770.
6      Q.  That's a number short.  436-76 --
7      A.  76-7770.
8      Q.  Three 7s?
9      A.  Three 7s and a zero.
10     Q.  Thank you.  Do you have a driver's
11  license?
12     A.  Yes, I do.
13     Q.  Do you have it with you?
14     A.  Yes, I do (indicating).
15     Q.  Thank you.
16     MR. KIRSCH:
17         What I would like to do, Lexie, is
18         just copy it and attach it as
19         Exhibit 3.
20     MS. BEVIS:
21         Do you want to read the number into
22         the record?
23  EXAMINATION BY MR. KIRSCH:
24     Q.  Yes.  Your driver's license number
25  is -- why don't you read it for me into the

Page 26

1  record (indicating).
2      A.  003694455.
3      MS. BEVIS:
4          We'll just get a copy of that at
5          the break.
6  EXAMINATION BY MR. KIRSCH:
7      Q.  Other than your daughter living
8  with you and your granddaughter, did you have
9  any other dependents at the time of Hurricane
10  Katrina?
11     A.  No, I did not.
12     Q.  Okay.  I want to get a brief
13  educational history.  Did you go to high
14  school?
15     A.  Yes, I did.
16     Q.  You graduated?
17     A.  Yes, I did.
18     Q.  What year?
19     A.  '69.
20     Q.  Okay.  Did you go to any schooling
21  after high school?
22     A.  Yes, I did.
23     Q.  Okay.  Where did you go?
24     A.  Delgado Community College.
25     Q.  How long did you go to Delgado for?

Page 27

1      A.  Two and a half years until I
2  received my degree.
3      Q.  And what did you receive a degree
4  in?
5      A.  Early childhood development.
6      Q.  Any other schooling after that?
7      A.  No.
8      Q.  Did you have any other type of
9  training?
10     A.  Yes, I did.
11     Q.  And what was that?
12     A.  Nursing assistant's training and
13  skilled labor training.
14     Q.  Where did you have your nursing
15  assistant training at?
16     A.  At the International Trade Mart on
17  Canal Street.
18     Q.  And how long ago was that?
19     A.  Oh, I can't begin to remember.  It
20  was quite a few years.  However it was.  It
21  was right after I graduated out of high
22  school.
23     Q.  And you said skilled labor
24  training.  What type of skilled labor?
25     A.  Being able to operate electrical

Page 28

1  equipment, like a jackhammer, anything in the
2  line of labor experience.
3      Q.  Okay.  And where would you have
4  gotten that training at?
5      A.  From -- well, I worked out of Local
6  689 and they sent me to a school in Livonia,
7  Louisiana and Connecticut.
8      Q.  Did you get any certificates or
9  degrees from either the nursing assistant or
10  skilled labor courses?
11     A.  Yes, I did.
12     Q.  Okay.  For both?
13     A.  Yes.
14     Q.  Any other type of vocational or
15  technical training?
16     A.  No.
17     Q.  What was the last job you held?
18     A.  Mercy Hospital.
19     Q.  And how long ago was that?
20     A.  '93.  '93.
21     Q.  Okay.  Have you ever been in the
22  military?
23     A.  No, I haven't.
24     Q.  Had you ever had any accidents or
25  injuries prior to Hurricane Katrina?

Page 29

8  (Pages 26 to 29)

DONNA M. AUGUSTINE (LEVEE)                                              7/13/2007

1      A.  Yes, I have.
2      Q.  **Okay.  Could you tell me the first**
3  **one you remember.**
4      A.  Well, I was kicked by a patient at
5  Mercy Hospital.  Caused me to have surgery.
6      Q.  **Surgery on what?**
7      A.  On my knee.
8      Q.  **How long ago was this?**
9      A.  Let me see.  Let me see.  I can't
10 remember, but it's been awhile.
11     Q.  **Do you remember if it was in the**
12 **2000s or the '90s or the '80s?**
13     A.  I think it was '93.  I'm not sure.
14     Q.  **So sometime in the early '90s?**
15     A.  Correct, yes.
16     Q.  **Okay.  Do you remember what type of**
17 **surgery you had?**
18     A.  Arthroscopic surgery to repair
19 tendons.
20     Q.  **And who was your doctor?**
21     A.  Dr. Shackleton.
22     Q.  **Where does Dr. Shackleton work out**
23 **of?**
24     A.  He worked out of Mercy Hospital.
25 His office was on Canal Street.
                                              Page 30

1      A.  No.
2      Q.  **After your arthroscopic knee**
3  **surgery, did your knees ever give you any**
4  **problems?**
5      A.  Yes.
6      Q.  **Have they been giving you problems**
7  **basically since 1993?**
8      A.  Yes.
9      Q.  **What type of problems have you had**
10 **with them since 1993?**
11     A.  They give out on me.  I fall.
12 Excruciating pain.
13     Q.  **Has anybody ever recommended**
14 **another knee surgery for you?**
15     A.  Yes.
16     Q.  **Who was that?**
17     A.  Um -- I can't think of the doctor's
18 name, but his office is on Napoleon.  What's
19 this doctor's name?
20     Q.  **Do you remember the year another**
21 **doctor recommended a knee surgery?**
22     A.  Yes.
23     Q.  **When was that?**
24     A.  In '95.  Let me see what is this
25 man's name.
                                              Page 32

1      Q.  **What's the next injury you recall**
2  **having?**
3      A.  That's pretty much it, major
4  accident, that I can remember.
5      Q.  **Have you ever been in any motor**
6  **vehicle accidents?**
7      A.  Yes.
8      Q.  **Were you ever injured in any of the**
9  **motor vehicle accidents?**
10     A.  No.
11     Q.  **Did you ever file a lawsuit as a**
12 **result of being kicked by the patient?**
13     A.  Yes, I did.
14     Q.  **Okay.  Do you remember where that**
15 **lawsuit was filed?**
16     A.  Where it was filed?
17     Q.  **Yeah.**
18     A.  Here in New Orleans.
19     Q.  **Do you remember if it was state or**
20 **federal court?**
21     A.  I don't know.
22     Q.  **Okay.  Other than the lawsuit as a**
23 **result of the knee injury, any other lawsuits**
24 **that you've ever filed other than obviously**
25 **the one we're here about today?**
                                              Page 31

1      Q.  **And did you have another knee**
2  **surgery?**
3      A.  No.
4      Q.  **What was the reason for that?**
5      A.  Well, they were going to give me a
6  total knee replacement and I just was not
7  ready to for to put my body through that kind of
8  trauma.
9      Q.  **Did you see any other doctors after**
10 **'95 for your knee problems?**
11     A.  Yes.
12     Q.  **Do you remember who they were?**
13     A.  Dr. Anderson in Baton Rouge,
14 Louisiana.
15     Q.  **Uh-huh.  Anyone else?**
16     A.  That was it.
17     Q.  **Okay.  How long did you see the**
18 **doctor on Napoleon Avenue that recommended**
19 **the surgery in 1995?**
20     A.  How many visits did I have or
21 how --
22     Q.  **How long, years, months?**
23     A.  About three years.
24     Q.  **So you would have been treating**
25 **until, treating with that doctor until about**
                                              Page 33

                                         9  (Pages 30 to 33)

DONNA M. AUGUSTINE (LEVEE)                                    7/13/2007

1    roughly 1998?
2        A.  About that, correct.  Yes.
3        Q.  Why did you stop seeing him in '98?
4        A.  Repeat the question.
5        Q.  Why did you stop seeing him in
6    1998?
7        A.  Why did I stop seeing my orthopedic
8    doctor in '98?
9        Q.  Yeah.
10       A.  I never stopped seeing him.
11       Q.  Okay.  So you --
12       A.  I continued seeing him up until
13   2005.
14       Q.  Okay.  So you kept seeing the
15   doctor --
16       A.  Right.
17       Q.  -- on Napoleon Avenue through 2005?
18       A.  Correct.
19       Q.  Okay.  Do you remember his address
20   or a clinic name?
21       A.  It's on the tip of my tongue.  I
22   really cannot tell you this doctor's name
23   right now, but further on through the process
24   if it come to me I will make it known to you.
25       Q.  Okay.  What I was, one of the

Page 34

1    time.  And I really didn't have no one to
2    physically take care of me while I had that
3    surgery.
4        Q.  Okay.  Is that still your
5    circumstance as we sit here today?
6        A.  Yes.
7        Q.  Other than the hospitalization at
8    mercy for the knee surgery, any other
9    hospitalizations?
10       A.  No.
11       Q.  Did you ever have an MRI or some
12   type of x-rays on your knee?
13       A.  Yes, I did.
14       Q.  Okay.  Which one, MRI?
15       A.  MRI.
16       Q.  Okay.  Where did you have that
17   done?
18       A.  Mercy Hospital.
19       Q.  Was that in '93 or was that after
20   the surgery?
21       A.  After the surgery.  And Charity
22   Hospital.
23       Q.  So you had an MRI at Charity
24   Hospital, too?
25       A.  Yes, I did.

Page 36

1    things I was trying to get is maybe if you
2    could give me his address maybe I could
3    figure out who he is.  Do you remember where
4    you would go for that ten-year period?
5        A.  It's on Napoleon, directly across
6    from Napoleon, sorry, directly across from
7    Baptist Hospital.
8        Q.  Is it on a corner?
9        A.  It's on the corner, correct.
10       Q.  What is that -- do you remember the
11   cross street, by any chance?
12       A.  No, I sure wouldn't.
13       Q.  And from '95 through 2005, the only
14   thing you saw him for were knee injuries or
15   did you see him for other things?
16       A.  Just for my knee, the pain in my
17   knees.
18       Q.  Did he continue to recommend a knee
19   replacement?
20       A.  Yes, he did.
21       Q.  Okay.  And you turned it down
22   because you didn't want to go through that
23   type of surgery, correct?
24       A.  My reason for turning it down
25   because he said I would be off my feet a long

Page 35

1        Q.  Was that after surgery also?
2        A.  Correct.
3        Q.  Any other pre-Katrina injuries that
4    you can think of?
5        A.  That's pretty much it.
6        Q.  Okay.  You told me your knee would
7    give out and you would fall sometimes.  Did
8    you ever have to go to the hospital or see
9    the doctor for other problems as a result of
10   the fall?
11       A.  Yes, I have.
12       Q.  Okay.  Why don't you tell me what
13   other injuries you may have had when you
14   fell.
15       A.  Well, no more than my knees were
16   scuffed up from falling.
17       Q.  Just from like brush burns?
18       A.  More or less, yes.
19       Q.  Okay.  Small cuts, things in that
20   regard?
21       A.  Correct.
22       Q.  No back injuries?
23       A.  No.
24       Q.  Or torn ligaments or anything in
25   that regard?

Page 37

10  (Pages 34 to 37)

DONNA M. AUGUSTINE (LEVEE)                                    7/13/2007

| | |
|---|---|
| 1      A.   The ligament is already torn in my<br>2   knee, yes.<br>3      Q.   Right.  That's the one you had<br>4   scope surgery for, correct?<br>5      A.   Right.<br>6      Q.   But other than that one injury we<br>7   already talked about, nothing else?<br>8      A.   No.<br>9      Q.   Okay.  Is -- you told me earlier<br>10  you were disabled.  Is the reason you are<br>11  disabled because of your knees?<br>12     A.   Yes.<br>13     Q.   When did you become disabled?<br>14     A.   2000.<br>15     Q.   Did you --<br>16     A.   Excuse me.  I've been disabled<br>17  since the surgery that was performed on my<br>18  knee, but I was only compensated in 2000.<br>19     Q.   Okay.  So in 2000, that's when the<br>20  Social Security Administration officially<br>21  said you were disabled?<br>22     A.   Correct.<br>23     Q.   Okay.  Did you -- I'm assuming you<br>24  had to go through a long drawn out process<br>25  for that?<br><br>                                Page 38 | 1   personal injury lawsuit?<br>2      A.   To my knowledge I think it was, um,<br>3   workmen's comp lawsuit.<br>4      Q.   Okay.  So the lawsuit would have<br>5   been against the hospital?<br>6      A.   Correct.<br>7      Q.   Okay.  Do you remember who your<br>8   attorney was?<br>9      A.   Robert Sharp.<br>10     Q.   And you didn't file a lawsuit<br>11  against the individual who actually kicked<br>12  you, right?<br>13     A.   No, I did not.<br>14     Q.   Okay.  Now, I want to shift -- go<br>15  ahead.<br>16     A.   I know the doctor's name.  Dr.<br>17  Martin, my orthopedic doctor.  Dr. Martin.<br>18     Q.   The last name is Martin?<br>19     A.   Yes.<br>20     Q.   Do you remember his first name by<br>21  any chance?<br>22     A.   No.<br>23     Q.   Okay.  Thank you.  Did -- now I<br>24  want to shift gears to after Hurricane<br>25  Katrina.  Did you have any injuries after<br><br>                                Page 40 |
| 1      A.   Yes.<br>2      Q.   You probably went to the Social<br>3   Security Administration office in New<br>4   Orleans?<br>5      A.   Correct.<br>6      Q.   Okay.  Did they have to have a<br>7   hearing and all that?<br>8      A.   Yes.<br>9      Q.   Okay.  When did you initially, what<br>10  year did you initially apply for the Social<br>11  Security benefits?<br>12     A.   In '93.<br>13     Q.   And it took until 2000 for you to<br>14  actually get them?<br>15     A.   Yes.<br>16     Q.   Were you working between '93 and<br>17  2000?<br>18     A.   No, I was not.<br>19     Q.   Did you receive worker's comp<br>20  benefits from Mercy?<br>21     A.   Yes, I did.<br>22     Q.   Okay.  We had talked about you<br>23  filing a lawsuit earlier, if you recall that.<br>24  Was the lawsuit a worker's comp lawsuit or<br>25  did you file both a worker's comp claim and a<br><br>                                Page 39 | 1   Hurricane Katrina that you sought medical<br>2   attention for?<br>3      A.   After Katrina.  Just the crying,<br>4   the sadness, depressed.<br>5      Q.   The stress essentially?<br>6      A.   Yes.<br>7      Q.   And who did you see for that?<br>8      A.   Dr. Derek Anderson in Baton Rouge,<br>9   Louisiana.<br>10     Q.   Had you ever saw -- well, what type<br>11  of doctor is Dr. Anderson?<br>12     A.   A primary care doctor.<br>13     Q.   Did you have a primary care doctor<br>14  in New Orleans?<br>15     A.   Yes.  Dr. Stephanie Sarrat.<br>16     Q.   S-A-R-R-A-T?<br>17     A.   Correct.<br>18     Q.   And where is Dr. Sarrat's office?<br>19     A.   On Napoleon directly across from<br>20  Baptist Hospital.<br>21     Q.   Had you ever -- I want to go back<br>22  to pre-Katrina.  Had you ever sought any type<br>23  of counseling or any type of mental health<br>24  treatment before Katrina?<br>25     A.   Yes.<br><br>                                Page 41 |

                                                    11 (Pages 38 to 41)

DONNA M. AUGUSTINE (LEVEE)                                    7/13/2007

1      Q.  Okay.  Who did you seek treatment
2   for that from?
3      A.  It was at Chartres Mental Health
4   Clinic.
5      Q.  Do you remember your doctor?
6      A.  Dr. Kloor.  K-L-O-O-R.
7      Q.  That's his last name?
8      A.  Correct.
9      Q.  And he was a psychologist, social
10  worker, psychiatrist?
11     A.  I think he was a psychiatrist.
12     Q.  How long did you see Dr. Kloor?
13     A.  Maybe a year after my surgery I
14  started seeing Dr. Kloor.
15     Q.  And how long did you see him in
16  time?  You said you went to see him a year
17  after the surgery, right?
18     A.  Yes.  Uh-huh.
19     Q.  Did you see him from say '94 to
20  2005 or how long?
21     A.  Okay.  '94 to 2004.  Yeah, 2004.
22     Q.  And you were seeing him for issues
23  related to your knee or --
24     A.  Correct.
25     Q.  Okay.  So you were having problems
                                        Page 42

1   have continued to see Dr. Kloor?
2      A.  Yes.
3      Q.  Okay.  Chartres Mental Health
4   Clinic, I've never heard of it.  Where is
5   that?
6      A.  On Elysian Fields Avenue.
7      Q.  Is there a cross street close to
8   that?
9      A.  St. Claude and the river, between
10  those streets.
11     Q.  Thank you.  Now I want to shift
12  gears back to after Katrina.  You said you
13  saw Dr. Sarrat for the stress, right?
14     A.  Correct.
15     Q.  Did you see anyone else for the
16  stress?
17     MS. BEVIS:
18        I don't -- she didn't state that
19     she saw Dr. Sarrat for the stress.
20     That was her New Orleans primary
21     care.
22     MR. KIRSCH:
23        No, she said --
24  EXAMINATION BY MR. KIRSCH:
25     Q.  Am I wrong about that?
                                        Page 44

1   dealing with the knee pain?
2      A.  Yes.  And the thought that I was
3   not being compensated properly, it just was
4   tearing me up.
5      Q.  Okay.  What happened in 2004 that
6   caused you to stop seeing him?
7      A.  Let me see.  I think when I got on
8   Medicaid and Medicare -- well, prior to that
9   I was seeing him with no charge, but when I
10  start receiving my disability there was some
11  little minor technicalities that kept me from
12  seeing Dr. Kloor, so I had no more dealings
13  with him.
14     Q.  Okay.  So you couldn't get it paid
15  for anymore, so you stopped seeing him?
16     A.  Correct.
17     Q.  Okay.  Did you see anyone else
18  other than Dr. Kloor?
19     A.  No.
20     Q.  Okay.  So after 2004, you pretty
21  much after 2004 you stopped going to see any
22  type of mental health professional?
23     A.  Correct.
24     Q.  Okay.  But in 2004 if you would
25  have had somebody to pay for it you would
                                        Page 43

1      A.  After Katrina in December was my
2   appointment with Dr. Sarrat.  I was in Baton
3   Rouge, so I went to see Dr. Sarrat
4   immediately in December and I was just upset,
5   crying.
6      Q.  Okay.  And so -- I see your point.
7      MS. BEVIS:
8        I'm sorry.  I might have been
9     confused.  I thought it was --
10     MR. KIRSCH:
11        No, no, no.
12  EXAMINATION BY MR. KIRSCH:
13     Q.  You told me -- I had my notes mixed
14  up.  I understand what your lawyer is saying.
15  You said you saw Dr. Anderson, who was your
16  new primary care physician?
17     A.  Correct.
18     Q.  For the stress, right?
19     A.  Correct.
20     Q.  You also saw Dr. Sarrat for stress
21  in December in Baton Rouge?
22     A.  Correct.  No, no.  I saw Dr. Sarrat
23  December of 2005.  And in 2006 I start seeing
24  Dr. Derek Anderson because the distance was
25  so far, so I stopped seeing her.
                                        Page 45

12  (Pages 42 to 45)

DONNA M. AUGUSTINE (LEVEE)                                    7/13/2007

| | |
|---|---|
| 1    Q.  Okay.  So in December 2005 you were | 1    post-Katrina or did you basically take the |
| 2  coming in town from Baton Rouge to see Dr. | 2  same medications? |
| 3  Sarrat? | 3    A.  Pretty much taking the -- well, |
| 4    A.  Correct. | 4  yeah, it changed after Katrina. |
| 5    Q.  Okay.  And then in '06, sometime in | 5    Q.  Okay.  What medicines were you on |
| 6  '06, you changed from Dr. Sarrat to Dr. | 6  before Katrina? |
| 7  Anderson because you didn't want to make the | 7    A.  Prevacid and Doxepin. |
| 8  commute? | 8    Q.  What is Prevacid for, if you know? |
| 9    A.  Correct. | 9    A.  Prevacid is for my stomach. |
| 10    Q.  Okay.  Other than Dr. Sarrat and | 10    Q.  And Doxepin is for -- |
| 11  Dr. Anderson, have you seen anybody else for | 11    A.  Doxepin is to aid me in sleeping at |
| 12  any type of injury or stress-related problem | 12  night. |
| 13  as a result of Katrina? | 13    Q.  Any pain meds or anything for your |
| 14    A.  No, I haven't. | 14  knees? |
| 15    Q.  Okay.  Were you prescribed any | 15    A.  Yes.  Vicodin.  That was pretty |
| 16  medications by either Dr. Sarrat or Dr. | 16  much it. |
| 17  Anderson? | 17    Q.  Okay.  And post-Katrina you said |
| 18    A.  Yes. | 18  your medications changed, is that right? |
| 19    Q.  Okay.  Where did you get those | 19    A.  Correct. |
| 20  filled? | 20    Q.  What medications were you taking |
| 21    A.  Walgreen's. | 21  after Katrina? |
| 22    Q.  And that would be a Walgreen's in | 22    A.  Vytorin.  I was prescribed Vytorin. |
| 23  Baton Rouge, correct? | 23    Q.  And what is Vytorin for? |
| 24    A.  Correct. | 24    A.  To bring my cholesterol down. |
| 25    Q.  Any other pharmacies? | 25    Q.  Do you have high blood pressure? |
| Page 46 | Page 48 |

| | |
|---|---|
| 1    A.  Wal-Mart in Baker, Louisiana. | 1    A.  I don't suffer with high blood |
| 2    Q.  When you evacuated -- well, did you | 2  pressure, but after Katrina I had it. |
| 3  evacuate for Hurricane Katrina? | 3    Q.  Okay.  And that's when you were put |
| 4    A.  Yes, I did. | 4  on Vytorin? |
| 5    Q.  Did you go to Baton Rouge? | 5    A.  Correct. |
| 6    A.  Yes, I did. | 6    Q.  Any other medication change? |
| 7    Q.  Okay.  So you evacuated to Baton | 7    A.  No. |
| 8  Rouge and have been there since the storm? | 8    Q.  I'm sorry.  Were you going to say |
| 9    A.  Correct. | 9  something else? |
| 10    Q.  So other than Walgreen's and | 10    A.  Yes.  The Vytorin is not for the |
| 11  Wal-Mart, you wouldn't have gotten | 11  blood pressure.  The Vytorin is for the |
| 12  prescriptions filled anywhere else? | 12  cholesterol, but I was never on no medication |
| 13    A.  No, I would not. | 13  for my blood pressure. |
| 14    Q.  Okay.  Before Katrina I'm assuming | 14    Q.  Have you ever had any prior |
| 15  you got medications for your knee injury and | 15  problems with your heart? |
| 16  maybe some from your psychiatrist? | 16    A.  Nope. |
| 17    A.  Correct. | 17    Q.  Okay.  Did you ever -- did you have |
| 18    Q.  Where would you have gotten those | 18  issues with your cholesterol before Hurricane |
| 19  prescriptions filled? | 19  Katrina? |
| 20    A.  Walgreen's on St. Bernard and Broad | 20    A.  If I did, I wasn't aware of it. |
| 21  Street. | 21    Q.  Okay.  So the only -- if I |
| 22    Q.  Any other pharmacies in New Orleans | 22  understand you correctly, the only medication |
| 23  that you may have used occasionally? | 23  change would have been Vytorin, and that |
| 24    A.  No. | 24  would have been for your cholesterol? |
| 25    Q.  Okay.  Did your medications change | 25    A.  Correct. |
| Page 47 | Page 49 |

13  (Pages 46 to 49)

DONNA M. AUGUSTINE (LEVEE)                                    7/13/2007

| | |
|---|---|

1     Q.  As far as your blood pressure goes,
2  you were not put on any medication for your
3  blood pressure?
4     A.  No, I was not.
5     Q.  Okay.  How long did you see Dr.
6  Sarrat and/or Dr. Anderson for the stress
7  issues?
8     A.  I only seen Dr. Sarrat that one
9  time in December.  That was my last
10  appointment with Dr. Sarrat.  In 2006 I
11  started seeing Dr. Derek Anderson in Baton
12  Rouge.  And I've been seeing him ever since.
13     Q.  Okay.  So you've been seeing him
14  through the present day?
15     A.  Correct.
16     Q.  Okay.  When was your last visit
17  with Dr. Anderson?
18     A.  June 1.
19     Q.  Do you see Dr. Anderson for the
20  issues that you have with your knees still?
21     A.  Well, he's taken X-rays of my
22  knees.  He says it is no more than bone --
23  bone to bone.  And he had intention on
24  referring me to an orthopedic, but never did.
25     Q.  Okay.  So you were seeing him for

Page 50

1  of the charges?
2     A.  Dismissed.
3     Q.  Okay.
4     A.  I was charged with theft, but I
5  didn't do the stealing, you know, I didn't do
6  the stealing.  I was with someone that was,
7  you know --
8     Q.  And the DA eventually dropped the
9  charges?
10     A.  Correct.
11     Q.  Okay.  Have you ever undergone any
12  type of alcohol or drug abuse testing?
13     A.  No.
14     Q.  You didn't have to do any type of
15  testing for a nursing job?
16     A.  Oh, for jobs, yes.  I thought, you
17  know, after Katrina.  Uh-uh.
18     Q.  So you would have undergone some
19  type of testing?
20     A.  Yes.
21     Q.  And I'm assuming you passed all
22  those tests?
23     A.  Yes, I did.
24     Q.  Okay.  Did you have any
25  participation in any civic-type activities

Page 52

1  some of your knee issues, too?
2     A.  Correct.  He was like pretty much
3  all-around doctor.
4     Q.  So you would have seen Dr. Anderson
5  for all your health issues since Hurricane
6  Katrina?
7     A.  Correct.
8     Q.  Okay.  Any other lawsuits you've
9  ever filed other than the comp lawsuit that
10  we talked about?
11     A.  No.
12     Q.  Thank you.  And I ask this of
13  everybody, so don't be offended.  Have you
14  ever been arrested?
15     A.  Yes, I have.
16     Q.  Okay.  How long ago?
17     A.  Twenty-five.
18     Q.  Twenty-five years?
19     A.  Twenty-five years, yes.
20     Q.  Okay.  What was the crime?
21     A.  Theft.
22     Q.  Any conviction?
23     A.  No.
24     Q.  Okay.  And you didn't -- they
25  dismissed the charges or what was the result

Page 51

1  like participate in, you know, parental
2  activities at school or you were on a, in a
3  Mardi Gras krewe or anything like that?
4     A.  No.
5     Q.  Did you ever go to Jazz Fest?
6     A.  No.
7     Q.  Did you ever go to the Essence
8  Festival?
9     A.  No.
10     Q.  Did you ever go to any of the
11  Saints' games?
12     A.  Yes.
13     Q.  What about the Hornets' games?
14     A.  Never been.
15     Q.  Bayou Classic?
16     A.  Never been.
17     Q.  Did you belong to a church?
18     A.  Yes, I did.
19     Q.  What church?
20     A.  New Orleans Bible Fellowship.
21     Q.  And that was in New Orleans?
22     A.  New Orleans East.
23     Q.  Is the church still there?
24     A.  Yes, it is.
25     Q.  Is it open?

Page 53

14  (Pages 50 to 53)

1      A.   Well, the church that I was
2   attending was New Orleans Bible Fellowship.
3   We were leasing this church monthly.  It was
4   a Seventh Day Adventist church.  We didn't
5   have our own church, so we were leasing that
6   church, but it's still there, but my pastor
7   since then has expired.
8      Q.   Sorry to hear that.  Do you attend
9   a church in Baton Rouge now?
10     A.   No.  I come down to New Orleans on
11  a Friday, I'm sorry, on a Saturday and
12  Sunday.  Saturday we have bible study and
13  Sunday we have church.
14     Q.   Okay.  So you still go to New
15  Orleans Bible Fellowship?
16     A.   Correct.
17     Q.   Okay.  It is just in a different
18  location?
19     A.   Well, we are leasing another church
20  on Claiborne and Bienville.
21     Q.   Okay.  But it is still the same
22  community --
23     A.   Correct, yes.  Yes.  And I was a
24  board member.
25     Q.   Are you a registered voter?

*Page 54*

1   the board because it was just too stressful
2   to have to come down every weekend.  And
3   sometimes it was impossible for me to make
4   some of the board meetings due to the
5   weather, but I'm still a member of New
6   Orleans Bible Fellowship, but I'm no longer a
7   board member as of May is when I resigned my
8   position.
9      Q.   May of this year?
10     A.   Correct.
11     Q.   What was -- I want to shift gears
12  now to the hurricane, Hurricane Katrina.
13  When did you first get notice that it may
14  impact New Orleans?
15     A.   Friday.  That Friday before the
16  hurricane.
17     Q.   And how did you find that out?
18     A.   The media, looking at the news.
19     Q.   What was your initial response to
20  it?
21     A.   I just said I ain't leaving because
22  I left the following year and nothing
23  happened, so I had made up my mind I wasn't
24  leaving.
25     Q.   You had left for Ivan?

*Page 56*

1      A.   Yes, I am.
2      Q.   Okay.  And you regularly voted?
3      A.   Yes, I do.
4      Q.   Did you vote in the most recent
5   elections?
6      A.   Yes, I did.
7      Q.   Other than the church, do you
8   belong to any other type of civic or social
9   organizations?
10     A.   No.
11     Q.   Any type of business or trade
12  organizations?
13     A.   No.
14     Q.   What about any type of
15  philanthropic organizations?
16     A.   No.
17     Q.   Okay.  Did you have any type of
18  participation in any City Council meetings or
19  any other type of governmental entity
20  meetings in the New Orleans area?
21     A.   No, I do not.
22     Q.   Okay.  Do you still come down -- it
23  sounds like you still come down to New
24  Orleans every week?
25     A.   Well, I've resigned my position on

*Page 55*

1      A.   Yes.
2      Q.   Okay.  What made you change your
3   mind?
4      A.   My sister that lives in Houston.
5      Q.   What did she do, she called you?
6      A.   Yes.
7      Q.   And she convinced you to leave?
8      A.   She indicated, "Donna, this is a
9   category 4, you know Betsy was a 3, what are
10  you waiting on to leave?  Leave."  So 1:30
11  Sunday I left.
12     Q.   1:30 in the afternoon?
13     A.   1:30 A.M., that morning.
14     Q.   Did anybody evacuate with you?
15     A.   My brother, my daughter and my
16  granddaughter and my nieces.
17     Q.   Did y'all ride in one car or --
18     A.   No.  My daughter and my
19  granddaughter, they rode in the van with me.
20  My brother and his grandchildren, they rode
21  in his Ram truck.
22     Q.   Okay.  So you drove or your
23  daughter?
24     A.   Yes, I did, I drove.
25     Q.   And the van was yours?

*Page 57*

15 (Pages 54 to 57)

DONNA M. AUGUSTINE (LEVEE)                                    7/13/2007

1     A.  No.  It's my son's.
2     Q.  Okay.  Do you have a car?
3     A.  No.
4     Q.  Did you have a car before Katrina?
5     A.  No.
6     Q.  Okay.  So you drove your son's
7  vehicle?
8     A.  Right, which was for my grandson,
9  but now I have it.
10    Q.  And your brother drove another
11 vehicle with his grandkids you said?
12    A.  Correct.  Yes.
13    Q.  And y'all went to Baton Rouge, if I
14 remember correctly?
15    A.  Correct.
16    Q.  Okay.  Did you do anything to
17 prepare for the storm?  Board up windows,
18 raise furniture, anything in that regard?
19    A.  No.
20    Q.  Okay.  What did you take with you?
21    A.  Two pair of jeans, three bras,
22 about four pair of panties, my purse, my
23 medicine, my cane, and that was pretty much
24 it.
25    Q.  Your -- strike that.  Where did you
                                      Page 58

1     Q.  Other than the 2,000 and 10,000 you
2  received before November of 2005, any other
3  aid you received from FEMA?
4     A.  That's pretty much it from FEMA.
5     Q.  Okay.  The apartment in -- on Baker
6  Boulevard that you talked about --
7     A.  Yes.
8     Q.  -- who was paying for that?
9     A.  Myself.
10    Q.  Okay.  Did you ever stay in a hotel
11 room or anything that was paid by FEMA?
12    A.  No, I didn't.
13    Q.  Okay.  Could the $10,000 have been
14 to pay for a place to live or anything or do
15 you know?
16    A.  Well, I did use it for somewhere to
17 live and to buy furniture.
18    Q.  Okay.  But it didn't say, when you
19 got the $10,000 check, it didn't say what you
20 got it for?
21    A.  I think personal -- I'm not sure,
22 but it did indicate what it was for, but
23 right offhand I couldn't tell you right now.
24    Q.  Okay.  Did you keep a copy of that
25 check?
                                      Page 60

1  stay in Baton Rouge?
2     A.  By my niece in Baker.
3     Q.  So you stayed with relatives?
4     A.  Correct.
5     Q.  How long did you live with your
6  niece?
7     A.  Until -- until November of 2005.
8     Q.  And then where did you go?
9     A.  From there I went to an apartment
10 complex on Baker Boulevard.
11    Q.  When you moved -- well, before
12 November 2005 had you received some of your
13 FEMA aid?
14    A.  Yes, I did.
15    Q.  Okay.  What type of aid did you
16 receive?
17    A.  I received 2,000 and I received
18 10,000.
19    Q.  This was all before November of
20 '05?
21    A.  Yes.
22    Q.  Okay.  Do you remember what the
23 $10,000 was for?
24    A.  I would imagine my personal
25 property.
                                      Page 59

1     A.  Did I make a copy?  No.  It wasn't
2  on my mind.
3     Q.  Okay.  Do you remember if the check
4  came by itself or with a letter or anything?
5     A.  With a letter.
6     Q.  Okay.  And the letter may have been
7  what told you what it was for?
8     A.  Correct.
9     Q.  Would you have kept that letter?
10    A.  Oh, I have that letter.
11    Q.  Okay.  After -- so how long did you
12 live on Baker Boulevard?
13    A.  A month.  A month and a half.  I'm
14 sorry.
15    Q.  So that basically got you to
16 January of '06?
17    A.  No.  January '06 I was living on
18 Old Hammond Highway.  I'm on the program,
19 Section 8 program, and they would not pay for
20 me to live on Baker Boulevard, so I had to
21 leave Baker Boulevard to go to a, an
22 apartment that covered Section 8.  So I left
23 there in December.
24    Q.  Okay.  What is -- could you tell me
25 what Section 8 is?
                                      Page 61

1      A.  Section 8 is a voucher program that
2   helps pay your rent for you under HUD.
3      Q.  So how much rent do you pay per
4   month after the voucher is expended?
5      A.  Well, it depend on my income.  As
6   of today, I don't pay no rent.
7      Q.  You said it depended on your
8   income.  Did you pay -- did at any point
9   post-Katrina did you pay rent?
10     A.  Yes, I did.
11     Q.  Okay.  What did you pay and for how
12  long did you pay it?
13     A.  It was -- I don't know exactly.  I
14  know it was two something.  It wasn't three
15  hundred.  It was 280, somewhere along up in
16  there, 290, something.
17     Q.  Okay.  So roughly the same amount
18  you were paying in New Orleans?
19     A.  This is for Baton Rouge, what I pay
20  in Baton Rouge, that's what you are talking
21  about?
22     Q.  Uh-huh.
23     A.  I don't pay no rent in Baton Rouge,
24  but prior to me moving I was paying rent.
25  Then Section 8 picked up in December.  So
                                        Page 62

1   lessor in New Orleans while you were
2   evacuated?
3      A.  No.
4      Q.  Okay.  Have you paid him anything
5   since Katrina?
6      A.  No.
7      Q.  And when you moved into the
8   property on Old Hammond Highway in December,
9   now that you are not paying any rent, where
10  you are not paying any rent, have you stayed
11  there since?
12     A.  I stood there until July of last
13  year.
14     Q.  And what was your reason for moving
15  in July?
16     A.  The apartment was the pits.  The
17  landlord said he was going to clean it and he
18  didn't do it, so I had to leave.
19     Q.  And you've got a new apartment?
20     A.  Correct.
21     Q.  Okay.  And you're still not paying
22  rent?
23     A.  Still not paying rent, correct.
24     Q.  Okay.  Where is the new apartment?
25     A.  2230 Sherwood Meadows Drive,
                                        Page 64

1   December of 2005, I haven't paid rent since
2   then.
3      Q.  Okay.  And what I'm trying to find
4   out -- thank you for the clarification -- all
5   I'm trying to find out is how much were you
6   paying from, I guess you said you moved to
7   the Baker Boulevard address in November?
8      A.  Correct.
9      Q.  So you had about a month where you
10  paid rent, right?
11     A.  Right.  Altogether --
12     Q.  How much did you pay --
13     A.  -- I paid $600.  Two hundred
14  deposit and four for the rent.
15     Q.  Did you get your deposit back?
16     A.  No.
17     Q.  Okay.  And you paid basically one
18  month of rent?
19     A.  Correct.
20     Q.  Okay.  And had you been living
21  in -- were you paying any rent while you
22  were, to the lessor in New Orleans while you
23  were evacuated?
24     A.  Repeat the question.
25     Q.  Were you paying any rent to the
                                        Page 63

1   Apartment A, Baton Rouge, 70816.
2      Q.  This apartment is a better
3   apartment, I take it?
4      A.  Yes.  Extremely.
5      Q.  Did you work at all after Katrina?
6      A.  No.  I'm not able to work.
7      Q.  Okay.  What were you doing while
8   you were living in Baker with your niece?
9      A.  Just crying my heart out.
10     Q.  Okay.
11     A.  Reminiscing about all what I lost
12  and all what I don't have.
13     Q.  You pretty much have stayed at home
14  since you moved to Baton Rouge?
15     A.  Correct.
16     Q.  Do you have any -- do you do any
17  activities outside the home?
18     A.  Well, it's pretty hard because
19  Baton Rouge, they don't have a sidewalk.  I
20  have to encounter those animals with the
21  black around their eyes, I forgot what they
22  are, but however it is, no.
23         MR. KOURY:
24            Raccoons?
25  EXAMINATION BY MR. KIRSCH:
                                        Page 65

17  (Pages 62 to 65)

| | |
|---|---|
| 1  Q. Raccoons? | 1  Q. Okay. |
| 2  A. Raccoons, yes. And armadillos. So | 2  A. I had seen her prior to that. That |
| 3  I just stay inside. | 3  is when my appointment was in December. |
| 4  Q. Okay. What type of activities did | 4  Q. Okay. Did you see -- what I'm |
| 5  you do outside the home while you were in New | 5  trying to find out is did you see Dr. Sarrat |
| 6  Orleans? | 6  post-Katrina before December of '05? |
| 7  A. Throw horseshoe. Bowling. And | 7  A. Yes. |
| 8  just walk City Park all the way around. | 8  Q. Okay. When did you see her? |
| 9  Q. Did your brother who evacuated with | 9  A. Um. I don't have my appointment |
| 10  you stay in Baton Rouge, too? | 10  book, but I did see her. |
| 11  A. Yes, he do. | 11  Q. Okay. You have a book that you |
| 12  Q. Does he live around you? | 12  actually keep or record what you did on? |
| 13  A. He lives in Baker near his daughter | 13  A. I did tell you my orthopedic was |
| 14  and I'm in Baton Rouge. | 14  Richard Martin. No, I don't have it in here. |
| 15  Q. Okay. Do you see them regularly? | 15  Q. Okay. That's your appointment |
| 16  A. Yes. I just saw my brother Sunday. | 16  book? |
| 17  He has cancer. | 17  A. More or less. Yes, like my dental, |
| 18  Q. I'm sorry to hear that. | 18  doctor appointment. |
| 19  A. He had one liver -- kidney taken | 19  Q. What other type information do you |
| 20  out. So it spread from there to his lung and | 20  have in your appointment book? |
| 21  his liver. | 21  A. Just when I go to the doctor. My |
| 22  Q. And you said for your church | 22  doctor's appointment. The results of my GI |
| 23  activities you come into New Orleans? | 23  tests. The results of my colonoscopy. |
| 24  A. Correct. | 24  Q. Where did you have your GI tests |
| 25  Q. How do you get into town? | 25  at? |
| Page 66 | Page 68 |

| | |
|---|---|
| 1  A. In the van. The truck. | 1  A. GI? |
| 2  Q. You drive? | 2  Q. You just told me the results of |
| 3  A. Yes. | 3  your GI tests. |
| 4  Q. Other than when you are driving to | 4  A. Oh, okay. This was at Charity. |
| 5  New Orleans for church activities, any other | 5  Dr. Philip. |
| 6  type of leisure activities you do in Baton | 6  Q. And that would have been |
| 7  Rouge? Do you go to any parks up there? | 7  pre-Katrina? |
| 8  A. No. | 8  A. Correct. |
| 9  Q. Have you gone on any vacations or | 9  Q. Okay. What was the -- you said you |
| 10  anything since Katrina? | 10  had a colonoscopy also? |
| 11  A. No. | 11  A. Yes. |
| 12  Q. Other than the stress we talked | 12  Q. Where was that, Charity also? |
| 13  about, did you incur any other type of injury | 13  A. My last colonoscopy was in Baton |
| 14  or illness as a result of Hurricane Katrina? | 14  Rouge at a specialty place right off of |
| 15  A. No. | 15  Drusilla or Jefferson. But I did have a |
| 16  Q. And if I remember correctly, the | 16  colonoscopy there. |
| 17  first time you sought any type of medical | 17  Q. Does your appointment book show |
| 18  attention for the stress you were | 18  what the place's name was in Baton Rouge? |
| 19  experiencing was in December of '05 when you | 19  A. I don't have the name of the place. |
| 20  saw Dr. Sarrat in New Orleans, right? | 20  Uh-uh. I don't have it, but I know where it |
| 21  A. Correct. | 21  was. |
| 22  Q. And after that one visit with Dr. | 22  Q. Okay. Other than Charity and |
| 23  Sarrat, you went to Dr. Anderson? | 23  Mercy, have you ever been to any other |
| 24  A. Yes, but when I saw Dr. Sarrat, I | 24  hospitals in the New Orleans area? |
| 25  didn't just see her in December. | 25  A. Tulane Medical Center. |
| Page 67 | Page 69 |

18 (Pages 66 to 69)

DONNA M. AUGUSTINE (LEVEE)                                    7/13/2007

1   Q.  What did you go to Tulane for?
2   A.  My stomach.
3   Q.  And this was pre-Katrina, right?
4   A.  Correct.
5   Q.  Any other hospitals?
6   A.  That's it.
7   Q.  Okay.  Had you ever had any --
8   strike that.  You said you were seeing Dr.
9   Kloor for the issues you were having with
10  your knee, correct?
11  A.  No.  Dr. Kloor was the
12  psychiatrist.
13  Q.  Right.  And you were having -- and
14  that was as a result of problems you were
15  having because of your knee problems?
16  A.  Correct.
17  Q.  Okay.  And you would have liked to
18  have continued to see him?
19  A.  Yes.
20  Q.  Okay.  Have you ever tried to see
21  anyone else, any other type of mental health
22  professional?
23  A.  No.
24  Q.  Okay.  Do you recall seeing any
25  other doctors other than the ones we've

                                        Page 70

1   A.  There was no doctor.
2   Q.  Did you have to submit medical
3   records or anything?
4   A.  Well, they were able to get my
5   medical records, but it wasn't no doctor.  It
6   was just me.
7   Q.  It was just you?
8   A.  Uh-huh.
9   Q.  Okay.  And the medical records they
10  would have gotten would have been from Dr.
11  Martin, I guess, for your knees?
12  A.  No.  It would have been from
13  Charity.
14  Q.  What medical records would have
15  come from Charity?
16  A.  Everything pertaining from my knee
17  to my acid reflux disease.  And that was
18  pretty much it.
19  Q.  Other than the -- well, how much do
20  you receive in Social Security benefits every
21  month?
22  A.  $648 a month.
23  Q.  And I'm assuming those benefits
24  would have continued to have been paid to you
25  even after the storm?

                                        Page 72

1   already talked about for any type of
2   illnesses or injuries?
3   A.  No.
4   Q.  And other than the surgery on your
5   knee, you've undergone no other surgeries?
6   A.  Yes, I've had other surgeries.
7   Q.  Okay.
8   A.  Prior to my knee.
9   Q.  What other surgeries have you had?
10  A.  I had a hysterectomy.
11  Q.  And where was that?
12  A.  Methodist Hospital in New Orleans
13  East.  And I had surgery done under both of
14  my eyes.
15  Q.  And where were those?
16  A.  On Napoleon Street at my
17  dermatologist's office, Dr. Scott Wilhelmus.
18  Q.  Both of those surgeries were
19  pre-Katrina?
20  A.  Yes.
21  Q.  Okay.  Any other surgeries?
22  A.  That's it.
23  Q.  Okay.  What doctor testified for
24  you at the disability hearing with the Social
25  Security Administration?

                                        Page 71

1   A.  Correct.
2   Q.  Okay.  So you continued to receive
3   your monthly income?
4   A.  Correct.
5   Q.  There's been no interruption in
6   that?
7   A.  No.
8   Q.  As a result of Hurricane Katrina,
9   correct?
10  A.  Correct.
11  Q.  Do you receive any other type of
12  benefits?
13  A.  No.  No more than food stamps, but
14  that's it.
15  Q.  Okay.  What happened with your --
16  you were paid worker's compensation benefits?
17  A.  Yes.
18  Q.  And what happened, did you settle
19  that for a lump sum or do you remember?
20  A.  There was no lump sum.  I had a
21  deposition.  The attorney say that workmen's
22  comp is going to pay my lawyer a thousand
23  dollars.  My lawyer wasn't injured, but
24  that's who got a thousand dollars, the
25  lawyer.  I didn't get nothing.

                                        Page 73

                                    19  (Pages 70 to 73)

DONNA M. AUGUSTINE (LEVEE)                                    7/13/2007

```
 1      Q.  So --
 2      A.  So --
 3      Q.  After, after a certain amount of
 4  time they cut you off of benefits?
 5      A.  Correct.
 6      Q.  How long did they pay your benefits
 7  for?
 8      A.  Two years.
 9      Q.  So you would have gotten benefits
10  basically through 1995?
11      A.  Correct.
12      Q.  Did you have any trial or anything?
13      A.  No.  There was no trial.
14      Q.  Okay.  And I know you told me at
15  the beginning of this deposition that you had
16  given a deposition before.  That was a
17  worker's comp deposition?
18      A.  Correct.
19      Q.  Okay.  You haven't given any other
20  depositions other than the one we're here
21  doing today, right?
22      A.  Correct.
23      Q.  Thank you.  We talked a little bit
24  about, as I understand it, you are making a
25  claim for stress-related problems as a result
                                        Page 74
```

```
 1  of Hurricane Katrina?
 2      A.  Yes.
 3      Q.  Okay.  Are you making any other
 4  type of personal injury claim?
 5      A.  Yes.
 6      Q.  What?
 7      A.  No, that's pretty much it.  That's
 8  it.
 9      Q.  Just your stress-related?
10      A.  My stress.  Yes.
11      Q.  From dealing with the loss of
12  items --
13      A.  The loss.
14      Q.  -- and having to evacuate and
15  things in that regard, right?
16      A.  Yes.
17      Q.  Okay.  And the only doctors that
18  you would have seen related to that would
19  have been Dr. Sarrat and Dr. Anderson,
20  correct?
21      A.  Correct.
22      Q.  Okay.  Do you have any idea of the
23  amount of medical expenses you've incurred
24  seeing those doctors related to the stress
25  only?
                                        Page 75
```

```
 1      A.  No, I sure don't.
 2      Q.  Okay.  Do you actually pay the
 3  doctors or does Medicaid or Medicare cover
 4  that?
 5      A.  Medicaid and Medicare pay for it.
 6  I have a co-pay where I pay three dollars or
 7  five dollars.  Five dollars.  I'm sorry.
 8      Q.  So the medical expenses you would
 9  have come out of pocket for would have been
10  five dollars per visit?
11      A.  Correct.
12      Q.  Okay.  When you went on each visit,
13  did you see him for stress-related problems
14  only or were you seeing him also for your
15  knee problems and your other health issues?
16      A.  Correct.  For a total physical I
17  saw Dr. Derek Anderson, took my blood
18  pressure, x-ray.
19      Q.  Okay.  So each time you saw him you
20  would have been seeing him for the variety of
21  issues that you have?
22      A.  Correct.  Correct.
23      Q.  Did you ever actually go and see
24  either Dr. Anderson or Dr. Sarrat only for
25  your stress-related problems?
                                        Page 76
```

```
 1      A.  No.
 2      Q.  Okay.  I'm just making sure it came
 3  out right because we had a lot of double
 4  negatives there.
 5          VIDEOGRAPHER:
 6          Excuse me, counsel.  I have to
 7          change tapes.
 8          MR. KIRSCH:
 9          Let's take a five-minute break.
10          VIDEOGRAPHER:
11          We're now off the record.  It is
12          the conclusion of tape one.  It is
13          10:46.
14          (OFF THE RECORD)
15          VIDEOGRAPHER:
16          We're now returning to the record.
17          It is 10:56.  This is the start of
18          tape 2.
19      EXAMINATION BY MR. KIRSCH:
20      Q.  Miss Augustine --
21      A.  Yes.
22      Q.  I want to go back.  I know you told
23  me you evacuated earlier and you went with
24  your daughter and your granddaughter.  Other
25  than the gas it would have taken to get to
                                        Page 77
```

                                    20  (Pages 74 to 77)

Page 78

```
 1    Baton Rouge, did you incur any other
 2    evacuation expenses?
 3        A.  No.
 4        Q.  And I think you told me earlier you
 5    had no receipts or anything of what you would
 6    have paid for gas to evacuate or any other
 7    type of expenses that were associated with
 8    evacuating, is that right?
 9        A.  Correct.  I don't have no receipts
10    for gas.
11            MS. BEVIS:
12            Are you just asking her about
13            transportation or the money that it
14            would have cost her to buy items to
15            replace?
16            MR. KIRSCH:
17            Well, I hadn't gotten to the
18            personal property or real property.
19            MS. BEVIS:
20            Okay.  Just transportation?
21            MR. KIRSCH:
22            I was talking about relocation
23            expenses.
24    EXAMINATION BY MR. KIRSCH:
25        Q.  You stayed with your daughter, I
```

Page 79

```
 1    believe you told me.  I mean your niece?
 2        A.  My niece.
 3        Q.  So you didn't --
 4        A.  I had to pay her.
 5        Q.  So you paid your niece?
 6        A.  Yes, I did pay her.
 7        Q.  Okay.  How much did you pay your
 8    niece?
 9        A.  Twenty-five -- I mean, $125 every
10    week.  And before they sent the money I was
11    adding up the weeks.  She deserved it.  I ate
12    swell.
13        Q.  Okay.  So your niece, your niece
14    fed you and everything and you paid her 125 a
15    week?
16        A.  Correct.
17        Q.  Did she ask you for that or you
18    feel that you needed to pay it to her?
19        A.  No, she didn't ask for anything.  I
20    just felt like, you know, she deserved it.
21    If I had more, I would have gave her more.
22        Q.  Okay.  And so you would have paid
23    her 125 a week until you moved into the --
24        A.  Baker Boulevard.
25        Q.  -- Baker Boulevard home.  And that
```

Page 80

```
 1    would have been in November?
 2        A.  Correct.
 3        Q.  And then you paid $600 in November,
 4    is that right?
 5        A.  Correct.
 6        Q.  And as of December you weren't
 7    paying any rent?
 8        A.  Yes.  I had to pay my deposit on
 9    Sherwood Meadows Drive.
10        Q.  Okay.  And how much was that?
11        A.  Two hundred.
12        Q.  But you aren't paying any rent at
13    this point in time?
14        A.  No rent, correct.
15        Q.  Okay.  And when you were living in
16    New Orleans you were paying somewhere between
17    two and three hundred dollars a month?
18        A.  Correct.
19        Q.  Okay.  And so since December
20    through the present time you haven't had to
21    pay the two hundred plus a month, two hundred
22    plus amount a month that you had to pay in
23    New Orleans?
24        A.  Correct.
25        Q.  Okay.  Other than your brother and
```

Page 81

```
 1    the people in the two cars that evacuated
 2    together, did y'all -- do you know any
 3    neighbors who evacuated?
 4        A.  Well, each side of my house, both
 5    of my neighbors evacuated.
 6        Q.  Okay.  Did you see them leave?
 7        A.  No.
 8        Q.  Okay.  Have you spoken with them
 9    since the storm?
10        A.  Yes, I have.
11        Q.  Okay.  Where did you see them?
12        A.  When the mayor made the
13    announcement, the area that I lived in was
14    able to go back and check the property of
15    your home, and that's when I saw one of my
16    neighbors.
17        Q.  Okay.  So you saw one of your
18    neighbors when you went back into town?
19        A.  Correct.
20        Q.  Okay.  When was the first time you
21    came back into New Orleans after the storm?
22        A.  Like I said, I don't know what date
23    it was, but the mayor was indicating if you
24    live in, whatever zip code that it was get,
25    this would be yours this week and maybe 70119
```

21 (Pages 78 to 81)

1    was the following week.  So whatever time my
2    zip code was indicated, that's when I was
3    able to go back and check my house.
4        Q.  Do you remember the month, if you
5    do?
6        A.  February, January.  Maybe February.
7    However it was it was a ghost town.  Wasn't
8    nobody there.
9        Q.  Okay.  But you think it would have
10   been probably sometime in 2006?
11       A.  Correct.  Correct.
12       Q.  And when you went back into town
13   I'm assuming the water had already receded?
14       A.  Correct.
15       Q.  Okay.  You had never been out to
16   your rental unit while the water was still
17   up?
18       A.  No.
19       Q.  Okay.  When you got there, did you
20   see a water line?
21       A.  Yes, I did.
22       Q.  Okay.  And where was the water
23   line?
24       A.  Outside of my house past my top
25   porch.

                                    Page 82

1        Q.  Let me do it this way.  You had
2    stairs going up on to the porch?
3        A.  Correct.
4        Q.  Okay.  Had it gotten to the top
5    stairs?
6        A.  It had exceeded the top stairs.  It
7    was on the porch.
8        Q.  Okay.  Did it go above the door,
9    the door entrance?
10       A.  Yes.
11       Q.  Okay.  Could you see a water line
12   on -- did you have a wood siding house or a
13   brick house?
14       A.  Wood.
15       Q.  Okay.  Could you see any water line
16   on the wood?
17       A.  Not like talking about it.
18       Q.  Okay.  So you couldn't, if I
19   understood that answer, you couldn't see a
20   water line on the wood?
21       A.  Not on my wood.
22       Q.  Okay.  And the way the house is
23   laid out, I'm assuming it's a raised house
24   from what you described to me, right?
25       A.  Correct.

                                    Page 83

1        Q.  It is what, about three or four
2    feet up in the air?
3        A.  About that, correct.
4        Q.  Okay.  How many steps do you have
5    to go up?
6        A.  Four.
7        Q.  Okay.  And the floor of your house
8    is about even with the porch or a little bit
9    above the porch?
10       A.  Correct.  Even with the porch.
11       Q.  Okay.  Did it have a basement or
12   anything?
13       A.  My house?
14       Q.  Yeah.
15       A.  No.  No basement.
16       Q.  Okay.  So the bottom floor would
17   have been somewhere even with the porch?
18       A.  Correct.
19       Q.  Okay.  And something I forgot to
20   ask you, and I don't want to forget about it.
21   You plan to permanently stay in Baton Rouge?
22       A.  No.
23       Q.  Okay.  You plan on moving back to
24   New Orleans?
25       A.  Yes.

                                    Page 84

1        Q.  Okay.  What are your plans in that
2    regard?
3        A.  Well, before I can come back to New
4    Orleans, the levee, everything have to be up
5    to par.  I watch the news religiously.  I'm
6    dying to get back, but I can't come back
7    until certain modifications has been made.
8        Q.  And what are those, what are you
9    looking to hear on the news?
10       A.  That the levees meet the standards
11   and that I am completely safe when it rain.
12   And the news is not indicating that it's safe
13   as of today for me to come back.
14       Q.  Okay.  Is anybody living with you
15   at the Baton Rouge address?
16       A.  I have a caregiver lives with me.
17       Q.  Where does your daughter and
18   granddaughter live?
19       A.  They have their own apartment in
20   Baker.
21       Q.  Is there a reason you moved out of
22   Baker to Baton Rouge?
23       A.  Well, the apartment that I -- yes,
24   there is a reason.  The apartment I had in
25   Baker, HUD was not going to pay for it, so I

                                    Page 85

                              22  (Pages 82 to 85)

1    had to find an apartment that HUD was going
2    to subsidize, and that was in Baton Rouge.
3        Q.   Okay.  You couldn't find a HUD
4    subsidized --
5        A.   Correct.
6        Q.   Apartment in Baker?  Is that right?
7        A.   Correct.
8        Q.   Thank you.  And we've already
9    covered you're not making a loss of earnings
10   claim, right?
11       A.   Repeat --
12       Q.   Loss of earnings claim because you
13   are disabled?
14       A.   Correct.
15       Q.   Okay.  And you're not making any
16   type of loss of business income?
17       A.   Correct.
18       Q.   You're not making any type of loss
19   of rental income?
20       A.   Yeah.  I had to pay rent.
21       Q.   Loss of rental income --
22       A.   No, no, no, no.
23       Q.   -- meaning somebody paid you rent?
24       A.   No, I'm sorry.
25       Q.   You would agree with me you are not

                                      Page 86

1        EXAMINATION BY MR. KIRSCH:
2        Q.   Real property means you owned a
3    home.
4        A.   Yes.  He did say land.  No, I'm not
5    making a claim for that.  Okay.  I'm sorry.
6        Q.   So you didn't own any home or
7    property in New Orleans?
8        A.   No.  No, I don't.
9        Q.   Okay.  And as I understand it, the
10   property that you would have owned in New
11   Orleans would have been what I call personal
12   property, which would have been things you
13   would have had in your apartment or your
14   rental unit?
15       A.   Correct.
16       Q.   Okay.  Let's first -- I want to
17   make sure I understand the complete layout of
18   the house you were in.  We already talked
19   about you had to go up four stairs, go on a
20   porch and go into the home, right?
21       A.   Correct.
22       Q.   And it was a wood or siding type
23   home?
24       A.   Correct.
25       Q.   And it was raised about three to

                                      Page 88

1    making a loss of rental income, right?
2        A.   Correct.  That's Katrina.  My mind
3    is gone.
4        Q.   With the -- have you filed income
5    tax returns?
6        A.   No.  I haven't worked.
7        Q.   And I think you told me you've been
8    disabled since 2000, right?
9        A.   Well, I've been compensated since
10   2000.  I've been disabled since my injury.
11       Q.   In '93?
12       A.   Correct.
13       Q.   Okay.  I'm going to ask you some
14   questions about real property.  When I say
15   real property, I'm talking about like homes,
16   immovable type, land, things in that regard,
17   okay?
18       A.   Okay.
19       Q.   Are you making any claim for any
20   real property damage?
21       A.   Yes.
22       Q.   Okay.
23       MS. BEVIS:
24       Wait.  Do you understand what real
25       property is?

                                      Page 87

1    four feet off the ground?
2        A.   Correct.
3        Q.   Okay.  Could you give me kind of a
4    picture of what the rooms look like when you
5    walk in did you enter into a living room?
6        A.   Correct.
7        Q.   Okay.  Was it a shotgun type house?
8        A.   Correct.
9        Q.   All right.  How many rooms did it
10   have?
11       A.   Five.
12       Q.   Okay.  When you first walk in the
13   front door you hit the living room, is that
14   the only room right there?
15       A.   Correct.
16       Q.   Okay.  When you go through the
17   living room what's the next room?
18       A.   A bedroom.
19       Q.   Okay.  Is it just one bedroom?
20       A.   Correct.
21       Q.   Okay.  And then you, as shotgun
22   houses are, you walk through the bedroom,
23   right?
24       A.   Correct.
25       Q.   What's the next room?

                                      Page 89

                          23  (Pages 86 to 89)

```
 1    A.  Bathroom.
 2    Q.  Okay.  And is the bathroom the only
 3 next room or is it kind of set to the side?
 4    A.  Set to the side.
 5    Q.  Okay.  What's adjacent to the
 6 bedroom?
 7    A.  The bedroom?
 8    Q.  Yeah.  I mean the bathroom.
 9    A.  A closet.
10    Q.  Okay.  And then there is a hallway
11 running --
12    A.  Correct.
13    Q.  -- in between the bathroom and the
14 closet?
15    A.  Correct.
16    Q.  Okay.  And what's the room after
17 that?
18    A.  Another bedroom.
19    Q.  Are there any other rooms?
20    A.  A kitchen.
21    Q.  And the kitchen is behind that
22 other bedroom?
23    A.  Correct.
24    Q.  Okay.  So it's two-bedroom, one
25 bath?
                              Page 90
```

```
 1    Q.  And, if I remember, the structure,
 2 it was a duplex?
 3    A.  Correct.
 4    Q.  And you would have, if you are
 5 facing it, you would have been to the left?
 6 Your door would have been to the left if you
 7 are facing the house from the street?
 8    A.  Okay.  Yes.
 9    Q.  Is that right?
10    A.  Uh-huh.  No, I'm sorry.  My door
11 would have been to the right.
12    Q.  Your door would have been to the
13 right if you're looking at it?
14    A.  If my house is where this gentleman
15 is standing (indicating), my house would have
16 been to the right.
17    Q.  Okay.  What was the -- what did the
18 neighbor's house look like so I can make sure
19 we're talking about the same one?
20    A.  My next-door neighbor?
21    Q.  Yes.  That was closest to your
22 door?
23    A.  The same as mine.
24    Q.  It was a white house?
25    A.  White house, correct.
                              Page 92
```

```
 1    A.  Correct.
 2    Q.  And it has one closet in that
 3 hallway, right?
 4    A.  Correct.
 5    Q.  On the -- is there a door going out
 6 the back?
 7    A.  Yes, there is, in the kitchen.
 8    Q.  Okay.  And how many stairs is it to
 9 go down the back?
10    A.  Four.
11    Q.  Okay.  What type of floors are
12 there?
13    A.  Hardwood floors.
14    Q.  Throughout the whole house?
15    A.  Correct.
16    Q.  Okay.  Even in the kitchen?
17    A.  No.  I'm sorry.  The kitchen had
18 tile.
19    Q.  Okay.  I'm assuming you had one
20 bedroom and your daughter and granddaughter
21 had the other bedroom?
22    A.  Correct.
23    Q.  Okay.  And the address was 2126
24 North Broad, right?
25    A.  Correct.
                              Page 91
```

```
 1    Q.  And then the other neighbor was,
 2 what, a pink or peach house, is that right?
 3    A.  The neighbor to my right has a blue
 4 house.
 5    Q.  So the neighbor you are closest to
 6 has a blue house?
 7    A.  Correct.
 8    Q.  Okay.  And the neighbor that the
 9 other rental unit is close to has a pink or
10 peach, a pink house, is that right?
11    A.  Next to my unit?  Correct.
12    Q.  Okay.  You came back in town, did
13 anybody come in town with you or was it just
14 you?
15    A.  My daughter.
16    MS. BEVIS:
17    Do you mean the first time she came
18    back?
19    MR. KIRSCH:
20    Yeah, the first time.
21    THE WITNESS:
22    Me, my daughter and my grandbaby.
23    All three of us.
24 EXAMINATION BY MR. KIRSCH:
25    Q.  And y'all came in town in the van?
                              Page 93
```

24  (Pages 90 to 93)

| | |
|---|---|
| 1    A.   In the SUV, yes. | 1    A.   Okay.  No problem. |
| 2    Q.   And you were under a yearly lease, | 2    Q.   When you got to the property were |
| 3  right? | 3  you able to get down the streets and |
| 4    A.   Correct. | 4  everything or were the streets blocked off? |
| 5    Q.   When did your lease run? | 5    A.   I would have been able to if I |
| 6    A.   From January -- no.  Wait a minute. | 6  wanted to. |
| 7  From November to November. | 7    Q.   So you drove up and you parked in |
| 8        (OFF THE RECORD) | 8  your driveway? |
| 9        VIDEOGRAPHER: | 9    A.   I park on the street, on Broad |
| 10        Return to the record.  It is 11:15. | 10  Street.  I didn't have a driveway.  I had a |
| 11  EXAMINATION BY MR. KIRSCH: | 11  garage on the back part of the house. |
| 12    Q.   And I think when we were talking | 12    Q.   And when we talked about the |
| 13  early on in the deposition you said you had | 13  structure, the garage was separate from the |
| 14  lived at this property in New Orleans for | 14  structure? |
| 15  five years before Katrina, right? | 15    A.   Correct. |
| 16    A.   Correct. | 16    Q.   Was it a slab garage or -- |
| 17    Q.   Okay.  And your lease would have | 17    A.   An aluminum-shed type garage. |
| 18  ran in November of '05? | 18    Q.   Okay.  One of like those Morgan |
| 19    A.   Correct. | 19  building-type garages?  Do you know what I'm |
| 20    Q.   And you would have had to sign a | 20  talking about? |
| 21  new lease? | 21    A.   I'm not familiar with a Morgan -- |
| 22    A.   Correct. | 22    Q.   It had like an aluminum roof, |
| 23    Q.   Okay.  Was there a reason you | 23  aluminum all around the side? |
| 24  picked that property to lease it? | 24    A.   Correct.  Yes. |
| 25    A.   Because it was nice. | 25    Q.   Okay.  And that was just in the |
|                          Page 94 |                          Page 96 |

| | |
|---|---|
| 1    Q.   Okay. | 1  backyard? |
| 2    A.   A nice area. | 2    A.   More or less, yes. |
| 3    Q.   Did you make any improvements to it | 3    Q.   Okay.  Do you know if it was on a |
| 4  yourself? | 4  concrete slab or was it just sitting on the |
| 5    A.   No. | 5  grass? |
| 6    Q.   Okay.  And you told me, I believe, | 6    A.   It was on a concrete slab. |
| 7  that you didn't have any type of renter's | 7    Q.   Any other structures for the rental |
| 8  insurance to cover your property inside, | 8  unit you were renting? |
| 9  right? | 9    A.   No. |
| 10    A.   No, I did not have any renter's | 10    Q.   What was the first thing you |
| 11  insurance. | 11  noticed when you got to the house? |
| 12    Q.   Okay.  Did you ever make any type | 12    A.   The insects. |
| 13  of list of what you lost? | 13    Q.   Did you see any damage on the house |
| 14    A.   Yes, I did. | 14  when you were, when you had just driven up? |
| 15    Q.   And who did you make that for? | 15    A.   No, I didn't see any. |
| 16    A.   My personal use. | 16    Q.   Okay.  Did you have any trouble |
| 17    Q.   Do you have a copy of that? | 17  getting in the front door? |
| 18    A.   Not with me. | 18    A.   No.  I just had to cross over a rat |
| 19    Q.   But do you have that in your | 19  that was on the porch, but no. |
| 20  possession? | 20    Q.   So you were able to walk up the |
| 21    A.   Yes, I do. | 21  stairs, walk through the porch, walk on the |
| 22    Q.   Just like all the other documents | 22  porch and open the door? |
| 23  that we talked about before, I'm just going | 23    A.   Correct. |
| 24  to ask that you give them to your lawyer so | 24    Q.   Okay.  The front door hadn't gotten |
| 25  she can get them to me.  Okay? | 25  swollen or anything preventing you from |
|                          Page 95 |                          Page 97 |

25  (Pages 94 to 97)

| | |
|---|---|
| 1 opening it? | 1 because we're going to go over those in a |
| 2    A. No. | 2 second. |
| 3    Q. Okay. When you walk in the house | 3    A. (Witness indicating). |
| 4 what do you see? | 4    Q. Thank you. I want to go back to |
| 5    A. My dead fish. | 5 you just walked in the home. You saw -- we |
| 6    Q. Anything else? | 6 talked about some of the damage you saw and |
| 7    A. Yes. My oriental rug was sopping | 7 you said you saw a water mark, correct? |
| 8 wet. | 8    A. Right. |
| 9    Q. Anything else you noticed in the | 9    Q. The -- where did you see a water |
| 10 living room? | 10 mark? |
| 11    A. I was able to see the water mark | 11    A. Where my stereo system was in the |
| 12 line from inside. | 12 corner, once you opened the door you was able |
| 13    Q. In the photographs that your | 13 to see the brownish line. |
| 14 attorney handed me that we showed you at the | 14    Q. Okay. And how high up was it? |
| 15 beginning of the deposition, the photographs | 15    A. I'd say about one and a half to two |
| 16 at least of the damage, was that taken that | 16 feet approximately. |
| 17 day when you walked in? | 17    Q. Did you notice any mold or mildew |
| 18    A. No, it wasn't taken that day. | 18 or anything? |
| 19 Maybe two weeks after. | 19    A. Yes. |
| 20    Q. You returned? | 20    Q. Okay. How high had that gotten? |
| 21    A. Yes. | 21    A. It was higher than the water mark. |
| 22    Q. Okay. | 22    Q. Okay. And you said the water mark |
| 23    MS. BEVIS: | 23 was about one and a half to two feet? |
| 24    Are all of the photographs after | 24    A. Correct. |
| 25    Katrina? | 25    Q. So maybe it was about halfway up |
| Page 98 | Page 100 |

| | |
|---|---|
| 1    MR. KIRSCH: | 1 the wall? |
| 2    No. That's why I specifically said | 2    A. Pretty much, yes. |
| 3    the ones that were after. | 3    Q. Which would have been about four |
| 4    MS. BEVIS: | 4 feet? |
| 5    Okay. I'm sorry. I didn't catch | 5    A. No, it wasn't that high. |
| 6    that. | 6    Q. Okay. So the mold had started |
| 7    THE WITNESS: | 7 creeping up about two or three feet? |
| 8    Oh, well -- | 8    A. Correct, from the water line. |
| 9 EXAMINATION BY MR. KIRSCH: | 9    Q. Okay. Do you have eight foot |
| 10    Q. Do you want to see it (indicating)? | 10 ceilings or bigger in your house? |
| 11    A. These here are before Katrina. | 11    A. No. Lower. |
| 12 This is the fish tank I was talking about. | 12    Q. Lower than eight feet? |
| 13 This is my appearance and all that before | 13    A. I would say so, yes. |
| 14 Katrina. This is my bookshelf. | 14    Q. Are they like a regular home |
| 15    Q. Well, let's do this. | 15 ceiling height? |
| 16    A. This is after Katrina (indicating). | 16    A. Yes. Yes. |
| 17 This is an after Katrina picture, this, that | 17    Q. Okay. So if I were to tell you |
| 18 (indicating). | 18 that a regular home ceiling heights are about |
| 19    Q. Why don't we create two piles. Put | 19 eight feet -- |
| 20 the after Katrina pictures in one pile for me | 20    A. Okay. Hypothetically speaking, |
| 21 and the pre-Katrina pictures in another pile. | 21 just as high as this ceiling here. |
| 22    A. There is two on here (indicating). | 22    Q. But it wasn't a big tall ceilings |
| 23 This is after Katrina and this is before | 23 that you see -- |
| 24 Katrina, so if you cut it in half. | 24    A. No. I could get on a six-foot |
| 25    Q. Okay. I got you. Hand me those | 25 ladder and do what I had to do if I had to do |
| Page 99 | Page 101 |

26 (Pages 98 to 101)

DONNA M. AUGUSTINE (LEVEE)                                         7/13/2007

```
 1   anything.
 2       Q.  Did you notice any water marks in
 3   the ceiling?
 4       A.  No.
 5       Q.  Okay.  You said you saw a water
 6   mark and some mold about two or three feet up
 7   the wall?
 8       A.  Correct.
 9       Q.  In the living room?
10       A.  Correct.
11       Q.  Any other damage you saw in the
12   living room?
13       A.  That was pretty much it outside of
14   my sofa and stuff that was smelly and wet,
15   other than that, that was it.
16       Q.  Okay.  Let's talk about the
17   personal property you had in there.  What did
18   you have in there?
19       A.  In my living room I had a fish
20   tank.  I had a component set.  I had a
21   bookshelf with encyclopedias and I had a
22   sofa.  I had two end tables and a cocktail
23   table and a television.  And some of my brass
24   was on the floor.
25       Q.  Okay.  You said you had a
```
                                                      Page 102

```
 1   on the floor.  What is that?
 2       A.  Unicorns that I had put on the side
 3   of my encyclopedias like a book mark, more or
 4   less.
 5       Q.  So they would have been in the
 6   bookshelf or just sitting on the floor?
 7       A.  Well, I had them on the floor
 8   because I had cleaned them.
 9       Q.  Okay.
10       A.  Okay.  Other than that they would
11   have been on the bookshelf.
12       Q.  Okay.  Your encyclopedias were in
13   the bookshelf?
14       A.  Correct.
15       Q.  Where on the bookshelf?
16       A.  On the top shelf.
17       Q.  Okay.  So they would have been high
18   enough that they wouldn't have gotten wet?
19       A.  They didn't get wet, but the
20   moisture, I couldn't even get them off the
21   bookshelf.  Everything was stuck to the
22   bookshelf.
23       Q.  Okay.  So all the books in the
24   bookshelf you said were stuck to the
25   bookshelf?
```
                                                      Page 104

```
 1   component?
 2       A.  A stereo system.
 3       Q.  Okay.  A stereo system.  Was
 4   that -- what was that sitting on?
 5       A.  The floor.
 6       Q.  You had your stereo on the floor?
 7       A.  Correct, yes.
 8       Q.  Okay.  You didn't have any type of
 9   entertainment center or anything to put your
10   stereo in?
11       A.  No.  It was geared for the floor.
12   The speakers, the turntable was higher, so
13   therefore the only thing that would have been
14   badly messed up would have been the speakers
15   where the water --
16       Q.  Would have gotten to it?
17       A.  Right.
18       Q.  So your actual stereo or turntable
19   was okay because it was raised high?
20       A.  Correct.
21       Q.  Okay.  And your TV was also high
22   enough that it wouldn't have gotten touched
23   by the water, right?
24       A.  Correct.
25       Q.  Okay.  You said you had some brass
```
                                                      Page 103

```
 1       A.  Ruined.  Yes.  Yes.
 2       Q.  Okay.  And then you said you had a
 3   sofa, right?
 4       A.  Correct.
 5       Q.  Was it leather or material?
 6       A.  It was a material sofa, which was
 7   my mother's sofa that she died on.  I sold
 8   mine in order to take hers, but if I would
 9   have knew this was going to happen --
10       Q.  Okay.  So the sofa got wet, I take
11   it?
12       A.  Yes.
13       Q.  Okay.  What were the end tables
14   made of?
15       A.  Wood.
16       Q.  Wood?
17       A.  Uh-huh.
18       Q.  What did they look like?
19       A.  They were white at the bottom all
20   the way around.  The top was fine, but the
21   bottom was white where the water mark had
22   done stopped on them.
23       Q.  And you said you had a cocktail
24   table, is that right?
25       A.  Yes.  Yes.
```
                                                      Page 105

27 (Pages 102 to 105)

DONNA M. AUGUSTINE (LEVEE)                                    7/13/2007

1     Q.  And what was that made of?
2     A.  Wood and glass.
3     Q.  Okay.  How did that appear?
4     A.  The same way.
5     Q.  The bottom was white?
6     A.  Right.  From the water stain on it.
7     Q.  Did you try to clean it off with
8  any type of polish to see if the wood was
9  messed up?
10    A.  No indeed.
11    Q.  Okay.  Any other damage to property
12 that was yours in the living room?
13    A.  That's pretty much it in the living
14 room.
15    Q.  Okay.  I think the next room is a
16 bedroom?
17    A.  Correct.
18    Q.  Is that your bedroom or your
19 daughter's bedroom?
20    A.  Mine.
21    Q.  Okay.  I'm assuming you had some
22 personal property in the bedroom, right?
23    A.  Yes.
24    Q.  Okay.  What did you have in the
25 bedroom?

Page 106

1     A.  Bed, TV, a dresser, a lot of
2  containers that goes, that I had under the
3  bed to put some of my stuff in.
4     Q.  Uh-huh.
5     A.  And that was pretty much it.
6     Q.  Okay.
7     A.  Oriental rug I had on the floor.  A
8  marble telephone table for my phone.  A
9  wrought iron bed.  A Bassett chest.  That's
10 it.
11    Q.  Okay.  I'm assuming the closet in
12 the hallway is your closet for your clothes?
13    A.  No.  The closet in the hallway was
14 more or less for the bathroom accessories.
15    Q.  Okay.
16    A.  In my bedroom I had a closet in the
17 bedroom.
18    Q.  Okay.  So your clothes would have
19 been in the bedroom?
20    A.  Correct.
21    Q.  Okay.  How was your closet
22 arranged, was it just one pole across the
23 top?
24    A.  Correct.
25    Q.  Okay.  And did you have any type of

Page 107

1  cabinets or anything built into the closet or
2  was it just one pole and that's it?
3     A.  It was a pole and a piece of two by
4  two, like a shelf, and that was pretty much
5  it.
6     Q.  Okay.  So you had a shelf above the
7  pole?
8     A.  Correct.
9     Q.  Okay.  When you walked in the
10 bedroom what's the first -- well, let me ask
11 you this.  You said you had a dresser.  Where
12 did you have your TV?
13    A.  The TV was mounted on the wall
14 (indicating).
15    Q.  Okay.  Up in the air?
16    A.  Correct.
17    Q.  Okay.  Any other furniture other
18 than the dresser --
19    A.  And the Bassett chest.
20    Q.  -- the Bassett chest, the marble
21 table and the bed?
22    A.  Correct.
23    Q.  Okay.  That's everything?
24    A.  And I had a component set in there,
25 too.

Page 108

1     Q.  Okay.  A stereo?
2     A.  A stereo, uh-huh.
3     Q.  Okay.  Where was that sitting?
4     A.  That was close to the window at the
5  foot of my bed.
6     Q.  Okay.  Was it on an end table?
7     A.  There it is right there
8  (indicating).  That's the one there that was
9  in my bedroom.  And there's another component
10 set next to the bookshelf.  This is the
11 living room, but that's the one that was in
12 my bedroom there (indicating).
13    Q.  All right.  Let's -- you are
14 pointing to a picture with the TV, which is
15 in the living room, and the stereo, which is
16 in your bedroom, right?
17    A.  Right here (indicating) --
18    Q.  Could you show it to the video
19 camera.
20    A.  Oh, okay.  On the end is my stereo.
21 Next to the stereo is my aquarium and the
22 bookshelf.  So this is the stereo that was in
23 the living room.
24    Q.  Uh-huh.
25    A.  And my aquarium and the bookshelf

Page 109

28  (Pages 106 to 109)

DONNA M. AUGUSTINE (LEVEE)                                    7/13/2007

1    (indicating)?
2        Q.   Right.  And then the stereo in the
3    left picture --
4        A.   In the left picture is the stereo
5    that's in my bedroom at the foot of my bed.
6        Q.   And it is on like a table, an end
7    table?
8        A.   And it is on a stand, correct.
9        Q.   Okay.
10       A.   And these were some of the under my
11   bed stuff when they broke the bed down.
12       Q.   Okay.  The containers underneath
13   your bed, I'm just looking in the picture you
14   just showed to the camera, it looks like it
15   was probably a fairly big container, huh?
16       A.   Drenched with water, yes.
17       Q.   Okay.  How high is it?
18       A.   The container?
19       Q.   Yeah.
20       A.   About that high (indicating).
21       Q.   Okay.  Did the water get over the
22   container?
23       A.   Yes.
24       Q.   Okay.
25       A.   Yes.
                                    Page 110

1        Q.   And did you open the container?
2        A.   Yes.
3        Q.   And the water got in the container
4    or did it --
5        A.   The water was already in it.  Once
6    I opened it up I was able -- oh, yes.
7        Q.   So the water actually seeped into
8    the container?
9        A.   Correct.
10       Q.   Okay.  And what was in the
11   container underneath your bed?
12       A.   My satin underclothes, my pajamas,
13   my gowns.  A lot of stuff I had ordered from
14   Chadwicks that I had never used and just put
15   it there under the bed.
16       Q.   Okay.  So that was clothes that you
17   hadn't used or didn't use on a regular basis?
18       A.   Correct.
19       Q.   Okay.  And the clothes you used on
20   a regular basis I assume were in the dresser?
21       A.   In the -- correct, yes.
22       Q.   Okay.  The stereo was high enough
23   that the water didn't get to it, right, in
24   your bedroom?
25       A.   Correct.  Uh-huh.
                                    Page 111

1        Q.   Okay.  The TV was mounted on the
2    wall, so the water wouldn't have gotten to
3    the TV?
4        A.   Correct.
5        Q.   The dresser, I'm assuming the
6    dresser had some type of water mark on it?
7        A.   Correct.  Yes.
8        Q.   How high did that go?
9        A.   On the dresser?  Probably to the
10   second drawer.
11       Q.   Okay.  How many drawers did the
12   dresser have?
13       A.   Five.
14       Q.   Five?
15       A.   Correct.
16       Q.   And it was just, it just went
17   straight up and down, one drawer each level?
18       A.   Correct.
19       Q.   Okay.  So the top three drawers
20   were okay?
21       A.   Pretty much, yes.
22       Q.   Okay.  What type of stuff was in
23   the bottom two drawers?
24       A.   Blouses.
25       Q.   Okay.  Did you put that stuff on
                                    Page 112

1    the list you made?
2        A.   I put it under clothing.  I wasn't,
3    you know --
4        Q.   You didn't make a list of every
5    piece of clothes you lost?
6        A.   No.
7        Q.   You just put clothing?
8        A.   Correct.
9        Q.   And did you assign any type of
10   amount of clothing that you lost or --
11       A.   No, I never put an amount, but it
12   was a lot.
13       Q.   Okay.  So the clothes in the top
14   three drawers you were able to --
15       A.   Save pretty much.
16       Q.   -- save?
17       A.   Yes.  T-shirts.
18       Q.   Okay.  And both TVs were okay, the
19   TV in the living room and the TV in the
20   bedroom, right?
21       A.   Yes.
22       Q.   And the stereo was okay?
23       A.   Correct.
24       Q.   In both rooms, it was only the
25   speakers that got damaged in the living room,
                                    Page 113

                                    29  (Pages 110 to 113)

DONNA M. AUGUSTINE (LEVEE)                                    7/13/2007

1    right?
2        A.  Correct.
3        Q.  Okay.  What did the -- how did the
4    water affect the wrought iron bed?
5        A.  I didn't -- all I saw was a white
6    mark on it, so I can't see where it did no
7    damage to the wrought iron bed.
8        Q.  Okay.  How did it affect the
9    dresser itself, the furniture?
10       A.  Stained it.
11       Q.  Okay.  Did you have trouble opening
12   the drawers on the bottom two?
13       A.  Well, I didn't even open them.
14   They were stuck.
15       Q.  Okay.  The other three opened fine?
16       A.  Was looking fine, uh-huh.
17       Q.  Okay.  The marble telephone table
18   that you said you had in your bedroom --
19       A.  Yes.
20       Q.  -- how was that affected?
21       A.  Just the bottom legs were wet from
22   the water.
23       Q.  Did you see if it was salvageable
24   or not?
25       A.  It could have been salvageable.
                                    Page 114

1    mark wouldn't have gotten all the way to the
2    top of the chest?
3        A.  Right.
4        Q.  Was the second shelf stuff okay?
5        A.  Well, pretty much everything in the
6    Bassett chest was okay.
7        Q.  Okay.  So you were able to take all
8    of that with you?
9        A.  What was in it, yes, was good.
10       Q.  So it kept the water out?
11       A.  Yes.
12       Q.  Okay.  Any other personal property
13   that you can think of that you lost in your
14   bedroom?
15       A.  Yeah.  I had one of those ovens,
16   electric ovens, that was in my -- I didn't
17   have a big kitchen, so I had it in my closet
18   in the box.  What else?  That's pretty much
19   it that I can think of.
20       Q.  Okay.  Then we're going to -- I
21   guess the next step is to go down the
22   hallway.
23       A.  Okay.
24       Q.  You said you had kitchen stuff in
25   the hallway closet, right?
                                    Page 116

1        Q.  But you left it there or what did
2    you do with it?
3        A.  Well, I had no choice.  I wasn't
4    able to get a U-Haul truck, okay, and I had a
5    certain amount of time that I had to get all
6    my stuff out the house.
7        Q.  Okay.  So you left it there?
8        A.  I couldn't get it, yes.
9        Q.  And then I think the only other
10   thing we haven't covered was a Bassett trunk,
11   is that right?
12       A.  Bassett chest.
13       Q.  Bassett chest.  What was in the
14   Bassett chest?
15       A.  Rollers, important papers.  I had
16   two shelves in there.  A lot of my important
17   papers, video, pictures.
18       Q.  The Bassett chest I'm assuming sat
19   on the floor, am I right?
20       A.  Correct.
21       Q.  How big was this chest?
22       A.  About that high and about that wide
23   (indicating).
24       Q.  Okay.  And -- so some of the
25   Bassett chest wouldn't have been -- the water
                                    Page 115

1        A.  No.
2        Q.  No?
3        A.  No.
4        Q.  What did you have in the hallway
5    closet?
6        A.  Towels, stuff for the bathroom.
7        Q.  Oh, okay.
8        A.  Sheets.
9        Q.  And I'm assuming there are shelves
10   in the closet?
11       A.  Correct.
12       Q.  Was there anything that got damaged
13   by the water in the closet?
14       A.  Yes.  Everything that sat on the
15   floor.  Important papers pertaining to my
16   mother's death.  Plot -- a lot of important
17   papers that were down there in a little hand,
18   a tote, it was in little totes, strictly was
19   geared down by that bottom part.  All that
20   was destroyed.  Pictures.
21       Q.  So what you would have lost in the
22   closet would have been photos and important
23   papers?
24       A.  Correct.
25       Q.  All the bathroom linens and
                                    Page 117

                                    30  (Pages 114 to 117)

DONNA M. AUGUSTINE (LEVEE)                                    7/13/2007

1   everything would have been fine because they
2   would have been above the water mark?
3       A.  Correct.
4       Q.  Okay.  When you walked across the
5   hallway and went into the bathroom did you
6   have any personal property that was affected
7   in the bathroom?
8       A.  No, not that I know of.  I didn't
9   see any.
10      Q.  Okay.  Then we go into your
11  daughter's room.
12      A.  Okay.
13      Q.  Did you have any personal property
14  in your daughter's room?
15      A.  No.
16      Q.  That would have been all your
17  daughter's stuff?
18      A.  Yeah.  All her nursing books was
19  destroyed.  Computer.
20      Q.  Okay.  But that would have been
21  your daughter's stuff, not yours?
22      A.  Well, I bought it, but she is
23  reaping the benefit from it, yes.
24      Q.  She was the owner of that property?
25      A.  I was the owner, she just lived in

Page 118

1       A.  It could have been.
2       Q.  Okay.  That was another situation
3   where you just couldn't get the stuff out in
4   time?
5       A.  I couldn't get a U-Haul truck.  You
6   know, nothing was available for me at that
7   time.
8       Q.  Okay.  The -- what about the night
9   stand?
10      A.  The night stand?
11      Q.  Uh-huh.
12      A.  In her bedroom.
13      Q.  Yeah.
14      A.  No, I couldn't take it.
15      Q.  Okay.  The chest, it was like a
16  Bassett chest also?
17      A.  No, no.  The Bassett chest was in
18  my bedroom.  In her room it was a chest, I
19  meant a dresser and one with the mirror
20  that's attached to it.
21      Q.  Uh-huh.
22      A.  And that was it.
23      Q.  Okay.  And she had -- she kept her
24  clothes in those?
25      A.  Correct.

Page 120

1   that back room.
2       Q.  Right.
3       A.  The only thing she owned was her
4   books for, her nursing books, and her
5   clothing pretty much.
6       Q.  Okay.  Okay.  So what did you have
7   that was yours back there?
8       A.  All but her computer.  Everything
9   else back there was mine's.
10      Q.  Okay.  I need to know specifics.
11      A.  Okay.  A brass bed.  A night stand.
12  A chest and a dresser.
13      Q.  Okay.  So it would have just been
14  the furniture?
15      A.  The furniture more or less,
16  correct.
17      Q.  Okay.  And all the contents of
18  those things as well as the computer was your
19  daughter's?
20      A.  Correct.
21      Q.  Okay.  And your daughter is over
22  eighteen, right?
23      A.  Correct.
24      Q.  Okay.  You -- was the brass bed
25  salvageable?

Page 119

1       Q.  Okay.  Were either one of those
2   salvageable?
3       A.  No.
4       Q.  We've covered all the personal
5   property now that you lost in there, right?
6       A.  Correct.
7       Q.  Okay.  And then we have the
8   kitchen.
9       A.  Correct.
10      Q.  Is the last room.
11      A.  Uh-huh.
12      Q.  What did you have in the kitchen?
13      A.  Washer, dryer, refrigerator, stove,
14  deep freezer, dinette set, microwave and a
15  microwave table.  Toaster.
16      Q.  So the fridge, the deep freezer,
17  those were all your property?
18      A.  Yes.
19      Q.  Okay.
20      A.  Stove.  Everything was mine.
21      Q.  Okay.  The kitchen was basically
22  just an empty room with the hookups when you
23  rented it?
24      A.  Correct.  Correct.
25      Q.  Okay.  Was anything salvageable in

Page 121

31  (Pages 118 to 121)

1    the kitchen?
2        A.   What was salvageable?  My dryer, I
3    think.  My stove.  I think the refrigerator,
4    it was gone.  The deep freezer was gone.  My
5    microwave was salvageable and that's pretty
6    much it.
7        Q.   Okay.  What -- when you said the
8    deep freezer was gone, you mean it was not
9    salvageable, right?
10       A.   Correct.
11       Q.   Okay.  Was there any evidence of
12   looting on your unit?
13       A.   Would you repeat the question?
14       Q.   Was there any evidence of looting
15   to your unit, meaning did anybody break into
16   it or anything?
17       A.   Not that I know of, no.
18       Q.   Okay.  So you were able to -- the
19   dryer, the stove and the microwave were all
20   salvageable, right?
21       A.   I would say so, but I had no -- the
22   only thing I could say I have is my
23   microwave, okay.
24       Q.   You were able to take that with
25   you?

Page 122

1        Q.   Did you see any water marks on any
2    of the ceilings?
3        A.   Nope, no water marks.  I didn't see
4    any.
5        Q.   Okay.  When -- did you go into the
6    backyard?
7        A.   Yes.
8        Q.   What did the backyard look like?
9        A.   The shed, the door was busted open.
10   I don't know if the pressure or the material
11   that was in the shed knocked, but it was
12   open.  All my stuff -- a trunk, air
13   condition, a king size bedroom set, two
14   televisions, four air conditions.  So much
15   stuff that was back there that I couldn't put
16   inside the house, considering the apartment I
17   had prior to me being on Broad, I had so many
18   windows, I had too many air conditions, so I
19   couldn't use them on the Broad Street, so
20   that's where they were at, in the back shed.
21   It's on the pictures.  You can see them on
22   there.
23       Q.   So all of that stuff was where, out
24   in the front -- they were in the yard?
25       A.   More or less in the yard on this

Page 124

1        A.   Right.  I was able to take that
2    with me.
3        Q.   Okay.  You left the dryer and the
4    stove?
5        A.   The dryer, the stove, the deep
6    freezer, yes.
7        Q.   Okay.  The -- did you have plates
8    and flat wear and things like that in there?
9        A.   My dishes, yes, I was able to take
10   that.
11       Q.   Those were all okay?
12       A.   Some of my pots that was sitting in
13   the rack, because a lot of them I had inside
14   the stove, the oven, I would put them in the
15   oven.  I had a big Magnalite roaster that sat
16   on the floor, but all the glunk, yeah, but
17   other than that, everything else was a waste.
18       Q.   So you were able to salvage most of
19   your pots and pans and all of your dishes and
20   silverware and things like that?
21       A.   Dishes for sure, correct.  Uh-huh.
22       Q.   Okay.  Something I didn't ask you.
23   Did you look at the ceilings in the other
24   rooms after you went in the living room?
25       A.   I pretty much looked -- yes.

Page 123

1    concrete slab foundation with the aluminum
2    top go over it.
3        Q.   Okay.  Did the shed have any wind
4    damage to it?
5        A.   No.  It seemed sturdy to me.  The
6    only thing was the door was open.
7        Q.   Was it ripped open?
8        A.   Uh-huh.
9        Q.   Was the door still on its hinges?
10       A.   Yes.  They were still on the
11   hinges.
12       Q.   Could you tell whether somebody had
13   gone in there and opened the door?
14       A.   Well, I had a key, but, no, I
15   couldn't tell.  Just with it being open and
16   observing so much of the stuff that was
17   sitting close to my stairs, no.
18       Q.   Okay.  Did -- the door had a lock
19   on it I take it?
20       A.   Yes.
21       Q.   And you locked it before you left?
22       A.   Yes.  Yes.
23       Q.   Okay.  Did you --
24       A.   A bike.  I'm sorry.  A bike I had
25   in there.  A bassinet.  A lot of -- a rocking

Page 125

32 (Pages 122 to 125)

1  horse for my grand -- there was so much back
2  there.
3      Q.  One thing I'm trying to do is see
4  if there is any way we can figure out how the
5  door got open.  Did you look to see if the
6  door had been busted open?
7      A.  No.
8      Q.  You just didn't look one way or the
9  other, right?
10     A.  No.
11     Q.  Okay.  What was the inside of the
12 garage, did it have shelves or did you just
13 lay everything on the floor?
14     A.  They had four shelves on the right
15 side and three along where the door is on the
16 left side there were shelves.  And on my
17 right side there were shelves (indicating).
18     Q.  So you had about seven shelves
19 total?
20     A.  Toward the front, yeah.
21     Q.  Did you have anything on those
22 shelves?
23     A.  Yes.  My propane gas for my pot for
24 boiling stuff in.  My fishing tackle stuff.
25     Q.  Did anything on those shelves make

Page 126

1      Q.  How big was the tree?
2      A.  It ought to be about 13, 14 feet
3  now.
4      Q.  Okay.  What kind of tree was it?
5      A.  Lemon.
6      Q.  Anything else in the backyard?
7      A.  Yes.  I had a lot of flower pots.
8  I had tomatoes and all of that.  A bird of
9  paradise.  It was gone.  Mildew, mold.
10     Q.  Anything else that you can think
11 of?
12     A.  Shovels, lawn mower, weed eater.
13 Lounge chairs.  Ladder.  Comforters,
14 blankets.
15     Q.  Anything else?
16     A.  That's pretty much it.
17     Q.  Okay.  And you said there was a
18 photograph of the garage, right?
19     A.  Uh-huh.  That look like it there.
20     Q.  Is that it (indicating)?
21     A.  Yes.  Yes.
22     Q.  It is the one on the left?
23     A.  Correct.
24     Q.  Could you show it to the video and
25 point to it?

Page 128

1      it out?
2      A.  No.
3      Q.  Were the shelves still intact when
4  you went in there?
5      A.  Yes.
6      Q.  Was the stuff still on the shelves?
7      A.  No.
8      Q.  It was on the floor?
9      A.  On the ground, yes.
10     Q.  Okay.  Did you have any type of gas
11 in there or anything?
12     A.  No more than a propane cylinder
13 deal.
14     Q.  You didn't anything like the little
15 gas cans that you use for lawn mowers or
16 anything?
17     A.  Oh, no.  No.
18     Q.  And when you actually walked out
19 the front door you saw some of this stuff
20 that you described to me on the, in the
21 backyard outside of the shed, right?
22     A.  Correct.  The best thing was the
23 tree I planted.
24     Q.  The tree was still standing?
25     A.  Beautiful, yes.  It is still there.

Page 127

1      A.  (Witness indicating.)
2      Q.  Is that a picture inside the
3  garage?
4      A.  Yes.  This is a picture inside the
5  garage.
6      Q.  Okay.  Did you take a picture of
7  any of the stuff that was in the yard?
8      A.  No.  Yep.  Yes, indeed.  Highchair,
9  all that.  You can pretty much see it on
10 there.  My first aid kit (indicating), that
11 was ruined.
12     Q.  I'm going to go through the
13 photographs real quickly with you in a
14 second.  Do you think we probably covered all
15 the personal property you lost now?
16     A.  I'm not sure.  Probably when this
17 is over more stuff will come to my mind, but
18 as of now, this is, you know, pretty much --
19     Q.  That's what you recall?
20     A.  Correct.
21     Q.  Okay.  Well, we talked about --
22 let's start and --
23     MR. KIRSCH:
24     Do you mind if I write on these,
25 Lexie?

Page 129

33 (Pages 126 to 129)

1      MS. BEVIS:
2      No.  Go ahead.
3      MR. KIRSCH:
4      I'm just going to put numbers at
5      the top.
6      MS. BEVIS:
7      Maybe use letters.
8      THE WITNESS:
9      And I don't know if I named the air
10     conditions that was back there in
11     the shed, too.  I did?
12  EXAMINATION BY MR. KIRSCH:
13     Q.  You are talking about the air
14  conditions you couldn't use on the property.
15     A.  Correct.
16     Q.  On the Broad Street property.
17     MR. KOURY:
18     How many were in there?
19     THE WITNESS:
20     Four.
21  EXAMINATION BY MR. KIRSCH:
22     Q.  We will mark this as Exhibit 4 in
23  globo.  And I've put letters at the top.  If
24  you can show it to the video camera, too.
25  Exhibit 4A is the photograph of your garage,

Page 130

1     Q.  Let's go to picture 4C and 4D.  We
2  talked about that.  4C is a picture in your
3  bedroom of the stereo and the trunk you had
4  underneath your bed, right?
5     A.  Correct.
6     Q.  And what is 4D?
7     A.  4D is a picture of my living room
8  with the bookshelf, my television, my
9  aquarium, my stereo system.
10     Q.  Okay.
11     A.  And the books that was on the
12  bookshelf.
13     Q.  Okay.  And then we have photographs
14  E and F.  And you will probably have to turn
15  it up.  Photograph, the one with the E next
16  to it --
17     A.  Okay.  Right here (indicating).
18     Q.  -- what is that of?  And can you
19  show the camera?
20     A.  We doing E?
21     Q.  Yeah.
22     A.  Okay.  This would be photograph E.
23  This is my washing machine and my stove and
24  part of my dinette set, my dishes, glasses
25  and stuff that I was taking off the shelf

Page 132

1  right?
2     A.  Correct.
3     Q.  4B is a photograph of what?
4     A.  My bedroom.
5     Q.  Okay.  Let's go to the next --
6     A.  No.  I'm sorry.  It's the living
7  room because there's the sofa.  The pillows
8  and stuff is throwed on top.  This is the
9  sofa here (indicating).
10     Q.  Okay.
11     A.  There's the air --
12     Q.  So your pillows didn't get wet?
13     A.  The pillows was probably on the
14  wrought iron bed.
15     Q.  Okay.
16     A.  And everything that was on the bed,
17  they just dumped it on the sofa.
18     Q.  Okay.  Did that get wet?
19     A.  What, the stuff that was on the
20  bed?
21     Q.  Yeah.
22     A.  No.
23     Q.  Okay.  So you were able to take
24  that with you?
25     A.  Yes.

Page 131

1  when I came.  That's pretty much it.
2     Q.  Okay.  And then photograph F?
3     A.  Photograph F is the second bedroom.
4  This is the computer desk.  This is part of
5  the computer.  I guess the floppy disks, the
6  monitor, whatever that is that sits on the
7  floor is disrupted.  There's a television.
8  There's the night stand.
9     Q.  Okay.  And that would have been
10  your --
11     A.  My daughter's --
12     Q.  -- your daughter's stuff?
13     A.  Correct.
14     Q.  Okay.  Let's look at photographs G
15  and H of Exhibit 4.
16     A.  Okay.  G is my daughter's Alero
17  car.  H is my dryer and my deep freezer.
18     Q.  And then Exhibit 4, I and J, I
19  think that's a before and an after picture,
20  right?
21     A.  All right.  I is my house before
22  Katrina and myself.  J is after Katrina, this
23  was my first visit to the house.  I'm in the
24  back standing up just looking.  That's my
25  daughter (indicating).  She's in shock.  And

Page 133

34  (Pages 130 to 133)

1  my grandbaby with the question mark look on
2  her face.  She's wondering about her Dora
3  sofa.  Okay.  These are the containers that's
4  sitting on top her dresser.  Our house was
5  full of these little containers, okay, where
6  we kept little clothing in them.
7      Q.  And those were sitting on top the
8  dresser?
9      A.  Yes.  This was sitting on top her
10  dresser in her bedroom.
11      Q.  So those would have made it through
12  the storm okay?
13      A.  These would've been fine, correct.
14  And she also had containers under the bed.
15      Q.  And then just real quick, K and L
16  are before pictures of your living room?
17      A.  Yes.
18      Q.  Okay.  Thank you.
19      A.  And these are the unicorns.  And
20  picture K, those were the unicorns that I was
21  cleaning that's on the bookshelf.  All the
22  books, everything pretty much stuck.
23      Q.  Okay.  And you said the unicorns
24  you had left on the floor?
25      A.  Yeah.  On my oriental rug.  I had
                                        Page 134

1  even cleaned them with the Brasso.
2      Q.  Okay.  And did you attempt to clean
3  the unicorns or anything?
4      A.  Oh, I took my unicorns with me.
5      Q.  Okay.  So you were able to salvage
6  those?
7      A.  I wasn't able to salvage them, but
8  I did take them, but I do know there is a
9  place here in New Orleans on Banks Street
10  that resalvages brass, so --
11      Q.  Okay.  So you may have -- have you
12  taken them there to try to get them salvaged?
13      A.  No, but I do have them.
14      Q.  Okay.  And do you plan on doing
15  that?
16      A.  Oh, yes.
17      Q.  Okay.  But you don't have any idea
18  what it is going to cost?
19      A.  No.  No.
20      Q.  Okay.  I'm going to mark as Exhibit
21  5 what I believe is some pictures of the
22  outside of your home and the neighboring
23  homes.  Can you look at them, look at those
24  three photographs and tell me if those are --
25      A.  Yes.  Uh-huh.
                                        Page 135

1      Q.  Can you look at the other two also.
2      A.  Yes.
3      Q.  That's your house with the
4  neighboring homes?
5      A.  Yes.
6      Q.  And if I remember correctly, your
7  unit would have been next to the blue house,
8  so this would have been your unit
9  (indicating)?
10      A.  Correct.  Uh-huh.
11      Q.  And the other unit would have been
12  rented by someone else?
13      A.  My neighbor, correct.
14      Q.  Okay.  Let's see.  And let's go to
15  the photograph.  You see the water line right
16  here (indicating)?
17      A.  Okay.  Yes.
18      MR. KIRSCH:
19      Can you get that?
20  EXAMINATION BY MR. KIRSCH:
21      Q.  And I was showing you, Miss
22  Augustine, let me move it back like this, you
23  see the water line on the bricks right there
24  (indicating)?
25      A.  I see it now, uh-huh.
                                        Page 136

1      Q.  Does that -- was that about where
2  the water line was when you got there in your
3  first visit?  Pretty much.  Like I say, I didn't
4      A.  Pretty much.  Like I say, I didn't
5  notice it on the brick.  I was paying
6  attention to the red and I was able to see it
7  much better on my neighbor, on Deeda's wall,
8  much better than I was able to see it on
9  mine.
10      Q.  But Deeda's wall would have been
11  about the same height as we're looking at it
12  right there (indicating)?
13      A.  Okay.  This is Deeda's house here.
14  And I was able to see -- like I said, Deeda's
15  house was not directly next to mine.  So I
16  was able to see it on her wall.  And it's
17  pretty hard to try and imagine it being
18  somewhere along up in here (indicating).
19      Q.  Okay.  But as we sit here, the
20  water line we do see, that's your
21  recollection of where it was?
22      A.  Correct.  Yes.
23      Q.  Okay.
24      MS. BEVIS:
25      Counsel, who took those
                                        Page 137

DONNA M. AUGUSTINE (LEVEE)                                    7/13/2007

```
 1        photographs?
 2     MR. KIRSCH:
 3        I don't know.
 4     MS. BEVIS:
 5        Do you know where you got them
 6        from?
 7     MR. KIRSCH:
 8        They were in my packet of stuff.
 9     MS. BEVIS:
10        Okay.  I would ask that any
11        photographs be provided to counsel
12        for plaintiffs --
13     MR. KIRSCH:
14        Okay.
15     MS. BEVIS:
16        -- at such time as they need to be
17        given over.  I assume that they
18        might be attached to your expert
19        reports.
20     MR. KIRSCH:
21        That should be the same ones
22        (indicating).
23  EXAMINATION BY MR. KIRSCH:
24     Q.  The pink house that we're looking
25  at there, is that how it looked before the
                                      Page 138
```

```
 1        storm?
 2     A.  Yes.
 3     Q.  Okay.  Did you ever place a dollar
 4  amount on the personal property you lost in
 5  the storm?
 6     A.  Yes, I did.
 7     Q.  And what was that?
 8     A.  Well, within the time when I did
 9  it, I put 30,000, but it soon went up to
10  80,000 when I realized all what I lost.  And
11  I come up with the amount of 30,000, I guess,
12  I don't know, I just thought it should be
13  about 30,000, and the more I get into it and
14  was able to investigate everything that was
15  in the back shed, I couldn't put an amount on
16  it.
17     Q.  Okay.  When you were trying to come
18  up with a number, were you -- you were making
19  the list that we talked about earlier?
20     A.  Correct.  Yes.
21     Q.  And were you writing dollar numbers
22  to the side on what it cost you?
23     A.  To a degree, yes.
24     Q.  Okay.  And then you added all those
25  up?
                                      Page 139
```

```
 1     A.  No, I didn't add them up.
 2     Q.  Okay.  You just kind of wrote it
 3  and kind of looked at it and got a rough
 4  number?
 5     A.  Correct.
 6     Q.  Okay.  But if we got that list from
 7  you that you said you still have, that would
 8  have dollar amounts?
 9     A.  Correct.
10     Q.  Okay.  And if I remember correctly,
11  you told me you thought you got the 10,000
12  from FEMA --
13     A.  Correct.
14     Q.  -- for the personal property that
15  you lost.
16     A.  Correct.
17     Q.  Okay.  Have you gotten any other
18  type of disaster relief payments from any
19  other entities?
20     A.  Red Cross.
21     Q.  Okay.  And what did they give you
22  money for?
23     A.  I guess because I was a victim of
24  the Katrina catastrophe.
25     Q.  Okay.  How much did you get from
                                      Page 140
```

```
 1  Red Cross?
 2     A.  Nine hundred.
 3     Q.  Around roughly what month did you
 4  get that?
 5     A.  Maybe the beginning of October.
 6     Q.  Okay.  And you would have had to
 7  fill out some paperwork for that?
 8     A.  Yes.
 9     Q.  Do you have that paperwork?
10     A.  No.
11     Q.  Did you get any other type of
12  disaster relief payments?
13     A.  Red Cross.  I think that's about --
14  United Way?  I think that's pretty much it.
15  I'm not sure.
16     Q.  But you think you got the two
17  payments from FEMA and --
18     A.  I know FEMA and I know the Red
19  Cross for sure.  Now, other agencies I got
20  vouchers to buy different little things that
21  I didn't have.
22     Q.  Okay.  Tell me about the vouchers
23  that you got.
24     A.  The Salvation Army gave a voucher
25  for I think 130.  Half was for clothing.  The
                                      Page 141
```

36  (Pages 138 to 141)

**Page 142**

1  other half was for food.  Yes.
2      Q.  Okay.  Any other vouchers?
3      A.  As a matter of fact, I just
4  received a voucher, I wouldn't say it was a
5  voucher, but Catholic Charities just bought a
6  mattress for my bed for me.  Catholic
7  Charities gave a $50 gas card.  That's pretty
8  much it for now I can think of.
9      Q.  Okay.  Other than the personal
10  property that we went through in detail when
11  we went through your house, any other types
12  of damages that you are seeking?
13      A.  No, no more than what I had on the
14  paper.
15      Q.  Okay.  But from what you remember,
16  we've covered all that when we went through
17  your house?
18      A.  Pretty much, yes.
19      Q.  Okay.  Are you seeking any other
20  type of relief other than monetary damages?
21      A.  No.
22      Q.  I'm going to go through -- we just
23  covered some of the relief, disaster relief
24  stuff you got, but I'm just going to go
25  through some others to make sure we didn't

**Page 143**

1  miss any.
2      A.  Okay.
3      Q.  So you got 2,000 and 10,000 from
4  FEMA, right?
5      A.  Correct.
6      Q.  Did you get any type of SBA loan?
7      A.  No.
8      Q.  Okay.  You said you did fill out a
9  Form 95, right?
10      A.  Correct.
11      Q.  Okay.  But you haven't gotten
12  anything from the Corps?
13      A.  No, I haven't.
14      Q.  Did you apply for any LRA or Road
15  Home grants?
16      A.  No.
17      Q.  Okay.  We covered the $900 you got
18  from Red Cross, right?
19      A.  Correct.
20      Q.  I think you did tell me you got
21  some food stamps?
22      A.  Correct.  Food stamps, yes.
23      Q.  Did you -- were you getting food
24  stamps before the storm?
25      A.  Yes, I was.

**Page 144**

1      Q.  Okay.  And did you just continue to
2  get them or did you have to go reapply?
3      A.  I had to apply for emergency
4  stamps.
5      Q.  Okay.  And what did you get in food
6  stamps?
7      A.  Maybe 150 or sixty.  About that
8  amount.
9      Q.  Okay.  Is that just one lump sum or
10  did you get that per week or --
11      A.  I got that every month until they
12  discontinued them.  And then put me on my
13  regular amount, which is 20 now, $20 of
14  stamps now.
15      Q.  Okay.  So before you regularly got
16  $20 a month in food stamps?
17      A.  I'm getting $20 a month now.  In
18  New Orleans I had 50, before Katrina, I was
19  getting like maybe $60 of stamps.
20      Q.  Okay.
21      A.  Then after Katrina I was getting
22  the 60 plus an emergency add-on, that brought
23  my stamps to about a hundred and something.
24      Q.  Okay.  And why did they eventually
25  go down to twenty?

**Page 145**

1      A.  Well, I guess the emergency system
2  that was giving us that amount ceased.
3      Q.  Okay.
4      A.  And since I don't pay any rent --
5      Q.  It went down to 20.
6      A.  Right, 20 but I pay utilities and
7  stuff, but no rent.
8      Q.  Did you pay utilities at the other
9  rental unit?
10      A.  Yes, I did.
11      Q.  Okay.  And have you received any
12  gifts or private donations or anything other
13  than the Catholic Charities stuff we just
14  talked about?
15      A.  No, I haven't.
16      Q.  Okay.  Do you have any other type
17  of relief, disaster relief applications out
18  standing where you are waiting to get a
19  response?
20      A.  No.
21      Q.  Okay.  So you haven't applied for
22  Road Home money or anything and just haven't
23  gotten it yet?
24      A.  Well, I thought Road Home was for
25  people that owned their own home.  I didn't

37 (Pages 142 to 145)

1  own my home.  I'm renting.
2      Q.  What about the Louisiana Recovery
3  Authority, have you applied for any of that?
4      A.  I had no knowledge of it.
5      Q.  Okay.  So all the relief that
6  you've applied for you've gotten?
7      A.  More or less, yes.
8      Q.  Okay.  And there is nothing
9  outstanding right now?
10     A.  No.
11     Q.  Okay.  Have you been, other than
12 your lawyer, have you been contacted by any
13 media outlet or other type of person, being
14 investigating or researching Hurricane
15 Katrina?
16     A.  No.
17     Q.  Okay.  You haven't spoken to any
18 newspaper, radio or television station about
19 your experience, have you?
20     A.  No, I haven't.
21     Q.  Okay.  As you know, I represent the
22 Orleans Levee District and there are several
23 other governmental entities in here, EJ Levee
24 District, the State of Louisiana.  Have you
25 spoken with employees from any of the local

                                    Page 146

1      vague, but you can try and answer.
2      THE WITNESS:
3      Repeat the question.
4  EXAMINATION BY MR. KIRSCH:
5      Q.  I just want to know what your
6  understanding of what this litigation is
7  trying to do.
8      A.  I would imagine trying to find
9  y'all fault that y'all failed to protect us
10 here in New Orleans.
11     Q.  Have you ever seen the complaint,
12 the lawsuit filed by the lawyers?
13     A.  I can't remember.
14     Q.  And if you can't remember seeing
15 the complaints, I assume you have never
16 discussed the allegations made in the
17 complaint?
18     A.  No, I haven't.
19     Q.  Okay.  Have you ever read any of
20 the pleadings filed by the defendants in the
21 lawsuit?
22     A.  Repeat the question.
23     Q.  Have you ever read any of the
24 pleadings, the documents the defendants have
25 filed in court?

                                    Page 148

1  governmental entities?
2      A.  No.
3      Q.  Okay.  Do you know why you were
4  chosen as a class rep?
5      A.  Yes.
6      Q.  Why?
7      A.  Well, due to my zip code, I was
8  randomly picked.
9      Q.  You would agree with me that you
10 can't represent owners of property, owners of
11 real property, right?
12     A.  Excuse me.  Say it again.
13     Q.  You would agree with me you can't
14 represent owners of real property?
15     A.  No.  I can't.
16     Q.  You don't agree with me or --
17     A.  No.  I can't represent -- I don't
18 own no property.
19     Q.  Right.  So you agree with me then?
20     A.  More or less.  Yes.  Either I'm not
21 feeling you.
22     Q.  What is your understanding of this
23 litigation, what it is trying to do?
24     MS. BEVIS:
25     Objection.  That's a little bit

                                    Page 147

1      A.  No, I haven't.
2      Q.  Okay.
3      A.  I don't think.
4      Q.  Do you know why the Port of New
5  Orleans has been sued?
6      A.  Do I know why?  (Witness nods
7  head.)  I imagine because you all are liable.
8  They are liable.
9      Q.  Okay.  But you don't know why,
10 that's just a guess?
11     A.  Well, from what I hear on the
12 television and what I read in the paper, you
13 know.
14     Q.  Do you know what the Port did, the
15 Port of New Orleans did?
16     A.  Not right offhand.
17     Q.  Okay.  What about the Sewerage and
18 Water Board department?
19     A.  What about them?
20     Q.  Do you know what they did and why
21 they have been sued?
22     A.  Well, they play a big part, too.
23     Q.  Okay.  But do you know what part
24 they play?
25     A.  No.  No.

                                    Page 149

                              38  (Pages 146 to 149)

DONNA M. AUGUSTINE (LEVEE)                                    7/13/2007

1    Q.  Okay.  Orleans -- the East
2  Jefferson Levee District?
3    A.  No.
4    Q.  Okay.  What about, the same
5  question with the Orleans Levee District.
6    A.  No.  I think my counsel would have
7  better information on that.
8    Q.  Okay.  Do you have any idea who are
9  the proposed class members?
10    A.  Somewhat.
11    Q.  Okay.  What is that, what's your
12  idea of that?
13    A.  Let me see if -- how I can phrase
14  this.  Repeat the question again.
15    Q.  I'm just asking if you know who are
16  the proposed members of the class, who is the
17  class that you've been, do you know who they
18  are that you are going to represent?
19    A.  I'm represent all the people that
20  was affiliated with Katrina that's renting
21  and going through the same thing that I'm
22  going through.
23    Q.  Okay.  Do you know if you're a
24  member of a, if you're representing a class,
25  the whole class, or a subclass?
                                   Page 150

1    A.  More or less a subclass in my area
2  where I live.
3    Q.  Okay.  And do you know what the
4  boundaries of your subclass are?
5    A.  I'm not sure, but I would imagine
6  the Gentilly area where I live.
7    Q.  But you don't -- for just the
8  geographical boundaries, you don't know the
9  streets or anything in that regard?
10    A.  No, I wouldn't know that.
11    Q.  Okay.  Have you ever met or
12  discussed the lawsuit with other class
13  representatives?
14    A.  No.
15    Q.  Are you aware that some homes had
16  wind damage?
17    A.  Yes.
18    Q.  Okay.  You're not representing
19  public corporations?
20    A.  No.
21    Q.  Any type of governmental entity?
22    A.  No.
23    Q.  You're not trying to represent any
24  private companies?
25    A.  No, I'm not.
                                   Page 151

1    Q.  Okay.  You're not representing
2  anybody who had a physical injury or a
3  wrongful death, are you?
4    A.  No, I'm not.
5    Q.  You're not representing anybody who
6  had any type of business interruption loss?
7    A.  No, I'm not.
8    Q.  Okay.  Do you have any idea of
9  where the water came from that affected your
10  home?
11    A.  I would imagine the river.
12    Q.  Okay.  When you say river, you mean
13  the Mississippi River?
14    A.  Lake Pontchartrain, the London
15  Canal that's right there by my house.
16    Q.  Okay.  So you think you got water
17  from Lake Pontchartrain --
18    A.  Right.
19    Q.  From the London Avenue Canal?
20    A.  Correct.
21    Q.  Did you include the Mississippi
22  River in that or when you said river you just
23  were talking in general?
24    A.  More or less in general because I
25  didn't really include the Mississippi, it is
                                   Page 152

1  like off.  Lake Pontchartrain, within that
2  boundary all the way around.
3    Q.  Okay.  So you were referring to the
4  London Avenue Canal and Lake Pontchartrain?
5    A.  Yeah.  Correct.  And I would
6  imagine whatever other bodies of water that's
7  connected with that.
8    Q.  But you don't know specifically
9  what water would have affected your house?
10    A.  No.
11    Q.  Okay.  I'm going to show you --
12  Lexie, do you have this (indicating)?
13       MS. BEVIS:
14       Uh-huh.
15  EXAMINATION BY MR. KIRSCH:
16    Q.  I'm going to show you the Form 95
17  with the response letter.  And I'm going to
18  mark it as Exhibit 6.  First of all, if you
19  go to page 2 of Exhibit 6, down at the bottom
20  you see signature of claimant, 13a?
21    A.  Okay.  Yes.
22    Q.  Donna M. Augustine.
23    A.  Yes.
24    Q.  Is that your signature?
25    A.  Yes, it is.
                                   Page 153

                              39  (Pages 150 to 153)

DONNA M. AUGUSTINE (LEVEE)                                    7/13/2007

```
 1      Q.  Okay.  It looks like you have a 225
 2  phone number and then a 504 number.
 3      A.  Correct.
 4      Q.  Is the 504 number your old number?
 5      A.  No.  The 504 number is my cell
 6  number.
 7      Q.  Okay.  And the 225 number is --
 8      A.  My Baton Rouge --
 9      Q.  The Sherwood, Baton Rouge number?
10      A.  Correct.
11      Q.  Okay.  Can I switch?  I think I
12  gave you my copy.  I'm sorry (indicating).
13  The -- you see where your address says 2126
14  North Broad?
15      A.  Correct.
16      Q.  Underneath there there's a
17  typewritten statement.  Do you see that, the
18  hurricane protection levees, do you see that?
19      A.  Yes, I do.
20      Q.  Did -- was that preprinted when you
21  got this form?
22      A.  This was already printed when I got
23  the form, yes.
24      Q.  Okay.  So --
25      A.  I think.  I'm not sure.  Yes.
                                        Page 154
```

```
 1      A.  Yes.
 2      Q.  You wrote PTSD.
 3      A.  Yes.
 4      Q.  Who told you you had PTSD?
 5      A.  My Dr. Sarrat and the changes I was
 6  going through, being I was a nursing
 7  assistant and an ER tech, I fit the mold for
 8  PTS.  PTSD, post-traumatic stress syndrome.
 9      Q.  Okay.  But your recollection is Dr.
10  Sarrat told you you had PTSD?
11      A.  Yes.
12      Q.  Okay.  And if I remember, Dr.
13  Sarrat is just a primary care physician or a
14  general practitioner, not a psychiatrist or
15  psychologist, correct?
16      A.  Correct.
17      Q.  Who is Shawana Brown?
18      A.  Shawana.
19      Q.  Shawana.  I'm sorry.
20      A.  My daughter.
21      Q.  Okay.  So she was -- your daughter
22  Shawana was living with you at the time?
23      A.  Correct.
24      Q.  And that's her new address in
25  Baker?
                                        Page 156
```

```
 1      Q.  I'm sorry?
 2      A.  I think, yes.  This was pretty much
 3  on here when I got it.
 4      Q.  Okay.  You didn't type that in, did
 5  you?
 6      A.  Oh, no.
 7      Q.  Okay.  The only stuff you put in
 8  was the handwritten notes?
 9      A.  Correct.
10      Q.  And I think underneath, you see 9,
11  Property Damage?
12      A.  Yes.
13      Q.  And underneath there there are some
14  handwritten notes where you say water damage,
15  all my belongs, mildew and mold everywhere,
16  shoes, stereo, blanket, sweater, clothes,
17  furniture, all that?
18      A.  Correct.
19      Q.  We pretty much covered all of that
20  when we went through your house, is that
21  right?
22      A.  Yes.  Yes.
23      Q.  Under number 10, the personal
24  injury/wrongful death section, do you see
25  that?
                                        Page 155
```

```
 1      A.  Correct.
 2      Q.  Okay.  And I think under Property
 3  Damage you wrote 30,000, and Personal Injury
 4  2,000?
 5      A.  Correct.
 6      Q.  And the 2,000 was for the stress we
 7  discussed?
 8      A.  Yes.
 9      Q.  Okay.  And the property damage you
10  valued at that time for thirty grand?
11      A.  Correct.
12      Q.  Okay.  I want to take you back to
13  number 10, Miss Augustine.  You see the
14  section where you say:  "Pain in both of my
15  knees?"
16      A.  Yes.
17      Q.  Are you attributing any of your
18  knee pain to this incident?
19      A.  Yes.
20      Q.  Okay.  Because when we talked
21  earlier you had indicated that your knees
22  were bothering you --
23      A.  Yes.
24      Q.  -- since '93 all the way through
25  the present, right?
                                        Page 157
```

40 (Pages 154 to 157)

DONNA M. AUGUSTINE (LEVEE)                                    7/13/2007

| | |
|---|---|
| 1    A.  Uh-huh. | 1  it now. |
| 2    **Q.  I need a verbal answer.** | 2    **Q.  Have you seen anybody?** |
| 3    A.  Yes.  I'm sorry.  Yes. | 3    A.  Well, I told my doctor, Dr. Derek |

**Page 158 (left column):**

1     A.  Uh-huh.
2     **Q.  I need a verbal answer.**
3     A.  Yes.  I'm sorry.  Yes.
4     **Q.  Thank you.  So I'm trying to figure**
5     **out why you are attributing your knee pain to**
6     **the hurricane.**
7     A.  The stress.  Stress brings on pain.
8     **Q.  Okay.  So it would just be through**
9     **the stress?**
10    A.  Correct.
11    Q.  Okay.
12         VIDEOGRAPHER:
13         Excuse me, counsel.  Let me change
14         tapes.  Off the record.  Conclusion
15         of tape 2.  It is 12:23.
16         (OFF THE RECORD)
17         VIDEOGRAPHER:
18         Returning to the record.  It is
19         12:38.  The start of tape 3.
20    EXAMINATION BY MR. KIRSCH:
21    Q.  Miss Augustine, I just wanted to
22    follow up and make sure, when you filled out
23    your Form 95 which you have in front of you
24    right there, you reviewed all the information
25    in it carefully before you signed it?
                                                   Page 158

**Page 160 (right column):**

1     it now.
2     **Q.  Have you seen anybody?**
3     A.  Well, I told my doctor, Dr. Derek
4     Anderson, he said he was going to make an
5     appointment for me to see a dermatologist.
6     Well, I haven't seen the dermatologist.  And
7     since I'm not familiar with Baton Rouge or
8     the doctors, I haven't seen nobody for it.
9     **Q.  Okay.  Did Dr. Anderson refer you**
10    **to a specific dermatologist?**
11    A.  No.
12    **Q.  Okay.  And do you have a**
13    **dermatologist that you plan on seeing?**
14    A.  If I see a dermatologist I would
15    like to see one in New Orleans.
16    **Q.  Okay.  But you don't have a name or**
17    **anything?**
18    A.  No, I don't have a name.  No.
19    **Q.  And you haven't seen one now --**
20    A.  No, I haven't.
21    **Q.  -- almost two years post storm?**
22    A.  No, I haven't.
23    **Q.  Okay.  Anything else you would like**
24    **to add?**
25    A.  That's pretty much it.
                                                   Page 160

**Page 159 (left column):**

1     A.  Pretty much, yes.
2     **Q.  Okay.  And you signed it knowing**
3     **that they had that bottom thing saying civil**
4     **penalty for presenting fraudulent claim,**
5     **right?**
6     A.  Correct.
7     **Q.  Okay.  So you would have read it**
8     **carefully before you signed it?**
9     A.  Yes.
10         MR. KIRSCH:
11         I attached that right?
12         MS. BEVIS:
13         Number 6.
14    EXAMINATION BY MR. KIRSCH:
15    Q.  Okay.  I just want to ask you, is
16    there anything else that you would like to
17    add?
18    A.  No.  Yes, I do.
19    Q.  Okay.
20    A.  Due to Katrina, prior to Katrina I
21    had a head full of hair.  I have lost the top
22    of my head, I don't have no hair
23    (indicating).  Receding hairline, yes, but my
24    hair is coming out.  I don't have this wig on
25    for stylish purposes.  It is because I need
                                                   Page 159

**Page 161 (right column):**

1         MR. KIRSCH:
2         I'm assuming we want to handle the
3         authorizations off the record?
4         MS. BEVIS:
5         That's fine.
6     EXAMINATION BY MR. KIRSCH:
7     Q.  Okay.  You had indicated you had a
8     son, right?
9     A.  Yes.
10    Q.  Where was he living at the time?
11    A.  On Dupre Street.
12    Q.  In New Orleans?
13    A.  In New Orleans, yes.
14    Q.  Did he evacuated also?
15    A.  Yes, he did.
16    Q.  Okay.  Where did he go?
17    A.  About 9:00 that Sunday prior to the
18    hurricane he came to Baton Rouge.  He stood
19    there about five hours and he drove to
20    Houston.
21    Q.  Okay.  Did he stay with relatives
22    in Houston?
23    A.  No.  We didn't have any -- well, we
24    had them, but he didn't stay with any.
25    Q.  Okay.  So he would have went up --
                                                   Page 161

DONNA M. AUGUSTINE (LEVEE)                                    7/13/2007

```
 1    is he still in Houston?
 2        A.   No.  He's here in New Orleans
 3    working.
 4        Q.   Okay.  He just went up to Houston
 5    and stayed in one of the FEMA hotels or
 6    whatever?
 7        A.   No.  No.  He paid for it.  He stood
 8    in a hotel, but I know FEMA didn't pay for
 9    it.
10    EXAMINATION BY MR. KOURY:
11        Q.   How old is he?
12        A.   My son?
13        Q.   Yes, ma'am.
14        A.   Forty.
15        Q.   Is he the only other child you
16    have, your son and your daughter?
17        A.   Correct.
18        Q.   What's his name?
19        A.   Sean DeJean.
20        MR. KIRSCH:
21        Thank you very much, Miss
22        Augustine.  I appreciate your time.
23        MR. KOURY:
24        Thank you.
25        MR. KIRSCH:
                                     Page 162
```

```
 1                WITNESS CERTIFICATE
 2
 3
 4        I, DONNA M. AUGUSTINE, do hereby
 5    certify that the foregoing testimony was
 6    given by me, and that the transcription of
 7    said testimony, with corrections and/or
 8    changes, if any, is true and correct as given
 9    by me on the aforementioned date.
10
11
12
      DATE SIGNED      WITNESS' SIGNATURE
13
14
15
16        Signed with corrections as noted.
17
          Signed with no corrections noted.
18
19
20    DATE TAKEN: July 13, 2007
21
22
23
24
25
                                     Page 164
```

```
 1        It was a pleasure meeting you.
 2        MS. BOYER:
 3        Thank you.
 4        VIDEOGRAPHER:
 5        The time is now 12:43.
 6
 7
 8
 9        (Whereupon, the deposition was
10    concluded at 12:43 P.M.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                     Page 163
```

```
 1                REPORTER'S CERTIFICATE
 2
 3        I, MARGARET MCKENZIE, Certified Court
 4    Reporter, do hereby certify that the
 5    above-named witness, after having been first
 6    duly sworn by me to testify to the truth, did
 7    testify as hereinabove set forth;
 8        That the testimony was reported by me
 9    in shorthand and transcribed under my
10    personal direction and supervision, and is a
11    true and correct transcript, to the best of
12    my ability and understanding;
13        That I am not of counsel, not related
14    to counsel or the parties hereto, and not in
15    any way interested in the outcome of this
16    matter.
17
18
          MARGARET MCKENZIE, CCR, RPR, RMR, CRR
19        CERTIFIED COURT REPORTER
20
21
22
23
24
25
                                     Page 165
```

42 (Pages 162 to 165)

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


**IN RE:** KATRINA CANAL BREACHES   CIVIL ACTION
**CONSOL**IDATED LITIGATION

NO. 05-4182 "K"(2)

**PERTAINS TO:** MRGO   JUDGE DUVAL

**FILED IN:** 05-4181, 05-4182,   MAG. WILKINSON
**05-5237,** 05-6073, 05-6314,
05-6324, 05-6327, 05-6359,
06-0225, 06-0886, 06-1885,
06-2152, 06-2278, 06-2287,
06-2824, 06-4024, 06-4065,
06-4066, 06-4389, 06-4634,
06-4931, 06-5032, 06-5155,
06-5159, 06-5161, 06-5162,
06-5260, 06-5771, 06-5786,
06-5937, 07-0206, 07-0621,
07-1073, 07-1271, 07-1285


Videotaped deposition of ETHEL COATS, 756
Louisiana Avenue, New Orleans, Louisiana  70115,
taken in the offices of Bruno & Bruno, 855
Baronne Street, New Orleans, Louisiana  70113, on
Tuesday, the 17th day of July, 2007, beginning at
9:28 a.m.


APPEARANCES:

        ARTHUR W. LANDRY AND JEANNE ANDRY LANDRY
        (BY:  ARTHUR W. LANDRY)
        710 Carondelet Street
        New Orleans, Louisiana  70130

        ATTORNEYS FOR THE PLAINTIFFS

APPEARANCES CONTINUED:
DUPLASS, ZWAIN, BOURGEOIS, MORTON, PFISTER
  & WEINSTOCK
(BY:  NICOLE M. BOYER)
Suite 2900
3838 North Causeway Boulevard
Metairie, Louisiana  70002

     ATTORNEYS FOR THE BOARD OF
     COMMISSIONERS FOR THE LAKE BORGNE
     BASIN LEVEE DISTRICT

STONE PIGMAN WALTHER WITTMANN
(BY:  CARMELITE M. BERTAUT)
546 Carondelet Street
New Orleans, Louisiana  70130-3588
          AND
JONES DAY
(BY:  AMY PAYNE)
2727 North Harwood Street
Dallas, Texas  75201-1515

     ATTORNEYS FOR WASHINGTON GROUP
     INTERNATIONAL, INC.
ALSO PRESENT:
EMMA I. DIANNA
STONE PIGMAN WALTHER WITTMANN
546 Carondelet Street
New Orleans, Louisiana  70130-3588

VIDEOTAPED BY:
GILLEY DeLORIMIER, C.L.V.S.
Depo-Vue, Inc.
Suite 205
3200 Ridgelake Drive
Metairie, Louisiana  70002
(504) 828-8856 or (888) 337-6883

REPORTED BY:

CAROL VALLETTE SLATER
Certified Court Reporter
Registered Professional Reporter

Page 2

---

        S T I P U L A T I O N
     IT IS STIPULATED AND AGREED by and
between counsel for the parties hereto that the
deposition of the aforementioned witness is
hereby being taken under the Federal Rules of
Civil Procedure, for all purposes, in accordance
with law;
     That the formalities of reading and
signing are specifically not waived;
     That the formalities of sealing,
certification and filing are specifically waived;
     That all objections, save those as
to the form of the question and the responsiveness
of the answer, are hereby reserved until such
time as this deposition, or any part thereof, may
be used or sought to be used in evidence.


            *    *    *    *

     CAROL VALLETTE SLATER, Certified
Court Reporter, Registered Professional Reporter,
in and for the Parish of Orleans, State of
Louisiana, officiated in administering the oath
to the witness.

Page 4

---

        I N D E X
EXAMINATION BY:                    PAGE
MS. PAYNE                    5

EXHIBITS:
Coats Exhibit Number 1             68
     Document entitled "Notice of
     Videotaped Deposition"
Coats Exhibit Number 2             69
     Document entitled "Plaintiffs'
     Response to MRGO Defendants' First
     Set of Joint Class Certification
     Requests For Admission,
     Interrogatories and Requests For
     Production of Documents"
Coats Exhibit Number 3             70
     Document entitled "Plaintiffs'
     Response to MRGO Defendants' First
     Set of Joint Interrogatories,
     Requests For Production of
     Documents and Requests For
     Admissions to Plaintiffs Regarding
     CommonLiability Issues"

Coats Exhibit Number 4             84
     Aerial photograph
Coats Exhibit Number 5             85
     Aerial photograph

Coats Exhibit Number 6             99
     Photographs
Coats Exhibit Number 7             99
     Photographs

Coats Exhibit Number 8             101
     Photograph
Coats Exhibit Number 9             146
     June 9, 2006, Corps of Engineers
     letter and Form 95

Page 3

---

THE VIDEOGRAPHER:
     This is the videotaped
deposition of Ethel Coats.  This
deposition is being held today at
855 Baronne Street, in New
Orleans, Louisiana, on July 17th,
2007.  The time is 9:28 a.m.
Would the court reporter please
now swear in the witness.
     ETHEL COATS,
after being first duly sworn in the cause,
testified as follows:
EXAMINATION BY MS. PAYNE:
     Q.   Good morning, Mrs. Coats.
     A.   Morning.
     Q.   My name is Amy Payne.  We met
earlier off the record.  I represent defendant
Washington Group and I'm going to take your
deposition today.
     A.   Uh-huh.
     Q.   How are you?
     A.   Fine.  Fine.
     Q.   Will you please state and spell your
name for the record?
     A.   My name is Ethel Coats, and

Page 5

2  (Pages  2 to 5)

1   spelling, E-T-H-E-L, Coats, C-O-A-T-S.
2        Q.   Is this your first time being
3   deposed?
4        A.   Yes.
5        Q.   And I'm sure your counsel ran down
6   with you the basics on depositions, but I'm just
7   going to remind you of a couple of things.  One
8   is that when I ask you a question, even if you
9   know what I'm about to say, if you let me finish
10  the question before you give your answer, that
11  will help the court reporter take it down.  And
12  I'll try to do the same.  I'll wait until you
13  finish your answer before I ask another question.
14  Just makes it easier.
15       A.   Yes.
16       Q.   And if at any time you don't
17  understand one of my questions, just let me know
18  and I'll try to clarify it.  Okay?
19       A.   Yes.
20       Q.   If you need a break at any time,
21  just let me know, and we'll take a break at your
22  convenience.
23       A.   Yes.
24       Q.   Mrs. Coats, what did you do to
25  prepare for the deposition today?

                                        Page 6

1        A.   Got a good night rest.
2        Q.   Anything else?
3        A.   Talked to God.
4        Q.   Did you meet with any of your
5   attorneys?
6        A.   This morning.  (Nods head
7   affirmatively.)
8        Q.   This morning?
9        A.   (Nods head affirmatively.)
10       Q.   Just when you were walking over for
11  the deposition?
12       A.   (Nods head affirmatively.)  A few
13  minutes before that.
14       Q.   Did you meet with anyone other than
15  your attorneys?
16       A.   No.
17       Q.   Did you review any documents in
18  preparation for the deposition?
19       A.   No.
20       Q.   Is there anything else that you may
21  have done to prepare?
22       A.   No.
23       Q.   Have you been involved in any other
24  lawsuits?
25       A.   No.

                                        Page 7

1        Q.   Ever involved in any kind of
2   criminal proceeding?
3        A.   No.
4        Q.   Have you ever filed for bankruptcy?
5        A.   No.
6        Q.   Let's just talk a little bit about
7   your background.  Where were you born?
8        A.   In St. Joseph, Louisiana.
9        MS. BERTAUT:
10            Miss Coats, I wonder if you
11       could speak up.  I'm having
12       difficulty hearing you.
13       THE WITNESS:
14            Okay.
15       A.   St. Joseph, Louisiana.
16  EXAMINATION BY MS. PAYNE:
17       Q.   And where is that?
18       A.   That's right out of -- right out
19  of -- St. Joseph is right out of Mississippi.
20       Q.   When did you first come to New
21  Orleans?
22       A.   When I was two years old.
23       Q.   Have you lived in New Orleans since
24  then?
25       A.   Yes.

                                        Page 8

1        Q.   You never lived anywhere else
2   besides New Orleans since you were two?
3        A.   No.  No.
4        Q.   Are you currently married?
5        A.   My husband's deceased.
6        Q.   Is that Jimmy Coats?
7        A.   Yes.
8        Q.   He passed away in 1999; is that
9   right?
10       A.   Yes.
11       Q.   Mrs. Coats, what is your maiden
12  name?
13       A.   Nelson.
14       Q.   And before you married Mr. Coats,
15  had you been married before then?
16       A.   Larry Franklin.
17       Q.   Anyone else?
18       A.   No.
19       Q.   Do you have any children?
20       A.   Three.
21       Q.   What are their names?
22       A.   Lintoi Franklin.  L-I-N-T-O-I.
23  Franklin.
24       Q.   And who else?
25       A.   Latrice Franklin.

                                        Page 9

                        3  (Pages 6 to 9)

1    Q.   Will you spell that as well?
2    A.   L-A-T-R-I-C-E Franklin.  Larry
3  Franklin.
4    Q.   And what years were they born?
5    A.   Oh, my God.  One was born in '72,
6  one's born in '74 and one's born in '76.
7    Q.   In that order that you gave them to
8  me?
9    A.   Uh-huh.
10   Q.   So, they're all in their 30s.  Were
11 any of them living with you before Hurricane
12 Katrina?
13   A.   My daughter was living next door to
14 me.
15   Q.   Latrice was?
16   A.   No.  Lintoi.
17   Q.   Oh, Lintoi.  Is Lintoi still living
18 with you?
19   A.   No, ma'am.  No, ma'am.  No.
20   Q.   And when you say "next door," was
21 she in -- I understand you were in a duplex --
22   A.   The house was a double till I turned
23 it into be a one, single home.
24   Q.   And, so, was Lintoi in 1022, or was
25 she next door in one of the other houses?

Page 10

1    A.   It's right out from Baton Rouge,
2  right before you get to Baton Rouge.
3    Q.   Oh, okay.  And where does Larry live
4  now?
5    A.   Well, Larry live in St. Rose.
6    Q.   And where is --
7    A.   Right out of Metairie.
8    Q.   Can you spell that for me, the
9  name --
10   A.   What?
11   Q.   Where he lives, where Larry lives?
12   A.   St. Rose?  I think it's R-O-S-S --
13 rose -- how do you -- rose.  Yeah -- S-T first, I
14 think.
15   THE WITNESS:
16       Am I right?  S-T and then
17   St. Rose?
18   MR. LANDRY:
19       I'm not supposed to be
20   helping you answer the questions.
21   THE WITNESS:
22       Oh, okay.
23   MS. PAYNE:
24       Oh, I've got it.  St. Rose.
25   Okay.

Page 12

1    A.   She was in 1022.
2    Q.   Okay.  Was she paying you rent?
3    A.   No.
4    Q.   Do you currently have anyone else
5  living with you?
6    A.   No.
7    Q.   Do you have any grandchildren?
8    A.   I have nine.
9    Q.   Where does Lintoi live now?
10   A.   Lintoi live in New Orleans East.
11   Q.   And where does Latrice live right
12 now?
13   A.   Latrice live in Hammond.
14   Q.   You'll have to forgive me.  I'm from
15 out of town.  Where is Hammond?
16   A.   Hammond is right there -- it's in --
17 it's in New Orleans, Louisiana.  It's in
18 Louisiana.
19   Q.   What part of New Orleans?
20   THE WITNESS:
21       Do you know where it at?
22   EXAMINATION BY MS. PAYNE:
23   Q.   Is it in New Orleans East or is it
24 in St. Bernard or is it on the other side of the
25 city?

Page 11

1    MR. LANDRY:
2        St. Rose.
3    MS. PAYNE:
4        Thank you very much.
5    MR. LANDRY:
6        It's up the river, as they
7    say.
8  EXAMINATION BY MS. PAYNE:
9    Q.   Now, the -- what is your current
10 address?
11   A.   756 Louisiana Avenue.
12   Q.   And that's in the uptown area,
13 right?
14   A.   Yes.
15   Q.   And before that, you lived at --
16   A.   1020 Charbonnet Street, in New
17 Orleans.
18   Q.   And then where did you live before
19 that?
20   A.   Metairie -- out in Kenner.
21   Q.   What was that address?
22   A.   9001 Fourth Street.  That was my
23 mother's new home.
24   Q.   And when did you move to the
25 Charbonnet Street address?

Page 13

4  (Pages 10 to 13)

**Page 14**

1     A.  When I was 31 years old.

2     Q.  Would that have been -- what year

3 would that have been?  Let's see here.  I may

4 have it in my notes.  1994, does that sound about

5 right?

6     A.  (Nods head affirmatively.)

7     Q.  So, whenever you moved into the

8 house in 1994, was that with your husband, Jimmy

9 Coats?

10    A.  Yes.

11    Q.  And who all was living with you at

12 that time?

13    A.  Just my husband and I.

14    Q.  And when did Lintoi move in with

15 you?

16    A.  When she was about 21.

17    Q.  So, she must have moved in with you

18 shortly after you moved into the house?

19    A.  Uh-huh.

20    Q.  And then at the time of Hurricane

21 Katrina, who else was living there with you

22 besides Lintoi?

23    A.  Nathan Morgan.

24    Q.  Can you spell his last name?

25    A.  M-O-R-G-A-N.

**Page 15**

1     Q.  Was this the man who was present

2 during the inspection of the property that took

3 place in mid-June --

4     A.  Yes.

5     Q.  -- I think.  But you said you don't

6 still live with Nathan?

7     A.  Yes, Nathan and I still live

8 together.

9     Q.  Oh, you do?

10    A.  Uh-huh.

11    Q.  So, only Nathan Morgan and Lintoi

12 were the only people living there?

13    A.  That's all.

14    Q.  Does Lintoi have children?

15    A.  Lintoi have three kids.

16    Q.  Where do they live?

17    A.  With her, at New Orleans East.

18    Q.  But they weren't living with you at

19 the time of Hurricane Katrina?

20    A.  Yes.

21    Q.  Oh, they were.  Okay.

22    A.  Uh-huh.

23    Q.  So, Nathan Morgan was living with

24 you?

25    A.  Yes.

**Page 16**

1     Q.  And Lintoi?

2     A.  Lintoi Franklin.

3     Q.  And her three children?

4     A.  Yes.

5     Q.  What are their names?

6     A.  One name Lindsay Franklin.

7 MS. BERTAUT:

8     I'm sorry.  I can't

9 understand you.

10 THE WITNESS:

11    Lindsay.

12 MS. BERTAUT:

13    Clancy?

14 THE WITNESS:

15    Lindsay.

16 EXAMINATION BY MS. PAYNE:

17    Q.  Lindsay?

18    A.  Yes.

19 MR. LANDRY:

20    Lindsay, I think.

21 EXAMINATION BY MS. PAYNE:

22    Q.  And who else?

23    A.  Crystal Lin, L-I-N.

24    Q.  And who is the third child?

25    A.  Ronald Alexis.

**Page 17**

1     Q.  Ronald Alexis?

2     A.  Uh-huh.

3     Q.  And how old is Lindsay?

4     A.  Lindsay's 12.

5     Q.  Right now, she's 12?

6     A.  Uh-huh.

7     Q.  And how old is Crystal right now?

8     A.  Nine.

9     Q.  And how old is Ronald --

10    A.  Four.

11    Q.  Sorry.

12    A.  Four.

13    Q.  Ronald's four?

14    A.  Uh-huh.

15    Q.  Okay.  So, at the time of Hurricane

16 Katrina, the people who were living with you were

17 Nathan Morgan, Lintoi Franklin, Lindsay Franklin,

18 Crystal Lin, Ronald Alexis?

19    A.  Yes.

20    Q.  And -- anyone else living there?

21    A.  No.

22    Q.  Does Nathan have any children?

23    A.  No.

24    Q.  Mrs. Coats, what is your educational

25 background?

5 (Pages 14 to 17)

1   A.   Eleventh grade.
2   Q.   And where did you go to high school?
3   A.   Bunche Village.  Bunche Village.
4   Q.   Will you describe your employment
5   history briefly?
6   A.   I was working for the school board;
7   I was a monitor.  Sitting work with the old
8   people.
9   Q.   When did you work for the school
10  board?
11  A.   I think I was, like, about 30 --
12  about 30 years old, I started working for them.
13  Q.   What school board?
14  A.   Adams Junior High School.
15  Q.   Is that in Jefferson Parish?
16  A.   Yes.
17  Q.   And how long did you work for the
18  school board at that junior --
19  A.   About five years.
20  Q.   And what did you do for the school
21  board?
22  A.   Monitor the hallways, make sure the
23  kids stayed in the classroom.  They had a
24  problem, bring them to the office.
25  Q.   And did you do anything during the

Page 18

1   time?
2   A.   I just did it on my own, self-
3   employed.
4   Q.   Oh, so did you charge for this, or
5   was this volunteer work?
6   A.   It was -- I would charge for it.
7   Q.   And they just paid you directly, the
8   people that you worked for?
9   A.   Right.  Right.
10  Q.   And about what time did you do this
11  work?
12  A.   What do you mean, what time?
13  Q.   What years?  How old were you?  How
14  long ago has it been?
15  A.   That was about -- ooh, I'd say -- my
16  baby -- Lintoi was 31 years old -- that was
17  30-some-odd years ago.
18  Q.   Which jobs did you have first, the
19  monitor --
20  A.   School.  School.
21  Q.   -- at the junior high school?  And
22  then you did the sitting work later?
23  A.   Uh-huh.
24  Q.   Have you had any jobs since then?
25  A.   No.

Page 20

1   summer?
2   A.   No.
3   Q.   Is that where your -- some of your
4   children went to school at that time?
5   A.   No.
6   Q.   Were you living on Charbonnet Street
7   when you worked there?
8   A.   (Nods head affirmatively.)  No.
9   Q.   That was before you moved to
10  Charbonnet Street, right?
11  A.   Yeah.  Right.
12  Q.   I'm sorry.  Just so I can keep my
13  time frame straight, how old are you now?
14  A.   Fifty-six.
15  Q.   Okay.  And then, besides the work
16  that you did as a monitor at the junior high
17  school, you said sitting work with older people?
18  A.   Uh-huh.
19  Q.   Describe that to me.
20  A.   Well, I would go in their homes, sit
21  with them, till -- maybe about three or four
22  hours, just sit there with them, make sure they
23  had their water, make sure they could go to the
24  bathroom, something like that.
25  Q.   Who were you employed by at that

Page 19

1   Q.   Have you looked for work since then?
2   A.   No.
3   Q.   Do you have any kind of business on
4   the side?
5   A.   No.
6   Q.   Mrs. Coats, can you describe for me
7   your experience with past hurricanes besides
8   Hurricane Katrina?
9   A.   I was in Betsy.
10  Q.   Hurricane Betsy?
11  A.   Uh-huh.
12  Q.   Where were you living at the time of
13  Hurricane Betsy?
14  A.   On Fourth Street, in Metairie -- in
15  Kenner, I mean.
16  Q.   Kenner.  And that was about 1965,
17  correct?
18  A.   Yes.
19  Q.   Did you have any damage during
20  Hurricane Betsy to your home?
21  A.   My mother and father, I was living
22  with them.  No.
23  Q.   Where exactly is Kenner located?
24  A.   Right out of New Orleans.  Right out
25  of Metairie.

Page 21

6  (Pages 18 to 21)

1    Q.   Which direction from New Orleans?
2  It's near the airport, right?
3    A.   Uh-huh.
4    Q.   Did you know anyone who had serious
5  damage from Hurricane Betsy?
6    A.   A lot of the neighbors had damage.
7    Q.   What kind of damage?
8    A.   Well, they had more wind damage and
9  they had roofs off and windows blowed out, and
10  some of them homes was destroyed, but we was one
11  of the lucky ones.  Our house stood the storm
12  pretty good.  We had damage, but it wasn't like
13  the neighbors' houses.
14    Q.   What kind of damage did your
15  parents' house have?
16    A.   Well, they had some -- the roof,
17  some of her siding came off her home, tore down
18  our fence, stuff like that.
19    Q.   You didn't have any flooding?
20    A.   Uh-uh.
21    Q.   And the neighbors that you've
22  described with wind damage and the roofs blown
23  off and that sort of thing in Hurricane Betsy,
24  are those your neighbors in Kenner?
25    A.   They all deceased now.  They was my

Page 22

1    A.   No.
2    Q.   Did you and your parents evacuate
3  during Hurricane Betsy?
4    A.   We went to a shelter at the school,
5  Washington Elementary.
6    Q.   And was the school there in Kenner?
7    A.   Yes.
8    Q.   How long did you have to stay at the
9  shelter?
10    A.   Overnight.
11    Q.   Any other hurricanes besides
12  Hurricane Betsy?
13    A.   No.
14    Q.   Were you around for Hurricane Ivan
15  in 2004?
16    A.   I don't remember Ivan.
17    Q.   What about Hurricane Georges in
18  1998?
19    A.   Uh-huh.
20    Q.   Do you remember that hurricane?
21    A.   Yes.
22    Q.   You would have been living at the
23  Charbonnet Street address, right?
24    A.   Uh-huh.
25    Q.   Do you remember anything about that

Page 24

1  neighbors.
2    Q.   Right.  At the time?
3    A.   Right.
4    Q.   Your neighbors in Kenner at the
5  time?
6    A.   Right.
7    Q.   Did any of your neighbors there have
8  flooding?
9    A.   No.
10    Q.   The Lower Ninth Ward got hit pretty
11  hard during Betsy, though, right?
12    A.   Yes.
13    Q.   Did you know anyone in that area who
14  sustained --
15    A.   No.  No.
16    Q.   You just heard stories about it on
17  the news?
18    A.   Right.
19    Q.   Did you actually get to see any of
20  the aftermath of Betsy in the Lower Ninth Ward,
21  the area where you live now, where you lived
22  before Hurricane Katrina?
23    A.   No.
24    Q.   Did you know anyone who was hurt
25  during Hurricane Betsy?

Page 23

1  hurricane?
2    A.   It wasn't any damage to none of our
3  neighbors or anything like that, so, no.  I
4  don't -- I remember it, but it wasn't any damage
5  to my neighborhood, so --
6    Q.   What do you remember about the
7  hurricane specifically?
8    A.   Just, I think it was wind damage and
9  plenty people had their homes, you know, like,
10  knocked down -- some damage to their homes and
11  stuff like that.  That's probably all I remember
12  about it.
13    Q.   Do you remember whether you stayed
14  there at your home during that hurricane?
15    A.   Yes.  Uh-huh.
16    Q.   And, so, did you have any flooding
17  from that hurricane?
18    A.   No, I didn't.  No.
19    Q.   Did you have any wind damage to your
20  home?
21    A.   No.  No.
22    Q.   There was no damage to your home at
23  all from that?
24    A.   No.
25    Q.   But you knew people who did have

Page 25

7  (Pages 22 to 25)

1  damage?
2       A.   Yes.
3       Q.   Who did you know that had damage
4  from --
5       A.   Just different people that was on
6  the news and around, you know.  I didn't know --
7  there wasn't anybody, like, kin to me or close
8  friends or anything like that, no.  I didn't know
9  nobody.
10      Q.   What kind of damage did you hear
11  about on the news?
12      A.   Like, some roofs, maybe, got blown
13  off and stuff, you know, that I can remember.
14      Q.   When Hurricane Georges came, did you
15  do anything to prepare your house for the storm?
16      A.   We boarded up our windows and
17  different stuff like that.
18      Q.   Anything that you did besides board
19  up the windows?
20      A.   Picked up all the furniture --
21  different -- barbecue grills and different things
22  like that that we had around.
23      Q.   Just bring those inside?
24      A.   Yeah.
25      Q.   Any other hurricanes that you

Page 26

1  remember?
2       A.   No.
3       Q.   When did you first hear about
4  Hurricane Katrina moving in the direction of New
5  Orleans?
6       A.   About four days before it hit.
7       Q.   And you were living at the
8  Charbonnet Street address at that time?
9       A.   Yes.  Yes.
10      Q.   At what point did you decide you
11  should evacuate for Hurricane Katrina?
12      A.   When they say it was coming direct
13  hit to New Orleans.
14      Q.   Do you remember when that was, how
15  far in advance?
16      A.   I think it was about two days
17  before.
18      Q.   So, describe for me what you just --
19  how -- the process that you went through getting
20  your house ready for Hurricane Katrina.
21      A.   Well, I boarded up everything, I
22  picked up all the stuff -- I picked up everything
23  out of the yard.  We placed it in the home.  We
24  turned all the water off to the house.  We turned
25  the lights off to the home.  We put some

Page 27

1  furniture and tried to elevate it up off the
2  floors and -- yeah.
3       Q.   What stuff did you try to elevate
4  off the floor?
5       A.   Some of my furniture.  Like, my
6  living room set, I went out and got some cinder
7  blocks and I tried to -- because I never had a
8  idea that the water would get that high in the
9  house.  So, we put it up on cinder blocks and
10  stuff like that.
11      Q.   And what else did you do to prepare?
12      A.   That's about -- took some clothes
13  and -- that's about it.
14      Q.   And did you have a car at the time?
15      A.   No.
16      Q.   How did you evacuate?
17      A.   With my daughter.
18      Q.   Did your daughter have a car at the
19  time?
20      A.   Yes.
21      Q.   Did Nathan have an automobile at the
22  time?
23      A.   No.
24      Q.   So, out of the people that you were
25  living with, Lintoi was the only one with the

Page 28

1  car?
2       A.   Uh-huh.
3       Q.   What kind of a car did she have?
4       A.   I think it was a -- like a little
5  Ford Expedition -- little Ford something, it was.
6  I done forgot what it was.
7       Q.   So, it was a SUV?
8       A.   Yeah, I think.
9       Q.   Where did you evacuate to?
10      A.   Hammond, Louisiana.
11      Q.   Why did you choose Hammond?
12      A.   That's where my sister lived.
13      Q.   So, you stayed with your sister?
14      A.   Uh-huh.
15      Q.   Did Nathan and Lintoi --
16      A.   Yes.
17      Q.   -- and the kids all go --
18      A.   Yes.
19      Q.   -- with you?
20  MR. LANDRY:
21           Be sure to wait till she's
22      finished asking the question.
23  THE WITNESS:
24      Oh.
25  EXAMINATION BY MS. PAYNE:

Page 29

8  (Pages 26 to 29)

Page 30

```
 1    Q.   We're making it hard here on Miss
 2  Slater to take everything down.
 3    A.   Oh.
 4    Q.   So, did the six of you all go to
 5  Hammond in the Expedition?
 6    A.   Yes.
 7    Q.   And what all were you able to take
 8  with you?
 9    A.   About two or three days of clothes,
10  and that was it.
11    Q.   Were you able to take any of -- you
12  know, your family photographs or --
13    A.   No.
14    Q.   Just the -- just the clothes and --
15    A.   Yes.
16    Q.   How long had Lintoi been living with
17  you at the time of Hurricane Katrina?
18    A.   About three years.
19    Q.   And all of that time, was she living
20  with you rent-free?
21    A.   Uh-huh.
22    Q.   What did you do with the other part
23  of the house before she moved in?
24    A.   What did I do with it?
25    Q.   Were you using the entire -- both
```

Page 31

```
 1  sides of the Charbonnet Street address, or was
 2  somebody else living there?
 3    A.   No.  I just had it -- I was going to
 4  do some renovating to it, and when she moved in,
 5  we stopped.  She moved out, I finished taking my
 6  house, and I renovated it, put it into one big
 7  single home.
 8    Q.   I'm not sure I'm exactly clear on
 9  the timing there.  Had you already started
10  renovating it before Lintoi moved in?
11    A.   Uh-huh.
12    Q.   About what year -- if you moved in
13  in 1994, how long after you moved in did you
14  start renovating it?
15    A.   Oh, that was -- it was just before
16  Katrina, about a year before Katrina, I started
17  renovating the home.
18    Q.   So, you started renovating it after
19  Lintoi had moved in?
20    A.   Right.
21    Q.   Okay.  Who lived in the 1022 side
22  before Lintoi moved in?
23    A.   Nobody.
24    Q.   It was empty?
25    A.   It was empty.
```

Page 32

```
 1    Q.   What did you use that side for?
 2    A.   It just was empty till I got money
 3  to redo it.
 4    Q.   Okay.  So, you were staying with
 5  your sister in Hammond, Louisiana?
 6    A.   Yes.
 7    Q.   How long did you stay there?
 8    A.   Three months.
 9    Q.   When was the first time that you
10  tried to go back to New Orleans after Hurricane
11  Katrina?
12    A.   About three weeks after.
13    Q.   So, probably sometime in late
14  September?
15    A.   Uh-huh.
16    Q.   And that first time that you tried
17  to go back, were you able to get to your house?
18    A.   No.
19    Q.   What happened?
20    A.   The house was still flooded.
21    Q.   The area was flooded?
22    A.   Right.
23    Q.   You couldn't get close?
24    A.   Yes.
25    Q.   How far did you get?
```

Page 33

```
 1    A.   Right by the St. Claude bridge.
 2    Q.   And then you had to turn back?
 3    A.   Right.  Yes.  Yes.
 4    Q.   When did you next try to go to see
 5  your house?
 6    A.   About -- maybe about four weeks
 7  later.
 8    Q.   Is that four weeks after the
 9  Hurricane Katrina, or four weeks after your
10  first --
11    A.   After the first time.
12    Q.   So, that would have been in mid-
13  October, probably?
14    A.   Yes.
15    Q.   Were you able to get to the house at
16  that time?
17    A.   No.
18    Q.   Why not?
19    A.   It was still flooded with -- and
20  they really wasn't allowing anybody down there.
21    Q.   The third time you tried, were you
22  able to get to the house?
23    A.   No.
24    Q.   No?  When was the next time you
25  tried?
```

9  (Pages 30 to 33)

1      A.   About another month after that.
2      Q.   Mid-November?
3      A.   Uh-huh.
4      Q.   And in mid-November, you still
5  couldn't get to the house?
6      A.   No.
7      Q.   Why couldn't you get to the house
8  then?
9      A.   Because it flooded the second time.
10     Q.   Is that flooding from Hurricane
11  Rita?
12     A.   It's -- flooded -- yes.  Rita.
13  Yeah, Rita.
14     Q.   When was the fourth time that you
15  tried to make it back to the house?
16     A.   Well, I gave it up, and I didn't go
17  back anymore till around -- maybe around, I
18  think, in May, I think.  I'm not sure.
19     Q.   So, May of the next year was the
20  first time that you personally made it back to
21  the house?
22     A.   Uh-huh.  Uh-huh.
23     Q.   What did you see when you went back
24  in mid-May?
25     A.   A disaster.  Everything was

Page 34

1      Q.   So, had you already -- were you
2  still with your sister at the time you finally
3  made it back to your house on Charbonnet Street,
4  or had you moved?
5      A.   Yes.  No.  Still at my sister's
6  house.
7      Q.   So -- what was that?
8      A.   I was still at my sister's house.
9      Q.   So, were you at your sister's house
10  longer than three months then?
11     A.   Well, I came down here and I stayed
12  about two weeks with my -- one of my other
13  sisters, and then I went back to Hammond.
14     Q.   Okay.  Just so I'm clear on the
15  chronology, Hurricane Katrina was at the very end
16  of August, 2005.
17     A.   Uh-huh.
18     Q.   And you went from there to
19  Hammond --
20     A.   Uh-huh.
21     Q.   -- to stay with your sister?
22     A.   Uh-huh.  Yes.
23     Q.   And how long did you stay at your
24  sister's house before you moved?
25     A.   I'd say a good five months.

Page 36

1  destroyed.
2      Q.   What did the house look like when
3  you walked up?
4      A.   Everything was just ramshack.
5      Q.   Was -- had other people been in at
6  that point to the house?
7      A.   No.
8      Q.   Did -- did anyone, like, Nathan, go
9  back sooner than you did?
10     A.   He couldn't -- no.
11     Q.   So, the -- who was with you when you
12  went back in mid-May of 2006?
13     A.   My daughter and I and I think it was
14  my brother.
15     Q.   Your daughter and your brother, and
16  that was it?
17     A.   Uh-huh.
18     Q.   Why didn't Nathan go with you?
19     A.   Nathan was working that day.
20     Q.   Does your brother live in Hammond as
21  well?
22     A.   Yes.
23     Q.   You said earlier that you stayed in
24  Hammond for about three months with your sister.
25     A.   Yes.

Page 35

1      Q.   So, probably in February was when
2  you moved the next time?
3      A.   Yes.
4      Q.   And where did you move in February
5  of 2006?
6      A.   756 Louisiana Avenue.
7      Q.   That's where you're living now?
8      A.   Yes.
9      Q.   And, so, you'd been living where you
10  currently live now for about two or three months
11  before you finally made it to your house in the
12  Lower Ninth Ward?
13     A.   Yes.
14     Q.   How come you didn't make it back
15  sooner?
16     A.   Well, they wasn't letting anyone
17  down in the Ninth Ward because the Ninth Ward
18  stayed flooded for so long.
19     Q.   How long did the Ninth Ward stay
20  flooded that you know of?
21     A.   Maybe about -- maybe about -- I'd
22  say about six weeks, if I'm not mistaken.  About
23  six weeks.
24     Q.   So, why did you wait so many months
25  after the flooding had gone away before you went

Page 37

10  (Pages 34 to 37)

1  back to see your house?
2      A.  Because they wouldn't let us down
3  there to see the house.  They wouldn't let nobody
4  down there.  It was so -- they had houses all in
5  the streets, and we just couldn't get to our home
6  at that time.  They wouldn't let us down there.
7  It was too dangerous to go.
8      Q.  And who was it that was keeping you
9  out of the neighborhood?
10     A.  The National Guards.
11     Q.  Did you know of anyone else who
12  got -- any of your neighbors who got to go back
13  in sooner?
14     A.  No.  No.
15     Q.  So, when you got back to your house
16  in May of 2006, do you recall being able to tell
17  how high the water got in the house?
18     A.  About -- my ceilings is nine feet.
19  So, it's about seven and a half.
20     Q.  So, nearly to the ceiling?
21     A.  Yes.
22     Q.  About seven and a half feet?
23     A.  Yeah.
24     Q.  How could you tell?
25     A.  They have a line where the water

Page 38

1      A.  One, two, three in the back part of
2  the house, where the -- where the two bedrooms --
3  where my -- where my two bedrooms was and where
4  my den was.
5      Q.  Did you have any damage to the roof?
6      A.  Uh-huh.
7      Q.  What kind of damage did you have to
8  the roof?
9      A.  I had a chimney in the house.  The
10  chimney was ruined.  The chimney was ruined.
11  Some of my shingles came off the house.  I forget
12  what you call these things, all of that was off
13  my house, what they puts down on the -- right on
14  the line of the house.  I done forgot what you
15  call them.
16     Q.  What happened to the chimney?
17     A.  Well, the chimney blowed off.
18     Q.  The whole chimney was blown off of
19  your house?
20     A.  The top, where the roof at, that was
21  just off.
22     Q.  Wow.  So, you must have had a lot of
23  wind damage at your house.
24     A.  I had some, not much, not that much,
25  because my roof is still on.  It just was a

Page 40

1  settled at.
2      Q.  And I assume everything in the house
3  was ruined?
4      A.  Yes.
5      Q.  Was there anything that you were
6  able to save?
7      A.  No.
8      Q.  Anything in the attic, that kind of
9  thing?
10     A.  No.
11     Q.  Was there window damage?
12     A.  Yes.
13     Q.  Even though you'd boarded them up?
14     A.  Uh-huh.
15     Q.  What kind of window damage?
16     A.  The windows was, like -- some of
17  them was blowed out, some of them was taken out,
18  some of them stayed, some of them was just --
19  there wasn't no windows in some part of the
20  house.
21     Q.  So, some of the windows were blown
22  out even though you had them boarded up?
23     A.  Yeah.
24     Q.  Do you remember what side of the
25  house those windows were on?

Page 39

1  few -- I don't know the things that run down
2  there, but it was just a -- because that's
3  bricks, and they just came off, you know.  It
4  wasn't a lot of wind damage.  It was just a few
5  bricks came off my chimney.
6      Q.  The thing that came off, was it
7  orange -- were they orange clips?
8      A.  Right.  Yeah.
9      Q.  Are those the hurricane clips or the
10  hurricane joints that people -- no, it's
11  something different?
12     A.  I think that's the closing where --
13  you know, where the line set where they closed
14  the -- I don't know what they.
15     Q.  Orange-red terra cotta ridge
16  markings?
17     A.  They was orange.  They was orange.
18  Yeah.
19     Q.  Okay.
20     A.  That was all what happened to the
21  roof.
22     Q.  Okay.  But -- well, the chimney --
23     A.  The chimney was bricks, and it had a
24  few bricks to fall with the -- you know, come
25  loose.

Page 41

11  (Pages 38 to 41)

Page 42

```
1        Q.    Okay.  So, a few of the bricks came
2   loose on the chimney, and that caused the whole
3   chimney to fall?
4        A.    Not the whole chimney.  Just about
5   ten bricks.
6        Q.    Oh, just part of the chimney?
7        A.    Yeah.
8        Q.    Okay.  Okay.  Did you have trees on
9   your property?
10       A.    No.
11       Q.    No?
12       A.    I had two trees.  Just one or two
13  trees.
14       Q.    One or two trees?
15       A.    Yeah.
16       Q.    Was there any damage to the trees?
17       A.    No.
18       Q.    Any damage to any of the trees in
19  your neighborhood?
20       A.    Yeah.  They had some damage to the
21  neighborhood trees.
22       Q.    Was there any debris around your
23  house?
24       A.    Plenty debris.  A whole lot.
25       Q.    What kind of -- I mean, what kind of
```

Page 43

```
1   things did you find?  Any big items?
2        A.    They had, like, the neighbors left
3   their cars.  The cars was all over.  They had
4   boats from some of the neighbors' house.  They
5   had --
6        Q.    The water had just picked that stuff
7   up --
8        A.    Picked all kind of stuff and just
9   set it in different places from different -- I
10  don't know where it come from.  Just different
11  places where it came from.  But we had a -- it
12  was just a disaster -- it was horrible.  It was
13  just like -- it was just like all kind of
14  different things.
15       Q.    At what point did you actually get
16  to start cleaning up your house and cleaning up
17  that area?
18       A.    What month I came back in?  May?  It
19  was about two weeks after that we got a chance to
20  go in and start gutting it, taking out all the
21  stuff and getting rid of it.
22       Q.    Did you personally do that work, or
23  did you hire someone to do it?
24       A.    Hired.
25       Q.    Who did you hire to do that for you?
```

Page 44

```
1        A.    A crew that Andry had.  A crew
2   that Brooke Andry's had to clean -- to gut the
3   house and clean it.
4        Q.    Brooke Andry's?
5        A.    Uh-huh.
6        Q.    Who was Brooke Andry's?
7        A.    That's -- she's a lawyer and she do
8   real estate.  She do's -- renovations on homes.
9        Q.    Okay.
10       A.    Troy's sister.  Yeah.
11       Q.    Mrs. Coats, do you know what a Form
12  95 is?
13       A.    No.
14       Q.    Do you remember signing a written
15  authorization to have your lawyer file a claim
16  with the United States Army Corps of Engineers?
17       A.    Yes.
18       Q.    That form is called a Form 95.
19       A.    Okay.
20       Q.    So, you know your attorney filed a
21  Form 95 on your behalf?
22       A.    Yes.
23       Q.    I just want to start by getting an
24  understanding of the injuries and, you know, the
25  relief that you're seeking in this lawsuit.  And
```

Page 45

```
1   the basic information I have right now in front
2   of me is your Form 95, and from looking at that,
3   it seems that there are three main types of
4   relief that you're seeking, and I just want to go
5   through them quickly with you and make sure I
6   understand what they are.  The first looks like
7   it's, you know, the damage to your home, to your
8   property.
9        A.    Yes.
10       Q.    The second, damage to your personal
11  possessions, your personal property that was in
12  your home.  And the third, severe mental
13  distress.
14       A.    Uh-huh.
15       Q.    Am I right, those are the three
16  types?
17       A.    Yes.  Yes.
18       Q.    Those are the three types of damages
19  you're seeking in the lawsuit?
20       A.    Yes.
21       Q.    Is there anything in addition to
22  those three?
23       A.    No.  No, ma'am.
24       Q.    And, again, I want to go through
25  each of those types and the circumstances of
```

12  (Pages 42 to 45)

1   those damages in more detail later, but just
2   before we get into the details, I want to make
3   sure I have the basic understanding of the types.
4   Beginning with your house at -- on Charbonnet
5   Street, can you just describe the location of
6   that house in the Lower Ninth Ward just for the
7   record, geographically where it's located?
8        A.   It's located right off of St. Claude
9   Avenue, across the Industrial Canal.
10       Q.   About how far from the Industrial
11  Canal is it?
12       A.   About six blocks.
13       Q.   And that was a one-level house --
14       A.   Uh-huh.
15       Q.   -- correct?
16       A.   Yes.
17       Q.   About how many square feet was the
18  house or is the house?
19       A.   I really don't know how many.  I
20  can't remember that right now.
21       Q.   Do you have any pictures of the
22  house before the -- of Hurricane Katrina?
23       A.   No.
24       Q.   You don't have any pictures of the
25  house before Hurricane Katrina?

Page 46

1   didn't take the pictures.  My insurance company
2   take the -- the man who came out, he took the
3   pictures.  I didn't take the pictures.
4        Q.   Oh, okay.  So, the insurance company
5   took the pictures.  Did you or did Nathan, your
6   daughter, anyone that you were with take any
7   photos?
8        A.   No, we didn't take any.
9        Q.   And just so I'm correct, you didn't
10  have any pictures of the house before the storm?
11       A.   No, I don't have any of those.  No.
12       Q.   Mrs. Coats, do you own any other
13  property besides the house on Charbonnet Street?
14       A.   No.
15       Q.   Do you know who owns the duplex next
16  door, the 16 -- 1016 and 18?
17       A.   Yes.
18       Q.   Who owns that?
19       A.   Alberta Greff (phonetic).
20       Q.   Can you spell that for us?
21       A.   I don't -- I don't really know how
22  she spell that last name.
23       Q.   Okay.  And how long has Alberta
24  Greff lived there?
25       A.   Since I been living there.

Page 48

1        A.   No.
2        Q.   When you were going in and looking
3   at the house, did you take any pictures or did
4   anyone take any pictures at that time of the
5   damage?
6        A.   Yes.
7        Q.   Do you have those pictures?
8        A.   Not right now.  My insurance company
9   has them, but I don't know -- can't get them
10  right now.
11       Q.   You sent them in to your insurance
12  company?
13       A.   Uh-huh.
14       Q.   Is that Alliance?
15       A.   Uh-huh.  Yes.
16       Q.   And did you keep copies of the
17  pictures that you sent in?
18       A.   No, I didn't.
19       Q.   Do you have the original negatives?
20       A.   No.
21       Q.   Were they taken with a digital
22  camera or a regular camera?
23       A.   A regular camera.
24       Q.   What happened to the negatives?
25       A.   I really don't know, because I

Page 47

1        Q.   She was there when you moved in?
2        A.   No.  She was renting it out then,
3   during that time.  I think that was rental -- it
4   was rental property.
5        Q.   I understand that place next door to
6   you got pretty heavy wind damage.
7        A.   Right.
8        Q.   Do you know who owns the property --
9   another door down from Alberta Greff's property,
10  the 1012 and 14?
11       A.   Arcenio -- they sold that house, and
12  I really don't know -- Arcenio, I think that's
13  his name.
14       Q.   Arcenio.  Do you know a last name?
15       A.   No.
16       Q.   Let's move on to your second kind of
17  injury that we talked about, the damage to your
18  personal property.
19       A.   Uh-huh.
20       Q.   And it sounds like, from what you
21  said earlier, everything that you left in the
22  house was completely destroyed and --
23       A.   Everything.
24       Q.   All you had was a few days' worth of
25  clothes that you took with you to your sister's

Page 49

13  (Pages 46 to 49)

1    house.
2        A.    Yes.
3        Q.    But did you submit an insurance
4    claim on your personal property to Alliance?
5        A.    Yes.
6        Q.    Was that on your homeowner's policy
7    or your flood policy or both?
8        A.    Both.
9        Q.    As part of that process, did you
10   make a list of all of the -- your personal
11   property that may have been damaged?
12       A.    Yes.
13       Q.    Did you keep a copy of that?
14       A.    Yes.
15       Q.    Do you still have that -- that --
16   that list of property?
17       A.    Yes.
18       Q.    Where is that list located?
19       A.    At my home now.
20       Q.    At the Louisiana address?
21       A.    (Nods head affirmatively.)
22       Q.    Did you come up with an estimate of
23   how much all of your personal property that you
24   lost was worth?
25       A.    That's contents?

                                    Page 50

1        Q.    Yes.
2        A.    Yes.
3        Q.    What was that estimate?
4        A.    It was about 56,000.
5        Q.    Fifty-six thousand dollars?
6        A.    Uh-huh.
7        Q.    And that covered everything that you
8    lost?
9        A.    In the home.
10       Q.    Was that actually your estimate or
11   was that the insurance company's estimate?
12       A.    That was mine.
13       Q.    Your estimate?
14       A.    Yes.
15       Q.    Does that include just your property
16   or does it include, you know, the property of
17   your daughter and Nathan and everyone?
18       A.    Everyone.
19       Q.    Everyone who was living there at the
20   time?
21       A.    Yes.
22       Q.    Is there any other high-dollar item
23   or is there anything that you have thought of
24   since you came up with that estimate that --
25   where the estimate should have been higher, or

                                    Page 51

1    are you pretty comfortable with that number?
2        A.    I think it should have been higher.
3        Q.    How much higher do you think it
4    should have been, looking back?
5        A.    Looking back, I'd say a good --
6    maybe another good hundred and something thousand
7    dollars, because I had my grandkids' clothes, I
8    had my grandkids' different things in there, my
9    daughter's stuff, and I just put down my losses,
10   but I didn't put down their losses during that
11   time.
12       Q.    Oh, okay.  So the $56,000 was your
13   losses only?
14       A.    My loss.  Mines only.
15       Q.    Okay.  I misunderstood you earlier.
16   I thought you said that was for everyone.
17       A.    I did, but I -- yeah, but when you
18   asked me the question, if I go back now, yes, I
19   would have did it different.
20       Q.    Okay.  But $56,000 is --
21       A.    It wasn't enough.
22       Q.    -- is enough for your losses, just
23   you?
24       A.    Yes, just mines.
25       Q.    But if you included the losses for

                                    Page 52

1    everyone living there, it may have been higher?
2        A.    Right.  Yeah.
3        Q.    Okay.  Let's talk about the third
4    type of injury, the severe mental distress.  Can
5    you just describe that for me briefly?
6        A.    The mental distress?
7        Q.    Yes.
8        A.    To walk in my home, to see
9    everything destroyed, it took a heavy toll on me.
10   I had to go back to the hospital.  My heart -- my
11   hair fell out.  I just couldn't sleep at night.
12   It was something that I don't think I'll ever
13   forget.  It was -- I must have vomit about two
14   weeks.  Vomit.  Every time I think about it --
15   everything was destroyed in that home.
16       Q.    Was that after you'd actually come
17   in and seen the loss yourself, or was it before
18   then, just suspecting?
19       A.    Just to walk in my home to see
20   everything just gone.  Everything.  I couldn't
21   stop shaking.  I cry.  And it just was horrible.
22   Right now, I think about my home, I'm not in it,
23   and it upsets my stomach.
24       Q.    We'll talk about this a little bit
25   more later, but you mentioned that your -- your

                                    Page 53

                        14  (Pages 50 to 53)

1    heart.  Has -- have you had any type of other
2    physical problems related to the hurricane?
3         A.   Pressure.
4         Q.   High blood pressure?
5         A.   Yes.
6         Q.   Is that something that you had
7    before the hurricane, or is that something that
8    you have as a result of it?
9         A.   The results of it.
10        Q.   So, before Hurricane Katrina, you
11   didn't have high blood pressure?
12        A.   Uh-uh.  No.
13        Q.   You didn't take any high blood
14   pressure medicine before the hurricane?
15        A.   No.  No.
16        Q.   Did you have any heart disease
17   problems before the hurricane?
18        A.   Uh-huh.
19        Q.   What kind of problems with heart
20   disease did you have before the hurricane?
21        A.   I just had to have open-heart
22   surgery.
23        Q.   And about when was that?
24        A.   I think it was about maybe about six
25   months before the hurricane.

Page 54

1    Hurricane Katrina?
2         A.   Yeah, because I was doing fine till
3    after this.  I was doing fine.
4         Q.   So, for you, it was probably more
5    like four types of injury then?
6         A.   Uh-huh.
7         Q.   It was the loss of your property --
8    your house?
9         A.   Uh-huh.  My house.
10        Q.   Your personal property?
11        A.   Yes.
12        Q.   The severe mental distress?
13        A.   Yes.
14        Q.   And then the heart and blood
15   pressure issues?
16        A.   Yes.
17        Q.   Is there any other type of injury
18   that you had?
19        A.   No.
20        Q.   Any other type of relief that you're
21   seeking besides those four things?
22        A.   Uh-uh.
23   MR. LANDRY:
24        Object to form.
25   THE WITNESS:

Page 56

1         Q.   So, the surgery was a success?
2         A.   Yes.
3         Q.   And were you taking medications for
4    that, for your heart disease?
5         A.   Aspirins.
6         Q.   Any other medications?
7         A.   Now, I'm taking Atenolols, Captopril
8    for my pressure.
9         Q.   What was the first medication?
10        A.   Atenolol.
11        Q.   Do you know how that's spelled?
12        A.   No.  Okay.
13        Q.   The medicine -- the first one that
14   you mentioned, the medicine for your heart, when
15   did you start taking that?
16        A.   They gave me that prescription,
17   like, about -- I'd say about a week -- two weeks
18   after I saw my home, for my pressure and
19   different things, for my heart, pressure, they
20   had to give me medicine, but right after the
21   storm -- before the storm, I wasn't taking
22   nothing but aspirin.  But after the storm, they
23   had to put me on all kind of medication.
24        Q.   So, is that another type of injury
25   that you would say you got as a result of

Page 55

1         Huh?
2    MR. LANDRY:
3         Go ahead.
4         A.   No.
5    EXAMINATION BY MS. PAYNE:
6         Q.   Okay.  What about -- I understand
7    from a list of health issues that I got from your
8    plaintiffs -- the plaintiffs' attorneys --
9         A.   I will take that back.  I'm on nerve
10   pills.  I would take nerve pills.  They're going
11   to give me nerve pills.
12        Q.   You're currently taking nerve pills?
13        A.   Uh-huh.
14        Q.   What kind of nerve pills?
15        A.   I really don't know the name right
16   now, but I have nerve pills, also.  I'm sorry
17   about that.
18        Q.   That's okay.  Do you take them every
19   day?
20        A.   Yes.
21        Q.   And what exactly are you taking them
22   for?  What are they supposed to do for you?
23        A.   Calm my nerves down because I get
24   so -- I can't just -- if I think about what
25   happened, I just go to crying, I can't stop.  And

Page 57

15  (Pages 54 to 57)

1    they give me nerve pills to calm me down.
2        Q.    I understand that you may have high
3    cholesterol, also; is that correct?
4        A.    That was before the storm.
5        Q.    Okay.  So -- okay.  So, you did have
6    some preexisting heart problems before the storm
7    and your surgery --
8        A.    Uh-huh.
9        Q.    -- but didn't have to take as much
10   medication until after?
11       A.    No.  No.  Right.
12       Q.    The high blood pressure came on
13   after the storm.
14       A.    Yes.
15       Q.    Before Hurricane Katrina, you had
16   never had any blood pressure problems --
17       A.    No.
18       Q.    -- is that correct?
19       A.    Right.
20       Q.    And then the nerve pills to help
21   calm you down --
22       A.    Right.
23       Q.    -- that was something that you
24   started taking after the storm?
25       A.    Yes.

                                        Page 58

1        Q.    What about The Road Home Program,
2    did you make a claim for assistance under that?
3        A.    Yes.
4        Q.    How much did The Road Home Program
5    pay you -- or have you received money from The
6    Road Home Program yet?
7        A.    Well, they say 76,000.
8        Q.    They paid -- The Road Home Program
9    paid you $76,000?
10       A.    Yes.
11       Q.    And how much did your flood
12   insurance pay?
13       A.    One twenty-five.
14       Q.    A hundred twenty-five thousand?
15       A.    Yes.
16       Q.    Was that the policy limit, the
17   maximum amount you were insured for?
18       A.    Yes.
19       Q.    What about your homeowner's
20   insurance, how much did that pay?
21       A.    Thirty-three dollars.
22       Q.    It sounded like you said $33.
23       A.    Thirty-three dollars for -- let me
24   see -- one was 33 and one was 1,017 -- 1,700.
25   One check was for 33 and one check was for

                                        Page 60

1        Q.    Had you ever taken any kind of nerve
2    pills or --
3        A.    No.  No.
4        Q.    Okay.  We're starting to talk over
5    each other a little bit again.
6        A.    I'm sorry.
7        Q.    It's okay.  It's hard to remember
8    because in a normal conversation, it's natural to
9    talk back and forth like that.  We just have to
10   remember she's taking down what we say.
11            Okay.  This is just another preview,
12   overview question.  We can get into more details
13   later.  But I want to get a preliminary list of
14   any type of claims you made for assistance or
15   insurance claims, anything like that, to recover
16   for the storm, and I know you said earlier you
17   had your flood insurance with Alliance; is that
18   right?
19       A.    Yes.
20       Q.    And your homeowner's insurance also
21   with Alliance?
22       A.    Yes.
23       Q.    Did you have any other kind of
24   insurance?
25       A.    No.

                                        Page 59

1    17 -- 1,700.
2        Q.    Seventeen hundred?
3        A.    Uh-huh.  One thousand, seven hundred
4    dollars.
5        Q.    Okay.  So, they sent you one check
6    for only $33?
7        A.    Thirty-three dollars.
8        Q.    What was that check for $33 for?
9        A.    My fence.
10       Q.    Oh, the fence.  But it probably cost
11   more than $33 to repair it, right?
12       A.    That's what they say.  Yeah.
13   Thirty-three dollars.  Yes.
14       Q.    Okay.  And what was the 1,700 for?
15       A.    To fix the damage on the roof.
16       Q.    So, the maximum you got from your
17   homeowners was $17,033.
18   MR. LANDRY:
19            Object.  Seventeen hundred.
20   MS. PAYNE:
21            My mistake.  Thank you,
22   Counsel.
23   MR. LANDRY:
24            Sure.
25   EXAMINATION BY MS. PAYNE:

                                        Page 61

                        16  (Pages 58 to 61)

1      Q.   One thousand, seven hundred
2  thirty-three dollars --
3      A.   Yes, ma'am.
4      Q.   -- was the maximum you got for your
5  homeowner's insurance?
6      A.   Yes.
7      Q.   Thank you.  What about FEMA?  Did
8  you get any assistance from FEMA?
9      A.   No.  All but the 2,500 they send you
10  when it first happened.
11     Q.   Twenty-five hundred?
12     A.   I think it was 2,500 they give
13  everybody.
14     Q.   Did you apply for additional
15  assistance from FEMA?
16     A.   I did, but they say I wasn't
17  available -- I wasn't eligible to get it.
18     Q.   Did you get a FEMA trailer?
19     A.   Yes.
20     Q.   How did you go about getting the
21  trailer?
22     A.   Well, I just called on the phone and
23  told them I needed -- you know, a trailer, and
24  they send a trailer out.
25     Q.   How long -- or did you stay in the

Page 62

1  trailer?
2      A.   One night.
3      Q.   Has anyone else used the trailer?
4      A.   No.
5      Q.   What do you use the trailer for?
6      A.   I had got the trailer to live in,
7  but the trailer -- by me having a nerve problem,
8  looked like the wall was closing in, the
9  trailer's too small.  They have, like, rodents
10  running in and out.  It's too small.  You
11  can't -- the tub and -- I just couldn't take it.
12     Q.   Have you tried to get someone to
13  take the trailer away?
14     A.   Well, I had said I was going to call
15  to see about getting it moved.
16     Q.   You have called?
17     A.   I'm going to call to see about it.
18     Q.   You are going to call.
19     A.   Uh-huh.
20     Q.   You but you haven't called yet?
21     A.   Uh-uh.
22     Q.   So, nobody's getting any use of the
23  trailer that you know of?
24     A.   No.
25     Q.   Were there any other programs where

Page 63

1  you got any type of assistance?
2      A.   I think it was Red Cross.
3      Q.   Red Cross?
4      A.   Uh-huh.
5      Q.   What kind of assistance did you get
6  from Red Cross?
7      A.   It was $1,000.
8      Q.   Did you have to apply for that or
9  was it automatic?
10     A.   We had to apply for it.
11     Q.   Were there any other programs where
12  you got any type of assistance?
13     A.   No.
14     Q.   Did you get any type of food stamps?
15     A.   Right after the storm, we did.
16     Q.   How long did you get food stamps?
17     A.   About two months.
18     Q.   Other than that, is there any other
19  type of assistance?
20     A.   No.
21     Q.   Okay.  I'm about to move on to
22  another area, but just one more time, I want to
23  go through and make sure I have all of your
24  injuries and types of relief down.
25     A.   Uh-huh.

Page 64

1      Q.   The loss of your property, severe
2  mental distress, loss of your personal
3  possessions --
4      A.   Okay.
5      Q.   -- and the physical injury, the
6  heart and high blood pressure problems.
7      A.   Right.
8      Q.   Is there anything else I'm leaving
9  out?
10     A.   No.
11     Q.   Okay.
12  MS. PAYNE:
13          This might be a good time to
14     take a break.
15  THE WITNESS:
16          Good.
17  MS. PAYNE:
18          You'd like to do that?
19  THE WITNESS:
20          (Nods head affirmatively.)
21  MS. PAYNE:
22          Okay.  Let's go off the
23  record.
24  THE VIDEOGRAPHER:
25          We're going off the record.

Page 65

17  (Pages 62 to 65)

1    It's 10:33.  This is the
2  conclusion of Tape 1.
3        (Whereupon, a discussion was
4  held off the record.)
5  THE VIDEOGRAPHER:
6        Returning to the record.  It
7  is 10:44.  This is the start of
8  Tape 2.
9  EXAMINATION BY MS. PAYNE:
10       Q.   Okay.  Mrs. Coats, while we were on
11  the break, I have a couple of things we talked
12  about earlier I just want to follow up real
13  quickly.
14       A.   Uh-huh.
15       Q.   When you were describing some of the
16  preparations that you took whenever you heard
17  about Hurricane Katrina coming, you mentioned
18  putting some of your furniture up on cinder
19  blocks.
20       A.   Uh-huh.
21       Q.   Had you ever had to do that before?
22       A.   No.
23       Q.   How did you think of doing that with
24  the cinder blocks?
25       A.   Because I had just bought my living

Page 66

1  room set and I thought of something to try to
2  save it, and it didn't.
3       Q.   Have you ever had any flooding in
4  the house before?
5       A.   No.
6       Q.   And then, just to clarify, the
7  house -- or the part of the duplex that was next
8  door, the 1022 part, did you ever rent that out
9  when you were living there?
10       A.   No.  No.
11       Q.   You never rented it out?
12       A.   No.
13  MS. PAYNE:
14        Okay.  I'm marking as Coats
15  Exhibit Number 1 the Notice of
16  Videotape Deposition for today.
17  This is just the deposition notice
18  that your attorneys got about us
19  doing the deposition today and
20  where it would be.  It has an
21  Exhibit A at the end with a list
22  of documents that we had
23  requested.  I just wanted to
24  clarify on the record with your
25  counsel that we made a prior

Page 67

1    agreement, I guess, like we did in
2  the other depositions, that you
3  would not actually be producing
4  those today because of the
5  outstanding -- we have an
6  outstanding -- defendants have an
7  outstanding motion to compel and
8  you have an objection to that and
9  that this will get worked out at
10  the hearing?  Is that correct?
11        (Whereupon, Coats Exhibit
12  Number 1 was marked for
13  identification.)
14  MR. LANDRY:
15        That's correct.
16  MS. PAYNE:
17        And you're not producing any
18  documents today at the deposition?
19  MR. LANDRY:
20        That's correct.
21  EXAMINATION BY MS. PAYNE:
22       Q.   Okay.  So, Mrs. Coats, I'm just
23  going to ask you a few questions about some
24  documents now.
25        Okay.  I'm handing you what's been

Page 68

1  marked as Coats Exhibit Number 2.  This is
2  "Plaintiffs' Response to MRGO Defendants' First
3  Set of Joint Class Certification Requests For
4  Admission, Interrogatories and Requests For
5  Production of Documents."  Have you seen this
6  before?
7        (Whereupon, Coats Exhibit
8  Number 2 was marked for
9  identification.)
10       A.   No.
11  EXAMINATION BY MS. PAYNE:
12       Q.   No.  You've never had a chance to
13  look over it?
14       A.   No.
15       Q.   Did your lawyers talk to you at
16  all -- and I'm not asking anything specific that
17  they said to you, but did they talk to you about
18  the discovery requests from defendants or
19  answering the requests?
20       A.   Explain that again.
21       Q.   Did your lawyers ever talk to you
22  about the defendants' discovery requests, like
23  asking for things like documents?  Did they ever
24  talk to you about the defendants' requests?
25  THE WITNESS:

Page 69

18  (Pages 66 to 69)

Page 70

```
 1          Did he?  That slip my mind?
 2    EXAMINATION BY MS. PAYNE:
 3          Q.   You may not have.  I'm just asking.
 4    Not that you remember?
 5          A.   No, not that I remember.
 6          Q.   Okay.  Your answer might be the same
 7    on this, too, but I just want to go ahead and
 8    show this one to you.  I'm handing you what's
 9    been marked as Coats Exhibit Number 3.  This
10    document is called "Plaintiffs' Response to MRGO
11    Defendants' First Set of Joint Interrogatories,
12    Requests For Production of Documents and Requests
13    For Admissions to Plaintiffs Regarding Common
14    Liability Issues."  Have you reviewed this
15    document before?
16          (Whereupon, Coats Exhibit
17          Number 3 was marked for
18          identification.)
19          A.   No.
20    EXAMINATION BY MS. PAYNE:
21          Q.   Do you have any familiarity with it?
22          A.   No.
23          Q.   Have you talked to your lawyers at
24    all about responses to the defendants' requests?
25          MR. LANDRY:
```

Page 71

```
 1          I'll just object to the
 2          form.
 3          You can answer it if you
 4          know or if you remember.
 5    THE WITNESS:
 6          Okay.
 7          A.   No.
 8    EXAMINATION BY MS. PAYNE:
 9          Q.   As far as you know, you haven't been
10    involved in responding to discovery at all --
11          A.   No.
12          Q.   -- is that right?
13          A.   Right.
14          Q.   So, The Road Home Program that we
15    were talking about before, did you keep a copy of
16    your application form to that?
17          A.   Yes.
18          Q.   Do you still have it, that copy?
19          A.   Yes.
20          Q.   And your insurance claims for your
21    homeowner's insurance, did you keep a copy of
22    that application?
23          A.   Yes.
24          Q.   Do you still have it?
25          A.   Yes.
```

Page 72

```
 1          Q.   And what about your flood insurance,
 2    did you --
 3          A.   Yes.
 4          Q.   Just a reminder -- you know.
 5          I'll ask it again so the record's
 6    clear.
 7          For your flood insurance policy, did
 8    you keep a copy of your application for that?
 9          A.   Yes.
10          Q.   But you didn't have any of the
11    pictures, am I right?
12          A.   No.
13          Q.   Because those were taken directly by
14    the insurance company?
15          A.   Yes.
16          Q.   Did you prepare any kind of notes or
17    summary or did you write down anything about your
18    experiences during Hurricane Katrina?
19          A.   No.
20          Q.   Your evacuation?
21          A.   No.
22          Q.   Did you make any notes about the
23    property when you returned in May of 2006?
24          A.   No.
25          Q.   Some of the work that you had done
```

Page 73

```
 1    on your property on Charbonnet Street, did you
 2    get any receipts for the work?
 3          MR. LANDRY:
 4          Object to the form.  Are you
 5          referring to before or after the
 6          storm?
 7    MS. PAYNE:
 8          Thank you.  I'll rephrase.
 9    EXAMINATION BY MS. PAYNE:
10          Q.   Some of the work that you had done
11    to the property after Hurricane Katrina, like,
12    the people that you paid to clean it out, for
13    example, do you have any receipts from them or
14    invoices for those expenses?
15          A.   No, I don't.
16          Q.   Do you remember whether you paid
17    them by cash or by check?
18          A.   Cash.
19          Q.   Cash.  Do you have any kind of
20    documents that would show what kind of work that
21    you had done after Hurricane Katrina?
22          A.   I don't have any documents, but I
23    can get some.
24          Q.   Just in your memory?
25          A.   Uh-huh.
```

19  (Pages 70 to 73)

1     Q.   Other than the list of the
2   possessions that you had that you gave to the
3   insurance company of the things that were lost,
4   do you have any other kinds of lists about the
5   personal possessions that you lost?
6     A.   Yes.
7     Q.   What kind of lists do you have?
8     A.   I have the lists about my furniture,
9   my pictures, my clothes.  What else I have a list
10  of?  Everything that I had in that house.
11    Q.   When did you make the other lists?
12    A.   Right after I got in the home, when
13  I went to the home, to --
14    Q.   And, then, did you use those other
15  lists that you made to get your final list for
16  the insurance company?
17    A.   Yes.
18    Q.   Do you still have the early drafts
19  of the lists?
20    A.   I don't know.  I have to check to
21  see.  I don't really know.
22    Q.   You might still have those?
23    A.   Yeah.
24    Q.   The people who gutted your house,
25  did you pay them cash, you said?

Page 74

1   different things.
2     Q.   When did they ask you for these
3   documents?
4     A.   About two months ago, I think it
5   was.
6     Q.   About two months ago?
7     A.   Or three months ago.
8     Q.   About three months ago?
9     A.   Uh-huh.
10    Q.   Do you remember what documents
11  specifically they asked you for?
12    A.   My losses in the home, damage to the
13  home.
14    Q.   Anything else?
15    A.   No, I don't think so.
16    Q.   Okay.  So, now, Mrs. Coats, I want
17  to go back to the four main categories of
18  injuries that we talked about generally before
19  and just get into more of the detail about the
20  circumstances for each of those types of
21  injuries, starting with the damage to your home.
22    A.   Uh-huh.
23    Q.   I know you weren't present during
24  the storm, but do you have a view or
25  understanding of how your house was damaged?

Page 76

1     A.   Yes.
2     Q.   How much did you pay them?
3     A.   Three thousand, five hundred
4   dollars.
5     Q.   Do you have any photographs or
6   videotapes or DVDs of the property damage that
7   you still have?
8     A.   No.
9     Q.   Have your attorneys already asked
10  you about all these documents?
11    A.   Yes.
12    Q.   Have you provided any of the
13  these --
14    A.   No.
15    Q.   -- documents to your attorneys?
16    A.   I'm sorry.  No.
17    Q.   Do you have plans to provide any of
18  the documents to your attorneys?
19    A.   Yes.
20    Q.   They have asked you for them?
21    A.   Yes.
22    Q.   When are you planning to provide
23  these documents to your attorneys?
24    A.   When I probably get them all
25  together.  Take time to get them together and

Page 75

1     A.   Uh-huh.
2     Q.   Please explain that.
3     A.   My home was damaged by floodwaters
4   that came from MRGO.
5     Q.   Floodwaters that came from MRGO?
6     A.   Yes.
7     Q.   When you say floodwaters that came
8   from MRGO, what -- what do you mean by that?
9   Where do you mean they came from?
10    A.   Where it came from?  Came from St.
11  Bernard Parish.  They didn't have nothing to stop
12  the water from coming through to the Lower Ninth
13  Ward.
14    Q.   So, that would be the water then
15  came from the -- basically, the east, through St.
16  Bernard Parish, and then to the Lower Ninth Ward,
17  is your understanding?
18    A.   Yes.
19    Q.   Do you know of any other source of
20  water that came to -- that would have reached
21  your house?
22    A.   No.
23    Q.   Have you heard anything from other
24  people about other sources of the water?
25    A.   No.

Page 77

20  (Pages 74 to 77)

1      Q.   Your understanding that the water
2  came from -- through St. Bernard Parish to the
3  Lower Ninth Ward, what is that understanding
4  based on?
5      A.   What the understanding is based on?
6  From my understanding -- okay.  Let me see if I
7  understand the basis of my understanding.  It
8  didn't come from the -- it couldn't have come
9  from nowhere else but that -- the -- from St.
10  Bernard Parish.
11     Q.   Why do you see that?
12     A.   Because the levee was all right.
13  There wasn't nothing wrong with the levee.  The
14  levee was okay.  I was right there by -- see --
15  St. Bernard Parish, then the Lower Ninth Ward.
16  And this water came through the Lower Ninth
17  Ward -- from MRGO to the Ninth Ward.
18     Q.   When you say that levee was okay,
19  which levee are you referring to?
20     A.   Six blocks from my home.
21     Q.   The Industrial Canal levee --
22     A.   Yes.
23     Q.   -- along where you live was okay?
24     A.   Right.  Right.
25     Q.   Are you aware of some breaches to

Page 78

1      A.   Uh-uh.
2      Q.   You didn't have any fire or problem
3  like that at your house, did you?
4      A.   No.
5      Q.   Do you know how much damage to your
6  house may have been caused by Hurricane Rita as
7  opposed to Hurricane Katrina?
8      A.   The home was messed up before Rita
9  came in.  Katrina was the one who did the damage
10  to my home.
11     Q.   How do you know which damage was
12  from Katrina versus which damage was from
13  Hurricane Rita?
14     A.   Because the damage was did before
15  Rita came along.  I think Rita was two weeks
16  after Katrina.  The Ninth Ward was flooded.
17  Everything was destroyed with Katrina.  When Rita
18  came along, you know, it probably made it a
19  little bit worse, but it was Katrina, the first
20  one, who came through and destroyed my home.
21     Q.   Okay.  I think I understand what you
22  mean by that.  Hurricane Katrina did a lot of
23  damage.  Hurricane Rita may have made it worse --
24     A.   Yeah.
25     Q.   -- but you don't really know the

Page 80

1  the Industrial Canal levee and floodwall, though?
2      A.   Was I -- no.
3      Q.   You don't know of any breaches along
4  the Industrial Canal?
5      A.   Uh-uh.  Uh-uh.  No.
6      Q.   Had you heard about any overtopping
7  of water along the Industrial Canal?
8      A.   No.
9      Q.   So, as far as you've heard or as far
10  as you're aware, there was no water coming into
11  the Lower Ninth Ward from the Industrial Canal.
12  It was all coming from St. Bernard Parish.
13  That's your understanding?
14     A.   Yes.
15     Q.   Okay.  Was there anything else that
16  caused damage to your house besides the flooding,
17  the water?  I guess we talked earlier about
18  some -- some wind damage to your chimney and to
19  the fence, right?
20     A.   Yes.
21     Q.   Was there any other type of wind
22  damage?
23     A.   No.  No.  None whatsoever.  No.
24     Q.   Do you know how much rain you got in
25  that area during the hurricane?

Page 79

1  exact amount; is that right?
2      A.   Yeah.  Right.
3      Q.   When you came back, was there any
4  sign of looting or vandalism to your home?
5      A.   No.
6      Q.   Let's talk a little bit about your
7  neighborhood.  I know that we talked about the
8  house that was right next door to you, the, I
9  guess, 1016 and 18 house.
10     A.   Uh-huh.
11     Q.   You said that house had a lot more
12  roof damage than yours.  Was that right?  Am I
13  remembering correctly?
14     A.   That house was destroyed by water,
15  also.  The roof was a little bit bad on that home
16  before Katrina.  But that house was destroyed,
17  just like my house was, from Katrina.
18     Q.   Right.  Got lots of water.
19     A.   Yes.
20     Q.   I thought you said earlier that that
21  house got more roof damage than your house got.
22  Is that correct?
23     A.   I can't remember saying it had wind
24  damage.  Can you go back over that and remind me?
25     Q.   It could have been my mistake.  I

Page 81

21  (Pages 78 to 81)

1    didn't want to repeat too much stuff that you
2    already talked about, but I can go through it
3    again.
4        A.   Okay.
5        Q.   The house right next door to
6    yours -- let me check the address -- 1016 and
7    18 --
8        A.   Uh-huh.
9        Q.   I was under the impression that in
10   addition to the flooding, it had heavy wind
11   damage.  Is that correct?
12       A.   No.  That house was -- that house
13   was pretty good till the water hit it.  The house
14   was good till the water hit that house, that
15   home.
16       Q.   So, it did not have wind damage --
17   I'm sorry.  Let me say that again.
18            That house did not have heavy wind
19   damage, as far as you know?
20       A.   Uh-uh.
21       Q.   Or do you remember?
22       A.   No.  It didn't have that, no.
23       Q.   Do you know, is there a pump station
24   in your neighborhood that pumps the water out
25   when it rains?

Page 82

1        Same objection.
2        Go ahead and answer the
3    question.
4        A.   Yes.
5    EXAMINATION BY MS. PAYNE:
6        Q.   And is it your understanding that
7    during Hurricane Katrina, there was various --
8    there were various breaches or overtopping of the
9    levees in different places?
10       A.   Yes.
11       Q.   All around the whole system, right?
12       A.   Yes.
13       Q.   But not all of those sources of
14   water from everywhere probably made it to your
15   house?
16       A.   No.
17       Q.   Mrs. Coats, I'm handing you a
18   document that's been marked Coats Exhibit Number
19   4.
20            (Whereupon, Coats Exhibit
21            Number 4 was marked for
22            identification.)
23       MS. PAYNE:
24            I have extras, Counsel.
25   EXAMINATION BY MS. PAYNE:

Page 84

1        A.   In my neighborhood?
2        Q.   Uh-huh.  I know some neighborhoods
3    have pump stations.
4        A.   I don't know.  It might have one,
5    but I don't think it's close to the homes.  It's
6    a good little distance from that home.
7        Q.   You know that New Orleans -- a lot
8    of New Orleans is below sea level, right?
9        A.   Yes.
10       Q.   And that you have an elaborate
11   hurricane protection system all around the city
12   with lots of different, you know, levees and
13   floodwalls that were built over years and years,
14   correct?
15       MR. LANDRY:
16            I'll object to the form of
17            that.  Go ahead.
18   EXAMINATION BY MS. PAYNE:
19       Q.   Is that your understanding?
20       A.   Wait.  Repeat.
21       Q.   Is it your understanding that there
22   is an elaborate hurricane protection system, with
23   lots of different levees and floodwalls around
24   your area that was built over a course of years?
25       MR. LANDRY:

Page 83

1        Q.   This is just a Google aerial shot
2    of, you know, way up in the air from where your
3    house is of the whole area taken after -- after
4    Hurricane Katrina.  The water's down.  I guess
5    it's from so high up, it's hard to see there, but
6    see the little yellow thumbtack pointing to the
7    area?
8        A.   Uh-huh.  Yes.
9        Q.   Does that look about right for where
10   your house is located in this area?
11       A.   Yes.
12       Q.   And I'm handing you another Google
13   aerial shot.  This time, it's a little bit closer
14   in.  It's marked Coats Exhibit Number 5.
15            (Whereupon, Coats Exhibit
16            Number 5 was marked for
17            identification.)
18   EXAMINATION BY MS. PAYNE:
19       Q.   You see there with the box there in
20   the 1020 Charbonnet Street address, the little
21   square?
22       A.   Uh-huh.
23       Q.   That's the approximate area.  Can
24   you tell which of those houses on the photo
25   shot -- which of those is yours?

Page 85

                              22  (Pages 82 to 85)

1     A.   Can I tell which one is mines?
2     Q.   Yeah.  Can you tell by looking at it
3   which of those houses is yours?
4     A.   No.
5     Q.   Is it -- are you pretty close to the
6   middle of the block?  Do you need a pair --
7     A.   Yeah.
8     Q.   -- of glasses?
9     A.   I'm going to see did I bring them.
10    Q.   You're like me.  I have separate
11  reading glasses from my regular glasses.  I
12  usually switch them out.  I forgot to bring them
13  this trip.
14    A.   I didn't bring mines either.  I left
15  them home.  I didn't think I was going to have
16  to -- my house is on here?
17    Q.   It's supposed to be.  Are you near
18  the middle of the block?
19    A.   Yes.  Can I get to the window?
20    Q.   A little more light maybe.
21    A.   Is that the one with the blue top on
22  it or -- I really can't.
23    Q.   Okay.  Yeah.  If you can't see then,
24  that's -- we can just move on.
25    A.   Okay.  You can close it because I

Page 86

1   really can't see.
2     Q.   The thing I was going to really get
3   at here with this picture is, you know, it's
4   taken after Hurricane Katrina, and you can see
5   all of the -- some of the houses with the blue
6   roofs, but yours didn't -- yours never had a blue
7   roof on it, did it?
8     A.   No.
9     Q.   You didn't have a blue tarp, because
10  you didn't have that serious of wind damage; is
11  that right?
12    A.   Right.
13    Q.   You had to have fairly serious wind
14  damage to get a -- at what point did somebody
15  actually get a blue tarp, do you know?
16    A.   When their roof was destroyed.  When
17  their roof was bad, bad, bad.
18    Q.   So, yours wasn't bad enough for a
19  blue tarp?
20    A.   No.  No.  I didn't have to have one.
21    Q.   Okay.  It didn't look like even on
22  your street there were any houses with a blue
23  tarp; is that right?
24    A.   Right.
25    Q.   But then a couple blocks over may

Page 87

1   have been a lot of blue tarps?
2     A.   Right.
3     Q.   So, it just kind of varied depending
4   on, you know, probably where you were and the
5   condition of the roof on whether you needed a
6   blue tarp or not; is that your understanding?
7     A.   Yeah.  My roof was fine.  My roof
8   was okay.
9     Q.   Yours was fine?
10    A.   Yeah.
11    Q.   Okay.  In your general neighborhood,
12  do you have an idea of about what percentage of
13  people had to have those blue tarps on their
14  roofs?
15    A.   Not very many, because -- no.  I can
16  remember, they didn't have very many homes with
17  blue roofs --
18    Q.   Just some --
19    A.   -- in my neighborhood.  Just some of
20  them.  Not all.  Not plenty, plenty people had
21  that many blue roofs.
22    Q.   Are you saying it was kind of
23  dependent on the neighborhood?
24    A.   Yeah, I guess so, because they
25  didn't have that many with blue roofs on.

Page 88

1     Q.   Okay.  You just remember some, but
2   not --
3     A.   Not a whole lot of houses.
4     Q.   Not a whole lot.  Okay.  All right.
5         Okay.  Getting back to your house
6   specifically and the damage to your house, I
7   understand you purchased the house in May of
8   1994; is that right?
9     A.   Yes.
10    Q.   And was the purchase price $16,000?
11    A.   Yes.
12    Q.   How did you decide to purchase that
13  particular property?
14    A.   Because I was living in the home at
15  the time when it went up for sale, so, I just
16  purchased the home.
17    Q.   Oh, were you a renter beforehand?
18    A.   Uh-huh.
19    Q.   Oh.  When did you start renting that
20  particular house?
21    A.   Maybe about -- before that, it was
22  about -- like, about seven, eight years before
23  that.
24    Q.   Okay.  So, you actually moved into
25  the house then sometime in the late 1980s?

Page 89

23  (Pages 86 to 89)

1      A.   Yes.
2          Q.   And then in 1994, you had the
3    opportunity to purchase it, so, you did?
4      A.   Yes.
5          Q.   When you purchased the house, do you
6    recall having an appraisal done of its value?
7      A.   No.  My insurance company did, but I
8    didn't have appraisal to come out.
9          Q.   The insurance company appraised it?
10     A.   Yes.
11         Q.   Do you know what amount they
12   appraised it to be worth?
13     A.   During that time?
14         Q.   Uh-huh.
15     A.   I think they appraised it to be,
16   like, about 70 -- 70,000.
17         Q.   Seventy thousand?
18     A.   Yes, during that time.
19         Q.   And how did you get to purchase it
20   for 16,000?
21     A.   Well, it's -- it was just -- it was
22   just was a lucky thing.  They just put it up for
23   sale for 16,000 because the lady was moving away
24   and she hurried up and put it for sale for 16,000
25   and we bought it.

                                        Page 90

1    appraised my home was the insurance company when
2    I put the insurance on it.  So, that's what they
3    say the house was worth.
4          Q.   But they said the house was worth
5    seventy, seven-zero?
6      A.   Seventy thousand.
7          Q.   Okay.
8      A.   But the lady sold the house for
9    16,000.  Now, why, we don't know.
10         Q.   Okay.  But you were required to
11   maintain fire and flood insurance as a condition
12   of your mortgage?
13     A.   Yes.  Yes.
14         Q.   And how much did you insure the
15   property for?
16     A.   For the fire insurance, I put
17   $80,000 -- up to 80.
18         Q.   And what about flood insurance, do
19   you remember?
20     A.   I had -- I think I put on there
21   150,000.
22         Q.   How did you decide on the 150,000
23   amount?
24     A.   When they was going around selling
25   insurance, that's all I could get on it right

                                        Page 92

1          Q.   So, it was actually worth 70,000 --
2    7-0, 70, or 17?
3          MR. LANDRY:
4              Object to form.
5          MS. PAYNE:
6              I'm not sure.  I may not
7          have heard the right amount the
8          first time.
9      A.   It was worth pretty good, but she
10   just wanted $70,000 because she was having a
11   problem with -- she said God was going to destroy
12   the world and that's all she wanted for it, and
13   that's what we gave her.
14   EXAMINATION BY MS. PAYNE:
15         Q.   God was going to destroy the world?
16     A.   Yes.
17         Q.   What did she mean by that?
18     A.   She say the world was coming to a
19   end.  That's all we know.  That sounds strange,
20   but that's what happened.
21         Q.   Okay.  Just for the record, so the
22   record is clear, and this is partly my hard of
23   hearing.  I apologize.  The appraisal was 70,000,
24   seven-zero?
25     A.   No.  The people who came out and

                                        Page 91

1    then and there.
2          Q.   Is your name on the title of the
3    house?
4      A.   Yes.
5          Q.   Is anyone else's name on the title?
6      A.   My deceased husband.
7          Q.   When you were a tenant, before you
8    actually purchased the house, did you just live
9    on one side, on 1020?
10     A.   Yes.
11         Q.   Did anyone else live on the other
12   side?
13     A.   No.
14         Q.   Did you make any substantial
15   improvements to the house from the time that you
16   purchased it until Katrina?
17     A.   Yes.  Yes.
18         Q.   What all did you do?
19     A.   I wanted to renovate it.  I wanted
20   to renovate the inside.  So, I did.  I wanted my
21   living room to be large.  I made a big living
22   room, a 12-by-24.  I made a big kitchen, a
23   12-by-24.  I did work in the bathrooms.  I did
24   work in the bedrooms.  I did work on the outside.
25         Q.   Sounds like you made a lot of

                                        Page 93

1    improvements.
2        A.   Yes.
3        Q.   **Did you have a new roof put on at**
4    **some point?**
5        A.   Yes.
6        Q.   **What year was that?**
7        A.   That was about -- I'd say about
8    seven or eight years before Katrina.
9        Q.   **So, probably in late '90s?**
10       A.   Uh-huh.
11       Q.   **What caused you to replace the roof**
12   **in the late 1990s?**
13       A.   Well, the roof had been on there so
14   long and they had a hailstorm, and the roof that
15   I had on there, they said that it was required
16   that we couldn't have those roofs anymore.  So, I
17   just went on and put a new roof on.  They had a
18   hailstorm and they had slate, and the hailstorm
19   broke some of those slates on it, and they said
20   it wasn't required for those kind of roofs.  So,
21   I put a new roof on my home.
22       Q.   **Did insurance help pay for that?**
23       A.   Yes.
24       Q.   **Did it pay for all of the new roof?**
25       A.   Uh-huh.

Page 94

1    75,000, one had bought one for 80-something
2    thousand, and my girlfriend just had purchased
3    one, she say, for 120,000.
4        Q.   **So, yours was somewhere in the kind**
5    **of middle?**
6        A.   Right, because I did a whole lot of
7    renovation to that home.
8        Q.   **Before Hurricane Katrina, did you**
9    **have any preexisting, unrepaired damage that you**
10   **had been meaning to take care of?**
11       A.   Not anything major, but I wanted to
12   take care of some different things, yes.
13       Q.   **What kinds of things did you want to**
14   **take care of?**
15       A.   Like, remodeling the other bathrooms
16   and putting a ceramic tile in my bath and the
17   kitchen.
18       Q.   **Do you know what year the house was**
19   **built?**
20       A.   No.
21       Q.   **I understand it was probably the**
22   **early 1900s.  Does that sound about right, or do**
23   **you know?**
24       A.   No, I don't know when it was really
25   built.

Page 96

1        Q.   **What do you think the fair market**
2    **value of your house was before Hurricane Katrina?**
3        MR. LANDRY:
4            Object to form.
5            You can answer.  I'm just
6        recording an objection for the --
7        A.   Well, I had -- I had put money into
8    that home.  I'd say about a hundred and something
9    thousand, I'd say, it was worth.
10   EXAMINATION BY MS. PAYNE:
11       Q.   **How much over 100,000?**
12       A.   About -- I'd say it was worth about
13   100,000.
14       Q.   **About 100,000?**
15       A.   (Nods head affirmatively.)
16       Q.   **Did you actually have the home**
17   **appraised?**
18       A.   No.
19       Q.   **Did you know about other homes in**
20   **your neighborhood selling for certain prices**
21   **about that time?**
22       A.   Uh-huh.
23       Q.   **About how much were those homes**
24   **tending to go for?**
25       A.   Okay.  One lady had bought hers for

Page 95

1        Q.   **How much was your house elevated?**
2        A.   It's up on four cinder blocks.
3        Q.   **Do you know about how many feet that**
4    **is?**
5        A.   I'd say about three feets.
6        Q.   **About three feet up?**
7        A.   Uh-huh.  Up.
8        Q.   **Is that pretty standard for your**
9    **neighborhood --**
10       A.   Yes.
11       Q.   **-- or do the houses vary some?**
12       A.   Pretty much all the houses up on
13   blocks like that.
14       Q.   **Are there any of the houses in your**
15   **neighborhood that are built on slabs?**
16       A.   No.
17       Q.   **Slab foundation?**
18       A.   No.
19       Q.   **Do you have any idea what your**
20   **property is currently worth today?**
21       A.   Since Katrina?
22       Q.   **Yes.**
23       A.   I don't know what they go for now.
24   No.  I really don't know.
25       Q.   **Have you had any type of appraisal**

Page 97

25  (Pages 94 to 97)

1    since Hurricane Katrina?
2        A.   No.
3        Q.   Have you heard about any of the
4    damaged homes in your area being sold and what
5    they have been sold for?
6        A.   Thirty to $40,000.
7        Q.   Because the land's worth something,
8    right?
9        A.   Oh, yeah.
10       Q.   So, you're not sure exactly the
11   amount, but it's going to be a little bit less
12   than 100 based on, you know, what the current --
13       A.   Because the houses is gutted out
14   now.  You not going to get the whole value, what
15   you put into it, because they gutted right now.
16   So, I can't say what they would really cost --
17   how much you could sell them for now.  I really
18   don't know.
19       Q.   I will go through a few pictures
20   with you.  I guess these were taken during those
21   home inspections in mid-June.
22       A.   Okay.
23       Q.   These first two I'm putting
24   together, marking it Coats Exhibit Number 6, the
25   Bates numbers, just for the record, are

Page 98

---

1    WGI-CC-000018 and WGI-CC-000035.  Are these both
2    pictures of your house on Charbonnet Street?
3            (Whereupon, Coats Exhibit
4            Number 6 was marked for
5            identification.)
6        A.   Yes.
7    EXAMINATION BY MS. PAYNE:
8        Q.   Okay.  One's taken, you know, kind
9    of from a distance at one angle and the other one
10   is more up close.  Okay.
11           And then I'll show you a couple
12   more.  I'm handing you what's been marked Coats
13   Exhibit Number 7.  Can you reach that?
14           (Whereupon, Coats Exhibit
15           Number 7 was marked for
16           identification.)
17   EXAMINATION BY MS. PAYNE:
18       Q.   Just for the record, this is marked
19   with a Document Number WGI-CC-000037 and
20   WGI-CC-000038.  Now, these are pictures taken of
21   the inside of the house.
22       A.   Yes.
23       Q.   And is the first page, 37, is that
24   the side where you were living originally?  Is
25   that right?

Page 99

---

1        A.   Yes.
2        Q.   Okay.  And is the other side the
3    part where your daughter was living and that you
4    were slowly repairing?
5        A.   Renovating.
6        Q.   I mean renovating.
7        A.   Yes.  It was all -- it was finished.
8    Yes.
9        Q.   Do you need to take a break?  Are
10   you okay?
11       A.   I'm all right.
12       Q.   Do you have plans to finish
13   repairing the house?
14       A.   Yes.
15       Q.   What do you have planned to -- I
16   mean, is there a schedule that you hope to move
17   back into it?
18       A.   Uh-huh.
19       Q.   When do you hope to be able to move
20   back into it?
21       A.   When I can get a contractor or
22   something, go ahead and see what they can do for
23   me.
24       Q.   I'm handing you what's been marked
25   as Coats Exhibit Number 8.

Page 100

---

1            (Whereupon, Coats Exhibit
2            Number 8 was marked for
3            identification.)
4        A.   Okay.
5    EXAMINATION BY MS. PAYNE:
6        Q.   Is this just a picture of the back
7    of your house?
8        A.   Yes.
9        Q.   And is this the structure there in
10   the very back, is that something that you added
11   on?
12       A.   Yes.
13       Q.   Did you add that on after you moved
14   into the house?
15       A.   Yes.
16       Q.   What year did you add that on, do
17   you remember?
18       A.   About -- about four years, five
19   years ago.
20       Q.   And is that just another bedroom?
21       A.   Yes.
22       Q.   Do you see the house sort of in the
23   background there?
24       A.   Yes.
25       Q.   And that's your neighbor's house,

Page 101

26  (Pages 98 to 101)

1  the 1016-18?
2     A.  Yes.
3     Q.  Is that stuff hanging off the
4  roof -- that wasn't a blue tarp, was it?  Do you
5  know?
6     A.  Yes.
7     Q.  That was a blue tarp?
8     A.  Yes.
9     Q.  Do you know what happened to it?
10     A.  I guess by wearing and tear, it
11  was -- came off or something.  I don't really
12  know.  Must have came off by wearing and tearing,
13  you know, by wind and rain.
14     Q.  But you're not familiar with exactly
15  how much wind damage that house got.  Is that --
16     A.  No.
17     Q.  Okay.  So, have you paid anyone to
18  do any work on your house besides the people who
19  gutted it out?
20     A.  No.
21     Q.  That's the only thing you've had
22  done so far?
23     A.  That's all.
24     Q.  Have you gotten estimates from
25  anyone else on other work?

Page 102

1     A.  Yes.
2     Q.  What kind of estimates have you
3  received so far?
4     A.  Well, two or three contractors told
5  me it would take, like, about 125,000, 130,000 to
6  put that house back together.
7     Q.  That sounds expensive.
8     A.  Uh-huh.
9     Q.  It sounds like more than what it was
10  worth before Hurricane Katrina happened.
11     A.  Sound like more than it was worth?
12     Q.  Right.  Didn't you tell me that you
13  thought it was worth about $100,000 before
14  Hurricane Katrina?
15     A.  Yes, before.
16     Q.  So, it would cost more than that,
17  you think, to repair it?
18     A.  Right.  Yes.
19     Q.  Once you put 125 to $130,000 into
20  it, into repairing the house, do you have an idea
21  of how much it would be worth at that time?
22     MR. LANDRY:
23       Object to form.
24       Go ahead.
25     A.  What, after I put the money into the

Page 103

1  home?
2  EXAMINATION BY MS. PAYNE:
3     Q.  Yes, to repair it.
4     A.  How much it would be worth then?
5     Q.  Uh-huh.
6     A.  I really don't know.  I don't know.
7     Q.  Did you have any termite damage to
8  the house that they discovered when they gutted
9  it?
10     A.  When they gutted it?
11     Q.  Yes.
12     A.  I think they had a few, right over
13  the door by the kitchen.
14     Q.  Some termite damage?
15     A.  Yes, a little bit.  Not much.
16     Q.  Did you ever have any of your soil
17  tested to find out if there was any type of soil
18  contamination at your house?
19     A.  No.
20     Q.  But do you have any reason to
21  suspect that there would be any soil
22  contamination at your house?
23     A.  No.
24     Q.  Did the contractors that you got the
25  estimate from about how much it would cost to

Page 104

1  repair the house, did they give you an estimate
2  on how long it would take to get that done?
3     A.  Maybe -- they say about maybe a
4  year -- maybe six months to close to eight months
5  to repair that house.
6     Q.  Do you have your house under a
7  termite contract?
8     A.  Yes.
9     Q.  Who's that with?
10     A.  I had it done that time -- I had it
11  with -- what the name of that company?  What the
12  name of that company?  The name of -- I can't
13  think about it right now, but I did -- I do have
14  it.  I do have it.  I had it.
15     Q.  How long have you had it under a
16  termite --
17     A.  Since I moved in that house.  The
18  owners had it and I just picked it up from there.
19     Q.  So, just so I have the numbers
20  straight, you said earlier that you thought the
21  fair market value of your house before Hurricane
22  Katrina was somewhere around $100,000.
23     A.  Yes.
24     Q.  And that after Hurricane Katrina, it
25  would still have been worth something, but you're

Page 105

27  (Pages 102 to 105)

1  not sure what the exact amount was.
2      A.  Right.
3      Q.  But other houses in the neighborhood
4  may have been selling for around 30 or $40,000.
5      A.  Now, that's me saying that.  I don't
6  really know.  I really don't know.
7      Q.  Don't know for sure?
8      A.  No.
9      Q.  And that an estimate that you've
10 been given for how much it would cost to repair
11 your house is 125 to $130,000?
12     A.  Yes.
13     Q.  So, what amount of money in the
14 lawsuit are you actually seeking for your house?
15 Are you seeking the total amount it would take to
16 repair it, or the value of the house before
17 Katrina?  What -- how much money are you seeking
18 for your house?
19     MR. LANDRY:
20         Object to form.
21     A.  I really don't know right now.  I
22 can't say now.  What I'm -- what I'm -- what I
23 want now?
24 EXAMINATION BY MS. PAYNE:
25     Q.  Yeah.  How much money would you like

Page 106

1  different things, but I really don't have the
2  money to do that house really the way it would be
3  wanted -- back the way they want to put it back
4  together.  That's the cheap way, they say, to put
5  my house back together.
6      Q.  Okay.  But just to be clear, your
7  house wasn't worth that much before Hurricane
8  Katrina, right?
9      MR. LANDRY:
10         Object to form.
11     A.  I think it was.  I really do,
12 because I had put money into that house.
13 EXAMINATION BY MS. PAYNE:
14     Q.  So, are you changing your testimony
15 from earlier about how much you thought the house
16 was probably worth?
17     A.  Yes, because I put a whole lot of
18 money into that house before Hurricane Katrina,
19 and everything was very expensive during that
20 time.
21     Q.  About how much money do you think
22 you've put into the house after you bought it
23 until Hurricane Katrina?
24     A.  I know I had put, like, about
25 $20,000 into that house because I wanted

Page 108

1  to get out of this lawsuit for your house?
2      A.  I would like to put it back --
3      MR. LANDRY:
4          Same objection.
5          Go ahead.
6      A.  Maybe just for the house, not for
7  my --
8  EXAMINATION BY MS. PAYNE:
9      Q.  Just talking about the house right
10 now, not the possessions or anything like that.
11 Just the house.
12     A.  To put it back together -- I'd say
13 about three something.  Three.  Three.  Three.
14 Because I would like to rebuild it.
15     Q.  Wait.  Three hundred thousand?
16     A.  Maybe two.  I'd say 200,000.
17     Q.  Okay.  I thought you just told me
18 that it only was going to cost 125 to $130,000.
19     A.  That's to put it together, that's
20 throwing it together, like the man say.  It's
21 not -- it's going to cost more than that to put
22 that house together back the way it really needs,
23 because what they would like to do, put
24 hurricane -- what they call it -- two-by-fours,
25 the ones like that, and they would like to do

Page 107

1  different things did to that house, and I had put
2  pretty good money into that house.
3      Q.  About $20,000, you think, you put
4  into the house?
5      A.  Yes.  Yes.
6      Q.  And how much do you think you could
7  have sold the house for prior to Hurricane
8  Katrina?
9      A.  I never thought about it, how much I
10 could sell it for, because I didn't want to sell
11 my home.  I always wanted to keep my home.
12     Q.  Do you think you might have been
13 able to get $200,000 for that house?
14     MR. LANDRY:
15         Object to form.
16     A.  Yeah, with the renovation work I was
17 doing to it, yes.
18 EXAMINATION BY MS. PAYNE:
19     Q.  The work that you had already
20 performed on it?
21     A.  Yes, I think I could have put --
22 could have got that.  When I finished doing it,
23 yes, I would have got that much for it, because I
24 was putting quality work into that home.
25     Q.  Sorry to keep going back over some

Page 109

28  (Pages 106 to 109)

1    of the same things.  You know, the defendants in
2    the lawsuit need to get an idea of, you know, how
3    much damages people in the lawsuit are claiming.
4    So, I'm just trying to get a number.  So -- one
5    quick break.
6         THE VIDEOGRAPHER:
7              Off the record?
8         MS. PAYNE:
9              One quick break off the
10        record.
11        THE VIDEOGRAPHER:
12             We're off the record.  It's
13        11:34.
14             (Whereupon, a discussion was
15        held off the record.)
16        THE VIDEOGRAPHER:
17             Returning to the record.
18        It's 11:35.
19    EXAMINATION BY MS. PAYNE:
20        Q.   Okay.  Like I was saying before we
21    took that quick break, just I'm representing the
22    defendants that you've sued in the lawsuit and,
23    you know, they just need to know, you know, how
24    much your losses are and what you're claiming.
25    So, that's why I'm asking you all these

                                              Page 110

1    a cheap price to put my house back together.  I
2    don't want a cheap price.
3         Q.   Okay.
4         A.   I want to put my house back together
5    like I did before Katrina.  Okay?
6         Q.   That makes sense.  Let's just back
7    up a little bit and just walk through it with
8    what we do know for sure and then we can kind of
9    go from there.
10        A.   Okay.
11        Q.   Bought the house in 1994 for $16,000
12    at a bargain, right?
13        A.   Yes, but I put more money out on
14    that house since then.  I put very -- a great
15    deal of money out on that home.
16        MR. LANDRY:
17             Just go ahead and answer the
18        question directly, but let's just
19        do this one more time, okay,
20        because it really is getting asked
21        and answered over and over and
22        over again.  If you think the
23        answers are inconsistent, that can
24        come out later on as well, but I
25        don't think we have to stay here

                                              Page 112

1    questions.  I'm not trying to trick you.
2         A.   Let me say it like this here.  I
3    don't know, because I don't know what Katrina
4    prices is out there going for now.  I don't know
5    how much it would take to put my home back
6    together now, but I do know the money I put out
7    before, what it would cost to put that house,
8    that's -- some of the contractors said this, some
9    of the contractors said it would take a little
10   bit more.  Some of them said it would take 20 to
11   30,000.  Some might say 140,000 because the --
12   out here, selling and buying now is real, real
13   high.  So, no, I can't answer that.
14        Q.   Okay.  And I know it's kind of
15   difficult because I'm asking you for estimates,
16   and a lot of these, you don't know for sure.
17        A.   Right, I don't know, because
18   everything is so high now.  Before Katrina, I was
19   putting out money and everything was very
20   expensive.  So, now, it's even higher since
21   Katrina.  So, I -- I don't work at Home Depot or
22   Lowe's to tell you the prices.  Okay?  I can't do
23   that.
24        Q.   Okay.  I think we can --
25        A.   And the contractor say that would be

                                              Page 111

1    long enough to get them all lined
2    up.
3         Now, just answer a question
4    as it's presented to you.
5    THE WITNESS:
6         Okay.
7    MR. LANDRY:
8         Okay.  Thank you.
9    EXAMINATION BY MS. PAYNE:
10        Q.   So, after you bought the house in
11   1994, you put about $20,000 into the house, you
12   think, on the upgrading it?
13        A.   You know what, I shouldn't answer
14   that, because it was a little bit more than that.
15   Because I was putting various -- I was putting my
16   house back together.  I wanted my house to be
17   much more than what I bought it for.
18        Q.   How much money do you estimate that
19   you spent between 1994, when you bought the
20   house, and Hurricane Katrina?
21        A.   Okay.  I really can't say because
22   that was all the different years and I was buying
23   stuff, buying stuff all along, putting into the
24   home.
25        Q.   What kinds of things did you do to

                                              Page 113

                                    29  (Pages 110 to 113)

1   improve the house between 1994 --
2        A.   Okay.  Like, I wanted my bathroom to
3   be the modern tubs with the -- you heard about
4   the tiger feets, I wanted all that.  I bought all
5   that to put in my home.  I was buying very, very
6   expensive things to put in my home.
7        Q.   And where did you get the money to
8   make these improvements to your home?
9        A.   Well, I had got -- my husband passed
10  away.  I got money from that.  I had got money
11  from saving money to put money into my home.  And
12  another thing, when I get my check once a month,
13  I would take so much and put out on the side for
14  my home.
15       Q.   Which check are you referring to
16  that you get once a month?
17       A.   My husband's, from the VA pension
18  check.
19       Q.   How much was the VA pension check?
20       A.   Do I have to answer that?
21  MR. LANDRY:
22            Well, let me object to the
23       form of the question, but this is
24       part of what's continuing to be
25       argued about now.  So, I think the

Page 114

1   judge's ruling is almost anything
2   is allowed.  So, reserving every
3   objection under the sun, you -- I
4   think the court wants you to
5   answer that question.
6   THE WITNESS:
7            Okay.
8        A.   Six hundred dollars a month.
9   EXAMINATION BY MS. PAYNE:
10       Q.   I'm sorry.  All I'm really trying to
11  do is get an estimate of how much you think that
12  you -- you know, money that you put into the
13  house before Hurricane Katrina, and I'm trying to
14  figure out the best way to go about it, and you
15  know, maybe going through every improvement that
16  you made is going to take a long time.  Maybe I
17  don't want to do that.  I -- but, I guess, that's
18  what we need to do.
19            So, can you tell me what the next
20  improvement is that you made to the house?
21       A.   Before Katrina?
22       Q.   Before Katrina, besides the work
23  that you just described on your bathroom.
24       A.   I put on a new deck to the front --
25  the porch.

Page 115

1        Q.   A new porch to the front.  Do you
2   remember how much that cost?
3        A.   With the -- with everything -- the
4   worker to do it -- I'd saw was about six or
5   $7,000.  I couldn't do it myself.  I had to pay
6   someone to come out and do it.
7        Q.   And just backing up for a second to
8   the work you had done on the bathrooms, how much
9   did that cost?
10       A.   Each bathroom cost me about $3,000
11  to do.
12       Q.   And how many bathrooms were there?
13       A.   Two.
14       Q.   So, about $6,000 for that?
15       A.   Yes.
16       Q.   What was the next work that you had
17  done on the house?
18       A.   I built a room onto the home.  I put
19  in new cabinets.
20       Q.   Were those new cabinets in the
21  kitchen?
22       A.   Yes.
23       Q.   When did you build the new room on
24  in the back?
25       A.   Five years before Katrina, I think

Page 116

1   it was.
2        Q.   About 2000?
3        A.   Yeah, I think so.  Around that time.
4        Q.   And how much did that cost?
5        A.   Oh, that cost about, I'd say, with
6   labor and everything, that must have cost me
7   about eight something.
8        Q.   About $8,000?
9        A.   Yeah, with the men.  Yes.
10       Q.   And then the new cabinets in the
11  kitchen, how much did that cost?
12       A.   I got those from Singer.  That cost
13  me for the cabinets and everything.  That was
14  about, I'd say, 10,000 for everything in the
15  kitchen and different things.
16       Q.   Any other improvements that you made
17  to the house?
18       A.   I put hardwood floors in my home.
19       Q.   Hardwood floors?
20       A.   Yes.
21       Q.   Were those throughout the entire
22  house?
23       A.   The kitchen and bathroom was ceramic
24  tiles.
25       Q.   So, kitchen and bath had ceramic

Page 117

30  (Pages 114 to 117)

1  tiles?
2      A.   Yes.  I had French doors all the way
3  through my home.
4      Q.   **Did you add on the French doors?**
5      A.   Yes.
6      Q.   **How much did it cost to do the**
7  **hardwood floors and the ceramic tiles?**
8      A.   About -- for the living room, the
9  bedroom -- I'm not too sure, but I think it was,
10  like, about 15 for the living room, bedroom.
11  Fifteen.
12      Q.   **Fifteen thousand dollars?**
13      A.   Yes, for that.
14      Q.   **And then how much did it cost to**
15  **install -- or to put in the French doors?**
16      A.   For one of my French doors, I paid
17  $300 apiece -- for one -- for the double doors, I
18  had to pay double for them because I wanted them
19  side by side.  They were six hundred and
20  something dollars apiece I paid for the double
21  doors to go from the living room to the kitchen.
22  So, I had one go from the living room to the
23  kitchen, one to the dining room to the kitchen.
24      Q.   **So --**
25      A.   So, I must have had about -- the

Page 118

1  four, five, six, seven.  I did about seven.  I
2  had got about seven of them.
3      Q.   **So, something around $700 for the**
4  **windows then?**
5      A.   I think.
6      Q.   **Anything else?**
7      A.   Well, I did -- I had -- when I
8  renovated, I did my drywalls, I put new walls and
9  new insulation in the home.  I tore the walls up
10  and put more walls in there.  Now, how much all
11  that cost, I can't say right now, but I did
12  put -- in the area, what I made it bigger -- see,
13  this is 12 by 24, this one.  Used to be two
14  rooms, but I turned them into one room, and I had
15  to put insulation and drywalls out through the
16  two front rooms, and they was 12-by-24s apiece.
17      Q.   **And do you have any idea how much**
18  **that cost?**
19      A.   No, I don't remember, because I
20  had -- I had somebody come in and do this for me,
21  but I done forgot how much that was, but I did do
22  that.
23      Q.   **Anything else?**
24          Okay.  I'm about ready to move on to
25  a different topic, but just to go back to

Page 120

1  double ones, I had about three of those.  The
2  single ones, I had about -- one go to my bedroom
3  door, one to my -- what it was -- my other
4  bedroom doors.  I had one -- the single.
5      Q.   **So, you had about three of the doors**
6  **that were six hundred --**
7      A.   Three of the double ones.
8      Q.   **-- and three of the singles, which**
9  **were 300?**
10      A.   Yes.
11      Q.   **So, about $2,700 for the French**
12  **doors?**
13      A.   Uh-huh.
14      Q.   **Any other improvements to the house?**
15      A.   I put in windows.
16      Q.   **Windows?**
17      A.   New windows.
18      Q.   **How much did it cost to put in the**
19  **windows?**
20      A.   Well, I bought them.  They was $90
21  apiece.
22      Q.   **Ninety dollars apiece.  And how many**
23  **windows?**
24      A.   Let me see.  They have two windows
25  to the front.  One, two -- two -- one, two, thee,

Page 119

1  something that you said a moment ago, about the
2  estimates that you've gotten about repairing your
3  house.
4      A.   Uh-huh.
5      Q.   **And it sounds like you've had a**
6  **range of estimates.  About how many people have**
7  **you gotten estimates from about the cost of**
8  **repairing your house?**
9      A.   About -- I'd say about four.
10      Q.   **And what was the lowest of those**
11  **estimates?**
12      A.   Forty -- 35 to 45,000.
13      Q.   **Thirty-five to 45,000?**
14      A.   Uh-huh.
15      Q.   **And what was the highest of those**
16  **estimates?**
17      A.   Well, one of the contractors say it
18  would take about 170,000.  One said the way I
19  wanted the home to did, it was going to cost --
20  the way I want it to be done, it was going to
21  take about two hundred and something thousand to
22  redo the whole thing like I wanted to be done.
23      Q.   **But some of the things that you**
24  **wanted to be done were improvements to the house**
25  **beyond how it was before Hurricane Katrina; am I**

Page 121

31 (Pages 118 to 121)

1    right?
2        MR. LANDRY:
3            Object to form.
4        A.   Wait a minute.  Say that again.
5    Repeat.
6    EXAMINATION BY MS. PAYNE:
7        Q.   For the $200,000 estimate to the way
8    you wanted it to be done, am I correct in -- that
9    some of those things that you wanted to be done
10   were improvements to how the house was before
11   Hurricane Katrina?
12       MR. LANDRY:
13           Same objection.
14           Go ahead.
15       A.   No.  I wanted to put back together
16   just -- maybe put back together like it was, but
17   that's their price that they want to charge me.
18   EXAMINATION BY MS. PAYNE:
19       Q.   Okay.  So, your goal was to get it
20   just back to how it was before Hurricane Katrina?
21       A.   Like it was or even better, but,
22   like they say, it's going to cost me a whole lot
23   of money to put back into that house.
24       Q.   Okay.  So, I'm about ready to move
25   on to the personal property losses that you have.
                                              Page 122

1    Is there anything else that -- about the loss to
2    your house that you haven't already told me that
3    you need to tell me about?
4        A.   The losses to my home?
5        Q.   Uh-huh.  Before we move on to
6    personal property.
7        A.   No, I don't think so.
8        Q.   Pretty much covered everything?
9        A.   Yeah.
10       Q.   Okay.  So, the loss of your personal
11   property, I think you said earlier, that when you
12   evacuated, you only were able to take a few
13   changes of clothes, and everything else, you
14   lost.
15       A.   Yeah.
16       Q.   I think that we already went over
17   this, and you estimated your losses for your
18   insurance company and gave them the itemized
19   lists, right?
20       A.   Uh-huh.
21       Q.   Is there anything other than what
22   you told me earlier about the personal property
23   that we need to talk about now?
24       A.   No, I don't think so.
25       Q.   Just to -- the amount that you gave
                                              Page 123

1    your insurance company was $56,000 for your
2    personal property?
3        A.   Uh-huh.
4        Q.   Okay.  Let's talk next about your
5    personal injury, the heart disease condition that
6    was worsened and the stress.
7        A.   Okay.
8        Q.   When did you first see a doctor for
9    your heart problem after Hurricane Katrina?
10       A.   When I went to my home and saw how
11   my home was damaged.
12       Q.   About how long after that did you
13   see the doctor?
14       A.   Maybe about a week.
15       Q.   And what's the name of that doctor?
16       A.   It was Lallie Kemp, in Hammond.
17       Q.   And how do you spell that name?
18       A.   I don't really know how -- I
19   can't -- I don't know.  Lallie Kemp.
20       Q.   Lallie Kemp?
21       A.   Uh-huh.
22       Q.   And, so, was that the time that you
23   started taking the extra heart pill?
24       A.   Uh-huh.
25       Q.   And you've been taking it ever
                                              Page 124

1    since?
2        A.   Yes.
3        Q.   How often do you go back for
4    checkups?
5        A.   Every three months.
6        Q.   Have you been getting any worse over
7    time when you go back for your checkups?
8        A.   Yes, I been getting -- my heart's
9    been bothering me a little bit, pressure's been
10   bothering me.
11       Q.   Has your doctor adjusted your heart
12   medication since that initial visit after you saw
13   your house?
14       A.   Uh-huh.  Yeah.
15       Q.   What kinds of things has he done
16   with your medication?
17       A.   I was on 25 milligrams; now, I'm on
18   50 milligrams for my pressure.  And I'm on -- my
19   pills for my heart was 25; now they 50
20   milligrams.
21       Q.   So, your doctor increased the dosage
22   for both your heart pill and your blood pressure
23   pill?
24       A.   Yes.  Yes.
25       Q.   When did he increase the dosage for
                                              Page 125

                          32  (Pages 122 to 125)

```
 1    your heart pill?
 2         A.   Maybe about a month after I went --
 3    maybe about a month after I went to the home.
 4    Maybe about a month after that.
 5         Q.   So, the first time you saw the
 6    doctor, he gave you --
 7         A.   He didn't do it right after that.
 8    Just when I got -- my nerves was real, real bad.
 9    That's when he had to do the pressure medicine
10    and the heart medicine, because I was having
11    problems.
12         Q.   Now, but you weren't taking any
13    heart medicine before the hurricane, right?
14         A.   No.  Uh-uh.
15         Q.   So, when did you start taking the
16    heart medicine after the hurricane?
17         A.   Maybe about -- I'd say about four --
18    maybe -- because I didn't go to the home for --
19    maybe about four months or five months
20    afterwards.
21         Q.   Okay.  So, you saw your home?
22         A.   Yeah.
23         Q.   Then, your doctor put you on the
24    heart medication for the first time?
25         A.   Yes.  Yes.
                                        Page 126
```

```
 1    through now?
 2         A.   Well, for my heart, for my pressure,
 3    going back for that.  I'm having problems with my
 4    heart again.
 5         Q.   Do you have medical insurance that
 6    covers the tests?
 7         A.   No.
 8         Q.   Do you have to pay for those out of
 9    your own pocket?
10         A.   Uh-huh.  Uh-huh.  I'm going to pay
11    for that.
12         Q.   Do you have records of your medical
13    expenses that you've had since Hurricane Katrina?
14         A.   No.
15         Q.   How do you pay for your doctors'
16    visits?
17         A.   Well, I been paying for it out of my
18    pocket.  Haven't been extremely high, but they
19    are fixing to see -- get some kind of help or
20    something for it now.
21         Q.   You have help from --
22         A.   No, for to go see about that now.
23         Q.   Okay.  So far, you haven't had any
24    type of assistance, but you are going to see if
25    you can get some?
                                        Page 128
```

```
 1         Q.   And then how long after that did he
 2    increase the heart medicine dosage?
 3         A.   Maybe about two weeks after that.
 4         Q.   And then after the dosage was
 5    increased, then, your medicine stayed the same
 6    since then?
 7         A.   It been the same since then.
 8         Q.   And then what about your blood
 9    pressure medicine?
10         A.   It's the same.
11         Q.   Did he increase the dosage for your
12    blood pressure medicine at the same time as your
13    heart medicine?
14         A.   Yes.
15         Q.   And since you've had your medicine
16    increased, have you been doing okay with your --
17         A.   No.
18         Q.   What kind of problems have you been
19    having with your --
20         A.   Well, they going to put me through a
21    whole lot of tests now.  I'm going through tests
22    right now.
23         Q.   Going through tests right now?
24         A.   Uh-huh.
25         Q.   What kind of tests are you going
                                        Page 127
```

```
 1         A.   Right.
 2         Q.   Do you have Medicaid or Medicare
 3    insurance?
 4         A.   No.
 5         Q.   Who is -- which doctor is actually
 6    treating you?
 7         A.   At Tulane.
 8         Q.   At Tulane?
 9         A.   Uh-huh.
10         Q.   Do you know the doctor's name?
11         A.   No, because I just got him.  He
12    going to put me through a whole lot of different
13    tests.  It's a new doctor.  This is the first
14    time I'm going to be going to this doctor since
15    the storm.
16         Q.   Is that where you had your surgery,
17    at Tulane?
18         A.   Uh-huh.
19         Q.   Is this the same or a different
20    doctor from your surgery?
21         A.   Different.
22         Q.   Different doctor.
23         A.   Uh-huh.
24         Q.   Has anyone else paid for any of your
25    medical expenses besides you?
                                        Page 129
```

                                    33  (Pages 126 to 129)

1     A.   No.
2         Q.   Do you know the approximate amount
3     that you've spent on medical since Hurricane
4     Katrina?
5     A.   No.
6         Q.   Do you have an estimate?  I mean, is
7     it 1,000, $10,000?
8     A.   For two of my prescriptions, it cost
9     me 100 -- $125 apiece.  So, since Katrina, I been
10    buying them for four months after Katrina.  I
11    don't know.  It should be about three
12    something -- 3,000 and something for -- for the
13    medicine I been buying because I buy about five
14    or six of them each time I go.
15        Q.   So, that's a lot of money.
16    How do I pay for it?
17        Q.   Yeah.
18    A.   Help from different family members.
19        Q.   So, other people are helping you pay
20    for your medications?
21    A.   Yes.
22        Q.   Who else is helping you pay for it?
23    A.   My sisters, my brothers, Nathan
24    Morgan.
25        Q.   Besides the medicine for the

Page 130

1     prescriptions -- I mean, the money that you paid
2     for the prescriptions, have you paid other money
3     just for the doctors' visits and testing?
4     A.   Yes, I have, but I have a clinic
5     doctor -- plenty of them sitting there, waiting
6     till I get my business straight so I can start
7     paying them.  You know, you don't have to pay it
8     all at once.  You can pay so much, you know.
9         Q.   Okay.  So, we've talked about your
10    heart pills and your blood pressure pills.
11    A.   Uh-huh.
12        Q.   Tell me about the nerve pills.  When
13    did you start taking those?
14    A.   About four months after I went to
15    the home.
16        Q.   Okay.  And have you been taking the
17    same pills for your nerves?
18    A.   It's the same pills.
19        Q.   And has your dosage changed on
20    those?
21    A.   (Shakes head negatively.)  No.
22        Q.   How are you doing on the nerve
23    pills?  Are they helping you?
24    A.   Sometime they do.  Just long as I
25    stay away from the home, I be okay.

Page 131

1         Q.   The estimate that you gave me
2     earlier for the amount of money that you're
3     spending on medicine, does that include the nerve
4     pills?
5     A.   Yes, it includes the nerve pills.
6         Q.   Okay.  Are you seeing a different
7     doctor that prescribed the nerve pills for you?
8     A.   Well, right now, I'm going to start
9     seeing a different doctor because I won't be
10    going to Lallie Kemp anymore.  I'm going to be
11    seeing a doctor at University.
12        Q.   Okay.  So, those were prescribed by
13    a doctor at Lallie Kemp, and then --
14    A.   Yeah.  Yeah.
15        Q.   Okay.  Is there -- before we move on
16    to your mental distress, is there anything else
17    for -- physically that we haven't already talked
18    about?
19    A.   No.
20        Q.   For the severe mental distress, you
21    told me earlier about how you were having
22    problems with vomiting for a while.
23    A.   Uh-huh.
24        Q.   Is there any other way the mental
25    distress manifests itself?  I mean, any other

Page 132

1     symptoms, physical symptoms?
2     A.   Crying, wanted to be by myself.
3     That's about it.
4         Q.   Did you see a counselor at all for
5     your mental distress?
6     A.   (Shakes head negatively.)
7         Q.   Just got the medication?
8     A.   Uh-huh.
9         Q.   Did you lose any family members or
10    friends in Hurricane Katrina?
11    A.   No.
12        Q.   Didn't you know anyone who --
13    A.   Other people did, but I didn't.
14        Q.   Did you know anyone who was
15    seriously injured?
16    A.   No.
17        Q.   So, most of your mental distress is
18    about losing your home and all your possessions?
19    A.   Yes.  Yep.
20        Q.   But I can tell it's been really hard
21    on you.
22    A.   (Nods head affirmatively.)
23        Q.   It sounds like the mental distress
24    part of the lawsuit --
25    A.   It came from -- see, my husband and

Page 133

34  (Pages 130 to 133)

Page 134

1  I -- I had different things in my house from my
2  husband because me and my husband was real, real
3  close.  I lost his flag, his uniform, because he
4  was in the service.  It was just a whole lot of
5  different things I had in that home I can't get
6  back.  I tried to look for them, but the water
7  took them away.
8      Q.  It sounds like you may have put a
9  lot more into your home and making it just like
10  you wanted than maybe a lot of people.
11      A.  My husband and I.
12      Q.  You and your husband.  So, you were
13  especially attached to everything you had there.
14      A.  (Nods head affirmatively.)  Yeah.
15  If I could only just get his uniform, his flag,
16  his pictures, his awards he had, my mother's
17  pictures, my father's pictures.  All those people
18  is deceased.  I can't get them back.  So, that's
19  where the mental problem come in at.  When I go
20  to the home, very hard for me.  So, that's why
21  I'm staying at 56 -- 756 Louisiana Avenue.  It's
22  hard for me to see that house and everything was
23  destroyed.
24      Q.  Do you still want to move back into
25  the how's vent annually, though?

Page 135

1      A.  (Nods head affirmatively.)
2      Q.  You do.
3      A.  Yeah.
4      Q.  Is there anything else about your
5  mental distress that you want to talk about right
6  now?
7      A.  No.
8  MS. PAYNE:
9          This might be a really good
10         time to take a break, have a
11         little something for lunch.
12      A.  I'm sorry.  But my kids' pictures.
13  Everything is gone.  It's not like -- if the
14  water just would have taken some of the things
15  and left some of the things of value to me, I
16  probably would have been all right, but it's hard
17  for me to even look at that house because it just
18  took everything from me, and that's what problem
19  I'm really having.
20  EXAMINATION BY MS. PAYNE:
21      Q.  That's very --
22      A.  It really is.  I wish I could get
23  his pictures back.  We loved one another, my
24  husband and I.  And I can't see his picture there
25  no more.  My mother and all -- I had her big

Page 136

1  pictures on the wall, my dad's picture.  The
2  water took -- so, that's why I'm having a mental
3  problem.  It make my stomach hurt.  Maybe some
4  people say I shouldn't go back, but that was my
5  home and my husband's.  We married on our knees
6  in that home, and I will never forget it.  The
7  pillows that we kneeled on to get married on --
8  in.  I had it, but it's gone.  Please, forgive.
9  But I lost a whole lot.  The house is sticks.
10  Look at it, all my babies gone.  So, that's where
11  the mental problem come in at.
12  MR. LANDRY:
13         Want to take a little break,
14  Ethel?
15  THE WITNESS:
16         Yeah.
17  THE VIDEOGRAPHER:
18         Going off the record.
19  Conclusion of Tape 2.  It's 12:07.
20         (Whereupon, a discussion was
21  held off the record.)
22  THE VIDEOGRAPHER:
23         Returning to the record.  It
24  is 1:22.  Start of Tape 3.
25  EXAMINATION BY MS. PAYNE:

Page 137

1      Q.  Welcome back from lunch.
2      A.  Thank you.
3      Q.  I have a couple of follow-up
4  questions from things that we talked about
5  earlier.
6      A.  Uh-huh.
7      Q.  Now, I understand Jimmy Coats was
8  previously married before he married you; is that
9  right?
10      A.  Uh-huh.
11      Q.  Did -- did he have any children with
12  Muriel Davis?
13      A.  Yes.
14      Q.  How many children did --
15      A.  One.
16      Q.  What's that child's name?
17      A.  Danielle.  Danielle.
18      Q.  And where is Danielle living now?
19      A.  Oh, I really don't know.  I don't
20  know.  I don't know.
21      Q.  You don't know?
22      A.  Uh-huh.
23      Q.  And then did Jimmy Coats have any
24  children with Sandra Sanders?
25      A.  Sandra?

35  (Pages 134 to 137)

Page 138

```
1        Q.   Sandra Sanders?  Do I have that name
2   right?
3        A.   That's Danielle, his daughter.
4        Q.   Oh, okay.  I was under the
5   impression that Jimmy Coats was married to Sandra
6   Sanders before he got married to you.
7        A.   Yes.
8        Q.   And did he have any children with
9   Sandra?
10       A.   One daughter.  One girl.
11       Q.   And who is that?
12       A.   Danielle.
13       Q.   Oh, so, Danielle was his daughter
14  with Sandra, not Muriel?
15       A.   Wait.  Sandra, that's who he had the
16  daughter with.  I don't know a Muriel.  Muriel?
17       Q.   Muriel Davis.
18       A.   Well, what did they say the son --
19  was it a boy child or something?
20       Q.   I don't know.  That's why I was
21  asking you.
22       A.   I don't know nothing about Danielle.
23       Q.   Do you know of any other children
24  that Jimmy Coats had besides Danielle?
25       A.   No.  Just that one girl.
```

Page 140

```
1        A.   I wasn't living with him.  I was
2   living out in Metairie -- out in Kenner.
3        Q.   Okay.  So, then -- so, you got
4   married to him after you moved into the house?
5        A.   Yes.
6        Q.   Did you live with him before you
7   moved into the house together?
8        A.   No.  No.
9        Q.   Okay.  And then -- when you first
10  moved into the house before you bought it, how
11  much money did you pay in rent?
12       A.   I think it was, like, about -- maybe
13  about 90-something dollars a month.
14       Q.   Okay.  Now you lived in that
15  neighborhood for a long time.  Did you know the
16  other people who lived on your block?
17       A.   Uh-huh.  Yes.
18       Q.   Did all of your neighbors evacuate
19  for Hurricane Katrina?
20       A.   Yes.
21       Q.   Do you know where they are now?  Do
22  you keep in touch with any of them?
23       A.   Some of them still live in Texas,
24  some of them in Baton Rouge, some of them in the
25  area that I'm living in now.
```

Page 139

```
1        Q.   But you didn't have any children
2   with him?
3        A.   No.
4        Q.   Okay.  Have you done anything to
5   open up a succession on your husband's property
6   to -- anything with the title of the house, going
7   to court?
8        A.   No.  My husband died.  My husband
9   made a will out.
10       Q.   Oh, he had a will?
11       A.   Uh-huh.
12       Q.   And in the will, did he leave
13  everything to you?
14       A.   Yes.
15       Q.   Did you probate the will?
16       A.   Yes.
17       Q.   Okay.  So, you said earlier that you
18  moved to the house on Charbonnet Street in the
19  late 1980s.
20       A.   Uh-huh.
21       Q.   Were you married to Jimmy Coats at
22  that time?
23       A.   No.  We stayed together about two
24  years till we married, and then we married.
25       Q.   Where did you live with him --
```

Page 141

```
1        Q.   Has anyone moved back in to that --
2        A.   They have a few peoples -- like,
3   one, two, three, four on the block -- on the --
4   out of the whole block, four peoples.
5        Q.   And did those people have to
6   completely redo their houses?
7        A.   Yes.
8        Q.   And do you have relatives who live
9   in New Orleans?
10       A.   No.
11       Q.   I thought your daughter lived in New
12  Orleans East.
13       A.   Oh, in New Orleans East.  I'm sorry.
14  Yes.
15       Q.   Just anywhere in New Orleans, just
16  do you have --
17       A.   I have a couple family members.
18  They live, like, in Carrollton.  I have a aunt
19  live in Carrollton.
20       Q.   Carrollton.  Where is Carrollton?
21       A.   Carrollton is -- my God -- that's
22  around -- what?
23       Q.   Is it in Orleans Parish?  Is it in
24  Orleans Parish?
25       A.   It's in Orleans Parish.
```

36  (Pages 138 to 141)

## Page 142

```
1    Q.   Who is it that lives in Carrollton?
2    A.   My aunt.
3    Q.   Your aunt?
4    A.   Uh-huh.
5    Q.   Did your aunt have any damage from
6  Hurricane Katrina?
7    A.   No, I don't think so.  Not much.
8  Not really.  Not much.
9    Q.   She wasn't --
10   A.   She was on rent, I think it was.
11 She was on rent.  She was renting a house.
12   Q.   Oh, okay.  And who else do you --
13 what other relatives do you have that live in the
14 city?
15   A.   A couple cousins, and that's about
16 it, but I don't even know where they live at or
17 anything like that.
18   Q.   Okay.  Do you have any friends who
19 live in St. Bernard Parish?
20   A.   No, I don't have any friends, but I
21 know a couple people was living there, and that's
22 about it.  I don't know -- I don't have any
23 friends.
24   Q.   But you said you know a couple of
25 people who live in St. Bernard?
```

## Page 143

```
1    A.   Yeah, Mr. Gil -- Gilbert Andry and
2  his wife.  And that's about it.  They was living
3  there.  They not living there anymore.
4    Q.   Do you know anyone who lives in New
5  Orleans East?
6    A.   My daughter.
7    Q.   Was she living with you at the time
8  of Hurricane Katrina?
9    A.   Yes.
10   Q.   And then she moved to New Orleans
11 East later?
12   A.   Yes.  Yes.
13   Q.   Do you know anyone else who lives in
14 New Orleans East?
15   A.   No.
16   Q.   Do you know any people who had a
17 friend or a loved one who drowned as a result of
18 Hurricane Katrina?
19   A.   They had several people saying their
20 loved ones had passed, but I don't really know.
21   Q.   Do you know of anyone who actually
22 had their roof blown off during the hurricane?
23   A.   No.
24   Q.   Have you heard of that happening to
25 anybody?
```

## Page 144

```
1    A.   (Shakes head negatively.)
2    Q.   Did you hear about any houses that
3  blew up after the storm because of natural gas
4  leaks?
5    A.   Did I hear about what?  Repeat that.
6    Q.   Any of the houses, did you hear on
7  the news --
8    A.   Yeah.
9    Q.   -- anything about houses blowing up
10 from natural gas leaks?
11   A.   Yes.
12   Q.   Did that happen to anybody you know?
13   A.   No.
14   Q.   Did you hear on the news about
15 criminal looting?
16   A.   Yes.
17   Q.   Did that happen to anyone you know?
18   A.   No.
19   Q.   Mrs. Coats, who do you blame for the
20 damages you're seeking in this lawsuit?
21   MR. LANDRY:
22       Object to form.
23       Go ahead.
24   A.   Who I blame?
25 EXAMINATION BY MS. PAYNE:
```

## Page 145

```
1    Q.   Uh-huh.  Yes.
2    A.   I blames the Corps of Engineer.
3    Q.   Is there anyone else besides the
4  Corps of Engineers?
5    A.   No.
6    Q.   Why do you blame the Army Corps of
7  Engineers?
8    MR. LANDRY:
9        Object to form.
10       Go ahead.
11   A.   Because, from my understanding, they
12 knew that those levees was bad and they needed
13 MRGO down in St. Bernard Parish.  They knew these
14 different things.
15 EXAMINATION BY MS. PAYNE:
16   Q.   Is there any other reason why you
17 blame the Corps of Engineers for what happened to
18 you?
19   A.   No.
20   Q.   Do you blame FEMA at all for what's
21 happened to you?
22   A.   Yes.
23   Q.   Why do you blame FEMA?
24   A.   Because I think they knowed that
25 was -- what was the problem.  Just like the Corps
```

37  (Pages 142 to 145)

Page 146

```
 1    of Engineer, they knew what was going on, and
 2    they should have taken care of that years back.
 3         Q.   Have you ever heard of Washington
 4    Group International?
 5         A.   No.
 6         Q.   That's my client in the lawsuit.
 7         A.   Okay.
 8         Q.   Do you have -- do you know of
 9    anything that that company did wrong as far as
10    Hurricane Katrina goes?
11         A.   No.
12         Q.   Mrs. Coats, I'm handing you what's
13    been marked as Coats Exhibit Number 9.  This is
14    a -- this is a Form 95 that we were talking about
15    earlier.  I think this front page is just a cover
16    sheet, you know, from the government saying they
17    received the Form 95, but the Form 95 itself
18    actually starts on Page 2.  You want to turn to
19    Page -- actually, can we start with the very last
20    page because that's the page that has your
21    signature on that.  I wanted to talk about that
22    with you.
23              (Whereupon, Coats Exhibit
24              Number 9 was marked for
25              identification.)
```

Page 147

```
 1         A.   I see.
 2    EXAMINATION BY MS. PAYNE:
 3         Q.   Is that your signature there at the
 4    bottom?
 5         A.   Yes.
 6         Q.   And then you printed your name
 7    below?
 8         A.   Yes.
 9         Q.   And this form, it's dated October
10    28th, 2005.  Do you see that at the top?
11         A.   Yes.
12         Q.   It says:  To Whom It May Concern.
13    You want to take a minute to look at the -- read
14    that, best you can without your glasses?
15         A.   I can't see it without my glasses.
16    Could you read it to me, please?
17         Q.   Would it help if I read it?
18         A.   Yes.
19         Q.   "I hereby authorize my
20              attorney, Jonathan B. Andry,
21              of The Andry Law Firm, 610
22              Baronne Street, New Orleans,
23              Louisiana, 70113, to represent
24              me in my claim against the
25              United States Army Corps of
```

Page 148

```
 1         Engineers and any other
 2         parties regarding the damages
 3         sustained by me as a result of
 4         the flooding of my property
 5         between August 29th, 2005 and
 6         September 30, 2005.  I authorize
 7         my attorney to sign all
 8         necessary forms, claim notices
 9         and any other documents necessary
10         to pursue the above-mentioned
11         claim."
12              Do you remember signing this form?
13         A.   Yes.
14         Q.   And this is just where you
15    authorized your attorney to --
16         A.   Yes.
17         Q.   Okay.  So, then, let's turn to the
18    form itself.  It starts on Page 2 of the exhibit.
19    I just want to kind of go through this whole
20    thing with you.  Are you with me on Page 2?
21         A.   Uh-huh.
22         Q.   Have you seen this form before?
23         A.   Yes, when I signed the paperwork, I
24    think.
25         Q.   Okay.  So, in Box 1, you see there
```

Page 149

```
 1    where it says it's submitted to the United States
 2    Army Corps of Engineers?
 3         A.   Uh-huh.
 4         Q.   And then Box 2, one over, that's
 5    your name, Ethel Coats, and the current address
 6    where you live now?  Are you with me, in that
 7    second box on the top of the page?
 8         A.   Okay.  Yeah.  I see it.  Wait.
 9    Wait.
10         MR. LANDRY:
11              Right here.
12         THE WITNESS:
13              Okay.
14         A.   All right.
15    EXAMINATION BY MS. PAYNE:
16         Q.   And then I want to skip down to that
17    big Box 8.  I don't know if you can see me
18    pointing here, but it's here kind of in the
19    middle of the page.
20         A.   Uh-huh.
21         Q.   I know this is hard for me to read
22    and I have my glasses on.
23         A.   Okay.
24         Q.   So, I just wanted to get you to look
25    at this, but if it would help, I can read it out
```

38  (Pages 146 to 149)

```
 1   loud.
 2        A.   Okay.
 3        Q.   Would you like for me to do that?
 4        A.   Yes.
 5        Q.   Okay.  The instructions say:
 6             "Basis of claim (State in
 7        detail the known facts and
 8        circumstances attending the
 9        damage, injury or death,
10        identifying persons and property
11        involved, the place of occurrence
12        and the cause thereof.)  (Use
13        additional pages if necessary.)"
14             And the form says, you know,
15        what's been added here:
16             "Since the Mississippi River
17        Gulf Outlet navigational/shipping
18        structure was cut into the marshes
19        of St. Bernard and Orleans
20        Parishes, the Corps of Engineers
21        has had a legal duty under
22        Louisiana law to maintain,
23        operate, design and/or construct
24        the MRGO in a manner so as to
25        prohibit the flooding of St.
                                    Page 150
```

```
 1   Bernard and Orleans Parishes.  The
 2        Corps breached that duty by
 3        improperly designing,
 4        constructing, operating and/or
 5        maintaining the MRGO which flooded
 6        St. Bernard and Orleans Parishes
 7        and my property."
 8             Are you satisfied with that
 9        statement as being your claim
10        against the government?
11        A.   Uh-huh.  Yes.
12        Q.   And then if you skip down to Box
13   Number 9, which is the very next one down,
14   "Property Damage" --
15        A.   Uh-huh.
16        Q.   -- the information inserted on the
17   form says:
18             "The damage was a complete
19        loss of structure and contents
20        located at 1020 Charbonnet Street,
21        New Orleans, Louisiana, 70117."
22        A.   Uh-huh.
23        Q.   You feel that's accurate?
24        A.   Yes.
25        Q.   What about at 1022, the part next
                                    Page 151
```

```
 1   door, did you submit a separate form for that, or
 2   is that --
 3        A.   All -- it's one form.
 4        Q.   You just did this one form?
 5        A.   One form.
 6        Q.   Do you know whether Nathan Morgan
 7   submitted a Form 95 of his own?
 8        A.   Yes.
 9        Q.   He did?
10        A.   Uh-huh.
11        Q.   Do you know any information about
12   what property he was claiming was damaged?
13        A.   His contents that he had in the
14   home.
15        Q.   Okay.  So, he submitted one for the
16   contents?
17        A.   Uh-huh.  Yes.
18        Q.   Did your daughter --
19        A.   Contents in the home.
20        Q.   Your daughter also submitted a form
21   for the contents?
22        A.   Yes.  Yes.  Yes.
23        Q.   Okay.  Now, the very next box down,
24   Box 10, it's asking for the nature and extent of
25   each injury or cause of death which forms the
                                    Page 152
```

```
 1   basis of the claim.  And what's in the box is:
 2             "As a direct and proximate
 3        result of the negligence of the
 4        United States Army Corps of
 5        Engineers, I have been injured to
 6        the extent that I have experienced
 7        severe emotional distress and
 8        mental anguish due to the loss of
 9        my property and almost all of my
10        possessions.  Ethel Coats."
11             Is that correct?
12        A.   Yes.
13        Q.   And then down a little bit further,
14   in Box 12, where it says "Amount of Claim (in
15   dollars)," you have to fill in here the amount of
16   your various claims, and under "Property Damage,"
17   you have $500,000.
18        A.   Uh-huh.
19        Q.   Can you explain to me how you
20   arrived at that amount of property damage?
21        MR. LANDRY:
22             Object to the form.
23   EXAMINATION BY MS. PAYNE:
24        Q.   I guess that would be all property?
25        A.   Yes.
                                    Page 153
```

                              39  (Pages 150 to 153)

1    Q.   You know, your real property and
2  your personal property?
3    A.   Yes.
4    Q.   Tell me what -- how you got to
5  $500,000?
6    A.   Well, I had to pay medical -- pay
7  medical, loss of the home, because it was saying
8  that they might have to just demolish the home,
9  and the contents of the home.
10   Q.   Okay.  I think the medical would be
11 included under personal injury part.
12   A.   Okay.
13       MR. LANDRY:
14           Object to form.
15 EXAMINATION BY MS. PAYNE:
16   Q.   But just talking about the property
17 damage, I think you told me earlier that you had
18 given your insurance company an estimate of about
19 $56,000 for your property.  And, so, is the rest
20 of that mainly damage to your house or what -- is
21 there some other property damage that you have
22 that we haven't already discussed?
23       MR. LANDRY:
24           Let me -- so that I don't
25           have to keep interrupting, let me
Page 154

1  just enter an objection as to form
2  as to all the questions regarding
3  these two damage boxes.  Just make
4  that continuous as long as we're
5  talking about that section.  That
6  way, I won't have to continue to
7  interrupt.
8      You may answer if you
9  remember what she asked you.
10 THE WITNESS:
11     No.
12 EXAMINATION BY MS. PAYNE:
13   Q.   Here, I can repeat it.  Would you
14 like for me to repeat it?
15   A.   Yes.
16   Q.   Is there -- you told me earlier that
17 the estimate that you gave for your personal
18 property damage, not counting the other people
19 living with you, but your personal property
20 damage to your insurance company was 56,000.
21   A.   Uh-huh.
22   Q.   And I know there -- you know, there
23 was the damage to your home as well, but is there
24 anything else that we haven't talked about that
25 would go into this 500,000 number for damages to
Page 155

1  your property?
2    A.   That's my property -- that's for my
3  contents or the --
4    Q.   The contents or -- do you think the
5  $500,000 number is accurate for the amount of
6  property damage you've sustained?
7    A.   Yes.
8    Q.   You think the 500,000 is accurate?
9    A.   Yes.  Yes.  Yes.
10   Q.   But is there any other property
11 damage we haven't already talked about today?
12   A.   No, there is no other.
13   Q.   For the next box, for "Personal
14 Injury," you also have $500,000 there, is your
15 amount of claim.  Can you explain how you got to
16 that number?
17   A.   Can I explain how I got to that
18 number?
19   Q.   Uh-huh.  Yes.
20   A.   No, not right now, I can't.  I can't
21 explain it.  I have to go back over and see what
22 it cost, this cost, that cost.
23   Q.   Do you have any idea how much of
24 that 500,000 would be for, you know, medical
25 expenses and prescriptions and how much of that
Page 156

1  would be for mental distress?
2    A.   How much of that would it be
3  costing?
4    Q.   That amount.  Uh-huh.
5    A.   That would be about 300,000 or maybe
6  for mental, what I went through, and for my home,
7  two hundred and something -- 200,000.
8    Q.   What would the 200,000 be for?
9    A.   Be for my -- the accents and
10 different things I had in my home, different
11 things I had, my loss.  That's what I think --
12 yes.
13   Q.   Okay.  According to this form, the
14 total amount of your claim is $1 million.  Do you
15 think that amount is accurate?
16   A.   Yes, for my loss, for everything, my
17 mental and -- my home and everything that I had.
18 Yes, I think it's worth it.  Yes.
19   Q.   Okay.
20   A.   Worth it to me.
21   Q.   Did -- when you were getting your
22 Form 95 filled out and turned in, did your
23 lawyers ask you for any kind of supporting
24 documentation, such as appraisals of the
25 property?  Did you have to provide them with
Page 157

40  (Pages 154 to 157)

1    anything like that?
2        A.   The appraisal of the property?  I
3    think I -- yes, I did, I think.
4        Q.   You did provide them, you think --
5        A.   I'm not too sure, but I think I did.
6        Q.   Did you get any type of written
7    reports from physicians about the nature and
8    extent of your injuries?
9        A.   Not yet, no.
10       Q.   Is that your signature at the bottom
11   of the page, that page that you're currently on,
12   the bottom of that first page of the Form 95?
13       A.   Right here, you talking about?
14   MR. LANDRY:
15           Right.  She wants to know if
16   that's your signature.
17       A.   Is that my signature?
18   EXAMINATION BY MS. PAYNE:
19       Q.   It might be your lawyer's.
20       A.   Okay.  It's my lawyer's signature.
21       Q.   Okay.  We talked earlier about the
22   various claims you made for assistance, and I
23   don't want to go over all of that again.  There's
24   just one or two things I forgot to ask you
25   earlier.  Do you know who your agent is for

Page 158

1        Q.   Do you understand that this lawsuit
2    is a proposed class action?
3        A.   Yes.
4        Q.   Do you know what a class action is?
5        A.   No.  Could you explain it to me?
6        Q.   It's where you have certain people
7    named plaintiffs, like, you're a named plaintiff
8    representing the rest of the class members.
9        A.   Uh-huh.
10       Q.   Does that sound familiar?
11       A.   Yes.
12       Q.   And do you understand you're a named
13   plaintiff in this -- this lawsuit?
14       A.   Yes.  Yes.
15       Q.   What's your understanding of what it
16   means to be a named plaintiff?  What are your
17   responsibilities?
18       A.   Because it's so many peoples that
19   was down and couldn't come and it just so
20   heartbroken -- it's so many peoples that's not
21   here, you know.  Plenty are not here right now.
22       Q.   And, so, what do you see as your
23   responsibility?
24       A.   To help them.
25       Q.   And what would you do to help them?

Page 160

1    the -- your insurance policies for homeowner's
2    and flood insurance?
3        A.   Do I know now?  Alliance Insurance
4    Agency.
5        Q.   Is there a particular person who you
6    dealt with?  Did you have an agent?
7        A.   The agency?  No, I don't know right
8    now.
9        Q.   And do you know where the office
10   that you dealt with was located?
11       A.   Metairie.  4444 York Street, in
12   Metairie.
13       Q.   Okay.  And we talked about The Road
14   Home Program earlier, and I wasn't completely
15   sure whether you -- did you actually receive your
16   money from The Road Home Program yet?
17       A.   Uh-huh.
18       Q.   And that was the $76,000 amount?
19       A.   Uh-huh.
20       Q.   They've given you your check and you
21   have that now?
22       A.   Uh-huh.  Yes.  I'm sorry.
23       Q.   Okay.  Mrs. Coats, do you understand
24   that this lawsuit is a proposed class action?
25       A.   Repeat that again.

Page 159

1        A.   Here, fighting for them.
2        Q.   Like giving this deposition?
3        A.   Yeah.  Yeah.
4        Q.   Do you know what subclass that you
5    represent, what people you represent in the
6    lawsuit?
7        A.   What people I'm representing?  My
8    neighbors and -- that's about it, my neighbors,
9    peoples in the neighborhood.
10       Q.   And how big of a neighborhood are
11   you talking about?
12       A.   The whole Lower Ninth Ward.
13       Q.   You're representing the whole Lower
14   Ninth Ward?
15       A.   That's what I'm trying, yeah.
16       Q.   Are you representing the people in
17   St. Bernard Parish?
18       A.   No.
19       Q.   Did you know any of the plaintiffs'
20   attorneys before this lawsuit?
21       A.   Did I know any of them?  No, I
22   didn't know Mr. Jon, no.  I didn't know him.  You
23   know, I know him, but I don't know him, like,
24   personal, but I know him.
25       Q.   You knew who he was?

Page 161

41  (Pages 158 to 161)

1    A.   Uh-huh.
2    Q.   When did you first start thinking
3  about filing a lawsuit relating to Hurricane
4  Katrina?
5    A.   Because when they start quoting
6  prices to me about my home and losses that I had
7  in my home and the mental state, that stage that
8  I was in.
9    Q.   And how did you go about finding a
10  lawyer?
11    A.   How I went about finding a lawyer?
12  To tell you the truth, I saw Mr. Jon on TV.
13    Q.   So, did you contact Mr. Andry's
14  office?
15    A.   Yes.
16    Q.   Have you met any of the other named
17  plaintiffs in the lawsuit?
18    A.   No.
19    Q.   Do you know who they are?
20    A.   No.
21    Q.   Do you know anything about the
22  damage that people suffered over in St. Bernard
23  Parish?
24    A.   Do I know?
25    Q.   Any specifics.

Page 162

1    A.   No, I don't know nothing about no
2  specifics, but I know it was destroyed like the
3  Lower Ninth Ward was.
4    Q.   Do you feel like you can represent
5  everybody in the Lower Ninth Ward as to what
6  happened to their individual houses and property?
7    MR. LANDRY:
8        Object to form.
9    A.   Yes.  Because they hurting just like
10  I am.  Yes.
11  EXAMINATION BY MS. PAYNE:
12    Q.   Do you feel like you could represent
13  everyone in St. Bernard Parish about what
14  happened to them and their damage and -- to their
15  houses and property?
16    MR. LANDRY:
17        Object to form.
18    A.   Do I think I could represent them,
19  too?  If I had to, I would -- yes, I would try to
20  do it because they lost just like the Ninth Ward.
21  We all lost.
22  EXAMINATION BY MS. PAYNE:
23    Q.   But do you think everyone's losses
24  were the same?
25    MR. LANDRY:

Page 163

1        Object to form.
2    A.   No.  No.  Everybody loss is not the
3  same.
4  EXAMINATION BY MS. PAYNE:
5    Q.   How are they different?
6    A.   How they different?
7    Q.   (Nods head affirmatively.)
8    A.   Some was on rent, some was on --
9  owning their own home, some lost family members,
10  you know, some -- I can't say was it the same.
11  It's not the same.
12    Q.   Right.  Some people may have had a
13  lot more flooding than others --
14    A.   Right.
15    Q.   -- is that right?
16    A.   Right.
17    Q.   Some people may have had really
18  serious personal injuries?
19    A.   Yes.
20    MR. LANDRY:
21        Object to form.
22    A.   Yeah.
23  EXAMINATION BY MS. PAYNE:
24    Q.   We're starting to talk over each
25  other a little bit again.  Sorry.

Page 164

1    A.   Okay.
2    Q.   I'll say that again.  Some people
3  may have had really serious injuries and some
4  didn't have any type of personal injury; is that
5  right?
6    A.   In St. Bernard Parish?
7    Q.   Uh-huh.  Yes.
8    A.   I really don't know what everybody
9  injuries are or what, I don't know, but I do know
10  they had water, just like I did.
11    Q.   But not everyone got the same amount
12  of water --
13    MR. LANDRY:
14        Object to form.
15  EXAMINATION BY MS. PAYNE:
16    Q.   -- in St. Bernard Parish and Lower
17  Ninth Ward, wouldn't you agree?
18    A.   I can't say how much water they got.
19    Q.   You just know how much --
20    A.   But I do know it was -- everybody
21  house was underwater in St. Bernard.  They
22  probably got a little bit more water than what we
23  did because they was more close to MRGO than what
24  I was.  So, I don't know.
25    Q.   Do you know the law firms that are

Page 165

42  (Pages 162 to 165)

1  going to represent the -- or who are asking to
2  represent the proposed class?
3      A.   Do I know what law firm going to do
4  it?  No, I really don't know.
5      Q.   Have you done anything to look into
6  the backgrounds of the lawyers who you do know
7  about?
8      A.   No.
9      Q.   Do you know whether the lawyers you
10  know about have handled other major class
11  actions?
12      A.   Yes.
13      Q.   You do know?
14      A.   I have heard of it.  I really don't
15  know about -- I heard of them.  I don't know.
16      Q.   How much time have you spent so far
17  doing work for this case?
18      A.   How much time have I spent?
19      Q.   Before today.
20      A.   Quite a little time just going over
21  different things, going to my home -- that's what
22  you mean?
23      Q.   I mean stuff for this lawsuit
24  particularly.
25      A.   Well, I don't -- I don't really have

Page 166

1      (Whereupon, a discussion was
2  held off the record.)
3  THE VIDEOGRAPHER:
4      Returning to the record.  It
5  is 2:03.
6  EXAMINATION BY MS. PAYNE:
7      Q.   I just wanted to get the chronology
8  straight of where all you were treated for your
9  heart condition.  So, before Hurricane Katrina,
10  did you have your surgery at Tulane?
11      A.   Uh-huh.
12      Q.   That's right?  And then did you ever
13  go to Charity or University Hospital before
14  Hurricane Katrina?
15      A.   Yes.
16      Q.   Which of those?
17      A.   Both of them.
18      Q.   Both of them?
19      A.   Uh-huh.
20      Q.   And then after -- is this anywhere
21  else that you went for that treatment before
22  Hurricane Katrina?
23      A.   No.
24      Q.   And then after Hurricane Katrina,
25  you went to Lallie Kemp?

Page 168

1  to do that.  I have my lawyers doing -- working
2  for me.  I don't have to do any of that.
3      Q.   A couple of follow-up questions.
4  Nathan Morgan, is he your boyfriend?
5  MR. LANDRY:
6      Object to form.
7      A.   He's my fiancé.
8  EXAMINATION BY MS. PAYNE:
9      Q.   He's your fiancé.  And what does he
10  do for a living?
11      A.   He's self-employed.  He cut grass
12  and he do landscape work.
13      Q.   How long has he been doing that?
14      A.   All his life.
15  MS. PAYNE:
16      I think that we're almost
17  finished.  I just want to take one
18  last break to confer.
19  MR. LANDRY:
20      Oh, sure.  Absolutely.
21  MS. PAYNE:
22      Can we go off the record for
23  a minute?
24  THE VIDEOGRAPHER:
25      Off the record.  It's 1:56.

Page 167

1      A.   Yes.
2      Q.   And then now you're going to
3  University and Tulane?
4      A.   I'm going to -- call that name
5  again.  What it is?
6      Q.   Lallie Kemp?
7      A.   No.  The other one.
8      Q.   Charity?
9      A.   Yes.
10      Q.   You're going to Charity?
11      A.   Yeah.
12      Q.   Are you also going to Tulane now?
13      A.   Yes.
14      Q.   Okay.  But not University now?
15      A.   No, not University.
16      Q.   Okay.  And then on your -- on your
17  various medications that you had filled, where
18  did you get those filled before Hurricane
19  Katrina?
20      A.   Walgreens around the corner in the
21  Ninth Ward, on -- right there in the Ninth Ward.
22      Q.   So, you remember what street that
23  Walgreens was on?
24      A.   Caffin Avenue.  I think it was
25  Caffin, if I'm not mistaken.  It was Caffin.

Page 169

43  (Pages 166 to 169)

Page 170

1    Q.    After Hurricane Katrina, where did
2  you get your prescriptions filled?
3    A.    Where did I get them filled at now?
4    Q.    Or where did you first get them
5  filled after Hurricane Katrina?
6    A.    Some in -- in Independence,
7  Louisiana, Hammond, and I had some that I got
8  filled right here in New Orleans.
9    Q.    Which pharmacy did you use in
10  Hammond?
11    A.    Wal-Mart.  Wal-Mart and --
12    Q.    Was this any other pharmacy in
13  Hammond that you used to get those filled?
14    A.    No.  Uh-uh.
15    Q.    And then when you came back to New
16  Orleans, where did you get the prescriptions
17  filled?
18    A.    Walgreens.
19    Q.    And which Walgreens?
20    A.    Tchoupitoulas.
21    Q.    For the work that you were doing on
22  your house before Hurricane Katrina, did you ever
23  get any building permits from the city for that
24  work?
25    A.    No.  I didn't really get any

Page 171

1  building permits.
2    Q.    I think you said, no, I didn't
3  really get any building permits?
4    A.    No.  I didn't get -- no, I didn't
5  have one.
6    Q.    And the assistance that you got from
7  FEMA, did you ever get any housing assistance
8  other than the trailer?
9    A.    I got rental assistance one time.
10  That was it.  Once.  One time.
11    Q.    How much was that?
12    A.    Fifteen.
13    Q.    Will you repeat that?
14    A.    Fifteen hundred.
15    Q.    Fifteen hundred dollars?
16    A.    Uh-huh.
17    Q.    Can you think of any other
18  assistance that you got that you haven't already
19  told me about today?
20    A.    No.  No.  I didn't get any.
21    Q.    Okay.  One last thing.  In some
22  papers that your lawyers filed, I understand in
23  the plaintiffs' motion for class certification --
24    MS. PAYNE:
25        And I can make this an

Page 172

1  exhibit if you want me to,
2  Counsel.
3    MR. LANDRY:
4        No.
5  EXAMINATION BY MS. PAYNE:
6    Q.    -- it says that you resided in one
7  half of the double, the address on Charbonnet
8  Street, you resided in one half of the double,
9  and rented the other half for $200 per month.  Is
10  that -- is that accurate or is that a mistake?
11    A.    Where did that come from?
12    Q.    Just some papers that -- it wasn't
13  anything that you filed.  It was something that
14  the lawyers filed with the court, a legal brief.
15  I just was wondering if that was accurate or not.
16    A.    No.
17    Q.    You didn't rent the other half?
18    A.    The other half -- did I rent it?
19    Q.    Yeah.  Did you rent it to someone?
20  Did they pay you rent, $200 per month?
21    A.    What I said was my daughter, she
22  would give me a helping hand, like, $200 a month,
23  but that was it.
24    Q.    Did she give you $200 every month?
25    A.    No, not every month, no.  Just

Page 173

1  something to -- you know, sometimes she would
2  help me if my light bill be kind of high or
3  something like that, you know.
4    Q.    Was there a set amount that she paid
5  you, a minimum and then sometimes paid you more,
6  or did it just depend?
7    A.    It was just -- depend on, you know,
8  how high was the light bill, the water bill or
9  something like that.
10    MS. PAYNE:
11        I don't have anything else.
12  Thank you very much, Mrs. Coats.
13  Thank you.
14    MS. BOYER:
15        Nothing.
16    MR. LANDRY:
17        Finished?
18    MS. BOYER:
19        Oh, no.  No.  I said no.
20    MS. BERTAUT:
21        Okay.  We're done.
22    MR. LANDRY:
23        Thank you.
24    THE VIDEOGRAPHER:
25        This concludes this

44  (Pages 170 to 173)

1  deposition.  It's 2:09 p.m.
2      (Whereupon, the testimony of
3  the witness was concluded.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 174

1      REPORTER'S CERTIFICATE
2
3
4      I, CAROL VALLETTE SLATER, Certified
5  Court Reporter, Registered Professional Reporter,
6  in and for the State of Louisiana, as the officer
7  before whom this testimony was taken, do hereby
8  certify that ETHEL COATS, after having been duly
9  sworn by me upon authority of R.S. 37:2554, did
10  testify as hereinbefore set forth in the
11  foregoing pages; that this testimony was reported
12  by me in the stenotype reporting method, was
13  prepared and transcribed by me or under my
14  personal direction and supervision, and is a true
15  and correct transcript to the best of my ability
16  and understanding; that I am not related to
17  counsel or the parties herein, nor am I otherwise
18  interested in the outcome of this matter.
19
20
21      CAROL VALLETTE SLATER (CCR 78020)
        CERTIFIED COURT REPORTER
22      REGISTERED PROFESSIONAL REPORTER
23
24
25

Page 176

1      WITNESS' CERTIFICATE
2
3
4
5      I, ETHEL COATS, read or have had the
6  foregoing testimony read to me and hereby certify
7  that it is a true and correct transcription of my
8  testimony, with the exception of any attached
9  corrections or changes.
10
11
12
13
14
15      (Witness' Signature)
16
17
18
19
20
21
22
23
24
25

Page 175

45  (Pages 174 to 176)

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

**IN RE:** KATRINA CANAL BREACHES    CIVIL ACTION
**CONSOL**IDATED LITIGATION

                                    NO. 05-4182
                                      "K" (2)
**PERTAINS TO:** MRGO                JUDGE DUVAL

**FILED IN:** 05-4181, 05-4182,    MAG. WILKINSON
**05-5237,** 05-6073, 05-6314,
05-6324, 05-6327, 05-6359,
06-0225, 06-0886, 06-1885,
06-2152, 06-2278, 06-2287,
06-2824, 06-4024, 06-4065,
06-4066, 06-4389, 06-4634,
06-4931, 06-5032, 06-5155,
06-5159, 06-5161, 06-5162,
06-5260, 06-5771, 06-5786,
06-5937, 07-0206, 07-0621,
07-1073, 07-1271, 07-1285

Videotaped Deposition of

HENRY EARL DAVIS,

7650 Morel Street, New Orleans, Louisiana

70128, taken in the offices of Bruno & Bruno,

855 Baronne Street, New Orleans, Louisiana

70113, on Wednesday, the 11th day of July,

2007, beginning at 10:34 A.M.

```
 1   APPEARANCES:
 2
 3       EXNICIOS LAW FIRM
             (BY:  RICHARD M. EXNICIOS, ESQ.)
 4       7916 Nelson Street
         New Orleans, Louisiana  70125
 5           ATTORNEYS FOR THE PLAINTIFFS
 6
         DUPLASS, ZWAIN, BOURGEOIS, MORTON,
 7       PFISTER & WEINSTOCK
             (BY:  NICOLE BOYER, ESQ.)
 8       Suite 2900
         3838 North Causeway Boulevard
 9       Metairie, Louisiana  70002
             ATTORNEYS FOR THE BOARD OF
10           COMMISSIONERS FOR THE LAKE BORGNE
             BASIN LEVEE DISTRICT
11
12       STONE PIGMAN WALTHER WITTMANN
             (BY:  CARMELITE BERTAUT, ESQ.)
13       546 Carondelet Street
         New Orleans, Louisiana  70130-3588
14
                 AND
15
         JONES DAY
16           (BY:  JEROME R. DOAK, ESQ.
                 AND
17           JULIA CRONIN, ESQ.)
         2727 North Harwood Street
18       Dallas, Texas  75201-1515
             ATTORNEYS FOR WASHINGTON GROUP
19           INTERNATIONAL, INC.
20
21
22
23
24
25
                                         Page  2
```

```
 1               S T I P U L A T I O N
 2
 3       It is stipulated and agreed by and between
 4   counsel for the parties hereto
 5   that the deposition of the aforementioned
 6   witness is hereby being taken under the
 7   Federal Rules of Civil Procedure, for all
 8   purposes, in accordance with law;
 9       That the formalities of reading and
10   signing are specifically not waived;
11       That the formalities of certification and
12   filing are specifically waived;
13       That all objections, save those as to the
14   form of the question and the responsiveness of
15   the answer, are hereby reserved until such
16   time as this deposition, or any part thereof,
17   may be used or sought to be used in evidence.
18
19               *  *  *  *
20
21       ROGER D. JOHNS, RDR, CRR, Certified Court
22   Reporter for the State of Louisiana,
23   officiated in administering the oath to the
24   witness.
25
                                         Page  4
```

```
 1
         APPEARANCES CONTINUED:
 2
 3
 4   VIDEOTAPED BY:
 5       Gilly Delorimier
         Depo-Vue, Inc.
 6
 7
 8   REPORTED BY:
         ROGER D. JOHNS, RMR, CRR, RDR, CSR
 9       Certified Court Reporter
         State of Louisiana
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                         Page  3
```

```
 1               I N D E X
 2
 3                                 PAGE
 4   Davis Exhibit 1............................ 49
 5   Davis Exhibit Number 2..................... 50
 6   Davis Exhibits 3, 4, and 5................ 58
 7   Exhibit 3................................. 58
 8   Exhibit 4................................. 59
 9   Exhibit 5................................. 59
10   Exhibit 6................................. 79
11   Davis Exhibit 7........................... 80
12   Davis Exhibit 8........................... 82
13   Davis Exhibit 9........................... 116
14
15
16
17
18
19
20
21
22
23
24
25
                                         Page  5
```

                                        2  (Pages  2  to  5)

```
 1        VIDEO OPERATOR:
 2      This is the videotaped deposition
 3   of Henry Davis.  This deposition is
 4   being held today at 855 Baronne Street
 5   in New Orleans, Louisiana, on July the
 6   11th, 2007 at approximately 10:34.
 7      Would the Court Reporter please
 8   now swear in the witness.
 9        HENRY EARL DAVIS,
10   7650 Morel Street, New Orleans, Louisiana
11   70128, after having been duly sworn by the
12   before-mentioned court reporter, did testify
13   as follows:
14   EXAMINATION BY MR. DOAK:
15      Q.  Mr. Davis, my name is Jerry Doak.  I
16   represent defendant Washington Group in this
17   litigation.  I'll be taking your deposition
18   today.
19      A.  Okay.
20      Q.  How are you?
21      A.  I'm fine.
22      Q.  Let's begin with have you been
23   deposed before, been in a deposition?
24      A.  Yes.
25      Q.  And what was that occasion and
```
                                        Page 6

```
 1   when?
 2      A.  I've had several.  I used to be a
 3   streetcar operator.
 4      Q.  Yes.
 5      A.  And whenever you have an accident,
 6   you eventually have got to do a deposition.
 7      Q.  Yes.
 8      A.  So I don't really remember the
 9   dates.  It's been a few years ago.
10      Q.  Okay.  There were several of those
11   occasions, though, where you gave a deposition
12   --
13      A.  Yes.
14      Q.  -- in that capacity?
15      A.  Yes.
16      Q.  More than five or less than five?
17      A.  More than five what?
18      Q.  Depositions.
19      A.  I don't really remember exactly how
20   many.  It could have been more, it could have
21   been a little bit less.
22      Q.  Okay.  Other than those depositions
23   connected with your job as a streetcar
24   operator, have you ever given a deposition for
25   a different kind of case?
```
                                        Page 7

```
 1      A.  No.  No.
 2      Q.  Okay.  Well, you know pretty much
 3   the routine of this, but I'll just reinforce a
 4   couple of points.  When I ask a question,
 5   please let me finish so that the Court
 6   Reporter can keep up with us.  We can't talk
 7   over each other.
 8      A.  Okay.
 9      Q.  And I will try to do the same for
10   you.  Also, if you don't understand my
11   question at any time, just let me know and I
12   will try to rephrase it so that you do
13   understand.
14      A.  Okay.
15      Q.  And finally, if you need a break,
16   use the restroom or just ready for a break,
17   let me know and we'll take a break at your
18   convenience.
19      A.  Okay.
20      Q.  What have you done to prepare for
21   this deposition?
22      A.  Went and explained to me what a
23   deposition is all about.  That's about it.
24      Q.  You met with your attorney?
25      A.  Yes.
```
                                        Page 8

```
 1      Q.  Okay.  And have you ever met with
 2   anyone other than your attorneys to prepare
 3   for this deposition?
 4      A.  No more than the ones I told you
 5   about earlier.  The ones job-related.  That's
 6   it.
 7      Q.  Okay.  And have you reviewed any
 8   documents or other materials to prepare for
 9   this deposition?
10      A.  No, none whatsoever.
11      Q.  Other than the lawsuits that you
12   referred to before about accidents that you
13   may have been around as a train operator, have
14   you ever been involved in any other lawsuits?
15      A.  Yeah, I have been involved in
16   lawsuits.  Nothing to this magnitude I don't
17   believe.
18      Q.  Right.  Would you tell us about
19   those other lawsuits that you have been
20   involved in?
21      A.  Once I was driving a friend's car
22   and somebody opened their door into traffic.
23      Q.  Yes.
24      A.  And I got in a lawsuit with that.
25      Q.  Okay.  And were you a witness or
```
                                        Page 9

3   (Pages 6 to 9)

HENRY DAVIS                                                    7/11/2007

| | |
|---|---|
| 1   were you one of the parties in that lawsuit? | 1       A.  No, that's the only one. |
| 2       A.  I was one of the parties.  I was | 2       Q.  Okay.  Have you ever been involved |
| 3   driving his car. | 3   in any kind of criminal proceeding? |
| 4       Q.  All right.  And what was the result | 4       A.  No. |
| 5   of the lawsuit? | 5       Q.  For the record, please, if you'd |
| 6       A.  That was years ago.  I don't really | 6   state your date of birth. |
| 7   remember what came out.  All I know is the | 7       A.  11/6/52. |
| 8   other guy was at fault. | 8       Q.  All right.  And where were you born? |
| 9       Q.  Okay.  Tell me about the next | 9       A.  Prentiss, Mississippi. |
| 10   lawsuit that you have been involved in that | 10       Q.  And when did you first come to New |
| 11   you can recall. | 11   Orleans? |
| 12       A.  I think I was in one where somebody | 12       A.  I came here to live in 1971. |
| 13   had stole somebody's car and ran into the back | 13       Q.  And have you lived here continuously |
| 14   of me at Chef and Downman.  All I did then was | 14   since 1971? |
| 15   just to get my car fixed, -- | 15       A.  Up until the storm. |
| 16       Q.  All right. | 16       Q.  I'm sorry? |
| 17       A.  -- you know. | 17       A.  Up until the storm and I had to |
| 18       Q.  Can you remember any other lawsuits | 18   leave then. |
| 19   you have been involved in? | 19       Q.  All right.  We'll get to that in a |
| 20       A.  Not right offhand, no. | 20   minute.  You are currently married to Yolanda |
| 21       Q.  Other than those two lawsuits and | 21   Ransom Davis? |
| 22   the lawsuits that you were involved in because | 22       A.  Yes. |
| 23   of your job as a train operator, have you ever | 23       Q.  And when did you marry her? |
| 24   been a witness in any other context? | 24       A.  That was February 28th -- I don't |
| 25       A.  No. | 25   remember the exact date. |
| Page 10 | Page 12 |

| | |
|---|---|
| 1       Q.  Have you ever been in a proposed | 1       Q.  Do you remember the year? |
| 2   class action? | 2       A.  That's the part I don't remember.  I |
| 3       A.  No. | 3   remember the date, but not the year. |
| 4       Q.  Have you ever been sued yourself? | 4       Q.  Give me an approximation.  Was it a |
| 5       A.  No. | 5   couple of years ago, five years ago, ten years |
| 6       Q.  In the materials I have reviewed, I | 6   ago? |
| 7   believe that you were in bankruptcy from 1992 | 7       A.  Maybe -- Maybe -- Maybe sixteen |
| 8   to 1995? | 8   years ago, something like that. |
| 9       A.  Yes, sir.  Is that Chapter 11? | 9       Q.  All right.  Have you ever been |
| 10       Q.  I'm not sure. | 10   married except -- |
| 11       A.  That's what it was. | 11       A.  Yes. |
| 12       Q.  Do you recall any other times you | 12       Q.  And tell me about the other |
| 13   have declared bankruptcy? | 13   marriages, when they were. |
| 14       A.  No, that's the only time. | 14       A.  I was married to Loretta Blunt |
| 15       Q.  And -- | 15   Davis.  I got married in 1971.  We separated |
| 16       A.  Now wait.  I got a question, | 16   in '75.  And then we got a divorce in probably |
| 17   though.  Chapter 11 is when you pay the whole | 17   '89 or something like that. |
| 18   bill yourself and bankruptcy is when you don't | 18       Q.  All right. |
| 19   pay it; right? | 19       A.  I'm just guessing at that date, too. |
| 20       Q.  I think they're both bankruptcy | 20       Q.  Was this Loretta Davis related to |
| 21   proceedings. | 21   Yolanda Davis? |
| 22       A.  Okay. | 22       A.  No. |
| 23       Q.  Is there a different kind of | 23       Q.  Okay.  And have you been married to |
| 24   bankruptcy that you think you might have been | 24   anyone else? |
| 25   involved in besides the one from 199- -- | 25       A.  No. |
| Page 11 | Page 13 |

                                                    4  (Pages 10 to 13)

HENRY DAVIS                                                    7/11/2007

| | |
|---|---|
| 1 | Q.  And how many children do you have? |
| 2 | A.  I got two biological kids. |
| 3 | Q.  And their names are? |
| 4 | A.  Latonia and Keoka. |
| 5 | Q.  Can you spell the second name, |
| 6 | please? |
| 7 | A.  K E O K A.  She's the oldest.  I |
| 8 | just said them in reverse order. |
| 9 | Q.  And how old is she? |
| 10 | A.  29. |
| 11 | Q.  And Latonia is how old? |
| 12 | A.  Latonia is eighteen. |
| 13 | Q.  And you said those are your two |
| 14 | biological children. |
| 15 | A.  Right.  And I also raised up Simeon |
| 16 | Ransom Kelly and Kedrick Ranelle Bias. |
| 17 | Kedrick Bias, B I A S. |
| 18 | Q.  How old are they? |
| 19 | A.  Kedrick is 32 and Simeon is -- She |
| 20 | was born in '81, so, 2001 is 20 years.  26, |
| 21 | Simeon is. |
| 22 | Q.  Were any of these children living |
| 23 | with you immediately before Hurricane |
| 24 | Katrina? |
| 25 | A.  Latonia was. |

Page 14

| | |
|---|---|
| 1 | driver.  I ended up as an instructor, training |
| 2 | people to drive buses and streetcars. |
| 3 | Q.  And when did you begin as a |
| 4 | streetcar driver for RTA? |
| 5 | A.  January the 17th, 1977. |
| 6 | Q.  And when did you retire? |
| 7 | A.  August 1st, last year. |
| 8 | Q.  2006? |
| 9 | A.  Yes. |
| 10 | Q.  Do you receive retirement benefits |
| 11 | from them? |
| 12 | A.  Yes. |
| 13 | Q.  And do you have any other employment |
| 14 | now in your retirement years? |
| 15 | A.  No. |
| 16 | Q.  You're fully retired since August of |
| 17 | last year? |
| 18 | A.  Yes. |
| 19 | Q.  Tell me about your experience with |
| 20 | past hurricanes, not Hurricane Katrina, but |
| 21 | past hurricanes at your house on Morel |
| 22 | Street. |
| 23 | A.  When -- Now when I know one is |
| 24 | coming, I leave town.  My wife was in Betsy as |
| 25 | a kid and she is terrified of storms.  So if |

Page 16

| | |
|---|---|
| 1 | Q.  And is she still living with you? |
| 2 | A.  No, she just recently moved to Baton |
| 3 | Rouge. |
| 4 | Q.  And approximately when was that? |
| 5 | How recent? |
| 6 | A.  Three weeks ago. |
| 7 | Q.  And do you have any other people who |
| 8 | are currently dependent on you? |
| 9 | A.  No. |
| 10 | Q.  And what is your current address? |
| 11 | Is that 7650 Morel Street? |
| 12 | A.  Yes, it is. |
| 13 | Q.  And how long have you been at that |
| 14 | address? |
| 15 | A.  Since December the 15th, 1986. |
| 16 | Q.  And what is your educational |
| 17 | background? |
| 18 | A.  I graduated from high school. |
| 19 | Q.  Any other specialized training? |
| 20 | A.  No more than training for my job at |
| 21 | RTA. |
| 22 | Q.  And tell me about your job at RTA. |
| 23 | I understand that you're retired, but I don't |
| 24 | know anything else. |
| 25 | A.  Well, I started there as a streetcar |

Page 15

| | |
|---|---|
| 1 | there's a chance we get it, I'm out of here. |
| 2 | Q.  In the prior hurricanes, though, was |
| 3 | there damage to your house in any of them? |
| 4 | A.  One a few years back.  I don't |
| 5 | remember the name of it.  We had a little wind |
| 6 | damage. |
| 7 | Q.  Okay. |
| 8 | A.  And that's about it. |
| 9 | Q.  Approximately what was the dollar |
| 10 | value of that wind damage? |
| 11 | A.  I think about $6,000 or something |
| 12 | like that. |
| 13 | Q.  All right. |
| 14 | A.  Had a roof and my shed and stuff |
| 15 | like that messed up.  That's about it. |
| 16 | Q.  Blown off and covered by your |
| 17 | homeowner's insurance? |
| 18 | A.  Yes.  Yes. |
| 19 | Q.  You used that money to fix the |
| 20 | house? |
| 21 | A.  That's correct. |
| 22 | Q.  On any of the other past hurricanes, |
| 23 | was your house ever damaged? |
| 24 | A.  No.  We'd leave and be back in two |
| 25 | days. |

Page 17

5  (Pages 14 to 17)

HENRY DAVIS                                                                7/11/2007

```
 1      Q.  Did you ever have water standing in
 2  the street as a result of those other --
 3      A.  Never.
 4      Q.  Water standing in your yard?
 5      A.  Never.
 6      Q.  So before Hurricane Katrina you
 7  believe that your neighborhood was pretty well
 8  located and situated as far as risk for
 9  hurricane damage?
10      A.  As far as drainage and stuff, yes, I
11  do.  I believe it was.
12      Q.  The hurricane that you had the wind
13  damage in, would that have been Hurricane Ivan
14  in 2004?  Or Hurricane Georges in 1998?
15      A.  Could have been George, I think.
16  I'm not sure which one it was.
17      Q.  Okay.  In the 20 years that you've
18  lived at this house on Morel, other than
19  Hurricane Katrina, you just had this one
20  incident, don't remember which hurricane it
21  was, and the damage there was limited to wind
22  damage, approximately $6,000 that you were
23  paid by your homeowner's insurance?  Is that
24  correct?
25      A.  That's correct.
                                     Page 18
```

```
 1  the rest of the day going through details, --
 2      A.  We are?  Well, we better take breaks
 3  and put money in that parking meter.
 4      Q.  Let us know when you need a break.
 5      A.  Okay.
 6      Q.  But just give me a brief overview so
 7  that I have a little bit of an idea about
 8  where were you before; during, I understand
 9  you evacuated, after, but could you just give
10  me a brief description so I kind of have an
11  understanding of what we're going to be
12  talking about for the rest of the day.
13      A.  Okay.  The Saturday before the storm
14  I left going to Mississippi.  That Monday, I
15  am looking at television and I see water all
16  over Jazzland so I know I am real close to
17  Jazzland.  At that point I know I am probably
18  under water, too.  Now, I wasn't sure, but
19  then when I tried to come back, I couldn't get
20  in, so then I was sure.
21      Q.  When did you try to come back?
22      A.  I tried to come back I think that
23  Friday after that Monday.
24      Q.  And Monday was the Hurricane
25  Katrina?
                                     Page 20
```

```
 1      Q.  All right.  And would you describe
 2  the location of your house just for the record
 3  geographically?  You're pretty near the Lake
 4  Pontchartrain, aren't you?
 5      A.  Yes.  I'm pretty near -- You know
 6  where Jazzland is?
 7      Q.  I'm from out of town, but I have
 8  looked at a map so I know where you are on the
 9  map.
10      A.  Okay.  Well, I'll describe it if
11  you're not from here.  Because all I can do is
12  tell you places that's around it.
13      Q.  Sure.  Go ahead.
14      A.  Okay.  Jazzland on one side, Haynes
15  and Morrison intersect.  Haynes -- I'm on
16  Morel between Morrison and, what's that
17  street, Curran.  Morrison and Curran.
18      Q.  To the north of your house up at
19  Lake Pontchartrain there is a levee wall up
20  there, isn't there?
21      A.  Yes, there is.
22      Q.  Approximately how far is that?
23      A.  From my house?  On Haynes, maybe
24  about half a mile.
25      Q.  Half a mile?  We're going to spend
                                     Page 19
```

```
 1      A.  No, Monday was the day of the -- I
 2  think Katrina was Sunday.  I think.  Was it?
 3  I think.
 4      Q.  I am not sure now.  Whichever day it
 5  was, Friday of that week --
 6      A.  Yeah, whatever day --
 7      Q.  -- was when you tried to come back?
 8      A.  After the storm on Friday I tried to
 9  come back.
10      Q.  All right.  And you say at that time
11  you were blocked by the police, you couldn't
12  get in?
13      A.  Yeah, I couldn't get in.
14      Q.  All right.  So you went back to
15  Mississippi?
16      A.  I went back to Mississippi.
17      Q.  And when was the second time that
18  you returned to New Orleans?
19      A.  It was a couple of months later.
20  Because after that I went to Baton Rouge.  My
21  job called me to go to Baton Rouge to work.
22  And I got off there and I don't know if there
23  was -- it was still kind of blocked off, but
24  nobody was there so I just came and looked.
25  Man, looked like a bomb had hit the place.  I
                                     Page 21
```

HENRY DAVIS                                                    7/11/2007

| | |
|---|---|
| 1 didn't think I'd be able to get back. | 1 date for that. They treated the stuff for |
| 2 Q. Tell me a little bit more | 2 mold and all of that. And it was in July of |
| 3 specifically about how your house on Morel | 3 '06 that I started putting it back together. |
| 4 looked. | 4 The last two weeks of July I think it was. |
| 5 A. All the furniture was in the same | 5 Q. And when were you able to move back |
| 6 spot. It just had mold coming up the wall. | 6 into the house? |
| 7 The floors and stuff was still wet -- | 7 A. I think it was in December. |
| 8 Q. Yes. | 8 Q. Okay. As I said, we're going to |
| 9 A. -- from the carpet. A smell out of | 9 come back and talk about all of that. I just |
| 10 this world. It just was horrible looking. | 10 wanted to get a little bit of a preview. |
| 11 Q. But no standing water? | 11 Do you know what a Form 95 is? |
| 12 A. No, the water had gone down, but I | 12 A. No. |
| 13 still had it in the rugs and stuff on the | 13 Q. You signed a written authorization |
| 14 floor. | 14 to allow your attorney to file a form with -- |
| 15 Q. Sure. It was still wet there? | 15 A. Okay. |
| 16 A. Uh-huh (affirmatively). | 16 Q. -- the government to make your claim |
| 17 Q. All right. | 17 against the Corps of Engineers. |
| 18 A. And the closets, I don't know, it | 18 A. Okay. |
| 19 was black stuff all over the place | 19 Q. And that was -- the government's got |
| 20 everywhere. | 20 a number for everything, and that piece of |
| 21 Q. This is a one story house? | 21 paper is called a Form 95. |
| 22 A. Yes. | 22 A. Okay. |
| 23 Q. Was there any damage to your roof? | 23 Q. You know that your attorney filed |
| 24 A. Some wind damage, yeah. I had -- | 24 that Form 95 on your behalf? |
| 25 Well, where my daughter's room is, there's | 25 A. Yes. |
| Page 22 | Page 24 |

| | |
|---|---|
| 1 some kind of vent pipe that comes out. The | 1 Q. And have you seen a copy of that? |
| 2 top, it had a plastic boot thing over it. | 2 A. Yes. |
| 3 That had split, water poured in; all the | 3 Q. All right. I want to begin by |
| 4 ceiling and everything fell down. | 4 understanding the injuries that you're |
| 5 Q. Okay. | 5 claiming in this lawsuit. I have had produced |
| 6 A. So that room was messed up the | 6 by your attorneys, of course, that Form 95 and |
| 7 worst, my daughter's room. | 7 it has three types of injuries, damages that I |
| 8 Q. Did any other ceilings fall in? | 8 understand. The first is your house being |
| 9 A. No. That's the only ceiling. | 9 severely damaged, and that's one type. I |
| 10 Q. No other roof damage you recall? | 10 understand that. Second was your personal |
| 11 A. Well, they had -- yeah, I had | 11 possessions; lawyers call it personal |
| 12 shingles blown off all around, but I was able | 12 property. |
| 13 to get it patched back up. | 13 A. Uh-huh (affirmatively). |
| 14 Q. And all of this was about two months | 14 Q. Your furniture and clothes and car |
| 15 later, so you're thinking October or so? | 15 and boat, all of that stuff other than your |
| 16 A. Somewhere in that neighborhood, | 16 house and land. |
| 17 yeah. | 17 A. Okay. |
| 18 Q. Maybe November? | 18 Q. So that's the second kind of damage |
| 19 A. Could be. | 19 you're seeking in the lawsuit. |
| 20 Q. When did you actually come back to | 20 A. Okay. |
| 21 New Orleans to begin repairing the house or | 21 Q. And third was severe mental |
| 22 occupying it? | 22 distress. Do I understand that those are the |
| 23 A. After they let everybody back in, I | 23 only three types of damages, types of relief |
| 24 had somebody come and gut the house, take all | 24 you're seeking in this lawsuit? |
| 25 the furniture out. I don't remember the exact | 25 A. Yes. |
| Page 23 | Page 25 |

7 (Pages 22 to 25)

HENRY DAVIS                                                                7/11/2007

```
 1      Q.  Is that correct?
 2      A.  That's correct.
 3      Q.  Not seeking any other relief,
 4   damages or injuries in this lawsuit?
 5      A.  No.
 6      Q.  And again, I am going to come back
 7   and talk about the circumstances of each of
 8   those types of damages in detail in a minute,
 9   but I would like to go through those three
10   types just to make sure I understand the
11   particular damage first.
12      A.  Okay.
13      Q.  Beginning with your house -- And
14   again, this is the house at 7650 Morel that
15   was damaged in the storm; right?
16      A.  Yeah.  Yes.
17      Q.  The house you lived at for 20 years?
18      A.  Yes.
19      Q.  Would you give me a kind of before
20   and after description of the house?  One
21   bedroom -- I mean one level house, you said?
22      A.  Yes.
23      Q.  I have seen a picture of brick
24   walls.
25      A.  Uh-huh (affirmatively).
```
                                        Page 26

```
 1      Q.  About how many square feet?
 2      A.  That, I don't really remember
 3   exactly, --
 4      Q.  Okay.
 5      A.  -- the square footage.  It's got
 6   three bedrooms, a living room, kitchen, and
 7   two baths.
 8      Q.  All right.
 9      A.  It was in really great shape before
10   the storm because I had did some work to it.
11      Q.  Yes.
12      A.  And it was, to me, it was just in
13   great shape.  It's back in that order now, but
14   in the time in between, I didn't think I'd
15   ever be able to get back in there when I first
16   saw it.
17      Q.  Do you have any pictures of the
18   house before and after?
19      A.  No, I had some of the storm, but I
20   think I gave them to Road Home, but I don't know
21   what I did with them after that or something.
22   I don't know if I got them back or not.
23      Q.  So you think you might have given
24   that with your application for the Road Home
25   Program?
```
                                        Page 27

```
 1      A.  Right.  Not -- Not Road Home.  The
 2   other one.
 3      Q.  The Form 95 that we talked about?
 4      A.  No.
 5      Q.  Your insurance?
 6      A.  No.
 7      Q.  We'll talk about those --
 8      A.  Yeah, I'll think about what it is in
 9   a minute.
10      Q.  We'll talk about those in a while
11   and maybe it'll come back then.  So that was
12   the damage to your home that you considered to
13   be pretty major damage.
14      A.  Right.
15      Q.  Okay.  Let's move to your second
16   kind of injury for your personal property.  Of
17   all of the possessions that you had in the
18   home, were all of them destroyed, some of them
19   destroyed?  Tell me about how much damage you
20   suffered there.
21      A.  Once I came in and saw it, I hired
22   somebody else just to -- It looked like it was
23   damaged to me.  Everything, you know, like it
24   was.
25      Q.  Were all of your clothes damaged?
```
                                        Page 28

```
 1      A.  Oh, yeah.  They had mold all over,
 2   up the wall and -- I don't think you could do
 3   anything with that.
 4      Q.  All right.  And your furniture?
 5      A.  Yeah.  Everything that was on the
 6   floor got wet.
 7      Q.  So it had soaked up the water and
 8   had mold on it?
 9      A.  Uh-huh (affirmatively).
10      Q.  All right.  What about --
11      A.  The computer and stuff that -- one
12   part sits right on the floor, so I know that
13   was gone.  The same thing with the surround
14   sound to the TV, it sits on the floor.  A part
15   of it.  So I didn't check the part that was
16   up, but just the whole thing.
17      Q.  Did you submit an insurance claim on
18   any of these items?
19      A.  Yes.
20      Q.  Was it your homeowner's insurance or
21   flood insurance or both?
22      A.  Flood.  Homeowner's didn't pay a
23   dime.
24      Q.  All right.  Did you prepare as part
25   of that insurance claim a list of these items
```
                                        Page 29

                                        8  (Pages 26 to 29)

1  of your personal property?
2      A.  Yes.
3      Q.  Okay.  We're going to talk about
4  that in some detail in a while.
5          Were there some items of your
6  personal possessions, though, that were
7  saved?  Maybe jewelry that your wife had or
8  maybe you had silverware, something of
9  particular value that would have been --
10     A.  No more --
11     Q.  -- up on a shelf and not been
12 damaged?
13     A.  No more than the stuff we left
14 with.  We left with a couple of watches and
15 some rings.  But the other stuff, once I got
16 back, I just told them, you know, -- Somebody
17 else went in before me.  So if anything was
18 salvageable, I didn't know anything about it.
19 I hired somebody to clean the house up.
20     Q.  Well, when you came back and you
21 looked at the house and you saw the mold
22 damage and the floors still wet and --
23     A.  Dark in that house.  No power.  We
24 looking with a flashlight.
25     Q.  At that point, though, before you

Page 30

1  hired someone to just take everything to the
2  outside, did you make the judgment that
3  everything inside had been ruined or not?
4      A.  It looked ruined to me.
5      Q.  Okay.  So, I mean, you didn't just
6  look around for five minutes and then say, "I
7  don't know if it's there or not, just take --
8  you know, just give it all away"?  You thought
9  it was ruined?
10     A.  I came in, they had a horrible
11 smell.
12     Q.  Yes.
13     A.  Carpet was squishing all over the
14 place.
15     Q.  Yes.
16     A.  No lights.  I am looking with a
17 flashlight.  I don't know how well I could be
18 in there a long period of time.  I looked to
19 the best of my ability, I get the heck out of
20 there.  I didn't see anything in that house
21 that I still wanted.
22     Q.  How long do you imagine you were in
23 the house doing that inspection?
24     A.  Maybe 20 minutes.
25     Q.  All right.  And at that time you

Page 31

1  left that address and just turned it over to
2  someone else?
3      A.  Right.
4      Q.  And --
5      A.  My daughter was still living here.
6  What I did is I gave her a key, I told her I'm
7  going to have somebody come out there to do
8  it, just come out and open the door when they
9  come in, which she came out and opened the
10 door and let them in.
11     Q.  Okay.  And who was that person that
12 you hired to do that?
13     A.  His name was Kedrick something.  I
14 saw a sign that he do that and I just hired
15 him.  Kedrick.  I don't know what his last
16 name was.  His name, his first name was
17 Kedrick, I know that.
18     Q.  Okay.  We're going to come back and
19 talk more about the detail and everything.
20 But that gives me an idea about the inside.
21         What about your property outside?
22 You have two automobiles, I believe, a --
23     A.  Yes.
24     Q.  A Tahoe and a Ford truck?
25     A.  That's what I have now.

Page 32

1      Q.  Okay.
2      A.  Before I got the Tahoe I had the
3  Ford truck and a -- and a -- what was that.  A
4  '97 Lumina.
5      Q.  All right.
6      A.  But when we left, we left the Lumina
7  there.
8      Q.  All right.
9      A.  It got totaled.  But they only gave
10 me I think $2,000 for it.  I thought that was
11 a rip-off.  It was in great shape.
12     Q.  I'll come back to the details of
13 that claim in a little while.  But you had
14 this car that had been left, and it was
15 totaled?
16     A.  Right.
17     Q.  And you resolved that by insurance
18 later?
19     A.  Right.
20     Q.  All right.  What about your -- Do
21 you have a boat trailer, or boat, or both?
22     A.  Both.
23     Q.  All right.  Were they left there
24 during Hurricane Katrina?
25     A.  Yes.

Page 33

HENRY DAVIS                                                                    7/11/2007

1      Q.   And what was their state when you
2  returned to your house?
3      A.   The boat was in good shape because
4  my neighbor across the street didn't leave.
5  He came over and put the plug in the boat.  So
6  the boat kind of floated and damaged the patio
7  poles and stuff just moving back and forth on
8  the trailer.
9      Q.   Okay.  Can you think of any other
10  high dollar items of personal property?
11     A.   That was lost.  My shed.  My shed
12  looked like a bomb hit it.  And homeowner's
13  was supposed to pay for that.  They didn't.  I
14  had the fence just destroyed all the way
15  around.  Homeowner's didn't pay nothing for
16  that either.  The roof damage, homeowner's
17  didn't pay a dime.  So all of that stuff I had
18  to fix myself out of my own pocket.
19     Q.   Let's go back and talk about those.
20  Tell me about your shed.  Where was it?
21     A.   It was in the same location as the
22  new shed I got now.  It just was --
23     Q.   Is this in the backyard?
24     A.   In the backyard, yes.
25     Q.   All right.  And how large was it?
                                    Page 34

1      Q.   Had it been hit by other debris in
2  the storm?  Why would it be gone?
3      A.   Maybe the wind blew it away.  I
4  don't know.  I don't know what happened to it.
5      Q.   Okay.
6      A.   I know it wasn't there.  But with
7  the fence missing, too, it could have been
8  anywhere.  I don't know.  The grass was high
9  all over the place.
10     Q.   Tell me about the fence.  The fence
11  around the yard.
12     A.   It was all gone.  It was just --
13  poles bent.
14     Q.   Chain link fence?
15     A.   It was a wooden fence.
16     Q.   A wooden fence?
17     A.   Uh-huh (affirmatively).
18     Q.   How high?
19     A.   Six foot.
20     Q.   How constructed?
21     A.   It was metal poles and two by fours
22  going across.  All of that was wiped out.
23     Q.   And what do you think on that?  It
24  had to be wind?
25     A.   That's what I say.  Homeowner's said
                                    Page 36

1      A.   This one is an 18 by 12.  That one
2  might have been 14 by 12.
3      Q.   Now, was this a structure you had
4  built or is it one of those metal sheds that
5  you buy at Sears or some place and kind of
6  construct it?
7      A.   No, it was a -- it was a built
8  shed.  Tin.  It was built out of tin.  I had a
9  guy come build it in the backyard.
10     Q.   All right.  What year was it built?
11     A.   That must have been built in about
12  '95 maybe.
13     Q.   And what kind of condition was it in
14  before Hurricane Katrina?
15     A.   It was in good shape before the
16  storm.
17     Q.   Okay.  And when you came a couple of
18  months after Hurricane Katrina, what condition
19  was it in?
20     A.   There was really nothing left but
21  the floor structure.  I don't know where all
22  the tin around it was -- it must have just
23  blew.  I don't know what happened to it.
24  Had a little bit of it in the yard, but some
25  of it was gone.
                                    Page 35

1  it wasn't.
2      Q.   But you said it was?
3      A.   Yeah, I said it was.
4      Q.   And your roof you said was --
5      A.   Shingles missing.
6      Q.   Tell me about the roof.  You said
7  there were some missing shingles before.
8      A.   Yes.
9      Q.   And you said that the seal around
10  the pipe --
11     A.   Pipe.
12     Q.   -- that came down to your daughter's
13  bedroom --
14     A.   It was all split.
15     Q.   Split?
16     A.   And water came in through that I'm
17  sure.
18     Q.   Okay.  Were there any other items?
19  I mean, I am going the call those two, the
20  shingles missing and the pipe that came down.
21  Was there any other damage to your roof?
22     A.   No, I got some gutters that leaked
23  that I don't think was leaking before.  I
24  can't figure out what could have caused it.
25  Maybe wind.  I don't know.
                                    Page 37

                                    10  (Pages 34 to 37)

HENRY DAVIS                                                              7/11/2007

1      Q.   Okay.  Anything else that comes to
2   mind just talking about the particular
3   injuries to the house or your personal
4   possessions that we haven't covered
5   generally?
6      A.   That's about it.  I don't know.
7      Q.   Let's talk about the third type of
8   injury that you're alleging, your severe
9   mental distress.  Tell me a little bit about
10  that.
11     A.   Tell you a little bit about me first
12  and then I'll get to that.
13     Q.   All right.
14     A.   I've been taking care of me since I
15  was 18 years old.  I never thought that I
16  would be homeless also.  When I came back that
17  Monday, I realized I was really homeless.  I
18  ended up staying with some people that didn't
19  want me there at their house.  And that's
20  really stressful when somebody wants you out
21  of their house and you can't find anywhere to
22  go.  That's super stressful.  I endured that
23  part for about a month and a half before I
24  could find anything, and I found a dump.  I
25  hurried up and moved into a dump.  When you

Page 38

1   walk on the floor, it felt like you were going
2   to fall through, and I am in an upstairs
3   apartment.  That was the best I could find at
4   that time.  So that's what I mean by that.
5      Q.   Okay.  Let's start with the living
6   with people.  This is when you first evacuated
7   New Orleans --
8      A.   No.
9      Q.   -- and went to Mississippi?
10     A.   No.  When I left Mississippi and
11  came to Baton Rouge due to my job, I was
12  living with my wife's cousin --
13     Q.   Yes.
14     A.   -- who already had seven or eight
15  other people living in his house, and it's a
16  small house.  It was horrible, man.
17     Q.   So this was when you first went to
18  Baton Rouge?
19     A.   When I went to Baton Rouge.
20     Q.   And that was about one and a half
21  months?
22     A.   Before I could find an apartment.
23     Q.   And at that time it was your
24  wife and your daughter, youngest daughter
25  living with you still?

Page 39

1      A.   Yeah.
2      Q.   All right.
3      A.   Well, what happened, that's -- my
4   youngest daughter stayed in Mississippi when I
5   left, because I thought I was only going to be
6   gone three or four days.  They had something
7   starting up in Baton Rouge for three or four
8   days, and that's what I told the gals, I was
9   going to be there for three or four days.  But
10  after I got to Baton Rouge, they wanted to
11  start up the whole nine yards and I really
12  didn't have anywhere to go, but I needed my
13  job so I had to do what I had to do.
14     Q.   So you had to stay with your wife's
15  cousin, and that was not a happy month and a
16  half?
17     A.   No.  No.
18     Q.   Okay.  And as a result of that month
19  and a half experience you suffered mental
20  distress?
21     A.   Man, just being homeless is enough
22  to do that.  But being with somebody else who
23  don't want you there, that was hard for me.
24     Q.   Now, the second part that you
25  identified was that you finally found a place

Page 40

1   that you could move your family, --
2      A.   Right.
3      Q.   -- but it was a dump?
4      A.   That was a dump.
5      Q.   Tell me about that.  That's still in
6   Baton Rouge?
7      A.   It's still in Baton Rouge.
8      Q.   Okay.
9      A.   At the front door, it felt like the
10  floor was loose.  When you step, it feel like
11  you about to go through.  The rooms was real,
12  real tiny.  You didn't have enough room really
13  to move around.  And the floors was all uneven
14  all over the place.  I think the rent was 400
15  a month or something like that.  But it just
16  wasn't a very nice place to be in.
17     Q.   So this was a small apartment that
18  was just a dump?
19     A.   Yes, it just was a dump.
20     Q.   How long did you live in this dump?
21     A.   About two months.  And then FEMA
22  gave me a trailer.  It was another little
23  hardship, but I made the best of that.
24     Q.   Okay.  So the FEMA trailer was
25  somewhat of a hardship, but nothing compared

Page 41

11  (Pages 38 to 41)

HENRY DAVIS                                                      7/11/2007

```
 1   to living with the relatives for a month and a
 2   half?
 3       A.  And the dump.  It was better than
 4   that.
 5       Q.  And the dump.  Okay.
 6       A.  It just was real tiny.  It was
 7   small.
 8       Q.  Okay.  Was there any other aspect of
 9   your mental distress between those three
10   items, living with your relatives, the dump,
11   and the FEMA trailer?
12       A.  That's about it.
13       Q.  Okay.  And how long were you in the
14   FEMA trailer?
15       A.  I don't know exactly what month I
16   went into it.
17       Q.  Was that still in Baton Rouge?
18       A.  It was still in Baton Rouge.
19       Q.
20       A.  It was still in Baton Rouge until
21   they got me a trailer here in New Orleans.
22   Well, I waited until I retired to come to the
23   one here in New Orleans to start to work on my
24   house.  I just didn't work here in New Orleans
25   about maybe four -- four months.  I came in
```
Page 42

```
 1   August.  September, October, November.  About
 2   three months.  Because I moved in by
 3   December.
 4       Q.  Okay.  Any other aspects to your
 5   mental distress that you haven't told me
 6   about?
 7       A.  Not that I could think of right now.
 8       Q.  Okay.  Again, preview question, but
 9   I want to get a list of the places that you
10   made claims for assistance.  I believe that
11   you mentioned that you had home insurance.
12   Did you make a claim against the home
13   insurance?
14       A.  Uh-huh (affirmatively).  What they
15   did is when I was in Baton Rouge, they gave me
16   $1,500.  Like a living expense.  I thought it
17   was.
18       Q.  Yes.
19       A.  In the end, they told me that they
20   gave me the $1,500 and that was an
21   overpayment.  That's the worst thing I ever
22   heard of, you know.
23       Q.  Okay.  We're going to go through
24   this again.  But the flood insurance, though,
25   you did receive?
```
Page 43

```
 1       A.  Yes.
 2       Q.  And how much of a policy for flood
 3   insurance did you have?
 4       A.  They gave -- I don't -- I think they
 5   gave me --
 6       Q.  Do you know what your policy limit
 7   was?
 8       A.  I don't -- I don't remember right
 9   now.
10       Q.  You know what I mean, the maximum
11   amount?
12       A.  I know.  I think I got pretty much
13   the maximum amount, though.
14       Q.  Okay.
15       A.  I think I did.
16       Q.  And what about was that
17   approximately?
18       A.  Well, they gave me my -- they paid
19   me for my contents and they gave me -- I think
20   they gave me 33,000 for the contents, I
21   think.
22       Q.  Okay.  And what did they pay you for
23   the house?
24       A.  I don't -- I don't know the exact
25   figure.
```
Page 44

```
 1       Q.  Okay.  And I know that you reached
 2   an agreement with the Road Home Program.
 3       A.  Yes.
 4       Q.  And how much did they pay you?
 5       A.  They gave me 52,000.
 6       Q.  Okay.  And were there any other
 7   Federal, state, local, charities, anything,
 8   any other programs that gave you --
 9       A.  FEMA gave me 2,000 and then they
10   gave me -- I don't know if it was $2,200 or
11   $2,400.  I don't remember the other one.
12   Somewhere in that field.
13       Q.  Okay.
14       A.  And LRA.  That's -- That's -- I got
15   a loan from them on my house.
16       Q.  What's the name again?
17       A.  Ain't that -- I think it's LRA.
18       Q.  LRE?
19       A.  LRA.
20       Q.  A?  And what was the loan amount?
21       A.  $10,000.
22       Q.  And that was for any purpose or to
23   use --
24       A.  For repairing stuff around -- You
25   know, I told you the homeowner's didn't give
```
Page 45

HENRY DAVIS                                                    7/11/2007

1  me anything.  I had to get my shed and stuff
2  put back.  So I used the money for that.
3      Q.  Okay.  I'm about to move on to
4  another area, but before I do, I want to
5  confirm that we have talked about all of your
6  injuries and damages and things.  I just want
7  to make sure that you're not seeking any other
8  relief.  You know, I have to get an exhaustive
9  list of everything you're claiming in the
10  lawsuit, all of which we're going to go
11  through again, but we're going to talk about
12  losing your house, number 1; number 2, losing
13  your personal possessions; and number 3, the
14  mental distress that you suffered as a result
15  of Hurricane Katrina.  Are you seeking any
16  other relief in this lawsuit other than for
17  those three categories?
18      A.  No.
19      Q.  Okay.  And I also want to confirm
20  with your Counsel.
21      MR. DOAK:
22          As we did in the prior
23      deposition, as you know, when the
24      deponent was noticed, attached to the
25      depo notice was Exhibit A with a list

                                    Page 46

1      A.  Not really.
2      Q.  There was -- I don't know that it
3  should.
4      A.  Okay.
5      Q.  I am just asking.
6      A.  Right.
7      Q.  There are three names.  There was a
8  set of what lawyers call requests for
9  admissions; there was a set of
10  interrogatories; and a set of document
11  requests, all pertaining to class
12  certification issues.  Do you remember seeing
13  or being asked anything about those discovery
14  requests?
15      A.  Not on the date you said, I don't
16  think.
17      Q.  Well, do you remember being involved
18  in those discovery requests on any other
19  date?  It would have been in the last couple
20  of months.
21      A.  I would have to see what you're
22  talking about.
23      Q.  That's what I am getting ready to do
24  next.
25      A.  I don't know if I can answer.

                                    Page 48

1  of document requests, and Defendants
2  agreed you didn't need to move for a
3  protective order on that.  You
4  informed us that you were making the
5  same objections which are the current
6  subject of discovery motions that are
7  pending.  But just to confirm with
8  you, based upon that agreement and
9  your current position, you're not
10  producing any documents in response to
11  that Exhibit A today, are you?
12      MR. EXNICIOS:
13          No, no documents are being
14      produced today.  Some documents were
15      produced previously and then the rest
16      of it is all part of that argument I
17      think taking place on the 17th.
18      MR. DOAK:
19          Okay.
20  EXAMINATION BY MR. DOAK:
21      Q.  Mr. Davis, on June 12th the
22  Plaintiff attorneys gave the Defendants some
23  responses to a written set of discovery that
24  we do in lawsuits.  Does that ring any bells
25  with you?

                                    Page 47

1      Q.  Mr. Davis, I'm handing to you what's
2  been marked as Davis Exhibit 1.  I ask that
3  you examine that.  I'll tell you that those
4  are the Plaintiff's responses to the
5  Defendants' class certification discovery
6  requests.
7      A.  I think I seen this one before.
8  Yeah.  I think I seen this one.
9      Q.  Did you see that after the answers
10  were prepared?
11      A.  No.  Is this the stuff that was sent
12  to me?
13      MR. EXNICIOS:
14          You can't ask me, unfortunately.
15      THE WITNESS:
16          I'm not sure.  Looks familiar,
17      but I am not sure.
18  EXAMINATION BY MR. DOAK:
19      Q.  You think it may look familiar?
20      A.  Yeah.
21      Q.  Do you think that you participated
22  in giving the answers, or was it sent to you
23  after it was already done just to keep you
24  abreast of what was going on in the lawsuit?
25      A.  I don't think it was already done.

                                    Page 49

                                    13  (Pages 46 to 49)

1    I don't think it was.  No.  I don't think it
2    was already done.  I think they sent me
3    something.
4        Q.  Let me hand you another document
5    that's been marked as Davis Exhibit Number 2.
6    And I will tell you that is the set of
7    Plaintiff's responses to the common liability
8    issues in the case.  I'd ask you the same
9    thing, to examine that document a little bit
10   so that we could discuss whether or not you
11   participated in its preparation.
12       A.  I think when I got this, it wasn't
13   answered and I didn't understand a lot of the
14   questions.  I did talk with somebody else on
15   this.
16       Q.  Okay.
17       A.  You know.  I didn't understand.  I
18   don't want to sign up on something I don't
19   understand.
20       Q.  I understand.
21       A.  So that's what may have happened
22   with this, --
23       Q.  Okay.
24       A.  -- you know.
25       Q.  But you think that you did talk to

Page 50

1    one of your attorneys?
2        A.  Yeah.
3        Q.  I am not asking anything about what
4    you talked about, but you think that you may
5    have talked to one of your attorneys about
6    these discovery requests?
7        A.  I think this is what led me to the
8    three things you asked me about at first,
9    other than a whole bunch of other stuff that I
10   saw.
11       Q.  Okay.
12       A.  I think this is what I was looking
13   at.
14       Q.  Okay.  Do you recall when that
15   meeting was?
16       A.  No.
17       Q.  Was it recent, a few weeks ago?  You
18   were talking about being prepared for this
19   deposition?
20       A.  No, I was talking with somebody on
21   the phone about this, I think.
22       Q.  Okay.
23       A.  But I don't know when it was.
24       Q.  Okay.
25       A.  I think whenever it was, it was

Page 51

1    shortly after I got it.  I got it like on a
2    Friday and it may have been that Monday or
3    something else I talked to somebody else on
4    it.  Because I didn't understand it.  I didn't
5    want to say a whole bunch of stuff that don't
6    pertain to me.
7        Q.  Okay.  Let me ask you a few
8    questions about some documents.  You indicated
9    that you have submitted claim forms at least
10   to the Road Home Program?  Is that correct?
11       A.  That's correct.
12       Q.  And did you keep a copy of that
13   application form?
14       A.  I may have.  I don't know.  I'm not
15   sure.
16       Q.  And you also indicated that you made
17   an insurance claim, both against your
18   homeowner's policy and your flood insurance
19   policy; correct?
20       A.  Correct.
21       Q.  Did you keep a copy of your
22   insurance claim form?
23       A.  Probably so at home.
24       Q.  And did you keep a copy of your
25   flood insurance claim form?

Page 52

1        A.  Yes, I'm sure.
2        Q.  Did you prepare any kind of notes,
3    eyewitness account, either at the time you
4    evacuated your house or on the trips when you
5    were coming back to your house on Morel about
6    your experiences?
7        A.  No.
8        Q.  Do you have any documents or notes
9    that refer to the damages to your house on
10   Morel?  Did you keep any paperwork?
11       A.  I may have.  I'm not sure.
12       Q.  You had to pay somebody to do the
13   work; right?
14       A.  Yes.
15       Q.  And who were the companies that did
16   the work?
17       A.  What, the gutting out work?  The
18   work that I was just speaking of?
19       Q.  Yes.
20       A.  Just the gutting out or the coming
21   back up?
22       Q.  Both.
23       A.  I got some paperwork on the coming
24   back up.  I used a guy, it was a contractor I
25   used, a Hispanic guy named Jose.  I got some

Page 53

14  (Pages 50 to 53)

1  paperwork on that.
2      Q.  And do you have any paperwork about
3  your personal possessions that were lost?  You
4  said you thought you might have prepared a
5  list to one of the insurance companies in the
6  claim.
7      A.  I sent that to the insurance
8  company.  I don't know if I got it still.  I
9  may have.  I'm not sure.
10     Q.  Have you looked for it?
11     A.  No.
12     Q.  Okay.  Do you have any photographs,
13 videotapes, DVDs that refer to any of your
14 property damage?
15     A.  I had photos and I think I left them
16 at the place I told you where I got the
17 $10,000 out of.  It's not the Road Home.  It's
18 something else.  Some kind of loan.
19     Q.  But you would have something at home
20 that would probably refresh your memory
21 there?
22     A.  Maybe not.  I may have left it with
23 -- The pictures?  I might not have gotten the
24 pictures back.  Because they had to reclassify
25 me or something when I went to the City.  I

Page 54

1  had to go to City Hall and bring the pictures.
2      Q.  Yes.
3      A.  So I don't know if they still have
4  them.
5      Q.  Okay.  But what were you doing at
6  City Hall that you left the pictures with
7  somebody?  I am trying to find --
8      A.  To get -- To get certified to get a
9  permit to -- to come back up with my house.
10     Q.  A building permit?
11     A.  Yeah.
12     Q.  Okay.  And so --
13     A.  So I had to take pictures to them in
14 order to get started on the house.
15     Q.  Okay.
16     A.  And I think they kept them.
17     Q.  Did you make a copy of those
18 pictures for your lawyers?
19     A.  No.
20     Q.  Okay.
21     A.  I don't think I had a lawyer at that
22 time.
23     Q.  The various documents that we have
24 just talked about that you think you might
25 have at home, --

Page 55

1      A.  Uh-huh (affirmatively).
2      Q.  -- have you ever been asked
3  questions about those documents by your
4  attorneys?
5      A.  I was asked that about the pictures
6  and I can't find them.
7      Q.  Okay.  But what about the other
8  documents, the claim forms for the insurance
9  or the Road Home, all --
10     A.  No.
11     Q.  -- the other things we went through?
12     A.  No.
13     Q.  No, they did not ask you questions
14 --
15     A.  No.
16     Q.  -- for those documents?
17     A.  No.
18     Q.  Okay.  Now, Mr. Davis, I would like
19 to go back and talk about your three
20 categories of injuries in a little bit more
21 detail and talk about the real circumstances
22 and the details of each.  I like to give you a
23 road map.  I'm not trying to trick you.
24     A.  I thought that's what we just did.
25     Q.  No, I wanted to understand what your

Page 56

1  injuries were.  I want to talk now a little
2  bit more about what are the circumstances and
3  what you know about how those injuries
4  occurred, beginning with your house on Morel
5  being damaged.  What do you know about how
6  that damage occurred?  You weren't present.
7  You have already told me that.
8      A.  No, not -- I already told you what I
9  thought happened, you know, in that.  You
10 know, like the part on the roof, I believe
11 that water came in through there.  Now, --
12     Q.  Right.
13     A.  -- that's all I know about that.
14     Q.  Right.  No, I -- What you said on
15 the roof I understand.
16     A.  Okay.
17     Q.  What about the water that came into
18 your neighborhood; do you have any idea where
19 that water came from?
20     A.  No.  I believe it was the MRGO,
21 though.
22     Q.  Okay.
23     A.  That's where I believe it come from,
24 but I didn't see where it came from.
25     Q.  I didn't know if you know, were

Page 57

15  (Pages 54 to 57)

HENRY DAVIS                                                      7/11/2007

1   there any levees nearby that had overtopping
2   or breaches near your house?
3       A.  None near my house overtopped.  All
4   -- All of them are still the same, intact.
5       Q.  Okay.  We have talked about wind and
6   rain already.
7       A.  Uh-huh (affirmatively).  Okay.
8       Q.  When you came back, any sign of
9   looting or vandalism to your house?
10      A.  No.  I came back, all the furniture,
11  everything was in the same spot where it was
12  when I left it, but it just was wet, most of
13  it.
14      Q.  Okay.
15      A.  You could see where it had been
16  wet.  And mud on the floor where water came
17  in.
18      Q.  Right.  Mr. Davis, I am going to
19  hand you what's been marked Davis Exhibits 3,
20  4, and 5.  They are photographs, two per
21  page.  I just want you briefly to identify
22  it.  I guess the first page of pictures,
23  Exhibit 3, are two pictures of the outside of
24  your house?  Is that correct?
25      A.  That's correct.

                                        Page 58

1       A.  Was there when they came out.
2       Q.  I'm sorry?
3       A.  That's the one that was there when
4   they came out, when they came out to take the
5   picture.
6       Q.  I'm sorry, I am not understanding.
7       A.  That's the one that was there when
8   they came to take the picture a few weeks
9   after the storm.
10      Q.  But it was working at the time,
11  wasn't it?
12      A.  It was working.
13      Q.  So it wasn't damaged too badly by
14  the storm, because it was working at the time
15  nearly two years after Katrina?
16      A.  Yeah.
17      Q.  Yes, you agree with my question?
18      A.  It was working.
19      Q.  Okay.  Now, from that it would
20  appear that there must not have been too much
21  standing water on that side of your house?
22      A.  Well, if you look at this picture
23  now, this air conditioner here is elevated as
24  opposed to a lot of them that's not.
25      Q.  You're right.  It's elevated.

                                        Page 60

1       Q.  And this is a more recent photo
2   showing how it appears today now that you have
3   repaired the house?
4       A.  Uh-huh (affirmatively).
5       Q.  And the second picture would be
6   Exhibit 4, and it's two more photographs of
7   the front of your house --
8       A.  Uh-huh (affirmatively).
9       Q.  -- and your garage area?
10      A.  That's correct.
11      Q.  And the next exhibit, Exhibit 5,
12  shows your kitchen on the bottom and the --
13      A.  Kitchen on the top.
14      Q.  I'm sorry, on the top.  And on the
15  bottom, the air conditioner compressor on the
16  side of your house.
17      A.  That's correct.
18      Q.  And that's the air conditioner
19  compressor that you had before the storm;
20  right?
21      A.  That's correct.
22      Q.  And yet --
23      A.  Just recently had it changed,
24  though.
25      Q.  You did?  But this one --

                                        Page 59

1       A.  Uh-huh (affirmatively).  So I don't
2   know how high the water would have to get to
3   move in.  But air conditioning on the side of
4   the house, rain goes through them all the
5   time, so you can't say it wasn't much standing
6   water.  Due to that running, you can't say
7   it.  I couldn't.  You might would, but I
8   wouldn't.
9       Q.  I understand that the elevation of
10  your house is maybe six to eight inches higher
11  than other houses on your street anyway.  Did
12  you know that?
13      A.  No, I didn't know that.
14      Q.  And you're pointing out in this
15  picture, Exhibit 5, that your air conditioning
16  compressor is sitting on a cement platform.
17      A.  Uh-huh (affirmatively).
18      Q.  And that serves to raise it up a
19  little bit.
20      A.  (Witness nods head affirmatively.)
21      Q.  And certainly there is room for a
22  few inches of water to be standing there
23  perhaps without damaging the air conditioner
24  compressor.  And I think that's what you're
25  saying.  Correct?

                                        Page 61

16  (Pages 58 to 61)

HENRY DAVIS                                                          7/11/2007

**Page 62**

1    A.   That's what I am saying.
2        MR. EXNICIOS:
3        He's already answered, but I
4    object to the form.  Your summary, I
5    lost your summary in there.
6    EXAMINATION BY MR. DOAK:
7        Q.   When your house was repaired, tell
8    me about how much they had to gut the
9    insides.  Did they take down the drywall?
10       A.   They took out four feet of drywall
11   in all of the rooms except my daughter's
12   room.  In my daughter's room I told you it
13   came in through the roof, so the whole thing
14   had to be gutted and replaced.
15       Q.   So that was much more severe damage?
16       A.   Right.
17       Q.   Obviously you had the roof collapse
18   and you also had water coming from above that
19   the other areas of the house didn't have that
20   problem.
21       A.   That's correct.
22       Q.   They had water from below, but not
23   on top.
24       A.   That's correct.
25       Q.   Okay.  And you have already conceded

**Page 63**

1    that that was the water that was coming down
2    this pipe, however that pipe was damaged up on
3    the top of your house?
4        A.   That's correct.
5        Q.   For the rest of your house, though,
6    you're saying that the sheet walls in all of
7    the various rooms, they just cut out, they cut
8    it out at four feet, replaced that, and still
9    used the existing two by four studs and redid
10   the house with that repair?
11       A.   Correct.
12       Q.   Okay.  And have you ever heard
13   anybody say that you probably only had a few
14   inches of water standing in your house?
15       MR. EXNICIOS:
16       Objection to the form.
17   EXAMINATION BY MR. DOAK:
18       Q.   Have you ever heard people say that
19   you had standing water in your house that was
20   not more than six inches?
21       A.   I ain't heard nobody say that.  I
22   heard my neighbor across the street say -- You
23   know, he was here.
24       Q.   Yes.
25       A.   He said he had about three feet of

**Page 64**

1    water in his house.
2        Q.   All right.
3        A.   I don't know how much I had in my
4    house really.
5        Q.   Okay.  Tell me about your other
6    neighbors.  What else happened in your -- to
7    your neighbors according to either your
8    observation when you came back and looked --
9        A.   Well, this particular neighbor had
10   to change everything, because I think they
11   tried to get up in their attic and they ended
12   up falling through and all of that kind of
13   stuff.  So then they ended up on the roof for
14   four days.
15       Q.   Oh, my.  So they made the mistake of
16   not evacuating.
17       A.   And I called them to get out of
18   there and they just didn't do it.
19       Q.   And what did he report about the
20   water in your neighborhood?
21       A.   He said that the storm had passed,
22   he was taking the boards down off of his
23   windows, and he heard the water rushing around
24   the corner, with ice chests and buckets
25   banging into stuff and he couldn't figure out

**Page 65**

1    where the water was coming from.  And in a few
2    minutes it was up on his truck and he ran and
3    he -- somebody else had left some kids with
4    him, and he pulls the thing down for the attic
5    and run up in the attic and those kids was
6    moving around and falling through the
7    sheetrock, and they had to go back outside,
8    get on a ladder, and go on the roof.  That's
9    what he said.
10       Q.   And they were stranded for four days
11   before they were rescued?
12       A.   Four days.  Helicopters flying right
13   by them, wouldn't stop.
14       Q.   I was told that when the inspectors
15   were out, they had observed a lot of roof
16   damage, wind and rain roof damage in your
17   neighborhood.
18       A.   Uh-huh (affirmatively).
19       Q.   Do you agree with that?
20       A.   Yes.
21       Q.   Do you know from your neighbors that
22   many of them submitted insurance claims
23   because they had damage not due to the
24   flooding of water, but due to wind and rain?
25       A.   Uh-huh (affirmatively).

17 (Pages 62 to 65)

HENRY DAVIS                                                    7/11/2007

1      MR. EXNICIOS:
2          Objection to the form.
3          Go ahead.
4  EXAMINATION BY MR. DOAK:
5      Q.  Your --
6      A.  I know that they made claims like
7  that.
8      Q.  And that they were paid for them?
9      A.  I don't know how much they was paid,
10  but I know they made claims.  But the one
11  neighbor that I am talking about, I know that
12  he made a claim.
13      Q.  Okay.  You were looking at your
14  watch, sir.  Do you want to go put some coins
15  in the meter?
16      A.  I figure I got a few more minutes
17  before I have to.
18      MR. EXNICIOS:
19          We'll pay -- I'll pay your
20      ticket.  Don't worry about it.  Jon
21      will pay your ticket.
22  EXAMINATION BY MR. DOAK:
23      Q.  Do you know the interior local levee
24  by name in your area?  Do you know what that
25  refers to?

Page 66

1  were there others who where there during
2  Hurricane Katrina?
3      A.  There were others around the corner
4  that I know of --
5      Q.  Okay.
6      A.  -- that stayed, too.  And I don't
7  know what happened with them.
8      Q.  What's the name of the neighbor
9  across the street?
10      A.  Albert Dase.
11      Q.  Spell his last name, please?
12      A.  D A S E.
13      Q.  Going back to the specific repairs
14  on your house, I know that we were just
15  beginning to get into this before, but what
16  was the name of the person who took all the
17  stuff out when you first gave the order to do
18  that?
19      A.  His name was Kedrick.  I don't
20  remember what his last name was.  It was a one
21  day job, you know.
22      Q.  Would you have any documentation
23  that might identify him?  Did you write him a
24  check or pay him by cash?
25      A.  I may have written him a check.  I

Page 68

1      A.  No, I don't know the name of it.
2      Q.  Okay.  Do you know, is there a pump
3  station in your neighborhood?
4      A.  It's further down Haynes.  It's
5  maybe about two miles from where I'm at.
6      Q.  Okay.  Do you know anything that was
7  said about whether that pump station had
8  problems during Hurricane Katrina?
9      A.  Not that I know of.
10      Q.  Meaning that you haven't heard
11  anything one way or another, or that you have
12  heard and that it did not have a problem?
13      A.  I hadn't heard anything one way or
14  another.
15      Q.  Okay.
16      A.  That's always a good sign to me.  If
17  I don't hear nothing, didn't nothing happen,
18  it was working.
19      Q.  Because you weren't there, you don't
20  know how fast the water was moving?
21      A.  I wasn't there, but my neighbor said
22  it was fast.
23      Q.  Right.  Was this one neighbor across
24  the street who was in the attic, was he the
25  only neighbor that you knew who stayed, or

Page 67

1  may have written him a check.  I don't know.
2  And I could have paid him by cash because it
3  wasn't that much.  I think he charged me
4  $1,500 to take all of that stuff out.  And
5  that was all of the appliances and everything.
6      Q.  Right.
7      A.  Took everything out and gutted the
8  -- gutted the house out.  And took out
9  sheetrock, too.  So I thought that was a good
10  price.  I jumped on it right away.
11      Q.  So he had to kind of cut that stuff
12  out, right?  Take it out to the curb?  Is that
13  right?
14      A.  That's right.
15      Q.  And did he take it away as well?
16      A.  No.  All he did was just set it out
17  to the curb and FEMA picked all of that stuff
18  up.
19      Q.  Okay.  I just kind of want to go
20  through the steps of you rebuilding your house
21  and find out what they were, who the
22  contractor was, what documents you have, kind
23  of how much it cost, is where I am going with
24  this.
25      A.  Uh-huh (affirmatively).

Page 69

18  (Pages 66 to 69)

HENRY DAVIS                                                      7/11/2007

1      Q.   So that was step one, to get the
2   old, ruined stuff out of the house.
3      A.   Uh-huh (affirmatively).
4      Q.   What was step two?
5      A.   Step two, I had Jose -- I don't even
6   know -- Jose something.  I got -- I probably
7   have something on him, his last name, when I
8   get home.  I had him to come back.  I gave him
9   different jobs.  I wanted to see what type
10  work he was doing --
11     Q.   Yes.
12     A.   -- before I give him everything.
13     Q.   Sure.
14     A.   So I gave him the drywall first.
15  And then I gave him the molding.  And then I
16  saw he was doing pretty good.  You know, I
17  just gave him different jobs to do until I was
18  back complete.  Inside.
19     Q.   So if step one was taking all of the
20  ruined stuff out, step two --
21     A.   Was drywall.
22     Q.   -- was beginning to replace the
23  drywall?
24     A.   Uh-huh (affirmatively).
25     Q.   Replace molding where you needed to

Page 70

1      A.   All of them.  Every door in the --
2   interior door had to be redone.
3      Q.   Okay.  How about the wood framing
4   around doors?
5      A.   All that had to be done.
6      Q.   Okay.  And all of this, is it fair
7   to say this is all step two in the process?
8      A.   Yeah, you could say.
9      Q.   Redoing all of that kind of thing?
10     A.   Yeah, all of the interior,
11  everything in the interior had to be redone.
12     Q.   Okay.
13     A.   Even the upper cabinets that didn't
14  get wet, it's no way you can match them, so
15  you got to replace all of that.
16     Q.   Okay.  And what comes after that?
17  then was it ready to be painted, or did they
18  then bring in the new cabinets and
19  refrigerator and that stuff?
20     A.   Well, they installed the cabinets.
21  They did the painting, too.  They did the
22  drywall.  They did the -- Once you put the
23  sheetrock up, you got to put some kind of
24  texture on it.  They did that part.  Then they
25  did the painting.  Then they did the floors

Page 72

1   replace it?
2      A.   Uh-huh (affirmatively).
3      Q.   Do all of that kind of --
4      A.   Do flooring.  He did some ceramic
5   tiles for me, too.
6      Q.   Yes.
7      A.   I wasn't going back with carpet
8   because carpet I believe is what held the mold
9   in place.
10     Q.   Yes.
11     A.   Places where I had ceramic tile
12  before, I didn't have as much mold in there as
13  I did where I had carpet.  So I figured if
14  this ever happened again, I have less damage.
15  So I went ceramic as opposed to carpet.
16     Q.   Right.  Did all of the cabinets that
17  sit on the floor --
18     A.   Gone.
19     Q.   -- in the kitchen have to be
20  replaced?
21     A.   Yes.
22     Q.   And your bathrooms as well?
23     A.   Yes.
24     Q.   How about the doors around the
25  house?

Page 71

1   and the molding.
2      Q.   This is still the same guy that you
3   liked?
4      A.   The same guy.  The same guy.  I
5   hired the same guy.
6      Q.   Okay.  Now, were you probably paying
7   him by check by this time?
8      A.   Yes.
9      Q.   Okay.
10     A.   I was paying him by check.
11     Q.   And do you have invoices for his
12  work?  He'd write you invoices every week or
13  every -- from time to time to say what --
14     A.   Yeah.
15     Q.   -- he had done?
16     A.   Yes, I think I still got them.
17     Q.   And kind of -- I mean, you need that
18  for your insurance claims and all of that, I
19  assume?
20     A.   I had sent all of that to them so I
21  don't really need it now, but I may still have
22  some of it.  But I had to send it off to them
23  to make sure they cut the check so I could pay
24  him.  A lot of times I paid him out of my
25  pocket and I sent it in and deposit the check

Page 73

19  (Pages 70 to 73)

HENRY DAVIS                                                    7/11/2007

1   and replace the money.
2        Q.  Okay.  So he's done kind of all of
3   the carpentry, drywall, moldings, wood frames,
4   doors, new cabinets.  Then you had new
5   appliances brought in.
6        A.  Yeah.  Right.
7        Q.  Okay.  What else is being done to
8   the house?
9        A.  That's about it.  I --
10       Q.  Was it about done by then?
11       A.  Pretty much.
12       Q.  All of your brick on the outside was
13  still okay?
14       A.  Yeah.  My brick was all right.
15       Q.  And you had to I guess have a little
16  roof work to fix the shingles that were popped
17  loose?
18       A.  Right.  I had to do that.  I had a
19  guy named Mike, was a little roofing thing
20  done.  It's hard to get other people to do any
21  patch work, you know.  So I got this guy to
22  just patch up.
23       Q.  Those guys were real busy at that
24  time, weren't they?
25       A.  They wasn't doing no patch work.  It

Page 74

1   got a few guys to make the flooring for it.
2   Made the flooring, they came and put it on top
3   of the flooring.  It came out nice.
4        Q.  Okay.  Do you have any invoices and
5   paperwork for that?
6        A.  Yes.  I got the part for the shed
7   itself, but not for the flooring.
8        Q.  Do you have an estimate for what was
9   the total cost of repairing your house?
10       A.  No.
11       Q.  I mean the house part.  We're not to
12  the personal property yet.
13       A.  I would have to look at the
14  paperwork.  Now, I had so much done in
15  different steps, I really don't know until I
16  look at it all together.
17       Q.  So you don't know?
18       A.  No, not right off.
19       Q.  What do you think the value of your
20  house was the day before Hurricane Katrina?
21       A.  Probably about 110.
22       Q.  And what is that based upon?
23       A.  The fact that I hadn't been long
24  refinancing.
25       Q.  As part of that refinancing did you

Page 76

1   was real hard to find somebody to do that.
2   But this guy said he would do it.  He got up
3   there, did a pretty good, reasonable price.
4        Q.  And also fixed the drain pipe?
5        A.  Right.  Right.  He fixed that, too.
6        Q.  Okay.  And what was the name of his
7   company?
8        A.  He got -- He got up there hisself
9   and did that.  His name was Mike.
10       Q.  Do you think you got a bill from
11  him, an invoice telling you what he did?
12       A.  No.  I paid Mike cash.  You couldn't
13  -- You couldn't get a regular company to fool
14  with no patches.  They was doing whole roofs
15  and that's it.  They had plenty of them to
16  do.  But I had to get this done now.  So I had
17  to get who I can.
18       Q.  Right.  And then you also had to --
19  you said you had somebody rebuild your shed?
20       A.  I went to Crowley, Louisiana; you
21  know those things they use as a carport --
22       Q.  Yes.
23       A.  -- on a lot of houses?  Well, I
24  bought one of those, enclosed with a roll-up
25  door, and I had -- I stopped at Home Depot and

Page 75

1   have appraisers come out and appraise the
2   house?
3        A.  They sent somebody out and appraised
4   it.
5        Q.  Right.  And I think your last
6   refinancing was in 2003?  Is that correct?
7   Maybe one in 2003 and another one in 2003?
8        A.  I think it was in 2003, yeah.
9        Q.  Would that have been the last
10  official appraiser who came to your house?
11       A.  Yes.
12       Q.  And you think he appraised the house
13  and lot for 110,000?
14       A.  I think so.
15       Q.  Okay.
16       VIDEO OPERATOR:
17       Excuse me, Counsel.  Go off the
18  record to change tapes?
19       MR. DOAK:
20       Yes, that's a good time to take a
21  break.
22       VIDEO OPERATOR:
23       Now off the record.  That's the
24  conclusion of tape 1.  It's 11:52.
25       (Recess.)

Page 77

| | |
|---|---|
| 1     VIDEO OPERATOR: | 1     MR. EXNICIOS: |

1     VIDEO OPERATOR:
2     Returning to the record, it's
3    12:05.  This is the start of tape 2.
4  EXAMINATION BY MR. DOAK:
5     Q.  What else can you tell me about
6  other houses in your immediate neighborhood in
7  terms of the different types --
8     A.  A lot of damage, severe roof damage
9  that you could see when you drive by.  Just
10  about everybody's fence was gone like mine.
11  One of my neighbor's shed, they ended up two
12  houses over in their yard.  He had one of
13  those little metal sheds, though.  And that
14  blew two -- two houses down.
15     Q.  You had a lot of the blue roofs in
16  your neighborhood, didn't you?
17     A.  I had a lot of just shingles gone.
18  I don't think they even got the blue roof up
19  there.  They just -- You can still see it.
20     Q.  But don't you recall that a lot of
21  your neighbors had roof damage?  I thought
22  that's what you just said.
23     A.  Some in my area.  But not on my
24  street.  On my street we didn't have no blue
25  roofs.  Just had missing shingles.  Didn't

Page 78

1     MR. EXNICIOS:
2     I think that yellow mark is like
3  a little push pin thing.  So I think
4  the arrow is supposed to be here.
5     THE WITNESS:
6     Oh, I can find it.  Okay.
7     MR. EXNICIOS:
8     I think we have other ones that
9  are better.
10     THE WITNESS:
11     Okay.  I thought it was the
12  yellow mark itself.
13  EXAMINATION BY MR. DOAK:
14     Q.  I am handing to you what's been
15  marked as Davis Exhibit 7, is where I was
16  really going.  Can you locate your house on
17  that photograph, please?
18     A.  Uh-uh (negatively).  Which street is
19  supposed to be mine?  This one or this one
20  (indicating)?
21     Q.  I thought that where this white "L"
22  is, that you are in this vicinity.  I wasn't
23  sure which one.  But I thought that you would
24  be able to recognize from that shot.
25     A.  This could be it, yeah.  I think

Page 80

1  nobody put a blue roof up.
2     Q.  Mr. Davis, I am going to pass to you
3  Exhibit 6, which is a totally unremarkable
4  Google aerial shot of your house --
5     A.  Oh, yeah.
6     Q.  -- from high altitude.
7     MR. EXNICIOS:
8     Is the yellow mark where his
9    house is supposed to be?
10     MR. DOAK:
11     Yes.
12     THE WITNESS:
13     Okay.
14  EXAMINATION BY MR. DOAK:
15     Q.  I mean, you can see the lake shore
16  and everything.  Doesn't that look right to
17  you, approximately?
18     A.  Approximately.
19     Q.  Okay.  I am really just showing you
20  that to kind of --
21     A.  But the only thing on this, this
22  picture looks like I'm right up against the
23  lake.  I'm not that close to it.  See that
24  here?  If this is the lake, looks like I'm
25  right up against it.

Page 79

1  that patio cover there.  That white "L",
2  that's what that is.  This is it right here.
3     Q.  You think that's you with that white
4  "L"?
5     A.  Uh-huh (affirmatively).  See this
6  patio cover here?  It goes around the back
7  like this.  That could be it right there.
8  This looks like a double driveway, too.  This
9  is it.
10     Q.  Why don't we have you take a pen --
11  I know it may not write on there very well,
12  but do your best just to draw a box around
13  your house.
14     A.  (Writing).
15     MR. EXNICIOS:
16     That didn't show up at all.
17  Actually, hers would work better.  Try
18  it again.  Make it better.
19     THE WITNESS:
20     If I do, it'll get on somebody
21  else's house.
22     MR. EXNICIOS:
23     As long as yours is in the
24  middle.
25  EXAMINATION BY MR. DOAK:

Page 81

21  (Pages 78 to 81)

**Page 82**

1    Q.  I realize this is a slick photocopy
2    paper to show the picture better.
3        MR. EXNICIOS:
4           That works.
5    EXAMINATION BY MR. DOAK:
6        Q.  It's kind of hard to write on.
7        A.  Give her her pen back.  Here you go.
8        Q.  Thank you.
9        A.  I do believe that's it.
10       Q.  I'm going to hand you, Mr. Davis,
11   what's been marked as Davis Exhibit 8.  I am
12   really just walking you through these so you
13   can identify your house comfortably and then
14   show you a little larger view of your
15   neighborhood.
16       A.  Uh-huh (affirmatively).  That's it
17   right here (indicating).  Draw around that
18   one, too?
19       Q.  No, I think we can identify it from
20   the other ones.  And you're right, that on
21   your side of the street in your block there
22   are not a lot of other blue roofs, but in your
23   general area there are quite a few houses that
24   that photograph shows as having the blue
25   roof.

**Page 83**

1        A.  Uh-huh (affirmatively).
2        Q.  Is that correct?
3        A.  That's correct.
4        Q.  And again, you know I am from out of
5    town, I have heard a little bit that these
6    blue roofs were some FEMA thing?  Do you know
7    about them?
8        A.  Right.  That's what it's supposed to
9    be.
10       Q.  And I'll tell you my understanding.
11   You can agree with it or you probably know
12   more than I do, but apparently if you had roof
13   damage, presumably wind, rain or debris, and
14   you could call FEMA, they would come out and
15   inspect it and, if you met some standard in
16   their mind, they had this blue roof thing that
17   they could put over to protect your house?
18       A.  Uh-huh (affirmatively).
19       Q.  Is that kind of what was going on?
20       A.  Kind of what was going on.
21       MR. EXNICIOS:
22          I'll object to the form, but I
23   understand the spirit of the question.
24   EXAMINATION BY MR. DOAK:
25       Q.  I'm sorry, your answer was?

**Page 84**

1        A.  I think that's kind of what was
2    going on.
3        Q.  So you agree with these aerial
4    photographs that in your neighborhood, there
5    was a lot of -- there were a lot of houses
6    that had this blue tarp roof on them?
7        MR. EXNICIOS:
8           I'm going to just object to the
9    form of the question again.  I mean,
10   you can count the number of roofs --
11       MR. DOAK:
12          Okay.
13       MR. EXNICIOS:
14          -- and how many of them have
15   blue tarps versus those that don't.
16       THE WITNESS:
17          Yeah.  Like on my street, I'm
18   concerned about the street that I turn
19   on more.
20   EXAMINATION BY MR. DOAK:
21       Q.  Sure.
22       A.  I really don't know too much about
23   these streets.  All the other ones in those
24   areas.  And then if I am riding down the
25   street, I still wouldn't be able to see that

**Page 85**

1    blue roof a lot.
2        Q.  I know.
3        A.  So I wouldn't know how many exactly
4    they had there.
5        Q.  You were very fair with me earlier
6    this morning.  You told me that there were a
7    lot of your neighbors that you knew had roof
8    problems --
9        A.  Right.
10       Q.  -- and made insurance claims.  This
11   is merely --
12       A.  I know they made claims, but I
13   didn't know they had roof -- blue roofs.
14       Q.  This is merely supporting what you
15   already told me.
16       A.  Okay.  Had little patches of blue
17   roofs here.
18       Q.  Do you know about any -- Have you
19   heard of houses that blew up after the storm
20   because of natural gas leaks?
21       A.  Didn't happen in my area.  Ours is
22   totally electric.
23       Q.  Okay.  That was my question.
24       A.  Yeah.
25       Q.  Was there any criminal activity,

22  (Pages 82 to 85)

HENRY DAVIS                                                    7/11/2007

1  looting in your area?
2       A.  There was a lot of looting in my
3  area, but not at my house.
4       Q.  Right.
5       A.  The guy that stayed there could hear
6  a lot of looting going on.  He could see
7  people pushing stuff in little plastic pools
8  and all kind of ice chests and stuff that
9  float.  They were just taking stuff at will.
10 Saw a lot of people got back and they think
11 that -- they thought it was the people that
12 was checking for -- if they had bodies left in
13 the house, they kick the door in.  That wasn't
14 true in all cases.  Because my door, they
15 didn't enter my house at all before, because I
16 had bars on it.  And I had to open the bars
17 when I came back to go in.
18      Q.  Would you agree with me that the
19 level of flooding was markedly different in
20 different portions of East New Orleans
21 depending upon where you lived?
22      A.  Yes.
23      Q.  There were some areas where it was
24 completely to the top of the first floor,
25 however many feet that is; correct?
                                      Page 86

1       A.  Correct.
2       Q.  And there were some areas that were
3  maybe three feet of standing water.  You said
4  your neighbor thought he had three feet of
5  standing water --
6       A.  Uh-huh (affirmatively).
7       Q.  -- in his living room.  Is that
8  correct?
9       A.  That's correct.
10      Q.  And I was looking around to see if I
11 could find it.  I don't know if you read that
12 article, but it was by the writer in the local
13 newspaper with a woman who came back and
14 thought a miracle had happened because she had
15 no water whatsoever at her house and she was
16 in East New Orleans.
17      A.  She must have been right on Haynes.
18      MR. EXNICIOS:
19        Objection to form.  I mean,
20 there's no question there.
21      MR. DOAK:
22        I am asking him if he happened to
23 hear of that article.
24 EXAMINATION BY MR. DOAK:
25      Q.  Which I'll find in a minute and I
                                      Page 87

1  will give you the address and see if you know
2  where it is.
3       A.  Probably a preacher's house.  I
4  heard of a preacher's house that that happened
5  to.
6       Q.  When you purchased your house in
7  1986, what was the purchase price?
8       A.  68-5.
9       Q.  And when you purchased it in 1986
10 did you have an appraisal done as part of the
11 financing then?
12      A.  The house was brand new.
13      Q.  Okay.
14      A.  I'm the only one that ever lived in
15 that house, man.
16      Q.  But they still send out an appraiser
17 to make sure it's worth the money.
18      A.  They had it appraised, but I didn't
19 have to do it.
20      Q.  Yes.
21      A.  I think the -- whoever we financed
22 it through had somebody to appraise it.  I
23 think that's what happened.  I'm not really
24 sure.
25      Q.  And the purpose of that is to ensure
                                      Page 88

1  that a professional appraiser makes a specific
2  value determination of how much that house is
3  worth; correct?
4       MR. EXNICIOS:
5         Objection to form.
6       THE WITNESS:
7         Oh, I don't know why they do it.
8  I think that's why.
9  EXAMINATION BY MR. DOAK:
10      Q.  You think that's why?
11      A.  (Witness nods head affirmatively.)
12      Q.  You're nodding your head "yes".
13      A.  I think -- Yes, I know why they do
14 it, but I think they do it so they won't lose
15 money, I guess.
16      Q.  Right.  Are your name and your
17 wife's name on the title of this house?
18      A.  In the beginning it was just me.
19 Years later I added her to it.
20      Q.  Okay.  And that's still true today?
21      A.  Yes.
22      Q.  And I know that it has been a
23 difficult process, but now that the home is
24 restored, it's very nice, isn't it?
25      A.  Yes.
                                      Page 89

                              23  (Pages 86 to 89)

HENRY DAVIS                                                    7/11/2007

---

1      Q.  Indeed, it's probably a little nicer
2  than it was before just because it's brand
3  new?
4      A.  Yeah, it's brand new again.
5      Q.  Again.  Is there anything else that
6  you want to tell me that you think is
7  important about the circumstances resulting in
8  the damage to your house?  We're going to move
9  on to your personal property in a minute.  I
10  am just trying to think if I have left
11  anything out or is there something important
12  that you have been thinking of that I haven't
13  asked?
14      A.  Well, with the house sitting like
15  that for so many days under water, I was told
16  that there's some kind of cables that run
17  through and they got little spots where they
18  patched it up, I got to get all of that
19  cleaned up and get it done.  I don't know how
20  much that's going to cost.  But it should be
21  done I was told.
22      Q.  Okay.
23      A.  And I can see the rust from where
24  it's coming from, you know, out of the
25  cement.  So I know it needs to be done.

Page 90

---

1      Q.  All right.
2      A.  I don't have a clue how much that
3  costs.  That's the only thing that bothers me
4  now.
5      Q.  Anything else that you are thinking
6  about with respect to the damage to your
7  house?
8      A.  That's about it.
9      Q.  Okay.  Let's turn to the
10  circumstances surrounding your loss of
11  personal property.  Again, we'll exclude your
12  car and boat, the outside stuff, for a
13  moment.
14      A.  Uh-huh (affirmatively).
15      Q.  But you basically said that except
16  for the few things you took with you when you
17  evacuated, everything inside of the house was
18  a total loss?
19      A.  Yeah.
20      Q.  And I keep hearing you refer a lot
21  to mold --
22      A.  Right.
23      Q.  -- was a big problem in your house?
24      A.  Yeah.
25      Q.  I hadn't thought of it before, but

Page 91

---

1  just visualizing what you were saying as you
2  were speaking this morning, I guess whenever
3  you have water, there's going to be a wicking
4  effect where it's going to drag the moisture
5  up curtains, sofas, even wood?
6      A.  Clothing in the closet.  You can
7  have a baby's dress here and a trenchcoat down
8  here.  If they next to each other, that baby
9  dress is going to get messed up.
10      Q.  Because it wicked the water all the
11  way up the trenchcoat.
12      A.  (Witness nods head affirmatively.)
13      Q.  And I hadn't thought of that
14  before.
15      A.  That's what happened.
16      Q.  But after hearing you speak so
17  vividly, lots of mold all the way through --
18      A.  And all the TV commercials and stuff
19  that they was talking about, you know, you
20  can't -- I was sitting listening to on
21  television, the news, about going in those
22  molded houses, you shouldn't be in them long,
23  you should have some kind of mask and all of
24  that stuff.  So I really didn't want to be in
25  there long.

Page 92

---

1      Q.  Okay.
2      A.  Didn't want more health problems due
3  to this later on.
4      Wait a minute.  I might -- my mic
5  might be turned the wrong way.
6      VIDEO OPERATOR:
7      You're okay.
8      THE WITNESS:
9      I thought he couldn't hear me.
10      MR. EXNICIOS:
11      If he can't hear you, he'll tell
12  you.
13      THE WITNESS:
14      Okay.
15  EXAMINATION BY MR. DOAK:
16      Q.  I think I asked you before and you
17  said that you did not have an estimated value
18  for the loss of all of your personal
19  possessions.
20      A.  I think I've answered that as they
21  gave me the max on -- on -- What they call
22  that?  What's the name for that?  What they
23  call your personal stuff when they --
24      Q.  Personal property?
25      A.  Yeah, it might -- it might be that.

Page 93

---

24  (Pages 90 to 93)

HENRY DAVIS                                                    7/11/2007

1   I thought it was something else.  I think.  I
2   don't remember the name that they called it,
3   but I think I got the max for that.  I think
4   about the insurance for my clothes and stuff.
5   I think they paid me the max, the insurance.
6   I think it was 33,000.  Well, that includes
7   your furniture and stuff, too, I think.
8       Q.  And that was your flood insurance
9   policy?
10      A.  Yes.
11      Q.  Do you think that that was enough to
12  pay for all of your personal property
13  possessions?
14      A.  It was the most I could get.  I
15  guess.  It had to do.
16      Q.  What about your car that you lost?
17  You had a claim for that on your automobile
18  policy?
19      A.  Yes.  And I had an insurance that
20  says, I don't remember how it's worded, but
21  they don't have to pay you blue book value.
22  Now, I didn't know if it was anything like
23  that until then.  It must have been a real
24  small print.  I never saw that nowhere.
25  Anyway, they only paid me $2,000 and I think
                                        Page 94

1       We're going off the record.  It's
2   now 12:25.
3       (Recess.)
4       VIDEO OPERATOR:
5           Returning to the record.  It's
6   12:30.
7   EXAMINATION BY MR. DOAK:
8       Q.  Okay.  So let me ask you again, Mr.
9   Davis.  What do you think the name of your
10  homeowner's insurance company was at the time
11  of the storm?
12      A.  It was -- I forgot.
13      Q.  Louisiana Citizens?
14      A.  Louisiana Citizen and Fidelity.
15      Q.  And Fidelity for your flood policy?
16      A.  Fidelity.
17      Q.  And you said this morning that you
18  submitted a claim on your homeowner's policy
19  to Louisiana Citizens?
20      A.  Yes.
21      Q.  But --
22      A.  They didn't -- They didn't give me a
23  dime.
24      Q.  Not any?
25      A.  No.  They said that the $1,500 they
                                        Page 96

1   the book value of it was 48 or something like
2   that, blue book value was 48 and they only
3   paid 2,000, and I felt like that was wrong,
4   and I couldn't do nothing about it.
5       Q.  And who was your homeowner's policy
6   with?  Powell, was that the name?
7       A.  I think it was GIA or something like
8   that.  That's when we went to Baton Rouge, we
9   went to GIA.
10      Q.  GIA?
11      A.  Uh-huh (affirmatively).
12      Q.  And you made a claim against GIA?
13  Do you know what that stands for?
14      A.  Can I call my wife and ask her?
15      MR. EXNICIOS:
16          No.
17  EXAMINATION BY MR. DOAK:
18      Q.  Sure.
19      A.  She probably know what it is.
20      MR. DOAK:
21          We'll go off the record for just
22      a minute.  Take a short break.
23      THE WITNESS:
24          Okay.
25      VIDEO OPERATOR:
                                        Page 95

1   gave me in the beginning was -- I was overpaid
2   with that.
3       Q.  Even though you had this roof damage
4   and the water --
5       A.  Even though the shingles was gone,
6   the fence was gone, and the thing on the roof
7   still had the hole in it.
8       Q.  The shed?
9       A.  The shed was gone, just wiped out.
10  The split in the roof where the water came in
11  was still there when they took the pictures,
12  and they didn't pay a dime.  What happened is
13  they sent somebody out three times.  Each time
14  -- They fired the first guy, he wasn't there
15  no more; then the second guy came out and said
16  I was supposed to get X amount of dollars.
17  His services were no longer needed either, so
18  I don't know what they were doing, you know.
19      Q.  Sounds like you need a lawyer.
20      A.  I got one now.
21      Q.  Okay.  And your flood policy with
22  Fidelity, --
23      A.  Right.
24      Q.  -- you --
25      A.  They -- They paid what they were
                                        Page 97

HENRY DAVIS                                                    7/11/2007

```
 1   supposed to pay.  They did.
 2        Q.  But that was $33,000?
 3        A.  That was just for my personal stuff.
 4        Q.  Personal possessions.
 5        A.  Right.
 6        Q.  And how much did they pay for your
 7   house?
 8        A.  I don't -- I should have asked
 9   that.  I wish you would have thought.  I don't
10   remember.
11        Q.  Did you receive paperwork when they
12   sent a check and stuff?
13        A.  Yeah.  Yeah.  I think I got all of
14   that.  I am not sure.
15        Q.  Where do you buy the Louisiana
16   Citizen insurance?  Do you know the broker
17   that you go through?  The agent?
18        A.  I don't really know.  All I know is
19   we had to go to GIA to pick up the check, and
20   I don't know if it's somebody out of there
21   that writes the policy or what.
22        Q.  Right.  The same question for
23   Fidelity.  Do you know where they are or who
24   you had dealings with?
25        A.  No.  I don't remember.
                                        Page 98
```

```
 1        Q.  But you did at one time receive
 2   letters from them --
 3        A.  Sure.
 4        Q.  -- explaining they were going to pay
 5   this or not pay that?
 6        A.  Right.  Right.
 7        Q.  Going back to your valuations, you
 8   said that you didn't feel like you could put a
 9   dollar number on your house without going back
10   and adding up all of your bills that you paid
11   out.
12        A.  Right.
13        Q.  Looking at your checkbook and the
14   records.
15        A.  Right.
16        Q.  Since the house wasn't completely
17   destroyed, you had the brick and everything --
18        A.  Uh-huh (affirmatively).
19        Q.  -- and you said that the last
20   appraisal was 110,000, --
21        A.  Uh-huh (affirmatively).
22        Q.  -- I would assume that your property
23   damage loss for the house only would probably
24   be less than $110,000?
25        A.  Yes.
                                        Page 99
```

```
 1        Q.  Okay.  But you don't -- A fair
 2   answer, you would have to look at your records
 3   to find out?
 4        A.  I have to look.
 5        Q.  And then for your personal
 6   possessions on the inside, you thought that
 7   the $33,000 probably was a fair price for the
 8   value of all of that?
 9        A.  Well, that's all I had it insured
10   for.  I had it insured for that amount of
11   money and they paid that amount of money and
12   so --
13        Q.  Do you think you have any loss
14   there, though, for those personal
15   possessions?  Maybe a little bit?
16        A.  A little bit maybe.
17        Q.  5,000?
18        A.  Somewhere in that neighborhood.
19        Q.  Okay.  And the car?
20        A.  Yeah, I think I only got half of
21   what I think it was worth.
22        Q.  And you thought the whole thing was
23   worth 4,800?
24        A.  Right.
25        Q.  Okay.
                                        Page 100
```

```
 1        A.  That's what the blue book value of
 2   it was.
 3        Q.  I'm with you.  Anything else in your
 4   -- any other numbers for your personal
 5   property?
 6        A.  I think that the amount of stuff
 7   that I lost that was in my shed was -- I had
 8   some expensive tools that was left.  With no
 9   fence around and your shed wide open, you
10   know, stuff just leave.  So I had a lot of
11   good stuff just leave.
12        Q.  Some of those looters?
13        A.  Yeah.  I don't know if it -- it
14   could have been the water taking some of it.
15   But some of those tools were too heavy for the
16   water to move.
17        Q.  Right.
18        A.  And I was told that one of my
19   neighbors seen one of the roofers using my
20   wheelbarrow.  Ain't no telling what all he had
21   in the wheelbarrow when he left the yard.  So
22   I lost some stuff that way that I didn't get
23   compensated for.
24        Q.  "That way" being theft?
25        A.  Yeah.
                                        Page 101
```

26  (Pages 98 to 101)

HENRY DAVIS                                                    7/11/2007

|   | |   | |
|---|---|---|---|

1    Q.  Yes.  I think that about does it for
2  personal property and real property.  Let's
3  turn to your last category of injury, the
4  severe mental distress, and I don't know that
5  there's a lot more to do there.  You told me
6  about three pieces of that.  Living with your
7  relatives, living in the dump, living in the
8  FEMA trailer.  We don't need to cover that
9  again.  But that was the basis for your
10  personal injury?
11    A.  Yes.
12    Q.  Was there anything else?
13    A.  That's about it.  Well, they kind of
14  -- in that FEMA trailer, if you don't want to
15  go to the store every week, you need somewhere
16  to store your stuff.  Like they had a little
17  small refrigerator freezer.  So if you bought
18  stuff this week, it was gone before next
19  week.  So you got to go back to the store.  I
20  don't like doing that.  Normally when I am at
21  home I make -- I go grocery shopping maybe
22  once a month because I got a freezer I can get
23  what I want, stack it all up, and then I ain't
24  got to go next week.
25    Q.  Okay.

Page 102

1    Q.  Your problem was you had poor living
2  conditions and the shrink wasn't going to help
3  you with the --
4    A.  Not at all.
5    Q.  Make the trailer any bigger?
6    A.  Not at all.
7    Q.  Make the relatives' apartment any
8  bigger?
9    A.  None of that would have helped.
10    Q.  Okay.  I take it you did not take
11  any medications for --
12    A.  No.
13    Q.  -- your stress?
14    A.  No.
15    Q.  No beer?
16    A.  Every now and then.
17    Q.  Okay.  Let's see.
18    A.  Kind of come from a -- I had a
19  praying grandmother.  Said when all else is
20  down, just pray.  It'll get better.
21    Q.  Good advice.  Any other details you
22  want to add to describe the losses that you
23  are seeking to get relief for in this
24  lawsuit?  We have talked about your house
25  damage, we have talked about the personal

Page 104

1    A.  Stuff like that, I didn't -- I
2  didn't like.
3    Q.  Did you ever go see a medical
4  professional about this mental distress?
5    A.  No.
6    Q.  A nurse, a psychiatrist, a counselor
7  of any kind?
8    A.  No.  Well, growing up, you get a
9  little used to being stressed out.  I was.
10  But I had nothing to compare this to.  This
11  was above and beyond anything I ever had to
12  deal with.  You know, I dealt with it.  I
13  think it was harder on my wife than me.  She
14  really had problems with it.  But then if I
15  don't be the stronger one, she can't make it.
16  So I got to be strong even if I don't think I
17  can make it.
18    Q.  So you didn't think that a medical
19  professional would really be able to help you
20  with this particular problem?
21    A.  No, because the problem would still
22  be there.  After I left his office, I still
23  have the same problem so I didn't see where it
24  made sense to spend money for somebody to tell
25  me I got a problem.  I know I got a problem.

Page 103

1  property, we have talked about the various
2  bases for your emotional distress.
3    A.  I don't know if any of y'all were
4  dislocated or anything, but during the time
5  right after that storm, even in Mississippi
6  where I was, they didn't have any power and it
7  was extremely hot.  Man, it was -- felt like
8  130 degrees everywhere.  It just -- it was
9  unbearable.  Day and night, you know.  That's
10  just suffering to me.  Unnecessary suffering.
11  I couldn't do anything about it.  I just had
12  to deal with it.
13    Q.  All right.
14    A.  And that went on for days.  The
15  people that I was living with managed to get a
16  generator enough to run some fans, but not --
17  not AC.  Still was hot.  Just was miserable.
18    Q.  Who do you blame for the damages
19  that you're seeking in this lawsuit?
20    A.  Well, I hear if we wouldn't have had
21  -- we survived the storm itself and I hear we
22  wouldn't have had any water if it wasn't for
23  the overtopping of the levees and the MRGO and
24  stuff.  So whoever was responsible for that is
25  responsible for what happened to me.

Page 105

27  (Pages 102 to 105)

HENRY DAVIS                                                    7/11/2007

```
 1      Q.  Do you think some of it was an act
 2  of God, that nobody could have prevented part
 3  of the damage, it was just a terrible
 4  hurricane?
 5      A.  With a hurricane --
 6      MR. EXNICIOS:
 7          Objection to form.
 8      THE WITNESS:
 9          The hurricane didn't do it.  The
10  hurricane -- I don't think the
11  hurricane did it.  I think it was a
12  man part.  I think we survived the
13  hurricane.  In fact, the water came
14  the day after when it was calm.  The
15  water came.  So we survived the
16  hurricane.
17  EXAMINATION BY MR. DOAK:
18      Q.  Okay.  Well, tell me about the water
19  came when it was calm.
20      A.  Sunny, no rain, no nothing.  Here
21  come water.
22      Q.  What day was that?
23      A.  Monday.
24      Q.  Were you here on Monday?
25      A.  No.  But my neighbor was.  He's the
                                      Page 106
```

```
 1  name is?  I think I did.
 2      A.  I think I told you.
 3      Q.  Okay.  Well, I have forgotten, but
 4  he hasn't.
 5      A.  Okay.
 6      Q.  Going back to the question about who
 7  you think is responsible here, and you gave an
 8  answer I understood about overtopping of the
 9  levees and things, that would include the
10  Corps of Engineers?
11      A.  If they was --
12      Q.  I'm sorry?
13      A.  If they in charge of that part, I
14  guess.  So I don't know.
15      Q.  Okay.  The people who designed how
16  high the levees would be?
17      A.  Whoever is at fault is at fault.  I
18  don't know who they are.
19      Q.  Okay.  How about FEMA?  Does FEMA
20  have some of the fault for that?  Do you know?
21      A.  They have anything to do with the
22  levees?
23      Q.  I am just asking you what --
24      A.  I don't know.
25      Q.  You don't know?
                                      Page 108
```

```
 1  only one I know of that saw what happened.  He
 2  said -- I told you earlier he saw the water.
 3  When he was taking them boards off his window,
 4  meaning the hurricane was over, everything was
 5  calm again, now here come the water.
 6      Q.  So maybe the water in your
 7  neighborhood didn't get there on the first day
 8  at the same time as it was in other parts of
 9  the city.
10      A.  What time --
11      MR. EXNICIOS:
12          Objection to form.
13      THE WITNESS:
14          What time was the water at the
15      other parts of the city?
16  EXAMINATION BY MR. DOAK:
17      Q.  Well, I don't know.  But the time
18  you're referring to, are you sure it was
19  Monday?  That's what your neighbor said?
20      A.  Well, I know it was after the
21  storm.  What day was the storm?  I know it was
22  the day after the storm.
23      Q.  The day after the storm.
24      A.  Yeah.  What day was the storm?
25      Q.  And did I ask you before what his
                                      Page 107
```

```
 1      A.  No.
 2      Q.  You're just saying whoever had to do
 3  with the levee system?  Is that right?
 4      A.  If they have -- When that water came
 5  through, wherever it came from, whoever is in
 6  charge of that, that's who's at fault to mine
 7  -- to the best of my knowledge.
 8      Q.  Okay.  Here is The Times Picayune
 9  article that I had mentioned earlier.  Do you
10  perchance know a Dolores Schafer?
11      A.  No.
12      Q.  Do you know where the 8000 block of
13  Lafourche Street would be, L A F O U R C H E?
14      A.  No.
15      Q.  It's in East New Orleans somewhere.
16      A.  Might be in Michoud.  Might be.  I'm
17  not sure.
18      Q.  That's okay.
19      A.  Spell it again.
20      Q.  L A F O U R C H E.
21      A.  I know that's in Michoud.  And it
22  had to be -- If they didn't get any water,
23  that must be right on Chef.  Must be right on
24  that corner.
25      Q.  And tell me about that part of
                                      Page 109
```

HENRY DAVIS                                                           7/11/2007

```
 1    town.
 2        A.  Chef Menteur Highway is a little bit
 3    higher than the rest of the streets out in
 4    that area.  So if you're right on the corner,
 5    all the water is going to pass you down here
 6    and come back.
 7        Q.  I see.  Yes, that's the title.  It
 8    says "Katrina left many in Eastern New Orleans
 9    unscathed."
10        A.  A lot of people that live right near
11    Chef or right on the corner of Haynes didn't
12    -- didn't get much water.
13        Q.  Okay.
14        A.  Because those are the high areas.
15        Q.  Okay.
16        A.  So if -- You know, water is not
17    going to be on this end of this hat
18    (indicating).  It will be back here
19    (indicating).  That's just how it is.
20        Q.  And New Orleans East, it's a large
21    area.  Do you have any idea how wide that is?
22        A.  All of that's Ninth Ward.  And the
23    Ninth Ward is the biggest ward in the city.
24    So it's huge.
25        Q.  Do you have relatives that live in
                                            Page 110
```

```
 1    East New Orleans.  It's just that in her area
 2    she got more water than us.
 3        Q.  How many miles is she from you?
 4        A.  Maybe two or three miles at the
 5    most.  She's back near Crowder.  And I am past
 6    Bullard.
 7        Q.  Okay.  And what happened on your
 8    street is completely different from what
 9    happened on her street.
10        A.  That's correct.
11        Q.  Who else do you have as a relative
12    in New Orleans?
13        A.  I got a sister that live across the
14    river.  And they didn't get no water on that
15    side.
16        Q.  Across the Mississippi River?
17        A.  Across the Mississippi River.
18        Q.  Which parish?
19        A.  Now, I don't know.  I just know
20    about the vicinity it's in.  I don't know what
21    parish it is.
22        Q.  Okay.  What other relatives do you
23    have in town?
24        A.  That's all I have in town now.
25        Q.  How about friends that you have and
                                            Page 112
```

```
 1    the city?
 2        A.  Yes.
 3        Q.  Where do they live?
 4        A.  My sister-in-law live on Lemans.
 5    They got about seven feet of water in their
 6    house.
 7        Q.  What parish?
 8        A.  That's in Orleans.  That's in
 9    Orleans Parish.
10        Q.  Okay.
11        A.  It's in Eastern New Orleans.
12        Q.  Okay.
13        A.  So, you know, certain areas got way
14    more water than others.
15        Q.  So they got a lot more water than
16    you got at your house?
17        A.  That's correct.
18        Q.  And that's your sister?
19        A.  My sister-in-law.
20        Q.  Sister-in-law?
21        A.  My wife's sister.  Yes.
22        Q.  And what was the particular area
23    again, the name of it?
24        A.  It's Eastern New Orleans.  All of
25    that East.  I'm in East New Orleans, she's in
                                            Page 111
```

```
 1    that you have talked to, or your children's
 2    friends?  I am just wondering.  Tell me about
 3    different people who you know and what their
 4    experience was in Hurricane Katrina.
 5        A.  I talked to one guy whose sister
 6    lived -- No, whose cousin lived upstairs; him
 7    and his sister went to their house and the
 8    water got all the way upstairs on the top step
 9    and they realized they had something
10    downstairs and they come and swam under water,
11    get it, and come back up.  And that was real
12    deep.  Like ten feet maybe more.
13        Q.  Okay.
14        A.  You know.  You hear so many
15    different stories.
16        Q.  Do you know any people who had a
17    friend or loved one who died as a result of
18    the storm, who drowned?
19        A.  Some of my co-workers.  I know of
20    one that died as a result of the storm.  Him,
21    his wife, and I think his son drowned in their
22    house.
23        Q.  Where did they live?
24        A.  Somewhere in the East.  I don't know
25    exactly where at.  But somewhere in the East
                                            Page 113
```

29  (Pages 110 to 113)

1  they drowned in the house.
2      Q.  **East, you mean East New Orleans?**
3      A.  Somewhere in East New Orleans, yeah.
4      Q.  **Okay.**
5      A.  I didn't know where he lived at.
6      Q.  **So they actually lost their life?**
7      A.  Right.  Well, if you pay attention
8  on those houses where they got it got it --
9  those numbers on there --
10     Q.  **Yes.**
11     A.  -- and you see a zero in most of
12  them, if you see where that zero is, if it's a
13  1 or a 2, it was either one or two people that
14  died in that house.
15     Q.  **Do you know any people who were**
16  **lucky like this lady that I gave you the**
17  **address of on Lafourche Street?**
18     A.  I know of one other guy who actually
19  evacuated his house and stayed gone all that
20  time and when he came back, there was nothing
21  done.  Nothing wrong with it.
22         The church that I go to, none of
23  the carpet got wet in it.  And it's only three
24  blocks from my house.  That's -- That's just
25  how it is.  This guy that I was telling you
                                        Page 114

1  But everything else going down the street got
2  messed up.
3      Q.  **The price of houses next to churches**
4  **is going to go up after this.**
5      A.  The fact -- The fact I try to be
6  there every Sunday.
7      Q.  **Good place to be in a storm?**
8      A.  Yeah.
9         MR. EXNICIOS:
10           Stay next to a preacher.
11  EXAMINATION BY MR. DOAK:
12     Q.  Any other stories about people you
13  worked with, friends, relatives, different
14  experiences around town?
15     A.  Most of them was just like me,
16  homeless.  Most of them.  Just one day you
17  don't have no home to go home to.
18     Q.  **Let's talk about the Form 95 that**
19  **your attorney filed with the government.  And**
20  **that was Jonathan Andry.  Mr. Davis, I hand**
21  **you what's been marked as Davis Exhibit 9.**
22  **That's the Form 95 that your attorney**
23  **submitted to the government along with a cover**
24  **letter from the government back to you.  Do**
25  **you recognize this document?**
                                        Page 116

1  about is a preacher.  So nothing happened to
2  my church or his house.  I don't know how.
3  Act of God.
4      Q.  **Was this just God protecting the**
5  **church, or is it on a little bit of a hill?**
6      A.  That church is not on a hill.  I
7  don't understand it.  The roof is all messed
8  up, but nothing is in the church.
9      Q.  **The water just ran a different way?**
10     A.  We still got the same carpet in the
11  church.  I don't understand it.
12     Q.  **I am from Kansas.  You know that**
13  **tornado they had?**
14     A.  Yeah.
15     Q.  **The same thing happened there.  We**
16  **have a little second house there in a little**
17  **town, this is just a couple of hours over, you**
18  **know, that it looked like a nuclear bomb had**
19  **gone off and the Methodist church standing**
20  **there open for business.**
21     A.  Yeah.
22     Q.  **Very strange.**
23     A.  I don't understand it.  The guy stay
24  right across the street from the church didn't
25  get no damage.  Both of them on the corner.
                                        Page 115

1      A.  Yeah, this was -- Yeah.  It was in
2  that stack.
3      Q.  **If you would turn to the second**
4  **page, that's where the Form 95 itself begins.**
5  **The upper right corner, you see a box number 2**
6  **with your name, "Henry Davis", on it?**
7      A.  Uh-huh (affirmatively).  Yeah, this
8  is when I was living in Baton Rouge in the
9  trailer.  4910 Hollier Road, Baton Rouge,
10  Louisiana.
11     Q.  **Down here on the lower right of the**
12  **exhibit is a date of claim for May 23, 2006.**
13     A.  Uh-huh (affirmatively).
14     Q.  **Do you see that?**
15     A.  Yeah.
16     Q.  **Did you see this claim form before**
17  **it was filed or after it was filed?**
18     A.  After it was filed.
19     Q.  **After it was filed.  And if you'll**
20  **look on the back page of this exhibit, there**
21  **is a document "To whom it may concern"**
22  **authorizing your attorney, Jonathan Andry, to**
23  **submit this form to the government for you.**
24     A.  Uh-huh (affirmatively).
25     Q.  **Is that your signature?**
                                        Page 117

                          30  (Pages 114 to 117)

HENRY DAVIS                                                                7/11/2007

| | |
|---|---|
| 1    A.  Yes, it is.<br>2    Q.  Okay.  So you authorized Mr. Andry<br>3  to prepare and submit this form, which he did<br>4  on May 23 of 2006?<br>5    A.  That's correct.<br>6    Q.  And when did you first see the<br>7  document?  Did he send you a copy of it?<br>8    A.  He sent me a whole stack of stuff to<br>9  look through and sign.<br>10    Q.  What else was in the stack?<br>11    MR. EXNICIOS:<br>12      Objection, calls for client<br>13    privilege.<br>14    MR. DOAK:<br>15      Could we explore a little bit<br>16    about, without getting into the<br>17    substance of the documents, just kind<br>18    of the category?<br>19  EXAMINATION BY MR. DOAK:<br>20    Q.  I don't want to ask questions that<br>21  get into the attorney-client privilege between<br>22  the substance of you talking to your attorney<br>23  or the substance of him talking to you.<br>24  Okay?<br>25    MR. EXNICIOS:<br><br><div align="right">Page 118</div> | 1    Q.  Your signature isn't on this,<br>2  though.<br>3    A.  Well, wait a minute.  Wait a<br>4  minute.  Look at that one.  Well, I was<br>5  thinking it was the same thing as this.<br>6    Q.  Your authorization, the last page,<br>7  apparently you did on January 3 of 2006.  That<br>8  was just you giving your attorney authority --<br>9    A.  Okay.<br>10    Q.  -- to act on your behalf.  This<br>11  document wasn't until five months later, in<br>12  May, when he actually submitted the form.<br>13    A.  Yeah.<br>14    Q.  So those were probably done at two<br>15  different times, don't you think?<br>16    A.  Probably so.<br>17    Q.  Okay.  Let's stay on this page of<br>18  the Form 95.<br>19    A.  That's the one I am on now.<br>20    Q.  Talk about it for a few minutes.<br>21    A.  Okay.<br>22    Q.  In the box that's marked number 8,<br>23  "Basis of claim," --<br>24    A.  Uh-huh (affirmatively).<br>25    Q.  -- would you please read that to<br><br><div align="right">Page 120</div> |
| 1      Yes.<br>2  EXAMINATION BY MR. DOAK:<br>3    Q.  If he sent you a fishing schedule,<br>4  of course, that's different.  That isn't<br>5  attorney-client privilege.  I am just kind of<br>6  wondering, can you talk in real general terms<br>7  about what else was in this stack?<br>8    A.  A lot of stuff was in there that I<br>9  didn't understand what it was and I didn't --<br>10  you know, the meaning of the stuff.  So when I<br>11  called back, I wanted them to explain to me<br>12  before I sign off on something.  I don't want<br>13  to be signing off on something and I don't<br>14  really know what it is.<br>15    Q.  Right.<br>16    A.  So I just called and asked, and a<br>17  lot of stuff we just went through, you know,<br>18  like that.<br>19    Q.  Right.<br>20    A.  So I don't really remember all of<br>21  those.<br>22    Q.  Okay.  But you remember that this<br>23  Form 95 was in that pile?<br>24    A.  Oh, yeah.  Because I see my<br>25  signature on it, I know it was in the pile.<br><br><div align="right">Page 119</div> | 1  yourself?  "Since the Mississippi River" --<br>2  There are just a few sentences there.  Let me<br>3  give you a moment to read that.<br>4    A.  Yeah, I remember reading this<br>5  before.<br>6    Q.  Okay.  Are you satisfied with that<br>7  statement as being the basis of your claim to<br>8  the government?<br>9    A.  Yeah.<br>10    Q.  Okay.  And down in box 9, dealing<br>11  with property damage, the second box down has<br>12  a sentence "The damage was a complete loss of<br>13  structure and contents located at 7650<br>14  Morel Street"?<br>15    A.  Which one, 9?<br>16    MR. EXNICIOS:<br>17      The second box.<br>18    THE WITNESS:<br>19      The second half right down here<br>20    (indicating).  Okay.<br>21  EXAMINATION BY MR. DOAK:<br>22    Q.  That statement is accurate, isn't<br>23  it?<br>24    A.  This part, "Complete loss of<br>25  structure", what does that mean now?  The<br><br><div align="right">Page 121</div> |

<div align="right">31  (Pages 118 to 121)</div>

HENRY DAVIS                                                              7/11/2007

| | |
|---|---|
| 1  bricks and everything else? | 1        Objection to form. |
| 2        Q.  A fair point.  You didn't -- "It was | 2  EXAMINATION BY MR. DOAK: |
| 3  a significant loss of your house" might have | 3        Q.  Is that correct? |
| 4  been a little bit more accurate? | 4        A.  No, it would be 160 if the house |
| 5        A.  Yeah. | 5  valued at 110. |
| 6        Q.  The next box, number 10, is for any | 6        Q.  Okay.  That's fine.  So item 12-A, |
| 7  personal injury or wrongful death, and this is | 7  it would have been more accurate to say |
| 8  where your attorney identifies that you | 8  approximately 160,000? |
| 9  experienced severe emotional distress.  And | 9        A.  I guess so. |
| 10  you and I have talked about that today. | 10        Q.  Correct? |
| 11  Correct? | 11        A.  Yes. |
| 12        A.  Correct. | 12        Q.  I am just trying to find out. |
| 13        Q.  Down in number 12, however, it asks | 13        A.  Okay. |
| 14  for the amount of the claim.  In number 12-A | 14        Q.  You know, I have got lots of |
| 15  it lists property damage, and that's both your | 15  Defendants and we're trying to figure out how |
| 16  house property and your personal possession | 16  much we're being sued for. |
| 17  property.  Now, he put in $500,000.  That's | 17        A.  Okay. |
| 18  not correct, is it?  You didn't have $500,000 | 18        Q.  And I need to understand. |
| 19  of property damage from what you told me | 19            Now, the next box is number 12-B, |
| 20  today. | 20  "personal injury", and that refers up here, |
| 21        A.  No.  No. | 21  we just talked about it, to the severe |
| 22        Q.  You had something less than $110,000 | 22  emotional distress. |
| 23  worth of real property damage for your house. | 23        A.  Yeah, I wouldn't know how to put a |
| 24  Correct? | 24  price tag on that.  Would you? |
| 25        A.  Uh-huh (affirmatively). | 25        Q.  Well, as a person I agree with you. |
| <div align="right">Page 122</div> | <div align="right">Page 124</div> |
| 1        Q.  And your personal possessions would | 1  It's awfully hard to value -- |
| 2  have been 33,000 plus the 5,000 extra you | 2        A.  It's very hard, man. |
| 3  thought? | 3        Q.  -- some things, and mental distress |
| 4        A.  Well, that's because -- I said that | 4  is one of those.  But, of course, in a court |
| 5  because that's all the insurance I had.  If I | 5  of law about the only thing they can do is |
| 6  had $2 million worth of insurance I'd be | 6  award money.  Sometimes we -- it is like how |
| 7  wanting 2 million.  But I only had 33.  That's | 7  much is a life worth?  Hard to make that |
| 8  what I said. | 8  decision.  But in lawsuits, as I think you |
| 9        Q.  Yes.  What do you think the dollar | 9  know, sometimes we have to do that even though |
| 10  value, the fair market value was of all of | 10  it's difficult. |
| 11  your personal possessions?  Not with regard to | 11        A.  Seem like -- |
| 12  what the insurance paid.  If you had to sell | 12        Q.  I am just asking you as you sit here |
| 13  them, what do you think the fair market value | 13  today and based upon your testimony with me |
| 14  of all of those things, your household | 14  and the different parts of your mental |
| 15  possessions, the car that you lost for $4,800, | 15  distress claim, what would you tell a jury |
| 16  what do you think the total of that would be? | 16  believe is fair amount of money to compensate |
| 17  $50,000? | 17  you for that emotional distress? |
| 18        A.  Yes, somewhere in that | 18        A.  I really wouldn't know how to put a |
| 19  neighborhood.  Close to it if it wasn't. | 19  price tag on that.  The reason being, I wasn't |
| 20        Q.  Around $50,000? | 20  the only one that was homeless.  My wife and |
| 21        A.  Around 50,000. | 21  my daughter was the same way.  They looked to |
| 22        Q.  So the total amount of your property | 22  me to make it right.  "Whatever it is, Dad, |
| 23  damage would be approximately 100,000, plus | 23  fix it."  I couldn't fix that.  So I don't |
| 24  50, 150,000? | 24  know how to put a price tag on that.  I really |
| 25        MR. EXNICIOS: | 25  don't. |
| <div align="right">Page 123</div> | <div align="right">Page 125</div> |

<div align="right">32  (Pages 122 to 125)</div>

1      Q.  Okay.  Down in this box that I am
2  pointing to, it says "Signature of claimant".
3      A.  Which box?
4      MR. EXNICIOS:
5        Down here (indicating).
6      THE WITNESS:
7        Okay.
8  EXAMINATION BY MR. DOAK:
9      Q.  That's not your signature, is it?
10     A.  No.
11     Q.  Presumably that's Mr. Andry's
12 signature.
13     A.  I don't know.
14     Q.  But whoever it is, my question is,
15 it's not your signature; correct?
16     A.  No.
17     Q.  Your signature looks like this last
18 page?
19     A.  The last page, yeah.  That's my
20 signature on the last page.
21     Q.  Okay.  New subject matter, although
22 I think we're pretty well through it.  This is
23 about all of the claims that you have filed
24 for other assistance.  And we have talked
25 about the claim that you made to your
                                    Page 126

1      Q.  No other State program?
2      A.  (Witness shakes head negatively.)
3      Q.  How about a charity, Red Cross, any
4  charitable or church organization?
5      A.  Yeah, Red Cross, I think there was
6  $500 or something.
7      Q.  Okay.  Let's talk about the Road
8  Home Program for a moment.  What do you
9  remember about the application process for
10 that?
11     A.  You had to go to a building right
12 off Poydras Street upstairs.  They fill you in
13 on, you know, what the Road Home Program does
14 and all of that.  And then they -- they set
15 you up some kind of date that you go to
16 closing.  And they give you an amount that you
17 supposed to get when you go to closing.  But
18 when I went to closing, I didn't get the
19 amount that they told me I was going to get.
20 But I ain't leaving a dime on the table, I'm
21 taking what you put up or not, and I just
22 appeal the rest.  That's all.
23     Q.  Okay.  But somewhere in there, that
24 process, there was an application form that
25 you and your wife had to complete?
                                    Page 129

1  should have been 4,800.
2      A.  It should have been.  I -- I thought
3  the least thing they would pay was the blue
4  book value, and they weaseled out of that.
5      Q.  Did you ever make any claims with
6  respect to that Murphy Oil leak?  You're not
7  in that area, are you?
8      A.  I don't think I am, no.  I don't
9  think I am.
10     Q.  Other than the Road Home, did you
11 make any other claims to any Federal
12 government program?
13     A.  FEMA.  I told you about FEMA.
14     Q.  FEMA.  I'm sorry.
15     A.  And I told you about -- I don't know
16 what the name of it.
17     Q.  LRA, I think?
18     A.  Yeah, something about -- I think
19 that's the name, LRA.
20     Q.  Okay.  Other than them and --
21     A.  That's it.
22     Q.  -- the Road Home, --
23     A.  That's it.
24     Q.  -- no other Federal program?
25     A.  No.
                                    Page 128

1  homeowner's insurance and they didn't give you
2  anything except the $1,500 advance.
3      A.  That's it.
4      Q.  And we'll have to find out where the
5  documents of that are, although you said you
6  might have a copy of some paperwork at home.
7      A.  Right.
8      Q.  And the flood insurance we have
9  talked about, and you said they paid $33,000,
10 which I guess was your policy limit for flood
11 insurance.
12     A.  That -- That was -- No, that was for
13 my personal.
14     Q.  I'm sorry, for your personal
15 property.
16     A.  Right.
17     Q.  And then some other unknown amount
18 for the house.
19     A.  Right.
20     Q.  And again, you have paperwork you
21 think --
22     A.  Yeah.  I probably have that at home.
23     Q.  -- that relates to that.  And an
24 automobile policy that related to the car, but
25 they only gave you 2,000 and you think it
                                    Page 127

HENRY DAVIS                                                    7/11/2007

1     A.  Yeah.
2         Q.  And you turned that in?  That was --
3     A.  I think we did that the first time.
4  We had the form, we filled it out and sent in
5  it, and then we had to go meet with them.
6         Q.  They call you in and kind of review
7  the details?
8     A.  Right.  Right.
9         Q.  Okay.  And you don't recall whether
10 you kept a copy of that form or not?  You
11 haven't looked for that yet?
12    A.  No.  I didn't know I was going to
13 need all of that.
14        I got one little question,
15 though.  How does Road Home, what does it have
16 to do with this?  That's just -- You know,
17 just out of curiosity, what does Road Home
18 have to do with MRGO?
19        Q.  It has to do with being a statement
20 that you have made about your losses in
21 Hurricane Katrina.
22    A.  Okay.
23        Q.  You understand that in this lawsuit
24 you are called a named Plaintiff, meaning it's
25 a proposed class action and, if certified, you
                                     Page 130

1  represent everybody in that neighborhood for
2  their damage?
3     A.  I don't really know what everybody's
4  damage is, but at the same token, I know what
5  mine was and I know what everybody immediately
6  around me is.  So I'll just use that as a
7  table of working with everybody.
8         Q.  But you understand that some people
9  in your very immediate area may have had
10 significant roof damage and others did not.
11 Right?
12    A.  Yeah.  I understand that.
13        Q.  And you understand that some people
14 in your area may have had a lot of things
15 stolen by looting and other people maybe had
16 nothing stolen?
17    A.  That's correct.
18        Q.  And you understand that some people
19 may have had a tree fall over on their house
20 and others did not?
21    A.  It's possible.
22        Q.  Lots of crazy things happen in a
23 hurricane.
24    A.  That's why I don't understand why
25 they just have one person represent everybody,
                                     Page 132

1  would be the class representative?
2     A.  I understand.
3         Q.  Those are kind of lawyer words.
4     A.  Okay.
5         Q.  What's your understanding, if any,
6  of what it means to be a named Plaintiff, to
7  be a class representative?
8     A.  To me it means that, in my
9  neighborhood, the area where I live, everyone,
10 every one of those people in that neighborhood
11 can't be there and they just want somebody
12 familiar with the neighborhood to represent
13 all of us, and I expect they want me to do
14 that.
15        Q.  What neighborhood are you referring
16 to?
17    A.  I am referring to the Little Woods
18 area, my area right there.
19        Q.  Little Woods is the name of your
20 subdivision?
21    A.  Yes.
22        Q.  How big is that?  A half mile by a
23 half mile?  A mile by a mile?
24    A.  Maybe a half mile by a half mile.
25        Q.  Okay.  And you feel that you could
                                     Page 131

1  because nobody, no one person can do it
2  exactly what happened to everybody out there.
3  It's no way.
4         Q.  Right.  Explain that for me, what
5  you mean.
6     A.  I mean, just like you asked me the
7  question about a tree falling on a house.
8         Q.  Right.
9     A.  How would I know a tree fell on
10 somebody's house three blocks over?  How would
11 I know?
12        Q.  Right.
13    A.  So how would I evaluate his property
14 as opposed to mine?  I thought maybe I would
15 just give you what happened to mine and y'all
16 figure out what happened with everybody else.
17        Q.  Right.  You don't know how to do
18 that.  All you can do is be fair about your
19 property.
20    A.  That's all I'm going to do.  I ain't
21 going to lie about nothing.  I can tell you
22 what happened at my house.  I can't tell you
23 what happened three blocks over.
24        Q.  Right.  Leave alone three miles
25 over.
                                     Page 133

34  (Pages 130 to 133)

1    A.  There you go.
2        Q.  **Did you know any of the Plaintiffs'**
3    **attorneys before this lawsuit?**
4    A.  No.
5        Q.  **When did you first get the idea that**
6    **maybe you would want to participate in a**
7    **lawsuit as a result of Hurricane Katrina?**
8    A.  When I found out that most of the
9    people in my area was saying it was from MRGO,
10   I wanted to know who was representing that.
11   And I found out from somebody that it was
12   these people.  So that's why I sent it in that
13   way.  I didn't know of anybody else that was
14   representing people for a class action suit.
15       Q.  **So that's what gave you an idea, and**
16   **then what was it that took you to -- what**
17   **lawyer did you go to see?**
18   A.  I don't know.  My wife got the
19   form.  I don't know where she got it from.
20   But we sat down, we filled it out, and we sent
21   it in and then we ended up with this group.  I
22   don't know if anybody else is doing this
23   lawsuit other than them.  I don't know.
24       Q.  **Tell me what you know about this**
25   **form that your wife got.  Something that she**

Page 134

1    saw some place?
2    A.  Yeah.  It was a class action suit
3    against MRGO, because the word was that's
4    where the water came from.
5        Q.  **Okay.**
6    A.  So I didn't know who was responsible
7    for where it came from, but I know it happened
8    after the storm.  And whoever it was, I think
9    they should have to pay.
10       Q.  **And then you sent in that form?**
11   A.  That's correct.
12       Q.  **And then somebody gave you a call?**
13   A.  Right.
14       MR. DOAK:
15           If we could take another short
16       break, I'll consult with my
17       colleagues.
18       VIDEO OPERATOR:
19           We're off the record.  It is
20       1:15.
21       (Recess.)
22       (End of deposition.)
23           *   *   *
24
25

Page 135

1
2                WITNESS'S CERTIFICATE
3
4        I, HENRY EARL DAVIS, read or have
5    had the preceding testimony read to me, and
6    hereby certify that it is a true and correct
7    transcription of my testimony, with the
8    exception of any attached corrections or
9    changes.
10
11
12   _____
     (Witness' Signature)
13   _____
14   DATE SIGNED
15
16   DEPONENT PLEASE INITIAL ONE:
17
18   _____ Read with no corrections
19
20   _____ Read and correction sheet attached
21
22   DATE TAKEN:  July 11, 2007
23
24
25

Page 136

1
2
3
4                REPORTER'S CERTIFICATE
5
6        I, ROGER D. JOHNS, RMR, RDR, CRR,
7    Certified Court Reporter, do hereby certify
8    that the above-named witness, after having
9    been first duly sworn by me to testify to the
10   truth, did testify as hereinabove set forth;
11   that the testimony was reported by me in
12   shorthand and transcribed under my personal
13   direction and supervision, and is a true and
14   correct transcript, to the best of my ability
15   and understanding; that I am not of counsel,
16   not related to counsel or the parties hereto,
17   and not in any way interested in the outcome
18   of this matter.
19
20
21
22           ROGER D. JOHNS
23         CERTIFIED COURT REPORTER
24           STATE OF LOUISIANA
25

Page 137

35 (Pages 134 to 137)

DAISY MAE INNIS (LEVEE)                                    7/16/2007

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE: KATRINA CANAL BREACHES        CIVIL ACTION

CONSOLIDATED LITIGATION              NO. 05-4182 K2

                                     JUDGE DUVAL

PERTAINS TO LEVEE                    MAG. WILKINSON


FILED IN 05-4181, 05-4182, 05-4191, 05-4568,
         05-5237, 05-6073, 05-6314, 05-6324,
         05,6327, 05-6359, 06-0020, 06-1885,
         06-0225, 06-0886, 06-11208, 06-2278,
         06,2287, 06-2346, 06-2545, 06-3529,
         06-4065, 06-4389, 06-4634, 06-4931,
         06-5032, 06-5042, 06-5159, 06-5163,
         06-5367, 06-5471, 06-5771, 06-5786,
         06-5937, 06-7682, 07-0206, 07-0647,
         07-0993, 07-1284, 07-1286, 07-1288,
         07-1289


        Deposition of DAISY MAE INNIS, given

at the offices of Bruno & Bruno, 855 Baronne

Street, New Orleans, Louisiana 70113, on July

16th, 2007.




REPORTED BY:

        JOSEPH A. FAIRBANKS, JR., CCR, RPR

        CERTIFIED COURT REPORTER #75005

DAISY MAE INNIS (LEVEE)                                             7/16/2007

---

Page 2

1  APPEARANCES:
2  REPRESENTING ORLEANS LEVEE DISTRICT:
3      MCCRANIE, SISTRUNK, ANZELMO, HARDY,
4      MAXWELL & MCDANIEL
5      (BY:  ANDRE J. LAGARDE, ESQUIRE)
6      3445 N. Causeway Boulevard, Suite 800
7      Metairie, Louisiana 70002
8      504-831-0946
9      - AND -
10     SUTTON LAW FIRM
11     (BY:  CHARLES E. SUTTON, JR., ESQUIRE)
12     2101 N. Highway 190, Suite 105
13     Covington, Louisiana 70433
14     985-249-5991
15
16  REPRESENTING THE PLAINTIFFS:
17     BRUNO & BRUNO
18     (BY:  DAVID S. SCALIA, ESQUIRE)
19     855 Baronne Street
20     New Orleans, Louisiana 70113
21     504-525-1335
22     - AND -
23
24
25

---

Page 4

1           E X A M I N A T I O N   I N D E X
2
3  EXAMINATION BY:                    PAGE
4
5  MR. SUTTON  ...........................   6
6           E X H I B I T   I N D E X
7
8  EXHIBIT NO.                        PAGE
9  Innis Exhibit 1 .........................   10
10 Innis Exhibit 2 .........................   12
11 Innis Exhibit 3 .........................   14
12 Innis Exhibit 4 .........................   22
13 Innis Exhibit 5, in globo ...............  193
14 Innis Exhibit 6, in globo ...............  193
15 Innis Exhibit 7, in globo ...............  194
16
17
18
19
20
21
22
23
24
25

---

Page 3

1      A.J. REBENNACK, ATTORNEY AT LAW
2      (BY:  A.J. REBENNACK, ESQUIRE)
3      1100 Poydras Street, Suite 2900
4      New Orleans, Louisiana 70163
5      504-782-0512
6
7  REPRESENTING BOARD OF COMMISSIONERS FOR THE
8  EAST JEFFERSON LEVEE DISTRICT:
9      DUPLASS, ZWAIN, BOURGEOIS, MORTON,
10     PFISTER & WEINSTOCK
11     (BY:  JENNIFER T. MORRIS, ESQUIRE)
12     Three Lakeway Center, 29th Floor
13     3838 N. Causeway Boulevard
14     Metairie, Louisiana 70002
15     504-832-3700
16
17  VIDEOGRAPHER:
18     JOHN WADSWORTH (HART VIDEO)
19
20
21
22
23
24
25

---

Page 5

1           S T I P U L A T I O N
2       IT IS STIPULATED AND AGREED by and
3  among counsel for the parties hereto that the
4  deposition of the aforementioned witness may be
5  taken for all purposes permitted within the
6  Federal Rules of Civil Procedure, in accordance
7  with law, pursuant to notice;
8       That all formalities, save reading
9  and signing of the original transcript by the
10 deponent, are hereby specifically waived;
11      That all objections, save those as to
12 the form of the question and the responsiveness
13 of the answer, are reserved until such time as
14 this deposition, or any part thereof, is used
15 or sought to be used in evidence.
16
17
18           * * *
19
20
21
22       JOSEPH A. FAIRBANKS, JR., CCR, RPR,
23 Certified Court Reporter in and for the State
24 of Louisiana, officiated in administering the
25 oath to the witness.

---

2 (Pages 2 to 5)

DAISY MAE INNIS (LEVEE)                                    7/16/2007

---

Page 6

1              DAISY MAE INNIS
2     4024 Stutz Street, New Orleans, Louisiana
3     70126, a witness named in the above
4     stipulation, having been first duly sworn, was
5     examined and testified on her oath as follows:
6          MR. REBENNACK:
7              Usual stipulations, except with
8          regard to the objections that have
9          been made by the plaintiffs regarding
10         the scope of the depositions and the
11         Order of the Magistrate.  We adopt
12         those objections of the plaintiff's
13         steering committee for this
14         deposition, as well.
15         MR. SUTTON:
16             For the record, my name is
17         Charles Sutton.  I represent Orleans
18         Levee District.  I'd like to note that
19         this deposition was noticed in
20         accordance with Federal Rule of Civil
21         Procedure 30, Case Management Order
22         Number 4, and Magistrate Wilkinson's
23         July 3rd, 2007 Order.
24     EXAMINATION BY MR. SUTTON:
25         Q.  Ms. Innis, again, my name is Charles

---

Page 7

1     Sutton.  I met you very briefly before your
2     deposition began this morning.
3          For the record, ma'am, would you
4     please provide me with your full name?
5          A.  Daisy Mae Innis.
6          Q.  Okay.  And what is your address,
7     Ms. Innis?
8          A.  4024 Stutz Street, New Orleans,
9     Louisiana.
10         Q.  Ms. Innis, have you ever had the
11     occasion to give a deposition before?
12         A.  I don't remember.
13         Q.  As you sit here today, you just -- you
14     can't recall?
15         A.  I can't recall.
16         Q.  Okay.  Well, let me briefly explain
17     some of the ground rules.  I'm simply going to
18     be asking you a series of questions here today.
19     Some of these other attorneys, after I get
20     through with my questions, they may ask you
21     some questions as well.  For my questions,
22     first of all, none of my questions are intended
23     to trick or mislead you, so I would ask that if
24     for any reason you don't understand my question
25     that you please let me know.

---

Page 8

1          A.  Yes.
2          Q.  Otherwise, if I ask you a question and
3     you answer it, I'll assume that you understood
4     my question.
5              Fair enough?
6          A.  Fair.
7          Q.  I would also ask that you answer
8     verbally, yes or no, instead of shaking or
9     nodding your head or saying unh-unh or uh-huh
10     so that the court reporter can take it down
11     appropriately.
12         A.  Yes.
13         Q.  Okay?  Certainly if you need to
14     explain your answer at any time you're more
15     than welcome to do so.  If I ask you a question
16     and you don't know or you don't remember,
17     please tell me that.  I don't want you here
18     guessing, so if I ask you a question and you
19     answer it, I'll assume that that answer is
20     based on your own personal knowledge.
21             Fair enough?
22         A.  Fair.
23         Q.  We may be here for some time, but this
24     is not an endurance contest.  If you need to
25     take a break for any reason, if you need to

---

Page 9

1     make a phone call, receive a phone call, go to
2     the restroom, get a drink of water, whatever,
3     let me know --
4          A.  Yes.
5          Q.  -- and I'll be happy to accommodate
6     you, we'll take a recess.  I would only ask
7     that if there's a question on the table that
8     you answer the question and then we take the
9     break.
10         A.  Yes.
11         Q.  Okay?  If at any time during the
12     deposition you think that you need to clarify
13     or change an answer that you've previously
14     given in the deposition, that it comes to you
15     that, you know, an answer that I gave a while
16     back was wrong or incomplete, please let me
17     know, and you're free to do so.  Okay?
18         A.  Yes.
19         Q.  Let me ask you before we get started,
20     are you currently on any medications?
21         A.  No.
22         Q.  Is there any reason as you sit here
23     right now why you think that you would be
24     physically, mentally, emotionally or otherwise
25     unable to understand my questions and fairly

---

                              3 (Pages 6 to 9)

DAISY MAE INNIS (LEVEE)                                    7/16/2007

Page 10

1  and truthfully answer my questions?
2     A.  No.
3     Q.  Any reason?
4     A.  No.
5     Q.  Okay.  I'm going to hand you,
6  Ms. Innis, what I have marked as Exhibit Innis
7  1, and I'll ask that Exhibit Innis 1 be
8  attached to the transcript of the deposition.
9        And for the record, I am handing
10 Ms. Innis a copy of the Notice of Videotape
11 Deposition of her deposition along with
12 attached Exhibit A to Notice of Deposition.
13 (Tendering.)
14       Ms. Innis, have you seen Exhibit 1
15 before?  And that's simply the notice of your
16 deposition, for your deposition here today.
17       (Innis Exhibit 1 was marked for
18 identification and is attached hereto.)
19    A.  No.
20 EXAMINATION BY MR. SUTTON:
21    Q.  Okay.  I would ask you, ma'am, if you
22 don't mind, to flip over to the sixth page of
23 Exhibit 1.  And if you want to look at mine,
24 it's titled Exhibit A to Notice of Deposition.
25 It's actually the sixth page in.

Page 11

1     A.  Okay.
2     Q.  Ms. Innis, as you will note, Exhibit A
3  is a three-paged document, and identified in
4  Exhibit A are twenty-three different items of
5  documents that the defendants have requested to
6  be produced in connection with your deposition
7  her today.
8        First of all, I would like to ask you,
9  ma'am, have you ever seen Exhibit A before?
10    A.  I don't recall.
11    Q.  Okay.  I would suggest to your
12 counsel, as we've done with the other
13 depositions, that at this time that we go off
14 the record and that we allow Ms. Innis,
15 together with her counsel, to perhaps just
16 review for a few minutes Exhibit A, and then
17 we'll come back on the record and I can go
18 through Exhibit A, and since it's attached I
19 won't have to read verbatim each and every
20 item.
21       MR. REBENNACK:
22       Sure.
23       MR. SUTTON:
24       Okay.  At this time why don't we
25       go off the record.

Page 12

1        (Off the record.)
2  EXAMINATION BY MR. SUTTON:
3     Q.  Ms. Innis, I'd like, at this time, to
4  review with you the list of requested documents
5  as identified in Exhibit A.  And Item Number 1
6  requests that you produce any Standard Form 95
7  that you submitted with the Army.
8        Did you, in fact, submit a Form 95
9  with the Army?
10    A.  Yes.
11    Q.  Okay.  I'm going to hand you what I've
12 marked as Exhibit Innis 2.  Would you take a
13 look at that.  (Tendering.)
14       Ma'am, you would agree with me that
15 Exhibit Innis 2 is a cover letter dated
16 September 13th, 2006, from the department Of
17 the Army to you.
18       (Innis Exhibit 2 was marked for
19 identification and is attached hereto.)
20    A.  Yes.
21 EXAMINATION BY MR. SUTTON:
22    Q.  And in that letter, if you'll notice
23 in the first paragraph, you would agree that in
24 the letter the Army acknowledges that it
25 received, on September 5, 2006, your Form

Page 13

1  '95 --
2     A.  Yes.
3     Q.  -- is that correct?
4        And if you'll flip over to the second
5  page of Exhibit 2, there is a second letter
6  from the Department of the Army.
7        This is dated September 30, 2006,
8  correct?
9     A.  Yes.
10    Q.  And it again acknowledges that it
11 received on September 5, 2006, your Form 95.
12    A.  Uh-huh.
13    Q.  Correct?
14    A.  Yes.  Sorry.
15    Q.  And if you'll flip over to the third
16 and fourth pages of Exhibit 2, that is, in
17 fact, your Form 95.
18    A.  Yes.
19    Q.  Okay.  And that form contains your
20 signature, correct?
21    A.  Yes.
22    Q.  And you completed and signed and dated
23 the form on August 31, 2006, correct?
24    A.  Right.
25    Q.  Ms. Innis, at this time I'm going to

4  (Pages 10 to 13)

DAISY MAE INNIS (LEVEE)                                    7/16/2007

---

**Page 14**

1  hand you what I've marked as Exhibit Innis
2  Number 3 and ask you if you could take a look
3  at that exhibit.  You would agree with me that
4  Exhibit 3 -- the first page of Exhibit 3 is a
5  February 5, 2007 letter from the Army to you
6  acknowledging that it received your claim on
7  January 11th, 2007, correct?
8          (Innis Exhibit 3 was marked for
9  identification and is attached hereto.)
10     A.  Yes.
11 EXAMINATION BY MR. SUTTON:
12     Q.  Okay.  And if you'll flip over to the
13 third page of Exhibit 3, this is a Form 95 that
14 you submitted with the Army.  Correct?
15     A.  Yes.
16     Q.  Okay.  And this is slightly different
17 than the Form 95 that we discussed and that's
18 been marked as Exhibit 2; correct?
19     A.  Yes.
20     Q.  And you can compare them, but I'll
21 note on this one, it's not
22 dated.  You'd agree that Exhibit 3 is not
23 dated, your Form 95; is that correct?  At the
24 bottom, you didn't date this form as you did
25 with the other form.

---

**Page 15**

1     A.  No.
2     Q.  That's correct?
3     A.  Yes.
4     Q.  Okay.  Other than Exhibits 2 and 3,
5  Ms. Innis, are you in possession of any Form
6  95s submitted by you or on your behalf to the
7  Department of the Army?
8     A.  (Shakes head negatively.)
9     Q.  Are you aware of any other Forms 95
10 that you submitted to the Army?
11     A.  No.
12     Q.  Item Number 2, Ms. Innis, requests
13 production of documents pertaining to any
14 administrative claims that you've submitted to
15 any governmental body or agency in connection
16 with Hurricane Katrina.  And let me just sort
17 of list some of those out with you.
18          Did you make a claim with FEMA?
19     A.  Yes.
20     Q.  Okay.  Did you apply for an SBA loan?
21     A.  Yes.
22     Q.  Did you make any claim for Red Cross
23 benefits?
24     A.  Yes.
25     Q.  Did you make a claim with the Road

---

**Page 16**

1  Home Program?
2     A.  Yes.
3     Q.  Did you make a claim for food stamps?
4     A.  Yes.
5     Q.  Did you make a claim with any other
6  government -- Red Cross isn't a government
7  body, but did you make a claim with any other
8  entity that I haven't discussed with you?
9     A.  No.  No.
10     Q.  And I'm going to discuss each of these
11 with you in more detail later on, but let me
12 ask you this:  As to any of these claims, FEMA,
13 SBA, Red Cross, Road Home Program, food stamps,
14 are you in possession of any documents
15 regarding either your applications for such
16 benefits or your receipt of benefits?
17     A.  Um -- documents for FEMA.
18     Q.  You do have documents for FEMA.
19     A.  Yes.
20     Q.  Do you have documents in connection
21 with your SBA application?
22     A.  Yes.
23     Q.  Do you have any documents in
24 connection with Red Cross benefits?  Applied
25 for or received?

---

**Page 17**

1     A.  I don't -- can't recall.
2     Q.  Okay.  What about Road Home Program?
3     A.  Yes.
4     Q.  And what about food stamps?
5     A.  No.
6     Q.  Okay.  Item Number 3, Ms. Innis,
7  requests documents relating to insurance claims
8  that you've filed in connection or as a result
9  of Hurricane Katrina.  Have you filed any
10 insurance claims?
11     A.  Yes.
12     Q.  Okay.  What type of insurance claims
13 have you filed?  For example, homeowner's
14 insurance?
15     A.  Homeowner's.
16     Q.  What about flood insurance?
17     A.  No.
18     Q.  Okay.  Did you have flood insurance at
19 the time of the storm?
20     A.  No.
21     Q.  You had homeowner's insurance.
22     A.  Yes.
23     Q.  And who is your homeowner's -- or who
24 was your homeowner's insurer at the time of the
25 hurricane?

---

JOHNS PENDLETON COURT REPORTERS                       800 562-1285

DAISY MAE INNIS (LEVEE)                                    7/16/2007

Page 18

1   A.  Allstate.
2     Q.  And do you maintain documents in
3   connection with your application for and/or
4   receipt of homeowner's insurance benefits?
5     A.  Do I have --
6     Q.  Do you still have documents regarding
7   your insurance claim?
8     A.  Yes.  Yes.
9     Q.  Did you make any other insurance
10  claims as a result of the hurricane in addition
11  to your claim with Allstate?
12    A.  Yes, I did.
13    Q.  Okay.  What other insurance claims did
14  you make?
15    A.  With Allstate?
16    Q.  Or anybody.
17    A.  Oh, no.  No.
18    Q.  Okay.  Let me make sure you understand
19  my question.  You made -- as far as insurance
20  goes, you made a homeowner's claim with
21  Allstate.  Correct?
22    A.  Yes.
23    Q.  Okay.  Did you have any other
24  coverages with Allstate for which you made a
25  claim?

Page 19

1     A.  No.
2     Q.  Okay.  Did you make an insurance claim
3   with anybody else?
4     A.  No.
5     Q.  No?
6     A.  No.
7     Q.  Okay.  I'm going to ask you to speak
8   up just a bit to make sure we get it on the
9   audio.
10    A.  All right.
11    Q.  Okay?  Item Number 4, Ms. Innis,
12  requests documents in your possession that
13  refer to any eyewitness accounts of Hurricane
14  Katrina.
15    Do you have any documents responsive
16  to this request?
17    A.  No.
18    Q.  Okay.  Item Number 5 requests
19  documents relating to matters alleged in the
20  complaint this was filed in this litigation,
21  the complaint that was filed by the lawyers on
22  behalf of the class.
23    Do you have any documents that relate
24  to the matters contained in the complaint?
25  Other than what we've gone over, your Forms 95

Page 20

1   and the photographs that you've produced.
2     A.  I don't remember.
3     Q.  Okay.  Ms. Innis, Item Number 6
4   requests statements that have been taken in
5   connection with this litigation.
6     Are you in possession of any type of
7   record recorded or transcribed statements given
8   by anyone?
9     MR. REBENNACK:
10      And I don't want to be overly
11      academic about this, I'm sure you'll
12      appreciate this, but anything that the
13      lawyers have done is work product, and
14      I just object for the record.
15      But you can answer his question.
16      Do you have any of those items, any
17      recordings or anything regarding
18      Hurricane Katrina?
19    THE WITNESS:
20      No.
21  EXAMINATION BY MR. SUTTON:
22    Q.  Item Number 7 requests photographs,
23  videotapes pertaining to the hurricane.  And
24  your counsel has provided me with copies of
25  photographs.

Page 21

1     A.  Yes.
2     Q.  And we'll go over those a little bit
3   later, but those are photographs, it looks like
4   probably -- I haven't counted them yet, but it
5   looks like perhaps about thirty or forty
6   photographs that your counsel has provided me
7   with.
8     Were all of these photographs taken by
9   you?
10    A.  Yes.
11    Q.  Are all of these photographs taken of
12  your property?
13    A.  Yes.
14    Q.  Okay.  And were they all taken after
15  Hurricane Katrina?
16    A.  Yes.
17    Q.  Okay.  Your attorney has --
18    MR. REBENNACK:
19      I'm sorry.  She may have wanted
20      to clarify that.  There may be some
21      photographs of a place where she went,
22      I think, after the hurricane.
23    THE WITNESS:
24      Yeah.  In the shelter, yes.
25    MR. REBENNACK:

6  (Pages 18 to 21)

DAISY MAE INNIS (LEVEE)                                    7/16/2007

Page 22

```
 1          Just to let you know.  In answer
 2    to your question.
 3    EXAMINATION BY MR. SUTTON:
 4       Q.  So they're all taken after the
 5    hurricane.
 6       A.  Yes.
 7       Q.  Most are taken of your property but
 8    some are taken of the shelter where you went.
 9       A.  Yes.
10       Q.  Okay.  Your attorney has also provided
11    me with five sheets in which each sheet
12    contains a couple of color copies of
13    photographs.
14       A.  Yes.
15       Q.  I tell you what -- and we'll mark the
16    five sheets in globo as Exhibit Innis Number 4.
17          Did you take the photographs indicated
18    in Exhibit 4?
19          (Innis Exhibit 4 was marked for
20    identification and is attached hereto.)
21       A.  No.
22    EXAMINATION BY MR. SUTTON:
23       Q.  Okay.  Do you know who took these
24    photographs?
25       A.  No.
```

Page 23

```
 1          MR. SUTTON:
 2          Counsel, do you want to state on
 3    the record just --
 4          MR. REBENNACKS:
 5          Well, do you want those now?  I
 6    think what they've been doing is
 7    you've been giving them back to me and
 8    they've been presenting you a package
 9    I think that's more responsive to all
10    of your items at one time.  It doesn't
11    matter, whichever way you went to do
12    it.
13          MR. SUTTON:
14          Why don't we go ahead and attach
15    it.  I'll just make copies of them.
16    But if you would just state on the
17    record, if you know --
18          MR. REBENNACK:
19          Who took these?
20          MR. SUTTON:
21          Do you know?  If you don't know,
22    you don't know.
23          MR. REBENNACK:
24          I don't know, to be honest.
25          You don't know who took these?
```

Page 24

```
 1          THE WITNESS:
 2          (Shakes head negatively.)  Sure
 3    don't.
 4          MR. REBENNACK:
 5          Here you go.  It might be this
 6    gentleman.  Paul Barnes?  It might be
 7    on behalf of the plaintiffs committee.
 8          MR. SUTTON:
 9          I would just note for the record
10    that Page 1 of Exhibit 4 is entitled
11    Levee Litigation, June 19th, 2007,
12    4024 Stutz Street, VID, that's V-I-D,
13    dash Paul Barnes, B-A-R-N-E-S.
14          MR. REBENNACK:
15          Right.
16    EXAMINATION BY MR. SUTTON:
17       Q.  Ms. Innis, are you in possession of
18    any other photographs regarding your property
19    taken either before or after Hurricane Katrina,
20    other than the ones that you've produced for me
21    here today?
22       A.  Before Katrina?
23       Q.  Yes, ma'am.  Before or after.
24       A.  I don't know.  They may have been
25    destroyed.  I don't know.
```

Page 25

```
 1          MR. REBENNACK:
 2          You have to speak up, Ms. Innis.
 3       A.  I don't know.
 4    EXAMINATION BY MR. SUTTON:
 5       Q.  Ms. Innis, Item Number 8 requests
 6    documents relating to any claim that you're
 7    asserting for damages as alleged in the
 8    complaint.
 9          Other than the documents that we've
10    reviewed thus far today, are you in possession
11    of any documents responsive to this item?
12       A.  I don't know.
13       Q.  I'm sorry?
14       A.  Rephrase that again.  I didn't
15    understand that.
16       Q.  Sure.  Item Number 8 requests
17    documents which relate to any claim that you're
18    asserting for damages in this action.
19          Other than the documents that we've
20    reviewed thus far today, are you in possession
21    of any documents which would be responsive to
22    Item Number 8?
23       A.  No.
24       Q.  Okay.  Item Number 9 requests
25    documents regarding any claim that you're
```

JOHNS PENDLETON COURT REPORTERS                      800 562-1285

DAISY MAE INNIS (LEVEE)                                          7/16/2007

---

Page 26

1  asserting for lost earnings, lost business
2  income and similar types of damages.
3       Let me just ask you, are you making
4  any type of economic claim in this litigation;
5  are you making any claim for lost earnings,
6  lost business income, anything of that nature?
7       A.  Lost earnings.
8       Q.  That's my question.  Are you making a
9  claim for lost earnings?
10      A.  Yes.
11      Q.  Okay.  Were you working at the time of
12 Hurricane Katrina?
13      A.  Before, yes.
14      Q.  No, at the time of Hurricane Katrina,
15 were you working?  Not before, but at the time
16 of the storm.
17      MR. REBENNACK:
18           Let me just object to the form.
19      I appreciate what you're -- but I
20      think she's misunderstanding your
21      question.
22           He's not talking about the very
23      day of, or the day before, but in the
24      immediate future, a week before, two
25      weeks before, a month before, were you

---

Page 27

1       working?
2       A.  Yes.
3  EXAMINATION BY MR. SUTTON:
4       Q.  Let me put it this way:  You were
5  employed at the time of Hurricane Katrina?
6       A.  Yes.
7       Q.  Who were you employed by?
8       A.  Kay 's Sitting Service.
9       Q.  And have you gone back to work since
10 the storm?
11      A.  Yes.
12      Q.  And I'll discuss that with you later,
13 but let's go back the Item Number 9.
14           Since you're making a claim for lost
15 earnings, what if any documents are you in
16 possession of that would refer or relate to
17 such a claim?
18      A.  I don't have any documents.
19      Q.  Okay.  Well, for example, do you have
20 copies of your income tax returns for the past
21 few years?
22      A.  Oh, I could get -- yes.
23      Q.  Do you have copies of any of your
24 payroll or earnings, either before or after
25 Katrina?  Do you maintain copies of your

---

Page 28

1  payroll stubs, anything of that nature?
2       A.  No.
3       Q.  Okay.  Just income tax returns.
4       A.  Just income tax, yes.
5       Q.  Okay.  Ms. Innis, if you don't mind,
6  flip the page over to the next item which is
7  Number 10.  And that requests documents which
8  pertain to your claim for, quote, economic and
9  compensatory damages.  I think this would be
10 akin, actually, to Item No. 9.  And you've told
11 me you're in possession of income tax returns.
12      A.  Uh-huh.
13      Q.  Are you making a claim -- are you
14 making a claim for any type of personal injury
15 as a result of Hurricane Katrina?
16      A.  Yes.
17      Q.  Okay.  I'll cover that with you in a
18 little bit later item.
19           Item Number 11 requests any
20 mathematical or formulaic calculations or
21 models that may be in your possession that
22 relate to your injury.
23           Are you in possession of any documents
24 responsive to this item?
25      A.  No.

---

Page 29

1       Q.  Item Number 12, Ms. Innis, requests
2  all mathematical or formulaic calculations
3  regarding the calculation of your damages.
4           Are you in possession of any documents
5  responsive to this request?
6       A.  No.
7       Q.  Okay.  Item Number 13, Ms. Innis,
8  requests documents relating to your evacuation.
9           Are you in possession of any documents
10 relating to any evacuation that you may have
11 made as a result of Hurricane Katrina?
12      A.  Yes.
13      Q.  Okay.  And what type of documents are
14 you in possession of?
15      A.  A lease.
16      Q.  I'm sorry?  A what?
17      A.  A lease.
18      Q.  A lease?
19      A.  That's a document, isn't it?
20      Q.  Yeah.  I understand.  What kind of
21 lease?
22      A.  A rent lease.
23      Q.  A rent lease.  Okay.  And actually,
24 one of the subsequent items discusses leases.
25 I think what this is really more looking at are

---

                                        8  (Pages 26 to 29)

DAISY MAE INNIS (LEVEE)                                    7/16/2007

Page 30

1   receipts such as hotel receipts, expenses that
2   you incurred in connection with an evacuation,
3   having to purchase food, gasoline, anything of
4   that nature.
5          Are you in possession of any documents
6   of that nature which would document the
7   evacuation expenses that you incurred?
8      A.  No.  I didn't save it.
9      Q.  Okay.  Item Number 14, Ms. Innis,
10  requests any -- requests copies of any
11  statements that you have given in connection
12  with this litigation.
13         And other than statements that you
14  have provided to your attorneys, are you in
15  possession of any documents responsive to this
16  request?
17     A.  No.
18     Q.  Okay.  Item Number 15, Ms. Innis,
19  requests any and all logs, journals, diaries or
20  other copies that you have made regarding
21  Hurricane Katrina.  Are you in possession of
22  any documents responsive to this request?
23     A.  No.
24     Q.  Okay.  Item Number 16 requests your
25  medical records from August, 2000, through the

Page 31

1   present.  Are you in possession of any
2   documents responsive to this request?
3      A.  No.
4      Q.  Item Number 17 requests documents
5   evidencing the application for or receipt of
6   any benefit paid to you as a result of
7   Hurricane Katrina.
8          Now, other than the documents we have
9   already discussed, FEMA, SBA, Red Cross, Road
10  Home, food stamps and your insurance claim, are
11  you in possession of any other documents that
12  may be responsive to this request?
13     A.  No.
14     Q.  Item Number 18 -- and this is perhaps
15  more geared to your attorneys, but Item
16  Number 18 requests any demonstrative evidence
17  or exhibits that you may refer to at the class
18  certification hearing.  And are you personally
19  in possession of any documents that you think
20  may be responsive to this request?
21     A.  I don't know.
22     Q.  You don't know.  Okay.
23         Item Number 19 requests computer
24  models that may be used at the class
25  certification hearing.  Are you in possession

Page 32

1   of any documents responsive to this request?
2      A.  I don't understand the question.
3      Q.  Okay.  Let me ask you this:  Are you
4   in possession of any computer models
5   regarding -- which in any way pertain to the
6   hurricane, showing, you know, weather patterns,
7   anything like that?
8      A.  No.
9      Q.  Okay.  Item Number 20 requests copies
10  of any complaints or petitions in any prior
11  litigation in which you have been a party.
12         Let me ask you, have you ever been a
13  party to litigation other than this litigation?
14     A.  No.
15     Q.  Okay.  So in response to Number 20,
16  your answer would be no, I'm not in possession
17  of any such documents.
18     A.  No.  I'm not.
19     Q.  That's correct?
20         MR. REBENNACK:
21         May I, counsel?
22         MR. SUTTON:
23         Sure.
24         MR. REBENNACK:
25         Litigation means any kind of

Page 33

1   lawsuit.
2          I assume is your question.
3          MR. SUTTON:
4          Sure.
5          MR. REBENNACK:
6          Any kind of claim; auto accident
7   claim, insurance claim, slip and fall.
8          THE WITNESS:
9          Oh, yes.
10         MR. REBENNACK:
11         That's what this gentleman would
12  like to ask you about.
13  EXAMINATION BY MR. SUTTON:
14     Q.  Other than this lawsuit --
15     A.  Yes.
16     Q.  -- have you ever been a party to a
17  lawsuit?
18     A.  Yes.
19     Q.  Okay.  How many lawsuits have you been
20  a party to?
21     A.  About three or four, I don't know.  I
22  don't remember.  Three or four.  I don't
23  remember.
24     Q.  Okay.  We'll go -- I'll ask you some
25  more questions about that later.  But as to

DAISY MAE INNIS (LEVEE)                                    7/16/2007

Page 34

1  right now, are you still in possession of any
2  petitions or complaints regarding any of those
3  other lawsuits?
4     A.  No.
5     Q.  Okay.  So as to Item Number 20, your
6  answer would be no, I'm not in possession of
7  any documents responsive to this request,
8  correct?
9     A.  Correct.
10    Q.  Okay.  Item Number 21 -- and here's
11 where we're getting to the lease agreement
12 Ms. Innis -- it requests a copy of any lease
13 agreements entered into by you.  And you've
14 told me you are in possession of a lease
15 agreement?
16    A.  Yes.
17    Q.  That was in effect at the time of the
18 hurricane --
19    A.  Yes.
20    Q.  -- correct?
21    A.  After the hurricane.
22    Q.  After the hurricane.  Okay.
23       Does this concern property that you
24 leased to someone else or that you leased from
25 someone else?

Page 35

1     A.  Leased from someone else.
2     Q.  Okay.  Was that property that you
3  began leasing, as you said, after the
4  hurricane?
5     A.  Yes.
6     Q.  Other than that lease, the lease that
7  you entered into after the hurricane, are you
8  in possession of any documents responsive to
9  this request?
10    A.  No.
11    Q.  Okay.  Item Number 21 requests
12 documents pertaining to eviction proceedings.
13 Are you in possession of any documents
14 responsive to this request?
15    A.  No.
16    Q.  Okay.  And Ms. Innis, finally, Item
17 Number 23 requests any and all documents in
18 your possession indicating that the deponent --
19 meaning you -- will protect the interests of
20 the proposed class.
21       Other than all of the documents that
22 we've discussed, do you know of any documents
23 that you may be in possession of responsive to
24 this request?
25    A.  No.

Page 36

1     Q.  Okay.
2     A.  I don't think so.
3     Q.  Okay.  Did you review any documents
4  specifically to prepare for your deposition
5  here today?
6     A.  Yes.
7     Q.  What documents did you review to
8  prepare for your deposition?
9     A.  Um -- my 95.
10    Q.  Your Form 95?
11    A.  Form 95.
12    Q.  What if any other documents did you
13 review to prepare for your deposition?
14    A.  That's about it.
15    Q.  That's it?
16    A.  Yes.
17    Q.  Nothing else?
18    A.  No.
19    Q.  Ms. Innis, after your deposition is
20 concluded, the court reporter here, who is
21 typing up all of my questions and your answers,
22 will prepare a transcript of your deposition.
23 You have the right to read and sign that
24 transcript; alternatively, you can exercise to
25 waive that right.  I don't know if you've

Page 37

1  discussed that with your counsel --
2        MR. REBENNACKS:
3           I think that we'll reserve it.  I
4        think I even remember something in the
5        CMO that the way that it has to be
6        done, you can only make corrections on
7        it on another page or something.
8        MR. SCALIA:
9           I think we're reading and signing
10       all of them.
11       MR. REBENNACK:
12          Okay.  Yeah.  Reserve.
13       MR. SUTTON:
14          Okay.
15 EXAMINATION BY MR. SUTTON:
16    Q.  Ms. Innis, have you ever gone by any
17 other name other than Daisy Mae Innis?
18    A.  Everett.
19    Q.  Is that your maiden name?
20    A.  Married name.
21    Q.  Everett?  E-V-E-R-E-T-T?
22    A.  Yes.
23    Q.  Okay.  Any other names?
24    A.  Evans Innis.
25    Q.  Evans?

                                    10 (Pages 34 to 37)

DAISY MAE INNIS (LEVEE)                                        7/16/2007

Page 38

1    A.  Yes.
2    Q.  And what name was Evans, was that a
3  maiden name or --
4    A.  You could say a maiden name.  Given at
5  birth.
6    Q.  Okay.  When you were growing up, your
7  name was Daisy Mae Evans?
8    A.  No.
9    Q.  Okay.  What was it?
10    A.  Given name at birth, Daisy Mae Evans.
11  Adopted name Innis.  Married name Everett.
12    Q.  And I'm not -- I mean, just to make it
13  clear, I'm not directing these questions solely
14  at you, these are questions that we ask all
15  witnesses just to obtain background
16  information.
17    A.  That's it.
18    Q.  And what is your date of birth, ma'am?
19    A.  12/4/42.
20    Q.  And you told me your current
21  address --
22    A.  Yes.
23    Q.  -- a little bit -- or a little while
24  ago.  Was that the same address that you had at
25  the time of the hurricane?

Page 39

1    A.  Yes.
2    Q.  And how long had you lived at the
3  Stutz Street address?
4    A.  About twenty years.
5    Q.  And other than the time after the
6  hurricane, the time period that you were not
7  living there, had you consistently lived at
8  that address?
9    A.  Before the hurricane?
10    Q.  Yes, ma'am.
11    A.  Yes.
12    Q.  Okay.  Ms. Innis, at the time of the
13  hurricane, who was living with you?
14    A.  My daughter.
15    Q.  And what's her name?
16    A.  Eleanor Elizabeth Everett.
17    Q.  And was anyone else living with you?
18    A.  No.
19    Q.  How old is your daughter?
20    A.  42.
21    Q.  Do you know if your daughter is a
22  plaintiff in this litigation?
23    A.  I think so.
24    Q.  And at the time of the hurricane, you
25  owned the property on Stutz Street?

Page 40

1    A.  Yes.
2    Q.  Okay.  Did anyone else own the
3  property with you or were you the sole owner?
4    A.  Sole owner.
5    Q.  Okay.  And do you have a Louisiana
6  Driver's License --
7    A.  Yes.
8    Q.  -- or Louisiana identification number?
9  Driver's license?
10    A.  (Nods affirmatively.)
11    Q.  Do you know the number of it?
12    A.  Not offhand.
13    Q.  Do you have it with you?
14    A.  Yes.
15    Q.  Can I see it for a second?
16    A.  (Tendering.)
17    Q.  Thank you.
18      MR. SUTTON:
19        Let the record reflect that
20      Ms. Innis has handed me her Louisiana
21      Driver's License bearing numbers
22      004786239, expiring 12/4/09.
23  EXAMINATION BY MR. SUTTON:
24    Q.  Ms. Innis, I note the restriction on
25  it is 01.  Do you have any idea what

Page 41

1  restriction that is?
2    A.  Glasses.
3    Q.  Glasses?  Thank you, ma'am.
4  (Tendering.)
5      And what's your Social Security
6  number?
7    A.  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.
8    Q.  Have you ever held a driver's license
9  in any other state?
10    A.  No.  I don't remember that.
11    Q.  Ms. Innis, what is your current
12  marital status?
13    A.  Divorced.
14    Q.  And your husband -- your former
15  husband was Mr. Everett; is that correct?
16    A.  Yes.
17    Q.  And what's his name?
18    A.  Clarence Everett.
19    Q.  And approximately when were you
20  divorced?
21    A.  That's thirty-five years ago.
22    Q.  When you were divorced?
23    A.  Thirty-six, thirty-seven.  Yeah.
24  About thirty-seven years ago.
25    Q.  And you haven't remarried since.

DAISY MAE INNIS (LEVEE)                                          7/16/2007

Page 42

1     A.  No.
2     Q.  That's correct?
3     A.  Right.
4     Q.  Do you have any other children other
5  than the daughter who was living with you?
6     A.  No.
7     Q.  Do you have anyone who is a dependent
8  upon you?
9     A.  No.
10     Q.  Is your daughter living with you at
11  the present time?
12     A.  No.
13     Q.  Is anyone living with you at the
14  present time?
15     A.  No.
16     Q.  How far did you get in school?
17     A.  10th.
18     Q.  Did you complete the 10th grade?
19     A.  Drop out.
20     Q.  And where were you going at the time?
21  Where were you going at the time of the 10th
22  grade?
23     A.  John H. Martin High School.
24     Q.  That's in New Orleans?
25     A.  Jefferson Parish.

Page 43

1     Q.  Have you -- since leaving high school,
2  have you had any type of formal education,
3  vocational training, anything since?
4     A.  No.
5     Q.  Let me go over with you, ma'am,
6  briefly, your employment history.  And you told
7  me at the time of Hurricane Katrina you were
8  employed -- was it Kay 's Sitting Service?
9     A.  Kay 's Sitting Service.
10     Q.  Okay.
11     A.  But then -- okay.
12     Q.  No, do you need to -- do you need to
13  finish your answer?
14     A.  Um -- they say you're self-employed
15  once they get the job.  After you've been there
16  with them for a year you're self-employed.
17     Q.  Okay.  Well, let's talk about that.
18         When did you begin working for Kay's?
19     A.  I don't remember.
20     Q.  I mean, was it several years before
21  the hurricane?
22     A.  Yeah.  Several years before the storm.
23     Q.  Where is Kay 's Sitting Service
24  located?
25     A.  1942 Williams Boulevard.

Page 44

1     Q.  Okay.  Do you know if they're still in
2  business?
3     A.  Yes.  They are.
4     Q.  And what was your job position with
5  Kay's?
6     A.  A sitter.
7     Q.  Okay.  And as a sitter, just generally
8  what were your duties, what would you do?
9     A.  Oh, take care of the sick, their
10  needs, whatever they needed.
11     Q.  Would you normally go to private homes
12  to do that?
13     A.  Private homes, yes.
14     Q.  Okay.  What types -- generally, you
15  know, at the time of the hurricane, what types
16  of hours would you work at that job?
17     A.  Twelve hours.
18     Q.  Twelve hours --
19     A.  Yes.
20     Q.  -- at a time?
21     A.  Yes.
22     Q.  Okay.  And approximately how many days
23  a week would you work?
24     A.  Five.
25     Q.  So you were putting in some long

Page 45

1  hours.
2     A.  Yes.
3     Q.  That's about what, sixty hours a week.
4  Is that right?
5     A.  Correct.
6     Q.  So you would typically work five
7  days --
8     A.  Five days.
9     Q.  -- and be off two days each week.
10     A.  Right.
11     Q.  Did you have a supervisor, a specific
12  supervisor?
13     A.  No.
14     Q.  Now, you said you had worked there for
15  several years at the time of the hurricane.
16  Were you paid by the hour or were you on a
17  salary or what?
18     A.  Paid by the hour.
19     Q.  Okay.  And what was your hourly wage
20  with Kay's?
21     A.  Oh, $7, $7.50, it depends.
22     Q.  $7 to $7.50, depending on the time of
23  day that you were working or something?
24     A.  Yes.
25     Q.  Were you paid overtime or was it just

12 (Pages 42 to 45)

DAISY MAE INNIS (LEVEE)                                    7/16/2007

---

Page 46

1  straight --
2      A.  It's straight time.
3      Q.  Straight time.
4      A.  Straight time.
5      Q.  Even if you worked sixty hours a week,
6  it was straight time.
7      A.  Yes.
8      Q.  Okay.  And were you paid weekly or
9  monthly or --
10     A.  Weekly.
11     Q.  And would they issue you a check?
12     A.  Yes.
13     Q.  When they issued the check, did they
14 take out for taxes?
15     A.  No.
16     Q.  Okay.  They would issue you a gross
17 check.
18     A.  Yes.
19     Q.  And then at the end of the year they
20 would issue you a 1099?
21     A.  Yes.
22     Q.  And so you would be responsible for
23 your own withholdings.
24     A.  Yes.
25     Q.  Okay.  And that's why you were telling

---

Page 47

1  me a few minutes ago that you were advised that
2  you were considered to be an independent
3  contractor, not an employee.
4      A.  Right.
5      Q.  I take it other than the pay, you
6  weren't provided any benefits.
7      A.  No.
8      Q.  That's right?  Just pay.
9      A.  Right.
10     Q.  Okay.  At the time of the hurricane,
11 were you working anywhere in addition to
12 working for Kay's?
13     A.  No.
14     Q.  Now, after the hurricane, you told me
15 you've returned to work?
16     A.  Yes.
17     Q.  Okay.  Did you return to work with
18 Kay's?
19     A.  No.
20     Q.  Okay.  Who did you return to work for?
21     A.  I was in Mississippi now.  I weren't
22 here.
23     Q.  Okay.  Well, regardless of where you
24 were, who did you go to work for?
25     A.  Um -- let see.  The last place I

---

Page 48

1  worked was, um -- I'm trying to think.
2          MR. SUTTON:
3             Why don't we go off the record.
4      (Off the record.)
5  EXAMINATION BY MR. SUTTON:
6      Q.  Ms. Innis, I believe I was asking you,
7  after the hurricane, when you first went back
8  to work, where did you go to work?
9      A.  Midsouth Building Service.
10     Q.  Midsouth Building Service.  And where
11 is Midsouth Building Service?
12     A.  2603 22nd Avenue, Gulfport,
13 Mississippi 39502.
14     Q.  And ma'am, when did you go to work,
15 when did you begin working for Midsouth
16 Building Service?
17     A.  I don't remember.
18     Q.  Can you tell me about how long after
19 the storm it was?  Do you know if it was in
20 '05, or '06?
21     A.  '06.  '06.
22     Q.  Okay.  And are you still employed at
23 Midsouth?
24     A.  No.
25     Q.  Okay.  About how long did you work

---

Page 49

1  there?
2      A.  Until June.  This year.
3      Q.  Just last month?  June of '07?
4      A.  No.  June -- it's probably May.
5  Because I came back here in May.
6      Q.  May of '07?
7      A.  Yes.
8      Q.  Just a couple months ago.
9      A.  Yes.
10     Q.  So you worked there what,
11 approximately a year or so?
12     A.  Yes.  About a year.  Almost a year.
13     Q.  Well, that would indicate, then, that
14 you started -- I'm not holding you to any date,
15 but about June of '06?
16     A.  I don't remember all those dates --
17     Q.  Okay.
18     A.  -- and times.
19     Q.  Okay.
20     A.  I'm going to be honest with you, I
21 don't remember.
22     Q.  What did you do for Midsouth?
23     A.  Um -- janitorial work.
24     Q.  Is this a company that provides
25 janitorial services for just different

---

DAISY MAE INNIS (LEVEE)                                    7/16/2007

|  | Page 50 |
|---|---|
| 1 | businesses and so forth? |
| 2 | A. Yes. |
| 3 | Q. So you would go around to the |
| 4 | different businesses and perform that work. |
| 5 | A. Yes. |
| 6 | Q. Were you employed full-time, |
| 7 | part-time? |
| 8 | A. Part-time. |
| 9 | Q. About how many hours would you work a |
| 10 | week? |
| 11 | A. Fifteen. |
| 12 | Q. Okay. You were paid by the hour? |
| 13 | A. Yes. |
| 14 | Q. Okay. And what was your hourly rate? |
| 15 | A. About $7.50. |
| 16 | Q. About the same hourly rate that you |
| 17 | had with Kay's? |
| 18 | A. Uh-huh. Yes. |
| 19 | Q. When you were working with Midsouth, |
| 20 | were you holding any other jobs? |
| 21 | A. Um -- during that time -- no. I don't |
| 22 | think so. |
| 23 | Q. Okay. Is there a reason why you were |
| 24 | working part-time fifteen hours a week as |
| 25 | opposed to full-time? Was it just because they |

|  | Page 51 |
|---|---|
| 1 | didn't offer it, or you had other things that |
| 2 | you had to take care of, or -- |
| 3 | A. That's all we worked, four hours. You |
| 4 | know, those hours. |
| 5 | Q. Okay. |
| 6 | A. It was only part-time. |
| 7 | Q. And you said you worked there until |
| 8 | about May of this year, a couple of months ago? |
| 9 | A. Yes. |
| 10 | Q. And at that time, I believe you told |
| 11 | me, you moved back to New Orleans. |
| 12 | A. Yes. |
| 13 | Q. Have you worked since moving back to |
| 14 | New Orleans? |
| 15 | A. No. |
| 16 | Q. After the storm, just to make sure I'm |
| 17 | clear on this, after the storm, the only job |
| 18 | that you've held is that with Midsouth? |
| 19 | A. Island View Casino. |
| 20 | Q. Where is that? |
| 21 | A. I had just started that a couple of |
| 22 | months. Island View Casino in Gulfport, |
| 23 | Mississippi. |
| 24 | Q. And about when did you begin there? |
| 25 | A. A couple of months before I left. |

|  | Page 52 |
|---|---|
| 1 | Q. Okay. About March or so? |
| 2 | A. Yeah. Yes. |
| 3 | Q. And how long did you work there? |
| 4 | A. A couple of months. |
| 5 | Q. And what did you do at Island View? |
| 6 | A. Housekeeping. |
| 7 | Q. And about how many hours a week did |
| 8 | you work there? |
| 9 | A. Eight hours a day. |
| 10 | Q. Eight hours a day? |
| 11 | A. Yes. |
| 12 | Q. Five days? |
| 13 | A. Yes. |
| 14 | Q. Forty hours a week? |
| 15 | A. Right. |
| 16 | Q. And what was your pay with Island |
| 17 | View? |
| 18 | A. Eight dollars, I think. |
| 19 | Q. An hour? |
| 20 | A. Yes. I think eight dollars. I'm not |
| 21 | sure. |
| 22 | Q. Okay. Approximately $8 an hour. |
| 23 | A. Yes. |
| 24 | Q. And that would certainly be reflected |
| 25 | in your pay records from the employer. |

|  | Page 53 |
|---|---|
| 1 | A. Yes. |
| 2 | Q. Did you -- I take it you voluntarily |
| 3 | quit both Midsouth and Island View. |
| 4 | A. Yes. I resigned. |
| 5 | Q. Okay. And you resigned because you |
| 6 | were moving back to New Orleans? |
| 7 | A. Yes. |
| 8 | Q. Okay. Are you currently looking for |
| 9 | work? |
| 10 | A. Somewhat. |
| 11 | Q. Okay. Have I covered all of your |
| 12 | employment and other work after the hurricane? |
| 13 | A. There was a school, and I can't |
| 14 | remember the name of that school, in Gulfport. |
| 15 | I can't remember the name of the school. I |
| 16 | worked at a school in the cafeteria, after the |
| 17 | storm. I can't remember the name. |
| 18 | Q. That's fine. Well, let me see if I |
| 19 | can get some information. |
| 20 | A. You all can find that out. |
| 21 | Q. Do you know if it was an elementary |
| 22 | school? |
| 23 | A. Elementary school, sir. |
| 24 | Q. Do you know what street it was on? |
| 25 | A. No. I can find out for you. |

JOHNS PENDLETON COURT REPORTERS                      800 562-1285

DAISY MAE INNIS (LEVEE)                                    7/16/2007

---

Page 54

1    Q.  Okay.  Well, tell me this:  You said
2  you worked in the kitchen, did you say?
3    A.  Yes.
4    Q.  Okay.  And what did you do at the
5  school?
6    A.  In the cafeteria?
7    Q.  Yes, ma'am.
8    A.  Um -- served lunch.
9    Q.  Okay.  And about how long did you work
10  at the school?
11    A.  From October -- I'm trying to think --
12  until school closed.  Maybe September when the
13  school opened -- I don't remember, because it
14  was after the storm.  I don't remember.
15    Q.  Let me ask you this:  Did you work
16  this past school year at this school?
17    A.  No.  No.
18    Q.  Okay.  Do you know about when you went
19  to work there?
20    A.  I don't remember.
21    Q.  Okay.  Do you know approximately how
22  many months you worked there?
23    A.  Until school closed.  About eight
24  months.
25    Q.  When you stay school closed, this past

---

Page 55

1  May you're talking about?
2    A.  No.
3    Q.  The previous year.
4    A.  Yes.
5    Q.  Okay.  So you were working there in
6  '06.  2006.
7    A.  Yes.
8    Q.  Okay.  Was that a full-time job?
9    A.  Part-time.
10    Q.  Okay.  About how many hours a week was
11  that?
12    A.  I don't remember.
13    Q.  Okay.  Do you recall what your pay was
14  at the school?
15    A.  Unh-unh.
16    Q.  No?
17    A.  No.
18    Q.  Okay.  Is there any reason?
19    A.  No, I don't remember.
20    Q.  Okay.  You didn't work at the school
21  this past year.
22    A.  No.
23    Q.  Okay.  Is there any particular reason
24  why you didn't return there?
25    A.  No.  No particular reason.

---

Page 56

1    Q.  Okay.  Now, we've discussed Midsouth,
2  Island View and the school in Gulfport.  Have I
3  now covered all of your post-Katrina
4  employment?
5    A.  Uh-huh.
6    Q.  Yes?
7    A.  Yes.  I'm sorry.
8    Q.  Ms. Innis, have you ever served in the
9  military?
10    A.  No.
11    Q.  I'm going to go back, now, and ask you
12  some information about your other lawsuits
13  which you touched upon earlier with me.
14      As best as you can recall as you sit
15  here today, what other lawsuits have you been
16  involved in as a party?
17    A.  Automobile accidents.  None other than
18  automobile accidents.
19    Q.  Okay.  And did you know about how many
20  automobile accidents you've been involved in?
21    A.  Far as I can remember, about three.
22    Q.  Okay.  And to the best of your
23  knowledge, were you involved in lawsuits
24  arising out of each and every one of those
25  automobile accidents?

---

Page 57

1    A.  I think so.
2    Q.  Okay.  And were you the injured person
3  in the accident?
4    A.  Yes.
5    Q.  And you would have been the plaintiff
6  in the lawsuits, is that correct?
7    A.  Yes.
8    Q.  Did these accidents occur in Orleans
9  Parish?
10    A.  Yes.
11    Q.  All of them?
12    A.  Yes.
13    Q.  When was the most recent?  And I'm
14  trying to get an idea if it was right before
15  the storm or if we're going back years and
16  years.
17    A.  We're going back years now.
18    Q.  You have not had an automobile
19  accident and a resulting lawsuit for several
20  years before the hurricane?
21    A.  Yes.
22    Q.  Okay.
23    A.  I think so.  I don't remember.
24    Q.  Now, you were involved in -- well, you
25  were involved in a lawsuit regarding divorce.

---

15 (Pages 54 to 57)

DAISY MAE INNIS (LEVEE)                                          7/16/2007

Page 58

1  Someone filed suit.
2      A.  Uh-huh.
3      Q.  Correct?
4      A.  Yes.
5      Q.  Other than the divorce lawsuit and the
6  lawsuits regarding the automobile accidents,
7  which you've told me occurred several years
8  ago, have you been involved in any other
9  lawsuits?
10     A.  No.
11     Q.  Have you suffered any accidents after
12 Hurricane Katrina?  Whether it's an automobile
13 accident, accident at work, anything of that
14 nature.
15     A.  No, nothing like that.
16     Q.  Have you made any type of claims after
17 Hurricane Katrina unrelated to the hurricane,
18 like a workers' comp claim?
19     A.  No.
20     Q.  Lawsuit, anything like that?
21     A.  No.
22     Q.  I'm asking this, I ask every witness
23 this, and every plaintiff in this litigation
24 has been asked this:  Do you have any criminal
25 record?

Page 59

1      A.  No.
2      Q.  Have you ever been treated for alcohol
3  or drug abuse?
4      A.  No.
5      Q.  At the time of the hurricane, you told
6  me, your daughter was living with you.  And she
7  was grown at the time?
8      A.  Yes.
9      Q.  She was not attending any school at
10 the time?
11     A.  No.
12     Q.  Did you regularly participate in any
13 church before Hurricane Katrina?
14     A.  Yes.
15     Q.  Okay.  And what church was that?
16     A.  Franklin Avenue Baptist Church.
17     Q.  That's that church reopened since the
18 hurricane?
19     A.  At another -- no.
20     Q.  Okay.  It hadn't reopened at all,
21 whether it that location or a different
22 location?
23     A.  It's a different location.
24     Q.  Okay.  That preacher and the
25 congregation have gone physically to a

Page 60

1  different location?
2      A.  Yes.
3      Q.  Is it still referred to as Franklin
4  Avenue Baptist church?
5      A.  No.  It's under another name until our
6  church is fixed.
7      Q.  Okay.  Now, I know you've just been
8  back a couple of months now, but have you
9  returned to go to that church or another church
10 or --
11     A.  No.
12     Q.  Did you -- prior to the hurricane, did
13 you belong to any type of neighborhood
14 association?
15     A.  No.
16     Q.  Did you know many of your neighbors,
17 say the neighbors on your block?
18     A.  A few, not too many.
19     Q.  Okay.  Do you know if any of the few
20 neighbors that you knew, if any of those have
21 returned to the neighborhoods yet?
22     A.  Yes.
23     Q.  They have?
24     A.  Yes.
25     Q.  Are they actually living in their

Page 61

1  homes or --
2      A.  Yes.  Getting theirs repaired.
3      Q.  Okay.  So your block is becoming --
4  beginning to get back to where it was,
5  somewhat --
6      A.  Somewhat.
7      Q.  -- before the hurricane.
8      A.  Yes.
9      Q.  In the sense at least that people are
10 moving back into their houses.
11     A.  Right.  Yes.
12     Q.  And I'd like to -- I just want to ask
13 you about some of your activities before the
14 storm.  Did you go to Mardi Gras?  Did you go
15 to the parades?
16     A.  I worked.
17     Q.  Okay.  You didn't go to the parades.
18     A.  Unh-unh.  Years ago I did.
19     Q.  Okay.  But in the several years
20 leading up to the storm, you weren't going to
21 the parades?
22     A.  No.
23     Q.  And you said because you were working.
24     A.  Yes.
25     Q.  And your answer may be the same to all

16  (Pages 58 to 61)

DAISY MAE INNIS (LEVEE)                                    7/16/2007

Page 62

```
 1    of these, but I'm going to ask you, did you
 2    normally go to Jazz Fest before the storm?
 3        A.  No.
 4        Q.  What about Saints games?
 5        A.  No.
 6        Q.  Hornets games.
 7        A.  No.
 8        Q.  The zoo?  Audubon Zoo?
 9        A.  Yes.
10        Q.  Okay.  How often would you go to the
11    zoo?
12        A.  About twice a year.
13        Q.  Have you been back since the storm to
14    the zoo?
15        A.  Yes.
16        Q.  Okay.  Did you think it was nice,
17    enjoy it?
18        A.  Yes.
19        Q.  What about City Park, did you use that
20    before the storm?
21        A.  Yes.
22        Q.  Okay.  And how often would you go
23    there?
24        A.  About three times a year.
25        Q.  And what would you normally do there,
```

Page 63

```
 1    picnic?
 2        A.  Picnic.
 3        Q.  Have you had the chance to go back
 4    there yet since the storm?
 5        A.  No.
 6        Q.  Did you attend the Essence Festival
 7    here in town?
 8        A.  No.
 9        Q.  What about the Bayou Classic game and
10    festivals, did you --
11        A.  No.
12        Q.  Are you a registered voter?
13        A.  Yes.
14        Q.  Okay.  And did you vote regularly
15    before the storm?
16        A.  Yes.
17        Q.  And have you voted since the storm?
18        A.  No.
19        Q.  Were you involved in any civic
20    organization or activities before the storm?
21        A.  No.
22        Q.  What about social organizations, did
23    you belong to any type of social organizations?
24        A.  No.
25        Q.  What about did you belong to any
```

Page 64

```
 1    business or trade organizations?
 2        A.  No.
 3        Q.  Before the storm, did you ever
 4    participate in city council meetings?
 5        A.  No.
 6        Q.  What about any other governmental
 7    entity meetings?  Orleans Levee Board meetings,
 8    Port of New Orleans meetings, Sewerage & Water
 9    Board meetings?
10        A.  No.  No.
11        Q.  Nothing like that.
12        A.  No.
13        Q.  Okay.  Have you participated in any
14    type of community-based post-Katrina planning
15    efforts?  I know some of the neighborhoods have
16    had meetings, things like that.  Have you had
17    any participation in anything like that?
18        A.  Yes.
19        Q.  Okay.  Tell me about that.
20        A.  I only attended two of those, because
21    I wasn't here.
22        Q.  Okay.  And who was putting on these,
23    or who participated in the two meetings that
24    you went to?
25        A.  Oh, I don't remember.  I'd have to get
```

Page 65

```
 1    all that.
 2        Q.  Was this a neighborhood type of
 3    meeting?
 4        A.  Yes.
 5        Q.  And what was the purpose of the
 6    meetings?
 7        A.  Trying to get the neighbors back, you
 8    know.  Trying to get us to come back and
 9    different things.  I don't recall too much of
10    it.
11        Q.  Did you have any type of leadership
12    role at the meetings or were you just an
13    attendee?
14        A.  I just attended.
15        Q.  And you've said you've attended, to
16    the best of your knowledge, two of those
17    meetings.
18        A.  Two of them, yes.
19        Q.  When was last one that you attended,
20    do you remember?
21        A.  I don't remember.
22            (Brief recess.)
23    EXAMINATION BY MR. SUTTON:
24        Q.  Ms. Innis, we're going to switch gears
25    here now, and I going to ask you some questions
```

                                    17 (Pages 62 to 65)

DAISY MAE INNIS (LEVEE)                                    7/16/2007

Page 66

1   about the hurricane itself.
2        About when was your first notice of
3   the hurricane?
4        A.   On the news.
5        Q.   Okay.  Was it -- you know about how
6   long before the hurricane actually made
7   landfall that you began hearing about it on the
8   news?
9        A.   No.
10       Q.   Just don't recall?
11       A.   I was on vacation.
12       Q.   Okay.  Were you on vacation and out of
13   town?
14       A.   Yes.  That's why I'm trying -- I was
15   trying to get it together some kind of way.  I
16   weren't here.
17       Q.   Okay.  Where were you?
18       A.   California.
19       Q.   Okay.  Did you remain in California
20   through the hurricane?
21       A.   I was due back the Sunday before the
22   storm.
23       Q.   The day before it made landfall --
24       A.   Yes.
25       Q.   -- you were due back, but you didn't

Page 67

1   come back.
2        A.   No.
3        Q.   Okay.  You stayed in California.
4        A.   Yes.
5        Q.   So while you were out in California,
6   you picked it up on the news.
7        A.   Yes.
8        Q.   Okay.  Obviously, you're a long way
9   away, but what were your initial actions that
10  you took; I mean, did you have family here that
11  you started calling or, to try to get things
12  taken care of on your house or, you know, what
13  did you do?
14       A.   I didn't have very much family here.
15  I did have a friend here, because I had my two
16  pets.
17       Q.   At your house?
18       A.   At my house.  They were taking care of
19  them and I wanted to make sure that my pets
20  were taken care of.
21       Q.   What kind of pets did you have?
22       A.   I had two dogs.
23       Q.   A friend came and got those for you?
24       A.   At the time -- how can I put this?  He
25  was supposed to have been going to get my pets.

Page 68

1        Q.   Okay.
2        A.   He said the water was rising and he
3   had to get his family out.
4        Q.   Okay.  Was your daughter here at the
5   time?
6        A.   My daughter and I was in California
7   together.  We was on vacation, sir.
8        Q.   Okay.  So you didn't really have
9   family here when you were gone?
10       A.   Right.
11       Q.   Okay.  The only thing -- I don't want
12  to say the same thing, but what you did have
13  here were your two dogs at your house.
14       A.   Right.  Yes.
15       Q.   Was someone taking care of the dogs at
16  your house?
17       A.   Yes.
18       Q.   Is it the same friend that you called?
19       A.   Yes.
20       Q.   Okay.  And what was your friend's
21  name?
22       A.   Joseph Bell.
23       Q.   Okay.  Was he a neighbor?
24       A.   Yes.
25       Q.   Okay.  And during that time period, he

Page 69

1   would come by and feed --
2        A.   Feed them.
3        Q.   -- and water them daily?
4        A.   Yes.
5        Q.   Were they staying inside your house?
6        A.   Yes.
7        Q.   So he'd let them go out and --
8        A.   Yes.
9        Q.   Okay.  You were scheduled to come back
10  the day before, you said?
11       A.   The Sunday before.
12       Q.   But did not come back.
13       A.   (Shakes head negatively.)
14       Q.   Were you visiting relatives in
15  California?
16       A.   Friends and family.
17       Q.   Okay.  Who were you staying with out
18  there?
19       A.   A friend of my daughter's.
20       Q.   Okay.
21       A.   I don't remember the names.  I
22  don't --
23       Q.   Okay.  And obviously they cancelled
24  your flight, I take it.
25       A.   Yes.  They cancelled.  My daughter was

18 (Pages 66 to 69)

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

DAISY MAE INNIS (LEVEE)                                          7/16/2007

Page 70

1   trying -- yes.
2       Q.  Okay.  How long did you and your
3   daughter remain in California?
4       A.  Three weeks.
5       Q.  Okay.  Did you continue to stay with
6   her friend?
7       A.  Yes.
8       Q.  And I take it you weren't in a
9   situation where you had to pay rent or
10  anything.
11      A.  No.
12      Q.  Okay.  After the three weeks, what
13  happened?
14      A.  We got a flight into Jackson.
15      Q.  Okay.  Where in California were you?
16      A.  Los Angeles.
17      Q.  All right.  So you're in Jackson now,
18  when you first come back, or you come to
19  Jackson about three weeks after the storm?
20      A.  After the storm.  Because, as you
21  know, you couldn't get a flight into New
22  Orleans.
23      Q.  Sure.  And when you got to Jackson,
24  what did you do?
25      A.  A relative picked us up.

Page 71

1       Q.  Okay.  And who was that?
2       A.  Angela Watson.
3       Q.  Okay.  And how is she related to you?
4       A.  Niece.
5       Q.  Okay.  Does she live in Jackson?
6       A.  No.
7       Q.  Okay.  Where does she live?
8       A.  Gulfport.
9       Q.  Okay.  Did you go with her to
10  Gulfport?
11      A.  Yes.
12      Q.  And is that when you started living in
13  Gulfport?
14      A.  Yes.
15      Q.  Okay.  And you lived there until just
16  about May of this year?
17      A.  Yes.
18      Q.  When you went to Gulfport -- well, let
19  me ask you this:  During the time that you were
20  in Gulfport, from what, about the end of
21  September of '05 until May of 07 '-- right?
22      A.  Yes.
23      Q.  Almost two years.
24      A.  Yes.
25      Q.  Okay.  Did you live in various places?

Page 72

1   Or did you live in the same place the entire
2   time?
3       A.  Do I have to name all of them?
4       Q.  Well, let's just start and see how it
5   goes.  When you first went, where did you stay,
6   with your niece?
7       A.  Temporarily, yes.
8       Q.  Okay.  Well, just generally, what are
9   some of the places that you lived in Gulfport?
10      A.  West Elementary, West Elementary
11  School shelter and Good Deed shelter.
12      Q.  How long did you live in those
13  shelters?
14      A.  I stayed in Good Deed maybe a month.
15  West Elementary, we had to leave out of there
16  because school was getting ready to open.
17      Q.  Okay.  And how long did you stay
18  there?
19      A.  So they sent us to Good Deed.
20      Q.  How long -- you first stayed at West
21  Elementary?
22      A.  Yes.
23      Q.  And how long did you stay there?
24      A.  Maybe about two, three weeks.
25      Q.  Okay.

Page 73

1       A.  I really don't remember.
2       Q.  Okay.  And that's fine.  If you don't
3   know, please tell me.  I'm just trying to get
4   an idea of where you've been while you were in
5   Gulfport.
6           So you stayed at West Elementary a few
7   weeks and then you went to, you say, good deed.
8       A.  Good Deed.  Yes.
9       Q.  For about a month.
10      A.  Right.
11      Q.  And what about after that?
12      A.  We was trying to get a trailer.
13      Q.  Okay.  A FEMA trailer?
14      A.  A FEMA trailer.
15      Q.  Were you able to the get one?
16      A.  Yes.
17      Q.  And about when did you get the FEMA
18  trailer, do you recall?
19      A.  No.
20      Q.  Was it still in '05 or are we now into
21  '06?
22      A.  Oh, God, I don't remember.
23      Q.  Okay.  Well, regardless --
24      A.  I don't remember.
25      Q.  When you got the FEMA trailer, were

DAISY MAE INNIS (LEVEE)                                    7/16/2007

Page 74

1  you in the FEMA trailer until you moved back
2  here a couple of months ago?
3      A.  No.  I moved -- I lived in the FEMA
4  trailer, 1107 Woodward Avenue, Gulfport,
5  Mississippi.
6      Q.  About how long were you in the FEMA
7  trailer?
8      A.  Not long.
9      Q.  More than a month, more than two
10 months?
11     A.  I don't remember.
12     Q.  Okay.  What reason or reasons did you
13 leave the FEMA trailer to go to an apartment?
14     A.  I was getting sick.
15     Q.  Okay.  From being inside the trailer?
16     A.  Yes.
17     Q.  The scent?  Okay.  So you felt for
18 health reasons you needed to get out.
19     A.  Get out, yes.
20     Q.  And you went to, you said, Woodward
21 Avenue?
22     A.  Yes.
23     Q.  That's an apartment?
24     A.  No, sir.
25     Q.  What is that?

Page 75

1      A.  A house.
2      Q.  A house.  You rented the house?
3      A.  Yes.
4      Q.  Were the rent payments made by anyone
5  else or did you have to make the payments?
6      A.  I had to make the payments.
7      Q.  Were you reimbursed by FEMA or anyone?
8      A.  No, unh-unh.  No, I paid the rent.
9      Q.  Okay.  And you were living there at
10 the time that you moved back to New Orleans?
11     A.  Yes.
12     Q.  Okay.  And can you tell me about how
13 long you lived at the Woodward Apartments?
14     A.  A year.
15     Q.  And during that time, you had to pay
16 the rent payments.
17     A.  Yes.
18     Q.  And how much was the monthly rent?
19     A.  $350.
20     Q.  Before you went to Woodward, did you
21 have any type of lodging expenses, or was it
22 all paid for?  You told me about the shelters,
23 the FEMA trailer.
24     A.  I didn't have no --
25     Q.  No lodging expenses before the

Page 76

1  apartment --
2      A.  No.
3      Q.  -- is that correct?
4      A.  Lodging?  What do you mean?
5      Q.  Well, did you have to pay for the FEMA
6  trailer, did you have to pay for the shelter in
7  any way?
8      A.  No, I didn't have -- no.
9      Q.  So the apartment was your first
10 lodging expenses.
11     A.  Right.  We did pay the people for
12 letting us put the trailer on their property.
13     Q.  Okay.  You paid them so much a month?
14     A.  Yes.
15     Q.  And how much did you pay them?
16     A.  $200.
17     Q.  $200 a month?
18     A.  Yes.
19     Q.  Okay.  And so you had the FEMA trailer
20 on private property?
21     A.  Yes.
22     Q.  Okay.  And during the entire time that
23 you were in Mississippi, were you living with
24 your daughter?
25     A.  Yes.

Page 77

1      Q.  Okay.  And you both moved back
2  together a couple of months ago.
3      A.  Yes.
4      Q.  Other than working after Hurricane
5  Katrina, and you told me about the three places
6  where you've worked, what generally have been
7  your activities, have you become involved in
8  anything in particular, any extracurricular
9  activities, or -- just trying to get an idea of
10 typical daily life.
11     A.  No, just going over to the house,
12 making sure that the work is being did on the
13 house.
14     Q.  On your house.
15     A.  Yes.  Going to the grocery, um -- been
16 to the zoo.  Oh, take -- go riding, look at the
17 city.
18     Q.  Okay.  Now, what I'd like to do,
19 Ms. Innis, is just go through some of the
20 claims that you have or may have in connection
21 with this litigation.
22     A.  Okay.
23     Q.  And what I'd like to first ask is --
24 well, why don't we do this:  Why don't we start
25 by going over your Form 95.  If you don't mind,

DAISY MAE INNIS (LEVEE)                                    7/16/2007

Page 78

1  I'm going to -- do you have Exhibit 2 in front
2  of you, ma'am?
3        MR. REBENNACK:
4           Yeah.  This is your Form 95.
5        This is one of them.
6  EXAMINATION BY MR. SUTTON:
7     Q.  Okay.  Are you looking on the Form 95
8  that is actually dated at the bottom 8/31/06?
9     A.  Yes.
10    Q.  Okay.  And the handwriting on the Form
11 95, is all of that handwriting yours?
12    A.  Yes.
13    Q.  Let's just go through the different
14 boxes.  Box Number 1, the typed portion that's
15 in that box, United States of America,
16 Department of the Army, et cetera, did you type
17 that in or was that already typed for you when
18 you got it?
19    A.  Already typed in.
20    Q.  Okay.  And in Box Number 2, you told
21 me you wrote that in.
22    A.  You.
23    Q.  Your name and address.
24    A.  Right.  Yes.
25    Q.  Box Number 3, where it's typed in Type

Page 79

1  of Employment and it looks like maybe civilian
2  is typed in, did you type in that?
3     A.  No.
4     Q.  This was already typed in for you?
5     A.  Yes.
6     Q.  Okay.  The Date of Birth, box
7  Number 4, that's your handwriting.
8     A.  Yes.
9     Q.  And Box Number 4, the Marital Status,
10 that handwriting is yours.
11    A.  Yes.
12    Q.  Okay.  Box Number 6, Date and Day of
13 Accident, the answer that's typed in, again,
14 you didn't type that in.
15    A.  No.
16    Q.  That was already typed in when you got
17 the form.
18    A.  Yes.
19    Q.  Okay.  Box Number 7, Time, unknown,
20 the word unknown that's typed in, again that
21 was typed in when you got the form.
22    A.  Yes.
23    Q.  Box Number 8, Basis of Claim, the
24 written in address, again that's your
25 handwriting, correct?

Page 80

1     A.  Yes.
2     Q.  If you'll look immediately below that,
3  Box 8A, the entire answer that's typed in which
4  begins the hurricane protection levees and
5  hurricane walls, et cetera, all of that type,
6  this was already typed in when you received
7  this form?
8     A.  Yes.
9     Q.  Okay.  And the word flood, that's the
10 single handwritten word flood in Box 8A,
11 that is your handwriting.
12    A.  Yes.
13    Q.  If you'll look next, ma'am, at Box
14 Number 9 which is entitled Property Damage, you
15 see that?
16    A.  Yes.
17    Q.  Okay.  The first part of that, Name
18 and Address of Owner, and your name and address
19 is handwritten in, that's your handwriting,
20 correct?
21    A.  Yes.
22    Q.  Okay.  The next portion of Box
23 Number 9 which begins Briefly Describe the
24 Property, the typed answer in that box again
25 was already in the box when you received the

Page 81

1  form, correct?
2     A.  Yes.
3     Q.  Box Number 10 which is entitled
4  Personal Injury/Wrongful Death, the typed
5  answer in that box was again already in the
6  form when you received it, correct?
7     A.  Yes.
8     Q.  Okay.  Box Number 11, Witnesses, under
9  Name the answer that's typed in is "claimant is
10 not aware of any witnesses at this time."
11 Again, that answer was already typed in for
12 you.
13    A.  Yes.
14    Q.  Let look at Box Number 12, now, which
15 is entitled Amount of Claim.  Under 12a is
16 entitled Property Damage.  And the amount of
17 $85,000 is written in.  Do you see that?
18    A.  Yes.
19    Q.  Is that what you have claimed with the
20 Department of the Army and that you're claiming
21 in this lawsuit that you have suffered as a
22 result of Hurricane Katrina?
23    A.  Yes.
24    Q.  Okay.  And it's your testimony here
25 today, consistent with the signed form that you

                              21 (Pages 78 to 81)

DAISY MAE INNIS (LEVEE)                                          7/16/2007

Page 82

1   submitted with the government, that you have
2   sustained $85,000 in property damage.
3        A.  Yes.
4        Q.  Okay.  Now, Box 12b, Personal Injury,
5   a line is drawn through that.  Did you draw
6   that line through there?
7        A.  Yes.
8        Q.  Okay.  And I take it that by doing so,
9   and by filing this form with the government,
10  you are not claiming any personal injury in
11  connection with Hurricane Katrina.
12           MR. REBENNACK:
13               Object to the form of the
14           question.
15  EXAMINATION BY MR. SUTTON:
16       Q.  Well, let me ask this:  On the Form
17  95, under the box Personal Injury, you
18  indicated that you had no claim for personal
19  injury, is that correct?
20       A.  Right.  Other than pain and suffering.
21       Q.  I'm sorry?  I didn't hear you.
22       A.  Pain and suffering.
23       Q.  No pain and suffering?
24       A.  Pain and suffering.
25       Q.  Okay.  Do you differentiate pain and

Page 83

1   suffering from personal injury?
2        A.  Well, I didn't know -- I didn't know
3   if I could put -- I thought when they said
4   property damage I could put it with pain and
5   suffering, so I didn't know.  Personal
6   injuries, I thought maybe something had to be
7   broke or --
8        Q.  Okay.  When you say personal injury,
9   are you referring to emotional distress?
10       A.  Yes.
11       Q.  You're not claiming any type of
12  physical injury or illness or disease.
13       A.  No.
14       Q.  Okay.  Your claim is limited to
15  emotional distress.
16       A.  Right.  Yes.
17       Q.  Okay.  Fair enough.  Under Box 12C,
18  Wrongful Death, you have a line through it, and
19  you're not making a claim for wrongful death.
20       A.  No.
21       Q.  Okay.  And Box 12d is a total, you
22  simply bought over the $85,000 from Box 12a and
23  put that as your total.
24       A.  Yes.
25       Q.  If you would, Ms. Innis, flip over to

Page 84

1   the next page.  About halfway down, you see
2   where it indicates insurance coverage?  About
3   halfway down the form?
4        A.  Yes.
5        Q.  Okay.  And there are several boxes
6   under insurance coverage.  Box Number 15 asks
7   if you carry accident insurance.  And the typed
8   answer is none that would cover this claim.
9            You see that?
10       A.  Yes.
11       Q.  Now, again, that typed answer was
12  already in the form when you received it,
13  correct?
14       A.  Yes.
15       Q.  And likewise, the typed answers
16  in response to the subsequent boxes, 16, 17
17  and/or 18, were also already included in the
18  form when you received it.
19       A.  Yes.
20       Q.  Okay.  And you told me earlier, and
21  we'll get into it later, that you had no flood
22  insurance.  Correct?
23       A.  No insurance.  No flood insurance.
24       Q.  You had homeowner's insurance.
25       A.  Homeowner's.

Page 85

1        Q.  All right.  Now, do you know who
2   provided the typed answers to the Form 95 that
3   you received?  Do you know if it was your
4   lawyer's office that did that?
5        A.  I'm sure.  I picked it up from the
6   lawyer's office.
7        Q.  You picked up the Form 95 from the
8   lawyer's office?
9        A.  Yes.
10       Q.  Do you know why you have two Form 95s?
11  You have one that's dated and one that's
12  undated that we've gone over.
13       A.  I don't know.
14       Q.  You just don't know?
15       A.  Maybe I forgot a file, trying to get
16  it filed, and I forgot to.
17       Q.  Okay.  As you sit here today, do you
18  recall, though, completing a Form 95 on two
19  separate occasions?
20       A.  Unh-unh.
21       Q.  You just don't recall?
22       A.  No.
23       Q.  Okay.  You'd agree that both, though,
24  claim property damage of $85,000?
25       A.  Yes.

                              22  (Pages 82 to 85)

DAISY MAE INNIS (LEVEE)                                    7/16/2007

Page 86

1    Q.  And that's what your claim is?
2    A.  Yes.
3    Q.  Now, let's go back to your injuries.
4  Just told me, except for emotional distress
5  you're not claiming any type of personal injury
6  claim.
7    A.  My -- my property what I lost.
8    Q.  Put that to the side for a second.
9  I'm just talking about personal injury in
10 general.
11       Other than emotional distress, you're
12 not making any other claim for personal injury?
13   A.  No.  No personal injury.
14   Q.  That's correct; is that correct?
15   A.  Yes.
16   Q.  Okay.  Tell me, Ms. Innis, what type
17 of emotional distress have you suffered as a
18 result of the hurricane and the results
19 thereof?
20   A.  Being out of my home, being away from
21 my home -- do I have the answer anymore of
22 these questions?  Because I'm about to cry.
23   Q.  Tell you what, do you want to take a
24 quick break?
25   A.  No, I might as well go ahead on

Page 87

1  through with this.
2    Q.  Okay.  And I know it's hard.
3    A.  Yes.  It is very hard.
4    Q.  This is our only opportunity to speak
5  with you in this type of formal setting, so I
6  need to ask these questions at this time.
7        You told me that you have emotional
8  distress and one of the reasons was the
9  extended period of which you weren't able to be
10 at home.
11   A.  Yes.
12   Q.  Okay.  You were living in Mississippi
13 for almost two years before you were able to
14 come back.
15   A.  Yes.
16   Q.  Okay.  I'm just trying to get an idea
17 of the reason or reasons, the basis for your
18 distress.  And different people have many
19 different reasons, and I'm just trying to get
20 your basis or your reasons.  And you've told me
21 one.
22       Let me ask you this:  Have you --
23 after the hurricane, have you sought any type
24 of -- have you sought any type of health care
25 with a psychiatrist, psychologist, counselor,

Page 88

1  mental health professional --
2    A.  No.
3    Q.  -- anything of that nature?
4        Okay.  Do you have any appointments
5  with any health care provider at this time?
6    A.  Yes.
7    Q.  Okay.  Who do you have an appointment
8  with?
9    A.  Oh, I have --
10       MR. REBENNACK:
11       (Tendering.)
12 EXAMINATION BY MR. SUTTON:
13   Q.  Ms. Innis, you've handed me a note
14 indicating --
15   A.  That's the doctor's name.
16   Q.  Okay.  And the doctor is Mona Shalaby?
17   A.  Shalaby.
18   Q.  That's S-H-A-L-A-B-Y, M.D.  Thank you.
19       Do you know what kind of doctor that
20 Dr. Shalaby is?
21   A.  I don't know, sir.
22   Q.  Who made the appointment for you with
23 Dr. Shalaby?
24   A.  I did, sir.
25   Q.  And what is the reason why you made

Page 89

1  the appointment with Dr. Shalaby?
2    A.  Personal reasons.
3    Q.  Do you relate this --
4    A.  Personal reasons, sir.
5    Q.  Do you relate those reasons to the
6  hurricane in any way?
7    A.  No, I don't think so.
8    Q.  Okay.  So your reason or reasons for
9  seeing Dr. Shalaby are not connected in any
10 way --
11   A.  I'm going to say personal.  Yearly
12 physical.
13   Q.  Okay.  And maybe my question wasn't
14 clear enough.  When I asked you about
15 appointments, do you have appointments with any
16 health care providers for your emotional
17 distress?
18   A.  I thought you was talking about a
19 mental doctor or something.  No, I don't have
20 no appointment with them.
21   Q.  Okay.  Well, Dr. Shalaby isn't a
22 mental doctor, though?
23   A.  No, she's not.
24   Q.  Okay.
25   A.  In your eyes maybe I need to see one,

23 (Pages 86 to 89)

DAISY MAE INNIS (LEVEE)                                    7/16/2007

Page 90

1   then.
2       Q.  Are you taking any type of
3   medication --
4       A.  No, sir.
5       Q.  -- for your emotional distress?
6       Ms. Innis, prior to the hurricane,
7   were you ever treated for any emotional
8   distress or any related type of illness --
9       A.  No.
10      Q.  -- or problem, I should say?
11      A.  No.
12      Q.  And prior to Hurricane Katrina, did
13  you ever take any type of medication for any
14  type of emotional distress?
15      A.  No.
16      Q.  And I take it since at least to date
17  you haven't sought any medical treatment in
18  connection with the hurricane, you're not
19  making any claim for medical expenses.
20      A.  No.
21      Q.  That's correct?
22      A.  Yes.  My losses.
23      Q.  I'm sorry?
24      A.  My losses in my house.
25      Q.  And you're talking about your personal

Page 91

1   property.
2       A.  Personal property.
3       Q.  And we're going to go through that.
4       Let's talk about evacuation.  Now, you
5   told me you were already in California at the
6   time of the hurricane --
7       A.  Yes.
8       Q.  -- on a preplanned vacation, I take
9   it.
10      A.  Yes.
11      Q.  How long you had been on your vacation
12  at the time of your hurricane?
13      A.  The 19th of August.
14      Q.  Okay.  So almost two weeks.
15      A.  Right.
16      Q.  Okay.  And then you continued to stay
17  with your daughter 's friend for about three
18  weeks.
19      A.  Yes.
20      Q.  Are you making any claim for
21  evacuation or relocation expenses in connection
22  with the hurricane; in other words, do you
23  claim to have been out of pocket for certain
24  expenses for having to evacuate or continue to
25  be away from New Orleans as a result of the

Page 92

1   hurricane?
2       A.  Well, I thought that was in this -- in
3   this $85,000 here.
4       Q.  Okay.  Well, you may have thought
5   that.  The Form 95 indicates property damage,
6   and generally that means your real property or
7   your personal property.
8       A.  Uh-huh.
9       Q.  So I want to make sure -- let's
10  separate the two out.  Okay?  What I'm talking
11  about now is simply evacuation or relocation
12  expenses.  Nothing to do with your property
13  itself.  It's just expenses that you may have
14  incurred as a result of having to live away
15  from home.  And what I'd like to ask you is,
16  are you making any claim in this lawsuit for
17  evacuation or relocation expenses?
18      MR. REBENNACK:
19          Object to the form.  I mean, I
20      don't want -- I think she's already
21      answered that, in another context, but
22      let me just object to the form.
23      MR. SUTTON:
24          Okay.
25  EXAMINATION BY MR. SUTTON:

Page 93

1       Q.  You can answer it.  You can go ahead
2   and answer it.
3       A.  I don't know.
4       Q.  Okay.
5       (Off the record.)
6   EXAMINATION BY MR. SUTTON:
7       Q.  You told me that you had to leave the
8   FEMA trailer because it was making -- or you
9   felt that you were getting sick.  Is that
10  correct?
11      A.  Yes.
12      Q.  Okay.  Did you ever seek any medical
13  care in connection with your feeling of
14  sickness from living in the FEMA trailer?
15      A.  Did I --
16      Q.  Did you ever go to a doctor because of
17  that?
18      A.  Um -- yes, I did.  They had those --
19  yes, I did.
20      Q.  Okay.  Well, tell me about that.
21      A.  It was my sinus.
22      Q.  Okay.  That's what the doctor told
23  you?
24      A.  Yes.
25      Q.  Okay.  Who was that?

JOHNS PENDLETON COURT REPORTERS                      800 562-1285

DAISY MAE INNIS (LEVEE)                                    7/16/2007

Page 94

1     A.  I don't know.  It was a doctor over
2  there at the time, um -- they had those free --
3  you know, free doctors over there.  So I don't
4  remember the doctor 's name.
5     Q.  It was a doctor in Gulfport?
6     A.  Yes.
7     Q.  Was he at a regular established
8  clinic?
9     A.  No, they was in a trailer, too.
10     Q.  The doctor was living in a trailer?
11        I'm trying to understand, Ms. Innis.
12  I wasn't there.  This is the first time I'm
13  hearing this.
14     A.  You go visit them in the trailer.  You
15  go to the doctor in the trailer.  Go see the
16  doctor at the trailer.
17     Q.  Okay.  The doctor's office was in a
18  trailer?
19     A.  At the trailer, right.
20     Q.  This was a doctor who had relocated
21  from New Orleans or he just happened to be in a
22  trailer?
23     A.  I don't know, sir.  I don't know.
24     Q.  Okay.
25     A.  And don't ask me that question no

Page 95

1  more.  Please don't.
2     Q.  Well, Ms. Innis --
3     A.  I'm telling you he was a medical
4  doctor.  They had doctors along the highway,
5  different doctors people were going to.
6     Q.  Sure.
7     A.  That's all I can tell you.
8     Q.  That's fine.  And you understand,
9  again --
10     A.  I hope you can understand me, too.
11     Q.  Okay.  Well, I need to ask you a few
12  more questions about that.
13        You said you don't remember his name;
14  correct?
15     A.  I said that, sir.
16     Q.  Okay.  Do you have any documents in
17  your possession regarding your treatment by
18  that doctor.  Did you keep any --
19     A.  I don't know, sir.
20     Q.  Did you pay out of pocket for that
21  visit?
22     A.  Free, sir.
23     Q.  It was free.
24     A.  Yes, sir.
25     Q.  Okay.  It was free in that no one

Page 96

1  paid?  He just treated you free or --
2     A.  It was a clinic like for those of us
3  that didn't have doctors.
4     Q.  Okay.  Did he prescribe any medication
5  for you?
6     A.  I don't remember.
7     Q.  Okay.  How many times did you see him?
8     A.  I don't remember.
9     Q.  Okay.  But when you did see him, it
10  was your understanding based upon your visit
11  with him that he indicated you had sinus
12  problems?
13     A.  Upper respiratory problem.
14     Q.  Did he specifically relate those
15  problems to you having been in the trailer?
16     A.  I told him about it.
17     Q.  Okay.  But he didn't tell you one way
18  or the other what he thought was the cause of
19  your sinus?
20     A.  Right.
21     Q.  Okay.  Let me go back to the
22  evacuation, because I want to make sure you
23  understand me on that.  Because you did tell me
24  earlier that when you lived in Gulfport, when
25  you went to was it Woodward, the apartments --

Page 97

1     A.  It was not an apartment.
2     Q.  The home?
3     A.  It was a house, 1107 Woodward Avenue.
4     Q.  Okay -- that you had to pay rent --
5     A.  Yes.
6     Q.  -- of $350 a month.
7     A.  Yes, I did.  $350.  I have proof of
8  that.
9     Q.  Okay.  Other than the apartment -- and
10  you paid that because you weren't able to live
11  in your house, right?
12     A.  Correct.  You got pictures of my house
13  how it's being fixed.  I couldn't live over
14  here.
15     Q.  Okay.  Fair enough.  Fair enough.
16        What I'm trying to learn is, say,
17  other than those rental payments, are there
18  other types of expenses that you incurred over
19  the past --
20     A.  I had utilities.
21     Q.  -- over the past two years?
22     A.  I had utilities.  I have receipts for
23  that.
24     Q.  Okay.  What I'm looking for are
25  expenses that you incurred that you would not

25  (Pages 94 to 97)

DAISY MAE INNIS (LEVEE)                                7/16/2007

Page 98

1  have incurred --
2      A.  If it had not been for the --
3      Q.  Exactly.  Like you would have incurred
4  utilities if you would have stayed here.
5      A.  Right.
6      Q.  But I'm looking for expenses that you
7  incurred during your evacuation or relocation
8  that you would not have incurred.
9      A.  I had to buy furniture.
10     Q.  Okay.  Fair enough.  You had to --
11     A.  I had to buy clothes.
12     Q.  Okay.
13     A.  Shoes.
14     Q.  While you were gone.  Okay.  Because
15 you lost your personal property in the storm.
16     A.  Right.
17     Q.  Okay.  What about, did you have to buy
18 a car?
19     A.  Yes.
20     Q.  Did you have a car at the time of the
21 hurricane?
22     A.  I had two.  My daughter had a car and
23 I had two cars.  I had one Cavalier and I had a
24 DeVille.  It was lost in the water.
25     Q.  Okay.  All of those were lost?

Page 99

1      A.  In the water, yes.
2      Q.  Okay.  What about did you take one of
3  them, did you take a car to the airport?
4      A.  No.  I had someone to bring me to the
5  airport.
6      Q.  Okay.  You told me earlier that you're
7  making a claim for lost earnings.
8      A.  Uh-huh.  Yes.
9      Q.  Okay.  And you told me that you were
10 working at the time of the hurricane about
11 sixty hours a week.
12     A.  Yes.
13     Q.  Earning about --
14     A.  I hadn't retired yet.
15     Q.  Earning about $7 to $7.50 an hour.
16     A.  Yes.
17     Q.  After the hurricane, and you've told
18 me about the three jobs that you had after the
19 hurricane in Mississippi, in Gulfport --
20     A.  Yes.
21     Q.  -- is it your testimony that you
22 attempted to find full-time jobs but was unable
23 to find --
24     A.  Unable.
25     Q.  -- full-time jobs in Mississippi?

Page 100

1      A.  Yes.
2      Q.  They just had no jobs available.  Is
3  that your testimony?
4      A.  No.  They had jobs.
5      Q.  Okay.
6      A.  But not the type of jobs that I was
7  looking for.  I was looking for my sitting
8  work.
9      Q.  Okay.  Well, you didn't do any sitting
10 work jobs, though, right, in Mississippi?  You
11 worked at a casino, you worked at a school, and
12 you worked for a janitorial service.
13     A.  Right.
14     Q.  Okay.  Is it your testimony that over
15 the eighteen months or twenty months that you
16 were in Mississippi that you were unable to
17 find a full-time job?
18     A.  I found a full-time job at the casino.
19     Q.  The last couple of months.
20     A.  Yes.
21     Q.  But until that last couple of months,
22 is it your testimony that you were unable to
23 find any type of full-time job that you could
24 work in?
25     A.  Yes.

Page 101

1      Q.  That's right.  That's your testimony.
2      A.  Yes.
3      Q.  Okay.  And that's the basis for your
4  claim for lost earnings.
5      A.  Yes.
6      Q.  Is that you were only able to find
7  part-time work --
8      A.  Part-time work.
9      Q.  -- until approximately March of '07.
10     A.  Right.
11     Q.  That simply there were no full-time
12 jobs available in Gulfport.
13     A.  If they'd them, I couldn't find them.
14     Q.  Okay.  And what is the amount of lost
15 earnings that you're claiming to have sustained
16 as a result of the hurricane?
17     A.  I don't know.
18     Q.  Have you ever tried to make a
19 determination of an approximation as to how
20 much you're claiming in the -- as far as last
21 earnings are concerned?
22     A.  No.
23     Q.  Now, you moved back to New Orleans two
24 months ago, correct?
25     A.  Yes.

26 (Pages 98 to 101)

DAISY MAE INNIS (LEVEE)                                    7/16/2007

Page 102

1    Q.  Are you continuing to claim that you
2  are unable to find employment here?
3    A.  No.
4    Q.  Are you simply not looking for work at
5  this time?
6    A.  Not at this time.  Not until they
7  finish with my home.
8    Q.  Okay.  And your home is currently
9  being repaired right now.
10   A.  Yes.
11   Q.  Are you contracting that work?
12   A.  I have someone else contracting the
13  work.
14   Q.  You have a contractor.
15   A.  Yes.
16   Q.  Well, why can't you work if you have a
17  contractor repairing your home?
18   A.  Because I want to be there and make
19  sure they do what I want them to do.
20   Q.  You want to be there 24 hours a day?
21   A.  Not 24 hours because they're not there
22  24 hours.
23   Q.  They're there in the daytime.
24   A.  Yes.
25   Q.  Okay.  But until your home is

Page 103

1  complete, you simply don't want to work.
2    A.  Not right now.
3    Q.  Okay.  Have you looked for any future
4  work at this time?
5    A.  Yes.
6    Q.  Okay.  And have you found that there
7  are jobs available out there?
8    A.  They have, yes.
9    Q.  Okay.  And you feel confident that
10  once you are ready to go back to work you'll be
11  able to find a job?
12   A.  Yes.
13   Q.  Have you discussed with your prior
14  employer Kay as far as whether or not you could
15  return there to work?
16   A.  Yes.  I have been there.
17   Q.  And have they offered you a job?  Have
18  they told you yes, when you're ready the come
19  back --
20   A.  When I'm ready.  Yes.
21   Q.  So essentially you have a job waiting
22  for you.
23   A.  Yeah.  Whenever I get ready to go
24  back.
25   Q.  Okay.  And that would be similar to

Page 104

1  the job that you had before the storm.
2    A.  Right.
3    Q.  Okay.
4    A.  Yes.
5    Q.  Same type of hours, same type of pay.
6    A.  Maybe.
7    Q.  Okay.  Well, they haven't told you
8  anything different yet.
9    A.  No.
10   Q.  Have you, since the storm, Ms. Innis,
11  have you applied for any unemployment benefits?
12   A.  No.  Since the storm?
13   Q.  Yes, ma'am.  At any time after the
14  storm.
15   A.  After the storm.
16   Q.  Well, since the storm.
17   A.  Since the storm, yes.
18   Q.  You have applied for unemployment
19  benefits.
20   A.  Yes.
21   Q.  Okay.  Who did you apply for, in
22  Louisiana or in Mississippi?
23   A.  Well, I was in Mississippi, living in
24  Mississippi, so it had to come from here.
25   Q.  From here Louisiana?

Page 105

1    A.  Louisiana.  I'm sorry.
2    Q.  So you came back over here and applied
3  in Louisiana?
4    A.  On the phone.
5    Q.  On the phone.  Okay.  When did you
6  apply for unemployment benefits?
7    A.  I don't remember that either.
8    Q.  Did you ever receive unemployment
9  benefits?
10   A.  I think I did.  A couple of times.
11   Q.  And you would receive those what, you
12  would get a check every week, correct?
13   A.  No, it didn't come in a check.  I
14  don't remember how I got it.  But it wasn't --
15  no, not a weekly check.
16   Q.  Would it be directly deposited into an
17  account?
18   A.  They gave me -- sent me like a card.
19  Like a credit card.
20   Q.  Okay.  That you could essentially use
21  anywhere?
22   A.  Yes.
23   Q.  Over approximately what period of time
24  did you receive unemployment benefits?
25   A.  I think about twice.

27 (Pages 102 to 105)

DAISY MAE INNIS (LEVEE)                                    7/16/2007

Page 106

1    Q. When you say like -- just two cards?
2 Or two periods of time?
3    A. Two periods of time.
4    Q. Okay. Over how many months, though,
5 did that encompass, are we talking about a year
6 or more than a year? I know often they go up
7 to like six months at a time. Did you --
8    A. No, it didn't go up to six months.
9 No.
10    Q. Okay.
11    A. It wasn't that long.
12    Q. You just don't recall?
13    A. No, I don't recall that.
14    Q. Do you recall at about what rate your
15 benefits were?
16    A. No.
17    Q. Okay. Have you received any monies or
18 benefits for lost wages from any other source,
19 other than unemployment benefits?
20    A. No.
21    Q. That would be the only one.
22    A. The only thing, yes.
23    Q. Did you file income tax returns for
24 2005, the year of the storm?
25    A. No.

Page 107

1    Q. Okay. What about this past year,
2 2006, did you file income tax returns?
3    A. Yes.
4    Q. Okay.
5    A. '06, yes.
6    Q. You didn't for '05, but you did for
7 '06?
8    A. Yes.
9    Q. Have you got any kind of notice from
10 the IRS telling you that you need to file them
11 for '05 yet or not?
12    A. I don't remember.
13    Q. Do you prepare your own income tax
14 returns or did you have a service?
15    A. I have a service.
16    Q. Okay. Who prepares your income tax
17 returns?
18    A. Who did my taxes? I'm trying to think
19 now. What's that person's name? I had -- I
20 can bring all that information if they need it.
21    Q. It's a local preparer, someone in New
22 Orleans?
23    A. Yes. No. It was in Mississippi.
24    Q. It was in Mississippi.
25    A. Yeah. But the company is -- it's not

Page 108

1 H&R Block, it's another company.
2    Q. It's like a national company?
3    A. Yeah. I think.
4    Q. You didn't own a business or anything
5 at the time of Hurricane Katrina, your own
6 business.
7    A. No.
8    Q. You're not claiming any kind of loss
9 of business or rental income, anything like
10 that.
11    A. No.
12    Q. Did you regularly file income tax
13 returns before Hurricane Katrina?
14    A. Yes.
15    Q. What type would you file, just regular
16 1040?
17    A. Yes.
18    Q. I would like to shift gears a little
19 bit here and talk about your real property,
20 your home. Okay?
21    A. Okay.
22    Q. You owned one piece of property in
23 Orleans Parish.
24    A. Yes.
25    Q. 4024 Stutz Street.

Page 109

1    A. Yes.
2    Q. Do you know what if any designated
3 flood zone that property is located?
4    A. I don't know what that be, Zone 4?
5    Q. I'm not talking about the class zone,
6 I'm talking about flood zones for insurance
7 purposes, like Flood Zone A, Flood Zone B.
8       Do you know? If you don't --
9    A. B, I think it is.
10    Q. You think it's B?
11    A. I think it's B. I think they told me
12 it was B.
13    Q. And you told me you have 100 percent
14 ownership of this property.
15    A. Oh, yes.
16    Q. Can you tell me about when you
17 purchased the house?
18    A. It had to have been '87 or '88. 1987
19 or 1988. I'm not sure.
20    Q. And do you recall approximately how
21 much you paid for the house when you bought it?
22    A. Thirty-two.
23    Q. Thirty-two thousand dollars?
24    A. Yes, sir.
25    Q. Was there any particular reason or

                                    28 (Pages 106 to 109)

DAISY MAE INNIS (LEVEE)                                    7/16/2007

Page 110

1    reasons why you chose this house?
2       A.  I liked it and I liked the area, the
3    lil -- the neighborhood.
4       Q.  Okay.  Were you from that area?  Or
5    were you moving from a different area?
6       A.  I was moving from a different part of
7    town.
8       Q.  What part of town had you been in?
9       A.  Carrollton.
10      Q.  And when you purchased the home,
11   Ms. Innis, in approximately 1987, just
12   generally what was the condition of the house?
13   Would you say good condition, fair condition?
14      A.  Um -- I would say in -- let's see.
15   Good condition.
16      Q.  Okay.  In connection with your
17   purchase of the home, did you take out a
18   mortgage?  Did you pay cash for it or did you
19   take out a mortgage?
20      A.  Mortgage.
21      Q.  Do you recall the amount of the
22   mortgage?
23      A.  Thirty thousand dollars.
24      Q.  Thirty thousand.
25      A.  Yes.

Page 111

1       Q.  So you paid two thousand down?
2       A.  I think it was thirty-two thousand.
3    Thirty-two thousand.
4       Q.  So you mortgaged 100 percent of the
5    property.
6       A.  Yes.
7       Q.  Okay.  Have you taken out any -- since
8    the original mortgage on the home, have you
9    taken out any additional mortgages, like a home
10   equity loan, anything like that?
11      A.  No.
12      Q.  Have you ever had it refinanced,
13   anything like that?
14      A.  No.
15      Q.  Was an appraisal done on the house
16   when you bought it?
17      A.  I'm sure -- yes.  I'm sure it was.
18      Q.  Do you -- today, do you have a copy of
19   that original appraisal?
20      A.  No.
21      Q.  Has the house, since the time that
22   you've owned it, has the house been reappraised
23   for any reason?
24      A.  No.
25      Q.  So as you sit here today, you don't

Page 112

1    have any appraisals on the home.
2       A.  No.
3       Q.  That's right?  That's correct?
4       A.  Yes.
5       Q.  After you purchased the home, and
6    prior to the hurricane, did you make any what
7    you would consider substantial improvements to
8    it?
9       A.  Yes.  I did.
10      Q.  Tell me about those.
11      A.  I added, um -- another bedroom to the
12   home.
13      Q.  And as you're looking at the home,
14   that would be to your left if you're facing the
15   home?
16      A.  To my left.
17      Q.  Okay.  In fact, let me show you -- if
18   you don't mind, look at the pictures contained
19   in Exhibit Innis Number 4.  The additional
20   bedroom, is that the portion that juts out to
21   the left as you look at the photograph?
22      A.  Yes.
23      Q.  And that addition is a single bedroom?
24      A.  Yes.
25      Q.  Okay.  Is there any like connecting

Page 113

1    bath to that bedroom or --
2       A.  Yes.
3       Q.  So you added a bedroom and a bathroom.
4       A.  No.  The bath was already there.  I
5    added a door that goes into the bath.
6       Q.  Okay.  When did you add the bedroom?
7       A.  I don't remember.
8       Q.  Do you know the approximate cost of
9    having to add that bedroom?
10      A.  Ten thousand.
11      Q.  Okay.  Did you take out a loan to --
12      A.  It was a -- yeah.  Another loan.
13      Q.  But that was a new loan.
14      A.  Right.
15      Q.  Did you do anything else -- or did you
16   have done anything else before the storm that
17   you would consider to be a substantial
18   improvement to the property?
19      A.  It was rewired, you know, brought up
20   to code.  New floors, painted.
21      Q.  Okay.  When you say rewired, all the
22   electrical wiring was redone throughout the
23   house?
24      A.  Yes.  Throughout the house, yes.
25      Q.  Okay.

                              29 (Pages 110 to 113)

DAISY MAE INNIS (LEVEE)                                           7/16/2007

Page 114

1     A.  This was after I bought the house I
2  did that.
3     Q.  That's what I'm asking for.  What have
4  you had done to the house?
5     A.  Rewired.
6     Q.  Do you know about how much it cost to
7  have the house rewired?
8     A.  At that time, $1,500.
9     Q.  And you said you put new floors in it.
10  What did it have in it when you bought it?
11     A.  Carpet.
12     Q.  You got the carpet ripped out?
13     A.  Yes.
14     Q.  Did you put new carpet in or did
15  you --
16     A.  No.  Hardwood floors.
17     Q.  Throughout the house?
18     A.  Throughout the house.
19     Q.  And what was the approximate cost of
20  having that done?
21     A.  I don't remember.
22     Q.  Several thousand dollars, though?
23     A.  Oh, no.  No.  Maybe about four.  Maybe
24  about four.
25     Q.  Four --

Page 115

1     A.  Thousand.
2     Q.  Four thousand?
3     A.  Yes.  Maybe.  I don't know.
4     Q.  Okay.  That's fine.  And what else --
5  you said one other thing, though.
6     A.  Had it painted, in and out.
7     Q.  In and out.  Okay.  And do you know
8  the approximate cost of having all the painting
9  work done?
10     A.  I don't remember.
11     Q.  Okay.  Have I covered everything with
12  you as far as what you would consider to have
13  been substantial improvements that you made to
14  the house?
15     A.  A roof.
16     Q.  You got a new roof put on?
17     A.  I had a new roof at that time put on.
18     Q.  Okay.
19     A.  Before -- way before the storm.
20     Q.  About when did you have the new roof
21  put on?
22     A.  Maybe about ten years, maybe ten,
23  fifteen years ago.
24     Q.  So it's been some time.
25     A.  Yes.

Page 116

1     Q.  Do you know how much that cost?
2     A.  No, not right offhand.
3     Q.  Okay.  Any other substantial
4  improvements?
5     A.  That's about it.
6     Q.  This house is -- it's on wood beams,
7  wood piers?  It's off the ground, right?
8     A.  Yes.
9     Q.  Do you know about how high off the
10  ground it is?
11     A.  No, I don't.  Not offhand, no, I
12  don't.
13     Q.  Okay.  It is a single-family
14  residence, correct?
15     A.  Yes.
16     Q.  And just -- just generally, what are
17  there inside, like how many bedrooms, et
18  cetera?
19     A.  Two bedrooms.  It's a living room,
20  dining room, two bedrooms, bath and a kitchen.
21     Q.  Okay.  Do you know the approximate
22  living square footage of the house?
23     A.  No.
24     Q.  Okay.  And it's a wood house, correct?
25     A.  With aluminum siding.

Page 117

1     Q.  With aluminum siding.  And just a
2  regular asphalt type of roof?
3     A.  Yes.
4     Q.  The finishes on the inside of the
5  house, is that sheetrock or is it plaster?
6     A.  Sheetrock.
7     Q.  It had plaster at one time, or?
8     A.  No.
9     Q.  Always?
10     A.  Always, since I've been there.
11     Q.  It had sheetrock?
12     A.  Sheetrock.  And with the construction
13  people, when they tore it out, it was
14  sheetrock.
15     Q.  Okay.  So when they took out the
16  sheetrock you were immediately at the wood
17  studs.
18     A.  Yes.
19     Q.  Do you know, Ms. Innis, when the house
20  was originally constructed?
21     A.  No, I don't.
22     Q.  Okay.  Are there any structures on
23  your lot other than the house?  Was there --
24  and I'm talking about at the time of the
25  hurricane.  Was there an attached garage or

                                      30  (Pages 114 to 117)

DAISY MAE INNIS (LEVEE)                                    7/16/2007

Page 118

1    shed or carport or anything like that?
2        A.   There was a lil -- a lil, um -- it was
3    a shed, and I turned it into like a lil den
4    back there in the back.
5        Q.   Okay.  Was it attached?
6        A.   No, it wasn't attached to the house.
7        Q.   It was in the backyard.
8        A.   In the back, yes.
9        Q.   But it wasn't a conditioned room.
10   There's no air conditioning or heating or
11   anything to it.
12       A.   No.
13       Q.   Okay.  Was that shed built off the
14   ground or was it on the ground?
15       A.   It's on the ground.
16       Q.   You have a picture of it?
17       A.   (Tendering.)  That's it right there.
18       Q.   Okay.  Thank you.
19       A.   That was did before the storm.  Just
20   before the storm I had it fixed.
21       Q.   You had a window AC, though, in it.
22       A.   We put that in there.
23       Q.   Before the storm?
24       A.   Before the storm, yes.
25       Q.   Okay.  And is this shed -- you said

Page 119

1    you turned it into a den?
2        A.   Like a lil den, yes.
3        Q.   Kind of like you can go out there and
4    just have a quiet sitting area?
5        A.   Sitting area, yes.
6        Q.   How big is that shed, do you know?
7    It's hard to tell in a photograph.
8        A.   It's a nice lil size.
9        Q.   Is the shed built on -- like on wood
10   piers or is it on a slab?
11       A.   It's on a slab.
12       Q.   It's on a concrete slab?
13       A.   Concrete slab.
14       Q.   And it's wood exterior.
15       A.   Yes.
16       Q.   Is it finished on the inside or is it
17   unfinished on the inside?
18       A.   It's finished.
19       Q.   With sheetrock?
20       A.   Yes.  Before the storm.
21       Q.   Okay.  And it had a similar roof to
22   the house, and just a typical asphalt type of
23   roof?
24       A.   Yes.
25       Q.   That shed was there when you bought

Page 120

1    the property?
2        A.   Yes.
3        Q.   But you fixed it up.
4        A.   Yes.
5        Q.   What kind of flooring did you have in
6    the shed?
7        A.   We didn't have -- started on the
8    flooring.
9        Q.   It was still concrete?
10       A.   Still concrete, yes.
11       Q.   Were the sheetrock walls painted yet,
12   or was it just --
13       A.   Painted.
14       Q.   And it had electricity inside of it?
15       A.   Yes.
16       Q.   What did you have, like a light
17   fixture or something?
18       A.   No, it had regular outlets.
19       Q.   Okay.  Thank you.  (Tendering.)
20       That shed wasn't up off the ground,
21   though, except for being on the slab.
22       A.   On the slab.
23       Q.   As opposed to your house which was --
24       A.   Off the ground.
25       Q.   -- off the ground.

Page 121

1        And you don't know how old that shed
2    was, do you?
3        A.   No.  When I bought the house the shed
4    was there.
5        Q.   Okay.  Do you know if either the house
6    or the shed had ever flooded before Hurricane
7    Katrina?
8        A.   No.  Not that I -- no.
9        Q.   What about in the May 1999 flood, did
10   the -- the shed didn't get any water in it in
11   that flood?
12       A.   No.
13       Q.   Okay.  So to your knowledge --
14       A.   To my knowledge it didn't.
15       Q.   And when you bought the house, the
16   people who sold it to you never told you that
17   it had flooded before?
18       A.   That it flood, right.
19       Q.   So to the best of your knowledge, the
20   house had never flooded.
21       A.   Never flood.
22       Q.   Now, you told me about you had put on
23   the new roof about ten years before the storm,
24   and you had put in new electrical wiring
25   throughout the house.

JOHNS PENDLETON COURT REPORTERS                          800 562-1285

DAISY MAE INNIS (LEVEE)                                    7/16/2007

Page 122

1    A.  Yes.
2    Q.  And you had painted the walls.
3         What about -- had you changed out any
4  of the plumbing throughout the house before the
5  storm?
6    A.  When I had the plumbing -- the
7  plumbing was okay.
8    Q.  Okay.  So you didn't make any major
9  renovations involving the plumbing.
10   A.  No.
11   Q.  Was the home, for cooling and -- for
12 cooling, did you have window units?
13   A.  Window units.
14   Q.  And what about heating, did you have
15 furnaces?
16   A.  Floor furnace.
17   Q.  Floor furnace.
18   A.  Floor furnace.
19   Q.  The siding, the aluminum siding on the
20 house, was that already on the house when you
21 bought it?
22   A.  Yes.
23   Q.  Do you have any idea what the fair
24 market value of your property was at the time
25 of Hurricane Katrina?

Page 123

1    A.  No.
2    Q.  Now, you had never put your house up
3  for sale, correct?
4    A.  No.
5    Q.  I'm just curious if you had seen any
6  of your neighbors put their houses up for sale
7  and what they were asking for them.
8    A.  I have one neighbor, he have a
9  house -- of his own house up for sale.  I think
10 he's asking up in the nineties for it.  I don't
11 know.  I didn't get that from him.
12   Q.  Was that before the storm?
13   A.  Before the storm.  It's still up for
14 sale.
15   Q.  Okay.  But before the storm he was
16 asking somewhere around ninety thousand for it?
17   A.  Yes.
18   Q.  Was his house comparable to yours as
19 far as size and so forth, or was it smaller,
20 bigger?
21   A.  Oh, I don't know.
22   Q.  You don't know?
23   A.  (Shakes head negatively.)
24   Q.  Okay.  So really, as you sit here
25 today just don't know what the fair market

Page 124

1  value of your home was at the time of the
2  hurricane.
3    A.  No.
4    Q.  That's correct?
5    A.  Correct.  I don't know.
6    Q.  And you don't know what would have
7  been the fair market value of the property,
8  just the property itself, at the time of the
9  hurricane.  Forgetting about the house for a
10 second, just the land.
11   A.  Just the land?
12   Q.  Yeah.
13   A.  No.
14   Q.  You had told me earlier you had
15 homeowner's insurance through I think Allstate?
16 Did you say Allstate?
17   A.  Yes.
18   Q.  Do you know what the limit of your
19 coverages were for both -- for the real and the
20 personal property, for your homeowner's?
21   A.  I don't know.
22   Q.  I'm sure at one point after the flood
23 you learned of that, though, when you were
24 dealing with them, how much you had in
25 coverage.

Page 125

1    A.  Yes.
2    Q.  Okay.  You just, as you sit here
3  today, you just don't recall what the coverage
4  was.
5    A.  I don't recall.  I don't recall.
6    Q.  Have you ever applied for insurance
7  coverage on the property and been denied for
8  any reason?
9    A.  No.
10   Q.  When is the first time after the storm
11 that you came back and saw your property?
12   A.  When the man gave us the okay.
13 Because they were going by ZIP codes.
14   Q.  Do you know about when that was?
15   A.  No.  I don't.
16   Q.  Okay.  Do you know whether it was
17 sometime, though, before the end of '05?
18   A.  I don't recall.  Right offhand I don't
19 recall.
20   Q.  When you came, did you come with your
21 daughter?
22   A.  Yes.
23   Q.  And when you first came back to your
24 property, Ms. Innis, when you came with your
25 daughter, what did you see in the way of

                                    32 (Pages 122 to 125)

DAISY MAE INNIS (LEVEE)                                      7/16/2007

Page 126

1  damages?
2      A.  The front door was open, just like
3  this in this picture.  The door was open, and
4  we walked in.
5      Q.  The door was still on the hinges?
6      A.  Yes.  But everything -- you know,
7  security, they had to go in to check to see if
8  anybody was in there or, or about the pets was
9  in there.  And the front door was open.  And,
10  um -- my daughter went in first because I was
11  out speaking with two of the neighbors.  And
12  they said we shouldn't have been back there by
13  ourself.
14      Q.  Who were you talking to?
15      A.  A neighbor.  I don't know his name
16  right offhand.
17      Q.  Were they already moving back in or --
18      A.  No.  They were checking on his rental
19  property.
20      Q.  Okay.
21      A.  And when I went in, when I did go in
22  the house, everything had been like moved
23  around.  Stuff was wet.
24      Q.  All the furniture and everything?
25      A.  Yeah.  Things had been moved around

Page 127

1  like somebody had just come in there and moved
2  stuff around.
3      Q.  Okay.
4      A.  Wet, damp, smelly.
5      Q.  Did you notice --
6      A.  The mold and stuff.
7      Q.  Could you see -- were you able to see
8  any type of waterline on the inside of your
9  house to get an idea of how high the water had
10  got in it?
11      A.  It's in the pictures.
12      Q.  Okay.  In those pictures?
13      A.  Yes.
14      Q.  Okay.  And I'll look through those
15  pictures, but as you recall, do you recall
16  about how high that waterline was in the house?
17      A.  Yes.
18      Q.  Okay.  About how high was it?
19      A.  From the floor, I can't -- I can't
20  say.  I can just show you on that picture.
21      Q.  Okay.  Why don't we go off the record
22  for a second.
23          (Off the record.)
24  EXAMINATION BY MR. SUTTON:
25      Q.  Ms. Innis, I want to refer you back to

Page 128

1  Exhibit Innis Number 4 which is a picture taken
2  of the front exterior of your home.
3      A.  Yes.
4      Q.  And you would agree that there are two
5  steps plus another step up to your porch?
6      A.  Right.  Yes.
7      Q.  And just looking at the picture, it
8  looks like, as a ballpark estimate, your home
9  is approximately maybe two and a half feet off
10  the ground?  Is that -- would you agree
11  somewhere in that neighborhood?
12      A.  Somewhere, yes.
13      Q.  You've also chosen from the pictures
14  that you've produced today a few pictures which
15  would indicate how high the water got inside
16  your house.
17      A.  It's a raised house.
18      Q.  And I've looked at these pictures
19  along with you and your counsel, and would you
20  agree with me that it looks like the water got
21  somewhere between approximately a foot to a
22  foot and a half inside your house?  Up off the
23  floor?  Does that sound approximately right?
24  And I'm not trying to state an exact
25  measurement.  Does that sound about right,

Page 129

1  based on your own visual observations?
2      A.  I don't know because I didn't measure
3  that.
4      Q.  Okay.  You just don't know?
5      A.  I don't know.
6      Q.  Did any of your -- any of the windows
7  break in your house as a result of the
8  hurricane?
9      A.  No.
10      Q.  Was your roof -- did your roof suffer
11  any damage?
12      A.  Yes.
13      Q.  Okay.  What type of damage did your
14  roof suffer?
15      A.  Water damage.
16      Q.  Okay.  Did any trees strike the roof,
17  or do you know what caused the roof to leak?
18      A.  No.
19      Q.  Had the roof leaked at any time before
20  the hurricane?
21      A.  No.
22      Q.  So this was the first time.
23      A.  Yes.
24      Q.  Okay.  Could you visually see roof
25  damage?

JOHNS PENDLETON COURT REPORTERS                     800 562-1285

DAISY MAE INNIS (LEVEE)                                    7/16/2007

Page 130

1    A.  You could see where it rained.
2    Q.  I mean from the outside, at the roof
3    itself.
4    A.  Oh, no, I couldn't see it.
5    Q.  Okay.  But when you went inside the
6    house, you could tell that rainwater got
7    through the ceiling?
8    A.  Yes.
9    Q.  And in what rooms did rainwater get
10   through the ceiling?
11   A.  The bedroom.  My bedroom.
12   Q.  Okay.  Is that the addition bedroom?
13   A.  The addition, yes.
14   Q.  Okay.  Did the roof leak and cause
15   water damage in any of the other rooms in the
16   house?
17   A.  Just that one room.
18   Q.  Just the bedroom.
19   A.  Yes.
20   Q.  Was any of your house 's exterior
21   damaged, the siding -- I don't know if you have
22   gutters on it, but anything like that.  Did
23   your siding get damaged at all by the wind or
24   rain or flooding, anything?
25   A.  No.

Page 131

1    Q.  Okay.  Really, all the damage was
2    limited to the inside?
3    A.  Inside.
4    Q.  And the roof, the part of the roof
5    that was damaged.
6    A.  Right.
7    Q.  Okay.  And you said you don't know
8    what caused the roof to be damaged in
9    connection with the hurricane.
10   A.  All I know is that it wasn't like that
11   before the storm.
12   Q.  Okay.  Did you notice -- do you have
13   trees on your property?
14   A.  One.
15   Q.  Okay.
16   A.  Not a big tree.  And they had one in
17   the property in the back, on the other
18   property, but it -- this damage didn't happen
19   in the back, it happened in my bedroom.
20   Q.  Was the tree on your property, was it
21   damaged?  Did it fall over?  Did limbs come
22   off?
23   A.  This lil tree here.  That's a flower.
24   That didn't do anything.
25   Q.  Okay.  You don't have any big trees.

Page 132

1    A.  No.
2    Q.  Did any of your neighbors -- did you
3    notice any damage to any of your neighbors'
4    trees, like trees breaking in half, falling
5    over, anything like that?
6    A.  No, I didn't notice.
7    Q.  You didn't notice one way or the
8    other?
9    A.  The tree that we did notice was on the
10   tracks, and my daughter called the railroad and
11   they -- because when it broke it fell on the
12   railroad.
13   Q.  How far is that tree from your
14   property?
15   A.  Oh, that's across the street.
16   Q.  Okay.  Was it broken like halfway up,
17   or was it rooted out of the ground?
18   A.  A branch or something had broke off
19   and it was on the track.
20   Q.  Okay.  Did you notice any type of
21   debris inside your house that you knew wasn't
22   yours, anything that may have, you know,
23   floated in?
24   A.  Floated inside?
25   Q.  Yes, ma'am.

Page 133

1    A.  Dirt.
2    Q.  Okay.  Was there a noticeable layer of
3    dirt in your house on the flooring?
4    A.  Uh-huh.
5    Q.  About how thick was it, do you know?
6    A.  I couldn't tell you, but I know it was
7    dirt.  You could see it on the hardwood floors.
8    By the floors being shiny, you could see it.
9    Q.  Okay.  Let's talk about your damages
10   to your house.  On your Form 95, you put
11   $85,000 down.  Okay?
12   A.  That's just a figure I put down.  I
13   thought for me being away from home, pain and
14   suffering, um -- inconvenience.
15   Q.  Okay.  Personal property?
16   A.  Personal property.
17   Q.  Real property.
18   A.  Yes.
19   Q.  But that figure then that you put down
20   for $85,000, in your mind --
21   A.  It's just was a figure that come into
22   my mind.  I don't know why, it just come into
23   my mind.
24   Q.  Okay.  But that figure in your mind
25   was intended to encompass and include all of

DAISY MAE INNIS (LEVEE)                                          7/16/2007

| Page 134 |
| --- |

1   your damages.
2      A.  (Nods affirmatively.)
3      Q.  And you just told me about the
4   emotional distress, the real property -- right?
5      A.  Yes.
6      Q.  -- the personal property --
7      A.  Yes.
8      Q.  -- the evacuation --
9      A.  Yes.
10     Q.  -- any damage that you incurred.
11     A.  Yes.
12     Q.  Okay.  And we've talked about some of
13  the other damages, but now I just want to focus
14  on the damage to your house.  Okay?
15        Do you have -- well, first of all, you
16  have a contractor who started working on your
17  house, right?
18     A.  Yes.
19     Q.  Has he given you a -- obviously he has
20  given you a written proposal as to the cost of
21  repairing your home.
22     A.  Yes.
23     Q.  Okay.  And you have a copy of that
24  that you can --
25     A.  No, I don't have a copy of it.

| Page 135 |
| --- |

1      Q.  Not with you, but you have a copy of
2   it.
3      A.  Oh, yes.
4      Q.  And that's -- did you sign a contract
5   with the contractor?
6      A.  No, I didn't sign a contract with him.
7      Q.  Okay.  What do you have in terms of
8   writing, do you have a proposal from him?
9      A.  Yes.
10     Q.  What's the name of your contractor?
11     A.  A2Z.  Not T-W-O, the number 2.
12     Q.  Are they a local company?
13     A.  Yes.
14     Q.  And what has been the proposed charges
15  for repairing your home to pre-Katrina state by
16  the contractor; what's he told you it's going
17  to cost?
18     A.  Well, I had three estimates, and that
19  was -- this one was the lowest one.  He said
20  fifty-five thousand.
21     Q.  Fifty-five thousand?
22     A.  Yes.
23     Q.  And that's who you're going with.
24     A.  Yes.
25     Q.  And he's the one -- he's currently

| Page 136 |
| --- |

1   doing the work on your home.
2      A.  Yes.
3      Q.  And at least as of right now, you
4   would defer to him that that's going to be the
5   amount that it's going to cost you just to make
6   the repairs to your home.
7      A.  Yes.
8      Q.  Fifty-five thousand dollars?
9      A.  Yes.
10     Q.  And you expect that once he gets
11  through your home is going to be at least as
12  good as it was before the hurricane.
13     A.  Or better.  A little better.
14     Q.  Yeah.  Some things are going to be new
15  in it, obviously.
16     A.  Yes.
17     Q.  And as he purchases things and works,
18  does he give you any kind of documentation the
19  charges?  What does he give to you?  Your
20  contractor.
21     A.  He don't give me anything.
22     Q.  The only thing you've gotten from him
23  is a written proposal?
24     A.  Yes.  And whatever I want or
25  whatever -- you know, when we get ready to get

| Page 137 |
| --- |

1   something, I'll go along with him.
2      Q.  Okay.  Now --
3      A.  Windows, doors, and stuff like that.
4      Q.  To pay him, are you using funds
5   provided by or from your insurance carrier or
6   what?
7      A.  Road Home.
8      Q.  Road Home.
9      A.  Road Home.  Road Home.
10     Q.  Well, you made a homeowner's claim
11  with Allstate.  What was the response by
12  Allstate to your claim?
13     A.  Well, that's turned over to Mr. Bruno.
14     Q.  I'm sorry?  Turned over to who?  Your
15  attorney?
16     A.  My attorney.  Yes.
17     Q.  Well, do you know, though, has
18  Allstate paid any benefits under the
19  homeowner's policy?
20     A.  Yeah.  They did.
21     Q.  Okay.  What did they pay you?
22     A.  Two thousand.  Just two thousand three
23  hundred, I think.  I have the papers on that.
24     Q.  You have the papers.
25     A.  I have the paperwork on that.

                                        35 (Pages 134 to 137)

JOHNS PENDLETON COURT REPORTERS                     800 562-1285

DAISY MAE INNIS (LEVEE)                                      7/16/2007

Page 138

1    Q.  But that's all they've paid you for
2  the damages to your home.
3    A.  Yes.
4    Q.  Okay.  They have contended that the
5  great majority of your damage is caused by
6  flood?  Is that right?
7    A.  Yes.
8    Q.  Okay.  And that's why they've only
9  paid you $2,300?
10   A.  Yes.
11   Q.  Okay.  And currently, then, you're in
12 litigation with Allstate?  You've hired an
13 attorney?
14   A.  Yes.
15   Q.  Do you know if a suit has been filed
16 on your behalf against Allstate?
17   A.  I don't know.
18   Q.  Okay.  Have there been any further
19 settlement negotiations or discussions?
20   A.  (Shakes negatively.)
21   Q.  None to your knowledge?
22   A.  Not to my knowledge, I'm sorry.
23   Q.  And you don't have any claim against
24 any other insurance company.
25   A.  No, sir.

Page 139

1    Q.  Allstate sent an adjuster out to take
2  look at your property?
3    A.  Yes.
4    Q.  And they give you a report based on
5  what the adjuster found?  Did they give you
6  some kind of letter where they showed why they
7  were paying the $2,300?
8    A.  Yes.  I think it was.  I think so.  I
9  think.
10   Q.  And you still have that?
11   A.  I think -- yes.
12   Q.  Now, let's talk about other payments
13 you've gotten.  Just for damages to your home.
14 Okay?  Allstate paid you $2,300.
15   A.  Yes.
16   Q.  And were you about to tell me about
17 the Road Home.
18       Have you actually received your funds
19 from the Road Home?
20   A.  Yes.
21   Q.  Okay.  And how much did the Road Home
22 pay you?
23   A.  $88,000.
24   Q.  $88,000.  Okay.  Is that currently,
25 though, in some type of account right now?

Page 140

1    A.  Yes.  We're using that to buy --
2  purchase the merchandise for the repairs of the
3  house.
4    Q.  And you have to use that money to
5  repair the house.
6    A.  That's right.  That's what I'm using
7  it for.  Only.
8    Q.  Okay.  Now, are you limited on what
9  you can do with the difference?  If it only
10 costs $55,000 to repair your house and they've
11 paid you $88,000, what options do you have to
12 use whatever difference there may be that's
13 left over?  Can you spend that like on
14 furniture and things like that, or --
15   A.  Yeah.  Probably will.
16   Q.  Or do you have an understanding on
17 that?
18   A.  Probably furniture.  Getting things
19 for the house.  Furniture.
20   Q.  Do you know if the -- in connection
21 with the Road Home Program, do you know if some
22 type of appraisal was made on your property in
23 order to determine how much they would pay you?
24   A.  I don't know.
25   Q.  Okay.

Page 141

1    A.  I don't know what the Road Home did.
2    Q.  Okay.  Did you have legal assistance
3  on the Road Home Program or did you do
4  everything yourself?
5    A.  Everything myself.
6    Q.  And you made an application and so
7  forth.
8    A.  Yes.
9    Q.  And you have maintained a copy of
10 that?
11   A.  Yes.
12   Q.  How far along is the contractor with
13 your house; A2Z?
14   A.  I'd say about the end of the month.
15 I'm hoping by the end of the month.
16   Q.  So they are almost done.
17   A.  They just have to put in sheetrock.
18 Sheetrock and then paint it.
19   Q.  Okay.  But they have done all the
20 wiring and plumbing and all that stuff?
21   A.  Yeah.  All that.
22   Q.  Basically, just finishing off at this
23 point.
24   A.  Yes.
25   Q.  You had to have your house gutted

JOHNS PENDLETON COURT REPORTERS                          800 562-1285

DAISY MAE INNIS (LEVEE)                                              7/16/2007

Page 142

1   before A2Z came in?
2       A.  I did some of it -- I did some, and
3   then before -- when they start looking, because
4   they had that mold and stuff, and so they said
5   I had to have it gutted all the way because the
6   mold was growing up -- going up.
7       Q.  So you gutted it floor to ceiling.
8       A.  Yes.
9       Q.  How much did you have to pay for the
10  gutting of the house?
11      A.  I don't know what they.  That's all
12  into the contract.
13      Q.  Oh.  That was part of A2Z.
14      A.  Yes.
15      Q.  So they directed the gutting, that's
16  included in the fifty-five thousand?
17      A.  Yes.  That's into that contract.
18      Q.  It wasn't a separate charge.
19      A.  No.
20      Q.  And as far as documentary evidence
21  regarding the repairs, you really don't have
22  any, all that would be with A2Z, is that
23  correct?
24      A.  Yes.  I could get all that for you.
25      Q.  But you would get it from A2Z.

Page 143

1       A.  Yes.
2       Q.  And I may have asked you this, and I
3   apologize if I did:  I know you told me you
4   moved back here a couple of months ago in May.
5   Where are you living right now?
6       A.  The trailer.
7       Q.  Okay.  On your property?
8       A.  Yes.
9       Q.  Is it a FEMA trailer?
10      A.  Yes.
11      Q.  Okay.  Is it similar to the FEMA
12  trailer you were living in in Mississippi?
13      A.  No.  This is a cottage.  My daughter
14  got that.  That's her trailer.
15      Q.  Your daughter got the one in
16  Mississippi?
17      A.  No, sir.  The one we're living in in
18  New Orleans, here.
19      Q.  Okay.
20      A.  The one that I had in Mississippi was
21  my trailer through FEMA.
22      Q.  Okay.  This is a little bit --
23      A.  It was a little mobile home.  It
24  wasn't a trailer.  Just a little -- one of them
25  little portable mobile homes.

Page 144

1       Q.  This one is nicer?
2       A.  Yes.
3       Q.  Okay.  And you're not having any of
4   the ill effects that you were having from the
5   other one.
6       A.  No.  I was afraid of that, but then
7   after a while I stayed in there I didn't have
8   no effects from it.
9       Q.  Okay.  And FEMA is paying for this
10  trailer that you all are staying in right now?
11      A.  Yes.  I'm sure they are.
12      Q.  You're not paying anything for it.
13      A.  No.
14      Q.  And you told me up to Hurricane
15  Katrina the only appraisal that you know of
16  that was done on house was when you initially
17  bought it back in 1987.
18      A.  Yes.
19      Q.  And since Katrina, you don't know OF
20  any appraisals that have been done on your
21  house at any time after the hurricane.
22      A.  No.  I'm not sure.  I'm not sure.
23      (Lunch break.)
24  EXAMINATION BY MR. SUTTON:
25      Q.  Ms. Innis, as you know, we're just

Page 145

1   coming back from lunch, but I understand that
2   there's something that you feel that you may
3   note to clarify on the record before we get
4   started.
5       A.  Yes.
6       Q.  And at this time, please let us know
7   what that is.
8       A.  That, um -- I receive Social Security.
9       Q.  Okay.  You receive Social Security.
10  Is it disability or supplemental security
11  income?
12      A.  Income.
13      Q.  SSI?
14      A.  No.
15      Q.  Just Social Security income.
16      A.  Yes.
17      Q.  And what is the reason that you
18  receive that?
19      A.  I had retired.
20      Q.  You're retired?
21      A.  After Katrina.  After the storm.
22      Q.  Okay.  You consider yourself to be
23  retired now?
24      A.  Semi, yes.
25      Q.  And is that another reason why you're

JOHNS PENDLETON COURT REPORTERS                                 800 562-1285

DAISY MAE INNIS (LEVEE)                                        7/16/2007

Page 146

1  not actively seeking any type of employment?
2      A. No, I'm still seeking employment.
3      Q. And once your house gets done, you
4  plan to go back?
5      A. Yes.
6      Q. But you're currently receiving Social
7  Security retirement benefits?
8      A. Yes.
9      Q. Okay. Do you receive those monthly?
10     A. Monthly.
11     Q. Okay. And what is your monthly rate?
12     A. $620. I think it is.
13     Q. And when did you begin receiving the
14  retirement benefits?
15     A. I think it's been a year, about, now.
16  Last year I think I signed up. Last year.
17  Since last year.
18     Q. Since sometime in 2006?
19     A. Yes. I'm thinking. Trying to think.
20     Q. Now, you've been kind enough to
21  provide me with photographs taken of the
22  property and I believe a couple of the shelters
23  that you stayed, right?
24     A. Yes.
25     Q. Okay.

Page 147

1      A. That's the shelter. (Tendering.)
2  This is the house, and this is the --
3      Q. Let's go off the record for just a
4  second.
5      (Off the record.)
6  EXAMINATION BY MR. SUTTON:
7      Q. Earlier this morning I asked you if
8  you had any photographs of the property taken
9  before Katrina. And I believe you told me you
10  weren't sure if you still had any of those
11  left. Is that --
12     A. Yes.
13     Q. That's correct.
14     A. That's correct.
15     Q. You may, you just don't know?
16     A. I just don't know right now.
17     Q. As far as photographs of the property
18  taken after Katrina, first of all you've
19  provided me, or you brought with you today
20  thirty-six I think you called these Polaroids?
21     A. Yes. That's little Polaroid, yes.
22     Q. Polaroid pictures.
23     A. Yes.
24     Q. And you would agree that all of the
25  Polaroid pictures are of your property.

Page 148

1      A. Yes.
2      Q. And I think you told me you, yourself,
3  took these pictures?
4      A. Yes.
5      Q. Okay. Do you know about when you took
6  these pictures? Were they taken at different
7  times or were they all taken at the same time?
8      A. The same time.
9      Q. The same time.
10     A. Yes. Those. The Polaroids at the
11  same time.
12     Q. Were they taken the first time that
13  you returned to the property, or later on?
14     A. Um -- the second time.
15     Q. Okay. So sometime in '05 they were
16  taken. 2005.
17     A. Yes.
18     Q. You're not sure when in 2005, but it
19  was the second time that you went to the
20  property.
21     A. Yes, sir.
22     Q. Okay. You've also brought with you
23  some -- I think those are considered 4x6
24  prints. Is that right?
25     A. Yes.

Page 149

1      Q. Some of the 4x6 prints that you
2  brought are of your property.
3      A. Right.
4      Q. As far as the 4x6 prints are
5  concerned, did you, yourself, take those
6  pictures?
7      A. Yes.
8      Q. Okay. Do you know about when those
9  pictures were taken?
10     A. They're not dated on the back, so. I
11  don't know. I didn't think -- forgot to put
12  the dates on there.
13     Q. And you just don't know when you took
14  those?
15     A. No. It wasn't long after those
16  pictures.
17     Q. It wasn't long after the Polaroid
18  pictures?
19     A. I can remember, it wasn't that long
20  afterward.
21     Q. Okay. One of these pictures shows
22  what appears to be -- I'm not sure if that's
23  siding stacked up beside your house --
24     A. The awning. That was the awning. The
25  wind blue the awning off of the back windows.

JOHNS PENDLETON COURT REPORTERS                       800 562-1285

DAISY MAE INNIS (LEVEE)                                    7/16/2007

|  | Page 150 |
|---|---|
| 1 | Q.  Okay.  You had -- was it like aluminum |
| 2 | awnings? |
| 3 | A.  Yes. |
| 4 | Q.  Okay.  And it justs out from the |
| 5 | house? |
| 6 | A.  Yes, sir. |
| 7 | Q.  Okay.  And a typical awning goes out |
| 8 | what, a couple of feet or so? |
| 9 | A.  Yes. |
| 10 | Q.  And that was damaged or destroyed in |
| 11 | connection with the hurricane, the awning. |
| 12 | A.  Yes, sir. |
| 13 | Q.  It was blown off the house by the |
| 14 | associated winds -- |
| 15 | A.  Yes. |
| 16 | Q.  -- as far as you know? |
| 17 | A.  As far as I know. |
| 18 | Q.  Okay.  And it looks like also in that |
| 19 | picture there's some siding coming off of the |
| 20 | house. |
| 21 | A.  From the wind. |
| 22 | Q.  From the wind?  Okay.  And you found |
| 23 | some certain places where that happened on your |
| 24 | house? |
| 25 | A.  Yes. |

|  | Page 151 |
|---|---|
| 1 | Q.  One of the pictures shows what appears |
| 2 | to be a dark colored -- is that a Taurus? |
| 3 | A.  '94 Chevy cavalier. |
| 4 | Q.  Chevy Cavalier.  That was your car? |
| 5 | A.  Yes. |
| 6 | Q.  And that car was, um -- left at your |
| 7 | house. |
| 8 | A.  Yes, sir. |
| 9 | Q.  Was that car ruined? |
| 10 | A.  Yes. |
| 11 | Q.  Okay.  Did you have insurance on the |
| 12 | car? |
| 13 | A.  Liability. |
| 14 | Q.  Okay.  So you didn't have any |
| 15 | comprehensive or collision? |
| 16 | A.  No, sir. |
| 17 | Q.  What happened to the car? |
| 18 | A.  They came and picked up, taking cars |
| 19 | off the street. |
| 20 | Q.  Okay.  You didn't receive any kind |
| 21 | of -- |
| 22 | A.  No. |
| 23 | Q.  -- payment for the car at all of. |
| 24 | A.  No, sir. |
| 25 | Q.  That was what did you say, a '94? |

|  | Page 152 |
|---|---|
| 1 | A.  A '94 Cavalier. |
| 2 | Q.  Cavalier.  Do you know the approximate |
| 3 | value of the car at the time of the storm? |
| 4 | A.  No, sir. |
| 5 | Q.  How long had you had the car? |
| 6 | A.  Since '94. |
| 7 | Q.  Oh, you bought it new. |
| 8 | A.  New. |
| 9 | Q.  Okay.  You kept it quite a while, |
| 10 | then. |
| 11 | A.  Yes. |
| 12 | Q.  Do you know how many miles it had on |
| 13 | it at the time? |
| 14 | A.  I don't remember now. |
| 15 | Q.  One of the pictures shows a looks like |
| 16 | a white Cadillac -- |
| 17 | A.  DeVille. |
| 18 | Q.  -- DeVille?  Was that your car? |
| 19 | A.  Yes. |
| 20 | Q.  Did you have any insurance on that |
| 21 | car? |
| 22 | A.  Yes, sir. |
| 23 | Q.  Okay.  You had -- |
| 24 | A.  Full coverage. |
| 25 | Q.  -- comprehensive coverage. |

|  | Page 153 |
|---|---|
| 1 | A.  Yes, sir. |
| 2 | Q.  Was that car ruined in the storm? |
| 3 | A.  Yes, sir. |
| 4 | Q.  Did you receive a settlement from your |
| 5 | insurance company? |
| 6 | A.  They paid it off. |
| 7 | Q.  Okay.  They paid the outstanding loan |
| 8 | off? |
| 9 | A.  Yes, sir. |
| 10 | Q.  Okay.  Was there any balance left over |
| 11 | after they paid the loan off that they paid to |
| 12 | you? |
| 13 | A.  No.  No, sir. |
| 14 | Q.  Do you know approximately what the |
| 15 | loan amount was that your insurer paid off on |
| 16 | the car? |
| 17 | A.  No, sir. |
| 18 | Q.  Who was your automobile insurer  that |
| 19 | covered the Cadillac? |
| 20 | A.  Oh, State Farm.  I'm sorry. |
| 21 | Q.  Were you satisfied with the settlement |
| 22 | that you had with them as far as them paying |
| 23 | off your loan? |
| 24 | A.  Yes, sir. |
| 25 | Q.  So after the storm you didn't have any |

DAISY MAE INNIS (LEVEE)                                      7/16/2007

Page 154

1   cars, but you didn't have any loans on cars
2   either anymore.
3       A.  No, sir.
4       Q.  That's correct?
5       A.  Yes, sir.
6       Q.  I'm sorry.  What year was that
7   Cadillac?
8       A.  A 2000?  Between 2000 and 2002, I
9   think.  I'm not sure.  I'm not sure.  Don't
10  quote me.
11      Q.  Did you buy that car new, too?
12      A.  No, sir.
13      Q.  You bought it used.
14      A.  Yes, sir.
15      Q.  How long had you had that car?
16      A.  It would have been a year old.  The
17  same year.
18      Q.  You had just gotten it, then, not too
19  long ago.
20      A.  Yes, sir.
21      Q.  How much did you pay for it, do you
22  remember?
23      A.  Twenty thousand.
24      Q.  Okay.  And you don't -- do you know
25  how much you owed on it?  Did you say?  At the

Page 155

1   time, or you just don't recall?
2       A.  I don't recall.
3       Q.  Okay.  Finally, Ms. Innis, you've
4   produced here today some additional 4x6 prints,
5   correct?
6       A.  Yes.
7       Q.  And it's your testimony that all of
8   those additional prints are photographs taken
9   of the shelter where you and your daughter
10  stayed?
11      A.  Yes, sir.
12      Q.  And you told me earlier -- I think you
13  identified two shelters where you all stayed.
14      A.  Yes, sir.
15      Q.  Those photographs are of which
16  shelter?
17      A.  Um -- Good Deed.
18      Q.  Good Deed?
19      A.  Yes.  That's the name of it.
20      Q.  And that's a shelter in Gulfport?
21      A.  In Gulfport, yes.  That was the second
22  shelter.
23      Q.  Okay.  Now, there's a photograph of it
24  looks like a cot?
25      A.  Yes.

Page 156

1       Q.  With a stuffed brown Teddy bear on it.
2       A.  That was for his lil brother, my
3   nephew.  My great nephew.
4       Q.  Your great nephew was sleeping on the
5   cot depicted in the photograph --
6       A.  Yes.
7       Q.  -- at night?
8           Okay.  Now, how is your great nephew
9   related to you?
10      A.  My sister's daughter's child.
11      Q.  Okay.
12      A.  Son.
13      Q.  There's a photograph with an
14  individual standing right in the middle of the
15  photograph with a gray outfit on.
16      A.  That's me.
17      Q.  That's you.
18      A.  Yes, sir.  Throwing my hands up as
19  though I had lost everything.
20      Q.  Now, there's a photograph of probably
21  seven or eight people standing around a table
22  with a gentleman sitting down with a cap in
23  front of him.
24      A.  That's one of the stars that come in
25  to visit.  We had different stars would come in

Page 157

1   and see us.  And I don't remember who he -- do
2   you know who that is?
3       Q.  Dave Chappelle?
4       A.  I can't say.  We had different ones
5   come in to see us and talk with us.
6       Q.  There's another photograph of that
7   same cot with a young lady sitting on the end
8   of it.
9       A.  That's my niece.
10      Q.  That's your niece.
11      A.  Yes, sir.
12      Q.  And what's her name?
13      A.  Frandon.
14      Q.  Finally, there's a photograph with a
15  young lady sitting on looks like some type of
16  bed with a blue and white comforter with her
17  leg stretched to another bed?
18      A.  That's my daughter Eleanor Elizabeth
19  Everett.
20      Q.  Okay.  Thank you for going over those
21  with me.
22      A.  You're welcome.
23      Q.  Now, you told me you're hoping to get
24  back into your house by approximately the end
25  of this month, beginning of next month.

40  (Pages 154 to 157)

DAISY MAE INNIS (LEVEE)                                    7/16/2007

---

Page 158

1      A.  Ending of this month, the beginning of
2  next month, sir.
3      Q.  When -- and you told me it was A2Z is
4  the contractor.
5      A.  A2Z.
6      Q.  Okay.  When did A2Z actually begin the
7  renovation work on your house?
8      A.  The 13th.
9      Q.  Of?
10     A.  Of May.
11     Q.  Well, they're working pretty fast
12  then.  It will be what, two and a half, three
13  months for them to do everything.
14     A.  Yes.
15     Q.  Did any of the structures on your
16  property contain asbestos, lead, or any other
17  hazardous material, to your knowledge?
18     A.  Not to my knowledge.  They didn't tell
19  me anything, because I asked them to let me
20  know.
21     Q.  If they found anything?
22     A.  If they found anything.
23     Q.  And so far they haven't said anything
24  to you.
25     A.  No.  No, sir.

---

Page 159

1      Q.  You pay property taxes on your
2  property, I take it.
3      A.  Yes, sir.
4      Q.  Your property is subject to the
5  homestead exemption, it's your only property.
6      A.  Yes, sir.
7      Q.  Do you know about what your annual
8  assessments are on your property, that you
9  actually had to pay as far as property tax
10  goes?
11     A.  Not right offhand, sir.  No, sir.
12     Q.  Do you know of any termite damage that
13  has ever occurred to your property?
14     A.  Yes, sir.  He did find termite
15  damage --
16     Q.  You did find termite damage, when they
17  gutted the house?
18     A.  Yes, sir.
19     Q.  How extensive was the termite damage
20  that you found?
21     A.  I'm not going to say real, real bad,
22  but, um -- enough.  They did -- how do I say
23  it?
24     Q.  Let me ask you this:  Did they have to
25  actually replace some of the studs in the

---

Page 160

1  walls?
2      A.  Yes, sir.
3      Q.  Did you know about how many studs they
4  had to replace?
5      A.  No, sir.
6      Q.  Okay.  Was the termite damage limited
7  to one room or one part of the house, or did
8  they find it --
9      A.  One part of the house.  That was the,
10  um -- when I walk in the door, it would be on
11  my right-hand side.  Just that one side.
12     Q.  As soon as you walk in the door?
13     A.  The living room and the dining area.
14     Q.  Sort of the wall between the living
15  room and the dining area?
16     A.  Yes, sir.
17     Q.  Okay.  But nowhere else in the house?
18     A.  No, sir.
19     Q.  Okay.  Had you previously had any
20  termite inspections or treatment to the house?
21     A.  I did.  Yes, sir.
22     Q.  How often would you get that done?
23     A.  Every year.
24     Q.  Okay.  You would have someone come out
25  once a year and spray?

---

Page 161

1      A.  Right.
2      Q.  Okay.  But before the hurricane and
3  before you gutted the walls, you didn't know of
4  any termite damage.
5      A.  No, sir.
6      Q.  Had before the storm, did your house
7  ever have any type of flooding caused by
8  plumbing problems --
9      A.  No, sir.
10     Q.  -- anything like that?
11        Did you ever have any major plumbing
12  leaks, anything of that nature in the house?
13     A.  No, sir.
14     Q.  Did you ever have any fire damage to
15  the house?
16     A.  No.
17     Q.  Did you ever have any mold damage to
18  the house before the hurricane?
19     A.  No.
20     Q.  Prior to the hurricane, had you had
21  any trees removed from the property?
22     A.  No.
23     Q.  You told me your -- as far as your air
24  conditioning goes, you have window units.
25     A.  Yes.

---

JOHNS PENDLETON COURT REPORTERS                        800 562-1285

DAISY MAE INNIS (LEVEE)                                    7/16/2007

Page 162

1    Q.  Okay.  And you had floor furnaces, you
2  said.
3    A.  Yes.
4    Q.  Okay.  I just want to make sure, you
5  said before the hurricane your roof had never
6  leaked?
7    A.  Correct.
8    Q.  Okay.  Based upon your going back to
9  the house after the hurricane, could you tell
10 whether or not your house had been vandalized
11 after the hurricane by anyone?
12   A.  Not when I first went back.  No.
13   Q.  Okay.  What about on any other
14 occasion?
15   A.  Yes.
16   Q.  Tell me about that.
17   A.  They had, um -- went in through the
18 window.  The few things we had salvaged we had
19 packed up.  We had packed.  And they broke in,
20 they took all what they wanted.  They went
21 through everything.  They took just about -- my
22 silver, my china, all that.  My crystal, all
23 that.  They stole all of that.
24   Q.  Now, did this vandalism occur after
25 the hurricane?

Page 163

1    A.  After the hurricane.
2    Q.  Or did you first discover it after the
3  hurricane?
4    A.  This happened after the hurricane,
5  after we went back to the house to get all that
6  wet stuff out, the pictures -- you know, after
7  we went back and took all the wet stuff out and
8  we -- what we could salvage.
9    Q.  You had already cleaned up some of
10 your personal items.
11   A.  Yes, sir.
12   Q.  You had boxed them up?
13   A.  Yes, sir.
14   Q.  And you were preparing to take them?
15   A.  Take them out, put them in storage.
16 At the time I didn't have a truck and there was
17 no storage.  I didn't think nobody would go
18 into my house.  I didn't think nobody would do
19 this.
20   Q.  You had it locked up.
21   A.  Yes, sir.
22   Q.  Door locked, windows locked?
23   A.  Yes, sir.
24   Q.  Okay.  What types of things were
25 stolen from you?  You said silver?

Page 164

1    A.  Silver, China, crystal, some of my
2  daughter's wedding gifts, um -- liquor I had,
3  things I had bought and put on the side.
4  Because I was going to retire at 65.  And I was
5  big things and putting them on the side.  New
6  things; sheets, towels, et cetera, you know.
7  All that.  They took all of that.
8    Q.  And these were things that you were
9  actually able to recover after the storm.
10   A.  Some.
11   Q.  They had been high enough up in your
12 house.
13   A.  Yes.
14   Q.  Okay.  And I know you can't place an
15 exact value, but what do you think,
16 approximately, was stolen in terms of value?
17   A.  Oh, I couldn't --
18   Q.  If you had to guess or estimate.  Do
19 you have any idea?
20   A.  Let's see.  My stuff, my daughter had
21 her stuff -- I don't know.  Maybe about ten,
22 fifteen thousand dollars worth of stuff.
23   Q.  Okay.  Do you have any idea as to the
24 origination of the floodwaters that came into
25 your home, you know, from which direction they

Page 165

1  came, from where they came?
2    A.  I can't answer that.
3    Q.  Just don't know?
4    A.  I don't know.  I don't know.  I can't
5  remember it right now.
6    Q.  You just know there was water that
7  rose and flooded your home.
8    A.  Yes.
9    Q.  But from where it came from, you don't
10 know.
11   A.  (Shakes head negatively.)
12   Q.  Is that fair?
13   A.  Yes.
14   Q.  Okay.  Ms. Innis, I appreciate you
15 discussing with me the damage to your real
16 property, your house.  I'd like to ask you some
17 questions now about your personal property
18 loss.  Okay?  Just tangible things.  Okay?
19 Clothing, TVs, anything like that.
20   A.  Clothes, TVs, shoes, papers, like you
21 need documents of certain things, I had a foot
22 locker -- we had stuff on the floor, a foot
23 locker, in the locker, with papers.
24   Q.  Okay.  Tell me about that.  Obviously
25 you lost -- like you said, you lost clothes,

DAISY MAE INNIS (LEVEE)                                    7/16/2007

Page 166

1  you lost some electronic goods --
2      A.  Yes.
3      Q.  -- um -- personal documents, things of
4  that nature?
5      A.  Yes.
6      Q.  You lost some furniture, I take it?
7      A.  Yes.
8      Q.  Okay.  Your house is one story.
9      A.  Yes.
10     Q.  All right.  And a lot of that -- a lot
11 of the personal property that you lost you lost
12 it because it was flooded --
13     A.  Yes.
14     Q.  -- I take it.  Now, you mentioned
15 water coming through the roof into your
16 bedroom.
17     A.  Yes.
18     Q.  Because of holes or whatever in the
19 room.  Rainwater was coming in.
20     A.  Yes.
21     Q.  Did you lose any personal property or
22 was any property damaged because of --
23     A.  The bed.
24     Q.  -- the water coming through?
25     A.  The dresser.  The top -- you know.

Page 167

1      Q.  Okay.  Like the top of the dresser was
2  ruined and things of that nature?
3      A.  Yes.  Mattress and --
4      Q.  Okay.  And you could tell that was
5  from the water coming through the roof.
6      A.  Yes, sir.
7      Q.  So you lost personal property both as
8  a result of the flooding and as a result of the
9  rainwater.
10     A.  Yes.
11     Q.  Okay.  And as a result of the
12 subsequent looting.
13     A.  Yes.
14     Q.  Now, you told me about the approximate
15 value of the property that was stolen from you.
16     A.  Yes.
17     Q.  You said about ten to fifteen thousand
18 dollars.
19     A.  Yes.
20     Q.  Do you have any idea as to about how
21 much the value of the property was that was
22 lost as a direct result of the storm?  You
23 know, the property was that in your house that
24 was damaged beyond repair.
25     A.  Oh, the living room, bed, dining room,

Page 168

1  two bedrooms, everything in the kitchen.
2      Q.  My question is, do you have any idea
3  as to the approximate value of your lost
4  belongings?  As a result of the storm.  I'm not
5  talking about the looting, the items that were
6  stolen from you.
7          You understand my question?
8      A.  From the water?
9      Q.  I'm sorry?  From the water.  Whether
10 it was floodwater or the items in your bedroom
11 that were destroyed as a result of the rain
12 coming in.  Just the total value of those
13 belongings.
14     A.  Let's see.  Maybe about thirty,
15 thirty-five thousand dollars worth of stuff.
16     Q.  Do you have any documentary evidence
17 which would support your claim in that regard?
18 Did you keep any kind of receipts or anything
19 like that?
20     A.  Everything was destroyed with the
21 water.
22     Q.  Okay.  So the answer would be no, you
23 don't have any documentary evidence?
24     A.  Right.
25     Q.  Okay.  You didn't have any type of

Page 169

1  personal property insurance coverage, insurance
2  on personal property as opposed to your house.
3  Or did you, through your homeowner's -- I guess
4  that covered personal property?
5      A.  Yes.  Homeowner's.
6      Q.  But again, that $2,300 that was paid
7  by Allstate, they didn't make a separate
8  payment for personal property to you.
9      A.  No.
10     Q.  And that's part of your claim right
11 now I take it.
12     A.  Yes.
13     Q.  Were you paid any other benefits or
14 received any money in connection with your lost
15 or damaged personal property?  From any other
16 source?
17     A.  FEMA did.
18     Q.  Okay.  What -- and I'm going to get to
19 the different relief in a little while, but
20 FEMA did make some payments to you.
21     A.  Yes.
22     Q.  Ms. Innis, you told me about your
23 different claims that you're making, your claim
24 for real property loss --
25     A.  Yes.

                              43 (Pages 166 to 169)

DAISY MAE INNIS (LEVEE)                                    7/16/2007

Page 170

1    Q.  -- your claim for personal property
2  loss --
3    A.  Yes.
4    Q.  -- your evacuation expenses --
5    A.  Yes.
6    Q.  -- and your emotional distress.
7    A.  Yes.
8    Q.  Okay.  Is there -- you know, as you
9  sit here today, can you think of any other
10  claim for any other type of damages that you're
11  making?
12    A.  My car.
13    Q.  Okay.  Well, and that's fair.
14  Technically, that would come under personal
15  property.
16    A.  Okay.
17    Q.  But you are making a claim for your
18  cars that were lost in the hurricane?
19    A.  (Nods affirmatively.)
20    Q.  One of which is a 1994 --
21    A.  Cavalier.  Chevy Cavalier.
22    Q.  Which you did not have any insurance
23  on?
24    A.  No.
25    Q.  And which, in all fairness, you just

Page 171

1  don't know what the value of the car was.
2    A.  No, sir.
3    Q.  And the other car, the 2000 to 2002
4  Cadillac, which you did have insurance on?
5    A.  Yes, sir.
6    Q.  The loan was paid out?
7    A.  Yes.
8    Q.  Which you believe was a fair
9  settlement.
10    A.  Yes.
11    Q.  Okay.  Have you gotten a new car, you
12  said?
13    A.  Yes.
14    Q.  Okay.  What kind of car do you have
15  now?
16    A.  An '07 Cadillac.
17    Q.  Okay.  Is that car paid for or do you
18  have a note on that car?
19    A.  I have a note.
20    Q.  You have a note on the car?
21    A.  Yes, sir.
22    Q.  So you just got a car.
23    A.  Yes, sir.
24    Q.  You got it new?
25    A.  Yes, sir.

Page 172

1    Q.  Brand new.  Okay.  Well, let's
2  consider that the claim for the cars fall
3  within personal property.
4    A.  Okay.
5    Q.  So you've told me about the real
6  property, personal property, emotional distress
7  and evacuation expenses.
8    A.  Yes.
9    Q.  With that in mind, with that
10  understanding, can you think of any other claim
11  for damages that you're making?  Any other type
12  of claim that you're making?
13    A.  No, not right -- no, sir, not right
14  offhand.
15    Q.  Okay.  Are you seeking any type of
16  damages in this litigation other than monetary
17  damages?
18    A.  What is monetary?
19    Q.  Money.  In exchange for -- are you
20  seeking any other type of relief other than
21  monetary damages?
22    A.  No.
23    Q.  You're not seeking any type of
24  injunctive relief, trying to order a party to
25  do or not do something.

Page 173

1    A.  No.
2    Q.  Okay.  Let's talk about the claims
3  that you've made and/or received following
4  Hurricane Katrina.  The first one is FEMA.  You
5  told me that you had applied with FEMA for some
6  relief.
7    A.  Yes.
8    Q.  And I think you told me earlier -- if
9  I'm misstating you, let me know -- that you di
10  receive a payment from FEMA of about $2300?  Is
11  that correct?
12    A.  No.  That was the insurance.
13    Q.  That's right.  What have you received
14  from FEMA?
15    A.  Right offhand, I don't know.  I'd have
16  to bring all that in.
17    Q.  Okay.  Well, FEMA did pay for certain,
18  I guess, rental expenses or living expenses?
19  They provided you a trailer.
20    A.  A trailer, yes.
21    Q.  Okay.  Um -- but you've said, I think,
22  when you rented the house they didn't pay for
23  any of that, the house in Gulfport.
24    A.  No.
25    Q.  Okay.  But they've paid for the

44 (Pages 170 to 173)

DAISY MAE INNIS (LEVEE)                                    7/16/2007

Page 174

1   trailer, or letting you use the trailer?
2       A.  Yes.
3       Q.  And as far as just money that FEMA has
4   given you, just don't know how much that you've
5   received from FEMA?
6       A.  No, but I do have the documents of
7   that.
8       Q.  Have you received more than one, you
9   know, particular benefit -- monetary benefit
10  from FEMA?
11      A.  Yes, sir.  It's been -- yes.
12      Q.  Okay.  And do you know what those
13  represented, what those payments were for by
14  FEMA?
15      A.  At that time, I think it was to help
16  me pay the rent for where the trailer was.
17      Q.  The two hundred dollars a month that
18  you're talking about?
19      A.  Yes, sir.  Yes.
20      Q.  Because you were living in a FEMA
21  trailer and they knew you had to have a place
22  to put it.
23      A.  Right.
24      Q.  So they paid for the rent.
25      A.  Yes.

Page 175

1       Q.  Okay.  But just to make it clear, you
2   just don't know how much you've received from
3   FEMA?
4       A.  Not right -- not today, no, sir.
5       Q.  All right.  Now, I think you told me
6   you applied for an SBA loan.
7       A.  Yes.
8       Q.  About when did you make that
9   application?
10      A.  Oh, God, it was in '06.
11      Q.  Sometime in 2006.
12      A.  Yes.  After the storm.
13      Q.  Did you apply for a certain amount?
14      A.  No.  I don't remember.  But I was
15  denied.
16      Q.  You were denied.
17      A.  Yes.
18      Q.  Okay.  Do you know why you were
19  denied?
20      A.  No.
21      Q.  Okay.  You have kept, though,
22  paperwork regarding that application?
23      A.  Yes.
24      Q.  Did you also keep the denial letter?
25      A.  Yes.

Page 176

1       Q.  Okay.  So you have all that.
2       A.  Yes.
3       Q.  Okay.  What was your reason or reasons
4   for seeking an SBA loan; what did you intend to
5   use the money for?
6       A.  Well, that was before I knew about the
7   Road Home, to try to get my house repaired so I
8   could go back home.  Come back home.
9       Q.  Would it be fair to say that now in
10  light of your receipt of the Road Home benefits
11  that you don't need an SBA loan?
12      A.  Yes.
13      Q.  That's correct?
14      A.  Correct.
15      Q.  We've talked about your Form 95 that
16  you filed with the government.
17      A.  Yes.
18      Q.  We've talked about the Road Home
19  application, you applied for Road Home funds
20  and you've received I think you told me
21  $88,000?
22      A.  Yes.
23      Q.  And is that an amount that you were
24  satisfied with, or were you requesting and
25  wanting more, or --

Page 177

1       A.  Um --
2       Q.  Did you think that was a fair payment?
3       A.  Well, I think so.
4       Q.  Okay.
5       A.  Yes.
6       Q.  Okay.  Did you -- when you applied,
7   though, did you ask for a specific amount?
8       A.  No, sir.  No.
9       Q.  And the Road Home, you went and sat
10  down with them and --
11      A.  Talked with them.
12      Q.  -- met with them and so forth?
13      A.  Yes.
14      Q.  But again, you don't know if they came
15  out to inspect your property or do anything
16  like that?
17      A.  I don't know.  I'm sure they did.
18      Q.  We talked about Red Cross, and I think
19  you said you received was it one payment from
20  Red Cross?
21      A.  One payment, yes.
22      Q.  And you said about what, about six
23  hundred?  I can't remember if you told me how
24  much.
25      A.  No, I can't remember.

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

DAISY MAE INNIS (LEVEE)                                    7/16/2007

Page 178

1     Q.  You can't remember how much you got
2  from Red Cross?
3     A.  But I know I did receive a check from
4  Red Cross, yes.
5     Q.  What about you applied for the
6  Louisiana Purchase, the food stamp program?
7     A.  Yes.
8     Q.  Did you receive those benefits?
9     A.  Once, yes.
10     Q.  Like a one-month period?
11     A.  Yes.
12     Q.  Do you recall about how much you
13  received in the way of food stamps?
14     A.  I don't know.
15     Q.  Okay.  Have you received any gifts or
16  private donations?
17     A.  No, sir.
18     Q.  Have you received any other type of
19  funds as a result of Hurricane Katrina?
20     A.  No, sir.
21     Q.  We've covered the all here today.
22     A.  Okay.
23     Q.  I wanted to ask you just a few
24  questions about your house.  It will just take
25  a couple of minutes.  I forgot to ask you

Page 179

1  earlier.  You told me that the house was
2  sheetrock and not plaster, correct?  Because
3  when they removed it that was all there.
4     A.  That's what it was, sheetrock.
5     Q.  And that was removed under -- this was
6  removed at your direction by A2Z.
7     A.  Yes.
8     Q.  Do you know when that sheetrock was
9  removed from the house?
10     A.  Early May they started.
11     Q.  Of this year?
12     A.  Of this year, yes.
13     Q.  And your house had not been gutted
14  before that time?
15     A.  No.
16     Q.  Okay.  You told me that you had the
17  additional bedroom added onto your house, when
18  you look at your house it's to your left?
19     A.  Yes.
20     Q.  And I apologize if I asked you this,
21  but can you tell me when that addition was put
22  on?  Approximately what year?
23     A.  It must have been the nineties,
24  somewhere up in the nineties, I can't --
25     Q.  Sometime in the nineties?

Page 180

1     A.  Somewhere up in the nineties, yes.
2     Q.  Okay.  And you said A2Z started doing
3  the repair work in mid May -- or May of this
4  year?
5     A.  May, the day after Mother 's Day.
6     Q.  Around May 20th, something like that?
7     A.  No.
8     Q.  It's earlier in the month, isn't it?
9     A.  That was May 13th when they started.
10     Q.  Oh.  I'm off a week.  Before they
11  started, there had not been any substantial
12  repair work done to your house?
13     A.  No.
14     Q.  Okay.  Do you know if in connection
15  with the work done by A2Z they had to repair
16  any of the floor joists in the house?
17     A.  We haven't checked that yet.
18     Q.  They haven't checked that?
19     A.  No.
20     Q.  Are they going to, do you know?
21     A.  Yes.
22     Q.  And they'll go underneath the house to
23  check that?
24     A.  Yes.
25     Q.  And they've discussed that with you?

Page 181

1     A.  Yes.
2     Q.  And they've told you that they may
3  need to make some repairs to the floor joists?
4     A.  They haven't said anything to me yet.
5     Q.  Okay.  Was the aluminum siding on the
6  house when you bought it?
7     A.  Yes.
8     Q.  Do you know when that was installed?
9  The aluminum siding?
10     A.  No.
11     (Brief recess.)
12  EXAMINATION BY MR. SUTTON:
13     Q.  Ms. Innis, you told me earlier that
14  when you purchased your home in approximately
15  1987 you took out a mortgage of I think you
16  said about thirty-two thousand dollars?
17     A.  Yes.
18     Q.  And then when you made the addition to
19  the home in the 1990s, you took out a loan of
20  about $10,000 --
21     A.  $10,000.
22     Q.  -- you told me.
23     A.  Yes.
24     Q.  At the time of Hurricane Katrina, were
25  you paying on both the original mortgage and

DAISY MAE INNIS (LEVEE)                                7/16/2007

Page 182

1  the loan?
2      A.  The loan was paid off.
3      Q.  Okay.  So the room was paid for.
4      A.  Yes.
5      Q.  You were paying on the original
6  mortgage?
7      A.  Mortgage.
8      Q.  Do you know what the approximate
9  balance on that mortgage was?
10     A.  When?
11     Q.  At the time of Hurricane Katrina.
12     A.  No.
13     Q.  Okay.  Do you know if in connection
14 with your receipt of the Road Home Program, do
15 you have to pay off that mortgage?  Is that
16 part of receiving the Road Home Grant, to pay
17 off the existing mortgage on the property?
18     A.  I don't know.
19     Q.  Okay.  Well, let me ask you this:  Are
20 you still making mortgage payments on the home?
21     A.  No, sir, I paid it off.
22     Q.  Oh.  You paid it off after the
23 hurricane?
24     A.  No.  After the hurricane.
25     Q.  You paid it off.

Page 183

1      A.  Yes.
2      Q.  Okay.  Do you know how much,
3  approximately, the payoff was that you paid on
4  it?
5      A.  Let's round it off to twenty-six
6  thousand.
7      Q.  Okay.  And to make that payment, you
8  used the funds from the Road Home to pay that?
9      A.  Yes.
10     Q.  So now you don't have any mortgage on
11 the home, it's free and clear.
12     A.  Yes.
13     Q.  Ms. Innis, have you contacted or been
14 contacted by anyone doing any type of research
15 or investigation regarding Hurricane Katrina?
16     A.  No.
17     Q.  Have you contacted or been contacted
18 by any media outlets such as newspaper, radio
19 station, television station, regarding
20 Hurricane Katrina?
21     A.  No.
22     Q.  Do you understand that you have been
23 identified in the complaint filed in this
24 lawsuit as one of the class representatives?
25     A.  Yes.

Page 184

1      Q.  Okay.  And you understand that's why
2  I'm taking your deposition here today as a
3  class representative?
4      A.  Yes.
5      Q.  Do you know why you, Ms. Innis,
6  yourself, was chosen to be a class
7  representative?
8      A.  Yes.
9      Q.  Okay.  What is your understanding as
10 to why you were chosen?
11     A.  So that my neighbors could come back
12 and our neighborhood could come back.
13     Q.  So that your neighbors could come
14 back -- neighborhood could come back.
15     A.  Neighborhood could come back.
16     Q.  And that's the extent of your
17 understanding as to why you were chosen to be a
18 class rep.
19     A.  Yes.  For my neighborhood.  My lil
20 area.
21     Q.  What is your understanding as to the
22 general nature of this litigation?  As to what
23 this litigation is about?
24     A.  Um -- to try to help the people --
25 trying to help my lil neighborhood, like I

Page 185

1  said.
2      Q.  Okay.  Trying to help them in what
3  way?
4      A.  To get back, you know, come back.
5      Q.  And that is the extent of your
6  understanding as to the nature of the
7  litigation --
8      A.  Uh-huh.
9      Q.  -- is that fair?
10     A.  Yes.  My community.  Help my
11 community.
12     Q.  Okay.  Did you participate in the
13 drafting of the complaint that was filed in
14 this lawsuit?  The actual complaint that was
15 filed with the Court, did you have any
16 participation in writing that up or drafting it
17 or anything like that?
18     A.  No.
19     Q.  Okay.  Have you ever seen or read the
20 complaint that was filed?
21     A.  I don't remember.
22     Q.  Have you discussed the
23 complaint and the allegations therein with
24 anyone?
25     A.  Um -- with the attorneys.

                              47 (Pages 182 to 185)

DAISY MAE INNIS (LEVEE)                                    7/16/2007

Page 186

1       Q.  With any of the other class members,
2  anybody like that, or just with the attorneys?
3       A.  Just with the attorneys.
4       Q.  Do you know who the defendants are in
5  this litigation?
6       A.  Um -- let me see.  There's so many of
7  them, from what I understand.
8       Q.  Okay.  Do you know any in
9  particularity as to who the defendants are,
10  though?
11       A.  Yep.  I can't call the name of it.
12       MR. REBENNACK:
13          Whatever you recall, ma'am.  Just
14       whatever you remember.
15  EXAMINATION BY MR. SUTTON:
16       Q.  Yeah.  And I don't want you to guess.
17  If you don't know, you don't know.  But --
18       A.  The Corps of Engineers.
19       Q.  The Corps of Engineers?
20       A.  Yeah.  The Army Corps of Engineers.
21       Q.  Do you know any other of the named
22  defendants, who they are?
23       A.  Um -- I can't remember.
24       Q.  Okay.  Fair enough.
25          What is your understanding, Ms. Innis,

Page 187

1  as to who are included as the proposed class
2  members?
3       A.  I don't remember right now.  I don't
4  remember.
5       Q.  Okay.  What your understanding as to
6  what your duties and responsibilities are as a
7  class representative?
8       A.  I don't know right now.
9       Q.  Okay.  Do you know what -- do you know
10  what subclass you represent in this litigation?
11       A.  4.
12       Q.  Subclass 4?
13       A.  4, I think it is.  I'm not sure, but I
14  think it's 4.
15       Q.  You're not sure.  Okay.
16          Do you know what the geographical
17  boundaries of that subclass are?
18       A.  I don't remember.  I do know, but I
19  don't remember.
20       Q.  Okay.  Do you know who the other class
21  representatives of Subclass 4 are?  Do you know
22  their names?
23       A.  No.
24       Q.  Okay.  Have you ever met with or
25  discussed this lawsuit with any of the other

Page 188

1  class representatives?  Not the lawyers, but
2  the class representatives.
3       A.  No.
4       Q.  Now, you've told me that you're not
5  making any claim for business interruption
6  loss, you didn't have a business at the time.
7  Right?
8       A.  No.
9       Q.  So you're not appearing as a
10  representative on behalf of those people who
11  are making a business interruption loss.
12  That's not the type of claim that you have, is
13  it?
14       MR. REBENNACK:
15          Object to the form.
16          You can answer the question,
17       though.
18       A.  No.
19  EXAMINATION BY MR. SUTTON:
20       Q.  And likewise, you're not making a
21  claim for wrongful death.
22       MR. REBENNACK:
23          Object to the form.
24          You can answer that.
25       A.  For myself or for --

Page 189

1  EXAMINATION BY MR. SUTTON:
2       Q.  For yourself.  You don't have a claim
3  for wrongful death.
4       A.  No.
5       Q.  And thus, you're not appearing as a
6  representative on behalf of those individuals
7  who have a wrongful death claim.
8       MR. REBENNACK:
9          Same objection.
10          You can answer it.
11  EXAMINATION BY MR. SUTTON:
12       Q.  Correct?
13       MR. REBENNACK:
14          You can answer the question.
15       A.  All right.
16  EXAMINATION BY MR. SUTTON:
17       Q.  Isn't that correct?
18       A.  Yes.
19       Q.  Likewise, you don't have a claim for
20  survival damages.
21       MR. REBENNACK:
22          Same objection.  I'll let it be
23       ongoing.
24          You can answer the question.
25  EXAMINATION BY MR. SUTTON:

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

DAISY MAE INNIS (LEVEE)                                    7/16/2007

---

Page 190

1    Q.  In other words, no one in your family
2  died as a result of Hurricane Katrina, did
3  they?
4    A.  No.
5    Q.  And thus, you don't have a claim for
6  survivor damages, for the injuries sustained by
7  someone who died, is that correct?
8    A.  In my family?
9    Q.  Yes, ma'am.  At all in connection with
10  the hurricane.
11       MR. REBENNACK:
12          Well, that's a different
13          question.  You said at all in
14          connection with the hurricane?
15       MR. SUTTON:
16          Yeah.
17       MR. REBENNACK:
18          Okay.  I object to the form of
19          the question.
20          You can answer the question.
21    A.  No.
22  EXAMINATION BY MR. SUTTON:
23    Q.  You understand that many homes in your
24  neighborhood suffered both flood damage but
25  they also suffered wind damage, as well, in

---

Page 191

1  connection with the hurricane.  Isn't that
2  correct?
3    A.  Yes.
4    Q.  In fact, many homes throughout New
5  Orleans suffered various types of damages,
6  flood damage, wind damage, vandalism, things of
7  that nature.
8    A.  Oh, yes.  Yes.
9    Q.  So the causes of the damages to many
10  of the properties throughout your subclass and
11  throughout the New Orleans area had multiple
12  causes --
13    A.  Yes.
14    Q.  -- in connection with the hurricane.
15    A.  Okay.
16       (Off the record.)
17  EXAMINATION BY MR. SUTTON:
18    Q.  Ms. Innis, you told me about the Form
19  95 that you submitted on behalf of yourself to
20  the Army Corps of Engineers.  Have you
21  submitted a Form 95 on behalf of any other
22  person?
23       MR. REBENNACK:
24          Object to the form.
25          You can answer the question.

---

Page 192

1    A.  No.
2  EXAMINATION BY MR. SUTTON:
3    Q.  Okay.  Do you know if your daughter
4  has submitted her own Form 95?
5    A.  That I don't know, sir.
6    Q.  You don't know.  Okay.
7    A.  She says she did.  We don't -- she
8  can't remember.  I don't know.
9    Q.  Is there anything that you'd like to
10  add that I haven't questioned you about here
11  today?
12       MR. REBENNACK:
13          Object to the form.
14    A.  No.
15  EXAMINATION BY MR. SUTTON:
16    Q.  Is there an answer that you've given
17  here today that you feel needs to be changed or
18  clarified in any manner?
19    A.  No.
20    Q.  Okay.  I appreciate your time.  I'm
21  going to pass you to those other attorneys and
22  see if they have any questions to ask you.
23  Okay?
24       MS. MORRIS:
25          I don't have anything.

---

Page 193

1       MR. REBENNACK:
2          We're through.
3          (Off the record.)
4       MR. SUTTON:
5          We have previously identified
6          Exhibits 1 through 4, the last Exhibit
7          Number 4 being color copies of
8          photographs taken of Ms. Innis' home,
9          and it's five sheets of paper.  I'd
10          like at this time to identify the
11          thirty-six Polaroid pictures taken by
12          Ms. Innis in globo as Exhibit Innis
13          Number 5.
14          (Innis Exhibit 5, in globo was marked
15  for identification and is attached hereto.)
16       MR. SUTTON:
17          I would like to introduce the
18          4-inch by 6-inch photographs of
19          Ms. Innis' home and property taken by
20          her to be marked and identified in
21          globo as Exhibit Innis Number 6.
22          (Innis Exhibit 6, in globo was marked
23  for identification and is attached hereto.)
24       MR. SUTTON:
25          And I would like to identify in

---

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

DAISY MAE INNIS (LEVEE)                                    7/16/2007

Page 194

1          globo as Exhibit Innis Number 7 the
2          4-inch by 6-inch photographs taken by
3          Ms. Innis of the shelter where she and
4          her daughter stayed following
5          Hurricane Katrina.
6          (Innis Exhibit 7, in globo was marked
7     for identification and is attached hereto.)
8          MR. REBENNACK:
9               No objection.  Will the court
10     reporter keep these exhibits?
11          (Off the record.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 195

1               WITNESS' CERTIFICATE
2
3          I, DAISY MAE INNIS, do hereby
4     certify that the foregoing testimony was given
5     by me, and that the transcription of said
6     testimony, with corrections and/or changes, if
7     any, is true and correct as given by me on the
8     aforementioned date.
9
10     _____    _____
11     DATE SIGNED          DAISY MAE INNIS
12
13     _____ Signed with corrections as noted.
14
15     _____ Signed with no corrections noted.
16
17
18
19
20
21
22
23
24
25     DATE TAKEN: July 16th, 2007

Page 196

1               REPORTER'S CERTIFICATE
2          I, JOSEPH A. FAIRBANKS, JR., CCR, RPR,
3     Certified Court Reporter in and for the State
4     of Louisiana, do hereby certify that the
5     aforementioned witness, after having been first
6     duly sworn by me to testify to the truth, did
7     testify as hereinabove set forth;
8          That said deposition was taken by me
9     in computer shorthand and thereafter
10     transcribed under my supervision, and is a true
11     and correct transcription to the best of my
12     ability and understanding.
13          I further certify that I am not of
14     counsel, nor related to counsel or the parties
15     hereto, and am in no way interested in the
16     result of said cause.
17
18
19
20
21
22
23     _____
24     JOSEPH A. FAIRBANKS, JR., CCR, RPR
25     CERTIFIED COURT REPORTER #75005