# PLAINTIFFS TRIAL EXHIBIT

# 21

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE:  KATRINA CANAL BREACHES      CIVIL ACTION
CONSOLIDATED LITIGATION

                                    NO. 05-4182 "K"(2)

 PERTAINS TO:  LEVEE                JUDGE DUVAL

 FILED IN:  05-4181, 05-4182,       MAG. WILKINSON
 05-5237, 05-6073, 05-6314,
 05-6324, 05-6327, 05-6359,
 06-0225, 06-0886, 06-1885,
 06-2152, 06-2278, 06-2287,
 06-2824, 06-4024, 06-4065,
 06-4066, 06-4389, 06-4634,
 06-4931, 06-5032, 06-5155,
 06-5159, 06-5161, 06-5162,
 06-5260, 06-5771, 06-5786,
 06-5937, 07-0206, 07-0621,
 07-1073, 07-1271, 07-1285




Videotaped deposition of BETTE J. JONES, 2111
Clouet Street, New Orleans, Louisiana  70117,
taken in the offices of Bruno & Bruno, 855
Baronne Street, New Orleans, Louisiana  70113, on
Monday, the 16th day of July, 2007, beginning at
9:16 a.m.



APPEARANCES:

        DEGRAVELLES, PALMINTIER, HOLTHAUS & FRUGÉ
        (BY:  JOSHUA M. PALMINTIER)
        618 Main street
        Baton Rouge, Louisiana  70801-1910

        ATTORNEYS FOR THE PLAINTIFFS

Page 2

```
 1    APPEARANCES CONTINUED:
 2
 3       DUPLASS, ZWAIN, BOURGEOIS, MORTON, PFISTER
          & WEINSTOCK
          (BY:  NICOLE M. BOYER)
 4       Suite 2900
         3838 North Causeway Boulevard
 5       Metairie, Louisiana  70002
 6          ATTORNEYS FOR THE BOARD OF
            COMMISSIONERS FOR THE LAKE BORGNE
 7          BASIN LEVEE DISTRICT
 8       McCRANIE, SISTRUNK, ANZELMO, HARDY,
          MAXWELL & McDANIEL
 9       (BY:  KYLE P. KIRSCH
          DARCY E. DECKER)
10       Suite 800
         3445 North Causeway Boulevard
11       Metairie, Louisiana  70002
12          ATTORNEYS FOR THE ORLEANS
            LEVEE DISTRICT
13
14    ALSO PRESENT:
15       KEITH HILL
16    VIDEOTAPED BY:
17       GILLEY DeLORIMIER, C.L.V.S.
         Depo-Vue, Inc.
         Suite 205
18       3200 Ridgelake Drive
         Metairie, Louisiana  70002
19       (504) 828-8856 or (888) 337-6883
20
21
22    REPORTED BY:
23       CAROL VALLETTE SLATER
         Certified Court Reporter
24       Registered Professional Reporter
25
```

Page 3

```
 1              I N D E X
 2
 3    EXAMINATION BY:                  PAGE
 4    MR. KIRSCH                    5
 5
 6
 7    EXHIBITS:
 8    Jones Exhibit Number 1        7
         Document entitled "Notice of
 9       Videotape Deposition"
10    Jones Exhibit Number 2        18
         Photocopied driver's license
11
      Jones Exhibit Number 3        125
12       Photocopied Medicare Health
         Insurance and Health Network of
13       Louisiana cards
14    Jones Exhibit Number 4        125
         August 5, 2006, Corps of Engineers
15       letter and Form 95
16    Jones Exhibit Number 5        134
         October 19, 2006, Corps of
17       Engineers letter and Form 95
18
19    REQUESTS FOR PRODUCTION:
20       Request Number 1        74
21       Request Number 2        111
22       Request Number 3        116
23
24
25
```

Page 4

```
 1              S T I P U L A T I O N
 2         IT IS STIPULATED AND AGREED by and
 3    between counsel for the parties hereto that the
 4    deposition of the aforementioned witness is
 5    hereby being taken under the Federal Rules of
 6    Civil Procedure, for all purposes, in accordance
 7    with law;
 8         That the formalities of reading and
 9    signing are specifically not waived;
10         That the formalities of sealing,
11    certification and filing are specifically waived;
12         That all objections, save those as
13    to the form of the question and the responsiveness
14    of the answer, are hereby reserved until such
15    time as this deposition, or any part thereof, may
16    be used or sought to be used in evidence.
17
18              *   *   *   *
19
20         CAROL VALLETTE SLATER, Certified
21    Court Reporter, Registered Professional Reporter,
22    in and for the Parish of Orleans, State of
23    Louisiana, officiated in administering the oath
24    to the witness.
25
```

Page 5

```
 1    THE VIDEOGRAPHER:
 2         This is the videotaped
 3    deposition of Bette Jones.  This
 4    deposition is being held today at
 5    855 Baronne Street, in New
 6    Orleans, Louisiana, on July the
 7    16th, 2007.  The time is 9:16 a.m.
 8         Would the court reporter
 9    please now swear in the witness.
10         BETTE J. JONES,
11    after being first duly sworn in the cause,
12    testified as follows:
13    EXAMINATION BY MR. KIRSCH:
14    Q.   Good morning, Miss Jones.  My name
15    is Kyle Kirsch.  I introduced myself to you a few
16    minutes ago.  I represent the Orleans Levee
17    District in the lawsuit you filed, and I'm here
18    to ask you some questions today.
19         First of all, have you ever given a
20    deposition before?
21    A.   Well, no.
22    Q.   Okay.  I'm going to go over how they
23    work just so that we can get through it quickly
24    and with as little trouble as possible.  The
25    first rule of depositions is you have to give
```

2 (Pages 2 to 5)

Page 6

1  verbal answers, "Yes" or "Nos."  Nods of the
2  heads don't work well because the court reporter
3  has to take this down in a question-and-answer
4  format.  So, if you can give me a verbal answer,
5  I'd appreciate it.  And if I prompt you, is that
6  a "Yes" or is that a "No," I'm not trying to be
7  difficult.  I'm just trying to make sure the
8  record is clear.  Okay?
9      A.   All right.
10     Q.   You understand you're under oath
11 just as if you were testifying in a court of law?
12     A.   Right.
13     Q.   Another rule is you can ask me to
14 rephrase a question if you don't understand it at
15 any time, but if you answer the question, I'm
16 going to assume you understood it.  Is that fair?
17     A.   Right.
18     Q.   You can -- you can always, if you
19 think of something you want to add, you can
20 always let me know, Mr. Kirsch, I remembered
21 something, you know, I need to add this to my
22 answer, I need to change my answer at any time in
23 the deposition.  Okay?
24     A.   Okay.
25     Q.   Thank you.  Not -- not a marathon.

Page 7

1  We'll probably take a break or two, but if you
2  need to take a break to use the restroom or to
3  get some water or anything, just let me know.  As
4  long as a question isn't pending, I'll be happy
5  to let you take a break.  Okay?
6      A.   Okay.
7      Q.   You're not on any medication,
8  alcohol or any other type of drugs that would
9  affect your ability to answer questions today,
10 are you?
11     A.   No, I'm not.
12     Q.   Okay.  I am going to attach as
13 Exhibit 1 the Notice of Deposition, and I'm going
14 to flip to Exhibit A of the Notice of Deposition.
15         (Whereupon, Jones Exhibit
16     Number 1 was marked for
17     identification.)
18     MR. PALMINTIER:
19         Kyle, can we go off the
20     record real quick?
21     MR. KIRSCH:
22         Sure.
23     THE VIDEOGRAPHER:
24         We're going off the record.
25     It is 9:18.

Page 8

1          (Whereupon, a discussion was
2      held off the record.)
3      THE VIDEOGRAPHER:
4          Returning to record.  It's
5      9:28.
6  EXAMINATION BY MR. KIRSCH:
7      Q.   Miss Jones, you went and reviewed
8  Exhibit A to the Notice of Deposition; is that
9  right?
10     A.   Yes.
11     Q.   And that was the first time you saw
12 that; is that correct?
13     A.   Right.
14     Q.   Okay.  I'm going to ask you -- I'm
15 going to go through them very quickly to see if
16 you -- did you -- first of all, did you bring
17 anything with you to the deposition today?
18     A.   No.
19     Q.   Okay.  You filled out a Form 95; is
20 that right?
21     A.   Yes.
22     Q.   Okay.  I do have a copy of that.
23 What about other type of administrative claims,
24 Number 2, do you have any -- have you made any
25 other type of administrative claims?

Page 9

1      A.   Yes.
2      Q.   You have?  Do you have that
3  documentation?
4      A.   My attorneys have, I guess.
5      Q.   You've given it to your attorneys?
6      A.   Uh-huh.
7      Q.   Is that a "Yes"?
8      A.   Yes.
9      Q.   Thank you.
10         You have -- do you have any
11 documents that refer or relate to any type of
12 insurance claim you made as a result of damages
13 or injuries that you sustained at -- on August
14 29th, 2005?
15     A.   Yes.
16     Q.   Okay.  Do you have that
17 documentation at home or have you given that to
18 your attorneys?
19     A.   My attorney.
20     Q.   Okay.  So, all that's with your
21 attorney?
22     A.   Yes.
23     Q.   Okay.  Do you have any of those
24 documents at your house?
25     A.   No.

(504)525-1753          HUFFMAN & ROBINSON, INC.          (800)749-1753
ONE SHELL SQUARE,#250 CERTIFIED COURT REPORTERS NEW ORLEANS, LA 70139

Page 10

1     Q.   Okay.  What about any documents
2  indicating eyewitness accounts of Hurricane
3  Katrina?
4     A.   No.
5     Q.   Okay.  Do you have any documents
6  regarding the class action complaint that's been
7  filed in this case?
8     A.   No.
9     Q.   Okay.  Have you ever seen the class
10 action complaint?
11    A.   Yes.
12    Q.   Okay.  Do you have that at home?
13    A.   Yes.
14    Q.   Okay.  That's the only document you
15 have at home, though?
16    A.   Right.
17    Q.   Okay.  Do you have any statements,
18 transcripts of, a description or -- explaining
19 the damages or injuries you may have sustained as
20 a result of Hurricane Katrina?
21    A.   No.
22    Q.   Okay.  Do you have any photographs
23 or videotapes of the damage that you may have
24 sustained as a result of Hurricane Katrina?
25    A.   I have photos.

Page 11

1     Q.   Okay.  You took photos of your home?
2     A.   Uh-huh.
3     Q.   Okay.  Did you take any video of
4  your home?
5     A.   No.
6     Q.   Okay.  So, are those photographs
7  with your attorney or at home?
8     A.   With my attorney.
9     Q.   Okay.  So, you've given those over
10 to your attorney?
11    A.   Right.
12    Q.   Okay.  And what attorney did you
13 turn all this over to?
14    A.   Mr. Bruno.
15    Q.   Mr. Bruno.  Okay.
16    MR. PALMINTIER:
17        Let the record reflect that
18    it's Joseph Bruno.
19    MR. KIRSCH:
20        Thank you.
21 EXAMINATION BY MR. KIRSCH:
22    Q.   Let's see.  Do you have any
23 documents relating to any claim for loss of
24 earnings, business income or anything in that
25 regard?

Page 12

1     A.   No.  Uh-uh.
2     Q.   Let's go to Number 10, if you can
3  flip the page.  Are you making a claim for loss
4  of earnings or loss of income?
5     A.   No.  I was retired.
6     Q.   Okay.  And you're not seeking any
7  other type of economic loss, business income or
8  anything in that regard --
9     A.   No.
10    Q.   -- is that correct?
11    A.   No.
12    Q.   You are seeking some or you are --
13    A.   What question you asking me?
14    Q.   I'm asking you if you're seeking any
15 type of economic damages.
16    A.   Is that 12?
17    Q.   Well, this is more in general.  I'm
18 trying to skip a lot of them.
19    A.   Oh.  Yes.
20    Q.   You are?
21    A.   (Nods head affirmatively.)
22    Q.   What type of economic damages are
23 you seeking?
24    A.   Well, my house.
25    Q.   And we're going to get to your

Page 13

1  property damage.
2     A.   Uh-huh.
3     Q.   When I refer to economic damage,
4  what I'm referring to is, like, loss of wages,
5  loss of business income, loss of rental income.
6     A.   No.
7     Q.   So, you're not seeking any of that?
8     A.   No.
9     Q.   Okay.  Do you have any journals or
10 diaries or other writings that you may have taken
11 notes in during Hurricane Katrina?
12    A.   No.
13    Q.   Okay.  Do you have any medical
14 records reflecting any injuries you may have
15 sustained as a result of Hurricane Katrina?
16    A.   Yes.
17    Q.   Okay.  Who has those medical
18 records?
19    A.   Baptist Hospital, in Mississippi.
20    Q.   What city in Mississippi?
21    A.   Jackson.
22    Q.   Okay.  Do you have any medical
23 records in your possession?
24    A.   No.
25    Q.   Okay.  Does your lawyer have any of

                                    4 (Pages 10 to 13)

(504)525-1753      HUFFMAN & ROBINSON, INC.      (800)749-1753
ONE SHELL SQUARE,#250 CERTIFIED COURT REPORTERS NEW ORLEANS, LA 70139

1  your medical records?  Did you turn any of them
2  over to your lawyer, like the other documents?
3       A.   No.
4       Q.   Okay.  So, the only place they would
5  be would be in Mississippi --
6       A.   In Mississippi.
7       Q.   -- at Baptist Hospital?
8       A.   Yeah.
9       Q.   Okay.  Do you have any documents
10 relating to receiving payments from insurance
11 companies as a result of damage you may have
12 sustained due to Hurricane Katrina?
13      A.   Yes.
14      Q.   Okay.  Have you turned those all
15 over to your lawyer, also?
16      A.   Yes.
17      Q.   Okay.  You are not leasing; is that
18 right?  You owned the home you lived in?
19      A.   Yes.
20      Q.   Okay.  And you don't own any rental
21 property; is that correct?
22      A.   No.
23      Q.   That didn't come out right.  Am I
24 correct in saying that you have no rental
25 property?

1       A.   Right.
2       Q.   All right.  Did you do anything to
3  prepare for this deposition?
4       A.   No.
5       Q.   Okay.  You didn't review any
6  photographs or anything like that?
7       A.   No.
8       Q.   All right.  The only thing you did
9  would have been met with your lawyer?
10      A.   Right.
11      Q.   Okay.  Did you -- did you discuss it
12 with your --
13      MR. KIRSCH:
14           You're a son or a brother?
15      MR. HILL:
16           Son.
17      A.   That's my son.
18 EXAMINATION BY MR. KIRSCH:
19      Q.   Your son.  Did you discuss it with
20 your son?
21      A.   Yes.
22      Q.   What did y'all discuss, if it wasn't
23 in the presence of your lawyer?
24      A.   I just told him that we would have
25 to come here for the deposition and we have to

1  find out what was going on with our community.
2       Q.   Okay.  And that -- that's the extent
3  of the discussion?
4       A.   Right.
5       Q.   Okay.  You have a right to read and
6  sign your deposition.  Your lawyer may want to
7  answer this.  If you choose, you can get a copy
8  of the deposition back and review it for -- you
9  know, typographical errors or things in that
10 regard and, so, I'm going to ask you if you'd
11 want to read and sign?
12      MR. PALMINTIER:
13           And I'll answer that
14           question.  We will be reading and
15           signing.
16      MR. KIRSCH:
17           Okay.
18 EXAMINATION BY MR. KIRSCH:
19      Q.   Could you -- could you state your
20 full name for the record?
21      A.   Bette June Jones.
22      Q.   Okay.  And your current date of
23 birth?
24      A.   3/18/39.
25      Q.   What's your current address, where

1  you live right now?
2       A.   2111 Clouet, C-L-O-U-E-T.
3       Q.   Okay.  And that's in New Orleans?
4       A.   Yes.
5       Q.   Okay.  And how long -- have you
6  lived there for over five years?
7       A.   Thirty-eight.
8       Q.   Does anyone live with you at the
9  Clouet address?
10      A.   My son.
11      Q.   Is that it?
12      A.   Yes.
13      Q.   And you own that home; am I correct?
14      A.   Yes.
15      Q.   Could you give me your Social
16 Security number?
17      A.   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.
18      Q.   Do you have a driver's license or an
19 ID card?
20      A.   Yes.
21      Q.   Do you have that with you?
22      A.   Yes.
23      Q.   May I see it?
24      THE WITNESS:
25           Give me my purse, Keith.

5 (Pages 14 to 17)

(504)525-1753        HUFFMAN & ROBINSON, INC.        (800)749-1753
ONE SHELL SQUARE,#250  CERTIFIED COURT REPORTERS  NEW ORLEANS, LA 70139

1          Pass that to him, please.
2    EXAMINATION BY MR. KIRSCH:
3          Q.   Thank you.  Okay.  You've handed me
4    a driver's license, and the license Number is
5    003158572.
6    MR. KIRSCH:
7          What I'd like to do, Josh,
8          is just attach this as Exhibit 2
9          to the deposition.
10   MR. PALMINTIER:
11         No objection.
12   MR. KIRSCH:
13         We can make a copy at the
14         next break.
15   MR. PALMINTIER:
16         Okay.
17         (Whereupon, Jones Exhibit
18         Number 2 was marked for
19         identification.)
20   EXAMINATION BY MR. KIRSCH:
21         Q.   Have you ever used a different name
22   or a Social Security number or anything other
23   than what we've already been provided?
24         A.   No.
25         Q.   Okay.  So, you've always been Bette

1    June Jones?
2          A.   No.  I was Bette June Jones Hill,
3    but my husband died.
4          Q.   Okay.  Any other names?
5          A.   No.
6          Q.   Okay.  So, Jones is your maiden
7    name?
8          A.   Yes.
9          Q.   Okay.  Have you lived in the New
10   Orleans metro area your whole life?
11         A.   All my life.
12         Q.   Okay.  You said that you were
13   married to Mr. Hill; is that right?
14         A.   Yes.
15         Q.   And he is now since passed away?
16         A.   In '64.
17         Q.   Okay.  Ever -- any other marriages?
18         A.   No.
19         Q.   Okay.  And I know Keith is sitting
20   right here.  Do you have any other children?
21         A.   A daughter.
22         Q.   Okay.  What's your daughter's name?
23         A.   Karen Ann Hill.
24         Q.   How old is Karen?
25         A.   Karen will be making 50 in

1    September.  9/28/57 and he's 45.  He'll be making
2    46 Halloween.
3          Q.   Okay.  And you said "he."  You're
4    referring to Keith.
5          A.   Keith.  Oh, yes.
6          Q.   Okay.  Do you have any dependents?
7          A.   No.
8          Q.   The only person that was living with
9    you at the time Hurricane Katrina arrived was
10   Keith?
11         A.   Yes.
12         Q.   Okay.  I want to get a quick
13   educational background on you.  Did you go to
14   high school?
15         A.   Yes.
16         Q.   Did you graduate?
17         A.   Yes.
18         Q.   Okay.  Did you -- after high school,
19   did you go to college?
20         A.   Yes.
21         Q.   Where did you go to college?
22         A.   Dillard.
23         Q.   Dillard?
24         A.   (Nods head affirmatively.)
25         Q.   Did you get a degree from Dillard?

1          A.   Yeah, a B.S.
2          Q.   Okay.  What was your degree in?
3          A.   Nursing.
4          Q.   Any other -- any other post-high
5    school schooling or training?
6          A.   Uh-uh.
7          Q.   Is that a "No"?
8          A.   No.
9          Q.   Thank you.
10         No type of vo-tech or technical
11   training, correct?
12         A.   No.
13         Q.   Okay.  And you said you retired.
14   How long have you been retired?
15         A.   Since '92.
16         Q.   And I assume you're receiving some
17   type of Social Security benefits?
18         A.   Yes.
19         Q.   Okay.  Do you have any other type of
20   income other than your Social Security benefits?
21         A.   No.
22         Q.   Have you ever been in the military?
23         A.   No.
24         Q.   Have you ever been involved in any
25   accidents where you've injured yourself before

Page 22

1   Hurricane Katrina?
2       A.   No.
3       MR. PALMINTIER:
4           I don't know if she
5   understood the question.
6       MR. KIRSCH:
7           Sure.  I'll be happy to
8   clear it up.
9   EXAMINATION BY MR. KIRSCH:
10      Q.   Did you -- have you ever been in a
11  car accident before?
12      A.   Oh, yes.
13      Q.   Okay.  Have you injured yourself in
14  a car accident?
15      A.   Yes.
16      Q.   Okay.  How many -- how many times
17  has that occurred?
18      A.   Once.
19      Q.   What -- what type of injuries did
20  you have from that car accident?
21      A.   A whiplash.
22      Q.   Anything else?
23      A.   No.
24      Q.   Okay.  Did you file a lawsuit as a
25  result of that?

Page 23

1       A.   Yes.
2       Q.   Where did that car accident take
3   place?
4       A.   I think it was on Claiborne and
5   Washington Avenue.
6       Q.   So, it would have been in New
7   Orleans?
8       A.   Uh-huh.
9       Q.   You filed a lawsuit in state court,
10  or do you know?
11      A.   Yes.  My lawyer did.
12      Q.   Okay.  And who was your lawyer at
13  that time?
14      A.   William Detweiler.
15      Q.   No other type of accidents where
16  you've injured yourself, whether it be a
17  trip-and-fall, slip-and-fall or anything like
18  that?
19      A.   Uh-uh.
20      Q.   I need a verbal answer.
21      A.   No.
22      Q.   Okay.  Thank you.  Have you been in
23  any accidents after Katrina where you've injured
24  yourself?
25      A.   No.

Page 24

1       Q.   The only lawsuit you've ever filed
2   is as a result of the motor vehicle accident we
3   just talked about?
4       A.   Right.
5       Q.   Okay.  How long ago did that take
6   place?
7       A.   Oh, it's about 18, 19 years ago.
8       Q.   Have you ever had any lawsuits filed
9   against you?
10      A.   No.
11      Q.   And I ask this of everyone, so,
12  please don't be offended.  Have you ever been
13  arrested?
14      A.   Yes.
15      Q.   Okay.  What was the charge?
16      A.   Shooting in city limits.
17      Q.   Did you enter a plea or was it
18  dismissed or what was the resolution?
19      A.   It was dismissed because it was,
20  like, New Year's Eve night, and everybody be
21  shooting, and I just happened to have the gun
22  when the police pass.
23      Q.   And that was the only -- the only
24  arrest?
25      A.   Yes.

Page 25

1       Q.   Thank you.  When you got -- you were
2   a nurse, I take it, correct?
3       A.   Yes.
4       Q.   Did you ever have to undergo any
5   type of alcohol or drug testing to get a job?
6       A.   Yes.
7       Q.   Okay.  Where would that have taken
8   place?
9       A.   Well, I worked at Charity and I had
10  to get it at Charity.  I worked at Touro and St.
11  Charles General, and every time you go to a
12  different job, they give you a VDRL.
13      Q.   Okay.  Have you ever undergone any
14  other type of drug or alcohol testing anywhere
15  else other than with the nursing jobs?
16      A.   No.
17      Q.   Okay.  Have you ever failed any of
18  the drug tests?
19      A.   No.
20      Q.   I want to talk a little bit about
21  things you may have done in your community.  Did
22  you belong to any type of civic organizations?
23      A.   No.
24      Q.   And all your children are out of
25  school, correct?

(504)525-1753        HUFFMAN & ROBINSON, INC.       (800)749-1753
ONE SHELL SQUARE,#250 CERTIFIED COURT REPORTERS NEW ORLEANS, LA 70139

1    A.   Oh, yes, indeed.  They better be.
2    Q.   What about -- what about church, did
3  you go to church?
4    A.   Yeah, I go to church.
5    Q.   Okay.  What church did you go to?
6    A.   Corpus Christi, on St. Bernard and
7  Galvez.
8    Q.   You still go there?
9    A.   Yes.
10   Q.   And there's still a community that
11  goes to church at Corpus Christi?
12   A.   Uh-huh.
13   Q.   Is that a "Yes"?
14   A.   Yes.
15   Q.   Thank you.
16        Any -- any type of neighborhood
17  associations that you belong to?
18   A.   Well, I volunteer twice a week at
19  the church.  We give away food.
20   Q.   That -- that would be at Corpus
21  Christi?
22   A.   Right.
23   Q.   Okay.  Any other type of
24  organizations that you belong to?
25   A.   No.

1    Q.   Okay.  Another good rule I didn't
2  talk about is let me finish my question before
3  you answer, and I'm going to try to do the same,
4  because while you did anticipate my question
5  correctly this time, it may not be the question
6  you think I'm asking.  Okay?
7    A.   Okay.
8    Q.   Thank you.
9        Did -- you said you lived at your
10  house for 38 years; is that right?
11   A.   Yes.
12   Q.   You knew most of the people on your
13  block?
14   A.   Oh, yes.
15   Q.   Okay.  Where are all your neighbors
16  living now?
17   A.   They only have three of us back in
18  the block.
19   Q.   Okay.  Do you know where the other
20  people are?
21   A.   No.
22   Q.   Okay.  Did you ever go to any Mardi
23  Gras parades, Jazz Fests, Essence Festival, any
24  of that?
25   A.   No.

1    Q.   Okay.  Did you ever go to the zoo or
2  the park?
3    A.   Yes.
4    Q.   Okay.  You registered to vote in
5  Orleans Parish?
6    A.   Yes.
7    Q.   Did you regularly vote?
8    A.   Yes.
9    Q.   Okay.  The -- and if I remember
10  correctly, the thing you did, kind of the civic
11  organization that you did before Katrina was
12  Corpus Christi Church, right?
13   A.   Right.
14   Q.   And you're still participating in
15  the church, correct?
16   A.   Right.
17   Q.   Did you belong to any business or
18  trade organizations?
19   A.   No.
20   Q.   Okay.  Did you ever go to any city
21  council or other type of governmental meetings?
22   A.   No.
23   Q.   What was your first notice of
24  Hurricane Katrina?
25   A.   Well, we kept watching the

1  television, listening, you know, whatever the
2  mayor and different people in Jefferson would
3  say.
4    Q.   Okay.  So, you -- the first notice
5  you had was from the news?
6    A.   Yes.
7    Q.   Okay.  About how -- how long before
8  August 29th?
9    A.   Well, that was that Saturday, and we
10  packed some stuff and put in the car, me and my
11  daughter and my granddaughter.
12   Q.   Okay.
13   A.   And --
14   Q.   I'm sorry.
15   A.   And we made reservations for
16  Mississippi, because we called the state
17  troopers, and they say go 55 south.
18   Q.   55 north?
19   A.   South.
20   Q.   You went up to Jackson, right --
21   A.   Uh-huh.
22   Q.   -- Mississippi?  Okay.  So, Saturday
23  was the first time you really noticed that
24  Katrina was maybe headed toward New Orleans?
25   A.   Right.

Page 30

1    Q.   Okay.  And you packed up and got
2  reservations and left that day?
3    A.   Yeah.
4    Q.   Okay.  Who went with you?
5    A.   My daughter, my granddaughter and
6  myself.
7    Q.   Where was your son?
8    A.   He didn't want to come.
9    Q.   Okay.  So, your son stayed?
10    A.   Yeah.
11    Q.   We had talked earlier -- was your
12  daughter and granddaughter living with you at the
13  time?
14    A.   No.
15    Q.   They just happened to be visiting
16  that day?
17    A.   No.  They live around the corner.
18    Q.   Okay.  Did you do anything to
19  prepare your property for the hurricane?  Did you
20  put, you know --
21    A.   We boarded -- boarded it up.
22    Q.   Okay.  So, you boarded up the
23  windows?
24    A.   Yeah, and that was it.
25    Q.   Okay.  What did you take with you?

Page 31

1    A.   Clothes, money.
2    Q.   Anything else?
3    A.   Some jewelry.
4    Q.   Anything else?
5    A.   That's it.
6    Q.   Who drove?
7    A.   My daughter drove.
8    Q.   Okay.  Whose car did y'all take?
9    A.   Mine.
10    Q.   Okay.  Did your daughter have a car?
11    A.   Yes.  She left it.
12    Q.   Did you have any other cars other
13  than the one you took?
14    A.   No.  My -- yeah -- didn't have --
15  no.  I just had my car.
16    Q.   Okay.  Did you do anything else
17  other than boarding up the house, packing up and
18  leaving with your daughter and granddaughter?
19    A.   No.
20    Q.   Okay.  Y'all left that morning, that
21  afternoon or that evening, on Saturday?
22    A.   That morning.
23    Q.   Okay.  How early in the morning?
24    A.   About 10:00.
25    Q.   And you went to stay in Jackson,

Page 32

1  Mississippi, right?
2    A.   Yes.
3    Q.   Okay.  Where did you stay in
4  Jackson?
5    A.   Hampton Inn.
6    Q.   How long did you stay at Hampton?
7    A.   Two months.
8    Q.   Did -- other than your daughter and
9  your granddaughter, did anyone else stay with
10  you?
11    A.   No.
12    Q.   Okay.  Y'all stayed in one room?
13    A.   Yeah, with double beds.
14    Q.   Okay.  Did -- who paid for the room
15  for those two months?
16    A.   Me.
17    Q.   Okay.  Did -- did FEMA pay for it at
18  all?
19    A.   No.
20    Q.   Okay.  During the -- even after,
21  post-Katrina, I'm assuming that you continued to
22  get your Social Security benefits?
23    A.   Oh, that was tied up, so, it took
24  months before I could get that.
25    Q.   Okay.  So, what did they do?  They

Page 33

1  gave you, like, back benefits?  How did that
2  happen?
3    A.   When I start getting it back, yeah.
4  I got it in Mississippi, I think, two months, and
5  then we came back to New Orleans.
6    Q.   Okay.  So, for the two months you
7  were in Mississippi, you got your check in
8  Mississippi from Social Security?
9    A.   No.  No.  It stood in Mississippi
10  for about two or three months.  We came back to
11  New Orleans.  We went back to Mississippi.  And a
12  couple of more months, then, we got it.
13    Q.   And I'm just -- because I'm a little
14  confused by the answer.  I'm not trying to be
15  difficult.  So, you didn't -- you tried to get
16  them to move it to your Mississippi address --
17    A.   Right.
18    Q.   -- but they couldn't do it; is that
19  right?
20    A.   Right.
21    Q.   Okay.  And then after two months,
22  you were able to return to New Orleans?
23    A.   Right.
24    Q.   And it took about another month?
25    A.   Two -- about two or three months.

9 (Pages 30 to 33)

Page 34

1    Q.   Another two to three months.
2    A.   And when we went back to Mississippi
3  to Social Security, that's when I got the checks.
4    Q.   Okay.  So, you came back to New
5  Orleans for two to three months, and then you
6  moved back to New Orleans -- strike that.
7         You stayed in Mississippi for two
8  months, you returned to New Orleans for another
9  two to three months, and then you went back to
10 Mississippi?
11   A.   Right.
12   Q.   Okay.  And it wasn't until you went
13 back to Mississippi that you actually got your
14 Social Security --
15   A.   Right.
16   Q.   -- benefits?
17   A.   Right.
18   Q.   And when you got them after that,
19 roughly, five months, you got a big check for all
20 the back pay?
21   A.   Right.
22   Q.   Okay.  Where did you stay for the
23 two to three months in New Orleans?
24   A.   I stayed by a cousin of mine's house
25 out there in Kenner.

Page 35

1    Q.   Okay.  Who was that?
2    A.   Ammerite Moore.
3    Q.   And where does she live in Kenner?
4    A.   On North Claiborne Drive, right off
5  Jefferson Highway.
6    Q.   Did she charge you any rent?
7    A.   No.  Because I was coming mostly to
8  see the adjuster, you know, and see what I could
9  do about the house and tried to get a carpenter
10 and, you know, different stuff like that.
11   Q.   Okay.  So, when you came back after
12 that two months, it was to handle the insurance
13 claim that you made; is that right?
14   A.   Right.
15   Q.   Okay.  When you moved back to
16 Jackson, where did you go?
17   A.   With my daughter.
18   Q.   Your daughter now lives in Jackson?
19   A.   Yes.
20   Q.   Okay.  Your daughter had taken up
21 permanent residence at that time, when you
22 returned?
23   A.   Yes.
24   Q.   Okay.  So, the two to three months
25 that you came back into New Orleans, your

Page 36

1  daughter had stayed in Jackson, Mississippi?
2    A.   Yes.
3    Q.   Okay.  She had gotten a job and
4  started working?
5    A.   Yes.
6    Q.   Okay.  And, so, she decided to live
7  in Jackson?
8    A.   Yes.
9    Q.   Okay.  Did she come back with you
10 initially to check on her home?
11   A.   Yes.
12   Q.   Okay.  Was she renting or did she
13 own it?
14   A.   No.  She wasn't renting.  It was my
15 house.
16   Q.   Okay.  Oh, you owned a couple
17 houses?
18   A.   What happened is I bought the house,
19 but I put it in my son name.  I gave it to my
20 son, and my son was staying with me.  And he --
21 she was staying in his house.
22   Q.   Okay.  So, I just want to be clear
23 on this.  As of August 29th of 2005, you only
24 owned one property; is that right?
25   A.   Right.

Page 37

1    Q.   And Keith owned the other
2  property --
3    A.   Right.
4    Q.   -- that your daughter lived in?
5    A.   Right.
6    Q.   Okay.  So, your daughter just stayed
7  in Mississippi and never came back?
8    A.   No.  She hasn't came -- she come
9  back to see how I am or, you know, to visit, but
10 she didn't come back to stay.
11   Q.   Right.  Okay.  While you were in
12 Jackson for the two months, what did you do?
13   A.   What you mean, what did I do?
14   Q.   Did you just stay in the hotel?
15 What were you doing for those two months?
16   A.   Well, we would stay in the hotel, go
17 out and eat and see what was going on on the
18 television for the news.
19   Q.   Did you go to any of the shelters to
20 get any type of assistance or anything?
21   A.   No.
22   Q.   Okay.  Did you go apply for any type
23 of benefits, food stamps or anything like that?
24   A.   The Red Cross gave us -- gave me
25 $182 and FEMA gave me that 2,300, and I did get,

10 (Pages 34 to 37)

Page 38

1      I think, $200 of food stamps.
2      Q.   But they never -- they never paid
3  for the hotel room?
4      A.   No.  I wish they would have.
5      Q.   Did -- did you go to any churches or
6  do any other type of recreational activities?
7      A.   No.
8      Q.   Okay.  Were you injured physically,
9  you know, hurt your arm or leg or anything?
10     A.   Depress.
11     Q.   Depressed.  Okay.  Well, I'm going
12  to talk about the stress that you experienced
13  from Hurricane Katrina, but what I want to know
14  first is:  Did you have any physical injuries or
15  illnesses as a result of Hurricane Katrina?
16     A.   No.
17     Q.   Okay.  The injury claim you're
18  making is related to the stress you experienced?
19     A.   Yes.
20     Q.   Okay.  And did you seek any type of
21  medical treatment for the stress?
22     A.   Yes.
23     Q.   Okay.  Where?
24     A.   Baptist Hospital, in Jackson.
25     Q.   Anywhere else?

Page 39

1      A.   No.
2      Q.   Okay.  Did you just go to the
3  emergency room or what did you do?
4      A.   I was referred to a specialist, Dr.
5  Douglas Wolf.
6      Q.   Who referred you to Dr. Wolf?
7      A.   The man at the hotel.
8      Q.   So, you went to Baptist Hospital
9  specifically to see Dr. Wolf?
10     A.   Yes.
11     Q.   What type of doctor is Dr. Wolf?
12     A.   Cardiologist.
13     Q.   Had you had previous problems with
14  your heart?
15     A.   Yes.
16     Q.   Okay.  You hypertensive -- or what
17  were the problems you had with your heart?
18     A.   I had had open-heart surgery in
19  1980.
20     Q.   You had a bypass?
21     A.   Yes.
22     Q.   Quadruple, or do you know?
23     A.   No.  Just my left aorta.
24     Q.   Okay.  So, one?
25     A.   Yeah.

Page 40

1      Q.   Were you -- did you have high blood
2  pressure before Katrina?
3      A.   Yes.
4      Q.   Did -- you took medicine, I assume,
5  for your high blood pressure before Katrina?
6      A.   No.
7      Q.   No?  You weren't on any medications?
8      A.   Before Katrina?
9      Q.   Yeah.
10     A.   Yeah, I was on a heart pill --
11     Q.   Okay.
12     A.   -- every other day.
13     Q.   What was that for?
14     A.   Digitalis, for my heart -- digoxin,
15  I mean.
16     Q.   Do you know what it does other than
17  just being for your heart?
18     A.   It helps the heartbeat regular.
19     Q.   Okay.  Any other type of medications
20  that you were on before Katrina?
21     A.   No.
22     Q.   Okay.  Where did you get your
23  prescriptions filled?
24     A.   Walgreens.
25     Q.   And that would have been in New

Page 41

1  Orleans?
2      A.   And in Jackson.
3      Q.   Okay.  Did you ever go to any other
4  pharmacies in either New Orleans or Jackson for
5  prescriptions?
6      A.   No.
7      Q.   Okay.  So, if we got the Walgreens
8  records, we'd know what prescriptions you were
9  getting --
10     A.   Right.
11     Q.   -- both before and after Katrina; is
12  that right?
13     A.   Right.
14     Q.   Thank you.
15         Who is your cardiologist in New
16  Orleans?
17     A.   Dr. Pappas, Nicholas Pappas.
18     Q.   Where did he work out of?
19     A.   East Jefferson.
20     Q.   Did you have your heart surgery or
21  your bypass surgery at East Jefferson?
22     A.   No.
23     Q.   Where was that?
24     A.   Tulane Medical Center.
25     Q.   Had you been to any of the other

11 (Pages 38 to 41)

1  hospitals in the New Orleans area other than EJ
2  and Tulane?
3      A.   No.
4      Q.   Okay.  You had never been to
5  Charity?
6      A.   When I had a baby.
7      Q.   Okay.  Other than -- other than when
8  you had a baby, had you ever been to Charity?
9      A.   No.
10      Q.   Okay.  And no other hospitals, like
11  LSU or --
12      A.   No.
13      Q.   -- Ochsner or Touro or St. Charles
14  General?
15      A.   No.
16      Q.   Okay.  Did you have any other
17  cardiologists besides Dr. Pappas?
18      A.   Dr. William B. Smith.
19      Q.   Where did Dr. Smith work out of?
20      A.   Tulane Medical Center.  Then, he
21  went to Mercy Hospital, but, you know --
22      Q.   Did you ever go to Mercy Hospital to
23  see him?
24      A.   A couple of times.
25      Q.   Okay.  Any other cardiologists?

1      A.   No.
2      Q.   Who -- who did your bypass surgery,
3  Dr. Smith?
4      A.   No.  Jim Jones.
5      Q.   And he would have been out of
6  Tulane, also?
7      A.   Yes.
8      Q.   Okay.  Did he have any other offices
9  or clinics?
10      A.   No.
11      Q.   Okay.  The only -- the only
12  healthcare provider that you went and saw after
13  Katrina was Dr. Wolf, and he was a cardiologist,
14  right?
15      A.   Yes.
16      Q.   Okay.  No other -- you didn't go see
17  any type of mental health professional?
18      A.   No.
19      Q.   Okay.
20      A.   But now I'm seeing my regular heart
21  doctor.
22      Q.   Okay.  And that's Dr. Pappas?
23      A.   Right.
24      Q.   Okay.  And you don't have any of the
25  records -- any of the medical records that you

1  would have seen your heart doctor for after
2  Katrina in your possession, do you?
3      A.   No.
4      Q.   Okay.  Are you still on the same
5  heart pill?
6      A.   Yes.
7      Q.   Okay.  Did your medication change at
8  all after Katrina?
9      A.   No.
10      Q.   So, you took the same medicine?
11      A.   Uh-huh.
12      Q.   Is that a "Yes"?
13      A.   Yes.
14      Q.   Thank you.
15          Other than your heart problem, did
16  you have any other health issues before Katrina?
17      A.   No, other than the eyeglasses and --
18  you know.
19      Q.   So, you had -- you had -- you wear
20  glasses, as I can see today.
21      A.   To read, yeah.
22      Q.   But no other -- no other health
23  issues other than the heart?
24      A.   Right.
25      Q.   Okay.  How did -- how did -- what

1  type of symptoms did you have from the stress
2  that you didn't experience before?
3      A.   Ooh, honey, I ain't never had a
4  headache before in my life, but I start getting
5  headaches, feeling bad.  Then, when I went to the
6  doctor, he told me he was going to have to put a
7  defibrillator in me.
8      Q.   Did -- I'm sorry.
9      A.   So, they put one in me in October of
10  '05.
11      Q.   You said you were feeling bad.
12  Other than the headaches, any other symptoms you
13  experienced?
14      A.   Just depress.
15      Q.   Okay.  When he put the defibrillator
16  in you in October of 2005, did he tell you why he
17  was doing that?
18      A.   He said it'll help the heart beat
19  better.
20      Q.   Okay.  Did he -- did he indicate
21  that -- what caused you to need a defibrillator?
22      A.   The stress and the depression.
23      Q.   Dr. Wolf told you that?
24      A.   Yes.
25      Q.   Where would the defibrillator --

Page 46

1  would that have been put in at Baptist Hospital?
2      A.   Yes.
3      Q.   And that's in Jackson, right?
4      A.   Yes.
5      Q.   And the -- the only medicines
6  that -- that you've taken, if I remember
7  correctly, has been the pill for your heart,
8  which has remained the same --
9      A.   Uh-huh.  Digoxin.
10     Q.   -- from before and after Katrina?
11     A.   Yes.
12     Q.   Okay.  When you had the
13 defibrillator put in, did they have to put you
14 under anesthesia?
15     A.   Yes.
16     Q.   Okay.  And how long were you in the
17 hospital?
18     A.   I think, four days.
19     Q.   Other than the defibrillator, the
20 heart surgery back in the '80s and going into the
21 hospital for your children, any other times
22 you've ever been hospitalized?
23     A.   No.
24     Q.   Do you have a primary care
25 physician?

Page 47

1      A.   No.
2      Q.   You know what that is?
3      A.   Yes.
4      Q.   Okay.  There's no doctor that you
5  would see for flus, colds and just general health
6  checkups?
7      A.   No.
8      Q.   Okay.  The only doctor you would
9  have seen would have been your cardiologist?
10     A.   Right.
11     Q.   Okay.  If you -- if you got a flu or
12 some type of, you know, cold or anything, who
13 would you go see?
14     A.   Well, sometime I'll call my little
15 niece.  She's a doctor.
16     Q.   Uh-huh.
17     A.   And sometime I'll call my heart
18 doctor and make a appointment and tell him I got
19 a runny nose, I need -- ask him could I get a flu
20 shot or whatever.
21     Q.   Okay.  So, you would go to your
22 heart doctor for that type of stuff?
23     A.   Right.
24     Q.   What is your niece's name?
25     A.   Cherilynne Cottles.

Page 48

1      Q.   Cherilynne?
2      A.   Cottles, C-O-T-T-L-E-S.
3      Q.   And where does she work?
4      A.   Well, right now, I don't know where
5  she's working.
6      Q.   Where did she work?
7      A.   She worked at Charity.
8      Q.   Would you ever go see her at
9  Charity?
10     A.   No.  I see her at her house.
11     Q.   Okay.  Did -- did you have health
12 insurance or were you on Medicaid, or what were
13 you on?
14     A.   I had health insurance.
15     Q.   Okay.  Where did you have your
16 health insurance?
17     A.   With Humana, and I had -- what it
18 is?  The red, white and blue card -- Medicare.
19     Q.   Oh, Medicare.  But you had health
20 insurance at Humana during this time period?
21     A.   Uh-huh.
22     Q.   Is that a "Yes"?
23     A.   Yes.
24     Q.   Thank you.
25          Did -- did Dr. Wolf ever tell you

Page 49

1  you -- that you had special limits after he put
2  the defibrillator in, that you couldn't do
3  certain things?
4      A.   No.
5      Q.   Okay.  You said you were retired,
6  but have you ever received any type of disability
7  benefits or anything like that?
8      A.   No.
9      Q.   What about unemployment?
10     A.   No.
11     Q.   Okay.  The only benefits you've ever
12 received, I take it, has been the Social Security
13 benefits that you got from being retired, right?
14     A.   Right.  Yes.
15     Q.   Thank you.
16          How much did you get per month from
17 Social Security?
18     A.   It's 626.
19     Q.   And that's a month, right?
20     A.   Yes.
21     Q.   So, you would have gotten roughly --
22 this is just an approximate number -- when you
23 got back to Jackson the second time, you would
24 have gotten a check somewhere in the 3,000 to
25 $4,000 range?

1    A.   Right.
2    Q.   Okay.  Any other type of injuries
3  that you're claiming other than what we've
4  already talked about as a result of Hurricane
5  Katrina?
6    A.   No.
7    Q.   Okay.  Who paid for the hospital
8  visits and everything after Katrina?
9    A.   Myself.
10    Q.   Okay.  Did Humana pay for it or did
11  you actually come out of pocket?
12    A.   I came out of pocket and paid for
13  some of it.
14    Q.   Okay.  How much -- do you know how
15  much you came out of pocket?
16    A.   I'd say a good $1,200.
17    Q.   Do you have receipts for that?
18    A.   Yes.
19    Q.   Okay.  Have you given those to your
20  lawyer or do you still have those?
21    A.   I still have them at home.
22    Q.   Okay.  I'm going to ask you to get
23  them to your lawyer so that they can give them to
24  us.  All right?
25    A.   Okay.

1    Q.   Thank you.
2         Other than the $1,200 -- I assume
3  you paid that to Dr. Wolf?
4    A.   Yes.
5    Q.   Okay.  Other than those medical
6  expenses, any other type of expenses?
7    A.   No.
8    Q.   Okay.  Would that 1,200 have also
9  included all your pharmaceutical or prescription
10  purchases?
11    A.   No.  No.
12    Q.   It would not have?
13    A.   Right.
14    Q.   Do you have any receipts for what
15  you paid for your prescriptions?
16    A.   No.
17    Q.   Okay.  And you didn't keep that
18  because you were getting the same prescription as
19  you had gotten before?
20    A.   Right.
21    Q.   Okay.  Did -- I'm assuming some of
22  your insurance paid for some of the
23  hospitalization.
24    A.   Right.
25    Q.   And that would have been Humana?

1    A.   Right.
2    Q.   Okay.  Do you have a copy of your
3  insurance card with you?
4    A.   Yes.
5    Q.   Okay.  I may ask you to pull it out
6  when we take a break so we can attach that as a
7  copy, also.  Okay?
8    A.   (Nods head affirmatively.)
9    Q.   Has anyone else other than Humana or
10  yourself paid for any of the medical expenses
11  you've incurred?
12    A.   No.
13    Q.   Okay.  We already talked about you
14  evacuated with your daughter and granddaughter,
15  right?
16    A.   Right.
17    Q.   Why did you go to Jackson?
18    A.   We didn't know where else to go.
19    Q.   Okay.  What made you go to Jackson,
20  I guess, is what I'm asking?
21    A.   Well, my daughter called the state
22  troopers, and they told us to go 55 south.
23    Q.   Okay.  So, you went 55 until you hit
24  Jackson?
25    A.   Right.

1    Q.   Okay.  Other than the gas that you
2  would have incurred, any other type of evacuation
3  expenses?
4    A.   Well, we stopped on the road for
5  food.  Then, we made reservations for a hotel.
6    Q.   You had the hotel for two months,
7  which we talked about earlier, right?
8    A.   Uh-huh.
9    Q.   Is that a "Yes"?
10    A.   Yes.
11    Q.   Thank you.
12         You had some food expenses?
13    A.   Yes.
14    Q.   Okay.  And you had gas expenses.
15    A.   Yes.
16    Q.   Any other type of expenses?
17    A.   Well, the hotel.
18    Q.   We talked about that already.
19    A.   Yeah.  Then, we got a apartment.
20  That was $800 a month.  Then, my daughter got
21  another apartment.
22    Q.   Okay.  The apartment's new.  So, did
23  you stay in the hotel for two full months?
24    A.   Yeah.
25    Q.   Okay.  And then you moved out of the

14 (Pages 50 to 53)

(504)525-1753          HUFFMAN & ROBINSON, INC.          (800)749-1753
ONE SHELL SQUARE,#250 CERTIFIED COURT REPORTERS NEW ORLEANS, LA 70139

Page 54

1  hotel.
2      A.   Yeah, because it was too expensive.
3      Q.   Okay.  I thought after you moved out
4  of the hotel, you came back to New Orleans.
5      A.   I came here and stood a week or a
6  couple of days taking care of my business.  Then,
7  I'd go with my son.  Then, I'd go back to
8  Mississippi.
9      Q.   Okay.  What was -- was your son --
10  where was he living?
11      A.   My son had evacuated to Texas.
12      Q.   You said you stayed with your son,
13  though.  I'm assuming in New Orleans.
14      A.   Yes.
15      Q.   Okay.  Where was he living while he
16  was in New Orleans after the storm?
17      A.   He was living in Mississippi with
18  us.  We went on the internet and found him.
19      Q.   Okay.  Let me try it this way.  Your
20  son initially went to Texas; is that right?
21      A.   My son --
22      Q.   After the storm.
23      A.   After the storm, he stayed here, in
24  New Orleans.
25      Q.   And they took him to Texas?

Page 55

1      A.   Right.
2      Q.   Okay.  He -- he was in Houston or do
3  you remember?
4      A.   No.
5      Q.   You have to answer from your
6  knowledge.
7      A.   No.  He was -- I think he was in
8  Austin.
9      Q.   Okay.  He eventually came to you in
10  Mississippi?
11      A.   Yes.
12      Q.   Okay.
13      A.   After we got him on the internet.
14      Q.   Okay.  You -- he gets to you in
15  Mississippi within that first two months?
16      A.   No.  About a week later.
17      Q.   Okay.  So, about a week after the
18  storm, your son finds you in Mississippi?
19      A.   Right.
20      Q.   Okay.  Then, y'all all stay in one
21  hotel room for two months.
22      A.   Right.  Me, my son, my daughter and
23  my granddaughter.
24      Q.   Okay.  After the two months, you
25  come back to New Orleans, if I remember

Page 56

1  correctly.
2      A.   Right.
3      Q.   And you stay with your friend in
4  Kenner for --
5      A.   My cousin.
6      Q.   -- your cousin, for two to three
7  months?
8      A.   I don't say two to three months.  A
9  few weeks or a couple of days, then back to
10  Mississippi.  You know, taking care of business,
11  then coming back, going back.
12      Q.   Okay.  I understand that.  You were
13  going back and forth.
14      A.   Right.
15      Q.   Okay.  And, so, during that two to
16  three months, you also rented an apartment?
17      A.   Right.
18      Q.   Okay.  Were your son and your
19  daughter and granddaughter all staying there,
20  also?
21      A.   Right.
22      Q.   Okay.  You were paying the full
23  amount, though, out of your pocket?
24      A.   Eight hundred dollars.
25      Q.   Okay.  But that was all coming out

Page 57

1  of your pocket?
2      A.   Yes.
3      Q.   Okay.  What about food and all that
4  and utilities, were you paying that, too?
5      A.   Yeah, but we was getting food
6  stamps.
7      Q.   Okay.  So, really, what you were
8  paying for was the apartment and the utilities?
9      A.   And utilities.  And gas.
10      Q.   You were paying all of that.  Your
11  son and daughter weren't paying anything?
12      A.   No.
13      Q.   Is that right?
14      A.   Right.
15      Q.   Okay.  And you stayed in that
16  apartment for a month?
17      A.   Two months.
18      Q.   Okay.  You still didn't get any FEMA
19  assistance to pay for the apartment?
20      A.   No indeed.
21      Q.   Okay.  After the -- those two months
22  in the apartment, you said you moved to another
23  apartment, right?
24      A.   My -- my daughter did, because I
25  came down to New Orleans and I stayed with my

Page 58

1  cousin, Stacy.
2      Q.  Okay.
3      A.  I stayed with her about a month.
4  They gave me a FEMA trailer, and that's what we
5  staying in now, a FEMA trailer.
6      Q.  Okay.  So, for you, you would have
7  paid two months of hotel, two months of an
8  apartment, and then you would have been back in
9  New Orleans in your FEMA trailer the rest of the
10  time.
11      A.  No.  I stayed by my niece over in
12  Algiers for two months, until I got the FEMA
13  trailer.
14      Q.  Okay.  Okay.  I just want to make
15  sure I have all the amounts you paid for lodging,
16  and that -- up in Mississippi.  And that would
17  have been two months at the hotel?
18      A.  Right.
19      Q.  And then two months at the
20  apartment.
21      A.  Right.
22      Q.  And after that, you would have
23  either been staying with friends, relatives or in
24  the FEMA trailer.
25      A.  Right.  Right.

Page 59

1      Q.  Okay.  And the FEMA trailer was put
2  on the Clouet address?
3      A.  Yes.
4      Q.  Did you keep receipts for the hotel
5  room?
6      A.  No.  I don't think so.
7      Q.  Okay.  How did you pay for the hotel
8  room?  Did you pay with a credit card?
9      A.  Yes.
10      Q.  Okay.  You have a Visa, a
11  MasterCard?  What do you have?
12      A.  Visa.
13      Q.  What about the apartment, how did
14  you pay for the apartment?
15      A.  Money, check.
16      Q.  A check?
17      A.  Yes.
18      Q.  Okay.  Where do you bank at?
19      A.  Well, I had to open a account in
20  Regions, but I had a account at Whitney here.
21      Q.  Okay.  What would you have paid -- I
22  just want the account that you would have paid
23  the money for the apartment out of.  Would that
24  have been Regions?
25      A.  Yes.

Page 60

1      Q.  Did you keep your credit card
2  statements from the time that you stayed in the
3  hotel that would have those charges on it?
4      A.  To be honest with you, I been going
5  from pillar to post for two and a half years.  I
6  really couldn't just put my hands on none of that
7  stuff.
8      Q.  Okay.  So, you don't know whether or
9  not you have that or not?
10      A.  Right.
11      Q.  Okay.  Can you think of any other
12  type of expenses that you would have incurred
13  that we haven't covered?
14      A.  Well, when we was in the hotel, we
15  had to go out and eat.
16      Q.  Right.
17      A.  We couldn't cook in the hotel.
18      Q.  Did you pay with your credit card
19  for that, also?
20      A.  And money out my pocket.
21      Q.  Okay.  So, you may have paid some
22  cash?
23      A.  Yes.
24      Q.  Okay.  What did you use the FEMA
25  money for?

Page 61

1      A.  I did that for some of the rent,
2  some of the food we was buying out in the street,
3  clothes.
4      Q.  How much were you getting in food
5  stamps?
6      A.  I was -- by myself, I was getting
7  $105.
8      Q.  Is that a week?
9      A.  Month.
10      Q.  A month.
11      A.  I wish I did have somebody give me
12  $105 for food every week.
13      Q.  And then your daughter was getting
14  food stamps, also?
15      A.  No.  She -- excuse me -- she hadn't
16  applied then.
17      Q.  Okay.  When you say "then," that was
18  during the four to five months you were up in
19  Jackson?
20      A.  Right.  Uh-huh.
21      Q.  Okay.
22      A.  So, the food stamps I had, it was
23  all of us.
24      Q.  Okay.
25      A.  You understand?

1    Q.    Was your son getting any food
2  stamps?
3    A.    No.
4    Q.    Okay.
5    A.    He was planning on going back to
6  work.
7    Q.    Was -- was he working at all in
8  Jackson, like your daughter?
9    A.    No.  He was working at Tulane.
10   Q.    So, he -- he continued to work for a
11 New Orleans-based business?
12   A.    Uh-huh.
13   Q.    Is that a "Yes"?
14   A.    Yes.
15   Q.    Okay.  Other than your son, do you
16 know of any other neighbors that didn't evacuate?
17   A.    No.
18   Q.    And you're currently residing in the
19 FEMA trailer at the Clouet address?
20   A.    Right.
21   Q.    Okay.  And you plan to, I'm
22 assuming, stay at the Clouet address?
23   A.    Oh, yes.
24   Q.    Okay.  You started your repairs on
25 the house?

1    A.    I'm trying to rebuild.
2    Q.    Have you started doing the work on
3  it?
4    A.    No.  Trying to wait on Road Home.
5    Q.    Okay.  And your son's returned to
6  New Orleans, also?
7    A.    Yes.
8    Q.    Is he living at the house where your
9  daughter lived?
10   A.    No.  We haven't fix -- he hasn't
11 fixed that yet.
12   Q.    Okay.  Where is he living?
13   A.    With me.
14   Q.    Okay.  In the trailer --
15   A.    Uh-huh.
16   Q.    -- on the Clouet address?
17   A.    Right.
18   Q.    Okay.  But you plan on -- he plans
19 on fixing the other home, also?
20   A.    Yes.
21   Q.    Okay.  And you're not making -- just
22 so we can skip this, you're not making a lost
23 earnings claim?
24   A.    No.
25   Q.    That was a double negative.  So, let

1  me get it right.  Am I correct in saying you are
2  not making a lost wage claim?
3    A.    Right.
4    Q.    Thank you.
5          And I'm also correct in saying that
6  you are not making a loss of income -- a loss of
7  rental income claim.
8    A.    Right.
9    Q.    Okay.  And I'm correct in saying
10 you're not making a loss of business income
11 claim.
12   A.    Right.
13   Q.    And since you're retired, I'm
14 assuming you haven't had to file taxes in the
15 last five years --
16   A.    No.
17   Q.    -- is that right?
18   A.    Right.
19   Q.    I want to talk about the damages you
20 sustained to real property, and real property, my
21 definition, is essentially a home or other type
22 of rental unit that you may own that you rent
23 out.  Okay?
24   A.    (Nods head affirmatively.)
25   Q.    As I understand it, the only real

1  property claim you're making is for the damage to
2  the house on Clouet Street; is that right?
3    A.    Yes.
4    Q.    Okay.  Could you give me -- the
5  address is 2111; is that right?
6    A.    Right.
7    Q.    Clouet?
8    A.    (Nods head affirmatively.)
9    Q.    Do you know if it's in a flood zone?
10   A.    It's not supposed to be in a flood
11 zone, but it is.
12   Q.    Do you know what flood zone it is
13 in?
14   A.    Four.
15   MR. PALMINTIER:
16        I think she's confusing the
17 subclassification with the flood
18 zone.
19   MR. KIRSCH:
20        Right.  I do, too.
21 EXAMINATION BY MR. KIRSCH:
22   Q.    Generally, it's, like, Flood Zone A.
23 Have you ever heard of that or not?
24   A.    Yes.
25   Q.    Okay.  Do you know if you're in a

Page 66

1  Flood Zone A or what you're in?
2     A.  I think it's A.
3     Q.  But you're not sure?
4     A.  I'm not sure.
5     Q.  Okay.  Does anyone else own the
6  house with you or is it strictly yours?
7     A.  My house.
8     Q.  Okay.  How much did you purchase it
9  for, if you recall?
10    A.  I think I paid 16 for it.
11    Q.  Sixteen thousand dollars?
12    A.  Yes.
13    Q.  And you bought that when you were
14  married to Mr. Hill; is that right?
15    A.  Yes.
16    Q.  Okay.  What was the condition of the
17  property at the time you bought it?
18    A.  It was in good shape.
19    Q.  Okay.  How old was it?
20    A.  I think it was about 18, 19 years
21  old.
22    Q.  And what year did you buy it in?
23    A.  I think it was '8-- no --
24  '70-something.
25    Q.  Okay.  Sometime in the 1970s?

Page 67

1     A.  Yeah.
2     Q.  Would it be toward the latter part,
3  the late '70s?
4     A.  No.  The early part of '70s.
5     Q.  Did you -- did you have a mortgage
6  on the property at the time Katrina --
7     A.  No.
8     Q.  Did you have to take out a loan to
9  buy the house?
10    A.  No.
11    Q.  Okay.  You bought it out --
12  outright?
13    A.  Yes.
14    Q.  Okay.  Do you know who did -- let me
15  ask this first: Have you ever had an appraisal
16  on the house?
17    A.  Yes.
18    Q.  When?
19    A.  Before Hurricane Katrina.
20    Q.  How long before Katrina?
21    A.  Oh, about six or seven years before
22  Katrina.
23    Q.  Okay.  Do you remember what it
24  appraised for?
25    A.  Not really.

Page 68

1     Q.  Okay.  Do you have a copy of the
2  appraisal?
3     A.  No.
4     Q.  Okay.  After you purchased the house
5  back in the early '70s, did you make any
6  improvements to it?
7     A.  Yes.  I put a new roof --
8     Q.  Uh-huh.
9     A.  -- new heating, new floors, new
10  bathtub, new kitchen and new windows.
11    Q.  Any add-ons?
12    A.  No.
13    Q.  Okay.  How long -- how old was the
14  roof at the time Katrina hit?
15    A.  I would say about eight years old.
16    Q.  You said you put a new -- did I
17  write it down wrong -- heater?
18    A.  Heating system, yes.
19    Q.  Yeah.  How old was that at the time
20  of Katrina?
21    A.  Oh, about ten years old.
22    Q.  Did you do the work on the floors,
23  the bathroom, the kitchen and the windows around
24  the same time?
25    A.  No.  Different intervals.

Page 69

1     Q.  Okay.  How long ago did you -- well,
2  what floors did you do first?
3     A.  The front room floor, the bedroom --
4  two bedroom floors, then the kitchen.
5     Q.  Okay.  And what did you do to them?
6     A.  I put -- I took the hardwood off and
7  pull tile all the way through.
8     Q.  Okay.  So, you had tile throughout
9  the whole house?
10    A.  Uh-huh.
11    Q.  And how long ago was that?
12    A.  Oh, that was about eight years
13  before the hurricane.
14    Q.  Okay.  And you also said you redid
15  the whole kitchen?
16    A.  Yes.
17    Q.  Okay.  How long ago was that?
18    A.  Right after they laid the tile.
19    Q.  Okay.  So, we're talking --
20    A.  About eight, ten years ago.
21    Q.  And then you said you put all new
22  windows --
23    A.  Yes.
24    Q.  -- in the whole house?
25    A.  Uh-huh.

18 (Pages 66 to 69)

Page 70

1     Q.   How long was that?
2     A.   Oh, that was the last year -- year
3   before -- no -- about three years ago, because
4   the hurricane been two and a half.
5     Q.   Okay.  So, it was about a year
6   before Hurricane Katrina?
7     A.   Right.
8     Q.   You recall doing any other types of
9   improvements?
10     A.   No.
11     Q.   Do you remember any of those
12   improvements requiring any type of building
13   permits or anything?
14     A.   No.
15     Q.   And you have -- after all of that
16   was done, you had an appraisal, but you don't
17   remember what it appraised for, correct?
18     A.   No.
19     Q.   Is that correct?
20     A.   That's correct, but Hurricane
21   Katrina took all that.
22     Q.   Okay.  I'm just -- I'm just trying
23   to find out if you know that because we don't --
24   do you know who the appraiser was?
25     A.   No, I don't, because I had a file

Page 71

1   cabinet, and in the file cabinet, all that was
2   there, and after we came back, all that was
3   soaking wet.  You couldn't find nothing.
4     Q.   Right.  I understand.  I'm just --
5   I'm trying to find out if there's any way we can
6   get that information, which is why I keep asking
7   you different questions about the same thing.
8     A.   Yeah.  Well, I don't know how I
9   could get it because it's been so long ago.
10     Q.   Right.  Okay.  Could you -- the --
11   give me a general description of what your house
12   looks like?
13     A.   It was a living room, dining room,
14   two bedrooms, kitchen, bath, and in the shed,
15   they had a wash area, dryer; and then the garage,
16   we used to store different stuff in it.
17     Q.   Was -- was it a brick home?  Was it
18   a raised home that was kind of wood or siding?
19     A.   It was wood.
20     Q.   Okay.  So, it was wood all around?
21     A.   Yeah.
22     Q.   Okay.  Was it a -- was it a shotgun
23   house, a duplex?
24     A.   No.  It was a duplex, but it had --
25   I had put awnings all the way around the house.

Page 72

1     Q.   Okay.  Did you -- you said it was a
2   duplex.  What did you do with the other side?
3     A.   It was a single house, but not no
4   shotgun house.
5     Q.   Okay.  It was just a regular single
6   house with a front door?
7     A.   Uh-huh.  Right.
8     Q.   Okay.
9     A.   And a porch.
10     Q.   When you -- when you walk in the
11   front door --
12     A.   That was the living room.
13     Q.   Okay.  The living room covered the
14   whole first section of the house?
15     A.   Living, dining room.
16     Q.   Okay.  It was one big room or did it
17   have walls in it?
18     A.   It was one big room, and then the
19   kitchen.
20     Q.   The kitchen followed the living
21   room?
22     A.   Yeah.  And on the right-hand side
23   was the two bedrooms.
24     Q.   Okay.  So, you walk in the front
25   door, you hit the living room.

Page 73

1     A.   And in the middle was the bath.
2     Q.   You hit the living room, right?
3     A.   (Nods head affirmatively.)
4     Q.   Is that correct?
5     A.   Yes.
6     Q.   And then you -- is there a hallway,
7   or what takes you to the kitchen?
8     A.   You just keep walking straight to
9   the kitchen.
10     Q.   Okay.  So, there's no door or
11   anything?
12     A.   No.
13     Q.   Just the living room goes straight
14   into the kitchen?
15     A.   Right.
16     Q.   And the kitchen is set off to the --
17   if you're facing it, to the right?
18     A.   No.  When you walk in, this is the
19   living room -- like, living, dining room, then
20   the kitchen.  On this side is two bedrooms and a
21   bath.
22     Q.   Okay.  Was it a square house, an
23   L-shaped house?
24     A.   Yes, square.
25     Q.   Square.  When -- what was in the

19 (Pages 70 to 73)

(504)525-1753        HUFFMAN & ROBINSON, INC.        (800)749-1753
ONE SHELL SQUARE,#250 CERTIFIED COURT REPORTERS NEW ORLEANS, LA 70139

Page 74

1   living room?
2       A.   Living room furniture.
3       Q.   Okay.
4       A.   Sofa, love seat, pictures, lamps.
5       Q.   Do you remember how many square feet
6   the house was?
7       A.   It's a 40 front and 131 deep.
8       Q.   Is that your lot size?
9       A.   Uh-huh.
10      Q.   Okay.  What about the house, the
11  actual house?
12      A.   Oh, I don't know.
13      Q.   Okay.  You never heard 1,500, 1,800
14  square feet, or anything like that?
15      A.   No, I sure don't.
16      Q.   Do you have any documentation that
17  would reflect that?
18      A.   I guess it's on the deed.
19      Q.   Okay.  You have a copy of the deed?
20      A.   Yes.
21      Q.   Okay.  And you still have that?
22      A.   It's in the safety deposit box.
23      Q.   Okay.  I'm going to ask you if you
24  could get a copy to your lawyer of the deed.
25      A.   All right.

Page 75

1       Q.   Do you have anything else that would
2   have a description of the property, of the home?
3       A.   Pictures.
4       Q.   Okay.  And you've given those to
5   your lawyer?
6       A.   Yes.
7       Q.   Had that house ever flooded before?
8       A.   No.
9       Q.   And you have no idea what the value
10  of the house was before Katrina.
11      A.   No.
12      Q.   Have you gotten any appraisals or
13  any idea how much the house is worth after
14  Katrina?
15      A.   No.
16      Q.   Did you have insurance on the house?
17      A.   Yes.
18      Q.   Okay.  What type of insurance?
19      A.   I had flood and homeowner's.
20      Q.   How much did you have in flood
21  insurance?
22      A.   Ninety.
23      Q.   Ninety thousand?
24      A.   Yes.
25      Q.   And was that all structure?

Page 76

1       A.   Yes.
2       Q.   Did you have any contents coverage?
3       A.   Well, that was included in the
4   90,000.
5       Q.   Okay.  So, the 90,000 would have
6   been combined contents and structure?
7       A.   Right.
8       Q.   Okay.  And who was that with, if you
9   remember?
10      A.   Allstate.
11      Q.   And you said you had a homeowner's
12  policy, also?
13      A.   Yes.
14      Q.   Okay.  How much did you have in
15  homeowner's, if you recall?
16      A.   A hundred, but they didn't give me
17  nothing.
18      Q.   Okay.  You had 100,000 in structure
19  coverage?
20      A.   Right.
21      Q.   And do you know how much you had in
22  contents coverage under your homeowner's
23  property -- policy?
24      A.   All that was included.
25      Q.   Okay.  So, the 100, again, would

Page 77

1   have been a combined limit?
2       A.   Yes.
3       Q.   Okay.  Was that also with Allstate?
4       A.   Yes.
5       Q.   Did you -- did you make a claim to
6   Allstate as a result of the damages?
7       A.   Yes.
8       Q.   You made a claim on both your flood
9   and homeowner's policy?
10      A.   Yes.
11      Q.   Okay.  How much were you paid from
12  your flood insurance?
13      A.   Ninety thousand.
14      Q.   Okay.  Did they come out and adjust
15  it, or did they just send you a check?
16      A.   They sent me a check.
17      Q.   Okay.  So, you didn't meet an
18  adjuster out there before you got your flood --
19      A.   Oh, yeah, I met a adjuster.
20      Q.   Okay.  What I'm trying to find out
21  is did you meet a flood adjuster from Allstate
22  or, you know, working for Allstate, before you
23  got the check for the flood?
24      A.   Oh, yes.  I met the Allstate
25  adjuster and me and him talked, and he adjusted

20  (Pages 74 to 77)

(504)525-1753        HUFFMAN & ROBINSON, INC.        (800)749-1753
ONE SHELL SQUARE,#250 CERTIFIED COURT REPORTERS NEW ORLEANS, LA 70139

Page 78

1    it, and about two weeks later, I got the check.
2        Q.   Okay.  And did another adjuster come
3    out for the homeowner's claim?
4        A.   Yes.
5        Q.   Okay.  And same guy or a different
6    person?
7        A.   Different person.
8        Q.   Okay.  But he was also with Allstate
9    in some capacity?
10       A.   Right.
11       Q.   And how long after the flood
12   adjuster?
13       A.   Oh, about two months.
14       Q.   Did you -- after he met you at the
15   house, do you remember your discussions with him?
16       A.   Two of the pillars had -- the house
17   had shift where the pillars had come off, where
18   they had come off the pillars, and he said
19   Allstate wasn't responsible for that because it
20   wasn't wind and some kind of damage.
21       Q.   Okay.
22       A.   So, I got -- I talked to Mr. Bruno
23   about that.
24       Q.   Okay.  Do you have another lawsuit
25   against Allstate pending?

Page 79

1        A.   You have to ask Mr. Bruno.
2        Q.   Okay.  I don't want to hear anything
3    you told Mr. Bruno.  Okay?
4        A.   (Nods head affirmatively.)
5        Q.   So, you don't know if you have a
6    lawsuit against Allstate pending or not --
7        A.   No.
8        Q.   -- is that right?
9        A.   No.
10       Q.   Let me -- when I asked you if you
11   had a lawsuit against Allstate, you told me you
12   didn't know, ask Mr. Bruno; is that right?
13       A.   Right.
14       Q.   Okay.  Did you have any problems
15   with your flood adjuster?
16       A.   No.
17       Q.   Who came in town with you when you
18   showed up at the house the first time?
19       A.   Keith.
20       Q.   Okay.  How long after the storm was
21   that?
22       A.   Oh, about two months.
23       Q.   Okay.  When you drove up, what is
24   the first thing you noticed on the house?
25       A.   Leaning.

Page 80

1        Q.   Okay.  That was the pillars that you
2    talked about earlier?
3        A.   Yeah.
4        Q.   Were you -- was it safe to walk in
5    and everything?
6        A.   Well, you could get on the porch,
7    but you couldn't open the doors.  You had to
8    force your way in.
9        Q.   Okay.  So, you had trouble opening
10   the front door?
11       A.   Yeah.
12       Q.   Did you -- did you notice a
13   waterline on the property?
14       A.   Oh, I had about a good six feet.
15       Q.   Okay.  It was six feet up on the --
16   on the wood?
17       A.   Yes.
18       Q.   Okay.  Because your house is raised?
19       A.   Yeah.
20       Q.   How high is it?
21       A.   Oh, it was, like, a normal house.
22   Like, about this high.
23       Q.   Okay.  So, about two or three feet?
24       A.   Yeah.
25       Q.   Okay.  And how many steps did you

Page 81

1    have to walk up to go onto the porch?
2        A.   Four.
3        Q.   Four steps.  And, so, the waterline
4    would have been six feet, though, above the three
5    feet off the ground; is that right?
6        A.   Right.
7        Q.   Okay.  Where did you see that
8    waterline?
9        A.   At my house.
10       Q.   Okay.  On the wood or did you have
11   to --
12       A.   On the Sheetrock.
13       Q.   Okay.  So, you had to go inside to
14   see the waterline --
15       A.   Uh-huh.
16       Q.   -- is that right?
17       A.   Yes.
18       Q.   Okay.  Did you notice any other
19   damage on the outside of the house other than it
20   had shifted?
21       A.   No, nothing other than it being
22   shift.
23       Q.   Okay.  Did you see the roof?
24       A.   Yeah, I seen the roof.
25       Q.   Uh-huh.

21 (Pages 78 to 81)

(504)525-1753      HUFFMAN & ROBINSON, INC.      (800)749-1753
ONE SHELL SQUARE,#250 CERTIFIED COURT REPORTERS NEW ORLEANS, LA 70139

Page 82

1    A.    It wasn't leaking.
2    Q.    Okay.  Did you notice if it was
3    missing any shingles or anything?
4    A.    Oh, plenty of those.
5    Q.    So, it was missing shingles?
6    A.    Uh-huh.
7    Q.    Is that a "Yes"?  I'm sorry.
8    A.    Yes.
9    Q.    Okay.  And that would have been
10   caused by the wind from Katrina, right?
11   A.    Yes.
12   Q.    But you didn't notice any leaks from
13   the missing shingles; is that right?
14   A.    No.  No, I didn't see any leaks.
15   Q.    Okay.  Any other damage you remember
16   on the outside of the house?
17   A.    All the awnings had came off some of
18   the windows.
19   Q.    Okay.  Were the awnings above the
20   watermark?
21   A.    Some of them.
22   Q.    Okay.  So, the awnings would have
23   been blown off by the wind?
24   A.    Right.
25   Q.    Okay.  The awnings are, like,

Page 83

1    metal --
2    A.    Aluminum.
3    Q.    Aluminum.  And all of them had been
4    blown off?
5    A.    Just about all of them.
6    Q.    Okay.  Any other damage on the
7    outside of the house that you recall?
8    A.    No.
9    Q.    Okay.  Let's go to when you get in.
10   Y'all had to forced front door open, right?
11   A.    Uh-huh.
12   Q.    Is that a "Yes"?  I'm sorry.
13   A.    Yes.  I'm sorry.
14   Q.    You walk in and the first room you
15   hit is the living room, right?
16   A.    Everything is topsy-turvy.
17   Q.    Okay.  And when you say everything
18   is topsy-turvy, you mean all the contents are
19   moved all around?
20   A.    Right.
21   Q.    Okay.  You saw -- at that point, you
22   saw that waterline six feet up the Sheetrock?
23   A.    (Nods head affirmatively.)  Clothes
24   dirty, bed done shifted, refrigerator turned
25   upside down.

Page 84

1    Q.    Okay.  I want to stay in the living
2    room first, though --
3    A.    Oh, okay.
4    Q.    -- if you don't mind.  We'll go room
5    by room.  You told me you had a sofa -- no -- a
6    love seat, huh?
7    A.    Sofa, love seat, recliner, big-
8    screen TV, a cabinet for the TV, a coffee table,
9    two end tables.
10   Q.    Anything else in the living room?
11   A.    Two lamps with crystal chandeliers
12   and a chandelier in the ceiling.
13   Q.    How was the chandelier in the
14   ceiling?
15   A.    Coming down.
16   Q.    It was hanging down a little bit?
17   A.    Yeah.  Uh-huh.
18   Q.    It hadn't dropped though?
19   A.    No.  But it had turned -- some of
20   the crystals where the water was was brown.
21   Q.    So, some of the chandelier touched
22   the water?
23   A.    Yeah.
24   Q.    Okay.  Did the chandelier hang,
25   like, on a cord --

Page 85

1    A.    Yes.
2    Q.    -- down from the ceiling?
3    A.    Yes.
4    Q.    So, it would have been -- it would
5    have gone below six feet then?
6    A.    Yes.
7    Q.    Okay.  When you say it was hanging,
8    was the ceiling kind of bowing down, or what
9    was -- what did the ceiling look like?
10   A.    Yes.
11   Q.    Did it -- did it look -- did the
12   ceiling look discolored?
13   A.    Yeah.  It was yellow.  Yellow and
14   brownish looking.
15   Q.    Kind of like where water had gotten?
16   A.    Right.
17   Q.    Was anything salvageable in the
18   living room?
19   A.    Well, I tried to save my lamps.  We
20   took those and put them in storage.
21   Q.    Okay.  Anything else?
22   A.    No.
23   Q.    Okay.  The chandelier wasn't
24   savable?
25   A.    (Shakes head negatively.)

22 (Pages 82 to 85)

Page 86

```
1        Q.   Is that a "Yes" or a "No"?
2        A.   It was destroyed.
3        Q.   Okay.  Then -- oh, wait.  Have we
4   covered all the contents of the living room?
5        A.   Yes.
6        Q.   Okay.  Then, we walk into the
7   kitchen, right?  Well, I guess you got the dining
8   room next.
9        A.   Uh-huh.
10       Q.   What's in the dining room?
11       A.   Table, chairs, buffet.
12       Q.   Anything else in the dining room?
13       A.   No.
14       Q.   Okay.  Ceiling looked kind of the
15   same, yellowish?
16       A.   Ceiling fan.
17       THE VIDEOGRAPHER:
18            Excuse me, Counsel.  I have
19   to go off the record to change
20   tapes.
21       MR. KIRSCH:
22            Okay.  You want to take a
23   five-minute break?
24       MR. PALMINTIER:
25            Sure.
```

Page 87

```
1        THE VIDEOGRAPHER:
2             We're going off the record.
3   Conclusion of Tape 1.  It's 10:49.
4             (Whereupon, a discussion was
5   held off the record.)
6        THE VIDEOGRAPHER:
7             Returning to the record.
8   It's 10:58.  Start of Tape 2.
9   EXAMINATION BY MR. KIRSCH:
10       Q.   We were just talking about the
11   dining room, and the last thing you had told me
12   about was the ceiling fan --
13       A.   Uh-huh.
14       Q.   -- in the dining room?  The ceiling
15   looked the same.  It was brownish, kind of bowing
16   in?
17       A.   Yeah, and you could see, you know,
18   where spots was.
19       Q.   Okay.
20       A.   And the blades on the fan had done
21   collapsed.
22       Q.   Okay.  They were kind of hanging
23   down?
24       A.   Yeah, just hanging.
25       Q.   Drooping?
```

Page 88

```
1        A.   Uh-huh.
2        Q.   Did -- you told me you had table,
3   chairs, a buffet and a ceiling fan in the dining
4   room.  Anything else?
5        A.   No.
6        Q.   How many chairs did you have?
7        A.   Eight.
8        Q.   And I'm assuming none of that was
9   salvageable?
10       A.   No.
11       Q.   The next rooms are the bedrooms; is
12   that right?
13       A.   Yeah.
14       Q.   You had one bedroom for yourself?
15       A.   And one for Keith.
16       Q.   And one for Keith.  What -- let's
17   talk about the bedroom that you had your stuff in
18   first.  What was in there?
19       A.   I had another big cabinet with a
20   television, 32-inch TV.  I had a king-size
21   bedroom set, two end tables, a nightstand and a
22   triple dresser, a big walk-in closet, ceiling fan
23   and a shredder.
24       Q.   Did the ceiling look the same?
25       A.   No.  It wasn't nothing wrong with
```

Page 89

```
1   that part of the ceiling.
2        Q.   Okay.  So, that ceiling and that
3   ceiling fan were all intact?
4        A.   The ceiling fan was droop, but the
5   ceiling wasn't.
6        Q.   The ceiling was white?
7        A.   Uh-huh.
8        Q.   Okay.  You just said "Uh-Huh."
9        A.   Yes.
10       Q.   Thank you.
11       A.   I'm sorry.
12       Q.   No.
13       MR. PALMINTIER:
14            That's okay.
15   EXAMINATION BY MR. KIRSCH:
16       Q.   That's all right.  And I don't mean
17   to be difficult.  I'm just trying to make sure
18   the record is clear.
19       A.   Right.  I understand.
20       Q.   You said you had a walk-in closet,
21   right?
22       A.   Uh-huh.
23       Q.   You had only clothes in the walk-in
24   closet, or what's in the walk-in closet?
25       A.   I had clothes, I had two cartons of
```

23 (Pages 86 to 89)

Page 90

1   shoes, I had a vacuum cleaner, I had Christmas
2   ornaments, I had presents that you and everybody
3   else had gave me, I had put way in the top.
4       Q.   Okay.  The stuff -- so, you had,
5   like, a pole running around where you hung your
6   clothes, right?
7       A.   Uh-huh.
8       Q.   Is that a "Yes"?
9       A.   Yes.
10      Q.   Thank you.
11          Did you have a kind of a shelf up at
12  the top that you could put stuff on above the
13  pole?
14      A.   Yes.  Yes.
15      Q.   How high was that shelf?
16      A.   Oh, I had a ten-foot ceiling.  So,
17  the shelves were very high.
18      Q.   Okay.  So, they would have been
19  above the waterline?
20      A.   Oh, yeah.  We salvaged that.
21      Q.   All of that stuff up at the top was
22  okay?
23      A.   Yes.
24      Q.   Okay.  Did the ceilings in the
25  closet look like the ceiling in the bedroom or

Page 91

1   like the living room?
2       A.   No.  Like the bedroom.
3       Q.   Okay.  So, they looked pretty clean.
4       A.   Uh-huh.
5       Q.   So, everything on top the shelves
6   was okay?
7       A.   Right.
8       Q.   Okay.  And what was on the shelves?
9       A.   Different things, like I said,
10  presents that my kids had gave me over the years,
11  other people, you know, my family, you know,
12  whatever, but everything at the bottom was
13  destroyed.
14      Q.   Okay.  And the bottom would have
15  been from the pole down?
16      A.   Yes.
17      Q.   Okay.  Did you have two levels of
18  clothes, or just one pole that you hung up?
19      A.   I had one pole, and the rest was
20  just, you know, stuff you put on the floor, in
21  boxes --
22      Q.   Okay.
23      A.   -- or cartons.
24      Q.   So, were all the clothes ruined?
25      A.   Oh, yes.

Page 92

1       Q.   Okay.  What was on the floors other
2   than the vacuums and the ornaments and the shoes?
3       A.   I had the shredder, and that's it.
4       Q.   Did -- did you ever make a list of
5   what you lost for your insurance company?
6       A.   Yeah.  I gave that to Mr. Bruno.
7       Q.   Okay.  So, Mr. Bruno has your list,
8   also?
9       A.   Yes.
10      Q.   Okay.  Did you give that to the
11  Allstate adjuster, also?
12      A.   No.
13      Q.   Okay.  Did you ever make a list that
14  you gave to your insurance company?
15      A.   Yes.
16      Q.   Okay.  Was that a list of all your
17  personal property, the things that are in your
18  house?
19      A.   Right.  Right.
20      Q.   Okay.  Did you put a value on the
21  things?
22      A.   Yeah, like a curio and all that, I
23  did.
24      Q.   Okay.  So, you would have put, you
25  know, curio, you know -- and I'm just making up

Page 93

1   numbers.
2       A.   Eighteen hundred dollars.
3       Q.   Eighteen hundred dollars.
4       A.   (Nods head affirmatively.)
5       Q.   So, you would have done that on your
6   list that you gave to Allstate?
7       A.   Yes.
8       Q.   And then you would have also done
9   that on the list you gave to Mr. Bruno?
10      A.   Right.
11      Q.   Okay.  Do you have any other type of
12  lists listing what you lost at home?
13      A.   No.
14      Q.   Okay.  Were the lists you gave to
15  Allstate and to Mr. Bruno identical or were they
16  different?
17      A.   Yes.  Yeah, they were the same.
18      Q.   Okay.  What adjuster did you give
19  that list of personal property that you lost, the
20  flood or the homeowner's, or both?
21      A.   Both.
22      Q.   Okay.  We've pretty much covered
23  everything that you lost in the -- in your
24  bedroom?
25      A.   Right.

24  (Pages 90 to 93)

Page 94

1    Q.   Okay.  Did you have any belongings
2  in Keith's bedroom yourself?
3    A.   Yeah, in his closet.
4    Q.   Okay.  Is that it, just the closet?
5    A.   Yeah.
6    Q.   Okay.  What did you have in the
7  closet?
8    A.   I had comforters, blankets, spreads,
9  plus his clothes.  He had three suits he had just
10 bought, never worn.
11   Q.   All right.  But those were Keith's.
12   A.   Uh-huh.
13   Q.   I'm here to talk about your damages.
14   A.   Oh, that's all I had in his room.
15   Q.   Okay.  So, the stuff you lost in the
16 closet in Keith's room would have been
17 essentially linens?
18   A.   Yeah, and alcohol.
19   Q.   How much did you have in there?
20   A.   Oh, I had two gallons of Jack
21 Daniel's, peppermint schnapps, JB, Chevas --
22 Chevas Regal.  I said JB Scotch and Chevas, Jack
23 Daniel's.  Oh, and some wine.
24   Q.   How many wine bottles, estimate?
25   A.   About 20.

Page 95

1    Q.   How many comforters did you have in
2  Keith's closet?
3    A.   Oh, I had about six.
4    Q.   Okay.  What about blankets?
5    A.   I had about ten.
6    Q.   And you said you also had some
7  bedspreads?
8    A.   Yes.
9    Q.   How many -- how many of those?
10   A.   I had -- let's see.  Two for his
11 bed, two for mine, two -- I had eight all
12 together.
13   Q.   Did you use those?
14   A.   Yeah.
15   Q.   Okay.
16   A.   I'd change them up every week.
17   Q.   All right.  So, we've covered all
18 the personal property that you lost in Keith's
19 bedroom and closet, right?
20   A.   Right.
21   Q.   Okay.  The only other room we
22 haven't covered is the kitchen, right?
23   A.   Keith bedroom.
24   Q.   Didn't we just talk about Keith's
25 bedroom?

Page 96

1    A.   No.  We talked about what I had in
2  Keith's closet.
3    Q.   Okay.  What did you have in Keith's
4  bedroom?
5    A.   A bedroom set.
6    Q.   Okay.  That was yours?
7    A.   I had bought it, yeah.
8    Q.   Okay.
9    A.   Nightstand, television, 32-inch,
10 computer, encyclopedias, his college books, his
11 graduation diploma, my daughter's graduation
12 diploma from high school and college.
13   Q.   The college books were Keith's,
14 right, not yours?
15   A.   Him and my daughter's.
16   Q.   Okay.  And the diplomas were Keith's
17 and your daughter's, right, not yours?
18   A.   Right.  No.
19   Q.   Okay.  Who did the encyclopedias
20 belong to?
21   A.   My children.
22   Q.   Okay.  Who did the computer belong
23 to?
24   A.   Keith.
25   Q.   Okay.  The TV, who did that belong

Page 97

1  to?
2    A.   Me.
3    Q.   The nightstand, that belonged to
4  you?
5    A.   Everything in the house, I bought,
6  except the computer.
7    Q.   Okay.  But the things that were
8  yours, because I'm here to talk about your claim,
9  were the bedroom set, the nightstand and the TV,
10 right?
11   A.   Everything in the house was mine.
12   Q.   Okay.
13   A.   When Keith got out the service -- he
14 stood in the service, I think, 12 years.  When he
15 came back to New Orleans, what he came here with
16 was his car and a computer.
17   Q.   Okay.  So, the computer wasn't
18 yours, right?
19   A.   Right.
20   Q.   And the diplomas weren't yours --
21   A.   No.
22   Q.   -- is that right?
23   A.   Right.
24   Q.   Okay.  And the college books weren't
25 yours?

(504)525-1753        HUFFMAN & ROBINSON, INC.        (800)749-1753
ONE SHELL SQUARE,#250 CERTIFIED COURT REPORTERS NEW ORLEANS, LA 70139

1     A.   No.  Some of them was.
2     Q.   Okay.  How many college books
3  belonged to you?
4     A.   About four.
5     Q.   Okay.  And -- well, let's ask it
6  this way:  Anything else that belonged to you
7  that was lost in there?
8     A.   A lot of photo albums.
9     Q.   Okay.  Where were the photos --
10  albums?
11     A.   Oh, we must have had about 20 of
12  them.
13     Q.   Where were they stored?
14     A.   They were stored on a shelf in
15  Keith's room.
16     Q.   In the closet?
17     A.   No.  In his room, on a shelf.
18     Q.   Just a shelf hanging on the wall,
19  kind of like a mantel?
20     A.   Yeah.
21     Q.   About how high was the mantel?
22     A.   About like this, like that.
23     Q.   About like that.  So, about four or
24  five feet high?
25     A.   Right.

1     Q.   Okay.  So, it would have been below
2  the waterline?
3     A.   Oh, it passed the waterline.
4     Q.   Right.  The waterline went above the
5  mantel?
6     A.   Right.
7     Q.   Okay.  Anything else that you can
8  think of that you lost in the -- in Keith's room
9  or closet?
10     A.   No.
11     Q.   Okay.
12     A.   Oh, and I had a desk.
13     Q.   And that's a desk you bought?
14     A.   Yeah.
15     Q.   Okay.  The only other room we
16  haven't covered is the kitchen; is that right?
17     A.   Right.
18     Q.   Okay.  What did you notice about the
19  kitchen?
20     A.   Well, the refrigerator, it turned
21  upside down.  I had a upright freezer, washer,
22  dryer, stove, countertop, microwave, dishes,
23  pots, spoons and knives, forks, groceries.
24     Q.   The kitchen layout, did you have,
25  like, cabinets that were on the ground and then

1  cabinets up in the air?
2     A.   Right.
3     Q.   Is that right?
4     A.   Uh-huh.  Right.
5     Q.   How high were the cabinets up in the
6  air?
7     A.   From the ceiling down.
8     Q.   Down to about where?
9     A.   To my arm length.
10     Q.   Okay.  So, when you saw the
11  waterline, did they get to the cabinets that were
12  from the ceiling down?
13     A.   Oh, no.  Uh-uh.  They didn't get to
14  the cabinets.
15     Q.   Okay.  So, everything --
16     A.   The onliest thing they got to was
17  the countertop.
18     Q.   Okay.  Everything in the top
19  cabinets in the kitchen was salvageable?
20     A.   Right.
21     Q.   Okay.  What was in the top cabinets?
22     A.   Dishes.
23     Q.   Okay.  Any -- any type of flatware
24  or --
25     A.   No.

1     Q.   -- cooking appliances?
2     A.   No.
3     Q.   Okay.  So, strictly dishes?
4     A.   Right.
5     Q.   So, all your dishes, you were able
6  to save?
7     A.   Salvage, yeah.
8     Q.   Okay.  You had all your flatware,
9  your spoons, forks and everything in the bottom
10  cabinets?
11     A.   No.  They were in the drawers.
12     Q.   Okay.  And that would have been part
13  of the bottom cabinets, right?
14     A.   Right.
15     Q.   What else were in the bottom
16  cabinets?
17     A.   Dishtowels, pots, pans, baking pans,
18  Corningware, knives, hammers and nails, you know,
19  like, you have a drawer you put every little
20  thing in.
21     Q.   Right.
22     A.   Well, I had a hammer in there, one
23  of those little, small hacksaws.
24     Q.   Okay.  Did you have a pantry in the
25  kitchen?

| Page 102 | Page 104 |
|---|---|

**Page 102**

1    A.   Yes.
2    Q.   Okay.  What was in the pantry?
3    A.   Food.
4    Q.   Okay.  Anything else but food in the
5  pantry?
6    A.   And a few pots.
7    Q.   Okay.  The pantry had shelves in it?
8    A.   Uh-huh.
9    Q.   Were there some shelves that were
10  out of the water, that were high enough that the
11  water didn't get to it?
12    A.   Right.
13    Q.   Okay.  What was on those shelves?
14    A.   Food.  Canned food.
15    Q.   Where were the pots and the pans?
16    A.   At the bottom.
17    Q.   Okay.  I'm assuming you didn't save
18  anything from the pantry?
19    A.   Oh, no, indeed.  We couldn't eat
20  none of that stuff.
21    Q.   Okay.  But the pots and pans and
22  everything were ruined, too?
23    A.   Oh, yes, indeed.
24    Q.   Okay.  Did you have anything else in
25  the kitchen that I'm missing?

**Page 103**

1    A.   The stove.
2    Q.   You told me in the beginning you had
3  a fridge, a washer, a dryer, a stove.
4    A.   Okay.
5    Q.   Anything else in the kitchen?
6    A.   What's that go over the kitchen --
7    Q.   The range?
8    A.   Yeah.  The range top.
9    Q.   Like, the fan that you turn on?
10    A.   Yeah.  Uh-huh.
11    Q.   Okay.  Did the water get to the
12  range?
13    A.   No.
14    Q.   No.  Okay.  When -- have you gutted
15  the house?
16    A.   Oh, yeah.
17    Q.   Okay.  You pulled all that out now?
18    A.   It's torn down completely.
19    Q.   Okay.  So, the whole house is torn
20  down?
21    A.   Right.
22    Q.   Okay.  It's now just a -- well,
23  there's nothing there?
24    A.   A empty lot.
25    Q.   An empty lot?

**Page 104**

1    A.   And a trailer we living in.
2    Q.   Okay.  Were there any signs of
3  vandalism?
4    A.   At my house?
5    Q.   Yes.
6    A.   No.
7    Q.   What about on the block?
8    A.   No.
9    Q.   Okay.  Were all the windows intact,
10  or did you have some of them that were broken
11  out?
12    A.   Some of them was broken out.
13    Q.   Okay.  Could you tell what caused
14  the windows to break?
15    A.   I guess the water and, you know,
16  wind and damage, you know.
17    Q.   But you're guessing.  You don't know
18  whether something flew into it or --
19    A.   No.
20    Q.   -- whether the water caused it? --
21    A.   No.
22  MR. PALMINTIER:
23       Don't guess.
24  EXAMINATION BY MR. KIRSCH:
25    Q.   -- is that right?

**Page 105**

1    A.   No.
2    Q.   Is that right?
3    A.   I don't know what happened.
4    Q.   Right.  Okay.  Thank you.
5       Did you -- did you notice if your
6  neighbors had roof damage, too?
7    A.   No.  I didn't pay no attention to
8  theirs.
9    Q.   Okay.  Did you look at any of the
10  neighbors' properties?
11    A.   No.
12    Q.   Okay.  Did you go look at the
13  property that Keith owns?
14    A.   Oh, yeah.
15    Q.   Okay.  Is it the same type of
16  structure?
17    A.   Yes.
18    Q.   Okay.  Did it have roof damage?
19    A.   No.
20    Q.   No roof damage?
21    A.   (Shakes head negatively.)
22    Q.   Did it --
23    A.   Some of the shingle -- them red
24  shingles had came off.
25    Q.   Okay.  So, it had some shingles

(504)525-1753       HUFFMAN & ROBINSON, INC.       (800)749-1753
ONE SHELL SQUARE,#250 CERTIFIED COURT REPORTERS NEW ORLEANS, LA 70139

Page 106

1  missing?
2      A.  Uh-huh.
3      Q.  Okay.  Had it been moved off its
4  piers?
5      A.  No.
6      Q.  Okay.  So, it was sitting all right?
7      A.  Uh-huh.
8      Q.  Has that one been torn down?
9      A.  No.
10     Q.  Okay.  You just gutted that one?
11     A.  Right.
12     Q.  Did that one have similar issues
13  with the ceiling like you had in your living
14  room?
15     A.  No.
16     Q.  Okay.  Did you have any trees on
17  your property?
18     A.  No.
19     Q.  Have you gotten any type of
20  estimates to replace your home?
21     A.  Yeah.  Two hundred thirty thousand,
22  260,000.
23     Q.  Who did you get those from?
24     A.  Different individuals.
25     Q.  Do you remember who those

Page 107

1  individuals were?
2      A.  Golden Hammer Construction and Josh
3  somebody.
4      Q.  You said Josh?
5      A.  Uh-huh.
6      THE WITNESS:
7          That man live over the
8      river, Keith, what's that man
9      stay --
10  EXAMINATION BY MR. KIRSCH:
11     Q.  You can't ask your son.
12     A.  Oh, I'm sorry.
13     Q.  If you don't remember, it's okay,
14  you can tell me you don't remember.
15     A.  Well, I don't remember.
16     Q.  Okay.  If it comes to you, just let
17  me know later on.
18     A.  Okay.
19     Q.  Other than the property listing, the
20  personal property listing that you gave to your
21  adjuster, did you make any other type of
22  documentary evidence or anything that would show
23  what you lost?
24     A.  No.
25     Q.  Okay.  Did you take photographs of

Page 108

1  what it looked like on the inside?
2      A.  When we could get in there, we took
3  some.
4      Q.  And it was still with all the stuff
5  inside the house, right?
6      A.  Right.
7      Q.  Okay.  Do you have any photographs
8  of the -- of the Clouet property pre-Katrina?
9      A.  I don't know.
10     Q.  You haven't seen any, though?
11     A.  I might have.  The pictures I had, I
12  gave to Mr. Bruno.
13     Q.  Okay.  So, he may have some
14  pre-Katrina; you're just not sure?
15     A.  Uh-huh.  Right.
16     Q.  When the -- when the homeowner
17  adjuster came out, other than him telling you he
18  wasn't going to cover the pillars, did he tell
19  you anything else?
20     A.  He said he could only offer me 1,100
21  and something dollars.
22     Q.  Were there any other houses in your
23  neighborhood that had gotten shifted off the
24  pillars like yours?
25     A.  I don't know.

Page 109

1      Q.  But you told me that the homeowner's
2  end didn't pay you anything; is that right?
3      A.  Right.
4      Q.  Did you agree with them?
5      A.  No.
6      Q.  Okay.  Why -- why didn't you agree
7  with them?
8      A.  Because I was insured.  I paid my
9  insurance policy, and I expected them to give me
10  what I had paid for.
11     Q.  Right.  And you felt that the wind
12  had moved the house off the pillars?
13     A.  Right.
14     Q.  I know you told me you had -- you
15  were waiting on Road Home money, right?
16     A.  Right.
17     Q.  And you told me that you had gotten
18  Red Cross, $182, right?
19     A.  Right.
20     Q.  FEMA gave you $2,300.
21     A.  Right.
22     Q.  And you got food stamps of 105 a
23  month.
24     A.  Yes.
25     Q.  I also have you -- something written

28 (Pages 106 to 109)

Page 110

1   down where you got $200.  Did you get that
2   initially or --
3          A.   I got that from one church we went
4   to and they gave me $100 worth of clothes and
5   $100 Wal-Mart card.
6          Q.   Okay.  So, that wasn't food stamps.
7   That was actually --
8          A.   That was $200.
9          Q.   Okay.  That actually came from a
10  church?
11         A.   Yes.
12         Q.   Okay.  Do you remember the name of
13  the church?
14         A.   Oh, no.  That was in Jackson,
15  Mississippi.
16         Q.   Okay.  Did you get any other type of
17  assistance from any of the governmental or, you
18  know, Red Cross-type organizations?
19         A.   No.
20         Q.   Okay.  And have you applied for any
21  other type of assistance other than The Road
22  Home?
23         A.   No.  I haven't applied for anything
24  but Road Home.
25         Q.   What did you have to do to apply for

Page 111

1   Road Home?
2          A.   Well, I went on Poydras Street and
3   applied.
4          Q.   Okay.  Did you keep copies of those
5   documents that you had to fill out?
6          A.   Yes.  Uh-huh.
7          Q.   Have you given them to your lawyer
8   yet?
9          A.   No.
10         Q.   Okay.  Can you get a copy of that to
11  your lawyer for us?
12         A.   Yes.
13         Q.   Thank you.
14              And have you gotten any response
15  back from Road Home?
16         A.   No.
17         Q.   Okay.  So, the only thing -- the
18  only documents you would have from Road Home
19  would be the application that you filled out --
20         A.   Right.
21         Q.   -- is that right?
22         A.   Right.
23         Q.   Who -- who tore the structure down
24  on Clouet Street?
25         A.   Aaron Joseph.

Page 112

1          Q.   Does he work for a company?
2          A.   He had his own little company after
3   the flood.
4          Q.   Okay.  So, he was kind of doing
5   business as himself?
6          A.   Uh-huh.
7          Q.   Where does Aaron live?
8          A.   He live about two blocks from me, on
9   Prieur Street.
10         Q.   Purvis?
11         A.   Prieur.
12         Q.   Can you spell that for me?
13         A.   P-R-I-E-R-E.
14         Q.   Is that his business address, too,
15  the Prieur Street?
16         A.   Well, that's his mother's address.
17         Q.   Okay.  How did you -- how did you
18  contact him to come do -- to come take your
19  house?
20         A.   I seen him when we drove up.  And he
21  say, Miss Bette, he say, anything -- you want me
22  to gut your house, I'll gut it out.  Give me
23  $400.  I'll gut it out now.  I said, no, indeed.
24  I say, the house is off the pillars.  I say, I
25  would really need somebody to tear it down, but

Page 113

1   we start taking pictures and stuff, and after we
2   took pictures and we went back to Mississippi and
3   came back here, and I saw him again, and I asked
4   him would he tear it down, and he tore it down
5   for $3,000.
6          Q.   Did you see any of it being torn
7   down or anything?
8          A.   Yes.
9          Q.   You were out there when they did it?
10         A.   No, but when I came from
11  Mississippi, I saw it.
12         Q.   Okay.  Was it gone when you came
13  back?
14         A.   Yeah.
15         Q.   Okay.  So, you didn't actually see
16  the process occur?
17         A.   No.
18         Q.   Do you know if there are any
19  photographs of that?
20         A.   No.
21         Q.   There are none --
22         A.   (Shakes head negatively.)
23         Q.   -- is that right?
24         A.   No.
25         Q.   That's not right?

29 (Pages 110 to 113)

Page 114

```
1        A.   They don't have no photographs of
2   it.
3        Q.   Thank you.
4             Do you know if any engineers or
5   anything went out to look at the property before
6   it was torn down?
7        A.   I don't know anything about that.
8        Q.   Okay.  And the only person that you
9   met from the insurer was an adjuster?
10       A.   Yes.
11       Q.   Okay.  He didn't have anybody with
12  him that was an engineer that would have done any
13  type of --
14       A.   Anybody -- every -- every time I saw
15  a adjuster, they was by themselves, and they was
16  a man all the time.
17       Q.   Okay.  How many adjusters did you
18  see?
19       A.   Three.
20       Q.   Okay.  So, you had the -- the flood
21  guy?
22       A.   Uh-huh.
23       Q.   You had the home --
24       A.   I didn't have no problem with him.
25       Q.   Right.
```

Page 115

```
1        A.   But --
2        Q.   You had a homeowner guy come out?
3        A.   Right.  I had a problem with him.
4        Q.   Okay.  You said there were three,
5   though.  Who was the third guy?
6        A.   Another homeowner, because, see, the
7   first one offered me, I think it was $600, and --
8   you don't want to know what I told him.  I told
9   him so many ugly things.  Then, they send another
10  man out, and he offered me -- I think it was
11  1,100.
12       Q.   But nobody -- but you never received
13  either six or 1,100?
14       A.   I didn't receive one penny.
15       Q.   Okay.  Do you have any idea what the
16  lot's worth?  Your lot.
17       A.   My lot is worth?  No.
18       Q.   Okay.  Do you have any diagrams or
19  building plans of the home?
20       A.   Yes.
21       Q.   Have you given those to your lawyer?
22       A.   No.  I gave it to the contractor.
23       Q.   Okay.  You gave it to the contractor
24  to give you an estimate?
25       A.   Yes.
```

Page 116

```
1        Q.   Okay.  Do you still have a copy of
2   the plans for yourself?
3        A.   Yes, at home.
4        Q.   Could you get those to your lawyer,
5   also for me?
6        A.   Yes.
7        Q.   Thank you.  You've -- you've -- you
8   pay property taxes on your house, huh, every
9   year?
10       A.   Yes.  Uh-huh.
11       Q.   And is it -- you get a homestead
12  exemption on it?
13       A.   Yes.
14       Q.   Okay.  Has your property ever had
15  any termites?
16       A.   No.
17       Q.   Did you have a termite contract?
18       A.   No.
19       Q.   What about any plumbing issues?  Had
20  it ever had any plumbing leaks or anything like
21  that?
22       A.   No.  Keith used to do all the
23  termite spraying.
24       Q.   Okay.  Had you ever had any fire
25  damage to that house?
```

Page 117

```
1        A.   No.
2        Q.   Any mold problems with the house?
3        A.   No.
4        Q.   Did you ever have trees on the lot?
5        A.   No.
6        Q.   You said you put in a heating system
7   about eight years ago, right?
8        A.   Yes.
9        Q.   What about the air-conditioning
10  system?
11       A.   Well, they had window units.
12       Q.   Okay.  How many window units did you
13  have?
14       A.   Three.
15       Q.   Had you ever had any roof leaks?
16       A.   No.
17       Q.   And how old was the roof?  I may
18  have asked you that.
19       A.   How old is the roof I live in?
20       Q.   The roof before Katrina, how old was
21  it?
22       A.   About ten years old.
23       Q.   Do you remember whether it was a
24  15-year roof or a 30-year roof?
25       A.   It was a 30-year roof.
```

30 (Pages 114 to 117)

(504)525-1753        HUFFMAN & ROBINSON, INC.        (800)749-1753
ONE SHELL SQUARE,#250 CERTIFIED COURT REPORTERS NEW ORLEANS, LA 70139

Page 118

1   Q.   Had you ever -- did you apply for
2   any type of SBA loan?
3   A.   No.
4   Q.   Did you ever receive any types of
5   gifts or donations?
6   A.   No.
7   MR. PALMINTIER:
8        Other than that -- what
9   she's already stated?
10  MR. KIRSCH:
11       Other than what we've
12  already talked about.
13  EXAMINATION BY MR. KIRSCH:
14  Q.   Have you been contacted by anyone
15  doing any type of research or investigation of
16  the storm?  You know, a media outlet or somebody
17  writing a book?
18  A.   No.
19  Q.   What about the newspaper?
20  A.   No.
21  Q.   Okay.  You understand, I represent
22  the Orleans Levee District, and there are other
23  governmental entities in here, like, the Corps,
24  the East Jefferson Levee District.  Have you ever
25  spoken with any of those governmental entities?

Page 119

1   A.   No.
2   Q.   Okay.  So, you haven't talked to any
3   of their employees?
4   A.   No.
5   Q.   Do you know why you were chosen as a
6   class representative?
7   A.   Well, I guess, because the people in
8   our community really need somebody to speak up
9   for us so we can get our stuff together and see
10  why these levees, you know, breached.
11  Q.   And your understanding of the
12  litigation is -- is what?  What is it trying to
13  do?
14  A.   What I'm trying to do?
15  Q.   The litigation, the lawsuit.
16  A.   Well, the lawsuit is to help get the
17  levees together and get New Orleans back into
18  good condition.
19  Q.   Did you participate in any way in
20  drafting the complaint that you have at your
21  house?
22  A.   No.
23  Q.   Okay.  Have you ever read it?
24  A.   I've read it, yeah.
25  Q.   Okay.  Have you ever discussed what

Page 120

1   was in it with anyone other than your lawyers?
2   A.   No.
3   Q.   Have you ever read any of the
4   answers filed by the defendants in the lawsuit?
5   A.   No.
6   Q.   Do you know why the Port of New
7   Orleans was sued?
8   A.   No.
9   Q.   Do you know why the Sewerage and
10  Water Board was sued?
11  A.   No.
12  Q.   Do you know why the levee district
13  was sued, the Orleans Levee District?
14  A.   No.
15  Q.   Do you know why the East Jefferson
16  Levee District was sued?
17  A.   No.
18  Q.   Okay.  Do you know why the Corps was
19  sued?
20  A.   Because of the levee breach.
21  Q.   Do you know why any of the
22  engineers, architects or contractors have been
23  sued?
24  A.   Because of the levee breach.
25  Q.   Do you know who's in -- who are the

Page 121

1   people that are going to make up the proposed
2   class?
3   A.   No, not really.
4   Q.   What's your understanding of your
5   duty and responsibility as a class rep?
6   A.   Well, to go in my community and let
7   the people know what's going on and see if we
8   could get these levees together right.
9   Q.   Do you know what subclass you've
10  been proposed as a class rep for?
11  A.   I don't understand the question.
12  Q.   Okay.  You understand you're being
13  put up as a class representative.
14  A.   Uh-huh.
15  Q.   Yes?  Is that a "Yes"?
16  A.   Yes.
17  Q.   Thank you.
18       Do you know what group you're going
19  to be representing as a class rep?
20  A.   Four.
21  Q.   Okay.  And what is your
22  understanding of the boundaries of Class 4, if
23  you know?
24  A.   Well, to try to help the community
25  so the levees, like, the London Avenue Canal,

31 (Pages 118 to 121)

Page 122

1   Industrial Canal, so those levees will not breach
2   again.
3       Q.   Okay.  And what I'm trying to find
4   out is something a little simpler than that.  Do
5   you know the geographic boundaries --
6       A.   No.
7       Q.   -- for your subclass?
8       A.   No.
9       Q.   Okay.  It seemed to me you've -- do
10  you know where your -- where the water came from
11  that would have flooded your house?
12      A.   No.
13      Q.   Do you know the other
14  representatives of Subclass 4?
15      A.   No.
16      Q.   Okay.  Have you ever talked with the
17  other class representatives?
18      A.   No.
19      Q.   Okay.  Are you aware that some homes
20  had sustained significant wind damage?
21      A.   I heard that.
22      Q.   Okay.  Have you ever seen them?
23      A.   No.
24      Q.   Okay.  You're not -- you're not here
25  to represent any public corporations, are you?

Page 123

1       A.   No.
2       Q.   Or private corporations?
3       A.   No.
4       Q.   You're not here to represent people
5   who rent places?
6       A.   No.
7       Q.   You're not here to represent people
8   who may have had somebody die as a result of
9   Hurricane Katrina?
10      A.   No.
11      Q.   Okay.  You're not here to represent
12  anyone who's had some type of business
13  interruption loss?
14      A.   No.
15      Q.   Okay.  And you're not here to
16  represent any individual who was renting at the
17  time of Katrina; is that right?
18      A.   No.
19      Q.   Is that right?
20      A.   Right.
21      Q.   Thank you.
22           We had talked about you'd filled out
23  a Form 95.
24      MR. KIRSCH:
25           Can we take a five-minute

Page 124

1   break just so we can get this
2   straightened out?
3       MR. PALMINTIER:
4           Sure.
5       THE VIDEOGRAPHER:
6           Going off the record.  It's
7   11:39.
8           (Whereupon, a discussion was
9   held off the record.)
10      THE VIDEOGRAPHER:
11          We're now returning to
12  record.  It's 11:49.
13  EXAMINATION BY MR. KIRSCH:
14      Q.   Miss Jones, when we broke, I got a
15  copy, first of all, of your driver's license,
16  which I've attached as Exhibit Number 2.  Can you
17  confirm that that's a copy of your driver's
18  license?
19      A.   Yes.
20      Q.   Okay.  And I also got a copy of your
21  Humana healthcare card as well as you Medicare --
22  it's actually Health Network for Louisiana
23  Medicaid and your Medicare health insurance card.
24      A.   Right.
25      Q.   Are those accurate copies that we'll

Page 125

1   attach as Exhibit 3?
2           (Whereupon, Jones Exhibit
3           Number 3 was marked for
4           identification.)
5       A.   Yes.
6   EXAMINATION BY MR. KIRSCH:
7       Q.   Okay.  When you said Humana earlier,
8   was that Health Network for Louisiana?
9       A.   Yes.
10      Q.   Okay.  So, that's what you were
11  referring to as Humana?
12      A.   Right.
13      Q.   Okay.  And we're about to talk --
14  what I'm going to hand you is a copy of your Form
15  95, or at least I think is your Form 95, along
16  with the letter from the Corps.  Could you look
17  at Exhibit 4 and tell me if that's the letter and
18  Form 95?
19          (Whereupon, Jones Exhibit
20          Number 4 was marked for
21          identification.)
22      A.   Yes.
23  EXAMINATION BY MR. KIRSCH:
24      Q.   Okay.  You recall receiving that
25  letter from the Army Corps, the first page of it?

Page 126

1    A.  Yeah.  Right.
2    Q.  Okay.  And then the second page of
3  Exhibit 4, the beginning of the Form 95, is that
4  your signature, Betty J. Jones?
5    A.  Right.
6    Q.  Okay.  You told -- I think I heard
7  you say you spell Bette B-E-T-T-E earlier?
8    A.  Uh-huh.
9    Q.  Is there a reason you signed it
10  B-E-T-T-Y?
11    A.  No.  I sign a lot of times Betty,
12  B-E-T-T-Y.
13    Q.  Okay.  So, you go by both Betty with
14  a Y and Bette with an E?
15    A.  And an E, uh-huh.
16    Q.  But your legal name would have an E
17  at the end?
18    A.  Right.
19    Q.  Okay.  And according to the Form 95,
20  if we're looking on the page that has the
21  handwritten notes, it's the second page of
22  Exhibit 4, is all the handwritten stuff your
23  handwriting?
24    A.  Yes.
25    Q.  Okay.  There's some typewritten

Page 127

1  language in there.  Did you put any of the
2  typewritten language in there?
3    A.  No.
4    Q.  Okay.  That was already there when
5  you got that form?
6    A.  Right.
7    Q.  Okay.  Now, you understood, if you
8  look at the bottom of Page 2, see where it says
9  "Civil Penalty For Presenting a Fraudulent
10  Claim"?
11    A.  Right.
12    Q.  You understood that this information
13  had to be accurate, right?
14    A.  Right.
15    Q.  And you reviewed it carefully, all
16  the information in this document?
17    A.  Right.
18    Q.  Okay.
19    A.  What I thought was accurate, anyway.
20    Q.  Right.  And the claim you were
21  making was for 2111 Clouet Street; is that right?
22    A.  Yes.
23    Q.  You see, under Section 8a, right
24  under where that address is written --
25    A.  Yes.

Page 128

1    Q.  -- the second sentence says:
2      The breaches and failure of
3  the hurricane protection levees
4  and walls were a result of Corps
5  of Engineers' negligence in the
6  design and construction of these
7  issues (sic) and walls and the
8  Mississippi River Gulf Outlet.
9      You see that sentence?
10    A.  Yes.
11    Q.  That was already on the form?
12    A.  Yes.
13    Q.  But you would have reviewed all that
14  before you signed it, correct?
15    A.  Right.
16    Q.  The -- if you go down to the next
17  section, Number 9, it says Betty J. Jones, you
18  see that handwritten?
19    A.  Right.
20    Q.  Right under that, it says:  Briefly
21  describe the property, nature and extent of
22  damage and the location. --
23    A.  Uh-huh.
24    Q.  -- where the property may be
25  expected (sic).  You see that section?

Page 129

1    A.  Yes.
2    Q.  Okay.  The language in there:
3      "Destruction of real and
4  personal property resulting from
5  water damage; loss of opportunity
6  to purchase a sufficient flood
7  insurance, to modify the property,
8  or to relocate as a result of
9  fraud and/or concealment by the
10  U.S. Army Corps of Engineers.
11      You see that typewritten in there?
12    A.  Yes.
13    Q.  Did you -- was that preprinted, too?
14    A.  Yes.
15    Q.  Okay.  You had flood insurance,
16  right?
17    A.  Right.
18    Q.  Now, you didn't -- am I correct in
19  understanding you didn't lose an opportunity to
20  purchase flood insurance?
21    A.  No.  I had flood insurance.
22    Q.  Okay.  And you had an opportunity to
23  get whatever flood insurance you needed, correct?
24    A.  Right.
25    Q.  Was there anything that prevented

33 (Pages 126 to 129)

Page 130

1  you from modifying the property that's at issue
2  on Clouet Street?
3       A.   It was in deplorable conditions.  I
4  had to have it torn down.
5       Q.   Right.  No.  I meant before.
6       A.   Oh, no.  It was in pretty nice shape
7  before the hurricane.
8       Q.   Okay.  Okay.  Okay.  And then under
9  the "Personal Injury/Wrongful Death" section, you
10  see Number 10?
11       A.   Uh-huh.
12       Q.   You say:  "I had to tear my house
13  down."
14       A.   Right.
15       Q.   That has nothing to do with the
16  personal injury claim, right?  That's your
17  property damage claim.
18       A.   Right.
19       Q.   Okay.  There is, if you look down
20  there, some preprinted -- "personal injury and
21  mental distress."
22       A.   Uh-huh.
23       Q.   You see that?
24       A.   Yes.
25       Q.   Okay.  Is -- is that referring to

Page 131

1  the stress we talked about earlier?
2       A.   Yes.  That's why I put the $167,000
3  down.
4       Q.   Okay.  And the $167,000 you're
5  referring to is in Section 12b, right?
6       A.   Right.
7       Q.   And that's under "Personal Injury"?
8       A.   Yeah.  And then I -- after -- I
9  didn't realize what I had did, and I called Mr.
10  Bruno and asked him could I come get another
11  copy, and I filled that one out.
12       Q.   Okay.
13       A.   And when I filled it out, I filled
14  it out --
15       MR. PALMINTIER:
16            Just answer the question.
17  EXAMINATION BY MR. KIRSCH:
18       Q.   Is this -- is this the first one
19  that you filled out?
20       A.   I think so.
21       Q.   Okay.  Did you fill -- did you
22  submit any other Form 95s to the Army Corps?
23       A.   Yeah.
24       Q.   Okay.  Do you have copies of those?
25       A.   Yes.

Page 132

1       Q.   Okay.  What would you have done with
2  the Form 95s?  Would you have sent them straight
3  to the Army Corps?
4       A.   Yes.
5       Q.   Okay.  And you remember sending two
6  different Form 95s to the Army Corps of
7  Engineers?
8       A.   Yes.  Yes.
9       MR. KIRSCH:
10            Do y'all have a copy of the
11       other one?
12       MR. PALMINTIER:
13            Yes.
14       MR. KIRSCH:
15            Can I see it?
16       MR. PALMINTIER:
17            Sure.
18       MR. KIRSCH:
19            Thank you.  Is there any way
20       we can make a copy of this and
21       attach it?
22       MR. PALMINTIER:
23            Uh-huh.
24  EXAMINATION BY MR. KIRSCH:
25       Q.   If we're down in Section 12 again,

Page 133

1  you put 12d, the total of your damages is "My
2  House."  You were really seeking damages for the
3  loss of your house, right?
4       A.   Right.
5       Q.   Okay.
6       A.   And for myself, too.
7       Q.   Okay.  Flip to the last page for me.
8  I just want to make sure I'm reading your
9  handwriting.
10       A.   Uh-huh.
11       Q.   You see the second set of
12  handwriting, it looks like:  "My insurance
13  company don't want to pay my" --
14       A.   -- "insurance at all."
15       Q.   At all.
16       A.   "Allstate Insurance Company."
17       Q.   Okay.  So, it says -- so, the
18  section beginning with:  "My insurance
19  company..." says:  "My insurance company don't
20  want to pay my insurance at all."
21       A.   Right.
22       Q.   Okay.  And then you identified
23  Allstate as your carrier?
24       A.   Right.
25       Q.   Okay.  Do you have copies of your

Page 134

1   insurance policies or premium notices or
2   anything?
3       A.   Yeah.
4       Q.   You have all that?
5       A.   Yes.
6       Q.   Have you given that to your
7   attorneys?
8       A.   Yes.
9       Q.   Okay.  So, we should be able to get
10  that information from them?
11      A.   Right.
12      Q.   Okay.  And we're going to attach as
13  Exhibit 6 -- can I put a sticker on it?
14      MS. DECKER:
15          5.
16  EXAMINATION BY MR. KIRSCH:
17      Q.   Oh, I'm sorry, Exhibit 5 -- the
18  second Form 95 you filled out, and I'm going to
19  attach it to you -- the letter from the Army
20  Corps' dated October 19th of 2006; is that right?
21      (Whereupon, Jones Exhibit
22      Number 5 was marked for
23      identification.)
24      A.   Uh-huh.
25  EXAMINATION BY MR. KIRSCH:

Page 135

1       Q.   You remember receiving that letter?
2       A.   Yes.
3       Q.   Okay.  And if you flip to the next
4   page, that's the form that you filled out?
5       A.   Right.
6       Q.   Okay.  Now, if I remember correctly,
7   and since we only have one copy, I'm going to
8   have to lean over a little, this time, the
9   preprinted language remained the same, right?
10      A.   Uh-huh.
11      Q.   And that's in Section 8 and Section
12  9, right?
13      A.   Right.
14      Q.   Okay.  And then you wrote in -- you
15  changed the number to 150,000, right?
16      A.   Uh-huh.
17      Q.   Is that a "Yes"?
18      A.   Yes.
19      Q.   Thank you.
20          And then on the Section 12a, you put
21  property damage of 150,000, correct?
22      A.   Right.  Right.
23      Q.   Under "Personal Injury," you put
24  "None," right?
25      A.   Right.

Page 136

1       Q.   And "Wrongful Death," "None,"
2   correct?
3       A.   Right.
4       Q.   Okay.  And, so, your total damages,
5   according to this form, would have been 150,000?
6       A.   Right.
7       Q.   Okay.  Let's see.  When we flip to the
8   page, it looks like you listed Allstate Insurance
9   as your company, right?
10      A.   Uh-huh.  Yes.
11      Q.   Says:  "Allstate paid me only 3,000
12  and took my deductible out."
13          Did you get paid $3,000, or what
14  happened there?
15      A.   They offered Mr. Bruno 3,000, and he
16  refused it.  So, what's going on now, I don't
17  know.
18      Q.   Okay.  But you never actually got a
19  check from Allstate?
20      A.   I haven't gotten anything from
21  Allstate other than the flood.
22      Q.   Okay.
23      A.   Now, I do have the flood money.
24      Q.   Right.  You got 90,000?
25      A.   Right.

Page 137

1       Q.   Okay.  Okay.  So, where it says they
2   only paid me 3,000, it actually should be --
3   should say they only offered me 3,000?
4       A.   Right.
5       Q.   Okay.  You never got an actual check
6   from Allstate?
7       A.   No.  I haven't gotten anything other
8   than the flood.
9       Q.   Okay.  Just to make sure, on Page 2,
10  where it says Betty J. Jones, you signed that?
11      A.   Yes.
12      Q.   Okay.  And that's your signature?
13      A.   Yes, that's my handwriting.
14      Q.   Okay.  And just like the other one,
15  you reviewed all the information in this to make
16  sure it was correct?
17      A.   Yes.
18      MR. KIRSCH:
19          Let's take a five-minute
20      break.  I may not have anything
21      left.
22      MR. PALMINTIER:
23          Okay.
24      THE VIDEOGRAPHER:
25          Going off the record.  It's

35 (Pages 134 to 137)

Page 138

```
1       12:01.
2           (Whereupon, a discussion was
3   held off the record.)
4       THE VIDEOGRAPHER:
5           Returning to record.  It's
6   12:07.
7   EXAMINATION BY MR. KIRSCH:
8       Q.   Miss Jones, something we didn't go
9   over when we went through your house.  I think
10  you told me that you had a shed or a -- and a
11  garage?
12      A.   Yeah.
13      Q.   We didn't -- we didn't talk about
14  what was in those and what was damaged or not
15  damaged.
16      A.   Well, they had three of my
17  grandchildren's bicycles.  Three bicycles.  They
18  had some material in that corner with stuff.
19  They had paint, ladders, barbecue grill, chafing
20  dishes and other miscellaneous stuff.
21      Q.   Okay.  Now, was that in the garage
22  or the shed?
23      A.   The garage.
24      Q.   Okay.  Is the garage attached to the
25  home or is it a separate structure?
```

Page 139

```
1       A.   No.  It's a separate structure.
2       Q.   Okay.  What type of structure was
3   it?  Was it on a slab?
4       A.   Yeah.
5       Q.   Okay.  Was it built with studs in
6   the ground?
7       A.   Yes.
8       Q.   Two-by-fours and everything?
9       A.   Uh-huh.
10      Q.   It was wood on the outside?
11      A.   No, tin on the outside.
12      Q.   A tin roof?
13      A.   Uh-huh.  Yes.
14      Q.   Did it have any roofing damage or
15  was there any damage to the tin?
16      A.   Yeah.  They had two or three of them
17  had blown off.
18      Q.   Is that two or three of the sections
19  on the roof?
20      A.   Yes, and somebody had -- well, not
21  somebody, but I guess the hurricane had blown a
22  freezer in the yard -- in the driveway part.
23      Q.   A freezer was in the garage, too?
24      A.   No.  It was in the driveway.  I
25  don't know who the freezer was for, but it was
```

Page 140

```
1   blown in my yard.
2       Q.   So, there was somebody else's
3   freezer in your yard --
4       A.   Yeah.
5       Q.   -- is that right?
6       A.   Right.
7       Q.   Okay.  So, we covered -- that's what
8   you called the garage, right?
9       A.   Right.
10      Q.   Anything else in the garage?
11      A.   No.
12      Q.   Okay.  Other than the two or three
13  sections of the tin that got ripped off of the
14  roof, any other damage to the tin?
15      A.   No.
16      Q.   Okay.  Where is the shed that you
17  were talking about, or is that the same thing?
18      A.   That's the same thing.
19      Q.   Okay.  So, you had one garage/shed?
20      A.   Uh-huh.
21      Q.   Any other structures that I'm
22  missing at your home that we haven't discussed
23  already?
24      A.   No.  No.
25      Q.   Okay.  Is there anything you want to
```

Page 141

```
1   add that you can think of that we haven't
2   discussed as to how you were damaged?
3       A.   No.
4       Q.   Okay.  And I'm assuming you haven't
5   thought of anything you want to clarify, any
6   answers or anything?
7       A.   No.
8       Q.   Okay.
9       MR. KIRSCH:
10          We just need to do the
11      authorizations, and we can do
12      those off the record, if that's
13      okay with you.
14      MR. PALMINTIER:
15          That's definitely okay with
16      me, and I have no questions.
17      MR. KIRSCH:
18          Thank you very much.  Y'all
19      don't have anything, huh?
20      MS. BOYER:
21          No.  No.
22      THE VIDEOGRAPHER:
23          This concludes this
24      deposition.  It is 12:11.
25
```

36 (Pages 138 to 141)

(504)525-1753        HUFFMAN & ROBINSON, INC.        (800)749-1753
ONE SHELL SQUARE,#250 CERTIFIED COURT REPORTERS NEW ORLEANS, LA 70139

Page 142

```
 1        WITNESS' CERTIFICATE
 2
 3
 4
 5        I, BETTE J. JONES, read or have had
 6   the foregoing testimony read to me and hereby
 7   certify that it is a true and correct
 8   transcription of my testimony, with the exception
 9   of any attached corrections or changes.
10
11
12
13
14
15        (Witness' Signature)
16
17
18
19
20
21
22
23
24
25
```

Page 143

```
 1        REPORTER'S CERTIFICATE
 2
 3
 4        I, CAROL VALLETTE SLATER, Certified
 5   Court Reporter, Registered Professional Reporter,
 6   in and for the State of Louisiana, as the officer
 7   before whom this testimony was taken, do hereby
 8   certify that BETTE J. JONES, after having been
 9   duly sworn by me upon authority of R.S. 37:2554,
10   did testify as hereinbefore set forth in the
11   foregoing pages; that this testimony was reported
12   by me in the stenotype reporting method, was
13   prepared and transcribed by me or under my
14   personal direction and supervision, and is a true
15   and correct transcript to the best of my ability
16   and understanding; that I am not related to
17   counsel or the parties herein, nor am I otherwise
18   interested in the outcome of this matter.
19
20
21        CAROL VALLETTE SLATER (CCR 78020)
            CERTIFIED COURT REPORTER
22          REGISTERED PROFESSIONAL REPORTER
23
24
25
```

(504)525-1753        HUFFMAN & ROBINSON, INC.        (800)749-1753
ONE SHELL SQUARE,#250 CERTIFIED COURT REPORTERS NEW ORLEANS, LA 70139

GLADYS LaBEAUD (LEVEE)                                    7/16/2007

Page 1

```
              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF LOUISIANA


IN RE:  KATRINA CANAL      CIVIL ACTION
BREACHES CONSOLIDATED
LITIGATION                 NO. 05-4182 "K" (2)

                           JUDGE DUVAL
PERTAINS TO:  LEVEE
                           MAG. WILKINSON

FILED IN:

05-4181, 05-4182, 05-4191,
05-4568, 05-5237, 05-6073,
05-6314, 05-6324, 05-6327,
05-6359, 06-0020, 06-1885,
06-0225, 06-0886, 06-11208,
06-2278, 06-2287, 06-2346,
06-2545, 06-3529, 06-4065,
06-4389, 06-4634, 06-4931,
06-5032, 06-5042, 06-5159,
06-5163, 06-5367, 06-5471,
06-5771, 06-5786, 06-5937,
06-7682, 07-0206, 07-0647,
07-0993, 07-1284, 07-1286,
07-1288, 07-1289
```

        Deposition of GLADYS R. LaBEAUD,
500 S. Jefferson Davis Parkway, Apt. 1, New
Orleans, Louisiana 70119, taken in the
offices of Bruno & Bruno, 855 Baronne St.,
Second Floor, New Orleans, Louisiana on
Monday, the 16th day of July, 2007 at 9:16
a.m.

GLADYS LaBEAUD (LEVEE)                                          7/16/2007

---

Page 2

```
 1
 2
 3    APPEARANCES (continued):
 4
 5
         BRUNO & BRUNO
 6       (By: L. Scott Joanen, Esquire)
         855 Baronne St.
 7       New Orleans, Louisiana 70113
         (504) 525-1335
 8          Attorneys for Plaintiffs
 9
10
11
         LABORDE & NEUNER
12       (By: James L. Pate, Esquire)
         One Petroleum Center, Suite 200
13       1001 West Pinhook Road
         Lafayette, Louisiana  70503
14       (337) 237-7000
            Attorneys for Defendant,
15          Orleans Levee District
16
17
18    DUPLASS, ZWAIN, BOURGEOIS, MORTON,
      PFISTER & WEINSTOCK
19       (By: Joseph E. Bearden, III, Esquire)
         3838 N. Causeway Blvd., Suite 2900
20       Metairie, Louisiana  70002
         (504) 832-3700
21          Attorneys for Defendant,
            Board of Commissioners for the
22          East Jefferson Levee District
23
24
25
```

Page 3

```
 1
      APPEARANCES (continued):
 2
 3
         CHRISTOVICH & KEARNEY
 4       (By: J. Warren Gardner, Jr., Esquire)
         Pan American Life Center
 5       601 Poydras St.
         New Orleans, Louisiana 70130-6078
 6       (504) 593-4272
            Attorneys for Defendant,
 7          Sewerage and Water Board of New
            Orleans
 8
 9
10
11
12
      ALSO PRESENT:
13
14       Ken Hart, CLVS
         Hart Video of Louisiana, L.L.C.
15       (866) 649-4278
16
17
18
      REPORTED BY:
19
         MARGARET MCKENZIE, CCR, RPR, CMR, CRR
20       Certified Court Reporter
21
22
23
24
25
```

---

Page 4

```
 1                    I N D E X
 2
 3
 4    EXAMINATION BY:
 5
 6    MR. GARDNER..............................6
 7
 8
 9
10
11    EXHIBITS:
12
13    Exhibit 1................................8
14
15    Exhibit 2................................9
16
17    Exhibit 3...............................14
18
19    Exhibit 4...............................79
20
21
22
23
24
25
```

Page 5

```
 1               S T I P U L A T I O N
 2        It is stipulated and agreed by and
 3    between counsel for the parties hereto that
 4    the deposition of the aforementioned witness
 5    is hereby being taken under the Federal Rules
 6    of Civil Procedure, for all purposes, in
 7    accordance with law;
 8        That the formalities of reading and
 9    signing are specifically not waived;
10        That the formalities of sealing,
11    certification and filing are specifically
12    waived;
13        That all objections, save those as to
14    the form of the question and the
15    responsiveness of the answer, are hereby
16    reserved until such time as this deposition,
17    or any part thereof, may be used or sought to
18    be used in evidence.
19
20              *  *  *  *  *
21
22        MARGARET MCKENZIE, Certified Court
23    Reporter, in and for the Parish of Orleans,
24    State of Louisiana, officiated in
25    administering the oath to the witness.
```

---

2 (Pages 2 to 5)

JOHNS PENDLETON COURT REPORTERS                          800 562-1285

GLADYS LaBEAUD (LEVEE)                                    7/16/2007

---

Page 6

```
1        VIDEOGRAPHER:
2        This is the videotape deposition of
3    Gladys R. LaBeaud.  This deposition
4    is being taken in the matter of In
5    Re:  Katrina Canal Breaches
6    Consolidated Litigation being taken
7    for the United States District for
8    the Eastern District of Louisiana.
9    We're at the Law Offices of Bruno
10   located at 855 Baronne Street,
11   Second Floor, in New Orleans,
12   Louisiana.  Today's date is July
13   16, 2007.  My name is Ken Hart.
14   I'm a certified legal video
15   specialist with Hart Video of
16   Louisiana.  The court reporter is
17   Margaret McKenzie.
18       Margaret, would you, please, swear
19   in the witness.
20       GLADYS R. LaBEAUD,
21   500 S. Jefferson Davis Parkway, Apt. 1, New
22   Orleans, Louisiana 70119, after having been
23   first duly sworn by the above-mentioned court
24   reporter, did testify as follows:
25   EXAMINATION BY MR. GARDNER:
```

Page 7

```
1        Q.  Miss LaBeaud, I'm Warren Gardner,
2    and I represent one of the defendants in the
3    lawsuit that you filed.  We're here today,
4    Miss LaBeaud, to take your deposition.  Have
5    you ever had your deposition taken before?
6        A.  No.
7        Q.  Okay.  Well, your deposition is my
8    opportunity and the opportunity for the other
9    attorneys in this room to ask you some
10   questions about the claims that you've made
11   in this lawsuit as an individual and as a
12   potential class representative and other
13   matters related to that.  If you don't
14   understand any of my questions, Miss LaBeaud,
15   just ask me to rephrase them and I'll do so.
16   Otherwise, I'll assume that when you've
17   answered the question you've understood it.
18   Is that clear?
19       A.  Yes.
20       Q.  Okay.  And I would also ask, Miss
21   LaBeaud, that in response to my questions and
22   to all of the questions, that you give us a
23   verbal response.  If the answer, for
24   instance, is yes, that you say yes rather
25   than just nod your head.
```

Page 8

```
1        A.  Yes.
2        Q.  Okay?  Miss LaBeaud, in connection
3    with your deposition a Notice of Deposition
4    was filed in this matter, which has an
5    exhibit attached to it requesting the
6    production of certain documents.  I'm going
7    to go through this with you and ask you if
8    you have brought any documents today with you
9    that are responsive to each of these 23
10   categories of documents.  Number 1 -- and
11   we're going to go ahead and attach the Notice
12   of Deposition to the deposition as Exhibit 1.
13       MR. JOANEN:
14       Before we go any further, let me be
15       sure, you have number one right
16       there which is the -- oh, I'm
17       sorry.  Okay.
18       MR. GARDNER:
19       Number 1 is going to be Notice of
20       Deposition.
21       MR. JOANEN:
22       Okay.
23       MR. GARDNER:
24       Okay.
25   EXAMINATION BY MR. GARDNER:
```

Page 9

```
1        Q.  And No. 1 attached to Exhibit A
2    requests a copy of each Standard Form 95
3    submitted to the Army Corps of Engineers as
4    well as any drafts thereof by the deponent,
5    which in this case is you, Miss LaBeaud, from
6    August of 2005 to the present.  Your attorney
7    has presented me with a copy of a Form 95 and
8    I'm going to show it to you and ask you if
9    you have any other documents that are
10   responsive to No. 1 other than that document
11   (indicating).
12       A.  No, I don't have -- I don't have
13   today any of --
14       Q.  Anything else other than this?
15       A.  Yeah.
16       Q.  Okay.  You don't have any drafts or
17   other drafts of this document?
18       A.  No.
19       Q.  Okay.  We're going to go ahead and
20   label the Form 95 as Exhibit 2.
21       MR. PATE:
22       How many pages is that, Warren?
23       MR. GARDNER:
24       That is one -- it is four pages.
25       Okay.  One thing, though, we forgot
```

3 (Pages 6 to 9)

GLADYS LaBEAUD (LEVEE)                                    7/16/2007

Page 10

1       to mention before we begin is this
2       deposition is we've agreed it is
3       being taken pursuant to Federal
4       Rule 3O CMO 4 and the court's order
5       of July 3, 2007.
6       MR. JOANEN:
7       Correct.  That's what I thought
8       Exhibit 1 was.  And we also, the
9       Plaintiffs' Liaison Committee is
10      proceeding with the reservation of
11      rights of that same order.
12      MR. GARDNER:
13      Right.  And is Miss LaBeaud going
14      to read and sign her deposition?
15      MR. JOANEN:
16      Yes.
17   EXAMINATION BY MR. GARDNER:
18      Q.  Okay.  Going back to Exhibit A,
19   Miss LaBeaud, number 2 refers to all
20   administrative claims relating to Hurricane
21   Katrina that the deponent has submitted to
22   any governmental body or agency, including,
23   but not limited to, claim forms submitted to
24   the Louisiana Recovery Authority.
25      A.  No.

Page 11

1       Q.  None?
2       A.  (Witness shakes head.)
3       Q.  Number 3 is all documents that
4    refer or relate to insurance claims that the
5    deponent has filed to recover for damages or
6    injuries, personal or property, sustained
7    between August 28, 2005 and September 25,
8    2005.
9       A.  No.
10      Q.  You made no insurance claims?
11      A.  Oh, yes, I've made insurance
12   claims, yes.
13      Q.  Okay.  Have you been -- have you
14   received any money from any insurance
15   carriers?
16      A.  Yes.
17      Q.  Okay.  Do you have any documents
18   relative to the claims that you've made?
19      A.  I have them, but I don't have it
20   with me.
21      Q.  Okay.  Those are at your home?
22      A.  Yes.
23      Q.  Okay.  Number 4 requests all
24   documents in the possession, custody or
25   control of the deponent or his or her

Page 12

1    attorneys that refer to any eyewitness
2    accounts of Hurricane Katrina.
3       A.  No.
4       Q.  Okay.  And when you say no, do you
5    mean you don't have those at all or you don't
6    have them here?
7       A.  I don't have them.
8       Q.  Okay.  You mean you don't have them
9    at all?
10      A.  No.
11      Q.  Okay.  Number 5 is all documents in
12   the possession, custody or control of the
13   deponent or his or her attorneys that relate
14   to matters alleged in the Levee Master
15   Consolidated Class Action Complaint or any
16   damages or injuries allegedly sustained by
17   the deponent as a result of Hurricane
18   Katrina.
19      A.  I don't have any documents, no.
20      Q.  Okay.  Number 6 is all statements,
21   transcriptions of recorded statements, tape
22   recordings, notes, diagrams and/or
23   descriptions that refer or relate to the
24   matters alleged in the Levee Master
25   Consolidated Class Action Complaint or any

Page 13

1    damages or injuries allegedly sustained by
2    the deponent as a result of Hurricane
3    Katrina.
4       A.  No.
5       Q.  Okay.  You don't have any?
6       A.  (Witness shakes head.)
7       Q.  All duplicates of all photographs,
8    digital video discs and/or videotapes that
9    refer or relate to the matters alleged in the
10   Levee Master Consolidated Class Action
11   Complaint or any damages or injuries
12   allegedly sustained by the deponent as a
13   result of Hurricane Katrina.  Now, Mr. Joanen
14   has made us some copies of some photographs.
15      A.  Yes.
16      Q.  Are those -- do you recognize those
17   photographs (indicating)?
18      Miss LaBeaud, did you take those
19   photographs?
20      A.  No.  My son did.
21      Q.  Okay.
22      A.  Yeah, these are them.
23      Q.  All righty.  And you said your son
24   took these photographs?
25      A.  Yes.

4 (Pages 10 to 13)

GLADYS LaBEAUD (LEVEE)                                         7/16/2007

| Page 14 |
|---|

1    Q.  Which son is that?
2    A.  Darryl LaBeaud.
3    Q.  Darryl.  We're going to go ahead
4    and label these for right now in globo as
5    Exhibit 3.  And Exhibit 3 is 22 pages of
6    photocopied photographs.  Miss LaBeaud, are
7    those the only photographs that you've seen
8    that show pictures of your home?
9    A.  Yes.
10   Q.  Okay.  And those pictures were
11   taken after Hurricane Katrina?
12   A.  Yes.
13   Q.  Do you have any that were taken
14   before Hurricane Katrina?
15   A.  I don't have any, no.  I may
16   have --
17   Q.  Okay.  Number 8 on Exhibit A is all
18   documents that refer or relate to any claim
19   that the deponent, which is you, Miss
20   LaBeaud, is asserting for any damage alleged
21   in the Levee Master Consolidated Complaint,
22   including, but not limited to, damages from
23   chemical or other contamination to her
24   property, land, home, commercial buildings or
25   improvements.

| Page 15 |
|---|

1    A.  No.
2    Q.  You don't have any documents?
3    A.  (Witness shakes head.)
4    Q.  Number 9 is all documents that
5    refer or relate to any claim that the
6    deponent is asserting for lost earnings,
7    future lost earnings, lost business
8    opportunities, lost future business income,
9    business interruption, lost rental income
10   and/or lost future rental income?
11   A.  No.
12   Q.  You don't have any documents?
13   Number 10 is all documents that evidence,
14   reflect, support or contradict the deponent's
15   claim for economic and compensatory injury,
16   compensatory damages in the Levee Master
17   Consolidated Class Action Complaint.
18   A.  No.
19   Q.  Okay.  Number 11 is all
20   mathematical or formulaic calculations or
21   other models that refer or relate to
22   determining the causes of the injury to the
23   deponent.
24   A.  No.
25   Q.  Number 12 is all mathematical or

| Page 16 |
|---|

1    formulaic calculations or other models that
2    refer or relate to the calculation of damages
3    for the deponent.
4    A.  No.
5    Q.  Number 13 is all documents that
6    refer or relate to the deponent's evacuation,
7    relocation and, if applicable, eventual
8    return to New Orleans, including, but not
9    limited to, records of expenses.
10   A.  No.
11   Q.  Okay.  Did you evacuate?
12   A.  Yes.
13   Q.  Okay.  Did you incur any expenses
14   in the evacuation?
15   A.  Yes.
16   Q.  Do you have any records of those
17   expenses?
18   A.  Some, yes.
19   Q.  And are those at your home?
20   A.  Yes.
21   Q.  Okay.  You have them, you just
22   don't have them with you today, this morning?
23   A.  Yes.
24   Q.  Number 14 requests all statements,
25   transcriptions of recorded statements, tape

| Page 17 |
|---|

1    recordings, notes, diagrams and/or
2    descriptions of events by the deponent
3    relative to the issues that are the subject
4    of this litigation.
5    A.  No.
6    Q.  Okay.  Number 15 are all dogs,
7    journals, diaries or other writings by the
8    deponent that refer or relate to Hurricane
9    Katrina or the matters at issue in this
10   litigation.
11   A.  No.
12   Q.  You don't keep a journal or a
13   diary?
14   A.  (Witness shakes head.)
15   Q.  No?
16   A.  No.
17   Q.  All of deponent's medical records
18   from August of 2000 to the present.
19   A.  No.
20   Q.  Do you have those at your house?
21   A.  Some.
22   Q.  Number 17 requests all documents
23   evidencing the application for or receipt of
24   any benefit, payment, insurance proceeds,
25   settlement, loan disbursement or other fund

JOHNS PENDLETON COURT REPORTERS                          800 562-1285

GLADYS LaBEAUD (LEVEE)                                    7/16/2007

Page 18

1  paid to the deponent and/or on his or her
2  behalf related to Hurricane Katrina or its
3  aftermath.
4      A.  Yes.
5      Q.  Do you have those at home?
6      A.  Yes.
7      Q.  And what documents would those be?
8      A.  Insurance proceeds.
9      Q.  Okay.  Have you received any money
10 from FEMA?
11     A.  Yes.  And --
12     Q.  And do you have any records of
13 that?
14     A.  Yes.
15     Q.  Yes, ma'am?
16     A.  Uh-huh.
17     Q.  All demonstrative evidence or
18 exhibits that the deponent or his or her
19 attorneys may refer to at the class
20 certification hearing and all documents that
21 refer or relate to such demonstrative
22 evidence or exhibits.
23     A.  No.
24     Q.  All computer models that the
25 deponent or his or her attorneys may refer to

Page 19

1  at the class certification hearing or in
2  support of class certification and all
3  documents that refer or relate to such
4  computer models.
5      A.  No.
6      Q.  Number 20 asks for a copy of the
7  complaint or petition in any prior litigation
8  in which the deponent has been a party.
9      A.  No.
10     Q.  Have you ever been involved in
11 another lawsuit?
12     A.  No.
13     Q.  This is the first lawsuit you've
14 ever been involved in?
15     A.  Yes.
16     Q.  Okay.  You've never been a
17 plaintiff in a lawsuit?
18     A.  No.
19     Q.  Okay.  Number 21 requests a copy of
20 any lease agreement entered into between the
21 deponent and any proposed class member.
22     A.  No.
23     Q.  Number 21 refers to all documents
24 that relate to eviction proceeding instituted
25 by or against the deponent after Hurricane

Page 20

1  Katrina.
2      A.  Eviction proceedings.  No.
3      Q.  You weren't evicted from your
4  residence and you didn't have to evict
5  anybody?
6      A.  Wait a minute now.  I'm not sure I
7  understand the question very well.  Well, if
8  you -- I had to leave, but if you call that
9  eviction --
10     Q.  No.  I mean an eviction would be a
11 legal proceeding where --
12     A.  No, no, no.  No.
13     Q.  All right.  Number 23 asks for all
14 documents in the deponent's possession
15 indicating that the deponent will protect the
16 interests of the proposed class.
17     A.  No.
18     Q.  Okay.  Miss LaBeaud, would you give
19 me your full name, please.
20     A.  Gladys R. LaBeaud.
21     Q.  R?
22     A.  Yes.
23     Q.  And what does the stand for?
24     A.  My maiden name.  R-O-W-A-N.  Rowan.
25     Q.  And Miss LaBeaud, what is your date

Page 21

1  of birth?
2      A.  December 29, 1930.
3      Q.  Were you born in New Orleans?
4      A.  No.
5      Q.  Where were you born?
6      A.  Natchez, Mississippi.
7      Q.  Okay.  And how long have you lived
8  in New Orleans?
9      A.  Approximately since '51.
10     Q.  Okay.  Are you on any medication
11 this morning?
12     A.  Yes.
13     Q.  And what kind of medication is
14 that?
15     A.  Ultracet.
16     Q.  Ultracet?
17     A.  Yes.
18     Q.  And what does that medication
19 address?
20     A.  Arthritis pain.
21     Q.  Does that medication in any way
22 affect your ability to give a deposition
23 today and answer questions?
24     A.  No.
25     Q.  Miss LaBeaud, what did you do in

6 (Pages 18 to 21)

GLADYS LaBEAUD (LEVEE)                                    7/16/2007

Page 22

1  preparation for this deposition?
2      A.  Well, talked with my lawyer, just
3  advised me whatever questions were asked me
4  just tell the truth.  That's it.
5      Q.  Well, other than -- well, how long
6  did you meet with your lawyer?
7      A.  A few minutes this morning.
8      Q.  Okay.  Did you review any
9  documents?
10     A.  No.
11     Q.  Had you met with your lawyer before
12 this morning?
13     A.  Yes.
14     Q.  And how long ago was that and for
15 how long did you meet with him?
16     A.  I think June 6.  I'm not sure about
17 the date, but maybe about 15, 20 minutes,
18 something like that.
19     Q.  Was that here, was that in this
20 office?
21     A.  In the building.  In the building.
22     Q.  And you didn't review any documents
23 in preparation for your deposition?
24     A.  No.
25     Q.  Okay.  Are you married?

Page 23

1      A.  Widow.
2      Q.  And how long have you been a widow?
3      A.  Since '79.
4      Q.  What was your late husband's name?
5      A.  Alton John LaBeaud.
6      Q.  Do you have any children?
7      A.  Yes.
8      Q.  And how many children do you have?
9      A.  Three.
10     Q.  And what are their names and ages?
11     A.  Darryl Keith.
12     Q.  Approximate ages.
13     A.  Forty-eight.
14     Q.  Darryl is forty-eight?
15     A.  Yes.  Pierre Francois.  He will be
16 45.  Faith Monique, 33.
17     Q.  Where do you presently reside?
18     A.  500 South Jefferson Davis Parkway,
19 Apartment 1.
20     Q.  And how long have you lived there?
21     A.  June 23, '07.
22     Q.  Of this year?
23     A.  Yes.
24     Q.  And where were you living before
25 that?

Page 24

1      A.  Richmond, Texas.
2      Q.  In Richmond, Texas?
3      A.  Yes.
4      Q.  And where were you living in
5  Richmond, Texas?
6      A.  Wait a minute.  What was the
7  address.  The riverside -- wait a minute.
8  River Park West.  It was 221, apartment 221
9  River Park West in Richmond, Texas.
10     Q.  Okay.
11     A.  77469.
12     Q.  Okay.  Are you presently living
13 alone?
14     A.  No.
15     Q.  Who do you live with?
16     A.  My daughter Faith and her daughter
17 Jasmine.
18     Q.  Where were you living at the time
19 of Hurricane Katrina?
20     A.  1708 Industry Street, New Orleans.
21     Q.  Okay.  And prior to Hurricane
22 Katrina how long had you lived at 1708
23 Industry Street?
24     A.  Since April of 1981.
25     Q.  And you purchased the house?

Page 25

1      A.  Yes.
2      Q.  Okay.  Now, did you own that house
3  or did you purchase that house with your
4  husband?  Or had he already passed away?
5      A.  He had already passed.
6      Q.  Did you purchase the house with any
7  of your children?
8      A.  Yes.
9      Q.  And which children?
10     A.  Darryl and Pierre.
11     Q.  They bought it with you in 1981?
12 They purchased it with you in 1981?
13     A.  Yes.
14     Q.  Do you know how much you purchased
15 it for?
16     A.  Forty-four thousand five hundred.
17     Q.  And do you know who you purchased
18 it from?
19     A.  A Mrs. Marian P. O'Brien.
20     Q.  And did you have to finance that
21 purchase with a mortgage or did you buy it
22 with cash?
23     A.  Neither one.
24     Q.  Okay.  How did you purchase it?
25     A.  With a down payment.

7 (Pages 22 to 25)

Page 26

1    Q.  Okay.  And then after you made the
2  down payment did you have monthly notes to
3  make?
4    A.  Yes.
5    Q.  Did you make those to a bank?
6    A.  Yes.
7    Q.  Do you know what bank that was?
8    A.  At that time Security Homestead.
9    Q.  And what were those monthly
10 payments, do you remember?
11   A.  $346.85 per month.
12   Q.  And have you paid that loan off?
13   A.  Well, I can't answer that question
14 yes or no.
15   Q.  Okay.  And why is that?
16   A.  Because I got Regions to pay that
17 off, and then I have an equity loan with
18 Regions.
19   Q.  Okay.  So you had another loan with
20 Regions to pay off the first loan?
21   A.  Yes.
22   Q.  Okay.  And do you still owe money
23 on the Regions loan?
24   A.  Yes.
25   Q.  Okay.  And how much are you paying

Page 27

1  on that?
2    A.  Approximately two eighty something
3  a month.
4    Q.  And when does that, when will that
5  note be paid off?
6    A.  I don't know.
7    Q.  Okay.  Do you remember
8  approximately when you entered into the loan
9  agreement with Regions?
10   A.  1986.
11   Q.  Okay.  Now, you said you bought the
12 home with your two sons.  Do they pay for
13 part of the mortgage?
14   A.  Actually now, no.
15   Q.  Now no?
16   A.  (Witness shakes head.)
17   Q.  And why is that?
18   A.  Because neither one of them lives
19 with me.
20   Q.  Okay.  Did they at one point pay
21 for part of the mortgage?
22   A.  Yes.
23   Q.  All right.  What type of a building
24 is 1708 Industry?
25   A.  A duplex.

Page 28

1    Q.  When you say duplex, is it one
2  house on top of another or is it side by
3  side?
4    A.  No.  Side by side.
5    Q.  Is it what is sometimes referred to
6  as a shotgun double?
7    A.  Yes.
8    Q.  Okay.  All right.  When you
9  purchased -- and it is 17 -- is it 1708 to
10 1710 Industry, is that -- are those the two
11 numbers of the two --
12   A.  Yes.
13   Q.  -- parts?  Okay.  Do you know how
14 old 1708-1710 Industry was when you purchased
15 it?
16   A.  No.
17   Q.  What would your best estimate be?
18   A.  1950.
19   Q.  That it was built around 1950?
20   A.  Yes.
21   Q.  And was it a wooden home?
22   A.  Yes.
23   Q.  Was it built on piers?
24   A.  Um --
25   Q.  You know what I mean by that?  Is

Page 29

1  it raised off the ground or --
2    A.  Yeah.
3    Q.  -- sit on a slab?
4    A.  Raised off the ground.
5    Q.  Okay.  And how many steps do you
6  have to go up to get to the front door?
7    A.  Four.
8    Q.  And it's one apartment next to the
9  other?
10   A.  Yes.
11   Q.  Okay.  Did your sons live with you
12 or did they live on one side and you on the
13 other?
14   A.  Before --
15   Q.  When you first bought it.
16   A.  Let me see now.  No.  No.  Neither
17 one.
18   Q.  Neither one?
19   A.  No.
20   Q.  Well, where did they live?  Did
21 they live in the same house or in the same
22 building or did they live in another house?
23   A.  Another house.
24   Q.  Okay.  So, did they ever live in
25 the duplex?

8 (Pages 26 to 29)

GLADYS LaBEAUD (LEVEE)                                    7/16/2007

Page 30

```
1      A.  Darryl has since then, but not at
2  first.
3      Q.  Wait.  I didn't follow you.
4      A.  Darryl has since then, but not at
5  first.
6      Q.  Okay.  Well, have you always lived
7  there in one side?
8      A.  Yes.
9      Q.  So since you purchased 1708
10  Industry you've always lived in that side of
11  the double?
12      A.  Yes.
13      Q.  Okay.  Did you rent out the other
14  side of the double?
15      A.  Yes.
16      Q.  Okay.  And how much rent did you
17  initially get for 1710 Industry?
18      A.  Initially about 265 at first.
19      Q.  Okay.  Now, did you continue to
20  rent that the whole time you owned the
21  property up to Hurricane Katrina?
22      A.  Yes.
23      Q.  Okay.  Now, I think you said at
24  some point Darryl lived in the house.  Did he
25  live with you or did he live in 1710?
```

Page 31

```
1      A.  1710.
2      Q.  Okay.  When he lived in 1710 did he
3  pay rent?
4      A.  Yes.
5      Q.  Okay.  Did the rent change from the
6  time you purchased the house until Hurricane
7  Katrina?
8      A.  Yes.
9      Q.  Okay.  What was the rent at the
10  time of Hurricane Katrina?
11      A.  $450.
12      Q.  Do you remember who was renting it
13  before Hurricane Katrina?
14      A.  Darryl.
15      Q.  Darryl was?
16      A.  Yes.
17      Q.  And Darryl would pay you $450 a
18  month?
19      A.  Yes.
20      Q.  Did Darryl have a written lease
21  with you?
22      A.  No.
23      Q.  It was just a verbal oral
24  agreement?
25      A.  Yes.
```

Page 32

```
1      Q.  Okay.  And how long before
2  Hurricane Katrina had Darryl lived at 1710
3  Industry approximately?
4      A.  Sixteen, eighteen months, something
5  like that.
6      Q.  And the whole time in those sixteen
7  to eighteen months he was paying you the $450
8  a month rent?
9      A.  Yes.
10      Q.  Would he write a check to you in
11  that amount?
12      A.  Sometimes.  Most times cash.
13      Q.  Did Darryl live there by himself or
14  did he have a family?
15      A.  He had a wife.
16      Q.  Did Darryl pay any utilities?
17      A.  Yeah.
18      Q.  Did he pay for his own water or did
19  you pay that?
20      A.  Water was included.
21      Q.  Included in the $450 a month?
22      A.  Uh-huh.
23      Q.  Had -- who had lived in the
24  apartment before Darryl?
25      A.  A person Charles Butler.
```

Page 33

```
1      Q.  Charles Butler?
2      A.  Yeah.
3      Q.  And how long had Mr. Butler lived
4  at 1710 Industry?
5      A.  Maybe about four or five years.  I
6  don't really know.
7      Q.  Okay.  So he was a long-term
8  tenant?
9      A.  Uh-huh.
10      Q.  And how much rent did he pay?
11      A.  Four twenty-five.
12      Q.  Okay.  And did he have a written
13  lease agreement with you?
14      A.  No.
15      Q.  And he would pay his own utilities?
16      A.  Yes.
17      Q.  Okay.  But you would pay the water
18  for his side?
19      A.  Yes.
20      Q.  And did he have any other expenses
21  other than the utilities in renting 1710
22  Industry?
23      A.  No.
24      Q.  Okay.  Was there any kind of yard
25  expense?
```

9 (Pages 30 to 33)

GLADYS LaBEAUD (LEVEE)                                    7/16/2007

Page 34

1    A.  I beg your pardon?  I didn't
2  understand you.
3    Q.  Was there any expenses in keeping
4  up the yard?
5    A.  What you mean, on the tenant's
6  part?
7    Q.  Yes.
8    A.  No.
9    Q.  I mean, did you pay to have the
10  grass cut?
11    A.  Yes.
12    Q.  Why did Mr. Butler move out?
13    A.  He passed.
14    Q.  Okay.  And he had rented the
15  property for approximately five years
16  straight before Darryl moved in?
17    A.  Uh-huh.
18    Q.  Okay.  Yes?
19    A.  Yes.  I'm sorry.  Yes.
20    Q.  Darryl and Pierre, are they still
21  co-owners of the property?
22    A.  Darryl is.
23    Q.  Okay.
24    A.  Pierre is not.
25    Q.  Before Hurricane Katrina were

Page 35

1  Darryl and Pierre both co-owners of the
2  property or just Darryl?
3    A.  Darryl.
4    Q.  Okay.  And what happened to
5  Pierre's interests?
6    A.  He got out of it because he wanted
7  to go in business for himself and he didn't
8  want a lot of credit.  So that's what he did.
9    Q.  Okay.  Did you and Darryl buy
10  Pierre out?
11    A.  No.  No.
12    Q.  Okay.  Do you know if the property
13  is still in Pierre's name?
14    A.  It isn't.
15    Q.  It isn't?
16    A.  No.
17    Q.  Okay.  The property is in your name
18  and Darryl's name?
19    A.  Yes.
20    Q.  And do you know how or why Pierre's
21  name is no longer -- Pierre is no longer
22  listed as owner of the property?
23    A.  He had the bank to did that.  He
24  wanted to go in business by himself and he
25  didn't want all of that credit, so some way

Page 36

1  or another they removed his name from the
2  property.
3    Q.  So the bank did that?
4    A.  Yes.
5    Q.  And which bank is that, is that
6  Regions?
7    A.  Regions.
8    Q.  Okay.  At the time of Hurricane
9  Katrina then the owners of the property were
10  you and your son Darryl?
11    A.  Yes.
12    Q.  Okay.  Before Darryl moved into the
13  property did he share the rent, the rental
14  income that the property generated with you?
15    A.  No.
16    Q.  Okay.  So, in other words, when Mr.
17  Butler was paying rent you wouldn't give any
18  of the rent to Darryl?
19    A.  No.
20    Q.  You kept it?  You kept it?
21    A.  (Witness nods head.)
22    Q.  And did Darryl ever pay any of the
23  notes?
24    A.  No.
25    Q.  Either to Regions or to Security?

Page 37

1    A.  (Witness shakes head.)
2    Q.  No?
3    A.  (Witness shakes head.)
4    Q.  Okay.  Was your property under a
5  termite contract?
6    A.  Yes.
7    Q.  Were both sides?
8    A.  Yes.
9    Q.  And who was that contract with?
10    A.  I don't remember.
11    Q.  Had you ever had any problems with
12  termites?
13    A.  No.
14    Q.  All right.  From the time you
15  bought the property until the time of
16  Hurricane Katrina did you make any
17  substantial improvements to the property?
18    A.  Yes.
19    Q.  Okay.  And what did you do with it?
20    A.  Added a utility room on the back
21  and enlarged the kitchen, the kitchen area.
22    Q.  Was that on the back of 1708 or was
23  it on the back of both?
24    A.  1708 mostly and partially on 1710.
25  And the roof.  I forgot about that.  Yeah.

JOHNS PENDLETON COURT REPORTERS                          800 562-1285

Page 38

1    Q.  Put a new roof on?
2    A.  (Witness nods head.)
3    Q.  All right.  Well, let me ask you --
4    A.  And added central air and heat.
5    Q.  Added central air and heat?
6    A.  Yes.
7    Q.  Was that to 1708 or was that to
8  both sides?
9    A.  1708.
10   Q.  Did 1710 just have window units?
11   A.  Yes.
12   Q.  And what type of heat did it have?
13   A.  Regular floor heating.
14   Q.  Floor furnaces?
15   A.  Yeah, floor furnaces, too.
16   Q.  Was the property on Industry Avenue
17  the only property you owned?
18   A.  Yes.
19   Q.  Okay.  Now, you said you added a
20  utility room?
21   A.  Yes.
22   Q.  And that was at the back of the
23  kitchen?
24   A.  Yes.
25   Q.  Okay.  And you said you enlarged

Page 39

1  the kitchen?
2    A.  Yes.
3    Q.  And how much did you enlarge the
4  kitchen?
5    A.  About four feet deep.
6    Q.  And the utility room was on the
7  other side of the kitchen?
8    A.  Well, on the back of the kitchen.
9    Q.  It was on the back of the kitchen?
10   A.  (Witness nods head.)
11   Q.  Did it extend into 1710, into the
12  1710 side?
13   A.  No.  No.  No.
14   Q.  It just went on the back?
15   A.  Uh-huh.
16   Q.  Okay.  On the back of the kitchen?
17   A.  (Witness nods head.)
18   Q.  So it was the last room in 1708?
19   A.  The last room would be the kitchen,
20  but then after that is the utility room.
21  Okay.
22   Q.  Right.  So it would be behind the
23  kitchen?
24   A.  Yeah.
25   Q.  Okay.  And do you know when you

Page 40

1  added on the utility room and enlarged the
2  kitchen?
3    A.  Not exactly.
4    Q.  Do you remember how much that cost?
5    A.  No.
6    Q.  Did you hire a contractor to do it,
7  to do the work?
8    A.  My son did it.
9    Q.  And that's Darryl?
10   A.  Yeah.
11   Q.  Did he charge you for the work?
12   A.  No.
13   Q.  Did you have to pay anything for
14  the improvements?
15   A.  No.
16   Q.  All right.  Now, what about central
17  air and heat, when was that added?
18   A.  I don't know exactly.  Within the
19  last I'd say seven, eight years.
20   Q.  Okay.  And do you remember who
21  added it, who the --
22   A.  No.
23   Q.  -- contractor was?
24   A.  No.
25   Q.  Was the air conditioning system

Page 41

1  under a maintenance contract?
2    A.  No.
3    Q.  All right.  And you also indicated
4  that you added a new roof?
5    A.  Yeah.
6    Q.  And when was that approximately?
7    A.  Maybe about five, six years ago.
8  Something like that.  I don't remember
9  exactly.
10   Q.  And do you remember who installed
11  the roof?
12   A.  No.
13   Q.  Do you remember how much it cost?
14   A.  No.
15   Q.  Do you have any records that would
16  show that?
17   A.  Not other than what got messed up
18  with Katrina.
19   Q.  Okay.  Had you ever had any
20  problems with the house, with roof leaks in
21  the house before Hurricane Katrina?
22   A.  No.
23   Q.  Okay.  Had you ever had any
24  problems with any water getting into the
25  house for any reason before Hurricane

GLADYS LaBEAUD (LEVEE)                                    7/16/2007

---

Page 42

1  Katrina?
2      A.  No.
3      Q.  Had there ever been any flooding to
4  the house?
5      A.  No.
6      Q.  Okay.  Had you ever had any fire
7  damage to the house?
8      A.  No.
9      Q.  Had the house ever had any other
10  damage from any other hurricane?
11      A.  No.
12      Q.  Had you ever had to make any
13  emergency repairs to the house?
14      A.  No.
15      Q.  Do you remember the name of any
16  contractor whoever performed any work on the
17  house before Hurricane Katrina?
18      A.  No.
19      Q.  And you can't tell us how much
20  money you spent improving the property before
21  Hurricane Katrina?
22      A.  No.
23      Q.  All right.  Now, did the house have
24  any insurance on it before Hurricane Katrina?
25      A.  Yes.

Page 43

1      Q.  And what kind of insurance?
2      A.  I had flood insurance.
3      Q.  And who was that written through?
4      A.  State Farm.
5      Q.  And do you know what the limits of
6  that coverage was?
7      A.  $120,100.
8      Q.  One hundred twenty thousand?
9      A.  And one hundred dollars, yeah.
10      Q.  $120, 100?
11      A.  Yeah.
12      Q.  That was the amount of insurance
13  that you had?
14      A.  Yes.
15      Q.  And was that for the structure and
16  contents or was that just for the structure?
17  Let me ask you this.  Did you have a separate
18  amount for structure and -- did you have a
19  separate amount for structure and for
20  contents?  Do you understand my question?
21      A.  I think so.  I may be a little bit
22  confused.  I wouldn't answer that yes or no,
23  but -- to tell you the truth, I really don't
24  know right now.
25      Q.  Okay.  Well, the $120,100, what did

Page 44

1  that represent?
2      A.  I think that was -- I know it was
3  flood and personal property may have been
4  included.  I don't really know.
5      Q.  Okay.  Did you have a homeowner's
6  policy --
7      A.  Yes.
8      Q.  -- on the property?
9      A.  Yes.
10      Q.  And what -- who had written that
11  policy?
12      A.  State Farm.
13      Q.  Okay.  Do you know what the
14  homeowner's was?
15      A.  Ten thousand.
16      Q.  Ten thousand?
17      A.  Yeah.
18      Q.  Okay.  Did you have any other kind
19  of insurance on the property?
20      A.  No.
21      Q.  Okay.  Did you own an automobile
22  before Hurricane Katrina?
23      A.  Yes.
24      Q.  Okay.  Was that damaged in the
25  storm?

Page 45

1      A.  Yes.
2      Q.  Okay.  Did you have insurance on
3  the automobile?
4      A.  Yes.
5      Q.  And what type of automobile was it?
6      A.  '93 Toyota Corolla.
7      Q.  And do you know how much insurance
8  you had on the vehicle?
9      A.  How much insurance?  No.  I can --
10  I can tell you what they paid.  I don't
11  remember.
12      Q.  What did they pay?
13      A.  Three thousand five hundred.
14      Q.  Okay.  How would you describe the
15  condition of your house prior to Katrina?
16      A.  Good.
17      Q.  Good?
18      A.  Yes.
19      Q.  Did it have any -- were there any
20  parts of the house that were unlevel?
21      A.  No.
22      Q.  Were there any -- there was no
23  indication that there were any leaks in the
24  roof?
25      A.  (Witness shakes head.)

---

GLADYS LaBEAUD (LEVEE)                                    7/16/2007

---

Page 46

1    Q.  No?
2    A.  (Witness shakes head.)
3    Q.  What type of electrical system did
4  you have in the house?  Was it the original
5  system or had that been changed?
6    A.  Some had been changed because, as I
7  said, when they put the addition on the back,
8  naturally they had to change some stuff.
9    Q.  Okay.  That was just for your side,
10  for the 1710 side?
11    A.  Yes.
12    Q.  Okay.
13    A.  Yes.  I would say yes.
14    Q.  Was the plumbing in the house the
15  original plumbing?
16    A.  Some of it had been changed.
17    Q.  Okay.  Was it changed on both sides
18  or just your side?
19    A.  Both sides.
20    Q.  And when was it changed?
21    A.  I don't remember.
22    Q.  How do you know it was changed?
23    A.  Because we had to install new bath
24  on 170 -- 1710 and 1718.
25    Q.  When did you put the new baths in?

---

Page 47

1    A.  I don't remember.
2    Q.  Did Darryl do that or did you hire
3  a contractor?
4    A.  No.  A plumber.
5    Q.  A plumber.  Did the house have wood
6  siding or vinyl siding?
7    A.  Vinyl.
8    Q.  Okay.  And when did you place the
9  vinyl -- did you install the vinyl siding or
10  did the house, did the house have vinyl
11  siding on it when you purchased it?
12    A.  It had vinyl siding.  And we had to
13  replace some at one time.
14    Q.  So when you purchased the house it
15  had the vinyl siding on it?
16    A.  Yes.
17    Q.  And you said you had to replace
18  some of it.  Why did you have to replace some
19  of it?
20    A.  Because it needed replacing.
21    Q.  Okay.  Did you ever look at the
22  wood siding underneath the vinyl?
23    A.  I don't know about those kind of
24  things really.
25    Q.  Okay.  Now, let me go back for a

---

Page 48

1  moment.  Miss LaBeaud, what is the highest
2  level of education that you've obtained?
3    A.  CNA.
4    Q.  Okay.  Did you go to school for
5  that?
6    A.  Yes.
7    Q.  Okay.  Did you graduate from high
8  school?
9    A.  Yes.
10    Q.  And what high school was that?
11    A.  Brumfield.
12    Q.  Brumfield?
13    A.  Yes.
14    Q.  And was that in Natchez?
15    A.  Yes.
16    Q.  Brumfield High School?
17    A.  Yes.
18    Q.  And when did you go there?  When
19  did you graduate?
20    A.  1948.
21    Q.  Now, did you have any -- did
22  you go to any kind of college after that?
23    A.  Vocational college.
24    Q.  Okay.  Where did you go to
25  vocational college?

---

Page 49

1    A.  Sidney Collier.
2    Q.  And where is that?
3    A.  On Louisa Street in New Orleans.
4    Q.  Okay.  And what did you study?
5    A.  Nursing aide.
6    Q.  Nursing aide?
7    A.  Yes.
8    Q.  And you are a CNA?
9    A.  I beg your pardon?
10    Q.  You are a CNA?
11    A.  Yes.  Yeah.
12    Q.  Okay.  And that's certified nursing
13  assistant?
14    A.  Yes.
15    Q.  After going to Sidney Collier did
16  you have any other training?
17    A.  The CNA was after Sidney.
18    Q.  Okay.  When -- how did you get your
19  CNA?
20    A.  American Rehab.
21    Q.  You went to American Rehab?
22    A.  Yes.
23    Q.  And is that a vocational school?
24    A.  Yes.
25    Q.  And approximately when did you go

---

13 (Pages 46 to 49)

GLADYS LaBEAUD (LEVEE)                                    7/16/2007

---

Page 50

1  there?
2      A.  '96.  1996.  I think that's right.
3      Q.  Okay.  And -- well, let me ask you
4  this.  At the time of Hurricane Katrina were
5  you working?
6      A.  No.
7      Q.  Were you retired?
8      A.  Yes.
9      Q.  Okay.  When was the last time prior
10 to Hurricane Katrina that you had been
11 employed?
12     A.  That I did what?
13     Q.  That you were employed.
14 Approximately.
15     A.  Let me see.  I'm trying to get the
16 years straight here.  I know I was 69 years
17 old when I retired, so subtract that from --
18     Q.  That's around 1999?
19     A.  Yeah.  That should be about right.
20     Q.  Okay.
21     A.  That should be about right, I
22 think.
23     Q.  So for the five years before
24 Hurricane Katrina you had been retired?
25     A.  Yes.

---

Page 51

1      Q.  Okay.  When you were last working
2  as a CNA where were you working?
3      A.  Mercy Baptist hospital.
4      Q.  And approximately how long had you
5  worked there?
6      A.  About five years.
7      Q.  Okay.  And was it always as a CNA?
8      A.  Yes.
9      Q.  Okay.  Now, you said your husband
10 passed away in 1979?
11     A.  Yes.
12     Q.  Okay.  And your husband's name was
13 Alton LaBeaud?
14     A.  Excuse me.  Yes.
15     Q.  Okay.  And how old was your husband
16 when he passed away?
17     A.  I think about 62.  About 62.
18     Q.  And was he employed at the time?
19     A.  No.
20     Q.  Where was the last place he had
21 been employed prior to his death?
22     A.  United Van Lines.
23     Q.  And when was his job?
24     A.  Long distance truck driver.
25     Q.  Was he retired at the time of his

---

Page 52

1  death?
2      A.  Well, no.  He was sick.  He hadn't
3  retired.
4      Q.  What illness did he have?
5      A.  Carcinoma of the liver.  Of the --
6      Q.  He had cancer?
7      A.  Yeah.
8      Q.  And you and Mr. LaBeaud had three
9  children?
10     A.  Yes.
11     Q.  And you told us a little bit about
12 them.  Do they all live in New Orleans right
13 now?
14     A.  Yes.
15     Q.  All right.  Is Darryl married?
16     A.  Yes.
17     Q.  And where does he live?
18     A.  42nd Street in Kenner.
19     Q.  And does Darryl have any children?
20     A.  No.
21     Q.  And where does Darryl work?
22     A.  Harrah's Casino.
23     Q.  Harrah's?
24     A.  Yes.
25     Q.  Okay.  And Pierre, is Pierre living

---

Page 53

1  in New Orleans?
2      A.  Yes.
3      Q.  And where does Pierre live?
4      A.  141 Torrey Pines.
5      Q.  Torrey Pines?
6      A.  Yes.
7      Q.  Is that across the river?
8      A.  No.  That's Eastover.
9      Q.  101 --
10     A.  No.  I said 141.
11     Q.  141 Torrey Pines?
12     A.  Yes.
13     Q.  In Eastover.  And did -- how is
14 Pierre employed?
15     A.  Self employed.
16     Q.  And what type of work does he do?
17     A.  Tile, marble, that sort of thing.
18     Q.  He's a flooring contractor?
19     A.  (Witness nods head.)
20     Q.  And is he married?
21     A.  Yes.
22     Q.  And does he have children?
23     A.  Three.
24     Q.  And Faith Monique lives with you?
25     A.  Yes.

---

14 (Pages 50 to 53)

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

GLADYS LaBEAUD (LEVEE)                                    7/16/2007

Page 54

1    Q.  And is she married?
2    A.  No.
3    Q.  And does she have children?
4    A.  Yes.
5    Q.  How many?
6    A.  One.
7    Q.  And how old is that child?
8    A.  Six.
9    Q.  And what is the child's name?
10   A.  Jasmine.
11   Q.  What is Jasmine's last name?
12   A.  Glass.
13   Q.  Bless?
14   A.  Glass (indicating).  G-L-A-S-S.
15   Q.  Okay.  Was Mr. LaBeaud your only
16   marriage?
17   A.  Yes.
18   Q.  And these three children are your
19   only children?
20   A.  Yes.
21   Q.  What is your Social Security
22   number?
23   A.  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.
24   Q.  And do you have a Louisiana
25   driver's license?

Page 55

1    A.  Yes.
2    Q.  Could I see it, please?
3    A.  Yes.  (Indicating).
4    Q.  All right.  Let the record reflect
5    that Miss LaBeaud has provided me with a copy
6    of her Louisiana driver's license bearing
7    number 002544863 with an expiration date
8    12-29-09.  And it was issued on 5-15-2006.
9    Now, Miss LaBeaud, when was your first notice
10   that Hurricane Katrina might strike the New
11   Orleans area?
12   A.  I think it was the Thursday before
13   the storm, I think it was.
14   Q.  All right.  What were your initial
15   actions in response to learning that?
16   A.  Scared.  Thinking what would we do.
17   Q.  And what did you do?
18   A.  We made preparations to -- started
19   making preparations to leave.
20   Q.  When you say we, who are you
21   referring to?
22   A.  Me and my children.
23   Q.  All three of your children?
24   A.  Yeah.
25   Q.  Had you ever left before when a

Page 56

1    hurricane was threatening to hit New Orleans?
2    A.  Yes.
3    Q.  Okay.  And what occasions were
4    that?
5    A.  I think one was Ivan.  I think it
6    was Ivan.  I believe that's right.
7    Q.  Did -- where did you leave when
8    Ivan was threatening to hit New Orleans?
9    A.  We went to Texas.
10   Q.  Went to Texas.  All right.  Now, in
11   the case of Hurricane Katrina did you -- you
12   said you made preparations to leave.
13   A.  Yes.
14   Q.  What type of preparations were
15   those?
16   A.  Started getting clothes, medicine,
17   things that we would -- could take that we
18   would actually need.  And called relatives in
19   Mississippi, so --
20   Q.  You called relatives in
21   Mississippi?
22   A.  Yeah.
23   Q.  And where were those relatives
24   living?
25   A.  Well, a niece in Magnolia,

Page 57

1    Mississippi.  Her house was closer.
2    Q.  That's who you called?
3    A.  Yes.
4    Q.  And did you plan on going to
5    Magnolia, Mississippi?
6    A.  Yes.
7    Q.  And how far is Magnolia from New
8    Orleans?
9    A.  About an hour and a half drive.  I
10   don't know mileage exactly.
11   Q.  Okay.  It is right over the state
12   line?
13   A.  Right over the state line?  I don't
14   really know how far it is over the state
15   line.
16   Q.  Okay.  Did you do anything to your
17   house to secure it?
18   A.  Darryl did whatever he could.  I
19   don't even remember what that was.
20   Q.  Do you know if he boarded it up?
21   A.  I think so.  I don't know.
22   Q.  All right.  And did you leave New
23   Orleans?
24   A.  Yes.
25   Q.  And where did you go?

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

GLADYS LaBEAUD (LEVEE)                                    7/16/2007

Page 58

1    A.  Magnolia, Mississippi.
2    Q.  You went to Magnolia.  Did all of
3  your children go with you?
4    A.  Yes.  Pierre and his family left at
5  different times, but Darryl and Faith and me
6  and the baby, we all left together.
7    Q.  Okay.  So you left with Darryl,
8  Faith --
9    A.  And Faith.
10    Q.  -- and your granddaughter.
11    A.  Uh-huh.
12    Q.  Did Darryl's wife go with you?
13    A.  Yes.
14    Q.  Okay.  And what is her name?
15    A.  Patricia.
16    Q.  Patricia?
17    A.  (Witness nods head.)
18    Q.  And you all went to Magnolia,
19  Mississippi?
20    A.  Yes.
21    Q.  And who lived in Magnolia?  You
22  said it was a niece?
23    A.  A niece.
24    Q.  What was her name?
25    A.  Wait a minute.  I'll tell you what

Page 59

1  the child's name is.  Felicia.
2    Q.  Felicia?
3    A.  Felicia Scott.
4    Q.  All right.  And did Pierre meet you
5  afterwards?  Did he go to Magnolia?
6    A.  I really don't remember.
7    Q.  Okay.
8    A.  Where did Pierre went.
9    Q.  How long did you stay in Magnolia,
10  Mississippi?
11    A.  Two days.
12    Q.  And which two days were those?
13    A.  That was Saturday and -- I think
14  Saturday and Sunday.  I think that's right.
15    Q.  Okay.  And where did you go once
16  you left Magnolia?
17    A.  Natchez, Mississippi.
18    Q.  And why did you leave Magnolia?
19    A.  She had all electric house.  The
20  electricity went out and they didn't have any
21  water.
22    Q.  Was this before the hurricane or
23  was this --
24    A.  It had to -- I would say it was
25  after or during the storm or something.  I

Page 60

1  don't know.  When we first went there she had
2  those things, but then after everything went
3  out.
4    Q.  Okay.  And because they went out
5  and she didn't have water you all went to
6  Natchez?
7    A.  Uh-huh.
8    Q.  Were you in one car?
9    A.  Yes.
10    Q.  And whose car were you in?
11    A.  Me, Faith and the baby was in her
12  car.
13    Q.  And was --
14    A.  Darryl and his wife was in his
15  truck.
16    Q.  Okay.  And how long did you stay in
17  Natchez?
18    A.  Approximately maybe a month.
19    Q.  A month?
20    A.  Probably something like that.
21    Q.  And where did you stay in Natchez?
22    A.  1234 Martin Luther King Drive.
23    Q.  1234 Martin Luther King Drive?
24    A.  Yes.
25    Q.  And what is that?

Page 61

1    A.  It is my sister's home.
2    Q.  And what type of residence is that?
3    A.  It's a house.
4    Q.  It's a house?
5    A.  Uh-huh.
6    Q.  Now, was there anybody there --
7  well, how many people were living in that
8  house?
9    A.  Two.
10    Q.  Two?
11    A.  Yes.
12    Q.  Before you all arrived?
13    A.  Her and her husband.
14    Q.  Okay.  So that was where you, your
15  daughter and your granddaughter and Darryl
16  and his wife stayed?
17    A.  No.  Darryl and his wife went to a
18  hotel.
19    Q.  Okay.  Now, you stayed in Natchez
20  approximately a month?
21    A.  Yes.
22    Q.  Okay.  Did you have to pay any
23  rooming expenses while you were in Natchez?
24    A.  No.
25    Q.  Okay.  How were the living

GLADYS LaBEAUD (LEVEE)                                    7/16/2007

Page 62

```
 1   arrangements in Natchez?
 2        A.  Well, she had three bedrooms and
 3   we, you know, we were welcome to use those
 4   and stuff.
 5        Q.  Were you comfortable?
 6        A.  Not really.
 7        Q.  And when you say not really, what
 8   do you mean?
 9        A.  Well, it wasn't home, for one
10   thing, and with all the other stuff going on,
11   it was just -- it is hard to explain.
12        Q.  Okay.  How long did it take you to
13   get from Magnolia to Natchez?
14        A.  Between I guess an hour and a half,
15   maybe two hours, something like that.
16        Q.  You didn't have any problems with
17   the traffic?
18        A.  No.
19        Q.  Now, after you left Natchez where
20   did you go?
21        A.  Texas.
22        Q.  Why did you leave Natchez?
23        A.  It was difficulty living with my
24   sister.
25        Q.  Okay.  And what was the difficulty?
```

Page 63

```
 1        A.  Well, some of the habits that she
 2   had and things, I really didn't even feel
 3   welcome.  Even under the circumstances.  I
 4   knew we couldn't stay there indefinitely, so
 5   Darryl made some arrangements for us to go to
 6   Texas, so we went.
 7        Q.  Okay.  And where in Texas did you
 8   go?
 9        A.  Well, first we stayed at a hotel,
10   one of the Drury Inns.
11        Q.  And what city in Texas was that?
12        A.  Rosenberg.
13        Q.  Did you pick Rosenberg, Texas for
14   any particular reason?
15        A.  No.  He did.  Pierre did.
16        Q.  Pierre did?
17        A.  Yes.
18        Q.  Okay.  Now, had Pierre gone to
19   Texas?
20        A.  Had he gone?
21        Q.  Yes.
22        A.  Yes.
23        Q.  Okay.  Did Pierre ever go to
24   Natchez?
25        A.  I don't know.  I don't remember.
```

Page 64

```
 1        Q.  Okay.  But it was Pierre's decision
 2   that the family would go to Rosenberg, Texas?
 3        A.  Yeah.
 4        Q.  And did Darryl go also?
 5        A.  Yes.
 6        Q.  Okay.  And you said initially you
 7   had a room in a Drury Inn?
 8        A.  Yes.
 9        Q.  And how long were you there?
10        A.  About a month.
11        Q.  A month?
12        A.  (Witness nods head.)
13        Q.  Did you have to pay for the room?
14        A.  No.
15        Q.  Okay.  Who paid for it?
16        A.  I think the Red Cross did.
17        Q.  All right.  Were you in the room by
18   yourself?
19        A.  No.  I just shared with my daughter
20   and the grandchild.
21        Q.  And did your son stay at the same
22   hotel?
23        A.  Yes.
24        Q.  Okay.  Were there other people from
25   the New Orleans area that were at the hotel?
```

Page 65

```
 1        A.  Yes.
 2        Q.  And you said you were in the Drury
 3   Inn for approximately one month?
 4        A.  Yes.
 5        Q.  And how was your stay there, were
 6   you comfortable?
 7        A.  It was okay under the
 8   circumstances.
 9        Q.  All right.  And after one month did
10   you leave the Drury Inn?
11        A.  Yes.
12        Q.  And where did you go from there?
13        A.  It was an apartment, an apartment
14   building.  What was the name of the place?
15        Q.  Was that in Richmond, Texas?
16        A.  Yes.
17        Q.  So you went from the Drury Inn to
18   an apartment in Richmond, Texas?
19        A.  Yes.
20        Q.  And who paid for that apartment?
21        A.  Well, actually, I paid for it out
22   of my pocket.  They weren't -- they wouldn't
23   accept FEMA's help, so -- and that's about,
24   at that time, that was the only decent thing
25   we could find, so --
```

JOHNS PENDLETON COURT REPORTERS                          800 562-1285

GLADYS LaBEAUD (LEVEE)                                    7/16/2007

---

**Page 66**

1    Q.  Okay.  How big of an apartment did
2   you rent?
3    A.  Two bedrooms, one bath and a shower
4   in another bathroom.  A kitchenette and
5   dining area combined.
6    Q.  So was it a total of three
7   bedrooms?
8    A.  No.  Two bedrooms.
9    Q.  Two bedrooms, one and a half baths?
10   A.  Yes.
11   Q.  Okay.  And how much was the rent on
12  the apartment?
13   A.  It was eight hundred and something
14  when we first went there, approximately
15  fortyish, I think.
16   Q.  Okay.  You said you paid for that
17  with your own money?
18   A.  Yes.
19   Q.  And did you have to sign a lease?
20   A.  Yes.
21   Q.  And do you have a copy of that
22  lease?
23   A.  I may have.  I'm not certain.
24   Q.  Okay.  And when you say you may
25  have, you obviously don't have it here today,

**Page 67**

1   but do you have it at your house?
2    A.  I think so.
3    Q.  Okay.  Did you have to sign the
4   lease agreement for a certain period of time?
5    A.  Yes.
6    Q.  And what was that?
7    A.  Six months.
8    Q.  Did the lease include utilities?
9    A.  Yes.  Well, well, actually, $20 was
10  for the washer and $20 was for the use of
11  dryer, and everything else we had to pay for.
12   Q.  Okay.  So you had to pay an
13  additional, in addition to the 840 a month
14  you had to pay for utilities?
15   A.  Yes.
16   Q.  Did you have to pay for water?
17   A.  Yes.
18   Q.  Do you know how much the utilities
19  and water were a month?
20   A.  Water ran thirty something dollars
21  at first.  The utilities varied.  I couldn't
22  give you an exact figure right now.
23   Q.  All right.  And in the apartment
24  were you, your daughter and your
25  granddaughter?

**Page 68**

1    A.  Yes.
2    Q.  Did your daughter contribute any
3   money toward rent?
4    A.  Yes.
5    Q.  How much?
6    A.  Whatever she could afford.
7    Q.  Okay.  Was she -- was your daughter
8   working before Hurricane Katrina?
9    A.  Yes.
10   Q.  And where was she working?
11   A.  East Jefferson Hospital.
12   Q.  What was her position at East
13  Jefferson?
14   A.  Tech II.
15   Q.  And what does a Tech II do
16  approximately, you know?
17   A.  Fix up the different drugs and
18  stuff for maybe IVs whatever, you know, or
19  the patient pills or whatnot and all.
20   Q.  Okay.  Do you know approximately
21  how much money your daughter was making as a
22  Tech II?
23   A.  No.
24   Q.  When she was living at 1708
25  Industry did she pay you any rent?

**Page 69**

1    A.  She contributed to the household,
2   yes.
3    Q.  And how much would she contribute a
4   month?
5    A.  Maybe four or five hundred.
6    Q.  Did Jasmine's father pay any money
7   toward her support?
8    A.  Yes.
9    Q.  And would he pay any of the rental
10  for her to stay at your house?
11   A.  No.  Just what the court designated
12  his child support.  Sometimes he would pay it
13  and sometimes he wouldn't.
14   Q.  Okay.  Did he pay any money toward
15  the apartment in Richmond?
16   A.  No.
17   Q.  All right.  And how would you pay
18  the rent in Richmond?  Did you write a check?
19   A.  Yes.
20   Q.  So you would have records of what
21  you paid in rent?
22   A.  Yes.
23   Q.  And you said the place, that the
24  apartment complex wouldn't accept FEMA?
25   A.  Yes.

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

GLADYS LaBEAUD (LEVEE)                                    7/16/2007

Page 70

1    Q.  And why is that?
2    A.  They said they didn't want to get
3  involved in the government's affairs because
4  they would have to take, probably take in a
5  group of people that they didn't want in the
6  building.  So that was their policy.
7    Q.  Okay.  Okay.  Now, did your other
8  two or did your two sons also stay at that
9  apartment complex?
10   A.  Pierre did.
11   Q.  Okay.  And what about Darryl?
12   A.  Darryl, he had another apartment in
13  another place in the city.
14   Q.  Okay.  And when you say the city,
15  you are referring to Houston?
16   A.  No.  Rosenberg.
17   Q.  Okay.  And where is Rosenberg,
18  Texas?
19   A.  About -- excuse me -- twenty miles
20  south of Houston.
21   Q.  Okay.  All right.  Now, how would
22  you describe the life in the apartment?
23   A.  Well, it was comfortable.  It was
24  quiet.
25   Q.  Was the apartment nice?

Page 71

1    A.  Yes.
2    Q.  How would you compare it to your
3  house on Industry Street?
4    A.  No comparison.
5    Q.  No comparison?
6    A.  No place like home.
7    Q.  Okay.  All right.  And you stayed
8  in the apartment for six months?
9    A.  From some part of October in 2005
10  until the 23rd of June, 2007.
11   Q.  So you stayed from October 2005
12  until June of 2007?
13   A.  Yes.
14   Q.  And then you moved back to New
15  Orleans?
16   A.  Yes.
17   Q.  Okay.  And you moved into the
18  apartment on South Jeff Davis?
19   A.  Yes.
20   Q.  Okay.  And during that time, from
21  October 2005 to June 2007 you were living in
22  the apartment with your daughter and your
23  granddaughter?
24   A.  Yes.
25   Q.  Okay.  Did your granddaughter

Page 72

1  attend school in, was it in Rosenberg or
2  Richmond?  In Richmond, Texas?
3    A.  Yeah.
4    Q.  Okay.  Did she enjoy the school in
5  Richmond?
6    A.  Yes.
7    Q.  How did you find that the school
8  compared to the schools in New Orleans?
9    A.  Better.
10   Q.  The school in Richmond was better?
11   A.  (Witness nods head.)
12     MR. JOANEN:
13       You have to answer yes.  The court
14       reporter has to take it down.
15     THE WITNESS:
16       Yes.
17  EXAMINATION BY MR. GARDNER:
18   Q.  Now, when you were living in
19  Richmond, Texas did you attend church in
20  Texas?
21   A.  Yes.
22   Q.  And which church did you attend?
23   A.  Most times Joel Osteen.
24   Q.  Joel Osteen?
25   A.  Yes.

Page 73

1    Q.  What kind of --
2    A.  Lakewood Church.
3  Interdenominational.
4    Q.  That has a large congregation?
5    A.  One of the largest.
6    Q.  Yes.  Did you like that church?
7    A.  Yes.
8    Q.  Okay.  Did you celebrate your
9  holidays in Richmond or someplace else?
10   A.  Richmond.
11   Q.  Okay.  Was your whole family there
12  for the holiday?  For Christmas, for
13  instance?  Let me ask you this.  Where did
14  you celebrate Christmas in 2005?
15   A.  At my daughter-in-law's relatives
16  we had dinner.
17   Q.  And where was that?
18   A.  At her house in Richmond.
19   Q.  Is this daughter-in-law, this is
20  Pierre's wife?
21   A.  Yes.
22   Q.  And how was that celebration?
23   A.  Good.  It was nice.
24   Q.  And did you celebrate Christmas in
25  2006 in Richmond?

19 (Pages 70 to 73)

GLADYS LaBEAUD (LEVEE)                                      7/16/2007

Page 74

```
 1      A.  Yes.
 2      Q.  And where was that?
 3      A.  We went out to dinner.
 4      Q.  And how was that?
 5      A.  It was okay.
 6      Q.  Prior -- well, prior to June 2007
 7  had you come back to New Orleans to visit?
 8      A.  Yes.
 9      Q.  Okay.  When was the first time you
10  came back?
11      A.  I don't remember exactly.  About,
12  maybe about three, between three, two and
13  three months, something like that.
14      Q.  Two and three months after the
15  storm?
16      A.  I think so.  Something.
17      Q.  And why did you come back?
18      A.  Well, I wanted to see what kind of
19  shape the house was in.
20      Q.  Okay.  Had you spoken to anybody
21  who had seen the house --
22      A.  Yeah.
23      Q.  -- before you went back?
24      A.  (Witness nods head.)
25      Q.  Who had seen the house?
```

Page 75

```
 1      A.  Both of my sons.
 2      Q.  Okay.  And what did they tell you?
 3      A.  What condition it was in.  They
 4  were -- they were hesitant about me coming
 5  down to see it because they didn't know how I
 6  was going to take is, so that's why it took
 7  me so long to come back, but eventually I
 8  did, so --
 9      Q.  Okay.  And so you said two to three
10  months after the storm you came back?
11      A.  Something like that, yeah.
12      Q.  And how did you come back?  Did you
13  drive?
14      A.  No.  They -- let me see.  The first
15  time I came back Darryl drove me.  Yeah.
16      Q.  Okay.  And were you living in Texas
17  when you came back?
18      A.  Yeah.
19      Q.  All right.  And when you came back
20  to New Orleans you went to visit your house?
21      A.  Yes.
22      Q.  And where did you stay in New
23  Orleans when you came back to visit?
24      A.  We stayed at a hotel somewhere
25  around Canal Street.
```

Page 76

```
 1      Q.  Okay.  And you went to visit your
 2  house?
 3      A.  Yes.
 4      Q.  Okay.  And what was the condition?
 5      A.  Terrible.
 6      Q.  What was the condition of the
 7  street, of Industry Street?
 8      A.  Deplorable.
 9      Q.  When you say deplorable, what do
10  you mean?
11      A.  It just -- it just looked like a
12  different color.  Debris and -- it just
13  looked like you are in another place or
14  something.
15      Q.  There was debris in the streets?
16      A.  Yeah.
17      Q.  Did you have any trouble driving
18  down the streets?
19      A.  Some.
20      Q.  Okay.
21      A.  Stop sign every corner.
22      Q.  What about the stop signs?
23      A.  Stop sign every corner.
24      Q.  Stop signs at every corner?
25      A.  Yeah.
```

Page 77

```
 1      Q.  All right.  The 1700 block of
 2  Industry Street, what are the streets that
 3  form the boundary of that block?
 4      A.  North Broad, Bruxelles.  The
 5  streets there sort of, they went kind of
 6  crazy.  If -- you, you, you --
 7      Q.  It runs at an angle?
 8      A.  You could say that.
 9      Q.  Which street runs at an angle,
10  North Broad or Bruxelles?
11      A.  Okay.  Let me see if I can -- if
12  this -- (indicating).  My house would be say
13  about here, two blocks off of North Broad.
14      Q.  Okay.
15      A.  So I'm bounded by Broad on one side
16  and Republic on the other.
17      Q.  Okay.  Why don't you draw a line
18  showing where Broad is, where Broad
19  intersects with Industry.
20      A.  Okay.  Like I said, this is Broad
21  right here and this is Republic and this is
22  Industry here (indicating).  This street is
23  coming back toward Canal Street here,
24  Republic.
25      Q.  Okay.
```

GLADYS LaBEAUD (LEVEE)                                    7/16/2007

---

Page 78

1      A.  And Industry runs into it, you see
2  (indicating).
3      Q.  Oh, Industry intersects North Broad
4  and Republic?
5      A.  Right.
6      Q.  Okay.  And you live in between
7  those two streets?
8      A.  Yes.
9      Q.  And you are about two blocks off of
10  North Broad?
11      A.  No.  I'm two houses from North
12  Broad.
13      Q.  All right.  So you are in the block
14  between Republic and North Broad?
15      A.  Yes.
16      Q.  On --
17      A.  On Industry.
18      Q.  Okay.
19      MR. JOANEN:
20      Do you want to attach this?
21      MR. GARDNER:
22      That's fine.
23      MR. JOANEN:
24      D?
25      MR. GARDNER:

---

Page 79

1      Four.  The photographs are 3.
2  EXAMINATION BY MR. GARDNER:
3      Q.  And when you first went to the
4  house did you take any photographs?
5      A.  No.
6      Q.  You produced some photographs here
7  this morning.  Were those taken at the time
8  of your first visit?
9      A.  Darryl had already taken those.
10      Q.  Okay.  So those picture --
11      A.  Before I went back.
12      Q.  So those pictures had been taken
13  before you arrived?
14      A.  (Witness nods head.)
15      Q.  Alll right.  When you saw your
16  house was there any indication from the
17  outside that it had been damaged?
18      A.  You could see a water line on the
19  outside of the house.  Evidently the water
20  must have sat there for quite awhile.
21      Q.  Okay.  Was there any damage to the
22  roof?
23      A.  Not that I could see.
24      Q.  Did your house have any gutters on
25  it?

---

Page 80

1      A.  Yes.
2      Q.  Were the gutters blown off?
3      A.  One -- two had fallen off some kind
4  of way.
5      Q.  Was there any damage to the vinyl
6  siding?
7      A.  Not that I could see.
8      Q.  Were -- what type of roofing
9  material was on your roof?
10      A.  I really don't know.
11      Q.  Okay.  Did you see any pieces of
12  roof on the ground, roof material on the
13  ground?
14      A.  No.
15      Q.  Okay.  Was any of the debris that
16  was in front of your house, was it any, was
17  it any -- part of your, the building of your
18  house, in other words, were there any pieces
19  of your house that had been blown off?
20      A.  I couldn't tell.
21      Q.  Did your house have a chimney?
22      A.  Yes.
23      Q.  Was the chimney intact or had it
24  had any damage?
25      A.  I don't know.

---

Page 81

1      Q.  Were there any trees on your
2  property?
3      A.  Yes.
4      Q.  Were those trees still standing?
5      A.  Yeah.  It fell down later.  Yes.
6      Q.  Okay.  Was there any tree branches
7  that were on your house?
8      A.  I don't know.
9      Q.  Was there any indication that any
10  tree branches had hit your house or damaged
11  it?
12      A.  I don't -- I don't know.
13      Q.  Was there any indication that any
14  flying debris had hit your house or damaged
15  your house?
16      A.  No.
17      Q.  Were there any large pieces of
18  debris on your property that had been, you
19  know, had been left there after the storm?
20      A.  I don't remember.
21      Q.  Okay.  Was the front door of your
22  house opened?
23      A.  I don't think so.
24      Q.  Was your house marked by the
25  National Guard?

---

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

GLADYS LaBEAUD (LEVEE)                                    7/16/2007

Page 82

1      A.  I don't remember if it was marked
2   then or the second time I went back.  I
3   really don't remember.
4      Q.  Okay.  Now, you said there was a
5   water line on the side of the house?
6      A.  Uh-huh.
7      Q.  And about how high off the ground
8   was the water line?
9      A.  I'd say about four feet.  Maybe
10  five.  I don't know.
11     Q.  Okay.  And how far off the ground
12  did your house sit?
13     A.  I think three feet something.  I'm
14  not sure.
15     Q.  Okay.  Did you go inside the house?
16     A.  Yes.
17     Q.  Okay.  And what was the condition
18  inside the house?
19     A.  The odor was terrible.  The carpet,
20  the sofa was a different color.  I remember I
21  had taken a Hoover and sit it up on the sofa.
22  I don't know what I was thinking, to keep
23  from getting wet or something, but anyway,
24  all the bedding was a different color.
25  Everything -- it sort of reminded you of

Page 83

1   this, tabletop and chairs.
2          VIDEOGRAPHER:
3          Excuse me.  Why don't we go off the
4          record to change tapes.
5          MR. GARDNER:
6          Okay.  Why don't we take a break.
7          (OFF THE RECORD)
8          (RECESS TAKEN AT 10:49 A.M.)
9          VIDEOGRAPHER:
10         We're now back on the record.
11         (ON THE RECORD AT 11:00 A.M.)
12  EXAMINATION BY MR. GARDNER:
13     Q.  Miss LaBeaud, did you tell me there
14  were or were not trees on your lot?
15     A.  I think you asked me if I had seen
16  any fallen trees, right?
17     Q.  Yeah, but let me ask you the
18  question again.  Were there any trees on your
19  lot before Hurricane Katrina?
20     A.  Yes.
21     Q.  Okay.  And how big were those
22  trees?
23     A.  Maybe three feet in diameter.  Very
24  tall.  I don't know how tall.
25     Q.  Okay.  And after the storm were

Page 84

1   there branches of the trees on your house?
2      A.  I don't know.
3      Q.  Okay.  Were there branches of the
4   trees -- I mean, did the trees appear that
5   they had been damaged in the storm?
6      A.  Not then.
7      Q.  Okay.  Not then?  Did they at a
8   later date?
9      A.  (Witness nods head.)  Yes.
10     Q.  And when was that?
11     A.  I don't know exactly.
12     Q.  Okay.
13     A.  Sometime later.
14     Q.  Now, the pictures that we
15  identified as Exhibit 3, these pictures were
16  taken before you visited the house?
17     A.  I think so.
18     Q.  Was -- did the house appear
19  to you to be in a different condition when
20  you saw it than it was in these pictures?
21     A.  Um --
22     Q.  Let me rephrase the question.  Do
23  these pictures show how the house looked when
24  you first saw it?
25     A.  Yeah.

Page 85

1      Q.  Okay.  Let me see if I could ask
2   you if you could find a photograph that shows
3   the water line that you talked about.
4      A.  Well, this is what seems to be a
5   water line here (indicating).
6      Q.  Okay.  And why don't we go ahead
7   and mark this photograph that you're
8   referring to as 3A.
9          MR. GARDNER:
10         Can I do that?
11         MR. JOANEN:
12         3.
13         MR. GARDNER:
14         I'm going to call it 3A.
15         MR. JOANEN:
16         Okay.
17  EXAMINATION BY MR. GARDNER:
18     Q.  Right there (indicating).  Did you
19  see any photograph that showed the water line
20  inside the house?
21     A.  Not that I could really see.
22     Q.  Well, let me show you one I saw.
23  Does this photograph show a water line as far
24  as you're concerned inside the house
25  (indicating)?

22 (Pages 82 to 85)

GLADYS LaBEAUD (LEVEE)                                    7/16/2007

---

Page 86

1   A.  That's the Hoover I put up there.
2  Silly.  I can't see one.
3   Q.  Well, is this line on the door
4  frame, is that a water line?
5   A.  No, because the water came up
6  higher than that.
7   Q.  Okay.
8   A.  You can see that this is all
9  different color stuff here and all
10 (indicating).  It had to come up higher than
11 that for this to be like it is.
12  Q.  Okay.  Do you know how high the
13 water line came up inside your house?
14  A.  Some places higher than others.  I
15 would say about between three, four feet in
16 some places.
17  Q.  Four feet was the highest?
18  A.  I would say depending on, you know,
19 what I could see -- like the top of my
20 dresser like up here (indicating), some of
21 the stuff up there was all messed up and
22 stuff.
23  Q.  Are these photographs, are these
24 just your apartment or are these your
25 apartment and Darryl's?

---

Page 87

1   A.  Both.
2   Q.  Okay.  Can you show me which
3  photographs just include the items in
4  Darryl's apartment.
5       MR. GARDNER:
6       Scott, do you have any yellow
7       stickies that she could mark these?
8       Some on the page are different
9       apartments.
10      MR. JOANEN:
11      Sure.
12      MR. PATE:
13      Warren, I put a red pen down there.
14      Or something like that.
15      MR. GARDNER:
16      We could do it like that.  It may
17      be easier.
18      MR. PATE:
19      Whatever works.
20      MR. GARDNER:
21      Yeah.
22 EXAMINATION BY MR. GARDNER:
23  Q.  These are --
24  A.  Darryl's.
25  Q.  These are Darryl's (indicating)?

---

Page 88

1   A.  Uh-huh.
2       MR. GARDNER:
3       Why don't we go off the record for
4       a second.
5       VIDEOGRAPHER:
6       Off the record.
7       (TIME IS NOW 11:18 A.M.)
8       VIDEOGRAPHER:
9       We're now back on the record.
10      (TIME IS NOW 11:29 A.M.)
11 EXAMINATION BY MR. GARDNER:
12  Q.  All right.  Miss LaBeaud, you went
13 through these pictures and you marked the
14 ones that represent Darryl's, the inside of
15 Darryl's apartment?
16  A.  Yes.
17  Q.  And you did that by writing Darryl
18 next to them with the red pen?
19  A.  Yes.
20  Q.  Okay.  Were -- was any of the
21 items, the contents of your house or your
22 apartment, were they salvageable after
23 Hurricane Katrina?
24  A.  Yes.
25  Q.  Okay.  And what types of things

---

Page 89

1  were you able to salvage?
2   A.  Some kitchen utensils and some
3  clothing.
4   Q.  Okay.  Anything else?
5   A.  Pictures.
6   Q.  Okay.  And which pictures were
7  those?  Pictures that were on the wall or
8  pictures that were in some other location?
9   A.  Some on the wall, some in albums.
10 And three clocks, wall clocks.
11      MR. PATE:
12      I didn't get that last one.
13      MR. GARDNER:
14      Some that were on the wall and some
15      that were in albums.
16      MR. PATE:
17      Thank you.
18 EXAMINATION BY MR. GARDNER:
19  Q.  Okay.  Do these pictures show any
20 of the clocks that you were able to salvage?
21  A.  (Witness shakes head.)  There is a
22 clock somewhere.  I don't know.
23  Q.  Well, do you know if the clock is
24 in the -- in the photograph?
25  A.  The clock I saw was in my kitchen.

---

GLADYS LaBEAUD (LEVEE)                                    7/16/2007

---

Page 90

1  There it is there (indicating).
2      Q.  All right.  So the clock you were
3  able to salvage was above the stove?
4      A.  Yeah.
5      Q.  Okay.  And why don't we identify
6  that as picture B (indicating).  Were you
7  able to salvage your microwave?
8      A.  Yeah.  Yeah.
9      Q.  Okay.  And it is located about how
10 many feet off the floor?  What would you
11 estimate?
12     A.  At least four feet I would say.
13     Q.  Okay.  But the microwave didn't get
14 any water damage, did it?
15     A.  I don't know.
16     Q.  Okay.  But you were able to salvage
17 it and reuse it?
18     A.  We're not using it.  I don't
19 know -- I don't know if it is any good or
20 not.
21     Q.  Okay.  Did you take it out of the
22 house?
23     A.  Darryl took it out the house.
24     Q.  Is it in your apartment on South
25 Jeff Davis?

---

Page 91

1      A.  No.  He has it in his place.
2      Q.  Okay.  But the clock was removed?
3      A.  Yeah.
4      Q.  Okay.  And you had other clocks
5  that were taken out of your house?
6      A.  We had two others, yeah.
7      Q.  Okay.  And are they working today?
8      A.  Yes.
9      Q.  Okay.  You said you removed some of
10 the pictures on the wall?
11     A.  Uh-huh.
12         MR. JOANEN:
13         Answer yes.
14         THE WITNESS:
15         Yes.
16 EXAMINATION BY MR. GARDNER:
17     Q.  Do the photographs show any of the
18 pictures you were able to remove?
19     A.  No.
20     Q.  And removed them because they were
21 still good?
22     A.  Yes.
23     Q.  Okay.  And you -- did you have any
24 pictures in photo albums?
25     A.  Yes.

---

Page 92

1      Q.  Okay.  Were you able to salvage
2  your photo albums?
3      A.  Yes.
4      Q.  Okay.  And where were your photo
5  albums?
6      A.  I had something like a bookcase
7  near my front door and they were up high,
8  so --
9      Q.  Okay.  Do you know how high they
10 were?
11     A.  That was -- the bookcase would go
12 about as high as the door there (indicating).
13 So they were a good distance up about near
14 the top shelves.
15     Q.  So they were more than four feet
16 off the ground?
17     A.  Yeah.
18     Q.  Were you able to salvage any
19 other books in the bookcase that were more
20 than four feet off the ground?
21     A.  Yeah.  Yeah.
22     Q.  Okay.  Is it fair to say that
23 anything that was more than four feet off the
24 ground was salvageable?
25     A.  No, because some of it was damp and

---

Page 93

1  like mildewed.  Just --
2      Q.  Okay.  But some of the items were
3  salvageable?
4      A.  Yeah.
5      Q.  All right.  What about your
6  clothing, were you able to salvage any of
7  your clothing?
8      A.  Some of those.
9      Q.  Okay.  What percent were you able
10 to salvage?  Half?
11     A.  No.  Less than half.
12     Q.  Okay.
13     A.  Maybe I would say maybe one-sixth
14 of what I had.
15     Q.  Okay.  Do you know if Darryl was
16 able to salvage any of the electronic
17 equipment in his apartment?
18     A.  No.
19     Q.  He was not?
20     A.  I don't know.
21     Q.  Okay.  Were you able to salvage any
22 of the electronic equipment in your
23 apartment?
24     A.  No.
25     Q.  So you weren't able to reuse the

---

24  (Pages 90 to 93)

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

GLADYS LaBEAUD (LEVEE)                                    7/16/2007

---

Page 94

1  television?
2      A.  No.
3      Q.  Now, did you ever have the house
4  gutted after Hurricane Katrina?
5      A.  Yes.
6      Q.  Is the house, is it presently being
7  repaired?
8      A.  We -- no.  We're waiting on
9  somebody to do elevation.
10     Q.  Okay.  Somebody to do flood
11 elevation?
12     A.  Elevation.
13     Q.  All right.  Now, you said you went
14 back to the house a second time?
15     A.  Yes.
16     Q.  How often do you go back to the
17 house?  Before you returned to New Orleans
18 how often did you go back to the house?
19     A.  Three times.
20     Q.  Three times.  Was there any change
21 in the condition in the different times you
22 went back?
23     A.  Not really.
24     Q.  Was there ever -- was there ever
25 any indication that your house had been

---

Page 95

1  looted?
2      A.  No.  No more than, I guess, you
3  could say people used the water until I had
4  that cut off.
5      Q.  Okay.  What about Darryl's
6  apartment, did anyone loot Darryl's
7  apartment?
8      A.  No.
9      Q.  Okay.  When you went back the first
10 time did you see any of your neighbors?
11     A.  The first time.  Yes.  Yes.
12     Q.  Were any of your neighbors living
13 in their houses?
14     A.  No.
15     Q.  What were they doing when you saw
16 them?
17     A.  Some of them had the trailers.
18     Q.  Moving furniture?
19     A.  No.  They, you know, the white
20 trailers.
21     Q.  Oh, the FEMA trailers?
22     A.  The FEMA trailers.
23     Q.  Okay.  All right.  So you had
24 neighbors that were living on the property.
25     A.  Uh-huh.

---

Page 96

1      Q.  Okay.  When you went back the first
2  time were there any blue roofs on the houses
3  in your neighborhood?
4      A.  Not that I recall.
5      Q.  Do you know what I mean when I saw
6  blue roof?
7      A.  I think so.  Repairing the roof.
8      Q.  Yeah.  What were the conditions of
9  the other houses on your block?  Was it the
10 same as yours?
11     A.  I don't really know.  I don't
12 really know.
13     Q.  Okay.  And you said a moment ago
14 that you all had gutted your house?
15     A.  Yes.
16     Q.  Did you gut the whole house?
17     A.  Yes.
18     Q.  Okay.  And when was the gutting
19 done?
20     A.  Sometime last -- was it July?  I
21 think it was sometime last year.  I think so.
22     Q.  July of 2006?
23     A.  I think it was later than that.
24 I'm not certain about the dates.
25     Q.  Okay.  Who -- did you hire someone

---

Page 97

1  to do the gutting?
2      A.  My son Pierre did.  He hired
3  someone to do it.
4      Q.  Okay.  Do you know how much it cost
5  to gut your house?
6      A.  No.
7      Q.  Okay.  Did they -- how much -- did
8  you have Sheetrock or did you have plaster in
9  your house?  Were the walls Sheetrock or
10 plaster?
11     A.  Excuse me.  That's my daughter.
12     MR. GARDNER:
13     Miss LaBeaud is taking a phone
14     call.
15     MR. JOANEN:
16     Off the record.
17     VIDEOGRAPHER:
18     Off the record.
19     (TIME IS NOW 11:40 A.M.)
20     VIDEOGRAPHER:
21     We're back on the record.
22     (TIME IS NOW 11:41 A.M.)
23 EXAMINATION BY MR. GARDNER:
24     Q.  Miss LaBeaud, you said your son
25 Pierre hired someone to gut the house?

---

25 (Pages 94 to 97)

GLADYS LaBEAUD (LEVEE)                                    7/16/2007

Page 98

1   A.  Yes.
2   Q.  And did you pay for the gutting?
3   A.  No.
4   Q.  Do you know how much it cost?
5   A.  No.
6   Q.  And I asked you if there was
7   Sheetrock or plaster on the walls in your
8   house.  Do you know the answer to that?
9   A.  Sheetrock.
10   Q.  Okay.  Do you know how high off the
11   floor the Sheetrock was removed or was it the
12   entire wall removed?
13   A.  The entire wall.
14   Q.  All the way to the ceiling?
15   A.  Yes.
16   Q.  Okay.  Were the ceilings removed?
17   A.  Yes.
18   Q.  Okay.  Before the ceilings were
19   removed did you see any water spots on them?
20   A.  No.  No.
21   Q.  I mean, do you remember one way or
22   the other if there were water spots?
23   A.  No, I don't remember.
24   Q.  Okay.  Had any of the ceilings
25   collapsed?

Page 99

1   A.  Yes.
2   Q.  Okay.  And in which rooms had the
3   ceilings collapsed?
4   A.  Both the living rooms.
5   Q.  Both the living rooms on your side
6   and on Darryl's side?
7   A.  Yeah.
8   Q.  And is that the first room when you
9   open the front door?
10   A.  Yes.
11   Q.  Okay.  And when the ceilings had
12   collapsed could you see daylight through the
13   ceiling?
14   A.  No.
15   Q.  Okay.  Could you see water dripping
16   out of the ceiling?
17   A.  No.
18   Q.  How big of an area of the ceiling
19   collapsed?
20   A.  Some of the -- I don't know, some
21   of the big boards up there, I don't know what
22   you call them, but it looked like --
23   Q.  You could see them?
24   A.  -- about three or four different
25   areas though.

Page 100

1   Q.  Okay.  You could see the joists in
2   the ceiling?
3   MR. JOANEN:
4   If I could just object.  When you
5   said the area that had collapsed, I
6   thought she said there was falling
7   down in both sides.
8   MR. GARDNER:
9   Right.
10   MR. JOANEN:
11   So I'm kind of confused now whether
12   she is talking about her side or
13   her son's side.
14   EXAMINATION BY MR. GARDNER:
15   Q.  All right.  Let's talk about your
16   side for a second.  The area in the living
17   room that had collapsed, how big was it?  In
18   the ceiling?
19   MR. JOANEN:
20   The living room in her side?
21   MR. GARDNER:
22   In her side.
23   THE WITNESS:
24   It looked like some of the boards
25   up there had fallen down.  I don't

Page 101

1   really remember.
2   EXAMINATION BY MR. GARDNER:
3   Q.  Okay.  But you could -- part of the
4   ceiling were missing?
5   A.  I could see the boards where they
6   had fallen.
7   Q.  Okay.  Okay.  And what about in
8   Darryl's apartment, was the situation the
9   same?
10   A.  About.
11   Q.  Now, other than gutting the house,
12   have there been any steps to repair it as of
13   today?
14   A.  Well, my son Pierre gotten permits.
15   Q.  Has any work begun?
16   A.  No.
17   Q.  Have you all received an estimate
18   on the amount of money it's going to cost to
19   repair the damage?
20   A.  Yes.
21   Q.  And what -- who performed that
22   estimate or who prepared the estimate?
23   A.  The insurance company.
24   Q.  Okay.  So the insurance company
25   sent an appraiser out to do an appraisal?

26 (Pages 98 to 101)

GLADYS LaBEAUD (LEVEE)                                    7/16/2007

Page 102

1     A.  No.  This was -- this was one of
2  the people that worked for the insurance.  It
3  was an estimate about what it would cost to
4  repair the house.
5     Q.  All right.  And what -- how much
6  did that estimate show?
7     A.  Approximately 161,000 some odd.
8     Q.  One hundred sixty-one thousand?
9     A.  Yes.
10     Q.  And that's just to repair the
11  house?
12     A.  Yes.
13     Q.  Okay.  And did you -- do you have a
14  copy of that estimate?
15     A.  Yes.
16     Q.  And that's at your house?
17     A.  Yes.
18     Q.  And who prepared it?
19     A.  A State Farm agent.
20     Q.  Okay.  And State Farm was your
21  insurance carrier?
22     A.  Yes.
23     Q.  Did you make a claim with State
24  Farm for flood damages?
25     A.  Yes.

Page 103

1     Q.  Okay.  And did you receive any
2  money from State Farm?
3     A.  Yes.
4     Q.  And how much was that?
5     A.  $120,100.
6     Q.  Okay.  And you have a record of
7  what you received from State Farm in your
8  records at your home?
9     A.  Yes.
10     Q.  Okay.  Now, did you make a claim
11  for damages to the contents of your
12  apartment?  When I say apartment, I'm
13  referring to your house, too.
14     A.  That -- wait a minute.  Let me see.
15  I was trying to think if that included the
16  contents.  I'm not exactly sure.  I would
17  have to look at that again.
18     Q.  Okay.  Did you ever have an
19  estimate done on the contents that you lost,
20  an estimate of the value?
21     A.  Yeah.  Yes.
22     Q.  Okay.  Did you -- and who prepared
23  that estimate?
24     A.  State Farm.
25     Q.  Okay.  And did they place a value

Page 104

1  on the contents that was damaged?
2     A.  Well, as I said, they made an
3  estimate of what it would cost to repair the
4  house.
5     Q.  Okay.  But what about the items
6  inside the house?
7     A.  No.
8     Q.  Okay.  Did you ever prepare a list
9  of all the items inside your house that were
10  damaged?
11     A.  No.
12     Q.  Okay.  Did you ever make a claim
13  for the items inside your house that were
14  damaged?
15     A.  No.
16     Q.  Okay.  Do you have an opinion as to
17  the value of the items inside your house that
18  were damaged?
19     A.  I have an opinion, yes.
20     Q.  Okay.  And what is that?
21     A.  I'd say approximately about a
22  hundred thousand dollars.
23     Q.  Okay.  And that's just the
24  contents?
25     A.  Yes.

Page 105

1     Q.  Okay.  Do you know if Darryl had
2  any insurance on the contents of his
3  apartment?
4     A.  I don't know.
5     Q.  Okay.  Do you know if Darryl made a
6  claim with any insurer for the contents of
7  his apartment?
8     A.  I don't know.
9     Q.  Okay.  But the total amount you
10  received from State Farm was $120,100?
11     A.  (Witness nods head.)
12     Q.  Yes?
13     A.  Yes.
14     Q.  Okay.  And did you receive any
15  other insurance payments?
16     A.  Homeowner's.
17     Q.  You did get some money from the
18  homeowner's?
19     A.  Yes.
20     Q.  And State Farm was the homeowner's?
21     A.  Yes.
22     Q.  And how much money did you get from
23  State Farm?
24     A.  That was a little better than ten
25  thousand.

                              27 (Pages 102 to 105)

GLADYS LaBEAUD (LEVEE)                              7/16/2007

Page 106

1     MR. PATE:
2         What was the number again?
3     MR. JOANEN:
4         Ten thousand.
5  EXAMINATION BY MR. GARDNER:
6     Q.  And do you know what the
7  homeowner's payment was for, what part of the
8  damage?
9     A.  They claim, I think, wind.  I
10 believe that's right.
11    Q.  Okay.  Do you -- what wind damage
12 are you aware of that you had to your house?
13    A.  Some of the shingles came off in
14 the back.
15    Q.  Okay.  And those are shingles on
16 the roof?
17    A.  Yes.
18    Q.  Did you have a garage --
19    A.  No.
20    Q.  -- on your property?  Did you have
21 a utility shed?
22    A.  Yes.
23    Q.  Okay.  And was it in the backyard?
24    A.  Yes.
25    Q.  Okay.  And what was its condition

Page 107

1  after the hurricane?
2     A.  It seemed to be okay.
3     Q.  How big was the utility shed?
4     A.  A little smaller than half the size
5  of this room I would say.
6     Q.  Half the width or the length?
7     A.  I'd say the width probably.
8     Q.  Okay.  All right.  Are there any
9  pictures of the utility shed in your
10 pictures?
11    A.  I think so.  I think I saw one.
12    Q.  All right.  Could you see if I
13 could find one for me.
14    A.  I don't see it now.
15    Q.  Okay.  Do you remember seeing it
16 when you looked the first time?
17    A.  I think I did.
18    Q.  All right.  We'll come back to
19 that.  But the utility shed appeared to be in
20 good shape after the storm?
21    A.  Yes.
22    Q.  Okay.  Did you have any broken
23 windows in your house?
24    A.  No.  No.
25    Q.  And I'm talking about when you saw

Page 108

1  it after the storm.
2     A.  No.
3     Q.  Other than the estimate that you
4  referred to that you thought State Farm had
5  performed regarding the damages to your
6  house, did you or any of your sons get an
7  estimate on the repairs to the house?
8     A.  No.
9     Q.  Okay.  Do you plan on moving back
10 into the house?
11    A.  I'd like to.
12    Q.  Okay.  Did you ever form an opinion
13 as to where the water came from that flooded
14 your house?
15    A.  Form an -- no.
16    Q.  Okay.  Do you have any idea how
17 long the water was in your house?
18    A.  About two weeks.
19    Q.  Okay.  Why do you say that?
20    A.  Well, I was told by some of the
21 neighbors that, you know, they would come
22 around looking and they could see where the
23 water had just come to a standstill in
24 certain places.
25    Q.  Okay.  And which neighbors were

Page 109

1  those?
2     A.  Some of the people that lived in
3  the area.
4     Q.  Okay.  Do you remember their names?
5     A.  Not really.
6     Q.  Okay.  Did you ever see any
7  pictures of the water in the neighborhood?
8     A.  No.
9     Q.  Okay.  And when you went out to
10 your house on later visits did you take any
11 additional photographs?
12    A.  No.
13    Q.  Okay.  Did your neighbors ever tell
14 you how high the water got in your
15 neighborhood?
16    A.  No.
17    Q.  Okay.  And you never -- did you
18 ever form an opinion as to how high the water
19 got?
20    A.  Well, from some of the houses I
21 could see some was higher, you know, the line
22 on the outside because a lot of the houses
23 around there are painted white.  You know,
24 you could see that streak around the house,
25 so evidently it was high in some places than

JOHNS PENDLETON COURT REPORTERS                   800 562-1285

GLADYS LaBEAUD (LEVEE)                                    7/16/2007

Page 110

1  it was in others.
2      Q.  Okay.  Now, before Hurricane
3  Katrina had you ever had your house
4  appraised?
5      A.  Yes.
6      Q.  Okay.  And when was the last time
7  before Hurricane Katrina that you had the
8  house appraised?
9      A.  In '96, I think.
10     Q.  Okay.  And why did you have it
11 appraised?
12     A.  Because I wanted to get a loan from
13 Regions.
14     Q.  You wanted to get a loan?
15     A.  Yes.
16     Q.  To -- for what reason?
17     A.  Some things I wanted to do.
18     Q.  Okay.  Did it have anything to do
19 with making improvements to the house?
20     A.  No.
21     Q.  Okay.  And who appraised your
22 house?
23     A.  I don't remember.
24     Q.  Well, was the appraisal done for a
25 bank?

Page 111

1      A.  Yes.
2      Q.  Okay.  And which bank was the
3  appraisal done for?
4      A.  Regions.
5      Q.  Regions.  And do you remember what
6  the appraised value of your house was?
7      A.  No.
8      Q.  Do you have a copy of that
9  appraisal at your home?
10     A.  Maybe.
11     Q.  Okay.
12     A.  I don't know.
13     Q.  Well, do you have any opinion as to
14 what the appraised or what the value of your
15 house was at the time before Hurricane
16 Katrina?
17     A.  No.
18     Q.  Okay.  Do you have any -- well, can
19 you estimate what you believe your house was
20 valued before Hurricane Katrina?
21     A.  I -- according to the housing that
22 had gone up as much as three times.  I would
23 say maybe about $135,000, at least.
24     Q.  $125,000?
25     A.  Thirty-five.

Page 112

1      Q.  A hundred and thirty-five.  And you
2  base that on what?
3      A.  Things I've seen in newspaper, seen
4  on TV, that sort of thing.
5      Q.  Okay.  Do you have any opinion
6  about what the value of your lot was worth
7  before Hurricane Katrina?
8      A.  No.
9      Q.  Do you have an opinion as to what
10 the value of your lot is today?
11     A.  No.
12     Q.  What about do you have an opinion
13 as to what the value of your house is today?
14     A.  No.
15     Q.  Have you had your house appraised
16 since Hurricane Katrina?
17     A.  No.
18     Q.  Do you know if any of the houses in
19 your neighborhood have been appraised since
20 Hurricane Katrina?
21     A.  No.
22     Q.  That you know of?
23     A.  No.
24     Q.  Did you continue your insurance
25 coverages on your house?

Page 113

1      A.  Yes.
2      Q.  Okay.  Is it insured today?
3      A.  Yes.
4      Q.  And that's with homeowner's and
5  flood?
6      A.  Yes.
7      Q.  Okay.  Do you know how much your
8  house was assessed for for purposes of
9  property tax before Hurricane Katrina?
10     A.  No.
11     Q.  Okay.  And do you know what the
12 assessed value is today?
13     A.  No.
14     Q.  Did you -- do you file income tax
15 returns?
16     A.  No.
17     Q.  When was the last time you filed an
18 income tax return?
19     A.  I think in '99.
20     Q.  Which was the last time you were
21 employed as a CNA?
22     A.  Yes.
23     Q.  Okay.  All right.  Are you making a
24 claim for any lost income as a result of
25 Hurricane Katrina?

GLADYS LaBEAUD (LEVEE)                                    7/16/2007

| Page 114 |
|---|
| 1     A.  No. |
| 2     Q.  All right.  Now, let's look at the |
| 3   Form 95 (indicating).  Miss LaBeaud, that, |
| 4   I'm going to ask you to look at Exhibit 1, |
| 5   which is a copy of the Form 95 which you |
| 6   produced this morning.  Do you recognize |
| 7   that? |
| 8     A.  This, yes. |
| 9     Q.  Okay.  Is the handwriting on the |
| 10  form, is that your handwriting? |
| 11    A.  Yes. |
| 12    Q.  Okay.  Did you complete it?  Did |
| 13  you fill out the form? |
| 14    A.  Yes. |
| 15    Q.  Okay.  You filled out the |
| 16  handwritten portions of the form? |
| 17    A.  Yes. |
| 18    Q.  All right.  Do you know who filled |
| 19  out the typewritten portions of the form? |
| 20    A.  No. |
| 21    Q.  When you completed this form were |
| 22  you living in Texas? |
| 23    A.  Yes. |
| 24    Q.  How did you get the form? |
| 25    A.  Through the mail. |

| Page 116 |
|---|
| 1     A.  It was. |
| 2     Q.  And on the second page, the |
| 3   insurance information, is that the State Farm |
| 4   policy that we were just referring to? |
| 5     A.  Second page. |
| 6     MR. JOANEN: |
| 7     It is this one right here |
| 8     (indicating). |
| 9     THE WITNESS: |
| 10    Yes. |
| 11  EXAMINATION BY MR. GARDNER: |
| 12    Q.  Okay.  Is this the only form you |
| 13  completed for the Corps of Engineers? |
| 14    A.  I believe so. |
| 15    Q.  Okay.  Do you know if Darryl made a |
| 16  claim with the Corps of Engineers? |
| 17    A.  I don't know. |
| 18    Q.  Okay.  Have you made a, any claims |
| 19  with FEMA? |
| 20    A.  No. |
| 21    Q.  Did you receive any money from |
| 22  FEMA? |
| 23    A.  Yes. |
| 24    Q.  Okay.  And what did you receive? |
| 25    A.  Twenty -- about -- I think about |

| Page 115 |
|---|
| 1     Q.  Do you know who sent it to you? |
| 2     A.  Bruno & Bruno attorneys. |
| 3     Q.  Okay.  Do you know if they |
| 4   completed the typed portion of the form? |
| 5     A.  I don't know it.  I believe it. |
| 6     Q.  Okay.  On -- under property damage, |
| 7   section 12 A, it has $100,000. |
| 8     A.  Yeah. |
| 9     Q.  Okay.  Did you complete that? |
| 10    A.  Yes. |
| 11    Q.  Okay.  And did you indicate that |
| 12  your property damage claim was $100,000? |
| 13    A.  Yes. |
| 14    Q.  Okay.  And do you think that's |
| 15  correct? |
| 16    A.  Approximately, yes. |
| 17    Q.  Okay.  Now, you didn't indicate any |
| 18  amount under personal injury. |
| 19    A.  Yes. |
| 20    Q.  Okay.  Are you making a personal |
| 21  injury claim in this case? |
| 22    A.  No. |
| 23    Q.  The phone number that's there, the |
| 24  281 number, is that your number in Richmond, |
| 25  Texas? |

| Page 117 |
|---|
| 1   25,000. |
| 2     Q.  Okay.  And did you receive any |
| 3   money from the Red Cross? |
| 4     A.  Some, yes. |
| 5     Q.  You said you received twenty-five |
| 6   thousand from FEMA? |
| 7     A.  Yes. |
| 8     Q.  And how much did you receive from |
| 9   the Red Cross? |
| 10    A.  I don't remember. |
| 11    Q.  Okay.  And what was the $25,000 |
| 12  that you received from FEMA for? |
| 13    A.  Housing and -- housing and I think |
| 14  it was clothing that was for me and the two |
| 15  children that lived with me. |
| 16    Q.  Okay.  Did the $25,000 cover all of |
| 17  your rental expenses in Texas? |
| 18    A.  Yes. |
| 19    Q.  So it covered all of your rental |
| 20  expenses, and plus it allowed you and your |
| 21  daughter and granddaughter to buy some new |
| 22  clothes? |
| 23    A.  Yeah. |
| 24    Q.  And have you made a claim with the |
| 25  Road Home program? |

JOHNS PENDLETON COURT REPORTERS                      800 562-1285

GLADYS LaBEAUD (LEVEE)                                    7/16/2007

Page 118

1    A.  Yes.
2    Q.  Okay.  Have you gotten a response?
3    A.  Yes.
4    Q.  And what was the response?
5    A.  They said we were -- I was
6    eligible.
7    Q.  Okay.  Did you -- have you received
8    any money from the Road Home program?
9    A.  Yes.
10   Q.  How much have you received?
11   A.  Seventy thousand eight hundred and
12   ninety-nine dollars and I think six cents.
13       MR. PATE:
14       What was the number?
15   EXAMINATION BY MR. GARDNER:
16   Q.  I think Miss LaBeaud has it
17   memorized.  What's the number?
18   A.  $70,899.06.
19   Q.  Have you made -- and is that the
20   entire amount you are eligible to receive
21   from the Road Home program?
22   A.  Is that the entire amount I was
23   eligible to receive?
24   Q.  Yes.
25   A.  No.

Page 119

1    Q.  Okay.  But do you anticipate
2    getting anymore?
3    A.  Anticipate, yes.
4    Q.  Have you received the $70,899.06?
5    A.  Yes.
6    Q.  And how much more do you anticipate
7    getting?
8    A.  Thirty thousand.
9    Q.  And why -- why do you anticipate
10   getting the thirty thousand?
11   A.  Because for the total grant that I
12   was eligible for came to the seventy that I
13   just mentioned plus the thirty for elevation.
14   And that came to that particular amount.
15   Q.  And the thirty thousand dollars is
16   to raise your house?
17   A.  Yes.
18   Q.  Okay.  Do you plan on doing that?
19   A.  Yes.  They said it is compulsory.
20   Q.  And the $70,899.06 is for what?
21   A.  The correct word I don't remember
22   right now, but --
23   Q.  Okay.  But is that for repairs to
24   your home?
25   A.  As I say, I really -- I'm not sure

Page 120

1    about --
2    Q.  Okay.  Well, do you plan on using
3    that to repair your home?
4    A.  Yes.
5    Q.  Okay.  And you plan on elevating
6    your home?
7    A.  Yes.
8    Q.  And throughout this deposition I've
9    referred to 1708 Industry as your home and
10   your apartment, and you realize I was talking
11   about the same thing?
12   A.  Yes.
13   Q.  Okay.  Have you applied for an SBA
14   loan?
15   A.  No.
16   Q.  All right.  Have you completely
17   resolved your flood insurance claim with your
18   insurer?
19   A.  Yes.
20   Q.  I mean, do you believe you are owed
21   any additional sums?
22   A.  No.
23   Q.  Okay.  Now, are all of your
24   children back in New Orleans?
25   A.  Yes.

Page 121

1    Q.  Okay.  Do you have any other
2    brothers or sisters who live in New Orleans?
3    A.  No.
4    Q.  Did Mr. LaBeaud have any other
5    siblings here?
6    A.  Yes.
7    Q.  Okay.  Do you have contact with
8    them?
9    A.  She's passed, too.  One sister.
10   Q.  Just one sister?
11   A.  Yes.
12   Q.  Okay.  So all of your immediate
13   relatives are back in New Orleans following
14   the storm?
15   A.  Yes.
16   Q.  Okay.  Prior to Hurricane Katrina
17   did you attend church at a particular
18   congregation?
19   A.  Yes.
20   Q.  And what was that?
21   A.  Mount Hermon Baptist Church.
22   Q.  And where was that located?
23   A.  1833 North Broad, right across the
24   street from my house.
25   Q.  Is that congregation still meeting?

GLADYS LaBEAUD (LEVEE)                                    7/16/2007

| Page 122 |
|---|
| 1    A. Yes. |
| 2    Q. Do you still attend church? |
| 3    A. I haven't been back yet. |
| 4    Q. Okay. Well -- you've just gotten |
| 5  back in New Orleans, right? |
| 6    A. Yes. |
| 7    Q. Do you plan on going back to that |
| 8  church? |
| 9    A. Yes. |
| 10   Q. Do you know if the congregation is |
| 11 the same size that it was before the storm or |
| 12 do you know? |
| 13   A. I don't really know. |
| 14   Q. Okay. Have you gone back to visit |
| 15 your neighborhood since you returned to New |
| 16 Orleans? |
| 17   A. Yes. |
| 18   Q. Okay. Are most of your neighbors |
| 19 back? |
| 20   A. Most, no. |
| 21   Q. Okay. |
| 22   A. I'm saying -- I don't really know |
| 23 because I didn't see them. I don't know. |
| 24   Q. Okay. Did you talk to any of your |
| 25 neighbors? |

| Page 123 |
|---|
| 1    A. Yes. |
| 2    Q. And which ones were those? |
| 3    A. A lady named Annette, her daddy. |
| 4  And another lady live on the corner, I can't |
| 5  think of that lady's name right now, but |
| 6  about four different people. |
| 7    Q. Okay. Do you know where most of |
| 8  your neighbors are living now? |
| 9    A. Not most, no. |
| 10   Q. Okay. And I'm talking about the |
| 11 ones that aren't living in New Orleans. |
| 12   A. A few of them, but maybe two or |
| 13 three, that's about it. |
| 14   Q. Okay. Have you kept contact with |
| 15 some of the neighbors that moved out of New |
| 16 Orleans? |
| 17   A. Yes. |
| 18   Q. And where did they move? |
| 19   A. One's in Westwego, I know that. |
| 20 And -- you said out of New Orleans. Let me |
| 21 see. I think one is in Pittsburgh. |
| 22   Q. Okay. Before Hurricane Katrina did |
| 23 you, did you belong to any social |
| 24 organizations? |
| 25   A. Just church stuff. That's all. |

| Page 124 |
|---|
| 1    Q. Just church. What about any |
| 2  philanthropical organizations? |
| 3    A. No. |
| 4    Q. Were you registered to vote in |
| 5  Orleans Parish before the storm? |
| 6    A. Yes. |
| 7    Q. Are you still registered? |
| 8    A. Yes. |
| 9    Q. Do you plan on voting? |
| 10   A. Yes. |
| 11   Q. Did you vote while you were away? |
| 12   A. Yes. |
| 13   Q. All right. Did you attend any |
| 14 Mardi Gras parades before the storm? |
| 15   A. No. |
| 16   Q. Okay. What about sporting events? |
| 17   A. No. |
| 18   Q. What about City Park or Audubon |
| 19 Park, did you ever visit that? |
| 20   A. Yes. |
| 21   Q. Have you been back to either park |
| 22 since the storm? |
| 23   A. No. |
| 24   Q. Do you plan on going back? |
| 25   A. Yes. |

| Page 125 |
|---|
| 1    Q. Now, when we were talking about |
| 2  your evacuation expenses, Miss LaBeaud, you |
| 3  said that you had to pay the apartment |
| 4  complex in Texas because they didn't want to |
| 5  be involved with payments from FEMA. |
| 6    A. Yes. |
| 7    Q. Okay. But as I understand your |
| 8  testimony, you have been reimbursed from FEMA |
| 9  all of your expenses that you incurred with |
| 10 that apartment complex, with renting that |
| 11 unit? |
| 12   A. No. It didn't work like that. |
| 13   Q. Okay. |
| 14   A. If -- my understanding was if the |
| 15 apartment wouldn't accept that, the rent from |
| 16 FEMA, then the tenant had to pay out of their |
| 17 pocket. |
| 18   Q. Right. |
| 19   A. FEMA did not reimburse the |
| 20 apartment. Or me. |
| 21   Q. But you were reimbursed? |
| 22   A. No, no, no. |
| 23   Q. You were not reimbursed? |
| 24   A. No. The money I received from FEMA |
| 25 is when I first, that was back in either the |

JOHNS PENDLETON COURT REPORTERS                          800 562-1285

GLADYS LaBEAUD (LEVEE)                                    7/16/2007

Page 126

1   latter part of October or the early part of
2   November. I was eligible for rental
3   assistance if I had been in a place that
4   would accept it. And the reason I wasn't was
5   because the places we found was just the
6   wrong neighborhood. A lot of crime and stuff
7   like that.
8       Q. In other words, the only places,
9   what you are telling us the only places that
10  FEMA would accept rental were in
11  neighborhoods you didn't want to live in?
12      A. The ones that we saw, yes.
13      Q. Okay. Well, you said you received
14  $25,000 from FEMA?
15      A. Yeah.
16      Q. Okay. And that was for rental
17  assistance and --
18      A. How -- they worded housing.
19      Q. Housing. Okay. Did that $25,000
20  cover all of your housing while you were
21  outside of New Orleans?
22      A. Yes.
23      Q. Okay. So even though FEMA didn't
24  pay the apartment complex for your rental
25  expense, they reimbursed or they paid you

Page 127

1   enough money to cover those rental expenses,
2   correct?
3       A. Yes.
4       Q. Okay. Have you ever been contacted
5   by anyone doing any research or investigation
6   regarding Hurricane Katrina?
7       A. No.
8       Q. Okay. Have you ever been contacted
9   by any newspaper or any part of the media
10  regarding Hurricane Katrina?
11      A. No.
12      Q. Okay. Do you understand that in
13  this case you've been identified as a class
14  representative for a proposed class action?
15      A. Yes.
16      Q. Okay. And do you know why you were
17  chosen to be a class representative?
18      A. Not exactly, no.
19      Q. Okay. What is your understanding
20  of the general nature of this lawsuit?
21      A. Well, it is believed that the Levee
22  Board was negligent and that is what caused a
23  lot of damage to the city and the residents.
24      Q. Okay. Did you -- have you ever
25  read the complaint in this case, the lawsuit?

Page 128

1       A. Some of it.
2       Q. Okay. And do you know who the
3   defendants are in the lawsuit?
4       A. Not all.
5       Q. Okay. Which ones do you know?
6       A. Well, the Levee Board, Boh
7   Brothers.
8       Q. Any others?
9       A. Not really.
10      Q. Okay. What do you understand or
11  who do you understand is included in the
12  proposed class or who are the proposed class
13  members?
14      A. People that were affected by
15  Katrina.
16      Q. Okay. Do you know the size of the
17  geographical area of the proposed class?
18      A. No.
19      Q. Okay. What do you understand your
20  duties and responsibilities of a class
21  representative are?
22      A. Just to tell the facts the way I
23  see them.
24      Q. Okay. Do you know if you represent
25  any particular subclass?

Page 129

1       A. No.
2       Q. You don't know?
3       A. (Witness shakes head.)
4       Q. Have you ever spoken with anyone
5   else who has been identified as a class
6   representative?
7       A. No.
8       Q. Okay. Other than your attorneys,
9   have you spoken with anyone regarding this
10  litigation?
11      A. No.
12      Q. Have you ever read any studies
13  regarding the levee failures following
14  Hurricane Katrina?
15      A. Some.
16      Q. Okay. And which ones are those?
17      A. The Picayune.
18      Q. Okay. Other than what was in the
19  Times-Picayune, have you read anything
20  regarding levee failures?
21      A. No.
22      Q. No. Okay. How often do you visit
23  your house on Industry Street?
24      A. About once every two or three
25  weeks.

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

GLADYS LaBEAUD (LEVEE)                                      7/16/2007

|  | Page 130 |
|---|---|

1    Q.  Do you know when the Sheetrock was
2  removed, when the walls and ceilings were
3  removed?
4    A.  No.
5    Q.  Okay.  Was it shortly after you
6  first visited the house in October of 2005?
7    A.  It was -- it was a little while.  I
8  don't remember exactly when.
9    Q.  But do you think it was sometime in
10  2005?
11    A.  I think it was more or less 2006.
12    Q.  2006.  Okay.  Do you know when?
13    A.  No.
14    Q.  Okay.  Do you remember when you
15  added on to the back of the house, what year?
16    A.  No.
17    Q.  Okay.  Do you remember -- do you
18  know approximately when that was?
19    A.  No.
20    Q.  Okay.  Well, was it more than ten
21  years before Hurricane Katrina?
22    A.  No.  I would -- I don't really
23  know.
24    Q.  Okay.  And the vinyl siding was on
25  the house when you bought it originally?

|  | Page 131 |
|---|---|

1    A.  Yes.
2    Q.  And I don't know if I asked you
3  this, but how much did you pay for the house
4  when you bought it?
5    A.  Forty-four thousand five hundred.
6    Q.  Was there an appraisal done at the
7  time you purchased?
8    A.  I -- I don't really know now.  It
9  has been such a long time ago.
10    Q.  Okay.
11    MR. GARDNER:
12    I think I'm pretty close to being
13    finished.
14    MR. JOANEN:
15    Okay.
16    MR. GARDNER:
17    We can take a few minutes.  Is
18    lunch here, do you know?
19    MR. JOANEN:
20    I just checked.  It was not yet.
21    VIDEOGRAPHER:
22    Off the record.
23    (THE TIME IS NOW 12:22 P.M.)
24    (OFF THE RECORD)
25    VIDEOGRAPHER:

|  | Page 132 |
|---|---|

1    We're now back on the record.
2    (THE TIME IS NOW 1:03 P.M.)
3  EXAMINATION BY MR. GARDNER:
4    Q.  We're back.  Miss LaBeaud, on the
5  Form 95, under section 10 where it has
6  personal injury/wrongful death, do you see
7  that?
8    A.  Yes.
9    Q.  There is a typed in portion that
10  says state name of injury or decedent and
11  underneath it it says personal injury and
12  mental distress.
13    A.  Uh-huh.
14    Q.  Do you see that?
15    A.  Yes.
16    Q.  Do you see what I'm talking about?
17    A.  Yes.
18    Q.  All right.  Are you making a claim
19  for mental distress?
20    A.  Not really.
21    Q.  Okay.  So the only claim you're
22  making in this litigation is for the property
23  damage to the property at 1708-1710 Industry
24  Streets?
25    A.  Yes.

|  | Page 133 |
|---|---|

1    Q.  Okay.  All right.  And following
2  Hurricane Katrina, you didn't see a doctor
3  for anything that you relate to Hurricane
4  Katrina?
5    A.  No.
6    Q.  Okay.  And you didn't see a
7  counselor for anything you relate to
8  Hurricane Katrina?
9    A.  No.
10    Q.  Okay.  And you didn't incur any
11  medical expenses for anything you relate to
12  Hurricane Katrina?
13    A.  No.
14    Q.  Okay.  How much -- prior to
15  Hurricane Katrina how much was your -- the
16  insurances that you paid on your house, do
17  you remember?
18    A.  No, not exactly.
19    Q.  Okay.  Do you know how much you
20  paid in taxes?
21    A.  Fifty-six dollars and some cents
22  per year.  Property tax you mean, huh?
23    Q.  Yes.
24    A.  Yes.  Fifty-six dollars and some
25  cents a year.

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

GLADYS LaBEAUD (LEVEE)                                      7/16/2007

Page 134

1    Q.  A year?
2    A.  Yes.
3    Q.  Okay.  Let me ask you something
4  else.  I know you had indicated you had taken
5  a loan out in 1996 and that it was secured by
6  the property.
7    A.  Uh-huh.
8    Q.  Was there a mortgage on the
9  property at the time of Hurricane Katrina?
10   A.  Yes.
11   Q.  Okay.  And that's the one that was
12  in favor of Regions Bank?
13   A.  Yes.
14   Q.  Okay.  We talked about that
15  earlier.
16   A.  Yes.
17   Q.  Okay.  That's the one.  There was
18  only one mortgage?
19   A.  Yes.
20   Q.  Okay.  Do you know how much your
21  property taxes are today?
22   A.  The total taxes right now, let me
23  see, about -- they should be about three
24  hundred and something dollars.
25   Q.  A year?

Page 135

1    A.  No.  I -- I can't give you a figure
2  for a year.  I don't -- I don't understand
3  how they did the property tax and this kind
4  of stuff.  I need to go to City Hall and talk
5  to somebody about that because it don't look
6  like to me it was right.  I was supposed to
7  be exempt, but it's some kind of -- something
8  just doesn't add up to me.  I don't know.
9    Q.  Okay.  Do you know how much you are
10  paying for the flood insurance and the
11  homeowner's insurance on your house?
12   A.  Flood is less than $500 for, from
13  August 1, '07 to -- no, I'm wrong.  August 7,
14  '07 to August 7, '08.
15   Q.  Okay.  So it is approximately $500
16  a year?
17   A.  Well, you could say a little less
18  than that.
19   Q.  Okay.
20   A.  And for homeowner's for a year,
21  fourteen hundred and I think eighty-two
22  dollars.
23   Q.  Okay.  Do you know if the
24  homeowner's has gone up since Hurricane
25  Katrina?

Page 136

1    A.  Yes.
2    Q.  Okay.  Has Darryl purchased his own
3  house?
4    A.  No.
5    Q.  Is he renting?
6    A.  Yes.
7    Q.  Okay.  Do you know if Darryl plans
8  to move back into 1710 Industry?
9    A.  I don't know.
10   Q.  Okay.  Do you plan on changing the
11  house at 1708-1710 Industry when you renovate
12  it?
13   A.  What you mean change?
14   Q.  I mean, are you going to make it
15  into one house or are you going to keep it as
16  it is, the floor plan?
17   A.  Right now I don't know.
18   Q.  Okay.  Are you even certain if
19  you're going to move back in?
20   A.  I want to.
21   Q.  Okay.
22   A.  It is my desire.
23   Q.  All right.  Now, you've provided
24  for us today some photographs.  And those are
25  the only photographs that you have of your

Page 137

1  property, right?
2    A.  Yeah.  I think that's right.
3    Q.  Have you ever been asked in this
4  litigation to provide any answers to any
5  questions called interrogatories?
6    A.  No.
7    Q.  Okay.  Have you ever been asked to
8  respond to any requests for production of
9  documents?
10   A.  No.
11   Q.  Okay.  Have you ever seen any
12  documents called interrogatories?
13   A.  Nope.
14   Q.  Okay.  Have you ever seen any
15  documents called request for production of
16  documents?
17   A.  What?
18   Q.  Have you seen a document called a
19  request for production of documents?
20   A.  No.
21   Q.  Okay.  You were never in the
22  military, were you?
23   A.  No.
24   Q.  Okay.  And you've never had a
25  problem with drugs or alcohol, have you?

35 (Pages 134 to 137)

GLADYS LaBEAUD (LEVEE)                                    7/16/2007

Page 138

1    A.  No.
2    Q.  Okay.  And you've never been
3  convicted of any crimes, have you?
4    A.  No.
5    Q.  Why don't you give me one minute.
6    MR. JOANEN:
7    Take your time.
8    MR. GARDNER:
9    Okay.
10    VIDEOGRAPHER:
11    Go off the record?
12    MR. GARDNER:
13    Yeah.
14    VIDEOGRAPHER:
15    Off the record.
16    (OFF THE RECORD AT 1:10 P.M.)
17    VIDEOGRAPHER:
18    We're back on the record.
19    (ON THE RECORD AT 1:14 P.M.)
20  EXAMINATION BY MR. GARDNER:
21    Q.  Miss LaBeaud, at the beginning of
22  the deposition when we went through the
23  Notice of Deposition, we went through those
24  categories of documents, you indicated that
25  your house, you had some documents that would

Page 139

1  relate to your insurance claims.
2    A.  Yes.
3    Q.  And you had some documents that
4  would relate to the moneys you received from
5  FEMA?
6    A.  Yes.
7    Q.  And you had some documents that
8  would relate to your evacuation.
9    A.  Yes.
10    Q.  Okay.  I'm going to ask that you
11  give those to your attorney and he can review
12  them and produce them to us.
13    A.  Yes.
14    Q.  Okay.
15    MR. JOANEN:
16    I have it written down.
17    MR. GARDNER:
18    All right.  All right.
19  EXAMINATION BY MR. GARDNER:
20    Q.  And you weren't asked to produce
21  those for today's deposition?
22    A.  No.
23    Q.  Okay.  One other thing.  I would
24  ask, you did not file income tax returns in
25  the last five years?

Page 140

1    A.  No, I did not.
2    Q.  Well, I would still ask, just so
3  that we can have a verification from the IRS
4  on that, that Miss LaBeaud execute for us
5  the, that income tax authorization and the
6  Social Security authorization, which are the
7  proof forms, and that's all the questions I
8  have.
9    MR. BEARDEN:
10    I don't have any questions.
11    MR. PATE:
12    No questions.
13    VIDEOGRAPHER:
14    Scott, do you have any questions?
15    MR. JOANEN:
16    No questions.
17    VIDEOGRAPHER:
18    This is the conclusion of the
19    videotape deposition.  We're now
20    going off the record.
21
22    (Whereupon, the deposition was
23  concluded at 1:16 P.M.)
24
25

Page 141

1    WITNESS CERTIFICATE
2
3
4    I, GLADYS LABEAUD, do hereby certify
5  that the foregoing testimony was given by me,
6  and that the transcription of said testimony,
7  with corrections and/or changes, if any, is
8  true and correct as given by me on the
9  aforementioned date.
10
11
12
     DATE SIGNED        WITNESS' SIGNATURE
13
14
15
16    Signed with corrections as noted.
17
      Signed with no corrections noted.
18
19
20  DATE TAKEN: July 16, 2007
21
22
23
24
25

GLADYS LaBEAUD (LEVEE)                                          7/16/2007

Page 142

1           REPORTER'S CERTIFICATE
2
3      I, MARGARET MCKENZIE, Certified Court
4  Reporter, do hereby certify that the
5  above-named witness, after having been first
6  duly sworn by me to testify to the truth, did
7  testify as hereinabove set forth;
8      That the testimony was reported by me
9  in shorthand and transcribed under my
10  personal direction and supervision, and is a
11  true and correct transcript, to the best of
12  my ability and understanding;
13      That I am not of counsel, not related
14  to counsel or the parties hereto, and not in
15  any way interested in the outcome of this
16  matter.
17
18
       MARGARET MCKENZIE, CCR, RPR, RMR, CRR
19     CERTIFIED COURT REPORTER
20
21
22
23
24
25

JOSE LUIS RODRIGUEZ (LEVEE)                              7/14/2007

Page 1

                    UNITED STATES DISTRICT COURT

                    EASTERN DISTRICT OF LOUISIANA


    IN RE:  KATRINA CANAL BREACHES      CIVIL ACTION
    CONSOLIDATED LITIGATION
                                        NO. 05-4182 "K"(2)

     PERTAINS TO:  LEVEE                JUDGE DUVAL

     FILED IN:  05-4181, 05-4182,      MAG. WILKINSON
     05-5237, 05-6073, 05-6314,
     05-6324, 05-6327, 05-6359,
     06-0225, 06-0886, 06-1885,
     06-2152, 06-2278, 06-2287,
     06-2824, 06-4024, 06-4065,
     06-4066, 06-4389, 06-4634,
     06-4931, 06-5032, 06-5155,
     06-5159, 06-5161, 06-5162,
     06-5260, 06-5771, 06-5786,
     06-5937, 07-0206, 07-0621,
     07-1073, 07-1271, 07-1285



    Videotaped deposition of JOSÉ LUIS RODRIGUEZ,
    2223 Prentiss Avenue, New Orleans, Louisiana
    70122, taken in the offices of Bruno & Bruno, 855
    Baronne Street, New Orleans, Louisiana  70113, on
    Saturday, the 14th day of July, 2007, beginning
    at 9:17 a.m.


    APPEARANCES:

         THE LAW OFFICE OF JOSEPH M. BRUNO
         (BY:  L. SCOTT JOANEN)
         855 Baronne Street
         New Orleans, Louisiana  70113


              ATTORNEYS FOR THE PLAINTIFFS

JOSE LUIS RODRIGUEZ (LEVEE)                                    7/14/2007

---

Page 2

```
1
2   APPEARANCES CONTINUED:
        DUPLASS, ZWAIN, BOURGEOIS, MORTON, PFISTER
          & WEINSTOCK
3       (BY: JENNIFER M. MORRIS)
        Suite 2900
4       3838 North Causeway Boulevard
        Metairie, Louisiana 70002
5
        ATTORNEYS FOR THE BOARD OF
6       COMMISSIONERS FOR THE LAKE BORGNE
        BASIN LEVEE DISTRICT
7
    McCRANIE, SISTRUNK, ANZELMO, HARDY,
8       MAXWELL & McDANIEL
        (BY: ANDRÉ J. LAGARDE)
9       Suite 800
        3445 North Causeway Boulevard
10      Metairie, Louisiana 70002
11      ATTORNEYS FOR THE ORLEANS
          LEVEE DISTRICT
12
    CHRISTOVICH & KEARNEY
13      (BY:  J. WARREN GARDNER, JR.)
        Suite 2300
14      601 Poydras Street
        New Orleans, Louisiana 70130
15
        ATTORNEYS FOR THE SEWERAGE AND
16        WATER BOARD OF NEW ORLEANS
17
18  VIDEOTAPED BY:
19      JOHN WADSWORTH
        Legal Video Specialist
20      HART VIDEO
        Bay 5
21      1185 Robert Boulevard
        Slidell, Louisiana 70458
22
23
24  REPORTED BY:
25      CAROL VALLETTE SLATER
        Certified Court Reporter
        Registered Professional Reporter
```

Page 3

```
1            I N D E X
2
3   EXAMINATION BY:            PAGE
4   MR. GARDNER                  6
5
6
7
8
9
10  EXHIBITS:
11  Rodriguez Exhibit Number 1A      22
        Document entitled "Notice of
12        Videotape Deposition"
13  Rodriguez Exhibit Number 2       91
        Photograph
14
    Rodriguez Exhibit Number 3       91
15      Photograph
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1            S T I P U L A T I O N
2        IT IS STIPULATED AND AGREED by and
3   between counsel for the parties hereto that the
4   deposition of the aforementioned witness is
5   hereby being taken under the Federal Rules of
6   Civil Procedure, for all purposes, in accordance
7   with law;
8        That the formalities of reading and
9   signing are specifically not waived;
10       That the formalities of sealing,
11  certification and filing are specifically waived;
12       That all objections, save those as
13  to the form of the question and the responsiveness
14  of the answer, are hereby reserved until such
15  time as this deposition, or any part thereof, may
16  be used or sought to be used in evidence.
17
18            *  *  *  *
19
20       CAROL VALLETTE SLATER, Certified
21  Court Reporter, Registered Professional Reporter,
22  in and for the Parish of Orleans, State of
23  Louisiana, officiated in administering the oath
24  to the witness.
25
```

Page 5

```
1   THE VIDEOGRAPHER:
2        We're on the record.  This
3   is the videotape of José Luis
4   Rodriguez, being held at 855
5   Baronne Street, New Orleans,
6   Louisiana, on July 14th, 2007, on
7   the indicated time on the
8   videotape of 9:17.
9        My name is John Wadsworth, a
10  certified video specialist, with
11  Hart Video of Louisiana.  The
12  court reporter is Carol Slater, of
13  Huffman & Robinson.
14       Would you please swear in
15  the witness.
16       JOSÉ LUIS RODRIGUEZ,
17  after being first duly sworn in the cause,
18  testified as follows:
19  MR. GARDNER:
20       Are we going to identify
21  ourselves?
22  MR. JOANEN:
23       Scott Joanen, on behalf of
24  the Levee PSLC.
25  MR. GARDNER:
```

2 (Pages 2 to 5)

JOSE LUIS RODRIGUEZ (LEVEE)                                    7/14/2007

Page 6

1        Warren Gardner, representing
2   the Sewerage and Water Board.
3        MR. LAGARDE:
4             André Lagarde, the Orleans
5        Levee District.
6        JENNIFER MORRIS:
7             Jennifer Morris, East
8        Jefferson Levee District.
9   EXAMINATION BY MR. GARDNER:
10       Q.   Mr. Rodriguez, I'm Warren Gardner,
11  and I represent the Sewerage and Water Board,
12  which is one of the defendants in the lawsuit
13  that you filed or that's been filed on your
14  behalf as a potential class representative.
15  We're here today, Mr. Rodriguez, to take your
16  deposition.  Have you ever been deposed before?
17       A.   I don't understand what that is.
18       Q.   Okay.  Well, the deposition is the
19  opportunity for the attorneys in this room to ask
20  you some questions about your claims in this
21  lawsuit and your claims as a potential class
22  representative in this lawsuit.  If you don't
23  understand any of my questions, please ask me to
24  rephrase them.  Otherwise, I'm going to assume
25  that when you've answered the question, you've

Page 7

1   understood it.  Is that clear?
2        A.   That's clear.
3        Q.   I would also ask, Mr. Rodriguez,
4   that in response to my questions, you give us a
5   verbal response.  If your answer, for instance,
6   is "Yes," you say "Yes" rather than nod your
7   head.  Even though this is being videotaped, it
8   makes it a lot easier for the court reporter to
9   copy what we're -- what we're discussing.
10       A.   Okay.
11       Q.   Okay?
12       A.   Uh-huh.
13       Q.   Now, have you ever filed a lawsuit
14  before?
15       A.   No.
16       Q.   So, this is the first lawsuit you've
17  ever been involved in?
18       A.   Yes.
19       Q.   Okay.  Mr. Rodriguez, did you bring
20  any documents with you today?
21       A.   No, sir.
22       Q.   Okay.  In connection with your
23  deposition, a Notice of Deposition has earlier
24  been filed, a copy of which I'm going to show to
25  your counsel, and attached to that Notice of

Page 8

1   Deposition was a list of 23 categories of
2   documents which were requested, and I'm going to
3   ask you if you have any of those documents in
4   your possession.
5        A.   Okay.
6        Q.   Okay.
7        MR. GARDNER:
8             Can I give him a copy of
9        this?
10       MR. JOANEN:
11            Sure.
12  EXAMINATION BY MR. GARDNER:
13       Q.   Turn to the back, please, or the
14  last two pages.
15       A.   Last two.
16       Q.   The page beginning Exhibit A.  I'm
17  sorry.  Last three.  All right, Mr. Rodriguez,
18  Number 1 to Exhibit A refers to a copy of each
19  Standard Form 95 submitted to the Corps of
20  Engineers as well as any drafts thereof by the
21  deponent, which is you, from August 25, 2005, to
22  the present.
23            Do you have any documents that are
24  responsive to that request?
25       A.   Yeah.

Page 9

1        Q.   And that's at your residence?
2        A.   Yes, sir.
3        Q.   Okay.  What documents do you have
4   that are responsive?  Do you have the Form 95?
5        A.   I have that.
6        Q.   Do you have any drafts of the Form
7   95?
8        A.   I don't recall.
9        Q.   Number 2 refers to all
10  administrative claims relating to Hurricane
11  Katrina that the deponent, which is you, has
12  submitted to any governmental body or agency,
13  including, but not limited to, claims forms
14  submitted to the Louisiana Recovery Authority.
15            Do you have any documents that would
16  be responsive to that other than the Form 95?
17       A.   I don't think so.
18       Q.   Okay.  Number 3 is all documents
19  that refer or relate to insurance claims that the
20  deponent has filed to recover for damages or
21  injuries, personal or property, sustained between
22  August 28th, 2005, and September 25th, 2005.
23       A.   I think I have some of those.
24       Q.   Okay.  Did you make any insurance
25  claims?

3 (Pages 6 to 9)

JOSE LUIS RODRIGUEZ (LEVEE)                                    7/14/2007

---

Page 10

1      A.   Just on the car.
2      Q.   Okay.  And you have documents that
3   are -- that refer to that claim?
4      A.   Yes, sir.
5      Q.   And those are at your home?
6      A.   At my home.
7      Q.   Okay.  Number 4 is all documents in
8   the possession, custody or control of the
9   deponent or his or her attorneys that refer or
10  relate to any eyewitness accounts of Hurricane
11  Katrina.  Do you have any documents that would be
12  responsive to that?
13     A.   Yeah.
14     Q.   Okay.  And what documents would
15  those be?
16     A.   Just pictures, some pictures.
17     Q.   And what pictures do you have?
18  What -- what --
19     A.   Of the water with my brother -- you
20  know, my brother on the jet ski.
21     Q.   Okay.  Your brother was on a jet ski
22  in water that you believe was the result of
23  Hurricane Katrina?
24     A.   Yeah.
25     Q.   Okay.  And where are those pictures?

---

Page 11

1      A.   I have some here.
2      Q.   With you?
3      A.   Yeah.
4      Q.   Okay.  So, you did bring some things
5   with you?
6      A.   Well, just -- yeah, this.
7      Q.   Okay.  You brought pictures with
8   you?
9      A.   Yeah.  You want to see them?
10     Q.   We'll get to them in a moment.
11     A.   Okay.
12     Q.   Number 5 is all documents in the
13  possession, custody or control of the deponent,
14  which is you, or his or her attorneys which
15  relate -- which refer or relate to matters
16  alleged in the Levee Master Consolidated Class
17  Action Complaint or any damages or injuries
18  allegedly sustained by the deponent as a result
19  of Hurricane Katrina.
20     A.   I don't understand that one.
21     Q.   Okay.  Well, do you have any
22  documents other than the photographs that relate
23  to the -- well, I don't know what's in the
24  photographs.  Let me start over.
25     A.   Okay, yeah.

---

Page 12

1      Q.   Do you have any documents that
2   relate to your claims in this case?
3      A.   Yeah.  Yeah.  I have -- when I left
4   from here, I went to the hospital out there
5   because I had some fungus from being in the
6   water, and that's -- if that's what you call
7   document.
8      Q.   All right.  And what documents would
9   those be?  Would those be medical records?
10     A.   Medical.  (Nods head affirmatively.)
11     Q.   All right.  Number 6 is all
12  statements, transcriptions or recorded
13  statements, tape recordings, notes, diagrams
14  and/or descriptions that refer or relate to the
15  matters alleged in the Levee Master Consolidated
16  Class Action Complaint or any damages allegedly
17  sustained by the deponent as a result of
18  Hurricane Katrina.  That request asks for
19  statements, transcriptions or recorded
20  statements, tape recordings, notes, diagrams or
21  descriptions that refer to the matters in the
22  lawsuit.  You don't have any documents?
23     A.   No.  Nothing.
24     Q.   All right.  Number 7 is all -- any
25  and all photographs, digital photograph disks

---

Page 13

1   and/or videotapes that refer or relate to matters
2   alleged in the Levee Master Consolidated Class
3   Action Complaint or any damages or injuries
4   allegedly sustained by the deponent as a result
5   of Hurricane Katrina.
6      A.   That'll be that.
7      Q.   All right.  And you brought those
8   photographs with you today?
9      A.   Yeah.
10     Q.   Okay.  All right.  Number 8 is all
11  documents that refer or relate to any claim which
12  the deponent is asserting for any damage alleged
13  in the Levee Master Consolidated Class Action
14  Complaint, including, but not limited to, damages
15  from chemical or other contamination to his
16  property, land, home, commercial buildings or
17  other improvements.
18     A.   Yeah.  The -- the one from the
19  hospital.  Right?  That'll be --
20     Q.   Well, that's relating to you
21  personally.
22     A.   Oh, okay.
23     Q.   I'm assuming it's a medical record
24  that relates --
25     A.   To me.

---

4 (Pages 10 to 13)

JOHNS PENDLETON COURT REPORTERS                         800 562-1285

JOSE LUIS RODRIGUEZ (LEVEE)                                      7/14/2007

Page 14

1    Q.   -- to you.
2    A.   Okay.
3    Q.   At the time of the -- of Hurricane
4  Katrina, did you own any property, land,
5  commercial buildings or improvements that --
6    A.   No.
7    Q.   Okay.
8    A.   No, sir.
9    Q.   Do you have any property of any kind
10 that you believe was damaged from chemical or
11 other contamination?
12   A.   Yeah.
13   Q.   What property is that?
14   A.   My car and all my furnitures and
15 stuff that I had.
16   Q.   Okay.  And do you have any documents
17 that relate to that?
18   A.   Yes.
19   Q.   And what documents would those be?
20   A.   Some pictures and just, like I told
21 you, the papers from when they send me the -- the
22 money from the car.
23   Q.   Okay.  The insurance claim?
24   A.   Yeah.
25   Q.   Okay.  Number 9 is all documents --

Page 15

1  excuse me.
2        Number 9 is all documents that refer
3  or relate to any claim the deponent is asserting
4  for lost earnings, future lost earnings, lost
5  business opportunity, lost future business
6  income, business interruption, lost rental income
7  and/or lost future rental income.
8    A.   No, I don't have any documents for
9  that.
10   Q.   Are you making a claim for lost
11 income in this matter?
12   A.   I'm not working right now.  Yeah --
13 I'm not working because of that.
14   Q.   Because of the storm?
15   A.   Uh-huh.
16   Q.   All right.  But you don't have any
17 documents that would be responsive to Number 9?
18   A.   No.
19   Q.   Okay.  All documents that evidence,
20 reflect, support, or contradict deponent's claim
21 for economic or compensatory damages in the Levee
22 Master Consolidated Class Action Complaint.
23   A.   Uh-uh.
24   Q.   The answer is no.
25   A.   Wait.  Could you repeat that again?

Page 16

1    Q.   Well, it's Number 10, all documents
2  that evidence, reflect, support or contradict
3  deponent's claim for economic and compensatory
4  damages in the Levee Master Consolidated Class
5  Action Complaint.
6    A.   No.
7    Q.   Number 11 is all mathematical or
8  formulaic calculations or other models that refer
9  or relate to determining the cause of injury to
10 deponent.
11   A.   (Shakes head negatively.)
12   Q.   No?
13   A.   No.
14   Q.   Okay.  Number 12, all mathematical
15 or formulaic calculations or other models that
16 refer or relate to the calculations of damages
17 for the deponent.
18   A.   No.
19   Q.   No?
20   A.   No.
21   Q.   Number 13 is all documents that
22 refer or relate to deponent's evacuation,
23 relocation and, if applicable, eventual return to
24 New Orleans, including, but not limited to,
25 records of expenses.

Page 17

1    A.   I have, you know, stuff like that,
2  you know, like, you know, receipts and everything
3  from having to move.
4    Q.   Okay.  And those are at your house?
5    A.   Yes, sir.
6    Q.   And those are receipts that are
7  related to your evacuation?
8    A.   Yeah.
9    Q.   Okay.  Number 14 is all statements,
10 transcriptions of recorded statements, tape
11 recordings, notes, diagrams and/or descriptions
12 of events by the deponent relative to the issues
13 that are the subject of this litigation.
14   A.   No.
15   Q.   No.  Okay.  You've got to answer --
16   A.   No.
17   Q.   -- verbally.
18   A.   Loud.  Okay.
19   Q.   Okay.  Number 15 is all logs,
20 journals, diaries or other writings by the
21 deponent that refer or relate to Hurricane
22 Katrina or the matters at issue in this
23 litigation.
24   A.   No.
25   Q.   Okay.  Number 16 is all of

5  (Pages 14 to 17)



Page 18

1  deponent's medical records from August, 2000 to
2  the present.
3      A.  Yeah, I have those.
4      Q.  Okay.  What medical records -- I
5  realize you didn't bring any here today, but what
6  medical records do you have at your home?
7      A.  The one when I went to Fort Myers,
8  Florida, when I went to the hospital over there,
9  for having fungus.
10     Q.  Okay.  All right.  Number 17 is all
11 documents evidencing the application for or
12 receipt of any benefit, payment, insurance
13 proceed, settlement, loan disbursement or other
14 funds paid to the deponent or on his behalf
15 related to Hurricane Katrina or its aftermath.
16     A.  Yes.
17     Q.  Okay.  And what documents would
18 those be?
19     A.  The -- like, the FEMA and the Red
20 Cross, that stuff.
21     Q.  And the insurance proceeds?
22     A.  Yeah.
23     Q.  All right.  And you have those at
24 your house?
25     A.  Yes, sir.

Page 19

1      Q.  Okay.  All demonstrative -- Number
2  18 is all demonstrative evidence or exhibits that
3  the deponent or his or her attorneys may refer to
4  at the class action hearing and all documents
5  that refer or relate to such demonstrative
6  evidence or exhibits.
7      A.  No.
8      Q.  Number 19 is all computer models
9  that the deponent or his or her attorneys may
10 refer to at the class certification hearing or in
11 support of class certification and all documents
12 that refer or relate to such computer models.
13     A.  Could you -- I didn't understand.
14     Q.  It's Number 19, if you could read
15 it.
16     A.  Okay.  No.
17     Q.  Okay.  Number 20 is a copy of the
18 complaint or petition in any prior litigation in
19 which the deponent has been a party.  And it's my
20 understanding that you have never been a party to
21 another litigation.
22     A.  No.
23     Q.  So, you wouldn't have a document
24 that's --
25     A.  No.

Page 20

1      Q.  Okay.  A copy of any lease agreement
2  entered into between the deponent and any
3  proposed class member.
4      A.  Uh-uh.  Say that again.
5      Q.  You have to answer verbally.
6      A.  Okay.  No.
7      Q.  All right.  Number 22 is all
8  documents that relate to any eviction proceeding
9  instituted by or against the deponent after
10 Hurricane Katrina.
11     A.  Yeah.
12     Q.  Okay.  You were evicted?
13     A.  Was I evicted?  Well, I couldn't
14 move in the house.
15     Q.  Okay.
16     A.  It was -- they have to repair it.
17 I'm not living in the same house --
18     Q.  All right.
19     A.  -- that I was living in.
20     Q.  But you weren't evicted.  You just
21 can't live there.
22     A.  Right.
23     Q.  But do you have documents that
24 relate to that?
25     A.  No.

Page 21

1      Q.  Do you have -- at the time of
2  Hurricane Katrina, were you living in a residence
3  that you leased?
4      A.  I rented, yeah.
5      Q.  Okay.  Did you have a written rental
6  agreement?
7      A.  No.
8      Q.  Did you have any insurance on --
9      A.  No.
10     Q.  -- on the place that you rented?
11     A.  No.
12     Q.  Okay.  Did you have any insurance on
13 the contents?
14     A.  No.
15     Q.  Any and all documents in the
16 deponent's possession indicating that the
17 deponent will protect the interests of the
18 proposed class.
19     A.  Yes.
20     Q.  What documents are those?
21     A.  The -- all the stuff that I just
22 told you I had earlier, huh?
23     Q.  Okay.  Do you believe those are
24 responsive to Number 23?
25     A.  Yeah.

JOSE LUIS RODRIGUEZ (LEVEE)                                    7/14/2007

---

Page 22

1    Q.  Okay.  All righty.  And let's go
2  ahead and attach the Notice of Deposition --
3  notice of videotape deposition, Mr. Rodriguez, as
4  Exhibit 1 to the deposition.  However, let's use
5  a different copy.  Could we use that copy?  I
6  wrote all over this one.
7        (Whereupon, Rodriguez
8        Exhibit Number 1A was marked for
9        identification.)
10 EXAMINATION BY MR. GARDNER:
11   Q.  All right.  Mr. Rodriguez, what did
12 you do in preparation of this deposition this
13 morning, if anything?
14   A.  Nothing.
15   Q.  Nothing?
16   A.  I didn't do nothing.  No.
17   Q.  Okay.  Did you meet with any of your
18 attorneys prior to the deposition?
19   A.  No, sir.  Oh, yeah, yeah.  I did.
20   Q.  Okay.  You met with Mr. Joanen?
21   A.  I was thinking before today.  Yeah.
22   Q.  Okay.  Before today, have you met
23 with any attorneys?
24   A.  Yes.
25   Q.  And when was that?

---

Page 23

1    A.  I don't remember the date.
2    Q.  Approximately how long --
3    A.  About two, three weeks ago.
4    Q.  Okay.  And how long did that meeting
5  last?
6    A.  Maybe 15, 20 minutes, something like
7  that.
8    Q.  And was that the only meeting you
9  had relative to this litigation?
10   A.  Yes, sir.
11   Q.  And how long did you meet with Mr.
12 Joanen this morning?
13   A.  About ten, 15 minutes.
14   Q.  And you didn't review any
15 documents -- or did you review any documents
16 prior to your deposition?
17   A.  No, sir.
18 MR. JOANEN:
19      You just have to answer what
20      your recollection is.
21 THE WITNESS:
22      Yeah.
23 EXAMINATION BY MR. GARDNER:
24   Q.  All right.  Mr. Rodriguez, are you
25 on any medication this morning?

---

Page 24

1    A.  No, sir.
2    Q.  And you realize you're under oath?
3    A.  Yes, sir.
4    Q.  And you realize the significance of
5  that?
6    A.  Yes, sir.
7    Q.  Okay.  What is your full name, sir?
8    A.  José L. Rodriguez.  Luis.
9    Q.  And what is your date of birth?
10   A.  7/22/66.
11   Q.  And where were you born?
12   A.  Cuba.
13   Q.  Are you a United States citizen?
14   A.  No, sir.
15   Q.  How long have you lived in New
16 Orleans?
17   A.  About 38 years.
18   Q.  And how old are you?
19   A.  Forty.
20   Q.  What are your parents' names?
21   A.  My father's name is José Rodriguez,
22 and my mother's name is Lourdes Rodriguez.
23   Q.  And are your parents still living?
24   A.  No.  My father died because of the
25 storm.

---

Page 25

1    Q.  And your mother?
2    A.  She's alive.
3    Q.  Okay.  And where does your mother
4  live?
5    A.  She lives on Prentiss, 2223 Prentiss
6  Avenue.
7    Q.  I'm sorry.  That's your present
8  address?
9    A.  That's my mailing address.
10   Q.  Okay.  Is that where you reside?
11   A.  What --
12   Q.  Is that where you sleep?
13   A.  No.  No, it's not.
14   Q.  All right.  Do you have any brothers
15 or sisters?
16   A.  Yes, I do.
17   Q.  And what are their names and ages?
18   A.  Maria Rodriguez is my sister.  She's
19 three, four years older than me.  So, that'll
20 make her 44.
21   Q.  And where does she live?
22   A.  She lives with my mother, 2223
23 Prentiss.
24   Q.  Okay.  Any others?
25   A.  Armando.

---

JOHNS PENDLETON COURT REPORTERS                        800 562-1285

JOSE LUIS RODRIGUEZ (LEVEE)                                    7/14/2007

---

Page 26

1    Q.   Armando?
2    A.   Armando Rodriguez.  He lives in
3  Slidell.
4    Q.   Okay.  And how old is Armando?
5    A.   Armando is three --
6    Q.   About.
7    A.   Thirty-eight.
8    Q.   Any others?
9    A.   Richard.  Richard Rodriguez.  And
10 he's about 33.
11   Q.   And does he live --
12   A.   He lives in New Orleans, Louisiana,
13 on Bruxelles.
14   Q.   On Bruxelles.  Okay.  Any others?
15   A.   Douglas Rodriguez, my younger
16 brother, he's in Houston.
17   Q.   And how old is he?
18   A.   He's about 29.
19   Q.   Okay.  Are you married?
20   A.   No, sir.
21   Q.   Do you have any children?
22   A.   I had a child.  I don't have any --
23   Q.   How old is your child?
24   A.   He was 12.
25   Q.   Is he alive?

---

Page 27

1    A.   No.
2    Q.   Okay.  And when did he pass away?
3    A.   He passed, like, three years before.
4    Q.   Okay.
5    A.   About two years before the storm.
6    Q.   And what was his name?
7    A.   Christopher.
8    Q.   Rodriguez?
9    A.   Yes, sir.
10   Q.   Do you have any dependents at this
11 point?
12   A.   No, sir.
13   Q.   All right.  Where -- you told me a
14 moment ago that your mailing address is 2223 --
15   A.   Prentiss Avenue.
16   Q.   2223 Prentiss.  All right.  And who
17 lives at that address?
18   A.   My mother and my sister.
19   Q.   Okay.  And that's Lourdes and Maria?
20   A.   And Maria, yes.
21   Q.   And is that an apartment?
22   A.   No.  It's a house.
23   Q.   It's a house.
24   A.   (Nods head affirmatively.)
25   Q.   Do they own the house or do you own

---

Page 28

1  the house?
2    A.   They own the house.
3    Q.   Now, when you say they own the
4  house, who --
5    A.   Well, my mom.  My mom owns the
6  house.  They both -- I guess they both went in on
7  it.  I don't know.
8    Q.   Did they buy the house after
9  Hurricane Katrina?
10   A.   Before.
11   Q.   Before?
12   A.   Uh-huh.
13   Q.   So, before Hurricane Katrina, who
14 bought the house?  Let me just make sure I'm
15 clear on this.
16   A.   My mom.
17   Q.   Did your dad?
18   A.   No.  He didn't -- they split up.  He
19 stayed living on Bruxelles, she went and bought a
20 house.  He was stuck on staying where he was at.
21 She wanted to move on.
22   Q.   Okay.  So, prior to Hurricane
23 Katrina, your parents got divorced?
24   A.   No.  They were separated.
25   Q.   Separated?

---

Page 29

1    A.   Right.
2    Q.   And your mother and sister purchased
3  the house that they're living in now on Prentiss?
4    A.   Right.
5    Q.   And that's your mailing address?
6    A.   Right.
7    Q.   Okay.  And do you know approximately
8  when they purchased the house?
9    A.   I'd say -- they might have had the
10 house maybe six, seven years, I think.
11   Q.   From --
12   A.   I don't know what day they bought
13 it.
14   Q.   I'm just asking approximately.
15   A.   About five, six years, I would say,
16 from now back.
17   Q.   Okay.  All right.  Now, your mailing
18 address is on Prentiss.
19   A.   Uh-huh.
20   Q.   Where are you actually living?
21   A.   I live on -- I be living --
22 sometimes I go by my brother in Slidell.  I been
23 kind of not stable, you know, because of a lot of
24 things I been going through, but, right now, I'm
25 at -- on Bruxelles at a house -- friend of mine's

---

8  (Pages 26 to 29)

JOSE LUIS RODRIGUEZ (LEVEE)                                    7/14/2007

Page 30

1   house.
2        Q.   Okay.
3        A.   28 -- let me see.  No.  2928
4   Bruxelles.
5        Q.   2928 Bruxelles?
6        A.   2928 Bruxelles.  That's right across
7   the street from where my dad's living.
8        Q.   Okay.  And who -- is this an
9   apartment?
10        A.   It's a house.
11        Q.   Okay.  And whose house is that?
12        A.   Angelo.
13        Q.   Angelo?
14        A.   Yeah.
15        Q.   And what's Angelo's last name?
16        A.   Sarter.
17        Q.   Sarter?
18        A.   Yeah.
19        Q.   S-A-R-T-E-R?
20        A.   Yeah, I believe.
21        Q.   Do you pay rent to Mr. Sarter?
22        A.   No.
23        Q.   Okay.  How long have you been living
24   at 2829 Bruxelles?
25        A.   About a month.

Page 31

1        Q.   And prior to that time, where were
2   you living?
3        A.   By Richard.
4        Q.   Excuse me?
5        A.   Richard, my other brother.
6   Bruxelles.
7        Q.   Okay.  And where does Richard live?
8        A.   He lives on Bruxelles.
9        Q.   Okay.  But what number?
10        A.   I don't remember the -- the address.
11   Let me see.  It was 2913 Bruxelles was the house
12   next door that I was renting before the storm.
13        Q.   Okay.
14        A.   And he lives on the other side.
15        Q.   So, 2915?
16        A.   No.  29 -- no.  2915 is another
17   house next door.  I don't remember that address.
18        Q.   Okay.  All right.  Let me ask you
19   this:  At the time of Hurricane Katrina, where
20   were you living?
21        A.   At that house.
22        Q.   29 --
23        A.   2913.
24        Q.   Bruxelles?
25        A.   Yeah.

Page 32

1        Q.   Okay.  Were you living there alone?
2        A.   Yes, sir.
3        Q.   Okay.  Is that -- what type of a
4   structure is that?
5        A.   It's a double, shotgun.
6        Q.   Is it a wood frame shotgun?
7        A.   Yes, sir.
8        Q.   Approximately how old was it?
9        A.   I don't know.  I would say --
10        Q.   What's your best estimate?
11        A.   Sixty years, maybe.
12        Q.   Did it have central air and heat?
13        A.   No, sir.
14        Q.   How high off the ground was it
15   raised?
16        A.   About three --
17        Q.   Three feet?
18        A.   Maybe three feet.
19        Q.   So, it wasn't built on a slab?
20        A.   No, not on a slab.
21        Q.   What kind of condition was it in
22   prior to Hurricane Katrina?
23        A.   It was in pretty good shape.
24        Q.   Had you ever had any problems with
25   any roof leaks?

Page 33

1        A.   No.  Before Hurricane Katrina?  No.
2        Q.   Right.  Before Hurricane Katrina?
3        A.   No.
4        Q.   Any problems with any mold?
5        A.   No.
6        Q.   Any problems with any termites?
7        A.   No.
8        Q.   Was there -- did you make -- how
9   long prior to Hurricane Katrina did you live at
10   2913 Bruxelles?
11        A.   About eight months.
12        Q.   Eight months?
13        A.   Uh-huh.
14        Q.   Did you make any improvements to
15   the -- to the unit?
16        A.   Some, in the bathroom.  I started in
17   the bathroom and then that -- everything went.
18        Q.   Okay.  What improvements did you
19   make in the bathroom?
20        A.   The tile.  Tile work.
21        Q.   Did you make any others?
22        A.   No.
23        Q.   Okay.  Did you have any insurance on
24   2913 Bruxelles?
25        A.   No.

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

JOSE LUIS RODRIGUEZ (LEVEE)                                7/14/2007

Page 34

1    Q.   Okay.  How big was that double --
2    was your side of the double?
3    A.   It's two bedroom -- you could make
4    it three.  Let me see.  They had one, two,
5    three -- six rooms all together, all the way
6    across.  You know, that's including the living
7    room, dining room, bathroom, six rooms.
8    Q.   There were six rooms on each side?
9    A.   Yeah.
10   Q.   Okay.  So, your side had six rooms?
11   A.   Yeah.
12   Q.   Okay.  And how many bathrooms did it
13   have?
14   A.   One.
15   Q.   One.  And how much rent did you pay?
16   A.   I was paying, like, $300.
17   Q.   And did you have a written
18   agreement?
19   A.   No.  That was my brother's house.
20   Q.   Okay.
21   A.   I was renting from him and fixing
22   the house and working out a deal with him.
23   Q.   And your brother was living on the
24   other side?
25   A.   Yes, sir.

Page 35

1    Q.   Okay.  This is which brother?
2    A.   Richard.  The one on Bruxelles.
3    Q.   And when you would pay him rent,
4    would you pay it with a check?
5    A.   Cash.
6    Q.   Cash.  Would you get a receipt?
7    A.   No.
8    Q.   Do you have any documents that, you
9    know, would indicate how much rent you were
10   paying?
11   A.   No, sir.
12   Q.   Now, you indicated you didn't have
13   any insurance on the structure at 2913 Bruxelles.
14   A.   Uh-huh.
15   Q.   Did you have any insurance on the
16   contents?
17   A.   No, sir.
18   Q.   Prior to Hurricane Katrina, what was
19   the value you would place on the -- on your
20   contents in the -- in the Bruxelles Street
21   apartment?
22   A.   I would say maybe 20 or 30,000,
23   something like that.
24   Q.   Okay.  Did you ever do an itemized
25   list of what was in the apartment prior to the

Page 36

1    storm?
2    A.   No.  No, I didn't.
3    Q.   How do you reach the figure 20 to
4    30,000?
5    A.   I'm just -- off the top of the head,
6    just thinking what I've lost.
7    Q.   Okay.
8    A.   You know, my TVs and everything that
9    I lost.  I just figured about that.
10   Q.   Okay.
11   A.   I'm not sure.
12   Q.   Did you -- did you ever take a
13   casualty loss on your income tax return for the
14   contents of your apartment?
15   A.   Yeah.
16   Q.   Okay.  Do you know what number was
17   placed on the casualty loss on your income tax
18   returns?
19   A.   I think it was ten -- 10,000, I
20   think.  I don't --
21   Q.   Okay.  Well, let me ask you this:
22   If you thought it was 20 to 30,000 why did you
23   take a $10,000 casualty loss?
24   A.   Well, you take whatever comes,
25   whatever they tell you, this is what it was

Page 37

1    worth, you know, and who am I to fight it, you
2    know.
3    Q.   Did somebody appraise your contents
4    loss at $10,000?
5    A.   No.  When we went -- when I went
6    down there and was -- you talking about the tax
7    paper?  That's what you talking about?  Well,
8    yeah, they asked me what did I have, and I told
9    them, and they figured it out theirself and they
10   told me that's what it came out to be.
11   Q.   This was your tax preparer who
12   figured it out?
13   A.   Yeah.
14   Q.   Who was that?
15   A.   I don't recall.  I just went
16   somewhere out in the east that they told me to go
17   and I just did it there.
18   Q.   Just so I'm clear on this, your tax
19   preparer estimated your casualty loss at $10,000?
20   A.   Uh-huh.
21   Q.   Did the apartment come furnished or
22   did you furnish it?
23   A.   I furnished it.
24   Q.   Okay.  Did you have to supply the
25   kitchen, or was the kitchen furnished?

JOHNS PENDLETON COURT REPORTERS                          800 562-1285

JOSE LUIS RODRIGUEZ (LEVEE)                                    7/14/2007

Page 38

```
 1     A.   It had -- he had a stove in there.
 2     Q.   Did you buy a refrigerator?
 3     A.   Yes, sir.
 4     Q.   Did you buy any other kitchen
 5  facilities?
 6     A.   Microwave.  Yeah.
 7     Q.   Other than the microwave?
 8     A.   Yeah, dishes.
 9     Q.   Did you buy a dishwasher?
10     A.   No.
11     Q.   Did it have a dishwasher?
12     A.   No.
13     Q.   Okay.  What type of electronic
14  equipment did you have in the house?
15     A.   Just TVs and PlayStation, Xbox.
16     Q.   Okay.  Other than your -- your
17  clothing, your furniture, the electronic
18  equipment and the kitchen equipment, did you have
19  anything -- any other category of items in your
20  apartment?
21     A.   No.
22     Q.   Now, did you -- did you have an
23  automobile at the time?
24     A.   Yeah.
25     Q.   Okay.  And what type of automobile?
```

Page 39

```
 1     A.   A Maxima.
 2     Q.   And as I understand it, that had
 3  insurance on it?
 4     A.   Yeah.
 5     Q.   And that had insurance that covered
 6  damage from Katrina?
 7     A.   Well, no, I didn't have full
 8  coverage.  I had just had insurance, and when I
 9  applied for it, they said that you qualify for,
10  like, 35 for the car.
11     Q.   Okay.  And that's $3,500 for damages
12  to the car?
13     A.   Yeah.
14     Q.   Okay.  And that was a claim you made
15  after Katrina?
16     A.   Yeah.
17     Q.   Okay.  And that claim was made with
18  your auto insurance carrier?
19     A.   Yeah.
20     Q.   And who was that?  What carrier was
21  that?
22     A.   Dunns & Son was the one that insured
23  it.  Dunns & Son.  I don't even know if they're
24  still --
25     Q.   Dunns & Son was the agent?
```

Page 40

```
 1     A.   Yeah.  Imperial, I think, was the
 2  actual insurance.
 3     Q.   Just so I'm clear on this, Imperial,
 4  which was your auto carrier, was the only
 5  insurance that you owned at the time -- that you
 6  had purchased at the time of Hurricane Katrina?
 7     A.   Yeah.
 8     Q.   All right.  Now, prior to 2913
 9  Bruxelles Street, where did you live?
10     A.   2223 Prentiss.  And before that --
11  yeah, on Bruxelles.  I was back on Bruxelles
12  before that.
13     Q.   How long did you live on Prentiss
14  before you lived at 2913 Bruxelles?
15     A.   About a year and a half, two years,
16  something like that.
17     Q.   Okay.  And you were living with your
18  mother and sister?
19     A.   Yeah.
20     Q.   Okay.  And were you paying any rent?
21     A.   No.
22     Q.   All right.  And before that, where
23  did you live?
24     A.   2913 Bruxelles.
25     Q.   Okay.  And that was your brother's?
```

Page 41

```
 1     A.   No.  That was -- that was another
 2  house I was living in.  After my son passed away,
 3  I moved out the house and moved in with my mom.
 4     Q.   Okay.  Before -- at the time of the
 5  storm, you were living at 2913 Bruxelles?
 6     A.   Wait.  No.  2915 was where I lived
 7  before I moved in with my mom.  It was upstairs
 8  house next to 2913.
 9     Q.   All right.  All right.  So, before
10  you lived with your mother and sister at 2223
11  Prentiss, you lived at 2915 Bruxelles?
12     A.   Bruxelles.  I had a family there.
13     Q.   You said you had a family there?
14     A.   I had a family.
15     Q.   Okay.  And how long did you live
16  there?
17     A.   About eight years.
18     Q.   Okay.  And that's where your son was
19  living?
20     A.   Yes.
21     Q.   Okay.  And you had only one child?
22     A.   Yes, sir.
23     Q.   Okay.  And what was your -- what was
24  his mother's name?
25     A.   Donna.
```

11 (Pages 38 to 41)

JOSE LUIS RODRIGUEZ (LEVEE)                                    7/14/2007

Page 42

1    Q.   And what was Donna's last name?
2    A.   Smith.
3    Q.   All right.  Was it just you, Donna
4  Smith and your son in the house?
5    A.   Yeah.  Well, she had -- she had a
6  son prior, before, you know.
7    Q.   And how old was he?
8    A.   Brian -- at the time, Brian was --
9    Q.   About.
10   A.   Brian must have been about 15, I
11 think.  Okay.
12   Q.   Okay.  Now, when you were living at
13 2913 Bruxelles, did you pay the utilities on your
14 side of the double?
15   A.   No.
16   Q.   Your brother did?
17   A.   Uh-huh.
18   Q.   Did you pay the water?
19   A.   No.  He paid all the bill -- all of
20 that.  I just was paying him, you know, the rent.
21 He took care of that.
22   Q.   All right.  So, the total expenses
23 to stay at 2913 Bruxelles was $300 a month?
24   A.   (Nods head affirmatively.)
25   Q.   Yes?

Page 43

1    A.   Yes.  Yes.
2    Q.   All right.  Let me go back for a
3  moment.  What's your Social Security number, Mr.
4  Rodriguez?
5    A.   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.
6    Q.   Is that the only Social Security
7  number you've ever had?
8    A.   Uh-huh.
9    Q.   Okay.  Do you have a -- a Louisiana
10 driver's license?
11   A.   Yes, sir.
12   Q.   Could I see that?
13   A.   Let me get it out.
14   Q.   I can just look at it through there.
15 All right.  Let the record reflect that Mr.
16 Rodriguez has presented me with his driver's
17 license, which indicates license Number --
18 Louisiana Driver's License Number 002976361, and
19 a residence address of 2223 Prentiss Avenue, in
20 New Orleans, and an expiration date of 7/22/09.
21        Mr. Rodriguez, did you attend high
22 school in New Orleans?
23   A.   Yes, sir.
24   Q.   And where was that?
25   A.   McDonogh 35.

Page 44

1    Q.   Did you graduate?
2    A.   Yes, sir.
3    Q.   In what year?
4    A.   '85.
5    Q.   And did you attend any college?
6    A.   No, sir.
7    Q.   Okay.  Is high school your highest
8  level of education?
9    A.   Yes, sir.
10   Q.   Did you attend any vocational
11 school?
12   A.   No, sir.
13   Q.   Okay.  Now, you indicated -- I think
14 you indicated to me that you were -- you had done
15 some tile work.
16   A.   Yeah.
17   Q.   Okay.  And is that trade referred
18 to --
19   MR. GARDNER:
20        You want me to --
21   MR. JOANEN:
22        No.
23 EXAMINATION BY MR. GARDNER:
24   Q.   Okay.  Is that trade referred to as
25 a tile installer?

Page 45

1    A.   Yeah.
2    Q.   Is there another way --
3    A.   No.  Tile installer.  That's it.
4    Q.   Okay.  How long have you been a tile
5  installer?
6    A.   Seven years.
7    Q.   Seven years from today, going back?
8    A.   No.  No.  I did it for seven years
9  before Katrina.  After Katrina, I haven't done
10 it.  The company kind of went under and --
11   Q.   Okay.  Before you were a tile
12 installer, what type of occupations were you
13 involved with?
14   A.   Insulation, and I worked in chemical
15 plants.
16   Q.   All right.  Let me ask you this:
17 When you got out of high school, where did you go
18 to work?
19   A.   Hard Rock Café.
20   Q.   Okay.  And how long did you work
21 there?
22   A.   About five years.
23   Q.   Okay.  And after -- what was your
24 job there?
25   A.   Maintenance.

                                    12  (Pages 42 to 45)

JOSE LUIS RODRIGUEZ (LEVEE)                                    7/14/2007

Page 46

1    Q.   Okay.  After that, where did you go
2  to work?
3    A.   I went to work for Cajun Insulation,
4  and we were subbing through -- working for
5  Entergy power plant.
6    Q.   Entergy?
7    A.   Yeah.
8    Q.   The utility?
9    A.   Uh-huh.
10   Q.   Yes?
11   A.   Yes, sir.
12   Q.   Okay.  And what type of work did you
13 do for Cajun Insulation?
14   A.   Insulator.
15   Q.   Okay.  How were you paid?  Were you
16 paid hourly?
17   A.   Yes, sir.
18   Q.   And what was the wage?
19   A.   Twelve -- 12.75, I believe I was
20 getting.
21   Q.   And how long did you work for Cajun
22 Insulation?
23   A.   About seven years.
24   Q.   And then where did you go to work?
25   A.   And then I went to Gulf South Marble

Page 47

1  & Tile.
2    Q.   Gulf South?
3    A.   Marble & Tile.
4    Q.   And that's when you started doing
5  tile work?
6    A.   Yes, sir.
7    Q.   When you worked at Cajun Insulation,
8  was that a union shop or nonunion shop?
9    A.   Nonunion.
10   Q.   All right.  Now, how did you come to
11 work for Gulf South Marble & Tile?
12   A.   Friend of mine, he did that work.
13   Q.   Okay.  And I assume this brings us
14 to the point that's approximately seven years
15 before Hurricane Katrina?
16   A.   Is that --
17   Q.   When you started working for Gulf --
18   A.   Yeah.  Yeah.
19   Q.   What was your position there, tile
20 installer?
21   A.   Yeah.
22   Q.   And what exactly does a tile
23 installer do?
24   A.   Install tile.
25   Q.   I mean, just cuts it and installs

Page 48

1  it?
2    A.   Yeah.
3    Q.   Okay.  And how much were you paid?
4    A.   I was paid -- getting paid $10 an
5  hour.
6    Q.   Was there some reason why you left
7  Cajun Insulation to go work for -- go work as a
8  tile installer?
9    A.   The risk of working in the chemical
10 plants and the pay rate.
11   Q.   Okay.
12   A.   Wasn't --
13   Q.   Had you had -- had you been involved
14 in any accidents in any chemical plants?
15   A.   No.  We had an incident, but no
16 accident.
17   Q.   What kind of an incident was it?
18   A.   A gas leak.
19   Q.   And did you have any kind of
20 detrimental effect from the gas leak?
21   A.   No.
22   Q.   So, you didn't have any injuries
23 while you were working for Cajun Insulation?
24   A.   No, sir.
25   Q.   And, so, you worked as a tile

Page 49

1  installer up to the time of Hurricane Katrina?
2    A.   Yes, sir.
3    Q.   Was that constant work, I mean?
4    A.   Yeah.
5    Q.   Did you work 40 hours a week?
6    A.   Uh-huh.
7    Q.   Did you have any benefits with that
8  job?
9    A.   No, sir.
10   Q.   Did you ever file a workers'
11 compensation claim?
12   A.   No, sir.
13   Q.   Were you ever injured on the job?
14   A.   No, sir.
15   Q.   And who was your -- your supervisor?
16   A.   Lucien.
17   Q.   And how many employees did that
18 company have?
19   A.   I think -- I'm not sure -- probably
20 about ten.
21   Q.   Okay.  Where were they located?
22 Where was the company located?
23   A.   Chalmette.
24   Q.   Okay.  All right.  Now, were you
25 ever in the military?  No?

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

Page 50

1       A.   No.
2       Q.   All right.  When did you -- when did
3  you first hear that Hurricane Katrina was going
4  to hit the Gulf Coast?
5       A.   I don't recall.  Maybe a day before,
6  something like that.
7       Q.   What -- what actions did you take
8  when you heard about it?
9       A.   Vertical.  I went to the J.W.
10 Marriott.
11      Q.   And that's the one downtown?
12      A.   Yes, sir.
13      Q.   Did you go with anyone else?
14      A.   My dad and my mom and my sister and
15 my dog.
16      Q.   And did you get a room there?
17      A.   Yes, sir.
18      Q.   Okay.  And did you -- you have
19 receipts for those -- the room that you --
20      A.   No.  I could probably get it.
21      Q.   I mean, did you pay with a credit
22 card?
23      A.   No.  My mom works there, so, she
24 already got it.
25      Q.   So, your mother had a connection to

Page 51

1  the room?
2       A.   Yes.
3       Q.   What's your mom's job there?
4       A.   She's a supervisor for the -- what
5  they -- the women who come clean up the rooms or
6  whatever that is.  She's the supervisor for that.
7       Q.   All right.  And how long had she
8  worked there prior to Hurricane Katrina, about?
9       A.   Ten years, I guess.
10      Q.   Okay.  And when did you, your
11 mother, sister and your dog check into the
12 Marriott?
13      A.   The day before.
14      Q.   That would have been Sunday, or
15 Saturday?
16      A.   The day before the 29th.  I don't
17 recall what day it was.
18      Q.   All right.  So, it would have been
19 August 28th.  And how long were you in the
20 Marriott?
21      A.   Like -- let me see -- three days.
22      Q.   All right.  And, so, you were in the
23 Marriott when Hurricane Katrina struck?
24      A.   Yes, sir.
25      Q.   And what were the conditions like in

Page 52

1  the Marriott?
2       A.   They were fine, nice.  Everything
3  was -- was okay.
4       Q.   Okay.  And where did you go after
5  you left the Marriott?
6       A.   We went towards -- when we evacuated
7  out the city?
8       Q.   Uh-huh.
9       A.   Went towards Texas, ended up in
10 Florida, though.
11      Q.   You went toward Texas but ended up
12 in Florida?
13      A.   Yeah.  Couldn't find no rooms.
14      Q.   Okay.  All right.  So, and how did
15 you get to Texas?  You drove?
16      A.   Drove.
17      Q.   And who had brought the car to the
18 Marriott?
19      A.   My sister.
20      Q.   Okay.  And, so, three days -- three
21 days after you entered the Marriott, you all
22 attempted to leave and drove toward Texas?
23      A.   Right.
24      Q.   And you couldn't find any rooms?
25      A.   Uh-huh.

Page 53

1       Q.   How far did you get in Texas?
2       A.   Beaumont, all the way to -- we went
3  to Beaumont, Houston, and then from there then we
4  took off and went towards Florida, because I had
5  a friend lived in Florida.
6       Q.   Okay.  Did you drive to Florida?
7       A.   Yes, sir.
8       Q.   So, you drove back through
9  Louisiana?
10      A.   No.  We had to go -- was taking
11 all kind of other routes because the interstate
12 was closed, the I-10, so, we was going just --
13 making our way there.  I didn't even know half of
14 the places I went through.
15      Q.   Okay.  Did you drive through
16 Louisiana at all?
17      A.   No.
18      Q.   Okay.  And how long did it take you
19 to get to Florida?
20      A.   Three days.
21      Q.   And where did you end up in Florida?
22      A.   Fort Myers.
23      Q.   All right.  And why did you choose
24 Fort Myers?
25      A.   Friend.  Friend.

JOSE LUIS RODRIGUEZ (LEVEE)                                    7/14/2007

Page 54

1      Q.   Was it your friend or was it a
2  friend of --
3      A.   My friend.  Friend of mine.
4      Q.   And who was that?
5      A.   Angel Grenado.
6      Q.   And did all -- did you say with
7  Angel Grenado?
8      A.   Yes, sir.
9      Q.   Did all of you stay with Angel
10 Grenado?
11     A.   Yes.
12     Q.   So, that's your mother --
13     A.   Me, my mother, my sister and my dog.
14     Q.   Okay.  And what happened to your
15 father?
16     A.   My father died after he left -- see,
17 well, the next day after the hurricane,
18 everything looked fine.  And he says, well, I'm
19 going home and check on my dog.  And I say, well,
20 let's eat breakfast first and I'm going to take
21 you.  He was stubborn.  He left.  So, when he
22 left, I looked outside and I seen water a little
23 bit.  I told my sister, let's go down there and
24 let's see if we can catch up with him in the car.
25 Went to go get him in the car.  Water was getting

Page 55

1  closer and closer.  So, we turned back around.
2  Since I couldn't get through with the car, I went
3  walking, looking for my dad.  The little the
4  next day to get back to the hotel on the jet ski
5  with my brother.  I walked to his house thinking
6  he, you know, made it there.  And he wasn't
7  there.  And then I stayed there because it got
8  dark.  And then, the next morning, my brother
9  brought me back to the hotel on the jet ski so I
10 could get my mom and them out because they were
11 saying they was evacuating the hotels.  So, we
12 left from there.
13     Q.   Okay.  Well, we need to go over
14 that.  The day after the storm, you, your mother
15 and sister planned on leaving.
16     A.   No.  We stay -- we was going to go
17 back home.  We thought everything was fine.  We
18 was going to go back home.
19     Q.   Okay.
20     A.   We say we was going to eat breakfast
21 and go back home.  We still haven't heard
22 anything because we had no radios or nothing.
23 So, my dad got up that morning and says, well,
24 I'm going to go.  I'm not going to eat breakfast.
25 I'm going to go ahead home and check on my dog

Page 56

1  and see if everything is all right.  I said,
2  well, wait a minute.  I'm coming with you.  Let
3  me eat breakfast first.  He left.
4      Q.   All right.  Now, how did he get to
5  his house?
6      A.   He didn't make it.
7      Q.   No.  But how did he -- how was he
8  going to get there?
9      A.   Walking.
10     Q.   He was going to walk from the
11 Marriott to his house?
12     A.   Yeah, which was maybe a 35-minute
13 walk, 40-minute walk.
14     Q.   Okay.  Where was his house?
15     A.   On Bruxelles.
16     Q.   Okay.  And that's --
17     A.   That's 2923 Bruxelles.
18     Q.   All right.  And what -- let me ask
19 you something.  What are the blocks that -- I
20 mean, the streets that form the boundaries of
21 that block?
22     A.   St. Bernard and Broad.
23     Q.   So, he is on Bruxelles between St.
24 Bernard and Broad?
25     A.   Yes, sir.

Page 57

1      Q.   And, so, the morning after the
2  storm, your father left the group.
3      A.   Uh-huh.
4      Q.   And attempted to walk back to his
5  house?
6      A.   Uh-huh.
7      Q.   And was that the last time you spoke
8  with him?
9      A.   Yes, sir.
10     Q.   Okay.  And when you saw him, which
11 direction was he walking?
12     A.   Towards the house.  He was going
13 towards Claiborne.
14     Q.   Okay.  Was he walking on Canal
15 Street?
16     A.   Yeah.
17     Q.   Okay.  So, he was walking from the
18 Marriott on Canal Street toward --
19     A.   Going up Canal Street, towards
20 Claiborne, to make that --
21     Q.   Okay.  And you asked him to stop?
22     A.   I asked him -- I said, well, wait
23 for me.  I'm going to, you know, get you home.
24 Let's just eat breakfast.  You know, everything
25 looks fine.  I'll bring you.  And he left.

JOSE LUIS RODRIGUEZ (LEVEE)                                    7/14/2007

Page 58

1    Q.   All right.  And then what did you
2  do?
3    A.   Then, I left walking.  After I
4  left -- after I couldn't make it with the car, I
5  went walking.
6    Q.   All right.  Now, why couldn't you
7  make it with the car?
8    A.   Because the water was rising.  It
9  started rising more.  You know, it was coming in
10  a little fast.
11    Q.   All right.  So, after your dad left,
12  you attempted to follow him in your car?
13    A.   Uh-huh.
14    Q.   And that was your car, the Maxima?
15    A.   No.  No.  That was my sister car.
16  The Maxima, I left at the house.
17    Q.   Okay.  All right.  And your dad had
18  already been walking?
19    A.   Yeah.
20    Q.   Okay.  And you attempted to drive up
21  Canal Street?
22    A.   Uh-huh.
23    Q.   Yes?
24    A.   Yes.
25    Q.   Okay.  And how far did you --

Page 59

1    A.   Okay.
2    Q.   And how far did you get up Canal
3  Street?
4    A.   I got all the way up Canal Street to
5  Rampart.  Rampart was as far as I got.
6    Q.   All right.  Now, when you got up to
7  Rampart, what did you see?
8    A.   Water and people coming, you know,
9  towards Canal Street.
10    Q.   Okay.  When you say "water," can you
11  give me a better description?
12    A.   Well, when I got to Rampart, the
13  water was, like, about maybe to the ankles.
14    Q.   All right.
15    A.   And then as you see -- as you look
16  further down from Rampart down St. Bernard,
17  because St. Bernard runs down across Rampart --
18    Q.   So, you were at the corner of Canal
19  and Rampart?
20    A.   Rampart and St. Bernard.
21    Q.   Okay.  So, you went up to Canal and
22  you turned down Rampart?
23    A.   On Rampart, yeah.
24    Q.   You left the Marriott, you drove up
25  Canal Street -- or you drove on Canal Street

Page 60

1  toward Rampart?
2    A.   To Rampart.
3    Q.   And then you took a right on
4  Rampart?
5    A.   Yes, sir.
6    Q.   And then you went down Rampart to
7  St. Bernard?
8    A.   Yeah, and that's as far as I could
9  go.
10    Q.   And you couldn't get any further
11  there.
12    A.   Uh-uh.
13    Q.   When you got to Rampart and St.
14  Bernard, you said you thought the water was about
15  ankle deep?
16    A.   Yeah, on Rampart.  Yeah.
17    Q.   Okay.  Then, what did you do?
18    A.   Then, I went back -- I took my
19  sister in the car back to the hotel.
20    Q.   Your sister was with you when you
21  went?
22    A.   Uh-huh.  Yeah.
23    Q.   Your mother was at the hotel?
24    A.   Yeah, she stayed at the hotel.
25    Q.   So, you got to Rampart and St.

Page 61

1  Bernard and you turned around and went back to
2  the Marriott?
3    A.   Uh-huh.
4    Q.   And what time of day was this?
5    A.   Around 10:30, 11:00, something like
6  that.
7    Q.   Okay.  All right.  Now, when you got
8  to the corner of Rampart and St. Bernard, what
9  did you see?
10    A.   Water and people.
11    Q.   Okay.  Were the people walking --
12  what direction were the people walking?
13    A.   They was coming towards Canal
14  Street, like, towards the Superdome.  They was
15  trying to make it to the high ground.
16    Q.   Okay.  So, they were walking from
17  St. Bernard toward Canal Street?
18    A.   Uh-huh.
19    Q.   Yes?
20    A.   Yes.
21    Q.   Okay.  When you were driving down
22  Canal Street, before you made the turn onto
23  Rampart, did you see any water --
24    A.   No.
25    Q.   -- any water sitting in the street?

16 (Pages 58 to 61)

JOSE LUIS RODRIGUEZ (LEVEE)                                    7/14/2007

Page 62

1      A.   Uh-uh.
2      Q.   Were there any people walking on
3   Canal Street?
4      A.   Yeah.
5      Q.   And what were they doing?
6      A.   Carrying all this stuff, you know --
7   they was carrying stuff, coming in towards,
8   like -- you know, towards -- trying -- some
9   people was trying to get into the hotels, some
10  people was trying to get into the Superdome.
11     Q.   Okay.  So, people were walking
12  toward the Superdome?
13     A.   Yeah.  They was coming to -- you
14  know, leaving the, you know, neighborhoods,
15  coming to the city part.
16     Q.   But you had no idea that you were
17  driving toward water that was ankle deep, right?
18     A.   No.
19     Q.   Okay.  You had no idea that there
20  was any water in the streets?
21     A.   Coming in like that, no.
22     Q.   Okay.  All right.  Now, how long did
23  it take you to get from Rampart and St. Bernard
24  back to the Marriott?
25     A.   About -- not even -- about five

Page 63

1   minutes, at the most.
2      Q.   Okay.  I mean, was there any debris
3   in the street or anything like that?
4      A.   They had debris and knocked poles
5   and trees and stuff, you know, down.
6      Q.   Now, when you got back to the
7   Marriott, what did you do?
8      A.   I left them there and I went
9   walking, looking for my dad.  I went in search,
10  looking for him.
11     Q.   How did you -- you left on foot?
12     A.   Yes.
13     Q.   Okay.  Do you remember approximately
14  what time you left the Marriott?
15     A.   Maybe about -- about 11:00, I would
16  say.
17     Q.   And this is 11:00 on the 30th of
18  August?
19     A.   Yeah, the day after Katrina.
20     Q.   Okay.  All right.  And what path did
21  you take?
22     A.   I took -- I went through the
23  Quarters.  I walked through the French Quarters
24  to Elysian Fields.
25     Q.   All right.  Was there any water in

Page 64

1   the street in the French Quarter?
2      A.   No.
3      Q.   So, you crossed Esplanade?
4      A.   Uh-huh.
5      Q.   Yes?
6      A.   Yes.
7      Q.   Okay.
8      A.   Yes.
9      Q.   And you got to Elysian Fields?
10     A.   Right.
11     Q.   And then what did you do?
12     A.   Then, I proceeded to walk -- you
13  know, trying to find -- when I got to Elysian
14  Fields, that's when the water started getting
15  deeper and deeper, and the further in I got, the
16  deeper it got.
17     Q.   All right.  When you got to the
18  corner of Elysian Fields and Rampart, was there
19  any water in the street?
20     A.   Yeah, a little bit.  About ankle
21  high.
22     Q.   Okay.  And then you continued to
23  walk --
24     A.   Up Elysian Fields --
25     Q.   On Elysian Fields away from the

Page 65

1   river?
2      A.   Right.
3      Q.   Okay.  And how far did you get?
4      A.   To the -- to the overpass by Lowe's,
5   and I couldn't go no further.  The water was
6   already at my chest over there.  So, I got on --
7      Q.   When you say the overpass at Lowe's,
8   which overpass are you referring to?
9      A.   Elysian Fields.  It goes over -- the
10  Elysian Fields overpass.
11     Q.   Okay.
12     A.   I couldn't go past that.
13     Q.   And there's a Lowe's at that corner?
14     A.   There's a Lowe's right there.
15     Q.   All right.  And at that point, the
16  water was chest deep?
17     A.   Uh-huh.
18     Q.   And how tall are you?
19     A.   Five-seven.
20     Q.   All right.  Then, what did you do?
21     A.   Then, I proceeded back to Claiborne
22  to go back to St. Bernard, to walk back to St.
23  Bernard and Broad the only way because all the
24  other streets was real deep.
25     Q.   All right.  So, you went -- you

17 (Pages 62 to 65)

JOSE LUIS RODRIGUEZ (LEVEE)                                7/14/2007

|  | Page 66 |
|---|---|

1  turned around and you went back down Elysian
2  Fields toward the river --
3      A.   Uh-huh.
4      Q.   -- till you reached North Claiborne?
5      A.   Claiborne.  Yeah.  Yeah.
6      Q.   All right.  And then at North
7  Claiborne, what did you do?
8      A.   I made a right.  I walked down
9  Claiborne to St. Bernard.
10     Q.   Okay.  Then, you walked down
11 Claiborne to St. Bernard Avenue.  And at St.
12 Bernard, what did you do?
13     A.   I proceeded walking down St. Bernard
14 to Broad.
15     Q.   Okay.  And at St. Bernard and Broad,
16 where did you go?
17     A.   I hung right there for a little
18 while until I found a buoy to hang onto, and then
19 I saw my brother on the jet ski.  That's where he
20 was on the jet ski, helping people out.
21     Q.   All right.  Let me ask you this:  Is
22 there a Walgreens at the corner of St. Bernard
23 and Broad?
24     A.   Yes, sir.
25     Q.   And that's -- that's where you --

|  | Page 67 |
|---|---|

1  that's where you stopped walking?
2      A.   That's where I stopped walking.
3      Q.   Okay.  And how deep was the water
4  there?
5      A.   About -- about right here.  I was on
6  the neutral ground.  Almost my chest.
7      Q.   Okay.  You were on the neutral
8  ground?
9      A.   Yeah.  I stepped onto the street, it
10 about to went over.
11     Q.   All right.  Did you have a watch on?
12     A.   No.
13     Q.   Okay.  Do you have any idea what
14 time it was when you got to St. Bernard and
15 Broad?
16     A.   No.  I know when my brother picked
17 me up, he told me it was, like, 6:00.
18     Q.   All right.  It was daylight, though,
19 when you got to St. Bernard and Broad?
20     A.   Yeah.
21     Q.   All right.  Now, how long did you
22 stay there?
23     A.   On St. Bernard -- I stayed there
24 about 15 minutes, and then I started going -- I
25 didn't see my brother until I got to Bruxelles.

|  | Page 68 |
|---|---|

1      Q.   All right.  Well, let me ask you
2  this:  Had you called your brother --
3      A.   No.
4      Q.   -- at any point?  Were you planning
5  on meeting your brother at some corner?
6      A.   No.  I didn't have a cell phone or
7  nothing wasn't working.  I was just -- he was --
8  I was just trying to get to the house -- I was
9  trying to get to my dad's house, not knowing he
10 was on the jet ski roaming around the
11 neighborhood.
12     Q.   All right.  So, you didn't have any
13 idea you were going to see your brother on the
14 jet ski?
15     A.   No.
16     Q.   My next question is:  Did you have a
17 cell phone with you?
18     A.   Uh-uh.
19     Q.   No?
20     A.   No.  No.
21     Q.   All right.  So, you got to the
22 corner of St. Bernard and Broad, and the water
23 was about chest deep.
24     A.   Chest deep.
25     Q.   And how long did you stay at St.

|  | Page 69 |
|---|---|

1  Bernard and Broad?
2      A.   About ten, 15 minutes, just to
3  recollect, get energy.
4      Q.   And the whole time you were standing
5  in water that was chest deep?
6      A.   Uh-huh.
7      Q.   Was there anyplace to stand where
8  the water was less -- was shallow?
9      A.   No.
10     Q.   All right.  And then what did you
11 do?
12     A.   Then, I proceeded up Broad to
13 Bruxelles.
14     Q.   All right.
15     A.   And I couldn't go down Bruxelles
16 because it was too deep right there.
17     Q.   Okay.  Does -- were there other
18 people walking down --
19     A.   Uh-huh.  Yeah.  They had people --
20 everybody was going -- I was the only one going
21 the opposite way from everybody.  Everybody was
22 going back towards Canal Street.
23     Q.   Okay.  So, you were moving against
24 the traffic?
25     A.   Right.

                                    18  (Pages 66 to 69)

JOHNS PENDLETON COURT REPORTERS                     800 562-1285

JOSE LUIS RODRIGUEZ (LEVEE)                                    7/14/2007

Page 70

1    Q.  Okay.
2    A.  Uh-huh.
3    Q.  The people traffic?
4    A.  Right.
5    Q.  Okay.  Did you see anyone -- was
6  anyone in a boat?
7    A.  They had some people in boats.  Most
8  people was on makeshift doors and stuff like
9  that.
10   Q.  Makeshift doors?
11   A.  Yeah.
12   Q.  What do you mean by that?
13   A.  They had doors that they put on --
14  you know, on the water and they sat on it, like a
15  boat.  They used it as -- like a raft.
16   Q.  All right.  Now, so, once you got to
17  the corner of St. Bernard and North Broad, you
18  then walked down North Broad toward Bruxelles?
19   A.  Yes.
20   Q.  Okay.  And how many blocks is that?
21   A.  Bruxelles is, like, a block off of
22  Broad.
23   Q.  Okay.  So, it was really just -- be
24  one block from where you were?
25   A.  Yeah.  One block there.  And then

Page 71

1  that was too deep.  I couldn't go there.  They
2  had, like, a big dip right there.
3    Q.  They had a big dip on Broad or on
4  Bruxelles?
5    A.  On Broad and Bruxelles.  Broad and
6  Bruxelles.  Broad and Bruxelles meet each other.
7    Q.  Okay.  But they don't meet at right
8  angles.  They meet at -- or do they meet at right
9  angles?
10   A.  Bruxelles cross Broad.
11   Q.  Okay.  All right.  And you attempted
12  to walk down Bruxelles?
13   A.  Uh-huh.
14   Q.  But the water was too deep?
15   A.  No.
16   Q.  All right.  When you got to the
17  corner of Bruxelles and Broad, you were on the
18  neutral ground?
19   A.  Yes, sir.
20   Q.  And how far was your father's house
21  from the corner of Bruxelles and Broad?
22   A.  Five blocks.
23   Q.  Five blocks.
24   A.  (Nods head affirmatively.)
25   Q.  And it was five blocks going --

Page 72

1    A.  Like --
2    Q.  Going toward the lake?
3    A.  Yeah.
4    Q.  Okay.
5    A.  Yeah.
6    Q.  All right.  And at that point, you
7  turned around?
8    A.  No.  I kept walking down to the next
9  street.  I don't recall the name of that street.
10   Q.  And that would be the street past
11  Bruxelles?
12   A.  Yeah.
13   Q.  So, that would be two streets from
14  the corner of St. Bernard and Broad?
15   A.  Right.
16   Q.  Okay.  And then what did you do?
17   A.  Then, I turned.  The water was
18  low -- they had, like, a little store and they
19  was looting.  So, a Kentwood water jug was
20  floating out, so, I grabbed on that.
21   Q.  An empty jug?
22   A.  Yeah, a empty jug.  Then, I floated
23  and I went down -- then, I turned on that street
24  and went to Bruxelles, and as I was floating down
25  Bruxelles, that's when I ran into my brother.

Page 73

1    Q.  All right.  So, you were floating
2  down Bruxelles on a Kentwood water jug?
3    A.  Water jug.
4    Q.  And you were headed on Bruxelles
5  going toward your father's home?
6    A.  Yes, sir.
7    Q.  And you saw your brother on a jet
8  ski?
9    A.  Yeah.
10   Q.  Okay.  Were you surprised to see
11  him?
12   A.  Yeah.  See him on a jet ski.  Yeah,
13  and I was glad.  I'm whistling come get me.
14   Q.  All right.  Did he have anybody else
15  on it but himself?
16   A.  No.  Yeah.  He was by hisself at
17  that time.
18   Q.  And this is Richard?
19   A.  Richard.
20   Q.  All right.  When you were going down
21  Bruxelles, did you see any other people?
22   A.  They had some people sitting on
23  their porch, you know, just hanging out, waiting
24  for somebody to come pick them up.
25   Q.  Okay.  And how deep was the water?

JOSE LUIS RODRIGUEZ (LEVEE)                                    7/14/2007

Page 74

1      A.   Well, it varied, you know, up to --
2  it varied, like, on the houses, up to the knee
3  maybe at the most if you standing on the porch.
4      Q.   Most of those are raised homes?
5      A.   Yeah.
6      Q.   I mean raised that they're on piers?
7      A.   Yeah.  Yeah.
8      Q.   All right.  So, when you saw your
9  brother on the jet ski, then, what did you do?
10     A.   I whistled for him.
11     Q.   Okay.  And what did he do?
12     A.   He came got me.
13     Q.   Okay.  And did you get on the jet
14  ski?
15     A.   Yeah.  He ran out of gas soon as I
16  got on it.
17     Q.   Okay.  And then what did you do?
18     A.   Well, we went to the house.  He
19  pushed the boat to the house.
20     Q.   And that's your father's house?
21     A.   No.  His house.
22     Q.   Okay.
23     A.   And I asked him did he see my dad.
24  He says no.  You know, what are you doing over
25  here?  I told him I was looking for my dad.

Page 75

1      Q.   All right.  Now, he took you back --
2  you went back to his house?
3      A.   Yeah.
4      Q.   And you were living on the other
5  side?
6      A.   On the other side, yeah.
7      Q.   So, you went back to both houses?
8      A.   Both houses.
9      Q.   All right.  And how far was your
10  house from the point that he picked you up on the
11  jet ski?
12     A.   About a block and a half.
13     Q.   Okay.  And when you got to your
14  house, what was the -- what did you all do?
15     A.   Just sat around and just freaking
16  about what was going on.
17     Q.   All right.  Was there water inside
18  your apartment?
19     A.   Yes, sir.
20     Q.   All right.  I know you said this
21  before, but you all lived in a shotgun double
22  that was side by side.
23     A.   Uh-huh.
24     Q.   One apartment wasn't on top of the
25  other?

Page 76

1      A.   No.
2      Q.   They were both --
3      A.   Yeah, even.  They were both even.
4      Q.   Okay.  And they were both raised --
5  and they were both raised on piers?
6      A.   Right.
7      Q.   Was there water in your apartment?
8      A.   Yeah.
9      Q.   And how much water was there?
10     A.   When I was -- about ankle.  About
11  ankle when I walked up into it.
12     Q.   All right.  Did you attempt to move
13  any furniture?
14     A.   No.  It was kind of moved around a
15  little bit.  Everything was moved around.  He
16  said -- he said it was higher than that.  I
17  didn't -- I didn't see that, but he said it was
18  higher than that and then it went down.
19     Q.   Okay.  Was there any waterline on
20  your walls?
21     A.   Yeah.  Uh-huh.
22     Q.   How --
23     A.   On the baseboard -- about -- about
24  the same height as that.
25     Q.   So, and that's about a foot?

Page 77

1      A.   Yeah, about that.
2      Q.   What about you're electronic
3  equipment, did you move that?
4      A.   All of that was -- it topped over.
5  You know, the tables, that floated, it knocked
6  them over.
7      Q.   When you got back to your apartment,
8  was there anything you could salvage?
9      A.   Some clothes, but nothing I could
10  take.  I couldn't take anything.  So, you know,
11  when -- when we came back after, you know, it
12  was, like, somebody been through all your stuff
13  and, you know.  After you evacuated, you know,
14  some of your stuff was just -- somebody been
15  through it.
16     Q.   All right.  But that was after you
17  came back.
18     A.   Yeah.
19     Q.   Okay.  So, after you came back, you
20  realized your house had been looted?
21     A.   Vandal -- yeah.
22     Q.   All right.  Was there any -- was
23  there any water coming through the ceiling?
24     A.   Yes, sir.
25     Q.   Had there been any damage to the

20  (Pages 74 to 77)

JOSE LUIS RODRIGUEZ (LEVEE)                                    7/14/2007

---

Page 78

1  roof of your apartment?
2      A.  Uh-huh.  The whole roof was messed
3  up.  His whole roof.  He had just got it redone.
4      Q.  He had just put a new roof on it?
5      A.  No.  Right -- you know, after the
6  hurricane.  After the damages.  You know, it blew
7  the roof off.  He said he saw it blowing off,
8  so -- he's got that done after the storm.
9      Q.  Okay.  Your brother stayed in the
10 apartment during the storm?
11     A.  Yes, sir.
12     Q.  And he said he saw the roof being
13 blown off?
14     A.  Uh-huh.
15     MR. JOANEN:
16         Have to answer "Yes."
17     THE WITNESS:
18         Yes.
19     MR. GARDNER:
20         All right.  I need to take a
21 break.  Five-minute.
22     MR. JOANEN:
23         Want to stretch your legs?
24     THE WITNESS:
25         Yeah.

Page 79

1      THE VIDEOGRAPHER:
2          Off the record.
3          (Whereupon, a discussion was
4      held off the record.)
5      THE VIDEOGRAPHER:
6          On the record.
7  EXAMINATION BY MR. GARDNER:
8      Q.  Mr. Rodriguez, let me go back a
9  moment to when we were talking about your arrival
10 at your home.  What time of the day do you think
11 you got there?
12     A.  It may have been about 5:30, 6:00,
13 or something like that.
14     Q.  It was still daylight?
15     A.  Yes, sir.
16     Q.  All right.  Now, you indicated that
17 your brother said the roof had been blown of the
18 double?
19     A.  Yeah.  He was watching it.  He was
20 seeing it go off.
21     Q.  All right.  Could you see holes
22 through the roof?
23     A.  Holes through -- yeah, you could see
24 straight -- straight up.
25     Q.  You could see straight up?

Page 80

1      A.  Uh-huh.
2      Q.  You could see daylight?
3      A.  Yeah.  Yeah.
4      Q.  All right.  And there was indication
5  that water had come into your apartment through
6  the roof?
7      A.  Uh-huh.
8      Q.  Yes?
9      A.  Yes, sir.
10     Q.  Could you tell how much?  A lot?
11     A.  It was a -- everything was wet.
12 Everything in the house was wet.
13     Q.  Could you tell how much of the water
14 had come through the roof?
15     A.  No.
16     Q.  But you could see daylight through
17 the roof?
18     A.  Yeah.
19     Q.  And how many places could you see
20 daylight?
21     A.  It was, like, three spots.  Where
22 the water came through the roof, the ceiling in
23 the house came down.
24     Q.  Had collapsed?
25     A.  Yeah.

Page 81

1      Q.  And that had happened in three
2  rooms?
3      A.  Yeah.  Well, one on his and two on
4  mine.
5      Q.  Okay.  The two in yours were in
6  which rooms?
7      A.  The two front rooms, the living room
8  and dining room, I guess.
9      Q.  Okay.  Did you have you're
10 electronic equipment in those rooms?
11     A.  Yeah.
12     Q.  Now, was all of the contents in the
13 apartment yours?
14     A.  Yeah.
15     Q.  Was the electricity working in your
16 apartment?
17     A.  Yes, sir.
18     Q.  It was working when you got back
19 there?
20     A.  Oh, no.  No.  Everything --
21     Q.  I meant when you arrived.
22     A.  Oh, no.  That -- during the flood,
23 no.  No.  Everything was out.
24     Q.  You said that when you got there,
25 the water was ankle deep?

---

21  (Pages 78 to 81)

JOSE LUIS RODRIGUEZ (LEVEE)                                    7/14/2007

Page 82

1      A.   Yeah.
2      Q.   Okay.  How long did you stay there?
3      A.   Overnight.  I stayed there --
4  because it started getting dark, so, we -- I
5  spent the night, and then the next morning, he
6  brought me -- we stayed till about 11:00,
7  watching the choppers go in and out, and then he
8  brought me back to Rampart on the jet ski.
9      Q.   Okay.  Where did you sleep?
10     A.   On the -- on the sofa.
11     Q.   Okay.  And how much water was in
12 your apartment while you were sleeping there?
13 Was it still ankle deep?
14     A.   It was like -- you know, it was a
15 little lower than ankle.  It looked like it was
16 dropping, it was coming down, but as you walked
17 in the house, the whole time you was splashing.
18     Q.   All right.  But the water seemed
19 like it came down a little?
20     A.   Yeah.  The next morning, it did go
21 down.  It was down by the next morning a little
22 bit.
23     Q.   Was it raining any time you were
24 there?
25     A.   No.

Page 83

1      Q.   All right.  Did you ever determine
2  where the water had come from?
3      A.   No.  I still -- I didn't know at
4  that point still.
5      Q.   Okay.  Did you ever have an
6  understanding why the water went down the next
7  morning, the morning after you arrived there?
8      A.   No.
9      Q.   Did -- did your brother ever tell
10 you what he thought about it or where the water
11 had come from or why the water went down the next
12 morning?
13     A.   No.  It looked like -- to me, it
14 looked like it was just settling.  It was
15 starting to settle at that time, because it was
16 still in motion -- when I -- when I got there in
17 the morning -- I mean, that day, it was still --
18 the water was still like -- you know, I didn't
19 know if it was from the boats and everything that
20 was coming through, but the water was still
21 moving.
22     Q.   Okay.  In which direction was it
23 moving?
24     A.   Like, in all directions.  It was,
25 like, just swirling, you know.

Page 84

1      Q.   So, it wasn't moving, like, either
2  up Bruxelles towards North Broad or away from
3  Bruxelles?
4      A.   Well, when you come up Broad, it
5  looked like it was coming from one end, and then
6  coming from St. Bernard, it looked like it was
7  coming up -- it looked like all of it, it was
8  just going towards Canal Street, like, that way,
9  but it didn't get all the way that far.
10     Q.   All right.  So, when you said it
11 looked like it was coming toward Canal Street,
12 you mean when you were on North Broad, it looked
13 like it was coming toward Canal Street?
14     A.   Yeah.
15     Q.   And when you were on Bruxelles,
16 which direction did it look like it was moving?
17     A.   Coming towards Broad.  The same --
18 you know, like, Canal Street.  The same way.
19     Q.   Okay.  So, when you were on
20 Bruxelles, the water looked like it was moving
21 toward Broad?
22     A.   Uh-huh.
23     Q.   Yes?
24     A.   Yes.
25     Q.   Yes.  And that was when you -- on

Page 85

1  the 30th, when you went to your house?
2      A.   Uh-huh.
3      Q.   Yes?
4      A.   Yes, sir.  Well, on the 30th, that's
5  when I left to go to -- let me see.  The 29th.
6  Yeah, the 30th is when I went to go to the
7  house -- to see if my dad made it to the house.
8      Q.   All right.  But when you were
9  talking about the direction of the water, were
10 you talking about your trip to the house or your
11 trip --
12     A.   My trip to the house, the water was
13 fighting me.
14     Q.   Okay.
15     A.   It was like, you know --
16     Q.   But was it moving towards you or was
17 it just rising?
18     A.   It was like -- it was like a push.
19 It was just, you know, like moving, swirling.  It
20 was like a swirl.
21     Q.   Okay.  But could you detect the
22 water moving in any direction?
23     A.   Yeah.  It was coming from -- from
24 Paris Avenue and all of that back -- from the
25 lakefront, looked like.

                                    22  (Pages 82 to 85)

JOHNS PENDLETON COURT REPORTERS                        800 562-1285

JOSE LUIS RODRIGUEZ (LEVEE)                                    7/14/2007

Page 86

1      Q.   It was coming from the lakefront and
2  moving toward --
3      A.   Towards -- towards Canal Street,
4  like.
5      Q.   Okay.  Now, you said you spent the
6  night in the apartment?
7      A.   Yes, sir.
8      Q.   And you got up the next morning?
9      A.   Uh-huh.
10     Q.   And you waited till 11:00 and then
11 your brother took you back to the Marriott?
12     A.   Yes, sir.
13     Q.   Okay.  And when you woke up the next
14 morning, what were the conditions like outside?
15     A.   It was weird, you know.  It was a
16 lot of choppers, a lot of Coast Guard people on
17 boats, you know.  It was just a weird scene, you
18 know, with the choppers coming in, picking up
19 people.  It was crazy.
20     Q.   Did you see any other people on your
21 street, on Bruxelles?
22     A.   Yeah.  They had a good bit of
23 people.  They had the upstairs house where I used
24 to live at.
25     Q.   Which house was that?

Page 87

1      A.   2915.  That one.  They had people up
2  there.  You know, that was a high, high ground up
3  there.  So, they had people up there.  And they
4  was trying to -- debating on whether to stay,
5  thinking the water was going to go down.  Those
6  were neighbors we been knowing for years.
7      Q.   All right.  Who were they?
8      A.   Miss Elaine, Keyana, her boyfriend
9  and Miss Elaine's sister.
10     Q.   Okay.  And that was a duplex where
11 the top apartment -- one apartment was on top of
12 the other?
13     A.   Yeah.  Yeah.
14     Q.   Okay.  So, the top apartment didn't
15 get any water?
16     A.   No.  Just roof.
17     Q.   Just roof damage?
18     A.   Yeah.
19     Q.   Okay.  Did you go into that
20 apartment?
21     A.   Well, I went up there to see what
22 they were doing, you know, how they was making
23 out.
24     Q.   Did they have roof damage?
25     A.   Yeah.

Page 88

1      Q.   I mean, was there water coming
2  through the ceiling?
3      A.   Uh-huh.  They had a tree came
4  through the house, in the back part of the house.
5  The front had leakage, too, but, you know --
6      Q.   Were there spots in their roof where
7  you could see daylight?
8      A.   Yeah.
9      Q.   All right.  And to get from your
10 house to Miss Elaine's house, you waded through
11 the water?
12     A.   Yeah.  You had to -- it's like, a
13 driveway apart.
14     Q.   Okay.  And how deep was the water
15 when you waded into it?
16     A.   About -- about right here, by my
17 stomach.
18     Q.   It appeared to have gone down a
19 little?
20     A.   Uh-huh.
21     Q.   Okay.  The reason I say that is
22 before you said it was chest high.
23     A.   Chest high.  Certain areas, like, by
24 Broad and St. Bernard, it was chest high.
25 Bruxelles, some parts of Bruxelles got up to my

Page 89

1  chin.  Some parts, I had to, you know, like, stay
2  afloat to stay up.  Then, some parts was real
3  low.  When we was on the jet ski, we was hitting
4  car rooftops, and I didn't know it was cars that
5  we was hitting.  It was the tops of cars.  In
6  some areas, you would scrape the bottom.  It
7  was -- the water was, like, up and down.
8      Q.   All right.  But let me ask you this:
9  On the morning that you woke up after sleeping
10 the night in your home, could you tell if the
11 water had -- the water outside had gone up or
12 gone down?
13     A.   It was slick.  It just stayed -- it
14 was still.  It was still at that time.
15     Q.   It wasn't moving?
16     A.   It wasn't moving.  It was, like,
17 glass.
18     Q.   Now, your attorney has shown me two
19 photographs that you took or that someone took --
20     A.   Uh-huh.
21     Q.   -- of a jet ski operator and someone
22 on the back of the jet ski.
23     A.   Uh-huh.
24     Q.   Do you know who took those pictures?
25     A.   Richard told me the neighbor -- the

                                    23  (Pages 86 to 89)

JOSE LUIS RODRIGUEZ (LEVEE)                                    7/14/2007

Page 90

1    neighbor on that house right there, one of the
2    neighbors around his house.
3        Q.   All right.  And is that you and your
4    brother on the jet ski?
5        A.   No.  That's my brother and that's
6    Ed.  That's another friend of ours.
7        Q.   All right.  And let me see if I
8    can -- if I can show you this picture and if you
9    could tell me -- do you know when that picture
10   was taken?
11       A.   When?
12       Q.   Yeah.
13       A.   I don't know exactly what day.  It
14   had to be on that -- that 30th, that same day.
15   Him and Ed was on the jet ski.
16       Q.   All right.  Is --
17       A.   Because he stayed -- he stayed,
18   like, three days after I left.  After he dropped
19   me off, he stayed.
20       Q.   Your brother stayed?
21       A.   Yeah, Richard stayed.
22       Q.   All right.  Is Richard the person
23   who is operating the jet ski in the picture?
24       A.   Yes, sir.
25       Q.   And can you tell what street he's

Page 91

1    on?
2        A.   He's on Abundance, I believe.
3        Q.   Okay.  So, that photograph wouldn't
4    show your house?
5        A.   No.  He was trying to find his cell
6    phone so he could give it to me.  He has a cell
7    phone with pictures of the street.
8        Q.   Okay.  But that's not why he was in
9    the jet ski.  In other words, he was going to
10   give you -- what you're referring to now is other
11   photographs?
12       A.   Other photographs, yeah.
13       Q.   Okay.  Okay.  And he was -- the
14   person on the back of the jet ski in this
15   picture -- and this picture, I'm going to refer
16   to as Exhibit Number 2 -- is named Ed?
17            (Whereupon, Rodriguez
18       Exhibit Number 2 and Rodriguez
19       Exhibit Number 3 were marked for
20       identification.)
21       A.   Yeah.
22   EXAMINATION BY MR. GARDNER:
23       Q.   Where did Ed live?
24       A.   Ed lived on the other side of Paris
25   Avenue, around -- closer to the Fairgrounds.

Page 92

1        Q.   Okay.  And you weren't -- you
2    weren't involved with this picture?
3        A.   No.  No.  Uh-huh.
4        Q.   All right.  And do you know who took
5    the picture?
6        A.   He says a guy that we call Meatball
7    took the picture.  I'm not sure.  I got to verify
8    that with him.
9        Q.   All right.  I'm going to show you a
10   second picture, and is that a picture of your
11   brother and Ed?
12       A.   Uh-huh.
13       Q.   Okay.  Yes?
14       A.   Yes, sir.
15       Q.   Okay.
16       A.   See, going that way, it's the
17   street -- see, Bruxelles is right here.  See how
18   it gets deeper over here?  As you go that way, it
19   gets deeper.  As you come up the other way, it
20   gets shallow.
21       Q.   All right.  So, they're on
22   Abundance, going towards Bruxelles?
23       A.   Yes, sir.
24       Q.   Okay.  And once again, it's your
25   brother and Ed.  And I'm going to go ahead and

Page 93

1    mark that as Exhibit 2.
2            Are these the only pictures that you
3    know of that show the water following Hurricane
4    Katrina?
5        A.   I can get more, probably, from
6    neighbors.  I didn't have any cameras, but, you
7    know, some people stayed and some people had some
8    cameras that they was able to use.
9        Q.   Okay.  But are these the only ones
10   you know of?
11       A.   Yes, sir.
12       Q.   And you said your brother took some
13   on his cell phone?
14       A.   Uh-huh.
15       Q.   But you haven't seen those?
16       A.   No.
17       Q.   Okay.  And did you take any pictures
18   of your apartment?
19       A.   After, no.
20       Q.   Okay.  Do you have any pictures of
21   it before?
22       A.   Yeah.
23       Q.   Okay.  All right.  So, the next
24   morning, or the morning after you arrived at your
25   apartment, your brother took you back to the

JOHNS PENDLETON COURT REPORTERS                          800 562-1285

JOSE LUIS RODRIGUEZ (LEVEE)                              7/14/2007

---

Page 94

1   Marriott?
2       A.   Uh-huh.
3       Q.   Yes?
4       A.   Yes, sir.
5       Q.   All right.  And you went on the jet
6   ski?
7       A.   Uh-huh.  Yes, sir.
8       Q.   And how far did you get before you
9   had to walk?
10      A.   Like, a block before Rampart.
11      Q.   Okay.  So, you would not have
12  reached the French Quarter yet?
13      A.   No.
14      Q.   In other words, you got out of the
15  jet ski before you reached the French Quarter?
16      A.   Yeah.  Yeah.  Right around Circle
17  Food Store.  St. Bernard runs up into Rampart.
18  About a block before that.
19      Q.   Right.  And from that point, you
20  walked to the Marriott?
21      A.   Yeah.
22      Q.   Could you see whether there were any
23  other people walking?
24      A.   Looting was going on by that time,
25  so, I was just trying to get to the hotel.

---

Page 95

1       Q.   You were wet?
2       A.   Yeah.
3       Q.   How deep was the water?
4       A.   Where?  On Canal Street?
5       Q.   Well, how deep was the water when
6   you reached the Circle Food Store?
7       A.   Well, it was still high at Circle
8   Food Store.  The jet ski was still riding.  I
9   didn't see -- I saw some people, it looked like
10  it might have hit them about their rib cage.
11  When I got back to Rampart, it was back to around
12  ankle.
13      Q.   And that's Rampart and St. Bernard?
14      A.   St. Bernard, yeah.
15      Q.   Okay.  And then you walked up --
16      A.   I walked all the way up Rampart.
17      Q.   To Canal?
18      A.   Uh-huh.
19      Q.   And then you walked down Canal
20  toward the Marriott?
21      A.   Yeah.
22      Q.   And as you walked toward the
23  Marriott, did the water get shallower?
24      A.   No.  It looked like it got higher.
25  It reached the hotel.  Like, the back part of the

---

Page 96

1   hotel we come out, it reached all the way to the
2   hotel.
3       Q.   How high was the water?  How deep
4   was the water at the hotel?
5       A.   About maybe to your calf.
6       Q.   Okay.  So, was it over a foot deep?
7       A.   Yeah.
8       Q.   And were your mother and sister --
9       A.   They were still there.  Yeah, my mom
10  was a wreck, and they was wondering if I was
11  coming back.  They was getting ready to put them
12  on buses because they was evacuating the hotels.
13      Q.   Okay.  We have to slow down and go
14  over that.  Was your dog with your mother?
15      A.   Yeah.
16      Q.   What kind of dog is it?
17      A.   A German Shepherd.
18      Q.   Now, you got back to the hotel and
19  you had not spoken with your mother between the
20  time you left and the between the time you
21  returned?
22      A.   Right.
23      Q.   Okay.  And what was going on at the
24  hotel when you arrived?
25      A.   Everybody was, you know, packing

---

Page 97

1   their clothes, you know, just getting ready to
2   leave because, you know, they had a lot of
3   police, a lot of Army people and people was
4   breaking into stores and then they had riots that
5   was breaking out.  So, they was trying to get
6   everybody that wasn't involved out -- you know,
7   out of harm's way.
8       Q.   Okay.  And you weren't involved in
9   any of the riots --
10      A.   No.
11      Q.   -- or the breaking in?
12      A.   No.
13      Q.   And what did you do when you got
14  back to the hotel?
15      A.   I told my Mom I didn't -- I couldn't
16  find my dad.  Richard didn't see him.  And, you
17  know, and they was telling me, we got to hurry up
18  and go because they telling everybody we got to
19  evacuate.  Let's get on this bus.  I said, I
20  don't want to get on the bus.  I said, let's get
21  the car and try get out of here in the car.  That
22  way we would have our own, you know, way of
23  getting around.  So, we got in the car and headed
24  to Texas.
25      Q.   All right.  Did you change your

---

25  (Pages 94 to 97)

JOSE LUIS RODRIGUEZ (LEVEE)                                    7/14/2007

| Page 98 |
|---|

1  clothes?
2      A.  No.
3      Q.  Why is that?
4      A.  They didn't have any water.  All I
5  had was what I had on.
6      Q.  Okay.  Did you and your brother ever
7  attempt to go to your father's house?
8      A.  Yeah.
9      Q.  That day?
10     A.  Yeah.  His house was -- let me see.
11 One, two, three -- he's four houses from
12 Richard's house.
13     Q.  All right.  So, after you got to
14 Richard's house, which is your house --
15     A.  Yeah.  Right.
16     Q.  Did you go to your father's house?
17     A.  Yeah, went over there.
18     Q.  Was your father there?
19     A.  No.
20     Q.  And did you do that the day you
21 arrived at Richard's house?
22     A.  Yes.
23     Q.  Your house?
24     A.  The same day.
25     Q.  All right.  So, you did that, you

| Page 99 |
|---|

1  went back to the house, went to bed and woke up
2  the next morning and left?
3      A.  Right.  His dog was still there, you
4  know.  His dog was still fine on the porch.
5      Q.  Did you do anything with the dog?
6      A.  Yeah.  Fed him and gave him some
7  water.  He didn't want to get off the porch
8  because the water was still deep.  So, just
9  stayed up there.  I just brought him some water
10 and food.  And the next day, I don't know where
11 he went.
12     Q.  What kind of house did your father
13 live in?  Was it a double?
14     A.  Double shotgun.
15     Q.  And it was built on piers?
16     A.  Yeah.
17     Q.  And was there water inside the
18 apartment?
19     A.  He didn't get any.
20     Q.  Okay.  Did his double appear to be
21 higher than yours?
22     A.  Yeah.  For some reason, yeah, it
23 seemed to be higher, because he didn't get as
24 much water as we got.  His floor may have gotten
25 wet, but that's it.  You know, like, if you threw

| Page 100 |
|---|

1  water on the floor, that's all that was --
2      Q.  Well, was there some reason why you
3  didn't spend the night in his apartment?
4      A.  No.  I don't know.  I just didn't.
5  I didn't.
6      Q.  All right.  Did he -- did his double
7  appear to have any roof damage?
8      A.  No.  In the back room, he did
9  have -- he did have roof damage.  I'm sorry.
10     Q.  Was there any indication when you
11 went into your father's apartment that he had
12 gotten there?
13     A.  No.
14     Q.  And did your dad live alone?
15     A.  Yes, sir.
16     Q.  All right.  Now, you said you got
17 back to the Marriott and you said you saw your
18 mother and your mother was a wreck?
19     A.  Uh-huh.
20     Q.  What did you mean by that?
21     A.  She was just like I didn't know what
22 would have happened to you.  She started hearing
23 all these stories about what was going on out
24 there and then seeing what was going on with the
25 looting and everybody -- she didn't know what

| Page 101 |
|---|

1  was -- so, I didn't have no means of calling her
2  and telling her I was all right and I made it
3  there.  So, she didn't know.  She was going
4  haywire --
5      Q.  Okay.
6      A.  -- till she saw me, she was better
7  off, you know.
8      Q.  All right.  And how long did you
9  stay at the Marriott before you left?
10     A.  Maybe -- maybe an hour.
11     Q.  Okay.  And how did you leave the
12 Marriott?
13     A.  In the car.
14     Q.  Okay.  In your sister's car?
15     A.  Yeah, my sister's car.
16     Q.  And that was when you began your
17 trip to Texas?
18     A.  Yeah.  Right.
19     Q.  Did you have to pay for the room at
20 the Marriott?
21     A.  No, sir.
22     Q.  Okay.  And when you left, it was
23 you, your dog, your sister and your mother?
24     A.  Yes, sir.
25     Q.  Okay.  Did you call your brother?

26 (Pages 98 to 101)

JOSE LUIS RODRIGUEZ (LEVEE)                                    7/14/2007

---

Page 102

1    A.   I tried.  We still -- I couldn't get
2  in touch with him.
3       Q.   Okay.  Did your father have a cell
4  phone?
5       A.   No, he didn't.
6       Q.   All right.  How long --
7  MR. GARDNER:
8          He needs to take a break.
9  THE VIDEOGRAPHER:
10          Let's go off the record to
11  change the video.
12          (Whereupon, a discussion was
13  held off the record.)
14  THE VIDEOGRAPHER:
15          On the record.
16  MR. GARDNER:
17          We're back on?
18  THE VIDEOGRAPHER:
19          Yes, sir.
20  EXAMINATION BY MR. GARDNER:
21       Q.   All right.  Now, you said you
22  were -- the three of you and your dog went to
23  Texas, but you couldn't find a place to stay?
24       A.   Right.  I had two brothers over
25  there, and I couldn't get in touch with neither

Page 103

1  one of them neither.
2       Q.   Okay.  And they were people who had
3  evacuated?
4       A.   Yeah.
5       Q.   And that was Armando?
6       A.   Armando and Douglas.
7       Q.   And Douglas lives in Texas?
8       A.   Well, yeah, after the storm, he
9  stayed up there.
10       Q.   Okay.  So, you went from Texas, you
11  drove to --
12       A.   I went over the -- I don't even know
13  where I was going.  My sister was navigating, but
14  she said we got to go that way, and we couldn't
15  go I-10.  It was closed.  So, we had to go
16  through all kind of other towns.  It took -- took
17  three days to get -- in the car without sleeping.
18       Q.   All right.  So, you went from
19  Beaumont to Fort Myers, Florida, and that took
20  three days?
21       A.   Yeah.
22       Q.   Did you stop anywhere?
23       A.   We tried.  Everybody was booked.
24  Everything was booked, hotels and everything.
25       Q.   So, you didn't have a hotel room

Page 104

1  between the time you left Houston until the time
2  you got to Florida?
3       A.   Right.
4       Q.   Did y'all sleep in the car?
5       A.   Yeah.
6       Q.   All right.  And when you got to Fort
7  Myers, you stayed with a friend?
8       A.   Yes.
9       Q.   And that was Angel --
10       A.   Angel Grenado.
11       Q.   -- Grenado and how long did you stay
12  with -- is it Mr. Grenado?
13       A.   Yeah.  I stayed with him about two
14  weeks, and then the Red Cross got us a room at
15  Suburban -- Suburban Inn, I think, is the name of
16  the place.
17       Q.   All right.  When you stayed with
18  Angel Grenado, was your mother and sister and the
19  dog with you?
20       A.   Yeah.
21       Q.   And then after two weeks, the Red
22  Cross found you all a room?
23       A.   A Suburban Inn, I think it was, the
24  name of it.
25       Q.   Did the Red Cross pay for that

Page 105

1  hotel?
2       A.   Yeah.
3       Q.   How long did you stay at the
4  Suburban Inn?
5       A.   About -- about two weeks, and then
6  they transferred us to a -- I can't think --
7       Q.   The Suburban Inn took your dog?
8       A.   Huh?
9       Q.   They took your dog?
10       A.   Yeah.  Yeah.  I can't think.  Some
11  other fancy hotel they sent us to at -- it was in
12  Cape Coral.  I can't think of the name.
13       Q.   Cape Coral?
14       A.   Yeah.
15       Q.   Did the Red Cross pay for that room?
16       A.   Yes, sir.
17       Q.   Okay.  How long were you there?
18       A.   I would say about a month, I think.
19       Q.   And you were, again, with your
20  mother, your sister and your dog?
21       A.   Yeah.  And, I think, by that time --
22  no, Richard didn't make it there yet.  He didn't make
23  it there yet.  Then, the Red Cross had got us a
24  house.  They put us in a house after that.
25       Q.   Okay.  And was that in Cape Coral?

JOSE LUIS RODRIGUEZ (LEVEE)                                    7/14/2007

Page 106

1    A.   That was in Cape Coral.
2    Q.   The house?
3    A.   Yeah.
4    Q.   Okay.  And did the Red Cross pay for
5  that expenses to rent the house?
6    A.   No.  A church -- a church did that.
7  A church took care of the house.
8    Q.   Okay.  What church was that?
9    A.   I can't think of the name of the
10  church.
11    Q.   You didn't have any expenses in
12  connection with the house?
13    A.   No.
14    Q.   It was all paid for?
15    A.   Right.
16    Q.   And how long were you in the house?
17    A.   A year.
18    Q.   A year?
19    A.   (Nods head affirmatively.)
20  MR. JOANEN:
21        You have to answer "Yes."
22    A.   Yes.  Yes.  I'm sorry.
23  EXAMINATION BY MR. GARDNER:
24    Q.   And how big was the house?
25    A.   Three-bedroom.

Page 107

1    Q.   All right.  Now, who lived in that
2  house?
3    A.   Me, my sister, my dog and Richard.
4  Richard came after.
5    Q.   And what about your mother?
6    A.   And my mom.
7    Q.   Where did your other two brothers
8  go?
9    A.   They stayed in Texas.
10    Q.   And that's Douglas and Armando?
11    A.   Right.
12    Q.   And by that time, you had made
13  contact with them?
14    A.   Yeah.  I got in touch with Richard
15  first and then -- you know, cell phones was just
16  starting to come in a little bit at a time.
17    Q.   Okay.  And then you stayed -- when
18  did you all leave the house in Cape Coral?
19    A.   When did we leave Cape Coral?  I
20  don't remember.
21    Q.   About when?  Was it this year?  Was
22  it last year?
23    A.   It was -- it was about a year and a
24  half, almost two years.  Year and a half,
25  something -- no.  About a year ago.

Page 108

1    Q.   About a year ago?
2    A.   Yeah.  I'll say about a year ago.
3    Q.   So, in about July of 2006, you moved
4  back to New Orleans, or you just left the house?
5    A.   I don't remember, to be honest.  I
6  don't remember.
7    Q.   Okay.  But you were in a house in
8  Cape Coral approximately a year?
9    A.   Yeah.  We would come back and forth
10  to see how everything -- when they allowed us to
11  come back, we came to see how -- what happened.
12    Q.   Okay.  Was the house in Cape Coral a
13  nice house?
14    A.   Yes, it was.
15    Q.   You were satisfied with that living
16  arrangement?
17    A.   Yes, I was.
18    Q.   Now, when did you first come back to
19  New Orleans after you evacuated?
20    A.   After I evacuated, like, right --
21  right around when they first -- right after the
22  water went down.  I don't remember what day
23  exactly it was, but I think they said we was able
24  to come in, and when I came in, it was still --
25  everything was still wet.  So, it wasn't long

Page 109

1  after.
2    Q.   Was it in September of 2005?
3    A.   I don't remember.
4    Q.   Was it within the first month
5  following the storm?
6    A.   Right after -- I don't know how
7  long.  It took them, like -- soon as he said that
8  we could come in, that the water was all out, we
9  came.
10    Q.   Okay.  And all of you came?
11    A.   No.  Just me and Richard at first.
12    Q.   And how did you get back to New
13  Orleans?
14    A.   In the car.
15    Q.   So, you drove?
16    A.   Yeah, we drove.
17    Q.   And whose car did you drive?
18    A.   My sister's.
19    Q.   Okay.  And where did you go when you
20  came back?
21    A.   To go look at the house on Prentiss.
22    Q.   And that was your mother and
23  sister's house?
24    A.   My mother's, yeah.
25    Q.   And what was the condition of the

JOSE LUIS RODRIGUEZ (LEVEE)                                    7/14/2007

Page 110

1  house on Prentiss?
2      A.  It was wiped out.
3      Q.  When you say it was wiped out --
4      A.  Took ten feet.
5      Q.  Took ten feet of --
6      A.  Water.
7      Q.  -- water?
8      A.  Yeah.
9      Q.  Was it a one-story house?
10     A.  Yeah, on a slab.
11     Q.  Could you tell if it had any roof
12  damage?
13     A.  No, I couldn't tell.
14     Q.  Were there any contents that were
15  salvageable?
16     A.  No.
17     Q.  Did it appear that the home had been
18  looted?
19     A.  No.
20     Q.  Okay.  Do you know if that house was
21  covered by any insurance?
22     A.  Yeah, I believe she was.
23     Q.  Did your mother have flood
24  insurance?
25     A.  Yeah.

Page 111

1      Q.  And did she have homeowner's
2  insurance?
3      A.  Uh-huh.  Yes, sir.
4      Q.  All right.  Now, after you went to
5  the house on Prentiss Street, where did you go?
6      A.  We went on Bruxelles.
7      Q.  Where did you go?
8      A.  To go look at my house -- mine and
9  Richard's house.
10     Q.  Okay.  And had the condition changed
11  since the time you left?
12     A.  Yeah.  It looked like somebody had
13  went in the house and just went through -- we
14  thought it was the people that was coming to
15  check and see if anybody was dead in the house
16  because the house was marked and a lot of doors
17  was knocked in.  But we went in, it was, like,
18  stuff was taken and moved around.
19     Q.  Okay.  So, the house had been
20  obviously looted?
21     A.  Yes, sir.
22     Q.  Could you -- was there anything that
23  looked like it could -- I mean, could you
24  identify anything that had been taken out?
25     A.  I didn't -- I wasn't thinking to

Page 112

1  remember anything.  I just took everything as a
2  loss.  So, I wasn't really looking for anything
3  that --
4      Q.  Okay.  Were any of your clothes
5  salvageable?
6      A.  Yeah.  Yeah.  I had some clothes
7  that were salvageable.
8      Q.  Was there anything else that was
9  salvageable?
10     A.  Not -- not -- no.  Like, the games
11  and all of that, no, none of that was
12  salvageable.
13     Q.  All right.  When you -- when you
14  left your apartment to go back to the Marriott,
15  did you secure it?
16     A.  Yeah.  Well, Richard was still
17  there, so, he said he was going to take care of
18  everything.  You know, he stayed.
19     Q.  Okay.  And how long did Richard
20  stay?
21     A.  About two or three days after I
22  left.
23     Q.  And did he tell you during those two
24  or three days if anyone had attempted to break
25  into your apartment?

Page 113

1      A.  No.  But he told me there was a lot
2  of people breaking in.  They was trying to steal
3  his jet skis.  You know, people was doing crazy
4  things.  So, he was just saying, man, it's time
5  to go because it's starting to getting out of
6  hand.  So, then, he left.
7      Q.  Okay.  Did anyone try to break into
8  Richard's apartment while he was there?
9      A.  No.
10     Q.  But he said someone tried to steal a
11  jet ski?
12     A.  Yeah.
13     Q.  Okay.  Did anybody try to steal
14  anything else that he told you?
15     A.  No.  They was trying to steal a jet
16  ski with him on it.  They was trying to -- you
17  know --
18     Q.  Was Richard's -- did Richard have
19  the same type of damage to his contents that you
20  had?
21     A.  Yeah.  I would say -- yeah.
22     Q.  Was he able to salvage any of the
23  contents?
24     A.  He salvaged some of the stuff, I
25  think, his clothes.  Everything that was -- that

JOSE LUIS RODRIGUEZ (LEVEE)                                    7/14/2007

Page 114

1   was -- like, that was in the closet up high that
2   didn't move was salvageable.
3        Q.   All right.  Did you have anything
4   like that?
5        A.   No.  Like, most of my stuff, like,
6   was on little dressers or little tables, and when
7   the water kind of lift that up, they was down on
8   the ground.  They was just --
9        Q.   All right.  How long did you stay
10  at -- how long did you stay at your house?
11       A.   For that day?
12       Q.   Yeah.
13       A.   When we came back, you talking
14  about?  About maybe an hour.
15       Q.   Okay.  Where had you planned to stay
16  when you got to New Orleans?
17       A.   At the hotel.
18       Q.   At the Marriott?
19       A.   Yeah.
20       Q.   Had your mom gone back?
21       A.   Huh?  Yeah, did she go back to work?
22  Yeah.  She went back to work.
23       Q.   When did your mother go back to
24  work, approximately?  In other words, your mother
25  went back to work at the Marriott before you went

Page 115

1   back to New Orleans, or did she?
2        A.   No.  No.  She stayed out of work the
3   whole time we was up there.
4        Q.   In Cape Coral?
5        A.   In Cape Coral.
6        Q.   Okay.  But she had the ability to
7   get you a room at the Marriott?
8        A.   Yeah.
9        Q.   Did Richard have any insurance on
10  his contents?
11       A.   I believe he did.  I'm not sure.
12       Q.   Did he have any flood insurance on
13  the structure?
14       A.   I'm not sure about that.
15       Q.   Do you know if he had any insurance
16  on the structure?
17       A.   I'm pretty sure he had insurance,
18  but on what and -- I know he had insurance
19  because he was talking about paying his
20  insurance, but --
21       Q.   He had insurance.  You're just not
22  exactly sure what it covered?
23       A.   Right.  Right.
24       Q.   So, you stayed at the Marriott?
25       A.   Yeah.

Page 116

1        Q.   Okay.  Now, how long were you in New
2   Orleans the first time you went back?
3        A.   When I came -- about two days.
4        Q.   Okay.  Did you know what had
5   happened to your father?
6        A.   No.  We still didn't know and -- I
7   had a gut feeling, but didn't want to see it, but
8   we put him on the internet, you know, like, to
9   search people, and that's how they contacted us.
10       Q.   Okay.  And who contacted you?
11       A.   Some lady.  They had him at a morgue
12  or something they told us about.
13       Q.   Did you ever learn as to how he
14  died?
15       A.   They told us they picked him up on
16  St. Bernard, where I was walking through, you
17  know, and it was, like, I walked right past my
18  dad, you know.  I'm thinking I passed right by
19  him.  Because, I mean, if he went before me and
20  that's where they say they picked him up from,
21  you know --
22       Q.   But did they say when they found
23  him?
24       A.   I don't -- my sister probably has
25  all of that on paper.

Page 117

1        Q.   Okay.  Okay.  Do you know what your
2   dad's cause of death was?
3        A.   Not sure.  Drowning, I guess.  I
4   don't know.
5        Q.   But do you know that one way or
6   another?
7        A.   I don't know.  It's probably on the
8   paper, too.
9        Q.   Okay.  But you don't know that for
10  certain?
11       A.   I'm pretty sure, yeah.
12       Q.   Did your dad know how to swim?
13       A.   He knew how to swim, but he was a
14  old man, and the water --
15       Q.   How old was your dad at the time of
16  Hurricane Katrina?
17       A.   He was 71, I think.
18       Q.   Okay.  So, after you stayed in New
19  Orleans for two days at the Marriott, you went
20  back to Florida?
21       A.   Uh-huh.
22       Q.   All right.  When you stayed at the
23  Marriott, was there any -- did you have to pay
24  for that?
25       A.   No.

30 (Pages 114 to 117)

JOSE LUIS RODRIGUEZ (LEVEE)                                    7/14/2007

Page 118

1      Q.   And when you went back to Florida,
2  how long did you stay there?
3      A.   I went back to Florida for about
4  three weeks, and then I brought my mom back.  She
5  wanted to come see it, so --
6      Q.   And had anything changed in the
7  condition of her house?
8      A.   No.  Everything was just stink, bad
9  smell.  You know, it was a bad smell.
10     Q.   Was there any indication that her
11 house had been looted between the time you went
12 there the first time and the time you brought her
13 there?
14     A.   No.
15     Q.   Okay.  Did you go back to your house
16 again?
17     A.   No, I didn't go back into town.
18     Q.   How long did you stay in New Orleans
19 when you brought your mama back?
20     A.   When we came back, maybe another
21 week or two.
22     Q.   And you stayed at the Marriott?
23     A.   Yeah.
24     Q.   And you weren't charged for that
25 room?

Page 119

1      A.   No.
2      Q.   And that's because the Marriott paid
3  for it?
4      A.   Right.  With my mom being employed
5  there.
6      Q.   Right.  In other words, she wasn't
7  charged either?
8      A.   Right.  Right.
9      Q.   And then you all went back to
10 Florida again?
11     A.   Right.  And then when we -- we came
12 back and started, like, straightening Richard's
13 house up a little bit so we could sleep there
14 every now and then and try and start getting it
15 so we could move back.
16     Q.   Okay.  And did you gut your
17 apartment?
18     A.   Huh?
19     Q.   Did you gut your house?
20     A.   Yeah.  Yeah.  He's still in the
21 process of doing that.  My mom and them was
22 staying there.  So, we fixed it up good enough so
23 that she could stay there with my sister while
24 she got her other house fixed.
25     Q.   All right.  So, did you have to

Page 120

1  remove all the Sheetrock in your house?
2      A.   Yeah.  Well, only so high.  We only
3  did it so high because it didn't go all the way
4  to the roof.
5      Q.   All right.  How high was that?
6  Three feet, four feet?
7      A.   Yeah.  A little past the sockets
8  like that.  A little bit past the sockets.
9      Q.   So, that's about three feet, maybe?
10     A.   Uh-huh.
11     Q.   Yes?
12     A.   Yes, sir.
13     Q.   All right.  Did you have to remove
14 the ceilings?
15     A.   Yeah.
16     Q.   Did you have to fix the roof?
17     A.   Yeah.
18     Q.   Did you pay for any of those
19 repairs?
20     A.   No.
21     Q.   Richard paid for them?
22     A.   Richard paid for them.
23     Q.   So, you fixed up the building where
24 you were living -- you and Richard were living so
25 your mother could live there?

Page 121

1      A.   Yeah.
2      Q.   How long was it before your mother
3  could live there?
4      A.   Maybe a year, I would say, because
5  he took -- he took -- what he did is he took the
6  walls down in the middle to make it one big
7  house.
8      Q.   Okay.
9      A.   You know, that's when he did certain
10 rooms -- like, the kitchen, he made that bigger
11 and he wanted to make another bedroom bigger.
12 So, he just made it, like -- instead of it being
13 like a double, right now, it's like a single,
14 pretty much.
15     Q.   But it's a bigger single?
16     A.   A bigger single.
17     Q.   Is your mother and sister still
18 living there?
19     A.   No.  They just -- as a matter of
20 fact, they just moved -- we in the process of
21 moving all the stuff to the new house.
22     Q.   To the new house, meaning on
23 Prentiss?
24     A.   On Prentiss, yeah.
25     Q.   All right.  So, when did you move

31 (Pages 118 to 121)

JOSE LUIS RODRIGUEZ (LEVEE)                                    7/14/2007

Page 122

1  back to New Orleans full time?
2      A.   I don't recall exactly.  It was,
3  like -- I have all of that on paper from the time
4  when we -- the lease was over at the other house
5  in Florida.
6      Q.   Okay.
7      A.   So, I know it was a year there, but
8  I don't remember the days.
9      Q.   All right.  Have you been back to
10 New Orleans all of 2007?
11     A.   Yeah.
12     Q.   Okay.  And where are you presently
13 living?
14     A.   At 2928 Bruxelles.  I don't know
15 where I'm going to be a week from now, but that's
16 where I'm at now.
17     Q.   What's happening in a week?
18     A.   I don't know.  I just haven't
19 been --
20     Q.   Oh, that's right.
21     A.   I bounce around.
22     Q.   That's right.  You're not living
23 next to your brother because your brother's made
24 his double one house?
25     A.   One house, right.  He's thinking

Page 123

1  about going -- making -- closing it back up again
2  now that my mom's gone, but he's not sure neither
3  what he's going to do.
4      Q.   All right.  Is your brother married?
5      A.   No.
6      Q.   Does he have any dependents?
7      A.   Yeah.  He got three -- three girls.
8      Q.   Do they live with him?
9      A.   No.
10     Q.   Okay.  Now, you said that since you
11 came back to New Orleans, you've been kind of
12 bouncing around from one apartment to another.
13     A.   Uh-huh.
14     MR. JOANEN:
15          You have to say "Yes."
16     A.   Yes.  Yes.  I'm sorry.
17 EXAMINATION BY MR. GARDNER:
18     Q.   I mean, is that a bad way to
19 describe it?
20     A.   What, bouncing?  No.  No.  You could
21 say living from pillar to post.  You know, I
22 just -- I don't know.  I just -- I'm not -- I
23 don't -- like, I haven't been able to -- to,
24 like, settle at a job or -- you know, just -- I
25 don't know.  I haven't been thinking right

Page 124

1  lately.
2      Q.   All right.  And why do you think
3  that is?
4      A.   I don't know.
5      Q.   All right.  Since you've come back
6  to New Orleans, have you paid rent to anyone?
7      A.   No.
8      Q.   Okay.  During the entire time you
9  evacuated from New Orleans, did you have to pay
10 any of your rooming expenses?
11     A.   No.
12     Q.   Now, are you presently employed now?
13     A.   No, sir.  I still do marble and
14 tile.  That's how I kind of been maintaining, you
15 know, doing that.
16     Q.   Who do you work for?
17     A.   Myself.
18     Q.   Okay.  How many hours a week do you
19 work?
20     A.   It depends.  It's like I just do it
21 as I finish it.  I do a job -- if I finish it --
22 or I might put eight hours one week -- I mean,
23 one day, and I be finished it in, like, two days,
24 maybe.  So, I don't have, like, a full week that
25 I would do, you know -- like, to make 40 hours.

Page 125

1      Q.   Do you support anyone other than
2  yourself?
3      A.   No, sir.
4      Q.   In the year 2005, do you remember
5  what your gross income was?
6      A.   I think it was 30.  Thirty thousand.
7      Q.   In 2004, do you remember what it
8  was?
9      A.   No.  Probably about the same.  It
10 didn't -- it didn't move much.  Didn't fluctuate.
11     Q.   Okay.  But in 2005, you only worked
12 through September.  2004 -- did you work the
13 entire year of 2004?
14     A.   I don't remember the total year.
15     Q.   All right.  Did you file an income
16 tax return in 2004 and 2005?
17     A.   I filed one in 2004.  2005 was -- it
18 was not a full -- I was working -- I worked at
19 different places.  So, I had, like, three forms I
20 did.  So, I remember that.
21     Q.   Okay.  What were the three places
22 you worked?
23     A.   I did some for Gulf South.
24     Q.   Okay.
25     A.   I did some for Prestige.

JOSE LUIS RODRIGUEZ (LEVEE)                                    7/14/2007

Page 126

1    Q.   Prestige Flooring?
2    A.   Yeah.  And I can't think of the
3  marble -- it's the same people who own -- Gulf
4  South Marble & Tile had, like, a separate
5  building to do countertops and everything, and I
6  did some work for him.  I don't remember --
7    Q.   Okay.  That was before Hurricane
8  Katrina?
9    A.   Before.  (Nods head affirmatively.)
10   Q.   So, before Hurricane Katrina, you
11  were working for three different people?
12   A.   Yeah.
13   Q.   Okay.  Let me ask you this:  Did you
14  complete -- did you file income tax -- did you
15  prepare an income tax return in 2004?
16   A.   I believe I did, yeah.
17   Q.   And did you do one in 2005?
18   A.   2005, I don't think I did.  I don't
19  think I did one.
20   Q.   What about 2006?
21   A.   No.  Definitely no.
22   Q.   Did you have any earnings in 2006?
23   A.   The same thing that I been doing,
24  like, the tile, certain -- you know, just trying
25  maintain myself.

Page 127

1    Q.   And how much money do you think
2  you've made in 2006?
3    A.   I don't know.  Maybe 15.
4    Q.   Fifteen thousand?  What about 2007,
5  how much money did you make the first half of the
6  year?
7    A.   Probably about the same, ten or
8  15,000.  I don't -- I don't remember.  I don't
9  recall that.
10   Q.   Do you plan on filing an income tax
11  return this year?
12   A.   I got to talk to somebody and find
13  out how to do that.  I don't know how to do that.
14   Q.   All right.  Before Hurricane
15  Katrina, did you prepare your own income tax
16  returns --
17   A.   No.
18   Q.   -- or did somebody else?
19   A.   No.  Somebody else did that.
20   Q.   Okay.  Since Hurricane Katrina, have
21  you attempted to look for work as a tile
22  installer?
23   A.   Somewhat.  I did, but not with want,
24  you know.
25   Q.   But not what?

Page 128

1    A.   Not with want.  Not with, you know
2  wanting to do it.
3    Q.   Okay.  And, again, why is that?
4    A.   I haven't -- it's like I can't --
5  it's hard for me to, like, take certain orders,
6  like shit -- stuff like that since the storm and
7  people talking to you in a certain way.  And I
8  haven't been able to take it, so, I get either,
9  you know, bad attitude with people sometimes.  I
10  don't know.  That's not me, though.
11   Q.   Had you ever had any kind of
12  problems with that before Hurricane Katrina?
13   A.   No, sir.
14   Q.   Have you seen a counselor or talked
15  to anyone about it?
16   A.   No, sir.
17   Q.   Now, you said when we began the
18  deposition that you were treated in Fort Myers,
19  Florida, for exposure to something.
20   A.   Yeah.
21   Q.   And what --
22   A.   He told me it was a fungus.
23   Q.   All right.  Now, why did you happen
24  to go to the doctor there?
25   A.   Why?  Because I -- the fungus -- it

Page 129

1  was, like -- you know, it was like a itch.  It
2  was all over my body, and I had to go find out
3  what it was.
4    Q.   Okay.  Had you ever had that itch
5  before?
6    A.   No, sir.
7    Q.   And when did that itch begin?
8    A.   After I got out the water, like --
9  when I was on the road, on the highway.
10   Q.   Okay.  And did it -- did your skin
11  change colors?
12   A.   Yeah.  It was like -- like red --
13  little, round circles with a bunch -- it was
14  itching and it got hard in the middle.  It was --
15  it was -- didn't look right.
16   Q.   And did you see any doctor before
17  you saw the doctor in Fort Myers?
18   A.   No.
19   Q.   Okay.  Do you know who the doctor
20  was that you saw?
21   A.   No.
22   Q.   Was he at an emergency room?
23   A.   Yeah, it was at an emergency room.
24   Q.   Do you remember the name of the
25  hospital?

JOSE LUIS RODRIGUEZ (LEVEE)                                    7/14/2007

Page 130

1     A.   No.  Gulf Coast, I think.  I have
2  that, too, the paperwork and stuff like that.
3     Q.   Okay.  And that was in Fort Myers?
4     A.   Yes, sir.
5     Q.   Did you see him more than once?
6     A.   No, just that one time.
7     Q.   Okay.  And what did he prescribe for
8  your itch?
9     A.   I forgot the name of the lotion.  It
10 was a -- some ointment that he told me to just
11 get.  You can get it over the counter.  He said
12 just put it on for a couple of days and see if it
13 goes away.  It should go away, and it did.
14    Q.   Was it cortisone?
15    A.   Cortisone.  That's it.
16    Q.   And did it go away?
17    A.   Yeah.
18    Q.   All right.  Do you know how much
19 that doctor's visit cost?
20    A.   I -- almost -- I think it was, like,
21 300 -- 200 and something, $300.
22    Q.   All right.  And the cortisone was
23 over-the-counter medication --
24    A.   Yeah.
25    Q.   -- that cost about $10?

Page 131

1     A.   Uh-huh.
2     Q.   Yes?
3     A.   Yes.
4     Q.   And did you see any other doctors
5  for anything that you believe was related to
6  Hurricane Katrina after the storm?
7     A.   No.
8     Q.   Okay.  Did you buy any other
9  medication?
10    A.   No.
11    Q.   Did one tube of the cortisone take
12 care of the problem?
13    A.   No.  No.  It took, like, about two
14 or three tubes.  It didn't go away, like, three
15 days, like he told me, but it went away.
16    Q.   Okay.  How long did it take it to go
17 away?
18    A.   About a week and a half, almost two
19 weeks.
20    Q.   And was it on both your arms?
21    A.   It was on my arms -- on this arm and
22 both my legs.
23    Q.   All right.  Now, when you say "this
24 arm," which arm are you talking about?
25    A.   My right.

Page 132

1     Q.   Right arm?
2     A.   Right arm and both legs.
3     Q.   Now, have you -- you indicated that
4  since the storm, you thought you weren't feeling
5  right or you weren't thinking right.
6     A.   Yeah.
7     Q.   Okay.  Had you ever had a period in
8  your life when you weren't thinking right?
9     A.   Yeah, when my son passed away.
10    Q.   Okay.  And what -- what was the
11 cause of your son's death?
12    A.   M.S., muscular dystrophy he had.
13    Q.   Did you see any -- any sort of a
14 counselor or a doctor or a psychologist or a
15 psychiatrist?
16    A.   No.
17    Q.   No one?
18    A.   No.
19    Q.   You didn't have any medical
20 treatment at all after your son's death?
21    A.   No.
22    Q.   Okay.  Have you -- and you haven't
23 had any -- you haven't seen any kind of a
24 psychologist or a psychiatrist after Hurricane
25 Katrina?

Page 133

1     A.   No.
2     Q.   Have you thought about seeing one?
3     A.   No, not really.
4     Q.   And do you attribute that not
5  feeling right to Hurricane Katrina?
6     A.   It's a big -- yeah.  Yeah.  I would
7  say yeah.
8     Q.   I mean, has it gotten better as time
9  goes on?
10    A.   No.  No, because it's basically the
11 same because -- it's like the feeling that I had
12 when I lost my son, and then, like, two years
13 later, you know, I'm not even over that, and then
14 this comes up.  You know, it's like it's not --
15 nothing's falling into place for me right now.
16    Q.   Okay.  So, at the time of Hurricane
17 Katrina, you were still having some personal
18 problems related to your son's death --
19    A.   Right.
20    Q.   -- correct?
21    A.   Yeah, correct.
22    Q.   Okay.  Did those personal problems
23 seem worse today than they did before Hurricane
24 Katrina, or are they about the same?
25    A.   I would say about the same.  It's

JOSE LUIS RODRIGUEZ (LEVEE)                                    7/14/2007

Page 134

1  almost like a way of life now.
2      Q.   Okay.  Prior to Hurricane Katrina,
3  were you having any -- any trouble doing work as
4  a tile installer?
5      A.   No.
6      Q.   Do you -- are the companies that you
7  worked for before Hurricane Katrina, are they
8  still in business today?
9      A.   No.
10     Q.   They're not?
11     A.   I don't think so, no.  I know
12  Gulf --
13     Q.   Did you --
14     A.   No.  I never -- I tried at Gulf
15  South, but they're not.  I know they're not there
16  anymore.
17     MR. JOANEN:
18         Take a break.  I'll go
19     upstairs.
20     MR. GARDNER:
21         What are we going to do
22     about lunch?
23         (Whereupon, a discussion was
24     held off the record.)
25     THE VIDEOGRAPHER:

Page 135

1          On the record.
2   EXAMINATION BY MR. GARDNER:
3       Q.   All right.  Mr. Rodriguez, when we
4   had earlier talked about these photographs, I had
5   indicated -- I had identified them as
6   Photograph -- Exhibit 1 and Exhibit 2.
7   Unfortunately, we already have an Exhibit 1.  So,
8   why don't we go ahead and call the Notice of
9   Video Deposition Exhibit 1A.
10     MR. GARDNER:
11         Is that okay?  That will
12     probably make it a little easier
13     since we've already talked about
14     the photographs --
15     MR. JOANEN:
16         That's fine.
17     MR. GARDNER:
18         -- in the past.
19  EXAMINATION BY MR. GARDNER:
20     Q.   Let me ask you about your skin
21  problems.  Had you ever had any skin problems in
22  the past?
23     A.   No, sir.
24     Q.   Had you ever seen a dermatologist?
25     A.   No, sir.

Page 136

1       Q.   Was the doctor you saw in Florida a
2   dermatologist?
3       A.   I don't know.  I just went in the
4   emergency room and he came.
5       Q.   Are the skin problems the only
6   physical injury you relate to Hurricane Katrina?
7       A.   Yes.
8          (Whereupon, a discussion was
9       held off the record.)
10     THE VIDEOGRAPHER:
11         On the record.
12  EXAMINATION BY MR. GARDNER:
13     Q.   When was the first time after
14  Hurricane Katrina that you went back to doing
15  tile work?
16     A.   Not too long after -- I'd say a
17  month -- maybe a month after I got here.
18     Q.   And that was approximately how long
19  after the storm?
20     A.   About a year -- maybe a year and a
21  half.
22     Q.   When you were in Florida, did you
23  attempt to look for any work?
24     A.   Yes.  Yes.
25     Q.   Did you get any work?

Page 137

1       A.   No.  Everything was getting in order
2   because I was going to work for Rinker, and then
3   another tile company up there, but, you know,
4   then I decided -- you know, I had to come down --
5   it was hard to work, knowing what was going on.
6       Q.   Okay.  But did you apply to work at
7   Rinker?
8       A.   Yeah.
9       Q.   Rinker is a tile installer?
10     A.   No.  Rinker is, like, a cement
11  company.
12     Q.   So, you were going to do something
13  other than tile work?
14     A.   Yeah.
15     Q.   And what type of job were you going
16  to do at Rinker?
17     A.   Servicing the heavy equipment.
18     Q.   Okay.  And why didn't you take the
19  job at Rinker?
20     A.   Because I wasn't sure that's where I
21  wanted to stay, you know.  I didn't know what --
22     Q.   Okay.  But you could have worked
23  there if you wanted to?
24     A.   Yes.
25     Q.   Okay.  And what was the rate of pay?

35 (Pages 134 to 137)

JOSE LUIS RODRIGUEZ (LEVEE)                                    7/14/2007

Page 138

1   A.   It was 15, I believe.
2   Q.   Fifteen dollars an hour?
3   A.   Dollars an hour, yeah.
4   Q.   Was that more than you were making
5   as a tile installer?
6   A.   Yes, it was.
7   Q.   And when you were in Florida, what
8   expenses did you have?
9   A.   None, really.  I mean, none.  None.
10  I had some money on me to carry me over, but my
11  mom kind of, you know -- if I needed anything,
12  she would handle it, but I didn't really need
13  anything.
14  Q.   Okay.  Did you pay for your own food
15  expenses?
16  A.   Yeah.
17  Q.   Other than food expenses, did you
18  have any other expenses?
19  A.   No, because, like, the Red Cross
20  gave us clothes, you know, and stuff like that,
21  so, I didn't buy anything, and then I wasn't to
22  buy anything the way we was going from hotel to
23  hotel, you know, one room and another, when they
24  kept -- sent us from one room to another until we
25  stabled down at the house.

Page 139

1   Q.   But once you got to the house, your
2   only expense was food expenses?
3   A.   Yeah.
4   Q.   And how were you paying for those?
5   A.   With the money -- with some money
6   that I still had left over when I left from the
7   storm, and when we went back to the house, you
8   know, in my drawer, you have a drawer with change
9   and stuff in it, money, and I still was able to
10  salvage some of that.
11  Q.   Okay. .  How much money did you take
12  with you to Florida?
13  A.   A thousand.
14  Q.   And was that enough to hold you over
15  for the expenses you needed while you were in
16  Florida?
17  A.   Uh-huh.  Yes, sir.
18  Q.   All right.  And when you got back to
19  New Orleans and you looked for tile work, did you
20  go back and look -- did you go back and call Gulf
21  South?
22  A.   Gulf South was not there.  I mean,
23  they had -- everything was flooded out over
24  there, so, I couldn't get in touch with anybody
25  there.  So, basically, what I did to make it, I

Page 140

1   just started -- I was gutting houses.  Gutting
2   houses, things like that.
3   Q.   What about Prestige Flooring, were
4   they around?
5   A.   I never tried to go back to Prestige
6   Flooring.
7   Q.   Okay.  But instead you went to work
8   gutting houses?
9   A.   Yes.
10  Q.   And did you work for a company or by
11  yourself?
12  A.   By myself.  Me and Richard, really.
13  Q.   Richard?
14  A.   Richard, yeah, my brother.
15  Q.   And how much did you make gutting
16  houses?
17  A.   I'd say -- how much we was charging?
18  I think it was about 400, $500 a house.
19  Q.   And how many houses did you gut?
20  A.   We might have gut about ten, maybe.
21  Q.   And that was over a period of how
22  long?
23  A.   Maybe a year.
24  Q.   And did you have any problem doing
25  that work?

Page 141

1   A.   No.
2   Q.   Did you have any problems working
3   with your brother?
4   A.   No, sir.
5   Q.   All right.  Now, you said a moment
6   ago you had these feelings that sometimes you
7   weren't thinking right.
8   A.   Yeah.
9   Q.   Did that come up while you were
10  gutting houses?
11  A.   Well, you going to have arguments,
12  but, you know, other than that, everything was
13  pretty -- pretty good.
14  Q.   Okay.  Between the time of Hurricane
15  Katrina and the time you got back to New Orleans,
16  did you file for unemployment?
17  A.   Yeah.
18  Q.   Did you receive any unemployment
19  benefits?
20  A.   No, sir.  No, sir.
21  Q.   Do you know why that is?
22  A.   No.  It looked like they sent me
23  something late -- since I was going and coming,
24  they had sent me some information about saying
25  that I -- that I did qualify, but when I called,

JOSE LUIS RODRIGUEZ (LEVEE)                          7/14/2007

---

Page 142

1  they told me I didn't, you know, so, I left it
2  alone.  I didn't pursue it.
3       Q.   Had you ever received unemployment
4  benefits in the past?
5       A.   No, sir.
6       Q.   Had you ever received any workers'
7  compensation benefits?
8       A.   No, sir.
9       Q.   When you were working with Richard,
10 you weren't working as a company.  You were just
11 working as yourself?
12      A.   Yeah, just both of us just trying to
13 make a little money.
14      Q.   Okay.  How is Richard employed?
15      A.   Richard, he cuts grass and he
16 works -- he drives buses for the school board.
17      Q.   For the Orleans Parish School Board?
18      A.   Yes, sir.
19      Q.   All right.  Have you tried to find a
20 tile installation company to work for, or do you
21 want to work for yourself?
22      A.   No, I haven't tried.  I kind of
23 rather do it myself.
24      Q.   How do you get work?
25      A.   It's been word-of-mouth, like, some

---

Page 143

1  of the houses that I've already done, you know,
2  somebody told them about it, and it's going about
3  that.  And it stopped because nobody has no
4  money, like, right now, but, I think, since Road
5  Home, they starting to call, you know, little by
6  little.  That's what I want to do, is try and do
7  my own thing.
8       Q.   How many houses have you done --
9  have you worked on?  How many days have you
10 worked in the last month?
11      A.   In the last month, say, about two
12 weeks.
13      Q.   Could you have worked more if you
14 wanted to?
15      A.   Maybe, yeah.  Yeah.
16      Q.   Are you working only two weeks in
17 the last month by choice or because there wasn't
18 enough work?
19      A.   Well, sometimes I would -- you know,
20 I don't feel like it, so, I won't.  But, mainly,
21 it's been people aren't ready yet.  It's wait for
22 this -- I got calls, but it's wait until this guy
23 gets finished with this and the painting.  It's a
24 waiting game.
25      Q.   So, when you work for people, do you

---

Page 144

1  do it on a time and labor -- time-and-material
2  basis, or do you give them estimates?
3       A.   A estimate.
4       Q.   Okay.  And does anybody else work
5  with you or do you work by yourself?
6       A.   I work by myself.
7       Q.   Do you have any stationery or
8  business forms?
9       A.   No, sir.
10      Q.   Okay.  When you give them an
11 estimate, it's just a handwritten estimate?
12      A.   Yeah.
13      Q.   Do you have any kind of --
14      A.   Or verbally.  You just tell them
15 this is what it is.
16      Q.   Do you have any kind of an
17 occupational business license?
18      A.   No, sir.
19      Q.   Do you believe that you've lost any
20 wages or income because of Hurricane Katrina?
21      A.   Well, I would probably still be
22 working, you know, for the other company, but
23 ever since that, I just haven't been feeling
24 that, you know, to try and do that again.  Like,
25 for the -- a company.

---

Page 145

1       Q.   Okay.  So, if the company was still
2  there, would you have gone back to work for it?
3       A.   Probably not.  I would have probably
4  tried to look for something else.
5       Q.   And that's just because you don't
6  feel up to working for a company?
7       A.   Yeah.  Yeah.  Yeah.
8       Q.   Okay.  Had you ever been terminated
9  from any of your prior employments?
10      A.   No, sir.
11      Q.   Have you ever received any kind of
12 disability benefits?
13      A.   No, sir.
14      Q.   Are you making a claim, Mr.
15 Rodriguez, for any nonphysical injury as a result
16 of Hurricane Katrina?
17      A.   Nonphysical?
18      Q.   Mental distress, emotional distress?
19      A.   No.  No.
20      MR. JOANEN:
21          Just for clarification on
22      that, he is being presented as the
23      class rep.  I don't know whether
24      it's in the class -- but the
25      class -- the master administrative

---

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

JOSE LUIS RODRIGUEZ (LEVEE)                    7/14/2007

Page 146

1    complaint is going to read that
2    Mr. Luis Rodriguez is representing
3    the claim of his father, Luis
4    Rodriguez, for his death.
5    MR GARDNER:
6        I'm going to ask him about
7    that in a second.
8    MR. JOANEN:
9        I don't know if he
10   understands that when you say
11   mental distress, that's kind of
12   hard to identify.
13   MR. GARDNER:
14       All right.  Is that the old
15   one or the new one?
16   MR. JOANEN:
17       I think it's the one we're
18   working on.
19   MR. LAGARDE:
20       It's the one we're going to
21   substitute, move to substitute.
22   MR. JOANEN:
23       He was substituted.
24   MR. GARDNER:
25       Well, wait.  Am I supposed

Page 147

1    to be seeing this?
2    MR. JOANEN:
3        We don't have any secrets.
4    MR. GARDNER:
5        Okay.  I just don't want
6    to --
7    MR. JOANEN:
8        I appreciate it.  I just
9    personally don't know what the
10   stages are, whether they filed it
11   yet or --
12   MR. GARDNER:
13       Okay.
14   MR. JOANEN:
15       I think we are substituting
16   two people, so -- because of the
17   Greers.
18   MR. GARDNER:
19       All right.  So, Mr.
20   Rodriguez is making a claim
21   related to the death of his father
22   in this litigation?
23   MR. JOANEN:
24       For this subclass, I believe
25   so.

Page 148

1    MR. GARDNER:
2        Is that -- let me just see
3    that.  Let me look at it again.
4    Let's go off the record for a
5    second.
6    THE VIDEOGRAPHER:
7        Off record.
8        (Whereupon, a discussion was
9    held off the record.)
10   EXAMINATION BY MR. GARDNER:
11       Q.   Mr. Rodriguez, you're making a claim
12   for the wrongful death of your father?
13       A.   Uh-huh.
14       Q.   And that's for the reasons that
15   we've stated before --
16       A.   Yes, sir.
17       Q.   -- or the reasons you stated before?
18       A.   Right.
19       Q.   And the only property damage claim
20   you're making is a claim for the damage to the
21   contents of your apartment and the damage to your
22   automobile?
23       A.   Right.
24       Q.   Okay.  You didn't own any real
25   estate at the time of Hurricane Katrina?

Page 149

1        A.   No, sir.  No, sir.
2        Q.   And you didn't own any other
3    property --
4        A.   No, sir.
5        Q.   -- other than what was in your
6    apartment and your car?
7        A.   Right.
8        (Whereupon, a discussion was
9    held off the record.)
10   THE VIDEOGRAPHER:
11       On the record.
12   MR. GARDNER:
13       Just so we're clear on this,
14   Mr. Rodriguez is going to reserve
15   the right to read and sign his
16   deposition.  And I usually say
17   this at the beginning, but it's
18   agreed we're taking this
19   deposition pursuant to Federal
20   Rule of Civil Rule of Procedure
21   30, the Case Management Order
22   Number 4 and the Court's order of
23   July 3rd, 2007, which is Document
24   Number 6222.
25   MR. JOANEN:

38 (Pages 146 to 149)

JOSE LUIS RODRIGUEZ (LEVEE)                                    7/14/2007

Page 150

```
 1          Yes, and I believe I'm
 2     maintaining a standing objection
 3     on behalf of the PSLC regarding
 4     the ruling.
 5          MR. GARDNER:
 6              The ruling.
 7     EXAMINATION BY MR. GARDNER:
 8     Q.   Okay.  Mr. Rodriguez, are you making
 9  any claim for any kind of nonmonetary relief?
10     A.   I don't understand that.
11     Q.   Okay.  Any relief other than
12  something that could be determined in dollar --
13  dollars?
14     A.   Say that again.
15     Q.   Are you -- are you seeking any kind
16  of relief that would ask someone to do something
17  as opposed to awarding damages in money?
18     A.   Yeah.
19     Q.   You are?
20     A.   Well, say that again because I
21  really don't understand what you just said,
22  really.
23     Q.   Okay.
24     A.   Am I doing what?
25     Q.   Do you know what nonmonetary relief
```

Page 151

```
 1  is?
 2     A.   No.
 3     Q.   Do you know what injunctive relief
 4  is?
 5     A.   No.
 6     Q.   Okay.  Do you know if you're seeking
 7  either one of those?
 8     A.   I don't know what neither one of
 9  those are.
10     Q.   Okay.  All right.  Well, are you
11  making any claims in this litigation other than
12  the ones we've discussed?
13     A.   No.
14     Q.   Okay.  Did you participate in any
15  church activities before the storm?
16     A.   Yes, I did.
17     Q.   Did you belong to a congregation?
18     A.   Yeah.
19     Q.   And what church was that?
20     A.   St. Raphael.
21     Q.   St. Raphael?
22     A.   (Nods head affirmatively.)
23     Q.   And how often did you participate?
24     A.   Every Sunday.
25     Q.   Okay.  Have you done that since
```

Page 152

```
 1  Hurricane Katrina?
 2     A.   Yeah, since --
 3     Q.   Is that church, is that congregation
 4  still ongoing?
 5     A.   No.
 6     Q.   Has it been --
 7     A.   It's not there.  I'm at St. Leo now.
 8     Q.   Okay.  St. Leo the Great?
 9     A.   Yes, sir.
10     Q.   Were those two congregations merged?
11     A.   Yeah, they have some people there,
12  yeah, from there.
13     Q.   Okay.  Do you go to St. Leo every
14  week?
15     A.   Every Sunday, yeah.
16     Q.   Okay.  Are there members of the
17  congregation from St. Raphael at the St. Leo's
18  church?
19     A.   I've seen one guy.
20     Q.   Do you know what happened to other
21  members of the church?
22     A.   No, sir.
23     Q.   Do you know if they're still in New
24  Orleans or --
25     A.   No, sir.
```

Page 153

```
 1     Q.   You don't know or --
 2     A.   I don't know.  I don't know.
 3     Q.   Are any of your family members --
 4  are all of your family members in New Orleans
 5  after Hurricane Katrina?
 6     A.   No.
 7     Q.   Okay.  Which ones are not?
 8     A.   My brother Douglas and -- well,
 9  Douglas, he's the only one.
10     Q.   And Douglas is in Houston?
11     A.   He's in Houston, yeah.
12     Q.   And is Douglas planning on
13  returning?
14     A.   No, sir.
15     Q.   Okay.  And why is that?
16     A.   He says he's going to stay up there.
17  Everything is easier going, some things, he says.
18  Better life up there.
19     Q.   Okay.  Better life in what sense?
20     A.   In -- well, the crime and, you know,
21  jobs and all of that's -- it's abundant up there,
22  he said.
23     Q.   Okay.  What type of an occupation
24  does he hold?
25     A.   He drives trucks.
```

                                    39 (Pages 150 to 153)

JOSE LUIS RODRIGUEZ (LEVEE)                                    7/14/2007

Page 154

1    Q.  For what kind of company?
2    A.  I don't know what kind of company.
3  I think it's a food company that he drives from
4  store to store, you know, drives a 18-wheeler and
5  brings the food, whatever they need.
6    Q.  And your mother and sister and your
7  other two brothers are in the greater New Orleans
8  area?
9    A.  Yeah.  Uh-huh.  Armando is in
10  Slidell, but his job is, like, out of town.  So,
11  he's, like always -- like, he's in Guam right
12  now.  So, he'll be going maybe to Hawaii next
13  month.  He's like that.
14    Q.  And I'm sorry.  What line of work is
15  he in?
16    A.  Chemical spill, I believe.  He
17  monitors chemical spills.
18    Q.  Okay.  Do you know what company he
19  works for?
20    A.  No, sir.  I don't know the name of
21  the company, but the company was working down
22  here when -- after Katrina -- they was doing the
23  cleaning up.
24    Q.  Did you have any contact with your
25  neighbors when you were living on Bruxelles

Page 155

1  Street?
2    A.  Uh-huh.  Yes.
3    Q.  Are most of those neighbors back?
4    A.  No.  Some of them are.  Like, Miss
5  Elaine and them, they're staying in Houston.
6  She's not coming back.  The one I was telling you
7  about, Miss Elaine and Keyana.
8    Q.  Is she not coming back ever?
9    A.  That's what she say.
10    Q.  And who else?
11    A.  Her daughter Keyana.
12    Q.  But what other neighbors?  Are there
13  any neighbors that are back?
14    A.  Yeah, they got neighbors that are
15  back.  Most of the ones, like, the older people,
16  most of them are back.  The younger folks didn't
17  come back.
18    Q.  Was there any reason for that that
19  you know of?
20    A.  No, not that I know of, no.
21    Q.  What percentage of the people that
22  were living on Bruxelles Street before the storm
23  are back now?
24    A.  I'd say about -- I'd say about 60.
25    Q.  60 percent?

Page 156

1    A.  Yeah.
2    Q.  All right.  Are you registered to
3  vote in Orleans Parish?
4    A.  No, sir.
5    Q.  Okay.  Have you ever been
6  registered?
7    A.  Yeah.  Well, I mean, I did -- when I
8  was in high school, I did, but I haven't done
9  anything else because they tell me since you
10  don't have your citizenship, you shouldn't, you
11  know, do that, so, I never did.  Because I always
12  thought I was because I came when I was four and
13  I graduated and everything.  So, I always had it
14  in my mind I'm a citizen.  I did the same tests
15  and everything.  So, that's what I always
16  thought.
17    Q.  But are you registered to vote?
18    A.  I did register, yeah.
19    Q.  But you just haven't voted?
20    A.  I haven't voted.
21    Q.  You weren't voting before Hurricane
22  Katrina?
23    A.  Before, when I was in high school,
24  yeah.  Right after I got out of high school, I
25  did register to vote.  But then they told me I

Page 157

1  shouldn't do that, I'm going to get in trouble
2  because I'm not a citizen, so, I kind of laid
3  off.
4    Q.  All right.  So, it was many years
5  before Hurricane Katrina that you stopped voting?
6    A.  Yes, sir.
7    Q.  When you got out of high school?
8    A.  Uh-huh.
9    Q.  When did you get out of high school?
10    A.  '85.
11    Q.  Okay.  So, you voted for a little
12  time after high school and then you stopped?
13    A.  That's it.
14    Q.  Are you a member of any civic
15  organizations?
16    A.  No, sir.
17    Q.  Any social organizations?
18    A.  No, sir.
19    Q.  Any business or trade organizations?
20    A.  No, sir.
21    Q.  Any philanthropic organizations?
22    A.  Uh-huh.
23    Q.  No?
24    A.  No organizations.
25    Q.  All right.  Are you involved with

JOSE LUIS RODRIGUEZ (LEVEE)                    7/14/2007

Page 158

1  any organizations at your church?
2      A.  No.
3      Q.  Do you attend Mardi Gras parades?
4      A.  Yes.
5      Q.  You did that before the storm?
6      A.  Yeah.
7      Q.  And you do that after the storm?
8      A.  Not as much, but I have gone.
9      Q.  All right.  What about the Jazz
10 Fest, did you attend that before Hurricane
11 Katrina?
12     A.  Yeah.
13     Q.  Did you attend it after Hurricane
14 Katrina?
15     A.  Yeah.
16     Q.  What about the Essence Festival, did
17 you attend that before Hurricane Katrina?
18     A.  No, sir.
19     Q.  Okay.  Did you attend it afterwards?
20     A.  No, sir.
21     Q.  What about Saints games, did you
22 attend those before Hurricane Katrina?
23     A.  No, sir.
24     Q.  Did you attend them after?
25     A.  No, sir.

Page 159

1      Q.  What about Hornets games, did you
2  attend them before Hurricane Katrina?
3      A.  Yes, sir.
4      Q.  Did you attend them after?
5      A.  No, sir.
6      Q.  What about Bayou Classic?
7      A.  No, sir.
8      Q.  You've never been to that?
9      A.  No.
10     Q.  What about City Park, did you ever
11 use City Park before Hurricane Katrina?
12     A.  Yeah.  Yes, sir.
13     Q.  Did you use it after?
14     A.  No, sir.
15     Q.  Why is that?  Just you didn't have
16 the need to?
17     A.  Yeah, that, and it's not the same
18 yet.  It's not --
19     Q.  Okay.  Did you ever participate in
20 any meetings at the city council regarding
21 Hurricane Katrina?
22     A.  No, sir.
23     Q.  All right.  Did you ever participate
24 in any community planning efforts regarding post-
25 Hurricane Katrina planning?

Page 160

1      A.  No, sir.
2      Q.  All right.  Did you receive any
3  money from FEMA after Hurricane Katrina?
4      A.  Yes, sir.
5      Q.  And what was that?
6      A.  Ten thousand.
7      Q.  Ten thousand?
8      A.  Yes, sir.
9      Q.  Let me ask you:  When you were
10 living on Bruxelles Street, did you get any sort
11 of rental assistance from the government?
12     A.  No.
13     Q.  Okay.  The $300 a month you paid in
14 rent was money that you actually paid to your
15 brother?
16     A.  Yeah.  Right.
17     Q.  Did you apply for an SBA loan
18 following Hurricane Katrina?
19     A.  Yes, sir.
20     Q.  And what was the purpose of the
21 loan?
22     A.  To get what I had -- what I've lost,
23 you know.  They came out and everything and they
24 took pictures and he -- you know, he says I was
25 approved, but I didn't have a job, so, you know,

Page 161

1  I couldn't -- you know, I had to take care of --
2  you know, leave all of that out, and I have never
3  done it.
4      Q.  And the purpose of the loan was to
5  cover your lost contents?
6      A.  Yes, sir.
7      Q.  Okay.  Did he tell you -- did you
8  know how much of a loan you were approved for?
9      A.  Forty-five.
10     Q.  Forty-five?
11     A.  Uh-huh.
12     Q.  And what was that supposed to cover?
13     A.  He went through the house.  He says
14 everything that was in there, the refrigerator,
15 the washer and dryer, my Xbox games, all the
16 games that I had.  You know, everything that I
17 had in the house.
18     Q.  But it was just the contents of the
19 house?
20     A.  Yeah.
21     Q.  And when you say he went through it,
22 who is "he"?
23     A.  Some SBA guy.  He he one came, met
24 me out there.
25     Q.  And did you prepare a Form 95?

                    41 (Pages 158 to 161)

JOHNS PENDLETON COURT REPORTERS              800 562-1285

JOSE LUIS RODRIGUEZ (LEVEE)                                    7/14/2007

Page 162

```
 1        A.   Yeah.
 2        Q.   Okay.  And that's the one you
 3   referred to earlier that you have at your house?
 4        A.   Yeah.
 5        Q.   Okay.  And did you prepare that or
 6   did someone else prepare it for you?
 7        A.   Someone else.
 8        Q.   And who was the someone else?
 9        A.   My sister.
10        Q.   Your sister?
11        A.   Uh-huh.
12        Q.   But you signed it?
13        A.   Yes, sir.
14        Q.   All right.  Did you -- did you apply
15   for a Road Home grant?
16        A.   No, sir.
17        Q.   Did you -- you received money from
18   the Red Cross, or did you just receive rental
19   assistance?
20        A.   Well, no.  Well, my mom and them was
21   getting it, so, I just told them do it all
22   together.  We was going to be staying in the same
23   house.  What she got was, like, maybe some gift
24   cards, stuff like that.
25        Q.   Okay.  So, the money from the Red
```

Page 163

```
 1   Cross basically went to the group?
 2        A.   Yes.  Yeah.
 3        Q.   And did you get any donations or
 4   gifts from any other organizations?
 5        A.   Yeah.  I received a car.
 6        Q.   You got a car?
 7        A.   Yeah.
 8        Q.   Okay.  Who gave you the car?
 9        A.   The church.
10        Q.   Which church?
11        A.   I can't remember the name of the
12   church.
13        Q.   Was it a church in Florida?
14        A.   Yes, sir.
15        Q.   What kind of a car did you get?
16        A.   A Dodge van.
17        Q.   Was this the same church that gave
18   you all the house?
19        A.   Yes, sir.
20        Q.   Okay.  Have you ever spoken with
21   anyone with any news media regarding Hurricane
22   Katrina?
23        A.   I did, but I don't remember who, but
24   I did talk to some people when we was at the Red
25   Cross.
```

Page 164

```
 1        Q.   Okay.  Were you ever interviewed by
 2   anyone?
 3        A.   I'm not sure.  I was talking to this
 4   lady.  I didn't see no camera or anything.  She
 5   was just asking questions.
 6        Q.   What did the questions relate to?
 7        A.   Like, you know, how everything went
 8   about.  You know, what -- you know, what did we
 9   do to get out.  Were we they there.  They just
10   wanted to know.
11        Q.   The type of things we've been
12   talking about today?
13        A.   Yes, sir.  Yes.
14        Q.   Okay.  When you submitted your Form
15   95, did it have any attachments or was it just
16   like a one --
17        A.   I think it had some other
18   attachments.  My sister, like I said, she had --
19   she took care of all of that.  But I think it had
20   something -- it wasn't just one piece of paper.
21        Q.   Do you know what those attachments
22   were?
23        A.   No, sir.
24        Q.   Have you ever spoken with anyone or
25   has anyone ever contacted you that was doing
```

Page 165

```
 1   research or an investigation regarding Hurricane
 2   Katrina?
 3        A.   No, sir.
 4        Q.   Okay.  Do you understand that you
 5   have been identified as a class representative in
 6   this matter?
 7        A.   Yes, sir.
 8        Q.   And do you know why you were chosen
 9   as a class representative?
10        A.   No, sir.
11        Q.   What is your understanding, if any,
12   of the general nature of the litigation?
13        A.   What is my understanding of it?
14        Q.   Yep.
15        A.   Wrongful death and everything that
16   was lost -- that you lost during the hurricane.
17        Q.   Okay.  Did you -- have you ever read
18   the complaint?
19        A.   No, sir.
20        Q.   Okay.  And you didn't participate in
21   formulating the complaint?
22        A.   No.
23        Q.   Okay.  Do you know who the parties
24   are to the litigation?
25        A.   All the -- no.
```

JOSE LUIS RODRIGUEZ (LEVEE)                                    7/14/2007

Page 166

1      Q.   I mean the defendants.  Do you know
2  who the defendants are in the litigation?
3      A.   Not all, no.
4      Q.   Do you know who any of them are?
5      THE WITNESS:
6          Would that be you?
7  EXAMINATION BY MR. GARDNER:
8      Q.   No.  No.
9      A.   No, I don't know anybody.
10     Q.   Okay.  What is your understanding of
11 who is -- who -- what is included in the proposed
12 class?
13     A.   I don't know.  I don't know.
14     Q.   Okay.  Do you know what your duties
15 and responsibilities are as a class
16 representative?
17     A.   Yeah, to come tell it like it is,
18 huh.
19     Q.   Okay.  Anything else?
20     A.   No.  That's it.
21     Q.   Do you know which subclass you
22 represent?
23     A.   Gentilly.
24     Q.   I mean, that's what you understand?
25     A.   Yeah.

Page 167

1      Q.   Okay.  Do you know any other
2  individuals that have been identified as class
3  representatives?
4      A.   No, sir.
5      Q.   Have you ever spoken with any
6  individuals that have been identified as class
7  representatives?
8      A.   No, sir.
9      Q.   Okay.  Have you ever -- at the
10 beginning of the deposition, we talked about the
11 Exhibit A to the Notice of Deposition, the
12 categories of documents there, and you identified
13 some that you have at your house, correct?
14     A.   Yes.
15     Q.   Okay.  Have you ever received
16 interrogatories or written questions regarding
17 this case?
18     A.   No.
19     Q.   Have you ever received any requests
20 for production of documents regarding this case?
21     A.   No.
22     Q.   Okay.  Other than these pictures
23 that you've brought here this morning, have you
24 ever provided any other documents of any kind to
25 your attorneys in this case?

Page 168

1      A.   No.
2      MR. GARDNER:
3          Let me just take about a
4  five-minute break.
5      MR. JOANEN:
6          Take your time.
7      THE VIDEOGRAPHER:
8          Off the record.
9          (Whereupon, a discussion was
10 held off the record.)
11     THE VIDEOGRAPHER:
12         On the record.
13 EXAMINATION BY MR. GARDNER:
14     Q.   All right.  Mr. Rodriguez, was a
15 succession opened when your dad -- after your dad
16 died?
17     A.   I don't think so.
18     Q.   Okay.  Was there -- did he have --
19 did he have any belongings that --
20     A.   He didn't have -- no.  No.  He was
21 renting.  So, no.
22     Q.   Okay.
23     A.   And everything -- like, his cars and
24 everything else that he did have, like, you know,
25 mechanical equipment and all of that, all of that

Page 169

1  was lost in the flood because it was in the
2  garage.
3      Q.   Okay.  Was there any documents
4  prepared that indicate who is the representative
5  of his succession --
6      A.   No.
7      Q.   -- or the executor of his estate
8  that you know of?
9      A.   No, I don't.
10     Q.   Okay.  And do you know if there was
11 a succession opened?
12     A.   No, I don't know.
13     Q.   Okay.  All right.  Now, have you
14 ever had any problems with drug or alcohol abuse?
15     A.   I did drink when -- after -- you
16 know, I started drinking after my son passed
17 away, but I wouldn't say alcoholic like --
18     Q.   All right.  Have you ever been
19 treated for alcohol abuse?
20     A.   No, sir.  No, sir.
21     Q.   Have you ever been treated for drug
22 abuse?
23     A.   No, sir.
24     Q.   Okay.  Have you ever been in any
25 sort of treatment facility?

43 (Pages 166 to 169)

JOSE LUIS RODRIGUEZ (LEVEE)                    7/14/2007

Page 170

1    A.   No.
2    Q.   Okay.  Have you ever sought any
3  medical care for alcohol or drug abuse?
4    A.   No, sir.
5    Q.   Okay.  Have you ever failed a drug
6  test?
7    A.   No, sir.
8    Q.   Has your drinking ever affected any
9  of your work?
10   A.   No.
11   Q.   Have you ever been convicted of a
12  crime?
13   A.   No, sir.
14   Q.   Have you ever been arrested?
15   A.   Yes, sir.
16   Q.   And what was -- what were the
17  circumstances surrounding that?
18   A.   Open container.
19   Q.   Excuse me?
20   A.   A open container.
21   Q.   Other than that?
22   MR. JOANEN:
23       In New Orleans?
24   A.   Huh?
25  EXAMINATION BY MR. GARDNER:

Page 171

1    Q.   Other than open container?  Is an
2  alcoholic drink an open container?
3    A.   Yes.
4    Q.   Other than that?
5    A.   Oh, other than that, yeah, in the
6  French Quarters, fighting.  Fighting -- Fighting
7  in the French Quarters.
8    Q.   And approximately when was that?
9    A.   That was about -- I'd say about
10  three, four years ago.
11   Q.   That was before Hurricane Katrina?
12   A.   Yeah.
13   Q.   And what did that involve?
14   A.   Some guys grabbing on a friend of
15  mine's girlfriend.
16   Q.   Okay.  And were those charges --
17   A.   Yeah, everything --
18   Q.   -- dropped?
19   A.   Uh-huh.
20   Q.   Same thing with the open container?
21   A.   Yeah.
22   Q.   Did you pay a fine?
23   A.   No.  It was -- it was --
24  MR. GARDNER:
25       Okay.  I don't have any

Page 172

1  other questions.  I have some
2  authorizations here that I'm going
3  to show your attorney and ask if
4  you would sign them and give them
5  to Mr. Lagarde.
6  THE WITNESS:
7       Okay.
8  MR. GARDNER:
9       Wait.  Let me give you -- I
10  think this is a full set.
11  MR. LAGARDE:
12       Scott, by way of
13  clarification, those are the
14  standard forms we've been using
15  throughout and they're returnable
16  to Charles Sutton.
17  MR. JOANEN:
18       Okay.  There was one of them
19  that was changed and --
20  MR. GARDNER:
21       We can go off the record.
22       (Whereupon, a discussion was
23  held off the record.)
24       (Whereupon, the testimony of
25  the witness was concluded.)

Page 173

1               WITNESS' CERTIFICATE
2
3
4
5       I, JOSÉ LUIS RODRIGUEZ, read or have
6  had the foregoing testimony read to me and hereby
7  certify that it is a true and correct
8  transcription of my testimony, with the exception
9  of any attached corrections or changes.
10
11
12
13
14
15       (Witness' Signature)
16
17
18
19
20
21
22
23
24
25

JOSE LUIS RODRIGUEZ (LEVEE)                              7/14/2007

Page 174

```
 1              REPORTER'S CERTIFICATE
 2
 3
 4        I, CAROL VALLETTE SLATER, Certified
 5   Court Reporter, Registered Professional Reporter,
 6   in and for the State of Louisiana, as the officer
 7   before whom this testimony was taken, do hereby
 8   certify that JOSÉ LUIS RODRIGUEZ, after having
 9   been duly sworn by me upon authority of R.S.
10   37:2554, did testify as hereinbefore set forth in
11   the foregoing pages; that this testimony was
12   reported by me in the stenotype reporting method,
13   was prepared and transcribed by me or under my
14   personal direction and supervision, and is a true
15   and correct transcript to the best of my ability
16   and understanding; that I am not related to
17   counsel or the parties herein, nor am I otherwise
18   interested in the outcome of this matter.
19
20
21        CAROL VALLETTE SLATER (CCR 78020)
         CERTIFIED COURT REPORTER
22        REGISTERED PROFESSIONAL REPORTER
23
24
25
```

JOHNS PENDLETON COURT REPORTERS              800 562-1285

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

IN RE:  KATRINA CANAL BREACHES      CIVIL ACTION
CONSOLIDATED LITIGATION
                                     NO. 05-4182
                                       "K" (2)
PERTAINS TO:  MRGO                   JUDGE DUVAL

FILED IN:  05-4181, 05-4182,    MAG. WILKINSON
05-5237, 05-6073, 05-6314,
05-6324, 05-6327, 05-6359,
06-0225, 06-0886, 06-1885,
06-2152, 06-2278, 06-2287,
06-2824, 06-4024, 06-4065,
06-4066, 06-4389, 06-4634,
06-4931, 06-5032, 06-5155,
06-5159, 06-5161, 06-5162,
06-5260, 06-5771, 06-5786,
06-5937, 07-0206, 07-0621,
07-1073, 07-1271, 07-1285

Videotaped Deposition of

GLYNN WADE,

4719 Bundy Road, New Orleans, Louisiana 70127,

taken in the offices of Bruno & Bruno, 855

Baronne Street, New Orleans, Louisiana 70113,

on Tuesday, the 10th day of July, 2007,

beginning at 9:09 A.M.

GLYNN WADE (MRGO)                                    7/10/2007

---

**Page 2**

APPEARANCES:

EXNICIOS LAW FIRM
(BY: RICHARD M. EXNICIOS, ESQ.)
7916 Nelson Street
New Orleans, Louisiana 70125
    ATTORNEYS FOR THE PLAINTIFFS

SUTTON LAW FIRM
(BY: CHARLES E. SUTTON, JR., ESQ.)
Suite 105
2101 North Highway 190
Covington, Louisiana 70433
    ATTORNEYS FOR THE BOARD OF
    COMMISSIONERS FOR THE
    ORLEANS LEVEE DISTRICT

DUPLASS, ZWAIN, BOURGEOIS, MORTON,
PFISTER & WEINSTOCK
(BY: NICOLE BOYER, ESQ.)
Suite 2900
3838 North Causeway Boulevard
Metairie, Louisiana 70002
    ATTORNEYS FOR THE BOARD OF
    COMMISSIONERS FOR THE LAKE BORGNE
    BASIN LEVEE DISTRICT

STONE PIGMAN WALTHER WITTMANN
(BY: CARMELITE BERTAUT, ESQ.)
546 Carondelet Street
New Orleans, Louisiana 70130-3588

        AND

JONES DAY
(BY: WILLIAM E. MARPLE, ESQ.)
2727 North Harwood Street
Dallas, Texas 75201-1515
    ATTORNEYS FOR WASHINGTON GROUP
    INTERNATIONAL, INC.

---

**Page 3**

APPEARANCES CONTINUED:

VIDEOTAPED BY:
    Gilly Delorimier
    Depo-Vue, Inc.

REPORTED BY:
    ROGER D. JOHNS, RMR, CRR, RDR, CSR
    Certified Court Reporter
    State of Louisiana

---

**Page 4**

S T I P U L A T I O N

    It is stipulated and agreed by and between
counsel for the parties hereto
that the deposition of the aforementioned
witness is hereby being taken under the
Federal Rules of Civil Procedure, for all
purposes, in accordance with law;
    That the formalities of reading and
signing are specifically not waived;
    That the formalities of certification and
filing are specifically waived;
    That all objections, save those as to the
form of the question and the responsiveness of
the answer, are hereby reserved until such
time as this deposition, or any part thereof,
may be used or sought to be used in evidence.

        * * * *

    ROGER D. JOHNS, RDR, CRR, Certified Court
Reporter for the State of Louisiana,
officiated in administering the oath to the
witness.

---

**Page 5**

I N D E X

                              PAGE
Wade 1................................. 62
Exhibit 2.............................. 66
Exhibit 3.............................. 74
Exhibit 4.............................. 92
Exhibit 5.............................. 100
Exhibit 6.............................. 101
Exhibit 7.............................. 103
Exhibit 8.............................. 104
Exhibit 9.............................. 106
Exhibit 10............................. 107
Exhibit 11............................. 109
12..................................... 110
13..................................... 111
14..................................... 112
15..................................... 114
Wade 16................................ 114
Wade 17................................ 116
Exhibit 18............................. 117
Wade 19................................ 119
20..................................... 119
Exhibit 21............................. 122
Wade Exhibit 22........................ 124
Exhibit 23............................. 150
Exhibit 24............................. 151

EXAMINATION BY MR. MARPLE:................6

---

2 (Pages 2 to 5)

GLYNN WADE (MRGO)                                    7/10/2007

Page 6

1          VIDEO OPERATOR:
2              This is the videotaped deposition
3      of Glynn Wade.  This deposition is
4      being held today at 855 Baronne
5      Street, New Orleans, Louisiana, on
6      July the 10th, 2007 at approximately
7      9:09 A.M.
8              Would the Court Reporter please
9          now swear in the witness.
10             GLYNN WADE,
11     4719 Bundy Road, New Orleans, Louisiana 70127,
12     after having been duly sworn by the
13     before-mentioned court reporter, did testify
14     as follows:
15     EXAMINATION BY MR. MARPLE:
16         Q.  Mrs. Wade, have you ever been
17     deposed before?  Given a deposition like this
18     before?
19         A.  No.
20         Q.  We said off the record, but I'll say
21     it on, if you need a break at any time, you
22     just let us know, we'll be happy to
23     accommodate you.  One other thing is, this
24     gentleman, the Court Reporter, is taking down
25     everything we say, questions and answers, so

Page 7

1      if you'll let me finish my question before you
2      start your answer, I'll try to not interrupt
3      you or start another question before you're
4      finished.  He'll have a question and answer,
5      so that the answer doesn't appear in the
6      middle of my question in the transcript.  Is
7      that okay to try to do that?
8          A.  Yes, it is.
9          Q.  I hate to ask you this, but can you
10     tell us your date of birth?
11         A.  October 19th, 1945.
12         Q.  We're about the same age.  I'm a
13     year or two behind you.  Where were you born?
14         A.  New Orleans, Louisiana.
15         Q.  What part?
16         A.  Orleans Parish.
17         Q.  And was it a particular neighborhood
18     where you grew up?
19         A.  An area in New Orleans called Zion
20     City, around North Broad Street.
21         Q.  And did you go to school in New
22     Orleans?
23         A.  Yes, sir, I did.
24         Q.  What high school did you go to?
25         A.  Walter L. Cohen Senior High School,

Page 8

1      C O H E N.
2          Q.  And what year did you graduate from
3      high school?
4          A.  1963.
5          Q.  Was that a public school?
6          A.  Yes, sir, it is.
7          Q.  I'm taking in those days it was
8      probably all black?
9          A.  Yes, it was.
10         Q.  And then did you go to college?
11         A.  Yes, sir, I did.
12         Q.  Where did you go?
13         A.  Dillard University.
14         Q.  And what years approximately were
15     you at Dillard?
16         A.  From 1963 to 1967.
17         Q.  And you got a degree there?
18         A.  Yes, sir, I did.
19         Q.  In what?
20         A.  Sociology.
21         Q.  And then did you have any further
22     education after college?
23         A.  Yes, sir, I did.
24         Q.  And what's that?
25         A.  I have a Master's degree in social

Page 9

1      work.
2          Q.  And where did you obtain that?
3          A.  Tulane University of School of
4      Social Work.
5          Q.  And approximately what year was
6      that?
7          A.  1985.
8          Q.  And as I understand it, you worked
9      as a social worker for several years?  Is that
10     correct?
11         A.  Yes, sir.
12         Q.  Have you worked at anything other
13     than in social work?
14         A.  Well, in between when I first moved
15     from Cleveland, Ohio, I worked with retarded
16     adults as an instructor they called it, but
17     really just working and teaching them a trade
18     for the Association of Retarded Citizens of
19     Greater New Orleans.
20         Q.  Now, after you graduated, did you
21     still live -- the first time from college, did
22     you still live in New Orleans then?
23         A.  No, sir.
24         Q.  Tell me where Dillard is.
25         A.  Dillard University is in New Orleans

GLYNN WADE (MRGO)                                          7/10/2007

---

Page 10

1   in the Gentilly area.
2       Q.  And then after college you moved
3   away to Ohio?
4       A.  Yes, sir.
5       Q.  And how long did you live in Ohio?
6       A.  From 1967 to 1972.
7       Q.  And then you came back to New
8   Orleans in '72?
9       A.  Yes, sir.
10      Q.  And have you lived in New Orleans or
11  the New Orleans area since then?
12      A.  Ever since then.
13      Q.  Do you remember Hurricane Betsy?
14      A.  Very well.
15      Q.  And tell us what you remember about
16  Betsy.
17      A.  Well, I remember that I was about 19
18  years old, a student at Dillard.  I was living
19  with my parents and I remember that it was a
20  very bad hurricane and a lot of people lost
21  their homes and lives.
22      Q.  And where were you living?  What
23  area of town were you living in then?
24      A.  The area called, referred to as Zion
25  City off of North Broad Street with my

---

Page 11

1   parents.
2       Q.  All right.  I wasn't sure if you
3   were still living there.  Did your area get
4   flooded?
5       A.  No, sir, it didn't.
6       Q.  The Lower Ninth got hit pretty hard;
7   right?
8       A.  Yes, it did.
9       Q.  Did you have occasion to see the
10  aftermath of Betsy in the Ninth Ward or other
11  places?
12      A.  Yes, sir, I did.
13      Q.  Did you have friends or
14  acquaintances that lived in the Lower Ninth?
15      A.  No, sir, I did not.
16      Q.  Now, you mentioned there was a lot
17  of homes lost and lives lost.  Did you know
18  people who had lost homes in Betsy?
19      A.  No, I got that information from the
20  news.
21      Q.  And the loss of life, that came from
22  the news as well?
23      A.  Yes, sir.
24      Q.  When you came back to -- Well, let
25  me back up just a second.  On Betsy, do you

---

Page 12

1   have any thoughts on what went wrong or what
2   caused the flooding with regard to Betsy?
3       A.  I have no idea, sir.
4       Q.  Now, when you came back in '72,
5   where did you live then?
6       A.  I first moved in the Lower Ninth
7   Ward with my mother and step-father, my two
8   year old baby and I.  And eventually, several
9   months later, I moved in the Gentilly area
10  with my great aunt who was well up in age and
11  asked me to move in with her to assist her.
12      Q.  And the home that you were living in
13  in the Lower Ninth, had it been flooded during
14  Betsy?
15      A.  I'm told by my step-father, my
16  mother that remarried, that yes, that house
17  had been flooded.
18      Q.  And do you know to what extent?  I
19  mean, what did they tell you about how bad it
20  was or anything?
21      A.  All I know is it had been flooded.
22      Q.  And then after you left with your
23  great aunt, where did you live next?
24      A.  Well, 13 years ago I was able to
25  move into New Orleans East.  My husband and

---

Page 13

1   I.
2       Q.  All right.  And I may not have --
3   Well, maybe we have.  But between about 1993
4   or 1994 when you moved to where you live now,
5   right?
6       A.  Yes, sir.
7       Q.  Have we covered the basic places you
8   have lived before that?
9       A.  Yes, sir, because my aunt left me
10  that house.
11      Q.  Give us the address of the house
12  where you live now.
13      A.  4719 Bundy Road.
14      Q.  And --
15      A.  New Orleans, Louisiana.
16      Q.  When you bought that house, do you
17  know how old it was?  In other words, when it
18  was built?
19      A.  Not really.  No.
20      Q.  And what kind of condition was it in
21  when you bought it?
22      A.  Excellent condition.
23      Q.  And then did you do any remodeling
24  between the time you bought it and Hurricane
25  Katrina?

---

                                    4 (Pages 10 to 13)

GLYNN WADE (MRGO)                                           7/10/2007

Page 14

1    A.  Yes, I did.
2    Q.  What did you do?
3    A.  One thing, my husband and I took the
4  screened back porch and we converted it into a
5  sun room, closed sun room.  We bought all new
6  carpeting through the entire house.  We, I
7  don't know, just renovated.  We renovated it.
8    Q.  And the house needed some updating
9  over the years between '93 or --
10   A.  It was in excellent condition, but
11 when we purchased the house I am told an
12 elderly Jewish couple owned it and he was an
13 engineer; he kept it in mint condition, too. ,
14 but the walls were dull, the carpet was dull,
15 so my husband and I worked with it to up- --
16 to upgrade it to more modern.
17   Q.  And prior to Katrina had you had any
18 flooding out there even in the street or
19 anything like that?
20   A.  We would have water come to the
21 sidewalk of our home.
22   Q.  And that was during heavy rains?
23   A.  I can't remember the different
24 hurricanes, but when we had -- not hard rains,
25 but with a hurricane, like George, I can

Page 15

1  remember that, I think that was -- I am not
2  sure, I think it was around 2000, maybe 1999,
3  I can't remember, but the water came to the
4  sidewalk.
5    Q.  And so during the time you have
6  lived in that home prior to Katrina, you
7  didn't have water come up in the house?
8    A.  No, sir.
9    Q.  All right.  And Hurricane George,
10 did you evacuate the house in the light of
11 warnings about Hurricane George?
12   A.  To be honest, no, because my husband
13 did not want to leave the house.
14   Q.  Did you do anything like board up
15 any windows or anything like that?
16   A.  He did that.
17   Q.  And what was your experience during
18 Hurricane George in this house?  I mean, how
19 bad was it or how much wind did you get, or
20 was there any damage to the house?
21   A.  No damage whatsoever to the house.
22   Q.  Were there high winds?
23   A.  If I recall, yes, there were high
24 winds.  But may I just interject?
25   Q.  Sure.

Page 16

1    A.  At the time, so much was going on,
2  my step-father had cancer, flat on his back,
3  and we had to try to get him to Tulane Medical
4  Center because Morial was taking in disabled
5  patients at Tulane Hospital, and my mom had
6  cancer, both of them were in their 80s, and
7  she did not want to leave him, but he had to
8  go to the hospital by himself.  So it was so
9  much going on trying to take care of two
10 elderly step-father and mother, trying to make
11 sure we had enough food in the house, and we
12 took out my mother, that to -- the concern of
13 the hurricane was very low to me, but my
14 husband stayed up all night watching, because
15 he does not sleep during hurricanes.  But I
16 was dealing with two elderly sick, ornery
17 parents.
18   Q.  And was there any other time during
19 the time you lived there where you considered
20 evacuating or maybe did evacuate prior to
21 Katrina?
22   A.  The year before Katrina, and I
23 cannot remember the name of the hurricane, I
24 really cannot remember, but we evacuated
25 because, number one, my parents had died, my

Page 17

1  daughter and my grandbaby left with her
2  daddy's people, my younger neighbors were
3  leaving and told us we best get out of the
4  area, too, so we followed the young couple on
5  our left-hand side of our house, we followed
6  them to a place named Humble, Texas.
7    Q.  And when you say on the left, would
8  that be as you're standing in your front yard
9  facing Bundy, to your left or as you face the
10 house to your left?
11   A.  Well, my house (indicating), they
12 live on this side (indicating) and the older
13 couple lived on my right-hand side.
14   Q.  How long were you away for the
15 evacuation for that hurricane, which I think
16 might have been Ivan --
17   A.  I think it was.
18   Q.  How long were you over there in
19 Humble?
20   A.  About a day and a half or two days.
21   Q.  And sort of gave the "all clear",
22 you came back and -- Is that right?
23   A.  Yes, sir.
24   Q.  And had there been any damage to
25 your house?

GLYNN WADE (MRGO)                                    7/10/2007

---

**Page 18**

1      A.  None.
2      Q.  I'm sorry, were you wanting to say
3  something else?
4      A.  No, sir.
5      Q.  Now, coming up to Hurricane Katrina,
6  can you just tell us generally your experience
7  with Katrina, if you left and when you came
8  back, where you went to, that sort of thing?
9      A.  Okay.  First of all, I need to tell
10  you that I am a State worker.  I'm a State
11  social worker.  Therefore, when there's a
12  hurricane, State workers, if they are called
13  to go and work a shelter, be it any part of
14  Louisiana, have to go.  If not, we're told
15  that we won't have a job after the hurricane.
16  So on Saturday, August 27th, 2005, about 8:00
17  A.M., I was notified by the State, saying to
18  get prepared and to pack clothes for three
19  days, get my family situated, and be ready to
20  move out with them later that day.  So I
21  called my daughter immediately, she was in the
22  Reserve living in New Orleans, and I told her
23  to contact her daddy's people right away and
24  leave New Orleans.  Leave New Orleans.  She's
25  an only child, as I am.  For my husband, I

---

**Page 19**

1  tried to get him to go with my step-children,
2  who are all adults.  Well, he is 13 years
3  older than me and very ornery and hard headed,
4  too.  So, therefore, I still got food for my
5  daughter and granddaughter and left food,
6  water, and juice for my husband, and I asked
7  my younger neighbors to please look out for
8  him and talk him into leaving with them.  I
9  had to be at City Hall that day for 3:00 and I
10  -- I didn't -- I didn't pack.  I was very
11  upset that I had to leave my family to go and
12  help other families.  I had to leave mine
13  behind.  So I took my clothes and put them in
14  a garbage bag, which is not me, because I had
15  just come from Hot Springs and my husband
16  bought me a brand new set of luggage that May,
17  but I figured if I have to go, at least I can
18  do it the way I want to do it.  So I put three
19  days of clothing in a garbage bag and I got to
20  City Hall about 3:00 that evening.  My
21  colleagues asked me had I gone crazy coming
22  with a garbage bag, but I told them, "Just
23  don't say anything to me.  I have to go, I'll
24  go the way I want to go."
25      But we stayed in City Hall from

---

**Page 20**

1  3:00 that evening until about 8:00 P.M. and
2  the head nurse of the -- the health head nurse
3  drove two other public health nurses and I,
4  the social worker, to Baton Rouge.  We got
5  there I think about 11:00.  So much happened
6  that day, but it was about 11:00 that night we
7  got to LSU campus.  It was the gymnasium on
8  that campus.  I am not sure, I think it's the
9  Pete Montz, something of that nature.  I had
10  never been there before.  And when we got
11  there, they were setting up, moving the
12  bleachers and setting up, putting, not beds,
13  but cots up.  We had to sign in and all of us
14  State workers that had just come in about
15  11:00, they told us to go sit in the bleachers
16  and rest for a while, because in a couple of
17  hours it would be our turn to receive the
18  people as they come in.
19      And there were, oh, even at 11:00
20  when we walked in, people coming in.  I recall
21  some people were coming in from Chalmette,
22  Louisiana and other areas of Louisiana.  I
23  remember Chalmette, because my mother lived on
24  Delery in Ninth Ward near Chalmette.  So I
25  remember it.  Some people from New Orleans,

---

**Page 21**

1  Lower Ninth Ward.  I could not sleep because
2  it was so -- it was so much excitement and I
3  was so nervous.  I had never experienced
4  that.  But I think I sat in the bleachers with
5  my co-workers maybe three or four hours and
6  then it was our turn to get up and start
7  working the shelters.  And when I say work,
8  that means that, of course, the nurses, public
9  health nurses were triaging and I as the
10  social worker were receiving the people and
11  was counseling them.  Because this apparently
12  was new to some of the people that were coming
13  in.
14      You see, I worked a -- they call
15  it a special needs shelter.  So that was
16  either disabled people, regardless of their
17  ages, or elderly people.  And that was an
18  experience for them, too, to have to leave
19  home.  And we prepared to work for three
20  days.  And it was okay going and receiving the
21  people, but I can recall about that Monday
22  more people start coming in and by that time
23  my husband had gotten lost from the neighbor,
24  but he wound up in a very nice shelter near
25  Tallulah, Louisiana and he called me and he

---

6 (Pages 18 to 21)

GLYNN WADE (MRGO)                                              7/10/2007

---

**Page 22**

1  told me, he said, "Now, we are hearing that
2  the --" That was Monday, "-- East New Orleans
3  is flooded and so be prepared, because they
4  said that a lot of the houses were under
5  water." I don't know, because I was in the
6  middle of the shelter working and we were not
7  allowed to look at TV, which was way to the
8  side for the people that came in and living in
9  the shelter were able to do, but I remember
10  some of the people that came into the shelter
11  that Saturday, they remembered where we'd say
12  we were from and they came -- I remember some
13  of them took me by the hand and they said,
14  "You're helping us and you're counseling, but
15  you have lost your home. Because if you lived
16  in East New Orleans, you have lost everything
17  you own." I didn't believe it. But I walked
18  to the TV and CNN, I think it was, was showing
19  all the time, showed the condition of New
20  Orleans all over, Lower Ninth, the East,
21  everywhere. And I still didn't believe my
22  house was damaged. Because it had never been
23  damaged before. But my husband called me and
24  he said, "Prepare, come into the real world."
25  He says, "You have lost -- we have lost

---

**Page 23**

1  everything we own."
2       So I can't say I accepted it, but
3  I had to make the best of working. I was
4  still on my job working and I decided to do
5  all I could to stay busy. And with me helping
6  others helped us to keep my sanity.
7            And that night, that Monday night,
8  I remember helicopters -- to this day I cannot
9  stand to hear helicopters or planes over my
10  head, because, oh, for about several days, but
11  starting that night, that Monday night,
12  helicopters were coming in bringing people
13  into the shelter. And as we accepted the
14  people, they start telling their stories to us
15  because we were counseling them. And I
16  remember many came from Chalmette, Louisiana.
17  And some of the families stated that they were
18  blessed by relatives to be able to get put on
19  the roof, some way that relatives, the men
20  relatives were able to bust holes in the roof,
21  and I remember one lady, she said her husband
22  and mother put -- brought her -- helped her to
23  get up to the roof and then helped their
24  disabled son to get up on the roof. And when
25  she tried to lean down to get her mom, she

---

**Page 24**

1  said the water came so fast that she couldn't
2  help her mother or her husband and she
3  actually, she stated, saw them floating around
4  the house drowned. And there were many other
5  stories that people had to tell us.
6  Meanwhile, I'm in shock about my situation,
7  but it wasn't like seeing relatives die. So I
8  was able to -- to listen, and one of the
9  things that we as social workers were able to
10  do is start getting names, phone numbers, and
11  addresses of relatives in other states,
12  because the doctors stated to us that once the
13  patients were triaged and stabilized, the ones
14  that were on the insulin or had heart
15  conditions or whatever, if we social workers
16  could contact relatives out of Louisiana and
17  talk with them and let them talk to them and
18  they would accept them on their end, then we
19  can get them ready for the helicopter and they
20  would fly the people all over the United
21  States. And that was what I was doing.
22       Q. And if I could just interrupt a
23  little bit, we can come back to this, if I
24  could pick up a little bit on when your
25  husband left, do you know what means of

---

**Page 25**

1  transportation he took out of New Orleans?
2       A. Yes, sir, I do.
3       Q. What was that?
4       A. He took our old green truck, pickup
5  truck.
6       Q. And he drove himself?
7       A. Yes.
8       Q. Did he have anybody else with him?
9       A. No.
10      Q. And I heard you mention I think a
11  granddaughter. Was there anybody else living
12  there in that house with you besides your
13  husband?
14      A. Just my husband and me. My daughter
15  and her daughter, who's 13, my granddaughter,
16  they had their own house.
17      Q. And you had tried to make some
18  provisions for them before you went to work on
19  that Saturday?
20      A. I did.
21      Q. Right?
22      A. I did.
23      Q. And then where did they live in
24  relationship to where you lived?
25      A. My daughter owned a home in

---

7 (Pages 22 to 25)

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

GLYNN WADE (MRGO)                                              7/10/2007

---

**Page 26**

1  Gentilly.
2      Q.   And then did they evacuate?  Do you
3  know when they evacuated?
4      A.   She finally told me she had
5  evacuated that Sunday evening with her
6  boyfriend.
7      Q.   And your husband called you, was it
8  on Monday?  Is that when you got the call from
9  him?
10     A.   It was about Monday -- If I recall,
11 it was about Monday evening, Monday night.
12     Q.   And what kind of telephone access
13 did you have and did he have?  Was it on a
14 land line or a cell phone or what?
15     A.   I had my cell phone and my husband
16 had his cell phone.  My daughter had her cell
17 phone.
18     Q.   And you were able to talk to your
19 husband on the cell phone?
20     A.   Yes, sir.
21     Q.   And then were you able to talk to
22 your daughter on her cell phone?
23     A.   Yes, sir.
24     Q.   And you obviously had electricity up
25 at LSU in Baton Rouge.

---

**Page 27**

1      A.   Yes, sir.
2      Q.   And the shelter where your husband
3  had gotten to had power, I guess, as well?
4      A.   Yes, sir.
5      Q.   And your daughter and granddaughter,
6  where did they go?
7      A.   The only place she could get
8  reservations was in San Antonio, Texas, on I
9  think it's an Air Force base.  She was still
10 in the Navy Reserve and they -- they took
11 her.
12     Q.   And then when was it that you and
13 your husband were able to get back together in
14 person?
15     A.   October 1st, 2005.
16     Q.   And where was that?
17     A.   I was still in Baton Rouge working
18 and he came down from Tallulah, Louisiana and
19 picked me up in the -- He had his truck.  He
20 took his truck.
21     Q.   And did you come back to New Orleans
22 then?
23     A.   I came back to Destrehan,
24 Louisiana.
25     Q.   And you stayed there for a few days

---

**Page 28**

1  or a while?
2      A.   Destrehan?
3      Q.   Yes.
4      A.   I stayed there for -- Well, back
5  up.  My administrator was trying to help us
6  State workers to get apartments.  Because we
7  all had lost our homes.  And I was blessed to
8  get a one room apartment -- one bedroom
9  apartment in Destrehan September of 2005 and I
10 immediately paid the rent and deposit.  So,
11 therefore, when my husband picked me up
12 October 1st, 2005 in Baton Rouge, we had our
13 apartment waiting for us.
14     Q.   And I have been to Destrehan and,
15 what, I am going to guess wrong if I try to
16 remember where it is, but it's out west on the
17 other side of the lake; right?
18     A.   Destrehan is near LaPlace.
19 Destrehan -- First Baton Rouge, Hammond,
20 LaPlace, Destrehan.
21     Q.   And you took up residence then in
22 that apartment for quite some time?
23     A.   From October 1st, 2005 to March
24 17th, 2007.
25     Q.   And when was it that you first came

---

**Page 29**

1  back to New Orleans and saw your house?
2      A.   October 1st, 2005.
3      Q.   All right.  I'm sorry, I might have
4  missed it.  You all drove all the way to New
5  Orleans?
6      A.   From Baton Rouge.
7      Q.   And --
8      A.   We went to our apartment.  My
9  husband could -- My husband had never seen
10 it.  I was the one that found it with my
11 co-workers and administrator.  So we went to
12 look at them for him to see the apartment and
13 then we had some -- a little cash money and
14 our landlord told us where we could go and get
15 a mattress and box spring, portable TV, a
16 little TV.  And we went and bought -- We got a
17 bed frame.  We set it up and before it got
18 dark October 1st, we went to look at our
19 house.
20     Q.   And what did you see when you went
21 to your house?  I mean, what condition was it
22 in?
23     A.   Well, before we went in, some of the
24 -- a lot of the bricks had been knocked off
25 the front of our house.  The picture window,

---

JOHNS PENDLETON COURT REPORTERS                          800 562-1285

GLYNN WADE (MRGO)                                    7/10/2007

Page 30

1  of course, was broken into, but they had to do
2  that to -- whomever, to search for bodies. We
3  went through that window and the water had
4  receded or gone down, but we could tell before
5  we went in the house the water line of our
6  house. Now, I can't say for sure, but it
7  looked like it was about four feet of water or
8  more. So when we got inside of the house, we
9  looked around. All of the furniture was wet.
10 The floor was slippery, wet and slippery. I
11 don't know what that black slippery was, but
12 we had boots on and we had held each other's
13 hand, but it was slippery, black sludge. But
14 the furniture, my living room furniture was
15 turned upside down. And then the kitchen was
16 next to the living room. Our refrigerator was
17 turned upside down. It's amazing. I have
18 never seen anything like that.
19       Some of the furniture that was in
20 the master bedroom was in the kitchen. Some
21 of the kitchen stuff was in the master bedroom
22 and the other two bedrooms. But everything
23 was just turned upside down. Damp, moldy,
24 stinky. Some of the pictures on our walls
25 that were hanging a little low were ruined.

Page 31

1  There was nothing in the house salvageable
2  except my mother's and daddy's portrait, and I
3  -- it was full of mold and sludge and I said,
4  "Just leave it alone. Just -- I won't try to
5  take it." But my husband took them down and
6  wiped them. And that was salvageable.
7       Q. What about things on top of the
8  counters? Had it reached the kitchen
9  countertops in the house?
10      A. Yes, sir.
11      Q. Now, did you do any -- Well, just
12 tell me what you did generally after that
13 time. Did you board anything up? Did you
14 leave it alone? I mean, what did you do?
15      A. Well, that evening we left because
16 it was getting dark and there was a curfew,
17 especially in the East. So we really weren't
18 supposed to even be there, but we did October
19 1st. But a couple of days later my husband
20 came back and he boarded up the window, the
21 window of our living room, but we didn't
22 really have to worry about anything because
23 everything was ruined. So nobody could steal
24 anything because it was stinky, dirty,
25 ruined.

Page 32

1       And we talked to friends and
2  neighbors and they start telling us about
3  having the house gutted out and taking all of
4  the debris out of the house. So we hired some
5  people to first take the debris out of the
6  house and then we hired people to -- men to
7  gut out the entire house.
8       Q. And was that -- had you contacted
9  your insurance agents at that point or made a
10 claim for flood on your homeowner's?
11      A. Yes, sir, I did that when I was at
12 Baton Rouge.
13      Q. And you had a flood policy on the
14 house?
15      A. Yes, sir, I did.
16      Q. And had you had that entire time
17 you lived there?
18      A. Yes, sir.
19      Q. Was that part of the requirement on
20 the mortgage, that you have flood insurance?
21      A. Yes.
22      Q. And you also then had a regular
23 homeowner's policy as well; right?
24      A. Yes, sir.
25      Q. Did you make claims under both of

Page 33

1  those policies?
2       A. Yes, I did.
3       Q. Were both of those with Allstate?
4       A. Yes, they were.
5       Q. Did you get -- Well, I'll just ask
6  you what the history was of -- Let's start
7  with the one on the homeowner's policy. What
8  did you claim under the homeowner's policy?
9  And did you fill out some forms to do that?
10      A. I filled out forms, but Allstate
11 stated for the homeowner's insurance that we
12 had very little wind damage and -- on our
13 roof. So, therefore, the deductible was far
14 more than what they claimed wind damage, so we
15 paid for the roof damage ourselves.
16      Q. Did you ever -- Did you contest that
17 or go any further with Allstate?
18      A. For wind damage?
19      Q. Yes.
20      A. No, sir. It didn't make sense.
21      Q. So Allstate said there's some wind
22 damage there to the roof and shingles off and
23 tile maybe or something there?
24      A. Uh-huh (affirmatively).
25      Q. Is that right?

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

GLYNN WADE (MRGO)                                    7/10/2007

---

Page 34

1    A.  Uh-huh (affirmatively).  Yes, sir.
2    Q.  But it was below what the deductible
3  on the policy was; right?
4    A.  That's correct.
5    Q.  And do you remember what the
6  deductible was?
7    A.  I can't remember if it was about --
8  maybe about $200.  I am not sure, but --
9    Q.  And you had that roof repaired then
10  on your own sometime fairly soon --
11    A.  Yes, sir.
12    Q.  -- after that?  And what did it cost
13  to repair that roof?
14    A.  About $200.
15    Q.  And was that somebody you -- some
16  roof people you knew that you hired or got
17  their name somewhere and hired them to do
18  that?
19    A.  Just a roofer that had put the roof
20  on a couple of years before Katrina.  He did
21  the repairs for us.
22    Q.  All right.  And when your roof
23  needed repairing a couple of years before, was
24  that --
25    A.  No, we bought a brand new roof.

---

Page 35

1    Q.  You bought a new one?
2    A.  Yes.
3    Q.  Was it because the other one had
4  gotten damaged by hail or it was old, or what
5  was the reason?
6    A.  Old.
7    Q.  Was it leaking at all?
8    A.  When?  After Katrina or what?
9    Q.  No, the old roof before you had it
10  repaired or replaced a couple --
11    A.  Every now and then we would have the
12  spots, water spouts -- spots showing and we
13  would pay our neighbor, a roofer.  And finally
14  my husband and I figured at our age we may as
15  well get a brand new roof rather than nickel
16  and dime and what have you.  We got a brand
17  new roof.
18    Q.  And now the roof that's on the house
19  now, that is same roof, but it's been repaired
20  after Katrina; right?
21    A.  That's correct.
22    Q.  When you came back to that house on
23  October 1st, did you take any photographs of
24  the inside of the house or outside?
25    A.  Not that day, but shortly after that

---

Page 36

1  my husband took pictures of the outside.  But
2  he did not take pictures of the inside as it
3  was with the debris and the furniture.  But he
4  took pictures of the house after it was gutted
5  out.
6    Q.  And that would have just been -- you
7  could have seen the studs and everything in
8  there; right?
9    A.  Yes, you can see that.
10    Q.  But no sheetrock or ceilings?
11    A.  It had all -- it had -- had all of
12  that gutted out.
13    Q.  And was that something you did on
14  your own to have that gutted, or by that time
15  had you gotten money from the flood policy or
16  something that you used for that?
17    A.  No, sir, we hadn't gotten money from
18  the flood policy.  But we knew that -- Well,
19  we were told mold was growing in the house,
20  the houses, so we got it gutted out.  We used
21  some of our life savings.
22    Q.  And you made a claim on the flood
23  policy about the same time you made one on the
24  homeowner's policy; right?
25    A.  Yes, sir, I did.

---

Page 37

1    Q.  And that also was with Allstate?
2    A.  Yes, sir.
3    Q.  Were you dealing with the same
4  people or different people at Allstate?
5    A.  The same people.
6    Q.  And where were they and who were
7  they, if you know?
8    A.  Okay.  I was blessed to be able to
9  -- my co-workers brought me to Allstate in
10  Baton Rouge when I was working, but I was able
11  to also get in touch with my agent in New
12  Orleans.
13    Q.  Who was that?
14    A.  John Elliott.
15    Q.  And on the flood policy, tell us
16  what happened on that claim.
17    A.  On the flood policy, they gave us
18  what we were insured for.
19    Q.  And what was that amount?
20    A.  If I recall, it was 84,900.
21    Q.  And about when did you get that
22  check?
23    A.  About February of 2006.
24    Q.  All right.  And was that for
25  contents and house or what?  I mean --

---

GLYNN WADE (MRGO)                                    7/10/2007

Page 38

1      A.  It was for the house.
2      Q.  And then did they pay anything on
3  the contents?
4      A.  Yes, they paid 38,000.
5      Q.  Another 38,000 for the contents?
6      A.  Uh-huh (affirmatively).
7      Q.  Do you have a file somewhere that
8  has your flood policy in it and your claim and
9  copies of these checks and so forth?
10     A.  I'm sure I have it in my red box at
11 home.
12     Q.  And would you also have in there the
13 -- well, was there correspondence with
14 Allstate on the homeowner's policy for the
15 roof damage?  Do you have anything --
16     A.  Oh, I never kept that, because after
17 we had to pay, it was no need.  And I was not
18 going to appeal it.
19     Q.  Do you have an idea of what your
20 house was worth before Katrina had you put it
21 on the market?  I mean, do you know what
22 houses around you were selling for, have an
23 idea of what your house was worth?
24     A.  The houses in my neighborhood before
25 Katrina were being sold for about $180,000.

Page 39

1      Q.  180?
2      A.  Yes.
3      Q.  That were comparable to yours in
4  size and everything?
5      A.  Yes, sir.
6      Q.  I take it, though, you have never
7  put your house on the market or had it
8  appraised; right?
9      A.  No, we didn't.
10     Q.  And sometime in -- Well, you had to
11 get a building permit then to redo the house;
12 right?
13     A.  Uh-huh (affirmatively).
14     Q.  Is that right?
15     A.  Yes, sir.
16     Q.  And you got that in 2007?  Am I
17 correct?
18     A.  Uh-uh (negatively).  I got it in --
19 yeah, about 200-- No, -- Yeah, about 2007.
20     Q.  Earlier this year?
21     A.  To be honest, it was probably about
22 somewhere in the middle of 2006.
23     Q.  And then you hired the contractors
24 yourselves to redo the house?
25     A.  Yes, sir, we did.

Page 40

1      Q.  And who did the work?
2      A.  Well, there was a Jamaican man that
3  was working on my co-worker's house in the
4  East and we got him to do some of the work.
5  We understand he's gone back to his homeland.
6  And there was also a Caucasian man that was
7  working on the house behind our house, and my
8  husband walked over to see his work and we
9  also hired him to do some of the work.
10     Q.  And at the end of the day, just with
11 respect to the house, not the furniture or any
12 contents, how much approximately did it cost
13 to have your house redone?
14     A.  Oh, with material and labor, about a
15 hundred some thousand.
16     Q.  And do you have receipts for all of
17 that somewhere, a file on what that cost?
18     A.  I didn't keep all of the receipts,
19 but what I -- what -- and a lot -- most of our
20 money came from, as I said, the flood policy
21 and then I was holding onto some money; my
22 parents had been dead in 2001, I inherited
23 their home.  I'm an only child.  And I used my
24 inheritance money, and my husband retired from
25 his welding company, MetFab, in 1997, but up

Page 41

1  until Katrina he still worked part time and he
2  had shares of 11,000 and I would not let him
3  draw the money out because I knew as long as
4  the company kept the shares we couldn't touch
5  them.  But since then, when we needed money to
6  add on to the 84,900, along with my -- my --
7  my inheritance and some little savings we were
8  able to do, we used it.
9      Q.  And do you have -- did you pay for
10 that by personal check?  I am just trying to
11 understand if you have a record somehow --
12     A.  You want to know the truth, these
13 men wanted cash money.
14     Q.  So you paid them in cash some and
15 would not -- you know what you paid, as you're
16 telling us, but you don't have a paper trail
17 on that?
18     A.  No.
19     Q.  Is that right?
20     A.  I didn't think I needed it.
21     Q.  Now, then you got mostly, or I would
22 -- You know I have been in your house,
23 Richard and I were out there with the
24 inspectors a couple of weeks ago, so I have
25 seen it.

11 (Pages 38 to 41)

GLYNN WADE (MRGO)                                          7/10/2007

Page 42

1      A.   Uh-huh (affirmatively).
2      Q.   So it would appear to be all new
3  furniture in the house everywhere.  Is that
4  right?
5      A.   Every bit of it.
6      Q.   And all the countertops are new;
7  correct?
8      A.   Everything in the house is brand
9  new.
10      Q.   And what about the air conditioning
11  unit on the outside?  You know, what we call
12  the compressor?
13      A.   All of that is new because it -- the
14  old one was ruined.
15      Q.   What about wiring?
16      A.   We paid an electrician to do that
17  first.
18      Q.   And was it completely rewired, or
19  did you just --
20      A.   Completely rewired.
21      Q.   And --
22      A.   Plumbing, too.
23      Q.   -- had anybody come in and taken the
24  old wiring, the copper or the pipes or
25  anything out of there before they got in there

Page 43

1  to gut the house, or afterwards?
2      A.   No.
3      Q.   You didn't have any vandalism or
4  theft in all of this?
5      A.   We did not have anything.
6      Q.   Let me back up a little bit to when
7  you bought that house.  You bought that with
8  your husband; right?
9      A.   Sure did.  GI Bill.
10      Q.   All right.  And it's in both of your
11  names?
12      A.   Yes, sir, it is.
13      Q.   Now, did there come a time when you
14  entered into a relationship with lawyers with
15  respect to Hurricane Katrina and possible
16  damages or claims that you might have?
17      A.   I didn't meet lawyers, but on my
18  job, when we returned to New Orleans October
19  1st, or shortly after that -- we say October
20  1st was on a Saturday if I recall.  When we
21  returned to work that Monday, several of my
22  co-worker social workers start giving
23  information about lawsuits.  Wrote it down so
24  we could get -- get it correct.  One of my
25  co-workers, I will not call her name, lost her

Page 44

1  home, a young white girl, lady, lost her --
2  lost everything she owns.  A social worker in
3  Chalmette.  She had just bought a home about
4  two or three years before Katrina.  She lost
5  everything.  Her home and everything inside.
6  She was one that gave us the information.  And
7  there were others, co-workers who had found
8  out about the Andry Law Firm and Bruno and
9  wrote the information down for us.  And I
10  immediately called for myself and for my
11  daughter, because my daughter lost her home.
12  Her home is demolished and she is still
13  waiting for Road Home money and she's been
14  diagnosed within a year with multiple
15  sclerosis.  So she's in bad health and has
16  lost everything she owned.  So I was inquiring
17  about everything and I signed up and I signed
18  her up.
19      Q.   And what's her name?
20      A.   Shelita Michelle Breland is her
21  maiden name, Smith, and on June 8th, last
22  month, she got married to Ray, Brian Ray, so
23  she's Shelita Michelle Breland Smith Ray, R A
24  Y.
25      Q.   And what was the street address of

Page 45

1  her home?
2      A.   St. Anthony.
3      Q.   And I thought -- I may not have
4  remembered right --
5      A.   It's the Gentilly area.  She's near
6  also UNO.
7      Q.   And when you say she lost her house,
8  how much water or what was the damage?  Water
9  or wind, how --
10      A.   The water went to the roof.
11      Q.   Right.
12      A.   And they demolished her house.
13      Q.   She had water up in the house, I
14  take it?
15      A.   Yes.
16      Q.   Do you know approximately how high?
17      A.   Well, I didn't go in.  She couldn't
18  go in with the multiple sclerosis, but we
19  stood on the outside while her boyfriend went
20  in.  He's now her husband.  And we could see
21  the water line.  It was to the ceiling.  And
22  we didn't go in, nor did we let our
23  granddaughter go in.  But I remember the face
24  on my granddaughter when she peeped through
25  the window to see all of her trophies, a

GLYNN WADE (MRGO)                                         7/10/2007

Page 46

1   straight A student, and all her trophies on
2   the floor ruined from the water.
3       Q.   And you say -- I think you might
4   have mentioned she also had roof or wind
5   damage to her house?
6       A.   Well, she had wind damage and what
7   have you, but the City found fit -- She
8   requested to have it demolished since it was
9   not repairable and, to be honest, when I went
10  October -- December of '06 to just check on
11  her house, because she had paid to get it
12  gutted, also she came down and had it gutted,
13  there was no more house.  It was just a slab.
14  So she's waiting for Road Home money to come
15  home and rebuild.
16      Q.   All right.  Now, you have a Road
17  Home -- You got Road Home money?
18      A.   Yes, sir, I did.
19      Q.   And when did you apply for that?
20      A.   I applied around -- Well, you know,
21  whenever they said to apply.  So maybe that
22  was maybe the beginning of 2006.  I can't
23  remember.
24      Q.   It was early on when the Road Home
25  Program came into effect and got rolling?

Page 47

1       A.   As soon as the -- it was in the news
2   and they gave the website and phone number,
3   what have you, I applied.
4       Q.   And I don't want to know anything
5   lawyers said or you said to your lawyers, but
6   were lawyers involved in that Road Home
7   application?
8       A.   No.  No, sir.  Uh-huh (negatively.)
9       Q.   And do you have a copy of that at
10  home somewhere?
11      A.   No.  Because I got my money.  And I
12  didn't see any need to keep all of that.  I
13  did get -- We did get our money on or about
14  maybe March or April of this year.
15      Q.   And how much Road Home money did you
16  get?
17      A.   22,000.
18      Q.   Now, in terms -- have you gotten any
19  other -- aside from amounts of money you may
20  have gotten initially right after Katrina,
21  have you gotten any other aid?  Like were you
22  getting rent assistance?
23      A.   No.  FEMA said I wasn't eligible.
24      Q.   You applied for rent assistance or
25  housing assistance and FEMA turned you down?

Page 48

1       A.   I paid -- I also applied for
2   assistance with my medication, because I'm on
3   about eight pills a day because of
4   hypertension, diabetes, high cholesterol.
5   Many other problems.  But I was denied.  FEMA
6   said that my husband and I were not eligible.
7           Red Cross, we could not get the
8   Red Cross at all on the phone.
9       Q.   And did you get food stamps?
10      A.   For about three months while we were
11  working in -- when I say "we", OPH workers, we
12  were working in Baton Rouge, some of the
13  co-workers drove us to Port Sulphur and I
14  think we got it from October, November,
15  December.  October, November and December,
16  both of '05 if I recall.  And at that time it
17  didn't matter what your livelihood was.  The
18  fact that you were a Katrina victim.
19      Q.   And there came a time when you made
20  a claim against the Army Corps of Engineers.
21  You filled out a form?  Do you recall that?
22      A.   Yes, sir.
23      Q.   And were the lawyers involved in
24  helping you fill out that form?
25      A.   Nobody -- No attorneys.  I have done

Page 49

1   everything on my own.
2       Q.   And the form, we have got it, we can
3   look at it in a little bit, but parts of it
4   were printed up, printed up ahead of time and
5   had some stuff filled in on it about what
6   happened with the levees and so forth and then
7   you filled in some additional information.  Is
8   that -- Do you remember that?
9       A.   Yes.  To be honest, maybe after I
10  had applied with the lawsuit, the law firm
11  mailed that to me.
12      Q.   So you may have gotten it from the
13  law firm and then you filled out some more
14  information on it?
15      A.   Yeah.
16      Q.   All right.  What I was wondering is
17  if there were in part of the social work
18  worker network or otherwise had these forms to
19  fill out to make claims against the Army Corps
20  of Engineers.  Is that something that was part
21  of the social work network or anything?
22      A.   There's no social work network, but
23  those that got them from the firm told us
24  where to call and get one from.
25      Q.   And when you were telling us about

13 (Pages 46 to 49)

GLYNN WADE (MRGO)                                                    7/10/2007

---

Page 50

1   some social workers you knew had already
2   learned something about potential lawsuits and
3   the Andry firm and the Bruno firm, did you
4   then tell other people about that other than
5   your daughter, about getting involved in it or
6   calling those firms?
7       A.  Yes, I did.  I told my neighbors
8   that were coming and looking at their homes
9   and gutting them out.  Yes, I told them.
10      Q.  Was there any part of the social
11  work you were doing or others were doing,
12  where you were doing social work where they
13  were handing out --
14      A.  Oh, no.
15      Q.  -- information or anything like
16  that?
17      A.  Oh, no.  That wasn't a part of the
18  social work work.  We as colleagues decided
19  since we're always dedicating our life to
20  helping others, we decided to help each other
21  this time because we were all in the same
22  boat.
23      Q.  And who were -- I think you
24  mentioned there might have been more than one
25  of these people that had learned about the law

---

Page 51

1   firms.  Who were these, what were these
2   people's names?
3       A.  No, I cannot give my colleagues'
4   names.  Because that had -- that is something
5   private between us as friends.
6       Q.  And do you know if any of them have
7   become actively involved in any of this
8   Katrina litigation of any kind, where their
9   name is, you know, on a pleading where they're
10  suing somebody?
11      A.  They haven't said anything and I
12  never mentioned anything to them.
13      Q.  Whereabouts did these -- Well, let's
14  identify how many of them.  How many were
15  there?
16      A.  How many what?
17      Q.  Of these social workers that had
18  somehow learned about the Andry and Bruno law
19  firm?
20      A.  About three.
21      Q.  And let's just call them A, B and C
22  for right now.  And give me where they lived.
23  I am not asking a street address at this
24  point, but what areas of town did they live
25  in?

---

Page 52

1       A.  As I said, one is a white one about
2   40 years old who had just purchased a house
3   two or three years before Katrina, they lost
4   everything.  She lived in Chalmette.
5       Q.  And the other two?
6       A.  The other one lives in Carrollton
7   area.  Another one lived in Gentilly area.
8       Q.  Now, did there come a time when you
9   retired as a social worker?
10      A.  Sir, I am still working.  I cannot
11  -- I am 6- -- I'll be 62 October 19th.  I
12  can't afford to even think about retiring.  We
13  have used -- We have spent all of our life
14  savings.  I can't live off of fixed income
15  with what they pay social workers.
16      Q.  Now, we talked about the Road Home
17  and insurance that you got.  Is there any
18  other source of funds, let's say, above $2,000
19  that you've gotten?
20      A.  No, sir.
21      Q.  Have you told us about the major
22  sources of aid or assistance or funds that you
23  have received already?
24      A.  What I got from Allstate, the flood
25  insurance, the Road Home, my husband's shares,

---

Page 53

1   which he earned that after --
2       Q.  I was really asking you about other
3   than your own funds that you had, have you
4   told us about most of those?
5       A.  We did not have any other.  That's
6   why we have exhausted our own personal nest
7   egg.
8       Q.  In terms of injury for which you're
9   seeking money in this lawsuit, can you tell us
10  what kinds of injury you have?
11      A.  Now, when you say -- I'm sorry.
12      Q.  I'll ask it a little differently.
13  Are you seeking money in the lawsuit for
14  damage to your home, to that structure?
15      A.  Yes, sir.
16      Q.  And are you seeking damage for the
17  contents of the home?
18      A.  Yes, sir.
19      Q.  And that would be furniture and
20  appliances and personal effects; correct?
21      A.  Yes, sir.
22      Q.  Were you able to salvage any of
23  those personal effects at all?
24      A.  No, sir.
25      Q.  Did your husband or you get any, or

---

GLYNN WADE (MRGO)                                            7/10/2007

---

Page 54

```
 1    anyone else get any of them out pre-Katrina,
 2    pictures or jewelry or anything?
 3        A.  My husband didn't take pictures of
 4    our little jewelry before pre-Katrina, but he
 5    did take pictures of his rifles and -- for
 6    hunting and I think his fishing equipment.  He
 7    took a picture.  He put it all on a chair and
 8    took pictures.
 9        Q.  Did he take those, that shotgun and
10    that rifle with him?
11        A.  No, sir.
12        Q.  He left it?
13        A.  He left for three days to come back
14    home.
15        Q.  When y'all got back around October
16    1st of 2005, were the guns still there?
17        A.  Oh, yeah, they were there.  But they
18    were ruined.  They were under our bed in our
19    master bedroom, but they were rusty and
20    stinking and just ruined.
21        Q.  And he hasn't been able to salvage
22    then, I take it?
23        A.  No, sir.
24        Q.  And then we got the green pickup
25    truck.  But you had a separate vehicle?
```

Page 55

```
 1        A.  My Dodge.  My little Dodge Car- --
 2    my little van, Dodge van.
 3        Q.  And you drove that out?
 4        A.  No, sir.  I left that.  I left -- I
 5    let my husband drive me to City Hall to join
 6    my co-workers.  I was to speak to drive.  I
 7    rode in the State car with my co-workers.  I
 8    left my van under my carport.
 9        Q.  And was it a loss?
10        A.  Yes, sir, it was.
11        Q.  Total loss?
12        A.  Total loss.
13        Q.  And what did you get from the
14    insurance company on that?
15        A.  About 2,000.
16        Q.  And what do you think -- I'm sorry?
17        A.  Which was a down payment on the
18    Nissan that I have now.
19        Q.  And were you satisfied in terms that
20    they paid you what the fair market value of
21    that was?
22        A.  Yeah, I think it was what the blue
23    book value was.
24        Q.  Were there any other vehicles that
25    you lost?
```

Page 56

```
 1        A.  No.
 2        Q.  Or a boat?
 3        A.  No, sir.  We couldn't afford that.
 4        Q.  Aside from the contents of the
 5    house, the structure, I assume the automobile
 6    you want to be reimbursed for damage to your
 7    van, minivan or whatever it was?  Is that
 8    right?
 9        A.  Yes, sir.
10        Q.  Do you have any personal injury for
11    which you're seeking damages?
12        A.  On myself?
13        Q.  Yes.
14        A.  No, sir.
15        Q.  Now, your husband is not named in
16    the lawsuit as a Plaintiff.  You understand
17    that; right?
18        A.  Uh-huh (affirmatively).
19        Q.  Is that correct?
20        A.  I think it is.
21        Q.  All right.  So is he seeking damages
22    for himself in this lawsuit aside from the
23    structure, the structural damage to the house
24    and the contents and the things we have talked
25    about that you're seeking recovery for?  Is he
```

Page 57

```
 1    seeking anything?
 2        A.  Can I back -- go back?
 3        Q.  Sure.
 4        A.  When I filled out that 94, 95,
 5    whatever, I made him fill out one.  He didn't
 6    want to.  I wanted him to fill out one.  So I
 7    think he is a part of the lawsuit.
 8        Q.  And you think he filled out one
 9    separately from yours?
10        A.  No, we filled it out together.  I
11    made him fill it out.
12        Q.  All right.  And -- Well, we'll just
13    look at it in a little bit.  But your
14    understanding is you included him on that Form
15    95?
16        A.  Not on mine.  Well, I had to put his
17    name down, though.  But I think I gave him one
18    to fill out putting my name on it also, if I
19    am correct.
20        Q.  All right.  Just so I understand,
21    you think he may have filled out one with your
22    help or had his name on it that had his
23    damages on it, and then there's one that has
24    yours on it?
25        A.  Yes, sir.
```

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

GLYNN WADE (MRGO)                                          7/10/2007

---

Page 58

1    Q.  All right.  And do you have copies
2  of those at home?
3    A.  I think I have a copy of the most
4  recent one that I filled out, which was last
5  year.  And it was from the Corps of Engineers
6  and what have you.  I got one and I said, "I
7  already sent one, but I better fill this one
8  out, too."  But I have copies of those and the
9  other ones.  In the process of moving from
10 Destrehan to back home and what have you, to
11 be honest, I don't think I have the old
12 copies.
13   Q.  When did they start the redo of your
14 house?  I mean, when did that start and when
15 did it get finished up?
16   A.  It got started around -- Let's see.
17 I got the money in about January, February of
18 2006.  Around March we proceeded on getting
19 people to do our repairs.  And I want to say
20 around May of 2006 my house was completed.
21   Q.  And you moved back in?
22   A.  No, sir.  Because I had -- we had
23 signed a lease because -- a year's lease
24 because the landlord was going up 70 dollars
25 every six months, so I thought I was going to

---

Page 59

1  save some money and I and my husband, which he
2  says it was me, locked ourselves in for
3  another year.  So we were not able to move
4  into our home in the East until March 17th of
5  2007.
6    Q.  And what, did somebody else live in
7  it during that time?
8    A.  No.  My husband would sleep at night
9  with me in Destrehan, but on or about 4:00 in
10 the morning he would get to our home on Bundy
11 Road because he said he did not want the
12 construction workers that were working on the
13 other houses thinking no one lived in that
14 house, because he said a lot of times they
15 would steal material or vandalize, or steal
16 material off the houses or what have you, so
17 he would be there 4:00 in the morning until
18 maybe 8:00 or 9:00 at night to watch our
19 house.
20   Q.  I want to go back to that flood
21 policy for just a minute.  Did you get all of
22 the coverage you had?  In other words, they
23 paid you the full amount for what you had it
24 insured for?
25   A.  What we could afford to have it

---

Page 60

1  insured.
2    Q.  And at the time of Katrina did you
3  still have a mortgage on that house?
4    A.  Sure did.
5    Q.  And what was the approximate balance
6  on the mortgage at that time?
7    A.  About 48,000.
8    Q.  And do you still have that same
9  mortgage?
10   A.  We paid the mortgage out first.  In
11 the event that we could not afford to get our
12 house repaired, we wanted to own our land.
13   Q.  So you paid off the mortgage?
14   A.  Yes, sir.
15   Q.  And so at this point have you
16 refinanced or gotten another mortgage or
17 anything like a home equity loan or anything
18 like that?
19   A.  No, sir.
20   Q.  You own it lock, stock and barrel
21 now?
22   A.  Yes.
23     MR. MARPLE:
24      Why don't we take just a little
25    break.  We have been going quite a

---

Page 61

1    while.
2      MR. EXNICIOS:
3       That's fine.
4      MR. MARPLE:
5       We'll take however long you all
6     need, five, ten, fifteen minutes.
7      VIDEO OPERATOR:
8       We're going off the record now.
9     It's 10:27.
10      (Recess.)
11      VIDEO OPERATOR:
12       Now returning to the record.
13     It's 10:28.  This is the start of tape
14     2.
15 EXAMINATION BY MR. MARPLE:
16   Q.  You were working for the State of
17 Louisiana as a social worker before Katrina?
18   A.  Yes, sir.
19   Q.  And what was your job description at
20 that time?
21   A.  Social worker.
22   Q.  What were you doing?
23   A.  Making referrals to persons that
24 walked off the street who needed resources.  I
25 also worked with the nurses into -- in the

---

GLYNN WADE (MRGO)                                          7/10/2007

Page 62

1  clinics.
2      Q.  And did you have a place that you
3  went to work every day?
4      A.  Yes, sir.
5      Q.  Where was that?
6      A.  Before Katrina, I was on Tulane
7  Avenue and Jeff Davis.  I should know the
8  address, but I don't.  It's Orleans Women's
9  Clinic for Family Planning, maternity.
10     Q.  And now where do you report to work?
11     A.  At 111 North Causeway at the
12 Jefferson Parish Health Unit, which is also a
13 public health clinic in Metairie, Louisiana.
14     Q.  I'm going to hand you what we have
15 marked as Wade 1, which I'll represent to you
16 is information that was provided to us by your
17 attorneys, and there's a list of names over
18 here on the left-hand side starting with
19 Kenneth Armstrong, Sr.  Do you see that?
20     A.  Yes, sir.
21     Q.  And then you're number 5 on that
22 list.  Do you know any of those other people?
23     A.  No, I don't.
24     Q.  And then it says "Current medical
25 condition", and I think you mentioned at least

Page 63

1  one or two of these, hypertension and diabetes
2  and pinched nerve.
3      A.  Yes, sir.
4      Q.  How long have you had hypertension?
5      A.  I've had hypertension since I was
6  about 40 years old.
7      Q.  And have you been under a doctor's
8  care for that?
9      A.  Yes, sir.
10     Q.  And are you taking medication for
11 it?
12     A.  I am taking three medications
13 because I had a stroke the year 2000.
14     Q.  And what medications are you
15 taking?
16     A.  Divon, D I -- D I V O N, I believe
17 it is.  I'm sorry, one is a -- water pill,
18 chloro-something.  And the other one is
19 Norvasc, N O R, I think, V A S.
20     Q.  And those are for hypertension?
21     A.  Yes, sir.
22     Q.  And then diabetes?
23     A.  They have changed the medication.  I
24 think -- It's a Metformin or something.
25     Q.  And how long have you had or been

Page 64

1  diagnosed with having diabetes?
2      A.  Since I was about 50.
3      Q.  And that's what we would call adult
4  onset diabetes?
5      A.  Yes, sir.
6      Q.  And do you test your blood sugar
7  level?
8      A.  Every day.
9      Q.  Prick your finger?
10     A.  Yes, sir.
11     Q.  And then you are taking some
12 medication for that; right?
13     A.  For the diabetes?
14     Q.  Yes.
15     A.  I take two tablets, one in the
16 morning and one at night.
17     Q.  And --
18     A.  And then -- And then an extra little
19 pill for diabetes called G L I M P I E (sic),
20 Glimep something.  I'm taking one pill for
21 diabetes in the morning, two at night.
22     Q.  And then the other thing it says
23 here is a pinched nerve.
24     A.  I refuse medication for the pain of
25 the pinched nerve.  Because currently I'm

Page 65

1  still going to the Elmwood Fitness Center,
2  getting in the pool twice a week, 7:00 in the
3  morning, before I go to work.
4      Q.  And where is that pinched nerve;
5  what part of your neck?
6      A.  Well, no, they said -- they showed
7  me a design where it's in the back and, as a
8  result of it, I have pain radiating through my
9  legs.  That's what brought me to the doctor
10 for that.  Severe pain in my legs.
11     Q.  So it's a lower back problem that
12 causes pain to radiate in your legs?
13     A.  Yes, sir.
14     Q.  And when you say it's a pinched
15 nerve, that's what --
16     A.  Well, they say it's a pinched nerve.
17     Q.  That's what the doctors have told
18 you?
19     A.  The neurologist.
20     Q.  And did you have an MRI for that?
21     A.  Yes, sir.
22     Q.  And when did you first have that
23 problem with a pinched nerve?
24     A.  Started about a year ago.
25     Q.  And is there something that you

GLYNN WADE (MRGO)                                                    7/10/2007

Page 66

1  think or your doctors have told you caused
2  it?
3        A.  They say age.
4        Q.  You have osteo- -- well, arthritis
5  in your vertebrae?  Is that what they're
6  telling you?
7        A.  One doctor did say that.
8        Q.  Are there any other medical problems
9  that you have at this time?
10       A.  High cholesterol.
11       Q.  And are you taking anything for
12  that?
13       A.  Yes, sir.  I am taking Crestor, C R
14  E S T O R.
15       Q.  And are these -- Well, let's --
16       A.  And Plavix because of the stroke I
17  had the year 2000.  P L A V I X.
18       Q.  Do any of those medications that
19  you're taking now affect your ability to
20  testify today?
21       A.  No, sir.
22       Q.  I'll show you what we have marked as
23  Exhibit 2.  May I look at this just for one
24  moment?  Okay.
25           MR. MARPLE:

Page 67

1           I didn't give you my copy, did I,
2       Richard?  It's got marking on it.
3           MR. EXNICIOS:
4           This is not the same thing.  You
5       gave me a different one.  So it might
6       be yours.
7           (Whereupon a discussion was held
8       off the record.)
9  EXAMINATION BY MR. MARPLE:
10       Q.  You okay?  What I have handed you
11  that's marked as Exhibit 2 is a document that
12  relates to one of the Form 95s that you filed
13  making a claim against the Army Corps of
14  Engineers.  Is that correct?
15       A.  Yes, sir.
16       Q.  And this one is one you filled out
17  in July of 2006?
18       A.  Yes.
19       Q.  If you look on I believe it's the
20  last page of this document, do you see "To
21  whom it may concern"?
22       A.  Uh-huh (affirmatively).
23       Q.  And --
24       A.  Yes, sir.
25       Q.  And is that your signature on that

Page 68

1  page?
2        A.  Yes, sir, it is.
3        Q.  That's your handwriting?
4        A.  Yes, sir, it is.
5        Q.  And would that indicate to you by
6  October 28, 2005 you had signed up, so to
7  speak, with the Andry Law Firm in connection
8  with Katrina claims?
9        A.  Yes.
10       Q.  And do you know in relationship to
11  October 28, 2005 how long before that it was
12  that you signed up with them or got in contact
13  with them?
14       A.  I don't remember.
15       Q.  Sometime before it, but in that
16  general time frame?
17       A.  Yes, sir.
18       Q.  Now, if we look at the form itself,
19  which is the page called "Claim for damage or
20  injury ", do you see that?
21       A.  Yes, sir.
22       Q.  There's typing on here at the top,
23  "United States Army Corps of Engineers" and
24  your name, "Represented by Jonathan B.
25  Andry".  Do you see all of that?

Page 69

1        A.  Yes, I do.
2        Q.  Did you type that or did someone
3  else type that?
4        A.  Someone else typed that.
5        Q.  All right.  Do you know how this
6  form came into your possession, if it did?  In
7  other words, how you actually got ahold of
8  it?
9        A.  Well, Andry Law Firm apparently
10  mailed it to me.  I called them and asked them
11  for whatever I needed to be a part of the
12  lawsuit.
13       Q.  And at that time you wanted to be
14  part of a lawsuit against the Army Corps of
15  Engineers?
16       A.  Yes, sir.
17       Q.  And on this one, do we see Mr.
18  Wade's name appear anywhere?
19       A.  Let's see.  I don't see his name on
20  here.
21       Q.  And does your handwriting or
22  anything you may have put on here by typing or
23  otherwise on this page, is any of that your
24  handwriting or your input?  As opposed to
25  somebody else having prepared it for you?

18 (Pages 66 to 69)

GLYNN WADE  (MRGO)                                    7/10/2007

---

Page 70

1     A.  Well, what I wrote is here
2  (indicating).  I mean when I signed my name.
3     Q.  Right.  What we looked at on the
4  back, the "To whom it may concern".  But this
5  page that we're looking at that says "Claim
6  for damage, injury or death" in the upper
7  left-hand corner on that page, is there
8  anything that you think you typed in or wrote
9  on this page?
10    A.  Well, I didn't write anything in,
11 nor did I type anything in.
12    Q.  Now, the amount of the claim down
13 here says, in 12-A as you get towards the
14 bottom, "Property damage, $500,000".  Do you
15 see that?
16    A.  Yes, sir.
17    Q.  What's that consist of?
18    A.  When you say -- When you say
19 property damage?
20    Q.  Yes.  How did you arrive at the
21 $500,000?  When we talked today, we have got a
22 house that's worth $180,000 and whether or not
23 what counts in that, but it would seem to me
24 180,000 for the house would be the max.  You
25 salvaged some of it, so it would be less than

---

Page 71

1  that.  And then you have got the contents
2  would be the main property damage.  Right?
3     A.  Yes, sir.
4     Q.  All right.  And if you've got a
5  $180,000 house that was worth something when,
6  you know, when it was stripped down and
7  everything and you have got the contents, how
8  do you get to $500,000 in property damage?
9     A.  I am going to answer you honestly.
10 I figure if you ask for far more, I come in
11 the middle, half or less.
12    Q.  You have got less property damage.
13 You asked for more hoping that you would
14 compromise somewhere where you come out about
15 right?
16    A.  That is correct.
17    Q.  This was what some people might call
18 your opening position?
19    A.  I don't know what it's called, but I
20 know usually when you ask for one thing, you
21 get far less.
22    Q.  And so in reality the property
23 damage you have is far less than 500,000;
24 correct?
25    A.  It's less than 500,000, yes.

---

Page 72

1     Q.  Do you have a number that you've
2  calculated to know what your property damage
3  is for the contents of your house, the damage
4  to the structure, and your van?
5     A.  No, sir.
6     Q.  You have not calculated that?
7     A.  No, sir, I haven't.
8     Q.  Then the next slot there is 12-B,
9  says "Personal injury, $500,000".  What's that
10 consist of?  What injuries is that?
11    A.  Well, I wasn't sure about the
12 personal injury, what that -- what that
13 meant.  Because I didn't claim to be injured
14 by Katrina.  I was in Baton Rouge working.
15    Q.  And your husband wasn't injured
16 either by Hurricane Katrina, because he got
17 out ahead of time, too; right?
18    A.  That's correct.
19    Q.  The address up at the top there is
20 P. O. Box 1101, Destrehan.  Is that the P. O.
21 Box you had up there somewhere at the Post
22 Office near the apartment?
23    A.  Yes, sir.
24    Q.  And when it talks about the basis of
25 the claim there, which is near the top of the

---

Page 73

1  page there, number 8, do you see that?
2     A.  Yes.  What about it?
3     Q.  Is that your understanding of what
4  the basis of your claim is against the Army
5  Corps of Engineers?
6     A.  To be honest, I -- I am not sure.  I
7  left it up to Andry Law Firm to -- to indicate
8  that.
9     Q.  Do you have any understanding from
10 personal knowledge of where the water came
11 from that flooded your house?
12    A.  No, sir, I don't.
13    Q.  And have you undertaken to make any
14 investigation since Katrina to try to
15 determine where that water came from?
16    A.  No, sir.
17    Q.  Number 8 talks about, I am basically
18 -- the design and operation and construction
19 of the MRGO.  Do you see that?
20    A.  Yes, sir.
21    Q.  And what I take it from what you're
22 telling me is you're not sure about whether
23 any, or any of the details of the construction
24 of the MRGO or otherwise that might have led
25 to flooding of your house.  Right?

---

JOHNS PENDLETON COURT REPORTERS                      800 562-1285

GLYNN WADE  (MRGO)                                    7/10/2007

Page 74

1       A.  All I know is that my house was
2  flooded.  I am depending on the attorneys
3  that's representing us to give the facts.  I
4  have no idea about that stuff.
5       Q.  And whether it came from rainwater
6  or water that came over a levee or through a
7  levee or which levee or which body of water,
8  that's something you don't know about as you
9  sit here today?
10      A.  I don't know anything about it.
11      Q.  Let me show you what we have marked
12  as Exhibit 3.  I believe this is the one I
13  handed to Rich earlier, giving you another one
14  now.  And is that a four-page document?
15      A.  Is this exactly what you have?
16          MR. EXNICIOS:
17            Yes, ma'am.  That appears to be
18        the same one.
19  EXAMINATION BY MR. MARPLE:
20      Q.  Is Exhibit 3 a four-page document?
21      A.  Yes, sir, it is.
22      Q.  And the top two pages are a letter
23  dated January 25th, 2007 from the Army Corps
24  of Engineers to you.  Is that correct?
25      A.  Yes, sir.

Page 75

1       Q.  Do you remember receiving that
2  letter?
3       A.  No, I don't.
4       Q.  You think you might have gotten it
5  and you just don't remember it?
6       A.  Yes, I believe that happened.
7       Q.  All right.  It's addressed to you
8  properly and everything; right?
9       A.  Yes, sir.
10      Q.  And it's called, or the subject line
11  is an "Acknowledgment of receipt of
12  complaint".  Do you see that?
13      A.  Yes, sir.
14      Q.  Now, if we go over to the third and
15  fourth pages, and particularly the third page,
16  this is a claim for damage, injury or death.
17  That's the same or close to being the same
18  type of form as the one we just talked about,
19  which was Exhibit 2.  Right?
20      A.  Yes, sir.
21      Q.  And this one's dated January 12,
22  2007.  Correct?
23      A.  Correct.
24      Q.  If you'd look on that page where
25  it's a claim for damage, you look down at

Page 76

1  number 14 in the lower right-hand corner, do
2  you see it's dated there, correct?  I'll point
3  it to you.  Right there (indicating).  Do you
4  see that?
5       A.  Okay.
6       Q.  Is that your signature there to the
7  left of that in item 13-A?
8       A.  Yes, sir, it is.
9       Q.  And is the handwriting on this page
10  your handwriting or is there someone else's
11  handwriting besides yours on this one?
12      A.  It's my handwriting.
13      Q.  And this is one -- Well, I'll ask.
14  Is this one you filled out yourself or did you
15  get part of this form from somebody and add
16  the additional information that's in
17  handwriting?  Can you tell us what happened in
18  that respect?
19      A.  I can't remember where I got this
20  form.  Yes, everything that's in here, I wrote
21  it.
22      Q.  And do you have any explanation for
23  why you would have filed this second claim
24  when you had filed one approximately six
25  months earlier?

Page 77

1       A.  Let me make sure I understand you.
2  You're asking me why did I file this one
3  (indicating) when I had gotten this one
4  (indicating)?
5       Q.  Well, as I understand it, the one we
6  marked as Exhibit 2 was in July, 2006 and this
7  --
8       A.  Yes.
9       Q.  -- is in January of 2007.  So I am
10  really asking you if you can explain it either
11  way.  But I am asking you why would you file
12  the second one.
13      A.  Because when I got this one
14  (indicating), and if I -- it is from the --
15  the Corps -- the Corps of Engineers, when I
16  got it, I filled it out because I figured that
17  if I didn't fill it out they would say I was
18  not cooperating.  So anything I got as far as
19  a form -- Well, this is 95?  I filled it out.
20      Q.  All right.  And the first two pages
21  there, the letter from the Army Corps of
22  Engineers to you, the Department of Army, is
23  dated January 25th, 2007.  Right?
24      A.  Yes, sir.
25      Q.  And the form is dated January 12,

                                    20  (Pages 74 to 77)

GLYNN WADE (MRGO)                                          7/10/2007

Page 78

1   2007. So it would appear, would it not, that
2   the January 25th letter is acknowledging this
3   claim? So it came after you filed this
4   claim. The letter from the Army Corps of
5   Engineers would have been after you filed this
6   claim. Correct?
7       A. Yes, sir.
8       Q. So you recall receiving something
9   from the Army Corps of Engineers that said you
10  need to fill out a Form 95 or something?
11      A. All I remember is getting the Form
12  95. It was from the Corps of Engineers. And
13  I remember trying to fill it out and mailing
14  it back.
15      Q. At this point you don't recall where
16  you got it, this form?
17      A. This form?
18      Q. This one that's dated --
19      A. It came in the mail I think from the
20  Corps of Engineers.
21      Q. And you think the Army Corps of
22  Engineers sent you a claim form that was
23  filled out in part saying "File a claim
24  against us"?
25      A. Sir, I have no idea what was going

Page 79

1   on. I was just filling out forms, to be
2   honest.
3       Q. Now, if we look at Exhibit 3 there,
4   I think you told us all the things that are
5   written in hand are your handwriting.
6   Correct?
7       A. That's correct.
8       Q. All right. If we look at 8-A,
9   there's some typed information there about
10  what happened and what the basis of the claim
11  is. You see that little paragraph that's
12  typed in 8-A?
13      A. Yes, sir.
14      Q. Right? Do you know, did you type
15  that or did someone else type it?
16      A. Obviously someone else typed it.
17      Q. And at this point you don't know who
18  did that?
19      A. No, I don't.
20      Q. Now, in 9 there it says "Briefly
21  describe the property, the nature and extent
22  of damage, and the location where the property
23  may be inspected." Do you see that?
24      A. You say 9?
25      Q. It's in 9, yes.

Page 80

1       A. I am looking at 9, but --
2       Q. Right below it there. I think it's
3   still part where it says "Briefly describe the
4   property".
5       A. Oh.
6       Q. Do you see that?
7       A. Yes, sir.
8       Q. It says "Destruction of real and
9   personal property resulting from water damage,
10  loss of opportunity to purchase a sufficient
11  amount of flood insurance." I wonder if you
12  could explain what that means.
13      A. I don't know what that means.
14      Q. Have you lost any opportunity to
15  purchase a sufficient amount of flood
16  insurance?
17      A. No.
18      Q. You have flood insurance now on the
19  property?
20      A. Yes, sir, I do.
21      Q. And do you know how much you have
22  your property insured for under the flood
23  policy?
24      A. Yes, sir. I don't pay until
25  September, 2007. This time I am asking

Page 81

1   Allstate to insure me for 100,000.
2       Q. And how did you arrive at the
3   $100,000 figure for your flood insurance?
4       A. Because of the cost of material and
5   labor.
6       Q. And that's because you got flooded
7   pretty badly up to four, four and a half feet
8   and it cost you about $100,000 to redo that
9   house; right?
10      A. It was over 100,000.
11      Q. But you thought 100,000 will take
12  care of you if it happens again?
13      A. Hopefully. I can't afford more than
14  $100,000 worth of flood insurance.
15      Q. Now, the other one, the next item,
16  it says "To modify the property or to relocate
17  as a result of fraud and/or concealment by the
18  U.S. Army Corps of Engineers". Do you know
19  what that's referring to, "to modify the
20  property"?
21      A. No, sir, I don't.
22      Q. All right. And can you tell us
23  anything about what the fraud or concealment
24  by the U.S. Army Corps of Engineers was?
25      A. I have no idea.

JOHNS PENDLETON COURT REPORTERS                          800 562-1285

GLYNN WADE (MRGO)                                                    7/10/2007

---

Page 82

1      Q.  Now, in the next item down, in 10,
2   it's got "mental distress" with a couple of
3   little stars there.  Do you see that?
4      A.  Yes, sir.
5      Q.  And that's your handwriting; right?
6      A.  Yes, it is.
7      Q.  And you have circled "Personal
8   injury" and it says "Personal injury and
9   mental distress", you have circled "mental
10  distress"?
11     A.  That's what I circled.
12     Q.  And you didn't have any personal
13  injury, but on this one you have got mental
14  distress.  Correct?
15     A.  Yes, sir.
16     Q.  And this one mentions Mr. Wade,
17  Adolph Wade, Sr.; right?
18     A.  Yes, sir.
19     Q.  That's your husband?
20     A.  Yes, it is.
21     Q.  And you.
22     A.  Yes, sir.
23     Q.  And you are mentally distressed
24  because you had about five feet of water in
25  the home and the flood water knocked the

---

Page 83

1   bricks off the front of the home and the house
2   was severely damaged and "We lost everything
3   we owned in our home."  Right?
4      A.  Yes, sir.
5      Q.  Can you describe for me the mental
6   distress that you have as a result of that?
7      A.  Well, at the time I wrote this, I
8   did have mental distress.  It's -- I'll have
9   mental distress until I die as a result of the
10  trauma we experienced.  But each day gets
11  better.  But to work for years, to try to
12  accomplish material goods, try to save a
13  little money in the bank, and to lose
14  everything you own can be mentally distressful
15  as well as physical, but somehow it just kept
16  me for a long time, but I did not go to a
17  psychiatrist.  For about a year I didn't sleep
18  hardly at night except maybe one or two hours
19  thinking about all that I have lost and my
20  husband and I trying to figure out how would
21  we try to gain some of it back.  Because we
22  will never, ever get what we lost.  All of the
23  heirlooms, family heirlooms from my
24  grandparents and my parents, they're not
25  replaceable.  They're not replaceable.  What

---

Page 84

1   monies we had that we had put aside to live
2   off of for a rainy day, I don't think we'll
3   ever get that back, to be honest.
4      Q.  Now, the heirlooms from your
5   grandparents, I take it that's something very
6   personal to you?
7      A.  Very personal.
8      Q.  And the value of that is not what
9   somebody -- to you is not what somebody might
10  have paid you for it.  It's personal and
11  individual to you.  Is that correct?
12     A.  It certainly is.
13     Q.  And to your neighbor, those
14  heirlooms might not have any value at all;
15  right?
16     A.  Probably so.
17     Q.  And vice versa.  If they had some,
18  you might empathize with them about the loss,
19  but personally that wouldn't have value to you
20  if they lost some of their heirlooms; right?
21     A.  That's right.
22     Q.  Can you tell us what those -- some
23  of those heirlooms that you lost were?
24     A.  China, our --
25     Q.  I'm sorry.  I apologize for

---

Page 85

1   interrupting, but China, did you salvage any
2   China?
3      A.  No.
4      Q.  Of yours or anybody's?
5      A.  No.
6      Q.  And is there a reason for that?  I
7   mean, I am -- just from a lay person's
8   standpoint, if it weren't broken, I would have
9   thought you could have cleaned China up.
10     A.  Everything that was in -- my China
11  was in the cabinets in the kitchen at the
12  bottom.  It was all broken.  Broken.
13     Q.  Were you able to salvage even one
14  dish or saucer or cup or anything of that --
15     A.  No, sir.
16     Q.  -- China?  And I am sorry I
17  interrupted you.  What else?
18     A.  Then I had a, what you call I guess
19  a place setting with knives and forks and what
20  have you that also belonged to my mom.  Then I
21  had pots and pans that belonged to my
22  grandmother that were not salvageable.  I had
23  linen, towels, pillow cases that had been in
24  the family for years.  When I said family, my
25  grandmother when she passed away, my mother

---

22 (Pages 82 to 85)

GLYNN WADE (MRGO)                                            7/10/2007

Page 86

1    got them; and my mother passed them to me, and
2    I was to pass them to my daughter.
3    Tablecloths. Just stuff that belonged in the
4    family. May not be important to other people,
5    but very important to us. Vases that we had
6    in the living room, the family Bible that was
7    on the -- on my coffee table that had been in
8    the family for years.
9        Q. And in that respect with these
10   heirlooms, --
11       A. Pictures of the family. Pictures.
12       Q. -- what you told us about these
13   items, there's not somebody else that you know
14   that could come in and describe that to the
15   Court or anybody as to what it meant other
16   than you. Is that right?
17       A. Right.
18       Q. Now, if we look on the form here, go
19   back to that claim -- Well, we were looking on
20   the handwritten one, the one where you filled
21   it out, you see "Property damage" in number
22   12-A?
23       A. Yes, sir.
24       Q. And it says $252,501, plus it looks
25   like 50,000 in contents. Have I got that

Page 87

1    right?
2        A. Yes.
3        Q. And how did you arrive at the
4    $252,501?
5        A. Off the top of my head.
6        Q. And the 50,000 in contents, how did
7    you come up with that?
8        A. The top of my head with the cost of
9    things now.
10       Q. And that's just to replace things;
11   that 50,000 doesn't include the sentimental
12   individualized value of losing that thing that
13   caused you some mental distress. Is that
14   right?
15       A. Right.
16       Q. And then the total over there is
17   just adding those two together. Right?
18       A. Yes, sir.
19       Q. And then I apologize if I asked you
20   this before, but that is your signature at the
21   bottom?
22       A. That is my signature.
23       Q. Now, Mr. Wade, was he involved in
24   filling this one out?
25       A. No, he wasn't.

Page 88

1        Q. And did he fill one out around this
2    time of his own, in his own handwriting like
3    this one?
4        A. To be honest, I cannot remember.
5        Q. Did you discuss this with him, this
6    form?
7        A. Yes, I told him what I was putting
8    down. I showed it to him.
9        Q. And did he express any agreement or
10   disagreement with any of the --
11       A. He didn't say anything.
12       Q. And did you say, "You need to fill
13   one of these out for yourself"?
14       A. No, I didn't, because I believe in
15   October of '05 when I was filling out one, he
16   filled out his.
17       Q. And something prompted you to fill
18   out this second one because you wanted to
19   cover your bases with the Army Corps of
20   Engineers in the forms; right?
21       A. Well, I just wanted to make sure I
22   was showing that I was cooperating by filling
23   out every form I was sent.
24       Q. And is there any reason why Mr. Wade
25   wouldn't have felt the same way? Filled one

Page 89

1    out?
2        A. Well, Mr. Wade is very passive. And
3    they sent it to me. So I filled it out.
4        Q. And I just want to back up a little
5    bit. Is it possible rather than the Army
6    Corps of Engineers sending you this form that
7    you got it through some other mechanism?
8        A. No, sir. This came from the -- If I
9    recall, you know, I can't -- I can't etch it
10   in stone -- Well, I'm pretty sure this was
11   from the Army of -- Army Corps of Engineers.
12       Q. All right. When you got this form,
13   if it came from the Army Corps of Engineers or
14   wherever it came from, did you -- and I am not
15   asking what was said, but did you contact your
16   lawyers and say, "I have gotten another form
17   here"?
18       A. No. No, I didn't call them.
19       MR. EXNICIOS:
20           Can we go off the record for like
21       one minute and I think I can help
22       resolve some of this?
23       MR. MARPLE:
24           Yes.
25       VIDEO OPERATOR:

GLYNN WADE (MRGO)                                    7/10/2007

Page 90

1       We're off the record. It's
2    11:15.
3       (Recess.)
4       VIDEO OPERATOR:
5          Returning to the record. It's
6    11:16.
7    EXAMINATION BY MR. MARPLE:
8       Q.  And while we were off the record,
9    Mrs. Wade, Mr. Exnicios gave some background
10   that there was a big media blitz sometime in
11   early 2007 here in New Orleans on television
12   and otherwise about filling out forms or a
13   Form 95 if you wanted to make a claim against
14   the Army Corps of Engineers. And does that
15   jog your memory in any way as to when or why
16   you might have filled out this second form?
17      A.  When I received this from the Corps
18   of Engineers, I filled it out because I
19   figured if they sent it to me, I should fill
20   it out. If I ignored it, they may think I was
21   not interested in the lawsuit.
22      Q.  All right. Is there any reason,
23   though, why the amounts and the things are
24   different on the second form, the one we have
25   marked as Exhibit 3, from Exhibit 2? I mean,

Page 91

1    is there a reason you just didn't copy that
2    one or put the same information on this second
3    form?
4       A.  I don't recall where the other one
5    was in my house. I may have lost it.
6       Q.  I have got some photos. We'll look
7    at this. We'll probably mark some of these,
8    but before we get too far into them I want to
9    make sure that it's your home. They have been
10   produced to us by your attorneys and, of
11   course, I am not familiar all the way with
12   your home. I am going to show you the set of
13   these.
14      MR. EXNICIOS:
15         I can look at hers.
16      MR. MARPLE:
17         If you don't mind looking at
18   hers. I'm afraid --
19      MR. EXNICIOS:
20         That's fine. Okay. I know what
21   those are. That's fine.
22   EXAMINATION BY MR. MARPLE:
23      Q.  And are those -- How many do we have
24   there? Four or five?
25      A.  There are three, four, five, six.

Page 92

1       Q.  Are those, all of those of your
2    home?
3       A.  Yes, sir, they are.
4       Q.  Let's see these just a second. Are
5    these photos that you believe were taken
6    immediately prior to Katrina by your husband
7    before he evacuated?
8       A.  No, that was taken about a year
9    before Katrina.
10      Q.  I am going to mark this set as
11   Exhibit 4. All right?
12      A.  And this is just some photos. You
13   have others. Some parts of the house.
14      Q.  Yes. They were taken about a year
15   --
16      A.  About a year before Katrina.
17      Q.  And what was the occasion on which
18   you took these photos? Or someone took them?
19      A.  The reason being that our Allstate
20   Insurance agent every year reminded us to
21   update and take pictures. And we had ignored
22   it. And for some reason my husband decided
23   one day to take pictures and to put it in our
24   red box where we keep important documents.
25      Q.  And when that red box -- Where was

Page 93

1    it during Katrina?
2       A.  The top of the closet in the master
3    bedroom.
4       Q.  And so it survived more or less
5    unscathed?
6       A.  Sure did. It was opened and I guess
7    persons who came into the home thought maybe
8    money or jewelry was in it, but it was
9    pictures of our house and burial insurance
10   policies.
11      MR. MARPLE:
12         We'll go off a second.
13      (Discussion off the record.)
14      VIDEO OPERATOR:
15         We're off the record. It is
16   11:21.
17      (Recess.)
18      VIDEO OPERATOR:
19         Returning to the record, it's
20   11:23.
21   EXAMINATION BY MR. MARPLE:
22      Q.  All right, Mrs. Wade. We were
23   talking about these photos and you said you'd
24   taken them for some insurance purposes and you
25   put them in the red box and then the red box,

                              24 (Pages 90 to 93)

GLYNN WADE (MRGO)                                        7/10/2007

Page 94

1  at least these contents survived Katrina. And
2  they were taken so you'd have a record if
3  something happened that you needed to make a
4  claim on your insurance, you could show what
5  the contents of the house were. Correct?
6      A.  Yes, I was advised by our agent to
7  do it.
8      Q.  And so your husband took these. And
9  this is the sun room, the very first one
10 that's got the Hawaiian Punch --
11     A.  Yes.
12     Q.  I'm not sure what that is, trash can
13 or beach ball or something in it. What is
14 that?
15     A.  This is where we would keep our soft
16 drinks and water --
17     Q.  All right.
18     A.  -- when we entertained.
19     Q.  And that's the room that you
20 enclosed that had been a screened-in porch and
21 you enclosed it; right?
22     A.  Yes, sir.
23     Q.  And you didn't run air conditioning
24 vents from the ceiling and heating from the
25 rest of the house back there; you cooled it

Page 95

1  with a window air conditioner. Then if you
2  needed heat in the wintertime, you probably
3  had a little space heater back there; right?
4      A.  Yes, sir.
5      Q.  As a matter of fact, I think I can
6  see the space heater under that table.
7      A.  That is it.
8      Q.  Correct?
9      A.  Yes.
10     Q.  Then on the second page, photos, if
11 you look at the next page, is another shot,
12 almost like the other one that we looked at on
13 top, and then down below we've switched around
14 and looking -- Well, I am not sure which way
15 we're looking, but that's still in the sun
16 room; right?
17     A.  Yes, it is.
18     Q.  And then the next photo at the top
19 is one of the bedrooms? Is that the master
20 bedroom?
21     A.  Yes, it is.
22     Q.  And below it is -- and in that
23 master bedroom, that's carpeting and that's
24 some of the carpeting that you had put down?
25 Is that correct?

Page 96

1      A.  Yes, sir, it is.
2      Q.  And then the next one, tell us what
3  room that is. I am not sure where we --
4      A.  That was our -- We took one of our
5  bedrooms then and made it our den. A little
6  sitting area.
7      Q.  And there's an aquarium there. Is
8  that a real one with water in it?
9      A.  Yes, it is.
10     Q.  And there's some kind of fish in
11 there?
12     A.  Yes, sir.
13     Q.  And did you lose any of those fish
14 in Katrina?
15     A.  Oh, yeah.
16     Q.  And there's a bird in the cage? Did
17 you take the bird with you?
18     A.  No, we didn't.
19     Q.  Did he get out or die, or do you
20 have any idea?
21     A.  I don't know what happened to him.
22 I don't even remember the cage afterwards
23 because everything was such topsy-turvy.
24     Q.  And then the next one is back in the
25 front entryway room, I believe. Those two

Page 97

1  pictures. Am I right?
2      A.  Yes, sir.
3      Q.  And there's pictures on the wall, of
4  course. And then there's carpet in that room
5  as well.
6      A.  Yes, sir.
7      Q.  And is that carpet you installed
8  after you bought the house?
9      A.  Yes, it is.
10     Q.  And those pictures up on the wall
11 there that we see in that first photo, did you
12 salvage any of those?
13     A.  The ones at the very top of my
14 husband and I, one is -- you can barely see
15 it, a picture of us we took in Hawaii and two
16 other top pictures, at the top (indicating),
17 those were salvageable. But the other ones
18 and the one at the bottom of the children and
19 grandchildren, his and mine, my children -- my
20 child, my grandchild, we lost those.
21     Q.  Then the next one is, looks like a
22 rifle and shotgun to me. Is that what you see
23 in that next picture at the top?
24     A.  Yeah, that's some of his hunting
25 stuff.

25 (Pages 94 to 97)

Page 98

1    Q.  And did he hunt deer and birds?
2    A.  Yes, sir.
3    Q.  Does he still hunt?
4    A.  No.
5    Q.  Your husband doesn't hunt any more?
6    A.  Not now.
7    Q.  Does he have guns?  Did he replace
8  the guns?
9    A.  He did get one gun, but he was also
10  in a hunting club where he could go with a
11  group of men.  But we can't afford for him to
12  be in the hunting club and, secondly, he has
13  one rifle now.
14    Q.  That's going to limit him to deer
15  pretty much now, huh?
16    A.  Sir?
17    Q.  That limits his hunting to deer?
18    A.  Right.
19    Q.  Then the bathroom there, that's a
20  real --
21    A.  That's one of the bathrooms.
22    Q.  It's kind of a 1950 -- I call it a
23  1950s bathroom?
24    A.  Yeah.
25    Q.  Because it's got that ceramic gas

Page 99

1  heater built into the wall; right?
2    A.  Yes.
3    Q.  And those things will heat up pretty
4  good.  That's the good news; right?
5    A.  Yes.  That's one of the bathrooms.
6    Q.  And then the next one -- Actually,
7  it's two of them of the kitchen.  And are
8  those cabinets wood?
9    A.  Yes.  I am not sure, sir, but I
10  think they were wood birch.  Those were.
11    Q.  And then we continue with some more
12  throughout the house.  Well, I guess one more
13  which shows a hallway --
14    MR. EXNICIOS:
15      She doesn't have those.
16    MR. MARPLE:
17      Okay.  It doesn't matter.
18    THE WITNESS:
19      But it is the hallway.
20    MR. EXNICIOS:
21      It's those there.
22    MR. MARPLE:
23      All right.  That's all right.
24    THE WITNESS:
25      It's the hallway.

Page 100

1  EXAMINATION BY MR. MARPLE:
2    Q.  That's fine.  I mean, it's kind of a
3  little more of the same.  Let me show you the
4  next group.
5    MS. BERTAUT:
6      That should be 5, right?  That
7    should be 5.
8    MR. MARPLE:
9      Are we ready for 5?
10    MR. EXNICIOS:
11      Yes.  The last pictures were 4.
12    MS. BERTAUT:
13      Yes.
14  EXAMINATION BY MR. MARPLE:
15    Q.  I'll show you what we have marked as
16  Exhibit 5.  And that's the infamous green
17  pickup truck of your husband; right?
18    A.  Yes, sir, it is.
19    Q.  And he likes that truck, doesn't he?
20    A.  He loves it.
21    Q.  And I like it, too.  And then your
22  little minivan, we can see a little bit of the
23  van that you had, I believe, there.  Is that
24  right?
25    A.  Yes, sir.

Page 101

1    Q.  Were these photos -- And then
2  there's one of the outdoor of the house.  Were
3  these taken at the same time as these others?
4    A.  Yes, sir, they were.
5    Q.  All right.  And this is an accurate
6  representation of what your house and actually
7  the vehicles looked like pre-Katrina?  Even
8  though it was taken a little while before
9  Katrina, things hadn't changed much?  Is that
10  right?
11    A.  Nothing had changed.
12    Q.  And that same is true in Exhibit 4.
13  Nothing substantially different immediately
14  before Katrina from when those photos were
15  taken maybe a year or so before Katrina; is
16  that right?
17    A.  No, sir, nothing had changed.
18    Q.  Now, I have some after Katrina, I
19  believe, but we'll ask.  Give them to you one
20  at a time.  Let me show you what we have
21  marked as Exhibit 6.  Is that a representation
22  or, excuse me, is that a photo of the house
23  taken sometime not -- You tell me what it is.
24    A.  That's after we returned from Baton
25  Rouge.

GLYNN WADE (MRGO)                                           7/10/2007

Page 102

1      Q.  If it wasn't October 1st, it was
2   sometime not too long after that?
3      A.  Shortly after that.
4      Q.  In October of 2005?
5      A.  Yes, sir.
6      Q.  And by that time you got no water
7   standing on the outside of the house anywhere;
8   correct?
9      A.  No, sir.
10      Q.  And you have got brick that are off
11   the front; correct?
12      A.  Yes, sir.
13      Q.  And as you look at the house and
14   looked at it, that was the main thing you saw
15   from the outside looking at the house, was
16   that window, picture window being out and
17   those brick being off?
18      A.  Yes, sir.
19      Q.  And is that blue, I am not sure what
20   it is -- blue tarp, is that one you bought or
21   is that some FEMA blue tarp?
22      A.  I don't remember where my husband
23   got that from.  But I am willing to think that
24   it was probably FEMA giving it out.
25      Q.  And they gave out blue tarps to put

Page 103

1   kind of -- It's something that became very
2   familiar around New Orleans, blue tarps on top
3   of houses, right, over the roofs?
4      A.  Yes, sir.
5      Q.  And that was primarily for people
6   that had roofs blown off or shingles blown off
7   and they put the blue tarps over them
8   supposedly to keep them from leaking and
9   getting rain in them, right, rainwater?
10      A.  Yes.
11      Q.  You saw a lot of those around town;
12   right?
13      A.  Yes, I did.
14      Q.  And you know some people that had
15   them?
16      A.  Yes.
17      Q.  Let me show you Exhibit 7, and is
18   that another post-Katrina photo taken about
19   this same time, in October, 2005 sometime?
20      A.  Yes, it is.
21      Q.  And in that if you just look, you're
22   not seeing any damage anywhere, are you?
23      A.  Well, I could -- I can see the
24   damage from where my bricks are missing near
25   my door, my front door.

Page 104

1      Q.  As we look around in the back,
2   that's of the sun room.  Is that correct?
3      A.  Yes, it is.
4      Q.  And from just visual observation,
5   you don't see any damage, right?  Other than
6   what you told us about where the brick are
7   off.
8      A.  Well, you can't see it, but there
9   was -- not on the outside, but on the inside.
10      Q.  Right.  I'm just talking about the
11   inside.  And then if we look at that photo at
12   the bottom of that one you're looking at,
13   which we have marked as Exhibit 7, you see a
14   few little -- you see some shingles, right,
15   almost above the door there that are a
16   different color?  Were those some of the ones
17   that were damaged that you had to have
18   replaced?
19      A.  I don't know.  I don't know.  My
20   husband took care of all of that.
21      Q.  Let me show you what we have marked
22   as Exhibit 8.  And this is after you had at
23   least begun to gut the house; right?
24      A.  Yes.
25      Q.  So how long after Katrina were these

Page 105

1   taken?  It would have been in this March or
2   early March, 2006 range?  Or actually maybe
3   before that?
4      A.  No.  No, this was along about --
5   Now, I'm not sure.  So much happened.  But I
6   would almost think that it was around December
7   of '05.
8      Q.  So by December '05 you had the
9   drywall, or sheetrock as some people call it,
10   stripped out of there; right?
11      A.  Yes, sir.
12      Q.  And this ceiling that we're looking
13   at, is that a new ceiling or is that the one
14   that had been in there?  You look at that
15   recessed light.
16      A.  That's the one that had been in
17   there.  But it doesn't really show.  They had
18   some mold on the ceiling, too.
19      Q.  And what I am getting at, I can't
20   tell if these ceiling fans are the new ones or
21   not.  Can you tell?
22      A.  Those are old, but we had to take
23   all of that down and rip out the ceiling.
24   They had mold inside of the ceiling.
25      Q.  So you think what we're seeing

GLYNN WADE (MRGO)                                          7/10/2007

Page 106

1   there, at least on the ceiling, those fans and
2   everything came out?
3        A.   When we had to rip the ceilings,
4   yes, all of that had to come out.
5        Q.   All right.  Now we get to a little
6   happier story, I hope.
7             MR. EXNICIOS:
8             9.
9   EXAMINATION BY MR. MARPLE:
10       Q.   I show you what we have marked as
11  Exhibit 9.  That's what your house looks like
12  today; right?
13       A.   Thank God, yes, sir.
14       Q.   And that was taken about when?
15       A.   About two weeks ago.
16       Q.   Recently this year, and you have got
17  the plants in the yard that are all -- have
18  the stuff around them, things around them
19  looking nice and the birdbath and all of that;
20  right?
21       A.   Yes, sir.
22       Q.   Were those plants and flowers in the
23  front, did you put those in or did you hire
24  somebody to put those in?
25       A.   We couldn't afford to hire anybody

Page 107

1   to put them.  Mr. Wade put it in.  We can't
2   afford a gardener.
3        Q.   And what about the brick that's now
4   been replaced on the front?  Was that a
5   contractor who did that --
6        A.   One of --
7        Q.   -- in front of your house?
8        A.   One of the contractors that worked
9   on our house, yes, he rebricked it, yes.
10       Q.   When you pull up to the house now,
11  just looking at it visual, does it look pretty
12  to you with all of that out front?
13       A.   To me it does.
14       Q.   It does to me, too.
15            Let's look at what we have marked
16  as Exhibit 10.  And that's what your kitchen
17  looks like today looking into the front room.
18  Am I right?
19       A.   Yes, it does.
20       Q.   And all of those cabinets are new;
21  correct?
22       A.   Brand new.
23       Q.   And the appliances are all brand
24  new; right?
25       A.   Everything in the kitchen, and

Page 108

1   you're looking also into my dining room,
2   everything is brand new.
3        Q.   The countertops, the microwave, the
4   hood, the double refrigerator, the light
5   fixtures, the fan, all brand new?
6        A.   Yes, sir, because if you recall the
7   pictures you had showed me previously,
8   everything was gutted out.  So we had to get
9   brand new everything.
10       Q.   And these are nice appliances, nice
11  looking; right?
12       A.   Well, I got what I could afford.
13       Q.   And everything works really nicely,
14  the appliances?  You haven't had any problem
15  with them yet, have you?
16       A.   No.
17       Q.   And the floor, the tiling there, is
18  that new or is that the older tile?
19       A.   That's the old tile.
20       Q.   So you salvaged the floor?
21       A.   We salvaged what we could, yes.
22       Q.   At least in this room.  And those
23  doors we see which are those six-panel doors,
24  those are new, too; right?
25       A.   Now, --

Page 109

1        Q.   See this one door that's opening
2   there down towards the --
3             MR. EXNICIOS:
4             (Indicating).
5   EXAMINATION BY MR. MARPLE:
6        Q.   -- dining room?
7        A.   Oh, no.
8        Q.   Those are brand new, right?
9        A.   Yes.
10       Q.   All the hardware on the doors are
11  new?
12       A.   Everything is brand new.
13       Q.   Right.  And all the furniture, you
14  may have mentioned this, but all of the dining
15  room furniture that we can see, and even what
16  we can see of the kitchen table, that's all
17  brand new?
18       A.   Everything we had in the house
19  before Katrina we lost.  We had to buy brand
20  new everything.
21       Q.   And then Exhibit 11 is another view
22  from the kitchen into the dining room.
23  Correct?
24       A.   Yes, sir.
25       Q.   And I am going to ask you, somebody

Page 110

1    did a really nice job of painting that house,
2    the walls and the colors and the baseboards
3    and everything. Right? Who did that?
4        A.  The men, the contractor from
5    Jamaica.
6        Q.  And he's good, because you look up
7    there along your ceiling line, he got those
8    lines perfect, didn't he?
9        A.  He and his workers. But I selected
10   the colors.
11       Q.  Well, and it's a little different --
12   different color scheme than what you had
13   before; right?
14       A.  Yes, sir.
15       Q.  Brighter, I'd call it more modern.
16   Would you agree with me on that? Hip?
17       A.  Beginning of newness, happiness,
18   life.
19       Q.  And it is newness and happiness and
20   life when you look at it even in the photo or
21   in real life; right?
22       A.  I think it is.
23       Q.  And then the next one we marked as
24   12 is -- You're going to have to tell me which
25   room this is. I am not positive if this is

Page 111

1    the front room or another room. Is that the
2    dining room, the same room we have -- Yes.
3        A.  The dining room.
4        Q.  Is that the room you walk into when
5    you walk in the front door? I can't
6    remember.
7        A.  No, sir. This is -- This is down
8    the closed-in sun porch.
9        Q.  Oh, this is the -- what was started
10   out as a screened-in porch that you closed in
11   and now it looks like this?
12       A.  Yes, sir.
13       Q.  All right. You have to admit it got
14   spruced up pretty darn good in this redo;
15   right?
16       A.  Well, I think it came out pretty
17   decent.
18       Q.  And that's new flooring then I bet
19   in there, isn't it?
20       A.  Yes, sir, it is.
21       Q.  And I am not sure that this is --
22       MS. BERTAUT:
23       13.
24   EXAMINATION BY MR. MARPLE:
25       Q.  It looks so pretty I don't want to

Page 112

1    put a sticker on it almost. I don't know if
2    that -- Is that the same bathroom we looked at
3    in an earlier photo, or not?
4        A.  Yes, it is.
5        Q.  And so what about -- Is the floor
6    new there?
7        A.  No, it's the same floor before
8    Katrina.
9        Q.  But everything else is new; right?
10       A.  Yes, sir.
11       Q.  And the one we're looking at, the
12   bathroom, that's the same bathroom now updated
13   is Exhibit 13; correct?
14       A.  Yes, sir.
15       Q.  And the next one I believe -- Well,
16   you're going to have to tell me. Is that the
17   master bedroom?
18       A.  Yes, it is.
19       Q.  And that's the same room that we
20   looked at earlier, now that it's updated,
21   because we had one of the master bedroom.
22   Right?
23       A.  That's correct.
24       Q.  And 14's a redo of the bed, all of
25   the furniture, the ceiling fan, every -- the

Page 113

1    curtains, everything in there is new except
2    the floor; right?
3        A.  No, I had carpet before in the
4    master bedroom. This time I have tile.
5        Q.  And the tile is new then?
6        A.  Yes, sir, it is. I told you, I used
7    -- we used our life savings to redo our
8    home.
9        Q.  Let me show you -- I am not going to
10   mark it right away, but is that the house
11   that's immediately to your left if you stand
12   in your yard looking at the street? It is,
13   isn't it? Because we can see that white vinyl
14   fence that's next to your house.
15       A.  Let's see. From where I am sitting,
16   yeah, it would be to the left.
17       Q.  If you walked out your front door
18   and just stood facing Bundy --
19       A.  It would be to the left.
20       Q.  And that's -- is that where one of
21   the neighbors lived, I believe you described
22   them as the younger couple?
23       A.  Yes, sir.
24       Q.  And they're back in their house;
25   right?

GLYNN WADE (MRGO)                                    7/10/2007

Page 114

1    A.  Yes, sir, they are.
2    Q.  Did they get theirs redone before or
3  after yours?
4    A.  We were doing it around the same
5  time.
6    Q.  All right.  And do you know if
7  that's a new roof on their house or that's the
8  pre-Katrina roof?  Do you know?
9    A.  It's the pre-Katrina roof, because
10  we both used the same roofers and we got roofs
11  on or about the same time by the -- our
12  neighbor who is a roofer.
13    Q.  And am I to understand that this is
14  the neighbor that did your roof that lives
15  there?
16    A.  No, sir.  Uh-uh (negatively).
17    Q.  Okay.  And did they have any damage,
18  do you know, that they had to have repaired
19  post-Katrina to the roof?
20    A.  I don't know.  I was in Destrehan.
21    Q.  I am just going to mark that
22  neighbor's house as 15.
23         And then I am going to show you
24  what we marked as Wade 16.  That's the next
25  neighbor down from where we're looking.  Is

Page 115

1  that right?  The gray house in Exhibit 16?  Or
2  white house?
3    A.  Yes.
4    Q.  And do you know those people?
5    A.  I don't know them personally, but
6  they were my neighbors, but they haven't moved
7  back in their home yet because of damage.
8    Q.  Right.  And I can't tell if that
9  truck is in their driveway or the house next
10  to them, but it looks like -- that big red
11  truck and that little red car.  Do you know?
12    A.  That's in the younger couple's
13  driveway.
14    Q.  Which would be the next drive down?
15    A.  Next to my house.  Left.  But the
16  white house is next to them.
17    Q.  Right.
18    A.  But the people have not moved back
19  in yet because I think they are waiting for
20  the Road Home money.  Their house has been
21  gutted.  All of us had, every one of us had,
22  in the neighborhood had to get our homes
23  gutted out because of the water damage.
24    Q.  All right.  And then the next house
25  down has got I'll call it a pinkish roof.  You

Page 116

1  see that one.  Do you know those people?
2    A.  I don't know them personally.
3    Q.  Let me show you what we have marked
4  as Wade 17.  And we're just moving down the
5  street to the left if you walked outside your
6  door and stood facing the street.  Right?
7  We're still moving the same direction down the
8  street.  Is that right?
9    A.  That's correct.
10    Q.  Do you see the house then that's got
11  what would appear to be roof damage on it, the
12  next house down the street?  Do you know those
13  people?
14    A.  I don't know them.  But I know they
15  live down -- they lived down the street from
16  me.  My husband and me.  I am not sure if they
17  have -- I don't think they have returned
18  either.
19    Q.  All right.  And does that look -- I
20  mean, can you see the roof damage on that
21  house?
22    A.  Yes, sir, I can.
23    Q.  And then if you look on down the
24  street, we see it looks like there's one or
25  two FEMA trailers down there; right?

Page 117

1    A.  Yes, sir.
2    Q.  Do you know any of those people down
3  there that have those FEMA trailers?
4    A.  No, I don't.  Sir, in our
5  neighborhood, we speak.  The men congregate
6  together and con-- you know, help each
7  other.  Those that are not able to cut grass,
8  the other ones would assist them to keep all
9  the lawns nice and neat so our subdivision
10  would be very clean and neat looking.  But the
11  women wave, speak, "Hello, neighbor."  The
12  majority of the men, the older men are
13  retired, but us wives are still working.  So
14  we wave, say hello, and we really don't visit
15  or know each other personally.  But we do
16  speak and say, "Hello, neighbor."  I don't
17  know these people.
18    Q.  And if we look at Exhibit 18, that's
19  another view of that same house that appears
20  to have the roof damage.  Right?
21    A.  Yes, sir.  But may I just say this,
22  too?
23    Q.  Sure.
24    A.  The houses -- The roofs that were
25  damaged bad, Mr. Allen did not do their roof

                          30 (Pages 114 to 117)

GLYNN WADE (MRGO)                                                7/10/2007

Page 118

1    -- roofs.  These are old.  It's my roof, my
2   younger neighbors' roof, we all got ours, and
3   some of the people across the street, a few of
4   them that could afford to, because when one
5   started doing something with the home, those
6   that could afford to would do something, too.
7   So when Wade and I decided to get our brand
8   new roof, then our young couple neighbors
9   decided to get a brand new roof and a few
10  across the street, husband and wife that was
11  school teachers, and I think maybe the couple
12  that was both postmen, both are -- both work
13  for the Post Office got new roofs.  But the
14  rest of the people, they didn't get new roofs
15  before Katrina and I would imagine they
16  couldn't afford to because their houses are
17  still vacant now.  They are waiting for Road
18  Home money to even try to do something to
19  their homes.
20      Q.  If you're going to live out on Bundy
21  Road, you have to keep up with the Wades;
22  right?
23      A.  Not really, no.  The Wades don't
24  have anything either.
25      Q.  Let me show you another photo.  This

Page 119

1   is yet a different house I believe in 18.  You
2   tell me.  It may be across the street or back
3   the other way from you.  Are you able to
4   tell?  I can give you a little help here by
5   putting it in perspective.  If we see this
6   house and then there are some others.  I am
7   trying to see if you can tell me where that
8   one is in relation to your house, if you
9   know.
10      A.  I don't know, but I think it's on
11  the same side that my house --
12      Q.  Going the other way, right?
13      A.  I believe so, yes.
14      Q.  And that house that we're looking at
15  in Wade 19, and I am going to mark it --
16      MS. BERTAUT:
17          20.
18      MR. EXNICIOS:
19          This is your first one?  Yes,
20      this is the first one.
21  EXAMINATION BY MR. MARPLE:
22      Q.  In Wade 19 and 20, and in particular
23  we see where it's the focus in Wade 19, it's
24  nearby your house; right?
25      A.  Yes, sir.

Page 120

1       Q.  And that one's got --
2       A.  It's heading towards Chef Highway, I
3   believe.
4       Q.  And it's got more roof damage than
5   either of the other ones we looked at, but
6   it's kind of the same type of roof where they
7   didn't get it replaced probably before Katrina
8   would be your view of that; right?
9       A.  I think so.
10      Q.  And those people don't appear to be
11  back in there either, do they?
12      A.  As I said, from talking with my
13  husband and the men in the neighborhood, many
14  of the neighbors are waiting for the Road Home
15  money.
16      Q.  Were you among the first to get the
17  Road Home money you think in your
18  neighborhood?
19      A.  I don't know.  I do know the younger
20  couple and I got our money about the same
21  time.  But my husband, in talking with me,
22  said that a lot of the men in the neighborhood
23  are saying they're waiting for the Road Home
24  money.
25      Q.  And then they're going to redo and

Page 121

1   move back in, most of them?  That neighborhood
2   is coming back when people get the money to
3   redo; right?
4       A.  They plan to.
5       Q.  Unlike some other neighborhoods,
6   wherever they might be in Lower Ninth or
7   Chalmette or some place, where they're not
8   coming back, at least very quickly like your
9   neighborhood.  Your neighborhood is vibrant.
10  There are people there doing stuff and wanting
11  to do stuff; right?
12      A.  Well, it's mostly people in their
13  60s and 50s and 40s that are still working and
14  trying to salvage their homes.
15      Q.  I don't know if you'll be able to
16  help or determine anything in here, but this
17  is a Google photo that's taken after Katrina
18  and after the water is down and it's got your
19  house identified there.  The way I --
20      A.  Take my glasses off.  These are
21  brand new glasses.
22      Q.  Mine, too.  I bought some new ones
23  just to come over here so I could see.
24      A.  Which one is my home?
25      Q.  If you look in the middle here, it's

31 (Pages 118 to 121)

GLYNN WADE (MRGO)                                                    7/10/2007

                                                                    Page 122

1    got a little square.  Do you see that?
2        A.  Yes, sir.
3        Q.  And I don't know if you can look at
4    the median there, or not the median, the
5    neutral ground and then the cut-through on the
6    neutral ground, whether you can place your
7    house there on Bundy Road or not, identify
8    it.
9        A.  No, I can't.  But I know it would be
10   one of them that did not have the tarp.
11       Q.  Right.  It's along in there
12   somewhere in the center of this photograph
13   that we're looking at that we have marked as
14   Exhibit 21.  Right?
15       A.  I guess, sir.
16       Q.  And you know that because you see
17   the neutral ground there on Bundy and where
18   the cut-through is and you know approximately
19   where you are; right?
20       A.  Yes, sir.
21       Q.  And then we see almost right there
22   in the middle of that, near where your home
23   would be, a couple of blue tarps.  One on
24   Bundy and then one on the next street over
25   behind it.  Do you see those?  Those blue

                                                                    Page 123

1    tarps?
2        A.  Which one?
3            MR. EXNICIOS:
4            Which one are you talking about?
5        Over here or --
6    EXAMINATION BY MR. MARPLE:
7        Q.  In the center.  If you're here in
8    the middle of this photograph, your house, and
9    you say you're not a blue tarp, --
10       A.  Uh-huh (affirmatively).
11       Q.  -- right?
12       A.  Uh-huh (affirmatively).
13       Q.  You didn't have a blue tarp.  Is
14   that right?
15       A.  No, we didn't.
16       Q.  Then there's two blue tarps, though,
17   right near there, whether it's next door or a
18   house or two down, you see a couple of blue
19   tarps; right?
20       A.  Yes, sir.
21       Q.  And those were the FEMA tarps that
22   people put over their houses when they had
23   roof damage from the wind; right?
24       A.  Yes, sir.
25       Q.  And there's a few others that are

                                                                    Page 124

1    across the street or a little ways away that
2    you can see in that photo, too, of some other
3    blue tarps in the general neighborhood of
4    where you are; right?
5        A.  Yes, sir.
6        Q.  Let me show you what we have marked
7    as Wade Exhibit 22.  And this has got some
8    file stamps on it, "Custodian of records".
9    I'll represent to you it's a public record.
10   You can go down to the -- whichever records
11   office you go to and get these things.  Just
12   so you know where they come from.  And this is
13   some paperwork you signed in connection with
14   getting your Road Home money.  Right?
15       A.  I guess it is.
16       Q.  I mean, you see, if you look on the
17   back pages there, that you have signed it.
18   Not the very back.  I guess the second-to-last
19   page, 4 or 5.  Glynn Williams LeBlanc Wade.
20   Did I get that right?
21       A.  Well, I divorced from Mr. LeBlanc,
22   but they said we had to put LeBlanc's name in
23   there because that was the only way they could
24   recognize me or pull my name up.  But I am --
25   Glynn Williams is my maiden name and I am

                                                                    Page 125

1    married to Adolph Wade and I am divorced from
2    Classy LeBlanc.
3        Q.  And is that your husband's signature
4    there, Adolph Wade?
5        A.  Yes, it is.
6        Q.  He was there somewhere and signed
7    this himself; right?
8        A.  Oh, yeah, he was there for the Road
9    Home meeting.
10       Q.  And was this one of the documents
11   that you signed -- Well, let me just ask.  Do
12   you sort of have a closing like you do when
13   you have a real estate loan and you go in and
14   sign a bunch of papers and then at the end of
15   all of that they hand you the check?
16       A.  No, they didn't hand us the check.
17   But the check came shortly after.
18       Q.  But what about the other part?  Do
19   you go in somewhere personally and sign all of
20   this stuff or is this done just -- you do it
21   and send this in and --
22       A.  No, we went into the office where it
23   was located; if I recall, Jefferson Parish.
24       Q.  And do you understand that what this
25   talks about is some of the restrictions on

                                                    32 (Pages 122 to 125)

GLYNN WADE (MRGO)                                              7/10/2007

Page 126

1  selling your house and you've got to live in
2  it yourself and all of that sort of thing that
3  are the rules and regulations in order to get
4  the Road Home money?
5      A.  Yes, I do.
6      Q.  And this gets filed up in the public
7  records, so that anybody that might try to buy
8  your house or whatever would know that it's
9  subject to these Road Home restrictions?  Do
10 you have a general understanding of how that
11 works?
12     A.  Yes, sir.  But we won't be selling
13 that house.  We'll die in that house.
14     Q.  I understand.  And the agreements
15 there -- Well, did you have any lawyers
16 helping you on this deal?
17     A.  No, sir.
18     Q.  On the application for Road Home?
19     A.  No.
20     Q.  Or anything else?
21     A.  No.  No.  I filled it out myself.
22     Q.  And in the middle of the page there,
23 under "Agreements", do you see there on the
24 first page where it says that "Now, therefore,
25 and in consideration of receipt of all grant

Page 127

1  proceeds as compensation for damages incurred
2  by the owner due to the hurricane and in order
3  to mitigate future damage from hurricanes and
4  similar natural disasters", you make the
5  following agreements?  Do you see that?
6      A.  You on the first page?
7      Q.  Yes, right in the first page where
8  it says "Agreements".
9      A.  Oh, "Agreements".  Okay.
10     Q.  Maybe you could just read that out
11 loud, that first sentence to us.
12     A.  The one that says "Covenant not to
13 sell the property"?
14     Q.  No, the one that begins "Now
15 therefore" right under the word "Agreements".
16     A.  Help me.
17         MR. EXNICIOS:
18           Where are you trying to start?
19 EXAMINATION BY MR. MARPLE:
20     Q.  Right under the word "Agreements".
21 And it starts "Now therefore".
22     A.  "Now therefore --"
23     Q.  Right.
24     A.  " -- and in consideration of receipt
25 of all grant proceeds as compensated for

Page 128

1  damages incurred by the -- by the owner due to
2  the hurricane --"  That's not true,, "And in
3  order to mitigate further damage from
4  hurricanes and similar natural disasters,
5  owner hereby makes the following covenants and
6  agreements with respect to the property, which
7  covenants and agreements shall constitute
8  covenants and restrictions running with the
9  encumbered property --"
10     Q.  Yes, you can stop."  That's first
11 sentence that what I was after.  It says "Now
12 therefore and in consideration of receipt of
13 all grant proceeds," and you got the grant
14 proceeds from the Road Home Program; right?
15     A.  Yes, sir, we did.
16     Q.  "As compensation for damages
17 incurred by the owner due to the hurricane".
18 Did you understand that you were getting that
19 money as compensation for damages incurred by
20 the hurricane from the government?
21     A.  Not compensate, but to help us to
22 finish with our house or whatever other
23 expenses that was needed.
24     Q.  And that's what I--
25     A.  This Road Home money could not

Page 129

1  compensate for the money we have spent on
2  getting our house.
3      Q.  And it compensated for part of it;
4  right?
5      A.  For some of it.
6      Q.  Some of it.  $70,000 -- Well, you
7  tell me, what did you get from Road Home?  Was
8  it 70?  I can't remember.
9      A.  No, sir.  I said we got 22,000 from
10 Road Home.
11     Q.  22,000 from Road Home.  Do you know
12 how they figured that?
13     A.  No, sir, I have no idea.
14     Q.  Because you can get up to 150,000 is
15 your understanding; right?
16     A.  No, I didn't -- I never knew how
17 much you could get.
18     Q.  You can get a lot more on --
19     A.  Most of the people I know didn't get
20 anything.
21     Q.  And do you know why you got 22,000
22 as opposed to some other number?  Did they
23 tell you why you got the 22,000?
24     A.  No, sir.
25     Q.  And are you satisfied with that

GLYNN WADE (MRGO)                                          7/10/2007

|  | Page 130 |
|---|---|

1   22,000?  I mean, did you appeal or anything?
2      A.  No, I did not appeal because my
3   husband and I figured if they run out of money
4   we best take what they offer us.  Appeal it?
5   We may never live to get it.  So we took what
6   was offered.
7      Q.  I may have asked you this earlier,
8   but do you have a file that has your Road Home
9   application or any --
10      A.  No, sir, I didn't keep up with that.
11      Q.  -- correspondence?
12      A.  After we got the money I did not
13   keep that.
14      Q.  And I am just trying to understand
15   your view of the Road Home money.  It was
16   partial compensation to you for your injury
17   due to the hurricane.  Is that right?
18      A.  It was not partial.  I would say a
19   small amount.
20      Q.  A small amount of compensation,
21   $22,000 worth of compensation?
22      A.  Yes.
23      Q.  For your injury; right?
24      A.  Yes, sir.  That's correct.
25      MR. MARPLE:

|  | Page 131 |
|---|---|

1         I need to take a little break and
2   I don't know --
3      MS. BERTAUT:
4         It's noon.
5      MR. MARPLE:
6         -- if we want to take a break.
7      MR. EXNICIOS:
8         It's noon.  How much longer do
9   you have?
10      MR. MARPLE:
11         Not very much longer.
12      THE WITNESS:
13         Not very much longer?
14      MR. MARPLE:
15         Don't hold me to it, but 45
16   minutes, 30 minutes, you know, an
17   hour.  I don't know, somewhere in that
18   range.
19      MR. EXNICIOS:
20         I don't think she believes you.
21      MS. BERTAUT:
22         No, I am just -- Where is this
23   going?  So you don't want to break for
24   lunch?  You want to take a little
25   short break?

|  | Page 132 |
|---|---|

1      MR. MARPLE:
2         That's fine.  That's where I was
3   going.  We need to ask the witness.
4   Can we go off the record?
5      VIDEO OPERATOR:
6         We're off the record.  It's
7   12:04.
8         (Recess.)
9      VIDEO OPERATOR:
10         Now returning to the record.
11   It's 12:18, start of tape 3.
12   EXAMINATION BY MR. MARPLE:
13      Q.  Mrs. Wade, do you have any family
14   members that had personal injuries from
15   Katrina?
16      A.  No, sir.
17      Q.  And I take it then you didn't have
18   any deaths of people in your family?
19      A.  No, sir.
20      Q.  Were there any people that you knew
21   that did die as a result of Katrina?
22      A.  None.
23      Q.  And you may have told us this, but
24   with respect to the mental distress or
25   emotional distress you have described, I think

|  | Page 133 |
|---|---|

1   you told us you hadn't been to a psychiatrist
2   or anybody.  Have you been to any kind of
3   health professional for that?
4      A.  No, sir, but this is what my job did
5   for all of us that had to work the shelters.
6   They had trainings whereas we had
7   debriefings.  We had many, many trainings
8   where we were able to actually discuss the
9   experiences we had and how they traumatized
10   us.  But that was as a group of State workers,
11   and it was mandatory for us who had worked the
12   shelters.
13      Q.  And did you find that helpful?
14      A.  It was extremely helpful.
15      Q.  And you can tell me if I am leaving
16   something out, but what I understood from
17   today, your big losses were the damage to your
18   house and some losses of heirlooms, but your
19   house is now put back together very nicely.
20   Right?
21      A.  My house is put back together.
22      Q.  I mean, is there anything you want
23   to do differently about what it looks like
24   than how you did it when you had it redone?
25      A.  I don't know, I probably would have

GLYNN WADE (MRGO)                                             7/10/2007

Page 134

1  to think about it. But --
2     Q. You do have all of those pretty
3  colors that are varied throughout the house.
4  I couldn't count them, but there's three or
5  four, five very bright colors that you
6  described to us, but each room almost has its
7  own color scheme. Right?
8     A. Yes, sir.
9     Q. And those are colors that you picked
10 personally, I take it?
11    A. Yes, sir.
12    Q. Was Mr. Wade involved in picking the
13 colors?
14    A. No, sir. He let me do it. He
15 selected the clock.
16    Q. All right. You brought up the clock
17 so now there's my opening. I wanted to talk
18 about the clock. For want of a better word,
19 I'll call it a coo-coo clock, but it's
20 probably not the name of it, but I am going to
21 describe it and you correct me or fill in
22 behind me. It's got jewels around it and
23 every hour or maybe more often it plays one of
24 about six or seven different pieces of music.
25 Correct?

Page 135

1     A. That's not real jewels now.
2     Q. I assumed they weren't, but I didn't
3  want to say they were rhinestones because I
4  thought you might correct me and say they were
5  diamonds.
6     A. No. No.
7     Q. And it plays "Love me tender" and
8  "Imagine" by the Beatles, and I can't
9  remember all of them, but I got a couple of
10 them right; right?
11    A. Yes, sir.
12    Q. Well, what's the history of that
13 clock? Where did you get it?
14    A. My husband was shopping in Sam's one
15 day and he saw it and he bought it.
16    Q. And you can go over and push the
17 button, and I don't know if it plays all seven
18 or eight that are on there, but it'll start
19 playing them if you want?
20    A. Right. Every hour in the day, and
21 it's $98 --
22    Q. I beg your pardon?
23    A. -- at Sam's. It's $98 at Sam's.
24    Q. I know, and I might get one if I can
25 find one over at Sam's at home.

Page 136

1     A. Airline. Airline Highway.
2     Q. And that's just something he liked
3  and enjoys; right?
4     A. Yes, sir.
5     Q. And it's a conversational piece,
6  too; right?
7     A. Yes, sir.
8     Q. I mean, anybody that comes into that
9  front door and is in that front room the first
10 time probably is going to say something or
11 comment or look at it?
12    A. Yes, sir.
13    Q. And your husband will say, "Go push
14 the button"; right?
15    A. Yes, sir.
16    Q. Like he did to me?
17    A. Uh-huh (affirmatively).
18    Q. Were you paid the entire time by the
19 State during and after Katrina?
20    A. Yes, sir.
21    Q. I mean, did you keep your same
22 salary and everything?
23    A. Yes, sir.
24    Q. Did it go up?
25    A. No, it didn't go up, but the fact

Page 137

1  that we were working 12 hours a day, we were
2  being paid 12 hours a day. And many days we
3  worked seven straight days without a day off.
4     Q. Did you get paid overtime? Is that
5  what I understand?
6     A. We got a little bit. We got a
7  little overtime.
8     Q. Did you get comp time for the extra
9  time you worked?
10    A. No, sir.
11    Q. Were you -- I may have just missed
12 it. Were you compensated in some way for
13 that?
14    A. We got overtime.
15    Q. You don't have any complaint with
16 the State about how much you got paid for how
17 many hours you worked?
18    A. They didn't pay us for all the hours
19 we worked, but I'm thankful to God for what I
20 did get.
21    Q. Were either you or your husband
22 operating any kind of business, little
23 business of any kind other than your job, his
24 as a welder and yours as a social worker?
25    A. No, my husband is a retired welder.

35 (Pages 134 to 137)

GLYNN WADE (MRGO)                                    7/10/2007

Page 138

1  He retired in 1997.
2      Q.  I thought I understood, and I may
3  have gotten this wrong, and I thought he
4  continues or continued --
5      A.  Part time.  He was working part time
6  before Katrina.  About four hours, five days a
7  week before Katrina.
8      Q.  And he's not worked as a welder
9  since then?
10     A.  No, sir.  They haven't opened the
11 shop back yet completely.
12     Q.  And tell us how old your husband is?
13     A.  He is 75 years old.
14     Q.  And he gets Social Security, I take
15 it?
16     A.  Yes, sir.
17     Q.  Does he have any other kind of
18 pension or --
19     A.  We had the shares.
20     Q.  -- military retirement?
21     A.  No, sir.  But we had the shares of
22 which, since Katrina he pulled it out to help
23 to get that house together.
24     Q.  Who do you blame for the damages
25 that you're seeking in this lawsuit?

Page 140

1  have to pay a higher flood insurance premium.
2  Did you understand that at all?
3      A.  My insurance, my Allstate Insurance
4  person did not say that, but I know since
5  Katrina flood insurance and homeowner's
6  insurance has gone up tremendously and since I
7  had to pay so much, I just told them to, for
8  flood insurance, let me have at least $100,000
9  worth.
10     Q.  And --
11     A.  Even without that, it's gone up.
12 Homeowner's and flood insurance.
13     Q.  Is there any kind of subsidy or
14 assistance that you're getting with respect to
15 paying any flood insurance premiums or
16 homeowner's premium?
17     A.  No more than my salary and his
18 retirement.
19     Q.  Have you talked about or thought
20 about the risk or likelihood of your house
21 flooding again?
22     A.  Yes, sir.
23     Q.  And what are your thoughts on
24 whether -- on how likely that is?
25     A.  I know it's a very high chance that

Page 139

1      A.  I blame no one.
2      Q.  And how is that?
3      A.  How can you blame someone?
4      Q.  Because the hurricane is an act of
5  God?
6      A.  That's what I am told it is.
7      Q.  Was there any -- Were there any
8  requirements when you redid that home or as
9  part of the Road Home money or anything that
10 you raise your house up or do anything like
11 that?
12     A.  They didn't require us to do that.
13     Q.  Have you ever looked at the
14 floodplain or flood risk of your house to know
15 if it's a category 1, 2, 3, 4, something else,
16 whether it's high or low or anything like
17 that?
18     A.  I don't understand that question.
19 Rephrase that, please.
20     Q.  Sure.  It wasn't a very good
21 question.  At least for determining flood
22 insurance premiums --
23     A.  Uh-huh (affirmatively).
24     Q.  -- there's categories of risk for
25 homes.  So if you're a high risk area, you may

Page 141

1  it can happen.  It can happen this year.
2  Because they preparing us State workers now,
3  training us so that if and when it happens and
4  we have to evacuate, we go back to shelters
5  again to work.
6      Q.  And the State's trying to prepare
7  better than they did the first time around, or
8  at least during Katrina so that they will be
9  better prepared the next time; right?
10     A.  Well, prepare State workers to be
11 more -- to know more about how to service
12 people in the shelters.
13     Q.  And even though you know that that
14 risk of flooding again is there, you have
15 nevertheless chosen to redo that house and
16 still live in the same house that flooded
17 during Katrina; right?
18     A.  Sir, we can't afford to move.
19     Q.  Do you not want to live where you're
20 living?
21     A.  I want to live where I am living.
22     Q.  I mean, is there some other area or
23 house that you have identified that you'd
24 rather be living in right now than the one
25 you're living in?

36 (Pages 138 to 141)

JOHNS PENDLETON COURT REPORTERS              800 562-1285

GLYNN WADE (MRGO)                                                    7/10/2007

| Page 142 | Page 144 |
|---|---|

**Page 142**

1    A.  I haven't even looked because I know
2  I cannot afford another house.
3    Q.  I may have asked you this.  I
4  apologize if I repeat it.  Did you ever have
5  problems with the pumps not pumping the water
6  out other than Katrina in your neighborhood?
7    A.  No, sir.  Never.
8    Q.  You heard about that around town
9  sometimes that it rained too much or the pumps
10  didn't work, the water would build up in the
11  streets and flood?
12    A.  We never had that in our
13  neighborhood.
14    Q.  Do you have any photos or videos or
15  anything that were taken during Katrina?
16    A.  No, sir.
17    Q.  Or any photos of any of the breaches
18  of levees around the New Orleans area?
19    A.  No, sir.
20    Q.  Did you have any of the soil tested
21  in your yard or otherwise to know if you got
22  any kind of contamination there?
23    A.  No, sir.
24    Q.  Do you have any suspicion that any
25  of your soil is contaminated with anything?

**Page 144**

1  beautiful gowns I bought throughout the years,
2  because we go to a lot of carnival balls.
3  Beautiful cocktail dresses and what have you.
4  But this was accumulated through years.  And
5  of which I took good care of my clothes.
6    Q.  In connection with the Allstate
7  payment on your flood policy, do you know if
8  you signed any papers where it says you are
9  assigning any right you had to sue somebody to
10  them, subrogation papers?  Do you know if you
11  did that or not?
12    A.  I don't think so.
13    Q.  Do you remember that coming up at
14  all in any discussions --
15    A.  No, sir.
16    Q.  -- where they subrogated, meaning
17  since they paid you for some damage, they want
18  to be able to turn around and sue the
19  Defendants in this lawsuit or somebody else
20  that they think might be responsible?
21    A.  I know nothing about that.
22    Q.  Now, you understand that you have
23  been designated in the lawsuit as a named
24  representative or class representative of
25  other members of a class of people.  Do you

**Page 143**

1    A.  I have never -- I have no idea.
2    Q.  Nobody has suggested to you that it
3  is, I take it, then?  Is that right?
4    A.  No, sir.
5    Q.  You have told us about things that
6  you're seeking money for in this lawsuit
7  today.  We have talked about that quite a
8  bit.  I wondered, is there anything else that
9  we haven't talked about, something that you
10  feel like you should be compensated for in
11  this lawsuit for some injury or damage that
12  you have that we haven't already talked about?
13    A.  No injury.  No injury.  But I would
14  like to be able to get some more -- some of
15  the things that I had in the past that I don't
16  think I would ever be able to afford again.
17  And one thing is like my husband loved his
18  rifles and his fishing equipment.  One thing I
19  owned with pride from working so many years
20  was a full length mink coat.  I will never be
21  able to afford that any more or get another
22  one.
23    Q.  You lost your mink coat in that
24  flood?
25    A.  Yes, sir, I did.  Besides a lot of

**Page 145**

1  have any understanding of what that entails or
2  if that's the case?
3    A.  Well, I have been told that I was.
4    Q.  Do you have any understanding of
5  what your duties are, what all that entails?
6    A.  Well, to my knowledge, I am to share
7  my experiences with Katrina.
8    Q.  Do you know who it is or what the
9  definition is of the people, other people that
10  you're representing in this lawsuit?
11    A.  I think it's persons in the
12  community that suffered the same damages that
13  I have, and my husband.
14    Q.  Do you know what geographical area
15  it encompasses?
16    A.  No.  I think it's New Orleans East.
17    Q.  Do you have any understanding of any
18  costs that you might be responsible for to
19  pay, notice to class members or if you lose
20  the case that there might be costs assessed
21  against you, costs of the lawsuit which might
22  include the cost of depositions and
23  transcripts and some other things?
24    A.  No, but I know I can't afford it.
25  So they could charge me, but I don't have the

JOHNS PENDLETON COURT REPORTERS                         800 562-1285

GLYNN WADE (MRGO)                                        7/10/2007

Page 146

1  money to give it to them.
2      Q.  Has any money been advanced to you
3  by the lawyers in this lawsuit for any reason?
4      A.  No, sir, not at all.
5      Q.  Did you know any of the lawyers in
6  the lawsuit, the lawyers that are representing
7  you, before you talked to the social workers
8  and called up the Andry firm?
9      A.  I never had heard of Andry or Bruno
10 and Bruno until Katrina.
11     Q.  Let me show you -- I am not going to
12 mark this by number, but I want to show you a
13 Complaint that has your name on it.  You see
14 your name up there at the top?
15     A.  Uh-huh (affirmatively).
16     Q.  And you need to answer out loud.
17     A.  Yes.
18     Q.  Thank you.
19     A.  Yes, sir.
20     Q.  Yes.  Thank you.  And do you know
21 the other two people, Dianne Lindsey and
22 Ronnie Lindsey?
23     A.  No, I don't know them, but where are
24 their names?
25     Q.  Up in the caption of the lawsuit up

Page 147

1  there at the top.
2      A.  Oh.  No, never heard of them.
3      Q.  Look at the very last page of this,
4  32.  And it's signed or it's got the name of
5  Frank Elliot.  Correct?
6      A.  Yes, sir.
7      Q.  And now, that's somebody different
8  than Mr. Bruno or Mr. Andry and I am just
9  wondering, without telling me anything that
10 was said by anybody, how you came into contact
11 or how Mr. Elliot came to represent you.
12     A.  I have no idea.
13     Q.  Around this time, this is dated
14 March 13th, 2007, you see that --
15     A.  Yes, sir.
16     Q.  -- when it was filed?  Were you in
17 consultation with lawyers about filing a
18 lawsuit?
19     A.  I knew when I filled out the Form 95
20 or whatever that lawyers would represent me,
21 but as far as counseling with any of them, I
22 have not.
23     Q.  And I am just trying to understand,
24 here's your name and these -- the two
25 Lindseys, which I think you told me you don't

Page 148

1  know them.  Is that right?
2      A.  That is correct.
3      Q.  And then there's lots of pages of
4  allegations and things, you know, said about
5  who did what in here.  And I am just wondering
6  if you have any knowledge or memory of seeing
7  this or contributing anything to this
8  document.
9      A.  No, sir, but I would assume that
10 since I was -- I am a part of the class
11 lawsuit or what have you, then the attorneys
12 that represented would do this, take care of
13 this for me, because I know nothing about the
14 law.
15     Q.  And this particular document, as I
16 understand it, you don't believe you have seen
17 before?  Is that right?
18     A.  To my knowledge I have never seen
19 it.
20     Q.  And the $350 fee that somebody's got
21 checked there on the front, do you see that on
22 the front page down there at the bottom?
23     A.  Yes, sir.
24     Q.  You didn't pay that; right?
25     A.  No, I haven't.

Page 149

1      Q.  Just backing up to Mr. Elliot, tell
2  me, how do you know him again?  I mean, what's
3  your relationship with Mr. Elliot?
4      A.  Mr. N. Frank Elliot?
5      Q.  Right.
6      A.  Never heard of him or seen him in my
7  life.  But I would assume he's an attorney or
8  somebody representing the lawsuit.
9      Q.  And you haven't been up to Lake
10 Charles to meet with him; right?
11     A.  No, sir.
12     Q.  And as far as you know he hadn't
13 come down to New Orleans to meet with you;
14 right?
15     A.  No.
16     Q.  And you haven't emailed anybody
17 named "felliot" at whatever that is on the
18 last page on the email; right?
19     A.  No, sir.
20     Q.  Did you have --
21     A.  Did --
22     Q.  Yes, I'll take that back actually.
23 Let's just make sure --
24     A.  It's with the items?
25     Q.  Let's be safe.  I'll just put a

38 (Pages 146 to 149)

GLYNN WADE (MRGO)                                              7/10/2007

Page 150

1    sticker on it.
2         MR. EXNICIOS:
3         23, I believe.
4    EXAMINATION BY MR. MARPLE:
5         Q.  And the document we have just been
6    talking about has been marked as Deposition
7    Exhibit 23.  Right?
8         A.  Yes, sir.
9         Q.  And it's got a name on it there sort
10   of in the middle of the page that says "New
11   Orleans East Class Action Complaint for
12   Damages"; right?
13        A.  Yes, sir.
14        Q.  And your name's up there among some
15   others that are named individually on behalf
16   of all other similarly situated.  Right?
17        A.  Yes.
18        Q.  With respect to requests for
19   production of documents, that sort of thing,
20   have you received or have any input into
21   answering questions, interrogatories or
22   producing documents other than the
23   photographs?
24        A.  I talked with Gwen who works for
25   Andry Law Firm and I gave her the best from --

Page 151

1    from my memory information.
2         Q.  And that was things you said as
3    opposed to documents; right?
4         A.  Yes.
5         Q.  You said to her.
6         A.  Yes.  I may have had a copy of the
7    -- the -- a copy of the flood insurance check
8    that I gave her.  But all other was from
9    memory.  To my knowledge.
10        Q.  Let me show you what we have marked
11   as Exhibit 24.  And let me make sure I've got
12   everything there.  This is all one document.
13   Actually, there's two staples there.  And
14   Exhibit 24 is a document called "Notice to
15   videotape deposition"; right?
16        A.  Yes, sir, that's what it says.
17        Q.  And it talks about the deposition of
18   you today at the offices of Bruno and Bruno on
19   Tuesday, July 10, starting at 9:00, which we
20   are at Bruno and Bruno and you're being
21   deposed and we started at 9:00; right?
22        A.  9:00, a little after 9:00.
23        Q.  What I was wondering is have you
24   seen this document before?
25        A.  I don't recall ever seeing it.

Page 152

1         Q.  In terms of learning about your
2    deposition, I don't want to know who you
3    talked to or what was said, but somebody in
4    one of the law offices communicated with you
5    and told you your dep was supposed to be
6    today, right?
7         A.  Yes, sir.
8         Q.  And you had a meeting a week or two
9    ago in one of the lawyers' offices to talk a
10   little bit about what was going to happen;
11   right?
12        A.  That's correct.
13        Q.  And that's how you knew when to show
14   up here today at the time you did?
15        A.  Yes, sir.
16        Q.  If you look at the second part of
17   that document called Exhibit A, you see that,
18   and it's got a long list of documents, but
19   have you looked at, seen that document before
20   where somebody was asking you this long, 23
21   items of documents to see if you had any of
22   those to produce?
23        A.  I believe that was given to me, a
24   thick thing and fill out what I could fill
25   out, what have you, maybe about a month or six

Page 153

1    weeks ago.
2         Q.  And let's look at some of these.  Do
3    you have any more of these Standard Form 95s,
4    the ones we looked at?  We had two of them on
5    two different dates.  Do you have any more
6    than those, other than the two we talked
7    about?  Like one for Mr. Wade?
8         A.  I know my husband filled out one,
9    but I don't remember bringing it to work to
10   make a copy.  The one that I do have, it has
11   nothing to do with him and I think I brought
12   it to work and made a copy of it before I sent
13   it, and I think that's the one that the Corps
14   of Engineers sent me, most recent one.
15        Q.  That's the one -- We have already
16   talked about that one.
17        A.  Right.
18        Q.  And all documents that refer or
19   relate to insurance claims, number 3 there,
20   you have some of those documents perhaps in
21   the red box or red file; right?
22        A.  Right.  Right.
23        Q.  And you haven't produced those to
24   your lawyers or to us yet; right?
25        A.  No.

JOHNS PENDLETON COURT REPORTERS                       800 562-1285

GLYNN WADE (MRGO)                                    7/10/2007

---

Page 154

1    Q. Go over on the next page. Number
2  15. All logs or diaries or other writings.
3  Did you keep any diary or log throughout
4  Katrina as to what was going on or your
5  impressions or anything like that?
6    A. No, sir.
7    Q. So I take it you wouldn't have logs,
8  journals or diaries or anything like that --
9    A. No, sir.
10    Q. -- that sets forth anything about
11  what was going on during Katrina while it was
12  happening?
13    A. No.
14    Q. Now, medical records, you'd have
15  some of those; correct? You have got medical
16  records for some of your medical conditions,
17  the prescriptions and at least bills from your
18  doctors and whatnot? Or no?
19    A. No, because, number one, I am a
20  State employee that pays for the Humana
21  program. So when I go to my doctor, all I
22  have to do is pay either a $15 or $25
23  co-payment and Ochsner keep the record, but I
24  didn't have -- it wouldn't have anything to do
25  with Katrina.

---

Page 155

1    Q. That's because none of your physical
2  or medical ailments are -- none of those --
3  you're not attributing any of those to
4  Katrina?
5    A. No, I never did, because they
6  didn't.
7    Q. And with respect to mental distress
8  or emotional distress, you don't have any
9  medical records related to that because you
10  didn't see a health care provider or
11  psychiatrist other than the social work
12  training you had; right?
13    A. That's correct.
14    Q. And I think I asked you this, but
15  you never leased that house on Bundy; you
16  never leased it to anybody, did you?
17    A. No, sir.
18    Q. And the only other place that you
19  leased or rented was the apartment up in
20  Destrehan?
21    A. That's the only one.
22    Q. Have you ever been a party to a
23  lawsuit other than this one? You know, where
24  you sued somebody or they sued you?
25    A. No. Well, --

---

Page 156

1    Q. Divorce. I understand that.
2    A. Divorce and also when my father, not
3  my step-father that died along around the same
4  time of my mother six years ago, but my
5  daughter is 37 and she was about eight. When
6  my dad died, he left his body and fender shop
7  to my daughter and me. She was about eight.
8  And someone in the neighborhood claimed that
9  they fell on the property and injured
10  themselves, and I had to hire an attorney to
11  assist me with that because they were trying
12  to sue me. I would have had to sell my
13  business that my daddy left me, the auto body
14  and fender shop.
15    Q. One of those slip and lawyer -- slip
16  and fall lawyers got ahold of that claim and
17  sued you? Is that what it was?
18    A. No, I didn't say that. Someone in
19  the --
20    Q. I was just kidding.
21    A. Someone in the neighborhood claimed
22  --
23    Q. Yes, I understand that.
24    A. -- that they fell one Sunday on my
25  property.

---

Page 157

1    Q. And did that result in a lawsuit
2  where they actually filed something that had,
3  you know, whatever their name was?
4    A. Well, I'm told -- the attorney said
5  it was a lawsuit, and it cost me quite a bit
6  of money to pay that attorney to prove that
7  the man did not fall on my property. He fell
8  on the corner, drunk.
9    Q. And did you have to go to trial and
10  testify in front of a Judge or give a
11  deposition like this or anything?
12    A. No, I didn't have to do that. The
13  attorney took care of everything.
14    Q. All right. And --
15    A. And he also got something from the
16  hospital, Charity Hospital where the man went
17  when he got injured or what have you and his
18  statement of what happened. The attorney took
19  care of everything for me.
20    Q. And then I think you answered this,
21  but let's just be sure. Other than like a
22  divorce proceeding or something like that,
23  have you ever sued anybody?
24    A. No, sir.
25    MR. MARPLE:

---

40 (Pages 154 to 157)

GLYNN WADE (MRGO)                                                    7/10/2007

Page 158

1        All right.  I believe that's all
2    the questions I have.
3        MR. SUTTON:
4        I don't have any questions.
5        MS. BOYER:
6        I don't have any.
7        MR. MARPLE:
8        I believe we're finished.
9        VIDEO OPERATOR:
10        This concludes the deposition.
11    The time is 12:49.
12        *   *   *
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 160

1
2
3            REPORTER'S CERTIFICATE
4
5        I, ROGER D. JOHNS, RMR, RDR, CRR,
6    Certified Court Reporter, do hereby certify
7    that the above-named witness, after having
8    been first duly sworn by me to testify to the
9    truth, did testify as hereinabove set forth;
10    that the testimony was reported by me in
11    shorthand and transcribed under my personal
12    direction and supervision, and is a true and
13    correct transcript, to the best of my ability
14    and understanding; that I am not of counsel,
15    not related to counsel or the parties hereto,
16    and not in any way interested in the outcome
17    of this matter.
18
19
20
21            ROGER D. JOHNS
22        CERTIFIED COURT REPORTER
23            STATE OF LOUISIANA
24
25

Page 159

1
2        WITNESS'S CERTIFICATE
3
4        I, GLYNN WADE, read or have had the
5    preceding testimony read to me, and hereby
6    certify that it is a true and correct
7    transcription of my testimony, with the
8    exception of any attached corrections or
9    changes.
10
11
        _____
12        (Witness' Signature)
13    _____
    DATE SIGNED
14
15    DEPONENT PLEASE INITIAL ONE:
16
    _____ Read with no corrections
17
18    _____ Read and correction sheet attached
19
20
    DATE TAKEN:  July 10, 2007
21
22
23
24
25

GLYNN WADE (MRGO)                                    7/10/2007

159

1
2                    WITNESS'S CERTIFICATE
3
4            I, GLYNN WADE, read or have had the
5    preceding testimony read to me, and hereby
6    certify that it is a true and correct
7    transcription of my testimony, with the
8    exception of any attached corrections or
9    changes.
10
11
                    *[signature: Glynn Wade]*
12           (Witness' Signature)
13    08/20/07
      DATE SIGNED
14
15    DEPONENT PLEASE INITIAL ONE:
16
      ✗___ Read with no corrections
17
18    _____ Read and correction sheet attached
19
20
      DATE TAKEN: July 10, 2007
21
22
23
24
25