# PLAINTIFFS TRIAL EXHIBIT

# 22

MICHAEL TRUAX (VOL I)                                   9/26/2007

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE: KATRINA CANAL BREACHES      CIVIL ACTION

CONSOLIDATED LITIGATION            NO. 05-4182 K2

                                   JUDGE DUVAL

PERTAINS TO LEVEE AND MRGO         MAG. WILKINSON


(V O L U M E   I)


        Deposition of MICHAEL W. TRUAX, MAI,
given in both the levees and MRGO cases, at the
offices of Stone, Pigman, Walther, Wittmann,
LLC, 546 Carondelet Street, New Orleans,
Louisiana 70130-3588, on September 26th, 2007.


REPORTED BY:

        JOSEPH A. FAIRBANKS, JR., CCR, RPR

        CERTIFIED COURT REPORTER #75005

MICHAEL TRUAX (VOL I)                                    9/26/2007

Page 22

1  in either case reference publications, as
2  requested. Do I take it from that that you
3  have not either authored or contributed to
4  authoring any professional publications?
5      A.  Correct.
6      Q.  So you've never written on any subject
7  in your field in a peer reviewed publication.
8      A.  Correct.
9      Q.  Have you ever presented a paper on any
10 subject in your field to a group of your peers
11 at some professional gathering or meeting?
12     A.  Not a paper that was submitted in
13 writing, no.  I have participated in a
14 convention, if you will, as the assessing
15 officers and an attorney group had a joint
16 session down here in New Orleans, and I
17 participated in a mock trial.
18     Q.  Is that the only time you've
19 participated in making any kind of a
20 presentation in your field?
21     A.  Oh, I think through the years I may
22 have been on one or two question and answer
23 type panels.  But I can't recall particularly
24 the dates and the locations.
25     Q.  Tell me about the assessing

Page 23

1  officer/attorney meeting and mock trial.  When
2  was that?
3      A.  It was held in New Orleans, um -- some
4  years ago.
5      Q.  How long ago is some years ago?
6      A.  I would say more than five, less than
7  ten.  And as I stated, it was a mock trial.
8      Q.  A mock trial for which litigation?
9      A.  Um -- no particular litigation.  It
10 was a presentation of how experts might testify
11 in a trial setting.
12     Q.  Who was the audience?
13     A.  It appeared to be a mix of assessors
14 and attorneys.
15     Q.  Who was the sponsor of the event?
16     A.  Um -- if you said the acronym, I would
17 recognize it.  But it was -- it's the --
18     Q.  LADC?
19     A.  No.  No, I want to say it was the --
20 it was sponsored primarily by the assessing
21 officers group, but there's a particular group
22 that also has a legal connection, and it was
23 that group.  I probably have it -- have some
24 record of it certainly in my files somewhere.
25     Q.  Would you furnish that information

Page 24

1  through counsel?
2      A.  I believe so.
3      Q.  And so you gave a mock testimony as an
4  expert?
5      A.  I was a participant.  Exactly.
6      Q.  And so you were put on the witness
7  stand, so to speak, and examined and
8  cross-examined.
9      A.  Correct.
10     Q.  And was that mock testimony
11 transcribed?
12     A.  I don't believe so.
13     Q.  Did you write any reports as an
14 expert, as a mock expert for the purpose of the
15 exercise?
16     A.  No.
17     Q.  Did your mock testimony deal with the
18 subject of mass appraisal in any way?
19     A.  No.
20     Q.  What did it deal with?
21     A.  I believe we kept it quite simple, and
22 the property being appraised, if you will, was
23 a house.
24     Q.  So you gave mock testimony on how you
25 went about appraising an individual piece of

Page 25

1  property?
2      A.  How I'd appraised it and, I guess, the
3  issues around the valuation of the house.
4      Q.  Did the issue deal with flood versus
5  wind and water damage?
6      A.  No.
7      Q.  Did it deal with flood damage in any
8  way?
9      A.  No.
10     Q.  The two question and answer panels you
11 think you remember being on, although you don't
12 remember when, did either one of those events
13 deal with the subject of mass appraisal?
14     A.  I don't believe so.
15     Q.  Did either deal with the appraisal of
16 flood damage to property?
17     A.  I do not believe so.
18     Q.  Item 5 calls for the production of the
19 entirety of your file with respect to the
20 Katrina case, to the extent that's not already
21 addressed in the preceding.  Now, you've given
22 us the disks and the folder of material
23 referring to Item 1, save for E-mails, and I
24 understand we're going to get some billing
25 records, and you've talked about matters that

MICHAEL TRUAX (VOL I)                                           9/26/2007

**Page 26**

1  you've reviewed and relied on, and of course
2  your CV.
3       Other than those things, is there
4  anything else that constitutes your file in the
5  Katrina case, including both MRGO and levee?
6    A. I did not reproduce maps that I had
7  used to run from property to property as we
8  were moving through the inspection process,
9  um -- certainly have the 12th Edition of The
10 Appraisal of Real Estate that was conceivably
11 part of that file. I did not produce that, as
12 well. But yes, substantially, you have all of
13 the records that I have.
14      MR. BRUNO:
15           By did way, we can't find any of
16      the production. Bill said he's going
17      to send us a copy, which is no
18      problem. And we got the bills
19      yesterday. I think. That's what I'm
20      confused about. Are the bills for
21      both MRGO and levee or is there a
22      differential?
23      MR. ZWAIN:
24           Just MRGO.
25      MR. MARPLE:

**Page 27**

1           Yeah. These were sent yesterday.
2      There's another copy of them.
3      (Tendering.)
4      MR. ZWAIN:
5           I will get you the levee bills.
6      I'm going to try for sometime today,
7      but at the latest tomorrow.
8    A. There is one thing I might add that I
9  didn't produce. You know, the articles and the
10 like that are sourced that are out there in the
11 public domain.
12 EXAMINATION BY MR. MEUNIER:
13   Q. So there are some articles that you
14 have reviewed and relied on that are in the
15 public domain that you have not produced?
16   A. Correct.
17   Q. Are those articles all referenced in
18 your various reports?
19   A. Yes.
20   Q. Item Number 6 calls for a list of all
21 cases in which you have testified. And this
22 was modified to refer to the last four years,
23 not five years as stated in the exhibit. You
24 have attached, and we're going to talk about
25 your testimony in depositions and trials in the

**Page 28**

1  last four years, you've made that an attachment
2  to your reports.
3    A. Correct.
4    Q. And that list is complete and up to
5  date at this point.
6    A. Yes. For the four years.
7    Q. All right. And 7 talks about the same
8  thing with respect to trials.
9           Number 8 references all materials
10 relied upon. And again, we're referred to this
11 material that you have produced, the CDs and
12 the material in this folder. In addition,
13 you've listed reliance documents associated
14 with your report.
15   A. Correct.
16   Q. And that would be a complete
17 identification of all that you have referred
18 to.
19   A. Correct.
20   Q. Item Number 9 asks for the most recent
21 six reports that you have prepared as an expert
22 in class action litigation. Do you have a
23 response to that request?
24   A. I have not been involved in a class
25 action certification case before.

**Page 29**

1    Q. Well, the request is for reports that
2  you have prepared in class action litigation,
3  not limiting it to the question of class
4  certification. Do you understand? So it would
5  be any kind of a report issued in any class
6  action for any purpose.
7           Is it your testimony that before this
8  case you have never rendered a written report
9  as an expert in any class action for any
10 purpose?
11   A. Well, when you say any purpose, could
12 I have certainly done an appraisal of a
13 property for someone who was potentially
14 involved in a class action dispute or some
15 sort? That's possible. But sitting here
16 today, I can't tell you that I have specific
17 recollection where that was a, I guess, an
18 important issue to me. But that's not -- it's
19 not inconceivable that I've done an appraisal
20 at the request of someone who was involved in a
21 class action litigation of some sort, but I was
22 not necessarily involved in that particular,
23 um -- the particulars of the class fight.
24 Someone may have just asked me to appraise a
25 property for their use in that arena and I

MICHAEL TRUAX (VOL I)                                          9/26/2007

Page 66

1    getting to something else?  Probably so.
2         Q.  In both Norco and the -- in the Shell
3    Norco project and in the Thompson-Hayworth
4    plant project, Mr. Truax, you participated in
5    studies of real estate or property value
6    impacts associated with, in the case of Shell
7    Norco, an explosion, in the case of
8    Thompson-Hayworth, environmental contamination;
9    is that not true?
10        A.  If your definition of impacts is we
11   studied data that theoretically would have
12   reflected whatever impacts there were
13   associated with the explosion in one instance
14   and the property contamination issues in the
15   other, then yes.  But did we articulate any
16   specific difference in values?  I don't believe
17   we did in either case.
18        Q.  Well, what you're saying is that in
19   terms of outcome in neither case did you ever
20   arrive at a conclusion one way or the other
21   whether such an impact had occurred, correct?
22        A.  I think what we said is, we let the
23   data speak for itself, and whatever impacts
24   there were theoretically would have been
25   represented in the data.

Page 67

1         Q.  Right.  So as an expert, you never
2    arrived at a conclusion one way or the other
3    whether there had or had not been a property
4    value impact in those cases, true?
5         A.  I think what we concluded was that the
6    data was to speak for itself, and whatever the
7    trend was, say, in the Norco case the trend
8    was.
9         Q.  Well, did you or did you not interpret
10   data in either of those cases?
11        A.  I think we reported data.  I'm not
12   sure we interpreted it.  We looked at the data,
13   and mathematically if values went up 10 percent
14   or down 10 percent, they -- it was what it was.
15        Q.  So using the language that you have
16   used in your CV, in both cases you were part of
17   a study of property value or real estate value
18   impact associated with, your words, in the case
19   of Shell an explosion, in the case of
20   Thompson-Hayworth environmental contamination,
21   but you're telling us that in both cases even
22   though that was the nature of the study all you
23   did was gather data and let the data speak for
24   itself.  Is that your testimony?
25        A.  That's where those projects ended once

Page 68

1    they were settled, yes.
2         Q.  So you never took them to the next
3    step of interpreting to answer the question
4    whether there was or was not impact, is that
5    what you're saying?
6         A.  I think I'm telling you that the data
7    itself, whatever impacts there were, would be
8    reflected in that data.
9         Q.  But you never took the interpretive
10   step of telling anyone what the data reflected
11   as to impact; is that your testimony?
12        A.  I'm telling you we were never asked --
13   we never got to the point in the assignment
14   where that was requested of us.
15        Q.  But the answer to the question whether
16   there was or was not impact was embedded in the
17   data for someone to interpret, if not you,
18   true?
19        A.  I think that's true.
20        Q.  Do you profess to have expertise on
21   interpreting property impact data in order to
22   answer the question whether there has or has
23   not been an impact associated with an event
24   such as an explosion?
25        A.  Well, I think as an appraiser I

Page 69

1    interpret data and reflect impact from any of a
2    host of factors every day.  That's what we do.
3         Q.  And had you gone to the extent of, in
4    these cases Shell Norco and Thompson-Hayworth,
5    of expressing the opinion whether there was or
6    was not a property value associated with
7    an event, in both cases you're telling us the
8    methodology you used was a sales -- a
9    transactional sales record comparison.  Is that
10   true?
11        A.  It was a study of comparable sales
12   that had transacted, yes.
13        Q.  And your methodology, then, is to
14   compare sales of properties that arguably,
15   according to plaintiffs, were impacted with
16   sales of properties that could not have been
17   impacted, is that the methodology?
18        A.  Ask that one more time.
19        Q.  I'm asking about your methodology.
20        A.  I understand.
21        Q.  Had you gone the full measure of
22   interpreting and expressing an opinion, the
23   methodology upon which you would have relied
24   would have been a comparison of sales data; you
25   told us that, right?

18  (Pages 66 to 69)

MICHAEL TRUAX (VOL I)                                    9/26/2007

Page 70

1    A.  Correct.
2    Q.  And the sales data comparison
3  methodology would have called for a comparison
4  of sales of properties in an area that the
5  plaintiffs claimed impact with sales
6  transactions in an area that would not have
7  been associated with an impact.  Is that true?
8    A.  If we were asked to do that.  We may
9  have been asked to do something quite different
10 than that.
11   Q.  No, sir.  I'm -- I'm trying to get
12 away from the question of where you ended in
13 those cases, and I'm asking a broader question
14 about your methodology.
15       Had you completed and gone all the way
16 with the interpretation.  You understand?
17   A.  I do understand.
18   MR. ZWAIN:
19       I think he answered your
20       question.
21   MR. BRUNO:
22       No, he didn't.
23 EXAMINATION BY MR. MEUNIER:
24   Q.  You've already told me, and I don't to
25 hear it again, that your methodology is a sales

Page 71

1  data comparison methodology.  Correct?
2    A.  Correct.
3    Q.  All right.  What I'm simply trying to
4  ask as a follow-up, so I can understand, is
5  does that methodology entail -- well, why don't
6  you tell me.  Under that methodology, what
7  different categories of sales are compared to
8  complete the methodology and arrive at your
9  interpretive conclusion?
10   A.  Well, again, I'll go back to what
11 you're asking me to do, as a client.  If the
12 client asks me, in either case, what is the
13 value of this particular property on this date,
14 then I would have certainly looked for
15 comparable sales that relate to that particular
16 property on that particular date and given them
17 that answer based upon that market information.
18 If the client asked me what is the value of
19 that property, in the case of, say, Norco, one
20 year after the explosion, as compared to what
21 it would have been one year prior to the
22 explosion, I would have analyzed sales that
23 related to the value issues for those two
24 property as of those given dates.
25       Would there be a difference?

Page 72

1  Possibly, possibly not.  But that's exactly
2  what I would do.
3    Q.  Now, in the report that you cosigned
4  with Mr. Roddewig, at Page 9 -- do you have
5  that report with you?
6    A.  Yes.
7    Q.  At Page 9 of that report, and in
8  setting forth your qualifications, you list
9  eight notable projects in which you have had
10 experience analyzing detrimental conditions as
11 they impact property values and markets,
12 correct?
13   A.  Correct.
14   Q.  And you do list Shell Norco, several
15 times in this list, correct?
16   A.  Well, there were several different
17 studies that we did around the Shell Norco
18 plant, so yes.
19   Q.  So are the three references to Shell
20 Norco in this list associated with the project
21 listing of Shell Norco in your CV attached to
22 your levee report?
23   A.  The first one on the list on Page 9 is
24 the same as the reference in the CV.
25   Q.  Right.

Page 73

1    A.  The other two were for other -- you
2  know, they did not relate to the cracker
3  explosion.
4    Q.  All right.  Let's talk about them.
5  You studied residential property values near
6  the fence line of Shell Norco.  That's the
7  fourth listing of your --
8    A.  Correct.
9    Q.  Was the aim of that analysis to
10 discern whether there had been an impact on
11 those property values due to proximity to the
12 refinery?
13   A.  The primary focus of that study was to
14 give them an estimate of values for a
15 structured buyout type program.  It was
16 voluntary, certainly, but they wanted an
17 estimate or some sense of the values for the
18 properties near and along the fence line as
19 they proceeded, I guess, to budget or do
20 something else with regard to buying those
21 properties, which I think they've been ding for
22 years, buying properties that became available
23 along their fence line.
24   Q.  Yes, sir, but you list the project as
25 an example of your significant experience in

19 (Pages 70 to 73)

MICHAEL TRUAX (VOL I)                                        9/26/2007

Page 74

1  determining the impact of detrimental
2  conditions on property values, correct?
3      A.  Well, clearly there was -- one of the
4  things we did was look at an attempt to focus
5  on sales in doing that, which were subject to
6  the same influence, that is, they were very
7  proximate to the Shell Norco facility, which
8  is, by most people's estimation, not considered
9  an amenity for a residential location.
10     Q.  And then the final listing here is the
11 Shell Norco project where you undertook to
12 determine the potential impact on property
13 value due to noise from the refinery, correct?
14     A.  Right.
15     Q.  And in other cases you undertook, for
16 example, to determine property value impact
17 from highway noise, correct?
18     A.  Correct.
19     Q.  Property value impact from PCB
20 contamination, correct?
21     A.  Correct.
22     Q.  Property value impact associated with
23 contamination due to hazardous materials for
24 commercial properties in New Orleans, correct?
25     A.  Correct.

Page 75

1      Q.  You've studied the property value
2  impact associated with leaks from a pipeline in
3  St. James Parish, haven't you?
4      A.  Right.
5      Q.  And you've studied the impact on
6  property values caused by mold contamination in
7  New Orleans.
8      A.  Correct.
9      Q.  Now, the Thompson-Hayworth project
10 which you list as a major one for your levee
11 report CV, is that identified in the listing on
12 Page 9 of your detrimental condition
13 experience?
14     A.  No, it wasn't listed there.
15     Q.  Why not?
16     A.  Probably an omission.  No particular
17 reason.
18     Q.  All right.  Well, can you think of any
19 other omissions of cases you haven't told us
20 about besides these where you have undertaken
21 part of an analysis aimed at discerning the
22 property value impact from an event such as
23 contamination or explosion?
24     A.  No.
25     Q.  Have you ever been asked to undertake

Page 76

1  an analysis of the possible impact on property
2  values associated with a flood event?
3      A.  Not that I recall.
4      Q.  And in all of these cases, your
5  reported wide experience in discerning possible
6  impact on property value associated with an
7  event, a negative event or a detrimental
8  condition, has your methodology always been a
9  sales transaction comparison?
10     A.  Yes.
11     Q.  You've told me you took a course in
12 statistics in college.  That's the only
13 training you've had in statistics?
14     A.  Well, I suspect in some of the
15 Appraisal Institute courses I've taken there
16 was probably cursory discussion of it.  And I
17 believe one of my seminars that I took was an
18 ABM seminar.
19     Q.  For purposes of the sales comparison
20 methodology that you've used in your
21 detrimental condition work, what can you tell
22 me constitutes a sufficient statistical sample
23 from which to draw conclusions about price
24 impact?
25     A.  Well, sufficient in terms of number,

Page 77

1  of specific number?  I can't tell you that I
2  would have a number for you.
3      Q.  Well, is the number that you need for
4  statistical purposes dependent on the number of
5  total properties in the study?
6      A.  It certainly probably is statistically
7  relevant, yes.
8      Q.  So, for example, if I have a hundred
9  properties that allegedly were affected by a
10 detrimental condition or an event such as an
11 explosion or a flood or any negative event, and
12 you have a hundred properties and you want to
13 ask the question whether there was or was not a
14 stigma or price effect from the event, what
15 would you regard for those hundred properties
16 to be the minimum number of properties that
17 you'd have to include in your sales comparison
18 methodology?
19     A.  Well, I'm not sure there's an answer
20 to that question, given the parameters only
21 that you've given me.  If, say, you had
22 tremendous variety in the whole hundred
23 properties, a statistical analysis may not be
24 appropriate at all.  Or whatever grouping you
25 use may be irrelevant because you may -- you

Page 78

1   know, I'm not a big proponent of statistical
2   applications for individual property appraisals
3   because I find it to be, in my experience,
4   particularly in local markets, very unreliable
5   in terms of a broad brush approach to an
6   individual property valuation.
7       Q.  Yeah.  So maybe I didn't ask my
8   question clearly enough.  I'm asking about your
9   methodology, your sales comparison methodology.
10          Whenever you undertake to discern the
11  price impact on -- the property value impact of
12  a detrimental condition, under your methodology
13  of comparing the sales transactions, can you
14  tell us what you regard to be a sufficient
15  number of transactions studied in order to draw
16  conclusions applicable to the property being
17  studied?
18      A.  I think I've told you that in almost
19  all these cases we studied the data broadly and
20  let the data speak for itself, and that we
21  never went to the final step, if you will, of
22  coming to value conclusions.  If you're asking
23  me how would I approach assessing the impact of
24  a particular property, we would go back to the
25  sales research, select the most relevant

Page 79

1   comparables, three, four, to be -- merely a
2   handful if they were very good comparables and
3   were directly related, or in my opinion were
4   very good indicators of value for the subject
5   property, and analyze it in that context.  We
6   would do it on an individual property basis.
7       Q.  So you'd ask the question whether
8   there was or was not a value impact a hundred
9   times for a hundred properties, right?
10      A.  To get an articulate, credible answer,
11  yes.
12      Q.  You'd ask that same question a
13  thousand times for a thousand properties.
14      A.  Yes.
15      Q.  You'd ask it thirty thousand times for
16  thirty thousand properties.
17      A.  Yes.
18      Q.  Same question.
19      A.  Same question.
20      Q.  You'd just keep asking the same
21  question on a per property basis.  That's your
22  approach?
23      A.  That's correct.
24      Q.  And how many comparables you'd have to
25  look at to answer that question for each and

Page 80

1   every property would depend upon the unique
2   characteristics of that property?
3       A.  Yes, and the characteristics of your
4   comparable data pool.
5       Q.  Now, you've listed all the occasions
6   on which you've given testimony in deposition
7   or in Court as an expert.  Have you ever been
8   subject to a Daubert challenge?
9       A.  No.
10      Q.  Do you know what I mean by a Daubert
11  challenge?
12      A.  Yes.
13      Q.  In what fields have you been tendered
14  as an expert in these various cases?
15      A.  Certainly in the field of real estate
16  valuation and consultation.
17      Q.  In what field are you being tendered
18  in this case?
19      A.  I think in the field of real estate
20  valuation and consultation.
21      Q.  And what does that field entail?
22      A.  Well, it entails certainly evaluating
23  real estate markets, potentially looking at
24  values, but also more broadly looking and
25  discussing those factors which might affect

Page 81

1   real estate values and affect markets.
2       Q.  Including potential negative effects
3   on value due to an event such as a flood.
4       A.  I think as it would relate to a value
5   issue, any factor that would affect value.
6       Q.  What percentage of your professional
7   time is spent serving as an expert in legal
8   cases?
9       A.  Oh, I would say less than 20 percent,
10  but, you know, that's a horseback estimate from
11  me.
12      Q.  And on those occasions when you serve
13  as an expert, what percentage of the time are
14  you hired by a defendant which has been sued in
15  a case?
16      A.  I don't know that I could give you a
17  good reasonable answer on that one.  I would
18  say more often than not my perception would be
19  that it's on the defendant's side.  But not
20  always.
21      Q.  What is your average annual income
22  from your work as a legal expert?
23      A.  Particularly as a legal expert?  I
24  wouldn't have a number on that, as well.
25      Q.  What percentage of your professional

MICHAEL TRUAX (VOL I)                                      9/26/2007

---

Page 82

1  income is associated with your legal work as an
2  expert?
3      A.  Again, if we link the 20 percent I've
4  given you as the amount of time I spent in that
5  effort, possibly 20 percent.
6      Q.  And your hourly rate is $250 an hour
7  for consulting and analysis, and $375 an hour
8  for testimony?
9      A.  Correct.
10     Q.  And we have received this document
11 relative to the MRGO case.  (Tendering.)
12         Can you verify that that is your total
13 bill for services to date as an expert in the
14 MRGO case?
15     A.  I believe that is correct.  We've
16 submitted three invoices in both of these cases
17 to this point.
18     MR. ZWAIN:
19         And I just E-mailed you the three
20         invoices he submitted in the levee
21         case, Joe.  You should be getting that
22         within seconds.
23 EXAMINATION BY MR. MEUNIER:
24     Q.  So the total amount that you
25 individually have billed to date in the MRGO

---

Page 83

1  case is $23,250?
2      A.  I didn't total those, nor exclude
3  anything that wasn't related to me.  I don't
4  remember if there was anyone else on those
5  invoices.  It's approximately thirty-two
6  thousand or so, for me personally.
7      Q.  Thirty-two thousand to date in MRGO.
8      A.  I think that's correct.
9      Q.  And the invoice that we're receiving
10 now for the billing in levees is about sixteen
11 thousand?  Does that --
12     A.  Again, you know, the numbers will
13 speak for themselves.
14     Q.  Well, do you think you spent twice as
15 much work in MRGO as in levee?
16     MR. ZWAIN:
17         There are three invoices there.
18         One was sixteen thousand.
19     MR. BRUNO:
20         One for eighteen, one for
21         seventeen and one for sixteen.
22 EXAMINATION BY MR. MEUNIER:
23     Q.  Does it sound right to you that
24 there's been billing to date in levee of about
25 $51,000 for your services?

---

Page 84

1      A.  Again, if that's what the numbers say.
2  I'm not going to dispute it.  Yeah.
3      Q.  And then $32,000 to date in MRGO.
4      A.  Correct.  Apparently.
5      Q.  And were you hired in both cases
6  simultaneously?
7      A.  Not simultaneously, but I think it was
8  close in time.
9      Q.  Okay.  In which case were you first
10 hired?
11     A.  I think I was hired in levee first,
12 but again the dates are shown on the invoices
13 as to when the first billing occurred, so.
14     Q.  So when were you retained in levee?
15     A.  I'm not looking at a levee invoice,
16 so.
17     MR. ZWAIN:
18         (Indicating.)
19     A.  Yeah.  I had my first meeting with
20 Gary Zwain and others in March of '07, and my
21 first billing for MRGO was around June.  So
22 levee would have been first.
23 EXAMINATION BY MR. MEUNIER:
24     Q.  So you had been retained for a little
25 over six months in these cases?

---

Page 85

1      A.  Approximately.
2      Q.  And your billing to date is about
3  $83,000 for that period of time?  $32,000 in
4  MRGO and $51,000 in levee?  Does that sound
5  right?
6      A.  Again, trusting that you're doing the
7  math correctly.
8      Q.  And what are you asked to do in these
9  cases?
10     A.  Well, I certainly have been asked to
11 go out and inspect all of the named plaintiffs'
12 properties, which was fairly time consuming,
13 um -- and then prepare the reports that you
14 have.
15     Q.  You have not been asked to do anything
16 in regard to the analysis of potential property
17 value impact due to the flood event?
18     A.  No.  As to particular value impact,
19 no.
20     Q.  And you told me before about the cases
21 in which you undertook to collect sales data
22 which would have a basis for some
23 interpretation, although you may not have
24 always arrived at the interpretation?
25     A.  Right.

---

Page 86

1    Q.  Have you even undertaken, in this
2  case, to collect sales data aimed at some later
3  discernment of a price impact due to flood?
4    A.  In levee, we looked at sales
5  transaction data in the study areas that are in
6  this report, and I believe that's contained in
7  a schedule within the report.
8    Q.  Is that it?  Is that the extent of
9  what you've done in that regard?
10   A.  Yeah.  I think we have made statements
11  about some transactional volume as indicated,
12  say, through the MLS system, but in terms of
13  actually looking at sales transactions and
14  collecting individual sale transactions, yeah,
15  the only place we have done that, to my
16  knowledge, is in the study areas.
17   Q.  How many total properties, residential
18  and commercial, are in the class areas of the
19  MRGO and levee cases that have been proposed?
20   A.  Thousands.
21   Q.  Can you be more specific?
22   A.  Um -- no, not particularly.
23   Q.  Well, I believe in your MRGO report,
24  which I think we'll end up talking about
25  tomorrow, you did set forth some numbers of

Page 87

1  residential properties in the MRGO subclass
2  areas.  Do you not recall what?
3    A.  Yeah.  I recall certainly -- if you
4  want to direct me to the page, I'll look at it
5  for you.
6    Q.  Okay.  Well, let's assume that in that
7  report you've got a total of about 66,000
8  residential properties in the MRGO class area,
9  if you want to find that.
10   A.  Yeah.  For efficiency, if you know
11  exactly where it is why don't you point me in
12  that direction.
13   Q.  Page 8 of your report, using 2000
14  census data, 34,000 residential properties in
15  New Orleans East, 7,000 in the Lower Ninth
16  Ward, 25,000 in St. Bernard, that's a total of
17  66,000, correct?
18   A.  If you have added correctly, correct.
19   Q.  And that's based on seven year old
20  census data.
21   A.  Correct.
22   Q.  And can we assume that there are more
23  than 66,000 -- or were more than 66,000
24  residential properties in New Orleans East,
25  Lower Ninth and St. Bernard as of August, 2005?

Page 88

1    A.  I think we can assume that.
2    Q.  All right.  So did that help you
3  arrive at any estimate of the total residential
4  properties, adding MRGO and the levee proposed
5  class areas?
6    A.  It would likely be somewhat north of
7  70,000.
8    Q.  It would be over 100,000, wouldn't it?
9    A.  I'm sorry.  You added --
10   Q.  Total, levee and MRGO.
11   A.  Oh.  Yeah, yeah, yeah.  Levee and
12  MRGO, yeah.
13   Q.  Easily over 100,000.
14   A.  Yes.  Yes.
15   Q.  Now, if you are charged in this case
16  with the task of analyzing whether or not there
17  has been any price impact or property value
18  impact for these properties that can be
19  associated with the flood in these communities
20  after Katrina, would your methodology, as it
21  has been heretofore, be a sales comparison
22  methodology?
23   A.  Yes.
24   Q.  And you would go property by property
25  and look for comparable sales transactions that

Page 89

1  fit that particular property.
2    A.  Correct.
3    Q.  And you would ask the question a
4  hundred thousand times or more, was there or
5  was there not a property value impact?  Same
6  question.  Right?
7    A.  Same question.  Likely different
8  parameters to be considered, but same basic
9  question, yes.
10   Q.  The question is common to every single
11  property, isn't it?  The question.
12       MR. MARPLE:
13          Object to the form.
14   A.  Potentially, yes.
15  EXAMINATION BY MR. MEUNIER:
16   Q.  Well, is the question different,
17  whether or not there was a property value
18  impact?  Does it change; does the question
19  change?
20   A.  No, but the answer may be -- will be
21  likely no in some cases, yes in others.
22   Q.  All right.  So you're going the take
23  the same common question and you're going to
24  ask it over a hundred thousand times, is that
25  your approach?

23  (Pages 86 to 89)

MICHAEL TRUAX (VOL I)                                    9/26/2007

Page 90

1    A.  Yes.
2    Q.  All right.  Now, how long is this
3  going to take?
4    A.  If you ask me to individually do it,
5  it would take a while.
6    Q.  Ten years?
7    A.  Well, realistically, no.  I mean, I
8  think we have a sense of that from what Road
9  Home is doing.  They've accomplished -- I
10  believe I last saw, you know, over -- or
11  planned to have 96,000 of these properties
12  settled, if you will, by year end, or something
13  like that.  And they have resorted to
14  individual property by property analysis to
15  facilitate the implementation of their program.
16    Q.  Well, they did a mass appraisal for
17  the first wave of properties.
18    A.  And it didn't work.
19    Q.  The people who were the subject of
20  those mass appraisals haven't given their money
21  back, have they?
22    A.  Oh, I suspect a lot of them have filed
23  appeals, but I'm not certain of that.
24    Q.  Okay.  Now, you're not telling us that
25  the Road Home program is setting out or has set

Page 91

1  out to discern the property value impact
2  associated with the flood, are you?
3    A.  I think the Road Home program has
4  implemented a specific property appraisal
5  process to utilize in their methodology as they
6  are implementing it to cut checks to people.
7  Pre-storm values certainly were the biggest
8  single issue that they've had to deal with on
9  the appraisal side.
10    Q.  Are you telling us that Road Home has
11  sought to discern whether or not there has been
12  a property value diminution that can be
13  associated with the flood that followed
14  Katrina?  Is that your testimony?
15    A.  At the heart of the Road Home program
16  is to -- an attempt to make people whole, at
17  some level, from the damages that they
18  incurred, as you probably well know,
19  incorporating a series of considerations
20  including insurance, grants, pre-storm values.
21  And the appraisal process, as I understand the
22  Road Home Program, has to do with establishing
23  appropriate pre-storm property values in the
24  majority.
25    Q.  Well, do you not understand my

Page 92

1  question when I ask weather it is the object of
2  the Road Home program, in your understanding of
3  that program, to discern whether or not there
4  has been a property value impact that can be
5  associated with the flood after Katrina?  Is
6  that the object of the program?
7    A.  Well, I possibly heard your prior
8  question a little differently.  But you have
9  asked me about damages.  Now, if we focus
10  entirely on property value impact --
11    Q.  Yes, sir.
12    A.  -- in some sense, certainly, their
13  impact -- the whole goal of the program is to,
14  um -- provide people money relating to their
15  impacts, their individual impacts.  Now, part
16  of that process, as I said, involves
17  establishing pre-storm property value, looking
18  at what grants they received, looking at, um --
19  what insurance proceeds they received.  That's
20  all a part of the process, as I understand it,
21  that goes into their assessment of impact to
22  the individual people and for these properties.
23    Q.  So you think the Road Home Program and
24  methodology are valid indicators of how you
25  could go about accomplishing the task, if it

Page 93

1  were given to you, of discerning the property
2  value impact of flood in the levee and MRGO
3  class areas.
4    A.  I think the Road Home Program
5  experience would suggest that individual
6  property appraisals, if needed, can be
7  accomplished for a tremendous number of
8  properties in a reasonable period of time.
9    Q.  Right.  And you'd have to go about
10  more than that, wouldn't you?  You'd have to do
11  your sales comparison methodology, and get into
12  comparables per property, as you discussed,
13  correct?
14    A.  Yes, and I believe that's exactly what
15  they're doing.
16    Q.  Well, but -- all right.  So how many
17  properties has Road Home disposed of now that
18  we're what, at two years and a month after
19  Katrina; what's their number of properties
20  accomplished, if you will?
21    A.  Oh, I can't tell you I know the
22  numbers definitively, but remember, don't -- in
23  terms of your time periods, remember, their
24  process was different for probably over a year
25  of that two-year window, and it ultimately

24  (Pages 90 to 93)

MICHAEL TRUAX (VOL I)                                    9/26/2007

Page 94

1  didn't work. So they then implemented the more
2  detailed analysis that's being conducted now by
3  the appraisal community, and they're doing
4  individual pre-storm property valuations.
5      Q.  So the detailed, house-by-house
6  appraisal is actually going faster for them
7  than the mass appraisal was? Is that what
8  you're saying?
9      A.  No, I didn't say that.
10     Q.  So when did Road Home begin its
11 appraisal work?
12     A.  Oh, I don't remember the exact date,
13 but clearly there's some articles, I know, that
14 I think are cited in some of these reports,
15 that had some dates about the -- that were
16 issued -- you know, Times Picayune articles
17 that talked about the problems and the new
18 process they were going to implement.
19     Q.  And how many properties have they
20 finished?
21     A.  I don't know the answer to that.
22     Q.  What percentage of the total have they
23 finished?
24     A.  I don't know that.
25     Q.  Do you think it's been a model of

Page 95

1  efficiency, this program?
2      A.  In its entirety? No.
3      Q.  Okay. So you don't know how many
4  years it would take you or a team with you to
5  accomplish the task of discerning property
6  value impact for over a hundred thousand
7  properties, you can't give me any estimate of
8  how long that will take, right? Using your
9  methodology -- sales comparison methodology.
10     A.  No, I couldn't give you an estimate.
11     Q.  Okay. Can you give me an estimate of
12 how much it would cost to conduct that analysis
13 in that way for all the properties involved in
14 this litigation?
15     A.  No.
16     Q.  Is it fair to say it would cost
17 millions of dollars?
18     A.  I think that's fair.
19     Q.  And is it fair to say it would take
20 years to finish?
21     A.  Probably years.
22     Q.  Now, let me go back to your CV in the
23 levee report, Page 21. You list seminars which
24 you've attended, correct?
25     A.  Correct.

Page 96

1      Q.  And in 1997, it looks like you
2  attended a seminar on the automated valuation
3  models. True?
4      A.  True.
5      Q.  Define automation valuation model for
6  me, please.
7      A.  Well, an automated valuation model, as
8  I think typically discussed in the appraisal
9  community, you know, it's an appraisal tool, if
10 you will, a regression analysis, usually
11 computer driven, where you input certain
12 parameters that you would judge to be relevant,
13 and those would be, you know, independent
14 variables, and the whole goal is to get an
15 output or the dependent variable based upon the
16 inputs.
17     Q.  Is it a methodology used in mass
18 appraisal?
19     A.  Again, yes. I mean, it's a tool that
20 is used in mass appraisal circumstances, yes.
21     Q.  Is it a tool which can be associated
22 with hedonic price modeling?
23     A.  Yes.
24     Q.  Contingent valuation?
25     A.  Now, contingent valuation would not

Page 97

1  typically, I think, employ an AVM. Or possibly
2  some element of it could, but I don't believe
3  so.
4      Q.  All right. Now you defined an
5  automatic valuation model. Define hedonic
6  price model.
7      A.  Well, an hedonic price model is
8  essentially, again, a modeling method where, my
9  understanding of it is it's a regression
10 analysis type of system that would be employed,
11 again, as a tool, to give you some output that
12 you might find useful.
13     Q.  Is it a model used to discern property
14 value impact associated with a detrimental
15 condition?
16     A.  When you say is it --
17     Q.  Yes. Is it? Is it used for that
18 purpose?
19     A.  It could be.
20     Q.  Define contingent valuation.
21     A.  Well, contingent valuation basically
22 is a -- basically a survey method where -- I
23 think generally used for, based upon all the
24 literature and everything I have read, where
25 you don't have an active market where the item

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

MICHAEL TRUAX (VOL I)                                    9/26/2007

Page 98

1   that you're studying is actively traded, so you
2   conduct surveys and, um -- from the surveys
3   make some projections.
4       Q.  Is it a tool that is used in
5   connection with discerning the property value
6   impact of detrimental conditions?
7       A.  Well, when you say when and is, I'm
8   sure someone has used it.  I believe someone
9   that is here today has used it, as I
10  understand.  But is it widely used and accepted
11  in the appraisal community?  To my knowledge,
12  no.
13      Q.  What is conjoint analysis?
14      A.  Well, conjoint analysis, I believe, is
15  basically the concept that, you know, an item
16  is the sum of the appeal of all of its
17  component parts and characteristics, and that
18  those elements can be segregated and, I guess,
19  analyzed independently at some level, though
20  certainly they interact one to another, but
21  that there's this interaction but yet distinct
22  component to all of those items -- I mean to a
23  given item of study.
24      Q.  Is that a tool which has been used in
25  connection with discerning the property value

Page 99

1   impact of detrimental conditions?
2       A.  Well, again, when you say has been
3   used, I believe someone has certainly probably
4   used it.  But again I don't believe it's
5   been -- well, the concept is used, I guess, in
6   appraisal methodology generally.  When we go in
7   and adjust for a various -- let's say a
8   characteristic of a property, we are saying
9   that characteristic is certainly discernible
10  and has some value associated with it.  So in
11  that sense we're giving credibility to the
12  concept of conjoint analysis.
13      Q.  When you say we, you mean real estate
14  appraisers?
15      A.  Yes.
16      Q.  Now, have you attended any automated
17  valuation models seminars since 1997?
18      A.  That was -- where that was the primary
19  topic, no, I don't believe so.
20      Q.  Well, is that the only seminar you've
21  ever attended at which automated valuation
22  models was the primary topic?
23      A.  To the best of my knowledge, yes.
24      Q.  In 1998, you attended a seminar called
25  "Understanding and Using DCF Models?"

Page 100

1       A.  Yes.
2       Q.  What is a DCF model?
3       A.  Discounted cash flow.
4       Q.  By the way, how long did the automated
5   valuation model seminar in 1997 last?
6       A.  Most of those seminars are one-day
7   seminars.
8       Q.  Okay.  Who sponsored that AVM seminar?
9       A.  It was likely the Appraisal Institute.
10      Q.  Where was it held?
11      A.  Don't know.  Or, rather, don't recall.
12      Q.  And in 1999 you attended a seminar
13  called "Attacking and Defending an Appraisal in
14  Litigation."  Was that a seminar about how to
15  conduct yourself as an expert in cases like
16  this?
17      A.  That would certainly be one
18  interpretation of that.
19      Q.  Was there any discussion about
20  automated valuation models or mass appraisal
21  techniques in that seminar?
22      A.  I don't recall.
23      Q.  You at and the he had a seminar called
24  appraisal trends in the year 2006, correct?
25      A.  Correct.

Page 101

1       Q.  What do you recall learning at that
2   seminar?
3       A.  I can't tell you I have a specific
4   recollection of that seminar, sitting here
5   today.
6       Q.  You don't know what appraisal trends
7   were discussed at that seminar last year?
8       A.  No.
9       Q.  Were automated valuation models
10  discussed?
11      A.  I think I've told you I don't have a
12  specific recollection of that particular
13  seminar, period.
14      Q.  Okay.  Do I understand correctly,
15  Mr. Truax, that you have never received any
16  formal classroom training regarding automated
17  valuation models outside of that one-hour
18  seminar ten years ago?
19      A.  Well, I think in terms of -- first, I
20  believe I said it was probably a one-day
21  seminar.
22      Q.  I'm sorry.  One day.
23      A.  Some of the Appraisal Institute
24  offerings may have touched upon AVMs.  And
25  certainly the USPAP updates, there's a section

26 (Pages 98 to 101)

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

MICHAEL TRUAX (VOL I)                                      9/26/2007

Page 102

1  that deals with mass appraisal use and
2  application in our industry.  So it would have
3  been touched on there.  But in terms of it
4  being, as I've said, a primary topic, I think
5  that's correct, that that would have been the
6  only one.
7      Q.  Have you ever -- I know you never
8  published on AVMs.  Have you ever used an AVM?
9      A.  No.
10     Q.  And you've never given a professional
11 presentation of an AVM.
12     A.  No.
13     Q.  What formal training do you have in
14 mass appraisal?
15     A.  None.
16     Q.  And you've never published or given a
17 paper on mass appraisal either.
18     A.  That's correct.
19     Q.  And you've never participated in a
20 mass appraisal.
21     A.  Correct.
22     Q.  Let me attach as Truax 1 the Exhibit A
23 Qualifications of Michael Truax which are part
24 of the witness' September 10, 2007 letter
25 report as Truax Number 2, Page 9 from the

Page 103

1  report the witness cosigned with Mr. Roddewig,
2  which we've referred to; as Truax 3, the
3  invoice to date in the MRGO case -- invoices to
4  date; and as Truax 4 the invoices to date in
5  the levee cases, which I assume we'll be able
6  to print out before we finish today.
7         (Exhibits 1, 2, 3 were marked for
8  identification and are attached hereto.)
9  EXAMINATION BY MR. MEUNIER:
10     Q.  Mr. Truax, would you dispute the
11 general assertion that AVMs are being used with
12 increasing frequency in the real estate
13 industry?
14     A.  Well, when you say increasing
15 frequency, I assume you mean over time are we
16 seeing those types of applications more broadly
17 used.  Or are there more of those today than
18 there were ten years ago.
19         Is that your question?
20     Q.  No, that's your question.  But if you
21 want to answer it that way, I'll go from there.
22     A.  No, go ahead and ask me a question.
23     Q.  No.  Answer your question first and
24 we'll go on from there.
25     MR. ZWAIN:

Page 104

1         Which question would you like him
2  to answer?
3  EXAMINATION BY MR. MEUNIER:
4      Q.  The question you just posed.  You were
5  saying they've been used more in the last ten
6  years?  Is that your question?
7      A.  I'm saying that's your question to me.
8      MR. ZWAIN:
9         He's asking for you to clarify
10        your question because he doesn't
11        understand it.  So would you --
12     MR. MEUNIER:
13        I'll ask it again.
14     MR. ZWAIN:
15        Good idea.
16 EXAMINATION BY MR. MEUNIER:
17     Q.  Would you dispute the general
18 assertion that AVMs are being used with
19 increasing frequency in the real estate
20 industry?
21     A.  I can't tell you that I definitively
22 know whether they're being used in a numerical
23 way more frequently today than they were, say,
24 a year ago or two years ago.  I can't answer
25 that.  I don't have that data to tell you.

Page 105

1      Q.  Do you know whether mass appraisal
2  techniques are being used with increasing
3  frequency in the real estate industry?
4      A.  Again, you're asking me a very
5  specific question, do I have data regarding
6  that I am personally aware of.  No, I do
7  not.
8      Q.  In fact, Mr. Truax, since you have
9  little or no formal training on the subject,
10 you've never published on the subject, would it
11 be fair to say that you do not have specialized
12 expertise regarding AVMs or mass appraisal?
13     A.  Well, I would ask you to define for me
14 what you mean by specialized expertise.
15     Q.  Do you hold yourself out as an expert
16 on AVMs or mass appraisal?
17     A.  No.
18     Q.  Now, you have listed in Exhibit B
19 attached to your September 10, 2007 levee
20 report the testimony that you have given in the
21 last four years, correct?  Do you have that?
22 I'm sorry.  It's Page 26 of the report that you
23 cosigned with Mr. Roddewig.
24     A.  You say 26?
25     Q.  Page 26 -- I'm sorry.  It's Page 26 of

Page 122

1   comparable sales, all of that, in my, um --
2   history and in my experience is the most
3   relevant approach.
4        Q.  Okay.  Does this article by
5   Mr. Roddewig endorse that approach?
6        A.  Well, again, you'd have to show me the
7   context in which maybe you're asking this
8   question as to the specifics of that, but, you
9   know, I don't know if that particular article
10  endorses that approach.
11       Q.  Does the article reference other
12  possible approaches to that question?
13       A.  Oh, I think that article -- yeah.  It
14  was a broad brush look at what has been
15  written, I believe, and, as I said, what the
16  history of the experience has been with how you
17  can approach those problems.
18       Q.  Has mass appraisal been used as a
19  methodology to address that question?
20       A.  Well, again, when you ask a question
21  like has it been, I'm sure in the world it has
22  been used, yes.
23       Q.  At the top of Page 30 you list -- you
24  cite an article by Bill Mundy and David McLean
25  called "Using the Contingent Value Approach,"

Page 123

1   correct?
2        A.  Yes.
3        Q.  Does that article endorse the
4   technique of contingent value?
5        A.  I think it does.
6        Q.  Does it endorse it as a means to
7   discern the price effect of environmental
8   damage on property following the event?
9        A.  I believe it does.
10       (Lunch break.)
11  EXAMINATION BY MR. MEUNIER:
12       Q.  Mr. Truax, I'm still referring to your
13  list of academic papers which is starting at
14  Page 28 and continuing in the exhibit
15  attachment to your September 10, '07 report.
16       You cite the article of Lamond, et al,
17  entitled "Does the Price Impact of Flooding
18  Fade Away."  Do you see that?
19       A.  Yes.
20       Q.  What did this article suggest in
21  response to that question?
22       A.  Again, I can't tell you I have
23  specific recollection.  Could you -- if you'd
24  show me the article I might have a better
25  recollection of it.

Page 124

1        Q.  No, sir, I don't have it with me.  But
2   you listed it as an article you've read, and --
3        A.  Correct.
4        Q.  -- I thought you might remember at
5   least --
6        MR. ZWAIN:
7            Do you remember all the articles
8        you've read?
9   EXAMINATION BY MR. MEUNIER:
10       Q.  Well, the basic answer to that
11  question posed in the title.  But you didn't
12  remember?
13       A.  Well, I can't remember what was
14  specifically provided in that particular
15  article.
16       Q.  You've listed, again on Page 30,
17  several articles by Moore and Jang, and Wilson
18  and Yellen, and Waller, all on -- all having
19  automated valuation models or AVM in the title.
20  I'm going to assume, based on your prior
21  answers, that you're not able today to tell me
22  what you recall about reading any of those
23  articles, that you recall from the articles
24  themselves.  Is that true?
25       A.  If you're going to ask me with

Page 125

1   particularity about one article for me to tell
2   you definitively that I have total recall of
3   that particular article sitting here today, no.
4   But if you want to show me the article, it may
5   refresh my memory with a little more
6   specificity as to what it said.
7        Q.  In the article by Bennie Waller called
8   "The Impact of AVMs on the Appraisal Industry,"
9   do you recall whether Mr. Waller in the article
10  characterized the impact of AVMs on the
11  appraisal industry as either negative or
12  positive, or some variation?
13       A.  Again, I can't tell you that I
14  remember that specific article as to what
15  Mr. Waller particularly said.  I think if you
16  look at the literature generally, you will see
17  that there are both positive and negative
18  aspects to the application of AVMs in the
19  appraisal business.
20       Q.  Well, have AVMs been bad for the
21  individual appraisal business?
22       A.  You're asking me for my personal
23  opinion?
24       Q.  Yes.
25       A.  Um -- no, I don't believe they've been

MICHAEL TRUAX (VOL I)                                    9/26/2007

Page 134

1     Q.  You're telling me that when you write
2  and sign expert reports in legal cases it's
3  routine for you to have others coauthoring the
4  report with you even though they're not named
5  in a report or sign the report?  That's a
6  routine practice for you?
7     A.  Absolutely, in the sense that I may
8  not have penned the words, but by the time I
9  have edited it, reviewed it and accepted it as
10 my own and sign it, it's my own.  And that's --
11 as I said, in almost every appraisal office I
12 have ever seen, um -- there are sometimes --
13 you might have one MAI who has two or three
14 people working independently with him in terms
15 of producing what ends up being substantially
16 the final product that that appraiser and that
17 appraiser alone signs.
18    Q.  Why is it you did not or could not
19 have written this by yourself?
20    A.  I could have.
21    Q.  But why didn't you?
22    A.  For several reasons.  One,
23 Mr. Roddewig and the Clarion team brought
24 valuable expertise to bear.  There were
25 certainly time constraints in terms of manpower

Page 135

1  resources that were useful in terms of bringing
2  that group into the picture, um -- so it was a
3  combination of reasons as to why.
4     Q.  So you needed Roddewig and his team to
5  join you as authors of this report because of
6  time and because of their expertise?
7     A.  In part, yes.
8     Q.  Okay.  What expertise did Roddewig and
9  his group bring to the writing of this report
10 that you did not possess on your own?
11    A.  Well, when you say the writing of the
12 report, I'm talking about the entire effort, in
13 terms of producing the studies, et cetera, that
14 are effectively a part of this report.  No --
15 are the words written, as I said, accepted
16 completely by me?  Yes, they are.  But did I
17 write every word?  No, I didn't.
18    Q.  No, sir.  My question was, what
19 expertise did Roddewig and his group at Clarion
20 bring to this effort that you did not possess
21 of your own accord?
22    A.  Well, they certainly had experience in
23 dealing with, um -- class action certification
24 cases.  Um -- that was probably the biggest
25 single one.

Page 136

1     Q.  How about expertise in the field of
2  mass appraisal, did they bring that to the
3  task?
4     A.  They certainly had a broader
5  background in those issues than I did.
6     Q.  How about expertise on AVMs, did they
7  bring that to the task?
8     A.  Well, when you say expertise, exactly
9  what do you mean expertise?
10    Q.  You and I have been using the word
11 before now, so I didn't know we had a problem
12 with it.
13    A.  No, I'm just asking.
14    Q.  Special knowledge, um -- training,
15 education, background, experience, all those
16 things.
17    A.  I think given the history that I'm
18 aware of in terms of cases they've been
19 involved with, certainly they have done more
20 research than I had at that particular time as
21 to that particular appraisal tool.
22    Q.  Okay.  So the first conclusion which
23 is that damages cannot accurately or equitably
24 be determined on a class-wide basis, is that an
25 opinion informed by the expertise or brought to

Page 137

1  this effort by Mr. Roddewig and Clarion?
2     A.  No.
3     Q.  So you believe that you have the
4  background and training to express that opinion
5  independent of Mr. Roddewig?
6     A.  Yes.
7     Q.  And you say that although you told
8  me -- I believe you've admitted that you've
9  never published or presented on the question of
10 mass appraisal or AVMs.  Correct?
11    A.  I've told you that I've not published
12 on those topics, that's correct.
13    Q.  And you've never been tendered or
14 testified as an expert to address the
15 appropriateness or applicability of mass
16 appraisals or AVMs in a class action case, have
17 you?
18    A.  Correct.
19    Q.  And you don't have any formal training
20 on the subject of mass appraisals or AVM that
21 you can think of other than the one-hour
22 seminar on AVMs that you went to ten years ago,
23 correct?
24    A.  Again, it was a one-day seminar.
25    Q.  I'm sorry.  One day.

                                35 (Pages 134 to 137)

MICHAEL TRUAX (VOL I)                                    9/26/2007

Page 150

1  that your office uses?
2      A.  No.  We have multiple templates that
3  we will -- as I think everyone, probably in
4  your business as well, you don't recreate the
5  wheel every time.  So we have standard form
6  formats that we use, but it's not a form in the
7  sense of a Fannie Mae Residential Appraisal
8  Form, no.  It's not that.  It's a narrative
9  document.
10     Q.  How long is it?
11     A.  Oh, it depends on the task.  But I
12  mean, we have reports we write that are four
13  hundred pages and we have reports that we write
14  that are ten.
15     Q.  All right.  But this template that you
16  use sets forth certain basic items or
17  components of an appraisal that you're going to
18  expect to use in every case?
19     A.  No, no, no.  And maybe I'm leading you
20  astray there.  The template is not a fixed,
21  fill-in-the-blanks form, it is merely a
22  structure, and we then customizes within the
23  subheadings of that structure what the output
24  is relative to the task at hand and the
25  complexity of it, all of those things.

Page 151

1      Q.  If you were to undertake an
2  individualized appraisal of the thousands of
3  properties subject to the claims in this case,
4  would you use a standardized form?
5      A.  Oh, we'd certainly create probably a
6  template that would work in the context of the
7  particular property being appraised.  It
8  wouldn't be the same for all of them.
9      Q.  So you'd use different forms for
10  different properties.
11     A.  Sure.  Well, it would also depend on
12  what was asked in terms of the results
13  presentation.  We have some options as to how
14  we can report a finding, and so that would
15  depend on what was asked for of us, as well.
16     Q.  In the four hundred or so appraisals
17  that you've done in the New Orleans area since
18  Katrina, just explain for me the basic steps
19  that you'd have followed to conduct these
20  appraisals.
21     A.  Well, with minor exception, it would
22  be the standard process.  We would go out,
23  certainly identify and inspect the property, do
24  whatever research was necessary to determine
25  how big the site is, its orientation, we would

Page 152

1  also then certainly, when we're doing a sales
2  comparison approach, go research the market and
3  discern what comparable sales are available for
4  comparisons, and then apply those.  You know,
5  and also if it's an income producing property,
6  go research the rental market.  In other words,
7  gather all appropriate market information that
8  myth bear on the valuation of the property and
9  apply those approaches, either cost or income
10  or sales comparison, or all three, as is
11  relevant to the valuation task at hand.
12     Q.  Tell me what's involved in applying
13  all the gathered information to the valuation
14  task at hand.  How do you go about doing that?
15     A.  Well, you go to the data sources that
16  are available to you.  Let's say if we're
17  talking, say, about a house, you would go into
18  that neighborhood and certainly research the
19  comparables that have occurred recently and see
20  which of those comparables was most like your
21  subject and use those to, through a comparative
22  process, to develop an opinion of value.  If it
23  was a new house, you might do a cost approach.
24  Um -- in the single family market, you rarely
25  do an income approach.

Page 153

1      Q.  The four hundred property appraisals
2  that you've done since Katrina I assume are
3  variable in terms of the time it took you
4  to complete the appraisal.
5      A.  Yes.
6      Q.  Give me a range from least to longest
7  in amount of time spent for these four hundred
8  properties you've appraised.
9      A.  Well, it probably ranges from a half a
10  day to sixty days.
11     Q.  Per property.
12     A.  Well, again, it depends on the
13  complexity, the workload -- remember, when I
14  give you these parameters, when I tell you it's
15  going to be sixty days to do an appraisal, I'm
16  not generally telling you -- that might be the
17  time frame in which I worked on that job, but
18  that wouldn't be the only job I was working on.
19  So when I quote a client thirty to sixty days,
20  that's -- it will take me that long to get him
21  his report, but I might produce twenty
22  appraisals in that window of time.
23     Q.  All right.  Well, can you give me the
24  average amount of time you spend to conduct an
25  appraisal such as the four hundred appraisals

39 (Pages 150 to 153)

Page 154

1  you've done since Katrina?
2      A.  I don't know that there is an average
3  that would be meaningful.  And I've never
4  calculated it, so, no, I couldn't tell you what
5  that would be.
6      Q.  Well, when you said a half a day to
7  sixty days, that's to complete the appraisal.
8      A.  Yeah.
9      Q.  Can you give me the range from the
10  least to most amount of time that you would
11  spend in completing the appraisals?  Actual
12  time spent.
13      A.  Well, I mean, you ask a question
14  that's got a lot of other parameters to it.  As
15  I said, we can provide our finding verbally to
16  you.  We're allowed to do that, as long as we
17  have a file that supports what I tell you.  So
18  if you ask me to give you a value estimate in a
19  property, and I had happened -- and this
20  happens -- to have appraised the property
21  across the street, it may have taken me an
22  hour.
23      Q.  All right.  I want to talk about the
24  four hundred that you did.  You have experience
25  with appraising four hundred properties since

Page 155

1  Katrina in the New Orleans area.  That's what
2  I'm talking about, okay?
3      A.  Right.
4      Q.  Now, you have no way -- you can't
5  estimate for me the average amount of time that
6  you have taken to conduct a single property
7  appraisal in that group of four hundred
8  properties you've done since Katrina, is that
9  your testimony?
10      A.  I'm telling you, yeah, our work is
11  diverse enough that I can't tell you an average
12  amount of time per appraisal.  Um -- no, I
13  mean, I guess if we wanted to take how many
14  hours I think I worked since Hurricane Katrina
15  and divide it by four hundred, possibly that
16  gives you a number, but I don't know what that
17  would be relevant to.
18      Q.  How about the amount you've charged
19  for these appraisals on an average basis; can
20  you give me any information about that?
21      A.  Not sitting here today that would be
22  useful.  That would be an absolute guess on my
23  part for the four hundred appraisals.
24      Q.  So you can't even state a range, that
25  it's been at least X amount and at most Y

Page 156

1  amount; you can't even do that?
2      MR. ANZELMO:
3          Objection to form.
4      A.  Oh, yeah.  I can give you, you know, a
5  likely range for the type of work we do.
6  EXAMINATION BY MR. MEUNIER:
7      Q.  These four hundred, that's what I'm
8  talking about.
9      A.  Well, these four hundred constitutes
10  the volume of work that I've done.
11      Q.  Right.
12      A.  So I mean, the fees could range from
13  five hundred dollars or three hundred dollars
14  up to twenty-five thousand on a fixed fee
15  basis.
16      Q.  I gather the twenty-five thousand
17  range would deal with commercial appraisals?
18      A.  Yes.
19      Q.  And the minimum charge for an
20  appraisal of a residential would be three to
21  five hundred dollars?
22      A.  Yes.  In our shop, that's correct.
23      Q.  And you have records of all of those
24  appraisals?
25      A.  Of the four hundred?

Page 157

1      Q.  Yes.
2      A.  Yes.
3      Q.  Are they all in the levee or MRGO
4  class areas?
5      A.  No.
6      Q.  Are any in the MRGO or levee class
7  area?
8      A.  Oh, sure.  Yes.
9      Q.  How many of the four hundred?
10      A.  Oh.  I don't know.  I don't know that
11  today.
12      Q.  When you say the Greater New Orleans
13  area, do I assume they're either in Orleans or
14  Jefferson?  Or do they also include St.
15  Bernard?
16      A.  No, it would include St. Bernard
17  probably, and include St. Tammany.  You know,
18  Greater New Orleans would be the seven parish
19  area.
20      Q.  Have any of those appraisals been
21  aimed at discerning damage due to Katrina?
22      A.  They were aimed certainly at, given
23  that they were post-Katrina, post-Katrina
24  values.  Now, whether they were used in that
25  manner by someone else, if they had a value

Page 166

```
 1   of, and the amount, and the number of variables
 2   that would have to be addressed, to
 3   realistically apply such a system here that it
 4   could be implemented and produce reasonable and
 5   credible results.
 6        Q.  Your second opinion deals with 42
 7   properties that are the class representatives'
 8   properties, correct?
 9        A.  Correct.
10        Q.  And you state that these properties --
11   that none of these properties is representative
12   of the other properties within the subclass
13   area?
14        A.  No, I didn't say none of these
15   properties were representative of any
16   properties in the subclass.  I didn't say that.
17        Q.  You say the 42 --
18        A.  I said they're not truly
19   representative of the tens of thousands of
20   other properties located within each of the
21   subclasses.
22        Q.  All right.  The 42 properties that
23   you're referring to are all of the proposed
24   class rep properties in the MRGO and the levee
25   cases, correct?
```

Page 167

```
 1        MR. MARPLE:
 2            I'm going to object to misstating
 3        that.
 4        MR. MEUNIER:
 5            I'm sorry.  This is the levee
 6        report.
 7   EXAMINATION BY MR. MEUNIER:
 8        Q.  So the 42 properties you're talking
 9   about here are all of the proposed class and
10   subclass reps in levee?
11        A.  Yes.
12        MR. ZWAIN:
13            Who aren't renters.
14        A.  That's correct.
15        MR. ZWAIN:
16            All of the properties of the
17        subclass representatives who own
18        property.
19   EXAMINATION BY MR. MEUNIER:
20        Q.  Who are owners of the property.  Okay.
21            And are you saying that none of those
22   42 properties is representative of the other
23   properties in that area?
24        A.  No.
25        Q.  Well, then I'm -- all right.  So let
```

Page 168

```
 1   me go to your language.  The 42 properties are
 2   not truly representative of the tens of
 3   thousands of other properties located within
 4   each of the subclasses.
 5            Tell me what that means.
 6        A.  Well, if you read the next sentence, I
 7   believe it answers the question for you.  It
 8   says, almost all of the class representative
 9   properties are residential, yet the class and
10   subclass definitions encompass substantial
11   numbers of commercial, industrial,
12   institutional, governmental, vacant and other
13   types of properties.
14        Q.  All right.  That's the reason they're
15   not representative, right?
16        A.  They do not -- they're not
17   representative of the entire spectrum of
18   properties that exist in the subclass areas,
19   that's correct.
20        Q.  All right.  So you're saying they're
21   representative of residential properties, but
22   they're not representative of non residential
23   properties?
24        MR. ZWAIN:
25            Object to the form of the
```

Page 169

```
 1        question.
 2        A.  They're representative, certainly, of
 3   the properties that are of like type and of
 4   such similarity that they would compare
 5   reasonably to.  No, so I'm not saying they
 6   wouldn't represent any of the properties in the
 7   subclass areas.  I'm saying they represent one
 8   segment only.
 9        Q.  And what segment is that?
10        A.  That's the residential segment, and
11   it's generally either the one or the two-family
12   category.
13        Q.  So the 42 owner properties, class rep
14   owned properties you feel are representative of
15   other residential properties in those areas,
16   but are not representative of non residential
17   properties, is that what you're saying?
18        A.  No, I'm also saying -- I'll take it
19   beyond that.  I'm saying they're representative
20   of -- they're not representative of even all
21   the residential properties, in that there are
22   different types, styles, classes, that are not
23   included in the named plaintiffs group.
24        Q.  Now, what is your definition of
25   representative, for purposes of this opinion?
```

MICHAEL TRUAX (VOL I)                                        9/26/2007

---

Page 170

1    A.  For my purposes, it would mean that
2    they would be a reasonable comparable, if you
3    will, to the properties that they're going to
4    be compared to.
5        Q.  So if you were doing the traditional
6    appraisal analysis of looking at comparables,
7    that's the population of what you call
8    representative of the properties that are
9    useful.
10       A.  That would be one way to think of it
11   in terms of that.  Would I consider these --
12   let's say I had a property you asked me to
13   evaluate.  Would I consider some of these
14   properties sufficiently comparable that I would
15   use them as such in an appraisal?  That would
16   be one test.
17       Q.  Well, have you sought to determine the
18   extent to which each property is representative
19   of other residential properties?
20       A.  Well, clearly I think we've stated
21   that in the report -- I believe we do some
22   statistics, yeah -- that it -- in terms of the
23   types of properties that we see in the various
24   neighborhoods by classification, single family
25   residential, multifamily, commercial,

---

Page 171

1    industrial, et cetera.  We have the acres and I
2    believe we have the percentages from the census
3    that were in those categories.  So clearly, as
4    I said, these -- no, certainly some of these 42
5    would be representative of some segment of
6    those subclasses.  But even within a given
7    property type, single-family, let's say, there
8    are probably -- in fact, I know, it's not
9    probably -- there are single-family homes that
10   are of a character and a style and a type, a
11   scale that would not be truly represented by
12   these particular representatives.
13       Q.  Well, so, in your view, to have a
14   representative property -- to have a
15   representative property, one would have to
16   have, for example, a commercial property
17   representing commercial, an institutional
18   representing institution, et cetera?
19       A.  I would think so.
20       Q.  Because your definition has to do with
21   a comparable value analysis that you perform as
22   an appraiser; that's what you're thinking of,
23   right?
24       A.  Well, even beyond a value analysis, in
25   terms of function, market appeal, all of those

---

Page 172

1    things, that's the only way you can truly make
2    a comparison that makes any sense.
3        Q.  All right.  In the class -- do you
4    know why these particular claimants are given
5    the title of class representative?  Do you know
6    what that legal term refers to?
7        A.  No, but I'm suspecting I'm going to
8    hear it.
9        Q.  So you don't know the criteria by
10   which they've been designated as
11   representatives by plaintiffs' counsel.
12       A.  No.
13       Q.  You don't know what the Rule 23
14   definition of typicality or adequacy of
15   representation is.
16       A.  No.
17       Q.  And you don't even know that those are
18   the rules that informed the selection of these
19   people as class reps; you're not aware of that.
20       A.  Am I aware of those legal rules?  No.
21       Q.  All right.  Now, your third
22   statement -- third opinion is that the
23   individual representatives are not
24   representative of other residential properties
25   including properties within the same

---

Page 173

1    neighborhood.  Correct?
2        A.  Correct.
3        Q.  Is that true in every one of the 42
4    cases?
5        A.  Oh, there would be variations, I
6    think, in terms of, one, what you defined as
7    their neighborhood, and some of the
8    neighborhoods would be better represented than
9    others by this grouping.  So, no, it wouldn't
10   be a uniform answer to that.
11       Q.  Your fourth conclusion that mass
12   appraisal techniques like AVMs cannot fairly
13   and effectively efficiently measure real
14   property damages, again I think you've told me
15   already you're not aware of any cases where
16   AVMs in fact have been used to perform mass
17   appraisal in class litigation.  Correct?
18       A.  I'm not, and particularly I'm not
19   locally.
20       Q.  And your statement to this effect is
21   driven, I take it, by the variability of
22   property characteristics within the class area?
23       A.  That's the primary cause, I believe,
24   of lack of applicability in our local market.
25       Q.  Your sixth conclusion is that the

---

MICHAEL TRUAX (VOL I)                                    9/26/2007

Page 194

1    A.  Correct.
2    Q.  Do you refer or can you refer to any
3  data on that subject more current than the
4  census taken seven years ago?
5    A.  Well, again, that's the source we
6  cited there and that was the base for those
7  numbers.
8    Q.  I'm being invited to go back on
9  something, which I think we probably should do
10  briefly.  I was exploring with you the analysis
11  of the flood-related value diminution effect,
12  if any, on unsold properties post-Katrina and
13  how one would go about, in other words,
14  deciding whether or not such a diminution in
15  value has occurred that can be associated with
16  the flood.
17    Are you aware that there already has
18  been a publicly reported analysis of the
19  diminution in the value of damaged -- homes
20  damaged by the Katrina comparing pre and
21  post-Katrina values on a square foot basis?
22    A.  Oh, I'm sure there have been a variety
23  of studies done that were -- you know, speak to
24  that kind of issue.
25    Q.  Are you specifically aware that it's

Page 195

1  been reported in The Times-Picayune issue of
2  January 7, 2006 that the sales price of
3  unrepaired homes has plummeted to about
4  42 percent of pre-Katrina levels?  Were you
5  aware of that?
6    A.  Am I aware that someone reported that
7  to The Times-Picayune?  I can't tell you I was
8  particularly aware, but I'm not surprised.
9    Q.  All right.  Let me show you the
10  Times-Picayune report I'm talking about.  It's
11  dated Sunday, January 7th, 2006.  (Tendering.)
12    MR. ZWAIN:
13      For the record, there had to be a
14    map where a little square at top
15    left-hand corner.  Is this the entire
16    article?
17    MR. MEUNIER:
18      I'm sorry, Gary.  I missed the
19    question.
20    MR. ZWAIN:
21      Is this the entire article?
22    MR. MEUNIER:
23      This is all I have with me.  But
24    if you're interested in exploring this
25    further tomorrow, we can certainly do

Page 196

1    that.
2    MR. ZWAIN:
3      Well, I would simply ask that if
4    you want to have Mr. Truax review and
5    comment on an article to figure out
6    what it's possible significance is,
7    that it's only fair that you provide
8    him with the complete article --
9    MR. MEUNIER:
10      Well, I won't ask him --
11    MR. ZWAIN:
12      -- as opposed to some extracted
13    paragraph.
14    MR. MEUNIER:
15      Fair enough.  I'm not going to
16    ask him to answer detailed questions
17    about it.
18  EXAMINATION BY MR. MEUNIER:
19    Q.  Just identify at least for the record
20  what appears to be the source of the
21  information, Mr. Truax, and if you're able to
22  discern the small print with me.  At the bottom
23  left-hand corner where it says sources, you see
24  that?
25    A.  Yes.

Page 197

1    Q.  Read for us the sources for the
2  information given in this -- on this map.
3    A.  Yeah.  It cites the New Orleans
4  Metropolitan Association of Realtors and Real
5  Property Associates, Inc.
6    Q.  Are you familiar with either one of
7  those --
8    A.  Well, I'm familiar with the New
9  Orleans Metropolitan Association of Realtors.
10  I'm not familiar with Real Property Associates,
11  Inc.  I was going to say I'm not familiar with
12  the name.
13    Q.  Are you a member of the New Orleans
14  Metropolitan Association of Realtors?
15    A.  Yes.
16    Q.  You are?
17    A.  Yes.
18    Q.  Were you, before today, aware of that
19  group being cited as a source for the
20  information reported on this -- in this
21  newspaper?
22    A.  Oh, I'm fairly certain -- I get and
23  pretty meticulously read the newspaper every
24  day, so I'm sure I saw this.
25    MR. ZWAIN:

MICHAEL TRUAX (VOL I)                                    9/26/2007

Page 218

1    neighborhood was, as it relates to the
2    valuation of the property.  Remember, all of
3    those factors, the risk, the perception of
4    recovery, all of those things, they're
5    assimilated by a buyer, and he processes those
6    in some fashion to determine what he's
7    ultimately going to pay for a property.  But
8    when -- you know, I don't know that it would be
9    particularly important to be precise on what
10   stage the -- say, the neighborhood recovery was
11   at at the given time.
12       Q.  And then you and Mr. Roddewig go
13   through the actual listing of different
14   questions that would apply to each stage,
15   right?
16       A.  Yes.  But again, all this has an eye
17   towards determining how a market participant --
18   what questions would they be asking before they
19   decided to buy?
20       Q.  All right.  Where in these questions
21   is there any inquiry into the effect of
22   residing in an area that supposedly was
23   protected by a flood control system which
24   failed to protect after Katrina?
25       A.  I'm sorry.

Page 219

1        Q.  You want me to ask it again?
2        A.  Yeah.  Please.
3        Q.  Where in any of these listed questions
4    is there an inquiry into the effect of residing
5    in an area that supposedly was protected by a
6    flood control system which is known to have
7    failed to protect after Katrina?  Tell me where
8    that inquiry appears in any of these questions
9    that are listed for the four stages.
10       A.  Well, I think -- you know, that's --
11   the risk of, say, a hurricane, the risk of
12   flooding, if you believe that the levee system
13   is inadequate, that's kind of overriding all of
14   the particular questions that you would ask in
15   a given, say, neighborhood.  So it almost begs
16   the question -- I mean, it is a fact of life
17   here in New Orleans if you lived here you were
18   protected by levees.  If the levees files,
19   might you get wet?  You assimilate whatever
20   risk you see associated with that.  But if you
21   choose to come to New Orleans, you live with
22   that fact.
23       (Brief recess.)
24   EXAMINATION BY MR. MEUNIER:
25       Q.  In your Paragraph 24, on Page 11, you

Page 220

1    also talked about peer reviewed literature that
2    addresses detrimental condition and suggests
3    that it's something that changes and is
4    typically temporary not permanent.  Let me ask
5    you, Mr. Truax, if the literature you're
6    referring to is that which is cited in the
7    report that you and Mr. Roddewig cosigned
8    starting at Page 25 and concluding at the top
9    of Page 27.
10       A.  Sorry.  I'm struggling with the page
11   numbers.  25 is my --
12       Q.  Yes, sir.  25 of the --
13       MR. ZWAIN:
14          Study.
15   EXAMINATION BY MR. MEUNIER:
16       Q.  -- the document that you and
17   Mr. Roddewig signed.
18       A.  Sorry.  Some of these that are cited
19   there?
20       Q.  No.  My question is -- I want to be
21   sure I understand.  In your report, Page 11,
22   Paragraph 24, when you refer to published peer
23   reviewed literature on the typically temporary
24   effects of detrimental conditions, are you
25   referring to the literature that's cited with

Page 221

1    specificity at Pages 25 and 26 of the study
2    that you and Mr. Roddewig signed?
3        A.  Well, those citations speak for
4    themselves, but there were other articles that
5    were in the source materials that also spoke to
6    value change over time from flooding events.
7        Q.  Well, let me, without taking the time
8    to go back to that list -- maybe we'll do that
9    tomorrow if we've got nothing better to do, but
10   looking at the ones that are actually cited
11   here, tell me whether any of the instances that
12   are discussed in these articles involved not
13   just a natural flood event but a flood control
14   or a levee system failure associated with a
15   flood event.
16       A.  I would have to look at the
17   particulars rather than just the little
18   quotations there that are excepted here to tell
19   you definitively if that's the case.  I'm
20   reasonably certain that there weren't control
21   structures of the nature that we had.
22       Q.  Were not.
23       A.  I think that's correct.
24       Q.  Okay.  Yeah, the fact is that these
25   articles that you and Roddewig cite that

56 (Pages 218 to 221)

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

Page 222

1  discuss the effect of hurricane flood events,
2  they're discussing events in which the natural
3  storm inflicted damage, not event in which
4  there was a failure of a flood control system
5  without which there would not have been a
6  catastrophic flood, am I correct?
7      A.  I think generally that's true.  I
8  just -- I thought I was recollecting one where
9  there was a dam structure that failed, and that
10  would have been a man made structure, but
11  general I agree with you.
12      Q.  And did any of these instances
13  discussed in the literature cited involve
14  flooding that covered 80 percent of the land
15  area of the metropolitan area with population
16  comparable in size to the levee and MRGO class
17  area?
18      A.  I certainly hope not, and I don't
19  believe so.
20      Q.  In fact, you would agree with me,
21  wouldn't you, that the flood event in this
22  case, in terms of its impact and the scope of
23  its -- of the damage is not comparable to any
24  flood event in the history of this country?
25      A.  No, I think we would all agree that it

Page 223

1  was fairly unprecedented.  Well, I take that
2  back now.  If you go back to the -- I guess it
3  was the mid nineties when the Mississippi River
4  Valley -- effectively, you know, about a third
5  of the United States ended up underwater, when
6  we had that massive Mississippi River flooding,
7  that was probably of a geographic scale
8  certainly to dwarf this, in terms of the areas
9  that ultimately were covered with water.  But
10  in terms of the population base that was
11  impacted and dislodged, I can't tell you if
12  that would be -- when you looked at all of the
13  states that were impacted, whether that would
14  be comparable in scale.  But that's the only
15  one that comes to mind that arguably would be
16  of a magnitude that could be compared to our
17  problem here.
18      Q.  Mr. Truax, can you rule out, as an
19  expert, the possibility that the stigma effect
20  associated with this event as it pertains to
21  property values will be permanent?
22      A.  Well, certainly the market determines
23  that, ultimately.
24      Q.  Right.
25      A.  So no one, no expert, can definitively

Page 224

1  know that.
2      Q.  Right.
3      A.  So the market will determine that.
4  All I can tell you is that historically there
5  is a change, as you move down the time line
6  with -- generally speaking, usually the values
7  will recover.
8      Q.  You can't rule out that it may take
9  ten years or more for the effects, if any, of
10  the property value diminution to disappear,
11  correct?
12      A.  No.  It may be ten, but it could be
13  two.  There's a lot of factors that could
14  impact it that we don't control.  So, or can
15  predict.  So there is no way to definitively
16  know that.
17      Q.  In fact, when you get into this
18  discussion about -- that you and Mr. Roddewig
19  initiated here of, you know, typically the
20  stigma effects are temporary and not permanent,
21  the truth is that in the professional view of
22  things there is no consensus on how long it
23  takes a flooded property to recover its
24  pre-flood value.  True?
25      A.  Well, every circumstance will be

Page 225

1  different.  Every situation will be different.
2  So when you say census, I think there is a
3  general consensus in the literature I've read
4  that you typically see recovery in most areas
5  impacted by these detrimental influences.  But
6  I don't disagree with you that can you
7  categorically say that in all cases you get it
8  and you get it at a certain pace?  No.  But,
9  you know, it may not -- we may reasonably say
10  it's going to be ten years, and circumstances
11  may change and it may be one or two.
12      Q.  Right.  And as you say, market will
13  determine that.
14      A.  Market determines that.
15      Q.  And in fact the market will take into
16  account the duration of the supposed stigma,
17  won't it?  Won't that be one of the things
18  reflected in the market appreciation of the
19  risk, how long that risks will exist?
20      A.  Absolutely.  The market will determine
21  that.
22      Q.  So again, you'll agree there's really
23  no consensus on how long it would take a
24  flooded property to recover its pre-flood
25  value.  There's no consensus on that question,

MICHAEL TRUAX (VOL I)                                    9/26/2007

Page 226

1    is there?
2        A.  Well, with the caveat that -- as I've
3    said, there is consensus, I think, in the peer
4    reviewed literature that typically, in somewhat
5    of a normalized circumstance, if you will,
6    there is recovery.  Now, we have now both said
7    it several times; the base of it, the magnitude
8    of it, is determined by a host of factors that
9    we probably cannot readily predict.
10       Q.  It's true, isn't it, in the case of
11   the California flooding that was discussed in
12   Footnote 27 -- on Page 26, rather, of your
13   report.  You see the first bullet point --
14       A.  Yes.
15       Q.  -- at the top of Page 26?
16       A.  Yes.
17       Q.  It's true that in that case, the
18   flooding of those two California towns, that
19   houses took more than ten years, more than ten
20   years to recover in the neighborhoods with the
21   greatest flood damage?  Isn't that true?
22       A.  I think that's right.
23       Q.  Now, going back to your report,
24   Page 11, Paragraph 25, you cite the wide
25   diversity of New Orleans neighborhoods in terms

Page 227

1    of housing types, conditions, et cetera,
2    correct?
3        A.  Yes.
4        Q.  And do you think that's a problem with
5    the use of AVMs by tax assessors, that's what
6    makes them not good indicators of market value
7    of that variability?
8        A.  That's certainly a big issue, yes.
9        Q.  Is it your position that there's no
10   way to control for variables using the AVM
11   technique?
12       A.  Well, clearly the AVM technique allows
13   for multiple inputs, so you can guide it at
14   some level.  But I'm here to tell you based on
15   my experience with the local market that the
16   variety is far too extensive and the number of
17   variables that you have to address far too
18   great to reliably produce, I believe, a model
19   that will produce accurate and credible
20   results.
21       Q.  Let's refer to your table on Page 13
22   in which you set forth an analysis of the
23   variations and the variables within the five
24   proposed subclass areas.
25           In the Belfort area, which is proposed

Page 228

1    subclass Number 2, you studied a total of 130
2    properties, correct?
3        A.  Correct.
4        Q.  How many total properties are in the
5    Belfort area?
6        A.  In the Belfort study area, we looked
7    at 130.
8        Q.  No.  How many total properties are in
9    subclass 2?
10       A.  Oh.  I'm sorry.  Um -- I don't recall
11   that number.
12       Q.  So you can't tell me then whether 130
13   represents a statistically significant or
14   sufficient sample of the properties in that
15   subclass?
16       A.  Well, in terms of it being a
17   significantly -- I mean a statistically
18   significant number, no.  It likely isn't.  That
19   wasn't the point of the study.
20           The point of the study was to say even
21   in such a small area as one with only 130
22   properties, here was the variety that was
23   demonstrated.
24       Q.  Right.  But you want to suggest that
25   we can extrapolate variability within a group

Page 229

1    of 130 to a much larger group not even knowing
2    how big that larger group is, correct?
3        A.  I'm telling you that, again, based
4    upon my experience and my understanding of the
5    variety in these neighborhoods, that no, could
6    you extrapolate 1:1 and say that based upon
7    this study we will find 62 percent
8    single-family residential throughout that
9    broader subclass area, the subclass area 2?
10   No, I'm not telling you that.  I'm telling you,
11   this study is what it is.  It demonstrates what
12   you see even in an area as small as nine
13   blocks.
14       Q.  And I suppose we'll get the same
15   answer with respect to Catina, which is
16   Subclass 1, Edinburgh which is Subclass 5,
17   Gaines which is Subclass 3, and Stutz which is
18   Subclass 4, the total properties studied, 170
19   in Catina, 138 in the Edinburgh, 90 in Gaines,
20   82 in Stutz, are not being presented by you as
21   a statistically significant or sufficient
22   samples of the total properties in each of
23   those sub chance areas, correct?
24       A.  No, I would agree with you that
25   they're not statistically significant numbers

MICHAEL TRUAX (VOL I)                                    9/26/2007

|  | Page 230 |
|---|---|

1  relative to the wholes of those subclasses.
2      Q.  How long did it take you to study each
3  of these five subclass areas?
4      A.  Well, in terms of the entire process,
5  as we were implementing it for use in this
6  report, probably -- now this is a horseback
7  estimate, but I'm going to give you man days,
8  if you will --
9      Q.  Okay.
10     A.  -- maybe five man days.
11     Q.  And can you tell me what professional
12 charges were associated with that work in that
13 estimate of your charges?
14     A.  I'm doing some math in my head.  Maybe
15 fifteen, twenty thousand dollars.
16     Q.  Is that just for you or did that
17 include the work of others?
18     A.  No, that would include others.  No,
19 I'm sorry.  I did that math wrong.  I
20 apologize.
21         No, it would be less than ten
22 thousand.
23     Q.  Are you multiplying 40 hours times --
24     A.  40 hours times, um -- $200.
25     Q.  $200?

|  | Page 231 |
|---|---|

1      A.  Yeah.
2      Q.  I thought your rate was $275.
3      A.  Well, we weren't using, the other
4  people that were helping weren't at the same
5  rate.
6      Q.  So you were charging $275, and others
7  were charging less, so you just took an average
8  of $200.
9      A.  Well, yeah.  You asked me how I got
10 take number, that's how.
11     Q.  Now, am I correct looking at the
12 property use portion of the table that the
13 total of 85 percent of the properties you
14 studied in the Belfort area of Subclass 2 are
15 residential?
16     A.  Yes.
17     Q.  And in the Catina area of Subclass 1,
18 76 percent?
19     A.  Yes.
20     Q.  77 percent, rather, were residential?
21     A.  Yes.
22     Q.  And in the Edinburgh area of Subclass
23 5, 50 percent were residential?
24     A.  Yes.
25     Q.  In the Gaines area of Subclass 3,

|  | Page 232 |
|---|---|

1      92 percent were residential?
2      A.  Yes.
3      Q.  And in the Stutz area of Subclass 4,
4  80 percent were residential?
5      A.  Yes.
6      Q.  And the percentages of commercial
7  properties in all 5 areas ranged from a low of
8  0 percent to a high of 3 percent.
9      A.  Correct.
10     Q.  Now, in the next two profiles
11 sections, the elevation and the depth of
12 flooding sections, you have entries for
13 demo/vacant land, right?
14     A.  Yes.
15     Q.  What does demo refer to?
16     A.  Well, remember, these were
17 observations made from the street.  So we
18 couldn't always tell if there had been a
19 demolition accomplished or if it had been a
20 vacant site previously.  So based upon the
21 observations from street right-of-way, it was
22 either demoed or vacant, but there was not a
23 building or a residence or a structure on the
24 site when we observed it.
25     Q.  So whatever properties you enumerate

|  | Page 233 |
|---|---|

1  in the demo/vacant land category include
2  demolished properties?
3      A.  Yes.  In other words, if we pulled up
4  to the lot and there was no residence on it,
5  one of two things could have been; it could
6  have been vacant before the storm, or they
7  could have demolished something that had been
8  there.
9      Q.  Is it reasonable to infer if a home
10 was demolished -- if a home was demolished
11 after Katrina it is reasonable to infer it
12 sustained some flood damage?
13     A.  No, I don't think you would
14 categorically say that had caused the demo.
15     Q.  You don't think that's a reasonable
16 inference?
17     A.  It is an inference, but the property
18 could have been destroyed by wind or a tree
19 could have fallen on it and cut it in half.  So
20 there are other reasons that a property
21 possibly required demolition.
22     Q.  And in Paragraph 30, Pages 14 and 15,
23 you cite the Catina area of Subclass 1 as
24 illustrative of variability in the elevation of
25 properties above street level, correct?

MICHAEL TRUAX (VOL I)                                    9/26/2007

Page 234

1      A.  I'm sorry.  Direct me again to where
2  you are?
3      Q.  Paragraph 30, Pages 14 and 15.
4      A.  Okay.  Yes.
5      Q.  But do I understand from the table
6  that 77 percent of the homes in the Catina area
7  ranged from an elevation of below 1 foot to
8  4 feet or more?
9          MR. ZWAIN:
10             Are you going back to the table
11         on the previous page?
12         MR. MEUNIER:
13             The table on Page 13.
14     A.  I'm sorry.  Ask me that question again
15  there.
16  EXAMINATION BY MR. MEUNIER:
17     Q.  Well, 77 percent of the homes that
18  were standing ranged in elevation from below
19  one foot to 4 feet or more, correct?  Excluding
20  the 23 percent of the demolished homes and
21  vacant land.
22     A.  You say you excluded those from your
23  calculation?
24     Q.  In other words, all the homes you
25  observed in the Catina area had elevation

Page 235

1  ranging from less than a foot to four feet or
2  more, correct?
3      A.  Yes.
4      Q.  Okay.  And the depth of the flooding
5  figures given for Catina indicate that
6  71 percent of the land experienced flooding of
7  4.1 feet or more, right?
8      A.  Excluding the demo and vacant, yes.
9      Q.  So in Catina, despite what you cite as
10  an elevation variability, it appears that
11  virtually all of the properties in the Catina
12  study area flooded; in fact, the table
13  indicates there was only no flooding in one
14  property, 1 percent of the study.
15     A.  I would say that's true in Catina,
16  yes.
17     Q.  It's also true in Edinburgh, by the
18  way, that every property but 1 experienced
19  flooding.
20     A.  That's probably correct, yes.
21     Q.  And in fact, in Gaines, every single
22  property experienced flooding.  Subclass area
23  3.
24     A.  Yes.
25     Q.  How did you determine the depth of

Page 236

1  habitable floor flooding?
2      A.  We knew the ground elevation, I
3  believe from the IPET study, and -- no, IPET
4  gave us the depths of flood from ground.  We
5  knew the NAVD 88 datum, there was an
6  adjustment, GCR did that, to get to what sea
7  level was, and we observed, from the street,
8  what -- the approximate elevation, so it's an
9  approximation, of the first habitable floor
10  area was, from ground.  So if you were on a
11  pier house, low pier, we said it was two feet
12  above ground, if it was, you know, a slab
13  house, we said that was a foot or less.
14     Q.  So you agree that the depth of
15  flooding is ascertainable with some degree of
16  certainty within all five subclass areas?
17     A.  Yes.
18     Q.  How did you determine the no flooding
19  category which is given under depth of
20  habitable floor flooding?
21     A.  Again, we did the math.  We took the
22  IPET depths of flooding in that particular
23  neighborhood and subtracted that from -- or
24  subtracted, rather, the elevation of the living
25  area, and that produced how much water should

Page 237

1  have been in the first habitable living area
2  level.  In other words, if you had three feet
3  of flooding from ground in the neighborhood,
4  your house was raised two feet -- your first
5  floor living area was raised two feet, you had
6  one foot inside.
7      Q.  All right.  You feel that's a reliable
8  methodology?
9      A.  I'm sorry.
10     Q.  Did you feel that's a reliable
11  methodology?
12     A.  Well, it's reliable for what it is.
13  Certainly it is an estimate from -- an eyeball
14  estimate in terms of the elevation from ground
15  to the living area of floor.  But I think it's
16  reasonably close, yes.
17     Q.  According to this table, approximately
18  20 percent of the total properties studied
19  experienced no flooding.  True?
20     A.  Where are you speaking from?
21     Q.  I'm counting 122 properties in all,
22  five areas.
23     A.  That had no flooding.
24     Q.  In the no flooding, and I'm counting
25  the total properties of all five areas to be

Page 238

```
 1    610.  So 122 no flooding cases out of 610 is
 2    20 percent.
 3        A.  That's approximately correct.
 4        Q.  Now, do you feel that that's a fair
 5    representation for the entire class area;
 6    20 percent?
 7        A.  I wouldn't have any idea as to whether
 8    you could extract that -- extend that over the
 9    whole class area.
10        Q.  And the property repaired profile on
11    the table at the bottom, am I correct that
12    among the cases you studied, about 43 percent
13    were repaired and reoccupied?  Totalling up,
14    265 repaired and reoccupied out of a total of
15    609?
16        A.  Again I'm trusting your math, but if
17    these are the numbers they are the numbers.
18        Q.  Do you think that is a figure,
19    43 percent repaired and reoccupied, that can be
20    extrapolated to the class?
21        A.  No.  I don't think you could readily
22    extrapolate these percentages across the class
23    boundaries.
24        Q.  Now, we have talked a little bit about
25    it, but in various places in your report you
```

Page 239

```
 1    discuss the fact that the class property, or
 2    the properties owned by the class
 3    representatives are not, in your view,
 4    representative.  Correct?
 5        A.  They're not representative of all of
 6    the properties certainly within the class
 7    area -- proposed class area.
 8        Q.  Paragraph 29, at Page 14, for example,
 9    you state that the class rep for this Edinburgh
10    study group within Subclass 5 is a multifamily
11    unit owner and yet there are only 38 percent of
12    those multifamily units in the study area, is
13    that right?
14        A.  Correct.
15        Q.  Then you note in Footnote 14 -- I'm
16    sorry, 4, that the property today is a
17    single-family unit.
18        A.  Well, it is a two-family dwelling in
19    style and construction, but the owner is
20    currently utilizing it as a single unit.
21        Q.  In order to have what you consider to
22    be representative properties identified,
23    Mr. Truax, would you have to have one property
24    from each of the property use, elevation, depth
25    of flooding and property repair entries in
```

Page 240

```
 1    order to be representative?
 2        A.  I'm sorry.  I'm going to have to ask
 3    you to ask that again.
 4        Q.  What would it take to produce
 5    representative properties in the subclass areas
 6    you've looked at here; how would you go about
 7    doing that?
 8        A.  Well, I think I've told you, because
 9    of the diversity and the lack of homogeneity in
10    most of our neighborhoods, it would be very
11    difficult to have a group of properties that
12    you say are truly representative of all of the
13    properties in these subclass areas.  I'm not
14    sure you could do it with a reasonable number
15    of, um -- of samples.
16        Q.  Let me refer you now to Page 17,
17    Paragraph 33.  Is it your testimony that the
18    Appraisal Institute guide rejects AVM as a
19    technique in appraising large numbers of
20    properties?
21        A.  I think the Appraisal Institute tells
22    appraisers that an AVM is a tool to be used,
23    potentially, if it's relevant, in certain
24    assignments.  The output of an AVM is not
25    considered an appraisal by the Appraisal
```

Page 241

```
 1    Institute, it is nearly merely a tool, just as
 2    we have other tools in our tool bag.  So -- and
 3    they caution, I believe, appraisers to be
 4    careful of that.
 5        Q.  Yes, but you agree with me, don't you,
 6    that the Appraisal Institute does not reject
 7    AVMs as a tool or technique which can be used
 8    in pricing large numbers of properties.
 9        A.  Well, as you pose that question, I
10    think the Appraisal Institute tells you it is
11    not an appraisal.  So I to be clear on that.
12    It is merely a tool that may give you guidance,
13    it may help you in selection of data, but it is
14    one tool.  Certainly before you would, quote,
15    unquote, appraise a property and give a point
16    value, let's say, for a single-family home.
17        Q.  So it's one tool that can be used in
18    doing that, but not reliable as a sole or
19    primary tool?
20        A.  Yes.  It is not an appraisal, it does
21    not replace the appraiser in terms of assigning
22    a value to a particular property.
23        Q.  You quote the institute, bottom of
24    Page 17, to the effect that mass appraisal
25    methods originated with county assessors,
```

Page 242

1   correct?
2      A.   That was the arena in which we most
3   often saw it used.
4      Q.   How long ago did these methods
5   originate with county assessors?
6      A.   Oh, some semblance of mass appraisal
7   techniques have probably been utilized almost
8   forever, in terms of the need for assessors,
9   particularly pre computers, to, um -- use a
10  methodology that let them evaluate, for their
11  purposes and their purposes only, large numbers
12  of properties.
13     Q.   And in how many counties in this
14  county are mass appraisal methods used by
15  assessors?
16     A.   Oh, I couldn't give you a number.  But
17  I'm sure it's substantial.
18     Q.   At the top of Page 18, you add
19  emphasis to the statement assessor models,
20  therefore, focus on equity rather than
21  individual market valuation veracity.  Correct?
22     A.   Correct.
23     Q.   So the purpose in focus of AVMs as
24  used by assessors is an equitable distribution
25  of the tax burden, correct?

Page 243

1      A.   That is correct.
2      Q.   Is it your impression that
3   Dr. Kilpatrick proposes to use this tool, this
4   technique, in the same way that assessors use
5   it to distribute the tax burden?
6      A.   Well, I've now told you
7   several times, you know, I can't tell you
8   definitively how Dr. Kilpatrick will use it
9   based upon his report as I have read it.  There
10  is not enough detail there for me to know that.
11     Q.   Paragraph 34, you say that the
12  inaccuracy of mass appraisal techniques is
13  specifically recognized by USPAP Standard 6,
14  correct?
15     A.   Correct.
16     Q.   And then you follow with the quote
17  that it is implicit in mass appraisal that even
18  when properly specified and calibrated mass
19  appraisal models are used, some individual
20  value estimates will not meet standards of
21  reasonableness, consistency and accuracy,
22  correct?
23     A.   Correct.
24     Q.   Do you think it's significant that the
25  statement there is not many, not most, but

Page 244

1   some?
2      A.   Is it significant?
3      Q.   To you.
4      A.   I think the statement stands for --
5   stands on its own.
6      Q.   Do you think if it were possible to
7   state that most or many individual value
8   estimates will not meet standards that the
9   USPAP standard would have so specified?
10     A.   Well, I think if you -- that statement
11  in context, if you look at other published
12  portions of Institute documents, you'll see
13  that, you know, they tell you that certainly
14  having uniformity of property type and basic
15  characteristics is critical to the output from
16  mass modeling technique being reliable and
17  really useful.  And what I've told you is that
18  in our submarket we don't have that
19  circumstance at all.  We have a tremendous
20  amount of variety, variety not only from
21  neighborhood to neighborhood but block to
22  block, and even in lot to lot in many
23  neighborhoods.  So the backdrop, if you will,
24  that let's an AVM work efficiently, or even
25  within what might be considered reasonable

Page 245

1   norms, don't exist here, in my opinion.
2      Q.   Isn't it true, Mr. Truax, that the two
3   federal government sponsored enterprises
4   Freddie Mac and Fannie Mae both use AVMs in the
5   mortgage evaluation process?
6      A.   Yes, I think I told you earlier, when
7   evaluating loan portfolios those types of
8   models are utilized as a check on the packages.
9   I'm not aware that they use them for individual
10  property valuation.
11     Q.   Isn't it also true that despite your
12  quote in Paragraph 35 from a 2004 Appraisers
13  News Online that AVMs are rarely accepted by
14  mortgage investors, the truth is that today, in
15  2007, AVMs are playing an increasing role in
16  the mortgage lending industry?  True?
17     A.   I think -- are they used in certain
18  segments of the mortgage industry?  Yes.
19     Q.   No, sir.  They're playing, today, in
20  2007, an increasing role in the mortgage
21  lending industry.  True?
22     A.   Well, increasing relative to what?
23     Q.   Increasing relative to before.
24     A.   Before when?
25     Q.   Before the statement.  Before now.  Is

Page 246

1  the role of AVMs increasing in the mortgage
2  lending industry?
3      A.  I don't know that I can answer that.
4      Q.  Would you be surprised to read that
5  statement in peer reviewed literature?
6      A.  No.
7      Q.  In fact, it's true that many lenders
8  are using AVMs as their primary appraisal tool
9  for certain kind of loans, including
10 refinancings and equity loans.  You agree?
11     A.  Certain lenders will use that when
12 there's a low loan to value circumstance and
13 they perceive their risk to be fairly minimal.
14     Q.  No, sir.  Many lenders are using AVMs
15 as their primary appraisal tool for certain
16 kinds of loans; do you agree?
17     A.  Well, I think the key point you make
18 is for certain kind of loans, in certain
19 circumstances.  I would agree, based upon my
20 knowledge, for a narrow market segment, yes.
21     Q.  Do you deny both contingent
22 valuation and conjoint analysis are methods
23 which a great majority of economists view as
24 acceptable and useful in measuring non market
25 values?

Page 247

1          MR. ANZELMO:
2              Objection to form.
3      A.  I'm not sure what that statement
4  means.
5          MR. ZWAIN:
6              Also he's not an economist.  So
7              you're asking him something outside of
8              his expertise.
9  EXAMINATION BY MR. MEUNIER:
10     Q.  So if you don't know what that means,
11 you I assume you wouldn't be surprised to read
12 that in the published literature either.
13     A.  Read the statement again when you say
14 non market values.
15     Q.  Contingent valuation and conjoint
16 analysis are methods which a great majority of
17 economists view as acceptable and useful in
18 measuring non market values.
19     A.  I'm aware that those methods are used
20 to -- for valuing certain commodities, if you
21 will, that don't typically trade, or there's no
22 active market for them.  Um -- but I'm not sure
23 that statement you've read me says that.
24     Q.  Well, in fact, you say in your report
25 at Paragraph 36 that these techniques of

Page 248

1  contingent valuation and conjoint analysis are
2  widely recognized limited to situations in
3  which natural resources or other goods having
4  no economic market need to be measured in
5  economic terms.
6      A.  I'm glad I said that, because that's
7  what I was attempting to just tell you.
8      Q.  Give me an example of what you mean by
9  that.
10     A.  Well, if there's -- I've seen it
11 argued that if there is an amenity, let's say,
12 that -- a, say, limited number of properties
13 have access to this amenity, and those
14 properties never trade, or they haven't traded
15 in any reasonable fashion such that you could
16 do an analysis to isolate the value of that
17 particular amenity, then if you were asked to
18 say, well, what's that worth, it becomes a
19 difficult task if there is no market evidence
20 to study.  And at that point, you have to -- or
21 you're left with having to go to alternate
22 methods to try to evaluate that.
23     Q.  How about the valuation of a
24 disamenity; same answer?
25         MR. ANZELMO:

Page 249

1          Object to form.
2      A.  Yeah.  Basically.
3  EXAMINATION BY MR. MEUNIER:
4      Q.  Now, you've talked already about what
5  you consider to be the high rate of error
6  associated with some of these appraisal
7  techniques, including contingent valuation and
8  conjoint analysis.
9      Do you deny, Mr. Truax, that the
10 uncertainty which is inherent in certain
11 methods such as these has been studied and has
12 been established to a degree allowing for
13 reliable results?  Do you deny that?
14     A.  Yeah.  I'm -- I don't agree with that.
15     Q.  And so you would be surprised to read
16 that in the published literature, too.
17     A.  Oh, I wouldn't be surprised to read
18 that in the published literature, but I don't
19 agree with that.
20         MR. MEUNIER:
21             Okay.  I believe we're at a
22             stopping point, and we'll resume
23             tomorrow at 9:30.
24
25