# PLAINTIFFS TRIAL EXHIBIT

# 23

Page 252

1      UNITED STATES DISTRICT COURT
2      EASTERN DISTRICT OF LOUISIANA
3
4 IN RE: KATRINA CANAL BREACHES    CIVIL ACTION
5 CONSOLIDATED LITIGATION      NO. 05-4182 K2
6                JUDGE DUVAL
7 PERTAINS TO LEVEE AND MRGO        MAG. WILKINSON
8
9      (V O L U M E   II)
10
11      Deposition of MICHAEL W. TRUAX, MAI,
12 given in both the levees and MRGO cases, at the
13 offices of Stone, Pigman, Walther, Wittmann,
14 LLC, 546 Carondelet Street, New Orleans,
15 Louisiana 70130-3588, on September 27th, 2007.
16
17
18
19
20
21
22
23 REPORTED BY:
24      JOSEPH A. FAIRBANKS, JR., CCR, RPR
25      CERTIFIED COURT REPORTER #75005

Page 253

1 APPEARANCES:
2 REPRESENTING ORLEANS LEVEE DISTRICT:
3      MCCRANIE, SISTRUNK, ANZELMO, HARDY,
4      MAXWELL & MCDANIEL
5      (BY:  THOMAS ANZELMO, ESQUIRE)
6      3445 N. Causeway Boulevard, Suite 800
7      Metairie, Louisiana 70002
8      504-831-0946
9
10 REPRESENTING WASHINGTON GROUP INTERNATIONAL:
11      JONES DAY
12      (BY:  WILLIAM E. MARPLE, ESQUIRE)
13      2727 North Harwood Street
14      Dallas, Texas 75201
15      214-220-3939
16      - and -
17
18      STONE PIGMAN WALTHER WITTMANN, L.L.C.
19      (BY:  CARMELITE M. BERTAUT, ESQUIRE)
20      546 Carondelet Street
21      New Orleans, Louisiana 70130
22      504-581-3200
23
24
25

Page 254

1 REPRESENTING THE PLAINTIFFS:
2      GAINSBURGH, BENJAMIN, DAVID, MEUNIER &
3      WARSHAUER, L.L.C.
4      (BY:  GERALD E. MEUNIER, ESQUIRE)
5      2800 Energy Centre
6      1100 Poydras Street
7      New Orleans, Louisiana 70163-2800
8      504-522-2304
9      - and -
10
11      BRUNO & BRUNO
12      (BY:  JOSEPH M. BRUNO, ESQUIRE)
13      855 Baronne Street
14      New Orleans, Louisiana 70113
15      504-525-1335
16      - and -
17
18      LAW OFFICE OF FRANK J. D'AMICO, JR.
19      (BY:  RICHARD M. EXNICIOS, ESQUIRE)
20      622 Baronne Street
21      New Orleans, Louisiana 70113
22      504-525-9561
23      - and -
24
25

Page 255

1      ANDRY LAW FIRM
2      (BY:  JONATHAN B. ANDRY, ESQUIRE)
3      610 Baronne Street
4      New Orleans, Louisiana 70113
5      504-586-8899
6      - AND -
7
8      FAYARD & HONEYCUTT
9      (BY:  D. BLAYNE HONEYCUTT, ESQUIRE)
10      519 Florida Avenue SW
11      Denham Springs, Louisiana 70726
12      225-664-0304
13
14 REPRESENTING BOARD OF COMMISSIONERS FOR THE
15 EAST JEFFERSON LEVEE DISTRICT:
16      FRILOT, PARTRIDGE, L.C.
17      (BY:  JOSEPH E. BEARDEN, III, ESQUIRE)
18      3600 Energy Centre
19      1100 Poydras Street
20      New Orleans, Louisiana 70163-3600
21      504-599-8000
22
23
24
25

Page 264

1          Same objection.
2      MR. ZWAIN:
3          Objection.  I don't think that's
4      what he said at all.
5      A.  I was going to say what I think I --
6  how I responded was, increased from when was --
7  you know, you're asking me if it's increased.
8  Well, I have to have a starting point, and we
9  never got around to that.  That's my
10  recollection of yesterday's conversation.
11  EXAMINATION BY MR. MEUNIER:
12      Q.  Let me ask it this way:  If you were
13  plotting it on a chart as a line, would you
14  dispute the fact that the line reflecting
15  frequency of use is going up, is rising?  Would
16  you dispute that?
17      A.  Well, certainly if you asked me that,
18  say, over a ten-year window, no, I would not
19  dispute that.
20      Q.  All right.  And in fact, what I wanted
21  to call attention to, if you look down on the
22  bottom left-hand side, the last full paragraph
23  of this article references a 2005 study that
24  was released -- that was performed by Benchmark
25  Consulting International.  Do you see the

Page 265

1  reference to that?
2      A.  I'm sorry.  Where were you?
3      Q.  Bottom left-hand side of the first
4  page of the article, last full paragraph on the
5  left-hand side.  According to?
6      A.  Okay.  I'm with you.
7      Q.  And do you see the report here that
8  according to the 2005 study the percentage of
9  valuations, obviously speaking about property
10  valuations, which were performed using AVMs
11  increased from 50 percent in 2003 to 66 percent
12  in 2005?  Do you have any basis on which to
13  dispute that increase?
14      A.  Well, as I say, I think the article
15  speaks for itself, it says what it says.  I
16  have -- I'm not attempting to dispute what this
17  author wrote.
18      Q.  And we see at the end of that same
19  paragraph the statement that as much as
20  50 percent of all originations, meaning
21  purchase, home equities, refinancings, involve
22  the use of valuation models as instruments in
23  the underwriting process.
24          Do you have any basis for disputing
25  that statement?

Page 266

1      A.  Again, the article speaks for itself.
2      Q.  And of course, on the right-hand side,
3  about five lines below that black box, you'll
4  see the statement that Fannie Mae and Freddie
5  Mac continue to legitimize the use of AVMs by
6  waiving independent valuation requirements by
7  use of their own internal AVMs.
8          You don't dispute that, do you?
9      A.  Same response, Mr. Meunier; the
10  article speaks for itself.
11      Q.  Now, referring there to the AVM
12  models, were you aware that the Freddie Mac
13  website discusses the Home Value Explorer, or
14  HVE, as Freddie Mac 's own automated valuation
15  model?  Have you ever been aware of that
16  before?
17      A.  No, I'm not familiar with that.
18      Q.  Well, it is true that AVMs are models
19  that can be customized to a particular use?
20      MR. ZWAIN:
21          Counsel, are you going to attach
22      this to the deposition as an exhibit?
23      MR. MEUNIER:
24          Yes.  I'll attach that article --
25      thank you, Gary.  That's Exhibit Truax

Page 267

1      6.
2          (Exhibit 6 was marked for
3  identification and is attached hereto.)
4  EXAMINATION BY MR. MEUNIER:
5      Q.  Can AVMs be customized for a
6  particular use?
7      A.  Yes.
8      Q.  In other words, this isn't a one size
9  fits all, some structure that's rigid; an AVM
10  is a model with different component that you
11  can adjust and change or vary according to your
12  particular use of the AVM, correct?
13      A.  That is correct.
14      Q.  And in fact, let me hand you a
15  printout from the Freddie Mac website, and it's
16  a two-paged printout.  You see the reference,
17  bottom left-hand side, to Home Value
18  Explorer --
19      A.  Yes.
20      Q.  -- which is reported here to be a
21  model that generates a property estimate within
22  seconds?
23          Do you have any doubt that it can do
24  that?
25      A.  Oh, I have no doubt that the AVM with

Page 280

1  it says, a --
2     Q.   Wait.  For the record, we're going
3  back to which article?
4     A.   "Evaluating AVMs" by Brenda White.  I
5  believe it was the first one you handed me.
6     Q.   Oh.  Today?
7     A.   Yes.  And further down in that
8  article, it reads, as sophisticated as AVMs are
9  today, relying on them in the appraisal process
10 can present risks.  AVMs accuracy tends to
11 suffer in areas where local housing is highly
12 heterogeneous or where there is lack of
13 sufficient long-term data.
14      So that's the very --
15    Q.   Which are the two concerns that you
16 have expressed; heterogeneity and lack of --
17    A.   Absolutely.  And so the very article
18 you were citing to me has the same concerns I
19 do.
20    Q.   Well, I think we're succeeding in
21 identifying the strengths and weaknesses of
22 them.
23    A.   Well, I believe so.
24    Q.   Okay.  Now, let me go back to the
25 Fannie Mae website comments.  Because the

Page 281

1  second sentence here is, as follows:  This is
2  not to suggest that conscientious, skilled
3  appraisers lack consistency and objectivity;
4  however, an AVM can significantly reduce the
5  time it takes to obtain an estimate, reduce the
6  costs associated, et cetera.
7         You don't, again, deny that the AVM,
8  on a mass appraisal approach to a hundred
9  thousand properties, is superior in reducing
10 time and costs associated with the appraisal
11 process, do you?
12    A.   No, I think if you're married to that
13 system and believe that it will produce
14 credible results, no, I suspect it would
15 certainly be more efficient and cost efficient
16 as well.
17    Q.   Right.  Let me attach as Truax 8 the
18 Fannie Mae website printout.  Uh-huh.
19         (Exhibit 8 was marked for
20 identification and is attached hereto.)
21 EXAMINATION BY MR. MEUNIER:
22    Q.   Now, we have spoken already about the
23 Appraisal Institute.  I'm not sure we've
24 identified or defined, in your deposition,
25 exactly who that is and the status of that

Page 282

1  organization.
2         What is the Appraisal Institute?
3     A.   It's a professional organization
4  that's been around for I think, oh, a hundred
5  or so years, a long time, that offers
6  professional education and certifies and
7  designates, if you will, appraisers as being
8  qualified professionals.  They offer the MAI
9  designation that I hold, among others.
10    Q.   And it's a credible organization,
11 correct?
12    A.   Yes.
13    Q.   Have you looked at the AIs discussion
14 of a publication by Linne and others called
15 "Guide to Appraisal Valuation Modeling?"
16    A.   I believe I have.
17    Q.   And let me again represent to you that
18 this is the printout yesterday from the AI
19 website.  And it's a discussion by the
20 Institute about that guide, correct?
21    A.   Well, I haven't read the entirety of
22 this in five seconds, but that appears to be
23 what it is.
24    MR. ZWAIN:
25         Well, take your time to read it

Page 283

1         then.
2     A.   Yeah.  I mean, what you've handed to
3  me is essentially the lead in that I guess very
4  briefly summarizes what that guide contains and
5  what it purports to present.
6  EXAMINATION BY MR. MEUNIER:
7     Q.   Well, and this invitation to look at
8  the guide suggests, doesn't it, that there is
9  an interplay that's available between the, you
10 know, statistical theories of the modeling and
11 traditional appraisal standard, it's not either
12 or, it's both and; correct?
13    MR. ZWAIN:
14         You're saying that that's what
15 this says?
16    MR. MEUNIER:
17         Yes.
18 EXAMINATION BY MR. MEUNIER:
19    Q.   That's what it says the guide invites,
20 is, the highlighting of that, if you look at
21 the middle of that paragraph, "Throughout the
22 text the authors highlight the interplay of
23 evolving statistical theory, traditional
24 appraisal standard and practices and simple
25 common sense.  This timely publication is

Page 292

1 more reliable, correct?

2    A.   That would be the purpose.

3    Q.   And of course you're not familiar, as

4 you sit here, with any of the available model

5 valuation practices or products, are you?

6    A.   Oh, I think I've told you I'm not an

7 AVM expert.  That's correct.

8    Q.   Okay.  Now, have you communicated with

9 Kerry Vandell, one of the other defendant

10 experts, about this case?

11   A.   I have met Kerry Vandell and been at a

12 conference, a meeting, if you will, with him.

13   Q.   A conference or a meeting with the

14 defendant lawyers?

15   A.   Um -- yes.

16   Q.   Who else was present at that meeting?

17   A.   Two gentlemen that were working with

18 Mr. Vandell, and I don't remember all of the

19 lawyers.

20   Q.   When did this meeting take place?

21   A.   Sometime in the last prior two months.

22 I don't remember the exact date.

23   Q.   And you consider Mr. Vandell credible.

24   A.   Based upon what I've read of him, and

25 at the meeting he certainly was professional.

Page 293

1    Q.   Now, you have told us, I believe, that

2 in your own experience with detrimental

3 condition factor evaluation, as it impacts or

4 potentially impacts property value, you've

5 always used the sales comparison approach.

6    A.   Correct.

7    Q.   That's been your methodology that

8 you've used in every case.

9    A.   Correct.

10   Q.   Have you read Mr. Vandell 's article

11 entitled "Optimal Comparable Selection and

12 Weighing in Real Property Valuation" published

13 in the AREUEA Journal, 1991?

14   A.   I have read several articles by

15 Mr. Vandell.  That one I'm not certain of.  If

16 you show it to me, it may refresh my memory.

17   Q.   All right.  (Tendering.)

18        Looking at the article now, are you

19 familiar with it?  Have you read it?

20   A.   Well, again, you're asking me to very

21 quickly make that judgment, and I'd have to

22 certainly read a little more.

23   Q.   Well, let me just -- I'm just going to

24 ask you about the first page, so why don't you

25 take a moment just to read the first couple of

Page 294

1 paragraphs of the introduction.

2      MR. ZWAIN:

3          Well, counsel, if you're going to

4    ask him about an article, I think it's

5    fair to give him an opportunity to

6    read the entire article if he does n't

7    recall having read it before.  I

8    certainly don't know if he does or

9    does.  But if you want to pick and

10   choose particular sentences out of an

11   article that he's never read and take

12   them out of context and not allow him

13   the opportunity to put them in some

14   kind of context, then I don't think

15   that's a fair method of questioning.

16     MR. MEUNIER:

17        If the only way we could ever

18   question a witness, particularly an

19   expert, about a particular section of

20   a document was to interrupt the

21   deposition and allow the witness to

22   read the entirety of the document,

23   then the deposition and discovery

24   practice would devolve into something

25   similar to a house-by-house appraisal

Page 295

1 of a hundred thousand homes.  So with

2 all due respect, Gary --

3    MR. ZWAIN:

4        Well, you're showing the witness

5    something he's never seen before, and

6    if you would ask him questions about

7    what it means then I don't think

8    you're right.

9      MR. MEUNIER:

10       But you haven't heard my

11   question.  And it may be a sentence

12   that he can readily agree or disagree

13   with, or, as you may be inviting him

14   to say, he may say I can't answer

15   until I read the whole article.  But

16   we'll wait and see.

17     MR. ZWAIN:

18       Fair enough.

19 EXAMINATION BY MR. MEUNIER:

20   Q.   Have you read the first couple of

21 paragraphs of the introduction?

22   A.   Yes, I have.

23   Q.   Okay.  Now, first of all, I want to

24 make sure I understand that the sales

25 comparison approach that Vandell is referring

Michael Truax on date 09/27/2007

Page 312

1 reference to Road Home Program recordings.
2     Tell me exactly what that references.
3     A.  That references the, um -- recorded
4 agreements, Road Home agreements that were
5 found in the study area, that were found in the
6 conveyance office of Orleans Parish.
7     Q.  And what information -- substantive
8 information from those agreements was used in
9 the analysis?
10     A.  It was just a notation that Road Home
11 agreements had been, um -- signed for -- with
12 regard to those particular properties.
13     Q.  And why was that considered relevant,
14 if at all?
15     A.  Well, I think it was an indicator of
16 recovery, if you will, that people were
17 availing themselves of those resources,
18 presumably to invest -- reinvest in those
19 properties and, therefore, those properties
20 would be redeveloped and improved or damage
21 repaired.
22     Q.  So the agreement was just used as an
23 indication of the fact that the person what,
24 had received Road Home --
25     A.  Yes.

Page 313

1     Q.  -- benefits?
2     A.  Yes.  Had gone to a closing, had
3 signed the agreement with the Road Home
4 organization.
5     Q.  And you researched the specific
6 properties in each study area to see if there
7 was a Road Home agreement?
8     A.  Yes.
9     Q.  In how many cases was there a Road
10 Home agreement?
11     A.  We can go to the back of the report,
12 and you will have a schedule.
13     Q.  Give me a page.
14     A.  We can go to Page 244, the very last
15 one.
16     Q.  You're going to have to help me with
17 the small print on this page.
18     A.  I believe the small print merely shows
19 the address.  But if you look at the color
20 scheme, in this particular study area there
21 were one, two, three, four, five, six, seven
22 recorded Road Home agreements.  And that was
23 for the Stutz area.  And there will be a page
24 like that for each of the study areas.
25     Q.  I see.  On Page 40 you also identify,

Page 314

1 as data that you looked, at under real estate
2 transaction data, pre-storm and post-storm real
3 estate transactions, correct?
4     A.  Correct.
5     Q.  And what was the significance of that
6 data in this study?
7     A.  I believe that basically demonstrates
8 that there was sales activity, transactional
9 volume, if you will, both in the pre-storm
10 circumstance and post-storm for which -- you
11 know, that could be used as a basis for
12 possibly drawing value conclusions both
13 pre-storm and post-storm if necessary.
14     Q.  And where is that data reflected in
15 the report?
16     A.  Again, there's -- if you go to
17 Page 241 -- well, no, I'm sorry, 242 and 243,
18 on Page 243 you see pre-Katrina sales, and that
19 period studied was from 2000 to 2005, and on
20 that particular page there were nine
21 transactions.
22     Q.  Page 242?
23     A.  Yes.  And then 243 shows post-Katrina
24 sales.  There were two in that study area
25 post-Katrina.

Page 315

1     Q.  All right.  So for every study area,
2 you profiled that same thing?
3     A.  Yes.
4     Q.  Now, on Page 40, at the bottom of that
5 page in the final paragraph, you talk about
6 data collected by way of field observations,
7 correct?
8     A.  Correct.
9     Q.  And it's stated here that the study
10 results in that regard involved the exercise of
11 judgment in some cases.  Can you give me an
12 example of what you mean by that?
13     A.  Well, we observed these properties in
14 the study areas from public right-of-way, the
15 street, essentially.  And we made such
16 judgments as what the elevation of the first
17 floor living areas, say, was above ground
18 elevation.  That was an eyeball estimate from
19 the street.  So it was a judgment of sorts.  We
20 also had to make judgments, necessarily, as to
21 whether, say, a property was reoccupied or not.
22 We looked at such things as whether the
23 electric meter was in place, whether there
24 appeared to be cars in the driveway, curtains
25 on the windows, et cetera.  So there was some

Michael Truax on date 09/27/2007

Page 316

1 judgment in that, as well.  So that's the kind
2 of judgments we were making, because we were
3 only able to obviously observe these properties
4 from the street.
5       Q.   On one occasion.
6       A.   Oh, no.  We saw them on more than one
7 occasion, possibly.  But visiting them more
8 than once probably wouldn't have dramatically
9 changed -- you would have made the same
10 judgments at each visit.
11      Q.   All right.  So you made judgments as
12 to the elevation of the property because you
13 were seeing it from a distance, from the
14 street?
15      A.   Correct.
16      Q.   You made judgments about whether the
17 property was reoccupied based on what it seemed
18 to look like or be --
19      A.   What would be reasonable based upon
20 what you could observe.
21      Q.   What other exercises in judgment were
22 made?
23      A.   The repair estimate.  Whether it was
24 being repaired or not was a judgment, as well.
25 Did you see repair activities, you know,

Page 317

1 underway?  Did you see evidence that some
2 historical repair activities had been
3 conducted?
4       Q.   Yeah.  Because repair activities could
5 have occurred the day after you left.
6       A.   Oh, absolutely.  No, I mean we could
7 only observe what we could observe when we
8 visited the properties.
9       Q.   Right.  What other exercises in
10 judgment?
11      A.   The use was generally pretty clear,
12 but not always.  So you would make some
13 judgments about that.
14      Q.   Use being what, whether it was --
15      A.   Single-family, two-family,
16 three-family --
17      Q.   Uh-huh.
18      A.   -- um -- institutional.  As I say,
19 there was probably less subjectivity in that
20 judgment because it was more readily observed
21 from the street.  But again, there was some
22 judgment in that.
23      Q.   Any other judgments?
24      A.   I think those were the primary.
25      Q.   Now, you note in the report, Exhibit

Page 318

1 D, that some of the information in the study
2 area analysis was provided in hurricane damaged
3 assessment reports from Nelson Architectural
4 Engineers, Inc.
5       Who is that?
6       A.   Nelson was a -- he's, I believe, a
7 forensic engineer.  They came in and looked at
8 the physical structures on all of the named
9 plaintiffs' properties.
10      MR. ZWAIN:
11          You have his report.
12      MR. MEUNIER:
13          That was my next question.
14          Is he being deposed?
15      MR. ZWAIN:
16          He was deposed the other day.  By
17 Mr. Bruno.
18      MR. MEUNIER:
19          Oh.  Well, then I know it was
20 done well.
21 EXAMINATION BY MR. MEUNIER:
22      Q.   Let me refer you to the neighborhood
23 observations set forth in the Plaintiff
24 Property Summary sheet starting at Page 87.
25 Just turn to Page 88 and we'll see a typical

Page 319

1 profile sheet.
2       And under neighborhood observations --
3       A.   Yes.
4       Q.   -- I notice that there's a bullet
5 point for long-term recovery prospects.
6       A.   Where are you, particularly?
7       Q.   The final bullet point under the
8 neighborhood observations, Page 88.
9       A.   Okay.  Yes.
10      Q.   And that statement, neighborhood 's
11 long-term recovery prospect is considered good,
12 that's certainly an exercise in judgment, isn't
13 it?
14      A.   That's an exercise in judgment, sure.
15      Q.   And I notice that you either use the
16 word good or reasonable or limited, depending
17 on the property.
18      A.   Well, that's the neighborhood
19 observation, so it would depend on the
20 neighborhood and what was observed in that
21 neighborhood.
22      Q.   Sometimes you'd say the prospects were
23 good, sometimes you'd say the prospects were
24 reasonable, and sometimes you'd say the
25 prospects are limited.

Michael Truax on date 09/27/2007

Page 320

1   A.  Correct.
2   Q.  Any other grades besides those three?
3   A.  I think those were the three.
4   Q.  All right.  And tell me your
5   definitions of that grading system, good,
6   reasonable and limited.
7   A.  Good, I believe, is intended to
8   suggest that reasonable-minded people with an
9   understanding of our local markets would likely
10  conclude that long term, that this
11  neighborhood, which is that one, the one we've
12  discussed happens to be Lakeview, will --
13  there's a likelihood that you will have
14  recovery.  That judgment was made based upon
15  certainly historical perspective about the
16  pre-Katrina circumstances of Lakeview and
17  generally attitudes that I believe exist
18  regarding that neighborhood even post-Katrina.
19  Q.  You were the grader on this?
20  A.  I was the grader.
21  Q.  Okay.  And when you say a good
22  prospect for long-term recovery, what do you
23  mean by long-term; what's the end date?  What's
24  the date on which a good outcome is finally
25  realized?

Page 321

1   A.  Well, I think the window is probably a
2   five to ten-year window.
3   Q.  All right.  So what you're saying is
4   that within -- in five to ten years from now,
5   what you're saying in those cases is that
6   there's a good prospect that that neighborhood
7   will be recovered.
8   A.  Recovered, reconstituted and become
9   hopefully much of what it was pre-Katrina, if
10  not better.
11  Q.  All right.  My next question was, when
12  you say recovered, you mean pre-Katrina status?
13  A.  Well, certainly we all know it's not
14  going to be -- non of the neighborhoods are
15  going to be exactly identical to what they
16  were.  But certainly I believe that this
17  particular neighborhood, Lakeview, will likely
18  recover to be, again, a very popular and
19  appealing area for people to live.  And will be
20  redeveloped.
21  Q.  Yes, but not the same as it was before
22  Katrina.
23  A.  No, I don't think same is in the cards
24  for most of our neighborhoods.
25  Q.  The new normal.

Page 322

1   A.  That's reasonable to say.
2   Q.  All right.  Now, define -- and we'll
3   finish with the definitions -- reasonable and
4   limited.  Tell me what the grading criteria for
5   those --
6   A.  Reasonable, to me, was an attempt to
7   say the jury is still out a bit in terms of the
8   direction that those neighborhoods are going.
9   It remains to be seen.  But it's not -- it
10  won't be, um -- unlikely that they recover and
11  become viable neighborhoods again.
12  Q.  Okay.
13  A.  Limited means the prospects are less
14  than 50 percent, let's saw, in my view.  Now,
15  these are my judgments.  That's all we can make
16  is a judgment about that.
17  Q.  Sure.  Uh-huh.
18  A.  But in those neighborhoods, I see it
19  as less probable -- not impossible, but less
20  probable that you're going to see a return to,
21  you know, maybe the status that you had
22  pre-Katrina.
23  Q.  And before we take a break let me just
24  make sure I understand.  What is the relevance
25  or pertinence of this analysis where you go by

Page 323

1   and say this neighborhood has got a good,
2   limited or reasonable prospect of good
3   long-term recovery?
4   A.  Well, part of any, you know, certainly
5   appraisal process is descriptive.  And this is
6   intended to describe, if you will, present
7   information about the named plaintiffs'
8   properties.  Clearly demonstrates that
9   neighborhood to neighborhood, there are
10  differences.
11  Q.  In your approach, the individualized
12  appraisal approach to investigating damages,
13  particularly diminution of property value
14  damages in this case, would you be relying on
15  these judgments as to whether a given
16  neighborhood has a long-term recovery prospect
17  that's either good, reasonable or limited?
18  A.  Well, I think absolutely, because that
19  is the very point, that without you
20  individualizing the analysis and the study, you
21  cannot globally, across the spectrum, determine
22  that everyone has the same prospects for
23  recovery.
24  Q.  Could you be wrong about your
25  evaluation of the long-term prospects?

**Michael Truax on date 09/27/2007**

Page 332

1  it was another one.  But I definitely have seen
2  literature that made that statement.  But it
3  could very well have been this very article
4  that's cited.
5      Q.   Now, Page 133 through 135, there's a
6  discussion about a 2003 Times-Picayune
7  investigation and a Louisiana Legislative Audit
8  report of that same year criticizing how
9  property tax assessments were conducted in New
10 Orleans and other parishes, correct?
11     A.   Correct.
12     Q.   Did either The Times-Picayune or the
13 Legislative Auditors, Mr. Truax, ever conclude
14 that it was inappropriate to use the mass
15 appraisal technique for tax assessment
16 purposes?
17     A.   My recollection of the articles, I
18 would tell you no, their focus was that the
19 assessment practices being followed in Orleans
20 Parish had some serious issues.
21     Q.   In fact, what they criticized were the
22 lack of adequate or sufficient data, not the
23 use of the mass appraisal technique, true?
24     A.   Well, you know, you had a host of
25 problems, but that was certainly -- the lack of

Page 333

1  data was certainly one of them.  I don't know
2  that they commented at all, positively or
3  negatively, regard application of a particular
4  mass appraisal technique.
5      Q.   Certainly you'd agree that neither The
6  Times-Picayune nor the auditors ever suggested
7  that it would be better or more workable to
8  have an assessment system based on individual
9  property-by-property appraisal; that was
10 certainly never suggested, was it?
11     A.   I don't know that that was or wasn't
12 suggested.  As I said, I think the focus of the
13 article, as I recollect it, was upon the
14 serious problems in how the process was being
15 implemented in Orleans Parish by the assessors
16 that were there at the time.
17     Q.   Let me ask it this way:  Has anyone in
18 your field ever suggested, in any county or
19 parish, that mass appraisal techniques be
20 abandoned entirely in favor of individualized
21 property appraisals as a basis for tax
22 assessment?
23     A.   Well, you've used two words, you've
24 said anyone in my field, anywhere.
25     Q.   Yes.

Page 334

1      A.   Now, there's no way I can know that.
2      Q.   No.  I should say that you know of.
3  That's obviously the qualification.
4      A.   Thank you.
5      Q.   You can only know what you know.  So
6  tell me if you know of anyone in your field
7  who's ever made that suggestion.
8      A.   Even my limited world, there are a
9  few.  I need to think of them.  I can't tell
10 you that I'm -- sitting here today recall a
11 specific discussion with anyone in my field
12 really about the topic.
13     Q.   Now, on Page 135 and 136, there's a
14 discussion in Exhibit D about the number of
15 appeals of tax assessments that are taken,
16 correct?
17     A.   Yes.
18     Q.   And you state with Mr. Roddewig that
19 that is an indication that mass appraisal
20 technique is inaccurate.  Correct?
21     A.   That was an indicator, yes.
22     Q.   So if people challenged the amount of
23 property tax they're asked to pay, your
24 conclusion is that the appraisal for tax
25 purposes, therefore, must be too high.

Page 335

1      A.   No, I don't believe that's what we
2  were particularly saying.  I believe -- as I've
3  told you, I believe Orleans Parish for the
4  first time in '08 had the ability to implement
5  some rudimentary automated valuation model type
6  approach to projecting the reassessments.  And
7  historically, prior to this change in system,
8  the gentlemen I talked to said they would have
9  a relatively limited number of appeals that at
10 least moved to the parish council level, and
11 usually it was 60 or 80.
12         With the system that was implemented
13 by the assessors in '08, you ended up with 5200
14 appeals.  So it was -- there was a dramatic
15 shift -- dramatic change in the number of
16 appeals that were filed.  And it was
17 indicative, I believe, that whatever system
18 they implemented wasn't proving to be very
19 workable.
20         Now, we all know that some of it was
21 certainly a knee jerk reaction to a dramatic
22 change in the numbers, but I think I told you
23 yesterday I am personally aware of several
24 instances where the numbers that came from
25 implementation of that system were, in my

Page 348

1  have occurred within the MRGO class area since
2  Katrina?
3     A.  I wouldn't want to hazard a guess.  I
4  would suggest it's probably less than that.
5     Q.  Just because there's less turnover in
6  places like St. Bernard?
7     A.  Exactly.
8     Q.  Well, I guess my question here is,
9  when you expressed the concern in the report
10  about having a large enough number of sales to
11  support a hedonic modeling approach, do you
12  believe that that number that you've discerned
13  in the levee area, levee class area, is
14  sufficient to support such an approach?  And if
15  not, tell me what the number would have to be.
16     A.  Well, I think the key word in this
17  statement that we have read from the report is
18  the submarket word.  I would not necessarily
19  hold that certainly the subclasses as proposed
20  herein constitute neighborhoods.  And because
21  of the nature of the New Orleans development
22  pattern and its unique characteristics, we have
23  little enclaves of very different character
24  type development interspersed throughout even
25  relatively small geographic areas.  So I think

Page 349

1  the point is that if you are going to have
2  relevant data to utilize in some sort of mass
3  appraisal technique like an AVM, it needs to be
4  sufficient in number to gain a reasonable
5  estimate of what, say, the average sale price
6  may be.
7     Q.  Well --
8     A.  But point being that, again, this goes
9  to the variety issue and the variability issue.
10     Q.  Well, can we agree, then, that you
11  don't know whether there would be a sufficient
12  number of sales to support the use of hedonic
13  modeling in the levee area based upon the 6900
14  plus transactions because we would have to know
15  how many of those transactions fell into the
16  discernible submarkets being studied?
17     A.  Certainly in part, yes.
18     Q.  But certainly with that many sales
19  transactions having occurred, you would
20  acknowledge the possibility that there may be
21  sufficient sales data within certain submarkets
22  to support hedonic modeling.
23     A.  Oh.  I think I've cited that several
24  times, that there are certainly limited
25  circumstances that it might work.  But I'm just

Page 350

1  saying, on an overall basis, I do not believe
2  that it would be workable on a broad scale in
3  the proposed subclass areas.
4     Q.  Now, Page 144, you set forth a
5  discussion about the problem with hedonic
6  models being the inability to truly isolate the
7  dependent variable, the factor that's being
8  studied.
9     A.  Correct.
10     Q.  For example, if you were trying to
11  study the effect of the flood, you're saying
12  that hedonic model is challenged because how do
13  you ever really truly isolate that and not know
14  that the outcome has been shaped by variables
15  that weren't even considered?  Fair?
16     A.  Fair.  And then on top of that, you
17  have the issue of flood being what?  Flood is
18  water.  Well, we had rainwater, as well.  So.
19     Q.  We're going to take care of that
20  problem.  That's going to be a legal issue that
21  you will have determined for you by the time
22  you appear.
23     MR. ZWAIN:
24       How gracious of you.
25     MR. MEUNIER:

Page 351

1       I think that's a fair statement.
2  We'll have to work that out.
3     MR. MARPLE:
4       Yeah.  Let me just object to that
5  statement.
6     MR. MEUNIER:
7       There are some who don't want to
8  work it out, but I think we're going
9  to try hard to work it out.
10  EXAMINATION BY MR. MEUNIER:
11     Q.  So we're talking here about the
12  omitted variable problem, right?
13     A.  Essentially, correct.
14     Q.  And you're aware, aren't you, that
15  hedonic models have been in use for many years.
16     A.  Yes.
17     Q.  You're familiar, no doubt, with the
18  1974 article by Rosen that generally supports
19  hedonic models as the best available method to
20  estimate price effects of property
21  characteristics?
22     A.  I believe I looked at that article,
23  but, you know, I don't dispute what you said.
24     Q.  Isn't it true, Mr. Truax, that all
25  hedonic -- it's true that with all hedonic

Michael Truax on date 09/27/2007

**Page 352**

1  models it's not necessary to include and
2  measure all characteristics of interest in
3  order for the model outcome to be accurate,
4  it's necessary, instead, that there be a
5  sufficient number of variables considered to
6  explain the price variation.
7      Would you agree with that?
8    A.  Well, I think -- I certainly agree
9  that there is a number of variables that -- it
10  would never be all.  That's probably correct.
11  But the number that might be necessary to
12  particularly isolate, or attempt the isolate,
13  as best you can, a single, say, value impact,
14  or associated with a single component, if you
15  will, of the pie, can vary tremendously
16  neighborhood to neighborhood.
17    Q.  Do you know what is meant by a
18  geographically weighted regression scheme?
19    A.  I can't tell you I'm entirely familiar
20  with it.
21    Q.  So you don't know whether it's true or
22  not that the variability in hedonic models in
23  terms of the variability of property
24  characteristics is routinely addressed in
25  hedonic schemes using geographically weighted

**Page 353**

1  regression scales.  You don't know that to be
2  true?
3    A.  No, I think I've told you I've not
4  studied these particular applications in any
5  depth.  I mean, clearly you can weight results
6  by neighborhood or by geography, and I assume
7  that's what they're referencing.
8    Q.  Now, Page 146 of Exhibit D, you set
9  forth five, quote, professionally recognized
10  techniques, close quotes, for determining the
11  impact of a detrimental condition, right?
12    A.  Yes.
13    Q.  The first of these is called the
14  paired sales analysis?
15    A.  Yes.
16    Q.  Which compares sales affected by a DC,
17  or detrimental condition, with similar sales
18  not affect by a DC.
19    A.  Right.
20    Q.  And that's your methodology?
21    A.  That is the methodology that I believe
22  is the most appropriate and the most relevant
23  to producing a credible result.
24    Q.  But all of these listed are
25  professionally recognized techniques.

**Page 354**

1    A.  Yes.
2    Q.  The fourth one, market data analysis,
3  studies the effects of DCs on other properties,
4  correct?
5    A.  Yes.
6    Q.  And it says that a study designed to
7  cross reference remediation and stigma costs
8  and losses illustrates the wide range of
9  effects of DCs and provides market data on
10  conditions of sales comparables.
11    Obviously you agree with that
12  statement because you made it in your report;
13  correct?
14    A.  Correct.
15    Q.  So this is an equally valid,
16  recognized approach to the investigation of the
17  impact of a detrimental condition in a market
18  data analysis?
19    A.  Yes.
20    Q.  You've already told us, of course,
21  that you've never published on mass appraisals
22  or AVMs or hedonic modeling, um -- and that you
23  don't really consider yourself or hold yourself
24  out as an expert on those things, but in this
25  report you cite and rely upon peer reviewed

**Page 355**

1  articles, correct?
2    A.  Correct.
3    Q.  Including, on Page 147, Footnote 103,
4  an article written by the same person who
5  prepared this report with you.
6    A.  Correct.
7    Q.  And it's Richard Roddewig.
8    A.  Correct.
9    Q.  So you're relying on Roddewig to
10  support opinions and conclusions in this case.
11    A.  Well, I think when we cite all of
12  these articles, remember, the articles in and
13  of themselves are the presentations and
14  opinions of the author, obviously, but the
15  point is that they're peer reviewed.  So
16  it's -- and I'm recollecting Dr. Kilpatrick 's
17  report, I believe most of his citations were of
18  his own articles.  So I -- you know, I think
19  the point of the citation and whatever weight
20  you give the article is the fact that at least
21  certainly at some level it was peer reviewed.
22    Q.  But you're relying on Roddewig, aren't
23  you, for the proposition stated here that
24  Kilpatrick 's survey techniques have been
25  tested and proven to be unreliable?  You're

Michael Truax on date 09/27/2007

Page 360

1 proposed class.  Now, all the questions that
2 I've asked and all the responses to those
3 questions that you've given pertinent to the
4 need for individual property analysis, and that
5 are not dependent on particular geography would
6 all be the same in connection with this
7 conclusion for MRGO, correct?
8    A.  Correct.
9    Q.  What about Number 2, the use of mass
10 appraisal techniques will not produce accurate
11 results; can we agree that the questions and
12 answers we have already been through in
13 connection with your service as a levee case
14 expert would simply be repeated in connection
15 with that conclusion?
16    A.  We can agree.
17    Q.  Okay.  Same for Number 3, that local
18 tax assessment data and values cannot reliably
19 be utilized?
20    A.  Yes.
21    Q.  And the same for Number 4, that --
22 well, Number 4 is unique to MRGO.  There you're
23 talking about the properties of the named
24 plaintiffs in MRGO only, correct?
25    A.  Correct.  We did have discussion about

Page 361

1 the representative nature of the group in
2 levees, as well.
3    Q.  Okay.  Now, Page 8, we've already had
4 some reference to this, but I want to make sure
5 about where we stand on your estimates here.
6 You, on Page 8, in giving a class description,
7 state that you've looked at 2000 census data,
8 and you determined that in New Orleans East, at
9 that time there were approximately 34,000
10 households, correct?
11    A.  Correct.
12    Q.  That's residential property units.  Is
13 that what's meant by household there?
14    A.  Yes.
15    Q.  And then in the Lower Ninth Ward,
16 according to the 2000 census data, there were
17 7000 residential property units.
18    A.  Correct.
19    Q.  And according to the census in 2000
20 for St. Bernard Parish, there were
21 approximately 25,000 residential property
22 units.
23    A.  Correct.
24    Q.  Now, can we agree that as of August,
25 2005, those totals of 34,000, 7,000 and 25,000

Page 362

1 likely were greater?
2    A.  Yes.
3    Q.  In every case -- in all three cases?
4    A.  Yes, that they were likely higher.
5    Q.  Is there a more current source for
6 determining the total number of residential
7 properties in those three areas?
8    A.  Well, the census data is -- there are
9 these interim findings, if you will, since they
10 only do the definitive studies every ten years,
11 that are created using some pretty extensive
12 extrapolation.  So that's, I'm sure, published,
13 but it's an extrapolation from a very limited
14 sampling.
15    Q.  All right.  Have you looked at that?
16    A.  I've seen it through the years, but we
17 tend to recognize them for what they are.  It's
18 an extrapolation.  But as you said earlier, I
19 would agree, with the concept, certainly, that
20 those numbers were higher than was reflected in
21 the 2000 study as of '05.
22    Q.  And this total of 66,000 residential
23 property units, if you add those numbers for
24 New Orleans East, Lower Ninth and St. Bernard,
25 that would not take into account the number of

Page 363

1 commercial properties?
2    A.  I think that's correct.
3    Q.  Any idea how many commercial
4 properties we're talking about?
5    A.  No, I wouldn't have a number for you.
6    Q.  Is there any source or reference that
7 you know of to discern those totals?
8    A.  In these neighborhoods, not
9 particularly.
10    Q.  Same with institutional and government
11 properties, that would be in addition -- those
12 numbers would be in addition to the 66,000?
13    A.  I would think so, yes.
14    Q.  If I understand your sales comparison
15 approach which you would recommend to discern
16 the negative effect of any of the flood on the
17 property values, you would literally, um --
18 analyze each and every one of these more than
19 66,000 properties, correct?
20    A.  I would analyze properties on an
21 individual basis taking into consideration
22 their particular characteristics, yes.
23    Q.  And you would look at the factors, in
24 each case, that are listed on Page 9 of your
25 report; correct?

Page 364

1    A.   Among others, but yes.
2        Q.   So there would be additional factors
3    that you'd look at?
4    A.   Yes.
5        Q.   Even beyond those listed on Page 9.
6    A.   Yes.
7        Q.   As I asked you yesterday if you were
8    familiar with the Freddie Mac or Fannie Mae
9    appraisal form -- Residential Appraisal Report
10   form.
11   A.   Right.
12       Q.   And I believe you told me that your
13   office actually uses its own template or form
14   for conducting appraisals?
15   A.   What I told you was that we have
16   multiple templates that we use as an outline,
17   if you will, and then we'll, um -- customize
18   them as needed for the particular property
19   being appraised.
20       Q.   All right.  Let me show you the
21   Uniform Residential Appraisal Report form for
22   Freddie Mac and Fannie Mae which actually was
23   produced by defense counsel and made an
24   attachment as Exhibit 12 to the Deposition of
25   Dr. Kilpatrick.

Page 365

1        Are you familiar with that form?
2    A.   Yes.
3        Q.   In conducting your appraisals of the
4    more than 66,000 residential property units for
5    your sales comparison method, would you utilize
6    a form similar to that one?
7    A.   Well, certainly I believe some
8    template would be established, this one or
9    something similar to it, to facilitate the
10   efficient appraisal of a large number of
11   properties.
12       Q.   Let me mark, then, as --
13   A.   My only point is it need not be this
14   precise form.
15       Q.   But it would be similar.
16   A.   It would be a form -- again, if you
17   were tasked to appraise a large number of
18   properties, you would create some efficiencies
19   via a template of some sort that would be
20   utilized to facilitate, you know, that type of
21   endeavor.
22       Q.   But at a minimum you'd be looking at
23   the factors listed on Page 9 of your report.
24   A.   Yes.
25       Q.   Let me mark as Truax 11 the Uniform

Page 366

1    Appraisal Report form.
2        (Exhibit 11 was marked for
3    identification and is attached hereto.)
4    EXAMINATION BY MR. MEUNIER:
5        Q.   Let me refer you now, Mr. Truax, to
6    the Fannie Mae website, I guess, guidance sheet
7    that accompanies this form, and it was also a
8    part of Kilpatrick Number 12 as an attachment,
9    and ask you if you've ever seen or reviewed
10   that guide sheet or that information sheet
11   before.  (Tendering.)
12   A.   I can't tell you I've reviewed this
13   recently.  Probably seen it through years or,
14   or something similar to it.
15       Q.   Okay.  And this Fannie Mae guide for
16   the execution of the form states that the
17   appraiser must, at a minimum, do four things,
18   and I'd like to ask you if you agree that all
19   four of these things must be done at a minimum
20   to conduct an appraisal in connection with the
21   use of this form.  (Indicating.)
22       Number 1:  Perform a complete visual
23   inspection of the interior and exterior areas
24   of the subject property.
25       Do you agree?

Page 367

1    A.   Not entirely.  There are various types
2    of appraisals that can be requested of an
3    appraiser.  If a complete appraisal, let's say,
4    is requested for mortgage lending purposes,
5    then that is absolutely correct.  But an
6    appraiser can be tasked to do an appraisal of a
7    property based upon exterior inspection only.
8    Obviously, there's a list of assumptions that
9    go with that finding, but it's not necessary in
10   all cases that a complete interior inspection
11   be accomplished to produce something that is
12   then called an appraised value.
13       Q.   Well, if you were using the sales
14   comparison methodology that you use to
15   investigate the detrimental condition factor,
16   in this case, again investigating whether
17   there's been property diminution post-Katrina
18   due to --
19   A.   Yes.
20       Q.   -- the flood, would you, for purposes
21   of that methodology, follow this minimum step
22   Number 1 on the Fannie Mae website?
23   A.   Yes, for that purpose I believe you
24   would.
25       Q.   So you'd be doing a complete visual

Michael Truax on date 09/27/2007

Page 368

```
1  inspection of the interior and exterior areas
2  of each and every one of more than 66,000
3  residential properties in the MRGO class area.
4      A.  In order to produce, yeah, accurate
5  and credible results, yes.
6      Q.  How long do you think that would take?
7      A.  I do not know.
8      Q.  How much do you think that would cost?
9      A.  I do not know.
10     Q.  The second minimum step, according to
11  Fannie Mae, is inspect the neighborhood.
12         Is that something that you would do in
13  connection with your sales comparison
14  methodology?
15     A.  Yes.
16     Q.  In this case.  How long do you think
17  it would take you to inspect the neighborhood
18  of more than 66,000 residential property units
19  in the MRGO class area?
20     A.  I do not know.
21     Q.  How much do you think that would cost?
22     A.  I do not know.
23     Q.  Number 3:  According to Fannie Mae, a
24  minimum step is inspect each of the comparable
25  sales from at least the street.
```

Page 369

```
1         Is that a step that you would follow?
2      A.  Yes.
3      Q.  So obviously the number of sales would
4  vary from street to street, correct?
5      A.  Well, the number of comparables --
6  yeah, that are relevant could vary property to
7  property.
8      Q.  Well, let me ask you, how would you go
9  about deciding what were the comparable sales
10  to look at on a given Street?
11     A.  You'd essentially follow the same path
12  you would in a normal appraisal, which means
13  that you would research the relevant areas that
14  you thought were particularly comparable to the
15  property being appraised and discover whatever
16  pool of data that existed that was reasonably
17  current, you'd, from that grouping, then select
18  those sales that you thought were particularly
19  comparable, and analyze those leading to a
20  value conclusion.
21     Q.  I guess you're going to tell me you
22  don't know how much that would cost or how long
23  that would take.  Am I correct?
24     A.  For 66,000?  You're correct.
25     Q.  Can you tell me how long you think it
```

Page 370

```
1  would take, on average, to do it one time, one
2  residential property, conduct the needed
3  research of comparable sales for that property
4  from the nearby properties?
5      A.  Well, I can tell you, you know,
6  residential appraisal shops will generally
7  produce -- you know, an appraiser -- a good
8  experienced residential appraiser will produce,
9  oh, probably two to three a day, if the
10  business volume was sufficient to warrant them
11  running at that pace.
12     Q.  And am I correct that because you
13  regard this property mix, even the residential
14  property mix in MRGO class area, as
15  heterogeneous -- correct?
16     A.  Correct.
17     Q.  -- that would make the task of
18  researching and discerning comparable sales
19  more challenging than if it were a homogenous
20  property?
21     A.  Correct.
22     Q.  Because now you got to look for truly
23  comparable properties, and to some extent
24  they're all different, you say.
25     A.  As you say, certainly the task in that
```

Page 371

```
1  type of neighborhood is more difficult.
2      Q.  The fourth minimum step, according to
3  Fannie Mae, is to research, verify and analyze
4  data from reliable public and/or private
5  sources.
6         Now, do you know what kind of data
7  Fannie Mae refers to there for purposes of an
8  appraisal?
9      A.  I think they're referring to
10  comparable data.
11     Q.  We're talking about sales data again?
12     A.  Yes.
13     Q.  Any other data?  Are we talking about
14  tax assessment data or --
15     A.  If a particular client, say, requires
16  that the tax assessment data be inputted on the
17  form, and some do, then certainly you would
18  research that.
19     Q.  And I guess you'd research the Road
20  Home appraisal data, as well, for either the
21  subject property or a perceived comparable.
22     A.  No, you wouldn't -- well, you wouldn't
23  particularly be focused upon that if your task
24  was to provide a market value estimate for the
25  property.  Your focus would be on transactional
```

Page 372

1 information regarding other properties that had
2 actually sold in the marketplace.
3    Q.  Okay.  Because the Road Home would
4 give you the pre-Katrina value -- appraisal
5 value?
6    A.  Well, you wouldn't -- you likely would
7 aren't have access to the Road -- remember, the
8 what the Road Home database might have is an
9 individual property appraisal.  It would not
10 necessarily be a sale of that property that
11 would be useful in appraising that
12 particular -- your subject property.
13    Q.  It would be a pre-Katrina appraisal
14 wouldn't it?  Isn't that what the Road Home --
15    A.  That's correct.
16    Q.  Yeah.
17    A.  But that's what it would be.  It would
18 be a pre-Katrina appraisal of a given property.
19    Q.  Right.  Well, under your methodology,
20 if you're trying to discern the detrimental
21 condition of the flood, do you or do you not
22 look for that Road Home pre-Katrina appraisal
23 data at some step in the process?
24    A.  Are you assuming we are appraising a
25 property that has been part of the Road Home

Page 373

1 system?  Is that your assumption?
2    Q.  Yeah.  Assuming there's some data from
3 Road Home for the property, would you be
4 interested in it for purposes of this
5 methodology?
6    A.  Oh, yeah.  Certainly, appraisers are
7 great collectors of information, so any
8 information that would assist them in
9 accomplishing their task would be of use.
10    Q.  And then the final fifth minimum step
11 identified by Fannie Mae is to report the
12 analysis of opinions and conclusions in this
13 appraisal report, again referring in this case
14 to that form report we've looked at.
15        But when you use this exact report,
16 every appraisal needs to end up, doesn't it, in
17 some sort of a written form where you state
18 your conclusions?
19    A.  Technically, it doesn't have to.  I
20 can give you a verbal report.  But in the
21 arenas you've been talking to me about --
22    Q.  Right.
23    A.  -- all those findings were usually
24 transmitted in some written form.
25    Q.  Right.  And for purposes of this

Page 374

1 litigation, if you were carrying out this task,
2 you would certainly reduce your conclusions --
3 your appraisal conclusions to written form --
4    A.  I believe so.
5    Q.  -- in each case.
6    A.  I believe so.
7    Q.  Okay.  I notice that the Fannie Mae
8 structure guide also then states or sets forth
9 what it calls required exhibits.  (Tendering.)
10        You see that?
11    A.  Yes.
12    Q.  Are all of those required exhibits
13 things that you would seek to obtain and attach
14 to the individual property appraisal for
15 purposes of your sales comparison methodology?
16    A.  I think these exhibits are certainly
17 typical of appraisal reports submitted to
18 Fannie Mae or Freddie Mac, but are they a
19 requirement in all cases for all appraisals?
20 No.  The key for an appraiser is to produce a
21 product that certainly is accurate, credible,
22 reliable and certainly suitable for the purpose
23 to which he was hired at some level.  That's
24 not to say that the value conclusion has to be
25 suitable, but that, for the purpose which the

Page 375

1 report was to be used, it has to be
2 appropriate.
3    Q.  And the exhibits that are required,
4 according to Fannie Mae, are street map, an
5 exterior building sketch, descriptive photos,
6 and any other data that's been looked at and
7 deemed relevant, correct?
8    A.  Correct.
9    Q.  All right.  Let me mark as Truax 12
10 the Fannie Mae Form 10004 guide.
11        (Exhibit 12 was marked for
12 identification and is attached hereto.)
13 EXAMINATION BY MR. MEUNIER:
14    Q.  Page 11 of your MRGO report, at the
15 bottom, you say the individual circumstances of
16 a property must be fully known, analyzed and
17 considered both on a macro and micro level.
18 And I know you have parenthetical explanations
19 of what macro and micro mean.
20        I want to make sure I understand.
21 When you say you're going to look at the
22 individual circumstances of the property on a
23 macro level, are you referring to comparable
24 properties in the neighborhood or in a larger
25 population?

Page 376

1    A.   In any appraisal, you should consider
2  any and all factors that bear on its valuation.
3  So it's not a fixed list, if you will.
4  Anything that you believe would impact the
5  value and that a potential buyer in the
6  marketplace would consider, then you as the
7  appraiser need to consider that.
8    Q.   Right.
9    A.   So as you say in the parenthetical
10  here regarding the macro issues would be the
11  neighborhoods.  Certainly neighborhood in the
12  context of an individual appraisal would
13  primarily relate to the competitive
14  neighborhood market area.  For example, if you
15  were in Lakeview, you probably would primarily
16  research Lakeview.
17    Q.   Uh-huh.
18    A.   The micro has to do with the
19  particular -- the more particular circumstances
20  that bear on your subject property, like is
21  there a junk yard on the property next door or
22  across the street, and would that impact a
23  buyer's thinking?  So -- but conceptually, you
24  would consider and analyze anything that you
25  think might have a bearing on the value of the

Page 377

1  property.
2    Q.   Would your macro level reference for
3  purposes of the MRGO subclass areas, St.
4  Bernard, Lower Ninth, New Orleans East, ever
5  extend beyond those areas?
6    A.   Well, as I said, I think we talked
7  about this yesterday, um -- let's say in one of
8  those areas if there is the fact that it is in
9  New Orleans, it is in an area protected by
10  levees, that influence certainly is overriding
11  to all of the properties in the area, and so
12  that's embedded in the sales we will use,
13  hopefully, because they will come from a
14  neighborhood that's in the same area.  So that
15  influence is inherently considered by virtue of
16  your comparable selection.  You might not have
17  to articulate it in your form or in whatever
18  form you use for an adjustment because it's
19  embedded in the comparables already.
20    Q.   Let me refer you to page 12 of your
21  MRGO report which begins a discussion about the
22  diversity of properties in the MRGO class area.
23           Do I understand that in order to
24  demonstrate the diversity of property types in
25  the entire MRGO class area -- and you regard

Page 378

1  that diversity as extending through all three
2  subclasses, right?
3    A.   There is diversity in all three
4  subclasses.
5    Q.   So in order to demonstrate that, you
6  conducted a study of one specific area,
7  correct?
8    A.   Correct.
9    Q.   And that's the, shall we call it the
10  Charbonnet area?
11    A.   Correct.
12    Q.   How did you come to select the
13  Charbonnet area as a suitable area that
14  illustrates diversity throughout the entire
15  MRGO class area?
16    A.   Well, we only had -- given the
17  criteria that I had accepted that I was going
18  to employ, which was that we would center
19  whatever study we did around one of the named
20  plaintiffs, we only had four to choose from in
21  that particular case, and the Charbonnet
22  property is certainly in the proposed class
23  area, and it has -- it clearly demonstrates
24  considerable diversity in the immediate area.
25    Q.   Yes, but your position is that that

Page 379

1  diversity demonstrated in the Charbonnet area
2  is a diversity which exists throughout the
3  entire MRGO class area, is that true?
4    A.   No, I don't think I'm telling you that
5  the diversity, particularly, say, the
6  percentages of various property types within
7  that small study area, that I'm contending that
8  that is to be extrapolated to the whole of the
9  class area.  That's not the intent at all.  The
10  intent was to say, if you study in this case
11  just an area as small as nine blocks, you get a
12  tremendous amount of diversity, even in a
13  subset that is that small.
14    Q.   Well, do you believe that if you then
15  moved over into a different subclass area,
16  different neighborhood, and looked at a
17  different nine blocks, you're going to find the
18  same degree of diversity?
19    A.   Oh, no.  That would vary.  You would
20  find some nine block areas that had probably
21  even greater diversity.  You'd find some nine
22  block areas that had a limited amount of
23  diversity.
24    Q.   Okay.
25    A.   No.  That's --

**Michael Truax on date 09/27/2007**

Page 380

1    Q.  All right.
2    A.  Absolutely.
3    Q.  So you're not seeking to extrapolate
4  to the entire class area any opinions about the
5  degree or extent of diversity from the study of
6  this one nine block area, are you?
7    A.  Not in a particular way.  But I'm here
8  to tell you, having been an appraiser here for
9  thirty odd years, I'm confident that there is
10  tremendous diversity over the full extent of
11  the class area.
12    Q.  Now, listing of percentages starting
13  at the bottom of Page 12 and then continuing to
14  the top of Page 13 of your report indicate that
15  in the Charbonnet study area 73 percent of the
16  property units were residential.  True?
17    A.  Well, more particularly, 33 percent
18  were single-family and 40 percent were
19  multifamily.  That can be, you know, anything
20  above a two-family or more.  But these are
21  residential classifications, that is correct.
22    Q.  73 percent were residential, true?
23    A.  A mix of single and multifamily, yes.
24    Q.  And 80 percent were vacant.  Is that
25  true?

Page 381

1    A.  Well, 80 percent of those properties
2  were unoccupied, yes.
3    Q.  So for the most part, the Charbonnet
4  study area was a vacant residential
5  neighborhood.
6    A.  Obviously -- yeah.  The majority of
7  the people in that particular area had not come
8  back and repaired and reoccupied their homes.
9    Q.  And according to Page 13, 86 percent
10  of the structures, or is this just residential,
11  are one-story?
12    A.  That would be structures.
13    Q.  That's all structures.
14    A.  Right.
15    Q.  86 percent of all structures, of all
16  types, were one-story?
17    A.  Correct.
18    Q.  Now, when you say one story, you mean
19  slab foundation?
20    A.  One level of living area.
21    Q.  One level of living I area.  I see.
22  You're not here referring to elevation.
23    A.  No.
24    Q.  So 86 percent of the properties were
25  one level.

Page 382

1    A.  Correct.
2    Q.  And then I guess it's in the next
3  category where you talk about something about
4  elevation.  You say, 72 percent were raised
5  above slab level, correct?
6    A.  Yes.  They were raised, typical New
7  Orleans style, older style home, raised on
8  piers.  Concrete block or brick piers.
9    Q.  So again, for the most part of the
10  Charbonnet study you're talking about one-story
11  raised structures.
12    A.  In the majority.
13      (Brief interruption.)
14  EXAMINATION BY MR. MEUNIER:
15    Q.  Still on Page 13 of your report,
16  Mr. Truax, you make a statement that there was
17  evidence of wind damage in 89 percent of the
18  structures in the Charbonnet study area?
19    A.  Yes.
20    Q.  How, how did you -- first of all, let
21  me ask you, do you profess to have expertise in
22  discerning different types of property damage,
23  that is, wind versus other types, for example?
24    A.  I think I would profess to have
25  experience, certainly, in looking at hundreds

Page 383

1  if not thousands of properties in my thirty
2  years of appraisal experience where we were
3  certainly looking for damage and that type of,
4  um -- structural characteristic as it would
5  relate to an appraisal.  So am I familiar with
6  seeing properties that have wind damage of
7  sorts?  Yes.
8    Q.  All right.  But notwithstanding your
9  experience in seeing that, you don't have the
10  training or specialized background, for example
11  possessed by adjusters who go out and, as a
12  profession, make distinctions between different
13  types of damages; you don't have that kind of
14  background, do you?
15    A.  Well, I believe when we were talking
16  about my background I told you after Hurricane
17  Katrina I actually worked as an adjuster for a
18  time.  So I did precisely that.
19    Q.  And how long did you do that?
20    A.  Oh, I probably did that for three
21  months.
22    Q.  Have you ever testified as an expert
23  in adjusting insurance claims?
24    A.  No.
25    Q.  Have you ever written a report as an

Page 384

1  expert in adjusting insurance claims?
2    A.  We wrote reports on every one of the
3  properties we adjusted.
4    Q.  I mean in litigation.
5    A.  No.
6    Q.  Have you ever written an expert report
7  for litigation purposes as an adjuster?
8    A.  No.
9    Q.  Well, do you hold yourself out as an
10  expert in legal proceedings in the field of
11  insurance adjusting?
12      MR. MARPLE:
13        Let me object to the form of the
14      question.
15    A.  No.
16  EXAMINATION BY MR. MEUNIER:
17    Q.  So the 89 -- I want to understand how
18  you arrived at this 89 percent figure for
19  evidence of wind damage.  Tell me what you mean
20  by wind damage.
21    A.  Those observations were made from
22  public right of way, so from the street, and in
23  this particular case the majority of the
24  evidence was roof related.  If we observed that
25  half the roof was missing or half the shingles

Page 385

1  on the roof were missing, the stacks and
2  turrets were removed, there was a blue tarp on
3  the roof, those were things that we were pretty
4  confident suggest there was evidence of wind
5  damage.  And wind damage, you asked me to
6  define it.  Wind damage, to me, is damage that
7  I suspect was caused by wind.
8    Q.  Right.  But specifically, you're
9  talking about roof damage?
10    A.  That was the primary evidence of that.
11  Now, at times you'd also see where there was
12  lap siding that might have been blown off, say,
13  a second floor portion of a building, or there
14  were windows that were, um -- blown -- broken
15  and open, say, on second floor levels.  Again,
16  we would have taken that as some evidence of
17  wind damage, probably.
18    Q.  Well, 86 percent of the homes were one
19  level properties.  86 percent of the structures
20  were one level, correct?
21    A.  Yes.
22    Q.  So when you saw a broken window in a
23  one level structure, you noted that as wind
24  damage?
25    A.  No, not in all cases.  That wouldn't

Page 386

1  have been enough on a one-story structure.  I
2  was just saying the primary -- the principal
3  area that was looked at closely was the roof.
4    Q.  Roof.  Okay.  Because you and I know
5  that broken windows can occur from anything
6  from a rock to any number of other things.
7    A.  Certainly.
8    Q.  And you're looking at properties two
9  years after an event --
10    A.  That's correct.
11    Q.  -- correct?
12    A.  Correct.
13    Q.  Were you trying to state the opinion
14  here, Mr. Truax, that 89 percent of the
15  properties in the Charbonnet area had wind
16  damage from Hurricane Katrina two years ago?
17    A.  I believe that the evidence of wind
18  damage that I saw was in the majority, yes,
19  associated with Hurricane Katrina.  Can I be
20  certain of that?  No.
21    Q.  You can't rule out intervening causes
22  for damage to a roof in the last two years, can
23  you?
24    A.  No.
25    Q.  So you made an assumption that if a

Page 387

1  house had evidence of wind damage now, two
2  years after Katrina, it must be due to Katrina;
3  that was your assumption?
4    A.  The inherent assumption was that the
5  damage we saw as we drove through that
6  neighborhood was in the majority caused by
7  Hurricane Katrina, yes.
8    Q.  Did the water level of the flooding in
9  the Charbonnet area reach the level of these
10  roofs?
11    A.  No.
12    Q.  What was the depth of the flooding in
13  the Charbonnet study area?
14    A.  I don't recall the depths of the
15  flooding exactly, but it wasn't at roof level.
16  I believe it was about, probably -- in the
17  subject property itself, I believe the -- it
18  was near the window line.
19    Q.  Did any of the residents in the
20  Charbonnet study area have to exit through
21  roofs by breaking out through a roof?
22    A.  Oh, I wouldn't know that.
23    Q.  If that happened and you saw evidence
24  of a hole in the roof, you'd call that wind
25  damage?

Page 388

1    A.   It might have been characterized as
2  that.
3    Q.   Now, you've got a reference in your
4  report to Exhibit C which are photographs of
5  the Charbonnet area, correct?
6    A.   Correct.
7    Q.   And you represent that these
8  photographs depict the wind damage?
9    A.   No, they depict essentially the
10  variety of properties that were -- an example
11  of the variety of the properties that were
12  observed in that nine block study area.
13    Q.   You didn't take photographs of wind
14  damage.
15    A.   Well, if you look at the second
16  photograph on I guess the first page, the
17  photograph probably doesn't show it real
18  well --
19    Q.   It says 5625 Burgundy?
20    A.   Yes.  You can see some evidence of
21  some shingles missing there on the front of
22  that house.
23    Q.   All right.  So let me make sure I
24  understand.  5625 burgundy, with the shadowed
25  area on the front of the roof you say are

Page 389

1  missing shingles.  Do you interpret that as
2  wind damage due to Hurricane Katrina two years
3  ago?
4    A.   Yes, probably.
5    Q.   All right.
6    A.   And if you go to the second page, the
7  5613 and 15 Burgundy Street --
8    Q.   Yes.
9    A.   -- that still has the remnants of the
10  blue tarp hanging off the roof.  And the blue
11  tarp program, I guess as you know, was
12  implemented by the Corps of Engineers after the
13  hurricane.
14    Q.   Well, when was that blue tarp put on
15  5613-15?
16    A.   Well, I don't know when, but it
17  certainly was subsequent to Hurricane Katrina.
18    Q.   Anytime subsequent?
19    A.   Um -- no, it wouldn't be -- you could
20  narrow the time parameters only in the sense --
21  I mean in the sense that that program began on
22  a certain date and ended on a certain date, and
23  it's not ongoing now, to my knowledge, so.
24    Q.   All right.  Well, what other wind
25  damage is reflected in the photographs attached

Page 390

1  to Exhibit C?
2    A.   There's none that are apparent.
3    Q.   Well, to get to this 89 percent
4  figure, I assume you did some mathematical
5  calculation, took a total and divided it by
6  another number.  True?
7    A.   Yes.
8    Q.   Tell me what your numbers were to
9  reach 89 percent.
10    A.   Well, we looked -- the study area
11  included 102 properties.
12    Q.   Okay.
13    A.   So 89 percent of 102 I guess would be
14  on the order of 90.
15    Q.   90 homes in the Charbonnet area with
16  evidence of wind damage that you say was
17  primarily based on damage to roof.
18    A.   Yes.  Now, I would tell you, as well,
19  it included those that had a new roof.
20    Q.   So in the 89 percent total, how many
21  properties did you put in that column because
22  they had a new roof?
23    A.   I couldn't tell you that subset of the
24  group.
25    Q.   Was it a majority of the group?

Page 391

1    A.   No, I wouldn't say it was the
2  majority, based upon my recollection.  But
3  there were a number of properties, certainly,
4  with new roofs in that area.
5    Q.   And so if it had a new roof -- you
6  assumed that if it had a new roof two years
7  after Katrina, you assumed it must have had
8  wind damage from Katrina to the roof during
9  Hurricane Katrina.
10    A.   Correct.
11    Q.   Now, made no effort to assess the
12  damage -- actual property damage associated
13  with wind events from Katrina in these area,
14  did you?  Quantify it.
15    A.   No.
16    Q.   You never went in the homes.
17    A.   No.  Other than the named plaintiffs.
18    Q.   There are, though, trained, skilled
19  adjusters, people with special training, who
20  can go into a home, and they can differentiate
21  between flood and wind damage, true?
22    A.   I believe that is the goal in many
23  cases.
24    Q.   You don't do that for a living, but
25  there are people who do that for a living,

**Michael Truax on date 09/27/2007**

Page 392

1 correct?
2    A.  I don't do that for a living, but as I
3 told you earlier I did do that post-Katrina for
4 a short period of time.
5    Q.  All right.  And even in that
6 three-month experience you had as an adjuster,
7 even without formal training, you were able to
8 tell the difference, weren't you, between flood
9 and wind damage?
10    A.  Yes.  I believe I was able to, yes.
11    Q.  Right.  Let me refer to the
12 worksheets, I guess for lack of a better word,
13 that we've been given as part of your reliance
14 materials.
15    A.  Yes.
16    Q.  And do I take it this is your
17 handwriting; am I correct this is your
18 handwriting on the sheet?
19    A.  If I could see it.
20    Q.  (Tendering.)  I have another copy.
21    A.  Yes.
22    Q.  And actually, under the column on this
23 document called evidence of wind damage, you
24 wrote yes, and then in some cases but not all
25 cases wrote the word roof, or in some cases new

Page 393

1 roof next to yes, correct?
2    A.  Correct.
3    Q.  In other cases you just wrote yes for
4 evidence of wind damage.
5    A.  Yes.
6    Q.  Now, do I assume correctly that when
7 you wrote just yes there was some evidence of
8 wind damage other than roof?
9    A.  No.
10    Q.  So if you saw a new roof or missing
11 shingles and you concluded that must be wind
12 damage from Katrina, you would write yes under
13 wind damage without noting roof in some cases?
14    A.  Probably in some cases, yes.
15    Q.  Why did you write roof in some cases
16 and simply yes in other cases?
17    A.  Some of it may be as mundane as we
18 were going down the street a little faster at
19 one point in time than another, I was writing
20 something else and didn't come back to fill
21 that in.  I mean, I don't think there was a --
22 there wasn't a, um -- absolute particular
23 effort in all cases to articulate what damage I
24 necessarily saw.
25    Q.  And this was a drive by process.

Page 394

1    A.  It was a drive by process.
2    Q.  You didn't stop the vehicle?
3    A.  No.  And if you note, you see a little
4 more articulation on the first page?  And then
5 as you move to the other pages -- when what we
6 saw was fairly routine, I believe you saw many
7 more just yeses.
8    Q.  The car sped up toward the end?
9    A.  No, I'm just telling you once we
10 looked at enough damaged roofs I didn't
11 articulate that it was all roof related in
12 every case.
13    Q.  Now, at Page 14 of your report -- and
14 let me attach as Truax 13 the work sheet that
15 we've looked at for the Charbonnet study area.
16       (Exhibit 13 was marked for
17 identification and is attached hereto.)
18 EXAMINATION BY MR. MEUNIER:
19    Q.  Page 14 of your report you state, at
20 the bottom, based on your experience and
21 knowledge regarding assessment practices in
22 Orleans and St. Bernard Parishes, I would not
23 consider it reasonable to rely on that data,
24 evaluation.
25       Tell me what experience and knowledge

Page 395

1 you have regarding assessment practices in St.
2 Bernard Parish.
3    A.  As I think I told you before, in doing
4 an appraisal, most of our appraisal work
5 includes properties in St. Bernard Parish, one
6 of the requirements of most of our clients is
7 that we research the assessed values of the
8 properties.  And so we would interact with the
9 tax assessment personnel of St. Bernard Parish
10 for that purpose, and obviously then have a
11 comparison of what the assessed value was
12 relative to either the conclusion that we were
13 coming to, and if the property was selling,
14 what it was selling for.  So much as we found
15 in Orleans Parish, the assessed values were
16 rarely compatible with the appraised values or
17 the sale prices.
18    Q.  And what technique is used in
19 St. Bernard, or has been used historically in
20 St. Bernard Parish for assessment valuation?
21    A.  I don't know.  I'm not as familiar
22 with their process, if you will, in
23 St. Bernard Parish.  I can only tell you the
24 results of their process were generally not
25 compatible with the actual market transactions

Page 396

1 that we saw.  And it was clearly a political
2 process at some level.
3    Q.  What do you mean by that?
4    A.  Well, I can tell you that if you knew
5 the assessor and there was, um -- you could go
6 in and maybe get a favorable result.  And I can
7 tell you that from experience because I lived
8 in St. Bernard.
9    Q.  But do I gather from your testimony
10 that as critical of the outcome as you may be,
11 you do not know what methodology has been used
12 historically, or even currently, in St.
13 Bernard, by the tax assessors to evaluate
14 properties?
15    A.  No, I do not know particularly their
16 process.
17    Q.  Now, let me refer you to Page 15 of
18 your report where you begin a discussion of the
19 properties of the class representatives.
20        And there were four properties that
21 you considered, correct?
22    A.  Correct.
23    Q.  And you state that these four
24 properties were inspected by you on June 18 and
25 19 of 2007, right?

Page 397

1    A.  Correct.
2    Q.  How long did you take for each
3 inspection?
4    A.  Well, there was certainly some
5 variations in the property types.  Probably
6 spent an hour and a half or so at Charbonnet,
7 maybe an hour.
8        Hamlet Street was a slab, the
9 structure was gone, so I spent less time
10 certainly at Hamlet Street.
11        Bundy and Morel, I'd say both an hour
12 to an hour and a half.
13    Q.  An hour and a half each?
14    A.  An hour to an hour and a half on each,
15 yes.
16    Q.  And what were your normal -- what
17 would your normal charges for that be?
18    A.  I think residential appraisals are
19 typically in the two hundred and fifty to three
20 hundred and fifty dollar range.  And I tell you
21 this, the time spent at each was probably
22 certainly a little longer than would have been
23 spent in a normal process.
24    Q.  Well, you say an hour to an hour and a
25 half is what you spent, so what would you think

Page 398

1 a normal process would be?
2    A.  Probably an on site inspection is
3 accomplished in probably somewhere between
4 thirty minutes and an hour tops --
5    Q.  Uh-huh.
6    A.  -- for a normal house.
7    Q.  Now, in the case of Ms. Coates at
8 1020-22 Charbonnet, you found this to be a
9 single-family residence, correct?
10    A.  Correct.
11    Q.  Which would put it within the
12 73 percent residential category for the
13 Charbonnet area, right?
14    A.  Um -- well, within the 33 percent
15 single-family category.
16    Q.  All right.  And within the 73 percent
17 residential category.
18    A.  If you want to combine the two.
19    Q.  And it was a raised, on piers,
20 structure, which puts it in the 72 percent
21 category for that area, correct?
22    A.  Correct.
23    Q.  So why is it you say the Charbonnet --
24 I mean the Coates home is not representative of
25 her neighborhood?

Page 399

1    A.  I think what I've said is that the
2 Coates home, the Hamlet Street property, the
3 Bundy Street and Morel Street properties are
4 not representative of a large segment of the
5 broader class areas.  They're all single-family
6 homes.  There are obviously other property
7 types within the class area.  That's what I
8 said.
9    Q.  So Ms. Coates' home, since 73 percent
10 of the homes are residential in that study
11 area, and 72 percent are raised like her house,
12 you're not saying her home is atypical of her
13 neighborhood, are you?
14    A.  No, I'm not contending these
15 properties wouldn't be representative of some
16 of the properties in the subclass area.  They
17 certainly would be, of some.
18    Q.  Okay.  Well, that's what I wanted to
19 make sure about.  You're not saying that the
20 class area is so diverse that it's impossible
21 to come up with a representative set of
22 properties; you're not saying that, are you?
23    A.  No.  I mean, I believe that there
24 could be some representative class.  The
25 problem is, there are many subclasses within

Page 400

1 this broad area, and the, say the Coates home
2 is a raised -- actually, a converted double
3 that is now used as a single-family residence.
4 That property, say, would not be particularly
5 representative of, say, all of the residential
6 in the subclass area.  There are different
7 styles, different characteristics that would
8 not make that, let's say, a comparable, if you
9 will, if I was appraising many, many other
10 properties in that same subclass area.  Even
11 single-family properties.
12     Q.  All right.  So you could assemble a
13 sample group of properties that as a group
14 would be representative of these class and
15 subclass areas, you just need more properties
16 to do that, more than four.
17     A.  Clearly, four isn't representative.
18 And at some level, that's what an appraisal
19 does.  An appraisal selects representative
20 properties for their particular property that
21 are precisely or as best we can determine the
22 properties that are representative of the
23 property you're approving.
24     Q.  And let me just make sure you
25 understand, Mr. Truax, as we discussed

Page 401

1 yesterday, the words representative and typical
2 have specialized meaning in class action cases,
3 and I want to make sure when you say
4 representative here you are not referring to
5 the use of that word as it's used for class
6 certification purposes.  Correct?
7     MR. MARPLE:
8         Let me object to the form of the
9     question as calling for a legal
10     conclusion.
11 EXAMINATION BY MR. MEUNIER:
12     Q.  Well, do you know what Rule 23 means
13 when it says a class representative has to be
14 an adequate representative?  Do you know what
15 that means?
16     A.  From a legal perspective, no.
17     Q.  So when you use the word
18 representative in your report, you are not
19 referring, intentionally, at least, to that
20 meaning, are you?
21     A.  No, I think I told you yesterday that
22 representative, to me, would be -- could be
23 likened to the word comparable.
24     Q.  Comparable.  Okay.  So you're using it
25 in an appraisal sense, meaning that it's got to

Page 402

1 have sufficient characteristics in common with
2 other properties for me to be able to compare
3 value, or utilize the values as a comparison.
4         Is that what you mean by
5 representative?
6     A.  Yes.
7     Q.  So by that definition, no residential
8 property could ever be representative of a
9 commercial property, could it?
10     A.  Typically not done that way, that's
11 correct.
12     Q.  And a one-story property could never
13 be representative of a two-story property.
14     A.  Again, typically an appraiser would
15 work very hard to compare two stores to a
16 two-story property if that's what his subject
17 was.
18     Q.  An old property could never really be
19 representative of a new property.
20     A.  Any host of variations like that,
21 that's correct.
22     Q.  So you take all the characteristics
23 that you look at for comparables -- and I think
24 we actually looked -- you have some bullet
25 point listings of things that you consider.

Page 403

1     A.  Correct.
2     Q.  You take that list, and your idea of
3 representative would be to group the properties
4 according to those characteristics, correct?
5     A.  Yes.  As best you can.  Obviously, you
6 rarely if ever find three identical -- or four
7 or five or however many that are identical to
8 your subject property, but that is the goal, is
9 to -- when you search for comparables, is to
10 find those that are most similar to your
11 subject.
12     Q.  And again, this discussion about the
13 class representative properties not being
14 representative, and we're using the words
15 differently, but, um -- you reference Exhibit C
16 which are the pictures that we looked at, your
17 photographs.
18     A.  Correct.
19     Q.  And the relevance here is that in the
20 Charbonnet study area, you found a church, you
21 found a Kentucky Fried Chicken, a school, as
22 well as homes, and your view is that none of
23 the homes could be considered representative of
24 the whole area because you've got a church and
25 you've got commercial establishments, et

Page 404

```
1  cetera.  That's your opinion.
2  A.   Correct.
3      (Off the record.)
4  MR. MEUNIER:
5        For the record, the plaintiffs in
6  levee and MRGO have no further
7  questions of the witness.  That
8  concludes the deposition.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 405

```
1        WITNESS' CERTIFICATE
2
3        I, MICHAEL W. TRUAX, MAI, do hereby
4  certify that the foregoing testimony was given
5  by me, and that the transcription of said
6  testimony, with corrections and/or changes, if
7  any, is true and correct as given by me on the
8  aforementioned date.
9
10 _____   _____
11 DATE SIGNED        MICHAEL W. TRUAX, MAI
12
13 _____ Signed with corrections as noted.
14
15 _____ Signed with no corrections noted.
16
17
18
19
20
21
22
23
24
25 DATE TAKEN:  September 27th, 2007
```

Page 406

```
1        REPORTER'S CERTIFICATE
2      I, JOSEPH A. FAIRBANKS, JR., CCR, RPR,
3  Certified Court Reporter in and for the State
4  of Louisiana, do hereby certify that the
5  aforementioned witness, after having been first
6  duly sworn by me to testify to the truth, did
7  testify as hereinabove set forth;
8        That said deposition was taken by me
9  in computer shorthand and thereafter
10 transcribed under my supervision, and is a true
11 and correct transcription to the best of my
12 ability and understanding.
13        I further certify that I am not of
14 counsel, nor related to counsel or the parties
15 hereto, and am in no way interested in the
16 result of said cause.
17
18
19
20
21
22
23  _____
24        JOSEPH A. FAIRBANKS, JR., CCR, RPR
25        CERTIFIED COURT REPORTER #75005
```