# PLAINTIFFS TRIAL EXHIBIT

# 24

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

IN RE:  KATRINA CANAL BREACHES      CIVIL ACTION
CONSOLIDATED LITIGATION
                                    NO. 05-4182
                                       "K" (2)
PERTAINS TO:  MRGO                   JUDGE DUVAL

FILED IN:  05-4181, 05-4182,     MAG. WILKINSON
05-5237, 05-6073, 05-6314,
05-6324, 05-6327, 05-6359,
06-0225, 06-0886, 06-1885,
06-2152, 06-2278, 06-2287,
06-2824, 06-4024, 06-4065,
06-4066, 06-4389, 06-4634,
06-4931, 06-5032, 06-5155,
06-5159, 06-5161, 06-5162,
06-5260, 06-5771, 06-5786,
06-5937, 07-0206, 07-0621,
07-1073, 07-1271, 07-1285


Videotaped Deposition of

KERRY DEAN VANDELL,

2658 Victoria Drive, Laguna Beach, California

92651, taken in the offices of Stone, Pigman,

Walther, Wittmann, 546 Carondelet Street, New

Orleans, Louisiana 70130, on Monday, the 17th

day of September, 2007.

KERRY DEAN VANDELL (MR GO)                                    9/17/2007

Page 54

1  the other side of that.  There were -- Let me
2  first find it.
3       Q.  Well, --
4       A.  Let me find the list of cases and
5  once I can do that --
6       Q.  Pertinent to that, though, let me
7  mention something.  We have from your 2006
8  C.V. a more extensive listing of your cases
9  and I am going to refer -- I am going to refer
10 you to those in just a minute.
11      A.  All right.  That's fine.
12      Q.  So why don't we defer on this
13 question until we get to that.  And then if
14 looking at that larger list you can identify
15 that acceptance of methodology occasions --
16      A.  That's fine.
17      Q.  Let's move on for now.
18      A.  That's fine.
19      Q.  Well, the final item on Exhibit A,
20 which is item 12, calls for the production of
21 any and all documents regarding your models
22 or, if we want to convert that to methodology
23 here, being put into effect anywhere in the
24 world in the last ten years.  I suppose I --
25 It's difficult, I know, to answer it that

Page 55

1  way.  Let me ask it this way.  Can you recite
2  the instances where, aside from those business
3  enterprise issues that you already discussed,
4  instances where your proposed methodology on
5  an issue within the field of your expertise
6  has been implemented and put into effect
7  either by a government entity or a private
8  enterprise?
9       A.  As I sit here now, first the term
10 "methodology"" I'm uncomfortable with.  I
11 offer opinions in many of these cases in terms
12 of appropriate treatment of certain issues.  I
13 don't consider that a methodology.  It's not a
14 model per se and I don't want that to be
15 construed as a model.  I offer opinions.  In
16 many cases the courts have made judgments that
17 were consistent with my opinions offered.
18 Whether or not the judge explicitly cited
19 that, it varies.  In certain cases they did
20 and in certain other cases they did not.  I
21 would need to take a look at the list.  It was
22 my understanding, and I haven't looked at this
23 recently, that we were asked to provide simply
24 the list of the last four years of class
25 actions so I don't obviously have a list of

Page 56

1  all of the prior, you know, testimony and
2  everything else.  But I would be happy to look
3  at your list and give my response to those.
4       Q.  All right.  Well, we have actually
5  moved beyond that.  Item 12 is broader.  It
6  had to do with the occasions on which your
7  model, your methodology, your proposed
8  treatment, if you will, --
9       A.  Your opinion.
10      Q.  -- has been put into effect.  Now, I
11 am excluding what we already talked about.  I
12 am trying to give this meaning.  We don't have
13 to go back and talk about the occasions where
14 you have testified on the discernment between
15 business enterprise value and real estate
16 value, because you have covered that.  This
17 would go beyond just legal appearances as an
18 expert to any work in your field.  And the
19 question would be, can you recite instances in
20 which your proposed treatment of an issue that
21 you're addressing within the field of your
22 expertise has been put into effect by either a
23 government or a private entity?
24      A.  In a number of cases I have offered
25 opinions.  The judgment of the court was such

Page 57

1  that it was consistent with the opinions that
2  I offered.  The extent to which the Judge
3  cited my testimony particularly as having
4  influence on that varied depending on the
5  circumstances.  But there were a number of
6  cases in which the judgments of the court were
7  consistent with the opinions that I offered.
8  I think that more appropriately characterizes
9  what my testimony and my contributions were as
10 opposed to somehow construing these as models
11 and methodologies that were adopted by the
12 court.
13      Q.  Let me move on and ask you for some
14 definitions of some terms so that we can have
15 this discussion on the same page.
16      A.  Certainly.
17      Q.  What is your definition of an
18 automated valuation model, or AVM?
19      A.  I would say an automated valuation
20 model is one that simply makes use of a large
21 scale database without individualized
22 evaluation of units of stock and applies an
23 approach, a mathematical approach to dealing
24 with that data in such a way that the outcome
25 is an estimation of, whether it be market

KERRY DEAN VANDELL (MR GO)                                    9/17/2007

Page 58

1   value, typically it's market value estimate.
2       Q.   What is your definition of hedonic
3   price model?
4       A.   Hedonic price model is a technique
5   whereby one assumes that a -- the utility
6   provided by a certain good, and most typically
7   it relates to housing, but it could relate to
8   other types of assets, actually exists within
9   a number of different dimensions or
10  characteristics of that unit.  And it's a
11  methodology whereby one attempts to fit the
12  data of those characteristics and the
13  relationship of those characteristics to the
14  sales price of the unit and applies usually
15  regression analysis to that data in order to
16  develop estimates of the contribution of
17  individual units of each of those
18  characteristics to the overall value and to
19  use those coefficients as inputs to the
20  estimation of other properties with other
21  mixes of the amounts of those
22  characteristics.
23      Q.   What is contingent valuation?
24      A.   Contingent valuation is a technique
25  that is based typically upon survey results

Page 59

1   that attempts to extract what we term
2   willingness to pay for certain types of items
3   that oftentimes are not priced in the
4   marketplace.  Oftentimes that's proposed to be
5   certain items such as environmental quality or
6   other such things.
7       Q.   What is conjoint analysis?
8       A.   Conjoint analysis is a technique
9   that attempts to extract, again through survey
10  information of respondents to various
11  questions that attempt to determine their --
12  their preference ordering of certain types of
13  characteristics and, again, their willingness
14  to pay for those characteristics.
15      Q.   How is contingent valuation
16  different from conjoint analysis?
17      A.   Conjoint analysis usually involves a
18  matrix of the trade-offs that are -- that are
19  provided and attempts to get down to a set of
20  questions that isolate for individuals; they
21  each make their decisions based upon the
22  questions asked and the trade-offs they're
23  asked to make, and then to translate that
24  usually through regression analysis, but there
25  are other means, to a willingness to pay

Page 60

1   measure, okay, analysis.
2       Q.   So there is some overlap between the
3   two techniques?
4       A.   Well, I mean, at a broad level.
5       Q.   Yes.
6       A.   But joint -- conjoint analysis is
7   more typically used for marketing purposes.
8   That they have been applied to enable firms to
9   decide which type of product in the
10  trade-off of quality, quantity, or various
11  other things, seems to be most acceptable to
12  the market.
13      Q.   What is perceived diminution?
14      A.   Perceived diminution of value?
15      Q.   Yes.
16      A.   I am not used to the "perceived".  I
17  mean, a diminution of value is one that has to
18  do with what the market will determine would
19  be a reduction in value, market value of an
20  asset due to a certain reason.
21          Perceived diminution would be,
22  supposedly, as I would view it, one's opinion
23  about a reduction -- a reduction of value
24  which could be unique to their own opinions.
25      Q.   In what field of expertise are you

Page 61

1   being tendered in this case?
2       A.   I am a real estate housing urban
3   economist who is -- has been involved with a
4   variety of exercises relating to the analysis
5   of real estate market dynamics in a number of
6   contexts, and a portion of my activity is
7   related to the valuation, the correct way to
8   treat or to extract estimates of the valuation
9   of various complex property interests.
10      Q.   Within that field, are the terms I
11  mentioned, automated valuation model, hedonic
12  pricing model, contingent valuation,
13  contingent analysis, and diminution of value,
14  pretty well accepted terms and pretty -- well
15  accepted terms of the terms of the definitions
16  you have just given?
17      A.   The terms are known, if that's what
18  you mean.
19      Q.   Yes.
20      A.   That those who study this are aware
21  of the terms.  Now, the degree to which
22  they're actually accepted in every case as
23  appropriate means of analysis, in certain
24  circumstances varies hugely by the
25  circumstances.

KERRY DEAN VANDELL (MR GO)                                    9/17/2007

Page 62

1        Q.  So when I say "terms", the concepts
2   as defined by you are accepted concepts in
3   your field.  Whether they are applicable to a
4   given set of facts is often debatable?
5        A.  Well, I would actually say that in
6   the field of economics at least, the
7   contingent valuation and conjoint analysis,
8   for example, there's substantial debate as to
9   their appropriateness.  Especially as they
10  reflect when they're compared against real
11  world behavior in terms of the trade-offs that
12  actually do occur in the way people price
13  things.  So I would say there's substantial
14  debate that still exists over their
15  appropriateness and probably more broadly
16  their inappropriate application in a number of
17  circumstances.
18        Hedonic analysis is a very common
19  technique in our field and there are
20  circumstances in which it's appropriately
21  applied.  There are other circumstances and --
22  but there's also a great deal of literature
23  with respect to its inadequacy in a number of
24  areas and the inappropriate application of
25  that technique.

Page 63

1        So yes, they're known issues.  As
2   to whether they're acceptable, in certain
3   circumstances a proper reply is an entirely
4   different set of questions.
5        Q.  And AVM, or automated valuation
6   model, would be like hedonic pricing model, an
7   accepted method or technique, the question
8   being whether it's appropriately applied to a
9   given issue?
10        A.  AVMs have become -- they're
11  relatively common.  They're applied in certain
12  circumstances.  There are other applications
13  where they have been determined to be
14  completely inapplicable and inappropriate.
15        Q.  Have you applied AVMs?
16        A.  Have I applied AVMs?  Meaning --
17        Q.  Well, have you applied or relied
18  upon AVMs in analyses that you have performed,
19  either in or outside of legal proceedings as
20  an expert?
21        A.  By AVMs, you mean have I undertaken,
22   -- have I undertaken hedonic analyses to back
23  out either estimates of value or estimates of
24  the contribution of various characteristics to
25  value?

Page 64

1        Q.  Well, that's why I began with the
2   definition.  I am using your definition of
3   AVM.  Do you want me to repeat it as I
4   understand it?
5        A.  Sure.
6        Q.  AVM makes use of large scale
7   database, of a large scale database without
8   individualized evaluation of units and applies
9   a mathematical approach to deal with data to
10  achieve market value estimates.  Is that a
11  correct --
12        A.  Yeah.  Well, in that context, I --
13  my research in the past -- some of my research
14  in the past has actually dealt with large
15  scale databases that contained information on
16  a variety of characteristics and sales prices
17  of homes and we estimated hedonic pricing
18  models associated with those.  So from that
19  standpoint if you want to term that an AVM, I
20  consider AVMs more applied in the assessment
21  field or in the underwriting field as being
22  more specific to that as opposed to
23  traditional academic research using hedonic
24  pricing methodology.
25        Q.  All right.  As an urban economist,

Page 65

1   housing urban economist, you don't hold
2   yourself out as an expert in real estate
3   appraisal, do you?
4        A.  I am not a registered appraiser, if
5   that's what you mean.  However, I feel fully
6   competent to value complex property
7   interests.
8        Q.  Have you ever conducted a real
9   estate appraisal --
10        A.  In the --
11        Q.  -- of a housing unit?
12        A.  For a housing unit?
13        Q.  Yes.
14        A.  Oftentimes informally I have
15  instructed my class as to how one goes about
16  that.  I have overseen projects where I have
17  them do that.  I -- I have certainly appraised
18  my own units.  I have not hired out as a fee
19  appraiser to undertake an appraisal for a
20  residential unit, no.
21        Q.  Well, you're not licensed as a real
22  estate appraiser?
23        A.  I am not licensed as a real estate
24  appraiser.
25        Q.  So you have never performed a

17 (Pages 62 to 65)

KERRY DEAN VANDELL (MR GO)                                          9/17/2007

Page 66

1   licensed real estate appraisal of a housing
2   unit?
3        A.  That's correct.
4        Q.  Now, your resume, Appendix A, lists
5   publications starting at page 4 and then
6   papers starting at page 10 that you have told
7   us is a complete listing; correct?
8        A.  Paper presentations on page 10.
9        Q.  And on page 4 --
10       A.  Publications.  That's correct.
11       Q.  Publications.
12       A.  That's correct.
13           MR. MEUNIER:
14           You want to take --
15           THE WITNESS:
16           Insofar as I know, that's
17   complete.
18           MR. MEUNIER:
19           We have been urged to consider a
20   break at this point so why don't we --
21           MR. DOAK:
22           This is the halfway point.  It
23   looked like you were about to go into
24   a new area.
25           THE WITNESS:

Page 67

1           I was about to suggest that.
2           MR. MEUNIER:
3           It's 10:30.  Why don't we take a
4   break.
5           VIDEO OPERATOR:
6           We're now going off the record.
7           (Recess.)
8           VIDEO OPERATOR:
9           This is the beginning of tape 2.
10   We're now back on the record.
11   EXAMINATION BY MR. MEUNIER:
12       Q.  Dr. Vandell, in your past
13   publications and paper presentations, have you
14   ever discussed the utility of the automated
15   valuation model?
16       A.  I had a number of papers that dealt
17   with hedonic pricing.  Multiple regression
18   analysis.  I don't know whether you would
19   define that as automatic valuation.  I don't
20   consider it the same.  I did have one paper, I
21   know we did some work for the Dallas Central
22   Appraisal District back in the early and mid
23   '80s that I believe was published in the
24   Property Tax Journal in the mid '80s, so that
25   should probably be here.

Page 68

1        Q.  Can you identify it on the list?  Is
2   this a publication or a paper?
3        A.  It's a publication.
4        Q.  Those are listed starting at page I
5   think 4 of your curriculum vitae.
6        A.  Let's see if I can find it.  Yes,
7   it's on page 7.  Thomas Thibodeau and Kerry
8   Vandell, "Using multiple regression analysis
9   to determine the accuracy of mass appraisals",
10   Property Tax Journal, June -- I'm sorry, it
11   was 1987.  Do you see it?
12       Q.  How many down?
13       A.  It's one, two, three, four, five
14   down.
15       Q.  I see it.  Okay.  So the multiple
16   regression analysis in that case was related
17   to a hedonic pricing model?
18       A.  Yes.  We were actually using this as
19   a check.  The Dallas Central Appraisal
20   District had what they considered an automatic
21   -- an automated valuation model methodology.
22   It was not really hedonic.  But the -- They
23   used a certain sort of criteria to -- Sorry, I
24   need to turn this off.  They used a certain
25   sort of criteria to determine where they

Page 69

1   should reappraise property.  They were
2   required to reappraise property over time,
3   especially if properties got too far out of
4   balance.  And there was a lot of appeals and
5   they were overvaluing, undervaluing property.
6   So the question they asked us to answer was
7   "Where should we allocate our manpower in
8   terms of determining where we're off", and
9   they were just doing it in an ad hoc fashion.
10   They would have adjustments and then they
11   would go out.  And they asked us to look at
12   the extent to which you could use multiple
13   regression analysis.  And remember, this was
14   more or less the early days of this whole
15   applying large scale databases to these sorts
16   of properties.  So it was like 20 -- well over
17   20 years ago.  And what we did was use that to
18   give some indication as to what neighborhoods
19   tended to be -- have some of the greatest
20   appreciation and what neighborhoods probably
21   had some of the least depreciation.  Actually
22   depreciation.  And then allow them to go in to
23   concentrate their manpower there in terms of
24   reassessment over time.  So it was more cost
25   effective in a way.  It was also more

                                      18  (Pages 66 to 69)

KERRY DEAN VANDELL (MR GO)                                    9/17/2007

Page 70

1  equitable in a way. Because you really are --
2  The end point of that hopefully was that they
3  were getting closer to the true market value
4  by updating, and they would go through the
5  normal appraisal process on these
6  reappraisals, but they would be updating those
7  in the areas that were most likely to be
8  wrong. So that was the nature of that paper.
9      Q. Are there any others in which you
10  have discussed the utility of the automatic --
11  I'm sorry, the automated valuation model
12  and/or hedonic pricing model?
13     A. That might take me a little bit of
14  time just to go through to make sure I don't
15  answer incorrectly, unless you have one in
16  mind that you want to call to my attention.
17     Q. Well, why don't we do this. We're
18  going to be here the better part of the day.
19  Do you mind if this is something we take up
20  later after perhaps you've had more time to go
21  through the list?
22     A. That's fine. I mean, just remind me
23  so I remember to go through it.
24     Q. All right. What is the AREUEA
25  Journal?

Page 71

1      A. That's pronounced usually AREUEA,
2  and it's American Real Estate and Urban
3  Economics Association. It's the oldest and
4  most respected academic association in the
5  field of real estate and urban economics. And
6  the journal is the official journal of that
7  organization.
8      Q. You served as editor?
9      A. Co-editor. That's correct.
10     Q. During the time you served as
11  co-editor, did that journal publish examples
12  of the use of hedonic pricing models?
13     A. I am sure that there were hedonic --
14  there was the use of hedonics in some of the
15  papers that were published during that period
16  of time.
17     Q. What is, generally stated, Dr.
18  Vandell, what is your view of the usefulness
19  or utility of automated valuation models?
20     A. I think in certain sets of
21  circumstances they serve their purpose
22  appropriately. Where you have neighborhoods
23  and housing markets that are relatively
24  homogeneous, not a lot of diversity, they're
25  relatively stable, they're in balance, that

Page 72

1  is, from a market equilibrium standpoint, that
2  you have a good data set that is complete,
3  that has a variety of different
4  characteristics of the home, it's updated and
5  so forth. That under those circumstances it
6  serves -- it can serve as an adequate cost
7  effective way of getting at least a first cut
8  of an estimate of value. It's not perfect.
9  And I go through in my report issues with
10  respect to the technique and how it can be
11  misapplied even in those circumstances. But I
12  think under the circumstances I have cited, it
13  can be used as a first cut. And the reason I
14  say "first cut", these AVMs in virtually every
15  case I know of are first cuts. That is,
16  they're provided and the homeowner has the
17  opportunity for appeal, and ultimately then
18  the appeal has to go through the traditional
19  valuation technique.
20     Q. Individual --
21     A. In terms -- The individual
22  appraisal. That's right. It's not as if they
23  just say, "Well, oil plug in the numbers and,
24  gee, it comes out the same way as before."
25  But it's not used at the litmus test.

Page 73

1  Ultimately the litmus test is going through
2  the full appraisal, inspecting the property
3  and determining to what extent the AVM result
4  was or was not accurate.
5      Q. And, generally stated, what is your
6  view of the utility of hedonic pricing
7  models?
8      A. Again, there are times in which
9  they're appropriately used and there are times
10  in which they're inappropriately used, and not
11  just inappropriately used; just incorrectly
12  used and creating results that are total
13  gibberish. They're not statistically valid.
14  They're biased estimates and so forth.
15  However, there are other circumstances under
16  the right conditions with data,
17  characteristics of data distribution, proper
18  structural modeling and so forth, in which you
19  can extract the information that you're
20  seeking. And again, it just depends on the
21  application and the characteristics of the
22  data.
23     Q. And what is your general view of the
24  utility of contingent valuation?
25     A. I have, frankly, considerable doubt

JOHNS PENDLETON COURT REPORTERS                        800 562-1285

KERRY DEAN VANDELL (MR GO)                                    9/17/2007

---

**Page 78**

1   the conditions that the Arrow-Solow panel
2   would impose upon this, and you were -- you
3   were applying the technique, I think that in
4   cases where there are -- there's not market
5   evidence, especially where there's not an
6   existing market, for example, for
7   environmental disamenities or other such
8   things, that one could potentially get some
9   sort of use out of that, as a start.  But
10  again, even with that, there also are some
11  qualifications.  Usually these estimates are
12  biased way upward by a factor, you know, by --
13  by several orders of magnitude relative to
14  what revealed preferences have generated.  So
15  I'd have to say that only under very limited
16  circumstance would you do it and then it's if
17  you are -- in the case in which you are
18  attempting to get some sense of a non-priced
19  amenity or disamenity and how relatively
20  valuable that can be to the, quote, public at
21  large to make use of -- for environmental
22  policy judgments and other such things.
23      Q.  So would you generally subscribe to
24  the limitations discussed in the Arrow-Solow
25  panel paper insofar as this technique is

---

**Page 79**

1   concerned?
2       A.  I would tend to agree that those are
3   issues.  Also the Houseman, the Diamond-
4   Houseman panel.  That those -- those are
5   fairly broadly known in terms of the
6   constraints.
7       Q.  Let me go back to your expert
8   witness work for a moment.  Is all of your
9   current work as an expert in legal cases
10  performed with the support of Analysis Group?
11      A.  No.
12      Q.  So you're also retained as an expert
13  witness in legal proceedings independent of
14  the Analysis Group?
15      A.  That's right.
16      Q.  Okay.  What percentage of your total
17  professional time do you currently spend
18  serving as an expert in legal proceedings?
19      A.  No more than one day a week.
20      Q.  So what is that, one-fifth?
21      A.  I mean, that -- We are -- That's a
22  maximum to which most universities restrict
23  their faculty and I don't go beyond that.
24      Q.  Okay.
25      A.  It may be less than that on average,

---

**Page 80**

1   but I know I don't work beyond it.
2       Q.  So no more than 20 percent you'd say
3   of your professional time?
4       A.  That's correct.  That's correct.
5       Q.  Have you ever been retained as an
6   expert on behalf of individual citizens who
7   were seeking to recover property damage as a
8   result of a defendant's alleged fault?
9       A.  You mean as a plaintiff -- an
10  individual citizen as opposed to a firm that
11  was seeking to --
12      Q.  Well, I don't want to get hung up on
13  whether it's the law firm for the Plaintiff or
14  the Plaintiff who retained you.
15      A.  No, no, I am not saying that.
16      Q.  What I am saying is, have you ever
17  been retained as an expert on behalf of
18  citizens who were seeking to recover property
19  damage as a result of some alleged fault or
20  environmental incident in litigation?
21      A.  Not that I remember.  I would have
22  to review everything.  But I don't remember a
23  circumstance like that.
24      Q.  Prior to this case, have you ever
25  offered expert testimony regarding the

---

**Page 81**

1   appropriateness of using an automated
2   valuation model?
3       A.  Again, that relates to a question
4   I'd have to go through and review everything.
5       Q.  We'll defer -- Okay.
6       A.  I don't -- Yeah.  I mean that's
7   similar to the question you had asked before
8   and I think I have the same answer.
9       Q.  I've got a list.  We'll go through
10  it?
11      A.  All right.
12      Q.  And I would ask the same question
13  with respect to hedonic pricing model.  Would
14  you be more comfortable looking at the actual
15  list?
16      A.  Well, I did cite that one that --
17  the Property Tax Journal.
18      Q.  Right.
19      A.  Right?  I have certainly undertaken
20  research which made use of hedonic pricing and
21  related -- related sort of methodologies.
22      Q.  As an expert in legal cases?
23      A.  No, I thought you were talking about
24  my academic papers.  I'm sorry.
25      Q.  No, no.

---

KERRY DEAN VANDELL (MR GO)                                    9/17/2007

---

Page 82

1       A.  No, no.  Expert in legal cases?  I
2   don't remember ever actually undertaking or
3   directing others to undertake a valuation
4   model making use of hedonic pricing
5   techniques.  But I would want to qualify that
6   --
7       Q.  We'll look at it.
8       A.  -- after I see the list.
9       Q.  Are you familiar with challenges
10  made to expert testimony under the authority
11  of the Daubert case of the U. S. Supreme
12  Court?
13      A.  Yes, to a degree.
14      Q.  Have you ever been the subject of a
15  Daubert challenge?
16      A.  No, I have not.
17      Q.  Now, your resume, the one we
18  previously identified, lists four cases in
19  which you have testified in the last four
20  years; correct?
21      A.  That's correct.
22      Q.  And we're going back four years,
23  meaning back to August of 2003; correct?
24      A.  That is correct.
25      Q.  Let me show you a curriculum vitae

---

Page 83

1   that is dated August, 2006 and ask you if that
2   is yours.
3       A.  Yes.
4       Q.  Does that C.V., curriculum vitae,
5   list, starting at page 34, the occasions in
6   which you have served as an expert witness
7   going back to 1977?
8       A.  Let's see.  You're talking about
9   supplemental private sector consulting, that
10  section?
11      Q.  Yes, sir.  Yes, sir.
12      A.  It includes not just expert witness,
13  but all consulting activity during that time.
14      Q.  The second listed case there, which
15  is Michael Best and Friedrich?  Do you see
16  that?
17      A.  Yes.
18      Q.  You appeared as an expert witness in
19  that case?
20      A.  That's correct.
21      Q.  You gave testimony in that case?
22      A.  No, I was not deposed.  I provided a
23  report.  I thought that the list requested
24  those where I gave testimony or deposition.
25      Q.  Let's just clarify.  So the reason

---

Page 84

1   that 2005 occasion on which you served as an
2   expert witness is not listed in your resume
3   for this case is because you did not give
4   expert testimony under oath in that Best
5   case?
6       A.  That's correct.
7       Q.  And the 2004-'05 case, which is the
8   fourth one listed there, City of Madison and
9   Stafford Rosenbaum, --
10      A.  Yes.
11      Q.  -- was that likewise a case in
12  which you were an expert witness but did not
13  give testimony?
14      A.  Yes.
15      Q.  And that's why that would not have
16  been listed as one of the last four years of
17  cases where you did that?
18      A.  That's correct.
19      Q.  I had earlier asked you if any of
20  the testimony that you previously have given
21  as an expert dealt with the utility or
22  appropriateness of AVMs, and I also would ask
23  the same question with respect to the utility
24  and appropriateness of hedonic price modeling,
25  and I believe we agreed that it would be

---

Page 85

1   easier for you to answer by reference to the
2   list.  So on the assumption that this is a
3   more complete list going back to 1977, could
4   you take a few moments and respond to that?
5       A.  Sure.  Do you want to just go one by
6   one --
7       Q.  Yes, sir.
8       A.  -- and I can say no or yes?
9       Q.  Well, or you can just go down the
10  list and tell me when you come to a case in
11  which --
12      A.  All right.
13      Q.  Understand the question, Dr.
14  Vandell.  It would be a case in which, whether
15  you testified or not, your expert witness
16  service dealt with the issue of the
17  appropriateness or utility of either AVMs or
18  hedonic pricing models.
19      A.  Right.  Okay.  I'm going to do that
20  and I will let you know if I come across
21  anything.
22          In 1996 I was called in Shea and
23  Gardner and had a meeting in Washington, D.C.
24  and was really a consultant at that time.  I
25  was not a testifying expert.  They had had --

---

                              22 (Pages 82 to 85)

KERRY DEAN VANDELL (MR GO)                                    9/17/2007

Page 86

1   This was on the Rocky Flats arsenal
2   contamination case.
3       Q.  Yes, sir.  It's listed at the top of
4   page 36.
5       A.  Page 36.  That's right.
6       Q.  Right.
7       A.  And they had asked me merely to
8   provide another opinion concerning the
9   appropriateness of the technique that had been
10  used by the expert, and I don't remember
11  exactly who the expert was.  This was -- He
12  was an econometrician out of Berkeley.  And
13  the way he was developing a price index over
14  time for housing and the effects over time,
15  and I provided my opinion at the time.  And I
16  don't remember the exact specifics of this,
17  but it had to do with his specification of the
18  model and I provided my input on that.
19      Q.  Now, did you give testimony in that
20  case?
21      A.  No.  No, I did not.  And I had no
22  written reports.
23      Q.  All right.  So that was my next
24  question.  There's no written reports setting
25  forth that analysis by you?

Page 87

1       A.  No.
2       Q.  But you gave a verbal opinion to --
3   Is Shea and Gardner a law firm in D.C.?
4       A.  Yes.
5       Q.  And you gave a verbal opinion to
6   that firm which dealt with the appropriateness
7   of an automated valuation model?
8       A.  I wouldn't call it an automated
9   valuation model at all.  This was a hedonic
10  model.  It was intended to develop a price
11  index for residential properties in -- in that
12  area of the Rocky Flats area over time.
13      Q.  Okay.
14      A.  And it was longitudinal.  That is,
15  year by year, quarter by quarter, and it was a
16  matter of just getting questioned about the
17  appropriateness of the specification and the
18  way in which they approached it.  And as I,
19  you know, as I remember their approach, I felt
20  was entirely -- was appropriate, although one
21  could have specified in an alternative fashion
22  that I felt would have been equally
23  appropriate, but I don't remember the
24  specifics of that.
25      Q.  Was the hedonic pricing model in

Page 88

1   that case being utilized to assess the price
2   effect of arsenal contamination on housing
3   values?
4       A.  It was -- It was looking I think at
5   the whole chain of events associated with the
6   Rocky Flats market at the time.
7       Q.  When you say whole chain of events,
8   --
9       A.  Well, from the very beginning of the
10  revealing of any sort of issues through the
11  more relevant time.  And these were properties
12  that surrounded Rocky Flats obviously in a
13  broad area and -- I mean, they were not on --
14  in the Rocky Flats property.
15      Q.  Right.
16      A.  Just so we're clear.  Surrounding
17  Broomfield Heights and other such places.
18      Q.  Let me be sure.  Rocky Flats refers
19  to an arsenal?
20      A.  Yes.  It was a large area of land
21  that is an arsenal up in the -- it's northwest
22  of Denver, Colorado.
23      Q.  And by "arsenal", you refer to it
24  having been a place where munitions were
25  stored and handled?

Page 89

1       A.  I believe at some point.  I don't
2   remember all the specifics of that.
3       Q.  Was it some sort of military --
4       A.  I believe.
5       Q.  -- contractor?
6       A.  Military or other -- some sort of
7   other.  But it may have been.
8       Q.  And was the issue, Dr. Vandell,
9   whether the storage of the munitions on that
10  property had a negative influence on the
11  values of surrounding property?
12      A.  I don't remember that it was the
13  storage or whether there were issues of
14  contamination of the area.
15      Q.  Leakage of chemicals from munitions?
16      A.  I don't remember the specifics of
17  that at all.
18      Q.  All right.  But the issue was, you
19  say, taking the whole chain of events from
20  when the first discovery or awareness of a
21  problem existed through a whole subsequent
22  chain of events and to try to analyze through
23  a hedonic pricing model how that chain of
24  events influenced, if at all, the value of
25  surrounding property?

23 (Pages 86 to 89)

Page 90

1     A.  That's correct.
2     Q.  Okay.  And that your opinion
3  expressed verbally to the law firm that hired
4  you -- And by the way, was that firm
5  representing the arsenal or the neighboring
6  property owners?
7     A.  I believe it was the arsenal, as I
8  remember.
9     Q.  And your opinion was that -- Well,
10  you did not offer an opinion, did you, that
11  the technique of hedonic pricing model was
12  inappropriate to address the issue at hand?
13     A.  I wasn't asked to opine as to
14  whether it was appropriate or inappropriate.
15     Q.  Okay.
16     A.  I was just asked under the
17  conditions that were given to me at the time,
18  did -- did he -- econometrically, was his
19  econometric technique appropriate under those
20  circumstances.  I wasn't making any judgment
21  whatsoever on the validity of the technique as
22  applied in that case, or the inappropriateness
23  of the technique as applied in that case.
24     Q.  Okay.
25     A.  That wasn't a question that was

Page 91

1  asked of me.
2     Q.  All right.  Would you proceed to
3  review the list and tell me of any other cases
4  in which as an expert you addressed the
5  utility or appropriateness of either AVMs or
6  hedonic pricing models?
7     A.  In 1987, the second from the top,
8  Stutzman and Bromberg in Dallas.
9     Q.  The second from the top on page 37?
10     A.  On page -- page 37.  Expert witness
11  testimony on the impact of violation of height
12  restrictions on adjacent property value.  I
13  don't remember specifically.  I know I didn't
14  take an analysis myself, but I think I was
15  asked to comment on -- This was a situation
16  where there had been inappropriately a
17  violation of a height restriction which
18  removed a view amenity from an adjacent office
19  building, and the question was what impact
20  would that have on rents.  And I think I was
21  asked at that time to evaluate.  There was
22  existing literature on the impact of
23  view on values, and I am sure some of that
24  literature dealt with hedonic pricing of that
25  amenity in various ways.  And as I remember, I

Page 92

1  gave some -- some testimony with respect to
2  what I felt that implied with respect to the
3  degree of -- of impact that that would have
4  had on the rents to be obtained from that
5  property.  But as I remember, it was less -- I
6  mean, maybe the literature, I mean, was part
7  of it.  More of it was more of a conceptual
8  sort of thing and thinking about view and not
9  dealing at all -- I know I didn't specify a
10  hedonic model or estimate that.  Okay.  Am I
11  making --
12     Q.  Well, before you move on, in that
13  case, the "Stutzman and Bromburg," parens,
14  "Dallas" reference is to a law firm?
15     A.  That's correct.
16     Q.  And by which interest were you
17  retained in that case?  The owner of the
18  building?
19     A.  I think it was the -- I think it was
20  the owner of the building that suffered the
21  view impingement.
22     Q.  And your testimony in that case was
23  given in a deposition, in court, or both?
24     A.  I can't even remember.
25     Q.  But you did give testimony under

Page 93

1  oath in that case?
2     A.  I don't remember that I did.  I
3  think it may have been settled prior to -- I
4  don't remember giving deposition in that
5  case.
6     Q.  The only reason I am asking that --
7     A.  I know I didn't testify in court.
8     Q.  The only reason I am asking that
9  question is because you wrote -- this C.V.
10  states "Expert witness testifying".
11     A.  Well, that may have been a
12  misstatement then.  I think it was expert
13  witness services.  I don't remember actually
14  giving testimony in a deposition in that.
15     Q.  Did you render a written report?
16     A.  I may have.  I don't fully
17  remember.  I may have.
18     Q.  Was it your opinion in that case
19  that the impingement on view as an amenity
20  related to the violation of the height
21  restrictions of neighboring property owners
22  did have a depressive effect on the value of
23  the building in terms of its capacity to
24  charge rent?
25     A.  That's correct.

                                    24  (Pages 90 to 93)

Page 94

1    Q.  And although you didn't construct --
2    you don't recall that you constructed any
3    hedonic pricing model to arrive at that
4    conclusion, do I understand that you reviewed
5    literature and referred to literature on the
6    utility of hedonic pricing models in order to
7    arrive at your conclusion?
8    A.  Well, I remember reviewing
9    literature.  There is a literature on the
10   value of view.  And some of those papers are
11   hedonic pricing models.  Not usually in the
12   context of office buildings.  Oftentimes it
13   had to do with residential properties that the
14   ocean was hidden from view due to the
15   construction of a large structure in front.
16   So, yeah, I mean, to that extent, yes, I was
17   commenting on the hedonic pricing.  And some
18   of this had been hedonic pricing literature.
19   It provided varying degrees of estimates.
20   This is really something that is pretty common
21   sense in terms of a -- that view in certain
22   cases is a tremendous amenity and it provides
23   a lot of value.  An obstruction of that view
24   could reduce value.
25   Q.  Keeping your property dry is a

Page 95

1    pretty good amenity, too, isn't it?
2    A.  I am not sure in what context you're
3    asking that.  Maybe we can hit that question
4    later.
5    Q.  That's fine.  What other instances
6    on this list do you see where you dealt with
7    the utility or appropriateness of the AVMs or
8    hedonic pricing model?
9    A.  That's it.
10   Q.  In the instance on page 36, the 1992
11   case where you were --
12   A.  Are you talking about my 2006
13   vitae?
14   Q.  Oh, no.  I'm still on the, yeah,
15   still on the 2006 more complete listing of
16   your expert witness work.  You see -- I think
17   it's actually marked.  It might be marked in
18   your copy.  The 1992 case in which you gave
19   expert witness testimony in the review of
20   landfill valuation?
21   A.  Right.
22   Q.  What did that case entail?  Do you
23   recall?
24   A.  I'm trying to remember.  Let me just
25   check.

Page 96

1    I believe that had to do with a --
2    Let's see.  I dealt with a couple of landfill
3    issues.  It was the extent to which -- And to
4    some extent it had to do, again, with business
5    enterprise valuation separation from real
6    estate.  That really a landfill is a
7    specialized form of a real estate asset.  But
8    a landfill operation is a business.  So the
9    question is how do you appropriately --
10   Q.  Tax --
11   A.  -- allocate those.  I don't remember
12   that it had to with tax per se.  It may have.
13   It may have had to do with some other issue
14   for, I don't remember, tipping fees or various
15   other things.
16   Q.  All right.  And then on page 37, let
17   me ask you about the 1981 school desegregation
18   case.  I think you may have alluded to this
19   earlier this morning.  But here you gave
20   expert witness testimony in Federal court in
21   Dallas on behalf of intervenors in a case
22   dealing with school busing?
23   A.  That's correct.
24   Q.  As part of a desegregation, school
25   desegregation plan?

Page 97

1    A.  That's correct.  As I indicated
2    before, the east Dallas intervenors, this was
3    a naturally integrated area of Dallas and they
4    felt that was the -- ideal that was trying
5    to be achieved by the courts.  So to include
6    and create busing in and out of students from
7    that -- in that area would not be in the best
8    interest of the objective of school
9    desegregation.  And what I did was review what
10   was at that time primarily sociological
11   literature on the importance of neighborhood
12   schools to the stability of neighborhoods.  I
13   don't remember that there was very much in the
14   true, you know, empirical economics literature
15   out at that time.
16   Q.  So your testimony did not deal with
17   the valuation of property or the effect on
18   housing values attributable to neighborhood
19   instability?
20   A.  I remember primarily the
21   sociological and the indicators that would
22   suggest stability.  Some of those indicators
23   could have been stability of property values,
24   but that wasn't the primary focus of that.
25   And I don't remember that it got into any sort

KERRY DEAN VANDELL (MR GO)                                    9/17/2007

Page 110

1  training or expertise, do you?
2       A.  I am not an attorney, no.  I have
3  had courses, law courses.
4       Q.  Tell me about those.  What law
5  courses?
6       A.  I have courses in land use, land use
7  law at Harvard back in the early '70s.
8       Q.  Do you have any training -- take any
9  courses in tort law?
10      A.  No.
11      Q.  The law courses you took in land use
12 are the only law courses you have taken?
13      A.  Yes.
14      Q.  And how many did you take?
15      A.  There was one course.  It included
16 both transactions and land use.
17      Q.  Other than that, you have no
18 classroom legal training?
19      A.  That's correct.
20      Q.  You have not attended any legal
21 education seminars?
22      A.  I participated in several.
23      Q.  As a real estate expert?
24      A.  I have made presentations as a real
25 estate expert in certain areas.

Page 111

1       Q.  Do you hold yourself out as an
2  expert on the requirements for class
3  certification under Federal Rule of Civil
4  Procedure 23?
5       A.  No, I do not.
6       Q.  You have not reviewed the
7  Plaintiffs' proposed trial plan for a common
8  issues trial in this case?  Is that correct?
9       A.  The Plaintiffs -- Maybe you can cite
10 which that is.  If it was included in my
11 reliance material, then I did.  If it was not,
12 I did not.
13      Q.  Well, it's not listed so I can
14 assume you did not -- you have not reviewed
15 the Plaintiffs' proposed trial plan for a
16 common issues trial?
17      A.  I take it I did not.
18      Q.  Do you know what is meant in class
19 actions by a common issues trial?
20      A.  It's my understanding that there has
21 to be a -- in comparing the individual
22 circumstances to those issues that were common
23 to all of the Plaintiffs or the proposed class
24 Plaintiffs, that the latter would be dominant
25 relative to the individual issues.

Page 112

1       Q.  Do you understand that in a common
2  issues trial, certain issues can be
3  adjudicated once and once only and have a
4  binding effect on all members of the class?
5       A.  I am not a legal expert in all of
6  that.  It really was not something that I felt
7  was relevant in terms of the way I was -- the
8  charge I was given.
9       Q.  And the listing of what Plaintiffs
10 must prove that you set forth in paragraph 7,
11 page 4, do you know whether common issues
12 trials have been known to address any of those
13 issues on a class-wide basis?
14      A.  In paragraph 7?
15      Q.  Yes, sir.
16      A.  And could you ask the question
17 again?
18      Q.  Do you know whether common issues
19 trials have been used to address and resolve
20 any of the items that you have set forth in
21 paragraph 7?  The duty, breach of duty, et
22 cetera?
23      A.  I mean, I won't hold myself out as
24 an expert in the law.  I mean, I am assuming
25 that those sorts of things have to be gone

Page 113

1  through in order to establish the class and to
2  make certain determinations.  Again, I am
3  intuiting that.  I am not holding that out as
4  my legal judgment, all right?
5       Q.  Yes, sir.  My question is, when you
6  set forth what you set forth in paragraph 7 or
7  with the help of Counsel came up with that
8  language, did you assume that the only way
9  those items can be proven and addressed is on
10 an individual plaintiff by plaintiff basis?
11      A.  I guess I am not clear on exactly
12 what you're asking.
13      Q.  When you set forth the list of
14 things that you understand a plaintiff must
15 prove in a case like this, when you set that
16 forth in your expert report -- Correct?
17      A.  To recover on a negligence claim.
18      Q.  Correct.
19      A.  Okay.  Now, this has nothing to do
20 with class action.  Right?
21      Q.  No.  What I am asking you is, when
22 you set forth those items of what a plaintiff
23 must prove, did you assume that the only way
24 that proof can be presented legally is on a
25 case by case, plaintiff by plaintiff basis?

KERRY DEAN VANDELL (MR GO)                                          9/17/2007



Page 114

1      A.  No, I didn't necessarily
2  automatically assume that.
3      Q.  So you don't as an expert purport to
4  say that none of those issues can be addressed
5  on a class-wide basis in a common issues
6  trial, do you?
7      A.  You're talking about as a general
8  state of affairs?
9      Q.  Yes.
10     A.  When I went into this, I was
11 agnostic about whether there was any case made
12 for common issues and for certifying the
13 class.  This statement is immaterial to that.
14 Subsequent to my analysis, in looking at the
15 circumstances of the case, I certainly did
16 come to certain conclusions in terms of
17 whether this had to be done on a case by case
18 basis.  But going into the analysis, I had no
19 priors.
20     Q.  Can the existence of a duty owed to
21 the plaintiff class be determined in a common
22 issues trial in a class-wide basis?
23     A.  You're using -- You're using some
24 legal terms.  I am just an old country boy
25 from Texas here.  You're going to have to help

Page 115

1  me out.  Let's go through this slowly.
2      Q.  Well, the problem, Dr. Vandell, --
3      A.  Let's go through this slowly and
4  explain to me what you're saying.
5      Q.  You may be an old country boy who's
6  not versed in legal principles, but your
7  report is rife with legal terminology.  So you
8  take --
9      A.  Okay.  I would like to go through
10 that again so I make sure I understand the
11 question.  I'll be happy to answer it.
12     Q.  All right.  Do you, in the listing
13 of issues or items of things a plaintiff must
14 prove in paragraph 7, go forward on the
15 assumption that the only way any of that proof
16 can be presented to court, in a court, is on
17 an individual plaintiff by plaintiff basis?
18         MR. DOAK:
19             Objection.  Asked and answered.
20         THE WITNESS:
21             Again, I think I testified that I
22         did not go into my analysis with that
23         presumption.
24 EXAMINATION BY MR. MEUNIER:
25     Q.  All right.

Page 116

1      A.  As a result of my analysis, I would
2  conclude that that does have to be done.  That
3  should -- That should be done in these
4  circumstances.  But going into this, there was
5  no -- I had no prior expectations.
6      Q.  So let's go one at a time in what
7  you have listed.  Are you saying, is it your
8  testimony, that whether a plaintiff had a duty
9  -- whether a defendant had a duty to
10 Plaintiffs as a class action, there's more
11 than one Plaintiff, that element of proof can
12 only be presented on an individual plaintiff
13 by plaintiff basis?
14     A.  No, I am not saying that.
15     Q.  You're not saying that.  How about
16 --
17     A.  You're -- I thought you were talking
18 about all of these -- all of these together,
19 each one -- all of these as a whole and each
20 one of those.  I'm sorry, I misunderstood what
21 you were asking.  I thought you were asking if
22 -- to prove negligence and recover on a
23 negligence claim, I went in in general with
24 the assumption that everything had to be done
25 on an individual basis, a plaintiff by

Page 117

1  plaintiff basis.  And I said I went into that,
2  I was completely agnostic on it.  I said in
3  the end I determined that -- and I was going
4  through thinking through this entire chain of
5  events, I did feel that for negligence
6  ultimately, which I would include any element
7  within that chain, or any one element within
8  that chain, potentially could require an
9  individual basis, an individual analysis.  I
10 am not saying that everyone had to.
11     Q.  I am afraid I don't understand that
12 question so let me try it again.  Paragraph 7,
13 you set forth for us what you understand a
14 plaintiff must prove in order to recover;
15 correct?
16     A.  That's correct.  All of those would
17 have to be proven in order to collect.  That's
18 correct.
19     Q.  And I have made reference to
20 something we call common issues trials in
21 class actions.  I think you acknowledged that
22 you're not familiar with that procedure.
23 Correct?
24     A.  That's correct.
25     Q.  And so you're not familiar with the

JOHNS PENDLETON COURT REPORTERS                        800 562-1285

KERRY DEAN VANDELL (MR GO)                                    9/17/2007

Page 118

1  fact that in common issues trials of class
2  actions, the proof of certain matters can
3  occur on a global class-wide basis, in a way
4  that applies to all class members. Were you
5  aware of that?
6      A. Generally.
7      Q. Okay. Are you suggesting to this
8  Court that none of the elements of proof for
9  recovery that you set forth in paragraph 7 are
10  susceptible of a presentation of proof for the
11  entire class in a common issues trial?
12      A. I say again --
13      MR. DOAK:
14          Object to the question as going
15      beyond the scope of this report.
16      THE WITNESS:
17          Again, I am -- I apologize for my
18      ignorance. I don't understand what you're
19      you're asking me.
20  EXAMINATION BY MR. MEUNIER:
21      Q. Well, that's probably good enough
22  for us to move on. Let's move on.
23      A. I don't understand what you're
24  asking me.
25      Q. You don't understand what I meant by

Page 119

1  that last question?
2      A. Well, if you want to try and
3  rephrase it again so I can -- There are many
4  phrases there with terminology that I am
5  relatively unfamiliar with and that they turn
6  in different directions. I want to make sure
7  if I answer, that at least I know exactly what
8  I am answering. I think I said, in response
9  to your previous question, I think I said --
10      Q. Go ahead.
11      A. Go ahead?
12      Q. Yes.
13      A. All right. I think I said in
14  response to your previous question that it
15  seemed to me that the entire chain of the five
16  conditions here would have to be met to prove
17  negligence. I was not claiming subsequent to
18  my report that every element within this chain
19  would have to be -- could -- had to be done on
20  an individual basis. But I would suggest that
21  there are certain aspects to this chain that
22  do require individual analysis. Now, I think
23  when we get into the substance of the report
24  we'll be able to better ascertain what those
25  elements in the chain are.

Page 120

1      Q. All right.
2      A. Now, I hope that responds to your
3  question. But since I am not sure exactly
4  what you were asking me --
5      Q. Oh, no, that's fine. So certain
6  elements of the chain as you put it, the links
7  of which are set forth in paragraph 7 of your
8  expert report, right? Language that you
9  signed and submitted as an expert; correct?
10      A. I'm sorry?
11      Q. You signed and submitted this
12  language as an expert in this case.
13      A. That's correct.
14      Q. The links in the chain of proof that
15  you're referring to are the five itemized
16  phrases in that paragraph; correct?
17      A. That's correct.
18      Q. Can the first link, a Defendant had
19  a duty to the Plaintiff, be proven on a
20  class-wide basis in a common issues trial?
21      A. I think you're asking me to opine on
22  some legal aspects to this that I am really
23  not qualified to opine on.
24      Q. You don't feel qualified. The same
25  with the others? If I ask the same question?

Page 121

1      A. No, I don't think you're going to
2  try -- to try to minimize. I will be able to
3  opine as to whether the -- the Defendant's
4  conduct -- Let me just -- I'm getting very
5  confused here because this is a very legal
6  aspect, I think. I think you're attempting to
7  go beyond what my -- what you're determining.
8  My analysis looks at the extent to which one
9  can ascertain that one common methodology or
10  model can adequately assign responsibility for
11  damages to a specific dependent -- defendant,
12  and that's it. I mean, to the extent that
13  that fits in your chain here or in --
14      Q. It's not my chain.
15      A. Or the various -- the conditions
16  that are required to recover on a negligence
17  claim, you'll have to determine whether that
18  does or not based upon the results. I was --
19  I have opined as an economist who was asked to
20  look at the relationship between the event of
21  Katrina and the outcome in terms of damages
22  and potential diminution of value.
23      Q. Let me ask it this way. In your
24  analysis, have you assumed that the links in
25  the chain of proof that you set forth in

31 (Pages 118 to 121)

KERRY DEAN VANDELL (MR GO)                                    9/17/2007

Page 122

1  paragraph 7 cannot be proven on a class-wide
2  basis, but must --
3          MR. DOAK:
4              Object.
5  EXAMINATION BY MR. MEUNIER:
6      Q.   -- but must be proven on a case by
7  case basis?  Is that your assumption?
8          MR. DOAK:
9              Objection.  Asked and answered
10  twice.
11          MR. MEUNIER:
12              I don't think I have gotten an
13  answer, though.
14          THE WITNESS:
15              You said the links as a whole, as
16  a group.
17  EXAMINATION BY MR. MEUNIER:
18      Q.   Right.
19      A.   No, I am not -- I am not saying
20  that.  I did not.
21      Q.   Okay.
22      A.   The overall question in the end is
23  whether there in fact is a -- whether in fact
24  the damages that were experienced by an
25  individual can be ascertained through some

Page 123

1  sort of mass or class -- class treatment.  And
2  my conclusion from my report, as you will see,
3  is that no, they cannot be.  All right?
4      Q.   Yes, sir.  But you didn't reach that
5  conclusion with training or knowledge as to
6  the available legal models of proof for common
7  issues in a class action trial.  Is that
8  correct?
9      A.   I -- You used again terminology of
10  -- that relates more I think to my knowledge
11  of past legal cases, and that's not really
12  what I am testifying on.
13      Q.   All right.  Are you familiar, Dr.
14  Vandell, with the Louisiana law definition of
15  proximate or legal cause?
16      A.   Not really in a legal context.
17      Q.   Are you aware that under Louisiana
18  law, when a Defendant's breach of duty or
19  legal fault combines with other causes to
20  bring about an injury, a Plaintiff still may
21  recover from that Defendant if the fault of
22  that Defendant was a substantial factor in
23  bringing about the harm?
24      A.   You're going to have to read that
25  through again.  I am not an attorney.

Page 124

1      Q.   All right.
2      A.   I am not familiar with the
3  terminology.  I would have to read it and
4  translate it in my own lay language to
5  understand what that is saying.
6      Q.   All right.  Then I am going to try
7  to break it down for you.
8      A.   That's fine.
9      Q.   Are you aware that under Louisiana
10  law, when a Defendant's breach of duty -- You
11  use that phrase all the time; certainly you
12  have some understanding of what that means.
13  Breach of duty.  You use it multiple times in
14  your report.
15      A.   Yes.
16      Q.   Okay.  Are you aware that under
17  Louisiana law when a Defendant's breach of
18  duty contributes to a Plaintiff's harm along
19  with other causes -- You with me so far?
20      A.   Contributes to a Plaintiff's harm.
21      Q.   In combination?
22      A.   In combination with other causes.
23      Q.   All right.  That when that happens,
24  a Plaintiff may recover damages from the
25  Defendant for the breach of duty if the breach

Page 125

1  was a substantial factor in bringing about the
2  harm.  Were you aware of that legal principle?
3      A.   But he would only be responsible for
4  those damages caused by him?
5      Q.   No.
6      A.   Again, this is something that -- I
7  mean, I'd be very happy to sit down with you
8  and go through the details of this, but it's
9  something that I feel is really more a legal
10  interpretation of this that goes beyond what
11  the scope of my analysis is doing.  Ultimately
12  it's you attorneys that have to determine,
13  once you incorporate my results, you have to
14  argue among yourselves as to how this relates
15  to Louisiana law.
16      Q.   Is it your assumption that a
17  Defendant's breach of duty must be the sole
18  cause of alleged harm, let's say flood damage,
19  in order for the Plaintiff to recover from
20  that Defendant?
21      A.   A Defendant's breach of duty must be
22  the sole cause --
23      Q.   The sole and only cause of alleged
24  harm, let's say flood damage, in order for the
25  Plaintiff to recover from that Defendant.  Is

KERRY DEAN VANDELL (MR GO)                              9/17/2007

## Page 126

1  that your belief?
2      A.  To be the only cause?
3      Q.  Yes, sir.
4      A.  I mean, what if they have several --
5  there are several causes?  And there are
6  several Defendants, some of whom one can
7  recover from and others they can't?  Or there
8  are others that were acts of God that create
9  damages, so there are multiple sources for
10  those damages.  Am I right?  I mean, all my
11  report is doing is attempting to get at a
12  methodology -- at an approach in which one
13  could determine the damages and at some point
14  hopefully quantify those damages and trace
15  those back to the actions of a particular
16  Defendant in terms of their breach of duty.
17  That's what we're doing.  I mean, in the end,
18  you'll have to determine whether -- how
19  consistent that is or whether there are
20  nuances in Louisiana law that may somehow
21  modify that, but those are the facts at which
22  I am going to be attempting to get at.  And I
23  am going to be asking myself, what is the
24  appropriate way to do that, and I am going to
25  be asking whether the way in which Mr. -- Dr.

## Page 127

1  Kilpatrick has proposed to do that can
2  actually get at that relationship.
3      Q.  So it is your understanding that a
4  Defendant's breach of duty need not be the
5  sole cause of harm for a Plaintiff to recover
6  from that Defendant?
7      A.  See, again, I'm sorry.  Maybe I am
8  ADD or something.  But when you go through
9  that sort of terminology, why don't you put it
10  into just straightening English language and
11  tell me what -- when you say a Defendant, the
12  sole cause of harm --
13      Q.  Sole, S O L E.
14      A.  Yes.
15      Q.  Only.
16      A.  I understand.
17      Q.  Nothing else.  That's what that
18  means?
19          MR. DOAK:
20          Oil object.  I have given you 25
21      minutes on this subject area.  I will
22      take this videotape to any Judge, and I
23      think he's answered very well, you
24      know, and I object to further
25      badgering him about the intricacies of

## Page 128

1  legal causation and other legal
2  propositions which he is not required
3  to know and he never said he knew and
4  he is not offering an opinion on.
5          MR. MEUNIER:
6          And I suggest to you, Counsel,
7      that his analysis and report is
8      predicated on what Counsel have told
9      him, which is inconsistent with the
10      Louisiana law of causation and the
11      allocation of fault.  It's a building
12      block for his analysis.  As his report
13      makes eminently clear.  So if you want
14      to take this up with the Court, I'll
15      be happy to.
16          MR. DOAK:
17          I think you're misreading the
18      report and I am sure you have seen the
19      statement.
20  EXAMINATION BY MR. MEUNIER:
21      Q.  And I am going to continue to ask
22  you what you are familiar with or not.  If
23  you're not --
24          MR. DOAK:
25          Page 25 making very clear what he

## Page 129

1      is doing and what he is not doing. ,
2  EXAMINATION BY MR. MEUNIER:
3      Q.  Dr. Vandell, if you're not familiar
4  with the legal principle, all you need to do
5  is tell me you're not and we will move on.
6  Fair?
7          MR. DOAK:
8          That's fair.
9  EXAMINATION BY MR. MEUNIER:
10      Q.  Okay.
11      A.  That will be fine.
12      Q.  Are you familiar with the legal
13  principles of comparative fault allocation in
14  Louisiana?
15      A.  No.
16      Q.  Do you know what comparative fault
17  allocation refers to?
18      A.  No.
19      Q.  Do you understand how fact finders,
20  Judges and juries in trials in Louisiana,
21  determine percentages of fault to be allocated
22  among different entities?
23      A.  No.
24      Q.  You don't know what factors go into
25  that decision?

Page 130

1     A.  What factors go into that, no.
2     Q.  Now, I assume, because you have not
3  referred to the Plaintiffs' trial plan for a
4  common issues trial, that you are not aware
5  that the Plaintiffs propose to ask the
6  question on a class-wide basis whether and to
7  what extent each Defendant caused or
8  contributed to flooding in a given area?  Are
9  you aware of that?
10     A.  Since I haven't read that, I am not
11  aware of that.
12     Q.  And assuming that the Plaintiffs do
13  not intend to reply on Dr. Kilpatrick or any
14  AVM or any hedonic price model to have that
15  question, a fault allocation for flooding
16  damage resolved in a trial, what criticism as
17  a real estate expert do you have for that
18  approach?
19     A.  Again, I am unclear as to exactly --
20  I think you're referring to certain legal
21  aspects of the treatment of the case here that
22  go beyond the substance of my report.
23     Q.  Well, in various places in your
24  report, for example, paragraph 4, page 9, you
25  cite the need to differentiate between breach

Page 131

1  of duty and non-recoverable damages and to
2  further differentiate among the Defendants and
3  others who are responsible for recoverable
4  damages; true?
5     A.  That's correct.
6     Q.  But assuming that no AVM, no hedonic
7  price model or anything of that kind is
8  proposed to be utilized for that
9  differentiation in this case by the Plaintiffs
10  in their legal model, the trial plan, what
11  criticism as a real estate expert do you offer
12  for that approach?
13        MR. DOAK:
14           Object to form.
15  EXAMINATION BY MR. MEUNIER:
16     Q.  Let me --
17     A.  I -- What -- What you seem to be
18  asserting is that it doesn't matter to what
19  extent objectively or factually each of the
20  Defendants and others had a role in creating
21  the damages.  My assumption is that matters to
22  the Court in the end and it would be a part of
23  their decision making in terms of judging
24  certification of the class.  Now, you may be
25  telling me that legally this is something that

Page 132

1  was agreed to outside of that.  I have no
2  knowledge of any of that.
3     Q.  Let me approach it this way.  You
4  have conduct, which is wrongdoing, negligence,
5  fault, failure to do things or doing things in
6  this category.  And you have all the
7  Defendants, you have nine Defendants, you have
8  God, you have everything included in the
9  conduct circle.  You understand?
10     A.  Right.
11     Q.  You have flood, which I will offer
12  is the rising water intrusion into and onto
13  property that previously was dry.  Fair
14  enough?
15     A.  You have more than that, but that's
16  fine.
17     Q.  Well, wait.  Do you understand that
18  the Plaintiffs in this case are only seeking
19  to recover flood damages?  Do you understand
20  that?
21     A.  That -- That's exactly -- That's
22  what the Complaint says, yes.
23     Q.  Right.  The Plaintiffs are not
24  seeking to recover in this case any damages
25  for wind or rain and debris.  Do you

Page 133

1  understand that?
2     A.  Oh, I agree entirely.
3     Q.  So when I put "flood" here, I am
4  talking about the intrusion by rising water
5  into and onto property.
6     A.  And I assume by "flood" you mean
7  those aspects of the flood that were caused by
8  conduct.  Is that correct?
9     Q.  That can be shown to be due to the
10  conduct, correct.
11     A.  And to the extent there are
12  different Defendants, it would be the extent
13  to which certain portions of that would be due
14  to certain Defendants.
15     Q.  I will tell you, Dr. Vandell,
16  legally, any Defendant whose action or failure
17  to act substantially contributed to the
18  flooding is liable.  And I will further tell
19  you that if more than one Defendant is liable,
20  there's an allocation of fault on a percentage
21  basis.  All right?  Is that --
22     A.  That's right.  I presume that
23  allocation is based upon or at least makes use
24  of input of whatever technical evidence is
25  available with respect to, say, for example,

KERRY DEAN VANDELL (MR GO)                                     9/17/2007

Page 154

1        Okay.  He's got a plane.  He's
2    got to be out of here at 5:00.
3        MR. MEUNIER:
4          2:15.
5        MR. DOAK:
6          5:00 is pressing it.
7        VIDEO OPERATOR:
8          Off the record.
9        (Recess.)
10       VIDEO OPERATOR:
11         We're now back on the record.
12   EXAMINATION BY MR. MEUNIER:
13       Q.  Dr. Vandell, have you been able to
14   now review the list of your publications and
15   papers in order to tell us in which of those
16   writings you discussed the utility or
17   appropriateness of AVMs or hedonic price
18   modeling?
19       A.  I'm sorry, no, I didn't know that
20   was my assignment during lunch time.
21       Q.  You get an F in the course.  You
22   just flunked the course.
23       A.  I'm sorry --
24       MR. DOAK:
25         You were supposed to remind us.

Page 155

1        THE WITNESS:
2          I can go through quickly and I
3      can -- I can go through them.  That
4      shouldn't take too long hopefully.
5      But --
6    EXAMINATION BY MR. MEUNIER:
7        Q.  Okay.
8        A.  Would you mind?
9        Q.  Well, we have to do it.
10       A.  All right.
11       Q.  Might as well do it.  If you want to
12   wait for the next break and then on the break
13   you can review it when we're not on the
14   record, that might --
15       A.  That would be fine.
16       Q.  Why don't we do that.
17       A.  All right.
18       Q.  Now, you do not dispute the fact, do
19   you, that a substantial amount of property
20   damage in the class and subclass areas
21   proposed in the MRGO case were affected as a
22   result of flooding?  That is, rising water
23   intrusion onto and into property?
24       A.  I guess that depends on the
25   definition of "substantial".  There were

Page 156

1    substantial property damages as a result of
2    the storm, and a not insignificant portion of
3    that damage would be due to flooding.
4        Q.  In your report at page 4, paragraph
5    8, you state "It is clear from numerous
6    sources --"
7        A.  Page 8?  I'm sorry.
8        Q.  Page 4, paragraph 8.
9        A.  Paragraph 8.  Okay.
10       Q.  "It is clear from numerous sources,"
11   you say, "that a substantial portion of the
12   property damage due to hurricane Katrina was
13   caused by wind, rain, and flying debris."  And
14   you cite two articles in footnote 2.  Both
15   articles in footnote 2 you date as October the
16   4th -- one, October 5th, the other October
17   4th, 2007.  Obviously that's a mistake.
18       A.  I'm sorry.  That was '5.
19       Q.  Should that be October, 2005?
20       A.  Yes.
21       Q.  In both cases?
22       A.  I -- No, it would have been later
23   than that.  It may have been actually 2007.  I
24   do have that in my -- Just didn't go over the
25   date.  I didn't notice that.

Page 157

1        Q.  Well, we haven't gotten to October
2    5th, 2007.
3        A.  No, I guess we haven't.  So it must
4    have been '06.
5        Q.  You don't think it was '05?
6        A.  '06, '05.  It could have been '05.
7    It just depends upon how far they got with
8    receiving, you know, claims at that time.  I
9    didn't know whether in that period of time
10   they would have it -- I'm sorry, I have it.  I
11   actually went over some of that, but it's on
12   your CD and I don't have a hard copy of that.
13       Q.  Let me show you a copy of an article
14   from The Financial Times --
15       A.  It was two on '05.  Okay?
16       Q.  Right.
17       A.  Thank you.
18       Q.  And isn't it true that the sources
19   that you cite in footnote 2 both refer to an
20   Insurance Services Office or ISO survey of
21   damage which had been conducted by October the
22   5th, 2005?
23       A.  That's correct.
24       Q.  And so this survey was reported
25   about five weeks after Katrina; correct?

                                    40  (Pages 154 to 157)

KERRY DEAN VANDELL (MR GO)                                     9/17/2007

Page 158

1      A.  That's correct.
2      Q.  And if you look at the article I
3  have given you from The Financial Times, which
4  is one of the articles I believe you cited,
5  you'll see that it's reported that inspectors
6  had arrived on the Gulf Coast to start
7  inspecting damages; hundreds of claims
8  assessors had arrived on the Gulf Coast to
9  start inspecting damages.  It's about the
10  middle way down in the article.  Correct?
11      A.  That's correct.
12      Q.  It's also stated in here that the
13  ISO was planning to conduct another survey in
14  two months time when more claims were filed.
15  Correct?  That's the paragraph after the one
16  --
17      A.  Yes.
18      Q.  Did you ever refer to this
19  subsequent survey by the ISO?
20      A.  I don't refer to it here, no.
21      Q.  So the sources here that you cited
22  for the proposition that substantial losses
23  occurred due to non-flood damage relates to an
24  ISO survey that was made five weeks after
25  Katrina, at a time when inspectors -- when

Page 159

1  assessors were starting to inspect damages.
2  Correct?
3      A.  That's correct.
4      Q.  Now, the article also tells us, does
5  it not, that the ISO survey included not just
6  this class area, in fact, not just the state
7  of Louisiana, but a total of six states,
8  Mississippi, Louisiana, Alabama, Florida,
9  Tennessee, and Georgia?  Correct?
10      A.  That's correct.  I don't think,
11  though, my report confines the statement of 34
12  billion to simply New Orleans.
13      Q.  No, sir.  You cite these articles
14  for the proposition that it is clear from
15  numerous sources that a substantial amount of
16  non-flood damages, that is, wind, rain,
17  debris, occurred due to Katrina.  Now, were
18  you making that statement as being relevant to
19  the MRGO class area?
20      A.  This statement didn't deal
21  specifically with MRGO class area.  However, I
22  would -- I certainly would intend to append
23  this to the extent there's additional, more
24  recent work that identifies the number of --
25  the amount of non-flood damage claims that

Page 160

1  have been made, and I believe that given that
2  information that I'll be able to still make
3  this statement.
4      Q.  Well, I appreciate that prediction.
5  But as you sit here today under oath, the only
6  sources that you are citing for the
7  proposition stated in your report are articles
8  based on an October, 2005 ISO survey that
9  dealt with six states.  Am I correct?
10      A.  That's correct.
11      Q.  You're not aware, are you, of any
12  survey comparing flood to non-flood damage in
13  Louisiana only?
14      A.  I thought that there was some
15  information -- Do you have the other article,
16  by any chance?
17      Q.  No, sir.
18      A.  I thought I saw other information
19  that said something about the amount in the
20  New Orleans region and I thought it was one of
21  these two articles.  I don't remember exactly
22  the source.  I would still consider that
23  amount, and I don't remember exactly what it
24  was, at the time it was -- it was something
25  like 11 billion, I thought, but I would have

Page 161

1  to look back at that.
2      Q.  What amount is that 11 billion for?
3      A.  I'm sorry?
4      Q.  What was the 11 billion for?
5      A.  I thought -- I'm sorry, don't quote
6  me.  I remember one of these articles had
7  something that was more specific to the New
8  Orleans area, and I would still consider that
9  to be -- to be significant at the time.
10  However, I would really wait.  And I think
11  I've conditioned my report on the ability to
12  update the most current information.  I
13  certainly intend to do so by the time of the
14  hearing.
15      Q.  Do you presume for purposes of your
16  analysis that there was a substantial amount
17  of non-flood property damage, i.e., wind,
18  rain, debris, which occurred in the MRGO class
19  area including all the subclass areas?
20      A.  A substantial amount, I do believe
21  that there was, yes.
22      Q.  And that's a predicate for your
23  analysis; correct?
24      A.  The predicate for my analysis
25  meaning that it is necessary --

JOHNS PENDLETON COURT REPORTERS                        800 562-1285

KERRY DEAN VANDELL (MR GO)                                    9/17/2007

Page 162

1      Q.  It's one of your premises.
2      A.  And that if it's not true, that my
3   analysis is wrong?
4      Q.  No, sir.  It's one of your premises,
5   is it not?
6      A.  It's one of my current beliefs.
7   It's not absolutely necessary for the verity
8   of the analysis itself.  But it could affect
9   the -- any sort of magnitudes that are derived
10  from the analysis.  Ultimately the decision
11  about the sources of damage, whether it be
12  wind, rain, overtopping, et cetera, et cetera,
13  would be made by others.  The technical
14  analyses by experts and others, some of which
15  are in the process of being made or have been
16  made, will determine that.  I don't think in
17  any way do the magnitudes of those estimates
18  affect the validity of my analysis.
19     Q.  Do you dispute that even if on an
20  individualized basis, it would be possible to
21  identify and quantify the property damage that
22  was due to flooding in the class area as
23  opposed to property damage due to wind, rain
24  and debris?
25     A.  Do I --

Page 163

1      Q.  Would it be possible to
2   differentiate that even if done on an
3   individualized basis?
4      A.  Would it be technically possible to
5   do that?
6      Q.  Yes, sir.
7      A.  I believe there are individuals who
8   could make estimates of that.  In fact, I
9   would believe that would be one of the
10  prerequisite analyses to be done on an
11  individualized basis to attempt to back into
12  the essential story as to what went on when
13  and what type of damage occurred to that
14  structure at what time and in what degree of
15  magnitude.
16     Q.  So it would be possible with
17  appropriate experts in this case to identify
18  flood damage as distinguished from wind, rain,
19  debris damage; correct?
20     A.  I believe it's possible to make
21  those sorts of estimates with proper technical
22  analysis, yes.
23     Q.  And as I think I covered with you
24  earlier, you understand that in this case, the
25  only damages sought by the Plaintiffs are

Page 164

1   those related to flood damage.  Correct?
2      A.  I understand.
3      Q.  Now, in your report at page 5,
4   paragraph 10, you set forth three different
5   approaches under Louisiana law for quantifying
6   the amount of property damages.  Correct?
7      A.  That's correct.
8      Q.  Cost of restoration, the difference
9   in value pre- and post-event, and cost of
10  replacement.  Those are essentially the three
11  approaches?
12     A.  Yes.  Less reasonable depreciation,
13  if the value before the damage can't be
14  reasonably determined or the cost of repairs
15  exceeds.  So conditioning factors on the third
16  one.
17     Q.  And which approach do you understand
18  Dr. Kilpatrick's method would utilize?
19     A.  My first -- We haven't discussed yet
20  breach of duty damages versus other damages
21  and I would say first Mr. Kilpatrick's, if
22  we're talking about the appropriate measure of
23  value diminution here, we should be talking
24  about breach of duty damages.  And on that
25  basis I would say Mr. Kilpatrick's approach is

Page 165

1      -- is not relevant to any of these.
2      Q.  All right.  Let me make sure I
3   understand what you're saying.  What do you
4   mean by breach of duty damage?
5      A.  Damages that are attributable to the
6   actions of a -- one or another of the
7   Defendants.
8      Q.  And as we were discussing before the
9   break, if the Plaintiffs propose first to
10  establish whether and to what extent the flood
11  or the rising water phenomenon in each area
12  was due to breach of duty, then you understand
13  that the inquiry into damages would be to what
14  extent has any given Plaintiff sustained harm
15  as a result of the flood.  Correct?  Do you
16  understand that, what we talked about this
17  morning?
18     A.  Yeah.  Maybe you better say it
19  again, because I want to make sure I
20  understand.
21     Q.  All right.  If it were established
22  that a given Defendant's breach of duty caused
23  or substantially contributed to the flood and
24  then the Plaintiff, through either an
25  individualized or mass approach undertook to

42 (Pages 162 to 165)

KERRY DEAN VANDELL (MR GO)                                    9/17/2007

1   around took place almost two years after the
2   event?
3       A.   That's correct.
4       Q.   Did you see any evidence of wind
5   damage?
6       A.   Yes.
7       Q.   What did you see?
8       A.   We saw areas where there had been
9   shingles blown, blown off.  And some of the
10  homes -- Now, these are not the Plaintiffs'
11  homes necessarily, although there was still
12  some evidence of those.  But -- And that those
13  were still in the same conditions as before.
14  They had not been renovated in any way.
15      Q.   So you saw shingles blown off of
16  some roofs?
17      A.   Right.
18      Q.   On any of these structures listed --
19      A.   We also saw roof damage where there
20  had been things blown into roofs and had
21  created damage through holes in roofs.  That's
22  correct.
23      Q.   On any of these structures that you
24  have listed?
25      A.   They're not the four Plaintiffs'

1   homes.
2       Q.   How about the other structures?
3       A.   Of the ones identified?
4       Q.   The ones you list on here, yes.
5       A.   No, but others we saw in the area.
6       Q.   How about evidence of rain damage;
7   did you see that two years later?
8       A.   It's hard to identify that at the
9   time.  There were clearly holes in roofs and
10  substantial leakage.  We still saw some
11  evidence of the blue tarps over property.  I
12  assume that there was rain damage created
13  during that time.
14      Q.   How about evidence of flooding?
15      A.   Evidence of flooding, we could see
16  flood lines in some of the areas.  In others,
17  it was rather difficult to see that.  Again,
18  remember, I couldn't get up and inspect
19  immediately adjacent to those.  We saw a
20  number of homes that were gutted in essence,
21  the drywall was taken out in prep for
22  renovation or still in their previous state.
23          The evidence that we saw, I should
24  say, varied substantially by property and
25  location.  That includes both flooding and

1   roof damage due to wind or rain damage, so
2   forth.
3       Q.   Explain what you mean by "variation
4   in flood damage".
5       A.   That in some cases there seemed to
6   be virtually no -- In some of the areas there
7   was very little evidence of flooding in the
8   properties themselves.  In some cases it
9   varied substantially.  For example, if the
10  house had a raised foundation, whether it was
11  on piers or had raised site, they were
12  relatively unaffected, whereas others next
13  door to it that would be on a slab would have
14  maybe one or two feet of water as evidenced by
15  any sort of water lines that we saw.
16      Q.   Is it fair to say, Dr. Vandell, that
17  the possibility of reliably determining or
18  reconstructing a level of flooding within a
19  class area here in this case is beyond your
20  expertise?
21      A.   Yes.  That's not what I've been
22  asked to opine on.  I am not an expert in
23  flood behavior.
24      Q.   Now, you say in your report starting
25  at page 10, paragraph 24, that the proposed

1   class area is both large and diverse.
2   Correct?
3       A.   Yes.
4       Q.   As a general proposition, is variety
5   in property usage, for example, residential
6   versus commercial, something which can be
7   controlled for in an automated valuation
8   model?
9       A.   You would have to separate models.
10  First, there's a real question as to the
11  validity of automated valuation model for
12  commercial property.  There's a very large
13  question yet as to how, given the
14  heterogeneity of retail, other types of
15  commercial property, whether an AVM type
16  system would work at all.
17      Q.   Is age of structure a variable which
18  can be controlled for in an automated
19  variation model?
20      A.   Age of structure can be included in
21  there, yes.
22      Q.   Can type of construction be a
23  variable that is controlled for in an AVM?
24      A.   Yes.
25      Q.   Can the condition of property, that

46  (Pages 178 to 181)

KERRY DEAN VANDELL (MR GO)                                    9/17/2007

Page 182

1   is, state of repair, be controlled in an AVM?
2       A.  It could be, and very rarely is done
3   very well.
4       Q.  Have you known instances of AVMs
5   that controlled for these variables that I
6   have mentioned?
7       A.  Of the ones that I have seen, some
8   do and some don't.
9       Q.  You yourself have published several
10  papers on the price effects of architectural
11  design; correct?
12      A.  That's correct.
13      Q.  Now, in support of your statement
14  that the class area includes a wide variation
15  of ages of structures, you refer us to census
16  data which is set forth in exhibit 2 to your
17  report.  Correct?
18      A.  Yes.
19      Q.  Now, this is taken, this printout --
20  By the way, who prepared this printout?  Did
21  you prepare it or did you actually --
22      A.  That was undertaken under my
23  direction by I believe it was Kristen Comeaux
24  at Analysis Group.
25      Q.  Okay.

Page 183

1       A.  By the way, what page is that?
2       Q.  It's exhibit 2 attached to your
3   report.
4       A.  Is that before the appendix or
5   after?  It must be --
6       Q.  It will be right after the map we
7   were just looking at.  Exhibit 1 was the map.
8       A.  Oh, there it is.  I'm sorry.  Thank
9   you.
10      Q.  So this was undertaken by Mr.
11  Comeaux, you said, and --
12      A.  Miss.  Miss --
13      Q.  Miss Comeaux?
14      A.  -- Comeaux, right.
15      Q.  And it is based on the 2000 census;
16  correct?
17      A.  That's correct.
18      Q.  So this data is from five years
19  prior to Hurricane Katrina?
20      A.  That's correct.
21      Q.  And you suggested a comparison of
22  the percentages of homes constructed before
23  1960, comparing the Lower Ninth Ward with St.
24  Bernard Parish, with the West Lake Forest
25  subdivision of New Orleans East.  Right?

Page 184

1       A.  Where was that?  That was one of the
2   examples that I used?
3       Q.  Yes, sir.  It's at page 11 of your
4   report.
5       A.  All right.
6       Q.  Talking about the wide variety of
7   properties, et cetera, and you say "As shown
8   in exhibit 2" and then you go on to state
9   "Percentages of homes built before 1960
10  according to this 2000 census data", right?
11      A.  Right.
12      Q.  And you isolated one of nine listed
13  subdivisions of New Orleans East, West Lake
14  Forest; correct?
15      A.  Isolate?  I identified one, yes.
16      Q.  Yes.
17      A.  Right.
18      Q.  But why did you -- Well, did you
19  ever calculate the percentages of homes
20  constructed before 1960 for all of New Orleans
21  East?  Not just the West Lake Forest
22  subdivision.
23      A.  I'm sure that's been aggregated
24  somewhere.  I haven't seen those figures.
25      Q.  Well, do you believe Miss Comeaux

Page 185

1   aggregated that?
2       A.  I don't know.  I have never seen --
3   This is the only report that I got
4   (indicating).
5       Q.  So you don't know of any calculation
6   for that data for that percentage of pre-1960
7   construction for New Orleans East in its
8   entirety; correct?
9       A.  No, although I am not certain what
10  relevance that would necessarily have as you
11  get to a larger and larger area.  And if you
12  can get more commonality.  Ideally, you would
13  like to get down to a block group which would
14  demonstrate high variability across those
15  block groups.  And I think that what she was
16  doing, or what I was doing here is identifying
17  one as an example and there was wide variation
18  within the New Orleans East area as well as
19  across New Orleans East versus the Lower Ninth
20  Ward versus St. Bernard Parish.
21      Q.  Do you believe that Dr. Kilpatrick's
22  approach would require a comparison of
23  properties of Lower Ninth with New Orleans
24  East with St. Bernard?
25      A.  I believe he could construct a model

47 (Pages 182 to 185)

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

KERRY DEAN VANDELL (MR GO)                                      9/17/2007

---

Page 210

1       Q.  Well, I am trying to stay for the
2   moment with the discussion just about the
3   techniques themselves.  These are techniques
4   which have a certain degree of uncertainty
5   inherent in them; correct?
6       A.  Correct.
7       Q.  But you have seen published
8   literature which study and establish the
9   degree of that uncertainty?
10      A.  For conjoint and -- Yes, that's
11  correct.
12      Q.  And which take the position that
13  with that accounted for, that you can obtain
14  reliable results with the techniques?
15  Accounting for the uncertainty variable, I
16  mean.
17      A.  No, not the uncertain- -- Well, it
18  has to satisfy -- I think I cited the NOAA
19  1993 standards for contingent valuation as to
20  what is required of the data and other such
21  things.  I think if you'll look at the actual
22  application of the technique, very seldom are
23  those sort of standards really satisfied.
24      Q.  Well, --
25      A.  So in my view, I -- I look upon

---

Page 211

1   contingent valuation results with a great deal
2   of suspicion.
3       Q.  Let me talk for a moment more about
4   AVMs.  We have referred to the fact that there
5   are published uses of AVMs; correct?
6       A.  There are --
7       Q.  There are uses of AVMs which are
8   discussed in the published literature?
9       A.  Yes, that's correct.
10      Q.  And approved in the published
11  literature?
12      A.  By "approved" you mean --
13      Q.  Supported.  Seen as helpful.
14      A.  There's literature about AVMs that
15  talks about the application, extension of the
16  methodology.  Maybe the improvement of the
17  methodology, including papers I have written.
18      Q.  That you have written.  And there
19  are published examples as well of how you can
20  use hedonic price models to quantify the price
21  effects of factors that have a negative
22  influence on housing value?
23      A.  That's -- That's correct.
24  Disamenities such as pollution, other such
25  things.

---

Page 212

1       Q.  Well, let's give some examples.  You
2   can use hedonic price modeling to quantify the
3   price effects of environmental contamination?
4       A.  Appropriately undertaken.
5       Q.  Proximity to a busy street?
6       A.  Yes.
7       Q.  Proximity to a landfill?
8       A.  That's correct.
9       Q.  Mortgage defaults?
10      A.  Hedonic pricing models to do what,
11  now?  To -- I guess I am unclear as to what
12  you're saying with that.
13      Q.  To quantify the price -- I am
14  talking about quantifying the price effect of
15  a factor that has a negative influence on
16  property value.
17      A.  Right.
18      Q.  Okay.
19      A.  What are you talking about, mortgage
20  defaults, though?  I am unclear as to --
21      Q.  Well, let me ask you, you've
22  published, have you not, on the use of AVMs
23  with respect to mortgage defaults?
24      A.  I am not sure what you are referring
25  to.  I'll try to be responsive if you tell me

---

Page 213

1   what paper you're talking about.
2       Q.  Well, I am going to need you for
3   that.
4       A.  Okay.
5       Q.  Unless you want me on a break, I can
6   consult about it and we can be more specific.
7       A.  I have done work on mortgage
8   defaults and I have undertaken predictive
9   models of mortgage defaults.
10      Q.  What kind of models?  Hedonic
11  models?
12      A.  Yes.  These -- Well, they're
13  hedonic, but they're not predicting value.
14  They're predicting defaults.
15      Q.  Okay.  So you used the hedonic model
16  --
17      A.  I am using multiple regression.  I
18  shouldn't say hedonic.  The hedonic model
19  truthfully deals with value of rents as the
20  dependent variable.  And I am using multiple
21  regression analysis to predict defaults or --
22  we also use proportional hazards estimation,
23  which is related to multiple regression.  But
24  we're predicting default rates there, not
25  value.  So they're not really hedonic models.

---

54 (Pages 210 to 213)

Page 214

1    Q.  When you were predicting default
2  rates, over what size or population of units
3  were you making that prediction?
4    A.  The analysis we did in Dallas,
5  Dallas Federal Savings and Loan, that was, you
6  know, loans made throughout the area.
7    Q.  Millions of homes?
8    A.  No.
9    Q.  Hundreds of thousands?
10    A.  No, there were something like --
11  There were several hundred defaults I remember
12  with Dallas Federal Savings when it existed,
13  and -- and then there were other properties
14  that were used as controls.  But we weren't
15  predicting values there.  We were using the
16  conditions of the neighborhood and the
17  property and especially the terms of the loan
18  as predictors for the likelihood of default.
19  I also did commercial mortgage default studies
20  which made use of samples, or the entire
21  portfolio of loans, commercial mortgage loans
22  from Travelers Realty Investment Company, and
23  those loans were made all over the country.
24  There were about 100 defaults in those and
25  they probably had a couple of thousand loans,

Page 215

1  something like that.
2    Q.  In principle, why do you, if you
3  believe this, why do you believe the
4  occurrence of a flood could not be a negative
5  factor, the price effect would be assessed
6  through a hedonic model?
7    A.  If you had a flat plain and every
8  property were the same and then certain --
9  certain of the homes had a flood and certain
10  of those did not, you would be able to do it
11  under those circumstances.  However, that's
12  not the circumstance that you are facing here
13  in the application.  You also are forgetting
14  the fact that we're talking about breach of
15  duty damages here and we have --
16    Q.  Let's not go back there.  Please.
17    A.  Well, even apart from that, --
18    Q.  You have to go to law school --
19  You're going to have to enroll in law school
20  for us to continue this discussion.
21    A.  Okay.  But you still have to
22  remember that non- -- non-flood damage in the
23  sequence of events that that occurred, apart
24  from breach of duty, can have an effect on the
25  amount of damage created by a flood.

Page 216

1    Q.  Yes.  I have asked you to presuppose
2  that I can isolate flood damage with a legal
3  model before the hedonic model ever shows up
4  on the scene.  And I know you're troubled by
5  that.  But --
6    A.  I always am suspicious of
7  presuppositions.
8    Q.  The main thing -- I just want you to
9  acknowledge that that's a legal argument and
10  it's not an argument for the property
11  experts.
12    A.  All right.
13    Q.  Now, at page 17, paragraph 38, you
14  challenge Dr. Kilpatrick's assertion that
15  stigma associated with Katrina flooding can be
16  measured as a negative effect on post-Katrina
17  property value.  Correct?
18    A.  Right.
19    Q.  Have you published and/or presented
20  on the phenomenon of stigma as that is used in
21  your field of expertise?
22    A.  Published a paper or presented --
23    Q.  Either published or presented on
24  that subject.
25    A.  I'm trying to remember if stigma per

Page 217

1  se.  I mean, I have dealt with negative --
2  with environmental justice issues and the
3  effects of, say, nearby petrochemical
4  facilities or something on -- on property
5  values.  I don't know of any other articles
6  that -- And you might have to help me here
7  again.
8    Q.  Well, one of the things you comment
9  on in this part of your report is you seem to
10  believe that Dr. Kilpatrick is using the term
11  "stigma" in some erroneous way.
12    A.  Okay.  Well, in that case I can
13  explain what I meant --
14    Q.  Right.  Right.
15    A.  -- if that's what you would like.
16  Yes.  There are a number of things that --
17  beyond the necessity of physical repair of the
18  property, remediation of the property that
19  could influence value.  That you could have
20  neighborhood amenities that disappear, schools
21  could be closed down, streets could be in
22  disrepair, you don't have trash collection, a
23  variety of things such as that.  It could well
24  be that the region's economic base is
25  diminished for a time.  Okay.  So there are

KERRY DEAN VANDELL (MR GO)                                    9/17/2007

Page 222

1  flooded due to levee failure.
2      A.  Right.
3      Q.  And according to the footnote that
4  continues on page 28, 15 months later there
5  was some kind of substantial recovery.
6      A.  Right.
7      Q.  You're not suggesting, of course, in
8  this case that the flooding which occurred
9  here could be compared to what happened in
10  California in 1988?
11     A.  Well, certainly not the breadth of
12  its effect.  I don't know about the
13  intensity.  I just don't know anything about
14  that.
15     Q.  We're now 24 months after the
16  event.  Do you believe that the stigma effect
17  has been diminished over time?
18     A.  I think there are -- I haven't
19  really studied that.  I do believe there have
20  been announcements certainly made of intent to
21  -- to improve the hurricane protection system
22  here.  Others would have to answer to the
23  extent to which those are believable or which
24  there's progress being made.  It's not for me
25  to decide that.  So, I mean, the point being

Page 223

1  is it really depends upon the circumstances
2  that I couldn't judge.
3      Q.  Right.  You haven't been following
4  the -- taking the pulse of the local populace
5  in reaction to press coverage about the Corps
6  of Engineers and the problems associated with
7  what happened, have you?
8      A.  Well, I have certainly followed the
9  press as anyone -- as anyone has in terms of
10  what's been going on.  I do get a sense that
11  the market -- and there are certain areas of
12  the market from what I have been able to see
13  that are coming back, and we saw certain
14  neighborhoods that very clearly, and they were
15  as impacted early on in terms of their general
16  location as other neighborhoods nearby, and
17  they're at a much greater stage of
18  redevelopment.  I also see some evidence of
19  gradual increases in the number of
20  transactions, which, by the way, is reverse of
21  what's going on in the country as a whole.
22  So, you know, I would say there is some
23  evidence of recovery going on here.
24     Q.  Is there evidence of stigma?
25     A.  I think that would be for the

Page 224

1  analysts to have to look at and to decompose.
2  I couldn't just answer that question here on
3  the fly.
4      Q.  So you see evidence of recovery, but
5  you're not willing to acknowledge continuing
6  stigma from the flood?
7      A.  If we're narrowly defining "stigma"
8  as a reputational effect, I -- I just have to
9  say I don't know.  I haven't studied that.
10     Q.  Is an oil spill an event which could
11  result in stigma?
12     A.  I think that to the extent that
13  there was a perception, an increased
14  perception that it could happen again, it
15  could result in stigma.  To the extent that it
16  was seen as a one-time event, it's unlikely to
17  occur again, I think that would go away.
18     Q.  Is the failure of a levee that
19  results in the flooding of an entire community
20  the kind of thing that can result in stigma?
21     A.  I think it depends upon expectations
22  as to whether the situation can be remediated
23  to an adequate degree.
24     Q.  So for someone living adjacent to
25  the failed area of the Industrial Canal where

Page 225

1  flooding occurred in this case, you don't
2  believe any stigma could be associated with
3  the property at that location?
4      A.  I think it depends upon
5  circumstances.  If you -- Again, if you were
6  in the Netherlands where they were repairing as
7  they have done with their flood control
8  system, that level, I would have no problem at
9  all living immediately adjacent to that.
10     Q.  How about here?
11     A.  I don't know the circumstances with
12  respect to the Army Corps' announcement and
13  other activity that's been undertaken.
14     Q.  At page 18, paragraph 39, you
15  discuss the omitted variable bias as a problem
16  with hedonic modeling; correct?
17     A.  Yes.  It's on 39, paragraph 39?
18     Q.  Page 18, paragraph 39.
19     A.  Right.
20     Q.  You suggest Dr. Kilpatrick would
21  have to collect and measure all relevant
22  property value characteristics; correct?
23     A.  That's correct.
24     Q.  Dr. Vandell, don't published papers,
25  including that by Rosen in 1974, generally

KERRY DEAN VANDELL (MR GO)                                          9/17/2007

Page 246

1  article entitled "Road Home rethinks
2  appraisals".
3        A.  Right.
4        Q.  And if you look at page 2, about the
5  middle of the way down, "In place of the AVM
6  and BPO", do you see that?
7        A.  Right.
8        Q.  "The Road Home will reply on past
9  files of private assessors," et cetera?
10       A.  Right.
11       Q.  And then the last sentence?
12       A.  Says "The private assessors and
13  Federal housing, to dig up alternative
14  appraisals from the same addresses with values
15  adjusted to reflect --" "The --" "Still will
16  be used as a reference point to check other
17  appraisals."  And the BPO is an estimation of
18  values of weight characteristics and
19  considering nearly comparable homes.  Yeah.  I
20  mean, and your question now?  Now that I
21  understand what the --
22       Q.  I asked if you understood that to be
23  true and you said you weren't sure.  So the
24  article --
25       A.  Well, apparently it is true if you

Page 247

1  believe -- if you believe this.  I am not sure
2  that I necessarily would agree that that's the
3  best way to proceed.  But, I mean, they have
4  to make political trade-offs.
5        Q.  That was my question.  What is your
6  view about the reliance on broker --
7        A.  I don't --
8        Q.  -- price opinions for folks?  Is it
9  --
10       A.  I don't personally hold much stock
11  in those, but -- they're not true appraisals.
12       Q.  Now, are you aware, Dr. Vandell,
13  that as a result of the Road Home appraisal
14  activity, by the end of this year it's
15  expected that there will be a complete
16  database reflecting pre-Katrina values of all
17  property in the MRGO class area?
18       A.  I knew that Road Home was proceeding
19  toward that.  I didn't have an sense that it
20  would be by the end of this year.
21       Q.  Now, assuming that is true, and that
22  such a database will exist based on initially
23  AVM approach and then subsequent
24  individualized appraisals, and assume that
25  database will exist by the end of this year,

Page 248

1  would the availability of this database
2  facilitate the use of an AVM approach in this
3  matter?
4        A.  Certainly having a more complete
5  database than a less complete database would
6  help in the introduction of a hedonic approach
7  to valuation.  As to whether that approach
8  would result in value estimates that are more
9  accurate than the traditional grid approach,
10  because remember, the gathering of this data
11  can also be used to reduce the cost of the
12  traditional grid approach because you have
13  much more comparable information around, or
14  recent sales information, and so forth.  So I
15  wouldn't say that it necessarily -- It
16  facilitates the use of it, but it also
17  facilitates the use of more traditional
18  appraisals.
19       Q.  And it addresses some of the
20  concerns we earlier talked about, having an
21  insufficient database, one of the concerns
22  cited by the Fannie Mae and Freddie Mac list.
23  Correct?  It addresses that concern?
24       A.  Well, it's a matter of degree.
25  Because, remember, we're not just simply --

Page 249

1  And again, I don't want to get in an argument
2  about breach of duty damages.
3        Q.  Please.  Please don't.
4        A.  We have the obligation to go beyond
5  just the valuation of the property; that we
6  have an obligation to separate out those
7  effects from one -- from one cause of the
8  complex meteorological event versus another
9  cause.
10       Q.  All right.
11       A.  And they can't deal with that unless
12  they have much more information that they're
13  intending to have.
14       Q.  And again for not the first time, I
15  will ask you, sir, to assume that there's a
16  legal model to deal with that about which,
17  with all due respect, you have no expertise to
18  comment on.
19       A.  I understand that.  I am still in
20  doubt, though, sir, about the --
21       Q.  Well, --
22       A.  About the -- the ability to -- to
23  bring in other than flood-related damage as an
24  influence on value.  It seems to me that's
25  still a valid issue here, apart from any

Page 250

1  arguments about breach of duty versus other
2  non-recoverable --
3      Q.  I understand.
4      A.  I mean, is that --
5      Q.  And yet the isolation of flood
6  damage and the distinction between that and
7  wind, rain and other damage, it is the
8  Plaintiff's burden and you understand that
9  that's all Plaintiffs are seeking to recover
10  in this case.  Correct?
11     A.  That's -- That's fine.  As long as
12  we can -- We still understand the interaction
13  between those, so it's not -- which would mean
14  that it would still be relevant data to
15  include if you're attempting to use a hedonic
16  approach or an AVM approach.
17     Q.  Right.  Well, my question simply was
18  this.  Freddie Mac or Fannie Mae, one or the
19  other listed one of the limits that they
20  perceive with the AVMs as the data set and
21  whether you have a sufficiently large and
22  comprehensive and reliable data set.
23     A.  Right.
24     Q.  And I am simply asking you to
25  acknowledge that if it's true that the Road

Page 251

1  Home has created that database, that that will
2  at least address and go toward alleviating one
3  of the stated limitations on the AVM from
4  Freddie Mac or Fannie Mae.
5      A.  I believe under the conditions under
6  which one would be applying an AVM here to
7  correctly get at the flood versus the other
8  damage, that it would -- the database would
9  still be inadequate to deal with that.  So I
10  guess I won't admit to that under those
11  circumstances.
12     Q.  So you retract your earlier
13  statement that the database would facilitate
14  the use of an AVM?  You don't think that's
15  true?
16     A.  It depends on the circumstances to
17  which an AVM is being applied.  In the case in
18  which it would be applied here, I believe that
19  that database would still be inadequate.
20     Q.  Okay.  Now, starting at page 24,
21  paragraph 50 of your report, you reference the
22  Murphy Oil litigation; correct?
23     A.  Page 24?
24     Q.  Page 24, paragraph 50.
25     A.  Yes.

Page 252

1      Q.  You reference Dr. Kilpatrick's role
2  as one of the Plaintiffs' experts in that
3  case?
4      A.  Correct.
5      Q.  Were you aware that that case was
6  not only certified as a class action by the
7  District Court, but that the decision to
8  certify it was affirmed on appeal to the
9  United States Fifth Circuit Court of Appeal?
10         MR. DOAK:
11            Object to form.
12         THE WITNESS:
13            I understand it was -- it was
14         certified.
15  EXAMINATION BY MR. MEUNIER:
16     Q.  Are you aware that Dr. Kilpatrick
17  was proposing a class-wide approach to
18  property damage claims by identifying the
19  stigma associated with oil contamination
20  within the -- oil contamination affecting the
21  Plaintiff class member property?
22     A.  I understand that's what his -- he
23  was proposing.
24     Q.  Now, you suggest the case is
25  distinguishable because there was only one

Page 253

1  source of oil contamination versus multiple
2  causes of flooding here.  Correct?
3      A.  That's right.  It's my understanding
4  the issue here was contamination by -- by oil
5  and that was readily identifiable as to the
6  affected -- the affected area and where there
7  was still physical evidence that remained.
8      Q.  So you are not aware, I assume, that
9  Murphy Oil, the Defendant, took the position
10  in that case that there was contamination due
11  to oil from other sources besides the spill?
12  You were not aware of that, were you?
13     A.  I was not aware of that.
14     Q.  You were also not aware of the fact
15  that in that case the Defendant, Murphy Oil,
16  took the position that the Corps of Engineers
17  should be an entity looked to for an
18  allocation of fault and responsibility for the
19  spill?
20     A.  No, I haven't looked at the details
21  of that case.
22     Q.  So you weren't aware of that
23  either?  Correct?
24     A.  Correct.
25     Q.  But you do know that despite those

KERRY DEAN VANDELL (MR GO)                                    9/17/2007



Page 254

1  issues, the Court approved the trial plan in
2  Murphy Oil similar to the one that we would
3  propose in this case? Were you aware of that?
4     A.  Sure.  I am aware of what they --
5  that they approved that, correct.
6     Q.  Now, at page 25, paragraph 53 of
7  your report, you set forth the way that you
8  would propose we go about appraising the
9  flood-related property damage of individual
10 class members in this case; correct?
11    A.  Correct.
12    Q.  First of all, tell me how many
13 properties are involved.
14    A.  How many properties are involved?
15    Q.  Yes, sir.
16    A.  It's my understanding there were in
17 each of the subclasses roughly 100,000
18 population and something like one-third of
19 that number of units, so what is that, 35,000
20 units in each.  I am approximating here.
21 Okay?  If there were 100,000 population.  And
22 so that would be 7- -- 70,000 units.  Plus
23 whatever commercial units would be involved.
24    Q.  All right.  So when you undertake
25 your appraisal approach in this case, your

Page 255

1  task is to do appraisals for 70,000 or so
2  homes, plus some number of commercial
3  properties?  That's the task; correct?
4     A.  That's correct.  Something similar
5  to what a community with 70,000 homes would be
6  expected to do with a full appraisal or
7  assessment of their housing stock every so
8  many years.
9     Q.  You mean by the tax appraiser --
10    A.  That's correct.
11    Q.  -- who uses an AVM approach?
12    A.  No.  Many tax appraisers use
13 standard reassessment every so many years.
14    Q.  Your --
15    A.  They have revaluations required for
16 their entire property stock on average once
17 every five years or so.
18    Q.  So you don't think tax assessors by
19 and large in this country rely on AVMs?
20    A.  That's not what I said.
21    Q.  Well, do you agree with that
22 statement?
23    A.  I said there were many tax --
24 even those that require AV- -- that may
25 require AVMs, still require oftentimes

Page 256

1  reassessments every so many years, which means
2  a walk-through, which mean a complete
3  individualized appraisal of every property.
4  Even if they have an AVM.  They have to test
5  the performance of their valuation system
6  against the actual sales.
7     Q.  Do you think that's what is taking
8  place in this community?
9     A.  What do you mean?
10    Q.  Do you think that is taking place in
11 this community?
12    A.  This community has -- Historically,
13 you mean?
14    Q.  Historically or today.
15    A.  I don't understand the question.
16    Q.  What you just talked about.  Where
17 you think that tax assessors come through and
18 do individualized appraisals on a periodic
19 basis.  Tax assessors.
20    A.  No, the ones I have been affiliated
21 with in Dallas and in Wisconsin and -- Now,
22 California is a different matter with
23 Proposition 13.  But in most communities, even
24 those that have AVMs, they still have to come
25 through and check because they have a

Page 257

1  requirement to ensure the validity and the
2  equity of the assessments that are going on.
3  So they look at the assessment sales ratio of
4  each community and they look at the
5  coefficient of dispersion for each community
6  to get a sense as to whether you're right on
7  average and whether you're treating everybody
8  fairly.  Depending upon that, they may have to
9  do a complete -- as they call it, a re-val
10 more frequently than every five years or so.
11 They may have to do it every other year if
12 they find that the properties are appreciating
13 or depreciating or they're especially badly
14 treating those, which can happen in very
15 heterogeneous communities.  So, you know, they
16 -- communities undertake full appraisals of
17 the property on average once every five years.
18    Q.  I was asking about your knowledge of
19 this community.
20    A.  I have very little knowledge -- You
21 are talking about current assessment practice
22 in New Orleans?  I understand that it's been
23 completely transformed.
24    Q.  Current and historical.
25    A.  Historically I wouldn't put much

KERRY DEAN VANDELL (MR GO)                                    9/17/2007

Page 258

1   stock in the assessment procedures that were
2   used in the New Orleans area.  I don't believe
3   that there were assessments, proper
4   assessments made from the evidence that I have
5   seen.
6       Q.  And you believe under the recent
7   revision that individualized appraisals are
8   involved?
9       A.  I don't have a sense as to what
10  their current requirements are.  I just am
11  familiar with what I see most generally out
12  there in the marketplace.
13      Q.  All right.  Let's talk about your
14  two-step process that you describe starting at
15  page 25, paragraph 53.
16          The first step, and you elaborate
17  on this in paragraph 54, is to determine
18  whether there was flood damage as opposed to
19  wind or rain damage; correct?
20      A.  You're referencing where in the
21  report?  I'm sorry.
22      Q.  Paragraphs 53 and 54.
23      A.  Right.  So you're referencing the
24  first step in 53?
25      Q.  I think you elaborate on it in 54.

Page 259

1       A.  Okay.  Assessing the impact due to
2   breach of duty -- and you don't want me to use
3   that term -- of a Defendant on the property.
4   So the first step, you have to gain detailed
5   information on each structure in the class
6   area, including its condition and its location
7   prior to Katrina.  That's correct.
8       Q.  All right.
9       A.  And then once -- once you gather
10  that information, you then have to -- and this
11  would be as a result of reports of experts --
12  determine and try to recreate in essence what
13  went on, pre-existing condition of Katrina,
14  what went on in terms of the sequence of
15  events that impacted that residence.  Was it
16   -- Was the roof blown off and rain came in?
17  Was there a breach of a levee that preceded or
18  maybe came after the flooding due to drainage
19  and run-off?  But assess that set of
20  circumstances and then determine the post- --
21  post-Katrina condition of that property.
22      Q.  All right.  Let's talk about the
23  first step where you gather detailed
24  information on the structure.  Now, this is
25  something you do before even visiting the

Page 260

1   property; correct?
2       A.  Well, you can try to visit it, but
3   it's two years hence, so much of this would
4   have to be done through interviews, whatever
5   other information existed from supplemental
6   sources.
7       Q.  What kind of detailed information on
8   the structure would you gather?
9       A.  You would want all of the normal
10  information on its size, its age, its --
11  various elements of the condition, what was
12  the -- how was the foundation structured, how
13  high was the -- was the floor above the ground
14  level, was it a slab foundation or on piers.
15  Was there -- Was the roof recently repaired.
16  Were there other elements that would cause
17  there to be some variation in condition across
18   -- across the properties.
19      Q.  All right.  And who would be
20  involved; what kinds of individuals would be
21  involved in this information gathering phase?
22      A.  Well, I would think actually this
23  sort of activity is oftentimes undertaken by
24  folks like insurance adjustors.  Well-trained
25  insurance adjustors can.

Page 261

1       Q.  Maybe you misunderstand.  I am
2   asking you how you are going to go about doing
3   it in this litigation.  So tell me --
4       A.  You were asking who would do this.
5       Q.  Tell me.  Tell me who you would use.
6       A.  And I am saying people such as those
7   that would be insurance adjustors, appraisers
8   or engineers who are -- such people as Mr.
9   Danner who could assess the pre-existing
10  condition of the property.
11      Q.  All right.  So you'd hire -- I'm
12  sorry?
13      A.  You also interview -- I'm sorry.
14      Q.  Okay.
15      A.  You would probably be interviewing
16  individuals about their property, the
17  condition; you would be gathering ideally
18  whatever information you could get.  If the
19  property was recently appraised prior to
20  Katrina, whether there was refinancing that
21  went on.  What little information may be
22  available from the assessment files about the
23  property.
24      Q.  All right.  Who would interview the
25  homeowners?  You'd hire paralegals for this or

KERRY DEAN VANDELL (MR GO)                           9/17/2007

Page 262

```
 1  investigators?
 2       A.  I haven't thought through that.
 3       Q.  Okay.
 4       A.  There would be a variety of ways.  I
 5  assume that the community would try to do such
 6  things in the most cost effective manner that
 7  would give them confidence that they had a
 8  reasonable estimate of the pre-existing
 9  condition of the property.
10       Q.  All right.  So you would need
11  interviewers.  You would need researchers to
12  research the history of the property.
13  Correct?
14       A.  You know, much of this could
15  actually hopefully be gained from -- there's
16  still property records, there are title
17  company records.  There are other such things.
18       Q.  So you would have to send a
19  researcher down to the recorder of mortgages
20  and conveyances and whatever and research the
21  records on the property, correct?
22       A.  To the extent that it gave you any
23  indication of the pre-Katrina condition of the
24  property.  Your interest is really not so much
25  of ownership patterns or any other
```

Page 263

```
 1  miscellaneous information.
 2       Q.  Yes.  I understand.  So you would
 3  research all available written records in the
 4  city archives, et cetera that would give you
 5  information about the pre-Katrina condition of
 6  the property.  Fair?
 7       A.  That's exactly correct.  I
 8  understand that that's what the Road Home
 9  Program is attempting to do.  And so hopefully
10  some of that information has already been
11  gathered.
12       Q.  All right.  And then in that you
13  would be trying to determine the size, age,
14  how high above the ground, state of roof
15  repair, et cetera, things like that?
16       A.  That's correct.
17       Q.  All right.  Now, after you have
18  gathered all of that information and you have
19  used the team of interviewers and researchers
20  for that, next you engage appraisers and
21  adjustors to express the opinion on a house by
22  house basis as to whether the damage in
23  Katrina was due to flood or wind or rain?
24       A.  I think you're elaborating this much
25  more beyond what would actually be involved in
```

Page 264

```
 1  terms of -- remember, many of these folks
 2  could be the same people.  Hopefully the
 3  expert studies that are done in terms of the
 4   -- the movement of the storm through the
 5  area, the maximum winds that were experienced,
 6  and the timing of those, all of that
 7  information could be gathered and, if
 8  necessary, could be put together in a way in
 9  which it would be readily ascertainable.  In
10  fact, I'm sure a lot of that information is
11  already there from many of the reports that
12  have been done already.
13       Q.  Now, after you gather all of this
14  data, would there then be an actual physical
15  inspection of the property?
16       A.  Well, you have to do a physical
17  inspection post-Katrina also.  Is that what
18  you're asking?
19       Q.  All right.  So --
20       A.  Yes.
21       Q.  So in every case there would have to
22  be a physical inspection of the property?
23       A.  That's exactly right.
24       Q.  And that's where you would have
25  post-Katrina value appraised?
```

Page 265

```
 1       A.  It would be as with any insurance
 2  adjustor's assignment, they would be
 3  determining what is the degree of damage, and
 4  hopefully with the supplemental information
 5  they could identify what was the source of
 6  that damage.  They would also have some notion
 7  of the sequence of events that created damage
 8  that would allow them to assign and say,
 9  "Well, look, this home was already flooded
10  through the drainage before the levee ever
11  broke" or "There was wind, substantial wind
12  that came through a roof that was gone because
13  it was blown off" or "This was entirely flood
14  damage."
15       Q.  Do you have an estimate of how long
16  it would take, start to finish, to complete
17  the interview of owner stage, the research of
18  written materials stage, the physical visit
19  and inspection stage, and all of the other
20  things that are involved?  What would be the
21  average length of time you think it would
22  take?
23       A.  I think that once a system was
24  established and if there was a properly
25  trained workforce in place, you could
```

KERRY DEAN VANDELL (MR GO)                                    9/17/2007

Page 266

1  undertake many of these tasks possibly even
2  subcontracting with insurance adjustors,
3  others who already have the necessary
4  technical skills; I don't believe that it
5  would take -- that it would take that many
6  manhours. It can be done on a mass basis, if
7  you will. I hate to use that term. But it
8  can be -- There are economies of scale in
9  doing many -- many of these as opposed to
10 doing one. In other words, you cannot take
11 just one and multiply it by the number of
12 units and say that's how long and how much
13 it's going to cost. There are a lot of
14 economies of scale that be undertaken.
15     Q. Well, I realize that. But you can't
16 conduct collective interviews. You have to do
17 that on an individual basis; right?
18     A. (Witness nods head affirmatively.)
19     Q. You have to interview the homeowner,
20 you have to find them, interview them?
21     A. (Witness nods head affirmatively.)
22     Q. That takes time, right?
23     A. That's correct.
24     Q. You got to record the interview,
25 write a report on it; right?

Page 267

1      A. Well, to whatever extent -- This is
2  essentially what happens many times with
3  assessments, too. The same thing occurs.
4      Q. You've got to send someone down to
5  the records office, wherever that is, and try
6  to do research on historical documents
7  pertinent to the property?
8      A. No, not unless -- I mean, if you're
9  getting building permits and so forth. That
10 should be able to be done. That can also be
11 done with all of the properties at one time
12 with one visit. There are a lot of economics
13 of scale by doing something like this en
14 masse. I don't really feel, quite frankly,
15 sir, that this would be that much more
16 involved. I mean certainly you could do -- to
17 do a 100 percent job on this, you can spend a
18 lot and take a lot of time. To do an
19 acceptable job that would really provide some
20 indication of the variation that exists I
21 don't believe would be that much more involved
22 than doing a complete revaluation of a
23 community's housing stock.
24     Q. No, I appreciate that's your
25 conclusion. But with all due respect, and I

Page 268

1  am trying to get you out of here by 5:00, --
2      A. Okay.
3      Q. -- that's not my question.
4      A. All right. And your question?
5      Q. I know the answer to that question,
6  what you think, that this would be a great
7  system. I am asking for specific, if you have
8  them, specific estimates on the amount of time
9  and money it would take to complete these
10 stages on a per property basis.
11     A. No, I haven't undertaken any --
12     Q. Do you have any estimate at all?
13     A. I haven't undertaken anything. I
14 think I gave you some rough estimate. I don't
15 think it would be that much more involved or
16 costly than a traditional thorough revaluation
17 of the property that a community goes through
18 every so many years.
19     Q. Yes, sir. But you don't have any
20 idea what that is.
21     A. Well, I have served on the board of
22 review of one. And I know that their
23 revaluations were about $12,000 per property.
24     Q. All right. Is that a fair estimate
25 --

Page 269

1      A. Correction. Not per property. I'm
2  not saying per property. The contract was an
3  additional $12,000 beyond what the additional
4  -- what the contract was. We had about 500
5  units in our community.
6      Q. Okay. And what was the total cost
7  for 500 units?
8      A. It was an additional $12,000 or so
9  on the contract.
10     Q. Additional over what?
11     A. Well, whatever their base level was
12 each year. They weren't involved with revals
13 each year. They were -- They were using
14 another -- another system.
15     Q. What was the cost to which you would
16 add the 12,000?
17     A. I don't remember what their base
18 cost was. Whatever is typical per unit. I
19 think -- You can look back on Dallas -- on the
20 study on Dallas and you can see what their
21 average cost for revaluation was and get an
22 estimate of what that typically is.
23     Q. All right. So we conduct
24 interviews, we do research into the records,
25 we send a physical -- we have a physical

JOHNS PENDLETON COURT REPORTERS                              800 562-1285

KERRY DEAN VANDELL (MR GO)                                    9/17/2007

Page 270

1   inspection done. We make reports of those
2   various efforts. Have to be written reports
3   of all of that per house; right?
4        A.  That would depend on how that works
5   out. Whether there's a form that's filled out
6   or whatever. There has to be information
7   provided.
8        Q.  And you, as you sit here, you
9   proposed this process in this case, but as you
10  sit here you have absolutely no idea how much
11  it would cost or how long it would take to
12  complete this for 70,000, approximately 70,000
13  houses; is that true?
14       A.  No, I indicated I didn't think it
15  would be significantly greater than what it
16  would cost the community to undertake a full
17  revaluation of their properties for assessment
18  purposes.
19       Q.  Yes, I know that, but you don't know
20  what that dollar amount comes to in this
21  case.
22       A.  That's something that if someone
23  wants to bring that out, you can reference
24  that somewhere else, including my paper where
25  we discuss those amounts. As I sit here now,

Page 271

1   I can't tell you what that dollar amount would
2   be. It's certainly an amount that these
3   communities incur, maybe not willingly, but
4   they incur without too much trouble every five
5   years or so.
6        Q.  So you don't know what the dollar
7   amount would be and you don't know what the
8   amount of time would be either. Is that
9   true?
10       A.  I think I have answered your
11  question. I think I indicated that it would
12  not be that much greater than -- It would not
13  be an order of magnitude greater than it takes
14  to revalue the property.
15       Q.  Yes. And I know you consider that
16  an answer, but you don't have either a dollar
17  amount or a time estimate. Is that true?
18       A.  That's true.
19       Q.  Do you intend to come up with either
20  a dollar amount or a time estimate for the
21  two-step approach that you propose in this
22  case?
23       A.  I don't know if that's -- that's
24  necessary. I could certainly do it if I felt
25  that that was important to -- a provision of

Page 272

1   this. I am not -- I could also reference what
2   comparable revaluations cost and provide an
3   estimate off of that.
4        Q.  Now, when your approach is carried
5   out, will there be reference at some point in
6   the process to comparable values? We talked
7   before about how agents and appraisers
8   sometimes have comparables that they refer
9   to. Would there be at any point in this
10  process reference to comparables as a
11  discernment of pre- or post-Katrina value?
12       A.  No, I think the first thing that
13  would be done is would be estimating using the
14  cost to cure, that is, the cost of
15  remediation. Okay? I mean, that would be an
16  outcome of this process that we have gone
17  through already. So those would come in at
18  different levels depending on the
19  circumstances that we talked about. In some
20  cases they may be zero or even no -- no cost
21  at all.
22       Q.  So --
23       A.  But --
24       Q.  Okay. So the post-Katrina
25  diminishment in value through stigma or

Page 273

1   otherwise would not be an object of your
2   analysis?
3        A.  The cost to cure would be -- would
4   be the purpose. I think in the first element,
5   the cost of remediation --
6        Q.  No, I understand what the cost of
7   remediation is. Yes.
8        A.  Is the first -- And I think if you
9   look back at Dr. Kilpatrick's testimony, he
10  talked about there being two elements in this
11  cost. One is the cost of remediation. And
12  then what he called stigma value, which I
13  indicated was, I felt, more different than
14  simply stigma. So we have a proposed means of
15  dealing with that. But the first element of
16  this is simply the cost to remediate. And
17  that's with what all insurance adjustors would
18  do. And that's all that would be necessary
19  under those circumstances. It's not necessary
20  to -- necessarily to identify comparables or
21  other such things under that circumstance.
22       Q.  Let me make sure I understand that
23  under your approach for the 70,000 homes or so
24  involved in the Plaintiff class of claims, you
25  would, under your approach, not address the

JOHNS PENDLETON COURT REPORTERS                          800 562-1285

KERRY DEAN VANDELL (MR GO)                                    9/17/2007

Page 274

1   diminution in property value post-Katrina that
2   could be associated with stigma or the
3   flooding event?
4       A.  No, I said I had a second -- there's
5   a second portion to my proposed methodology
6   that deals explicitly with stigma and more.
7   Stigma is generally defined.
8       Q.  All right.  How many homes are
9   involved in that tier?
10      A.  That will be the same -- the same
11  number of homes and, however, there are a lot
12  of economies again in dealing with this in an
13  individual basis and looking at the individual
14  circumstances of homes with respect to impact
15  of changes in the -- the amenity levels in the
16  local jurisdiction, the local job base and so
17  forth.  This would be consistent with most
18  market studies that are done, market
19  feasibility studies that are done all the time
20  in terms of looking forward in time.  And
21  remember, again, I know you're not going to
22  like this term, but the only relevant issue
23  here is the breach of duty damages.  And so
24  what you're trying to do is to look at, under
25  the existing situation, what is the

Page 275

1   anticipated future value at some point of
2   stabilization in the future and then looking
3   at the user cost of this property over time,
4   discounting this to the present, to give you
5   some indication of what the current value is.
6   This is as opposed to Dr. Kilpatrick's
7   proposal, which was still very ambiguous to
8   me, but he seemed at first to be talking about
9   contemporaneous sales which he then
10  acknowledged immediately after Katrina
11  essentially did not exist, so he then began
12  talking about retrospective, getting sales and
13  doing a retrospective valuation on that.
14          If you look at USPAP again, which
15  Dr. Kilpatrick referenced quite frequently,
16  they have very strict rules for the use of
17  retrospective sales and as a basis for
18  pre-existing appraisals.  And part of those
19  rules is established in that at the time at
20  which those appraisals are supposedly for,
21  that there be clear evidence as to what the
22  anticipated future conditions were going to
23  be.  So that's something we argue you should
24  not be -- He does not provide those sorts of
25  conditions at all.  What we're doing is taking

Page 276

1   the current -- current condition as-is and
2   doing what most real estate investors and
3   making decisions and making value estimates
4   do, in projecting going forward what you
5   anticipate is going to be the likely course of
6   events in terms of value and ultimate
7   stabilization of the market, discounting to
8   the present.  There are two circumstances --
9   two situations.  One as-is, given that
10  everything happened, and then the "but if"
11  estimate, that is, backing out, assuming that
12  if we say certain of the levee breaches were
13  the breach of duty damages or something like
14  that, that assuming those did not occur, what
15  would be the circumstances in that case.  And
16  the differences between those, or that is, the
17  present value of the differences between those
18  is a valid estimate of the stigma and other
19  damages, the other non-physical damages
20  associated with the property.  That can vary
21  dramatically from unit to unit, because many
22  of those amenities are very localized and they
23  affect different units differently.
24      Q.  Right.  So we have talked about the
25  approach you would take for the 70,000

Page 277

1   properties, plus commercial, in order to
2   discern cost to cure, cost of restoration.
3   Now, in addition for each and every one of the
4   housing units you're going to perform a stigma
5   analysis that is going to compare the present
6   value calculation of the repaired property at
7   some time in the future when the market is
8   stable as if there were no flooding and then a
9   similar present- --
10      A.  No, no, no, not as if there were no
11  flooding.  As the flooding actually occurred.
12  First under the current -- the current
13  situation exactly as it is going to the
14  future.
15      Q.  Then you do a present value of what
16  the house would sell for in the future when
17  the market is stable as if no flooding had
18  occurred.
19      A.  No, as if the breach of duty
20  flooding had not occurred.  Or --
21      Q.  Breach of duty flooding, fine.
22  Brief of duty flooding.
23      A.  Fine.  All right?
24      Q.  And then you're going to subtract
25  one from the other and you're going to see if

KERRY DEAN VANDELL (MR GO)                                    9/17/2007

Page 278

1  there's any negative for the property owner,
2  and that's going to be the stigma recovery.
3      A.  Right.  In some cases it could
4  actually be negative stigma.  It could be
5  positive.
6      Q.  Now, you don't -- I assume you don't
7  know either today, you have done no
8  calculation on how long that's going to take
9  and how much that's going to cost to do that
10 house by house, one at a time?
11     A.  Again, I don't believe this is going
12 to be something that's an order of magnitude
13 greater than what a --
14     Q.  Sir, Dr. Vandell, with all due -- I
15 didn't ask you if you thought it was going to
16 take a long time or how much -- I asked you as
17 you sit here, do you have a calculation for us
18 on how long it's going to take and how much
19 it's going to cost?  Yes or no?  Do you have
20 that calculation?
21     A.  I do not have that calculation as I
22 sit here.
23     Q.  But you will have to go property by
24 property and do the two present value
25 calculations you talked about; correct?

Page 279

1      A.  That's correct.
2      Q.  And will, in those cases where there
3  is a stigma that depresses the value, will it
4  be expressed as a percentage of value -- a
5  percentage diminution of property value?
6      A.  It'll probably be expressed as a
7  dollar.
8      Q.  As a dollar amount --
9      A.  As a dollar amount.
10     Q.  -- between what the house would sell
11 for in one case and what it would sell for --
12     A.  That's correct.
13     Q.  -- in the other?
14         And the market has to be at
15 equilibrium within the class area before you
16 can proceed with those calculations?
17     A.  One would be making -- The terminal
18 value, that is, when you assume a terminal
19 stabilized value, that would be at an assumed
20 future point in time at which the market has
21 stabilized.  And that would be dependent on
22 various market studies that are done looking
23 at the condition of the market and the
24 transition that's taking place.
25     Q.  All right.  So you'll have to

Page 280

1  conduct that study as well?
2      A.  That can be done -- You don't have
3  to do that individually for every property.
4      Q.  Now, that's something you can do
5  class-wide?
6      A.  There may be some variation across
7  some markets, but generally you don't have to
8  do it individually by property by property.
9      Q.  I can't believe it.  You really
10 think there's --
11     A.  The problem deals with the market.
12     Q.  You really think there is something
13 that can be done class-wide in this case.
14         All right.  When -- How long
15 before we have market equilibrium?
16     A.  I -- That will depend upon the
17 analyses that are undertaken by the experts.
18 I know in the evidence from the flooding in
19 California, it demonstrated that there was
20 relatively rapid recovery, at least form the
21 transitional effects, the dysequilibrium
22 effects of the market.
23     Q.  Yes, but you agree with me that
24 there's no way to compare the flooding in
25 California in that case with what happened

Page 281

1  here?
2      A.  No, but the extent to which there's
3  attenuation of the stigma effects, I don't --
4  I don't think there's a huge variation in
5  that.  It's not going to be ten years down the
6  road or anything like that.
7      Q.  Do you think the markets --
8      A.  My guess is five -- five to seven
9  years.  I think there's --
10     Q.  Five to seven from today?
11     A.  That's just a rough -- a rough
12 guess.
13     Q.  Okay.
14     VIDEO OPERATOR:
15         Go off the record to change
16 tapes?  That's the end of tape 4.
17 We're going off the record.
18         (Whereupon a discussion was held
19 off the record.)
20     MR. MEUNIER:
21         We're done.
22              *   *   *
23
24
25

71 (Pages 278 to 281)