# PLAINTIFFS TRIAL EXHIBIT

# 25

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE: KATRINA CANAL BREACHES      CIVIL ACTION

CONSOLIDATED LITIGATION            NO. 05-4182 K2

                                   JUDGE DUVAL

PERTAINS TO LEVEE AND MRGO         MAG. WILKINSON


(V O L U M E   I)


Deposition of JOHN A. KILPATRICK, PH.D., MRICS, given in both the levees and MRGO cases, at the offices of Bruno & Bruno, 855 Baronne Street, New Orleans, Louisiana 70113, on August 13th, 2007.


REPORTED BY:

        JOSEPH A. FAIRBANKS, JR., CCR, RPR

        CERTIFIED COURT REPORTER #75005

JOHN KILPATRICK (LEVEE VOL I)                                    8/13/2007

---

Page 6

1          E X A M I N A T I O N   I N D E X
2
3    EXAMINATION BY:                    PAGE
4
5    MR. ZWAIN   ...........................    8
6          E X H I B I T   I N D E X
7
8    EXHIBIT NO.                    PAGE
9    Exhibit Kilpatrick 1 ....................   11
10   Exhibit Kilpatrick 2 ....................   11
11   Exhibit Kilpatrick 3 ....................   63
12   Exhibit Kilpatrick 4 ....................  121
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 8

1          JOHN A. KILPATRICK, PH.D., MRICS
2    2601 Fourth Avenue, Suite 650, Seattle,
3    Washington 98121, a witness named in the above
4    stipulation, having been first duly sworn, was
5    examined and testified on his oath as follows:
6    EXAMINATION BY MR. ZWAIN:
7         Q.  Dr. Kilpatrick, my name is Gary Zwain.
8    I represent East Jefferson Levee District and
9    the Lake Borgne Levee District.
10        How are you?
11        A.  I'm fine.  Thank you.
12        Q.  Good.  I appreciate your coming to New
13   Orleans and agreeing to submit yourself to this
14   deposition.  You've given depositions before,
15   because I know, I've read them, so you know
16   what the ground rules are.
17        A.  Yes.
18        Q.  All right.  If I ask you a question
19   that you don't understand, ask me the rephrase
20   or repeat and I'll be happy to do that;
21   otherwise, if you answer the question I'm going
22   to have to assume that you've understood it.
23        Fair enough?
24        A.  Fair enough.
25        Q.  All right.  Also, you've written a

---

Page 7

1          S T I P U L A T I O N
2         IT IS STIPULATED AND AGREED by and
3    among counsel for the parties hereto that the
4    deposition of the aforementioned witness may be
5    taken for all purposes permitted within the
6    Federal Rules of Civil Procedure, in accordance
7    with law, pursuant to notice;
8         That all formalities, save reading
9    and signing of the original transcript by the
10   deponent, are hereby specifically waived;
11        That all objections, save those as to
12   the form of the question and the responsiveness
13   of the answer, are reserved until such time as
14   this deposition, or any part thereof, is used
15   or sought to be used in evidence.
16
17
18               * * *
19
20
21
22        JOSEPH A. FAIRBANKS, JR., CCR, RPR,
23   Certified Court Reporter in and for the State
24   of Louisiana, officiated in administering the
25   oath to the witness.

---

Page 9

1    report in this case, or in these cases, I
2    should say, that deals with both MRGO and
3    levee, the MRGO case and the levee case all in
4    one report.
5         Am I understanding that correctly?
6         A.  Yes.
7         Q.  All right.  So can we have an
8    agreement that if I ask you a question, unless
9    I refer specifically to the levee case or to
10   the MRGO case that the question will pertain to
11   both cases?
12        A.  That's fine.
13        Q.  And if you answer the question without
14   making specific reference to the MRGO case or
15   to the levee case, your answer will be deemed
16   to pertain to both cases.  Fair enough?
17        A.  Yes.
18        Q.  Would you state your full name for the
19   record, please.
20        A.  John Aaron Kilpatrick.
21        Q.  And your address?
22        A.  My business address or home address?
23        Q.  Your business address.
24        A.  Care of Greenfield Advisors, L.L.C.
25   Suite 650, 2601 Fourth Avenue, Seattle

---

JOHN KILPATRICK (LEVEE VOL I)                                    8/13/2007

---

**Page 10**

1  Washington 98121.
2    Q.  These depositions are being noticed in
3  connection with the MRGO case and with what's
4  called the levee case, and I'd like to know --
5  I'm going to show you copies of each and ask if
6  you have seen them before. (Tendering.)
7    A.  I've seen one or the other. I think
8  I've seen the Notice of Videotape Deposition.
9  I don't recall seeing the Renotice of Videotape
10  Deposition.
11    Q.  All right.  In looking at the Renotice
12  of Deposition for the MRGO case and for the
13  levee case, I realize that you looked through
14  it quickly, did you notice any substantial
15  differences between the renotice and the
16  original notice?
17    A.  I didn't read that carefully.
18    Q.  I think the renotice, the difference
19  between the re notice and the original notice
20  was with respect to changing the date from
21  July 13th to August 13th.  It was a typo, I
22  think, from the original notice.  Other than
23  that, the notices are the same.
24    MR.MEUNIER:
25      Including the exhibits.

---

**Page 11**

1    MR. ZWAIN:
2      Including the Exhibit A, yes.
3      And I'm going to mark for
4  identification the Renotice of
5  Videotape Deposition for the levee
6  case as Exhibit Kilpatrick 1, and for
7  the MRGO case as Exhibit 2.
8    MR. BECNEL:
9      You're going to ask that those
10  be attached to the depo.
11    MR. ZWAIN:
12      Yes, sir.
13    (Exhibit Kilpatrick 1 was marked for
14  identification and is attached hereto.)
15    (Exhibit Kilpatrick 2 was marked for
16  identification and is attached hereto.)
17  EXAMINATION BY MR. ZWAIN:
18    Q.  Now, if you would, Dr. Kilpatrick,
19  would you turn to Exhibit A on either of the
20  notices you care to.
21    Have you been presented with that
22  exhibit prior to today?
23    A.  Yes.
24    Q.  When was the first time you saw it?
25    A.  I believe Thursday afternoon.

---

**Page 12**

1    Q.  And how did you get it?
2    A.  I believe it was either faxed or
3  E-mailed.  I'm pretty sure faxed to us.
4    Q.  Thursday afternoon, August 9th?
5    A.  I believe that's correct.
6    Q.  And were you asked to make a search of
7  the materials at your disposal, in your
8  possession or under your control to determine
9  whether or not any of those materials were
10  responsive to any of the items requested in
11  Exhibit A?
12    A.  Yes.
13    Q.  Did you make such a search?
14    A.  Yes.
15    Q.  Have you produced certain documents
16  responsive to Exhibit A, specifically Items 1
17  through 18?
18    A.  Yes.
19    Q.  And have you brought them here with
20  you today?
21    A.  Yes.  Except for these items which I
22  had already provided prior to this along with
23  my original affidavit.
24    Q.  All right.  We're going to go through
25  these items one by one.  And what I'd like you

---

**Page 13**

1  to do is, if you could designate what items you
2  provided both prior and today that are
3  responsive to each one of those.  Can we do
4  that?
5    A.  Yes.
6    Q.  All right.  What if any materials have
7  you provided in response to Exhibit A, number
8  1, which is a request for any and all materials
9  considered or relied upon by the deponent in
10  connection with this litigation?
11    A.  Well, shortly after delivery of the
12  deposition -- excuse me, shortly after delivery
13  of the affidavit, we sent to counsel a CD
14  containing all of the footnoted material on my
15  original affidavit, with the exception of one
16  paper.  I think there was a citation to an
17  article by I believe it was Bruce and Sundell
18  which, as it turns out, we did not have in our
19  possession, and so we had to get that, and it
20  was subsequently Fed Ex'd the very next day.
21  So all of those footnoted materials relied upon
22  in preparation of the affidavit were delivered
23  at least a week ago.
24    Q.  All right.  The article you Fed Ex'd
25  was Fed Ex'd to whom?

---

JOHNS PENDLETON COURT REPORTERS                          800 562-1285

Page 62

1    yet.
2    MR. ZWAIN:
3       Great.
4    MR. BECNEL:
5       Okay.
6    MR. ZWAIN:
7       Thank you.
8    (Off the record.)
9    MR. BECNEL:
10      On behalf of the plaintiffs, and
11   I would assume on behalf of the
12   defendants at all future depositions,
13   if we have anyone in the room who is
14   not an attorney and has not identified
15   themselves, then we need to put onto
16   the record also present and have those
17   people identify themselves and on
18   whose side they are in the room for.
19   MR. RIGAMER:
20      I am Greg Rigamer, and I am an
21   expert witness retained by Tom
22   Anzelmo.
23   MR. VANDELL:
24      I am Kerry Vandell.  I'm an
25   expert retained by Jones, Day.

Page 63

1    MR. RODDEWIG:
2       I'm Richard Roddewig.  I'm a
3    consulting expert retained by the
4    defendants in the levee case.
5    EXAMINATION BY MR. ZWAIN:
6    Q.  All right.  Dr. Kilpatrick, I have
7    handed you what I've marked as Kilpatrick
8    Exhibit Number 3, which purports to be your
9    affidavit prepared for this case, the article
10   you wrote entitled "The Aftermath of Katrina,"
11   that was attached to your affidavit, and also
12   your Listing of Trial Testimony by John A.
13   Kilpatrick, Greenfield Advisors, followed
14   finally by your curriculum vitae.
15      Is that what you have before you?
16      (Exhibit Kilpatrick 3 was marked for
17   identification and is attached hereto.)
18   A.  I do.
19   EXAMINATION BY MR. ZWAIN:
20   Q.  All right.  Let's turn first, if we
21   could to your curriculum vitae.  If you would
22   look quickly through it and tell us whether in
23   fact it is current I would be appreciative.
24   A.  It appears to be up to date.
25   Q.  All right.  How do you describe your

Page 64

1    area of expertise?
2    A.  Real estate finance.
3    Q.  Do you hold a law degree?
4    A.  No.
5    Q.  Have you ever been to law school?
6    A.  No.
7    Q.  Do you profess any expertise regarding
8    the legal requirements for a class
9    certification under the Federal Rules of Civil
10   Procedure?
11   A.  Only to the extent that those have
12   economic and real estate valuation
13   implications.
14   Q.  In terms of the legal requirements, I
15   take it you would defer to the lawyers in this
16   case and the judge in this case to know those
17   better than you.
18   A.  Yes.
19   Q.  Are you a demographer?
20   A.  Only to the extent one becomes
21   reasonably competent with demographics in the
22   course of doing large scale real estate
23   analyses.
24   Q.  Do you have any formal training in
25   demography?

Page 65

1    A.  Geography, specifically economic
2    geography, which includes a substantial
3    component in demographics.
4    Q.  And where did you obtain that specific
5    training?
6    A.  Academically at the University of
7    South Carolina, and then as a matter of ongoing
8    work I've participated in work with the, um --
9    American Association of Geographers, in fact,
10   presented a paper at one of the applied
11   geography conferences.  So to the extent, um --
12   one develops expertise in that area, I've done
13   it, but I wouldn't told myself out to be a
14   demographer, per se.
15   Q.  So you know something about demography
16   but you're not an expert in that field.  Is
17   that fair to say?
18   A.  Well, not really fair to say.  It's
19   important that one has a certain degree of
20   expertise in population and economic
21   demographics in order to be able to do the
22   thing I do.  I mean, I've done a whole lot of
23   studies which have had substantial demographic
24   components.  I've done input/output models, for
25   example, which have economic demographic and

JOHN KILPATRICK (LEVEE VOL I)                                    8/13/2007

---

Page 66

```
 1   population demographic components.  So it's not
 2   my principal field of endeavor.  There are
 3   other people who do it more than I do, but I've
 4   certainly done enough of it to be able to hire
 5   myself out for consulting work in those kinds
 6   of studies.
 7       Q.  All right.  Does Greenfield Advisors
 8   retain or employ any demographers by trade?
 9       A.  We retain and employ economists and
10   survey researchers who have extensive training
11   in demographics, particularly with respect to
12   sampling and surveying of demographics.
13       Q.  Okay.  Do you hold yourself out as a
14   sociology expert?
15       A.  Only to the extent that there's a
16   sociological components to real estate, real
17   estate values.  I certainly wouldn't profess to
18   be able to teach sociology in university, but
19   have garnered sufficient training to be able
20   the utilize sociology, particularly with
21   respect to the statistics of sociology, in the
22   work I do.
23       Q.  All right.  So to the extent that you
24   have expertise in demography, to the extent
25   that you have expertise in sociology, would I
```

Page 67

```
 1   be correct in understanding you to mean that to
 2   the extent those disciplines apply to real
 3   estate and finance of real estate that's the
 4   way you use them.
 5       A.  That's correct.
 6       Q.  What about urban planning, do you have
 7   any expertise in urban planning?
 8       A.  Again, to the extent it's necessary to
 9   understand how urban planning impacts real
10   estate finance, real estate valuation, I've
11   delivered lectures at the -- in the urban
12   planning program at the University of
13   Washington and have, um -- spoken at urban
14   planning meetings.  I can't remember them
15   offhand, I know I've done it.  Um -- so indeed
16   I've got more than a passing familiarity with
17   urban planning.
18       Q.  And what about anthropology?
19       A.  No.  Not too good with anthropology.
20       Q.  History?
21       A.  Yeah.  Actually started out as a
22   history major in college and switched.  I
23   certainly wouldn't profess to be an historian,
24   but I'm more than an amateur at history,
25   history research, those kinds of things.
```

Page 68

```
 1       Q.  Prior to Katrina -- you told us that
 2   post-Katrina you've been down here about
 3   fifteen times.  Before Katrina, how frequently,
 4   if ever, had you traveled to New Orleans?
 5       A.  A few times.  I frankly can't remember
 6   how many times prior to Katrina.  I'd say the
 7   most recent time prior to Katrina was about
 8   2002 or something like that.  Um -- and I know
 9   I had been here off and on since the early
10   1980s.
11       Q.  Can you give me an estimate as to how
12   many times you've been in New Orleans prior to
13   Katrina?
14       A.  Less than a half dozen.
15       Q.  Less than a half a dozen?
16       A.  Yes.
17       Q.  And what was purpose for those trips,
18   generally speaking?
19       A.  Usually just personal visits.  I can't
20   think of any business related trips I made.
21       Q.  Prior to Katrina, had you performed
22   any studies relative to New Orleans, New
23   Orleans real estate, New Orleans refinance?
24       A.  I can't recall.
25       Q.  Okay.
```

Page 69

```
 1       MR. BECNEL:
 2          Gary, I assume when you say New
 3       Orleans you mean the metropolitan
 4       area.  Or are you just saying New
 5       Orleans?
 6   EXAMINATION BY MR. ZWAIN:
 7       Q.  I'm going to ask you the same question
 8   with regard to the St. Bernard area.  Any
 9   specific visits or -- well, let's say visits to
10   St. Bernard prior to Katrina?
11       A.  Not that I can recall.
12       Q.  Any particular studies,
13   investigations, review of data that you made
14   with regard to St. Bernard real estate or real
15   estate finance issues in St. Bernard prior to
16   Katrina?
17       A.  No.
18       Q.  How much of the work you do is for
19   purposes of litigation?
20       A.  I don't know if I have ever broken
21   that out.  Um -- I mean, me personally, a big
22   chunk of the work I do is just running the
23   firm.  Um -- then in the twenty or so hours a
24   week that I get to spend doing billable hours
25   stuff, probably half of it is litigation, half
```

---

JOHNS PENDLETON COURT REPORTERS                              800 562-1285

JOHN KILPATRICK (LEVEE VOL I)                          8/13/2007

Page 70

```
 1   of it is non litigation.  So I guess overall,
 2   probably 25 percent of my active business time
 3   is associated with litigation.
 4       Q.  And how much of your litigation work
 5   involves class actions?
 6       A.  Oh, currently, probably 5 or
 7   10 percent.
 8       Q.  The rest involves actions either by
 9   individuals or by groups of individuals who are
10   not trying to achieve class certification?
11       A.  Right.  It waxes and wanes.  I mean,
12   if we have a big class action going on, then it
13   may occupy a substantial portion of my time.
14   Of late, our big class action cases have all
15   been quiet, so my attention has been focused --
16   if you had asked me that question a month ago,
17   I would have said zero.
18       Q.  How many class actions are you
19   currently involved in as an expert?
20       A.  Four or five.
21       Q.  Which ones besides this one?
22       A.  Oh, the, um -- Saginaw, Michigan case,
23   I think there's a case in Maryland, um -- I
24   think there's -- the, um -- Perine case that we
25   talked about a little earlier which is in West
```

Page 71

```
 1   Virginia.  There's another case in West
 2   Virginia that's just starting to raise its
 3   head, totally separate from Perine, just a
 4   different case in West Virginia.  Um -- there
 5   is a case in Kansas that's -- we haven't been
 6   doing anything on for several months, but it's
 7   slated to go to trial starting in September so
 8   I'll be pretty busy on that.  Um -- I'm sure
 9   there are others, but I can't recall offhand.
10       Q.  What's the name of the case in
11   Maryland, do you remember?
12       A.  No, I can't remember as I sit here
13   today.
14       Q.  Who is the law firm that you're
15   working for?
16       A.  Peter Angelos law firm.  Law Office of
17   Peter Angelos.
18       Q.  What's the name of the other case in
19   West Virginia that's not Perine?
20       A.  I can't remember the citation.  It
21   involves Monsanto.
22       Q.  Who is the lawyer you're working for?
23       A.  Um -- they're a consortium of law
24   firms, the local counsel in the West Virginia
25   is the Caldwell Law Practice.  C-A-L-D-W-E-L-L.
```

Page 72

```
 1   I think they're in Charleston, West Virginia.
 2   I'd have to go back and look.
 3       Q.  And what about the case in Kansas, is
 4   that different from the Amoco case?
 5       A.  No.  That is the Amoco case.  And
 6   again, I'm not talking about the Coffeeville
 7   case which is the one that I've been retained
 8   on but not -- have not worked on yet.  There's
 9   a separate one in southeastern Kansas which is
10   the Amoco case.
11       Q.  Are all of the cases that you
12   currently have pending and that are class
13   actions, do they all involve your retention on
14   behalf of the plaintiffs?
15       A.  Currently, I think all of our cases
16   are plaintiff.  We do a fair amount of defense
17   work, but I don't think any of them are pending
18   right now, with the exception -- I'll take that
19   back.  We are involved in a case which we're
20   engaged by Kirkpatrick, Lockhart in their
21   defense of Burlington Northern Santa Fe.
22       Q.  Is that a class action?
23       A.  I can't recall if it is or isn't.
24   It's a large scale case.  It involves a lot of
25   property owners, but I don't know if they have
```

Page 73

```
 1   applied for class certification or not.  I
 2   don't think they did, come to think of it.
 3       Q.  And what is the name of the lawyer
 4   you're working with?
 5       A.  Um -- Craig Trueblood.  He's what used
 6   to be Preston, Gates & Ellis that just got
 7   acquired by Kirkpatrick Lockhart.
 8       Q.  Have you done a report in that case?
 9       A.  Several.
10       Q.  What are you being asked to do; what
11   opinions are you being asked to give?
12       A.  Oh.  They've got a contaminated town,
13   they know they contaminated it, they're sorry
14   about that and they want to know how deep the
15   bottom of the well is; they want to know how
16   much damages are.  And so they knew we were
17   going to give them a straight answer and so
18   they hired us.
19           Actually, we've done quite a few cases
20   for Burlington Northern.  They tend to fess up
21   when they make a mistake, so we've done cases
22   for them in Haver, Montana, Livingston,
23   Montana, um -- a couple of other places I can't
24   recall.  Different law firms.  I guess we've --
25   somehow or another every time Burlington
```

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

Page 74

1  Northern gets engaged in the case they tell
2  whatever lawyer's working for them to go hire
3  us.  So we've worked for probably half a dozen
4  law firms.
5      Q.  So if I'm understanding you correctly,
6  and maybe I'm not, those cases involve
7  situations where Burlington Northern has an
8  environmental problem and they want to settle
9  it and they consult you with respect to
10 settlement allocation issues?
11     A.  They consult with us with respect to
12 how badly the property is damaged, how much the
13 environmental contamination has impacted the
14 property values.
15     Q.  In any of the cases in which you've
16 been retained by Burlington Northern, have you
17 used contingent valuation methodologies to
18 write your reports?
19     A.  Oh, of course.  We use that all the
20 time.  It's popular and highly accepted
21 appraisal methodology written about in a whole
22 variety of publications, including the
23 Appraisal Journal, and accepted by, um -- an
24 extensive group of appraisers who work both on
25 plaintiff and defense cases.  So it would be

Page 75

1  inappropriate of us not to consider contingent
2  valuation in a case, particularly involving
3  environmental damages, environmental
4  contamination.
5      Q.  Have you worked with Mr. Trueblood in
6  all of the Burlington Northern cases?
7      A.  No, just a handful of them.  We worked
8  for, as I mentioned, probably five or six other
9  law firms.  He just happens to be the one we're
10 currently working with.  There are other
11 active -- there are other cases under which
12 we're currently retained, but they're not
13 active.  It is just that the one with
14 Mr. Trueblood happens to be currently active.
15     Q.  And you don't know the name of that
16 case?
17     A.  No.
18     Q.  And it's pending where?  I'm sorry.
19     A.  As we said, we have cases pending in
20 Montana and Washington.  The one with
21 Mr. Trueblood is pending in Washington.
22     Q.  Would the reports, any of the reports
23 that you've written for Burlington Northern be
24 included within the reports -- the damage
25 reports we've asked you to produce earlier this

Page 76

1  morning?
2      A.  I hadn't thought about it.  We were
3  talking this morning about class actions, and
4  I'm not -- again, the Burlington Northern cases
5  have not been class actions.  The plaintiffs
6  have not pursued class certification in those
7  cases.
8      Q.  About how many plaintiffs or
9  properties are involved in each of those cases?
10     A.  Um -- a lot.  For instance, in either
11 Haver or Livingston, there was a neighborhood
12 which had quite a few residences in it in which
13 Burlington Northern declared the residences to
14 be 100 percent diminished in value and just
15 bought them all.  We didn't get a chance to
16 appraise those.  They just said, look, we'll
17 just go ahead and buy them up and pay
18 unimpaired market value for them, because we
19 know they're fully contaminated by the plume of
20 oil which is underneath the houses.  So I can't
21 recall just how many houses were in that
22 neighborhood.  At least a dozen or so.
23     Q.  All right.  In those cases where
24 you've done contingent valuation appraisals for
25 Burlington Northern, how many properties were

Page 77

1  in one of those, best as you can recall?
2      A.  Well, we got one in Skykomish,
3  Washington, that's the town in which the
4  Kirkpatrick Lockhart case is involved.  And I
5  guess 100 properties, both residential and
6  commercial.  I've lost track of how many.
7      Q.  That's the one in Washington, correct?
8      A.  Right.
9      Q.  What about the one in Montana?
10     A.  No.  Not the one Montana, just the one
11 in Washington.  I think we have -- I believe
12 we've used contingent valuation in some of the
13 Montana ones, as well, but I can't speak to
14 that as I sit here.  I would think we would.
15 It would certainly be something we would
16 consider given the fact that these were
17 environmentally impaired properties and the
18 findings of contingent valuation are so widely
19 used in those kind of cases.
20     Q.  All right.  Well, let me see if I
21 understand.  How many cases have you worked on
22 for the Burlington Northern?
23     A.  A lot.  I don't have a number.  In
24 other words, we've worked in several different
25 cities, there have been multiple projects in

JOHN KILPATRICK (LEVEE VOL I)                                    8/13/2007

Page 78

1    all of these cities involving as many as six
2    different law firms.
3        Q.  And are all of these projects in
4    litigation, or were they in litigation?
5        A.  Some were, some weren't.  In Montana,
6    all of them were in litigation.  In Skykomish,
7    Washington, I don't know if any of them had
8    actually filed or if Burlington Northern was
9    just trying to preempt filing by going ahead
10   and settling the cases.  I'm not sure if
11   anything was filed or not.
12           The issue in the state of Washington
13   was responsive to a state department of ecology
14   action against them.  So to the extent that
15   that had a litigious background to it, of
16   course they were in litigation.  But I don't
17   recall if any of the individual property owners
18   had filed tort actions.
19       Q.  How many property in the Montana case?
20       A.  Again, I've lost track.  We have got
21   at least two different cities.  I recall
22   working in Haver and Livingston.  We worked on
23   at least a half dozen properties in those two
24   towns, if not more.  And as I said, there were
25   also residential properties in those towns that

Page 79

1    we didn't do any specific work on, just sort of
2    general advisement.
3        Q.  So you're telling me that in each case
4    in Montana, there were about a half dozen
5    properties in each of those cases?
6        A.  No, probably total in Montana, about a
7    half a dozen.
8        Q.  Half a dozen properties.
9        A.  Right.
10       Q.  Did you perform contingent valuation
11   with respect to any of those properties?
12       A.  Well, I'm -- as I sit here today, I
13   would say we probably used the result of our
14   contingent valuation surveys to aid us in
15   formulating value opinions.  I say probably
16   because I can't say that with certainty as I
17   sit here.
18       Q.  All right.
19       A.  I haven't read those reports in, oh,
20   gosh, two or three years.
21       Q.  Besides the two Montana cases and the
22   Washington case, what other Burlington Northern
23   cases have you used contingent valuation?
24       A.  I think those are all the cases we
25   worked for, for Burlington Northern.

Page 80

1        Q.  All right.  Those three cases.
2        A.  Right.
3        Q.  Are there any other cases in which --
4    where you've worked for defendants?
5        A.  Oh, I'm sure there are, I just can't
6    recall them offhand.
7        Q.  What percentage of your work is
8    defense as opposed to plaintiff?
9        A.  Well, on a total hourly basis, um --
10   it varies from time to time.  I mean, when
11   we've got one of these big defense-related
12   cases, it might be eating up all of my
13   litigation time.  Presently, for example, we're
14   in a big bankruptcy case in, um -- in Texas in
15   which we're using, again, contingent valuation.
16       Q.  On how many pending cases do you have
17   currently, and of those which you have pending
18   currently how many are for defense and how many
19   are for plaintiff, can you estimate?
20       A.  Oh, no.  Not really.  I'll say
21   probably a total of fifty or so projects with
22   our firm right now, of which probably half of
23   them are litigious, and I'm guessing a third
24   defendant, two thirds plaintiff.  But that's a
25   pretty wild guess.

Page 81

1        Q.  Let's turn, if we may, to your list of
2    trial testimony attached to your report.  And
3    can you go through this document and tell us
4    which cases are class actions?
5        A.  Well, let's see here.  Um -- starting
6    on the very first page of it, and the third one
7    down which is 04-1201, Thomas v. A. Wilbert &
8    Sons and Dow Chemical, that's a class action.
9        Q.  All right.
10       A.  Um -- then we have 04-0115, Turnbull
11   v. MTA.  I can't recall if that's a class
12   action or not.  It involved multiple property
13   owners, but I'm not sure if that was certified
14   as a class or not.  I didn't get involved in
15   the early stages, but only came in to testify
16   as to the damages.
17       Q.  All right.  How many properties
18   involved in Turnbull?
19       A.  A couple dozen.
20       Q.  How many properties involved in
21   Thomas?
22       A.  Don't know.  We measured it on an
23   acreage basis.  It's quite a few thousand
24   acres.  I'm not quite sure how many discreet
25   property owners, because we valued it as an

JOHN KILPATRICK (LEVEE VOL I)                                    8/13/2007

**Page 94**

1        And I said, yeah, we do.
2        Um -- so I think that's the biggest
3    one, but we're doing some other fairly big
4    ones.  You know, Neodesha is pretty big.
5    Saginaw is pretty big.
6        Q.  Are there any cases that -- class
7    action cases that you are currently involved in
8    that did not appear on this list because you
9    were retained after the list was prepared?
10       A.  Yeah.  We have got a couple of cases
11   that we haven't -- this list only lists things
12   in which I've been deposed or testified.  We've
13   got another case in Maryland, in a different
14   county in Maryland, it's not the Koch v. Hicks
15   case which is in Baltimore county, but it's a
16   case in, um -- in a different county, and I
17   can't remember which one it is, in which we're
18   currently retained and actually have begun work
19   but I've not been deposed and I don't know that
20   I've written an affidavit yet.
21       Q.  What's the name of the case?
22       A.  I cannot recall.  It's just in the
23   town of Jacksonville, Maryland.
24       Q.  What lawyer are you working for?
25       A.  Again, Peter Angelos.

**Page 95**

1        Q.  How many properties?
2        A.  I haven't figured that out yet.
3        Q.  Do you have any ballpark estimate?
4        A.  A couple hundred.
5        Q.  Any other cases that don't appear on
6    this document?  Class actions?
7        A.  Maybe.  I don't want to say no, but I
8    can't recall any as I sit here.
9        Q.  All right.  Do you hold the MAI
10   designation from the Appraisal Institute?
11       A.  No.
12       Q.  What association, if any, do you have
13   with the Appraisal Institute?
14       A.  Well, I'm an associate member, I'm on
15   the publications review panel, um -- I use them
16   as a source of continuing education credits
17   from time to time.  Um -- I've sat on a couple
18   of committees with them but I can't remember
19   what they are, and I don't have time to do much
20   of that anymore.
21       Q.  What do you have to do to be an
22   associate member of the Appraisal Institute?
23       A.  I think your dues check has to clear
24   the bank.  I'm being a little facetious because
25   I believe historically they had two categories

**Page 96**

1    of -- they had three categories of members.
2    They had what are called designated members who
3    are people who had gone through kind of a
4    practitioner education process and been --
5    received one of several designations.  MAI, as
6    you just cited, is one of them.  Those are
7    called designated members.
8        Then anybody who's a state certified
9    appraiser who hasn't pursued that route is
10   called an associate member.
11       Um -- and then anyone who's not a
12   state certified appraiser but nonetheless wants
13   to be a member of the Appraisal Institute is
14   called an affiliate member.  But that's a
15   distinction that gets lost on a lot of people.
16       Q.  Have you ever taken any of the
17   necessary courses for certification as an MAI?
18       A.  Yes, all of them.
19       Q.  Have you ever completed a
20   demonstration appraisal report for review and
21   approval?
22       A.  I'm the only person in history to be
23   allowed to do a research project in lieu of a
24   demonstration report.  And in fact, my research
25   project is now being used as the demonstration

**Page 97**

1    research project for anybody else who wants to
2    find out how to take that route.
3        Q.  Have you ever taken the MAI exam?
4        A.  Yes.
5        Q.  Pass it?
6        A.  Yes.
7        Q.  When did you pass it?
8        A.  A couple of years ago.
9        Q.  So I thought in answer to my previous
10   question that you did not hold an MAI
11   designation for the Appraisal Institute.
12       You do, in fact, hold such a
13   designation?
14       A.  No, not yet.  You have to -- there is
15   one final requirement.  You have to go through
16   an experience log.  It's a fairly time
17   consuming process where you have to go through
18   and list all the experience -- all the
19   appraisal reports you've done over time and
20   submit copies of them and go through an
21   experience review process.  That's the only
22   thing I haven't done for the MAI designation.
23   And I'm also working on a commercial pilot 's
24   license, and to be frank with you, that's just
25   emotionally more important to me right now than

Page 98

```
 1   the MAI designation.
 2       Q.  How many appraisals have you done?
 3       A.  In my life?
 4       Q.  Yes, sir.
 5       A.  I've lost track.  Hundreds, if not way
 6   more than hundreds.
 7       Q.  So what do you physically have to do
 8   in order to complete your application for MAI
 9   designation?
10       A.  Well, now you're starting to sound
11   like my commercial pilot instructor.  You know,
12   why don't you just sit down and do it, John.
13   It's just going to take a couple of weeks of
14   your time, and if you just do it you'll be a
15   commercial pilot.  But no, I haven't gotten
16   around to doing it yet.
17       Q.  Okay.  Just tell me what you have to
18   do.
19       A.  I got to sit down and do all that
20   stuff, compile the log and send it in and go to
21   some meetings and have some phone conferences,
22   and I just haven't been able to carve out a
23   couple of weeks of my time in the last two
24   years to do that.  It's just not
25   professionally, um -- if I were a journeyman
```

Page 99

```
 1   appraiser, you know, had a bachelor's degree
 2   and I was a state certified appraiser and
 3   wanted the figure out a way to charge my
 4   clients a little bit more money, I'd carve out
 5   a couple of weeks and do this thing.  But,
 6   um -- you know, given what I do for a living,
 7   it's not -- it's not a thing that holds very
 8   much promise.  I certainly am not going to be
 9   able to raise my billing rates any more by
10   getting it, so.
11       Q.  Do you have a permanent Louisiana
12   appraisal license?
13       A.  I think so.  I know I've got at least
14   a temporary practice permit, but my suspicion,
15   given the number of projects we do in this
16   state, is that I've got a permanent one.
17       Q.  So as you sit here today, you're not
18   sure?
19       A.  No.  It's one or the other.
20       Q.  Did you get that license in connection
21   with or at around the time that you were first
22   retained as an expert witness in one of your
23   Louisiana cases?
24       A.  Yeah.  Four or five years ago.
25       Q.  And that would have been the case
```

Page 100

```
 1   through Mr. Pendley?
 2       A.  No.  No.  No.  No.  No.  I've done
 3   earlier cases prior to ever meeting
 4   Mr. Pendley.
 5       Q.  What other cases in Louisiana have you
 6   done?
 7       A.  I think the first project I ever
 8   worked on here was the Guillory versus Union
 9   Pacific project.
10       Q.  All right.  Any other cases besides
11   that case and the one for Mr. Pendley noted in
12   your trial testimony lift which I believe was
13   the Thomas case?
14       A.  Oh.  I've done other projects, I
15   just -- they haven't gotten -- they aren't -- I
16   haven't been deposed or testified in them.
17       Q.  What other projects?
18       A.  I've done one, um -- in Baton Rouge
19   regarding valuation of a neighborhood generally
20   called Devil's Swamp, which is a finger of land
21   surrounded on about three sides by the
22   Mississippi to the northwest of Baton Rouge and
23   to the west of the Baton Rouge Canal.  I've
24   done --
25       Q.  Is that litigation you're working on?
```

Page 101

```
 1       A.  Well, it's for settlement.  It could
 2   potentially go into litigation, but it's
 3   probably not.
 4       Q.  Who are you working for?
 5       A.  Again, Pat Pendley.  There's some
 6   other lawyers involved in that, but he retained
 7   me.
 8       Q.  And what has he asked you to do?
 9       A.  Oh, figure out what the land is worth
10   in the as is -- as if unimpaired condition.
11       Q.  And that figure, whatever figure you
12   arrive at, is going to be the basis for some
13   settlement negotiations?
14       A.  That's correct.
15       Q.  What other Louisiana projects do you
16   have?
17       A.  We have got the CITGO oil spill matter
18   in Lake Charles.  CITGO spilled a couple
19   million gallons of slop oil, as it's called,
20   into, um -- the Calcasieu estuary and into the
21   Calcasieu Ship Canal.  And I'm mostly involved
22   in determining the unimpaired value of a track
23   of development land which fronts on the, um --
24   fronts on the ship canal.
25       Q.  And what lawyers are you working for
```

JOHN KILPATRICK (LEVEE VOL I)                                    8/13/2007

Page 110

1  for the Journal of Real Estate Literature, I
2  specifically directed my attention to, um --
3  two items, which are the third and second from
4  the bottom in the list, in the bibliography on
5  Page 227 of that.  The Brookings Institute,
6  "New Orleans After the Storm, Lessons from the
7  Past, Plan for the Future," published October,
8  2005, and the Urban Land Institute, "New
9  Orleans, Louisiana, A Strategy for Rebuilding,"
10  Washington, D.C., 2005.  So I took another
11  glance at those two articles just to refresh my
12  memory on some of the supportive material that
13  Professor Dermisi and I have put into this
14  article.
15       I read the National Geographic
16  article, the current article about New Orleans,
17  which I've included a copy of that National
18  Geographic issue in the box which I brought
19  with me here today.
20       Um -- that's about it.
21  Q.  All right.  You said you read your
22  affidavit, notice of deposition, the article
23  that you attached to your affidavit, the
24  National Geographic article, and you said
25  something else about documents supportive of

Page 111

1  this deposition.  So I'm not sure what you
2  meant.
3  A.  Sure, I asked my staff to, um --
4  devote whatever people we had available to
5  be -- to, um -- print out as much as we could
6  to be responsive to Appendix A to your notice.
7  And I also reviewed two articles which appear
8  on Page 227 of the Kilpatrick Dermisi article,
9  and those were the Brookings Institute article
10  and the Urban Land Institute publication.  I
11  reviewed those and put them in a box, and then
12  reviewed the National Geographic article and
13  put it in the box.
14  Q.  Since your report was prepared, you
15  have not felt the need to change it or alter
16  your opinions and conclusions stated in this
17  report?
18  A.  No.
19  Q.  Have you ever had an occasion to read
20  either the Complaint and Amended Complaint
21  filed in the levee case and the complaint filed
22  in the MRGO case?
23  A.  Yeah.  I think I did.  They don't
24  stand out in my mind.  I was focusing my
25  attention more on real estate issues and not so

Page 112

1  much on legal issues.
2  Q.  Okay.  So you may have read it, you
3  may not, you just don't remember?
4  A.  That's correct.
5  Q.  All right.  Have you ever read any of
6  the depositions of any of the plaintiffs that
7  we've taken in these cases?
8  A.  No.
9  Q.  Have you read any summaries of those
10  depositions?
11  A.  No.  I obviously will want to read
12  those when we get to the actual empirical
13  portion of this case.  But at present, that
14  wasn't part of formulation of my opinion.
15  Q.  Have you met any of the class
16  representatives in this case?
17  A.  Know, I may have.  I don't know.
18  Q.  Do you remember speaking to any of
19  them?
20  A.  No.  I mean, I've met lots and lots of
21  people here, so I don't know if any of them
22  happen to be included in the class reps.  I
23  don't want to be disinclusive of that, but I
24  haven't purposefully met with anyone in my role
25  as an expert in the case and their role as a

Page 113

1  class rep in the case.
2  Q.  Have you reviewed any of the
3  plaintiffs' written discovery responses in this
4  case?
5  A.  No.  But again, I certainly will when
6  we get to the appropriate part of the analysis.
7  Q.  Have you reviewed the Motion for Class
8  Certification in the levee case?
9  A.  I think so.  I don't recall if I have
10  or haven't.
11  Q.  Have you reviewed the Amended Motion
12  for Class Certification in the levee case?
13  A.  Again, I can't recall if I have or
14  haven't.
15  Q.  Have you reviewed the Motion for Class
16  Certificate in the MRGO case?
17  A.  Again, I can't recall.
18  Q.  Have you reviewed the Amended Motion
19  of Class Certification in the MRGO case?
20  A.  No.
21  Q.  And have you looked at any photographs
22  or diagrams or any other descriptions or
23  depictions of any of the class representatives'
24  properties in these cases?
25  A.  Not specific the formulating my

JOHN KILPATRICK (LEVEE VOL I)                    8/13/2007

Page 118

1  Um -- first formally contacted, it's been
2  pretty recently. But I don't remember the
3  exact date.
4      Q. What do you remember about your first
5  contact?
6      A. Um -- not much. Just that we received
7  a phone call. I think it was Mr. Becnel, I'm
8  not positive about that, who called me and
9  said, um -- you know, we've got this thing
10 we're going to do and we need you to help us do
11 it.
12     Q. Uh-huh.
13     A. And I said sure.
14     Q. And that was about how many weeks,
15 months ago?
16     A. I can't remember.
17     Q. All right. What part of the year?
18     A. I assume it was summer. It wasn't
19 that long ago. I'd have to go back and check
20 on my billing records. But it wasn't eons ago.
21     Q. So we're speaking at some point in the
22 spring or summer of 2007?
23     A. I think so. But again, I just
24 can't -- I really can't tell you. It would be
25 reflected in my correspondence, which would

Page 119

1  have been sent to you, you know, in response
2  the discovery.
3      Q. Sent to me?
4      A. Well, sent to them for them to send to
5  you.
6      Q. Okay.
7      A. I always respond to the discovery via
8  my client.
9          MR. MEUNIER:
10             You mean the reliance material?
11     A. It should have been sent with the
12 reliance material. If not, then that was an
13 inadvertent omission and we'll correct that.
14         MR. BECNEL:
15             Gary, just for the record, he
16     knew that most of us in the Murphy Oil
17     were also involved, or some of us, in
18     MRGO and levee. That was always in
19     the back of his mind but he had no
20     assignment.
21 EXAMINATION BY MR. ZWAIN:
22     Q. When were you actually retained for
23 purposes of these cases?
24     A. Again, that would be in our
25 contractual material.

Page 120

1      Q. Which you thought you gave us but I
2  don't think you did.
3      A. I thought I did, but if I didn't we'll
4  correct that error in a hurry.
5      Q. Okay. Well, give me your best
6  recollection as to when you believe you were
7  formally retained for purposes of these cases?
8      A. I want to say early summer. Late
9  spring, early summer. It may not have been
10 that long ago.
11     Q. And what were you retained to do?
12     A. Um -- I can't recall the exact
13 phrasing of our assignment. I usually in our
14 contractual documents put a sentence or two, it
15 tends to be fairly open-ended, provide
16 litigation support in the flooding cases. So
17 I'll have to go back and look and see exactly
18 how that was phrased. It wouldn't have been,
19 um -- a terrifically narrowly defined scope of
20 work. Let me put it that way.
21     Q. Well, I'm going to show you what I'm
22 marking as Exhibit Kilpatrick Number 4. And I
23 will represent to you that this is a copy of
24 Levee Plaintiffs Final Witness List for Class
25 Certification dated July 20th of 2007. And

Page 121

1  I'll direct your attention to Witness
2  Number 30, which is you, and the description of
3  your area of testimony listed next to your
4  name, which says, Dr. Kilpatrick 's testimony
5  will address the diminution of value of the New
6  Orleans real estate market resultant of the
7  August/September 2005 Metropolitan New Orleans
8  inundation and that such diminution can be
9  quantified on a class wide basis. (Tendering.)
10         Would you read that, please, and tell
11 me whether that's a fair appreciation of
12 the scope of your opinions in these cases will
13 be?
14         (Exhibit Kilpatrick 4 was marked for
15 identification and is attached hereto.)
16     A. Yeah. I think that's very nice
17 wording.
18 EXAMINATION BY MR. ZWAIN:
19     Q. Okay.
20     A. I like that.
21     Q. All right. So is the scope of the
22 opinions contained in that description that
23 which your report, your affidavit in this case
24 is directed to?
25     A. It is supportive and consistent with

JOHN KILPATRICK (LEVEE VOL I)                           8/13/2007

Page 130

1  general purpose data gathering trips which
2  included focus groups that we conducted as part
3  of our initial survey research.
4      Q.  Was this for Murphy Oil?
5      A.  Yes.
6      Q.  Okay.
7      A.  So I guess that's a petty good summary
8  of what I did.
9      Q.  How were the survey groups composed in
10  Murphy Oil?
11     A.  We did either seven or eight focus
12  groups.  I think it was eight, two each in --
13  and I believe, I'm talking off the top of my
14  head now -- two each in Wilmington, North
15  Carolina, Corpus Christi, Texas, St. Charles,
16  Missouri, I think, and here.
17     Q.  When you say here, what specific area
18  in the New Orleans area are you talking about?
19     A.  We actually did two here in New
20  Orleans.  Both of them were done in the City of
21  New Orleans.  In fact, I think both of them
22  were conducted at the, um -- at the Sheraton
23  Hotel on Canal Street.
24     Q.  And the people were from New Orleans?
25     A.  Were from Greater New Orleans.  I

Page 131

1  think some were from Orleans Parish and some
2  were from St. Bernard Parish.
3      Q.  Do you know what parts of Orleans and
4  what parts of St. Bernard?
5      A.  The ones from St. Bernard were
6  specifically -- and I'm talking off the top of
7  my head, I don't have the protocols in front of
8  me.  But I believe one of the focus groups was
9  to be made up of people who had been impacted
10  by the Murphy Oil spill and one of the focus
11  groups was to be made up of people who had been
12  affected by flooding but not the Murphy Oil
13  spill.
14     Q.  Okay.  Are the questionnaires that you
15  would have posed to the focus groups, I'm
16  assuming you did, contained in the materials
17  that you produced here today?
18     A.  They should be.  If not, I have staff
19  working to copy the paper files, and as we
20  discussed earlier today, whatever hasn't been
21  disclosed to you today with respect to Murphy
22  certainly will be disclosed as quickly as
23  possible.
24     MR. BECNEL:
25         Counsel, I'm going to ask for a

Page 132

1  Protective Order, only because we have
2  settled with Murphy for the class wide
3  boundaries.  We have not settled and
4  we're under an obligation to continue
5  for people that are in immediate
6  proximity, which -- whose cases will
7  be litigated down the road or
8  hopefully settled.  And I would ask
9  that -- I don't have any objection to
10  you guys looking at any of it, but
11  that it doesn't go beyond you and to
12  the defense counsel at this point.
13  MR. ZWAIN:
14      What about our experts?
15  MR. BECNEL:
16      As long as they're not experts
17  for Murphy in defending that other
18  litigation.
19  MR. ZWAIN:
20      I think we can work something
21  out.
22  MR. BECNEL:
23      Okay.
24  MR. MEUNIER:
25      Make sure the material comes to

Page 133

1  you.
2  MR. BECNEL:
3      Yeah.
4  EXAMINATION BY MR. ZWAIN:
5      Q.  Besides those focus groups, making
6  court appearances, attending depositions, what
7  else have you done in your trips to New Orleans
8  post-Katrina?
9      A.  You're speaking about the Murphy
10  related things or other trips?
11     Q.  Well, you said in your first sentence
12  in Paragraph 4, you made extensive examinations
13  of the New Orleans market.
14         What does extensive examinations mean?
15     A.  Well, number one, I've made just a lot
16  of, um -- personal familiarization with, um --
17  New Orleans geographically.  I've driven around
18  the street, familiarized myself with the
19  neighborhoods.  I, um -- rented a plane here
20  and flew myself around the area and observed
21  the lakefront area from 2000 feet up.
22  Essentially drove the whole south side of Lake
23  Pontchartrain in a Cessna 177.
24     Q.  How long did that take?
25     A.  Well, I was in the plane for most of

JOHN KILPATRICK (LEVEE VOL I)                                    8/13/2007

---

Page 134

1   the day.  I did other things that day besides
2   just drive along -- just fly along Lake
3   Pontchartrain.  I guess I was flying there
4   for -- it's no more than about a fifteen,
5   twenty minute flight.  Well, I did it twice, so
6   about an hour 's worth of flying along Lake
7   Pontchartrain.
8        Q.  All right.  What else in terms of
9   extensive examinations of the New Orleans
10  market have you done besides fly over the city?
11       A.  Well, um -- I don't want to get, I
12  guess, too personal here, but we have adopted a
13  church here, St. Paul's Episcopal Church in the
14  Lakeview neighborhood, and so we attended
15  church with them a couple of times, met with
16  the rector there extensive, got to know him
17  personally.
18       Q.  Who is that?
19       A.  Reverend Wil Hood.  He's the newly
20  appointed rector at St. Paul 's and a friend of
21  mine.
22       Q.  Okay.  What else -- what other
23  extensive examinations of the New Orleans
24  market have you done besides fly over the city
25  and associate yourself with this church?

---

Page 135

1        MR. BECNEL:
2            Let me enter a further objection
3        in order to tell you this, that he has
4        met on numerous occasions with a
5        plethora of other experts that I'm
6        asking him not to go into those other
7        experts.  They're not, per se, experts
8        in the real estate market, but they
9        have reported things in testing and
10       what they found and things of that
11       type.
12       MR. ZWAIN:
13           Well, I think I'm entitled to go
14       into just that.
15       MR. BECNEL:
16           Have at it.  And I'll ask that
17       this part of the record be sealed
18       outside of your experts and, um -- and
19       the lawyers.
20  EXAMINATION BY MR. ZWAIN:
21       Q.  What I want to know is what other
22  things have you done that you would include
23  within the term extensive examinations of the
24  New Orleans market.
25       A.  Well, as we were just discussing, I,

---

Page 136

1   um -- have met with other I'll call them
2   physical science experts who have a familiarity
3   with specifically the Murphy Oil case.
4        Q.  Who?
5        A.  Can't remember the names offhand.
6        Q.  What did they tell you?
7        A.  Oh, we basically talked about the
8   extent and the finger printing of oil coming
9   out of Murphy.  Um -- these were mainly folks
10  who are involved in finding out whose oil is
11  what.  And so they were explaining to me what
12  they had done with respect to Murphy.
13       Q.  Have you met with any of the
14  plaintiffs' experts or other consultants or
15  experts not for the plaintiffs with regard to
16  your extensive examinations of the New Orleans
17  market?
18       A.  Over and above the Murphy work, no.
19  But I had meetings with various experts with
20  respect to Murphy.
21       Q.  Okay.
22       A.  And, um -- we met with a couple of,
23  um -- appraisers here.
24       Q.  Who?
25       A.  Oh, Mr. Oubre.

---

Page 137

1        Q.  What's his first name?
2        A.  You know, I totally forgot his first
3   name.
4        Q.  Where's his office?
5        A.  Baton Rouge.
6        Q.  Why did you meet with him?
7        A.  Well, I had lunch with him a couple of
8   months ago to just ask him questions about the
9   New Orleans market.  I've decided to open a
10  permanent office down here.
11       Q.  Where?
12       A.  In a town home that I bought at the
13  intersection of Canal Boulevard and Robert E.
14  Lee in the Lakeview neighborhood.  And so I
15  wanted to get Mr. Oubre's personal assessment
16  of the market, really more inclined to the
17  potential of he and I working together on some
18  projects.  But it was, um -- mostly a friendly
19  lunch, and we ended up spending most of the
20  time talking about how to grill oysters.  And
21  I'm not trying to be facetious, we just didn't
22  talk about real estate that much.
23       Q.  How long was your lunch with
24  Mr. Oubre?
25       A.  About forty-five minutes to an hour.

---

JOHN KILPATRICK (LEVEE VOL I)                              8/13/2007

Page 138

1     Q.  Have you had any other contact with
2   Mr. Oubre about this case?
3     A.  I've had no contact with Mr. Oubre
4   about this case.
5     Q.  Have you retained Mr. Oubre for any
6   appraisal purposes or any other reasons, to
7   helped you out in terms of preparing your
8   report or opinions relative to this case?
9     A.  No.
10     Q.  Who if anyone else have you talked
11   with regarding your extensive examinations of
12   the New Orleans market?
13     A.  Well, I've had meetings with Gulf
14   Coast Bank.  That was primarily relative to
15   financing the townhouse.  But in the process of
16   meeting with Gulf Coast Bank I had, again,
17   conversations about the market for contractors,
18   what it was like after Katrina as opposed to
19   before Katrina.
20     Q.  Who did you talk to?
21     A.  One of their senior lending officers.
22     Q.  Who was that?
23     A.  Name escapes me right now.
24     Q.  How long did you talk to him?
25     A.  Oh.  Multiple times over a period of,

Page 139

1   um -- a month or so.
2     Q.  Did you take notes regarding any of
3   your conversations?
4     A.  Um -- no, not really.
5     Q.  Did you tape the conversations?
6     A.  No.
7     Q.  There's no record of those
8   conversations.
9     A.  No.
10     Q.  There's no record of any conversation
11   you had with Mr. Oubre?
12     A.  No.
13     Q.  Who else did you talk to regarding
14   your extensive examinations of the New Orleans
15   market?
16     A.  Oh, real estate agents at Latter &
17   Blum.  That's L-A-T-T-E-R --
18     Q.  Who?
19     A.  B-L-U-M.  A Mr., um -- Lester Sack.
20   S-A-C-K.  And I met with him about, um -- oh,
21   four or five times.  He is, um -- the -- he
22   actually owned the townhouse that we bought,
23   but he was also the agent for the townhouse.
24     Q.  Okay.  And any record of your
25   conversations with Mr. Sack?

Page 140

1     A.  No, nothing, um --
2     Q.  What's the sum total of time you spent
3   with him, would you estimate?
4     A.  A few hours.
5     Q.  Okay.  Anybody else?
6     A.  Well, a number of contractors,
7   electrician, a general contractor, um -- people
8   at Lowe's, cabinet makers, people who sell
9   ceramic tile, folks who sell appliances, um --
10   let's see here, the head of the homeowner's
11   association in the condo complex.
12     Q.  Condo complex in which you bought your
13   townhouse?
14     A.  Right.
15     Q.  All right.
16     A.  The people at the lakefront airport,
17   and specifically the folks in the fixed base
18   operator office there.
19     Q.  Have you taken notes of any of these
20   conversations?
21     A.  No.
22     Q.  Made any record of them whatsoever?
23     A.  No.  And of course, um -- the people I
24   rented the airplane from, had a nice
25   conversation with them.

Page 141

1       Oh, I'm trying to be all-inclusive
2   here.  Um -- again, having visited here so many
3   times, I tend to talk to a lot of people.
4     Q.  Right.  I just want to know about your
5   extensive examinations of the New Orleans
6   market.  Is that what these conversations all
7   entail?
8     A.  Yes.
9     Q.  Okay.
10     A.  I talked to a professor at a junior
11   college over in St. Bernard Parish.  His name
12   escapes me right now.  We've corresponded a
13   couple of times about his impressions of New
14   Orleans before and after Katrina.  Um --
15     Q.  Has anyone else from Greenfield made
16   extensive examinations of the New Orleans
17   market for purposes of these lawsuits?
18     A.  Well, none have done anything with
19   respect to this lawsuit.  I mean, this has all
20   been general purpose data gather, all conducted
21   after the conclusion of our Murphy work and
22   before the, um -- beginning of our, um --
23   flooding work.  And all conducted for just
24   general information, general familiarity with
25   the New Orleans market.  And, um -- part of it

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

Page 142

1  is to gain a familiarity with -- that we needed
2  to gather prior to making the decision to open
3  an office, but part of it also is just general
4  purpose information.
5      I was writing an article for the
6  Journal of Real Estate Literature, of course
7  that's attached here.  I wanted to get general
8  impressions about the marketplace as part of
9  the research I was doing for that article.  So
10 it's all, um -- basically research on my
11 nickel, not on my client 's, to get better
12 familiar with how the market dynamics were
13 working pre and post-Katrina.
14     Q.  So as a result of your extensive
15 examinations do you feel that you have a
16 fairly -- or do you feel you have an adequate
17 understanding of the New Orleans market that
18 would allow you to advocate your opinions at
19 the class certificate hearing scheduled in
20 November?
21     A.  Yes.
22     Q.  You don't have to do any more
23 extensive examination for purposes of that
24 hearing?
25     A.  I'm not going to suggest that I won't,

Page 143

1  but --
2      MR. MEUNIER:
3          Again, subject to my earlier
4      objection reservation that counsel
5      developing legal strategy may invite
6      him to do more.  But subject to that
7      qualification he can answer for
8      himself.
9      A.  I'm not going to suggest that I won't,
10 but I don't at this juncture have to.
11 EXAMINATION BY MR. ZWAIN:
12     Q.  How many neighborhoods are there in
13 the class as defined in the levee case?
14     A.  I don't know.
15     Q.  How many markets?
16     A.  Well, the word market has a bit of a,
17 um -- lay connotation to it.  As a --
18     Q.  Well, you used the term New Orleans
19 market at Paragraph 4 of your affidavit.  What
20 did you mean by that?
21     A.  I'm thinking of New Orleans broadly as
22 being a real estate market.  Admittedly, a
23 person who might buy a house in one
24 neighborhood might not be a potential buyer of
25 a house in another neighborhood, but broadly

Page 144

1  defined New Orleans can certainly be considered
2  one comprehensive market.
3      Q.  How many neighborhoods are there in
4  the class defined by the levee complaint?
5      A.  At this point, I don't know.  That's
6  something that we would certainly empirically
7  determine when we begin doing our quantitative
8  what you guys might call merits analysis.
9      Q.  What is the topography of any of those
10 neighborhoods?
11     A.  Well, without a map in front of me,
12 I'm going to make a general characterization.
13 Compared to other parts of the country, one
14 might consider most of New Orleans to be flat.
15 But in fact there's a rolling topography such
16 that, for example, in Lakeview you might have a
17 change in elevation of as much as ten or twelve
18 feet in a span of just a short distance.  So
19 compared to, say, my own home neighborhood of
20 the Cascade Mountains, it's pretty flat.
21 Compared to a wheat field in Iowa -- or a corn
22 field in Iowa, it's fairly rolling in some
23 places.
24     Q.  Have you familiarized yourself yet
25 with the mix of residential uses or commercial

Page 145

1  uses, or governmental uses, industrial uses
2  that affect any particular area or neighborhood
3  within the class defined by the levee
4  complaint?
5      A.  Not specifically to the various
6  neighborhoods within the class definition.
7  Clearly, that's the sort of work that we would
8  do at the empirical investigation phase of our
9  analysis.
10     Q.  Would your answer to my question be
11 the same if I were to pose it with reference to
12 the MRGO complaint?
13     A.  That's correct.
14     Q.  What is your understanding of how the
15 class is defined, or the proposed class is
16 defined by the levee complaint?
17     A.  Broadly speaking, it's defined by a
18 series of subclasses that have to do with,
19 um -- areas that flooded from, um -- either
20 water from the MRGO canal or water from the
21 Lake Pontchartrain.  In general, it's made up
22 of subclasses defined by the topography of
23 areas east and west of the canal.
24     Q.  What's the difference in topography of
25 areas east and west of the canal?

JOHN KILPATRICK (LEVEE VOL I)                                    8/13/2007

Page 146

1    A.  Well, at this point I can't comment on
2  that, but we will certainly.
3    Q.  You don't know?
4    A.  That's correct.
5    Q.  What's the difference in topography
6  between any of the subclasses identified in the
7  levee complaint?
8    A.  That's part of what we're going to
9  examine in our empiric investigation.
10   Q.  Don't know that?
11   A.  Don't know.
12   Q.  You say in the third sentence of
13  Paragraph 4 that since the Murphy Oil spill
14  matter concluded, quote, we have continued to
15  gather data about the New Orleans market, and I
16  continue to conduct personal inspections of
17  neighborhoods affected by the flooding.
18       Did I read that correctly?
19   A.  Yes.
20   Q.  What data have you gathered?
21   A.  I think that sentence probably ought
22  to focus on the personal inspections and less
23  on the data.  We've actually not gathered an
24  extensive amount of data.  There is in the file
25  box, for example, a, um -- copy of the National

Page 147

1  Geographic which has a great article about New
2  Orleans in the current edition.
3    Q.  Do you regard that as data?
4    A.  Yes.  We've got material from the
5  Urban Land Institute, we've got data from the
6  Brookings Institute, we've got data from the
7  Whitehouse post-Katrina study, we've got a
8  great deal of data that I and, um -- Professor
9  Dermisi gathered for the article that just came
10  out in the Journal of Real Estate Literature.
11  So all of that is what I'm referring to when I
12  talk about data.
13   Q.  Regarding the Urban Land Institute,
14  you cite something from them in your article.
15  If you could turn to Page 225 of that article,
16  which is attached to your report, I want to ask
17  you something about that.
18   A.  I'm at 225, yes.
19   Q.  Look at Footnote 8.
20   A.  Yes.
21   Q.  It says, under -- you see where it
22  says Zone A?
23   A.  Yes.
24   Q.  And then if you look at the second
25  sentence, it reads:  It is anticipated that

Page 148

1  block-by-block and even parcel-by-parcel
2  analysis will be required, and great care must
3  be taken to get the residents to determine
4  appropriate patterns of reinvestment.  In many
5  cases, partial and even block reconfigurations
6  may be needed.
7       What does that sentence mean to you?
8    A.  Well, first, there is nothing in that
9  sentence that's inconsistent with a mass
10  appraisal model I want to stress that.
11   Q.  I just asked what it meant to you.
12   A.  I understand, and I'm trying to tell
13  you, counsel.
14   Q.  Okay.
15   A.  Um -- number two, the -- ULI 's
16  analysis does not preclude the notion of
17  gathering consistent data throughout the
18  market, but it does recognize the fact that the
19  data within whatever database is put together
20  is going to have to have a certain level of
21  specificity.
22   Q.  I just asked what the sentence meant
23  to you.
24   A.  I understand.  Counselor, I'm trying
25  to answer that.

Page 149

1    Q.  Okay.  Go ahead.
2    A.  Thank you.  That sentence then means,
3  to me, that in the conduct of a mass appraisal
4  model our databases will include information
5  specific to individual parcels and properties.
6  So within the context of the work I do, and
7  within the context of my reading of the ULI 's
8  recommendations, I find great support for
9  creation of a large scale, comprehensive
10  database such as we would propose to do in this
11  case.
12   Q.  So you agree with the sentence I just
13  read?
14   A.  Every bit of it, yes.
15   Q.  You said that the use of the term
16  market was a layman 's term.  What did you mean
17  by that?
18   A.  Well, I want to make sure that I'm not
19  imbuing any economic meaning, or shall I say
20  meaning within the jargon of economics, to the
21  word market.  I'm tending to use the word
22  market in a broader context.  Market does have
23  some meanings within the field of economics
24  which are somewhat different from the way most
25  people take it.  When I'm using the word market

Page 166

1   empirically investigate in the merits phase of
2   the work I've done.  I will do.  Excuse me.
3       Q.  Do you know if the subclass boundaries
4   correlate at all with the neighborhood areas in
5   New Orleans?
6       A.  I haven't investigated that yet.
7       Q.  So you don't know.
8       A.  And it may very well be that they
9   don't, precisely, simply because flooding may
10  or may not have followed, um -- neighborhood
11  boundaries.  When we get to the edge of an
12  economically defined neighborhood, floodwaters
13  don't often stop or start.  So indeed it would
14  not be inconsistent with my expectations to
15  find that part of a neighborhood flooded and
16  part of it didn't flood.  Now that's not at
17  all, um -- undermining the notion that this is
18  the way you study these things; indeed, this is
19  supportive of the notion that a large scale,
20  statistically valid mass model is the only way
21  you study these kind of things.  But
22  nonetheless, um -- I don't, as I sit here
23  today, have a -- have I done any sort of
24  precise measurement of the flooding boundaries
25  versus the neighborhood boundaries.

Page 167

1       Q.  Have you done any measurement?
2       A.  No.
3       Q.  If I'm understanding you correctly,
4   I'm gathering that you would almost expect that
5   the neighborhood boundaries for the
6   neighborhoods in New Orleans would not
7   correlate with the class boundaries drawn by
8   the plaintiffs' complaint --
9       A.  No, I didn't say that at all.
10      Q.  -- in the levee case.
11      A.  All I really said was that it wouldn't
12  surprise me and it wouldn't be inconsistent
13  with my expectations if in fact the flooding
14  didn't in all cases follow neighborhood
15  boundaries.  However, there are also cases
16  where flooding or other kinds of events such as
17  this do follow neighborhood boundaries.  We
18  talked this morning, for example, about the St.
19  Croix, Virgin Islands case where the, um -- red
20  dust followed neighborhood boundaries quite
21  precisely because neighborhood boundaries
22  coincided with topographical boundaries.  So
23  indeed if any of the neighborhoods in the
24  affected area are consistent with topographical
25  features, then it wouldn't be surprising for

Page 168

1   the flooding extent to be coincidental with the
2   neighborhood extent.
3       Q.  Do you expect that you will be in a
4   position to offer opinions at the class
5   certification hearing in November as to whether
6   or not the subclass boundaries as defined
7   either in MRGO or in levee correlate or
8   correspond to neighborhood boundaries?
9       A.  I don't have an opinion one way or the
10  other about that right now.  I may or may not
11  be asked to opine with respect to that.
12      Q.  What additional work would you have to
13  do in order to figure that out?
14      A.  I haven't determined that scope of
15  work yet.
16      Q.  But you would need to do some
17  additional work?
18      A.  Yes.
19      Q.  Okay.  Now, you say in the last
20  sentence of Paragraph 6 that you believe the
21  amount of damage can be determined on a
22  subclass-by-subclass basis.
23          What does that mean?
24      A.  Well, for example, we just finished a,
25  um -- case in Spelter, West Virginia in which

Page 169

1   the area was divided into multiple subclasses,
2   and so it was helpful for us to be able to
3   total up the damages by totalling up the
4   aggregate value on an unimpaired basis of all
5   the properties in each geographically defined
6   subclass, the aggregate value on an impaired
7   basis of all those properties, and the
8   difference between A and B of course equals the
9   damages.  So totaling things up on a
10  subclass-by-subclass basis makes for a useful
11  and handy mnemonic for the work we do.  There
12  are any one of a number of ways that we could
13  total this up, but that happens to be one of
14  them and we can do it that way.
15      Q.  Well, if you don't know whether or not
16  neighborhood boundaries correlate or correspond
17  with subclass boundaries, how are you going to
18  determine damages on a subclass-by-subclass
19  basis?
20      A.  Well, remember, as I testified this
21  morning, once we get to the merits phase we
22  will have a database with every single property
23  that's been affected by this flood.  Using a
24  mass appraisal model does not obviate a
25  property-by-property value.  It simply provides

JOHN KILPATRICK (LEVEE VOL I)                          8/13/2007

Page 170

```
 1   a statistically valid, extraordinarily
 2   efficient and rigorously peer reviewed
 3   methodology in which one can accomplish this
 4   thing without spending millions of dollars in
 5   unneeded costs and years of time.  So if you
 6   want to know all of the damage to properties in
 7   a particular subclass, if you want to know all
 8   of the damage to properties in a particular
 9   neighborhood which were flooded as opposed to
10   the properties in that neighborhood that
11   weren't flooded, if you want to know Sam and
12   Susan Jones' house and how much it was damaged
13   by the flood, we'll be able to pull that out of
14   the database.  In fact, using a valid, sortable
15   database, I can give you a total of how many --
16   how much dollar damage was done to all the
17   houses with fireplaces.  I can give you a
18   damage figure for all the houses that are one
19   story as opposed to all of the houses that are
20   two story.  So that using this kind of model
21   that I'm proposing here provides a set of
22   exceptionally powerful tools not only for the
23   plaintiff attorneys but as well as for the
24   defense attorneys and certainly provides a
25   level of efficiency for the Court that just
```

Page 171

```
 1   doesn't -- isn't available any other way.
 2      Q.   You say that the amount of damages,
 3   the amount of damage can be determined on a
 4   subclass-by-subclass basis expressed as a
 5   percentage of loss of pre-Katrina property
 6   value.  Right?
 7      A.   Correct.
 8      Q.   Am I understanding that correctly to
 9   mean that you will be in a position to
10   calculate each individual 's percentage of loss
11   on a subclass-by-subclass basis?
12      A.   Or on a type of property by type of
13   property basis, or on -- if you want to know
14   the percentage loss for John and Susan Jones'
15   house, we can do it that way, too.
16      Q.   Okay.  Also, if I'm understanding you
17   correctly, what you will not be able to
18   determine, and what you're expressing no
19   opinions about, is the amount of damage
20   expressed in the necessary repair costs in
21   order to repair damage caused by flooding.
22      A.   At this juncture, um -- it's not my
23   anticipation to do that.  At this juncture, my
24   anticipation is to develop a comprehensive loss
25   in value model, that is to say, what is the
```

Page 172

```
 1   diminution in value which would encompass both
 2   the anticipated repair costs as well as any
 3   stigma damage which might be associated with
 4   other economic losses in the marketplace.  So,
 5   as is well captured in the literature,
 6   immediately after Katrina a loss in market
 7   value of an individual property, or a whole
 8   collection of properties, would be the sum of
 9   that anticipated repair cost plus the stigma
10   damages dealt to the property.
11      Q.   Well, are you going to be able to
12   delineate what repair costs might be
13   attributable to wind and rain as opposed to
14   flood?
15      A.   Well, with can certainly delineate
16   what loss in value might be attributable to
17   flood as opposed to other factors.  And indeed,
18   we have got some very powerful tools, such as
19   survey research, which have proven to be
20   consistently useful and acceptable not only for
21   determining the total amount of market value
22   lost to a given property but also to be able to
23   delineate, on a statistically valid and
24   reliable basis, how much loss is attributable
25   to one component as opposed to how much loss is
```

Page 173

```
 1   attributable to another component.
 2          In the Murphy Oil case, that's
 3   precisely what we were in the process of doing
 4   when the case finally settled.
 5      Q.   Are you going to be able to attribute
 6   or allocate value lost to a particular source
 7   of damage, in other words, waters coming from a
 8   particular place as opposed to another place?
 9      A.   I'm not sure I understand that
10   question.
11      Q.   Are you going to be able to attribute,
12   on any particular property, that amount of
13   damage attributable to water coming from the
14   17th Street Canal as opposed to the London
15   Avenue Canal, for instance?
16      A.   Oh, I see.  Well, that's an intriguing
17   research question.  As I sit here today, it
18   seems like something that would certainly be
19   doable.  We've been thinking about flooding in
20   the aggregate, that is to say if you have a
21   particular house and it's been flood damaged,
22   what's it's loss in market value.  But if the
23   modelers tell us that there is an apportionment
24   issue, that this damage ought to be apportioned
25   between 60 percent that water and 40 percent
```

                                        44  (Pages 170 to 173)

JOHN KILPATRICK (LEVEE VOL I)                                      8/13/2007

Page 174

1   this other water, then that becomes almost a
2   trivially simple exercise.  And if in fact the
3   modelers can draw a geographic model over water
4   and express that through GIS shape files or
5   other statistical, um -- expressions or other
6   mathematical expressions, it becomes almost
7   trivially simple to incorporate that into our
8   valuation model.
9       Q.  And what if they can't?
10      A.  In other words, what if it's unknown
11  as to how much water on Sam and Susan Jones'
12  house came from this source as opposed to this
13  other source?
14      Q.  What if the plaintiffs' modelers can't
15  make an attribution with respect to how much
16  damage was allocated -- allocable from one
17  source of water as opposed to another source of
18  water?
19      A.  Well, then in my somewhat lay opinion,
20  that becomes a matter for the Courts to decide.
21  We, as valuation experts, can certainly tell
22  the Court what the aggregate amount of
23  diminution of value to Sam and Susan Jones'
24  house is and then leave it up to the Court to
25  decide how much of that damage to allocate to

Page 175

1   one defendant as opposed to how much to
2   allocate to another defendant.  My lay
3   understanding is the Courts do that all the
4   time.
5       Q.  Okay.  Who are the defendants or
6   potential parties at fault with respect to the
7   17th Street Canal?
8       A.  Oh.  I don't know.
9       Q.  London Avenue Canal?
10      A.  You know, I haven't got myself, um --
11  bogged down in that, because who might be at
12  fault here is not part of -- you know, my job
13  is not to lay fault on people, my job is just
14  to measure.
15      Q.  Industrial Canal?
16      A.  I don't know.
17      Q.  Do you have an understanding as to
18  where the water from any of the canals went?
19      A.  You know, I think I read that, but I
20  can't recall offhand.  And when say read it,
21  not in the material provided to me by my
22  clients, but in general reading and studying
23  I've done about New Orleans.
24      Q.  Does your model deal with, or does
25  your -- model.  Does your projected model deal

Page 176

1   with business interruption loss?
2       A.  Well, we haven't gotten to the
3   specifics of that yet.
4       Q.  Does your business model deal with
5   anything other than diminished real estate
6   values?
7       A.  We haven't gotten specific to that
8   yet.  We certainly can.  I mean, that's
9   something that's, um -- easily modelable and
10  doable.
11      Q.  Well, but you were asked -- I think we
12  just discussed a moment ago that you were asked
13  to determine from a real estate analysis and
14  appraisal perspective whether this case can
15  best be analyzed by a class action.  Right?
16      A.  Right.
17      Q.  That's what you're doing in this case,
18  right?
19      A.  Right.
20      Q.  You're not undertaking to do anything
21  else, so far as we know, correct?
22      A.  Correct.
23      Q.  Turning to Paragraph 7, the fourth
24  subparagraph, can plaintiffs be found who are
25  representative of the class and adequately

Page 177

1   represented so as to protect the interests of
2   the class?  Do you see that?
3       A.  I do.
4       Q.  Have you made any determinations as to
5   whether or not the proposed class
6   representatives are representative of the class
7   and adequately represent the class?
8       A.  I haven't made any determination.
9   I've had conversations with the clients about
10  this issue from an appraisal perspective and
11  how, um -- in our work in cases like this it's
12  often useful for us as appraisers to have class
13  representatives who are within the -- any
14  statistical sample we take.  But, um -- other
15  than that, I haven't made any particular
16  empirical determination.
17      Q.  Do you know whether these class
18  representatives are within any statistical
19  sample that you might take?
20      A.  I haven't made that determination.
21  That's something that we will make a
22  determination of when we get to the empirics
23  component of this.
24      Q.  So you won't have that determination
25  made by November.

JOHN KILPATRICK (LEVEE VOL I)                                    8/13/2007

| | |
|---|---|
| Page 178 | Page 180 |

**Page 178**

1     A.  I didn't say that.
2     Q.  Well, I'm asking you.
3     A.  We may be asked to do that, but we
4  haven't done it yet.
5     Q.  So in answer to my question are
6  these -- do you think these class
7  representatives adequately represent and
8  protect the interests of the class, your answer
9  is you don't know?
10    A.  I haven't made any sort of empirical
11 determination about it.  I know that sounds
12 like a fancy way of saying I don't know, but
13 it's a little different.
14    Q.  That's what it sounds like.
15    A.  It's a little bit different.
16    MR. BECNEL:
17       Counsel, remember, you're not
18    entitled to merits discovery right
19    now.  This is certification only.
20    MR. ZWAIN:
21       That's why I'm asking about the
22    class representatives.
23    MR. BECNEL:
24       No.  Merits.  Three fourths of
25    what you've been asking for the last

**Page 179**

1     hour is merits.
2  EXAMINATION BY MR. ZWAIN:
3     Q.  Do you know whether all of the
4  properties located within any class boundary --
5  subclass boundary flooded?
6     A.  Perhaps I didn't understand that
7  question.  Could you repeat it, please?
8     Q.  Do you know whether all of the
9  properties located in each subclass boundary,
10 either from MRGO or levee, flooded?
11    A.  Not yet.  That's something I'll
12 empirically determine as part of the merits
13 investigation.
14    Q.  Do you know the percentages of those
15 houses or those properties that flooded as
16 opposed to those that did not?
17    A.  Again, that's something that I'll
18 determine as part of the merits investigation.
19    Q.  Do you know the percentage of
20 properties that flooded due to rainwater as
21 opposed to those that flooded due to canal
22 breaches?
23    A.  Same answer.
24    Q.  Do you know the percentage of those
25 that flooded due to rainwater or canal breaches

**Page 180**

1  or overtopping?
2     A.  Same story.  Same answer.
3     Q.  To the extent that there are
4  properties within any class boundaries that did
5  not flood, would you expect those properties'
6  values to be diminished or increased?
7     A.  That would be a matter for empirical
8  investigation.
9     Q.  You don't know.
10    A.  Well, I'm going to stick with that
11 would be a matter for our empirical
12 investigation.
13    Q.  That investigation won't take place
14 until after the class certification hearing is
15 complete?
16    A.  Properly so, that's correct.
17    Q.  The model that you propose to suggest
18 to the Court as a basis in part to support
19 class certification, what will your valuation
20 date be?
21    A.  Well, there are two answers to that
22 question.  From a practical matter, we're going
23 to have a conversation with our clients to make
24 that determination.  Um -- my recommendation,
25 however, will be that the unimpaired values of

**Page 181**

1  properties be valued immediately before
2  Katrina, and the impaired values of the
3  properties will be effective immediately after
4  Katrina.  But there are occasions when the
5  Courts have asked us to use other dates more
6  arbitrarily set.
7     Q.  So for pre-Katrina values, you're
8  going to use values effective August 28th 2005?
9     A.  I believe that's the date, yes.
10    Q.  For post-Katrina value, you're going
11 to use values August 30th, 2005?
12    A.  Right.  Assuming the, um -- our
13 clients and the Court, um -- concur with that
14 recommendation.
15    Q.  And why are you going to select as the
16 valuation date for a post-Katrina value
17 August 30th, 2005?
18    A.  Well, you want to pick a date
19 immediately after Katrina.
20    Q.  Why?
21    A.  In other words -- well, if you have an
22 event which occurred, and we want to, um --
23 pick up an impact of that event, it's a little
24 bit, um -- silly, in fact -- I mean, we could
25 pick any arbitrary date and say what's the

JOHN KILPATRICK (LEVEE VOL I)                          8/13/2007

Page 186

1        (Brief recess.)
2    EXAMINATION BY MR. ZWAIN:
3        Q.  Turning to the next page, the last
4    section of Section 9 of your report, you open
5    the last paragraph with the sentence this
6    extensive albeit incomplete list of factors
7    affecting the entire class of properties and in
8    ways that lead to large effects on property
9    values throughout the class argue very strongly
10   for class treatment.
11           What other factors, besides those that
12   you've listed in Paragraph 9, which I
13   understand to be Hurricane Katrina, floodwater,
14   economics effects, stigma, perception of risk,
15   higher insurance premiums -- what other common
16   factors do you believe are present?
17       A.  Well, you have, um -- the general
18   economic factors for the marketplace, which is,
19   um -- includes but certainly not limited to the
20   loss of jobs, the loss of an economy, the loss
21   of the economic drivers, and to a certain
22   extent a large scale, um -- reduction in the
23   housing stock in the marketplace is an economic
24   factor that feeds on itself.  Let me give you
25   an example.  Assume you have a marketplace of

Page 187

1    100,000 holes, the loss of one or two or even a
2    hundred homes might not have a significant
3    detrimental impact on the market.  But a loss
4    of fifty thousand residences for a period of
5    time necessitating these people move away is
6    going to have a huge and measurable impact on
7    the values of the remaining homes and the
8    values of the homes once restored.  And so
9    you've got these kinds of macroeconomic factors
10   which are certainly going to be common to every
11   one of the properties described in this class
12   action.
13           You've got what I call the loss of
14   culture.  And that's a very important point
15   here in New Orleans.  It's important in other
16   areas, as well.  We know that there are
17   significant problems with respect to, um -- the
18   reason for being for New Orleans that no longer
19   exists, the music, culture, the arts, those
20   kinds of things.  People want to move to New
21   Orleans to be close to those kinds of things.
22   Those things have been impacted in a
23   systematic, common way by the events of this
24   case and are, therefore, common impacts in the
25   valuation equation throughout the New Orleans

Page 188

1    market.
2           Now, those are just two that come to
3    mind right now.  I'm sure that there are going
4    to be others that we will empirically determine
5    as we get into the merits phase of our
6    investigation.
7        Q.  Why did you move to New Orleans?
8        A.  Well, I've got a lot of business down
9    here.  I mean, remember, I deal in damaged real
10   estate.  And I think -- I'm not trying to be
11   silly here, but this is sort of the global
12   epicenter for damaged real estate right now.
13   So it's not just this Katrina project, but we
14   have other projects throughout the other Gulf
15   Coast states, we knew we were going to locate a
16   southeastern office even before Katrina, but
17   after Katrina this became the logical place to
18   do it.  Had Katrina not occurred, we probably
19   would have gone to Atlanta or someplace like
20   that, but -- you know, A, we wanted to locate
21   something common to the various cases we're
22   doing and, B, we wanted to give something back
23   in a little way.
24       Q.  Why did you choose to move to the
25   Lakeview area as opposed to Mandeville or

Page 189

1    uptown New Orleans or the French Quarter or a
2    place that wasn't affected by flooding?
3        A.  Well, a couple of reasons.  First, as
4    I testified earlier today, I now have a
5    relationship with St. Paul 's church in that
6    neighborhood.  And so this townhouse is just a
7    few blocks from that church.  B, I'm a pilot,
8    and this is relatively close to the lakefront
9    airport, so it will be easy to get in and out
10   of there.  C, I'm -- I also involved in water
11   sports, boating, those kinds of things, and
12   it's not far from the marina, if that ever gets
13   going again.  So, you know, from a personal
14   perspective, it was a great place to invest in
15   real estate.  From a business perspective, it
16   was a good investment; I could get it pretty
17   cheap because, let's face it, after Katrina
18   real estate here is pretty cheap.
19       Q.  How much did you buy it for?
20       A.  A hundred and fifty thousand.
21       Q.  Had it been flooded?
22       A.  Yes.
23       Q.  To who extent?
24       A.  The ground floor, when I bought it,
25   was stripped back to stud walls.  There's some,

                                    48  (Pages 186 to 189)

JOHN KILPATRICK (LEVEE VOL I)                                    8/13/2007

Page 194

1  floor, those sorts of things.  That's what
2  carries you up to about ninety thousand on the
3  rehab.
4      Q.  Was the purchase of this property
5  financed by Gulf Coast Bank?
6      A.  Yes.
7      Q.  Was there an appraisal done in
8  connection with that purchase?
9      A.  Yes.
10      Q.  Who did the appraisal?
11      A.  I can't remember.
12      Q.  But it was an individual appraisal?
13      A.  Yes.
14      Q.  Do you know whether all the damage to
15  your townhouse was flood damage or was there
16  some wind and rain damage?
17      A.  Um -- there was a minimal amount of
18  wind damage.  Um -- we went ahead and had the
19  place reroofed anyway, even though it -- the
20  house was about fifteen years old.  The roof
21  was about fifteen years old, and so I went
22  ahead and had it reroofed.  It was the first
23  thing I did after I bought it, at a cost of I
24  think $2,300.  So I don't know how much of that
25  was wind damage and how much of it was just old

Page 195

1  age of the roof, but I went ahead and had that
2  done anyway.
3      Q.  Was there ever a blue roof on the
4  roof?
5      A.  There wasn't when I bought it.
6      Q.  Okay.  Do you know the names of the
7  people you purchased from?
8      A.  Yes.  As I testified this morning, it
9  was Mr. and Mrs. Lester Sack.  S-A-C-K.
10      Q.  And where is Mr. Sack today?
11      A.  He lives in the warehouse district
12  here in New Orleans.
13      Q.  Did he buy a new condominium after he
14  sold his townhouse?
15      A.  I don't know what his living
16  arrangements are now other than he lives in the
17  warehouse district.
18      Q.  You made mention previously to cost
19  savings that you felt would result from use of
20  mass appraisal techniques as opposed to
21  individual appraisals and the time that might
22  be saved by doing mass appraisal as opposed to
23  individual appraisals.
24          Did I understand you correctly about
25  that?

Page 196

1      A.  Yes.
2      Q.  If you were retained to do a mass
3  appraisal, damage model report, whatever you
4  call it, what do you think it would cost in
5  terms of fees and expenses?
6      A.  Well, I don't have a good estimate of
7  that.  These kinds of cases range anywhere from
8  a hundred thousand to a million dollars in
9  terms of the appraisal expense.  A lot of that
10  depends on, um -- a number of factors that I
11  haven't ascertained at this point.  We have
12  done cases like this for in the range of a
13  hundred thousand.
14      Q.  Well, the largest case I think you've
15  had in terms of numbers of properties was that
16  case up in West Virginia.  Is that right?
17      A.  That's correct.
18      Q.  How much did that cost?
19      A.  I don't know.  I would estimate that
20  our budget to date is somewhere north of a half
21  a million.
22      Q.  In the West Virginia case.
23      A.  That's correct.
24      Q.  You would expect that preparation of a
25  damage report and model would be greater in

Page 197

1  this case than it would be in that case?
2      A.  I have no estimate of that one way or
3  other.  The -- you know, what I do know is
4  that any way you stack it up, it's going to be
5  at least an order of magnitude cheaper than
6  doing individual appraisals on these
7  properties.
8      Q.  Well, what's the cost of doing
9  individual appraisals on the property?
10      A.  Well, let's do the math.  We've got a
11  hundred and fifty thousand houses, let's say,
12  at three hundred bucks a throw, just for the
13  appraisers.  That assumes we can hire enough
14  appraisers.  That's forty-five million dollars.
15  Now, if you're going to run this project,
16  you're going to have a supervisory process to
17  sort of aggregate and supervise all these
18  people.  It's going to take you another, oh,
19  less say at least another 25 to 50 percent of
20  that, so let's just say that the cost alone is
21  somewhere in the sixty million range.
22      Q.  Uh-huh.
23      A.  I'm probably being conservative.  I
24  don't know if you can do these properties for
25  three hundred bucks a throw, but if you can

JOHN KILPATRICK (LEVEE VOL I)                                    8/13/2007

Page 198

1  that's the number.  Now, let's start talking
2  about time.  A hundred and fifty thousand
3  properties, let's say an appraiser can do --
4  and this is going to be tough, but let's say he
5  could do five a week.  Okay?  Now I'm going to
6  try to do the math in my head.  That's thirty
7  thousand man weeks, or -- and I mean people
8  weeks, because we have female appraisers, as
9  well.  Excuse me.  Thirty thousand person
10 weeks, fifty work weeks in a year, assuming we
11 give them a little bit of a vacation, is six
12 hundred person years.  If we hire, let's say,
13 every appraiser in the state of Louisiana, we
14 could probably do the job in two to three
15 years.  However, mortgage lending, eminent
16 domain and taxation in the state would freeze
17 for a period of two to three years as we sucked
18 up every available appraiser in the state.
19     So in terms of an expense, it's
20 horrendous.  In terms of an organizational
21 undertaking, yes, I would like to have the job.
22 And in terms of the disruption to the appraisal
23 community in the state of Louisiana, it's
24 utterly unprecedented.
25     Q.  You seem readily able to run a quick

Page 199

1  calculation as to how much it would take to do
2  individual approvals.  I'm just curious as to
3  why that same calculation can't be done to run
4  a mass appraisal, something you're so
5  intimately familiar with.
6     A.  Well, I said that it was going to cost
7  somewhere between a hundred thousand and a
8  million.  Given -- given the various, um --
9  components of a mass appraisal model, there are
10 a number of different ways we could stack it
11 up, and until we get into the empirics of it,
12 um --
13     Q.  You just don't know.
14     A.  I just don't know.  But it is pretty
15 obvious that it's at least an order and a half
16 of magnitude cheaper than trying to do it by an
17 individual appraisal process.
18     Q.  What does an order and a half
19 magnitude cheaper mean?
20     A.  It's got more than a zero difference
21 in the price.  I mean, we go from a million at
22 the upper end of my scale to sixty million
23 doing it the other way.
24     Q.  In paragraph 11, you talk about
25 numerosity.  And again, you mention in the

Page 200

1  first sentence, our own research into the
2  post-Katrina market in New Orleans.
3     What research into the post-Katrina
4  market in New Orleans have you done?
5     A.  Well, all of that, um -- research that
6  I detailed with respect to the five or ten
7  trips that I've made to, um -- New Orleans
8  since the end of Murphy Oil, not to mention all
9  the research that we did with respect to Murphy
10 Oil.
11     Q.  Well, I think you were talking before
12 about extensive investigation which you
13 mentioned in -- or extensive examinations which
14 you wrote about in Paragraph 4, and now in
15 Paragraph 11 we're talking about your own
16 research.  So is there a distinction between
17 the two?
18     A.  Not really.
19     Q.  Okay.  You say that your own research
20 demonstrates that tens of thousands of
21 individual properties have been similarly
22 affected by the flooding.  What does similarly
23 affected mean?
24     A.  Well, they've been flooded.  I mean --
25     Q.  By what?

Page 201

1     A.  Excuse me -- by water.
2     Q.  Coming from where?
3     A.  From various sources.
4     Q.  You say in Paragraph 17, in the second
5  sentence, that real estate markets are
6  segmented, of course, by property types and by
7  neighborhoods, and properties are heterogeneous
8  in many of their characteristics.
9     Have you made any attempts to segment
10 the real estate markets in the levee case or
11 the MRGO case?
12     A.  No.  And here we're using markets
13 somewhat more analogously to neighborhoods.  I
14 don't want to get away from the notion that New
15 Orleans is one big market and that within that
16 big market you have multiple neighborhoods.  So
17 I don't want anything I've said there to be
18 construed otherwise.  Certainly, as I testified
19 earlier, a rigorous investigation into this
20 would be part of the empirical analysis.
21     Q.  You say in the first sentence of
22 Paragraph 17, an additional common factor in
23 this case would be the local market and in
24 particular a degree of stigma in market
25 perceptions of the affected properties.

51 (Pages 198 to 201)

JOHN KILPATRICK (LEVEE VOL I)                        8/13/2007

---

Page 202

```
 1  Correct?
 2      A.  Correct.
 3      Q.  Is the stigma the same in each
 4  segmented market?
 5      A.  We don't know that.  The fact that you
 6  would have stigma and an underlying necessary
 7  and sufficient conditions for stigma are common
 8  not only throughout New Orleans but wherever
 9  stigma is an applicable term.  Nonetheless, the
10  fact that stigma can be measured by a common
11  model throughout the marketplace is well
12  established in the literature, and the
13  measuring of that stigma, even as it might vary
14  across the marketplace or across neighborhoods
15  or even from property to property, would be an
16  empirical exercise.
17      Q.  What is the stigma suffered by
18  property owners in the MRGO case?
19      A.  Well, in general terms, it's
20  diminution in value, over and above, um --
21  merely the cost of repair.
22      Q.  What's the stigma?
23      A.  But -- well, that's what it is.
24      Q.  No, not what's the amount of the
25  stigma, what's the stigma?
```

Page 203

```
 1      A.  Well, I just -- I mean, I just said,
 2  stigma is a term that we real estate appraisers
 3  give to that diminution in value of property
 4  over and above the cost of restoration.
 5      Q.  All right.  Stigma is a function of
 6  perception, right?
 7      A.  Well, among other things.  It's a
 8  function of risk.  All property values are a
 9  function of perception.  Indeed if you don't
10  perceive that a property has value, then it
11  doesn't have any value.  So everything in life
12  that has value is a matter of perception, and
13  everything in live that is a diminution in
14  value is because of perception.  Stigma is
15  merely one of those things.
16      Q.  Okay.  What is the stigma associated
17  with any individual piece of property in the
18  MRGO case?
19      A.  Well, I'm giving you an empirical
20  definition of it.  And I'm an empiricist.  So
21  we're going to go out and measure that.  But
22  I'm not trying to define stigma as a causality
23  factor.  The causality factor here is flooding.
24  Stigma is the explanation that we place on the
25  diminution of value of the property over and
```

Page 204

```
 1  above anticipated cost of repair.
 2      Q.  So you're trying to assess a stigma
 3  value related to flooding.
 4      A.  Not really.  We're trying to assess
 5  the diminution in value on these properties
 6  after the flooding, as a result of the
 7  flooding, and stigma is the label we give a
 8  portion of that diminution in value.  But it's
 9  not the cause of the diminution in value, it's
10  the empirical definition of that diminution in
11  value.
12      Q.  Well, is there a stigma associated
13  with the fact that New Orleans is in an area
14  that is prone to be affected by hurricanes?
15      A.  Well, that's an issue which may or may
16  not be captured in prices prior to Katrina.
17  And in fact, there's some studies that have
18  been done, particularly with respect to
19  earthquakes in California, that ask the
20  question does the market already discount the
21  likelihood of an earthquake prior to the
22  earthquake actually happening?  And in fact, it
23  looks like markets are pretty good at pricing
24  the anticipation of what we might call normal
25  events, that is to say, anticipatable events.
```

Page 205

```
 1      So in fact, we know that New Orleans
 2  has been hit by storms of varying magnitudes
 3  throughout it's life, but the likelihood of
 4  another one of those storms is generally
 5  captured in real estate prices already.  And as
 6  a result of that, these anticipatable events
 7  would be discounted in the pre-Katrina pricing
 8  model.
 9      Q.  How familiar are you with New
10  Orleans 's history of being affected by
11  tropical storms and hurricanes?
12      A.  I did little bit of research in that
13  with respect to the paper that I wrote for the
14  Journal of Real Estate Literature.  I recognize
15  the fact that throughout it's history New
16  Orleans and all of the cities on the Gulf Coast
17  have been storm prone.
18      Q.  Are you familiar, specifically, with
19  New Orleans history with respect to the effect
20  hurricanes and other tropical storm systems
21  have had on it over the years?
22      A.  What I'm saying is I've read about it,
23  and I can't recount it to you verbatim as I sit
24  here today.
25      Q.  Well, what do you know about it?
```

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

JOHN KILPATRICK (LEVEE VOL I)                                8/13/2007

Page 206

1      A.  Well, New Orleans gets hit by storms
2  on occasion.
3      Q.  When was the last one?
4      A.  Offhand, I can't tell you.
5      Q.  Okay.  How many in the 20th century?
6      A.  Oh, I can't tell you that offhand.
7      Q.  How often has New Orleans flooded?
8      A.  That I can't tell you either.
9      Q.  What areas of town have flooded prior
10  to Katrina?
11      A.  Well, that's part of what I need to
12  study with respect to the, um -- empirical
13  component of this case.  But our focus of study
14  is going to be specific to the Katrina
15  flooding.  And in fact, it's going to be
16  empirically determinable just how much
17  diminution in value has occurred with respect
18  to Katrina as opposed to all of that flooding
19  that may have happened in the past and the
20  discounted notion of normal flooding occurring
21  in the future.
22      Q.  What's normal flooding?
23      A.  Well, you have anticipatable events.
24  I just mentioned the earthquake study out of
25  California.  Markets are pretty good at

Page 207

1  anticipating the fact that they're going to
2  have some problems.  New Orleans has,
3  throughout its history, had storms that have
4  come through, and so property values here
5  discounted normal events.  Katrina and the
6  follow-up flooding is not a normal event and
7  not discounted in real estate prices;
8  therefore, our study will be able to isolate
9  specifically what impact this Katrina-related
10  flooding has had on property values as opposed
11  to any of the other flooding that's happened in
12  the past several centuries.
13      Q.  You say in Paragraph 20, in your last
14  sentence, these effects can also be measured by
15  the same methods in areas not affected by
16  flooding and, thus, unaffected areas can be
17  used as controls for model testing.
18          What do you mean by that?
19      A.  Well, if we want to test a hedonic
20  model -- and all real estate appraisals,
21  whether you're talking about individual
22  appraisals or mass appraisals, are, at the end
23  of the day, some form of hedonic model.  If you
24  want to test that hedonic model, you can take a
25  control areas that's unaffected by the flooding

Page 208

1  and apply that hedonic model to it and get an
2  output which let's you fine tune the model.
3  The term of art in real estate appraisal is
4  called calibrating the model.  That language is
5  contained in the Uniform Standards of
6  Professional Appraisal Practice Standards Rule
7  6.  So we can use a control area to calibrate
8  whatever model is utilized empirically here.
9      Q.  Well, what control area or control --
10  what area would you want to use as your control
11  for model testing for, let's say, Subclass 1 in
12  the levee case?
13      A.  Well, we haven't determined that.
14  That's a part of the empirical investigation to
15  go in and make a determination as to which
16  control areas.  And I would almost certainly
17  say plural areas would provide us with a good
18  model testings or model calibration areas for
19  the various neighborhoods in these subclasses.
20      Q.  You haven't even started to think
21  about that?
22      A.  Yeah, I've started thinking about it.
23      Q.  Well, have you identified any
24  potential areas of interest?
25      A.  No.  Not yet.  When we get to the

Page 209

1  empirics, that's something that we'll want to
2  do some testing.  But those will be empirically
3  determined class areas.  We won't try to ex
4  ante make a determination, we'll want to do
5  some appropriate empirics and make sure that
6  we've, um -- developed an appropriate set of
7  control areas.
8      Q.  So I guess would I be correct in
9  assuming that you haven't considered any areas
10  for model testing with respect to any of the
11  subclasses in either the levee case or the MRGO
12  case?
13      A.  Well, we haven't begun the empirics to
14  determine those.  That doesn't mean we haven't
15  started considering it.
16      Q.  Well, what areas have you considered?
17      A.  Well, we would consider any area that
18  hasn't flooded. we consider any area --
19      Q.  Give me an example.
20      A.  Well, we might even go to the other
21  side of the lake --
22      Q.  Where?
23      A.  -- and work over there.  I mean, I've
24  thought about going out to Metairie.  I've
25  thought about, um -- going, um -- further out.

JOHNS PENDLETON COURT REPORTERS                       800 562-1285

JOHN KILPATRICK (LEVEE VOL I)                                    8/13/2007

Page 210

1   But we've just thought about these areas that
2   we're going to want to empirically test.  And
3   unquestionably that's an appropriate and
4   important part of the empirical testing, but I
5   think we would be getting the cart way before
6   the horse if we try to arbitrarily establish or
7   even begin to identify some potential control
8   areas today without doing the appropriate level
9   of testing.
10      Q.  But what would you be testing for?
11      A.  Well, we would be testing in a
12  pre-Katrina control area for pricing models
13  that resemble what we would have seen prior to
14  Hurricane Katrina.
15      Q.  Seen where?
16      A.  In the affected area versus the
17  unaffected area.
18      Q.  The affected area being entire
19  Subclass 1, for instance, in the levee case?
20      A.  Well, neighborhoods within Subclass 1.
21      Q.  And you don't know how many
22  neighborhoods there are.
23      A.  Well, I think we determined earlier
24  today that that's an empirical determination.
25      Q.  So you'd have to get a test group for

Page 211

1   each and every neighborhood identified in each
2   and every subclass in the levee case and in the
3   MRGO case?
4       A.  Well, I'm certain that within our
5   empirical investigation we will delineate, A,
6   neighborhoods, B, neighborhood characteristics,
7   and C, pricing factors within those
8   neighborhoods affected by those neighborhood
9   characteristics.
10      Q.  Well, let me just -- let's say there's
11  a hundred neighborhoods in Subclasses 1 through
12  5 in New Orleans.  Does that mean you'd have to
13  get a hundred different control groups to
14  correspond with each of those neighborhoods?
15      A.  No.
16      Q.  What does it mean?
17      A.  It means that to the extent those
18  hundred neighborhoods have differences, we will
19  went to identify a sufficient number of control
20  areas in order to be able to accommodate those
21  hundred neighborhoods.  Now you might have a
22  hundred neighborhoods but a lot of them are
23  alike.  You might have twenty kinds of
24  neighborhood characteristics, that is to say
25  twenty sets of characteristics which define a

Page 212

1   neighborhood.  So in fact, many neighborhoods
2   might be alike, they just are different
3   neighborhoods.  And so with that, we might at
4   most need twenty control areas.  Although
5   oftentimes we find that even though two
6   neighborhoods have different pricing
7   characteristics we can capture those in one
8   control area.  So, in fact, the number of
9   control areas might be much smaller than the
10  number of neighborhoods.  You'll never need --
11  or I don't want to say never, but you hardly
12  ever need a number of control areas greater
13  than the number of neighborhoods.  But all in
14  all --
15      Q.  You might need as many control groups
16  as there are neighborhoods, and you might need
17  less, but you're still going to need multiple
18  control groups.
19      A.  Well, sure, but it's an empirically
20  manageable task.  In other words, within the
21  context of a statistically robust pricing
22  model, it's a pretty easy thing to manage.
23  It's certainly a heck of a lot easier to manage
24  this than it would be to manage a hundred and
25  fifty thousand individual appraisals.

Page 213

1       By the way, each of those hundred and
2   fifty thousand individual appraisals would have
3   to draw data from an unaffected area, and so
4   would have to go find identically the same
5   number of control areas that we'll have to find
6   in this mass appraisal model.  So I want to
7   make sure I'm making clear that the use of
8   control areas is not something that's
9   necessitated only by the model we're talking
10  about.  Even if we were to do the hundred and
11  fifty thousand individual appraisals at a cost
12  of sixty million dollars that your line of
13  questioning suggests, we would still need to go
14  find control areas from which to draw
15  comparable data.
16      Q.  What control area did the appraiser
17  who appraised your townhouse use?
18      A.  I think he used unflooded houses, or
19  excuse me, post-repair or unflooded houses in
20  the Lakeview neighborhood.
21      Q.  Was he right to do that?
22      A.  I'm not going to suggest he was wrong.
23  I mean, he managed to do an appraisal which
24  satisfied the bank and the bank reviewers.
25      Q.  Did it satisfy you?

54 (Pages 210 to 213)

JOHN KILPATRICK (LEVEE VOL I)                                    8/13/2007

Page 214

1   A.  Well, yes.  I didn't have a problem
2   with it.  Um -- but the numbers on his
3   appraisal certainly wouldn't disagree very much
4   with the, um -- kind of numbers we would expect
5   to find in a mass appraisal.
6       Q.  In fact, you felt his appraisal was an
7   accurate estimation of the value of your
8   property?
9       A.  Yes.  And indeed, um -- if you want to
10  do that again for 60 million, three years and
11  five hundred appraisers, we can probably do all
12  of those.  I'm not suggesting that an
13  individual appraisal is not inaccurate.  I'm
14  simply suggesting, A, a mass appraisal, that is
15  to say doing all these at the same time, is a
16  far, far superior way, certainly from an
17  efficiency perspective.  B, there's no way I'm
18  going to be able to do a statistical
19  characterization of his appraisal, it just
20  seemed right to me and it seemed right to the
21  bank.  But with respect to a mass appraisal,
22  we're certainly going to be able to
23  statistically characterize that in a way that's
24  consistent with the needs of the Court, and C,
25  if I had a whole bunch of appraisers do a whole

Page 215

1   bunch of things -- appraisals, individual
2   appraisals like were done for my townhouse, I'm
3   going to have a big management problem managing
4   the inherent inconsistencies among the five or
5   six hundred appraisers doing the work.  By
6   doing one big mass appraisal, we get over those
7   inconsistencies.
8       Q.  Is your firm or are you the only firm
9   or person qualified to do a mass appraisal in
10  this case?
11      A.  When you say are we the only persons
12  qualified to do it, you mean here in the United
13  States?
14      Q.  All right.  Let's start with the
15  United States.
16      A.  Well, good point.  I would say nearly
17  any real estate academic would be familiar with
18  hedonic models and large scale valuation
19  models.  If you open nearly any rigorous real
20  estate, um -- journal published by the academic
21  organizations, you will find real estate
22  studies done using hedonic pricing models.
23  They're exceptionally common.  I notice you
24  have Dr. Vandell here with you advising you.
25  I've cited several of his papers.  They're in

Page 216

1   the cardboard box I brought with me today where
2   he's used these types of models for valuation
3   purposes.  So the fact is, you could find a lot
4   of academics to do a study like this and indeed
5   do these studies all the time.
6       Our firm happens to be set up with the
7   research analysts and the computer tools and
8   such to do it on a practical basis.  So I'm
9   sure there are other people qualified here in
10  the United States, but I don't know if all
11  those other people have, um -- the necessary
12  tools and staff in order to be able to do this
13  thing.
14      Q.  Is Dr. Vandell qualified to do it, in
15  your view?
16      A.  I certainly hope so.  His curriculum
17  vitae would suggest he's familiar with this
18  stuff.
19      Q.  What about Mr. Roddewig?
20      A.  Well, you know, I've read a lot of
21  Mr. Roddewig 's work.  He doesn't believe in
22  these things, and so --
23      Q.  Is he qualified?
24      A.  Well, you know, it's like asking if an
25  atheist is qualified to be a priest.  Probably

Page 217

1   not.  You got to start out by being a believer
2   before you can put on the collar and the robe.
3       Q.  I guess it's fair to say that all
4   these persons who are qualified to conduct a
5   mass appraisal might not necessarily agree with
6   you that a mass appraisal is an appropriate
7   thing to do relative to these cases.  Is that a
8   fair statement?
9       A.  You know, good people can have
10  disagreements.  I -- we have academic
11  organizations that get together and present
12  papers and critique those papers, and sometimes
13  those presentations can get -- sometimes they
14  can be very friendly, but sometimes they can be
15  rather contentious.  People can disagree with
16  how one of these gets done and whether or not
17  it ought to be done, um -- but the fact of the
18  matter is, A, I haven't heard a good substitute
19  for it, B, you might be able to nip around the
20  edges and say, well, you shouldn't do it this
21  way, you ought to take way, but at the
22  end of the day you get around to the same
23  probably, you're going to have to do it.  And,
24  um -- so I think that certainly you could find
25  somebody who's going to criticize this.  I

JOHN KILPATRICK (LEVEE VOL I)                          8/13/2007

Page 222

1  Performance of Exterior Insulation Finish
2  Systems, coauthored with Douglas C. Brown and
3  Ronald C. Rogers that appeared in January,
4  1999.  Boy, I think there was everybody.
5       I am looking, but I don't see one
6  more.  So apparently -- and I'll reserve the
7  right to add to this if something has been left
8  off.  Apparently it's just those two.
9       Q.  Do either of those deal with mass
10 appraisal techniques?
11      A.  Um -- no, not really.
12      Q.  Have you ever forwarded any letters to
13 the editor at the Appraisal Journal?
14      A.  Yeah.  I think I have, and I can't
15 remember what about.
16      Q.  Were they published?
17      A.  Yeah.  I think so.  I just can't
18 remember what they were about.
19      Q.  Did you -- sorry.  Go ahead.
20      A.  I apologize.  I recall having sent a
21 letter to the editor of the journal about
22 something that was published, but it was quite
23 a few years ago.
24      Q.  Was it in response to Mr. Wilson 's
25 article?

Page 223

1       A.  No, that one wasn't published.  The
2  one that was published was in response to, I
3  think, an article that had been written by the
4  late William Kenard and Bill Mundy.  It would
5  have been written about 2002 or so.  I think I
6  wrote about that.
7       There was also an article I want to
8  say coauthored with -- or a paper -- a letter,
9  excuse me, coauthored sometime in the last few
10 years, maybe with Grant Austin out of -- he's
11 an appraiser out of Fort Lauderdale.  He and I
12 had done some stuff together.  Um -- I don't
13 keep track of letters to the editor.  So no.
14      Q.  What is contingent valuation?
15      A.  It's one of several survey research
16 methods that have come into acceptance in the
17 appraisal field.  It comes from other fields,
18 but it's been adapted for use by appraisers.
19 There are a few people who criticize it.  I
20 mean, Mr. Roddewig here at the table is
21 probably the leading critic of it.  Um -- but,
22 um -- generally, there probably are more
23 proponents than critics.
24      Q.  What is it?
25      A.  Um -- well --

Page 224

1       Q.  How does it work?
2       A.  -- it's a real estate appraisal
3  technique.  It's a survey, research based
4  statistical technique where you elicit from a
5  statistically valid pool of respondents their,
6  um -- opinions and attitudes toward, um -- some
7  contingency, which may be a property
8  impairment, for example, but you -- it was
9  historically used to value other kinds of
10 contingencies.
11      You use contingent valuation to value,
12 um -- positive amenities.  For instance, home
13 builders who are trying to offer a new
14 subdivision and have a home with some new
15 features in it that aren't offered in this
16 marketplace could use contingent valuation to
17 find out how much a market participant is going
18 to be willing to pay for this exiting new
19 product that the builder is trying to offer.
20      Similarly, quite a few researchers
21 have used contingent valuation in what's called
22 natural resource damage cases.  A lot of that
23 is written about in journals like Land
24 Economics and things like that.
25      Within the appraisal profession, there

Page 225

1  are a lot of appraisers who use contingent
2  valuation.  Outside of the appraisal profession
3  there are a lot of people in urban planning and
4  such who use contingent valuation for their
5  work.
6       Q.  I've seen reference in your report to
7  automated valuation models, hedonic models,
8  regression models.  I didn't see any reference
9  to contingent valuation.
10      Did I miss something?
11      A.  No, I don't think I had anything in
12 there about contingent valuation.
13      Q.  Are you intending to recommend
14 contingent valuation techniques with respect to
15 any model that you might construct for either
16 the MRGO or the levee cases?
17      A.  Well, I intend to recommend some
18 survey research.  I think survey research will
19 be exceptionally valuable in this case to get
20 at the truth of the matter.  That having been
21 said, specifically which survey research
22 methodology we might employ might in fact be an
23 empirically determined matter.
24      Q.  Well, what's the difference between
25 survey research and contingent valuation?

                        57 (Pages 222 to 225)

JOHNS PENDLETON COURT REPORTERS          800 562-1285

JOHN KILPATRICK (LEVEE VOL I)                              8/13/2007

Page 226

1      A.  Well, contingent valuation is just one
2  of a whole host of survey research tools and
3  techniques.  It's a fairly large bag full of
4  tools.  Which one we pull out and use is
5  something that we'll develop when we develop
6  the scope of work of the merits phase.
7      Q.  All right.  So are you or are you not
8  going to recommend the use of contingent
9  valuation on either the MRGO model you want to
10  build or the levee model you want to build?
11      A.  Well, counselor, I may not have been
12  clear about that.
13      Q.  And it may be me.  I'm just dense.
14      A.  No, that's okay.  Let me try to be
15  clearer.
16          Every appraiser, even in an
17  individual, single property appraisal, uses
18  some kind of survey research.  When the
19  appraiser appraised the townhouse that I
20  bought, he used some kind of survey research in
21  order to ascertain what comparable data was
22  selling for and what market participants were
23  viewing in the marketplace.  So every time
24  every appraiser does every appraisal, there is
25  a little bit of survey work into it.  There are

Page 227

1  several different what I'll call systematic and
2  statistically valid methods which come into
3  play when we're looking at a large number of
4  properties; in other words, when we've got a
5  scope of work sufficient to be able to gather a
6  lot of data, we can start utilizing some
7  methodology that has some statistical validity
8  to it.  Contingent valuation is one of those
9  which, as I say, is highly regarded outside of
10  the appraisal profession by people who value
11  real estate.  It's also regarded within the
12  appraisal profession by quite a few appraisers,
13  although there are some appraisers who don't
14  like it.  They tend to be atheists on that
15  subject.
16          There's also conjoint analysis.
17  There's perceived diminution.  These three
18  together are some of the statistically valid
19  survey research techniques.  I think certainly
20  in a case here where you had a market that just
21  froze after the flooding and properties didn't
22  transact, and the market is still in what we
23  might gently call disarray, a statistically
24  valid survey research technique like this would
25  be extraordinarily valuable.  That doesn't mean

Page 228

1  we can't do it without it, that just means it's
2  a tool that we would want to bring into play
3  and would highly recommend that.
4          And so whether we use conjoint or
5  perceived diminution or contingent valuation or
6  something else will be a matter that we'll
7  decide when we put together the scope of work
8  of our merits phase.
9      Q.  Did you use any of those survey
10  research approach titles or terminologies in
11  your report?
12      A.  No.
13      Q.  Why not?
14      A.  Well, whether you choose to use those
15  or some other tools and techniques, the kernel
16  of this problem is explaining to the Court
17  whether a large, statistically valid and
18  reliable appraisal model is preferred over a
19  set of individual happenstance appraisals done
20  by four or five hundred individual appraisers
21  over a period of three years at a cost of tens
22  of millions of dollars.  The individual
23  methodologies from which the appraiser might
24  choose to employ for the mass appraisal model
25  are irrespective of the superiority of the mass

Page 229

1  appraisal model.
2          In other words, um -- it's like
3  getting sick and deciding whether to go to the
4  doctor or not go to the doctor.  If you're sick
5  and you're sick enough that, you know, you're
6  in decline, you need to go to the physician and
7  get yourself taken care of.  I mean, that's the
8  superior course of action.  You know, trying to
9  treat yourself with some aspirin and chicken
10  soup is probably not going to solve your
11  problem.  So that's what we've got here.  You
12  know, we've got a big problem, it needs to be
13  solved in a statistically valid, efficient way.
14  We don't know exactly what diagnosis the
15  physician is going to give us, and we don't
16  know exactly what treatment the physician might
17  apply, but we know that going to the physician
18  is a much, much superior course of action to
19  just staying home and getting worse and worse.
20  Those are our choices here.
21      Q.  So you may or may not use some form of
22  survey research in connection with constructing
23  your model either in the MRGO case or the levee
24  case, you haven't made that determination yet.
25      A.  Well, we're almost certainly going to

58 (Pages 226 to 229)

JOHN KILPATRICK (LEVEE VOL I)                          8/13/2007

Page 230

1   use at least minimal survey research.  As I
2   say, every appraiser in every appraisal uses at
3   least some simplistic survey research.  Exactly
4   how much survey research or what kind of survey
5   research we use is a matter for determination
6   at a later date.
7       Q.  What will that depend on?
8       A.  Well, we haven't even begun talking
9   about the scope of work with our clients, and I
10  think we want to have a more detailed
11  conversation with them about how much scope is
12  needed to get where we've got to go here.
13      Q.  Well, do you have any ideas or
14  recommendations that you're thinking of making?
15      A.  Well, I can think of several ways to
16  pursue this thing.  I mean, you could pursue
17  these damages based on a survey research model,
18  you could pursue it in a lot of non appraisal
19  models.  I mean, I've done when are called
20  input output models which construct valuation
21  component based on pure economic factors, loss
22  of jobs, loss of market rents, loss of the
23  economy, what's been the aggregate impact on
24  the economy of the area?  But if we're strictly
25  talking about a property value diminution case,

Page 231

1   then as I said, I'm certainly going to make
2   that recommendation.
3       Q.  Regardless of what technique you use,
4   whether it be an hedonic modeling or regression
5   analysis or contingent valuation or -- let's
6   see, the automated, um -- something or other.
7   Um -- what's that model going to tell us at the
8   end of the day?
9       A.  It's going to tell us two things:
10  Number one, on a property-by-property basis,
11  within the confines of a statistically valid
12  database, it's going to tell us what these
13  properties were worth prior to this flooding.
14  And again, that's going to be on a
15  property-by-property basis which will be
16  sortable either by subclass areas or in any one
17  of a number of different ways.  If we want to
18  know how much all the houses with two and a
19  half baths in this affected area were worth,
20  we'll be able to tell you that.  If you want to
21  know how much all the two-story houses were
22  worth, we'll be able to tell you that.  So on a
23  property-by-property basis, we'll be able to
24  tell you in a statistically reliable and valid
25  manner how much all these properties were

Page 232

1   worth.  That's point number one.
2       Point number two:  We will be able to
3   tell you what the impaired, that is to say,
4   post-flooding value of these properties was
5   immediately after Katrina, and that's of course
6   after extracting for exogenous effects.  For
7   example, you talking about wind damage.  We
8   can, if called upon by our clients, use
9   appropriate kind of tools and techniques to
10  actually separate out the market, um --
11  valuation component of one damage versus
12  another damage.
13      And then finally, if in fact their
14  modelers are able to tell us the boundaries of
15  water, they say, well, over in this area it was
16  all this water, over in that area it was all
17  that, and over here we have a computer model
18  that tells us it's 60/40 or 75/25 this water
19  versus that water, we can actually total up
20  what these damages are based on whose water
21  came on the property.
22      And so a robust, valid, large scale,
23  statistically reliable computer model that
24  we'll be able to develop using tried and true
25  valuation techniques within the scope of

Page 233

1   appraisal standards will give you all of this
2   information at the end of the day.
3       Q.  So let me see if I understand.  At the
4   end of the day, I'm going to know, for a
5   particular piece of property, Mr. Smith 's
6   piece of property in Subclass 1 of the levee
7   case, what the value of his home, let's say,
8   was on the day before Katrina struck, and what
9   the diminished value of his home would have
10  been on the day after Katrina left; is that
11  right?
12      A.  That's right.  And not only would we
13  be able to do that, but we'll be able to do it
14  probably two years quicker and 90 or 95 percent
15  cheaper then the alternative method being
16  proffered.
17      Q.  Will I be able to know what the amount
18  of repair costs we sustained as a result of
19  Katrina?
20      A.  That will simply be a component of the
21  diminution of value.  The market value will be
22  the standard that we will be seeking here.  And
23  so the market value is the difference in the
24  value before Katrina versus the value after
25  Katrina, and that diminution in value will

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

JOHN KILPATRICK (LEVEE VOL I)                          8/13/2007

Page 234

1    capture both the repair costs as well as any
2    other loss in value suffered by --
3        Q.   How will it do that?
4        A.   Well, it's a diminution in market
5    value.  In other words, we're looking at what
6    the market value of the house was pre-Katrina
7    versus the market value of the house
8    post-Katrina.  And so that difference between
9    the two will definitionally include both any
10   anticipated repair costs immediately after
11   Katrina plus any other what we're calling
12   stigma damages -- what we're labeling as stigma
13   damages which would impact this property value.
14       Q.   How are you going to factor in what
15   somebody has paid to repair his or her house,
16   in terms of your model?
17       A.   Well, that's a cumbersome way to do
18   it, and I'm not going to -- you know, I'm not
19   really sitting here debating that issue, per
20   se, because I'm a real estate appraiser and not
21   a construction manager.  I mean, you might have
22   construction managers that are going to look at
23   these things very differently.  But as a real
24   estate appraiser I'm focused on market value
25   issues.  So market value should include the

Page 235

1    perceived -- the market perceptions of repair
2    costs plus that other stigma issue that we're
3    talking about.  So it's certainly not necessary
4    to get at the heart of market value for us to
5    go out and count every 2x4 and every box of
6    nails and every sheet of plywood bought in the
7    marketplace.  I mean, that would be an
8    extraordinarily cumbersome, expensive, time
9    consuming and probably not even valid way of
10   getting at the truth here.
11       Q.   Well, do you understand that people
12   have claims out there for the costs that
13   they've incurred to repair their homes as a
14   result of whatever damage occurred through
15   Katrina?
16       A.   I understand that.  And here's a way
17   of getting at the heart of that, which is, you
18   know -- and we talked about the townhouse that
19   I have acquired and am going to fix up.  If I
20   chose to bring it back to pre-Katrina state, it
21   would probably cost me about $60,000.  I'm
22   actually going to put about ninety thousand
23   dollars into it.  Now, I don't have a dog in
24   this fight because I didn't own that house
25   prior to Katrina, but the point of it is, if I

Page 236

1    did, would my basis in diminution value be
2    60,000 or 90,000?  Well, it's neither.  It's
3    the market value issue.  It doesn't have
4    anything to do with whether I get top of the
5    line kitchen cabinets and imported appliances
6    and slate floors, or whether I go back to the
7    same old carpet and off-the-rack Lowe's
8    counters that were there before Katrina.  It
9    doesn't have anything to do with that.
10       It has everything to do with the
11   market value issue.  That's what we as
12   appraisers are going to measure.  And in so
13   doing, by the way, we're able to come up with a
14   measure of value which is consistent all the
15   way across the market; in other words, a person
16   on one side of the canal gets treated the same
17   way a person on the other side of the canal
18   gets treated.  They're going to be treated in a
19   manner which is consistent all the way across
20   the board.
21       (Brief recess.)
22   EXAMINATION BY MR. ZWAIN:
23       Q.   I'm curious as to why you apparently
24   believe that the most accurate date to measure
25   a class member's property damage is the day

Page 237

1    after Katrina occurred and not, for instance,
2    on the date this case goes to trial.
3        Could you explain?
4        A.   Well, I think the -- if the issue at
5    hand is determining the impact of flooding on
6    this property, then we would want to pick a
7    date as close as possible to the actual
8    flooding itself.  But if as a matter of Court
9    requirement we're to value as of the opening
10   day of trial or the filing of the lawsuit or
11   what have you, we as appraisers can deal with
12   that and deal with it all the time.
13       Q.   All right.  What would the -- let's
14   assume class member Smith owns a $100,000 home
15   that's valued on the day before Katrina and
16   suffers flooding that requires him to pay what
17   ultimately would be something in the
18   neighborhood of $50,000 to repair it.  On the
19   day after Katrina he obviously would not have
20   paid those costs, but by the time of trial
21   let's assume that he has and that his house has
22   been restored and rebuilt.
23       What if any differences in the
24   appraisal of Mr. Smith's property would we
25   expect to see if the date of damage was

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

JOHN KILPATRICK (LEVEE VOL I)                                    8/13/2007

Page 238

1   measured on the date of trial as opposed to
2   August 30th, 2005?
3       A.  Well, it becomes certainly a lot
4   simpler to measure it as of the date after
5   Katrina, because as I mentioned, we're not
6   getting hung up on an accounting measure here,
7   that is to say I'm not tying to figure out what
8   Mr. Smith paid for his 2x4 or the plywood or
9   what his neighbor across the street paid for
10  his 2x4 and plywood, and maybe Mr. Smith had to
11  hire a contractor but the neighbor across the
12  street put in some sweat equity because he
13  couldn't find a contractor, so Smith had to pay
14  thirty thousand dollars to get something done
15  where the neighbor across the street only paid
16  fifteen thousand dollars but the neighbor
17  across the street had to work on his own every
18  weekend for a year.  You get a whole lot of
19  these kind of nuances in the case.
20       Market value is a much more clean and
21  efficient way of doing it.  It's certainly much
22  more statistically valid if done in a mass
23  appraisal setting.  And also, and this is very
24  important to stress, this diminution in market
25  value will capture both the anticipated fair

Page 239

1   market value of the repair costs plus any
2   additional stigma that might be suffered by
3   these property owners.
4       Q.  Okay.  But all I want -- I don't know
5   that that answers my question.
6       What would be expected the difference
7   in appraised value to be if the damage were
8   measured on the date of the trial, presumably
9   sometime in 2008, 2009, I don't know, 2010, as
10  opposed to day after Katrina?
11      A.  I don't have any expectations going
12  into this.  I mean, I'm trying to approach this
13  entirely as objectively as I can.  And so
14  whether that property would have gone up down
15  or sideways in value is not something that I
16  have any priors about.
17      Q.  It's not something that you have any
18  priors about -- prior conceptions?
19      A.  Opinions, conceptions, biases.  I
20  mean, I don't come into this with any sort of
21  bias about this.  I think that by focusing --
22  and it's my opinion, and obviously if the Court
23  wants to institute a separate date, that's
24  fine, but I still think, A, you get at the
25  heart of the matter by looking at real estate

Page 240

1   market value and, B, you get at the heart of
2   real estate market value by looking at the date
3   of the actual event occurred.
4       And by the way, this market value that
5   I keep going at, this is the standard for all
6   kinds of takings in the state of Louisiana, any
7   other kind of property value diminution case in
8   the state of Louisiana.  If this was a road
9   widening and I was going to expand one of these
10  streets from two lanes to four so I had to take
11  a portion of everybody's front yard and I was
12  going to knock down some of their houses, the
13  Court wouldn't care that you spent fifty
14  thousand for your house and your neighbor spent
15  a hundred thousand for his, the Court is going
16  to require that appraisers measure the
17  diminution in market value associated with that
18  taking.  This is identically the same kind of
19  problem.  The flooding precipitated a taking on
20  these properties -- and I'm not trying to get
21  bogged down in takings law or what have you,
22  I'm just saying that as an appraiser, if
23  requested to analyze this sort of problem, my
24  standard for analyzing it would be the
25  diminution in market value.  It's no different

Page 241

1   here.
2       Q.  Well, takings are measured by how
3   much -- a taking measures how much a
4   property 's market value was worth at the time
5   of the taking, correct?
6       A.  Well, it depends.  I mean, for
7   example, we might have an eminent domain action
8   in which the property is going to be taken as
9   of a specific date.  Now, if the property owner
10  decides to protest and wants to, um -- go to
11  trial on this thing, the date of value is still
12  going to be, as you put it, the date of the
13  taking, the date on which he's going to lose
14  ownership or control of the property, not the
15  date of trial.  And so in many jurisdictions,
16  the taker is allowed to go ahead and acquire
17  the property as of a given date, and then we'll
18  sort out the valuation issues later on when the
19  judge gets some room on his schedule.
20      And so, in fact, that is a perfect
21  analogy to the flooding situation where the
22  flood precipitated a take, we'll go ahead and
23  measure the take as of the date the take
24  occurred, not as of the date we finally got
25  around the adjudicating the value of the take.

JOHN KILPATRICK (LEVEE VOL I)                                    8/13/2007

Page 242

1       Q.  Well, how do you handle some people
2   who didn't flood and who had a spike in values
3   to their homes that occurred shortly after
4   Katrina there were properties in New Orleans
5   that didn't flood and were selling at a
6   premium?
7       A.  Well, first thing first.  My
8   understanding is this case involves flooded
9   property, so that particular property would not
10  be part of the impaired data set.
11      Q.  Uh-huh.
12      A.  So that particular case has no
13  relevance here.  Second, if in fact you have
14  that kind of property value spiking, and to the
15  extent that was anticipated by the market as of
16  the day after Katrina, then that will be
17  captured in the market value estimation.  But
18  remember, that anticipatory factor is -- is
19  predicated upon this house not being flooded,
20  and all the properties in this case are
21  properties that were flooded.
22      Q.  Are you familiar with the tax
23  assessment system in New Orleans?
24      A.  In a cursory manner.  I'm going to
25  become more familiar with it because, a, I just

Page 243

1   got a tax assessment notice in the mail the
2   other day and, B, as part of the empirical
3   analysis in this case we're going to
4   investigate how properties were assessed.  But
5   the actual tax assessments themselves and the
6   manner in which that was conducted is
7   irrelevant to our investigation, because while
8   we're going to be using mass appraisal
9   standards, which are the standards set forth
10  for tax assessors, we're not relying on those
11  tax assessments, per se, for our value.  We're
12  going to, in fact, replicate all of that
13  through the use of an efficient mass appraisal
14  model.
15      Q.  So are you or are you not going to use
16  tax assessment data in order to determine
17  pre-Katrina value?
18      A.  We will investigate that data, it's
19  clear that we're going to want to get some
20  property descriptions, so we're going to take a
21  look at that data and see how accurate it is.
22  I'm not obviating the use of any particular
23  database in mind.  We -- when we were looking
24  at St. Bernard Parish, we found that there was
25  robust data available, but that the tax

Page 244

1   assessment dollar figures themselves were
2   probably not going to be reliable.
3       Q.  What do you understand that the tax
4   assessment system in New Orleans and St.
5   Bernard to be?
6       A.  Well, they all are based on some form
7   of mass appraisal model.  But we also
8   understand that the actual practice of tax
9   assessment in the parishes in Louisiana is --
10  let's be kind and say it purportedly varies in
11  quality from place to place.  And so if we're
12  trying to do a mass appraisal model that spans
13  more than one of these tax assessing districts,
14  then we are certainly going to want to redo
15  that ourselves.
16      Q.  And how are you going to redo it?
17      A.  Well, you use underlying data, that is
18  to say property descriptions, and then go get
19  market data from control areas in order to
20  value the properties themselves.  In other
21  words, we use actual transactional data --
22      Q.  From someplace else.
23      A.  -- from someplace that didn't flood.
24      And, you know, one of the interesting
25  things is, if we set the date as pre-Katrina,

Page 245

1   then property transactions in the very
2   neighborhoods themselves become pre-Katrina
3   control areas.  In short, it becomes highly
4   efficient to use the neighborhoods themselves
5   as control areas by simply reverting to
6   pre-Katrina transactions.  In other words, we
7   go before Katrina, we measure transactions in
8   the very neighborhoods that we're determining,
9   and that gives us the transactional price basis
10  for fleshing out our hedonic model.
11      Q.  Why wouldn't you use the same kind of
12  data in a post-Katrina valuation?
13      A.  Because post-Katrina, these markets
14  slammed shut.  Now, we'll examine transactional
15  prices post-Katrina, but that's going to be in
16  just one or several methodologies that we would
17  propose to use.  But yes, indeed we're going to
18  investigate post-Katrina transactions
19  recognizing the fact that pre-Katrina these
20  flooded markets were highly at disequilibrium.
21      Q.  If you're using the after Katrina as
22  your post-Katrina value date, how are you going
23  evaluate post-Katrina transactions?
24      A.  Well, we'll do that, we're going to
25  look at -- we're going to propose to look at

JOHN KILPATRICK (LEVEE VOL I)                          8/13/2007

Page 246

```
 1   survey research, we can look to the extent that
 2   there are other markets that have been impacted
 3   by similar cataclysmic events, we can take a
 4   look at --
 5       Q.  But I don't understand how you're
 6   going to factor in post-Katrina transactions if
 7   you're using the value date as the day after
 8   Katrina hit, when presumably there would be no
 9   such transaction.
10       A.  Well, the day after, there won't be,
11   but there's certainly going to be transactions
12   within a short period of time afterward.  Now,
13   the question is to what extent are those
14   transactions valid measures of true equilibrium
15   value in this marketplace?
16       Q.  Why wouldn't they be?
17       A.  Well, we're going to have to take a
18   look.  You have a disequilibrium that goes on
19   after a cataclysmic event like this where you
20   have some folks who simply have to sell, they
21   got to take whatever price they can get, you
22   have other people who hold their houses off the
23   market because they have what's called a
24   reservation price phenomenon, that is to say
25   they can't sell because they owe a mortgage and
```

Page 247

```
 1   they can't take fifty thousand dollars for the
 2   house because they owe the bank a hundred.  So
 3   the market tends to freeze up, and those
 4   transactions which do occur tend not be
 5   representative of equilibrium pricing.
 6       Q.  Well, how long would you expect the
 7   market to take to hit equilibrium?
 8       A.  That's a matter for empirical
 9   investigation.
10       Q.  You don't know?
11       A.  Don't know.  But it's certainly
12   ascertainable as to whether or not the market
13   is back to equilibrium yet.
14       Q.  Your investigation may show that the
15   market has hit equilibrium at the point we are
16   now?
17       A.  It may very well.
18       Q.  If I'm understanding your report
19   correctly, the various mass appraisal
20   techniques that you cite are applicable to
21   assessment of residential values.  Is that
22   correct?
23       A.  Well, let's don't limit it to
24   residential, but yes.  Although mass appraisal
25   is used for all kind of property, including
```

Page 248

```
 1   commercial, industrial, farmland, you name it.
 2   If you go into any of the three thousand or
 3   more counties which are taxing jurisdictions in
 4   America, you will find that all manner of
 5   property is appraised using mass appraisal
 6   techniques.
 7       Q.  Well, there was some mention in your
 8   report that mass appraisal techniques, as
 9   applied to commercial properties, are becoming
10   more accepted.  I don't have a particular page
11   or paragraph to cite to you.  It's in there.
12           Do you remember what I'm talking
13   about?
14       A.  I seem to remember making that sort of
15   reference, counselor.  If you will refer me to
16   the precise cite I'll be more than happy to
17   explain what I meant in the context in which I
18   said it.
19       Q.  All right.  I'll do that.
20           Here is it, Paragraph 45.
21       A.  45?
22       Q.  Yes.
23       A.  Thank you.
24       Q.  You say -- your last sentence says, so
25   even in the case of commercial properties, AVM
```

Page 249

```
 1   methods are becoming more accepted and
 2   accurate.
 3           Did I read that correctly?
 4       A.  You did.
 5       Q.  Are AVM methods universally accepted
 6   to appraise commercial properties?
 7       A.  Well, no.  I mean, I've just pointed
 8   out you've got Mr. Roddewig here as a
 9   consultant and he's an atheist on the subject.
10   The so there are people that don't believe in
11   these things.  But if you read the sentence
12   immediately before that, it reads, our firm is
13   currently completing an evaluation study of an
14   AVM product used by lenders as support for
15   commercial property lending decisions.  So the
16   use of AVMs is universally recognized by tax
17   assessors for all of their tax assessment
18   appraisal decisions.  And what those two
19   sentences taken together mean is that the use
20   of AVMs for commercial lending decisions is
21   rapidly catching on in the United States.
22       Q.  But not as accepted as they would be
23   for use in appraising residential values.
24       A.  Well, for lending purposes, um -- we
25   started using AVMs a lot earlier.  And so you
```

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

Page 250

1    see a lot more AVM based lending decisions in
2    residential not because it's more or less
3    accepted but simply because the available,
4    um -- tools and techniques which are all
5    computer and statistical based predate the ones
6    for commercial.  So it's not as if one is more
7    accepted than the other, it is just that we've
8    been doing one more frequently than the other,
9    or longer than the other, shall I say.
10       Q.  Look at Paragraph 36 of your report.
11   Now, the second and third sentence, we
12   recognize that there are problems associated
13   with data in the New Orleans market due to
14   damage from Hurricane Katrina.  Much of the
15   records base depended upon by appraisers was
16   destroyed and has not been yet been restored.
17       What are you referring to?
18       A.  Well, for example, in St. Bernard
19   Parish, when we first went in there after the
20   Murphy Oil spill, we found that there was a
21   problem getting tax assessment data.  We
22   eventually were able to work around that
23   problem and find sources of data.  But there
24   were some data records problems immediately
25   after Katrina.  Fortunately, enough, we're

Page 251

1    sitting here a couple of years afterward and a
2    lot of these databases are in the process of
3    being restored.
4        Q.  All right.  So is there a records
5    based destruction problem with reference to the
6    levee case?
7        A.  Well, we recognize that that may be a
8    problem.  Fortunately enough, in the case of a
9    large scale mass appraisal problem -- or
10   project, excuse me, we'll have access to lots
11   of databases and we'll be able to, in a
12   statistically efficient manner, compare and at
13   times merge these databases into one efficient
14   and reliable database.
15       Q.  I just want to know what your
16   understanding is as to what records in New
17   Orleans were destroyed.
18       A.  My understanding is that some records
19   were destroyed as a result of flooding.  I
20   can't, as I sit here today, tell you precisely
21   which of those were destroyed other than the
22   St. Bernard Parish tax assessment data that I
23   referred to earlier.
24       Q.  Do you know if any New Orleans records
25   were destroyed?

Page 252

1        A.  Um -- again, I can't cite which ones
2    other than my understanding that some were.
3        Q.  And what's that understanding based
4    on?
5        A.  Um -- offhand, I can't give you a
6    citation for that understanding.
7        Q.  In Paragraph 3, among others, you cite
8    Dr. Vandell 's 1991 article.  And for what
9    point are you citing that?
10       A.  Well, just to show the superiority of
11   a statistically valid mass appraisal model over
12   and above ad hoc type adjustments made by
13   appraisers in individual property appraisals.
14   Professor Vandell 's paper, albeit about
15   sixteen years old, provided a nice quote there,
16   quote, bias can enter, unquote, which describes
17   I think very succinctly one of the clear and
18   compelling problems with using individual
19   property appraisals in cases like this.
20       Q.  Paragraph 43, you cite the Flower &
21   Ragas report?
22       A.  Yes.
23       Q.  That model, it's my understanding, was
24   used to assist in allocation of settlement
25   funds that were reached in the Murphy Oil case.

Page 253

1    Is that right?
2        A.  No.  The study that Flower & Ragas did
3    was published thirteen years ago.  Now, um --
4    later on that was applied, but that study that
5    I'm citing here was the one that predated
6    Murphy Oil.
7        Q.  All right.  I think I've run out of
8    questions for today.
9        MR. MEUNIER:
10           Okay.
11           (Recessed for the day.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25