# PLAINTIFFS TRIAL EXHIBIT

# 26

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE: KATRINA CANAL BREACHES      CIVIL ACTION

CONSOLIDATED LITIGATION            NO. 05-4182 K2

                                   JUDGE DUVAL

PERTAINS TO LEVEE AND MRGO         MAG. WILKINSON


(V O L U M E   II)


Deposition of JOHN A. KILPATRICK, PH.D., MRICS, given in both the levees and MRGO cases, at the offices of Bruno & Bruno, 855 Baronne Street, New Orleans, Louisiana 70113, on August 14th, 2007.


REPORTED BY:

JOSEPH A. FAIRBANKS, JR., CCR, RPR

CERTIFIED COURT REPORTER #75005

Page 269

1     A.  Oh, you know, I want to say June or
2  July of this year.  I may be off by a month or
3  so there.
4     Q.  Now, what we've marked as Exhibit 6
5  contains your opinion as to the diminished
6  value of the properties in the vicinity of the
7  Spelter smelter, is that correct?
8     A.  That's correct.
9     Q.  And it explained how you went about
10 finding all that and what your actual
11 conclusion was as to the diminished value
12 correct?
13    A.  That's correct.
14    Q.  One of the things you used in the
15 Spelter smelter case was a contingent value
16 survey, correct?
17    A.  Correct.
18    Q.  And some of the results of that were
19 produced as an appendix to what we've marked as
20 Exhibit 6, correct?
21    A.  Yes.
22    Q.  I want to ask you a little more about
23 testimony yesterday on the diminished value
24 that you're going to attempt to model in the
25 levee case and the MRGO case.  I believe you've

Page 270

1  said that's going to be a percentage of
2  pre-Katrina market value.  Right?
3     A.  Well, it would be my anticipation that
4  that's the way we would express it, yes.
5     Q.  And what I was not quite clear about
6  is what factors are going to be in that
7  percentage?
8     A.  Well, it's not a built-up percentage,
9  per se; in other words, it's not 10 percent for
10 this, plus 20 percent for that, plus 30 percent
11 for this other thing.  But we have a, um-- a
12 very interesting situation here which is
13 somewhat different from the Spelter situation.
14 Um -- in the Spelter situation, we had a market
15 in which knowledge and understanding of the
16 contamination problem was not widespread and
17 incorporated into the pricing phenomenon.  In
18 other words, if you just go into Spelter and
19 attempt to measure property prices at the
20 present time, you're going to get disingenuous
21 results simply because not everybody knows
22 about the contamination, not everyone
23 appreciates the extent or the danger of the
24 contamination.
25     Here in New Orleans, the fact and

Page 271

1  reality of the flooding is not something that's
2  been hidden under a rock.  The people who were
3  property owners at the time of the flood kind
4  of knew about the flood.  And I'm not trying to
5  be silly there, but it certainly wasn't
6  something that we could say was hidden from
7  people.
8     In addition, potential market
9  participants, that is to say anybody who might
10 want to buy into this market, people who might
11 move here in the normal course of a well
12 functioning market equilibrium, certainly at
13 this juncture would have no reason to not be
14 aware of Katrina.  It's one of the most
15 publicized events in the history of the world.
16 As a result of that, we have a post-Katrina
17 market in which we're going to be able to
18 observe pricing phenomenon that are going to
19 tell us something.  Now, they won't tell us
20 everything, because we do know that, um --
21 houses that didn't flood, or properties that
22 weren't damaged in New Orleans, had some
23 spikes, um -- and so in fact, if you go outside
24 of the flood zone, you are indeed going to find
25 a disequilibrium.  But I think we're going to

Page 272

1  have a pricing phenomenon here that's going to
2  tell us a whole lot.  And so um -- that's one
3  of the ways in which our analysis of the
4  diminution in value is going to, here in New
5  Orleans, and specifically in the flooded areas,
6  is going to differ from the analysis we did in
7  Spelter.
8     Q.  Okay.  What I was trying to get at is
9  what the components you think will make up this
10 percentage, stigma or perceived risk of
11 flooding is one.
12    A.  Well --
13    Q.  Is that right?
14    A.  One would, um -- surmise that the
15 market pricing phenomenon here in New Orleans
16 is capturing that stigma.  In other words,
17 there is a diminution in value, a diminution in
18 market value, and a great deal of that is going
19 to be reflected in the transactional market.
20 I'm not suggesting all of it, but certainly a
21 great deal of it is going to be reflected in
22 the transactional market post-Katrina.  So as
23 we go into the flooded area post-Katrina and
24 start measuring, um -- the transactional
25 market, to a certain extent we're going to pick

JOHN A. KILPATRICK (VOL II)                                    8/14/2007

Page 273

1  up transaction prices, pricing differentials
2  that are going to include both the anticipated
3  cost of repair plus the stigma. And so I'm
4  not -- we're not going to go in and try to
5  impute stigma, we are instead going to be able
6  to go and to a certain extent directly measure
7  stigma by the diminution in property prices
8  which will help us formulate an opinion of the
9  diminution in market value.
10     Q.  Um -- so you plan to look at actual
11  post-Katrina sales of property in New Orleans
12  and in St. Bernard and in the class areas to
13  determine diminished value, if any, is that
14  correct?
15     A.  Well, that would be my recommendation
16  to the clients. Now, as of this juncture,
17  um -- I have recommendations rather than plans.
18  But we would certainly recommend that a
19  starting point for our analysis is going to be
20  a widespread, um -- examination of the property
21  pricing phenomenon immediately after Katrina
22  and, in fact, all the way to today.
23     Q.  You told us yesterday you were going
24  to do it -- your recommendation was to do it
25  immediately post-Katrina. Now you're saying

Page 274

1  you're going to look at it all the way up until
2  whenever you get your report done; is that
3  right?
4     A.  No, that's not what I said.
5        MR. MEUNIER:
6           Objection to the form.
7     A.  Our proposed valuation date would be
8  immediately after Katrina. Um -- we can, of
9  course, oblige whatever arbitrary date might be
10  established by the Court. But nonetheless, in
11  order to formulate an opinion of value
12  immediately after Katrina, we would be remiss
13  in not capturing any data which might be
14  available to us during the period from Katrina
15  right up until the day we, um -- put wet ink on
16  a paper.
17     Q.  And let's take your hypothetical
18  hundred thousand dollar piece of property that
19  includes a structure, a home, and the real
20  property pre-Katrina. You've used that
21  example, I believe, here before. Right? And
22  let's say today, and this is a property touched
23  by water in some way, it's worth a hundred and
24  fifty thousand dollars.
25        Does it have a diminished value?

Page 275

1     A.  Well, let me give if an actual
2  example. I mean, that's a hypothetical, but I
3  think reality is probably more explanatory than
4  hypothetical. Yesterday we talked about a
5  townhouse that I bought in order to create an
6  office here in, um -- New Orleans. In the
7  small, um -- enclave of townhouses where I
8  bought this, pre-Katrina these townhouses had
9  been selling in the high three hundred, low
10  four hundred range. So let's take the middle
11  of that and go four hundred. The particular
12  townhouse that I acquired had damage to the
13  first floor as a result of flooding, no damage
14  to the second, and de minimis damage to the
15  roof. I was able to acquire that townhouse,
16  um -- roughly, almost two years after Katrina,
17  at a price of about a hundred and fifty
18  thousand dollars. I'm not sure of the exact
19  number.
20        If prices in New Orleans had been
21  going up at pre-Katrina rates, and I'm just
22  going to pick an almost arbitrary percentage of
23  5 percent a year, it may have been a little
24  less than that, it may have been a lil little
25  more, but let's say that, that four hundred

Page 276

1  thousand dollar townhouse should have been
2  worth about four hundred and forty, four
3  hundred and fifty thousand dollars. So I
4  picked it up for a hundred and fifty thousand
5  dollars, or a diminution in value of roughly
6  two-thirds of its otherwise unimpaired value.
7  Now, that diminution in value was a sum of the
8  anticipated repair cost, which as I testified
9  yesterday would be somewhere between sixty and
10  ninety thousand dollars, and the stigma damage,
11  that is to say the loss in value from it being
12  in a neighborhood which was subjected to the
13  flooding that is at the heart of this case. So
14  there, we've got one example of absolute actual
15  diminution in value of a property in the flood
16  area that withstood about an 8-foot floodwater
17  into the ground floor, um -- and is repairable
18  and has a, um -- an anticipated repair cost.
19  Um -- that's the sort of market data that we
20  want to gather on a class-wide basis and
21  present to the Court as a part of our opinion.
22     Q.  So am I to understand you are not
23  going to recommended that there be a contingent
24  value survey done to determine stigma or
25  diminished value in these two cases?

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

Page 297

1  this would be an useful criticism for us to
2  incorporate in our work.  Um -- that having
3  been said, um -- it's not applicable to what
4  I'm proposing to do here.
5      Q.   And he gives the example that comes
6  out of contingent value surveying where they
7  found that some people valued two hundred
8  thousand oily ducks, from contamination, I
9  assume, the same as two thousand oily ducks.
10 Correct?
11     A.   Well, I understand the question,
12 counselor, but given the fact that I haven't
13 been asked to value any oily ducks in this
14 case, I'm not sure if I understand what it
15 means to me here.
16     Q.   And by the way, in the Spelter smelter
17 case, you were dealing with contamination.
18     A.   We didn't have any oily ducks there
19 either.
20     Q.   But you had contamination.
21     A.   That's correct.
22     Q.   And in the Murphy Oil case, you had
23 contamination of from oil.
24     A.   We had oil but no ducks.
25     Q.   All right.  And in this case, meaning

Page 298

1  the MRGO and levee cases, there's no
2  contamination for which you're going to try to
3  determine a diminished value, is that correct?
4      A.   At this juncture, I haven't been asked
5  about contamination, I've been asked about
6  impairment from the flood, that's correct.
7      Q.   And the impairment from the flood I'm
8  a little curious about, and maybe your own
9  experience with buying the townhouse could shed
10 some light on it.
11         Did you have a fear of future flooding
12 when you bought that townhouse?
13     A.   Well, I'm always hesitant to use the
14 word fear.  Not that I'm a fearless sort of
15 guy, but I have an excellent insurance company
16 to help me allay those fears.  And so by buying
17 what I consider to be a, um -- a rock solid
18 insurance policy, I expect, and I have every
19 reason to expect that, um -- if the, um --
20 townhouse again floods as a result of, um --
21 let's say a breach in the levee, I will be,
22 um -- sipping a cup of coffee and watching it
23 from three thousand miles away.
24     Q.   And that's the same kind of
25 determination some other buyers, or probably

Page 299

1  most buyers, in the Greater New Orleans area
2  are going to make now, tomorrow, next month, a
3  year from now, when they buy a home.?
4          MR. BECNEL:
5              Objection.
6          MR. MEUNIER:
7              Objection to form.  Calls for
8          speculation.
9      A.   Well, A, it is speculative, and that
10 indeed would be hypothetical, and we're not
11 trying to measure anything hypothetical here.
12 But B, everybody with what I would consider to
13 be an ironclad insurance policy, I still paid a
14 two-thirds diminished price for this townhouse.
15 See, even with the advantages that I have of
16 being able to afford and acquire excellent
17 insurance, I'm still not willing to pay full
18 pre-Katrina market value for this townhouse
19 that I bought.
20     Q.   In other words, if it had been three
21 hundred thousand dollars, you wouldn't have
22 bought it.
23     A.   That's correct.
24     Q.   Have you seen the Home Depot out there
25 on Veterans Highway?

Page 300

1      A.   Seen it, been to it, spent about an
2  hour there.
3      Q.   And I think you mentioned the Lowe's,
4  it's also out there on Veterans highway.
5  Right?
6      A.   I believe so, yes.
7      Q.   And you mentioned yesterday that you
8  had had some contact or talked to some people
9  at Lowe's.  I was assuming that's the one you
10 were talking about.
11     A.   Yes.
12     Q.   Pretty robust business at both places?
13     A.   I asked them about that.  In fact, I
14 sat down with one of the managers while I was
15 there and asked them if they were getting more
16 business since Katrina than they got before
17 Katrina.  And they said, no, they had a
18 significant diminution in business post-Katrina
19 than they had pre-Katrina.  I was actually
20 surprised, because I went in there on a
21 Saturday back in I think April, and, um -- it
22 seemed to be quit crowded.  So I had the same
23 sort of, um -- innocent reaction that your
24 question implies, which is, wow, post-Katrina
25 these people are selling a lot of stuff.  So I

12  (Pages 297 to 300)

JOHN A. KILPATRICK (VOL II)                              8/14/2007

Page 301

```
 1    sat down and asked one of the managers, I said,
 2    did you work here pre-Katrina?
 3         Yes.  She said she did.
 4         And I said, now, did you have more
 5    business pre-Katrina or less business?
 6         She said, no, this is a significant
 7    diminution in business from what we had
 8    pre-Katrina, it would have been much busier
 9    prior to Hurricane Katrina.
10       Q.  What was her name?
11       A.  I can't remember.
12       Q.  How old was she?
13       A.  Um -- I'd say in her thirties.
14       Q.  And what color hair did she have?
15       A.  Blonde.  That sort of thing I
16    remember.
17       Q.  And she was the manager of that Home
18    Depot?
19       A.  No, she was one of the managers.
20       Q.  She was managing an aisle way or two
21    of tools or something?
22       A.  A department.
23       Q.  And you understand that she knew what
24    the financials were for that whole store for a
25    period of months?
```

Page 302

```
 1       A.  Oh, I'll bet you got to go way up the
 2    beltway, um -- in the, um -- hierarchy of Home
 3    Depot to know that.  But, um -- I found, in my,
 4    um -- work that often people on the street can
 5    give you pretty good indications of things
 6    that, um -- the accountants three thousand
 7    miles away can't give you.  So I believe that,
 8    um -- her reaction, by itself, would not be,
 9    um -- an indication of the change in the
10    economy in the Greater New Orleans area, but if
11    her reaction is indicative of, um -- a
12    collection of reactions, then I think we might
13    have something there.
14       Q.  And let me ask you, if there are
15    businesses, Home Depot, or sheetrockers or
16    people that demolish homes or painters or
17    contractors whose business, like yours, has
18    improved because of Katrina, will they owe the
19    defendants money at the end of the day?
20       A.  Well, that's an interesting question.
21    And first, I hesitate to say that my business
22    has improved.  My business has gone up, um --
23    but, you know, I deal in people who have -- in
24    situations where people have awful things
25    happen to them; people have contaminated homes,
```

Page 303

```
 1    where people have flooded homes, people have
 2    disasters hit them.  And so I'm hesitant to use
 3    the word improved to describe that.  Um -- so
 4    the question is, do I owe your clients some
 5    money because I have increased business here in
 6    the state of Louisiana?  We had a lot of
 7    business here in the state of Louisiana before
 8    Katrina.  I'm just sorry to say that the good
 9    citizens of this city need my help because they
10    got hit by this disaster.
11       Q.  And, but businesses whose business has
12    improved -- and you'll agree that there are
13    those kinds of businesses in New Orleans whose
14    business has improved since Katrina, right?
15       A.  Um -- I'm going to be hesitant to say
16    yes to that.  I mean, there are certain
17    businesses here in New Orleans who potentially
18    are doing, um -- better, but I haven't measured
19    any of those.  I haven't attempted to ascertain
20    any of those.
21         Hypothetically?  That might be right,
22    but again, I don't deal in hypotheticals here.
23    We're trying to deal in reality.
24       Q.  And let's say -- and this percentage
25    that you could come up with for diminished
```

Page 304

```
 1    value as we sit here today, that's hypothetical
 2    because it hasn't happened yet, right?
 3       A.  No.  No.  I'm not going to come up
 4    with a hypothetical value here.  I think we've
 5    got reality that we could measure in the
 6    marketplace in the affected flooded areas.  So
 7    I'm -- I really take offense at the use of the
 8    word hypothetical.  Um -- I've answered this
 9    several times, counselor.  I'm not measuring
10    hypothetical values in this flooded area.
11    We're going in there to measure reality in the
12    flooded area.
13       Q.  And with respect to businesses that
14    have improved, they wouldn't be entitled to a
15    diminished value; is that correct?
16         MR. MEUNIER:
17             Well, wait.  Hold on.  Are you
18         asking a legal question, now?  Because
19         if you are calling on the witness to
20         expound on a legal right or duty or
21         breach of a duty or right to
22         compensation, then I think the
23         question is improper.
24         MR. MARPLE:
25             Objection to the speaking
```

JOHN A. KILPATRICK (VOL II)                              8/14/2007

Page 305

1        objection.
2    EXAMINATION BY MR. MARPLE:
3        Q.  You can answer.
4        A.  Well, again, I don't have an opinion
5    about that one way or the other.  I, um -- I'm
6    a real estate appraiser, not a lawyer.
7        Q.  The hypothetical situation we've been
8    talking about a time or two, is a property
9    that's a residence that's worth a hundred
10   thousand dollars pre-Katrina.  Can we assume
11   that for just a moment?
12       A.  We can assume a hundred thousand
13   dollar, um -- let's call it a typical
14   residence, sure.
15       Q.  Okay.  And let's say that that owner
16   spends seventy-five thousand dollars to restore
17   that house to its pre-Katrina state, neither
18   improving it or not as good, but to the same
19   state that it was in pre-Katrina.  Will you
20   accept that?
21       A.  As a, um -- as a hypothetical,
22   strictly for purposes of answering your
23   question, but having no relationship whatsoever
24   to the analysis I'm intending to do here, of
25   course.

Page 306

1        Q.  All right.  And let's say your -- at
2    the end of the day, your percentage of
3    diminished value post-Katrina is 50 percent.
4        A.  Well, um -- again, for purposes purely
5    of illustrating a, um -- a question which has
6    no bearing on the analysis we're going to do,
7    sure.
8        Q.  All right.  And so that house's
9    post-Katrina value is fifty thousand dollars --
10   or it's been impaired fifty thousand dollars is
11   a better way to put it, under our hypothetical.
12   Correct?
13       A.  Correct.
14       Q.  And the owner has seventy-five
15   thousand dollars in cost to get it back to its
16   pre-Katrina state, correct?
17       A.  Correct.
18       Q.  And so as I understand what -- under
19   your proposed model, the owner is just going
20   to have to eat that twenty-five thousand
21   dollars that they spent in cost beyond the
22   diminished value.  Is that right?
23       A.  No.  No.  Again, you've crossed the
24   line back over into -- and I don't want to call
25   it my model, but it's certainly the universally

Page 307

1    accepted model for constructing a hedonic
2    pricing evaluation of a large scale area.  It's
3    not the John Kilpatrick model, it's the mass
4    appraisal model.  But that model would, um --
5    pick up the, um -- change in market value,
6    um -- and, um -- generally speaking, as a
7    generality, that change in market value would
8    include the sum of the anticipated repair
9    costs, plus the additional stigma over and
10   above that which diminishes market value.  So
11   if you've got a pre-Katrina house of a hundred
12   thousand dollars pre-Katrina value, and it's
13   anticipated that it's going to cost
14   seventy-five thousand in order to restore that
15   damaged house back up to its original
16   condition, then we would, um -- anticipate
17   finding a market value of that house far below
18   twenty-five thousand dollars.
19           Now, that's our anticipation, but
20   we'll let the market speak for itself.  And,
21   um -- in the few instances of data that I've
22   gathered thus far have told me that the market
23   will probably price that pretty well.
24       Q.  Even though yesterday you gave us the
25   example of the person that put sweat equity in

Page 308

1    and may have gotten repairs done for fifteen
2    thousand and the other person spent thirty
3    thousand, even though the cost of repair varied
4    from property to property --
5        A.  Right.
6        Q.  -- you can take that into account and
7    compensate the class members on a mass
8    appraisal basis without them having to come in
9    with receipts and prove up their actual cost of
10   restoration, right?
11       A.  Generally speaking, we would
12   anticipate, and certainly there's a lot of
13   literature out there to support this, that the
14   diminution of market value will capture both
15   the anticipated repairs costs as well as the,
16   um -- additional diminution in value associated
17   with stigma.
18           Case in point:  Some people put in
19   some sweat equity and had to put in some sweat
20   equity because they either didn't have the cash
21   to, um -- pay or they didn't have a job and
22   they had some spare time, or they, um -- simply
23   couldn't find anybody to do repairs.  Um -- you
24   can have wildly differential actual
25   out-of-pocket costs of repair that might vary

JOHNS PENDLETON COURT REPORTERS              800 562-1285

Page 341

1  house a couple of months ago at a two-thirds
2  discount from the approximate otherwise
3  unimpaired value. So I think mere restoration
4  of services has not totally alleviated the
5  potential for stigma damages. Nonetheless, our
6  model will pick that up.
7       Q. Have you conducted an individual
8  appraisal of residential property in the last
9  four years using a Fannie Mae Form 1004?
10      A. Yeah.
11      Q. And when did you do that?
12      A. I can't remember. I know I've done
13 quite a few in the last four years. I just
14 can't remember exactly when or where. I would
15 guess it been a couple of dozen.
16      Q. And were those for lenders?
17      A. Um -- I doubt it very strongly. Um --
18 I would say these were probably either for
19 investment or litigation purposes.
20      Q. Let me show you what we've marked as
21 Kilpatrick Deposition Exhibit 12. Do you
22 recognize that as a Fannie Mae Form 1004?
23          (Kilpatrick Exhibit 12 was marked for
24 identification and is attached hereto.)
25      A. I do. I have the software in my

Page 342

1  office to print these out. It's like a canned
2  software package, and there are different
3  providers who, um -- have a contract with
4  Fannie Mae and Freddie Mac to be able to print
5  this form out. We use a firm called "a la
6  mode" software in our office, and I can get a
7  key and fill in all these blanks and do it
8  right from my laptop in my office.
9       Q. And so am I to understand you can, if
10 you want to, you, meaning Mr. Kilpatrick, can
11 fill out a lot of the information that is asked
12 for, or for which there are blanks to fill in,
13 from your desk?
14      A. Well, um -- after appropriate field
15 research, you can. I mean, um -- the starting
16 point for filling this form out is to go out in
17 the field and do field research. On an
18 individual property-by-property basis, it
19 eventually gets pretty expensive if we're going
20 to do a whole bunch of them. That's why this
21 is an appropriate form to use if you just want
22 to appraise one house. But if you want to
23 appraise a hundred and fifty thousand houses,
24 or even a hundred or a couple of hundred or a
25 thousand, a mass appraisal model consistent

Page 343

1  with Appraisal Standards Rule 6 is the accepted
2  and appropriate method for doing that.
3       Q. The Universal Residential Appraisal
4  Report, Fannie Mae Form 1004, is the maybe even
5  required but certainly the accepted individual
6  appraisal report form that's used by most
7  lenders when they're doing individual
8  appraisals of residential property, correct?
9       A. On an individual basis. But including
10 the addendum, this report here is fifteen pages
11 long. No, if I was going to produce this
12 fifteen-page report on a hundred and fifty
13 thousand properties, that would be a document
14 two million two hundred and fifty thousand
15 pages long. It would certainly be much more
16 efficient for the Court if I were to do this in
17 a computerized database and a simple mass
18 appraisal report summarizing all of that rather
19 than burdening the Court with reading two
20 million two hundred and fifty thousand pages of
21 individual appraisals.
22      Q. With respect to any work you're doing,
23 I take it you're not going to do any modeling
24 or anything for any health problems that any of
25 the class members or putative class members may

Page 344

1  have, right?
2       A. No, that's not my field.
3       Q. And that would include you're not
4  going to do any modeling or work on mental
5  distress or emotional distress that any class
6  member may have. Is that right?
7       A. No.
8          MR. MEUNIER:
9             Counsel, just for the record, you
10         meant to associate with the appraisal
11         report those two attachments, the
12         frequently asked questions and the --
13         MR. MARPLE:
14             Oh, sure.
15 EXAMINATION BY MR. MARPLE:
16      Q. You understand, and I think you may
17 have referenced, Mr. Kilpatrick, that there's
18 some explanatory materials attached to that
19 that came from the Fannie Mae website. Is that
20 right?
21      A. That's correct. What's missing from
22 here are, um -- forms for photographs of the
23 property, sketches of the property. If in fact
24 this was required by a lender, I wouldn't send
25 the lender these frequently asked questions,

JOHN A. KILPATRICK (VOL II)                                    8/14/2007

Page 345

1    but I would send the lender various addenda and
2    appendices which would include the text of,
3    um -- any, um -- limiting conditions or
4    assumptions or hypothetical conditions, plus
5    photographs and maps of the property itself as
6    well as the comparables. So when I said that
7    this document would go up to about fifteen
8    pages, that's the typical length of a Fannie
9    Mae or Freddie Mac Uniform Residential
10   Appraisal Report submitted, um -- for, um --
11   Fannie Mae underwriting.
12       Q.  And you told us you've done several of
13   these in the last four years, and I apologize
14   if you already answered, but were they done in
15   connection with litigation reports?
16       A.  Probably. They may have also been
17   done for investment purposes. Or I think in
18   one case we had a, um -- we do a fair amount of
19   investment consultation, things like that. And
20   I think we were aiding a, um -- an estate in,
21   um -- disposing of a single-family residence
22   that had a value in the eight to ten million
23   dollar range. So we started out by doing an
24   appraisal, and I think we used a URAR form for
25   that, and then we followed up with a

Page 346

1    consultation project on the estate disposition.
2    In short, we do those for a lot of things. I
3    cannot recall a circumstances in which we did
4    one for financing purposes.
5        Q.  You're familiar with the Appraisal of
6    Real Estate 12th Edition, correct?
7        A.  Yes.
8        Q.  And you cite it in your report as
9    being an authoritative and reliable source on
10   the appraisal of real estate, correct?
11       A.  I mean, to the extent -- to the
12   extent -- it is what it is. I mean, it's,
13   um -- it's exceptionally valuable and used as a
14   textbook for appraisal courses. But let's
15   don't lose site of the fact that it is what it
16   is.
17       Q.  Can I have a copy of your report? I
18   think it might be Exhibit 4.
19       A.  Which report?
20       Q.  Deposition Exhibit 3 or 4.
21       A.  There we go. Here's Deposition
22   Exhibit 3.
23       Q.  In your report, you say that the
24   Appraisal of Real Estate 12th -- and that's the
25   back I have here, right?

Page 347

1        A.  Yes.
2        Q.  -- is universally regarded as the
3    leading authoritative guide on the subject in
4    the world today.
5            Meaning the appraisal of real estate,
6    right?
7        A.  Yes.
8        Q.  Have you done work to determine the
9    number of housing units in New Orleans East, or
10   the New Orleans East subclass of MRGO?
11       A.  No, not yet.
12       Q.  Or in St. Bernard Parish?
13       A.  No, not yet. Well, let my take that
14   back. We did some studies about St. Bernard
15   Parish with respect to the Murphy Oil case. I
16   don't have that number memorized, but as I
17   recall yesterday I cited a database of
18   twenty-eight thousand plus properties which we
19   had gathered in St. Bernard Parish. So I think
20   that is indicative of the research we've done
21   thus far in St. Bernard Parish.
22       Q.  And do you know if that's the totality
23   of the properties, or is that something less
24   than the whole, the twenty-eight thousand?
25       A.  As I sit here today, I can't tell you.

Page 348

1        Q.  And did that include businesses?
2        A.  Again, I can't tell you.
3        Q.  And I assume then you don't know if it
4    included professional offices, retail stores,
5    shopping centers, or any other aspect or type
6    of property. Right?
7        A.  Well, we do know from our studies in
8    St. Bernard Parish that there are some
9    properties that have mixed uses. In other
10   words, you might have somebody who owns a home
11   and runs a chiropractor 's office in the ground
12   floor, or has a, um -- automobile repair shop
13   in the backyard. These are not uncommon mixed
14   uses in some lightly zoned residential
15   neighborhoods.
16       Q.  And with respect to those people who
17   may be a chiropractor or a car repair guy that
18   may have claims for damages from lost business,
19   are you going to model that and opine to the
20   Court as to what those damages are for business
21   losses?
22       A.  We have not been asked to do --
23           MR. MEUNIER:
24               Objection, just on the basis that
25           it's repetitive and was already asked

Page 353

1    Q.  Have you studied the knowledge of
2   flood risk in New Orleans East or St. Bernard
3   Parish or the Lower 9th Ward population prior
4   to Katrina?
5    A.  By studied, I'm not sure exactly what
6   you mean.  We did a series of focus groups -- I
7   talked about this yesterday.  We did a series
8   of, um -- eight focus groups with respect to
9   the Murphy Oil litigation.  We did two each in
10  I think it was Corpus Christi, Wilmington, St.
11  Charles, Missouri, and here in Louisiana, here
12  in New Orleans.  Our two focus groups here in
13  New Orleans, if I recall correctly, one was
14  made up of St. Bernard Parish residents who did
15  not get an oil, um -- contamination, and then
16  St. Bernard Parish residents who did get an oil
17  contamination.  And our objective in these
18  focus groups was to make a determination of the
19  perceptions of risk of a variety of
20  circumstances, flooding being one of them, and
21  to be able to create a separating equilibrium
22  between the flood damage and the subsequent oil
23  damage.  And so I would suggest to you that
24  from an appraisal perspective, that's probably
25  the most extensive study of this kind of

Page 354

1   phenomenon ever done by a real estate
2   appraiser.
3        Is there more to be done?  Sure.  Am I
4   going to do more?  That's certainly going to be
5   my recommendation to the client.
6    Q.  And you produced those focus group
7   results to us in the box yesterday, right?
8    A.  Or on the CDs which are in the box,
9   yes.
10   Q.  And whatever that is that's in there
11  of those focus group results is the most
12  extensive study that's ever been done in the
13  real estate world.
14   A.  Appraisal community.  I would -- I
15  would hold forth that I don't know of one more
16  extensive.  If indeed someone has done a more
17  extensive study of perceptions sessions of risk
18  of flooding in an appraisal context, I would
19  appreciate it if you would send me a copy of
20  that.
21   Q.  Do you know of any others that have
22  been done?
23   A.  I don't know anybody who's done a
24  fraction of what we've done in this case.
25   Q.  I understand.  But just with respect

Page 355

1   to focus groups and flooding and perception of
2   flooding, similar to the one you produced to
3   us, do you know anybody else that's ever done
4   another one of those focus group studies?
5    A.  I don't know if it was focus group
6   studies or not.  FEMA, of course, does
7   extensive studies of, um -- flood risks
8   throughout the United States.  And real estate
9   appraisers are, as a matter of course, familiar
10  with, um -- FEMA flood maps.  Many appraisers
11  have copies of the FEMA flood maps in their
12  offices, they use them as part of real estate
13  appraisal practice.  I've been using FEMA flood
14  maps for over two decades.  So that's probably
15  the largest repository of flood risk
16  information that is used by real estate
17  appraisers.  There may be other studies, and as
18  I say, I would appreciate it, um -- if people
19  bring those to my attention.
20   Q.  All right.  And I'm talking about
21  focus group studies, not FEMA studies, where
22  they actually go out and map elevations and
23  whatever they do to come up with these flood
24  risk areas and ratings.  I am talking about
25  focus groups where some real estate appraiser

Page 356

1   or somebody in the real estate business trying
2   to make an appraisal did something similar to
3   what you did in the Murphy Oil case with those
4   focus groups.
5        Are you aware of anybody else having
6   ever having done that before?
7    A.  No, I'm not.  And just to make matters
8   complete, I also want to point out that the
9   results of those, um -- studies were, um --
10  incorporated into a presentation that was
11  accepted for presentation at the 2007 American
12  Real Estate Society meetings in San Francisco.
13  So not only did we do those focus group
14  studies, but I also made a presentation about
15  those studies before colleagues in the field.
16   Q.  And that means what, the fact that you
17  made a presentation about it?
18   A.  Well, just adds to what we have done
19  in this matter.  And it adds to the fact that I
20  didn't just do this back in Murphy Oil and drop
21  it.  We are continuing to study the results of
22  those focus groups and, in fact, giving very
23  serious consideration to eventually producing a
24  journal article for submission and peer review.
25   Q.  Now, my original question was had you

Page 357

1    done any studies of the knowledge of flood risk
2    by the public in New Orleans East or St.
3    Bernard or the Lower 9th Ward prior to Katrina?
4       A.   Um -- well, the focus groups helped us
5    with that.  In fact, that was part of the
6    questioning in the focus groups, was to elicit
7    from people their anticipation of flood risks
8    as buyers in this market, or for that matter
9    buyers in other hurricane or flood prone
10   communities such as Wilmington, Corpus Christi
11   and St. Charles, Missouri.  We chose those
12   communities for focus groups specifically
13   because people who have bought homes in those
14   communities are aware of the risks -- and I'll
15   call them the normal and natural risks, of,
16   um -- of flooding and/or hurricanes.
17      Q.   All right.  And those focus groups
18   were done after Katrina, right?
19      A.   That's correct.
20      Q.   And did those focus groups which we
21   have here ask questions or determine any
22   knowledge of risk by anybody of these
23   participants of flood risk prior to Katrina?
24      A.   That's exactly what we were asking.
25      Q.   All right.  And then did you ask them,

Page 358

1    okay, now what do you know about it now?
2       A.   Yes.
3       Q.   Is any work you're doing going to
4    include renters?
5       A.   To the extent that rental values
6    impact the market value of homes, we're
7    certainly going to survey rental rates before
8    and after Katrina.  And that may include an
9    actual survey of renters, but it will certainly
10   include a survey of landlords, property
11   managers, brokers, and other market
12   participants to inquire about rental rates
13   before Katrina and rental rates after Katrina.
14      Q.   As it would affect value of the homes,
15   correct?
16      A.   Correct.
17      Q.   Not as determining a percentage or any
18   amount of damage that a renter gets.
19      A.   That's correct.
20      Q.   Okay.  And would a renter have the
21   same amount of intangible stigma, injury, or
22   whatever that is, as a homeowner?
23      A.   Renters are going to have a couple of
24   different layers of damage, but that's not part
25   of this case.  That's not part of what we're

Page 359

1    measuring.  Our focus is on market value of
2    homes themselves.  And so, um -- the varying
3    stigma levels suffered by renters is outside
4    the scope of what I've contemplated or what I'm
5    opining to here.
6       Q.   And are you proposing that there is a
7    model for which you can construct the damage to
8    rental property, property that is owned for
9    rental purposes, whether it be a home or a
10   duplex or an apartment complex?
11      A.   If it's, um -- a residence which is a
12   part of this, um -- study, um -- and it has the
13   potential to be rented and rental rates in that
14   neighborhood can be ascertained, then certainly
15   for the sake of completeness we'll include that
16   as part of our analysis.
17      Q.   And what about an apartment complex,
18   let's say a 100-unit apartment complex, are you
19   going to opine on the diminished value or
20   perhaps increased value of an apartment
21   complex?
22      A.   Well, I haven't, um -- determined yet
23   from my clients whether non residential
24   property is going to be part of the case, but
25   certainly if non residential property, that

Page 360

1    is -- and when I say non residential property,
2    I include apartment complexes because it's
3    income producing, exclusively income producing.
4    So if you have apartments, office buildings,
5    shopping centers, industrial property, vacant
6    land, um -- whatever, even public buildings
7    within a flooded area, all of that is easily
8    ascertainable because all of those have pre and
9    post-Katrina determinable market values.  And
10   so we could, in the same kind of model, model
11   pre and post-Katrina market values of every
12   square inch of the flooded area irrespective of
13   its pre or post-Katrina use.
14           And by the way, that will also take
15   into account properties which have a change in
16   use pre and post-Katrina.
17      Q.   And you could do a refinery?
18      A.   Well, I could, sure.
19      Q.   I mean, is that within the scope of
20   this, the Murphy Oil Refinery; are you going to
21   come up with a diminished value for Murphy Oil
22   Refinery?
23      A.   I have not yet asked whether the
24   actual Murphy Oil Refinery is included in the
25   property list to be appraised.  If it is, we'll

Page 361

```
 1  do it.  If it's not, we won't.
 2      Q.  Do you know approximately the number
 3  of square miles in St. Bernard Parish?
 4      A.  No.  It's probably in my files.  Um --
 5  but I don't know that off the top of my head.
 6      Q.  And do you know what percentage of
 7  whatever the area of St. Bernard Parish is is
 8  water versus land?
 9      A.  No.  And again, that's probably in my
10  files, but I don't have that offhand.
11      Q.  All right.  Do you know the land area
12  of Orleans Parish?
13      A.  No.  Not off the top of my head, but
14  again, that may be in my files.  It's less
15  probable than St. Bernard.
16      Q.  And do you know how many miles of
17  levees there are in St. Bernard Parish and
18  Orleans Parish?
19      A.  Offhand, no.  But again, that may very
20  well be in my files.
21      Q.  Do you have an approximation?  Is it
22  more than a hundred miles of levees?
23      A.  No, I don't have an approximation.
24  Again, I've flown over much of it, I know it to
25  be quite a few miles, but I didn't, um -- I
```

Page 362

```
 1  didn't stop to do a calculation of, um -- how
 2  many miles per hour I was flying and how many
 3  minutes it took me to fly over the levee.
 4      Q.  Would the state of repair or
 5  improvement of levees in a given area of
 6  Orleans Parish or St. Bernard Parish be a
 7  factor in the post-Katrina value of individual
 8  properties?
 9      A.  Well, that's something that we'll
10  elicit with some surveys which I would
11  recommend doing.  And I want to point out that
12  we don't measure dollar or percentage figure
13  with the survey and then put that into the
14  equation.  Or don't need to do that.  We
15  certainly can do it and we did it in the
16  Spelter case which you cited earlier.  But,
17  um -- our use of surveys of people will help us
18  explain why we're observing this, um --
19  phenomenon of a diminution in property value.
20  And if in fact people's reluctance to buy in
21  those flood prone areas now, post-Katrina, is a
22  result of fear or risk associated with their
23  understanding of the maintenance level of the
24  levees, then that will come out.  But we're not
25  going into this presupposing that to be the
```

Page 363

```
 1  truth.
 2      Q.  But that would be something that you
 3  would consider in determining -- under your
 4  model in arriving at a value post-Katrina of
 5  properties, right?
 6      A.  Well, no.  That's something that
 7  market participants would consider.  And so if
 8  in fact market participants are considering
 9  that to be a factor in their purchase
10  decisions, and particularly if that
11  consideration is manifested in the prices
12  people are paying for properties, then that's
13  going to come out in the values that we observe
14  in the marketplace -- or excuse me, the prices
15  we observe in the marketplace and the value
16  opinions we determine from those prices.  So
17  that's not something John Kilpatrick is going
18  to make any, um-- presuppositions about, that
19  is a factor which may or may not be captured in
20  people's pricing decisions, and we of course
21  will test for that.
22      Q.  Did you investigate the state of levee
23  repair up there around that townhouse that you
24  bought before you purchased it?
25      A.  Not specifically.  My wife and I drove
```

Page 364

```
 1  by it and observed it.  Um -- there are some
 2  places where I saw people working on the levee
 3  and there are some places where I saw just bare
 4  metal sticking out of the ground.  But I
 5  didn't, um -- make any, um -- intense, um --
 6  calculations about that because I recognized
 7  the fact that I was paying a price for the
 8  property which already incorporated some risk
 9  of subsequent levee failure.
10      Q.  Did you have any discussions or
11  thought or do any work scratching around on a
12  piece of paper what the potential for increased
13  value was of that townhouse?
14      A.  Well, I think that's pretty obvious,
15  that if in fact values ever get restored back
16  to their pre-Katrina levels I stand to, um --
17  make a few dollars on the townhouse.  On the
18  other hand, if it takes ten or fifteen years,
19  for example, for these prices to get back to
20  where they were pre-Katrina, well, on a time
21  adjusted basis I'm not going to make any money
22  on that townhouse at all.  So there is an
23  investment risk associated with that.  And but,
24  um -- that sword cuts both ways.
25      Q.  And that's the kind of things that an
```

28  (Pages 361 to 364)

1   individual buyer takes into consideration when
2   they buy any piece of residential property,
3   right?
4       A.  Of course.  And that's something that
5   we're going to be able to measure, just like
6   any other appraiser measures those things, by
7   looking at market prices, by doing surveys of
8   market participants, by examining other factors
9   in the market, and concluding an opinion of
10  value.  Either way you cut it, counselor, there
11  are two ways of doing this thing.  You can
12  either do a property-by-property appraisal, and
13  if you do a property-by-property appraisal you
14  incorporate all that stuff.  Or you do mass
15  appraisal, in which case you incorporate all
16  that stuff.  Both alternatives, either
17  property-by-property or a mass appraisal,
18  incorporate identically the same information.
19  The only different between the two is that mass
20  appraisal is so very much more efficient and so
21  very much more statistically reliable and so
22  very much more characterizable in terms of
23  means and standard deviations, as opposed to
24  the extraordinarily expensive mechanism of
25  doing individual house-by-house appraisals.

1       Q.  I'm confused.  Maybe you can help me
2   out a little bit.  I thought you had told us
3   that you were going to recommend that you do
4   the fair market value post-Katrina on
5   August 30th, 2005, the day after the hurricane
6   was here.
7       A.  The day after the flood.  I want to
8   make sure that I differentiate between the
9   hurricane and the flood.  Our -- obviously,
10  we've linked the two of them and we've used the
11  word Katrina in a rather sloppy fashion, but
12  the focus of our attention is going to be pre
13  and post the flood.
14      Q.  All right.  And then you've told us
15  the market was in disequilibrium at that point,
16  so you couldn't use sales as a measure because
17  it was frozen up and there wasn't anything
18  going on as of that time, post-Katrina.  Right?
19      A.  Well, immediately after Katrina, you
20  know, for a short period of time, there were no
21  sales.  Now, we do know that there are sales
22  which have manifested since Katrina in the
23  flooded areas.  To the extent we're able to
24  develop an opinion of value using those, we'll
25  use them.  We're certainly going to gather all

1   of the data about sales post-Katrina that we
2   possibly can and analyze all of that data to
3   find out what truth lies in there.
4       Q.  And if somebody's pre-Katrina value of
5   their property and structure was $100,000, and
6   let's say three months ago they sold it for
7   $200,000, and they had $25,000 in restoration
8   costs, do they get money for diminished value
9   at the end of the day?
10      A.  Well, if we try to do this on a
11  property-by-property basis, you would get,
12  potentially, those aberrations, because indeed
13  you're going to find that in any large number
14  of cases you're going to have people who, um --
15  whose transactions stands out.
16          And let me give you an example that's
17  outside of the realm of property value, but
18  something you might understand.  Let's talk
19  about cigarette smoking for minute.  I think
20  it's kind of universally recognized that
21  cigarette smoking is dangerous for people.  I
22  used the smoke a long time ago, I finally got
23  convinced that it was danger and quit.  That
24  having been said, some people smoke cigarettes
25  and don't die.  You smoke cigarettes, you

1   appear to be alive.
2       Q.  Thank you.
3       A.  You're quite welcome.  Take it as a
4   compliment.
5           Now, having said that, does that
6   diminish the likelihood that cigarettes are
7   going to kill people?  No, it doesn't at all.
8           So the fact is, if you go into a very
9   large study group, you're going to find people
10  who have individual experiences which are
11  called outliers.  And we have outliers in real
12  estate.  You have a property that ought to be
13  worth a hundred thousand dollars, that somebody
14  picks up for zero.  You have a property that
15  ought to be worth a hundred thousand dollars
16  that somebody comes along and pays two hundred
17  for.  Now, these outliers would tend to skew
18  the reality of the situation if we were trying
19  to do property-by-property appraisals.  But by
20  taking in the account all of this data at the
21  same time, all hundred and fifty thousand
22  properties, and creating a statistically valid
23  and reliable data set with respect to all of
24  this, we're able to account for the outliers,
25  explain what they are, and then report the

Page 369

1    measure of central tendency.
2         Now, indeed counselor, if in fact the
3    truth is that $100,000 houses pre-Katrina are
4    selling for $200,000 today, then your clients
5    win.  And this is the only way to get at the
6    truth of that.
7         Q.  Or if we had actual sales data and
8    showed that we can get at it that way, too.
9         A.  Well, that's exactly what I propose to
10   do, counselor.  And in fact, whichever side is
11   right in this case, whether the plaintiffs are
12   right or the defense is right, all I'm
13   proposing to do is to follow the tried and true
14   methodology on a large scale, statistically
15   valid basis to get at the truth.  And so the
16   only thing I'm proposing to do here is study
17   the actual data in the marketplace on a
18   statistically valid and reliable basis in order
19   to get at the truth.  And if the truth falls
20   down on the plaintiffs' side, so be it.  If the
21   truth falls down on the defense side, so be it.
22   But any objection to the analysis I'm proposing
23   is an objection to a statistically valid method
24   of getting at the truth.
25        Q.  Is the market now in equilibrium?

Page 370

1         A.  Don't know.  But that's something that
2    can only be tested in a large scale,
3    statistically valid analytical process.
4         Q.  And it could be or could not be,
5    correct?
6         A.  Well, it could or could not be, but,
7    you know, if I was going to try to perform an
8    individual appraisal, the likes of which you
9    were suggesting with the Fannie Mae form a
10   minute ago, then I'd still have to do a large
11   scale test of this market in order to determine
12   whether sales in the marketplace were
13   equilibrium sales or not.  So in fact even if I
14   wanted to use this one Fannie Mae appraisal
15   form which is Exhibit 12 in order to perform a
16   single appraisal in that marketplace, for it to
17   be in any way, shape or form valid I'd have to
18   start out with some sort of large scale test in
19   order to determine if the comps in the
20   neighborhood were indeed valid comps.
21        Q.  All right.  Market data of actual
22   sales is going to be one of the primary forms
23   of data or sources of data post-Katrina that
24   you're going to use, right?
25        A.  Both pre and post-Katrina.  But yes,

Page 371

1    that's correct.
2         Q.  All right.  But then in addition,
3    you've mentioned different kinds of surveys for
4    different issues to screen for or to provide
5    information to you, right?
6         A.  Consistent with best practices in the
7    appraisal profession, we, um -- would
8    recommended to our clients that we can use
9    survey research in order to help explain the
10   phenomenon that we're observing in the
11   marketplace.
12        Q.  And have you developed any protocol or
13   budget that -- for how many of these surveys
14   that you would conduct?
15        A.  No.  We haven't developed that yet,
16   but certainly as part of the scope of work
17   process in the merits phase we will develop
18   those protocols.
19        Q.  There are sales of residential
20   properties that have taken place in New
21   Orleans, quite a few, now, in 2007 and
22   particularly second half of 2006, correct?
23        A.  Yes.  I think we have already
24   discussed the fact that I bought one of them.
25        Q.  Yeah.  And typically each of those

Page 372

1    residences, if they were sold to -- from one
2    private owner to the other, would have had --
3    the lender would have done an appraisal,
4    something similar to the Form 1004 we have
5    talked about earlier, right?
6         A.  Um -- one would think so.  I have not
7    examined all those transactions, but if in fact
8    the property has been financed with a federally
9    regulated mortgage, then that would be the
10   protocol.
11        Q.  Let me ask you if you're familiar with
12   a book called A Guide to Appraisal Valuation
13   Modeling published by the Appraisal Institute.
14        A.  The name sounds familiar.  Who's the
15   author of it?
16        Q.  The authors are Mark L. Linne and
17   Stephen Cane and George Dell.
18        A.  Yes, I'm familiar with it.  I reviewed
19   it.
20        Q.  You did?
21        A.  Yes.  I was the reviewer on that book.
22        Q.  Is this the one, or one of the ones
23   you told us you did review earlier?
24        A.  It is.
25        Q.  All right.

JOHN A. KILPATRICK (VOL II)                        8/14/2007

Page 421

1       Let me enter an objection,
2   counsel.  Where?  Because there's
3   different programs in Mississippi and
4   Louisiana.
5       MR. MARPLE:
6          Good objection.
7       MR. BECNEL:
8          And Rita and Katrina.
9       MR. MARPLE:
10         I accept that one.
11  EXAMINATION BY MR. MARPLE:
12      Q.  In the Greater New Orleans area, do
13  you have any idea of the order of magnitude of
14  money that's been allocated or that may be paid
15  out in the Road Home program?
16      A.  No.
17      Q.  Lots of it.  Billions.
18      A.  I don't have that number in mind.  I
19  really don't.
20      Q.  Do you know what the maximum amount is
21  you can get under the Road Home program as an
22  individual homeowner?
23      A.  No, I don't.
24      Q.  You wouldn't have any reason to
25  disagree if it's a hundred and fifty thousand

Page 422

1   dollars; right?
2       A.  I have no reason to agree or disagree.
3       Q.  If you're doing a contingent value
4   survey like the one that was done in the West
5   Virginia case, in guidelines of people that are
6   expert in this do they state a preference for
7   whether you do it by telephone or in person?
8       A.  I'm not sure.  Um -- and when I say
9   that, there's a lot of -- there are a lot of
10  peer reviewed, published studies which have
11  been done by telephone.  The Appraisal Journal
12  is replete with contingent value surveys that
13  have been done by telephone.  And indeed in
14  Mr. Roddewig 's article that you brought up a
15  little earlier, he's got citations to four
16  different contingent value studies which he
17  doesn't analyze in this article, but he
18  nonetheless footnotes them, which were
19  telephone based contingent valuation studies.
20          On the other hand, um -- I understand
21  that in some neighborhoods there's a lot of
22  argument for doing face-to-face studies.  Um --
23  that in fact, um -- if you have neighborhoods
24  where telephone, um -- usage is not ubiquitous,
25  or at the other end of the socioeconomic

Page 423

1   spectrum where unlisted phone numbers are
2   ubiquitous, then it may be helpful to do
3   face-to-face studies.
4       Q.  Let me ask, since yesterday have you
5   undertaken to formulate any additional opinions
6   than what were in your report and what you
7   talked about yesterday and today so far?
8       A.  I can't say any additional opinions.
9   Um -- I've had very minor anecdotal additional
10  support for my opinions, but not additional,
11  no.
12      Q.  If this has been asked, I apologize,
13  but do you know what the homestead exemption is
14  in Louisiana?
15      A.  Hasn't been asked, and no, I don't
16  know what it is.  I'm aware that there is one.
17  I just don't have it memorized.
18      Q.  And you're not a hydrologist, right?
19      A.  No.
20      Q.  Not an engineer?
21      A.  No.
22      Q.  Let me ask you about the MAI.  The MAI
23  designation that we talked about yesterday that
24  you've got to do some -- a little bit more work
25  to get is the way I understand your testimony

Page 424

1   by submitting some reports or something that
2   you've already done and you haven't pulled
3   together.  I mean, that's the gist of what
4   understood you to say.
5       A.  Yeah.  I got to take a couple of weeks
6   and pull together some reports, go to some
7   meetings.  When I say a couple of weeks, it's
8   not like a continuous couple of weeks, I have
9   to take a day here and a few days there, and I
10  just haven't put together the time to do it.
11      Q.  And I'm handing you Exhibit 15
12  which -- you recognize what that is?
13          (Kilpatrick Exhibit 15 was marked for
14  identification and is attached hereto.)
15      A.  Yes.  It's a listing of the -- of
16  three designations currently held by what are
17  called designated members of the appraisal
18  institute.
19  EXAMINATION BY MR. MARPLE:
20      Q.  And it lists some things you have to
21  do to get an MAI designation, right?
22      A.  Yes.
23      Q.  And would you tell us which of these
24  you've done?  It's the first -- I mean, maybe
25  there's others, but it says receive a passing

JOHN A. KILPATRICK (VOL II)                                    8/14/2007

Page 425

1    grade on eleven examinations that reflect 380
2    hours of classroom instruction.  Have you
3    completed that?
4        A.  Nailed every one of them.
5        Q.  All right.  And then you got to
6    receive a passing grade on a 4-module, 2-day,
7    comprehensive examination.
8        A.  It was a very relaxing couple of days.
9        Q.  You already know all this stuff,
10   right?
11       A.  I teach this stuff.
12       Q.  And then you've got to do a
13   demonstration report.  Is that the one you
14   haven't done yet?
15       A.  No.  There is an option to do what's
16   called a research report, it's got to be a
17   comprehensive real estate research project, in
18   lieu of a demonstration report.  You have to
19   submit a proposal as if you were responding to
20   a request for proposals from an agency, it's
21   got to go before a committee, got to be
22   approved, and then you have to actually do it.
23   I did a demonstration report on the valuation
24   of real estate investment trusts.  And it was
25   not only accepted, it's the only -- I'm the

Page 426

1    only candidate for an MAI who's ever been able
2    to do that, and my demonstration report -- my
3    research project is being used, I'm told, as
4    the example for how to do one of those by
5    anybody who makes that request.
6        Q.  And is that what you're going to
7    submit there?
8        A.  No, I have already done that  I did
9    that I guess a year or two ago.
10       Q.  All right.  What's left?  I'm not
11   clear what's left for you to do.
12       A.  There's something called an experience
13   log.  You have to justify that you have -- if
14   you'll notice, under this little MAI triangle
15   about two-thirds of the way down the page, it
16   says experience:  Receive credit for 4500 hours
17   of experience, all of which must meet strict
18   criteria.  Well, I've got to fill out a log,
19   and you've got to submit a certain number of
20   reports that you've done on, um -- properties,
21   and then this has to go before a board, and you
22   have to go to a meeting and have a big all-day
23   session about this thing.  And I frankly -- in
24   fact, I've one of my assistants the other day,
25   I said, you know, we need to pull this MAI log

Page 427

1    thing together and get around to it.  She told
2    me, John, it's going to take you two or three
3    days to do that.  And I said, well, ask me
4    again -- remind me when I have two or three
5    spare days.  And I might get to it after I
6    retire.
7        Q.  With respect to any of the proposed
8    class members or the named plaintiffs in MRGO
9    or levee group cases, do you know which of them
10   had flooding prior to Katrina?
11       A.  No, I don't.
12       Q.  Is that something you're going to need
13   to take into consideration when you do any
14   modeling in this case?
15       A.  Well, I think for all of the
16   properties, not just the representative cases,
17   but all 150,000, and I'm using that number
18   loosely, for all of these we're going to want
19   to see how that's reflected in pre-flooding,
20   unimpaired market values.  And so that's
21   something that of course not just for the named
22   plaintiffs but for everybody in this class
23   we'll want to take into account, and hopefully
24   that will be picked up in our unimpaired
25   valuation.

Page 428

1        Q.  And so you're going to have to find
2    data somewhere on what the flooding was in
3    particular neighborhoods pre-Katrina, whether
4    it was from just a heavy rainfall, right?
5        A.  No, that's the brilliance of using
6    market value appraisal methodologies such as
7    we're proposing here, that's going to be
8    reflected in the market value of these homes.
9    And so if we've got homes that have been
10   subjected to flooding before Katrina as a
11   result of other kinds of circumstances, then
12   that's going to be picked up in the pre-Katrina
13   values.
14       Q.  Let me show you what's marked as
15   Exhibit 16.  And I'm sure you'll recognize that
16   as also being attached to your expert report in
17   this case.  Right?
18           (Kilpatrick Exhibit 16 was marked for
19   identification and is attached hereto.)
20       A.  Right.
21   EXAMINATION BY MR. MARPLE:
22       Q.  And that is an article that you wrote
23   somewhat recently, after Katrina, right?
24       A.  Correct.
25       Q.  And one of the things you discuss is,

Page 433

```
 1       A.  Well, again, I think I testified
 2   already that I have not done a, um -- thorough
 3   investigation of that.  I only know what I read
 4   about in the newspaper.  And I recognize the
 5   fact that adjudicating Road Home from an
 6   appraisal perspective turned out to be
 7   horrendously expensive and probably could have
 8   been done considerably cheaper if they had
 9   opted to use a mass appraisal model.
10       Q.  And you don't know whether the Road
11   Home program considered using the mass
12   appraisal approach and decided against it or
13   what their reasons were for doing it the way
14   that they're doing it, right?
15       A.  Well, you know, I don't want to blow
16   my own horn here, but I think we testified
17   yesterday that my firm is one of the few in the
18   country that's really set up to do one of these
19   in this kind of circumstance, and I know they
20   didn't call me.
21       Q.  Are you familiar with Morris Knutsen?
22       A.  Name's familiar, but I don't know how
23   I know that name.
24       Q.  Or Washington Group International?  Do
25   you know what their role would be, if any, in
```

Page 434

```
 1   this litigation?
 2       A.  No.
 3       Q.  You haven't done any work for them, I
 4   take it.
 5       A.  No.
 6       Q.  To the extent that some sort of
 7   diminished value of cultural heritage or
 8   anything like that is involved in this case,
 9   you're not the person that's going to opine on
10   what those factors are or what goes into that,
11   you would only quantify something somebody else
12   did?
13       A.  Well, the quantification is manifested
14   in market values.  The decline in cultural
15   heritage, public services, loss of schools,
16   churches, utilities, services, all those kind
17   of things, are things which contribute to the
18   diminution in market value.  So indeed it gets
19   the cart before the horse to try to talk about
20   cultural services and then use that to opine
21   with respect to property value diminution.  We
22   will observe property value diminution but then
23   use those kind of factors to explain the things
24   that we're seeing.
25       Q.  And I think you've testified there
```

Page 435

```
 1   could be a lot of different factors that would
 2   go into that diminished value.
 3       A.  And by isolating the time period
 4   immediately surrounding the flood, we'll be
 5   able to control for changes in those another
 6   factors exogenous to the problem.
 7       Q.  And you haven't developed a protocol
 8   for how you would allocate these various
 9   factors, whether it's loss of cultural heritage
10   or fear -- perceived fear of future flooding,
11   or anything like that, to determine how you
12   would allocate within whatever the diminished
13   value, if any, is, is that right?
14       A.  At the present, we haven't, although
15   it doesn't seem to be a terribly complicated
16   problem.  Certainly this is one of the benefits
17   of using survey research, it becomes almost
18   trivially simple to, in a statistically valid
19   and comprehensive manner, determine from among
20   various reasons how much one would allocate to
21   A versus B versus C.
22       (Brief recess.)
23   EXAMINATION BY MR. MARPLE:
24       Q.  Mr. Kilpatrick, have you ever seen
25   what we've marked as Exhibit 17 before?
```

Page 436

```
 1       (Kilpatrick Exhibit 17 was marked for
 2   identification and is attached hereto.)
 3       A.  Yeah.  I did.
 4   EXAMINATION BY MR. MARPLE:
 5       Q.  And Mr. Wilson, here, the author, has
 6   criticisms of mass appraisal method, right?
 7       A.  That's correct.
 8       MR. BECNEL:
 9           Counsel, once again this is a
10   copyrighted document.
11       MR. MARPLE:
12           Will you advise him as to fair
13   use?
14       MR. BECNEL:
15           I don't think you can do that.
16       MR. MARPLE:
17           You know, he produced a bunch of
18   this stuff.
19       MR. BECNEL:
20           Yeah, but he isn't a lawyer.
21       MR. MARPLE:
22           Oh, it a different rule for
23   lawyers?
24       MR. BECNEL:
25           Yeah.
```

46 (Pages 433 to 436)

JOHN A. KILPATRICK (VOL II)                                    8/14/2007

Page 457

1      A.  Well, I'm not sure I understand that
2  question, then.
3      Q.  Okay.  Do you have an understanding
4  that the model you are to recommend or advocate
5  for use by the Court is to include an appraisal
6  of individual pieces of real estate owned by
7  individual class members?
8      A.  Well, I understand that, um -- but
9  there's a little bit of a subtle nuance here.
10  I'm not recommending a model to the Court, per
11  se, I'm trying to explain to the court what the
12  appropriate model is.
13      Q.  I understand.
14      A.  It may seem like a subtle difference
15  to you, it's a real difference to me, but that
16  model will of course include an appraisal
17  opinion of value on each and every residence in
18  the affected area -- each and every property in
19  the affected area.  I think we're sticking to
20  residences here, so we'll -- I'll limit that
21  answer to residences.
22      MR. MEUNIER:
23          Perhaps just to clarify, real
24      property diminution, as an element of
25      recovery, is the subject of the Rule

Page 458

1          23 certification request by the
2      plaintiffs.  So I don't want your
3      question to be misunderstood by the
4      witness.
5  EXAMINATION BY MR. ZWAIN:
6      Q.  Well, if I'm understanding what your
7  basic bottom line opinion is going to reflect,
8  and I'm looking at, if you have your report in
9  front of you, Exhibit 3, Paragraph 6, last
10  sentence, I believe that the amount of the
11  damage can be determined on a
12  subclass-by-subclass basis expressed as a
13  percentage loss of pre-Katrina property value.
14          Did I read that correctly?
15      A.  You did.
16      Q.  So if I understand what you're going
17  to do is you are going to seek to appraise each
18  individual class member 's property value loss
19  comparing the post-Katrina value to the
20  pre-Katrina value and state a percentage of
21  what that loss is.
22      A.  Well, it will come out as a dollar
23  figure and as a percentage.  And so I might
24  have Sam and Susan Jones' house at a particular
25  address and I might -- this model, the mass

Page 459

1  appraisal model, which has proven so useful in
2  so many other situations, would determine and
3  allow me the opine that Mr. and Mrs. Jones'
4  house would have been worth a hundred thousand
5  dollars before Katrina, that it's been
6  diminished in value 50 percent, and so
7  immediately after Katrina it has a diminished
8  value of fifty thousand dollars.
9      Q.  Okay.  And that percentage or that
10  dollar figure that will you state for the Jones
11  residence will contain within it the amount of
12  diminution attributable to stigma?  True?
13      A.  As one of its components, yes.
14      Q.  And the amount of diminution
15  attributable to necessary repair costs?
16      A.  Um -- as one of the components, yes.
17      Q.  And the amount of diminution
18  attributable to economic or social disruption.
19      A.  Well, that's part and parcel of
20  stigma.  In other words, the social disruption
21  stigmatizes homes within affected neighborhoods
22  because it diminishes services, culture, the
23  neighborhood, all of those external assets
24  which make up the value of homes.
25      Q.  Okay.  So when you use economic or

Page 460

1  social disruption in your report, that's
2  synonymous with stigma.
3      A.  It's part of stigma.  It's not
4  synonymous with stigma but it's contributory to
5  stigma.
6      Q.  All right.
7      A.  And by the way, I want to be very
8  clear.  We're not going to go exogenously
9  measure stigma and then imply it in the model.
10  The model itself will measure diminution in
11  value, part of which is anticipated repair cost
12  and part of which is the other diminution in
13  value which we're labeling stigma.  Stigma is
14  just a label that we put on that diminution in
15  value which is over and above the anticipated
16  repair cost.
17      Q.  Just so I'm clear, what components
18  comprise stigma in your mind?
19      A.  Well, I don't want to try to offer an
20  all inclusive list here.
21      Q.  Do the best you can.
22      A.  Well, I would suggest to you that
23  stigma will include but certain not be limited
24  to, um -- risk of a recurrence of, um -- the,
25  um -- post-Katrina flood, it will include a

52 (Pages 457 to 460)

Page 461

```
 1   loss of community services such as schools and
 2   shopping and other kinds of services, it will
 3   capture all of those changes in the value of
 4   the neighborhood, um -- from pre Katrina to
 5   post-Katrina which have been stimulated by the
 6   flood, and it will include any other factors
 7   which have influenced the values of these
 8   properties as a result of the flooding.
 9       Q.  All right.  So those components
10   comprise stigma.  And we've talked about repair
11   costs or anticipated repairs cost as making up
12   the percentage figure which will represent
13   diminution of value of a particular class
14   members 's home.
15           Is that all that goes into that
16   percentage?
17       A.  Well, no, I don't want to make that an
18   all-inclusive list.
19       Q.  Then --
20       A.  That's just what hits me on the top of
21   my head right now.
22       Q.  Well, I'm trying to be as
23   all-inclusive as we can possible be right now
24   because I want to come to an understanding as
25   to what that percentage means.
```

Page 462

```
 1       A.  Well, counsel, I've been focused very
 2   narrowly on defining the model for the Court,
 3   which is of course that it's a pre-Katrina
 4   value model versus post-Katrina value model.
 5   And I've attempted to explain to you that
 6   within that model there's going to be
 7   anticipated costs of repair of these
 8   properties, plus an additional component, an
 9   additional diminution in value which we're
10   labeling stigma.  Now, the question you're
11   positing to me is what things make up, why --
12   other than repair costs, why else would
13   properties be diminished in value?  Um -- which
14   is a matter for great study.  And indeed, as
15   part of the, um -- merits phase of this, that's
16   arts of what we're going to study.  Now, we
17   just spent a lot of time today talking about
18   contingent valuation.  One of the reasons I'm
19   going to survey people is to ask them the
20   question, why is this true, why is this
21   diminution in value occurring; in other words,
22   what is it that's causing these properties to
23   be diminished in value?  In short, counselor,
24   as I sit here today I can think of some
25   reasons, but I really want to ask the good
```

Page 463

```
 1   people of New Orleans what those reasons are.
 2   And that will be part of the merits phase of my
 3   investigation.
 4       Q.  So as we sit here today, other than
 5   those categories that might comprise stigma
 6   that you specifically mentioned, you cannot
 7   give us or don't feel comfortable giving us at
 8   this time an estimate of the number of
 9   variables or varieties of influences that might
10   make up stigma damage.
11       A.  Well, just to the contrary,
12   counselor -- and first, it's not that I don't
13   feel comfortable about something.  As you'd
14   probably guess, I'm pretty comfortable
15   answering as many questions as I can as long as
16   they don't run into that gray area of ethical
17   problems.  The issue, however, is that in our
18   empirical investigation of the whys and
19   wherefores of the New Orleans market, we want
20   to let the market speak for itself.  And in
21   fact, part of our merits investigation will be
22   an exploration of why those things are true.
23   So I'm not going to try and presuppose any
24   motivations on the part of market participants
25   here in New Orleans.  Indeed, I think that a
```

Page 464

```
 1   rigorous analysis of this case would require
 2   that we go out and let the citizens of New
 3   Orleans and prospective buyers in New Orleans
 4   tell us what those reasons are.  And what's
 5   what I'm going to investigate.  I'm not going o
 6   put a cap on the number of reasons, I'm not
 7   going to put a cap on what those reasons are,
 8   and I'm not going to try to suggest any reasons
 9   ex ante to this study.
10       Q.  Now, despite the likelihood -- and we
11   used the Smith property as our mythical -- the
12   Smith property as our example.  The likelihood
13   that Mr. and Mrs. Smith 's repair invoices,
14   estimates, what they paid for repair costs,
15   will not be reviewed by you or your team,
16   you're going to make an assessment as to what
17   their anticipated repair costs are anyway, is
18   that right?
19       A.  No, we're going to make an appraisal
20   of what their diminution in market value is.
21   And appraisal principles would tell us that
22   people won't pay more for a house than is
23   dictated by its anticipated cost of repair and
24   its stigma and these other factors --
25       Q.  Okay.  I guess what I'm trying to find
```

JOHN A. KILPATRICK (VOL II)                                    8/14/2007

Page 477

1   region has certainly suffered to varying
2   degrees from the flooding event, but those have
3   been differential in different parts of the
4   market.  For example, yesterday evening my wife
5   and I were looking at home prices on
6   St. Charles Street.  If you go down in the 4000
7   and 5000 blocks of St. Charles Street, you get
8   some very nice homes with some very nice home
9   prices.  That neighborhood doesn't seem to be
10  too negatively affected.  On the other hand,
11  you go out where we just bought a townhouse in
12  Lakeview, and those property prices seem to be
13  quiet severely affected.  Now, all of these
14  properties share in the same New Orleans
15  market, they're all part of the City of New
16  Orleans, they all have the same kind of public
17  services and such and so forth, but these
18  impacts will be felt differentially in
19  neighborhoods that were flooded versus
20  neighborhoods that weren't flooded.  So we have
21  to take all of that into account in a more
22  holistic sense.
23      Q.  Okay.  Referring to the economic
24  effects that you mentioned in Paragraph 9, are
25  you assuming that those effects are permanent

Page 478

1   or transitory?
2       A.  Not assuming anything about them.
3       Q.  Well, in your opinion, are they
4   permanent or transitory?
5       A.  At this juncture, I don't have an
6   opinion about that, but I certainly will be
7   prepared to develop some opinions about that in
8   the merits phase of the model that we're
9   proposing the Court to adopt.
10      Q.  What effect, if any, do or will fully
11  repaired levees by an estimated date of 2010
12  have with regard to stigma damage?
13      A.  I think that's a matter that we need
14  to investigate, and I suspect that some sort
15  of, um -- survey research as I've been
16  rigorously asked about here today will help us
17  reveal the truth of that matter.
18      Q.  All right.  So if I'm understanding
19  you correctly, issues such as whether or not
20  certain economic effects are permanent or
21  transitory or whether an effect by repaired
22  levees, what effect that might have, your model
23  incorporates a certain amount of speculation
24  into the future as to what conditions will
25  affect the properties that you're being asked

Page 479

1   to model a value for, is that correct?
2       A.  Well, I'm hesitant --
3           MR. MEUNIER:
4               Objection to the form of the
5           question.
6       A.  I'm hesitant to accept the word
7   speculative in there.  All property values are
8   anticipatory in nature.  The market value of
9   any property, whether it's residential or
10  income producing to farmland, what have you, is
11  the present value of the future benefits which
12  one anticipates receiving.  In the case of
13  income producing property, it's the present
14  value of future rents discounted at an
15  appropriate discount rate.  In the case of
16  residential property, it's the imputed value of
17  all of the subjective enjoyment and utility one
18  will receive into the future, discounted by a
19  rational market to the present.  So as long as
20  rational expectations hold and markets are
21  reasonably efficient, then people will
22  understand what is known or knowable or at
23  least believed or believable about the future
24  and will discount that to a certain extent to
25  formulate opinions of value.

Page 480

1           So indeed all value is a present value
2   of anticipated future benefits, and some
3   changes in the status of the levees some years
4   down the road will be one of those anticipated
5   future benefits.
6       EXAMINATION BY MR. ZWAIN:
7           Q.  Will it be necessary to the
8   construction of your model to make predictions
9   or speculations about the fluctuation of
10  insurance rates over the next decade or so?
11          A.  No, none whatsoever.  Because as I
12  said, if we live in a world with rational
13  expectations and some reasonable degree of
14  efficiency, those anticipations will already be
15  discounted in market values.
16      Q.  Well, how will market values be
17  affected if insurance rates decline?
18      A.  Um -- if we indeed were able to hold
19  all other things equal, then market values
20  would marginally increase if insurance rates
21  marginally decrease.  But that's if we're able
22  to hold everything else equal.  Indeed we know
23  that nothing happens in a vacuum, and in fact
24  declining insurance rates can in fact happen
25  coincidental with other factors.  So an

57 (Pages 477 to 480)

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

JOHN A. KILPATRICK (VOL II)                          8/14/2007

Page 481

1  anticipated decline in insurance rates would be
2  something that market participants would
3  measure alongside of other anticipated changes.
4          The good news is that an appraisal
5  model such as we're proposing here will capture
6  all of that because, again, as long as markets
7  are acting with rational expectations and
8  there's a reasonable efficiency about the
9  knowledge of those anticipated future insurance
10 changes, then the market will have already
11 discounted those.
12     Q.  What effect will your model have to
13 account for future rises or declines in
14 interest rates?
15     A.  Well, to the extent future rises or
16 declines in interest rates are already captured
17 in market values, then we don't have to make any
18 assumptions about those, market value has
19 already captured the market's expectation of
20 future rises and declines in interest rates.
21     Q.  Have you done any research or
22 published any works in connection with
23 assessing real estate values in places like
24 Homestead, Florida, or Charleston, South
25 Carolina, or other areas that have been damaged

Page 482

1  due to hurricanes such as Hurricanes Hugo and
2  Andrew?
3      A.  I may have with respect to Charleston.
4  I have to go back and look.  Um --
5      Q.  Have you published?
6      A.  I can't recall.  Um -- I may have been
7  cited in some newspaper articles, you know,
8  just interviewed by the newspaper, something
9  like that.  And I usually don't keep track of
10 those things because, I mean, there are a lot
11 of them.
12     Q.  Have you read any in connection with
13 preparing for this case?
14     A.  No.  No.  Not really.  I mean, I lived
15 through Hurricane Hugo down in Charleston, and
16 in fact I got up in the middle of the night and
17 watched the eye pass over my house.  So I'm
18 quite familiar with, um --
19     Q.  You're drawn to hurricane prone areas
20 of the country, are you?
21     A.  No, I lived there.  I'm very familiar
22 with that.  And, um -- so we're very familiar
23 with the lead up and the reaction and the
24 aftermath to Hugo and everything that happened
25 there.

Page 483

1          With respect to Homestead, I visited
2  Homestead shortly after the hurricanes down
3  there, and in fact visited Key West shortly
4  after they had some hurricanes in the last year
5  or year before last, I can't remember.  I,
6  um --
7      Q.  All I want to know is if you reviewed
8  any literature that deals with property values
9  in places like Homestead and Charleston
10 subsequent to their having been hit by
11 hurricanes, such as --
12     A.  Right, and what I'm saying is I've
13 done personal investigations of those.  And
14 there was a de minimis hiccup in Charleston,
15 and property values continued to move upward at
16 an unabated pace, the rate at which they had
17 moved upward prior to Hurricane Hugo.
18         Key West has had some fluctuations in
19 property values before and after the hurricanes
20 hit there a couple of years ago, but I haven't
21 done any intense study of Key West.
22     Q.  All right.  But there's literature out
23 there that would shed some light on all that.
24     A.  That's right.  That's correct.
25     Q.  All right.  Yesterday I asked you

Page 484

1  whether or not you had had an opportunity to
2  read any other expert reports that the
3  plaintiffs group have had generated in this
4  case.  And you said you had not.  I'm just
5  wondering if you took the opportunity last
6  night or this morning to do that.
7      A.  No.
8      Q.  Okay.  How differently, if at all,
9  would you treat two contiguous properties, one
10 that experienced, say, five feet of flooding
11 and the other that experienced, say, two
12 inches?
13     A.  Well, that would mean that one of them
14 sits up on a cliff and the other one sits down
15 in a gully.
16     Q.  Is that what that would mean to you?
17     A.  Yeah.  I don't know if there are very
18 many cliffs and gullies in the affected area.
19 But indeed to the extent the modeling provides
20 us with that kind of differential, that will
21 have to be taken into account.
22     Q.  So you don't think you're going to see
23 that phenomenon very often in either the levee
24 case or the MRGO case where one house suffers
25 substantial flooding and the house right next

                          58  (Pages 481 to 484)

Page 485

1  door to it or within a block of it suffers very
2  little to no flooding?
3      A.  Well, your earlier question was
4  contiguous.  So now you're talking about a
5  block away.  You may very well have that sort
6  of differential a block away.  That's possible.
7  Contiguous I'd find a little bit unlikely.
8  Nonetheless, the model -- any appraisal model,
9  whether we do a mass appraisal or individual
10  appraisals, we're going to take that into
11  account.
12      Q.  How are you going to take it into
13  account?
14      A.  Well, we're going to let the data
15  speak for itself.  It's a diminution in value
16  case.  So we'll value the two houses -- the
17  only difference here is whether we value them
18  all at the same time or we hire every appraiser
19  in the region and spend three years trying to
20  appraise them one at a time and generate two
21  million pages worth of paper.  I mean, we're
22  going to take this into account in either
23  model.
24      Q.  Just tell me how the model takes in
25  into account.  That's all I want to know.

Page 486

1      A.  Well, we're going to measure market
2  values.  We'll have a market value before and
3  the market value after, and the data will speak
4  for itself.  But in the merits phase, either in
5  the two million page model or maybe the hundred
6  page model, we're going to go out and measure
7  the differential market values between the
8  house that was severely flooded versus the
9  house in your first question that's next door
10  that only had two inches of flooding.  We'll
11  have to measure that.  The data will speak for
12  itself and the model will take that into
13  account.
14      Q.  How is the model going to do that?
15  Walk me through it.
16      A.  Well, at this juncture we know what
17  the model is going to look like.  We're going
18  to have to go gather the data to see what
19  market value data in these markets tell us
20  about the value of one house versus the value
21  of another house.  In other words, you're
22  asking me to tell you just what, for example,
23  the sales adjustment grid on a house I haven't
24  appraised yet is going to look like.  I don't
25  know what the adjustments are going to be.  I

Page 487

1  don't know what the exact factors are going to
2  be.  I'm not sure exactly how much stigma this
3  house might be because it sits up on a hill in
4  a neighborhood that was otherwise flooded,
5  versus a house that sits down in a gully in a
6  neighborhood that was otherwise above water --
7  or above the water level.  So indeed, this is
8  something we're going to empirically
9  investigate in the merits phase.  It doesn't
10  have anything to do with which model we choose.
11      Q.  You haven't seen houses in
12  neighborhoods in New Orleans where on one lot
13  the house sits on a slab virtually flush with
14  the ground, and right next door to it is a
15  house raised three or four feet off the ground?
16  You've not seen that?
17      A.  As I sit here thinking about it, sure
18  we've seen that.  And counselor, we're going to
19  appraise that.  It's going to be included in
20  the appraisal.  And exactly what appraisal
21  adjustments we're going to use, as I sit here
22  today, not only would I not know but no
23  appraiser would know that.  We're going to have
24  to go out and investigate in the field the
25  market values and report that to you in an

Page 488

1  appraisal report.  But at this juncture, I
2  haven't done the merits investigation yet.  At
3  this juncture, what I'm testifying to is that
4  these factors, whatever they tend to be, will
5  be more easily ascertainable, more efficiently
6  measured, and more statistically validly
7  reportable in a mass appraisal model than they
8  would be in a grossly inefficient individual
9  house appraisal.  But we're going to measure
10  identically the same thing.  We just haven't
11  measured it yet.
12      Q.  Well, I'd still like you to tell me
13  how you're going to measure for that.  And if
14  you can't tell me, I guess you should tell me
15  you can't tell me.
16      A.  Well, I can tell you, but not today.
17      Q.  When?
18      A.  Well, once we have done our merits
19  investigation.
20      Q.  How long is that going to take?
21      A.  Well, a whole lot less time than it
22  would take if we were trying to do one
23  appraisal at a time.
24      Q.  But I didn't ask you that.
25          How long is it going to take?

Page 489

```
 1      A.  Well, after the certification of this
 2  case, and once we have begun our merits
 3  investigation, um -- certainly a matter of
 4  months.  Not a matter of three years or more
 5  the way individual appraisals would take.  But
 6  it certainly will take a matter of months.
 7      Q.  How many months?
 8      A.  I can't tell you at this juncture.
 9  More than three, probably less than twelve.
10      Q.  Okay.  How many people are you going
11  to have working on it?
12      A.  I haven't tasked that out yet, because
13  working with my client, in a manner properly
14  prescribed by appraisal standards, we will
15  develop a scope of work that's sufficient for
16  the intended use of this appraisal in this
17  case.
18      Q.  How many people with your background
19  will be asked to work on it with you?
20      A.  Well, we have got, oh, I guess about
21  eight people with Ph.D.'s on our payroll either
22  under contract or as full-time employees.  I
23  suspect, as I sit here today, um -- we may have
24  as many as four people with Ph.D.s working on
25  the project.
```

Page 490

```
 1      Q.  And what are their hourly rates?
 2      A.  They vary from three hundred and fifty
 3  dollars -- excuse me, I think I've got one at
 4  two seventy-five, up to my own six hundred.
 5      Q.  All right.  And for purposes of
 6  preparing this model, will you be working on
 7  anything else during the time it takes to
 8  prepare this model?
 9      A.  Yes.  You talking about me personally
10  or my firm?
11      Q.  Both.
12      A.  Well, the firm, as I indicated
13  yesterday under questioning, has at any point
14  in time thirty to fifty projects going on.
15      Q.  Right.  You told us you're very busy.
16  So I'm just wondering how much time you have to
17  devote to this project?
18      A.  Well, I will certainly personally
19  devote a substantial amount of time.
20      Q.  How much time?
21      A.  I at this juncture can't tell you, but
22  I think it's fair to say more than, um -- 10
23  percent of my time.  But certainly less than
24  100 percent of my time.
25      Q.  What about your colleges?
```

Page 491

```
 1      A.  I may very well task a couple of the
 2  Ph.D.s to work on it a quarter to half time,
 3  and more than likely several master degreed
 4  people to work on it, probably one of them
 5  full-time.
 6      Q.  How many master's degreed people?
 7      A.  On my payroll?
 8      Q.  How many will you assign to this
 9  matter?
10      A.  I haven't decided that yet.
11      Q.  Approximately?
12      A.  Well, in total, um -- including
13  contract employees, it wouldn't surprise me if
14  we have four or five people.  Now, they won't
15  all work full time.  We would probably have one
16  Master degreed person or Ph.D.'d person, I
17  hadn't figured that out yet, working as a
18  project coordinator full time on the project
19  for the duration of the project.  Then we
20  would --
21      Q.  At what hourly rate?
22      A.  They vary anywhere from a hundred to a
23  hundred and seventy-five an hour.
24      Q.  Okay.  Will any other types of people
25  be working on this project besides Greenfield
```

Page 492

```
 1  people?
 2      A.  Well, we have other research analysts,
 3  many of whom have bachelor's degrees.  In fact,
 4  I think nearly all of them have bachelor's
 5  degrees.
 6      Q.  And how many of them will be working
 7  on this project?
 8      A.  Probably one or two full-time, and
 9  then we'll put some part-time people on it from
10  time to time as we need them.
11      Q.  And at what rates?
12      A.  They vary in hourly rate from fifty to
13  a hundred dollars an hour.
14      Q.  And will they be working full time on
15  this project or part-time?
16      A.  Probably one or two people working
17  full time and we'll put other people on the
18  project on an as-needed basis.
19      Q.  Anybody else?
20      A.  Um --
21      Q.  At Greenfield.
22      A.  At Greenfield?  Um -- to the extent we
23  need to hire temporary people, and they may
24  usually be billed out at rates of fifty or
25  sixty bucks an hour.  Particularly when we
```

JOHN A. KILPATRICK (VOL II)                                    8/14/2007

Page 501

```
 1        pursue this case.  In fact, this
 2        week --
 3    MR. ZWAIN:
 4        I hear you, Danny.  I hear you.
 5    MR. BECNEL:
 6        -- I will file -- for the record,
 7    I will file seventy thousand lawsuits
 8    this week or next week.  And I'm
 9    putting your clients on notice for
10    policy limits.
11    MR. ZWAIN:
12        I'm a levee district.  I --
13    MR. BECNEL:
14        I know you are.  Whatever
15    policies there are.  Whatever policies
16    you are, I'm putting you on notice for
17    policy limits.  Failing that, take
18    your chances.
19    MR. ZWAIN:
20        Okay.  Well, don't be surprised
21    if I didn't file you back.
22    MR. BECNEL:
23        Well, that's why I got it on the
24    record for you.
25    THE WITNESS:
```

Page 503

```
 1    of time.
 2        Q.  So you're just going to take a
 3    sampling of actual real estate transactions in
 4    various areas of town and compare those samples
 5    to your data as a whole?
 6        A.  That's right.  Counselor, this is a
 7    textbook case of how to use this kind of
 8    situation.  I could not have dreamed up a
 9    better circumstance for using a large scale
10    hedonic mass appraisal model.  There's utterly
11    no other way I'd consider doing this.  And
12    frankly, when it's all over with I'm going to
13    write I book about it.
14        Q.  Me, too.
15    MR. ZWAIN:
16        All right.  I'm done.  Thank you
17    very much.
18    MR. BECNEL:
19        That's it?  Thank you.
20
21
22
23
24
25
```

Page 502

```
 1        And counselor, may I amend what
 2    my earlier testimony of $60 million
 3    was predicated on the notion of a
 4    hundred and fifty thousand properties.
 5    If we have three hundred thousand
 6    properties, the math would suggest
 7    that we're talking about over a
 8    hundred million dollars in appraisal
 9    costs and over four and a half million
10    pages of appraisal reports to deliver
11    to the Judge.
12    EXAMINATION BY MR. ZWAIN:
13        Q.  Okay.  How are you going to test the
14    accuracy of your model?
15        A.  Sampling.
16        Q.  Describe it.
17        A.  We'll go out and sample actual prices.
18    In fact, if we indeed determine that the market
19    is at equilibrium, then the testing will be a
20    tautology.  But in fact we can pretest the
21    model by going into unaffected areas, and that
22    is the say control areas.  And indeed the model
23    itself will use pre-Katrina prices in the
24    affected areas of the control area, so we'll
25    have almost a perfect test case for this ahead
```

Page 504

```
 1        WITNESS' CERTIFICATE
 2
 3        I, JOHN A. KILPATRICK, Ph.D., do
 4    hereby certify that the foregoing testimony was
 5    given by me, and that the transcription of said
 6    testimony, with corrections and/or changes, if
 7    any, is true and correct as given by me on the
 8    aforementioned date.
 9
10    _____   _____
11    DATE SIGNED        JOHN A. KILPATRICK, Ph.D.
12
13    _____  Signed with corrections as noted.
14
15    _____  Signed with no corrections noted.
16
17
18
19
20
21
22
23
24
25    DATE TAKEN: August 14th, 2007
```