PAUL D. KUHLMEIER                                                     9/21/2007

Page 82

1  commingling existed even among overtopping
2  versus IHNC breaches versus rainwater, and
3  then you add --
4      Q.  The other type of commingling which
5  I was referring to in my questioning of you
6  that I think we were talking in different
7  tracks was a type of commingling phenomenon
8  where equilibrium is achieved once the maximum
9  capacity of each sub-compartment is obtained
10 and then you have water flow from one
11 compartment to another to another to another.
12     A.  I'm sorry, I was somehow -- somehow
13 I am missing it. I'm just not following you.
14     Q.  I am not asking you about
15 necessarily the commingling of the water
16 sources in this line of questions. I'm asking
17 you about once you obtained equilibrium, in
18 other words, you fill up these basins, once
19 you fill up the basins, you will have a flow
20 of water from basin to basin; in other words,
21 it's a commute from one basin to another to
22 another to another.
23     A.  Oh, I see what you're trying to
24 say. You know, see, the problem with that is,
25 of course, you don't have to fill up the basin

Page 83

1  before you're having transference. Right?
2  Because it could be going through the Peoples
3  Canal, it could be moving through Florida
4  drain, it could be going through the pipe
5  system. So, I mean, there's transference
6  ongoing among these various sub-basins from
7  the very beginning of the production of the
8  water.
9      Q.  So you have commingling of water
10 sources just as a result of the different
11 types of intrusions entering into east bank,
12 and then you have a situation where
13 equilibrium is obtained and you have
14 transference of water from compartment to
15 compartment to compartment. So when you
16 reach a situation where it's not possible at a
17 given location, a given property --, take a
18 property let say in Gentilly, it's not
19 possible to tell which molecule of water comes
20 from a breach from the 17th Street Canal
21 versus the Industrial Canal.
22     A.  It is not possible to -- I want to
23 make sure I understand your question. Were
24 you talking about at an individual location?
25 We're talking about an individual house now?

Page 84

1      Q.  Yes. Yes.
2      A.  At any given house --
3      Q.  Yes.
4      A.  -- within the Orleans east bank?
5      Q.  I would say at houses where -- Let's
6  take those, as an example, those Delft
7  locations, those eight Delft locations. And
8  you pick a house where you determine that
9  there are multiple water source contributions
10 through the HEC-RAS model. You cannot tell
11 which molecule of water came from 17th Street
12 versus a breach of IHNC or an overtopping, can
13 you?
14     A.  At an individual location, absent
15 knowing specific information about the house,
16 like its elevation, its floor foundation, et
17 cetera, et cetera, you -- I cannot tell you
18 what the precise source mixture will be.
19     Q.  And if we are to now talk about
20 geographical area such as the Delft locations
21 and not talk about specific houses, and you
22 have commingled water sources, you can't
23 separate one molecule of water from another in
24 terms of its origin? In other words, you
25 can't identify the origin of any particular

Page 85

1  molecule of water at -- let's say at a
2  selected physical location.
3      A.  Absent specific information about
4  that location, like I just mentioned, you
5  cannot.
6      Q.  But where there have been multiple
7  water sources that have impacted that location
8  either as a result of source commingling or as
9  a result of transference of water, once
10 equilibrium was obtained you can't identify by
11 water molecule its origin?
12     A.  Well, first of all let's get past
13 this equilibrium. There -- There is -- Until
14 you have reached a point in time where there
15 can be -- you have overwhelmed the drainage
16 system and there is no -- you know, no other
17 conveyance way, you know, equal- -- you're not
18 at an equilibrium. You're continuing to move
19 water from one point A to point B. All
20 right? So I'm sorry, but the way you're
21 crafting your -- these questions, particularly
22 with sense to, you know, characterizing them
23 as equilibrium, you know, you would have to be
24 very specific about the time at which you are
25 talking about.

JOHNS PENDLETON COURT REPORTERS

PAUL D. KUHLMEIER                                                    9/21/2007

---

Page 86

1    Q. Have you attempted to determine when
2  equilibrium was achieved between waters that
3  intruded through IHNC either as a result of
4  overtopping or breaching, and waters that came
5  from the interior canals?
6    A. Well, ultimately equilibrium is
7  achieved at high water.
8    Q. And that happened, did it not?
9    A. On or around September 2nd.
10   Q. And when you had a state of
11 equilibrium, you had waters completely
12 commingled?
13   A. They were commingled, yes, sir. And
14 they were commingled throughout time from the
15 very beginning.
16   Q. Did you ever take a look at the
17 Delft report figure 4.3, which shows the east
18 bank covered in blue (indicating)?
19   A. I am sure I saw it. I've reviewed
20 their document.
21   Q. And does this essentially depict the
22 maximum flood level at the east bank?
23      MR. ZWAIN:
24      Will you identify the page of
25   that report?

---

Page 87

1      MR. REICH:
2      Yes. It's page 31. Figure 4.3.
3      THE WITNESS:
4      Well, like I said, I'm -- my
5   charge was not to look at Orleans
6   east. It was to look at Orleans east
7   bank.
8  EXAMINATION BY MR. REICH:
9    Q. All right.
10   A. So I didn't spend any time on it. I
11 believe you're showing there -- Is that St.
12 Bernard or is that Orleans east bank? It's
13 not Orleans east bank.
14   Q. Did you make the decision only to
15 look at east bank and not to look at any of
16 the other subclasses that were defined in the
17 Plaintiffs' Class Action Complaint?
18   A. I don't know what you mean.
19   Q. Was your assignment just to focus on
20 east bank?
21   A. The Levee District litigation.
22   Q. Yes.
23   A. Yes, that's my -- that's my charge.
24   Q. Okay. Did you do any type of
25 simulations to determine what the effect of

---

Page 88

1  the running of pumps would have been if they
2  had been operative?
3    A. My work, as I think we talked about
4  at the very beginning, was to determine the
5  sources -- contributions of the various
6  sources to the class, proposed class
7  representatives, and compare them to determine
8  whether or not they would be indicative of
9  anyone. And so as a consequence -- for class
10 certification purposes. So as a consequence,
11 I am exclusively interested in what happened.
12 Not what could have happened, might have
13 happened, or didn't happen. And so concisely
14 stated, no.
15   Q. So you didn't try to simulate the
16 work that the Delft modelers did where, for
17 example, they looked at a situation 100
18 percent pumps functioning and no breaches, no
19 overtopping, and just rainfall?
20   A. No.
21   Q. Do you have any criticism about such
22 a simulation to determine what in fact would
23 have happened had there been no overtopping
24 and no breaches of the levees, but the pumps
25 were working?

---

Page 89

1    A. Well, it would seem to me that --
2  I'm sorry.
3    Q. Go ahead.
4    A. It would seem to me that woulda,
5  coulda, shoulda is not at issue in class
6  certification, so --
7    Q. Are you a lawyer?
8    A. No.
9    Q. Are you a judge?
10   A. No.
11   Q. So how do you know what is
12 appropriate or not for class certification
13 purposes?
14   A. Just my personal belief.
15   Q. So it sounds like you must know
16 something about the certification process. I
17 am trying to understand. Did you take any
18 courses in class certification when you went
19 to engineering school?
20   A. No.
21   Q. If the flooding hadn't taken place,
22 of course, the pumps would have been
23 functioning; true?
24   A. I don't know.
25   Q. Was it your understanding that the

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

PAUL D. KUHLMEIER                                          9/21/2007

Page 90

1    12 or so pumping -- What were there, 12
2    pumping stations?
3        A. I would to go back and look at my
4    notes.
5        Q. I think it's around 12 pumping
6    stations, give or take. If pumping stations
7    had been functioning and you had the rainfall
8    that took place and you didn't have levee
9    breaches and overtopping, how much water do
10   you think would have ended up in the east bank
11   area in terms of what the surface profile
12   would be? Would you have had a foot, would
13   you have six inches?
14       A. I didn't make that calculation.
15       Q. Have you seen any information that
16   reflects what the level would have been?
17       A. I believe some of -- something of
18   that sort was performed by IPET reported in
19   the IPET report.
20       Q. Do you think you would have ended up
21   with a foot? Does that sound like a
22   reasonable estimate?
23       A. I don't have an opinion.
24       Q. No opinion?
25       A. No.

Page 91

1        Q. What was your understanding of why
2    the pumps failed?
3        A. My understanding is it varied. Some
4    of them -- Some of them, you know, were
5    overwhelmed and flooded. Some lost power at
6    various times. I would have to look at the
7    operating logs for each of the pump stations
8    to give you the, you know, most accurate
9    response to that.
10       Q. Was one of your jobs in this
11   litigation to rebut the work of the Delft
12   people?
13       A. One of my objectives, as I mentioned
14   at the onset of our discussion today, was to
15   critique the work of the Delft report.
16       Q. So why didn't you try to do a
17   simulation of what would have happened if the
18   pumps were working and no breaches or
19   overtopping had taken place?
20       A. I think again, I mentioned, I told
21   you why, is that my charge was to determine
22   the mixture of sources into Orleans east bank
23   as to what actually occurred. You're talking
24   about hypotheticals that didn't occur. I
25   don't consider them germane to my work at this

Page 92

1    time.
2        Q. So your main charge was to identify
3    the contribution sources which you do in this
4    fashion throughout your report and what those
5    contribution sources would have done with
6    respect to specific property owners. Is that
7    true?
8        A. I looked at the specific proposed
9    class representatives.
10       Q. But you also looked at the influence
11   of the levee breaches and the overtopping, the
12   rainfall, and the pump action on the volume of
13   water that would enter east bank.
14       A. Yes.
15       Q. And you didn't look at that from the
16   standpoint of subclasses? You looked at what
17   the impact would be on that entire east bank
18   area. We went through that this morning;
19   correct?
20       A. I looked at Orleans east bank from
21   sources and the ultimate result of those
22   sources distributed throughout the complex
23   interworkings of Orleans east bank.
24       Q. The bottom line was without the
25   breaches at London Avenue and 17th Street,

Page 93

1    there would not have been any additional water
2    intrusion after the first date of the event,
3    August 29; true?
4        A. The --
5        Q. Is that true?
6        A. The effect of the breaches of London
7    and 17th Street, as I recall, result in the
8    about a one-third increase in the footprint of
9    flood waters to the 28,000 --
10       Q. Objection, non-responsive.
11          MR. REICH:
12             Could you read my question back
13       to him, please?
14          (Requested question read back.)
15          THE WITNESS:
16             Oh, okay. I'm sorry. No.
17   EXAMINATION BY MR. REICH:
18       Q. There would not have been additional
19   water intrusion; correct?
20       A. Yes.
21       Q. After the first day?
22       A. Yes.
23       Q. All right. And as far as water
24   surface elevation goes, without the internal
25   breaches -- by "internal breaches" I'm talking

PAUL D. KUHLMEIER                                                          9/21/2007

Page 98

1    the table that we're looking at.
2        Q.  And did you attempt to determine
3    what the water surface elevation increase to
4    the basin as a whole would be, or did you
5    simply look at compartments in the basin?
6        A.  My work being to look at the inner
7    workings of the Orleans east bank, which is,
8    for the purposes of this report is based on
9    four -- I'm sorry, 20 sub-basins and the
10   distribution throughout all of Orleans east
11   bank that's encompassed by those 20
12   sub-basins.
13       Q.  And Delft looked at eight locations,
14   correct, to evaluate water surface elevation
15   as a function of water flow?
16       A.  Well, they picked -- they published
17   eight locations from which they then depicted
18   the source contributions over time at those
19   eight locations as I recall their figures.
20       Q.  Would it be theoretically possible,
21   just as you have done in figures 43 and figure
22   44, to look at the influence of the breaches
23   and the overtopping on water surface elevation
24   to the basin as a whole?  You looked at
25   volumetric conviction, you looked at flow

Page 99

1    rates to the basin as a whole.  Could you also
2    look at what happens to water surface
3    elevation to the basin as a whole?  Would that
4    be theoretically possible?
5        A.  Absolutely, and it's published.
6    That's what you see in figure 58.
7        Q.  So whether you use one basin to
8    determine impact of rainfall, 17th Street and
9    London breaches, Industrial Canal overtopping
10   and breaches, and rainfall, or whether you use
11   a number of compartments, whether it be 20 or
12   37, is really a question of judgment, is it
13   not?
14       A.  Absolutely not.
15       Q.  Well, somebody made a judgment to
16   look at how volumetric contribution impacts
17   the basin as a whole.  You could have looked
18   at volumetric contribution in each one of
19   those 20 compartments; correct?
20       A.  And I did.
21       Q.  All right.  But you also looked at
22   it in terms of the impact on the basin as a
23   whole; true?
24       A.  I did it.  And I did that, too.
25       Q.  Okay.  And would it be also possible

Page 100

1    to look at changes in water surface elevation
2    to perhaps determine averages and ultimately
3    come up with a change in water surface
4    elevation to the east bank as a whole?
5        A.  I have no idea what you just asked.
6    You said something about averages.
7        Q.  I'll strike that.  That was a little
8    muddy.
9            If you take and do an analysis of
10   these compartments, you can average what the
11   water surface changes are in these
12   compartments; correct?
13       A.  Yes.
14       Q.  And then figure out what effect that
15   would have on the basin as a whole; true?
16       A.  Yes.
17       Q.  All right.  And you could do it with
18   20 compartments, you could do it with 37
19   compartments, you could do it with eight
20   compartments; correct?
21       A.  The more refinement, the more
22   accuracy that results.
23       Q.  All right.  So as you increase the
24   fineness of the mesh, as you use a finer mesh,
25   you're saying you're going to get a more

Page 101

1    accurate or reliable result?
2        A.  That's not how I would actually say
3    it, but I know what you're saying and the
4    answer would be yes.
5        Q.  And you used, what, a 10 meter by 10
6    meter grid for your outputs?
7        A.  Yes.
8        Q.  All right.  And Delft used a 50 by
9    50 meter output.  Is that true?
10       A.  That's as I understand it, yes.
11       Q.  And is the Delft model designed to
12   use a 50 by 50 meter output, the SOBEK-1D/2D
13   and the HEC-RAS uses a 10 by 10, or is that
14   something that you control as a modeler?
15       A.  I control it.
16       Q.  All right.  So the more time that
17   you spend doing the exercise, the more reduced
18   you can have those grid squares?
19       A.  Basically, yes.
20       Q.  Did the levee breaches, in your
21   judgment, constitute about 50 percent of the
22   water that intruded into east bank?
23       A.  Yeah, on that order.
24       Q.  Okay.  And did you do a calculation
25   of the number of cubic feet of water or acre

26  (Pages 98 to 101)

PAUL D. KUHLMEIER                                         9/21/2007

---

Page 106

1  yes.
2     Q. On a graduate level?
3     A. Yes, sir.
4     Q. Okay. And what courses have you
5  taken and when did you take them?
6     A. I took courses at -- I have taken
7  courses at a number of institutions.
8     Q. Do you hold yourself out as a
9  meteorologist?
10    A. No, sir.
11    Q. Did you have a meteorologist discuss
12 any of the descriptive material about the
13 storm before you published it in your report?
14    A. Did I consult a meteorologist?
15    Q. Yes, sir.
16    A. No.
17    Q. Did you rely upon information from
18 other sources to prepare the meteorological
19 descriptions that you have in your report?
20    A. I relied upon the sources cited in
21 the document.
22    Q. For a description of meteorological
23 conditions that pertained to the -- to Katrina
24 and the events preceding Katrina, did you rely
25 upon National Weather Service data?

---

Page 107

1     A. Yes, sir.
2     Q. I noted that you indicated that you
3  looked at rainfall and rainfall distribution
4  by reviewing NEXRAD data?
5     A. Yes, sir.
6     Q. All right. You got that from the
7  weather service?
8     A. Yes, sir.
9     Q. Is it true that NEXRAD data only
10 provides a small percentage of cells with data
11 and that you have to make certain
12 extrapolations in order to use it?
13    A. I would -- I can't answer that. I
14 don't know.
15    Q. In what format did you receive the
16 NEXRAD data?
17    A. That, I don't recall either.
18    Q. What expertise do you have in using
19 NEXRAD data?
20    A. Other than inputting directly into
21 the model, none.
22    Q. Had you ever done that before?
23    A. Yes.
24    Q. Are there certain things that you
25 need to be careful about when you use NEXRAD

---

Page 108

1  data?
2     A. Such as?
3     Q. I am just asking.
4     A. Well, I can't answer that. It's too
5  broad.
6     Q. Is there an error rate that has been
7  described in the published literature with
8  regard to NEXRAD data?
9     A. I don't know.
10    Q. Is NEXRAD data more accurate than
11 rain gauge data?
12    A. Interesting point, considering some
13 observations that someone showed rainfalls as
14 high as 20 inches, which would be substantial
15 -- substantially greater than the 14 inches
16 published. But taken in its totality, I don't
17 have an opinion, no.
18    Q. The 14 inches of rainfall, was that
19 over the entire east bank or was it over just
20 a portion of the east bank?
21    A. Well, that's an important point.
22 There was significant variation in the
23 distribution of rainfall which my work takes
24 into account and Mr. Kok's does not.
25    Q. But did you use 14 inches as an

---

Page 109

1  input for your modeling?
2     A. To the -- I used the input, the
3  distribution of rainfall that's articulated in
4  the figures and the tables in my report.
5     Q. The NEXRAD data that you received,
6  was that all of the NEXRAD data that the
7  Weather Bureau had compiled for August 29th?
8     A. A member of my staff collected that
9  information, so I can't -- I have no -- I
10 can't answer that definitively.
11    Q. Was that data just a snapshot in
12 time of the rainfall activity that was taking
13 place?
14    A. No, the data goes from the point in
15 time in which rainfall started on the 28th to
16 the time it -- to when it stopped sometime on
17 the 29th.
18    Q. Is there anyone who did any type of
19 quality control review of that particular
20 data, to your knowledge?
21    A. No.
22    Q. Was there gauge data available that
23 you could have used in your model?
24    A. It may well have been recognized, as
25 I specifically state in my report, that I used

---

Page 114

1  got back in the vehicle and moved on.
2     Q. I noticed in the reliance materials
3  that were presented to the Plaintiff's Counsel
4  that there was a collection of photographs.
5  Did you take those photographs yourself?
6     A. I have not personally taken
7  photographs --
8     Q. Okay.
9     A. -- for this case.
10    Q. I received on a disk quite a number
11 of photos and it was a disk that contained the
12 materials that you relied upon. Did you
13 review photographs from the neighborhoods in
14 developing any of the conclusions that you
15 have put into your report?
16    A. Yes.
17    Q. All right. Did you use any of those
18 photographs for the purpose of inputting
19 information into your HEC-RAS model?
20    A. Yes.
21    Q. Did you use any of the photographs
22 to determine whether or not any of the
23 properties had shared characteristics such as
24 the type of foundation that the properties may
25 have been on, whether it was a slab or pier

Page 115

1  beam, for example?
2     A. Yeah, the diversity in construction
3  types within Orleans east bank and throughout
4  the New Orleans area is almost striking. It's
5  amazing. There's no California tract housing
6  in the Orleans east bank.
7     Q. Have you ever heard of the
8  expression that no two snowflakes are alike?
9     A. Yeah, I believe I have heard that.
10    Q. But snowflakes do share common
11 characteristics, do they not?
12    A. I would assume so.
13    Q. And despite your comment about the
14 diversity of housing types being striking in
15 the east bank, did you observe any shared
16 characteristics of residential housing in the
17 east bank?
18    A. Such as?
19    Q. I am just asking.
20    A. I'm not sure what it is that --
21    Q. Did you, for example, determine, in
22 fact put in your report, that 40 percent of
23 the properties were of a particular type of
24 foundation?
25    A. Right. And that was the -- based on

Page 116

1  the -- that was by work based on work by Mr.
2  Nelson and his associate and, as I recall,
3  that was the first 17 they looked at and then
4  we did the Supplemental Plaintiffs it turn and
5  the distribution is almost two-third pier and
6  beam versus one-third slab on grade. There's
7  been studies done by others that have looked
8  into the distribution of home construction
9  types here in the Orleans area over time --
10    Q. Let's talk about --
11    A. -- throughout history.
12    Q. Let's talk about pier and beam
13 versus slab construction for a moment. That's
14 objective information, is it not? If a
15 property is on pier and beam, that's something
16 that's readily observable; correct?
17    A. Yes, sir.
18    Q. Okay. And pier and beam is usually
19 associated with some elevation above ground
20 level; correct?
21    A. Yes.
22    Q. And it averages, what, 3.5 feet? Is
23 that what you put in your report?
24    A. The structures, you know, that Mr.
25 Nelson was looking at, it appeared that it was

Page 117

1  on that order, on the order of about 3, 3 and
2  a half feet.
3     Q. And the slab is basically ground
4  level?
5     A. Yes, sir.
6     Q. Okay. So you could input, for
7  example, the property is on pier and beam,
8  it's 3.5 feet above ground level, you can put
9  that into your HEC-RAS model and use it as an
10 input, could you not?
11    A. No, it would be an output.
12    Q. Output. All right. Why would it be
13 an output?
14    A. Because the model calculates the
15 resulting surface profiles. Right?
16    Q. Right.
17    A. Based on ground level. If I have a
18 pier and beam, I need to go into the output
19 and look at the elevation.
20    Q. Yes, sir. Okay.
21    A. You know, where the finished floor
22 is. Right?
23    Q. Right.
24    A. And then, you know, evaluate that
25 specifically.

30  (Pages 114 to 117)

PAUL D. KUHLMEIER                                           9/21/2007

Page 118

1    Q.  Right.  And that will make a
2  difference as to where the water level impacts
3  the house.
4    A.  Yes, sir.
5    Q.  And that's something that can be
6  done very objectively and readily; true?
7    A.  Yes, sir.
8    Q.  Okay.  In the Murphy Oil case, did
9  you offer an opinion that the homes were so
10  diverse that commonality did not exist?
11    A.  I don't recall.
12    Q.  Did you offer an opinion that there
13  were different water source contributions that
14  impacted the different properties and,
15  therefore, commonality was absent in that
16  case?
17    A.  I don't recall, but I don't think
18  so.
19    Q.  All right.  Did you offer opinions
20  that there was an absence of commonality
21  because of different concentrations of oil
22  that affected the properties?
23    A.  As I recall, the distribution of oil
24  was a function of the release mechanisms
25  associated with the tank and the hydraulics of

Page 119

1  flow within St. Bernard Parish.
2    Q.  And the Court thought it was
3  appropriate to certify that case as a class;
4  correct?
5    A.  My recollection is that the Court
6  heard my testimony and confined the
7  distribution of the class consistent with the
8  hydraulics and patent transport of the oil.
9  That's my recollection.
10    MR. BRUNO:
11       You are wrong.
12    MR. ZWAIN:
13       Objection.
14    MR. TREEBY:
15       I would object to Mr. Bruno's
16  unsolicited comment.
17    MR. BRUNO:
18       Still wrong.
19    MR. ZWAIN:
20       At a convenient time we can break
21  for lunch.
22    MR. TREEBY:
23       Move to strike.
24    MR. BRUNO:
25       I move to strike your comments.

Page 120

1  EXAMINATION BY MR. REICH:
2    Q.  The bottom line is that in Murphy
3  you offered opinions trying to show that there
4  was diversity among the properties and there
5  was diversity among the impacts from the
6  breached aboveground tank?
7    MR. ZWAIN:
8       Object.  Been asked and answered.
9  EXAMINATION BY MR. REICH:
10    Q.  Correct?
11    A.  Again, I would have to go back and
12  review my testimony and my report to give you
13  an answer.  I just don't have a specific
14  recollection at that level to -- you know, on
15  the Murphy case.
16    Q.  And here aren't you doing the same
17  thing when you try to distinguish between pier
18  and beam and slab and say these are strikingly
19  different kinds of properties or they may have
20  different kind of paint jobs or different
21  finishes?  Does that really make any
22  difference in terms of whether or not a
23  property that has been impacted by four feet
24  of water, has suffered structural damage?
25    A.  Well, as a civil engineer I can tell

Page 121

1  you there is a myriad of property-specific
2  variables that have to be evaluated before one
3  can make a determination as to the cause and
4  the effect of, whether it be wind, rainfall or
5  flooding waters on a property.  The home
6  construction, the elevation, the maintenance
7  history of the house, whether or not it's
8  suffered termite damage, et cetera, et
9  cetera.
10    Q.  Are you aware that the certification
11  in this case is designed to look at impacts of
12  the flooding and whether or not the class and
13  subclasses are appropriately certifiable based
14  upon flooding issues and we're not looking --
15    MR. ZWAIN:
16       Object to the form of the
17  question.
18    MR. MAYEAUX:
19       Object to the form of the
20  question
21  EXAMINATION BY MR. REICH:
22    Q.  Are you aware of that?
23    A.  No.
24    Q.  Okay.  Have you seen anything in any
25  of the materials that you have reviewed

JOHNS PENDLETON COURT REPORTERS

800 562-1285

5afaf5c4-730b-4ff1-9536-08569fc62d6b

PAUL D. KUHLMEIER                                          9/21/2007

Page 130

```
 1   high water level would have the same source
 2   distributions, that's the level of sensitivity
 3   of this model, at a high water level.  At four
 4   feet, they would, as you will notice, they all
 5   change -- they're different because they're at
 6   different elevations.
 7       Q.  Did you do any type of analysis
 8   independent of IPET to determine what the high
 9   water levels were, or did you just directly
10   take the IPET high water level data and use
11   that as the definitive high water mark for
12   each property?
13       A.  Oh, within the context of this
14   table?
15       Q.  Yes.
16       A.  Yeah, the -- the IPET maximum water
17   elevation is what I used in the report, and
18   then the floor elevations, ground elevations
19   were taken by -- from a report generated
20   through Mr. Nelson.  And I think actually they
21   had another local surveyor that actually
22   collected the data -- you know, that did the
23   surveying.
24       Q.  Is it true that the significance of
25   a four foot water elevation is that at four
```

Page 131

```
 1   feet the property is presumed by FEMA to be
 2   totaled?
 3       A.  That -- That -- I read a document to
 4   that effect published by FEMA, so that's why I
 5   happened to select -- I selected the four
 6   foot.
 7       Q.  So structurally FEMA has determined
 8   that a property is no longer functional if
 9   there's four feet of water as measured from
10   the ground level?  Is that correct?
11       A.  You know, I don't know the specifics
12   as to, you know, how FEMA arrived at the four
13   foot number.  I selected that number as
14   representative based on my, you know, reading
15   of a FEMA document that apparently has some
16   precedent of determining total structural loss
17   at four feet of depth in a house.
18       Q.  Let's look at basin 1.  That's 5010
19   Frankfort Street?  Correct?
20       A.  Yes, sir.
21       Q.  All right.  Floor elevation minus
22   4.10.  Is that minus 4.10 based upon a
23   particular vertical datum?
24       A.  Yes.
25       Q.  Which vertical datum was used?
```

Page 132

```
 1       A.  I'd have to go back and check.  It
 2   was either 88-9496 or 88-2004.65.
 3       Q.  Okay.  And who made the selection of
 4   the datum for the calculation of the floor
 5   elevation?
 6       A.  It would have been -- The local
 7   surveyor published his results, and hopefully
 8   if it was different than what I have in my
 9   modeled, I would have corrected if they were
10   different data parameters.
11       Q.  Talking about the inputs for your
12   model, I looked at your reliance materials and
13   I didn't see on that disk any of the inputs
14   for your model.  Have you produced that to
15   Counsel?
16       A.  Inputs to the model?
17       Q.  Yes.
18       A.  Not to my knowledge.
19       Q.  You still have it in your
20   possession?
21       A.  Yes.
22       Q.  Okay.
23          MR. REICH:
24             I would request all inputs that
25          were used by Dr. Kuhlmeier for both
```

Page 133

```
 1   the HEC-HMS and the HEC-RAS, HEC-RAS
 2   models.
 3   EXAMINATION BY MR. REICH:
 4       Q.  Is that information that you have
 5   readily available?
 6       A.  As readily available as the folks at
 7   Delft.
 8       Q.  I didn't ask about the folks at
 9   Delft.  I'm just talking about what you have
10   available.
11       A.  I know.  But I have asked for that
12   input from your side and --
13       Q.  I am not asking you about that.  Do
14   you understand that in a deposition, the
15   lawyer asks the question, the witness has to
16   respond?  And please try not to volunteer.
17   Otherwise, we're going to have a very messy
18   record.
19       A.  Oh, okay.
20       Q.  Do you have that information
21   available to you?
22       A.  Yes.
23       Q.  Will you be able to turn it over to
24   your Counsel who could then make it available
25   to us?
```

JOHNS PENDLETON COURT REPORTERS

800 562-1285

5afaf5c4-730b-4ff1-9536-08569fc62d6b

Page 138

1  at the output from your model and you're not
2  looking at any other external source of data?
3      A.  Well, I am confused.
4      Q.  All right.
5      A.  The floor elevation was surveyed in.
6      Q.  That's what I am talking about.
7      A.  So a local surveyor went out and he
8  said that -- that the floor elevation of 5010
9  Frankfort Street is at a minus 4.1 feet mean
10 sea level. All right? So my output looks at
11 two things. The distribution of water sources
12 --
13     Q.  Right.
14     A.  -- four feet above that. So at
15 minus .1 feet, right? And then at another
16 surface elevation, in this particular case at
17 2.6 feet of mean sea level.
18     Q.  Did you attempt to do any type of
19 statistical test or sensitivity analysis to
20 correlate what your outputs demonstrated
21 versus what the survey information reflected?
22     A.  In a sense that I compared the high
23 water marks observed by Nelson in their --
24 when they did their individual surveys,
25 against what the model said the water level

Page 139

1  should be, I did -- I did those comparisons.
2      Q.  Is all of the data contained in
3  table 9 modeled data? Are all of these
4  outputs from the model?
5      A.  You mean the various percentages?
6      Q.  Not just the percentages, but the
7  elevations that are referenced.
8      A.  No, the floor elevation and the
9  ground elevations were surveyed of observed
10 data.
11     Q.  Okay. Strictly surveyed data?
12     A.  Yes, sir.
13     Q.  Not calculated?
14     A.  That's correct.
15     Q.  Okay. What about the water
16 elevation? For example, it says minus .10.
17 That means there's four feet of water above
18 the minus .10 elevation; correct?
19     A.  Yes. Yes, sir.
20     Q.  All right. And then the
21 percentages, those were outputs from the
22 model?
23     A.  Yes, sir.
24     Q.  Are you trying to demonstrate that
25 there is some variability in terms of

Page 140

1  percentage calculations from source -- from
2  these different sources depending upon the
3  location of the property, the topography, et
4  cetera?
5      A.  Yes, I do, as does Mr. Kok in his
6  report.
7      Q.  Okay. Now, have you attempted,
8  though, to look at what the scatter of data
9  might be for the same water surface elevations
10 for properties that are within the same
11 basin? You have 20 basins. If you were to
12 analyze, let's say, five properties that are
13 in basin 1 and look at what the distribution
14 -- what the scatter of the data is, in other
15 words, what is the distribution of your
16 statistical outputs in basin 1 and to do it
17 for basin 5 and then to do a comparison
18 between the two, did you do anything like that
19 just to see whether there are significant
20 differences from basin to basin versus within
21 a basin?
22     A.  Well, the level of sensitivity in
23 the model currently, and it's as we have
24 discussed, it's subject to refining. We're
25 continuing to refine it with 37 basins and

Page 141

1  then onward. And as we do that, we will be
2  able to -- the numbers, the results, of
3  course, are going to change because we're now
4  in a more and more refined basis.
5          What's published here is sensitive
6  to, at the high water level is based -- is
7  sensitive to 20 basins. So any given
8  plaintiff's location in basin number 5, let's
9  say, at high water level will have the same
10 water percentage distribution. However, those
11 distributions house to house are going to be
12 different as the water rises because they're
13 at different elevations.
14         So, you know, does that answer
15 your question?
16     Q.  After August the 29th when rainfall,
17 overtopping from IHNC, breaching from IHNC,
18 and the pump activity played no role, did you
19 try to determine what the percentage
20 distributions would be after the point in time
21 where that condition would obtain? Which
22 would be beginning August 30th.
23     A.  Yes.
24     Q.  Okay.
25     A.  Sure.

PAUL D. KUHLMEIER                                          9/21/2007

Page 142

1    Q.  And where are those outputs
2  reflected?  Because I don't see any specific
3  dates referenced in table 9.
4    A.  That's right.  I didn't publish the
5  dates.  And I would have to go back and --
6  That's a good point.  It would have been nice
7  -- I should have -- If I had had enough space
8  I could have put a column there that showed
9  the time at which the water reached, say, four
10  feet right at the Frankfort location and the
11  time at which the water reached its maximum
12  elevation on Frankfort Street.  Because all of
13  those are -- are -- in many of those cases,
14  those are going to be what they are,
15  different.
16    Q.  Once you eliminate all of the
17  contributing sources except for interior levee
18  breaches, does the data become more
19  homogeneous?  In other words, do you have less
20  variation in percent source contribution?
21    A.  Well, that would depend on the
22  specific basin.  You still have -- Obviously
23  cycling is going on.  You have an input that's
24  continuing.  It might now have been reduced to
25  three inputs, let say the London breaches and

Page 143

1  17th, but those are still considering, are
2  pushing water, you know, under gravity flow in
3  various directions.  So it's by --
4  consequently, the water associated with
5  rainfall, overtopping, and elsewhere is going
6  to be influenced by the, you know, the
7  circulation of the water in totality -- in its
8  totality.
9    Q.  Aside from the commingling resulting
10  from these basins being filled up, after the
11  29th the only contributing sources of water
12  into the east bank were the breaches from the
13  London Avenue Canal and the 17th Street Canal;
14  true?
15    A.  New additions?  Yes.
16    Q.  Okay.  So if you were able to model,
17  in terms of percent source contribution, that
18  additional inflow, whether it do on it a
19  basin-wide or sub-basin-wide basis, wouldn't
20  you expect the percent variations to be much
21  less scattered?  In other words, the numbers
22  are going to tend to converge in terms of
23  source contribution because you're only
24  looking at the levee breaches?
25    A.  Yeah, I don't know.  I'm --

Page 144

1    Q.  Do you understand the question?
2    A.  I'm not sure I am really -- I'm not
3  sure I'm really understanding your question.
4    Q.  I'm talking about the scatter of the
5  numbers.  You can have numbers that are far
6  apart, 2 percent, 30 percent, 80 percent,
7  whatever, you know, big -- big gaps, but if
8  you were simply to model after day one, after
9  August 29th, because you only have interior
10  breaches, aren't you going to have a more
11  homogeneous picture with respect to the
12  percentages of source contributions?
13    A.  That -- That would depend on the
14  location of the -- the physical location of
15  the sub-- of the sub-basins of interest.
16  Some yes, some no probably.
17    Q.  Let's take an area such as Mid City,
18  for example.  Are you familiar with that
19  area?
20    A.  What do you call Mid City?
21    Q.  Well, I have some pictures, I
22  thought.
23       MR. REICH:
24       Do you have those?
25       VIDEO OPERATOR:

Page 145

1       Dr. Kuhlmeier, can I ask you to
2  square up?
3       THE WITNESS:
4       Sorry.
5       VIDEO OPERATOR:
6       Thank you.
7  EXAMINATION BY MR. REICH:
8    Q.  Here they are.
9    A.  Oh, I was looking at him.
10       (Whereupon a discussion was held
11  off the record.)
12  EXAMINATION BY MR. REICH:
13    Q.  I'm going to show you what has been
14  marked for identification as some copies of
15  photographs, Exhibits 7 through 10.  Can you
16  tell me if you recognize what is depicted in
17  those pictures?
18       MR. MAYEAUX:
19       Counsel, were these locations
20  modeled by the Delft team?
21       MR. REICH:
22       I am not positive if they were.
23       MR. MAYEAUX:
24       Because we requested the address,
25  of XY coordinates for the Delft

JOHNS  PENDLETON  COURT  REPORTERS            800  562-1285

5afaf5c4-730b-4ff1-9536-08569fc62d6b