UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: KATRINA CANAL BREACHES  　　　　CIVIL ACTION
CONSOLIDATED LITIGATION

　　　　　　　　　　　　　　　　　　　　　NO.: 05-4182

　　　　　　　　　　　　　　　　　　　　　SECTION "K"(2)

FILED IN:  05-4181, 05-4182, 05-4191, 05-4568, 05-5237,
　　　　　　05-6073, 05-6314, 05-6324, 05-6327, 05-6359,
　　　　　　06-0020, 06-1185, 06-0225, 06-0886, 06-11208,
　　　　　　06-2278, 06-2287, 06-2346, 06-2545, 06-3529,
　　　　　　06-4065, 06-4389, 06-4634, 06-4931, 06-5032,
　　　　　　06-5042, 06-5159, 06-5163, 06-5367, 06-5471,
　　　　　　06-5771, 06-5786, 06-5937, 06-7682, 07-0206,
　　　　　　07-0647, 07-0993, 07-1284, 07-1286, 07-1288,
　　　　　　07-1289

PERTAINS TO: LEVEE

---

## LEVEE DEFENDANTS' JOINT REPLY DESIGNATIONS FOR ERIK L. NELSON, PH.D., P.E. (SEPTEMBER 25, 2007 DEPOSITION)

| FROM | | TO | |
|---|---|---|---|
| PAGE | LINE | PAGE | LINE |
| 9 | 2 | 10 | 10 |
| 12 | 2 | 12 | 8 |
| 59 | 20 | 63 | 21 |



EXHIBIT 4

| | | | |
|---|---|---|---|
| 89 | 18 | 89 | 24 |
| 109 | 14 | 109 | 21 |
| 127 | 16 | 130 | 11 |
| 134 | 24 | 137 | 10 |
| 141 | 6 | 148 | 2 |
| 152 | 12 | 156 | 15 |
| 174 | 3 | 174 | 12 |
| 176 | 21 | 177 | 19 |
| 182 | 13 | 183 | 1 |

```
                UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF LOUISIANA

IN RE: KATRINA CANAL       CIVIL ACTION
BREACHES CONSOLIDATED
LITIGATION             NO. 05-4182 "K" (2)

                    JUDGE DUVAL
PERTAINS TO: LEVEE
                    MAG. WILKINSON

FILED IN:

05-4181, 05-4182, 05-4191,
05-4568, 05-5237, 05-6073,
05-6314, 05-6324, 05-6327,
05-6359, 06-0020, 06-1885,
06-0225, 06-0886, 06-11208,
06-2278, 06-2287, 06-2346,
06-2545, 06-3529, 06-4065,
06-4389, 06-4634, 06-4931,
06-5032, 06-5042, 06-5159,
06-5163, 06-5367, 06-5471,
06-5771, 06-5786, 06-5937,
06-7682, 07-0206, 07-0647,
07-0993, 07-1284, 07-1286,
07-1288, 07-1289


        Deposition of ERIK L. NELSON, Ph.D.,
Nelson Architectural Engineers, Inc., 2740
Dallas Parkway, Suite 220, Plano, Texas
75093, taken in the Law Offices of Duplass,
Zwain, Bourgeois & Morton, Three Lakeway
Center, 29th Floor, Metairie, Louisiana on
Tuesday, the 25th day of September, 2007 at
9:02 a.m.
```

                                1

```
APPEARANCES:


    BRUNO & BRUNO
    (By: Joseph M. Bruno, Esquire)
    855 Baronne St.
    New Orleans, Louisiana 70113
    (504) 525-1335
        Attorneys for Plaintiffs



    RICHARD M. MARTIN, JR., ESQUIRE
    855 Baronne St.
    New Orleans, Louisiana 70113
    (504) 525-1335
        Attorneys for Plaintiffs




    JACOBS & SARRAT
    (By: Darlene M. Jacobs, Esquire)
    823 St. Louis St.
    New Orleans, Louisiana 70112
    (504) 522-0155
        Attorneys for Plaintiffs




    McCRANIE, SISTRUNK, ANZELMO, HARDY,
    MAXWELL & McDANIEL
    (By: Thomas P. Anzelmo, Esquire)
    3445 N. Causeway Blvd., Suite 800
    Metairie, Louisiana 70002
    (504) 831-0946
        Attorneys for Defendant,
        Orleans Levee District
```

                                2

```
APPEARANCES (continued):



    SUTTON LAW FIRM, LLC
    (By: Charles E. Sutton, Jr., Esquire)
    2101 N. Hwy. 190
    Suite 105
    Covington, Louisiana 70433
    (985) 249-5991
        Attorneys for Defendant,
        Orleans Levee District



    DUPLASS, ZWAIN, BOURGEOIS, MORTON,
    PFISTER & WEINSTOCK
    (By: Joseph E. Bearden, III, Esquire)
    3838 N. Causeway Blvd., Suite 2900
    Metairie, Louisiana 70002
    (504) 832-3700
        Attorneys for Defendant,
        Board of Commissioners for the
        East Jefferson Levee District
        and Lake Borgne Levee District




    CHRISTOVICH & KEARNEY
    (By: J. Warren Gardner, Jr., Esquire)
    Pan American Life Center
    601 Poydras St.
    New Orleans, Louisiana 70130-6078
    (504) 593-4272
        Attorneys for Defendant,
        Sewerage and Water Board of New
        Orleans
```

                                3

```
APPEARANCES (continued):


    Present Via Internet I-DEP:

        Dennis Reich, Esquire

        Kirk Aurandt, Esquire







ALSO PRESENT:

    John Wadsworth, CLVS
    Hart Video of Louisiana, L.L.C.
    (866) 649-4278








REPORTED BY:

    MARGARET MCKENZIE, CCR, RPR, CMR, CRR
    Certified Court Reporter
```

                                4

## Page 5

INDEX

EXAMINATION BY:

MR. BRUNO.............................8

EXHIBITS:

Exhibit 1............................36

## Page 6

STIPULATION

It is stipulated and agreed by and between counsel for the parties hereto that the deposition of the aforementioned witness is hereby being taken under the Federal Rules of Civil Procedure, for all purposes, in accordance with law;

That the formalities of reading and signing are specifically not waived;

That the formalities of sealing, certification and filing are specifically waived;

That all objections, save those as to the form of the question and the responsiveness of the answer, are hereby reserved until such time as this deposition, or any part thereof, may be used or sought to be used in evidence.

\* \* \* \* \*

MARGARET MCKENZIE, Certified Court Reporter, in and for the Parish of Orleans, State of Louisiana, officiated in administering the oath to the witness.

## Page 7

ERIK L. NELSON, Ph.D., Nelson Architectural Engineers, Inc., 2740 Dallas Parkway, Suite 220, Plano, Texas 75093, after having been first duly sworn by the above-mentioned court reporter, did testify as follows:

VIDEOGRAPHER:

We're on the record. This is the deposition of Erik R. Nelson taken at 2900 Lakeway Three on September 25, 2007. My name is John Wadsworth representing Hart Video of Louisiana. The court reporter is Margaret McKenzie with Johns Pendleton. And will counsel, please, introduce themselves.

MR. BRUNO:

Good morning. My name is Joseph Bruno. I'm Plaintiffs' Liaison Counsel.

MR. ANZELMO:

My name is Tommy Anzelmo. I represent the Orleans Levee District.

MR. SUTTON:

## Page 8

I'm Charles Sutton, representing the Orleans Levee District.

MR. GARDNER:

Warren Gardner, representing the Sewerage & Water Board.

MR. BEARDEN:

Joseph Bearden, East Jefferson Levee District.

MR. ANZELMO:

For purposes of the record, we will read and sign.

ERIK L. NELSON, Ph.D., Nelson Architectural Engineers, Inc., 2740 Dallas Parkway, Suite 220, Plano, Texas 75093, after having been first duly sworn by the above-mentioned court reporter, did testify as follows:

EXAMINATION BY MR. BRUNO:

Q. Okay. My very first question is how would you prefer to be addressed? I see you have a Ph.D. Would you prefer that I call you Mr. Nelson or Dr. Nelson? What works for you?

A. It doesn't matter to me. If you want to use Dr. Nelson, that's fine, or Mr.

1  Nelson, that's fine.
2  Q. Okay. All right. Good. Now, you
3  -- let's just sort of get some sense of what
4  you do on a day-to-day basis at your firm.
5  You are president of Nelson Architectural
6  Engineers, right?
7  A. Yes, sir.
8  Q. So what kind of work do you guys do
9  on a daily basis?
10  A. We investigate perils, damages from
11  different types of perils. We consult and
12  generally in the areas of engineering,
13  architecture, industrial hygiene and safety,
14  fire investigation and surety consulting.
15  Those are our five main practice areas.
16  Q. All right. I'm a little confused
17  to start. When you -- when you say you
18  investigate the peril, are you investigating
19  the cause of the peril or is the focus rather
20  on what damages resulted from the peril?
21  A. Both. In some cases we're doing
22  cause and origin only. In some cases we're
23  doing cause and origin with damages.
24  Q. All right.
25  A. Assessing damages and recommended

9

1  the amount of money that one would assess
2  with regard to, well, at least in our
3  business, on the law side, is damage.
4  A. It depends on the scope of the
5  assignment. In some cases we may just be
6  doing cause and origin. For example, a fire
7  investigation. We may investigate the cause
8  and origin of the fire and that may be the
9  end of the assignment. And in some cases we
10  may be investigating the cause and origin,
11  but they want to delineate the damages
12  between the different causes, and that may
13  assist a carrier in determining coverage. We
14  don't do coverage, but we do cause and origin
15  and we can delineate those items. And in
16  some cases we may take it a step further and
17  actually do the recommended repairs and
18  consult on the project.
19  Q. Okay. And when you do that, that
20  is, when you are delineating the damage that
21  may be related to a particular cause, do you
22  then assign a value to that component of the
23  damage or is it rather maybe a percentage?
24  A. It depends on the scope of the
25  assignment. Sometimes we do, sometimes we

11

1  repair.
2  Q. This may seem a simplistic
3  question, but just for the record, what in
4  your mind is the distinction between cause
5  and origin and damages?
6  A. Damages can be a result of multiple
7  causes. Doing a cause and origin
8  investigation narrows down a damage to a
9  particular source, something that caused that
10  damage. We are reenacting what happened.
11  Q. All right. So that -- well, what I
12  heard, I thought I heard you say was, yes,
13  damages can result from multiple causes. We
14  all know that, but the question is what, if
15  anything, do you do to assess either the
16  damages from a quantitative or qualitative
17  analysis? Or do you not do that at all? I
18  don't know.
19  A. I don't understand your question.
20  Q. Well, how much and what was
21  damaged?
22  A. How much was damaged?
23  Q. Yeah. How much money, you know, is
24  the thing useable or not useable, can it be
25  repaired, what would it cost to replace it.

10

1  don't.
2  Q. All right. The point is that you
3  have the ability to do both, you can assess
4  the amount of damage caused by a particular
5  cause in terms of the dollar amount necessary
6  to repair or you could do it expressed as a
7  percentage?
8  A. Yes, sir.
9  Q. Okay. Have you found in doing this
10  kind of work that you're able to complete --
11  that's a bad question. When you're asked to
12  delineate the cause and origin and then to
13  also delineate the particular damage caused
14  by a particular cause and origin and then
15  also then to establish a dollar value, have
16  you been able, have you ever had an
17  assignment that you just were not able to do
18  it? The causes were so confounding that you
19  just couldn't divide up the various causes as
20  was the requested assignment?
21      MR. ANZELMO:
22      I object to the form of the
23      question. If you understand, you
24      can answer.
25  EXAMINATION BY MR. BRUNO:

12

1  rain from above?
2  A. They give us -- they give us data.
3  They give us information that we can use to
4  make that determination.
5  Q. All right. What data assists you
6  in making that determination?
7  A. Physical characteristics of the
8  residence. Test data that we get from our
9  levelness surveys, our plumbness surveys to
10 see how the structure behaved.
11 Q. Okay. All right. Well, let's
12 break it down then. Let's talk about
13 property physically located within the
14 structure. Let's talk about tables and
15 chairs and rugs and lamps, like that. Mr.
16 Nelson, my name is Fireman's Fund. I want to
17 know if any personal property -- do you
18 understand what I mean by personal property?
19 A. You're talking about contents?
20 Q. Yes. Let's use the word contents.
21 A. Or nonstructural items.
22 Q. Nonstructural items. Let's use
23 that. Let's use both.
24   MR. ANZELMO:
25   And we're in a hypothet now? Is

57

2   MR. BRUNO:
3   We've been in a hypothet for some
4   time. Keep up with me. I'm going
5   fast.
6   MR. ANZELMO:
7   That's why I said, we're in a
8   hypothet.
9  EXAMINATION BY MR. BRUNO:
10 Q. Okay. Good. All right. Now, the
11 question to you, Mr. Nelson, the expert, is
12 whether or not any personal property or
13 contents was damaged by water from above.
14 Please explain to me the methodology, the
15 tests that you would utilize in order to
16 answer that question.
17 A. We would go to the site and inspect
18 the structure, get statements from the
19 occupant or homeowner if they're available.
20 Look at the physical attributes of the
21 residence. Look at the damage that was done.
22 Look at the physical evidence from the
23 damage. Run certain tests, whatever those
24 may be. Take that data back, form some
25 hypotheses and refine our data and form

58

1  conclusions.
2  Q. All right. What would be
3  indicators of damage from above?
4  A. Physical evidence of water damage
5  to ceilings, upper areas of the walls.
6  Q. You need to have evidence of an
7  access point, right?
8  A. Yes, sir.
9  Q. I mean, obviously if there is no
10 hole in the roof, you could eliminate damage.
11 I'm sorry, you could eliminate as a cause
12 water, water from above?
13   MR. ANZELMO:
14   I object to the form.
15   MR. BEARDEN:
16   Objection to the question.
17   THE WITNESS:
18   No, sir.
19 EXAMINATION BY MR. BRUNO:
20 Q. You can't. All right. What would
21 you do to eliminate consideration of water
22 damage from above?
23 A. Well, we'd have to look at the
24 envelope as a whole and look for other points
25 of entry within the exterior veneers,

59

1  flashing, roof areas, assuming the roof,
2  assuming the roof was not damaged.
3  Q. Okay.
4  A. It doesn't mean it doesn't leak.
5  Q. Sure.
6  A. Look at other issues, maybe
7  mechanical systems. You could have a
8  condensation problem. Other issues that
9  could cause other possible causes of water
10 intrusion.
11 Q. All right. So do I take it that
12 the first thing you do in answering the
13 question that I posed, this hypothetical
14 question, is that you have to look for the
15 potential for access for that water from
16 above to get inside the building?
17 A. True.
18 Q. All right. So after you have
19 determined that there is access, what do you
20 do next?
21 A. If, if we're in the field and
22 we're, we find a point of access, then we
23 correlate that with the damage and the
24 physical evidence of the damage.
25 Q. Okay. All right. So we have our

60

```
 1   chair and we have physical evidence of a hole
 2   in the roof and we have a water line of two
 3   feet above the, what do we call it,
 4   threshold?
 5        MR. ANZELMO:
 6        Finished floor.
 7   EXAMINATION BY MR. BRUNO:
 8   Q.   Finished floor. We have two feet.
 9   All right. And we have a little line around
10   the bottom of the chair leg at two feet,
11   which one would expect, right, from the
12   height of the water?
13   A.   True.
14   Q.   Okay. So how do you determine
15   whether or not that part of the chair leg,
16   from the water line below, was caused by the,
17   by the water from above as opposed to the
18   water from below?
19   A.   Again, we'd look at the timing
20   issue.
21   Q.   Timing. All right.
22   A.   If the water intrusion and the
23   points of entry occurred prior to the rising
24   water, then it may have been damaged first by
25   the upper water.
```

61

```
 1   Q.   Right.
 2   A.   Water from above.
 3   Q.   Okay. Now, but in order to
 4   ascertain the extent of damage, now you've
 5   got to know how much water came from the hole
 6   in the roof, right?
 7   A.   Not necessarily.
 8   Q.   Well, if your water line is at two
 9   feet, and again forgive me, but water line
10   from below was at two feet, all right, and
11   you've got then physical evidence of damage
12   from that little line below, let's assume the
13   paint is off of it or something like that,
14   can you assume that the whole two feet is
15   caused by the water from above if, in fact,
16   you learn that the hole preceded the water
17   from below?
18   A.   Not necessarily.
19   Q.   Right. Well, so how do you do it?
20   How do you, how do you ascertain the
21   contribution of the rain versus the
22   contribution of the water from below to that
23   two-foot of chair, of chair leg that's the
24   issue on the table?
25   A.   Well, you could look at the timing
```

62

```
 1   issue and look at the physical damages.
 2   Q.   All right.
 3   A.   If you needed to measure the
 4   volume, I suppose you could estimate that.
 5   Q.   Right.
 6   A.   If you're looking at the physical
 7   damage, if the chair is damaged from above,
 8   and I don't think we've ever done anything
 9   that specific -- we don't usually deal with
10   contents.
11   Q.   Right.
12   A.   But look at the timing issue and
13   assess how much water rose to that level from
14   above --
15   Q.   Right.
16   A.   -- and look at the water lines,
17   water marks and the physical evidence to
18   determine how much water came from below, we
19   can break it down that way. Different
20   sources of water, different amounts of water
21   and what was damaged.
22   Q.   Can you think of a single instance
23   wherein you have determined in a
24   Katrina-related evaluation that any property
25   damage which was physically located below the
```

63

```
 1   so-called water line was caused by damage
 2   from water from above?
 3   A.   Have we done that in any single
 4   property?
 5   Q.   Have you made that determination
 6   that, in fact, it was damaged from water from
 7   above? A little different question than what
 8   you just said.
 9   A.   I don't recall.
10   Q.   Well, you've evaluated a bunch of
11   properties in this case.
12   A.   Yes, sir.
13   Q.   Can you identify a single property
14   wherein you can say to the judge or the jury
15   that water damage from above was a cause of
16   damage to any item of property or component
17   of property that was below the water line?
18        MR. ANZELMO:
19        And we're talking contents?
20        MR. BRUNO:
21        We're talking, we're talking
22   contents first. That's a good
23   point, Tommy.
24        MR. ANZELMO:
25        I just want to --
```

64

1 covered by floodwater?
2   A. I don't know exactly. Only what
3 I've seen in other documents of roughly 75
4 percent --
5   Q. Right.
6   A. -- to maybe 80 percent.
7   Q. As part of your, as part of the
8 scope of work that you were asked to do, did
9 you, in fact, determine where the water went
10 within the geography as we propose be
11 certified as a class?
12   A. No, sir.
13   Q. All right. Did you identify the
14 principal -- before we go there. Can we
15 agree that there was flooding in the City of
16 New Orleans post-Katrina?
17   A. Yes, sir.
18   Q. Okay. Can you identify the
19 principal sources of water that caused the
20 flooding in the city?
21   A. In general.
22   Q. Okay. And what are they?
23   A. Rainfall, overtopping and levee
24 breaches.
25   Q. All right. Did you quantify the

89

1 amount of rainfall?
2   A. No, sir.
3   Q. Now, did you make a distinction
4 between the rain that fell from the sky that
5 would have been removed had the pumps
6 continued to work as opposed to the rainfall
7 that accumulated because the pumps stopped
8 working?
9   A. No, sir.
10   MR. BRUNO:
11   Let's take a break. He wants to
12   change the tape anyway.
13   VIDEOGRAPHER:
14   Off the record.
15   (OFF THE RECORD)
16   VIDEOGRAPHER:
17   On the record.
18 EXAMINATION BY MR. BRUNO:
19   Q. All right. Let's see. You said
20 that you didn't make a distinction, but you
21 would agree with me, would you not, that if
22 rainfall is a potential cause in fact of
23 flooding, that the failure of the pumps to
24 continue removing water from the sky, from
25 the area, is also a cause of the flooding?

90

1   MR. ANZELMO:
2   Objection to the form.
3   MR. GARDNER:
4   Objection.
5   MR. BEARDEN:
6   Objection to the form of the
7   question.
8   THE WITNESS:
9   I don't know.
10 EXAMINATION BY MR. BRUNO:
11   Q. You weren't asked to evaluate that?
12   A. Correct.
13   Q. Would you -- if you concluded
14 factually that the -- I'm sorry. Withdraw
15 the question. Have you reviewed the
16 deposition of the Sewerage and Water Board?
17   A. No, sir.
18   Q. Okay. If you concluded factually
19 that the pumps stopped at some point in time
20 while it was raining for whatever reason,
21 that the failure of the pumps to pump was a
22 cause in fact of the flooding?
23   MR. BEARDEN:
24   I object to the form.
25   MR. GARDNER:

91

1   Objection.
2 EXAMINATION BY MR. BRUNO:
3   Q. A cause in fact of the flooding, a,
4 not the only, not the sole, a --
5   MR. ANZELMO:
6   I wasn't sure you were finished.
7   Now that I know you are, I do
8   object to the form of the question.
9 EXAMINATION BY MR. BRUNO:
10   Q. May I have an answer, please.
11   A. I suppose that could be true, yes,
12 sir.
13   Q. All right. And I know the answer,
14 but just for the record, please allow me to
15 ask you, were you asked to evaluate whether
16 or not the pumps, in fact, stopped pumping at
17 any point during Katrina?
18   A. No, sir.
19   Q. And so it logically follows that
20 you weren't asked to ascertain if they, in
21 fact, stopped pumping, you weren't asked why
22 they stopped pumping, right?
23   A. No, sir. I was not.
24   Q. Now, you say that one of the other
25 potential sources of flooding is overtopping.

92

```
1   is lowest?
2     A. True.
3     Q. And it sort of piles up until the
4   source of water stops?
5     A. True.
6     Q. And so that if you have a lake out
7   there (indicating) and you have a levee
8   that's missing, the water will continue to
9   flow through the break in the levee until
10  such time as the water outside the levee gets
11  to the same height as the water inside the
12  levee, would you agree with that?
13    A. Yes, sir.
14    Q. What exactly was the scope of your
15  assignment in this case?
16    A. The scope is spelled out in Chapter
17  1. It's basically to do condition
18  assessments.
19    Q. Chapter 1.
20    A. Under Introduction, the first page.
21  Page 1.1.
22    Q. Is it your belief that the
23  plaintiffs in this litigation are suing the
24  Orleans Levee District for wind damage?
25    A. I don't think so.
```

109

```
1     A. That was part of our assignment.
2     Q. I understand it was part of your
3   assignment, but do you know what the logic
4   was behind asking you to assess wind damage?
5     MR. BEARDEN:
6       Object to the form of the question.
7     MR. GARDNER:
8       Object to the form.
9     MR. ANZELMO:
10      Join.
11    THE WITNESS:
12      No, sir.
13  EXAMINATION BY MR. BRUNO:
14    Q. Would it surprise you to know that
15  no plaintiff in the case makes any claim that
16  any defendant caused wind damage?
17    A. No, sir.
18    Q. You know, in fact, that the claims
19  made by the plaintiffs are that they
20  sustained damage from water and that the
21  defendants had some role in that water, you
22  understand that?
23    A. Yes, sir.
24    Q. Okay. I may have asked you this,
25  and forgive me. Do you know how long the
```

111

```
1   Q. Well, do you know that
2   any claimant in this litigation makes any
3   claim against any defendant for wind damage?
4     A. I don't know.
5     Q. Okay. Do you think any defendant
6   in this case could be liable to any plaintiff
7   for wind damage?
8     MR. ANZELMO:
9       Objection to the form of the
10      question.
11    MR. BEARDEN:
12      Objection to the form.
13    MR. GARDNER:
14      Objection.
15    THE WITNESS:
16      I don't know.
17  EXAMINATION BY MR. BRUNO:
18    Q. Okay. Do you know why you were
19  asked to assess wind damage?
20    MR. ANZELMO:
21      Objection to form.
22    THE WITNESS:
23      Yes, sir.
24  EXAMINATION BY MR. BRUNO:
25    Q. Okay. Why is that?
```

110

```
1   property that was inundated with water as a
2   result of the breaches of the levee stayed
3   underwater, what period of time?
4     A. Which property?
5     Q. Any property that was underwater,
6   how long did it stay underwater.
7     A. No, sir, I don't know that.
8     Q. Do you know how long it took to
9   dewater the city? In other words, from the
10  time that they were able to put the pumps
11  back on and they started, when they had
12  actually blocked the breaches or covered the
13  breaches, how long it took for the water to
14  be removed from the city?
15    A. Not specifically, no, sir.
16    Q. All right. Do you, when you talk
17  about storm surge in your report, are you
18  suggesting that there was storm surge within
19  the geographic area that we propose is a
20  class?
21    A. Specifically I don't know, but
22  generally, it's part of the overall equation
23  as far as water levels rising.
24    Q. I understand that, but you -- well,
25  how about this. You say wave action.
```

112

1  Q. No? Well, how much did you spend
2  to evaluate, on average, each property?
3  A. I don't know. There's a lot of
4  other time in there.
5  Q. So you can't tell me how much money
6  you spent per home?
7  A. Well, if you took the total and
8  divided by the number of homes, that would be
9  a total --
10 Q. Right.
11 A. -- but as far as how much time was
12 spent --
13 Q. I understand.
14 A. -- at the site on each home, I
15 don't know.
16 Q. I'm with you. I'm just asking you
17 then, can I conclude therefore you cannot
18 tell me how much you spent to evaluate on
19 average on each house?
20 A. Correct. Other than an aggregate
21 total.
22 Q. Other than aggregate. So if we use
23 the aggregate, we've got about a little bit
24 better than ten thousand a house. What other
25 stuff did you do, by the way, other than just

125

1  Q. -- evaluate the houses?
2  A. We wrote the report.
3  Q. Okay. All right. Well, you have
4  any ideas as to how to solve the problem? In
5  other words, do you as an expert have any
6  opinion whatsoever as to how we might avoid
7  evaluating each house with several experts to
8  determine the amount of damage caused by
9  flooding in order to A. do it quicker and, B.
10 spend less money?
11     MR. ANZELMO:
12     Objection to form.
13     MR. GARDNER:
14     Objection to the form.
15     MR. BEARDEN:
16     Objection to the form of the
17     question.
18     THE WITNESS:
19     No, sir.
20 EXAMINATION BY MR. BRUNO:
21 Q. No ideas? Do you have any
22 experience with aggregate appraisal?
23 A. No, sir.
24 Q. No. Okay. So you would defer to
25 others on that?

126

1      MR. ANZELMO:
2      Objection to the form.
3      MR. BEARDEN:
4      Objection to the form of the
5      question.
6      MR. BRUNO:
7      You are objecting to the form of
8      "so you would defer to others on
9      that issue?"
10     MR. ANZELMO:
11     Yes.
12 EXAMINATION BY MR. BRUNO:
13 Q. Okay. Fine. Would you defer to
14 others on that issue?
15 A. Yes, sir.
16 Q. Okay. Whatever. Now, do you
17 believe that you could, with regard to each
18 individual house, ascertain the amount of
19 damage caused solely by the rain?
20 A. It could be done, yes, sir.
21 Q. Okay. Please explain how you would
22 go about doing that?
23     MR. MARTIN:
24     He didn't answer your question.
25     You asked him if he could do it.

127

1      MR. BRUNO:
2      Fair enough. I know, but that's a
3      fair --
4  EXAMINATION BY MR. BRUNO:
5  Q. Can you -- could you do it?
6  A. Yes, sir.
7  Q. All right. So tell me exactly what
8  you would do to answer that question. What
9  would be -- what would you tell the judge
10 would be your evaluative procedure in
11 determining how much damage was due to rain.
12 A. Well, you'd have to take the
13 overall damage. You'd have to do a site
14 assessment and you would have to break it
15 down by contribution of damages through
16 various testing methodology similar to what
17 we've done.
18 Q. Uh-huh. Would you agree with me
19 that the water line would identify that part
20 of the property damaged by the flood?
21     MR. BEARDEN:
22     I object to the form of the
23     question.
24     MR. ANZELMO:
25     Join in the objection.

128