```
 1      MR. ANZELMO:
 2      Me, too.
 3      THE WITNESS:
 4      Not necessarily.
 5  EXAMINATION BY MR. BRUNO:
 6   Q. Why not?
 7   A. Because there are other influences
 8  that need to be considered.
 9   Q. Like what?
10   A. Maintenance, termite damage, water
11  intrusion from other sources. Age of the
12  property. Material effects. Characteristics
13  of the building.
14   Q. How would the age of the property
15  impact the amount of damage done by water
16  from below?
17   A. Older structures are more
18  sensitive, especially if they haven't been
19  maintained as well.
20   Q. Right.
21   A. Are more sensitive to any type of
22  force.
23   Q. Well, regardless of their age,
24  there is still going to be damage from water
25  from below. All you're telling me is that if
```

                                   129

```
 1  it may or may not be that it's going to
 2  sustain more damage than a property that's
 3  younger, isn't that what you are really
 4  saying?
 5   A. Not necessarily, but I think in
 6  general an older property can sustain more
 7  damage.
 8   Q. Well, sure. But again --
 9   A. It depends on the individual basis.
10  There are other characteristics that are
11  involved.
12   Q. Well, each and every house is going
13  to have a certain age, right?
14   A. Yes, sir.
15   Q. Certain materials of construction?
16   A. Yes, sir.
17   Q. And once you ascertain the water
18  level above the threshold, if you will,
19  you'll be able to have a basis upon which to
20  determine what the damages are, right?
21      MR. ANZELMO:
22      Objection to form.
23      THE WITNESS:
24      Not without going to the site.
25  EXAMINATION BY MR. BRUNO:
```

                                   130

```
 1   Q. Okay. Fine. Going to the site you
 2  will be able to determine the damages?
 3   A. After going to the site, yes, sir.
 4   Q. All right. What I'm not sure that
 5  I understand is if the water is two feet
 6  above the threshold, okay, and let's assume
 7  for the sake of our discussion we've won the
 8  case, the defendant owes us some money, okay,
 9  they have to pay us for damage due to this
10  flood. Okay?
11   A. Okay.
12   Q. And you've determined that the
13  water line is two feet above the threshold.
14   A. Okay.
15   Q. Explain to me how you are going to
16  reduce the amount of the claim by the age of
17  the property.
18   A. That would be done through
19  delineating the damages.
20   Q. All right. Well, you've got some
21  mold growth and that's all you got. Are you
22  going to reduce the amount of that claim
23  because it's an old piece of property?
24      MR. ANZELMO:
25      I object to form.
```

                                   131

```
 1      THE WITNESS:
 2      When you say reduce the amount of
 3      the claim, you're talking about
 4      dollars or depreciation or
 5      something.
 6  EXAMINATION BY MR. BRUNO:
 7   Q. Dollars. No, no, no. We're not
 8  talking about depreciation. No, no, no, no,
 9  no. That has nothing to do with this.
10   A. Okay.
11   Q. We're talking about on day one it's
12  dry, on day 35 it's been sitting in water for
13  35 days and now I want to make my house the
14  way it was before the storm. That's my goal.
15   A. Okay.
16   Q. Okay. So now, again, we've decided
17  that somebody is responsible and we now have
18  to determine how much money they're going to
19  pay me to repair my home. Okay.
20   A. Okay.
21   Q. There's no depreciation involved
22  here. It's just how much do we -- what's it
23  cost to fix it.
24   A. Okay.
25   Q. What I'm trying to understand is
```

                                   132

Page 133

```
 1   what does age have to do to the determination
 2   of the amount of money necessary to make the
 3   repair?
 4   A.  Because the way the structures are
 5   affected, if an older home is more damaged,
 6   given all other variables equal --
 7   Q.  Right.
 8   A.  -- if one is older and in a weaker
 9   state, the repairs can be different and --
10   Q.  Sure.
11   A.  -- therefore, the dollars will be
12   different.
13   Q.  Well, I understand that, but what
14   I'm trying to understand from you is I still
15   get my dollars, right, I don't care if my
16   house is three hundred years old, I still get
17   an amount of money necessary to repair my
18   house, right?
19   A.  True.
20   Q.  Okay.  If my house is a day old, I
21   get whatever number you come up with to
22   repair my house, right?
23   A.  True.
24   Q.  So age is not a factor?
25   A.  No, it is a factor.
```

Page 134

```
 2       I object to the form of the
 3       question.
 4   EXAMINATION BY MR. BRUNO:
 5   Q.  It is a factor in determining how
 6   much, but it is not a factor in determining
 7   whether or not I get my house fixed, right?
 8       MR. BEARDEN:
 9       Objection.
10       MR. GARDNER:
11       Objection.
12       MR. ANZELMO:
13       Objection to the form.
14   EXAMINATION BY MR. BRUNO:
15   Q.  Isn't that true?
16   A.  It is a factor in determining the
17   dollars.
18   Q.  How much?  Sure.
19   A.  As to whether your house gets fixed
20   or not, assuming there is some level of
21   damage, there is some threshold, yes, there
22   is some damage.  There has to be some damage,
23   if there is no damage there is no dollars.
24   Q.  Of course.  So the fact of flooding
25   means there may be some damage, so we're
```

Page 135

```
 1   going to assess whether there is some damage,
 2   and once we make that assessment we come up
 3   with a dollar amount, right?
 4   A.  Correct.
 5   Q.  All right.  The fact of its age may
 6   be interesting, but really it is what it is
 7   in terms of the amount of money necessary to
 8   fix the house, right?
 9   A.  It is what it is, but the age is an
10   influence on what that repair is.
11   Q.  Understood.  But I don't care.  Do
12   you think anybody cares about the influence?
13   I mean, all I care about is getting my house
14   fixed.
15       MR. ANZELMO:
16       Objection to form.
17   EXAMINATION BY MR. BRUNO:
18   Q.  So is it relevant to the issue of
19   fixing my house, how old it is or what
20   materials of construction there are if my
21   only goal is to fix my house?
22       MR. ANZELMO:
23       Same objection.
24       MR. GARDNER:
25       Objection.
```

Page 136

```
 1       MR. BEARDEN:
 2       Objection to form.
 3       MR. ANZELMO:
 4       And also asked and answered.
 5       THE WITNESS:
 6       Yes, sir, it is relevant.
 7   EXAMINATION BY MR. BRUNO:
 8   Q.  Why?
 9   A.  Because it will affect what the end
10   result, what the damages are.
11   Q.  The amount.
12   A.  And that amount is a function of
13   age.
14   Q.  Sure.
15   A.  What those damages are.  And those
16   damages have to be converted to dollars.
17   Q.  Right.  And that wasn't my
18   question.  My question to you is if my only
19   goal is to repair my house and, therefore, my
20   only goal is to determine how much I need to
21   fix my house, then the issue of age and
22   materials of construction don't have any real
23   relevance to the question of either fixing or
24   not fixing the person's house.
25       MR. ANZELMO:
```

1  Same objection.
2    MR. BEARDEN:
3    Asked and answered.
4    MR. GARDNER:
5    Same objection.
6    THE WITNESS:
7    I think it does. Maybe I'm not
8    following your questioning, but I
9    think it does have an effect on
10   damages.
11 EXAMINATION BY MR. BRUNO:
12  Q. Well, would you agree with me that
13 the effect is limited to the amount of
14 damages, not to the fact of damages?
15  A. Okay. Okay.
16  Q. Fair enough?
17  A. Fair enough.
18  Q. Okay. Now, I recognize that we've
19 already established the older houses are
20 likely to be more costly to repair, the
21 materials of construction may have some
22 impact on how much money you have to spend to
23 fix it. We understand all those things.
24    MR. ANZELMO:
25    Objection to form.

137

1  not his testimony.
2    MR. BRUNO:
3    I'm asking if he agrees. That's my
4    question.
5    MR. BEARDEN:
6    And I think he said, no, he did not
7    agree.
8    MR. BRUNO:
9    I'm trying to understand why you
10   don't agree.
11   MR. BEARDEN:
12   Okay. Well, ask him why he doesn't
13   agree.
14   MR. BRUNO:
15   I just did.
16   MR. ANZELMO:
17   And he told you. And he told you.
18   MR. BRUNO:
19   He did not.
20   MR. BEARDEN:
21   All right. Well, ask him the
22   question again.
23   MR. BRUNO:
24   I'm not going to ask him the
25   question again. I've already asked

139

1    Objection.
2    MR. BEARDEN:
3    Objection to form of the question.
4 EXAMINATION BY MR. BRUNO:
5  Q. Great. Do we agree on that?
6  A. No, sir.
7  Q. We don't agree that the age may
8 influence the amount of money we have to
9 spend to repair? We just did that.
10  A. The age does influence, yes, sir.
11  Q. Of course. And the materials of
12 construction influence?
13  A. Yes, sir.
14  Q. Okay. All right. I mean, I'm
15 reading it. I recognize that we already
16 established that the old houses are likely to
17 be more costly to repair. The materials of
18 construction may have some impact on how much
19 money you have to spend to fix it.
20    MR. BRUNO:
21    We understand you object to form.
22    What is your problem with the form?
23    MR. ANZELMO:
24    Because that was your testimony,

138

1  the question and I want an answer.
2    MR. ANZELMO:
3    That's why we objected earlier,
4    because it was asked and answered.
5    MR. BRUNO:
6    Tommy, I'm reading it. No, it's
7    not here. It's right -- the
8    wonderful thing about realtime is
9    it is right here.
10   "I recognize that we've already
11   established that the older houses
12   are likely to be more costly to
13   repair, the materials of
14   construction may have some impact
15   on how much money you have to spend
16   to fix it. We understand all those
17   things."
18   Now, before I could get the next
19   word out of my mouth, you object to
20   form. So I wasn't even -- you
21   didn't even allow me to get the
22   words out of my mouth. So, no --
23   MR. BEARDEN:
24   Those words aren't Erik's words,
25   those are your words.

140

1  MR. BRUNO:
2      Yes, because I wasn't finished, and
3      I'm still not finished because you
4      keep interrupting me.
5  EXAMINATION BY MR. BRUNO:
6  Q.  So what I want to know is, and here
7  is my question, you agree that those things
8  influence the amount of the damage?
9  A.  What things? Can you make a list?
10 Q.  Age, materials of construction.
11 A.  Those things influence the amount
12 of the damages?
13 Q.  Yes.
14 A.  Yes, sir.
15 Q.  All right. Thank you. Did you
16 identify any property that was not damaged by
17 flood?
18 A.  Yes, sir.
19 Q.  Which property was that?
20 A.  Murat.
21 Q.  What number?
22 A.  We were there earlier.
23 Q.  The same one?
24 A.  Twenty-nine.
25 Q.  Twenty-nine?

141

1  Q.  All right. Let me write that down.
2  Murat. And did you give me another one?
3  A.  Clematis.
4  Q.  What's the number?
5  A.  That's our number 26. Murat is 29.
6  Q.  Got you?
7  A.  Clematis is number 26. Broad --
8  Q.  You are giving me a third?
9  A.  Broad Street is 24.
10 Q.  Anyone else? No damages. These
11 are properties just saying they had no water
12 damage. Anyone else?
13     MR. ANZELMO:
14     The question was about flood.
15 EXAMINATION BY MR. BRUNO:
16 Q.  I'm sorry. I meant flood. Water
17 from below. How about that? And I lost
18 track. 29, 26, 24?
19 A.  Twenty-nine, 26, 24 and 28 or 30, I
20 forget which one.
21 Q.  Thirty is St. Philip?
22 A.  Correct.
23 Q.  Okay. Is that the right one?
24 A.  Correct.

142

1  Q.  All right. So it's not the --
2  whatever you said. You said it was 30 or
3  another one.
4      MR. ANZELMO:
5      It was 28 or 30 is what he said.
6  EXAMINATION BY MR. BRUNO:
7  Q.  Do you want to look at 28, too,
8  just to make sure?
9  A.  It's one of those. Both of those
10 are kind of borderline.
11 Q.  28. Let's just put 28 in there,
12 too, okay. These are, these five properties
13 are properties that you believe were not
14 damaged or may not have been damaged by
15 flooding or water from below?
16 A.  Correct.
17 Q.  Okay. Good. Let's start with 24.
18 This 24 -- no, no. I'm sorry. I'm on the
19 wrong one. 24 is 1619-1621 North Broad
20 Street. Are we on the same page?
21 A.  Yes, sir.
22 Q.  All right. And you determined that
23 the highest flood elevation in the property
24 was what?
25 A.  Minus about a foot below finished

143

1  floor.
2  Q.  All right. Now, from what I gather
3  from your report, that's at, that's at your
4  observed water mark?
5  A.  Correct.
6  Q.  Okay. And then you indicate that,
7  and I need to understand this, the IPET high
8  water mark is 3.6?
9  A.  Correct.
10 Q.  Is that for this lat/long?
11 A.  Is that for what?
12 Q.  This latitude and longitude? In
13 other words, what's that 3.6 refer to?
14 A.  That's a number we got from GCR as
15 a relative IPET water mark in that area.
16 Q.  Well, how close?
17 A.  I don't know.
18 Q.  How does the 3.6 relate to the
19 negative 1.1?
20 A.  The 3.6, it shows a roughly 6
21 inches above finished floor. Our water mark
22 shows roughly a foot below finished floor.
23 Q.  Okay. Just to be clear, isn't that
24 a negative 6 or is that -- you see, you see a
25 3.6 NAVD88 and then you say zero foot dash --

144

```
 1   is that dash or minus? That's where I'm
 2   having a hard time.
 3       A.   Beside that, that's a zero foot
 4   dash six inches. That is positive. So
 5   that's a positive number.
 6       Q.   That's what got me confused. So
 7   this is positive?
 8       A.   Yes, sir.
 9       Q.   So according to IPET, it was 6
10   inches above the floor, and according to your
11   observation the highest water mark you found
12   was 1.1, not 1.1, but 1 foot 1 inches.
13       A.   Minus.
14       Q.   Minus.
15       A.   Yes.
16       Q.   Okay. What did -- what did the
17   owner say, if you know, about water
18   intrusion?
19       A.   The owner said it didn't flood.
20       Q.   Is this finished floor above grade?
21       A.   Yes, sir.
22       Q.   And did the water of negative 1-1,
23   did that go high enough to affect any of the
24   foundation?
25       A.   Not that I recall.
```
                                    145

```
 1   water mark?
 2       MR. ANZELMO:
 3       Objection to form.
 4       THE WITNESS:
 5       No, sir.
 6   EXAMINATION BY MR. BRUNO:
 7       Q.   It's a negative?
 8       A.   Ours is a negative, yes, sir.
 9       Q.   It's the dashes between the numbers
10   that's getting me confused.
11       MR. ANZELMO:
12       Look before the number.
13   EXAMINATION BY MR. BRUNO:
14       Q.   If I look at IPET, it is not one
15   inch above, it is one inch below?
16       A.   Correct.
17       Q.   According to IPET?
18       A.   Correct.
19       Q.   And your observed water mark is ten
20   inches below finished floor, right?
21       A.   Correct.
22       Q.   Okay. And this is Mr. Kaiser
23   again. Do you know what his claim is about
24   his property?
25       A.   No flood.
```
                                    147

```
 1   Kaiser is making about his particular house
 2   as it relates to flood damage?
 3       A.   No, sir.
 4       Q.   You've got the summaries around
 5   here someplace. These wouldn't be
 6   alphabetical, would they, by any stretch --
 7       MR. SUTTON:
 8       Yes, they are.
 9       MR. BRUNO:
10       Oh. Cool.
11       MR. SUTTON:
12       They are indexed in the front, too.
13       MR. BRUNO:
14       Yeah, well, this is easier. While
15   he's looking for that, this
16   property is at 1619 North Broad.
17   EXAMINATION BY MR. BRUNO:
18       Q.   All right. The next property is
19   26. And that's Clematis Street?
20       A.   Yes, sir.
21       Q.   Okay. Here we have, if I'm reading
22   this correctly again, it's one inch above
23   finished floor according to IPET, and your
24   finding ten inches above finished floor by
```
                                    146

```
 1       Q.   He claims no flood?
 2       A.   Yes, sir.
 3       Q.   This is the guy with all the
 4   property?
 5       MR. ANZELMO:
 6       Yes, sir.
 7   EXAMINATION BY MR. BRUNO:
 8       Q.   Okay. 26. Let's see. 28, I
 9   guess, would be next logically. Paul Morphy
10   Street. Okay. This is going to be, let's
11   see, 11 inches above finished floor, if I'm
12   reading this correctly, finally, according to
13   IPET?
14       A.   Correct.
15       Q.   And he's -- and the water mark, is
16   it right at finished floor?
17       A.   That's what ours shows, yes.
18       Q.   Okay. Did you find any water
19   damage, flood damage to this property?
20       A.   I don't recall the specifics. It
21   would be detailed. I mean, it is one of
22   those that's right there at the level, so --
23       Q.   Right. Where do I look to find
24   your conclusions about that?
25       A.   Well, we haven't broken down each
```
                                    148

```
 1   property to delineate damages between wind
 2   and flood.
 3   Q.  Why not?
 4   A.  We weren't asked to do that.
 5   Q.  Oh, okay.  Well, so I can't look at
 6   anyone of these reports and I can't determine
 7   what you conclude about whether there is
 8   flood damage or not?
 9   A.  You can conclude that there is
10   flood damage or not.
11   Q.  How do I do that?  Just tell me how
12   to do it.
13   A.  You have to review the summaries
14   and review the data.
15   Q.  I'm looking at the summary, okay.
16   Let's walk through Paul Morphy Street.  Where
17   do I look, I mean, you identify the water
18   marks.  I mean, you talk about what you see,
19   but I can't find anywhere you say, yes, there
20   is water damage or, no, there is not water
21   damage.
22        MR. BEARDEN:
23        I object to the form.  I think you
24        mean flood, right, not water?
25        MR. BRUNO:

                    149
```

```
 1   Q.  I'm sorry.  Say --
 2        MR. ANZELMO:
 3        6.2.1.  It is a table.
 4   EXAMINATION BY MR. BRUNO:
 5   Q.  Just give me a little bit of help.
 6   Which tab are you under?
 7   A.  Tab -- it is Chapter 6.
 8   Q.  Chapter 6 of --
 9   A.  Page 6.5 and 6.6.
10   Q.  Is that the report tab?
11   A.  Yes, sir.
12        MR. ANZELMO:
13        Joe, it would be toward the back of
14        the volume.  Look at his volume.
15        Joe.
16        MR. BRUNO:
17        All right.  Oh, I see.  It is after
18        all this stuff.  All right.
19        MR. ANZELMO:
20        Do you see at the top of the page?
21        What's the page you're on, top
22        left?
23        MR. BRUNO:
24        Analysis of Damage to Subject
25        Structures.

                    151
```

```
 1        property damages from above or
 2        below, sideways, from any source.
 3        MR. BEARDEN:
 4        My mistake.
 5        THE WITNESS:
 6        The general discussion of the
 7        damages would be in the text and in
 8        the summaries.
 9   EXAMINATION BY MR. BRUNO:
10   Q.  Am I looking at the summary?
11   A.  You're looking at the summary.  And
12   there are also summary tables.  This is just
13   factual information.  If you look at the way
14   the report is divided up, this is just
15   factual information in Chapter 4.
16   Q.  Okay.
17   A.  This is what we found in the field.
18   Then when you go to the later discussions,
19   there is a discussion on the different causes
20   of damages.
21   Q.  Okay.  Show me.
22   A.  There is a chart.
23   Q.  Just point me to --
24   A.  If you go to Chapter 6 and go to
25   table 6.2.1.  Those are all your --

                    150
```

```
 1        THE WITNESS:
 2        Yes, sir.
 3   EXAMINATION BY MR. BRUNO:
 4   Q.  So how do I find the house on Paul
 5   Morphy Street?
 6   A.  Go to the page 6.5.  Those tables,
 7   they should be in color.
 8   Q.  6.2?
 9   A.  There are two pages.  There is a
10   summary of all the damages to all the
11   properties.
12   Q.  Okay.  So again let's go to Mr.
13   Morphy's number 24.  Let's use that as an
14   example.
15        MR. ANZELMO:
16        No, that's -- excuse me.  It is not
17        24.  I think it might be 28.
18        MR. BRUNO:
19        No.  The person we talked to,
20        Thurman Kaiser.
21        MR. BEARDEN:
22        It is Broad Street.
23   EXAMINATION BY MR. BRUNO:
24   Q.  Broad Street.  I'm sorry.  Broad
25   Street.  Okay.  So this is 24.  And you find

                    152
```

```
 1   termite damage.  But termite damage is not
 2   caused by flooding, right?
 3       A.  Correct.
 4       Q.  So do you know if the plaintiff is
 5   making a claim for termite damage?
 6       A.  I don't know.
 7       Q.  Okay.  Scouring of soils, is that
 8   caused by flooding?
 9       A.  Yes, sir, it can be.
10       Q.  Roof damage, that's not caused by
11   flooding, right?
12       A.  No, sir.
13       Q.  The veneer damage, is that caused
14   by flooding?
15       A.  It could be.
16       Q.  But you don't indicate whether it
17   is or it is not?
18       A.  We're not delineating.
19       Q.  I understand.  So in order for me
20   to make that assessment, I have to go back
21   out to the house?
22       A.  No.  You might, but we just haven't
23   that done that.  That wasn't part of the
24   scope.
25       Q.  Okay.  Well, if I ask you to do it,
```

153

```
 1   Objection to form.
 2   EXAMINATION BY MR. BRUNO:
 3       Q.  You said the word estimate.  So is
 4   there a number involved here?
 5       A.  Yes, sir.
 6       Q.  All right.  And does the number
 7   relate to, to money?
 8       A.  No, sir.
 9       Q.  What does the number relate to?
10       A.  Water levels.
11       Q.  Water levels.  Okay.
12       A.  Floodwater levels.
13       Q.  All right.  So you're estimating,
14   you're estimating -- I'm just confused.  What
15   is the estimate of?  It, it's an estimate of
16   how much water got in the house or --
17       A.  It's an estimate of how much damage
18   was to the finishes from floodwater.
19       Q.  Okay.
20       A.  From all sources.
21       Q.  Okay.  And that -- so you end up
22   with a number of dollars?
23       A.  No, sir.
24       Q.  You end up with an exactly what
25   then?  I'm trying to follow you.  What are
```

155

```
 1   I mean we didn't have to now take the
 2   time for us to figure out whether this
 3   gentleman deserves any money, what do you do
 4   to determine whether or not the veneer damage
 5   is caused by flooding or not?  Do you have
 6   enough information in your files that you can
 7   draw that conclusion or do you have to do any
 8   more work?
 9       A.  I think in general we do.  There
10   may be a specific case where it may require
11   some more follow-up, but I think in general
12   we took a lot of data that we could use to
13   delineate.
14       Q.  Okay.  All right.  You say also
15   with regard to this property "the estimated
16   damage to finishes."  What does that mean?
17       A.  Because a lot of the properties had
18   already been repaired, we're using the gauge
19   of the estimated IPET water line or our water
20   line to gauge some type of flood level to the
21   finishes, damage to finishes.  That's what
22   that is.
23       Q.  I don't understand.  Whose estimate
24   are you relying on?
25           MR. ANZELMO:
```

154

```
 1   you -- you say it is an estimated number that
 2   relates to the damage to finish.  So at the
 3   end of the day, what's the number?
 4       A.  The number we're basing that on is
 5   the water, estimated water depth.
 6       Q.  No.  I'm not asking you what it is
 7   based upon.  I'm asking you what the, at the
 8   end of the formulaic string what do I see, do
 9   I see a number?
10       A.  Yes, sir.  I think we are saying
11   the same thing.
12       Q.  I don't know.
13       A.  The number is the water line, or
14   the water level, if it's above the floor
15   inside the house.
16       Q.  Well, how do you -- well, 92
17   percent refers to the percentage of
18   structures that have similar kind of damage.
19   That means 92 percent of the structures had
20   some damage to finish?
21           MR. ANZELMO:
22               Objection to form.
23           MR. GARDNER:
24               Objection to form.
25           MR. BEARDEN:
```

156

1  you agree with me that the conclusion to which
2  you make reference at page 8.6 is at least in
3  part caused by the fact of the flooding to
4  the entire city and the attendant, I don't
5  know, lawlessness and loss of police
6  protection and the like that we all know that
7  occurred after the storm?
8      MR. ANZELMO:
9      I object to the form.
10     MR. GARDNER:
11     Objection to the form.
12     MR. BEARDEN:
13     Objection to the form.
14     THE WITNESS:
15     I don't know.
16 EXAMINATION BY MR. BRUNO:
17  Q. Well, you do know that for a period
18 of time there were no police in the city?
19     MR. ANZELMO:
20     Objection to the form.
21     MR. GARDNER:
22     Objection to the form.
23     MR. BEARDEN:
24     Objection to the form.
25 EXAMINATION BY MR. BRUNO:

173

1  into the bowl of the city until such time as
2  the height of the water inside the bowl got
3  to the height of the water outside the bowl?
4      MR. ANZELMO:
5      Objection to form.
6      MR. GARDNER:
7      Objection to form.
8      MR. BEARDEN:
9      Objection to form.
10     THE WITNESS:
11     I don't know.
12 EXAMINATION BY MR. BRUNO:
13  Q. What would be the other sources of
14 water then, what could possibly be the source
15 of water other than that on the Tuesday, the
16 Wednesday or the Thursday after the storm?
17     MR. ANZELMO:
18     Objection as to form.
19     THE WITNESS:
20     As I understand it from the
21     hydrology reports, and that's not
22     my area of expertise, that the
23     bowls, the different parts of the
24     bowl or the basins influenced each
25     other.

175

1      A. I don't know that.
2      Q. Okay. Now let's go to page 11.2.
3  You talk about discussion. You say, "The
4  height of the water above the structure was a
5  distinct and variable parameter in the
6  flooded structures of New Orleans. The water
7  level varied due to three conditions:
8  Topography, type of foundation system and the
9  structures' height or, generally, the number
10 of stories." Right?
11     A. Yes, sir.
12     Q. But the fact is that the height of
13 the water was solely due to the fact that
14 that water got as high as the lake because
15 they were not able to seal up the breaches in
16 the levee after the Monday of the storm?
17     MR. ANZELMO:
18     Objection to form.
19     THE WITNESS:
20     I don't know.
21 EXAMINATION BY MR. BRUNO:
22  Q. Well, in other words, the water got
23 as high as it did because the height of the
24 lake got, caused water to continue to intrude

174

1 EXAMINATION BY MR. BRUNO:
2  Q. Even if they do influence each
3 other, the chief influence is the water that
4 comes inside the bowl itself, the entire
5 Metro bowl?
6      MR. BEARDEN:
7      I object to the form.
8      MR. GARDNER:
9      I object to form.
10     MR. ANZELMO:
11     Object to form.
12     THE WITNESS:
13     As far as the water that gets
14     inside the Metro bowl, as you call
15     it.
16 EXAMINATION BY MR. BRUNO:
17  Q. Yes.
18     A. Or the subclass area that we're
19 talking about, from all sources, I would
20 agree with that.
21  Q. Right. Finally, 11.5, page 11.5,
22 the proposed class boundaries presents no
23 meaningful divisions?
24     MR. ANZELMO:
25     Subpart 4?

176

```
 1  EXAMINATION OF MR. BRUNO
 2  Q. Subpart 4.
 3  A. Yes, sir.
 4  Q. You are not referencing topography
 5  there, are you?
 6  A. No, sir, we're not referencing
 7  topography. We're referencing the
 8  variability in damages.
 9  Q. Okay. Just -- that's the only
10  thing you are referencing there?
11  A. Well, not necessarily.
12  Q. What else would you be referencing?
13  A. Well, there's variability in
14  damages.
15  Q. Right.
16  A. There's variability in
17  characteristics of the buildings and there's
18  also variability in the wind and water forces
19  that the members were subjected to.
20  Q. Well, let's assume that you're --
21  have you ever heard of the Grand Teton dam
22  failure in 1974?
23  A. No, sir.
24  Q. Let's assume you live in the
25  vicinity of an area that's protected by a dam
```

177

```
 1  A. I don't know if it is as simple as
 2  that. I mean, the conclusions we reached
 3  here are because of the characteristics of
 4  this case.
 5  Q. Right.
 6  A. And a hypothetical case, I don't
 7  know.
 8  Q. Well, what would be different?
 9  What would be the difference between my
10  hypothetical case and this case that would
11  cause the conclusions to be different? You
12  essentially argue in your opinions that
13  everybody's damages are different. Well,
14  okay. Fine. In the case of a dam break
15  everybody's damages would be different, too,
16  isn't that true?
17     MR. BEARDEN:
18        Objection to the form of the
19        question.
20     MR. GARDNER:
21        Same objection.
22     THE WITNESS:
23        It depends.
24  EXAMINATION BY MR. BRUNO:
25  Q. Are people's damages going to be
```

179

```
 1  and intrude everywhere. All of the conclusions
 2  intrude everywhere. All of the conclusions
 3  that you reach in your report would be
 4  reached with regard to all the potentially
 5  damaged properties that may have been damaged
 6  by a dam break, isn't that true?
 7     MR. BEARDEN:
 8        I object to the form of the
 9        question.
10     THE WITNESS:
11        You're talking about a hypothetical
12        case? Where the forces of water
13        basically originate from one
14        source.
15  EXAMINATION BY MR. BRUNO:
16  Q. Yes.
17  A. But the characteristics of the
18  buildings would all vary?
19  Q. Right. Just like you've got here.
20  A. And the damages, therefore, could
21  vary.
22  Q. Right. So all of the conclusions
23  that you reach here would be the same
24  conclusions that you would reach in that
25  hypothetical situation, isn't that true?
```

178

```
 1  the same if the source of damages is a dam as
 2  opposed to a broken levee or rain or
 3  whatever?
 4  A. I don't know. I would have to know
 5  the facts of the case, and the
 6  characteristics.
 7  Q. Sir, is your testimony that the
 8  damages that would be sustained by a dam
 9  break would be the same for everybody, is
10  that what you are going to tell the judge?
11     MR. ANZELMO:
12        Objection to the form of the
13        question.
14     MR. GARDNER:
15        Objection to the form.
16     THE WITNESS:
17        I don't know. I don't know -- I
18        don't fully understand your
19        hypothetical and how that compares
20        to this case.
21  EXAMINATION BY MR. BRUNO:
22  Q. Well, if you have an area that is
23  dry and that becomes wet because of dam
24  breaks, tell me how that's different from an
25  area that is dry and becomes wet as a result
```

180

1  overflow? Tell me what the difference is
2  with regard to your conclusions would be in
3  those two situations.
4      MR. ANZELMO:
5      Objection to form. And I believe
6      it's been asked and answered.
7      MR. BRUNO:
8      No, I don't have an answer. I have
9      an "I don't know."
10     MR. ANZELMO:
11     Which is an answer.
12     THE WITNESS:
13     In your hypothetical, I mean, you
14     just have a single point source of
15     water.
16 EXAMINATION BY MR. BRUNO:
17 Q. Right. True.
18 A. You don't have a hurricane. You
19 don't have wind. You don't have wind-driven
20 rain.
21 Q. Right.
22 A. There are many characteristics or
23 many parts of the forces that are applied —
24 Q. Agreed.

181

1  break case.
2  Q. Of course. But the conclusions
3  would be the same regardless of that, isn't
4  that true?
5      MR. ANZELMO:
6      Object to form.
7      MR. GARDNER:
8      Object to the form of the question.
9      MR. BEARDEN:
10     Object to the form.
11 EXAMINATION BY MR. BRUNO:
12 Q. That is your conclusions here, that
13 everybody's damages are essentially
14 different, that's your conclusion here,
15 right?
16 A. That's my conclusion here, yes.
17 Q. Okay. So in the case of a dam
18 break everybody's damages would be different
19 as well because of age of the house,
20 preexisting conditions, all that stuff that
21 you referred to, all those things are
22 potentiated in the dam break hypothet, aren't
23 they?
24 A. They potentially all could be

182

1  different.
2  Q. All right. Well, is there any
3  potential that they could all be the same?
4  A. The potential, yes.
5  Q. They could all have the same
6  damages?
7  A. They could.
8  Q. Okay. Good. That's helpful.
9  Thank you. On that I have no more questions.
10     MR. ANZELMO:
11     Thank you very much.
12     VIDEOGRAPHER:
13     Off the record at 1:25.
14
15
16 (Whereupon, the deposition was
17 concluded at 1:25 p.m.)

183

1       WITNESS CERTIFICATE
2
3
4       I, ERIK L. NELSON, Ph.D., do hereby
5  certify that the foregoing testimony was
6  given by me, and that the transcription of
7  said testimony, with corrections and/or
8  changes, if any, is true and correct as given
9  by me on the aforementioned date.
10
11
12
   DATE SIGNED       WITNESS' SIGNATURE
13
14
15
16    Signed with corrections as noted.
17
      Signed with no corrections noted.
18
19
20 DATE TAKEN: September 25, 2007

184