```
                                    jr1003007
22   difference in the value post-Katrina?
23        A.   Again, you would have to look at
24   hedonic models to be used at a point in time.
25   It could help you -- if you do know one of
```

                                                        162

```
 1   the models, it would help you determine the
 2   value at a point in time on a very thing.
 3   Then you have a different thing trying to
 4   help you develop, if you use a different
 5   category, a different point in time, then you
 6   can use a hedonic model then if you wish.
 7   Then you look at the differences to what you
 8   are looking at.   So it doesn't give you the
 9   diminution by itself.   It gives you a process
10   of maybe getting to it.
11        Q.   And is that a process that could be
12   used on a class-wide basis in this matter?
13        A.   No.   For the same reasons about the
14   AVM.
15        Q.   Okay.   And that's my real question.
16        A.   Yeah.
17        Q.   For the exact same reasons as the
18   AVM?
19        A.   For the same reasons.   Exactly.
20        Q.   And that would be the heterogenous
21   community and the causation and the net
22   damage?
23        A.   Particularly in the case of hedonic
24   modeling, heterogeneity.
25        Q.   On page 28 and 29 you talk about
```
                            Page 144

jr1003007

8   the fact that the people in the Road Home
9   Program could not have sold their residence
10  at the value that they believe they could
11  have, and that's the reason they moved back?
12      A.  I mean, that's a possibility
13  certainly.  I can't -- I don't know exactly
14  why each one made that decision, so I can't
15  discount that.
16      Q.  I guess that's my question.  Have
17  you actually looked and interviewed any of
18  these people in the Road Home Program and
19  asked them the reason they moved back?
20      A.  No, I have not.
21      Q.  Okay.  If you were to prepare an
22  AVM in connection with this case, would one
23  of the factors be the amount of flood that
24  each structure sustained?
25      A.  There you're asking for an addition

167

1   to an AVM that really probably hasn't been
2   done before.  You are talking about repairs,
3   restoration.  Typically, AVMs are dealing
4   with houses that are whole.  So now you have
5   to add a whole new set of equations or whole
6   new set of variables.  I think it would be
7   very difficult to do.  I mean, if someone
8   said, Dr. Richardson, this is your
9   assignment, I'd do the best I could, but I
10  wouldn't guarantee any good results.
11      Q.  And assume that somebody says, Dr.

Page 148

jr1003007

19  judgment calls on the part of a person.
20  Obviously you want to be as close. For
21  example, when we do the revenue forecasts for
22  the State, we really would love to be within
23  about two to three percent. Now, that would
24  be true for revenue forecasts. I'm not going
25  to say that's the right number for everything

170

1   you do, such as housing appraisals or fair
2   market value of housing. It would probably
3   be bigger than that, to be honest.
4       Q.  Do you know what that percentage
5   would be?
6       A.  It would be -- again, it's a
7   judgment call on everybody's part.
8       Q.  Okay. Because I would assume even
9   individual appraisals or valuations of
10  property damage would have some margin of
11  error?
12      A.  Oh, certainly.
13      Q.  Just to make sure I'm clear. When
14  you were talking about the heterogenous
15  reason why AVMs would not be appropriate in
16  this matter, was that based solely upon the
17  subclasses that were proposed by the
18  plaintiffs?
19      A.  No. I think you could draw the
20  subclasses any way you want to. In New
21  Orleans you are still going to find the

Page 151

```
                                jr1003007
22   heterogeneic problem, unless you make it into
23   like 177 subclasses, something of that
24   nature.
25        Q.   I was wondering.  Have you looked
```

171

```
 1   at that and have any opinions on how you
 2   could draw subclasses that would give you
 3   homogeneous neighborhoods?
 4        A.   Not with five subclasses, no.
 5        Q.   Not with five.  Just looking at the
 6   entire levee class, have you done any studies
 7   or rendered any opinions on how you could
 8   divide the class into subclasses that were
 9   homogeneous?
10        A.   No, I have not.  No.
11        Q.   I don't know if you answered this
12   or not, but in your expert opinion, do you
13   believe that a buyer would consider whether a
14   house had flooded in the past or not in
15   making a decision on whether to purchase that
16   house?
17        A.   Some buyers may be concerned,
18   interested in that certainly.  I can't say
19   they would not be.  Certainly some could be.
20        Q.   So it's your opinion that some
21   buyers would not consider whether or not a
22   house had flooded say by nine feet in their
23   decision on whether to purchase that
24   property?
25        A.   To some it may not be an issue, but
```

Page 152

```
 1                    UNITED STATES DISTRICT COURT
 2                    EASTERN DISTRICT OF LOUISIANA
 3
 4
 5   IN RE:  KATRINA CANAL BREACHES    *   Docket 05-CV-4182-K
     CONSOLIDATED LITIGATION           *
 6                                     *   New Orleans, Louisiana
                                       *
 7                                     *   October 18, 2007, 1:15 p.m.
     * * * * * * * * * * * * * * * *
 8
 9
10
                  TRANSCRIPT OF PROCEEDINGS BEFORE THE
11                  HONORABLE STANWOOD R. DUVAL JR.
                      UNITED STATES DISTRICT JUDGE
12
13
     APPEARANCES:
14
15   For the Plaintiffs:          The Law Offices of Joseph M. Bruno
                                  BY:  JOSEPH M. BRUNO, ESQ.
16                                855 Baronne Street
                                  New Orleans, Louisiana 70113
17
18   For the Plaintiffs:          Gainsburgh Benjamin David
                                    Meunier & Warshauer
19                                BY:  GERALD E. MEUNIER, ESQ.
                                       KARA M. HADICAN, ESQ.
20                                1100 Poydras Street, Suite 2800
                                  New Orleans, Louisiana 70163
21
22   For the Plaintiffs:          RICHARD M. MARTIN JR., ESQ.
                                  416 Gravier Street
23                                New Orleans, Louisiana 70130
24
25
```

22

1  of that nature, but I couldn't list them for you right now, if
2  that's what you are asking me to do, no.
3  Q.  You couldn't list them to the Court; right?
4  A.  I couldn't list them for the Court, but they are not hard
5  to find and they are not hard to understand.
6  Q.  Let me ask you a couple questions about what Mr. Zwain has
7  asked you, your knowledge on the methodology of property tax.
8  I wasn't sure if I heard your answer or if you didn't answer
9  the question.  Have you ever actually prepared a methodology
10 for any property tax assessment?
11 A.  I've not prepared a methodology.  We have studied it,
12 though, and I have co-edited several books that included
13 methodology on assessment practices.
14 Q.  Okay.  It's my understanding -- and we'll get to that
15 potentially later on.  When you testified as far as your
16 experience with the New Orleans tax assessment, how did you
17 come about that information?
18 A.  Well, that was about -- as we talk about, in the '80s we
19 were doing this book.  Also, we are looking at property
20 taxation and we are looking at assessment practices.  So you
21 talk to people who do that and you find out what they are
22 doing.  The same thing when I was helping with the Roemer
23 Administration; we were looking at possible ways of making
24 changes in the property tax assessment practices.  We had to
25 look at what they were doing.  So that's what we were doing at

1  that time.
2  Q.  Okay.  That was back in the '80s and '90s?
3  A.  Yes, sir.
4  Q.  In the 2000s, in this century, you haven't actually gone
5  out and looked at the methodology being used; correct?
6  A.  Not in the 2000s.  Now, in 1999 I co-edited this
7  *Handbook on Taxation*.  We talked about state, local, federal,
8  and international taxes.  In the local taxes, we looked at
9  property taxes and we certainly looked at methodology of
10 assessment, yes.
11 Q.  Well, let me ask you this:  Back in the '80s or '99, what
12 percentage of the parishes used AVMs for property tax
13 assessment?
14 A.  Back in the '80s?  I doubt if any of them used it.
15 Q.  Back in '99, that would have been the last time you looked
16 at it?
17 A.  In '99, and that was the national thing, not just a state
18 element.  So, nationally, certainly some people -- in fact, in
19 the chapter in the book they talked about computer-assisted
20 models in which they were essentially types of AVMs.  They were
21 suggesting and in that article they were talking about how AVMs
22 can be used in certain situations if the properties are
23 sufficiently homogeneous and put all the little criteria down.
24 This is when they might be useful.
25 Q.  In fact, that book that you co-authored, that chapter was

23

1  written by your co-author; correct?
2  A.  That chapter was written by a different person.
3  Q.  I want to know your personal experience on the
4  methodology.  How did you personally become aware of the
5  methodology used in taxation as it is in Louisiana for property
6  tax assessment?
7  A.  That would have to be with interviews, talking to people
8  who actually were involved with that process, not personal,
9  hands-on myself, no.
10       MR. HONEYCUTT:  Your Honor, I have no further
11 questions, but I do object to his introduction as an expert in
12 any other area other than general economics.
13       THE COURT:  The Court notes your objection for the
14 purpose of the record.  I'm going to allow him to testify as
15 tendered.  The Court will accord such weight to his testimony
16 as it deems appropriate after I hear it since this isn't really
17 a *Daubert* hearing as to this witness.  We are kind of doing it
18 the old way.  Oh, those wonderful days before *Daubert*.
19       MR. ZWAIN:  A lot simpler.
20       THE COURT:  Yes.  Go ahead.
21       MR. ZWAIN:  Your Honor, if I may, with counsel's
22 permission, I would like to approach your clerk and hand you
23 in globo the exhibits I'm going to use with Dr. Richardson that
24 will illustrate some of the concepts that he is going to talk
25 about.

24

1        THE COURT:  Okay.
2        MR. ZWAIN:  For the record, they are Defense Exhibits
3  5 through 12.
4        THE COURT:  Thank you very much.
5        MR. HONEYCUTT:  We would object to the relevancy of
6  any of this material, Your Honor.
7        THE COURT:  Okay.  Since I'm not in a position to
8  determine how relevant it is, I will have to overrule your
9  objection at this point, but it will certainly be reurged at
10 the end.
11              DIRECT EXAMINATION
12 BY MR. ZWAIN:
13 Q.  Dr. Richardson, we listened to Dr. Vandell this morning
14 and colloquy among and between counsel with respect to the idea
15 that mass appraisals are not suited to areas where homogeneity
16 is lacking.  Do you remember that testimony?
17 A.  Yes, I do.
18 Q.  Do you agree with Professor Vandell that mass appraisals
19 are not suited where an area is too heterogeneous or not
20 sufficiently homogeneous?
21 A.  Yes.  I think Professor Vandell said that.  I think, if
22 you look at almost any information on the AVMs, you will find
23 that qualification.  Homogeneity is very vital.
24 Q.  Dr. Vandell described what he felt the concept of
25 heterogeneity was or homogeneity was with respect to real

## 26

1  estate issues. I don't want you to repeat what he said, but in
2  terms of relating it to the areas in question -- New Orleans,
3  St. Bernard Parish -- can you tell us whether in your opinion
4  those areas are homogeneous or heterogeneous with respect to
5  their real estate mix?
6        MR. HONEYCUTT: Your Honor, I would object to the
7  cumulative nature, if I could just make that continuing.
8        THE COURT: That objection is noted. The Court is
9  wondering, too, what is *homogeneous*? Is it the barracks of a
10 military base? I'm not quite sure what it is. Every house
11 looks alike, the same size, sort of like *Pleasantville*? I'm
12 not quite sure. When does something metamorphose into
13 heterogeneousness for the purpose of a multiple regression
14 formula and an AVM?
15        MR. ZWAIN: It's all beyond me, but I'm sure
16 Dr. Richardson could --
17        THE COURT: It's beyond me at this point, too.
18        THE WITNESS: I will try to be helpful to you,
19 Your Honor.
20 BY MR. ZWAIN:
21 Q.  Would you explain to the Court the factors that go into
22 determining whether areas are heterogeneous or homogeneous from
23 a real estate mix standpoint.
24 A.  If I can kind of start with this little experience I had
25 when I came to New Orleans in November of 2005 to the American

---

1  Institute of Architects, one of the interesting things when
2  they were talking -- these were people who had so-called
3  "aesthetic values," artistic values, much more than I do. The
4  one comment they made was, "We want to help New Orleans recover
5  as it was. We don't want New Orleans to become another Dallas,
6  Texas," with all due respect for people from Dallas.
7        THE COURT: Certainly Highland Park, I guess, might
8  be an example of homogeneousness, but maybe not, every house
9  being a million dollars or above or something. Go ahead.
10       THE WITNESS: But I think the element there -- the
11 difference there was you're talking about in New Orleans you
12 have unique neighborhoods. In Dallas and in many other cities
13 that have expanded very quickly in the last 30 or 40 years, you
14 have subdivisions that are, again, very similar in nature in
15 terms of the cost of those homes, the size, all the covenants
16 that might determine how they can be built, how they can look,
17 which way the garage can face, and everything of that nature.
18 So that was the first thing.
19       I think the second thing, if you look at
20 New Orleans, looking at numbers -- which economists like to
21 look at -- what is kind of revealing is in New Orleans
22 43 percent of the homes are pre-1949.
23       THE COURT: 1940 --
24       THE WITNESS: 1949.
25

---

## 27

1  BY MR. ZWAIN:
2  Q.  What does that mean?
3  A.  Well, if you compare them to the state, that number is
4  about 15 percent; or look at the whole state to this country,
5  that number is about 22 percent. You see that, again,
6  New Orleans is from that -- just looking at the age of the
7  stock of housing.
8  Q.  Why does the age of the stock of housing make a difference
9  in terms of an area's homogeneity or heterogeneity or not?
10 A.  Well, partly because the houses are built in a different
11 era. Different size houses are built side by side. Different
12 elements were built there. You would have low income houses,
13 high income houses very close to each other, almost touching in
14 some cases, or blocks away, whereas today in the suburbs you
15 don't have that going on. So that's one of the elements why
16 the age of the stock makes a difference.
17       Also, you have repair issues, maintenance issues,
18 things of that nature, that, again, create different problems
19 for housing possibilities. I mean, if you are going to redo
20 the house, if you are thinking about redoing that house, you
21 have to rewire it for the current world. It's a major
22 difference that you have to worry about. So that's the type
23 of -- it's rebuilding, repairing, maintenance. That is what
24 goes into that.
25 Q.  Let me ask you about another possible factor. We asked

---

## 28

1  Dr. Kilpatrick in his depositions if he was aware of the number
2  of neighborhoods that existed in either the Levee class area or
3  the MRGO area. My recollection, I believe, was that he was
4  not, but that that would be an issue that would have to be
5  looked into. Why do neighborhoods need to be looked into in
6  order to determine whether or not an area is heterogeneous or
7  homogeneous or suitable for a mass appraisal model?
8  A.  I think neighborhoods are of a unique character,
9  historical characteristics by themselves. This is why if you
10 look at New Orleans, if you look at the whole Orleans Parish, I
11 think there are over 70 neighborhoods that are well defined.
12 These neighborhoods have been defined for a long time. They
13 are not just recently defined neighborhoods.
14       If you look just in the area that's dealing with the
15 five subclasses with the Levee litigation, you have 54
16 neighborhoods. These neighborhoods all are well defined in
17 terms of the type of houses that are there, the community
18 spirit that might be there, the style of housing that might be
19 there. So in that sense they are all very different, unique.
20 Q.  Let me stop you there and let me direct your attention to
21 what we have marked as Defense Exhibit 5. All these maps, I
22 think, have markings on them, delineations, boundaries,
23 whatever you call it. Would you explain to the Court what
24 these lines mean, first the green lines.
25 A.  Well, the green lines on Exhibit 5 and on every exhibit --

30

```
 1  the green lines will be the classes or the subclasses as
 2  defined by the plaintiffs.
 3  Q.   In the Levee case?
 4  A.   In the Levee case, yes, sir.
 5  Q.   What are the little gray lines?
 6  A.   The little gray lines will be the division of the
 7  neighborhoods, and there should be 54 neighborhoods not
 8  counting New Orleans East and the Lower Ninth Ward and
 9  Holy Cross.
10  Q.   So if I'm reading this correctly, what I'm seeing is that
11  there are multiple neighborhoods within each subclass area
12  designated in the Levee case; is that right?
13  A.   That is correct, uh-huh.
14  Q.   Now, did you draw these lines, or were these lines drawn
15  at your behest, or where did you get the information with which
16  these lines were drawn?
17  A.   I did not draw the lines. This information all came from
18  the Greater New Orleans Community Data Center.
19  Q.   What is the Greater New Orleans Community Data Center?
20  A.   It is part of a nonprofit -- the Greater New Orleans
21  Nonprofit Neighborhoods Center I believe is what it is
22  called -- and they have been creating for more than --
23  pre-Katrina, well before Katrina, in terms of putting together
24  information on different neighborhoods. You go to their Web
25  site and they have all the maps out there showing the
```

```
 1  neighborhoods. They have information about these neighborhoods
 2  from the census, telling you about differences in income,
 3  household, education of the people who live there,
 4  transportation of those people in terms of how they get to
 5  work, in terms of the employment opportunities that they have,
 6  and so on.
 7  Q.   So these neighborhood lines and the names that they are
 8  given are well established within New Orleans lore and
 9  recognized by the public agencies or entities that deal with
10  the local economy?
11  A.   These neighborhoods are historically developed. They have
12  not been something divided up recently. These are a long time
13  coming.
14  Q.   Explain to the Court, if you will, and to the rest of us
15  how one neighborhood differentiates itself from another. In
16  other words, what makes Central City different than the
17  Lower Garden District? Why are they different neighborhoods
18  and why are those lines drawn where they are?
19  A.   One, we do it with information. If you look at the
20  information, for example, on Exhibit 5, this says "Income by
21  Neighborhood." What we have looked at, we have said, "Okay.
22  Are these neighborhoods somewhat similar in terms of the wealth
23  capacity?" What we looked at and, you know, because you are
24  trying to get a sense, this is -- we define it in this
25  situation income being greater than $60,000 per year. Now,
```

31

```
 1  remember, this is based on census-tracked information from
 2  2000, now. You look down at Audubon -- and everybody has a
 3  sense of where Audubon is.
 4           THE COURT: The Court happens to live -- I'm in the
 5  other 51 percent. Go ahead. I'm teasing.
 6           THE WITNESS: I understand now.
 7           49 percent of those people make $60,000 or more,
 8  and that was in 2000. Then you look right next door to it and
 9  you have Freret; you see 12 percent of those people. You go
10  right down to Uptown, only 28 percent. So you see right there,
11  very closely tied together, you have a big dispersion of what
12  you might call "wealth."
13           You look up to Gentilly, now, you see it's a
14  little bit more common and you have -- in Gentilly you have --
15  I think there are eight neighborhoods in Gentilly or so. You
16  are seeing about 18 percent in Milneburg and about 22 percent
17  in Gentilly Terrace, 14 percent in Dillard itself. So you see,
18  again, there's that diversion there of income.
19           Now, what you do is then you look at the next
20  exhibit, which is Exhibit 6, and then again we are looking at
21  Audubon. This is the poverty level. We said Audubon had
22  49 percent of its people that made above $60,000. You look at
23  this chart, this is those living below the poverty level.
24  18 percent live below the poverty level. So if you have
25  that -- you have within this one district a very, very small
```

32

```
 1  subunit. You see this diversion or dispersion of wealth.
 2           You look up into other areas, as well, and you
 3  see in Freret you have got 34 percent. You had 12 percent
 4  making above $60,000. You have 34 percent making below the
 5  poverty level.
 6  BY MR. ZWAIN:
 7  Q.   So if I'm understanding you correctly by what Exhibits 5
 8  and 6 depict, they depict one level of heterogeneity, which is
 9  defined by the 50-some-odd neighborhoods within the Levee class
10  boundaries, and then a second level of heterogeneity even
11  within the neighborhoods themselves to the extent that the
12  income levels perhaps in one neighborhood can differ so
13  dramatically from house to house, block to block?
14  A.   That's right. I think that's what helps define
15  heterogeneity in terms of saying these are rather remarkable
16  differences within a very, very small geographic area.
17  Q.   So what does that mean in terms of constructing an
18  accurate and reliable econometric model or AVM in this case?
19  A.   Well, it says you have a lot of different housing stocks.
20  Q.   So what?
21  A.   Because, now, how do you make that model? Remember, you
22  have to have good, accurate data. There has to be some
23  consistency in that data. You can't go from -- a couple houses
24  are, say, 5,000 square feet and a couple houses are 1,000
25  square feet, and just using some per-foot measure may not be
```

33

1  the right way. It's not going to get you a good number because
2  you are trying to get an estimate of housing value. Well, that
3  type of variation, that type of variance is not going to get
4  you a very good average and that's the problem. That's what
5  the problem is you are going to cope with.
6  Q.   All right. We have talked about neighborhoods. We have
7  talked about income. What other factors affect the idea of
8  heterogeneity in terms of real estate mix?
9  A.   Again, another possibility -- and this is something
10 heterogeneity talked about, the types of properties that are
11 going to be covered under this AVM that Dr. Kilpatrick is going
12 to make. Obviously, I think he will certainly cover
13 owner-occupied homes. However, in New Orleans 53 percent of
14 your residences will be renters, so over half. It's not clear
15 to me that he plans to use that in his model, so that means you
16 have a large number of houses that are not being covered by
17 this AVM. You also have an element, if you have a lot of
18 renters in a particular neighborhood, it may have an impact on
19 the value of the owner-occupied homes as well. There could be
20 a feedback effect.
21 Q.   Let's go back to the idea about what the scope of
22 Dr. Kilpatrick's model might cover. We know it's going to
23 cover, according to him, owner-occupied residences; correct?
24 A.   I guess. I think that's pretty sure.
25 Q.   Then he starts to diverge a little bit or become unclear a

34

1  little bit in terms of what, if anything, it might cover beyond
2  that. I think I heard Mr. Meunier say this morning and also in
3  a deposition taken earlier in this case that, although there
4  won't be modeling for income derived from commercial real
5  estate, which I assume includes rented residences, there will
6  still be some modeling of the real estate itself. Is that
7  possible to do?
8  A.   I don't think so, no. The value of property depends very
9  much upon the income that those properties might generate. If
10 you are having a fourplex, having a duplex, having a multiunit
11 apartment building, I mean, obviously the value of that
12 property depends pretty much on its income being generated.
13 Unless there is some alternative use, you tear this down and
14 build something entirely different, that could make the
15 difference there.
16 Q.   Have you valued commercial properties before?
17 A.   Not directly, no, sir.
18 Q.   You have considered the impact of certain outside,
19 external forces on commercial property in terms of affecting
20 their value?
21 A.   On business activity, yes.
22 Q.   The methods that are available to determine lost value of
23 commercial property are simply not suitable to mass appraisal
24 techniques?
25          MR. HONEYCUTT: Your Honor, I'm going to object

35

1  again. He just said he didn't know anything about the
2  valuation of the actual building, that his expertise is more in
3  the loss of the income stream.
4          THE COURT: Do you want to repeat your question,
5  Counsel?
6          MR. ZWAIN: I forgot what it was.
7          (WHEREUPON the question was read out loud by the
8  court reporter.)
9          THE WITNESS: I would agree with that, yes.
10         MR. HONEYCUTT: Your Honor, before that, though, he
11 had stated that it was not and he had never done an actual
12 evaluation of the property itself, but it was limited to the
13 loss of income stream.
14         THE COURT: You can use that in argument, sir.
15 BY MR. ZWAIN:
16 Q.   What other factors are there that go into making a
17 determination in terms of an area's heterogeneity or
18 homogeneity?
19 A.   Well, I mean, you have all the other areas. You have
20 things such as the public services that might be available
21 within the area. You have the other amenities, the ability for
22 public transportation opportunities. You have a lot of those
23 things that will also go into the value of property in a
24 certain area. You can kind of get, again, the sense of the
25 variation in that if you look on Exhibit 8 -- and for the Court

36

1  we should make this one correction. It's not rent above
2  $1,000; it's mortgage payments above $1,000. This is dealing
3  with owner-occupied homes, so there's a big difference there.
4  Q.   So this map attempts to track monthly mortgage payments
5  above $1,000?
6  A.   Monthly mortgage payments.
7          THE COURT: So the word *rent* should be *mortgage
8  payments*?
9          THE WITNESS: Yes, sir.
10         Doing that, again, you see a big variation among
11 these neighborhoods relatively close by. Again, looking at
12 Audubon, you see 88 percent above that. Right next door, you
13 see in Freret 44 percent. Right down in Uptown, 74 percent.
14 So you see that variation throughout the area, and that
15 suggests there are significant differences in those homes that
16 are in those particular neighborhoods in terms of the value of
17 those homes.
18 BY MR. ZWAIN:
19 Q.   Won't I see this mix in other small southern cities or is
20 New Orleans unique?
21 A.   Any city the size of New Orleans -- you go to
22 Jacksonville, Atlanta -- of course, Atlanta is much bigger now,
23 but Mobile you aren't going to see that same type of division,
24 no. You will see much less variance.
25 Q.   Now, I take it there are other factors that go into

38

1  determining whether an area is heterogeneous or homogeneous
2  that you have not mapped out. Would you explain some of those
3  to the Court, please.
4  A.  Again, there's a lot of other information, like I said.
5  There's like the transportation. There's the household
6  information, if there's a female head of household, the age of
7  the household --
8  Q.  What does a female head of household have to do with
9  property value and the heterogeneity issue?
10 A.  Well, typically, if you look statistically, female heads
11 of household have a much lower income, so it's one more factor
12 of the income ability of that community.
13 Q.  Lower incomes are associated with lower property values?
14 A.  That's right.
15 Q.  I'm sorry. Go ahead.
16 A.  That's correct. Then other factors you're talking about,
17 you have the age distribution. If you have a lot of children
18 in that neighborhood, that may suggest you need good
19 educational facilities. If they are not there, that affects
20 it. If you have more people earning Social Security, that
21 suggests an older population. They might need certain public
22 services. So that's what you are looking for at that stage
23 that will make differences in these communities.
24 Q.  Now, do you include within Exhibits 5 through 12 some
25 post-Katrina data?

1  A.  Yes. All the data up through 8 will be pre-Katrina data,
2  indicating that before Katrina the neighborhoods were very
3  diverse. And, of course, post-Katrina you're interested in
4  what's happening by neighborhood.
5  Q.  Okay. Let me stop you there for one second. How does the
6  rate of recovery from the storm relate to property value and,
7  in particular, the heterogeneity issue?
8  A.  Well, in relation to property value in terms of --
9  obviously, if you have property in an area that is recovering
10 very quickly, its value will recover very quickly. You find
11 that the rate of recovery differs substantially from
12 neighborhood to neighborhood, which says in certain
13 neighborhoods the value of the property may be back to
14 pre-Katrina levels already and in other neighborhoods it's not.
15 So there's that distinction you have to make.
16 Q.  All right. Let's look at Exhibit 9. What does that tell
17 us?
18 A.  Exhibit 9 and Exhibit 10 will be information that was
19 developed by the Louisiana Department of Labor based on their
20 collection of taxes from businesses that provide contributions
21 to the unemployment insurance program.
22 Q.  Before you go any further, do we have to fix another typo
23 on these Exhibits 9 and 10?
24 A.  Yes. That's a good point. There's another typo on the
25 labeling where on the left-hand side it says "February 2005 to

39

1  April 2006." That's really the information -- the base
2  information is the second quarter 2005 or pre-Katrina. April
3  should be the fourth quarter 2006.
4  Q.  So it runs, essentially, from April 1, 2005 until
5  December 31, 2006?
6  A.  That's correct. It's quarterly data. It's quarterly
7  data. It's quarterly information, what we have, yes. That's
8  the benchmarks. Just before Katrina and now almost 18 months
9  after Katrina is what it amounts to.
10 Q.  Tell us what this Exhibit 9 means in terms of real estate
11 value and heterogeneity.
12 A.  Well, first, in terms of values of property, it means you
13 have businesses coming back. You have employment
14 opportunities. You have people in that neighborhood that,
15 again, puts pressure on, increases the demand for housing
16 there. It certainly makes that property get back close to or
17 above its pre-Katrina value. That's the issue of making the
18 property value.
19         Heterogeneity, you find that if you look across the
20 map you will see that there are major differences. Like,
21 again, looking at Audubon, all of its businesses are back plus
22 four percent. If you, obviously, look down at the Lower Ninth
23 Ward, it's 20 percent of their businesses are back. Even up
24 into the Lakeview area you see approaching 70 percent. Over in
25 Gentilly you're in the 50 to 60 percent range except in, I

40

1  guess, at the top there near Pontchartrain Park it's
2  80 percent.
3  Q.  Lakewood, you have got 18 percent above pre-Katrina levels
4  compared to their next-door neighbors in Navarre, who are only
5  at 58 percent pre-Katrina levels; is that right?
6  A.  Let me find Lakewood on the map here.
7          THE COURT:  The Court can see that and takes note of
8  it.
9  BY MR. ZWAIN:
10 Q.  So am I correct in understanding that this map shows a
11 very uneven and wildly fluctuating rate of recovery depending
12 upon what neighborhood you look at?
13 A.  Definitely. That's one of the things that we have tried
14 to explain to everybody coming here in terms of the financial
15 people, the congressmen, the other persons who come and are
16 interested in New Orleans' recovery. Some of the people fly in
17 and they go to the French Quarter and they believe, "What's
18 wrong? Nothing," or they go down to Tulane University right
19 now and there's not much they see wrong. If they go to the
20 Lower Ninth Ward, it's a whole different sight they see, or
21 they go to certain places in Gentilly. But if they go there
22 over the last 18 months, they would notice progress every time
23 they go there, though. So, you see, every area is coming up at
24 a different rate. That's kind of the thing about the recovery,
25 that it's so differentiated it's very hard to get a handle on