1  it.
2  Q.  It's fluid, isn't it?
3  A.  Oh, it's very fluid.  For example -- and, again, this is
4  personal experience because, doing the research, I go to the
5  communities.  I visited Dillard University probably about eight
6  months after the storm.  That would be the spring of 2006.
7  It's a lovely campus and it was badly hurt by the water.  They
8  had people working just incredibly fast.  It was amazing the
9  construction going on at that time.
10      The neighborhoods around that university, you saw
11  more trailers out in front of the houses per block than you did
12  any place else.  People had come back there and they were doing
13  their own work on their own houses.  If you come back today,
14  you see that area is much better, much improved.  So you get
15  the sense of, "My golly, the dynamic nature of improvements is
16  tremendous."  Now, you go to some other areas, it hasn't come
17  back quite as fast.  That's true, too.
18  Q.  Let's talk about what Exhibit 10 shows.  Again, you have
19  to make that same typographical error change with respect to
20  the dates?
21  A.  Yes, sir.  You make that same change up under -- that's
22  from the second quarter 2005 as the base, the fourth quarter
23  2006 as the recovery period.  What you discover here is -- this
24  is employment by these units.  The first was business
25  establishments.  The second one is employment.  Again, you get

1  a sense of the number of people who come back into the areas in
2  terms of having jobs within those neighborhoods.
3      Again, obviously along the Uptown, Carrollton, along
4  the river bank, you find that the numbers are fairly high,
5  though as you move back into the city and into an area like
6  Broadmoor it is only 40 percent.  If you move up into the
7  Mid-City area, it's about 60 percent.  When you move up, again,
8  into the Gentilly area, it varies from way down in 14 up to 67
9  and then, of course, over to Lakeview in the 30s.
10  Q.  This is data that is from December of 2006?
11  A.  2006, right.
12          THE COURT:  You're talking about Exhibit --
13          MR. ZWAIN:  I'm talking about Exhibits 10, 9, and 8.
14          THE COURT:  You said December 2006?
15          MR. ZWAIN:  It cuts off December 2006.
16          THE WITNESS:  Well, it's the fourth quarter.
17          THE COURT:  We need to amend Exhibit 10 to the fourth
18  quarter as well?
19          MR. ZWAIN:  Yes, sir.
20          THE COURT:  Thank you.
21  BY MR. ZWAIN:
22  Q.  So what I'm wondering is, if we collected the same types
23  of data and brought it current until today, given your
24  experience with post-Katrina recovery efforts and rates of
25  recovery, would you expect to see the same fluctuation today as

1  we see effective December 31, 2006?
2  A.  Well, I see everybody being better.  I would expect to see
3  some variation among neighborhoods because every neighborhood
4  is not fully whole right now.
5  Q.  If we looked at data today, your expectation would be that
6  the fluctuation of that data would be pretty much the same as
7  it is depicted on these maps, which take us through December
8  2006?
9  A.  Obviously, what you are looking for in the end, you are
10  hoping to get a hundred percent --
11  Q.  Absolutely.
12  A.  -- and then everybody is the same.  You are not going to
13  be there at the end of 2007.
14          THE COURT:  I have just a question on Exhibit 10,
15  just so I understand it.  It's not incredibly relevant.  On the
16  neighborhood Lake Terrace on Exhibit 10, you have a 268 percent
17  employment number.  Does that mean, in essence, that two and a
18  half times more people are employed than were employed before?
19  Tell me what it means.
20          THE WITNESS:  That's what it means.  It's a low base.
21  It's like going from five to ten.  That's the type of thing.
22          THE COURT:  So the number is more dramatic because
23  the base is lower?
24          THE WITNESS:  Yes, sir.  The percentage changes so
25  dramatically because the base is lower.

1          THE COURT:  Are more people living there than were
2  living there before the storm?
3          THE WITNESS:  This is our employment.  This is people
4  working in there, more people working in there than before the
5  storm; not living there, necessarily, but working in there.
6          THE COURT:  It's actually where they work rather than
7  where they live?
8          THE WITNESS:  Yes.
9          THE COURT:  It's not the people there who are
10  unemployed; it's the people who work in that area?
11          THE WITNESS:  Yes.  Exactly.  Yes, sir.
12          THE COURT:  I see.  Okay.  Thank you.
13  BY MR. ZWAIN:
14  Q.  The number of people who work in an area affect real
15  estate areas; correct?
16  A.  It certainly shows that area is working and coming back.
17  I think it indicates the ability of that area to come back
18  because it is obviously viable.
19  Q.  Let's take a look, then, at Exhibits 11 and 12.  First,
20  Exhibit 11.
21  A.  Okay.  Let me explain this.  This information comes from
22  GCR & Associates, which is a firm here in town that's working
23  with Entergy on its utility infrastructure.  This is
24  measuring -- for example, Exhibit 11, it's dated December 2006.
25  It will be the active accounts in December 2006 compared to the

46

 1  active accounts in December 2004. Obviously, pre-Katrina is
 2  what you have to look at.
 3  Q.  This appears to be on a block-by-block basis; is that
 4  correct?
 5  A.  Yes. In this one you see -- I guess in this case it would
 6  be the blue lines would be the neighborhoods, but in this
 7  situation you have within the neighborhoods the block-by-block
 8  information because you have that more microdata that will be
 9  available to us. Again, you look here, you see obviously the
10  green is what the good number is in terms of having most of
11  their active accounts are back. The red is the bad number,
12  having very few of their active accounts back. Then you go
13  from red to orange to yellow and up to a light green and to a
14  darker green.
15          So you see a tremendous variation, I mean, block by
16  block within a neighborhood about what has come back. This is
17  one of the things, again, that is intriguing about the
18  recovery. It makes, again, any type of mathematical model very
19  difficult to establish because of all this great divergence,
20  great differences a block away. That's what you are going to
21  run into in terms of trying to develop that mathematical model.
22  Q.  Now, Exhibit 11 depicts resettlement patterns as of
23  December 2006; is that right?
24  A.  Yes, sir.
25  Q.  Now, when we say "resettlement patterns," what they are

 1  going on is the number of people who actually have their
 2  electricity turned on?
 3  A.  Well, they are active accounts. Active accounts.
 4  Q.  There is felt to be a correlation between those active
 5  accounts and people actually living in the places where those
 6  accounts exist?
 7  A.  That's one of the methods they are using to estimate
 8  population because you don't have a survey all the time. You
 9  have to estimate it somehow mathematically.
10  Q.  Now, let's turn to Exhibit 12. Again, that depicts
11  resettlement patterns block by block based upon the
12  establishment of utility accounts; correct?
13  A.  Yes. It's the same thing. This is going from August 2007
14  to August 2005. That's the base that you're dealing with
15  there. It's on active accounts.
16  Q.  This depicts the state of affairs that existed eight
17  months after the last map was drawn? Exhibit 12 depicts the
18  status as of August 2007 whereas Exhibit 11 depicted it as of
19  December 2006; correct?
20  A.  Yes, sir, that's correct.
21  Q.  Now, I can see with my own eyes that there are some
22  substantial changes here. Can you describe to the Court
23  basically what they are and how this reinforces perhaps your
24  opinion that the heterogeneity of the area and the variation of
25  the pace of recovery makes it difficult to model or do the

47

 1  models that Dr. Kilpatrick wants to propose to the Court?
 2  A.  Well, I think there are a couple of things. First, you
 3  see -- and this is a good thing. You see a lot more green.
 4  You see a lot less red. So those are both very good elements.
 5  You also appreciate that this city certainly is in that
 6  come-back mode, but again it's not uniform. It's not even
 7  across the city, unfortunately. It is diverse.
 8          You still see areas where you see only maybe half of
 9  their active accounts back. There are a few blocks where you
10  have still in the very low, less than 20 percent level being
11  back. Again, you are seeing that improvement, but again it's
12  not -- obviously, it's not been accomplished. You want the map
13  to be all green at some point, but at this point in time it's
14  not. There's a lot of variation there still.
15  Q.  I have a question. We talked this morning a lot about
16  market equilibrium. Do you remember that?
17  A.  Yes, uh-huh.
18  Q.  I'm wondering whether the maps we see in front of us --
19  Exhibit 12, for instance -- and what you know about the pace
20  and differentiation of post-Katrina recovery suggests that
21  while some areas of the city may be in equilibrium, others may
22  not be?
23  A.  That's certainly possible, yes.
24  Q.  So it's a little misleading, I guess, to say that the
25  New Orleans market in general is in equilibrium because it may

48

 1  not address the certain submarkets, the neighborhoods or the
 2  subneighborhoods that may be in distress and not in
 3  equilibrium?
 4  A.  Yes. I think that is one of the complications that is
 5  going to confront any type of AVM, any type of mathematical
 6  model that requires or needs that type of equilibrium to be
 7  correctly specified and estimated.
 8  Q.  So your opinion is that based on the data we have
 9  explained to the Court, your experience with the local economy
10  here and the recovery here, that there is far too great an
11  extent of heterogeneity to believe that an accurate and
12  reliable mass appraisal model can be done?
13  A.  Yes, that's my opinion.
14          THE COURT: Have you introduced your exhibits, sir?
15  Do you intend to introduce these?
16          MR. ZWAIN: Yes, sir. I offer, file, and introduce
17  into the record Exhibits 5 through 12.
18          MR. HONEYCUTT: I would object to the relevancy,
19  Your Honor.
20          THE COURT: Subject to the objection, let them be
21  admitted.
22  BY MR. ZWAIN:
23  Q.  Now, did you also hear Dr. Vandell talk this morning about
24  the existence of accurate and reliable data as being a
25  necessary predicate to view an AVM or a hedonic model?

50

1  A. Yes. Of course, that's true for any model you build, yes.
2  Q. Would you discuss with the Court what the data is with
3  regard to real estate values in the two class areas we are
4  concerned about.
5  A. Well, first, obviously you are going to need information
6  about pre-Katrina. If you are going to rely on information
7  from the tax assessors, you have to appreciate in this area you
8  have seven tax assessors. In fact, they run across the five
9  subclass areas, so one subclass might be in three different
10 areas -- I haven't looked at it -- or at least two different
11 assessors. You are going to find the quality of information
12 from assessor to assessor is going to be very different because
13 they keep different records. That's just the way it has been.
14 Now, that will change in 2010 when they start having one
15 assessor, possibly, but at this point in time it's going to be
16 different.
17        So pre-Katrina data, if you are looking for the
18 assessor data as being very accurate, consistent across
19 subclasses, I think you're going to be surprised what you get.
20 Now, obviously if you are getting information from sales that
21 come off MLS files, things like that, you expect that to be
22 somewhat accurate.
23 Q. Now, is it your recollection of Dr. Kilpatrick's testimony
24 that he was not yet aware of what the assessor data looks like
25 in either of these classes?

1  A. I got the feeling that was true, yes.
2  Q. Because he hadn't even reviewed it, had he?
3  A. Not at that time, no.
4  Q. So he is in for a surprise?
5  A. At that point, right.
6  Q. Tell the Court the difference, if there is one, between a
7  model that is peer reviewed in the literature and that same
8  model being applied in the field. Does the fact that a model
9  is peer reviewed in the literature mean anything, as far as its
10 actual use, in terms of its accuracy and reliability?
11 A. I think you have to look at what you're trying to
12 accomplish. If you are trying to put something into an
13 academic article or into a professional journal and you're
14 noting it has these qualities, you're focusing on the
15 theoretical part, the conceptual part, on what makes it look
16 neat as in an abstract sense and you think, "And it will work."
17 You're making the deal it is going to work in the real world,
18 too, but that's not the ultimate goal. The ultimate goal is to
19 have other people say, "That's a good model. It may work. Who
20 knows?"
21        Now, if you go over here to the other side of the
22 coin, where you say this is going to be applied to a real world
23 event, now the validation, the reliability, is a different
24 issue. For example, when we do revenue forecasting, that's not
25 abstract. The state budget depends on it. So if our number is

51

1  way off, particularly if it's too low and they spend a lot more
2  money than they have, we put the state in a real bind.
3         This is saying, like in tax assessment, property tax
4  assessors, they come out and put estimates of property values
5  on a person's property. That's the number that that person is
6  going to pay a tax on. Now, in that situation, if a person
7  thinks it's too high, they are going to appeal. So you have an
8  element of saying, "Wait a minute. There's something wrong
9  here." That person may be right or wrong. If it's too low,
10 odds are the person won't say a thing. So, in that sense, you
11 don't get any type of feedback from that particular thing.
12         So there's an asymmetrical situation as far as the
13 feedback you might get. In the real world, if you are talking
14 about something is going to have a real impact on people, you
15 have a different level of how do you decide if that is a good
16 fit or a good model.
17 Q. Now, the people who run the Road Home Program, they bought
18 an automated valuation model; is that right?
19 A. Yes, they did.
20 Q. That model, as I understand it, was ballyhooed as being
21 the most advanced, one of the best there was available;
22 correct?
23 A. Well, I don't know if I would say it like that exactly,
24 but I would say -- first, they bought the services of one is
25 what they really did. But, again, they had every reason to

52

1  pick a good model. They're intelligent people. They had a
2  task at hand, trying to find pre-Katrina values, and they
3  wanted to see if they could do it as fast as possible. So they
4  went out and they bought, at least in their judgment, the best
5  model that they could find who would do that for them.
6  Q. Tell the Court why it didn't work.
7         MR. HONEYCUTT: Object. Your Honor, first of all, I
8  don't think he has laid a proper foundation as to whether or
9  not he knows how it worked because I don't think he has even
10 testified that he personally reviewed that model.
11        THE COURT: Counsel.
12        MR. ZWAIN: I thought it was public knowledge it
13 didn't work.
14 BY MR. ZWAIN:
15 Q. Do you know whether it worked?
16        MR. HONEYCUTT: Objection.
17        THE COURT: You're saying why it didn't work. Is he
18 doing like Zeus, giving birth to Athena through his head, or
19 did he actually work with the Road Home? Did he study the
20 model? Did he go over it? Does he know of any political
21 considerations? Was it a bad model? In other words, what's
22 his personal knowledge? I would like to know what he is basing
23 his opinion on to some degree since I'm actually hearing this.
24 BY MR. ZWAIN:
25 Q. Would you tell us whether or not you know the model worked

54

```
 1  or not.
 2  A.  Say that again.
 3  Q.  Would you tell us whether you know if the model worked.
 4      MR. HONEYCUTT:  Objection, Your Honor: Leading and
 5  foundation.
 6      THE COURT:  You might want to lay a foundation.
 7  Obviously, they did something else.  We all know that.  So if
 8  he can't enlighten us any more than that, let's move on.  If he
 9  can enlighten us as to the intricacies of why it didn't work
10  through his own personal knowledge or based on studies he has
11  made and can opine as an expert --
12  BY MR. ZWAIN:
13  Q.  Have you studied or investigated the problems with or the
14  way in which the AVM model purchased by the state worked with
15  regard to the Road Home Program?
16  A.  Yes.  What I did is I asked persons working with the LRA,
17  the Louisiana Recovery Authority, people who are in the top
18  positions, and I talked to them about what happened.
19  Q.  Who did you talk to?
20  A.  I talked with Mr. Adam Knapp, who was the assistant
21  director of the LRA and would have a good knowledge --
22      MR. HONEYCUTT:  Objection:  Hearsay.
23      THE COURT:  Okay.  It's a hearsay objection.
24  Although I want to be equanimous in the way that I allow a lot
25  of latitude in this hearing, but at the same time whatever
```

```
 1  hearsay -- it's not his personal knowledge.  It's what somebody
 2  from the Road Home said.  If you want to bring him over here,
 3  that's fine, but I'm not sure that repeating what he said --
 4      MR. ZWAIN:  Well, I agree it's hearsay, Your Honor.
 5  I'm not necessarily sure that the hearsay rules apply in a
 6  Daubert hearing.  My understanding is that Federal Rule 104
 7  relaxes that standard somewhat and the Rules of Evidence don't
 8  strictly apply.  I think all you need to do is show that it's
 9  relevant.
10      MR. HONEYCUTT:  Your Honor, I assert that they do
11  actually apply in a Daubert hearing.  In fact, in this specific
12  situation, he is specifically getting ready to try to say what
13  somebody else said and is basing his opinion on.
14      THE COURT:  Let me say this:  Whatever it is, it
15  won't have a great deal of effect on this Court.
16      MR. ZWAIN:  I'll move on.
17      THE COURT:  I understand.  I have a lot of latitude
18  in this kind of hearing.  I have Rule 104 right here and it
19  says:
20          "Preliminary questions concerning the
21  qualification of a person to be a witness, the existence of a
22  privilege, or the admissibility of evidence shall be determined
23  by the Court, subject to the provisions of subdivision (b).  In
24  making its determination, it is not bound by the Rules of
25  Evidence except with respect to privileges."
```

55

```
 1          Your point is well taken about Rule 104.
 2  Whatever the Road Home people said, I don't know how it's going
 3  to disqualify Dr. Kilpatrick because I would have to have more
 4  information.  I'll let it in just for the sake of the record.
 5  BY MR. ZWAIN:
 6  Q.  Briefly, tell us what you know about why the AVM didn't
 7  work in the Road Home Program.
 8  A.  They were very specific.  I asked very specific questions
 9  and, essentially, it really kind of backs up all the
10  information that was just shown in the exhibits.  They said
11  very clearly you had because of the heterogeneity of the
12  communities and the neighborhood --
13      MR. HONEYCUTT:  We object again to hearsay.
14      THE COURT:  Also, by the way, from the Court's
15  standpoint, I don't know if the Road Home Program is a paradigm
16  for anything, whether it's for individual appraisals or
17  automated models.  Apparently neither is working very well, but
18  go ahead.
19      MR. ZWAIN:  I would simply offer that --
20      THE COURT:  We will have to come up with a third way
21  of appraisal.  Go ahead.
22      MR. ZWAIN:  We have that.
23  BY MR. ZWAIN:
24  Q.  Finally, Dr. Richardson, you heard some discussion this
25  morning about the extent of work that Dr. Kilpatrick did with
```

56

```
 1  respect to the Murphy Oil case; correct?
 2  A.  Yes.
 3  Q.  It was mentioned that he may have collected data with
 4  regards to 28,000 homes in the Murphy Oil class action;
 5  correct?
 6  A.  I heard that, yes.
 7  Q.  All in St. Bernard Parish?
 8  A.  That's correct.
 9  Q.  Now, if he has collected that data in the manner in which
10  was described this morning, would you expect that he would be
11  in a position to tell us or describe for us in some detail what
12  the proposed protocol for his operational appraisal model would
13  be?
14      MR. HONEYCUTT:  Objection:  Argumentative,
15  Your Honor, and leading.
16      THE COURT:  Subject to your objection, I'm going to
17  allow him to testify.
18      THE WITNESS:  Obviously, if you collect that much
19  information, you must have some idea of the model that you're
20  going to use it with, which means you should be able to be very
21  candid and very open about what that model is going to look
22  like.
23      MR. ZWAIN:  Thank you.  Those are all the questions I
24  have.
25      THE COURT:  Thank you, sir.
```

70

```
 1  the model it's hard to -- the specific model -- you have to
 2  make --
 3       THE COURT: So if you don't know exactly what model
 4  there is, it's hard for you --
 5       THE WITNESS: It's hard to say exactly, yes sir.
 6       THE COURT: That's fair enough. Okay. Good.
 7  BY MR. HONEYCUTT:
 8  Q. Just to follow up on that: Statistically significant is
 9  actually a professional judgment call; right?
10  A. No, that's not a judgment call at all. That's a
11  statistical call.
12  Q. No, no, no, no. As far as the range, that's something
13  that, as an expert, you would --
14  A. No. Technically, I mean, you are talking about -- you are
15  looking at the parameters. You say, "This is statistically
16  significant." That has nothing to do with a judgment, no.
17  That is black and white.
18  Q. Doctor, let me ask you: Isn't it true that hurricanes can
19  cause losses that can be quantified? Right?
20  A. Surely, yes.
21  Q. In fact, you said that in your report; right?
22  A. Yes.
23  Q. In fact, isn't it true that the amount of flooding would
24  directly correlate to the amount of the damage?
25  A. Well, I typically would say the amount of flooding or the
```

```
 1  amount of water in a home will have an impact on the damage
 2  that might have been created, certainly, yes.
 3  Q. Now, it's my understanding from listening to your
 4  testimony that your opinion would be that it would be better to
 5  do individual appraisals on each piece of property; correct?
 6  A. I think that is what you are forced to do in order to try
 7  to get an accurate number that is good for the person who was
 8  damaged and the person who actually has to pay.
 9  Q. In fact, an individual appraisal is also just an estimate
10  of what the damages are; correct?
11  A. That's right. I mean, it's an estimate, yes.
12  Q. The same as an AVM; correct?
13  A. Yes. All property values will be an estimate at some
14  point because there's not a market transaction going on.
15  Q. I want to go back and ask you: You testified and admitted
16  you have never performed an AVM before, ever; correct? Never
17  prepared one?
18  A. Yes, I think I said that.
19  Q. But you have performed or prepared some econometric
20  models; right?
21  A. I have prepared econometric models.
22  Q. In fact, you prepared one in the 1970s; correct?
23  A. Yes, 1975, for the state legislature.
24  Q. 1975. You also prepared one in 1983?
25  A. 1983.
```

71

```
 1  Q. You update that one every year?
 2  A. We update that every year, yes, sir.
 3  Q. Other than those two, those are the only two econometric
 4  models you have prepared; correct?
 5  A. Yes. Well, the only ones, but you have to appreciate
 6  updating is what you are supposed to do every year.
 7  Q. I understand.
 8       THE COURT: Let me ask you: Have progression models
 9  improved and been refined over the years since '75 to now or
10  are they static?
11       THE WITNESS: Statistics has changed a great deal
12  since I was a grad student, for example. You have more, I
13  guess, advanced methods of viewing things, but that really
14  deals with a very set type of problem. If you look at big
15  econometric models that I have worked with, we are using
16  essentially the same methods I used as a grad student back in
17  the late 1960s. So that has not changed a great deal, but
18  there are other statistical techniques that are used today to
19  look at, say, survey data, look at time series analysis and
20  things of that nature that have very specific uses, yes. So
21  it's not static, but what I'm doing is a little bit, yes.
22  BY MR. HONEYCUTT:
23  Q. Doctor, isn't it true that you have never made a
24  recommendation that AVMs not be used in establishing property
25  assessments? Correct?
```

72

```
 1  A. That is true unless you take this case out.
 2  Q. With the exception of this case; right?
 3  A. Yes, uh-huh.
 4  Q. I want to go through your qualifications a little bit to
 5  see what tax boards you sat on. First of all, you have
 6  co-authored a handbook in taxation?
 7  A. Yes.
 8  Q. In connection with that, you never would have recommended
 9  that AVMs not be used for property assessment except for this
10  case; right?
11  A. Say that again. I'm not sure I caught all the negatives.
12  Q. Inside the book you never said, "Don't use AVMs"?
13  A. That's right. I did not. Yes, uh-huh.
14  Q. Now, it's my understanding that you served on several
15  boards; correct?
16  A. Yes. I don't know which ones you are referring to.
17  Q. Well, I'm trying to glance at the tax ones that you have
18  served on.
19  A. I provided assistance to the State of Kansas in some tax
20  studies. I did property taxation there for them and also
21  severance taxes. I also served on the tax commission of the
22  Law Institute at LSU. Then I was the fiscal adviser to
23  Governor Roemer, and I guess I also advised Governor Edwards,
24  and then I advised Governor Foster on tax issues.
25  Q. I guess that's my question. Serving on all those boards
```

74

```
1  and issues, it was never your recommendation that AVMs not be
2  used in establishing a property assessment; correct?
3  A.    Again, I'm trying to make this perfectly clear in my
4  deposition and in here. This is not AVMs are bad in total.
5  This is AVMs are not suitable in this situation for what you
6  are trying to accomplish here. I don't think they will serve
7  you well, the state well, or the members of the class or the
8  other persons well.
9         MR. HONEYCUTT: No further questions.
10        THE COURT: Any redirect?
11        MR. ZWAIN: None, Your Honor.
12        THE COURT: You may step down, sir. Would you all
13  like to take a recess before the next witness? Five minutes.
14  This is the last witness?
15        MR. MEUNIER: I think this concludes the live witness
16  portion of the first motion. We are ready to now move to the
17  second motion, which is plaintiffs' motion on Mr. Truax.
18  Before we close this portion, if you don't mind doing this
19  briefly before the recess, I want to make sure that we have in
20  the record the merged excerpts of the deposition testimony of
21  Dr. Kilpatrick.
22        THE COURT: I have them, but you probably ought to
23  put them in the record.
24        MR. TREEBY: I admitted them first thing. I stood
25  up --
```

```
1         THE COURT: You did?
2         MR. TREEBY: Yes.
3         THE COURT: That's right.
4         MR. TREEBY: That's my Exhibit 1, and Exhibit 2 was
5  the DVD.
6         MR. MEUNIER: We would like to make Exhibit 1 a joint
7  exhibit, with the understanding that it is the entire merged
8  excerpts from Dr. Kilpatrick's deposition testimony as well as
9  all --
10        THE DEPUTY CLERK: It's the highlighted one?
11        MR. TREEBY: It's both. We gave the Court first the
12  entire deposition transcript with highlighted portions that
13  were designated among us.
14        THE COURT: I have it right here, and then I got
15  another one with a few more lines.
16        MR. TREEBY: Right. Then we gave the Court an
17  integrated one that didn't have all the rest of the transcript,
18  just the transcript that had been designated.
19        THE COURT: I have that as well.
20        MR. TREEBY: That's what I was admitting this
21  morning. I will join, though. We can also have the
22  highlighted one. Then this morning we gave the Court and gave
23  counsel those same designated portions in a DVD with the live
24  video.
25        THE COURT: I will look at the live testimony.
```

75

```
1         MR. TREEBY: I don't have any problem with all three
2  of those being a joint exhibit.
3         MR. MEUNIER: Well, the thing that I understood we
4  were submitting was -- because a lot of effort went into this.
5  Both sides got together and decided --
6         MR. TREEBY: That's what I'm talking about.
7         MR. MEUNIER: -- which portions of Dr. Kilpatrick's
8  earlier deposition would be admitted for the purposes of today.
9  That's the document that I want to make a joint exhibit. I
10 also want to make sure that associated with it are all of the
11 exhibits that were attached to Dr. Kilpatrick's deposition,
12 including his affidavit, report, CV, etc.
13        MR. TREEBY: We gave all the exhibits on a CD to
14 Your Honor. We would join that that would be admitted as part
15 of Exhibit 1, which is now a joint exhibit.
16        THE COURT: Right.
17        MR. TREEBY: Ms. Daley has it.
18        THE COURT: You can file that one in the record,
19 assuming it's the same thing.
20        MR. TREEBY: Same thing, I assume. I haven't seen
21 that one. I have seen the other one that we both agreed upon.
22        THE COURT: Do we have an extra copy that can go into
23 the record for appellate purposes?
24        MR. TREEBY: Yes.
25        THE COURT: I'll tell you what we will do.
```

76

```
1         MR. TREEBY: I gave two copies. Do you want a third?
2         THE LAW CLERK: Not of the CD.
3         MR. TREEBY: Not of the CD, you're right, but the
4  other things I gave two copies.
5         THE LAW CLERK: Yes.
6         MR. TREEBY: Do we just need another copy of the CD?
7         THE COURT: Yes, if we can get those in the record,
8  and we can have one for our purposes.
9         MR. MEUNIER: Your Honor, one final housekeeping
10 matter. Are you going to entertain closing remarks on the
11 Kilpatrick motion? Have you heard enough? Are you ready to
12 move to the Truax motion?
13        THE COURT: I think I've heard enough, but if you
14 want something I'm going to give it to you.
15        MR. MEUNIER: It's a matter of your need, Judge, not
16 my desire.
17        MR. TREEBY: I would suggest, Your Honor, that if
18 Your Honor wants or if anybody wants to do it that we do it
19 after Mr. Truax's testimony, keep it open --
20        MR. MEUNIER: Or we can submit a brief written --
21        MR. TREEBY: -- because he has to be out of here
22 tonight.
23        THE COURT: All right. That's fine.
24        MR. MEUNIER: We can even submit a brief post-hearing
25 memo.
```