UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: KATRINA CANAL BREACHES          CIVIL ACTION
CONSOLIDATED LITIGATION
                                        NO.: 05-4182 "k" (2)

                                        SECTION "K"(2)

FILED IN:   05-4181, 05-4182, 05-4191, 05-4568, 05-5237,
            05-6073, 05-6314, 05-6324, 05-6327, 05-6359,
            06-0020, 06-1185, 06-0225, 06-0886, 06-11208,
            06-2278, 06-2287, 06-2346, 06-2545, 06-3529,
            06-4065, 06-4389, 06-4634, 06-4931, 06-5032,
            06-5042, 06-5159, 06-5163, 06-5367, 06-5471,
            06-5771, 06-5786, 06-5937, 06-7682, 07-0206,
            07-0647, 07-0993, 07-1284, 07-1286, 07-1288,
            07-1289

PERTAINS TO: LEVEE

LEVEE DEFENDANTS' JOINT REPLY
DESIGNATIONS FOR MICHAEL W. TRUAX, MAI

I.   September 26-27, 2007 Deposition

     FROM                              TO

     PAGE      LINE                    PAGE      LINE

     32        24                      35        5

     56        7                       64        2

     66        2                       68        1



| | | | |
|---|---|---|---|
| 71 | 3 | 72 | 2 |
| 78 | 7 | 80 | 4 |
| 85 | 8 | 85 | 14 |
| 88 | 15 | 89 | 9 |
| 89 | 16 | 91 | 24 |
| 92 | 23 | 93 | 15 |
| 98 | 13 | 99 | 15 |
| 121 | 17 | 122 | 3 |
| 136 | 22 | 137 | 6 |
| 137 | 19 | 139 | 18 |
| 139 | 24 | 141 | 3 |
| 141 | 9 | 142 | 12 |
| 151 | 16 | 152 | 25 |
| 157 | 3 | 158 | 7 |
| 165 | 13 | 166 | 21 |
| 167 | 25 | 168 | 19 |
| 169 | 24 | 172 | 2 |
| 173 | 11 | 173 | 24 |
| 176 | 11 | 176 | 17 |
| 178 | 4 | 178 | 21 |
| 193 | 20 | 194 | 7 |
| 198 | 16 | 201 | 15 |
| 204 | 14 | 205 | 9 |

| | | | | |
|---|---|---|---|---|
| 205 | 18 | | 206 | 10 |
| 206 | 22 | | 208 | 18 |
| 227 | 21 | | 228 | 23 |
| 231 | 11 | | 232 | 5 |
| 235 | 17 | | 236 | 13 |
| 236 | 18 | | 238 | 3 |
| 238 | 24 | | 240 | 15 |
| 241 | 5 | | 241 | 22 |
| 245 | 2 | | 245 | 10 |
| 246 | 7 | | 246 | 20 |
| 262 | 18 | | 264 | 10 |
| 268 | 8 | | 269 | 9 |
| 269 | 21 | | 272 | 22 |
| 273 | 5 | | 276 | 25 |
| 279 | 12 | | 280 | 19 |
| 285 | 3 | | 287 | 13 |
| 310 | 14 | | 311 | 20 |
| 322 | 2 | | 323 | 23 |
| 334 | 18 | | 336 | 13 |
| 351 | 24 | | 352 | 16 |
| 369 | 8 | | 369 | 20 |
| 371 | 19 | | 373 | 9 |
| 379 | 14 | | 380 | 11 |

| PAGE | LINE | | PAGE | LINE |
|---|---|---|---|---|
| 385 | 8 | | 385 | 17 |
| 399 | 18 | | 400 | 11 |
| 401 | 12 | | 403 | 11 |

II. <u>**October 18, 2007 Testimony at Daubert Hearing**</u>

| **FROM** | | | **TO** | |
|---|---|---|---|---|
| PAGE | LINE | | PAGE | LINE |
| 99 | 7 | | 100 | 6 |
| 105 | 5 | | 105 | 17 |
| 107 | 10 | | 109 | 5 |
| 116 | 20 | | 117 | 9 |
| 118 | 14 | | 119 | 7 |
| 120 | 25 | | 121 | 21 |
| 126 | 17 | | 129 | 13 |
| 134 | 12 | | 134 | 24 |
| 139 | 2 | | 139 | 23 |
| 141 | 8 | | 141 | 24 |
| 142 | 17 | | 144 | 5 |
| 148 | 15 | | 150 | 18 |
| 151 | 24 | | 152 | 22 |
| 153 | 18 | | 154 | 4 |
| 155 | 18 | | 156 | 17 |
| 157 | 24 | | 158 | 22 |

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

IN RE: KATRINA CANAL BREACHES        CIVIL ACTION

CONSOLIDATED LITIGATION              NO. 05-4182 K2

                                     JUDGE DUVAL

PERTAINS TO LEVEE AND MRGO           MAG. WILKINSON

(V O L U M E   I)

Deposition of MICHAEL W. TRUAX, MAI, given in both the levees and MRGO cases, at the offices of Stone, Pigman, Walther, Wittmann, LLC, 546 Carondelet Street, New Orleans, Louisiana 70130-3588, on September 26th, 2007.

REPORTED BY:

JOSEPH A. FAIRBANKS, JR., CCR, RPR

CERTIFIED COURT REPORTER #75005

**Page 30**

1 wasn't necessarily aware of that.
2      But as I said, sitting here today I
3 don't recollect any property that -- where I
4 was aware that it was involved in a class suit.
5      Q. All right. So you've never knowingly
6 rendered an expert report in a class action
7 before this case.
8      A. Correct.
9      Q. Number 10 asks that you furnish all
10 documents pertaining to any model that you
11 propose to do. Would it be safe to say that
12 you don't intend to produce any modeling in
13 this case?
14     A. Correct.
15     Q. Number 11 likewise refers to models
16 and would be non applicable. And the same
17 with -- well, let me ask you about Number 11
18 and 12 together. Those refer to models that
19 you may have produced in prior cases, as well
20 as models that may have been put into effect
21 even outside of the litigation.
22        Can you think of anything that fits
23 that description in your case?
24     A. No.
25     Q. Let me refer to your CV, Mr. Truax.

**Page 31**

1 And for pagination purposes I'm going to refer
2 to Exhibit A attached to your September 10,
3 2007 levee report. And it begins at Page 21.
4     Do you have that?
5     A. I do.
6     Q. You have a BS in engineering; correct?
7     A. Correct.
8     Q. During your undergraduate career, did
9 you take any courses in statistics?
10    A. Yes.
11    Q. How many?
12    A. I believe one.
13    Q. Did you take any course in
14 multiregression analysis?
15    A. I believe in certainly some of the
16 engineering courses we -- there was some
17 minimal discussion of regression type analysis
18 in analyzing certain strength of materials and
19 the like type issues in the engineering field.
20    Q. Now, on graduating, you worked for
21 about twenty-six years for Max Derbes, Inc. as
22 a realtor, appraiser and developer, correct?
23    A. Correct.
24    Q. What were your professional
25 activities, generally, in those various

**Page 32**

1 categories of activity, realtor, appraiser and
2 developer?
3     A. It was principally doing appraisal and
4 consulting work. I did do some limited
5 development myself, and held a broker's
6 license and through the years accounted as a
7 broker/agent in several transactions.
8     Q. Principally, though, you worked as a
9 real estate appraiser?
10    A. Yes.
11    Q. Then you became a partner with the
12 Derbes company in 2002, correct?
13    A. That is correct.
14    Q. And formed your own company then in
15 March of 2005.
16    A. Correct.
17    Q. How, if at all, has your professional
18 activity changed since forming your own company
19 in March of '05?
20    A. It is substantially the same.
21    Q. So most of your professional time is
22 spent as a real estate appraiser?
23    A. Correct.
24    Q. When did you become certified in
25 Louisiana as a general real estate appraiser?

**Page 33**

1     A. I don't recall the year, but it was --
2 once the certification law was passed it was
3 very shortly thereafter.
4     Q. Can you give me some general idea when
5 it was?
6     A. I really don't remember when they
7 passed the law. Obviously those of us -- I was
8 already an MAI at the time, or had that
9 designation. The transition was fairly simple,
10 I had to sit and take the comprehensive exam
11 and submit the experience requirement -- the
12 hours of experience that they required. But I
13 don't remember the exact date that they passed
14 the certification law in Louisiana.
15    Q. And when you say -- when you reference
16 MAI with the Appraisal Institute, what does MAI
17 stand for?
18    A. It stands for Member of the Appraisal
19 Institute.
20    Q. And when did you become a member?
21    A. I believe '84.
22    Q. How did you come to be a certified
23 general appraiser for the State of Michigan?
24    A. We were involved -- our firm was
25 involved in several major project appraisals in

Case 2:05-cv-04182-SRD-JCW   Document 16669-14   Filed 12/10/08   Page 7 of 10

Page 34

```
 1   the state of Michigan, so I became certified in
 2   that state to assist in those appraisals.
 3       Q.  When was that?
 4       A.  Oh, I believe I first became certified
 5   there three or four years ago, and have
 6   maintained it through the current date.
 7       Q.  Well, what is involved in maintaining
 8   your MAI status?
 9       A.  We're required to take a certain
10   amount of education on a site specific basis.
11   I believe it's 100 hours every five years,
12   including certainly USPAP or standards course,
13   and they're fairly flexible beyond that in
14   terms of course materials you can take.
15       Q.  And what is involved in maintaining
16   your certification as a Louisiana real estate
17   appraiser?
18       A.  Well, they operate on a two-year
19   cycle, and require I believe it's thirty or
20   sixty hours, I forget which, every two years.
21   And there's certainly some crossover in terms
22   of the hours that can be used for the institute
23   as well as the state.
24       Q.  Have you been an MAI without
25   interruption since 1984?
```

Page 35

```
 1       A.  Yes.
 2       Q.  And have you been -- has your
 3   certification in Louisiana been without
 4   interruption since you received it?
 5       A.  Yes.
 6       Q.  In your CV, this is at Page 22, you
 7   list -- you have a listing under approved fee
 8   appraiser for, and then you list different
 9   entities.  What is meant by approved fee
10   appraiser?
11       A.  Most of the entities cited on that
12   list are financial institutions, and generally
13   they'll have an approval process that they
14   require before they will engage you to do work
15   for them.  So in these cases I went through
16   that process and was certainly approved by the
17   gate keeper at those institutions to do work
18   for them.
19       Q.  So in each of these cases listed under
20   approved fee appraiser, you initiated or sought
21   approval from the entity and followed whatever
22   procedures that entity had to be approved?
23       A.  Essentially, yes.  I mean, we don't
24   always initiate the inquiry.  Many times the
25   bank will call us and, because we may have some
```

Page 36

```
 1   expertise in a field they have interest in or
 2   have a property where that expertise is
 3   required, and will then ask us to submit the
 4   necessary paperwork to become approved so that
 5   we can work for them.
 6       Q.  And I notice that Jefferson Parish is
 7   one of the entities that has -- that is listed
 8   here.
 9       A.  Yes.
10       Q.  But not Orleans Parish.
11       A.  I'm not sure Orleans Parish has the
12   same process.  We have worked for Orleans
13   Parish, or departments of Orleans Parish.
14       Q.  So are you saying Jefferson Parish has
15   a process for the approval of fee appraisers,
16   but you don't believe that Orleans does?
17       A.  I remember the -- you know, the
18   necessity for, quote, being approved by
19   Jefferson Parish.  As I say, I've done jobs for
20   Orleans Parish and I don't remember any process
21   that required anything of me to become
22   approved.
23       Q.  At Page 22 on the bottom and
24   continuing to the top of Page 23, you list
25   corporate and institutional clients that you
```

Page 37

```
 1   have worked for, correct?
 2       A.  That's a partial list, yes.
 3       Q.  Have you ever been retained by
 4   individual citizens in a class action or mass
 5   tort case?
 6       A.  Well, I think I alluded to earlier
 7   that over my thirty years, possibly an
 8   appraisal I did for someone or a given property
 9   may have been for a client who was involved in
10   some class action case, but I'm not aware, and
11   I have no specific recollection where that was
12   the particular use of my appraisal.
13       Q.  What was done for the City of New
14   Orleans, which is one of the clients listed
15   here?
16       A.  The majority of the work I've done for
17   them had to do with the sale of surplus
18   property or the relocation of streets.
19   Sometimes they'll do some exchanges with
20   property owners when they want to relocate a
21   street.  Generally, that type of work.
22       Q.  Nothing dealing with flooding or flood
23   damage?
24       A.  No.
25       Q.  Nothing dealing with mass appraisal.
```

Page 54

1 recall the particulars of the analysis process,
2 but I know we reviewed sales data, and I made
3 some effort to do that through the market.
4     Q.  What do you mean through the market?
5     A.  We looked at market evidence as best
6 we could to determine if there was a
7 discernible value difference been those
8 properties, I believe, on the canal versus
9 those off the canal.
10    Q.  Well, did you have reference to actual
11 sales transactions involving the properties
12 that were subject to the sloughing impact?
13    A.  Yes.
14    Q.  So some of those properties were being
15 sold at the time the sloughing was taking
16 place?
17    A.  Um -- they were certainly being sold
18 in a reasonable period of time.  I remember we
19 had transactions of properties on that canal
20 where the problem was apparent.
21    Q.  And so your analysis consisted of
22 comparing sales transactions of properties
23 affected by the sloughing with sales
24 transactions of comparable property in a
25 different location?

Page 55

1     A.  Well, as I told you, I can't tell you
2 sitting here today all the particulars of the
3 analysis.  I'm telling you what I generally
4 recollect.  But clearly, we did look at sales
5 evidence.
6     Q.  All right.  Do you have a name for the
7 technique or the methodology that you used for
8 your analysis?
9     A.  In that case, we would have called it
10 the sales comparison approach, I suspect.
11    Q.  You used no survey techniques in that
12 case.
13    A.  No, not that I recall.
14    Q.  No hedonic model?
15    A.  No.
16    Q.  What work have you done for attorney
17 Gerald Wasserman?
18    A.  The ones that come to mind most
19 recently have to do with establishing a rent
20 for several commercial use properties that were
21 subject to a lease renewal, and the lease
22 renewal rental rate was to be established by an
23 appraisal process.
24    Q.  So it was the appraisal of an
25 individual commercial property that was

Page 56

1 involved?
2     A.  Yes.
3     Q.  You list projects, major projects you
4 call them, on Pages 23 and 24 of your CV.  Do
5 you see that?
6     A.  Yes.
7     Q.  One of which was a project associated
8 with the Shell Norco explosion, correct?
9     A.  Yes.
10    Q.  Who retained you in the Shell Norco
11 case?
12    A.  It was the law firm that was certainly
13 representing Shell.  I want to say it was Adams
14 and Reese.
15    Q.  Adams and Reese?
16    A.  Yeah.
17    Q.  And what were you retained to do?
18    A.  We were retained to study -- basically
19 do a sales study, track activity and value
20 levels demonstrated primarily in St. Charles
21 and St. John Parish with -- over time, to
22 determine if was there any long-term impacts.
23 That was -- ultimately, it proved to be just a
24 study.  But the focus was trying to see what
25 the value trending was post the cracker

Page 57

1 explosion which I think occurred in '88.
2         MR. MEUNIER:
3             We've got someone here that knows
4         something about the case.
5         MR. BRUNO:
6             How can I forget?  They won't let
7         me forget.
8 EXAMINATION BY MR. MEUNIER:
9     Q.  You were aware that was a class
10 action.
11    A.  Yes.  Well, I'm certainly aware
12 ultimately there was a class determined, you
13 know, but we weren't directly -- like I said,
14 ours was purely a study.  It was a research
15 study.
16    Q.  Right.  Did you issue any reports as
17 an expert in that case?
18    A.  I will tell you we likely had
19 certainly some written transmission of
20 something along the way, but I don't recall a
21 comprehensive report submission other than we
22 had data folders, I recall that, and listings
23 of certain of the sales transactions and the
24 sales prices and the like in the communities we
25 were studying.  But in terms of issuing maybe a

## Page 58

1  finding, I don't recall whether it was
2  settled -- it ultimately was settled, and I
3  just don't recall whether we took it beyond
4  that stage at any point in our involvement.
5      Q.  Do you still have a file containing
6  whatever it is you wrote in that case?
7      A.  Probably not.
8      Q.  Not on computer.
9      A.  No.  No, it was a paper process,
10 unfortunately, in the majority back then, or we
11 had a Wang computer system, which finally blew
12 up.  And so whatever was on it is certainly
13 gone.
14     Q.  Did you give testimony under oath in
15 that case, either in trial or at a hearing or
16 deposition?
17     A.  No.  Not that I recall.
18     Q.  How many properties were the subject
19 of your sales study?
20     A.  Well, we were looking at a very broad
21 area in terms of sales activity.  So if you say
22 the subject, it was a majority of the developed
23 portions of St. Charles Parish, certainly
24 downriver of the Norco facility, and of the St.
25 John, I don't remember whether we went into the

## Page 59

1  core of the LaPlace area at the time but we
2  certainly looked at developments in St. John
3  the Baptist Parish, as well.
4      Q.  Do you have an estimate of the total
5  number of properties involved in your study?
6      A.  No.
7      Q.  Safe to say, though, that it included
8  thousands of properties, both residential and
9  commercial?
10     A.  I think that's fair.
11     Q.  In two different parishes, St. Charles
12 and St. John.
13     A.  Correct.
14     Q.  And your mission for the defendant
15 Shell was to discern the stigma effect, if any,
16 on property values which might be associated
17 with the plant explosion.
18         MR. ZWAIN:
19             Object to the form of the
20         question.
21     A.  Not exactly.  Our mission was to
22 collect and collate the data, and then
23 ultimately we would have looked at, certainly,
24 what the results were.  And I know we did.  We
25 had some preliminary findings that just fell

## Page 60

1  from the data itself.
2  EXAMINATION BY MR. MEUNIER:
3      Q.  Well, your mission was to collect the
4  data and look at the data for what purpose?
5      A.  To determine whether there was a, you
6  know, a trend, a discernible value trend,
7  because clearly the arguments were being made,
8  yes, that values I think had declined
9  substantially and were going to -- I assume
10 someone was claiming were going to stay in a
11 depressed state.
12     Q.  So are you troubled by my use of the
13 word stigma, if I ask you whether or not your
14 mission in that case was to address the
15 question of whether any stigma effect could be
16 discerned in property values related to the
17 explosion?
18     A.  No, I'm not troubled by your use of
19 the word.  For me, you know, stigma has to be
20 linked to some factor.  Stigma, as most people
21 use it, that would be considered in any
22 appraisal.  So it's a -- you know, whatever
23 factors there are, of the many hundreds, you
24 know, it's no different than any of the other
25 things we would consider.

## Page 61

1      Q.  But in that case, the factor at issue
2  that might have some relationship to property
3  values was a chemical or refinery explosion,
4  correct?  That was the factor?
5      A.  Well, certainly the factor that
6  warranted the study for Shell was that, yes.
7      Q.  Right.  Okay.  Now, tell us what
8  technique or techniques or methodology you
9  adopted in order to undertake this study.
10     A.  We followed fairly traditional
11 appraisal methods.  We researched sales
12 activities, went and researched the data
13 regarding those sales, and then tracked them
14 over a period of time.  I don't recall the
15 period of time.
16     Q.  Now, you were referring again to sales
17 transactions for both residential and
18 commercial properties, in the two parishes?
19     A.  I don't recall much of a focus on
20 commercial, because certainly probably in
21 number there were considerably less.  But we
22 certainly were -- the majority of the sales
23 data points were residential.
24     Q.  And were you referring to sales
25 transactions in the area in question that

Page 62

1 predated the refinery event?
2   A.  I don't have a specific recollection
3 of the time period that we studied sales, but
4 we likely would have looked at something before
5 the explosion.
6   Q.  And then you obviously looked at sales
7 transactions after the event.
8   A.  Yes.
9   Q.  You also looked at sales transactions
10 for properties you considered comparable that
11 were outside of the area being studied; am I
12 correct?
13   A.  I don't know that in moving along with
14 that process that we ever got to a point of
15 looking at any control area.  We may have, I
16 just don't recollect it today.
17   Q.  Well, tell me, as precisely as you
18 can, how you were going to come up with a
19 conclusion about whether there was or was not a
20 stigma effect from the event by the comparison
21 of sales transactions.
22   A.  Well, I think I've told you that my
23 recollection is we never did that.  We were
24 never tasked to do that.  We were tasked to do
25 the study, tracking the data, per se, but never

Page 63

1 got to the point of doing anything other than
2 reporting what the data presented to us.
3   Q.  Well, maybe I misunderstood you
4 before.  You knew that Shell's interest was in
5 determining whether or not there was a provable
6 stigma effect from the refinery event, agreed?
7       MR. ZWAIN:
8           Object to form of the question.
9   A.  Well, I can't tell you that I know
10 definitively that that was Shell's interest.
11 What I'm telling you is that my recollection is
12 that what we were tasked to do and what we did
13 was study the raw data.  I don't recall us
14 going beyond studying, say, sales as they moved
15 over the time line from the explosion forward,
16 and I do remember I believe looking from year
17 to year saying -- and noting what change in the
18 data we saw.  But we never, to my knowledge,
19 or, you know, I don't recollect us ever
20 making -- coming to a conclusion with regard to
21 any stigma or any kind of impact, damage
22 estimate, whatever you want to call it.  I
23 don't think we ever did that.
24   Q.  You were never asked to do that.
25   A.  I don't think we were asked to do

Page 64

1 that.  And I believe that's what I told you
2 earlier.  We did a sales study is what we did.
3       MR. ZWAIN:
4           When it's convenient to break,
5       can we do so?
6       MR. MEUNIER:
7           Yeah, let's take a break.
8       (Off the record.)
9 EXAMINATION BY MR. MEUNIER:
10   Q.  I don't know if I asked you, or if you
11 can recall what your total charges were for the
12 sales study work you did in the Shell Norco
13 case.
14   A.  I do not recall.
15   Q.  Now, one of the other projects that
16 you list as a major project in your CV involved
17 the Thompson-Hayworth plant in New Orleans,
18 correct?
19   A.  Correct.
20   Q.  And you say you did a market study of
21 real estate value impact associated with
22 environmental contamination.  Correct?
23   A.  Correct.
24   Q.  Was that a study of the stigma, or
25 potential stigma effect on properties

Page 65

1 associated with contamination?
2   A.  Again, much as with the Norco case,
3 the Shell case, as it evolved, it turned out to
4 be just a sales study and a little bit of
5 investigative work as to who was living at what
6 property at the time.  But again, it ultimately
7 was settled before it went beyond that.
8   Q.  Yes, sir, but as in Shell, was your
9 work undertaken as part of a prospective
10 investigation of the potential stigma effect
11 associated with that?
12       MR. ZWAIN:
13           Object to the form of the
14       question.
15   A.  I don't recall, today, whether that
16 task was specifically cited.  But -- because I
17 do remember in the initial stages of that
18 assignment was to really identify, through
19 whatever records we had, property owners and
20 residents of the properties in the immediate
21 area.  And then I believe it did evolve into
22 where we did start to look into sales
23 transactions in the area, but I do not believe
24 it ever got beyond that phase.  Now, would
25 there have been probably a long-term view of