Page 66

1 getting to something else? Probably so.
2    Q. In both Norco and the -- in the Shell
3 Norco project and in the Thompson-Hayworth
4 plant project, Mr. Truax, you participated in
5 studies of real estate or property value
6 impacts associated with, in the case of Shell
7 Norco, an explosion, in the case of
8 Thompson-Hayworth, environmental contamination;
9 is that not true?
10    A. If your definition of impacts is we
11 studied data that theoretically would have
12 reflected whatever impacts there were
13 associated with the explosion in one instance
14 and the property contamination issues in the
15 other, then yes. But did we articulate any
16 specific difference in values? I don't believe
17 we did in either case.
18    Q. Well, what you're saying is that in
19 terms of outcome in neither case did you ever
20 arrive at a conclusion one way or the other
21 whether such an impact had occurred, correct?
22    A. I think what we said is, we let the
23 data speak for itself, and whatever impacts
24 there were theoretically would have been
25 represented in the data.

Page 67

1    Q. Right. So as an expert, you never
2 arrived at a conclusion one way or the other
3 whether there had or had not been a property
4 value impact in those cases, true?
5    A. I think what we concluded was that the
6 data was to speak for itself, and whatever the
7 trend was, say, in the Norco case the trend
8 was.
9    Q. Well, did you or did you not interpret
10 data in either of those cases?
11    A. I think we reported data. I'm not
12 sure we interpreted it. We looked at the data,
13 and mathematically if values went up 10 percent
14 or down 10 percent, they -- it was what it was.
15    Q. So using the language that you have
16 used in your CV, in both cases you were part of
17 a study of property value or real estate value
18 impact associated with, your words, in the case
19 of Shell an explosion, in the case of
20 Thompson-Hayworth environmental contamination,
21 but you're telling us that in both cases even
22 though that was the nature of the study all you
23 did was gather data and let the data speak for
24 itself. Is that your testimony?
25    A. That's where those projects ended once

Page 68

1 they were settled, yes.
2    Q. So you never took them to the next
3 step of interpreting to answer the question
4 whether there was or was not impact, is that
5 what you're saying?
6    A. I think I'm telling you that the data
7 itself, whatever impacts there were, would be
8 reflected in that data.
9    Q. But you never took the interpretive
10 step of telling anyone what the data reflected
11 as to impact; is that your testimony?
12    A. I'm telling you we were never asked --
13 we never got to the point in the assignment
14 where that was requested of us.
15    Q. But the answer to the question whether
16 there was or was not impact was embedded in the
17 data for someone to interpret, if not you,
18 true?
19    A. I think that's true.
20    Q. Do you profess to have expertise on
21 interpreting property impact data in order to
22 answer the question whether there has or has
23 not been an impact associated with an event
24 such as an explosion?
25    A. Well, I think as an appraiser I

Page 69

1 interpret data and reflect impact from any of a
2 host of factors every day. That's what we do.
3    Q. And had you gone to the extent of, in
4 these cases Shell Norco and Thompson-Hayworth,
5 of expressing the opinion whether there was or
6 was not a property value impact associated with
7 an event, in both cases you're telling us the
8 methodology you used was a sales -- a
9 transactional sales record comparison. Is that
10 true?
11    A. It was a study of comparable sales
12 that had transacted, yes.
13    Q. And your methodology, then, is to
14 compare sales of properties that arguably,
15 according to plaintiffs, were impacted with
16 sales of properties that could not have been
17 impacted, is that the methodology?
18    A. Ask that one more time.
19    Q. I'm asking about your methodology.
20    A. I understand.
21    Q. Had you gone the full measure of
22 interpreting and expressing an opinion, the
23 methodology upon which you would have relied
24 would have been a comparison of sales data; you
25 told us that, right?

Page 70

1    A. Correct.
2    Q. And the sales data comparison
3 methodology would have called for a comparison
4 of sales of properties in an area that the
5 plaintiffs claimed impact with sales
6 transactions in an area that would not have
7 been associated with an impact. Is that true?
8    A. If we were asked to do that. We may
9 have been asked to do something quite different
10 than that.
11    Q. No, sir. I'm -- I'm trying to get
12 away from the question of where you ended in
13 those cases, and I'm asking a broader question
14 about your methodology.
15       Had you completed and gone all the way
16 with the interpretation. You understand?
17    A. I do understand.
18    MR. ZWAIN:
19       I think he answered your
20       question.
21    MR. BRUNO:
22       No, he didn't.
23 EXAMINATION BY MR. MEUNIER:
24    Q. You've already told me, and I don't to
25 hear it again, that your methodology is a sales

Page 71

1 data comparison methodology. Correct?
2    A. Correct.
3    Q. All right. What I'm simply trying to
4 ask as a follow-up, so I can understand, is
5 does that methodology entail -- well, why don't
6 you tell me. Under that methodology, what
7 different categories of sales are compared to
8 complete the methodology and arrive at your
9 interpretive conclusion?
10    A. Well, again, I'll go back to what
11 you're asking me to do, as a client. If the
12 client asks me, in either case, what is the
13 value of this particular property on this date,
14 then I would have certainly looked for
15 comparable sales that relate to that particular
16 property on that particular date and given them
17 that answer based upon that market information.
18 If the client asked me what is the value of
19 that property, in the case of, say, Norco, one
20 year after the explosion, as compared to what
21 it would have been one year prior to the
22 explosion, I would have analyzed sales that
23 related to the value issues for those two
24 property as of those given dates.
25       Would there be a difference?

Page 72

1 Possibly, possibly not. But that's exactly
2 what I would do.
3    Q. Now, in the report that you cosigned
4 with Mr. Roddewig, at Page 9 -- do you have
5 that report with you?
6    A. Yes.
7    Q. At Page 9 of that report, and in
8 setting forth your qualifications, you list
9 eight notable projects in which you have had
10 experience analyzing detrimental conditions as
11 they impact property values and markets,
12 correct?
13    A. Correct.
14    Q. And you do list Shell Norco, several
15 times in this list, correct?
16    A. Well, there were several different
17 studies that we did around the Shell Norco
18 plant, so yes.
19    Q. So are the three references to Shell
20 Norco in this list associated with the project
21 listing of Shell Norco in your CV attached to
22 your levee report?
23    A. The first one on the list on Page 9 is
24 the same as the reference in the CV.
25    Q. Right.

Page 73

1    A. The other two were for other -- you
2 know, they did not relate to the cracker
3 explosion.
4    Q. All right. Let's talk about them.
5 You studied residential property values near
6 the fence line of Shell Norco. That's the
7 fourth listing of your --
8    A. Correct.
9    Q. Was the aim of that analysis to
10 discern whether there had been an impact on
11 those property values due to proximity to the
12 refinery?
13    A. The primary focus of that study was to
14 give them an estimate of values for a
15 structured buyout type program. It was
16 voluntary, certainly, but they wanted an
17 estimate or some sense of the values for the
18 properties near and along the fence line as
19 they proceeded, I guess, to budget or do
20 something else with regard to buying those
21 properties, which I think they've been ding for
22 years, buying properties that became available
23 along their fence line.
24    Q. Yes, sir, but you list the project as
25 an example of your significant experience in

Page 78

1  know, I'm not a big proponent of statistical
2  applications for individual property appraisals
3  because I find it to be, in my experience,
4  particularly in local markets, very unreliable
5  in terms of a broad brush approach to an
6  individual property valuation.
7    Q. Yeah. So maybe I didn't ask my
8  question clearly enough. I'm asking about your
9  methodology, your sales comparison methodology.
10      Whenever you undertake to discern the
11 price impact on -- the property value impact of
12 a detrimental condition, under your methodology
13 of comparing the sales transactions, can you
14 tell us what you regard to be a sufficient
15 number of transactions studied in order to draw
16 conclusions applicable to the property being
17 studied?
18    A. I think I've told you that in almost
19 all these cases we studied the data broadly and
20 let the data speak for itself, and that we
21 never went to the final step, if you will, of
22 coming to value conclusions. If you're asking
23 me how would I approach assessing the impact of
24 a particular property, we would go back to the
25 sales research, select the most relevant

Page 79

1  comparables, three, four, to be -- merely a
2  handful if they were very good comparables and
3  were directly related, or in my opinion were
4  very good indicators of value for the subject
5  property, and analyze it in that context. We
6  would do it on an individual property basis.
7    Q. So you'd ask the question whether
8  there was or was not a value impact a hundred
9  times for a hundred properties, right?
10   A. To get an articulate, credible answer,
11 yes.
12   Q. You'd ask that same question a
13 thousand times for a thousand properties.
14   A. Yes.
15   Q. You'd ask it thirty thousand times for
16 thirty thousand properties.
17   A. Yes.
18   Q. Same question.
19   A. Same question.
20   Q. You'd just keep asking the same
21 question on a per property basis. That's your
22 approach?
23   A. That's correct.
24   Q. And how many comparables you'd have to
25 look at to answer that question for each and

Page 80

1  every property would depend upon the unique
2  characteristics of that property?
3    A. Yes, and the characteristics of your
4  comparable data pool.
5    Q. Now, you've listed all the occasions
6  on which you've given testimony in deposition
7  or in Court as an expert. Have you ever been
8  subject to a Daubert challenge?
9    A. No.
10   Q. Do you know what I mean by a Daubert
11 challenge?
12   A. Yes.
13   Q. In what fields have you been tendered
14 as an expert in these various cases?
15   A. Certainly in the field of real estate
16 valuation and consultation.
17   Q. In what field are you being tendered
18 in this case?
19   A. I think in the field of real estate
20 valuation and consultation.
21   Q. And what does that field entail?
22   A. Well, it entails certainly evaluating
23 real estate markets, potentially looking at
24 values, but also more broadly looking and
25 discussing those factors which might affect

Page 81

1  real estate values and affect markets.
2    Q. Including potential negative effects
3  on value due to an event such as a flood.
4    A. I think as it would relate to a value
5  issue, any factor that would affect value.
6    Q. What percentage of your professional
7  time is spent serving as an expert in legal
8  cases?
9    A. Oh, I would say less than 20 percent,
10 but, you know, that's a horseback estimate from
11 me.
12   Q. And on those occasions when you serve
13 as an expert, what percentage of the time are
14 you hired by a defendant which has been sued in
15 a case?
16   A. I don't know that I could give you a
17 good reasonable answer on that one. I would
18 say more often than not my perception would be
19 that it's on the defendant's side. But not
20 always.
21   Q. What is your average annual income
22 from your work as a legal expert?
23   A. Particularly as a legal expert? I
24 wouldn't have a number on that, as well.
25   Q. What percentage of your professional

Page 82

```
 1   income is associated with your legal work as an
 2   expert?
 3       A.  Again, if we link the 20 percent I've
 4   given you as the amount of time I spent in that
 5   effort, possibly 20 percent.
 6       Q.  And your hourly rate is $250 an hour
 7   for consulting and analysis, and $375 an hour
 8   for testimony?
 9       A.  Correct.
10       Q.  And we have received this document
11   relative to the MRGO case.  (Tendering.)
12           Can you verify that that is your total
13   bill for services to date as an expert in the
14   MRGO case?
15       A.  I believe that is correct.  We've
16   submitted three invoices in both of these cases
17   to this point.
18       MR. ZWAIN:
19           And I just E-mailed you the three
20           invoices he submitted in the levee
21           case, Joe.  You should be getting that
22           within seconds.
23   EXAMINATION BY MR. MEUNIER:
24       Q.  So the total amount that you
25   individually have billed to date in the MRGO
```

Page 83

```
 1   case is $23,250?
 2       A.  I didn't total those, nor exclude
 3   anything that wasn't related to me.  I don't
 4   remember if there was anyone else on those
 5   invoices.  It's approximately thirty-two
 6   thousand or so, for me personally.
 7       Q.  Thirty-two thousand to date in MRGO.
 8       A.  I think that's correct.
 9       Q.  And the invoice that we're receiving
10   now for the billing in levees is about sixteen
11   thousand?  Does that --
12       A.  Again, you know, the numbers will
13   speak for themselves.
14       Q.  Well, do you think you spent twice as
15   much work in MRGO as in levee?
16       MR. ZWAIN:
17           There are three invoices there.
18           One was sixteen thousand.
19       MR. BRUNO:
20           One for eighteen, one for
21           seventeen and one for sixteen.
22   EXAMINATION BY MR. MEUNIER:
23       Q.  Does it sound right to you that
24   there's been billing to date in levee of about
25   $51,000 for your services?
```

Page 84

```
 1       A.  Again, if that's what the numbers say.
 2   I'm not going to dispute it.  Yeah.
 3       Q.  And then $32,000 to date in MRGO.
 4       A.  Correct.  Apparently.
 5       Q.  And were you hired in both cases
 6   simultaneously?
 7       A.  Not simultaneously, but I think it was
 8   close in time.
 9       Q.  Okay.  In which case were you first
10   hired?
11       A.  I think I was hired in levee first,
12   but again the dates are shown on the invoices
13   as to when the first billing occurred, so.
14       Q.  So when were you retained in levee?
15       A.  I'm not looking at a levee invoice,
16   so.
17       MR. ZWAIN:
18           (Indicating.)
19       A.  Yeah.  I had my first meeting with
20   Gary Zwain and others in March of '07, and my
21   first billing for MRGO was around June.  So
22   levee would have been first.
23   EXAMINATION BY MR. MEUNIER:
24       Q.  So you had been retained for a little
25   over six months in these cases?
```

Page 85

```
 1       A.  Approximately.
 2       Q.  And your billing to date is about
 3   $83,000 for that period of time?  $32,000 in
 4   MRGO and $51,000 in levee?  Does that sound
 5   right?
 6       A.  Again, trusting that you're doing the
 7   math correctly.
 8       Q.  And what are you asked to do in these
 9   cases?
10       A.  Well, I certainly have been asked to
11   go out and inspect all of the named plaintiffs'
12   properties, which was fairly time consuming,
13   um -- and then prepare the reports that you
14   have.
15       Q.  You have not been asked to do anything
16   in regard to the analysis of potential property
17   value impact due to the flood event?
18       A.  No.  As to particular value impact,
19   no.
20       Q.  And you told me before about the cases
21   in which you undertook to collect sales data
22   which would have been a basis for some
23   interpretation, although you may not have
24   always arrived at the interpretation?
25       A.  Right.
```

Page 86

1  Q. Have you even undertaken, in this
2  case, to collect sales data aimed at some later
3  discernment of a price impact due to flood?
4  A. In levee, we looked at sales
5  transaction data in the study areas that are in
6  this report, and I believe that's contained in
7  a schedule within the report.
8  Q. Is that it? Is that the extent of
9  what you've done in that regard?
10  A. Yeah. I think we have made statements
11  about some transactional volume as indicated,
12  say, through the MLS system, but in terms of
13  actually looking at sales transactions and
14  collecting individual sale transactions, yeah,
15  the only place we have done that, to my
16  knowledge, is in the study areas.
17  Q. How many total properties, residential
18  and commercial, are in the class areas of the
19  MRGO and levee cases that have been proposed?
20  A. Thousands.
21  Q. Can you be more specific?
22  A. Um -- no, not particularly.
23  Q. Well, I believe in your MRGO report,
24  which I think we'll end up talking about
25  tomorrow, you did set forth some numbers of

Page 87

1  residential properties in the MRGO subclass
2  areas. Do you not recall what?
3  A. Yeah. I recall certainly -- if you
4  want to direct me to the page, I'll look at it
5  for you.
6  Q. Okay. Well, let's assume that in that
7  report you've got a total of about 66,000
8  residential properties in the MRGO class area,
9  if you want to find that.
10  A. Yeah. For efficiency, if you know
11  exactly where it is why don't you point me in
12  that direction.
13  Q. Page 8 of your report, using 2000
14  census data, 34,000 residential properties in
15  New Orleans East, 7,000 in the Lower Ninth
16  Ward, 25,000 in St. Bernard, that's a total of
17  66,000, correct?
18  A. If you have added correctly, correct.
19  Q. And that's based on seven year old
20  census data.
21  A. Correct.
22  Q. And can we assume that there are more
23  than 66,000 -- or were more than 66,000
24  residential properties in New Orleans East,
25  Lower Ninth and St. Bernard as of August, 2005?

Page 88

1  A. I think we can assume that.
2  Q. All right. So did that help you
3  arrive at any estimate of the total residential
4  properties, adding MRGO and the levee proposed
5  class areas?
6  A. It would likely be somewhat north of
7  70,000.
8  Q. It would be over 100,000, wouldn't it?
9  A. I'm sorry. You added --
10  Q. Total, levee and MRGO.
11  A. Oh. Yeah, yeah, yeah. Levee and
12  MRGO, yeah.
13  Q. Easily over 100,000.
14  A. Yes. Yes.
15  Q. Now, if you are charged in this case
16  with the task of analyzing whether or not there
17  has been any price impact or property value
18  impact for these properties that can be
19  associated with the flood in these communities
20  after Katrina, would your methodology, as it
21  has been heretofore, be a sales comparison
22  methodology?
23  A. Yes.
24  Q. And you would go property by property
25  and look for comparable sales transactions that

Page 89

1  fit that particular property.
2  A. Correct.
3  Q. And you would ask the question a
4  hundred thousand times or more, was there or
5  was there not a property value impact? Same
6  question. Right?
7  A. Same question. Likely different
8  parameters to be considered, but same basic
9  question, yes.
10  Q. The question is common to every single
11  property, isn't it? The question.
12     MR. MARPLE:
13        Object to the form.
14  A. Potentially, yes.
15  EXAMINATION BY MR. MEUNIER:
16  Q. Well, is the question different,
17  whether or not there was a property value
18  impact? Does it change; does the question
19  change?
20  A. No, but the answer may be -- will be
21  likely no in some cases, yes in others.
22  Q. All right. So you're going the take
23  the same common question and you're going to
24  ask it over a hundred thousand times, is that
25  your approach?

Page 90

1  A. Yes.
2  Q. All right. Now, how long is this
3  going to take?
4  A. If you ask me to individually do it,
5  it would take a while.
6  Q. Ten years?
7  A. Well, realistically, no. I mean, I
8  think we have a sense of that from what Road
9  Home is doing. They've accomplished -- I
10 believe I last saw, you know, over -- or
11 planned to have 96,000 of these properties
12 settled, if you will, by year end, or something
13 like that. And they have resorted to
14 individual property by property analysis to
15 facilitate the implementation of their program.
16 Q. Well, they did a mass appraisal for
17 the first wave of properties.
18 A. And it didn't work.
19 Q. The people who were the subject of
20 those mass appraisals haven't given their money
21 back, have they?
22 A. Oh, I suspect a lot of them have filed
23 appeals, but I'm not certain of that.
24 Q. Okay. Now, you're not telling us that
25 the Road Home program is setting out or has set

Page 91

1  out to discern the property value impact
2  associated with the flood, are you?
3  A. I think the Road Home program has
4  implemented a specific property appraisal
5  process to utilize in their methodology as they
6  are implementing it to cut checks to people.
7  Pre-storm values certainly were the biggest
8  single issue that they've had to deal with on
9  the appraisal side.
10 Q. Are you telling us that Road Home has
11 sought to discern whether or not there has been
12 a property value diminution that can be
13 associated with the flood that followed
14 Katrina? Is that your testimony?
15 A. At the heart of the Road Home program
16 is to -- an attempt to make people whole, at
17 some level, from the damages that they
18 incurred, as you probably well know,
19 incorporating a series of considerations
20 including insurance, grants, pre-storm values.
21 And the appraisal process, as I understand the
22 Road Home Program, has to do with establishing
23 appropriate pre-storm property values in the
24 majority.
25 Q. Well, do you not understand my

Page 92

1  question when I ask weather it is the object of
2  the Road Home program, in your understanding of
3  that program, to discern whether or not there
4  has been a property value impact that can be
5  associated with the flood after Katrina? Is
6  that the object of the program?
7  A. Well, I possibly heard your prior
8  question a little differently. But you have
9  asked me about damages. Now, if we focus
10 entirely on property value impact --
11 Q. Yes, sir.
12 A. -- in some sense, certainly, their
13 impact -- the whole goal of the program is to,
14 um -- provide people money relating to their
15 impacts, their individual impacts. Now, part
16 of that process, as I said, involves
17 establishing pre-storm property value, looking
18 at what grants they received, looking at, um --
19 what insurance proceeds they received. That's
20 all a part of the process, as I understand it,
21 that goes into their assessment of impact to
22 the individual people and for these properties.
23 Q. So you think the Road Home Program and
24 methodology are valid indicators of how you
25 could go about accomplishing the task, if it

Page 93

1  were given to you, of discerning the property
2  value impact of flood in the levee and MRGO
3  class areas.
4  A. I think the Road Home Program
5  experience would suggest that individual
6  property appraisals, if needed, can be
7  accomplished for a tremendous number of
8  properties in a reasonable period of time.
9  Q. Right. And you'd have to go about
10 more than that, wouldn't you? You'd have to do
11 your sales comparison methodology, and get into
12 comparables per property, as you discussed,
13 correct?
14 A. Yes, and I believe that's exactly what
15 they're doing.
16 Q. Well, but -- all right. So how many
17 properties has Road Home disposed of now that
18 we're what, at two years and a month after
19 Katrina; what's their number of properties
20 accomplished, if you will?
21 A. Oh, I can't tell you I know the
22 numbers definitively, but remember, don't -- in
23 terms of your time periods, remember, their
24 process was different for probably over a year
25 of that two-year window, and it ultimately

Page 98

1 that you're studying is actively traded, so you
2 conduct surveys and, um -- from the surveys
3 make some projections.
4    Q. Is it a tool that is used in
5 connection with discerning the property value
6 impact of detrimental conditions?
7    A. Well, when you say when and is, I'm
8 sure someone has used it. I believe someone
9 that is here today has used it, as I
10 understand. But is it widely used and accepted
11 in the appraisal community? To my knowledge,
12 no.
13    Q. What is conjoint analysis?
14    A. Well, conjoint analysis, I believe, is
15 basically the concept that, you know, an item
16 is the sum of the appeal of all of its
17 component parts and characteristics, and that
18 those elements can be segregated and, I guess,
19 analyzed independently at some level, though
20 certainly they interact one to another, but
21 that there's this interaction but yet distinct
22 component to all of those items -- I mean to a
23 given item of study.
24    Q. Is that a tool which has been used in
25 connection with discerning the property value

Page 99

1 impact of detrimental conditions?
2    A. Well, again, when you say has been
3 used, I believe someone has certainly probably
4 used it. But again I don't believe it's
5 been -- well, the concept is used, I guess, in
6 appraisal methodology generally. When we go in
7 and adjust for a various -- let's say a
8 characteristic of a property, we are saying
9 that characteristic is certainly discernible
10 and has some value associated with it. So in
11 that sense we're giving credibility to the
12 concept of conjoint analysis.
13    Q. When you say we, you mean real estate
14 appraisers?
15    A. Yes.
16    Q. Now, have you attended any automated
17 valuation models seminars since 1997?
18    A. That was -- where that was the primary
19 topic, no, I don't believe so.
20    Q. Well, is that the only seminar you've
21 ever attended at which automated valuation
22 models was the primary topic?
23    A. To the best of my knowledge, yes.
24    Q. In 1998, you attended a seminar called
25 "Understanding and Using DCF Models?"

Page 100

1    A. Yes.
2    Q. What is a DCF model?
3    A. Discounted cash flow.
4    Q. By the way, how long did the automated
5 valuation model seminar in 1997 last?
6    A. Most of those seminars are one-day
7 seminars.
8    Q. Okay. Who sponsored that AVM seminar?
9    A. It was likely the Appraisal Institute.
10    Q. Where was it held?
11    A. Don't know. Or, rather, don't recall.
12    Q. And in 1999 you attended a seminar
13 called "Attacking and Defending an Appraisal in
14 Litigation." Was that a seminar about how to
15 conduct yourself as an expert in cases like
16 this?
17    A. That would certainly be one
18 interpretation of that.
19    Q. Was there any discussion about
20 automated valuation models or mass appraisal
21 techniques in that seminar?
22    A. I don't recall.
23    Q. You at and the he had a seminar called
24 appraisal trends in the year 2006, correct?
25    A. Correct.

Page 101

1    Q. What do you recall learning at that
2 seminar?
3    A. I can't tell you I have a specific
4 recollection of that seminar, sitting here
5 today.
6    Q. You don't know what appraisal trends
7 were discussed at that seminar last year?
8    A. No.
9    Q. Were automated valuation models
10 discussed?
11    A. I think I've told you I don't have a
12 specific recollection of that particular
13 seminar, period.
14    Q. Okay. Do I understand correctly,
15 Mr. Truax, that you have never received any
16 formal classroom training regarding automated
17 valuation models outside of that one-hour
18 seminar ten years ago?
19    A. Well, I think in terms of -- first, I
20 believe I said it was probably a one-day
21 seminar.
22    Q. I'm sorry. One day.
23    A. Some of the Appraisal Institute
24 offerings may have touched upon AVMs. And
25 certainly the USPAP updates, there's a section

Page 118

1    A.  Well, I can't tell you, sitting here
2 today, that I would be able to definitively
3 tell you what his approach, you know,
4 particularly would involve.
5    Q.  Do you know -- you don't know the
6 answer to that question?
7    A.  No, I think I'm telling you, if you're
8 going to ask me about the particulars of
9 Dr. Kilpatrick's approach, I'm not sure in my
10 general recollection of the document that it
11 was very particular in any respect.
12    Q.  So do you know whether his approach
13 will entail reference to transactional data; do
14 you know one way or the other if it will?
15    A.  We'll, given what I read, no, I can't
16 tell you that it was definitively on precisely
17 what he would do.
18    Q.  So let me ask it this way:  Do you
19 assume for purposes of your position and your
20 opinion in this case that Dr. Kilpatrick's
21 approach will not entail reference to sales
22 transactional data?  Is that your assumption?
23    A.  I don't know that I'm assuming
24 anything about what Dr. Kilpatrick would do in
25 terms of particular application of his model.

Page 119

1 I think clearly he was going to use a mass
2 appraisal technique.  Now, how he particularly
3 implements that mass appraisal technique, I
4 can't tell you.
5    Q.  Can mass appraisal techniques be used
6 in conjunction with reference to actual sales
7 data, actual transactional information?  Can
8 that be done?
9    A.  Yes.
10    Q.  Can a mass appraisal technique use
11 actual sample appraisals in the field?
12    A.  Can that be done?
13    Q.  Yes.
14    A.  Yes.
15    Q.  You've reviewed the expert report of
16 Kerry Vandell?
17    A.  Yes.
18    Q.  Are you relying on any of the opinions
19 and conclusions of Mr. Vandell in your
20 analysis?
21    A.  I know I read an article by him, and I
22 certainly read his report.  But did I rely on
23 any of the -- say the primary research that
24 they did or whatever his group did?  No, I
25 don't think we did that.

Page 120

1    Q.  Now, you have listed certain academic
2 papers, starting at the bottom of Page 28 and
3 then continuing to Page 31 of this list of
4 documents reviewed, correct?
5    A.  Correct.
6    Q.  Is it your testimony, Mr. Truax, that
7 you have read each of these academic papers?
8    A.  It is my testimony that if I missed
9 one, um -- it would be a limited number.  And
10 yes, I have read the vast majority of these.
11    Q.  On Page 29 you reference in article by
12 George Dell called The Myth and The Reality --
13 "AVMs, The Myth and The Reality, The Problem
14 and The Solution," correct?
15    A.  I see that, correct.
16    Q.  What is the problem and what is the
17 solution, according to that article?
18    A.  Oh, I can't tell you today I would
19 recall specifically that particular article.
20    Q.  What is the myth and what is the
21 reality, according to that article?
22    A.  According to Mr. Dell?
23    Q.  Yeah.
24    A.  As I told you, you know, I can't tell
25 you sitting here today that I remember the

Page 121

1 particulars of that specific article.
2    Q.  You list an article further down on
3 Page 29 by Richard Roddewig who cosigned the
4 report with you in this case.
5    A.  Correct.
6    Q.  And this is an article titled "Valuing
7 Contaminated Properties, et cetera," right?
8    A.  Yes.
9    Q.  So this article addresses the
10 methodology for discerning the price effect or
11 property value impact of environmental
12 contamination?
13    A.  Well, clearly that was a -- as I'm
14 remembering that one, it was a history, if you
15 will, of how contaminated properties have been
16 treated in the appraisal world.
17    Q.  Okay.  Now, you've set forth your own
18 methodology, which is a sales comparison
19 methodology, when you go about trying to
20 discern property value impact of a detrimental
21 condition or environmental event, correct?
22 We've talked about that.
23    A.  Yes.  And I think I've told you that,
24 yeah, in my opinion, that sales comparison
25 approach, property specific evaluation,

Page 122

1  comparable sales, all of that, in my, um --
2  history and in my experience is the most
3  relevant approach.
4     Q.  Okay.  Does this article by
5  Mr. Roddewig endorse that approach?
6     A.  Well, again, you'd have to show me the
7  context in which maybe you're asking this
8  question as to the specifics of that, but, you
9  know, I don't know if that particular article
10 endorses that approach.
11    Q.  Does the article reference other
12 possible approaches to that question?
13    A.  Oh, I think that article -- yeah.  It
14 was a broad brush look at what has been
15 written, I believe, and, as I said, what the
16 history of the experience has been with how you
17 can approach those problems.
18    Q.  Has mass appraisal been used as a
19 methodology to address that question?
20    A.  Well, again, when you ask a question
21 like has it been, I'm sure in the world it has
22 been used, yes.
23    Q.  At the top of Page 30 you list -- you
24 cite an article by Bill Mundy and David McLean
25 called "Using the Contingent Value Approach,"

Page 123

1  correct?
2     A.  Yes.
3     Q.  Does that article endorse the
4  technique of contingent value?
5     A.  I think it does.
6     Q.  Does it endorse it as a means to
7  discern the price effect of environmental
8  damage on property following the event?
9     A.  I believe it does.
10       (Lunch break.)
11 EXAMINATION BY MR. MEUNIER:
12    Q.  Mr. Truax, I'm still referring to your
13 list of academic papers which is starting at
14 Page 28 and continuing in the exhibit
15 attachment to your September 10, '07 report.
16       You cite the article of Lamond, et al,
17 entitled "Does the Price Impact of Flooding
18 Fade Away."  Do you see that?
19    A.  Yes.
20    Q.  What did this article suggest in
21 response to that question?
22    A.  Again, I can't tell you I have
23 specific recollection.  Could you -- if you'd
24 show me the article I might have a better
25 recollection of it.

Page 124

1     Q.  No, sir, I don't have it with me.  But
2  you listed it as an article you've read, and --
3     A.  Correct.
4     Q.  -- I thought you might remember at
5  least --
6        MR. ZWAIN:
7            Do you remember all the articles
8        you've read?
9  EXAMINATION BY MR. MEUNIER:
10    Q.  Well, the basic answer to that
11 question posed in the title.  But you didn't
12 remember?
13    A.  Well, I can't remember what was
14 specifically provided in that particular
15 article.
16    Q.  You've listed, again on Page 30,
17 several articles by Moore and Jang, and Wilson
18 and Yellen, and Waller, all on -- all having
19 automated valuation models or AVM in the title.
20 I'm going to assume, based on your prior
21 answers, that you're not able today to tell me
22 what you recall about reading any of those
23 articles, what you recall from the articles
24 themselves.  Is that true?
25    A.  If you're going to ask me with

Page 125

1  particularity about one article for me to tell
2  you definitively that I have total recall of
3  that particular article sitting here today, no.
4  But if you want to show me the article, it may
5  refresh my memory with a little more
6  specificity as to what it said.
7     Q.  In the article by Bennie Waller called
8  "The Impact of AVMs on the Appraisal Industry,"
9  do you recall whether Mr. Waller in the article
10 characterized the impact of AVMs on the
11 appraisal industry as either negative or
12 positive, or some variation?
13    A.  Again, I can't tell you that I
14 remember that specific article as to what
15 Mr. Waller particularly said.  I think if you
16 look at the literature generally, you will see
17 that there are both positive and negative
18 aspects to the application of AVMs in the
19 appraisal business.
20    Q.  Well, have AVMs been bad for the
21 individual appraisal business?
22    A.  You're asking me for my personal
23 opinion?
24    Q.  Yes.
25    A.  Um -- no, I don't believe they've been

Page 134

1  Q. You're telling me that when you write
2  and sign expert reports in legal cases it's
3  routine for you to have others coauthoring the
4  report with you even though they're not named
5  in a report or sign the report? That's a
6  routine practice for you?
7  A. Absolutely, in the sense that I may
8  not have penned the words, but by the time I
9  have edited it, reviewed it and accepted it as
10 my own and sign it, it's my own. And that's --
11 as I said, in almost every appraisal office I
12 have ever seen, um -- there are sometimes --
13 you might have one MAI who has two or three
14 people working independently with him in terms
15 of producing what ends up being substantially
16 the final product that that appraiser and that
17 appraiser alone signs.
18  Q. Why is it you did not or could not
19 have written this by yourself?
20  A. I could have.
21  Q. But why didn't you?
22  A. For several reasons. One,
23 Mr. Roddewig and the Clarion team brought
24 valuable expertise to bear. There were
25 certainly time constraints in terms of manpower

Page 135

1  resources that were useful in terms of bringing
2  that group into the picture, um -- so it was a
3  combination of reasons as to why.
4  Q. So you needed Roddewig and his team to
5  join you as authors of this report because of
6  time and because of their expertise?
7  A. In part, yes.
8  Q. Okay. What expertise did Roddewig and
9  his group bring to the writing of this report
10 that you did not possess on your own?
11  A. Well, when you say the writing of the
12 report, I'm talking about the entire effort, in
13 terms of producing the studies, et cetera, that
14 are effectively a part of this report. No --
15 are the words written, as I said, accepted
16 completely by me? Yes, they are. But did I
17 write every word? No, I didn't.
18  Q. No, sir. My question was, what
19 expertise did Roddewig and his group at Clarion
20 bring to this effort that you did not possess
21 of your own accord?
22  A. Well, they certainly had experience in
23 dealing with, um -- class action certification
24 cases. Um -- that was probably the biggest
25 single one.

Page 136

1  Q. How about expertise in the field of
2  mass appraisal, did they bring that to the
3  task?
4  A. They certainly had a broader
5  background in those issues than I did.
6  Q. How about expertise on AVMs, did they
7  bring that to the task?
8  A. Well, when you say expertise, exactly
9  what do you mean expertise?
10  Q. You and I have been using the word
11 before now, so I didn't know we had a problem
12 with it.
13  A. No, I'm just asking.
14  Q. Special knowledge, um -- training,
15 education, background, experience, all those
16 things.
17  A. I think given the history that I'm
18 aware of in terms of cases they've been
19 involved with, certainly they have done more
20 research than I had at that particular time as
21 to that particular appraisal tool.
22  Q. Okay. So the first conclusion which
23 is that damages cannot accurately or equitably
24 be determined on a class-wide basis, is that an
25 opinion informed by the expertise or brought to

Page 137

1  this effort by Mr. Roddewig and Clarion?
2  A. No.
3  Q. So you believe that you have the
4  background and training to express that opinion
5  independent of Mr. Roddewig?
6  A. Yes.
7  Q. And you say that although you told
8  me -- I believe you've admitted that you've
9  never published or presented on the question of
10 mass appraisal or AVMs. Correct?
11  A. I've told you that I've not published
12 on those topics, that's correct.
13  Q. And you've never been tendered or
14 testified as an expert to address the
15 appropriateness or applicability of mass
16 appraisals or AVMs in a class action case, have
17 you?
18  A. Correct.
19  Q. And you don't have any formal training
20 on the subject of mass appraisals or AVM that
21 you can think of other than the one-hour
22 seminar on AVMs that you went to ten years ago,
23 correct?
24  A. Again, it was a one-day seminar.
25  Q. I'm sorry. One day.