Page 138

1   A.  And, no, I wouldn't agree with you on
2 that. Certainly in appraisal literature and in
3 readings and the like I'm aware of the
4 application -- potential application for AVMs.
5 And I'm here to tell you, in the local market I
6 see no reasonable way to apply an AVM,
7 certainly in the New Orleans market, because of
8 the tremendous variety and variability of all
9 the properties involved such that you could I
10 think realistically expect to get credible,
11 reasonable results from one. That's my
12 opinion.
13      And I'm not aware of anyone here
14 particularly street appraisers -- in fact, I
15 can tell you I'm definitively not aware of any
16 street appraisers that have applied any type of
17 AVM in doing appraisal work here in the New
18 Orleans area.
19   Q.  All right. So you formed the first
20 conclusion without any -- without being
21 informed by any of the expertise of the
22 Roddewig group or Clarion, correct?
23   A.  Had I never met Mr. Roddewig, that
24 would have been my opinion, that's correct.
25 Because, you know, the background they bring

Page 139

1 probably confirmed some of the notions that I
2 would have come to and did come to
3 independently, that that methodology, that
4 appraisal tool, isn't very relevant in the New
5 Orleans market.
6   Q.  All right. How about the conclusion
7 that's set forth as Letter D on Page 5, that
8 mass appraisal techniques such as AVMs are
9 prone to high rates of error and cannot fairly,
10 efficiently and accurately measure real
11 property damages, et cetera? Is that a
12 conclusion and an opinion that you have formed
13 without reliance on or input from Mr. Roddewig
14 and his colleges at Clarion?
15   A.  No. That would have been my
16 independent experience in terms of the very
17 limited application that I'm aware of, of even
18 rudimentary AVMs under the local market.
19   Q.  All right. Well, you told me that
20 you've never participated in any mass
21 appraisal, and you've never utilized an AVM.
22      Is that true?
23   A.  That is correct.
24   Q.  Okay. So tell me now what experience
25 supports your statement that mass appraisal

Page 140

1 techniques such as AVMs are prone -- let's take
2 the first part -- to high rates of error?
3      What's your experiential basis for
4 that statement?
5   A.  Well, the only local entity that I'm
6 aware of that uses AVMs in a very basic way,
7 rudimentary way, not real complex, is Jefferson
8 Parish. Their assessment department. And as a
9 matter of course in doing an appraisal in our
10 community, as in most, the appraisers always
11 check assessed values as part of the reporting
12 process. And my experience with assessed
13 values as compared to transaction prices and/or
14 appraised prices that myself and others have
15 included relative to the assessed values, is
16 that the assessed values, even coming from
17 their application certainly of an AVM process,
18 are generally not compatible. It's rare that
19 we find an assessed value that's, say, within
20 10 percent of the appraised value.
21   Q.  All right. What do you consider to be
22 a, quote, high rate of error?
23   A.  Oh, I think in the residential market,
24 if you're missing by, you know -- I'll expand
25 and say even 15 percent, consistently, that's a

Page 141

1 pretty high rate of error. And the errors I'm
2 talking about that we see routinely are very
3 often much higher than that.
4   Q.  You're talking again about Jefferson
5 Parish assessor values of homes?
6   A.  As compared to either the transaction
7 price and/or, say, the appraised value that an
8 appraiser has come up with for that property.
9   Q.  Right. So you're talking about
10 instances where mass appraisal or AVM has been
11 used by assessors for the purpose of property
12 tax determination.
13   A.  Yes. Because locally, that certainly,
14 as I said, is one of the few places that we've
15 seen AVMs even attempted. If not the only.
16   Q.  And so based upon a greater than
17 15 percent rate of error comparing the assessor
18 for tax purposes values with market values in
19 Jefferson Parish, it's based upon that that you
20 draw the conclusion that mass appraisal
21 techniques such as AVMs are prone to a high
22 rate of error to assess to measure property
23 damages in this litigation.
24      MR. ANZELMO:
25         Objection to form.

Page 142

1  EXAMINATION BY MR. MEUNIER:
2  Q. Is that correct?
3  A. Well, I think, as you read it, based
4  upon my experience in the New Orleans
5  marketplace, and based upon my knowledge of the
6  New Orleans marketplace, the only place I'm
7  aware AVMs have been applied in any even
8  rudimentary sense have been on the assessment
9  side. So based upon that experience, I do find
10 that locally, in this marketplace, yeah, the
11 AVMs that have been attempted have produced
12 high rates of error.
13 Q. Again, the AVM experience that you're
14 referring to, Mr. Truax, has to do with
15 assessment of property values for the purpose
16 of determining a property tax, correct?
17 A. It purports to present the fair market
18 value of the property.
19 Q. For the purpose of a property tax.
20 A. Correct. It's for that purpose.
21 Q. Now, do you have any other
22 experience-based or experience-related
23 foundation, other than what you've talked
24 about, or for the statement of your conclusion
25 Number 4 on Page 5 of the report?

Page 143

1  A. Well, clearly the -- I think we've
2  mentioned this earlier: Clearly the
3  application of an AVM with regard -- the
4  attempt to apply an AVM with regard to the Road
5  Home calculation, the Road Home Program
6  calculations proved disastrous. We've talked
7  about that. That's another attempt to apply an
8  AVM in a local market that did not work, and
9  produced, obviously, high rates of error.
10 Q. What do you mean by high rates of
11 error in the Road Home Program?
12 A. Well, I can't tell you I know
13 statistically what the particular results were,
14 but the fact that, you know, the majority of
15 the people apparently had serious problems with
16 the numbers that were being generated by that
17 system. And it was significant enough that
18 obviously they scrapped it. Now, what
19 percentage -- you know, what percentage the
20 dispute was about, I don't know that, and I
21 don't know that I have ever seen that written.
22 Q. So you can't say that the rate of
23 error in Road Home is greater than 15 percent?
24 A. On an overall basis? No, I can't say
25 that.

Page 144

1  Q. Okay. Anything else that forms the
2  basis for your Conclusion Number 4, in your
3  experience?
4  A. Well, again, you know, it's couched in
5  terms of the New Orleans marketplace. Those
6  are the only -- those are the only applications
7  that I've seen attempted.
8  Q. Jefferson Parish assessors and Road
9  Home.
10 A. Well, and Orleans -- the Orleans
11 Parish reassessment process that was recently
12 all over the news, I think there was an
13 attempt, again it was a rudimentary one, to
14 apply some AVM type methodology to the
15 reassessments, and I think you've probably
16 read, as I have, that that had a few issues
17 with it, as well.
18 Q. Well, the fact that people are unhappy
19 doesn't necessary mean that the numbers are
20 wrong, correct?
21 A. Well, I guess that's true.
22 Q. All right. So what's the rate of
23 error on the reassessment in New Orleans?
24 A. Well, I can tell you the particular
25 experiences I know about particularly, and one

Page 145

1  of my partners, his house went from being
2  woefully under-assessed to extremely
3  exorbitantly assessed. Neither number was
4  correct.
5     I'm aware of at least three or four
6  other cases, particular cases, where I know
7  definitively that the numbers were
8  extraordinarily high in the AVM application as
9  that particular assessment was applied.
10 Q. Have you now told me all of your
11 experience-related support for the fourth
12 conclusion of your report?
13 A. I believe those are the only instances
14 where I know AVMs have been attempted to be
15 applied, with which I'm familiar, and they were
16 generally unsuccessful.
17 Q. Your fifth conclusion about the lack
18 of a uniform, consistent method to measure the
19 impairment of property caused by Katrina, is
20 that a conclusion that you reach based on your
21 own expertise or has the Roddewig group
22 supported or contributed to that opinion?
23 A. Well, I mean, I think, you know, their
24 thoughts were certainly considered in all of
25 this. As I said, we've worked on this jointly.

```
                                    Page 150                                              Page 152
 1   that your office uses?                       1   also then certainly, when we're doing a sales
 2      A.  No.  We have multiple templates that  2   comparison approach, go research the market and
 3   we will -- as I think everyone, probably in  3   discern what comparable sales are available for
 4   your business as well, you don't recreate the 4  comparisons, and then apply those.  You know,
 5   wheel every time.  So we have standard form  5   and also if it's an income producing property,
 6   formats that we use, but it's not a form in the 6  go research the rental market.  In other words,
 7   sense of a Fannie Mae Residential Appraisal  7   gather all appropriate market information that
 8   Form, no.  It's not that.  It's a narrative  8   myth bear on the valuation of the property and
 9   document.                                     9   apply those approaches, either cost or income
10      Q.  How long is it?                      10   or sales comparison, or all three, as is
11      A.  Oh, it depends on the task.  But I   11   relevant to the valuation task at hand.
12   mean, we have reports we write that are four 12     Q.  Tell me what's involved in applying
13   hundred pages and we have reports that we write 13  all the gathered information to the valuation
14   that are ten.                                14   task at hand.  How do you go about doing that?
15      Q.  All right.  But this template that you 15    A.  Well, you go to the data sources that
16   use sets forth certain basic items or       16   are available to you.  Let's say if we're
17   components of an appraisal that you're going to 17  talking, say, about a house, you would go into
18   expect to use in every case?                18   that neighborhood and certainly research the
19      A.  No, no, no.  And maybe I'm leading you 19  comparables that have occurred recently and see
20   astray there.  The template is not a fixed, 20   which of those comparables was most like your
21   fill-in-the-blanks form, it is merely a     21   subject and use those to, through a comparative
22   structure, and we then customizes within the 22  process, to develop an opinion of value.  If it
23   subheadings of that structure what the output 23  was a new house, you might do a cost approach.
24   is relative to the task at hand and the     24   Um -- in the single family market, you rarely
25   complexity of it, all of those things.      25   do an income approach.

                                    Page 151                                              Page 153
 1      Q.  If you were to undertake an           1      Q.  The four hundred property appraisals
 2   individualized appraisal of the thousands of 2   that you've done since Katrina I assume are
 3   properties subject to the claims in this case, 3  variable in terms of the time you it took you
 4   would you use a standardized form?           4   to complete the appraisal.
 5      A.  Oh, we'd certainly create probably a  5      A.  Yes.
 6   template that would work in the context of the 6    Q.  Give me a range from least to longest
 7   particular property being appraised.  It     7   in amount of time spent for these four hundred
 8   wouldn't be the same for all of them.        8   properties you've appraised.
 9      Q.  So you'd use different forms for      9      A.  Well, it probably ranges from a half a
10   different properties.                       10   day to sixty days.
11      A.  Sure.  Well, it would also depend on 11      Q.  Per property.
12   what was asked in terms of the results      12      A.  Well, again, it depends on the
13   presentation.  We have some options as to how 13  complexity, the workload -- remember, when I
14   we can report a finding, and so that would  14   give you these parameters, when I tell you it's
15   depend on what was asked for of us, as well. 15   going to be sixty days to do an appraisal, I'm
16      Q.  In the four hundred or so appraisals 16   not generally telling you -- that might be the
17   that you've done in the New Orleans area since 17  time frame in which I worked on that job, but
18   Katrina, just explain for me the basic steps 18   that wouldn't be the only job I was working on.
19   that you'd have followed to conduct these   19   So when I quote a client thirty to sixty days,
20   appraisals.                                 20   that's -- it will take me that long to get him
21      A.  Well, with minor exception, it would 21   his report, but I might produce twenty
22   be the standard process.  We would go out,  22   appraisals in that window of time.
23   certainly identify and inspect the property, do 23     Q.  All right.  Well, can you give me the
24   whatever research was necessary to determine 24   average amount of time you spend to conduct an
25   how big the site is, its orientation, we would 25  appraisal such as the four hundred appraisals
```

Page 154

1  you've done since Katrina?
2     A. I don't know that there is an average
3  that would be meaningful. And I've never
4  calculated it, so, no, I couldn't tell you what
5  that would be.
6     Q. Well, when you said a half a day to
7  sixty days, that's to complete the appraisal.
8     A. Yeah.
9     Q. Can you give me the range from the
10 least to most amount of time that you would
11 spend in completing the appraisals? Actual
12 time spent.
13    A. Well, I mean, you ask a question
14 that's got a lot of other parameters to it. As
15 I said, we can provide our finding verbally to
16 you. We're allowed to do that, as long as we
17 have a file that supports what I tell you. So
18 if you ask me to give you a value estimate in a
19 property, and I had happened -- and this
20 happens -- to have appraised the property
21 across the street, it may have taken me an
22 hour.
23    Q. All right. I want to talk about the
24 four hundred that you did. You have experience
25 with appraising four hundred properties since

Page 155

1  Katrina in the New Orleans area. That's what
2  I'm talking about, okay?
3     A. Right.
4     Q. Now, you have no way -- you can't
5  estimate for me the average amount of time that
6  you have taken to conduct a single property
7  appraisal in that group of four hundred
8  properties you've done since Katrina, is that
9  your testimony?
10    A. I'm telling you, yeah, our work is
11 diverse enough that I can't tell you an average
12 amount of time per appraisal. Um -- no, I
13 mean, I guess if we wanted to take how many
14 hours I think I worked since Hurricane Katrina
15 and divide it by four hundred, possibly that
16 gives you a number, but I don't know what that
17 would be relevant to.
18    Q. How about the amount you've charged
19 for these appraisals on an average basis; can
20 you give me any information about that?
21    A. Not sitting here today that would be
22 useful. That would be an absolute guess on my
23 part for the four hundred appraisals.
24    Q. So you can't even state a range, that
25 it's been at least X amount and at most Y

Page 156

1  amount; you can't even do that?
2     MR. ANZELMO:
3       Objection to form.
4     A. Oh, yeah. I can give you, you know, a
5  likely range for the type of work we do.
6  EXAMINATION BY MR. MEUNIER:
7     Q. These four hundred, that's what I'm
8  talking about.
9     A. Well, these four hundred constitutes
10 the volume of work that I've done.
11    Q. Right.
12    A. So I mean, the fees could range from
13 five hundred dollars or three hundred dollars
14 up to twenty-five thousand on a fixed fee
15 basis.
16    Q. I gather the twenty-five thousand
17 range would deal with commercial appraisals?
18    A. Yes.
19    Q. And the minimum charge for an
20 appraisal of a residential would be three to
21 five hundred dollars?
22    A. Yes. In our shop, that's correct.
23    Q. And you have records of all of those
24 appraisals?
25    A. Of the four hundred?

Page 157

1     Q. Yes.
2     A. Yes.
3     Q. Are they all in the levee or MRGO
4  class areas?
5     A. No.
6     Q. Are any in the MRGO or levee class
7  area?
8     A. Oh, sure. Yes.
9     Q. How many of the four hundred?
10    A. Oh. I don't know. I don't know that
11 today.
12    Q. When you say the Greater New Orleans
13 area, do I assume they're either in Orleans or
14 Jefferson? Or do they also include St.
15 Bernard?
16    A. No, it would include St. Bernard
17 probably, and include St. Tammany. You know,
18 Greater New Orleans would be the seven parish
19 area.
20    Q. Have any of those appraisals been
21 aimed at discerning damage due to Katrina?
22    A. They were aimed certainly at, given
23 that they were post-Katrina, post-Katrina
24 values. Now, whether they were used in that
25 manner by someone else, if they had a value

Page 158

1 base, a pre-Katrina value base to measure that
2 against, I don't know.
3    Q. You also say that you've inspected
4 more than one hundred homes -- or that you
5 inspected more than one hundred homes
6 immediately after Katrina.
7    A. Yes.
8    Q. Why did you do that?
9    A. Well, in the post-Katrina environment,
10 most of our clients were missing in action, and
11 so in an effort to stay busy and produce some
12 income we certainly had the talents to cross
13 over into the insurance adjuster world, which
14 is what most of us did for a time.
15    Q. So what did those inspections consist
16 of?
17    A. They were basically going out to
18 inspect properties that were damaged from wind
19 and fallen trees and the like. They were the
20 non flood damaged properties that were subject
21 to an insurance claim.
22    Q. Non flood damaged?
23    A. Well, they might have been flood
24 damaged, but we weren't interested -- we were
25 not looking at flood damage in terms of the

Page 159

1 liability of the people we were looking for, we
2 were working for insurance -- we were doing
3 insurance adjustments for wind, rain, that sort
4 of damage.
5    Q. So the damage that you focused on in
6 those inspections was only damage above the
7 floodwater line of that particular property?
8    A. That would generally be true, yes.
9    Q. Anything below that line you would
10 consider flood damage and you were not
11 addressing that, correct?
12    A. No. Typically, there was another
13 adjuster that came out that dealt with the
14 flood issues. There was some coordination.
15    Q. So your understanding when you did the
16 inspections that you're talking about was that
17 any damage existing below the waterline, or the
18 flood line, was not going to be covered by the
19 insurer for whom you were doing these
20 inspections?
21    MR. ANZELMO:
22       Objection to form.
23    MR. ZWAIN:
24       We adopt that.
25 EXAMINATION BY MR. MEUNIER:

Page 160

1    Q. Is that your understanding --
2    A. Would you mind repeating that?
3    Q. You've told us that when you went out
4 and you got into the insurance adjusting
5 business for a while, you went out and you
6 inspected over a hundred homes.
7    MR. ZWAIN:
8       Are we switching class actions
9    now?
10 EXAMINATION BY MR. MEUNIER:
11    Q. No. You were looking only at damage
12 from Katrina above the flood line is what you
13 told me.
14    A. Well, that may not be precisely
15 correct. On a practical level that's pretty
16 close, but it would have been any damage that
17 was caused by the insured liability, which
18 would be for wind, rain, fallen trees, those
19 sorts of damage claims.
20    Q. And you focused your attention on
21 damage above the flood line.
22    A. That would have been the focus,
23 correct.
24    Q. Now, what did you -- did you use
25 forms, standard forms for these inspections?

Page 161

1    A. Yeah. They have a canned program, if
2 you.
3    Q. Who is that?
4    A. We didn't use standard forms,
5 necessarily, on inspections, but in terms of
6 the damage that we saw, then it was inputted
7 into a canned program that the insurance
8 adjusters use.
9    Q. And what was the charge per
10 inspection?
11    A. Remarkably, in that world it's a
12 percentage of the claim amount.
13    Q. A percentage of the what? I'm sorry.
14    A. Of what ultimately becomes the claim
15 amount.
16    Q. And what was the average time you
17 spent inspecting a property, if you can tell
18 me?
19    A. Oh, well, that varied, as well. I
20 mean, if we were at a very large house with
21 lots of damage and where a lot of detail was
22 required, you could take more than a day. But
23 I'd say the average, the typical where you had
24 some limited -- where you had roof damage and
25 you had some limited interior damages, oh,

Page 162

```
 1  probably a couple of hours.
 2      Q.  Now, in neither these inspections nor
 3  in the appraisals of post-Katrina value for the
 4  four hundred or so properties, in neither case
 5  were you undertaking to discern the property
 6  value impact of the flood event, is that true?
 7  As a diminution of property value.
 8      A.  Correct.  Well, in truth and fact, we
 9  weren't really attempting to discern property
10  value impact, period, even for the items we
11  were looking at.  We were discerning repair
12  cost is what we were doing.
13      Q.  Right.  Now, Mr. Truax, you don't have
14  any legal training or education, do you?
15      A.  No.
16      Q.  You don't hold yourself out as an
17  expert on the Louisiana law of fault or
18  causation?
19      A.  I do not.
20      Q.  Refer to Page 8 -- I'm sorry.  4.
21  Page 4, Paragraph 8.  Final sentence of that
22  paragraph.
23         It is apparent to me that Hurricane
24  Katrina caused damage in a variety of ways,
25  only a few of which could in any way relate to
```

Page 163

```
 1  any conduct of one of more defendant.
 2         What is the basis in your expertise
 3  for making that statement?
 4      A.  Well, if you go to the first sentence
 5  of that Paragraph 8, it says based upon my
 6  reading of the First Supplemental and Amending
 7  Levee Master Consolidated Class Action
 8  Complaint filed by plaintiffs as well as my
 9  conversations with attorneys for defendants.
10  So clearly I had a sense from counsel as to
11  what these defendants may be liable for.
12      Q.  A sense from counsel for the
13  defendants?
14      A.  Yes.
15      Q.  So the defendants have told you that
16  there are only a few damages suffered in
17  Katrina which could in any way relate to their
18  conduct?
19      MR. ANZELMO:
20         Object to form.
21      A.  Well, I was certainly aware that this
22  was about the flood event, as I think we all
23  are.  And I was certainly aware based upon my
24  own experience that many properties in our area
25  had been substantially damaged by wind, rain,
```

Page 164

```
 1  falling trees, looting, so I was -- nothing I
 2  had read suggested that those -- that type of
 3  property damage was at issue.
 4  EXAMINATION BY MR. MEUNIER:
 5      Q.  Right.  Well, which what you call few
 6  damages that could relate to the conduct of one
 7  or more defendant?
 8      A.  Well, the few being the flood events
 9  from the various water sources.
10      Q.  And we've already established that you
11  agree that the plaintiffs are only seeking
12  recovery in this case for damages relating to
13  the flooding.
14      MR. ZWAIN:
15         Objection to the form of the
16         question.  You're asking for a legal
17         conclusion.
18      A.  Well, the flood being water caused by
19  levee overtopping or breaching, I assume, and
20  not rain.
21  EXAMINATION BY MR. MEUNIER:
22      Q.  Now, we're back at the conclusions
23  again.  I want to review these in a different
24  way.  You start at Page 4.  And your first
25  conclusion that damages cannot accurately be
```

Page 165

```
 1  determined on a class-wide basis.
 2         Is it your testimony that you're not
 3  aware of any class action litigation in which
 4  property damage had been -- property damages
 5  had been determined on a class-wide basis?
 6      A.  No.
 7      Q.  Have you researched that subject?
 8      A.  Not particularly, in the sense that I
 9  am, as I think I've told you, very confident
10  that a class-wide system is not going to work
11  and be even remotely applicable in this
12  submarket, that is Metropolitan New Orleans.
13      Q.  And you state here that it is the
14  variations between properties that make it
15  necessary to consider damages on a
16  property-by-property rather than a class-wide
17  basis, correct?
18      A.  That is what I state.
19      Q.  Therefore, you do not believe that
20  variations between properties can be controlled
21  for in any model approach to appraisal on a
22  class-wide basis, is that your testimony?
23      A.  I do not believe in this submarket
24  that a model could be constructed, at least
25  upon my understanding of what they're capable
```

Page 166

1  of, and the amount, and the number of variables
2  that would have to be addressed, to
3  realistically apply such a system here that it
4  could be implemented and produce reasonable and
5  credible results.
6  Q. Your second opinion deals with 42
7  properties that are the class representatives'
8  properties, correct?
9  A. Correct.
10 Q. And you state that these properties --
11 that none of these properties is representative
12 of the other properties within the subclass
13 area?
14 A. No, I didn't say none of these
15 properties were representative of any
16 properties in the subclass. I didn't say that.
17 Q. You say the 42 --
18 A. I said they're not truly
19 representative of the tens of thousands of
20 other properties located within each of the
21 subclasses.
22 Q. All right. The 42 properties that
23 you're referring to are all of the proposed
24 class rep properties in the MRGO and the levee
25 cases, correct?

Page 167

1       MR. MARPLE:
2            I'm going to object to misstating
3       that.
4       MR. MEUNIER:
5            I'm sorry. This is the levee
6       report.
7  EXAMINATION BY MR. MEUNIER:
8  Q. So the 42 properties you're talking
9  about here are all of the proposed class and
10 subclass reps in levee?
11 A. Yes.
12      MR. ZWAIN:
13           Who aren't renters.
14 A. That's correct.
15      MR. ZWAIN:
16           All of the properties of the
17      subclass representatives who own
18      property.
19 EXAMINATION BY MR. MEUNIER:
20 Q. Who are owners of the property. Okay.
21      And are you saying that none of those
22 42 properties is representative of the other
23 properties in that area?
24 A. No.
25 Q. Well, then I'm -- all right. So let

Page 168

1  me go to your language. The 42 properties are
2  not truly representative of the tens of
3  thousands of other properties located within
4  each of the subclasses.
5       Tell me what that means.
6  A. Well, if you read the next sentence, I
7  believe it answers the question for you. It
8  says, almost all of the class representative
9  properties are residential, yet the class and
10 subclass definitions encompass substantial
11 numbers of commercial, industrial,
12 institutional, governmental, vacant and other
13 types of properties.
14 Q. All right. That's the reason they're
15 not representative, right?
16 A. They do not -- they're not
17 representative of the entire spectrum of
18 properties that exist in the subclass areas,
19 that's correct.
20 Q. All right. So you're saying they're
21 representative of residential properties, but
22 they're not representative of non residential
23 properties?
24      MR. ZWAIN:
25           Object to the form of the

Page 169

1       question.
2  A. They're representative, certainly, of
3  the properties that are of like type and of
4  such similarity that they would compare
5  reasonably to. No, so I'm not saying they
6  wouldn't represent any of the properties in the
7  subclass areas. I'm saying they represent one
8  segment only.
9  Q. And what segment is that?
10 A. That's the residential segment, and
11 it's generally either the one or the two-family
12 category.
13 Q. So the 42 owner properties, class rep
14 owned properties you feel are representative of
15 other residential properties in those areas,
16 but are not representative of non residential
17 properties, is that what you're saying?
18 A. No, I'm also saying -- I'll take it
19 beyond that. I'm saying they're representative
20 of -- they're not representative of even all
21 the residential properties, in that there are
22 different types, styles, classes, that are not
23 included in the named plaintiffs group.
24 Q. Now, what is your definition of
25 representative, for purposes of this opinion?

Page 170

1   A. For my purposes, it would mean that
2   they would be a reasonable comparable, if you
3   will, to the properties that they're going to
4   be compared to.
5   Q. So if you were doing the traditional
6   appraisal analysis of looking at comparables,
7   that's the population of what you call
8   representative of the properties that are
9   useful.
10  A. That would be one way to think of it
11  in terms of that. Would I consider these --
12  let's say I had a property you asked me to
13  evaluate. Would I consider some of these
14  properties sufficiently comparable that I would
15  use them as such in an appraisal? That would
16  be one test.
17  Q. Well, have you sought to determine the
18  extent to which each property is representative
19  of other residential properties?
20  A. Well, clearly I think we've stated
21  that in the report -- I believe we do some
22  statistics, yeah -- that it -- in terms of the
23  types of properties that we see in the various
24  neighborhoods by classification, single family
25  residential, multifamily, commercial,

Page 171

1   industrial, et cetera. We have the acres and I
2   believe we have the percentages from the census
3   that were in those categories. So clearly, as
4   I said, these -- no, certainly some of these 42
5   would be representative of some segment of
6   those subclasses. But even within a given
7   property type, single-family, let's say, there
8   are probably -- in fact, I know, it's not
9   probably -- there are single-family homes that
10  are of a character and a style and a type, a
11  scale that would not be truly represented by
12  these particular representatives.
13  Q. Well, so, in your view, to have a
14  representative property -- to have a
15  representative property, one would have to
16  have, for example, a commercial property
17  representing commercial, an institutional
18  representing institution, et cetera?
19  A. I would think so.
20  Q. Because your definition has to do with
21  a comparable value analysis that you perform as
22  an appraiser; that's what you're thinking of,
23  right?
24  A. Well, even beyond a value analysis, in
25  terms of function, market appeal, all of those

Page 172

1   things, that's the only way you can truly make
2   a comparison that makes any sense.
3   Q. All right. In the class -- do you
4   know why these particular claimants are given
5   the title of class representative? Do you know
6   what that legal term refers to?
7   A. No, but I'm suspecting I'm going to
8   hear it.
9   Q. So you don't know the criteria by
10  which they've been designated as
11  representatives by plaintiffs' counsel.
12  A. No.
13  Q. You don't know what the Rule 23
14  definition of typicality or adequacy of
15  representation is.
16  A. No.
17  Q. And you don't even know that those are
18  the rules that informed the selection of these
19  people as class reps; you're not aware of that.
20  A. Am I aware of those legal rules? No.
21  Q. All right. Now, your third
22  statement -- third opinion is that the
23  individual representatives are not
24  representative of other residential properties
25  including properties within the same

Page 173

1   neighborhood. Correct?
2   A. Correct.
3   Q. Is that true in every one of the 42
4   cases?
5   A. Oh, there would be variations, I
6   think, in terms of, one, what you defined as
7   their neighborhood, and some of the
8   neighborhoods would be better represented than
9   others by this grouping. So, no, it wouldn't
10  be a uniform answer to that.
11  Q. Your fourth conclusion that mass
12  appraisal techniques like AVMs cannot fairly
13  and effectively efficiently measure real
14  property damages, again I think you've told me
15  already you're not aware of any cases where
16  AVMs in fact have been used to perform mass
17  appraisal in class litigation. Correct?
18  A. I'm not, and particularly I'm not
19  locally.
20  Q. And your statement to this effect is
21  driven, I take it, by the variability of
22  property characteristics within the class area?
23  A. That's the primary cause, I believe,
24  of lack of applicability in our local market.
25  Q. Your sixth conclusion is that the

Page 174

1 types -- I'm sorry. Your fifth conclusion is
2 that the wide array in the types and sources of
3 damages caused by Katrina preclude a uniform
4 common method to measure impairment to real
5 property. Correct?
6     A. Yes. That was speaking to the
7 particular damage issue in this case, which is
8 the flooding associated with the levee breaches
9 and overtoppings.
10     Q. So your testimony is that you can only
11 discern flood damage to a property on a
12 property-by-property basis.
13     MR. ZWAIN:
14        Object to the form of the
15     question.
16     A. I think to get reasonable, credible,
17 accurate results, I think that is the case,
18 yes.
19 EXAMINATION BY MR. MEUNIER:
20     Q. Now, do you understand that
21 Dr. Kilpatrick proposes to use a mass appraisal
22 technique to actually evaluate the physical
23 flood damage done to a given piece of property
24 and that's your belief?
25     A. Well, my reading of his report, other

Page 175

1 than saying that certainly he's going to use
2 mass appraisal techniques, possibly an AVM, the
3 particulars of what he's going to do I can't
4 tell you I could give that from my reading.
5     Q. Yeah. But my question is whether you
6 are assuming, in making this statement, that
7 Dr. Kilpatrick will use a mass appraisal
8 technique for the purpose of evaluating the
9 physical flood damage done to a specific piece
10 of property. Is that your assumption?
11     A. No, I don't believe that was
12 necessarily my assumption making that
13 statement. What I think that I'm trying to
14 tell you is that the mass appraisal techniques,
15 the AVM modeling, et cetera, I do not believe
16 will work even to produce a value estimate for
17 the whole of properties, if you will, before
18 you even address the issue of the particular
19 damage associated with the flood event versus
20 the wind event and all of the various causes
21 that led to property damage.
22     Q. And you take the position that the
23 diminution -- the possible diminution of
24 property value associated with the flood event
25 in this case cannot be approached on a

Page 176

1 class-wide basis; is that true?
2     A. I'm sorry.
3     Q. The property diminution --
4     A. Right.
5     Q. -- associated with flooding, in your
6 view, cannot be approached on a class-wide
7 basis.
8     A. I know of no method that would produce
9 accurate and credible results on an individual
10 property basis employing methods like that.
11     Q. So if we get back to the question of
12 determining whether or not there was a property
13 value diminution that can be associated with
14 the flood, your approach, you say the only way
15 to do that is on a property-by-property basis,
16 correct?
17     A. Yeah. Yes.
18     Q. You're going to go one property at a
19 time, and you're going to ask the question in
20 each case, the same question, was there or was
21 there not a diminution in value associated with
22 flooding.
23     MR. ZWAIN:
24        Objection, asked and answered.
25     MR. MEUNIER:

Page 177

1        True.
2     MR. ZWAIN:
3        Is this a good time to break?
4     MR. MEUNIER:
5        Sure.
6     (Off the record.)
7 EXAMINATION BY MR. MEUNIER:
8     Q. In the Paragraph F on Page 5, your
9 sixth opinion states that the types of mass
10 appraisal techniques advocated by
11 Dr. Kilpatrick are prone to high rates, et
12 cetera, et cetera -- high rates of error, et
13 cetera. What are the types of mass appraisal
14 techniques that you understand being advocated
15 advocate by Dr. Kilpatrick?
16     A. Certainly I believe that some
17 automated valuation model effort would be --
18 that's what I take from what he has written,
19 would be employed to accomplish the mass
20 appraisal.
21     Q. All right. So are you saying that all
22 AVMs are prone to high rates of error?
23     A. No, there are likely applications for
24 AVMs that would probably work reasonably well.
25 I'm just saying in the New Orleans market --

Page 178

1 the New Orleans marketplace is not one of them.
2 We have far too much variety and lack of
3 homogeneity to accomplish that.
4     Q.  So you're saying for the New Orleans
5 community, any and all uses of AVMs would be
6 prone to high rates of error.
7     A.  Well, when you say any and all, I
8 mean, certainly for some use possibly an AVM
9 may produce some result that someone might find
10 useful for some reason.  All I'm saying is for
11 the reasons that I think, or I believe are at
12 issue herein, I don't believe an AVM will work.
13     Q.  Give me an example of a use for which
14 an AVM might work in the New Orleans market.
15     A.  Oh, I guess if you were reviewing,
16 say, a portfolio of residential loans that were
17 maybe based in the New Orleans market, you may
18 be able to use it in some way as a test of some
19 reasonableness, but I don't believe that you
20 could produce reliable and accurate individual
21 property valuations through use of an AVM.
22     Q.  You then state that the inaccuracy of
23 mass appraisal techniques has been recognized
24 by the Appraisal Institute.
25     A.  Yes.

Page 179

1     Q.  Now, is the specific authority for
2 that statement what you later set forth in
3 Paragraphs 33 and 35 at Pages 17 and 18 of your
4 report?
5     A.  You said 33 and 35?
6     Q.  Paragraphs 33 and 35 on Pages 17 and
7 18.  The paragraphs where you quote the
8 appraisal institute on AVMs.  My question is,
9 are those the references that you present in
10 support of this statement in Paragraph F on
11 Page 5?
12     A.  I think 33 and 35 are instances of
13 that, but I think if you read what limited
14 presentations there are in the 12th Edition of
15 the Appraisal of Real Estate, I believe some
16 language in USPAP, as I remember, there are
17 some cautions about the, um -- application of
18 AVMs when you don't have homogeneous -- a
19 homogeneous type area and properties that have
20 reasonably similar characteristics and the
21 like.  It cautions you as to the reliability of
22 the output.
23     Q.  Is it your assumption and belief,
24 Mr. Truax, that Dr. Kilpatrick proposes to use
25 a mass appraisal technique in the same way that

Page 180

1 tax assessors use the mass appraisal technique?
2     A.  Well, as I think I've told you now
3 several times, in reading Dr. Kilpatrick's
4 report I can't tell you definitively that I
5 understand, in a detailed way, how he would
6 precisely apply it.
7     Q.  All right.  Paragraph G on Page 5 is
8 your seventh conclusion in which you say some
9 of the types of mass appraisal techniques
10 advocated by Dr. Kilpatrick are not generally
11 accepted.  And you give examples of contingent
12 valuation and conjoint analysis.  Correct?
13     A.  Yes.
14     Q.  Are those the only types of mass
15 appraisal techniques advocated by
16 Dr. Kilpatrick which you believe are not
17 generally accepted by the national or local
18 communities of real estate appraisers?
19     A.  Well, as I say -- you keep asking me
20 about the types advocated by Dr. Kilpatrick.  I
21 only keep telling you that I don't see enough
22 specificity in what he's written to tell you --
23 tell me precisely what types he's advocating.
24 Clearly those types, the contingent valuation
25 survey method, particularly, is not widely

Page 181

1 accepted, and I'm not aware of anyone having
2 used that locally to evaluate property or
3 property interests.
4     Q.  All right.  Can you tell me the
5 authority for the statement that contingent
6 valuation is not a generally accepted
7 technique?
8     A.  Yes.  I mean, I've read -- certainly
9 I've read that in several of the articles that
10 I've reviewed.  And we have done enough
11 national profile work.  I can tell you from my
12 own personal experience I have not seen it
13 employed in thirty odd years of appraising
14 properties in any significant way at all.
15     Q.  And can you tell me the authority for
16 the statement that conjoint analysis is not a
17 generally accepted technique?
18     A.  Well, I've told you, embedded in the
19 appraisal process at some level is some measure
20 of conjoint analysis.  Because when we make
21 adjustments for different factors, we are
22 implicitly saying we can isolate that factor.
23 But in terms of it, I guess, from the bottom up
24 being used to say we can layer every single
25 property characteristic, every property