Page 190

```
 1  class area, this question you pose, 14C, would
 2  be relevant to that investigation for the sold
 3  properties, correct?
 4      A.  Well, yes, because it certainly would
 5  bear on what the net proceeds say to a property
 6  owner.  If the commission structure was
 7  3 percent before Katrina and now it's
 8  10 percent, certainly the net proceeds to that
 9  property owner would be changed.
10      Q.  And in the same investigation of
11  whether there's been a diminution, a
12  post-Katrina diminution in value that can be
13  associated with the flood event, the question
14  for the unsold properties would be whether the
15  prospective sale of that property would be less
16  than if you had sold it Katrina never having
17  occurred, right?  That would be the question
18  for the unsold properties?
19      A.  Yeah.  Again, is there a structural
20  change that produces the net proceeds?  But
21  again, I would say you're mixing Katrina event
22  and flood event, and the Katrina event is -- I
23  believe, you know, involves things other than
24  just the flood.
25      Q.  Yes, sir, but in the same way that
```

Page 191

```
 1  I've asked you to assume today and I'll ask you
 2  to again assume tomorrow, that the plaintiffs
 3  in this case are only seeking to recover
 4  damages for the flood, the rising water?
 5      A.  Oh, I understand that fully.
 6      Q.  And that likewise, the plaintiffs
 7  would only be investigating the question
 8  whether a diminution in property value can be
 9  associated with the flood, whether it can or
10  not, would be the relevant question, you
11  understand.
12          MR. ZWAIN:
13              I object to the form of that
14          question because it, number one, asks
15          for a legal conclusion, I think, and
16          number two, it misstates what I
17          understand the class is seeking,
18          realizing that I may not understand it
19          as perfectly as you guys.
20  EXAMINATION BY MR. MEUNIER:
21      Q.  Let me just draw attention to your own
22  report, and maybe we can get closure on this.
23          For unsold properties, properties that
24  remain unsold since Katrina, if we were to
25  investigate whether for those properties there
```

Page 192

```
 1  has been diminished value that can be
 2  associated with the flood rising water
 3  intrusion event, if that were the -- if that
 4  were the question, is that related to what you
 5  asked in Paragraph 15B on Page 8, which is how
 6  will the current market values of individual
 7  properties change in the future as the market
 8  continues to recover from Katrina?
 9          MR. ZWAIN:
10              And I will again object to the
11          form of the question.
12      A.  15B relates to the notion that values
13  change over time.  One of the principle, one of
14  the preeminent principles in the real estate
15  market is the principle of change.  It rarely
16  stays static.  So there will be change, because
17  your values are as of a point in time, a
18  specific point in time.  And that statement
19  recognizes that over time a value structure may
20  be changing and that may impact what someone's
21  impact may truly be.
22  EXAMINATION BY MR. MEUNIER:
23      Q.  How is that question relevant to the
24  assessment of property damages?
25      A.  Well, let's say you had no notion of
```

Page 193

```
 1  selling your property, you repaired it, it's
 2  back on line, you had sufficient insurance
 3  proceeds, et cetera, and it was worth a hundred
 4  thousand before the storm and it's worth a
 5  hundred and ten after.  Then other than some
 6  damage issues relating to having to stay in a
 7  hotel for a while, et cetera, in terms of the
 8  property value damage what is your measure of
 9  damage?
10      Q.  Because without Katrina it's worth
11  three hundred thousand.
12      A.  Well, that's your hypothet, but I'm
13  just saying, argue -- isolate on -- well,
14  maybe -- you're pointing out there is not a
15  simple answer to that, because there are so
16  many variables that have to be considered in
17  terms of assessing how some individual property
18  is impacted by the storm and all the events
19  associated with it.
20      Q.  In Paragraph 16 and 17, Pages 8 and 9
21  in your report, you state that more than half
22  of the 188,000 -- in Paragraph 16, you state
23  the more than half of the 188,251 occupied
24  homes in New Orleans were occupied by tenants,
25  correct?
```

```
                                      Page 194
 1    A.  Correct.
 2    Q.  Do you refer or can you refer to any
 3  data on that subject more current than the
 4  census taken seven years ago?
 5    A.  Well, again, that's the source we
 6  cited there and that was the base for those
 7  numbers.
 8    Q.  I'm being invited to go back on
 9  something, which I think we probably should do
10  briefly.  I was exploring with you the analysis
11  of the flood-related value diminution effect,
12  if any, on unsold properties post-Katrina and
13  how one would go about, in other words,
14  deciding whether or not such a diminution in
15  value has occurred that can be associated with
16  the flood.
17        Are you aware that there already has
18  been a publicly reported analysis of the
19  diminution in the value of damaged -- homes
20  damaged by the Katrina comparing pre and
21  post-Katrina values on a square foot basis?
22    A.  Oh, I'm sure there have been a variety
23  of studies done that were -- you know, speak to
24  that kind of issue.
25    Q.  Are you specifically aware that it's
```

```
                                      Page 195
 1  been reported in The Times-Picayune issue of
 2  January 7, 2006 that the sales price of
 3  unrepaired homes has plummeted to about
 4  42 percent of pre-Katrina levels?  Were you
 5  aware of that?
 6    A.  Am I aware that someone reported that
 7  to The Times-Picayune?  I can't tell you I was
 8  particularly aware, but I'm not surprised.
 9    Q.  All right.  Let me show you the
10  Times-Picayune report I'm talking about.  It's
11  dated Sunday, January 7th, 2006.  (Tendering.)
12        MR. ZWAIN:
13            For the record, there had to be a
14        map where a little square at top
15        left-hand corner.  Is this the entire
16        article?
17        MR. MEUNIER:
18            I'm sorry, Gary.  I missed the
19        question.
20        MR. ZWAIN:
21            Is this the entire article?
22        MR. MEUNIER:
23            This is all I have with me.  But
24        if you're interested in exploring this
25        further tomorrow, we can certainly do
```

```
                                      Page 196
 1  that.
 2        MR. ZWAIN:
 3            Well, I would simply ask that if
 4        you want to have Mr. Truax review and
 5        comment on an article to figure out
 6        what it's possible significance is,
 7        that it's only fair that you provide
 8        him with the complete article --
 9        MR. MEUNIER:
10            Well, I won't ask him --
11        MR. ZWAIN:
12            -- as opposed to some extracted
13        paragraph.
14        MR. MEUNIER:
15            Fair enough.  I'm not going to
16        ask him to answer detailed questions
17        about it.
18  EXAMINATION BY MR. MEUNIER:
19    Q.  Just identify at least for the record
20  what appears to be the source of the
21  information, Mr. Truax, and if you're able to
22  discern the small print with me.  At the bottom
23  left-hand corner where it says sources, you see
24  that?
25    A.  Yes.
```

```
                                      Page 197
 1    Q.  Read for us the sources for the
 2  information given in this -- on this map.
 3    A.  Yeah.  It cites the New Orleans
 4  Metropolitan Association of Realtors and Real
 5  Property Associates, Inc.
 6    Q.  Are you familiar with either one of
 7  those --
 8    A.  Well, I'm familiar with the New
 9  Orleans Metropolitan Association of Realtors.
10  I'm not familiar with Real Property Associates,
11  Inc.  I was going to say I'm not familiar with
12  the name.
13    Q.  Are you a member of the New Orleans
14  Metropolitan Association of Realtors?
15    A.  Yes.
16    Q.  You are?
17    A.  Yes.
18    Q.  Were you, before today, aware of that
19  group being cited as a source for the
20  information reported on this -- in this
21  newspaper?
22    A.  Oh, I'm fairly certain -- I get and
23  pretty meticulously read the newspaper every
24  day, so I'm sure I saw this.
25        MR. ZWAIN:
```

Page 198

1   Let the record reflect also that
2   this article apparently refers to a
3   study with regard to the properties in
4   Jefferson Parish, Orleans Parish, and
5   Plaquemines Parish, St. Bernard
6   Parish, also appears to represent, at
7   least the map, areas of the west bank,
8   and clearly areas outside the scope of
9   what this litigation is concerned
10  with.
11       MR. MEUNIER:
12           Yeah. And I'll be happy to limit
13       my attention to the class and subclass
14       areas.
15  EXAMINATION BY MR. MEUNIER:
16       Q. And just looking at the class and
17  subclass areas, Mr. Truax, do you see that
18  according to this article there has been a
19  diminution in post-Katrina values on a square
20  foot basis for damaged properties?
21       MR. ZWAIN:
22           You're referencing the date of
23       the article, I take it.
24       MR. MEUNIER:
25           Pardon?

Page 199

1        MR. ZWAIN:
2            You're referencing as of the date
3        of the article?
4        A. And they are, um -- I haven't done the
5   math, but I assume -- I mean, obviously for the
6   damaged properties there was no base
7   pre-Katrina. You only had damaged properties
8   post-Katrina.
9   EXAMINATION BY MR. MEUNIER:
10       Q. Well, if you look again at that source
11  box on the bottom left-hand corner --
12       A. Yes.
13       Q. -- it says ZIP codes with five or more
14  sales only. Pre-Katrina figures are closed
15  sales from January through August of '05, and
16  the post-Katrina figures are October of '05
17  through December '06.
18       A. That's fine. But I'm saying, you
19  obviously could not have --
20       MR. ZWAIN:
21           December '05.
22       MR. MEUNIER:
23           Sorry?
24       MR. ZWAIN:
25           December '05. Through

Page 200

1   January 7th, '06?
2        A. My only point to you was, you
3   obviously only have damaged properties
4   pre-Katrina. You didn't have Katrina damage
5   pre-Katrina. So what is the base for the value
6   reduction for the damaged properties on a
7   percentage basis? It's not comparing damaged
8   properties to damaged properties. You've
9   changed the base.
10  EXAMINATION BY MR. MEUNIER:
11       Q. So as I understand it, this is the
12  first you've ever been made aware of this
13  study, correct?
14       A. No, I've told you I get and read the
15  newspaper every day. I'm sure I saw it.
16       Q. Right.
17       A. But there have been a lot of these
18  that I've noted in the paper over the last
19  several years.
20       Q. Did you discount the validity of what
21  you see reported on this sheet?
22       A. Oh, I'm sure it represents what they
23  say it represents, but how valid it is in, say,
24  my world -- would I use this as an appraiser?
25  No. I would not. I would have to fully

Page 201

1   understand the source of the information that
2   they used, how reliable it was. I mean,
3   they're taking whole ZIP codes, and if a ZIP
4   code had five sales in it they have produced a
5   result. Well, you know, I don't purport to be
6   a statistician, obviously, but you could have
7   one sale at a million dollars in one of these
8   Zip codes and every other sale sold for a
9   hundred thousand, and you're going to get a
10  result that's kind of skewed by the one sale.
11  So, it is what it is, but until I understood
12  the database which created these numbers I
13  couldn't tell you whether this is, you know,
14  approximately accurate, highly accurate, or
15  woefully inaccurate. So I don't know.
16       Q. And you did research and you said that
17  there were more than 6900 sales transactions as
18  of September '07?
19       A. Correct.
20       Q. And that was -- was that residential
21  properties in the levee class area?
22       A. That was transactions that cycled
23  through the multilist service. It was not all
24  transactions. So that's a minimum. Because we
25  all know there are lots of sales that occur

Page 202

1  outside of the MLS system.
2  Q. Right. Sales by owner and that kind
3  of thing.
4  A. Well, just ones they never listed.
5  Sales by owners or other means.
6  Q. But you didn't, in terms of what was
7  the basis for this January '06 report, you
8  didn't discern when you looked at it how many
9  transactions had occurred prior to December of
10 '05.
11 A. I don't -- well, for what period?
12 Q. From Katrina to December of '05.
13 A. Um -- no, I don't think we cut that
14 little slice out of it.
15 Q. Okay. Why don't we mark this as what
16 is it, Truax Number 5?
17       MR. ZWAIN:
18           With the understanding that
19 you're going to provide the complete
20 article sometime tomorrow?
21      EXNICIOS:
22          I've got it. We've just got to
23 have it copied.
24      MR. ZWAIN:
25          I'd like him to have the

Page 203

1  opportunity to look at the complete
2  article.
3       MR. EXNICIOS:
4           It's also available online.
5       MR. ZWAIN:
6           He may have something different
7  to say about the article at some point
8  later.
9       MR. BRUNO:
10          If he wants to have it, we'll
11 give him one.
12      MR. ZWAIN:
13          Thank you.
14      MR. BRUNO:
15          It makes no sense to attach it
16 because there's been no reference to
17 it in the deposition.
18      MR. MEUNIER:
19          I didn't say attach it.
20      MR. BRUNO:
21          I thought you said attach it.
22      MR. ZWAIN:
23          I said I have no problem
24 attaching this with the
25 understanding --

Page 204

1       MR. BRUNO:
2           Even though it's available on
3  nola.com. I'm telling you. You
4  inquired. It's publicly available.
5  Go get it.
6       MR. ZWAIN:
7           Well, then, give me back all my
8  exhibits.
9       MR. BRUNO:
10          You didn't give me anything that
11 was publicly available. That's the
12 point.
13 EXAMINATION BY MR. MEUNIER:
14 Q. Mr. Truax, Pages 10 and 11 of your
15 report, Paragraphs 19, 20, 22, you discuss the
16 variability in post-Katrina rents and business
17 income from both individual and commercial
18 properties in the class area, right?
19 A. Well, I talk about, yeah, particularly
20 the rents that would have been derived from
21 residential and commercial type properties.
22 Q. And your point here, the relevance of
23 this is that you believe that rents have
24 increased since Katrina. Is that your --
25 A. For some market segments, yes.

Page 205

1  Q. And what is the relevance of that?
2  A. Well, that the -- that consideration
3  has to be accounted for in assessing value
4  impact. There could -- you know, many
5  properties in the levee class area probably had
6  an increase in value, they weren't damaged at
7  all, in fact they had a value enhancement as a
8  consequence of all the events associated with
9  Hurricane Katrina.
10 Q. Okay. Now, the mass appraisal
11 technique being proposed in this case would not
12 be utilized to quantify business income or
13 rental income loss. You understand that?
14 A. If that's -- you're telling me that
15 that's what I guess Dr. Kilpatrick proposes,
16 that he's not going to use it for that, I
17 believe you.
18 Q. But what I'm trying to understand, I
19 think I understand, is that the reason you're
20 mentioning the high rents is that if we were to
21 analyze this diminution in value possibility
22 post-Katrina, you're saying we would have to
23 take into account the fact that post-Katrina
24 income producing properties are earning more
25 money than before Katrina?

Page 206

1  A. Well, understand for an income
2  producing piece of real estate, it's value is
3  directly linked in many ways to the income it
4  produces.
5  Q. Right.
6  A. So if the net operating income from
7  your property has increased by as much as
8  39 percent, then you're going to have a
9  commensurate increase in property value. So
10 the property value will, in fact, be increased.
11 Q. But the comparison, again --
12 A. It may not be 1:1, but there will
13 be -- it impacts it.
14 Q. But the comparison, again, would be
15 between that property post-Katrina being valued
16 as it is with Katrina having happened and the
17 potential value of that same property had
18 Katrina never happened; isn't that the relevant
19 comparison for the diminution of value
20 analysis?
21 A. I believe generally so, yes.
22 Q. Page 11, Paragraph 23, you discuss the
23 case of an individual who's spent more to
24 repair his property, for example, because of
25 historic restoration requirements he spends

Page 207

1  more than the difference between the pre and
2  the post-Katrina value. That's the scenario
3  you've discussed, right?
4  A. (Nods affirmatively.)
5  Q. In other words, I've had to spend more
6  to fix my property than whatever diminution in
7  value there may be in the property.
8  A. Well, and that you can recover. I
9  mean, it's not uncommon for historic type
10 properties, because of the obligations that
11 come with, you know, being located in an
12 historic district and mandates that they place
13 upon you.
14 Q. So how would you propose to calculate
15 the loss of that individual?
16 A. Well, I think that's the very point,
17 that you have to look at that individually and
18 understand his circumstances. If the historic
19 group comes into the one and says, your
20 obligation is to, um -- the only thing we're
21 going to demand of you is that you fix the old
22 shutters that now have a few slats that are
23 broken, whereas the next guy, the obligation
24 for whatever reason is to -- the damage was
25 more substantial and now they want you to

Page 208

1  restore it to make it look like it looked in
2  1800 when that wasn't the case before, well
3  then that's a different issue.
4  Q. Well, why is it relevant to the
5  inquiry of whether there's been a diminution in
6  property value?
7  A. Well, if that obligation attaches to
8  the property, which it would, then it affects
9  how a buyer or whomever would see the value of
10 that property.
11 Q. So you're saying the cost of repair or
12 restoration would be a factor to input in
13 addressing the post-Katrina value of the
14 property.
15 A. That's correct. In other words, that
16 and any other factor that would -- that a
17 prudent buyer would consider before he acquired
18 that property.
19 Q. All right. Do you have any idea of
20 what percentage of the total properties at
21 issue in the levee case would be instances
22 where more has been spent to repair or restore
23 the property than the value of the property?
24 A. No. I wouldn't have a percentage for
25 you.

Page 209

1  Q. Paragraph 24, Page 11, you state that
2  generally accepted standards of professional
3  appraisal practice in the peer reviewed
4  literature recognize that the effect of the
5  detrimental conditions such as that caused by
6  hurricane will change over time and when impact
7  occurs is typically temporary rather than
8  permanent. Right?
9  MR. ZWAIN:
10     Sorry. What paragraph are you
11 on?
12 MR. MEUNIER:
13     Paragraph 24, Page 11.
14 MR. ZWAIN:
15     All right.
16 EXAMINATION BY MR. MEUNIER:
17 Q. Now, do you interpret the stigma or
18 detrimental condition claim associated with
19 flooding that's being asserted here on
20 plaintiffs' behalf, do you interpret that as
21 referring, among other things, to the risk of
22 recurrent flooding following a hurricane?
23 A. I'm struggling with how that relates
24 to what you read me.
25 Q. Oh, I'm going to get there. This is a

Page 226

```
 1  is there?
 2     A.  Well, with the caveat that -- as I've
 3  said, there is consensus, I think, in the peer
 4  reviewed literature that typically, in somewhat
 5  of a normalized circumstance, if you will,
 6  there is recovery.  Now, we have now both said
 7  it several times; the base of it, the magnitude
 8  of it, is determined by a host of factors that
 9  we probably cannot readily predict.
10     Q.  It's true, isn't it, in the case of
11  the California flooding that was discussed in
12  Footnote 27 -- on Page 26, rather, of your
13  report.  You see the first bullet point --
14     A.  Yes.
15     Q.  -- at the top of Page 26?
16     A.  Yes.
17     Q.  It's true that in that case, the
18  flooding of those two California towns, that
19  houses took more than ten years, more than ten
20  years to recover in the neighborhoods with the
21  greatest flood damage?  Isn't that true?
22     A.  I think that's right.
23     Q.  Now, going back to your report,
24  Page 11, Paragraph 25, you cite the wide
25  diversity of New Orleans neighborhoods in terms
```

Page 227

```
 1  of housing types, conditions, et cetera,
 2  correct?
 3     A.  Yes.
 4     Q.  And do you think that's a problem with
 5  the use of AVMs by tax assessors, that's what
 6  makes them not good indicators of market value
 7  of that variability?
 8     A.  That's certainly a big issue, yes.
 9     Q.  Is it your position that there's no
10  way to control for variables using the AVM
11  technique?
12     A.  Well, clearly the AVM technique allows
13  for multiple inputs, so you can guide it at
14  some level.  But I'm here to tell you based on
15  my experience with the local market that the
16  variety is far too extensive and the number of
17  variables that you have to address far too
18  great to reliably produce, I believe, a model
19  that will produce accurate and credible
20  results.
21     Q.  Let's refer to your table on Page 13
22  in which you set forth an analysis of the
23  variations and the variables within the five
24  proposed subclass areas.
25         In the Belfort area, which is proposed
```

Page 228

```
 1  subclass Number 2, you studied a total of 130
 2  properties, correct?
 3     A.  Correct.
 4     Q.  How many total properties are in the
 5  Belfort area?
 6     A.  In the Belfort study area, we looked
 7  at 130.
 8     Q.  No.  How many total properties are in
 9  subclass 2?
10     A.  Oh.  I'm sorry.  Um -- I don't recall
11  that number.
12     Q.  So you can't tell me then whether 130
13  represents a statistically significant or
14  sufficient sample of the properties in that
15  subclass?
16     A.  Well, in terms of it being a
17  significantly -- I mean a statistically
18  significant number, no.  It likely isn't.  That
19  wasn't the point of the study.
20         The point of the study was to say even
21  in such a small area as one with only 130
22  properties, here was the variety that was
23  demonstrated.
24     Q.  Right.  But you want to suggest that
25  we can extrapolate variability within a group
```

Page 229

```
 1  of 130 to a much larger group not even knowing
 2  how big that larger group is, correct?
 3     A.  I'm telling you that, again, based
 4  upon my experience and my understanding of the
 5  variety in these neighborhoods, that no, could
 6  you extrapolate 1:1 and say that based upon
 7  this study we will find 62 percent
 8  single-family residential throughout that
 9  broader subclass area, the subclass area 2?
10  No, I'm not telling you that.  I'm telling you,
11  this study is what it is.  It demonstrates what
12  you see even in an area as small as nine
13  blocks.
14     Q.  And I suppose we'll get the same
15  answer with respect to Catina, which is
16  Subclass 1, Edinburgh which is Subclass 5,
17  Gaines which is Subclass 3, and Stutz which is
18  Subclass 4, the total properties studied, 170
19  in Catina, 138 in the Edinburgh, 90 in Gaines,
20  82 in Stutz, are not being presented by you as
21  a statistically significant or sufficient
22  samples of the total properties in each of
23  those sub chance areas, correct?
24     A.  No, I would agree with you that
25  they're not statistically significant numbers
```

Page 230

1  relative to the wholes of those subclasses.
2    Q. How long did it take you to study each
3  of these five subclass areas?
4    A. Well, in terms of the entire process,
5  as we were implementing it for use in this
6  report, probably -- now this is a horseback
7  estimate, but I'm going to give you man days,
8  if you will --
9    Q. Okay.
10   A. -- maybe five man days.
11   Q. And can you tell me what professional
12 charges were associated with that work in that
13 estimate of your charges?
14   A. I'm doing some math in my head. Maybe
15 fifteen, twenty thousand dollars.
16   Q. Is that just for you or did that
17 include the work of others?
18   A. No, that would include others. No,
19 I'm sorry. I did that math wrong. I
20 apologize.
21      No, it would be less than ten
22 thousand.
23   Q. Are you multiplying 40 hours times --
24   A. 40 hours times, um -- $200.
25   Q. $200?

Page 231

1    A. Yeah.
2    Q. I thought your rate was $275.
3    A. Well, we weren't using, the other
4  people that were helping weren't at the same
5  rate.
6    Q. So you were charging $275, and others
7  were charging less, so you just took an average
8  of $200.
9    A. Well, yeah. You asked me how I got
10 take number, that's how.
11   Q. Now, am I correct looking at the
12 property use portion of the table that the
13 total of 85 percent of the properties you
14 studied in the Belfort area of Subclass 2 are
15 residential?
16   A. Yes.
17   Q. And in the Catina area of Subclass 1,
18 76 percent?
19   A. Yes.
20   Q. 77 percent, rather, were residential?
21   A. Yes.
22   Q. And in the Edinburgh area of Subclass
23 5, 50 percent were residential?
24   A. Yes.
25   Q. In the Gaines area of Subclass 3,

Page 232

1  92 percent were residential?
2    A. Yes.
3    Q. And in the Stutz area of Subclass 4,
4  80 percent were residential?
5    A. Yes.
6    Q. And the percentages of commercial
7  properties in all 5 areas ranged from a low of
8  0 percent to a high of 3 percent.
9    A. Correct.
10   Q. Now, in the next two profiles
11 sections, the elevation and the depth of
12 flooding sections, you have entries for
13 demo/vacant land, right?
14   A. Yes.
15   Q. What does demo refer to?
16   A. Well, remember, these were
17 observations made from the street. So we
18 couldn't always tell if there had been a
19 demolition accomplished or if it had been a
20 vacant site previously. So based upon the
21 observations from street right-of-way, it was
22 either demoed or vacant, but there was not a
23 building or a residence or a structure on the
24 site when we observed it.
25   Q. So whatever properties you enumerate

Page 233

1  in the demo/vacant land category include
2  demolished properties?
3    A. Yes. In other words, if we pulled up
4  to the lot and there was no residence on it,
5  one of two things could have been; it could
6  have been vacant before the storm, or they
7  could have demolished something that had been
8  there.
9    Q. Is it reasonable to infer if a home
10 was demolished -- if a home was demolished
11 after Katrina it is reasonable to infer it
12 sustained some flood damage?
13   A. No, I don't think you would
14 categorically say that had caused the demo.
15   Q. You don't think that's a reasonable
16 inference?
17   A. It is an inference, but the property
18 could have been destroyed by wind or a tree
19 could have fallen on it and cut it in half. So
20 there are other reasons that a property
21 possibly required demolition.
22   Q. And in Paragraph 30, Pages 14 and 15,
23 you cite the Catina area of Subclass 1 as
24 illustrative of variability in the elevation of
25 properties above street level, correct?

Page 234

1  A. I'm sorry. Direct me again to where
2  you are?
3  Q. Paragraph 30, Pages 14 and 15.
4  A. Okay. Yes.
5  Q. But do I understand from the table
6  that 77 percent of the homes in the Catina area
7  ranged from an elevation of below 1 foot to
8  4 feet or more?
9      MR. ZWAIN:
10         Are you going back to the table
11     on the previous page?
12     MR. MEUNIER:
13         The table on Page 13.
14  A. I'm sorry. Ask me that question again
15  there.
16  EXAMINATION BY MR. MEUNIER:
17  Q. Well, 77 percent of the homes that
18  were standing ranged in elevation from below
19  one foot to 4 feet or more, correct? Excluding
20  the 23 percent of the demolished homes and
21  vacant land.
22  A. You say you excluded those from your
23  calculation?
24  Q. In other words, all the homes you
25  observed in the Catina area had elevation

Page 235

1  ranging from less than a foot to four feet or
2  more, correct?
3  A. Yes.
4  Q. Okay. And the depth of the flooding
5  figures given for Catina indicate that
6  71 percent of the land experienced flooding of
7  4.1 feet or more, right?
8  A. Excluding the demo and vacant, yes.
9  Q. So in Catina, despite what you cite as
10 an elevation variability, it appears that
11 virtually all of the properties in the Catina
12 study area flooded; in fact, the table
13 indicates there was only no flooding in one
14 property, 1 percent of the study.
15 A. I would say that's true in Catina,
16 yes.
17 Q. It's also true in Edinburgh, by the
18 way, that every property but 1 experienced
19 flooding.
20 A. That's probably correct, yes.
21 Q. And in fact, in Gaines, every single
22 property experienced flooding. Subclass area
23 3.
24 A. Yes.
25 Q. How did you determine the depth of

Page 236

1  habitable floor flooding?
2  A. We knew the ground elevation, I
3  believe from the IPET study, and -- no, IPET
4  gave us the depths of flood from ground. We
5  knew the NAVD 88 datum, there was an
6  adjustment, GCR did that, to get to what sea
7  level was, and we observed, from the street,
8  what -- the approximate elevation, so it's an
9  approximation, of the first habitable floor
10 area was, from ground. So if you were on a
11 pier house, low pier, we said it was two feet
12 above ground, if it was, you know, a slab
13 house, we said that was a foot or less.
14 Q. So you agree that the depth of
15 flooding is ascertainable with some degree of
16 certainty within all five subclass areas?
17 A. Yes.
18 Q. How did you determine the no flooding
19 category which is given under depth of
20 habitable floor flooding?
21 A. Again, we did the math. We took the
22 IPET depths of flooding in that particular
23 neighborhood and subtracted that from -- or
24 subtracted, rather, the elevation of the living
25 area, and that produced how much water should

Page 237

1  have been in the first habitable living area
2  level. In other words, if you had three feet
3  of flooding from ground in the neighborhood,
4  your house was raised two feet -- your first
5  floor living area was raised two feet, you had
6  one foot inside.
7  Q. All right. You feel that's a reliable
8  methodology?
9  A. I'm sorry.
10 Q. Did you feel that's a reliable
11 methodology?
12 A. Well, it's reliable for what it is.
13 Certainly it is an estimate from -- an eyeball
14 estimate in terms of the elevation from ground
15 to the living area of floor. But I think it's
16 reasonably close, yes.
17 Q. According to this table, approximately
18 20 percent of the total properties studied
19 experienced no flooding. True?
20 A. Where are you speaking from?
21 Q. I'm counting 122 properties in all,
22 five areas.
23 A. That had no flooding.
24 Q. In the no flooding, and I'm counting
25 the total properties of all five areas to be

Page 238

```
 1   610.  So 122 no flooding cases out of 610 is
 2   20 percent.
 3       A.  That's approximately correct.
 4       Q.  Now, do you feel that that's a fair
 5   representation for the entire class area;
 6   20 percent?
 7       A.  I wouldn't have any idea as to whether
 8   you could extract that -- extend that over the
 9   whole class area.
10       Q.  And the property repaired profile on
11   the table at the bottom, am I correct that
12   among the cases you studied, about 43 percent
13   were repaired and reoccupied?  Totalling up,
14   265 repaired and reoccupied out of a total of
15   609?
16       A.  Again I'm trusting your math, but if
17   these are the numbers they are the numbers.
18       Q.  Do you think that is a figure,
19   43 percent repaired and reoccupied, that can be
20   extrapolated to the class?
21       A.  No.  I don't think you could readily
22   extrapolate these percentages across the class
23   boundaries.
24       Q.  Now, we have talked a little bit about
25   it, but in various places in your report you
```

Page 239

```
 1   discuss the fact that the class property, or
 2   the properties owned by the class
 3   representatives are not, in your view,
 4   representative.  Correct?
 5       A.  They're not representative of all of
 6   the properties certainly within the class
 7   area -- proposed class area.
 8       Q.  Paragraph 29, at Page 14, for example,
 9   you state that the class rep for this Edinburgh
10   study group within Subclass 5 is a multifamily
11   unit owner and yet there are only 38 percent of
12   those multifamily units in the study area, is
13   that right?
14       A.  Correct.
15       Q.  Then you note in Footnote 14 -- I'm
16   sorry, 4, that the property today is a
17   single-family unit.
18       A.  Well, it is a two-family dwelling in
19   style and construction, but the owner is
20   currently utilizing it as a single unit.
21       Q.  In order to have what you consider to
22   be representative properties identified,
23   Mr. Truax, would you have to have one property
24   from each of the property use, elevation, depth
25   of flooding and property repair entries in
```

Page 240

```
 1   order to be representative?
 2       A.  I'm sorry.  I'm going to have to ask
 3   you to ask that again.
 4       Q.  What would it take to produce
 5   representative properties in the subclass areas
 6   you've looked at here; how would you go about
 7   doing that?
 8       A.  Well, I think I've told you, because
 9   of the diversity and the lack of homogeneity in
10   most of our neighborhoods, it would be very
11   difficult to have a group of properties that
12   you say are truly representative of all of the
13   properties in these subclass areas.  I'm not
14   sure you could do it with a reasonable number
15   of, um -- of samples.
16       Q.  Let me refer you now to Page 17,
17   Paragraph 33.  Is it your testimony that the
18   Appraisal Institute guide rejects AVM as a
19   technique in appraising large numbers of
20   properties?
21       A.  I think the Appraisal Institute tells
22   appraisers that an AVM is a tool to be used,
23   potentially, if it's relevant, in certain
24   assignments.  The output of an AVM is not
25   considered an appraisal by the Appraisal
```

Page 241

```
 1   Institute, it is nearly merely a tool, just as
 2   we have other tools in our tool bag.  So -- and
 3   they caution, I believe, appraisers to be
 4   careful of that.
 5       Q.  Yes, but you agree with me, don't you,
 6   that the Appraisal Institute does not reject
 7   AVMs as a tool or technique which can be used
 8   in pricing large numbers of properties.
 9       A.  Well, as you pose that question, I
10   think the Appraisal Institute tells you it is
11   not an appraisal.  So I to be clear on that.
12   It is merely a tool that may give you guidance,
13   it may help you in selection of data, but it is
14   one tool.  Certainly before you would, quote,
15   unquote, appraise a property and give a point
16   value, let's say, for a single-family home.
17       Q.  So it's one tool that can be used in
18   doing that, but not reliable as a sole or
19   primary tool?
20       A.  Yes.  It is not an appraisal, it does
21   not replace the appraiser in terms of assigning
22   a value to a particular property.
23       Q.  You quote the institute, bottom of
24   Page 17, to the effect that mass appraisal
25   methods originated with county assessors,
```

Page 242

1  correct?
2  A. That was the arena in which we most
3  often saw it used.
4  Q. How long ago did these methods
5  originate with county assessors?
6  A. Oh, some semblance of mass appraisal
7  techniques have probably been utilized almost
8  forever, in terms of the need for assessors,
9  particularly pre computers, to, um -- use a
10 methodology that let them evaluate, for their
11 purposes and their purposes only, large numbers
12 of properties.
13 Q. And in how many counties in this
14 county are mass appraisal methods used by
15 assessors?
16 A. Oh, I couldn't give you a number. But
17 I'm sure it's substantial.
18 Q. At the top of Page 18, you add
19 emphasis to the statement assessor models,
20 therefore, focus on equity rather than
21 individual market valuation veracity. Correct?
22 A. Correct.
23 Q. So the purpose in focus of AVMs as
24 used by assessors is an equitable distribution
25 of the tax burden, correct?

Page 243

1  A. That is correct.
2  Q. Is it your impression that
3  Dr. Kilpatrick proposes to use this tool, this
4  technique, in the same way that assessors use
5  it to distribute the tax burden?
6  A. Well, I think I've now told you
7  several times, you know, I can't tell you
8  definitively how Dr. Kilpatrick will use it
9  based upon his report as I have read it. There
10 is not enough detail there for me to know that.
11 Q. Paragraph 34, you say that the
12 inaccuracy of mass appraisal techniques is
13 specifically recognized by USPAP Standard 6,
14 correct?
15 A. Correct.
16 Q. And then you follow with the quote
17 that it is implicit in mass appraisal that even
18 when properly specified and calibrated mass
19 appraisal models are used, some individual
20 value estimates will not meet standards of
21 reasonableness, consistence and accuracy,
22 correct?
23 A. Correct.
24 Q. Do you think it's significant that the
25 statement there is not many, not most, but

Page 244

1  some?
2  A. Is it significant?
3  Q. To you.
4  A. I think the statement stands for --
5  stands on its own.
6  Q. Do you think if it were possible to
7  state that most or many individual value
8  estimates will not meet standards that the
9  USPAP standard would have so specified?
10 A. Well, I think if you -- that statement
11 in context, if you look at other published
12 portions of Institute documents, you'll see
13 that, you know, they tell you that certainly
14 having uniformity of property type and basic
15 characteristics is critical to the output from
16 mass modeling technique being reliable and
17 really useful. And what I've told you is that
18 in our submarket we don't have that
19 circumstance at all. We have a tremendous
20 amount of variety, variety not only from
21 neighborhood to neighborhood but block to
22 block, and even in lot to lot in many
23 neighborhoods. So the backdrop, if you will,
24 that let's an AVM work efficiently, or even
25 within what might be considered reasonable

Page 245

1  norms, don't exist here, in my opinion.
2  Q. Isn't it true, Mr. Truax, that the two
3  federal government sponsored enterprises
4  Freddie Mac and Fannie Mae both use AVMs in the
5  mortgage evaluation process?
6  A. Yes, I think I told you earlier, when
7  evaluating loan portfolios those types of
8  models are utilized as a check on the packages.
9  I'm not aware that they use them for individual
10 property valuation.
11 Q. Isn't it also true that despite your
12 quote in Paragraph 35 from a 2004 Appraisers
13 News Online that AVMs are rarely accepted by
14 mortgage investors, the truth is that today, in
15 2007, AVMs are playing an increasing role in
16 the mortgage lending industry? True?
17 A. I think -- are they used in certain
18 segments of the mortgage industry? Yes.
19 Q. No, sir. They're playing, today, in
20 2007, an increasing role in the mortgage
21 lending industry. True?
22 A. Well, increasing relative to what?
23 Q. Increasing relative to before.
24 A. Before when?
25 Q. Before the statement. Before now. Is