Page 246

1  the role of AVMs increasing in the mortgage
2  lending industry?
3     A.  I don't know that I can answer that.
4     Q.  Would you be surprised to read that
5  statement in peer reviewed literature?
6     A.  No.
7     Q.  In fact, it's true that many lenders
8  are using AVMs as their primary appraisal tool
9  for certain kind of loans, including
10 refinancings and equity loans.  You agree?
11    A.  Certain lenders will use that when
12 there's a low loan to value circumstance and
13 they perceive their risk to be fairly minimal.
14    Q.  No, sir.  Many lenders are using AVMs
15 as their primary appraisal tool for certain
16 kinds of loans; do you agree?
17    A.  Well, I think the key point you make
18 is for certain kind of loans, in certain
19 circumstances.  I would agree, based upon my
20 knowledge, for a narrow market segment, yes.
21    Q.  Do you deny that both contingent
22 valuation and conjoint analysis are methods
23 which a great majority of economists view as
24 acceptable and useful in measuring non market
25 values?

Page 247

1        MR. ANZELMO:
2            Objection to form.
3     A.  I'm not sure what that statement
4  means.
5        MR. ZWAIN:
6            Also he's not an economist.  So
7        you're asking him something outside of
8        his expertise.
9  EXAMINATION BY MR. MEUNIER:
10    Q.  So if you don't know what that means,
11 you I assume you wouldn't be surprised to read
12 that in the published literature either.
13    A.  Read the statement again when you say
14 non market values.
15    Q.  Contingent valuation and conjoint
16 analysis are methods which a great majority of
17 economists view as acceptable and useful in
18 measuring non market values.
19    A.  I'm aware that those methods are used
20 to -- for valuing certain commodities, if you
21 will, that don't typically trade, or there's no
22 active market for them.  Um -- but I'm not sure
23 that statement you've read me says that.
24    Q.  Well, in fact, you say in your report
25 at Paragraph 36 that these techniques of

Page 248

1  contingent valuation and conjoint analysis are
2  widely recognized limited to situations in
3  which natural resources or other goods having
4  no economic market need to be measured in
5  economic terms.
6     A.  I'm glad I said that, because that's
7  what I was attempting to just tell you.
8     Q.  Give me an example of what you mean by
9  that.
10    A.  Well, if there's -- I've seen it
11 argued that if there is an amenity, let's say,
12 that -- a, say, limited number of properties
13 have access to this amenity, and those
14 properties never trade, or they haven't traded
15 in any reasonable fashion such that you could
16 do an analysis to isolate the value of that
17 particular amenity, then if you were asked to
18 say, well, what's that worth, it becomes a
19 difficult task if there is no market evidence
20 to study.  And at that point, you have to -- or
21 you're left with having to go to alternate
22 methods to try to evaluate that.
23    Q.  How about the valuation of a
24 disamenity; same answer?
25       MR. ANZELMO:

Page 249

1            Object to form.
2     A.  Yeah.  Basically.
3  EXAMINATION BY MR. MEUNIER:
4     Q.  Now, you've talked already about what
5  you consider to be the high rate of error
6  associated with some of these appraisal
7  techniques, including contingent valuation and
8  conjoint analysis.
9         Do you deny, Mr. Truax, that the
10 uncertainty which is inherent in certain
11 methods such as these has been studied and has
12 been established to a degree allowing for
13 reliable results?  Do you deny that?
14    A.  Yeah.  I'm -- I don't agree with that.
15    Q.  And so you would be surprised to read
16 that in the published literature, too.
17    A.  Oh, I wouldn't be surprised to read
18 that in the published literature, but I don't
19 agree with that.
20       MR. MEUNIER:
21            Okay.  I believe we're at a
22       stopping point, and we'll resume
23       tomorrow at 9:30.
24
25

Case 2:05-cv-04182-SRD-JCW   Document 16669-18   Filed 12/10/08   Page 2 of 10

Page 252

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

IN RE: KATRINA CANAL BREACHES   CIVIL ACTION

CONSOLIDATED LITIGATION         NO. 05-4182 K2

                                JUDGE DUVAL

PERTAINS TO LEVEE AND MRGO      MAG. WILKINSON

(V O L U M E   II)

Deposition of MICHAEL W. TRUAX, MAI, given in both the levees and MRGO cases, at the offices of Stone, Pigman, Walther, Wittmann, LLC, 546 Carondelet Street, New Orleans, Louisiana 70130-3588, on September 27th, 2007.

REPORTED BY:

JOSEPH A. FAIRBANKS, JR., CCR, RPR

CERTIFIED COURT REPORTER #75005

Page 261

1  District.
2  MS. BERTAUT:
3      Carmelite Bertaut, Washington
4  Group International.
5  MR. ANZELMO:
6      Tommy Anzelmo representing the
7  Orleans Levee District.
8  MR. MARPLE:
9      Bill Marple representing
10 Washington Group International. And I
11 note that plaintiffs' expert
12 Mr. Kilpatrick is also present today.
13 MR. ZWAIN:
14     And I'm Gary Zwain. I represent
15 East Jefferson Levee District in the
16 levee case and Lake Borgne Basin Levee
17 District in the MRGO case.
18     MICHAEL W. TRUAX, MAI
19 3045 Ridgelake Drive, Suite 100, Metairie,
20 Louisiana 70002, a witness named in the above
21 stipulation, having been previously sworn, was
22 reminded of his oath and was examined and
23 testified on his oath as follows:
24 EXAMINATION BY MR. MEUNIER:
25     Q. Good morning.

Page 262

1      A. God morning.
2      Q. Mr. Truax, we were speaking yesterday
3  about the extent to which AVMs are used in the
4  mortgage industry, mortgage lending business.
5  And I was wondering if you were aware of a
6  survey that was conducted in 2005 by the
7  consulting group Benchmark Consulting
8  International.
9      A. I don't have any specific recollection
10 of that survey, no.
11     Q. What is the Mortgage Bankers
12 Association of America?
13     A. I can't tell you that I'm intimately
14 familiar with the group. I expect that it is a
15 group of mortgage lenders that subscribe to or
16 as a group do certain things, but that's all I
17 would note definitively.
18     Q. All right. Let me show you, and I
19 want to just ask you a couple of questions
20 about what's said in it, an article that
21 appeared in the September 2006 issue of
22 Mortgage Banking which is a publication of the
23 Mortgage Bankers Association of America.
24 (Tendering.) And the article is entitled
25 "Evaluating AVMs."

Page 263

1      Do you see the statement in the second
2  sentence of the first paragraph to the effect
3  that AVMs are becoming increasingly important
4  to the mortgage industry? You see that
5  statement?
6      A. I see that statement.
7      Q. Now, you don't deny or dispute the
8  truth of that statement, do you, that AVMs are
9  becoming increasingly important to the mortgage
10 industry?
11     A. Well, important is, you know, a
12 judgment call, I think, so it's hard for me to
13 say that I, you know, agree with it, disagree
14 with it, dispute it. The statement speaks for
15 itself.
16     Q. Well, you don't dispute that AVMs are
17 used with increasing frequency in the mortgage
18 industry, do you?
19     MR. MARPLE:
20     Objection, asked and answered.
21 EXAMINATION BY MR. MEUNIER:
22     Q. I believe you did admit that
23 yesterday, they're used with increasing
24 frequency?
25     MR. MARPLE:

Page 264

1      Same objection.
2  MR. ZWAIN:
3      Objection. I don't think that's
4  what he said at all.
5      A. I was going to say what I think I --
6  how I responded was, increased from when was --
7  you know, you're asking me if it's increased.
8  Well, I have to have a starting point, and we
9  never got around to that. That's my
10 recollection of yesterday's conversation.
11 EXAMINATION BY MR. MEUNIER:
12     Q. Let me ask it this way: If you were
13 plotting it on a chart as a line, would you
14 dispute the fact that the line reflecting
15 frequency of use is going up, is rising? Would
16 you dispute that?
17     A. Well, certainly if you asked me that,
18 say, over a ten-year window, no, I would not
19 dispute that.
20     Q. All right. And in fact, what I wanted
21 to call attention to, if you look down on the
22 bottom left-hand side, the last full paragraph
23 of this article references a 2005 study that
24 was released -- that was performed by Benchmark
25 Consulting International. Do you see the

Page 265

1  reference to that?
2  A. I'm sorry. Where were you?
3  Q. Bottom left-hand side of the first
4  page of the article, last full paragraph on the
5  left-hand side. According to?
6  A. Okay. I'm with you.
7  Q. And do you see the report here that
8  according to the 2005 study the percentage of
9  valuations, obviously speaking about property
10 valuations, which were performed using AVMs
11 increased from 50 percent in 2003 to 66 percent
12 in 2005? Do you have any basis on which to
13 dispute that increase?
14 A. Well, as I say, I think the article
15 speaks for itself, it says what it says. I
16 have -- I'm not attempting to dispute what this
17 author wrote.
18 Q. And we see at the end of that same
19 paragraph the statement that as much as
20 50 percent of all originations, meaning
21 purchase, home equities, refinancings, involve
22 the use of valuation models as instruments in
23 the underwriting process.
24    Do you have any basis for disputing
25 that statement?

Page 266

1  A. Again, the article speaks for itself.
2  Q. And of course, on the right-hand side,
3  about five lines below that black box, you'll
4  see the statement that Fannie Mae and Freddie
5  Mac continue to legitimize the use of AVMs by
6  waiving independent valuation requirements by
7  use of their own internal AVMs.
8     You don't dispute that, do you?
9  A. Same response, Mr. Meunier; the
10 article speaks for itself.
11 Q. Now, referring there to the AVM
12 models, were you aware that the Freddie Mac
13 website discusses the Home Value Explorer, or
14 HVE, as Freddie Mac's own automated valuation
15 model? Have you ever been aware of that
16 before?
17 A. No, I'm not familiar with that.
18 Q. Well, it is true that AVMs are models
19 that can be customized to a particular use?
20    MR. ZWAIN:
21       Counsel, are you going to attach
22    this to the deposition as an exhibit?
23    MR. MEUNIER:
24       Yes. I'll attach that article --
25    thank you, Gary. That's Exhibit Truax

Page 267

1  6.
2     (Exhibit 6 was marked for
3  identification and is attached hereto.)
4  EXAMINATION BY MR. MEUNIER:
5  Q. Can AVMs be customized for a
6  particular use?
7  A. Yes.
8  Q. In other words, this isn't a one size
9  fits all, some structure that's rigid; an AVM
10 is a model with different component that you
11 can adjust and change or vary according to your
12 particular use of the AVM, correct?
13 A. That is correct.
14 Q. And in fact, let me hand you a
15 printout from the Freddie Mac website, and it's
16 a two-paged printout. You see the reference,
17 bottom left-hand side, to Home Value
18 Explorer --
19 A. Yes.
20 Q. -- which is reported here to be a
21 model that generates a property estimate within
22 seconds?
23    Do you have any doubt that it can do
24 that?
25 A. Oh, I have no doubt that the AVM with

Page 268

1  a computer application can do that.
2  Q. And you see that it's reported here
3  that HVE, this particular model used by Freddie
4  Mac, encompasses several models rolled into one
5  single product? Correct?
6  A. Again, I'll tell you the article
7  you've given me speaks for itself.
8  Q. Let me -- but you've already
9  acknowledged, you've never utilized an AVM,
10 developed a model, customized one, or really
11 had any experience in the application of an
12 AVM. Am I correct?
13 A. That's correct. I believe I've told
14 you that I don't dispute that AVMs have
15 applications that might be reliable. I'm just
16 telling you that in the local market I would
17 tell you that the variability, the unique
18 character of our neighborhoods make -- I
19 believe, AVM output would not be useful in this
20 particular submarket. I'm not disputing that
21 AVMs, for some uses and in some applications,
22 wouldn't be fine.
23 Q. Okay. So you think what calls into
24 question the utility of an AVM is the
25 variability or heterogeneity of the subject

Page 269

1 properties?
2   A. That's one of the factors, yes.
3   Q. Would you consider that the main
4 factor that calls the use of the AVM into
5 question for the present case?
6   A. Well, particularly if you're speaking
7 of just the valuation side of it, not
8 necessarily the damage articulation, yes, that
9 would probably be the biggest single factor.
10  Q. Of course, we have already talked
11 about the fact they're used by virtually every
12 tax assessing authority in the country,
13 correct?
14      MR. MARPLE:
15         Objection.
16  A. No, I would say I don't agree with
17 that.
18 EXAMINATION BY MR. MEUNIER:
19  Q. Certainly a clear majority.
20  A. Not the majority in our metro area.
21  Q. Not the majority -- AVMs are not used
22 by the majority of tax assessing authorities in
23 Louisiana?
24  A. Basically in -- until 2008, of the
25 seven Orleans Parish assessors, I'm not aware

Page 270

1 that any of them effectively used AVMs prior to
2 the 2008 reassessment. They didn't even have
3 the computer capability to do it.
4   Q. Well, I thought you spent a lot of
5 time yesterday talking about the failure of the
6 tax assessor system as proof that mass
7 appraisal is not an accurate indicator of
8 market value.
9   A. Oh, they used mass appraisal. What
10 they do is, they use mass appraisal techniques,
11 but they don't use automated valuation models
12 to do that.
13  Q. What mass appraisal techniques do they
14 use?
15  A. Well, mass appraisal is when you're
16 appraising a large number of properties and
17 you're using some common factors across a broad
18 range of properties that you're evaluating. It
19 doesn't mean that you have to use an automated
20 valuation model to do that. Those assessors
21 are doing mass appraisals, that is, they're
22 appraising all the properties in their
23 district.
24  Q. Uh-huh.
25  A. But to my knowledge, they didn't even

Page 271

1 have the computer capability to implement any
2 sort of automated valuation model until very
3 recently. On the Orleans Parish side.
4   Q. Okay. Well, tell me, if you can, in a
5 little bit more detail, how mass appraisals are
6 accomplished. And I assume you're talking
7 about appraisals of properties without there
8 being an individual property by property
9 appraisal. Correct?
10  A. Well, certainly the hope would be that
11 every property in the assessor's taxing
12 district is appraised individually, if you
13 will, taking into account all of its particular
14 characteristics. I think the reality in
15 Orleans has been that that was not generally
16 accomplished.
17  Q. Right. So tell me how you understand
18 the mass appraisal methodology to have occurred
19 in Orleans --
20  A. Well --
21  Q. -- historically.
22  A. Well, I think historically what we
23 know is, even the state tax commission couldn't
24 determine what process was being implemented by
25 several of the assessors. I think one of the

Page 272

1 articles I've read cited that I think the Third
2 District assessor, they actually interviewed
3 him and went down and looked at this records
4 and couldn't find a process, period, that was
5 used for him to do his mass appraisal. So I
6 can't tell you what some of them were doing.
7   Q. Well, how do you know it was a mass
8 appraisal?
9   A. Because he was appraising thirty
10 thousand odd properties, or whatever the number
11 is. So it was a mass appraisal effort on his
12 part, and he was in fact, you know, providing a
13 value basis for all of these properties without
14 individually looking at them.
15  Q. Right.
16  A. But without implementing any kind of
17 structured process like an AVM.
18  Q. All right. Would it have been better
19 for the use of an AVM in that situation?
20  A. Realistically, in his particular
21 situation? I think probably most anything
22 would have been better.
23  Q. Okay. Including an AVM.
24  A. Probably.
25  Q. So where AVMs have been used, you have

Page 273

1  no dispute that AVMs have been appropriately
2  used for certain purposes, correct?
3      A.  I think there are applications where
4  they would be appropriate.
5      Q.  Your problem with applying the AVM
6  model, some customized version of an AVM to
7  this case for the discernment of, for example,
8  the detrimental condition diminution of value
9  issue, is that there's too much heterogeneity
10 in the property population to make the model
11 accurate for that purpose?
12     A.  Well, you took the AVM now beyond just
13 valuing property.  You said to establish the
14 impact of the detrimental condition, which is I
15 guess at some level a damage issue.  Well,
16 there are two problems.  You have to base lack
17 of homogeneity of the properties themselves,
18 and then secondarily you have the varied
19 impacts because of the different
20 characteristics of all of these properties,
21 where they're located, the elevation of the
22 land, elevation of the flooding, et cetera,
23 that also now becomes a factor, and again
24 introduces another host of variables that I
25 don't believe you can properly input -- you'd

Page 274

1  have so many variables to try to model that I
2  think any result would be innately unreliable.
3      Q.  Let's stick with the first point.
4  You're right, let's not combined those ideas.
5  The first point being a valuation process using
6  an AVM.
7          Is your concern with a mass appraisal
8  approach in this case to achieve that valuation
9  outcome with the use of an AVM, is your concern
10 the heterogeneity of the property?
11     A.  Well, I think in the local market
12 that's the primary one.
13     Q.  Okay.
14     A.  But there are others.  And the other I
15 think large one in this case would be a lack of
16 good data input to apply your model, even if
17 you've got it structured.  Let's say you're
18 driving it by dollars per square foot of living
19 area.  Well, to my knowledge, most of Orleans
20 Parish, they don't know how big any of the
21 residences are.  That's not a part of the
22 database.
23     Q.  They being the tax assessors?
24     A.  Yes.
25     Q.  Uh-huh.  No other source of that data

Page 275

1  is available, to your knowledge?
2      A.  Oh, for those properties that, say,
3  have sold in the last ten years or so, for that
4  period, that were listed through the MLS
5  system, you would probably have the ability to
6  retrieve information from that.  But then what
7  you wouldn't know is did someone make an
8  addition after they bought that house, was it
9  altered, was there a demolition.  So there
10 would be things that would have to be altered
11 even to that database.  But I'm not aware of
12 any current, accurate database that would give
13 you probably all the necessary base physical
14 information that you would need on a
15 property-by-property basis for that to have
16 reasonable output.
17     Q.  You'd go about building that database
18 one house at a time.
19     A.  I know of no other way to accurately
20 and reliably gain that data.
21     Q.  You wouldn't refer to any existing
22 sources of data, you'd go out in the field and
23 gather the data?
24     A.  No, I think I would go to whatever
25 sources of data were available to you.  And

Page 276

1  certainly if there was a means to get
2  information on properties that you considered
3  reliable, you would certainly avail yourself of
4  that.  But I'm not aware of one that would give
5  you any significant number of the properties,
6  again from a reliable source.
7      Q.  Since heterogeneity is your primary
8  concern for the use of an AVM for the
9  valuation, for the determination of market
10 value in a mass appraisal basis, do I assume
11 that you're not aware of instances where AVMs
12 have been used with a heterogeneous property
13 base -- with a subject property base that was
14 heterogeneous?
15     A.  Well, again, every property database
16 is going to have some variety, you know.  I
17 think New Orleans -- the New Orleans area is
18 relatively unique in terms of the tremendous
19 variety we have.  Those of us that live here
20 know, you know, you have the mansion next to
21 the shack.  You will have tremendous change
22 block by block in terms of the market appeal
23 and parameters that drive value in our
24 marketplace.  It's just a function of our
25 checkerboard development through history.

Page 277

1  Q. What is your feeling about the
2  heterogeneity of the property base to which
3  Freddie Mac and Fannie Mae subject AVMs?
4  A. Well, sitting here, I can't tell you
5  what base they're applying them to, and how
6  they use them.
7  Q. Is New York City a heterogeneous
8  property population?
9  A. In a global way, I would say so.
10  Q. Let me refer you now to a printout
11  from the Fannie Mae website that discusses
12  AVMs, and I want to ask you a question about
13  this.
14      Before I forget, let me give an
15  Exhibit Number Truax 7, if I haven't done so
16  already, to the printout from the Freddie Mac
17  website.
18      (Exhibit 7 was marked for
19  identification and is attached hereto.)
20  EXAMINATION BY MR. MEUNIER:
21  Q. What I'm showing you now, Mr. Truax,
22  is from a Fannie Mae website and discussing
23  AVMs. It begins with the statement the
24  strengths of AVMs relative to traditional real
25  estate appraisals are speed, reduced cost,

Page 278

1  consistency and objectivity.
2      Do you disagree with that statement?
3  MR. MARPLE:
4      Let me object to the foundation
5  for representation in the first part
6  of your question that this was taken
7  from Fannie Mae.
8  MR. MEUNIER:
9      All right. Subject to that
10  objection we'll proceed.
11  EXAMINATION BY MR. MEUNIER:
12  Q. I'm going to ask you to assume it was.
13  We'll be able to prove that at the appropriate
14  time.
15  A. Again, I will tell you -- you know,
16  the statement speaks for itself, but I will
17  tell you, particularly relative to the
18  consistency and objectivity components of that,
19  I think what they're telling you is it will be
20  internally consistent. That is true. Because
21  you will have built your box and your
22  parameters will be your parameters, and it will
23  be internally consistent. And given the logic
24  of your program, it will be objective with
25  regard, again, to its internal assumptions.

Page 279

1  I wouldn't want you to -- I don't
2  believe this is intended to say that it is
3  necessarily better or worse than, say, a value
4  or analysis that an appraiser who went out to a
5  property and looked at all the parameters
6  himself would -- his conclusion would be any
7  less objective than, say, the AVM output.
8  Q. All right. So your concern has to do
9  with the accuracy or reliability of the market
10  valuation, correct?
11  A. That's one of my concerns, certainly.
12  Q. Uh-huh. But the fact that AVMs
13  certainly in a mass appraisal approach to a
14  hundred thousand properties, you don't dispute
15  for a moment that it would be superior in terms
16  of speed, reduced cost, consistency and
17  objectivity as compared to a traditional
18  house-by-house appropriate; you don't dispute
19  that, do you?
20  A. Well, again, I think -- I think I have
21  responded to that in terms of what I believe
22  the consistency, objectivity comments relate
23  to. I mean, one of the other articles you gave
24  me -- you know, you had me read a certain
25  portion of it. Well, further in the article,

Page 280

1  it says, a --
2  Q. Wait. For the record, we're going
3  back to which article?
4  A. "Evaluating AVMs" by Brenda White. I
5  believe it was the first one you handed me.
6  Q. Oh. Today?
7  A. Yes. And further down in that
8  article, it reads, as sophisticated as AVMs are
9  today, relying on them in the appraisal process
10  can present risks. AVMs accuracy tends to
11  suffer in areas where local housing is highly
12  heterogeneous or where there is lack of
13  sufficient long-term data.
14      So that's the very --
15  Q. Which are the two concerns that you
16  have expressed; heterogeneity and lack of --
17  A. Absolutely. And so the very article
18  you were citing to me has the same concerns I
19  do.
20  Q. Well, I think we're succeeding in
21  identifying the strengths and weaknesses of
22  them.
23  A. Well, I believe so.
24  Q. Okay. Now, let me go back to the
25  Fannie Mae website comments. Because the

Page 285

```
 1   Q.  So you've heard about it.
 2   A.  Yes.
 3   Q.  My question really, Mr. Truax -- and I
 4   know you're at a disadvantage never having had
 5   practical experience with mass appraisal or
 6   AVMs.  But do you understand that AVMs are not
 7   juxtaposed as an alternative to traditional
 8   pricing methods and practices but, rather, as
 9   models which allow the interplay between
10   statistical tools and traditional appraisal
11   methods?  Do you understand that?
12        MR. MARPLE:
13            I object to the first sentence in
14        that question.
15   A.  Mr. Meunier, I well understand that
16   AVMs are a tool.  And the Institute is very
17   clear as to how they see AVMs.  It is a tool in
18   our bag as appraisers that we should be aware
19   of and certainly utilize, possibly, if it's
20   appropriate.
21   EXAMINATION BY MR. MEUNIER:
22   Q.  Uh-huh.
23   A.  What I've now told you, I think
24   numerous times, is I don't believe an AVM
25   application in our particular submarket will
```

Page 286

```
 1   produce reliable, credible results.  At the end
 2   of the day, for the Appraisal Institute,
 3   everything is about producing reliable,
 4   credible, professional results.
 5   Q.  Yeah.  I understand.  But my question
 6   is a little different.
 7        If your concern about there not being
 8   reliable, credible results has to do with the
 9   uninvolvement of traditional appraisal
10   practices or appraisals in the field, do you
11   understand that AVMs actually can and do
12   utilize the services of appraisers in the
13   field?
14        MR. MARPLE:
15            Object to the form of the
16        question.
17   A.  What I would tell you is I'm certainly
18   aware that there are many ways to structure an
19   AVM.  There are many ways to test an AVM.  What
20   I'm telling you is, based upon my understanding
21   of what the capabilities are, and my
22   understanding of the parameters that we have to
23   deal with in the class area -- or potential
24   class area here, that I do not believe at the
25   end of the day if I were to implement some sort
```

Page 287

```
 1   of AVM the -- what I would ultimately have to
 2   do would be essentially identical in
 3   character -- to produce credible results would
 4   be essentially identical in character to going
 5   out and individually looking at every property
 6   and looking at every characteristic that I
 7   would do in a normal appraisal process.  I do
 8   not believe at the end of the day you would get
 9   any real benefit from the AVM that you could
10   feel very comfortable about in terms of the
11   output unless you did the rigorous property
12   inspection and look on an individual property
13   basis.
14   Q.  So any kind of devised or designed
15   shortcut or streamlining effort that obviates a
16   house-by-house traditional appraisal of a
17   hundred thousand or more properties, in your
18   view, sacrifices essential reliability.
19   A.  Oh, no.  I'm not saying that in any
20   case anywhere.  What I'm telling you is, based
21   upon my understanding of the data that's
22   available in our submarket, the variety that is
23   demonstrated in our submarket, that I do not
24   believe there are going to be many efficiencies
25   gained if the goal is to be -- is to produce
```

Page 288

```
 1   accurate and credible results on a
 2   property-by-property basis.
 3   Q.  Right.  So --
 4   A.  I'm not telling you that an AVM could
 5   not be tried.  What I'm telling you is, given
 6   my day-to-day understanding of the marketplace,
 7   that I do not believe that at the end, when
 8   you've finished, that if you wanted accurate,
 9   credible results, that you would have gained
10   any real efficiencies.
11   Q.  Right.  So in this case, your position
12   and your opinion is that there is no kind of
13   AVM shortcut or streamlining that could
14   possibly be implemented, even in conjunction
15   with traditional appraisal practice, because as
16   soon as you introduced any kind of AVM
17   streamlining mechanism, you have lost
18   reliability and accuracy?
19        MR. MARPLE:
20            Objection, asked and answered.
21   EXAMINATION BY MR. MEUNIER:
22   Q.  Is that your position?
23   A.  No, I think -- look, again, as a tool,
24   it could be used as a tool.
25   Q.  In this case.  I'm talking about in
```

Page 309

1  one report. This addenda report, if you will,
2  is a supporting element of a single finding, if
3  you will.
4      Q. Well, I understand. It's my first
5  experience with an expert who writes a report
6  and then another report that he attaches to his
7  other report, so forgive me if this is new to
8  me.
9      Have you done this before?
10     A. In this particular form? Probably
11 not. But I -- you know, a report comes to mind
12 where we had, you know, as many as ten
13 signatories on it, and not everyone was
14 responsible for -- all of the ten signatories,
15 not everyone was responsible for the entirety
16 of the pieces and parts. But, yeah, so in that
17 context I've done it, yes.
18     Q. At Page 38 of your -- of Exhibit D,
19 you identify the properties that you studied in
20 each of the five proposed subclass areas,
21 correct?
22     A. I'm sorry. Let me get to 38.
23     Q. Page 38.
24     A. Yes.
25     Q. And these, in fact, are the same exact

Page 310

1  properties and study areas that are discussed
2  in your main report; in fact, this chart on
3  Page 38 is identical to the one on Page 12 of
4  your main report, is that correct?
5      A. Yes.
6      Q. And you don't really have any
7  particular reason why we're duplicating the
8  exact same chart and the exact same property
9  identification in both documents as opposed to
10 doing it one time?
11     A. No particular reason. This is just
12 the way we put together this particular
13 submission.
14     Q. The truth is, Mr. Truax, you needed
15 Roddewig's signature on something discussing
16 the criticism of Dr. Kilpatrick's mass
17 appraisal because you were not qualified to do
18 so, isn't that true?
19         MR. MARPLE:
20            Objection to the form.
21     A. Well, you're asking me if I'm
22 qualified to criticize or have an opinion
23 regarding what I believe I can take from what
24 Mr. Kilpatrick has presented to us. No, I
25 don't need anyone to, um -- support me, if you

Page 311

1  will, as to my opinions. My opinions are what
2  they are, and I think you have them in this
3  document.
4      Q. So there was really no necessity of
5  having Roddewig in support of your opinions for
6  you to express your conclusions in this case?
7      A. Roddewig and Clarion brought resources
8  to the table that were beneficial, and I
9  availed myself of those resources.
10     Q. Now, in what follows Page 38 is a more
11 detailed analysis of these class -- these study
12 area properties, but your conclusions set forth
13 in Exhibit D are essentially the same as those
14 set forth in your main report, namely these
15 properties you say are not representative of
16 other properties in the area, correct?
17     A. Correct. And you will find the same
18 conclusions in the MRGO report, which was
19 written before I had any significant
20 involvement with Clarion at all.
21     Q. Now, Page 40 of the Exhibit D lists
22 data that you and Roddewig and others, I guess,
23 looked at, right? Page 40?
24     A. Yes.
25     Q. And under post-storm data, there's a

Page 312

1  reference to Road Home Program recordings.
2      Tell me exactly what that references.
3      A. That references the, um -- recorded
4  agreements, Road Home agreements that were
5  found in the study area, that were found in the
6  conveyance office of Orleans Parish.
7      Q. And what information -- substantive
8  information from those agreements was used in
9  the analysis?
10     A. It was just a notation that Road Home
11 agreements had been, um -- signed for -- with
12 regard to those particular properties.
13     Q. And why was that considered relevant,
14 if at all?
15     A. Well, I think it was an indicator of
16 recovery, if you will, that people were
17 availing themselves of those resources,
18 presumably to invest -- reinvest in those
19 properties and, therefore, those properties
20 would be redeveloped and improved or damage
21 repaired.
22     Q. So the agreement was just used as an
23 indication of the fact that the person what,
24 had received Road Home --
25     A. Yes.

Page 321

1    A. Well, I think the window is probably a
2 five to ten-year window.
3    Q. All right. So what you're saying is
4 that within -- in five to ten years from now,
5 what you're saying in those cases is that
6 there's a good prospect that that neighborhood
7 will be recovered.
8    A. Recovered, reconstituted and become
9 hopefully much of what it was pre-Katrina, if
10 not better.
11    Q. All right. My next question was, when
12 you say recovered, you mean pre-Katrina status?
13    A. Well, certainly we all know it's not
14 going to be -- non of the neighborhoods are
15 going to be exactly identical to what they
16 were. But certainly I believe that this
17 particular neighborhood, Lakeview, will likely
18 recover to be, again, a very popular and
19 appealing area for people to live. And will be
20 redeveloped.
21    Q. Yes, but not the same as it was before
22 Katrina.
23    A. No, I don't think same is in the cards
24 for most of our neighborhoods.
25    Q. The new normal.

Page 322

1    A. That's reasonable to say.
2    Q. All right. Now, define -- and we'll
3 finish with the definitions -- reasonable and
4 limited. Tell me what the grading criteria for
5 those --
6    A. Reasonable, to me, was an attempt to
7 say the jury is still out a bit in terms of the
8 direction that those neighborhoods are going.
9 It remains to be seen. But it's not -- it
10 won't be, um -- unlikely that they recover and
11 become viable neighborhoods again.
12    Q. Okay.
13    A. Limited means the prospects are less
14 than 50 percent, let's saw, in my view. Now,
15 these are my judgments. That's all we can make
16 is a judgment about that.
17    Q. Sure. Uh-huh.
18    A. But in those neighborhoods, I see it
19 as less probable -- not impossible, but less
20 probable that you're going to see a return to,
21 you know, maybe the status that you had
22 pre-Katrina.
23    Q. And before we take a break let me just
24 make sure I understand. What is the relevance
25 or pertinence of this analysis where you go by

Page 323

1 and say this neighborhood has got a good,
2 limited or reasonable prospect of good
3 long-term recovery?
4    A. Well, part of any, you know, certainly
5 appraisal process is descriptive. And this is
6 intended to describe, if you will, present
7 information about the named plaintiffs'
8 properties. Clearly demonstrates that
9 neighborhood to neighborhood, there are
10 differences.
11    Q. In your approach, the individualized
12 appraisal approach to investigating damages,
13 particularly diminution of property value
14 damages in this case, would you be relying on
15 these judgments as to whether a given
16 neighborhood has a long-term recovery prospect
17 that's either good, reasonable or limited?
18    A. Well, I think absolutely, because that
19 is the very point, that without you
20 individualizing the analysis and the study, you
21 cannot globally, across the spectrum, determine
22 that everyone has the same prospects for
23 recovery.
24    Q. Could you be wrong about your
25 evaluation of the long-term prospects?

Page 324

1    A. I think any future projection, and
2 that's what we're talking about here, is
3 subject to -- to, um -- error. But, you know,
4 reasonable -- you go with what appears to be
5 reasonable based upon all the evidence that's
6 available to you at the time.
7    Q. Could a reasonable, equally competent,
8 qualified appraiser come to a different grade
9 than you for the long-term recovery prospects
10 of a neighborhood?
11    A. Theoretically, no. If you presented
12 exactly the same facts to both, the theory
13 would be that, no. But reality? Yes.
14    Q. All right. If you took a hundred
15 appraisers and they ran through these same
16 neighborhoods --
17    A. Oh, yeah, you're not going to get a
18 hundred same opinions.
19    Q. -- you're not going to get the same
20 good, reasonable or limited, are you?
21    A. No.
22       (Off the record.)
23 EXAMINATION BY MR. MEUNIER:
24    Q. Mr. Truax, at Page 132 of the Exhibit
25 D report, there's a discussion about