Page 333

1 data was certainly one of them. I don't know
2 that they commented at all, positively or
3 negatively, regard application of a particular
4 mass appraisal technique.
5    Q. Certainly you'd agree that neither The
6 Times-Picayune nor the auditors ever suggested
7 that it would be better or more workable to
8 have an assessment system based on individual
9 property-by-property appraisal; that was
10 certainly never suggested, was it?
11    A. I don't know that that was or wasn't
12 suggested. As I said, I think the focus of the
13 article, as I recollect it, was upon the
14 serious problems in how the process was being
15 implemented in Orleans Parish by the assessors
16 that were there at the time.
17    Q. Let me ask it this way: Has anyone in
18 your field ever suggested, in any county or
19 parish, that mass appraisal techniques be
20 abandoned entirely in favor of individualized
21 property appraisals as a basis for tax
22 assessment?
23    A. Well, you've used two words, you've
24 said anyone in my field, anywhere.
25    Q. Yes.

Page 334

1    A. Now, there's no way I can know that.
2    Q. No. I should say that you know of.
3 That's obviously the qualification.
4    A. Thank you.
5    Q. You can only know what you know. So
6 tell me if you know of anyone in your field
7 who's ever made that suggestion.
8    A. Even my limited world, there are a
9 few. I need to think of them. I can't tell
10 you that I'm -- sitting here today recall a
11 specific discussion with anyone in my field
12 really about the topic.
13    Q. Now, on Page 135 and 136, there's a
14 discussion in Exhibit D about the number of
15 appeals of tax assessments that are taken,
16 correct?
17    A. Yes.
18    Q. And you state with Mr. Roddewig that
19 that is an indication that mass appraisal
20 technique is inaccurate. Correct?
21    A. That was an indicator, yes.
22    Q. So if people challenged the amount of
23 property tax they're asked to pay, your
24 conclusion is that the appraisal for tax
25 purposes, therefore, must be too high.

Page 335

1    A. No, I don't believe that's what we
2 were particularly saying. I believe -- as I've
3 told you, I believe Orleans Parish for the
4 first time in '08 had the ability to implement
5 some rudimentary automated valuation model type
6 approach to projecting the reassessments. And
7 historically, prior to this change in system,
8 the gentlemen I talked to said they would have
9 a relatively limited number of appeals that at
10 least moved to the parish council level, and
11 usually it was 60 or 80.
12    With the system that was implemented
13 by the assessors in '08, you ended up with 5200
14 appeals. So it was -- there was a dramatic
15 shift -- dramatic change in the number of
16 appeals that were filed. And it was
17 indicative, I believe, that whatever system
18 they implemented wasn't proving to be very
19 workable.
20    Now, we all know that some of it was
21 certainly a knee jerk reaction to a dramatic
22 change in the numbers, but I think I told you
23 yesterday I am personally aware of several
24 instances where the numbers that came from
25 implementation of that system were, in my

Page 336

1 opinion as an appraiser who is familiar with
2 the values in these given areas, they were
3 dramatically overassessed.
4    Q. But that's not a condemnation of mass
5 appraisal as a technique, it's a challenge to
6 how the technique has been applied, correct?
7    A. That is correct. And it points, I
8 think, also to the notion that in our
9 particular submarket, as I've now told you many
10 times, it is difficult to implement a system
11 that is going to take into account all of the
12 varieties and vagaries of the types of
13 properties that we have.
14    Q. And have you ever known a person in a
15 real estate transaction to complain about an
16 appraisal done in a traditional individualized
17 appraisal method?
18    A. I'm sorry. You have to restate that
19 one.
20    Q. Have you ever known a person in a real
21 estate transaction to complain about the
22 outcome of an individualized appraisal?
23    A. Yes.
24    Q. Does that criticism condemn the
25 methodology of individualized appraisal?

Case 2:05-cv-04182-SRD-JCW    Document 16669-19    Filed 12/10/08    Page 2 of 10

Page 349

1  the point is that if you are going to have
2  relevant data to utilize in some sort of mass
3  appraisal technique like an AVM, it needs to be
4  sufficient in number to gain a reasonable
5  estimate of what, say, the average sale price
6  may be.
7      Q. Well --
8      A. But point being that, again, this goes
9  to the variety issue and the variability issue.
10     Q. Well, can we agree, then, that you
11 don't know whether there would be a sufficient
12 number of sales to support the use of hedonic
13 modeling in the levee area based upon the 6900
14 plus transactions because we would have to know
15 how many of those transactions fell into the
16 discernible submarkets being studied?
17     A. Certainly in part, yes.
18     Q. But certainly with that many sales
19 transactions having occurred, you would
20 acknowledge the possibility that there may be
21 sufficient sales data within certain submarkets
22 to support hedonic modeling.
23     A. Oh. I think I've cited that several
24 times, that there are certainly limited
25 circumstances that it might work. But I'm just

Page 350

1  saying, on an overall basis, I do not believe
2  that it would be workable on a broad scale in
3  the proposed subclass areas.
4      Q. Now, Page 144, you set forth a
5  discussion about the problem with hedonic
6  models being the inability to truly isolate the
7  dependent variable, the factor that's being
8  studied.
9      A. Correct.
10     Q. For example, if you were trying to
11 study the effect of the flood, you're saying
12 that hedonic model is challenged because how do
13 you ever really truly isolate that and not know
14 that the outcome has been shaped by variables
15 that weren't even considered? Fair?
16     A. Fair. And then on top of that, you
17 have the issue of flood being what? Flood is
18 water. Well, we had rainwater, as well. So.
19     Q. We're going to take care of that
20 problem. That's going to be a legal issue that
21 you will have determined for you by the time
22 you appear.
23     MR. ZWAIN:
24         How gracious of you.
25     MR. MEUNIER:

Page 351

1      I think that's a fair statement.
2  We'll have to work that out.
3      MR. MARPLE:
4         Yeah. Let me just object to that
5  statement.
6      MR. MEUNIER:
7         There are some who don't want to
8  work it out, but I think we're going
9  to try hard to work it out.
10 EXAMINATION BY MR. MEUNIER:
11     Q. So we're talking here about the
12 omitted variable problem, right?
13     A. Essentially, correct.
14     Q. And you're aware, aren't you, that
15 hedonic models have been in use for many years.
16     A. Yes.
17     Q. You're familiar, no doubt, with the
18 1974 article by Rosen that generally supports
19 hedonic models as the best available method to
20 estimate price effects of property
21 characteristics?
22     A. I believe I looked at that article,
23 but, you know, I don't dispute what you said.
24     Q. Isn't it true, Mr. Truax, that all
25 hedonic -- it's true that with all hedonic

Page 352

1  models it's not necessary to include and
2  measure all characteristics of interest in
3  order for the model outcome to be accurate,
4  it's necessary, instead, that there be a
5  sufficient number of variables considered to
6  explain the price variation.
7      Would you agree with that?
8      A. Well, I think -- I certainly agree
9  that there is a number of variables that -- it
10 would never be all. That's probably correct.
11 But the number that might be necessary to
12 particularly isolate, or attempt the isolate,
13 as best you can, a single, say, value impact,
14 or associated with a single component, if you
15 will, of the pie, can vary tremendously
16 neighborhood to neighborhood.
17     Q. Do you know what is meant by a
18 geographically weighted regression scheme?
19     A. I can't tell you I'm entirely familiar
20 with it.
21     Q. So you don't know whether it's true or
22 not that the variability in hedonic models in
23 terms of the variability of property
24 characteristics is routinely addressed in
25 hedonic schemes using geographically weighted

6a5da895-188c-4221-ab42-6901ea8d8f49

Page 369

1  Is that a step that you would follow?
2  A.  Yes.
3  Q.  So obviously the number of sales would
4  vary from street to street, correct?
5  A.  Well, the number of comparables --
6  yeah, that are relevant could vary property to
7  property.
8  Q.  Well, let me ask you, how would you go
9  about deciding what were the comparable sales
10  to look at on a given Street?
11  A.  You'd essentially follow the same path
12  you would in a normal appraisal, which means
13  that you would research the relevant areas that
14  you thought were particularly comparable to the
15  property being appraised and discover whatever
16  pool of data that existed that was reasonably
17  current, you'd, from that grouping, then select
18  those sales that you thought were particularly
19  comparable, and analyze those leading to a
20  value conclusion.
21  Q.  I guess you're going to tell me you
22  don't know how much that would cost or how long
23  that would take.  Am I correct?
24  A.  For 66,000?  You're correct.
25  Q.  Can you tell me how long you think it

Page 370

1  would take, on average, to do it one time, one
2  residential property, conduct the needed
3  research of comparable sales for that property
4  from the nearby properties?
5  A.  Well, I can tell you, you know,
6  residential appraisal shops will generally
7  produce -- you know, an appraiser -- a good
8  experienced residential appraiser will produce,
9  oh, probably two to three a day, if the
10  business volume was sufficient to warrant them
11  running at that pace.
12  Q.  And am I correct that because you
13  regard this property mix, even the residential
14  property mix in MRGO class area, as
15  heterogeneous -- correct?
16  A.  Correct.
17  Q.  -- that would make the task of
18  researching and discerning comparable sales
19  more challenging than if it were a homogeneous
20  property?
21  A.  Correct.
22  Q.  Because now you got to look for truly
23  comparable properties, and to some extent
24  they're all different, you say.
25  A.  As you say, certainly the task in that

Page 371

1  type of neighborhood is more difficult.
2  Q.  The fourth minimum step, according to
3  Fannie Mae, is to research, verify and analyze
4  data from reliable public and/or private
5  sources.
6  Now, do you know what kind of data
7  Fannie Mae refers to there for purposes of an
8  appraisal?
9  A.  I think they're referring to
10  comparable data.
11  Q.  We're talking about sales data again?
12  A.  Yes.
13  Q.  Any other data?  Are we talking about
14  tax assessment data or --
15  A.  If a particular client, say, requires
16  that the tax assessment data be inputted on the
17  form, and some do, then certainly you would
18  research that.
19  Q.  And I guess you'd research the Road
20  Home appraisal data, as well, for either the
21  subject property or a perceived comparable.
22  A.  No, you wouldn't -- well, you wouldn't
23  particularly be focused upon that if your task
24  was to provide a market value estimate for the
25  property.  Your focus would be on transactional

Page 372

1  information regarding other properties that had
2  actually sold in the marketplace.
3  Q.  Okay.  Because the Road Home would
4  give you the pre-Katrina value -- appraisal
5  value?
6  A.  Well, you wouldn't -- you likely would
7  aren't have access to the Road -- remember, the
8  what the Road Home database might have is an
9  individual property appraisal.  It would not
10  necessarily be a sale of that property that
11  would be useful in appraising that
12  particular -- your subject property.
13  Q.  It would be a pre-Katrina appraisal
14  wouldn't it?  Isn't that what the Road Home --
15  A.  That's correct.
16  Q.  Yeah.
17  A.  But that's what it would be.  It would
18  be a pre-Katrina appraisal of a given property.
19  Q.  Right.  Well, under your methodology,
20  if you're trying to discern the detrimental
21  condition of the flood, do you or do you not
22  look for that Road Home pre-Katrina appraisal
23  data at some step in the process?
24  A.  Are you assuming we are appraising a
25  property that has been part of the Road Home

31 (Pages 369 to 372)

Page 373

1 system? Is that your assumption?
2    Q. Yeah. Assuming there's some data from
3 Road Home for the property, would you be
4 interested in it for purposes of this
5 methodology?
6    A. Oh, yeah. Certainly, appraisers are
7 great collectors of information, so any
8 information that would assist them in
9 accomplishing their task would be of use.
10    Q. And then the final fifth minimum step
11 identified by Fannie Mae is to report the
12 analysis of opinions and conclusions in this
13 appraisal report, again referring in this case
14 to that form report we've looked at.
15       But when you use this exact report,
16 every appraisal needs to end up, doesn't it, in
17 some sort of a written form where you state
18 your conclusions?
19    A. Technically, it doesn't have to. I
20 can give you a verbal report. But in the
21 arenas you've been talking to me about --
22    Q. Right.
23    A. -- all those findings were usually
24 transmitted in some written form.
25    Q. Right. And for purposes of this

Page 374

1 litigation, if you were carrying out this task,
2 you would certainly reduce your conclusions --
3 your appraisal conclusions to written form --
4    A. I believe so.
5    Q. -- in each case.
6    A. I believe so.
7    Q. Okay. I notice that the Fannie Mae
8 structure guide also then states or sets forth
9 what it calls required exhibits. (Tendering.)
10       You see that?
11    A. Yes.
12    Q. Are all of those required exhibits
13 things that you would seek to obtain and attach
14 to the individual property appraisal for
15 purposes of your sales comparison methodology?
16    A. I think these exhibits are certainly
17 typical of appraisal reports submitted to
18 Fannie Mae or Freddie Mac, but are they a
19 requirement in all cases for all appraisals?
20 No. The key for an appraiser is to produce a
21 product that certainly is accurate, credible,
22 reliable and certainly suitable for the purpose
23 to which he was hired at some level. That's
24 not to say that the value conclusion has to be
25 suitable, but that, for the purpose which the

Page 375

1 report was to be used, it has to be
2 appropriate.
3    Q. And the exhibits that are required,
4 according to Fannie Mae, are street map, an
5 exterior building sketch, descriptive photos,
6 and any other data that's been looked at and
7 deemed relevant, correct?
8    A. Correct.
9    Q. All right. Let me mark as Truax 12
10 the Fannie Mae Form 10004 guide.
11       (Exhibit 12 was marked for
12 identification and is attached hereto.)
13 EXAMINATION BY MR. MEUNIER:
14    Q. Page 11 of your MRGO report, at the
15 bottom, you say the individual circumstances of
16 a property must be fully known, analyzed and
17 considered both on a macro and micro level.
18 And I know you have parenthetical explanations
19 of what macro and micro mean.
20       I want to make sure I understand.
21 When you say you're going to look at the
22 individual circumstances of the property on a
23 macro level, are you referring to comparable
24 properties in the neighborhood or in a larger
25 population?

Page 376

1    A. In any appraisal, you should consider
2 any and all factors that bear on its valuation.
3 So it's not a fixed list, if you will.
4 Anything that you believe would impact the
5 value and that a potential buyer in the
6 marketplace would consider, then you as the
7 appraiser need to consider that.
8    Q. Right.
9    A. So as you say in the parenthetical
10 here regarding the macro issues would be the
11 neighborhoods. Certainly neighborhood in the
12 context of an individual appraisal would
13 primarily relate to the competitive
14 neighborhood market area. For example, if you
15 were in Lakeview, you probably would primarily
16 research Lakeview.
17    Q. Uh-huh.
18    A. The micro has to do with the
19 particular -- the more particular circumstances
20 that bear on your subject property, like is
21 there a junk yard on the property next door or
22 across the street, and would that impact a
23 buyer's thinking? So -- but conceptually, you
24 would consider and analyze anything that you
25 think might have a bearing on the value of the

Case 2:05-cv-04182-SRD-JCW   Document 16669-19   Filed 12/10/08   Page 5 of 10

Page 377

1   property.
2       Q.  Would your macro level reference for
3   purposes of the MRGO subclass areas, St.
4   Bernard, Lower Ninth, New Orleans East, ever
5   extend beyond those areas?
6       A.  Well, as I said, I think we talked
7   about this yesterday, um -- let's say in one of
8   those areas if there is the fact that it is in
9   New Orleans, it is in an area protected by
10  levees, that influence certainly is overriding
11  to all of the properties in the area, and so
12  that's embedded in the sales we will use,
13  hopefully, because they will come from a
14  neighborhood that's in the same area.  So that
15  influence is inherently considered by virtue of
16  your comparable selection.  You might not have
17  to articulate it in your form or in whatever
18  form you use for an adjustment because it's
19  embedded in the comparables already.
20      Q.  Let me refer you to page 12 of your
21  MRGO report which begins a discussion about the
22  diversity of properties in the MRGO class area.
23      Do I understand that in order to
24  demonstrate the diversity of property types in
25  the entire MRGO class area -- and you regard

Page 378

1   that diversity as extending through all three
2   subclasses, right?
3       A.  There is diversity in all three
4   subclasses.
5       Q.  So in order to demonstrate that, you
6   conducted a study of one specific area,
7   correct?
8       A.  Correct.
9       Q.  And that's the, shall we call it the
10  Charbonnet area?
11      A.  Correct.
12      Q.  How did you come to select the
13  Charbonnet area as a suitable area that
14  illustrates diversity throughout the entire
15  MRGO class area?
16      A.  Well, we only had -- given the
17  criteria that I had accepted that I was going
18  to employ, which was that we would center
19  whatever study we did around one of the named
20  plaintiffs, we only had four to choose from in
21  that particular case, and the Charbonnet
22  property is certainly in the proposed class
23  area, and it has -- it clearly demonstrates
24  considerable diversity in the immediate area.
25      Q.  Yes, but your position is that that

Page 379

1   diversity demonstrated in the Charbonnet area
2   is a diversity which exists throughout the
3   entire MRGO class area, is that true?
4       A.  No, I don't think I'm telling you that
5   the diversity, particularly, say, the
6   percentages of various property types within
7   that small study area, that I'm contending that
8   that is to be extrapolated to the whole of the
9   class area.  That's not the intent at all.  The
10  intent was to say, if you study in this case
11  just an area as small as nine blocks, you get a
12  tremendous amount of diversity, even in a
13  subset that is that small.
14      Q.  Well, do you believe that if you then
15  moved over into a different subclass area,
16  different neighborhood, and looked at a
17  different nine blocks, you're going to find the
18  same degree of diversity?
19      A.  Oh, no.  That would vary.  You would
20  find some nine block areas that had probably
21  even greater diversity.  You'd find some nine
22  block areas that had a limited amount of
23  diversity.
24      Q.  Okay.
25      A.  No.  That's --

Page 380

1       Q.  All right.
2       A.  Absolutely.
3       Q.  So you're not seeking to extrapolate
4   to the entire class area any opinions about the
5   degree or extent of diversity from the study of
6   this one nine block area, are you?
7       A.  Not in a particular way.  But I'm here
8   to tell you, having been an appraiser here for
9   thirty odd years, I'm confident that there is
10  tremendous diversity over the full extent of
11  the class area.
12      Q.  Now, listing of percentages starting
13  at the bottom of Page 12 and then continuing to
14  the top of Page 13 of your report indicate that
15  in the Charbonnet study area 73 percent of the
16  property units were residential.  True?
17      A.  Well, more particularly, 33 percent
18  were single-family and 40 percent were
19  multifamily.  That can be, you know, anything
20  above a two-family or more.  But these are
21  residential classifications, that is correct.
22      Q.  73 percent were residential, true?
23      A.  A mix of single and multifamily, yes.
24      Q.  And 80 percent were vacant.  Is that
25  true?

JOHNS PENDLETON COURT REPORTERS                    800 562-1285

6a5da895-188c-4221-ab42-6901ea8d8f49

Page 385

1  on the roof were missing, the stacks and
2  turrets were removed, there was a blue tarp on
3  the roof, those were things that we were pretty
4  confident suggest there was evidence of wind
5  damage. And wind damage, you asked me to
6  define it. Wind damage, to me, is damage that
7  I suspect was caused by wind.
8      Q.  Right. But specifically, you're
9  talking about roof damage?
10      A.  That was the primary evidence of that.
11  Now, at times you'd also see where there was
12  lap siding that might have been blown off, say,
13  a second floor portion of a building, or there
14  were windows that were, um -- blown -- broken
15  and open, say, on second floor levels. Again,
16  we would have taken that as some evidence of
17  wind damage, probably.
18      Q.  Well, 86 percent of the homes were one
19  level properties. 86 percent of the structures
20  were one level, correct?
21      A.  Yes.
22      Q.  So when you saw a broken window in a
23  one level structure, you noted that as wind
24  damage?
25      A.  No, not in all cases. That wouldn't

Page 386

1  have been enough on a one-story structure. I
2  was just saying the primary -- the principal
3  area that was looked at closely was the roof.
4      Q.  Roof. Okay. Because you and I know
5  that broken windows can occur from anything
6  from a rock to any number of other things.
7      A.  Certainly.
8      Q.  And you're looking at properties two
9  years after an event --
10      A.  That's correct.
11      Q.  -- correct?
12      A.  Correct.
13      Q.  Were you trying to state the opinion
14  here, Mr. Truax, that 89 percent of the
15  properties in the Charbonnet area had wind
16  damage from Hurricane Katrina two years ago?
17      A.  I believe that the evidence of wind
18  damage that I saw was in the majority, yes,
19  associated with Hurricane Katrina. Can I be
20  certain of that? No.
21      Q.  You can't rule out intervening causes
22  for damage to a roof in the last two years, can
23  you?
24      A.  No.
25      Q.  So you made an assumption that if a

Page 387

1  house had evidence of wind damage now, two
2  years after Katrina, it must be due to Katrina;
3  that was your assumption?
4      A.  The inherent assumption was that the
5  damage we saw as we drove through that
6  neighborhood was in the majority caused by
7  Hurricane Katrina, yes.
8      Q.  Did the water level of the flooding in
9  the Charbonnet area reach the level of these
10  roofs?
11      A.  No.
12      Q.  What was the depth of the flooding in
13  the Charbonnet study area?
14      A.  I don't recall the depths of the
15  flooding exactly, but it wasn't at roof level.
16  I believe it was about, probably -- in the
17  subject property itself, I believe the -- it
18  was near the window line.
19      Q.  Did any of the residents in the
20  Charbonnet study area have to exit through
21  roofs by breaking out through a roof?
22      A.  Oh, I wouldn't know that.
23      Q.  If that happened and you saw evidence
24  of a hole in the roof, you'd call that wind
25  damage?

Page 388

1      A.  It might have been characterized as
2  that.
3      Q.  Now, you've got a reference in your
4  report to Exhibit C which are photographs of
5  the Charbonnet area, correct?
6      A.  Correct.
7      Q.  And you represent that these
8  photographs depict the wind damage?
9      A.  No, they depict essentially the
10  variety of properties that were -- an example
11  of the variety of the properties that were
12  observed in that nine block study area.
13      Q.  You didn't take photographs of wind
14  damage.
15      A.  Well, if you look at the second
16  photograph on I guess the first page, the
17  photograph probably doesn't show it real
18  well --
19      Q.  It says 5625 Burgundy?
20      A.  Yes. You can see some evidence of
21  some shingles missing there on the front of
22  that house.
23      Q.  All right. So let me make sure I
24  understand. 5625 burgundy, with the shadowed
25  area on the front of the roof you say are

Page 397

1    A.  Correct.
2    Q.  How long did you take for each
3  inspection?
4    A.  Well, there was certainly some
5  variations in the property types.  Probably
6  spent an hour and a half or so at Charbonnet,
7  maybe an hour.
8        Hamlet Street was a slab, the
9  structure was gone, so I spent less time
10  certainly at Hamlet Street.
11        Bundy and Morel, I'd say both an hour
12  to an hour and a half.
13    Q.  An hour and a half each?
14    A.  An hour to an hour and a half on each,
15  yes.
16    Q.  And what were your normal -- what
17  would your normal charges for that be?
18    A.  I think residential appraisals are
19  typically in the two hundred and fifty to three
20  hundred and fifty dollar range.  And I tell you
21  this, the time spent at each was probably
22  certainly a little longer than would have been
23  spent in a normal process.
24    Q.  Well, you say an hour to an hour and a
25  half is what you spent, so what would you think

Page 398

1  a normal process would be?
2    A.  Probably an on site inspection is
3  accomplished in probably somewhere between
4  thirty minutes and an hour tops --
5    Q.  Uh-huh.
6    A.  -- for a normal house.
7    Q.  Now, in the case of Ms. Coates at
8  1020-22 Charbonnet, you found this to be a
9  single-family residence, correct?
10    A.  Correct.
11    Q.  Which would put it within the
12  73 percent residential category for the
13  Charbonnet area, right?
14    A.  Um -- well, within the 33 percent
15  single-family category.
16    Q.  All right.  And within the 73 percent
17  residential category.
18    A.  If you want to combine the two.
19    Q.  And it was a raised, on piers,
20  structure, which puts it in the 72 percent
21  category for that area, correct?
22    A.  Correct.
23    Q.  So why is it you say the Charbonnet --
24  I mean the Coates home is not representative of
25  her neighborhood?

Page 399

1    A.  I think what I've said is that the
2  Coates home, the Hamlet Street property, the
3  Bundy Street and Morel Street properties are
4  not representative of a large segment of the
5  broader class areas.  They're all single-family
6  homes.  There are obviously other property
7  types within the class area.  That's what I
8  said.
9    Q.  So Ms. Coates' home, since 73 percent
10  of the homes are residential in that study
11  area, and 72 percent are raised like her house,
12  you're not saying her home is atypical of her
13  neighborhood, are you?
14    A.  No, I'm not contending these
15  properties wouldn't be representative of some
16  of the properties in the subclass area.  They
17  certainly would be, of some.
18    Q.  Okay.  Well, that's what I wanted to
19  make sure about.  You're not saying that the
20  class area is so diverse that it's impossible
21  to come up with a representative set of
22  properties; you're not saying that, are you?
23    A.  No.  I mean, I believe that there
24  could be some representative class.  The
25  problem is, there are many subclasses within

Page 400

1  this broad area, and the, say the Coates home
2  is a raised -- actually, a converted double
3  that is now used as a single-family residence.
4  That property, say, would not be particularly
5  representative of, say, all of the residential
6  in the subclass area.  There are different
7  styles, different characteristics that would
8  not make that, let's say, a comparable, if you
9  will, if I was appraising many, many other
10  properties in that same subclass area.  Even
11  single-family properties.
12    Q.  All right.  So you could assemble a
13  sample group of properties that as a group
14  would be representative of these class and
15  subclass areas, you just need more properties
16  to do that, more than four.
17    A.  Clearly, four isn't representative.
18  And at some level, that's what an appraisal
19  does.  An appraisal selects representative
20  properties for their particular property that
21  are precisely or as best we can determine the
22  properties that are representative of the
23  property you're approving.
24    Q.  And let me just make sure you
25  understand, Mr. Truax, as we discussed

Page 401

1  yesterday, the words representative and typical
2  have specialized meaning in class action cases,
3  and I want to make sure when you say
4  representative here you are not referring to
5  the use of that word as it's used for class
6  certification purposes.  Correct?
7       MR. MARPLE:
8            Let me object to the form of the
9       question as calling for a legal
10      conclusion.
11 EXAMINATION BY MR. MEUNIER:
12     Q.  Well, do you know what Rule 23 means
13 when it says a class representative has to be
14 an adequate representative?  Do you know what
15 that means?
16     A.  From a legal perspective, no.
17     Q.  So when you use the word
18 representative in your report, you are not
19 referring, intentionally, at least, to that
20 meaning, are you?
21     A.  No, I think I told you yesterday that
22 representative, to me, would be -- could be
23 likened to the word comparable.
24     Q.  Comparable.  Okay.  So you're using it
25 in an appraisal sense, meaning that it's got to

Page 402

1  have sufficient characteristics in common with
2  other properties for me to be able to compare
3  value, or utilize the values as a comparison.
4            Is that what you mean by
5  representative?
6     A.  Yes.
7     Q.  So by that definition, no residential
8  property could ever be representative of a
9  commercial property, could it?
10    A.  Typically not done that way, that's
11 correct.
12    Q.  And a one-story property could never
13 be representative of a two-story property.
14    A.  Again, typically an appraiser would
15 work very hard to compare two stores to a
16 two-story property if that's what his subject
17 was.
18    Q.  An old property could never really be
19 representative of a new property.
20    A.  Any host of variations like that,
21 that's correct.
22    Q.  So you take all the characteristics
23 that you look at for comparables -- and I think
24 we actually looked -- you have some bullet
25 point listings of things that you consider.

Page 403

1     A.  Correct.
2     Q.  You take that list, and your idea of
3  representative would be to group the properties
4  according to those characteristics, correct?
5     A.  Yes.  As best you can.  Obviously, you
6  rarely if ever find three identical -- or four
7  or five or however many that are identical to
8  your subject property, but that is the goal, is
9  to -- when you search for comparables, is to
10 find those that are most similar to your
11 subject.
12    Q.  And again, this discussion about the
13 class representative properties not being
14 representative, and we're using the words
15 differently, but, um -- you reference Exhibit C
16 which are the pictures that we looked at, your
17 photographs.
18    A.  Correct.
19    Q.  And the relevance here is that in the
20 Charbonnet study area, you found a church, you
21 found a Kentucky Fried Chicken, a school, as
22 well as homes, and your view is that none of
23 the homes could be considered representative of
24 the whole area because you've got a church and
25 you've got commercial establishments, et

Page 404

1  cetera.  That's your opinion.
2     A.  Correct.
3        (Off the record.)
4        MR. MEUNIER:
5            For the record, the plaintiffs in
6        levee and MRGO have no further
7        questions of the witness.  That
8        concludes the deposition.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

6a5da895-188c-4221-ab42-6901ea8d8f49

1

```
1                      UNITED STATES DISTRICT COURT

2                      EASTERN DISTRICT OF LOUISIANA

3

4

5    IN RE:   KATRINA CANAL BREACHES    *    Docket 05-CV-4182-K
     CONSOLIDATED LITIGATION            *
6                                       *    New Orleans, Louisiana
                                        *
7                                       *    October 18, 2007, 1:15 p.m.
     *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
8

9

10
                     TRANSCRIPT OF PROCEEDINGS BEFORE THE
11                     HONORABLE STANWOOD R. DUVAL JR.
                        UNITED STATES DISTRICT JUDGE
12

13
     APPEARANCES:
14

15   For the Plaintiffs:          The Law Offices of Joseph M. Bruno
                                  BY:   JOSEPH M. BRUNO, ESQ.
16                                855 Baronne Street
                                  New Orleans, Louisiana 70113
17

18   For the Plaintiffs:          Gainsburgh Benjamin David
                                    Meunier & Warshauer
19                                BY:   GERALD E. MEUNIER, ESQ.
                                       KARA M. HADICAN, ESQ.
20                                1100 Poydras Street, Suite 2800
                                  New Orleans, Louisiana 70163
21

22   For the Plaintiffs:          RICHARD M. MARTIN JR., ESQ.
                                  416 Gravier Street
23                                New Orleans, Louisiana 70130

24

25
```

97

1  Mr. Roddewig played in the issuance of his report.
2              Finally, this business that the playing field
3  here is exclusively mass appraisal is simply wrong. Plaintiffs
4  acknowledge in their papers in the Kilpatrick memo and they
5  have acknowledged just now individual appraisal is an
6  appropriate method to evaluate real estate. It is absolutely
7  an appropriate method.
8              Now, I understand they want to cut corners and
9  they want to do the quick and easy. They want to set up, take
10 three to 12 months to do a model, and they just want the Court
11 to focus on the model. The fact of the matter is this is an
12 accepted methodology and he is an expert in this methodology.
13 Should this case ever get to a liability trial, the defendants
14 have the right to have the jury hear about what is the gold
15 standard in real estate valuation in the terms of assigning and
16 transferring permanently your rights.
17             I dare say no one in this courtroom would agree
18 to pledge their personal wealth in the purchase or sale of a
19 home based exclusively on an AVM spit-out number. They would
20 ask for an appraiser to come out and look at their property,
21 Your Honor, and that is an appropriate thing for the defendants
22 to hear from. In fact, we even heard this morning for the
23 first time that the trial plan the plaintiffs have proposed
24 will include some sort of after-the-fact individual appraisal
25 if, in fact, the class member is unhappy with what the AVM

---

1  model spits out.
2              So, once again, the plaintiffs are conceding, if
3  you will, Your Honor, that the gold standard is the individual
4  appraisal. Should a jury ever have to hear this, they are
5  entitled to hear this methodology. It's an appropriate
6  methodology. It's recognized. You will hear from Mr. Truax it
7  is the primary methodology for mortgages, and it's certainly
8  what the lending institutions locally are requiring. There's
9  no dispute to that, Your Honor. Dr. Kilpatrick talks about the
10 AVMs being used in a very limited mortgage context.
11             Finally, Your Honor, if the Court wants to hear
12 from somebody who knows about the New Orleans market, that
13 person is Mike Truax. If you want to hear about Seattle,
14 Washington, or you want to know what the suburbs of Dallas or
15 Las Vegas look like and what models might work there, Mr. Truax
16 is not the expert. But if you want to hear about what is
17 unique about the New Orleans market and sets it apart, there is
18 no better person than this acknowledged expert in the field of
19 real estate valuation.
20             For all these reasons, we urge you to listen to
21 the testimony of Mr. Truax and deny plaintiffs' motion. Thank
22 you, Your Honor.
23             MR. MARTIN:  Your Honor, it's our information that
24 there are three reports.
25             MS. BERTAUT:  Do you have a third report or do you

---

98

1  have attachment Exhibit D to the Levee report?
2              MR. MEUNIER:  Your Honor, so I can clarify this,
3  there was an August 28, 2007 report that Mr. Truax signed alone
4  in the MRGO case. I'm not sure that has been offered.
5              MS. BERTAUT:  Yes, it is. That's No. 1.
6              MR. MEUNIER:  All right. Then there was a
7  September 10, 2007 report which he signed alone in the Levee
8  case and attached to that is a September 10, 2007 -- it's a
9  report within a report that's co-signed by him and Roddewig.
10             MS. BERTAUT:  That's in here. Would you like to
11 look, Mr. Meunier?
12             MR. MEUNIER:  Well, when you offered two reports, I
13 want to make sure that -- there are really three reports. The
14 reason I mention it is because when the complaint is made about
15 the Roddewig issue, that has to do with the report within the
16 report that's an attachment.
17             MS. BERTAUT:  Your Honor, with all due respect, it's
18 a single report. The Roddewig signature is attached to an
19 exhibit, which is here.
20             THE COURT:  You-all can probably debate about that
21 for a long time, but it's in evidence and I'll figure it out.
22             MS. BERTAUT:  Thank you, Your Honor.
23             THE COURT:  Thank you. Let's proceed.
24             MR. MARTIN:  Your Honor, we call Mr. Michael Truax.
25             (WHEREUPON Michael W. Truax, having been duly sworn,

---

99

1  testified as follows.)
2              THE DEPUTY CLERK:  Please state your full name and
3  correct spelling for the record.
4              THE WITNESS:  Michael William Truax, T-R-U-A-X.
5                       DIRECT EXAMINATION
6  BY MR. MARTIN:
7  Q.  Mr. Truax, thank you for your appearance here today.  I
8  appreciate you being here.
9              Would you please tell me what type of expertise you
10 are offering to the Court.
11 A.  I am a real estate appraiser and consultant, and I would
12 speak to issues that relate to those fields.
13 Q.  All right. Are you offering yourself as an expert in mass
14 appraisal?
15 A.  Not as an expert.  I certainly have knowledge about mass
16 appraisal and AVMs in the course of just general appraisal
17 practice.
18 Q.  Are you challenging Dr. Kilpatrick's professional
19 qualifications?
20 A.  No, I'm not challenging his professional qualifications in
21 any personal way, no.
22 Q.  Now, I guess the place where we want to get started is:
23 Is it true that your opinion is that AVMs and AVM-type models
24 will not effectively work in our submarket because of the
25 variety, lack of homogeneity, etc., that exists in this