101

1 particular submarket? I'm quoting your words.
2 A. Yes. I believe that that is the primary problem in this
3 particular submarket.
4 Q. This is your opinion in a nutshell?
5 A. That's the primary issue. I think data collection would
6 be another issue in terms of implementing an effective model.
7 Q. Other than the opinion we just discussed, what other
8 opinions, if any, are you offering?
9 A. If you go to the report, particularly to MRGO, the primary
10 focus really was to determine what would the appropriate
11 analysis methodology be to produce reliable and credible
12 results with regard to the issues at hand in this case. I was
13 also asked to offer an opinion as to the reliability of
14 assessment data for use in this endeavor. I was asked to
15 comment on the reliability of mass appraisal techniques as I
16 have interacted with them in the local market. I also was
17 asked to speak to whether the named plaintiff properties that I
18 inspected were representative of the entirety of the class
19 area.
20 Q. That is the ambit of your opinions?
21 A. Essentially, yes. There may be some other issues that I
22 speak to, but certainly that's the guts of it.
23 Q. Okay. First, you haven't been asked in your report to
24 offer any opinions about flood devaluation of property, have
25 you?

1 A. Well, in terms of offering specific opinions as to values
2 of particular properties, no, but certainly that ultimately
3 would be the issue, I suspect, in this case.
4 Q. Now, one thing which has struck me as curious today is we
5 have had a number of map-type exhibits introduced, but none of
6 them seems to detect the extent or the depth of flooding. Have
7 you, in the course of your assignment for the defense, looked
8 at any maps which show the extent or the depth of flooding?
9 A. Well, certainly in my report there are six studies that
10 were undertaken around named plaintiffs' properties, one in
11 MRGO and five in the Levee case. Certainly, in the Levee case
12 I had information regarding the depth of flooding into the
13 habitable first-floor area in all of those cases.
14 Q. So you had information as to whether a condition of
15 flooding was a condition common to or typical of dwellings in
16 the areas you analyzed?
17 A. I had particular information with regard to those study
18 areas. Certainly, in the course of this endeavor, I saw maps
19 and other information that related to flooding throughout much
20 of the metro area.
21 Q. Based upon your own personal observations of, for example,
22 the notorious "bathtub ring" on houses and your perusal of
23 maps, isn't it true that one thing that is common to and
24 typical of the persons who are the putative plaintiff class is
25 that their homes flooded and their personal belongings and

102

1 their properties were damaged by floodwaters?
2 A. Well, let me respond in two ways. First, in terms of the
3 class boundaries that are drawn and are shown on a map in one
4 of these reports, not all of those properties flooded. Then,
5 in terms of flooding, again, that would be a matter of degree.
6 If there was a raised home that was the first floor
7 habitable -- a habitable first floor, say, at an elevation of
8 five feet, and the flood depth in that particular neighborhood
9 was two feet above ground level, then it's a subjective call as
10 to whether that property or that home, certainly, flooded.
11      THE COURT: Your question was: Did the class
12 representatives flood, all of them? Just ask: Did all of the
13 class representatives flood? He can explain his answer after.
14 If that's what you are getting at, let's get to it.
15 BY MR. MARTIN
16 Q. Mr. Truax, I was too general in the last question. Let's
17 limit it to the class representatives. Did you observe whether
18 their homes flooded and whether they suffered damage to
19 personal and real property as a result of flooding?
20 A. Okay. So you are asking me now about the 42 properties in
21 Levee and the four in MRGO?
22 Q. Yes, sir, I am.
23 A. Based upon my observations, I would suggest that several
24 of the plaintiffs' properties may not have flooded in terms of
25 water entering the living area.

103

1 Q. So, by and largely the overwhelming majority of those
2 properties that you inspected yourself were flooded and
3 sustained damage due to flooding?
4 A. I would say that's a fair statement.
5 Q. Okay. So that means that flooding and flood damage
6 consequent to flooding were conditions common to and typical of
7 the class representatives' homes; isn't that true?
8 A. For the majority of the 42 plus four that I inspected,
9 yes.
10      THE COURT: Sir, I want to point out this is not the
11 class certification hearing.
12      MR. MARTIN: Right.
13 BY MR. MARTIN:
14 Q. Now, you have never published any articles on AVMs, have
15 you, sir?
16 A. That's correct.
17 Q. You have never used an AVM, have you, sir?
18 A. That's correct.
19 Q. You have never given a professional presentation on an
20 AVM?
21 A. That's correct.
22 Q. You have no formal mass appraisal training?
23 A. I have had some training, in general knowledge, regarding
24 AVMs and mass appraisal techniques, just in the course of
25 general appraisal education.

104

1  Q. You mentioned a one-day seminar.
2  A. I had a one-day seminar and certainly there is a --
3  Standard 6 of USPAP deals with mass appraisal. Certainly,
4  presentations with regard to USPAP would have covered that
5  topic as well.
6  Q. You have never published any papers on mass appraisal?
7  A. That's correct.
8  Q. You have told us during the course of your deposition that
9  you have no data regarding the usage of mass appraisals in the
10 real estate industry.
11 A. I'm not sure I told you that. You may want to point me to
12 my deposition if you say I said that.
13 Q. I believe the question posed to you at the time was, "Do
14 you know whether mass appraisal techniques are being used with
15 increasing frequency in the real estate industry?" Do you
16 recall what your answer was?
17         MS. BERTAUT: Your Honor, could we show the witness
18 the deposition?
19         THE COURT: Sure. We can do that just for the sake
20 of time. Do we have an extra copy?
21         MR. MARTIN: I'm going to withdraw that question and
22 move on.
23 BY MR. MARTIN:
24 Q. Mr. Truax, is it true that you do not hold yourself out as
25 an AVM expert?

105

1  A. I do not hold myself out to be an expert in the
2  construction and use of an AVM, that's correct.
3  Q. You do not hold yourself out as a mass appraisal expert?
4  A. That's generally correct, yes.
5  Q. Were you here today when Dr. Vandell said that AVMs are
6  relatively good for making a preliminary cut on area damages?
7  A. I heard him say that.
8  Q. Do you agree with that?
9  A. Well, I'm not sure entirely what he intended by that.
10 AVMs have a function. AVMs are a viable tool to be used in the
11 valuation or evaluation of property, but that's what it is,
12 it's a tool.
13 Q. Do you agree that they are a valuable tool for
14 understanding generally if an area has suffered damages?
15 A. Well, they can be. They are not, categorically, always,
16 no. They can be if the data is sufficient and there's enough
17 homogeneity to make them useful.
18 Q. Mr. Truax, have you ever given court testimony on the
19 applicability or the appropriateness of mass appraisals? I
20 mean excluding today.
21 A. No.
22 Q. Have you ever given court testimony regarding the
23 applicability or appropriateness of AVMs, excluding today?
24 A. No.
25 Q. Have you ever given trial testimony regarding the

106

1  appropriateness or the applicability of hedonic price modeling?
2  A. No.
3  Q. Have you ever given trial testimony regarding the
4  appropriateness or applicability of contingent valuation?
5  A. No.
6  Q. Have you ever given trial testimony regarding the
7  appropriateness or applicability of a conjoint analysis?
8  A. No.
9  Q. Have you ever previously been involved in a class
10 certification proceeding?
11 A. No.
12 Q. Have you ever previously attempted to render an opinion
13 which related to class certification?
14 A. Not in a trial setting, no.
15 Q. Have you ever been tendered, before today, as an expert to
16 address the appropriateness of mass appraisal techniques?
17 A. No.
18 Q. Have you ever been tendered as an expert to address the
19 appropriateness of AVMs?
20 A. No.
21 Q. Did you do any modeling in this case?
22 A. No.
23 Q. Did you do any --
24 A. Modeling in the sense that it's been used in the
25 discussions today.

107

1  Q. Well, did you do any modeling in any other sense?
2  A. Well, if we define *modeling* very broadly, it's potentially
3  creating an analysis system of sorts to produce, say, a value
4  estimate in the appraisal world. Have I created systems that I
5  have used internally, certainly, to produce a value estimate,
6  yes.
7  Q. Did you do that in this case?
8  A. No. Because as I said earlier, I have not been asked to
9  produce particular value estimates at this point.
10 Q. Have you reduced any comparison of data to graphs or
11 tables? For example, you said you talked about a survey in a
12 geographic area. Did you reduce that to any sort of
13 statistical or graphic-type information?
14 A. Yes. In the report you will see the study areas and it
15 presents the -- and there are numerous maps that go with it
16 that show, for example, the types of property uses demonstrated
17 in the nine-block area.
18 Q. All right. That was attempting to identify how many
19 identical properties or nearly identical properties were
20 located within the area?
21 A. No. It was meant to factually just present the data that
22 was available within that nine-block study area factually.
23 Q. Maybe I'm talking about two different sides of the same
24 coin. Wasn't it your purpose to try and show to the greatest
25 extent you could that all of the properties within the area

109

1 were in one way, shape, or form different from one another?
2 A. No.
3 Q. Well, isn't that what variation in the class areas is
4 about?
5 A. Well, I believe, unless I misunderstood your question, you
6 asked me what the purpose of those studies were.
7 Q. Right.
8 A. The purpose of those studies were to potentially confirm,
9 I guess, if you will, the variability that from my experience I
10 thought likely existed, but it was a factual presentation of
11 the type, the certain characteristics, etc., that those
12 properties in that study area demonstrated.
13 Q. Well, confirming variability means confirming differences
14 between properties; isn't that correct?
15 A. It demonstrates what it demonstrates.
16 Q. I'm asking you whether that's what you mean by "confirming
17 variability."
18 A. There were many differences in certainly the study areas
19 property to property.
20 Q. So your task was to try and find as many differences
21 between properties as you could to support your opinion; is
22 that correct?
23 A. I'm sorry. The way you posed that, I'm telling you my
24 task was to factually present the evidence regarding differing
25 characteristics, regarding differing property types that were

1 found within those study areas.
2 Q. All right. Now, by "differing property types" you're
3 talking about structures of different numbers of stories, slab
4 versus pier, brick versus wood? Are those the distinctions?
5 A. Physical characteristic differences, use differences, yes.
6 Q. All right. Did you attempt to determine, for example, on
7 a percentage basis how many of those properties within the
8 subject area had suffered the intrusion of floodwaters?
9 A. Well, certainly in most of these areas I would say the
10 majority of the properties has had some flooding impacts.
11 Q. These homes also had impacts like loss of electrical
12 service due to the wiring going underwater?
13 A. In many cases.
14        THE COURT: Counsel, I hate to interrupt you, but how
15 does this go to his qualifications? That's what we are here
16 for; right?
17        MR. MARTIN: It is. I'm going to be getting to that.
18        THE COURT: If this witness stays, I'm going to hear
19 this again at some point. I would rather not hear it twice.
20 BY MR. MARTIN
21 Q. Mr. Truax, as defense counsel has said, you're not a
22 lawyer, are you, sir?
23 A. I am not a lawyer.
24 Q. You have not read the various pleadings which have been
25 filed in this matter relating to class certification?

110

1 A. I have read some, but possibly not all.
2 Q. You are not personally familiar with the legal concepts of
3 commonality and typicality as they are applied under Federal
4 Rule of Civil Procedure 23?
5 A. I've read some things about those terms; but, no, I would
6 not hold myself out to be expert or entirely familiar with them
7 from a legal perspective.
8 Q. Do you know whether the concepts of commonality and
9 typicality under Rule 23 are similar to or different from the
10 appraisers' concept of comparability?
11 A. I wouldn't be able to tell you that I could definitively
12 tell you that.
13 Q. Do you contend today that no matter who wrote portions of
14 your report or an exhibit to your report that if you signed the
15 report the work is yours?
16 A. That is correct.
17 Q. Are you able today to segregate Mr. Roddewig's original
18 work from yours in the report, where I think Exhibit D is his
19 report which is attached as an exhibit?
20 A. No, not entirely.
21 Q. Well, how much of your report is really his work that
22 you're presenting as your own?
23 A. Well, first, it's not his report, it's our report, and
24 it's an exhibit to my affidavit. As I view the document, it is
25 a single document. It is very common in our world to have one

111

1 or many authors of a document, but from the appraisal
2 perspective once I, as an MAI, sign that report, once
3 Mr. Roddewig, as an MAI, signs that report, we both accept all
4 of the findings and the facts that are in it.
5 Q. How much of the work of Exhibit D is Michael Truax's work?
6 A. When you say "how much," you are talking pages?
7 Q. I'm talking about Exhibit D. What portion of that work
8 was yours and not Mr. Roddewig's?
9 A. The entire effort was a team effort. There were multiple
10 drafts, some of which that I did more work on than he did or
11 his team did. It was a mix, but at the end of the day we each
12 edited each other's work. It was a combined effort.
13 Q. I'm asking you a very direct question: How much of the
14 content of Exhibit D was your original work?
15 A. I would suggest to you I wrote something on every page.
16 Q. Are you able to give us a general estimate? Is it
17 50 percent yours? Is it 10 percent yours? How much of
18 Exhibit D is your original work?
19 A. I wouldn't be able to hazard a guess on a percentage
20 basis.
21 Q. How much of your report is Mr. Roddewig's original work?
22 A. Again, it was a team effort, so I couldn't tell you that
23 either.
24 Q. Is Mr. Roddewig's AVM experience much more extensive than
25 yours?

### 116

1  Q.  Whether it's appraising the dollar value of damage or
2  whether it's adjusting the value of damage, isn't the cost of
3  performing that repair an item which is reflected in the
4  overall value of a home post-Katrina?
5  A.  That is certainly an element that is reflected, that's
6  correct.
7  Q.  Now, in your finding that there was no commonality, no
8  comparability between one named plaintiff's home and another,
9  did you take into consideration whether homes had suffered the
10 same types of damages?
11 A.  Well, certainly throughout the area, as a consequence of
12 Hurricane Katrina and all the events associated with it, there
13 was some commonality of impacts.  Certainly, in flooded areas
14 and homes that had water particularly intrude into living
15 areas, the types of damage that you saw were generally very
16 similar.
17 Q.  Okay.
18 A.  Now, the level and extent may be different, but the types
19 were generally similar.
20 Q.  So getting back to your opinion about comparability and
21 that mass appraisal should give way to house-by-house
22 appraisal, why wouldn't someone whose home had suffered
23 sheetrock and wood floor damage and wiring damage be comparable
24 to someone else's house that had had the same problem?
25 A.  Well, across the class boundaries, I think one issue

### 117

1  certainly is that not everyone's house was impacted nearly the
2  same way and the particular characteristics impacted, now.  It
3  didn't mean that -- two houses may have been in the same
4  neighborhood, as has been discussed earlier, one on four-foot
5  piers, one at slab grade.  If the flooding in the neighborhood
6  is three feet, well, the one house gets two feet of water in
7  the house, the other property gets no water in the house, so
8  the impact from the same flood event is going to be
9  dramatically different for those two homes.
10 Q.  Well, a question of degree; correct?
11 A.  A question of degree and extent, yes.
12 Q.  Why would you not seek to compare like types of damages?
13 Why are those not comparable?
14 A.  I'm sorry.  I'm not quite getting your question.
15 Q.  Well, if homes in a general area -- if the majority of the
16 homes suffered water entry, damage to walls, damage to
17 furniture, damage to wiring, damage to personal property, why
18 wouldn't you consider that as a basis for comparability as
19 opposed to whether or not a house had two floors, was made out
20 of wood, or was made out of brick?
21 A.  Well, when we get to, say, the notion of valuing -- let's
22 say pre-Katrina values for properties, before we even consider
23 the damage issues -- a comparable that is representative, if
24 you will, of your subject property is certainly one that's
25 going to be similar to it in as many characteristics as you can

### 118

1  find.
2      The notion of commonality, now, I think -- and I want
3  to make sure I'm clear -- that we are talking about
4  representative here as well.  The representative notion that I
5  put forth in the report was that the 42 named plaintiffs'
6  properties, particularly in Levee, were not representative of
7  the breadth of the variety, the type, and all of those things
8  that existed in the whole of the class area.
9  Q.  Now, that is a conclusion you were reaching based upon
10 your qualifications to identify similar structures in an
11 appraisal sense; is that correct?
12 A.  It is from the perspective of my experience as an
13 appraiser, correct.
14 Q.  Now, you do not have experience or qualifications to
15 perform mass appraisals to see if the water entry, which has
16 gone into most of the homes in the class area and which has
17 caused admittedly similar types of damage -- walls, floors,
18 electrical service, furniture, personal property, appliances --
19 you're not qualified to make a mass appraisal analysis of the
20 impact of those similar damages across a wide area, are you?
21 A.  I think I am qualified to tell you that on a mass basis,
22 if you will, across the breadth of these class areas, that
23 while there may be commonality in that there was a flood event,
24 there will not be commonality in terms of its impact on the
25 individual properties.  They will be very different in many,

### 119

1  many cases.
2  Q.  Now, you propose the individual evaluation of 100,000-plus
3  structures; isn't that correct?
4  A.  It is my opinion that that is the only method that will
5  produce reliable and credible results in this case, given all
6  of the variety and the lack of homogeneity that's demonstrated
7  in the market.
8  Q.  Have you given any thought to what that would cost?
9  A.  Not in a particular way, no.
10 Q.  How many millions of dollars would it cost to appraise
11 100,000-plus homes?
12 A.  Oh, I couldn't tell you.  Understand, if you are tasked to
13 do an individual appraisal, the cost is one thing.  If you are
14 tasked to do 100,000 properties, as has attempted to be now
15 accomplished by the Road Home Program, the cost is something
16 else.  Also, you would build a system of sorts where you would
17 have certainly efficiencies.  I believe the Road Home Program
18 plans to have completed 96,000 appraisals by year-end.
19 Q.  I'm simply asking you:  Do you have an idea how much it
20 would cost to implement your proposed measure of appraising
21 houses one by one?
22 A.  No.  In terms of giving you a total cost for that effort,
23 no.
24 Q.  How long would it take?
25 A.  I have not studied that, particularly.

121

```
 1  Q.  How much time do you believe is necessary to devote to
 2  properly appraise a home?  Is there a typical amount of time
 3  you spend?
 4  A.  Well, I heard it said earlier that I had said it was a
 5  half a day a house, and I don't believe I said that.
 6  Residential appraisers will generally be able to do three or
 7  four a day if they are doing a high-volume job and are really
 8  geared up to do that.
 9  Q.  Can you tell us how long it would to take to do
10  100,000-plus units even if you are doing three or four a day?
11  A.  Well, if you would ask only me personally to do them, it
12  would take a while.  You tell me how big your team is and I
13  will tell you how long it might take.  It's just mathematics at
14  that point.
15  Q.  Since you have an opinion that mass appraisal does not
16  work and that individual appraisal is the only way to go, would
17  you agree, though, that the five subclass areas are
18  overwhelmingly residential?
19  A.  I would agree that, yes, they are residential in the
20  sense -- if you're lumping single-family and multifamily
21  together, yes.
22  Q.  Would you agree that there was an overwhelming percentage
23  of those homes which flooded within the five subclass areas?
24  A.  Yes.  I would say the majority did.
25  Q.  If there is information available as to the prestorm worth
```

```
 1  of the home and if there is information available about the
 2  cost of repairing the homes, whether that be an average across
 3  the community or addition of all the costs and dividing it for
 4  a specific number, why couldn't those parameters be inputted
 5  into an automated valuation model and be used to come up with a
 6  general picture of the impact of the storm flood damage on the
 7  community?
 8  A.  Well, again, we get back to the same issues of the variety
 9  not only in terms of the characteristics of a particular
10  property but also the characteristics of the damage they
11  incurred.  By way of example, let's say there were properties
12  certainly in some of these subneighborhoods that, had I
13  appraised them pre-Katrina, I likely would have told you that
14  the improvements needed to be demolished, that they were in
15  such poor condition that they contributed nothing to the value
16  of the site upon which they sat.  So in those cases the repair
17  cost would be of no merit because, frankly, the improvements
18  even before they flooded had no value contribution.  That's an
19  example of the kind of idiosyncrasy that you are going to find.
20  Again, I've talked about the varied impacted with regard to the
21  level of damage.
22  Q.  Are you academically and professionally qualified to
23  absolutely rule out the applicability of a mass appraisal to
24  get a general picture of flood impact on the subclass areas?
25  And, if you are, tell me what experience you are relying upon
```

122

```
 1  to say mass appraisals are impossible.
 2  A.  Well, I can tell you several things.  As a matter of
 3  general appraisal education and training, everything that I
 4  have read always cautions the appraiser, when applying a mass
 5  appraisal technique, that you do need to be very careful and
 6  make sure that you have enough homogeneity and that the data is
 7  sufficient to allow you to implement that system and produce
 8  reliable and credible results.
 9          Standard 6 of USPAP says the appraiser need not be
10  technically versed in the mathematical algorithm that, say, a
11  model produces, but he has to understand what the AVM is
12  basically doing and he has to make sure that the results are
13  credible.
14          I have been exposed to results of some semblance of
15  an AVM in terms of reviewing, say, assessment data through the
16  years in this area, Orleans, Jefferson, St. Bernard parishes.
17  You generally find that it is not consistent or the value
18  implications from the assessment data is not consistent with
19  either the values of appraisals or the values that are
20  demonstrated by actual sales in the marketplace.  So my
21  interaction with that system does allow me to comment on at
22  least what my experience has been with the results of a mass
23  appraisal effort in the particular local market.
24  Q.  Okay.  What I'm asking you is:  Are you professionally
25  qualified to say that there is not an AVM model which can be
```

123

```
 1  validated to use information to generate a general picture of
 2  the impact of flooding in the class area?
 3  A.  Well, I would have to ask you again -- you know,
 4  everything we do as appraisers and USPAP is about credible
 5  results in the context of the task at hand.  So your question
 6  is very difficult for me to answer because, you know, if you
 7  tell me you are looking for a 50 percent margin, you are
 8  willing to accept that risk, maybe an AVM could be constructed
 9  that would accommodate you.
10          THE COURT:  I think, Counsel, we are meandering here.
11  You asked him if he had the professional qualifications to
12  opine as to whether a model could be developed that would be
13  statistically, let's say, viable.
14          MR. MARTIN:  I'm following up.
15          THE COURT:  I don't want to ask the question.
16          MR. MARTIN:  No, Judge, you're not.
17  BY MR. MARTIN
18  Q.  Early on, I asked you whether you had qualifications with
19  regard to AVMs and you said no.  So I'm simply asking you now,
20  at the end of things, what qualifications --
21          THE COURT:  Maybe that's when you should have
22  stopped.
23          MR. MARTIN:  You're right.  I'll stop now,
24  Your Honor.
25
```

125

BY MR. MARTIN:
Q. Reflecting back on your comments about your lack of experience and training in mass appraisal and AVMs, what basis do you have -- having acknowledged you don't have any relevant experience, can you say that there is not an AVM model out there that wouldn't be perfectly suitable for use in this case and generate a meaningful and accurate picture of the flood impact on property values in the class area?
A. I think I've told you I'm not an expert in the construction of AVMs and that's what I told you earlier. I guess I would tell you that I could not hold myself out as an expert in the construction of some model in a utopian setting that might be able to be constructed that would produce credible results. I can only tell you, based upon my experience with mass appraisal efforts on a local level and my understanding of the need of homogeneity in your data pool or in your dataset as well as your population that you're trying to evaluate, that that's a problem in this market. I am not an expert in the construction of creating an AVM model. Could theoretically, in an academic way, someone construct one that potentially could be useful to someone? Possibly, yes.
    MR. MARTIN: Thank you, sir. No further questions.
    THE COURT: I don't know how long you are going to be. I have to go make a little 10-minute talk at 5:00 to a group in Judge Lemelle's court. I don't want to rush you. You

could start and I can stop at 4:45 and come back.
    MS. BERTAUT: Judge, I don't know that I can finish in 20 minutes.
    THE COURT: Why don't we start and then we'll stop you in midstream, if you don't mind.
    MS. BERTAUT: Thank you.
    MR. MARTIN: May we ask that counsel not confer with the witness during the break?
    THE COURT: You can ask, but I'm going to allow him to do so --
    MS. BERTAUT: Thank you.
    THE COURT: -- especially in a 104(a) setting. Go ahead.

CROSS-EXAMINATION
BY MS. BERTAUT:
Q. Mr. Truax, do you have a field of expertise that you would like to offer the Court in this matter?
A. Yes. I'm a real estate appraiser and consultant with over 30 years of experience in the local market.
Q. Beyond your on-the-job experience, do you have any training as an appraiser?
A. Yes. I have taken all the courses offered by the Appraisal Institute prerequisite to obtaining the MAI designation. I also have taken all the necessary coursework and passed the exams and the like necessary to receive a state

126

certification in the state of Louisiana and Michigan. I have continued to stay abreast of changes in my field through continuing education. I think we are required to take 100 hours every five years. So I am current in that regard as well.
Q. Let me back you up a minute. Do you have an undergraduate degree, sir?
A. Yes, I do.
Q. Where is that degree from?
A. I have a B.S. in Engineering from Tulane University.
Q. When did you receive that degree from Tulane?
A. In '76.
Q. What did you do after your Tulane degree?
A. Well, I played professional football for a short time and then almost immediately after that moved right into the appraisal business.
Q. How did you become involved in the appraisal business?
A. Well, I graduated in engineering, but realized I didn't care to be a practicing engineer. The skill set I obtained in that educational field was, I think, an analytical one. Some of my family was in the real estate business and suggested maybe I should look at appraising because it was kind of a blend of the two things, the real estate, but yet had more of an analytical aspect to it than with brokerage. So I tried it and liked it and have stayed with it.

127

Q. So if I'm doing the math correctly, 31 years would have put you about 1976, '77, something like that?
A. Yes.
Q. Now, you have mentioned that you were a licensed Louisiana appraiser. Do you know the requirements or do you recall the requirements of your obtaining that certification?
A. Well, the certification law was passed, I believe, in the 1990s and I had already held the MAI designation at that time. There was no grandfathering process, though. I was required to submit experience credits, demonstrate the number of hours of education required, and then sit for a comprehensive examination like everyone else. So I did all of those things.
Q. So if I understand you correctly, then your work in real estate valuation actually predates the Louisiana certification process?
A. Yes. That certification law was, as I said, passed in the '90s, and I have been doing that for many, many years before that.
Q. We have heard the designation of an MAI. Would you tell the Court what that is.
A. That's an acronym for a member of the Appraisal Institute. The Appraisal Institute is, I believe, the preeminent organization that, if you will, offers professional designations in my field, which is the field of real estate appraisal.

129

1  Q.  Are you a member of the Appraisal Institute?
2  A.  Yes. I hold the MAI designation.
3  Q.  How long have you been a member of the Appraisal
4  Institute?
5  A.  I believe since 1984.
6  Q.  In order to obtain that designation, would you tell the
7  Court what study or proficiency you had to demonstrate.
8  A.  Well, at that time it was a little more stringent, I
9  believe, than it is even today. You had to have five years of
10 experience; an internship, if you will, under another MAI. You
11 had to submit certain demonstration reports that were reviewed.
12 You had to take a battery of courses -- I believe it was six or
13 seven at the time -- and then sit for a comprehensive
14 examination that I guess in some ways that would be likened to
15 the C.P.A. exam.
16 Q.  Do you have to be an MAI to be a licensed Louisiana
17 appraiser?
18 A.  No, you do not.
19 Q.  Are all Louisiana licensed appraisers MAIs?
20 A.  Oh, no. I would venture to say most aren't.
21 Q.  Do you know if Dr. Kilpatrick is an MAI?
22 A.  He is not.
23 Q.  Now, since you have been designated a member of the
24 Appraisal Institute in 1984, are you required to do anything to
25 continue that designation?

1  A.  Yes. As I said, we have to take 100 hours of continuing
2  education in five-year cycles.
3  Q.  Are you current with that, sir?
4  A.  Yes.
5  Q.  Are you also a member of the Louisiana Realtors
6  Association?
7  A.  Yes. I have a brokerage license and so I am a member of
8  the Louisiana Realtors Association and the Metropolitan
9  Association of New Orleans. Those organizations have to do
10 with the brokerage business.
11 Q.  How about the National Association of Realtors? Are you
12 also a member of that?
13 A.  Yes.
14 Q.  Now, sir, let's talk a few minutes about your background
15 in appraisals. Can you tell the Court the type of clients that
16 you have undertaken appraisals for, sir?
17 A.  Well, over the course of 30 years, certainly it's all
18 varieties, both financial institutions, corporate clients,
19 individuals. It's a very broad range.
20 Q.  Have you ever been retained to appraise property that is
21 being used or considered as collateral for loans made by
22 financial institutions?
23 A.  Oh, very, very often. That's one of the core parts of our
24 business. So I would tell you we probably have an appraisal
25 being conducted almost always having to do with a mortgage

130

1  lending and loan underwriting endeavor.
2  Q.  It's a large portion of the appraisal business, is it?
3  A.  Yes.
4  Q.  To your knowledge, can you share with the Court the
5  various banks or other financial institutions which accept your
6  appraisals and rely on them?
7  A.  Yes. It's shown on my qualifications, but nearly all of
8  the local banks and even regional and national banks that
9  operate in our community, I'm an approved appraiser for them.
10 That would include Whitney, Capital One, Chase, AmSouth,
11 Fidelity, almost all of them.
12 Q.  Eustis Mortgage?
13 A.  Yes.
14 Q.  Omni Bank?
15 A.  Yes.
16 Q.  How about LaSalle Bank?
17 A.  Yes. LaSalle out of Chicago, yes.
18 Q.  Is that a national bank?
19 A.  Yes.
20 Q.  What about -- is it G.E. Bank?
21 A.  G.E. Capital --
22 Q.  G.E. Capital.
23 A.  -- is a lender on large projects.
24 Q.  On those occasions where you have been asked by financial
25 institutions to appraise property, how have you gone about

131

1  doing that in connection with their consideration of the
2  property as loan collateral?
3  A.  We follow a pretty traditional process. We certainly go
4  out and inspect the property thoroughly; collect all data
5  relevant to its particular characteristics; investigate the
6  market; look for any externalities that might impact the value
7  conclusion; implement any one or all three of the classical
8  evaluation approaches to value -- the cost approach, the income
9  capitalization approach, or the sales comparison approach -- as
10 is needed for that particular assignment.
11         THE COURT: We are going to take a recess until 5:15.
12         MS. BERTAUT: Thank you, Your Honor.
13         THE DEPUTY CLERK: All rise.
14         (WHEREUPON the Court took a brief recess.)
15         THE DEPUTY CLERK: All rise.
16         Court is in session. Please be seated.
17         THE COURT: If any of you hear that at the little
18 talk I gave that I said I was really happy to be there because
19 I was in this horrible hearing, I didn't really mean it.
20 BY MS. BERTAUT:
21 Q.  Mr. Truax, when we left the hearing, we were discussing
22 your work for financial institutions. I just have one or two
23 follow-ups in that area.
24         On the occasions when you have been asked to
25 determine the property values in connection with the financial

133

```
 1  institution extending credit, have you ever employed an AVM to
 2  derive the value of the property?
 3  A.    No.
 4  Q.    Has any financial institution ever asked you to employ an
 5  AVM to ascertain the value of the property?
 6  A.    No.
 7  Q.    Other than financial institutions, can you share with the
 8  Court what other corporations have retained you to appraise
 9  property in the greater New Orleans area?
10  A.    Again, there's a list of my qualifications in the report,
11  but all of the major oil companies, certainly a host of
12  corporations regarding various service businesses, Jiffy
13  Lube -- again, there's a laundry list.
14  Q.    Entergy, Halliburton?
15  A.    Yes.  Lots of oil companies, oil service companies.
16  Q.    Have you ever been retained in litigation?
17  A.    Yes.
18  Q.    Has any court ever retained you to appraise property on
19  its behalf?
20  A.    Yes.
21  Q.    Do you recall which courts?
22  A.    I think it was the 19th district.
23  Q.    If your CV also reflected the 24th JDC, would that be
24  correct?
25  A.    Yes.
```

```
 1  Q.    Has the City of New Orleans ever retained you to appraise
 2  property?
 3  A.    Yes.  I have appraised for the City of New Orleans,
 4  St. Bernard Parish, Terrebonne Parish.
 5  Q.    Have you ever been retained to appraise property for
 6  Loyola University?
 7  A.    Loyola and Tulane as well.
 8  Q.    How about the Archdiocese of New Orleans?
 9  A.    Yes.
10  Q.    Can you tell the Court approximately how many appraisals
11  you have performed in your 30 years?
12  A.    Oh, it would be thousands.
13  Q.    Have all of those been in the greater New Orleans area?
14  A.    No.  There have been, certainly, some that were outside of
15  the metro area, but the majority have been in the greater
16  New Orleans area.
17  Q.    I think we went over this.  You are also a licensed
18  appraiser in the state of Michigan; is that right?
19  A.    That is correct.
20  Q.    Would you say the vast majority of your appraisals have
21  been done in the greater New Orleans area?
22  A.    Absolutely.
23  Q.    Have you frequently appraised property in Gentilly?
24  A.    Yes.
25  Q.    Lakeview?
```

134

```
 1  A.    Yes.
 2  Q.    New Orleans East?
 3  A.    Yes.
 4  Q.    Ninth Ward?
 5  A.    Yes.
 6  Q.    How about the Lower Ninth?
 7  A.    Not as frequently, but yes.
 8  Q.    Throughout St. Bernard?
 9  A.    Yes.
10  Q.    Into Jefferson?
11  A.    Yes.
12  Q.    When you have done these thousands of appraisals, can you
13  just share with us the types of properties you have been asked
14  to evaluate?
15  A.    Yes.  It would be all varieties, from single family to
16  very large industrial facilities, neighborhood commercial, "big
17  box" commercial, shopping centers, office buildings, the whole
18  breadth of -- the broad spectrum of properties that exist in
19  the marketplace.
20  Q.    In each of these appraisals, do you physically inspect the
21  property as part of the appraisal?
22  A.    Yes.  Yes.  That would be true in all of the --
23  particularly any that certainly were related to the mortgage
24  lending, yes.
25  Q.    Is it important in your line of work to stay abreast of
```

135

```
 1  trends that affect real estate?
 2  A.    Absolutely.
 3  Q.    Can you tell us why that is?
 4  A.    Well, one of the principles in our business and in any
 5  valuation effort is the principle of change, so certainly you
 6  have to stay abreast of not only changes in market dynamics but
 7  also in the tools that are out there for you to use as an
 8  appraisal.  So you always try to stay abreast of that through
 9  your continuing education, through reading journals, and the
10  like.
11  Q.    Now, in addition to being a real estate appraiser, have
12  you ever performed any other professional services in
13  connection with real estate?
14  A.    Yes.  As I said earlier, I hold a broker's license and I
15  have acted as an agent in transactions.  I developed a property
16  in the Uptown area of New Orleans, a condominium conversion,
17  and sold the condominium units.
18  Q.    After Katrina did you have an occasion to work as an
19  adjuster in the area?
20  A.    Yes.  After Katrina, as might be expected, many of the
21  appraisal clients were missing in action for a while.  We had
22  the skill set to transition into doing some adjusting, so we
23  did some insurance adjusting for a time.
24  Q.    What was the type of damage that you were being asked to
25  evaluate?
```

### 136

1  A.    We were adjusting for an all-perils carrier, so it was
2  wind and rain damage, but not flood damage.
3  Q.    Were you evaluating the cost of repair of these items?
4  A.    Yes. We were looking to the cost to repair the
5  properties, generally.
6  Q.    You mentioned that it was not flood damage that you were
7  being asked to adjust. Were you aware from your inspection of
8  the homes that some of those homes were also damaged by
9  floodwaters, though?
10 A.    Yes.
11 Q.    Can you tell the Court how many structures you adjusted of
12 property damage caused by general perils in some manner after
13 Hurricane Katrina?
14 A.    It was approximately 100.
15 Q.    Can you tell us the use or nature of the structures that
16 you adjusted?
17 A.    The majority were single-family residences.
18 Q.    Where was this?
19 A.    It was across the metro area, so they had varied
20 locations, but it was all in metro New Orleans, obviously.
21 Q.    Now, beyond the property adjusting since Hurricane
22 Katrina, have you had occasion to appraise properties since the
23 hurricane? Let me back up. Is there a distinction between
24 appraising a property and doing property damage adjusting?
25 A.    Yes. I did not put those in the same pot. The adjustment

### 137

1  was one effort and then the normal appraisal work is, I
2  believe, what you are asking me about now.
3  Q.    Okay. How many properties in the New Orleans area have
4  you appraised since Hurricane Katrina?
5  A.    It's over 400.
6  Q.    Sir, are you currently employed?
7  A.    I'm a part owner in the firm of Truax Robles & Baldwin
8  Appraisers.
9  Q.    I take it from the title that that's an appraisal
10 business?
11 A.    Yes, it is.
12 Q.    Have you ever been certified as an expert by a court
13 before?
14 A.    Yes.
15 Q.    Can you tell the Court how many times?
16 A.    Well, in the last four -- I think it's provided in my
17 report. I have testified 12 times in the last four years, but
18 I've been certified in a host of state courts, federal district
19 court, bankruptcy court, both the Eastern District and Western
20 District.
21 Q.    That was going to be my follow-up question. Have you been
22 recognized as an expert by a judge in this Court?
23 A.    Yes.
24 Q.    Do you have an understanding as to which fields you have
25 been previously accepted as an expert?

### 138

1  A.    Yes. It's been generally in the field of real estate
2  appraisal and consulting.
3  Q.    Has any court ever refused to accept you as an expert?
4  A.    No.
5  Q.    Prior to today, have you ever been the subject of a
6  hearing such as this one known as a *Daubert* hearing?
7  A.    No.
8  Q.    Have you ever reviewed Dr. Kilpatrick's report offered by
9  the plaintiffs?
10 A.    Yes.
11 Q.    What is your understanding of the method that
12 Dr. Kilpatrick has proposed to estimate plaintiffs' damages in
13 this case?
14 A.    Well, clearly --
15          MR. MARTIN: Your Honor, we object as the question is
16 seeking an answer beyond the man's self-admitted
17 qualifications.
18          THE COURT: I'm going to note your objection. I am
19 going to let him answer the question based on his understanding
20 of what the report is.
21          THE WITNESS: I believe he purports to employ a mass
22 appraisal technique, particularly an AVM, to accomplish the
23 task, but his report does not provide details as to exactly how
24 that would be done.
25

### 139

1  BY MS. BERTAUT:
2  Q.    Now, in your practice as an appraiser, are you familiar
3  with mass appraisal processes such as AVMs?
4  A.    Yes. Not from the construction end of that topic, but
5  certainly in terms of my interaction with the results of AVMs.
6  For almost every mortgage lending appraisal that we do, it's a
7  requirement that we research and analyze the assessed value of
8  the property. We have to comment on its compatibility or lack
9  of compatibility with the conclusion we are ultimately reaching
10 in that appraisal, and so it's a matter of routine.
11          While the systems that have been implemented,
12 certainly by the assessors locally, are pretty rudimentary in
13 terms of their, say, using an AVM or mass appraisal, they in
14 fact are -- they use a mass appraisal. That's what they are
15 doing. They are doing mass appraisal when they do assessments.
16 My experience with that is I found that those values that are
17 presented in the assessment data are generally not at all
18 compatible with the values that we are coming up with in the
19 appraisal.
20 Q.    Is the value set by the mass appraisal processes in the
21 area the same as the value that you derive through an
22 individual appraisal?
23 A.    No. It's routinely quite different.
24 Q.    How would you characterize the difference? Would you call
25 it significant?

141

```
 1         MR. MARTIN:  I have to object.  There's no foundation
 2   laid for what underlying study it was, what the scale of
 3   difference is --
 4         THE COURT:  The Court will note your objection.
 5         MR. MARTIN:  -- and, Your Honor, the witness is being
 6   led.
 7         MS. BERTAUT:  Your Honor, we can go back through it.
 8   BY MS. BERTAUT:
 9   Q.   Can you explain to the Court why you are required, when
10   you do an appraisal, to collect the tax assessed value of the
11   property that you are appraising?
12   A.   Well, it can have a bearing on, certainly, I think the
13   underwriting process.  I think the lender wants to know
14   certainly what the tax liability has historically been.  Then
15   we address the issue typically in many of these appraisals as
16   to what the change might be if that property were then assessed
17   at the fair market value that we are concluding because that
18   can have a bearing, particularly for investment properties, on
19   what the net operating income that flows from the operation of
20   that property might be to support a loan payment.  So it's not
21   merely a passing interest for them; they want to know.
22   Q.   How frequently do you collect this information on the
23   properties you are appraising?
24   A.   We do it in all cases when it involves a property that is
25   being appraised for mortgage lending purposes and we generally
```

```
 1   do it in many others as well.
 2   Q.   When you do collect this tax assessed value, do you
 3   compare it to the value that you have derived through your
 4   individual appraisal?
 5   A.   Yes.  It's beyond reporting; it's report and analyze.  So
 6   we do speak to its compatibility or lack thereof with the value
 7   conclusion that's coming from the report.
 8   Q.   A typical appraisal undertaken for a financial institution
 9   that is going to consider the property for collateral, can you
10   give us an example of what the analyzed portion of your
11   appraisal would be with respect to the tax assessed value?
12   A.   Yes.  We would look to the assessed reported value from
13   the assessor's office and -- let us say the property has
14   appraised, hypothetically, for a million dollars and the
15   assessed value is $300,000.  That kind of range is not
16   uncommon, that it would be a factor of three.  So we would
17   state, certainly, that the tax liability -- if the property
18   were sold, that the fair market value we are concluding, let's
19   say, in that appraisal, the tax liability may be substantially
20   higher than has been historically demonstrated.
21   Q.   Can you estimate or tell us how frequently you have found
22   that there are noncomparable values reported in the tax
23   assessed values as against the values you have reached on the
24   properties with individual appraisals?
25   A.   I would say it's a clear majority in my experience.
```

142

```
 1   Q.   Mr. Truax, do you need to be familiar with all the
 2   mathematical formulas that support the tax assessed values in
 3   order to conclude the values they produce are significantly
 4   different than the values you have derived in an appraisal?
 5   A.   No.
 6   Q.   Do you need to have ever constructed an AVM to appreciate
 7   that the values generated by an AVM are not compatible with the
 8   fair market values that you have found in your appraisal?
 9         THE WITNESS:  No.
10         MR. MARTIN:  Objection, Your Honor.
11         THE COURT:  What's the nature of your objection?
12         MR. MARTIN:  There has been no predicate as to what
13   the purpose of the AVM is.  We have been discussing tax
14   assessments, but the question, as posed, was far broader.
15         THE COURT:  The objection is noted.  You can proceed.
16   BY MS. BERTAUT:
17   Q.   Do you believe that only individuals who have designed an
18   AVM are capable of recognizing a disparity between the values
19   reached by an AVM as compared to an individual appraisal?
20   A.   No.
21   Q.   What uses of AVMs, beyond tax assessments, are you aware
22   of in the community?
23   A.   Well, certainly an AVM was utilized early in the Road Home
24   process and did not prove to be successful.  They abandoned
25   that and went to individual property evaluations.
```

143

```
 1   Q.   Have you been recruited or contacted to do any individual
 2   appraisals in connection with the Road Home grant process?
 3   A.   Yes.  The ICF people contacted our office and tried to
 4   recruit us to do appraisal work for them.
 5   Q.   You mentioned tax assessment.  Do you have any familiarity
 6   with the current tax reassessment going on in Orleans Parish?
 7   A.   Yes.  2008 was a reassessment period for Orleans Parish,
 8   so all properties had to be reevaluated.  We had some newly
 9   elected assessors that attempted to implement a more rigid
10   process than had been previously done and employed, I guess,
11   what would be called a "rudimentary AVM."  The results proved
12   to be quite problematic for many, and I have personal
13   experience with some of that.
14         One of my partners, his assessment -- which was
15   admittedly quite low before the reassessment process -- when
16   she implemented her system, it increased by a factor of five
17   and it was tremendously overassessed.  We were called by
18   several individuals -- maybe more than several -- who wanted
19   our assistance to help them combat what they considered to be
20   the faulty valuations that were coming out of that assessment
21   process.
22   Q.   We have also talked in court today about the use of AVMs
23   by financial institutions in the New Orleans area.  Are you
24   aware of the use of AVMs in the financial community here?
25   A.   Yes.  Some of the local banks have used AVMs, particularly
```