145

==with regard to second mortgage and/or lines of credit type situations or as a secondary test, if you will, on the value of a loan portfolio. I am not aware of any that are using AVMs as a primary means of valuing property for, say, a first mortgage loan.==
Q. Let's talk for a minute about the reports that you issued in this case. We have previously offered Truax Defense Exhibit 1 and Truax Defense Exhibit 2. Did you render a written report in this case?
A. Yes.
Q. How many reports did you render?
A. Two: One for the MRGO side; and one for the Levee side.
Q. I'm going to ask you to identify what's been marked as Truax Defense Exhibit 1. I'm going to ask you to give it back to me after you identify it.
       MS. BERTAUT: May I approach the witness, Your Honor?
       THE COURT: Go ahead. You may.
       THE WITNESS: Truax 1 is the MRGO report. I think at the back of what you handed me there are a number of photographs that are attached, as well, that I had taken pictures of the named plaintiffs' properties.
BY MS. BERTAUT:
Q. What is the date of that document?
A. August 28, 2007.
Q. I'm going to show you another document that's been marked

as Truax Defense Exhibit 2. Can you identify that for the Court?
A. Yes. This is the Levee report.
Q. First of all, what date is that, Mr. Truax?
A. I believe that one was September 10, 2007.
Q. There was some discussion as to how many reports, total, you submitted in the case.
A. I submitted two reports: One for MRGO; and one for Levee.
Q. The discussion of materials signed by Mr. Roddewig, can you tell the Court in which of the reports that Mr. Roddewig was involved in?
A. Mr. Roddewig and the Clarion group were involved in the Levee report.
Q. That is Defense Exhibit 2?
A. Correct.
Q. Which report was rendered first?
A. The MRGO report.
Q. Was Mr. Roddewig involved in the MRGO report?
A. No, not at all.
Q. Is it unusual in the appraisal profession to consult with other real estate professionals in conducting consulting work?
A. No. It is very, very usual.
Q. On the occasions that you have consulted with others to produce a report, do you have a policy as to the disclosure of that consultation?

146

A. Yes. It's either disclosed that they were substantial contributors or they actually sign a portion of the report.
Q. Is that your understanding of the standards in the appraisal industry?
A. Yes.
Q. Does Truax Defense Exhibit 1, the MRGO report, set forth the substance of your expected testimony as to the MRGO class?
A. Yes.
Q. Did you sign that report?
A. Yes, I did.
Q. Truax Defense Exhibit 2, the Levee report, does it set forth the substance of your expected testimony in this case?
A. Yes.
Q. Have you signed that report?
A. Yes, I have.
Q. I would like, if you would, for you to take a look at page 151 that Mr. Martin directed you to of Defense Exhibit 2, which is the Levee report, and ask if you can compare the substance of the conclusions reflected on page 151 of the Levee report with the opinions reflected on page 2 of the MRGO report.
A. Well, they are substantially the same. The words are not identical, but the conclusions, the thoughts are essentially the same.
Q. Who drafted Defense Exhibit 1, the MRGO report?

147

A. I can tell you I did that in its entirety.
Q. Are there differences in the Levee and the MRGO report other than the Roddewig consultation?
A. Yes. I mean, certainly in terms of the presentation and how it is put together, yes.
Q. Do I understand there were ten times the number of class representatives in the Levee as in the MRGO?
A. That's correct. There were a total of, I think, 42 properties in Levee and only four in MRGO.
Q. The inspections of the combined 46 class representative properties -- you said you conducted inspections of those properties?
A. I did.
Q. Did you personally go to each property?
A. I did.
Q. I'm going to ask you: Would you say that the conclusions in the Levee report are substantially similar to the conclusions you reached in the MRGO report?
A. Yes. The substance of them are basically identical.
Q. In the interest of time, I'm going to ask you to focus right now on the MRGO report and ask if you can tell me what you were asked to do in the MRGO case.
A. I was basically asked to offer opinions, based upon my experience and training and study, as to the appropriate analysis methodology to be used to provide accurate value and

149

1  damage estimates for properties in the proposed class area. I
2  was also asked to --
3  Q.   Can I stop you there a second? What do you mean by "value
4  and damage estimates"?
5  A.   Well, there would be two issues here. One might certainly
6  be the pre-Katrina value of these properties as it would relate
7  to the ultimate question, which would be the damage issue.
8  Q.   What else were you asked to do?
9  A.   I was asked to comment on the efficacy and reliability of
10 mass appraisal techniques for use in this particular submarket
11 in, again, addressing the value and damage issues.
12 Q.   Did you, in fact, in your report comment on the efficacy
13 and reliability of mass appraisal techniques?
14 A.   Yes.
15 Q.   What was the basis for those opinions?
16 A.   Based upon my general appraisal education, I was certainly
17 aware that AVMs, their result was most reliable and credible
18 when you had a certain set of predicates that existed before
19 you applied that process, and that was that you had generally a
20 homogeneous area and you had a relatively limited number of
21 variables that you had to deal with. So we certainly looked to
22 the area that was proposed for the class and said, "Does that
23 meet that criteria?" and my conclusion was it did not.
24      New Orleans is fairly unusual in terms of the
25 diversity that it demonstrates. I know earlier there was talk

1  about the various neighborhoods. Well, even within those
2  various neighborhoods there can be tremendous differences block
3  to block. Lakeview is the poster child for lack of
4  homogeneity. You had half-a-million or $600,000 homes next to
5  properties that required demolition, basically.
6       So the New Orleans market, with our checkerboard
7  development patterns and its tremendous diversity in terms of
8  aging housing, is just not a good place to apply a mass
9  appraisal technique.
10 Q.   When you were making the conclusions that you did
11 concerning the use of mass appraisals in this case, did you
12 rely on your experience with the assessed values and comparison
13 of those assessed values to the --
14 A.   Well, I was certainly aware that that is a mass appraisal
15 effort, that certainly the results did not prove to be very
16 reliable.
17 Q.   What else were you asked to do in MRGO?
18 A.   I was also asked to look at the adequacy of the
19 plaintiffs' properties as being representative of the breadth
20 of the properties that you found in the entirety of the class.
21 Q.   Let's talk about that a minute. Is the term
22 *representative* a real estate term?
23 A.   No. It wouldn't be one that would be classically used in
24 real estate vernacular, say, in the production of an appraisal
25 report.

150

1  Q.   Is there a term that you use in real estate that means the
2  ability of one property to stand as reflective of another
3  property's value?
4  A.   Yes. I mean, that term is *comparable* and that is the term
5  you generally will see sprinkled throughout most appraisal
6  reports.
7  Q.   Were you also asked in MRGO to discuss the reliability of
8  using the local tax assessment data and values for use as a
9  safety check, if you will, in determining value and damage
10 estimates against a model for the proposed class properties?
11 A.   Yes. My experience in the local markets has been for many
12 years that that data was generally unreliable as an indicator
13 of certainly a value. Even just the raw data you get from the
14 assessors' offices is very, very limited and I know of no one
15 locally that relies on it as a true indicator of value.
16 Q.   In each of the four areas that we have discussed, did you
17 reach opinions in each of those areas?
18 A.   Yes, I did.
19 Q.   Are the opinions that you reached set out in your MRGO
20 report?
21 A.   Yes. On page 2.
22 Q.   I don't want to get into the substance, but I did want to
23 just have you go through the MRGO report and explain to the
24 Court how the report is set up and how it reflects the various
25 opinions, without actually going through the opinions.

151

1  A.   Generally, beyond the cover page, you have an executive
2  summary of salient facts and conclusions. It just outlines
3  what I was asked to do and what the conclusions are.
4       MR. MARTIN:  Your Honor, it's got an index.
5       THE COURT:  True.
6       MR. MARTIN:  It's self-explanatory. We stipulated it
7  says what it says.
8       THE COURT:  Unless there's some specific point you
9  want to make that goes to his expertise --
10      MS. BERTAUT:  Your Honor, I had understood that the
11 claim here is that none of this is acceptable to the
12 plaintiffs, and I wanted the Court to appreciate the amount of
13 work. I also understood in opening argument that Mr. Truax was
14 being criticized for not having done any work and providing no
15 data to the Court. So I think, both those points, plaintiffs
16 have raised the --
17      THE COURT:  I'm not sure he said that, but I'm sure
18 you won't go through each and every thing. You can ask him --
19      MS. BERTAUT:  Let me do this, Your Honor.
20      MR. MARTIN:  My comment was about AVMs, not this.
21      THE COURT:  Go ahead, Counsel. I'm going to assume a
22 lot of time and effort was spent on the report by the witness.
23 BY MS. BERTAUT:
24 Q.   I'm going to ask you to take a look at pages 12 and 13,
25 which is captioned "Applicability/Reliability of Mass Appraisal

153

```
 1  Techniques to Determine Property Values and/or Damages."  Can
 2  you tell us:  What was the purpose of this section of your
 3  report?
 4  A.   Well, the purpose was to essentially test the conclusion
 5  that there was tremendous diversity and variety in at least
 6  this little small portion of the subclass area, which would
 7  make it very difficult to employ an AVM or a mass appraisal
 8  technique and get reliable results for individual properties.
 9           So we studied essentially a nine-block area, the
10  square in which the named plaintiff's property -- in this case,
11  on Charbonnet Street -- was located and any square that touched
12  it.  We just cataloged what we factually observed in terms of
13  the property use or type -- in this case single-family
14  residence, multifamily, commercial, industrial, institutional,
15  and vacant land -- and some of the property characteristics:
16           Was it occupied or vacant at the time of observation?
17  Were they one-stories or one-and-a-half to two-stories?  What
18  kind of foundation did they have, slab or raised pier?  Was
19  their evidence of wind damage?  We looked for those
20  characteristics that might have a bearing on what was at issue
21  in this case, which certainly was elevation and certain
22  particular types of construction.
23  Q.   In the MRGO report, are the photographs associated with
24  that survey set forth in Exhibit C?
25  A.   Yes.  Exhibit C is a compilation of some of the variety
```

```
 1  that was demonstrated photographically in that particular study
 2  area.
 3  Q.   Did you do a similar survey of the nine-block area around
 4  some of the Levee class rep properties as well?
 5  A.   Yes.  We did a similar survey and used the same basic
 6  criteria and did one in each of the proposed subclass areas.
 7  So there were a total of five done in the Levee case.
 8  Q.   Where is that set forth in your report?
 9  A.   Yes.  That's in Exhibit D and I believe it begins on --
10  the details of those studies I believe on page 41, then it
11  extends back into the report because there are, as I said, five
12  in that case.
13  Q.   Have you ever been asked to do an appraisal to determine
14  the general impact of an event on a community?
15  A.   On a community?  We have certainly done appraisals to
16  assess the impact of, say, takings and condemnations, but in
17  terms of for a whole community, no.
18  Q.   Is it within your expertise as an expert appraiser to
19  conclude that a process is unreliable when it has consistently
20  produced inaccurate appraisal results in multiple instances?
21  A.   Oh, absolutely, because basically our standards require
22  that of us in that any application, even if it's an accepted
23  methodology, if it's producing unreliable results, our
24  standards would tell us we shouldn't employ it because
25  reasonable, credible results are the key to any appraisal
```

154

```
 1  process.
 2  Q.   Would you recommend to a client the use of a process that
 3  has previously failed to produce reliable and accurate results?
 4  A.   No.
 5           MS. BERTAUT:  I think that might be all I have,
 6  Judge.
 7           THE COURT:  Take your time.
 8           MS. BERTAUT:  Hearing nothing further --
 9           THE COURT:  I have a few questions.  I'll let you, if
10  you want, to follow up.
11           MS. BERTAUT:  Sure.
12           THE COURT:  Just a few, believe me.  I don't want to
13  keep you too long.
14           You talked about the tax assessment, the tax
15  assessors use what I think you term rudimentary -- is it AVMs?
16           THE WITNESS:  Correct.
17           THE COURT:  Do you know, first, prior to the recent
18  firestorm we had in New Orleans, how often did the tax
19  assessors reappraise then reassess?
20           THE WITNESS:  They were required by state law on a
21  four-year cycle to absolutely do it.
22           THE COURT:  Right.
23           THE WITNESS:  Now, some of the more progressive
24  jurisdictions, not necessarily in this locale, tried to do it
25  annually through usually an indexing system and they would try
```

155

```
 1  to address those issues that they could.  Some do what they
 2  call "sales chasing."  Jefferson Parish was particularly good
 3  at that.  If you sold your house for half a million dollars, it
 4  pretty well went on the rolls at half a million dollars, but by
 5  state law they had to do it and report that to the state tax
 6  commissioner every four years.
 7           THE COURT:  So is it your understanding they would
 8  use, in order to do that, every four years, at least, some type
 9  of AVM process to do that?
10           THE WITNESS:  Well, an AVM --
11           THE COURT:  "They," I'm talking about Jefferson and
12  Orleans.
13           THE WITNESS:  Yes.  An automated valuation model is
14  just a system that is automated in the sense that it
15  produces -- you put an input in and you get a result.  It can
16  be very rudimentary; that is, you can do it strictly based upon
17  one variable or you could have it be a lot more complex.
18           THE COURT:  I'm looking at the conclusion in I think
19  it's the Levee.  I'm going to read it to you:
20           "The types of mass appraisal techniques that are
21  advocated in the expert report of Dr. Kilpatrick are prone to
22  high rates of error that make them inappropriate for fair and
23  accurate determination of damages in the New Orleans
24  marketplace."
25           Okay.  Are you familiar with the appraisal
```

156

```
 1   techniques purported to be utilized by Dr. Kilpatrick as
 2   opposed to the appraisal techniques utilized in the AVMs the
 3   tax assessors use and how they match up, if they do?
 4            THE WITNESS:  Well, both are an effort at mass
 5   appraisal and certainly have an automated valuation element to
 6   them in that there will be inputs and then there's an output
 7   and there's an attempt to have a system that is calibrated and
 8   will produce fairly uniform results.  That's the attempt.
 9                 Well, one problem certainly that I have alluded
10   to earlier, I can't tell you definitively what Dr. Kilpatrick
11   is going to do.  I mean, I conceptually understand what you
12   would do to potentially build a model, but there's no detail
13   there to say exactly how.  As I've said, it can be as simple as
14   a one-variable system to a very complex system.  What I do know
15   is, based upon the results of a rudimentary system as applied
16   by assessors in the local market, the results were generally
17   not very good.
18            THE COURT:  Okay.  I know you certainly haven't
19   testified to this, and I'm sure you will acknowledge that even
20   appraisals done on the ground by independent appraisers, who
21   are qualified, vary?
22            THE WITNESS:  Absolutely.
23            THE COURT:  Any follow-up at all?
24            MS. BERTAUT:  No, Your Honor.  Thank you.
25
```

157

```
 1                       REDIRECT EXAMINATION
 2   BY MR. MARTIN:
 3   Q.   The obligatory question:  During the break, did you
 4   discuss your prospective testimony?
 5   A.   No.
 6   Q.   Thank you.  Mr. Truax, after 30 years of obtaining various
 7   licenses, attending mandatory continuing education, joining
 8   associations, you are still not an AVM expert?
 9   A.   I would not hold myself out to be an expert in AVMs.
10   Q.   You do not hold yourself out as being a mass appraisal
11   expert?
12            THE COURT:  We have established that.
13            MR. MARTIN:  We have gone through that.
14            THE COURT:  The question is:  Does he have enough
15   expertise to say, "These things are bad because my appraisals
16   show a substantial difference"?  That's one of the things.
17   BY MR. MARTIN:
18   Q.   Now, your service as a mortgage loan appraiser for the
19   sale of homes has nothing to do with mass appraisal, does it?
20   A.   No.  Those were individual property appraisals.
21   Q.   Your acceptance by various banks and lending institutions
22   as an appraiser has nothing to do with mass appraisal, does it?
23   A.   That's correct.
24   Q.   You have never used or employed AVMs, so you are not
25   qualified to opine upon any methodology proposed by
```

158

```
 1   Dr. Kilpatrick, are you?
 2   A.   No, I would disagree with that.  As I said, as a part of
 3   my general appraisal training, I certainly am aware -- an AVM
 4   is merely an appraisal tool.  The Appraisal Institute,
 5   remember, it says that the output of an AVM is not an
 6   appraisal.  It is what it is.  It is not an appraised value.
 7   It is just the output of that system.  It is an appraisal tool
 8   that an appraiser can use for guidance, but it is not
 9   considered an appraisal.  I am certainly able, based upon my
10   general education and training as a appraiser, to comment as to
11   whether I think that tool is applicable given the set of
12   circumstances and facts that I find in a given marketplace.
13   Q.   I asked you about the methodology Dr. Kilpatrick proposes
14   to use.  Isn't it true that you are not qualified to opine upon
15   his proposed methodology?  He is an expert in AVMs.  You admit
16   you are not.
17   A.   Well, I think I can opine as to the general application of
18   the methodology, which would be an AVM.  I do not believe,
19   based upon my training and experience and knowledge, given the
20   lack of homogeneity and the other facts that we have discussed,
21   as to it being an applicable tool to use in this particular
22   case.
23   Q.   You spoke about collection of tax data.  That was with
24   respect to single appraisals; is that correct, sir?
25   A.   Yes.  That's generally accomplished on a
```

159

```
 1   property-to-property basis.
 2   Q.   Okay.  So that has nothing to do with mass appraisal, does
 3   it?
 4   A.   Not in terms of a mass appraisal effort.  But, certainly,
 5   as I have said, I have appraised thousands of properties, so
 6   it's a lot of properties.
 7   Q.   Now, tax assessed value is different than loan value,
 8   isn't it, on a property?  They have two different purposes?
 9   A.   Yes.
10   Q.   Very often what you can sell a house for or what an
11   appraiser says a house is worth is different than what you pay
12   taxes on?  Those are different numbers, aren't they?
13   A.   I think I have said, in this particular locale, they are
14   very different in many, many cases, but I think by state law
15   they are supposed to be the same.
16   Q.   But the way you equalize them is a recent sale; is that
17   correct?  If you sell a house, that should be the next assessed
18   value?  Did you say that?
19   A.   Well, that's true to a point.  As I said, a lot of the
20   jurisdictions do what they call "sales chasing," but that is
21   not the preferred method to establish the databases as I
22   understand what the assessors are supposed to be doing.
23   Q.   Tax assessments and the appraisals you do for lending
24   institutions are two different things, aren't they?
25   A.   They are certainly two different purposes for
```