```
                UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF LOUISIANA

IN RE: KATRINA CANAL BREACHES   * CIVIL ACTION
                                * NO. 05-4182
PERTAINS TO: BARGES             * Consolidated
                                * SECTION "K(2)"
Boutte v. Lafarge       05-5531 *
Mumford v. Ingram       05-5724 * JUDGE DUVAL
Lagarde v. Lafarge      06-5342 *
Perry v. Ingram         06-6299 * MAG. WILKINSON
Benoit v. Lafarge       06-7516 *
Parfait Family v. USA   07-3500 *
Lafarge v. USA          07-5178 *
  *   *   *   *   *   *   *   * *

           Deposition of WILLIAM J. THOMASSIE,
   P.E., given at Chaffe McCall, L.L.P., 2300
   Energy Centre, 1100 Poydras Street, New
   Orleans, Louisiana 70163-2300, on September
   10th, 2008.

   REPORTER BY:
          JOSEPH A. FAIRBANKS, JR., CCR, RPR
             CERTIFIED COURT REPORTER #75005
```

Page 1

1  APPEARANCES:
2  REPRESENTING THE BARGE PSLC:
3      KHORRAMI, POLLARD & ABIR, L.L.P.
4      (BY:  H. SCOTT LEVIANT, ESQUIRE)
5      (BY:  DYLAN POLLARD, ESQUIRE)
6      444 South Flower Street, 33rd Floor
7      Los Angeles, California 90071
8      213-596-6000
9
10 REPRESENTING LAFARGE NORTH AMERICA:
11     GOODWIN PROCTOR, L.L.P.
12     (BY:  MARK S. RAFFMAN, ESQUIRE)
13     901 New York Avenue, NW
14     Washington, D.C. 20001
15     202-346-4000
16 - and -
17     LAFARGE NORTH AMERICA, INC. LEGAL
18     DEPARTMENT
19     (BY:  PETER L. KEELEY, ESQUIRE)
20     12950 Worldgate Drive, Suite 500
21     Herndon, Virginia 20170
22     703-956-3437
23 - and -
24
25

Page 2

1      CHAFFE MCCALL, L.L.P.
2      (BY: DEREK WALKER, ESQUIRE)
3      2300 Energy Centre
4      1100 Poydras Street
5      New Orleans, Louisiana 70163-2300
6      504-585-7000
7
8  REPRESENTING NEW YORK MARINE & GENERAL
9  INSURANCE COMPANY:
10     SUTTERFIELD & WEBB, LLC
11     (BY:  DANIEL A. WEBB, ESQUIRE)
12     650 Poydras Street, Suite 2715
13     New Orleans, Louisiana 70130
14     504-598-2715
15
16 ALSO PRESENT:
17     CHRIS ALFIERI, ESQ.
18     NICOLE BOYER, ESQ.
19     WILLIAM EMORY, ESQ.
20     RICHARD PAVLICK, ESQ.
21
22 VIDEOGRAPHER:
23     GILLEY DELORIMIER (DEPO-VUE)
24
25

Page 3

1           E X A M I N A T I O N   I N D E X
2
3  EXAMINATION BY:                         PAGE
4
5  MR. LEVIANT .................................6
6  MR. HANNA   ...............................82
7           E X H I B I T   I N D E X
8
9  EXHIBIT NO.                              PAGE
10 Exhibit Plaintiffs 1 ........................67

Page 4

1 (Pages 1 to 4)

```
 1         S T I P U L A T I O N
 2         IT IS STIPULATED AND AGREED by and
 3    among counsel for the parties hereto that the
 4    deposition of the aforementioned witness may be
 5    taken for all purposes permitted within the
 6    Federal Rules of Civil Procedure, in accordance
 7    with law, pursuant to notice;
 8         That all formalities, save reading
 9    and signing of the original transcript by the
10    deponent, are hereby specifically waived;
11         That all objections, save those as to
12    the form of the question and the responsiveness
13    of the answer, are reserved until such time as
14    this deposition, or any part thereof, is used
15    or sought to be used in evidence.
16
17
18              * * *
19
20
21
22         JOSEPH A. FAIRBANKS, JR., CCR, RPR,
23    Certified Court Reporter in and for the State
24    of Louisiana, officiated in administering the
25    oath to the witness.
                                              Page 5
```

```
 1         WILLIAM J. THOMASSIE, P.E.
 2    2626 Canal Street, Suite 202, New Orleans,
 3    Louisiana 70119, a witness named in the above
 4    stipulation, having been first duly sworn, was
 5    examined and testified on his oath as follows:
 6    EXAMINATION BY MR. LEVIANT:
 7      Q.  Good morning, Mr. Thomassie.
 8      A.  Good morning.
 9      Q.  The oath that you have just given is
10    the same that you would give in a court of law.
11    Do you understand that?
12      A.  Yes, I do.
13      Q.  I would ask you a series of questions
14    today.  Will you please promise me that if you
15    are guessing as to an answer you'll let me know
16    that?
17      A.  Sure.
18      Q.  And do you know of any reason why you
19    can't give your best testimony today?
20      A.  No, I do not.
21      Q.  Have you ever been deposed before?
22      A.  Yes, I have.
23      Q.  On how many occasions?
24      A.  Two or three.
25      Q.  And can you please tell me
                                              Page 6
```

```
 1    approximately when those depositions occurred?
 2      A.  Within the last five years.  The most
 3    recent being approximately a year ago.
 4      Q.  And why did you give a deposition a
 5    year ago?
 6      A.  I was providing expert witness
 7    testimony on a legal case.
 8      Q.  What type of case was it?
 9      A.  It was a structural damage case
10    involving a marine dock here in the river.
11      Q.  Have you ever provided a deposition as
12    a party to litigation?
13      A.  I don't understand what you mean.
14      Q.  Have you ever been a plaintiff or a
15    defendant and given a deposition because of
16    that?
17      A.  No.  My only deposition testimony has
18    come, um -- similar to what we're here for
19    today, based on a report that I presented, to
20    discuss that.
21      Q.  Have you ever testified in court?
22      A.  Yes, I have.
23      Q.  On how many occasions?
24      A.  Once.
25      Q.  When was that?
                                              Page 7
```

```
 1      A.  I believe that was November of last
 2    year, 2007.
 3      Q.  And why were you testifying in court
 4    in November of 2007?
 5      A.  I was an expert witness on the case
 6    that I just referred to that I was deposed for
 7    recently.
 8      Q.  That was the case about marine dock
 9    damage?
10      A.  Yes.
11      Q.  Was that marine dock damage connected
12    in any way to Hurricane Katrina?
13      A.  No, it wasn't.
14      Q.  Was it connected to any hurricane?
15      A.  No, it wasn't.
16      Q.  What opinions have you reached in this
17    litigation?
18      A.  Um -- all of my opinions are
19    formulated and presented in the report, which I
20    brought a copy with me to have handy today.
21    Um -- they're basically three different
22    findings:  First, the scope of my study was to
23    investigate the structural condition and
24    responses of properties within the class
25    certification area, and that included all the
                                              Page 8
```

**Page 9**

properties between the Inner Harbor Navigation Canal, which in my report is referred to as the IHNC -- that's the common vernacular that we'll probably use a lot today -- between the IHNC, Paris Road at Chalmette, the Mississippi River and the Florida Avenue/40 Arpent Canal boundary to the north.

Within that area, I reviewed a lot of the properties in the area, and there were three specific findings that we came up with through that review. The first was that the properties within the area that I just described experienced damage as a result of multiple causes, whether it was flood, wind, rain, fire or, um -- some other various damages that were observed; second finding was that each individual property, depending on whether or not it was a residence or a commercial building or if it was two-story or one-story, or if it was new or it was old, that each building behaved a little differently based on what its specific circumstance was; and then the third component was, um -- we saw a difference in the response of each building depending on where it was located. If it was

**Page 10**

located immediately near the breaches it responded one way, if it was far away from the breaches it may have responded another way. If it was on high ground in a sheltered neighborhood it may have fared better than if it was on low ground in a more vulnerable area.

Q. Have you just told me all of the opinions that you are offering in this case?

A. I'm not going to say that that limits it to all of the opinions, but that's basically the high level 1, 2, 3 bullet points of the report. The primary conclusions in the report and the study.

Q. Is it fair to say that you have just told me all of the principal conclusions that you reached?

A. Principal, yes.

Q. Is it fair to say that any other opinions you have are ancillary to the three points you've just testified to?

A. Yes.

Q. I just want to make sure that I fully understand those conclusions that you've reached. The first conclusion is that the property damage experienced by buildings within

**Page 11**

the defined class boundary varied as to the cause of the damage --

A. That's correct.

Q. -- is that correct?

A. That is correct.

Q. The second is that buildings within the defined class boundary performed differently based on characteristics of the building.

A. That's correct.

Q. And third, the extent of damages to buildings within the defined class boundary varied by location within the class zone.

A. That's correct.

Q. I want to work through each of the three of these major conclusions and go in order starting with the first conclusion that the condition of the -- that the damage to the building varied as to the cause of the damage.

What did you do in the preparation of your report to determine how damage varied by cause?

A. Everything that I reviewed was purely based on visual evidence, whether it was in the form of aerial photographs, ground level

**Page 12**

photographs, ground level videos, um -- site visits. And then most recently, well, within the last few months, we did representative property inspections on the twelve properties that were offered for the class representation. So each one of those properties I personally inspected inside and out. But otherwise, everything that I'm relying upon is visual evidence. Documentation.

Q. Why did you rely upon visual inspection of properties to reach your first conclusion?

A. I had to look at each individual property and look at properties to see what their reaction was. A property that may have been damaged by flood, um -- would have different characteristics potentially to a property that was damaged by wind. Obviously a property that was damaged by fire would look significantly different than it would if it were not, if it had not burned. So I was looking at visual evidence to see if I could see if there was roof damage, if that was in the form of missing shingles or missing siding. Or if in the case of a building that may have