```
              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF LOUISIANA

IN RE: KATRINA CANAL BREACHES  * CIVIL ACTION
                               * NO. 05-4182
PERTAINS TO: BARGES            * Consolidated
                               * SECTION "K(2)"
Boutte v. Lafarge      05-5531 *
Mumford v. Ingram      05-5724 * JUDGE DUVAL
Lagarde v. Lafarge     06-5342 *
Perry v. Ingram        06-6299 * MAG. WILKINSON
Benoit v. Lafarge      06-7516 *
Parfait Family v. USA  07-3500 *
Lafarge v. USA         07-5178 *
* * * * * * * * * * *

       Deposition of KENNETH J. BOUDREAUX,
PH.D., given at Chaffe McCall, L.L.P., 2300
Energy Centre, 1100 Poydras Street, New
Orleans, Louisiana 70163-2300, on September
17th, 2008.

REPORTER BY:
       JOSEPH A. FAIRBANKS, JR., CCR, RPR
       CERTIFIED COURT REPORTER #75005
```
Page 1

1  APPEARANCES:
2  REPRESENTING THE BARGE PSLC:
3      KHORRAMI, POLLARD & ABIR, L.L.P.
4      (BY: H. SCOTT LEVIANT, ESQUIRE)
5      444 South Flower Street, 33rd Floor
6      Los Angeles, California 90071
7      213-596-6000
8  - and -
9      BRIAN A. GILBERT, P.L.C.
10     (BY: BRIAN A. GILBERT, ESQUIRE)
11     821 Baronne Street
12     New Orleans, Louisiana 70113
13     504-885-7700
14
15 REPRESENTING LAFARGE NORTH AMERICA:
16     GOODWIN PROCTOR, L.L.P.
17     (BY: MARK S. RAFFMAN, ESQUIRE)
18     901 New York Avenue, NW
19     Washington, D.C. 20001
20     202-346-4000
21 - and -
22
23
24
25
Page 2

1      CHAFFE MCCALL, L.L.P.
2      (BY: DEREK WALKER, ESQUIRE)
3      (BY: CHARLES BLANCHARD, ESQUIRE)
4      2300 Energy Centre
5      1100 Poydras Street
6      New Orleans, Louisiana 70163-2300
7      504-585-7000
8
9  ALSO PRESENT:
10     CHRIS ALFIERI, ESQ.
11     NICOLE BOYER, ESQ.
12     DARCY DECKER, ESQ.
13     RICHARD PAVLICK, ESQ.
14
15 PRESENT VIA I-DEP:
16     KIRK AURANDT, ESQ.
17
18
19
20
21
22
23
24 VIDEOGRAPHER:
25     GILLEY DELORIMIER (DEPO-VUE)
Page 3

1           E X A M I N A T I O N   I N D E X
2
3  EXAMINATION BY:                          PAGE
4
5  MR. LEVIANT ................................6
6           E X H I B I T   I N D E X
7
8  EXHIBIT NO.                              PAGE
9  Exhibit 1   ...............................17
10
Page 4

1 (Pages 1 to 4)

```
 1          STIPULATION
 2       IT IS STIPULATED AND AGREED by and
 3  among counsel for the parties hereto that the
 4  deposition of the aforementioned witness may be
 5  taken for all purposes permitted within the
 6  Federal Rules of Civil Procedure, in accordance
 7  with law, pursuant to notice;
 8       That all formalities, save reading
 9  and signing of the original transcript by the
10  deponent, are hereby specifically waived;
11       That all objections, save those as to
12  the form of the question and the responsiveness
13  of the answer, are reserved until such time as
14  this deposition, or any part thereof, is used
15  or sought to be used in evidence.
16
17
18            * * *
19
20
21
22       JOSEPH A. FAIRBANKS, JR., CCR, RPR,
23  Certified Court Reporter in and for the State
24  of Louisiana, officiated in administering the
25  oath to the witness.
                                          Page 5
```

```
 1       KENNETH J. BOUDREAUX, PH.D.
 2  1424 Bordeaux Street, New Orleans, Louisiana
 3  70115, a witness named in the above
 4  stipulation, having been first duly sworn, was
 5  examined and testified on his oath as follows:
 6  EXAMINATION BY MR. LEVIANT:
 7    Q.  Good morning, Dr. Boudreaux.
 8    A.  Good morning.
 9    Q.  My name is Scott Leviant.  We've
10  informally introduced ourselves before the
11  deposition started.
12       First of all, do you understand that
13  the oath you've given just now is the same oath
14  you'd give if you were testifying in court?
15    A.  I do.
16    Q.  I'm going to ask you a series of
17  questions today.  You will please be sure to
18  let me know if you're guessing as to any part
19  of your answer?
20    A.  Yes.
21    Q.  Is there any reason why you can't give
22  your best testimony this morning?
23    A.  No.
24    Q.  Have you ever been deposed before?
25    A.  Yes.
                                          Page 6
```

```
 1    Q.  About how many times?
 2    A.  It would be a guess, but it's been
 3  hundreds of times.
 4    Q.  And have those depositions occurred
 5  for the most part in civil litigation?
 6    A.  I think with one exception, yes.
 7    Q.  Have you been retained as an expert to
 8  testify on behalf of both plaintiffs and
 9  defendants in various cases?
10    A.  Yes.
11    Q.  Without reviewing your entire
12  deposition history, can you give me your best
13  estimate of the number of times you have
14  testified on behalf of defendants as opposed to
15  plaintiffs?
16    A.  To give you a, um -- an informative
17  answer, I would have to separate that into two
18  main types of litigation.  In personal injury
19  and wrongful death litigation, about 80 percent
20  of the time I'm retained by defendants.  So I
21  would guess my testimony for defendants has
22  been about that proportion in that type of
23  litigation.  In the other type, which I call
24  commercial litigation, which would include this
25  and other kinds of things like antitrust and
                                          Page 7
```

```
 1  contract disputes and so forth, it's about
 2  evenly split between plaintiff and defendant.
 3    Q.  In this particular lawsuit, about when
 4  were you retained as an expert by Lafarge?
 5    A.  It's probably been four, six months
 6  ago.
 7    Q.  And at the time of your retention what
 8  were you told that your assignment would be?
 9    A.  I was told that I was going to be
10  asked to evaluate the viability of a class
11  designation for business owners in this matter.
12    Q.  And does that essentially sum up your
13  entire assignment as an expert in this matter?
14    A.  I believe so.
15    Q.  Thinking back over the times you've
16  served as an expert witness in litigation, how
17  many times have you testified as an expert in a
18  class action?
19    A.  In a class action.
20    Q.  Yes.
21    A.  Um -- I would guess probably between a
22  half dozen and ten times.  Again, that's a
23  rough estimate.
24    Q.  Excluding this case, in any of the
25  other times you have offered expert opinions in
                                          Page 8
```

**Page 9**

```
 1  cases where a class certification was sought,
 2  how many times have you offered an opinion
 3  about the viability of class treatment of an
 4  issue?
 5     A.  If I understand your question, your
 6  question is limited to the issue of class
 7  certification.
 8     Q.  Yes.
 9     A.  There's been only one other time that
10  I can recall.
11     Q.  Can you recall the name of that
12  matter?
13     A.  Um -- I believe its formal name is
14  Oliver versus Orleans Parish School Board and a
15  Louisiana, um -- Restoration District or
16  something like that.
17     Q.  And what class-related issue were you
18  asked to opine on?
19     A.  It was an issue of class certification
20  where the plaintiffs were school teachers who
21  had been terminated by either the school board
22  or the restoration or reconstruction district.
23  I'm getting that name wrong.  I'll come up with
24  it eventually, but it's something like that.
25     Q.  What opinion related to certification
```

**Page 10**

```
 1  did you offer in that matter?
 2     A.  Um -- the opinion I offered was that
 3  the methodology that had been proposed for the
 4  calculation of damages on the part of
 5  plaintiffs as a class was not one that would
 6  produce reasonable results.
 7     Q.  In that case did you offer what you
 8  believe would be the correct methodology?
 9     A.  I offered what would be a correct
10  methodology for the calculation of damages at
11  the level of plaintiffs, yes.
12     Q.  In that case was it your opinion that
13  damages had to be calculated on an individual
14  basis?
15     A.  Yes.
16     Q.  Turning back to the assignment you had
17  in this case which was the address the issue of
18  whether business loss, liability and damages
19  could be addressed on a class basis, did you
20  reach any conclusions?
21     A.  Yes.
22     Q.  What conclusions have you reached in
23  this case?
24     A.  Well, they essentially are captured in
25  my report, but in a nutshell, um -- it's my
```

**Page 11**

```
 1  view that any methodology that attempts to
 2  perform aggregative analysis of damages and
 3  related causality in this matter from the
 4  perspective of businesses that were damaged or
 5  interrupted in the area at issue is not
 6  destined to produce valid results.
 7     Q.  Can you think of any other conclusions
 8  you've reached?  Any major conclusion.
 9     A.  Well, again, my report is a portrayal
10  of what my analysis and conclusions are.  I
11  guess a related conclusion was that the
12  proposed methodology, as I read the Kilpatrick
13  report, I didn't believe that that was a
14  methodology that would perform as the
15  Kilpatrick report alleges it would have.
16     Q.  Do you believe that your report sets
17  forth all of the conclusions you've reached in
18  this matter?
19     A.  Certainly those that came to mind.
20  It's certainly possible that there are related
21  or subcategories that could come up in
22  discussion that would expand that, but I'm
23  willing to stand on that report as I sit here
24  today.
25     Q.  After you were given your assignment
```

**Page 12**

```
 1  in this case, what did you do to get yourself
 2  to the point where you would have a conclusion
 3  in mind?
 4     A.  Well, I read the Kilpatrick report.  I
 5  looked at the documents that are listed in my
 6  report.  I did some informal investigation of
 7  the area at issue and -- again, informally, the
 8  easily obtainable data about the businesses
 9  that were there prior to the storm.  I then
10  relied on my familiarity with business damage
11  calculations to make a judgment in my view of
12  what would be necessary in order for there to
13  be a viable methodology constructed that would
14  use aggregative methods to produce reasonable
15  damage estimates.  I listed those in my report
16  and evaluated as to whether I felt those
17  conditions existed here.  And it was my
18  conclusion that they didn't.
19     Q.  Have you ever constructed an
20  econometric model?
21     A.  Of any sort?
22     Q.  Yes.
23     A.  Sure.  Yes.
24     Q.  Have you ever constructed a
25  econometric report for analyzing any aspect of
```

3 (Pages 9 to 12)