**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

In re:  KATRINA CANAL BREACHES
CONSOLIDATED LITIGATION

PERTAINS TO:  BARGE

Mumford v. Ingram          05-5724

CIVIL ACTION

Case No.:  05-4182
and consolidated cases

SECTION "K" (2)

COMPLAINT (7TH AMENDED AND
CONSOLIDATED)   CLASS ACTION

Hon. Stanwood R. Duval, Jr.
Magistrate Judge Joseph C. Wilkinson, Jr.

| | | |
|---|---|---|
| IN RE:  KATRINA CANAL BREACHES | * | |
| CONSOLIDATED LITIGATION | * | CIVIL ACTION |
| | * | |
| | * | NO. 05-4182 |
| PERTAINS TO:  BARGE | * | and consolidated cases |
| | * | |
| | * | SECTION "K"  (2) |
| Boutte v. Lafarge          05-5531 | * | |
| Mumford v. Ingram          05-5724 | * | |
| Lagarde v. Lafarge          06-5342 | * | JUDGE |
| Perry v. Ingram          06-6299 | * | STANWOOD R. DUVAL, JR. |
| Benoit v. Lafarge          06-7516 | * | |
| Parfait Family v. USA          07-3500 | * | MAG. JUDGE |
| Lafarge v. USA          07-5178 | * | JOSEPH C. WILKINSON, JR. |

**Style Definition:** Normal: Font: 12 pt, Not Expanded by / Condensed by , Line spacing: single, Don't adjust space between Latin and Asian text, Don't adjust space between Asian text and numbers

**Style Definition:** Heading 1: Font: (Default) Times New Roman, No underline, Underline color: Auto, Font color: Auto, Not Expanded by / Condensed by , Space After:  12 pt, Add space between paragraphs of the same style, Line spacing:  single, Outline numbered + Level: 1 + Numbering Style: I, II, III, … + Start at: 1 + Alignment: Left + Aligned at:  0" + Tab after:  0.25" + Indent at:  0", Widow/Orphan control

**Style Definition:** Heading 2: Font: (Default) Times New Roman, Underline, Font color: Auto, Not All caps, Not Expanded by / Condensed by , Space After:  12 pt, Add space between paragraphs of the same style, Line spacing: single, Outline numbered + Level: 2 + Numbering Style: A, B, C, … + Start at: 1 + Alignment: Left + Aligned at:  0.5" + Tab after:  0.75" + Indent at:  0.5", Widow/Orphan control, Don't keep lines together

**Style Definition:** Heading 3: Font: Bold, Underline color: Auto, Font color: Auto, Not Expanded by / Condensed by , Indent: Left:  1", Hanging:  0.5", Space After:  12 pt, Line spacing:  single, Outline numbered + Level: 3 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at:  1" + Tab after:  1.25" + Indent at:  1", Widow/Orphan control

**Style Definition** ... [15]
**Style Definition** ... [14]
**Style Definition** ... [13]
**Style Definition** ... [12]
**Style Definition** ... [11]
**Style Definition** ... [10]
**Style Definition** ... [9]
**Style Definition** ... [8]
**Style Definition** ... [7]
**Style Definition** ... [6]
**Style Definition** ... [5]
**Style Definition** ... [4]
**Style Definition** ... [3]
**Style Definition** ... [2]
**Style Definition:** ParaNumber: Tab stops: 0.25", List tab
**Style Definition** ... [1]
**Formatted:** Normal

## BARGE PLAINTIFFS' SEVENTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR DAMAGES

**I.**

**JURISDICTION~~,~~ AND VENUE ~~AND ELECTION UNDER RULE 9(h)~~**

1.      Jurisdiction is specifically conferred on this Court by various federal statutes including, but not limited to, the following:  Diversity of Citizenship, pursuant to 28 U.S.C. § 1332; and Admiralty or Maritime jurisdiction pursuant 28 U.S.C. § 1333.  In addition, this Court has jurisdiction over this action for maritime tort damages, pursuant to the Extension of Admiralty Act, 46 U.S.C. § 30101(a) ("The admiralty and maritime jurisdiction of the United States extends to and includes cases of injury or damage, to person or property, caused by a vessel on navigable waters, even though the injury or damage is done or consummated on land.").  Jurisdiction over any Louisiana State cause of action contained in this Complaint arises, in part, under the doctrine of supplemental jurisdiction, 28 U.S.C. § 1367(a).

2.      Venue as to each Defendant is proper in this District pursuant to 18 U.S.C. § 1965, because each of the Defendants resides, is found, has an agent, controls and/or transacts affairs in this District.  In addition, the Defendants are engaged in interstate and foreign commerce, and a substantial part of the events giving rise to the claims for violations of federal law occurred in this District, all in the course of interstate and foreign commerce.

**II.**

**PARTIES**

**A.    PLAINTIFFS**

3.      **Plaintiff ETHEL MAE COLEMAN MUMFORD**:  At the time of the flooding subject of this suit, Ms. Mumford resided at 4829 Burgundy Street, New Orleans, Louisiana 70117, in the Lower Ninth Ward.  Mrs. Mumford is approximately 81 years old and works as a cleaning service provider.  She owns her residence, which was a single-family, one story house of approximately 1200 square feet, on a 45' x 115' lot, together with a carport,

garage, and patio.  She resides now at 1423 Feliciana Street, New Orleans, Louisiana 70117.

Ms. Mumford also owns rental properties in the Lower Ninth Ward, including properties at:

> (a)      6101 N. Robertson Street;
>
> (b)      6105-07 N. Robertson Street;
>
> (c)      6113-15 N. Robertson Street; and,
>
> (d)      4829 Burgundy Street.

All of these properties were damaged by flooding proximately caused by Defendants.  Of

these properties, the property at 6113-15 N. Robertson has been restored by Diamond

Construction at a cost of $109,000.00.  Ms. Mumford has also begun the restoration process

the 4829 Burgundy Street.

4.      Mrs. Mumford suffered damages as a result of the breaches of the eastern

Industrial Canal floodwall, which damages were proximately caused by Defendants, on

August 29, 2005.  Ms. Mumford is a proposed Class Representative for ~~Sub-Class~~Subclass

One, described *infra*.

~~5.~~      **Plaintiff JOSEPHINE LONG RICHARDSON**:  At the time of the flooding

made the subject of this suit, Mrs. Richardson resided with her late husband, Joseph

Richardson, at 1321 Egania Street, New Orleans, Louisiana 70117, in the Lower Ninth Ward.

She is approximately 81 years old, and was formerly a cashier for K&B.  She owns that

property, a single -family, one story house on a lot approximately 120' x 30'. She has been

unable to return to her home for an extended period, residing for a time at 9696 Hayne

Boulevard, Apt. 13, New Orleans, Louisiana 70127.  Recently, her property at 1321 Egania

Street was restored sufficiently to render it habitable.  At the time of the storm, her husband,

Joseph Richardson, sent Mrs. Richardson to safety, while he remained to secure their family

home.  Mr. Richardson became trapped in the attic and drowned due to the flooding caused by

ING 4727.  Mrs. Richardson suffered damages as a result of the breaches of the eastern

Industrial Canal floodwall, which damages were proximately caused by Defendants, on

August 29, 2005.  Mrs. Richardson is also bringing a wrongful death claim on behalf of her

late husband, Joseph Richardson.  Mrs. Richardson is a proposed Class Representative for

~~Sub Class~~Subclass One, described *infra*.  Mrs. Richardson is a member of Category Three, the WRONGFUL DEATH CATEGORY.

~~6.~~      **Plaintiff JIMMIE DONNELL HARRIS**:  At the time of the flooding made the subject of this suit, Mr. Harris resided at 924 Lamanche Street, New Orleans, Louisiana, 70117, in the Lower Ninth Ward.  He is approximately 40 years old, and is a New Orleans Fire Department volunteer firefighter and a member of the United States Army Reserve deployed to the streets of New Orleans in the immediate aftermath of Katrina.  He owns his aforesaid residence, where he lived with his wife and daughter until the flood.  The house was a two story, single -family residence, of approximately 2400 square feet on a lot approximately 90' x 120', and had undergone addition of about one-thousand square feet in 2002, plus addition of a new shed and carport.  He, along with his wife and daughter, were forced to relocate to 790 Bateswood Drive, Apt. 24, Houston, Texas 77282 while their family home was restored.  Just recently, the family was able to return home.  Mr. Harris suffered damages as a result of the breaches of the eastern Industrial Canal Floodwall, which damages were proximately caused by Defendants, on August 29, 2005.  Mr. Harris is a proposed Class Representative for ~~Sub-Class~~Subclass One, described *infra*.

~~7.~~5.    **Plaintiff MICHAEL JOSEPH RICHE, as owner of MR. RIBBON, and RESIDENTIAL RENTAL PROPERTY**:  At the time of the flooding made the subject of this suit, Mr. Riche owned Mr. Ribbon, a wedding supply business located at 8825-27 W. Judge Perez Drive, Chalmette, Louisiana, in the Village Square Shopping Center.  The business property, which he owned, was approximately 4000 square feet of showroom, sales, office, and warehouse area, all destroyed by the flood.  Mr. Riche has been financially unable to reestablish or repair his business, and lost his clientele.  At the time of the flooding made the subject of suit, Mr. Riche also owned residential rental property at 128-130 W. Phillip Court, consisting of a two story townhouse duplex of approximately 2400 square feet.  The property was rented at the time of the flooding.  Mr. Riche has been financially unable to make repairs and return his property to the rental market.  Mr. Riche's business and business property suffered damages as a result of the breaches of the eastern Industrial Canal floodwall,

which damages were proximately caused by Defendants, on August 29, 2005. Mr. Riche is a resident of Lacombe, Louisiana. Mr. Riche is a proposed Class Representative for ~~Sub-Class~~Subclass Two, described *infra*.

~~8.~~6.     **Plaintiff JACOB ROBERT "BOB" GLASER AND DIANNE GLASER as owners of HOLIDAY JEWELERS**: At the time of the flooding made the subject of this suit, Mr. and Mrs. Glaser owned Holiday Jewelers, a retail jewelry business located at 8400 W. Judge Perez Drive, Suite 7, Chalmette, Louisiana 70043. Mr. Glaser is approximately 58 years old. Mrs. Glaser is fifty-six (56) years old. They leased the property where the business was located, which consisted of approximately 1000 square feet of showroom, office, and workshop space. Due to the loss of inventory, equipment, fixtures, and clientele, as well as the financial inability to amass start-up costs after thirty-one (31) years in business, they have not been able to reestablish their business, and have been forced to seek employment on the Northshore. Jacob and Dianne Glaser's business suffered damages as a result of the breaches of the eastern Industrial Canal floodwall, which damages were proximately caused by Defendants, on August 29, 2005. Jacob and Diane Glaser are residents of Madisonville, Louisiana. Jacob and Dianne Glaser are proposed Class Representatives for ~~Sub-Class~~Subclass Two.

~~9.~~7.     **Plaintiffs HERMAN AND AIDA KOCH as owners of RESIDENTIAL RENTAL PROPERTY**: At the time of the flooding made the subject of this suit, Mr. and Mrs. Koch were the owners of several residential rental properties in the affected areas. Mr. and Mrs. Koch are approximately 71 and 66 years old, respectively. After the destruction of their residence, Mr. and Mrs. Koch now reside at 506 Country Club Drive, Picayune, Mississippi. Their pre-August 29, 2005 income was based upon rental income generated by the following properties:

       (a)     3409-11 Shangri La Lane, Chalmette, Louisiana, was a one story double of  approximately 2400 square feet on a 60' x 120' lot. Mr. and Mrs. Koch had made recent improvements before the flood, including new

flooring and paint.  Both units were rented at the time of the flooding.
Recently, the property was restored, and 3411 is now rented.

(b)   3619 Shangri La Street, Chalmette, Louisiana, was a party wall double,
half of which was owned by Mr. and Mrs. Koch.  It has approximate
interior space of 1250 square feet, and sits on a 60' x 125' lot with a
shed.  It was newly painted in 2004, and was rented at the time of the
flooding.  3619 Shangri La Street was recently restored but has not been
rented.

(c)   6317-19 Douglas Street, New Orleans, Louisiana 70117 in the Lower
Ninth Ward was a single story double located in an historic district.  It
was approximately 3000 square feet on a lot of approximately 45' x 200',
plus two out buildings containing a carport and laundry space.  New
floors were installed in 2003.  Both units were rented at the time of the
flooding, but have not been repaired due to Mr. and Mrs. Koch's
financial inability to pay for same, and, therefore, cannot be rented.

(d)   6035-37 Burgundy Street, New Orleans, Louisiana 70117 in the Lower
Ninth Ward was a single story shotgun double of approximately 2500
square feet on a 50' x 120' lot with a double shed and carport.  Extensive
improvements and renovations in early 2005 included new kitchens,
plumbing, and floors.  Both units were rented at the time of the flooding
but were not repaired due to Mr. and Mrs. Koch's financial inability to
pay for same.  They had to sell that property to a private party.

(e)   8545-8547 Deerfield, Chalmette, Louisiana 70043 is a single, divided
structure, consisting of approximately 4000 square feet, on a 55' x 120'
lot with two outbuildings.  Mr. and Mrs. Koch used to reside in the
residence half of the property located at 8545 Deerfield and rent out
8547 Deerfield.  The entire property was newly painted and carpeted in

6

2005.  Both halves have been repaired in the aftermath, and 8545
Deerfield is now rented.

~~10.~~8.   Mr. and Mrs. Koch's business and business property suffered damages as a result of the breaches of the eastern Industrial Canal floodwall, which damages were proximately caused by Defendants, on August 29, 2005.  Mr. and Mrs. Koch are proposed Class Representatives for ~~Sub-Class~~Subclass Two, described *infra*.

~~11.~~9.   As a result of the flooding in the class area, Mr. and Mrs. Koch suffered damages as a result of the breaches of the eastern Industrial Canal floodwall, which damages were proximately caused by Defendants, on August 29, 2005.  They are also a proposed Class Representatives for ~~Sub-Class~~Subclass One, described *infra*.

**B.    DEFENDANTS**

~~12.~~10.  Defendant **LAFARGE NORTH AMERICA, INC**. ("Lafarge") is a foreign corporation licensed to and doing business in the State of Louisiana and within the venue of this Honorable Court.

~~13.~~11.  Defendant **NEW YORK MARINE & GENERAL INSURANCE COMPANY is a foreign** insurance corporation, authorized to and doing, or engaging in, business activity in the State of Louisiana and within the geographical reaches of this Honorable Court.

Defendant **NEW YORK MARINE & GENERAL INSURANCE COMPANY**, at all times pertinent, had in full force and effect a policy or policies of marine insurance, P & I insurance, wharfinger's insurance, stevedore's insurance, hull insurance, bumbershoot insurance, pollution insurance, primary, excess and/or surplus insurance, and/or other policies of liability insurance in full force and effect at all times pertinent hereto and which provide coverage to Defendant, Lafarge North America, Inc., for the types of liabilities and damages alleged herein, rendering said insurer jointly liable with its insured, and the other Defendants, in the premises.

~~14.~~12.  Defendant **AMERICAN STEAMSHIP OWNERS MUTUAL PROTECTION AND INDEMNITY ASSOCIATION, INC.** is a foreign insurance

7

corporation, authorized to do and doing, or engaging in, business activity in the State of

Louisiana and within the geographical reaches of this Honorable Court.   Defendant

**AMERICAN STEAMSHIP OWNERS MUTUAL PROTECTION AND INDEMNITY**

**ASSOCIATION, INC.**, at all times pertinent, had in full force and effect a policy or policies

of marine insurance, P & I insurance, wharfinger's insurance, stevedore's insurance, hull

insurance, bumbershoot insurance, pollution insurance, primary, excess and/or surplus

insurance, and/or other policies of liability insurance in full force and effect at all times

pertinent hereto and which provide coverage to Defendant, Lafarge North America, Inc., for

the types of liabilities and damages alleged herein, rendering said insurer jointly liable with its

insured, and the other Defendants, in the premises.

~~15.~~13.  Defendant **ZITO FLEETING, LLC** is a foreign limited liability corporation

authorized to do, doing, and/or engaging in business activity in the State of Louisiana.

~~16.~~14.  Defendant **ZITO FLEETING, INC**. is a Louisiana corporation, domiciled in

the Parish of Jefferson, State of Louisiana.

~~17.~~15.  Defendants **XYZ1** and **XYZ2** INSURANCE COMPANIES are foreign, alien, or

domestic insurers licensed to do and doing business in the State of Louisiana but whose

~~true identities~~true identities are unknown at the present time.  On information and belief,

Defendants **XYZ1** and **XYZ2** INSURANCE COMPANIES issued to Zito Fleeting, Inc. and/or

Zito Fleeting, LLC a policy or policies of liability and/or other insurance, in full force and

effect at all times pertinent hereto, which provide(s) cover for the types of damages and

liabilities alleged herein, rendering said insurer(s) jointly liable with its (their) insured(s), and

the other Defendants, in the premises.

~~18.~~16.  Defendant **NORTHERN ASSURANCE COMPANY OF AMERICA**, a

foreign, alien, or domestic insurer authorized to do, doing, and/or engaging in business activity

in the State of Louisiana.  Defendant **NORTHERN ASSURANCE COMPANY OF**

**AMERICA** at all times pertinent, had in full force and effect a policy or policies of marine

insurance, P & I insurance, wharfinger's insurance, stevedore's insurance, hull insurance,

bumbershoot insurance, pollution insurance, primary, excess and/or surplus insurance, and/or

other policies of liability insurance in full force and effect at all times pertinent hereto and which provide coverage to Defendant, Lafarge North America, Inc., for the types of liabilities and damages alleged herein, rendering said insurer jointly liable with its insured, and the other Defendants, in the premises.

19.17.  Defendant **AMERICAN HOME ASSURANCE COMPANY**, a foreign, alien, or domestic insurer authorized to do, doing, and/or engaging in business activity in the State of Louisiana.  Defendant **AMERICAN HOME ASSURANCE COMPANY** at all times pertinent, had in full force and effect a policy or policies of marine insurance, P & I insurance, wharfinger's insurance, stevedore's insurance, hull insurance, bumbershoot insurance, pollution insurance, primary, excess and/or surplus insurance, and/or other policies of liability insurance in full force and effect at all times pertinent hereto and which provide coverage to Defendant, Lafarge North America, Inc., for the types of liabilities and damages alleged herein, rendering said insurer jointly liable with its insured, and the other Defendants, in the premises.

### III.

### CLASS ACTION ALLEGATIONS

**A.**     **Definitions Of PLAINTIFF Classes**

20.18.  The Named Plaintiffs describe the Class they seek to represent as all persons and/or entities (hereinafter referred to only as "persons") who/which, on August 29, 2005, were residents of, or owned properties or businesses in, the following geographic area: the Industrial Canal floodwall on the West, Paris Road on the East, the Mississippi River on the South, and, on the North, the Public Belt or other Railway adjacent to and immediately north of Florida Avenue and the east-west channel or canal (Florida Walk Canal and Forty Arpent Canal) extending from the aforementioned railway to Paris Road.  Excluded from the Class are any persons who are directors, officers and/or employees of any Defendant or their affiliates, and the immediate family members thereof, as well as all attorneys for the Class and any employees of the attorneys or their firms.

9

**Formatted:** Indent: First line:  0.2", Don't add space between paragraphs of the same style, Line spacing:  Exactly 23 pt, No widow/orphan control

**Formatted:** Indent: Hanging:  0.5", Don't add space between paragraphs of the same style, Line spacing:  Exactly 23 pt, No widow/orphan control, Keep lines together

21.19.  The Named Plaintiffs propose the following ~~Sub-Class~~Subclasses and Definitions for Subclasses One and Two:

(a)   **PERSONAL/REAL PROPERTY CLAIM ~~SUB-CLASS (SUB-CLASS~~SUBCLASS (SUBCLASS** ONE): All persons who are members of the Class and who sustained personal or real property loss and/or damages as a result of the flooding that began on Monday, August 29, 2005.

(b)   **BUSINESS CLAIM SUBCLASS** (~~SUB-CLASS~~SUBCLASS TWO) All businesses and/or the owners of such businesses, where the businesses (1) were located in the geographic area defined by the Industrial Canal floodwall on the West, Paris Road on the East, the Mississippi River on the South, and, on the North, the Public Belt or other Railway adjacent to and immediately north of Florida Avenue and the east-west channel or canal (Florida Walk Canal and Forty Arpent Canal) extending from the aforementioned railway to Paris Road, and (2) sustained loss and/or damages related to flooding that began on Monday, August 29, 2005.

22.20.  For purposes of clarity, and ease of reference by the Parties and the Court, the Named Plaintiffs identify several Categories of persons that are members of the Class.  Those Categories of persons are described and/or defined as follows:

(a)   The **PERSONAL/REAL PROPERTY CLAIM ~~SUB-CLASS~~SUBCLASS** contains a Category of persons suffering consequential emotional harm, denominated the ZONE OF DANGER PROPERTY CLAIM CATEGORY (Category One), defined as: (1) all persons who are members of the Class (2) who sustained personal or real property loss and/or damages as a result of the flooding that began on Monday, August 29, 2005, and (3) at the time they sustained personal or real property loss and/or damages were physically present in the geographic area defined by the Industrial Canal floodwall on the West,

Paris Road on the East, the Mississippi River on the South, and, on the
North, the Public Belt or other Railway adjacent to and immediately
north of Florida Avenue and the east-west channel or canal (Florida
Walk Canal and Forty Arpent Canal) extending from the aforementioned
railway to Paris Road at that time they sustained personal or real
property loss and/or damages.  The total number of such persons in this
category is, upon information and belief, less than 5,000 persons and
likely less than 4,000 persons.

(b)      the Class contains a Category of persons, denominated the PERSONAL
INJURY CATEGORY (Category Two), who (1) are members of the
Class; (2) were, at the time of flooding on August 29, 2005, present in
the geographic area defined by the Industrial Canal floodwall on the
West, Paris Road on the East, the Mississippi River on the South, and,
on the North, the Public Belt or other Railway adjacent to and
immediately north of Florida Avenue and the east-west channel or canal
(Florida Walk Canal and Forty Arpent Canal) extending from the
aforementioned railway to Paris Road; and, (3) sustained personal
injuries as a result of flooding that began on Monday, August 29, 2005.
The total number of such persons in this category is, upon information
and belief, less than 5,000 persons and likely less than 4,000 persons.

(c)      the Class contains a Category of persons, denominated the WRONGFUL
DEATH CATEGORY (Category Three), who (1) are members of the
Class; and, (2) who have a claim for wrongful death related to the
flooding that began on Monday, August 29, 2005.  The total number of
such persons in this category is, upon information and belief, less than
several hundred persons.

~~23.~~21.  Plaintiffs submit that the Class or ~~Sub-Classes~~SubClasses defined herein may
be divided, in this Court's discretion, into further or additional ~~sub-classes.~~subclasses.  As of

the filing of this Seventh Amended Complaint, Named Plaintiffs are not seeking certification of the Categories described above. The Categories are defined for ease of reference by the parties and the Court.

**B.**     **Maintenance Of The Action**

~~24.~~22.  Named Plaintiffs bring this action individually and as representatives of all similarly situated persons pursuant to the provisions of Rule 23 of the Federal Rules of Civil Procedure.

**C.**     **Class Action Requisites**

~~25.~~23.  This class action meets the prerequisites for the maintenance of a class action as set forth in Rule 23 of the Federal Rules of Civil Procedure in that:

(a)     The members of the Class are so numerous that their individual joinder is impracticable. Plaintiffs are informed and believe that the practices complained of herein affected approximately 47,000 persons, although the precise number and identities of the members of each of the Classes are currently unknown to Plaintiffs. Since the Class may be identified and/or verified from business and public records, the number and identities of members of each of the classes can be ascertained;

(b)     A substantial majority of all factual, legal, statutory, declaratory, and injunctive relief issues that are raised in this Complaint are common to the Class and will apply uniformly to every member of the Class;

(c)     The claims of the representative Plaintiffs are typical of the claims of each member of the Class. Plaintiffs, like all other members of the Class, have sustained damages arising from Defendants' violations of the laws of the State of Louisiana and/or the law of the United States. Plaintiffs and the members of the Class were and are similarly or

12

identically harmed by the same negligent and unlawful conduct engaged in by the Defendants;

(d)    The representative Plaintiffs will fairly and adequately represent and protect the interests of the Class, and have retained counsel who are competent and experienced in class action litigation.  There are no material conflicts between the claims of the representative Plaintiffs and the members of the Classes that would make class certification inappropriate.  Counsel for the Class will vigorously assert the claims of all Class Members.

26.24.  This action is properly maintained as a Class Action pursuant to Rule 23(b) of the Federal Rules of Civil Procedure in that:

(a)    Without class certification and determination of declaratory, injunctive, statutory and other legal questions within the class format, prosecution of separate actions by individual members of the Plaintiff Class will create the risk of:

1)    Inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the parties opposing the Class; or,

2)    Adjudication with respect to individual members of the Class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudication or substantially impair or impede their ability to protect their interests; or

(b)    The parties opposing the Class have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole; or

(c)    Common questions of law and fact exist as to the members of the Class and predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy, including consideration of:

1)    The interests of the members of the Class in individually controlling the prosecution or defense of separate actions;

2)    The extent and nature of any litigation concerning the controversy already commenced by or against members of the Class;

3)    The desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

4)    The difficulties likely to be encountered in the management of a class action.

~~27.~~25.  Class Plaintiffs contemplate the eventual issuance of notice to the proposed members of the Class that would set forth the subject and nature of the instant action. Business and/or public records can be utilized for assistance in the preparation and issuance of the contemplated notices.  To the extent that any further notices may be required, Plaintiffs would contemplate the use of additional media (e.g., internet/television/radio) and/or mailings.

~~28.~~26.  Among the many questions of law and fact common to the class are:

(a)    Whether Lafarge allowed loaded Barge ING 4727 to be docked at the Lafarge facility on the Industrial Canal on Friday, August 26, 2005;

(b)    Whether Lafarge refused to remove the loaded Barge ING 4727 from the Lafarge North America facility on the Industrial Canal on and after Friday, August 26, 2005;

(c)    Whether Lafarge unloaded Barge ING 4727 on Saturday, August 27, 2005;

14

(d)     Whether Lafarge refused to remove the unloaded Barge ING 4727 from the Lafarge North American facility on the Industrial Canal on and after Saturday, August 27, 2005;

(e)     Whether Lafarge switched unloaded Barge ING 4727 from inboard of a loaded barge to outboard of a loaded barge on Saturday, August 27, 2005;

(f)     Whether Assistant Manager Ed Busch directed Zito Fleeting to "release" Barge ING 4727;

(g)     Whether placing unloaded Barge ING 4727 outboard of a loaded barge created a "sail effect" that increased the likelihood of a breakaway in high winds;

(h)     Whether Lafarge had a Hurricane Checklist which required that all barges be cabled to the shore;

(i)     Whether Lafarge used fewer mooring lines than specified in U.S. Coast Guard standards for stormy weather to attach unloaded Barge ING 4727 to a loaded barge;

(j)     Whether Lafarge used three single-part (strand) lines to attach unloaded Barge ING 4727 to a loaded barge;

(k)     Whether Lafarge failed to inspect the moorings on Barge ING 4727 to determine whether those moorings exceed U.S. Coast Guard standards for mooring barges to each other in stormy weather;

(l)     Whether Lafarge was in possession of the Sector New Orleans Hurricane Plan prior to the arrival of Hurricane Katrina;

(m)    Whether the Sector New Orleans Hurricane Plan required that mooring lines should be "doubled up" as part of hurricane preparedness activities;

(n)     Whether  the Sector New Orleans Hurricane Plan identified barges moored near bridges as requiring special attention when determining adequate mooring;

(o)     Whether, on August 26, 2005, the Governor of Louisiana issued an emergency proclamation, directing waterfront facilities to secure hazards and halt cargo operations;

(p)     Whether, shortly before the time that Barge ING 4727 was delivered to the Lafarge North America facility on the Industrial Canal, Lafarge had suffered approximately $170,000 in losses due to stock shortages of oil field cement;

(q)     Whether Barge ING 4727 broke free of its moorings on Monday, August 29, 2005;

(r)     Whether the East wall of the Industrial Canal was breached in two locations proximate to the Lower Ninth Ward, a "North" breach and a "South" breach;

(s)     Whether, somewhere between 4:00 a.m. and 6:00 a.m. on August 29, 2005, Barge ING 4727 struck the East wall of the Industrial Canal floodwall opposite the Lafarge facility (the "North" breach);

(t)     Whether, shortly after Barge ING 4727 struck the East wall of the Industrial Canal in the area of the "North" breach, it broke through the Industrial Canal in the area of the "South" breach;

(u)     Whether Barge ING 4727 was the only barge that broke free of its moorings in the Industrial Canal proximate to the Lower Ninth Ward;

(v)     Whether, when Barge ING 4727 struck the East wall of the Industrial Canal, it caused the "South" breach proximate to the Lower Ninth Ward;

(w)     Whether, when Barge ING 4727 struck the East wall of the Industrial Canal, it caused the "North" breach proximate to the Lower Ninth Ward;

16

(x)     Whether Ingram breached a duty to the Class when it failed to retrieve Barge ING 4727 prior to August 29, 2005 and engaged in the conduct alleged herein;

(y)     Whether Lafarge breached a duty to the Class when it engaged in the conduct alleged herein;

(z)     Whether 33 CFR § 6.14-2 created a duty of care in Defendant regarding the mooring of Barge ING 4727 on the dates in question, and if so, what was the nature and scope of that duty;

(aa)    Whether 33 CFR § 6.19-1 created a duty of care in Defendant to protect and secure Barge ING 4727 and the surrounding levies, and if so, what was the nature and scope of that duty; and,

(bb)    Whether 33 CFR § 162.75 (b)(3)(ii) created a duty of care in Defendant regarding the mooring of Barge ING 4727 on the dates in question, and if so, what was the nature and scope of that duty.

29.27.   As to the issues raised in this case, a class action is superior to all other methods for the fair and efficient adjudication of this controversy, since joinder of all class members is impracticable and since many legal and factual questions to be adjudicated apply uniformly to all class members.  Further, the expense and burden of individual actions makes it difficult for all class members to individually redress the wrongs they have suffered.  There will be substantially less difficulty in managing this case as a class action than as tens of thousands of individual actions.

30.28.   The class action is superior to other available methods for a fair and efficient adjudication of the claims presented by this Complaint and would reduce the financial, administrative and procedural burdens on the parties and on the Court which individual litigation otherwise would impose.

17

**IV.**

**GENERAL ALLEGATIONS**

**Formatted:** Indent: First line:  0.2", Don't add space between paragraphs of the same style, Line spacing:  Exactly 23 pt, No widow/orphan control

~~31.~~29.  Ingram Barge Company ("Ingram") at all times pertinent was the owner of a steel freight barge approximately 200 feet in length, 35 feet in breadth, and 12 feet in depth, identified as ING 4727, VIN #955868, hull # 1942-10, and alternative VIN #CG025606.

~~32.~~30.  During the year 2005 and at all times pertinent hereto, Lafarge was party to a Transportation Agreement with Ingram, whereby Ingram would carry cargo for Lafarge via Ingram's barges.  The aforesaid Transportation Agreement between Lafarge and Ingram contains provisions whereby Lafarge is to safely moor Ingram's barges.

~~33.~~31.  During the week of August 26, 2005, Ingram had in transit from Lafarge's Joppa, Illinois facility two 200 foot hopper barges, ING 4727 and ING 4745, containing H Grade cement bound for Westlake, Louisiana.  Leading up to that shipment, the Lafarge France Road facility experienced a "stockout" condition relative to H Grade oilfield cement. Due to this stockout condition, Lafarge had incurred charges of approximately $170,000.00. While en route to Westlake, Louisiana, these barges were diverted to the France Road facility in light of the said stockout condition.

~~34.~~32.  The France Road facility is a waterfront terminal located on the western side of the Inner Harbor Navigation Canal (or Industrial Canal), a navigable shipping channel intersecting the heavily populated New Orleans residential, commercial and industrial area designated the Ninth Ward.  The Lower Ninth Ward is located on the immediate east side of the Industrial Canal.

~~35.~~33.  ING 4727 and ING 4745 were delivered to the Lafarge facility on the morning of August 26, 2005, at about 1125 hours by the towing vessel CONNIE Z, operated by Zito Fleeting, Inc. and/or Zito Fleeting, LLC, an agent for Ingram Barge Company.

~~36.~~34.  On or about August 26, 2005, Lafarge allowed loaded Barge ING 4727 to be docked at the Lafarge facility on the Industrial Canal.  In and around that time, it was commonly known that Hurricane Katrina was in the Gulf of Mexico, approaching the Southern Coast of the United States, and likely to impact the Southern Coast of the United States within

a few days.  Despite this imminent threat, Lafarge refused to remove the loaded Barge ING 4727 from the Lafarge North America facility on the Industrial Canal to a place of safety.

37.35.  Lafarge began unloading Barge ING 4727 on the night of August 26, 2005, after Governor Blanco had proclaimed a State of Emergency, after President Bush and Mayor Nagin made nationwide and local broadcasts advising of the severity and potential effect of Katrina on New Orleans and after numerous weather advisories by local media and weather services warning of Hurricane Katrina.  Lafarge continued its unloading activities into Saturday, August 27, 2005.

38.36.  At the time, the Lafarge France Road facility was undergoing a construction project, and lacked regular phone and fax lines, email and other forms of communications, and as a consequence, its New Orleans waterside employees were not aware of the progress and strength of Hurricane Katrina as they arrived for work on the morning of August 27, 2005, until so advised by an employee's wife.

39.37.  After unloading Barge ING 4727, Lafarge failed or refused to remove the unloaded Barge ING 4727 from the Lafarge North American facility on the Industrial Canal to a place of safety.  Instead, Lafarge switched unloaded Barge ING 4727 from inboard of a loaded barge to outboard of a loaded barge on Saturday, August 27, 2005.  At approximately 1000 hours on August 27, 2005, concerned that the empty ING 4727 could ride up onto and damage the Lafarge dock during the effects of Katrina, acting Terminal Manager Ed Busch called Joseph C. Domino, Inc. and ordered that the two Ingram Barge tier be "topped around," an maneuver whereby the empty ING 4727 and the full ING 4745 would swap positions, resulting in the empty ING 4727 resting outboard in the Industrial Canal, and ING 4745 resting inboard against the Lafarge dock.  Mr. Busch did not elect to have the barges removed or fleeted, to scuttle or ballast them, and did not request that any moorings be added or changed.  Placing unloaded Barge ING 4727 outboard of a loaded barge created a "sail effect" that increased the likelihood of a breakaway in high winds.

40.38.  In and around that same time, Lafarge Terminal Manager Ed Busch allegedly directed Zito Fleeting to "release" Barge ING 4727.  Ingram had given long-standing

19

instruction to Lafarge that Zito was to be contacted for towing or fleeting service with respect to Ingram's barges.   Allegedly, Mr. Busch reached only a voicemail recording, and left a message, although Zito's computerized telephone records fail to confirm that any call was placed from Lafarge or any of its employees on this date.  Lafarge did not receive or did not heed a faxed or emailed notice from Zito that they would suspend operations.  Despite the foregoing, Zito could have removed ING 4727 from the IHNC that day.

41.39.  During the time that Lafarge was unloading Barge ING 4727 and switching it outboard of a loaded barge, Lafarge had a Hurricane Checklist which required that all barges be cabled to the shore.  Instead of cabling Barge ING 4727 to shore, Lafarge simply moored Barge ING 4727 to the loaded barge adjacent to it.  In doing so, Lafarge used fewer mooring lines than specified in U.S. Coast Guard standards for stormy weather to attach unloaded Barge ING 4727 to a loaded barge.  In particular, Lafarge used three single-part (strand), two-inch diameter nylon mooring lines to attach unloaded Barge ING 4727 to a loaded barge. Lafarge also failed to inspect the moorings on Barge ING 4727 to determine whether those moorings exceed U.S. Coast Guard standards for mooring barges to each other in stormy weather.

42.40.  On this same morning, an Ingram Barge employee, Stanley Cook, arrived at the premises to "check on" Ingram's barges.  At no time did Lafarge confer with Ingram or Zito concerning safety measures with respect to Ingram's barges and the approach of Hurricane Katrina.

43.41.  Lafarge had no power vessels at the France Road facility in order to move or remove Barge ING 4727, or to capture it should it part from its berth.  However, Lafarge did have the ability to move vessels, including Barge ING 4727, using third-party vendor towing companies.  For example, the captain of the REGINA H indicated that, had Lafarge requested, he could have taken Barge ING 4727 out of the canal.

44.42.  At approximately noon on August 27, 2005, after filing several trucks with H Grade cement for delivery to Lafarge's customers, the Lafarge employees then present abandoned the France Road facility and did not return until after Katrina.

45.43.  Joseph C. Domino, Inc. placed Lafarge's order with and dispatched Unique Towing, Inc. to service Lafarge's request.  At about 1425 hours on the August 27, 2005, the REGINA H arrived at the Lafarge facility, which was at that time abandoned.  The ING 4727 and ING 4745 two-barge tier was topped around and ING 4745 was moored to the dock.  The empty ING 4727 was now outboard of ING 4745, with at least eight feet of freeboard height exposed, and was moored only to ING 4745 using only the three aforesaid single part lines. ING 4727 was not moored to the dock.  No moorings were added, but for a spare piece of mooring line that REGINA H deckhand Eric Thigpen found on the premises after expressing to REGINA H Captain Raymond Grabert concern about the adequacy of the moorings.  No moorings were added between ING 4727 and ING 4745, and neither was moved, fleeted, ballasted or scuttled.  The REGINA H allegedly had spare lines, but did not add them to the Ingram barge's moorings because Lafarge had not requested additional mooring lines.

46.44.  Lafarge was at all times pertinent subject to and  in violation of the Rules and Regulations for the Inner Harbor Navigation Canal, extracts of which  are published in the United States Coast Pilot, Volume 5, Chapter 8, Mississippi River, Article (207), which states in part that vessels shall not be berthed two abreast alongside any wharves, bulkheads, or clusters.  The regulation exempts small barges, which Barge ING 4727 was not.  At all times pertinent, until the breakaway events, Lafarge had at its dock two tiers of barges: one tier of five loaded Bunge barges, and the tier of two Ingram barges that included Barge ING 4727.

47.45.  United States Coast Pilot 5, Gulf of Mexico, Puerto Rico, and Virgin Islands, 2003,30th Edition-Chapter 8, Mississippi River, page 302, article (205), Extracts from the rules and regulations for the Inner Harbor Navigation Canal provide:  Article (208) - Vessels shall not be berthed two abreast alongside any wharves, bulkheads, or clusters, except that small barges or other small craft may be moored two or more abreast when necessary clearances for proper operation of the canal can be maintained, and permission of the Superintendent shall have been obtained. At all times pertinent, until the breakaway events, Lafarge had at its dock two tiers of barges: one tier of five loaded Bunge barges, and the tier

of two Ingram barges.  Lafarge did not seek permission of the Superintendent, and was subject to and in violation of these provisions at all times pertinent.

48.46.  Lafarge was at all times pertinent subject to and in violation of Title 33 Code of Federal Regulations (CFR) Part 162-INLAND WATERWAYS NAVIGATION REGULATIONS, § 162.75, stating:  All waterways tributary to the Gulf of Mexico (except the Mississippi River, its tributaries, South and Southwest Passes and Atchafalaya River) from St. Marks, Fla., to the Rio Grande. Paragraph (b) (3) (ii) Waterways: Anchoring or mooring: When tied up individually, all vessels and tows shall be moored by bow and stern lines. Tows shall be secured at sufficiently frequent intervals to insure their not being drawn away from the bank by winds, currents, or the suction of passing vessels. Lines shall be shortened so that the various barges in a tow will be as close together as possible."

49.47.  Lafarge was at all times pertinent subject to and in violation of  Title 33 Code of Federal Regulations (CFR) Part 6, PROTECTION AND SECURITY OF VESSELS, HARBORS, AND WATERFRONT FACILITIES, § 6.14-2 Condition of waterfront facility a danger to vessel, and § 6.19–1 Responsibility for Security of Vessels and Waterfront Facilities, Primary responsibility, whereunder waterfront facility have, along with vessel owners and masters, primary responsibility for the protection and security of such vessels.

50.48.  Lafarge was at all pertinent times subject to, and in violation of, the provisions of 33 CFR 162.75 (b)(3)(ii) Anchoring and Mooring: for failure to ensure that Barge ING 4727 was adequately moored to withstand the anticipated hurricane force winds of Hurricane Katrina.

51.49.  Lafarge was at all pertinent times subject to, and in violation of the provisions of 33 CFR 6.19, Primary responsibility, for failure to ensure that Barge ING 4727 was secure and safe at the Lafarge facility.

52.50.  While Lafarge was cavalierly dismissing the threat posed by Hurricane Katrina to the ill-managed and secured Barge ING 4727, Lafarge, as a maritime facility operator, was or should have been aware of the Sector New Orleans Hurricane Plan prior to the arrival of Hurricane Katrina.  The Sector New Orleans Hurricane Plan required that mooring lines

should be "doubled up" as part of hurricane preparedness activities.  The Sector New Orleans
Hurricane Plan identified barges moored near bridges as requiring special attention when
determining adequate mooring.

53.51.  The Sector New Orleans hurricane plan issued by the United States Coast
Guard, New Orleans, Louisiana, was enacted pursuant to the congressional enabling statute,
33 USC 1221, which provides that the Congress finds and declares:

"(a) That navigation and vessel safety protection of the marine environment and
safety and security of the United States ports and waterways are matters of
major national importance;

(b) That increased vessel traffics in the nation's ports and waterways creates
substantial hazard to life, property, and the marine environment;

(c) That increased supervision of vessel and port operations is necessary in
order to -

(1) Produce the possibility of vessel or cargo loss, or damage to
life, property or the marine environment;

(2) Prevent damage to structures in, on, or immediately adjacent
to the navigable waters of the United States or the resources within such
waters;

(3) Ensure that vessels operating in the navigable waters of the
United States shall comply with all applicable standards and
requirements for vessel construction, equipment, manning and
operational procedures; and

(4) Ensure that the handling of dangerous articles and substances
on the structures in, on, or immediately adjacent to the navigable waters
of the United States is conducted in accordance with established
standards and requirements; and

(d) That advanced planning is critical in determining proper  and adequate
protection measures for the nation's ports, and waterways and the marine

23

environment with continuing consultation with either federal agencies, state
representatives, affected users, and the general public, in the development and
implementation of such measures."

54.52.  On August 26, 2005, the Governor of Louisiana issued an emergency
proclamation regarding the approaching hurricane.  Despite this proclamation and the other
obvious warnings of danger, Lafarge continued operations, under financial pressure to limit
losses due its "stockout" condition.  Lafarge urgently needed the cargo in Barge ING 4727 to
fulfill orders.

55.53.  Defendants Zito Fleeting, Inc. and Zito Fleeting, LLC (hereinafter "Zito
Companies"), at all times pertinent, had contracts with, among others, Ingram and Lafarge,
whereby said corporations acted as agents, or agents *pro hac vice*, for Ingram and Lafarge,
with the responsibility to deliver loaded barges to, and remove empty barges from, the Lafarge
cement plant on the Industrial Canal and to fleet the incoming full barges, and outgoing empty
barges, as required, directed, or necessary.

56.54.  Ingram instructed and directed Lafarge to deal directly with the Zito Companies
in the handling and fleeting of their barges without consulting the aforesaid owners of the
barges.

57.55.  The Zito Companies failed to fleet the Ingram Barge 4727 ("ING 4727") on
August 26, 2006, in the face of approaching Hurricane Katrina and, instead, delivered the
barge to the Lafarge Facility, knowingly incapable of securing the barge at its wharfing
facility.

58.56.  The Zito Companies failed to remove ING 4727 from the Lafarge facility on the
Industrial Canal as requested, and as was its responsibility, as the agent, or agent *pro hac vice*,
for Ingram and Lafarge, and as a consequence, the barge broke loose during the hurricane and
went through the Eastern side floodwall of the Industrial Canal, thereby flooding the Ninth
Ward, Eastern New Orleans, and Arabi.

59.57.  Zito Fleeting, Inc., Zito Fleeting, LLC and XYZ1, and XYZ2 Insurance Companies are liable jointly and severally, with the other Defendants previously named herein for the damages caused by the consequent flooding.

60.58.  Barge ING 4727 broke free of its inadequate moorings in the early morning of Monday, August 29, 2005.  Somewhere between 4:00 a.m. and 6:00 a.m. on August 29, 2005, Barge ING 4727 struck the East wall of the Industrial Canal floodwall opposite the Lafarge facility, causing the "North" breach in the East wall of the Industrial Canal.  Shortly after Barge ING 4727 struck the East wall of the Industrial Canal in the area of the "North" breach, it broke through the Industrial Canal in the area of the "South" breach.  These breaches caused a huge amount of water from Lake Ponchatrain, the Industrial Canal, and the Mississippi Gulf Outlet to flow into the Ninth Ward of the City of New Orleans, Eastern New Orleans East, and Arabi and Chalmette in St. Bernard Parish.

**V.**

**CLAIM FOR RELIEF**

**(NEGLIGENCE)**

**(AGAINST ALL DEFENDANTS)**

61.59.  Defendants had a duty to conform to the standard of conduct of a reasonable man under like circumstances.  In this instance, those circumstances included the approach of a Category 5 hurricane.

62.60.  In the shipping/maritime context, a shipmaster not only has a duty to take all reasonable steps consistent with safety to this ship and her crew, to avoid or minimize the chance of harm to others, but also a duty to avoid collisions.  Masters, owners, operators, and agents of vessels or other waterfront facilities have, as a *primary responsibility*, the protection and security of vessels and waterfront facilities.

63.61.  Standards of maritime care dictate that a high (empty) barge should not be moored to a low (full) barge due to the unsecure mooring condition that results, that barges should not be berthed or abandoned in a waterway within a residential area with a hurricane

approaching, that barges should be fleeted, ballasted or scuttled in advance of an approaching hurricane, that a barge's owners should be consulted with regard to safeguarding of the barge in advance of an approaching hurricane, and those standards of maritime care inherent in the Sector New Orleans Hurricane Plan, regulations, recommendations, standards manuals, maritime industry guides, and in the general maritime and other applicable law.

64.62.  Defendants and their agents negligently breached their duties of care to Plaintiffs and other members of the Class.  In particular, Defendant Lafarge was negligent for ordering the barge to be delivered, failing to remove the barge out of the canal to a fleet and/or safe harbor, continuing to unload the barge, failing to properly secure and/or moore the barge.

65.63.  The allision between the unmanned barge and the eastern side of the Industrial Canal flood wall compels Defendants to prove that their negligence was not a proximate cause of the allision.  At all times pertinent the aforesaid barge was under the joint, and concurrent, control and supervision of Defendants through their employees acting in the course and scope of their employment with Defendants.  The incident was of a kind and nature that cannot occur without negligence, and all of the facts are within the exclusive knowledge, and control of Defendants and not equally accessible to Plaintiffs, wherefore the doctrine of *res ipsa loquitur* is applicable and specially pleaded herein.

66.64.  In the alternative, and should the court find *res ipsa loquitur* to be inapplicable, then, and in that event, Plaintiffs allege that the aforesaid barge was negligently left by Defendants unmanned, improperly moored, and without a power vessel to assist in its control in the direct path of the approaching category five (5) Hurricane Katrina.

67.65.  The unmanned and unsupervised Barge ING 4727, abandoned by Defendants to the elements, broke loose from its inadequate moorings and crashed through the Eastern side floodwall of the Industrial Canal, taking out a large section of the flood wall and causing a huge amount of water from Lake Ponchatrain, the Industrial Canal, and the Mississippi Gulf Outlet to flow into the Ninth Ward of the City of New Orleans, Eastern New Orleans East, and Arabi and Chalmette in St. Bernard Parish, causing catastrophic property damage, death, and personal injury, to the class members and the representative of the class.

68.66.  Defendant Lafarge is jointly and severally liable for negligence, and/or for creation and/or maintenance of and/or failure to remedy unreasonably hazardous conditions, in the following nonexhaustive particulars, and in manners inherent in the foregoing and/or in Lafarge's acts and omissions, all in violation of all applicable statutes, ordinances, regulations, jurisprudential rules or presumptions, maritime standards of care, guidelines and recommendations, all of which are pled in extenso by reference:

(a)     Diversion of ING 4727 and/or ING 4745 from original Westlake destination;

(b)     Receipt of ING 4727 and/or ING 4745 on August 26, 2005;

(c)     Unloading of ING 4727, and/or failure to timely or sufficiently avoid, cease and/or suspend cargo delivery, product distribution and/or unloading operations;

(d)     Failure to move, remove, fleet, ballast or scuttle ING 4727 and/or ING 4745 ;

(e)     Failure to implement or adhere to LNA Terminal Hurricane Preparation Checklist;

(f)     Failure to implement, promulgate or adhere to adequate hurricane plan for barges and/or safety policy;

(g)     Failure to communicate with Ingram, the Commander of the Port, and/or superior authorities within the Lafarge organization concerning ING 4727 and/or ING 4745;

(h)     Failure to adhere to mooring requirements in Ingram-LNA Transportation Agreement;

(i)     Failure to have or use adequate and effective communications equipment and/or means of communications including but not limited to telephones, facsimile lines and equipment, e-mail, Internet access, radios and television for timely and reasonable apprisal and knowledge of the status of Hurricane Katrina, and/or suspension of Zito operations;

27

(j)    Failure to adequately moor ING 4727 and/or ING 4745  under the circumstances, in manners including but not limited to

    1)    failure to cable ING 4727 to shore;

    2)    failure to moor ING 4727 to dock;

    3)    use of insufficient diameter, strength and/or quality of mooring line;

    4)    failure to use sufficient parts of mooring line;

    5)    failure to tie or fasten mooring line adequately;

    6)    failure to allow for storm surge;

    7)    mooring of high barge ING 4727  to low barge ING 4745;

    8)    failure to have sufficient or extra mooring line available

    9)    failure to use, place, order or arrange for additional mooring line;

    10)    failure to use sufficient mooring points;

    11)    mooring barges abreast;

    12)    mooring adjacent to inadequately moored Bunge barge tier;

    13)    failure to permit ING 4727 to remain moored inboard of loaded barge ING 4745, or to dock;

    14)    failure to adequately instruct or arrange for proper mooring methods for ING 4727 and/or ING 4745.

(k)    Failure to obtain and/or use reasonable and proper equipment, supplies, hardware, materials and/or methods for mooring of ING 4727;

(l)    Failure to implement, heed or adhere to Sector New Orleans Hurricane Plan, Port Condition Whiskey, X-Ray, Yankee and/or Zulu Proclamations, Governor's State of Emergency Proclamation, applicable provisions of Coast Pilot 5, United States Code, Code of Federal Regulations, and American Waterways Operators (AWO) and/or Responsible Carriers Program (RCP) standards;

(m)    Failure to take notice of or heed storm surge warnings;

28

(n)     Failure to monitor ING 4727 during Katrina;

(o)     Failure to obtain or provide for power vessel for ING 4727;

(p)     Failure to prevent breakaway of ING 4727;

(q)     Failure to adequately moor five Bunge barge tier;

(r)     Failure to recapture ING 4727 following breakaway;

(s)     Failure to prevent ING 4727 from striking and/or breaching IHNC

     floodwall;

(t)     Failure to implement or exercise standards of good seamanship;

(u)     Failure to exercise reasonable means of custody and control over ING

     4727;

(v)     Abandonment of the France Road facility in the face of Hurricane

     Katrina, notwithstanding that it had left inadequately moored barges in

     the IHNC

(w)     Failure to act reasonably, to do what could have been done, or see what

     could have been seen;

(x)     Failure to take reasonable measures to protect plaintiffs' persons and

     their property;

(y)     Failure to rescue plaintiffs or their property, or to take reasonable

     measures to protect plaintiffs' persons and their property from effects of

     breakaway and/or floodwall collision and breaches;

(z)     Negligent and/or reckless endangerment;

(aa)    Destruction of approximately 7.5 square miles of real and personal

     property owned by entities other than Lafarge North America, Inc,

     including but not limited to that owned by plaintiffs herein.

(bb)    Wilful, wanton and careless and/or reckless conduct;

(cc)    Any and all others proven.

    ~~69.~~67.  Defendants, Zito Fleeting, Inc. and Zito Fleeting, LLC. are jointly and severally

liable for negligence, and/or for creation and/or maintenance of and/or failure to remedy

unreasonably hazardous conditions,  in the following nonexhaustive particulars, and in manners inherent in the foregoing and/or in Zito Fleeting, Inc.'s and/or Zito Fleeting, LLC.'s acts and omissions, all in violation of all applicable statutes, ordinances, regulations, jurisprudential rules or presumptions, maritime standards of care, guidelines and recommendations, all of which are pled in extenso by reference:

(a)   Failure to respond to telephone call and/or request for release of ING 4727 by Lafarge North America, Inc.

(b)   Negligent delivery of ING 4727 on August 26, 2005 in spite of approach of Hurricane Katrina;

(c)   Failure to adequately fleet, move, retrieve or remove ING 4727 from IHNC;

(d)   Failure to inform Ingram of release of ING 4727;

(e)   Failure to communicate with Ingram and/or LNA concerning safety of ING 4727 in light of Hurricane Katrina;

(f)   Failure to take notice of or heed storm surge warnings;

(g)   Failure to implement or exercise standards of good seamanship;

(h)   Failure to exercise reasonable means of custody and control over ING 4727;

(i)   Failure to act reasonably, to do what could have been done, or see what could have been seen;

(j)   Failure to take reasonable measures to protect plaintiffs' persons and their property;

(k)   Negligent and/or reckless endangerment;

(l)   Willful, wanton and careless and/or reckless conduct;

(m)   Any and all others proven.

70.68.  Plaintiffs plead the doctrine of *respondeat superior*.

71.69.  As a result of Defendants' wrongful acts and omissions, Defendants are jointly and severally liable to the Plaintiffs for all damages they sustained which were caused by the

events subject of suit, together with legal interest thereon from the date of judicial demand until paid, and for all costs of these proceedings.

72.70.  The aforementioned conduct of Defendants was so reckless as to be oppressive, subjecting Plaintiffs and the other class members to cruel and unjust hardship in conscious disregard of their rights and was despicable, carried on with a willful and conscious disregard of the rights and safety of Plaintiffs and the other class members.

## VI.

## PRAYER

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

(a)     For Certification of the Classes defined herein, or such other Classes or Sub-ClassesSubclasses as the Court deems just and appropriate;

(b)     For general damages in an amount yet to be ascertained;

(c)     For compensatory damages in an amount yet to be ascertained;

(d)     For exemplary/punitive damages in an amount yet to be ascertained;

(e)     For prejudgment interest according to law in an amount yet to be ascertained;

(f)     For attorneys' fees in an amount yet to be ascertained;

(g)     For costs of suit in an amount yet to be ascertained; and,

(h)     For such other and further relief as this Court may deem proper.

WHEREFORE, Plaintiffs prays that the Defendants be duly cited to appear and answer this petition, and, after the legal delays and due proceedings are had, that there issue a judgment in favor of the Nominal Plaintiffs, and the Class that they seeks to represent, in amounts to be fixed by the jury, to truly and fully compensate them for the compensatory damages sustained by them, and for punitive damages to punish and deter Defendants for such reckless, wanton, egregious, and reprehensible conduct, together, with prejudgment legal interest thereon from the date of occurrence and all costs of these proceedings.

Dated: _____, 2008        Respectfully submitted

By: /s/  Shawn Khorrami

SHAWN KHORRAMI  (CA Bar #180411)
DYLAN POLLARD  (CA Bar #180306)
H. SCOTT LEVIANT  (CA Bar #200834)
MATT BAILEY  (CA Bar #218685)
444 S. Flower St., Thirty-Third Floor
Los Angeles, California 90071
Telephone:     (213) 596-6000
Facsimile:     (213) 596-6010
skhorrami@kpalawyers.com
dpollard@kpalawyers.com
hsleviant@kpalawyers.com
mbailey@kpalawyers.com


/s/  Brian Gilbert

Brian A. Gilbert, Esq.(21297)
LAW OFFICE OF BRIAN A. GILBERT, P.L.C.
821 Baronne Street
New Orleans, Louisiana 70113
Telephone: (504) 885-7700
Telephone: (504) 581-6180
Facsimile: (504) 581-4336
bgilbert@briangilbertlaw.com


/s/  Lawrence D. Wiedemann

Lawrence D. Wiedemann.(13457)
Karl Wiedemann (18502)
Karen Wiedemann (21151)
WIEDEMANN & WIEDEMANN
821 Baronne Street
New Orleans, Louisiana 70113
Telephone: (504) 581-6180
Facsimile: (504) 581-4336
lawrence@wiedemannlaw.com
karl@wiedemannlaw.com
karen@wiedemannlaw.com


/s/  Patrick J. Sanders

Patrick J. Sanders (18741)
3316 Ridgelake Drive
Suite 100
Metairie, LA 70002
Telephone: 504-834-0646
pistols42@aol.com

32

/s/  Richard T. Seymour
_____
Richard T. Seymour (D.C. Bar #28100)
Law Office of Richard T. Seymour, P.L.L.C.
1150 Connecticut Avenue N.W., Suite 900
Washington, D.C.  20036-4129
Voice: 202-862-4320
Cell:   202-549-1454
Facsimile:  800-805-1065 and 202-828-4130
rick@rickseymourlaw.net

*Attorneys for Barge Plaintiffs*

**CERTIFICATE OF SERVICE**

I do hereby certify that I have on this 29th day of September, 2008 served a copy of the

foregoing pleading on counsel for all parties to this proceeding, by electronic filing notification.

/s/ Brian Gilbert, Esq.
_____

Dated: December 1, 2008

Formatted: Left:  0.83", Right:  0.83", Section start: Continuous, Suppress Endnotes, Header distance from edge:  1", Footer distance from edge:  1"

Formatted: Font: Shruti, Bold, Underline

33

| Page 1: [1] Style Definition | Richard T. Seymour | December 14, 2008 10:56:00 PM |

Attorney Name: Add space between paragraphs of the same style, Widow/Orphan control

| Page 1: [2] Style Definition | Richard T. Seymour | December 14, 2008 10:56:00 PM |

TOC 1: Check spelling and grammar, Not Expanded by / Condensed by , Indent: Left:  0", First line:  0", Right:  0", Line spacing:  single, No widow/orphan control, Don't adjust space between Latin and Asian text, Don't adjust space between Asian text and

| Page 1: [3] Style Definition | Richard T. Seymour | December 14, 2008 10:56:00 PM |

TOC 5: Font: 12 pt, Not Expanded by / Condensed by , Indent: Left:  0.67", First line:  0", Right:  0", Line spacing:  single, No widow/orphan control, Don't keep lines together, Don't adjust space between Latin and Asian text, Don't adjust space between

| Page 1: [4] Style Definition | Richard T. Seymour | December 14, 2008 10:56:00 PM |

TOC 4: Check spelling and grammar, Not Expanded by / Condensed by , Indent: Left:  0.5", First line:  0", Right:  0", Line spacing:  single, No widow/orphan control, Don't adjust space between Latin and Asian text, Don't adjust space between Asian text an

| Page 1: [5] Style Definition | Richard T. Seymour | December 14, 2008 10:56:00 PM |

TOC 3: Check spelling and grammar, Not Expanded by / Condensed by , Indent: Left:  0.33", First line:  0", Right:  0", Line spacing:  single, No widow/orphan control, Don't adjust space between Latin and Asian text, Don't adjust space between Asian text a

| Page 1: [6] Style Definition | Richard T. Seymour | December 14, 2008 10:56:00 PM |

Footnote Text: Font: 10 pt, Font color: Auto, Not Expanded by / Condensed by , Indent: First line:  0", Space After:  0 pt, Line spacing:  single, Don't adjust space between Latin and Asian text, Don't adjust space between Asian text and numbers

| Page 1: [7] Style Definition | Richard T. Seymour | December 14, 2008 10:56:00 PM |

Body Text: Font: 12 pt, Not Expanded by / Condensed by , Left, Space After:  6 pt, Line spacing:  single, Don't adjust space between Latin and Asian text, Don't adjust space between Asian text and numbers

| Page 1: [8] Style Definition | Richard T. Seymour | December 14, 2008 10:56:00 PM |

Footer: Font: 12 pt, Font color: Auto, Add space between paragraphs of the same style, Line spacing:  single, Don't adjust space between Latin and Asian text, Don't adjust space between Asian text and numbers

| Page 1: [9] Style Definition | Richard T. Seymour | December 14, 2008 10:56:00 PM |

Header: Font: 12 pt, Font color: Auto, Add space between paragraphs of the same style, Line spacing:  single, Don't adjust space between Latin and Asian text, Don't adjust space between Asian text and numbers

| Page 1: [10] Style Definition | Richard T. Seymour | December 14, 2008 10:56:00 PM |

Heading 9: Font: (Default) Arial, 11 pt, Not Italic, Font color: Auto, Space Before:  12 pt, After:  3 pt, Add space between paragraphs of the same style, Line spacing:  single, Outline numbered + Level: 9 + Numbering Style: i, ii, iii, … + Start at: 1 +

| Page 1: [11] Style Definition | Richard T. Seymour | December 14, 2008 10:56:00 PM |

Heading 8: Font: Times New Roman, 12 pt, Italic, Font color: Auto, Space Before:  12 pt, After:

| Page 1: [12] Style Definition | Richard T. Seymour | December 14, 2008 10:56:00 PM |
|---|---|---|

Heading 7: Font: Times New Roman, 12 pt, Not Italic, Font color: Auto, Space Before:  12 pt, After:  3 pt, Add space between paragraphs of the same style, Line spacing:  single, Outline numbered + Level: 7 + Numbering Style: i, ii, iii, … + Start at: 1 +

| Page 1: [13] Style Definition | Richard T. Seymour | December 14, 2008 10:56:00 PM |
|---|---|---|

Heading 6: Font: Times New Roman, 11 pt, Bold, Not Italic, Font color: Auto, Space Before:  12 pt, After:  3 pt, Add space between paragraphs of the same style, Line spacing:  single, Outline numbered + Level: 6 + Numbering Style: a, b, c, … + Start at: 1

| Page 1: [14] Style Definition | Richard T. Seymour | December 14, 2008 10:56:00 PM |
|---|---|---|

Heading 5: Font: 13 pt, Bold, Italic, Underline color: Auto, Font color: Auto, Not Expanded by / Condensed by , Space Before:  12 pt, After:  3 pt, Line spacing:  single, Outline numbered + Level: 5 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment:

| Page 1: [15] Style Definition | Richard T. Seymour | December 14, 2008 10:56:00 PM |
|---|---|---|

Heading 4: Font: Times New Roman, 14 pt, Not Italic, Font color: Auto, Not Expanded by / Condensed by , Space Before:  12 pt, After:  3 pt, Line spacing:  single, Outline numbered + Level: 4 + Numbering Style: a, b, c, … + Start at: 1 + Alignment: Left +