UNITED  STATES  DISTRICT  COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re:  KATRINA CANAL BREACHES | § | CIVIL ACTION |
| CONSOLIDATED LITIGATION | § | NO. 05-4182 "K" (2) |
| | § | JUDGE DUVAL |
| | § | MAG. WILKINSON |
| | § | |
| PERTAINS TO: MRGO, *Robinson* (06-2268) | § | |
| | § | |

**UNITED STATES' OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT ON THE DISCRETIONARY FUNCTION EXCEPTION**

This lawsuit concerns the Army Corps of Engineers' design, construction, and maintenance of the MRGO.  The United States contends that the Corps's conduct is protected by the discretionary function exception to the Federal Tort Claims Act ("FTCA") and thus is not amenable to suit.  *See generally* Doc. 16511-2.  In their cross-motion for partial summary judgment, Plaintiffs take the contrary position.  Relying principally on two statutes, the Fish and Wildlife Coordination Act ("FWCA") and the National Environmental Policy Act ("NEPA"), Plaintiffs argue that the Corps failed to comply with certain procedural requirements, thus precluding application of the discretionary function exception.

As this Court knows well, application of the discretionary function exception depends on a two-prong test that examines whether the challenged conduct was

(1) discretionary and (2) "susceptible to policy analysis." *United States v. Gaubert*, 499 U.S. 315, 325 (1991); *Andrade v. Chojnacki*, 338 F.3d 448, 457 (5th Cir. 2003); *In re Katrina Canal Breaches Consol. Litig.*, 05-4182, 2008 WL 2186400, at *3 (May 27, 2008) (Duval, J.).  In their motion, Plaintiffs "focus only on the first prong" of this test.  *See* Doc. 16510-2 at 2.

For conduct to be considered "discretionary" under the first prong, it must "involv[e] an element of judgment or choice." *Gaubert*, 499 U.S. at 322.  "The requirement of judgment or choice is not satisfied if a 'federal statute, regulation or policy specifically prescribes a course of action for an employee to follow,' because 'the employee has no rightful option but to adhere to the directive.'" *Id.* (quoting *Berkovitz v. United States*, 486 U.S. 531, 536 (1988)).  In their motion, Plaintiffs argue that this test is not satisfied because the Corps's conduct was prescribed by various statutes and regulations, with which the Corps failed to comply.

Specifically, Plaintiffs argue that the Corps violated requirements of:

(1) the Fish and Wildlife Coordination Act ("FWCA") by not consulting with federal and state wildlife and fisheries agencies and reporting to Congress their concerns about the MR-GO's negative ecological impact; (2) the National Environmental Policy Act ("NEPA") by not preparing an adequate Environmental Impact Statement for the MR-GO project and its over 30-year history of operations and maintenance activities; and (3) national and Army Corps policies by not protecting wetlands.

Doc. 16510-2 at 2.

None of these arguments has merit.  First, in attempting to conjure a violation of the FWCA, Plaintiffs have conspicuously misrepresented the requirements of that law.  At no time prior to the authorization of the MRGO was the Corps required to coordinate its activities with state or federal fish and wildlife agencies.  Moreover, there is ample,

undisputed evidence that subsequent to authorization of the MRGO, the Corps did coordinate its activities with fish and wildlife authorities, just as the law provided.

Second, NEPA did not require the Corps to produce an EIS. Indeed, as the case law interpreting NEPA makes clear, the decision whether to produce an EIS, as opposed to a less burdensome Environmental Assessment ("EA"), is one committed to the discretion of the agency. Even if the Corps abused its discretion by failing to prepare an EIS, assuming that one should have been produced, the United States would still be entitled to immunity, as the discretionary function exception protects all discretionary policy choices—even those that are abuses of discretion.

Finally, even if the FWCA or NEPA had "specifically prescribed a course of action" not taken by the Corps, the putative violation of such a directive would not prevent application of the discretionary function exception to the challenged conduct. The conduct at issue in this case—the design, construction, operation, maintenance, and repair of the MRGO—was inherently discretionary, and the Corps's discretion in undertaking those functions would not have been removed by any of the antecedent procedural violations posited by Plaintiffs. Moreover, even if such omissions had constituted violations of law (and they assuredly did not), those violations would not have negated the Corps's discretion as to the conduct that supposedly caused Plaintiffs harm. That conduct—the Corps's design, construction, and maintenance of the MRGO—involved policy-driven matters of judgment and choice concerning how best to create and maintain a deep-draft shipping channel from

the Port of New Orleans to the Gulf of Mexico.  Plaintiffs' motion therefore misses the mark.

Instead, this case should be dismissed for lack of subject matter jurisdiction.

**ARGUMENT**

**I.  The Corps Did Not Violate the FWCA.**

Plaintiffs argue that the discretionary function exception does not apply because the

Corps violated the FWCA.  The supposed violation:  failing to consult with federal and state

fish and wildlife agencies prior to submitting the Chief's Report to Congress.  *See* Doc.

16510-2 at 5-7.  Although the 1958 version of the FWCA would have required the Corps to

consult with fish and wildlife officers and submit a report to Congress when *proposing* a

project like the MRGO, the 1946 version of that law, which governed the conduct

challenged in this case, did not require consultation until *after authorization* of the MRGO.

Accordingly, the Corps did not violate the FWCA.

The pertinent events concerning the authorization of the MRGO were not subject to

the 1958 FWCA.  The Chief's Report was submitted to Congress in 1951.  Congress acted on

that report in 1956 when it authorized construction of the MRGO.  *See* Pub. L. No. 84-455,

70 Stat. 65 (1956).  At that time, the FWCA required consultation *after* authorization, not

before:

> Whenever the waters of any stream or other body of water *are authorized*  to
> be impounded, diverted, or otherwise controlled for any purpose whatever by
> any department or agency of the United States . . . such department or agency
> first shall consult with the Fish and Wildlife Service and the head of the
> agency exercising administration over the wildlife resources of the State . . .
> and the reports and recommendations [of those authorities] shall be made an
> integral part of any report submitted by any agency of the Federal

4

Government responsible for engineering surveys and construction of such projects.

FWCA, § 2, 60 Stat. 1080 (1946) (emphasis added).

By its terms, the 1946 Act required consultation with fish and wildlife agencies and reporting of fish and wildlife agency recommendations "[w]henever . . . waters . . . *are authorized* to be impounded, diverted, or otherwise controlled . . . ." *Id.* (emphasis added). Under the 1946 Act—the law in effect when the Chief's Report was submitted to Congress—the Corps was required to coordinate with the relevant fish and wildlife authorities only *after* Congressional authorization.

This construction of the 1946 Act is confirmed by the 1958 amendment. In 1958, two years after Congress authorized the MRGO, the Act was amended to provide that consultation must occur not only after control of waters is "authorized," but also whenever control of waters is *"proposed"*:

> [W]henever the waters of any stream or other body of water are *proposed* or authorized to be impounded, diverted, the channel deepened, or the stream or other body of water otherwise controlled or modified for any purpose whatever, including navigation and drainage, by any department or agency of the United States . . . such department or agency first shall consult with the United States Fish and Wildlife Service, Department of the Interior, and with the head of the agency exercising administration over the wildlife resources of the particular State. . . .
>
> In furtherance of such purposes, the reports and recommendations [of those authorities] . . . shall be made an integral part of any report prepared or submitted by any agency of the Federal Government responsible for engineering surveys and construction of such projects when such reports are presented to the Congress or to any agency or person having the authority or power, by administrative action or otherwise, (1) to authorize the construction of water-resource development projects or (2) to approve a report on the modification or supplementation of plans for previously authorized projects, to

5

which this Act applies. . . . The reporting officers in the project reports of the Federal agencies shall give full consideration to the reports and recommendations of the Secretary of the Interior and to any report of the State agency of the wildlife aspects of such projects, and the project plan shall include such justifiable means and measures for wildlife purposes as the reporting agency finds should be adopted to obtain maximum overall project benefits.

FWCA, § 2(a)-(b), 72 Stat. 563, 564 (1958) (codified at 16 U.S.C. § 662(a)-(b)) (emphasis added).

This amendment broadened the Act by making its consultation requirement applicable to "proposed" actions and by imposing that requirement (and others) whenever a "modifi[cation]" (and not just initial "control") was anticipated. The legislative history of the 1958 amendment makes it clear that a principal purpose of the amendment was to make the consultation and reporting requirements applicable prior to project authorization:

This amendment to the Coordination Act would grant authority to the agencies of Government engaged in construction to consult with the Fish and Wildlife Service *before* and during the building of Federal water development projects. . . . Under the bill suggestions regarding changes could be made *previous* to the commencement of construction. Such plans, or recommendations, whether accepted or rejected by the construction agency, would be submitted to the Congress *at the time authorization legislation for the project was under consideration. . . .*

Unquestionably, the bill, if enacted, would result in the Congress having better information on the effects of water projects on fish and wildlife resources while considering project-authorizing legislation. It will then, of course, be for the Congress to decide what conservation measures should be incorporated in any project.

1958 U.S.C.C.A.N. 3446, 3446, 3451, S. Rep. No. 85-1981 (1958) (emphasis added).

As this language demonstrates, Congress amended the FWCA in 1958 to require the Corps and similar agencies to consult with fish and wildlife agencies whenever the Corps was

*proposing* to control or modify the waters of a stream or other body of water.  Any report to Congress that *proposed* such an activity was required to integrate the views of fish and wildlife agencies.  By expanding the consultation and reporting requirements to apply prior to authorization, Congress sought to ensure that it would be apprised of the views of fish and wildlife agencies "while considering project-authorizing legislation."  Because these obligations were imposed by the *1958* amendment, it is clear that Plaintiffs are wrong in asserting that the Corps was required to consult and to include the views of fish and wildlife agencies in its *1951* MRGO Report to Congress.

Further, there is no question that the Corps complied with its post-authorization requirement.  Indeed, this compliance is thoroughly documented by Plaintiffs' own statement of facts.  *See, e.g.*, Doc. 16510-4 ¶ 16 (citing, *inter alia*, Doc. 16510-20 (letter from United States Secretary of the Interior, Fred A. Seaton, to Army Secretary William M. Bruckner, Aug. 22, 1957 (Pls.' Ex. 8)); 16510-16 through 19 (*An Interim Report on Fish and Wildlife Resources as Related to Mississippi River-Gulf Outlet Project, Louisiana and an Outline of Proposed Fish and Wildlife Studies*, Appendix I, Apr. 1958 (Pls.' Ex. 7))).

The MRGO design documents further demonstrate the extensive post-authorization coordination that occurred.  The comments and suggestions of both federal and state fish and wildlife agencies are addressed in General Design Memorandum No. 2.  That 1959 document sets forth the Corps's reasons for rejecting channel routes favored by fish and wildlife agencies and for selecting the route along which the MRGO would later be constructed.  *See* Doc. 16510-25 (GDM No. 2) ¶¶ 33, 61; Doc. 16510-27 (GDM No. 2), App. III.  In General

Design Memorandum No. 1-B, the Corps accepted many of the recommendations provided by the Fish and Wildlife Service. *See* Doc. 16511-8 (GDM No. 1-B) ¶¶ 33, 35.

The Fish and Wildlife Service's own documents also reflect significant coordination with the Corps. In a letter dated September 24, 1959, the Fish and Wildlife Service stated that it had provided the Corps with thirty specific recommendations for construction of the MRGO. *See* Doc. 16510-28 (Pls.' Ex. 13). The Corps fully accepted or modified its plans in response to the vast majority of those recommendations. *Id.*

Similarly, there is no question that the Corps complied with its reporting obligations. Even as amended in 1958, the FWCA required only that reports of fish and wildlife agencies "be made an integral part of any [Corps] report . . . *when* such [Corps] reports are presented to the Congress . . . ." FWCA, § 2(a)-(b), 72 Stat. 563, 564 (1958) (emphasis added). Not even the 1958 Act imposed an independent obligation that the Corps create an additional, post-authorization report to Congress integrating the views of fish and wildlife agencies. The Chief's MRGO Report was delivered to Congress prior to 1958, and there was no subsequent obligation to make a further report, integrating the views of fish and wildlife agencies. There is nothing in the 1958 amendment to the contrary.

Plaintiffs also argue that the Corps was required to give "serious consideration" and "great weight" to the recommendations of these authorities.[1] But neither the 1946 Act nor

---

[1] The "great weight" language used by Plaintiffs comes from the decision in *Sierra Club v. Alexander*, 484 F. Supp. 455 (N.D.N.Y. 1980), which itself is based on a Corps regulation, 33 C.F.R. § 320.4. *See Alexander*, 484 F. Supp. at 469-70. That regulation, however, was not promulgated until 1978—long after the MRGO had been constructed.

the 1958 Act contains any such requirement.  Instead, the 1946 law merely required

consultation, without any elaboration of what such consultation would entail, and the 1958

law added the requirement that fish and wildlife recommendations receive "full

consideration."  It is clear, however, that even under the 1958 law, the Corps had discretion

to reject any and all such recommendations in order to "obtain maximum overall project

benefits."  *Id.*; *see also* 1958 U.S.C.C.A.N. at 3451 ("The legislation would be a permissive law

so far as it concerns the relationship between water project construction agencies and fish

and wildlife conservation agencies.  The latter would not be given any veto power over any

part of the water resource development program.").

The hortatory directive to give "full consideration" to the views of fish and wildlife

agencies does not eliminate the protection afforded by the discretionary function exception.

General requirements such as this do not set forth a "specific direction" but instead allow

considerable room for the exercise of judgment and choice.  *Guile v. United States*, 422 F.3d

221, 231 (5th Cir. 2005) (holding that inclusion of general safety requirements in contract did

not preclude application of discretionary function exception); *In re Katrina Canal Breaches*,

2008 WL 2186400, at *3 (quoting *Gaubert*, 499 U.S. at 322); *see also ALX El Dorado, Inc., v.

Sw. Sav. & Loan Ass'n*, 36 F.3d 409, 411-12 (5th Cir. 1994).

In this respect the directive to give "full consideration" to other agencies' views is

akin to the Homeland Security Presidential Directive ("HSPD-5") issued prior to Hurricane

Katrina which required the Department of Homeland of Security to "'integrate Federal

Government domestic prevention, preparedness, response, and recovery plans into one all-

discipline, all hazards plan.'" *In re Katrina Canal Breaches*, 2008 WL 2186400, at *4 (quoting

*Freeman v. United States Dep't of Homeland Sec.*, Civil Action No. 06-4846, 2007 WL

1296206, at *6 (Apr. 30, 2007)).  This Court recognized that that directive was too general to

remove judgment and choice:

> [T]he HSPD-5 . . . does not contain any specific course of conduct, but rather
> includes directives to formulate a plan without any specific requirements
> otherwise.  Therefore, the HSPD-5 does not amount to a required duty that
> would prevent the discretionary exception from applying.

*In re Katrina Canal Breaches*, 2008 WL 2186400 at *4; *accord Freeman*, 2007 WL 1296206, at

*7 ("[E]ven where stronger 'must' language is used the document is still a very high level

overview of the anticipated rollout plan for federal resources during a domestic incident.");

*see also Mid-South Holding Co. v. United States*, 225 F.3d 1201, 1207 n.7 (11th Cir. 2000)

("Even if, as Mid-South conjectures, pertinent guidelines had *required* Customs Service

agents to exercise due care during their search, such a general proviso would be insufficient

to divest the agents of their discretion in devising the course by which to conduct the

search.") (emphasis added); *Irving v. United States*, 162 F.3d 154, 163 (1st Cir. 1998) (en

banc) ("[T]he regulations neither mandate a particular *modus operandi* for conducting

inspections nor otherwise materially restrict compliance officers' flexibility.  Of particular

importance, the regulations do not prescribe any specific regimen governing the scope or

detail of general administrative inspections performed by compliance officers."); *Calderon v.*

*United States*, 123 F.3d 947, 950 (7th Cir. 1997) (concluding that statute requiring the

"safekeeping, care, and subsistence of all persons charged with or convicted of offenses"

10

failed to "set[] forth [the] particular conduct the BOP personnel should engage in or avoid while attempting to fulfill their duty to protect inmates").

Plaintiffs' contention that the Corps failed to comply with the FWCA is utterly baseless. It flies in the face of the plain language of the pertinent law—the 1946 Act—which only required consultation *after* authorization. The record confirms what Plaintiffs concede: the Corps consulted and coordinated with the pertinent agencies while it was designing the deep-draft channel and made changes in response to recommendations that were, in the Corps's judgment, consistent with "maximum overall project benefits." For all of these reasons, the FWCA does not prevent application of 28 U.S.C. § 2680(a) to the design, construction, operation, and maintenance of the MRGO.

## II.  The Corps Did Not Violate A Specific, Mandatory Provision Of NEPA.

By the year NEPA was enacted, 1969, construction of the MRGO had been long completed and maintenance dredging of this channel to preserve its design dimensions had begun.

By 1972, the Corps had begun to consider the potential environmental impacts caused by this dredging, and in 1976, it issued an EIS on this subject. *See* Doc. 16510-4 (Pls.' Stmt. of Undisputed Facts) ¶¶ 54-58. Nine years later, in 1985, the Corps published a "Supplemental Information Report" designed to complement the 1976 EIS. *Id.* ¶¶ 87-88. Additionally, between 1980 and 2004, the Corps performed at total of 26 EAs concerning its MRGO-maintenance activities. *Id.* ¶ 95.

In their motion, Plaintiffs argue that the Corps violated a specific, mandatory provision of NEPA by failing to do more.  Specifically, Plaintiffs fault the Corps for "not preparing a comprehensive evaluation of the significant and cumulative environmental impacts . . . from dredging and bank erosion that had occurred *since* its 1976 [EIS]" *See* Doc. 16510-2 at 13 (emphasis added); *id.* at 22 (faulting the Corps for failing to produce a "comprehensive EIS").  NEPA, however, did not specifically require the production of a cumulative, comprehensive EIS, and instead left the determination of whether such an undertaking was required to the Corps's discretion.

To be sure, "NEPA . . . requires federal agencies to prepare a detailed [EIS] for all 'major  federal actions significantly [affecting] the quality of the human environment.'" *Spiller v. White*, 352 F.3d 235, 237 (5th Cir. 2003) (quoting 42 U.S.C. § 4332(C)); *see also Nevada v. United States*, 221 F. Supp. 2d 1241, 1247 (D. Nev. 2002) ("NEPA applies to the actions of federal agencies, and requires the preparation of an Environmental Impact Statement (EIS) when a federal agency engages in a major federal action that significantly affects the quality of the human environment.").  But an agency exercises judgment in determining whether the environmental impact of a proposed action will be "significant." To guide this determination, NEPA allows the agency to choose to prepare an EA instead of an EIS.  *Spiller*, 352 F.3d at 238 ("The EA is a rough-cut, low-budget environmental impact statement designed to show whether a full-fledged environmental impact statement . . . is necessary."); *see also O'Reilly v. United States Army Corps of Eng's*, 477 F.3d 225, 228 (5th Cir. 2007).  If the EA reveals that the proposed action will "significantly" harm the

environment, then an EIS must be produced.  But if the EA reveals that the impact will not

be "significant," then no EIS is required.  In the latter circumstance, the agency is authorized

to issue a "Finding of No Significant Impact" ("FONSI").  *See O'Reilly*, 477 F.3d at 228;

*Spiller*, 352 F.3d at 238.

        This critical decision—whether particular conduct requires the production of a

complete EIS or merely an EA/FONSI—is committed to the judgment of the agency.  As the

Supreme Court noted in *Kleppe v. Sierra Club*, 427 U.S. 390 (1976), determining whether a

comprehensive EIS is necessary "requires the weighing of a number of relevant factors,

including the extent of the interrelationship among proposed actions and practical

considerations of feasibility."  *Id.* at 412.  The Court further observed that "[r]esolving these

issues . . . is properly left to the informed *discretion* of the responsible federal agencies."  *Id.*

(emphasis added); *see also Sabine River Auth. v. United States Dep't of Interior*, 951 F.2d

669, 677-78 (5th Cir. 1992) (holding that courts should employ the "the highly deferential

'arbitrary and capricious' standard" to review an agency's decision not to produce an EIS); *id.*

at 678 (holding that in reviewing an agency's decision whether to produce an EIS, the court

must "ensure that the agency has arrived at a *reasoned judgment*") (emphasis added); *Kern v.*

*United States Bureau of Land Mgmt.*, 284 F.3d 1062, 1070 (9th Cir. 2002) ("An agency's

decision not to prepare an EIS once that agency has prepared an EA is reviewed for *abuse of*

*discretion*, and will be set aside only if it is 'arbitrary and capricious.'") (emphasis added);

*Crouse Corp. v. Interstate Commerce Comm'n*, 781 F.2d 1176, 1193 (6th Cir. 1986) ("An

agency decision, based on an EA, that no EIS is required, can be overturned only if it is

arbitrary, capricious, or an abuse of discretion."); *Save Our Wetlands v. Julich*, No. Civ.A.01–3472, 2002 WL 59401, at *3 (E.D. La. Jan. 15, 2002) (Duval, J.) ("Review of an agency's FONSI, is conducted under an 'arbitrary and capricious standard."') (quoting *Sabine River Auth.*, 951 F.2d at 677-78).[2]

As these cases demonstrate, the decision whether to prepare an EIS is fundamentally a protected discretionary function.  The highly deferential standard of review under the Administrative Procedure Act that applies to such decisions does not permit courts to "second guess" agency decisions regarding how to comply with NEPA.  *See Envtl. Law & Policy Ctr. v. United States Nuclear Regulatory Comm'n*, 470 F.3d 676, 685 (7th Cir. 2006)

---

[2]  The unpublished district court case relied upon by Plaintiffs, *Adams v. United States*, No. CV-03-0049-E-BLW, 2006 WL 3314571 (D. Idaho Nov. 14, 2006), is proved wrong by the very precedent upon which it purports to be based.  *See Adams,* 2006 WL 3314571, at *1 n.2 (citing *Great Basin Mine Watch v. Hankins,* 456 F.3d 955 (9th Cir. 2006)). In *Great Basin*, the Ninth Circuit recognized that agencies have discretion in deciding whether to produce a series of EAs rather than a single comprehensive EIS.  *See Great Basin,* 456 F.3d at 969.  The court held that where an "agency declines to produce a single EIS, plaintiffs must show that the [agency] was *arbitrary and capricious* in failing to prepare one comprehensive environmental statement." *Id.* (internal quotation marks omitted) (emphasis added); *see also Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 894 (9th Cir. 1992) ("To prevail, plaintiffs must show that the Forest Service was arbitrary and capricious in failing to prepare one comprehensive environmental statement.").  Implicit in the *Great Basin* holding is the court's recognition that it is engaged in judicial review of an agency's exercise of discretion.

Further, in a more recent, reported decision, a district court reached the opposite conclusion from that reached in *Adams.*  In *Quechan Indian Tribe v. United States*, 535 F. Supp. 2d 1072 (S.D. Cal. 2008), the court recognized that whether to prepare an EIS is both discretionary and "clearly grounded in public policy considerations." *Id.* at 1111-12.  It therefore held that an agency's failure to produce an EIS is protected by the discretionary function exception.  *See id.* ("[T]o the extent the decision to prepare a 'categorical exclusion' rather than an environment analysis or impact statement is the basis for Plaintiff's tort claims, the tort claims must be dismissed.").

("'[I]t is not our role to second-guess. We merely consider whether the [agency] followed required procedures, evaluated relevant factors and reached a reasoned decision.'") (quoting *Van Abbema v. Fornell*, 807 F.2d 633, 636 (7th Cir. 1986)); *Julich*, 2002 WL 59401, at *3 (recognizing that under NEPA, "courts are not permitted to critique an agency's substantive decisions or to second guess the extent or quality of its decisionmaking process"). The incompatibility of reviewing the correctness of such agency decisions under the FTCA, which also prohibits judicial "second-guessing," is patent. *See United States v. Varig Airlines,* 467 U.S. 797, 814 (1984) (noting that the purpose of the discretionary function exception is "to prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort").

As demonstrated above, the worst that can be said of the Corps's decision to forgo the production of an EIS is that it amounted to an abuse of discretion.[3]  "The discretionary function exception, however, protects all policy choices, even those that are an abuse of discretion."  *In re Katrina Canal Breaches*, 2008 WL 2186400, at *6.  Accordingly, Plaintiffs' argument based on NEPA must be rejected.

---

[3]  The same is true with respect to Plaintiffs' suggestion that the 1976 EIS "was legally inadequate" because it failed to discuss certain topics.  *See* Doc. 16510-2 at 14.  Decisions such as what to include in an EIS are committed to the agency's discretion.  *See Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1361 (11th Cir. 2008) (holding that "abuse of discretion" standard applies also to "drafting decisions like how much discussion to include on each topic, and how much data is necessary to fully address each issue").

III.    **The Procedural Requirements Relied Upon By Plaintiffs, Even If Violated, Would Not Deprive The United States Of Discretionary Function Immunity**

Even if the Corps *had* violated a specific, mandatory provision of the FWCA or NEPA—and, as demonstrated above, it did not—such a violation would not have negated the discretionary function immunity enjoyed by the United States.

First, the laws on which Plaintiffs rely mandate certain procedures which, Plaintiffs argue, the Corps did not follow before dredging the MRGO.  It is clear, however, that failing to "follow[] mandated procedures" amounts only to an abuse of discretion, which of course cannot form the basis for an FTCA claim.  *See Jayvee Brand, Inc. v. United States*, 721 F.2d 385, 390 (D.C. Cir. 1983) ("[W]e conclude that making a discretionary decision without following mandated procedures should be characterized, for the purposes of the FTCA, as an abuse of discretion.  It follows that the discretionary function exception applies and the district court was without jurisdiction to entertain this suit."); *see also Franklin Sav. Corp. v. United States*, 180 F.3d 1124, 1132 n.11 (10th Cir. 1999) ("To allow plaintiffs to avoid the discretionary-function bar by alleging that RTC employees breached a specific duty to report information, even though the harmful decisions based on the information were themselves discretionary, would be in tension with precedent."); *Fisher Bros. Sales, Inc. v. United States*, 46 F.3d 279, 285-86 (3rd Cir. 1995) (en banc) (rejecting "plaintiffs['] attempt to avoid application of the discretionary function exception by looking behind the injury-causing decision and finding fault with an aspect of the data on which it may have been based"); *Johnson v. United States*, 949 F.2d 332, 339-40 (10th Cir. 1991) (applying discretionary function exception to bar claim challenging agency's "information gathering activity," which

16

was mandatory, because it was "inextricably tied to" and "a component of the overall policy
decision," which was discretionary).[4]

Here, moreover, the supposedly "mandatory" conduct in which the Corps failed to
engage—consulting with other agencies, compiling information, and submitting reports—all
would have been antecedent to what was the ultimately discretionary conduct which
allegedly caused Plaintiffs' injuries:  deciding whether, when, how, and where to dredge the
MRGO in order to keep the deep-draft channel deep enough and wide enough to facilitate
use by deep-draft vessels.[5]   As demonstrated above, the purported failure to follow

---

[4] Similarly, permitting recovery under the FTCA based on violations of the FWCA
and NEPA would "subvert a congressional decision to preclude regulated entity liability in"
those statutes.  *See Abreau v. United States*, 468 F.3d 20, 30 (1st Cir. 2006).  In *Abreau*, the
plaintiffs sought damages under the FTCA based on the Navy's failure to obtain a permit
required by the Resource Conservation Recovery Act ("RCRA").  *Id.* at 29.  The First Circuit
held that the claim was barred by the discretionary function exception.  *See id.* at 30-31.
Specifically, the court held that "[i]mposing liability under the FTCA because of the failure
of a federal employee to comply with a mandatory directive is not permissible" because to do
so "would adversely affect the RCRA statutory scheme."  *Id.*  The court recognized that with
respect to the RCRA, "Congress affirmatively decided to limit the available remedies and to
preclude compensatory damages."  *Id.* at 31.  The same, of course, is true with respect to the
FWCA and NEPA, neither of which permits the recovery of compensatory damages.  *See,
e.g.*, *San Carlos Apache Tribe v. United States*, 272 F. Supp. 2d 860, 885 (D. Ariz. 2003)
("There is, however, no private right of action under NEPA. . . .  There is no private right of
action under the FWCA.") (citations omitted); *United States v. 45,149.58 Acres of Land,* 455
F. Supp. 192, 203 (D.C.N.C. 1978) ("[P]rivate litigants can recover no money damages for an
agency's failure to file an EIS, even if required.").

[5] There can be no question that this conduct was discretionary.  Indeed, NEPA only
applies to discretionary conduct.  *See Sierra Club v. Babbitt*, 65 F.3d 1502, 1512 (9th Cir.
1995) (observing that application of NEPA is "triggered by a discretionary federal action");
*Friends of the Columbia Gorge, Inc. v. United States Forest Serv.*, 546 F. Supp. 2d 1088, 1100
(D. Ore. 2008) ("Non-discretionary actions do not trigger NEPA."); *Nevada*, 221 F. Supp. 2d
at 1247 ("NEPA applies only to discretionary agency actions, not to ministerial or mandatory
(continued...)

17

mandated procedures prior and subsidiary to the actual dredging decisions would not have stripped the United States of its discretionary function immunity.

Second, and finally, Plaintiffs' reliance on these procedural statutes is misplaced because the connection between the alleged violations of these statutes and Plaintiffs' asserted damages is nonexistent. Plaintiffs have not shown and cannot show that the failure to consult with fish and wildlife agencies prior to authorization of the MRGO has any causal relationship to the damage they allege. Nor have they shown that the Corps's decision to conduct a series of EAs instead of an EIS caused the harm of which they complain. Their inability to demonstrate any causal connection between these alleged violations and their alleged damage dooms their motion. In order for the violation of prescribed conduct to negate discretionary function immunity, "there must be a causal connection between the violation and [the plaintiff's] asserted damages." *Montijo-Reyes v. United States*, 436 F.3d 19, 26 (1st Cir. 2006); *see also Sloan v. United States Dep't of HUD*, 236 F.3d 756, 762 (D.C. Cir. 2001); *Franklin Sav. Corp.*, 180 F.3d at 1133.

In *Montijo-Reyes*, the plaintiffs sought to hold the Corps liable for negligently discharging dredged material. *Id.* at 24. When the United States asserted discretionary function immunity, the plaintiffs responded that the discharge of dredged material was non-discretionary because the Clean Water Act "mandated a course of conduct for the Corps to

---

[5](...continued)
actions."); *cf. Save Barton Creek Ass'n v. FHWA*, 950 F.2d 1129, 1134 (5th Cir. 1992) ("'The EIS process is supposed to inform the decision-maker. This presupposes [the decision-maker] has judgment to exercise.'") (quoting W. Rodgers, *Environmental Law* § 7.6, at 763 (1977)).

follow before disposing of dredged material." *Id.*  The First Circuit rejected the plaintiffs'

argument, finding that there was no causal link between the Corps's failure to comply with

the Clean Water Act and the damages claimed by the Plaintiffs:

> Plaintiffs do not allege that the Corps's failure to obtain a certificate or waiver
> caused the damages to their homes.  Reviewing the complaint, Plaintiffs allege
> that with knowledge of the constant wind at La Marginal Beach, the Corps
> discharged fine sand without adequate protection.  Thus, the harm to
> Plaintiffs' homes was allegedly caused by either negligent disposal site
> selection or negligent maintenance of the disposal site.  We hold that
> Plaintiffs' failure to obtain a water quality certificate or exemption did not
> proximately cause this harm.

*Id.* at 25; *see also id.* at 26 ("[W]e hold that the CWA and [Water Qaulity Standards

Regulations ("WQSR")] do not overcome the discretionary function exemption where, as

here, Plaintiffs fail to allege a causal connection between the Corps's failure to comply with

the CWA and WQSR and the purported damages for which they seek recovery under the

FTCA."); *Sloan*, 236 F.3d at 762 (holding that immunity applied because "[t]he complaint

does not allege any damages arising from the investigation itself, but only harm caused by

the [discretionary] suspension to which it assertedly led"); *Franklin Sav. Corp.*, 180 F.3d at

1133 (holding that immunity applied because "[t]he complaint does not suggest that

plaintiffs' multi-million-dollar injuries flow from a failure to perform the arguably

nondiscretionary function of drafting memoranda listing alternatives, and not from neglect

of the discretionary function of comprehensively and objectively weigh[ing] the alternative

actions available").

The holdings in *Montijo-Reyes*, *Sloan*, and *Franklin Savings Corp.* are consistent with

the Supreme Court's discretionary function jurisprudence.  *See, e.g.*, *Berkovitz*, 486 U.S. at

536 (recognizing that "the nature of the challenged conduct" determines whether discretionary function immunity applies); *Varig Airlines*, 467 U.S. at 813 (holding that "it is the nature of the conduct . . . that governs whether the discretionary function exception applies in a given case").   As these cases demonstrate, in deciding whether discretionary function immunity applies, the question is not, as Plaintiffs suggest, whether there was some law that the United States somehow violated.   Rather, the question for the Court is whether *the challenged conduct* —i.e., the design, construction, operation, maintenance, and repair of the MRGO—was governed by a law that "mandate[d] particular conduct" that the Corps failed to perform.  *Gaubert,* 499 U.S. at 324.

Nowhere in their 50-page complaint do Plaintiffs allege that their damages were *caused* by the Corps's supposed violations of the FWCA or NEPA.  Nowhere in their motion do they adduce any evidence that would support a finding that their alleged damage was caused by the violations they allege.  Accordingly, even if the Corps had failed to follow a procedure mandated by one of these laws, the United States would still be entitled to discretionary function immunity.

IV.    **The Corps Did Not Violate Any Other Specific, Mandatory "Policy."**

Ending with a whimper, Plaintiffs halfheartedly point to three additional statements of policy which they contend strip the United States of its discretionary function immunity. First, on page 24 of their memorandum, Plaintiffs point to Executive Order 11990, which requires federal agencies to "provide leadership" and "take action" to minimize damage to wetlands.  *See* Doc. 16510-35 §1.  The Executive Order also requires agencies to "consider factors relevant to a proposal's effect on the survival and quality of the wetlands."  *Id.* § 2. Such obligations—"to provide leadership," to "take action," and to "consider factors"—are not nearly specific enough to strip the United States of its discretionary function immunity. *See Guile*, 422 F.3d at 231; *In re Katrina Canal Breaches*, 2008 WL 2186400, at *3.[6]

Second, on page 25 of their memorandum, Plaintiffs point to provisions of the Department of the Army's 1972 "Digest of Water Resources Policies, and Activities."  One such provision requires the Corps to ensure that its work in wetlands "minimize[s] adverse effects."  Doc. 16510-40 at 2.  The very next sentence of that provision, however, says that this goal "shall be included *insofar as practicable*."  *Id.* (emphasis added).  Another provision says that a "specific proposal in or on a wetland *should be evaluated* in recognition of the complete and interrelated wetland area of which it is a part."  *Id.* (emphasis added).  None of this could fairly be characterized as a "mandatory" prescription.

_____

[6]   Moreover, section 8 of Executive Order 11990 provides that it "does not apply to projects presently under construction" as of May 24, 1977.  As such, it obviously does not apply to the design or construction of the MRGO, nor does it apply to any maintenance activities that occurred prior to that date.

Third, also on page 25 of their memorandum, Plaintiffs point to a letter from the EPA to the Corps dated July 24, 1975.  *See* Doc. 16510-80 at 2.  This letter purportedly refers to a Corps regulation that states that "the unnecessary alteration or destruction of [the wetlands] *should be discouraged* as contrary to the public interest."  *Id.*  Again, this is not the type of specific, mandatory prescription required to negate discretionary function immunity.

In short, the Executive Order and regulations cited by Plaintiffs do not contain mandatory directives that prescribe specific conduct.  At most, they contain precatory language delineating broad policy aims regarding the management of wetlands.  Ample precedent establishes that discretionary function immunity cannot be overcome in this way.

But even if the Corps's conduct were somehow inconsistent with one of these provisions, the United States would still be entitled to discretionary function immunity.  As has already been demonstrated, any failure to "consider" factors or to "evaluate" the potential impact upon wetlands would have occurred prior to the ultimately discretionary act of dredging, and so would be of no moment in deciding whether discretionary function immunity applies.  *See, e.g.*, *Jayvee Brand*, 721 F.2d at 390; *Johnson*, 949 F.2d at 339-40.  Moreover, there would be no "causal connection between the violation" and Plaintiffs' asserted damages.  *See Montijo-Reyes*, 436 F.3d at 26; *Sloan*, 236 F.3d at 762; *Franklin Sav. Corp.*, 180 F.3d at 1133.  Accordingly, just as with the supposed violations of the FWCA and NEPA, any violation of these provisions would have no effect on application of the discretionary function exception to this case.

<u>CONCLUSION</u>

For these reasons, Plaintiffs' motion should be denied, and this case should now be dismissed for want of subject matter jurisdiction.

Respectfully Submitted,

GREGORY G. KATSAS
Assistant Attorney General

THOMAS DUPREE
Principal Deputy Assistant Attorney General

PHYLLIS J. PYLES
Director, Torts Branch

JAMES G. TOUHEY, JR
Assistant Director, Torts Branch

 s/ Kara K. Miller
KARA K. MILLER
JEFFREY P. EHRLICH
PAUL LEVINE
Trial Attorneys
ROBIN SMITH
Senior Trial Counsel
Civil Division, Torts Branch
U.S. Department of Justice
Benjamin Franklin Station, P.O. Box 888
Washington, D.C.  20044
(202) 353-2574 / (202) 616-5200 (Fax)

Attorneys for the United States of America

## <u>CERTIFICATE OF SERVICE</u>

I certify that the foregoing document, the United States' Response to Plaintiffs'

Statement of Undisputed Facts, and exhibits cited therein were served by ECF on all counsel

of record on December 18, 2008.


                <u> s/ Kara K. Miller  </u>
                KARA K. MILLER