UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In Re: KATRINA CANAL BREACHES | § | CIVIL ACTION |
| CONSOLIDATED LITIGATION | § | NO. 05-4182 "K" (2) |
| | § | JUDGE DUVAL |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | § | MAG. J. WILKINSON |
| | § | |
| PERTAINS TO: | § | |
| | § | |
| MRGO (*Robinson*, 06-2268) | § | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | § | |

**UNITED STATES' RESPONSE TO PLAINTIFFS' STATEMENT OF
UNCONTESTED FACTS IN SUPPORT OF THEIR MOTION
FOR PARTIAL SUMMARY JUDGMENT (DOC. 16510-4)**

Local Rule 56.1 provides that "[e]very motion for summary judgment shall be accompanied by a separate, short and concise statement of the material facts as to which the moving party contends there is no genuine issue to be tried." Plaintiffs' submission (Doc. 16510-4) plainly fails to comply with this directive. Rather than submitting a plain list of *material* facts, Plaintiffs, as in previous factual submissions (*see* Doc. 10337-8), submitted a prolix historical retrospective that is full of irrelevancies and argumentation. The format—lengthy paragraphs, rather than "short and concise" sentences—frustrates the purpose of the Local Rule (and Fed. R. Civ. P. 56), which is to aid the Court in identifying

the specific facts that are material to the legal issues, so that the Court can decide whether any of them are genuinely in dispute. *See Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner*, 101 F.3d 145, 151 (D.C. Cir. 1996) (discussing similar local rule of the District Court for the District of Columbia). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Plaintiffs' motion for partial summary judgment requires this Court to decide two legal issues: (1) whether the Fish and Wildlife Coordination Act ("FWCA"), 16 U.S.C. § 661, *et seq.*, required any action by the Army Corps of Engineers prior to authorization of the MRGO, including whether it required the views of fish and wildlife agencies to be incorporated in reports submitted to Congress; and (2) whether the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321, *et seq.*, allowed the Corps to exercise judgment in deciding whether to prepare a Supplemental Environmental Impact Statement concerning the maintenance dredging of the MRGO in the decades following the 1976 MRGO Final Environmental Impact Statement. Plaintiffs' motion for partial summary judgment (Doc. 16510), like the United States' motion to dismiss or in the alternative for summary judgment (Doc. 16511), presents legal questions that can be answered without resort to Plaintiffs' Statement of Facts ("PUF"). The PUF sets forth opinions, argument, conclusions of law, and facts that are not of any consequence to the legal questions presented by Plaintiffs' motion.

Accordingly, the "facts" contained in the PUF are almost entirely immaterial.  Plaintiffs'

motion should be denied, the United States' Motion to Dismiss or, in the Alternative, for

Summary Judgment should be granted, and this case should be dismissed.

Notwithstanding Plaintiffs' non-compliance with Local Rule 56.1, the United States

provides the following responses to each of Plaintiffs' enumerated paragraphs.  Any facts not

contested are done so for purposes of this summary judgment motion only.

**Plaintiffs' Statement No. 1:**

Congress first passed the Fish and Wildlife Coordination Act ("FWCA") on March 10,

1934.  Exh. 1 (Law of March 10, 1934, ch. 55, § 1, 48 Stat. 401 (1934) (codified at 16 U.S.C. §

662)).

**Response to Statement No. 1:**

Immaterial.  The United States also objects to this statement because it is an assertion

of law, not a statement of fact that requires a response, and it is argumentative.

**Plaintiffs' Statement No. 2:**

Congress amended the FWCA in 1946 in order to "promote effectual planning,

development, maintenance, and coordination of wildlife conservation and rehabilitation . . .

" and to require "coordination" between any federal agency proposing to "impound,"

"divert," or "control" a waterway, or body of water and both the United States Department of

Interior Fish and Wildlife Service ("FWS") and the State agency with jurisdiction over

wildlife resources.  Exh. 2 (Act of August 14, 1946, § 1, ch. 965, 60 Stat. 1080 (1946)).

**Response to Statement No. 2:**

Immaterial.  The United States also objects to this statement because it is an assertion of law, not a statement of fact that requires a response, and it is argumentative.

**Plaintiffs' Statement No. 3:**

In enacting the 1946 amendments, Congress stated that the amendments "would place in effect a much-needed program and facilities for the effectual planning, maintenance, and coordination of wildlife conservation, management, and rehabilitation."  Exh. 3 at p. 1 (House of Representatives, Committee on Agriculture, Report No. 1944, 79th Cong. 2d Sess. (April 17, 1946); Exh. 4 (Senate, Committee on Agriculture and Forestry, Report No. 1698, 79th Cong. 2d Sess. (July 10, 1946) (adopting same).

**Response to Statement No. 3:**

Immaterial.  The United States also objects to this statement because it is an assertion of law, not a statement of fact that requires a response, and it is argumentative.

**Plaintiffs' Statement No. 4:**

The 1946 version of the FWCA required that federal agencies "first shall consult with the Fish and Wildlife Service and the head of the agency exercising administration over the wildlife resources of the State wherein the [water] impoundment, diversion or other control facility is to be constructed with a view of preventing the loss of and damage to wildlife resources . . . ."  Exh. 2 (Fish and Wildlife Coordination Act of 1946, (60 Stat. 1080)).

4

**Response to Statement No. 4:**

Misleading.  Plaintiffs have truncated the relevant statutory language so that it is not apparent that the law required consultation *after* authorization of a water control project, not before.  The United States also objects to this statement because it is an assertion of law, not a statement of fact that requires a response, and it is argumentative.

**Plaintiffs' Statement No. 5:**

The statute also mandated that following such consultation and any "surveys and investigations" conducted by the federal and state agencies, their "reports . . . shall be made an integral part of any report submitted [to Congress] by an agency of the Federal government responsible for engineering surveys and construction of such projects."  Exh. 2 (Fish and Wildlife Coordination Act of 1946, (60 Stat. 1080)).

**Response to Statement No. 5:**

This is not a statement of fact.  It is a misstatement of law, requiring no response.  Without waiving this objection, Defendant observes that the language quoted by Plaintiffs applied to post-authorization reports.  The report of the Chief of Engineers recommending construction of the MRGO was sent to Congress prior to authorization.  The United States also objects to this statement because it is argumentative.

**Plaintiffs' Statement No. 6:**

At the time of planning for the MR-GO, the Army Corps was "an agency of the Federal government responsible for engineering surveys and construction of such projects,"

and the MR-GO was a federal water development project subject to the FWCA's consultation and reporting requirements.

**Response to Statement No. 6:**

This is not a statement of fact.  It is a misstatement of law, requiring no response. Without waiving this objection, Defendant observes that the FWCA's reporting requirement did not apply to the planning of the MRGO, because the planning occurred prior to authorization.  *See* Pls. Exh. 2, Pub. L. No. 79-732, 60 Stat. 1080 (1946).  The United States also objects to this statement because it is argumentative.

**Plaintiffs' Statement No. 7:**

At the time of planning for the MR-GO, the state counterpart to the FWS was the former Louisiana Department of Wild Life and Fisheries ("Louisiana Department of Wildlife").

**Response to Statement No. 7:**

Immaterial.  The FWCA's reporting requirement did not apply to the planning of the MRGO, because the planning occurred prior to authorization.  *See* Pls. Exh. 2, Pub. L. No. 79-732, 60 Stat. 1080 (1946).

**Plaintiffs' Statement No. 8:**

The MR-GO's planning process was not completed until the Army Corps submitted its recommendation to Congress in House Doc. No. 245 (September 25, 1951).  Exh. 5 (House Doc. No. 245 (September 25, 1951)) ("1951 MR-GO Report").

6

**Response to Statement No. 8:**

Immaterial and contested. The FWCA's reporting requirement did not apply to the planning of the MRGO, because the planning occurred prior to authorization. *See* Pls. Exh. 2, Pub. L. No. 79-732, 60 Stat. 1080 (1946). The Chief's Report to Congress recommended construction according to plans described in the report of the Division Engineer, dated September 30, 1946. *See* Pls. Exh. 5, H.R. Doc. No. 82-245 (Chief's MRGO Report) at 5, 18. The United States also objects to the statement because the meaning of "planning process" is vague and ambiguous.

**Plaintiffs' Statement No. 9:**

The FWCA mandated that the Army Corps consult and coordinate with the FWS and Louisiana Department of Wildlife with regard to the MR-GO's investigation, planning, and design, and this mandatory coordination had to occur before the Army Corps submitted its recommendation to Congress. Exh. 2 (Fish and Wildlife Coordination Act of 1946, (60 Stat. 1080)).

**Response to Statement No. 9:**

This is not a statement of fact. It is a misstatement of law. The FWCA did not require consultation before authorization. *See* Pls. Exh. 2, Pub. L. No. 79-732, 60 Stat. 1080 (1946). The United States also objects to this statement because it is argumentative.

**Plaintiffs' Statement No. 10:**

The FWCA mandated that the Army Corps report to Congress the concerns of the FWS and Louisiana Department of Wildlife with regard to the MR-GO's investigation, planning and design.  Exh. 2 (Fish and Wildlife Coordination Act of 1946, (60 Stat. 1080)).

**Response to Statement No. 10:**

This is not a statement of fact.  It is a misstatement of law.  The FWCA did not require consultation before authorization, and it did not require a report to Congress after authorization.  *See* Pls. Exh. 2, Pub. L. No. 79-732, 60 Stat. 1080 (1946).  The United States also objects to this statement because it is argumentative and vague.

**Plaintiffs' Statement No. 11:**

Congress intended that the Army Corps must communicate with FWS and Louisiana Department of Wildlife during the MR-GO's initial planning before construction commenced.  Exh. 4 at p. 3 (House of Representatives, Committee on Agriculture, Report No. 1944, 79th Cong. 2d Sess. (August 17, 1946).

**Response to Statement No. 11:**

Immaterial and contested.  *See* Pls. Exh. 2, Pub. L. No. 79-732, 60 Stat. 1080 (1946). The United States also objects to this statement because it is an assertion of law, not a statement of fact that requires a response, and it is argumentative.

**Plaintiffs' Statement No. 12:**

The Army Corps did not consult or coordinate with FWS or Louisiana Department of Wildlife before it submitted the 1951 MR-GO Report to Congress. Exh. 5 at MRGOY00059, Paragraph 80 ("*Coordination with other agencies*") (1951 MR-GO Report); Exh. 6 at p. 2 (*A Special Report on Fish and Wildlife Resources in Relation to the Mississippi River - Gulf Outlet Project Louisiana*, Nov. 8, 1957); Exh. 7 at p. 4, ¶2 (*An Interim Report on Fish and Wildlife Resources as Related to Mississippi River-Gulf Outlet Project, Louisiana and an Outline of Proposed Fish and Wildlife Studies*, April 1958); Exh. 8 at p 1 (letter from United States Secretary of the Interior, Fred A. Seaton to Army Secretary Wilber M. Bruckner, August 22, 1957); Exh. 24 (FWS Information Service Statement, "Louisiana Canal's Effects on Fish and Wildlife Arouse Concern of Conservationists," Sept. 26, 1957).

**Response to Statement No. 12:**

Immaterial and contested. The FWCA did not require consultation before authorization. *See* Pls. Exh. 2, Pub. L. No. 79-732, 60 Stat. 1080 (1946). Further, the Corps did inform the appropriate fish and wildlife agencies of its plans prior to submitting the Chief's Report to Congress. *See* U.S. Exh. 39, Mississippi River-Gulf Outlet Record of Public Hearing, August 5, 1943 at 10 (testimony of the Governor of Louisiana that he "appear[ed] [] on behalf of the State of Louisiana which, in *all* of its departments and agencies, urges the approval of the project") (emphasis added). *See also id.* at 36-38 (listing "parties to whom notice was sent of public hearing to be held on 5 and 6 March 1947," which list included the

Governor of Louisiana and the U.S. Fish and Wildlife Service).

**Plaintiffs' Statement No. 13:**

The Government cites to an August 5, 1943 Record of Public Hearing contending that the FWS and the Louisiana Department of Wildlife were consulted about the MR-GO at this hearing.  Exh. 9 at pp. 23-24 n.17 (USA Reply in Support of Motion to Dismiss (Doc No. 1183-1)); Exh. 10 (Record of Public Hearing on the Mississippi River Gulf Outlet, Aug. 5, 1943).

**Response to Statement No. 13:**

Immaterial.  *See* Pls. Exh. 2, Pub. L. No. 79-732, 60 Stat. 1080 (1946).  The statement is contested because the Record of Public Hearing reflects that coordination occurred, not necessarily that a specific consultation occurred at the hearing.  *See* U.S. Exh. 39.  The United States also objects to the statement as argumentative.

**Plaintiffs' Statement No. 14:**

None of the invitees at the August 5, 1943 Public Hearing has the FWS or the Louisiana Department of Wildlife in their title.  Exh. 10 (Record of Public Hearing on the Mississippi River Gulf Outlet, Aug. 5, 1943).

**Response to Statement No. 14:**

Immaterial and contested.  At the August 5, 1943, public hearing held in New Orleans, Governor Jones testified that he "appear[ed] [] on behalf of the State of Louisiana which, in *all* of its departments and agencies, urges the approval of the project." U.S. Exh. 39

10

at 10 (emphasis added).  Further, the Record of Public Hearing does not include a list of

invitees to that hearing; rather, it includes lists of parties present and of speakers at the

hearing.  *See* U.S. Exh. 39.  The August 5, 1943, Record of Public Hearing also lists "parties to

whom notice was sent of public hearing to be held on 5 and 6 March 1947," which list

includes both the Governor of Louisiana and the U.S. Fish and Wildlife Service, in addition

to many other federal, state, and local entities.  *Id.* at 36-38.

**Plaintiffs' Statement No. 15:**

No one from the FWS or the Louisiana Department of Wildlife spoke at the August 5,

1943 Public Hearing.  Exh. 10 (Record of Public Hearing on the Mississippi River Gulf

Outlet, Aug. 5, 1943).

**Response to Statement No. 15:**

Immaterial.  The Governor of Louisiana represented the state fish and wildlife agency

at the hearing.  *See* U.S. Exh. 39 at 10.

**Plaintiffs' Statement No. 16:**

The Government contends that, pursuant to the 1946 FWCA, it did consult and

coordinate with the FWS and the Louisiana Department of Wildlife prior to submitting the

1951 MR-GO Report to Congress.  Exh. 11 (Defendant United States' Response to Plaintiffs'

First Set of Interrogatories, Aug 1, 2007) at pp. 11-13, Response to Interrogatory No. 4 citing

to (a) Exh. 5 (1951 MR-GO Report (September 25, 1951)); (b) Ex. 12 (MRGO Design

Memorandum No. 2 (1959)); (c) Exh. 8 (letter from United States Secretary of the Interior,

Fred A. Seaton to Army Secretary Wilber M. Bruckner, August 22, 1957); (d) Exh. 7 (*An*

*Interim Report on Fish and Wildlife Resources as Related to Mississippi River-Gulf Outlet*

*Project, Louisiana and an Outline of Proposed Fish and Wildlife Studies*, April 1958); and (e)

Exh. 13 (Memorandum from F.C. Gillett, Acting Regional Director for the United States Fish

and Wildlife Service to the Director of the Fish and Wildlife Service in Washington, D.C.,

September 24, 1959).

**Response to Statement No. 16:**

      Uncontested that the Corps complied with the FWCA consultation requirements.

**Plaintiffs' Statement No. 17:**

      All of the documents cited by the Government in support of its contention that it

consulted and coordinated with the FWS and the Louisiana Department of Wildlife prior to

submitting the 1951 MR-GO Report to Congress concern communications after the 1951

MR-GO Report was submitted to Congress. *Id.*

**Response to Statement No. 17:**

      Immaterial and contested. The consultation requirements did not apply prior to

authorization. *See* Pls. Exh. 2, Pub. L. No. 79-732, 60 Stat. 1080 (1946). *See also* U.S. Exh. 39

(Record of Public Hearing on the Mississippi River Gulf Outlet, Aug. 5, 1943).

**Plaintiffs' Statement No. 18:**

      None of the documents cited by the Government support its contention that it

consulted and coordinated with the FWS and the Louisiana Department of Wildlife before

submitting the 1951 MR-GO Report to Congress.  *Id.*

**Response to Statement No. 18:**

Immaterial and contested.  The consultation requirements did not apply prior to authorization.  *See* Pls. Exh. 2, Pub. L. No. 79-732, 60 Stat. 1080 (1946).  *See also* U.S. Exh. 39 (Record of Public Hearing on the Mississippi River Gulf Outlet, Aug. 5, 1943).

**Plaintiffs' Statement No. 19:**

After submitting the 1951 MR-GO Report, the Army Corps did not forward to Congress the information that the FWS and Louisiana Department of Wildlife had communicated to the agency about the destruction of the wetlands from saltwater intrusion, including scientific reports, studies, correspondence, and other documents.  Exh. 6 at p. 2 (*A Special Report on Fish and Wildlife Resources in Relation to the Mississippi River - Gulf Outlet Project Louisiana*, Nov. 8, 1957); Exh. 7 at p. 4, ¶2 (*An Interim Report on Fish and Wildlife Resources as Related to Mississippi River-Gulf Outlet Project, Louisiana and an Outline of Proposed Fish and Wildlife Studies*, April 1958); Exh. 8 at p. 1 (letter from United States Secretary of the Interior, Fred A. Seaton to Army Secretary Wilber M. Bruckner, August 22, 1957); Exh. 12 (MRGO Design Memorandum No. 2 (1959)); Exh. 13 (Memorandum from F.C. Gillett, Acting Regional Director for the United States Fish and Wildlife Service to the Director of the Fish and Wildlife Service in Washington, D.C., September 24, 1959); Exh. 14 at p. 2 (letter from Cary W. Kerlin to Jack A. Stephens, May 31, 1979); Exh. 23 ("Statement of Louisiana Wildlife and Fisheries Commission relative to the

New Orleans [sic] to the Gulf Tidewater Channel," May 29, 1957); Exh. 24 (FWS

Information Service Statement, "Louisiana Canal's Effects on Fish and Wildlife Arouse

Concern of Conservationists," Sept. 26, 1957).

**Response to Statement No. 19:**

Immaterial.  The consultation requirements did not apply prior to authorization, and

the Corps of Engineers was not required to provide the stated information to Congress.  *See*

Pls. Exh. 2, FWCA, Pub. L. No. 79-732, 60 Stat. 1080 (1946), amended by § 2(a)-(b), 72 Stat.

563, 564 (1958) (codified at 16 U.S.C. § 662(a)-(b)) (Pls. Exh. 16).  The United States also

objects to this statement because it is argumentative and vague.

**Plaintiffs' Statement No. 20:**

After the Army Corps submitted the 1951 MR-GO Report to Congress, the FWS and

Louisiana Department of Wildlife requested that the Army Corps delay construction to allow

studies about the MR-GO's impacts, mitigation measures, and alternative routes, but these

requests were denied.  Exh. 7 at pp. 19-20, ¶¶48-51; pp. 26-27, ¶69 (*An Interim Report on*

*Fish and Wildlife Resources as Related to Mississippi River-Gulf Outlet Project, Louisiana*

*and an Outline of Proposed Fish and Wildlife Studies*, April 1958); Exh. 13 at p. 1

(Memorandum from F.C. Gillett, Acting Regional Director for the United States Fish and

Wildlife Service to the Director of the Fish and Wildlife Service in Washington, D.C.,

September 24, 1959); Exh. 23 ("Statement of Louisiana Wildlife and Fisheries Commission

relative to the New Orleans [sic] to the Gulf Tidewater Channel," May 29, 1957); Exh. 24

14

(FWS Information Service Statement, "Louisiana Canal's Effects on Fish and Wildlife Arouse Concern of Conservationists," Sept. 26, 1957).

**Response to Statement No. 20:**

Immaterial.  The FWCA did not mandate that the Corps accede to the request of the state agency.  *See* Pls. Exh. 2, Pub. L. No. 79-732, 60 Stat. 1080 (1946).  Even after the FWCA was amended in 1958, the Corps was not required to accede to the requests of the Louisiana Department of Wildlife.  *See* Pls. Exh. 16, FWCA, § 2(a)-(b), 72 Stat. 563, 564 (1958) (codified at 16 U.S.C. § 662(a)-(b)); Pls. Exh. 17, S. Rep. No. 85-1981, at 6 ("The legislation would be a permissive law so far as it concerns the relationship between water project construction agencies and fish and wildlife conservation agencies.  The latter would not be given any veto power over any part of the water resource development program.").

**Plaintiffs' Statement No. 21:**

The MR-GO destroyed over 62,000 acres (over 100 square miles) of storm surge buffering wetlands.  Exh. 15 at pp. 16-20, 46 (Expert Report of John W. Day, Jr. and Gary P. Shaffer (July 11, 2008)).

**Response to Statement No. 21:**

Immaterial and contested.  The statement is argumentative and vague, as it fails to identify the location of the "over 100 square miles."   Further, the statement is contradicted by the expert report it cites.  The report of John Day and Gary Shaffer does not state that the MRGO destroyed "over 100 square miles" of wetlands.  It states that a total of 24,150 acres

were "affected" by the MRGO, an area substantially smaller than that in this statement.  U.S.

Exh. 40 at 47.  24,150 acres equals approximately 38 square miles, far less than the 100 square

miles described in the statement.  This statement is immaterial because it does not set forth

any fact of consequence to the legal issues before the Court.  Moreover, it will be refuted by

the United States' experts when the produce their reports.

## Plaintiffs' Statement No. 22:

In 1958, while the MR-GO was still being designed and constructed, Congress

amended the FWCA.  Exh. 16 (Fish and Wildlife Coordination Act, § 1, P.L. 85-624, 72 Stat.

463 (1958); codified at 16 U.S.C. §662).

## Response to Statement No. 22:

Uncontested.

## Plaintiffs' Statement No. 23:

The 1958 amendments to the FWCA stated:  "The reporting officers in project reports

of the Federal agencies shall give full consideration to the report and recommendations of

the Secretary of the Interior and to any report of the State agency on wildlife aspects of such

projects, and the project plan shall include such justifiable means and measures for wildlife

purposes as the reporting agency finds should be adopted to obtain maximum overall project

benefits."  Exh. 16 at p. 2, §2(b) (Fish and Wildlife Coordination Act, § 1, P.L. 85-624, 72

Stat. 463 (1958); codified at 16 U.S.C. §662); *see also* Exh. 93 at p. 19-10 (Army Corps, Water

Resources Policies and Authorities, EP 1165-2-1, July 30, 1999) (Army Corps's policy

16

mandates "that equal consideration be given to fish and wildlife resources and that measures to conserve these resources are incorporated. . .into water resources development projects. Further, the Act requires the Corps to give full consideration to the recommendations, including those for mitigation, of the USFWS, the NMFS and those of the appropriate state agencies.").

**Response to Statement No. 23:**

Immaterial.  The United States also objects to this statement because it is an assertion of law, not a statement of fact that requires a response, and it is argumentative.

**Plaintiffs' Statement No. 24:**

The Act retained the previous requirements of the 1946 version of the law requiring consultation and coordination with the FWS and the head of the State agency exercising administration over the wildlife resources of the State, the incorporation of any FWS and state agency's concerns into the planning and design of any proposed water resource project, and inclusion of any FWS and state agency's findings into any report to Congress.  Exh. 16 at p. 2, §2(a)(b) (Fish and Wildlife Coordination Act, § 1, P.L. 85-624, 72 Stat. 463 (1958); codified at 16 U.S.C. §662).

**Response to Statement No. 24:**

Uncontested, but misleadingly incomplete.  The 1958 amendment substantially broadened the reporting requirement.  The amendment required that consultation occur not only when a water control project was authorized but when such a project was being

proposed.  It also enlarged the scope of these requirements to encompass projects that would "modify" streams and other bodies of water.  *See* Pls. Exh. 16, FWCA, § 2(a)-(b), 72 Stat. 563, 564 (1958) (codified at 16 U.S.C. § 662(a)-(b)).  The United States also objects to this statement because it is an assertion of law, not a statement of fact that requires a response, and it is argumentative.

**Plaintiffs' Statement No. 25:**

Under the FWCA, the Army Corps, after submitting to Congress the 1951 MR-GO Report, had a continuing mandate to consult and coordinate with FWS and Louisiana Department of Wildlife with regard to the MR-GO's investigation, planning, design and construction and to report to Congress their concerns about the project.  Exh. 17 at p. 1 (Senate Report 85-1981, 1958 U.S.C.C.A.N. 3446 (July 28, 1958)).

**Response to Statement No. 25:**

This is not a statement of fact.  It is a misstatement of law and therefore requires no response.  Without waiving this objection, Defendant points out that at no time prior to construction of the MRGO did the FWCA require that the Corps make a report to Congress. *See* Pls. Exh. 16, FWCA, § 2(a)-(b), 72 Stat. 563, 564 (1958) (codified at 16 U.S.C. § 662(a)-(b)).  The United States also objects to this statement because it is argumentative.

**Plaintiffs' Statement No. 26:**

The legislative history confirms the 1958 Amendments required the Army Corps "to consult with the Fish and Wildlife Service before and during the building of federal water

18

development projects." Exh. 17 at p. 1 (Senate Report 85-1981, 1958 U.S.C.C.A.N. 3446 (July 28, 1958)).

**Response to Statement No. 26:**

Immaterial. The record amply reflects that the Corps consulted with fish and wildlife agencies before and during construction of the MRGO. The United States also objects to this statement because it is an assertion of law, not a statement of fact that requires a response, and it is argumentative.

**Plaintiffs' Statement No. 27:**

This consultation and reporting obligation existed between construction agencies "such as the Corps of Engineers" and the FWS and the Louisiana Department of Wildlife envisioning "considerable study . . . in some cases, with suggested changes in construction plans to the great advantage of our wildlife resource." Exh. 17 at p. 1 (Senate Report 85-1981, 1958 U.S.C.C.A.N. 3446 (July 28, 1958)).

**Response to Statement No. 27:**

Immaterial. The FWCA did not require the Corps to modify its plans. *See* Pls. Exh. 16, FWCA, § 2(a)-(b), 72 Stat. 563, 564 (1958) (codified at 16 U.S.C. § 662(a)-(b)); Pls. Exh. 17, S. Rep. No. 85-1981, at 6 ("The legislation would be a permissive law so far as it concerns the relationship between water project construction agencies and fish and wildlife conservation agencies. The latter would not be given any veto power over any part of the water resource development program."). The United States also objects to this statement

because it is an assertion of law, not a statement of fact that requires a response, and it is
argumentative.

**Plaintiffs' Statement No. 28:**

The 1958 Amendments also sought to "provide that wildlife conservation shall
receive equal consideration with other features of the planning of federal water resource
development programs [with] the effect of putting fish and wildlife on the basis of equality
with . . . navigation . . . in our water resource programs, which is highly desirable and
proper, and represents an objective long sought by conservationists of the nation." Exh. 17 at
p. 4 (bottom) (Senate Report 85-1981, 1958 U.S.C.C.A.N. 3446 (July 28, 1958)).

**Response to Statement No. 28:**

Immaterial.  The United States also objects to this statement because it is an assertion
of law, not a statement of fact that requires a response, and it is argumentative.

**Plaintiffs' Statement No. 29:**

These mandatory consultation and reporting requirements under the FWCA were
designed to serve the purpose of informing Congress about the environmental impacts of an
Army Corps project.  Exh. 17 at p. 1 (Senate Report 85-1981, 1958 U.S.C.C.A.N. 3446 (July
28, 1958)).

**Response to Statement No. 29:**

Immaterial.  The United States also objects to this statement because it is an assertion
of law, not a statement of fact that requires a response, and it is argumentative.

20

**Plaintiffs' Statement No. 30:**

There is no evidence that the Army Corps ever reported to Congress the concerns of the FWS and Louisiana Department of Wildlife about the MR-GO as mandated under the FWCA.  Exh. 6 at p. 2 (*A Special Report on Fish and Wildlife Resources in Relation to the Mississippi River - Gulf Outlet Project Louisiana*, Nov. 8, 1957); Exh. 7 at p. 4, ¶2 (*An Interim Report on Fish and Wildlife Resources as Related to Mississippi River-Gulf Outlet Project, Louisiana and an Outline of Proposed Fish and Wildlife Studies*, April 1958); Exh. 8 at p. 1 (letter from United States Secretary of the Interior, Fred A. Seaton to Army Secretary Wilber M. Bruckner, August 22, 1957); Exh. 12 (MRGO Design Memorandum No. 2 (1959)(no evidence that this Design Memorandum was sent to Congress); Exh. 13 (Memorandum from F.C. Gillett, Acting Regional Director for the United States Fish and Wildlife Service to the Director of the Fish and Wildlife Service in Washington, D.C., September 24, 1959); Exh. 14 at p. 2 (letter from Cary W. Kerlin to Jack A. Stephens, May 31, 1979).

**Response to Statement No. 30:**

This is not a statement of fact.  It is a misstatement of law and therefore requires no response.  Without waiving this objection, Defendant points out that at no time prior to construction of the MRGO did the FWCA require that the Corps make a report to Congress.  *See* Pls. Exh. 16, FWCA, § 2(a)-(b), 72 Stat. 563, 564 (1958) (codified at 16 U.S.C. § 662(a)-(b)).  The United States also objects to this statement because it is argumentative.

21

**Plaintiffs' Statement No. 31:**

One of the FWCA's objectives is to inform Congress of the environmental

consequences of projects to enable Congress to consider conservation measures.  Specifically,

the Senate stated that "[u]nquestionably, the bill, if enacted, would result in the Congress

having better information on the effects of water Projects on fish and wildlife resources

while considering project-authorizing legislation.  It will then, of course, be for the Congress

to decide what conservation measures should be incorporated in any project."  Exh. 17 at p. 5

(Senate Report 85-1981, 1958 U.S.C.C.A.N. 3446 (July 28, 1958)).

**Response to Statement No. 31:**

Immaterial.   The MRGO report was provided to Congress in 1951 and construction

was authorized in 1956.  The United States also objects to this statement because it is an

assertion of law, not a statement of fact that requires a response, and it is argumentative.

**Plaintiffs' Statement No. 32:**

In connection with ongoing Operations and Maintenance ("O&M") activities for the

MR-GO and after enactment of the National Environmental Policy Act ("NEPA") in 1969,

the Army Corps prepared numerous environmental disclosure documents involving dredging

and other actions.  42 U.S.C Sections 4321 *et seq.*

**Response to Statement No. 32:**

Immaterial.

**Plaintiffs' Statement No. 33:**

It is well known (and the Army Corps knew) that healthy wetlands have a positive effect in reducing the height and intensity of storm surge—anywhere from 1 foot per 2.75 miles (0.36 feet/mile) to 1 foot per 1.4 miles (0.71feet/mile) depending on the type of vegetation.  Kemp Expert Report (Exh. 27) at pp. 184, Figure 9.5; *see also* Exh. 28 (U.S. Army Corps of Engineers, Lake Pontchartrain and Vicinity, Louisiana, Design Memorandum No. 1 Hydrology and Hydraulic Analysis Part 4 – Chalmette Extension, Plate No. 6 "Overland Surge Elevations, Coastal Louisiana" (October 1967)).

**Response to Statement No. 33:**

Immaterial and contested.  The positive effects of wetlands is overstated.  Plaintiffs' own expert, Paul Kemp, admitted that the data set forth in this statement are not useful in assessing the benefit, if any, of "healthy wetlands" during Hurricane Katrina.  *See* U.S. Exh. 38, Deposition of G. Paul Kemp (Nov. 27, 2007) at 197:10-198:19.

**Plaintiffs' Statement No. 34:**

Four decades before Hurricane Katrina, the Army Corps acknowledged the MR-GO was a direct, efficient route for hurricane surge into the heart of Greater New Orleans, created undesirable effects of excessive, high velocity, and erosive currents in the IHNC and significant salinity increases, and had the potential to deliver storm surges that would cause catastrophic property damage and loss of human life.  House Document 231, 89th Congress (1965) (Exh. 52) at pp. 17, 63; Memo re: LPV to Chief of Engineers, Department of the Army

from Major General R.G. MacDonnell (Exh. 36) (July 24, 1963) at NED-213-000000433; Exh.

53 at p. 25; Letter of Department of the Army, New Orleans District, Corps of Engineers

from Colonel Thomas J. Bowen, District Engineer to Acting Division Engineer, Lower

Mississippi Valley (Exh. 48) (October 19, 1966) at p. AFW-467-000001821; Team Louisiana

Report (Exh. 30) at pp. vii; 223; Final IPET Report (Exh. 29) at p. IV-2, IV-135 to IV-136;

Naomi Depo (Ex. 17) at 323:24-325:6.

**Response to Statement No. 34:**

Immaterial and contested.  Plaintiffs' statement cites to the Report of the District

Engineer included in the Report to Congress regarding the LPV Hurricane Protection

Project.  The cited report does not say the MRGO was a "direct, efficient route for hurricane

surge into the heart of Greater New Orleans" or that the MRGO would "deliver storm surges

that would cause catastrophic property damage and loss of human life."  *See* Pls. Exh. 52.

Instead, the report describes that the MRGO "provides a deep, direct route for the inflow of

*saline currents* from the Gulf of Mexico," and that it "will produce high velocity currents in

the Inner Harbor Navigation Canal, *creating a hazard to navigation* and causing serious scour

and damage."  *Id.* at 17 (emphasis added).  The remaining exhibits cited by Plaintiffs also do

not support their Statement No. 34.

**Plaintiffs' Statement No. 35:**

In 1988, the Lower Mississippi Valley Division of the Army Corps recommended that

the alternative of completely closing the MR-GO should be evaluated in order to "reduce the

24

possibility of catastrophic damage to urban areas by a hurricane surge coming up this

waterway [the MR-GO]. . . ."  1988 Army Corps Reconnaissance Report (Exh. 32) at

Comment 2.

**Response to Statement No. 35:**

Immaterial.

**Plaintiffs' Statement No. 36:**

After construction of the MR-GO was completed, the Army Corps received notice on

multiple occasions about the risk of serious flooding posed by the hazards to life and

property that it created in placing into Greater New Orleans a deep channel with direct

access to the Gulf of Mexico.  Kemp Expert Report (Exh. 27) at pp. 21-31, 170-92, 191-95.

**Response to Statement No. 36:**

Immaterial and contested.  The United States objects to this statement because it is

vague and argumentative ("serious flooding posed by the hazards to life and property").  The

United States also contests the statement because the opinions of Plaintiffs' expert, Paul

Kemp, do not demonstrate that the Army Corps of Engineers received "notice."

**Plaintiffs' Statement No. 37:**

In 1962, the Army Corps considered construction of two "floodgates" to control

hurricane surge at Bayou Bienvenue and Bayou Dupre along Reach 2 of the MR-GO.  Letter

from U.S. Department of the Interior to District Engineer, NOD (Exh. 42) (October 22,

1962).

**Response to Statement No. 37:**

Immaterial.

**Plaintiffs' Statement No. 38:**

In 1966, the Army Corps acknowledged that during Hurricane Betsy, it was observed that large amounts of water flowed through the MRGO Reach 1 into the IHNC which then exited into Lake Pontchartrain.  Lake Pontchartrain and Vicinity Design Memorandum No. 2: Citrus Back Levee, Appendix E: Report on the Controlling Elevation of the Seabrook Lock (Exh. 51) (October 1966) p. 4.

**Response to Statement No. 38:**

Immaterial and contested.  The United States objects to the statement because it misrepresents the contents of the document it cites, which states that "[t]he passage of hurricane 'Betsy' in September 1965 demonstrated that, under certain conditions, permitting flow to enter Lake Pontchartrain from the IHNC is advantageous.  'Betsy's' surge crested at approximately 11 feet m.s.l. at the junction of the Canal and the MR-GO, while at Seabrook the crest stage was about 6 feet m.s.l."  Pls. Exh. 51 at 4.  The United States also objects to the statement as vague and ambiguous ("observed," "large amounts of water").

**Plaintiffs' Statement No. 39:**

After Hurricane Betsy, the Army Corps considered in 1967 and again in 1969 the construction of a hurricane surge barrier from the GIWW to Reach 2 of the MR-GO in order to prevent hurricane surge from Lake Borgne entering the combined GIWW/MRGO Reach 1

and the IHNC west of Paris Road.  Lake Pontchartrain and Vicinity Design Memorandum

No. 2: Citrus Back Levee, Appendix C: Report on Evaluation of Alternative Plans Involving

Modifications in the Alignment of the Lake Pontchartrain Barrier (Exh. 50) at p. 2 (March

1967); Exh. 47 at AFW-467-000001698-1699.

**Response to Statement No. 39:**

      Immaterial.

**Plaintiffs' Statement No. 40:**

      In 1975, the Army Corps acknowledged that a storm surge barrier from the GIWW to

Reach 2 of the MR-GO "would have provided hurricane protection for the industrial

development along the IHNC outside the authorized protective works" and "[a] relatively

safe harbor, during hurricane conditions, would be provided in the IHNC and the MR-

GO/GIWW since the navigation structures would control the ingress of hurricane tides and

reduce wave action."  Exh. 37 at NED-125-000000995-997 (correspondence between K.R.

Heiberg III and G.J. Lannes dated April 11, 1975 and April 21, 1975).

**Response to Statement No. 40:**

      Immaterial and contested.  The document cited by Plaintiffs is marked with a line

through the text and the words "NOT SENT."  Pls. Exh. 37 at NED-125-000000996-997.  This

document cannot be considered to represent the position of the Army Corps of Engineers or

any sort of "acknowledgment," as Plaintiffs allege.

27

**Plaintiffs' Statement No. 41:**

Long before Hurricane Katrina, the Army Corps knew or should have known about the role of the MR-GO "funnel" as a potential hurricane highway that was likely to cause catastrophic flooding.  As stated by the Congressional Research Service:  "In contrast to continuing differences of opinion regarding the role of the MRGO as a hurricane highway for moving water from the Gulf to the City, there is a degree of consensus on the channel's funnel effect at the intersection of Reach 1, Reach 2, and the GIWW.  The Berkeley, IPET, and Louisiana Working Group reports all noted that at the confluence of the MRGO and the GIWW, there was no barrier in place to prevent the channeling of the waters from Lake Borgne into the narrow confines of Reach 1.  As a result, Reach 1 hydraulically connected Lake Pontchartrain and Lake Borgne, and allowed the Lake Borgne waters to be pushed into the interior of New Orleans and toward Lake Pontchartrain. . . .  This connectivity is shown to have both amplified surge level and velocity through the interior of the city, and raised the level of Lake Pontchartrain.  As pressure on the levees throughout this area increased, structural failures along the IHNC and Lake Pontchartrain canals occurred."  CRS Report for Congress, *Mississippi River Gulf Outlet (MRGO):  Issues for Congress*, Nicole T. Carter, Charles V. Stern, Aug. 4, 2006 (Exh. 49) at p. 7.

**Response to Statement No. 41:**

Immaterial and contested.  Plaintiffs' statement is argumentative, not factual.  Further, citation to a Congressional Research Service Report published August 4, 2006,

which discussed conclusions by groups formed after Hurricane Katrina to analyze the causes

of flooding, cannot be considered evidence of what the Army Corps of Engineers knew "long

before Hurricane Katrina."  *See* Pls. Exh. 49.

**Plaintiffs' Statement No. 42:**

From the time the MR-GO was being constructed and thereafter, the Army Corps

knew that the MR-GO created a funnel that could enhance surge, waves, and currents

during hurricanes and create a serious flooding risk. Letter from Kenneth J. Le Sieur to

Colonel Thomas J. Bowen, November 24, 1965 (Exh. 43); October 1, 1969 draft

memorandum regarding the proposed Mississippi River-Gulf Outlet New Ship Lock and

reviewing the Dock Board Proposals for a St. Bernard Parish Site (Exh. 44) (AFW-143-

000001049); Naomi Depo. (Exh. 31) at 357:15-360:12; Disposition Form dated 06-21-1971;

Subject: MR-GO—New Ship Lock; Return Levees; signed by Mask (Exh. 46) (AFW-440-

000000938); Letter dated 08-16-1971; Subject: MR-GO—New Ship Lock; Return Levees;

signed by Becnel (Exh. 45) (AFW-440-000000936); Environmental Impact Study Ship

Channel Project prepared by Coastal Environments, Inc., prepared for St. Bernard Parish

Police Jury dated October 1972 (Exh. 39). (MRGO-CEI-000340), p. 54; Army Corps,

Environmental Considerations of an Expanded Mississippi River-Gulf Outlet, Appendix I

(Exh. 35) at NED-111-000001197); Final IPET Report (Exh. 29) at p. IV-258.

**Response to Statement No. 42:**

Immaterial and contested.  Plaintiffs' own exhibits contradict their assertion in

Statement No. 42.  Rather than supporting Plaintiffs' statement that "the MR-GO created a

funnel," Plaintiffs' Exhibit 43 states that "[t]he U.S. Army Corps of Engineers proposal for a

*levee* along the south shore of the Gulf Outlet to Bayou Dupre, and along the north shore of

the Intercoastal Waterway would form a funnel . . . ."  Pls. Exh. 43 at 3 (emphasis added).

Exhibit 45 states that "any hurricane induced inflow of gulf waters into Lake Borgne would

be general over all land areas in St. Bernard Parish east of the MR-GO where the marsh is

lower than 3 ft.  *This low relief tends to render the MR-GO inconsequential in any analysis*

*of stages (surges) exceeding about 5 ft.*"  Pls. Exh. 45 at AFW-440-000000936 (emphasis

added).  *See also* Pls. Exh. 46 at AFW-440-000000938 ("the 'funnel' formed by the east and

west *levees* at the confluence of the MR-GO and GIWW") (emphasis added).  The United

States objects to the citation to the deposition testimony at Exhibit 31; the cited testimony

consists only of the witness reading from a document provided by Plaintiffs' attorney, and

the witness does not adopt or endorse the content of the letter he is asked to read.  *See* Pls.

Exh. 31 at 358-360.  In fact, when asked "Do you know what investigation Major West is

referring to that the Corps had conducted prior to November, 1969 about the funnel effect?,"

the witness responded, "I have no idea."  *Id.* at 360.  Plaintiffs' citation to this testimony in

Statement No. 42 plainly misrepresents the testimony of the witness and is improper.

**Plaintiffs' Statement No. 43:**

In 1966, after Hurricane Betsy but before completion of the MR-GO's construction, the Army Corps commissioned a report (Bretschneider and Collins, Storm Surge Effects of the Mississippi River Gulf Outlet (1966) ("Bretschneider and Collins Report") which concluded that in all cases (slow, moderate, and rapidly rising surge during hurricanes), the predicted effect of building the contemplated LPV levee system that now forms the throat of the funnel was to hasten the onset of peak surge and to lengthen the period of highest water. Team Louisiana Report (Exh. 30) at pp. 249-50.

**Response to Statement No. 43:**

Immaterial and contested.  Plaintiffs' statement cites to an analysis of the Bretschneider and Collins report, not to the report itself, which concluded that "the effect of the Mississippi River-Gulf Outlet is almost negligible for all large hurricanes accompanied by slow rising storm surges.  It may be expected that once in a while a storm may occur which has a somewhat freakish, more rapidly rising surge in which case the Gulf Outlet Channel may have a very marked effect.  However, such a storm will not produce tides which are as high as the more critical hurricane tracks such as Betsy or the synthetic hurricane."  Pls. Exh. 60 at 4, Bretschneider and Collins, Storm Surge Effects of the Mississippi River Gulf Outlet (1966).

31

**Plaintiffs' Statement No. 44:**

As early as 1966, the Army Corps understood that under certain hurricane conditions the MR-GO would have "a marked effect" on storm surge and on wave action.  Exh. 60 at p. 4 (Bretschneider & Collins study NED-188-000000513639; Exh. 61 at NED 192-000000684 (December 9, 1992 memo "MRGO, St Bernard Parish (Bank Erosion) rev Recon Study).

**Response to Statement No. 44:**

Immaterial and contested.  The study cited by Plaintiffs found that under certain "somewhat freakish" hurricane conditions, the MRGO "may" have "a marked effect," not that it "would" have such an effect.  It is uncontested that the Bretschneider and Collins study concluded that "the effect of the Mississippi River-Gulf Outlet is almost negligible for all large hurricanes accompanied by slow rising storm surges.  It may be expected that once in a while a storm may occur which has a somewhat freakish, more rapidly rising surge in which case the Gulf Outlet Channel may have a very marked effect.  However, such a storm will not produce tides which are as high as the more critical hurricane tracks such as Betsy or the synthetic hurricanes."  Pls. Exh. 60 at 4 (Plaintiffs' citation to Exh. 61 is an error).

**Plaintiffs' Statement No. 45:**

Long before Hurricane Katrina, the Army Corps knew that the MR-GO was destroying tens of thousands of acres of cypress forests, grasses, marshes, swamps, trees, shrubs and other wetlands ("wetlands") that provided a natural barrier and sponge for storm surge and that the loss of these wetlands reduced storm surge protection for New Orleans

32

and St. Bernard Parish.  Report to the Police Jury of the Parish of St. Bernard of the

Tidewater Channel Advisory Committee (Exh. 40) (1957) at p. 2; "Interim Survey Report on

Hurricane Study of Morgan City, Louisiana, and Vicinity." (November 1962); USACE Fact

Sheet (Exh. 34), January 2005; letter from United States Secretary of the Interior, Fred A.

Seaton to Army Secretary Wilber M. Bruckner, August 22, 1957 (Exh. 8); U.S. Department of

the Interior, U.S. Fish and Wildlife Service, Press Release, "Louisiana Canal's  Effects on Fish

and Wildlife Arouse Concern of Conservationists," September 26, 1957 (Exh. 55) at p. 1; U.S.

Fish and Wildlife Service, An Interim Report on Fish and Wildlife Resources as Related to

Mississippi River Gulf Outlet Project, Louisiana and an Outline of Proposed Fish and

Wildlife Studies (Exh. 38) (April 1958); UDI-001-000000120; 1988 Army Corps

Reconnaissance Report (Exh. 32) at p. 27; Team Louisiana Report (Exh. 30) at p. 112; Expert

Report of  John W. Day, Jr. and Gary P. Shaffer (July 11, 2008), pp. 16-20, 46;

**Response to Statement No. 45:**

Immaterial and contested.  Defendant's experts will controvert this statement when

they produce their reports.  The United States also objects to this statement as vague ("Tens

of thousands of acres," "barrier and sponge," "reduced storm surge protection").

**Plaintiffs' Statement No. 46:**

By 1975, the Army Corps had acknowledged "[t]he marsh west of the MR-GO has

been significantly modified by, inter alia, the MR-GO channel, existing levees, and by the

hurricane levee now under construction."  Exh. 62 at AFW-180-000001008, Paragraph 8.

**Response to Statement No. 46:**

Immaterial.

**Plaintiffs' Statement No. 47:**

Long before Hurricane Katrina, the Army Corps knew that erosion of the unarmored

banks of Reach 2 of the MR-GO had vastly widened the channel beyond its authorized 650'

top width, caused large breaches in the rapidly dwindling marsh buffer between the

navigation channel and the open waters of Lake Borgne and Breton Sound, and exposed

neighboring people and property to direct hurricane attacks from Lake Borgne.  Corps

Reconnaissance Report (Exh. 32) at Comment 2; Army Corps, Habitat Impact of the

Construction of the MRGO (Exh. 41) (December 1999) at NED-188-000001556 et seq.

**Response to Statement No. 47:**

Immaterial and contested.  The United States objects to Statement No. 47 because it is

vague and argumentative.  The reference to "unarmored banks of Reach 2 of the MR-GO" is

contested because the statement is vague as to time; foreshore protection had been installed

on the banks of the MRGO by 1988, and additional protection had been installed by the time

of Hurricane Katrina.  *See* U.S. Exh. 42 at 14, 1988 Bank Erosion Reconnassance Report.

Further, "large breaches," "rapidly dwindling marsh buffer," and "direct hurricane attacks

from Lake Borgne" are too vague to be able to address.  Finally, the United States contests the

reference to the MRGO's "authorized 650' top width."  The MRGO authorization was for a

channel specified by its bottom width; the authorization does not prescribe a "top width."

34

*See* U.S. Exh. 1, Pub. L. No. 84-455, 70 Stat. 65 (1956); U.S. Exh. 23, H.R. Doc. 82-245 (1951).

It is uncontested that erosion of the banks of the MRGO had occurred and widened the

width between the banks.

<u>Plaintiffs' Statement No. 48:</u>

The Final Environmental Impact Statement prepared in 1976 ("1976 FEIS")

(1) did not  discuss such significant adverse effects as wetlands destruction, channel erosion

and widening, and increased risk of flooding during hurricanes; (2) did not include any

mention of cumulative impacts, mitigation measures, and alternatives such as closure; (3) did

not mention or analyze the applicability of  the Army Corps's own "high priority" Wetlands

Resources Policy and its relationship to the O&M dredging; and (4) did not offer any

substantive response to sharply critical comments about its inadequate environmental

analysis submitted by the Environmental Protection Agency, Department of Commerce,

Department of the Interior, and Louisiana Wildlife and Fisheries Commission.  Exh. 63 (Final

Composite Environmental Statement for Operation and Maintenance Work on Three

Navigation Projects In the Lake Borgne Vicinity Louisiana; Final 1976 EIS Document); *see*

*also* Exh. 59 at 82:23-83:19, 131:11-25-142:25 (30(b)(6) witness John Saia), (The Corps

30(b)(6) witness testified that: it had no method of analyzing cumulative impacts on the

wetlands; admitted that its internal regulations would have required reporting significant

impacts on the wetlands in an EIS; noted that its internal regulations require analyzing

cumulative insignificant impacts and testified that the Corps exercised "discretion" to omit

analysis of the wetlands impact in the 1976 EIS.); *see also* responses to Agency Comments to the Draft EIS at 181:8-184:14, (The Corps 30(b)(6) designated witness testified that: the Corps had a duty to respond to comments of reviewing agencies but that the District Engineer exercised "discretion" to ignore analysis of certain comments as "insignificant"-- despite the level of significance attached by the commenting agency); *see also* Exh. 73 at 32:9-35:9 (day two 30(b)(6) of Saia on October 1, 1008) (The Corps 30(b)(6) witness also admitted, however, that the District does not have the authority to omit comments and analysis of reviewing agencies 30(b)(6) of Saia on October 1, 1008 ("Saia day 2) Exh. 73 at 32:9-35:9) (The Corps's 30(b)(6) witness testified that the Corps was obliged to respond to the EPA's comments regarding insufficiency of information on environmental impacts contained in the 1974 DEIS; the District Engineer arbitrarily refused to develop the requested information. Saia day 2, Exh. 73 at 60:1-71:12) (*See* similar Corps 30(b)(6) testimony regarding Department of Commerce comments on salinity on the wetlands noting that despite the DOC's comments, it did not perceive the need to discuss these effects with regard to O&M. Saia day 2, Exh. 73 at 79:11-81:22, 82:18-85:17) (*See, also* 30(b)(6) Corps testimony regarding omission of discussion of land loss or storm surge as appropriate despite comments of reviewing agencies. Exh. 73 at 90:15-93:20, 96:8-97:3 and 98:23-99:7.) (*Also note*, Corps 30(b)(6) testimony regarding Corps admission that the SIR on over depth dredging also fails to address impact of channel widening. Saia day 2, Exh. 73 at 118:6-119:17).

**Response to Statement No. 48:**

Immaterial and contested.  The United States objects to Statement No. 48 as argumentative and compound.  Rather than a "short and concise" statement of material fact, this is an argumentative assertion regarding at least four subject matter areas of an Environmental Impact Statement and at least seven sections of deposition testimony.  Statement No. 48 is a violation of Local Rule 56.1 and does not present statements of fact to which the United States can respond.  Notwithstanding this objection, the statement is contested because it misrepresents the EIS.  *See* Pls. Exh. 63.

**Plaintiffs' Statement No. 49:**

The Army Corps performed a total of 26 Environmental Assessments ("EAs") of the MR-GO relating to Operation and Maintenance between the years 1980 and 2004.  Exh. 64 (Appendix L of the Mississippi River-Gulf Outlet Deep Draft De-authorization Study Integrated Final Report to Congress (Hereinafter "Appendix L, MR-GO De-Authorization Study")

**Response to Statement No. 49:**

Immaterial.

**Plaintiffs' Statement No. 50:**

The 26 EAs prepared by the Army Corps found no significant impact on the environment ("FONSI") and omitted any discussion of the relationship between the need for dredging and the continuing loss of wetlands and unmitigated bank stabilization, cumulative

impacts, mitigation measures, or alternatives such as closure. Exh. 64 (Appendix L, MR-GO
De-Authorization Study).

**Response to Statement No. 50:**

Immaterial and contested.  The United States objects to and contests Statement No. 50
to the extent it implies that each of the referenced EAs "omitted" something that was
required.  Further, the United States does not understand the meaning of the phrase
"unmitigated bank stabilization."

**Plaintiffs' Statement No. 51:**

The Army Corps acknowledged in 1993 that a comprehensive EIS would alert
Congress to the escalating, significant environmental problems caused by the MR-GO and
might prompt Congressional consideration of closing the MR-GO.  Exh. 65 at pp. 1505-1506
(Memorandum for file, *Mississippi River-Gulf Outlet, St. Bernard Parish, LA (Bank Erosion)
Revised Reconnaissance Study and Feasibility Study*, Oct. 6, 1993).

**Response to Statement No. 51:**

Immaterial and contested.  Plaintiffs' Statement No. 51 misrepresents the contents of
the memorandum it cites, which makes no mention of "alert[ing] Congress," "escalating,
significant environmental problems caused by the MR-GO," or "prompt[ing] Congressional
consideration of closing the MR-GO."  *See* Pls. Exh. 65.  Rather, the memorandum describes
a meeting regarding an MRGO Revised Reconnaissance Study and Feasibility Study in which
"[t]he decision was made to prepare a Supplemental EIS to the existing MRGO EIS," noting

38

that one reason to prepare and EIS rather than an EA was that "we may consider the closure

of the MRGO as a non-structural alternative." *Id.*

**Plaintiffs' Statement No. 52:**

In 2007, Congress, after becoming more informed about the environmental and safety

problems created by the MR-GO, voted to deauthorize (close) the MR-GO to deep draft

vessels.  Public Law 109-234**,** Mississippi River-Gulf Outlet Deep Draft De-authorization

Study Integrated Final Report,

http://mrgo.usace.army.mil/default.aspx?p=MRGOFinalReport.

**Response to Statement No. 52:**

Immaterial.  The United States also objects to this statement because it is an assertion

of law regarding a statute passed after Hurricane Katrina, not a statement of fact that requires

a response, and it is argumentative.

**Plaintiffs' Statement No. 53:**

The Army Corps never prepared a Supplemental Environmental Impact Statement

("SEIS") to discuss the mounting, cumulative environmental devastation wrought by the

MR-GO over three decades, any mitigation measures, or any alternatives, including possible

closure, where the Corps acknowledges that all subsequent environmental analysis resulted

in a finding of no significant impact to warrant a supplemental impact statement.  Exh. 64

(Appendix L, MR-GO De-Authorization Study); Exh. 73 at 156:16-155:15 (30(b)(6)

Deposition of John Saia, October 1, 2008).

**Response to Statement No. 53:**

Immaterial and contested.  The United States objects to this statement as argumentative and vague.  The statement also is contested because it is an incomplete representation of the facts.  Plaintiffs' exhibits show that discussions were held and a decision made to prepare a Supplemental Environmental Impact Statement for the MRGO Revised Reconnaissance Study and Feasibility Study.  Pls. Exh. 65 at NMP-036-000001505-06 (documenting that "[t]he decision was made to prepare a Supplemental EIS to the existing MRGO EIS, which was prepared in 1976.").  It is uncontested that a SEIS was not completed.

**Plaintiffs' Statement No. 54:**

On October 30 1972, the Army Corps prepared a "Draft Environmental Statement Mississippi River-Gulf Outlet, Louisiana (Maintenance) Associated Water Features Gulf of Mexico Chandeleur Sound Breton Sound Lake Pontchartrain Gulf Intracoastal Waterway" ("1972 DEIS") which examined "dredging of the main channel only."  Exh. 66 at p. i (1972 DEIS).

**Response to Statement No. 54:**

Immaterial.

**Plaintiffs' Statement No. 55:**

In 1974, the U.S. Army Engineer District, New Orleans, Louisiana completed a "Review Draft" entitled "Composite Draft Statement for Operation and Maintenance Work on Three Navigation Channels in the Lake Borgne Vicinity Louisiana"  ("1974 DEIS").  The

document describes the "Administrative" action under review as the:

> operation and maintenance of the following projects in the vicinity of Lake Borgne Louisiana:  The Mississippi River Gulf Outlet….Operation and Maintenance …consist(ing) primarily of periodic dredging and subsequent material deposition along the total of 111.3 miles.  Maintenance dredging is accomplished by a cutter head pipeline dredge.

Exh. 67 at p. i, ¶2 (1974 DEIS).

### Response to Statement No. 55:

Immaterial.  Uncontested except that the document states that it was "Prepared *for* U.S. Army Engineer District, New Orleans [] *by* Stanley Consultants, Inc."  Pls. Exh. 67 at VRG-038-000000371.

### Plaintiffs' Statement No. 56:

The 1974 DEIS removed references to studies regarding the MR-GO's effect on storm surge and wave action that had been part of the 1972 DEIS.  Exh. 66 at pp. 13, 14 (1972 DEIS); Exh. 67 (1974 DEIS); *see also* Exh. 59 at 82:23-83:19; 131:11-132:3-142:25, 181:8-184:14 (30(b)(6) Deposition of John Saia, Sept. 30, 2008); Exh. 73 at 32:9-35:9; 60:1-71:12; 79:11-81:22; 82:18-85:17; 90:15-93:20; 96:8-97:3; 98:23-99:7; 118:6-119:17 (30(b)(6) Deposition of John Saia, October 1, 2008).

### Response to Statement No. 56:

Immaterial.

41

**Plaintiffs' Statement No. 57:**

Per NEPA mandates, the 1974 DEIS "Review Draft" was forwarded to agencies outside the Army Corps for comment on the cumulative environmental impacts of the operation and maintenance of the MR-GO project on the human environment surrounding the MR-GO.  42 U.S.C. §4321, et seq.; Exh. 67 at pp. ii-iv, ¶5 (1974 DEIS).

**Response to Statement No. 57:**

Immaterial.  The United States also objects to this statement because it is an assertion of law, not a statement of fact that requires a response, and it is argumentative. Furthermore, it appears that the draft forwarded for review and comment was the April 1975 draft, rather than the 1974 draft.  *See* Pls. Exh. 68, Final EIS, at IX-14 (commenting on a draft "which accompanied your letter of April 30, 1975"); U.S. Exh. 43, April 1975 Draft EIS, VRG-035-000000001-412.

**Plaintiffs' Statement No. 58:**

In March 1976, the U.S. Army Engineer District, New Orleans, Louisiana completed a Final Environmental Impact Statement ("1976 FEIS") for the MR-GO project pursuant to 40 CFR Part 1500.6 (d)(1).  Exh. 68 (*Final Composite Environmental Statement for Operation and Maintenance Work on Three Navigation Projects In the Lake Borgne Vicinity Louisiana*, March 1976).

**Response to Statement No. 58:**

Uncontested that the Final Environmental Impact Statement for Operation and Maintenance of the MRGO dated March 1976 was completed pursuant to NEPA.  The United States also objects to the assertion of law in this statement, which is not a statement of fact that requires a response, and it is argumentative.

**Plaintiffs' Statement No. 59:**

The Environmental Protection Agency ("EPA") noted in its Comment (published in the 1976 FEIS) that the 1974 DEIS did not fully analyze the environmental impact of salinity on the wetlands area surrounding the MR-GO.  Exh. 68 at p. IX-12 (1976 FEIS, Environmental Protection Agency Comment Letter of July 24, 1975); *see also* Exh. 59 at 82:23-83:19, 131:11-142:25, 181:8-184:14 (30(b)(6) Deposition of John Saia, Sept. 30, 2008); Exh. 73 at 32:9-35:9, 60:1-71:12, 79:11-81:22, 82:18-85:17, 90:15-93:20, 96:8-97:3, 98:23-99:7, 118:6-119:17 (30(b)(6) Deposition of John Saia, October 1, 2008).

**Response to Statement No. 59:**

Immaterial.  The statement "did not fully analyze" is contested because it does not appear in the EPA Comment Letter and is argumentative, and Statement No. 59 is contested because EPA's comments were not limited to the "impact of salinity."  *See* Pls. Exh. 68 at IX-12.

**Plaintiffs' Statement No. 60:**

The EPA noted in its July 24, 1975 Comment Letter that the 1974 DEIS did not

contain "sufficient information to assess fully the environmental impact of the proposed

project or action as required by 40 CFR Part 1500.8(a)(1).  Exh. 68 at p. IX-13 (1976 FEIS,

Environmental Protection Agency Comment Letter of July 24, 1975); *see also* Exh. 59 at

82:23-83:19, 131:11-142:25, 181:8-184:14 (30(b)(6) Deposition of John Saia, Sept. 30, 2008);

Exh. 73 at 32:9-35:9, 60:1-71:12, 79:11-81:22, 82:18-85:17, 90:15-93:20, 96:8-97:3, 98:23-99:7,

118:6-119:17 (30(b)(6) Deposition of John Saia, October 1, 2008).

**Response to Statement No. 60:**

Immaterial.  The United States also objects to the assertion of law in this statement,

which is not a statement of fact that requires a response, and it is argumentative and

contested.  The reference to the cited C.F.R. section is not included in the EPA Comment

Letter.  *See* Pls. Exh. 68 at IX-13.  Moreover, from 1970-78, the guidelines published at 40

C.F.R. Part 1500 were non-binding.  *Andrus v. Sierra Club*, 442 U.S. 347, 354-57 (1979).  The

remainder of Statement No. 60 is uncontested.

**Plaintiffs' Statement No. 61:**

The EPA noted in its July 24, 1975 Comment Letter that the 1974 DEIS did not

contain information in order to allow for complete assessment of the interrelated impacts of

the MR-GO on local, state and federal projects in Southern Louisiana as required by 40 CFR

Part 1500.8 (a)(1).  Exh. 68 at p. IX-13 (1976 FEIS, Environmental Protection Agency

Comment Letter of July 24, 1975); *see also* Exh. 59 at 82:23-83:19, 131:11-142:25, 181:8-184:14 (30(b)(6) Deposition of John Saia, Sept. 30, 2008); Exh. 73 at 32:9-35:9, 60:1-71:12, 79:11-81:22, 82:18-85:17, 90:15-93:20, 96:8-97:3, 98:23-99:7, 118:6-119:17 (30(b)(6) Deposition of John Saia, October 1, 2008).

**Response to Statement No. 61:**

Immaterial.  Statement No. 61 is contested because the EPA Comment Letter stated that the EIS "should contain additional information," not that the draft "did not contain information" to "allow for complete assessment of interrelated impacts . . . ."  Pls. Exh. 68 at IX-12.  The United States also objects to the assertion of law in this statement, which is not a statement of fact that requires a response, and it is argumentative and contested.  The reference to the cited C.F.R. section is not included in the EPA Comment Letter.  *See* Pls. Exh. 68 at IX-12-13.  Moreover, from 1970-78, the guidelines published at 40 C.F.R. Part 1500 were non-binding.  *Andrus v. Sierra Club*, 442 U.S. 347, 354-57 (1979).

**Plaintiffs' Statement No. 62:**

The EPA also noted that the 1974 DEIS failed to contain an environmental evaluation of the adverse and beneficial effects of the interrelated projects, *i.e.*, the GIWW, the Lake Pontchartrain and Vicinity Hurricane Protection Project, MR-GO, and Michoud Canal as required by 40 CFR Part 1500.8 (a) (1).  Exh. 68 at p. IX-13 (1976 FEIS, Environmental Protection Agency Comment Letter of July 24, 1975); *see also* Exh. 59 at 82:23-83:19, 131:11-142:25, 181:8-184:14 (30(b)(6) Deposition of John Saia, Sept. 30, 2008); Exh. 73 at 32:9-35:9,

60:1-71:12, 79:11-81:22, 82:18-85:17, 90:15-93:20, 96:8-97:3, 98:23-99:7, 118:6-119:17

(30(b)(6) Deposition of John Saia, October 1, 2008).

**Response to Statement No. 62:**

Immaterial.  The United States also objects to the assertion of law in this statement,

which is not a statement of fact that requires a response, and it is argumentative and

contested.  The reference to the cited C.F.R. section is not included in the EPA Comment

Letter.  *See* Pls. Exh. 68 at IX-12-13.  Moreover, from 1970-78, the guidelines published at 40

C.F.R. Part 1500 were non-binding.  *Andrus v. Sierra Club*, 442 U.S. 347, 354-57 (1979).

**Plaintiffs' Statement No. 63:**

The EPA noted in its July 24, 1975 Comment Letter that the 1974 DEIS did not

contain sufficient detail regarding the long-term and secondary project impacts of the MR-

GO, noting that the construction of the MRGO provides open channel for tidal water to

introduce salinity, land loss, and wetland erosion as required by 40 CFR Part 1500.8 (a)(3)(ii)

and 1500.8(6).  Exh. 68 at p. IX-13 (1976 FEIS, Environmental Protection Agency Comment

Letter of July 24, 1975); Exh. 59 at 14:4-11, 82:23-83:19, 131:11-142:25, 181:8-184:14

(30(b)(6) Deposition of John Saia, Sept. 30, 2008); Exh. 73 at 32:9-35:9, 60:1-71:12, 79:11-

81:22, 82:18-85:17, 90:15-93:20, 96:8-97:3, 98:23-99:7, 118:6-119:17 (30(b)(6) Deposition of

John Saia, October 1, 2008).

**Response to Statement No. 63:**

Immaterial.  The United States also objects to the assertion of law in this statement, which is not a statement of fact that requires a response, and it is argumentative and contested.  The reference to the cited C.F.R. section is not included in the EPA Comment Letter.  *See* Pls. Exh. 68 at IX-12-13.  Moreover, from 1970-78, the guidelines published at 40 C.F.R. Part 1500 were non-binding.  *Andrus v. Sierra Club*, 442 U.S. 347, 354-57 (1979).

**Plaintiffs' Statement No. 64:**

The EPA noted in its July 24, 1975 Comment Letter that the 1974 DEIS did not contain discuss mitigative measures in the MRGO O&M that could reduce salinity levels of the MR-GO as required by 40 CFR Part 1500.8 (4).  Exh. 68 at p. IX-13 (1976 FEIS, Environmental Protection Agency Comment Letter of July 24, 1975); *see also* Exh. 59 at 82:23-83:19, 131:11-142:25, 181:8-184:14 (30(b)(6) Deposition of John Saia, Sept. 30, 2008); Exh. 73 at 32:9-35:9, 60:1-71:12, 79:11-81:22, 82:18-85:17, 90:15-93:20, 96:8-97:3, 98:23-99:7, 118:6-119:17 (30(b)(6) Deposition of John Saia, October 1, 2008).

**Response to Statement No. 64:**

Immaterial.  The United States also objects to the assertion of law in this statement, which is not a statement of fact that requires a response, and it is argumentative and contested.  The reference to the cited C.F.R. section is not included in the EPA Comment Letter.  *See* Pls. Exh. 68 at IX-12-13.  Moreover, from 1970-78, the guidelines published at 40 C.F.R. Part 1500 were non-binding.  *Andrus v. Sierra Club*, 442 U.S. 347, 354-57 (1979).

**Plaintiffs' Statement No. 65:**

The Army Corps's summarization and response to this EPA Comment Letter, as

included in Section 9 of the "Coordination Comment and Response" portion of the 1976

FEIS, does not address the effect of open water channel of access created by the MR-GO and

dismisses the EPA's concerns with regard to the impact of MR-GO's dredge material

placement on wetlands from salt water intrusion.  In response to this environmental impact,

the Army Corps stated:

> Construction of the MR-GO resulted in certain recognized socio-economic
> and environmental changes.  Secondary impacts are still underway and will
> continue until a state of equilibrium on natural dynamics is obtained.  This
> environmental statement concerns only the actions necessary to operation and
> maintenance of the MR-GO and associated bayous, and is not intended to
> address impacts of original construction.

Exh. 68 at IX-3 (1976 FEIS); see also Exh. 59 at 82:23-83:19, 131:11-132:3-142:25,

181:8-184:14 (30(b)(6) Deposition of John Saia, Sept. 30, 2008); Exh. 73 at 32:9-35:9,

60:1-71:12, 79:11-81:22, 82:18-85:17, 90:15-93:20, 96:8-97:3, 98:23-99:7, 118:6-119:17

(30(b)(6) Deposition of John Saia, October 1, 2008).

**Response to Statement No. 65:**

Immaterial and contested.  The United States objects to and contests Statement No. 65

because the meaning of the phrases "open water channel of access created by the MR-GO"

and "impact of MR-GO's dredge material placement on wetlands from salt water intrusion"

are not understood.  The quotation of the Army Corps of Engineers' response to EPA's

comments is not contested.

**Plaintiffs' Statement No. 66:**

The EPA's letter dated July 26, 1975 further stated:

The Army Corp of Engineers, in regulations published on July 22, 1974, has also recognized the unique qualities of wetland areas and the need for their preservation. The Corp in discussing wetlands states "As environmentally vital areas, they constitute a productive and valuable public resource, the unnecessary alteration or destruction of which should be discouraged as contrary to the public interest."

Therefore, in order to minimize the existing adverse and future long-term (secondary) impacts of the MRGO, we recommend that mitigative measures that could reduce salinity levels in the Lake Borgne-Pontchartrain System be incorporated into the operation and maintenance of the MR-GO project.  For example, such measures could include the completion of the Seabrook Lock in the Inner Harbor Navigational Channel System, controlled releases of freshwater from the Mississippi River, and saltwater intrusion barriers.  Without control measures, salt water intrusion and water quality degradation will continue to be a major problem in the project area.

Exh. 68 at p. IX-12 (1976 FEIS, Environmental Protection Agency Comment Letter of July 24, 1975); see also Exh. 59 at 82:23-83:19, 131:11-142:25, 181:8-184:14 (30(b)(6) Deposition of John Saia, Sept. 30, 2008); Exh. 73 at 32:9-35:9, 60:1-71:12, 79:11-81:22, 82:18-85:17, 90:15-93:20, 96:8-97:3, 98:23-99:7, 118:6-119:17 (30(b)(6) Deposition of John Saia, October 1, 2008).

**Response to Statement No. 66:**

Immaterial.

**Plaintiffs' Statement No. 67:**

The Army Corps's response to the EPA's comment does not address its own internal policy regarding wetlands preservation and did not analyze the comment, instead the Army Corps dismissively noted:

> The proposals for salinity control measures in the MR-GO system would require authorization for new construction features. Such new construction features would require environmental and socio-economic investigation and impact analysis. Consideration of these measures in this assessment of the impacts of the project operation and maintenance is not appropriate.

Exh. 68 at p. IX-13 (1976 FEIS); Exh. 69 at p. A-135 (December 1972 Digest of Water Resources Policies and Activities, EP 1165-2-1); see also Exh. 59 at 82:23-83:19, 131:11-142:25, 181:8-184:14 (30(b)(6) Deposition of John Saia, Sept. 30, 2008); Exh. 73 at 32:9-35:9, 60:1-71:12, 79:11-81:22, 82:18-85:17, 90:15-93:20, 96:8-97:3, 98:23-99:7, 118:6-119:17 (30(b)(6) Deposition of John Saia, October 1, 2008).

**Response to Statement No. 67:**

Immaterial.  The United States objects to the statement as argumentative, not factual, and objects to the reference to Army Corps of Engineers' internal policy because it is legal argument, not a statement of fact that requires a response.  The quotation of the Response to EPA's comment is not contested.

**Plaintiffs' Statement No. 68:**

The EPA's letter dated July 24, 1975 concluded that it had "reservations" concerning the environmental effects of certain aspects of the proposed action.  The EPA further

50

concluded that further study of suggested alternatives or modifications was required and

asked the Army Corps to reassess those aspects.  Moreover, the EPA concluded that it

believed that the draft impact statement "did not contain sufficient information to assess

fully the environmental impact of the proposed project."  Exh. 68 at p. IX-13 (1976 FEIS,

Environmental Protection Agency Comment Letter of July 24, 1975); *see also* Exh. 59 at

82:23-83:19, 131:11-142:25, 181:8-184:14 (30(b)(6) Deposition of John Saia, Sept. 30, 2008);

Exh. 73 at 32:9-35:9, 60:1-71:12, 79:11-81:22, 82:18-85:17, 90:15-93:20, 96:8-97:3, 98:23-99:7,

118:6-119:17 (30(b)(6) Deposition of John Saia, October 1, 2008).

**Response to Statement No. 68:**

Immaterial.

**Plaintiffs' Statement No. 69:**

The Army Corps took no action on the EPA's recommendations concerning further

study of suggested alternatives or modifications and did not attempt to cure the EPA's

concerns about insufficient information to assess fully the environmental impact of the

proposed project.  1976 FEIS at IX-3; *see also* Exh. 59 at 82:23-83:19, 131:11-142:25, 181:8-

184:14 (30(b)(6) Deposition of John Saia, Sept. 30, 2008); Exh. 73 at 32:9-35:9, 60:1-71:12,

79:11-81:22, 82:18-85:17, 90:15-93:20, 96:8-97:3, 98:23-99:7, 118:6-119:17 (30(b)(6)

Deposition of John Saia, October 1, 2008).

**Response to Statement No. 69:**

Immaterial and contested.  The Army Corps of Engineers did not take "no action;" the Corps responded to each of the EPA's comments and recommendations in the Final EIS.  Pls. Exh. 68 at IX-1-4.

**Plaintiffs' Statement No. 70:**

The Department of the Interior ("DOI") likewise brought to the Army Corps's attention certain perceived deficiencies, and DOI sharply disputed certain contentions contained in the 1974 DEIS.  Specifically, the DOI disagreed with the Army Corps's unsubstantiated conclusion that spoil disposal would "constrain the westward erosion of the MR-GO channel bank" which was contributing to the widening of the surface of the MRGO. Exh. 68 at p. IX-20 (1976 FEIS); *see also* Exh. 59 at 82:23-83:19, 131:11-132:3-142:25, 181:8-184:14 (30(b)(6) Deposition of John Saia, Sept. 30, 2008); Exh. 73 at 32:9-35:9, 60:1-71:12, 79:11-81:22, 82:18-85:17, 90:15-93:20, 96:8-97:3, 98:23-99:7, 118:6-119:17 (30(b)(6) Deposition of John Saia, October 1, 2008).

**Response to Statement No. 70:**

Immaterial and contested.  The United States objects to this statement as argumentative, not factual.  The Department of the Interior letter does not reference any "unsubstantiated conclusion," nor does it describe "deficiencies."  *See* Pls. Exh. 68 at IX-20. In fact, the letter states that, "[i]n general, the statement is comprehensive and well written." *Id.*  The comments describe where DOI "believe[s] the statement could be improved in

certain areas." *Id.* It is uncontested that the DOI disagreed with the statement that "the elevated spoil disposal areas constrain the westward erosion of the MR-GO channel bank." *Id.*

**Plaintiffs' Statement No. 71:**

In its response, the Army Corps merely rejected out of hand the DOI's comment without addressing the merits of its stated concern about bank erosion.   Exh. 68 at p. IX-7 (1976 FEIS); *see also* Exh. 59 at 82:23-83:19, 131:11-132:3-142:25, 181:8-184:14 (30(b)(6) Deposition of John Saia, Sept. 30, 2008); Exh. 73 at 32:9-35:9, 60:1-71:12, 79:11-81:22, 82:18-85:17, 90:15-93:20, 96:8-97:3, 98:23-99:7, 118:6-119:17 (30(b)(6) Deposition of John Saia, October 1, 2008).

**Response to Statement No. 71:**

Immaterial and contested.  The United States further objects to this statement as argumentative, not factual.  Plaintiffs' statement mischaracterizes the testimony of Mr. Saia, and it incorrectly describes the Final EIS.  The Army Corps of Engineers wrote a two-paragraph response to DOI's comment in the Final EIS, Section 9.  Pls. Exh. 68 at IX-7.

**Plaintiffs' Statement No. 72:**

The United States Department of Commerce, Assistant Secretary for Science and Technology, responded to the 1974 DEIS on July 3, 1975 noting that the DEIS failed to identify the land loss process of marsh deterioration resulting from saltwater intrusion in violation of 40 CFR Part 1500.8 (a) (1).  Exh. 68 at p. IX-14 (1976 FEIS).

**Response to Statement No. 72:**

Immaterial.  The United States objects to the assertion of law in this statement, which is not a statement of fact that requires a response, and it is argumentative and contested.  The reference to the cited C.F.R. section is not included in the EPA Comment Letter.  *See* Pls. Exh. 68 at IX-12-13.  Moreover, from 1970-78, the guidelines published at 40 C.F.R. Part 1500 were non-binding.  *Andrus v. Sierra Club*, 442 U.S. 347, 354-57 (1979).

**Plaintiffs' Statement No. 73:**

The Department of Commerce's response of  July 3, 1975 indicated that a 1973 study by Anon, "On Environmental Considerations of an Expanded Mississippi River Gulf Outlet" cited to two 1970 authoritative studies—one by Chabreck, "Marsh Zones and Vegetation Types in the Louisiana Coastal Marshes"  and one by Palmisano, "Plant Community-Soil Relationships"—that went unreferenced in the 1974 DEIS and reported that saltwater intrusion into fresh and brackish marshes resulted in maximum loss of marsh and noted that when "salinity is increased in areas underlain by thick organic sequences, instead of being replaced by saline grasses the marshes simply break up and revert to open ponds and lakes" in violation of 40 CFR Part 1500.8 (a)(1).  Exh. 68 at IX-14 (1976 FEIS).

**Response to Statement No. 73:**

Immaterial.  The United States also objects to the assertion of law in this statement, which is not a statement of fact that requires a response, and it is argumentative and contested.  The reference to the cited C.F.R. section is not included in the letter from the

Department of Commerce.  *See* Pls. Exh. 68 at IX-14.  Moreover, from 1970-78, the

guidelines published at 40 C.F.R. Part 1500 were non-binding.  *Andrus v. Sierra Club*, 442

U.S. 347, 354-57 (1979).

**Plaintiffs' Statement No. 74:**

The Army Corps's 1976 FEIS did not act upon this comment in Section 9 of the

"Coordination Comment and Response" portion of the 1976 FEIS and made no reference to

impact of saltwater intrusion as a cause of land loss nor did it include the referenced studies

in the body of the document. Exh. 68 at IX-1-10 (1976 FEIS); *see also* Exh. 59 at 82:23-83:19,

131:11-132:3-142:25, 181:8-184:14 (30(b)(6) Deposition of John Saia, Sept. 30, 2008); Exh. 73

at 32:9-35:9, 60:1-71:12, 79:11-81:22, 82:18-85:17, 90:15-93:20, 96:8-97:3, 98:23-99:7, 118:6-

119:17 (30(b)(6) Deposition of John Saia, October 1, 2008).

**Response to Statement No. 74:**

Immaterial and contested.  The Army Corps of Engineers responded to the

Department of Commerce comments in the Final EIS and addressed the comment regarding

"marsh material released by marsh deterioration in the project area as a result of saltwater

intrusion."  Pls. Exh. 68 at IX-4.

**Plaintiffs' Statement No. 75:**

The State of Louisiana, Department of Public Works letter, dated May 30, 1975, noted

that the 1974 DEIS did not adequately identify the role of the proposed locks at Seabrook

and Rigolets as to hurricane protection in the vicinity in violation of 40 CFR Part 1500.8

(a)(1).  Exh. 68 at IX-21 (1976 FEIS).

**Response to Statement No. 75:**

Immaterial and contested.  This statement misrepresents the contents of the cited letter.  The letter cited by plaintiffs states, in pertinent part, as follows:  "On Page II-116, Paragraph (g), the last sentence should be expanded to provide a more meaningful and factual statement.  The persons who are vaguely or less familiar with the purposes and functions of the locks at Rigolets and Seabrook will not understand the full association and purpose in the overall project and will probably conclude that that [sic] two structures mentioned do not themselves provide hurricane protection nor would they control salinity changes.  A more full explanation is needed."  Pls. Ex. 68 at IX-21.  The letter also compliments the Draft EIS as comprehensive.  *See id.* ("It is very evident that careful and comprehensive considerations have been utilized in the preparation of this Composite Draft EIS.  We compliment the New Orleans District for a job well done and urge its final acceptance and approval.").  The United States also objects to the assertion of law in this statement, which is not a statement of fact that requires a response, and it is argumentative and contested.  The reference to the cited C.F.R. section is not included in the Department of Public Works letter.  *See* Pls. Exh. 68 at IX-12-13.  Moreover, from 1970-78, the guidelines published at 40 C.F.R. Part 1500 were non-binding.  *Andrus v. Sierra Club*, 442 U.S. 347, 354-57 (1979).

**Plaintiffs' Statement No. 76:**

The State of Louisiana, Department of Public Works stated that the DEIS, as written at page II-116 (g), failed to inform the reader of the "locks association and purpose in the

overall project" and failed to inform the reader that the two proposed structures themselves in fact provide hurricane protection and manage salinity in the vicinity in violation of 40 CFR Part 1500.8 (a)(1).  Exh. 68 at IX-21 (1976 FEIS).

**Response to Statement No. 76:**

Contested and immaterial.  This statement misrepresents the contents of the cited letter for the same reasons stated in response to Statement No. 75.  The United States also objects to the assertion of law in this statement, which is not a statement of fact that requires a response, and it is argumentative and contested.  Moreover, from 1970-78, the guidelines published at 40 C.F.R. Part 1500 were non-binding.  *Andrus v. Sierra Club*, 442 U.S. 347, 354-57 (1979).

**Plaintiffs' Statement No. 77:**

The Army Corps made no alteration in its discussion of Section II-116(g) of the 1976 FEIS relevant to the impact that the proposed Seabrook and Rigolets Locks were expected to have on hurricane protection and salinity intrusion in the marshes in violation of 40 C.F.R. Part 1500.8(a)(1).  Exh. 68 at II-116-117(g) (1976 FEIS).

**Response to Statement No. 77:**

Contested and immaterial.  This statement is contested because it is plainly incorrect: the Final Environmental Statement reflects that Section 2.09(g) was changed from its Draft form and that a response to the State of Louisiana, Department of Public Works comment regarding that section is included in Section 9.01(g) at page IX–8.  *See* Pls. Exh. 68, Final

Environmental Statement (1976) at IX-8; *compare id.* at § 2.09(g), page II-116 ("Hurricane protection will be provided by the Lake Pontchartrain, Louisiana and Vicinity project.  This project will include a lock and control structure at the Rigolets, a navigation structure and control structure at Chef Menteur Pass, and a lock and control structure at Seabrook.  The structures at Seabrook can be operated to modify salinities in Lake Pontchartrain.  The structures at the Rigolets and Chef Menteur will be designed and operated to maintain existing hydrologic conditions in Lake Pontchartrain.") *with* Pls. Exh. 67; U.S. Exh. 41, Draft Environmental Statement (1974)[1] at § 2.09(g), page II-87 ("Construction of locks at Rigolets and at the Seabrook Lock on the IHNC are expected to control salinity changes in Lake Pontchartrain and to provide hurricane protection.").

The United States also objects to the assertion of law in this statement, which is not a statement of fact that requires a response, and it is argumentative and contested.  Moreover, from 1970-78, the guidelines published at 40 C.F.R. Part 1500 were non-binding.  *Andrus v. Sierra Club*, 442 U.S. 347, 354-57 (1979).

**Plaintiffs' Statement No. 78:**

The Louisiana Wildlife and Fisheries Commission ("LWFC") also objected to the

---

[1]  Plaintiffs' exhibits include excerpts from two Draft Environmental Statements, one dated October 30, 1972 (Exh. 66) and another dated December 1974 (Exh. 67).  Another Draft was issued April 30, 1975, which is the version transmitted for comment.  *See* Pls. Exh. 68, Transmittal Letter at VRG-034-000000023; U.S. Exh. 43 (1975 DEIS).  Section 2.09(g) was unchanged between the December 1974 Draft and the April 1975 Draft.  *See* U.S. Ex. 41 (1974 DEIS); U.S. Exh. 43 (1975 DEIS).

Army Corps's failure to analyze the MRGO's "significant" contribution to ecological changes of "considerable magnitude" caused by saltwater intrusion into the marshlands and estuaries of South Louisiana.  Exh. 68 at IX-8 to IX-9 (1976 FEIS).

Response to Statement No. 78:

Contested and immaterial.  This statement is contested because plaintiffs misrepresent the contents of the letter cited.  The letter from the Louisiana Wildlife and Fisheries Commission commenting on the Draft Environmental Statement for Operation and Maintenance work on the MRGO does not state that it is an "objection" nor does it mention a "failure to analyze" on the part of the Corps of Engineers.  Pls. Exh. 68 at IX-22.  The paragraph referencing saltwater intrusion to the marsh states:  "Salt water intrusion into normally brackish or fresh water areas is a problem of considerable magnitude which is causing significant ecological changes in the marsh lands and estuaries of South Louisiana. The MR-GO has contributed to this process and implementation of the proposed project would enhance the adverse effects of this channel and result in further deterioration of high quality marsh and water bottoms."  *Id.*

Plaintiffs' Statement No. 79:

The LWFC also noted that implementation of the proposed O & M dredging projects would "enhance the adverse effects of this channel and result in further deterioration of high quality marsh."  Exh. 68 at IX-9 (1976 FEIS).

**Response to Statement No. 79:**

Immaterial.

**Plaintiffs' Statement No. 80:**

In lieu of addressing the LWFC's concerns, the Army Corps concluded that it was

inappropriate to present or analyze these impacts:

> This EIS recognizes the continual changes resulting from previous actions.
> We know of no definitive evidence which indicates that discontinuation of
> dredging operations would restore the salinity levels to pre-1960 conditions.
> Salinity control measures would require new construction features
> necessitating environmental and socio-economic investigation and impact
> analysis.  Consideration of these measures in this assessment of the impact of
> project operations and maintenance is not appropriate.

Exh. 68 at IX-9 (1976 FEIS).

**Response to Statement No. 80:**

Immaterial and contested.  The United States contests and objects to plaintiffs'

argumentative characterization of the Corps of Engineers' response to the LWFC comments

("In lieu of addressing the LWFC's concerns . . . . ").  The United States does not contest that

the block quote in Statement No. 80 is the Corps of Engineers' response in the Final

Environmental Statement to the LWFC comment regarding salt water intrusion.  *See* Pls.

Exh. 68 at IX-9.

**Plaintiffs' Statement No. 81:**

The 1976 FEIS does not contain any of the following:

a.      a description of the wetlands environment in the MR-GO vicinity as it existed

prior to the proposed maintenance dredging and operation of the MR-GO in violation of 40 CFR Part 1500.8 (a)(1);

b.       a description of the interrelationships and cumulative environmental impacts of the proposed maintenance dredging and operation of the MR-GO as it impacts the storm surge environment in the vicinity and other related Federal projects (for example, specifically but not exclusively, the locks at Seabrook and Rigolets); the wetlands environment in the MR-GO vicinity, and channel erosion as required by 40 CFR Part 1500.8 (a)(1), (a) (3);

c.       a description of the  probable adverse environmental effects of the Operation, Maintenance, and Dredging on the storm hazards in the environment which could not be avoided as required by 40 CFR Part 1500.8 (a)(5).

d.       the interrelationships of the MR-GO on other related Federal projects, in particular, the relationship that the MR-GO has or may have on the Lake Pontchartrain Hurricane Protection Project in violation of 40 CFR Part 1500.8 (a)(1).  Exh. 59 at 126:19-127:16 (30(b)(6) Deposition of John Saia, September 30, 2008); Exh. 68 at I-11-13 (1976 FEIS).

e.       any detail regarding the probable impact of the proposed maintenance dredging and operation of the MR-GO on the wetlands environment in the MR-GO vicinity as they affect storm surge and channel erosion as required by 40 CFR Part 1500.8 (a)(3);

f.       an analysis of the secondary, or indirect, as well as primary or direct,

61

consequences of the maintenance dredging and operation of the MR-GO on the wetlands
environment as it relates to storm surge and channel erosion in the MR-GO vicinity, as
required by 40 CFR Part 1500.8 (a)(3)(ii);

g.      an evaluation of the cumulative environmental impacts of the MR-GO O&M
as required by 40 CFR Part 1500.8 (a) (1); Exh. 59 at 126:13-18 (30 (b)(6) Deposition of John
Saia, September 30, 2008);

h.      an analysis of alternatives to the proposed maintenance dredging and
operation of the MR-GO (and their benefits) relative to environmental changes presented to
the storm surge environment and impacts on storm hazards, wetlands loss, and channel
erosion as required by 40 CFR Part 1500.8(a)(4);

i.      the required statement indicating the extent to which the stated
countervailing benefits could be realized by following reasonable alternatives to the
proposed action that would avoid some or all of the adverse environmental effects on the
wetlands environment in the MR-GO vicinity as required by 40 CFR Part 1500.8 (a)(8).

j.      an analysis in sufficient detail to reveal the Army Corps's comparative
evaluation of the environmental benefits, costs, and risks of the Operation, Maintenance, and
Dredging and each reasonable alternative as it impacted storm hazards, wetlands loss, and
channel erosion in the vicinity of the MR-GO, as required by 40 CFR Part 1500.8 (a)(4).

k.      any descriptions of appropriate alternatives to resolve conflicts concerning
methods of mitigating the effects of maintenance dredging and operation of the MR-GO on

storm surge, wetlands loss, and channel erosion in the MR-GO vicinity as required by 40 CFR Part 1500.8 (a)(4);

l.      a rigorous exploration and objective evaluation of the environmental impacts of all reasonable alternative mitigating measures that might neutralize or avoid some or all of the adverse environmental effects of the existence of and continued maintenance dredging and operation of the MR-GO as required by 40 CFR Part 1500.8 (a)(4);

m.      an analysis of the operation and maintenance of the MR-GO reducing the environmental benefits of the wetlands environment in the MR-GO vicinity or the alternative of taking no action or of postponing action pending further study of the effects as required by 40 CFR Part 1500.8 (a)(4);

n.      the required statement on the extent to which the Operation, Maintenance, and Dredging involves tradeoffs between short-term environmental gains at the expense of long-term losses, and a discussion of the extent to which the Operation, Maintenance, and Dredging foreclose future options regarding the environment, as required by 40 CFR Part 1500.8 (a)(6); and

o.      the required section indicating what other interests and considerations of Federal policy are thought to offset the adverse environmental effects of the proposed action on the wetlands environment in the MR-GO vicinity as required by 40 CFR Part 1500.8 (a)(8).

63

**Response to Statement No. 81:**

Immaterial and contested.  The United States also objects to the assertion of law in this statement, which is not a statement of fact that requires a response, and it is argumentative and contested.  Moreover, from 1970-78, the guidelines published at 40 C.F.R. Part 1500, cited by Plaintiffs as having been violated, were non-binding at the time the 1976 Final Environmental Statement was prepared and published.  *Andrus v. Sierra Club*, 442 U.S. 347, 354-57 (1979).  To the extent Statement No. 81 includes factual statements, those statements are contested because the 1976 Final Environmental Statement did not omit legally required information.  *See* Pls. Exh. 63.

**Plaintiffs' Statement No. 82:**

The Army Corps concedes that the 1976 FEIS contains no analysis that reaches the specific conclusion about the health and safety of the human environment related to erosion of the banks along the MR-GO.  Exh. 56 at 281:6-282:16 (30(b)(6) Deposition of Gregory Miller, October 14, 2008).

**Response to Statement No. 82:**

Immaterial and contested.  The United States objects to the argumentative characterization of the United States's testimony.  What is contained in the 1976 Final Environmental Statement is shown by the document itself, and the witness's characterization of the document is not pertinent or material to the legal issues before the Court.

**Plaintiffs' Statement No. 83:**

At no time after 1976 did the Army Corps ever prepare a Final or Supplemental Environmental Impact Statement concerning ongoing O&M dredging activities that discussed their impact on the environment, mitigation measures, alternatives, risks to human life and property, and other disclosures required by NEPA and implementing regulations. Exh. 64 (Appendix L, MR-GO De-Authorization Study); *see also* Exh. 59 at 82:23-83:19, 131:11-132:3-142:25, 181:8-184:14 (30(b)(6) Deposition of John Saia, Sept. 30, 2008); Exh. 73 at 32:9-35:9, 60:1-71:12, 79:11-81:22, 82:18-85:17, 90:15-93:20, 96:8-97:3, 98:23-99:7, 118:6-119:17 (30(b)(6) Deposition of John Saia, October 1, 2008).

**Response to Statement No. 83:**

Immaterial and contested.  The United States also objects to this statement because it is an assertion of law, not a statement of fact that requires a response, and it is argumentative. The United States contests the assertion in Statement No. 83 that the Army Corps of Engineers failed to do something that was required by NEPA.

**Plaintiffs' Statement No. 84:**

From 1976 to the time of Hurricane Katrina, the Army Corps knew that the MR-GO's unarmored channel continued to widen at the rate of 42 feet per year, eventually expanding through unmitigated erosion to 2,000 feet and in some places 3,000 feet.  Exh. 27 at pp. 46, 148 (Kemp Expert Report (July 11, 2008); Exh. 70 (Memorandum of Cecil W. Soileau (Chief, Hydraulics and Hydrologic Branch, Commenting on Army Corps, Mississippi River-Gulf Outlet, St. Bernard Parish, Louisiana (Bank Erosion), May 24, 1988).

**Response to Statement No. 84:**

Immaterial and contested.  Statement No. 84 implies that the entirety of the MRGO channel remained "unarmored" "from 1976 to the time of Hurricane Katrina" and that "unmitigated erosion" occurred throughout that time.  These statements are refuted by Plaintiffs' own exhibits.  Contrary to plaintiffs' statement that the MRGO "continued to widen at the rate of 42 feet per year," the May 24, 1988, Memorandum Plaintiffs cite states that "[e]rosion rates along the MR-GO vary from 6 ft to 40 feet per year."  Pls. Exh. 70 at NED-192-000000254.  *See also* Pls. Statement No. 114 (stating that "conduct was causing the surface width of the MR-GO to expand at a rate averaging over 15 feet per year").  Further, the 1988 MRGO Bank Erosion Reconnaissance Report, shows that by 1988, bank protection had been installed along much of the leveed reach of the MRGO and that erosion was therefore not "unmitigated" in that area.  *See* Pls. Exh. 83, U.S. Exh. 42, 1988 Reconnaissance Report at 14 (describing that the MRGO project "was modified in August 1969" and that "the project modification, provided for, *as a mitigation measure*, protecting a portion of the foreshore lying between the Lake Pontchartrain and Vicinity Hurricane Protection project levees and the MR-GO.  This included six miles along the north bank of the MR-GO in the reach which is part of the GIWW and 18 miles along the south shore of the MR-GO. . . .  Foreshore protection along the north bank of the MR-GO and for 13 miles along the south bank from Bayou Bienvenue to the end of the leveed reach, as authorized by the August 1969 project modification, has been completed.  Foreshore protection on the south bank

from Bayou Bienvenue to the IHNC is indefinitely deferred until the need arises.") (emphasis added).

Statement No. 84 is immaterial because it is not a fact of consequence to the legal issue of whether the United States violated any mandatory and specific directive.

**Plaintiffs' Statement No. 85:**

During the same time period, the Army Corps knew that the MR-GO continued to destroy wetlands through channel widening, disposal of dredged material, and continuing salt water intrusion at an average loss of 211 acres of marsh per year during the 20-year period between 1968 and 1987 and a total of 4,200 acres of highly productive marsh adjacent to the MR-GO channel.  1988 Army Corps Reconnaissance Report (Exh. 32) at p. 2, Comment 2; Army Corps, Habitat Impact of the Construction of the MRGO (Exh. 41) (December 1999) at NED-188-000001556 *et seq.*; Exh. 74 at pp. 18-19 (Army Corps and Louisiana Department of Natural Resources, "Land Loss and Marsh Creation, St. Bernard, Plaquemines and Jefferson Parishes—Feasibility Study" (April 1990)).

**Response to Statement No. 85:**

Immaterial and contested.  Statement No. 85 is contested because it is vague and compound.  It is uncontested that the 1988 MRGO Bank Erosion Reconnaissance Report states that "[e]rosion of the channel banks has caused an average loss of 211 acres of marsh per year during the 20 year period between 1968 and 1987."  Pls. Exh. 83, U.S. Exh. 42 at 27.  With respect to the remaining facts in Statement No. 85, the statements are too vague for the

67

United States to respond; it is unclear what time period or periods are being referenced or to what the plaintiffs statement regarding "a total of 4,200 acres of highly productive marsh adjacent to the MR-GO channel" refers.

Statement No. 85 is immaterial because it is not a fact of consequence to the legal issue of whether the United States violated any mandatory and specific directive.

**Plaintiffs' Statement No. 86:**

During the same time period, the Army Corps knew (or should have known) that the reduction in protective wetlands (both in the Golden Triangle and Central Wetlands Unit and immediately in front of the LPV structures) and increase in channel width would likely have a demonstrable effect on flooding levels in the vicinity of the MR-GO during hurricanes.  1988 Army Corps Reconnaissance Report (Exh. 32) at Comment 2; Exh. 71 at ¶¶ 19-27 (Kemp Supplemental Declaration).

**Response to Statement No. 86:**

Immaterial and contested.  Statement No. 86 is contested because it is vague ("during the same time period;" "protective wetlands;" "immediately in front of the LPV structures") and it is contradicted by plaintiffs' own expert.  *See* U.S. Exh. 38, Deposition of Paul G. Kemp, Nov. 27, 2007, at 200:3-16 (testifying that he did not have the ability to calculate or quantify the attenuating effect of wetlands on storm surge).

Statement No. 86 is immaterial because it is not a fact of consequence to the legal issue of whether the United States violated any mandatory and specific directive.

**Plaintiffs' Statement No. 87:**

On July 11, 1985 the ACE published a "Supplemental Information Report" ("1985 SIR") to complement the 1976 FEIS.  Exh. 72 (1985 SIR).

**Response to Statement No. 87:**

Immaterial.

**Plaintiffs' Statement No. 88:**

The 1985 SIR was intended "to evaluate the ongoing removal of allowable over depth and advanced maintenance during routine maintenance dredging."  Exh. 72 at NOP-002-000002283 (1985 SIR).

**Response to Statement No. 88:**

Immaterial.

**Plaintiffs' Statement No. 89:**

The 1985 SIR conceded that the over depth dredging practice was "inadvertently omitted from the [1976] FEIS."  Exh. 72 at NOP-002-000002283 (1985 SIR).

**Response to Statement No. 89:**

Immaterial and contested as argumentative, not factual.  Statements in the SIR were not concessions. This statement is immaterial because it is not a fact of consequence to the legal issue of whether the United States violated any mandatory and specific directive.

**Plaintiffs' Statement No. 90:**

The 1985 SIR does not evaluate the effects of over depth dredging on the MR-GO surface width, wetlands loss, or the subsequent effect on storm hazard; nor does it in any way evaluate the effects of over depth dredging on the human environment.  Ex. 72 (1985 SIR).

**Response to Statement No. 90:**

Immaterial and contested.  The 1985 SIR supplements the 1976 Final Environmental Statement and describes "affected environments," "impacts," and concludes that "[t]he continued removal of sediment as allowable overdepth and advanced maintenance would have no additional impacts on the human environment."  Pls. Exh. 72 at NOP-002-000002282-87.

**Plaintiffs' Statement No. 91:**

Without evaluating the impact of the over depth dredging on the MR-GO surface width or the surrounding wetlands and its impact on storm surge, the 1985 SIR concludes that the over depth dredging would have no impact on the human environment.  Exh. 72 at NOP-002-000002287 (1985 SIR).

**Response to Statement No. 91:**

Immaterial and contested as argumentative, not factual.  Further, the 1985 SIR did not conclude that overdepth dredging would have *no* impact on the human environment; as a supplement to the 1976 Final Environmental Statement, it concluded that "[t]he continued

removal of sediment as allowable overdepth and advanced maintenance would have *no additional impacts* on the human environment." Pls. Exh. 72 at NOP-002-000002287.  This statement is immaterial because it is not a fact of consequence to the legal issue of whether the United States violated any mandatory and specific directive.

**Plaintiffs' Statement No. 92:**

Between 1980 and 2004, the Army Corps performed a total of 26 EAs of the MR-GO—each with formulaic Findings of No Significant Impact ("FONSI")—relating to routine O&M activities.  Exh. 64 (Appendix L, MR-GO De-Authorization Study).

**Response to Statement No. 92:**

Immaterial and contested.  The United States objects to the argumentative characterization of "formulaic" Findings of No Significant Impact.  It is uncontested that 26 Environmental Assessments were performed relating to the MRGO between 1980 and 2004 and that each EA resulted in a Finding of No Significant Impact.

**Plaintiffs' Statement No. 93:**

Each of EAs that the Army Corps prepared was limited to analysis of discrete segments of designated miles along the 76 mile channel, and some are further subdivided into two and three sub-EAs prepared separately, addressing even smaller designated areas for the proposed action.  *See, e.g.*, Exh. 75 (EA 162 (miles 23-2); miles 49.9-56.1; miles 0 to (-)2.5).

**Response to Statement No. 93:**

Immaterial and contested.  The United States objects to plaintiffs' argumentative characterization of EAs as being "limited" or "subdivided."  The EAs identify and analyze proposed action or actions, and many EA titles identify mile markers for project locations. Statement No. 93 is not a fact of consequence to the legal issue of whether the United States violated any mandatory and specific directive.

**Plaintiffs' Statement No. 94:**

Not all the EAs prepared by the Army Corps were published for comment.  *See, e.g.,* Exh. 76 (EA 47 South bank Foreshore Protection); Exh. 77 (Army Corps Maintenance Dredging (NOP-019-000000736-789); Exh. 90 (EA 72 Jetty repairs); Exh. 91 (EA 294 Breton Island Restoration).

**Response to Statement No. 94:**

Immaterial.  Statement No. 94 is not a fact of consequence to the legal issue of whether the United States violated any mandatory and specific directive because neither NEPA nor its implementing regulations require that Environmental Assessments be published for comment.  *See* 40 C.F.R. § 1503.1 (requiring comments be obtained for draft environmental impact statements only; not environmental assessments).

**Plaintiffs' Statement No. 95:**

The 26 EAs of the MR-GO relating to O&M activities between the years 1980 and 2004 consisted of: 8 relating to Bank Stability, 8 relating to Dredge Spoil Deposition, 2

relating to Dredging, 2 relating to Floatation Channels, 2 relating to the Reach 3 jetties, 2 unknown, 1 relating to Wetlands Creation, and 1 relating to Marsh Enhancement.  Exh. 64 (Appendix L, MR-GO De-Authorization Study).

**Response to Statement No. 95:**

Immaterial and contested.  Statement No. 95 appears to categorize the purpose of each EA by its title from the listing in Appendix L of the MRGO Deep Draft De-Authorization Report, Pls. Exh. 64.  Such categorization is contested because some listed EAs may fall into more than one category, and Statement 95 does not identify which EAs are in each listed subject category, and it is contested that the subjects of 2 EAs are "unknown."  However, the subjects of the EAs are not a fact of consequence to the legal issue of whether the United States violated any mandatory and specific directive.

**Plaintiffs' Statement No. 96:**

Each of the total 26 EAs is accompanied by a Finding of No Significant Impact ("FONSI").  Exh. 64 (Appendix L, MR-GO De-Authorization Study).

**Response to Statement No. 96:**

Immaterial.

**Plaintiffs' Statement No. 97:**

The initial design memoranda for the MR-GO expressly foresaw the eventuality that the erosion of the MR-GO—because the banks were unarmored— would necessitate bank stabilization measures and foreshore protection measures, but the Army Corps proceeded

without protecting the channel banks.  Exh. 78 at p. 7 (Podany Deposition Exhibit 41,

General Design Memoranda (GDM) 1A); Exh. 79 at p. 5 (Podany Deposition Exhibit 42,

GDM 1B); Exh. 80 at pp. 1-30 (Podany Deposition Exhibit 43, GDM 2 Supplement 4

(foreshore protection)); Exh. 58 at 74:8-77:16 (30(b)(6) deposition testimony of Thomas

Podany, Oct. 9, 2008).

**Response to Statement No. 97:**

    Immaterial.

**Plaintiffs' Statement No. 98:**

    In 1984, the Army Corps participated in a study partially funded by St. Bernard Parish

of the MRGO entitled "The Mississippi River Gulf Outlet: A Study of Bank Stabilization" and

published by Coastal Environments, Inc.  Exh. 81 (Podany Deposition Exhibit 38); Exh. 58 at

144:3-146:2 (30(b)(6) deposition testimony of Thomas Podany, Oct. 9, 2008)

**Response to Statement No. 98:**

    Immaterial.

**Plaintiffs' Statement No. 99:**

    On March 26, 1987, the New Orleans District Planning Division held a meeting to

discuss (a) the potential damages that would be sustained by the failure to abate the banks of

the MR-GO, including the economic value of land lost to erosion vis-à-vis hurricane

protection and (b) bank protection alternatives, including different dredging techniques.

Exh. 82 at NED-000001167-1169 (Memorandum for Record re Mississippi River Gulf Outlet

(MR-GO), Bank Erosion Reconnaissance Study Interdisciplinary Planning Team Meeting to

Select Alternative Bank Erosion Control Measures for Evaluation in the MR-GO

Reconnaissance Report, April 6, 1987).

**Response to Statement No. 99:**

   Immaterial and contested.  Statement No. 99 is contested because it misrepresents the

contents of the document cited.  It is uncontested that Exhibit 82 includes a Memorandum

for Record, which reflects that a meeting of the MRGO Bank Erosion Reconnaissance Study

Interdisciplinary Planning Team was held on March 26, 1987, and that the subject of the

meeting was "to select alternative bank erosion control measures for evaluation in the MR-

GO Reconnaissance Report."  Pls. Exh. 82 at NED-192-000001167.  The Memorandum for

Record further reflects that a discussion was held regarding "the potential damages that may

be sustained in the MR-GO if unabated erosion losses occur along its unleveed banks," and

that valuation tasks were identified, to include the "[e]conomic value of area directly lost to

erosion," not only vis-a-vis hurricane protection, as plaintiffs' Statement 99 implies, but also

the recreation, commercial, and other value.  *Id.*  The Memorandum for Record further

reflects that causes of erosion were discussed as well as alternatives to reduce or prevent the

erosion.  *Id.* at NED-192-000001168-69.  Contrary to plaintiffs' statement that the

alternatives discussed included "different dredging techniques," the only mention of

dredging was with respect to dredge material *disposal. Id.* at NED-192-000001169

("Different dredge material disposal sites and techniques").

**Plaintiffs' Statement No. 100:**

The Army Corps associated erosion of the MR-GO with hurricane protection, yet it performed 147 dredging events over the remainder of the MRGO and never supplemented its 1976 EIS to address the known impacts of the ongoing dredging on erosion and loss of wetlands or on its effect on hurricane protection in the area of the MR-GO.  Exh. 64 (Appendix L, MR-GO De-Authorization Study).

**Response to Statement No. 100:**

Immaterial and contested.  Statement No. 100 is contested because it is vague, compound, and argumentative.  The statements "over the remainder of the MRGO," "ongoing dredging," and "known impacts of the ongoing dredging on erosion and loss of wetlands or on its effect on hurricane protection in the area of the MR-GO" are too vague to be able to respond.  To the extent plaintiffs' statement attributes erosion and loss of wetlands to "ongoing dredging," the United States contests this statement; the record and plaintiffs' exhibits show that erosion of the banks of the MRGO is attributed to waves from wind and ship wakes and other causes *not* including dredging of the MRGO.  *See* Pls. Exh. 83, U.S. Exh. 42, 1988 Bank Erosion Reconnaissance Report at 10 ("Most of the Mississippi River-Gulf Outlet is experiencing severe erosion along its unleveed banks.  The erosion is a result of channelization, ship and wind generated waves, storm activity, and subsidence.  Associated with subsidence is eustatic sea level rise that has been estimated at 0.5 feet per century.").  *See also id.* App. E, USFWS Planning Aid Letter at 1 ("This erosion is believed to be mostly

76

caused by the huge wakes of fast-moving ships."). Further, the document cited by plaintiffs does not support their statement that the "Army Corps associated erosion of the MR-GO with hurricane protection." *See* Pls. Exh. 64 (providing a list of titles of Environmental Assessments and Environmental Impact Statements relating to the MRGO).

**Plaintiffs' Statement No. 101:**

In its 1988 bank erosion reconnaissance study, the Army Corps acknowledged the problems of salt water intrusion, environmental loss of marsh, and hurricane protection associated with loss of storm buffer along the north bank of the MRGO from Lake Borgne. Exh. 83 at p. 10, LMVD Comment No. 2, p. 16, 24-25, 26-27, Appendix E at pp. 3-8 (Podany Deposition Exhibit 37, 1988 Bank Erosion Reconnaissance Report); Exh. 58 at 113:10-116:1, 126:13-129:17 (30(b)(6) deposition testimony of Thomas Podany, Oct. 9, 2008).

**Response to Statement No. 101:**

Immaterial and contested. The statement is contested because it is argumentative and because the document does not use the term "storm buffer." *See* Pls. Exh. 83.

**Plaintiffs' Statement No. 102:**

In 1987, the Army Corps expressly considered the need to evaluate bank stabilization measures along the MR-GO for its hurricane protection impacts. Exh. 82 at NED-000001167-1169 (Memorandum for Record re Mississippi River Gulf Outlet (MR-GO), Bank Erosion Reconnaissance Study Interdisciplinary Planning Team Meeting to Select Alternative Bank Erosion Control Measures for Evaluation in the MR-GO Reconnaissance

Report, April 6, 1987).

**Response to Statement No. 102:**

Immaterial.

**Plaintiffs' Statement No. 103:**

When the Army Corps undertook a consideration of shore protection of the MR-GO,

a memorandum dated October 6, 1993, expressly concluded that such efforts would require

the Army Corps to alert Congress of the environmental concerns inherent in the MRGO

through a full EIS.  Exh. 65 at pp. 1505-1506 (Memorandum for file, *Mississippi River-Gulf*

*Outlet, St. Bernard Parish, LA (Bank Erosion) Revised Reconnaissance Study and Feasibility*

*Study*, Oct. 6, 1993).

**Response to Statement No. 103:**

Immaterial and contested.  Statement No. 103 is contested because it is vague and

misrepresents the contents of the memorandum cited.  The record reflects that the Army

Corps of Engineers "undertook a consideration of shore protection of the MR-GO" on

numerous occasions, including as early as the first Design Memorandum dated 1957 (*see* Pls.

Exh. 78, U.S. Exh. 4, Design Memorandum No. 1-A at 7), and the time period referenced by

Statement No. 103 is therefore unclear.  The October 6, 1993, Memorandum for File cited in

Statement No. 103 does not conclude that *any* consideration of shore protection "would

require the Army Corps to alert Congress of the environmental concerns inherent in the

MRGO through a full EIS."  Rather, the Memorandum reflects that a discussion was held

78

regarding "the possible options for Environmental Input to the Feasibility Report" for an

MRGO Revised Reconnaissance Study and Feasibility Study, and it reflects a decision for this

study "to prepare a Supplemental EIS to the existing MRGO EIS, which was prepared in

1976." Pls. Exh. 65 at NMP-036-000001505-06. The Memorandum makes no mention of

any "environmental concerns inherent in the MRGO." *See id.*

**Plaintiffs' Statement No. 104:**

While the Army Corps undertook a consideration of shore protection of the MR-GO,

the Army Corps noted that a full EIS to Congress would necessitate public comment that

would both challenge the limited scale of the Army Corps proposed protection efforts in

light of the public desire for more extensive remedy, and would likely raise for Congressional

consideration the closing of the MR-GO. Exh. 65 at pp. 1505-1506 (Memorandum for file,

*Mississippi River-Gulf Outlet, St. Bernard Parish, LA (Bank Erosion) Revised Reconnaissance*

*Study and Feasibility Study*, Oct. 6, 1993).

**Response to Statement No. 104:**

Immaterial and contested. Statement No. 104 is contested for the same reasons as

stated in response to Statement No. 103; the statement is vague and misrepresents the

contents of the memorandum cited. The United States further objects to the argumentative

nature of plaintiffs' Statement No. 104. Plaintiffs' Exhibit 65 makes no mention of Congress,

and rather than describing the proposed action as of a "limited scale" as plaintiffs state, the

Memorandum notes that the proposed action is of "large scope," which was one reason in

favor of preparing an EIS for the Study.  Pls. Exh. 65 at NMP-036-000001505-06.  Another

reason in favor of preparing an EIS was the fact that the Corps's study "may consider the

closure of the MRGO as a non-structural alternative."  *Id.* at NMP-036-000001506.  The

Memorandum reflects that a decision was made "to prepare a Supplemental EIS to the

existing MRGO EIS, which was prepared in 1976."  *Id.*

**Plaintiffs' Statement No. 105:**

The Army Corps understood in 1988 that the loss of land in front of the flood

protection structures around Lake Borgne caused by erosion of the MR-GO was removing

the last line of defense to reduce the impact of storm surge and waves.  Exh. 83 at p. 24,

Appendix E at pp. 6, 8 (Podany Deposition Exhibit 37, 1988 Bank Erosion Reconnaissance

Report); Exh. 58 at 128:13-129:17 (30(b)(6) deposition testimony of Thomas Podany, Oct. 9,

2008).

**Response to Statement No. 105:**

Immaterial and contested.  Statement No. 105 is contested because "in front of the

flood protection structures around Lake Borgne" is vague, and because the 1988 Bank

Erosion Reconnaissance Report does not attribute the loss of land in the vicinity of the

MRGO only to "erosion of the MR-GO."  It is uncontested that the 1988 Bank Erosion

Reconnaissance Report noted that "[w]ithout the buffering effect of the marsh, developed

areas adjacent to the study area would be more susceptible to flooding."  Pls. Exh. 83, U.S.

Exh. 42 at 23.

**Plaintiffs' Statement No. 106:**

In its 1988 Bank Erosion Reconnaissance Study, the Army Corps considered structural

bank protection options, including rock dikes, alternative disposal areas, concrete block,

timber pile, stone, and shell core dikes.  Exh. 83 at pp. 34–35 (Podany Deposition Exhibit 37,

1988 Bank Erosion Reconnaissance Report); Exh. 58 at 33:9-34:24, 139:7-142:25 (30(b)(6)

deposition testimony of Thomas Podany, Oct. 9, 2008).

**Response to Statement No. 106:**

Immaterial.  The erosion abatement structures considered by the Army Corps of

Engineers in 1988 are not a fact of consequence to the legal issue before the Court of

whether the United States violated any mandatory and specific directive.

**Plaintiffs' Statement No. 107:**

In its 1988 Bank Erosion Reconnaissance Study, the Army Corps considered

alternatives to operation of the MRGO that might mitigate the erosion of the banks of the

MRGO, including: reduction of and alternatives to maintenance dredging.  Exh. 83 at pp. 34-

50 (Podany Deposition Exhibit 37, 1988 Bank Erosion Reconnaissance Report); Exh. 58 at

33:9-34:24, 146:3-147:22 (30(b)(6) deposition testimony of Thomas Podany, Oct. 9, 2008).

**Response to Statement No. 107:**

Immaterial and contested.  Statement No. 107 is contested because the 1988 Bank

Erosion Reconnaissance Report does not reflect consideration of "reduction of and

alternatives to maintenance dredging;" rather, the non-structural alternatives considered

were "restricting vessel size and/or transit speed in the MR-GO." Pls. Exh. 83, U.S. Exh. 42 at 30. The United States objects to Statement No. 107 as immaterial, however, as the erosion abatement alternatives considered by the Army Corps of Engineers in 1988 are not a fact of consequence to the legal issue before the Court of whether the United States violated any mandatory and specific directive.

**Plaintiffs' Statement No. 108:**

The Army Corps acknowledged by the time of its 1988 bank erosion reconnaissance investigation that the problems associated with erosion had an impact on the human environment which would be regulated by NEPA, but it never incorporated this information into its environmental disclosures—either in the EAs or a Supplemental Environmental Impact Statement. Exh. 58 at 157:5-159:25 (30(b)(6) deposition testimony of Thomas Podany, Oct. 9, 2008).

**Response to Statement No. 108:**

Immaterial and contested. Statement No. 108 misrepresents the deposition testimony it cites. The witness testified that the 1988 Bank Erosion Reconnaissance Report "is a preliminary document, it's not an environmental assessment or an EIS," but that the format includes some of the same subjects that would be addressed in an environmental assessment or EIS and that the Reconnaissance Report, as a preliminary document, may "look a little bit like" a draft environmental assessment. Pls. Exh. 58 at 158

**Plaintiffs' Statement No. 109:**

The Army Corps's St. Bernard Parish Bank Erosion Reconnaissance Study dated December 9, 1992, found that wind generated waves were not limited to the width of the channel during hurricanes.  Exh. 84 at 1832 (Memorandum re MRGO, St. Bernard Parish, (Bank Erosion) Revised Recon Study, Dec. 9, 1992).

**Response to Statement No. 109:**

Immaterial.  Statement No. 109 is uncontested except that the Memorandum at Exhibit 84, dated December 9, 1992, and with the subject "MRGO, St. Bernard Parish, (Bank Erosion) Revised Recon Study" was not itself a Reconnaissance Study or Report but appears to be comments related to a Revised Reconnaissance Study then underway.  *See* Pls. Exh. 84.

**Plaintiffs' Statement No. 110:**

On October 6, 1993, in response to evaluating proposed action associated with the Mississippi River Gulf Outlet St. Bernard Parish (Bank Erosion) Revised Reconnaissance and Feasibility Study, the Army Corps evaluated the need to prepare either an EA or and EIS. The Army Corps concluded that the large scope of the proposed action would necessitate an EIS, local interests would not want a small scale bank protection project, and once environmental organizations determine how costly the limited bank protection project is expected to be, they will want an analysis of closure of the MR-GO as a possible alternative. Exh. 65 at pp. 1505-1506 (Memorandum for file, *Mississippi River-Gulf Outlet, St. Bernard Parish, LA (Bank Erosion) Revised Reconnaissance Study and Feasibility Study*, Oct. 6, 1993).

**Response to Statement No. 110:**

Immaterial.  The United States objects to Statement No. 110 as compound and not in compliance with Local Rule 56.1.

**Plaintiffs' Statement No. 111:**

Between 1963 and 2005, the Army Corps sought and obtained appropriations for approximately 147 dredging events and removed approximately 492,422,925 million cubic yards of sediment which became spoil.  Exh. 85 at p. 5 (Compilation of Dredging Events Notice of Intent to Introduce Summary Evidence; Exhibit A-F, served on Defendant on September 12, 2008).

**Response to Statement No. 111:**

Immaterial and contested.  Statement No. 111 is contested because it is vague; the statement does not identify the MRGO or other specific project to which the stated dredging events relate.  The statement is immaterial because it is not a fact of consequence to the legal issue of whether the United States violated any mandatory and specific directive.

**Plaintiffs' Statement No. 112:**

For the years 1970 to 1979, the Army Corps sought tens of millions of dollars for funding for new work and ongoing maintenance activities for the MR-GO as follows:

| | | |
|---|---|---|
| 1970 | $800,000 for new work and, $8,813,988 for maintenance work; |
| 1971 | $1,800,000 for new work and $1,875,500 for maintenance work; |
| 1972 | $794,00 for new work and $2,826,803 for maintenance work; |
| 1973 | $900,000 for new work and $1,809,800 for maintenance work; |
| 1974 | $580,000 for new work and $2,534,100 for maintenance work; |

     1974   $1,000,000 for new work and $1,940,000 for maintenance work;
     1976   $2,500,000 for new work and $6,586,400 for maintenance work;
     1977   $-285,000 sought, ($1,042,750 spent) for new work, $4,060,000 for
maintenance work;
     1978   $800,000 for new work, $4,453,000 for maintenance work;
     1979   $1,235,000 for new work and $7,090,000 for maintenance work.

Exh. 92 (Annual Reports of the Chief of Engineers on Civil Works Activities

(1970-72-1974-79).

**Response to Statement No. 112:**

     Immaterial.

**Plaintiffs' Statement No. 113:**

     None of these appropriations requests were accompanied with an EIS outlining the

impact of the maintenance of the MRGO on wetlands, channel widening, and storm hazards,

or any of the other information required by NEPA and implementing regulations.

**Response to Statement No. 113:**

     Immaterial and contested.  The United States also objects to this statement because it

is an assertion of law, not a statement of fact that requires a response, and it is argumentative.

Further, plaintiffs' legal conclusion is incorrect, as neither NEPA nor its implementing

regulations required at any time that appropriation requests be accompanied by an EIS.

From 1970-78, the guidelines published at 40 C.F.R. Part 1500, cited by plaintiffs in

Statement No. 75 as having been violated, were *non-binding*.  *Andrus v. Sierra Club*, 442

U.S. 347, 354-57 (1979).  Mandatory regulations for implementing NEPA's procedural

provisions were not issued until 1978. *Id.* at 357. Those mandatory regulations specifically do not require that appropriation requests be accompanied by an EIS. *Id.* at 357; 40 C.F.R. §1508.17 ("Legislation includes a bill or legislative proposal to Congress . . . but does not include requests for appropriations."). Therefore, Statement No. 113 is immaterial to the legal issue of whether the United States violated any mandatory and specific directive.

**Plaintiffs' Statement No. 114:**

The Army Corps never presented Congress with an objective analysis of the dredging consequences, including the Army Corps's own understanding that its conduct was causing the surface width of the MR-GO to expand at a rate averaging over 15 feet per year and caused the channel to triple in width. Exh. 86 at 1865 (*The Mississippi River Gulf Outlet: A Study of Bank Stabilization*); Exh. 87 at 1559 (New Orleans District Corps of Engineers for the Environmental Subcommittee of the Technical Committee Convened by EPA in Response to St. Bernard Parish Council Resolution 12-98. December 1999. Habitat Impacts of the construction of the MRGO, March 16, 2000).

**Response to Statement No. 114:**

Immaterial and contested. The Secretary of the Army presented Congress with an objective analysis of the proposed Mississippi River-Gulf Outlet in his submission to Congress found at House Document 82-245 (1951). *See* U.S. Exh. 23. The Secretary's letter transmitted a letter and report from the Chief of Engineers as well as comments of the Governor of Louisiana and a report of the Board of Engineers for Rivers and Harbors with

accompanying papers, which included a transcript of a public hearing, "attended by some

500 representatives of Federal, State, city, and parish agencies; financial, commercial,

industrial, and shipping interests; and numerous civic and social organizations," and 89

exhibits from the hearing.  U.S. Exh. 23, H.R. Doc. 82-245 at 25 (1951).  Moreover, Statement

No. 114 is contested because it is vague; the statement is not limited in time, the surface

width of the MRGO was not expanding at a uniform rate (*see* response to Statement No. 84),

and the entirety of the channel did not "triple in width."  Further, Statement No. 114 is

immaterial to the legal issue of whether the United States violated any mandatory and

specific directive because nothing required the Army Corps of Engineers to inform Congress

of the matters in Statement No. 114 prior to Hurricane Katrina.

## Plaintiffs' Statement No. 115:

On January 31, 1975, the senior Army Corps officer in Mobile wrote to his

counterpart in New Orleans.  It was five years after NEPA's enactment, and the Army Corps

was legally obligated to prepare comprehensive environmental reviews of major activities

like the continuous dredging as part of the MR-GO's O&M.  Colonel Drake Wilson advised

Colonel E.R. Heiberg, III that "[t]he secret for planning a 3-week vacation is to bypass NEPA

and 404 contacts . . . ."  Exh. 88 at p. 2 (Letter from Colonel Drake Wilson to Colonel E.R.

Heiberg, III, dated January 31, 1975) ("404 contacts" refers to the EPA, DOI, State of

Louisiana and other agency that the Army Corps must make in order to comply with all

relevant environmental regulations like NEPA and the Clean Water Act).

87

**Response to Statement No. 115:**

Immaterial and contested.  The United States objects to Statement No. 115 because it includes numerous factual statements rather than a "short and concise" statement as required by L.R. 56.1.  Further, Statement No. 115 is Immaterial because the letter found at Exhibit 88 that Statement No. 115 quotes in no way pertains to the MRGO.  It is thus immaterial to plaintiffs' motion and the legal issues before the Court.  It is uncontested that Exhibit 88 is a letter dated January 31, 1975, from the Mobile, Alabama, District to the New Orleans District of the Army Corps of Engineers.  It is further uncontested that NEPA was passed by Public Law 91-190, 83 State. 852, on January 1, 1970, and that a letter dated January 31, 1975, would have been written approximately five years after NEPA's enactment.  Finally, it is uncontested that the language quoted from plaintiffs' Exhibit 88 in Statement No. 115 is accurately quoted from one line of the letter; this language, however, it is not a fact of consequence to the legal issues presented by Plaintiffs' motion.

**Plaintiffs' Statement No. 116:**

Colonel (later Brigadier General) Heiberg was the New Orleans District Commander at the time of the creation of the Final Environmental Impact Statement in 1976 for the MR-GO dredging.  Exh. 68 at IX-23, IX-24 (1976 FEIS).

**Response to Statement No. 116:**

Immaterial and contested.  Identification of the Commander of the Army Corps of Engineers New Orleans District in 1976 is not a fact of consequence to any legal issue before the Court.  The United States therefore objects to Statement No. 116 as it violates Local Rule 56.1.  It is uncontested that the Final Environmental Statement for Operation and Maintenance of the MRGO was completed in 1976.  *See* Pls. Exh. 64.

**Plaintiffs' Statement No. 117:**

Thirty years later and four months before Hurricane Katrina, an Army Corps environmental compliance official Richard Boe, after reviewing the agency's MR-GO environmental disclosure history, concluded that the agency had heeded Colonel Drake's advice because it had been deficient in its reporting and short-sighted in its analysis of the significant adverse and cumulative impacts of the MR-GO.  Exh. 89 ("Draft Mississippi River-Gulf Outlet PM-R Proposal for Gaining National Environmental Policy Act Compliance for the Operation and Maintenance Program" (April 11, 2005) ("Army Corps 2005 Memorandum"); Exh. 73 at 177:14-186:14 (30(b)(6) Deposition of John Saia, October 1, 2008).

**Response to Statement No. 117:**

Immaterial and contested.  Statement No. 117 is contested because it is vague, compound, and argumentative; it is not a "short and concise" statement of fact as required by L.R. 56.1.  It is uncontested that plaintiffs' Exhibit 89 is a draft memorandum written in April

2005 by Richard Boe, an Army Corps of Engineers employee at the New Orleans District. The United States contests and objects to the remainder of Statement No. 117 as argumentative and a misrepresentation of the contents of the draft memorandum at Exhibit 89. The United States objects to the argumentative characterization that the Corps of Engineers had been "deficient" or "short-sighted," as those words do no appear in Exhibit 89, which in fact states that "NEPA compliance is complete for all existing O&M activities." Exh. 89 at 1. Likewise, the United States objects to plaintiffs' statement that Richard Boe "concluded that the agency had heeded Colonel Drake's advice" as argumentative, not factual. Further it is immaterial because it is not of any consequence to the legal issues presented by Plaintiffs' motion.. Finally, because the document is marked "Draft," the United States contests that it represents any conclusion by the author or by the Army Corps of Engineers.

**Plaintiffs' Statement No. 118:**

During that period of continuous dredging, the Army Corps conducted at least 147 dredging missions and removed and disposed of over 492 million cubic yards of spoil into the wetlands along the MR-GO and elsewhere—more than originally excavated in constructing either the MR-GO or the Panama Canal. Exh. 85 at p. 5 (Notice of Intent to Introduce Summary Evidence; Exhibit A-F, 1963-2005 Maintenance Dredging History of the Mississippi River Gulf Outlet, served on Defendant on September 12, 2008); Exh. 49 at CRS-1 (N. Carter & C. Stern, "Mississippi River Gulf Outlet:  Issues for Congress at CRS-1

(Congressional Research Service), August 4, 2006); Exh. 27 at p. 5 (Kemp Expert Report (July

11, 2008)); http://www.pancanal.com/eng/general/canal faqs/index.html

**Response to Statement No. 118:**

Immaterial and contested.  Statement No. 118 is contested because it is vague,

compound, and argumentative.  Plaintiffs do not identify what is meant by "that period of

continuous dredging," and the United States contests that dredging of the MRGO occurred

continuously during any time period.  *See* Pls. Exh. 85.  Further, most dredging of the

MRGO was performed by contractors, rather than conducted by the Army Corps of

Engineers.  *See id.*  The statement that dredge spoil was disposed "into the wetlands along

the MR-GO and elsewhere" is too vague for the United States to evaluate, as are the

statements regarding the of total cubic yards of spoil and number of dredging missions

without identification of the time period to which those statements pertain.  The statement

that 492 million cubic yards of spoil is "more than originally excavated in constructing either

the MR-GO or the Panama Canal" is argumentative and not a fact of consequence to any

legal issue before the Court.

**Plaintiffs' Statement No. 119:**

The Army Corps 2005 Memorandum acknowledged that the Army Corps had

segmented its environmental review, issuing periodic Findings of No Significant Impact

("FONSI"), and not preparing a comprehensive evaluation of the significant and cumulative

environmental impacts on the environment from O&M dredging and bank erosion that had

occurred since its 1976 Environmental Impact Statement ("EIS").  Army Corps 2005

Memorandum, pp. 1-2:

> [T]he dredged material disposal sites and methods that have been used along
> the inland reach since the mid-1980s bear little resemblance to those described
> in the environmental impact statement (EIS) prepared in 1976 for the O&M of
> the MR-GO.  All of the changes that have occurred in the dredging and
> disposal plan since preparation of the original EIS have been addressed in
> environmental assessments (EAs) and associated findings of no significant
> impact (FONSIs). . . . The cumulative impact of all the changes that have
> already occurred since preparation of the 1976 EIS alone constitutes a
> significant impact on the environment, compared to the O&M plan described
> in the EIS, although there has been no supplemental EIS (SEIS) prepared.  In
> summary, both the existing O&M of the channel and the proposed changes to
> the O&M of the channel require preparation of an SEIS.

Exh. 89 at pp. 1-2 (Army Corps 2005 Memorandum).

**Response to Statement No. 119:**

Immaterial and contested.  Statement No. 119 is contested because the document at

Exhibit 89 is marked "Draft" and does not represent any acknowledgment by the Army

Corps of Engineers.  Exhibit 89 also is not a fact of consequence to the legal issue of whether

the United States violated any mandatory and specific directive.

**Plaintiffs' Statement No. 120:**

The Army Corps 2005 Memorandum concedes that the Army Corps had not

implemented preferred bank stabilization measures for channel stabilization of the MRGO

and that the 1976 FEIS had not considered alternative preferential methods of dredging that

were under consideration in 2005.  Exh. 89 at p. 2 (Army Corps 2005 Memorandum).

**Response to Statement No. 120:**

Immaterial and contested.  Statement No. 120 is contested because the document at Exhibit 89 is marked "Draft" and does not represent any concession by or position of the Army Corps of Engineers.  Further, Statement No. 120 misrepresents the contents of the draft memorandum.  Finally, Exhibit 89 is not a fact of consequence to the legal issue of whether the United States violated any mandatory and specific directive.

**Plaintiffs' Statement No. 121:**

The Army Corps concedes that pursuant to NEPA, it was required to report the fact the banks of the MR-GO were eroding in an EIS.  Exh. 56 at 280:12-24 (30(b)(6) Deposition of Gregory Miller, October 14, 2008).

**Response to Statement No. 121:**

Contested.  The United States also objects to this statement because it is an assertion of law, not a statement of fact that requires a response, and it is argumentative.  The Army Corps of Engineers has made no such concession, and the deposition testimony cited by plaintiffs does not support plaintiffs' conclusion in Statement No. 121.  The witness stated that the particular document about which he was being questioned, the 1976 Final Environmental Statement, did not appear to analyze "the specific conclusion of the health and safety of the human environment related to erosion of the banks;" the witness did not testify that the Army Corps of Engineers was required to perform that analysis in that particular EIS or in any other EIS.  *See* Pls. Exh. 56 at 282:2-24.  Further, while the issue of

what mandatory and specific directives NEPA imposed on the Army Corps of Engineers is relevant to plaintiffs' motion for summary judgment, the legal issue of what NEPA required of the Corps of Engineers is one for the Court to determine, and plaintiffs' Statement No. 121 is not a fact of consequence to the Court's resolution of that question.

**Plaintiffs' Statement No. 122:**

The Army Corps concedes that it never did an analysis to determine whether or not the erosion of the banks of the MRGO negatively impacted the health and safety of the human environment.  Exh. 56 at 282:17-24 (30(b)(6) Deposition of Gregory Miller, October 14, 2008).

**Response to Statement No. 122:**

Immaterial and contested.  The Army Corps of Engineers has made no such concession, and the deposition testimony cited by plaintiffs does not support plaintiffs' conclusion in Statement No. 122.  The witness stated that the particular document about which he was being questioned, the 1976 Final Environmental Statement, did not appear to analyze "the specific conclusion of the health and safety of the human environment related to erosion of the banks," Pls. Exh. 56 at 282:7-24; the witness did not testify that the Army Corps of Engineers "never" did an analysis to determine "whether or not the erosion of the banks of the MRGO negatively impacted the health and safety of the human environment." Further, the legal issue of what NEPA required of the Corps of Engineers is one for the Court to determine, and plaintiffs' Statement No. 122 is not a fact of consequence to the Court's

resolution of that question.

**Plaintiffs' Statement No. 123:**

The Army Corps concedes that after 1976, it never did a comprehensive environmental analysis investigating the extent to which MRGO was eroding its banks and impacting the environmental impact. Exh. 56 at 310:5-12 (30(b)(6) Deposition of Gregory Miller, October 14, 2008).

**Response to Statement No. 123:**

Immaterial and contested. The Army Corps of Engineers has made no such concession, and the deposition testimony cited by plaintiffs does not support plaintiffs' conclusion in Statement No. 123. The witness did not testify that after 1976 the Army Corps of Engineers "never" performed a "comprehensive analysis investigating the extent to which MRGO was eroding its banks and impacting the environmental impact [sic]." In fact, the testimony reveals that after being asked whether he could "point to a comprehensive analysis that would have investigated the extent to which MRGO was eroding its banks and having environmental impact, other than the environmental impact report of '76 and the '68 foreshore protection general design memorandum," the witness first answered "no," but corrected himself to refer to "the findings of the reconnaissance study." Pls. Exh. 56 at 310:5-25. Further, the legal issue of what NEPA required of the Corps of Engineers is one for the Court to determine, and plaintiffs' Statement No. 123 is not a fact of consequence to the Court's resolution of that question.

**Plaintiffs' Statement No. 124:**

The Army Corps concedes significant environment impacts result (a) from erosion, wave wash, and drawdown effects produced by large vessel traffic causing highly productive marsh to be converted to open water and (b) from saltwater intrusion in the marsh modifying the character of much of the marsh area.  Exh. 56 at 317:17-318:13 (30(b)(6) Deposition of Gregory Miller, October 14, 2008).

**Response to Statement No. 124:**

Immaterial and contested.  Statement No. 124 is contested because it is vague as to time and, as such, implies more than the cited deposition testimony states.  The witness to which this statement is attributed agreed that the conclusions stated on page 54 of the 1988 Bank Erosion Reconnaissance Report (Pls. Exh. 83) were significant effects.  *See* Pls. Exh. 56, 30(b)(6) Deposition of Gregory Miller, at 317:16-318:13.  Further, this statement is not a fact of consequence to the legal issue of whether the United States violated any mandatory and specific directive.

**Plaintiffs' Statement No. 125:**

The Army Corps acknowledges that the MR-GO human environment included areas that were impacted by land changes due to the MR-GO project.  Exh. 59 at 17:7-23 (30(b)(6) Deposition of John Saia, September 30, 2008).

**Response to Statement No. 125:**

Immaterial and contested.  Statement No. 125 is contested because it misrepresents the deposition testimony it cites.  In response to being asked, "[i]s it fair to say that the MRGO human environment included areas that were impacted by land changes," the witness responded, "[y]ou could say that.  You know, you'd have to define it as related to the project."  Pls. Exh. 59 at 17:19-23.  Statement No. 125 takes a general statement not related to a particular project involving the MRGO and attributes it to "the MR-GO project" as a whole.  The United States contests this extension of the testimony.  Further, Statement No. 125 is not a fact of consequence to the legal issue of whether the United States violated any mandatory and specific directive.

**Plaintiffs' Statement No. 126:**

The Army Corps concedes that it did not analyze the cumulative effect of changes brought about by the MR-GO in terms of their impact on the human environment.  Exh. 59 at 126:13-18 (30(b)(6) Deposition of John Saia, September 30, 2008).

**Response to Statement No. 126:**

Immaterial and contested.  Statement No. 126 is contested because it is vague as to time and because the Army Corps of Engineers has made no such concession; the deposition testimony cited by plaintiffs does not support plaintiffs' conclusion in Statement No. 126.  In a discussion that appears to be focused on the 1976 Final Environmental Statement, the witness stated that he does not recall whether the Corps analyzed the "cumulative effect of

changes and the impact on the environment with regard to the MRGO." Pls. Exh. 59 at

126:13-17. Further, Statement No. 126 is not a fact of consequence to the legal issue of

whether the United States violated any mandatory and specific directive.

**Plaintiffs' Statement No. 127:**

Although the Army Corps understood it was important, it did not analyze and report

on the changes in environment in the wetlands around the MR-GO or the conversion in the

wetlands environment because of salinity. Exh. 59 at 144:1-145:7 (30(b)(6) Deposition of

John Saia, September 30, 2008).

**Response to Statement No. 127:**

Immaterial and contested. Statement No. 127 is contested because it is vague as to

time and because the deposition testimony cited by plaintiffs does not support plaintiffs'

conclusion in Statement No. 127. The cited deposition testimony pertains only to a

discussion of the 1976 Final Environmental Statement, and neither the questions nor the

answers addressed what the Army Corps of Engineers understood as "important" in 1976 or

at any other time. *See* Pls. Exh. 59 at 144-145. Further, Statement No. 127 is not a fact of

consequence to the legal issue of whether the United States violated any mandatory and

specific directive.

**Plaintiffs' Statement No. 128:**

The Army Corps concedes that

a.       an EIS is the basis for the decision makers to consider the environmental

aspects of a project taken by a federal agency;

b.       the ultimate decision makers who consider the environmental aspects of a

project undertaken by the Government is the Congress which makes the final

decision in legislation which it passes;

c.        the purpose of the EIS is to give Congress an informed perspective on the

environmental impact of a proposed action;

d.       NEPA mandates that Congress decides environmental policy; and

e.       the objective of the EIS is to provide Congress with an informed perspective

on the impacts of whatever action is proposed.

Exh. 59 at 14:1-16:2 (30(b)(6) Deposition of John Saia, September 30, 2008).

## Response to Statement No. 128:

Immaterial.  The United States also objects to this statement because it is an assertion

of law, not a statement of fact that requires a response, and it is argumentative.  The purposes

and objectives of an Environmental Impact Statement and the mandates of NEPA are legal

issues for the Court to determine.  Plaintiffs' Statement No. 128 is not a fact of consequence

to the Court's resolution of these questions.

## Plaintiffs' Statement No. 129:

During the three decades of dredging the MR-GO, the Nation had a policy to

maximize protection of wetlands.  This mandatory policy found expression in statutes,

regulations, and policy statements issued by the President and federal agencies.  *See* Exh. 18

(Water Bank Act of 1980, Public Law 91-559 (84 Stat. 1468; 16 U.S.C. §§1301-1311)

(December 19, 1970), as amended on January 2, 1980 by Public Law 96-182 (93 Stat. 1317));

Exh. 19 (Emergency Wetlands Resources Act of 1986, (16 U.S.C. §§ 3901-3932, November

10, 1986, as amended 1988 and 1992)); Exh. 20 (Clean Water Act, (33 U.S.C. §1251 et seq.

(1972)); Exh. 21 (Executive Order No. 11990 (May 24, 1977)); Exh. 93 at 19-1 through 19-26

(Army Corps, Water Resources Policies and Authorities, EP 1165-2-1, July 30, 1999).

## Response to Statement No. 129:

Immaterial and contested.  The United States also objects to this statement because it

is an assertion of law, not a statement of fact that requires a response, and it is argumentative.

Statement No. 129 is contested because it is vague; the statement does not identify the "three

decades of dredging the MR-GO," and dredging occurred over more than three decades,

beginning in 1958.

## Plaintiffs' Statement No. 130:

One of the primary purposes of this major federal initiative was preserving wetlands

for flood control protection benefits.  *See, e.g.,* Exh. 18 (Water Bank Act of 1980, 16 U.S.C

§1301); Exh. 19 (Emergency Wetlands Resources Act of 1986, 16 U.S.C. §3901 (a)(1-9)); Exh.

22 (North American Wetlands Conservation Act of 1989, 16 U.S.C. §4401 (a)(4)); Exh. 21

(Executive Order No. 11990).

**Response to Statement No. 130:**

Immaterial.  The United States also objects to this statement because it is an assertion of law, not a statement of fact that requires a response, and it is argumentative.  Further, Statement No. 130 is not a fact of consequence because plaintiffs' motion for summary judgment does not maintain that the United States violated any provision of the cited statutes or that the statutes imposed any mandatory and specific directive on the Army Corps of Engineers.

**Plaintiffs' Statement No. 131:**

In the Emergency Wetlands Resources Act, it is stated: "Congress finds that wetlands provide a natural means of flood and erosion control by retaining water during periods of high runoff, thereby protecting against loss of life and property."  Exh. 19 (Emergency Wetlands Resources Act, 16 U.S.C. §3901 (a)(6)).

**Response to Statement No. 131:**

Immaterial.  The United States also objects to this statement because it is an assertion of law, not a statement of fact that requires a response, and it is argumentative.  Moreover, Statement No. 131 is not a fact of consequence because plaintiffs' motion for summary judgment does not maintain that the United States violated any provision of the cited statute or that the statute imposed any mandatory and specific directive on the Army Corps of Engineers.

**Plaintiffs' Statement No. 132:**

The North American Wetlands Conservation Act of 1989 states that "wetland ecosystems provide substantial flood and storm control values and can obviate the need for expensive manmade control measures." Exh. 22 (North American Wetlands Conservation Act of 1989, 16 U.S.C. §4401 (a)(4)).

**Response to Statement No. 132:**

Immaterial. The United States also objects to this statement because it is an assertion of law, not a statement of fact that requires a response, and it is argumentative. Moreover, Statement No. 132 is not a fact of consequence because plaintiffs' motion for summary judgment does not maintain that the United States violated any provision of the cited statute or that the statute imposed any mandatory and specific directive on the Army Corps of Engineers.

**Plaintiffs' Statement No. 133:**

One of the purposes of Executive Order No. 11990 is to "to avoid to the extent possible the long and short term adverse impacts associated with the destruction or modification of wetlands and to avoid direct or indirect support of new construction in wetlands wherever there is a practicable alternative. . . ." Exh. 21 at p. 1 (Executive Order No. 11990).

**Response to Statement No. 133:**

Immaterial.  The United States also objects to this statement because it is an assertion of law, not a statement of fact that requires a response, and it is argumentative.  Moreover, Statement No. 133 is not a fact of consequence because plaintiffs' motion for summary judgment does not maintain that the United States violated any provision of the cited Executive Order or that the Order imposed any mandatory and specific directive on the Army Corps of Engineers.

**Plaintiffs' Statement No. 134:**

In 2006, President George W. Bush announced "a new national policy on wetlands to achieve an overall increase of U.S. wetlands each year . . . ."  Exh. 25 at p. 3 (White House Council on Environmental Quality, *Conserving America's Wetlands 2006: Two Years of Progress Implementing the President's Goal* (April 22, 2006)).

**Response to Statement No. 134:**

Immaterial.  The United States also objects to this statement because it is an assertion of law, not a statement of fact that requires a response, and it is argumentative.  The United States further objects to Statement No. 134 because it cites a policy statement announced in 2006, after Hurricane Katrina and long after the conduct challenged in this action occurred.

**Plaintiffs' Statement No. 135:**

This new federal policy was expressly distinguished by President Bush from "[t]he old policy of wetlands . . . to limit the loss of wetlands. . . . Instead of just limiting our losses, we

will expand the wetlands of America." Exh. 25 at p. 3 (White House Council on Environmental Quality, *Conserving America's Wetlands 2006: Two Years of Progress Implementing the President's Goal* (April 22, 2004)).

**Response to Statement No. 135:**

Immaterial.  The United States also objects to this statement because it is an assertion of law, not a statement of fact that requires a response, and it is argumentative.  The United States further objects to Statement No. 134 because it cites a policy statement announced in 2006, after Hurricane Katrina and long after the conduct challenged in this action occurred.

**Plaintiffs' Statement No. 136:**

President Bush stressed that wetlands "provide a protective buffer for our towns and cities against floods and storm surges . . . ." Exh. 25 at p. 3 (White House Council on Environmental Quality, *Conserving America's Wetlands 2006: Two Years of Progress Implementing the President's Goal* (April 22, 2004)).

**Response to Statement No. 136:**

Immaterial.  The United States also objects to this statement because it is an assertion of law, not a statement of fact that requires a response, and it is argumentative.  The United States further objects to Statement No. 134 because it cites a policy statement announced in 2006, after Hurricane Katrina and long after the conduct challenged in this action occurred.

**Plaintiffs' Statement No. 137:**

In 1977, President Jimmy Carter issued Executive Order No. 11990—"Protection of

Wetlands".  Exh. 21 (Executive Order No. 11990).

**Response to Statement No. 137:**

Immaterial.  The United States also objects to this statement because it is an assertion

of law, not a statement of fact that requires a response, and it is argumentative.

**Plaintiffs' Statement No. 138:**

Executive Order No. 11990 ordered every federal agency "to minimize the

destruction, loss or degradation of wetlands and to preserve and enhance the natural and

beneficial values of wetlands in carrying out the agency's responsibilities for acquiring,

managing, and disposing of Federal lands and facilities."  Exh. 21 at p. 1, Section 1(a)

(Executive Order No. 11990).

**Response to Statement No. 138:**

Immaterial.  The United States also objects to this statement because it is an assertion

of law, not a statement of fact that requires a response, and it is argumentative.

**Plaintiffs' Statement No. 139:**

Executive Order No. 11990 covered any agency like the Army Corps "conducting

Federal activities and programs affecting land use, including but not limited to water and

related land resources planning, regulating, and licensing activities."  Exh. 21 at p. 1, Section

1(a); p. 2 Section 7(a) (Executive Order No.11990)

**Response to Statement No. 139:**

Immaterial.  The United States also objects to this statement because it is an assertion of law, not a statement of fact that requires a response, and it is argumentative.

**Plaintiffs' Statement No. 140:**

Executive Order No. 11990 expressly covered "dredging."  Exh. 21 at p. 2, Section 7(b) (Executive Order No. 11990).

**Response to Statement No. 140:**

Immaterial.  The United States also objects to this statement because it is an assertion of law, not a statement of fact that requires a response, and it is argumentative.

**Plaintiffs' Statement No. 141:**

The Army Corps was directed that it "shall consider factors relevant to a proposal's effect on the survival and quality of the wetlands … such as flood and storm hazards."  Exh. 21 at p. 2, Section 5 (Executive Order No.11990).

**Response to Statement No. 141:**

Immaterial.  The United States also objects to this statement because it is an assertion of law, not a statement of fact that requires a response, and it is argumentative.

**Plaintiffs' Statement No. 142:**

Consistent with this federal policy to maximize wetlands preservation, the Army Corps issued a policy statement in 1972 detailing the agency's high priority commitment to preserve wetlands.  *See* Exh. 26 at p. A-135, Sections 19-1, 19-2, 19-3 (The December 1972

Digest of Water Resources Policies and Activities, EP 1165-2-1).

**Response to Statement No. 142:**

Immaterial.  The United States also objects to this statement because it is an assertion of law, not a statement of fact that requires a response, and it is argumentative.

**Plaintiffs' Statement No. 143:**

The MR-GO operation and maintenance is an ongoing project subject to the Digest of Water Resources Policies and Activities Civil Works, December 1972 EP 1165-2-1.  Exh. 57 at 20:1-21:12. (30(b)(6) Deposition of Zoltan Montvai, Oct. 7, 2008).

**Response to Statement No. 143:**

Contested and immaterial.  The statement is not supported by the testimony of Mr. Montvai.  The United States also objects to this statement because it is an assertion of law, not a statement of fact that requires a response, and it is argumentative.

**Plaintiffs' Statement No. 144:**

The record demonstrates that the Army Corps took no steps to minimize adverse effects or arrest the decimation of cypress forests, marshes, and swamps that its O&M activities were causing.  Exh. 27 at pp. 180-195 (Expert Report of G. Paul Kemp (July 11, 2008); Exh. 57 at 35:25-37:20 (30(b)(6) Deposition of Zoltan Montvai, Oct. 7, 2008).

**Response to Statement No. 144:**

Immaterial and contested as argumentative and vague.  Contrary to the statement, the record demonstrates that, among other efforts to abate the erosion of the banks of the

MRGO and the loss of marsh from that erosion, the Army Corps of Engineers installed bank protection along much of the leveed reach of the MRGO by 1988.  *See* Pls. Exh. 83, U.S. Exh. 42, 1988 Reconnaissance Report at 14 (describing that the MRGO project "was modified in August 1969" and that "the project modification, provided for, as a mitigation measure, protecting a portion of the foreshore lying between the Lake Pontchartrain and Vicinity Hurricane Protection project levees and the MR-GO.  This included six miles along the north bank of the MR-GO in the reach which is part of the GIWW and 18 miles along the south shore of the MR-GO. . . . Foreshore protection along the north bank of the MR-GO and for 13 miles along the south bank from Bayou Bienvenue to the end of the leveed reach, as authorized by the August 1969 project modification, has been completed.  Foreshore protection on the south bank from Bayou Bienvenue to the IHNC is indefinitely deferred until the need arises.").  Further, the Army Corps of Engineers practiced other efforts to increase the marsh area and prevent further loss, such as the beneficial use of dredged material.

**Plaintiffs' Statement No. 145:**

Before Hurricane Katrina, the Army Corps neither provided Congress with any reports of studies on wetland preservation nor requested funding from Congress for wetland preservation along the MR-GO.  Exh. 57 at 42:13-43:3, 45:3-10, 48:4-16 (30(b)(6) Deposition of Zoltan Montvai, Oct. 7, 2008).

**Response to Statement No. 145:**

Immaterial and contested.  Statement No. 145 misrepresents the deposition testimony

cited.  The witness testified that he "can't answer the question if there were documents sent

to Congress to notify them of that," and that "[t]he only time you would ask for money is

once Congress gives us an authority to study that problem."  Pls. Exh. 57 at 43:1-10.  Further,

the 1988 Bank Erosion Rconnaissance Report reflects that it was mailed to the entire

Louisiana congressional delegation, including two senators and eight representatives.  Pls.

Exh. 83, U.S. Exh. 42 at D-1.

**Plaintiffs' Statement No. 146:**

The Army Corps could have gone to Congress to ask Congress for authority to

remediate the adverse effects of the MR-GO.  Exh. 57 at 41:6-19 (30(b)(6) Deposition of

Zoltan Montvai, Oct. 7, 2008).

**Response to Statement No. 146:**

Immaterial and contested.  Plaintiffs quotation over-simplifies the witness's

testimony.  After answering the question in the affirmative, the witness went on to explain

the difference between the theoretical possibility and the reality with respect to the MRGO,

explaining that a feasibility analysis would be required prior to a recommendation for such a

change being made by the Chief of Engineers to Congress, and with respect to the MRGO,

no feasibility analysis was completed because of difficulty finding a local sponsor to cost

share the study, as was required by WRDA of 1986.  Pls. Exh. 57 at 41-46.  The United States

also objects to this statement because it is an assertion of law, not a statement of fact that requires a response, and it is argumentative.

**Plaintiffs' Statement No. 147:**

The MR-GO destroyed over 100 square miles of once thriving wetlands that had protected Greater New Orleans from hurricane surge and waves.  Exh. 15 at pp. 16-20, 46 (Expert Report of John W. Day, Jr. and Gary P. Shaffer (July 11, 2008))

**Response to Statement No. 147:**

Immaterial and contested.  The statement is argumentative and vague, as the plaintiffs do not identify the location of the "over 100 square miles" nor do they define the meaning of "once thriving wetlands."  Further, the statement is contradicted by the expert report it cites. The report of John Day and Gary Shaffer does not state that "[t]he MR-GO destroyed over 100 square miles of once thriving wetlands."  The report states that "tens of thousands" of acres of wetlands were "destroyed" by the MRGO after construction, but the only attempt to identify a specific quantity of acres of loss states a total of 24,150 acres.  U.S. Exh. 40 at 47. 24,150 acres equals approximately 38 square miles, far less than the 100 square miles in Statement No. 147.  Additionally, the statement that the wetlands "had protected Greater New Orleans from hurricane surge and waves" is an expert opinion, and it is not supported by the expert report cited, particularly given the discrepancy in the amount of loss stated in the expert report and plaintiffs' Statement No. 147.  Finally, this statement is immaterial because it does not set forth any fact of consequence to the legal issues before the Court.

**Plaintiffs' Statement No. 148:**

In *Save Our Wetlands v. Rush*, Civil Nos. 75-3719, 77-976 (December 30, 1977),  the court found that the FEIS was flawed because it inadequately addressed possible adverse effects, failed to reflect required close consultation with FWS, overstated the project's benefits versus costs, and failed to discuss possible alternatives.  Exh. 94 (Opinion in *Save Our Wetlands v. Rush*, Civil Nos. 75-3719, 77-976 (December 30, 1977).

**Response to Statement No. 148:**

Immaterial and contested.  The United States objects to Statement No. 148 because it presents conclusions of a legal opinion unrelated to this case.  *Save Our Wetlands v. Rush* pertained to the Environmental Impact Statement for the Lake Pontchartrain and Vicinity Hurricane Protection Plan, and the Court's opinion is wholly unrelated to the MRGO.  *See* Pls. Ex. 94.  Statement No. 148 is not in compliance with Local Rule 56.1, and it is immaterial to the legal issues before this Court in this litigation.

**Plaintiffs' Statement No. 149:**

The Army Corps promulgated regulations recognizing wetlands as "[e]nvironmentally vital areas" whose "unnecessary alteration or destruction . . . should be discouraged as contrary to the public interest."  Exh. 68 at p. IX-12 (1976 FEIS, Environmental Protection Agency Comment Letter of July 24, 1975).

**<u>Response to Statement No. 149:</u>**

Immaterial and contested.  The United States also objects to this statement because it is an assertion of law, not a statement of fact that requires a response, and it is argumentative. Further, the legal regulation referenced is not identified, and the statement is therefore not helpful to the Court or material to the legal issues before the Court.

The United States' Response to Plaintiffs' Statement of Uncontested Facts in Support of Their Motion For Partial Summary Judgment is respectfully submitted.

GREGORY G. KATSAS
Assistant Attorney General

THOMAS DUPREE
Principal Deputy Assistant Attorney General

PHYLLIS J. PYLES
Director, Torts Branch

JAMES G. TOUHEY, JR.
Assistant Director, Torts Branch

/s/ Kara K. Miller
_____

KARA K. MILLER
JEFFREY P. EHRLICH
PAUL LEVINE
Trial Attorneys
ROBIN SMITH
Senior Trial Counsel
Civil Division, Torts Branch
U.S. Department of Justice
Benjamin Franklin Station, P.O. Box 888
Washington, D.C.  20044
(202) 353-2574 / (202) 616-5200 (Fax)

Attorneys for the United States

Dated: December 18, 2008