UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:  KATRINA CANAL BREACHES CONSOLIDATED LITIGATION | CIVIL ACTION NUMBER:  05-4182 "K"(2) JUDGE DUVAL MAG. WILKINSON |
| PERTAINS TO:  *Robinson* (No. 06-2268) | |

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S RENEWED MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................. 1

II.   FACTS .................................................................................................................. 3

    A.    The Government's Skewed Perspective ................................................... 3

    B.    Plaintiff's Starkly Conflicting View ........................................................ 5

        1. The Corps Failed to Comply with the FWCA and NEPA ............................. 6

            a.    FWCA ................................................................................. 6

            b.    NEPA .................................................................................. 8

        2. The Corps Had Feasible Mitigation Measures to Correct Known Defective Conditions Which Were Not "Ineradicable" ................................ 10

        3. The Corps Never Made A Decision About The Advisability of Correcting .. The MR-GO's Defects ........................................................................ 11

        4. Congress Relied On The Corps To Exercise Professional Engineering ......... Judgment In Implementing Project Authorization ........................... 13

III.  ARGUMENT ..................................................................................................... 16

    A.    The Government Has the Burden To Establish Both Prongs of the DFE Test 16

    B.    The First Prong Is Not Satisfied Because Defendant Has Not Even Attempted to Prove That The Corps Complied With Mandatory Requirements of the FWCA, NEPA, and Wetlands Protection Policies .............................................. 16

    C.    Under the Second Prong, Defendant Cannot Show That All Its ...................... 19

        1. The Chief of Engineers Never Made A Decision .......................................... 21

        2. Not Every Government Decision Is Based on Policy Analysis ..................... 22

        3. Implementation of The Congressional Authorization For The MR-GO IS .. Not Protected By The DFE ............................................................ 23

            a.    When Arguing *Indian Towing*, The Government ................................ 24

            b.    The Continuing Vitality of *Indian Towing* ........................................ 26

c.       The Government's Attack on Fifth Circuit DFE ..........30

4.       The MR-GO's Operation and Maintenance Are Not Immunized ..33

5.       The MR-GO O&M Dredging Does Not Involve Inherently .........
         Immune Discretionary Conduct ..............................39

6.       *National Union* Is Inapplicable Here ...........................41

D.       The Due Care Doctrine Is Inapplicable Here .........................43

IV.  CONCLUSION .......................................................45

# TABLE OF AUTHORITIES

## Cases

*Adams v. United States*
2006 WL 3314571 ................................................................................................ 7, 17, 19

*Alabama Electric Cooperative, Inc. v. United States*
769 F.2d 1523 (11th Cir. 1985) ............................................................................ 28

*Andrulonis v. United States*
952 F.2d 652 (2d Cir. 1991)................................................................................... 20

*ARA Leisure Servs. v. United States*
831 F.2d 193 (9th Cir. 1987) .......................................................................... 34, 36-37

*Aretz v. United States*
604 F.2d 417, 431 n. 18 (5th Cir. 1979) ............................................................... 28

*Arizona Maint. Co. v. United States*
864 F.2d 1497, 1504 (9th Cir. 1989) ............................................................... 36, 37

*Artez v. United States*
604 F.2d 417 ........................................................................................................ 35

*Ashford v. United States*
511 F. 3d 501 (5th Cir. 2007) ........................................................................ passim

*Atchison, Topeka and Santa Fe R.R. Co. v. Callaway*
382 F.Supp. 610 (D.C. Cir 1974)........................................................................... 6

*Bean Horizon Corp. v. Tenn. Gas Pipeline Co.*
1998 WL 113935 (E.D. La. 1998) ........................................................... 32, 38, 40

*Berkovitz v. United States*
486 U.S. 531 (1988)......................................................................................... 16, 19

*Bevilacqua v. United States*
122 F. Supp. 493 (W.D. Pa. 1954).................................................................... 25

*Bolt v. United States*
509 F.3d 1028 (9th Cir. 2007) ............................................................................ 20

*Branch v. City of Lafayette*
663 So.2d 216 (La. App. 1995)............................................................................ 31

*Buchanan v. U.S.*
 915 F. 2d 969 (5th Cir. 1990) ................................................................ 44

*Butler v. United States*
 726 F.2d 1057 (5th Cir. 1984) .............................................................. 27

*Caplan v. United States*
 877 F.2d 1314 (6th Cir. 1989) .............................................................. 36

*Collins v. United States*
 783 F.2d 1225 (5th Cir.1986) ............................................................... 23

*Cope v. Scott*
 45 F.3d 445, 452 (D.C. Cir. 1995) ............................................. 20, 36, 38

*Coumou v. United States*
 115 F.3d 64, 65 (5th Cir. 1997) ............................................................ 32

*Dalehite v. United States*
 346 U.S. 15, 42 (1953) ..................................................................... 6, 43

*Denham v. United States*
 834 F.2d 518 (5th Cir. 1987) ............................................................ 22, 28

*Faber v. United States*
 56 F.3d 1122 (9th Cir. 1995) ............................................................... 36

*Graci v. United States*
 435 F. Supp. 189 (E.D. La. 1977) ......................................................... 32

*Hatahley v. United States*
 351 U.S. 173 (1956) ............................................................................ 44

*In Re FEMA Trailer Formaldehyde Products Liability Litigation*
 2008 WL 4534377 (E.D. La. Oct. 3, 2008) ........................................... 35

*In re Glacier Bay*
 71 F.3d 1447 (9th Cir. 1995) ............................................................... 36

*In re Katrina Canal Breaches Conol. Litig.*
 471 F.Supp.2d 684 (E.D. La. 2007) ................................................. passim

*In re Katrina Canal Breaches Consol. Litig.*
 2008 WL 2186400 (E.D. La. May 27, 2008)). ................................... 20, 21

iv

*Indian Towing Co. v. United States*
  350 U.S. 122 (1955) ................................................................... passim

*Johnson v. Sawyer*
  47 F.3d 716 (5th Cir. 1995) ............................................................... 32

*Kennewick Irr. Dist. v. United States*
  880 F.2d 1018 (9th Cir. 1989) ........................................................... 36

*Marsh v. Oregon Natural Resources Council*
  490 U.S. 360 (1989) ....................................................................... 18

*Maryls Bear Medicine v. United States*
  241 F.3d 1208, 1213 (9th Cir. 2001) ............................................. 16, 36

*McCall v. United States Dept. of Energy*
  914 F.2d 191 (9th Cir. 1990) ............................................................. 36

*Medley v. United States*
  480 F. Supp 1005 (M.D. Ala. 1979) .................................................... 37

*Nat'l Wildlife v. Andrus*
  440 F. Supp. 1245 (D. D.C. 1977) ....................................................... 7

*National Fire Ins. v. United States*
  115 F. 3d 1415 (9th Cir. 1997) ......................................................... 41

*National Union Fire Ins. v. United States*
  115 F. 3d 1415 (9th Cir. 1997) ......................................................... 41

*Norton v. Southern Utah Wilderness Alliance et. al.*
  542 U.S. 55 (2004) ........................................................................ 18

*O'Reilly v. U.S. Army Corps of Engineers*
  477 F.3d 225 (5th Cir. 2007) ........................................................... 18

*O'Toole v. United States*
  295 F.3d 1029 (9th Cir. 2002) ..................................................... passim

*Oberson v. United States Dept. of Agric.*
  514 F.3d 989 (9th Cir. 2008) ........................................................... 36

*Oregon Natural Resources Council v. Marsh*
  52 F.3d 1485 (9th Cir. 1995) ........................................................... 18

*Payton v. United States*
    679 F.2d 475 (5th Cir. 1982) ................................................................ 28

*Rayonier v. United States*
    352 U. S. 325 (1957)............................................................... 20, 31, 34

*Ryan v. Chicago, B. & Q. R. Co.*
    59 F.2d 137 (7th Cir. 1932) ................................................................ 15

*Scientists Inst. For Pub. Info., Inc. v. A.E.C.*
    481 F.2d 1079 (D.C. Cir. 1973) ........................................................... 6

*Seaboard Coast Line Railroad Co. v. United States*
    473 F.2d 714 (5th Cir. 1973) ................................................... passim

*See Berkovitz v. United States*
    486 U.S. 531 (1998)............................................................................ 7

*Sheridan Transp. Co. v. U.S.*
    834 F. 2d 467 (5th Cir. 1987) ............................................................ 35

*Smith v. United States*
    375 F.2d 243 (5th Cir. 1966) ............................................................ 22

*South Dakota v. Yankton Sioux Tribe*
    522 U.S. 329 (1998)........................................................................... 44

*Southern Natural Gas Co. v. Pontchartrain Mat.*
    711 F.2d 1251 (5th Cir. 1983) .......................................................... 40

*State of Louisiana v. Lee*
    758 F.2d 1081 (5th Cir. 1985) .......................................................... 18

*Summers v. United States*
    905 F.2d 1212 (9th Cir. 1990) .......................................................... 36

*Sutton v. Earles*
    26 F.3d 903 (9th Cir. 1994) .............................................................. 37

*Terbush v. United States*
    516 F.3d 1125 (9th Cir.2008) ........................................................... 41

*Trevino v. General Dynamics Corp.*
    865 F.2d 1474 (5th Cir. 1989). ................................................ passim

*Turnbull v. United States*
    2007 WL 2153279 (N.D. Ohio 2007) ....................................................................... 43

*United States v. 2,606.84 Acres of Land in Tarrant County, Texas*
    432 F.2d 1286 (5th Cir. 1970) ................................................................................. 15

*United States v. Gaubert*
    499 U.S. 315 (1991) ..................................................................................... passim

*United States v. Hunsucker*
    314 F.2d 98 (9th Cir. 1962) ................................................................................... 29

*United States v. S.A. Empresa de Viacao Aereo Rio Gradense (Varig Airlines)*
    467 U.S. 797 (1984) ............................................................................ 19, 21, 31

*Welch v. United States*
    409 F.3d 646 (4th Cir. 2005) ................................................................................. 44

*Whisnant v. United States*
    400 F.3d 1177 (9th Cir. 2005) ...................................................................... 35, 37-38

*Wysinger v. United States*
    784 F.2d 1252 (5th Cir. 1986) ................................................................ 24, 28, 37

**Statutes**

28 U.S.C. § 2680 ................................................................................................. passim

40 C.F.R. §1500.13 (1974) ....................................................................................... 19

La. Civ. Code Art. 667 .............................................................................................. 36

La. Civ. Code Art. 2315 ............................................................................................ 36

Fed. R. Civ. P. 56(c) .................................................................................................. 3

Pub. Law 84-455 ............................................................................................... passim

## I.     INTRODUCTION

The Government's latest attempt to deny Katrina victims their day in court—this time based on the Discretionary Function Exception ("DFE")—reduces to the following dual propositions:

*By virtue of Congress authorizing the MR-GO in Public Law No. 84-455, the Army Corps could not exercise at any time its judgment whether to undertake measures to remedy the "ineradicable" hazards created by the MR-GO's defective conditions by means of erecting surge and salt water barriers, protecting wetlands, or armoring channel banks.

*The Corps, unrestricted by any legal authority, was at total liberty to disregard legal mandates (such as the Fish and Wildlife Coordination Act ("FWCA") and National Environmental Policy Act ("NEPA")) and to ignore chronic safety hazards and objective standards of professional judgment in the unfettered exercise of its discretion.

Defendant's motion—breathtakingly audacious in its boundless immunity claim—is the latest incarnation of its historic campaign to use the DFE to effect a judicial repeal of the Federal Tort Claims Act ("FTCA").   Under the Government's view, the Army Corps was beyond the reach of the law and had carte blanche to construct, operate, and maintain the MR-GO with impunity in the most reckless—and indeed, knowingly dangerous—manner.   As we demonstrate below, however, the world view posited by the Government is belied by the facts, and the Government's radical interpretation of the DFE is repudiated by a vast body of longstanding federal jurisprudence.

Summary judgment must be denied for the following reasons:

*Under the two-part DFE test, (1) the Government cannot carry its burden to establish that the Corps had discretion to ignore specific legal mandates prescribed in federal statutes,

regulations, or its own policy.  The Corps violated the Fish and Wildlife Coordination Act ("FWCA"), National Environmental Policy Act ("NEPA"), and mandatory federal and internal Corps wetlands protection policies, all of which specifically prescribed the agency's conduct and eliminated its discretion; and (2) the Government cannot carry its burden of demonstrating that its actions for the past 50 years were the result of any deliberative process or grounded in political, social, or economic policy.  Indeed, the Corps maintains here that it in fact never exercised its judgment.  *See* Motion at pp. 4-5, 41.  Even if it had exercised its judgment, implementing the statutory authorization for the MR-GO required only the application of objective, ordinary non-policy decisions concerning technical, engineering and professional judgments addressing safety hazards known to be threatening to life and property.  As a matter of law, this conduct is simply not the nature and quality of decisions which Congress intended to shield from tort liability.

*The Corps had the legal responsibility (but failed) to advise Congress of the defects in the waterway and improvements necessary to mitigate the resulting hazards and to make recommendations to Congress about potential remedial measures to address those defects.

*The glaring defects in the waterway were in fact eradicable by means of feasible mitigation measures known by the Corps before and after the MR-GO was constructed.

*The Corps did not exercise due care in implementing Public Law No. 84-455 because it did not adhere to mandatory legal requirements (FWCA, NEPA, and wetlands protection policies).  Futhermore, the agency knowingly operated and maintained a dangerous ship channel in a manner that it knew expanded in width by more than 300% beyond its authorized width and at an unauthorized depth.

2

Ultimately, the Corps cannot establish the absence of genuine issues as to material facts, much less entitlement to summary judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Ashford v. United* States, 511 F. 3d 501, 505 (5th Cir. 2007) ("That fact dispute makes summary judgment on the discretionary function exception improper.").   Once Congress decided to authorize the MR-GO, it relied on the Corps' professional judgment and engineering decisions to implement the project competently in compliance with all applicable federal laws and Louisiana law imposing a duty of due care.   The Corps cannot escape liability either for its failure to propose to Congress the need for and the availability of feasible remedial measures to eliminate the MR-GO's known defective conditions or for its failure to meet its separate legal duty of due care to remedy the safety hazards that the Corps itself created.   In the final analysis, the FTCA will retain its central purpose of affording Katrina victims compensation for Government negligence by this Court enforcing the salutary rule that putative fiscal concerns do not trump safety in the implementation and operation of a project like the MR-GO.  *See, e.g., O'Toole v. United States,* 295 F.3d 1029, 1036 (9th Cir. 2002).

## II.     FACTS

### A.     The Government's Skewed Perspective

The Government's rendition of the facts proceeds from its view of "[t]he relevant inquiry": "whether the controlling statutes, regulations, and administrative policies *eliminated* the Corps' discretion with respect to the design, construction, operation, repair, and maintenance of the MR-GO."  Motion at p. 25 (emphasis added).  The Corps' answer is clear:  its "judgment" was restrained for 50 years by the dictates of the MR-GO authorizing legislation which prevented the agency from exercising any discretion, professional judgment, or other deliberative

3

conduct that deviated from the alleged sole mandated task of maintaining channel depth at 36 feet.  Motion at p. 5.

This admission is fatal.  Under controlling DFE law, if the Corps did no analysis, engaged in no deliberative process, and performed no policy balancing, it cannot claim the DFE. Like the Government's concession in *Indian Towing Co. v. United States*, 350 U.S. 122 (1955), discussed in Section III.B.3(a), *infra*, the Corps' admission that its conduct with regard to the MR-GO's maintenance "did not stem from the exercise of administrative or executive judgment" removes its conduct from the realm of discretionary immunity under 28 U.S.C. § 2680(a), thereby subjecting its alleged negligence to the same standards applicable to any ordinary non-governmental actor.

Notwithstanding its primary argument that it could make no discretionary judgments, the Government reverses field, asserting that all its conduct after the initial Congressional authorization is inherently immune as a discretionary judgment.  This immunity would supposedly extend to every decision or failure to decide, ranging from routine dredging to remediation of known safety hazards.

Defendant also argues that for a half century following the authorization of the MR-GO, it was exempt from contemporaneous legal mandates (like NEPA and FWCA) and objective professional standards of care (like the duty of a landowner not to flood its neighbor).  Thus, the Government insists, the Corps was not subject to legislation that would require it to inform Congress of either known hazards created by its O&M practices or of the known feasible remedial measures at the Corps' disposal.

Finally, the Corps contends that because its "cabined" discretion" (Motion at p. 41) so completely compelled it to act in the manner that it did, Plaintiffs challenge to their behavior is in

fact a challenge to the legislation authorizing the MR-GO, and any such challenge is doomed by the due care exemption.

The Government is incorrect in all respects.

### B.      Plaintiff's Starkly Conflicting View

As demonstrated by the accompanying Plaintiffs' Response to Defendant's Statement of Uncontested Facts and Plaintiffs' Statement of Uncontested Facts, the Government's rendition of the controlling facts is sharply disputed.   The evidence establishes that the Corps violated mandatory legal prerequisites to the exercise of any discretion (FWCA, NEPA, and wetlands protection policies); the Corps was well aware of the MR-GO's dangerous conditions but failed to exercise due care to eliminate the known hazards it created with feasible remediation measures that would not impede the MR-GO's operation as a deep-draft shipping channel; the Corps (via the Chief of Engineers) never exercised discretion to address remedial measures; the Corps never informed Congress of the MR-GO's deficiencies or recommended any feasible remedial measures; and the Corps failed to exercise professional judgment as engineers to establish prudent engineering plans and to competently implement those plans, including any necessary remedial measures to correct safety hazards.

Plaintiffs do not challenge the validity of the authorizing statute.  Instead, they challenge the Corps' longstanding failure to exercise ordinary due care required by Louisiana tort law and the Corps' misperception that its negligent conduct was "mandated" by the authorizing statute. Plaintiffs maintain that the Corps' violation of mandatory legislation requiring the Corps to engage in interagency coordination (FWCA) and to advise Congress of known and obvious hazards created by the MR-GO (NEPA) precludes it from immunity for its negligence under the FTCA.   Furthermore, Plaintiffs contend that the DFE cannot apply here because the Corps

admits that it *never* exercised "judgment."   Regardless, Plaintiffs demonstrate that the Corps' conduct with respect to unrelenting, dangerous O&M—without rectifying obvious safety hazards—is not of the nature and quality that Congress intended to shield in 28 U.S. C. § 2680 (a).

The Corps' motion is little more than a series of "post hoc" rationalizations designed to invoke the DFE.  *See Atchison, Topeka and Santa Fe R.R. Co. v. Callaway*, 382 F.Supp. 610, 618 (D.C. Cir 1974); *Scientists Inst. For Pub. Info., Inc. v. A.E.C.*, 481 F.2d 1079, 1095 (D.C. Cir. 1973).  The Government has offered no contemporaneous evidence of any specific decision by any identified decision-maker or the reasons for any decision nor how any putative decision about the MR-GO's implementation, operation, and maintenance is "susceptible to policy analysis."  This does not satisfy the Government' burden of proof.  The record here demonstrates that these made-for-litigation excuses are factually and legally untenable and represent the latest example of the "[un]commendable zeal of officials . . . to conceal or minimize their carelessness. . . ."  *Dalehite v. United States*, 346 U.S. 15, 50 (1953) (Jackson, J., dissenting).

### 1.      The Corps Failed to Comply with the FWCA and NEPA

### a.      FWCA

At the time the MR-GO was authorized, the Corps was under a mandatory obligation to comply with the FWCA.  Plaintiffs' Statement of Uncontested Facts ("PUF") 1-11;[1] *see also* Plaintiffs' Memorandum in Support of Motion for Partial Summary Judgment (Doc. No. 16510-2) at pp. 4-6; *In re Katrina Canal Breaches Conol. Litig.*, 471 F.Supp.2d 684, 696 (E.D. La. 2007).  The Corps had no discretion but to comply with the statute's specific mandates before

---

[1] Plaintiffs filed their Plaintiffs' Statement of Uncontested Facts (Doc. No. 16510-4) in support of Plaintiffs' Motion for Partial Summary Judgment on DFE (Doc. No. 16510-2).  For the Court's convenience, that pleading is incorporated by reference, and the numbering of these PUFs for this opposition resumes from where the PUFs filed in support of Plaintiffs' motion left off.

recommending construction of the MR-GO.  *See Berkovitz v. United States,* 486 U.S. 531, 536 (1998).  In violation of the FWCA, the Corps did not consult or coordinate with FWS or Louisiana Department of Wildlife before it submitted the 1951 MR-GO Report to Congress. PUF 12.  In further violation of the FWCA and after the 1951 MR-GO Report, the Corps did not forward to Congress information that the FWS and Louisiana Department of Wildlife had communicated to the agency about the destruction of the wetlands from saltwater intrusion, including scientific reports, studies, correspondence, and other documents.  PUF 19.

To the contrary, the Corps concealed from Congress detailed information from these two environmental agencies, including their plea that the Corps delay construction to allow studies about the MR-GO's impacts, mitigation measures, and alternative routes; but these requests were denied.  PUF 20.  This unlawful conduct left Congress uninformed about the MR-GO's significant adverse environmental effects when it authorized the ship channel.  This pattern of concealment would continue for decades right up to the time of Hurricane Katrina.

The 1958 amendments to the FWCA reflect an increase in environmental awareness and concerns on the part of Congress and imposed stricter duties to report on a continuous basis. Nonetheless, the Corps never reported to Congress the serious and mounting concerns of the FWS and Louisiana Department of Wildlife about the MR-GO as mandated under the FWCA. PUF 22-30.  These FWCA violations are egregious because reporting these environmental issues to Congress is at the heart of the FWCA regulatory scheme.  PUF 31; *see also Nat'l Wildlife v. Andrus,* 440 F. Supp. 1245, 1255 (D. D.C. 1977).  If Congress had been fully informed, it might not have authorized the MR-GO or might have required changes to ameliorate the predicted environmental disaster.  PUF 29, 52; c*f. Adams v. United States*, 2006 WL 3314571, at *2 (D. Idaho 2006) (Government loses because it cannot satisfy its burden of proof that an adequate

NEPA analysis would make no difference since "[i]t is impossible to say what the result would be.").

### b. NEPA

These flagrant FWCA violations were compounded by the Corps' chronic failure to comply with NEPA. Over the three decades after NEPA's enactment, the Corps never informed Congress of the channel's deficiencies or the availability of feasible mitigation measures to correct known defects. PUF 48, 51, 53, 104, 114, 162. As demonstrated in Plaintiffs' Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Partial Summary Judgment (Doc. No. 16510-2) (pp. 13-19) and the NEPA Amicus Curiae Brief filed by the State of Louisiana, St. Bernard Parish, Entergy Corporation, Entergy New Orleans, Entergy Louisiana, LLC, and Hartford Steam Boiler Inspection and Insurance Company (Doc. No. 16507-3), the Corps never prepared any Environmental Impact Statements (or other environmental disclosure document) discussing the channel's deficiencies, the impacts of the continued O&M, the inherent threat to human life and property, or any mitigation measures. Ignorant of the problems, Congress never had the opportunity to evaluate, much less grant informed approval of, the Corps' continuing illegal and reckless conduct in the face of imminent harm to the human environment.

The NEPA violations are evidenced by the Corps' failure to prepare an adequate Environmental Impact Statement ("EIS") with regard to O&M dredging. PUF 48-53, 59-91, 104, 108, 110, 121-28. The Corps has conceded that its relentless dredging was subject to NEPA. PUF 32, 119, 121. Nevertheless, without completing an adequate EIS or otherwise alerting Congress to the MR-GO's role as a hurricane hazard and environmental scourge that had destroyed over 100 square miles of surge buffering wetlands, the Corps sought and obtained

annual appropriations for approximately 147 dredging events and removed approximately 492 million cubic yards of sediment—more than was originally excavated in constructing either the MR-GO or the Panama Canal—that actively contributed to the vast widening of the channel and destruction of wetlands.  PUF 21-53, 59-91, 104, 108, 110-112, 118, 121-28.

These appropriations requests should have been accompanied by an EIS outlining the impact of the maintenance of the MRGO on wetlands, channel widening, and storm hazards, or any of the other information required by NEPA and its accompanying regulations.  PUF 113. Nor did the Corps ever present to Congress an objective analysis of the dredging consequences, including the Corps' own understanding that its conduct was causing the surface width of the MR-GO to expand at a rate averaging over 15 feet per year and causing the channel to triple in width.  PUF 84, 114.  In a remarkably candid assessment of its historic lack of compliance only months before Hurricane Katrina, the Corps' environmental compliance officer conceded that the Corps had been deficient in its reporting and short-sighted in its analysis of the significant adverse and cumulative impacts of the MR-GO.  PUF 117.  Moreover, the Corps acknowledged that it had segmented its environmental review, issuing unwarranted Findings of No Significant Impact ("FONSI"), and failing to prepare a comprehensive evaluation of the significant and cumulative environmental impacts on the environment from O&M dredging and bank erosion that had occurred since its 1976 EIS.  PUF 119.

The FWCA and NEPA violations stand as insuperable barriers to DFE immunity.  The Corps' failure to satisfy these statutory mandates and the Corps' violations of its own and federal wetlands protection policies[2] are causally connected to the tortious harm suffered by Plaintiffs.

---

[2] The Corps also violated mandatory federal and its own wetlands protection policies.  *See* Plaintiffs' Memorandum in Support of Motion for Partial Summary Judgment (Doc. No. 16510-2) at pp. 24-25; PUF 129-42.

Beginning in 1951 and right up to the day of Hurricane Katrina, the Corps actively concealed from the Congress and the public highly material information about predicted environmental damage and the Corps' own concern about "the possibility of catastrophic damage to urban areas by a hurricane surge coming up this waterway. . . ."  PUF 35.  This is hardly the kind of conduct that Congress intended to shield with immunity.

2. **The Corps Had Feasible Mitigation Measures to Correct Known Defective Conditions Which Were Not "Ineradicable"**

Plaintiffs allege that four defective conditions caused the catastrophic flooding.  The record overwhelmingly shows that for decades the Corps was fully aware of all four deficiencies of the MR-GO—direct surge conduit from the Gulf of Mexico to the heart of Greater New Orleans, the "funnel effect," destruction of wetlands, and widening of the channel.  *See* Plaintiffs' Statement of Uncontested Facts in Support of Plaintiffs' Motion for Partial Summary Judgment (Doc No. 16510-4) Nos. 21, 34-47, 84, 147; Plaintiffs' Exh. 27 (Kemp Expert Report) at pp. 185-95.  "The history of the MR-GO is characterized by a stubborn unwillingness on the part of the Corps to acknowledge, much less ameliorate, the growing body of data indicating that the channel posed a serious threat of flooding the neighboring communities along Reaches 1 and 2 and the IHNC."  Plaintiffs' Exh. 27 (Kemp Expert Report) at p. 185.  Indeed, in a 1988 study, the Corps itself recognized "the possibility of catastrophic damage to urban areas by a hurricane surge coming up this waterway [the MR-GO]. . . ."  PUF 35; *see also* PUF 36.

Contrary to the Government's suggestion, the MR-GO's deficiencies were never "ineradicable."  Even before the MR-GO's construction and thereafter, the Corps was well aware of technically feasible mitigation measures for bank and wetlands protection and surge and saltwater barriers, none of  which would have impeded use of the navigation channel by deep-draft vessels.  PUF 163; *see also* Defendant's Motion at p. 36, note 8 (bank protection works

10

were technically feasible).  For example, the Corps in 1962 considered construction of two "floodgates" to control hurricane surge at Bayou Bienvenue and Bayou Dupre along Reach 2 of the MR-GO.  PUF 37.  Likewise, after Hurricane Betsy, the Army Corps considered in 1967 and again in 1969 the construction of a hurricane surge barrier from the GIWW to Reach 2 of the MR-GO in order to prevent hurricane surge from Lake Borgne entering the combined GIWW/MRGO Reach 1 and the IHNC west of Paris Road.  PUF 39; *see also* PUF 40; Motion at p. 3, note 1.

The problem was not that the Corps lacked readily available means to fix the MR-GO. The problem was a "record of disregard of public safety that is unimaginable given the wealth of knowledge and expertise possessed by the USACE and the known potential hazard of introducing a major body of water susceptible of transporting storm surge into a major metropolitan area from the Gulf of Mexico."  Plaintiffs' Exh. 27 (Kemp Expert Report) at p. 188.

Such callous indifference is hardly immune from a negligence action seeking accountability.

### 3.    The Corps Never Made A Decision About The Advisability of Correcting The MR-GO's Defects

The DFE presumes that a governmental actor in fact made a discretionary decision.  The record here demonstrates, and the Corps concedes, that at no time did the Chief of Engineers[3] engage in a policy analysis or reach a decision—*i.e.,* exercise his discretion—about the impact of the MR-GO's ongoing O&M on the wetlands or extensive bank erosion as it pertained to the hazard of storm surge or about how to address the MR-GO's known (and worsening) defects.

---

[3] Under the chain of command, the Chief Engineer is the Corp official vested with ultimate decision-making authority, and his approval would be required for any definitive agency deliberative process about the advisability of remedial measures.  PUF 169.

PUF 168.   The Army Corps never conducted a policy-based analysis of remedial measures associated with the MR-GO's O&M.  PUF 170.

Plaintiffs' expert, Dr. G. Paul Kemp, reviewed the extensive chronology of Corps documents relating to the MR-GO over its half century history.  PUF 171.[4]  The evidence shows that the Corps was long aware of and evaluated the harm created by the MR-GO O&M and of possible necessary remedial options (including closure).  Nonetheless, the Corps never presented an analysis of either the defects or their solutions to Congress.  Instead, in a studied effort to avoid a deliberate conclusion,[5] the Corps continued the same harmful conduct and exacerbated the dangerous conditions.  PUF 172.[6]  Tragically, at the time of Hurricane Katrina, the Corps was still studying the chronic problems with the MR-GO.  PUF 173, 180.

Based on his comprehensive study, Dr. Kemp concluded that the Corps never reached a conclusion about what to do with the MR-GO:

> Throughout this half century, the Corps conducted numerous studies of the channel's adverse effects. However, it never reached a definitive conclusion or recommendation for any plan of action until more than two years after Hurricane Katrina devastated Greater New Orleans. Indeed, at no time before the catastrophic flooding did the Corps weigh alternatives, balance the social, financial, and political considerations in favor of and against each potential course of action, evaluate the risk to people and property, *and* make a recommendation to Congress in the exercise of its policy-making judgment about the preferable course of action with respect to the MRGO's defects. . . .. . . My reading of the record indicates that certainly by 1988, if not earlier, the Corps knew about the nexus between many of the deficiencies noted above and the likelihood of

---

[4] Plaintiffs have prepared an electronic, hyperlinked version of the MR-GO Chronology which is based on a review of several million pages of Corps documents and has 52 pages of entries.  That DVD—Appendix B to Dr. Kemp's Expert Report (Plaintiffs' Exh. 102) is being lodged with the Court and served on Defendant's counsel.

[5] The Corps has admitted that it never exercised its judgment on these matters.  *See* Motion at pp. 4-5, 41.

[6] The Government's claim that the Corps lacked funding for remedial measures is a half-truth. The fact of the matter is that the Corps never asked Congress for any money.  PUF 177-78.  Yet it is conceded that that the Corps had established procedures to seek Congressional support for the MR-GO for O&M, studies, and reevaluation.  PUF 164-67.

> catastrophic flooding. Nevertheless, before Hurricane Katrina, the Corps never completed any study recommending a plan to Congress to mitigate known hazards.

PUF 174 (emphasis in original).

Dr. Kemp's conclusion is fully supported by the senior Corps official designated to testify on this subject. Zoltan Montvai agreed that despite environmental laws requiring that the Corps objectively report the adverse environmental impacts of its conduct, the Corps before Hurricane Katrina neither provided Congress with any reports of studies on wetland preservation nor requested funding from Congress for wetland preservation along the MR-GO. PUF 175. Similarly, the Army Corps took no steps to minimize adverse effects or arrest the decimation of cypress forests, marshes, and swamps that its O&M activities were causing. PUF 176. Finally, the Army Corps failed to meet its legal duty of due care under Louisiana law and its statutory duty to advise Congress of the MR-GO's adverse effects and the need for remediation. PUF 177. The indisputable fact is that the Corps never acted. PUF 175-79.

All in all, "'[f]or a half century, the Corps' consistent course of action was continued harm –no action—despite detailed institutional knowledge decades before Hurricane Katrina that the MRGO, in the Corps's own words in 1988, posed a possible threat 'of catastrophic damage to urban areas by a hurricane surge coming up [MRGO] . . . ." PUF 179.

### 4.  Congress Relied On The Corps To Exercise Professional Engineering Judgment In Implementing Project Authorization

While the Government insists (and for purposes of this motion must live with its litigation position) that the Corps could not exercise judgment to correct known safety hazards because of the authorizing legislation, the truth of the matter is that the agency misperceives the extremely limited purpose and effect of the legislation. In approving the project, Congress endorsed only the concept of the ship channel. Congress neither designs ship channels nor

reviews detailed engineering plans for massive public works projects.  Consistent with long-time practice, Congress relied on the Corps to exercise prudent professional judgment in making engineering decisions, preparing final detailed design plans, and operating and maintaining the MR-GO in a safe manner.  PUF 157-60.

In Public Law No. 84-455, Congress merely approved the project "substantially in accordance with recommendation of the Chief of Engineers as contained in House Document Numbered 245, Eighty-second Congress."  PUF 150.  House Document No. 245 ("1951 MR-GO Report"), which had been submitted five years earlier, was merely an "investigation" and "a preliminary examination and survey" of the MR-GO.  PUF 151.  The Division Engineer's Report[7] explored "the advisability and cost" of a shipping outlet from the Mississippi River to the Gulf of Mexico.  PUF 152.  Most of his 28-page report was a feasibility study.  PUF 153.[8]

The report highlighted the tentative, conceptual nature of the proposed project.  The Division Engineer's Report discussed in only the most general terms the concept of "a deep-draft outlet and tidewater harbor" and its approximate route.  PUF 154.  The recommendation was expressly "subject to such modifications of location, alinement [sic], and dimensions as may be approved by the Chief of Engineers . . . ."  PUF 157.  The most significant aspect of the MR-GO Report is what was not evaluated.  The Division Engineer did not evaluate the vertical slope configuration; method and extent of maintenance dredging; manner or location of disposal of

---

[7] The 1951 MR-GO Report included the Report of the Chief of Engineers who endorsed the accompanying Report of the Board of Engineers for Rivers and Harbors, which in turn approved the accompanying New Orleans Division Engineer's Report.  PUF 155.

[8] The Division Engineer's Report was devoted almost entirely to a discussion of the region's characteristics and demographics, existing navigation  projects, the IHNC and Port of New Orleans, local interests' desired improvements, existing and prospective ship traffic, local navigation hazards and surveys of rivers and passes, alternative routes to the Gulf, cost-benefit analysis, economic and national defense justification, and conclusion and recommendation.  PUF 156.

dredged material for construction and maintenance; channel bank or wetlands protection; or potential storm surge from the Gulf of Mexico and Lake Borgne with regard to potential affect on flooding hazards in the vicinity.  Significantly, in reporting to Congress, the Division Engineer did not perform any analysis of installing surge and saltwater barriers or bank and wetlands protection features; nor did he evaluate the benefits of such improvements in terms of reducing the cost of maintenance (reduced dredging) or protecting adjoining property.

In short, contrary to the Government's representation, Congress obviously cannot be said to have rejected or eliminated features of a plan or design that was never presented, much less evaluated by it.  Despite legal mandates, Congress was neither apprised by the Corps of any of the four defective conditions that created the storm hazard nor informed of the remedial measures that Plaintiffs contend should have been the subject of a deliberative process and presented to Congress for consideration.  Contrary to the Government's assertion, the Congressional authorization of the project did not mandate, much less codify (and immunize) for all time, any defects in the MR-GO's design, construction, operation, or maintenance.

Congress charged the Corps—the water development experts—with the responsibility to build, operate, and maintain the MR-GO consistent with all federal legal mandates and Louisiana tort law.  PUF 158, 160.  Historically, Congress has relied on the professional expertise, judgment, and experience of these specialists to engineer authorized projects.  *See United States v. 2,606.84 Acres of Land in Tarrant County, Texas*, 432 F.2d 1286, 1292 (5th Cir. 1970); *see also,* PUF 150, 159-61; *see also Ryan v. Chicago, B. & Q. R. Co.*, 59 F.2d 137, 142 (7th Cir. 1932).  The Congressional authorization was therefore a mandate to build, operate, and maintain the MR-GO in a safe and competent professional manner—and not a strait-jacket.  PUF 161.

### III.    ARGUMENT

#### A.    The Government Has the Burden To Establish Both Prongs of the DFE Test

Federal courts apply a two-part test for DFE.  *See generally Ashford v. United States*, 511 F.3d at 505; *see In re Katrina Canal Breaches Consol. Litig.,* 471 F.Supp.2d at 697 (citing *Berkovitz v. United States*, 486 U.S. 531, 536 (1988)).  In a recent articulation, the Fifth Circuit has succinctly laid out the methodology:

> First, for the exception to apply, the challenged act must involve an element of judgment.  In other words, the Government needs to establish there was 'room for choice' in making the allegedly negligent decision.  If a 'federal statute, regulation or policy' specifically prescribes a course of action for the federal employee to follow, the employee has no choice but to adhere to the directive.  If the Government can establish that the challenged act involved an element of judgment, step two of the test is met and the discretionary-function exception will apply only if that judgment is the kind that the exception is designed to shield.

*Ashford v. United States*, 511 F.3d at 505 (citing *United States v. Gaubert*, 499 U.S. 315, 322-23 (1991)).  The burden is on the Government to satisfy both prongs as to every challenged act.  *See Ashford v. United States*, 511 F.3d at 505; *Maryls Bear Medicine v. United States*, 241 F.3d 1208, 1213 (9th Cir. 2001); *In re Katrina Canal Breaches Consol. Litig.,* 471 F.Supp.2d at 699 ("The Court cannot accept on the record before it that all actions done by the Corps were based on policy determinations.)

As demonstrated below, the Government does not satisfy either prong of the test.

#### B.    The First Prong Is Not Satisfied Because Defendant Has Not Even Attempted to Prove That The Corps Complied With Mandatory Requirements of the FWCA, NEPA, and Wetlands Protection Policies

The Government has utterly failed to satisfy its burden on the first prong. *See* Section II.B., *supra.*  Indeed, it does not even make an attempt.  This fatal omission is remarkable in light the fact that Plaintiffs interposed the FWCA in their successful opposition to the motion to

dismiss, prompting the Court's observation that if any violations are established, "the discretionary function exception is ineffective as the first prong is not met." *In re Katrina Canal Breaches Consol. Litig.,* 471 F.Supp.2d at 699.   The Government's Sphinx-like silence is understandable since the Corps clearly did not obey legislative and regulatory mandates.

The Corps was legally obligated to follow prescribed courses of conduct before it could construct the MR-GO and before it could engage in its ongoing operation and maintenance.   In other words, unless and until the Corps fully complied with all legal mandates, it had no discretion to exercise. *See Adams v. United States,* 2006 WL 3314571, at *2 ("The BLM's failure to comply with NEPA meant that the agency had no discretion—it could not proceed until it complied with NEPA.")   In their Motion for Partial Summary Judgment, Plaintiffs establish that the Corps violated the FWCA, NEPA, and wetlands protection policies.[9]

A revealing example of the Corps' failure to comply with legal mandates is its non-stop O&M dredging program that lasted nearly four decades.   Indisputably, the Corps was under a duty to examine the environmental impacts of its actions regarding the MR-GO; prepare supplemental NEPA documents; prepare legislative EISs; and evaluate cumulative impacts of its conduct as it affected the natural and human environment in the vicinity of the MRGO. *See* NEPA Amicus Brief and accompanying Declaration of Nicholas C. Yost, dated November 20, 2008 ("Yost Decl.") at ¶¶ 6, 12, 13,14,15,16.   It did none of these.

---

[9] In the interest of judicial economy, Plaintiffs refer the Court to, and incorporate by reference, Plaintiffs' Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Partial Summary Judgment (Doc. No. 16510-2), Plaintiffs' Statement of Uncontested Facts (Doc. No. 16510-4), the NEPA Amicus Curiae Brief filed by the State of Louisiana, St. Bernard Parish, Entergy Corporation, Entergy New Orleans, Entergy Louisiana, LLC, and Hartford Steam Boiler Inspection and Insurance Company (Doc. No. 16507-3), and the Declaration of Nicholas Yost (Doc. No. 16533-2).

17

NEPA mandates that "[a]gencies have continuing obligations to reassess ongoing projects to avoid or minimize adverse environmental effects."  40 CFR §1500.13 (1974); *see also* Yost Decl. at ¶¶ 6 (c), 13, 15; *O'Reilly v U.S. Army Corps of Engineers*, 477 F.3d 225, 238 (5th Cir. 2007).  Ongoing maintenance dredging operations of the MR-GO included approximately 147 dredging events along the channel.  PUF 100, 111, 118.  Each one of these dredging events constituted "significant circumstances" that required the Corps to take a "hard look" and assess the need to supplement the existing EIS.  *See State of Louisiana v. Lee*, 758 F.2d 1081 (5th Cir. 1985) (dredging events permitted by the Corps were found to constitute Federal action for NEPA); *see also* Yost Decl. at ¶6(a), 12, 13, 14, 15, 16.

This statutorily-mandated "hard look" necessitated that the Corps also assess the cumulative effects of its ongoing conduct.  *O'Reilly v. U.S. Army Corps of Engineers*, 477 F.3d at 238; *Norton v. Southern Utah Wilderness Alliance et. al.,* 542 U.S. 55, 73 (2004) (citing *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 370-374 (1989)).  On remand, the court in *Oregon Natural Resources Council v. Marsh*, 52 F.3d 1485, 1492 (9th Cir. 1995) concluded that the Corps' "duty to discuss cumulative impacts in an EIS is mandatory and not within the agency's discretion."  *See* 40 CFR 1502.16, 1508.7-8; *see also O'Reilly v. U.S. Army Corps of Engineers*, 477 F.3d at 227; Yost Decl. at ¶¶ 6(e), 12(b), 13.

Despite this mandatory duty, the Corps neglected to evaluate the environmental effects of these dredging events or to address at any time the cumulative impact of 38 years of continuous dredging on the environment.[10]  Tellingly, the Corps itself has acknowledged that it was deficient in its reporting, and myopic in its analysis, of the channel's significant adverse and cumulative impacts.  PUF 117, 119-20.  Moreover, the Corps admittedly segmented its environmental

_____

[10] In addition, the Corps failed to assess measures that might mitigate those effects.  *See* Yost Decl. at ¶ 12 (d), 16.

review, issuing unwarranted Findings of No Significant Impact ("FONSI") and failing to prepare a comprehensive evaluation of the significant and cumulative environmental impacts on the environment from O&M dredging and bank erosion since its 1976 EIS.  PUF 119.

The decision to proceed with this relentless dredging regime and to allow unmitigated channel widening and wetlands destruction—a substantial factor in the catastrophic flooding of the greater New Orleans areas—without informed Congressional approval is not entitled to DFE immunity.  *Adams v. United States,* 2006 WL 3314571 (Bureau of Land Management's failure to comply with NEPA in using a potentially toxic pesticide defeated DFE); *see also Collins v United States Mine Safety and Health Admin ,* 783 F. 2d 1225, 1230-1231 (5th Cir 1986).

This conspicuous failure of proof on the first prong is the end of the DFE analysis.  *See Ashford v.United States*, 511 F.3d at 505.  As demonstrated below, the Government has also fallen short of satisfying the second prong that all of its decisions were the kind that Congress sought to immunize in Section 2680 (a).

C.     **Under the Second Prong, Defendant Cannot Show That All Its Decisions About the MR-GO Were Protected Policy Deliberations**

For a governmental act to be an immune "element of judgment," it must be "susceptible to a policy analysis grounded in social, economic, or political concerns."  *Gaubert*, 499 U.S. at 325.  Government decisions fall along a spectrum.  At one extreme are protected regulatory agency actions "fully grounded in regulatory policy, where the government employee's exercise of judgment is directly related to effectuating agency policy goals" (*O'Toole v. United States*, 295 F.3d 1029, 1035 (9th Cir. 2002)), such as agency regulation and oversight of savings and loans (*Gaubert*), FDA release of polio vaccine lots (*Berkovitz v. United States*, 486 U.S. 531 (1988)), FAA implementation and enforcement of airline safety standards (*United States v. S.A. Empresa de Viacao Aereo Rio Gradense (Varig Airlines)*, 467 U.S. 797 (1984)), and how to

19

respond to an emergency situation (*In re Katrina Canal Breaches Consol. Litig.*, 2008 WL 2186400 (E.D. La. May 27, 2008)).  At the other extreme are "those agency decisions totally divorced from the sphere of policy analysis," such as driving a government vehicle (*O'Toole v. United States*, 295 F.3d 1029, 1035 (9th Cir. 2002)), fighting a forest fire (*Rayonier v. United States,* 352 U. S. 325 (1957)), and snow and ice removal in a parking lot (*Bolt v. United States*, 509 F.3d 1028 (9th Cir. 2007)).

Ultimately, a court must be satisfied that the judgment exercised  is "the kind of conduct for which Congress had waived sovereign immunity. . . ."  *In re Katrina Canal Breaches Consol. Litig.,* 471 F.Supp.2d at 700 (discussing *Andrulonis v. United States,* 952 F.2d 652 (2d Cir. 1991)).  Not every decision by a government official—even those involving some element of judgment—are insulated by the DFE from a negligence suit.  *See Trevino v. General Dynamics Corp.* 865 F.2d 1474, 1484 (5th Cir. 1989).  In denying the first motion to dismiss, this Court, after carefully reviewing the most significant DFE decisions, reached a conclusion that the facts, after discovery, now confirm:

> In the context of this litigation, the Government's position appears to be . . . overly broad—that is that *all decisions taken* implicated the Government's policy with respect to the construction and maintenance of the MR-GO. . . . *See Cope v. Scott*, 45 F.3d 445, 452 (D.C. Cir. 1995) (engineering judgment no more matter of policy than objective scientific principles found to be exempt exercise of policy judgment . . .in *Berkovitz*).

*In re Katrina, supra,* 471 F. Supp. 2d at 701 (emphasis added).

As discussed below, several categories of decisions have been held not to be immunized, including determinations concerning implementation of a public works project, operation and maintenance of the project, correcting known safety hazards, and adherence to professional standards.  As a mater of law, these decisions have been found not to implicate policy formulation.  Thus, as this Court has recognized, "'[c]ourts have generally drawn a line between

decisions at a planning level, or decisions at an operational level, or decisions that are merely incident to carrying out a government policy.'"   *In re Katrina Canal Breaches Consol. Litig.*, 2008 WL 2186400, at *5 (E.D. La. May 27, 2008) (citing *Trevino, supra,* 865 F.2d at 1484 (5th Cir. 1989)).

### 1.    The Chief of Engineers Never Made A Decision

The Government's motion is conspicuously silent about what "decisions" relating to the MR-GO are protected by the DFE.  Defendant does not cite to any specific decision or specify a deliberative process by anyone or offer any document in which any such deliberative process is memorialized.  Incredibly, without any such proof, Defendant wants this Court to cloak it with immunity for a half century of the MR-GO history.  On its face, as this Court has noted, this is overreaching:

> Considering the allegations concerning the failure to armor the banks the MRGO, the failure to properly maintain the MRGO, and the ongoing nature of this project, [dismissal is inappropriate]. . . .  The MRGO is not a simple one-time, isolated project.  Its history spans more than fifty years and innumerable Congressional reports and authorization bills. *The Court cannot accept on the record before it that all actions done by the Corps were  based on policy determinations.*

*In re Katrina Canal Breaches Consol. Litig.,* 471 F.Supp.2d at 699 (emphasis added).

The Government's failure to isolate any particular exercise of discretion—or a decision-making analysis—defeats the DFE claim.  "The discretionary function exception insulates the Government from liability if the action challenged in the case involves the permissible *exercise* of policy judgment." *Berkovitz,* 486 U.S. at 537 (emphasis added).  The doctrine is intended to avoid judicial second-guessing of "legislative and administrative *decisions* grounded in social, economic, and political policy through the medium of an action in tort."  *United States v. S.A. Empresa de Viacao Aereo Rio Gradense (Varig Airlines*), 467 U.S. at 814.  At a minimum, the Court must be presented with some "considered policy choice."  *Trevino, supra,* 865 F.2d at

1485, note 11.  Failing to identify any putatively protected decision, the Government's DFE claim fails at the threshold.

By law, the Army Corps acts by and through the Chief of Engineers.  PUF 169.  Under the chain of command, approval by the Chief Engineer would be evidence of a decision-making deliberative process regarding remedial measures.  The record here demonstrates that at no time did the Chief of Engineer reach a decision—*i.e.,* exercise his discretion—about whether or how to address the MR-GO's known (and worsening) defects.  PUF 168, 170, 172.  The Corps never evaluated wetlands and extensive bank protection or surge and saltwater barriers (or whether their implementation would frustrate the MR-GO's navigation purpose) and never came to a conclusion whether to implement or reject any of these remedial measures.  PUF 170; *see also* PUF 172-80.[11]  Accordingly, this essential prerequisite for the DFE has not been established.

## 2.    Not Every Government Decision Is Based on Policy Analysis

Ever since the enactment of the FTCA over 60 years ago, the Government has advocated an expansive application of the DFE.  *See, e.g., Smith v. United* States, 375 F.2d 243, 246 (5th Cir. 1966) (dismissing Government's argument "absolutist interpretation of *Dalehite*" as "rejected by *Indian Towing* and especially by *Rayonier.*"); *Denham v. United States*, 834 F.2d 518, 520 (5th Cir. 1987) (Army Corps's negligent operation of a lake as a swimming area was not immunized, noting that "[t]he government's approach would subsume practically any decision within the discretionary function exception and thereby vitiate the FTCA.")  Federal

---

[11] The Government's discussion of the deposition testimony of Edmund Russo, the MR-GO operations manager in the New Orleans District office, about foreshore protection, dredging, and wetlands protection (Motion at pp. 37-40) misses the mark because no specific decision (and the supporting reasons) are identified and, in any event, any decisions by Russo—as opposed to the Chief of Engineers—do not qualify for DFE protection.

courts—and particularly the Fifth Circuit—have recognized the Draconian implications of such a wholesale evisceration of the FTCA predicated on the argument that

> [A]ny federal official vested with decision-making power is thereby invested with sufficient discretion for the government to withstand suit when those decisions go awry.  Most conscious acts of any person, whether he works for the government or not, involve choice. Unless government officials (at no matter what echelon) make their choices by flipping coins, their acts involve discretion in making decisions.

*Smith,* 375 F.2d at 246; *see also Collins v. United States,* 783 F.2d 1225, 1233-34 (5th Cir.1986) (Brown, J., concurring) ("Every act of a rational being involves some choices. . . .  It is plain that the discretionary function exception of section 2680(a) must be applied with restraint if the Tort Claims Act is to achieve the dual purposes which motivated its enactment.").

"The decisions of this circuit have been extraordinarily careful to avoid any interpretation of the discretionary function exception that would embrace any governmental act merely because some decision-making power was exercised by the official whose act was questioned."  *Trevino,* 865 F.2d at 1484.  Thus, the Government's inveterate attempt to sweep virtually all decisions within the DFE ambit trivializes important policy decisions that are properly immunized (such as whether to build a navigable waterway) and renders meaningless the waiver of sovereign immunity in the FTCA.  As discussed below, certain types of government decisions are not deemed to be based on policy analysis.

### 3.   Implementation of The Congressional Authorization For The MR-GO Is Not Protected By The DFE

Ever since the seminal decision in *Indian Towing Co. v. United States*, 350 U.S. 61 (1955), federal jurisprudence has consistently recognized a clear distinction between the initial policy decision to initiate a government project and the implementation of that decision.  The former is immunized, the latter is not.  The governing principle here was summarized by the Fifth Circuit in *Trevino v. General Dynamics Corp., supra*: "Once the government makes a

discretionary decision, the discretionary function exception does not apply to subsequent decisions made in the carrying out of that policy, 'even though discretionary decisions are constantly made as to how those acts are carried out.'"   865 F.2d at 1484 (quoting *Wysinger v. United States*, 784 F.2d 1252, 1253 (5th Cir. 1986)).

> a.   **When Arguing *Indian Towing*, The Government Conceded That The Only Discretionary Act Undertaken Was The Decision To Operate The Lighthouse And That Subsequent Operational And Maintenance Decisions Are Not Immune**

In *Indian Towing,* the bulk of the Supreme Court's discussion dealt with rejecting the Government's tautological argument that the maintenance of a lighthouse was a "uniquely governmental" function.   The Supreme Court noted that "all Government activity is inescapably 'uniquely governmental' in that it is performed by the Government."   350 U.S. at 67.   After stressing that "[t]he question is one of liability for negligence at what this Court has characterized the 'operational level' of governmental activity" (*id.* at 64), the Supreme Court stated:

> The Coast Guard need not undertake the lighthouse service.  *But once it exercised its discretion to operate a light . . . and engendered reliance on the guidance afforded by the light, it was obligated to use due care to make certain that the light was kept in good working order; and, if the light did become extinguished, then the Coast Guard was further obligated to use due care to discover this fact and to repair the light or give warning that it was not functioning.*  If the Coast Guard failed in its duty and damage was thereby caused to petitioners, the United States is liable under the Tort Claims Act.

*Id.* at 69 (emphasis added).

*Indian Towing* therefore stands for the proposition that the decision to install a lighthouse was "discretionary" (and thereby unassailable), but once that decision was made, the lighthouse's operation and maintenance was non-immune activity, thereby subjecting the Government to liability for its negligent failure to perform the work necessary to maintain the lighthouse in an

"operational" condition.

*Indian Towing* is significant to this case for another germane reason.

The Supreme Court devoted only scant attention to the issue of whether the conduct at issue was immunized by 28 U.S.C. § 2680 (a) because the Government made a critical concession that is highly relevant to our case.  As Justice Frankfurter notes in the majority opinion, "the Government concedes that the exception of § 2680 relieving from liability for negligent 'exercise of judgment' (which is the way the Government paraphrases a 'discretionary function' in § 2680 (a)) *is not involved here . . . .*"  *Id.* at 64 (emphasis added).  This concession was made unambiguously in the Government's brief:

> Petitioners . . . argue that the failure of the light in the lighthouse did not stem from the exercise of administrative or executive judgment; consequently, they say, the claim is not within the coverage of 28 U.S.C. § 2680 (a)). . . . But it is *not* our basic contention that the claim arises out of the performance of a discretionary function *in the sense that those words mean the exercise of judgment.*

Exh. 119 (Supplemental Brief for the United States on Reargument) (1955 WL 72515, at *1-2) (emphasis in original).

In pressing its main argument that operating a lighthouse was a uniquely governmental function, the Solicitor General agreed that "the discretionary function exception, 28 U.S.C. § 2680 (a), does not apply if the negligent act causing injury occurs *after* the discretionary function has been exhausted . . . ."  *Id.* at p. 14 (emphasis supplied).  Then the Government illustrated a situation where its activities would subject it to liability:

> Liability was imposed [in *Bevilacqua v. United States*, 122 F. Supp. 493 (W.D. Pa. 1954)] because of the Army's negligent failure to light up lanterns on the locks of a dam, which it built, resulting in the death of two fishermen whose boat went over the dam at night.  Unlike the present situation, *the Government itself had created a structure which constituted a dangerous condition,* a structure comparable to many erected by private persons.  That case would seem to fall within the ambit of the rule of private tort liability that *an individual is liable if he erects a structure or uses his property in a manner which is unreasonably*

25

> *dangerous to persons in the vicinity. Prosser on Torts* (1941), pp. 602-03.

Exh. 119 at *14-15 (emphasis added).

That is precisely the situation here. The Government "itself had created [the MR-GO] which constituted a dangerous condition," and Louisiana law imposes liability on "an individual . . . if he erects a structure or uses his property in a manner which is unreasonably dangerous to persons in the vicinity." *See* note 16, *infra.* While the decision to build the MR-GO was an immune exercise of discretion, "the negligent act[s] causing injury occur[red] *after* the discretionary function" at an operational level. This Court should enforce the Government's prior binding concession relied upon by the Supreme Court in *Indian Towing.*

### b.     The Continuing Vitality of *Indian Towing*

Over the half century since *Indian Towing*, federal courts have faithfully applied its rule to defeat DFE claims involving the implementation and ongoing operation of a federal project. Three decades after *Indian Towing* was decided, the Supreme Court cited the case as illustrative of the scope of the DFE. *See Berkovitz*, 486 U.S. at 538, n. 3 (failure to maintain lighthouse in good condition was not a "permissible exercise of policy judgment"); *see also, Gaubert*, 499 U.S. at 326 (Government was held liable in *Indian Towing* "because making sure the light was operational 'did not involve any permissible exercise of policy judgment.'").

Federal courts—particularly the Fifth Circuit—have applied *Indian Towing* in a variety of circumstances. In *Seaboard Coast Line Railroad Co. v. United States*, 473 F.2d 714 (5th Cir. 1973), a train and railroad tracks belonging to the plaintiff were damaged in a train derailment. The accident occurred at a location next to a drainage ditch, which was part of the construction of a United States Army Aviation Center at Fort Rucker, Alabama. The plaintiff claimed that the ditch was negligently designed in such a way as to divert water onto the railroad right of way.

The District Court found that "the actions of the government *in designing the drainage system* were negligent and that the floods resulting therefrom constituted an actionable trespass and a nuisance." *Seaboard Coast Line*, 473 F.2d at 715 (emphasis added).  The District Court further ruled that the Government "failed to exercise reasonable care *to avoid casting an unnatural concentration of water* and ditch-filling mud on plaintiff's right of way."  *Id.* (emphasis added).

> The Fifth Circuit affirmed the District Court's decision, stating:
>
> We think the District Court was neither clearly erroneous regarding the facts, nor in error in applying the law. The discretionary function envisioned by 28 U.S.C. § 2680(a) and by *Dalehite* was the government's policy decision to construct an aircraft maintenance facility at Fort Rucker and to build a drainage system in furtherance of that goal. *Once the government decided to build a drainage ditch, it was no longer exercising a discretionary policy-making function and it was required to perform the operational function of building the drainage ditch in a non-negligent manner.*

*Id.* at 716 (emphasis added).

*Indian Towing* and *Seaboard Coast Line* are authoritative for rejecting DFE claims involving ongoing conduct of federal projects and programs.  The Fifth Circuit has consistently applied them in cases where the Government undertakes to supply a service or manage a project.  For example, in *Butler v. United States,* 726 F.2d 1057 (5th Cir. 1984), the Fifth Circuit held that the DFE did not defeat a claim involving individuals who drowned in a depression formed by Army Corps dredging operations while repairing a hurricane-damaged seawall.  The Government argued that the Corps' "decisions regarding the designs, plans and specifications of the warning system, as well as the carrying out of those decisions, fall within the discretionary function exception."  *Id.* at 1062.  Citing *Indian Towing* and *Seaboard Coast Line,* the Fifth Circuit rejected the argument.  "We agree with the district court that once these decisions were made, the Government was no longer exercising a discretionary function and was required to perform the

related functions with reasonable care." 726 F.2d at 1063; *see also Payton v. United States*, 679 F.2d 475, 480 (5th Cir. 1982) ("discretionary decision-making, then, is accompanied by nondiscretionary acts of execution, whether termed operational, ministerial, or clerical."); *Aretz v. United States*, 604 F.2d 417, 431 n. 18 (5th Cir. 1979) (DFE did not apply to claim for negligent classification of a chemical as an explosive and failure to warn government contractor).

Again in *Denham v. United States,* 834 F.2d 518 (5th Cir. 1987), the Fifth Circuit applied *Indian Towing* and *Seaboard Coast Line* to deny DFE immunity to the ongoing management of governmental activities. There a swimmer broke his neck swimming at a lake operated by the Army Corps. The Fifth Circuit affirmed the District Court's finding of gross negligence, rejecting the Government's request to immunize all conduct associated with the lake's operation. The appellate court agreed that "the critical discretionary decision was to create a designated swimming area at Temple Lake Park. . . .[A]ctions taken in implementing that decision were not protected by the discretionary function exception." 834 F.2d at 520. Immunizing negligent management would "subsume practically any decision within the discretionary function exception and thereby vitiate the FTCA. . . . We do not believe that Congress intended one who was injured because of a danger negligently created by the Corps within a designated swimming area to have no legal remedy." *Id.* at 521; *see also Wysinger v. United States,* 784 F.2d 1252, 1253 (5th Cir. 1986).

Other circuits have relied upon the *Indian Towing/*Seaboard *Coast Line* rationale to reject the application of DFE to the ongoing management of Government projects. For example, in *Alabama Electric Cooperative, Inc. v. United States,* 769 F.2d 1523 (11th Circuit 1985), the Eleventh Circuit held that the DFE did not immunize the Corps from liability for negligent design of dikes and jetties along the Alabama River to reduce dredging costs. The Army

Engineers had not consulted an authoritative technical report on dike design but instead designed the system using unscientific "rules of thumb."  Rejecting the Government's reliance on certain language in *Dalehite*," the appellate court stated:

> [T]he primary flaw in the Corps' argument is that it seeks to blindly apply the terms "plans, specifications or scheduled of operations" without reference to the underlying rationale of the discretionary function exception. . . .  To apply this language to an engineer without reference to the underlying rationale of the discretionary function exception is to take the passage out of its intended context. The point is that the discretionary function exception affords the government the right to make its *policy* decisions free from the fear of judicial second-guessing. . . .  Thus, when one examines 'the nature of the conduct,' it is clear that there is nothing to suggest that all *design* decisions are inherently 'grounded in social, economic, and political policy. . . . [and] *in the absence of such a policy decision, the Corps' engineers must be held to the same professional standards of reasonableness and due care that a private engineer faces when he plies his trade*.

*Id.* at 1530-31 (emphasis in original); *see also United States v. Hunsucker,* 314 F.2d 98, 105 (9th Cir. 1962) (Army Corps liable for "its failure to take reasonable precautions to prevent [flood] damage" to neighboring land caused by a drainage ditch); *In re Katrina Canal Breaches Consol. Litig.,* 471 F.Supp.2d at 704-05.

These decisions demonstrate that no meaningful factual or legal distinction exists between a defective lighthouse, drainage system, or system of river dikes and jetties, on the one hand, and the MR-GO, on the other hand.  In each instance, the only immunized Government activity was the initial Congressional decision to undertake the project; thereafter, all acts of implementation involving design, construction as well as ongoing management were not the kind of discretionary decisions protected by the DFE.  Under these circumstances, the Government has a legal duty to exercise due care.

c.      **The Government's Attack on Fifth Circuit DFE
Jurisprudence Is Totally Misplaced**

Recognizing that its arguments are doomed by *Indian Towing, Seaboard Coast Line,* and

Fifth Circuit progeny, the Government launches an eight-page assault on post-*Dalehite* circuit

court cases—and particularly the Fifth Circuit's decisions—as erroneously decided.  Motion at

pp. 17-25.  This asserted "error" stems from neglecting *Dalehite's* supposed "teaching" that the

DFE extends beyond "just 'the initiation of programs and activities.' *Dalehite*, 346 U.S. at 35.

'It also includes determinations made by executives or administrators in establishing plans,

specifications, or schedules of operations.' *Id.* at 35-36." Motion at p. 17.   According to the

Government, these courts have improperly relied upon what *Gaubert* allegedly termed the

"'nonexistent dichotomy between discretionary functions and operational activities,' *Gaubert*,

499 U.S. at 326 . . . ."  Motion at p. 19.  Such wayward opinions allegedly include *Seaboard*

*Coast Line. Denham, Payton, and Butler*—all Fifth Circuit decisions applying the *Indian*

*Towing/Seaboard Coast Line* ruling that once a federal agency undertakes to supply a service, it

must be held responsible for negligent acts in supplying the service, even though discretionary

decisions are constantly made as to how to carry out the implementation.  *See* Motion at pp. 19-

20.

The Government's invitation to retreat from its concession in *Indian Towing*—that the

authorizing act is the only discretionary act—and to ignore five decades of federal case law by

turning the clock back to 1953 should be declined.  This argument is sheer sophistry.

First, *Gaubert* did not establish a *per se* rule that all operational decisions are protected.

Discussing *Indian Towing*, the Supreme Court reemphasized its prior holding that

> [t]here the Coast Guard had negligently failed to maintain a lighthouse by
> allowing the light to go out.  The United States was held liable, not because the
> negligence occurred at the operation level but because *making sure the light was*

> operational "*did not involve any permissible exercise of policy judgment.*"
> *Berkovitz,* 486 U.S. at 538 n.3.

499 U.S. at 326 (emphasis added).

Second, *Gaubert* acknowledged that "'it is the nature of the conduct, not the status of the actor' that governs whether the exception applies.'" *Id.* at 322 (quoting *Varig Airlines,* 467 U.S. at 813). Importantly, not all conduct, even involving an exercise of judgment or choice, is exempt. *Id.* at 322-23. ("Furthermore, even 'assuming the challenged conduct involves an element of judgment,' it remains to be decided 'whether that judgment is of the kind that the discretionary function exception was designed to shield.'") (citing *Berkovitz,* 486 U.S. at 536); *see also Varig Airlines,* 467 U.S. at 813. The DFE "protects only governmental acts and decisions based on considerations of public policy." *Gaubert,* 499 U.S. at 323 (citing *Berkovitz,* 486 U.S. at 537). The challenged activity must be "conduct that involves the *permissible* exercise of policy judgment." *Berkovitz*, 486 U.S. at 538-39 (emphasis added). Thus, "[t]here are obviously discretionary acts performed by a Government agent that are within the scope of his employment but within the discretionary function *because these acts cannot be said to be grounded in the policy of the regulatory regime.*" 499 U.S. at 325, n. 7 (emphasis added); *see also id.* at 335 ("Ordinarily, an employee working at the operational level is not responsible for policy decisions, even though policy considerations may be highly relevant to his actions." (Scalia, J., concurring)).[12]

---

[12] In assessing whether Congress intended to insulate certain types of conduct, one touchstone is to inquire whether the conduct by a private individual "under similar circumstances" would be considered tortious under state law. *See Indian Towing*, 350 U.S. at 64-65; *see also Rayonier v. United States,* 352 U.S. 315, 318-20 (1957). Louisiana law imposes liability on landowners who cause flooding of their neighbors' property. *See* La. Civ. Code Art. 667, 2315; *Lombard v. Sewerage & Water Bd.,* 284 So. 2d 905, 914 (La. 1973) (damage to homes resulting from construction of drainage canal); *Branch v. City of Lafayette,* 663 So .2d 216, 220 (La. App. 1995) (water damages to home after heavy rainfall caused by defective drainage system). In the post-

Finally, *Gaubert,* like *Berkovitz* and *Varig Airlines,* involved a federal regulatory program necessarily characterized by "policy-based decisions by regulators exercising day-to-day supervisory authority . . . ." 499 U.S. at 334.  Conversely, the MR-GO, is a public works project voluntarily undertaken by the Government whose implementation is neither a regulatory program nor the kind of activity whose negligently-created dangerous conditions Congress intended to shield from tort liability.  *See Dalehite,* 467 U.S. at 813 (DFE applies to "the discretionary acts of the Government acting in its role as a regulator of the conduct of private individuals.")  Thus, *Gaubert* creates a precedent for limiting DFE application to regulatory programs.

Post-*Gaubert* decisions by the Fifth Circuit and District Courts have faithfully respected these principles.  In *Coumou v. United States,* 115 F.3d 64, 65 (5th Cir. 1997), the court stated: "We have noted that 'courts have generally drawn a line between decisions at a planning level, or decisions that exercise policy judgment, and decisions at an operational level, or decisions that are merely incident to carrying out a government policy.'"  (citing *Trevino v. General Dynamics Corp.*, 865 F.2d at 1484); *see also, Johnson v. Sawyer,* 47 F.3d 716, 728 (5th Cir. 1995) (applying *Indian Towing* assumption of duty analysis); *Bean Horizon Corp. v. Tennesse Gas Pipeline Company*, 1998 U.S. Dist. Lexis 3341, at *12 (E.D. La. 1998) (Clement, J.) ( "Once the government takes an action, such as marking a reef or placing a navigational aid, however, it must act reasonably with respect to those who are likely to rely upon it.").  Indeed, the Fifth Circuit has aptly stated that the planning/operational distinction is not talismanic, but whatever

---

Betsy litigation involving the MR-GO, Chief Judge Heebe determined that Louisiana law imposed a legal duty on the Corps to operate the MR-GO in a safe manner and to prevent the MR-GO from causing flood damages.  *See Graci v. United States*, 435 F. Supp. 189, 195-96 (E.D. La. 1977).

the level, there must be a permissible judgment or policy choice.  *See Trevino v. General Dynamics Corp.,* 865 F.2d at 1484.

This Court has properly recognized that "*Indian Towing* constitutes a hybrid 'due care' application to deny immunity based on the failure of the Coast Guard to exercise due care in the maintenance of a lighthouse which duty it had taken up. . . .  [T]*here is no responsibility to provide aid, but once the decision is made to undertake such a duty, one must do so with due care.*"  *In re Katrina Canal Breaches Consol. Litig.*, 471 F.Supp.2d at 699 (emphasis added).

Contrary to the Government's wishful thinking, the *Indian Towing/Seaboard Coast Line* rule is alive and well in the Fifth Circuit, and as such, it requires that the DFE claim here be rejected.

### 4.     The MR-GO's Operation and Maintenance Are Not Immunized

Historically, decisions involving operation, maintenance, and repair of safety hazards are not the kind of policy-based decision protected by the DFE.  In routinely declining to extend the "susceptible to policy analysis" concept of *Gaubert* to negligent acts associated with failure to protect public safety and property, courts have warned that the "susceptib[ility]" language in *Gaubert* is "not meant to open the door to ex post rationalizations by the Government in an attempt to invoke the discretionary function shield."  *Bear Medicine*, 241 F.3d at 1216.[13]  Rather, "[t]here must be reasonable support in the record for a court to find . . . that a decision was policy-based or susceptible to policy analysis."  It is well settled that ("a failure to adhere to

---

[13]In *Bear Medicine*, the Ninth Circuit held that the DFE did not apply to the Bureau of Indian Affairs' negligent supervision and management of safety aspects of a logging operation.  241 F.3d at 1215-17.  The appellate court relied in part on its "long-held doctrine that safety measures, once undertaken, cannot be shortchanged in the name of policy.  *Id.* at 1216-17.

accepted professional standards) is not 'susceptible to a policy analysis.'"  *Id.* at 1216, 1217 (citations omitted).

In *O'Toole v. United States*, 295 F.3d 1029 (9th Cir. 2002), the Ninth Circuit refused to apply the DFE to a suit for damages for flooded property caused by a negligent failure to properly maintain a system of irrigation canals owned by the Bureau of Indian Affairs ("BIA"). The Ninth Circuit ruled that the agency's "decision to allow the irrigation system . . . to fall into disrepair . . . was not a decision 'susceptible to policy analysis,' *Gaubert*, 499 U.S. at 325, or 'grounded in social, economic, and political policy,' *id.* at 323 (quoting *Varig*, 467 U.S. at 814)." 295 F.3d at 1037.  "We hold that an agency's decision to forego, for fiscal reasons, the routine maintenance of its property – maintenance that would be expected of any other landowner – is not the kind of policy decision that the discretionary function exception protects."  *Id.* at 1036.[14]

The Court of Appeals in *O'Toole* supported its decision with three observations.  First, in *ARA Leisure Servs. v. United States*, 831 F.2d 193 (9th Cir. 1987), the Court had previously rejected a similar argument regarding safe maintenance of a federal park road.  *O'Toole,* 295 F.3d at 1036.[15]  Second, the Supreme Court has stated that one purpose behind the FTCA was to "prevent the unfairness of allowing 'the public as a whole to benefit' from the services performed by Government employees,' while allocating 'the entire burden' of government employee negligence to the individual, 'leav[ing] him destitute or grievously harmed'."  *Id.* (citing *Rayonier Inc.,* 352 U.S. at 320).  Finally, relying on *Indian Towing*, the court noted that

---

[14] The Ninth Circuit reasoned that the "government's choice not to make needed repairs on its property due to budgetary constraints [is] more like lighthouse maintenance, *see Indian Towing Co. v. United States,* 350 U.S. 61 (1955)" than "regulation of airline safety, *see Varig,* 467 U.S. at 314-20 . . . ."  *O'Toole,* 295 F.3d at 1035-36.

[15] In *ARA Leisure Servs.,* the Ninth Circuit held that "allocation of funds among projects" was not a policy decision "of the nature and quality that Congress intended to shield from tort liability." 831 F.2d at 196.

"the BIA was under no obligation to acquire Bowler Ranch, but, once it did, *it also acquired the obligation to keep its irrigation system from causing harm to others to the same extent that private landowner must.*"  *O'Toole,* 295 F.3d at 1036-7; *see also Sheridan Transp. Co. v. U.S.*, 834 F. 2d 467, 474 (5th Cir. 1987) ("Once the Coast Guard voluntarily assumed the duty to mark [by positioning a buoy], it also assumed the obligation to use due care in doing so.").[16]

Similarly in *Whisnant v. United States,* 400 F.3d 1177 (9th Cir. 2005), the Ninth Circuit held that the failure of a government agency to implement safety procedures for meat inspection at a commissary that it owned and operated was not immune.  Following a thorough review of leading cases on the second prong of DFE (summarized by this Court in *In re Katrina Canal Breaches Consol. Litig.*, 471 F.Supp.2d at 701-03), the Court observed that the conduct at issue was like the failure to operate with due care the lighthouse in *Indian Towing.*  "As we have summarized: 'The decision to adopt safety precautions may be based in policy considerations, *but the implementation of those precautions is not. . . .,* [S]afety measures, once undertaken, cannot be shortchanged in the name of policy.'"  400 F.3d at 1182 (citing *Bear Medicine,* 241 F.3d at 1216-17).[17]

*O'Toole* and *Whisnant* are representative of numerous cases that belie the Government's argument here that the Corps, despite being aware of the MR-GO's hazardous conditions, was

---

[16]Even in the emergency situations of providing temporary housing for Katrina victims, the District Court rejected the DFE as to the claims that FEMA negligently acted and/or failed to act appropriately when put on notice that allegedly dangerous levels of formaldehyde were present in the emergency housing units that FEMA had distributed to hurricane victims.  *See In Re FEMA Trailer Formaldehyde Products Liability Litigation,* 2008 WL 4534377, (E.D. La. Oct. 3, 2008) (Englehardt, J.) (relying on *Indian Towing/Seaboard Coast Line* rule).

[17] In *Artez v. United States,* 604 F.2d 417, 431 note 18 (5th Cir. 1979)*,* the Fifth Circuit similarly stated: **"**It reads the discretionary function exemption too broadly to argue that because the decision to adopt the disclaimer as part of Army procurement regulations was discretionary, any safety related liability violates the discretionary function exemption. The exemption applies only to acts or omissions "in the performance of" a discretionary function, 28 U.S.C. § 2680(a)."

nevertheless at liberty to make a policy-related judgment not to remedy the safety hazards or merely to continue its dangerous management without making any decisions.  Courts insist that where, as here, the tortious conduct is associated with "a choice to be exercised within established objective safety standards, and the plaintiffs claim negligence in failure to follow such standards, the discretionary function exception does not apply."  *Arizona Maint. Co. v. United States*, 864 F.2d 1497, 1504 (9th Cir. 1989); *see e.g., Oberson v. United States Dept. of Agric.*, 514 F.3d 989, 797-98 (9th Cir. 2008); *Bear Medicine*, 241 F.3d at 1217 and 1215; *ARA Leisure*, 831 F.2d at 195; *Faber v. United States*, 56 F.3d 1122, 1125 (9th Cir. 1995); *McCall v. United States Dept. of Energy*, 914 F.2d 191, 196 (9th Cir. 1990); *Summers v. United States*, 905 F.2d 1212, 1216 (9th Cir. 1990); *Caplan v. United States*, 877 F.2d 1314, (6th Cir. 1989); *Cope v. Scott* , 45 F.3d 445, 452 (D.C. Cir. 1995).

Similarly, where a government agency does not follow professional standards to avoid or correct safety hazards, the DFE does not apply.  It is well established that governmental actions based on objective professional norms are not the kind of judgments meant to be protected from liability by the DFE because those actions do not involve a weighing of policy considerations. *See Bear Medicine*, 241 F.3d at 1214; *see also Kennewick Irr. Dist. v. United States*, 880 F.2d 1018, 1030 (9th Cir. 1989) ("decisions involving 'the application of objective scientific standards' . . . are not insulated by the discretionary function exception because they do not involve the weighing of economic, political and social policy considerations.") (citation omitted). Thus, the DFE did not protect a contracting officer's decision not to remove unsuitable material during construction of an allegedly negligently-constructed canal, which was based on objective "engineering practices," not "public policy." *Kennewick*, 880 F.2d at 1031; *see also In re Glacier Bay*, 71 F.3d 1447, 1453 (9th Cir. 1995) (where hydrographers' actions in preparing water charts

relied on "scientific hydrographic judgment" rather than policy considerations, exception did not apply, even though "an element of judgment" was involved); *Arizona Maint. Co. v. United States*, 864 F.2d 1497, 1504 (9th Cir. 1989) ("The choice of how much dynamite to use [in executing seismic refraction surveys] at the particular location was not one 'grounded in social, economic, or political policy,'" but "was one governed by objective standards . . ."); *Medley v. United States,* 480 F. Supp 1005 (M.D. Ala. 1979) (decision to build a dump truck was discretionary but the military was under a duty to design it safely.  The design and installation of a defective lever in a dump truck reflects a mistake of professional judgment not a political policy decision and is therefore not an immune discretionary function.).

Given the Government's propensity to cloak all of its challenged action in the DFE mantle, a robust judicial skepticism is essential in evaluating alleged justifications for conduct where, as here, "the government  . . . create[s] the danger" causing grave injury to people and property.  *Wysinger v. United States*, 784 F.2d 1252, 1253 (5th Cir. 1986); *see also Sutton v. Earles,* 26 F.3d 903, 910 (9th Cir. 1994) (Navy's decision not to post speed limit signs after creating a hazard to navigation was not immunized).  Similarly, judicial vigilance to prevent "the discretionary function exception to all but swallow the Federal Tort Claims Act" is especially warranted where, as here, the Government takes on the role of private landowner and facilities operator.  *ARA Leisure Servs. v. United States*, 831 F.2d 193, 196 (9th Cir. 1987); *Whisnant v. United States*, 400 F.3d at 1183.  "'Every slip and fall, every failure to warn, *every inspection and maintenance* decision can be couched in terms of policy choices based on allocation of limited resources.'"  *Whisnant*, 400 F.3d at 1184 (quoting *O'Toole v. United States*, 295 F.3d 1029, 1037 (9th Cir. 2005)) (emphasis in original).

Again, that is why federal courts routinely reject the argument that budgetary concerns are a sufficient ground for a DFE finding.  "'Were we to view inadequate funding alone as sufficient to garner the protection of the discretionary function exception, we would read the rule too narrowly and the exception too broadly.'"  *Whisnant v. United States*, 400 F.3d at 1184 (quoting *O'Toole v. United States*, 295 F.3d 1029, 1037 (9th Cir. 2002)); *see also Cope v. Scott*, 45 F.3d 445, 448 (D.C. Cir. 1995) ("'Budgetary constraints' . . . 'underlie virtually all government activity.'") (citation omitted).

In our case, the Corps created and undertook the O&M of this channel.  Once it became aware that its conduct with regard to the MR-GO posed a risk to the safety of the population in its vicinity, objective safety standards—along with the availability of feasible mitigation measures used by engineers—required that the Corps remedy, mitigate, and warn of those hazards—and perhaps halt dredging altogether.[18]  Rather than comply with these legal duties, the Corps did the exact opposite and proceeded to exacerbate the known hazard it created by continuing massive dredging and allowing wetlands to perish and channel banks to widen.

The Corps was fully capable of remediating the MR-GO's long known and dangerous deficiencies. PUF 163.  The Army Engineers are the self-proclaimed experts at constructing and operating ship channels like the MR-GO.  PUF 158.  The agency was legally obligated to employ

---

[18] The Corps' own safety regulations for dredging create a duty to halt dredging where safety hazards are detected.  While dredging the MR-GO, the Corps was subject to internal regulations which required that in the face of safety hazards, it was mandatory that it cease operations while evaluating a remedy for a known hazardous condition.  *See Bean Horizon Corp, supra;* §§ 8-2(c)(1) and 8-6 of EP 1130-2-520, § 8-2(c)(1), § 8-11 of EP 1130-2-520, and § 8-2(i) of ER 1130-2-520, as well as ER 1180-1-6 § 8-2(i); EP  1130-2-528 § 8.  When it became aware of the MR-GO's catastrophic flooding threat (no later than 1988), the Corps did not cease operation and maintenance of the MR-GO; nor did the agency even present to Congress the feasible mitigative measures for bank protection.  PUF 35.

due care and to follow professional standards in designing, constructing, operating, and maintaining the MR-GO.  *See* note 12, *supra.*

### 5. The MR-GO O&M Dredging Does Not Involve Inherently Immune Discretionary Conduct

Contrary to the Government's argument (Motion at pp. 27, 31), the implementation of routine O&M is not inherently immune discretionary conduct.  *See Bear Medicine*, 241 F.3d at 1216.[19]  As noted earlier, the Corps has conceded that no policy judgment or decision went into its actions regarding O&M.  Motion at pp. 4-5, 41.  On notice of the dangerously defective and hazardous conditions that the Corps itself created (PUF 34-47), the Corps concedes that it employed no policy judgment or balancing for the perpetuation of that conduct.  The Corps cannot avoid its responsibility to employ objective safety considerations when implementing routine O&M.  *See Whisnant,* 400 F.3d at 1177.

With regard to the ongoing harm the Corps' O&M of the MR-GO inflicted, the Corps incorrectly asserts that its cited authorities support the proposition that governmental dredging activities on navigable waterways are *per se* matters of judgment and choice grounded in policy, thereby qualifying as the nature and quality of conduct that is not actionable under the FTCA. *See* Motion at pp. 26-27.  However, the authorities cited by the Government do not stand for this proposition.  Indeed, nothing in those cases detract from the Supreme Court's directive that this Court must independently determine, on a case-by-case basis, if "the quality and nature of the decision [associated with a resulting act] is one that Congress intended to protect." *Gaubert,* 499 U.S. at 323.

---

[19] The Court need not reach this issue since Plaintiffs have demonstrated that the Corps utterly failed to comply with NEPA for decades with continuous O&M dredging.  *See* Sections II. B.1., III. B., *supra*.

The Corps' reliance on a decision in this District is curious since it supports Plaintiffs' position.  In *Bean Horizon Corp. v. Tenn. Gas Pipeline Co.*, 1998 WL 113935 (E.D. La. 1998), the District Court held that the DFE did *not* apply to the challenged conduct (which included the Corps' acts associated with dredging).   In applying a *Gaubert* analysis to the dredging-related conduct, Judge Clement, in denying the Government's motion to dismiss, accepted the plaintiff's contention that the Corps failed to adhere to mandatory safety regulations requiring that the Corps cease hazardous dredging activity upon notice of a dangerous condition.[20]  *Id.* at *6; *see Gaubert,* 499 U.S. at 322.   Thus, summary judgment was denied because genuine issues of material fact existed concerning a possible violation by a Corps inspector who failed to adhere to mandatory Corps regulations and engineering practices.  *Bean Horizon Corp,* 1998 WL 113935 at *7.

Judge Clement also denied summary judgment because of the existence of genuine issues of material fact concerning whether the Corps acted negligently in carrying out its allegedly discretionary decisions.   *Id.*   Consistent with the *Indian Towing/Seaboard Coast Line* rule, the court noted that once the Corps undertook to embark upon an action, it had a "continuing duty" to use due care to make certain that its actions were not negligent.  In *Bean,* the Corps had a legal obligation to remedy any errors in its charts "once it [takes] it upon itself to indicate the position of one of the pipelines on the charts."  *Bean Horizon Corp,* 1998 WL 113935, at *7 (citing *Southern Natural Gas Co. v. Pontchartrain Mat.,* 711 F.2d 1251, 1257, n. 8 (5th Cir.1983)).

---

[20] "TGPC has cited several allegedly mandatory regulations relevant to this suit, including §§ 8-2(c)(1) and 8-6 of EP 1130-2-520, § 8-2(c)(1), § 8-11 of EP 1130-2-520, and § 8-2(i) of ER 1130-2-520, as well as ER 1180-1-6 § 8-2(i) generally. Most importantly, TGPC has cited one of the Corps' guidelines entitled "Action of Inspectors in Cases of Immediate Hazard."   *Bean Horizon Corp,* 1998 WL 113935 * 5.

In the final analysis, none of the Government's authorities stand for the blanket proposition that dredging activities on navigable waterways are inherently immune discretionary functions under the FTCA.  Rather, as the Supreme Court has directed since *Gaubert*, each case requires a discrete analysis of the nature and quality of the decision associated with the alleged tortious activity in assessing the applicability of the DFE.  By erroneously attempting to rely on the overly broad claim that dredging on its face is an immune discretionary function, the Corps fails to satisfy its burden of demonstrating that the challenged discretionary decision is protected by the DFE.  *See Ashford v. United States,* 511 F.3d at 504-05; *see also Terbush v. United States***,** 516 F.3d 1125, 1128 (9th Cir.2008).

### 6.      *National Union* **Is Inapplicable Here**

The Government's reliance on the Ninth Circuit's opinion in *National Union Fire Ins. v. United States*, 115 F. 3d 1415 (9th Cir. 1997) is misplaced.  *See* Motion at pp. 32-34.  The gravamen of the Ninth Circuit's decision was that the Army Corps had the discretion to decide whether or not to repair a faulty harbor breakwater located in a man-made harbor in Redondo Beach, California.  When the Corps failed to act, disaster struck.  Significantly, however, the court noted that "[n]o regulation or policy required the Corps to do something it failed to do.  No individual violated any specific regulation or policy."  115 F.3d at 1421.  Repairs were not mandated by any specified plans or a detailed authorization; it was for the Corps to decide what to do.  Nothing mandated a certain course of action.  Under such circumstances, it is not surprising that the court would find that the DFE applied.

This is a far cry from the present situation.  Here, of course, several legal mandates eliminated the Army Corps' discretion.  The FWCA *mandated* consultation with the FWS and Louisiana Department of Wildlife.  NEPA *mandated* that the Army Corps undertake a detailed

EIS or SEIS, including a sufficient analysis of the cumulative impacts that the MR-GO would have on the affected community.  In addition, Public Law 84-455 itself mandated certain project dimensions that were not followed.  PUF 47.  These requirements were not discretionary; they were mandatory.  They simply were not done.

Moreover, the omitted repair in *National Union* was one of three choices: "…[1] do nothing, [2] raise the subsided portion of the breakwater back to fourteen feet, or [3] await the results of an on-going study to decide whether to raise the breaker in one larger project to 22 feet."  115 F.3d at 417.  In our case, the Army Corps simply did not have the discretion to decide not to consult with the state and federal environmental agencies; it did not have the discretion to decide not to follow NEPA or federal wetland protection policies (including its own).  Plaintiffs here challenge the adequacy of the Army Corps' engineering judgment in the course of "designing, planning, constructing or maintaining" the MR-GO and its failure to address known safety hazards and potential remedies.  Finally, Plaintiffs do not challenge inaction on behalf of the Corps.  Instead, Plaintiffs challenge the Corps' election to knowingly continue the harm and exacerbate the hazardous and dangerous condition that it created.

In any event, *National Union* is not controlling here.  Controlling Supreme Court and Fifth Court precedent discussed above bar the application of the DFE to engineering decisions regarding safety and the design, construction, maintenance and operation of federal projects.[21]

---

[21] Moreover, the continued viability of *National Union* in the Ninth Circuit is questionable as evidenced by the Ninth Circuit's subsequent decision holding the Government liable for failure to remove debris from an irrigation canal, *i.e.*, "routine maintenance of its property," in *O'Toole v. United States*, *supra,* 295 F.3d at 1036.  ("We hold that an agency's decision to forego, for fiscal reasons, the routine maintenance of its property – maintenance that would be expected of any other landowner – is not the kind of policy decision that the discretionary function exception protects.")

**D.     The Due Care Doctrine Is Inapplicable Here**

Almost as an afterthought, the Government also argues that it is immune from liability under the due care exception to the FTCA.  *See* 28 USC § 2680(a).  This argument is untenable for several reasons.

First, the due care exception prevents a plaintiff from challenging the validity of a statute under the guise of a tort action.  *See Gaubert*, 499 U.S. at 337; *Dalehite v. United States,* 346 U.S. 15, 42 (1953).  Plaintiffs do not challenge the validity of Pub. Law. No. 84-455.  Not surprisingly, the Government does not cite to any such allegation in the First Amended Complaint.

Instead, as noted earlier, Plaintiffs have offered substantial evidence that the Army Corps failed to satisfy the express provisions of the 1946 and 1958 amendments to the FWCA in the administrative process of presenting the MR-GO project to Congress for approval and thereafter in implementation of that legislative authorization.  Plaintiffs therefore allege that the Government's noncompliance with applicable statutory laws created the hazards of the MR-GO and caused Plaintiffs' damages.  Since Plaintiffs are not challenging the legality or constitutionality of the MR-GO-related legislation, the "due care exception" is inapplicable.

Second, Pub. L. No. 84-455 did not mandate the challenged conduct here.  *See* Section II.B.4, *supra*.  Instead, the Congressional authorization was a mandate for the Corps, using its professional engineering judgment and expense, to build, operate, and maintain the MR-GO in a safe and competent professional manner.  The statute was not a strait-jacket.  PUF 158, 161.

Third, the Government's reliance on the authorization implies Congressional action or intent where none exists.  Public Law No. 84-455 did not abrogate, or exempt the MR-GO from, all other existing law.  *See Turnbull v. United States,* 2007 WL 215 3279, at *8 (N. D. Ohio

2007).  For example, it did not repeal the FWCA nor decree future laws like NEPA, otherwise applicable to the MR-GO, shall not be applicable.  Nor does Public Law No. 84-455 begin with the words "Notwithstanding any other contrary provisions of law…"  *See, e.g., South Dakota v. Yankton Sioux Tribe,* 522 U.S. 329, 351 (1998) (When Congress legislates, it is presumed to be aware of existing law.).

Similarly, when the Corps designed, operated and maintained the MR-GO, it was not merely carrying out the dictates of Public. Law No. 84-455, but also the dictates of the FWCA, NEPA, its own policy statement on wetlands, and national wetlands policy.  *See* Plaintiffs' Memorandum in Support of Motion for Partial Summary Judgment (Discretionary Function Exception) (Doc. No. 16510-2); *see also* Section III.B., *supra*.  The Corps cannot pick and choose which statutes to follow.[22]

Fourth, even if Public Law 82-455 were the only law in existence, it is sharply disputed that the Army Corps exercised due care (in the sense that there was no deviation) under the statute.  For example, the legislation mandated dimensions of 36 feet in depth and 500 feet in width, yet it is undisputed that in some MR-GO sections, the width exceeded 2,000 feet and reached 3,000 feet in others, and the depth vastly exceeded 36 feet at some places over time.  PUF 47, 114.

Finally, "'[d]ue care' implies at least some minimal concern for the rights of others." *Hatahley v. United States*, 351 U.S. 173, 181 (1956).  In *Buchanan v. U.S.*, 915 F. 2d 969, 970-71 (5th Cir. 1990), the Fifth Circuit noted that "[t]he first clause, exempting actions mandated by

---

[22] The Corps reliance on *Welch v. United States*, 409 F.3d 646 (4th Cir. 2005), is misplaced. *Welch* merely addressed the very narrow issue of whether the Government had deviated from its statutory obligation to detain all aliens deportable by reason of their having committed certain enumerated offenses.  409 F.3d at 652.  The case does not suggest that other federal laws which might be applicable were abrogated by the statute authorizing the immigrant's detention.

statute or regulation, *applies only if the actor has exercised due care*." (Emphasis added). Does "due care" contemplate a situation where the Corps would design, build and continue to operate and maintain a dangerous and defective channel that creates and continues to perpetuate a flood hazard, even after the agency is undeniably on notice of the defective and dangerous condition? Louisiana law emphatically says "no." *See* note 16, *supra*. Accordingly, since Plaintiffs have offered compelling evidence of the Army Corps' negligence and lack of "due care" in fulfilling Congressional directives, the "due care" exception is inapplicable.

## IV.   CONCLUSION

For all the foregoing reasons, Defendant's Renewed Motion to Dismiss for Lack of Subject Matter Jurisdiction, or in the alternative, for Summary Judgment should be denied.

Dated: December 18, 2008                                  Respectfully submitted,


                                                   **O'Donnell & Associates P.C.**

                                                   By: s/ Pierce O'Donnell

                                                   Pierce O'Donnell (*pro hac vice*)
                                                   550 S. Hope St., Suite 1000
                                                   Los Angeles, California 90071
                                                   Phone:  (213) 347-0290
                                                   Fax:  (213) 347-0298


                                                   **Law Offices of Joseph M. Bruno**
                                                   By: s/ Joseph M. Bruno
                                                   Joseph M. Bruno (LSBA No. 3604)
                                                   855 Baronne Street
                                                   New Orleans, Louisiana 70133
                                                   Telephone: (504) 525-1335
                                                   Facsimile:  (504) 581-1493

**The Andry Law Firm, LLC**                        **Domengeaux Wright Roy & Edwards LLC**
By: s/ Jonathan B. Andry                           Bob F. Wright (LSBA No. 13691)
Jonathan B. Andry (LSBA No. 20081)                 James P. Roy (LSBA No. 11511)
610 Baronne Street                                 556 Jefferson Street, Suite 500

New Orleans, Louisiana 70113
Telephone: (504) 586-8899
Facsimile: (504) 585-1788

**Fayard & Honeycutt**
Calvin C. Fayard, Jr. (LSBA No. 5486)
Blayne Honeycutt (LSBA No. 18264)
519 Florida Avenue, S.W.
Denham Springs, Louisiana 70726
Telephone: (225) 664-4193
Facsimile: (225) 664-6925

**Ranier, Gayle & Elliot, LLC**
N. Frank Elliot III
1419 Ryan Street
Lake Charles, LA 70601
Telephone: (337) 494-7171
Facsimile: (337).494.7218

**McKernan Law Firm**
Joseph Jerry McKernan (LSBA No 10027)
John Smith (LSBA No. 23308)
8710 Jefferson Highway
Baton Rouge, Louisiana 70809
Telephone: (225) 926-1234
Facsimile: (225) 926-1202

**Law Office of Elwood C. Stevens, Jr., a Professional Law Corporation**
Elwood C. Stevens, Jr. (LSBA No. 12459)
1205 Victor II Boulevard
P.O. Box 2626
Morgan City, Louisiana 70381
Telephone: (985) 384-8611
Facsimile: (985) 385-4861

P.O. Box 3668
Lafayette, Louisiana 70502-3668
Telephone: (337) 233-3033
Facsimile: (337) 233-2796

**Girardi & Keese**
Thomas V. Girardi (*pro hac vice*)
1126 Wilshire Boulevard
Los Angeles, CA 90017
Telephone: (213) 489-5330
Facsimile: (213) 481-1554

**Levin, Papantonio, Thomas, Mitchell Echsner & Proctor, P.A.**
Clay Mitchell (*pro hac vice*)
Matt Schultz (*pro hac vice*)
316 S. Baylen Street, Suite 600
Pensacola, Florida 32502-5996
Telephone: (850) 435-7140
Facsimile: (850) 436-6123

**Gainsburgh, Benjamin, David, Meunier & Warshauer, LLC**
Gerald E. Meunier (LSBA 9471)
2800 Energy Centre
1100 Poydras Street
New Orleans, Louisiana 70163
Telephone: (504) 522-2304
Facsimile: (504) 528-9973

**Cotchett, Pitre, Simon & McCarthy**
Joseph W. Cotchett (*pro hac vice*)
840 Malcolm Road, Suite 200
Burlingame, California 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577

**Law Office of Frank J. D'Amico, Jr. APLC**
Frank J. D'Amico, Jr. (LSBA No. 17519)
Richard M. Exnicios, Esq. (LSBA No. 25666)
622 Baronne Street
New Orleans, LA 70113
Telephone: (504) 525-9561
Fax: 504-525-9522

**Robinson, Calcagnie & Robinson, Inc.**
Mark Robinson (Cal State Bar No. 54426
620 Newport Center Drive – 7th Floor
Newport Beach, CA 92660
1-888-701-1288

<u>**CERTIFICATE OF SERVICE**</u>

I, Pierce O'Donnell, hereby certify that on December 18, 2008, I caused to be served

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION**

**TO DEFENDANT'S RENEWED MOTION TO DISMISS FOR LACK OF SUBJECT**

**MATTER JURISDICTION OR, IN THE ALTERNATIVE, FOR SUMMARY**

**JUDGMENT**, upon Defendants' counsel, Robin D. Smith, George Carter, Keith Liddle, and

Richard Stone by ECF and email at robin.doyle.smith@usdoj.gov; george.carter@usdoj.gov,

keith.liddle@usdoj.gov, and richard.stone@usdoj.gov.

/s/ Pierce O'Donnell