UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:  KATRINA CANAL BREACHES CONSOLIDATED LITIGATION | CIVIL ACTION NUMBER:  05-4182 "K"(2) JUDGE DUVAL MAG. WILKINSON |
| PERTAINS TO:  *Robinson* (No. 06-2268) | |

**PLAINTIFFS' STATEMENT OF UNCONTESTED FACTS IN SUPPORT OF OPPOSITION TO DEFENDANT'S RENEWED MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

1.      Congress first passed the Fish and Wildlife Coordination Act ("FWCA") on March 10, 1934.  Exh. 1 (Law of March 10, 1934, ch. 55, § 1, 48 Stat. 401 (1934) (codified at 16 U.S.C. § 662)).[1]

2.      Congress amended the FWCA in 1946 in order to "promote effectual planning, development, maintenance, and coordination of wildlife conservation and rehabilitation . . . " and to require "coordination" between any federal agency proposing to "impound," "divert," or "control" a waterway, or body of water and both the United States Department of Interior Fish and Wildlife Service ("FWS") and the State agency with jurisdiction over wildlife resources.  Exh. 2 (Act of August 14, 1946, § 1, ch. 965, 60 Stat. 1080 (1946)).

3.      In enacting the 1946 amendments, Congress stated that the amendments "would place in effect a much-needed program and facilities for the effectual planning, maintenance, and

---

[1] Plaintiffs' Undisputed Facts numbers 1 through 149 are the identical facts submitted in support of Plaintiffs' Motion for Partial Summary Judgment Concerning the Discretionary Function Exception.  Facts 150 through 181, herein, are newly presented uncontested facts.

coordination of wildlife conservation, management, and rehabilitation." Exh. 3 at p. 1 (House of Representatives, Committee on Agriculture, Report No. 1944, 79th Cong. 2d Sess. (April 17, 1946); Exh. 4 (Senate, Committee on Agriculture and Forestry, Report No. 1698, 79th Cong. 2d Sess. (July 10, 1946) (adopting same).

4.      The 1946 version of the FWCA required that federal agencies "first shall consult with the Fish and Wildlife Service and the head of the agency exercising administration over the wildlife resources of the State wherein the [water] impoundment, diversion or other control facility is to be constructed with a view of preventing the loss of and damage to wildlife resources . . . ." Exh. 2 (Fish and Wildlife Coordination Act of 1946, (60 Stat. 1080)).

5.      The statute also mandated that following such consultation and any "surveys and investigations" conducted by the federal and state agencies, their "reports . . . shall be made an integral part of any report submitted [to Congress] by an agency of the Federal government responsible for engineering surveys and construction of such projects." Exh. 2 (Fish and Wildlife Coordination Act of 1946, (60 Stat. 1080)).

6.      At the time of planning for the MR-GO, the Army Corps was "an agency of the Federal government responsible for engineering surveys and construction of such projects," and the MR-GO was a federal water development project subject to the FWCA's consultation and reporting requirements.

7.      At the time of planning for the MR-GO, the state counterpart to the FWS was the former Louisiana Department of Wild Life and Fisheries ("Louisiana Department of Wildlife").

8.      The MR-GO's planning process was not completed until the Army Corps submitted its recommendation to Congress in House Doc. No. 245 (September 25, 1951). Exh. 5 (House Doc. No. 245 (September 25, 1951)) ("1951 MR-GO Report").

9.      The FWCA mandated that the Army Corps consult and coordinate with the FWS and Louisiana Department of Wildlife with regard to the MR-GO's investigation, planning, and design, and this mandatory coordination had to occur before the Army Corps submitted its recommendation to Congress.  Exh. 2 (Fish and Wildlife Coordination Act of 1946, (60 Stat. 1080)).

10.     The FWCA mandated that the Army Corps report to Congress the concerns of the FWS and Louisiana Department of Wildlife with regard to the MR-GO's investigation, planning and design.  Exh. 2 (Fish and Wildlife Coordination Act of 1946, (60 Stat. 1080)).

11.     Congress intended that the Army Corps must communicate with FWS and Louisiana Department of Wildlife during the MR-GO's initial planning before construction commenced.  Exh. 4 at p. 3 (House of Representatives, Committee on Agriculture, Report No. 1944, 79th Cong. 2d Sess. (August 17, 1946).

12.     The Army Corps did not consult or coordinate with FWS or Louisiana Department of Wildlife before it submitted the 1951 MR-GO Report to Congress.  Exh. 5 at MRGOY00059, Paragraph 80 ("*Coordination with other agencies*") (1951 MR-GO Report); Exh. 6 at p. 2 (*A Special Report on Fish and Wildlife Resources in Relation to the Mississippi River - Gulf Outlet Project Louisiana*, Nov. 8, 1957); Exh. 7 at p. 4, ¶2 (*An Interim Report on Fish and Wildlife Resources as Related to Mississippi River-Gulf Outlet Project, Louisiana and an Outline of Proposed Fish and Wildlife Studies*, April 1958); Exh. 8 at p 1 (letter from United States Secretary of the Interior, Fred A. Seaton to Army Secretary Wilber M. Bruckner, August 22, 1957); Exh. 24 (FWS Information Service Statement, "Louisiana Canal's Effects on Fish and Wildlife Arouse Concern of Conservationists," Sept. 26, 1957).

13.     The Government cites to an August 5, 1943 Record of Public Hearing contending that the FWS and the Louisiana Department of Wildlife were consulted about the MR-GO at this hearing.  Exh. 9 at pp. 23-24 n.17 (USA Reply in Support of Motion to Dismiss (Doc No. 1183-1)); Exh. 10 (Record of Public Hearing on the Mississippi River Gulf Outlet, Aug. 5, 1943).

14.     None of the invitees at the August 5, 1943 Public Hearing has the FWS or the Louisiana Department of Wildlife in their title.  Exh. 10 (Record of Public Hearing on the Mississippi River Gulf Outlet, Aug. 5, 1943).

15.     No one from the FWS or the Louisiana Department of Wildlife spoke at the August 5, 1943 Public Hearing.  Exh. 10 (Record of Public Hearing on the Mississippi River Gulf Outlet, Aug. 5, 1943).

16.     The Government contends that, pursuant to the 1946 FWCA, it did consult and coordinate with the FWS and the Louisiana Department of Wildlife prior to submitting the 1951 MR-GO Report to Congress.  Exh. 11 (Defendant United States' Response to Plaintiffs' First Set of Interrogatories, Aug 1, 2007) at pp. 11-13, Response to Interrogatory No. 4 citing to (a) Exh. 5 (1951 MR-GO Report (September 25, 1951)); (b) Ex. 12 (MRGO Design Memorandum No. 2 (1959)); (c) Exh. 8 (letter from United States Secretary of the Interior, Fred A. Seaton to Army Secretary Wilber M. Bruckner, August 22, 1957); (d) Exh. 7 (*An Interim Report on Fish and Wildlife Resources as Related to Mississippi River-Gulf Outlet Project, Louisiana and an Outline of Proposed Fish and Wildlife Studies*, April 1958); and (e) Exh. 13 (Memorandum from F.C. Gillett, Acting Regional Director for the United States Fish and Wildlife Service to the Director of the Fish and Wildlife Service in Washington, D.C., September 24, 1959).

17.     All of the documents cited by the Government in support of its contention that it consulted and coordinated with the FWS and the Louisiana Department of Wildlife prior to

submitting the 1951 MR-GO Report to Congress concern communications after the 1951 MR-GO Report was submitted to Congress. *Id*.

18.     None of the documents cited by the Government support its contention that it consulted and coordinated with the FWS and the Louisiana Department of Wildlife before submitting the 1951 MR-GO Report to Congress. *Id*.

19.     After submitting the 1951 MR-GO Report, the Army Corps did not forward to Congress the information that the FWS and Louisiana Department of Wildlife had communicated to the agency about the destruction of the wetlands from saltwater intrusion, including scientific reports, studies, correspondence, and other documents. Exh. 6 at p. 2 (*A Special Report on Fish and Wildlife Resources in Relation to the Mississippi River - Gulf Outlet Project Louisiana*, Nov. 8, 1957); Exh. 7 at p. 4, ¶2 (*An Interim Report on Fish and Wildlife Resources as Related to Mississippi River-Gulf Outlet Project, Louisiana and an Outline of Proposed Fish and Wildlife Studies*, April 1958); Exh. 8 at p. 1 (letter from United States Secretary of the Interior, Fred A. Seaton to Army Secretary Wilber M. Bruckner, August 22, 1957); Exh. 12 (MRGO Design Memorandum No. 2 (1959)); Exh. 13 (Memorandum from F.C. Gillett, Acting Regional Director for the United States Fish and Wildlife Service to the Director of the Fish and Wildlife Service in Washington, D.C., September 24, 1959); Exh. 14 at p. 2 (letter from Cary W. Kerlin to Jack A. Stephens, May 31, 1979); Exh. 23 ("Statement of Louisiana Wildlife and Fisheries Commission relative to the New Orleans [sic] to the Gulf Tidewater Channel," May 29, 1957); Exh. 24 (FWS Information Service Statement, "Louisiana Canal's Effects on Fish and Wildlife Arouse Concern of Conservationists," Sept. 26, 1957).

20.     After the Army Corps submitted the 1951 MR-GO Report to Congress, the FWS and Louisiana Department of Wildlife requested that the Army Corps delay construction to allow

studies about the MR-GO's impacts, mitigation measures, and alternative routes, but these requests were denied.  Exh. 7 at pp. 19-20, ¶¶48-51; pp. 26-27, ¶69 (*An Interim Report on Fish and Wildlife Resources as Related to Mississippi River-Gulf Outlet Project, Louisiana and an Outline of Proposed Fish and Wildlife Studies*, April 1958); Exh. 13 at p. 1 (Memorandum from F.C. Gillett, Acting Regional Director for the United States Fish and Wildlife Service to the Director of the Fish and Wildlife Service in Washington, D.C., September 24, 1959); Exh. 23 ("Statement of Louisiana Wildlife and Fisheries Commission relative to the New Orleans [sic] to the Gulf Tidewater Channel," May 29, 1957); Exh. 24 (FWS Information Service Statement, "Louisiana Canal's Effects on Fish and Wildlife Arouse Concern of Conservationists," Sept. 26, 1957).

21.    The MR-GO destroyed over 62,000 acres (over 100 square miles) of storm surge buffering wetlands.  Exh. 15 at pp. 16-20, 46 (Expert Report of John W. Day, Jr. and Gary P. Shaffer (July 11, 2008)).

22.    In 1958, while the MR-GO was still being designed and constructed, Congress amended the FWCA.  Exh. 16 (Fish and Wildlife Coordination Act, § 1, P.L. 85-624, 72 Stat. 463 (1958); codified at 16 U.S.C. §662).

23.    The 1958 amendments to the FWCA stated:  "The reporting officers in project reports of the Federal agencies shall give full consideration to the report and recommendations of the Secretary of the Interior and to any report of the State agency on wildlife aspects of such projects, and the project plan shall include such justifiable means and measures for wildlife purposes as the reporting agency finds should be adopted to obtain maximum overall project benefits."  Exh. 16 at p. 2, §2(b) (Fish and Wildlife Coordination Act, § 1, P.L. 85-624, 72 Stat. 463 (1958); codified at 16 U.S.C. §662); *see also* Exh. 93 at p. 19-10 (Army Corps, Water

Resources Policies and Authorities, EP 1165-2-1, July 30, 1999) (Army Corps's policy mandates "that equal consideration be given to fish and wildlife resources and that measures to conserve these resources are incorporated. . .into water resources development projects. Further, the Act requires the Corps to give full consideration to the recommendations, including those for mitigation, of the USFWS, the NMFS and those of the appropriate state agencies.").

24.     The Act retained the previous requirements of the 1946 version of the law requiring consultation and coordination with the FWS and the head of the State agency exercising administration over the wildlife resources of the State, the incorporation of any FWS and state agency's concerns into the planning and design of any proposed water resource project, and inclusion of any FWS and state agency's findings into any report to Congress.  Exh. 16 at p. 2, §2(a)(b) (Fish and Wildlife Coordination Act, § 1, P.L. 85-624, 72 Stat. 463 (1958); codified at 16 U.S.C. §662).

25.     Under the FWCA, the Army Corps, after submitting to Congress the 1951 MR-GO Report, had a continuing mandate to consult and coordinate with FWS and Louisiana Department of Wildlife with regard to the MR-GO's investigation, planning, design and construction and to report to Congress their concerns about the project.  Exh. 17 at p. 1 (Senate Report 85-1981, 1958 U.S.C.C.A.N. 3446 (July 28, 1958)).

26.     The legislative history confirms the 1958 Amendments required the Army Corps "to consult with the Fish and Wildlife Service before and during the building of federal water development projects."  Exh. 17 at p. 1 (Senate Report 85-1981, 1958 U.S.C.C.A.N. 3446 (July 28, 1958)).

27.     This consultation and reporting obligation existed between construction agencies "such as the Corps of Engineers" and the FWS and the Louisiana Department of Wildlife

envisioning "considerable study . . . in some cases, with suggested changes in construction plans to the great advantage of our wildlife resource." Exh. 17 at p. 1 (Senate Report 85-1981, 1958 U.S.C.C.A.N. 3446 (July 28, 1958)).

28.     The 1958 Amendments also sought to "provide that wildlife conservation shall receive equal consideration with other features of the planning of federal water resource development programs [with] the effect of putting fish and wildlife on the basis of equality with . . . navigation . . . in our water resource programs, which is highly desirable and proper, and represents an objective long sought by conservationists of the nation." Exh. 17 at p. 4 (bottom) (Senate Report 85-1981, 1958 U.S.C.C.A.N. 3446 (July 28, 1958)).

29.     These mandatory consultation and reporting requirements under the FWCA were designed to serve the purpose of informing Congress about the environmental impacts of an Army Corps project. Exh. 17 at p. 1 (Senate Report 85-1981, 1958 U.S.C.C.A.N. 3446 (July 28, 1958)).

30.     There is no evidence that the Army Corps ever reported to Congress the concerns of the FWS and Louisiana Department of Wildlife about the MR-GO as mandated under the FWCA. Exh. 6 at p. 2 (*A Special Report on Fish and Wildlife Resources in Relation to the Mississippi River - Gulf Outlet Project Louisiana*, Nov. 8, 1957); Exh. 7 at p. 4, ¶2 (*An Interim Report on Fish and Wildlife Resources as Related to Mississippi River-Gulf Outlet Project, Louisiana and an Outline of Proposed Fish and Wildlife Studies*, April 1958); Exh. 8 at p. 1 (letter from United States Secretary of the Interior, Fred A. Seaton to Army Secretary Wilber M. Bruckner, August 22, 1957); Exh. 12 (MRGO Design Memorandum No. 2 (1959)(no evidence that this Design Memorandum was sent to Congress); Exh. 13 (Memorandum from F.C. Gillett, Acting Regional Director for the United States Fish and Wildlife Service to the Director of the

Fish and Wildlife Service in Washington, D.C., September 24, 1959); Exh. 14 at p. 2 (letter from Cary W. Kerlin to Jack A. Stephens, May 31, 1979).

31.     One of the FWCA's objectives is to inform Congress of the environmental consequences of projects to enable Congress to consider conservation measures.  Specifically, the Senate stated that "[u]nquestionably, the bill, if enacted, would result in the Congress having better information on the effects of water Projects on fish and wildlife resources while considering project-authorizing legislation.  It will then, of course, be for the Congress to decide what conservation measures should be incorporated in any project."  Exh. 17 at p. 5 (Senate Report 85-1981, 1958 U.S.C.C.A.N. 3446 (July 28, 1958)).

## NEPA

### Army Corps's Knowledge of MR-GO's Adverse Effects At The Time of Preparing Environmental Disclosure Documents

32.     In connection with ongoing Operations and Maintenance ("O&M") activities for the MR-GO and after enactment of the National Environmental Policy Act ("NEPA") in 1969, the Army Corps prepared numerous environmental disclosure documents involving dredging and other actions.  42 U.S.C Sections 4321 *et seq.*

33.     It is well known (and the Army Corps knew) that healthy wetlands have a positive effect in reducing the height and intensity of storm surge—anywhere from 1 foot per 2.75 miles (0.36 feet/mile) to 1 foot per 1.4 miles (0.71feet/mile) depending on the type of vegetation. Kemp Expert Report (Exh. 27) at pp. 184, Figure 9.5; *see also* Exh. 28 (U.S. Army Corps of Engineers, Lake Pontchartrain and Vicinity, Louisiana, Design Memorandum No. 1 Hydrology and Hydraulic Analysis Part 4 – Chalmette Extension, Plate No. 6 "Overland Surge Elevations, Coastal Louisiana" (October 1967)).

34.     Four decades before Hurricane Katrina, the Army Corps acknowledged the MR-GO was a direct, efficient route for hurricane surge into the heart of Greater New Orleans, created undesirable effects of excessive, high velocity, and erosive currents in the IHNC and significant salinity increases, and had the potential to deliver storm surges that would cause catastrophic property damage and loss of human life.  House Document 231, 89th Congress (1965) (Exh. 52) at pp. 17, 63; Memo re: LPV to Chief of Engineers, Department of the Army from Major General R.G. MacDonnell (Exh. 36) (July 24, 1963) at NED-213-000000433; Exh. 53 at p. 25; Letter of Department of the Army, New Orleans District, Corps of Engineers from Colonel Thomas J. Bowen, District Engineer to Acting Division Engineer, Lower Mississippi Valley (Exh. 48) (October 19, 1966) at p. AFW-467-000001821; Team Louisiana Report (Exh. 30) at pp. vii; 223; Final IPET Report (Exh. 29) at p. IV-2, IV-135 to IV-136; Naomi Depo (Ex. 17) at 323:24-325:6.

35.     In 1988, the Lower Mississippi Valley Division of the Army Corps recommended that the alternative of completely closing the MR-GO should be evaluated in order to "reduce the possibility of catastrophic damage to urban areas by a hurricane surge coming up this waterway [the MR-GO]. . . ."  1988 Army Corps Reconnaissance Report (Exh. 32) at Comment 2.

36.     After construction of the MR-GO was completed, the Army Corps received notice on multiple occasions about the risk of serious flooding posed by the hazards to life and property that it created in placing into Greater New Orleans a deep channel with direct access to the Gulf of Mexico.  Kemp Expert Report (Exh. 27) at pp. 21-31, 170-92, 191-95.

37.     In 1962, the Army Corps considered construction of two "floodgates" to control hurricane surge at Bayou Bienvenue and Bayou Dupre along Reach 2 of the MR-GO.  Letter from U.S. Department of the Interior to District Engineer, NOD (Exh. 42) (October 22, 1962).

38.     In 1966, the Army Corps acknowledged that during Hurricane Betsy, it was observed that large amounts of water flowed through the MRGO Reach 1 into the IHNC which then exited into Lake Pontchartrain.  Lake Pontchartrain and Vicinity Design Memorandum No. 2: Citrus Back Levee, Appendix E: Report on the Controlling Elevation of the Seabrook Lock (Exh. 51) (October 1966) p. 4.

39.     After Hurricane Betsy, the Army Corps considered in 1967 and again in 1969 the construction of a hurricane surge barrier from the GIWW to Reach 2 of the MR-GO in order to prevent hurricane surge from Lake Borgne entering the combined GIWW/MRGO Reach 1 and the IHNC west of Paris Road.  Lake Pontchartrain and Vicinity Design Memorandum No. 2: Citrus Back Levee, Appendix C: Report on Evaluation of Alternative Plans Involving Modifications in the Alignment of the Lake Pontchartrain Barrier (Exh. 50) at p. 2 (March 1967); Exh. 47 at AFW-467-000001698-1699.

40.     In 1975, the Army Corps acknowledged that a storm surge barrier from the GIWW to Reach 2 of the MR-GO "would have provided hurricane protection for the industrial development along the IHNC outside the authorized protective works" and "[a] relatively safe harbor, during hurricane conditions, would be provided in the IHNC and the MR-GO/GIWW since the navigation structures would control the ingress of hurricane tides and reduce wave action."  Exh. 37 at NED-125-000000995-997 (correspondence between K.R. Heiberg III and G.J. Lannes dated April 11, 1975 and April 21, 1975).

41.     Long before Hurricane Katrina, the Army Corps knew or should have known about the role of the MR-GO "funnel" as a potential hurricane highway that was likely to cause catastrophic flooding.  As stated by the Congressional Research Service:  "In contrast to continuing differences of opinion regarding the role of the MRGO as a hurricane highway for

moving water from the Gulf to the City, there is a degree of consensus on the channel's funnel

effect at the intersection of Reach 1, Reach 2, and the GIWW.  The Berkeley, IPET, and

Louisiana Working Group reports all noted that at the confluence of the MRGO and the GIWW,

there was no barrier in place to prevent the channeling of the waters from Lake Borgne into the

narrow confines of Reach 1.  As a result, Reach 1 hydraulically connected Lake Pontchartrain

and Lake Borgne, and allowed the Lake Borgne waters to be pushed into the interior of New

Orleans and toward Lake Pontchartrain. . . .  This connectivity is shown to have both amplified

surge level and velocity through the interior of the city, and raised the level of Lake

Pontchartrain.  As pressure on the levees throughout this area increased, structural failures along

the IHNC and Lake Pontchartrain canals occurred."  CRS Report for Congress, *Mississippi River

Gulf Outlet (MRGO):  Issues for Congress*, Nicole T. Carter, Charles V. Stern, Aug. 4, 2006

(Exh. 49) at p. 7.

   42. From the time the MR-GO was being constructed and thereafter, the Army Corps

knew that the MR-GO created a funnel that could enhance surge, waves, and currents during

hurricanes and create a serious flooding risk. Letter from Kenneth J. Le Sieur to Colonel Thomas

J. Bowen, November 24, 1965 (Exh. 43); October 1, 1969 draft memorandum regarding the

proposed Mississippi River-Gulf Outlet New Ship Lock and reviewing the Dock Board

Proposals for a St. Bernard Parish Site (Exh. 44) (AFW-143-000001049); Naomi Depo. (Exh.

31) at 357:15-360:12; Disposition Form dated 06-21-1971; Subject: MR-GO—New Ship Lock;

Return Levees; signed by Mask (Exh. 46) (AFW-440-000000938); Letter dated 08-16-1971;

Subject: MR-GO—New Ship Lock; Return Levees; signed by Becnel (Exh. 45) (AFW-440-

000000936); Environmental Impact Study Ship Channel Project prepared by Coastal

Environments, Inc., prepared for St. Bernard Parish Police Jury dated October 1972 (Exh. 39).

(MRGO-CEI-000340), p. 54; Army Corps, Environmental Considerations of an Expanded Mississippi River-Gulf Outlet, Appendix I (Exh. 35) at NED-111-000001197); Final IPET Report (Exh. 29) at p. IV-258.

43.     In 1966, after Hurricane Betsy but before completion of the MR-GO's construction, the Army Corps commissioned a report (Bretschneider and Collins, Storm Surge Effects of the Mississippi River Gulf Outlet (1966) ("Bretschneider and Collins Report") which concluded that in all cases (slow, moderate, and rapidly rising surge during hurricanes), the predicted effect of building the contemplated LPV levee system that now forms the throat of the funnel was to hasten the onset of peak surge and to lengthen the period of highest water.  Team Louisiana Report (Exh. 30) at pp. 249-50.

44.     As early as 1966, the Army Corps understood that under certain hurricane conditions the MR-GO would have "a marked effect" on storm surge and on wave action.  Exh. 60 at p. 4 (Bretschneider & Collins study NED-188-000000513639; Exh. 61 at NED 192-000000684 (December 9, 1992 memo "MRGO, St Bernard Parish (Bank Erosion) rev Recon Study).

45.     Long before Hurricane Katrina, the Army Corps knew that the MR-GO was destroying tens of thousands of acres of cypress forests, grasses, marshes, swamps, trees, shrubs and other wetlands ("wetlands") that provided a natural barrier and sponge for storm surge and that the loss of these wetlands reduced storm surge protection for New Orleans and St. Bernard Parish.  Report to the Police Jury of the Parish of St. Bernard of the Tidewater Channel Advisory Committee (Exh. 40) (1957) at p. 2; "Interim Survey Report on Hurricane Study of Morgan City, Louisiana, and Vicinity." (November 1962); USACE Fact Sheet (Exh. 34), January 2005; letter from United States Secretary of the Interior, Fred A. Seaton to Army Secretary Wilber M.

Bruckner, August 22, 1957 (Exh. 8); U.S. Department of the Interior, U.S. Fish and Wildlife

Service, Press Release, "Louisiana Canal's   Effects on Fish and Wildlife Arouse Concern of

Conservationists," September 26, 1957 (Exh. 55) at p. 1; U.S. Fish and Wildlife Service, An

Interim Report on Fish and Wildlife Resources as Related to Mississippi River Gulf Outlet

Project, Louisiana and an Outline of Proposed Fish and Wildlife Studies (Exh. 38) (April 1958);

UDI-001-000000120; 1988 Army Corps Reconnaissance Report (Exh. 32) at p. 27; Team

Louisiana Report (Exh. 30) at p. 112; Expert Report of  John W. Day, Jr. and Gary P. Shaffer

(July 11, 2008), pp. 16-20, 46.

46.     By 1975, the Army Corps had acknowledged "[t]he marsh west of the MR-GO

has been significantly modified by, inter alia, the MR-GO channel, existing levees, and by the

hurricane levee now under construction."  Exh. 62 at AFW-180-000001008, Paragraph 8.

47.     Long before Hurricane Katrina, the Army Corps knew that erosion of the

unarmored banks of Reach 2 of the MR-GO had vastly widened the channel beyond its

authorized 650' top width, caused large breaches in the rapidly dwindling marsh buffer between

the navigation channel and the open waters of Lake Borgne and Breton Sound, and exposed

neighboring people and property to direct hurricane attacks from Lake Borgne.  Corps

Reconnaissance Report (Exh. 32) at Comment 2; Army Corps, Habitat Impact of the

Construction of the MRGO (Exh. 41) (December 1999) at NED-188-000001556 et seq.

<u>**Summary of Noncompliance With NEPA and Implementing Regulations**</u>

48.     The Final Environmental Impact Statement prepared in 1976 ("1976 FEIS")

(1) did not  discuss such significant adverse effects as wetlands destruction, channel erosion and

widening, and increased risk of flooding during hurricanes; (2) did not include any mention of

cumulative impacts, mitigation measures, and alternatives such as closure; (3) did not mention or

analyze the applicability of  the Army Corps's own "high priority" Wetlands Resources Policy

and its relationship to the O&M dredging; and (4) did not offer any substantive response to

sharply critical comments about its inadequate environmental analysis submitted by the

Environmental Protection Agency, Department of Commerce, Department of the Interior, and

Louisiana Wildlife and Fisheries Commission.  Exh. 63 (Final Composite Environmental

Statement for Operation and Maintenance Work on Three Navigation Projects In the Lake

Borgne Vicinity Louisiana; Final 1976 EIS Document); *see also* Exh. 59 at 82:23-83:19, 131:11-

25-142:25 (30(b)(6) witness John Saia), (The Corps 30(b)(6) witness testified that: it had no

method of analyzing cumulative impacts on the wetlands; admitted that its internal regulations

would have required reporting significant impacts on the wetlands in an EIS; noted that its

internal regulations require analyzing cumulative insignificant impacts and testified that the

Corps exercised "discretion" to omit analysis of the wetlands impact in the 1976 EIS.); *see also*

responses to Agency Comments to the Draft EIS at 181:8-184:14, (The Corps 30(b)(6)

designated witness testified that: the Corps had a duty to respond to comments of reviewing

agencies but that the District Engineer exercised "discretion" to ignore analysis of certain

comments as "insignificant"-- despite the level of significance attached by the commenting

agency); *see also* Exh. 73 at 32:9-35:9 (day two 30(b)(6) of Saia on October 1, 1008) (The Corps

30(b)(6) witness also admitted, however, that the District does not have the authority to omit

comments and analysis of reviewing agencies 30(b)(6) of Saia on October 1, 1008 ("Saia day 2)

Exh. 73 at 32:9-35:9) (The Corps's 30(b)(6) witness testified that the Corps was obliged to

respond to the EPA's comments regarding insufficiency of information on environmental

impacts contained in the 1974 DEIS; the District Engineer arbitrarily refused to develop the

requested information. Saia day 2, Exh. 73 at 60:1-71:12) (*See* similar Corps 30(b)(6) testimony

regarding Department of Commerce comments on salinity on the wetlands noting that despite the DOC's comments, it did not perceive the need to discuss these effects with regard to O&M. Saia day 2, Exh. 73 at 79:11-81:22, 82:18-85:17) (*See, also* 30(b)(6) Corps testimony regarding omission of discussion of land loss or storm surge as appropriate despite comments of reviewing agencies.  Exh. 73 at 90:15-93:20, 96:8-97:3 and 98:23-99:7.)  (*Also note*, Corps 30(b)(6) testimony regarding Corps admission that the SIR on over depth dredging also fails to address impact of channel widening. Saia day 2, Exh. 73 at 118:6-119:17).

49.     The Army Corps performed a total of 26 Environmental Assessments ("EAs") of the MR-GO relating to Operation and Maintenance between the years 1980 and 2004.  Exh. 64 (Appendix L of the Mississippi River-Gulf Outlet Deep Draft De-authorization Study Integrated Final Report to Congress (Hereinafter "Appendix L, MR-GO De-Authorization Study")

50.     The 26 EAs prepared by the Army Corps found no significant impact on the environment ("FONSI") and omitted any discussion of the relationship between the need for dredging and the continuing loss of wetlands and unmitigated bank stabilization, cumulative impacts, mitigation measures, or alternatives such as closure. Exh. 64 (Appendix L, MR-GO De-Authorization Study).

51.     The Army Corps acknowledged in 1993 that a comprehensive EIS would alert Congress to the escalating, significant environmental problems caused by the MR-GO and might prompt Congressional consideration of closing the MR-GO.  Exh. 65 at pp. 1505-1506 (Memorandum for file, *Mississippi River-Gulf Outlet, St. Bernard Parish, LA (Bank Erosion) Revised Reconnaissance Study and Feasibility Study*, Oct. 6, 1993).

52.     In 2007, Congress, after becoming more informed about the environmental and safety problems created by the MR-GO, voted to deauthorize (close) the MR-GO to deep draft

vessels.  Public Law 109-234**,** Mississippi River-Gulf Outlet Deep Draft De-authorization Study

Integrated Final Report, http://mrgo.usace.army.mil/default.aspx?p=MRGOFinalReport.

53.     The Army Corps never prepared a Supplemental Environmental Impact Statement

("SEIS") to discuss the mounting, cumulative environmental devastation wrought by the MR-GO

over three decades, any mitigation measures, or any alternatives, including possible closure,

where the Corps acknowledges that all subsequent environmental analysis resulted in a finding

of no significant impact to warrant a supplemental impact statement.  Exh. 64 (Appendix L, MR-

GO De-Authorization Study); Exh. 73 at 156:16-155:15 (30(b)(6) Deposition of John Saia,

October 1, 2008).

<u>**1976 Environmental Impact Statement**</u>

54.     On October 30 1972, the Army Corps prepared a "Draft Environmental Statement

Mississippi River-Gulf Outlet, Louisiana (Maintenance) Associated Water Features Gulf of

Mexico Chandeleur Sound Breton Sound Lake Pontchartrain Gulf Intracoastal Waterway"

("1972 DEIS") which examined "dredging of the main channel only."  Exh. 66 at p. i (1972

DEIS).

55.     In 1974, the U.S. Army Engineer District, New Orleans, Louisiana completed a

"Review Draft" entitled "Composite Draft Statement for Operation and Maintenance Work on

Three Navigation Channels in the Lake Borgne Vicinity Louisiana"  ("1974 DEIS").  The

document describes the "Administrative" action under review as the:

> operation and maintenance of the following projects in the vicinity of
> Lake Borgne Louisiana:  The Mississippi River Gulf Outlet....Operation
> and Maintenance …consist(ing) primarily of periodic dredging and
> subsequent material deposition along the total of 111.3 miles.
> Maintenance dredging is accomplished by a cutter head pipeline dredge.

Exh. 67 at p. i, ¶2 (1974 DEIS).

17

56.     The 1974 DEIS removed references to studies regarding the MR-GO's effect on storm surge and wave action that had been part of the 1972 DEIS.  Exh. 66 at pp. 13, 14 (1972 DEIS); Exh. 67 (1974 DEIS); *see also* Exh. 59 at 82:23-83:19; 131:11-132:3-142:25, 181:8-184:14 (30(b)(6) Deposition of John Saia, Sept. 30, 2008); Exh. 73 at 32:9-35:9; 60:1-71:12; 79:11-81:22; 82:18-85:17; 90:15-93:20; 96:8-97:3; 98:23-99:7; 118:6-119:17 (30(b)(6) Deposition of John Saia, October 1, 2008).

57.     Per NEPA mandates, the 1974 DEIS "Review Draft" was forwarded to agencies outside the Army Corps for comment on the cumulative environmental impacts of the operation and maintenance of the MR-GO project on the human environment surrounding the MR-GO.  42 U.S.C. §4321, et seq.; Exh. 67 at pp. ii-iv, ¶5 (1974 DEIS).

58.     In March 1976, the U.S. Army Engineer District, New Orleans, Louisiana completed a Final Environmental Impact Statement ("1976 FEIS") for the MR-GO project pursuant to 40 CFR Part 1500.6 (d)(1).  Exh. 68 (*Final Composite Environmental Statement for Operation and Maintenance Work on Three Navigation Projects In the Lake Borgne Vicinity Louisiana*, March 1976).

**Environmental Protection Agency Comments**

59.     The Environmental Protection Agency ("EPA") noted in its Comment (published in the 1976 FEIS) that the 1974 DEIS did not fully analyze the environmental impact of salinity on the wetlands area surrounding the MR-GO.  Exh. 68 at p. IX-12 (1976 FEIS, Environmental Protection Agency Comment Letter of July 24, 1975); *see also* Exh. 59 at 82:23-83:19, 131:11-142:25, 181:8-184:14 (30(b)(6) Deposition of John Saia, Sept. 30, 2008); Exh. 73 at 32:9-35:9, 60:1-71:12, 79:11-81:22, 82:18-85:17, 90:15-93:20, 96:8-97:3, 98:23-99:7, 118:6-119:17 (30(b)(6) Deposition of John Saia, October 1, 2008).

18

60.     The EPA noted in its July 24, 1975 Comment Letter that the 1974 DEIS did not contain "sufficient information to assess fully the environmental impact of the proposed project or action as required by 40 CFR Part 1500.8(a)(1).  Exh. 68 at p. IX-13 (1976 FEIS, Environmental Protection Agency Comment Letter of July 24, 1975); *see also* Exh. 59 at 82:23-83:19, 131:11-142:25, 181:8-184:14 (30(b)(6) Deposition of John Saia, Sept. 30, 2008); Exh. 73 at 32:9-35:9, 60:1-71:12, 79:11-81:22, 82:18-85:17, 90:15-93:20, 96:8-97:3, 98:23-99:7, 118:6-119:17 (30(b)(6) Deposition of John Saia, October 1, 2008).

61.     The EPA noted in its July 24, 1975 Comment Letter that the 1974 DEIS did not contain information in order to allow for complete assessment of the interrelated impacts of the MR-GO on local, state and federal projects in Southern Louisiana as required by 40 CFR Part 1500.8 (a)(1).  Exh. 68 at p. IX-13 (1976 FEIS, Environmental Protection Agency Comment Letter of July 24, 1975); *see also* Exh. 59 at 82:23-83:19, 131:11-142:25, 181:8-184:14 (30(b)(6) Deposition of John Saia, Sept. 30, 2008); Exh. 73 at 32:9-35:9, 60:1-71:12, 79:11-81:22, 82:18-85:17, 90:15-93:20, 96:8-97:3, 98:23-99:7, 118:6-119:17 (30(b)(6) Deposition of John Saia, October 1, 2008).

62.     The EPA also noted that the 1974 DEIS failed to contain an environmental evaluation of the adverse and beneficial effects of the interrelated projects, *i.e.*, the GIWW, the Lake Pontchartrain and Vicinity Hurricane Protection Project, MR-GO, and Michoud Canal as required by 40 CFR Part 1500.8 (a) (1).  Exh. 68 at p. IX-13 (1976 FEIS, Environmental Protection Agency Comment Letter of July 24, 1975); *see also* Exh. 59 at 82:23-83:19, 131:11-142:25, 181:8-184:14 (30(b)(6) Deposition of John Saia, Sept. 30, 2008); Exh. 73 at 32:9-35:9, 60:1-71:12, 79:11-81:22, 82:18-85:17, 90:15-93:20, 96:8-97:3, 98:23-99:7, 118:6-119:17 (30(b)(6) Deposition of John Saia, October 1, 2008).

63.     The EPA noted in its July 24, 1975 Comment Letter that the 1974 DEIS did not contain sufficient detail regarding the long-term and secondary project impacts of the MR-GO, noting that the construction of the MRGO provides open channel for tidal water to introduce salinity, land loss, and wetland erosion as required by 40 CFR Part 1500.8 (a)(3)(ii) and 1500.8(6).  Exh. 68 at p. IX-13 (1976 FEIS, Environmental Protection Agency Comment Letter of July 24, 1975); Exh. 59 at 14:4-11, 82:23-83:19, 131:11-142:25, 181:8-184:14 (30(b)(6) Deposition of John Saia, Sept. 30, 2008); Exh. 73 at 32:9-35:9, 60:1-71:12, 79:11-81:22, 82:18-85:17, 90:15-93:20, 96:8-97:3, 98:23-99:7, 118:6-119:17 (30(b)(6) Deposition of John Saia, October 1, 2008).

64.     The EPA noted in its July 24, 1975 Comment Letter that the 1974 DEIS did not contain discuss mitigative measures in the MRGO O&M that could reduce salinity levels of the MR-GO as required by 40 CFR Part 1500.8 (4).  Exh. 68 at p. IX-13 (1976 FEIS, Environmental Protection Agency Comment Letter of July 24, 1975); *see also* Exh. 59 at 82:23-83:19, 131:11-142:25, 181:8-184:14 (30(b)(6) Deposition of John Saia, Sept. 30, 2008); Exh. 73 at 32:9-35:9, 60:1-71:12, 79:11-81:22, 82:18-85:17, 90:15-93:20, 96:8-97:3, 98:23-99:7, 118:6-119:17 (30(b)(6) Deposition of John Saia, October 1, 2008).

65.     The Army Corps's summarization and response to this EPA Comment Letter, as included in Section 9 of the "Coordination Comment and Response" portion of the 1976 FEIS, does not address the effect of open water channel of access created by the MR-GO and dismisses the EPA's concerns with regard to the impact of MR-GO's dredge material placement on wetlands from salt water intrusion.  In response to this environmental impact, the Army Corps stated:

> Construction of the MR-GO resulted in certain recognized socio-economic and environmental changes.  Secondary impacts are still underway and

will continue until a state of equilibrium on natural dynamics is obtained.
This environmental statement concerns only the actions necessary to
operation and maintenance of the MR-GO and associated bayous, and is
not intended to address impacts of original construction.

Exh. 68 at IX-3 (1976 FEIS); *see also* Exh. 59 at 82:23-83:19, 131:11-132:3-142:25, 181:8-

184:14 (30(b)(6) Deposition of John Saia, Sept. 30, 2008); Exh. 73 at 32:9-35:9, 60:1-71:12,

79:11-81:22, 82:18-85:17, 90:15-93:20, 96:8-97:3, 98:23-99:7, 118:6-119:17 (30(b)(6)

Deposition of John Saia, October 1, 2008).

66.     The EPA's letter dated July 26, 1975 further stated:

The Army Corp of Engineers, in regulations published on July 22, 1974,
has also recognized the unique qualities of wetland areas and the need for
their preservation. The Corp in discussing wetlands states "As
environmentally vital areas, they constitute a productive and valuable
public resource, the unnecessary alteration or destruction of which should
be discouraged as contrary to the public interest."

Therefore, in order to minimize the existing adverse and future long-term
(secondary) impacts of the MRGO, we recommend that mitigative
measures that could reduce salinity levels in the Lake Borgne-
Pontchartrain System be incorporated into the operation and maintenance
of the MR-GO project.  For example, such measures could include the
completion of the Seabrook Lock in the Inner Harbor Navigational
Channel System, controlled releases of freshwater from the Mississippi
River, and saltwater intrusion barriers.  Without control measures, salt
water intrusion and water quality degradation will continue to be a major
problem in the project area.

Exh. 68 at p. IX-12 (1976 FEIS, Environmental Protection Agency Comment Letter of July 24,

1975); *see also* Exh. 59 at 82:23-83:19, 131:11-142:25, 181:8-184:14 (30(b)(6) Deposition of

John Saia, Sept. 30, 2008); Exh. 73 at 32:9-35:9, 60:1-71:12, 79:11-81:22, 82:18-85:17, 90:15-

93:20, 96:8-97:3, 98:23-99:7, 118:6-119:17 (30(b)(6) Deposition of John Saia, October 1, 2008).

67.     The Army Corps's response to the EPA's comment does not address its own

internal policy regarding wetlands preservation and did not analyze the comment, instead the

Army Corps dismissively noted:

> The proposals for salinity control measures in the MR-GO system would require authorization for new construction features.  Such new construction features would require environmental and socio-economic investigation and impact analysis. Consideration of these measures in this assessment of the impacts of the project operation and maintenance is not appropriate.

Exh. 68 at p. IX-13 (1976 FEIS); Exh. 69 at p. A-135 (December 1972 Digest of Water Resources Policies and Activities, EP 1165-2-1); *see also* Exh. 59 at 82:23-83:19, 131:11-142:25, 181:8-184:14 (30(b)(6) Deposition of John Saia, Sept. 30, 2008); Exh. 73 at 32:9-35:9, 60:1-71:12, 79:11-81:22, 82:18-85:17, 90:15-93:20, 96:8-97:3, 98:23-99:7, 118:6-119:17 (30(b)(6) Deposition of John Saia, October 1, 2008).

68.    The EPA's letter dated July 24, 1975 concluded that it had "reservations" concerning the environmental effects of certain aspects of the proposed action.  The EPA further concluded that further study of suggested alternatives or modifications was required and asked the Army Corps to reassess those aspects.  Moreover, the EPA concluded that it believed that the draft impact statement "did not contain sufficient information to assess fully the environmental impact of the proposed project."  Exh. 68 at p. IX-13 (1976 FEIS, Environmental Protection Agency Comment Letter of July 24, 1975); *see also* Exh. 59 at 82:23-83:19, 131:11-142:25, 181:8-184:14 (30(b)(6) Deposition of John Saia, Sept. 30, 2008); Exh. 73 at 32:9-35:9, 60:1-71:12, 79:11-81:22, 82:18-85:17, 90:15-93:20, 96:8-97:3, 98:23-99:7, 118:6-119:17 (30(b)(6) Deposition of John Saia, October 1, 2008).

69.    The Army Corps took no action on the EPA's recommendations concerning further study of suggested alternatives or modifications and did not attempt to cure the EPA's concerns about insufficient information to assess fully the environmental impact of the proposed project.  1976 FEIS at IX-3; *see also* Exh. 59 at 82:23-83:19, 131:11-142:25, 181:8-184:14 (30(b)(6) Deposition of John Saia, Sept. 30, 2008); Exh. 73 at 32:9-35:9, 60:1-71:12, 79:11-

81:22, 82:18-85:17, 90:15-93:20, 96:8-97:3, 98:23-99:7, 118:6-119:17 (30(b)(6) Deposition of John Saia, October 1, 2008).

## Department of Interior Comments

70.     The Department of the Interior ("DOI") likewise brought to the Army Corps's attention certain perceived deficiencies, and DOI sharply disputed certain contentions contained in the 1974 DEIS.  Specifically, the DOI disagreed with the Army Corps's unsubstantiated conclusion that spoil disposal would "constrain the westward erosion of the MR-GO channel bank" which was contributing to the widening of the surface of the MRGO.  Exh. 68 at p. IX-20 (1976 FEIS); *see also* Exh. 59 at 82:23-83:19, 131:11-132:3-142:25, 181:8-184:14 (30(b)(6) Deposition of John Saia, Sept. 30, 2008); Exh. 73 at 32:9-35:9, 60:1-71:12, 79:11-81:22, 82:18-85:17, 90:15-93:20, 96:8-97:3, 98:23-99:7, 118:6-119:17 (30(b)(6) Deposition of John Saia, October 1, 2008).

71.     In its response, the Army Corps merely rejected out of hand the DOI's comment without addressing the merits of its stated concern about bank erosion.  Exh. 68 at p. IX-7 (1976 FEIS); *see also* Exh. 59 at 82:23-83:19, 131:11-132:3-142:25, 181:8-184:14 (30(b)(6) Deposition of John Saia, Sept. 30, 2008); Exh. 73 at 32:9-35:9, 60:1-71:12, 79:11-81:22, 82:18-85:17, 90:15-93:20, 96:8-97:3, 98:23-99:7, 118:6-119:17 (30(b)(6) Deposition of John Saia, October 1, 2008).

## Department of Commerce Comments

72.     The United States Department of Commerce, Assistant Secretary for Science and Technology, responded to the 1974 DEIS on July 3, 1975 noting that the DEIS failed to identify the land loss process of marsh deterioration resulting from saltwater intrusion in violation of 40 CFR Part 1500.8 (a) (1).  Exh. 68 at p. IX-14 (1976 FEIS).

73.     The Department of Commerce's response of  July 3, 1975 indicated that a 1973 study by Anon, "On Environmental Considerations of an Expanded Mississippi River Gulf Outlet" cited to two 1970 authoritative studies—one by Chabreck, "Marsh Zones and Vegetation Types in the Louisiana Coastal Marshes"  and one by Palmisano, "Plant Community-Soil Relationships"—that went unreferenced in the 1974 DEIS and reported that saltwater intrusion into fresh and brackish marshes resulted in maximum loss of marsh and noted that when "salinity is increased in areas underlain by thick organic sequences, instead of being replaced by saline grasses the marshes simply break up and revert to open ponds and lakes" in violation of 40 CFR Part 1500.8 (a)(1).  Exh. 68 at IX-14 (1976 FEIS).

74.     The Army Corps's 1976 FEIS did not act upon this comment in Section 9 of the "Coordination Comment and Response" portion of the 1976 FEIS and made no reference to impact of saltwater intrusion as a cause of land loss nor did it include the referenced studies in the body of the document. Exh. 68 at IX-1-10 (1976 FEIS); *see also* Exh. 59 at 82:23-83:19, 131:11-132:3-142:25, 181:8-184:14 (30(b)(6) Deposition of John Saia, Sept. 30, 2008); Exh. 73 at 32:9-35:9, 60:1-71:12, 79:11-81:22, 82:18-85:17, 90:15-93:20, 96:8-97:3, 98:23-99:7, 118:6-119:17 (30(b)(6) Deposition of John Saia, October 1, 2008).

## State of Louisiana's Comments

75.     The State of Louisiana, Department of Public Works letter, dated May 30, 1975, noted that the 1974 DEIS did not adequately identify the role of the proposed locks at Seabrook and Rigolets as to hurricane protection in the vicinity in violation of 40 CFR Part 1500.8 (a)(1). Exh. 68 at IX-21 (1976 FEIS).

76.     The State of Louisiana, Department of Public Works stated that the DEIS, as written at page II-116 (g), failed to inform the reader of the "locks association and purpose in the

overall project" and failed to inform the reader that the two proposed structures themselves in fact provide hurricane protection and manage salinity in the vicinity in violation of 40 CFR Part 1500.8 (a)(1).  Exh. 68 at IX-21 (1976 FEIS).

77.     The Army Corps made no alteration in its discussion of Section II-116(g) of the 1976 FEIS relevant to the impact that the proposed Seabrook and Rigolets Locks were expected to have on hurricane protection and salinity intrusion in the marshes in violation of 40 C.F.R. Part 1500.8(a)(1).  Exh. 68 at II-116-117(g) (1976 FEIS).

78.     The Louisiana Wildlife and Fisheries Commission ("LWFC") also objected to the Army Corps's failure to analyze the MRGO's "significant" contribution to ecological changes of "considerable magnitude" caused by saltwater intrusion into the marshlands and estuaries of South Louisiana.  Exh. 68 at IX-8 to IX-9 (1976 FEIS).

79.     The LWFC also noted that implementation of the proposed O & M dredging projects would "enhance the adverse effects of this channel and result in further deterioration of high quality marsh."  Exh. 68 at IX-9 (1976 FEIS).

80.     In lieu of addressing the LWFC's concerns, the Army Corps concluded that it was inappropriate to present or analyze these impacts:

> This EIS recognizes the continual changes resulting from previous actions. We know of no definitive evidence which indicates that discontinuation of dredging operations would restore the salinity levels to pre-1960 conditions. Salinity control measures would require new construction features necessitating environmental and socio-economic investigation and impact analysis.  Consideration of these measures in this assessment of the impact of project operations and maintenance is not appropriate.

Exh. 68 at IX-9 (1976 FEIS).

### Critical Omissions of Legally Required Information in The 1976 FEIS

81.     The 1976 FEIS does not contain any of the following:

     a.   a description of the wetlands environment in the MR-GO vicinity as it existed prior to the proposed maintenance dredging and operation of the MR-GO in violation of 40 CFR Part 1500.8 (a)(1);

     b.   a description of the interrelationships and cumulative environmental impacts of the proposed maintenance dredging and operation of the MR-GO as it impacts the storm surge environment in the vicinity and other related Federal projects (for example, specifically but not exclusively, the locks at Seabrook and Rigolets); the wetlands environment in the MR-GO vicinity, and channel erosion as required by 40 CFR Part 1500.8 (a)(1), (a) (3);

     c.   a description of the  probable adverse environmental effects of the Operation, Maintenance, and Dredging on the storm hazards in the environment which could not be avoided as required by 40 CFR Part 1500.8 (a)(5).

     d.   the interrelationships of the MR-GO on other related Federal projects, in particular, the relationship that the MR-GO has or may have on the Lake Pontchartrain Hurricane Protection Project in violation of 40 CFR Part 1500.8 (a)(1).  Exh. 59 at 126:19-127:16 (30(b)(6) Deposition of John Saia, September 30, 2008); Exh. 68 at I-11-13 (1976 FEIS).

     e.   any detail regarding the probable impact of the proposed maintenance dredging and operation of the MR-GO on the wetlands environment in the MR-GO vicinity as they affect storm surge and channel erosion as required by 40 CFR Part 1500.8 (a)(3);

     f.   an analysis of the secondary, or indirect, as well as primary or direct, consequences of the maintenance dredging and operation of the MR-GO on the wetlands environment as it relates to storm surge and channel erosion in the MR-GO vicinity, as required by 40 CFR Part 1500.8 (a)(3)(ii);

g.   an evaluation of the cumulative environmental impacts of the MR-GO O&M as required by 40 CFR Part 1500.8 (a) (1); Exh. 59 at 126:13-18 (30 (b)(6) Deposition of John Saia, September 30, 2008);

h.   an analysis of alternatives to the proposed maintenance dredging and operation of the MR-GO (and their benefits) relative to environmental changes presented to the storm surge environment and impacts on storm hazards, wetlands loss, and channel erosion as required by 40 CFR Part 1500.8(a)(4);

i.   the required statement indicating the extent to which the stated countervailing benefits could be realized by following reasonable alternatives to the proposed action that would avoid some or all of the adverse environmental effects on the wetlands environment in the MR-GO vicinity as required by 40 CFR Part 1500.8 (a)(8).

j.   an analysis in sufficient detail to reveal the Army Corps's comparative evaluation of the environmental benefits, costs, and risks of the Operation, Maintenance, and Dredging and each reasonable alternative as it impacted storm hazards, wetlands loss, and channel erosion in the vicinity of the MR-GO, as required by 40 CFR Part 1500.8 (a)(4).

k.   any descriptions of appropriate alternatives to resolve conflicts concerning methods of mitigating the effects of maintenance dredging and operation of the MR-GO on storm surge, wetlands loss, and channel erosion in the MR-GO vicinity as required by 40 CFR Part 1500.8 (a)(4);

l.   a rigorous exploration and objective evaluation of the environmental impacts of all reasonable alternative mitigating measures that might neutralize or avoid some or all of the adverse environmental effects of the existence of and continued maintenance dredging and operation of the MR-GO as required by 40 CFR Part 1500.8 (a)(4);

m.  an analysis of the operation and maintenance of the MR-GO reducing the environmental benefits of the wetlands environment in the MR-GO vicinity or the alternative of taking no action or of postponing action pending further study of the effects as required by 40 CFR Part 1500.8 (a)(4);

n.  the required statement on the extent to which the Operation, Maintenance, and Dredging involves tradeoffs between short-term environmental gains at the expense of long-term losses, and a discussion of the extent to which the Operation, Maintenance, and Dredging foreclose future options regarding the environment, as required by 40 CFR Part 1500.8 (a)(6); and

o.  the required section indicating what other interests and considerations of Federal policy are thought to offset the adverse environmental effects of the proposed action on the wetlands environment in the MR-GO vicinity as required by 40 CFR Part 1500.8 (a)(8).

82.    The Army Corps concedes that the 1976 FEIS contains no analysis that reaches the specific conclusion about the health and safety of the human environment related to erosion of the banks along the MR-GO.  Exh. 56 at 281:6-282:16 (30(b)(6) Deposition of Gregory Miller, October 14, 2008).

**Continuing Degradation of the Environment After 1976**

83.    At no time after 1976 did the Army Corps ever prepare a Final or Supplemental Environmental Impact Statement concerning ongoing O&M dredging activities that discussed their impact on the environment, mitigation measures, alternatives, risks to human life and property, and other disclosures required by NEPA and implementing regulations.  Exh. 64 (Appendix L, MR-GO De-Authorization Study); *see also* Exh. 59 at 82:23-83:19, 131:11-132:3-142:25, 181:8-184:14 (30(b)(6) Deposition of John Saia, Sept. 30, 2008); Exh. 73 at 32:9-35:9,

60:1-71:12, 79:11-81:22, 82:18-85:17, 90:15-93:20, 96:8-97:3, 98:23-99:7, 118:6-119:17

(30(b)(6) Deposition of John Saia, October 1, 2008).

84.     From 1976 to the time of Hurricane Katrina, the Army Corps knew that the MR-GO's unarmored channel continued to widen at the rate of 42 feet per year, eventually expanding through unmitigated erosion to 2,000 feet and in some places 3,000 feet. Exh. 27 at pp. 46, 148 (Kemp Expert Report (July 11, 2008); Exh. 70 (Memorandum of Cecil W. Soileau (Chief, Hydraulics and Hydrologic Branch, Commenting on Army Corps, Mississippi River-Gulf Outlet, St. Bernard Parish, Louisiana (Bank Erosion), May 24, 1988).

85.     During the same time period, the Army Corps knew that the MR-GO continued to destroy wetlands through channel widening, disposal of dredged material, and continuing salt water intrusion at an average loss of 211 acres of marsh per year during the 20-year period between 1968 and 1987 and a total of 4,200 acres of highly productive marsh adjacent to the MR-GO channel. 1988 Army Corps Reconnaissance Report (Exh. 32) at p. 2, Comment 2; Army Corps, Habitat Impact of the Construction of the MRGO (Exh. 41) (December 1999) at NED-188-000001556 *et seq*.; Exh. 74 at pp. 18-19 (Army Corps and Louisiana Department of Natural Resources, "Land Loss and Marsh Creation, St. Bernard, Plaquemines and Jefferson Parishes—Feasibility Study" (April 1990)).

86.     During the same time period, the Army Corps knew (or should have known) that the reduction in protective wetlands (both in the Golden Triangle and Central Wetlands Unit and immediately in front of the LPV structures) and increase in channel width would likely have a demonstrable effect on flooding levels in the vicinity of the MR-GO during hurricanes. 1988 Army Corps Reconnaissance Report (Exh. 32) at Comment 2; Exh. 71 at ¶¶ 19-27 (Kemp Supplemental Declaration).

## Supplemental Information Report

87.     On July 11, 1985 the ACE published a "Supplemental Information Report" ("1985 SIR") to complement the 1976 FEIS.  Exh. 72 (1985 SIR).

88.     The 1985 SIR was intended "to evaluate the ongoing removal of allowable over depth and advanced maintenance during routine maintenance dredging."  Exh. 72 at NOP-002-000002283 (1985 SIR).

89.     The 1985 SIR conceded that the over depth dredging practice was "inadvertently omitted from the [1976] FEIS."  Exh. 72 at NOP-002-000002283 (1985 SIR).

90.     The 1985 SIR does not evaluate the effects of over depth dredging on the MR-GO surface width, wetlands loss, or the subsequent effect on storm hazard; nor does it in any way evaluate the effects of over depth dredging on the human environment.  Ex. 72 (1985 SIR).

91.     Without evaluating the impact of the over depth dredging on the MR-GO surface width or the surrounding wetlands and its impact on storm surge, the 1985 SIR concludes that the over depth dredging would have no impact on the human environment.  Exh. 72 at NOP-002-000002287 (1985 SIR).

## Environmental Assessments and Findings of No Significant Impact

92.     Between 1980 and 2004, the Army Corps performed a total of 26 EAs of the MR-GO—each with formulaic Findings of No Significant Impact ("FONSI")—relating to routine O&M activities.  Exh. 64 (Appendix L, MR-GO De-Authorization Study).

93.     Each of EAs that the Army Corps prepared was limited to analysis of discrete segments of designated miles along the 76 mile channel, and some are further subdivided into two and three sub-EAs prepared separately, addressing even smaller designated areas for the proposed action.  *See, e.g.*, Exh. 75 (EA 162 (miles 23-2); miles 49.9-56.1; miles 0 to (-)2.5).

94. Not all the EAs prepared by the Army Corps were published for comment. *See, e.g.,* Exh. 76 (EA 47 South bank Foreshore Protection); Exh. 77 (Army Corps Maintenance Dredging (NOP-019-000000736-789); Exh. 90 (EA 72 Jetty repairs); Exh. 91 (EA 294 Breton Island Restoration).

95. The 26 EAs of the MR-GO relating to O&M activities between the years 1980 and 2004 consisted of: 8 relating to Bank Stability, 8 relating to Dredge Spoil Deposition, 2 relating to Dredging, 2 relating to Floatation Channels, 2 relating to the Reach 3 jetties, 2 unknown, 1 relating to Wetlands Creation, and 1 relating to Marsh Enhancement. Exh. 64 (Appendix L, MR-GO De-Authorization Study).

96. Each of the total 26 EAs is accompanied by a Finding of No Significant Impact ("FONSI"). Exh. 64 (Appendix L, MR-GO De-Authorization Study).

### The Army Corps Knew About Inevitable Bank Erosion With Unarmored Channels At The Time of Designing The MR-GO and Thereafter But Never Incorporated This Information Into Environmental Documents

97. The initial design memoranda for the MR-GO expressly foresaw the eventuality that the erosion of the MR-GO—because the banks were unarmored— would necessitate bank stabilization measures and foreshore protection measures, but the Army Corps proceeded without protecting the channel banks. Exh. 78 at p. 7 (Podany Deposition Exhibit 41, General Design Memoranda (GDM) 1A); Exh. 79 at p. 5 (Podany Deposition Exhibit 42, GDM 1B); Exh. 80 at pp. 1-30 (Podany Deposition Exhibit 43, GDM 2 Supplement 4 (foreshore protection)); Exh. 58 at 74:8-77:16 (30(b)(6) deposition testimony of Thomas Podany, Oct. 9, 2008).

98. In 1984, the Army Corps participated in a study partially funded by St. Bernard Parish of the MRGO entitled "The Mississippi River Gulf Outlet: A Study of Bank Stabilization"

31

and published by Coastal Environments, Inc.  Exh. 81 (Podany Deposition Exhibit 38); Exh. 58 at 144:3-146:2 (30(b)(6) deposition testimony of Thomas Podany, Oct. 9, 2008)

99.     On March 26, 1987, the New Orleans District Planning Division held a meeting to discuss (a) the potential damages that would be sustained by the failure to abate the banks of the MR-GO, including the economic value of land lost to erosion vis-à-vis hurricane protection and (b) bank protection alternatives, including different dredging techniques.  Exh. 82 at NED-000001167-1169 (Memorandum for Record re Mississippi River Gulf Outlet (MR-GO), Bank Erosion Reconnaissance Study Interdisciplinary Planning Team Meeting to Select Alternative Bank Erosion Control Measures for Evaluation in the MR-GO Reconnaissance Report, April 6, 1987).

100.     The Army Corps associated erosion of the MR-GO with hurricane protection, yet it performed 147 dredging events over the remainder of the MRGO and never supplemented its 1976 EIS to address the known impacts of the ongoing dredging on erosion and loss of wetlands or on its effect on hurricane protection in the area of the MR-GO.  Exh. 64 (Appendix L, MR-GO De-Authorization Study).

101.     In its 1988 bank erosion reconnaissance study, the Army Corps acknowledged the problems of salt water intrusion, environmental loss of marsh, and hurricane protection associated with loss of storm buffer along the north bank of the MRGO from Lake Borgne.  Exh. 83 at p. 10, LMVD Comment No. 2, p. 16, 24-25, 26-27, Appendix E at pp. 3-8 (Podany Deposition Exhibit 37, 1988 Bank Erosion Reconnaissance Report); Exh. 58 at 113:10-116:1, 126:13-129:17 (30(b)(6) deposition testimony of Thomas Podany, Oct. 9, 2008).

102.     In 1987, the Army Corps expressly considered the need to evaluate bank stabilization measures along the MR-GO for its hurricane protection impacts.  Exh. 82 at NED-

000001167-1169 (Memorandum for Record re Mississippi River Gulf Outlet (MR-GO), Bank Erosion Reconnaissance Study Interdisciplinary Planning Team Meeting to Select Alternative Bank Erosion Control Measures for Evaluation in the MR-GO Reconnaissance Report, April 6, 1987).

103.    When the Army Corps undertook a consideration of shore protection of the MR-GO, a memorandum dated October 6, 1993, expressly concluded that such efforts would require the Army Corps to alert Congress of the environmental concerns inherent in the MRGO through a full EIS.  Exh. 65 at pp. 1505-1506 (Memorandum for file, *Mississippi River-Gulf Outlet, St. Bernard Parish, LA (Bank Erosion) Revised Reconnaissance Study and Feasibility Study*, Oct. 6, 1993).

104.    While the Army Corps undertook a consideration of shore protection of the MR-GO, the Army Corps noted that a full EIS to Congress would necessitate public comment that would both challenge the limited scale of the Army Corps proposed protection efforts in light of the public desire for more extensive remedy, and would likely raise for Congressional consideration the closing of the MR-GO.  Exh. 65 at pp. 1505-1506 (Memorandum for file, *Mississippi River-Gulf Outlet, St. Bernard Parish, LA (Bank Erosion) Revised Reconnaissance Study and Feasibility Study*, Oct. 6, 1993).

105.    The Army Corps understood in 1988 that the loss of land in front of the flood protection structures around Lake Borgne caused by erosion of the MR-GO was removing the last line of defense to reduce the impact of storm surge and waves.  Exh. 83 at p. 24, Appendix E at pp. 6, 8 (Podany Deposition Exhibit 37, 1988 Bank Erosion Reconnaissance Report); Exh. 58 at 128:13-129:17 (30(b)(6) deposition testimony of Thomas Podany, Oct. 9, 2008).

106.    In its 1988 Bank Erosion Reconnaissance Study, the Army Corps considered structural bank protection options, including rock dikes, alternative disposal areas, concrete block, timber pile, stone, and shell core dikes.  Exh. 83 at pp. 34-35 (Podany Deposition Exhibit 37, 1988 Bank Erosion Reconnaissance Report); Exh. 58 at 33:9-34:24, 139:7-142:25 (30(b)(6) deposition testimony of Thomas Podany, Oct. 9, 2008).

107.    In its 1988 Bank Erosion Reconnaissance Study, the Army Corps considered alternatives to operation of the MRGO that might mitigate the erosion of the banks of the MRGO, including: reduction of and alternatives to maintenance dredging.  Exh. 83 at pp. 34-50 (Podany Deposition Exhibit 37, 1988 Bank Erosion Reconnaissance Report); Exh. 58 at 33:9-34:24, 146:3-147:22 (30(b)(6) deposition testimony of Thomas Podany, Oct. 9, 2008).

108.    The Army Corps acknowledged by the time of its 1988 bank erosion reconnaissance investigation that the problems associated with erosion had an impact on the human environment which would be regulated by NEPA, but it never incorporated this information into its environmental disclosures—either in the EAs or a Supplemental Environmental Impact Statement.  Exh. 58 at 157:5-159:25 (30(b)(6) deposition testimony of Thomas Podany, Oct. 9, 2008).

109.    The Army Corps's St. Bernard Parish Bank Erosion Reconnaissance Study dated December 9, 1992, found that wind generated waves were not limited to the width of the channel during hurricanes.  Exh. 84 at 1832 (Memorandum re MRGO, St. Bernard Parish, (Bank Erosion) Revised Recon Study, Dec. 9, 1992).

110.    On October 6, 1993, in response to evaluating proposed action associated with the Mississippi River Gulf Outlet St. Bernard Parish (Bank Erosion) Revised Reconnaissance and Feasibility Study, the Army Corps evaluated the need to prepare either an EA or and EIS.  The

Army Corps concluded that the large scope of the proposed action would necessitate an EIS, local interests would not want a small scale bank protection project, and once environmental organizations determine how costly the limited bank protection project is expected to be, they will want an analysis of closure of the MR-GO as a possible alternative.  Exh. 65 at pp. 1505-1506 (Memorandum for file, *Mississippi River-Gulf Outlet, St. Bernard Parish, LA (Bank Erosion) Revised Reconnaissance Study and Feasibility Study*, Oct. 6, 1993).

### The Army Corps Sought MR-GO Appropriations Without An EIS

111.    Between 1963 and 2005, the Army Corps sought and obtained appropriations for approximately 147 dredging events and removed approximately 492,422,925 million cubic yards of sediment which became spoil.  Exh. 85 at p. 5 (Compilation of Dredging Events Notice of Intent to Introduce Summary Evidence; Exhibit A-F, served on Defendant on September 12, 2008).

112.    For the years 1970 to 1979, the Army Corps sought tens of millions of dollars for funding for new work and ongoing maintenance activities for the MR-GO as follows:

| | |
|---|---|
| 1970 | $800,000 for new work and, $8,813,988 for maintenance work; |
| 1971 | $1,800,000 for new work and $1,875,500 for maintenance work; |
| 1972 | $794,00 for new work and $2,826,803 for maintenance work; |
| 1973 | $900,000 for new work and $1,809,800 for maintenance work; |
| 1974 | $580,000 for new work and $2,534,100 for maintenance work; |
| 1974 | $1,000,000 for new work and $1,940,000 for maintenance work; |
| 1976 | $2,500,000 for new work and $6,586,400 for maintenance work; |
| 1977 | $-285,000 sought, ($1,042,750 spent) for new work, $4,060,000 for maintenance work; |
| 1978 | $800,000 for new work, $4,453,000 for maintenance work; |
| 1979 | $1,235,000 for new work and $7,090,000 for maintenance work. |

Exh. 92 (Annual Reports of the Chief of Engineers on Civil Works Activities (1970-72-1974-79).

113.     None of these appropriations requests were accompanied with an EIS outlining the impact of the maintenance of the MRGO on wetlands, channel widening, and storm hazards, or any of the other information required by NEPA and implementing regulations.

114.     The Army Corps never presented Congress with an objective analysis of the dredging consequences, including the Army Corps's own understanding that its conduct was causing the surface width of the MR-GO to expand at a rate averaging over 15 feet per year and caused the channel to triple in width.  Exh. 86 at 1865 (*The Mississippi River Gulf Outlet: A Study of Bank Stabilization*); Exh. 87 at 1559 (New Orleans District Corps of Engineers for the Environmental Subcommittee of the Technical Committee Convened by EPA in Response to St. Bernard Parish Council Resolution 12-98. December 1999. Habitat Impacts of the construction of the MRGO, March 16, 2000).

## The Army Corps Admits "Bypass[ing]" NEPA

115.     On January 31, 1975, the senior Army Corps officer in Mobile wrote to his counterpart in New Orleans.  It was five years after NEPA's enactment, and the Army Corps was legally obligated to prepare comprehensive environmental reviews of major activities like the continuous dredging as part of the MR-GO's O&M.  Colonel Drake Wilson advised Colonel E.R. Heiberg, III that "[t]he secret for planning a 3-week vacation is to bypass NEPA and 404 contacts . . . ."  Exh. 88 at p. 2 (Letter from Colonel Drake Wilson to Colonel E.R. Heiberg, III, dated January 31, 1975) ("404 contacts" refers to the EPA, DOI, State of Louisiana and other agency that the Army Corps must make in order to comply with all relevant environmental regulations like NEPA and the Clean Water Act).

116.     Colonel (later Brigadier General) Heiberg was the New Orleans District Commander at the time of the creation of the Final Environmental Impact Statement in 1976 for the MR-GO dredging.  Exh. 68 at IX-23, IX-24 (1976 FEIS).

117.     Thirty years later and four months before Hurricane Katrina, an Army Corps environmental compliance official Richard Boe, after reviewing the agency's MR-GO environmental disclosure history, concluded that the agency had heeded Colonel Drake's advice because it had been deficient in its reporting and short-sighted in its analysis of the significant adverse and cumulative impacts of the MR-GO.  Exh. 89 ("Draft Mississippi River-Gulf Outlet PM-R Proposal for Gaining National Environmental Policy Act Compliance for the Operation and Maintenance Program" (April 11, 2005) ("Army Corps 2005 Memorandum"); Exh. 73 at 177:14-186:14 (30(b)(6) Deposition of John Saia, October 1, 2008).

118.     During that period of continuous dredging, the Army Corps conducted at least 147 dredging missions and removed and disposed of over 492 million cubic yards of spoil into the wetlands along the MR-GO and elsewhere—more than originally excavated in constructing either the MR-GO or the Panama Canal.  Exh. 85 at p. 5 (Notice of Intent to Introduce Summary Evidence; Exhibit A-F, 1963-2005 Maintenance Dredging History of the Mississippi River Gulf Outlet, served on Defendant on September 12, 2008); Exh. 49 at CRS-1 (N. Carter & C. Stern, "Mississippi River Gulf Outlet:  Issues for Congress at CRS-1 (Congressional Research Service), August 4, 2006); Exh. 27 at p. 5 (Kemp Expert Report (July 11, 2008));

http://www.pancanal.com/eng/general/canal_faqs/index.html

119.     The Army Corps 2005 Memorandum acknowledged that the Army Corps had segmented its environmental review, issuing periodic Findings of No Significant Impact ("FONSI"), and not preparing a comprehensive evaluation of the significant and cumulative

environmental impacts on the environment from O&M dredging and bank erosion that had occurred since its 1976 Environmental Impact Statement ("EIS").  Army Corps 2005 Memorandum, pp. 1-2:

> [T]he dredged material disposal sites and methods that have been used along the inland reach since the mid-1980s bear little resemblance to those described in the environmental impact statement (EIS) prepared in 1976 for the O&M of the MR-GO.  All of the changes that have occurred in the dredging and disposal plan since preparation of the original EIS have been addressed in environmental assessments (EAs) and associated findings of no significant impact (FONSIs).  . . . The cumulative impact of all the changes that have already occurred since preparation of the 1976 EIS alone constitutes a significant impact on the environment, compared to the O&M plan described in the EIS, although there has been no supplemental EIS (SEIS) prepared.  In summary, both the existing O&M of the channel and the proposed changes to the O&M of the channel require preparation of an SEIS.

Exh. 89 at pp. 1-2 (Army Corps 2005 Memorandum).

120.    The Army Corps 2005 Memorandum concedes that the Army Corps had not implemented preferred bank stabilization measures for channel stabilization of the MRGO and that the 1976 FEIS had not considered alternative preferential methods of dredging that were under consideration in 2005.  Exh. 89 at p. 2 (Army Corps 2005 Memorandum).

121.    The Army Corps concedes that pursuant to NEPA, it was required to report the fact the banks of the MR-GO were eroding in an EIS.  Exh. 56 at 280:12-24 (30(b)(6) Deposition of Gregory Miller, October 14, 2008).

122.    The Army Corps concedes that it never did an analysis to determine whether or not the erosion of the banks of the MRGO negatively impacted the health and safety of the human environment.  Exh. 56 at 282:17-24 (30(b)(6) Deposition of Gregory Miller, October 14, 2008).

123.    The Army Corps concedes that after 1976, it never did a comprehensive environmental analysis investigating the extent to which MRGO was eroding its banks and

impacting the environmental impact.  Exh. 56 at 310:5-12 (30(b)(6) Deposition of Gregory Miller, October 14, 2008).

124.    The Army Corps concedes significant environment impacts result (a) from erosion, wave wash, and drawdown effects produced by large vessel traffic causing highly productive marsh to be converted to open water and (b) from saltwater intrusion in the marsh modifying the character of much of the marsh area.  Exh. 56 at 317:17-318:13 (30(b)(6) Deposition of Gregory Miller, October 14, 2008).

125.    The Army Corps acknowledges that the MR-GO human environment included areas that were impacted by land changes due to the MR-GO project.  Exh. 59 at 17:7-23 (30(b)(6) Deposition of John Saia, September 30, 2008).

126.    The Army Corps concedes that it did not analyze the cumulative effect of changes brought about by the MR-GO in terms of their impact on the human environment.  Exh. 59 at 126:13-18 (30(b)(6) Deposition of John Saia, September 30, 2008).

127.    Although the Army Corps understood it was important, it did not analyze and report on the changes in environment in the wetlands around the MR-GO or the conversion in the wetlands environment because of salinity.  Exh. 59 at 144:1-145:7 (30(b)(6) Deposition of John Saia, September 30, 2008).

128.    The Army Corps concedes that

a.   an EIS is the basis for the decision makers to consider the environmental aspects of a project taken by a federal agency;

b.   the ultimate decision makers who consider the environmental aspects of a project undertaken by the Government is the Congress which makes the final decision in legislation which it passes;

c.   the purpose of the EIS is to give Congress an informed perspective on the environmental impact of a proposed action;

d.   NEPA mandates that Congress decides environmental policy; and

e.   the objective of the EIS is to provide Congress with an informed perspective on the impacts of whatever action is proposed.

Exh. 59 at 14:1-16:2 (30(b)(6) Deposition of John Saia, September 30, 2008).

## WETLANDS POLICY

129.    During the three decades of dredging the MR-GO, the Nation had a policy to maximize protection of wetlands.  This mandatory policy found expression in statutes, regulations, and policy statements issued by the President and federal agencies.  *See* Exh. 18 (Water Bank Act of 1980, Public Law 91-559 (84 Stat. 1468; 16 U.S.C. §§1301-1311) (December 19, 1970), as amended on January 2, 1980 by Public Law 96-182 (93 Stat. 1317)); Exh. 19 (Emergency Wetlands Resources Act of 1986, (16 U.S.C. §§ 3901-3932, November 10, 1986, as amended 1988 and 1992)); Exh. 20 (Clean Water Act, (33 U.S.C. §1251 et seq. (1972)); Exh. 21 (Executive Order No. 11990 (May 24, 1977)); Exh. 93 at 19-1 through 19-26 (Army Corps, Water Resources Policies and Authorities, EP 1165-2-1, July 30, 1999).

130.    One of the primary purposes of this major federal initiative was preserving wetlands for flood control protection benefits.  *See, e.g.,* Exh. 18 (Water Bank Act of 1980, 16 U.S.C §1301); Exh. 19 (Emergency Wetlands Resources Act of 1986, 16 U.S.C. §3901 (a)(1-9)); Exh. 22 (North American Wetlands Conservation Act of 1989, 16 U.S.C. §4401 (a)(4)); Exh. 21 (Executive Order No. 11990).

131.    In the Emergency Wetlands Resources Act, it is stated: "Congress finds that wetlands provide a natural means of flood and erosion control by retaining water during periods

of high runoff, thereby protecting against loss of life and property."  Exh. 19 (Emergency

Wetlands Resources Act, 16 U.S.C. §3901 (a)(6)).

132.    The North American Wetlands Conservation Act of 1989 states that "wetland

ecosystems provide substantial flood and storm control values and can obviate the need for

expensive manmade control measures."  Exh. 22 (North American Wetlands Conservation Act of

1989, 16 U.S.C. §4401 (a)(4)).

133.    One of the purposes of Executive Order No. 11990 is to "to avoid to the extent

possible the long and short term adverse impacts associated with the destruction or modification

of wetlands and to avoid direct or indirect support of new construction in wetlands wherever

there is a practicable alternative. . . ."  Exh. 21 at p. 1 (Executive Order No. 11990).

134.    In 2006, President George W. Bush announced "a new national policy on

wetlands to achieve an overall increase of U.S. wetlands each year . . . ."  Exh. 25 at p. 3 (White

House Council on Environmental Quality, *Conserving America's Wetlands 2006: Two Years of

Progress Implementing the President's Goal* (April 22, 2006)).

135.    This new federal policy was expressly distinguished by President Bush from

"[t]he old policy of wetlands . . . to limit the loss of wetlands. . . . Instead of just limiting our

losses, we will expand the wetlands of America."  Exh. 25 at p. 3 (White House Council on

Environmental Quality, *Conserving America's Wetlands 2006: Two Years of Progress

Implementing the President's Goal* (April 22, 2004)).

136.    President Bush stressed that wetlands "provide a protective buffer for our towns

and cities against floods and storm surges . . . ."  Exh. 25 at p. 3 (White House Council on

Environmental Quality, *Conserving America's Wetlands 2006: Two Years of Progress

Implementing the President's Goal* (April 22, 2004)).

137.   In 1977, President Jimmy Carter issued Executive Order No. 11990—"Protection of Wetlands".  Exh. 21 (Executive Order No. 11990).

138.   Executive Order No. 11990 ordered every federal agency "to minimize the destruction, loss or degradation of wetlands and to preserve and enhance the natural and beneficial values of wetlands in carrying out the agency's responsibilities for acquiring, managing, and disposing of Federal lands and facilities."  Exh. 21 at p. 1, Section 1(a) (Executive Order No. 11990).

139.   Executive Order No. 11990 covered any agency like the Army Corps "conducting Federal activities and programs affecting land use, including but not limited to water and related land resources planning, regulating, and licensing activities."  Exh. 21 at p. 1, Section 1(a); p. 2 Section 7(a) (Executive Order No.11990)

140.   Executive Order No. 11990 expressly covered "dredging."  Exh. 21 at p. 2, Section 7(b) (Executive Order No. 11990).

141.   The Army Corps was directed that it "shall consider factors relevant to a proposal's effect on the survival and quality of the wetlands … such as flood and storm hazards."  Exh. 21 at p. 2, Section 5 (Executive Order No.11990).

142.   Consistent with this federal policy to maximize wetlands preservation, the Army Corps issued a policy statement in 1972 detailing the agency's high priority commitment to preserve wetlands.  *See* Exh. 26 at p. A-135, Sections 19-1, 19-2, 19-3 (The December 1972 Digest of Water Resources Policies and Activities, EP 1165-2-1).

143.   The MR-GO operation and maintenance is an ongoing project subject to the Digest of Water Resources Policies and Activities Civil Works, December 1972 EP 1165-2-1. Exh. 57 at 20:1-21:12. (30(b)(6) Deposition of Zoltan Montvai, Oct. 7, 2008).

144.     The record demonstrates that the Army Corps took no steps to minimize adverse effects or arrest the decimation of cypress forests, marshes, and swamps that its O&M activities were causing.  Exh. 27 at pp. 180-195 (Expert Report of G. Paul Kemp (July 11, 2008); Exh. 57 at 35:25-37:20 (30(b)(6) Deposition of Zoltan Montvai, Oct. 7, 2008).

145.     Before Hurricane Katrina, the Army Corps neither provided Congress with any reports of studies on wetland preservation nor requested funding from Congress for wetland preservation along the MR-GO.  Exh. 57 at 42:13-43:3, 45:3-10, 48:4-16 (30(b)(6) Deposition of Zoltan Montvai, Oct. 7, 2008).

146.     The Army Corps could have gone to Congress to ask Congress for authority to remediate the adverse effects of the MR-GO.  Exh. 57 at 41:6-19 (30(b)(6) Deposition of Zoltan Montvai, Oct. 7, 2008).

147.     The MR-GO destroyed over 100 square miles of once thriving wetlands that had protected Greater New Orleans from hurricane surge and waves.  Exh. 15 at pp. 16-20, 46 (Expert Report of John W. Day, Jr. and Gary P. Shaffer (July 11, 2008))

148.     In *Save Our Wetlands v. Rush*, Civil Nos. 75-3719, 77-976 (December 30, 1977), the court found that the FEIS was flawed because it inadequately addressed possible adverse effects, failed to reflect required close consultation with FWS, overstated the project's benefits versus costs, and failed to discuss possible alternatives.  Exh. 94 (Opinion in *Save Our Wetlands v. Rush*, Civil Nos. 75-3719, 77-976 (December 30, 1977).

149.     The Army Corps promulgated regulations recognizing wetlands as "[e]nvironmentally vital areas" whose "unnecessary alteration or destruction . . . should be discouraged as contrary to the public interest."  Exh. 68 at p. IX-12 (1976 FEIS, Environmental Protection Agency Comment Letter of July 24, 1975).

150.    In Public Law No. 84-455, Congress approved the Corps construct the MR-GO "substantially in accordance with recommendation of the Chief of Engineers as contained in House Document Numbered 245, Eighty-second Congress."  Defendant's Exh. 1.

151.    House Document No. 245 ("1951 MR-GO Report"), which had been submitted five years earlier, was an "investigation" and "a preliminary examination and survey" of the MR-GO.  Plaintiffs' Exh. 101 at p. 1.

152.    The Division Engineer's Report explored "the advisability and cost" of a shipping outlet from the Mississippi River to the Gulf of Mexico.  Plaintiffs' Exh. 101 at p. 18.

153.    Most of the Division Engineer's Report was a feasibility study.  Plaintiffs' Exh. 101 at pp. 17-45.

154.    The Division Engineer's Report discussed in general terms the concept of "a deep-draft outlet and tidewater harbor" starting at the existing IHNC:  "to a turning basis south of [Michoud], and a channel 36 feet deep and 500 feet wide extending as a land and water cut on tangents and easy curves . . . to and along the south shore of Lake Borgne and through the marshes to and through Chandeleur Sound and Islands at or north of Errol Island, to deep water in the Gulf of Mexico, a distance of approximately 70 miles."  Plaintiffs' Exh. 101 at p. 43, ¶82; p. 38, ¶60(b).

155.    The 1951 MR-GO Report included the Report of the Chief of Engineers who endorsed the accompanying Report of the Board of Engineers for Rivers and Harbors, which in turn approved the accompanying New Orleans Division Engineer's Report.  Plaintiffs' Exh. 101 at pp. 4-17.

156.    The Division Engineer's Report was devoted almost entirely to a discussion of the region's characteristics and demographics (Plaintiffs' Exh. 101 at pp. 19-22), existing navigation

projects (*id.* at pp. 22-23), the IHNC and Port of New Orleans (*id.* at pp. 23-25), local interests'

desired improvements (*id*. at pp. 25-26, 39-40), existing and prospective ship traffic (*id.* at pp.

26-30), local navigation hazards and surveys of rivers and passes (*id.* at pp. 30-31), alternative

routes to the Gulf (*id*. at pp. 31-35), cost-benefit analysis (*id*. at pp. 35-37), economic and

national defense justification (*id*. at pp. 40-42), and conclusion and recommendation (*id*. at pp.

43-44).

157.    The report highlighted the tentative, conceptual nature of the proposed project.

The recommendation was expressly "subject to such modifications of location, alinement [sic],

and dimensions as may be approved by the Chief of Engineers . . . ."  Plaintiffs' Exh. 101 at p.

43.

158.    For more than a century, the Corps has prided itself on being the engineers for

Congress.  Plaintiffs' Exh. 104 at p. xiii (Harold Ickes, Foreword, Arthur Maas, *Muddy Waters:*

*The Army Engineers and The Nation's Rivers* (Da Capo Press 1951)).

159.    The legislative endorsement of administrative flexibility in project

implementation by the Corps is also reflected in the recommending language in the approved

1951 MR-GO Report—"subject to such modifications of location, alinement [sic], and

dimensions as may be approved by the Chief of Engineers . . . ."  Plaintiffs' Exh. 101 at p. 43,

¶82.

160.    In the case of the MR-GO, Congress expected the Corps to make the detailed

engineering decisions about how to design and construct the MR-GO and, if necessary, to make

substantial changes where necessary.

161.    The Congressional authorization was a mandate to build, operate, and maintain

the MR-GO in a safe and competent professional manner.

162.     The Corps never informed Congress of the channel's deficiencies or the availability of feasible mitigation measures to correct these known defects.

163.     The MR-GO's deficiencies were never "ineradicable" because technically feasible mitigation measures for bank and wetlands protection and surge and saltwater barriers—which would not have impeded use of the navigation channel by deep-draft vessels—were always available to the Corps.  *See, e.g.*, Plaintiffs' Exh. 50 at p. 2 (Lake Pontchartrain and Vicinity Design Memorandum No. 2: Citrus Back Levee, Appendix C: Report on Evaluation of Alternative Plans Involving Modifications in the Alignment of the Lake Pontchartrain Barrier, March 1967); Plaintiffs' Exh. 47 at AFW-467-000001698-1699; Plaintiffs' Exh. 42 (Letter from U.S. Department of the Interior to District Engineer, NOD, October 22, 1962); Plaintiffs' Exh. 37 at NED-125-000000995-997 (correspondence between K.R. Heiberg III and G.J. Lannes dated April 11, 1975 and April 21, 1975); *see also* Defendant's Motion at p. 36, note 8 (bank protection works were technically feasible).

164.     The Corps had established procedures to seek Congressional support for the MR-GO—for example for funding increases for ongoing operation and maintenance.  Plaintiffs' Exh. 114 at 122:14-127:16 ((30(b)(6) witness John Saia, Oct. 1, 2008).

165.     The Corps could request funding to evaluate problems (reconnaissance reports) and to recommend funding for solutions (feasibility reports).  Plaintiffs' Exh. 114 at 134:14-137:10; 139:10-140:9 ((30(b)(6) witness John Saia, Oct. 1, 2008).

166.     The Corps could—and in fact, did—request funding for a reevaluation study about closing the MR-GO—a long delayed and protracted process that lasted from 1999 to 2007. Plaintiffs' Exh. 114 at 133:2-21 ((30(b)(6) witness John Saia, Oct. 1, 2008).

167.    At the time of Hurricane Katrina, the Corps was still studying the myriad problems with the MR-GO.  Plaintiffs' Exh. 27 (Kemp Expert Report) at pp. 195-95.

168.    The record here demonstrates that at no time did the Chief of Engineers engage in a policy analysis or reach a decision—*i.e.,* exercise his discretion—about the impact of the MR-GO's ongoing operation and maintenance on the wetlands or extensive bank erosion as it pertained to the hazard of storm surge or about whether or how to address the MR-GO's known (and worsening) defects.

169.    Under the chain of command, the Chief Engineer is the Corp official vested with ultimate decision-making authority, and his approval would be required for any definitive agency deliberative process about the availability of remedial measures.  Plaintiffs' Exh. 110 (Army Corps's Digest of Water Resources Policies and Activities, EP 1165-2-1, Dec. 1972) at p. A-67.

170.    The Army Corps never conducted a policy-based analysis of remedial measures associated with the MR-GO's O&M.

171.    Plaintiffs' expert, Dr. G. Paul Kemp, reviewed the extensive chronology of Corps documents relating to the MR-GO over its half century history.  Plaintiffs' Exh. 27 at pp. 185-95; Exh. 102 (Kemp Appendix B).

172.    The evidence shows that for decades the Corps studied *ad nauseam* the MR-GO's deficiencies, but the agency never reached a definitive conclusion about what to do and instead continued the same harmful conduct and exacerbated the dangerous conditions.  Plaintiffs' Exh. 27 (Kemp Expert Report) at p. 187 ("Like it had always done in the past, the agency delayed and delayed its [closure] study and never reached a definitive conclusion.").

173.    At the time of Hurricane Katrina, the Corps was still studying (reevaluating) the chronic problems with the MR-GO.  Plaintiffs' Exh. 27 (Kemp Expert Report) at p. 187.

174.    Dr. Kemp concluded:

> Throughout this half century, the Corps conducted numerous studies of the channel's adverse effects. However, it never reached a definitive conclusion or recommendation for any plan of action until more than two years after Hurricane Katrina devastated Greater New Orleans. Indeed, at no time before the catastrophic flooding did the Corps weigh alternatives, balance the social, financial, and political considerations in favor of and against each potential course of action, evaluate the risk to people and property, and make a recommendation to Congress in the exercise of its policy-making judgment about the preferable course of action with respect to the MRGO's defects. . . .. . . My reading of the record indicates that certainly by 1988, if not earlier, the Corps knew about the nexus between many of the deficiencies noted above and the likelihood of catastrophic flooding. Nevertheless, before Hurricane Katrina, the Corps never completed any study recommending a plan to Congress to mitigate known hazards.

Plaintiffs' Exh. 27 at p. 195, 197.

175.    Dr. Kemp's conclusion is fully supported by the senior Corps official designated to testify on this subject.  Zoltan Montvani agreed that before Hurricane Katrina, the Army Corps neither provided Congress with any reports of studies on wetland preservation nor requested funding from Congress for wetland preservation along the MR-GO.  Plaintiffs' Exh. 57 at 42:13-43:3, 45:3-10, 48:4-16 (30(b)(6) Deposition of Zoltan Montvai, Oct. 7, 2008).

176.    Similarly, the Army Corps took no steps to minimize adverse effects or arrest the decimation of cypress forests, marshes, and swamps that its O&M activities were causing.  Plaintiffs' Exh. 27 (Kemp Expert Report) at pp. 180-195; Exh. 57 at 35:25-37:20 (30(b)(6) Deposition of Zoltan Montvai, Oct. 7, 2008).

177.    The Army Corps could have gone to Congress to ask Congress for authority and money to remediate the adverse effects of the MR-GO, but it did not.  Plaintiffs' Exh. 57 at 41:6-19 (30(b)(6) Deposition of Zoltan Montvai, Oct. 7, 2008).

178.    The Army Corps never asked Congress for authority to remediate the adverse effects of the MR-GO.  Plaintiffs' Exh. 27 at pp. 185-95.

179.    Dr. Kemp concluded that "[f]or a half century, the consistent course of action was no action—despite detailed institutional knowledge decades before Hurricane Katrina that the MRGO, in the Corps's own words in 1988, posed a possible threat 'of catastrophic damage to urban areas by a hurricane surge coming up [MRGO] . . . ."  Plaintiffs' Exh. 27 (Kemp Expert Report) at p. 187.

180.    After Katrina, it took the Corps two more years to complete its reevaluation study, and even though the agency recommended closure to the Congress, "the Corps did not acknowledge the MRGO's contribution to the severe flooding during Hurricane Katrina and its continuing danger; nor did the USACE recommend as elements of its plan essential remedial steps for ecosystem restoration and prevention of storm surge along Reach 1, Reach 2, and the IHNC.  In typical fashion, the agency continues to study these issues to the present day." Plaintiffs' Exh. 27 (Kemp Expert Report) at p. 195.

181.    Plaintiffs' negligence claims are predicated *solely* on the Corps' incompetence during the project's investigation, planning, construction, maintenance and operational phases. First Amended Complaint ¶¶ 1-3, 12, 29-30, 49-50, 52-53, 64-68, 77, 84-86, 91-93, and 102.


Dated: December 18, 2008                              Respectfully submitted,


**O'Donnell & Associates P.C.**

By: s/ Pierce O'Donnell

Pierce O'Donnell (*pro hac vice*)
550 S. Hope St., Suite 1000
Los Angeles, California 90071
Phone:  (213) 347-0290
Fax:  (213) 347-0298

**Law Offices of Joseph M. Bruno**
By: s/ Joseph M. Bruno
Joseph M. Bruno (LSBA No. 3604)
855 Baronne Street
New Orleans, Louisiana 70133
Telephone: (504) 525-1335
Facsimile:  (504) 581-1493

**The Andry Law Firm, LLC**
By: s/ Jonathan B. Andry
Jonathan B. Andry (LSBA No. 20081)
610 Baronne Street
New Orleans, Louisiana 70113
Telephone: (504) 586-8899
Facsimile:  (504) 585-1788

**Domengeaux Wright Roy & Edwards LLC**
Bob F. Wright (LSBA No. 13691)
James P. Roy (LSBA No. 11511)
556 Jefferson Street, Suite 500
P.O. Box 3668
Lafayette, Louisiana 70502-3668
Telephone: (337) 233-3033
Facsimile:  (337) 233-2796

**Fayard & Honeycutt**
Calvin C. Fayard, Jr. (LSBA No. 5486)
Blayne Honeycutt (LSBA No. 18264)
519 Florida Avenue, S.W.
Denham Springs, Louisiana 70726
Telephone: (225) 664-4193
Facsimile:  (225) 664-6925

**Girardi & Keese**
Thomas V. Girardi (*pro hac vice*)
1126 Wilshire Boulevard
Los Angeles, CA 90017
Telephone: (213) 489-5330
Facsimile:  (213) 481-1554

**Ranier, Gayle & Elliot, LLC**
N. Frank Elliot III
1419 Ryan Street
Lake Charles, LA 70601
Telephone: (337) 494-7171
Facsimile: (337).494.7218

**Levin, Papantonio, Thomas, Mitchell Echsner & Proctor, P.A.**
Clay Mitchell (*pro hac vice*)
Matt Schultz (*pro hac vice*)
316 S. Baylen Street, Suite 600
Pensacola, Florida 32502-5996
Telephone: (850) 435-7140
Facsimile:  (850) 436-6123

**McKernan Law Firm**
Joseph Jerry McKernan (LSBA No 10027)
John Smith (LSBA No. 23308)
8710 Jefferson Highway
Baton Rouge, Louisiana 70809
Telephone: (225) 926-1234
Facsimile:  (225) 926-1202

**Gainsburgh, Benjamin, David, Meunier & Warshauer, LLC**
Gerald E. Meunier  (LSBA 9471)
2800 Energy Centre
1100 Poydras Street
New Orleans, Louisiana 70163
Telephone: (504) 522-2304
Facsimile:  (504) 528-9973

**Law Office of Elwood C. Stevens, Jr., a**
**Professional Law Corporation**
Elwood C. Stevens, Jr.  (LSBA No. 12459)
1205 Victor II Boulevard
P.O. Box 2626
Morgan City, Louisiana 70381
Telephone: (985) 384-8611
Facsimile:  (985) 385-4861

**Cotchett, Pitre, Simon & McCarthy**
Joseph W. Cotchett  (*pro hac vice*)
840 Malcolm Road, Suite 200
Burlingame, California 94010
Telephone:  (650) 697-6000
Facsimile:  (650) 697-0577

**Law Office of Frank J. D'Amico, Jr. APLC**
Frank J. D'Amico, Jr. (LSBA No. 17519)
Richard M. Exnicios, Esq. (LSBA No. 25666)
622 Baronne Street
New Orleans, LA 70113
Telephone: (504) 525-9561
Fax: 504-525-9522

**Robinson, Calcagnie & Robinson, Inc.**
Mark Robinson (Cal State Bar No. 54426
620 Newport Center Drive – 7th Floor
Newport Beach, CA 92660
1-888-701-1288

## <u>CERTIFICATE OF SERVICE</u>

I, Pierce O'Donnell, hereby certify that on December 18, 2008, I caused to be served

**PLAINTIFFS' STATEMENT OF UNCONTESTED FACTS IN SUPPORT OF**

**OPPOSITION TO DEFENDANT'S RENEWED MOTION TO DISMISS FOR LACK OF**

**SUBJECT MATTER JURISDICTION OR, IN THE ALTERNATIVE, FOR SUMMARY**

**JUDGMENT**, upon Defendants' counsel, Robin D. Smith, George Carter, Keith Liddle, and

Richard Stone by ECF and email at robin.doyle.smith@usdoj.gov; george.carter@usdoj.gov,

keith.liddle@usdoj.gov, and richard.stone@usdoj.gov.

<u>/s/ Pierce O'Donnell</u>