UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:  KATRINA CANAL BREACHES
CONSOLIDATED LITIGATION

CIVIL ACTION
NUMBER:  05-4182 "K"(2)
JUDGE DUVAL
MAG. WILKINSON

PERTAINS TO:  *Robinson*
(No. 06-2268)

**PLAINTIFFS' RESPONSE TO DEFENDANT UNITED STATES'
STATEMENT OF UNCONTESTED FACTS**

Plaintiffs hereby respond to the Defendant's Statement of Uncontested Facts filed in

support of its Motion for Summary Judgment on the Discretionary Function Exception.

**1.      The construction of the Mississippi River-Gulf Outlet was authorized by
Public Law Number 84-455.  70 Stat. 65 (1956) (Ex. 1).  This law required that construction
"be prosecuted under the direction of the Secretary of the Army and supervision of the
Chief of Engineers, substantially in accordance with the recommendation of the Chief of
Engineers contained in House Document Numbered 245, Eighty-second Congress." *Id.***

Uncontested that Public Law Number 84-455 authorized construction of the MR-GO and

that it also required that construction "be prosecuted under the direction of the Secretary of the

Army and supervision of the Chief of Engineers, substantially in accordance with the

recommendation of the Chief of Engineers contained in House Document Numbered 245,

Eighty-second Congress."

Contested insofar as this fact is misleading and incomplete in that it implies that Public

Law 84-455 was the *only* law or statute that was applicable to the MR-GO's designs,

construction, operation and maintenance.  To the contrary, the MR-GO's design, construction, operation and maintenance were governed by the Fish & Wildlife Coordination Act, NEPA, and a national AND Army Corps wetlands policy, in addition to Public Law 84-455.  *See* Plaintiffs' Motion for Partial Summary Judgment on DFE (Doc No. 16510-2).  Plaintiffs contend that the Army Corps failed to follow the statutory mandates of the FWCA, NEPA, and a national and Army Corps wetlands policy, and because of these failures, the discretionary function and due care exception do not apply.  *Id*.

     **2.**     **In response to a request from Congress for a report as to the "advisability and cost of providing an emergency outlet from the Mississippi River in the interest of national defense and general commerce," the Chief of Engineers recommended construction of a deep-draft channel on the east side of the Mississippi River.  H.R. Doc. No. 82-245 at 4 (1951) (Ex. 23); *see also id.* at 12, 17, 39-43; *cf.* H.R. Doc. No. 71-46, at 1-3, 25 (1930) (Ex. 3).**

     Uncontested.

     **3.**     **The Chief's Report informed Congress that the recommended route ran from the Inner Harbor Navigation Canal eastward along the Intracoastal Waterway to a point near Micheaud before striking a southeasterly course "to and along the south shore of Lake Borgne and through the marshes to and across Chandeleur Sound" to the Gulf of Mexico.  H.R. Doc. No. 82-245 at 5 (Ex. 23); *see also id.* at 38, 43.**

     Uncontested.

4.      **The Chief's Report stated that the recommended channel would be dug "through the marshes."** *Id.* **at 5.**

Uncontested that this is what the quote reads.  Contested in that Defendant's use of this quote implies that Congress was somehow informed of the predicted devastation that the Army Corps's construction of the MR-GO would have on the adjacent wetlands protecting Greater New Orleans.  To the contrary, there is undisputed evidence that the concerns of the United States Department of Interior Fish and Wildlife Service ("FWS") and the Louisiana Department of Wild Life and Fisheries ("Louisiana Department of Wildlife") concerning the impact that the Army Corps's digging "through the marshes" would have on the wetlands was never communicated to Congress before or after the Army Corps submitted H.R. Doc. No. 82-245 (the "1951 MR-GO Report") to Congress, in violation of the FWCA.  *See* Plaintiffs' Uncontested Fact ("PUF") filed in support of their Motion for Partial Summary Judgment (Doc No. 16510-4) Nos. 12, 19, 25, 30.

5.      **The Division Engineer's plan for the MRGO included neither bank protection nor surge barriers.** *See generally* **H.R. Doc. No. 82-245 (Ex. 2)**.

Contested that the H.R. Doc No. 82-245 did not include bank protection:

> Proponents of additional deep-draft outlets have assumed that such channels can be secured and maintained by dredging, but departmental experience in maintenance and improvement of Gulf-coast entrance channels does not support such an assumption where shallow exposed coastal lakes or sounds are encountered.  *It has been demonstrated repeatedly that such channels should be sited through land cuts or provided with effective barriers to preclude return of dredged spoil into dredged channels.  Hence the plan of improvement presented herein for an east-bank outlet and tidewater harbor provides for maximum use of land cuts, for a permanent retention dike across the sound and for jetties at the Gulf entrance.*

*See* Plaintiffs' Exh. 5 at p. 37, ¶59 (emphasis added).

Contested that H.R. Doc. No. 82-245 did not include surge barriers.

> *Shore line changes*—Construction of a deep-draft channel across
> Chandeleur Sound with dredged material deposited seaward of a retention
> dike, as contemplated by the plan of improvement, *will create a*
> *continuous barrier across the sound to intercept prevailing south east*
> *seas, will reduce the magnitude of feeble rotary currents which obtain in*
> *the sound*, and cause no material change in the mainland shore line.

*See* Plaintiffs' Exh. 5 at p. 39, ¶65 (emphasis added).

In addition, there were other Army Corps's MR-GO design memoranda that expressly
included surge barrier structures:  For example, the Lake Pontchartrain, Louisiana and Vicinity
and Mississippi River-Gulf Outlet, Seabrook Lock, Design Memorandum No. 1, General, dated
April 1970 (Plaintiffs' Exh. 96) detailed a surge barrier structure:

a.  "With specific respect to Seabrook Lock, the authorization provides for
construction, operation, and maintenance . . . structure at the lakeward terminus of
the IHNC in the vicinity of Seabrook Bridge in New Orleans, Louisiana . . . It
contemplates that annual costs for operation and maintenance of the lock be borne
entirely by the United States."  *Id.* at p. 1.

b.  "The Lake Pontchartrain Barrier Plain is based upon limiting the entry of
hurricane-driven waters into Lake Pontchartrain, and in order that this may be
accomplished, the MR-GO—IHNC link must be controlled."  *Id.* at p. 8.

c.  "Construction of the MR-GO established a large, deep (36 feet by 500 feet) direct
connection with the highly saline waters of Breton Sound.  Tidal flow in the MR-
GO reaches Lake Pontchartrain via the IHNC, and salinities in the lake and *in the*
*marsh adjacent to the MR-GO have increased significantly since its completion*.
Unless means are provided to restore a favorable salinity regimen, major damage

4

to marine life in the lake *and in the marsh traversed by the MR-GO may be anticipated.*"  *Id*. at pp. 8-9 (emphasis added).

In addition, there were other Army Corps's plans for the MR-GO that expressly included foreshore protection.  Specifically, the Mississippi River-Gulf Outlet, Louisiana, Design Memorandum No. 2, General Supplement No. 4, Foreshore Protection, April 1968 (Plaintiffs' Exh. 97), which stated:

a.  In House Document No. 231, 89th Congress, the project document for the "Lake Pontchartrain, La. And Vicinity," hurricane protection project, the cost for levee foreshore protection along the MR-GO and the Gulf Intracoastal Waterway (GIWW) was included with the portion of the project costs to be distributed in accordance with the 70%-30% formula specified in the authorization.  Local interests expressed concern that the project for the Chalmette area included charges to local interests for foreshore protection along the MR-GO required to protect the levee berm from wind-generated and vessel-generated waves during high tide periods.  Since the existence of the MR-GO dictates the location of that part of the Chalmette levee paralleling the south bank of the MR-GO and adds to the exposure of the levee, local interests considered that the foreshore protection work was not a cost of the hurricane protection project, but a navigation cost [federal cost] to protect the levee against wavewash.  In addition, at the time that the MR-GO was authorized, a levee of substantial dimensions existed within the City of New Orleans for a distance of about 6 miles along what was to become the north bank of the outlet.  The MR-GO exposes the foreshore fronting this levee to direct attack by waves generated by oceangoing vessels.  *Therefore, providing the*

5

> *means for achieving the necessary erosion control for those areas, where such*
>
> *control is essential, is considered to be a function of the MR-GO project.*

Exh. 97 at AFW-341-000000613-14, ¶3 (emphasis added).

b. By ENGCW-OM 1st Indorsement [sic] dated 15 April 1966 to LMVED-A letter dated 21 March 1966, subject "Hurricane Protection – Lake Pontchartrain, La. and Vicinity – Chalmette Area."  The Chief of Engineers directed that the costs for foreshore protection contiguous to the levee plan for the Chalmette area along the MR-GO be charged to the navigation project.

*Id.* at AFW-341-000000614; *see also id.* at AFW-341-000000643.

c. This *directive* was *amplified* and *clarified* by OCE in 1st Indorsement to LMVBC letter of 24 April 1967, subject "Hurricane Protection – Lake Pontchartrain and Vicinity."  Specifically, OCE concluded that the levee foreshore protection along the MR-GO is properly a feature of the Mississippi River-Gulf Outlet project, and the costs for such protection are, *in their entirety*, chargeable to that project.

*Id.* (emphasis added); *see also id.* at AFW-341-000000634, 636, 650-51.

d. In view of the thickness of the organic material along the MR-GO, it is impracticable to extend the foreshore protection to firm material.  However, construction of the foreshore protection dike which will consist of 1.75 feet of riprap on 0.75 feet of shell placed on a 1 on 3 slope between elevations -3.0 and 3.0 is based on experience along the Mississippi River below New Orleans and *recent observations of the magnitude of erosion along the MR-GO.  Accordingly, a foreshore protection dike with a bottom elevation of -3.0 will adequately serve*

> *to prevent erosion of the foreshore area located between the levee and the*
>
> *alignment of the dike, and therefore, preserve the structural integrity of the levee.*

Plaintiffs' Exh. 98 at NED-095-000000337 (Mississippi River-Gulf Outlet, Louisiana, Design
Memorandum No. 2, General Supplement No. 4, Foreshore Protection, April 1968) (emphasis
added).

This is further contested because this statement implies that Congress approved
engineering plans for the MR-GO.  The Division Engineer's Report was merely an
"investigation" and did not include any details about the proposal, including bank protection and
surge barriers.  The engineering for the MR-GO would be prepared by the Army Corps after
authorization.

**6.    The estimated cost for construction of the MRGO was $67,000,000 "exclusive
of aids to navigation, and $1,000,000 annually for maintenance in addition to that now
required . . . ." *Id.* at 5.**

Uncontested.

**7.    The Division Engineer calculated the cost of the project and the benefit/cost
ratio based on his judgment that construction and maintenance of inland sections of the
channel would involve only routine dredging operations.  *Id.* at 33.**

Uncontested.

**8.    The Division Engineer also compared multiple routes in determining where
to construct the MRGO.  *Id.* at 12 (comparing costs and benefits of alternate routes into
account in preparing recommendation), H.R. Doc. No. 82-245 at 39 (Ex. 23) (comparing
east-bank and west-bank costs); *cf.* H.R. Doc. No. 82-245 (Ex. 2) at 2-3 (Bureau of Budget**

**"no objection" letter, comparing costs and benefits),** *id.* **at 33 (considering necessity of**

**protective works in comparing relative "advantage" of west-bank route).**

Uncontested that the Division Engineer compared multiple routes in determining where

to construct the MR-GO.

Contested to the extent that this statement implies that the Army Corps could not

unilaterally and was not mandated to coordinate and consult with the FWS and the Louisiana

Department of Wildlife concerning the multiple proposed routes for the MR-GO.  In fact,

pursuant to the FWCA, the Army Corps was required to (1) coordinate and consult with the FWS

and the Louisiana Department of Wildlife on selecting a proposed route for the MR-GO, and (2)

to report to Congress any concerns raised by these two agencies about the proposed routes of the

MR-GO.

It is undisputed that the Army Corps did not coordinate and consult with the FWS and the

Louisiana Department of Wildlife concerning the MR-GO prior to submitting to Congress the

1951 MR-GO Report.  See Plaintiffs' Statement of Uncontested Facts ("PUF") Nos. 9-12.

Subsequent to the 1951 MR-GO Report, there is evidence of communication between the

Army Corps and the FWS and the Louisiana Department of Wildlife concerning the proposed

routes of the MR-GO.  *See* PUF Nos. 19-20; Defendant's Exh. 28 (MR-GO Design Memo # 2) at

p. 24, ¶61.  Indeed, the FWS and Louisiana Department of Wildlife requested a different route

than the route selected by the Army Corps in order to prevent loss and damage to wildlife

resources.  *See ibid* ("[the FWS's] report made certain general recommendations for mitigation

of losses to fish and wildlife values and proposed an extensive regional study to fully document

existing values over a wide area of the Gulf of Mexico."); *see also id.* at Appendix III, p. 3

(EDP-023-000000783) letter from Louisiana Department of Wildlife  to Army Corps ("it is the

consensus opinion of our staff that the advantages offered by route "D". . . would provide the most suitable materials for confining the anticipated salt water intrusion."); Appendix III, p. 4 (EDP-023-000000784) teletype from FWS to Army Corps ("studies to date indicate route "D" would be significantly less detrimental to fish resources within marsh area than routes "B" [route selected by Army Corps] or E-6. . . .").

In violation of the FWCA, the FWS and Louisiana Department of Wildlife's concerns detailed above were not reported to Congress.  In fact, when the Army Corps communicated with Congress, it expressly omitted any mention of these agencies' concerns of the MR-GO's route and its expected environmental devastation that the selected route would have on the wetlands protecting Greater New Orleans.  *See id.* at Appendix IV, p. 4 (EDP-023-000000796), p. 6 (EDP-023-000000798); p. 7 (EDP-023-000000799) (memorandum from Division Engineer W.A. Carter to the New Orleans District Engineer, "As you know, *we did not furnish any comparative costs estimates or other specific facts in replying to these letters*.") (emphasis added).

**9.      The Chief's recommendation was conditioned, *inter alia*, on the furnishing by "local interests . . . free of cost to the United States all lands, easements, rights-of-way, and spoil-disposal areas for the initial construction, and when as required for subsequent maintenance."  *Id.* at 5.**

Uncontested.

**10.      After authorization, the Corps prepared a series of designs for the MRGO.  *See* MRGO Design Mem. No. 1-A:  Channels Mile 63.77 - Mile 68.85 (Apr. 1957 (rev. Jul. 1957)) (Ex. 25) [hereinafter DM 1-A]; MRGO Design Mem. No. 1-B:  Channels Mile 39.01 - Mile 63.77 (Sept. 1958 (rev. May 1959)) (Ex. 26) [hereinafter DM 1-B]; MRGO Design Mem. No. 1-C: Channels Mile 0 to Mile 36.43 (Bayou La Loutre); Mile 0 to Mile -9.75 (38**

**ft. contour) (Nov. 1959) (Ex. 27) [hereinafter DM 1-C]; MRGO Design Mem. No. 2: Gen'l**

**Design (June 1959) (Ex. 28) [hereinafter DM 2].**

Uncontested that the above described Design Memoranda were prepared.

Contested in that other Design Memoranda pertinent to the MR-GO were also prepared.

*See, e.g.*,:

- MRGO Design Memorandum No. 1-C, Supplement No. 1, Stone Retention Dike

  Extension (Approved Jan. 31, 1966)

- MRGO Design Memorandum No. 1-C, Supplement No. 2, Relocation and

  Modification of Turning Basin (Approved Mar. 17, 1964)

- MRGO Design Memorandum No. 2, Supplements 1 & 2 (June 1954)

- MRGO Design Memorandum No. 2, Supplement 3, Bayou La Loutre Reservation

  (February 1963, Submitted February 29, 1968)

- MR-GO Design Memorandum No. 2, Supplement No. 4, Foreshore Protection

  (April 29, 1968; Approved July 3, 1968) (AFW-341-000000609-658; NED-188-

  000004386)

**11.    "[E]rosion due to wave wash in open areas [was] expected in the upper part**

**of the channel slope where the peat and highly organic clays are exposed." DM 1-A ¶ 16, at**

**7 (Ex. 4); *accord* DM 1-B ¶ 19, at 5 (Ex. 5). Channel protection was considered**

**unnecessary and was not designed because the District Engineer "presumed that sufficient**

**rights of way w[ould] be furnished by local interests to preclude use of channel protection**

**or that additional rights of way w[ould] be furnished when the need ar[ose]." DM 1-A ¶**

**16, at 7; *accord* DM 1-B ¶ 19, at 5; *see also* DM 2 ¶ 47, at 22 (noting that "surface widening**

**due to erosion" was "anticipated" because "[b]ank protection works to prevent this**

**anticipated erosion [had] not [been] recommended as a project feature, nor included in the costs") (Ex. 7).**

Contested as incomplete insofar as there were other Army Corps's MR-GO design memoranda that expressly included surge barrier structures:  For example, the Lake Pontchartrain, Louisiana and Vicinity and Mississippi River-Gulf Outlet, Seabrook Lock, Design Memorandum No. 1, General, dated April 1970 (Plaintiffs' Exh. 96) detailed a surge barrier structure:

a. "With specific respect to Seabrook Lock, the authorization provides for construction, operation, and maintenance . . . structure at the lakeward terminus of the IHNC in the vicinity of Seabrook Bridge in New Orleans, Louisiana . . . It contemplates that annual costs for operation and maintenance of the lock be borne entirely by the United States." *Id.* at p. 1.

b. "The Lake Pontchartrain Barrier Plain is based upon limiting the entry of hurricane-driven waters into Lake Pontchartrain, and in order that this may be accomplished, the MR-GO—IHNC link must be controlled." *Id*. at p. 8.

c. "Construction of the MR-GO established a large, deep (36 feet by 500 feet) direct connection with the highly saline waters of Breton Sound.  Tidal flow in the MR-GO reaches Lake Pontchartrain via the IHNC, and salinities in the lake and *in the marsh adjacent to the MR-GO have increased significantly since its completion*. Unless means are provided to restore a favorable salinity regimen, major damage to marine life in the lake *and in the marsh traversed by the MR-GO may be anticipated.*" *Id*. at pp. 8-9 (emphasis added).

In addition, there were other Army Corps's plans for the MR-GO that expressly included foreshore protection.  Specifically, the Mississippi River-Gulf Outlet, Louisiana, Design Memorandum No. 2, General Supplement No. 4, Foreshore Protection, April 1968 (Plaintiffs' Exh. 97), which stated:

> e.   In House Document No. 231, 89th Congress, the project document for the "Lake Pontchartrain, La. And Vicinity," hurricane protection project, the cost for levee foreshore protection along the MR-GO and the Gulf Intracoastal Waterway (GIWW) was included with the portion of the project costs to be distributed in accordance with the 70%-30% formula specified in the authorization.  Local interests expressed concern that the project for the Chalmette area included charges to local interests for foreshore protection along the MR-GO required to protect the levee berm from wind-generated and vessel-generated waves during high tide periods.  Since the existence of the MR-GO dictates the location of that part of the Chalmette levee paralleling the south bank of the MR-GO and adds to the exposure of the levee, local interests considered that the foreshore protection work was not a cost of the hurricane protection project, but a navigation cost [federal cost] to protect the levee against wavewash.  In addition, at the time that the MR-GO was authorized, a levee of substantial dimensions existed within the City of New Orleans for a distance of about 6 miles along what was to become the north bank of the outlet.  The MR-GO exposes the foreshore fronting this levee to direct attack by waves generated by oceangoing vessels.  *Therefore, providing the means for achieving the necessary erosion control for those areas, where such control is essential, is considered to be a function of the MR-GO project.*

Exh. 97 at AFW-341-000000613-14, ¶3 (emphasis added).

     f.   By ENGCW-OM 1st Indorsement [sic] dated 15 April 1966 to LMVED-A letter dated 21 March 1966, subject "Hurricane Protection – Lake Pontchartrain, La. and Vicinity – Chalmette Area." The Chief of Engineers directed that the costs for foreshore protection contiguous to the levee plan for the Chalmette area along the MR-GO be charged to the navigation project.

*Id.* at AFW-341-000000614; *see also id.* at AFW-341-000000643.

     g.   This *directive* was *amplified* and *clarified* by OCE in 1st Indorsement to LMVBC letter of 24 April 1967, subject "Hurricane Protection – Lake Pontchartrain and Vicinity." Specifically, OCE concluded that the levee foreshore protection along the MR-GO is properly a feature of the Mississippi River-Gulf Outlet project, and the costs for such protection are, *in their entirety*, chargeable to that project.

*Id.* (emphasis added); *see also id.* at AFW-341-000000634, 636, 650-51.

     h.   In view of the thickness of the organic material along the MR-GO, it is impracticable to extend the foreshore protection to firm material. However, construction of the foreshore protection dike which will consist of 1.75 feet of riprap on 0.75 feet of shell placed on a 1 on 3 slope between elevations -3.0 and 3.0 is based on experience along the Mississippi River below New Orleans and *recent observations of the magnitude of erosion along the MR-GO. Accordingly, a foreshore protection dike with a bottom elevation of -3.0 will adequately serve to prevent erosion of the foreshore area located between the levee and the alignment of the dike, and therefore, preserve the structural integrity of the levee.*

Plaintiffs' Exh. 98 at NED-095-000000337 (Mississippi River-Gulf Outlet, Louisiana, Design Memorandum No. 2, General Supplement No. 4, Foreshore Protection, April 1968) (emphasis added).

**12.     The design memoranda included no barriers to impede the flow of water through the channel.  *See* DM 1-A, at 2-9 & Plate 2 (Ex. 4); DM 1-B, at 3 (Ex. 5) & Plates 2-9 (Ex. 26).**

Contested as incomplete as there were other relevant design memoranda concerning the MR-GO that expressly called for barriers that would impede the flow of water through the MR-GO.  Specifically, the Lake Pontchartrain, Louisiana and Vicinity and Mississippi River-Gulf Outlet, Seabrook Lock, Design Memorandum No. 1, General dated April 1970 states that as part of "The Chalmette Area Plan" (which became designated solely as a federal responsibility – *see* foreshore protection discussion below) "With specific respect to Seabrook Lock, the authorization provides for construction, operation, and maintenance . . . structure at the lakeward terminus of the IHNC in the vicinity of Seabrook Bridge in New Orleans, Louisiana . . . It contemplates that annual costs for operation and maintenance of the lock be borne entirely by the United States." (p. 1) "The Lake Pontchartrain Barrier Plain is based upon limiting the entry of hurricane-driven waters into Lake Pontchartrain, and in order that this may be accomplished, the MR-GO—IHNC link must be controlled." (p. 8) "Construction of the MR-GO established a large, deep (36 feet by 500 feet) direct connection with the highly saline waters of Breton Sound. Tidal flow in the MR-GO reaches Lake Pontchartrain via the IHNC, and salinities in the lake and *in the marsh adjacent to the MR-GO have increased significantly since its completion*.  Unless means are provided to restore a favorable salinity regimen, major damage to marine life in the

lake *and in the marsh traversed by the MR-GO may be anticipated.*" (p. 9) (NPM-014-000000276).

13.     **The design memoranda stated that channel protection could "be provided if and when the need for it becomes necessary."  DM 1-A ¶ 16, at 7 (Ex. );** *accord* **DM 1-B ¶ 19, at 5 (Ex. 5).**

Contested as incomplete as incomplete in that there were other MR-GO design memoranda relevant to the MR-GO that expressly included foreshore protection.  Specifically, the Mississippi River-Gulf Outlet, Louisiana, Design Memorandum No. 2, General Supplement No. 4, Foreshore Protection, April 1968 (Plaintiffs' Exh. 97), which stated:

a.   In House Document No. 231, 89th Congress, the project document for the "Lake Pontchartrain, La. And Vicinity," hurricane protection project, the cost for levee foreshore protection along the MR-GO and the Gulf Intracoastal Waterway (GIWW) was included with the portion of the project costs to be distributed in accordance with the 70%-30% formula specified in the authorization.  Local interests expressed concern that the project for the Chalmette area included charges to local interests for foreshore protection along the MR-GO required to protect the levee berm from wind-generated and vessel-generated waves during high tide periods.  Since the existence of the MR-GO dictates the location of that part of the Chalmette levee paralleling the south bank of the MR-GO and adds to the exposure of the levee, local interests considered that the foreshore protection work was not a cost of the hurricane protection project, but a navigation cost [federal cost] to protect the levee against wavewash.  In addition, at the time that the MR-GO was authorized, a levee of substantial dimensions existed within the

City of New Orleans for a distance of about 6 miles along what was to become the

north bank of the outlet.  The MR-GO exposes the foreshore fronting this levee to

direct attack by waves generated by oceangoing vessels.  Therefore, providing the

means for achieving the *necessary* erosion control for those areas, where such

control is *essential*, is considered to be a function of the MR-GO project.

Exh. 97 at AFW-341-000000613-14, ¶3 (emphasis added).

     b.   By ENGCW-OM 1st Indorsement [sic] dated 15 April 1966 to LMVED-A letter

dated 21 March 1966, subject "Hurricane Protection – Lake Pontchartrain, La.

and Vicinity – Chalmette Area."  The Chief of Engineers directed that the costs

for foreshore protection contiguous to the levee plan for the Chalmette area along

the MR-GO be charged to the navigation project.

*Id.* at AFW-341-000000614; *see also id.* at AFW-341-000000643.

     c.   This *directive* was *amplified* and *clarified* by OCE in 1st Indorsement to LMVBC

letter of 24 April 1967, subject "Hurricane Protection – Lake Pontchartrain and

Vicinity."  Specifically, OCE concluded that the levee foreshore protection along

the MR-GO is properly a feature of the Mississippi River-Gulf Outlet project, and

the costs for such protection are, *in their entirety*, chargeable to that project.

*Id.* (emphasis added); *see also id.* at AFW-341-000000634, 636, 650-51.

     d.   In view of the thickness of the organic material along the MR-GO, it is

impracticable to extend the foreshore protection to firm material.  However,

construction of the foreshore protection dike which will consist of 1.75 feet of

riprap on 0.75 feet of shell placed on a 1 on 3 slope between elevations -3.0 and

3.0 is based on experience along the Mississippi River below New Orleans and

> *recent observations of the magnitude of erosion along the MR-GO.  Accordingly,*
> *a foreshore protection dike with a bottom elevation of -3.0 will adequately serve*
> *to prevent erosion of the foreshore area located between the levee and the*
> *alignment of the dike, and therefore, preserve the structural integrity of the levee.*

Plaintiffs' Exh. 98 at NED-095-000000337 (Mississippi River-Gulf Outlet, Louisiana, Design Memorandum No. 2, General Supplement No. 4, Foreshore Protection, April 1968) (emphasis added).

**14.     Construction on the MRGO began in 1958.  MRGO Reconnaissance Report on Channel Bank Erosion at 14 (Feb. 1988) (Ex. 8) [hereinafter 1988 Recon. Rep.]. By mid-1961, the project was 20 percent complete.  H.R. Doc. No. 89-231 at 53 (1965) (Ex. 9).**

Uncontested.

**15.     The channel was opened to traffic in 1963 and reached full project dimensions five years later.   1988 Recon Rep. at 14 (Ex. 8).**

Uncontested that the MR-GO was opened to traffic in 1963 and that it reached full project dimensions five years later.

Contested to the extent that this statement implies that the MR-GO's construction was, in any way, actually completed or finished in 1968 or at any time before Hurricane Katrina.  To the contrary, the MR-GO's construction was never completed and was ongoing from the day construction commenced and until the day Hurricane Katrina struck.  *See* Plaintiffs' Exh. 95 at p. 11-3 (Secretary of the Army Annual Report Fiscal Year 2005): (**Condition as of Sep. 30.** Construction was initiated March 1958.  The channel unit is 90 percent complete and the shiplock unit is 8 percent complete.  The total project is 76 percent complete.") (bold in original).

Plaintiffs also contest this statement to the extent that it implies that the MR-GO stayed at full project dimensions after 1968.  While Plaintiffs have no reason to dispute that the MR-GO reached "full project dimensions" at some date in 1968, Plaintiffs contend that the Army Corps violated the project dimension mandates detailed in the 1951 MR-GO Report (H.R. Doc. No. 82-245) by allowing the MR-GO to greatly exceed authorized project dimensions during its ongoing construction.  *See* PUF Nos. 47, 84.

Specifically, the 1951 MR-GO Report (H.R. Doc. No. 82-245) detailed the MR-GO's authorized dimensions a being "a connecting harbor channel *36 feet deep and 500 feet wide* extending from the existing inner harbor canal to a turning basin south of Micheaud, and a channel *36 feet deep and 500 feet wide* extending as a land and water cut on tangents and easy curves from a turning basin south of Micheaud southeasterly to and along the south shore of Lake Borgne and through the marshes to and through Chandeleur Sound. . . ."  Plaintiffs' Exh. 5 at p. 44, ¶82 (emphasis added).  Public Law Number 84-455 authorized the construction of the MR-GO "substantially in accordance with the recommendations of the Chief of Engineers contained in House Document Number 245. . . ."  Defendant's Exh. 1.

When Katrina struck Greater New Orleans in August 2005 (and while the Army Corps continued its construction), the MR-GO's width had expanded well passed its authorized width of 500 feet to over 2,000-3,000 feet in some locations.  Plaintiffs' Exh. 27 at pp. 189-90; Exh. 100 (Kemp Expert Report) at pp. 78, 161, 169; *see also* Defendant's Exh. 14 (April 22, 2008 Keith O'Cain Depo.) at 87:3-14.  An over 300% increase from the authorized project width is not "substantially in accordance" with Chief of Engineer's recommendations detailed in House Document Number 245.

**16.     The Corps designed the MRGO with a 36-foot depth that would be created and maintained across a 500-foot span by "box cutting" that would result in "theoretical" side slopes not steeper than 1:2.  DM No. 1-A ¶ 7, at 3-4 (Ex. 4); DM No. 1-B ¶ 7, at 2, Endorsement of Div. Eng'r (Oct. 23, 1958) (Ex. 5).**

Uncontested that the authorized depth of the MR-GO was 36 feet and the authorized width was 500 feet.  Uncontested that the MR-GO Design Memorandum contemplated side slopes of 1:2.

Contested that the Design Memoranda sections cited by Defendant prescribed "box cutting" or used the word "theoretical" to describe the slide slopes.  In fact, the Division Engineer's comments in his October 23, 1958 endorsement state that step cuts should be considered "in lieu of making a box cut" based upon test data concerning how the stress of excavation affects the sheer strength of the dredged material.  *See* Defendant's Exh. 26 (DM 1B at Endorsement of Div. Eng'r (Oct. 23, 1958) at ¶2(d).

**17.     Design Memorandum No. 1-C stated that the channel would "have theoretical side slopes of 1 on 2 and have a bottom width of 500 feet."  DM 1-C ¶ 5(a) at 1 (Ex. 6); *accord*  DM 2 ¶ 47, at 22 (Ex. 7) (stating that the "channel slopes should be cut not steeper that 1 on 2").**

Uncontested.

**18.     The depth of the channel was diminished by soils and vegetation carried by winds, waves, and currents from the adjacent marsh and more distant places.  *See* Nov. 14, 2007 30(b)(6) Dep. of Keith O'Cain at 498:8-499:17 (Ex. 10).**

Uncontested that the MR-GO caused the destruction of the soils, vegetation and marshland, which in turn diminished the depth of the channel.

Plaintiffs do contest this statement to the extent that a significant, unstated reason for the loss of vegetation was salt water from the MR-GO.

In particular, the MR-GO caused saltwater from the Gulf of Mexico and Lake Borgne to intrude on the freshwater wetlands of Greater New Orleans, which "contribut[ed] significantly" to mash loss in the area. *See* Plaintiffs' Exh. 83 (1988 Corps Recon. Report) at p. 27 and p. 54 ("Saltwater intrusion into marsh that remains has significantly modified the former fresh/intermediate marsh character of much of the study area."); Defendant's Exh. 35 (1994 Corps Recon. Report) at p. 32; *see also* Plaintiffs' Exh. 83 (1988 Corps Recon. Report) at Appendix "E," U.S. Fish & Wildlife Service, *Planning-Aid Report on Mississippi River-Gulf Outlet, Bank Erosion Reconnaissance Study*, Aug. 1987, at p. 3:

> When the Bayou La Loutre Ridge was breached during construction, saline waters from Breton Sound traveled the length of the waterway. . . . [A 1981 Army Corps] study further suggested that no saltwater wedge exists in the Gulf Outlet and that salinities are uniform from the water surface to the bottom of the waterway. The increase in salinity caused by the Gulf Outlet has had a significant effect on the kind of marsh that vegetates the area. . . . Following project construction, saltwater intrusion caused the freshwater vegetation and a large amount of brackish marsh vegetation in the study area to die. Without the vegetation to hold it, large amounts of organic marsh soil eroded and large areas of marsh became open water. . . .

*See also* Defendant's Exh. 35 (1994 Corps Recon. Report) at p. 18:

> The Mississippi River-Gulf Outlet navigation channel has a more significant effect on salinities because it is a deep draft channel cut through the Bayou La Loutre alluvial ridge to the Gulf of Mexico. Higher salinities cause swamps and marshes to convert to more saline vegetation types which are less robust and more susceptible to erosion.

*Id*. at p. 21 and Appendix "B" at B-5 ("The MR-GO Outlet channel provides a direct route for saltwater to enter the estuarine marsh system as well as a route for freshwater to exit the estuarine system and enter the Gulf of Mexico. . . . Since the construction of the MR-GO, the

amount of saline marsh has increased and fresh marshes have been converted to brackish marshes and some intermediate marsh.").

**19.     Erosion and deposition occurred for a number of reasons, including: (1) natural subsidence and sea level rise; (2) wind-driven waves; (3) wave wash caused by vessel activity; and (4) dredging activities.  *See* May 21, 2008 Dep. of Edmond Russo at 42:1-43:18 (Ex. 11); Apr. 4, 2008 Dep. of Chris Accardo at 27:14-22 (Ex. 12); *cf.* Sept. 16, 2007 Kemp Report ¶ 50, at 38 ("The reason for this dramatic increase is the erosion effect of ship traffic and waves in [sic] the unstable banks and the MR-GO's delivery of saltwater to Greater New Orleans' wetlands.") (Ex. 13).**

Contested as incomplete.  The MR-GO was also responsible for the erosion and deposition of soils, vegetation and marshland.

In particular, the MR-GO caused saltwater from the Gulf of Mexico and Lake Borgne to intrude on the freshwater wetlands of Greater New Orleans, which "contribut[ed] significantly" to mash loss in the area.  *See* Plaintiffs' Exh. 83 (1988 Corps Recon. Report) at p. 27 and p. 54 ("Saltwater intrusion into marsh that remains has significantly modified the former fresh/intermediate marsh character of much of the study area."); Defendant's Exh. 35 (1994 Corps Recon. Report) at p. 32; *see also* Plaintiffs' Exh. 83 (1988 Corps Recon. Report) at Appendix "E," U.S. Fish & Wildlife Service, *Planning-Aid Report on Mississippi River-Gulf Outlet, Bank Erosion Reconnaissance Study*, Aug. 1987, at p. 3:

> When the Bayou La Loutre Ridge was breached during construction, saline waters from Breton Sound traveled the length of the waterway. . . . [A 1981 Army Corps] study further suggested that no saltwater wedge exists in the Gulf Outlet and that salinities are uniform from the water surface to the bottom of the waterway.  The increase in salinity caused by the Gulf Outlet has had a significant effect on the kind of marsh that vegetates the area. . . .  Following project construction, saltwater intrusion caused the freshwater vegetation and a large amount of brackish marsh

vegetation in the study area to die.  Without the vegetation to hold it, large amounts of organic marsh soil eroded and large areas of marsh became open water. . . .

*See also* Defendant's Exh. 35 (1994 Corps Recon. Report) at p. 18:

The Mississippi River-Gulf Outlet navigation channel has a more significant effect on salinities because it is a deep draft channel cut through the Bayou La Loutre alluvial ridge to the Gulf of Mexico.  Higher salinities cause swamps and marshes to convert to more saline vegetation types which are less robust and more susceptible to erosion.

*Id*. at p. 21 and Appendix "B" at B-5 ("The MR-GO Outlet channel provides a direct route for saltwater to enter the estuarine marsh system as well as a route for freshwater to exit the estuarine system and enter the Gulf of Mexico. . . .  Since the construction of the MR-GO, the amount of saline marsh has increased and fresh marshes have been converted to brackish marshes and some intermediate marsh.").

**20. The top width of the MRGO expanded as a result of these processes.  *E.g.*, Apr. 22, 2008 Dep. of Keith O'Cain at 86:24-87:8 (Ex. 14).**

Contested as it is unclear what Defendant means by "these processes."

Contested in that the excerpt of deposition transcript cited by Defendant does not include any mention of what "these processes" may or may not be, and only concerns the undisputed fact that the MR-GO expanded in some sections well beyond its authorized project dimensions to more than 2,000 feet in some portions.

Contested to the extent that it is implied that "these processes" were unavoidable and "ineradicable."  The Army Corps was well aware for decades of the feasible mitigation measures to prevent bank erosion.  PUF 163.

**21. The Corps repeatedly dredged the MRGO to restore the waterway to the prescribed depth.  Nov. 14, 2007 30(b)(6) O'Cain Dep. at 498:8-499:17 (Ex. 10).**

Contested.  The Army Corps also performed a significant amount of over dredging to obtain construction material for the LPV "levees."  *See* Plaintiffs' Exh. 83 (1988 Corps Recon. Report) at p. 16.  Specifically, the Army Corps dredged the MR-GO well beyond the authorized depth of 36 feet.  In a letter dated June 17, 2004 to Pete Savoy, Coastal Zone Management, St. Bernard Parish, Don T. Riley, Brigadier General, U.S. President Designee, Mississippi River Commission stated "dredging below -36 ft. MLG occurred during construction of the hurricane protection levee along the MRGO in St. Bernard and Orleans Parishes.  During the 1960s to 1980s, the Corps dredged the MRGO between miles 66 and 46 to obtain borrow material for construction of the hurricane protection levees.  Borrow-dredging was conducted to as deep as -70 ft. MLG.  Currently, portions of the channel in these limits remain deeper than -36 ft. MLG."  Plaintiffs' Exh. 99 at p. 3.

**22. Without repeated dredging, the ongoing shoaling would have prevented ships from using the channel.  *Id.* at 494:13-20; 498:8-499:17.**

Uncontested.

**23. Contractors were authorized to use a box cut method of dredging.  *See* Mar. 31, 2008 Dep. of Richard Broussard at 54:21-55:16 (Ex. 15); Apr. 22, 2008 O'Cain Dep. at 29:17-30:6 (Ex. 14).**

Uncontested.

**24. Box cutting was approved because it was expected to yield a 1 on 2 slope and was less costly than stepping cuts up gradually along the diagonal.  *See* Apr. 22, 2008, O'Cain Dep. at 31:20-21; 57:10-15; 58:24 – 60:8 (Ex. 14); *cf.* USACE Engineer Reg. 1130-2-520 ch. 8-2a(10) (allowing box cutting on navigable waterways) [hereinafter ER] (Ex. 16); Ex. 17 (illustration of typical box cut design section).**

Uncontested.

**25. As a matter of policy, the Corps authorized overdepth dredging to account for inaccuracies in dredging.  ER 1130-2-307 ¶ 9 [hereinafter ER] (Ex. 18);  *see also* DM 1-A ¶ 7, at 3-4 (Ex. 4); DM 1-B ¶ 7, at 2 (Ex. 5); DM 1-C ¶ 5(a), at 1 (Ex. 6); DM 2 ¶ 46-48, at 21-22 (Ex. 7); *cf.* ER-1130-2-520 ch. 8-2a(10) (allowing overdepth dredging on navigable waterways) (Ex. 16); ER-1130-2-307 ¶ 9a, at F-3 (1968); Mar. 31, 2008 Broussard Dep. at 23:25-24:11 (Ex. 15) (overdepth dredging provides a working tolerance); Apr. 22, 2008 O'Cain Dep. at 10:25 – 11:1 (Ex. 14) (allowable MRGO overdepth was two feet).**

Uncontested.

**26. The Corps authorized advance maintenance dredging.  ER 1130-2-520 ch. 8-2a(7) (Ex. 16); ER 1130-2-307 ¶ 9(g) (Ex. 18); *see also* Apr. 22, 2008 O'Cain Dep. at 10:8–11:2 (Ex. 14); *cf.* DM No. 1-A, ¶ 7, at 4 (advance maintenance depth was initially two feet) (Ex. 4); DM 1-B, ¶ 7 (Ex. 5), at 2; DM 1-C, ¶ 5(a), at 1 (Ex. 6); Apr. 22, 2008 O'Cain Dep. at 10:17 – 11:2 (advance maintenance depth was increased to four feet).**

Uncontested that the Corps authorized advanced maintenance dredging.

Contested that this authorization of advanced maintenance dredging was proper if the purpose was to provide channel dimensions for the larger ships traversing the MR-GO. Specifically, the Army Corps stated that "the MR-GO channel was designed for a relatively small general cargo vessel (freighter).  However, ship sizes have increased and larger container vessels move over the MR-GO to and from several container facilities located in New Orleans." Plaintiffs' Exh. 83 (1988 Corps Recon. Report) at p. 26.  The Army Corps's Navigation and Dredging Operations and Maintenance Policies (USACE Engineer Reg. 1130-2-520, Defendant's Exh. 16) at p. 8-2a(7) states that "[a]dvance maintenance [dredging] *shall not* be

used to provide navigation channel dimensions *for vessels that exceed the design limitations of the project*." (emphasis added). Accordingly, because the MR-GO was only designed for small general cargo vessels, any instance or event where the Army Corps performed advanced maintenance dredging in order to provide channel dimensions for larger vessels that exceeded the MR-GO's design limitations, the Army Corps violated its own dredging policy.

**27. Wave wash from ships traveling on the MRGO caused bank erosion, diminishing the depth of the channel, widening the top, and eroding adjacent marsh. *See* 1988 Recon. Rep. at 26 (Ex. 8); MRGO Reconnaissance Report on Channel Bank Erosion at 1 (Jan. 1994) (Ex. 20) [hereinafter 1994 Recon. Rep.].**

Uncontested that wave wash from ships traveling on the MR-GO was one of the causes of bank erosion that diminished the channel's depth, widened the top, and eroded adjacent marsh.

Contested in that the MR-GO itself was also a substantial factor in causing these exact same problems. In particular, the MR-GO caused saltwater from the Gulf of Mexico and Lake Borgne to intrude on the freshwater wetlands of Greater New Orleans, which "contribut[ed] significantly" to mash loss in the area. *See* Plaintiffs' Exh. 83 (1988 Corps Recon. Report) at p. 27 and p. 54 ("Saltwater intrusion into marsh that remains has significantly modified the former fresh/intermediate marsh character of much of the study area."); Defendant's Exh. 35 (1994 Corps Recon. Report) at p. 32; *see also* Plaintiffs' Exh. 83 (1988 Corps Recon. Report) at Appendix "E," U.S. Fish & Wildlife Service, *Planning-Aid Report on Mississippi River-Gulf Outlet, Bank Erosion Reconnaissance Study*, Aug. 1987, at p. 3:

> When the Bayou La Loutre Ridge was breached during construction,
> saline waters from Breton Sound traveled the length of the waterway. . . .
> [A 1981 Army Corps] study further suggested that no saltwater wedge
> exists in the Gulf Outlet and that salinities are uniform from the water

surface to the bottom of the waterway.  The increase in salinity caused by the Gulf Outlet has had a significant effect on the kind of marsh that vegetates the area. . . .  Following project construction, saltwater intrusion caused the freshwater vegetation and a large amount of brackish marsh vegetation in the study area to die.  Without the vegetation to hold it, large amounts of organic marsh soil eroded and large areas of marsh became open water. . . .

*See also* Defendant's Exh. 35 (1994 Corps Recon. Report) at p. 18:

The Mississippi River-Gulf Outlet navigation channel has a more significant effect on salinities because it is a deep draft channel cut through the Bayou La Loutre alluvial ridge to the Gulf of Mexico.  Higher salinities cause swamps and marshes to convert to more saline vegetation types which are less robust and more susceptible to erosion.

*Id*. at p. 21 and Appendix "B" at B-5 ("The MR-GO Outlet channel provides a direct route for saltwater to enter the estuarine marsh system as well as a route for freshwater to exit the estuarine system and enter the Gulf of Mexico. . . .  Since the construction of the MR-GO, the amount of saline marsh has increased and fresh marshes have been converted to brackish marshes and some intermediate marsh.").

**28. The Corps studied various alternatives for stabilizing the banks and found that some methods were "prohibitively expensive" and others lacked the necessary support of a non-federal public body.  *See id.* at 35-71; 1988 Recon. Rep. at 30-62 (Ex. 29); 1994 Recon. Rep. at 1-2, 70-71 (Ex. 35); *cf.* 33 U.S.C. § 426i(a) (authorization to "implement . . . measures for the prevention or mitigation of shore damages attributable to Federal navigation works" is contingent upon "a non-Federal public body['s] agree[ing] to operate and maintain such measures").**

Contested to the extent that the Army Corps (via the Chief of Engineers) never engaged in a deliberative process by which it made any finding about the advisability of alternative means for bank stabilization.

Contested to the extent that it is implied that remedial measures for the 100% federally funded and federally owned MR-GO had to be operated and maintained by a "non-Federal public body."

Contested as incomplete in that there were other Army Corps's MR-GO Design Memoranda that expressly included foreshore protection.  Specifically, the Mississippi River-Gulf Outlet, Louisiana, Design Memorandum No. 2, General Supplement No. 4, Foreshore Protection, April 1968 (Plaintiffs' Exh. 97), which stated:

    a.  In House Document No. 231, 89th Congress, the project document for the "Lake Pontchartrain, La. And Vicinity," hurricane protection project, the cost for levee foreshore protection along the MR-GO and the Gulf Intracoastal Waterway (GIWW) was included with the portion of the project costs to be distributed in accordance with the 70%-30% formula specified in the authorization.  Local interests expressed concern that the project for the Chalmette area included charges to local interests for foreshore protection along the MR-GO required to protect the levee berm from wind-generated and vessel-generated waves during high tide periods.  Since the existence of the MR-GO dictates the location of that part of the Chalmette levee paralleling the south bank of the MR-GO and adds to the exposure of the levee, local interests considered that the foreshore protection work was not a cost of the hurricane protection project, but a navigation cost [federal cost] to protect the levee against wavewash.  In addition, at the time that the MR-GO was authorized, a levee of substantial dimensions existed within the City of New Orleans for a distance of about 6 miles along what was to become the north bank of the outlet.  The MR-GO exposes the foreshore fronting this levee to

direct attack by waves generated by oceangoing vessels.  Therefore, providing the

means for achieving the *necessary* erosion control for those areas, where such

control is *essential*, is considered to be a function of the MR-GO project.

Exh. 97 at AFW-341-000000613-14, ¶3 (emphasis added).

b.   By ENGCW-OM 1st Indorsement [sic] dated 15 April 1966 to LMVED-A letter

dated 21 March 1966, subject "Hurricane Protection – Lake Pontchartrain, La.

and Vicinity – Chalmette Area."  The Chief of Engineers directed that the costs

for foreshore protection contiguous to the levee plan for the Chalmette area along

the MR-GO be charged to the navigation project.

*Id.* at AFW-341-000000614; *see also id.* at AFW-341-000000643.

c.   This *directive* was *amplified* and *clarified* by OCE in 1st Indorsement to LMVBC

letter of 24 April 1967, subject "Hurricane Protection – Lake Pontchartrain and

Vicinity."  Specifically, OCE concluded that the levee foreshore protection along

the MR-GO is properly a feature of the Mississippi River-Gulf Outlet project, and

the costs for such protection are, *in their entirety*, chargeable to that project.

*Id.* (emphasis added); *see also id.* at AFW-341-000000634, 636, 650-51.

d.   In view of the thickness of the organic material along the MR-GO, it is

impracticable to extend the foreshore protection to firm material.  However,

construction of the foreshore protection dike which will consist of 1.75 feet of

riprap on 0.75 feet of shell placed on a 1 on 3 slope between elevations -3.0 and

3.0 is based on experience along the Mississippi River below New Orleans and

*recent observations of the magnitude of erosion along the MR-GO.  Accordingly,*

*a foreshore protection dike with a bottom elevation of -3.0 will adequately serve*

*to prevent erosion of the foreshore area located between the levee and the*

*alignment of the dike, and therefore, preserve the structural integrity of the levee.*

Plaintiffs' Exh. 98 at NED-095-000000337 (Mississippi River-Gulf Outlet, Louisiana,

Design Memorandum No. 2, General Supplement No. 4, Foreshore Protection, April 1968)

(emphasis added).

Dated: December 18, 2008                                    Respectfully submitted,


**O'Donnell & Associates P.C.**

By: s/ Pierce O'Donnell

Pierce O'Donnell (*pro hac vice*)
550 S. Hope St., Suite 1000
Los Angeles, California 90071
Phone:  (213) 347-0290
Fax:  (213) 347-0298


**Law Offices of Joseph M. Bruno**
By: s/ Joseph M. Bruno
Joseph M. Bruno (LSBA No. 3604)
855 Baronne Street
New Orleans, Louisiana 70133
Telephone: (504) 525-1335
Facsimile:  (504) 581-1493

**The Andry Law Firm, LLC**                  **Domengeaux Wright Roy & Edwards LLC**
By: s/ Jonathan B. Andry                      Bob F. Wright (LSBA No. 13691)
Jonathan B. Andry (LSBA No. 20081)           James P. Roy (LSBA No. 11511)
610 Baronne Street                            556 Jefferson Street, Suite 500
New Orleans, Louisiana 70113                  P.O. Box 3668
Telephone: (504) 586-8899                     Lafayette, Louisiana 70502-3668
Facsimile:  (504) 585-1788                    Telephone: (337) 233-3033
                                              Facsimile:  (337) 233-2796

**Fayard & Honeycutt**                        **Girardi & Keese**
Calvin C. Fayard, Jr. (LSBA No. 5486)         Thomas V. Girardi (*pro hac vice*)
Blayne Honeycutt (LSBA No. 18264)             1126 Wilshire Boulevard
519 Florida Avenue, S.W.                      Los Angeles, CA 90017
Denham Springs, Louisiana 70726               Telephone: (213) 489-5330

Telephone: (225) 664-4193
Facsimile:  (225) 664-6925

**Ranier, Gayle & Elliot, LLC**
N. Frank Elliot III
1419 Ryan Street
Lake Charles, LA 70601
Telephone: (337) 494-7171
Facsimile: (337).494.7218

**McKernan Law Firm**
Joseph Jerry McKernan (LSBA No 10027)
John Smith (LSBA No. 23308)
8710 Jefferson Highway
Baton Rouge, Louisiana 70809
Telephone: (225) 926-1234
Facsimile: (225) 926-1202

**Law Office of Elwood C. Stevens, Jr., a Professional Law Corporation**
Elwood C. Stevens, Jr.  (LSBA No. 12459)
1205 Victor II Boulevard
P.O. Box 2626
Morgan City, Louisiana 70381
Telephone: (985) 384-8611
Facsimile:  (985) 385-4861

**Law Office of Frank J. D'Amico, Jr. APLC**
Frank J. D'Amico, Jr. (LSBA No. 17519)
Richard M. Exnicios, Esq. (LSBA No. 25666)
622 Baronne Street
New Orleans, LA 70113
Telephone: (504) 525-9561
Fax: 504-525-9522

Facsimile:  (213) 481-1554

**Levin, Papantonio, Thomas, Mitchell Echsner & Proctor, P.A.**
Clay Mitchell (*pro hac vice*)
Matt Schultz (*pro hac vice*)
316 S. Baylen Street, Suite 600
Pensacola, Florida 32502-5996
Telephone: (850) 435-7140
Facsimile:  (850) 436-6123

**Gainsburgh, Benjamin, David, Meunier & Warshauer, LLC**
Gerald E. Meunier  (LSBA 9471)
2800 Energy Centre
1100 Poydras Street
New Orleans, Louisiana 70163
Telephone: (504) 522-2304
Facsimile:  (504) 528-9973

**Cotchett, Pitre, Simon & McCarthy**
Joseph W. Cotchett  (*pro hac vice*)
840 Malcolm Road, Suite 200
Burlingame, California 94010
Telephone:  (650) 697-6000
Facsimile:  (650) 697-0577

**Robinson, Calcagnie & Robinson, Inc.**
Mark Robinson (Cal State Bar No. 54426
620 Newport Center Drive – 7th Floor
Newport Beach, CA 92660
1-888-701-1288

## CERTIFICATE OF SERVICE

I, Pierce O'Donnell, hereby certify that on December18, 2008, I caused to be served

**PLAINTIFFS' RESPONSE TO DEFENDANT UNITED STATES' STATEMENT OF**

**UNCONTESTED FACTS**, upon Defendants' counsel, Robin D. Smith, George Carter, Keith

Liddle, and Richard Stone by ECF and email at robin.doyle.smith@usdoj.gov;

george.carter@usdoj.gov, keith.liddle@usdoj.gov, and richard.stone@usdoj.gov.

/s/ Pierce O'Donnell