| 82d Congress | HOUSE OF REPRESENTATIVES | Document |
|---|---|---|
| *1st Session* | | No. 245 |

# MISSISSIPPI RIVER-GULF OUTLET

## LETTER

### FROM

# THE SECRETARY OF THE ARMY

#### TRANSMITTING

A LETTER FROM THE CHIEF OF ENGINEERS, UNITED STATES ARMY, DATED MAY 5, 1948, SUBMITTING A REPORT, TOGETHER WITH ACCOMPANYING PAPERS AND AN ILLUSTRATION ON A REVIEW OF REPORTS ON, AND A PRELIMINARY EXAMINATION AND SURVEY OF, THE MISSISSIPPI RIVER–GULF OUTLET AND THE MOBILE TO NEW ORLEANS INTRACOASTAL WATERWAY, REQUESTED BY RESOLUTIONS OF THE COMMITTEE ON RIVERS AND HARBORS, HOUSE OF REPRESENTATIVES, ADOPTED ON MAY 5, 1943, AND THE COMMITTEE ON COMMERCE, UNITED STATES SENATE, ADOPTED ON APRIL 19, 1943, AND ALSO AUTHORIZED BY THE RIVER AND HARBOR ACT APPROVED ON MARCH 2, 1945

October 1, 1951.—Referred to the Committee on Public Works and ordered to be printed, with one illustration

## LETTER OF TRANSMITTAL

DEPARTMENT OF THE ARMY,
*Washington 25, D. C., September 25, 1951.*

The SPEAKER OF THE HOUSE OF REPRESENTATIVES.

DEAR MR. SPEAKER: I am transmitting herewith a report dated May 5, 1948, from the Chief of Engineers, United States Army, together with accompanying papers and an illustration, on a review of reports on, and a preliminary examination and survey of, the Mississippi River-Gulf outlet. This investigation was requested by resolutions of the Committee on Rivers and Harbors, House of Representatives, adopted on May 5, 1943, and the Committee on Commerce, United States Senate, adopted on April 19, 1943, and also authorized by the River and Harbor Act approved on March 2, 1945.

In accordance with section 1 of Public Law 14, Seventy-ninth Congress, the views of the Governor of the State of Louisiana are set forth in the enclosed communication.

89600—51——1

1

Prod. # MRGOX7284

The Bureau of the Budget makes certain comments on the report and advises that there is no objection to authorization of the recommended works, with the understanding, however, that no appropriation for construction of the project will be sought until such time as the budgetary situation clearly makes possible the initiation of such improvements. The complete views of the Bureau of the Budget are contained in the attached copy of its letter.

Sincerely yours,

FRANK PACE, Jr.,
*Secretary of the Army.*

---

### COMMENTS OF THE BUREAU OF THE BUDGET

EXECUTIVE OFFICE OF THE PRESIDENT,
BUREAU OF THE BUDGET,
*Washington 25, D. C., September 17, 1951.*

The honorable the SECRETARY OF THE ARMY.

MY DEAR MR. SECRETARY: Reference is made to Secretary Royall's letter dated May 12, 1948, submitting the proposed report of the Chief of Engineers on the Mississippi River-Gulf outlet, requested by resolutions of the Committee on Rivers and Harbors, House of Representatives, adopted May 5, 1943, and the Committee on Commerce, United States Senate, adopted April 19, 1943, and also authorized by the River and Harbor Act approved March 2, 1945.

The Chief of Engineers recommends modification of the existing project for the Mississippi River, Baton Rouge to the Gulf of Mexico, to provide for construction of two new features:

(1) A seaway canal, 36 feet deep and 500 feet wide, extending 70 miles as a land and water cut from Michoud southeasterly to Lake Borgne, and across Chandeleur Sound to the 38-foot contour in the Gulf of Mexico, with protective jetties, a permanent retention dike through Chandeleur Sound, and a wing dike along the islands as required.

(2) An inner tidewater harbor consisting of a 1,000- by 2,000-foot turning basin 36 feet deep at the landward end of the seaway canal, and a connecting channel 36 feet deep and 500 feet wide extending westerly along the Gulf Intracoastal Waterway from the turning basin to the Industrial Canal.

The plan also provides for the future construction of a channel and a lock at Meraux to furnish an additional connection between the tidewater harbor and the river. The results of this project would be, therefore, a new harbor at New Orleans and a new entrance channel entirely separate from the Mississippi River. The new harbor and channel would supplement but not replace the present port facilities at New Orleans and the present entrance channel in the river.

The Federal cost of the recommended project is estimated on the basis of 1948 prices at $67,000,000 for construction, with annual charges of $4,004,000, including $1,000,000 for maintenance. The estimated non-Federal cost is $610,000 with annual charges of $23,000.

The prospective tangible annual benefits total $5,835,000. These include $3,250,000 savings in ship turn-round time; $950,000 savings due primarily to relief of congestion at existing general cargo terminals and in the landward access facilities to the present wharves; and

Prod. # MRGOX7285

$1,635,000 from reduced sailing time of coastwise vessels, reductions in hazards to navigation, savings in terminal handling charges and annual charges on wharves, and enhancement in value of water-front property.

The economic justification for the project as presented in the report is based largely on savings to shipping and ship-borne commodities once they reach the harbor and the direct monetary benefits from the outlet channel to the Gulf when considered as a separate incremental feature would not appear to warrant the large ultimate cost. However, while the inner harbor basin part of the plan can be operated feasibly as a separate unit without the seaway through use of existing and proposed connections to the Intracoastal Waterway and the Mississippi River, it is apparent that many of the advantages of convenience and efficiency which could be offered by the inner harbor would be lost without the tidal connection and that the economic benefits of the combined harbor and channel project would appear to justify its costs.

It is considered that the inner harbor and outlet channel works, taken together, are valuable long-range improvements which may be added to the backlog of work to be undertaken as conditions permit. Accordingly, you are advised that there would be no objection to authorization of the recommended works, with the understanding, however, that no appropriation for construction of the project will be sought until such time as the budgetary situation clearly makes possible the initiation of such improvements.

Sincerely yours,

ELMER B. STATTS,
*Acting Director.*

---

### COMMENTS OF THE GOVERNOR OF LOUISIANA

[Telegram]

BATON ROUGE, LA., *April 28, 1948.*

Lt. Gen. R. A. WHEELER,
Chief of Engineers, United States Army,
Washington, D. C.:

Reference is made to the review of reports on the Mississippi River-Gulf and Mobile to New Orleans Intracoastal Waterway as proposed by the Chief of Engineers, United States Army.

I am familiar with the provisions of this proposed report and thoroughly concur in the views and recommendations expressed therein. The project recommended will be of inestimable benefit to the State of Louisiana and to the Nation. A tidewater channel to the sea will permit rapid development of sorely needed additional port facilities by the Board of Commissioners, Port of New Orleans, and will provide great additional benefits to the port.

Support of the State of Louisiana for a tidewater canal from New Orleans to the Gulf on the eastern side of the Mississippi River is well shown by Concurrent Resolution No. 18 of the Louisiana Legislature of 1944, in which it was resolved that the Governor of Louisiana be specifically empowered to aid and assist the Federal Government in obtaining and completing such a project.

JAMES H. DAVIS,
*Governor of Louisiana.*

Prod. # MRGOX7286

4           MISSISSIPPI RIVER-GULF OUTLET

REPORT OF THE CHIEF OF ENGINEERS, UNITED STATES ARMY

DEPARTMENT OF THE ARMY,
OFFICE OF THE CHIEF OF ENGINEERS,
*Washington, D. C., May 5, 1948.*

Subject: Mississippi River-Gulf outlet and the Mobile to New Orleans
Intracoastal Waterway.

To: The Secretary of the Army.

1. There is submitted herewith for transmission to Congress the
report of the Board of Engineers for Rivers and Harbors in response
to resolution of the Committee on Commerce of the United States
Senate, adopted April 19, 1943, requesting the Board to review the
reports on Mississippi River-Gulf outlet submitted in Committee on
Rivers and Harbors, House of Representatives, Document No. 46,
Seventy-first Congress, second session, and previous reports, and to
review the reports on the Mobile, Ala., to New Orleans Intracoastal
Waterway submitted in the report of the Chief of Engineers dated
April 27, 1942, and previous reports, with a view to determining
whether any modification of the recommendations contained therein
is advisable at this time, particularly with respect to the advisability
and cost of providing an emergency outlet from the Mississippi River
in the interest of national defense and general commerce by the con-
struction and maintenance of a permanent deep-draft channel 40 feet
deep or of such lesser depth as may be determined to be an economical
ship channel, from the Industrial Canal, New Orleans, La., eastward
along the authorized route of the Intracoastal Waterway to a point
at or near the Mississippi Sound, mouth of the Rigolets, thence to the
40-foot contour in the vicinity of the Government light at the north-
ern extremity of the Chandeleur Islands; and also a resolution of the
Committee on Rivers and Harbors of the House of Representatives,
adopted May 5, 1943, requesting the Board to review the reports on
Mississippi River-Gulf outlet submitted in Committee on Rivers and
Harbors, House of Representatives, Document No. 46, Seventy-first
Congress, second session, and previous reports; and to review the
reports on the Mobile, Ala., to New Orleans Intracoastal Waterway
submitted in the report of the Chief of Engineers dated April 27, 1942,
and previous reports, with a view to determining whether any modifi-
cation of the recommendations contained therein is advisable at this
time, particularly with respect to the advisability and cost of providing
an emergency outlet from the Mississippi River in the interest of
national defense and general commerce by the construction and main-
tenance of a permanent deep-draft channel 40 feet deep or of such
lesser depth as may be determined to be an economical ship channel,
from the Industrial Canal, New Orleans, La., eastward along the
authorized route of the Intracoastal Waterway to a point at or near
the Mississippi Sound, mouth of the Rigolets, thence to the 40-foot
contour in the vicinity of the Government light at the northern ex-
tremity of the Chandeleur Islands.  It is also in review of the report
of the division engineer on a ship canal to extend from the Mississippi
River at a point at or near the city of New Orleans, La., to the Gulf
of Mexico, by way of the best available route or routes, authorized
by the River and Harbor Act approved March 2, 1945.

Prod. # MRGOX7287

2. I concur in general in the views and recommendations of the Board. It is noted that the conditions of local cooperation prescribed by the Board include among other requirements that local interests make necessary highway changes. The existing project for the Gulf Intracoastal Waterway provides, however, for the United States to construct a highway bridge over this section of that waterway. Since existing congressional authority specifically provides for the construction of a highway crossing by the United States, it is considered that the project for the ship channel should carry similar authority.

3. I recommend modification of the existing project for Mississippi River, Baton Rouge, to the Gulf of Mexico, to provide for construction of a seaway canal 36 feet deep and 500 feet wide extending 70 miles as a land and water cut on tangents and easy curves from a point south of the Intracoastal Waterway at Micheaud southeasterly to and along the south shore of Lake Borgne and through the marshes to and across Chandeleur Sound to Chandeleur Island at or north of Errol Island, thence increasing gradually to a width of 600 feet and depth of 38 feet in the Gulf of Mexico, with protective jetties at the entrance, a permanent retention dike through Chandeleur Sound, and a wing dike along the islands as required; a turning basin at the landward end of the seaway canal, 36 feet deep, 1,000 feet wide and 2,000 feet long; and a connecting channel 36 feet deep and 500 feet wide extending westerly along the Gulf Intracoastal Waterway from the turning basin to the Industrial Canal, including construction of a suitable highway bridge with approaches to carry Louisiana State Highway 61 over the channel; all generally in accordance with the plans of the division engineer and with such modifications thereof as in the discretion of the Secretary of the Army and the Chief of Engineers may be desirable, at an estimated cost to the United States of $67,-000,000 for construction exclusive of aids to navigation, and $1,000,000 annually for maintenance in addition to that now required; provided that, prior to initiation of construction, local interests furnish free of cost to the United States all lands, easements, rights-of-way, and spoil-disposal areas for the initial construction, and when and as required for subsequent maintenance; furnish assurances satisfactory to the Secretary of the Army that they will accept ownership of the highway bridge and approaches upon completion of construction, together with maintenance, operation, and future replacement or alteration as may be required; will provide and maintain any other bridges required over the waterway, and accomplish all necessary utility and other highway relocations and alterations and the maintenance thereof; will hold and save the United States free from all claims for damages due to construction, maintenance, and operation of the project; and will construct, maintain, and operate terminal facilities commensurate with requirements of the expanded port.

R. A. WHEELER,
*Lieutenant General,*
*Chief of Engineers.*

Prod. # MRGOX7288

## REPORT OF THE BOARD OF ENGINEERS FOR RIVERS AND HARBORS

DEPARTMENT OF THE ARMY,
THE BOARD OF ENGINEERS FOR RIVERS AND HARBORS,
*Washington, D. C., April 20, 1948.*

Subject: Mississippi River-Gulf outlet and the Mobile to New Orleans Intracoastal Waterway.

To: The Chief of Engineers, United States Army.

1. This report is in response to the following resolutions adopted April 19, and May 5, 1943, respectively:

*Resolved by the Committee on Commerce of the United States Senate*, That the Board of Engineers for Rivers and Harbors, created under section 3 of the River and Harbor Act, approved June 13, 1902, be, and is hereby, requested to review the reports on Mississippi River-Gulf outlet submitted in Committee on Rivers and Harbors, House of Representatives, Document numbered 46, Seventy-first Congress, second session, and previous reports, and to review the reports on the Mobile, Alabama, to New Orleans Intracoastal Waterway submitted in the report of the Chief of Engineers dated April 27, 1942, and previous reports, with a view to determining whether any modification of the recommendations contained therein is advisable at this time, particularly with respect to the advisability and cost of providing an emergency outlet from the Mississippi River in the interest of national defense and general commerce by the construction and maintenance of a permanent deep draft channel 40 feet deep or of such lesser depth as may be determined to be an economical ship channel, from the Industrial Canal, New Orleans, Louisiana, eastward along the authorized route of the Intracoastal Waterway to a point at or near the Mississippi Sound mouth of the Rigolets, thence to the 40-foot contour in the vicinity of the Government light at the northern extremity of the Chandeleur Islands.

*Resolved by the Committee on Rivers and Harbors of the House of Representatives, United States*, That the Board of Engineers for Rivers and Harbors created under section 3 of the River and Harbor Act, approved June 13, 1902, be, and is hereby requested to review the reports on Mississippi River-Gulf outlet submitted in Committee on Rivers and Harbors, House of Representatives, Document Numbered 46, Seventy-first Congress, second session, and previous reports; and to review the reports on the Mobile, Alabama, to New Orleans Intracoastal Waterway submitted in the report of the Chief of Engineers dated April 27, 1942, and previous reports, with a view to determining whether any modification of the recommendations contained therein is advisable at this time, particularly with respect to the advisability and cost of providing an emergency outlet from the Mississippi River in the interest of national defense and general commerce by the construction and maintenance of a permanent deep draft channel 40 feet deep or of such lesser depth as may be determined to be an economical ship channel, from the Industrial Canal, New Orleans, Louisiana, eastward along the authorized route of the Intracoastal Waterway to a point at or near the Mississippi Sound mouth of the Rigolets thence to the 40-foot contour in the vicinity of the government light at the northern extremity of the Chandeleur Islands.

It is also in review of the report of the division engineer on a ship canal to extend from the Mississippi River at a point at or near the city of New Orleans, La., to the Gulf of Mexico, by way of the best available route or routes, authorized by the River and Harbor Act approved March 2, 1945.

2. The Mississippi River below New Orleans, La., flows generally southeast through an extensive Delta area and enters the Gulf of Mexico through numerous passes, of which the largest three, Pass a Loutre, Southwest Pass, and South Pass, branch at a common location designated as the Head of Passes. South and Southwest Passes, respectively 13.5 and 20.2 miles long, have been improved by the United States to provide entrance channels from the Gulf to the Mississippi River for deep-draft traffic. Controlling depths on June 30, 1946, were 30 feet in South Pass and 35 feet in Southwest Pass.

Prod. # MRGOX7289

From the Head of Passes, zero river mileage, to New Orleans, mile 100, the natural river channel has controlling dimensions in excess of 40 feet in depth and 1,400 feet in width, and from New Orleans to Baton Rouge, La., mile 230, the least depth is 35 feet over a minimum width of 500 feet; the average width in the latter section being in excess of 1,000 feet. Mean range of tide is about 16 inches at the mouth of Southwest Pass and 9 inches at the Head of Passes with the tidal effect extending sometimes as far as Baton Rouge. River stage fluctuation is as much as 4 feet at Head of Passes, 20 feet at New Orleans, and 44 feet at Baton Rouge. River flow at New Orleans has ranged between 1,560,000 and 50,000 cubic feet per second. There are no tributaries below Baton Rouge.

3. Three projects prior to 1945 provided for improvement of Mississippi River below Baton Rouge. The River and Harbor Act of March 3, 1875, as amended, authorized construction of jetties and appurtenant works to secure and maintain a channel through South Pass, 26 feet deep and 200 feet wide with a central depth of 30 feet. Subsequent authorizations for additional project improvements provided for regulating works at Head of Passes, dredging in the river, and jetty extension. The act of June 13, 1902, as amended, provided for a channel through Southwest Pass, 35 feet deep and 1,000 feet wide, to be secured and maintained by jetties, contraction works, and dredging. Appurtenant works included construction of revetted openings through narrow banks where required; closure of minor outlets; construction and maintenance of sills, bank revetment and dikes; and dredging in the river at and above Head of Passes for regulation of flow in unimproved passes. The act of June 20, 1938, authorized improvement of Mississippi River between Baton Rouge and New Orleans to provide a channel 35 feet deep and 1,500 feet wide within the limits of the port of New Orleans, and of the same depth and 500 feet wide from the port of New Orleans to Baton Rouge. Costs to June 30, 1945, for new work and for maintenance, respectively, were: South Pass, $8,765,000 and $6,149,200; Southwest Pass, $16,-170,760 and $13,851,060; and Baton Rouge to New Orleans, $184,320 and $703,740. Estimated annual cost of maintenance, as approved June 30, 1944, for South Pass is $150,000, for Southwest Pass, $680,000, and from Baton Rouge to New Orleans, $89,000.

4. The existing project "Mississippi River, Baton Rouge to the Gulf of Mexico," a modification of the three original projects with addition of Mississippi River between New Orleans and Head of Passes, was authorized by the River and Harbor Act approved March 2, 1945, which provides for channel dimensions listed below, at an estimated cost of $4,200,000 for new work and $250,000 annually for maintenance in addition to that previously approved:

| Location | Depth below (mean low Gulf) | Width |
|---|---|---|
| | Feet | Feet |
| Mississippi River: | | |
| Baton Rouge to New Orleans | 35 | 500 |
| Port limits of New Orleans | 35 | 1,500 |
| New Orleans to Head of Passes | 40 | 1,000 |
| Southwest Pass | 40 | 800 |
| Southwest Pass Bar Channel | 40 | 600 |
| South Pass | 30 | 450 |
| South Pass Bar Channel | 30 | 600 |

Prod. # MRGOX7290

Preparatory work was commenced during the fiscal year 1946 for improvement of the river and passes to secure project dimensions, including a 40-foot channel via Southwest Pass. Total costs under the existing project to June 30, 1946, were $46,889,210, of which $25,132,751 was for new work and $21,756,459 for maintenance. Estimated total annual cost of maintenance approved in 1945 is $1,194,000.

5. The Gulf Intracoastal Waterway from Apalachee Bay, Fla., to the vicinity of the Mexican border, Texas, crosses Mississippi River at New Orleans. The existing project provides for a waterway 12 feet deep and 125 feet wide except between Mobile, Ala., and New Orleans, where the width is 150 feet. Access from the Mississippi River to the waterway is provided through the inner-harbor navigation-canal lock, 640 feet long, and 75 feet wide, with a depth of 31.5 feet over the sills, located at mile 92.7 on the east bank, and through Harvey lock, 425 feet long, 75 feet wide, and 12 feet deep over the sills, at mile 98.2 on the west bank. Use of the inner-harbor navigation facilities is secured from the Board of Commissioners of the Port of New Orleans by rental agreement which provides for control by the United States of that part of the inner-harbor navigation canal prism south of a point 3,000 feet north of Florida Avenue in New Orleans, together with the lock, forebay, and the St. Claude Avenue and Florida Avenue Bridges at an annual rental to be determined by negotiation between the Board of Commissioners and the Chief of Engineers. The rental was $254,400 for the fiscal year 1946. A modification of the project was authorized by the River and Harbor Act approved March 2, 1945, which provides for an alternate connection, 12 feet deep and 125 feet wide, from Mississippi River at mile 88 in the vicinity of Algiers on the west bank to and through a lock 760 feet long, 75 feet wide, and 13 feet deep over the sills, thence 9 miles to the Intracoastal Waterway west of Harvey lock. The estimated cost to the United States is $8,000,000 for construction and $120,000 annually for maintenance in addition to that now required. Work has been initiated under this authorization. The existing Plaquemine waterway and the recently authorized Plaquemine-Morgan City route provide for additional connections between Mississippi River in the vicinity of Baton Rouge, and the Gulf Intracoastal Waterway near Morgan City, La., west of New Orleans.

6. The State of Louisiana through the Board of Commissioners of the Port of New Orleans constructed the inner-harbor navigation canal (Industrial Canal) from Mississippi River at mile 92.7 on the east bank, 5.5 miles through the east section of New Orleans to Lake Pontchartrain. Controlling dimensions are 150 by 20 feet at the lake, the depth increasing to 30 feet at a turning basin 1,000 feet square, 2 miles from the river. From the turning basin to the lock 2,000 feet from the river, and riverward of the lock, the depth is 32 feet. The Gulf Intracoastal Waterway enters the Industrial Canal from the east. The lock and a portion of the canal prism described in paragraph 5 above are under control of the United States. Administration of the Industrial-Canal properties is vested in the Board of Commissioners of the Port of New Orleans. Numerous smaller canals and connecting waterways have been constructed or improved by various local interests and by the United States throughout the Mississippi Delta.

Prod. # MRGOX7291

7. The Mississippi River from Head of Passes to and including Baton Rouge constitutes a major world port which also serves as a transshipment terminal for shallow-draft vessels using the river, its tributaries, and connecting streams and channels, including the Gulf Intracoastal Waterway. The area commercially tributary to the port is not limited to definite bounds. Inland commerce may originate in or be destined to any of the States between the Appalachian and Rocky Mountains. Ocean commerce is carried by ships calling at all major United States and world ports. New Orleans, with a population of 494,537 in 1940, is the principal port city. Baton Rouge, population about 34,719 in 1940, is an important oil-refinery center. Industrial developments include shipbuilding and aircraft manufacturing at New Orleans; aluminum, synthetic rubber, and chemical plants in addition to the oil refineries at Baton Rouge; five major plants handling or processing petroleum products and two sugar refineries along the river between the two cities; and a large sulfur plant, several oil terminals, and seafood-processing plants on the river below New Orleans. Agricultural products, principally sugarcane, strawberries, tobacco, garden truck, and citrus fruits, are grown along the river below Baton Rouge. Shrimping and oyster fleets are based on bayous and canals which connect the river with coastal bays and sounds. The Louisiana oil fields have been extended by discoveries in areas adjoining the Mississippi River below New Orleans. The port area is served by nine major railroads and a network of improved Federal and State highways.

8. Commerce on the lower Mississippi River through the passes averaged 13,170,000 tons during the 10-year period 1936 to 1945. In 1945, seagoing commerce through the passes, both foreign and coastwise, amounted to 13,387,000 tons, of which 4,047,000 tons were imports and coastwise receipts and 9,340,000 tons were exports and coastwise shipments. Sixty-six percent of the in-bound tonnage and 61 percent of the out-bound, were manufactured and miscellaneous commodities. This commerce was loaded or unloaded at points on the river from Head of Passes to Baton Rouge as follows: Lower harbor below New Orleans, 4 percent; east bank within the port of New Orleans, 62 percent, of which 3 percent originated at or was destined to points within the inner harbor (Industrial Canal); west bank within the port of New Orleans, 6 percent; Mississippi River between New Orleans and Baton Rouge, 9 percent; and port of Baton Rouge, 19 percent. Barge commerce over the Gulf Intracoastal Waterway east and west of the Mississippi River during the 7-year period 1939 to 1945, inclusive, averaged 3,682,000 tons on the section from Mobile Bay to New Orleans, and 7,288,000 tons through Harvey lock at New Orleans. In 1945, 5,172,000 tons moved over the section from Mobile Bay to New Orleans, 88 percent of which was east-bound and 9,253,000 tons through Harvey lock, 93 percent being east-bound. Records for 1945 show 3,227 transits of seagoing ships through South Pass and 1,531 through Southwest Pass, and 47 transits of barges through both passes. Of the vessel trips through South Pass, 49 were at drafts of 30 to 33 feet and of those through Southwest Pass, 143 were at drafts of 30 to 36 feet. Trips of vessels using the Gulf Intracoastal Waterway during 1945 were 8,325 east-bound and 8,280 west-bound over the section Mobile Bay to New Orleans, 17,755 east-bound and 18,053 west-bound through Harvey lock.

89660—51—2

Prod. # MRGOX7292

9. Extensive terminal and transfer facilities for both deep- and shallow-draft traffic are located along the Mississippi River at Baton Rouge and downstream to the Head of Passes with the greatest concentration being at New Orleans. Terminal facilities on the east bank of Mississippi River at New Orleans form an almost continuous quay for 10 miles. Terminals on the west bank opposite the city are located at Westwego, Gretna, and Algiers. A United States naval dry dock is at Algiers. Four lateral slips and marginal wharves are located along the Industrial Canal. Most of the wharf area of the port of New Orleans is connected by rail, principally by the New Orleans Public Belt Railway. Public terminal business is controlled by the Board of Commissioners of the Port of New Orleans through supervision of public wharves owned by the State of Louisiana and covering about 62 percent of the improved water front. Port facilities at New Orleans also include a free port area for transshipment of foreign commerce without clearing through customs. Space for additional terminal facilities is available along the river banks but river-stage fluctuation and attenuation of surface-transportation facilities are restrictive factors on additional river-front developments. Industrial and terminal facility sites are available also along the Intracoastal Waterway east of New Orleans but rail and highway connections are limited.

10. Local interests desire provisions for the expansion of tidewater terminal facilities at New Orleans to serve further increase in waterborne commerce incident to continuing development of the Mississippi Valley and of New Orleans as a premier world port. They estimate that expansion of harbor space and general cargo handling facilities is required to provide an additional annual capacity of at least 3,000,000 tons. The Board of Commissioners of the Port of New Orleans proposes enlargement of the inner harbor to provide for expansion of harbor facilities, construction of a new lock for access to the Mississippi River, and construction of a seaway initially 500 feet wide and 36 feet deep from the Industrial Canal to the Gulf east of Chandeleur Islands. The Mississippi Valley Seaway Canal Association and other interests on the west bank of Mississippi River at New Orleans propose construction of a tidewater harbor and terminal facilities on the west bank near Westwego, connection with the river through duplicate deep-draft locks and construction of a seaway 600 feet wide and 40 feet deep from the proposed harbor southward to the Gulf in the vicinity of Grand Isle. Proponents of each route cite the availability of large areas of adjacent land for development of a tidewater port, the freedom of a seaway channel from shoaling due to river-borne sediment as is encountered in the improved channel through the Mississippi River and passes, the freedom from fog induced by the difference in temperature of river and gulf water at their junction, the advantage of the direct alinement as compared to the bends in the river channel, and the reduction in the congestion of river traffic within the existing port limits which would be provided by an additional outlet. Proponents of the west-bank route state that it provides the shortest distance between New Orleans and the Gulf, traverses unimproved lands rather than open water, and would facilitate construction of a canal-bank highway to Grand Isle to open up the area and enhance values of adjacent lands. It is stated that the Board of Commissioners, Port of New Orleans,

Prod. # MRGOX7293

contemplates expenditure of $30,000,000 for further development of east-bank-harbor facilities but no definite offer of local cooperation has been received in connection with the proposed west-bank-development. Interests using the inland waterways suggest the expansion of lock facilities for light-draft traffic. Petroleum interests state their aversion to side channel outlets and advise that they prefer to use the improved river channel.

11. The division engineer has conducted surveys and studies of the existing and authorized improvements in the Mississippi River and pass channels and of the available sites for a tidewater harbor at New Orleans with essential connecting channels including the several available alinements for a seaway canal to the Gulf. He reports that the usual hazards encountered in restricted channels and their outlets attend navigation of the river and its passes and, under provisions made for their control, they are only minor. New Orleans enjoys equality with other major Gulf and Atlantic ports on rates for vessel and cargo insurance and pilotage charges. The division engineer finds that the river and its improved outlets afford seagoing vessels direct access to marginal wharves on both banks from Head of Passes to Baton Rouge and to inner harbor terminals through the Industrial-Canal lock, hence an additional outlet will supplement but not replace facilities afforded by the river and its improved passes under the existing project.

12. After consideration of the alternative locations and routes for an additional outlet, the division engineer selected two plans of improvement for detailed investigation. One plan provides for creation of a tidewater harbor on the east bank of the Mississippi River, generally as advocated by the Board of Commissioners of the Port of New Orleans, by construction of a channel 36 feet deep and 500 feet wide along the Gulf Intracoastal Waterway from the existing Industrial Canal to a turning basin south of Micheaud; the turning basin 36 feet deep, 1,000 feet wide, and 2,000 feet long; and a seaway canal, 36 feet deep and 500 feet wide, extending 70 miles as a land and water cut on tangents and easy curves from the turning basin southeasterly to and along the south shore of Lake Borgne and through the marshes to and through Chandeleur Sound and Chandeleur Islands at or north of Errol Island, to deep water in the Gulf of Mexico. Provision is included for a permanent retention dike along the canal across Chandeleur Sound; for parallel jetties from Chandeleur Islands to the 20-foot contour in the Gulf, with a wing dike along the islands as required; and for the canal through the jetties and across the bar to be flared to a width of 600 feet at the 38-foot contour. The plan provides for the future construction of a channel and a lock at Meraux on the left bank of Mississippi River at mile 86, to furnish a connection from the tidewater harbor to the river additional to the existing industrial canal and lock when such construction is warranted by prospective commerce. Costs of the foregoing east-bank improvements, exclusive of the future connecting channel and lock, as estimated in 1946, total $53,500,000, of which $53,000,000 are Federal costs of construction, including $400,000 for aids to navigation, and $500,000 are non-Federal costs for rights-of-way and spoil-disposal areas. Corresponding annual carrying charges are estimated at $3,270,000, of which $3,240,000, including $810,000 for maintenance, are Federal and $30,000 are non-Federal. The

Prod. # MRGOX7294

alternate plan provides for improvements on the west bank of Mississippi River, substantially as proposed by the Mississippi Valley Seaway Canal Association and other west-bank interests, to consist of an eased entrance channel 36 feet deep from the right bank of Mississippi River near Westwego at mile 103, leading into and combined with a riverside mooring basin and forebay; a lock tentatively 760 feet long and 110 feet wide with a depth of 40 feet on the sills; a landside forebay and turning basin suitable for development as a tidewater terminal harbor; a seaway canal, 36 feet deep and 500 feet wide, extending 55 miles as a land and water cut on tangents and easy curves from the terminal turning basin southerly to and through the Barataria marshes and Caminada Bay and Pass to deep water in the Gulf of Mexico; and readjustment of the Mississippi River main west-bank levee, relocation or reconstruction of highways, railways, and utilities, and construction of a movable railway and highway bridge. Provision is included for parallel jetties from Caminada Pass to the 20-foot contour in the Gulf and for the canal through the jetties and across the bar to be flared to a width of 600 feet at the 38-foot contour. Costs of the improvements under the alternate plan, as estimated in 1946, total $53,500,000, of which $53,000,000 are Federal costs of construction, including $300,000 for aids to navigation, and $500,000 are non-Federal costs for rights-of-way and spoil-disposal areas. Annual carrying charges are estimated at $2,870,000.

13. The division engineer has considered the prospective benefits under each of the two plans of improvement on the basis of economies that may be effected in pertinent present and prospective general cargo commerce (foreign and coastwise), inland-waterway commerce, and internal port traffic, together with savings on construction and operation costs of terminal facilities, and benefits due to enhancement of property values incident to creation of tidewater harbors. He notes that the proposed outlets at New Orleans would not benefit river terminals and installations above and below the port nor be utilized by petroleum interests now using the river channel in view of their aversion to locks and side channels. He estimates annual benefits of $5,260,000 as being reasonably prospective from the proposed improvements on the east side of Mississippi River, as a result of reduction in sailing and turn-round time and navigation hazards for deep-draft general-cargo vessels, savings in terminal handling and annual wharf charges, and enhancement of water-front property. The annual benefits from comparable items of savings to commerce and from land enhancement attributable to the alternate west-bank improvements are estimated to total $1,690,000. The ratio of estimated annual benefits to annual carrying charges is 1.61 under the plan providing for the supplementary outlet eastward of Mississippi River and 0.59 under the alternate plan for the west-bank outlet, therefore, the division engineer finds that the improvements to provide the eastward outlet are economically justified and those for the west-bank outlet lack economic justification. He also notes that the improvements would greatly enhance the capacity of the port for emergency war service by provision of an additional outlet and wide dispersion of terminal facilities for embarkation of personnel, material, and supplies in the interest of national defense. The division engineer recommends modification of the existing project "Mis-

Prod. # MRGOX7295

Case 2:05-cv-04182-SRD-JCW   Document 16790-11   Filed 12/18/08   Page 13 of 22

sissippi River, Baton Rouge to the Gulf of Mexico" to provide for the construction of the additional east-bank deep-draft outlet with turning basin and connecting harbor channel; with provision for the future construction of an additional lock near Meraux and connecting channels and appurtenances between the turning basin and the Mississippi River when such is found to be economically justifiable; generally as outlined in his report subject to such modifications of location, alinement, and dimensions as may be approved by the Chief of Engineers, at an estimated initial cost of $53,000,000 for construction and $810,-000 annually for maintenance and operation in addition to that now required; subject to the provision that, prior to any construction expenditures, local interests furnish free of cost to the United States all lands, easements, rights-of-way, and spoil-disposal areas required for initial construction and subsequent maintenance; and furnish assurances satisfactory to the Secretary of the Army that they will hold and save the United States free from claims for damage incident to construction, maintenance, and operation of the improvement, and will construct, maintain, and operate terminal facilities commensurate with requirements of the expanded port, under regulations approved by the Secretary of the Army, to insure its equitable operation in the public interest.

14. Local interests were notified of the plan of improvement proposed by the division engineer and afforded opportunity to present additional information and comments to the Board.   At their request the Board held a public hearing in New Orleans in order to further develop the views of local interests.   Representatives of the Department of Public Works, State of Louisiana, the Board of Commissioners of the Port of New Orleans, the New Orleans Tidewater Development Association, the New Orleans Association of Commerce, the Mississippi Valley Association, and other agencies both inland and local, and private interests, presented testimony on the commerce and commercial potentialities of the port of New Orleans, and on the need for improvement and expansion of port facilities to relieve congestion at the public terminals and to provide for efficient and economical transshipment of the expanding commerce.   They pointed out the obsolescence and difficulty of maintenance of some of the present river terminals and the lack of suitable space on the river front for necessary expansion.   They claimed that the development of new water-front areas is necessary to encourage industrial expansion at New Orleans.   These interests expressed general approval of the division engineer's recommended plan of improvement and urged its adoption for early construction.   However, testimony was presented to the effect that the new river lock and connecting channel to the proposed tidewater harbor was not needed at this time.   The Board of Commissioners of the port of New Orleans reiterated its willingness and ability to provide the necessary local cooperation in the project as recommended by the division engineer.   The Mississippi Valley Seaway Canal Association, representatives of Jefferson Parish, and other agencies and interests favoring the west-bank seaway route presented testimony regarding the commerce of the west-bank terminals at New Orleans and pointed out the possibilities for industrial expansion in that area.   They urged the adoption of the west-bank seaway location.   No definite offer of local cooperation on west-bank improvements was received.

Prod. # MRGOX7296

14 MISSISSIPPI RIVER–GULF OUTLET

VIEWS AND RECOMMENDATIONS OF THE BOARD OF ENGINEERS FOR
RIVERS AND HARBORS

15. After careful consideration of the recommendations of the division engineer, of information presented by local interests at the hearing and through correspondence, and of data subsequently developed by additional field investigations, the Board is of the opinion that the most practicable plan for expansion of the harbor facilities of the port is by the creation of an off-river tidewater harbor with a seaway outlet as proposed by the division engineer. Since the existing river terminals will continue to be used along with new tidewater terminals, an adequate connection between the tidewater harbor and the river is essential. The existing Industrial Canal and lock would provide an adequate river connection for the east-bank harbor location but a new lock would be required for the west-bank location. Hence the tidewater harbor with seaway outlet and river connection could be provided on either side of the river at approximately the same cost. However, the east side location has certain advantages due to its relation to existing land access facilities and to the natural direction of harbor expansion for the benefit of shipping and industry. It provides for development in a location consistent with the over-all planning of the Board of Commissioners of the port of New Orleans which is the authorized agency of the State of Louisiana responsible for administration and development of the port.

16. Consideration was also given to the advisability of providing a deep-draft lock at Meraux with a connecting channel to the east-bank tidewater harbor either to serve as a main entrance in lieu of the seaway canal or to serve in conjunction with the seaway canal. While the substitution of the lock connection in lieu of the seaway canal would result in considerable reduction in initial expenditure, it would subject shipping to serious delays and possible damage from accidents with the attendant losses offsetting much of the saving in first cost. Furthermore, future requirements for increased lock capacity to accommodate growth in commerce would probably result in expenditures nullifying any initial savings. Provision of the new lock and channel in conjunction with the seaway canal is not justified at this time by the requirements of existing and prospective commerce. The necessary river connection is available through the existing Industrial Canal and lock. The need for an additional river connection and its proper location is a matter for later consideration when warranted by future development of the port and its commerce.

17. The Board is of the opinion that the exact location of the outlet to the Gulf and the alinement of the seaway should be determined after more complete studies of sand movement, wave action, and local currents are made in cooperation with the Beach Erosion Board. Hence, if the improvement is authorized, ample provision should be made for modifications of the location and alinement of the canal should further studies show that a more suitable location is available.

18. The Board notes that construction costs have increased since the division engineer's estimates were prepared. The Board estimates that the cost of the recommended improvements, based on 1948 price levels, would be $66,100,000, of which $65,490,000, including $490,000 for aids to navigation, would be Federal costs of construction, and $610,000 would be non-Federal costs of lands, rights-of-way, and spoil

Prod. # MRGOX7297

Case 2:05-cv-04182-SRD-JCW   Document 16790-11   Filed 12/18/08   Page 15 of 22

disposal areas.  Corresponding annual carrying charges are estimated
at $4,027,000, of which $4,004,000, including $1,000,000 for project
maintenance, would be borne by the United States, and $23,000 by
local interests.

19.  The volume of deep-sea commerce of the port of New Orleans
has shown a variation with national and world economic situations.
A peak of 13,150,000 tons was reached in 1929, followed by a low of
8,000,000 tons in 1932, a peak of 13,100,000 tons in 1937, and a low of
6,200,000 tons during the recent war.  Commerce increased to 12,150,-
000 tons in 1946.  Foreign commerce has been increasing generally
since the early 1930's and has shown a remarkable growth since the
low in 1942, but due to a reduction in the movement of petroleum
products it is unlikely to reach the 1921 peak of 11,000,000 tons for
some time to come.  Recent increases are due mainly to movements
of general cargo.  Imports of general cargo in 1946 were about double
those in 1932 with indications of a volume of 2,000,000 tons by the
early 1950's.  Exports show indications of reaching a volume of
3,800,000 tons by the same time.  No distinct trend is shown by
the coastwise receipts of general cargo but shipments are increasing
with indications of attaining the prewar volume of 600,000 tons by
1950 and the previous peak of 900,000 tons a few years later.  Con-
gestion of the existing terminal facilities has resulted in recent refusals
by port authorities of shipments to the port.  The capacity of existing
general-cargo terminals is limited to about 4,500,000 tons per year
for economic and efficient movement of commerce and about 5,000,000
tons per year is their peak capability.  The lack of sufficient terminal
facilities has become a dominant factor in limiting the current growth
of commerce at New Orleans.  Conditioned on the provision of
adequate port facilities, it is estimated that commerce in general cargo
alone will reach an annual volume of 7,500,000 tons in about 10 years.
The east-bank seaway channel and tidewater harbor improvements
will permit the development of terminal facilities in addition to those
existing on the river water front, and will provide for relief of con-
gestion at the existing terminals and more efficient handling of cargo
with resultant savings in cost of vessel operation because less time
will be required in port.  Analysis of general-cargo commerce in 1946
shows that a volume of 4,254,000 tons moved over the general wharves,
requiring 2,060 calls of deep-draft vessels.  The average movement
per call was 2,065 tons.  Ship time in port for each call recently
ranged from 1.5 to 21.75 days and averaged about 7 days.  Allowing
for the most efficient and economical operation of the existing ter-
minals, they would provide for movement of 4,250,000 tons leaving
3,250,000 tons of the estimated 7,500,000 tons of general cargo to be
moved over new terminals to be provided in the proposed tidewater
harbor.  On the basis of current tonnage movements, the 3,250,000
tons would require 1,550 calls of deep-draft vessels using the newer,
more efficient terminal facilities.  Estimates by vessel operators show
that savings in ship turn-round time provided by these facilities
would be a minimum of 1.25 days per call.  A representative analysis
of ship operating costs of all deep-draft vessels calling at New Orleans
during a recent period shows an average of $70 per hour to be generally
applicable.  On these bases the savings in ship time in transporting
cargo to and from the new terminals is estimated at $3,250,000
annually.  In addition, relief of congestion at existing general cargo

Prod. # MRGOX7298

terminals and in the landward access facilities to all the present terminal wharves will save ship time in loading and unloading and provide benefits to industrial and commercial tonnage using those facilities estimated at $950,000 annually. Further benefits creditable to the improvement would result from reduced sailing time of coast-wise vessels, reduction in hazards to navigation, savings in terminal handling charges and annual charges on wharves, and enhancement in value of water-front property. These additional benefits are estimated to have an annual value of $1,635,000. The sum of the tangible benefits estimated by the Board is $5,835,000, which com-pared with annual charges of $4,027,000 shows a benefit-cost ratio of 1.45. Additional benefits to industry and employment would accrue throughout the vast tributary area and the improvements would greatly enhance the capacity of the port for emergency war service.

20. The Board concludes that the existing terminal facilities of the port of New Orleans are inadequate to serve the needs of the growing commerce. Possibilities are extremely limited for the development of additional terminal facilities in locations along the present water front which would provide for accessibility and economical operation. The creation of a tidewater harbor with free access to deep water in the Gulf of Mexico is required to provide for the necessary expansion of terminal facilities. The east-bank seaway channel, turning basin, and connecting channel would be adequate for and would best meet the requirements for terminal facility expansion. The estimated benefits to commerce substantially exceed the estimated annual carry-ing charges for the improvements, therefore, the project is economically justified. The division engineer's plan of improvement to create an east-bank tidewater harbor and outlet, if properly supported by the supplemental development and administration by local interests of modern, efficient terminal facilities will serve adequately the needs of the expanding commerce of the tributary area extending through the Mississippi Valley and into many of the adjoining States. The Board of Commissioners of the Port of New Orleans has signified its willingness and ability to meet the requirements of local cooperation including the construction and operation of terminal facilities sufficient for the needs of commerce.

21. The Board of Engineers for Rivers and Harbors recommends that the existing project for "Mississippi River, Baton Rouge to the Gulf of Mexico," be modified to provide for construction of a seaway canal 36 feet deep and 500 feet wide extending 70 miles as a land and water cut on tangents and easy curves from a point south of the Intra-coastal Waterway at Micheaud southeasterly to and along the south shore of Lake Borgne and through the marshes to and across Chan-deleur Sound to Chandeleur Islands at or north of Errol Island, thence increasing gradually to a width of 600 feet and depth of 38 feet in the Gulf of Mexico, with protective jetties at the entrance, a permanent retention dike through Chandeleur Sound, and a wing dike along the islands as required; a turning basin at the landward end of the seaway canal, 36 feet deep, 1,000 feet wide, and 2,000 feet long; and a con-necting channel 36 feet deep and 500 feet wide extending westerly along the Gulf Intracoastal Waterway from the turning basin to the Industrial Canal; all generally in accordance with the plans of the

Prod. # MRGOX7299

division engineer and with such modifications thereof as in the discretion of the Secretary of the Army and the Chief of Engineers may be desirable, at an estimated cost to the United States of $65,000,000 for construction exclusive of aids to navigation, and $1,000,000 annually for maintenance in addition to that now required; provided that, prior to any construction expenditures, local interests furnish free of cost to the United States all lands, easements, rights-of-way, and spoil-disposal areas required for initial construction and subsequent maintenance; make necessary highway, railway, and utility changes; and furnish assurances satisfactory to the Secretary of the Army that they will hold and save the United States free from all claims for damage due to construction, maintenance, and operation of the project, and will construct, maintain, and operate terminal facilities commensurate with requirements of the expanded port, under regulations approved by the Secretary of the Army.

For the Board:

R. C. CRAWFORD,
*Major General,*
*Senior Member.*

---

## REPORT OF THE DIVISION ENGINEER

### SYLLABUS

The Board of Commissioners of the Port of New Orleans, the State agency for operation of the port, requests Federal construction of an additional deep-draft outlet (seaway) from New Orleans to the Gulf of Mexico east of Chandeleur Islands. West-bank interests, by the Mississippi Valley Seaway Canal Association, request a deep-draft outlet (seaway) from the river at Westwego to the Gulf south of Caminada Bay.

Under uniform postulates, comparison of estimated annual charges and benefits indicates economic justification for proposed east bank but not for proposed west-bank improvements.

The division engineer finds that the proposed outlet and tidewater harbor east and southeast of New Orleans, in conjunction with the river and its improved passes and the Intracoastal Waterway and Industrial Canal, will facilitate expansion and improvement of port facilities to serve all water-borne commerce that may be attracted to the port with resulting benefits to present and prospective seagoing and inland waterway navigation and commerce considerably in excess of charges for construction and operation, and will greatly enhance the capacity of the port for war service by providing for dispersion of terminal facilities.

He recommends that the existing project, "Mississippi River, Baton Rouge to the Gulf of Mexico," be modified to provide for an additional east-bank, deep-draft outlet and tidewater harbor by construction of connecting harbor channel 36 feet deep and 500 feet wide extending from the existing inner harbor canal to a turning basin south of Michaud; and a channel 36 feet deep and 500 feet wide extending as a land and water cut on tangents and easy curves from this turning basin southeasterly to and along the south shore of Lake Borgne and through the marshes to and through Chandeleur Sound and Islands, at or north of Errol Island, to deep water in the Gulf of Mexico, a distance of approximately 70 miles, with provision for the future construction, when found to be economically justifiable, of an additional lock near Meraux with necessary channels and appurtenances for connections with the turning basin and the Mississippi River, generally as outlined in paragraph 60 hereof, subject to such modifications of location, alinement, and dimensions as may be approved by the Chief of Engineers, at an estimated cost of $53,000,000 for construction and $810,000 annually for maintenance and operation, in addition to that now required; subject to stated conditions of local cooperation.

Prod. # MRGOX7300

WAR DEPARTMENT, CORPS OF ENGINEERS,
OFFICE OF THE DIVISION ENGINEER,
LOWER MISSISSIPPI VALLEY DIVISION,
*Vicksburg, Miss., September 30, 1946.*

Subject: Review of reports on Mississippi River-Gulf outlet and the Mobile to New Orleans Intracoastal Waterway.

To: The Chief of Engineers, United States Army.

## I. GENERAL

1. *Authority.*—This report is submitted in compliance with instructions of the Chief of Engineers contained in third endorsement, dated June 22, 1943, and in accordance with congressional authorities as follows:

*Resolved by the Committee on Commerce of the United States Senate,* That the Board of Engineers for Rivers and Harbors, created under section 3 of the River and Harbor Act, approved June 13, 1902, be, and is hereby, requested to review the reports on the Mississippi River-Gulf outlet submitted in Committee on Rivers and Harbors, House of Representatives, Document numbered 46, Seventy-first Congress, second session, and previous reports, and to review the reports on the Mobile, Alabama, to New Orleans Intracoastal Waterway, submitted in the report of the Chief of Engineers dated April 27, 1942, and previous reports, with a view to determining whether any modification of the recommendations contained therein is advisable at this time, particularly with respect to the advisability and cost of providing an emergency outlet from the Mississippi River in the interest of national defense and general commerce by the construction and maintenance of a permanent deep-draft channel 40 feet deep or of such lesser depth as may be determined to be an economical ship channel, from the Industrial Canal, New Orleans, Louisiana, eastward along the authorized route of the Intracoastal Waterway to a point at or near the Mississippi Sound mouth of the Rigolets, thence to the 40-foot contour in the vicinity of the Government light at the northern extremity of the Chandeleur Islands.

Adopted April 19, 1943.

*Resolved by the Committee on Rivers and Harbors of the House of Representatives, United States,* That the Board of Engineers for Rivers and Harbors created under section 3 of the River and Harbor Act, approved June 13, 1902, be, and is hereby, requested to review the reports on Mississippi River-Gulf outlet submitted in Committee on Rivers and Harbors, House of Representatives, Document Numbered 46, Seventy-first Congress, second session, and previous reports; and to review the reports on the Mobile, Alabama, to New Orleans Intracoastal Waterway, submitted in the report of the Chief of Engineers dated April 27, 1942, and previous reports, with a view to determining whether any modification of the recommendations contained therein is advisable at this time, particularly with respect to the advisability and cost of providing an emergency outlet from the Mississippi River in the interest of national defense and general commerce by the construction and maintenance of a permanent deep draft channel 40 feet deep or of such lesser depth as may be determined to be an economical ship channel, from the Industrial Canal, New Orleans, Louisiana, eastward along the authorized route of the Intracoastal Waterway to a point at or near the Mississippi Sound mouth of the Rigolets, thence to the 40-foot contour in the vicinity of the Government light at the northern extremity of the Chandeleur Islands.

Adopted May 5, 1943.

PUBLIC LAW 14, SEVENTY-NINTH CONGRESS, APPROVED MARCH 2, 1945

SEC. 6. The Secretary of War is hereby authorized and directed to cause preliminary examinations and surveys to be made at the following-named localities:

\*        \*        \*        \*        \*        \*        \*

Ship canal to extend from the Mississippi River at a point at or near the city of New Orleans, Louisiana, to the Gulf of Mexico, by way of the best available route or routes.

\*        \*        \*        \*        \*        \*        \*

Prod. # MRGOX7301

2. *Reports being reviewed.*—In the first of the reports reviewed, House Document No. 46, Seventy-first Congress, second session, the Chief of Engineers found no necessity for another deep-water outlet from the Mississippi River and no justification for acquisition of the Industrial Canal and lock at New Orleans. In House Document No. 230, Seventy-sixth Congress, first session, the Chief of Engineers recommended modification of the project for the Louisiana and Texas Intracoastal Waterway to provide for a channel 12 feet deep and 125 feet wide from the Mississippi River through Harvey lock, near New Orleans, La., to Corpus Christi, Tex., subject to prescribed conditions of local cooperation. In an unpublished report, dated April 27, 1942, the Chief of Engineers recommended modification of the Intracoastal Waterway project—

to provide for a channel 12 feet deep and 150 feet wide in the Mississippi Sound and Lake Borgne and from the mouth of the Rigolets to the Mississippi River near New Orleans, and for acquisition of control of that part of the inner-harbor navigation canal prism south of a point 3,000 feet north of Florida Avenue, together with the lock and forebay and the St. Claude Avenue and Florida Avenue Bridges.

Modifications recommended were adopted by the act approved 23 July 1942 which authorized—

deepening and enlarging the Intracoastal Waterway from its present eastern terminus to the vicinity of the Mexican border.

## II. DESCRIPTION

3. *General.*—The Mississippi River and its tributaries drain the central valley from the Appalachian to the Rocky Mountains and from Canada to the Gulf of Mexico. The basin comprises about 1,240,000 square miles and includes all or parts of 31 States and 2 Canadian Provinces. Above Baton Rouge (230 miles above Head of Passes), the river is improved for 9-foot navigation to Minneapolis–St. Paul, Minn. Similar channels extend through the Illinois waterway to Chicago and up the Ohio River to Pittsburgh. Between Baton Rouge and New Orleans (miles 100 to 230), the natural channel has a least depth of 35 feet over a minimum width of 500 feet and an average width in excess of 1,000 feet, except at two crossings near Baton Rouge where dredging is occasionally required. Between New Orleans and Head of Passes the natural channel is still larger, with controlling dimensions in excess of 40 feet in depth and 1,400 feet in width.

4. The river, a silt-bearing and delta-forming stream, enters the Gulf through numerous passes, of which the largest three—Pass a Loutre, Southwest Pass, and South Pass—are formed at a trifurcation designated Head of Passes. Above this point minor passes include Cubits Gap on the left bank at mile 3, the Jump, on the right bank at mile 10, and Baptiste Collette on the left bank at mile 11. South and Southwest Passes (lengths 13.5 and 20.2 miles, respectively) have been improved under Federal projects to provide alternate entrance channels for deep-draft traffic with controlling depths of 30 feet in South Pass and 35 feet in Southwest Pass. Unimproved outlets are obstructed by shoals and bars with controlling depths of 6 to 10 feet.

5. An outlet from the east (left) bank of the river at New Orleans may be provided along various routes traversing the marshes and Lake

Prod. # MRGOX7302

Borgne, Breton, Chandeleur, or Mississippi Sounds and the Chandeleur Islands. Currents in the sounds are tidal. Where restricted between islands as in Mississippi Sound, reversing currents obtain with velocities up to 2 miles per hour at strength of ebb and flood; elsewhere in the sounds irregular rotary currents prevail with velocities generally less than a mile an hour (fig. 2 [1]). Here currents depend largely on winds which have no dominant directional trend (fig. 3 [1]). A west-bank outlet from the vicinity of New Orleans, sited through the Barataria marshes and Caminada Bay, would be land-locked except at Caminada Bay and the Gulf entrance.

6. Water-surface elevations in the passes depend upon wind, tide, and river stages. Mean tidal variation, about 16 inches at Southwest Pass jetties, is about 9 inches at Head of Passes. Tidal effect is perceptible above Baton Rouge at extreme low river stage. Water surface at the passes may be lowered as much as 2 feet by "northers", generally in winter; and high storm tides, up to 6 feet, have been observed. Fluctuation of water surface due to river stage, insignificant at seaward ends of jetties, is as much as 4 feet at Head of Passes, 20 feet at New Orleans, and 44 feet at Baton Rouge. River-discharge measurements at New Orleans have ranged between 1,560,000 and 50,000 cubic feet per second. Under the existing flood-control project the Bonnet Carre spillway is operated to preclude stages in excess of 20 feet at New Orleans (Carrollton—elevation of gage zero, −0.13 mean sea level, extreme readings, +21.27 and −1.00).

7. There are no tributaries below Baton Rouge. At New Orleans the river is crossed by the Gulf Intracoastal Waterway, which is under improvement by the Federal Government to provide a channel 12 feet deep and 125 feet wide from Apalachee Bay, Fla., to the Mexican border, except between Mobile and New Orleans, where the width is 150 feet. Access from the river to the waterway is provided through the inner-harbor navigation canal (Industrial Canal) lock (640 by 75 by 31.5 feet) at mile 92.7, east bank, and through Harvey lock (425 by 75 by 12 feet) at mile 98.2, west bank. An alternate connection, authorized by the River and Harbor Act approved March 2, 1945, provides for a channel (12 by 125 feet) extending from the river at mile 88 to and through a lock (760 by 75 by 13 feet) and thence to the Intracoastal Waterway 6 miles from Harvey lock, a distance of 9 miles. An additional west-bank connection (9 by 100 feet) is provided through Plaquemine waterway, which extends 56 miles from Plaquemine lock (260 by 55 by 10 feet) at mile 208 to Morgan City, 95 miles from Harvey lock. Modification of the Plaquemine improvement is authorized by the River and Harbor Act approved July 24, 1946, to provide for a channel (12 by 125 feet) extending from the river at the lower limit of the port of Baton Rouge, mile 228.5, to and through a new lock (500 by 56 by 12 feet) and thence to and along the existing Plaquemine waterway to Morgan City, a distance of 65 miles. Reference is made to United States Coast and Geodetic Survey Charts, United States Engineer Department Quadrangles of the area, to accompanying plates 1–5 and figures 1–9.[2]

8. *Tributary area.*—The Mississippi River, between Head of Passes and Baton Rouge, constitutes a major world port which also serves as

[1] Not printed.
[2] Only plate 1 printed.

Case 2:05-cv-04182-SRD-JCW   Document 16790-11   Filed 12/18/08   Page 21 of 22

a transhipment terminal for shallow-draft commerce utilizing the network of inland waterways formed by the river, its tributaries and connecting streams, including the Gulf Intracoastal Waterway. The area commercially tributary to the port is not limited by definite bounds. Inland water-borne commerce may originate in or be destined to any of the States between the Appalachian and Rocky Mountains. Ocean commerce is carried by ships which call at all major United States and world ports.

9. New Orleans (population 494,537 in 1940) is the principal port city. Its peacetime industries are allied with shipping and have been developed to utilize raw and semifinished products attracted to the port by its harbor and transportation facilities. Baton Rouge (population 34,719 in 1940) is an important oil-refinery center. Industrial operations of the port cities, expanded prodigiously by war activities, include shipbuilding and aircraft manufacturing at New Orleans; aluminum, synthetic rubber, and chemical plants as well as oil refineries at Baton Rouge. Much, if not most, of the increase in population and industrial activity may be permanent. Along the river between Baton Rouge and New Orleans, five major plants for handling or processing petroleum products and two sugar refineries are located; below New Orleans at Port Sulphur, mile 39, sulfur is produced and shipped.

10. Agricultural lands along the river below Baton Rouge are productive; principal crops being sugarcane, strawberries, tobacco, and garden produce. Below New Orleans, fishing and farming are the chief occupations of rural residents along the river. Garden truck and citrus fruits are principal crops. Shrimping and oyster fleets are based on bayous and canals which connect the river with coastal bays and sounds. Proven Louisiana oil fields have been extended by new discoveries in areas adjoining the Mississippi below New Orleans and continuing expansion of production and distribution of petroleum products along the Gulf coast make this commodity the outstanding item of inland and ocean commerce.

11. The area at and below New Orleans forms part of the Mississippi River Delta, a low alluvial plain of geologically recent deposits. Here the natural banks of the river and bayous vary from 0 to 12 feet in height and general ground elevations are little if any above or below mean sea level. Mississippi River levees, which extend below New Orleans to mile 11.5 left bank (except for Bohemia spillway, mile 33 to mile 44); and to mile 10.5, right bank, protect narrow strips of land from Mississippi River floods. There are numerous lakes, bayous, and sloughs between both river banks and the Gulf. Generally, bays and sounds along the coast are separated from the Gulf by detached islands or chains of islands.

12. The port area of New Orleans is served adequately by improved streets, highways, and railways. Rail service is provided by the Gulf, Mobile, & Ohio; Illinois Central; Southern Railway (New Orleans & Northeastern); Louisiana & Arkansas; Louisiana Southern; Louisville & Nashville; Missouri Pacific; Southern Pacific; and Texas & Pacific Railroads. The New Orleans Public Belt Railroad, the New Orleans Terminal Co., and the Texas Pacific-Missouri Pacific Terminal Railroad of New Orleans, provide switching service and interconnections between main line railroads and wharves.

Prod. # MRGOX7304

13. *Bridges.*—Bridges crossing portions of waterways under consideration are listed in table 1.[1]

14. *Prior reports.*—Prior reports are listed in table 2.[1]

## III. EXISTING PROJECTS

15. Prior to 1945, deep-water navigation on the Mississippi River was provided for under projects for "South Pass, Mississippi River," "Southwest Pass, Mississippi River," and "Mississippi River, Baton Rouge to New Orleans."

16. The River and Harbor Act of March 3, 1875, as amended, authorized Mr. James B. Eads and associates to construct jetties and appurtenant works to secure and maintain for 20 years a channel through South Pass, 26 feet deep and 200 feet wide with central depth of 30 feet. The contract was completed and maintenance was assumed by the United States in January 1901. Additional works authorized in connection with the improvement include regulating works at Head of Passes, dredging in the river below Cubits Gap, and jetty extension.

17. The act of June 13, 1902, as amended, provided for a channel through Southwest Pass, 35 feet deep and 1,000 feet wide, to be secured and maintained by means of jetties, contraction works, and dredging. Essentially the plan provides for contracting the pass to a uniform cross section with surface width of about 1,420 feet; channel improvement by dredging, placing dredged material between dikes or behind bulkheads and jetties; dredging a bar channel, inclining left from the jettied channel; construction of revetted openings through narrow banks where required; closure of minor outlets; construction and maintenance of sills, bank revetment and dikes, and dredging in the river at and above Head of Passes for regulation of flow in Pass a Loutre, Cubits Gap, and the Jump.

18. The act of June 20, 1938, authorized improvement of the Mississippi River between Baton Rouge and New Orleans to provide a channel 35 feet deep and 1,500 feet wide within the limits of the port of New Orleans where the board of commissioners of the port has jurisdiction over both banks, and for a channel of the same depth, 500 feet wide, from the port of New Orleans to a line one-half mile downstream from the Mississippi River bridge at Baton Rouge.

19. Costs of the several projects to June 30, 1945, were as follows:

| Project | New work | Maintenance | Annual maintenance [1] |
|---|---|---|---|
| South Pass | $3,765,000.00 | $6,149,200.39 | $150,000 |
| Southwest Pass | 16,170,762.06 | 13,851,001.18 | 680,000 |
| Baton Rouge to New Orleans | 181,320.99 | 703,738.96 | 80,000 |

[1] As approved, June 30, 1944.

20. The River and Harbor Act of March 2, 1945, authorized modification of projects outlined above to form the existing project, "Mississippi River, Baton Rouge to the Gulf of Mexico," providing for channel dimensions listed below, at an estimated cost of $4,200,000 for new work and $250,000 annually for maintenance in addition to that already authorized.

[1] Not printed.

Prod. # MRGOX7305