| Location | Depth (mean low Gulf) | Width |
|---|---|---|
| | *Feet* | *Feet* |
| Baton Rouge to New Orleans | 35 | 600 |
| Port limits of New Orleans | 35 | 1,600 |
| New Orleans to Head of Passes | 40 | 1,000 |
| Southwest Pass | 40 | 800 |
| Southwest Pass bar channel | 40 | 600 |
| South Pass | 30 | 450 |
| South Pass bar channel | 30 | 600 |

21. The existing project, "Gulf Intracoastal Waterway," provides for a channel 12 feet deep and 125 feet wide from Apalachee Bay, Fla., to the vicinity of the Mexican border, Texas, except between Mobile Bay, Ala., and New Orleans, La., where the width is 150 feet, and for rental of inner-harbor navigation canal (Industrial Canal) facilities at New Orleans. Project dimensions for the waterway across Louisiana were secured in 1942. During the same year, as a war measure, the waterway east of New Orleans was enlarged to provide a channel 17 feet deep and 165 feet wide extending 7.3 miles from the Industrial Canal to the Michaud Canal, except for a section 0.8 mile long in the vicinity of the Paris Road Bridge (5.3 miles east of the Industrial Canal). Costs under the existing project to June 30, 1945, for the section of the waterway in the lower Mississippi Valley division, i. e., from Lake Borgne, light No. 41, to the Sabine River, were $13,574,734.93 for new work (including $353,541.19 public-works funds), $2,130,510.09 for maintenance, and $1,830,026.99 for operation and care of locks and bridges. In addition, $521,484.91 was expended prior to June 30, 1935, for operation and care of works under provisions of the permanent indefinite appropriation.

The River and Harbor Act of March 2, 1945, authorized modification of the project, "Gulf Intracoastal Waterway," to provide an alternate waterway connection with the river in the vicinity of Algiers to afford a channel 12 feet deep and 125 feet wide extending from the river at mile 88 to and through a lock (760 by 75 by 13 feet) and thence to the intracoastal waterway, a distance of 9 miles, at an estimated cost to the United States of $8,000,000 for construction and $120,000 annually for maintenance in addition to that already authorized. The River and Harbor Act of July 24, 1946, authorized modification of the project to provide for a channel 12 feet deep and 125 feet wide for the—

Plaquemine-Morgan City Route from * * * the vicinity of Morgan City * * * via the present waterway * * * to Indian Village, and thence by way of Bayou Grossetete and a new land cut to and through a new terminal lock (500 by 56 by 12 feet) and entrance channel to the Mississippi River in the vicinity of Port Allen opposite the lower limit of the port of Baton Rouge * * * at an estimated cost of $8,000,000 for construction and $100,000 annually for maintenance in addition to that already authorized. Construction of these improvements will be initiated when funds are available.

## IV. LOCAL COOPERATION AND OTHER IMPROVEMENTS

22. *Local cooperation* is not required for the existing project, "Mississippi River, Baton Rouge to the Gulf," except for maintenance for 100 feet adjacent to wharves and structures. The existing

Prod. # MRGOX7306

Case 2:05-cv-04182-SRD-JCW   Document 16790-12   Filed 12/18/08   Page 2 of 23

project for the intracoastal waterway provides that local interests furnish, free of cost to the United States, all rights-of-way and spoil-disposal areas required for the improvement and defray the costs of alteration or reconstruction of highway bridges.   These conditions have been complied with as required.

23. *Other improvements.*—The inner-harbor navigation canal (industrial canal), constructed by the New Orleans Dock Board, extends 5½ miles from the river to Lake Pontchartrain through the east section of the city.   Controlling dimensions are 150 by 20 feet at the lake, the depth increasing to 30 feet at the turning basin, 2 miles from the river.   Thence to the river the depth is 32 feet except through the lock, 2,000 feet from the river, where usable dimensions are 75 by 640 feet, with 31.5 feet depth over the sills.   Under authority granted in the act approved July 23, 1942, acquisition of control of the Industrial-Canal lock and so much of the canal as is used by Intracoastal Canal traffic was effected by lease dated April 1, 1944, since which date the facility has been operated toll-free on a 24-hour-per-day basis.

24. *Terminal and transfer facilities.*—At Baton Rouge, these comprise a public concrete wharf and appurtenances for barge and deep-draft vessel traffic and private terminals and docks for handling oil and other commodities, located along the river front as far as the Baton Rouge Bridge (reference unpublished report, Survey of Terminals and Landings on the Inland Waterways of the United States, Board of Engineers for Rivers and Harbors, 1941).

25. Port facilities at New Orleans, described in detail in the Port of New Orleans, La., Port Series No. 5, revised 1938, include at least 100 wharves with depths varying from 12 to 40 feet.   On the left bank, structures are located on the levee and form an almost continuous quay for 10 miles.   Public terminal business is controlled by the Board of Commissioners, Port of New Orleans, with wharves covering about 62 percent of the improved water front.   Most of the wharf area is served by modern transit sheds equipped with riverside aprons 20 to 30 feet wide for shipside loading, and with landside streets and railroad tracks, notably the New Orleans Public Belt Railroad, for interchange of commodities between terminals and railroads.   On the right bank, railway and private terminal piers and wharves are sited at Westwego, Gretna, and Algiers.   At the last-named location are drydocks for deep-draft vessels of which the largest is that of the United States naval installation, which is placed at the service of commercial craft when private docks are not available. Above New Orleans, private terminals for seagoing commerce are operated by five oil companies and two sugar refineries, and below the city at least four oil companies have private terminals; the pier of the Seatrain Line is located at Belle Chasse; and the Freeport Sulphur Co. operates its terminal at Port Sulphur.   The inner-harbor navigation canal and lock, which provides access for vessels which can negotiate the sill (i. e., with fresh-water draft not more than 31 feet), affords four lateral slips, marginal wharves, a turning basin 1,000 feet square, and a connecting channel to the Intracoastal Waterway east from the city where industrial sites (including the Higgins Industries) were developed in war years.   Here undeveloped terminal sites are available but railway and highway connections are limited. In general, terminal facilities at New Orleans, developed to meet increasing requirements of expanding commerce of a premier river

Prod. # MRGOX7307

Case 2:05-cv-04182-SRD-JCW   Document 16790-12   Filed 12/18/08   Page 3 of 23

terminal and transfer port serving both deep- and shallow-draft traffic, have been installed along unstable river banks where stage fluctuation is a restrictive factor. The dock board states that these terminals must soon be augmented to serve further increase in water-borne commerce incident to continuing development of the Mississippi Valley and the Nation. Extension of marginal wharves above or below the city involves attenuation of surface transportation with attendant decreased efficiency of terminal transfer operations. Expansion along the Intracoastal Waterway and development of a tide-water terminal basin on unimproved property is highly desirable if the improvement is located close enough to the city to facilitate continuing development of water-front terminals with highway and rail-road connections. Establishment of a free port area for transshipment of foreign commerce of the port without clearance through customs, deferred during war years, has been authorized by the Department of Commerce and presumably will be activated in the early future as a feature of postwar reconstruction.

## V. IMPROVEMENT DESIRED

26. *General.*—A public hearing held at New Orleans, August 5, 1943, was attended by some 500 representatives of Federal, State, city, and parish agencies; financial, commercial, industrial, and shipping interests; and numerous civic and social organizations. Transcript of hearing and exhibits I–LXXXIX,[1] presented at that time or later, are appended. The Board of Commissioners of the Port of New Orleans (the New Orleans Dock Board), and others proposed a deep-draft outlet channel (seaway) from the Industrial Canal to the Gulf, east of the Chandeleur Islands. Jefferson Parish officials, the Mississippi Valley Seaway Canal Association, and other west-bank interests proposed a similar channel on the west bank from Westwego to the Gulf at Grand Isle. The Inland Waterways Corporation and others suggested the advisability of expanding lock facilities for inland-waterway traffic.

27. *East bank outlets.*—The dock board stated (exhibit LVII [1]) that an additional east-bank outlet (seaway) would afford a deep, safe, and dependable tidewater channel from New Orleans to deep water in the Gulf, which would involve no difficult problems in engineering; that its cost would be reasonable in comparison with resulting benefits; that it would not be subject to shoaling by river-borne sediment; and that it would make available large areas of land for future development of a tidewater port. On July 16, 1945, the dock board submitted a second brief (exhibit LVII–A [1]) in which it outlines its status as an agency of the State of Louisiana, recounts addresses and briefs submitted at the public hearing, and presents engineering reports by Col. Elliot J. Dent, United States Army, retired, consulting engineer; Dr. Robert W. French, Louisiana State University; and V. J. Bedell Co., consulting engineers. Later, on June 1, 1946, the dock board submitted a supplementary brief (exhibit LVII–B,[1] report by Knappen Engineering Co.), in which it is pointed out that New Orleans needs to expand its general-cargo-handling facilities and harbor space to provide at least 3,000,000 tons additional annual capacity, and that such expansion may be effected

[1] Not printed.

Prod. # MRGOX7308

economically by enlargement of the inner harbor and construction of a deep-draft outlet canal, for which channel dimentions of 500 by 36 feet would suffice initially, with estimated cost of $25,000,000 for dredging and $1,380,000 annually for maintenance of the proposed canal, unless provided with a permanent dike for retention of dredged spoil. It is noted that access to the tidewater harbor may be provided by an additional deep-draft lock (40 by 100 by 1,000 feet), with connecting channel to the river, at an estimated cost of $24,200,000. It is stated that the dock board has spent over $30,000,000 in 25 years on inner-harbor improvements and contemplates an additional expenditure of $30,000,000 for further development.

28. *West bank outlets.*—The Seaway Canal Association, in its brief (exhibit LXXIV-A [1]), lists "reasons" and "advantages" in support of a west bank outlet, stating, among other things, that it is the shortest route between New Orleans and deep water in the Gulf, traversing unimproved lands rather than open water, thus involving minimum maintenance costs and facilitating construction of a highway to Grand Isle, to open up the area and enhance values of adjacent lands.

## VI. COMMERCE

29. *Existing commerce.*—Total traffic on the lower river for the period 1936–45, comprising that reported in annual reports of the Chief of Engineers for Mississippi River passes and ports of New Orleans and Baton Rouge, was as follows:

[Thousands of tons]

| Year | Passes | Port of New Orleans | Port of Baton Rouge | Year | Passes | Port of New Orleans | Port of Baton Rouge |
|---|---|---|---|---|---|---|---|
| 1936 | 14,005 | 14,332 | 5,092 | 1941 | 13,533 | 20,007 | 8,150 |
| 1937 | 16,906 | 17,173 | 6,510 | 1942 | 8,200 | 22,637 | 7,744 |
| 1938 | 16,319 | 17,225 | 7,092 | 1943 | 7,025 | 21,329 | 6,802 |
| 1939 | 15,597 | 16,305 | 7,898 | 1944 | 9,053 | 23,949 | 7,844 |
| 1940 | 15,807 | 16,706 | 7,501 | 1945 | 13,387 | 25,205 | 6,967 |

30. Seagoing commerce through the passes, including foreign and coastwise traffic, for the years 1941 and 1945, consisted of commodities classified as follows:

[Thousands of tons]

| Commodity class [1] | 1941 | | 1945 | |
|---|---|---|---|---|
| | Imports | Exports | Imports | Exports |
| Products of agriculture | 2,711 | 531 | 959 | 1,246 |
| Animal products | 101 | 75 | 141 | 87 |
| Products of mines | 400 | 430 | 173 | 2,169 |
| Products of forests | 164 | 557 | 102 | 171 |
| Manufacturing and miscellaneous | 1,114 | 7,445 | 2,072 | 5,667 |
| Total | 13,533 | | 13,387 | |

[1] Imports and exports in table include coastwise receipts and shipments.

31. Distribution of seagoing commerce at points on the river from Head of Passes to Baton Rouge for the years 1941 and 1945 is shown in the following table:

[1] Not printed.

Prod. # MRGOX7309

[Thousands of tons]

| Points of loading or unloading | Receipts and shipments 1941 | Receipts and shipments 1945 | Points of loading or unloading | Receipts and shipments 1941 | Receipts and shipments 1945 |
|---|---|---|---|---|---|
| Below New Orleans: | | | Above New Orleans: | | |
| Pilottown | 252 | 234 | Avondale | | 170 |
| Port Sulphur | 323 | 362 | St. Rose | 297 | 204 |
| Total, lower harbor | 575 | 596 | Destrehan | 169 | 36 |
| | | | Good Hope | 186 | 165 |
| Within port of New Orleans: | | | Norco | 350 | 493 |
| Inner Harbor (Industrial Canal) | 121 | 250 | Gramercy | 11 | |
| East bank river wharves | 5,538 | 8,113 | Total, New Orleans to Baton Rouge | 913 | 1,104 |
| Total, east bank | 5,659 | 8,363 | Port of Baton Rouge | 4,118 | 2,505 |
| Belle Chasse | 538 | 220 | Grand total | 13,533 | 13,387 |
| Gretna | 175 | 2 | | | |
| Marrero | 946 | 296 | | | |
| Westwego | 609 | 241 | | | |
| Total, west bank | 2,268 | 759 | | | |

82. *Intracoastal waterway traffic.*—That east and west of the Mississippi River for the period 1939–45 was recorded by sections as follows:

[Thousands of tons]

| Year | Mobile Bay to New Orleans | Mississippi River, La., to Atchafalaya River — Harvey Lock | Mississippi River, La., to Atchafalaya River — Plaquemine Lock [1] | Year | Mobile Bay to New Orleans | Mississippi River, La., to Atchafalaya River — Harvey Lock | Mississippi River, La., to Atchafalaya River — Plaquemine Lock [1] |
|---|---|---|---|---|---|---|---|
| 1939 | 1,077 | 2,063 | 391 | 1943 | 4,470 | 8,753 | 3,201 |
| 1940 | 2,051 | 3,389 | 420 | 1944 | 5,807 | 11,441 | 2,362 |
| 1941 | 3,054 | 6,180 | 1,300 | 1945 | 5,172 | 9,253 | 1,600 |
| 1942 | 3,545 | 8,937 | 3,404 | | | | |

[1] Through traffic.

33. Through freight traffic on the Intracoastal Waterway for sections east and west of the Mississippi River for the years 1941 and 1945 consisted of commodities classified as follows:

[Thousands of tons]

| Commodity class | Mobile Bay to New Orleans — East | Mobile Bay to New Orleans — West | Mississippi River to Atchafalaya River — Harvey Lock East | Mississippi River to Atchafalaya River — Harvey Lock West | Mississippi River to Atchafalaya River — Plaquemine Lock [1] East | Mississippi River to Atchafalaya River — Plaquemine Lock [1] West |
|---|---|---|---|---|---|---|
| 1941—Products of agriculture | 185 | 24 | 37 | 66 | 9 | 12 |
| Animal products | 72 | 11 | 25 | 3 | | |
| Products of mines | 11 | 50 | 94 | 346 | | 9 |
| Products of forests | 70 | 23 | 29 | 17 | 27 | 2 |
| Manufacturing and miscellaneous | 1,629 | 809 | 4,803 | 1,060 | 1,073 | 168 |
| Total | 2,884 | | 6,180 | | 1,300 | |
| 1945—Products of agriculture | 13 | 1 | 14 | 25 | | 2 |
| Animal products | 109 | | 6 | 3 | | |
| Products of mines | 94 | 522 | 2,920 | 149 | 949 | 88 |
| Products of forests | 72 | 1 | 4 | 1 | | 1 |
| Manufacturing and miscellaneous | 4,254 | 106 | 5,620 | 605 | 534 | 32 |
| Total | 5,172 | | 9,253 | | 1,600 | |

[1] Through traffic

Prod. # MRGOX7310

34. *Industrial-canal traffic.*—Statistics relating to Intracoastal Waterway (pars. 32 and 33) do not cover commerce pertinent to the industrial canal and lock. Traffic served by this facility, as recorded by the dock board for fiscal years 1934–43, consisted of vessels and cargoes as follows:

*Traffic through Industrial Canal and lock*

| Fiscal year | Vessels | Cargo | Fiscal year | Vessels | Cargo |
|---|---|---|---|---|---|
| | | *Thous. tons* | | | *Thous. tons* |
| 1934 | 13,382 | 5,353 | 1939 | 16,194 | 5,905 |
| 1935 | 12,660 | 5,505 | 1940 | 17,070 | 6,081 |
| 1936 | 13,451 | 5,151 | 1941 | 19,705 | 7,040 |
| 1937 | 14,401 | 5,625 | 1942 | 21,986 | 7,509 |
| 1938 | 16,499 | 5,002 | 1943 | 25,700 | 9,826 |

35. *Vessel traffic.*—The following tabulation shows trips and drafts of vessels traversing the passes during the years 1941 and 1945:

| Draft (feet) | Steamers | | | | Barges | |
|---|---|---|---|---|---|---|
| | South Pass | | Southwest Pass | | Both passes | |
| | In-bound | Out-bound | In-bound | Out-bound | In-bound | Out-bound |
| 1941—35 to 34 | | | | 25 | | |
| 33 to 33 | | | 4 | 53 | | |
| 31 to 32 | 3 | 10 | 9 | 70 | | |
| 30 to 31 | 1 | 23 | 5 | 30 | | |
| 28 to 30 | 20 | 108 | 35 | 72 | | |
| 26 to 28 | 62 | 216 | 86 | 47 | | |
| 24 to 26 | 176 | 234 | 116 | 28 | | 2 |
| 22 to 24 | 232 | 174 | 78 | 30 | 2 | |
| 20 to 22 | 235 | 169 | 82 | 47 | | 2 |
| 18 to 20 | 385 | 234 | 97 | 63 | 2 | 1 |
| Under 18 | 718 | 520 | 162 | 265 | 10 | 9 |
| Total | 1,832 | 1,703 | 674 | 716 | 14 | 14 |
| 1945—35 to 36 | | | | 1 | | |
| 33 to 34 | | | | 21 | | |
| 32 to 33 | | 4 | 7 | 46 | | |
| 31 to 32 | | 31 | 1 | 49 | | |
| 30 to 31 | 2 | 12 | 5 | 13 | | |
| 29 to 30 | 30 | 215 | 71 | 90 | | |
| 26 to 28 | 90 | 156 | 78 | 47 | | |
| 24 to 26 | 77 | 146 | 58 | 45 | | 12 |
| 22 to 24 | 141 | 140 | 68 | 35 | | |
| 20 to 22 | 160 | 176 | 70 | 71 | | |
| 18 to 20 | 317 | 248 | 116 | 107 | 1 | |
| Under 18 | 647 | 569 | 338 | 101 | 18 | 16 |
| Total | 1,521 | 1,706 | 812 | 719 | 19 | 28 |

Prod. # MRGOX7311

36. Trips and drafts of vessels which moved through sections of the Intracoastal Waterway during 1941 and 1945 are shown in the following tabulation:

| Draft (feet) | 1941 | | | | 1945 | | | |
|---|---|---|---|---|---|---|---|---|
| | East-bound | | West-bound | | East-bound | | West-bound | |
| | Self-pro-pelled | Barges | Self-pro-pelled | Barges | Self-pro-pelled | Barges | Self-pro-pelled | Barges |
| Mobile Bay to New Orleans | | | | | | | | |
| 9 to 12 | | | | | 145 | 22 | 145 | |
| 6 to 9 | 2,661 | 2,331 | 2,321 | 1,367 | 2,340 | 4,161 | 1,878 | 757 |
| 3 to 6 | 6,529 | 644 | 6,824 | 258 | 1,120 | 101 | 1,027 | 29 |
| Under 3 | 507 | 1,158 | 657 | 2,399 | 210 | 211 | 219 | 4,225 |
| Total | 13,811 | | 13,826 | | 8,325 | | 8,280 | |
| Mississippi River, La., to Sabine River, Tex. | | | | | | | | |
| 9 to 12 | | | | | 781 | 745 | 714 | 405 |
| 6 to 9 | 4,630 | 5,648 | 4,608 | 5,634 | 5,295 | 8,865 | 5,307 | 4,684 |
| 3 to 6 | 4,076 | 1,805 | 4,817 | 1,027 | 4,551 | 999 | 4,355 | 1,470 |
| Under 3 | 402 | 7,162 | 637 | 7,029 | 306 | 6,773 | 162 | 10,468 |
| Total [1] | 24,043 | | 24,642 | | 28,315 | | 27,055 | |
| Plaquemine to Morgan City | | | | | | | | |
| 6 to 9 | | 1,071 | | 308 | 433 | 790 | 489 | 157 |
| 3 to 6 | 569 | 85 | 1,112 | 52 | 200 | 64 | 200 | 89 |
| Under 3 | 561 | 392 | 19 | 1,183 | 39 | 260 | 39 | 879 |
| Total | 2,678 | | 2,074 | | 1,910 | | 1,943 | |

[1] East and west through Harvey lock, 13,115 and 13,652 in 1941; 17,755 and 18,053 in 1945.

37. *Prospective seagoing traffic.*—Shipping interests anticipate (exhibit LVII–A[1]) an increase of 50 percent or more in seagoing commerce at New Orleans. Analysis by the United States Maritime Commission (exhibit LXXXVIII [1]) discloses that general-cargo foreign trade of the port did not increase between 1923 and 1940 but that constwise shipping and internal traffic in the decade ending in 1940 was more than twice that of the decade of the twenties, and that the total general-cargo traffic in foreign, coastwise, and internal trade almost doubled in 17 years ending in 1940. Noting that analysis of trade prospects of New Orleans does not bear out traffic estimates of proponents, the Maritime Commission suggests that New Orleans should share in expansion of general-cargo foreign trade expected by the Department of Commerce and will need the proposed additional channel and port facilities to care for that expansion. Petroleum interests state (exhibit LXXXII [1]) their aversion to side channel outlets and advise that they prefer to use the improved river channel. Terminals for bulk traffic in oil and sulfur are outside the port of New Orleans and these commodities properly may be excluded in estimates of prospective commerce for proposed outlets. Thus seagoing commerce that may be

[1] Not printed.

Prod. # MRGOX7312

Case 2:05-cv-04182-SRD-JCW   Document 16790-12   Filed 12/18/08   Page 8 of 23

served by proposed east-bank outlets consists of general cargo which is served by east-bank and inner-harbor terminals (par. 31) and a 50-percent increase in this traffic is a reasonable expectancy; hence, prospective commerce pertinent to this section of the port may be expected to expand to more than 10,000,000 tons, terminal handling of which would be facilitated by a tidewater harbor with a direct outlet to the Gulf, especially if proposed tidewater facilities and existing east bank terminals are operated by a single agency, i. e., the New Orleans Dock Board.

38. Prospective deep-draft commerce, that may be served by the proposed west-bank outlet, consists of general cargo which now uses west-bank terminals between Belle Chasse and Westwego (par. 31), and this traffic also may be expected to increase by 50 percent to more than 3,000,000 tons, handling difficulties for which would be lessened by a tidewater harbor with direct outlet to the Gulf.

39. *Inland-waterway traffic.*—During the period 1939–45, Intracoastal Waterway commerce between Mobile and New Orleans varied between 1,500,000 and 6,000,000 tons, and during the war years (1941–45), averaged nearly 4,500,000 tons. Reasonably, some decline in postwar waterway traffic may be expected, but improvement of the waterway connecting the Tombigbee and Tennessee Rivers, authorized by the River and Harbor Act approved July 24, 1946, presupposes diversion of Mississippi River traffic of 3,000,000 tons or more (H. Doc. No. 486, 79th Cong., 2d sess.). If such diversion is effected, traffic on the Mobile–New Orleans section of the Gulf Intracoastal will be increased correspondingly. Thus prospective Intracoastal Waterway commerce (Mobile–New Orleans section) may be far greater than that reported for war years and may exceed 10,000,000 tons.

40. During the period 1939–45, Intracoastal Waterway commerce through Harvey lock, i. e., west of New Orleans, varied between 2,000,000 and 11,500,000 tons, and in war years (1941–45) averaged more than 9,000,000 tons. Some decline in this great traffic may be expected as a feature of postwar reconversion, especially in view of the recommended enlargement and extension of the Plaquemine alternate route to the Mississippi River opposite Baton Rouge; but some, if not all, of such decline may be offset by expanding oil production in the Gulf area.

## VII. DIFFICULTIES ATTENDING NAVIGATION

41. Usual hazards encountered in restricted channels and outlets therefrom attend navigation of the river and its passes. Fog observations by the New Orleans district for 1941 disclosed that in that year there were 50 occurrences at Burrwood on Southwest Pass, of which those characterized as "moderate" (visibility less than $\frac{5}{8}$ mile) obtained 134 hours; "thick" (visibility less than $\frac{5}{16}$ mile) 48 hours; and "dense" (visibility less than $\frac{1}{8}$ mile) 14 hours, indicating that fog is only a minor navigation hazard for traffic to and from New Orleans. River currents, less than a knot at low stages and more than 6 knots at crest of flood at and below New Orleans, retard up-bound and accelerate down-bound traffic but do not constitute a serious hazard for modern full-powered vessels. A traffic-control-signal system in New Orleans Harbor is operated during high stages. Flood flows up to 3 knots down Southwest Pass and 4 knots down South Pass emerge

Prod. # MRGOX7313

Case 2:05-cv-04182-SRD-JCW   Document 16790-12   Filed 12/18/08   Page 9 of 23

to meet littoral currents of varying strength (up to 2 knots), generally from east to west across the bar channels. Attendant highwater shoaling at the bar entrance of Southwest Pass entails restricting drafts of vessels when adequate depth cannot be maintained by dredging operations. Such restriction prescribes a maximum draft, generally not less than 31 feet, during high stages of prolonged floods, but in 1946 it was necessary to restrict maximum draft to 30 feet for 10 days (March 12–22).

Low-powered vessels, when encountering cross currents at the entrance to South Pass, find it difficult to negotiate the turn at the junction of bar and jetty channels. Similar difficulty at Southwest Pass is less drastic. Regulations promulgated in 1931, directing vessels with speed less than 9 knots to negotiate Southwest Pass rather than South Pass when Mississippi I  er stage at Carrollton exceeds 15 feet, effected material reduction in frequency of navigation casualties. There were but 33 accidents (20 in South Pass) incident to 51,764 trips through the passes in the period 1932–41 as compared to 116 incident to 48,384 trips in the period 1922–31. Accidents reported (tables 4 and 5 [1]) include those due to mechanical defects of vessels and lack of knowledge or errors in judgment by navigators as well as those due to fog, currents, and storms. On the river between Head of Passes and Baton Rouge there are few navigation difficulties. The channel is well defined by trees along the banks and well marked by modern aids to navigation.

42. Freight and insurance rates and pilotage charges reflect conditions affecting ship operations at ports. Major Gulf ports have equal rates to United States Atlantic ports and to foreign ports within a given range. The port equality principle is likewise preserved in determination of vessel and cargo insurance. Comparative pilotage charges (30-foot draft) are $180 at New Orleans, Mobile, Jacksonville, and Charleston; $220 at Savannah; and $165 at Houston.

## VIII. SURVEYS

43. Gage observations and hydrographic surveys of the river and passes necessary for a continuing record of changing conditions have been made regularly by the New Orleans district. These records together with hydrographic charts and coastal current observations of the United States Coast and Geodetic Survey, and summary report of the geology of the lower alluvial valley, prepared for the Mississippi River Commission, were supplemented by marine current observations, fathometer surveys, and subsurface exploration.

## IX. DEVELOPMENT OF EXISTING OUTLETS, BAR ADVANCE

44. Alternative routes for outlets from the Mississippi River to the Gulf of Mexico have been investigated in the interest of seagoing navigation, from time to time for almost a century. Recourse to a ship canal was considered, but not recommended except as a last resort, in the 1852 report (Ex. Doc. No. 16, 33d Cong., 1st sess.). A ship canal from the river near Fort St. Phillip to the Gulf was reported as feasible in the 1874 report (H. Doc. No. 113, 43d Cong., 1st sess.) A canal was considered but construction of jetties was recommended

[1] Not printed.

Prod. # MRGOX7314

in the 1875 report (H. Ex. Doc. No. 114, 43d Cong., 1st sess.). Improvement of South Pass with provision for jetty construction (the Eads contract) was authorized by the River and Harbor Act of March 3, 1875. On completion of the prescribed maintenance period, January 28, 1901, the improvement was accepted and has since been maintained by the Department. The South Pass improvement provided a dependable outlet, but it became evident that a larger outlet channel was required for increasing requirements of ocean commerce. Reports, based on investigations and surveys prosecuted in 1898 and 1899 for a channel 35 feet deep and adequate width through Southwest Pass (H. Doc. No. 122, 55th Cong., 3d sess. and H. Doc. No. 329, 56th Cong., 1st sess.), are project documents for improvement of Southwest Pass (pars. 19 and 20).

45. Improvement of deep-draft channels through the bars at the passes involved solution of engineering problems for which there was a dearth of precedent. In consequence, work was carried on gradually through many years. Experience revealed that bar channels at the passes should be located, not in prolongation of jettied channels, but on divergent alinements directed across littoral currents and into prevailing winds. Accordingly, bar channels for South Pass and Southwest Pass are inclined left at the lower end of the jettied channels with angles of divergence between 35° and 40°. As southeast winds are dominant in the vicinity of the passes, the littoral current deflects fresh-water discharge with its load of sediment to west (right) sectors of bars where deposition of sand and silt and attendant bar advance involves minimum encroachment of bar channels.

46. Observations made in 1931–33 indicated that during low river stages marine currents scour bar channel areas at the passes to but not below a depth of 32 feet to maintain project depth across the South Pass bar and to facilitate maintenance of the Southwest Pass bar channel. Eventual alteration of direction and effectiveness of marine currents incident to growth and advance of bars may be expected to involve extension of jetties and reconstruction of entrance channels. However, accelerated bar advance in recent years (1941–45) indicates that jetty extension and bar channel relocation will be necessary in the early future. Advance of bar contours, as revealed by hydrographic surveys, is shown on plate 3.[1]

47. Prior to adoption of the principle of divergent bar channels for the passes, continued maintenance of satisfactory entrance channels was open to question. In the report under review (Rivers and Harbors Committee Doc. No. 46, 71st Cong., 2d sess., 1930), the Board of Engineers for Rivers and Harbors found—

there was no serious difficulty in maintaining adequate channels during the past 5 years, and conditions are now such that it is believed that continued maintenance on a reasonable basis is assured.

The record evidences that such maintenance is practicable, and attendant costs to date are reasonably in line with those at other major American ports (table 3 [1]). However, the necessity for jetty extension due to bar advance, will cause maintenance to become increasingly costly and difficult.

[1] Not printed.

Prod. # MRGOX7315

## X. ADDITIONAL OUTLETS

48. Consideration was given to nine alternative outlets in reports contained in House Document No. 46, 71st Cong., 2d sess. The route outlined in authorizing resolutions and those proposed at and subsequent to the public hearing for this review (fig. 1 [1]) generally correspond to those discussed in reference reports as Chandeleur, Lake Borgne, and Barataria routes. Comparative estimates under uniform postulates (table 6 [1]) indicate that relatively slight difference in over-all cost of east-bank outlets and appurtenances results from change in alinement between common termini.

49. An east-bank outlet from New Orleans necessarily traverses marshlands and open waters (Lake Borgne, Mississippi, Chandeleur, or Breton Sounds) to the Gulf of Mexico. Construction and maintenance of inland sections of such a channel involve only routine dredging operations. Offshore sections, however, present more complex problems. Departmental experience in developing and maintaining harbors along the Gulf coast has shown it to be difficult to maintain deep channels in open shoal waters, particularly if alinement transverses prevailing winds and currents unless dikes of some type are provided. A nearby project, pertinent to a Mississippi east-bank outlet, is that for Gulfport-Ship Island Pass across Mississippi Sound. Here the authorized 26- by 220-foot channel, substantially in line with prevailing southeast winds but transverse to tidal currents through the sound, has been maintained by dredging alone since 1934 at an average annual cost of about $10,000 per mile, it being noted that shoals may consist of soft mud even though the dredged bottom is sand (reference, H. Doc. No. 692, 69th Cong., 2d sess, p. 25).

50. Construction work near New Orleans, notably that at the Industrial Canal lock where quicksand was encountered, and in the Gulf Intracoastal Waterway, indicates that subsurface strata in this part of the lower Delta comprise variable thicknesses of humus, clay, sand, and silt, and mixtures thereof. Borings in Chandeleur and Breton Sounds indicate that similar materials would be encountered there (plates 4 and 5 [1]).

51. The proposed west-bank outlet, as outlined in the brief (exhibit LXXIV-A [1]), leaves the river at or near mile 103, crosses the Texas & Pacific Railroad and then veers to a tangent extending southerly to and through Caminada Bay and Pass to the Gulf of Mexico west of Grand Isle. This route offers the obvious advantage that exposed shoal water is encountered only in Caminada Bay and at the Gulf entrance where protection works would be necessary.

52. *Sea level harbor basins.*--Proponents of east-bank outlets stressed the advantage of a tidewater channel and the benefits resulting from reclamation of marshlands for use in development of a tidewater port (par. 27). Generally tidewater harbor basins serve ports, such as London, Antwerp, and Le Havre, located on waterways where great tidal fluctuations make it advisable to provide constant level terminal basins connected with the tideway through locks. Use of such basins reduces foundation uncertainties and facilitates handling of cargoes at shipside. At New Orleans the range of tide

[1] Not printed.

is inconsequential but seasonal fluctuation of river stage, up to 20 feet, augments problems attendant upon construction and maintenance of marginal wharves or quays on unstable river banks.

53. The existing industrial canal affords tidewater terminal facilities for vessels not exceeding a draft of 31 feet in fresh water, but the alinement of the canal, transverse to railroads and highways, and use of the lock for inland waterway as well as oceangoing traffic cause serious congestion. However, the canal may readily be utilized as a feature of a tidewater harbor east of New Orleans along and south of the Intracoastal Waterway, development of which merits consideration in connection with further improvement of the Intracoastal Waterway as well as expansion of the port of New Orleans.

54. A sea level harbor on the east bank at New Orleans would serve oceangoing and inland-waterway commerce and should comprise a deep-draft turning basin with suitable slips and wharves, connecting channels leading to the Intracoastal Waterway and to the river through the existing lock and through a new deeper-draft lock, with or without an additional outlet to the Gulf (pl. 5 [1]). Similarly, a sea level harbor on the west bank would serve seagoing and Intracoastal Waterway commerce if it provides a deep-draft lock and a terminal turning basin with connecting deep-draft channel to the river and a shallow-draft channel to the Intracoastal Waterway, with or without an additional deep-draft outlet to the Gulf. Either alternative would provide a practically constant level tidewater harbor and, if implemented by adequate facilities to supplement marginal wharves now available on the river, would make New Orleans terminals equal if not superior to those of any world port.

55. *Relation between existing and proposed additional outlets.*—Characteristics of existing channels and proposed outlets with respect to channel dimensions, sailing distance, difficulties attending navigation, engineering problems, relation to sections of the ports, and cost are summarized as follows:

(a) *Channel dimensions.*—Initially, proponents proposed project dimensions of 40 by 600 feet for proposed outlets but in its latest brief (exhibit LVII-B [1]) the dock board suggests that a 36- by 500-foot channel will suffice. The existing project authorizes a 40-foot channel 800 feet wide through Southwest Pass and 600 feet across the bar, but these dimensions have not yet been secured.

(b) *Sailing distance.*—Proponents of east-bank outlets state that such improvement would provide a short route from New Orleans to deep water in the Gulf, and those supporting a west-bank outlet point out that their proposal would not only provide a short route to deep water in the Gulf, but also the shortest route from New Orleans (Harvey lock) to Dry Tortugas (Florida Straits) or Cape San Antonio (Yucatan Channel) on Gulf-Atlantic sea lanes. Sailing distance from New Orleans by way of the proposed west-bank outlet to Cape San Antonio is shorter than by South Pass by 12 miles but to Dry Tortugas sailing distances are equal. Similarly, distances from New Orleans to the same points by way of proposed east-bank outlets are longer than by South Pass by 32 and 10 miles, respectively (fig. 4 [1]). Speed limitations in restricted channels, time required for lockage, and efficiency of terminal operations and resulting time required for turn-around, are dominant factors and minor distance differentials are inconsequential.

(c) *Navigation difficulties.*—Most of the hazards attendant upon negotiation of restricted entrance channels, including those due to mechanical defects and human frailty, as well as those incident to fog and storm, are common to the river channel and proposed outlets alike. Those due to vagaries of river currents and unpredictable shoaling at entrances to the passes may be largely eliminated by recourse to an artificial outlet not subject to river currents if the outlet also is protected from transverse marine currents.

[1] Not printed.

Prod. # MRGOX7317

(d) *Relation of outlets to sections of the port.*—For seagoing vessels, the river and its improved outlets afford direct access to marginal wharves on both banks from Head of Passes to Baton Rouge and to inner harbor terminals through the Industrial Canal lock. Proposed additional outlets would serve terminals on new tidewater terminal basins primarily with access to marginal river wharves through deep-draft locks. Hence an additional outlet will supplement but not replace facilities afforded by the river and its improved passes under the existing project.

(e) *Costs.*—As of June 30, 1945, costs of the existing project were about $25,000,000 for new work and $21,000,000 for maintenance, and modification to secure a 40-foot channel in Southwest Pass is authorized at an estimated cost of $4,200,000. Approved estimates for annual maintenance costs are $1,169,000 (pars. 19 and 20). Proposed additional plans of improvement on the east and west banks are estimated to cost $53,000,000 each (table 7 [1]).

## XI. ECONOMIC ASPECT

56. Major expansion of seagoing commerce in postwar years is expected by local interests, estimates of increase range from 50 percent suggested by shipping interests (exhibit LVII–A [1]) to 200 percent of previous peak years suggested by economists (p. 4, appendix B of exhibit LVII–A [1]). The United States Maritime Commission noted that foreign and coastwise commerce doubled in the 17 years ending in 1940 and stated that analysis of trade prospects of New Orleans does not bear out traffic estimates of proponents but suggested that New Orleans should share in expansion of foreign trade expected by the Department of Commerce. The division engineer believes that continuing increase in seagoing commerce reasonably may be expected but notes that petroleum interests expressed their aversion to locks and side channels (par. 37). Accordingly he considers that a 50 percent increase in seagoing general cargo traffic of recent years (excluding war years, 1942–44), pertinent to specific sections of the port to be served directly by proposed outlets, is a reasonable expectancy. On this basis prospective annual commerce related to east and west bank proposals is estimated at 10,000,000 and 3,000,000 tons, respectively (pars. 37 and 38). Creation of a tidewater harbor on either bank at New Orleans effecting material economies in terminal-handling costs would tend to divert traffic to the improvement. However, the Board of Commissioners of the Port of New Orleans, a legally constituted agency of the State of Louisiana, has jurisdiction of the port and is a dominant factor in its development. Hence, assumption of a common percentage increase in commerce recorded for specific sections of the port directly affected by proposed improvements is a fair basis for estimating prospective commerce for the west-bank proposal and ultra conservative for the east-bank proposal sponsored by the dock board. Because traffic diversion that may result from provision of a tidewater harbor is unpredictable, prospective commerce for and the economic aspect of each of the proposed outlets is evaluated by extrapolating recorded traffic movements of recent years, war years excluded.

57. Economies adduced by proponents of additional outlets (seaways) and tidewater harbors include (a) savings in sailing time and attendant transportation costs; (b) reduction in hazards to navigation on the river and passes; (c) savings in port costs, including land transportation, pilotage, stevedoring, and maintenance charges on terminal wharves; (d) enhancement of land values; and (e) savings in

[1] Not printed.

Prod. # MRGOX7318

Case 2:05-cv-04182-SRD-JCW   Document 16790-12   Filed 12/18/08   Page 14 of 23

cost and maintenance of Federal projects.   With respect to economies adduced (table 8 [1]) it is considered that—

(a) Calculated savings in sailing time, based on traffic between New Orleans and Mobile, Pensacola, or Panama City (5,500 hours, p. 20, exhibit LVII–B [1]), adduced for an east-bank outlet, must be discounted as coastwise vessels do not necessarily make all ports of call.   Reasonably not more than 50 percent of such savings in sailing time (say 2,500 hours) may be accepted.   Similar saving in sailing time for coastwise traffic between New Orleans and Lake Charles, the Sabine ports or Galveston is applicable to a west-bank outlet.   Sailing distance differentials for foreign commerce (between New Orleans and Florida Strait or Yucatan Channel and points beyond) are relatively inconsequential.   A major saving incident to proposed east-bank improvements, adduced by east-bank proponents and accepted by analysts of the United States Maritime Commission, is reduction in turn-around time (time required in port, i. e., in-bound pratique to out-bound clearance).   Reasonably up to 10,000,000 tons of prospective commerce may be expected to use proposed east-bank-harbor facilities, involving, at trip tonnage rates indicated by traffic through the passes (pars. 29 and 35), upward of 2,000 vessel trips annually.   Reduction in turn-around time, to be effected by installation and operation of modern terminal equipment "made possible by location in tidewater with central railroad yard service," is estimated at 1¼ days per trip (pp. 12 and 13, exhibit LVII–B [1]).   Resulting savings in time (60,000 hours) are attributable to proposed east-bank improvements; i. e., tidewater harbor access and outlet channels.   Similar reduction in turn-around time on 3,000,000 tons of prospective traffic involving 600 vessel trips would apply to proposed west-bank outlet and access channels if implemented by similar facilities with proportional savings in time (18,000 hours).   Sailing time of general cargo vessels is currently valued at $65 per hour.

(b) Reduction in navigation hazards adduced by proponents of an east-bank outlet, some $120,000 (p. 30, exhibit LVII–B [1]), are applicable to side channels on either bank but must be discounted in amount because navigation accidents may be expected in any restricted channel and in the open seas.   It is considered that not more than 25 percent of savings adduced may be accepted in support of proposed improvements on either bank.

(c) Savings in port costs adduced by east-bank proponents include several items found by analysts of the United States Maritime Commission to be exaggerated so only 50 percent of these savings (say $700,000) may be accepted in support of the proposal.   Savings in pilotage may be disregarded since pilotage charges at New Orleans are in line with those at other Gulf and Atlantic ports.   Savings in annual charges on wharves on a tidewater harbor as compared with those on the river ($750,000) may be accepted but such savings are attributable to both channel and terminal improvements and only 50 percent ($370,000) are accepted in support of the channel.   Proportionate savings under this category are applicable to proposed west bank improvements.

(d) Proposed east-bank improvements would render adjacent lowlands suitable for development as terminal and industrial sites on the water front.   Resulting increase in land values varies from $300

[1] Not printed.

Prod. # MRGOX7319

to $800 per acre with corresponding enhancement estimated at $100,000 per year. Similar enhancement for proposed west-bank improvements is estimated at $30,000 per year.

(e) Proposed east-bank improvements include provision for a connecting channel for the Intracoastal Waterway to complete the section from Mobile to New Orleans and obviate the need for continued lease of Industrial Canal facilities. Appropriate allocation of cost for the connection is indicated by the comparable alternate west-bank connection authorized by the River and Harbor Act approved March 2, 1945 (S. Doc. No. 188, 78th Cong., 2d sess.); i. e., $8,000,000 for Federal construction and $100,000 for non-Federal expenditures for rights-of-way, with estimated annual Federal and non-Federal charges of $500,000 and $30,000, respectively. Corresponding Federal costs for leased facilities on the east bank now cost about $450,000, including annual rental payment of $240,000 which may be eliminated on termination of the lease. However, as only 2 percent of present commerce would be unable to use this existing lock, its replacement in the immediate future is not essential. Completion of the section of the Intracoastal Waterway west of the river provided for by existing authorizations is under construction, and the proposed west-bank outlet cannot be substituted for authorized features thereof. Proposed outlets on either bank would supplement but not replace navigation facilities provided by the river and its improved passes, so savings thereon may not be adduced in support of additional outlets.

58. In summary, annual benefits reasonably to be expected from alternative additional outlets outlined herein, implemented by effective operation of superior modern terminal facilities, are estimated at $5,260,000 for east-bank or $1,690,000 for west-bank outlets (table 8 [1]).

### XII. PLANS OF IMPROVEMENT

59. *General.*—Proponents of additional deep-draft outlets have assumed that such channels can be secured and maintained by dredging, but departmental experience in maintenance and improvement of Gulf-coast entrance channels does not support such assumption where shallow exposed coastal lakes or sounds are encountered. It has been demonstrated repeatedly that such channels should be sited through land cuts or provided with effective barriers to preclude return of dredged spoil into dredged channels. Hence the plan of improvement presented herein for an east-bank outlet and tidewater harbor provides for maximum use of land cuts, for a permanent retention dike across the sound and for jetties at the Gulf entrance. The proposed west-bank outlet would be land-locked so requires protection works (jetties) only at its Gulf entrance. Under criteria set forth in table 6,[1] plans of improvement are set forth below and shown on plates 1–5 [1] for additional deep-draft outlets to the Gulf on the east and west bank alternately. Each includes provision for access and outlet channels, lock with forebays, and turning basins. East-bank improvements outlined constitute a tidewater harbor and seaway outlet substantially as sponsored by the Board of Commissioners of the Port of New Orleans. Those for the west bank are substantially as proposed by the Mississippi Valley Seaway Canal Association, an organization of west-bank interests.

[1] Not printed.

Prod. # MRGOX7320

60. *East-bank improvements.*—These include complementary features as follows:

(*a*) *Tidewater harbor and connecting channels.*—Supplementing facilities provided by the existing projects "Mississippi River, Baton Rouge to the Gulf of Mexico" and "Gulf Intracoastal Waterway," this feature provides for creation of a tidewater harbor by construction of a 36- by 500-foot channel from the existing inner-harbor canal to a turning basin south of Micheaud.   Provision is also made for an eased entrance channel 36 feet deep from the left bank of the Mississippi River near Meraux (mile 86) leading into and combined with a river-side mooring basin and forebay; a lock tentatively 760 feet long and 110 feet wide, with a depth of 40 feet on the sills; a landside forebay and mooring basin leading into a connecting harbor channel 36 feet deep and 500 feet wide when such construction is warranted by prospective commerce.

(*b*) *Outlet (seaway).*—This feature provides for construction of a channel 36 feet deep and 500 feet wide extending as a land and water cut on tangents and easy curves from a turning basin south of Michaud southeasterly to and along the south shore of Lake Borgne and through the marshes to and through Chandeleur Sound and Islands, at or north of Errol Island, to deep water in the Gulf of Mexico, a distance of 70 miles.   Provision is included for a permanent retention dike across the sound and for parallel jetties from Chandeleur Islands to the 20-foot-depth contour in the Gulf, with a wing dike along the islands, as required, the channel through the jetties and across the bar to be flared to provide a width of 600 feet at the 38-foot contour.

61. *Costs.*—Estimated costs and annual charges for proposed east bank improvements (table 7 [1]) are summarized as follows:

[Millions of dollars]

| Feature | First cost | | Annual charges | |
|---|---|---|---|---|
| | Federal | Non-Federal | Federal | Non-Federal |
| Tidewater harbor and outlet (seaway) | 53.00 | 0.50 | 3.24 | 0.03 |

62. *West-bank improvements.*—These include complementary features as follows:

(*a*) *Lock and appurtenances.*—This feature provides for construction of an eased entrance channel 36 feet deep from the right bank of the Mississippi River near Westwego (mile 103) leading into and combined with a riverside mooring basin and forebay; a lock tentatively 760 feet long and 110 feet wide with a depth of 40 feet on the sills; and a landside forebay and turning basin suitable for development as a tidewater terminal harbor as proposed by its sponsors.   The plan involves readjustment of the Mississippi River main west-bank levee; relocation or reconstruction of highways, railways, and utilities; and construction of a movable railway and highway bridge.

(*b*) *Outlet (seaway).*—This feature provides for a channel 36 feet deep and 500 feet wide extending as a land and water cut on tangents and easy curves from the terminal turning basin (feature (*a*)) to and through the Barataria marshes and Caminada Bay and Pass to deep

[1] Not printed.

Prod. # MRGOX7321

water in the Gulf of Mexico, a distance of 55 miles. Provision is included for parallel jetties from Caminada Pass to the 20-foot-depth contour in the Gulf; the channel through the jetties and across the bar to be flared to provide a width of 600 feet at the 38-foot contour.

63. *Costs.*—Estimated costs and annual charges for west bank improvements (table 7 [1]) are summarized as follows:

[Millions of dollars]

| Feature | First cost | | Annual charges | |
|---|---|---|---|---|
| | Federal | Non-Federal | Federal | Non-Federal |
| (a) Lock, access channel, and turning basin | 26.0 | 0.2 | 1.40 | 0.01 |
| (b) Outlet (seaway) | 27.0 | 0.3 | 1.44 | 0.02 |
| Total | 53.0 | 0.5 | 2.84 | 0.03 |

64. *Résumé of estimates of costs and benefits.*—As shown above, estimated costs for proposed east-bank improvements (tidewater harbor and additional deep-draft outlet to the Gulf with connecting channel to the inner harbor) are $53,000,000 for Federal construction and $500,000 for non-Federal expenditures for rights-of-way. Attendant total annual charges, $3,270,000, are commensurate with annual benefits to commerce reasonably to be expected, $5,260,000 (table 8 [1]). The economic ratio is 1.61. Estimated costs for proposed west bank improvements (tidewater terminal and deep-draft outlet to the Gulf) are $53,000,000 for Federal construction and $300,000 for non-Federal expenditures for rights-of-way. Attendant annual charges, $2,870,000, are considerably in excess of benefits to commerce reasonably to be expected, $1,690,000 (table 8 [1]). The economic ratio is 0.59.

### XIII. SPECIAL SUBJECTS

65. *Shore line changes.*—Construction of a deep-draft channel across Chandeleur Sound with dredged material deposited seaward of a retention dike, as contemplated by the plan of improvement, will create a continuous barrier across the sound to intercept prevailing southeast seas, will reduce the magnitude of feeble rotary currents which obtain in the sound, and cause no material change in the mainland shore line. Aids to navigation have not been defined but the local commandant of the United States Coast Guard service collaborated in preparation of cost estimates for navigation aids. The proposed west-bank outlet, land-locked inshore from Caminada Bay, likewise would cause no material change on the mainland shore. Aids to navigation for the proposed channel have not been defined.

### XIV. DISCUSSION

66. The Board of Commissioners for the Port of New Orleans, the legally constituted agency of the State of Louisiana for operation of the port, together with civic and political organizations and financial, industrial, and shipping interests of the city, State, and alluvial

---
[1] Not printed.

Prod. # MRGOX7322

valley, sponsor Federal construction of an additional deep-draft
outlet from the Mississippi River at New Orleans to and across
Chandeleur Sound to the Gulf of Mexico. They point out that harbor
expansion and improved terminals for general-cargo traffic are now
urgently required for present and prospective commerce. The board's
consultants advise that installation and operation of improved
terminals on a tidewater harbor would effect a saving of 1¼ days per
vessel trip with coincident economies in port charges and in construc-
tion and operation costs of terminal wharves and appurtenances.
The board cites its large investment in marginal river wharves and
Industrial-Canal facilities and contemplated new improved terminals
on a tidewater harbor east of the city as an appropriate measure of
local cooperation.

67. West-bank interests, including the Mississippi Valley Seaway
Canal Association, request Federal construction of an additional outlet
from the west bank of the river to the Gulf south of Caminada Bay.
They stress the relatively short distance to the Gulf by the west-bank
alinement and suggest that terminal development could be financed
by the State of Louisiana.

68. Continued expansion of the great seagoing and inland waterway
commerce of the port is assured by its location on the Mississippi
River at the junction of the Gulf Intracoastal Waterway, where it
constitutes the gateway to the great system of inland waterways of
the central valley of the Nation. Obviously adequate outlets to the
Gulf of Mexico are essential and expansion and improvement of
harbor facilities are necessary to provide economically for the con-
venience and safety of expanding commerce.

69. Existing outlets through the improved passes suffice to serve
present commerce but accelerating shoaling of the Southwest Pass bar
indicates that expensive jetty extension and bar channel relocation
will be necessary in the early future, in connection with operations
required, but not initiated, to secure and maintain project channel
dimensions now authorized. An additional outlet, not subject to
vagaries of the river, obviously will provide added assurance of
uninterrupted access to the sea for deep-draft shipping.

70. Existing riverside wharves normally serve a great volume of
commerce, and during war years these terminals were severely over-
taxed to move a vast tonnage of military supplies which was not
reported in published statistics. Site restrictions incident to the
location of marginal wharves on unstable leveed banks riverward of
built-up city streets preclude expansion of these facilities to serve
additional commerce, so the dock board plans construction of new
and improved terminals on a tidewater harbor with direct egress to
the sea through the proposed east-bank outlet (seaway).

71. Proposed outlets at New Orleans obviously would not directly
benefit river terminals and installations above and below the port.
Moreover, petroleum interests, notably the Standard Oil Co. at Baton
Rouge, express preference for continued use of the river and aversion
to locks and side channels. Hence economic justification for addi-
tional outlets is calculated on the basis of economies that may be
effected in pertinent present and prospective general-cargo commerce
(foreign and coastwise), inland-waterway commerce, and internal-port
traffic, together with savings on construction and operation costs of
terminal facilities, and on benefits due to enhancement of property

Prod. # MRGOX7323

values incident to creation of tidewater harbors. On this basis it is found that the proposed west-bank outlet is not economically justified at this time (pars. 63 and 64).

72. Prospective seagoing commerce, general cargo, pertinent to an east-bank outlet developed as a tidewater harbor is estimated at not less than 10,000,000 tons annually (par. 37). This estimate excludes all seagoing traffic in oil, the dominant commodity of water-borne commerce, and disregards possible diversion of traffic not served by east-bank terminals heretofore. It is considered ultraconservative. Prospective waterway commerce east of New Orleans, greatly expanded in war years, may be expected to decline, but such decline presumably will be offset by diversion of Mississippi River commerce to the authorized Tombigbee-Tennessee waterway (par. 39). The east-bank improvement outlined herein may in the future be amplified, when found justifiable, by the construction of an additional lock and connecting channels to the Mississippi River, which will complete the Mobile-New Orleans section of the Gulf Intracoastal Waterway (which now utilizes leased facilities of the State-owned Industrial Canal) and relieve congestion in the harbor. The improvement, implemented by improved port facilities, will effect reduction in turn-around time for seagoing general-cargo vessels, savings in terminal and transfer charges, and in costs for construction and operation of terminal facilities. Resulting benefits are estimated at $5,260,000 annually (par. 64).

73. Estimated costs for the east-bank improvement are $53,000,000 for Federal construction and $500,000 for non-Federal expenditures for rights-of-way (par. 61). Corresponding annual charges, Federal and non-Federal, are $3,240,000 and $30,000, respectively. The indicated ratio of charges to benefits is 1.61.

74. Under established practice, port development is effected co-operatively, with harbor channels and connections (access, outlet and inland waterway channels), turning basins and locks, as well as bridges over land cuts, generally provided by the Federal Government. Rights-of-way and terminal facilities (including slips, piers, warehouses, land transportation, and other port facilities) are responsibilities of port authorities, subject to regulations approved by the Secretary of War to ensure equitable operation. The plan outlined in paragraph 60 supra is predicated on such cooperative development to create a tidewater harbor with alternate outlets to the river and sea. Full utilization of existing river, inner harbor, and Intracoastal Waterway facilities is contemplated. The plan lends itself to step construction, with priorities and definitive location of features fixed in the discretion of the Chief of Engineers to fit into a flexible, long-range program of port development to serve the public through many generations.

75. Comprehensive development of a national port such as New Orleans properly should be planned to facilitate its use for national defense in emergencies. In the recent World War, the port of New Orleans, the Mississippi River, and the system of inland waterways were important factors in deployment of war supplies, but locks and terminals at New Orleans were greatly overtaxed. With continuing growth of population and development of resources of the Mississippi Valley and decentralization of industry, it is believed that the port, the river, and the inland waterways will be used to a still greater extent in another national emergency.

Prod. # MRGOX7324

76. Although future technical developments of warfare cannot be foreseen clearly, the basic principle of dispersion undoubtedly will continue to apply to protection of important installations, such as national ports of embarkation. The recent war demonstrated that harbor facilities, if dispersed and provided with unrestricted or alternate exits to the sea, are rendered inoperative by air or sea action with great difficulty, and if damaged can be restored to usable condition quickly, in part if not completely. Hence wide dispersion of harbor facilities should be provided for in any plan for comprehensive port development. New Orleans riverside wharves, of timber construction on long wood piles, cannot be expected to resist destruction by bombing as practiced in the recent war, and attack by atomic bombing is now possible. These terminals, sited on unstable banks subject to shoaling and scour by a river with a 20-foot range of stage, cannot be developed for efficiency and permanence to the degree possible on constant level harbors, so preferably additional installations in the interest of national defense should be located off the river with unrestricted outlet to the sea and access to the river through locks which, from a security standpoint, can be considered as alternate entrances. Locks are attractive targets for aerial bombing and are subject to sabotage unless well guarded. However, recent war experience disclosed that massive lock structures resist bombing attacks and damaged gates can be repaired or replaced, so locked harbors are not easily rendered inoperative by aerial attack. Recourse to alternate locks and access channels ensures the availability of part if not all of a dispersed harbor.

77. No expression as to possible use of proposed port improvements by the United States Navy has been received. Naval officers advise (exhibit III [1]) that the Navy would not construct a base without unobstructed outlet to the sea, but that any aid to shipping would be of value (exhibit XLI [1]).

78. National defense not only involves military installations, but also, complete systems of transportation by air, land, and water to facilitate mobilization and deployment of personnel, materials, and supplies. Due to the unpredictable nature of future wars, the hazards inherent in industrial concentrations at coastal ports, and the possibility of attack without warning, it well may be necessary to use national ports of embarkation such as New Orleans to an unprecedented degree, so port-development plans should include provision for potential sites for new facilities required by new emergencies.

79. The improvement outlined in paragraph 60 will provide a tidewater outlet and harbor sufficiently spacious for dispersion of docks and cargo-handling facilities, thus permitting flexible operation of inland and seagoing commerce utilizing the river and passes, the tidewater harbor and outlet, and the Intracoastal Waterway. Provision of such facilities in time of peace so that they may be available for adaptation to the requirements of any emergency is patently in the national interest.

80. *Coordination with other agencies.*—After perusal of the report, the director of the Louisiana Department of Public Works, designee for the Governor of Louisiana, expressed full concurrence with findings presented; the president of the New Orleans Tidewater Develop-

[1] Not printed.

ment Association also concurs, but favors construction priority for the outlet channel in preference to the lock and access channel; and the chief engineer of the Board of Commissioners for the Port of New Orleans advises that the plan is substantially that proposed by that agency.

## XV. Conclusion and Recommendation

81. *Conclusion.*—Taking cognizance of the favorable economic aspect of the proposed additional deep-draft outlet from New Orleans to the Gulf of Mexico seaward of the Chandeleur Islands if developed comprehensively as a tidewater harbor, with access to the river, and the Intracoastal and Industrial Canals, and implemented by superior port terminals and facilities; the division engineer considers it advisable to adopt a long-range development program for the port of New Orleans as a major feature of existing projects for "Mississippi River, Baton Rouge to the Gulf of Mexico," and "Gulf Intracoastal Waterway," to be prosecuted in cooperation with the local port authority, the Board of Commissioners of the port of New Orleans, as agent for the State of Louisiana. He finds that the proposed outlet and tidewater harbor east and southeast of New Orleans, in conjunction with the river and its improved passes, will permit expansion and improvement of port facilities to serve all water-borne commerce that may be attracted to the port as the gateway to the Mississippi Valley and its improved inland waterways, with resulting benefits to present and prospective seagoing and inland-waterway navigation and commerce considerably in excess of charges for construction and operation. He also considers that the proposed improvement will greatly enhance the capacity of the port for emergency war service, since it provides for wide dispersion of terminal facilities for embarkation of personnel, material, and supplies in the interest of national defense.

82. *Recommendation.*—The division engineer recommends that the existing project, "Mississippi River, Baton Rouge to the Gulf of Mexico," be modified to provide for an additional east bank, deep-draft outlet and tidewater harbor by construction of a connecting harbor channel 36 feet deep and 500 feet wide extending from the existing inner harbor canal to a turning basin south of Micheaud, and a channel 36 feet deep and 500 feet wide extending as a land and water cut on tangents and easy curves from a turning basin south of Micheaud southeasterly to and along the south shore of Lake Borgne and through the marshes to and through Chandeleur Sound and Islands, at or north of Errol Island, to deep water in the Gulf of Mexico, a distance of approximately 70 miles; with provision for the future construction of an additional lock near Meraux and connecting channels and appurtenances between the turning basin and the Mississippi when such is found to be economically justifiable, generally as outlined in paragraph 60 hereof, subject to such modifications of location, alinement, and dimensions as may be approved by the Chief of Engineers, at an estimated initial cost of $53,000,000 for construction and $810,000 annually for maintenance and operation, in addition to that now required; subject to the provision that, prior to any construction expenditures, local interests furnish, free of cost to the United States, all lands, easements, rights-of-way, and spoil-

Prod. # MRGOX7326

disposal areas required for initial construction and subsequent maintenance; and furnish assurances, satisfactory to the Secretary of War, that they will hold and save the United States free from claims for damage incident to construction, maintenance, and operation of the improvement; and will construct, maintain, and operate terminal facilities commensurate with requirements of the expanded port, under regulations approved by the Secretary of War, to ensure its equitable operation in the public interest.

R. W. CRAWFORD,
*Major General, United States Army,*
*Division Engineer.*

LIST OF ILLUSTRATIONS MADE IN CONNECTION WITH THE REPORT OF THE DIVISION ENGINEER

(only plate 2 printed)

Plate 1—Index.
Plate 2—Plan of Improvement.
Plate 3—Hydrographic bar surveys and advance of contours, Southwest Pass.
Plate 4—Physical data and tentative sections.
Plate 5—Ship canal termini and locks.



PLAN OF IMPROVEMENT

MISSISSIPPI RIVER—GULF OUTLET
LOUISIANA

PLATE 2

Prod. # MRGOX7328