UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

IN RE: KATRINA CANAL BREACHES       CIVIL ACTION
CONSOLIDATED LITIGATION             NO. 05-4182  K2
                                    JUDGE DUVAL
PERTAINS TO:  MRGO AND ROBINSON
                    (No. 06-2268)

(V O L U M E   2)

Rule 30(b)(6) deposition of THE
UNITED STATES OF AMERICA, BY AND THROUGH THE
UNITED STATES ARMY CORPS OF ENGINEERS'
DESIGNEE JOHN SAIA, given at the U.S. Army
Corps of Engineers New Orleans District
offices, 7400 Leake Avenue, New Orleans,
Louisiana 70118-3651, on Wednesday, October 1,
2008.

1        there's an impact on.

2 EXAMINATION BY MS. GILBERT:

3     Q.   And in the impacts discussed by

4 over-depth dredging, does this information,

5 Supplemental Information Statement discuss or

6 analyze widening of the channel with respect

7 -- as an impact of over-depth dredging?

8     A.   See that it talks about the depth of

9 the -- of the channel.  It discusses that.

10     Q.   But does -- I'm sorry.

11     A.   I don't see -- I see channel depth.

12 I don't see channel -- anything about channel

13 widening in here.

14     Q.   Okay.  So that is not included among

15 the impacts discussed by over-depth dredging?

16     A.   I don't see a discussion of it.  I

17 just see a discussion of the depth related.

18        MS. GILBERT:

19          Okay.  Before we go on to Exhibit

20       9, I'm going to hand over the

21       deposition to Mr. Pierce O'Donnell to

22       complete.

23 EXAMINATION BY MR. O'DONNELL:

24     Q.   I finally get a chance?

25          Mr. Saia, how should I pronounce

1 your name?

2      A.   That's fine.

3      Q.   Saia?

4      A.   Saia.  Saia.  Saia.

5      Q.   Saia.

6      A.   I've had them all.

7      Q.   I'm another one of the lawyers for

8 the Plaintiffs in the Robinson case and the

9 other consolidated cases, and you have been

10 designated for a few additional topics and I

11 appreciate you letting me interrupt Miss

12 Gilbert's flow.

13           Topic 3 on the list of 30 (b)(6)

14 is, quote, "The Army Corps' budget,

15 appropriations, proposals, and requests for

16 funding associated with the construction and

17 maintenance of the MRGO, including all

18 supporting documentation and submissions to

19 Congress."  Is that an area that you have been

20 designated by the Corps to testify about?

21      A.   Yes.

22      Q.   Okay.  What was your -- Very

23 briefly, during your career with the Corps

24 were you involved in this area regularly?

25      A.   Yes.

1    Q.   Okay.  What was your function?

2    A.   You want me to go way back or --

3    Q.   Well, however far you need to go.

4    A.   I was Chief of Programs Management

5 from about 1980 to '88 in Sacramento,

6 California.

7    Q.   Chief of Programs Management?

8    A.   Yeah, Programs Management.

9    Q.   This is all with the Corps; right?

10   A.   Yeah, all with the Corps.

11   Q.   And that was with the Sacramento

12 District?

13   A.   Yes.

14   Q.   Okay.

15   A.   And I was -- supervised that

16 function for about six years and was

17 responsible for the budgetary activities here

18 in New Orleans.

19   Q.   And what period of time were you

20 responsible for the budgetary activities?

21   A.   2000, July, 2000 to December, 2004.

22   Q.   Prior to July, 2000, did you have

23 any involvement with the budgeting process for

24 the New Orleans District with regard to the

25 MRGO?

1      A.    No.

2      Q.    From July, 2000 to 2004 when you

3 were responsible for budget programming in the

4 New Orleans District, was the MRGO one of the

5 activities that was included within the

6 purview of your work?

7      A.    Yes.

8      Q.    You know, there's "Computers for

9 Dummies".  Can you give me the Corps budgeting

10 process for me, dummies, in just a skeletal

11 form?  In other words, there's a process, and

12 I have read a lot of documents on it.

13      A.    Yes.

14      Q.    Just tell me the basic steps by

15 which you ultimately get a proposal to

16 Congress for appropriations.

17      A.    Okay.

18      Q.    And why don't we focus on the MRGO.

19 As I understand it, there was an annual, or

20 maybe not annual, but there was a periodic

21 appropriation from Congress for operations and

22 maintenance of the MRGO.  Is that correct?

23 O&M?

24      A.    Yes, for many years.

25      Q.    For many years.  Okay.  I have heard

1 a lot of testimony in the last two days that

2 that -- included within that was the regular

3 dredging activities; correct?

4       A.    For O&M.

5       Q.    For O&M.  Right.

6       A.    Yeah, O&M appropriation.

7       Q.    Just tell me the steps, you know,

8 that you would follow by which you would

9 ultimately get to Congress for a request for

10 an appropriation for the MRGO.

11      A.    Well, I'm going to tell you in

12 general for all projects, which MRGO would

13 fall under the same procedures that are used

14 for all projects.  About -- Let's say you

15 would start in March and starting the

16 formulation of your budget to go to Congress,

17 which would be a year and a half later, for

18 funds that you would get a year and a half

19 later hopefully.  So in March you prepare your

20 needs at the District level.  You submit those

21 to the Division by approximately June.

22 Subsequently, they review it; you have

23 comments going back and forth relative to the

24 budget request.  Then after that, you -- after

25 submission, it goes to Headquarters.

1 Headquarters reviews it relative to the

2 overall budget for the nation for the various

3 appropriations.  After that, it goes to the

4 Assistant Secretary of the Army's Office,

5 who's also responsible for the overall

6 budget.  And that would be in the summer,

7 probably August time frame, somewhere around

8 there, August, September.  So during that

9 period of time.

10              Then after that, the Assistant

11 Secretary of the Army for Civil Works submits

12 it to OMB, and I would say that was probably

13 around September time frame, something like

14 that.  Then you'll get a pass-back from the

15 Office of Management & Budget around November

16 or December.

17      Q.   What is a pass-back?

18      A.   A pass-back is basically telling you

19 what you're going to get by project in terms

20 --

21      Q.   It is project by project?

22      A.   Yes.

23      Q.   So OMB would actually get to the

24 MRGO O&M level?

25      A.   I would assume so.  You know, I

1 can't answer for them, but the way I

2 understand it, they define by project what the

3 requirements will be.

4      Q.   They don't just say, "Instead of a

5 billion and a half, we're only going to give

6 you a billion and you whack it -- you whack or

7 divide it up."  No, they're more precise than

8 that?

9      A.   As far as I understand.

10     Q.   Okay.  Fine.  Go ahead.  Now we got

11 the OMB that says, "This is what you're going

12 to get."

13     A.   Well, then the pass-back, and then

14 there's rebutting or responding to it.

15     Q.   Okay.  There's a dialogue, so to

16 speak?

17     A.   There's a dialogue between the

18 Secretary of the Army's Office and so forth.

19 So you're into the December time frame.

20              After that, you have all the

21 adjustments made, you're ready for presenting

22 the President's budget; that will occur in --

23 you know, it's changed a little bit here and

24 there, but about the beginning of February,

25 the President releases the budget to

1 Congress.

2               Okay.  After that, that's -- Now

3 everyone knows what's in the budget and then

4 there is local testimony that occurs to the

5 subcommittee.  Normally that's done in March

6 or April.  So we're already a year, you know,

7 past a year.  Then during that period after

8 interested parties, public testimony, you go

9 to -- it starts going through the -- to the

10 committee for action, to subcommittees.

11      Q.   To subcommittee, committee?

12      A.   Yeah, to the House, Senate, and so

13 forth.  And so from maybe April, May, you

14 start seeing some work on it.  And then you

15 get into the summer.

16               If you do get a budget agreement

17 in the House, they go through their process,

18 and in the Senate, and then there's going to

19 be differences between the projects as they're

20 looked at at each -- they're looked at at the

21 project level.  If there are differences, then

22 they have a conference committee come together

23 and the conference committee then makes a

24 recommendation to the House and the Senate,

25 and they reach an agreement between what --

1 you know, what's going to be appropriated in

2 the bill.

3      Q.   Okay.

4      A.   And then after that, if it's acted

5 on, once it's acted on in the House and the

6 Senate, it's passed, it goes to the President

7 for signature.  And it may be different than

8 what we started with.  It could be plus or

9 minus, whatever, compared to the President's

10 budget, or it doesn't get signed at all and

11 the -- what happens is a continuing

12 resolution.  Just to continue at the same

13 levels that you -- of obligation in the

14 previous year and you're not allowed to start

15  -- generally you're not allowed to start any

16 new work.

17      Q.   And the fiscal year begins what,

18 October 1st?

19      A.   October 1st.

20      Q.   So that's the 18 month cycle

21 approximately you described earlier?

22      A.   Correct.

23      Q.   Now, I have read a fair number of

24 Corps documents the last couple of years and I

25 have noticed that as part of the budgeting

1 process, starting in the New Orleans District,

2 various types of documents are generated to

3 justify a budget request.  Am I correct about

4 that?

5      A.   That's correct.

6      Q.   Do you remember generically what

7 some of them are called?

8      A.   Well, normally you prepare a

9 justification sheet.

10      Q.   A justification sheet?  Okay.

11      A.   Of course, different projects, you

12 prepare different documents.  For construction

13 projects, you prepare a PB-2-A, which is the

14 schedule of expenditures and obligations they

15 were going to incur through the life of a

16 construction project.

17      Q.   O&M gets a justification sheet?

18      A.   Yes, it does.

19      Q.   Because that's already an existing

20 project?  And this is the operation --

21      A.   Yes, and that's submitted all the

22 way up ultimately to committee, that document.

23      Q.   So that goes to the committee.

24      A.   And it's also published in a

25 document, a Congressional document.

1     Q.   Do you know what that document is
2 called?

3     A.   It's some House report, Senate
4 report on appropriations for the energy and --
5 you know, for the committee, Energy and Water
6 Development, something like that.

7     Q.   And the justification sheet on O&M
8 for the MRGO is initiated at the District
9 level?

10     A.   Yes, it is.

11     Q.   Is it modified or altered as it goes
12 up through this pecking order you described?

13     A.   Yes, it is.

14     Q.   Okay.

15     A.   And one thing I might point out,
16 each year the preparation of the budget is
17 based on an Engineering Circular that's put
18 out, and each year it changes to some degree.

19     Q.   Okay.

20     A.   And it specifies how the budget is
21 to be put together.

22     Q.   I have seen documents called
23 disposition form?  Does that have to do with
24 the budget?

25     A.   A disposition form is used many

1 years ago, but it's -- it's just a -- a way of

2 sending out a note, a message.  It's the

3 old-time email you'd say.

4        Q.   Got it.  Okay.

5        A.   Something like that.

6        Q.   We got emails, too.  I'll ask you to

7 assume that, and I had a lot of them here,

8 over the years of the MRGO, over some 50 years

9 the Corps periodically initiated studies of

10 the MRGO's impacts.  I think some of them have

11 been --

12        A.   The ones we have discussed.

13        Q.   Yes.  There's a habitat study that

14 was done and there was a bank erosion

15 reconnaissance report in '88, another one in

16 '94.  Are you familiar with these documents

17 generally?

18        A.   No.

19        Q.   Okay.  I take it --

20        A.   I am just familiar with the ones we

21 have discussed here.

22        Q.   Okay.  You were not employed in the

23 New Orleans District until July of 2000?  Is

24 that correct?

25        A.   That's correct.

1      Q.   So you didn't have anything to do

2 with the MRGO or any of the studies or reports

3 that preceded that?

4      A.   Correct.

5      Q.   If the Corps -- This is a

6 hypothetical.  If the Corps concluded that

7 something had to be done to ameliorate the

8 MRGO, say, foreshore protection -- Do you know

9 what foreshore protection is?

10     A.   (Witness nods head affirmatively.)

11     Q.   Do you know what that is?

12     A.   Yeah, along the MRGO.

13     Q.   Upper --

14     A.   In the upper reaches along the north

15 and south banks.

16     Q.   Right.  Would that be done through

17 the normal O&M process, or was there another

18 process for budgeting that?

19     A.   Let me think about -- There was a

20 determination that I read where part of it at

21 along the lower end, or towards the south end

22 was done under -- under MRGO, and the upper

23 end was done as part of Lake Pontchartrain and

24 Vicinity project, the north side.

25     Q.   Okay.  I think that's correct.  Now,

1 let's take just the lower end, because that

2 was a MRGO allocated cost; correct?

3     A.   Yes.

4     Q.   Was that done under the O&M

5 budgeting process?

6     A.   I believe it was.  I don't recall.

7     Q.   Are you aware of any other budget

8 category for the MRGO during its history, or

9 certainly during the period you were here more

10 precisely, other than O&M?

11     A.   During the period I was here, it was

12 O&M and construction.

13     Q.   Okay.  And give me -- what was --

14 What was a construction budget item under MRGO

15 from mid 2000 on?

16     A.   It was -- The re-evaluation report

17 was under construction general.

18     Q.   What was the purpose of the

19 re-evaluation report?

20     A.   To re-evaluate the need for the

21 navigation channel and consideration of

22 potentially closing it.

23     Q.   Ultimately the Corps did a final,

24 I'll call it shorthand, deauthorization study

25 for Congress?  You're familiar with that?

1      A.   Did a re-evaluation report.

2      Q.   Was the re-evaluation report that

3  led ultimately to the recommendation of the

4  deauthorization of the MRGO part of that

5  process?  Was that an ongoing process?

6      A.    It started in I believe 1999 and

7  there was a draft report, as I understand, put

8  out after I left, which was something like May

9  of 2005.  There was a draft report.

10     Q.    That was just before Katrina; right?

11     A.    Yes.

12     Q.    To your knowledge, until the Corps

13 submitted to Congress sometime I believe in

14 2007 the final deauthorization report, had the

15 Corps ever recommended to Congress the closure

16 of the MRGO?  Or in the technical parlance,

17 the deauthorization of the MRGO?

18     A.    Right.  During the period I was

19 here, we did not make that recommendation and

20 as far as I could see in the 2005 report did

21 not make that recommendation, the May.

22     Q.    Okay.  The budgeting that was done

23 on the foreshore protection for the upper end

24 on the LPV, have you studied at all why the

25 decision was made to make that an LPV budget

1 item rather than an O&M MRGO item?  In other

2 words, can you speak authoritatively on that?

3      A.   I did read something recently about

4 it and I would have refer back to that.  That

5 it was considered that -- Well, as a matter of

6 fact, it had been authorized by -- under LPV.

7      Q.   The foreshore protection?

8      A.   Yes.

9      Q.   Okay.  Was that the basis of a

10 recommendation made by the Corps to have that

11 done as part of the LPV?

12     A.   I don't recall.  I don't have that

13 information.

14     Q.   But what you're telling me is if the

15 Corps determines that some work needs to be

16 done to remediate the MRGO, there are

17 budgetary procedures for doing that?

18     A.   There are budgetary procedures.

19     Q.   Okay.

20     A.   Could you clarify "remediate"?

21     Q.   Well, if the Corps is concerned with

22 the widening of the channel in the lower end

23 and we need to do some kind of armoring or

24 jetties or dikes, --

25     A.   Okay.

1    Q.   -- there's a procedure to go to

2 Congress and do that; right?

3    A.   Yes.

4    Q.   In your experience at the Corps, did

5 you ever see Congress initiate an activity

6 with regard to the MRGO as opposed to the

7 Corps recommending some activity to the

8 Congress as part of the budget process?

9    A.   You know, generally, I am going to

10 talk generally, not specifically to MRGO,

11 there is a lot of nuances in starting work.

12 But the Corps, to start work, needs authority

13 to do the work.  You know, to do a study.  It

14 just doesn't come -- Unless there's a project

15 that can be elevated that there is an issue,

16 then there's a request to consider proceeding

17 with something on an ongoing project.  But if

18 it's a new project, then there has to be

19 Congressional authority provided.

20    Q.   So --

21    A.   Now, in many cases that authority

22 does exist in many various acts.  The Congress

23 did provide different authorities to do

24 studies.

25    Q.   And it might depend on whether you

1 were going to do a $10,000 study or a million

2 dollar study, for example; right?

3      A.   Just a lot of issues.  Whether you

4 have an existing project that's ongoing or

5 versus you have an authority that goes -- Some

6 authorities go back to the '60s, for

7 instance.  We talked about the Louisiana

8 coastal area going back to the 1960s when that

9 authority to do that study.  Now, that work

10 didn't happen, as a study didn't happen until

11 2000.

12      Q.   Four decades later?

13      A.   Right.

14      Q.   Okay.  We've learned that there are

15 different stages of studies or reports done by

16 the Corps.  Are you familiar with a

17 feasibility study, what a feasibility study

18 is?

19      A.   Yes, sir.

20      Q.   What is it?

21      A.   A feasibility study is done to look

22 at certain issues, problems of the nature that

23 the Corps of Engineers could be involved in,

24 whether it be flood control, navigation,

25 environmental restoration, et cetera, et

1 cetera.  And a feasibility study lays out the

2 cost and benefits and justification and

3 assesses the environmental impact, social

4 impacts, et cetera, as a basis for working

5 with the local community, state agencies,

6 Federal agencies, et cetera, to define a plan

7 to respond to those problems that were -- were

8 indicated, and the feasibility report is used

9 to go to Congress for authorization of a

10 project.

11     Q.   Okay.  So when we see House Report

12 number 245, House Report number 231, which

13 pre-dated NEPA, but those would be feasibility

14 studies that lead to a recommendation of a

15 project to Congress?

16     A.   Normally, yes.

17          MR. SMITH:

18            Objection to the form of the

19        question.  It's vague.  "They would

20        be".

21 EXAMINATION BY MR. O'DONNELL:

22     Q.   They were in effect feasibility

23 studies recommending the MRGO or the LPV or

24 whatever to Congress?

25          MR. SMITH:

1              Objection to the phrase "in

2       effect."  It's vague.

3 EXAMINATION BY MR. O'DONNELL:

4       Q.   Are you familiar with HR-23 -- House

5 Report number 231 or 245?

6       A.   I don't recall those numbers, but go

7 ahead and explain what they were.

8       Q.   Okay.  The Chief Engineer sends a

9 study, a report, to Congress and says, "We

10 would like to build the MRGO."

11      A.   Uh-huh (affirmatively).

12      Q.   This happened in '51 or -- sometime

13 in -- sometime a long time ago.  Okay?

14 Congress passes an act --

15      A.   Right.

16      Q.   -- of legislation saying --

17 authorizing that -- referencing the report,

18 authorizing that that project go forward.  You

19 would be substantially in accordance with the

20 recommendation of the Chief, et cetera, et

21 cetera, referring to the report.

22      A.   Right.

23      Q.   Is that a feasibility study?

24      A.   Well, could you -- do you have the

25 number that you're referring to?  Could you

1 just -- Do you have it there?

2          MR. KELLS:

3              I don't.  I'm not sure.

4 EXAMINATION BY MR. O'DONNELL:

5      Q.   I don't have it handy, but --.

6      A.   Well, I can explain a feasibility

7 report process that you go through for a new

8 project, and MRGO did have a feasibility

9 report that was processed to Congress.

10     Q.   That's all I needed to know.  You

11 also mentioned a reconnaissance report.  What

12 is a reconnaissance report as opposed to a

13 feasibility report or study?

14     A.   A reconnaissance report -- The thing

15 is, you got to realize reconnaissance reports

16 have changed over time.  So if you look at one

17 today, it's different than one many years

18 ago.  But what a reconnaissance report does is

19 you, with available information, you look at

20  -- Say if you have a navigation issue or a

21 flood control problem, you look at the

22 potential for constructing a project to

23 resolve those problems and if there's anything

24 that's viable.  If there is something that's

25 viable, then it's a basis for making the

Page 140

1 determination whether to proceed into the

2 feasibility phase.  At this point in time, a

3 reconnaissance report is done at full Federal

4 -- full Federal cost, and a feasibility cost

5 is cost shared.  So when you complete the

6 recon you determine whether to proceed, you

7 lay out the plan for the feasibility study and

8 you need a sponsor to proceed to the next step

9 that is willing to cost share.

10     Q.   We're going to mark this as the next

11 exhibit in order, Exhibit 10.

12          MR. SMITH:

13            Are you going to be asking him

14       about this?  Because I'm not sure he's

15       the one we've got designated to

16       discuss this.

17          MR. O'DONNELL:

18            No, generically.

19          MR. SMITH:

20            Got you.

21 EXAMINATION BY MR. O'DONNELL:

22     Q.   Sir, I put before you Exhibit 10, a

23 February, 1988 Army Corps reconnaissance

24 report on bank erosion for the MRGO.  Do you

25 see that?

1    A.    Yes, I do.

2    Q.    Is this a reconnaissance report?

3    A.    That's what it states.

4    Q.    Okay.

5    A.    Yes.

6    Q.    I'll represent that it seems to be.

7          MR. SMITH:

8              So stipulated.

9    EXAMINATION BY MR. O'DONNELL:

10   Q.    At this time period in 1988 --

11         MR. O'DONNELL:

12             Well, probably one of the few

13      things we'll agree on, buddy.

14   EXAMINATION BY MR. O'DONNELL:

15   Q.    But in February of '88, would a

16   reconnaissance report in the process precede a

17   feasibility report or study?

18   A.    Yes.

19   Q.    Okay.  And do reconnaissance reports

20   typically make a recommendation one way or

21   another about further study or action?

22   A.    Yes.

23   Q.    Okay.

24         MR. O'DONNELL:

25             All right.  I want to mark this

1        as 10.  That's the only copy I have,

2        Robin.  I saved a tree.  But it's the

3        --

4 EXAMINATION BY MR. O'DONNELL:

5        Q.  Sir, would you just take a look at

6 Saia Exhibit 11?  It is also an Army Corps

7 reconnaissance report on bank erosion, but

8 this one is dated 1994.  Do you have that?

9        A.  Wait a minute.  These are the same.

10        MR. SMITH:

11            No, they're -- This is '88.

12        That's '94.  Oh, this is '94.  I think

13        you must have gotten mixed up.

14        MR. O'DONNELL:

15            There's two of them.

16        MR. SMITH:

17            I know, but he gave him the '94

18        and marked it as 10.  We can fix it.

19        MR. O'DONNELL:

20            Let's fix this.  We'll stipulate

21        that the '98 report will be 10 and the

22        '94 report --

23        MR. SMITH:

24            '88?

25        MR. O'DONNELL:

1          I'm sorry, the 1988 report will

2      be 10 and the January, 1994 report

3      will be 11.

4 EXAMINATION BY MR. O'DONNELL:

5     Q.   Okay.  So let's go back again.

6     A.   Okay.

7     Q.   Approximately six years apart,

8 between 1988 and 1994, another bank erosion

9 reconnaissance report for the MRGO was

10 prepared.  Do you see that?

11     A.   Wait.

12          MR. SMITH:

13          His confusion is he's only seen

14      -- He's seen the '94 report twice.

15      You were asking him about '88.

16 EXAMINATION BY MR. O'DONNELL:

17     Q.   Forgive me.

18          MR. SMITH:

19          You showed him the '94.

20          THE WITNESS:

21          Okay.  I'll give you this one.

22 EXAMINATION BY MR. O'DONNELL:

23     Q.   The closest to a senior moment I

24 hope to have today.

25          Now I put before you the two

1 exhibits, both bank erosion reconnaissance

2 reports, one in '98 and -- one in '88 and one

3 in '94.  Do you see that?  1988 and 1994.  Do

4 you see that?

5      A.   Yes, I do.

6      Q.   Okay.  Do you know why they did two

7 reports six years apart?

8      A.   They may have been for different

9 purposes.

10     Q.   Okay.  That's fair.  Do you know of

11 the different purposes?  And if you're not the

12 witness on that, that's fine.

13          MR. SMITH:

14             He's really not the witness on

15        that.  I really think we ought to just

16        wait until we get the witness.

17          MR. O'DONNELL:

18             All right.

19 EXAMINATION BY MR. O'DONNELL:

20     Q.   Let me see if I can summarize this

21 very easily, sir.  And at least I have them

22 marked so you don't have to mark them again.

23             Typically at least in this time

24 period of the late '80s or early '90s a

25 reconnaissance report would precede a

1 feasibility report?

2      A.   Correct, or not.

3      Q.   May not lead to a feasibility

4 report?

5      A.   That's correct.  It may stop right

6 there.

7      Q.   I got that.  You mentioned another

8 type of report or study called re-evaluation.

9      A.   Yes.

10      Q.   Is that a third type of report the

11 Corps did in this time period?

12      A.   That was another report that was

13 started I believe in '99.

14      Q.   Again, would it have been authorized

15 by Congress and a budget appropriated for it?

16      A.   It was based on the authorized

17 project that existed, yes.  And it was funded

18 by Congress during a period of time.

19      Q.   To evaluate --

20      A.   Yes.

21      Q.   To evaluate or re-evaluate the

22 continuing viability or utility of keeping the

23 MRGO open?

24      A.   Yes.

25      Q.   I don't believe you have been

1 designated on that subject, correct, the

2 closure of the MRGO?

3          MR. SMITH:

4               No, he's not.

5 EXAMINATION BY MR. O'DONNELL:

6     Q.   Other than the annual appropriation

7 process which you were kind enough to describe

8 to me at the beginning of my examination, is

9 there a special or supplemental budget process

10 at least in your experience with Congress when

11 the Corps finds that a need arises that is not

12 covered by an existing authority or

13 appropriation?

14     A.   On occasion there are supplemental

15 appropriations and sometimes they have been

16 used for operation and maintenance.  Maybe

17 there's been a large storm occur along the

18 coast of --

19     Q.   Okay.  Fair.  I am going to mark

20 this as the next, which hopefully is 12.

21 Thank God it's not a reconnaissance report.

22     A.   I need to look at it first.

23     Q.   I wouldn't be able to get it right.

24 I have put before you as Exhibit 11 --

25          MR. O'DONNELL:

1          Can I borrow yours for one

2     second, Robin, after you sticker it?

3     MR. SMITH:

4          Let me make sure I get this

5     stickered right here.  Which one do

6     you want?

7     MR. O'DONNELL:

8          The latest one, yes, the one I

9     just marked.

10    MR. SMITH:

11         The latest is 12.

12    MR. O'DONNELL:

13         12.  Just give that to the

14    witness for one second.

15    MR. SMITH:

16         Sure.

17    MR. O'DONNELL:

18         I just want to identify it.

19 EXAMINATION BY MR. O'DONNELL:

20    Q.  Sir, I put before you as Saia 12 a

21 report of the Environmental Subcommittee to

22 the MRGO Technical Committee dated March 16,

23 2000.  Do you see that?

24    A.  Yes.

25    Q.  Have you seen this document before?

1      A.   Yes.

2      Q.   In what capacity?  In what context

3 did you see it?

4      A.   More recently.

5      Q.   Because you were going to testify

6 about it?

7      A.   Yes.

8      Q.   You were designated?  Is that why?

9      A.   Right.  That's correct.

10      Q.   Okay.  I believe that the first

11 part, the first 43 pages, relates to a task

12 force that was done by St. Bernard Parish.

13 But attached to it beginning on page 44, sir,

14 it's the last Bates numbers in the right

15 corner is 1556.  Do you see that?

16      A.   Okay.  Correct.

17      Q.   "Habitat impacts of the construction

18 of the MRGO, December, 1999"?  Do you see

19 that?

20      A.   Yes.

21      Q.   And it says "Prepared by the New

22 Orleans District Corps of Engineers for the

23 Environmental Subcommittee of the Technical

24 Committee convened by EPA in response to the

25 St. Bernard Parish Council resolution".  Do

1 you see that?

2        A.    Yes.

3        Q.    And then there's a report that goes

4 from Bates stamp 1556 to 1630.  Do you see

5 that?

6        A.    Yes.

7        Q.    Was this prepared by Susan Hawes, to

8 your knowledge?

9        A.    As far as I know, yes.

10       Q.    Okay.  Do you know why she prepared

11 it?

12       A.    She was participating on the

13 committee.

14       Q.    Do you know whether this document

15 was ever given to Congress?

16       A.    Not to my knowledge.

17       Q.    Do you know what use, if any, was

18 made of this document other than providing

19 this information to this committee convened by

20 EPA?

21       A.    As I understood, it relates to the

22 re-evaluation report and was provided as some

23 information for the re-evaluation.

24       Q.    So this was commissioned, if you

25 will, internally by the Corps to be prepared

1 by Ms. Hawes as part of the re-evaluation

2 study and was also furnished to this other EPA

3 convened committee?

4      A.   I don't know if it was

5 commissioned.  It was her participation on the

6 committee.

7      Q.   And who is Susan Hawes?

8      A.   Susan Hawes is -- works in Planning

9 Programs and Project Management Division.  She

10 is an advisor, environmental advisor to the

11 District Engineer.

12      Q.   She's a --

13      A.   At that time that's what she did.

14      Q.   She was like a biologist or

15 something?

16      A.   Environmental.  I don't know what

17 her environmental background is.

18      Q.   For a number of years she was

19 involved with the issue of the wetlands along

20 the MRGO?

21      A.   Yes, and many other projects.

22      Q.   A knowledgeable person?

23      A.   Yes.

24      Q.   Okay.  In the period that you were

25 at the Corps between 2000 and -- was it 2004

1 you said?

2      A.   Yes.   2000.

3      Q.   Do you recall any budget requests

4 initiated by the New Orleans District to

5 Congress for wetlands preservation or

6 retarding the loss of wetlands because of the

7 MRGO?

8      A.   You're talking about environmental

9 restoration.

10      Q.   Yes, as part of the O&M budget of

11 the MRGO between -- You were there in '00

12 sometime to '04.  Do you remember that the

13 Corps ever initiated any budget proposals to

14 Congress dealing with either retarding the

15 loss of wetlands or restoring the wetlands?

16      A.   There was, and I can't remember the

17 exact year, probably around 2003, 2004, and

18 also there was associated with the Louisiana

19 Coastal Area environmental restoration in the

20 MRGO area.  So there was consideration of a

21 budget request relative to MRGO.  However, it

22 got, as I recall, it got wrapped into

23 Louisiana coastal area.

24      Q.   Right.

25      A.   And got taken -- it got responded to

1 in a report that we discussed earlier.

2      Q.   Right.   In terms of MRGO budget, not

3 some other coastal wetlands, Breaux Act or

4 whatever else may have been going on,

5 vis-a-vis the MRGO are you aware during your

6 tenure, was there ever any money requested of

7 Congress and appropriated for wetlands

8 restoration?

9      A.   In operation and maintenance?

10      Q.   Yes.

11      A.   The only funds that were -- that

12 were used was relative to the beneficial use

13 for dredged material which is under a Section

14 204 program.

15      Q.   Under the Clean Water Act or WARDA?

16      A.   Or WARDA.   It's WARDA.

17      Q.   That's all caps W A R D A?   Is that

18 the Water --

19      A.   Resources Development Act.

20      Q.   Right.   Thank you.

21      A.   And that related to putting

22 materials on lands to restore -- to create

23 habitat.

24      Q.   During your tenure did the Army

25 Corps ever recommend to Congress the creation

1 of any kind of rock plug dike or other

2 structure to prevent saltwater from the Gulf

3 going up the MRGO Reach 2 into the

4 marshlands?

5     A.   I think it was under consideration

6 in the report.

7     Q.   The re-evaluation study?

8     A.   The re-evaluation report, but that

9 didn't go to Congress.

10     Q.   Until much later, 2007?

11     A.   I don't know.

12     Q.   You weren't there?

13     A.   No.

14        MR. O'DONNELL:

15           I have nothing further.  Thank

16       you.

17           So, to be fair, we have exhausted

18       with this witness topic 3 and 27 to

19       30.

20        MR. SMITH:

21           Pierce, is there anything we can

22       do to get you to stay?

23        MR. STEVENS:

24           He'll take that as a supreme

25       compliment.

1          MR. O'DONNELL:

2               You know I can't respond to

3      that.

4          MR. BRUNO:

5               Robin, we're still on the

6      record.

7          MS. GILBERT:

8               Off the record.

9          VIDEO OPERATOR:

10              Off the record at 2:56.

11          (Recess.)

12          VIDEO OPERATOR:

13               Returning to the record, it's

14      3:11.

15 EXAMINATION BY MS. GILBERT:

16      Q.   Mr. Saia, I am going to direct your

17 attention to what's been marked as Exhibit 9.

18 It's a two-page document Bates stamped number

19 NOP-019, five zeroes, 108 and 109 and it's

20 entitled, handwritten on the top, "NEPA

21 documents and project authority."  Have you

22 ever seen this document before?

23      A.   Not until now.

24      Q.   Have you ever seen a document like

25 this that summarizes all of the NEPA-related

1 documents associated with the MRGO project?

2     A.   No.

3     Q.   Have you ever seen a document like

4 this associated with any other project?

5     A.   Not like this, no.  I have seen

6 listings of, in time, of different projects,

7 different actions, but not -- not something

8 like this.

9     Q.   Have you had an opportunity to look

10 at the environmental assessments itemized in

11 this document?

12     A.   No.

13     Q.   Because you have testified already

14 that there were no other final environmental

15 impact statements filed with the CEQ relating

16 to the MRGO project, would it be safe to say

17 that all of the environmental assessments

18 conducted associated with the MRGO resulted in

19 a finding of no significant impact?

20     A.   For those that are listed -- what I

21 have in front of me, there -- I would have to

22 look.  It looks like they're all FONSIs.

23     Q.   If there was an environmental

24 assessments that resulted in something other

25 than a FONSI, would that have been an