# DECISION-MAKING CHRONOLOGY FOR THE LAKE PONTCHARTRAIN & VICINITY HURRICANE PROTECTION PROJECT

## FINAL REPORT FOR THE HEADQUARTERS, U.S. ARMY CORPS OF ENGINEERS

## SUBMITTED TO THE INSTITUTE FOR WATER RESOURCES OF THE U.S. ARMY CORPS OF ENGINEERS

**Douglas Woolley**

**Leonard Shabman**

**March 2008**

## Executive Summary

### Hurricane Protection Decision Chronology Origin and Purpose

The Assistant Secretary of the Army for Civil Works [ASA(CW)], John Paul Woodley, Jr., and the U.S. Army Corps of Engineers (Corps) Director of Civil Works, Major General Don Riley, commissioned the Hurricane Protection Decision Chronology (HPDC) shortly after Hurricane Katrina struck the Gulf Coast of the United States on August 29, 2005.

The requested report was to provide an explanation, as opposed to an evaluation, of how Corps policies and organization, legislation, and financial and other factors influenced the decisions that led to the Lake Pontchartrain and Vicinity Hurricane Protection Project (LP&VHPP) protective structures in place when Hurricane Katrina struck the Gulf Coast.

The study focus on project decision-making is intended to complement the engineering forensics investigations on the performance of the LP&VHPP during Katrina conducted by the Interagency Performance Evaluation Task Force and other institutions.

The HPDC represents an exhaustive examination of a highly complex 50-year record of project decision-making and project implementation involving the Corps, local sponsors, government at all levels, and the courts. It can serve as a national resource for planners and decision-makers to make better future decisions about the nation's critical public works infrastructure by learning from the past.

The HPDC authors are solely responsible for the content of this report, and the report does not necessarily represent the views of the Office of the ASA(CW) or the Corps.

### Background

Hurricane Katrina had a disastrous impact along the Gulf Coast, and the Greater New Orleans metropolitan area in particular, when it made landfall on August 29, 2005. Soon thereafter, Corps leadership recognized the need for two comprehensive studies to address many of the nation's questions about the New Orleans-area hurricane protection network.

Lieutenant General Carl A. Strock, former Corps Commander, first commissioned the Interagency Performance Evaluation Task Force (IPET) to answer five key questions:

- what was the hurricane protection network in place on Aug. 29, 2005,
- what forces did Hurricane Katrina put on the protection network,
- how did the protection network perform (what worked, what failed and why),
- what were the consequences of this event, and
- what would be the risk and reliability of the protection network on June 1, 2006?

It became apparent during the course of the IPET study that while that investigation would provide engineering and scientific insight into how the New Orleans-area hurricane protection system performed during Katrina, it would not address critical questions about how the protection network that existed on August 29, 2005 came to be.

The Honorable Mr. Woodley and Major General Riley then commissioned the Corps' Institute for Water Resources (IWR) to convene an external group to collect, record, and analyze project memoranda, reports, and related documentation in order to describe and explain decision-making for the LP&VHPP.

The IWR established the independent study team of Drs. Douglas Woolley and Leonard Shabman, both water resources planning and policy experts, to conduct the inquiry and prepare the HPDC. (Brief biographies for the report authors are included at the end of this summary.) Mr. Paul Scodari of the IWR supported the study team throughout its inquiry.

**Focus**

The 50-year history of the LP&VHPP contains many more decisions and actions than could be fully addressed in the HPDC. Accordingly, this report focuses on the chronology of project decisions identified as important by the report authors from their reviews of engineering forensic investigation reports, and other post-Katrina reporting. These include, but are not limited to, the IPET report, media accounts, and congressional testimony in the aftermath of Hurricane Katrina. Specifically, the HPDC report focuses on project decision-making in three areas:

- the selection of the overall protection approach for the project area (Barrier Plan versus High Level Plan), and for the outfall canals in metro New Orleans (Frontage Protection versus Parallel Protection),

- the selection of the design hurricane, and the treatment of new information as it became available during the project history on hurricane science, surge modeling, and land subsidence that determined the design and constructed heights of protective structures across the project network, and

- the design of I-wall parallel protection structures for the outfall canals.

Map ES-1 displays the project area and the names of the various political jurisdictions, waterways, and different locations within the overall project area that are referred to throughout this report. Map ES-1 also shows the perimeter of LP&VHPP protective structures that were in place, as well as the locations where breaches occurred in the project protection network, when Katrina made landfall. Most breaches occurred where storm-driven water overtopped project structures. However, one breach occurred along the 17th Street Outfall Canal and two occurred along the London Avenue Outfall Canal before water reached the tops of the floodwalls that parallel each canal. Also, one of the breaches along the Inner Harbor Navigation Canal (IHNC) occurred before water reached

the tops of the canal floodwalls. (The source of the information presented on project breaches is the IPET report.)

**Approach**

The study team followed a structured process to obtain all relevant and available project documents, and to ensure that logical descriptions and explanations of project decisions were made from those documents. Report preparation began after reviewing an initial compilation of project documents. Those documents were used to record project decisions and to formulate preliminary explanations for those decisions and the forces affecting them. The sequencing, description, and explanation of project events were then tested against the recollections of former and present Corps employees and officials from local assuring agencies in a series of interviews. The effort to secure project documentation continued throughout the report development process, and the report text was modified as new documents were obtained (see Chapter 1).

While it is impossible to know what records may have been lost over the 50-year project history, the HPDC report authors are confident that most, if not all, of the key reports prepared for the LP&VHPP were reviewed, as were many internal Corps memoranda, and letters related to the development of those reports. These documents are referenced in the report and are cited in an annotated master chronology of project events presented in Appendix A. Copies of all original project documents used in preparing the report are available electronically on a compact disc accompanying this report.

The master chronology of project events includes project planning reports, design memoranda, administrative correspondence, letters, budget justification statements, hearing records, and much more. Each chapter of the report includes a shorter chronology relevant to the subject of that chapter.

The reliance on project chronologies disciplined the development of the report in two ways. First, the chronologies made it impossible to attribute causes to decisions and events that were not consistent with the order of their occurrence. Second, the chronologies helped to ensure that project decisions were explained in the context of their own time by reducing the opportunity for contemporary scientific understandings, technical capabilities, and current civil works policies to affect the description and explanation of historical project decisions. This placed a premium on understanding the legal, regulatory, budgetary, and organizational setting at the time that the project decisions were made.



**Map ES-1: The LP&VHPP Area, Protective Structures, and Breach Areas**

This summary includes three timelines that trace the broad history of key project decisions and the significant historical events that provided the context for those decisions. The timelines are brief summaries of the more-detailed chapter chronologies. They are provided in this summary to illustrate the 50 years that elapsed during project planning, design, and construction, as well as the complexity of the decisions made and the multiplicity of decision-makers.

A first, rough draft of the full report was prepared in July 2006 and reviewed by Corps internal technical review teams who were asked to identify any errors of fact and errors of omission that could be demonstrated through the provision of documents that had not been available to the HPDC team at the time the draft was prepared. In this way, new documents were identified and a second draft was prepared in December 2006. That draft went through another round of Corps internal review that helped the study team to identify and secure additional project documents. This second draft was also reviewed by an independent External Review Panel (ERP) convened by the National Association of Flood and Stormwater Management Agencies. The ERP was asked to evaluate the clarity of the report's description and explanation of project decisions, and to identify any errors of logic. The ERP report was delivered to the HPDC team through IWR, and Drs. Woolley and Shabman addressed the ERP comments and suggestions in a draft final HPDC report completed in June 2007.

In July 2007, the draft final HPDC report, as well an electronic database of project documents that were used for its preparation, were placed on the IWR website for public review. The announcement that accompanied the public release provided an overview of the study origin and purpose, solicited public comments on the report contents that could help to clarify the record of project decision-making that could be supported with the provision of corroborating project-related documentation. Through this public review process, which lasted for several months, a few additional project-related documents were secured. Those additional project documents have been folded into the database of source documents are reflected in the final report presented here.

**Report Organization**

This final report is organized into six chapters and several appendices. Chapter 1 provides a detailed description of the study origin, purpose, focus, and approach. Because of the long history and complexity of project decision-making, Chapter 2 offers a high-level overview of the decades-spanning sequence of project decisions that resulted in the project structures in place in August 2005.

With this broad overview as a background, Chapter 3 provides a detailed examination of particular project performance decisions, including a description of how the choice of storm parameters, surge modeling approaches, and the treatment of subsidence and datum issues were initially analyzed and then further evaluated in light of new information.

Chapter 4 details design decisions for the outfall canals, including the selection of the parallel protection approach over the frontage protection approach, and the designs for the I-walls that were eventually constructed along the canals. Reference is made throughout Chapters 2–4 to the concerns of local sponsors and the Corps New Orleans District office about project cost increases, budget limitations, and continuing delays in project completion. Chapter 5 provides a detailed and data-driven description of the basis for these concerns, and how they focused the Corps New Orleans District on finishing the project as it was then designed and budgeted.

Chapter 6 summarizes report findings and concludes with the authors' own reflections on project decision-making and lessons learned for flood and storm damage reduction efforts. Appendix A presents the master chronology of project events. Appendix B provides a glossary of key terms used throughout the report. Appendix C lists those individuals who were interviewed for this report, and Appendix D provides brief biographies for the report authors.

**Overview of Selected Key Events in the Project History**

**The Original Barrier Plan:** The Corps' New Orleans District (the District) completed an "Interim Survey Report" for the LP&VHPP in 1962, after seven years of planning, that outlined a comprehensive plan for preventing flooding in the greater New Orleans area resulting from the "Standard Project Hurricane" (SPH). The original project plan, termed the "Barrier Plan," included floodgates (surge barriers) in the passes to Lake Pontchartrain to prevent SPH-driven surges from entering the lake. The planned barriers were meant to reduce the "stillwater" surge heights along the lakefront. Barrier-dampened hurricane surges would then be contained by the existing local levees along the three outfall canals that penetrated into metro New Orleans from Lake Pontchartrain. The barrier complexes were to be accompanied by levees and floodwalls in other locations designed to withstand SPH surges (see Chapter 2).

**The Design Storm:** The SPH performance standard was chosen for the design of the Barrier Plan in order to prevent loss of life and catastrophic damage. Although a benefit-cost analysis was completed for the plan, considerations of cost or of optimizing net economic benefits were not factors in the District selecting the SPH standard as the recommended degree of project protection. Moreover, according to data reported in the 1962 planning report, the design elevations of project structures, including freeboard or extra height to account for wave action, were estimated to protect against the stillwater surge heights resulting from the SPH as well as from the "Probable Maximum Hurricane" (PMH). The PMH represented the most severe storm thought possible in the project area at that time (see Chapters 2 and 3).

**Congressional Authorization:** Congress authorized the Barrier Plan in 1965 to provide protection from a storm with the SPH wind speed and central pressure parameters established in the report of the Chief of Engineers. The Congress also required the federal government to assume 70 percent of the construction cost, and local sponsors to pay the remaining 30 percent either in the form of cash or as in-kind contributions of lands,

easements, rights-of-way, or project work. After authorization, the District set out to develop the detailed engineering designs for plan features, secure the required funding, acquire land rights needed for project implementation, and construct project features. At the time of authorization, the District estimated that the project would be completed by the mid-to-late-1970s (see Chapter 2).

**Hurricane Betsy Challenged the Original Design:** Doubts about the adequacy of the original project designs were soon raised by the experience of Hurricane Betsy in 1965. While Hurricane Betsy had wind speed and central pressure parameters very similar to those chosen to define the design hurricane (SPH), Betsy's wind fields and associated wave action called into question the adequacy of the original design heights for project levees and floodwalls. Accordingly, the District requested and received permission from the Corps' Lower Mississippi Division (the Division) and Corps Headquarters to increase structure heights by 1-2 feet across the project network (see Chapters 2 and 3).

**Opposition to the Barrier Plan:** Soon after authorization, the planned surge barriers at the passes to Lake Pontchartrain met with opposition from certain state government elected officials, congressional representatives, and various local citizen and interest groups. Some opponents feared the barriers would adversely affect navigation access to the lake, while others cited the possible flooding of the north shore of the lake when the barriers were closed. The operation and maintenance costs of the barrier complexes were also issues of concern. However, potential adverse environmental effects were the most widely-cited concern of organized opponents to the Barrier Plan (see Chapter 2).

**Federal Court Injunction:** In 1975, a local environmental advocacy group challenged the adequacy of the project environmental impact statement (EIS) in the U.S. District Court for the Eastern District of Louisiana. That EIS had been prepared by the District in order to comply with the National Environmental Policy Act (NEPA). After protracted deliberations, the court found that the project EIS did not meet NEPA requirements, and in December 1977 the court issued an injunction on further construction of the Barrier Plan until the analytical deficiencies were resolved. In March 1978, the court lifted the injunction for all non-barrier elements of the project, noting that those levees and floodwalls had no adverse effect on the lake and therefore could proceed. However, the injunction effectively placed on hold project work on certain lakefront levees and the outfall canals, since the design and construction of those features would be affected by the final resolution of the proposed barriers (see Chapter 2).

**Switch to the High Level Plan:** In response to the court injunction against the barriers, the District in consultation with the Division initiated an engineering and environmental reevaluation of both the Barrier Plan and the alternative "High Level Plan," which involved higher lakefront levees in lieu of barrier complexes. In 1985, well after the original date projected for project completion, the Director of Civil Works approved replacing the barriers with increased levee heights along the lakefront, under the discretionary authority vested in the Chief of Engineers. No other elements of the original LP&VHPP plan were reevaluated or modified; construction of those elements proceeded

in accordance with the original designs as modified after Hurricane Betsy (see Chapters 2 and 3).

**Treatment of the Outfall Canals:** The original Barrier Plan did not include any project works for the three main outfall canals in metro New Orleans, since the 1962 planning report had concluded that the existing local levees along the canals would be sufficient to withstand barrier-dampened hurricane surges from Lake Pontchartrain. However, the District subsequently determined, based on the experience of Hurricane Betsy in 1965, that the existing canal levees did not meet the design height or stability required for the LP&VHPP under the recommended Barrier Plan or the alternative High Level Plan, and thus would need to be addressed by the project.

The District and the relevant local sponsor, the Orleans Levee District (OLD), engaged in a protracted debate over how best to address surges into the outfall canals. The District favored placing gates at the canal mouths to the lakefront that would close automatically when there was a threatening storm surge. The District determined that this "frontage protection" alternative was the most cost-effective plan for providing hurricane protection for the outfall canals. However, the OLD adamantly preferred higher walls along the canals, termed "parallel protection," as the best means to protect against hurricane surges from Lake Pontchartrain while still allowing the canals to be used to pump storm water from the city into the lake during storm conditions. Congressional action in the early 1990s resolved the debate in favor of the local sponsor by directing the Corps to implement parallel protection for the outfall canals and requiring the federal government to assume 70% of the total cost (see Chapters 2 and 4).

**Revisions to I-wall Design Guidance:** The Division in 1989 issued revised design guidance governing sheet pile penetration depths for I-type floodwalls (I-walls) used for hurricane protection. The revised guidance followed a field experiment, the results of which the Division interpreted as indicating that reduced sheet pile penetration depths would reduce the costs of hurricane protection I-walls without compromising engineering reliability. The revised design guidance was applied for design of the I-walls used to implement parallel protection along the outfall canals (see Chapters 2 and 4).

**Reported Project Completion Progress as of August 2005**: The District annually prepares a project Budget Justification Sheet (BJS) for the administration and the Congress. The BJS include, among other things, estimates of the current completion status for different project "units." The project BJS for fiscal year 2006 reported that the Chalmette Unit, which includes project works in St. Bernard Parish and some parts of Orleans Parish, was 98 percent complete in 2005. The New Orleans East Unit, which includes project work in most of Orleans Parish except for the floodwalls along the outfall canals, was reported to be 92 percent complete in 2005. The reported completion percentages for these project units has remained virtually unchanged since 1994, when the Chalmette Unit was first reported to be 98 percent complete and the New Orleans East Unit was reported to be 90 percent complete. Project work along the outfall canals was reported to be nearing completion in 2005. Project work in the New Orleans West

Unit, which includes project elements in Jefferson Parish and St. Charles Parish, was reported to be only 65 percent complete in 2005 (see Chapters 2 and 5).

It is important to recognize that the reported completion percentages for project units are in reference to the original project design heights as modified after Hurricane Betsy, and in accord with design changes introduced by the 1985 switch to the High Level Plan. Further, the reported project completion progress does not reflect the fact that many completed reaches of the project were below design grades due to datum errors when they were implemented and regional land subsidence over time since construction.

Figure ES-1 presents a chronology of project events relating to significant congressional, judicial, and Corps Headquarters decision-making for the project. Chapter 2 provides more detail on these project decisions.



**Figure ES-1: Significant Congressional, Judicial, and Corps Headquarters Decisions**

**The Context for Project Decision-Making**

The planning, design, and construction of the LP&VHPP took place over a time period roughly equivalent to one-quarter of the history of the United States. Project implementation has been complicated by numerous factors, including the large scope and complexity of the project, the many federal budget cycles in which project construction was funded, the varied partnership relationships between the District and multiple local sponsors, and the difficulties for project construction caused by variable and often poor foundation conditions. Throughout this long implementation period, new conceptual understanding was gained about the potential intensity of storms in the Gulf of Mexico, and about the changing landscape of coastal Louisiana and its implications for hurricane protection. This new knowledge was accompanied by increased and higher-quality data, new modeling capabilities, and advances in computing power.

The District and Division offices were aware of the relevant new information as it became available and had to make a series of often difficult decisions about how to accommodate that knowledge into ongoing project design and construction. Concerns about further delaying project completion and for escalating project costs in a budget-constrained environment were significant considerations that played a role in how the District responded to new information.

**Project Cost Growth:** The total estimated cost of the LP&VHPP when it was authorized in 1965 was $80 million. By 2005, the total estimated cost of the project was over $700 million, or nearly nine times the originally estimated price. Project cost growth was driven by significant price inflation over the period 1973-1983 and project design changes made over time (see Chapters 2 and 5)

**Constrained Federal and Local Budgets:** The amount of federal funds available for water development projects nationwide did not increase after 1980, even as demands for civil works funding increased across the nation. In Louisiana, a significant share of federal funding was allocated to projects other than the LP&VHPP. At the same time, the local sponsors for the project who were required to provide 30 percent of the costs of construction had difficulty raising the funds to meet this cost-sharing obligation. Various local sponsors for the project expressed concern for their ability to pay their required cost-shares as project costs grew over time, and Congress acted at different times to relieve part of that cost burden. Local funding for the project, apart from project work in St. Bernard Parish, was eventually secured. However, it is questionable whether the local sponsors for project works in Orleans, Jefferson, and St. Bernard Parishes would have been able to pay for any additional project changes that significantly increased project costs beyond what was budgeted (see Chapters 2 and 5).

**Delays in Project Completion:** One effect of project cost growth within a constrained budget environment was to extend the time to project completion. Growing project costs had to be funded from a static federal budget spread among competing civil works priorities nationally and in Louisiana.

A variety of other factors slowed project completion over time, including 1) the challenge of unifying local support and assigning cost-sharing responsibility among the various

local sponsors of the project, 2) local sponsors' difficulty in securing needed rights-of-way, 3) the unanticipated extra length of time required between lifts for certain levees in order to allow for settlement, 4) addressing the requirements of the Barrier Plan litigation, and, 5) reconciling disagreements between the District and the OLD over the choice of surge protection alternatives for the outfall canals.

Frustration with delays in project implementation and escalating project costs in the face of constrained federal and local budgets was apparent within the District and among local sponsors. This focused the District and local sponsors on completing the project as then designed and budgeted. At the same time, project sponsors were reluctant to seek approval for project changes that would increase project costs, and thus required funding, and that would extend the time for project completion further into the future. Another effect of project cost growth within a constrained budget environment was to motivate the District to seek out cost efficiencies for the project that were consistent with engineering reliability (see Chapters 2 and 5).

**Hurricane Protection Performance Decisions**

**Treatment of New Information on Storm Risks:** The District, following Corps policy for the provision of flood protection in urban areas, intended to build project levees and floodwalls that could withstand and not be significantly overtopped by the most severe storm event reasonably characteristic of the project area (the SPH). The project record shows that over time new information became available on storm parameters, potential surge levels, and datum issues that indicated significant overtopping of project structures as designed and constructed was increasingly likely to happen during the life of the project. However, the District did not request authority or funds to incorporate this new information into project design and construction once project construction was underway.

As one example, District staff reported that Hurricane Camille, which sideswiped New Orleans in 1969, had higher wind speeds and lower central pressure than what was thought to be the meteorological worst case scenario—the PMH as estimated in the 1962 Interim Survey Report. Camille and other more recent storm experiences were reflected in downward revisions to central pressure parameters (more severe) for the project area SPH and PMH made by the National Weather Service in 1979. In the years following, new storm data further affirmed the increased likelihood that storms more severe than the design storm could occur over the project's life.

However, the design heights across the LP&VHPP were not updated after 1968 to reflect the new meteorological information. Reasons for the adherence to the original design storm parameters were variously related to the District's interpretation of the 1965 project authorization language, concerns among the District and local sponsors about increases in project costs in relation to limited federal and local budgets, and the District's concern about maintaining, to the extent possible, consistency in the degree of protection being provided across the protective network as different parts of the project were completed over time (see Chapters 2 and 3).

**Treatment of New Information on Vertical Datum and Benchmarks:** The District's 1985 decision on the use of datum benchmarks for project construction provides another example of the difficulties inherent in the incorporation of new information into project implementation. Project construction to that point had relied largely on 1964-era benchmark elevations for the National Geodetic Vertical Datum (NGVD) to ensure that structures were built to intended design grades. When the National Geodetic Survey adjusted benchmark elevations in the area in the early 1980s to reflect subsidence over the previous 20 years, the District adopted a policy to not switch to the new benchmarks. The stated rationale for this decision was that to do otherwise would result in varying levels of protection across the project area, since it would be impractical and too costly to modify already constructed project features.

The 1985 benchmark decision exacerbated a more fundamental error with respect to the District's use of the NGVD as the reference point for project construction. The NGVD was originally established in 1929 using mean sea level (MSL) measured at 21 stations in the U.S. and five stations in Canada. Project structures were constructed relative to NGVD under the erroneous assumption that this datum corresponds with local MSL—the reference point used for the engineering design of project structures. However, the NGVD was actually lower than local MSL; the result was that many LP&VHPP structures were constructed to grades that were below intended design heights. Project records indicate that the District was generally aware of this disparity by the early 1990s; nevertheless, project construction continued forward using NGVD (see Chapters 2 and 3).

**Treatment of New Surge Modeling:** By the early 1990s, the District recognized in general terms that accumulated new knowledge indicated that the authorized degree of project protection was not being provided by the project as designed and constructed. About that time, District-sponsored work began on the adaptation of a sophisticated long-wave surge model, the Advanced Circulation (ADCIRC) model, for use in the technical evaluation of storm surges.

A 1993 District-sponsored pilot study conducted by the Corps Coastal Engineering Research Center used an early version of the ADCIRC model to estimate the effects of the 1979 downward revision of the SPH central pressure parameter on surges elevations in the project area. That study found that the revised central pressure parameter produced an increase in SPH surge heights of 1-2 feet for certain storm tracks under one set of assumptions, while under another set of assumptions the change had little effect on originally estimated storm surge elevations. The pilot study also concluded that local MSL had increased with respect to NGVD by approximately one foot since 1929.

In 1994, the District requested authority from the Division to conduct a numerical model study using the ADCIRC model and modern data to more-precisely determine the existing degree of project protection. However, noting limitations with the available ADCIRC model, the District decided to pursue further model refinement and testing before using the model for a project reevaluation that might form the basis for recommending project changes. The District undertook an effort to improve the model

from 1995 to 2004, and in 2004 an independent technical review team gave the model development work a positive review (see Chapters 2 and 3).

Figure ES-2 presents a chronology of project events related to project performance decisions and the District's response to new information on storm risks, surge modeling, and datum issues in the project area that emerged over time. These decisions are reviewed in detail in Chapter 3.



**Figure ES-2: Project Performance Decisions**

**Design Decisions for the Outfall Canals**

The selection of protection approach for the outfall canals was complicated by the different objectives and constraints of the relevant local sponsor, the OLD, and the federal government, as represented by the District. The District's sole objective was to

identify and recommend the most inexpensive (least-cost), reliable means of providing SPH surge protection for the outfall canals, in accordance with the District's interpretation of federal policy and the project authorizing language regarding local responsibility for internal drainage. The District recommended a frontage protection alternative (butterfly gates) for two of the three outfall canals as the least-cost plan for providing SPH surge protection.

The OLD had two objectives for the choice of protection alternative for the outfall canals—enhancement of hurricane protection, and the capacity to drain rainfall from the city via the canals during storm conditions. The OLD's opposition to the District-recommended frontage protection plan was based on these dual objectives and the distribution of costs to local agencies and the federal government under the different alternatives. The OLD, together with the New Orleans Sewerage & Water Board (SWB), the city agency responsible for interior drainage, viewed the frontage protection plan as incompatible with the need to drain rainfall from the city during storm events. Also, costs were a major concern to these local agencies.

The SWB and OLD were already planning to drive sheet pile walls along the existing levees of at least one canal in order to increase interior drainage capacity. Thus, if the frontage protection gates were implemented as part of the LP&VHPP, then the OLD as the local sponsor would be required to pay 30 percent of its cost, and the SWB and the OLD would bear the full costs of improving the canal levees for interior drainage purposes (as well the costs of any local decision to install auxiliary pumps at the canal mouths to allow for continuous pumping of rainwater out of the city to Lake Pontchartrain via the canals when the gates were closed during storm events). From the local perspective, the parallel protection plan was the best way to address both hurricane protection and interior drainage objectives and secure 70 percent federal funding toward those ends.

However, the District maintained that if the local sponsor insisted on pursuing parallel protection within the LP&VHPP, then any incremental costs of this plan above the cost of the least-cost, reliable alternative plan (the frontage protection gates) would be considered a project "betterment." Corps policy and the original project authorization defined such betterments as the full responsibility of the local sponsor. Thus, the District informed the local sponsor that if the parallel protection plans were pursued, the federal government would restrict its financial contribution for the plan to 70 percent of the total cost of the least-cost, frontage protection plan.

At the request of OLD, Congress acted through conference report language accompanying the 1990 Water Resources Development Act to resolve the disagreement between the District and the OLD. In that conference report, the Congress directed the Corps to incorporate hurricane protection for the outfall canals into the project, and to favorably consider implementing the parallel protection alternative. However, this conference report did not address how the costs of parallel protection would be shared among federal and local project sponsors.

The Congress, in the Energy and Water Development Appropriations Act of 1992, finally resolved the choice of the parallel protection alternative and its cost-share apportionment in favor of the local sponsor. In that act, Congress directed the Corps to implement parallel protection along the outfall canals and stipulated that the federal government pay 70 percent of the total cost. The effect of this congressional action was to redistribute much of the costs for drainage and storm protection from the OLD to the federal government.

In subsequent years, the Executive Branch, through successive administrations, did not budget for parallel protection work at the outfall canals. This was based on an interpretation that the congressional directive to implement parallel protection at 70 percent federal cost violated administration budget rules that require the Corps to implement the least-cost alternative for providing the authorized project purpose, and that define interior drainage as a local responsibility. Nevertheless, Congress added federal funding each year for parallel protection that the District used to implement the work (see Chapters 2 and 4).

I-type floodwalls (I-walls) were the dominant structural approach chosen to implement parallel protection along the canals, largely because they could be constructed within the very limited existing rights-of-way. During the mid-to-late-1980s, the District and Division offices were concerned that existing Corps criteria for I-wall sheet pile design were too conservative, and thus more costly than necessary, for the type of short-term loading conditions believed to characterize hurricane events.

Accordingly, the District in consultation with the Division conducted the so-called E-99 Sheet Pile Wall Field Load Test in the East Atchafalaya Basin to investigate I-wall performance under poor foundation and short-term loading conditions. The interpretation of the test results led to the Division issuing revised design criteria that reduced required sheet pile penetration depths for hurricane protection I-walls. Use of the guidance to develop final plans and specifications for I-walls resulted in substantial cost reductions for constructing parallel protection along the outfall canals (see Chapters 2 and 4).

The two project decisions described above on the design of project protection for the outfall canals were driven largely by cost considerations. However, none of the design memoranda and other project documentation reviewed for this study indicate that the District or local sponsor viewed the parallel protection approach as involving potentially greater risk of failure than the frontage protection approach. Similarly, the project record indicates that the revisions to I-wall design criteria that were used to implement parallel protection works were made with the expectation that cost savings could be realized without compromising engineering reliability.

Figure ES-3 summarizes key project decisions relating to the design of project protection for the outfall canals. These decisions are reviewed in detail in Chapter 4.



**Figure ES-3: Design Decisions for the Outfall Canals**

**Authors' Reflections on Project Decision-Making**

1. **Concerns about project cost growth, constrained federal and local budgets, delays in project completion, and the possible need for reauthorization if major changes were proposed, help to explain District decisions to construct the project according to original designs and datum benchmarks**

Project construction was not yet underway when significant project design changes were requested and approved following Hurricane Betsy. At that time, the increase in project costs associated with the design change might have appeared readily affordable to project sponsors, and the change involved virtually no delay in project implementation.

In later years, however, the accommodation of new information in project design and construction would have required adjustments to ongoing construction activities as well as retrofitting project features that had already been constructed. Such changes would have significantly increased project costs and implementation delays at a time when local concerns about project costs and urgency for project protection were paramount, and a

stagnant Corps construction general budget had to be spread among competing priorities. It was in the context of a history of local sponsors' frustrations over project delays and costs, federal and local budget limits, and increasing scrutiny of water project investment proposals at the Washington, DC level, that new information suggesting the need for project reevaluation and redesign that might take years to analyze and get approved was either put aside for later consideration (e.g., the 1985 datum benchmark decision), or subjected to further study (e.g., the decision to refine the ADCIRC surge model before applying it for project reevaluation) (see Chapter 6).

2. **There was no Corps organizational process that required and provided funding for a continuing assessment of project performance capability during the post-authorization implementation period**

The District was not expected to routinely track and as needed revisit—using whatever tools were available at the time—the ability of the project to provide the authorized degree of protection as new information became available. The absence of a standing, agency-wide process for continuing assessment and reporting of project performance capability left the District to make its own determination as to whether the analytical foundation was adequate for requesting changes to project designs, and for satisfying higher federal authorities and local sponsors that additional project funding was warranted (see Chapter 6).

3. **There is no evidence in the project record indicating that project engineers believed that the decisions made would threaten engineering reliability**

The adoption of parallel protection for the outfall canals significantly increased the number of miles of floodwalls and other structures exposed to storm surges, and increased the probability that a storm surge could find a weak spot in the project network. Conservative designs for I-walls, the primary means of providing parallel protection, would minimize the likelihood that weak spots might develop.

Meanwhile, in a separate effort, the E-99 Sheet Pile Wall Field Load Test was initiated to determine whether sheet pile penetration beyond a certain depth was unnecessarily costly for I-walls exposed to only short-term loading conditions. That sequence of events started by limiting the design and purpose of the test, and extended through analysis of a relatively limited amount of data. The interpretation of the test data resulted in revised design criteria that reduced sheet pile penetration depths for the I-walls used to implement parallel protection at the outfall canals. The available project record does not indicate recognition of possible limitations of the test procedures, possible uncertainties in the test results data or the Division's interpretation of that data, or the potential significance of the resulting revised design criteria once parallel protection plans were chosen for surge protection at the outfall canals.

These two design decisions for the outfall have been criticized in some post-Katrina engineering reports as reducing the reliability of project protection. Ultimately, engineering experts will need to resolve whether the selection of parallel protection and

the use of reduced sheet pile penetration depths, or the combination of the two, actually did reduce the reliability of the protection along the outfall canals when compared to the alternative frontage protection approach. The sequence of project events outlined in this report can not answer these questions.

However, the available project record does clearly show that cost considerations and policy interpretations, at both local and federal levels, played a significant role in these design decisions for the outfall canals. That same record also includes no evidence that anyone within the Corps had fully evaluated the possible joint effects of the two design decisions on the reliability of the protection network.

At that time, formal engineering reliability evaluation methods were not highly developed by the engineering community outside of a few areas such as nuclear power plant safety. Nonetheless, the concept of engineering reliability would not have been unfamiliar to project engineers and designers, and the nascent state of formal evaluation methods at the time that the project decisions were made can not fully explain the absence in the project record of engineering reliability questions and considerations (see Chapter 6).

**4. The only recurring organizational provision for systematically reporting the expected performance capability of the project was the annual Budget Justification Sheet (BJS)**

The limited purpose of the BJS is to justify requested federal appropriations for ongoing project work in the next fiscal year. Thus, the BJS are not recognized by District and Division offices as an appropriate vehicle for reporting accumulating information indicating that significant hurricane surge overtopping of at least some project reaches was increasingly likely to happen over the life of the project. Nevertheless, the BJS represents the only routine means for reporting on the status of the project to the administration and the Congress, and the HPDC team found no records of other formal communications before 2005 suggesting that these matters were conveyed by the District or Division to Corps Headquarters, Congress, or local sponsors (see Chapter 6).

**Author's Reflections on the Future**

**1. The importance of sharing knowledge**

By the early-to-mid-1990s, the District was aware in the most general terms that a project completed with the funds being requested would provide less than the authorized degree of protection (DOP). However, at that time the leaders in the District were not sufficiently confident in the best available surge model for specifying the detailed design changes that might be needed to provide the authorized DOP, and for justifying the cost increases they would entail, in a post-authorization change report. This decision was made in the context of long-standing concerns of the District and local sponsors about project affordability, completion delays, and ensuring consistency in protection levels across the project network. In that context, the District made the judgment that further refinement and testing of the best available surge model was needed before applying the

model to identify project changes that might be required to meet the SPH surge protection standard, and for securing those changes under the Chief's discretionary authority or through a new congressional authorization.

These District decisions, although understandable, point to the need for changes in the way the Corps shares information and communicates risk, particularly as related to possible changes in expected project performance over time. To argue for this change is not to suggest that modified or additional project structures would have been funded and built if the general understanding of the diminished capability of the project had been shared. In fact, it is unlikely given the history told here that the necessary detailed studies, approvals, authorities, funding, and construction sequences all would have rolled out in time to provide a project built to the original design intent by the year 2005. Moreover, it is questionable whether the project, if it had been built and maintained to original design intent, would have prevented to a significant extent the flooding of New Orleans that occurred as a result of Katrina.

Nevertheless, other decisions might have been made differently if the District's general knowledge about project performance deficiencies had been disseminated outside the District and Division offices. Perhaps the sharing of this information would have had effects on land development and use decisions, or decisions on new or enhanced drainage pumping capability, evacuation planning and emergency response programs, and specialized protection of critical infrastructure. Even if no changes in project structures or any other responses were made, the organization would have made available to higher federal authorities and local sponsors the knowledge and understanding, however limited, that it possessed.

Moving forward, Corps project evaluation and reporting protocols must be attentive to ensuring that all project sponsors and relevant government officials at all levels are as fully informed about project capabilities and limitations as are the technical specialists within the Corps. Further, Corps policies and procedures should seek ways to ensure that the affected public and its political leadership share with the Corps the project decisions that do get made in consideration of new information (see Chapter 6).

## 2.  Need for flexibility and adaptation in planning, design, and implementation

As future protection of the Gulf Coast is planned, it must be recognized that the vision set forth in any plan will necessarily change during implementation in response to new information, changing costs, stakeholder values, and agency missions, policies, and budget priorities. Indeed, past decision influences that led to cost increases and completion delays for the LP&VHPP remain endemic in the way the nation manages and directs the Corps program today. Decision-making that is the result of competing values, diverse interests, and disagreement between experts gives the appearance of being chaotic. But it is that reality that must be recognized and then orchestrated for providing protection for the Gulf Coast region. Future decisions, whether made within or outside the Corps, will be a continuing process requiring planning and decision-making

mechanisms that recognize, accommodate, and then adapt plans to changing values and new information (see Chapter 6).

.