## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **In re** | **CIVIL ACTION NO. 05-4182** |
| **KATRINA CANAL BREACHES** | **SECTION "K" (2)** |
| **CONSOLIDATED LITIGATION** | |
| | **JUDGE DUVAL** |
| | **MAGISTRATE JUDGE WILKINSON** |

**PERTAINS TO:**

**MRGO, NO. 06-2268 (Robinson)**

_____

## AMICUS BRIEF IN OPPOSITION TO UNITED STATES'S RENEWED MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

**May It Please the Court:**

Universal Health Services, Inc. ("UHS"), Plaintiff in four consolidated matters in the MRGO category of cases,[1] submits this amicus brief in opposition to the Renewed Motion to Dismiss for Lack of Subject Matter Jurisdiction or, in the Alternative, for Summary Judgment (the "Motion") filed by the United States ("Defendant").  UHS files this brief to respond to issues raised by Defendant's Memorandum of law and its reliance upon the decision in *United States v. Gaubert*.[2]

---

[1] The four case numbers in which UHS is a Plaintiff are 07-5016, 07-5286, 07-5254, and 07-5350.

[2] 499 U.S. 315, 111 S. Ct. 1267 (1991).

Defendant asserts that the discretionary function exception to the Federal Tort Claims Act (FTCA) bars Plaintiffs' claims.  Federal courts have created a two-prong test, the *Gaubert/Berkovitz* test, to determine when the discretionary function exception applies.  In this brief, UHS focuses exclusively on the second prong and shows that the Corps's conduct is not susceptible to policy analysis.  Therefore, the Corps is unable to satisfy its burden under the second prong.

## I.     The *Gaubert/Berkovitz* Two-prong Test.

The United States Supreme Court has prescribed a two-prong test for determining the application of the discretionary function exception to the FTCA.[3]  First, a court must determine whether the challenged action was a discretionary one — whether it involved an element of judgment or choice for the acting employee or whether it was governed by a mandatory statute, policy, or regulation.[4]  When a "federal statute, policy, or regulation specifically prescribes a course of action for the employee to follow" then the requirement of judgment or choice is not satisfied "because the employee has no rightful option but to adhere to the directive" and the discretionary function exception **cannot** apply.[5]

Only if the court determines that the challenged action is discretionary does it then move on to the second prong of the test.  At this stage the court must determine whether the challenged action is the kind of action that Congress intended to protect when it drafted the discretionary function exception — whether the action involves a decision susceptible to social, economic, or policy

---

[3] *See Gaubert,* 499 U.S. at 322-25*; Berkovitz v. United States*, 486 U.S. 531, 536-37, 108 S. Ct. 1954 (1988).

[4] *See Gaubert,* 499 U.S. at 322; *Berkovitz*, 486 U.S. at 536.

[5] *See Gaubert,* 499 U.S. at 322; *Berkovitz*, 486 U.S. at 536.

analysis.[6]  This second prong was created in furtherance of the discretionary function exception's overall purpose of "prevent[ing] judicial 'second guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort."[7]

The PSLC and *amici* parties have thoroughly demonstrated that Defendant cannot meet its burden regarding the first prong of the *Gaubert/Berkovitz* test.  As explained in their briefs, the Corps knowingly ignored, circumvented, and violated the federally mandated regulations established by the Fish and Wildlife Coordination Act (FWCA) and the National Environmental Policy Act (NEPA).  Because these statutes prescribed a specific course of conduct, the Corps had no other option but to adhere to the directives of the statutes.  Therefore, the requirement of judgment or choice necessary for the Government to carry its burden under the first prong is not satisfied.  If the Government cannot satisfy its burden under the first prong then the analysis is over and the discretionary function exception **cannot** apply.  This first prong is a necessary threshold finding, and because the Corps cannot clear this hurdle, the second prong is irrelevant and the discretionary function exception cannot be applied to shield the Government.

However, out of an abundance of caution, UHS will address the second prong of the *Gaubert/Berkovitz* test.  UHS presents three propositions that will aid this Court in analyzing the factual assertions and jurisprudential citations regarding the second prong of the test:

- Defendant's decisions regarding the operation and maintenance of the MRGO were not grounded in policy and do not satisfy the second prong of the *Gaubert/Berkovitz* test.

---

[6] *See Gaubert,* 499 U.S. at 322-23; *Berkovitz*, 486 U.S. at 536-37.

[7] *Gaubert,* 499 U.S. at 323; *Berkovitz*, 486 U.S. at 537.

- The decision in *Gaubert* is distinguishable from the facts and circumstances present in this case and does not apply to this case.

- When Congress drafted the FTCA, the primary justifications for the discretionary function exception were removing the distorting threat of liability and protecting the doctrine of separation of powers. Judicial assessment of the Corps's conduct in this suit does not trigger any serious issues regarding these factors, and therefore the discretionary function exception does not apply.

**A.**   **Defendant's decisions were not grounded in policy and do not satisfy the second prong of the *Gaubert/Berkovitz* test.**

UHS asserts that Defendant cannot carry its burden under the second prong of the *Gaubert/Berkovitz* test because the Corps's decisions were not susceptible to social, economic, or policy analysis, thus were not the kind of decisions that Congress intended to protect when it drafted the discretionary function exception.

Since the inception of the FTCA and the discretionary function exception, courts have recognized the difficulty in "charting a clear path through the weaving lines of precedent regarding what decisions are susceptible to social, economic, or political policy analysis."[8] Justice Antonin Scalia, concurring in *Gaubert*, recognized that "lower courts have had difficulty in applying" this policy judgment test.[9] However, two recent decisions, one from the United States Court of Appeals for the Ninth Circuit and one from this very Court, successfully found a path through the "weaving lines of precedent" and the reasoning laid out by both courts should be looked to and followed by this Court.

---

[8] *Whisnant v. United States*, 400 F.3d 1177, 1181 (9th Cir. 2005); *see also In re FEMA Trailer Formaldehyde Products Liability Litig'n*, 2008 WL 454377 (E.D. La. 2008) ("courts have, admittedly, gone back and forth on what is/is not considered to be susceptible to policy judgement").

[9] *Gaubert*, 499 U.S. at 335 (Scalia, J., concurring).

In *Whisnant v. United States*,[10] the plaintiff had a contract to provide seafood products to the base's commissary and contracted pneumonia and other health problems as a result of exposure to toxic/carcinogenic mold that had accumulated in the meat department.   The plaintiff brought an action under the FTCA to recover his damages claiming that the Government's operation and maintenance of the base's commissary was negligent.   The Ninth Circuit noted two trends in circuit precedent:

> First, a dominant theme in our case law is the need to distinguish between design and implementation: we have generally held that the *design* of a course of governmental action is shielded by the discretionary function exception, whereas the *implementation* of that course of action is not.   Second, and relatedly, matters of scientific and professional judgment - particularly judgments concerning safety - are rarely considered to be susceptible to social, economic, or political policy.[11]

In light of these trends, the court ultimately found that the discretionary function exception did not bar plaintiff's suit.[12]   Regarding the first trend, the court noted that the plaintiff alleged only that the government negligently implemented the safety inspection procedures designed to safeguard the health and safety of employees and customers, not that the design of those procedures was negligent.[13]   Based on this, the court found that "the government's duty to maintain its grocery store as a safe and healthy environment is not a policy choice of the type the discretionary function exception shields."[14]

---

[10] 400 F.3d 1177 (9th Cir. 2005).

[11] *Id.* at 1181.

[12] *Id.* at 1183.

[13] *Id.*

[14] *Id.*

Lastly, the court reasoned that removing an obvious health hazard "involves professional and scientific judgment, not decisions of social, economic, or political policy" and a "failure to adhere to accepted professional standards is not susceptible to a policy analysis."[15]  Because cleaning up a health hazard is a matter of safety, not policy, the court found that the government's conduct could not be protected under the discretionary function exception.

The reasoning in *Whisnant* can be applied to the government's conduct in this suit.  Because the government's __implementation__ of its dredging procedures and operations were not decisions grounded in social, economic, or political policy, the discretionary function exception does not shield them.  The implementation of these procedures and operations constituted, instead, ordinary non-policy decisions involving technical, scientific, and professional judgment.

In its memorandum of law, Defendant cites to an Engineer Regulation that specifically defines the Corps's policy: "It is the policy with respect to authorized navigation projects to have full project dimensions maintained where feasible and justified."[16]  The fact that the Corps allowed the project dimensions of the MRGO to widen to three or four times its authorized 650 feet top width, removed 492,000,000 cubic yards of spoil, and destroyed 100 square miles of hurricane buffering wetlands, is glaring evidence that the Government negligently implemented its technical and professional judgment regarding dredging operations.  The state of the MRGO and its facilitation of the damage wrought by Hurricane Katrina demonstrates that the Corps' implementation of its dredging policies and operations failed to adhere to professional standards.  Just as in *Whisnant,* that failure is __not susceptible to a policy analysis__.

---

[15] *Id.*

[16] Def.'s Memo. of Law at 29.

The second recent decision that provides insight into the circumstances before this Court is *In re FEMA Trailer Litigation*.[17]  In *In re FEMA Trailer*, plaintiffs filed a FTCA claim against the Federal Emergency Management Agency (FEMA) alleging that FEMA negligently selected and provided emergency housing units (EHUs) and negligently responded to complaints and concerns of formaldehyde in those EHUs.  The court denied FEMA's motion for summary judgment regarding the negligent response to the complaints and concerns of formaldehyde.[18]

The court focused on specific factual allegations that, instead of immediately responding to the formaldehyde complaints and concerns, FEMA officials attempted to avoid litigation by essentially "sticking their heads in the sand" and neglected to conduct "testing in fear that such testing would 'imply FEMA's ownership of the issue.'"[19]  The court analyzed FEMA's decisions against the second prong of the *Gaubert/Berkovitz* test and found that once an agency obtains knowledge of a dangerous condition it has a duty to quickly and adequately respond, and placing other concerns over its duty to respond is not a policy decision:

> Although there are many cases analyzing the second prong of the <u>*Berkovitz*</u> test relating to the discretionary function exception, and courts have, admittedly, gone back and forth on what is/is not considered to be susceptible to policy judgment, this Court concludes that, in this case, FEMA's duty to quickly and adequately respond to concerns and complaints of formaldehyde was **<u>not</u>** a policy choice of the type that the discretionary function exception shields.  When an agency is faced with a matter of public safety, donning the litigation battle armor should not be confused with weighing policy considerations and responding reasonably and promptly in such a way that can be considered to be "susceptible to policy analysis."  The evidence unfortunately reveals that FEMA may have — at least for some time after it claims it acquired knowledge of the potential formaldehyde issue . . . placed strategic

---

[17] 2008 WL 454377 (E.D. La. 2008).

[18] *Id.* at *23-*24.

[19] *Id.* at *21.

litigation concerns over and above an appropriate discretionary response to the potential harmful effects of formaldehyde in EHUs.

The evidence also reveals that the initial instructions to ignore the potential problem and to not initiate testing right away primarily came from FEMA's OGC — not from individuals charged with the discretion to respond to formaldehyde concerns. FEMA's response to formaldehyde concerns involved decisions of professional and scientific judgment; it did not involve decisions of social, economic, or political policy.[20]

Based on this analysis, the court reasoned that the "government undertook in its discretion to provide a service (i.e. the supply of safe, habitable alternative housing to disaster victims)," however, "[i]ts decision to, at least for a time, ignore potential health concerns associated with this alternative housing . . . did not involve any permissible exercise of policy judgment."[21]

As both the Plaintiffs and the *amici* parties detailed in their memoranda of law, the Corps had knowledge of the dangers and negative environmental impacts associated with the MRGO. For example, by 1976, the Corps reported in its First Environmental Impact Statement (FEIS) that: (a) the MRGO was a direct, efficient route for hurricane surge into the heart of Greater New Orleans; (b) that the MRGO created a funnel that enhanced waves and storm surge; and, (c) that the operation and maintenance of the MRGO had destroyed the wetlands, exacerbated channel bank erosion, and caused the banks to widen and destroy even more wetlands.[22]

However, instead of conducting the environmental impact statements, consulting with local officials, and alerting Congress of the situation, the Corps ignored its obligations under the federal statutes of FWCA and NEPA and even actively circumvented those obligations by segmenting its

[20] *Id.* at *22 (emphasis added) (citation omitted).

[21] *Id.*

[22] *See Amici* Party's Memorandum of Law at 4-5.

studies to hide the cumulative effects of its actions.   The Corps's conduct in response to the information in front of it was not unlike that of FEMA.   FEMA was faced with formaldehyde exposure and put other concerns ahead of public safety.   Here, the Corps was faced with a "Hurricane Highway" but ignored its legal obligations, shielded reality from Congress, and put other concerns ahead of properly addressing the circumstances.   FEMA avoided testing to hide its culpability, and the Corps has avoided conducting more in-depth environmental impact statements in order to conceal the effects of the MRGO.

Just as in *In re FEMA Trailer*, the Corps's conduct should not be confused with weighing policy considerations and responding reasonably and promptly in such a way that can be considered to be "susceptible to policy analysis."   The Corps was aware of the dangers created by the MRGO but put other concerns ahead of an appropriate response to these dangers.

B.   ***Gaubert* does not apply to this instance because it is distinguishable from the circumstances that exist in this suit.**

In *Gaubert*, federal regulators associated with the Federal Home Loan Bank and Board (FHLBB) decided to advise and oversee aspects of the operation of Independent American Savings Association (IASA), a savings and loan chartered in Texas and federally insured.   The regulators provided regulatory and financial advice, selected new officers and directors, and participated in the day-to-day management of the IASA.   After assuming control, the regulators announced that the IASA had a substantial negative net worth.   Plaintiff, the former manager Thomas Gaubert, filed a FTCA claim against the FHLBB alleging that he sustained substantial losses due to FHLBB's negligent operation and management of IASA.[23]

_____

[23] *Gaubert*, 499 U.S. at 315.

In applying the two-prong test, the Court ruled that there was no statute, policy, or regulation governing the conduct of the FHLBB therefore the Government had met its burden regarding the first prong of the test.

Regarding the second prong of the test, the Court found that the FHLBB had clear discretion to supervise IASA pursuant to the Home Owners' Loan Act of 1933 which authorized the FHLBB to provide for the "organization, incorporation, examination, and regulation" of federally insured savings and loan associations and FHLBB Resolution No. 82-381, which made it the "policy of the FHLBB that violations of law or regulation, and unsafe or unsound practices will not be tolerated and will result in the imitation of strong supervisory and/or enforcement action by the Board."[24]  The Resolution even recognized that "supervisory action must be tailored to each case and that such action will vary according to the severity of the violation."[25]

Based on these statutory provision and Resolution No. 82-381, the Court decided that governmental policy was furthered when the FHLBB exercised their discretion to choose the manner in which it supervised the IASA.

The facts and circumstances presented to the Court in *Gaubert* are wholly different from the ones present in this suit.  The most obvious difference between *Gaubert* and this suit is that while the FHLBB was able to satisfy its burden under the first prong of the test the Corps is completely unable to cross this hurdle.  The Corps's conduct was not discretionary because the FWCA and NEPA prescribed mandatory formal regulations that the Corps had no choice but to follow.  These statutory provisions removed the Corps option to use judgment or choice therefore the first prong

---

[24] *Id.* at 315, 329.

[25] *Id.* at 330.

of the test is not satisfied.  Thus, the analysis is complete and the Corps cannot hide behind the discretionary function exception.

The other major difference between *Gaubert* and this suit is that the FHLBB was acting pursuant to a governmental policy that provided for the manner and extent of its supervision over federally insured savings and loan associations.  The statutes and FHLBB Resolution present in *Gaubert* clearly established a governmental policy to protect against unsafe and unsound banking practices.  It was the nature of this policy and the nature of the FHLBB's conduct in furtherance of that policy that "involved the kind of policy judgment the discretionary function exception intended to shield."[26]

The situation before this Court is completely different from that in *Gaubert*.  Here, there is no clear, detailed, or structured governmental **policy** regarding the Corps's implementation of its dredging procedures.  The fact that there is no government policy regarding implementing the dredging operations means that these types of decisions that are grounded in the policy of the regulatory scheme and is **not** the kind of judgment that the exception intended to shield.

**C.    Judicial assessment of the Corps's conduct does not trigger any serious issues regarding the factors that Congress intended to guide and inform application of the discretionary function exception.**

The language and legislative history of the discretionary function exception explain that Congress had two primary justifications in mind when it approved the wording of the exception: (1) "complex" nuisance — the idea that the threat of civil liability induces government officials to make decisions not on applicable policy objectives that should guide the execution of their authority but

---

[26] *Id.* at 332.

-11-

rather out of a concern to limit their potential liability;[27] and, (2) separation of powers — when the court is put in a situation when it must second-guess discretionary policy decisions made by officials in other branches of government.[28]  Based on this Congressional intent, the discretionary function exception should **only** apply when the plaintiff's tort claim challenges a governmental action which involves the kind of discretionary determination that should be made without the distorting threat of litigation or calls on a court to second-guess a policy judgment.

The analysis which properly applies Congress' intent is one in which the court determines whether the Government was acting in a governing capacity or as a private party:

> When the government acts in a non-governing capacity - when it performs some sort of function or service that could be performed by a private party - there is **no compelling reason, as a matter of law, to treat the acts any differently than if they were performed by a private party**.  This is the fundamental assumption of the FTCA.  Civil liability for negligent torts committed in the course of non-governing activities poses no identifiable complex nuisance or separation of powers concern.  The only "incentive" that potential liability for negligent acts would place on government officials performing activities analogous to private conduct would be the incentive to act in a reasonable manner, particularly when the contemplated act poses the threat of causing harm.  Presumably, most government employees are already motivated by this concern.  So, to the extent that government employees already seek to act as a reasonably prudent person, the addition of a potential for liability arising from imprudent acts should not alter their job performance.  Also, to the extent that some individual employees have no internal motivation to act with care, the threat of liability would be expected to have an overwhelmingly positive impact on them.

> In addition, allowing civil tort lawsuits against the government arising from non-governing acts would not call on the courts to step beyond their assigned role within our system.  Indeed, our courts routinely both adjudicate disputes involving specific allegations that a defendant has acted unreasonably and determine the consequences and appropriate compensation for those actions.  Courts are equipped

---

[27] *See Barr v. Mateo*, 360 U.S. 564, 564-65, 570-71 (1959).

[28] *See Dalehite v United States*, 346 U.S. 15, 26, 73 S.Ct. 956, 963 (1953); *Berkovitz*, 486 U.S. at 536-37.

to gather information about a specific dispute, and are authorized to determine and apply the relevant law to the facts, and issue orders, where necessary, to compensate the injured.  In the course of adjudicating an otherwise unexceptional tort claim that happens to be brought against a federal defendant, the court will not be called upon to impose its will on the performance of duties that are properly left to other arms of the government within our system.[29]

Applying the analysis grounded in Congress' intent to the facts before this Court, shows that the discretionary function exception does not apply to the Corps's conduct.  The tort claim against the Corps for its negligence will not challenge the kind of discretionary determination that should be made without the distorting threat of litigation nor will it require this Court to second-guess a policy judgment.

The Corps's knowledge of potential liability for its operation and maintenance of the MRGO would create **no complex nuisance problems**.  The Corps's implementation of its operation and maintenance procedures was not a policy determination and the threat of liability arising from the failure to perform those procedures in a reasonable manner would only have one significant impact — it would give the Corps and its employees an added incentive to perform the act in the same manner as a reasonable private person would under the same circumstances.  Holding the Corps to the same standard for its implementation of its operation and maintenance procedures as the Court would expect from a private party would only improve the Government's services and enable it to better function and safeguard the general public.  A reasonably prudent private person would not have allowed for the massive widening and negative environmental impacts that have occurred under the Corps control and, under the functional interpretation of the discretionary function exception,

---

[29] Mark C. Niles, "Nothing but Mischief": The Federal Tort Claims Act and the Scope of Discretionary Immunity, 54 Admin. L. Rev. 1275, 1338-39 (emphasis added).

there is no compelling reason to treat the Corps acts any "differently than if they were performed by a private party."[30]

Further, this Court's assessment of the Corps's conduct would not necessarily pose any significant separation of powers concerns. The facts that will be presented to the Court in order to prove or disprove negligence will not involve governmental policy analysis and will be identical to the kinds of facts normally presented to the Court in tort suits involving private parties. This Court's analysis of the allegations and facts presented regarding whether or not the Corps was negligent in implementing its operation and maintenance procedures will not require this Court to perform any task specifically delegated to another branch of government. Further, the evidence presented regarding the Corps's negligence will be no different than what would be introduced against any private party who contracted to maintain the MRGO and did so negligently.

Analyzing the discretionary function exception in this case as Congress intended does not raise any serious issues regarding the distorting threat of litigation or separation of powers and clearly shows that the exception should not apply to the Corps's negligent implementation of its operation and maintenance of the MRGO. In fact, using this analysis improves the Government's function, returns the discretionary function exception to its limited scope, and ensures that the federal Government acts reasonably and bears its fair share of the burden caused by its negligent acts.

II.    **Conclusion**

The Corps's negligent implementation of its operation and maintenance procedures regarding the MRGO resulted in catastrophic damage to the entire city of New Orleans. Now the Corps is attempting to avoid being held accountable for its actions by hiding behind the discretionary function

---

[30] *See id.*

exception to the FTCA.   But the Corps's implementation of its operation and maintenance procedures was not grounded in policy and the Government cannot satisfy its burden under the second prong of the *Gaubert/Berkovitz* test.   Furthermore, the decision in *Gaubert* is distinguishable from this suit and judicial assessment of the Corps's conduct does not trigger any serious issues regarding Congress' primary justifications of removing the threat of liability and protecting the separation of powers.

Therefore, UHS asserts that the Corps's actions were not grounded in policy decisions and are not the kind of decisions that Congress intended to protect when it drafted the discretionary function exception, and the Corps's motion to dismiss and its motion for summary judgment should be denied.

Respectfully submitted,

/s/ James M. Garner

_____

JAMES M. GARNER #19589
DARNELL BLUDWORTH #18801
JOHN T. BALHOFF, II #24288
ASHLEY G. COKER #30446
**SHER GARNER CAHILL RICHTER KLEIN &
  HILBERT, L.L.C.**
909 Poydras Street, Twenty-eighth Floor
New Orleans, Louisiana  70112-1033
Telephone: (504) 299-2100
Facsimile: (504) 299-2300
**ATTORNEYS FOR UNIVERSAL HEALTH
SERVICES, INC.**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 18, 2008 a copy of the above and foregoing has been filed electronically with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.


s/ James M. Garner

_____

JAMES M. GARNER