UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:  KATRINA CANAL BREACHES                CIVIL ACTION
CONSOLIDATED LITIGATION
                                              NO.:  05-4182

                                              SECTION "K"(2)

FILED IN:    05-4181, 05-4182, 05-4191, 05-4568, 05-5237,
             05-6073, 05-6314, 05-6324, 05-6327, 05-6359,
             06-0020, 06-1885, 06-0225, 06-0886, 06-11208,
             06-2278, 06-2287, 06-2346, 06-2545, 06-3529,
             06-4065, 06-4389, 06-4634, 06-4931, 06-5032,
             06-5042, 06-5159, 06-5163, 06-5367, 06-5471,
             06-5771, 06-5786, 06-5937, 06-7682, 07-0206,
             07-0647, 07-0993, 07-1284, 07-1286, 07-1288,
             07-1289

PERTAINS TO:  LEVEE

## MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

MAY IT PLEASE THE COURT:

Defendant Sewerage and Water Board of New Orleans ("SWB") moves for summary judgment dismissing the remaining claims asserted against it in Plaintiffs' Corrected Restated Levee Master Consolidated Class Action Complaint (Doc.7571).  In the complaint, it is claimed the SWB is liable to plaintiffs for damages caused by the breach of the 17th Street Canal levee and floodwall.  For several reasons, including those stated by this Court in dismissing similar claims brought against the SWB by others, summary judgment should be granted.  The SWB had no duty to plaintiffs regarding the design, construction, and maintenance of the levees and floodwalls along the 17th Street Canal.

1

THE CLAIMS AGAINST THE SEWERAGE AND WATER BOARD OF NEW ORLEANS

On August 29, 2005, a section of levee on the Orleans Parish side of the 17th Street Canal breached just south of the Hammond Highway bridge. In Plaintiffs' Corrected Restated Levee Master Consolidated Class Action Complaint, plaintiffs claim the SWB negligently caused the breach of the 17th Street Canal levee.[1] Plaintiffs allege the SWB failed in its duty to properly design and construct the levee and floodwall. ¶136. They allege the SWB negligently rejected the "Barrier Plan" in favor of the High Level parallel plan. ¶137. Moreover, they allege the SWB was negligent in requesting the canal be dredged to a depth lower than the sheet piles only on and too close to the Orleans Parish side of the canal. ¶87. Finally, they allege residents reported to the SWB that water was "underseeping the levee" and the SWB failed to report the underseepage to other authorities or to take measures to remedy the underseepage. ¶¶87(f) and 139.[2]

THE SWB IS ENTITLED TO SUMMARY JUDGMENT IN ITS FAVOR

The SWB is not responsible for the failure of the 17th Street Canal levee. First, the SWB did not design or construct the levee and floodwall. Second, the levee and floodwall on the 17th Street Canal were not within the SWB's jurisdiction. The SWB owed no duty to

---

[1] On August 26, 2008, the Court issued its Order and Reasons (Doc.14613) striking claims against the SWB relating to the Orleans Avenue and London Avenue Canals. The sole remaining claims against the SWB relate to the breach of the 17th Street Canal levee.

[2] Plaintiffs also alleged the SWB negligently refused to implement the use of flood gates at the mouth of the canal and insisted on the "parallel plan." ¶87(e). This allegation, too, was struck by this Court's August 26, 2008, Order and Reasons. (Doc.14613).

plaintiffs with regard the failure of the 17th Street Canal levee and plaintiffs can not prove the elements of their negligence cause of action against it.

FACTS

1.    The 17th Street Canal

The City of New Orleans's history is unique.  Founded on alluvial soils on the east bank of the Mississippi River, the City grew and prospered despite precarious proximity to the Gulf of Mexico.  Beset by heavy rains and low elevation, much below sea level, the citizens of the New Orleans found creative ways to drain both the areas first developed along the river and the surrounding swamp to create solid land necessary for further growth and development.  Due to the topography, higher elevations along the river receding toward Lake Pontchartrain, the City decided to dig canals into which rainwater and the swamps drained by gravity to the lake.  Long before the creation of the Sewerage and Water Board of New Orleans, the 17th Street Canal was created as part of this drainage solution.

In August, 1871, the Commissioner of the Second Drainage District began to dig the 17th Street Canal from Northline Street to the Lake.  S*ee Jefferson and Lake Pontchartrain Railroad Company v. the City of New Orleans*, 30 La. Ann. 970, 1878 WL 8715 (La. 1878); and 31 La. Ann. 478, 1879 WL 7254 (La. 1879).  The canal was "50 feet wide, the excavated earth was thrown on the side … (the west side), forming thereby a sound and now well-settled roadbed, from 5 to 7 feet higher than the surrounding country, and the latter is low and swampy." *Orleans & J. Ry. Co. v. Jefferson & L. P. Ry. Co.,* 51 La. Ann. 1605, 1611, 26 So. 278, 280 (La. 1899).  The canal was redredged in 1897 and again in 1929.  Exhibit No. 1.

From the time the 17th Street Canal and the other outfall canals were dug, the City developed almost all of the land between the Mississippi River and Lake Pontchartrain. With that growth, however, it became necessary to drain more water from more areas into the drainage canals.  Every time it rained, rainwater needed to be moved not only from the areas developed at the time the outfall canals were created, but also from newly drained and developed areas.  Consequently, to avoid flooding, more and more water needed to be moved through the drainage canals.

By the 1970's, it had become apparent that the 17th Street Canal was inadequate to drain all of the land that it served.  Besides draining parts of the City of New Orleans, the east bank of Jefferson Parish had transformed from rural pasture and swampland to robust suburb.  The area in Jefferson Parish known as Hoey's Basin relied upon the 17th Street Canal to drain its developed areas.  Because the area served by the 17th Street Canal was prone to flooding in heavy rainstorms, the SWB in its discretion decided it was necessary to increase the capacity of the 17th Street Canal.[3]

On August 22, 1978, the board contracted with Modjeski and Masters to design hydraulic improvements to re-excavate the canal to meet drainage requirements and to obtain permits necessary to complete the work.  Exhibit No. 2.  Pursuant to the Rivers and Harbors Act, 33 U.S.C. §403, Modjeski sought a permit from the United States Army Corps of Engineers to complete improvements to the 17th Street Canal.  Modjeski responded to Corps

---

[3] In ruling on the United States' Motion to Dismiss, the Court found, "[t]he SWB was indeed seeking an increase in the volume of water that it could drain through this canal to prevent flooding during a rain event." (Doc.10984, p. 42).

of Engineers questions and requests for information.  It changed its plans to meet Corps comments and objections.  Finally, on June 13, 1984, the SWB received a permit from the Corps of Engineers to make improvements to the canal.  Exhibit No. 3.[4]

As of June, 1984, the dredging plan was set.  The dredging plan was not obscure, but was known to the Corps of Engineers because it reviewed and approved the plan.  The parameters of the canal, its size and shape, were public record and were vetted not only by independent engineers, Modjeski, and through public hearings, but by the appropriate governing body, the Corps of Engineers.

2.      The 17th Street Canal Levees and Floodwalls

At the same time the dredging permit was being considered, separately, the design of the levees lining the canal was under review.   In 1965, Congress passed the Lake Pontchartrain and Vicinity Hurricane Protection Project ("LPVHPP").  (Doc.10984, p. 5); Flood Control Act of 1965, 29 Stat. 1073, 1077 (42 U.S.C. §1962d-5).  It charged the Corps of Engineers with protecting the City of New Orleans from the Standard Project Hurricane.[5] Over the next 40 years, the Corps of Engineers investigated, planned and constructed flood protection for the metropolitan area.

At first, the levees lining the 17th Street Canal were not implicated.  Initially, the Corps sought to build barriers at the Rigolets and at Chef Menteur to stop storm surge from

---

[4] As pointed out by the Court, the Corps' review included evaluation of potential flood hazards created by the project. 33 C.F.R. § 320.4(a).  (Doc.10984, p. 41-42).

[5] *Decision-Making Chronology for the Lake Pontchartrain & Vicinity Hurricane Protection Project* (Final Report for the Headquarters, U.S. Army Corps of Engineers) drafted by Douglas Woolley and Leonard Shabman (March 2008), p. ES-6. ("HPDC").

entering the lake. (Doc.10984, p. 4).   When the "Barrier Plan" failed to pass muster[6], however, the Corps turned its attention to the south shore of Lake Pontchartrain.

In 1980, the Corps began to study alternatives to the Barrier plan.  (Doc.10984, p. 10). On August 17, 1982, the Corps indicated it favored the "High Level" plan over the "Barrier" plan for the LPVHPP. Exhibit No. 4.  Four months later, on December 20, 1982, Frederic Chatry, Chief, Engineering Division, of the Corps advised that the 17th Street Canal levees were in the planned alignment of the LPVHPP.  Exhibit No. 5.  In July, 1984, the Corps' Reevaluation Study officially recommended the High Level plan rather than the Barrier plan, although specific protection for the outfall canals was left unresolved.  (Doc.10984, p. 12); Exhibit No. 6.  Based upon that study, on February 7, 1985, the Corps officially decided to proceed with the High Level plan.  Exhibit No. 7.

Accordingly, as one part of the Corps of Engineers was reviewing and approving a plan to dredge the 17th Street Canal, another section of the Corps was in the process of federalizing the levees lining the canal and initiating a plan to redesign those levees. (Doc.10984, p. 16).  It would take another 5 years, until March, 1990, however, before the Corps would decide on the design plan for the 17th Street Canal and officially adopt the parallel protection plan.   (Doc.10984, pp. 16-17); Exhibit No. 8, General Design Memorandum No. 20, p.35.

The levee on the east or Orleans Parish side of the 17th Street Canal historically fell within the jurisdiction of the Orleans Levee District.  Exhibit No. 9.  When the Corps of

_____

[6] *See*, *Save Our Wetlands, Inc. v. Early J. Rush, III*, Civ. A. No. 75-3710, (E.D. La. Dec. 30, 1977); *see also* Doc.10984, p. 9.

Engineers decided to make the 17th Street Canal levees part of the LPVHPP, although the Orleans Levee Board remained the local sponsor for work to the levee, the Corps took over design responsibility.

On March 9, 1984, the Orleans Levee Board contracted with Modjeski and Masters to prepare plans and specifications for construction of the 17th Street Canal levee to conform to the "High Level" plan. Exhibit No. 10. Though hired by OLD, the Corps set design criteria, including setting factors of safety, that Modjeski had to follow. That design criteria evolved as Modjeski set about its work. (Doc.10984, p. 14-15).

To stabilize the levees, the design criteria called for steel sheet piles to be driven into the levees. A geotechnical analysis by Eustis Engineering, on July 27, 1983, recommended a sheet pile tip elevation of -17.1 C.D at Sta. 554+00 to 589+00 on both the Orleans and Jefferson sides of the canal.[7] Exhibit No. 11. Based upon initial design criteria, at Station 560+00, the location of the 17th Street Canal levee breach, Modjeski designed the sheet piles to be driven to -36.5 ft. below sea level. The Corps, however, changed the Modjeski design. At first, the change was small, but later as the design criteria changed, the design changes became larger. On January 4, 1988, Fred Chatry of the Corps wrote to Barney Martin of Modjeski regarding changes to the factor of safety used in determining sheet pile penetration. Chatry advised that the sheet pile tip elevation at Sta. 553+70 to 568+00 should be -35.3 ft. Exhibit No. 12.

---

[7] C.D. is Cairo Datum; 20.43 C.D. equates to sea level; therefore, -17.1 C.D. equals about -37.5 ft. below sea level.

The shortening of the sheet piles continued.  On December 23, 1987, after completion of the "E-99 Sheet Pile Wall Load Test Report", the Corps concluded that excessive sheet pile penetrations are not warranted.  Exhibit No. 13.  In June of 1988, the Corps of Engineers completed Technical Report No. 1 on its E-99 Sheet Pile Wall Field Load Test.  Despite the results of the test, which showed wall failure in soil conditions similar to the soil conditions found at the 17th Street Canal, the Corps concluded the sheet piles in the 17th Street Canal levees could be shortened.  HPDC, p. ES-15, 17; Exhibit No. 14.

Based upon the revised design criteria furnished by the Corps of Engineers, on August 31, 1988, Eustis Engineering issued revised analysis recommending sheet pile tip elevation at Sta. 553+70 to 568+00 of -12.8 ft. NGVD.  Exhibit No. 15.

Ultimately, after a series of submittals and responses, Modjeski submitted its final plans and specifications for the 17th Street Canal Parallel Flood Protection project on October 10, 1989.  On October 20, 1989, Fred Chatry of the Corps responded commenting:

> Imposition of recent revisions to the I-wall design criteria mandated by our Lower Mississippi Valley Division office, results in higher sheet pile tip elevations.  The resulting sheet pile tip elevations are shown on enclosure 1.  Revise the plans to show the new tip elevations.  This will result in a lower overall cost for the Project.
>
> Once the above comments are incorporated into the plans and specifications, we have no objection to your proceeding with the proposed work.

Exhibit No. 16.  The required tip elevation imposed by "enclosure 1" at the site of the breach was -9.75 feet below sea level.

On January 3, 1990, final plans incorporating the sheet pile tip elevation changes "imposed by the Corps" were submitted by Modjeski.  Exhibit No. 17.  These plans were approved (as evidenced by the Corps' issuance of General Design Memorandum No. 20 recommending parallel protection for the 17th Street Canal).  Exhibit No. 8.

When the Corps made the 17th Street Canal levee part of the LPVHPP, Modjeski's design called for sheet piles to be driven to -36.5 feet below sea level.  After the Corps revised the design criteria, the final planned tip elevation of the sheet piles at Sta. 560+00, the location of the levee breach, was -9.75 ft feet below sea level.  Exhibit No. 18.  Consequently, after the permit was issued for dredging the 17th Street Canal, the design of the adjoining levees was changed to raise the tip elevation of the sheet piles from 18 feet below the bottom of the canal (the canal bottom at Sta. 560+00 was -18.5 ft. below sea level) to 8.75 ft. above the bottom of the canal.

3.      The Dredging Project and Construction of the Levees and Floodwalls

Since the hydraulic improvements to the canal and the modifications to the levees and floodwalls were scheduled to be accomplished at about the same time, the SWB and OLD agreed to bid the projects together.  On May 9, 1990, OLD contracted with Boh Brothers to complete the excavation and flood protection work.  Exhibit No. 19.  Pursuant to the contract, Boh dredged the eastern half of the canal.  On July 4, 1990, a work order was issued for Boh to proceed.  On March 11, 1992, Boh's work was substantially complete.  On August 20, 1992, OLD accepted Boh's work.  Exhibit No. 20, affidavit of William Conway.

A similar arrangement was reached with the East Jefferson Levee District ("EJLD") for the levee work and dredging on the western side of the 17th Street Canal.  On May 15, 1992, EJLD contracted with Professional Construction Services, Inc., to do levee work and to dredge the western half of the canal.  EJLD Contract No. 92-1.  That work was completed and accepted by EJLD on March 24, 1994.  Exhibit No. 20.

While the dredging and levee work by Boh and Professional was underway, Modjeski was completing plans and specifications for the floodwalls capping the levees for the Corps of Engineers.  On December 4, 1990, Modjeski made a proposal to OLD to provide engineering services for concrete cap and sheet pile adjustment on the Orleans side.  Exhibit No. 21.  Final drawings and specifications for re-driving of sheet piles and capping of the walls were completed by Modjeski in November, 1992, and forwarded to the Corps.  Exhibit Nos. 20 and 22.  Modjeski did not administer the capping project.  Instead, the capping of the floodwalls and adjustment of the sheet piles was administered by the Corps of Engineers pursuant to the Corps' specifications.  Exhibit No. 23.

On June 28, 1993, the Corps awarded Contract DACW29-93-C-0081 to Pittman Construction Company, Inc., for redriving sheet piles and capping the floodwalls.  Pittman's work was accepted by the Corps on April 25, 1995.  Exhibit No. 20.

LAW AND ARGUMENT

The SWB is not legally responsible for the breach of the 17th Street Canal.  As a matter of law, the SWB had no jurisdiction over or responsibility for the levees and floodwalls along the canal.  As the SWB only had jurisdiction over drainage, not flood protection, the SWB could not and did not control the level of protection provided by the levees and floodwalls along its dredged canal.  It had to rely on the parties responsible for the levees and floodwalls to adequately investigate and design the level of protection necessary to contain the canal.

1.      The SWB owed no duty to plaintiffs for the design and construction of the 17th Street Canal Levees and Floodwalls

        a.      Negligent design and construction of floodwalls

        Plaintiffs claim the SWB had a duty to plaintiffs to design and construct floodwalls in a safe manner.  ¶ 136 of Plaintiffs' Corrected Restated Levee Master Consolidated Class Action Complaint [Doc.7571].  This is not correct.

        The SWB was created in 1899.  It is a limited jurisdiction entity.  At first, its duties were limited to water and sewerage.  In 1903, the SWB merged with the Drainage Commission and added drainage as one of its responsibilities.  La. R.S. 33:4071(A)(1), in part, provides:

>               A.     (1)   The public water system, the public sewerage
>               system, and the public drainage system of the city of New
>               Orleans shall be constructed, controlled, maintained, and
>               operated by a sewerage and water board . . . .

        The SWB is not responsible for flood protection.  The OLD has sole jurisdiction over the Orleans Parish levees.  La. R.S. 38:281(6) and 307.  And, Congress, made the Corps of

Engineers responsible for hurricane protection. (Doc.10984, p. 5).  As this court pointed out in considering the United States' dismissal motion, hurricane protection and drainage responsibility are separate.  The Corps of Engineers focuses on hurricane protection and the SWB focuses on improving drainage in the City of New Orleans.  (Doc. 10984, p. 15).

Here, the SWB did not design and construct the levees and floodwalls on the 17th Street Canal and is not responsible for them.  This Court has already considered claims that the SWB is responsible for the levees and has rejected them.  In related suits consolidated in the Katrina Canal Breaches Consolidated Litigation, *DePass*, No. 06-5127, *Bourgeois*, No. 06-5131, and *Sims*, No. 06-5116, the Court granted the SWB's motion to dismiss claims that the SWB has responsibility for the condition of the levees.  It said, "[i]n light of the statutory authority that has been iterated herein, this court finds that ¶71 of the original complaint should be dismissed because it specifically alleges the SWB is liable for deterioration of the levees, for which SWB clearly does not have responsibility under La. Rev. Stat. §§ 33:4071, 38:282(6) and 38:307(A)(1)." Order and Reasons, p. 9 (Doc.16050).

This Court has dismissed similar claims against the Parish of Jefferson (Doc. 8390), the City of New Orleans (Doc. 1133), and the Port of New Orleans (Doc. 8389).  In doing so, it found that it is the Orleans Levee District that is charged with the legal responsibility for the levees, no one else.  The Court held:

> . . . the maintenance of the levees involved would be the duty of the Orleans Levee District, not the Dock Board . . . .  Thus, a levee board is a creature or agency of the state brought into existence for the purpose of discharging the state's duties of flood protection.

*See* Dismissal Order (Doc. 1133); Order and Reasons (Doc. 13613)("the Orleans Levee District clearly has custody over the levee system.").

Plaintiffs' claim that the SWB had the duty to design and construct the floodwalls is incorrect.  That claim should be dismissed.

       b.       Negligent rejection of the "Barrier Plan"

Similarly, plaintiffs' claim that the SWB negligently rejected the "Barrier Plan" and insisted on implementation of the "High Level" parallel plan for the 17th Street Canal should be rejected.  ¶137 of Plaintiffs' Corrected Restated Levee Master Consolidated Class Action Complaint (Doc.7571).  First, the allegation is factually incorrect.  Second, the SWB had no duty with regard the determination as to which flood protection system was employed.

The Barrier plan contemplated the building of barriers at the Rigolets and Chef Menteur to stop storm surge from entering Lake Pontchartrain during hurricanes.  At the time this plan was being considered, the SWB supported the Barrier plan and had nothing to do with its rejection.  In a letter dated November 23, 1977, Stuart H. Brehm, Jr., Executive Director of the SWB, expressed the SWB's support for the Barrier plan.  Exhibit No. 24.  The Barrier plan was not implemented due to two decisions; one, a court decision enjoining implementation of the plan, *Save Our Wetlands, Inc. v. Early J. Rush, III*, Civ. A. No. 75-3710, (E.D. La. Dec. 30, 1977); and, two, a subsequent decision by the responsible party, the Corps of Engineers, to pursue the High Level plan.  The SWB did not reject the Barrier plan.

Furthermore, the SWB had no power to reject the Barrier plan.  The SWB has limited jurisdiction.  It does not have jurisdiction over hurricane protection.  The Corps, appointed

by Congress, has responsibility for hurricane protection. (Doc.10984, p. 15). The SWB had no duty or responsibility for choosing and implementing a hurricane protection plan. Accordingly, the SWB was not negligent in the decision to implement the High Level plan instead of the Barrier plan and plaintiffs' claim should be dismissed.

2.      The SWB Did Not Negligently Dredge the 17th Street Canal

The SWB has responsibility for drainage of the City of New Orleans. La. R.S. 33:4071(A)(1). The statute creating the SWB makes it responsible for drainage, but it does not dictate how the SWB is to carry out that responsibility. The method the SWB employs to carry out its drainage function is left to its discretion.

In the 1970's when the City of New Orleans was beset with heavy rainstorms that caused flooding in areas served by the 17th Street Canal, the SWB in keeping with its responsibility sought to improve drainage. It sought the aide of expert engineers to analyze the problem and based upon their recommendations decided to make hydraulic improvements to the 17th Street Canal. To complete those improvements, the SWB retained independent engineers to design the hydraulic improvements. The plan designed by these engineering experts called for the dredging of the 17th Street Canal to increase its capacity.

Plaintiffs claim the SWB was negligent in seeking a dredging permit to dredge the canal to a depth lower than the sheet piles, to dredge the canal only on the Orleans Parish side too close to the floodwall, and in dredging in a manner that compromised the safety of the canal/levee floodwalls. ¶87(a)(b)(c) and (d) of Plaintiffs' Corrected Restated Levee Master Consolidated Class Action Complaint (Doc.7571). Plaintiffs are incorrect.

a.      Dredging Below the Sheet Piles

From its creation in 1871, the canal existed for over 80 years before sheet piles were considered to reinforce its levees.  In 1956, the Orleans Levee District engineered OLD Project 24-C-11, Sheet Piling and Capping along 17th Street Canal. EJLD Answer to Interrogatory No. 5 in Levee.  There, for the first time, sheet piles were driven into the levee on the Orleans side of the canal.  These sheet piles, however, were minimal in length and did not reach the bottom of the canal.

The dredging plan permitted by the Corps of Engineers called for the bottom of the canal to be dredged to an elevation of -18.5 feet below sea level.  In conducting geotechnical analysis for the project, on January 12, 1984, Eustis Engineering found sediment had settled in the canal and suggested the canal bottom previously was as deep or deeper than the proposed dredging design.  Exhibit No. 25, p. 6.

While the SWB planned to re-excavate the canal bottom back to historic elevation, due to the legal division of responsibility by the Louisiana Legislature and Congress, it had to rely on those responsible for the levees to make sure the levees were sufficient to protect the City from waters that might enter the canal.  The legislature put the Orleans Levee Board in exclusive charge of Orleans Parish levees and flood protection.  Congress put the Corps of Engineers in charge of hurricane protection.

Before the Corps of Engineers made the 17th Street Canal levees part of the LPVHPP and revised the sheet pile guidelines, Modjeski's plan for the levees called for sheet piles driven to -36.5 feet, well below the depth the canal bottom was to be dredged.  After the

15

Corps decided on the Parallel Protection plan "with new sheet pile guidance" the design was revised and the plan called for sheet piles to be driven to -9.75 feet.

When the SWB received a permit from the Corps to dredge the canal, it was not contemplated that the canal bottom would be dredged below the sheet piles. Instead, it was planned that sheet piles would be driven below the bottom of the canal. The SWB had no control over this occurring, however, as levees and floodwalls were not its province. After the Corps took charge of the levees, the SWB had to rely on the Corps since it had exclusive jurisdiction and was the entity reviewing and coordinating both the dredging and levee plan, to properly design and implement flood protection adjacent to the canal.

> b.     The Canal was not Dredged on the Orleans Parish Side Only

Plaintiffs mistakenly allege the SWB sought to dredge the canal only on the Orleans Parish side. Perhaps the mistake stems from the fact the dredging near the breach site took place in two phases.

In 1990, the OLD contracted with Boh Brothers to dredge the eastern half of the canal. That work was substantially complete by March of 1992. Exhibit No. 26, "As-Built" of dredging of east side of 17th Street Canal. Under the Boh contract, about 60% of the channel work was completed. Exhibit No. 27. In May of 1992, the EJLD contracted with Professional Construction Services, Inc., to dredge the western half of the canal. By March of 1994, Professional's work was complete and accepted by EJLD. Exhibit No. 28, "As-Built" of dredging of west side of 17th Street Canal. Thus, plaintiffs' allegation is incorrect.

The allegation that the dredging was too close to the floodwalls on the Orleans side of the canal is a variant of the above allegation. Because of their mistaken belief the canal was only dredged on the Orleans side, plaintiffs suggest the canal was dredged closer to the Orleans side walls than the Jefferson side. As can be seen by the "As-Builts," the dredging was completed on both sides without favoring one side or the other.

    c.      The SWB Did Not Negligently Compromise the Levees

Again, the SWB was not responsible for the levees. The dredging plan was approved in 1984. Subsequent to the permitting of the dredging project, others evaluated the levees and redesigned them to protect the City from flooding. This allegation seeks to make the SWB responsible for something it otherwise had no jurisdiction over. It is another way to allege the SWB is responsible for the design and construction of the levees.

When the dredging permit was issued in 1984, those that subsequently evaluated and designed the levees knew the design of the canal and had sufficient information to design and construct levees adequate to contain canal waters. That they evidently did not adequately do so does not make the SWB responsible for their failure. Due to the legal division of responsibilities, the SWB had to rely upon the entities that were responsible for flood protection. The SWB does not become responsible for those entities' failure where the SWB had no duty with regard the design and construction of the levees in the first place.

Additionally, even if the SWB had such a duty, which is denied, it can not be liable for the exercise or performance of policy making or discretionary acts within its lawful powers and duties. La. R.S. 9:2798.1. Specifically, that statute provides in pertinent part:

> B.   Liability shall not be imposed on public entities or their officers or employees based upon the exercise or performance or the failure to exercise or perform their policymaking or discretionary acts when such acts are within the course and scope of their lawful powers and duties.

La. R.S. 9:2798.1(B).

According to the Louisiana Supreme Court, the object of this statute "is to provide immunity from liability for offenses and quasi offenses of public entities, as defined therein, when the acts or omissions of the public entities are policymaking or discretionary acts or omissions." *Gregor v. Argenot Great Central Insurance Company*, 02-1138 (La. 5/20/2003); 851 So.2d 959, 964.  "[P]olicymaking . . . means the *planning of a course of action* for the social or political well-being of the state." *Id*., at 965. On the other hand, "[w]hen applied to public functionaries, discretion means a power or right conferred upon them by law of acting officially in certain circumstances, according to the dictates of their own judgment and conscience, uncontrolled by the judgment or conscience of others." *Id*.; *citing* Black's Law Dictionary 419 (5th ed. 1979).  The immunity applies to decisions made both at the policy making or ministerial level and at the operational level.  *Gregor*, 851 So.2d at 967.

The SWB has the duty to provide drainage to the City of New Orleans.  No statute, however, directs how the SWB is to carry out that lawful duty.  The details of its drainage duty are left to the SWB's discretion.

Here, the SWB determined a need to improve drainage for the area served by the 17th Street Canal. (Doc.10984, p.42).  Heavy rainfall was causing floods.  To relieve that flooding problem, based upon the recommendations of independent engineers, the SWB decided to

dredge the canal. See, Exhibit No. 29. This discretionary act was made within the course and scope of the SWB's lawful powers and duties. It can have no liability for the exercise of its policymaking or discretionary decision to dredge the canal to perform its lawful duty to drain the City.

The immunity extends not only to the decision to dredge the canal, but also to the operational decisions regarding the method and scope of the dredging. In deciding the method and scope of the dredging project, the SWB made policy decisions based upon engineering analysis of its drainage needs balanced against the cost of the project both financially and in terms of the cost to citizens of doing nothing to improve the canal's hydraulic capacity.

The case of *Hontex Enterprises, Inc. v. City of Westwego*, 02-506 (La. App. 5 Cir. 12/10/02); 833 So.2d 1234, is analogous. There, the West Jefferson Levee District made the decision to close a gap in a levee to protect citizens from flooding. In doing so, however, it caused flooding to a seafood packaging plant owned by Hontex and destroyed its inventory of frozen shrimp. The levee caused the plant's own pumping system to be overwhelmed and blocked access to the plant to rescue inventory and other items.

The Court in *Hontex* reviewed the facts and agreed the decision to build the levee was a tactical one made to protect citizens from the threat of a flood. The decision was within the realm of discretionary functions grounded in social, economic, and public policy and defendants were immune from liability. *Id.*, at 1240.

Here, to protect citizens being flooded by heavy rainstorms, the SWB in its discretion decided to improve the drainage capacity of the 17th Street Canal.  To make hydraulic improvements it decided to dredge the canal to increase its capacity.  This discretionary decision was within the realm of its policymaking function to construct, control, maintain and operate the public drainage system for the citizens of New Orleans.  La. R.S. 33:4071(A)(1).  The SWB denies the decision to dredge was negligent or caused harm, however, the SWB is immune from liability for that decision. La. R.S. 9:2798.1.

Furthermore, the SWB did not direct or control the details of the actual dredging project.  The SWB contracted with Modjeski and Masters to design the dredging project. Exhibit No. 2.  The Corps of Engineers reviewed and made changes to the project and issued a permit allowing it. Exhibit No. 3.  The dredging project was then contracted by the Orleans Levee District and performed by Boh Brothers.  The SWB did not direct or control the details of the design or performance of the dredging project and is not responsible for any negligence by the engineer designing the project or the contractor carrying it out.

The employer of an independent contractor is not liable for physical harm caused to another by the act or omission of the contractor or his servants.  Restatement (Second) Torts, §409 (1965).  A principal who hires independent contractors over which he has no operational control has no duty to discover and remedy hazards created by its independent contractors.  *Wilkins v. P.M.B. Systems Engineering, Inc.*, 741 F.2d 795, 800 (5th Cir. 1984). Under Louisiana law, unless the activity in which the injury occurred was ultra-hazardous … "[a] principal is not liable for the torts of an independent contractor unless the principle

exercises operational control over or expressly or impliedly authorizes the independent contractor's actions." *Duplantis v. Shell Offshore*, 948 F.2d 187, 192 (5th Cir. 1991).

Here, the SWB did not design the dredging plan; Modjeski did.  Furthermore, the details of the dredging plan were reviewed and revised by the Corps of Engineers, not the SWB.  The SWB relied on the expertise of its independent contractor and obeyed the dictates of the governing authority the Corps of Engineers.  The SWB was interested in increasing the hydraulic capacity of its drainage canal.  It did not direct the details of the design of that project or the completion of its construction.

If the details of the design of the dredging project were faulty, the SWB is not responsible.  The design was completed by an independent contractor, Modjeski, and reviewed and approved by the Corps of Engineers.  The SWB is not liable to plaintiffs for injuries allegedly caused by faulty design and completion of the dredging project.

3.    The SWB is not liable to plaintiffs with regard reports of underseepage.

Plaintiffs claim the SWB is liable for damages caused by its alleged failure to respond to reports of underseepage in the backyards of residents living on Bellaire Drive along the 17th Street Canal.  Plaintiffs are wrong.

First, the SWB denies the allegation that underseepage of the levee was reported to it.  Second, by this allegation, plaintiffs again attempt to make the SWB responsible for the condition of the levee.  The SWB is not responsible for the condition of the levee along the 17th Street Canal and plaintiffs can not make it responsible for the maintenance of the levee simply by reporting to it a possible problem with the levee.

On December 6, 2004, the SWB received a call from Mrs. Marcello at 6800 Bellaire Drive about a leak in the street. An inspector was dispatched. He found no leak, but did find standing water in the street. On December 7, 2004, Mrs. Marcello again complained of a leak in the street. A Work Order was issued to examine for a water main leak between the street and the sidewalk. After inspection, a Work Order was issued to repair an inlet service leak between the curb and the street. On December 10, Ms. Marcello again called asking for an update because she claimed the leak was causing her driveway to sink. On December 13, 2004, Ms. Mignon called to ask for an update on the repair of the water main in front of 6800 Bellaire Drive.

On February 2, 2005, Mrs. LeBlanc, at 6780 Bellaire Drive called about a leak in the street since December 7, 2004. On February 7 and 8, 2005, SWB crews went out to inspect for a water main leak, but were not able to locate the leak. On February 10, 2005, a contractor, Earth Tech, was dispatched and investigated the leak. Earth Tech located a leak at 6800 Bellaire Drive. On February 11, 2005, a SWB crew repaired a leak to a ¾" inlet service line under the driveway at 6800 Bellaire Drive. The excavation was back-filled and dressed up. On February 14, 2005, the paving department requested Boh Brothers make repairs to the driveway. On February 23, 2005, Boh Brothers repaved the excavated area. See Affidavit of Chris Fontan, Exhibit No. 30.

After the repair was made, the SWB did not receive any further calls or complaints of standing water or leaks in the vicinity of either property. Further, at no time was the SWB told about a leak in a property owners' backyard and no record of any such report exists.

The SWB is a limited jurisdiction entity.  It is responsible for sewerage, water, and drainage.  Its jurisdiction does not extend on to private property beyond the water or sewerage hookup in the front of the property.  Its jurisdiction does not extend into backyards. The SWB's work would only address problems within its jurisdiction.

In this case, there was a leak in a homeowner's front yard.  A leak was found to a ¾" inlet service line attached to the water main.  Since that problem fell within the SWB's jurisdiction, it addressed and repaired the problem.  After it cleaned up and repaved the homeowner's driveway, the SWB never again heard about a problem with a leak or standing water in the vicinity of 6780 or 6800 Bellaire Drive.  If there was a problem, as far as the SWB knew, it was resolved.  The homeowners did not again contact the SWB to let it know of any continuing issue.

The SWB denies it was told of anything other than a leak that was repaired.  After the repair, hearing nothing further, the SWB was unaware of any further problem.  The SWB was not negligent.

Even were the SWB advised of underseepage, which is denied, that would not create responsibility for the condition of the levee.  Underseepage indicates a levee problem.  It indicates the levee is not keeping water out.  As stated above and previously found by this court, the SWB is not responsible for the condition of the levee.

Being aware of a defect in a thing not within your garde does not create a duty to repair the thing or notify the person who has control of the thing.  *George v. Western Auto Supply Company, Inc.*, 527 So.2d 428, 429 (La. App. 4 Cir. 1988)(an adjacent property

owner has no legal duty to inform or notify the City of a defective sidewalk).  And a person without *garde* over a thing is not liable for defects in the thing.  *Johnson v. Meridith*, 00-1384 (La. App. 3 Cir. 3/8/2001); 780 So.2d 1281 (levee board did not have *garde* of road and therefore could not be liable to plaintiff); *Giorgio v. Alliance Operating Corp.*, 05-0002 (La. 1/19/06); 921 So.2d 58.

This Court has held the SWB does not have *garde* over the levees and, therefore, is not responsible for the condition of the levees.  Even were it told that the levee had a problem, jurisdiction over the levee would not be created.  The legislature and Congress have delegated responsibility for the levees and flood protection.  The SWB does not have power to change that.  Summary judgment in favor of the SWB on the underseepage claim should be granted.

CONCLUSION

This Court has already ruled in the Sewerage and Water Board of New Orleans's favor in other cases, finding that it does not have liability for any design, construction or maintenance deficiencies of the 17th Street Canal levees or floodwalls.  The Court's legal analysis equally applies here too.  Plaintiffs' Corrected Restated Levee Master Consolidated Class Action Complaint against the SWB should be dismissed with prejudice.

Respectfully submitted,

s/Charles M. Lanier, Jr.

**CHARLES M. LANIER, JR. - #18299, T.A.**
**J. WARREN GARDNER, JR. - #5928**
**KEVIN R. TULLY - #1627**
**CHRISTOVICH & KEARNEY, LLP**
601 Poydras Street, Suite 2300
New Orleans, Louisiana 70130-6078
Telephone: (504) 561-5700

**GEORGE R. SIMNO III - #12271**
**GERARD M. VICTOR - #9815**
625 St. Joseph Street, Room 201
New Orleans, Louisiana 70165
Telephone:  (504) 585-2242
Facsimile:   (504) 585-2426

ATTORNEYS FOR DEFENDANT SEWERAGE
AND WATER BOARD OF NEW ORLEANS

## C E R T I F I C A T E

I do hereby certify that on the 23rd day of December, 2008, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to all participating counsel of record.  I also certify that I have mailed the foregoing by United States Postal Services, First Class, to all non-CM/ECF participants.

s/Charles M. Lanier, Jr.

**CHARLES M. LANIER, JR.**