# EXHIBIT 1

LMNOD-SP (17th Street Canal)2                                    13 February 1981

The 17th Street Canal was dug by the City of New Orleans in 1872. It was redredged in 1897 and again in 1929. The 17th Street Canal is the main stormwater drainage outlet from approximately 8,100 acres of urbanized land in Orleans Parish (Uptown area) and approximately 2,460 acres of similar area in Jefferson Parish (between Metairie Road and the Mississippi River). The applicant's project is to improve the present hydraulic characteristics of the canal to allow the pumping rate of Pump Station No. 6 to increase. While the dredging south of the Hammond Highway Bridge is mainly to reshape the canal for hydraulic improvement, the dredging between the Hammond Highway Bridge and Lake Pontchartrain is to remove obstructions and fill which presently block approximately 25% of the cross-sectional flow area of the canal.

The applicant proposes to remove all obstructions from the canal including all boat mooring facilities. The applicant has stated that people whose boats are displaced by the project will be allowed to moor their boats to the proposed sheet pile wall on the west side of the canal. The project will displace approximately nine residences and two businesses presently located in the drainage canal. However, these improvements will decrease the flooding potential to approximately 200,000 residents of urban areas in Jefferson and Orleans Parishes.

Plans for the proposed work are now on file in the Office of the District Engineer, US Army Engineer District, New Orleans, Foot of Prytania Street, New Orleans, Louisiana, and may be seen by anyone having interest in the matter. Protests to the proposed work, suggestions for modification thereof or objections to it, stating reasons therefor, will be received up to and including 16 March 1981. Letters should contain both the applicant's name and the notice number.

The decision whether to issue a permit will be based on an evaluation of the probable impact of the proposed activity on the public interest. That decision will reflect the national concern for both protection and utilization of important resources. The benefit which reasonably may be expected to accrue from the proposal must be balanced against its reasonably foreseeable detriments. All factors which may be relevant to the proposal will be considered; among those are conservation, economics, esthetics, general environmental concerns, historic values, fish and wildlife values, flood damage prevention, land use, navigation, recreation, water supply, water quality, energy needs, safety, food production, and, in general, the needs and welfare of the people.

Certification that the proposed activity will not violate applicable water quality standards will be required before a permit is issued.

No properties listed in the National Register of Historic Places are near the proposed work. The possibility exists that the proposed work may damage or destroy presently unknown archeological, scientific, prehistorical, or

2

LMNOD-SP (17th Street Canal)2                    13 February 1981

historical sites or data. Copies of this notice are being sent to the State
Archeologist, State Historical Preservation Officer, and the National Park
Service.

You are requested to communicate the information contained in this letter to
any other parties whom you deem likely to have interest in the matter.

Our initial finding is that the proposed work would neither affect any species
listed as endangered by the US Department of Interior nor affect any habitat
designated as critical to the survival and recovery of any endangered species.

A preliminary assessment of environmental, social, and other factors indicates
that an environmental impact statement (EIS) is not required. Permit
assessment is a continuing process. This preliminary determination of EIS
requirement will be changed if data or information brought forth in the
coordination process is of a significant nature.

The applicant has certified that the proposed activity described in the
application complies with and will be conducted in a manner that is consistent
with the Louisiana Coastal Resources Program.

It has been determined that a public hearing will be conducted by this district
prior to taking final action to issue or deny the permit. An additional public
notice will be issued announcing the time and place for the hearing.

This application was submitted in August 1979. Processing has been delayed
because of the need for additional information. This data has only recently
been provided.

The applicant has advised this office that responsibility for obtaining
required local permits will be assigned to the contractor.

The applicant has instituted legal action to require removal of structures and
boats from the canal.

1 Incl                                THOMAS A. SANDS
Dwg (6 sheets)                        Colonel, CE
                                      District Engineer

            cy:  Mr. Larry Cook, Modjeski and Masters
            cy:  Messrs. Howell, Greco, Schambach
                                          2/24/81

                          3

MODJESKI-E2
00033

# EXHIBIT 2

EXCAVATE METAIRIE RELIEF OUTFALL CANAL

UNITED STATES OF AMERICA
STATE OF LOUISIANA
PARISH OF ORLEANS
CITY OF NEW ORLEANS

BE IT KNOWN, That on this _____22nd_____ day of the month of
_____AUGUST_____, in the year of Our Lord, one thousand nine hundred
and seventy-eight,

BEFORE ME, _____DAVID S. CRESSY_____, a Notary Public in and
for the Parish of Orleans, State of Louisiana, duly qualified and com-
missioned, and Official Notary of the City of New Orleans, and in the
presence of the two witnesses hereinafter named and undersigned,

PERSONALLY CAME AND APPEARED:

The HONORABLE ERNEST N. MORIAL, acting herein in his capacity as
President of the Sewerage and Water Board of New Orleans, according to
copy of resolution attached hereto, hereinafter designated as "BOARD";
and

MODJESKI & MASTERS, domiciled in the City of New Orleans, Parish
of Orleans, State of Louisiana, herein represented by _____W. B. CONWAY_____,
its duly authorized _____PARTNER_____, hereinafter called the
"ENGINEERS";

Which said appearers declared:

WHEREAS, the Board, by resolution dated August 9, 1978, authorized
the employment of Modjeski & Masters for planning of the Excavation of
the Metairie Relief Canal Plant;

WHEREAS, the Engineers, in consideration of the covenants and
agreements hereinafter set forth, have agreed to furnish all engineering
services connected with the Excavation of the Metairie Relief Canal in
accordance with the suggested procedures of the American Society of
Civil Engineers as outlined in its "Manual No. 45", dated 1972, and
titled "Consulting Engineering, A Guide for the Engagement of Engineering
Services".

WITNESSETH:

SECTION 1.00 - THE ENGINEERS AGREE TO PERFORM THE FOLLOWING SERVICES:

Article 1.10 - PROJECT SCOPE

DESCRIPTION OF PROJECT - CAPITAL PROGRAM NO. 489

RE-EXCAVATE METAIRIE RELIEF (17TH ST.) OUTFALL
CANAL FROM STATION #6 TO LAKE

MODJESKI
EXHIBIT 4

20

Provide a complete set of plans for the re-excavation of the
Metairie Relief Outfall Canal from Station #6 to the Lake that
will provide the proper discharge flow according to the criteria
and information supplied by the Sewerage and Water Board.  Cross-
sections, taken at 500' intervals, will be supplied by the Sewerage
and Water Board, however, any other cross-sections and any sur-
veying that are necessary will be done by the Consultant under
Article 1.70.  All cross-sections and surveying must be tied to
the U.S.E.D. levee baseline.

Work shall include:

1. Obtaining the dredging and deposit or disposal permit
   required by the United States Corps of Engineers.
   This will include the preparation of any preliminary
   plans that may be required.

2. Obtaining all approvals from other agencies that are
   necessary to get this permit.

3. Obtaining soil borings and making all soil studies and
   recommendations that are necessary to assure the stability
   of the levees.

4. A complete study that will assure the proper performance
   of this canal under all operational conditions.

   The total estimated cost of the project shall not exceed
   $800,000.00.  This estimated cost is based on material and
   contractor costs for the year 1978.

Article 1.20 - PRELIMINARY ENGINEERING PLANS AND ESTIMATES

Prepare and submit to Board for review and
written approval preliminary engineering plans
and construction cost estimates of the project.
In preparing these preliminary plans and con-
struction cost estimates, the Engineers will
perform the services set forth in Articles 1.21
through 1.24 to the extent necessary and reasonably
required for this preliminary phase of the
engineering service.

Article 1.21 - COORDINATION

a. Consult with the Board's General Superintendent
   and his staff and coordinate with them through-
   out the planning period all matters pertinent
   to these proposed improvements.

b. Consult with and coordinate pertinent engineering
   and permit matters with Federal, State and local
   agencies having jurisdiction.

Article 1.22 - SURVEYS AND INVESTIGATIONS

a. Conduct ground reconnaissance of the area,
   and make visual inspection of the location

- 2 -

and other field conditions affecting the
proposed improvements.·

b. Plan and supervise surveys, subsurface in-
vestigations, and tests.

:icle 1.23 – ENGINEERING STUDIES AND ANALYSIS

a. Review with the Board's staff all existing
design data and flow requirements for the
Metairie Relief Canal.

b. Based on the information provided by surveys
of property, topography, rights-of-way and
hydrography, determine the location of the
project and its appurtenances.

c. Develop the project including structural and
hydraulic criteria· for facilities to be provided.

d. Prepare preliminary plans, elevations and
typical sections of the proposed project.

e. Prepare descriptions of materials of con-
struction to be provided.

f. Prepare preliminary cost estimate for the ·
proposed project.

g. Prepare estimated schedules from design phase
to completion of project.

·ticle 1.24 – ENGINEERING REPORTS·

a. Review, correlate and evaluate all data
collected and prepare report of findings for
conferences with Board and its staff.

·ticle 1.30 – DESIGN, ENGINEERING PLANS AND SPECIFICATIONS
Prepare and submit to the Board for review and
written approval final designs, working plans
and specifications for solicitation of competi-
tive bids and for construction, including the
following engineering services:

rticle 1.31 – Review preliminary engineering plans and estimates
with Board's Superintendent and staff, and continue
this coordination through design phase.

rticle 1.32 – Consult with and coordinate all pertinent engineering

- 3 -

matters with public and private utilities involved.

Article 1.33 - Plan and supervise surveys, subsurface investigations and tests.

Article 1.34 - Designate for the Board, areas needed for rights-of-way, easements, and property acquisitions for construction of proposed improvements.

Article 1.35 - Prepare permit drawings and data and assist Board in preparation of permit applications with Federal, State and other agencies and obtain final approval of appropriate Federal, State and Local Agencies.

Article 1.36 - Develop final designs and draft specifications, contract documents, and cost estimates and submit to Board and appropriate Federal, State and local agencies for review and approval before proceeding with final plans.

Article 1.37 - Prepare contract drawings, and include in the contract documents provisions for receipt of alternate bids, as approved by the Board, so as to enable the Board to adjust the construction cost as established in Article 1.10.

Article 1.38 - Complete specifications and contract documents for construction and obtain final approval of Board. Develop detailed breakdown of quantities and cost estimated.

Article 1.40 - CONTRACT DOCUMENTS & BIDS

Article 1.41 - Furnish the Board three (3) sets of the plans and three (3) draft copies of the specifications, also the original tracings of the plans and masters of the specifications.

Article 1.42 - Assist in the preparation of invitations to Bidders, prepare addenda, attend bid openings, analyze the bids received and make recommendations to the Board.

Article 1.43 - Redesign any portion of the project as may be required by the Board to secure bids in conformity with limit of construction cost as set forth in Article 1.10, reasonable allowances to be made for

- 4 -

increases in construction cost resulting from any
undue delays by the Board in obtaining bids.

Article 1.44 - Prepare alternates as may be required by the
Board to secure bids in conformity with limits
of construction cost as set forth in Article 1.10,
reasonable allowances to be made for increases
in construction cost resulting from any undue
delays by the Board in obtaining bids.

Article 1.50 - CONTRACT ADMINISTRATION

To provide general administration of construction
contracts, which shall include the following
engineering services, in performance of which,
the Engineers will diligently endeavor to protect
the Board against defects and deficiencies in the
work, but do not guarantee the Contractors'
performance.

Article 1.51 - Consult with and advise the Board during construction.

Article 1.52 - Prepare and recommend for execution by the Board,
Work Orders, Stop Orders, Change Orders, Shipping
Orders, and similar notices to the Contractor.

Article 1.53 - Issue such additional instructions to the Contractor
as may be necessary for interpretation of the plans
and specifications or to illustrate changes required
in the work.

Article 1.54 - Review Shop Drawings, material samples and lists
and other data for approval submitted by the
Contractor.

Article 1.55 - Supervise and review Testing Laboratory services
for control and testing of materials used in the
work.

Article 1.56 - Make periodic visits to job site to check the
Contractor's work for compliance with contract
requirements.

Article 1.57 - Review construction progress schedule submitted
by Contractors and Suppliers in coordination with
job requirements, and approve such schedule when

- 5 -

they satisfactorily meet the construction program.

Article 1.58 - Review Contractors estimates of construction progress and materials stored, and prepare and execute Partial Payment Certificates of Work completed for periodic payments to the Contractor; make final inspection of and certification of completion of the work in accordance with the contract requirements for the Board's acceptance and for final payment to the Contractor.

Article 1.60 - COMPLETION

Engineer will assist the Board's engineering staff in turning over the completed Metairie Relief Canal to Board's operating personnel at completion of construction contracts.

Article 1.62 - Keep records of all approved field construction modifications and revise the reproducible set of plans to conform with construction methods.

Article 1.70 - ADDITIONAL ENGINEERING SERVICES

As provided by the American Society of Civil Engineers and outlined in its Manual No. 45 dated 1972, pages 28 and 29, the following services if and when required by the Board are to be performed by the Engineers, but at additional compensation, and are not included in the basic fee:

Article 1.71 - Soils investigations - including test borings, related analysis, and recommendations.

Article 1.72 - Detailed mill, shop, and/or laboratory inspection of materials and equipment.

Article 1.73 - Land surveys, establishment of boundaries and monuments, and related office computations and drafting.

Article 1.74 - Field surveys, photogrammetry, and field layouts of construction.

Article 1.75 - Technical inspection of construction by a full-time(licensed resident engineer and supporting staff, as required by the Board.

- 6 -

Article 1.76 - Additional copies of reports, contract drawings, and documents above the specified number furnished in the basic services.

Article 1.77 - Extra travel and subsistence for the Engineer and his staff beyond that normally required under basic circumstances, when authorized by the Board.

Article 1.78 - Assistance to the Board as expert witness in litigation arising from the development or construction of the project.

Article 1.79 - Investigation involving detailed consideration of operation, maintenance, and overhead expenses; and the preparation of rate schedules, earning and expense statements, feasibility studies, appraisals, valuations, and material audits or inventories required for certification of force account construction performed by the Board.

Article 1.80 - Preparation of applications and supporting documents, permits and studies required by Federal, State and Local Agencies.

Article 1.81 - Redesign of any portion of the project after written approval by the Board, except for redesign for correction of errors or omissions, and except as provided in Article 1.43 for which there will be no additional compensation.

Article 1.82 - Preparation of alternates authorized in writing by Board, except as provided in Article 1.44 for which there will be no additional compensation.

SECTION 2.00 - THE BOARD AGREES

Article 2.10 - Upon execution of the Contract for the Engineering Plans and Estimates, it may immediately authorize the Engineers to proceed with work as outlined in Articles 1.20 through 1.24.

Article 2.11 - When and as required, after written approval of preliminary Engineering Plans and Estimates, it may instruct and authorize the Engineers to proceed with design and engineering plans and specifications as outlined in Articles 1.30 through 1.38.

Article 2.12 - When and as required, after written approval of

- 7 -

26

Engineering Plans and Estimates, it may instruct
and authorize the Engineers to proceed with design
and engineering plans and specifications as outlined
in Articles 1.40 through 1.44.

Article 2.13 – When and as required, upon award of construction
contract, it may instruct and authorize the
Engineers to furnish Contract Administration and
Completion services as outlined in Articles 1.50
through 1.62.

Article 2.14 – When and as required, it may instruct and authorize
the Engineers to perform the applicable Additional
Engineering Services outlined in Articles 1.70
through 1.82 hereof.

Article 2.15 – It will assist the Engineers throughout the work
by placing at their disposal upon request all
available records and information in its possession,
including any construction drawings, property maps,
and soil reports or topographic maps of the area.

Article 2.16 – That all services stated to be furnished by the
Board shall be without cost to the Engineers.

Article 2.17 – To remunerate the Engineers in compensation for
their services as set forth in Section 3.00 hereof.

SECTION 3.00 – PAYMENTS

Article 3.10 – FOR BASIC ENGINEERING SERVICES

The Board shall pay the Engineer for performance
of the services described in Articles 1.20 through
1.62 except as noted a Basic Fee as follows:

(a) Preliminary Studies and Analysis

For Articles 1.20 through 1.24 except Article
1.21 (b) a Basic Fee of $33,000.00.
Services under Article 1.21 (b) shall be paid
under Article 3.22.

(b) Final Design Plans and Specifications

For Articles 1.30 through 1.38 except Article
1.35 a Basic Fee of $41,000.00.

- 8 -

Services under Article 1.35 shall be paid
under Article 3.22.

  (c)  <u>Bid Documents</u>

For Articles 1.40 through 1.44, a Basic Fee
of $1,400.00.

  (d)  <u>Administration of Construction</u>

For Articles 1.50 through 1.62, a Basic Fee
of $12,000.00.

Article 3.12 - If any part of this project is deferred or abandoned
by the Board after Engineering Services have begun,
the Engineers shall be paid for actual work per-
formed prior to notification of abandonment. The
fee for this work shall be a pro-rata share of the
basic fee based on the phase or percentage of
planning actually completed and the agreed esti-
mated construction contract cost of the abandoned
or deferred work.

Article 3.20 - The Board shall reimburse the Engineers addi-
tionally to the foregoing when applicable for
Additional Services as referred to in Articles
1.70 through 1.82 inclusive as follows:

Article 3.21 - For the time of principals, preparing for and
appearing in litigation or public hearings or
negotiations for permits as indicated in Article
1.78 payment shall be at the rate of Two Hundred
Dollars ($200.00) per day.

Article 3.22 - For the Services of Engineers' principals and
personnel employed under Articles 1.21 (b),
1.35, 1.79, 1.80, 1.81 and 1.82 - Additional
Engineering Services, when authorized by Board,
the salaries of such principals and personnel for
the hours actually engaged in performing work or
services, (such payment to be made at a rate
equal to the employees' annual salary divided by
1,900 scheduled working hours in the year for all
straight time worked and at $1\frac{1}{2}$ times such rate
for all overtime work exceeding eight (8) hours

- 9 -

in any one day or forty (40) hours in any work
week, or on Sunday, or holidays;) plus an amount
equal to One Hundred Twenty-five (125%) per cent
of the sum of such salary costs for taxes,
insurance, overhead and fee.

Article 3.23 - For the services of field staff including resident
engineers, inspectors, and clerks, for services in
connection with Article 1.75, charges based on
salary cost computed as described in Article 3.22
above, plus twenty-five (25%) per cent for direct
salary costs, and then plus Fifty (50%) per cent
of the sum of such costs for overhead and fee.

Article 3.24 - Direct engineering office and field expenses, in-
cluding printing, reproduction work and photographs,
telephone toll charges, telegrams, automobile
rental charges, authorized subsistance and travel
expenses (twelve (12¢) cents per mile to cover
the use of Engineers' automobiles, except those
of resident field personnel, when employed on
the work) and the cost of soil borings, load tests,
laboratory and inspection services, field surveys,
investigations and reports (Articles 1.71 through
1.82) all when specifically authorized and
chargeable directly to the work under this agree-
ment, plus ten (10%) per cent of the sum of all
such direct costs to cover general overhead only
but no fee or profit.

SECTION 4.00 - THE BOARD AND THE ENGINEERS FURTHER AGREE

Article 4.10 - ENGINEERS INDEPENDENT STATUS:  The Engineers shall
at all times during the life of this Agreement be
considered as, and acting in the capacity and not
as employees of the Board, nor shall the Board be
obligated to any person, firms or corporations in
any manner on account of any obligation contracted
for or on behalf of the Engineers in the performance

- 10 -

of their services under the terms of this Agreement, except as described in Article 4.30.

Article 4.20 - ENGINEERS ON TRAVEL:  Travel by the Engineers during performance of the design phases hereof, as may be undertaken for their principal benefit, but as may be intended to also benefit the Board and the proposed improvements, shall be without cost to the Board unless otherwise specifically authorized.

Article 4.30 - CONTRACT ASSIGNMENT:  The Engineers shall have the right to assign this Agreement to any bank to assist in financing the services to be performed under this Agreement.

Article 4.40 - INSURANCE

The Engineers shall secure and maintain at their own expense such insurance as will protect them from claims under the Workman's Compensation Acts and from claims for bodily injury, death, or property damage which may arise from the performance of their services under this Agreement; and shall carry Professional Liability Insurance.  Insurance for bodily injury or death shall be in the amount of $100,000.00 for one (1) person, and not less than $300,000.00 for all injuries and/or deaths resulting from any one (1) occurrence.  The insurance for property damage shall be in the amount of $300,000.00 for each accident and not less than $300,000.00 aggregate.  Automotive Liability P.I. $300,000.00/$300,000.00, P.D. $300,000.00/$300,000.00.  The Professional Liability Insurance shall be in the amount of $1,000,000.00.

Article 4.50 - TERMINATION

This agreement may be terminated by either party by thirty (30) days written notice forwarded to the last known address of either party, except that such

- 11 -

termination shall not occur during the period of
progress of any one phase of this Contract as
defined in Articles 2.10, 2.11, 2.12 or 2.13.
Termination by either party may occur during the
period of progress of any one of these phases if
based upon a substantial failure to perform in
accordance with the terms hereof by one (1) party,
through no fault of the other party.  In case of
dissolution of either corporation, or the death,
incapacitation, or withdrawal of three (3) or more
of its principal officers engaged on the work, the
Board shall have the option to terminate this
Agreement in whole or in part.  If terminated,
the Engineers shall be paid for services performed
to the date of termination, including fees earned
and reimbursements then due, plus terminal expenses,
which expenses shall be subject to audit by the
Board.

THUS DONE, PASSED AND SIGNED in my office at New Orleans, Louisiana,
on the day, month and year first above written, in the presence of

KATHERINE SISK               and        KATHERINE G. HOLLIFIELD

competent witnesses, both of lawful age and domiciled in this City,
who hereunto sign these presents, together with the said parties and me,
Notary, after due reading of the whole.

SEWERAGE AND WATER BOARD OF NEW ORLEANS

BY: _____
                    PRESIDENT

MODJESKI & MASTERS

BY: _____
                    PARTNER

WITNESSES:

_____
_____

/s/ DAVID S. CRESSY
      NOTARY PUBLIC

APPROVED AS TO FORM:

_____
SPECIAL COUNSEL
SEWERAGE AND WATER BOARD
OF NEW ORLEANS

A TRUE COPY:

_____
      NOTARY PUBLIC

- 12 -

31

R-110-78

## RESOLUTION

BE IT RESOLVED by the Sewerage and Water Board of New Orleans, at its regular meeting held on August 9, 1978, at which a quorum was present, that authority be and it is hereby conferred on the President or President Pro Tem of the Board to enter into an agreement with MODJESKI & MASTERS, as Engineers, for the following project:

> All engineering services in connection with the excavation of the Metairie Relief (17th Street) Outfall Canal from Station #6 to Lake.

All engineering services connected with said project shall be in accordance with the suggested procedures of the American Society of Civil Engineers as outlined in its "Manual No. 45", dated 1972, and titled "Consulting Engineering, A Guide for the Engagement of Engineering Services".

The estimated cost of the project shall not exceed $800,000.00 and is based on material and contractor costs for the year 1978. The fee of the Engineers shall be as set out in Article 3.10 of the Agreement.

BE IT FURTHER RESOLVED that the Officer herein named is authorized, empowered and directed to enter into the necessary contract or agreement before the City Notary of New Orleans to sign, seal and deliver the same and to do and perform any act or deed legally necessary in order to properly effectuate the objects and purposes hereof.

---

I, Stuart H. Brehm, Jr., Executive Director, Sewerage and Water Board of New Orleans, do hereby certify that the above and foregoing is a true and correct copy of a Resolution adopted at the Regular Monthly Meeting of said Board, duly called and held, according to law, on August 9, 1978.

STUART H. BREHM, JR.
EXECUTIVE DIRECTOR
SEWERAGE AND WATER BOARD OF NEW ORLEANS

# EXHIBIT 3

b. That all activities authorized herein shall, if they involve, during their construction or operation, any discharge of pollutants into waters of the United States or ocean waters, be at all times consistent with applicable water quality standards, effluent limitations and standards of performance, prohibitions, pretreatment standards and management practices established pursuant to the Clean Water Act (*33 U.S.C. 1344*), the Marine Protection, Research and Sanctuaries Act of 1972 (*P.L. 92-532, 86 Stat. 1052*), or pursuant to applicable State and local law.

c. That when the activity authorized herein involves a discharge during its construction or operation, or any pollutant (*including dredged or fill material*), into waters of the United States, the authorized activity shall, if applicable water quality standards are revised or modified during the term of this permit, be modified, if necessary, to conform with such revised or modified water quality standards within 6 months of the effective date of any revision or modification of water quality standards, or as directed by an implementation plan contained in such revised or modified standards, or within such longer period of time as the District Engineer, in consultation with the Regional Administrator of the Environmental Protection Agency, may determine to be reasonable under the circumstances.

d. That the discharge will not destroy a threatened or endangered species as identified under the Endangered Species Act, or endanger the critical habitat of such species.

e. That the permittee agrees to make every reasonable effort to prosecute the construction or operation of the work authorized herein in a manner so as to minimize any adverse impact on fish, wildlife, and natural environmental values.

f. That the permittee agrees that he will prosecute the construction or work authorized herein in a manner so as to minimize any degradation of water quality.

g. That the permittee shall allow the District Engineer or his authorized representative(s) or designee(s) to make periodic inspections at any time deemed necessary in order to assure that the activity being performed under authority of this permit is in accordance with the terms and conditions prescribed herein.

h. That the permittee shall maintain the structure or work authorized herein in good condition and in reasonable accordance with the plans and drawings attached hereto.

i. That this permit does not convey any property rights, either in real estate or material, or any exclusive privileges; and that it does not authorize any injury to property or invasion of rights or any infringement of Federal, State, or local laws or regulations.

j. That this permit does not obviate the requirement to obtain state or local assent required by law for the activity authorized herein.

k. That this permit may be either modified, suspended or revoked in whole or in part pursuant to the policies and procedures of 33 CFR 325.7.

l. That in issuing this permit, the Government has relied on the information and data which the permittee has provided in connection with his permit application. If, subsequent to the issuance of this permit, such information and data prove to be materially false, materially incomplete or inaccurate, this permit may be modified, suspended or revoked, in whole or in part, and/or the Government may, in addition, institute appropriate legal proceedings.

m. That any modification, suspension, or revocation of this permit shall not be the basis for any claim for damages against the United States.

n. That the permittee shall notify the District Engineer at what time the activity authorized herein will be commenced, as far in advance of the time of commencement as the District Engineer may specify, and of any suspension of work, if for a period of more than one week, resumption of work and its completion.

o. That if the activity authorized herein is not completed on or before _____ day of _____ , 19 _____ , (*three years from the date of issuance of this permit unless otherwise specified*) this permit, if not previously revoked or specifically extended, shall automatically expire.

p. That this permit does not authorize or approve the construction of particular structures, the authorization or approval of which may require authorization by the Congress or other agencies of the Federal Government.

q. That if and when the permittee desires to abandon the activity authorized herein, unless such abandonment is part of a transfer procedure by which the permittee is transferring his interests herein to a third party pursuant to General Condition t hereof, he must restore the area to a condition satisfactory to the District Engineer.

r. That if the recording of this permit is possible under applicable State or local law, the permittee shall take such action as may be necessary to record this permit with the Register of Deeds or other appropriate official charged with the responsibility for maintaining records of title to and interests in real property.

2

SWB-ED-F0040-001422

s. That there shall be no unreasonable interference with navigation by the existence or use of the activity authorized herein.

t. That this permit may not be transferred to a third party without prior written notice to the District Engineer, either by the transferee's written agreement to comply with all terms and conditions of this permit or by the transferree subscribing to this permit in the space provided below and thereby agreeing to comply with all terms and conditions of this permit. In addition, if the permittee transfers the interests authorized herein by conveyance of realty, the deed shall reference this permit and the terms and conditions specified herein and this permit shall be recorded along with the deed with the Register of Deeds or other appropriate official.

u. That if the permittee during prosecution of the work authorized herein, encounters a previously unidentified archeological or other cultural resource within the area subject to Department of the Army jurisdiction that might be eligible for listing in the National Register of Historic Places, he shall immediately notify the district engineer.

II. **Special Conditions:** (*Here list conditions relating specifically to the proposed structure or work authorized by this permit*):

v. That all dredging will be performed by bucket dredge or other similar mechanical dredge equipment to lessen turbidity impacts. No hydraulic dredging is to be performed.

w. That no dredging will be performed during Pumping Station No. 6 pumping operations.

x. That adequate silt screens will be placed in the immediate area of dredging operations to control turbidity.

y. That dredged material from the canal will be transported from the site by leak-proof trucks. Care will be taken during loading and transportation operations to control spillage of material from the trucks.

z. That a physical barrier will be constructed on the berm of the dredge area to control elutriate from entering the canal.

aa. That the site or sites from the offsite disposal of dredged material will be approved by the New Orleans District Corps of Engineers prior to disposal operations.

bb. That the disposal method such as coverage with clear fill, depth of disposal material, etc., will be in accordance with applicable state environmental laws and regulations.

cc. That the New Orleans District reserves the right to inspect the site during operations and add additional conditions to the permit to protect the overall public interest.

dd. That the permittee is aware that approvals or permits are required from the Orleans Levee Board and the Jefferson Levee Board.

ee. That the permittee is aware that the work authorized under this permit may not necessarily be creditable under the "Lake Pontchartrain, Louisiana and Vicinity Hurricane Protection" project.

ff. That the permittee will submit three sets of the final plans and specifications to the Chief of Engineering Division of the New Orleans District for information and further coordination with the permittee's architect-engineering firm.

gg. That in issuing this permit the New Orleans District recognizes that structures and mooring facilities in the canal will be removed and that some boat mooring structures may be placed in the canal after dredging . The New Orleans District interposes no objection to boat mooring structures in the canal provided the structures are installed by or under the approval of the permittee.

hh. That the permittee will maintain the present level of hurricane protection throughout the duration of the construction.

3

The following Special Conditions will be applicable when appropriate:

**STRUCTURES IN OR AFFECTING NAVIGABLE WATERS OF THE UNITED STATES:**

a. That this permit does not authorize the interference with any existing or proposed Federal project and that the permittee shall not be entitled to compensation for damage or injury to the structures or work authorized herein which may be caused by or result from existing or future operations undertaken by the United States in the public interest.

b. That no attempt shall be made by the permittee to prevent the full and free use by the public of all navigable waters at or adjacent to the activity authorized by this permit.

c. That if the display of lights and signals on any structure or work authorized herein is not otherwise provided for by law, such lights and signals as may be prescribed by the United States Coast Guard shall be installed and maintained by and at the expense of the permittee.

d. That the permittee, upon receipt of a notice of revocation of this permit or upon its expiration before completion of the authorized structure or work, shall, without expense to the United States and in such time and manner as the Secretary of the Army or his authorized representative may direct, restore the waterway to its former conditions. If the permittee fails to comply with the direction of the Secretary of the Army or his authorized representative, the Secretary or his designee may restore the waterway to its former condition, by contract or otherwise, and recover the cost thereof from the permittee.

e. Structures for Small Boats: That permittee hereby recognizes the possibility that the structure permitted herein may be subject to damage by wave wash from passing vessels. The issuance of this permit does not relieve the permittee from taking all proper steps to insure the integrity of the structure permitted herein and the safety of boats moored thereto from damage by wave wash and the permittee shall not hold the United States liable for any such damage.

**MAINTENANCE DREDGING:**

a. That when the work authorized herein includes periodic maintenance dredging, it may be performed under this permit for _____ years from the date of issuance of this permit (*ten years unless otherwise indicated*);

b. That the permittee will advise the District Engineer in writing at least two weeks before he intends to undertake any maintenance dredging.

**DISCHARGES OF DREDGED OR FILL MATERIAL INTO WATERS OF THE UNITED STATES:**

a. That the discharge will be carried out in conformity with the goals and objectives of the EPA Guidelines established pursuant to Section 404(b) of the Clean Water Act and published in 40 CFR 230;

b. That the discharge will consist of suitable material free from toxic pollutants in toxic amounts.

c. That the fill created by the discharge will be properly maintained to prevent erosion and other non-point sources of pollution.

**DISPOSAL OF DREDGED MATERIAL INTO OCEAN WATERS:**

a. That the disposal will be carried out in conformity with the goals, objectives, and requirements of the EPA criteria established pursuant to Section 102 of the Marine Protection, Research and Sanctuaries Act of 1972, published in 40 CFR 220-228.

b. That the permittee shall place a copy of this permit in a conspicuous place in the vessel to be used for the transportation and/or disposal of the dredged material as authorized herein.

This permit shall become effective on the date of the District Engineer's signature.

Permittee hereby accepts and agrees to comply with the terms and conditions of this permit.

_____ x June 13, 1984 _____
PERMITTEE                                       DATE

**BY AUTHORITY OF THE SECRETARY OF THE ARMY:**

_____        June 13, 1984 _____
C. J. Nettles, Chief, Operations Division          DATE
for Robert C. Lee, Colonel
DISTRICT ENGINEER
**U.S. ARMY, CORPS OF ENGINEERS**
Transferee hereby agrees to comply with the terms and conditions of this permit.

_____        _____
TRANSFEREE                                       DATE

Enclosure
Set of dwg (11 sheets)                    4

SWB-ED-F0040-001424



## PROJECT LOCATION

Scale in Feet

METAIRIE OUTFALL CANAL
SEWERAGE AND WATER BOARD
OF ORLEANS PARISH, LA.
PREPARED BY: MODJESKI AND MASTERS
SH 1 OF 11        MAY, 1983

SWB-ED-F0040-001425



20.43 = 0.0 MSL
ELEVATIONS SHOWN ARE
CAIRO DATUM. 20.43 CAIRO
DATUM = 0.0 MEAN SEA LEVEL.

GENERAL PLAN - 1

SCALE : 1" = 400'

PREPARED BY:
MODJESKI AND MASTERS
METAIRIE OUTFALL CANAL
MAINTENANCE DREDGING
JEFFERSON PARISH, LA.
SEWERAGE AND WATER BOARD
OF NEW ORLEANS
SH 2 OF 11    MAY, 1983

SWB-ED-F0040-001426

GENERAL PLAN - 2

SCALE : 1" = 400'

20.43 CAIRO DATUM = 0.0 MSL

PREPARED BY
MODJESKI AND MASTERS

METAIRIE OUTFALL CANAL
MAINTENANCE DREDGING
JEFFERSON PARISH, LA.

SEWARAGE AND WATER BOARD
OF NEW ORLEANS

SH 3 OF 11   MAY, 1983

SWB-ED-F0040-001427



SECTIONAL VIEW 300' NORTH OF THE BUCKTOWN BRIDGE

(LOOKING SOUTH)

1"= 40'

METAIRIE OUTFALL CANAL
SEWERAGE AND WATER BOARD
OF ORLEANS PARISH, LA.
PREPARED BY: MODJESKI AND MASTERS
SH 9 OF 11         MAY 1983

SWB-ED-F0040-001428



ORLEANS PARISH                                                JEFFERSON PARISH

EXISTING LEVEE
EL. 29(±)

EXISTING SHEET PILE
WALL EL. 27.6

EXISTING GROUND
EL. 24.2 TO 25.5

NORMAL WATER
SURFACE

EL. 14(±)

225  200  175  150  125  100  75  50  25  0

40
30
20
10
0

EXISTING

LEVEE EL. 26.0

PROPOSED FLOODWALL
EL. 31.0

PROPOSED SHEET PILE
WALL AND MOORING
FACILITIES

EL. 26.0

NORMAL WATER SURFACE

EL. 2.0

225  200  175  150  125  100  75  50  25  0

40
30
20
10
0

PROPOSED

SECTIONAL VIEW BETWEEN BUCKTOWN BRIDGE AND HAMMOND HIGHWAY

(LOOKING SOUTH)

1"= 40'

22.43 CAIRO DATUM = 0.0 m.s.L.

METAIRIE OUTFALL CANAL
SEWERAGE AND WATER BOARD
OF ORLEANS PARISH, LA.
PREPARED BY: MODJESKI AND MASTERS
5/5 OF 11          MAY 1973

SWB-ED-F0040-001429



ORLEANS PARISH

JEFFERSON PARISH

LEVEE EL. 27(±)

LEVEE EL. 29(±)

EXISTING SHEET
PILE WALL EL. 30.4

EXISTING SHEET
PILE WALL EL. 32.0

NORMAL WATER SURFACE

EL 9.0(±)

225   200   175   150   125   100   75   50   25   0

40
30
20
10
0

EXISTING

LEVEE EL. 26.0

LEVEE EL. 26.0

FLOODWALL EL. 31.0

FLOODWALL EL. 32.0

NORMAL WATER SURFACE

225   200   175   150   125   100   75   50   25   0

40
30
20
10
0

EL 2.0

PROPOSED

SECTIONAL VIEW BETWEEN HAMMOND HIGHWAY AND VETERANS HIGHWAY

(LOOKING SOUTH)

1"=40'

CAIRO DATUM = 0.0 m s L

METAIRIE OUTFALL CANAL
SEWERAGE AND WATER BOARD
OF ORLEANS PARISH, LA



ORLEANS PARISH

JEFFERSON PARISH

EXISTING BIKE PATH
STA. 590+38 TO STA. 625+30

LEVEE EL. 27.4(±)

EXISTING SHEET PILE
WALL EL. 30,4

LEVEE EL. 30(±)

EXISTING SHEET PILE
WALL EL. 32.0

NORMAL WATER SURFACE

EL 12.0(±)

225  200  175  150  125  100  75  50  25  0

40
30
20
10
0

EXISTING

RELOCATED BIKE PATH
STA. 590+38 TO STA 625+30

LEVEE EL. 29.0

LEVEE EL. 29.0

FLOODWALL EL. 31.0

FLOODWALL
EL. 32.0

NORMAL WATER SURFACE

225  200  175  150  125  100  75  50  25  0

EL 30

40
30
20
10

PROPOSED

SECTIONAL VIEW BETWEEN VETERANS HIGHWAY AND I-10

(LOOKING SOUTH)

1" × 40'

20.43 CAIRO DATUM = 0.0 M.S.L

METAIRIE OUTFALL CANAL
SEWERAGE AND WATER BOARD
OF ORLEANS PARISH, LA.

PREPARED BY  MODJESKI AND MASTERS
SH 7 OF 11                    MAY, 1983

SWB-ED-F0040-001431



ORLEANS PARISH                                                JEFFERSON PARISH

EXISTING BIKE PATH
STA. 642+76 TO 675+00

EL.31(±)                                                    EL.32.5(±)        40
                                                                              30
NORMAL WATER SURFACE                                                          20
                                                                              10
EL 12.0(±)                                                                     0
225    200    175    150    125    100    75    50    25    0

EXISTING

RELOCATED BIKE PATH
STA. 642+76 TO STA. 675+00

EL.33.0                                                     EL 33.0           40
                                                                             30
NORMAL WATER SURFACE                                                          20
                                                                             10
                                                                              0
225    200    175    150    125    100    75    50    25    0
                            EL 40

PROPOSED

SECTIONAL VIEW BETWEEN I-10 AND PUMP STATION NO. 6

(LOOKING SOUTH)

1"=40'

20.43 CAIRO DATUM = 0.0 m.S.L.

METAIRIE OUTFALL CANAL
SEWERAGE AND WATER BOARD
OF ORLEANS PARISH, LA.
PREPARED BY MODJESKI AND MASTERS
SH. 8 OF 11                      MAY, 1983

SWB-ED-F0040-001432



MATERIAL TO BE EXCAVATED

10'(±)CL.          10'(±)CL.          NORMAL WATER SURFACE

CONCRETE BLOCK MATS REQUIRED

EXCAVATION LIMITS AT BRIDGES
NO SCALE

NOTE:   NO EXCAVATION WILL BE REQUIRED BETWEEN I-10 EASTBOUND AND
        I-10 WESTBOUND. HOWEVER CONCRETE BLOCK MATS WILL BE REQUIRED.

*2∂.43 CAIRO DATUm = 0.0 m.S.L.*

| METAIRIE OUTFALL CANAL |
| SEWERAGE AND WATER BOARD |
| OF ORLEANS PARISH, LA. |
| PREPARED BY: MODJESKI AND MASTERS |

SWB-ED-F0040-001433



SWB-ED-F0040-001434

SYNOPSIS OF HYDRAULIC ANALYSIS

I.   Determination of Cross-sectional Area

Reference:   Open-channel Hydraulics by Chow, 1959
             Pages 165-168

A.   A velocity of 4 fps was determined to be the recommended
     allowable.

B.   The Manning Formula was used to arrive at the desirable cross-
     sectional area of 2500 sf.

C.   The D'Aubuisson Method was used to calculate the backwater
     effect of the bridges and other obstructions.

II.  History of Project

A.   Phase I

     1.   Canal capacity analyzed for 7225 cfs.

     2.   Canal capacity analyzed for 10,000 cfs from Hammond
          Hwy. to the Lake and 6650 cfs from Pump Station No. 6
          to Hammond Hwy.

B.   Phase II - canal capacity analyzed for 10,400 cfs from Pump
             Station No. 6 to the Lake.

     1.   M & M Manual Calculations

     2.   HEC 2 by consultant of Jefferson Parish

     3.   Hydro-dynamic Model & HEC 2 by Drs. Alawady and Suhada

     4.   Linfield-Hunter Analysis

SWB-ED-F0040-001435