**CONDITIONS IF NO FEDERAL ACTION TAKEN**

HUMAN RESOURCES.   Based on historical trends, population growth in the Lake Pontchartrain economic study area probably will continue.   Table 9 compares OBERS BEA Regional Projections for the New Orleans SMSA prepared by the Bureau of Economic Analysis with the most recent (1976) population projections published by the University of New Orleans (UNO).

The exact location of this population growth within the five-parish economic study area will be influenced by many factors, including the availability of land in other areas, construction costs, interest rates, flood protection, environmental concerns, the proximity of housing to the work place and commercial centers, differences in lifestyles, the rising cost of home ownership relative to incomes, and the construction of two new bridges--one paralleling the existing Greater New Orleans Bridge and a second further up river at Luling, Louisiana.   As the figures for St. Tammany Parish illustrate, population in the eastern portion of the study area has increased somewhat more rapidly than projected in UNO's 1976 report.   Much of the new residential development which has occurred since 1970 in Orleans Parish (coextensive with the city of New Orleans) has also taken place in the eastern part of the city.

In recent years, the largest volume of population growth in the study area has taken place in Jefferson Parish.   This pattern is expected to continue in the near future.   The Corps' latest analysis predicts the population of St. Charles Parish to increase from 39,000 in 1985 to 60,000 by the year 2035.   However, the possibility of variation could be relatively high in view of the volume of economic activity in the parish.   The amount of land on both sides of the Mississippi River and Lake Pontchartrain is probably sufficient to accommodate anticipated population growth over the theoretical life of the project.

## TABLE 9

POPULATION PROJECTION: NEW ORLEANS SMSA
AND LAKE PONTCHARTRAIN ECONOMIC STUDY AREA

| | 1980[1] | 1985 | 1990 | 1995 | 2000 | 2030 |
|---|---|---|---|---|---|---|
| 1980 New Orleans SMSA | 1,186,725 | | | | | |
| No change in share[2] | — | 1,250,391 | 1,327,657 | — | 1,443,682 | 1,717,879 |
| Low change in share[2] | — | 1,212,216 | 1,275,472 | — | 1,376,981 | 1,634,445 |
| Moderate change in share[2] | — | 1,200,790 | 1,252,375 | — | 1,333,651 | 1,562,256 |
| 1976 Lake Pontchartrain Economic Study Area[3] | | | | | | |
| Jefferson Parish | 454,592 | 539,249 | 606,121 | 658,628 | 702,729 | — |
| Orleans Parish | 557,482 | 541,964 | 529,939 | 528,632 | 523,026 | — |
| St. Bernard Parish | 64,097 | 76,986 | 85,438 | 92,260 | 98,267 | — |
| St. Tammany Parish | 110,554 | 94,455 | 106,760 | 119,732 | 132,917 | |
| SMSA | 1,186,725 | 1,252,654 | 1,328,258 | 1,399,252 | 1,456,939 | — |
| St. Charles Parish | 37,259 | 40,206 | 44,271 | 48,378 | 52,003 | — |
| TOTAL | 1,223,984 | 1,292,860 | 1,372,529 | 1,447,630 | 1,508,942 | — |

[1] US Department of Commerce, Bureau of the Census, 1980 Census of Population. "Number of Inhabitants, Louisiana."

[2] US Water Resources Council, 1980 OBERS BEA Regional Projections, Vol. 8, July 1981. The Low- and Moderate- variations reflect changes in the SMSA's share of the state's total employment.

[3] University of New Orleans, Projections to the year 2000 of Louisiana Population and Housing, Segal et al., 1976.

ECONOMIC RESOURCES.    Some  local  analysts  have  suggested  that  the
continued  growth  of  labor-intensive  service  industries  requiring
domestic skills, without the concurrent growth of industries requiring
more technical skills, could result in a less desirable occupational mix
for  the  metropolitan  area.    One  of  the  purposes  of  the  Almonaster-
Michoud  Industrial  District  (A-MID)  project,  located  in  eastern  New
Orleans  and  within  the  authorized  project  levees,  is  to  generate
additional  employment  and  broaden  the  area's  occupational  base.    The
A-MID project is supported by both the city of New Orleans and the Board
of  Commissioners  of  the  Port  of  New  Orleans.    In  addition  to  the
construction of new port facilities along the MR-GO, the project hopes
to  attract  industries  requiring  more  technical  skills  in  jobs  paying
higher salaries.

Failure  to  provide  adequate  hurricane  protection  could  discourage
further  economic  growth  in  some  of  the  undeveloped  areas,  possibly
diverting capital investments to other areas with a greater level of
natural flood protection, but with fewer locational advantages.  Lack of
industrial  expansion  could  inhibit  future  commercial  activity  as  well,
although  mineral  production  would  probably  continue,  depending  on
resource  availability.    The  area's  mild  climate,  natural  resources,
transportation  access,  and  cultural  and  historical  significance  offer
future  development  potential;  however,  it  will  also  experience  the
threat of future hurricanes.

EMPLOYMENT AND INCOME.    Income  and  employment  projections  for  the  New
Orleans SMSA were contained in the 1980 OBERS BEA Regional Projections
prepared by the US Department of Commerce for the US Water Resources
Council.    These  projections,  shown  in  Tables  10  and  11,  contained  three
levels  of  projections  (defined  in  the  tables)  related  to  the  possible
change  in  the  areas  share  of  Louisiana's  total  employment  in  various
industries.

TABLE 10
NEW ORLEANS SMSA--POPULATION, PERSONAL INCOME,
AND LABOR AND PROPRIETOR'S INCOME, 1969 AND 1978, AND PROJECTED, 1985-2030

| | HISTORICAL | | NO-CHANGE-IN-SHARE[1] | | | | LOW-CHANGE-IN-SHARE[2] | | | | MODERATE-CHANGE-IN-SHARE[3] | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1969[4] | 1978[5] | 1985 | 1990 | 2000 | 2030 | 1985 | 1990 | 2000 | 2030 | 1985 | 1990 | 2000 | 2030 |
| POPULATION (JULY 1) | 1,016,960 | 1,141,054 | 1,250,391 | 1,327,657 | 1,443,682 | 1,717,679 | 1,212,216 | 1,275,672 | 1,376,981 | 1,634,445 | 1,200,790 | 1,232,175 | 1,335,651 | 1,582,256 |
| TOTAL PERSONAL INCOME (PLACE OF RESIDENCE)[6] | 4,100,435 | 5,918,709 | 8,120,186 | 10,010,573 | 14,034,381 | 30,653,307 | 7,399,931 | 9,507,039 | 13,002,478 | 28,764,671 | 7,705,201 | 9,281,192 | 12,648,921 | 27,150,544 |
| ($1,000'S OF 1972 DOLLARS) | | | | | | | | | | | | | | |
| BY PLACE OF WORK | | | | | | | | | | | | | | |
| TOTAL LABOR AND PROPRIETORS' INCOME[6] | 3,442,227 | 4,711,925 | 6,632,748 | 8,210,179 | 11,539,426 | 25,255,541 | 5,384,616 | 7,785,097 | 10,840,366 | 23,689,461 | 6,106,112 | 7,600,846 | 10,415,197 | 23,322,044 |
| AGRICULTURAL PRODUCTION | 1,752 | 2,544 | 2,300 | 2,546 | 3,082 | 5,241 | 1,244 | 2,462 | 2,964 | 4,850 | 5,032 | 2,225 | 2,886 | 4,850 |
| NONFARM | 3,439,495 | 4,709,967 | 6,650,444 | 8,207,632 | 11,536,345 | 25,250,300 | 6,383,372 | 7,782,634 | 10,837,402 | 23,684,610 | 6,303,887 | 7,598,623 | 10,412,411 | 22,318,194 |
| PRIVATE | 2,981,008 | 4,078,684 | 5,810,439 | 7,190,710 | 10,161,904 | 22,336,414 | 5,543,595 | 6,765,792 | 9,463,293 | 20,751,736 | 5,463,577 | 6,381,877 | 9,019,332 | 19,409,262 |
| AGRICULTURAL SERVICES, FORESTRY FISHERIES, AND OTHER[7] | 7,000 | 14,357 | 19,854 | 23,997 | 31,446 | 66,383 | 19,784 | 23,846 | 29,156 | 65,726 | 19,818 | 23,661 | 31,016 | 65,020 |
| MINING | 200,768 | 276,897 | 342,894 | 349,417 | 331,869 | 410,713 | 309,113 | 305,418 | 300,437 | 347,956 | 298,097 | 284,981 | 266,411 | 233,785 |
| CONSTRUCTION | 244,718 | 291,885 | 492,425 | 554,037 | 690,709 | 1,136,931 | 480,707 | 537,115 | 666,045 | 1,286,928 | 475,761 | 528,838 | 648,322 | 1,139,864 |
| MANUFACTURING | 340,067 | 580,369 | 834,478 | 1,185,143 | 1,816,085 | 4,306,642 | 799,849 | 1,025,171 | 1,340,369 | 3,601,546 | 776,302 | 944,973 | 1,200,621 | 3,073,962 |
| NONDURABLE GOODS | 204,249 | 199,351 | 288,772 | 369,993 | 540,387 | 1,254,830 | 254,161 | 313,935 | 451,032 | 1,026,424 | 243,213 | 289,374 | 382,546 | 845,954 |
| DURABLE GOODS | 333,318 | 381,018 | 605,706 | 815,150 | 1,280,438 | 3,051,811 | 545,688 | 711,188 | 1,089,357 | 2,575,123 | 531,089 | 675,600 | 988,105 | 2,228,008 |
| TRANSPORTATION AND PUBLIC UTILITIES | 451,061 | 667,138 | 932,596 | 1,158,641 | 1,629,022 | 3,489,744 | 897,411 | 1,093,591 | 1,320,931 | 3,249,056 | 875,524 | 1,041,021 | 1,442,438 | 3,014,009 |
| WHOLESALE TRADE | 317,338 | 430,850 | 595,334 | 716,588 | 972,923 | 2,015,626 | 547,250 | 642,348 | 855,122 | 1,760,053 | 534,841 | 613,084 | 785,671 | 1,557,205 |
| RETAIL TRADE | 378,820 | 514,447 | 669,146 | 663,050 | 1,155,039 | 2,424,393 | 693,171 | 836,683 | 1,144,705 | 2,601,529 | 693,689 | 835,101 | 1,135,871 | 2,374,843 |
| FINANCE, INSURANCE, AND REAL ESTATE | 226,016 | 309,448 | 470,282 | 597,727 | 878,350 | 2,037,386 | 444,462 | 555,751 | 856,698 | 1,863,597 | 433,999 | 535,697 | 757,282 | 1,705,758 |
| SERVICES | 623,226 | 854,076 | 1,363,018 | 1,760,010 | 2,625,541 | 6,247,595 | 1,251,638 | 1,743,858 | 2,396,842 | 6,175,345 | 1,350,026 | 1,734,330 | 2,570,500 | 6,084,319 |
| GOVERNMENT | 651,487 | 631,283 | 839,945 | 1,016,923 | 1,394,441 | 2,313,887 | 859,978 | 1,016,943 | 1,394,109 | 2,912,713 | 839,910 | 1,016,346 | 1,393,079 | 2,060,931 |
| FEDERAL CIVILIAN | 132,791 | 189,761 | 251,084 | 300,372 | 414,464 | 856,916 | 254,411 | 358,426 | 432,397 | 874,004 | 255,437 | 310,889 | 427,084 | 886,885 |
| FEDERAL MILITARY | 17,867 | 20,327 | 35,232 | 39,334 | 49,123 | 89,570 | 35,234 | 39,334 | 45,223 | 89,570 | 35,232 | 39,334 | 48,323 | 89,570 |
| STATE AND LOCAL | 500,829 | 411,195 | 553,630 | 674,017 | 931,755 | 1,967,402 | 550,335 | 658,883 | 923,489 | 1,929,139 | 549,241 | 666,423 | 917,773 | 1,932,477 |

1/ In the no-change-in-share procedure, for each industry, the substate area's share of the State's employment was held constant throughout the projection period. A substate area's projected share of total (all-industry) State employment, therefore, will change only to the extent that the substate area has a disproportionate share of the State's fast- or slow-growth industries.

2/ In the low-change-in-share procedure, for each industry, the substate area's share of the State's employment was projected to change from 1978 to 1980 at an annual rate of change equal to 75 percent of the annual rate of change equal in the share from 1969 to 1978; from 1980 to 1985, at an annual rate equal to 1/2 of the projected annual rate for 1978 to 1980; and for each succeeding 5-year period, at 1/2 of the projected rate for the preceding 5-year period.

3/ In the moderate-change-in-share procedure, for each industry, the substate area's share of the State's employment was projected to change from 1978 to 1980 at an annual rate of change equal to 85 percent of the annual rate of change in the share from 1969 to 1978; from 1980 to 1985, at an annual rate equal to 2/3's of the projected annual rate for 1978 to 1980; and for each succeeding 5-year period, at 2/3's of the preceding 5-year period.

4/ Estimates based on the 1967 Standard Industrial Classification (SIC).

5/ Estimates based on the 1972 SIC.

6/ Consists of wage and salary disbursements, other labor income, and proprietors' income.

7/ Consists of wages and salaries paid to United States residents working for international organizations.

SOURCE: 1980 OBERS BEA Regional Projections

TABLE 11
NEW ORLEANS SMSA - EMPLOYMENT BY INDUSTRY
BY PLACE OF WORK, 1969 AND 1978, AND PROJECTED, 1985-2030

| | HISTORICAL | | NO-CHANGE-IN-SHARE[1] | | | | LOW-CHANGE-IN-SHARE[2] | | | | MODERATE-CHANGE-IN-SHARE[3] | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1969 | 1978 | 1985 | 1990 | 2000 | 2030 | 1985 | 1990 | 2000 | 2030 | 1985 | 1990 | 2000 | 2030 |
| TOTAL EMPLOYMENT | 448,437 | 546,203 | 631,403 | 710,195 | 797,704 | 924,270 | 631,403 | 682,171 | 760,196 | 879,435 | 635,461 | 669,840 | 736,943 | 840,828 |
| AGRICULTURAL PRODUCTION | 2,990 | 3,851 | 1,553 | 1,451 | 1,292 | 1,031 | 1,553 | 1,403 | 1,242 | 980 | 1,500 | 1,381 | 1,210 | 945 |
| NONFARM | 445,447 | 544,358 | 649,850 | 708,748 | 795,413 | 923,249 | 649,850 | 680,768 | 758,955 | 878,454 | 633,961 | 668,459 | 735,733 | 839,883 |
| PRIVATE | 375,907 | 463,428 | 554,387 | 606,610 | 684,579 | 797,503 | 554,387 | 578,860 | 648,023 | 753,083 | 528,716 | 566,679 | 624,454 | 714,895 |
| AGRICULTURAL SERVICES, FORESTRY FISHERIES, AND OTHER | 1,622 | 2,223 | 2,789 | 3,120 | 3,670 | 4,427 | 2,789 | 3,109 | 3,649 | 4,390 | 2,791 | 3,113 | 3,638 | 4,360 |
| MINING | 15,667 | 17,652 | 17,608 | 15,771 | 12,493 | 7,906 | 17,608 | 13,745 | 10,650 | 5,336 | 15,257 | 12,807 | 9,406 | 5,334 |
| CONSTRUCTION | 26,721 | 39,076 | 44,768 | 44,907 | 43,012 | 38,718 | 44,768 | 43,538 | 41,476 | 37,272 | 43,345 | 42,845 | 42,389 | 35,912 |
| MANUFACTURING | 57,331 | 51,632 | 65,119 | 75,120 | 91,704 | 113,431 | 65,119 | 64,663 | 74,963 | 93,950 | 56,157 | 60,618 | 68,345 | 81,240 |
| NONDURABLE GOODS | 25,295 | 21,455 | 25,993 | 29,291 | 34,886 | 43,511 | 25,993 | 22,854 | 28,737 | 35,509 | 21,864 | 22,035 | 24,820 | 29,116 |
| DURABLE GOODS | 32,036 | 30,177 | 39,126 | 45,829 | 56,897 | 71,920 | 39,126 | 39,846 | 44,226 | 60,441 | 34,292 | 37,781 | 43,621 | 52,126 |
| TRANSPORTATION AND PUBLIC UTILITIES | 47,207 | 31,416 | 58,354 | 58,314 | 66,515 | 76,340 | 55,383 | 58,678 | 63,650 | 70,613 | 54,642 | 56,784 | 60,068 | 65,138 |
| WHOLESALE TRADE | 32,614 | 38,967 | 46,582 | 50,140 | 55,274 | 62,411 | 46,582 | 44,700 | 46,280 | 54,344 | 41,599 | 42,254 | 44,188 | 47,615 |
| RETAIL TRADE | 68,273 | 95,385 | 114,901 | 126,049 | 143,020 | 165,917 | 114,901 | 123,265 | 141,928 | 164,580 | 113,742 | 124,795 | 140,955 | 164,944 |
| FINANCE, INSURANCE, AND REAL ESTATE | 24,356 | 32,319 | 43,051 | 48,832 | 57,817 | 72,255 | 43,051 | 45,244 | 52,872 | 65,789 | 39,798 | 43,499 | 49,499 | 59,993 |
| SERVICES | 101,086 | 131,256 | 161,556 | 180,150 | 208,996 | 254,501 | 161,556 | 179,922 | 208,612 | 253,981 | 161,385 | 179,603 | 297,786 | 253,374 |
| GOVERNMENT | 69,560 | 83,930 | 95,463 | 102,138 | 111,833 | 125,744 | 95,463 | 101,908 | 111,331 | 125,391 | 95,245 | 101,780 | 111,278 | 124,988 |
| FEDERAL CIVILIAN | 13,236 | 15,804 | 17,431 | 18,577 | 20,443 | 23,419 | 17,431 | 17,687 | 18,935 | 20,895 | 17,770 | 19,089 | 21,165 | 24,371 |
| FEDERAL MILITARY | 6,903 | 7,370 | 7,342 | 7,342 | 7,342 | 7,342 | 7,342 | 7,342 | 7,342 | 7,342 | 7,342 | 7,342 | 7,342 | 7,342 |
| STATE AND LOCAL | 48,915 | 60,574 | 70,701 | 76,219 | 84,049 | 94,993 | 70,701 | 73,651 | 81,694 | 94,090 | 70,133 | 73,248 | 82,772 | 93,276 |

1/ In the no-change-in-share procedure, for each industry, the substate area's share of the State's employment was held constant throughout the projection period. A substate area's projected share of total (all-industry) State employment, therefore, will change only to the extent that the substate area has a disproportionate share of the State's fast- or slow-growth industries.

2/ In the low-change-in-share procedure, for each industry, the substate area's share of the State's employment was projected to change from 1978 to 1980 at an annual rate of change equal to 75 percent of the annual rate of change equal to the share from 1969 to 1978; from 1980 to 1990, at an annual rate equal to 1/2 of the projected annual rate for 1978 to 1980; and for each succeeding 5-year period, at 1/2 of the projected rate for the preceding 5-year period.

3/ In the moderate-change-in-share procedure, for each industry, the substate area's share of the State's employment was projected to change from 1978 to 1980 at an annual rate of change equal to 85 percent of the annual rate of change in the share from 1969 to 1978; from 1980 to 1990, at an annual rate equal to 2/3's of the projected annual rate for 1978 to 1980; and for each succeeding 5-year period, at 2/3's of the preceding 5-year period.

SOURCES: 1980 OBERS BEA Regional Projections

At the present time, the low-change-in-share projections have been determined to represent the most likely growth trend for the New Orleans SMSA (Jefferson, Orleans, St. Bernard, and St. Tammany Parishes). The Corps' latest analysis of projected population growth in St. Charles Parish indicates a somewhat higher rate of increase than anticipated for the SMSA, based on historical trends. Population in St. Charles Parish is expected to increase from 39,000 in 1985 to 60,000 by the year 2035. The possibility for significant variations from these figures, however, seems relatively high because of their dependency on the factors discussed previously.

LAND USE. The same conditions which will influence future economic growth in the area will influence land use. If hurricane protection is not provided, land use densities probably will increase in the more protected areas of the project and stimulate growth in adjacent areas. Without additional protection, the demand for (and value of) the more protected adjacent lands within the economic study area would tend to increase. The higher land values would be reflected in the cost of home ownership, commercial property, and eventually the cost of goods, services, and overall cost-of-living.

**ENVIRONMENTAL RESOURCES**

WATER QUALITY. Projected future water quality conditions for the project area were modeled in conjunction with the New Orleans-Baton Rouge Metropolitan Area Water Resources Study, completed by the New Orleans District, Corps of Engineers in 1981. Data from that study, combined with additional information, provides an overview of future conditions.

48

Dissolved oxygen, pH, and fecal coliform violations are expected to continue along the southern shore of Lake Pontchartrain. Jefferson Parish has proposed to construct a regional wastewater treatment facility which will have an outfall in the Mississippi River rather than in a storm water drainage canal leading to the lake. The southern portion of Lake Pontchartrain has been identified as eutrophic, and the condition is expected to worsen.

In the IHNC and GIWW, a continuation of fecal coliform violations is expected, and occasional dissolved oxygen violations are anticipated. Fecal coliform violations can be reduced by disinfecting municipal waste and storm water from the New Orleans area. Occasional violations of dissolved oxygen, pH, and fecal coliform would occur in the MR-GO, caused by inadequate treatment of municipal wastes, urban storm water runoff, wastes from camps and individual homes, and/or solid wastes. Coliform violations are of particular concern because of the numerous connections with Lake Borgne. As with most other water bodies in the area, Lake Borgne is expected to have occasional dissolved oxygen, pH, and coliform violations. These are expected to continue until measures are taken to improve water quality in the MR-GO, Lake Pontchartrain, and Lake St. Catherine.

BOTANICAL AND ZOOLOGICAL RESOURCES. The most significant change in vegetation would be loss of marsh habitat, which would result in a decrease in the wildlife and fishing resources of the area. Most of this loss would be through the conversion of these productive marshes to less productive open water through subsidence and erosion. Marsh would also be converted to levees, disposal and developed areas, scrub shrub forest and upland developed habitat types. At the present time, there are 2,417 acres of brackish-saline marsh in the area subject to potential construction impact by the authorized plan or alternatives developed to that plan. By the year 2100, there would be only an estimated 857 acres remaining.

49

While the projected loss rate is numerically not as high as that associated with marshes, the forested habitats also will be decreased mainly at the expense of a gain in the upland developed habitat type through urban growth.    These forested habitats, especially the bottomland hardwoods, are very important to wildlife due to the limited existence of such resources.   The continued loss of these resources would result in a significant reduction of fish and wildlife resources in the study area.  There are presently 41 acres of bottomland hardwoods and 213 acres of cypress tupelo in the area of potential construction impact.  By the year 2100, these acreages are estimated to be 3 and 56, respectively.    Additional  information  concerning  biological  and zoological resources can be found in the EIS.

If one or several hurricanes struck the project area, there would be some damage to the cypress-tupelo forests because of the saline waters that the hurricane would push inland.  Fresh marsh could also be adversely impacted by saline waters; it might become a more brackish type or become open water.  Some wildlife would be drowned by hurricane tides.  Fisheries would probably not be impacted by hurricanes.

CULTURAL RESOURCES. The National Register properties and districts located within the present and proposed levee system would be vulnerable to hurricane-related flood damage.   Other historic properties not presently listed in the National Register would be subject to the same effects.

The Mandeville seawall is subject to collapse during hurricane or other storm-generated wave action.   Such a collapse could lead to erosion and flood damages to the historic town of Mandeville.   In particular, the three National Register properties located on Lakeshore Drive and the proposed historic district would be adversely affected by failure of the seawall.

The many archeological sites located throughout the marshes and swamps of the study area would continue to be adversely affected, as a result of the urban growth, industrialization and related development which will continue to expand into presently undeveloped low-lying areas. The shoreline retreat and the destructive natural forces of subsidence and erosion also will continue.

RECREATIONAL RESOURCES. If no Federal action is taken, the proposed project area will continue to experience an increase in urban population. Current facilities are now being used extensively by residents of the Greater New Orleans area. Newly constructed boat launches and park areas along Lake Pontchartrain in Jefferson Parish are of ample size and quality to lessen the pressure on current needs; however, future expanded populations will require additional recreational facility development as well as improvement and expansion of existing facilities.

The Jefferson Parish Recreation Department has developed a Recreation Master Plan dated March 1982. Contained in this plan are four sites along the lakefront identified for future recreational development. These include the proposed Bucktown Park with marina, increased development of the linear park system, the proposed Causeway Center development, and a recreational development adjacent to the new Williams Boulevard boat launch.

Orleans Parish also will experience increased demand for recreational facilities, especially in the vicinity of Lake Pontchartrain. The existing green spaces and "pocket parks" adjacent to the existing levee on the batture side are at times utilized to their maximum capacity for activities such as picnicking, jogging, walking for pleasure, sightseeing, and field sports. Fishing, crabbing, and sightseeing are primary activities which occur close to the lake's edge.

51

St. Bernard and St. Charles Parishes do not have the intensity of recreational development existing in Jefferson or Orleans Parishes. Land- and water-related recreational activities coexist in this area, and are dominated by fishing and hunting. These areas will continue to provide an attractive base for future use, and an increasing demand will be placed on existing recreational facilities in the area. As the existing recreational areas will not satisfy the additional recreational demand, increased development of facilities will be required.

**PROBLEMS, NEEDS, AND OPPORTUNITIES**

The primary problems, needs, and opportunities identified in this study relate to the adequacy of the existing level of hurricane protection for the Metropolitan New Orleans area.

PROBLEMS CONCERNING IMPROVED HURRICANE PROTECTION. Because of the extent and types of existing development, limitations on the times for advance flood-forecasting, and limitations on the capacities of hurricane evacuation routes, development of strictly nonstructural measures would not be responsive to the problems and needs of the area related to the threat of hurricane flooding. Conversely, the nature of the area's natural environment and degree of existing development dictate that any feasible structural measures probably would result in some environmental losses and/or social disruptions. The projected decline in marsh acreage in the absence of additional Federal action could increase wave surge damages since the marshes would no longer be there to attenuate such surges.

NEEDS AND OPPORTUNITIES FOR IMPROVED HURRICANE PROTECTION. As it currently exists, the ongoing project provides varying degrees of protection to the populated areas of Jefferson, Orleans, and St. Bernard Parishes. As yet, no protection to St. Charles and St. Tammany Parishes has been accomplished under the project. However, there is a

52

recognizable potential for the occurrence of hurricane flooding events which would exceed the existing levels of protection. Projections indicate the population in the study area will continue to increase with an attendant increase in economic investments in the area. The potential loss of life and property damage from a hurricane will escalate accordingly. There is a need to provide adequate hurricane protection in the study area. The opportunity exists to increase the levels of protection to those areas which currently enjoy some degree of hurricane protection, and also to extend hurricane protection to surrounding areas which do not now enjoy any such protection.

The reevaluation study provides the opportunity to assess methods of reducing adverse environmental impacts. Measures such as levee realignments and alternative construction methods will be investigated.

IMPROVEMENTS DESIRED. The controversy surrounding the originally conceived project which culminated in the 1977 court injunction indicated that, while the general public and special interest groups are in support of urban hurricane protection for the study area, there is a widespread desire that potential adverse project impacts upon the natural and social environment be minimized. The input received at the 21 November 1981 and the 12 April 1984 meetings held in New Orleans confirmed these basic public concerns. In particular, environmental interests are opposed to the enclosure of wetland areas by levees and the use of hydraulic fill from Lake Pontchartrain. The project as conceived at the time of congressional authorization has legal assurances from local sponsors. The local sponsors still desire hurricane protection against SPH flooding; however, some of the sponsors have expressed concerns that modifications to the existing plan of improvement might increase their financial responsibilities.

53

**PLANNING CONSTRAINTS**

Legislative and executive authorities have specified the range of impacts to be assessed, and have set forth the planning constraints and criteria which must be applied when evaluating alternative plans. Plans must be developed with due regard to the benefits and costs, both tangible and intangible, as well as associated effects on the ecological, social, and economic well-being of the region. Federal participation in developments also should insure that any plan is complete within itself, efficient and safe, economically feasible in terms of current prices, environmentally acceptable, and consistent with local, regional, and state plans. As far as practical, plans should be formulated to maximize the beneficial effects and minimize the adverse effects of the considered improvements. Adverse environmental impacts will be mitigated to the extent justified on a monetary and non-monetary basis.

The project, as originally conceived and authorized by Congress, is being built to provide SPH protection. Total flooding resulting from the occurrence of a SPH event in the New Orleans area would be potentially catastrophic in terms of loss of human life and in human suffering. Current Corps of Engineers planning criteria for urban flood protection states that when the potential for catastrophic loss of life exists SPH should be the minimum level of protection recommended unless there are other overriding considerations. Since no such considerations can be identified, provision for SPH protection as a minimum level of protection was assumed to be the primary planning constraint.

**PLANNING OBJECTIVES**

The following planning objectives were established in response to the identified problems, needs, and opportunities.

54

o  provide more adequate hurricane protection for the east bank of the Metropolitan New Orleans area;

o  maximize the project's contribution to the Nation's economic development by reducing hurricane-related flood damages;

o  minimize adverse impacts to the natural environment and social well-being.

The following paragraphs present the planning rationale and the results of study efforts in delineating, combining, evaluating and assessing measures and plans, to meet the primary planning objective--improved hurricane protection for the New Orleans metropolitan area.

## MANAGEMENT MEASURES

Management measures considered for providing improved hurricane protection for the New Orleans metropolitan area were limited to those such as levees, floodwalls, and floodgates to reduce flooding from hurricane-driven surges.  These structural barrier measures include those which provide direct protection to developed areas and those which reduce flooding to developed areas along Lake Pontchartrain by preventing hurricane-driven surges from entering the lake.

Nonstructural measures such as flood-forecasting, combined with evacuation, and the national flood insurance program are currently employed in the study area and will continue to be employed over the period of analysis, with or without further Federal action.  There are no other practicable nonstructural measures for improving hurricane protection to the study area.

## PLAN FORMULATION RATIONALE

Alternative plans for providing improved hurricane protection for the New Orleans metropolitan area were limited to those which would provide, as a minimum, SPH protection. The SPH is a theoretical event; that is, a design concept which represents a composite of storm parameters estimated from historic events. Alternatives were not designed to protect against a specific historic hurricane; instead, the hurricane(s) used in the design of alternative plans were based upon the estimated probabilities of various hurricanes occuring with given magnitudes of certain important storm parameters such as central barometric pressure, wind speeds, forward translation speeds, storm tracks, etc. The selection of the value(s) of the parameters are based on historic data and experience. The alternative plans are not based upon one theoretical SPH event, but upon several SPH events, each of which would be critical to a given project reach. Levees along the New Orleans lakefront were designed to protect against the worst probable hurricane likely to occur in terms of flood threat to that specific area. For example, levees along the Jefferson Parish lakefront were designed against a similar type event, but not necessarily the same event considered critical to the New Orleans lakefront. Thus, alternative comprehensive plans were designed to protect against several theoretical worst probable hurricanes. While a SPH event does not have a specific frequency, the design SPH storm for protection bordering Lake Pontchartrain has a return frequency of approximately 300 years. The return frequency of the design SPH critical to the Chalmette, Inner Harbor, Citrus Back, and New Orleans East Back Levees is approximately 200 years.

Protection from the SPH was the minimum level of protection considered appropriate for recommendation due to the catastrophic impacts which would result from the overtopping of levees and floodwalls protecting such a densely-populated urban area. Extensive property

damage and risk to human life would occur if structures providing lower levels of protection experienced significant overtopping during a hurricane more severe than the design storm.

There are two purposes of the studies presented herein. One purpose was to develop sufficient data to allow a rational decision on the best way to complete the project; that is, the economic costs and benefits and environmental impacts which already have been incurred as a result of prior project construction were not factors in plan formulation purposes, and are not reflected in the main report. The second purpose was to analyze previous impacts as well as those which might occur as a result of detailed plans. This data has been used to prepare the accompanying EIS supplement and to determine the amount of mitigation necessary. (A separate Mitigation Report/EIS is presently being prepared.)

As construction of the authorized hurricane protection project is ongoing, and the analyses required for this study are time consuming and cannot be continuously adjusted as construction progresses, it was necessary to freeze construction activities at some point in time. For purpose of economic analysis, existing conditions are defined as 1 October 1979 conditions. Accordingly, costs-to-complete reflect costs beginning 1 October 1979. Costs incurred before that date are the same for all plans, and do not affect plan selection. Costs reflect 1 October 1981 price levels, and the annual discount rate used for formulation was the rate in effect when construction funds for the project were first appropriated, 3 1/8 percent. The economic period of analysis (project life) used was 100 years beginning in 1993 for the barrier plan and 1988 for the high level plan. These years represent

57

the point of beneficial completion defined as achievement of 100-year
level of protection. Environmental impacts which already have occurred
or can be reasonably expected to occur in the near future, based upon
current construction scheduling, can be quantified through 1983.
Therefore, existing conditions for environmental analysis are defined as
1984 conditions.

Incremental analysis of the separable project areas and the
sensitivities of variations in levels of protection, annual discount
rates, and design methods will be discussed in the recommended plan
section and in Appendix B, Economic Analysis.

**PLANS CONSIDERED IN PRELIMINARY PLANNING**

Two design concepts formed the basis for the formulation of all
preliminary planning alternatives. One concept would utilize barrier
structures at the lake's main tidal passes in conjunction with
levee/floodwall works. Plans based upon this concept, which are similar
to the authorized plan, are hereafter referred to as barrier plans. The
other concept would depend solely upon raising levees and floodwalls.
Plans based upon this design concept are hereafter referred to as high
level plans.

Alternative levee alinements were considered for the New Orleans
East and St. Charles Parish areas with both the barrier and high level
design concepts. The other areas are completely developed and/or have
existing levee systems developed to an extent that make alternative
alinements impracticable. Work on levees and floodwalls for the
authorized plan (the barrier design concept) has progressed to a stage
that precludes alternative construction methods for these features.
With the high level design concept, these levee and floodwalls would be
significantly higher in some reaches and a sufficient amount of work
remains to allow the development of alternative construction methods.

With the barrier design concept, the barrier control structures may need to be enlarged for environmental considerations.

BRIEF DESCRIPTION OF PLAN ELEMENTS. All plans were compared to the Future With No Additional Federal Action Condition. This condition assumes that hurricane protection improvements as they existed in October 1979 will continue to be operated and maintained over the project life. Actually, some additional work, such as some levee gap closures, would be completed to a degree of protection comparable to that of the rest of the levee. The various project reaches presently have different levels of protection as a result of being in various stages of construction.

Elements Common To All Plans. Some elements would be common to any barrier or high level plan developed. Some levees and floodwalls would follow the same alinement and have the same design under either type of plan as they would not be affected by the construction of the barriers. These levees and floodwalls include those in the Chalmette area, along either side of the IHNC, and along the Citrus-New Orleans East back levee between the IHNC and the point where the alternative Maxent Canal alinement intersects the levee. The Mandeville seawall feature does not provide hurricane protection; therefore, its design is not dependent on whether barriers are constructed. The alinement of the levees along the Citrus Lakefront, the New Orleans Lakefront and the Jefferson Parish Lakefront would be the same with or without barriers, although these levees would be significantly larger without the barriers. The advanced state of construction of existing levees and the extensive development in these areas make alternative alinements impracticable in these reaches.

BARRIER STRUCTURE(S) ALTERNATIVES. The barrier complexes included in the authorized plan and presented in the August 1974 EIS would be constructed at Lake Pontchartrain's three main tidal passes; Seabrook,

The Rigolets, and Chef Menteur Pass.  Any barrier plan would require
barrier complexes at all three locations; however, it is possible that
the current designs would not be appropriate.  Potential design
modifications do not stem from any engineering deficiencies, but to the
possible need to increase the size of the openings to minimize adverse
effects upon the transport of biological, chemical, and physical
constituents through The Rigolets and Chef Menteur Pass.  (No
modification for the Seabrook complex would be necessary.)  The
transport of such constituents is considered essential to the biological
viability of the lake, and severe restrictions may have a significant
adverse effect.

A number of complicated, time consuming, and expensive
environmental-related studies would be required before a determination
could be made as to the most suitable size of barrier complex.  Cost
estimates were developed for three sizes of complexes at The Rigolets
and Chef Menteur Pass.  These estimates, shown in Table 12, provide a
means of assessing the costs involved in modifying the structures to any
reasonable size.  Because conduct of the necessary studies would have
delayed this planning effort, the decision was made that, for
preliminary plan formulation analysis, the costs of the smallest (and
least expensive) complexes would be considered for the barrier plans.
Selection of the least expensive complex would present the barrier plan
from the most favorable economic standpoint.  If necessary, the
sensitivity of the results of the formulation analysis to barrier sizes
and costs can be determined.

Figures 2, 3, and 4 depict artist's view of the conceptual designs
of the Seabrook, Chef Menteur Pass, and The Rigolets complexes which
were used in the development of cost estimates.

Levee Alinements.  Because of the degree of existing development, there
are practicable limits to levee alinement variations.   There are

60

## TABLE 12

### ESTIMATES OF FIRST COSTS TO COMPLETE BARRIER COMPLEXES
(1,000's of 1981 dollars)

| COMPLEX | SIZE | COST |
|---------|------|------|
| Seabrook | N/A | 45,725[1] |
| Chef Menteur Pass | 43% of Natural Opening[2] | 109,301 |
| | 50% of Natural Opening | 119,192 |
| | 90% of Natural Opening | 151,093 |
| The Rigolets | 35% of Natural Opening[2] | 195,501 |
| | 50% of Natural Opening | 228,215 |
| | 90% of Natural Opening | 325,006 |

[1]Reflects only 50 percent of total first cost, which is hurricane protection project share, the other 50 percent is to be borne by the MR-GO navigation project.

[2]1975 designs.

reasonable alternative alinements to the existing levee system only in two areas; the Citrus-New Orleans East area, and the East Bank of St. Charles Parish area.

Citrus-New Orleans East Levee Alinements.   In the Citrus-New Orleans East area, the existing levee system incloses a large area of wetlands.   Several groups and individuals are of the opinion that development of these wetlands would not be in the public interest. Further, the view has been expressed that the wetlands could be made much more productive if normal tidal exchange were reestablished.   For these reasons, an alternate levee alinement was considered which would protect nonwetland areas which are presently developed or subject to development, but which would exclude wetland areas encompassed by the existing levee system.   This alternative is called the Maxent Canal alinement, because a portion of it parallels a local drainage channel known as Maxent Canal.   The alternative levee alinements in the New Orleans East area are shown on Plate 6.

St. Charles Parish Levee Alinements.   The St. Charles Parish area east of the Mississippi River presently is not protected from hurricane tidal flooding from Lake Pontchartrain.   A levee along the St. Charles Parish lakefront between the Jefferson Parish Lakefront levee on the east and the Bonnet Carre' Spillway on the west was a feature of the authorized plan; however, because of environmental concerns and considerations, its construction was indefinitely deferred in the early 1970's.   Since the time the lakefront levee was proposed, the economic criteria which are applied to flood damage reduction projects to determine their economic feasibility has changed considerably, particularly with respect to the development of wetlands.   Additionally, a suit was entered in the same court which enjoined construction of portions of the project to force construction of the St. Charles Lakefront levee.   That suit is currently being held in abeyance pending submission of the final EIS.



**Intentionally Blank**

**Page 64**



**Intentionally Blank**

**Page 66**