PROPOSED

RIGOLETS COMPLEX

LAKE BORGNE

Point at Clear Bay

FIGURE 4

**Intentionally Blank**

**Page 68**

As a result of these environmental, economic, and legal concerns, three alternative levee alinements were developed for St. Charles Parish. The authorized lakefront alinement was retained for further study. A second considered alinement would lie just north of US Highway 61 (known locally as Airline Highway), and run east-west, paralleling Airline Highway from the Jefferson-St. Charles Parish line to the Bonnet Carre' Spillway. This North of Airline Highway alinement was selected because it essentially protects all the existing development in the area. The third alinement, called the South of Airline Highway alinement, was basically a modification of the North of Airline alinement, in that the alinement veers south of Airline Highway for a portion of its length to avoid inclosing about 3,000 acres of wetlands. In the event that the lakefront levee was not the most economically justified for St. Charles Parish, a Jefferson-St. Charles Parish Boundary levee would be necessary. This alternative would consist of strengthening and lengthening the existing return levee running along the St. Charles/Jefferson Parish line to prevent the existing mainline levee system from being flanked. Although the Jefferson-St. Charles Parish Boundary levee would be part of the Jefferson Parish protective work, it is considered in this section because it is dependent upon the alternative selected for St. Charles Parish, and thus is included as an alternative. The levee alinements developed for St. Charles Parish are shown on Plate 7.

Levee Construction Methods. Because of the advanced state of construction on the authorized (barrier) plan levees, no viable alternatives for levee work could be developed for barrier plans, except in St. Charles Parish. Levee work associated with barrier plans basically consists of either hauled clay levee construction or floodwall construction, depending upon relative feasibility. However, since levee heights for some project reaches would need to be significantly higher for a high level plan than for a barrier plan, alternate methods of levee construction were developed for certain levee reaches to attain the appropriate level of protection. Such methods of construction

include various permutations and combinations of hauled clay fill, hydraulic fill, or floodwall construction methods.

Outfall Canals at New Orleans Lakefront. One unresolved issue concerns three main outfall canals in New Orleans which empty into Lake Pontchartrain along the reach known as the New Orleans Lakefront (see Plate 5). Levees flank these gravity drainage canals for a considerable distance inland from the lake, tying into pumping stations at the head of the canals. Subsequent to project authorization, these levees were determined to be inadequate in terms of both grade and stability. Five basic alternatives were formulated to address the problem of deficient guide levees for both high level and barrier type plans. Since the economics of the alternatives are essentially the same for either plan and do not affect plan selection, only cost estimates for solutions compatible with the Barrier Plan were developed.

The first solution provides for raising and strengthening the guide levees to assure SPH protection, without concern for the number of house relocations necessary. At October 1981 price levels, this solution would cost about $200,000,000.

The second solution would be identical to the first, except that all house relocations would be avoided. This solution would cost about $250,000,000.

A third solution would provide for floodgates at the mouths of the outfall canals which could be closed when high lake levels threaten the integrity of the guide levees. During these times, pumps would be stopped and interior rainfall flooding would be increased. However, closure operations of the floodgates would occur infrequently and generally for short durations. Additionally, such operations would occur during times of high lake levels when the capacities of the existing pumping stations already would be greatly reduced. Therefore, in dollar terms, increased annualized residual flood damages due to

70

closure of the floodgates would be relatively minor.  The costs of the floodgates is estimated to be about $20,000,000.

A fourth solution would be the same as the third, except that auxillary pumping stations would be provided at the lake to provide pumping capability when the floodgates were closed.  The cost of these improvements is estimated to be $124,000,000 (about $20,000,000 for floodgates and $104,000,000 for pumping stations).  However, both the New Orleans Sewerage and Water Board and the engineering staff from the Corps of Engineers have serious reservations that this solution will work because of potential surging problems between stations.

A fifth solution would involve relocating the existing pumping stations to the lake; however, the cost of improving gravity drainge to the relocated stations would be much more expensive than raising and strengthening the return levees.  These costs in conjunction with the cost of pump station relocations were assumed to be prohibitive and estimates were not developed.

No specific solution has been developed for the guide levee problem at this time, therefore, for plan formulation purposes, it was decided to incorporate the costs of the fourth alternative (floodgates in conjunction with auxilliary pumping stations) into the costs of New Orleans Lakefront levee alternatives.  The cost of this solution under the High Level Plan is estimated to be 3 to 5 percent higher than under the Barrier Plan ($3.7 to $6.2 million).  Since this difference represents less than 1 percent of the total construction cost of the High Level Plan and will not affect plan selection, a separate cost estimate was not developed.  The cost of the fourth alternative (about $124,000,000) represents a reasonable upper limit of the range of probable alternatives to the outfall canals problem and will be used for both plans.

71

BRIEF DESCRIPTION OF PLANS. The various plan elements were combined to form 16 basic preliminary plans. For the barrier concept, various combinations of levee alinement alternatives yielded eight plans (two levee alinement alternatives in New Orleans East and four levee alinement alternatives in St. Charles Parish equals eight levee alinement combinations). Each of the barrier plans assume the "minimum" sized structures at The Rigolets and at Chef Menteur Pass. For high level plans, eight levee alinement alternatives also were developed. For all these, a number of permutations were possible due to possible variations in levee construction methods by reach. Table 13 briefly lists and describes the 16 basic preliminary plans. Table 14 lists and displays costs for the various elements which can be combined to form plans.

INITIAL SCREENING OF PLANS. Economic, environmental, and social considerations were the factors used for screening the plans. All preliminary plans were presumed to be economically justified on an overall basis; all would result in some net adverse impacts to the environment; and all would have net positive social impacts, i.e., provide protection to human life and property. The plans were screened to determine those which minimized first cost and environmental impacts.

The alternatives initially were divided into two main groups, barrier plans and high level plans. Within each main group of plans, alternatives were subgrouped and compared by holding all other factors equal and comparing one varying element at a time. For instance, Plan 1 was the same as Plan 5 except for their levee alinements in the Citrus-New Orleans East area. This process was reiterated as necessary to consider other plan elements, such as levee construction methods.

Screening of Barrier Plans. With the barrier plans, alternative alinements in the Citrus-New Orleans East and St. Charles Parish areas were developed. The advanced state of construction on existing levees in other areas precluded alternative levee alinement or alternative methods of levee construction with the barrier plans.

## TABLE 13

### DESCRIPTION OF PRELIMINARY PLANS

| Plan | Barriers (yes/no) | New Orleans East Alinement | St. Charles Parish Alinement |
|------|-------------------|----------------------------|------------------------------|
| 1[1] | Yes | Existing | Lakefront |
| 2[1] | Yes | Existing | North Airline |
| 3[1] | Yes | Existing | South Airline |
| 4[1] | Yes | Existing | Boundary Levee |
| 5[1] | Yes | Maxent Canal | Lakefront |
| 6[1] | Yes | Maxent Canal | North Airline |
| 7[1] | Yes | Maxent Canal | South Airline |
| 8[1] | Yes | Maxent Canal | Boundary Levee |
| 9[2] | No | Existing | Lakefront |
| 10[2] | No | Existing | North Airline |
| 11[2] | No | Existing | South Airline |
| 12[2] | No | Existing | Boundary Levee |
| 13[2] | No | Maxent Canal | Lakefront |
| 14[2] | No | Maxent Canal | North Airline |
| 15[2] | No | Maxent Canal | South Airline |
| 16[2] | No | Maxent Canal | Boundary Levee |

[1]/Size of barrier structures may vary.

[2]/Methods of levee construction may vary.

TABLE 14

SUMMARY ESTIMATES OF FIRST COSTS TO COMPLETE[1/]

| Description | Barrier Plan SPH Protection | High Level Plan SPH Protection |
|---|---|---|
| | ($) | ($) |
| ST. CHARLES PARISH | | |
| Lakefront Alinement | 123,072,000 | 143,559,000 |
| Alinement North of Airline Hwy | 37,498,000 | 55,721,000 |
| JEFFERSON PARISH LAKEFRONT LEVEE | | |
| All Earthen Levee: | | |
| Hauled clay fill (straddle) | N/A | 524,467,000 |
| Hauled clay fill | 8,871,000 | 249,306,000 |
| Hydraulic fill w/o ponding area | N/A | 123,173,000 |
| Hydraulic fill with ponding area | N/A | 244,061,000 |
| I-Wall on Levee with Barge Berm: | | |
| Hauled clay fill | N/A | 284,619,000 |
| Hydraulic fill w/o ponding area | N/A | 155,683,000 |
| Hydraulic fill with ponding area | N/A | 276,350,000 |
| I-Wall on Levee: | | |
| Hauled clay fill | N/A | 167,708,000 |
| T-Wall on Levee: | | |
| Hauled clay fill | N/A | 657,668,000 |
| JEFFERSON-ST. CHARLES PARISH BOUNDARY LEVEE | | |
| With St. Charles Parish Lake-front Levee | N/A | N/A |
| With St. Charles Parish North of Airline Highway Levee | 9,248,000 | 14,095,000 |
| With No Levee in St. Charles Parish | 10,511,00 | 18,941,000 |
| NEW ORLEANS LAKEFRONT LEVEE (West of IHNC) | | |
| Hauled Clay Fill | 188,150,000 | 224,311,000 |
| I-Wall on Levee | N/A | 220,861,000 |
| I-Wall on Levee (w/ Barge Berm) | N/A | 215,813,000 |

**TABLE 14** (Continued)

SUMMARY ESTIMATES OF FIRST COSTS TO COMPLETE[1]

| | COST | |
|---|---|---|
| Description | Barrier Plan SPH Protection | High Level Plan SPH Protection |
| | ($) | ($) |
| CITRUS LAKEFRONT LEVEE | | |
| Hauled Clay Fill | 8,571,000 | 60,156,000[2] |
| Hauled Clay Fill | N/A | 109,470,000[3] |
| Hydraulic Clay Fill without Ponding Area | N/A | 73,520,000[3] |
| Hydraulic Clay Fill with Ponding Area | N/A | 105,194,000[3] |
| I-Wall on Levee | N/A | 37,475,000[4] |
| I-Wall on Levee (w/ Barge Berm) | N/A | 46,854,000[5] |
| | | |
| NEW ORLEANS EAST LEVEES | | |
| Maxent Canal Levee[6] | 79,920,000 | 120,772,000 |
| | | |
| New Orleans East Back Levee[6] (Michoud Canal to Sta 1006+59) with Maxent Canal Levee | 9,533,000 | N/A |
| | | |
| New Orleans East Back Levee[6] (Michoud Canal to Maxent Canal) with Maxent Canal Levee | N/A | 8,154,000 |
| | | |
| New Orleans East Lakefront Levee[7] | | |
| Hauled Clay Fill | 12,185,000 | 34,843,000 |
| I-Wall on Levee | N/A | 32,022,000 |
| | | |
| South Point to GIWW Levee[7] | 585,000 | 5,182,000 |
| | | |
| New Orleans East Back Levee (Michoud[7] Canal to Sta 1006+59) with NOE/S Point to GIWW Levees | 17,087,000 | 17,087,000 |
| | | |
| CITRUS BACK LEVEE (IHNC TO MICHOUD CANAL) | 5,050,000 | 5,050,000 |
| | | |
| EAST BANK OF IHNC (MR-GO TO LAKE PONTCHARTRAIN) | 3,423,000 | 3,423,000 |
| | | |
| WEST BANK OF IHNC | 33,324,000 | 33,324,000 |

75

TABLE 14 (Continued)

SUMMARY ESTIMATES OF FIRST COSTS TO COMPLETE[1]

| | COST | |
| Description | Barrier Plan SPH Protection | High Level Plan SPH Protection |
| --- | --- | --- |
| | ($) | ($) |
| MANDEVILLE SEAWALL | 2,378,000 | 2,378,000 |
| CHALMETTE AREA PLAN | 65,925,000 | 65,925,000 |
| SEABROOK COMPLEX (50% OF TOTAL COST) | 45,725,000 | N/A |
| CHEF MENTEUR COMPLEX | | |
| 43% of Natural Opening | 109,301,000 | N/A |
| 50% of Natural Opening | 119,192,000 | N/A |
| 90% of Natural Opening | 151,093,000 | N/A |
| RIGOLETS COMPLEX | | |
| 35% of Natural Opening | 195,501,000 | N/A |
| 50% of Natural Opening | 228,215,000 | N/A |
| 90% of Natural Opening | 325,006,000 | N/A |

[1] October 1981 price levels.

[2] Uses "existing" levee alinement, a retaining wall along Hayne Blvd., and a breakwater on the lakeside of railroad tracks.

[3] In the lake alinement.

[4] Uses "existing" levee embankment.

[5] Uses "existing" levee alinement with a breakwater on the lakeside of railroad tracks.

[6] With New Orleans East Maxent Canal Alinement only.

[7] With New Orleans East existing alinement only.

Screening of Citrus-New Orleans East Levee Alinements. Plans 1, 2, 3, and 4 are similar to Plans 5, 6, 7, and 8, respectively, except for the alinement of the levees in the Citrus-New Orleans East area. With Plans 1, 2, 3, and 4, SPH protection would be provided via the existing alinement around New Orleans East, which extends eastward along the lakefront to South Point and thence generally southward to the GIWW and westward along the GIWW to the IHNC. With Plans 5, 6, 7, and 8, SPH protection would be provided by a new levee along the Maxent Canal alinement which excludes the eastern portion of the existing loop. These alinements are shown on Plate 6.

The portion of the existing loop in New Orleans East, which would be excluded from SPH protection if the Maxent Canal alinement were adopted, is essentially undeveloped. Therefore, the economic benefits foregone with the Maxent Canal alinement were relatively small, and the economic comparison of the two alinements was reduced to comparing the costs of alinements to determine the most economical plan for providing protection to the Citrus-New Orleans East area loop. Although the Maxent Canal alinement would be much shorter than the existing levee system, it would be a new levee, while the existing levee is in an advanced state of construction. The cost of the Maxent Canal levee, approximately $89,000,000, is much higher than the cost of completing the existing levee system, approximately $29,900,000. For this reason Plans 1, 2, 3, and 4, are better plans from an economic standpoint than Plans 5, 6, 7, and 8.

From an environmental standpoint, the difference in direct impacts between the two alinements were limited to direct construction impacts, that is, the conversion of wetlands to levee rights-of-way, and these impacts were insignificant due to the relatively small areas impacted.

With Plans 1, 2, 3, and 4, approximately 13,000 acres of land, most of which is wetlands, would be provided SPH protection that would be

excluded from such protection if the Maxent Canal alinement were
adopted.   The natural environment of this area would not be signifi-
cantly affected by its inclosure by an SPH levee system.   The area has
been inclosed by a system of railroad embankments and levees since 1958,
prior to authorization of the project.   Four small, low-head gravity
drainage structures were included in the levee system for draining the
area, and these have been operated for that purpose since that time.
The structures have been lengthened as the levees were enlarged and
positive closures were added solely to assure the integrity of the
system.   The drainage structures normally remain in the "closed"
position by means of flap gates.   The wetlands would continue to be
inclosed if the existing New Orleans East alinement were adopted and
have been cut from normal tidal exchange for over 2 decades.   This
alteration of tidal hydrology is attributable to preproject conditions.

Although there is the potential for development of the 13,000 acres
of wetlands inclosed by the existing levee system when raised to SPH
level of protection, the development of these wetlands would be
regulated under the permit authority of Section 404 of the Clean Water
Act.  Under this authority, a permit from the US Army Corps of Engineers
is required for the discharge of dredge or fill materials in wetlands.
Decisions on such operations are based on the overall public interest.
(A request has been made by New Orleans East, Incorporated, for a permit
to develop an area which would include 9,800 acres of wetlands in the
New Orleans East area.  This area is shown on Plate 6.  An EIS is being
prepared by the developer.  That EIS, when finalized, will be used by
the New Orleans District Engineer in making a final decision on whether
to award the permit.)

The two levee alternatives for the Citrus-New Orleans East area are
essentially the same in terms of direct environmental impacts due to
construction.   Completing the existing levee system is a more
economically feasible alternative than the Maxent Canal levee

alternative, and is a more flexible alternative in that it protects, but does not preclude the future development, of wetlands. Future policies and needs may be such that development of these wetlands is desirable. This additional planning flexibility also is a factor in favor of completing the existing levee system.

When comparing the two levee alinement alternatives considered for the Citrus-New Orleans East area as part of the barrier plans, the completion of the existing levee system alternative was judged superior or equal to the Maxent Canal levee alternative based on all screening criteria. It is less costly (by $59,000,0000) and leaves additional planning options available. Therefore, Plans 5, 6, 7, and 8 were eliminated from further consideration.

Screening of St. Charles Parish Alinement. The remaining barrier plans (1, 2, 3, and 4) are similar except for the levee alinement in St. Charles Parish. A comparison of the plans was made to determine the most acceptable alternative.

Plan 1, the authorized Lakefront alinement, would extend from the Jefferson Parish Lakefront levee to the east Bonnet Carre' Spillway guide levee. This levee would protect that portion of St. Charles Parish east of the Mississippi River from hurricane-induced flooding. Plan 2, designated the North of Airline Highway alinement, would extend from the Jefferson-St. Charles Parish boundary to the Bonnet Carre' Spillway, and would be located immediately north of US Highway 61, known locally as Airline Highway. This plan would protect the developed portion of St. Charles Parish, but leave the wetland area adjacent to the lake open to normal interchange with the lake waters. Plan 3 is similar to Plan 2, except that the alinement veers south of Airline Highway in one section to avoid inclosing 3,000 acres of wetlands which would be inclosed by Plan 2.

Plan 4 is a no action alternative for St. Charles Parish; however, it would be required to provide complete hurricane protection to Jefferson Parish if the Lakefront alinement is not constructed. This alternative would be an extension and expansion of the existing return levee located along the Jefferson-St. Charles Parish boundary. Selection of either the North of Airline Highway or South of Airline Highway alinement would require construction of a portion of this boundary levee from the lake to Airline Highway. This alternative is addressed in this analysis because it is directly related to the selected alternative for St. Charles Parish; however, it would be part of the Jefferson Parish protection system.

For purposes of preliminary screening, the alternatives which would provide protection for St. Charles Parish were first compared (Plans 1 through 3). All three plans would have similar direct adverse environmental impacts, i.e., require a similar amount of wetlands be converted to levee rights-of-way. All three alinements were also considered sufficient to provide adequate protection for existing and future development. The trade-off analyses between plans thus reduced to comparing first costs against indirect environmental impacts. Indirect environmental impacts would relate to reductions of the biological productivity of inclosed wetlands due to alteration of the wetland's hydrology and/or induced urban development.

Since Plan 3, the South of Airline Highway alinement, was a variation of Plan 2, the North of Airline Highway alinement, these levee alternatives were first compared. As can be seen from Plate 7, Plan 3 differs from Plan 2 only in that its levee alinement veered south of Airline Highway for a short section to avoid encompassing about 3,000 acres of wetlands. These wetlands are subject to reduced tidal exchange, as they are connected to the wetlands north of Airline Highway only by culverts under the road. Thus, the difference in direct construction impacts between Plans 2 and 3 would be minimal; i.e.,

alteration of wetland hydrology under Plan 2 would be minimal, as drainage through the levee would be provided.

Differences in potential indirect environmental impacts between plans were next compared. Plan 2 would enhance the potential for development of the 4,000 acres of wetlands which Plan 3 would not. However, any development would be regulated under the Section 404 permit process. For purposes of analysis, it was apparent that both Plans 2 and 3 have similar indirect environmental impacts. Since Plan 3 would have a greater levee length and cost about 20 to 25 percent more than Plan 2, it was determined that Plan 3 did not merit further investigation.

Detailed designs and costs were developed for Plans 1, and 2, and 4. The latter is the no action alternative for St. Charles Parish, and would require construction of the Jefferson-St. Charles Parish Boundary Levee. First costs of these plans are presented in Table 15. Although part of the Jefferson Parish protection feature, the Boundary Levee is included because, as previously discussed, it is related to the selection of the St. Charles alternative.

### TABLE 15

SUMMARY OF FIRST COSTS FOR ST. CHARLES PARISH LEVEE
ALINEMENTS, BARRIER PLANS ($1,000,000's October 1981 price levels)

| Alinement | Costs |
|---|---|
| Lakefront (Plan 1) | 123 |
| North of Airline Highway (Plan 2)[1] | 37 |
| No Action[1] (Plan 4) | 0 |

[1] Would necessitate construction of Jefferson-St. Charles Parish Boundary Levee at a cost of $9,248,000 with Plan 2 or $10,511,000 with Plan 4.

Plans 1 and 2, both mainline levee plans, then were compared. Plan 1, the Lakefront alinement, would encompass all developed land on the east bank of St. Charles Parish and about 29,000 acres of undeveloped wetlands (26,000 acres north of Airline Highway and 3,000 acres south of Airline Highway). The estimated first cost of the plan would be $123,000,000. Plan 2, the North of Airline Highway alinement, would encompass all developed land on the east bank of St. Charles Parish and about 3,000 acres of wetlands; and have a first cost of about $37,000,000. The difference in the two plans amounted to 26,000 more acres of wetlands being inclosed by Plan 1 than by Plan 2, and Plan 1 costing an estimated $86,000,000 more than Plan 2. Although both plans contain provisions for drainage structures which allow for tidal exchange during normal conditions, the natural regime of tidal sheet flow interchange would be reduced under Plan 1, tending to also reduce the biological productivity of the inclosed wetlands. Additionally, there is no discernable need to develop the wetlands north of Airline Highway in the foreseeable future. Plan 2, the North of Airline Highway alinement, was determined superior to Plan 1, the Lakefront alinement, in terms of both environmental and economic feasibility. Plan 1 was therefore eliminated from further consideration.

Finally, Plan 2, the North of Airline Highway alinement, was compared to the no action alternative for St. Charles Parish, the Jefferson Parish-St. Charles Parish Boundary Levee. Plan 2 would encompass 3,000 acres of wetlands, provide SPH protection for the St. Charles Parish area susceptible to hurricane-induced flooding from Lake Pontchartrain and cost about $37,000,000. The Boundary Levee would provide SPH protection only for the western flank of the eastern portion of Jefferson Parish and cost about $11,000,000. The environmental impacts of Plan 2 were considered minimal, so the trade-off analysis between Plan 2 and the no action alternative reduced to measuring the differences between the economic and social impacts of the two. Plan 2 would cost $37,000,000 more than the no action alternative. However,

Plan 2 would provide SPH protection to the developed portion of the East Bank of St. Charles Parish, while the no action alternative would provide no protection for this area. (The area would receive some protection as a result of the barrier structures, even though no mainline levee work would be provided.) The investment of $37,000,000 was determined to be justified on the basis of both tangible and intangible benefits, therefore the no action alternative was eliminated from further study. Plan 2 was the only barrier plan chosen for detailed study.

High Level Plans Considered in Preliminary Planning. Eight basic high level plans (based on alinement) were formulated for preliminary consideration. Permutations of each plan also were possible with regards to variations in levee construction methods. The basic high level alternatives thus can be defined in terms of levee alinements and construction methods. The initial screening of high level alternatives followed the same rationale as that applied to the screening of barrier alternative plans. Screening initially was done with regards to levee alinement, then performed relative to the levee alinement(s) selected; i.e., levee construction methods.

Plans 9 through 12, which were high level plans incorporating completion of the existing levee system in the New Orleans East area as plan features, initially were compared to Plans 13 through 16, high level plans incorporating construction of a Maxent Canal levee alinement as a plan feature. Closing the levee system in the New Orleans East area to a SPH level of protection was considered a given planning constraint. Completing the existing levee system was estimated to result in approximate first costs ranging from $54,000,000 to $57,000,000 (the range of costs reflects the fact that alternative levee construction methods were considered). The cost of a Maxent Canal levee alinement was estimated to have a first cost of about $129,000,000. The trade-off analyses between plans reduced to the same type of analyses as

83

those applied to barrier plans including environmental considerations. Since completion of the existing levee system would be far less expensive ($72,000,000 to $75,000,000 in terms of first costs), that alternative was determined to be preferable for completing the project in the New Orleans East area.   Therefore, Plans 13 through 16 were eliminated from further consideration.

Plans 9 through 12 then were compared with respect to differences in the impacts of the St. Charles Parish levee alinement feature.   The same rationale which was applied to barrier plan alternatives with respect to the screening of St. Charles Parish levee alinements was applied to high level plan alternatives, with similar results.   Detailed designs and costs were not developed for Plan 11, the South of Airline Highway alinement, as preliminary analysis indicated this alinement would cost considerably more than Plan 10, the North of Airline Highway alinement, and offer no significant advantages.   Plan 11 was eliminated from further consideration at the preliminary screening stage.   First costs for Plans 9, 10, and 12 are presented in Table 16.

TABLE 16

SUMMARY OF FIRST COSTS FOR ST. CHARLES
PARISH LEVEE ALINEMENTS, HIGH LEVEL PLANS
($1,000,000's October 1981 Price Levels)

| ALINEMENT | COSTS |
|---|---|
| Lakefront (Plan 9) | 144 |
| North of Airline Highway (Plan 10)[1] | 56 |
| No Action[1]   (Plan 12) | 0 |

[1] Would necessitate construction of Jefferson-St. Charles Parish Boundary Levee at a cost of $14,095,000 with Plan 10 and $18,941,000 with Plan 12.

When compared to Plan 10 (the North of Airline Highway alinement), Plan 9 (Lakefront alinement), would be much more expensive and have greater adverse environmental impacts, while offering no advantages. (This is essentially as previously discussed in screening of St. Charles alinements for the Barrier Plan.)   Thus, Plan 9 was eliminated from further consideration.   Plan 10 was compared to Plan 12, no action (Boundary Levee alinement for Jefferson Parish). The trade-off analysis reduced to determining if the cost of Plan 10 would be justified.   The results of this analysis are presented in the section titled Sensitivity Analysis and in Appendix B. After consideration of the potential damage which could result to St. Charles Parish if no action were taken, Plan 12 was eliminated from further consideration. Plan 10 was thus the only high level plan chosen for detailed study.   A portion of the Boundary Levee will remain in the overall plan as a part of the plan of protection for Jefferson Parish.

Although only one high level plan, Plan 10, was chosen for further study, there were a number of possible permutations of this plan depending upon the type of levee construction chosen for each of several levee reaches.   The screening rationale used for selection of specific levee construction methods is presented in subsequent paragraphs. Alternative methods of levee construction for high level SPH protection were developed for all lakefront reaches of the existing levee system. From east to west, these reaches include:   the New Orleans East Lakefront levee reach, the Citrus Lakefront levee reach, the New Orleans Lakefront levee reach, and the Jefferson Parish Lakefront levee reach.

Two levee construction methods were considered for completing the New Orleans East levee reach to a high level-SPH level of protection; hauled clay fill and I-type floodwall on levee. (The latter is hereafter referred to as I-wall on levee.)   Table 17 presents a summary comparison of the costs and primary impacts of each of these two methods of levee construction.

TABLE 17

SUMMARY COMPARISON OF IMPACTS OF PRELIMINARY ALTERNATIVES
TO COMPLETE THE NEW ORLEANS EAST LAKEFRONT LEVEE REACH
FOR HIGH LEVEL PLANS

| Type of Construction | First Cost ($1,000,000's Oct 1981 Price Levels) | Acres of Wetlands Directly Affected |
|---|---|---|
| Hauled   Clay Fill | 35 | 210 |
| I-Type Floodwall[1/] | 32 | 143 |

[1/]Subject to potential barge impacts.

The hauled clay fill method of construction would consist of
raising and strengthening the existing levee section by means of shaping
and compacting hauled clay fill, and would cost about $3,000,000 more to
construct than the alternative method of construction.  The I-type
floodwall on levee would consist of improving the levee base by the same
methods of construction as for the hauled clay fill alternative, except
to a lesser elevation, and building a concrete-capped, steel sheet pile
I-wall on top of the levee base to SPH grade.  A comparison of these two
levee construction methods revealed that the direct environmental
impacts of either method would be small (indirect environmental impacts
were judged to be identical).    Based strictly upon economic and
environmental data, it initially appeared that the I-wall on levee
method of construction would be preferable to the hauled clay fill
method of construction; however, it was determined that the two methods
of construction were not comparable in terms of certainty of maintaining
design protection.    The I-wall would be subject to potential barge
impact and breeching by loose (runaway) barges on Lake Pontchartrain
during hurricane events.   Although the I-wall design could be modified
to include a berm to preclude barge impacts, such a modification would
result in significant increases in cost and in environmental impacts.

While the potential for barge impact/breeching of an I-wall design would be difficult if not impossible to quantify in terms of potential frequency, it was considered a significant design consideration. Since the differences in environmental impacts were relatively small between construction method alternatives, the trade-off analysis reduced to comparing first costs against design integrities. The greater first cost of the hauled clay fill construction method over that of an I-wall-on-levee construction method (about $3,000,000) was considered to be justified on the basis of assuring design protection integrity. Therefore, the hauled clay fill levee construction method was selected as the construction method for the New Orleans East Lakefront levee reach for Plan 10.

Alternative construction methods for the Citrus Lakefront levee reach were next screened. Six construction methods were developed for completing the levee reach to provide high level SPH protection. These methods include hauled fill and I-type floodwall (with and without barge berms), already discussed, and hydraulic fill, with and without ponding areas. These terms refer to the pumping of material from the bottom of Lake Pontchartrain, and using the material to form the levee. Since that material would be mixed with water, extensive runoff would occur (hydraulic fill without ponding areas). Various measures can be used to reduce this runoff (hydraulic fill with ponding areas). Such measures may range from silt curtains to dikes. The first costs for using each of these construction methods are displayed in Table 18.

The differences between the six alternative methods of levee construction to complete the Citrus Lakefront levee reach were related to costs, direct environmental impacts, and design integrities. Both alternatives using an I-wall feature were the least expensive in terms of economic cost, and would also result in the least adverse environmental impacts. In comparing these two alternatives, it was found that the I-wall on levee alternative would affect no natural habitat and cost

87

TABLE 18

SUMMARY COMPARISON OF FIRST COSTS OF PRELIMINARY ALTERNATIVES TO
COMPLETE THE CITRUS LAKEFRONT LEVEE REACH FOR HIGH LEVEL PLANS
($1,000,000's, October 1981 Price Levels)

| TYPE OF CONSTRUCTION | FIRST COSTS |
|---|---|
| Hauled Clay Fill[1] | 60 |
| Hauled Clay Fill[2] | 109 |
| Hydraulic Clay Fill[2] (without ponding area) | 74 |
| Hydraulic Clay Fill[2] (with ponding area) | 105 |
| I-Wall on Levee[3] | 37 |
| I-Wall on Levee[4] (with barge berm) | 47 |

[1] Uses "existing" levee alinement, a retaining wall along Haynes Blvd.
and a breakwater on the lakeside of railroad tracks.

[2] In-the-Lake alinement.

[3] Uses "existing" levee embankment.

[4] Uses "existing" levee alinement with a breakwater on the lakeside of
railroad tracks.

about $37,000,000, while the I-wall on levee with barge berm would
affect 35 acres of lake bottoms and cost $47,000,000. The trade-off
analysis between plans essentially was 35 acres of lake bottom and a
$10,000,000 difference in cost versus a difference in design
integrity. As was the case for the New Orleans East levee I-Wall
alternative, the Citrus Lakefront levee I-Wall alternative would be
subject to potential breeching by barge impact while the I-wall with
barge berm would not be subject to such breeching. The initial
additional investment of $10,000,000 and loss of 35 acres of lake bottom
in this area were considered justified to assure the levee reach's
design integrity. The I-Wall with barge berm alternative was selected
as the preferred construction method to complete the Citrus Lakefront
levee reach to high level SPH protection.

The next levee reach screened with respect to alternative methods of construction for Plan 10 was the New Orleans Lakefront. None of the three considered alternatives would affect any wetlands or lake bottoms, and indirect environmental impacts would be identical. All alternatives would be a modification of the existing levee, the alinement of which runs through an area which is heavily urbanized (primarily residential) to the landside and heavily used for recreational purposes (primarily green space) to the lakeside. Therefore, the social impacts of each of the three alternatives could vary and was a screening consideration. The estimated first costs of the three alternatives considered is displayed in Table 19.

## TABLE 19

SUMMARY COMPARISON OF FIRST COSTS OF PRELIMINARY ALTERNATIVES TO
COMPLETE THE NEW ORLEANS LAKEFRONT LEVEE REACH FOR HIGH LEVEL PLANS
($1,000,000's, October 1981 Price Levels)

| TYPE OF CONSTRUCTION | FIRST COSTS[1] |
|---|---|
| Hauled Clay Fill | 224 |
| I-Wall on Levee | 221 |
| I-Wall on Levee with Barge Berm | 216 |

[1] Includes $124,000,000 for a solution to deficient return levees along New Orleans' three main canal outfalls for cost comparison purposes.

·The two factors which were used to screen the New Orleans Lakefront levee reach alternatives were first costs and social impacts. First costs for work not common to all alternatives (work not related to the outfall canals), would vary from $92,000,000 to $100,000,000 (first costs less $124,000,000 for outfall canal work). Potential differences in social impacts would relate to levee configurations (heights and widths). Levee elevations would vary from 14.5 to 17.5 feet, and it was determined that differences between net levee elevations would have

minimal impacts with regards to affecting residents' view of the lakefront. Levee base widths would vary from about 140 to 230 feet, and increases would result in a reduction of green space. Of the three alternatives, the I-wall with barge berm would be the least expensive in terms of first cost. The width of the barge berm greatly reduces the required depth of the sheet piling. The reduction in steel sheet piling required offsets the increased fill costs thus, the I-wall with barge berm is less expensive than the I-wall without barge berm. In terms of levee rights-of-way, the two I-wall alternatives would be the least disruptive. A further consideration was that once construction was completed, the I-wall with barge berm feature would offer the greatest potential for recreational use and beautification. Considering all aspects, the I-wall with barge berm was chosen as the preferred method of construction for the New Orleans Lakefront levee reach.

The final levee reach to be considered with regard to construction method screening was the Jefferson Parish Lakefront levee reach. The existing Federal levee has a design grade of 10 feet. Work by local interests, not to Corps of Engineers standards for design integrity, has raised the levee grade to 14 feet. The high level plan design grade would be 14 feet, built to Corps standards. Nine alternatives were developed for completion of the levee to provide high level SPH protection. Table 20 presents the first costs associated with the nine alternatives.

Six of the nine alternatives were eliminated on the basis of first costs. The three alternatives not initially eliminated were the all earthen levee, hydraulic fill without ponding area ($123,000,000); I-wall on levee with barge berm, hydraulic fill without ponding area ($156,000,000); and I-wall on levee, hauled clay fill ($167,000,000). All three alternatives would have similar direct environmental impacts in terms of acres of lake bottoms which would be converted to levee rights-of-way. Environmental impacts would vary, as the hydraulic fill

TABLE 20

SUMMARY COMPARISON OF FIRST COSTS OF PRELIMINARY ALTERNATIVES TO
COMPLETE THE JEFFERSON PARISH LAKEFRONT REACH FOR HIGH LEVEL PLANS
($1,000,000's, October 1981 Price Levels)

| TYPE OF CONSTRUCTION | FIRST COSTS |
|---|---|
| All Earthen Levee | |
|    Hauled Clay Fill (straddle) | 524 |
|    Hauled Clay Fill | 249 |
|    Hydraulic Fill without Ponding Area | 123 |
|    Hydraulic Fill with Ponding Area | 244 |
| | |
| I-Wall on Levee With Barge Berm | |
|    Hauled Clay Fill | 285 |
|    Hydraulic Fill without Ponding Area | 156 |
|    Hydraulic Fill with Ponding Area | 276 |
| | |
| I-Wall on Levee Without Barge Berm | |
|    Hauled Clay Fill | 167 |
| | |
| T-Wall (hauled clay fill) | 658 |

construction methods would result in short term turbidity during
construction of the first lift(s). Alternatives also would vary in
terms of design integrity, i.e., I-wall on levee without barge berm
would be subject to potential barge impacts.

In comparing the three alternatives, the hydraulic fill methods
were first compared. Both alternatives would be comparable in terms of
design integrity. The I-wall alternative would result in slightly less
short term turbidity during construction and take slightly less time to
construct. These positive considerations were considered minor compared
to the greater cost ($33,000,000), and it was eliminated from further
consideration.

Finally, the all earthen levee, hydraulic fill without ponding area alternative was compared to the I-wall on levee, hauled clay fill alternative. Of the two alternatives, the I-Wall alternative would cost $44,000,000 more and have a lesser degree of design integrity; conversely, the I-wall alternative would not result in any short term turbidity during construction and would take less time to construct. In comparing differences between the two alternatives it was decided that the all earthen levee, hydraulic fill without ponding area was the preferred method of construction for completing the Jefferson Lakefront levee reach.

The selected method of construction would impact 573 acres of lake bottom through construction of borrow pits up to 60 feet deep. The adverse environmental impacts associated with these holes could be eliminated by the use of hauled material at a cost of at least $249 million. The potential impacts are not severe enough to warrant the additional expenditure of $126 million more than the selected alternative.

In summary, Plan 2 and a variation of Plan 10 were selected for more detailed evaluation and all other plans were eliminated. Both plans incorporate the same basic levee alinement. For ease of presentation, Plan 2 is henceforth referred to as the Barrier Plan, and Plan 10 is henceforth referred to as the High Level Plan. The Barrier Plan is shown on Plate 8 and the High Level Plan is shown on Plate 9.

## PLAN ASSESSMENT AND EVALUATION

Information presented in the following paragraphs describes in detail each of the two plans considered. Significant beneficial and adverse impacts and an evaluation also are discussed. Responsibilities for implementation are presented for each of the detailed plans.

## THE BARRIER PLAN

PLAN DESCRIPTION. This plan would provide SPH protection to the major urban areas in and immediately adjacent to New Orleans. The main features of the plan consist of barrier structures at Lake Pontchartrain's main tidal passes, improvement of the existing system of levees and floodwalls, and extension of the existing levee system to encompass the populated portion of the east bank of St. Charles Parish. The general location of the plan's proposed features are shown on Plate 8. Details of individual plan features are discussed in subsequent paragraphs.

Barrier Features. The primary features of this plan would be barrier complexes at Lake Pontchartrain's three main tidal passes: The Rigolets, Chef Menteur Pass, and Seabrook. The purpose of these complexes is to control inflows to the lake during times of approaching hurricanes to keep lake levels from rising, thereby reducing the need to raise levees and floodwalls.

The Rigolets complex would consist of barrier levees, a control structure, a navigation lock with approach channels, and a closure dam. The complex would provide a barrier against tidal influx through The Rigolets into Lake Pontchartrain under hurricane conditions, yet provide continuous tidal interchange and navigation movement under nonhurricane conditions. The cost estimate used in plan formulation is based upon a gated control structure, 1,088 feet long, which would provide a cross-sectional area of flow equal to approximately 35 percent of the natural cross-section, and allow for passage of over 90 percent of the natural tidal prism. As normal tidal interchange would occur through the control structure, and since tidal exchange is a critical factor to the ecology of the lake, costs for control structures with lengths of 1,564 feet and 2,856 feet, which would provide 50 percent and 90 percent, respectively, of the natural cross-section, also were

93

developed. (The costs of these alternate designs are presented in
Tables 12 and 14.) Regardless of the size of the control structure, the
navigation lock would be 110 by 800 feet. An artist's conceptual view
of The Rigolets complex with the 35 percent opening is shown on
Figure 4.

The Chef Menteur complex would consist of a closure dam astride the
existing natural channel, barrier levees, a bypass channel for the GIWW
channel (the only barrier complex feature which has been built), a
control structure astride a new channel cut, and a navigation structure
with approach channels. The complex would provide a barrier against
tidal influx through Chef Menteur Pass into Lake Pontchartrain under
hurricane conditions, and also provide for continuous tidal interchange
and navigation movement during nonhurricane conditions. The cost
estimate used for plan formulation purposes is based upon a gated
control structure 612 feet long which would provide a cross-sectional
area of flow equal to approximately 43 percent of the natural cross-
sectional area of the pass, and allow for passage of over 90 percent of
the natural tidal prism. Costs for control structures with lengths of
748 feet and 1,360 feet which would provide 50 percent and 90 percent,
respectively, of the natural cross-section, also were developed. (The
costs of these alternate designs also are presented in Tables 12
and 14.) The navigation structure would consist of a floodgate with
guidewalls. An artist's conceptual view of the Chef Menteur complex
with the 43 percent opening is shown on Figure 3.

The Seabrook complex would consist of a navigation lock, a control
structure, and a closure dam. The complex would serve three
functions: (1) during hurricane conditions, the lock and control
structure would be closed to provide a barrier against tidal influx into
Lake Pontchartrain; (2) during normal conditions the complex would
provide a means for regulating salinity levels in Lake Pontchartrain
which are affected by the MR-GO; and, (3) the lock would provide safe

passage in an area where currents are a hazard to navigation. Because
of this multi-purpose nature, the 1965 authorizing legislation mandated
that the first costs of the complex be apportioned equally between the
hurricane protection project and the MR-GO navigation project.
Therefore, only 50 percent of the first costs of the Seabrook complex
are reflected in Tables 12 and 14. (Due to the nature of the Seabrook
complex, alternative sizes of the control structure are not feasible.)
An artist's conceptual view of the Seabrook complex is shown on
Figure 2.

Chalmette Area Levee. The Barrier Plan includes an extensive levee
system, which has been divided into logical reaches for analysis. One
of these is a large ring levee system which would encompass and protect
that portion of Orleans Parish located on the east bank of the
Mississippi River, south of the GIWW and west of the MR-GO; the
populated areas of St. Bernard Parish (located primarily along the east
bank of the Mississippi River); and a large area of undeveloped wetlands
in St. Bernard Parish. The levee system, known as the Chalmette Area
Plan, is independent of the barrier structures, as the threat of tidal
flooding to the area originates from Lake Borgne rather than Lake
Pontchartrain, and the barrier structures would have little effect upon
water levels in Lake Borgne. The levee system, which is under
construction, makes use of the existing Mississippi River levee to the
west. The northern and eastern portions of the system utilize existing
dredged material disposal banks along the south bank of the GIWW and
west bank of the MR-GO. The southern portion of the system is a new
levee.

The northern levee reach, which fronts the GIWW, is an all earthen
levee being constructed by means of hydraulic fill. The levee length is
5.6 miles and the final levee elevation and base width will be 14.0 feet
and 500 feet, respectively. The eastern portion of the levee system,
which fronts the MR-GO, is an all earthen levee also being constructed

by means of hydraulic fill. The length of this levee is 14.0 miles and the final levee elevation and bottom width will be 17.5 feet and 500 feet, respectively. There are two navigable floodgates in place at Bayou Bienvenue and at Bayou Dupre along the eastern portion of the levee system. These normally remain open and allow navigation, gravity drainage, and tidal exchange to the inclosed wetlands. The southern portion of the system is an all earthen levee being constructed by means of a combination of hydraulic fill and hauled clay fill. The levee is 10.1 miles long, the elevation will vary from 16.5 to 17.5 feet, and the base widths will vary from 250 to 500 feet. A gravity drainage structure is under construction at Creedmore Canal in the southern portion of the levee system.

Additional Independent Levee Reaches. There are four other levee reaches which are independent of the barrier structures: the IHNC East Bank Levee and IHNC West Bank Levee which parallel the IHNC, the Citrus Back Levee which runs along the northern bank of the GIWW and forms the southern boundary of the Citrus area, and the New Orleans East Back Levee which runs along the northern bank of the GIWW and forms the southern boundary of the New Orleans East Area. These levees protect against tidal surges originating from Lake Borgne and traveling via the MR-GO, GIWW, and/or IHNC.

The IHNC East Bank Levee, under construction and nearing completion, is basically I-type floodwalls driven into a hauled clay levee base, with some short sections of all earthen levee. The net grades of the levee/floodwall vary from 13 to 14 feet, and levee base widths vary from 50 to 55 feet. Total levee length is about 3.0 miles.

The IHNC West Bank Levee, near completion, also is basically I-type floodwalls driven into a hauled clay levee base with short sections of all earthen levee. The net grades of the levee/floodwall varies from 13 to 14 feet while levee base width is 20 feet. Total levee length is about 5.0 miles.