Orleans Lakefront levee feature includes a barge berm which will have a wide flat crown.  Upon completion, this berm would offer an improvement over existing conditions, because it would be a long clear continuous green space which could be utilized for high-demand recreational activities such as jogging and walking.  The barge berm also offers the potential for landscaping and recreational development at a relatively modest cost.  Landscaping recommendations are considered embellishments and are not intended to be mitigation features of the plan.

The Barrier Plan's barrier features at The Rigolets and at Chef Menteur Pass would cause some long term reductions to the fisheries values of Lake Pontchartrain, and adversely affect recreational as well as commercial fishing activities.  Additionally, these two features would increase water velocities in the tidal passes, adversely affecting navigation in those areas.  In particular, recreational craft such as small fishing boats and sail boats would be affected.

Neither plan would require any business or residential relocations, nor cause any job relocations.  The temporary relocation of walkways leading to camps located to the lake side of the Southern Railroad would be required during construction of the Citrus Lakefront levee and New Orleans East Lakefront levee.  The social impacts of the two plans vary enough in terms of type and extent to make direct comparisons of plan impacts difficult; however, comparison of some aspects can be made.  In general, the short term construction impacts of the High Level Plan are greater than for the Barrier Plan.  Long term impacts are considered to be greater for the Barrier Plan.

ENGINEERING CONSIDERATIONS.  Both plans are engineeringly feasible and would provide more adequate hurricane protection to the Metropolitan New Orleans area.  Both fulfill the primary planning objective of providing hurricane protection to urban areas subject to catastrophic flooding. Neither of the plans considered in detail would be readily reversible because of the massive scope and areal extent of the individual project features.

PUBLIC INTEREST CONSIDERATIONS. Considering the sensitivity, risks, and uncertainty associated with analyses of the plans, and the constraint to recommend SPH protection to urban areas subject to catastrophic flooding, the High Level Plan was identified as the plan being in the best overall national interest. Additionally, the High Level Plan was considered to be more acceptable by various interest groups.

RECOMMENDED PLAN. A review of all aspects and effects of the two plans considered in detail resulted in the selection of the High Level Plan as the recommended plan. The High Level Plan has greater net benefits, is less damaging to the environment, and is more acceptable to the public. Analysis of social considerations indicate it has more short-term adverse social impacts than the Barrier Plan, but probably has fewer long term impacts. Both plans are engineeringly feasible. Thus, the High Level Plan was determined to be the most desirable of any of the practicable alteratives considered for providing more adequate hurricane protection for the Metropolitan New Orleans area.

## SENSITIVITY ANALYSIS

As with all water resources planning projects, there are elements of risk and uncertainty associated with the analyses which resulted in choosing the recommended plan. A detailed sensitivity analysis is contained in Appendix B, Economic Analysis; however, a summary of pertinent aspects which contain an element of risk and uncertainty is contained herein.

Selection of a design storm is based on a statistical analysis of storm-related data, and involves a certain amount of risk and uncertainty. Because of the potential for catastrophic destruction in the area, the SPH was selected as the design storm. To insure that all sections of the study area would be provided some level of protection, several SPH storms were evaluated, each of which would be critical to a given project reach. By considering several project historic events, risks and uncertainty were minimized.

The sensitivity of the economic analysis to errors which would change the economic feasibility was considered to be low. Unit prices used in project costing were based on unit cost of similar work conducted in the New Orleans District, and a contingency factor of 25 percent was added to insure the total cost was not undervalued. Population projections and projections of future development were not a consideration in the determination of economic feasibility, as the project is justified on the basis of protection to existing development. With a ratio of average annual benefits to average annual costs of 4.2 to 1, the feasibility would be relatively insensitive to any errors in benefit calculation.

When construction funds for this project were first appropriated, the interest rate in effect was 3 1/8 percent. Section 80 of the 1974 Water Resources Development Act allows the use of that discount rate for this project reevaluation; however, the same legislation also requires analysis of the project using the current Federal discount rate (7 7/8 percent). Using that rate, average annual benefits for the High Level plan were calculated as $93,889,000 and average annual charges $56,660,000. The benefit-to-cost ratio is 1.6 to 1, with net benefits of $37,229,000.

The economic justification of each separable portion of the project was investigated independently. The project is composed of four separable areas as shown in Table 25. The Chalmette and New Orleans East areas are closed loop systems easily separated from the remainder of the project. The St. Charles levee reach can also be considered independently. This section represents an extension of the hurricane protection levees to an area not currently provided any protection.

TABLE 25

SEPARABLE AREAS FOR INCREMENTAL ANALYSIS

| AREA | COMPONENT LEVEE REACHES |
|------|-------------------------|
| Chalmette | Chalmette Area Plan |
| New Orleans East | Citrus Lakefront<br>New Orleans East Lakefront<br>South Point to GIWW<br>New Orleans East Back<br>Citrus Back<br>IHNC East Bank |
| Orleans-Jefferson | IHNC West Bank<br>Orleans Lakefront<br>Jefferson Lakefront<br>Jefferson-St. Charles Boundary |
| St. Charles | St. Charles North of Airline Highway |

The remainder of the project area, the Orleans-Jefferson area, was considered as one unit. This area cannot logically be broken down into smaller components. If either parish were implemented separately a return levee approximately 5 miles long would be required along the parish line from Lake Pontchartrain to the Mississippi River levee. The cost of this levee with the associated relocations required would be very expensive and could approach the cost of providing protection to the adjacent area while providing no additional benefits.

The results of the incremental analysis reveal that each separable portion of the tentatively selected plan does have a benefit-cost ratio greater than one at the project interest rate of 3 1/8 percent. Table 26 summarizes the analysis results.

TABLE 26

INCREMENTAL ANALYSIS OF SEPARABLE AREAS FOR
THE HIGH LEVEL PLAN
(Oct 81 price levels; 3 1/8 percent Annual Discount Rate)

| AREA | FIRST COST ($000) | ANNUAL COST ($000) | ANNUAL BENEFITS ($000) | BENEFIT-COST RATIO |
|------|------|------|------|------|
| St. Charles | 55,721 | 1,879 | 2,902 | 1.5:1 |
| Chalmette | 65,925 | 2,518 | 4,924 | 2.0:1 |
| Orleans-Jefferson | 391,251 | 13,970 | 70,024 | 5.0:1 |
| New Orleans East | 112,439 | 4,307 | 17,921 | 4.2:1 |

Projections of future with and without project land use assumed land use trends would continue at the observed 1956-1978 rate for the life of the project. For purposes of plan selection, it does not matter significantly whether the ratio is geometric as assumed, or logarithmic, because the Barrier Plan would impact far more habitat and would significantly impact the lake itself. Mitigation plans will be sensitive to analysis of future conditions because needs will be based on project-induced habitat losses. Selection of mitigation features will be determined by the efficiency of proposed management measures in preventing without project losses. Projections of future shoreline erosion should be approximately as accurate as land use projections, thus, the uncertainty associated with various mitigation features should be equal.

# DESCRIPTION OF
# RECOMMENDED PLAN

The recommended plan provides for the modification of the Lake Pontchartrain, Louisiana, and Vicinity project to provide SPH protection to urban areas in the New Orleans metropolitan area that are located generally between the Mississippi River and Lake Pontchartrain. The most significant difference between the authorized plan and the recommended plan is that the barrier design concept of the authorized plan is abandoned in favor of the high level design concept of the recommended plan.

## PLAN FEATURES

The specific features of the recommended plan are described below and are presented on Plate 9.

### ST. CHARLES PARISH AREA

This feature provides for the construction of a new levee parallel to and immediately north of US Highway 61 (Airline Highway), between the levee along Jefferson-St. Charles Parishes boundary and the east Bonnet Carre' Spillway guide levee. The levee would be earthen with a crown elevation of 13.5 feet, except for short reaches where there are width restrictions. In these reaches the levee would have an earthen base topped by a floodwall with a top elevation of 14 feet. Four drainage structures would be provided through the levee at locations where there is drainage through Airline Highway. The drainage structures would remain open to maintain existing drainage patterns and would be closed only during a threat of a hurricane. (This feature is significantly different from the St. Charles Parish levee included in the authorized plan. The authorized levee extended along the Lake Pontchartrain shoreline of St. Charles Parish.)

132

## JEFFERSON PARISH AREA

This feature would provide for the improvement of the existing protective works along the Jefferson–St. Charles Parish boundary and along the Jefferson Parish Lakefront. The existing Federal levee along the Jefferson–St. Charles Parish boundary would be raised and topped with a floodwall. The elevation of the floodwall cap would range from 14 feet at the lake to 13.5 feet at the St. Charles Parish levee. The existing levee along the Jefferson Parish Lakefront would be increased in section and raised to an elevation of 14 feet. Floodwalls would provide frontage protection at the four existing pumping stations and tie into new floodgates across the traffic lanes of the Lake Pontchartrain Causeway. (This feature is significantly different from the authorized plan. With the authorized plan, the existing Jefferson Parish Lakefront levee would require only frontage protection work.)

## NEW ORLEANS AREA

This feature provides for the enlargement of earthen levees and the construction of floodwalls along the New Orleans Lakefront between the Jefferson Parish Lakefront levee and the existing floodwall along the west bank of the IHNC and for the construction of measures to prevent overtopping of the outfall canals for the three pumping stations which are setback from the lakefront. The earthen levees would be topped by a floodwall with an elevation of 14.5 feet. Floodwalls would be provided in four reaches where rights-of-way are limited: around the marinas near the Orleans–Jefferson Parish line, at the Pontchartrain Beach Amusement Park, at the Seabrook Bridge, and at the American Standard manufacturing plant immediately east of the amusement park. Floodwall elevation at the marinas and at Pontchartrain Beach would be 13.5 feet. (The existing floodwall, at the marinas, which has an elevation of 11.0 feet, may be determined to be adequate in more detailed studies.) The floodwall at the American Standard plant would have an elevation of 19.5 feet or greater. Floodgates or road ramps

would be provided at streets crossed by the levees and floodwalls. (The levees and floodwalls along the lakefront are much higher than the authorized plan; the floodwall system along the west bank of the IHNC is similar to the authorized plan.)

## CITRUS-NEW ORLEANS EAST AREA

This feature provides for the enlargement of the existing levee and floodwall system surrounding the Citrus-New Orleans East area. Reaches of levee included in this feature are the Citrus Lakefront levee, the New Orleans East Lakefront levee, the South Point to GIWW levee, the New Orleans East back levee, the Citrus back levee, and the IHNC east levee. The Citrus Lakefront levee would consist of 0.7-miles of floodwall and 4.3 miles of earthen levee topped by a floodwall with a barge berm. The 0.7-miles of floodwall, which are completed to a grade of 11.0 feet would have a top elevation of 13.5 feet and the floodwall on the earthen levee would have an elevation of 15.0. The New Orleans East Lakefront would be an all earthen levee enlarged and raised to an elevation of 16.5 over its 6.2-mile length. The 8.3-mile long South Point to GIWW levee, also an all earthen levee, would be enlarged and raised to elevations ranging from 13.5 to 15 feet. Minor modifications could be required to the four drainage structures. The New Orleans East back levee would be an all earthen levee enlarged and raised to an elevation of 17.5 feet. The Citrus Back levee would be an all earthen levee enlarged and raised to an elevation of 14 feet, except around the Michoud Canal where a floodwall with elevations ranging from 18 to 22 feet would be provided because of restrictive rights-of-way. The IHNC east bank reach is a floodwall system with an elevation ranging from 13 to 14 feet. (The Citrus Lakefront, New Orleans East Lakefront, and South Point to GIWW reaches are significantly larger than the authorized plan; the New Orleans East Back levee, the Citrus back levee, and the IHNC East levee reaches are similar to those features with the authorized plan.)

### CHALMETTE AREA PLAN

This feature provides for completing the levees around the Chalmette area to elevations ranging from 14 to 17.5 feet. (This feature is similar to the authorized plan feature.)

### MANDEVILLE SEAWALL

This feature provides for a rehabilitation of a 1.5-mile seawall along the lakeshore of Mandeville. The improvements would have an elevation of 6 feet. (This feature is similar to the authorized plan feature.)

## DESIGN AND COST CONSIDERATIONS

Some features and segments of features of the recommended plan would be similar to those for the authorized plan. This includes the Chalmette area plan feature; the Mandeville Seawall feature; the Citrus back levee, New Orleans East back levee, and the IHNC East levee reaches of the Citrus-New Orleans East feature; and the IHNC west levee reach of the New Orleans feature. The design of the remaining features of the recommended plan has changed significantly. General information on the design of these remaining features is discussed below; detailed information is presented in Appendix A, Engineering Investigations.

### ST. CHARLES PARISH AREA

This levee along the north side of Airline Highway between the Jefferson-St. Charles Parish boundary levee and the east Bonnet Carre guide levee, would be constructed of hauled clay fill. The levee would be constructed in three lifts (two fill lifts and one shaping lift). In areas of restricted rights-of-way the levee would be smaller with a floodwall driven atop the levee to obtain the design elevation.

### JEFFERSON PARISH AREA

The Jefferson Parish lakefront would be raised and widened to the lakeside of the existing Federal levee. Construction would be in four lifts--two hydraulic fill lifts and two shaping lifts. Floodwalls would provide frontage protection at the four pumping stations in this reach. Floodwalls would also be utilized in areas where existing facilities would preclude the use of levees.

The Jefferson-St. Charles boundary levee would be constructed of hauled clay fill with a floodwall driven into the levee. The new levee would be an enlargement of the existing Federal levee.

### NEW ORLEANS AREA

The New Orleans Lakefront levee would be completed by hauled clay fill with a wide flat barge berm (which would also act as a wave breaker) and an I-wall driven into the crown of the design levee section. In addition to the basic design section, the cost estimate for this feature includes about $124,000,000 for rectifying deficiencies of return levees paralleling New Orleans' main outfall canals. The mouths of these canals break the levee line at the lakefront.

### CITRUS-NEW ORLEANS EAST AREA

The Citrus Lakefront, New Orleans East Lakefront, and South Point to GIWW reaches of this feature would require significant modification with the recommended plan.

The Citrus Lakefront levee is complete to barrier specifications except for foreshore protection. The current levee design provides for 0.7-miles of I-wall (completed) and 4.3 miles of all earthen levee using hauled clay fill. The recommended plan provides for completing the

136

levee utilizing the 0.7-miles of I-wall, and 4.3 miles of I-wall driven atop the existing earthen levee, with a barge berm to the lake side of the levee.  It should be noted that the existing 0.7 miles of I-walls would not be overtopped during an SPH event with barrier structures in place, but some overtopping of the I-walls could be expected to occur during an SPH event with the recommended plan (without the barriers). While overtopping of the existing I-walls would not cause failure, they are not structurally sufficient to allow raising to prevent overtopping.

The cost estimate for completing the Citrus Lakefront levee feature of the recommended plan includes costs for removing the existing I-walls and replacing them with higher I-walls which would not be subject to overtopping or failure during SPH events without barrier structures (the existing I-wall elevation is 11.0 feet and the new I-wall elevations would be between 13.5 and 19.5 feet); however, it may be determined during the course of future studies that overtopping of the existing I-walls will result in small enough volumes of inflows to the protected area that overtopping can be tolerated, i.e., I-walls won't be replaced.  The remaining 4.3 miles of levee would be completed by driving I-walls atop an earthen embankment with a net grade of 12.0 feet and width of 70 feet.  The net grade of the I-wall would be 15.0 feet. The levee is located to the land side of the Southern Railroad embankment.  Just at the lake side of the railroad embankment, paralleling the levee/floodwall section, a barge berm would be constructed to a net grade of 12.0 feet and a width of 53 feet.  The barge berm would be constructed with a shell core covered with derrick stone.

The New Orleans East Lakefront levee is complete to barrier plan specifications except for foreshore protection.  The levee design provides for an all earthen design of hauled clay fill.  With the recommended plan the levee would be enlarged by the same method.  The design calls for improving the 6.2 miles of levee to attain a final levee elevation of 16.5 feet and a final levee width of 272 feet.

The South Point to GIWW levee is complete to authorized plan specifications except for some work at drainage structures and a road crossing at Highway 90. The levee design provides for an all earthen levee of hauled clay fill upon a locally constructed levee. The recommended plan provides for utilizing a similar type design; however, the design calls for greater levee heights and widths. The design provides for improving the 8.3 miles of levee to attain final elevations of varying from 13.5 to 15.0 feet and final widths varying from 130 to 176 feet. It is anticipated that only minimal modifications of the existing drainage structures will be necessary.

**RELOCATIONS**

No relocations of businesses or residences would be required due to plan construction. Temporary relocations of walkways leading to camps located to the lakeside of the Citrus Lakefront and New Orleans East Lakefront levee reaches would be necessary during construction. Recreational facilities along the Jefferson Parish Lakefront and New Orleans Lakefront would be destroyed and/or disrupted during levee construction. These would require replacement. Other relocation requirements such as road ramps, etc., would be minimal.

## OPERATION AND MAINTENANCE CONSIDERATIONS

Operation and maintenance of the recommended plan would include mowing and periodic inspection and repair of levees and operation and maintenance of structures, such as floodgates and drainage structures. Construction, operation, maintenance and replacement costs are summarized in Table 27. Replacement costs are the costs of periodic replacement of operating machinery and equipment for such items as floodgates and drainage structures. Detailed construction cost estimates are presented in Appendix A, Section 4.

## PLAN ACCOMPLISHMENTS

The recommended plan would provide SPH protection for the developed urban areas located generally between the Mississippi River and Lake Pontchartrain. These include the following separable protection areas which are delineated on Plate 4: St. Charles Parish, Jefferson Parish, New Orleans, Citrus, New Orleans East, and Chalmette. Average annual benefits are estimated at $95,771,000, which would result from the prevention of flood damages to existing and future development and savings in emergency costs.

## SUMMARY OF ECONOMIC,
### ENVIRONMENTAL, AND SOCIAL EFFECTS

A summary of the economic, environmental, and social effects of the recommended plan is presented in the following paragraphs.

### ECONOMIC EFFECTS

The total cost to complete the recommended plan is estimated at $627,714,000, and average annual costs are estimated at $22,769,000 including $21,423,000 for interest and amortization, $964,000 for operation and maintenance and replacements, $376,000 for recreation losses, and $6,000 for fish and wildlife losses. Average annual benefits are estimated at $95,771,000 including $88,430,000 for hurricane flood damages prevented to existing development, $6,002,000 for damages prevented to future development, and $1,339,000 for savings in emergency costs. The benefit-to-cost ratio is 4.2 and net benefits, the difference in annual benefits and annual cost, would average $73,002,000.

TABLE 27

SUMMARY OF COSTS TO COMPLETE THE HIGH LEVEL PLAN
($1,000's, October 1981 Price Levels,
3 1/8 Percent Annual Discount Rate and a 100-Year Project Life)[1]

| FEATURE | FIRST COST | ANNUAL OPERATION AND MAINTENANCE COSTS[2] |
|---|---|---|
| CHALMETTE AREA PLAN | 65,925 | 249 |
| CITRUS-NEW ORLEANS EAST AREA | | |
| Citrus Back Levee | 5,050 | 27 |
| New Orleans East Back Levee | 17,087 | 17 |
| South Point to GIWW levee | 5,182 | 25 |
| New Orleans East Lakefront Levee | 34,843 | 22 |
| Citrus Lakefront Levee | 46,854 | 95 |
| IHNC East Bank Levee | 3,423 | 30 |
| Total | 112,439 | 246 |
| WEST NEW ORLEANS AREA | | |
| IHNC West Bank Levee | 33,324 | 30 |
| New Orleans Lakefront Levee[3] | 215,813 | 324 |
| Total | 249,137 | 354 |
| EAST BANK OF JEFFERSON PARISH AREA | | |
| Jefferson Parish Lakefront Levee | 123,173 | 92 |
| Jefferson-St. Charles Parish | | |
| Boundary Levee | 18,941 | 13 |
| Total | 142,114 | 105 |
| EAST BANK OF ST. CHARLES PARISH AREA | | |
| North of Airline Highway Levee | 55,721 | 39 |
| MANDEVILLE SEAWALL | 2,378 | 1 |
| TOTAL | 627,714 | 964 |

[1] Cost to complete from 1 October 1979.

[2] Includes annualized costs of replacements and O&M on completed work.

[3] Includes $124,000,000 for solution to outfall canals' problems.

## ENVIRONMENTAL EFFECTS

Implementation of the recommended plan would directly impact 213 acres of cypress-tupelogum swamp, 54 acres of brackish-saline marsh, 984 acres of lake bottoms, 88 acres of scrub-shrub, and 351 acres of developed uplands which are primarily existing levees. The 213 acres of swamp and 54 acres of marsh would be converted to levees and borrow areas. Of the 984 acres of lake bottoms affected, 573 acres would be deepened for borrow for the construction of the Jefferson Parish Lakefront levee and 411 acres would be converted to levee. The construction of the Jefferson Parish Lakefront levee would also create temporary turbidity during construction in the vicinity of the levee.

The north of Airline Highway alinement would provide some opportunity for development due to an additional increment of protection from the 100-year flood. However, the area has been and presently is being developed without the increased flood protection afforded by the proposed levee. The levee as proposed is designed with flow through culverts which would maintain the existing exchange of nutrients, water and organisms between the wetlands north and south of Airline Highway. These culverts are to be gated so they can be closed during times of potential hurricane flooding.

No economic benefits were claimed for this area due to its wetland status. Similarly, the additional levee height to be added to the New Orleans East levee would provide increased flood protection to a wetland area. Any development in either of these wetlands would necessitate a permit from the Corps of Engineers and mitigation, if necessary, would be determined on a case by case basis.

141

## SOCIAL EFFECTS

The implementation of the recommended plan would result in improved hurricane protection to approximately 160,000 residences in the study area and in minor increases in property values. There would be minor, temporary degradation of air quality and there would be temporary noise pollution during construction. Esthetic values along the Lake Pontchartrain south shore in Orleans and Jefferson Parishes would be greatly reduced during construction. After construction, more open space would exist.

# PLAN IMPLEMENTATION

## INTRODUCTION

The purpose of this section is to present the division of responsibilities between the Federal and non-Federal interests in connection with the development of the proposed undertaking and documentation of the intention of non-Federal interests to fulfill their responsibilities.

## DIVISION OF RESPONSIBILITIES

### FEDERAL RESPONSIBILITIES

Contingent upon the approval of this document by the Chief of Engineers, filing of the final EIS with EPA, receipt of supplemental assurances from non-Federal interests to carry out provisions of the project, the Federal Government will be responsible for preparing additional detailed designs and plans and bearing 70 percent of the first cost.

### NON-FEDERAL RESPONSIBILITIES

In accordance with Public Law 89-298, which authorized the Lake Pontchartrain, Louisiana, and Vicinity Hurricane Protection project, non-Federal interests must, prior to initiation of construction of major design changes, assure the Secretary of the Army, with respect to the major design changes, that they will without cost to the United States:

a. Provide all lands, easements, and rights-of-way, including borrow and spoil-disposal areas necessary for construction, operation, and maintenance of the project; [1]

b. Accomplish all necessary alterations and relocations to roads, railroads, pipelines, cables, wharves, drainage structures, and other facilities required by the construction of the project;

c. Hold and save the United States free from damages due to the construction works;

d. Bear 30 percent of the first cost, to consist of the fair market value of the items listed in subparagraphs (a) and (b) above and a cash contribution as presently estimated below, to be paid either in a lump sum prior to initiation of construction or in installments at least annually in proportion to the Federal appropriation prior to start of pertinent work items, in accordance with construction schedules as required by the Chief of Engineers, or, as a substitute for any part of the cash contribution, accomplish in accordance with approved construction schedules items of work of equivalent value as determined by the Chief of Engineers, the final apportionment of costs to be made

---

[1] Local interests are also required to comply with the requirements of the Uniform Relocation and Real Property Acquisition Policies Act of 1970 (PL 91-646), in acquiring real property. A constitutional amendment was provided by the Louisiana Legislature on 1 February 1972 allowing local interests to comply.

after actual costs and values have been determined; $\underline{2/}$ (A summary of the estimated remaining cost for each local sponsor is presented in Table 26.)

e. Provide all interior drainage and pumping plants required for reclamation and development of the protected areas;

f. Maintain and operate all features of the project in accordance with regulations prescribed by the Secretary of the Army, including levees, floodgates and approach channels, drainage structures, drainage ditches or canals, floodwalls, and stoplog structures; and

---

$\underline{2/}$This requirement has been modified by section 92 of Public Law 93-251, which is also commonly referred to as "The Hebert Bill." Basically, this law provides that for 24 years following the initiation of construction for the Lake Pontchartrain project (fiscal year 1967) local sponsors have the option of either paying each year's share in full down to the following amount:

One twenty-fifth of total cash owed in a given year (local share) and one twenty-fifth of the cumulative unpaid balance from previous years and an interest payment on the cumulative unpaid balance computed at an annual interest rate of 3.225 percent.

Interest is paid only on money owed from previous years, not on the current year's contribution.

In the project's twenty-fifth year, fiscal year 1991, local sponsors must pay that year's share and the unpaid balance from prior years and interest on the unpaid balance.

Interest payments are not treated as project monies, they are turned over to the Treasury Department.

Section 221 of Public Law 91-611, which requires that construction not begin until each non-Federal sponsor has entered into a written agreement to furnish the required cooperation, also applies to this deferred payment plan.

g. Acquire adequate easements or other interest in land to prevent encroachment on existing ponding areas unless substitute storage capacity or equivalent pumping capacity is provided promptly. (see footnote 1 on page 144).

CURRENT STATUS OF ASSURANCES. The basic assurances for the Chalmette Area Plan have been accepted. Joint assurances of the St. Bernard Parish Police Jury and the Lake Borgne Basin Levee District were accepted on 28 September 1966. The Lake Borgne Basin Levee District and St. Bernard Parish Police Jury executed, on 20 April 1976, a new joint agreement of assurance covering all requirements of local cooperation and a deferred payment plan as authorized by Public Law 93-251. These assurances were approved on behalf of the United States on 7 December 1977. Assurances from the Board of Commissioners of the Orleans Levee District were accepted on 10 October 1966. The assurances were amended on 16 September 1971 to reflect an increase in cost participation. These amended assurances, which supersede the 10 October 1966 assurances, were approved on behalf of the United States on 29 March 1974. Subsequent to this approval, it became evident that problems would exist in obtaining acceptable assurances from two agencies for the Barrier Plan. For this reason, the original assurances from the Orleans Levee District dated 10 October 1966 are considered in full effect. This 1966 assurance (for Chalmette Plan only) was supplemented to include Public Law 91-646 on 29 May 1975, and approved on behalf of the United States on 8 July 1975. The Orleans Levee District executed a new agreement of assurances covering all requirements of local cooperation and a deferred payment plan as authorized by Public Law 93-251 on 30 March 1976. These assurances were approved on behalf of the United States on 7 December 1977.

Supplemental assurances were required to insure compliance with the provisions of Public Law 91-646. The Louisiana Office of Public Works, designated as the coordinating agency by the Governor on 5 March 1971,

146

TABLE 28

SUMMARY OF LOCAL COSTS
($1,000,000's)

|  | FIRST COST[1] | LOCAL SHARE |
|---|---|---|
| TOWN OF MANDEVILLE | | |
| Mandeville Seawall | 2.4 | 0.7 |
| ORLEANS LEVEE DISTRICT | | |
| Citrus New Orleans East | 112.5 | 33.8 |
| New Orleans | 249.1 | 74.7 |
| Chalmette | 21.6 | 6.5 |
| Total | 383.2 | 115.0 |
| ST. BERNARD PARISH/LAKE BORGNE BASIN LEVEE DISTRICT | | |
| Chalmette | 44.3 | 13.3 |
| PONTCHARTRAIN LEVEE DISTRICT | | |
| Jefferson | 142.1 | 42.6 |
| St. Charles | 55.7 | 16.7 |
| Total | 197.8 | 59.3 |
| TOTAL | 627.7 | 188.3 |

[1]Cost to complete after October 1979; October 1981 price levels.

was requested to have the St. Bernard Parish Police Jury and the Lake Borgne Levee District execute supplemental assurances. A joint supplemental assurance dated 26 February 1975 was received from those agencies, and approved on behalf of the United States on 17 March 1975.

LAKE PONTCHARTRAIN BARRIER PLAN. Basic assurances for the current Barrier Plan (exclusive of the Chalmette Area Plan) were obtained from the Board of Commissioners of the Orleans Levee District and accepted on 10 October 1966. The Orleans Levee District requested assistance in carrying out the assurances due to the rising non-Federal cost of participation and the widespread benefits to be derived by the

surrounding parishes.   The Governor of the State of Louisiana, by
Executive Order (5 March 1971), designated the Louisiana Office of
Public Works as the local coordinating agency.   Through this procedure,
the Pontchartrain Levee District, the St. Tammany Parish Police Jury,
and the Orleans Levee District have provided assurances for the Barrier
Plan.     Amended   assurances   to   provide   for   an   increase   in   cost
participation   were   executed   by   the   Orleans   Levee   District   on
16 September 1971, and approved on behalf of the United States on
29 March 1974.    The amended assurances supersede the 10 October 1966
assurances.   Subsequent to the approval of the 1971 assurance, it became
evident that problems existed in obtaining acceptable assurances from
two agencies for this plan.   For this reason, the original 10 October
1966 assurances from the Orleans Levee District are considered in full
effect.    On 30 March 1976, the Orleans Levee District executed a new
agreement of assurance covering all requirements of local cooperation
and a deferred payment plan as authorized by Public Law 93-251.   These
assurances were approved on behalf of the United States on 7 December
1977.   Assurances providing for participation pursuant to the action of
the Governor have been obtained from the Pontchartrain Levee District.
Assurances on behalf of the St. Tammany Parish Police Jury were executed
by the Governor on 8 May 1982 under Section 81, Title 38, Louisiana
Revised Statutes of 1950, as amended.    Neither of the latter two
assurances has been accepted for lack of supporting documents.   However,
on 20 September 1976, the Pontchartrain Levee District executed a new
agreement of assurance covering all requirements of local cooperation
and a deferred payment plan as authorized by Public Law 93-251.    On
19 October 1976, Governor Edwards executed an instrument designating the
Louisiana Office of Public Works to lend financial assistance in
connection with this project.   The Louisiana Office of Public Works
executed an act of assurance dated 8 November 1976 agreeing:  to fulfill
all local cooperation requirements for that portion of the project in
St. Tammany Parish;   and   to   lend   financial   assistance   after   the
Pontchartrain Levee District has contributed $100,000 in cash toward

that portion of the Barrier Plan which is the responsibility of that levee district. These assurances were approved on behalf of the United States on 7 December 1977. Supplemental assurances required by Public Law 91-646 were received as follows:

a. Orleans Levee District: supplemental assurances were executed on 21 September 1973.

b. Pontchartrain Levee District: supplemental assurances were executed on 15 October 1973.

c. St. Tammany Parish Police Jury: the assurances executed by the Governor on 8 May 1972 included Public Law 91-646 requirements.

The Mandeville Seawall portion of the project is not covered by any existing assurances.

The assurances listed as items b and c above have not been accepted on behalf of the Government due to lack of supporting data; however, substitute assurances incorporating the deferred payment plan authorized by Public Law 93-251 and Public Law 91-646 have been executed by these levee districts. These assurances were approved on behalf of the United States on 7 December 1977.

The Water Resources Development Act of 1974 (Public Law 93-251) enacted 7 March 1974, provided that local assuring agencies for this project (both plans) could, if they so chose, repay their cash obligation using a deferred payment plan. New assurances have been executed by local interests incorporating such a deferred payment plan. These assurances were approved by the Secretary of the Army on 7 December 1977. Local interests have been making payments under this plan since fiscal year 1977 and are current in payment.

Local interests have cooperated in all efforts to date and have given assurances that all requests for additional cooperation will be expedited.    However, they have delayed granting rights-of-way as scheduled on certain items due to lawsuits brought by landowners and challenges made in court by environmental concerns.    Some local interests are constructing items of flood protection works at vulnerable locations as work in-kind in lieu of cash contribution.   They will be given credit only for the portion meeting project requirements.   This work has been closely coordinated with the New Orleans District.

All negotiations for relocations are the responsibility of local interests and are on schedule.

On 1 January 1979, the State of Louisiana formed the Jefferson Levee   District   and   assigned   to   it   the   responsibility   of   the Pontchartrain levees on the east bank of the Mississippi River.   (These levees previously were the responsibility of the Pontchartrain Levee District.)   Revised assurances are being sought from the Pontchartrain Levee District to cover the St. Charles portion of the project, and new assurances are being sought from the Jefferson Levee District for the Jefferson Parish segment of the project.

# STUDY PARTICIPANTS AND COORDINATION

The District Engineer, New Orleans District, Corps of Engineers, had the responsibility for conducting and coordinating the study, consolidating information from other agencies and interested parties, formulating the plan and associated recommendations, and preparing the report. Coordination was maintained with the US Environmental Protection Agency, US Fish and Wildlife Service, National Marine Fisheries Service, Louisiana Department of Transportation and Development (Office of Public Works), Jefferson Levee District, Lake Borgne Basin Levee District, Orleans Levee District, Pontchartrain Levee District, St. Bernard Parish Police Jury, and other Federal, state, and local agencies.

A public meeting for this study was held on 21 November 1981 in New Orleans, Louisiana, to discuss the plans under consideration. Attendees included representatives of Federal, state, and local agencies, the state legislature, parish offices, special interest groups, and the news media, as well as members of the affected public. Most testimony at the meeting was in favor of the High Level Plan. A representative of the Jefferson Levee District expressed concern about the high cost of the Jefferson Parish protection under the High Level Plan. The executive attorney of Save Our Wetlands Inc., an environmental interest group, expressed support for the High Level Plan but was opposed to the protection of any wetland areas which might be developed in the future. As a general conclusion, the testimony at the meeting supported the High Level Plan.

A second public meeting was held on 12 April 1984 in New Orleans, Louisiana, to present the tentatively selected plan to the public.

Representatives from various government agencies, special interest groups, the news media, and the general public attended. Attendees clearly preferred the High Level Plan to the Barrier Plan, but reservations over environmental issues were also expressed. In addition to the opposition expressed at the first meeting to the protection of wetland areas, concern was expressed over the size of the proposed borrow pits in Lake Pontchartrain required to construct the Jefferson Parish lakefront levee. Comments also addressed the quantity and timing of mitigation.

A draft of this report was transmitted to all agencies, groups and individuals who normally receive such documents, and to additional agencies, groups and individuals who have expressed an interest in the project. Their comments were considered in the preparation of the final report.

# FINAL SUPPLEMENT I TO THE ENVIRONMENTAL IMPACT STATEMENT

## LAKE PONTCHARTRAIN, LOUISIANA, & VICINITY HURRICANE PROTECTION PROJECT

## PARISHES

ST. BERNARD

ORLEANS

JEFFERSON

ST. CHARLES

ST. JOHN

THE BAPTIST

TANGIPAHOA

ST. TAMMANY

## ABSTRACT

New Orleans and adjacent municipalities are located in southeastern Louisiana. The New Orleans District has investigated public concerns relating to the needs and opportunities to provide hurricane flood protection. Of the 16 plans considered, two were selected for detailed study. The Barrier Plan provides for barriers to control inflows to Lake Pontchartrain and levees and floodwalls around developed areas. Inflows to the lake would be regulated by control structures and associated barriers and locks in the main tidal passes of the lake: the Inner Harbor Navigation Canal, The Rigolets, and Chef Menteur Pass. The resulting lower lake levels would reduce the height and cost of levees along the south shore of the lake. A new levee system would be constructed in St. Charles Parish. The Barrier Plan would provide a high level of hurricane protection for those urban areas located generally between the Mississippi River and Lake Pontchartrain. Completion of this plan would destroy 2,363 acres of highly productive marsh and result in an unquantified reduction in tidal transport of nutrients and biota which could affect fisheries. The High Level Plan proposes to provide basically the same hurricane flood protection as the Barrier Plan but no barriers would be built; instead, existing levees would be raised, new levees would be built in St. Charles Parish and floodwalls provided where necessary. Completion of the High Level Plan would cause the loss of approximately 54 acres of marsh and would be less costly to implement than the Barrier Plan. This plan is the most efficient from the viewpoint of national economic development and would be the least environmentally damaging. Because of strong opposition to the Barrier Plan and no known significant opposition to the High Level Plan, implementation of this plan is more feasible. The High Level Plan more nearly meets all planning objectives. Thus, the High Level Plan has been selected as the Recommended Plan.

Send your comments to OCE, ATTN: DAEN-CWP by

If you would like further information on this statement, please contact Mr. Larry Hartzog, U. S. Army Corps of Engineers, New Orleans, P. O. Box 60267, New Orleans, Louisiana. 70160. Commercial telephone: (504) 838-2524

## JULY 1984

## LEAD AGENCY U.S. ARMY CORPS OF ENGINEERS DISTRICT NEW ORLEANS, LOUISIANA

NOTE    *Information, displays, maps, etc. discussed in the Main Report and Appendixes are incorporated by reference in the EIS.*

**Intentionally Blank**

**Page EIS - 2**