# 1. SUMMARY

## 1.1. INTRODUCTION

1.1.1. New Orleans and its suburbs are bordered by water on three sides: Lake Pontchartrain lies to the north, Lake Borgne to the east, and the Mississippi River to the south (see Plate 1). This densely populated low-lying area is susceptible to heavy damage and faces high risk to human life from hurricane-induced flooding. In 1965, Congress authorized the US Army Corps of Engineers (Corps) to construct a hurricane protection system for the New Orleans metropolitan area. Part of the authorized plan included features to prevent an increase in water levels in Lake Pontchartrain as a hurricane approached. This was to have been accomplished by placing barrier structures in the Rigolets and Chef Menteur tidal passes and the Inner Harbor Navigation Canal. The structures at Chef Menteur and the Rigolets would remain open except immediately prior to, and during, hurricanes. In addition to the barrier complexes, levees would be built along the entire lakefront from the Bonnet Carre' Spillway to South Point, with back levees around the Citrus and New Orleans East areas and a ring levee in the Chalmette area (see Plate 3).

1.1.2. A final Environmental Impact Statement (EIS) on the authorized plan (Barrier Plan) was filed with the Council on Environmental Quality in 1975. In 1977, the EIS was ruled inadequate and a court injunction was issued to stop all construction of the Chef Menteur and Rigolets barrier structures, pending preparation of a legally adequate EIS. In the interim, the court allowed construction of the levee portion of the plan to continue. Project reevaluation studies pursuant to the court-ordered revision of the EIS have led to the selection of an alternative to the Barrier Plan. This alternative, called the High Level Plan, would provide hurricane protection by raising and strengthening levees and floodwalls to a higher elevation than required by the Barrier Plan and would have no requirements for the barriers. Since the 1975 final EIS was considered to be adequate in terms of describing impacts of the levees, this EIS supplement will analyze only post-1984 impacts; i.e., the additional impacts that would be incurred by completing either the Barrier or High Level Plan. Construction impacts prior to 1984 are addressed only to determine the amount of mitigation necessary.

## 1.2. MAJOR CONCLUSIONS AND FINDINGS

### 1.2.1. RATIONALE FOR THE NATIONAL ECONOMIC DEVELOPMENT (NED) PLAN

The Barrier Plan would provide maximum total benefits because it would protect not only all areas protected by the High Level Plan, but also some populated areas along the north shore of Lake Pontchartrain. However, the High Level Plan is the least expensive and would provide maximum excess benefits over costs and was designated the NED Plan.

1.2.2. **RATIONALE FOR THE RECOMMENDED PLAN**

1.2.2.1. The High Level Plan would result in the least environmental damage in terms of direct construction impacts. It would destroy 54 acres of marsh as opposed to 2,363 acres impacted by the Barrier Plan. Although the High Level Plan would have wider based levees, the Barrier Plan would require more miles of levees to connect the barrier structures. Raising the Jefferson Parish Lakefront levees to the height necessary for the High Level Plan would create short-term turbidity in the lake adjacent to the levee. The short-term turbidity caused by construction of the barrier structures (especially the damming of Chef Menteur Pass) would be more significant, because it would occur in areas more valuable to the ecosystem. Construction of the Barrier Plan would necessitate dredging approximately 512 acres to a depth of 20 to 40 feet below existing bottoms. The High Level Plan would entail deepening 573 acres of lake bottoms to 60 feet below existing bottoms. Although this facet of the High Level Plan may be more environmentally damaging than the Barrier Plan, the other environmental impacts of the Barrier Plan are far more significant. The Barrier Plan also would have potential adverse impacts on an endangered species, the bald eagle. Additionally, the Barrier Plan would restrict the transport of biota and nutrients through the tidal passes and result in a long-term reduction in the productivity of Lake Pontchartrain and reduce its export to other systems.

1.2.2.2. In terms of social impacts, however, the High Level Plan is the least acceptable. During raising of the levees for the High Level Plan along the Orleans and Jefferson Parish lakefronts, esthetic values would be greatly reduced because of noise, dust, and movement of equipment. Recreational values would be diminished as the existing linear recreational green spaces in Jefferson and Orleans Parishes are destroyed; however, levees would be designed to preserve and protect the recently developed Williams Boulevard and Bonnabel Boulevard boat launch complexes. Once construction is complete, the new levees would provide continuous green spaces that could be landscaped and redeveloped for recreation. The barriers in The Rigolets and Chef Menteur Pass would increase water velocities, and thereby adversely affect navigation (including small fishing boats and sail boats). The barriers also would reduce the biological productivity of Lake Pontchartrain, which would decrease the harvest of sport and commercial fish and shellfish. In terms of implementation, the Barrier Plan would be strongly opposed by a broad spectrum of interests. Opposition to the High Level Plan is much less. In summary, the High Level Plan comes closest to meeting all planning objectives. It provides adequate hurricane protection to the east bank of the New Orleans metropolitan area, is most effective in terms of NED, minimizes adverse impacts on the natural environment and social well-being, and exploits some project-related opportunities to enhance social well-being. Thus, the High Level Plan was selected as the Recommended Plan.

### 1.2.3. CONCLUSIONS OF THE SECTION 404 EVALUATION PROCESS

Concerns involving Section 404 of the Clean Water Act initially were discussed in public notices dated 29 November 1974 and 22 January 1975, in a 22 February 1975 public meeting, and in a 25 August 1975 Statement of Findings. Only the barrier complexes, New Orleans East levees, and Chalmette area levees were considered in this process. Three new Section 404(b)(1) Evaluations were prepared in 1982. They document findings specified in the Revised Guidelines for Specification of Disposal Sites for Dredged or Fill Material published in the "Federal Register" on 24 December 1980. These evaluations concluded: that no practicable alternative to the High Level Plan exists which would have less adverse impacts to the aquatic ecosystem, that applicable state and Federal water quality standards would not be violated, that the discharge would not contribute to a significant degradation of the waters of the United States, and that appropriate and practicable steps have been taken to minimize adverse impacts to the aquatic ecosystem. A Section 404 Public Notice was sent to the agencies and the public at the same time that the draft of this EIS supplement was released. A State Water Quality Certificate was received on 29 June 1984. All Section 404(b)(1) Evaluations are included in Appendix C, Sections VII to IX.

### 1.2.4. FINDINGS RELATING TO EXECUTIVE ORDER 11990 (PROTECTION OF WETLANDS)

1.2.4.1. This Executive Order states that Federal agencies should not alter wetlands unless there is no practicable alternative. Of the two plans considered, the High Level Plan would destroy the fewest acres of wetlands. The South Point to Gulf Intracoastal Waterway (GIWW) levee alinement in New Orleans (see Plate 6) incloses 13,000 acres of wetlands; however, as a result of levees constructed by local authorities, these wetlands have been inclosed and removed from tidal exchange with Lake Pontchartrain since 1958. Raising the levees would increase the developmental potential; however, no development in these wetlands can occur without a Section 404 Permit from the Corps of Engineers. An application for a permit to develop 9,800 acres of this area has been made (see Plate 6), and the applicant is preparing an EIS on his proposal. Since the fate of these wetlands is dependent upon regulatory decisions, their potential loss is not attributed to this hurricane protection project. Mitigation for any loss of these wetlands will be addressed at the time the permit is processed.

1.2.4.2. In St. Charles Parish, a somewhat similar situation exists concerning the wetlands south of Airline Highway. Approximately 4,000 acres of cypress tupelo swamp are presently partially isolated from the wetlands north of Airline Highway by locally constructed railroad and highway embankments. The proposed hurricane protection levee would preserve the existing hydraulic connections between the wetlands south of Airline Highway and the area outside the levee.

1.2.4.3. Although the tentatively selected plan would provide an additional level of flood protection, the 4,000 acres would remain wetlands. No development in these wetlands could occur under Federal regulations without a Section 404 permit from the Corps of Engineers. Thus, development of these wetlands would be determined by the permit process and not by levee placement. Mitigation for any fish and wildlife losses incurred through development would be addressed at the time a specific permit is processed.

### 1.2.5. FINDINGS RELATING TO EXECUTIVE ORDER 11988 (FLOOD PLAINS)

The proposed action would occur within a flood plain. Practicable alternatives have been identified and are discussed in Section 4 of the EIS, and no reasonable nonflood plain alternatives exist. Section 6 of the EIS describes the beneficial and adverse impacts of each alternative and describes any expected losses of flood plain benefits. Views of the general public have been obtained at several public meetings, the most recent on 12 April 1984. The Recommended Plan preserves the most flood plain benefits derived from socioeconomic and environmental values and still provides flood protection.

### 1.2.6. FINDINGS OF THE ENDANGERED SPECIES ASSESSMENT

A 1982 Endangered Species Assessment concluded that the High Level Plan would not adversely impact any endangered species nor their critical habitat. The US Fish and Wildlife Service (FWS) concurred with this assessment. Subsequently, an eagle nest was discovered near the levee alinement in St. Charles Parish. We have determined that the High Level Plan would not impact this nest. This information is contained in a revised assessment. The revised assessment and correspondence with FWS is contained in Appendix C, Section I.

### 1.2.7. COASTAL ZONE MANAGEMENT CONSISTENCY DETERMINATION

A Consistency Determination was prepared to determine if the High Level Plan is consistent with the Louisiana Coastal Zone Management Act. It determined that the plan is consistent with all applicable guidelines to the maximum extent practicable. This Determination was sent to the Louisiana Department of Natural Resources (DNR) who stated in a 19 June 1984 letter that all features are consistent with the Louisiana Coastal Resources Program to the maximum extent practicable, except the alinement in New Orleans East. The DNR maintains that the New Orleans East alinement may not be consistent, while the Corps believes that our alinement is consistent to the maximum extent practicable. We are pursuing informal consultation with DNR and believe the conflict can be resolved. The Consistency Determination is contained in Appendix C, Section X. Correspondence with DNR is contained in Appendix D, Public Views and Responses.

## 1.3. AREAS OF RESOLVED CONTROVERSY

*The major resolved controversy involves the Barrier Plan.* This plan was opposed by several Federal agencies, environmental groups, and some citizens of the north shore of Lake Pontchartrain because of unquantifiable, but significant, impacts on the biology and hydrology of the lake, and the potential to increase north shore flooding. Detailed investigations for this study indicated that the High Level Plan was more feasible considering both environmental and economic aspects. Thus, the High Level Plan is the Recommended Plan.

## 1.4. UNRESOLVED ISSUES

1.4.1. The plan described in the 1975 EIS included a levee alinement along the lakefront in St. Charles Parish. There was extensive environmental opposition to such an alinement because it would inclose 25,000 acres of wetlands north of Airline Highway and impact another 1,000 acres of wetland by construction (see Plate 3). Because of environmental considerations, this alinement was put in an indefinitely deferred status in the early 1970's. A suit to force construction of the levee was entered in the same court which enjoined construction of the barrier features. This suit is being held in abeyance pending submission of the final EIS supplement for this project.

1.4.2. The FWS recommends that the St. Charles Parish levee segment be eliminated; but if it is determined that the levee is in the public interest, they recommend a levee alinement immediately adjacent to Airline Highway. They suggest that the exact location be determined jointly by the New Orleans District (NOD), FWS, National Marine Fisheries Service (NMFS), and the Louisiana Department of Wildlife & Fisheries (LW&F) during the advance engineering and design stage. In addition, it was recommended that the Corps should maintain complete control of the gated water control structures to be incorporated in the alinement. The Corps has determined that the levee is in the public interest and the Recommended Plan includes an alinement just north of Airline Highway. The aforementioned agencies will be consulted during preparation of the General Design Memorandum for this levee segment.

1.4.3. A second unresolved issue involves the levee alinements in the New Orleans East area described in paragraph 1.2.5. above. Environmental groups claim that raising the South Point-to-GIWW levee to high level specifications would make development of the inclosed wetlands more attractive. These wetlands have been inclosed for more than 2 decades. Although raising the levee to Standard Project Hurricane (SPH) level of protection would increase potential for development of the 13,000 acres of wetland, any filling operations would be regulated under the permit authority of Section 404. Decisions on such operations are based on public interest and the District Engineer will make an independent decision on the matter.

1.4.4. Another unresolved issue, ancillary to that discussed in paragraph 1.4.3., concerns tidal exchange between the inclosed wetlands and Lake Pontchartrain. Since 1958, the only exchange has been drainage through four flapgates in the South Point to GIWW levee. These remain in the closed position except after a heavy rain. Environmental groups and natural resource agencies desire that tidal exchange be reestablished to preserve the viability of the marsh, to allow it to again function as an estuarine nursery area for fish and shellfish, and to again export nutrients and detritus to the adjacent estuary. Such a resumption of tidal exchange is considered to be infeasible for several reasons; the most significant is that such an action would necessitate purchase of flooding easements and could require the elevation of Interstate 10. Easements would require Congressional authorization and incur additional costs to the local sponsors, who are opposed to such action. (For further discussion of this matter, see paragraphs 4.2.10. and 4.2.11.)

1.4.5. The FWS recommends that nondevelopment easements be purchased over the 9,700-acre wetland area in New Orleans East and that the water control structures in the South Point to GIWW levee be modified to reestablish tidal exchange. It is NOD's position that the proper solution to the problem of development in New Orleans East is via the permit process. However, one alternative we are studying in our preliminary mitigation plan is to restore tidal exchange to New Orleans East and purchase perpetual flowage easements where appropriate.

1.4.6. There still remains some disagreement over the source of fill material for the high level levee along the Jefferson Parish lakefront. The most economical method of obtaining and placing the fill material is by the proposed hydraulic dredging of the lake bottom adjacent to the lakefront alinement. This method would result in creation of a submarine borrow pit approximately 60 feet in depth and 500 feet in width for a distance of approximately 9 miles. The FWS objects to this method of obtaining fill material and recommends either utilization of hauled fill or development of a method of dredging that would alleviate water quality and biological productivity problems. The Corps has analyzed various other methods of obtaining fill material including hauled fill (including barge transport) and a combination of hauled fill and hydraulic fill. None of these methods was found to be cost effective. Further discussion of this analysis is contained in the main report on pages 90 to 92.

1.4.7. No agreement has been reached with the numerous environmental interests concerning the issue of concurrent mitigation. The Corps has agreed to mitigate for all construction impacts from project initiation to project completion. However, to finalize detailed mitigation plans and costs, further scoping, evaluation, and interagency coordination are required. Therefore, the mitigation plan will be prepared as a separate report which will be accompanied by an EIS and Fish and Wildlife Coordination Act Report. Environmental intrests and the FWS would like

the finalized mitigation plan to accompany the present EIS. The draft mitigation report is scheduled for public release in the summer of 1985 and should be finalized by early 1986. Project construction will not be completed by this date and mitigation plans will be initiated upon approval to obtain mitigation as concurrently as practicable with the remaining construction.

## 1.5. RELATIONSHIP OF PLANS TO ENVIRONMENTAL REQUIREMENTS

Table 1.5 indicates the relationship of each plan to Federal and state environmental protection statutes and other environmental requirements.

FC = Full Compliance
PC = Partial Compliance
N/A = Not Applicable

Table 1.5

RELATIONSHIP OF PLANS TO ENVIRONMENTAL PROTECTION STATUTES OR OTHER ENVIRONMENTAL REQUIREMENTS

| | HIGH LEVEL | BARRIER |
|---|---|---|
| FEDERAL STATUTES | | |
| 1. Preservation of Historical Archeological Data Act of 1974. Completion of the ongoing and planned cultural resource studies will bring project into full compliance. | PC | PC |
| 2. Clean Air Act, as Amended. | FC | FC |
| 3. Clean Water Act of 1977. | FC | F |
| 4. Coastal Zone Management Act of 1972, as Amended. | FC 1/ | PC |
| 5. Endangered Species Act of 1973, as Amended. Compliance will be achieved upon receipt of a Biological Opinion from FWS regarding our ammended Biological Assessment. | PC | PC |
| 6. Estuary Protection Act. | FC | FC |
| 7. Federal Water Project Recreation Act. | FC | FC |
| 8. Fish and Wildlife Coordination Act. | FC | FC |
| 9. Land and Water Conservation Fund Act. | FC | FC |
| 10. Marine Protection Research and Sanctuaries Act of 1972, as Amended. | N/A | N/A |
| 11. National Historic Preservation Act. Completion of ongoing and planned cultural resource studies will bring the project into full compliance. | PC | PC |

1/ The Corps considers inself to be in full compliance with this feature, DNR does not concur.

Table 1.5 (Continued)

RELATIONSHIP OF PLANS TO ENVIRONMENTAL PROTECTION STATUTES OR OTHER ENVIRONMENTAL REQUIREMENTS

| | | HIGH LEVEL | BARRIER |
|---|---|---|---|
| 12. | National Environmental Policy Act. Compliance requires signature of the Record of Decision. | PC | PC |
| 13. | River and Harbor Act. | FC | FC |
| 14. | Watershed Protection and Flood Prevention Act. | N/A | N/A |
| 15. | Wild and Scenic Rivers Act. | FC | FC |
| EXECUTIVE ORDERS | | | |
| 1. | Executive Order 11988, Floodplain Management. | FC | FC |
| 2. | Executive Order 11990, Protection of Wetlands. | FC | FC |
| 3. | Executive Order 12114, Environmental Effects Abroad of Major Federal Action. | N/A | N/A |
| 4. | Executive Memorandum, Analysis of Impacts on Prime or Unique Agricultural Lands in Implementing NEPA. | FC | FC |
| 5. | Executive Order 11593, Protection and Enhancement of the Cultural Environment. Completion of ongoing and planned cultural resource studies will bring the project into full compliance. | PC | PC |
| STATE AND LOCAL POLICIES | | | |
| 1. | Air Control Law. | FC | FC |
| 2. | Archaeological Treasure Act. | FC | FC |
| 3. | Historic Preservation Districts Act. | N/A | N/A |
| 4. | Louisiana Natural and Scenic Streams Act. | FC | FC |

Table 1.5 (Continued)

RELATIONSHIP OF PLANS TO ENVIRONMENTAL PROTECTION STATUTES OR OTHER ENVIRONMENTAL REQUIREMENTS

| | HIGH LEVEL | BARRIER |
|---|---|---|
| 5. Protection of Cypress Trees (EO 1980-3). | FC | FC |
| 6. Water Control Law. | FC | FC |
| LAND USE PLANS | | |
| 1. Louisiana Coastal Zone Management Plan. | FC 1/ | FC |
| 2. Land Use Element of the Area-Wide Comprehensive Plan (Jefferson, Orleans, St. Bernard, and St. Tammany Parishes). | FC | FC |
| REQUIRED FEDERAL ENTITLEMENTS | | |
| None are required. | | |

# 2. TABLE OF CONTENTS


| Title | Page |
|---|---|
| Cover Sheet | EIS-1 |
| 1. SUMMARY | EIS-3 |
| 1.1. INTRODUCTION | EIS-3 |
| 1.2. MAJOR CONCLUSIONS AND FINDINGS | EIS-3 |
| 1.3. AREAS OF RESOLVED CONTROVERSY | EIS-7 |
| 1.4. UNRESOLVED ISSUES | EIS-7 |
| 1.5. RELATIONSHIP OF PLANS TO ENVIRONMENTAL REQUIREMENTS | EIS-9 |
| 2. TABLE OF CONTENTS | EIS-13 |
| 3. NEED FOR AND OBJECTIVES OF ACTION | EIS-15 |
| 3.1. STUDY AUTHORITY | EIS-15 |
| 3.2. PUBLIC CONCERNS | EIS-15 |
| 3.3. PLANNING OBJECTIVES | EIS-15 |
| 4. ALTERNATIVES | EIS-17 |
| 4.1. DEVELOPMENT OF ALTERNATIVES | EIS-17 |
| 4.2. PLANS ELIMINATED FROM FURTHER STUDY | EIS-18 |
| 4.3. FUTURE WITHOUT ADDITIONAL FEDERAL ACTION | EIS-21 |
| 4.4. PLANS CONSIDERED IN DETAIL | EIS-22 |
| 4.5. COMPARATIVE IMPACTS OF ALTERNATIVES | EIS-27 |
| 5. AFFECTED ENVIRONMENT | EIS-31 |
| 5.1. ENVIRONMENTAL CONDITIONS | EIS-31 |
| 5.2. SIGNIFICANT RESOURCES | EIS-32 |
| 5.3. SECTION 122 ITEMS | EIS-48 |
| 6. ENVIRONMENTAL EFFECTS | EIS-51 |
| 6.1. SIGNIFICANT RESOURCES | EIS-51 |
| 6.2. SECTION 122 ITEMS | EIS-65 |
| 7. LIST OF PREPARERS | EIS-69 |
| 8. PUBLIC INVOLVEMENT | EIS-71 |
| 8.1. PUBLIC INVOLVEMENT PROGRAM | EIS-71 |
| 8.2. REQUIRED COORDINATION | EIS-72 |
| 8.3. STATEMENT RECIPIENTS | EIS-72 |
| 8.4. PUBLIC VIEWS AND RESPONSES | EIS-78 |
| 9. LITERATURE CITED | EIS-79 |

**Intentionally Blank**

# 3. NEED FOR AND OBJECTIVES OF ACTION

## 3.1. STUDY AUTHORITY

3.1.1. The ongoing hurricane protection project was authorized by Public Law 89-298, 27 October 1965, House Document 231, 89th Congress, 1st Session (the Flood Control Act of 1965) generally in accord with recommendations contained in a report from the Chief of Engineers. Upon receipt of funds in 1966, construction of the hurricane protection project began.

3.1.2. In response to the National Environmental Policy Act of 1969, the US Army Corps of Engineers prepared an Environmental Impact Statement (EIS) and filed it with the Council on Environmental Quality in January 1975. Shortly thereafter, the adequacy of the EIS was challenged in court. On 30 December 1977, major portions of the project were enjoined from further construction by United States District Court, Eastern District of Louisiana, New Orleans Division. Subsequently, in March 1978, the injunction was modified to allow construction to continue on all portions of the project except the barrier complexes at Chef Menteur Pass and The Rigolets. Studies to support a legally adequate EIS have been in progress since the injunction.

## 3.2. PUBLIC CONCERNS

The primary public concern relates to the adequacy of the existing hurricane protection in the New Orleans metropolitan area. Although varying levels of protection exist, there remains a potential for significant hurricane-induced flooding to exceed present low levels of protection. Such flooding could result in extensive property damage and loss of human life. The controversy surrounding the originally conceived project indicates that, while the public supports hurricane protection, there is widespread concern about possible adverse environmental and social impacts from the project.

## 3.3. PLANNING OBJECTIVES

The following planning objectives were established in response to the identified problems, needs, and opportunities: provide more adequate hurricane protection for the east bank New Orleans area; maximize the project's contribution to the Nation's economic development; minimize adverse impacts on the environment and social well-being; and exploit project-related opportunities to enhance the environment and social well-being.

**Intentionally Blank**

# 4. ALTERNATIVES

## 4.1. DEVELOPMENT OF ALTERNATIVES

4.1.1. Alternative plans were limited to structural measures because all feasible nonstructural measures are in use, but do not provide adequate hurricane protection. Two basic design concepts were considered--high level and barrier. Under each concept, various levee alinements in New Orleans East and St. Charles Parish were possible. Using combinations of these elements, 16 alternative plans were formulated (see Table 4.1).

TABLE 4.1

ALTERNATIVE PLANS

| PLAN | BARRIERS | NEW ORLEANS EAST ALINEMENT | ST. CHARLES PARISH ALINEMENT |
|---|---|---|---|
| 1 | Yes | Existing | Lakefront |
| 2 | Yes | Existing | North Airline |
| 3 | Yes | Existing | South Airline |
| 4 | Yes | Existing | Boundary Levee |
| 5 | Yes | Maxent Canal | Lakefront |
| 6 | Yes | Maxent Canal | North Airline |
| 7 | Yes | Maxent Canal | South Airline |
| 8 | Yes | Maxent Canal | Boundary Levee |
| 9 | No | Existing | Lakefront |
| 10 | No | Existing | North Airline |
| 11 | No | Existing | South Airline |
| 12 | No | Existing | Boundary Levee |
| 13 | No | Maxent Canal | Lakefront |
| 14 | No | Maxent Canal | North Airline |
| 15 | No | Maxent Canal | South Airline |
| 16 | No | Maxent Canal | Boundary Levee |

4.1.2. The barrier concept involves controlling inflows to Lake Pontchartrain during approaching hurricanes, thus reducing the required heights of levees and floodwalls which would protect the New Orleans area. Inflow would be controlled by construction of barrier complexes at Lake Pontchartrain's three main tidal passes: the Inner Harbor Navigation Canal (IHNC), The Rigolets, and Chef Menteur. Each barrier complex would consist of a gated control structure, a closure dam, a navigational structure and approach channels, and any necessary tie-ins to adjacent levees (see Figures 2, 3, and 4). The high level concept proposes to provide hurricane protection by raising existing levees and constructing new levees in St. Charles Parish.

4.1.3. The New Orleans East area levees inclose 13,000 acres of wetlands (see Plate 6). Concerns have been expressed that development of these wetlands would not be in the public interest. Thus, an alternative alinement along the Maxent Canal was formulated to protect developed lands, but exclude these wetlands.

4.1.4. The east bank of St. Charles Parish is not protected from tidal flooding from Lake Pontchartrain. A levee along the lakefront was part of the original plan; however, because of environmental considerations, a decision was made in the early 1970's to indefinitely defer construction of this feature. Three alternative levee alinements have been developed. The North of Airline alinement would extend along the existing return levee at the St. Charles-Jefferson Parish line to just north of Airline Highway, then turn west and parallel the highway to the Bonnet Carre' Spillway (see Plate 7). The South of Airline alinement is a modification of the previous alinement that would veer south of the highway to avoid inclosing about 3,000 acres of wetlands. The St. Charles-Jefferson Parish Boundary alinement would consist of strengthening and lengthening the existing return levee, along the St. Charles-Jefferson Parish line. This would provide protection to Jefferson Parish from high water caused by flooding of the St. Charles Parish wetlands, but would not provide any protection to developed areas of St. Charles Parish.

## 4.2. PLANS ELIMINATED FROM FURTHER STUDY

4.2.1. For a detailed rationale of the process of screening alternative plans, see pages 72 to 92 of the Main Report.

4.2.2. **PLAN** 1 consists of the barrier complexes, the existing alinement in New Orleans East, and the Lakefront alinement in St. Charles Parish (see Table 4.1). This plan would inclose 28,000 acres of wetlands in St. Charles Parish, but would allow for limited tidal exchange between these wetlands and the lake during normal conditions. An additional 1,000 acres of wetland would be lost to levee and borrow. However, sheet flow interchange would be eliminated, reducing the biological productivity of the wetlands and the lake. Further analysis indicated there was no discernable need to develop these wetlands during

the project life. Cost analyses showed the Lakefront alinement had the highest first cost to protect St. Charles Parish. For both environmental and economic reasons, Plan 1 was eliminated.

4.2.3. **PLAN 3** consists of the barrier complexes, the existing New Orleans East levee, and the South of Airline alinement in St. Charles Parish. This plan avoids inclosing approximately 3,000 acres of wetlands south of Airline Highway. However, these forested wetlands are subject to tidal exchange only through culverts under Airline Highway. The North of Airline alinement would include similar culverts; thus, when these two alinements are compared, neither would alter the existing hydrology as long as the culverts remain open. Since the South of Airline alinement is approximately 2.5 miles longer, it would cost substantially more. Thus, Plan 3 was eliminated, mainly for economic reasons.

4.2.4. **PLAN 4** consists of the barrier complexes, the existing New Orleans East levee, and the Boundary Levee alinement for St. Charles Parish. This plan would provide no hurricane protection to the east bank of St. Charles Parish, but would serve to complete hurricane protection for highly developed Jefferson Parish. Since analysis showed that there was a potential for extensive damage and loss of life from hurricane-induced flooding in the developed portion of the east bank of St. Charles Parish, Plan 4 was eliminated.

4.2.5. **PLAN 5** consists of the barrier complexes, the Maxent Canal alinement in New Orleans East, and the Lakefront alinement in St. Charles Parish. The Maxent Canal alinement would avoid increasing the height of levees which now inclose approximately 13,000 acres of wetlands. (These wetlands have been inclosed since 1958 by a system of railroad embankments and levees.)

4.2.6. The Maxent Canal alinement is much shorter than the existing levee system to the east; however, it would be a new levee on a poor foundation as opposed to an existing levee in an advanced stage of construction. Thus, it would cost $70,000,000 more to build the Maxent Canal alinement than to complete the existing levee alinement, and, in addition, costs and plans must be developed to prevent flooding of Interstate 10. The number of acres of land required to build the Maxent Canal alinement is approximately equal to the number needed to finish the existing levee.

4.2.7. At the time of project authorization, it was assumed that the 13,000 acres of wetlands would be developed and project benefits for urban expansion were claimed. Subsequently, national policy changed to support preservation of wetlands. In this study, no benefits are claimed for future urban development in these wetlands.

4.2.8. Recently, the New Orleans District received a permit request (under authority of Section 404 of the Clean Water Act of 1977) from a

private developer. New Orleans East, Inc., proposes to develop approximately 9,800 of the 13,000 acres, and is preparing an Environmental Impact Statement on the proposed development. Subsequent to submittal of the EIS, the District Engineer will make a decision to approve or deny the permit. This decision will be based on national interest.

4.2.9. A consideration related to the Maxent Canal alinement is the possibility of tidal exchange between the 13,000 acres of wetlands and Lake Pontchartrain. To drain the area to the west of the South Point to GIWW levee, local authorities built four small gravity drainage structures with flap gates in the late 1950's. These structures have been improved and floodgates added as a part of Federal work on the project. At the present time, the floodgates are open, but the drainage structures remain closed because of the flap gates. Thus, there has been no tidal exchange between these wetlands and Lake Pontchartrain in over 2 decades.

4.2.10. Environmental groups, the NMFS, and the FWS have suggested that tidal exchange be reestablished to increase the productivity of the wetlands for waterfowl, furbearers, and estuarine fish and shellfish. By rejoining these wetlands and the lake, the normal exchange of nutrients and detritus could occur and the marsh would be available as a nursery area for fish and shellfish. This reconnection is opposed by several interests. The local levee board claims that landowners granted rights-of-way for the preproject levee system with the understanding that the inclosed area would be drained and developed. The levee board is concerned that implementing a plan counter to the original goals would open them to legal liability. They also claim that reopening the area to tidal exchange would require acquisition of expensive flowage easements. This is beyond the original authority of the project, and a purpose for which they did not agree to provide assurances. Further, it could increase their financial burden. Therefore, they do not wish to participate in such an action. The local authority responsible for operating and maintaining drainage in an adjacent housing development fears that increased water levels would lead to further infiltration into the forced drainage system and raise costs. The local mosquito control authority is concerned that tidal interchange might increase breeding habitat for mosquitoes near populated areas. In addition, reestablishment of tidal exchange could cause flooding of Interstate 10, a major route through the area; therefore, costs and plans must be developed to prevent such flooding. Restoration of tidal interchange to all or part of New Orleans East will be further investigated during mitigation studies.

4.2.11. The Maxent Canal alinement does not increase the existing hurricane protection to the wetland area between Maxent Canal and the existing South Point to GIWW levee, but would preclude development of that area. Future national or local policies and needs may make such development desirable, and project completion using the existing levee

could accomodate such policy changes without future additional costs for hurricane protection. Because of this consideration and the excessive costs of the Maxent Canal alinement compared to the existing alinement, Plan 5 was eliminated.

4.2.12. **PLANS 6, 7, AND 8** consist of barrier complexes, the Maxent Canal alinement, and various alinements in St. Charles Parish. The Maxent Canal alinement was determined to be infeasible for reasons discussed in paragraphs 4.2.5. through 4.2.11. above. Plans 6, 7, and 8 were eliminated from further study.

4.2.13. **PLAN 9** utilizes the high level concept with the existing alinement in New Orleans East and the Lakefront alinement in St. Charles Parish. The Lakefront alinement is undesirable from both environmental and economic viewpoints as described in paragraph 4.2.2, so Plan 9 was eliminated.

4.2.14. **PLAN 11** utilizes the high level concept with the existing levee alinement in New Orleans East and the South of Airline alinement. Because of the undesirability of the South of Airline alinement as described in paragraph 4.2.3., Plan 11 was eliminated.

4.2.15. **PLAN 12** has the high level concept, the existing levee in New Orleans East, and the Jefferson-Orleans Parish Boundary levee alinement in St. Charles Parish. Plan 12 was eliminated for reasons discussed in paragraph 4.2.4. In this case, the trade-off analysis indicated the incremental cost of Plan 10 over Plan 12 (about $56,000,000) was justified.

4.2.16. **PLANS 13, 14, 15, AND 16** all include the high level concept, the Maxent Canal alinement, and varying alinements in St. Charles Parish. They were eliminated mainly because of the undesirability of the Maxent Canal alinement, as discussed in paragraphs 4.2.5. through 4.2.11.

## 4.3. FUTURE WITHOUT ADDITIONAL FEDERAL ACTION

4.3.1. This project is ongoing and this EIS supplement includes only work from 1984 to 2100. In a strict sense, no future without-project exists; instead it is the future with no additional Federal action.

4.3.2. Significant improvement in the overall quality of project area surface waters is not anticipated. The water quality of Lake Pontchartrain is expected to improve slightly as a result of the planned cessation of municipal wastewater discharge from the south shore. However, pumping of bacteria-laden storm waters into the lake will continue, and the growth of the Port of New Orleans will increase opportunities for hazardous material spills. Much of the remaining marsh of the study area will convert to water, scrub shrub, or upland developed habitat (see Tables 4.3 and 6.3). Forested areas will be cleared and

developed. The continued loss of these habitats will decrease the fish and wildlife resources of the area. Recreational development will continue, especially in Orleans and Jefferson Parishes.

4.3.3. Hurricane-induced flooding could also affect numerous acres of wildlife habitat by increasing salinities.

4.3.4. The rising floodwaters could additionally cause drowning of terrestrial wildlife or isolation of these animals from their food base or feeding areas.

4.3.5. Population growth in the economic area will continue. In recent years, the largest volume of growth has taken place in Jefferson Parish. Most of the new residential expansion in Orleans Parish has occurred in the eastern part of the city. The east bank section of St. Charles Parish also is projected to grow at a rapid rate. People, dwellings, and businesses in the New Orleans metropolitan area will continue to be threatened with loss of life and property from hurricanes. This could discourage future economic growth in undeveloped areas and could delay construction of such proposed developments as the Almonaster-Michoud Industrial Development. In addition, land-use density in the more protected portions of the area will increase, raising the costs of such valuable lands.

## 4.4. PLANS CONSIDERED IN DETAIL

### 4.4.1. **BARRIER PLAN**

4.4.1.1. This plan would provide barrier complexes at the three tidal passes. Levees would protect the east banks of St. Charles and Jefferson Parishes, Orleans Parish, and portions of St. Bernard Parish. (For a detailed description of plan features, see the Plan Assessment and Evaluation Section in the Main Report.) The Rigolets complex would consist of barrier levees, a 110- by 800-foot navigational lock, a closure dam, and a gated control structure 1,088 feet long with riprapped approach channels and a sill at present bottom depth (see Figure 4). The complex would provide a cross-sectional area of flow equal to about 35 percent of the natural cross section and would allow for passage of over 90 percent of the natural tidal prism. The Chef Menteur complex would consist of an earthen closure dam across the existing channel, barrier levees, a bypass channel for the GIWW, a navigational floodgate on a new channel, and a 612-foot gated control structure astride another new channel (see Figure 3). The sill of the control structure would be 10 feet above the floor of the approaches. The control structure would provide a cross-sectional area of flow equal to approximately 43 percent of the natural cross section of the pass and would allow for passage of over 90 percent of the natural tidal prism. The Seabrook complex would consist of a navigational lock, a control structure, and a closure dam (see Figure 2). The only work that has been accomplished on the barrier complexes is the GIWW bypass channel.

4.4.1.2. The Chalmette Area Plan is a levee system which would protect the populated areas of St. Bernard Parish and inclose 16,312 acres of marsh (see Plate 4). All first lifts of this levee system have been completed except a short portion near Florida Avenue which is under construction. Table 4.2 shows the height and width of the various levee reaches and describes the method of construction. There are existing navigable floodgates in Bayous Bienvenue and Dupre which normally remain in the open position to allow navigation, gravity drainage, and tidal exchange to the inclosed marshes. A gravity drainage structure is planned at Creedmore Canal. Borrow material for construction would be taken from the Mississippi River-Gulf Outlet (MR-GO), the GIWW, and existing pits along the south reach of the levee.

4.4.1.3. The levees protecting the IHNC are described in Table 4.2. All first lifts have been completed.

4.4.1.4. The New Orleans East area, shown on Plate 6, would be protected by levees with dimensions described in Table 4.2. This system inclosed 13,000 acres of marsh. All first lifts are completed. There are four small gravity drainage structures with both flap and sluice gates in the South Point to GIWW reach of this levee system. The flap gates are normally closed and only allow drainage out of the inclosed marsh during and immediately after heavy rains. Borrow material for the back levee would be taken from existing pits. Hauled clay probably would come from pits in the Slidell area.

4.4.1.5. The Citrus Back and Lakefront, New Orleans Lakefront, Jefferson Lakefront, and St. Charles levee systems are shown on Plate 8 and described in Table 4.2. "Riprap" foreshore protection will be provided between the IHNC and Paris Road segment of the Citrus lakefront levee and along the Citrus Back. This will require the excavation of shallow, lakeside floatation channels to enable the "riprap" material to be barged in.

4.4.1.6. In Orleans Parish, there are three major outfall canals flanked by return levees which tie into pumping stations at the heads of the canals. These return levees are inadequate in terms of grade and stability. Several alternatives are being considered; however, no specific solution has been finalized with the local agencies.

4.4.1.7. The existing seawall in front of the town of Mandeville would be renovated and strengthened (see Plate 8).

4.4.1.8. IMPLEMENTATION RESPONSIBILITIES. Since the Seabrook complex would not only be part of the hurricane protection project, but is also an authorized feature of the MR-GO navigation project, 50 percent of its first costs and all operation and maintenance costs are allocated to MR-GO. All other features of the Barrier Plan are allocated to the hurricane protection project. The Federal Government would pay 70 percent of the first costs and non-Federal interests would be

TABLE 4.2
LEVEE DIMENSIONS AND TYPE

| | BARRIER PLAN | | HIGH LEVEL PLAN | | |
|---|---|---|---|---|---|
| | Final Levee | | | | |
| REACH | Height (feet) | Width (feet) | Height (feet) | Width (feet) | TYPE OF LEVEE AND PREPROJECT CONDITION OF LAND |
| Chalmette North | 14 | 500 | 14 | 500 | Hydraulic fill on existing GIWW dredged material. |
| Chalmette East | 17.5 | 500 | 17.5 | 500 | Hydraulic fill on existing MR-GO dredged material. |
| Chalmette South | 16.5-17.5 | 250-500 | 16.5-17.5 | 250-500 | Hydraulic and hauled clay fill on existing levee first built for this project. |
| IHNC East and West | 13-14 | 20-55 | 13-14 | 20-55 | I-wall on hauled clay base; some hauled clay levee only. Both on IHNC dredged material. |
| New Orleans East Back | 17.5 | 300-500 | 17.5 | 300-500 | Hydraulic fill on locally built levee. |
| South Point-GIWW | 12.5-14 | 70-146 | 13.5-15 | 130-176 | Hauled clay fill on locally built levee. |
| New Orleans East Lakefront | 14 | 190 | 16.5 | 272 | Hauled clay fill on locally built levee. |
| Citrus Lakefront | 13.5 | 85 | 13.5-15 | 85 | Hauled clay fill on locally built levee. I-wall on hauled clay base with barge berm.1/ Floodwall at Lincoln Beach. Foreshore protection. |
| Citrus Back | 14 | 300 | 14 | 300 | Hydraulic fill on existing levee. Foreshore protection. |
| New Orleans Lakefront | 12 | 60 | 14.5 | | Hauled clay fill on existing levee. I-wall on levee with barge berm. 1/ Floodwall at Lakefront Airport, Seabrook Beach, American Standard, Pontchartrain Beach, and Orleans Marina. |
| Jefferson Lakefront | 10 | 180-240 | 14 | 686 | Hydraulic fill on existing Federal levee. |
| Jefferson-St. Charles Boundary | 9-11 | | 14 | 686 | Hydraulic fill on existing Federal levee. |
| St. Charles at Airline Highway | 11.5 | 180 | 13.5 | 238 | Hauled clay fill with floodwall in restricted areas. |

1/ The most recent engineering studies indicate that hauled clay may be less costly than an I-wall with barge berm. If such a design change is made, a Supplemental Information Report will be prepared.

responsible for the remaining 30 percent. All the annual operation and maintenance costs would be borne by non-Federal interests.

4.4.1.9. MITIGATION. Project impacts are being minimized to the greatest degree possible through the following actions: use of existing levee alinements to the maximum extent feasible; use of I-wall, T-wall, or other floodwall type design to minimize levee widths in sensitive areas where feasible; use of silt curtains, turbidity diapers, retainment dikes or other turbidity control devices where possible; and provision of erosion control to intermediate levee lifts. Unavoidable environmental impacts would have to be mitigated by various compensation measures.

### 4.4.2. HIGH LEVEL PLAN DESCRIPTION

4.4.2.1. This plan would raise levees and floodwalls to a height sufficient to protect against hurricane surges from Lakes Pontchartrain and Borgne. The design for some features (Chalmette Area Plan, IHNC East and West levees, Citrus Back levee, New Orleans East Back levee, and Mandeville Seawall) is identical to that under the Barrier Plan because these features function independently of barrier structures. All other levee reaches for the High Level Plan are similar in alinement to the Barrier Plan, but are higher and wider because the water levels in Lake Pontchartrain would be higher without the barriers. Table 4.2 indicates the elevation, width, and method of construction of each reach. Plate 9 shows the location of the reaches. Only minimal modification of the four existing structures in the South Point-to-GIWW reach is expected. The same problems involving the grade and stability of the outfall canal return levees as described in paragraph 4.4.1.6. would exist. The hydraulic fill for the Jefferson Parish levee would be obtained from an in-lake borrow pit to be located approximately 2,500 feet offshore and parallel to the shoreline. These borrow sites would be discontinuous and approximately 9 miles in length, 500 feet in width, and 60 feet in depth National Geodetic Vertical Datum (NGVD).[1/] Recent hydraulic analysis of water movements in Lake Pontchartrain have indicated that, even during extreme weather conditions (hurricanes), the bottom waters of a 60-foot borrow pit would not mix with adjacent Lake Pontchartrain waters. Further consideration will be given to physical configuration, orientation and side slope pitch of the proposed borrow pits in order to expedite filling of the pits and, thereby, reduce the probability of sustained water quality impacts.

---

[1/] Unless otherwise noted, all elevations in this report herein are expressed in feet referenced to National Geodetic Vertical Datum, formerly referred to as mean sea level.

4.4.2.2. IMPLEMENTATION RESPONSIBILITY. The legislative authority for this project specifies that the costs be shared, with the Federal Government bearing 70 percent of the first costs and non-Federal interests paying 30 percent. All annual operation and maintenance costs would be the responsibility of non-Federal interests.

4.4.2.3. MITIGATION. As previously noted, to properly estimate mitigation needs, all construction impacts associated with the project (from start to completion) have been considered.

4.4.2.4. The impacts associated with the post-1984 completion of both the Barrier Plan and the High Level Plan are noted in Tables 6.1, 6.2, and 6.3. On an annualized basis, approximately 32 acres of brackish/saline marsh and 106 acres of cypress-tupelo swamp would be lost due to completion of the High Level Plan. Comparable numbers for completion of the Barrier Plan would be 1,283 acres of brackish/saline marsh and 92 acres of swamp. Annualized losses of 740 acres of brackish/saline marsh and 81 acres of fresh/intermediate marsh have already occurred between 1979 and 1984. Thus, to fully mitigate for the Barrier Plan, it would be necessary to mitigate for an annualized loss of 81 acres of fresh/intermediate marsh, 2,023 acres of brackish/saline marsh, and 92 acres of swamp. The High Level Plan would be fully mitigated by replacing the habitat units associated with an annualized loss of 81 acres of fresh/intermediate marsh, 772 acres of brackish/saline marsh, and 106 acres of swamp. In addition, it would be necessary to mitigate for the annualized loss of 431 acres of lake bottoms with the High Level Plan or 279 acres with the Barrier Plan.

4.4.2.5. In order to mitigate these wetland losses, various plans are being developed. One plan would be to manage various marshes in St. Bernard Parish (see Plate 12). Without management, these marshes would deteriorate over time. Mitigation measures would include the construction of a series of shallow water distribution ditches, low-level dikes and water-control structures.

4.4.2.6. Another concept would involve providing protection to marsh immediately adjacent to Lake Pontchartrain in St. Charles Parish, Orleans Parish, and in the Manchac Wildlife Management Area through shoreline stabilization. Management of wetlands in St. Charles Parish will also be considered (see Plate 12). Reestablishment of tidal exchange to all or part of the area of New Orleans East east of the Maxent Canal alinement will be considered. Filling of the Chef Menteur Bypass Channel or similar work in that area will also be studied.

4.4.2.7. While still building the Barrier Plan in 1976, extensive marsh areas near Chef Menteur Pass were diked for future disposal. After the court injunction, these dikes were breached reestablishing tidal exchange. Many of the borrow canals were plugged to prevent erosion. Thus, these areas have been restored to a great extent. In addition, a borrow pit near Yscloskey utilized for levee construction has been

modified to act as a controlled release reservoir to benefit fish and wildlife production when water levels are normally low in the adjacent marshes (see Plate 12).

4.4.2.8. A separate Mitigation Plan/EIS is being prepared. During the summer and early fall of 1984, a series of meetings and workshops will be held with interested parties. The plan should be completed and ready for review by higher authority within the Corps of Engineers by early 1985. Public review is scheduled for the summer of 1985 and filing of the final EIS on mitigation should occur early in 1986. Our goal is to fully mitigate for all construction impacts of the project. One manner in which mitigation needs will be determined is through the Habitat Evaluation Procedure of the USFWS.

## 4.5. COMPARATIVE IMPACTS OF ALTERNATIVES

The following Table 4.3., Comparative Impacts of Alternatives, describes in a comparative form the base and without condition, the impacts of the detailed plans on significant resources, and plan economic characteristics. More detailed information on the impacts described in this table are described in Section 6, Environmental Effects.