Plan, or under future with no additional Federal action conditions. Thus, the High Level Plan should not impact any blue list species that utilize forested areas; although by 2100, most such species would be gone from the area of potential construction impact, due to lack of habitat.

6.1.8.2. BARRIER PLAN. Blue list species that use marsh habitat could be moderately impacted by the net loss of 837 more acres of marsh. As described above, species utilizing forested habitat would not be affected by the Barrier Plan.

## 6.1.9.   RECREATION

6.1.9.1. HIGH LEVEL PLAN. Implementation of the High Level Plan would adversely impact more lakeshore recreation than the Barrier Plan. The linear impact zone would disrupt land-based recreational features in proximity to the shoreline. Some hunting land would also be affected. Localized turbidity would impact the sport fishing resource in the vicinity of work during construction. The Jefferson Parish lakefront area would lose the 10.5-mile Jefferson Parish National Recreational Trail and its associated uses. Potential project impacts to the Williams and Bonnabel boat launch complexes would be eliminated with design modifications, such as constructing a floodwall around the site. The existing boat launch in the vicinity of the Jefferson Downs Race Track would be lost due to construction. This two-lane boat ramp is in a state of disrepair and does not justify costly levee alterations.

6.1.9.2. Development of the proposed Bucktown and Causeway sites has not been initiated. Both sites would be affected by the High Level Plan, and it can be assumed that the proposed developments would not be implemented as originally intended unless additional modification to the levee design is made.

6.1.9.3. The project would not impact most of the recreational activities on the New Orleans Lakefront; however, facilities existing in close proximity to the levee work either would be destroyed or avoided by design modification of the levee. There is concern over the future of one covered picnic shelter in the vicinity of Beauregard Avenue and Lakeshore Drive. This facility is located near the existing levee, and design modification to the levee would be necessary. Three children's play areas, two of which are located in an area of tall pine trees, would be lost due to sloping and grading of the new levee. The 72 picnic tables are not permanent structures and could be individually relocated. The 18 boat launching lanes located at the Seabrook bridge would not be affected. In Orleans Parish, activities that occur between the roadway and the lake's edge, such as picnicking and fishing, would not be impacted by levee work. Casual walking on the levee and access across the crown would be disturbed during construction and circulation restricted after construction due to the placement of an I-wall in the

levee crown. Many trees in the vicinity of work which have an esthetic value would be lost. The proposed levee in this area includes a barge berm which would have a wide flat crown. Upon completion, the levee crown would have a recreational potential as a jogging or hiking trail. The barge berms offer the potential for landscaping and recreational development. Facilities and unique areas lost due to construction would be restored to their preproject condition.

6.1.9.4. The numerous private summer camps in the Citrus Lakefront area are not located within the levee construction right-of-way and should only be affected by possible restricted access at times. The project would impact the minimal fishing and crabbing in the area during construction (see Volume II, Appendix C, Section XI, Figure 1 for location of existing and proposed recreational facilities).

6.1.9.5. Turbidity due to construction of levees would be minimal and would not significantly impact the fishing experience. The High Level Plan would have a negative impact on potential man-days attributed to recreational fishing. The USFWS has estimated 712 man-days valued at $2,776 and 265 man-days of hunting valued at $2,894 would be lost due to project construction. Consult the USFWS Final Coordination Act report, Volume II, Section XIV, Table 8.

6.1.9.6. Sport hunting and waterfowl hunting would be adversely affected under this plan. In the year 2100, compared with future with no additional Federal action, 86 man-days of small game hunting and 209 man-days of large game hunting, which includes waterfowl hunting, would be lost.

6.1.9.7. Project-induced impacts on recreational man-days would predominately occur in the St. Charles, Jefferson, and Orleans Parishes lakefront areas. Annual man-days of recreation currently total 765,207. Projected annual use for the project life is assumed to remain constant. If no design modifications are made to the levee design, 317,852 annual man-days of recreation would be lost by the year 2100. Design modifications of the levee at Williams Boulevard and Bonnabel Boulevard in Jefferson Parish, and in the vicinity of one picnic shelter in Orleans Parish being investigated would save 201,813 annual man-days. A detailed analysis showing the calculations of these affected man-days is provided in the Environmental Resources Appendix, Section IX.

6.1.9.8. There would be no impact to wildlife management areas or refuges.

6.1.9.9. BARRIER PLAN. Implementation of the Barrier Plan would adversely affect water-oriented recreation in close proximity to the barrier complexes. Construction of navigable structures at the two passes would reduce the channel width, at times creating a bottleneck effect for recreational boats. Depending upon the size of vessels

passing through, it might not be possible for two or more sailboats to pass at the same time.

6.1.9.10.  Short-term localized turbidity would be evident in the vicinity of each barrier complex during and shortly after construction, adversely affecting recreational fishing.  As discussed in paragraph 6.1.5.10., sportfishing, shrimping, and crabbing would not maintain their current levels.  A reduction in the number of man-days attributed to sportfishing and related activities would result.  The Barrier Plan would have a negative impact on potential man-days attributed to recreational fishing.  USFWS has estimated that 16,793 man-days of sportfishing valued at $65,493 and 922 man-days of hunting valued at $9,526 (total 17,715 man-days and $75,019) would be lost due to project construction.  Consult the USFWS Coordination Act Report, Volume II, Section XIV, Table 8.

6.1.9.11.  Small and large game hunting, including waterfowl hunting, would be adversely affected under this plan.  In the year 2100, compared with future with no additional Federal action, 111 man-days of small game hunting would be gained; however, 375 man-days of large game, which includes waterfowl hunting, would be lost.  Additional information dealing with quantification and comparison of plans can be found in the Recreation Section of the Environmental Resources Appendix.

6.1.9.12.  There would be no impact on wildlife management areas or refuges.

6.1.10.  **NATIONAL REGISTER OF HISTORIC PLACES**

6.1.10.1.  HIGH LEVEL PLAN.  Implementation of this plan would have a positive effect on the numerous National Register properties located within the existing and proposed levee system by protecting them from hurricane-related flood damage.  The renovation of the Mandeville seawall would protect it from failure during hurricane or other storm generated wave action and, thus, protect the three National Register properties located on Lakeshore Drive and the proposed National Register district from erosion and flood damages.

6.1.10.2.  The plan would not adversely impact any resource currently listed in or determined eligible for listing in the National Register. Most of the project impact areas have been covered by cultural resources surveys.  The remote sensing survey of offshore borrow areas located three anomaly clusters which may represent significant historic remains in the Howze Beach area and four such anomaly clusters in the Jefferson borrow area.  We are studying the feasibility of avoiding project impacts on these clusters.  If avoidance is not feasible, the anomalies would be tested to determine their significance, and appropriate mitigative steps, if required, would be taken.

6.1.10.3. BARRIER PLAN. Construction of this plan would also have a positive effect on National Register properties located within the levee system by protection from hurricane-related flood damage. Additionally, this plan would reduce flood heights in Lake Pontchartrain and, thus, provide some measure of protection for the numerous National Register properties located along the fringes of the lake. These include the three lighthouses, Forts Pike and Macomb, archeological sites 16ST1 and 16SJB2, and the three properties and proposed district in Mandeville. Protection to Mandeville would also be provided by renovation of the seawall which would protect it from failure during hurricane wave action. The possible adverse effects of this plan would include impacts on the three anomaly clusters located by remote sensing surveys in the Howze Beach borrow area and possible visual impacts of the Rigolets and Chef Menteur barrier complexes on Forts Pike and Macomb, respectively.

## 6.2. SECTION 122 ITEMS

Section 122 of the River and Harbor and Flood Control Act (Public Law 91-611) provides a broad outline of the basic and minimum social, economic, and environmental factors to be considered in evaluating the impacts of water resource development. In addition to natural resources, these impacts include such things as property values, employment, and businesses, esthetic values, and community cohesion. For an additional discussion see Appendix B, Exhibit 2, Socioeconomic Assessment.

### 6.2.1. MINERALS

6.2.1.1. HIGH LEVEL PLAN. Gas pipelines would be relocated to provide passage through hurricane protection levees. This would mean temporary disruption in transport of gas or oil during relocations.

6.2.1.2. BARRIER PLAN. Similar to the High Level Plan.

### 6.2.2. AIR QUALITY

6.2.2.1. HIGH LEVEL PLAN. Emissions from machinery and dust created during construction would slightly degrade air quality from intermittent construction activities during the first quarter of the project. This impact would be minor and temporary.

6.2.2.2. BARRIER PLAN. Direct construction impacts would be similar for this plan.

### 6.2.3. NOISE

6.2.3.1. HIGH LEVEL PLAN. This plan would increase noise levels within the area during construction. Levee construction would take place in segments. Noise impacts would therefore last no longer than a month at any one location. Because most residences are more than 100 feet from

the construction sites, construction noise levels would be decreased by
at least 26 decibels inside the houses (Bolt, et al., 1971).

6.2.3.2. BARRIER PLAN. Same as impacts noted above.

6.2.4. **FLOOD CONTROL**

6.2.4.1. HIGH LEVEL PLAN. Completion of the project would facilitate
the flood protection of existing developments, as well as currently
undeveloped areas which have been planned for development by both public
and private interest.  In addition, protection would be afforded the
east bank of St. Charles Parish south of Airline Highway.  No additional
hurricane protection would be provided to the north shore area of Lake
Pontchartrain.

6.2.4.2. BARRIER PLAN. Similar to the High Level Plan, except some
degree of protection would be provided to the north shore area of Lake
Pontchartrain.

6.2.5. **PROPERTY VALUES**

6.2.5.1. HIGH LEVEL PLAN. The additional amount of flood protection
that would be provided by the project would increase property values
within the study area.

6.2.5.2. BARRIER PLAN. Impacts would be similar to the High Level
Plan; however, additional benefits could be realized from the protection
afforded the north shore.

6.2.6. **BUSINESS AND INDUSTRIAL ACTIVITY**

6.2.6.1. HIGH LEVEL PLAN. This plan would provide additional flood
protection for existing and anticipated business and industrial
activities.  More incentive would exist to accelerate development of the
Almonaster-Michoud Industrial District.

6.2.6.2. BARRIER PLAN. These impacts would be similar to those for the
High Level Plan with additional development incentive for the protected
area of the north shore.  Conversely, this plan is perceived by some as
foreclosing certain water-based development opportunities on the north
shore.

6.2.7. **EMPLOYMENT**

6.2.7.1. HIGH LEVEL PLAN. Construction of the project would generate
additional employment, resulting in some employment benefits.  Although
such benefits were not included in the economic analysis of the project,
they were estimated to provide an indication of this impact on the local
economy.  The average annual employment benefits attributable to project
construction are estimated at $4,240,000.  Long-term employment benefits
are expected to be minor.

6.2.7.2. BARRIER PLAN. Benefits to employment would be similar to the High Level Plan but for a slightly longer term. These construction related employment benefits are estimated on an average annual basis to be $5,360,000.

## 6.2.8. HOUSING

6.2.8.1. HIGH LEVEL PLAN. The level of hurricane and flood protection to the New Orleans metropolitan area would be increased. This would result in benefits to approximately 160,000 dwellings. Future housing developments would receive benefits from hurricane protection. For further detail refer to Appendix B, Economics.

6.2.8.2. BARRIER PLAN. This plan would have similar impacts on housing; however, 167,000 units (including some on the north shore) would receive flood protection benefits.

## 6.2.9. ESTHETIC VALUES

6.2.9.1. HIGH LEVEL PLAN. During construction of this plan, esthetics along the New Orleans and Jefferson Parish lakefronts would be impaired. The scenic vistas along the lakefront as well as greenspaces, parks, and other recreational areas along the shoreline would be temporarily degraded. The esthetics of these areas would be greatly reduced due to unsightly stockpiling of fill material, excavation activities, and other construction activities associated with levee building. Most of these impacts would be temporary and, upon completion of construction and landscaping, should result in additional greenspaces, recreational areas, and scenic vistas.

6.2.9.2. BARRIER PLAN. The esthetics of the natural coastal passes would be temporarily altered through construction activity and permanently affected by the placement of barriers. The bypass channels, borrow, and disposal areas associated with barrier construction would contribute to the degradation of the naturalness of the marsh vistas. The barriers themselves would detract from the natural openness of the passes as well as hinder their navigability. The disposal sites would be greatly elevated above the normal marsh level and would be void of vegetation, resulting in an unpleasing disruption of the panoramic view normally afforded in a marsh vista. However, within a year these areas should become revegetated with plants indicative of more upland areas; therefore, these areas would culminate in a somewhat reduced long-term visual impact.

## 6.2.10. COMMUNITY COHESION

6.2.10.1. HIGH LEVEL PLAN. The environmental community is concerned over the potential project-induced development in New Orleans East beyond the Maxent Canal. The fact that the community generally favors this plan, plus the additional flood protection and eventual increased

recreational space along the lakefront provided by this plan, minimizes the impact on community cohesion.

6.2.10.2. BARRIER PLAN. Community cohesion would be increased because of additional flood protection. Environmental opposition to the Barrier Plan is strong.

## 7. LIST OF PREPARERS

The following people were primarily responsible for preparing this Environmental Impact Statement:

| NAME | DISCIPLINE/EXPERTISE | EXPERIENCE | ROLE IN EIS PREPARATION |
|---|---|---|---|
| Joseph L. Dykes | Civil Engineer | 15 years, planning studies, New Orleans District | Project Manager |
| Lynn Devaul | Civil Engineer | 5 years, planning studies, New Orleans District; 2 years, engineering studies, Metcalf & Eddy | Project Manager |
| Larry Hartzog | Fisheries Biologist | 5 years, environmental studies, New Orleans District; 4 years, fisheries research, Florida Game and Freshwater Fish Commission; 2 years, water quality analyst, Hercules Chemical | EIS Coordinator, Sections 5, 6, and 9 of EIS. |
| Robert D. Lacy | Regional Economist | 13 years, economic studies, New Orleans District | Preparation of general descriptions of socio-economic conditions and socioeconomic assessments of items required by Section 122 of the River and Harbor and Flood Control Act of 1970. |
| Nicholas G. Constan | Regional Economist | 15 years, economic studies, New Orleans District | Compiled and completed the economic analysis. |
| Everett K. Johnson, Jr. | Regional Economist | 14 years, economic studies, New Orleans District | Overall preparation of economics portion. |
| Suzanne R. Hawes | Marsh Ecologist | 12 years, environmental studies, New Orleans District | Sections 1, 3, 4, 7, and 8 of EIS, Review of EIS, Land Use projections. |
| E. Scott Clark | Wildlife Biologist | 4 years, environmental studies, New Orleans District | Endangered Species Assessment, Coastal Zone Management Consistency Determination |
| James Warren | Environmental Engineer | 6 years, environmental engineer, New Orleans District | Effects on water quality |
| Stephen F. Finnegan | Landscape Architect | 7 years, landscape architect, New Orleans | Effects on recreation |
| Michael E. Stout | Archeologist | 7 years, archeologist, New Orleans District | Effects on cultural resources |
| Henry P. Glaviano | Technical Writer/Editor | 13 years, technical writer/editor, New Orleans District; 4 years, technical writer/editor, Boeing Company | Review and Editing |

**Intentionally Blank**

**Page EIS - 70**

# 8. PUBLIC INVOLVEMENT

## 8.1. PUBLIC INVOLVEMENT PROGRAM

8.1.1. There has been a long history of public involvement in this project. A formal public meeting was held in New Orleans on 15 March 1956 during formulation of the original plan. Subsequently, the US Army Corps of Engineers has participated in numerous public affairs of various types at which project purposes, features, and impacts have been exposed to widespread public scrutiny and analysis. In 1972, a draft Environmental Impact Statement (EIS) was released to Federal, state, and local agencies, and to the interested public for review and comment. Responses to all comments were published in the 1975 final EIS. When the court enjoined construction of the barriers until impacts were better described, several Federal agencies (the US Fish and Wildlife Service, National Marine Fisheries Services, Louisiana Department of Wildlife and Fisheries, and US Environmental Protection Agency) provided input into the Scope of Work for a baseline study of Lake Pontchartrain and its passes. This study was completed in 1980 by the Louisiana State University (LSU) Center for Wetlands Resources. An environmental consultant for the Corps, Dr. Eugene Cronin, prepared a Scope of Work for a study to characterize the passes to assess barrier impacts. The same agencies approved this Scope of Work. Once the contract was awarded, a Technical Advisory Group composed of these same agencies was formed to help oversee the work of the contractor (LSU Center for Wetlands Resources). In 1981, when the tentative decision was made to choose the High Level Plan instead of the Barrier Plan, the contract was cancelled.

8.1.2. Public meetings to discuss the tentatively selected High Level Plan were held in New Orleans, Louisiana, on 21 November 1981 and 12 April 1984. The four major issues raised at the public meetings concerned the levee alinement in New Orleans East, the levee alinement in St. Charles Parish, the proposed borrow pits in Lake Pontchartrain for the Jefferson Parish Lakefront levee, and mitigation plans.

8.1.3. A number of people stated that they preferred the Maxent Canal alinement to the authorized alinement selected for New Orleans East. Choosing the Maxent Canal alinement would exclude 13,000 acres of wetlands from the protected area at an additional cost of $70 million. The Corps does not feel this aditional expenditure is justified. These wetlands have been excluded from normal tidal exchange by a levee system for over 20 years and the proposed levee would not change the existing drainage patterns.

8.1.4. Concern over the levee alinement in St. Charles centered around the exact location of the levee and the choice of alinements. Some preferred the south of Airline Highway alinement because no wetlands would be inclosed. The south alinement is more costly than the north alinement, however. In addition, the proposed levee north of Airline

Highway would have culverts to maintain the existing flow patterns. The levee alinement north of and parallel to the Airline Highway would be more precisely determined in the design stage. Requests to locate the levee as close to the highway as possible will be considered.

8.1.5. The third item concerned the possible adverse environmental impacts of the borrow pits for the Jefferson Parish levee. Alternative methods of construction and levee designs were considered but were ruled out as too costly or as being of lesser design integrity. The New Orleans District is continuing to investigate ways of minimizing the impacts and will implement measures of reasonable cost.

8.1.6. Many agencies and individuals were concerned that no mitigation plan had been developed to accompany this supplemental EIS. The plan is being developed and an additional public meeting was held in June of 1984; the mitigation report and an accompanying EIS will be complete by early 1986.

## 8.2. REQUIRED COORDINATION

Circulation of the draft supplement to the EIS in December 1983 accomplished the remaining required coordination with the National Park Service and State Historic Preservation Officer. Circulation to the list of agencies, groups, and individuals mentioned in the following paragraph will satisfy requirements of the National Environmental Policy Act.

## 8.3. STATEMENT RECIPIENTS

All members of Congress, Federal, state, and local agencies, environmental groups, and libraries listed below have been furnished copies of the draft supplemental main report/EIS (Volume 1) and appendixes. A notice of availability of the draft supplemental main report/EIS has been sent to all others thought to have an interest in the study.

**FEDERAL**

Honorable J. Bennett Johnston, US Senator

Honorable Russell B. Long, US Senator

Honorable Lindy (Mrs. Hale) Boggs, US Congresswoman

Honorable Robert L. Livingston, US Congressman

Honorable William "Billy" Tauzin, US Congressman

Department of the Interior, Office of Environmental Project Review

US Environmental Protection Agency, The Administrator

US Environmental Protection Agency, Regional EIS Coordinator, Region VI

US Department of Commerce, Director, Office of Ecology and Conservation

US Department of Commerce, National Oceanic and Atmospheric Administration, National Marine Fisheries Service, Southeast Region

National Marine Fisheries Service, Environmental Assessment Branch

US Department of Agriculture, Washington, DC

US Department of Agriculture, Southern Region, Regional Forester, Forest Service

US Department of Energy, Director, Office of Environmental Compliance, Washington, DC

Federal Emergency Management Administration, Washington, DC

Soil Conservation Service, State Conservationist

US Department of Transportation, Deputy Director of Environmental and Policy Review

Federal Highway Administration, Division Administrator

US Department of Health and Human Services, Washington, DC

US Department of Housing and Urban Development, Regional Administrator, Region VI

Advisory Council on Historic Preservation, Washington, DC

Advisory Council on Historic Preservation, Golden, Colorado

**STATE**

Louisiana Department of Health and Human Resources, Office of Health Services and Environmental Quality

Louisiana Department of Transportation and Development, Office of Public Works, Assistant Secretary

Louisiana Department of Highways, Public Hearings and Environmental Impact Engineer

Louisiana Department of Wildlife and Fisheries, Ecological Studies Section

Louisiana Department of Wildlife and Fisheries, Secretary

Louisiana Department of Natural Resources, Coastal Resources Program

EIS-73

Louisiana Department of Natural Resources, Office of Environmental Affairs, Water Pollution Control Division

Louisiana Department of Natural Resources, Division of State Lands

Louisiana Department of Commerce, Research Division

Louisiana Department of Culture, Recreation, and Tourism, State Historic Preservation Officer

Louisiana Department of Culture, Recreation, and Tourism, Office of State Parks

Louisiana Department of Natural Resources, Office of Environmental Affairs

Louisiana Department of Natural Resources, Office of Forestry

Louisiana State Planning Office, Policy Planner

Louisiana State University, Department of Geography and Anthropology, Curator of Anthropology

Louisiana State University, Center for Wetland Resources

Louisiana State University, Coastal Studies Institute, Library

Department of Natural Resources, Division of State Lands

Governors Coastal Protection Task Force

Jefferson Levee District

Orleans Levee District

Lake Borgne Levee District

Pontchartrain Levee District

**LOCAL AGENCIES**

Metropolitan Regional Clearinghouse, New Orleans

President, Plaquemines Parish Commission Council

President, St. Bernard Parish Police Jury

St. Tammany Parish Police Jury

Mayor, City of New Orleans

Mayor, Town of Mandeville

Regional Planning Commission

Ad Hoc Committee on Lake Pontchartrain

**ORGANIZATIONS**

Ecology Center of Louisiana, Inc., President

Orleans Audubon Society, Mr. Barry Kohl

Environmental Defense Fund

Save Our Wetlands, Inc.

Dr. Oliver Houck, Tulane Law School

**ACADEMIC LIBRARIES**

Delgado Junior College

Dillard University

Louisiana State University

Loyola University

Tulane University

University of New Orleans

**PUBLIC LIBRARIES**

Ascension Parish Library

Jefferson Parish Library

Orleans Parish Library

St. Charles Parish Library

St. James Parish Library

St. John the Baptist Parish Library

St. Tammany Parish Library

Tangipahoa Parish Library

## 8.4.  PUBLIC VIEWS AND RESPONSES

8.4.1.    The major public view that influenced this study was oppo-
sition to the Barrier Plan.   Several Federal agencies, environmental
groups, and some citizens on the north shore opposed the barriers
because they either feared the impacts on the biology and hydrology of
Lake Pontchartrain or feared increased flooding on the north shore.
These views were incorporated into the decision making process which
resulted in eliminating consideration of the Barrier Plan and choosing
the High Level Plan as the Recommended Plan.

8.4.2.    Another public view that influenced alternative selection was
the opposition to the St. Charles Parish Lakefront levee which would
have impacted 26,000 acres of wetlands north of Airline Highway.
Environmental groups and the US Fish and Wildlife Service were the major
proponents of preservation of this marsh.  The selected alinement in the
High Level Plan leaves these wetlands in their natural state.

## 8.5.  STATEMENT COMMENTATORS

**FEDERAL**

Department of Commerce, National Oceanic and Atmospheric Administration,
National Ocean Service (24 February 1984)

Department of Commerce, National Oceanic and Atmospheric Administration,
National Marine Fisheries Service (16 February 1984)

Department of Commerce, National Oceanic and Atmospheric Administration,
National Marine Fisheries Service (24 February 1984)

Department of Commerce, National Oceanic and Atmospheric Administration,
National Weather Service (26 January 1984)

Environmental Protection Agency, Region VI

Gulf of Mexico Fishery Management Council

Department of Housing and Urban Development, Fort Worth Regional Office

Department of the Interior, Office of the Secretary, Office of
Environmental Project Review (29 February 1984)

Department of the Interior, Fish and Wildlife Service (8 March 1984)

Department of Transportation, Federal Highway Administration
(18 March 1984)

Department of Transportation, Federal Highway Administration
(22 March 1984)

**STATE**

Department of Culture, Recreation and Tourism (16 February 1984)

Department of Culture, Recreation and Tourism (20 February 1984)

Department of Environmental Quality

Department of Natural Resources (28 February 1984)

Department of Natural Resources (19 June 1984)

Department of Transportation and Development, Office of Public Works

Wildlife & Fisheries Statement

**ORGANIZATIONS**

Audubon Society, New Orleans Chapter

Board of Levee Commissioners of the Orleans Levee District

City of New Orleans

Environmental Defense Fund (9 February 1984)

Environmental Defense Fund (6 March 1984)

Geodata Inc.

League of Women Voters of Louisiana

Louisiana Wildlife Federation Inc. (27 February 1984)

Louisiana Wildlife Federation Inc. (1 March 1984)

Regional Planning Commission, Jefferson, Orleans, St. Bernard, St. Tammany Parishes

St. Charles Parish

Sierra Club, Delta Chapter

**INDIVIDUALS**

Mr. Milton Cambre

Ms. Juanita Grimes

Ms. Moira Ford

Mr. Michael Halle

Dr. Oliver Houck

## 8.6. PUBLIC VIEWS AND RESPONSES

Public views expressed to this agency concerning the Lake Pontchartrain Hurricane Protection Project were considered in the preparation of the Draft and Final Supplement to the Environmental Impact Statement for Lake Pontchartrain, Louisiana, and Vicinity, Hurricane Protection Project. As discussed in Section 1.4 of the EIS, several controversial issues may require resolution prior to project implementation. These issues were brought forth at the public meeting. Public views and responses are presented in Appendix D.

## 9. LITERATURE CITED

Bahr, Leonard M. Jr., Jean Pantell Sikora, and Walter B. Sikora, 1980. Macrobenthic Survey of Lake Pontchartrain, Louisiana. 1978. Pages 659-696 in Stone James H. ed. Environmental Analysis of Lake Pontchartrain, Louisiana, Its Surrounding Wetlands and Selected Land Uses. 1980.

Bolt, Beranek, and Newman. 1971. Noise from Construction Equipment and Operations, Building Equipment, and Home Applicances. US Environmental Protection Agency NTID300.1.

Cavit, M. H. 1979. Dependence of Menhaden Catch on Wetland Habitats: A Statistical Analysis. Unpublished report submitted to US Fish and Wildlife Service, Ecological Services Field Office, Lafayette, Louisiana. US Fish and Wildlife Service, Office of Biological Services, National Coastal Ecosystems Team. 12 pages.

Chapoton, Robert B. 1982. Personal Communication (August 17, 1982). National Marine Fisheries Service, Beaufort Laboratory.

Cramer, Glenn W. and John Day, Jr. 1980. Productivity of Swamps and Marshes Surrounding Lake Pontchartrain, Louisiana. Pages 593-645 in Stone, James ed. Environmental Analysis of Lake Pontchartrain Louisiana, Its Surrounding Wetlands and Selected Land Uses.

Danell, R. M. 1961. Trophic Spectrum of An Estuarine Community Based on Studies of Lake Pontchartrain, Louisiana. Ecology 42: 553-568.

Davis, J. T.  B. J. Fotenot, C. E.  Hoenke, A. M. Williams, and J. S. Hughes. 1970. Ecological Factors Affecting Anadromous Fishes of Lake Pontchartrain and Its Tributaries. Louisiana Wildlife and Fisheries Commission, Bulletin No. 9.

Environmental Affairs Unit, Office of Analysis and Planning, City of New Orleans. 1981. Comprehensive Environmental Strategy for New Orleans.

Gambrell, R. P., R. A. Khalid, M. G. Verloo, V. H. Patrick, Jr. 1977. Transformations of Heavy Metals and Plant Nutrients in Dredged Sediments as Affected by Oxidation Reduction Potential and pH. Dredged Materials Research Program, U.S. Army Corps of Engineers.

Gunter, G. 1961. Habitat of Juvenile Shrimp (Family Penaeidae). Ecology 42(3): 598-600.

Levine, Steven J.  1980.  Gut contents of Forty-four Lake Pontchartrain
    Fish Species 1977-1978.  Pages 899-994 in Stone, James H. ed.
    Environmental  Analysis  of  Lake  Pontchartrain,  Louisiana,  Its
    Surrounding Wetlands, and Selected Land Uses, 1980.

Montz,  G.  N.    1974.    Lake  Pontchartrain  and  Vicinity  Hurricane
    Protection Project, Final Environmental Impact Statement prepared
    for New Orleans Army Corps of Engineers District.

Odum,  W.  E.,  J.  C.  Zieman,  and  E.  J.  Heald.   1973.   The Importance of
    Vascular  Plant  Detritus  to  Estuaries.    Pages  91-114  in  R.  H.
    Chabreck ed.   Proceedings of Coastal Marsh and Estuary Management
    Symposium, Louisiana State University, Baton Rouge.

Pisapia,  Ralph  C.   1974.   Biological  Implications  of  Dredge  Holes.   US
    Fish  and  Wildlife  Service,  Division  of  River  Basin  Studies,
    Annapolis, Maryland.

Remane, A. and Schlieper.  1971.  Biology of Brackish Water.  Wiley and
    Sons.  210 pp.

Rogillio,  Howard  E.  and  Brassette,  Richard  S.    1977.    A  Survey  of
    Sportfish  in  Lake  Pontchartrain,  Louisiana  Wildlife  and  Fisheries
    Commission,  New  Orleans,  Louisiana.    Contribution  from  Dingell-
    Johnson Project F-24, Louisiana.

Stone, James H., Nancy A. Drummond, Lawrence L. Cook, Edward C. Theriot
    and Dianne M. Kindstedt.  1980.  The Distribution and Abundance of
    Plankton of Lake Pontchartrain, Louisiana.  1978.  Pages 437-583 in
    Stone,  James  H.  ed.  Environmental  Analysis  of  Lake  Pontchartrain,
    Louisiana, Its Surrounding Wetlands and Selected Land Uses.

Swenson,  Erick  M.    1980.    General  Hydrography  of  Lake  Pontchartrain,
    Louisiana.  Pages 57-157 in Stone, James ed. Environmental Analysis
    of  Lake  Pontchartrain  Louisiana,  Its  Surrounding  Wetlands  and
    Selected Land Uses.

Thompson,  Bruce  A.  and  J.  Stephen  Verret.    1980.    Nekton  of  Lake
    Pontchartrain,  Louisiana  and  Its  Surrounding  Wetlands.    Pages  711-
    825  in  Stone,  James  H.  ed.  Environmental  Analysis  of  Lake
    Pontchartrain, Louisiana, Its Surrounding Wetlands and Selected Land
    Uses, 1980.

Thompson,  Bruce  A.  and  Stone,  James  H.   1980.   Selected Commercial Fish
    and Shellfish Data from Lake Pontchartrain, Louisiana During 1963.
    1975, Some Influencing Factors and Possible Trends.  Pages 1069-1129
    in  Stone,  James  H.  ed.  Environmental  Analysis  of  Lake  Pontchartrain,
    Louisiana, Its Surrounding Wetlands and Selected Land Uses.  1980.

Turner, R. E.   1979.   Louisiana's Coastal Fisheries and Changing
     Environmental Conditions.   Pages 363-370 in J. W. Day, Jr.,
     Dr. R. Culley, Jr., R. E. Turner, and A. J. Mumphrey, Jr., eds.
     Proceedings of the Third Coastal Marsh and Estuary Management
     Symposium.   Louisiana State University Division of Continuing
     Education, Baton Rouge, Louisiana.

US  Army  Engineer  Waterways  Experiment  Station,  CE,  Vicksburg,
     Mississippi.  Effects on Lake Pontchartrain, La., of Hurricane Surge
     Control  Structures  and  Mississippi  River-Gulf  Outlet  Channel;
     Hydraulic Model Investigation, by I. C. Tallant and H. B. Simmons.
     November 1963, viii, 43 pp. and appendix - illus - table.
     (Technical Report No. 2-636)

# RECOMMENDATIONS

I recommend that the existing project plan for hurricane protection for Lake Pontchartrain, Louisiana, and Vicinity, authorized by Public Law 89-298 on 27 October 1965, be modified to provide for the implementation of a Federal project for hurricane protection, in accordance with the plan tentatively selected herein, with such further modifications thereto as in the discretion of the Chief of Engineers may be advisable. These tentative recommendations are made with the provision that, prior to proceeding with redirecting or initiating construction of plan features which vary from that which is provided for by the current plan of improvement, local interests provide adequate supplements to current assurances.

Robert C. Lee
Colonel, Corps of Engineers
District Engineer

153











SCALE OF MILES

LAKE PONTCHARTRAIN, LOUISIANA, AND
VICINITY HURRICANE PROTECTION PROJECT

NEW ORLEANS
LAKEFRONT
OUTFALL CANALS

U.S. ARMY ENGINEER DISTRICT, NEW ORLEANS
CORPS OF ENGINEERS
DECEMBER 1982          FILE NO. H-2-29706

PLATE 5



LAKE PONTCHARTRAIN

N.O. EAST AREA

CITRUS AREA

LEGEND

┼┼┼┼┼┼  Existing Levee

┼┼┼┼┼┼  Existing Levee To Be Modified

┼┼┼┼┼┼  New Levee

┼┼┼┼┼┼  Secondary Levee

⊢┤  Drainage Structure

① Existing Alinement

② Maxent Canal Alinement

▨ New Orleans East, Inc. Permit Area

LAKE PONTCHARTRAIN, LOUISIANA, AND
VICINITY HURRICANE PROTECTION PROJECT

ALTERNATIVE
NEW ORLEANS EAST
ALINEMENT

U.S. ARMY ENGINEER DISTRICT, NEW ORLEANS
CORPS OF ENGINEERS
DECEMBER 1982       FILE NO. H-2-29706

SCALE OF MILES

1   0   1   2   3   4   5

PLATE 6



LAKE PONTCHARTRAIN

LEGEND

Existing Levee

Existing Levee To Be Modified

New Levee

① Lakefront Alinement

② N. Airline Hwy

③ S. Airline Hwy

④ Return Levee Only

Drainage Structure

SCALE OF MILES

1   0   1   2   3   4   5

LAKE PONTCHARTRAIN, LOUISIANA, AND
VICINITY HURRICANE PROTECTION PROJECT

ST. CHARLES PARISH
ALINEMENTS

U.S. ARMY ENGINEER DISTRICT, NEW ORLEANS
CORPS OF ENGINEERS
DECEMBER 1982            FILE NO. H-2-29706

PLATE 7











