# EXHIBIT 7

DAEN-CWP-C (LMNPD-F, 8 Aug 84) 2nd End
SUBJECT: Lake Pontchartrain, Louisiana, and Vicinity Hurricane
Protection Project

HQ, U.S. Army Corps of Engineers, Washington, D.C. 20314-10007 FEB 1985

TO: Commander, Lower Mississippi Valley Division

1. I have reviewed the revised Post Authorization Change (PAC) Notification Report, the Reevaluation Report and Final Supplement I to the Environmental Impact Statement. I find that the High Level Plan will provide the New Orleans area the authorized standard project hurricane level of protection at a total project cost of about $103 million less than the Barrier Plan. Savings in remaining costs would be about $146 million. Remaining benefits of the High Level Plan are about 10% greater than those of the Barrier Plan. Implementation of the High Level Plan will avoid the adverse environmental impacts of construction of the barriers and is environmentally superior to the authorized Barrier Plan. Mitigation concepts are included in the Reevaluation Report and development of a specific mitigation plan is scheduled for completion in 1985. There are no basic differences in the local cooperation requirements of either plan. Therefore, I concur with the recommendations of the New Orleans District and Lower Mississippi Valley Division Commanders and approve the PAC.

2. The Final Supplement I to the Environmental Impact Statement was filed with EPA on 29 November 1984, and given notice in the Federal Register on 7 December 1984. The 30 day administrative review period has expired, and I have reviewed the comments received and have signed the Record of Decision adopting the High Level Plan.

3. Approval authority for the reevaluation report is delegated in accordance with ER 1105-2-10, paragraph 1-5a(3).

4. Development and finalization of a specific mitigation plan should proceed expeditiously.

FOR THE COMMANDER:

1 Encl
wd all Encl
Added 1 Encl
6. ROD

JOHN F. WALL
Major General, USA
Director of Civil Works

CF:
New Orleans Dist.

3

RECORD OF DECISION

Lake Pontchartrain, Louisiana, and Vicinity,
Hurricane Protection Project

I have reviewed recommendations by the New Orleans District
and Lower Mississippi Valley Division Engineers for modifica-
tions to the authorized plan to reduce flood damages from
hurricane-induced storm surges in the portion of the New Orleans
area located generally between Lakes Pontchartrain and Borgne
and the Mississippi River.  The modified (High Level) Plan
recommended includes:

    o  improving the existing hurricane protection levee system
in Orleans and Jefferson Parishes,

    o  improving existing levees and constructing new ones in
St. Bernard Parish,

    o  repairing and rehabilitating the Mandeville Seawall in
St. Tammany Parish,

    o  building a new mainline hurricane levee on the east bank
of St. Charles Parish just north of U.S. Highway 61 (Airline
Highway),

    o  and raising and strenthening the existing levee which
extends along the Jefferson-St. Charles Parish boundary between
Lake Pontchartrain and Airline Highway.

Following review of the views of interested agencies and the
concerned public, I find the plan to be economically justified
and in the public interest.

In addition to a "No Action" alternative and the original
authorized (Barrier) plan, various structural and nonstructural
plans were considered and are described in the Corps of
Engineers final report.  Nonstructural measures such as
flood-forecasting, combined with evacuation; and the National
Flood Insurance Program are currently employed in the study area
and will continue to be employed with or without Federal
action.  There are no other practicable non-structural measures
for improving hurricane protection to the study area.  The
recommended High Level Plan would provide standard project
hurricane level of protection, is the environmentally preferable
plan, and provides greater net national economic development
benefits.

Technical, economic, and environmental criteria used in the formulation of alternative plans were those specified in the Water Resources Council's Principles and Guidelines.  I considered applicable laws, executive orders, regulations, and local governmental plans in evaluating the alternatives.  I found the benefits to be gained with construction of the recommended project to outweigh any adverse effects.  Various approaches to project construction and levee alignment that would avoid or minimize environmental harm resulting from the selected alternative were considered; and a study is underway to complete development of an appropriate mitigation plan which will compensate for significant fish and wildlife losses caused by the recommended plan, thus insuring that all practicable means to minimize environmental harm will be implemented.  As the development of mitigation measures would have no effect on the plan formulation and because of the need to proceed with the construction of hurricane protection measures in the New Orleans area, I have processed the EIS for the modified plan prior to the completion of the mitigation plan.  Based on my review of these evaluations, I hereby approve the High Level Plan.

7 FEB 1985
_____
Date

_____
JOHN F. WALL
Major General, USA
Director of Civil Works

2

# EXHIBIT 8



**LAKE PONTCHARTRAIN, LA.**
**AND VICINITY**
**LAKE PONTCHARTRAIN**
**HIGH LEVEL PLAN**



US _____ PROPERTY OF THE
UN___ ST___S GOVERNMENT

EXHIBIT

E 37

# DESIGN MEMORANDUM NO. 20

## GENERAL DESIGN

# ORLEANS PARISH
# JEFFERSON PARISH

# 17th. St. Outfall Canal
# (Metairie Relief)

### IN TWO VOLUMES
### VOLUME I

## DEPARTMENT OF THE ARMY
NEW ORLEANS DISTRICT, CORPS OF ENGINEERS
NEW ORLEANS, LOUISIANA

## MARCH 1990



**US Army Corps of Engineers**
New Orleans District

RESEARCH LIBRARY
US AR__ ___ ___ER WATERWAYS
EXP__ __ENT STATION
VICKSBURG, MISSISSIPPI

**SERIAL NO.**

lakefront; U-shaped reinforced concrete channel; and total replacement of existing pumping stations and construction of a new station near the lakefront. All of the plans were dropped because of excessive costs.

67. <u>Plan Selection</u>. The task of providing hurricane protection at the 17th Street Outfall Canal presents some unique problems. Unlike Orleans and London Avenue Outfall Canals, the 17th Street Canal is straight from its source, Pumping Station No. 6, to its outfall at Lake Pontchartrain. The canal thus has an unobstructed path for wave transmission from the lake into the canal. There is also considerable raparian development at or near the outfall end of the canal. This development consists primarily of wood framed construction which was built at an elevation below the elevation of the design hurricane. If this development is subjected to the conditions that could occur during a Standard Project Hurricane, it would most likely be destroyed by high water and wave action. The resulting debris, given the direction of wave attack, would pile up at the proposed fronting protection structure. Model study of the proposed structure conducted for London Avenue showed that proper gate operations were very sensitive to entry and exit conditions. Debris could prevent proper operation of the structure. Recognizing this potential the fronting protection plan was designed with a breakwater as an integral part of the plan. The fronting protection structure was formulated and designed with the same objectives as those considered for Orleans and London Avenue Outfall Canals. The structure must provide for maximum flexibility for pumping interior drainage. These objectives were described earlier in this report. The objectives are best accomplished with the use of the butterfly valve gated structure. Detailed cost estimates for the fronting protection plan are contained in Appendix D, Volume I. The total cost for the Butterfly Valve Fronting Protection Plan is estimated to be $20.5 million. This cost is about 1 percent less than the estimated cost for the parallel protection plan. Given the degree of accuracy of a DM scope design and cost estimate, one can consider the plans to have essentially the same cost. The fronting protection plan has inherently a higher maintenance and operational cost than does the parallel protection plan. The parallel protection plan is the preferred plan of the Orleans Levee District and the East Jefferson Levee District. The Sewerage and Water Board of New Orleans prefers the parallel protection plan since it fully accommodates their needs and also has an additional benefit in that work of the Veterans Highway, I-10 and I-610 bridges will improve the conveyance characteristics of the canal. Given all of the factors above, the tentatively recommended Federal plan for the 17th Street Outfall Canal is the Parallel Protection Plan.


ESTIMATE OF COST

68. <u>General</u>. Based on October 1989 price levels, the total estimated first cost for constructing the 17th Street Outfall Canal Parallel Protection Plan is $20,700,000. A cost of $15,975,000 is for the levees and floodwalls feature, $2,247,000 is for Engineering and Design and

# EXHIBIT 9

MOTION:  #5-052186

RESOLUTION:  #5-052186

BY:  President Schneider
     Engineering Committee
     Vice-President Ross

                                        May 21, 1986

                        R E S O L U T I O N

     WHEREAS, the levee on the east side of the Seventeenth

Street Canal is the responsibility of the Board of Commis-

sioners of the Orleans Levee District, and

     WHEREAS, this levee is inadequate to fully protect the

City of New Orleans from flooding in the event of a hurricane,

and

     WHEREAS, the Board of Commissioners of the Orleans Levee

District has resolved to construct improvements to provide

interim flood protection at this vital flood protection levee

and have retained a consultant to prepare plans for the

construction of the interim flood protection, and

     WHEREAS, funds are now available for the cost of con-

struction of the flood protection, and

     WHEREAS, to achieve maximum economy and efficiency in

this construction, the work should be performed in conjunction

with the proposed dredging of the Seventeenth Street Canal

by the Sewerage and Water Board of New Orleans, and

     WHEREAS, the Sewerage and Water Board of New Orleans now

has funds available for the proposed dredging contract and

are interested in performing the work at the earliest possible

date, and

                              -1-

SWB-ED-F0046-001669

-2-

WHEREAS, in order for the interim flood protection work to be fully creditable by the Army Corps of Engineers toward this Board's required portion of the cost of the Lake Pontchartrain and Vicinity Hurricane Protection Plan (High Level Plan) the construction must conform with the Army Corps of Engineers requirements and must be designed and constructed in such a manner that it can be fully incorporated into the final protection plan, and

WHEREAS, the General Design Memorandum for this levee is not scheduled to be completed by the Army Corps of Engineers until November, 1987, and not accepted until February, 1988, and

WHEREAS, the Board of Commissioners of the Orleans Levee District considers it urgent that the plans for the project be completed and construction begin simultaneously with the dredging work of the Sewerage and Water Board of New Orleans.

BE IT HEREBY RESOLVED, That the Board of Commissioners of the Orleans Levee District request the Army Corps of Engineers to expedite work on the General Design Memorandum of the Seventeenth Street Canal Levee so that the flood protection can be provided to the City of New Orleans at the earliest possible date.

AYES: Commissioners Ducote, Ross, Talbot, & Uddo

NAYS: none

ABSENT: none

RESOLUTION ADOPTED: yes

THE FOREGOING IS CERTIFIED TO
BE A TRUE AND CORRECT COPY.

H. B. LANSDEN, SECRETARY
THE BOARD OF COMMISSIONERS
OF THE ORLEANS LEVEE DISTRICT

SWB-ED-F0046-001670

# EXHIBIT 10

This Contract entered into on this day by and between

Orleans Levee District, State of Louisiana
acting by and through William Slatten, President,
and the Board of Levee Commissioners, both of
whom are hereinafter referred to as "District";

and

ModJeski and Masters, Consulting Engineers
Room 510, 1055 St. Charles Avenue
New Orleans, Louisiana 70130
hereinafter referred to as "Engineers"

as follows, to-wit:

Whereas, the District is desirous of accomplishing necessary remedial and/or
upgrading work to restore and/or improve the existing flood protection under its
jurisdiction, and,

Whereas, the services of an Engineering firm are needed to assist with these
projects, all as covered in the following provisions of this Contract;

Now, Therefore, "District" and "Engineer", for the consideration hereinafter
set out, agree as follows:

1. Employment of Engineers:

The District hereby employs the Engineers and the Engineers agree to perform
all necessary professional services hereinafter set forth in Article 2 of this
Agreement.

2. Character and Extent of Services:

The Engineers shall furnish the following work and services; Perform various
Engineering and related services required to accomplish preliminary design
stages to final contract plans and specifications including design reports as
required by the District. An indefinite quantity option Contract is to be used.
Work Packets will be issued to the Engineers under fixed price delivery orders
issued against this Contract. Each Work Packet will be variable, with a minimum
size of $2,000.00. The work required under each Work Packet may consist of one
or more of the following work items:

A.  Site inspection to determine existing conditions of particular flood
protection works being repaired and/or upgraded.

B.  Preparation of design feasibility reports to include alternate cost
comparison for repairing/upgrading any of the existing floodworks.

C.  Engineering Design (Plans and Specifications):

1.  Prepare final design, plans, and specifications sufficient for the
award of construction contracts on proposed, repairs, improvements and additions
to the flood protection system as per Work Packet. It is understood; that final
plans and specifications will not be prepared for any Work Packet, or the
District obligated for payment therefore, until said District has, in writing,
ordered the Engineers to proceed with said final plans and specifications.

MODJESKI
EXHIBIT 3

2.   Attend all negotiations of contracts or openings of bids; review and tabulate contractors' proposals, and make recommendations concerning the award of the contract or contracts.

D.   General Inspection of Construction:

1.   Provide general construction inspection in the field to protect the District's interests in regard to project plans and specifications.

2.   Keep records of all construction quantities and amounts, issue certificates of payment to the contractor and handle the general administration and engineering inspection of the work.

E.   Resident Inspection:

When requested by the District, maintain a responsible representative or representatives on the job with authority to act as agent for the Engineers, as required, for the proper observation of the work.  It is specifically included herein that such inspection of construction will include the services of a qualified fulltime resident field representative or representatives at all times during construction of the facilities.

F.   Furnish the District two (2) copies of final construction plans modified to show changes made during construction.

G.   Assignments:

1.   Assignments will vary in scope to include the various types of work cited above.  The work packets will be issued on an intermittent basis over the one-year period of the contract, and shall require the services of design engineers (civil, structural, etc.) draftpersons, surveyors and miscellaneous support personnel.  The Engineers shall furnish all professional engineering, supervision, labor, plant, transportation, materials and other supplies necessary to perform the required services within the time specified on the delivery order issued for each packet.  All of the above shall be done under professional supervision in accordance with specifications.  The completed work will be delivered to the District's Chief Engineer.

2.   As a minimum, two work packets shall be issued under this contract as follows:

Packet 1 – Feasibility Study and Report – A study of levee improvement work along the 17th Street Outfall Canal required to conform to the Corps of Engineers High Level Plan for Lake Pontchartrain Flood Protection, the study to include the consideration of alternatives for both levee improvements and bridge retrofitting required.  A report of findings with recommendations will be made.

Packet 2 – Final Engineering Design – The preparation of Engineering Designs, Final Plans and Specifications for the bridge retrofitting and any levee improvements as decided upon by the Levee Board.

H.   Changes:

1.   The District may, as any time, by written order, make changes within the general scope of the contract in the services to be performed.  If such changes cause an increase or decrease in the Engineers cost, or time

16

required for, performance of any services under this contract, whether or not changes by any order, an equitable adjustment shall be made and the contract shall be modified in writing accordingly. Any claim of the Engineers for adjustment under this clause must be asserted in writing within 30 days form the date of receipt by the Engineer of the notification of change unless the District grants a further period of time before the date of final payment under the contract.

2. No services for which an additional costs or fee will be charged by the Engineer shall be furnished without the prior written authorization of the District.

## Period of Service:

The contract shall extend a minimum of one full year effective from the date of execution thereof. The Engineers shall be allowed to make any deliveries under this contract (90) ninety days beyond the contract completion date on work packets issued within the contract. This Engineering Contract may be extended at the option of the District in order to complete ongoing work or to accomplish additional work as required by the District.

## 3. Compensation:

For the Engineering services designated in Article 2, "Character and Extent of Services", the District shall pay the Engineers, fees established as follows:

A. Payment for engineering services described under Paragraph 2 will be made in accordance with the following unit prices and will be applied to the quantities used in developing the delivery order for each work packet.

### ENGINEER'S FEES

| ITEM NO. | ITEM | UNIT | UNIT PRICE |
|----------|------|------|-----------|
| 1 | Principal (Project Manager) | Hour | $ 80.00 |
| 2 | Supervisor (Project Engineer) | Hour | $ 60.00 |
| 3 | Engineer | Hour | $ 50.00 |
| 4 | Pre-Professional Engineer | Hour | $ 35.00 |
| 5 | Engineering Technician | Hour | $ 30.00 |
| 6 | Draftsperson | Hour | $ 22.50 |
| 7 | Construction Inspector | Hour | $ 30.00 |
| 8 | Vehicle | Mile | $ 0.21 |

B. Payment will be made as the Engineers' invoice is received for all services satisfactorily performed. The Engineer may submit invoices on a monthly basis with supporting documentation for partial payment on a particular work packet.

C. If inspection is required to be furnished by the Engineers in accordance with Article 2, D and E hereof, the Engineers shall assign personnel, acceptable to the District, at salaries acceptable to the District. The fee for this work shall be on the basis of the actual salary paid to personel assigned to this project times a multiplier of 2.5, plus reimbursement of actual transportation expenses paid to such personnel. Payment of this fee shall be due and payable monthly during the construction period.

17

4. Special Conditions:

These special conditions become a part of this Agreement:

A. The Engineers shall secure and maintain such insurance as will protect them from claims under the Workmen's Compensation Acts, and from claims for Bodily Injury, Death or Property Damage which may arise from the performance of their services under this Agreement. This insurance shall be carried on the employees, cars and other equipment employed by the Engineers in connection with the District's work and the Engineers shall comply with all other requirements of Federal, State, and Local Laws.

B. The Engineers shall furnish, without additional compensation, ten (10) sets of plans and ten (10) sets of all specifications. Additional copies of plans and specifications to be at the cost of others. The Engineers shall furnish without additional compensation 25 copies of each Engineering Report required by District.

C. The District agrees to cooperate with the Engineers in the approval of all report, plans and specifications, or should they disapprove of any part of said plans and specifications, shall within thirty (30) days advise the Engineers of the changes desired in order that no undue expense will be caused the Engineers because of lack of decisions.

D. If the Engineers are caused extra drafting or other expenses due to change ordered by the District after the completion and approval of the specifications and general working drawings, they shall be equitably paid for such extra expense in accordance with the service involved.

E. It is understood that the Engineers may select, subject to the approval of the District, a Geotechnical Engineer for Soils and/or a reputable Testing Laboratory to make solid and field laboratory tests on materials and equipment. The Geotechnical Engineer and/or the Testing Laboratories will be employed directly by the District, which will pay the cost of this work.

F. No deduction shall be made from the Engineers fee on account of penalty, liquidated damages, or other sums withheld from payment to Contractor.

G. The undertaking of inspection by the Engineers, in accordance with provisions of Article 2, D and E hereof, or otherwise, shall not be construed as supervision of actual construction, since the Engineers or their authorized representative will, in no case, act as superintendent or foreman, or will they interfere with the management of the work. It further shall not be construed to make the Engineers or their authorized representative responsible for providing a safe place or safe conditions for the performance of work under the Contract, by: the contractor; the contractor's employees; subcontractor; employees of any supplier; or by any person for access, visits, work, travel or occupancy.

H. Approval, by the Engineers, of any work done by the Material Testing Laboratory or by Soil Testing Laboratory shall not relieve said laboratories from the responsibility for errors of faulty work of any kind or their part in connection with material or soil testing or reports covering same, or shall such approval be construed as making the Engineers responsible for errors of any sort on the part of said laboratories.

5. Ownership of Documents:

Original reports, drawings and specifications as instruments of service are the property of the Engineers, whether the work for which they are made by

18

executed or not.  Heretofore in this Agreement specified, District shall be
furnished copies of these drawings and specifications and reproducibles of
working drawings.

6.  Successors and Assigns:

The District and the Engineers each bind themselves, their partners,
successors, executors, administrators, and assigns to the other parties to this
Agreement, and to the partners, successors, executors, administrators, and
assigns of such other party in respect of all convenants of this Agreement.

Except as above, neither the District nor the Engineers shall assign, sublet
or transfer their interests in this Agreement without the written consent of the
other.

Thus done, entered into and signed in the presence of the witnesses whose
names are subscribed opposite each respective signature, on and as of the 9th
day of March · 19 84

WITNESSES:

ORLEANS LEVEE DISTRICT
STATE OF LOUISIANA

_President_

MODJESKI AND MASTERS

W.B. Conway, Partner

19

# EXHIBIT 11

PARTNERS

J. BRES EUSTIS
REG. C. E.

CHARLES A. BRAGG (1918-1979)
REG. C. E.

JOHN W. ROACH, JR.
REG. C. E.

GERALD A. BRAGG
REG. C.E.

LLOYD A. HELD, JR.
REG. C. E.

# EUSTIS ENGINEERING COMPANY

SOIL AND FOUNDATION CONSULTANTS

BORINGS • TESTS • ANALYSES

3011 28ᵗʰ STREET
METAIRIE, LOUISIANA 70002

P. O. BOX 8708
METAIRIE, LOUISIANA 70011

PHONE (504) 834-0157

OFFICERS

EUSTIS ENGINEERING CO.,INC.
ASSOCIATED WITH
EUSTIS ENGINEERING CO.
CHAIRMAN OF THE BOARD
J. BRES EUSTIS
PRESIDENT
JOHN W. ROACH, JR.
CORP. VICE-PRESIDENT AND
CHIEF ADMINISTRATIVE OFFICER
GERALD A. BRAGG
VICE PRESIDENT AND
CHIEF ENGINEER
LLOYD A. HELD, JR.

27 July 1983

Modjeski and Masters
Consulting Engineers
1055 St. Charles Avenue
New Orleans, Louisiana  70130

Attention Mr. Barney Martin

Gentlemen:

Floodwall and Slope Stability Reanalysis
Sewerage and Water Board of New Orleans
Metairie Relief Canal
Station 539+00 to Station 670+00
Orleans and Jefferson Parishes, Louisiana

This report contains the results of floodwall analyses, slope stability analyses and other pertinent analyses based on revised high and low water elevations furnished by the Corps of Engineers and Modjeski and Masters.  The furnished water elevations for the analyses are as follows:

| Locations | Still Water | Still Water + Free Board | Low Water |
|---|---|---|---|
| Lake Ponchartrain to Veterans Blvd. Bridge | 32.0 C.D. | 34.0 C.D. | 15.5 C.D. |
| Veterans Blvd. Bridge to I-10 Bridge | 32.5 C.D. | 35.0 C.D. | 15.5 C.D. |
| I-10 Bridge to Railroad Bridge | 33.0 C.D. | 35.0 C.D. | 15.5 C.D. |

Subsoil stratification, soil parameters and cross-sections (except between Stations 635+00 and 670+00) are contained in our previous reports for the subject project as follows:

a)   Station 539+00 to Station 554+00.  Subsoil stratification and soil parameters are shown on Figure 27 of our report dated 27 October 1981.  Cross-sections are contained in

-1-

EE 032040

Modjeski and Masters                    27 July 1983

the supplemental letters to that report dated 11 November 1981 and 11 December 1981.  A typical cross-section through this reach is shown on Enclosure 1 of that report.

b)   Station 554+00 to Station 635+00.  Subsoil stratification and soil parameters are shown on Figure 164 of our report dated 2 November 1981.  Cross-sections are shown on Figures 165, 166, 167 and 168 of the report.

c)   Station 635+00 to Station 670+00.  Subsoil stratification and soil parameters are shown on Figure 164 of the report dated 2 November 1981.  However, it is understood that the cross-section shown on Figure 169 of this report will be revised.  In this reach, the existing levee will be raised to el 33.0 C.D. and a sheetpile floodwall driven in the levee crown one foot from the canal side edge.  The top of the floodwall will be at el 35.0 C.D. and the canal and levee slopes will be 1 vertical on 3 horizontal.

d)   Station 617+50 to Station 663+00.  Subsoil stratification, soil parameters and typical cross-sections are shown on Figure 20 of our report dated 23 August 1982.


Floodwall Analyses

     Except for the floodwall between Stations 539+00 and 554+00 on the Jefferson side, the high water condition is critical and the floodwall will consist of cantilever sheetpiles.  On the Jefferson side between Stations 539+00 and 554+00, the low water condition is critical and the floodwall will consist of sheetpiles anchored at el 25.5 C.D.  A factor of safety of 1.5 was applied to the soil shear strengths to determine the required sheetpile penetration.  A factor of safety of 1.0 was applied to the soil shear strengths to determine the maximum bending moment and required anchor force.  Results of the computations are summarized in the following tabulation and typical lateral pressure diagrams are shown on Enclosure 1.

| Locations | Water Elev.-C.D. | Sheetpile Tip Elev. C.D. | Maximum Moment Ft.-K/L.F. |
|---|---|---|---|
| Stations 539+00 to 554+00 Orleans Side | 34.0 | -17.0 | 41.8 @ El. 10.5 |
| Stations 539+00 to 554+00 Jefferson Side | 15.5 | -27.0 | 41.8* @ El. 10.5 |
| Stations 554+00 to 589+00 Orleans & Jefferson Sides | 34.0 | -17.1 | 23.0 @ El. 16.5 |

EE 032041

Modjeski and Masters                    27 July 1983

| Locations | Water Elev.-C.D. | Sheetpile Tip Elev. C.D. | Maximum Moment Ft.-K/L.F. |
|-----------|------------------|--------------------------|---------------------------|
| Stations 589+00 to 614+00 Orleans & Jefferson Sides | 34.0 | - 2.0 | 14.6 @ El. 20.0 |
| Stations 614+00 to 625+00 Orleans & Jefferson Sides | 34.0 | 8.9 | 9.0 @ El. 22.0 |
| Stations 625+00 to 635+00 Orleans & Jefferson Sides | 35.0 | 10.4 | 8.9 @ El. 23.0 |
| Stations 635+00 to 670+00 Orleans & Jefferson Sides | 35.0 | 25.9** | 0.3 @ El. 31.0 |

   *An anchor force of 4.3 K/LF is indicated.

   **A minimum penetration to El. 21.0 is recommended.

## Slope Stability Analyses

   Slope stability analyses of the proposed levee and canal
improvements were based on a low water elevation of 15.5 C.D.
in the canal and the Corps of Engineers' Method of Planes
Analysis.  Results of these analyses are summarized in the
following tabulation and typical computations are shown on
Enclosure 1.

| Locations | Factor Of Safety |
|-----------|------------------|
| Stations 539+00 to 554+00 (Orleans Side) | 1.418 |
| Stations 539+00 to 554+00 (Jefferson Side) | * |
| Stations 554+00 to 589+00 (Both Sides) | 1.211 |
| Stations 589+00 to 614+00 (Both Sides) | 1.207 |
| Stations 614+00 to 625+00 (Both Sides) | 1.217 |
| Stations 625+00 to 635+00 (Both Sides) | 1.208 |
| Stations 635+00 to 670+00 (Both Sides) | 1.297 |

   *Analyses not performed but, by inspection, factor
   of safety is greater than 1.418.

   Landside slope stability analyses were previously performed
and results are shown on Figure 20 of our report dated 23 August
1982.  However, as previously indicated, the cross-section

EE 032042

Modjeski and Masters                    27 July 1983

shown at Station 646+00 has been revised and, therefore,
additional landside stability analyses may be required.  These
analyses will be performed when the final levee configuration
is determined and the results of the test section have been
evaluated.

Settlement Analyses

    The proposed cross-section between Stations 635+00 and
670+00 indicates a levee crown at el 33.0 C.D.  Since the
great majority of the existing levee through this reach on
the Jefferson side is at el 33.0 C.D., very little fill will
be required and settlement of the levee should be negligible.
On the Orleans side, the existing levee crown ranges between
el 30.0 and 31.0 C.D. throughout most of the reach.  For
purposes of the computations, a 3-ft thick fill height and a
30-ft crown width were assumed.  The computations indicate a
total estimated settlement of 3 to 4 inches including
consolidation of the subsoils and shrinkage in the fill material.

Uplift Analysis

    Reference is made to Figure 20 of our report dated
23 August 1982 which shows analyses to determine the potential
for a blow-out at the landside toe of the levee due to hydrostatic
uplift pressure in the underlying stratum.  These analyses were
revised based on the revised high water elevations furnished by
the Corps of Engineers, and the results are summarized below.

| Locations | Water Elev. C.D. | Factor Of Safety |
|---|---|---|
| Lake Ponchartrain to Sta. 617+50 | 32.0 | 1.03 |
| Sta. 617+50 to Sta. 663+00 | 33.0 | 0.51 |
| Sta. 663+00 to Pump Station | 33.0 | 0.97 |

    These revised computations indicate the possibility of
a blow-out between Station 617+50 and the Pump Station.  Unless
the results of the test section indicate a substantial reduction
in hydrostatic pressure, precautions must be taken to prevent a
blow-out during high water conditions between Stations 617+50
and the Pump Station.

                              Yours very truly,
                              EUSTIS ENGINEERING COMPANY

LN:kdl
Enclosure 1               By   *John W. Roach, Jr.*

                               John W. Roach, Jr.

EE 032043



TYPICAL X-SECTION — STA. 539+00 TO STA. 554+00

ORLEANS (EAST) SIDE

JEFFERSON (WES

SCALE: 1"=20'

COMPUTER ANALYSIS

| SLIP SURFACE | | DRIVING FORCE | | | | RESISTING FORCE | | | | FACTOR OF SAFETY ΣR/ΣD |
|---|---|---|---|---|---|---|---|---|---|---|
| NUMBER | ELEV. | +Dₐ | -Dᵧ | ΣD | +Rₐ | +Rᵦ | +Rₚ | ΣR | |
| A | 1 | 6.0 | 17166 | 1155 | 16481 | 16350 | 4850 | 4850 | 24450 | 1.485 |
| B | 2 | -16.0 | 59574 | 7875 | 47659 | 32280 | 16003 | 13555 | 57818 | 1.418 |
| C | 3 | -42.0 | 125955 | 38210 | 87717 | 88512 | 38600 | 49195 | 187311 | 1.782 |

SOIL PARAMETERS SHOWN ON FIGURE 17
ALL ELEVATIONS REFER TO MEAN LOW GULF
BY INSPECTION, STABILITY ON ORLEANS SIDE NOT CRITICAL.

EE 032044

Sheet 2 Enclosure 1



IEE 032045



FLOODWALL ANALYSIS

ORLEANS SIDE

JEFFERSON SIDE

ENT = 41.8 FT-K/LF AT EL. 10.5

ANCHOR FORCE = 4.3 K/LF
MAX. MOMENT = 41.8 FT-M/LF AT EL. 10.5

AFETY = 1.5 APPLIED TO SOIL STRENGTHS TO DETERMINE REQUIRED PENETRATION.
AFETY = 1.0 APPLIED TO SOIL STRENGTH TO DETERMINE MOMENT & ANCHOR FORCE.
SSURES SHOWN ARE I PSF.

EES 032046

FLOODWALL & SLOPE STABILITY REANALYSIS
SEWERAGE & WATER BOARD OF NEW ORLEANS
METAIRIE RELIEF CANAL
STATION 539+00 TO STATION 670+00
ORLEANS & JEFFERSON PARISHES, LOUISIANA

FOR
MODJESKI AND MASTERS, INC.
CONSULTING ENGINEERS
NEW ORLEANS, LOUISIANA

EUSTIS ENGINEERING COMPANY
SOIL AND FOUNDATION CONSULTANTS
METAIRIE, LA.

JULY 1983

# EXHIBIT 12



REPLY TO
ATTENTION OF:

# DEPARTMENT OF THE ARMY
### NEW ORLEANS DISTRICT, CORPS OF ENGINEERS
#### P.O. BOX 60267
#### NEW ORLEANS, LOUISIANA 70160-0267

January 4, 1988

Engineering Division
Structural Design Section

Mr. Barney T. Martin, Jr.
Modjeski and Masters
Consulting Engineers
1055 St. Charles Avenue
New Orleans, Louisiana  70130

Dear Mr. Martin:

Reference is made to your letter dated November 2,
1987 to Mr. Ed Bailey, Chief Engineer of the Orleans
Levee District, and to your letter dated November 12,
1987 to this office, in which you requested our review
of the in-progress plans and specifications for the
17th Street Canal, Parallel Flood Protection, Phase 1B,
Hammond Highway to Southern Railway, OLB project number
2043-2047.

We are considering changes in the factors of safety
used in determining penetration of I-wall sheet piling
and changes in the method of determining I-wall
deflections.  We will let you know more by the end of
January 1988.  However, we have reviewed the subject
plans and specifications based on present criteria and
offer the following comments:

a. <u>Sta. 636+00 to Sta. 638.31.</u>  Our preliminary
analysis indicates that a higher tip penetration for
the steel piling in this area can be obtained by
applying submerged soil weight on the floodside of the
floodwall and also by raising the levee crown to
elevation 11.0 National Geodetic Vertical Datum.

b.  A transition in sheet pile tip penetration is
required for the sections between station 589+00 and
station 590+00, station 614+00 and station 615+00, and
between station 635+00 and station 636+00.

c. <u>Station 625+00 to Sta. 635+00.</u>  Our preliminary
analysis indicates that a lower tip penetration of the
sheet piling than the penetration shown on the plan is
required to satisfy the floodwall stability into the
canal.

MODJESKI-E2
01208

-2-

d.  Based on the information presented in the typical sections, drawing number 3, a discontinuity in the sheetpile wall would occur at station 589+00.  This should be clarified.

e.  Our stability analysis of the floodwall reaches described in enclosures 1 through 8, indicates that a more economical design for the floodwall in those reaches can be obtained by using the floodwall layout depicted on the enclosures.  It is recommended that you revise the subject plans to reflect the floodwall layout shown on the enclosures.

f.  Since the dredging of the canal will not extend into the Jefferson Parish side, the potential for scour of the levee on this bank of the canal will exist.  To be able to detect such scour, control lines, as shown on enclosures 9 through 13 will be required.  These control lines should be added to the drawings. Additionally, survey cross-sections of the existing levee and canal bank, with initial cross-sections of the levee and dredged canal immediately after construction and cross-sectional surveys taken on a yearly basis thereafter, must be provided to this office.  These surveys are required to detect erosion into the control lines, which if it occurs, could cause failure of the subject levee.  Should erosion beyond the control lines occur, the Sewerage and Water Board of New Orleans will be responsible for taking corrective action at their own cost.

If there are any questions concerning our requirements, please let us know.

Sincerely,

Frederic M. Chatry
Chief, Engineering
Division

Enclosures

MODJESKI-E2
01209



STA 553+70 TO STA 568+00
ORLEANS SIDE

SCALE : 1" = 20'

FLOODSIDE TOE SAME AS
MODJESKI + MASTERS PLANS

MODJESKI-E2
01210

ENCL. 1