# EXHIBIT 21

PARTNERS

W. B. CONWAY
H. H. SNYDER
C. F. COMSTOCK
J. J. SCHERRER
J. M. KULICKI

SENIOR ASSOCIATES

R. W. CHRISTIE
C. T. FORTRAN
H. E. WALDNER

CONSULTANTS

T. R. KEALEY
R. E. FELSBURG

ASSOCIATES

H. E. ECKHOFF
T. Y. SOONG
J. E. PRICKETT
B. P. STRAIN, JR
D. F. SORGENFREI
B. T. MARTIN, JR.
J. L. MCKENNEY
G. A. MURRAY
D. H. LEROY
R. A. LITTLE
L. V. BORDEN
E. W. ROHRBAUGH

**MODJESKI AND MASTERS**

CONSULTING ENGINEERS

*Founded 1893*

1055 ST. CHARLES AVE.
NEW ORLEANS, LA 70130
TELEPHONE 504 · 524·4344

January 7, 1991

Board of Commissioners of the
  Orleans Levee District
Suite 202, Administration Bldg.
New Orleans Lakefront Airport
New Orleans, LA  70126

ATTN: Mr. Frederick M. Chatry, Chief Engineer

RE:  17TH STREET CANAL FLOOD PROTECTION SYSTEM
     CAPPING OF FLOODWALLS
     OLB PROJECT NO. 2043-0207

Gentlemen:

Reference is made to our proposal of December 4, 1990 to provide
engineering services in connection with the placement of a concrete
cap on the Orleans-side Floodwall along the 17th Street Canal.
That proposal included a construction cost estimate of $2,876,840
based on the floodwall cross section as presented in Corps of
Engineers Design Memorandum No. 20 with appropriate adjustments for
actual site conditions.

However, we have now been informed by Design Engineering Inc. that
the DM 20 floodwall cross section should be modified to include
decorative wall treatment on the protected side. This will require
an increase in floodwall thickness as well as increased forming
costs. Further, because high level flood protection now being
provided by the sheet pile wall can only be allowed to be breached
for a short segment (say 100 ft.) at any one time, costs of
redriving sheet pile, of forming concrete wall and of pouring the
wall will be considerably greater than normal. Additionally, there
will be some pile trimming required and some shear studs required
which were not included in the previous estimate.

All of these differences lead to the conclusion that the previously
submitted estimate should be revised. Accordingly, we submit
herewith as Exhibit 1 a revised construction cost estimate for this
project. We now estimate the construction cost of placing a
concrete floodwall on the already existing sheet pile floodwall to
be $3,933,790.

MODJESKI-E1
00046

*B*

# MODJESKI AND MASTERS

Bd. of Commissioners        January 7, 1991                    Page 2


We propose a revised total lump sum fee for engineering services in connection with the concrete floodwall of $255,645.00 based on 6.5% of construction cost.   In accordance with Section 8.3 of our contract, we understand that certain percentages of this fee are applicable to certain phases of the work and that if construction is administered by the COE, our Construction Phase Services may not be required.

We believe this proposal is now responsive to your requirements.


                         Very truly yours,

                         MODJESKI AND MASTERS
                         Consulting Engineers

                         WILLIAM B. CONWAY

WBC:jrb


cc:  Mr. Walter Baudier
     Design Engineering Inc.

MODJESKI-E1
00047

# EXHIBIT 22

**PRINCIPALS**

W. B. CONWAY, P.E.
H. H. SNYDER, P.E.
C. F. COMSTOCK, P.E.
J. J. SCHERRER, P.E.
J. M. KULICKI, PH.D., P.E.
H. E. WALDNER, P.E.
D. F. SORGENFREI, P.E.

**ASSOCIATES**

T. Y. SOONG, P.E.
J. E. PRICKETT, P.E.
B. P. STRAIN, JR., P.E.
B. T. MARTIN, JR., P.E.
J. L. McKENNEY, P.E.
G. A. MURRAY, P.E.
D. H. LeROY, P.E.
R. A. LITTLE, P.E.
L. V. BORDEN, P.E.
L. K. HUANG, P.E.
D. R. MERTZ, PH.D., P.E.
M. C. IRWIN, P.E.
B. E. PETERSON, P.E.
Z. PRUCZ, PH.D., P.E.
E. W. ROHRBAUGH

## MODJESKI AND MASTERS, INC.

### CONSULTING ENGINEERS

*Since 1893*

1055 ST. CHARLES AVE.
NEW ORLEANS, LA 70130
TELEPHONE 504 - 524-4344
FAX NO. 504 - 561-1229

December 2, 1992

Mr. W. Eugene Tickner                                    **JN 1412**
Chief, Engineering Division
U.S. Army Corps of Engineers
Post Office Box 60267
New Orleans, Louisiana 70160-0267

Attn:  Mr. Bob Grubb

RE:  **17TH STREET OUTFALL CANAL**
     **CAPPING OF FLOODWALLS**
     **ORLEANS LEVEE BOARD PROJECT NO. 24311**

Dear Mr. Tickner:

We transmit by this letter Plans and Specifications for
Construction Division Final Review on the captioned project. As
requested, we are providing 4 full size sets of drawings numbered
1-17 and 4 sets of specifications in hard copy format. The plans
and specifications are also being transmitted to you in the
required electronic format.

| Drawing Files: | | Specification Files: | |
|---|---|---|---|
| 1. | TS | TITLE | |
| 2-5. | PLAN 1-4 | BID | |
| 6-7. | LTS001-002 | TOC | |
| 8. | FCTS | EP | (C2A) |
| 9-12. | FCPL01-04 | CLEAR.GRU | (C2B) |
| 13. | FCJD | STRUC.EXE | (C2C) |
| 14-15. | RBS001-002 | F&S | (C2D) |
| 16-17. | AS001-002 | SHEET | (C2E) |
| | | FORMWORK | (C3A) |
| | | STEEL | (C3B) |
| | | JOINTS | (C3C) |
| | | CONCRETE | (C3D) |
| | | METAL | (C5A) |
| | | CATHODIC | (C16A) |
| | | H-CLAUSE.CON | (H) |

MODJESKI-E1
00115

Responses to Final Review Comments are attached. Briefly, changes
have been made to the scope of the project. The wall is now 24
inches in width instead of 21 inches to allow more room for
deviations from line in the sheetpile. The sheet pile is now to be
driven to grade instead of being trimmed; thus emergency sheet pile
is no longer required because the existing sheeting will merely be

**M O D J E S K I   A N D   M A S T E R S ,   I N C.**

December 2, 1992

Mr. W. Eugene Tickner                                                        Page 2

pulled up in place in the event of a hurricane. All stations are
now referenced to the centerline of the sheet pile instead of the
baseline.   The Contractor will now use a cofferdam just south of
Hammond Highway to ensure a dry working area.   The cofferdam will
also be a bid item.     We have eliminated sandbagging south of
Hammond Highway by completing the wall as indicated in Dwg. No. 11
without a 90-degree turn (See response to CELMN-CD-QM Comment #6).
The specification for removal of the existing coal tar epoxy paint
from the sheet pile is now added to Section C2E of the
specifications.  We have specified sandblasting after consulting
with the manufacturer of the paint.

Some issues remain currently unresolved, and we will continue to
work on these during this review.

The drawings have some very minor errors.  We have corrected these
errors on our system (AUTOCAD), but given the expense of the
translation and the possibility of further revisions, we will
correct these in INTERGRAPH prior to Final Submittal.

We request the right to update the Special Clause "OTHER WORK IN
THE AREA" prior to advertisement should the East Jefferson Levee
District's project schedule change.

The Special Clause "UTILITIES AND IMPROVEMENTS" will require
updating if L.P.& L. allows for weekend outages of the power line
during the May to September period or if another L.P.& L. project
in the vicinity takes the line out of service during this project,
thus eliminating the need for an outage for construction purposes.

We may receive further information on Orleans Marina tidal gage
information from the Orleans Levee Board to further update the
information currently provided in C2E-10.

Resolution of Right-of-Way immediately north of Hammond Highway is
still required from the Orleans Levee Board.

If you have any questions or require any further information,
please let us know.  Otherwise we will await your comments.

Very truly yours,

**MODJESKI AND MASTERS**
**Consulting Engineers**

*Felton Suthon*

Felton Suthon

FS:gls:tickner3
cc:  Mr. F. Mineo, O.L.B.

RESPONSES TO FINAL REVIEW COMMENTS

Comments of CELMN-CD-OM- Sep. 23, 1992:

1a          Cost Engineering had previously requested that
            information on access sites be placed in the drawings.
            Information on access sites is contained on drawings 2-5,
            16 and 17, and in the Special Clause "ACCESS AND TRUCKING
            REQUIREMENTS".

1b,21,25    Vibration monitoring will be handled by the Orleans Levee
            Board.     See  Special  Clause  entitled  "VIBRATION
            MONITORING" for Contractor responsibilities.

1c          Cementitious Paint is specified in C3D-12.2.1,2.

3           Many of the changes to C3A through C3D were specified by
            other Corps departments. We have carefully incorporated
            the attachment into our specifications. Please note that
            in C3D-7.2.3 and 7.2.4 we have simplified the section
            based on a 1-inch minimum clearance from rebar to sheet
            pile.   Also note that because a cofferdam will be built
            from Sta. 69+93.33 to Sta. 9+25.80 to maintain dry
            working conditions, there will be no construction joints,
            thus eliminating C3D-10.3.

4           We have eliminated "VARIATIONS IN ESTIMATED QUANTITIES,
            SUBDIVIDED ITEMS" as there are no subdivided items.

5,12        See C2A-7.6, C2A-15.2, C2A-16.2 and Drawings 2-5 for all
            information on protected side erosion (hay bales).  It
            will be paid for by the linear foot for approximately
            11,593 feet.

6 7 8       South of Hammond Highway, we previously called for an
20 58a      angle point and a required corner at Sta. 9+28 to provide
58b         the necessary turn to construct floodgates for Hammond
            Highway as per DM-20.  Recent events indicate that there
            is some uncertainty as to the future of the area (new
            bridge or floodgates?) and we have thus decided to build
            the floodwall straight to Sta. 9+25.80 without an angle
            point or any required sheeting.  This plan would allow
            for future construction of either floodgates or a new
            bridge.  The drawings and the specifications now contain
            no required sheeting, no required sandbagging, and no
            required angle point south of Hammond Highway.

9           Engineering Division will have to answer this.

10          We have provided a list of Contract Clauses in Section I.

11          Done- See C2A-8.1.

13          Done- See C2B-6.2.

MODJESKI-E1
00117

14          Drawings 2-5 and the Special Clause "OFF-SITE STORAGE"
            contain this information.

15          C2C-2(5).  The reference to C2C-5.2 has been corrected to
            be to C2C-4.2.

16          Done- See C2C-2.2

17 50b      C2C-4.1.  Since we have no soil borings and the excavated
            material is to be re-used, the reference to the Unified
            Soil Classification System has been omitted.

18 55b      See Dwg. No. 5 for details of rip-rap storage.

19          We have reduced the clearing currently specified in C2B-
            4.3 from 20 feet on either side of the sheet pile to 5
            feet on either side.

22          The sheets are all to be driven to required grade with
            exceptions noted in the plans and specifications.  In an
            emergency, the sheets will all be in place and must only
            be raised.     See C2E-9 and H-10(j)(5) for emergency
            procedures.  There is no longer any need for emergency
            sheet pile.

23          C2E-3.3 now C2E-3.2- Done.

24 26       This section has been removed. See comment 6.

27-29       C3A-5, C3B-4, C3C-3. All done.

30-34       Fertilizing, Seeding and Mulching (Section C2D)- We have
            incorporated the mulching into the areas described in
            C2D-4.2.1.  The reference to C2D-6.2.1 has been removed.

35          If a different section is required, please inform us.

36          C3D-12.2.2- TT-P-0035 is the USCE spec and will be used
            on this job.

37          Typos corrected.

38          $1,360 for liquidated damages included in H-1.

39          Sentence included in H-4.

40-42       We have altered the reference line for the project to be
            the centerline of the sheet pile wall.  All references to
            Stations are now to Wall Line (W/L).

43          We have deleted "QUANTITY SURVEYS".

44 60       See Drawings 2-5 and 16-17 for all right-of-way (RW)
            information on the plans.  H-12 has been revised to

MODJESKI-E1
00118

reflect this and obstructions to RW.  Access to all RW
from off-site has been arranged as follows:

Ramps adjacent to I-10: OLB has applied for permit from
LaDOTD.

West Harrison Lot: OLB and City of New Orleans (Owner) by
agreement.

South of Hammond Highway: OLB and Robert S. Lupo (Owner)
by agreement.

North of Hammond Highway: See cover letter (UNRESOLVED)

45          LP&L Power Line: See cover letter (UNRESOLVED)

45a         The title has been changed as requested.

46          "STONE SOURCES" has been deleted.

47          "GOVERNMENT FURNISHED PROPERTY" has been deleted.

48          We have updated and relocated the submittal register as
            requested.

49          We cannot respond to this item.

50a         The benchmark has been surveyed as recently as June of
            1992 to start the West Side Levee Improvements (East
            Jefferson Levee District Contract 92-1).

50c         See  General  Notes  and  Special  Clause  "VIDEOTAPE
            DOCUMENTATION."

51-54       We have included the legend, floodwall centerline, RW
            lines, and utility lines on the plans (Dwgs. 2-5).
            Included in these sheets are details of storage, access,
            safety fence, and erosion control.  Because of the
            limited plan area on the drawings, the access road and
            storage details have been provided at the bottom of the
            drawing.  All sheets have been revised to be oriented in
            the same direction as the Panel Layouts (Dwgs. 9-12).  We
            have  eliminated  the  Description  of  Work  as  per
            Specifications Section comment # 1.

54a         The RW is very limited from Sta. 40+13 to Sta. 10+86.
            The Contractor will have to arrange a way of constructing
            the cap from the canal.

54b-e,58c   The Contractor will have to use a cofferdam as indicated
            in C2E-7, "Provisions for Cofferdam".  This will allow a

dry working area and allow for painting of the concrete. Therefore, there is no longer a toe anchor form or required crushed stone.

55a     This no longer applies, as the basis of stationing is now the sheet pile wall.

56a     There is no need to indicate lines and slopes for excavation and backfill because this item is a lump sum item. We have indicated areas for excavation for access on Dwgs. 2 through 5.

56b     We have provided transitional details.

57      The floodwall cap layout is presented as shown to show the protected side of the cap in order to detail the required treatment of the cap.   We have adjusted the plans to reflect a south-to-north arrangement.

59      The reinforcing schedule is shown on Dwgs. 14-15.

61      The access ramps are detailed on Dwg. 17 and located on Dwgs. 2-5.   See also the Special Clause "Access and Trucking Requirements".

62      We cannot answer this.

MODJESKI-E1
00120

Comments of CELMN-ED-DS- Aug. 13, 1992:

1        These items have been handled as requested.

2        The Orleans Levee Board (OLB) is aware of the finish on
         the Jefferson floodwall.   The choice of finish is the
         OLB's decision.  The flood side of both the Jefferson and
         Orleans floodwalls will be pearl grey and thus similar in
         appearance.

3        We have detailed this information in the Special Clause
         entitled "Access and Trucking Requirements" as well as on
         Dwgs. 2-5 and 16-17.

4        Appendix H-2 is referenced in the Special Clause entitled
         "Signal Lights".

MODJESKI-E1
00121

Comments of CELMN-ED-CF- Aug. 27, 1992:

1        No response.

2        Done.

3-4      South of Hammond Highway, we previously called for an
         angle point and a required corner at Sta. 9+28 to provide
         the necessary turn to construct floodgates for Hammond
         Highway as per DM-20.  Recent events indicate that there
         is some uncertainty as to the future of the area (new
         bridge or floodgates?) and we have thus decided to build
         the floodwall straight to Sta. 9+25.80 without an angle
         point or any required sheeting.  This plan would allow
         for future construction of either floodgates or a new
         bridge.  The drawings and the specifications now contain
         no required sheeting and no angle point south of Hammond
         Highway.

         The sheets are all to be driven to required grade with
         exceptions noted in the plans and specifications.  In an
         emergency, the sheets will all be in place and must only
         be raised.   Therefore, there will only be a "Driving
         Existing Sheet Pile" item, which will include the minor
         costs of associated trimming at transitions and adjacent
         to the U.S. Sprint Fiber Optic Line.

5        Done.

6-8      No response.

MODJESKI-E1
00122

# EXHIBIT 23

PRINCIPALS
W. B. CONWAY, P.E.
H. H. SNYDER, P.E.
C. F. COMSTOCK, P.E.
J. J. SCHERRER, P.E.
J. M. KULICKI, PH.D., P.E.
H. E. WALDNER, P.E.
D. F. SORGENFREI, P.E.

# MODJESKI AND MASTERS, INC.
## CONSULTING ENGINEERS
### *Since 1893*

1055 ST. CHARLES AVE.
NEW ORLEANS, LA 70130
TELEPHONE 504 - 524-4344
FAX NO. 504 - 561-1229

## July 31, 1992

ASSOCIATES
T. Y. SOONG, P.E.
J. E. PRICKETT, P.E.
B. P. STRAIN, JR., P.E.
B. T. MARTIN, JR., P.E.
J. L. MCKENNEY, P.E.
G. A. MURRAY, P.E.
D. H. LEROY, P.E.
R. A. LITTLE, P.E.
L. V. BORDEN, P.E.
L. K. HUANG, P.E.
D. R. MERTZ, PH.D., P.E.
M. C. IRWIN, P.E.
B. E. PETERSON, P.E.
Z.    PRUCZ, PH.D., P.E.
E. W. ROHRBAUGH

JN 1412

Mr. Richard F. Allen
City of New Orleans
City Planning Commission
9W City Hall 1300 Perdido St.
New Orleans, Louisiana 70112

**RE:   17TH STREET OUTFALL CANAL**
**        CAPPING OF FLOODWALLS**
**        ORLEANS LEVEE BOARD PROJECT NO. 24311**

Dear Mr. Allen:

We are enclosing one copy each of the Final Review Drawings and
Specifications on the captioned project.   The set of drawings
contains 15 sheets numbered 1-17, excluding 14 and 15, which are
reinforcing sheets to be included later.

We are writing you as consulting engineers for the applicant for
this project, the Orleans Levee Board.   The job is being
administered  by  the  U.S.  Corps  of  Engineers.    Thus,  the
specifications are U.S. Corps of Engineers specifications, which
have been used by both the Levee Board and the Corps on projects in
this area.   This should satisfy most of your concerns about the
project.

The schedule for the project is January, 1993 through March, 1994.

Specific responses to your letter to us dated April 13, 1992 are as
follows:

1.    Sections C2C and C2D of the specifications address earthwork.
2.    Section C2C addresses the correct manner of excavation and
      backfill of the levee to avoid damage to the levee.
3.    Sections C2A-7 and C2A-8 address this comment.   Drainage
      through the Canal should be unaffected by this project.
4.    Sections C2A-7.4, C2A-8.2, and C2B address the disposition of
      all debris.
5.    Sections C2A-7 and H-13 address damage to and restoration of
      adjacent lands.

MODJESKI-EI
00186

**MODJESKI AND MASTERS, INC.**
July 31, 1992

Mr. Richard F. Allen                                            Page 2

Should you have any questions, please call.

Very truly yours,

**MODJESKI AND MASTERS, INC.**
**Consulting Engineers**

*Felton Suthon*

Felton Suthon

FS:gls:0001

cc:   Mr. W. E. Tickner, U.S.C.E.
      Mr. A. Francingues, O.L.B.
      Mr. J. Holtgreve, D.E.I.

MODJESKI-E1
00187

EXHIBIT 24



*MOON LANDRIEU, President*
*HARRY McCALL, JR., President Pro-Tem.*

# Sewerage & Water Board OF NEW ORLEANS

CITY HALL • CIVIC CENTER
NEW ORLEANS, LA., 70165 • 586-4588

*STUART H. BREHM, JR.*
*Executive Director*

November 23, 1977

Mr. August Perez, III
2609 Canal Street
New Orleans, LA  70119

Dear Augie:

I read your letter in the Times Picayune of November the 21st, relative to "Hurricane Protection".

While I can agree with much of what you say, I certainly cannot agree with your conclusion that we should abandon the barrier plan.

I did not even know that a "Part B" proposal had been developed, but I certainly can agree with your logical conclusion that to construct high level levees around the entire Shoreline of Lake Pontchartrain, as well as in other contiguous waterway areas where this high level levee would be needed would be almost ludicrous.

I don't know if you are aware or not, but in order to keep Lake Pontchartrain from emptying into the City of New Orleans under the project hurricane it would be necessary that the small back levees in the <u>area between the Industrial Canal and Jefferson Parish</u> be raised to an elevation around twenty feet plus or minus over mean sea level. This will require utilization of a Land Strip approximately 150 feet in width in the current parkway area extending along that section of the Lakefront. Additionally, because of the tide level aspects that will be encountered, something similar or perhaps some very special type of levee would be required along the London Avenue Drainage Canal, the Orleans Avenue Drainage Canal, and the Seventeenth Street Drainage Canal. A possible alternative (certainly a safer one) would be to relocate Drainage pumping stations 6, 7, and 5 to the Lakefront making the high level canals low level, then rearranging the drainage system between the Lake and Florida Avenue/Metairie Ridge and between the Orleans/Jefferson Parish Line and the Industrial Canal.

-1-

*Members of the Board:*   ROBERT P. AULSTON, III • JAMES L. BEVERLY • PHILIP C. CIACCIO • RUSSELL L. CUOCO • RENE A. CURRY • DR. ALBERT W. DENT
JOSEPH V. DIROSA • JOSEPH I. GIARRUSSO • WILLIAM A. HOLTON, JR. • MOON LANDRIEU • HARRY McCALL, JR. • ALDEN J. McDONALD, JR. • MRS. R. KING MILLING

November 23, 1977

Augie:

From the Lakefront Airport East, one of two options would be available, raise the existing levees and at the same time broaden these levees so as to either add on the Lakeside or to widen on the riverside and use Haynes Blvd., or in the alternative to put some type of sheet piling in this entire levee area with a concrete cap.

You stated that "second a most important consideration is exactly what the probability of this "killer" storm is. This cannot be calcuated mathematically because it has never happened in recorded history." This is incorrect, Camille was a project hurricane that struck the Gulf Coast. The wind force intensity and "fetch" of Camille was utilized by Dr. Simpson of Miami, and he shifted the location of Camille 30 miles west to the project area for New Orleans, (pass Chef Menteur) and based upon this shift and computer study it indicated that between 100,000 and 150,000 people would have died depending on the time of day on night.

I must admit there will be some inconvenience brought on by the barrier plan. As an example, when you or I decide to go fishing through either the Chef or Rigolets we may encounter some delay in going through the systems. I doubt, however, that this would be much more of a delay than waiting for the L & N Railroad Bridge when a train is approaching or passing.

I cannot agree with your contention that this would have an adverse effect because of the "additional cost of commerical water transportation". I think when we are considering the lives of the people of the City of New Orleans; I do not think that a small delay in commerical water transportation would in any manner or form significantly compare to this danger.

Also, let me point out that this is not the first barrier arrangement for hurricane protection. There are three such barrier plans that have been executed along the East Coast, and the fourth is now under construction. Additionally, in other portions of the world this to is being put into effect, such as the Thames River in England.

I want to call to your attention that as regards to the ecology impact, that the Environmental Impact statement that was prepared in connection with this project has been approved by all official agencies that are involved, and I can think of no one except some hard core environmentalists and ecologists who feel that this barrier plan is not environmentally sound, and they would sacrifice the project as well as the lives of the people of the City of New Orleans. In closing, let me point out just one instance that I personally know of as relative to a project hurricane.

In 1974, when "Carmen" was hovering over the Coast of Louisiana

Augie:                    November 23, 1977                    Page 3

and her course had been plotted so that the eye was to cross at
pass Chef Menteur; we, "Sewerage and Water Board, Levee Board,
and City Officials" met with corp of engineer personnel at Prytania
Street to determine what course of action should we take i.e.,
attempt some type of evacuation or "ride it out". At that time,
the Chief Hydrologist for the corp predicted that with the winds
that were in Carmen at that time and following the path that the
storm was taking, we could expect to have <u>four feet of clear water
running over the back levees along the Lakefront between the
Industrial Canal and the New Basin Canal.</u>

Fortunately, while we were "sweating it out" Carmen took a westerly
course, passing west of New Orleans and we were spared. Needless
to say, this scared my pants off, and I never again want to see a
situation where we are faced with this danger.

As a final after thought, David P. Barnes, Chief Meteorologist
for the New Orleans Hurricane Warning Office said, "The National
Weather Service recognizes that the greatest natural disaster
that could <u>affect the United States</u> may occur in the Lake
Pontchartrain area as a result of massive Lake flooding induced
by a severe hurricane". (Underlining added for emphasis).

I think the time has come when we had better start listening to
those experts who have the responsibility to protect our lives
and property and to quit listening to the special interests
groups who want to protect and preserve all of their commercial and
political opinions as well as the Environmental groups, who are
perfectly willing to stick their heads in the sand to avoid
facing the danger.

                              Sincerely,

                              Stuart H. Brehm, Jr.
                              Executive Director

SHBjr/dmp

## Views of Readers

# Is Big Money Behind ERA?

Editor, The Times-Picayune:

Hitler perfected the big lie. Tell one outlandish enough, repeat it often enough and it becomes believable. Persons promoting the Equal Rights Amendment have the Hitler technique in their oft-repeated charges that "groups such as Stop ERA have vast sums of money." (Letter, Mindy Guillas, Louisiana where dollar is king.)

Neither Ms. Guidry nor her cohorts or document their charges. As a member of Stop ERA, I know that is only by personal sacrifice that we have own nickels and dimes that we have been able to oppose those who are pushing for ERA.

Do the ERA proponents repeat this lie in order to cover up the vast sums of money made available to them? A breakdown, in part, of the sources of U.S. tax money voted by the Congress to the National Commission for International Women' Year, unknown thousands of U.S. tax dollars appropriated by the Citizens Advisory Council on the Status of Women, operating within the U.S. Department of Labor ($80,000 in 1974); thousands of dollars appropriated to the State Commission on the Status of Women ($123,277 for Louisiana Commission in 1975-76); $288,000 from Rockefeller Foundation to California Status of Women, 1974; $18,000, National Organization for Women, 1973; $250,000 given by women's groups to hire public relations firm to promote ERA. (Washington, Star, 12 Nov.).

New Orleans

Is as bad enough that from our taxes depleted personal income we have to fight ERA proponents who are using our own tax dollars against us. It adds insult to injury to see in print the unsubstantiated charge that "groups such as Stop ERA have vast sums of money . . . and have therefore been able to defeat the ERA in states such

MARILYN THAYER.

## Hurricane Protection

New Orleans

Editor, The Times-Picayune:

I want to thank you and to compliment you on your recent editorial and articles in referring to the controversy over the one-year "barrier plan" more system for the hurricane protection torium for New Orleans.

I have a personal interest in this matter as my home is in the Chef Pass, which is beyond the present hurricane protection system. Therefore I would like to pass on to you what I consider significant points of the controversy.

First, there is no question that the Corps of Engineers has made an in-depth study of this situation. The study is very technical and I am hardly in a position to discredit it.

Second, a most important consideration is exactly what the probability of this "killer" storm is. This cannot be calculated mathematically because it has never happened in recorded history. Therefore it is impossible to make a projection but I think that most all ex-

perts would agree that the probability of this exact storm is very unlikely. (But it could happen next year and we must address ourselves to the potential problem.)

The third important point is to evaluate the people and land as they are protected now and accept the responsibility of continued protection for them. As a result of the many years of construction systems to protect people from high tides and hurricane damages New Orleans has an extensive levee system. We do have a commitment to these people inside of this present system to be protected. There is no question that, even in a storm situation that is highly unlikely, those people should be protected to the fullest extent of our knowledge and resources.

By the same token, the people who are not now protected and who knowingly live, like myself, exposed to the possibility of flooding, do not necessarily demand that obligation.

The fourth point is whether or not government should invest in further land development or include more land in the now questionable hurricane protection system.

The Corps has expertly presented a multitude of ways to compensate for the "killer" stormated. Most have been properly eliminated. In the final analysis they recommended two works able solutions, the "barrier plan" and the "high-level plan."

The recommended "barrier plan", in effect, is to construct physical barriers

(operable dams) across the Rigolets, the Chef and the Industrial Canal which will control the water level in Lake Pontchartrain. This plan has an estimated price of $399 million.

The "high-level plan," in effect, is Part A, raising of existing levees and Part B, the construction of additional levees around the entire shore of Lake Pontchartrain. Part A is estimated to cost only $100 million. Part B's estimated cost is not calculated, and both mated the Corps and I agree it is totally impractical.

The Corps use this very fact, though, to substantiate the only reason for going to the barrier plan over the high-level plan. They take the total acreage affected and divide it by the cost. Obviously the high-level plan, including Part A and Part B, would not be practical. But if we construct only Part A, that is the most practical solution—$250 million more practical.

A multitude of other things have surfaced while debating these plans; for instance, the ecology impact, the additional cost of commercial water transportation, inconvenience to the water sports of boating and fishing, and the impact on the shrimping and oyster industry.

All things considered, there is no doubt the high-level plan Part A should be implemented — save the $250 million and further protect only the people to whom we are committed, and abandon immediately the barrier plan.

AUGUST PEREZ III.