UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: KATRINA CANAL BREACHES CONSOLIDATED LITIGATION | * CIVIL ACTION<br>*<br>* NO. 05-4182<br>* |
| PERTAINS TO: MRGO | * SECTION "K" (2)<br>* |
| FILED IN:  06-0020, 06-5260, 06-5308, 06-5785, 06-5786, 06-8708, 07-1113, 07-1349, 07-3173, 07-3500, 07-4392, 07-4550, 07-4555, 07-4837, 07-4945, 07-4976, 07-4979, 07-4995, 07-5007, 07-5012, 07-5013, 07-5016, 07-5067, 07-5254, 07-5286, 07-5339, 07-5343, 07-5344, 07-5350, 07-5355, 07-5356, 07-5375, 07-5397 | * JUDGE DUVAL<br>*<br>* MAGISTRATE WILKINSON<br>*<br>*<br>*<br>*<br>* |

* * * * * * * * * * * * * * * * * * * * * * * * * * *

# MEMORANDUM OF LAW IN SUPPORT OF WASHINGTON GROUP INTERNATIONAL, INC.'S MOTION FOR SUMMARY JUDGMENT AND FOR ENTRY OF RULE 54(B) JUDGMENT WITH RESPECT TO CERTAIN INDIVIDUAL ACTIONS

William D. Treeby, 12901
Carmelite M. Bertaut, 3054
Heather S. Lonian, 29956
Stone Pigman Walther Wittmann L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Telephone:    (504) 581-3200
Facsimile:     (504) 581-3361

Adrian Wager-Zito
Debra S. Clayman
Jones Day
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
Telephone:    (202) 879-4645
Facsimile:     (202) 626-1700

December 31, 2008              *Attorneys for Washington Group International, Inc.*

## I.     INTRODUCTION

In the aftermath of Hurricane Katrina, more than thirty class-action complaints were filed against Defendant Washington Group International, Inc. ("WGII") and other Defendants. These class-action complaints ultimately were consolidated into a Plaintiffs' Amended MRGO Master Consolidated Class Action Complaint (Doc. No. 11450) ("Master Complaint").[1] On October 9, 2008, following years of discovery, WGII moved for summary judgment on all claims alleged against it in the Master Complaint based on the government contractor defense.[2] After extensive briefing and oral argument, on December 15, 2008, this Court granted WGII's motion for summary judgment in its entirety.[3]

Several individual (or non-class) actions also were filed against WGII and were consolidated under the *In re Katrina* umbrella. Many of these individual actions simply recite the same substantive allegations against WGII that the MRGO Plaintiffs' Subgroup Litigation Committee ("MRGO PLSC") already made in its Master Complaint.[4] Accordingly, WGII

---

[1] *See* Case Management Order No. 4, § II(B)(1) (Doc. No. 3299) ("These Master Consolidated Class Action Complaints shall supersede and replace all previously filed class action complaints.").

[2] *See* Memorandum of Law In Support of WGII's Motion for Summ. J. (Doc. No. 15861-2) ("Summ. J. Br."); Statement of Undisputed Material Facts in Support of WGII's Motion for Summ. J. (Doc. No. 15861-3) ("Stmt. of Undisputed Facts").

[3] *See* MRGO PSLC's Opp. to WGII's Motion for Summ. J. (Doc. No. 16216); Response of the MRGO PSLC to the Statement of Undisputed Material Facts In Support of WGII's Motion for Summ. J. (Doc. No. 16216-3); Reply Mem. of Law In Support of WGII's Motion for Summ. J (Doc. No. 16303) ("Reply Br."); Sur Reply of the MRGO PSLC to the Reply Mem. of Law (Doc. No. 16345); Hearing Tr. on Motion for Summ. J. (Doc. No. 16522); Order and Reasons (Duval, J.) (Doc. No. 16723).

[4] *See Cochran v. Boh Brothers Constr. Co.*, No. 06-5785 (E.D. La. Sept. 8, 2006), *O'Dwyer v. La. Dept. of Transp. and Dev.*, No. 06-5786 (E.D. La. Sept. 8, 2006), *Lundy v. United States*, No. 07-3173 (E.D. La. June 6, 2007), *Parfait Family v. United States*, No. 07-3500 (E.D. La. June 26, 2007), *Abair v. United States*, No. 07-4392 (E.D. La. Aug. 27, 2007), *Huey v. United States*, No. 07-4550 (E.D. La. Aug. 28, 2007), *Radio Parts, Inc. v. United States*, No. 07-4555 (E.D. La. Aug. 28, 2007), *Ferrara v. United States*, No. 07-4945 (E.D. La. Aug. 29, 2007), *Entercom Commc'ns Corp. v. United States*, No. 07-4976 (E.D. La. Aug. 29, 2007), *White III, L.L.C. v. United States*, No. 07-4979 (E.D. La. Aug. 29, 2007), *CII Carbon, L.L.C. v. United States*, No. 07-4995 (E.D. La. Aug. 29, 2007), *Keppel v. United States*, No. 07-5007 (E.D. La. Aug. 29, 2007), *Wetco Rest. Group, L.L.C. v. United States*, No. 07-5012 (E.D. La. Aug. 29, 2007), *Sloan v. United States*, No. 07-5013 (E.D. La. Aug. 29, 2007), *Universal Health Servs., Inc. v. United States*, No. 07-5016 (E.D. La. Aug. 29, 2007), *Connick v. United States*, No. 07-5067 (E.D. La. Aug. 29, 2007), *Universal Health Servs., Inc. v. United States*, No. 07-5254 (E.D. La. Aug. 30, 2007), *Universal Health*

requests that the Court now grant summary judgment to WGII in those individual actions that share the same substantive allegations as the Master Complaint for all of the reasons argued in its summary judgment motion and related briefing, and for all of the reasons set forth in this Court's December 15, 2008 Order and Reasons (Doc. No. 16723).

A handful of other individual actions consolidated under the *In re Katrina* umbrella contain claims that are not substantively identical to the claims set forth in the Master Complaint.[5] Thus, WGII hereby submits the following Memorandum of Law in Support of Summary Judgment to specifically address this allegation:

> Upon information and belief, Defendant [WGII] contracted to level and clear abandoned industrial sites along the Industrial Canal between the flood wall and the canal. It is believed that the *use of heavy vehicles and/or other heavy construction equipment* along the Industrial Canal between the flood wall and the canal damaged the levee and/or flood wall and caused and/or contributed [to] the above-mentioned breach in the levee and/or flood wall.[6]

Based on facts in the record that are not genuinely disputed, the Individual Plaintiffs' "heavy vehicles and equipment" claim against WGII must be dismissed because it, like the claims

---

(continued…)

*Servs., Inc. v. United States*, No. 07-5286 (E.D. La. Aug. 31, 2007), *Wetco Rest. Group, L.L.C. v. United States*, No. 07-5339 (E.D. La. Sept. 4, 2007), *Keppel v. United States*, No. 07-5343 (E.D. La. Sept. 4, 2007), *Sloan v. United States*, No. 07-5344 (E.D. La. Sept. 4, 2007), *Universal Health Servs., Inc. v. United States*, No. 07-5350 (E.D. La. Sept. 4, 2007), *CII Carbon, L.L.C. v. United States*, No. 07-5355 (E.D. La. Sept. 4, 2007), *White III, L.L.C. v. United States*, No. 07-5356 (E.D. La. Sept. 4, 2007), *Entercom Commc'ns Corp. v. United States*, No. 07-5375 (E.D. La. Sept. 4, 2007), *Aleman v. United States*, No. 07-5397 (E.D. La. Sept. 4, 2007).

[5] *See LeDuff v. Boh Bros. Constr. Co.*, No. 06-5260 (E.D. La. Aug. 29, 2006), *Tauzin v. Board of Comm'rs for the Orleans Parish Levee Dist.*, No. 06-0020 (E.D. La. Jan. 3, 2006), *Richardson v. Boh Bros. Constr. Co.*, No. 06-8708 (E.D. La. Oct. 19, 2006), *Carney v. Boh Bros. Constr. Co.*, No. 07-1349 (E.D. La. Mar. 19, 2007), *Douville v. Boh Bros. Constr. Co.*, No. 07-1113 (E.D. La. Feb. 28, 2007), *Albano v. United States*, No. 07-4837 (E.D. La. Aug. 28, 2007).

[6] LeDuff Compl. ¶ 50 (emphasis added); *see* Tauzin Compl. ¶ 41; Richardson Compl. ¶ 12; Carney Compl. ¶ C.1; Douville Compl. ¶ C.1; Albano Compl. ¶ 32.

alleged in Plaintiffs' Master Complaint, is barred by the well-established federal government contractor defense.[7]

## II. STATEMENT OF FACTS

In 1998, after decades of study, Congress appropriated funds to begin construction of the Inner Harbor Navigation Canal ("IHNC") Lock Replacement Project.[8] As part of its plan, the United States Army Corps of Engineers ("Corps") intended to dredge a two-way bypass channel (one lane 22-feet deep and the other 31-feet deep) through the East Bank Industrial Area ("EBIA") in the Lower Ninth Ward of New Orleans.[9] In July 1999, the Corps selected WGII via a pre-existing Indefinite Delivery-Indefinite Quantity Contract known as a Total Environmental Restoration Contract ("TERC"), to provide demolition and environmental remediation services in the EBIA to prepare the site for dredging.[10] This project became known as Task Order 26 of the TERC.[11]

WGII wholly incorporates herein the Statement of Facts from its previously-filed Summary Judgment Brief at 1-42 (Doc. No. 15861-2), its Statement of Undisputed Facts (Doc. No. 15861-3), and Exhibits 1-124 attached thereto.

---

[7] Separately, WGII moves for summary judgment with respect to *Gisevius v. Boh Bros. Constr. Co.*, No. 06-5308, (E.D. La. Aug. 29, 2006). The claims in the *Gisevius* Complaint are based solely on an allegation that WGII and other defendants "were responsible for the safe design, buildings, construction, and maintenance of the levees, the hurricane walls, in the New Orleans metropolitan area." *Gisevius* Compl. ¶ 2. But the record is wholly devoid of any evidence that WGII designed, built, constructed or maintained levees or floodwalls in the New Orleans area. Indeed, the undisputed record evidence is that WGII did not have any involvement whatsoever in these activities. *See* WGII's Objections and Responses to MRGO PSLC Requests for Admissions and Interrogatories, RFA No. 2 and Int. Nos. 25-26, June 14, 2007 (attached hereto as Ex. A); Guillory I at 121:1-5 [Ex. 17]; Guillory II at 47:2-11 [Ex. 6]. Thus, WGII is entitled to summary judgment in this case as a matter of law.

[8] *See* Stmt. of Undisputed Facts ¶¶ 1-14 and record citations referenced therein.

[9] *See* Stmt. of Undisputed Facts ¶¶ 15-16 and record citations referenced therein.

[10] *See* Stmt. of Undisputed Facts ¶¶ 23-24, 28 and record citations referenced therein.

[11] *See* Stmt. of Undisputed Facts ¶ 29 and record citations referenced therein.

### III. APPLICABLE LAW – GOVERNMENT CONTRACTOR DEFENSE

WGII fully incorporates the law sections of its previously filed Summary Judgment Brief at 42-52 (Doc. No. 15861-2) and Reply Brief (Doc. No. 16303), as well as this Court's December 15, 2008 Order and Reasons at 26-35 (Doc. No. 16723). As the Court held, to successfully claim immunity under the government contractor defense, a contractor must prove: (1) the government "'approved reasonably precise specifications;'" (2) the work "'conformed to those specifications;'" and (3) the contractor "'warned of those [work-related] dangers that were known to the supplier/contractor but not to the government.'" Order and Reasons at 28 (Doc. No. 16723) (citing *Kerstetter v. Pacific Scientific Co.*, 210 F.3d 431, 435 (5th Cir. 2000); *Boyle v. United Tech. Corp.*, 487 U.S. 500, 512 (1988)). WGII undisputedly meets these three conditions with respect to the Individual Plaintiffs' "heavy vehicles or equipment" allegation stated above. *See supra* p. 2.

### IV. THE GOVERNMENT CONTRACTOR DEFENSE BARS PLAINTIFFS' "HEAVY VEHICLES OR EQUIPMENT" CLAIM AGAINST WGII

#### A. Condition 1: The Corps Approved Reasonably-Precise Specifications For All Heavy Vehicles And Equipment That WGII Used On Task Order 26

As set forth in WGII's Summary Judgment Brief (Doc. No. 15861-2), Statement of Undisputed Facts (Doc. No. 15861-3) and accompanying Exhibits, there is ample, undisputed evidence in this case that the Corps' back-and-forth review of the proposed work plans for WGII's (and its subcontractors') work on Task Order 26, which included the use of heavy equipment/vehicles at the EBIA, satisfies the first condition of the government contractor defense. *See* Summ. J. Br. at 47 ("the United States need not have actually prepared the specifications in order to have 'approved' them;" "[i]f the evidence shows that the federal government provided a 'substantive review or evaluation' of the contractors plans, and not merely a bureaucratic 'rubber stamp,' the first condition" of the government contractor defense is

satisfied) (citing *Kerstetter*, 210 F.3d at 435; *Trevino v. Gen. Dynamics Corp.*, 865 F.2d 1474, 1480 (5th Cir. 1989)); Order and Reasons at 31-32 (Doc. No. 16723) (citations omitted).

1. Project Work Plan

One of the Corps' early Statements of Work ("SOW") on Task Order 26 directed WGII to draft eight major work plans for various aspects of its remediation and demolition project: a Project Work Plan ("PWP"), Waste Management Plan ("WMP"), Storm Water Pollution Prevention Plan ("SWPPP"), Sampling and Analysis Plan ("SAP"), Contractor Quality Control Plan ("CQCP"), Site Safety & Health Plan ("SSHP"), Hurricane Preparedness Plan ("HPP"), and a Perimeter Monitoring Plan ("PMP").[12]  These work plans "were prepared with significant give and take between the two parties and set out the broad parameters as well as the details and 'best practices' to occur in the performance of Task Order 26."[13]

The PWP, in particular, described the type of construction equipment WGII and its subcontractors were to use in clearing the above-ground and subsurface structures/obstructions at the EBIA.  For example, for building demolition, the PWP specified:

> A hydraulic shear mounted on a track excavator will be used to cold cut steel supports for large buildings.  Excavators with hydraulic thumbs, hydraulic breakers or concrete pulverizers will be used to remove brick/block constructed buildings.  Smaller buildings may be leveled using a bulldozer or other approved method.  Torch or flame cutting of building steel with lead based paint is prohibited.[14]

---

[12] *See* Stmt. of Undisputed Facts ¶ 62 (citing SOW, May 15, 2000 [Ex. 48 at 2]; Guillory I at 98:7-24 [Ex. 17]; PWP, Oct. 2000 [Ex. 4 at 9]).

[13] Order and Reasons at 12 (Doc. No. 16723) (citing Stmt. of Undisputed Facts ¶ 63).

[14] PWP [Ex. 4 at 41].

"Foundation demolition," on the other hand, "will be accomplished with either a hydraulic hammer (hoe ram), hydraulic splitter or other approved method," [15] and "piling removal," will require use of a "vibratory pile extractor suspended from a crane."[16]

The Corps reviewed and commented on WGII's draft PWP on virtually a line-by-line basis, and specifically critiqued (and later approved) the construction equipment WGII proposed to use.[17]  For example, in its comments on a draft PWP dated September 18, 2000, the Corps vetoed WGII's proposal to use a wrecking ball to demolish structures in the EBIA:  "The use of a wrecking ball to demolish foundations could cause excessive and unnecessary noise, dust and vibrations in the adjacent neighborhood, and is not an approved method of demolition . . . Recommend only saw cutting or a track hoe with hydraulic concrete crushing attachment."[18]

Finally, and perhaps most importantly, per the Corps' instruction, the PWP also provided that no remediation work on the site could take place within 15 feet of the levees/floodwalls bordering the EBIA.[19]  Mr. Lee Guillory, the Corps' Construction Manager and a Contracting Officer Representative ("COR") on Task Order 26, testified that the Corps developed this "guideline at the beginning of the project" to prevent contractors, such as WGII, from "plac[ing] any moving equipment, heavy equipment, within 15 feet of the floodwall face."[20]  This 15-foot

---

[15] PWP [Ex. 4 at 44].

[16] *See* PWP [Ex. 4 at 45]; *see also id.* at 52 ("A grid trenching operation using a powered trencher to a depth of five feet will be used to find any residual underground objects on a 25-foot grid.").

[17] *See* Corps' Comments on WGII's Final PWP, Nov. 1, 2000 [Ex. 47]; PWP [Ex. 4 at 2].

[18] Corps' Comments on WGII's Final PWP [Ex. 47 at 8]; *see id.* ("The equipment listed [in the fifth paragraph of the proposed PWP] would not be appropriate for structure #74, a 60x110 concrete block building with a precast concrete roof."); Guillory II at 37:6-24 [Ex. 6].

[19] PWP [Ex. 4 at 55]; Order and Reasons at 12 (Doc. No. 16723).

[20] Stmt. of Undisputed Facts ¶¶ 72-74 (citing Guillory I at 159:21-160:5 [Ex. 17]).

boundary was "like a clearance zone that you do not do any work in there because it has the possibility of the equipment impacting the floodwall."[21]

Thus, there is no question that the Corps substantively considered and approved reasonably-precise specifications in the PWP for the type of heavy equipment to be used in the EBIA, and the proximity to the levees/floodwalls that any such equipment could be used.

2. Preparatory Phase Meetings and Corps' Review and Approval of Subcontractor Work Plans

Another of the eight major work plans, the Contractor Quality Control Plan ("CQCP"), mandated that WGII and its subcontractors follow a three-phase quality control system to ensure that each feature of their work (also known as a "Definable Feature Of Work" or "DFOW") was performed in accordance with contract requirements and with Corps approval.[22]  The three-phase quality control system consisted of the "Preparatory Phase," the "Initial Phase," and the "Follow-Up Phase."[23]

During the Preparatory Phase, which commenced just prior to the start of each work feature, WGII was required to, *inter alia*:  (1) review each paragraph of the applicable specifications; (2) review any applicable plans (*e.g.*, SAP, SSHP, PWP, etc.); (3) *verify that appropriate drawings and submittals for materials and equipment were submitted and that the Corps actually approved them*; (4) examine the work area to ensure all preliminary work was complete; (5) discuss field methods and procedures for the work; and (6) ensure that the work

---

[21] *Id.*

[22] Stmt. of Undisputed Facts ¶¶ 75-76 and record citations referenced therein.

[23] Stmt. of Undisputed Facts ¶¶ 76-87 and record citations referenced therein (describing three-phase quality control system).

959778v.1

plan for the specific task has been approved by the Corps.[24]  At least one Corps representative, as well as relevant subcontractors, attended each Preparatory Phase meeting.[25]  After every meeting, WGII drafted meeting minutes and submitted them to the Corps for review and correction.[26]  The Preparatory Phase meeting minutes, which are attached to WGII's Summary Judgment Brief, contain undisputed evidence of the Corps' review and consideration of the equipment WGII (or its subcontractors) intended to use at the EBIA.[27]

Additionally, WGII's local subcontractors prepared the specific work plans for each feature of work, which were then discussed with the Corps during Preparatory Phase meetings. As set forth in its Summary Judgment Brief, these subcontractor work plans—which were reviewed and approved by the Corps before commencing work—also specified the precise type of construction equipment to be used on Task Order 26.  For example, the Corps tasked WGII with removing an abandoned sewer lift station located underground at the EBIA's Saucer Marine site.[28]  In the sewer lift station work plan, WGII's subcontractor described the specific equipment to be used for this feature, including a "LS-418-110 ton crawler crane equipped with a hydraulic

---

[24] *See* Stmt. of Undisputed Facts ¶ 78 and record citations referenced therein; CQCP, Oct. 2000 [Ex. 53 at 22-23]; Guillory II at 91:6-22 [Ex. 6]; *see also* Roe at 146:20-148:14 [Ex. 22] (in the preparatory meeting "you're bringing your subs on and they're telling you what equipment they're going to use and, you know, the real detail").

[25] *See* Guillory II at 91:15-22, 104:18-106:11 [Ex. 6]; Clouatre at 65:7-14, 65:17-66:2 [Ex. 35]; *see also* Guillory II at 100:20-103:7 [Ex. 6].

[26] *See* Guillory II at 58:18-59:13 [Ex. 6]; *see also id.* at 77:3-78:3.

[27] *See* Prep. Phase Mtg. Min., Demo., Mar. 29, 2001 [Ex. 65 at 1] (equipment to be used for demolition and piling removal discussed); Prep. Phase Inspection Min., Lift Station, Oct. 3, 2001 [Ex. 76 at 3] (listing equipment to be used for sewer lift station removal); Prep. Phase Inspection Mtg. Min., Concrete Blocks, Nov. 14, 2001 [Ex. 83 at 1] (specific equipment for concrete block removal discussed during meeting); QAR #267, Jan. 16, 2002 [Ex. 37 at 10] (equipment to be used for removal of barge, fuel tanker, and sunken debris described in preparatory phase meeting agenda);  QAR #340, Apr. 16, 2002 [Ex. 93 at 7, 10] (during preparatory phase meeting, "Phil Staggs, WGI, gave a detailed description of the Remediation Procedures and Work Plan . . . along with the equipment and personnel that will be utilized").

[28] *See* Stmt. of Undisputed Facts ¶¶ 110-12 and record citations referenced therein.

vibratory pile driver" and a "PC 270 Excavator with Hoeram."[29] These equipment specifications were discussed during the Preparatory Phase meeting for the lift station removal,[30] and the Corps reviewed and commented on several drafts of the work plan before approving it in October 2001.[31] Similar undisputed evidence exists in the record for the other features of work WGII and its subcontractors performed on Task Order 26,[32] all of which clearly demonstrates that the Corps reviewed and approved heavy equipment specifications sufficient to satisfy the first condition of the government contractor defense.

      **B.**    <u>**Condition 2**</u>**:  WGII's Use Of Heavy Vehicles And Equipment On Task Order 26 Was In Conformity With Corps-Approved Specifications**

The second condition of the government contractor defense tests whether the contractor's work conformed to the government's approved specifications.  *Boyle*, 487 U.S. at 512.  As described in WGII's Summary Judgment Brief, this condition may be satisfied by showing that the United States supervised the contractor's implementation of approved specifications, *In re Katrina*, 2007 WL 4219351, at *5 (citing *Trevino*, 865 F.2d at 1480), or that the government inspected, accepted as complete, or used the contractor's work.  *See* Order and Reasons at 33 (Doc. No. 16723) (citing *Kerstetter*, 210 F.3d at 435-36); *Miller v. Diamond Shamrock Co.*, 275

---

[29] Lift Station Removal Plan (Revised), Oct. 19, 2001 [Ex. 64 at 3-5].

[30] *See* Prep. Phase Inspection Min., Lift Station [Ex. 76 at 3].

[31] *See* Stmt. of Undisputed Facts ¶¶ 113-18 and record citations referenced therein; Order and Reasons at 14-16 (Doc. No. 16723).  Likewise, as part of Task Order 26, WGII removed several subsurface concrete blocks from the Boland Marine site, including a concrete block commonly referred to as the "wedding cake."  *See* Stmt. of Undisputed Facts ¶¶ 126-27 and record citations referenced therein.  WGII's subcontractor created a work plan for this DFOW that listed detailed equipment specifications, such as use of PC 270 and PC 400 Excavators to break and remove the concrete foundations, and a "LS-418 100 Ton crane equipped with a MKT V5C hydraulic vibratory woodpile extractor" to remove timber pilings located at the base of the foundations.  Wedding Cake Final Work Plan, Dec. 11, 2001 [Ex. 63 at 3-5].  The Corps reviewed these equipment specifications during the wedding cake Preparatory Phase meeting and ultimately approved the specifications in December 2001.  *See* Prep. Phase Inspection Mtg. Min., Concrete Blocks [Ex. 83 at 1]; Stmt. of Undisputed Facts ¶¶ 128-33 and record citations referenced therein; Order and Reasons at 22 (Doc. No. 16723).

[32] *See, e.g.*, Hamp's Demo. Work Plan, Apr. 12, 2001 [Ex. 62 at 17-26]; Stewart Submittal for Removal/Disposal of Barge and Tanker, Dec. 2001 [Ex. 87 at 12-15, 19-31]; QAR #340 [Ex. 93 at 10] (describing equipment to be used for soil remediation).

F.3d 414, 420 (5th Cir. 2001) (government's written acceptance of its contractor's work constitutes compelling evidence that the contractor's work conformed to approved specifications); *Tate v. Boeing Helicopters*, 55 F.3d 1150, 1156 (6th Cir. 1995) (second condition satisfied by proof the government "inspected and approved" contractor's work); Summ. J. Br. at 48-50.

As this Court noted, the record demonstrates that "[a]t every stage" of Task Order 26, "the Corps found no deficiencies in [WGII's] performance of the contract and ultimately accepted the project in its entirety."[33] For instance, the Corps' Quality Assurance Inspectors on Task Order 26 conducted both Initial Phase and *daily* Follow-up Phase inspections of WGII's and its subcontractors work.[34] In all such instances, the Corps found WGII's work to be in conformance with approved specifications.[35] In addition, following a final site inspection by the Corps on May 26, 2005, WGII concluded its physical work in the EBIA, and the Corps declared Task Order 26 "substantially complete."[36]

Lastly, in August 2005, just weeks before Hurricane Katrina struck New Orleans, WGII submitted a Technical Completion Report for Task Order 26 to the Corps.[37] Among other things, the Completion Report summarized the features of work WGII and its subcontractors performed, including the types of construction equipment used.[38] After review and comment on WGII's

---

[33] Order and Reasons at 33 (Doc. No. 16723); Summ. J. Br. at 54-55; 59-60.

[34] *See* Stmt. of Undisputed Facts ¶¶ 82-84 and record citations referenced therein (describing Initial Phase inspections), ¶¶ 85-87 (describing Follow-up Phase inspections); *see also* Summ. J. Br. at 19-20.

[35] *See, e.g.*, Stmt. of Undisputed Facts ¶¶ 105-09 and record citations referenced therein (demolition and piling removal), ¶¶ 122-25 (sewer lift station removal), ¶¶ 137-39 (concrete block removal), ¶¶ 147-50 (fuel tanker car removal), ¶¶ 169-77 (soil remediation), ¶¶ 191-94 (borrow pit construction), ¶¶ 202-05 (excavations under Surekote Road).

[36] Stmt. of Undisputed Facts ¶¶ 207-09 and record citations referenced therein.

[37] Stmt. of Undisputed Facts ¶¶ 211-12 and record citations referenced therein.

[38] *See* Technical Completion Report, Aug. 2005 [Ex. 24 at 30-38, 126-80].

draft report, the Corps approved the Completion Report on August 23, 2005, and accepted WGII's work on Task Order 26 as finally complete.[39]

### C. Condition 3: WGII Had No Actual Knowledge Of Any Potential Danger Its Work Posed To The Levees/Floodwalls

A federal contractor satisfies the government contractor defense's third condition by proving it knew of no "reasons not known to the government why the application" of the approved specifications "[wa]s unsafe or unreasonable." *In re Katrina*, 2007 WL 4219351, at *5; *see also Kerstetter*, 210 F.3d at 436; *In re Air Disaster*, 81 F.3d at 575-76; *Stout*, 933 F.2d at 336-37. But the third condition does not oblige the contractor to test for or discover inherent risks that neither the United States nor its contractor ever considered to be problematic. *See Boyle*, 487 U.S. at 513 (the standard is not what a contractor should have "reasonably known" because that is inadequate to "protect the federal interest embodied in the 'discretionary function' exemption"); *see also Kerstetter*, 210 F.3d at 436 (holding the government contractor defense applies "even when the contractor did not warn the government of latent defects . . . that neither the contractor nor the government considered"). Instead, the contractor must warn the United States "of dangers about which it has *actual knowledge*," and not about dangers which, in hindsight, the contractor allegedly *should have* identified. *See Kerstetter*, 210 F.3d at 436 (quoting *Trevino*, 865 F.2d at 1487) (emphasis in original); Order and Reasons at 34 (Doc. No. 16723) (citation omitted).

Moreover, *Boyle's* third condition tests only whether the contractor knew of dangers "not known to the government." *In re Katrina*, 2007 WL 4219351, at *5. Thus, a contractor also may satisfy this third condition by showing the United States' knowledge of potential risks either equaled or exceeded the contractor's knowledge. *See, e.g.*, *Miller*, 275 F.3d at 422-23 (affirming

---

[39] Stmt. of Undisputed Facts ¶¶ 211-13 and record citations referenced therein.

summary judgment partly because the United States knew of the danger posed by a byproduct of Agent Orange); *Kerstetter*, 210 F.3d at 438 n.9 (affirming summary judgment partly because the United States "knew at least as much as the contractors"); *In re Air Disaster*, 81 F.3d at 575 (affirming summary judgment partly because the United States knew of the alleged risk); *Stout*, 933 F.2d at 336-37 (affirming summary judgment partly because the United States' verbal and written warnings to the plaintiff showed the United States knew of the risk).

There is absolutely no evidence in the record that WGII had actual knowledge that the heavy equipment it used on Task Order 26, in accordance with government-approved specifications, would damage the nearby levees and floodwalls. To the contrary, as this Court already found: "WGII was performing a remediation contract which did not involve any flood control structures," and to the extent WGII's work could impact the nearby levees/floodwalls, the Corps, and not WGII, "had the responsibility and duty to insure the integrity of the levee system."[40] Indeed, the Corps fulfilled its responsibility in this instance by scrutinizing the type of equipment used on the project,[41] and more importantly, by expressly prohibiting WGII and its subcontractors from working within 15 feet of the protected side of the levees and floodwalls.[42]

---

[40] Order and Reasons at 34 (Doc. No. 16723); *see* Stmt. of Undisputed Facts ¶¶ 56, 182-88, 199-201 and record citations referenced therein.

[41] *See supra* Part IV.A.

[42] *See supra* Part IV.A.1.

## V. CONCLUSION

For all of the foregoing reasons, WGII respectfully requests that the Court grant its motion for summary judgment and enter a Rule 54(b) judgment as to the claims asserted against WGII.

Dated: December 31, 2008                                    Respectfully submitted,

                                                   */s/Heather S. Lonian*
William D. Treeby, 12901
Carmelite M. Bertaut, 3054
Heather S. Lonian, 29956
Stone Pigman Walther Wittmann L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Telephone:   (504) 581-3200
Facsimile:    (504) 581-3361

Adrian Wager-Zito
Debra S. Clayman
Jones Day
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
Telephone:   (202) 879-4645
Facsimile:    (202) 626-1700

Attorneys for Washington Group International, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing Memorandum Of Law In Support Of Washington Group International, Inc.'s Motion For Summary Judgment and for Entry of rule 54(B) Judgment With Respect To Certain Individual Actions has been served upon all counsel of record through the Court's CM/ECF electronic filing system or by placing same in the United States mail, postage prepaid and properly addressed, this 31st day of December, 2008.

                                                   */s/Heather S. Lonian*