# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

|  |  |
|---|---|
| | * |
| IN RE:  KATRINA CANAL BREACHES | *   CIVIL ACTION |
| CONSOLIDATED LITIGATION | * |
| | *   NO. 05-4182 |
| | * |
| PERTAINS TO:  MRGO | *   SECTION "K" (2) |
| | * |
| FILED IN: 06-0020, 06-5260, 06-5308, 06-5785, 06- | *   JUDGE DUVAL |
| 5786, 06-8708, 07-1113, 07-1349, 07-3173, 07-3500, | * |
| 07-4392, 07-4550, 07-4555, 07-4837, 07-4945, 07- | *   MAGISTRATE WILKINSON |
| 4976, 07-4979, 07-4995, 07-5007, 07-5012, 07-5013, | |
| 07-5016, 07-5067, 07-5254, 07-5286, 07-5339, 07- | |
| 5343, 07-5344, 07-5350, 07-5355, 07-5356, 07-5375, | |
| 07-5397 | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*   \*

## STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF WASHINGTON GROUP INTERNATIONAL, INC.'S MOTION FOR SUMMARY JUDGMENT AS TO CERTAIN INDIVIDUAL ACTIONS

William D. Treeby, 12901
Carmelite M. Bertaut, 3054
Heather S. Lonian, 29956
Stone Pigman Walther Wittmann L.L.C.
546 Carondelet Street
New Orleans, Louisiana  70130
Telephone:     (504) 581-3200
Facsimile:     (504) 581-3361

Adrian Wager-Zito
Debra S. Clayman
Jones Day
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
Telephone:     (202) 879-4645
Facsimile:     (202) 626-1700

December 31, 2008

*Attorneys for Washington Group International, Inc.*

**A.      The Lock Replacement Project On The IHNC**

1.      The Inner Harbor Navigational Canal ("IHNC") or Industrial Canal, connects the Mississippi River, the Gulf Intracoastal Waterway ("GIWW"), Lake Pontchartrain, and the Mississippi River-Gulf Outlet ("MRGO").[1]  *ACORN v. U.S. Army Corps of Eng'rs*, No. Civ. A. 00-0108, 2000 WL 43332, at *6 (E.D. La. Apr. 20, 2000) (Duval, J.).

2.      The IHNC navigation lock, currently located north of the St. Claude Avenue Bridge, "passes barge traffic between the Mississippi River at New Orleans and the GIWW." *Id.* The IHNC and the lock "link [] small ships traveling between the MR-GO and the Mississippi River." *Id.*

3.      The IHNC navigation lock has operated since the early 1920s but "was projected to become dimensionally obsolete by 1970." *Id.*[2]

4.      In 1956, Congress authorized the Corps to construct an additional lock or a replacement for the existing IHNC lock, with suitable connection channels.  In doing so, Congress gave the Chief of Engineers discretion to determine both when construction of the lock would be "economically justified" and what the appropriate "type, dimensions, and cost estimates" of the project should be.  River and Harbor Act of 1956, Pub. L. No. 84-455, 70 Stat. 65.

5.      In 1960, the Corps began investigating lock replacement alternatives. *ACORN*, 2000 WL 433332 at *6.

6.      Throughout the 1980s and 1990s, the Corps evaluated various potential plans and sites for the new lock. *Id.* at *7.

---

[1] All exhibits referred to herein are attached to Washington Group International, Inc.'s ("WGII") Memorandum In Support of Motion for Summary Judgment submitted herewith.

[2] *See* Mississippi River-Gulf Outlet New Lock and Connecting Channels Evaluation Report, Mar. 1997 ("1997 Eval. Rep."), Vol. 1 [Ex. 1 at 2].

959677v.1

7.      In 1986, Congress modified the 1956 River and Harbor Act and directed the Secretary of the Army to determine the precise location and design of the lock project, provided that the Secretary consulted with "affected local communities" and made "a maximum effort to assure the full participation of members of minority groups" living in communities affected by the new lock.  Water Resources Development Act of 1986, Pub. L. No. 99-662, § 844(a)-(b), 100 Stat. 4082, 4177 ("WRDA").

8.      For all WRDA projects, Congress directed the Secretary of the Army to weigh "national economic development . . . the quality of the total environment, the well-being of the people of the United States, the prevention of loss of life, and the preservation of cultural and historical values."  *Id.* § 904.

9.      In 1996, the WRDA was amended again to require the Secretary to submit "a comprehensive community impact plan, . . . that, to the maximum extent practicable, provides for mitigation or compensation, or both, for the direct and indirect social and cultural impacts" that the lock replacement project could have on surrounding communities.  WRDA of 1996, Pub. L. No. 104-303, § 326(b) 110 Stat. 3658, 3717.

10.      By March 1997, the Corps had developed a nine-volume Final Evaluation Report ("1997 Evaluation Report") that included an analysis of the various lock replacement alternatives considered, an Environmental Impact Statement ("EIS"), a Corps' Community Impact Plan ("Mitigation Plan"), and technical data to support the analyses.  *ACORN*, 2000 WL 43332 at *7.[3]

11.      Mr. Gerald Dicharry, Senior Project Manager for the lock replacement project, supervised the Corps' preparation of the 1997 Evaluation Report.[4]

---

[3] Deposition of Gerald Dicharry, Oct. 2, 2008 ("Dicharry," Ex. 2) at 14:22-15:24.

[4] Dicharry at 17:11-24.

959677v.1

12.     After a "thorough analysis and evaluation of all practicable alternatives," their "social, environmental, and economic effects," the policy objectives of WRDA 1986, and "subsequent Congressional guidance," the 1997 Evaluation Report ultimately recommended the "North of Claiborne Avenue Plan."[5]

13.     The North of Claiborne Avenue Plan provided for the construction of a new lock—110 feet wide by 36 feet deep by 1,200 feet long—north of Claiborne Avenue on the IHNC, as well as a new St. Claude Avenue Bridge.[6]

14.     In 1998, the Corps' lock replacement project received approval from the Secretary of the Army, followed by appropriations from Congress to begin construction. *ACORN*, 2000 WL 433332 at *8.[7]

**B.     The East Bank Industrial Area**

15.     Because constructing a new lock on the IHNC would require shutting down "a vital link" to the GIWW for at least five years, the North of Claiborne Avenue proposal also included a plan for building a temporary two-way bypass channel in a 32-acre industrial area between Claiborne and Florida Avenues, west of the floodwall located between Surekote Road and Jourdan Avenue, and east of the IHNC.[8]

16.     The Corps proposed dredging a 220-feet wide bypass channel to a depth of 31 feet on the canal side (transit channel), and 22 feet on the floodwall side (laying channel).[9]  This two-

---

[5] 1997 Eval. Rep., Vol. 1 [Ex. 1 at 5]; Dicharry at 18:18-25.

[6] *See* 1997 Eval. Rep., Vol. 1 [Ex. at 9].

[7] *See* IHNC Project Fact Sheet [Ex. 3].

[8] *See* 1997 Eval. Rep., Vol. 1 [Ex. 1 at 4-5]; Project Work Plan ("PWP").

[9] *See* 1997 Eval. Rep., Vol. 3 [Ex. 5 at 3-4]; Deposition of Lee Guillory Vol. II, Aug. 22, 2008 ("Guillory II,"Ex. 6) at 118:5-24.

way channel would run north from Claiborne Avenue to Florida Avenue and occupy nearly two-thirds of the 32-acre site, known as the East Bank Industrial Area ("EBIA").[10]

17.     The Corps initially considered building the bypass channel on the west bank of the IHNC, but the east side was selected because the inventory of facilities on the EBIA (abandoned barges, buildings, storage tanks, wharves, bulkheads, fencing, transformer units, and other debris) were more expendable than the facilities on the west side.[11]

18.     The Corps determined that dredging this proposed bypass channel would not impact the existing levee/floodwall structures bordering the EBIA.[12]

19.     Between 1945 and 2000, the Port of New Orleans owned and leased the EBIA to private companies for marine services use and petroleum distribution.[13]  After decades of commercial use, the EBIA was littered with assorted structures, contaminants, and debris that the Corps needed to remove before dredging the bypass channel.[14]

20.     The Corps "did an extensive amount of preliminary site investigations" at the EBIA.[15]  Specifically, the Corps hired contractors, Waldemar S. Nelson, Inc. and Dames & Moore, Inc., to preliminarily assess the demolition and site preparation necessary for construction of the new lock, including building the bypass channel at the EBIA.[16]  The

---

[10] *See* 1997 Eval. Rep., Vol 3 [Ex. 5 at 4-5]; 1997 Eval. Rep., Vol. 4 (Plates B-14T, B-15T) [Ex. 7 at 2-3]; Guillory II at 118:11-20.

[11] Dicharry at 29:5-30:14; 1997 Eval. Rep., Vol. 3 [Ex. 5 at 2].

[12] *See* Dicharry at 31:17-32:1.

[13] Sampling and Analysis Plan ("SAP"), Jan. 2001 [Ex. 8 at 14-18].

[14] SAP [Ex. 8 at 14].   *See* 1997 Eval. Rep., Vol. 5 [Ex. 11 at 3-7].

[15] Guillory II at 47:19-48:3.

[16] *Id.*

-4-

contractors reported their findings in an 8-volume Design Documentation Report submitted to the Corps in early 1999.[17]

21.    For planning purposes, the Corps divided the EBIA into six facilities, each named for its most recent tenant.  From south to north, the sites were International Tank Terminal ("ITT"), Saucer Marine, Mayer Yacht, Indian Towing, McDonough Marine and Boland Marine.[18]

22.    Plaintiffs allege that the two levee/floodwall failures on the east side of the IHNC occurred near Boland Marine to the north, and Saucer Marine to the south.[19]

C.    **Corps Hires WGII As Its Contractor To Clear And Remediate The EBIA**

The Total Environmental Restoration Contract ("TERC")

23.    In August 1994, WGII (formerly, Morrison Knudsen Corporation or "M-K") and the Corps' Tulsa District entered into an Indefinite Delivery-Indefinite Quantity Contract for the remediation of various Hazardous, Toxic, and Radioactive Waste ("HTRW") sites in the southwest region.[20]

24.    This "umbrella" contract, also known as a Total Environmental Restoration Contract ("TERC"), provided the general requirements for all of WGII's anticipated work on HTRW sites in the region with the understanding that the Corps would prepare a specific

---

[17] Design Doc. Rep. No. 1, Feb. 1999, Vol. 1 [Ex. 12 at 6-9]; Dicharry at 36:20-38:14.

[18] *See* RECAP Submittal Rep. - Criteria Doc., Apr. 2001 [Ex. 13 at 58, 63].

[19] *See* Decl. of Robert Bea, Apr. 16, 2006 [Ex. 14 at 24] (attached to MRGO Plaintiffs' Initial Disclosures).

[20] *See* Total Envt'l Restoration Contract ("TERC"), Aug. 17, 1994 [Ex. 15 at 1-109]; Deposition of Anne Veigel, April 17, 2008 ("Veigel," Ex. 16) at 35:20-36:8.

959677v.1

Statement of Work ("SOW") for each individual Delivery Order (or "Task Order") it later issued.[21]

25.    "[F]or the sake of time, expediency, [and] experience," the Corps-NOD chose to utilize the WGII TERC contract that was based in the Corps' Tulsa District to complete the EBIA clean-up.[22]  The cost-reimbursable nature of the TERC was "highly desirable" because it provided "[f]lexibility for the Corps to accomplish the work within the time and money [allotted], and . . . to handle the unknowns, unknown contamination, unknown debris, unknown foundations," that might be discovered during the course of performing the contract.[23]

26.    The cost-reimbursable nature of the TERC required the Corps "to intently monitor, [to] work with the contractor in a team type approach, to track all costs, labor, equipment, materials, [and] personnel."[24]

27.    Because the TERC was a cost-reimburseable contract, the Corps' on-site Task Order representative always had to "know what was being spent and why it was being spent," so that he or she could decide if each of the contractor's proposed activities were "justifiable or not."[25]

### Task Order 26 under the TERC

28.    On July 12, 1999, the Corps formally tasked WGII with preparing to demolish the existing structures in the EBIA, removing surface and subsurface obstructions, characterizing the contaminants on the site and ultimately remediating the site in accordance with the Louisiana

---

[21] *See* Veigel at 68:23-69:5; TERC [Ex. 15 at 8, 10]; *see also* Deposition of Lee Guillory Vol. I, June 30, 2008 ("Guillory I," Ex. 17), at 37:5-15; Guillory II at 44:16-23.

[22] Guillory I at 46:24-47:10.

[23] Guillory II at 39:11-24; Project Execution Plan, Jun. 1, 1999 [Ex. 18 at 4]; *see also* Deposition of George Bacuta, Ph.D., July 2, 2008 ("Bacuta," Ex. 19), at 23:19-24:13, 52:6-53:16, 55:4-55:17.

[24] Guillory II at 40:21-41:10.

[25] Deposition of James Montegut, Aug. 8, 2008 ("Montegut," Ex. 23) at 24:4-10.

959677v.1

Department of Environmental Quality's ("LDEQ") new Risk Evaluation and Corrective Action Program ("RECAP") standards.[26]

29.     This task, considered part of the larger IHNC Lock Replacement Project, became known as "Task Order 26" of the TERC.[27]

30.     WGII initially was to perform Task Order 26 in accordance with the project's first SOW, dated June 1, 1999, which was drafted by the Corps-NOD's Construction Manager and Contracting Officer Representative ("COR"), Lee A. Guillory, P.E.[28]

31.     A SOW "in essence lists the work elements, a little description of the site, [and] a little description of the work to be performed."[29]

32.     The Corps typically would send a SOW to WGII with a Request for Proposal ("RFP") asking WGII to provide an estimated cost for the work identified in the SOW.[30]  In response to the RFP, WGII would draft and submit a proposal.[31]

33.     Mr. Guillory and his staff at the Corps then conducted an independent analysis of the proposal, known as a "Technical Analysis," to determine whether WGII's proposal was reasonable.[32]  The Corps negotiated or commented on WGII's proposal, verbally or in writing,

---

[26] *See* Technical Completion Rep., Aug. 2005 [Ex. 24 at 13-14]; PWP [Ex. 4 at 15]; Delivery Order 0026, July 12, 1999 ("Task Order 26") [Ex. 25]; Cmt. Submittal, Draft Rec. Rep., Oct 15, 1999 [Ex. 26 at 6].

[27] Delivery Order 0026, July 12, 1999 ("Task Order 26") [Ex. 25].

[28] *See* SOW No. 1 attached to Task Order 26 [Ex. 25 at 3-7]; Guillory II at 45:4-9, 45:23-46:1.

[29] Roe at 16:1-12.

[30] *See, e.g.*, RFP for Mod. 10, Aug. 6, 2001 [Ex. 27]; *see also* Roe at 87:3-16.

[31] Guillory II at 116:8-12.

[32] *See, e.g.*, Technical Analysis of Proposal #113, Aug. 31, 2001 [Ex. 28]; Guillory II 45:14-22.

959677v.1

and WGII submitted a revised proposal.[33]  This process continued until the Corps accepted

WGII's proposal and issued the Task Order (or modification thereto).[34]

34.    Task Order 26 and its modifications (the "contract") included the Corps' SOWs,

the WGII proposals that the Corps accepted and the applicable terms of the TERC.[35]

### D.    Roles And Responsibilities Of Corps And WGII Personnel On Task 26

#### Lee A. Guillory, P.E. (COR, Construction Manager)

35.    Lee Guillory, a professional engineer in the Construction Division of the Corps-

NOD and a Functional Team Leader ("FTL") for the Lock Replacement Project,[36] became the

Contracting Officer Representative ("COR") for Task Order 26 in August 1999.[37]

36.    Mr. Guillory served as both COR and Construction Manager, and was

"instrumental in the planning, direction, coordination, execution and construction management"

of Task Order 26.[38]

37.    Prior to Task Order 26, Mr. Guillory had "extensive experience of six years of

being a project engineer on the ground in different area offices, supervising, monitoring and

administrating construction contracts for earthen levees, hurricane protection levees . . . and

major navigational structures."[39]  From this experience, he understood "how levees and

floodwalls are built in New Orleans."[40]

---

[33] Roe at 102:22-103:2; *see e.g.*, WGII Revised – Final Proposal #113, Sept. 24, 2001 [Ex. 29].

[34] Guillory I at 146:3-148:13.

[35] *See, e.g.*, Contract Mod. 1, Nov. 23, 1999 [Ex. 30 at 1-12]; Contract Mod. 10, Sept. 25, 2001 [Ex. 31 at 2].

[36] *See* Summary of Experience for L. Guillory [Ex. 32 at 1]; Guillory II at 11:5-12:18.

[37] Ltr. from A. Smith, Aug. 18, 1999 [Ex. 33 at 5-8]; Guillory II at 25:15-26:18.

[38] Summary of Exp. [Ex. 32 at 1-2].

[39] Guillory II at 18:21-19:5.

[40] *Id*. at 19:6-9; Summary of Exp. [Ex. 32 at 1, 3].

38.      As COR, the Corps designated Mr. Guillory to perform the following functions on Task Order 26: (1) verify that WGII performed the technical requirements of the project in accordance with the contract terms and specifications;[41] (2) conduct inspections of the work site throughout the project to assess WGII's performance;[42] (3) maintain liaison and direct communications with WGII;[43] and (4) where work deficiencies or other problems were observed, record and report the incidents to the Contracting Officer, notify WGII of the deficiencies, and direct appropriate action to effect correction.[44]

James Montegut (COR, Project Engineer)

39.      James Montegut, a Project Engineer in the Construction Division of the New Orleans District, was first assigned to Task Order 26 when site mobilization began in early 2001.[45]

40.      As the Project Engineer and on-site COR for Task Order 26,[46] Mr. Montegut was responsible for overseeing WGII's performance and ensuring WGII worked in an efficient and cost-effective manner.[47]

41.      In addition to reviewing and approving WGII's proposed expenses on Task Order 26,[48] Mr. Montegut managed the Corps' on-site Quality Assurance Representatives ("QA

---

[41] Ltr. from A. Smith, Aug. 18, 1999 [Ex. 33 at 5-6]; Guillory II at 27:23-28:11.

[42] Ltr. from A. Smith, Aug. 18, 1999 [Ex. 33 at 5-6]; Guillory II at 28:12-29:12.

[43] Ltr. from A. Smith, Aug. 18, 1999 [Ex. 33 at 5-6]; Guillory II at 30:25-31:14.

[44] Ltr. from A. Smith, Aug. 18, 1999 [Ex. 33 at 5-6]; Guillory II at 31:15-32:17.

[45] Montegut at 26:11-24.

[46] Guillory II at 29:2-12; Ltr. from J. Weatherly, Jan. 30, 2001 [Ex. 34 at 1-2].

[47] Montegut at 30:12-31:3, 43:21-46:18.

[48] *Id*. at 28:5-28:14, 68:12-15.

959677v.1

Representatives" or "QA Inspectors"),[49] met daily with WGII's on site personnel,[50] approved plans for various features of work,[51] and monitored the physical progress of work on a day-to-day basis.[52]

42.    If Mr. Montegut encountered a situation on-site that required additional assistance from the Corps, or if he determined a work plan warranted further engineering review or input before he could approve it, he consulted with Mr. Guillory.[53]

43.    Mr. Montegut had "thirty-three years of experience on the job" relating to "issues of underseepage with floodwalls."[54]

### Quality Assurance Representatives ("QA Inspectors")

44.    At all times, the Corps had at least one or more QA Inspectors on-site monitoring WGII's and its subcontractors' work.  The QA Inspectors assigned to the EBIA were Alvin Clouatre and Alex Brogna, but at varying times also included Robert Ariatti, P.E. and Steven Keen.[55]

45.    The QA Inspectors monitored the project and WGII's operations to ensure compliance with the Corps' safety regulations, the contract, and the Corps-approved specifications and drawings.[56]  If the QA Inspector saw WGII or its subcontractors proceeding in

---

[49] *Id.* at 42:15-43:19.

[50] *Id.* at 43:21-44:13.

[51] *Id.* at 62:12-63:16, 64:25-66:7.

[52] *Id.* at 43:21-44:2, 55:1-56:7.

[53] *Id.* at 32:9-33:18, 62:12-63:6.

[54] *Id.* at 47:4-17.

[55] *Id.* at 42:15-43:1; Guillory II at 29:9-14; 96:14-17, 110:8-10, 166:17-20.

[56] Deposition of Alvin Clouatre, June 20, 2008 ("Clouatre," Ex. 35) at 29:3-10; Deposition of Phillip Staggs, Apr. 26, 2008 ("Staggs," Ex. 36) at 126:7-11; 223:23-224:4.

959677v.1

a way that was not in compliance with the Corps-approved work plans, he would notify the WGII Quality Control representative and the on-site COR, Mr. Montegut.[57]

46.     The Corps' QA Inspectors documented their monitoring activities (and inspection results) in a daily Quality Assurance Report ("QAR") addressed to Mr. Guillory and initialed by Mr. Montegut.[58]

<u>Primary WGII Employees on Task Order 26</u>

47.     Steven Roe was WGII's Program Manager for the overall TERC from mid-1997 until May 2001.[59]

48.     Mr. Roe drafted and negotiated WGII's initial proposal on Task Order 26, and was responsible for "provid[ing] overall program leadership and direction" from WGII's Denver Office.[60]

49.     Dennis O'Conner was WGII's Project Manager from Task Order 26's inception in 1999 to June 7, 2004.[61]   He had an undergraduate degree in geology and geography, but was not an engineer.[62]

50.     Mr. O'Conner was "responsible for all performance aspects of the project and [was] the point of contact for the USACE on-site supervision."[63]   He also was accountable for "project cost, schedule, safety and overall quality and technical management."[64]

---

[57] Clouatre at 55:13-56:3, 51:25-52:17, 89:23-90:9.

[58] Guillory II at 93:5-15; Montegut 69:6-70:25; *see, e.g.*, Inspectors Quality Assurance Rep. ("QAR") #267, Jan. 16, 2002 [Ex. 37]; QAR #318, Mar. 19, 2002 [Ex. 38]; QAR #324, Mar. 26, 2002 [Ex. 39].

[59] Roe at 10:8-19; 18:13-19:5; Ltr. From J. Sensebe, May 20, 2001 [Ex. 40 at 1-2].

[60] Roe at 103:6-9, 92:2-16; PWP [Ex. 4 at 19].

[61] O'Conner at 18:21-19:19, 81:3-12; Email from D. O'Conner, June 2, 2004 [Ex. 42 at 1]; Org. Chart, June 19, 2002 [Ex. 43 at 1-2].

[62] O'Conner at 16:15-24.

[63] PWP [Ex. 4 at 19].

51.     Phillip Staggs was WGII's on-site Construction Manager from July 2000 to March 2005.[65]

52.     Mr. Staggs, an experienced construction worker (but not an engineer), supervised all WGII and subcontractor site activities related to demolition, remediation and site restoration. He also reviewed daily subcontractor reports and coordinated field activities with the Corps.[66]

E.     **Phase I:  Recommendation Report for Demolition and Site Preparation**

Statement of Work for Demolition and Remediation of EBIA

53.     In its June 1999 SOW for Task Order 26, the Corps directed WGII to provide "all engineering services . . ., as required, in connection with the technical review of site documents, attendance at site meetings and travel necessary for the period of approximately 21 June 99 through 30 Sep 99 associated with the demolition and remediation" of the EBIA.[67]

54.     The June 1999 SOW directed WGII to draft a "Recommendation Report" describing the scope and duration of the needed EBIA remediation and demolition activities, "including any data gaps that may need to [be] filled by sampling or other investigations."[68]  Mr. Guillory, who drafted the June 1999 SOW,[69] stated that "all engineering services" was "a general description to include all engineering, administration, design, contract bidding, subcontract bidding, award, any self-performed construction that [WGII] or M-K would do themselves."[70]

---

(continued…)

[64] *Id.*

[65] Staggs at 26:16-22, 28:3-22.

[66] PWP [Ex. 4 at 19]; Staggs at 13:19-26:5.

[67] SOW No. 1 attached to Task Order 26 [Ex. 25 at 3-4].

[68] *Id.* at 4; Roe at 43:15-44:5.

[69] Guillory I at 98:15-99:2; Guillory II at 44:24-46:1.

[70] Guillory II at 46:2-16.

55.     The SOW did not include, and the Corps did not expect WGII to perform, engineering services related to the nearby levees and floodwalls, which were "outside of [the Corps'/WGII's] work site."[71]

56.     Throughout Task Order 26, the Corps never requested or expected any geotechnical engineering support from WGII relating to the EBIA's levees and floodwalls.[72]

<u>"Back and forth" in developing the Recommendation Report</u>

57.     The Recommendation Report established a "chronological approach to the demolition and preparation of the site," and the "work methodologies for the 32-acre project site."[73]  The Report included a list of more than twenty proposed tasks or "Definable Features Of Work" ("DFOWs") ranging from the development of each work plan to site mobilization to building demolition, piling removal and remediation of the EBIA.[74]

58.     The Corps substantively reviewed and commented on WGII's outline and its drafts of the Recommendation Report.[75]  Mr. Guillory and his HTRW team[76] provided written comments on each draft of the Recommendation Report in the form of a "Comment Submittal" spreadsheet.[77]

---

[71] Guillory I at 121:1-5; Guillory II at 47:2-11; Clouatre at 77:23-78:17; Roe at 123:14-124:8.

[72] Guillory II at 46:17-47:1, 53:24-56:5, 57:17-58:8, 254:21-255:20; Staggs at 136:8-137:1; Roe at 107:14-108:10.

[73] Rec. Rep., Dec. 1999 [Ex. 44 at 13].

[74] *Id.* at 66 (Table 6-1).

[75] Guillory II 48:20-49:6; Cmt. Submittal, Rec. Rep., Aug. 6, 1999 [Ex. 45]; Cmt. Submittal, Draft – Rev. B Rec. Rep., Nov. 5, 1999 [Ex. 46].

[76] *See, e.g.*, Transmittal and Cmts., Final PWP, Nov. 1, 2000 [Ex. 47]; Bacuta at 74:2-23; Guillory II at 152:4-16.

[77] *See, e.g.*, Cmt. Submittal, Rec. Rep. [Ex. 45]; Guillory II at 61:15-63:2; Bacuta at 74:12-76:17.

-13-

59.     After reviewing the Corps' comments, WGII would either concur or take exception to the comment, as well as add any rebuttal or clarification comments to the spreadsheet.[78]

60.     The Corps reviewed WGII's responses, and could either agree or disagree.[79]  If the Corps disagreed with WGII's response, the Corps typically called a team meeting and "discussed the issue until we came to a consensus of opinion."[80]

61.     The Corps formally accepted WGII's final Recommendation Report on January 19, 2000,[81] and the Report "formed the basis of subsequent specifications for work and work orders and proposals."[82]

### F.     Phase II:  Development of Eight Major Work Plans

62.     From August to October 2000, the Corps' modification to Task Order 26 directed WGII to, *inter alia*, draft eight major work plans for various aspects of the remediation and demolition project:  a Project Work Plan ("PWP"), Waste Management Plan ("WMP"), Storm Water Pollution Prevention Plan ("SWPPP"), Sampling and Analysis Plan ("SAP"), Contractor Quality Control Plan ("CQCP"), Site Safety & Health Plan ("SSHP"), Hurricane Preparedness Plan ("HPP"), and a Perimeter Monitoring Plan ("PMP").[83]

---

[78] Guillory II at 63:3-19.

[79] *Id.*

[80] *Id.* at 63:20-24.

[81] Rec. Rep. [Ex. 44]; Guillory II at 64:17-65:9.

[82] Guillory I at 78:7-11.

[83] *See* SOW, May 15, 2000 [Ex. 48 at 2]; Guillory I at 98:7-24; PWP [Ex. 4 at 9].

959677v.1

63.     In developing each work plan, WGII received substantial input from both the Corps and the LDEQ during meetings[84] and through written comments to drafts.[85]

64.     Ultimately, the Corps approved and accepted the general specifications set forth in each of the work plans.[86]

65.     The work plans incorporated requirements of the TERC, the Corps' SOWs, applicable RECAP requirements, and previously approved guidelines from the Recommendation Report.[87]

66.     Because there were still a significant number of unknowns about the site (*e.g.*, the extent of contamination and the number and type of buried or submerged obstructions),[88] these eight work plans were designed to provide "guidance and reference for the execution of project activities," but not to provide detailed specifications for each and every DFOW.[89]

67.     The more detailed plans and specifications for each DFOW typically were drafted by WGII's subcontractors and were reviewed, discussed and approved by WGII and the Corps on an on-going basis.[90]

---

[84] *See, e.g.*, Work Plan Gen. Discussion Mtg., Aug. 3, 2000 [Ex. 49]; Work Plan LDEQ Mtg. Min., Aug. 21, 2000 [Ex. 50]; Work Plan Gen. Discussion Mtg., Oct. 17, 2000 [Ex. 51]; Cmt. Submittal, Draft PWP, Oct. 27, 2000 [Ex. 52]; Guillory I at 116:23-25, 119:6-120:4; Bacuta at 110:18-112:10.

[85] *See, e.g.*, Transmittal and Cmts., Final PWP [Ex. 47].

[86] *See, e.g.*, CQCP, Nov. 1, 2000 [Ex. 53, Approval at 2]; SWPPP Approval Page, Nov. 14, 2000 [Ex. 54]; HPP Approval Page, Nov. 14, 2000 [Ex. 55]; PMP Approval Page, Nov. 14, 2000 [Ex. 56]; PWP [Ex. 4, Approval at 2].

[87] *See, e.g.*, PWP [Ex. 4 at 9-10].

[88] Guillory II at 47:12-48:11; Roe at 128:6-18.

[89] Rec. Rep. [Ex. 44 at 38]; Guillory I at 111:4-112:18, 144:17-145:11.

[90] *See* Clouatre at 89:23-90:9.

-15-

959677v.1

Project Work Plan ("PWP")

*Back-and-forth between Corps and WGII in developing the PWP*

68.     The PWP was "one of the eight project plans" that was "developed jointly between [WGII] and the Corps to begin" remediation and demolition activities on the site.[91]

69.     Among other things, the PWP generally described the currently-known structures and foundations to be demolished,[92] the types of equipment to be used,[93] depth for piling removal,[94] and remediation procedures.[95]  The PWP also called for the removal of Surekote Road at the end of the project, and upon the Corps' approval, the final grading and re-vegetating of the area.[96]

70.     The Corps held numerous meetings with WGII regarding the PWP, and reviewed drafts and commented on each aspect.[97]

71.     WGII resolved and incorporated all of the comments raised by the Corps into the Final PWP, which Mr. Guillory approved on November 16, 2000.[98]

*Corps instructions regarding the levees/floodwalls*

72.     Per the Corps' instruction, the PWP also set the work site's boundaries:  all soil remediation and associated excavations were confined to "the area 15-feet west of the floodwall."[99]

---

[91] Guillory I at 78:12-79:2.

[92] PWP [Ex. 4 at 41-44] (Table 3-5).

[93] *Id*. at 41; *Id*. at 50.

[94] *Id*. at 45-46.

[95] *Id*. at 55-56.

[96] *Id*. at 58.

[97] *See* Work Plan LDEQ Mtg. Min. [Ex. 50]; LDEQ Mtg. Min. [Ex. 57]; Transmittal and Cmts., Final PWP [Ex. 47].

[98] Guillory II at 84:24-85:17.

73.     The Corps issued this "guideline at the beginning of the project that the contractors, [WGII], should not place any moving equipment, heavy equipment, within 15 feet of the floodwall face, which coincided with the curb side of Surekote Road, and would use that as like a clearance zone that you do not do any work in there because it has the possibility of the equipment impacting the floodwall."[100]

74.     Mr. Guillory developed the 15-foot guideline based on a "consensus of opinion between myself and the rest of the small HTRW team" at the Corps-NOD.[101]

### Contractor Quality Control Plan ("CQCP")

75.     The "USACE managed its prime contractor [WGII] by identifying Definable Features of Work (DFOWs)" for Task Order 26.[102]

76.     For each DFOW, the CQCP mandated that WGII and its subcontractors follow a three-phase quality control system to ensure that the work was performed in accordance with contract requirements and with Corps approval.[103]   The three-phase quality control system consisted of the "Preparatory Phase," the "Initial Phase," and the "Follow-Up Phase."[104]

---

(continued…)

[99] PWP [Ex. 4 at 55].

[100] Guillory I at 159:21-160:5; *see* Guillory II at 82:20-83:13.

[101] Guillory II at 83:2-7.

[102] Technical Completion Rep. [Ex. 24 at 30]; *see* Rec. Rep. Dec. 1999 [Ex. 44 at 66] (Table 6-1); *see also* TERC [Ex. 15 at 23].

[103] CQCP [Ex. 53 at 22]; TERC [Ex. 15 at 21-23]; SOW, May 15, 2000 [Ex. 48 at 4-5]; Guillory II at 90:2-10.

[104] CQCP [Ex. 53 at 22-24].

959677v.1

77.     The CQCP also required WGII to submit a "photographic record" consisting of at least 36 exposures of "progress photographs of field activities, inspection locations, and final constructed features" on a monthly basis.[105]

*The Preparatory Phase*

78.     The Preparatory Phase commenced just prior to the start of each DFOW, and required WGII to, *inter alia*:  (1) review each paragraph of the applicable specifications; (2) review any applicable plans (*e.g.*, SAP, SSHP, PWP, etc.); (3) verify that appropriate drawings and submittals for materials and equipment were submitted and that the Corps actually approved them; (4) examine the work area to ensure all preliminary work was complete; (5) discuss field methods and procedures for the work; and (6) ensure that the work plan for the specific task has been approved by the Corps.[106]

79.     WGII held a preparatory meeting for each significant definable feature (or subfeature) of work and provided an agenda to the Corps in advance.[107]

80.     At least one Corps representative, as well as relevant subcontractors, attended each Preparatory Phase meeting.[108]

81.     After every meeting, WGII drafted meeting minutes and submitted them to the Corps for review and correction.[109]

---

[105] *Id*. at 27; *see* Guillory II at 130:19-25; *see also*, *e.g.*,  Monthly Photo Log, Nov. 20, 2001 [Ex. 59]; Monthly Photo Log, Nov. 29, 2004 [Ex. 60].

[106] *See* CQCP [Ex. 53 at 22-23]; Guillory II at 91:6-22; Roe at 126:15-130:2, 144:21-145:10, 146:20-148:14.

[107] Guillory II at 91:15-22, 104:18-106:11.

[108] *Id*. at 91:15-22; Clouatre at 65:7-14; 65:17-66:2; *see also* Guillory II at 100:20-103:7.

[109] *See* Guillory II at 58:18-59:13; *see also id.* at 77:3-78:3.

-18-

*The Initial Phase*

82.     WGII's Contractor Quality Control System Manager ("CQCSM") conducted Initial Phase inspections with a Corps QA Inspector as work began on each DFOW.[110]

83.     While observing WGII or subcontractor personnel at work, the CQCSM and QA Inspector, *inter alia*, (1) checked the preliminary work for compliance with the contract and the Preparatory Phase meeting minutes; (2) verified that the level of workmanship met acceptable standards; (3) resolved any conflicts; and (4) checked that any required inspections or tests had been or were being performed.[111]

84.     The results of the initial inspections were recorded in a form attached to WGII's Daily Quality Control Report ("DQCR"), which was then submitted to the Corps for review.[112]

*The Follow-Up Phase*

85.     WGII's CQCSM, with the Corps QA Inspector performed follow-up phase inspections on a daily basis throughout the duration of a particular DFOW.  The follow-up phase consisted of monitoring compliance with contract requirements; evaluating the workmanship of the contractor; ensuing that testing was performed on-site; ensuring that "rework items" were corrected; and ensuring that subcontractors were not concealing any non-conforming work.[113]

---

[110] CQCP [Ex. 53 at 23]; Guillory II at 91:23-92:9.

[111] CQCP [Ex. 53 at 23]; Guillory II at 91:23-92:9; O'Conner at 166:4-15.

[112] Guillory II at 92:17-93:4; Montegut at 69:6-19; *see, e.g.*, DQCR #267, Jan. 16, 2002 [Ex. 37 at 3-5]; DQCR #298, Feb. 22, 2002 [Ex. 84 at 3-6]; DQCR #300, Feb. 25, 2002 [Ex. 85 at 4-6]; DQCR #319, Mar. 19, 2002 [Ex. 38 at 3-5]; DQCR #325, Mar. 26, 2002 [Ex. 39 at 3-5]; DQCR #341, Apr. 16, 2002 [Ex. 93 at 3-5]; DQCR #431, Aug. 19, 2002 [Ex. 95 at 3-6]; DQCR #390, June 21, 2002 [Ex. 97 at 3-5]; DQCR #769, Jan. 21, 2004 [Ex. 98 at 3-5]; DQCR #959, Nov. 1, 2004 [Ex. 99 at 3-5]; DQCR #1014, Jan. 18, 2005 [Ex. 100 at 3-5]; DQCR #473, Oct. 23, 2002 [Ex. 101 at 3-6]; DQCR #485, Nov. 7, 2002 [Ex. 102 at 3-6].

[113] CQCP [Ex. 53 at 23-24]; Guillory II at 92:10-93:4.

-19-

86.     The CQCSM reported the results of WGII's follow-up phase inspections in the DQCR submitted to the Corps for review.[114]

87.     The Corps' QA inspectors reported their observations to Messrs. Guillory and Montegut in a daily QAR.[115]

*Corps' Pre-Final and Final Acceptance Inspections*

88.     In addition to the three-phase system, the CQCP provided for the Corps' own inspections at the end of each DFOW.  During this Pre-Final Inspection, the Corps often established a "punch list" of items that needed to be finished or corrected before Final Inspection and completion.[116]

89.     During the Final Acceptance Inspection, the Corps made sure any such punch-list items were remedied and that the contractors' work complied with plans and specifications.[117]

Subcontractor Work Plans

90.     WGII used local subcontractors to complete many tasks.[118]

91.     WGII and the Corps "got together, discussed what had to be accomplished" and "worked hand in hand in developing the scopes of work for the subcontracts."[119]

---

[114] *See, e.g.*, DQCR #267 [Ex. 37 at 3-5]; DQCR #298 [Ex. 84 at 3-6]; DQCR #300 [Ex. 85 at 4-6]; DQCR #319 [Ex. 38 at 3-5]; DQCR #325 [Ex. 39 at 3-5]; DQCR #341 [Ex. 93 at 3-5]; DQCR #431 [Ex. 95 at 3-6]; DQCR #390 [Ex. 97 at 3-5]; DQCR #769 [Ex. 98 at 3-5]; DQCR #959 [Ex. 99 at 3-5]; DQCR #1014 [Ex. 100 at 3-5]; DQCR #473 [Ex. 101 at 3-6]; DQCR #485 [Ex. 102 at 3-6]; *see also* Guillory II at 92:10-93:4.

[115] *See, e.g.*, QAR #183, Sept. 18, 2001 [Ex. 69]; QAR #220, Nov. 6, 2001 [Ex. 70]; QAR #245, Dec. 13, 2001 [Ex. 71]; QAR # 221, Nov. 7, 2001 [Ex. 80]; QAR # 225, Nov. 13, 2001 [Ex. 81]; QAR #267, Jan. 16, 2002 [Ex. 37]; QAR #297, Feb. 22, 2002 [Ex. 84]; QAR #299, Feb. 24-25, 2002 [Ex. 85]; QAR #318, Mar. 19, 2002 [Ex. 38]; QAR #324, Mar. 26, 2002 [Ex. 39]; QAR #340, Apr. 16, 2002 [Ex. 93]; QAR #430, Aug. 18-19, 2002 [Ex. 95]; QAR #389, June 21, 2002 [Ex. 97]; QAR #759, Jan. 21, 2004 [Ex. 98]; QAR #949, Oct. 30-Nov. 1, 2004 [Ex. 99]; QAR #999, Jan. 18, 2005 [Ex. 100]; QAR #471, Oct. 23, 2002 [Ex. 101]; QAR #483, Nov. 7, 2002 [Ex. 102]; *see also* Clouatre at 36:6-37:2; 152:17-153:17; Guillory II at 92:10-93:4.

[116] CQCP [Ex. 53 at 30]; Guillory II at 93:23-94:6; 113:11-114:8.

[117] CQCP [Ex. 53 at 30]; Guillory II at 94:7-16, 94:22-95:2, 95:4-96:13, 113:11-114:8.

[118] *See* Rec. Rep. [Ex. 44 at 50]; Staggs at 38:1-39:8; Guillory I at 144:15-16.

-20-

92.     Once the subcontract's scope of work was finalized, WGII sent a Request For Proposal ("RFP") to potential subcontractors.[120]  Potential subcontractors then drafted and submitted plans in response to the RFP, which included proposed means and methods for accomplishing the work.[121]

93.     Upon receiving proposals from potential subcontractors, WGII "evaluated them based on technical merit and cost, made a spreadsheet of all the different bidders, and made a recommendation to the Corps as to who they thought would be the most appropriate subcontractor to complete that portion of the work."[122]

94.     The Corps reviewed WGII's recommendation and, if an agreement was reached, the subcontractor was hired.[123]

95.     Thereafter, the Corps reviewed, revised and approved the subcontractor's work plans for major DFOWs before physical work began.[124]

G.     **Phase III:  Performance of DFOWs Per Corps-Approved Plans**

96.     Between February 2001 and May 2005, WGII performed the following seven DFOWs:  Demolition and Piling Removal; Sewer Lift Station at Saucer Marine; Concrete Block #004 ("Wedding Cake") at Boland Marine; Submerged Fuel Tanker Car; Soil Remediation

---

(continued…)

[119] Guillory II at 100:20-103:7; Guillory I at 144:24-145:11; *see, e.g.*, Email from L. Guillory, June 18, 2001 [Ex. 61].

[120] Guillory I at 144:24-145:11; Guillory II at 100:20-103:7; O'Conner at 152:8-153:5.

[121] O'Conner at 152:13-16; *see, e.g.*, Hamp's Demo. Work Plan, Apr. 12, 2001 [Ex. 62]; Wedding Cake Final Work Plan, Dec. 11, 2001 [Ex. 63]; Lift Station Removal Plan (Revised) [Ex. 64].

[122] Guillory I at 145:13-19; *see also* Guillory II at 100:20-103:7.

[123] Guillory I at 145:20-146:2; *see also* O'Conner at 152:8-19; Guillory II at 100:20-103:7.

[124] *See, e.g.*, Guillory II at 106:22-107:14, 122:15-123:7.

959677v.1

(Including Remediation of the Canal Bank); Borrow Pit at McDonough Marine Site; Excavation Under Surekote Road at McDonough Marine.

97.     All of these DFOWs were completed in accordance with the guidelines developed with and approved by the Corps in the eight major work plans, and with the work plans and specifications reviewed by the Corps during the Preparatory Phase Meetings.[125]

Demolition and Piling Removal

*Plans/specifications were reviewed and approved by the Corps*

98.     The PWP set forth general guidelines for demolition and piling removal activities.[126] WGII submitted a more specific proposed work plan to the Corps through its local demolition subcontractor, Hamp's Construction, L.L.C.[127]

99.      The Hamp's demolition work plan described the means and methods for all major demolition tasks, including building demolition and removal of pilings, bulk heads, and sheet pilings.[128]

100.    Hamp's submitted its initial draft plan to WGII in February 2001.[129]  On March 29, 2001, WGII held a Preparatory Phase meeting with Hamp's and four Corps representatives to address the demolition feature of work.[130]

101.    During the preparatory meeting, WGII and the Corps "would have taken the actual scope of work from the subcontract and the project work plans and quality control plans and have discussed each of the phases of work, what [the Corps] expected from the contractors

---

[125] *See* Guillory I at 111:4-112:18, 144:17-145:11; Roe at 144:21-145:10, 146:20-148:14.

[126] *See* PWP [Ex. 4 at 9-10].

[127] Hamp's Demo. Work Plan, Apr. 12, 2001 [Ex. 62 at 17-26].

[128] *See id.*

[129] *See id.* at 11.

[130] Prep. Phase Mtg. Min., Demo., Mar. 29, 2001 [Ex. 65]; Guillory II at 104:18-105:13.

959677v.1

and subcontractors, what level of quality control that [the Corps] expected of all the different tiers and what type of QA the government would provide during those phases of work."[131]

102.    On April 11, 2001, WGII, its subcontractors and the Corps held an additional Preparatory Phase meeting to further discuss and coordinate quality assurance/control requirements and site safety issues for the structural demolition feature of work.[132]

103.    Before major field work actually began, the Corps formally approved Hamp's work plan subject to its "red-lined changes."[133]

104.    In August 2001, WGII and the Corps also held a separate Preparatory Phase Meeting for bulkhead/sheet piling removal near Mayer Yacht, which was part of the demolition feature of work.[134]

> *WGII's work conformed with approved plans/specifications and was accepted by the Corps*

105.    Once the subcontractors began working, WGII and the Corps conducted two different Initial Phase inspections in accordance with the CQCP.[135]

106.    All work was determined to be "in full compliance with work plans."[136]

107.    WGII and the Corps QA Inspectors performed follow-up phase inspections for this feature of work until its completion.  The QA Inspectors reported the results of their

---

[131] Guillory II at 105:22-106:11; *see also id.* at 106:22-107:2.

[132] Supervisory Coordination Mtg. Min., Demo., Apr. 11, 2001 [Ex. 66]; Guillory II at 109:2-110:16.

[133] Hamp's Demo. Work Plan, Apr. 12, 2001 [Ex. 62 at 1]; Guillory II at 107:3-14.

[134] *See* Prep. Phase Inspection Mtg., Demo., Aug. 8, 2001 [Ex. 67 at 1-5]; Guillory II at 111:14-22.

[135] *See* Initial Phase Inspection, Demo., Apr. 23, 2001 [Ex. 68]; Initial Phase Inspection, Piling Removal, Aug. 28, 2001 [Ex. 67 at 6-7]; *see also* Guillory II at 110:19-111:22; CQCP [Ex. 53 at 23].

[136] *See* Initial Phase Inspection, Demo., Apr. 23, 2001 [Ex. 68]; Initial Phase Inspection, Piling Removal, Aug. 28, 2001 [Ex. 67 at 6-7]; *see also* Guillory II at 110:19-111:22.

inspections in a QAR, which documented, among other things, any "deficiencies observed," any "corrective action" taken or any "verbal instructions given to [the] contractor" by the Corps.[137]

108.    WGII and the Corps conducted Pre-Final and then Final Inspections for the demolition/piling removal feature of work on a site-by-site basis.[138]

109.    After the Final Inspections were complete, the Corps signed "Acceptance Reports" for each site verifying that "all work is complete, acceptable, and complies with contract requirements."[139]

<u>Sewer Lift Station at Saucer Marine</u>

110.    Based on investigations conducted at the EBIA prior to Task Order 26, the Corps knew that subsurface structures, including an abandoned sewer lift station, would have to be excavated and removed.[140]

111.    The lift station was "basically . . . a large diameter pipe with pumps in it, valves and ladders to get down into it, all encased in . . . metal pipe.  Over the years, being exposed to a brackish water in the Industrial Canal, that thing was deteriorated substantially."[141]

112.    The lift station was located at the corner of the Saucer Marine and Mayer Yacht sites, approximately 80 to 100 feet from the floodwall.[142]

---

[137] *See, e.g.*, QAR #183, Sept. 18, 2001 [Ex. 69 at 2]; QAR #220, Nov. 6, 2001 [Ex. 70 at 2]; QAR #245, Dec. 13, 2001 [Ex. 71 at 2].

[138] *See* Pre-Final Inspection Reps., Demo., Aug-Sept. 2001 [Ex. 72]; Guillory II at 113:20-24; Final Acceptance Reps., Demo., May-Nov. 2001 [Ex. 73]; Final Acceptance Rep., Demo., McDonough Marine, Sept. 18, 2001 [Ex. 74].

[139] Final Acceptance Reps., Demo. [Ex. 73]; Final Acceptance Rep., Demo., McDonough Marine [Ex. 74].

[140] Guillory II at 34:20-35:21.

[141] Montegut at 75:3-10.

[142] Guillory I at 83:2-6; Guillory II at 132:12-23.

*Plans/specifications were reviewed and approved by the Corps*

113.    WGII's subcontractor, Hamp's, submitted its initial proposal for removing the lift station as part of its February 2001 demolition and piling removal plan.[143]

114.    By September 2001, before work on the lift station began, the technical approach in the February plan had to be changed based on newly-acquired information.[144]

115.    The revised plan required the use of a "braced excavation" or "cofferdam"—designed by a licensed professional engineer in Louisiana—to prevent movement of the surrounding soil during excavation. [145]

116.    The subcontractor submitted its first revised proposal to WGII in late September 2001,[146] and a preparatory meeting was held with the Corps on October 3, 2001 to discuss the new plan.[147]  The Corps reviewed and approved the sewer lift station submittals under consideration during the meeting,[148] but requested that the subcontractors reevaluate the measurements for the cofferdam sheet pilings and submit a revised plan for approval.[149]

117.    The Corps reviewed and commented on the plan at least two more times before finally approving it on October 19, 2001.[150]

---

[143] *See* Hamp's Demo. Work Plan [Ex. 62].

[144] *See* Lift Station Removal Plan (Revised) [Ex. 64 at 3]; *see also* QAR #183 [Ex. 69 at 2].

[145] *See* Lift Station Revised Work Plan, Oct. 1, 2001 [Ex. 75 at 2-4]; Guillory I at 142:15-143:10.

[146] *See* Lift Station Revised Work Plan [Ex. 75 at 2].

[147] Prep. Phase Inspection Min., Lift Station, Oct. 3, 2001 [Ex. 76].

[148] *Id*. at 1; Guillory II at 134:15-19.

[149] Prep. Phase Inspection Min., Lift Station [Ex. 76 at 4]; Lift Station Revised Work Plan [Ex. 75 at 1].

[150] Guillory I at 167:18-22, 180:17-181:13; Lift Station Removal Plan (Rev. 1), Oct. 10, 2001 [Ex. 77]; Lift Station Removal Plan (Revised-Add. 1), Oct. 12, 2001 [Ex. 78 at 1-4]; Lift Station Removal Plan (Revised) [Ex. 64]; Guillory II at 134:20-135:16.

-25-

118.     The final October 19th plan "incorporated all of the [Corps'] review comments," which primarily "had to do with structural integrity of the hole and preventing soil displacement outside the hole, inside the hole, worker safety, equipment safety . . . et cetera."[151]

119.     The approved Lift Station Removal Plan included, among other details, the dimensions of the proposed excavation area, precise design specifications for the cofferdam and requirements for backfilling the excavated hole.[152]

120.     Given the design of the cofferdam for the lift station excavation, the Corps was "not concerned it was going to damage the flood control structures" along Jourdan Avenue:

> Location, proximity . . . the rigidity . . . of the design, the depth of the design, the bracing and the waler system. I felt confident that that was not going to adversely affect any of the adjacent soil or site.[153]

121.     Like the Corps, WGII was not aware of any potential danger to the levees and floodwalls from this excavation.[154]

>     *WGII's work conformed with approved plan/specifications and was accepted by Corps*

122.     An Initial Phase Inspection for the lift station removal and cofferdam installation was held on October 30, 2001.[155]  The results of the inspection, which were reviewed and approved by the Corps, indicated that "[a]ll work is in compliance with the Revised Lift Station Removal Plan submitted on 10/19/01."[156]

---

[151] Guillory I at 181:14-23, 168:8-19.

[152] Lift Station Removal Plan (Revised) [Ex. 64 at 6-8].

[153] Guillory I at 169:22-170:9.

[154] *See* O'Conner at 206:10-208:20.

[155] Initial Phase Inspection, Lift Station, Oct. 30, 2001 [Ex. 79].

[156] *Id*.; Guillory II at 136:5-9.

123.    WGII and the Corps held routine follow-up inspections of the lift station excavation to ensure work proceeded in accordance with the Corps-approved plans.[157]

124.    During one follow-up inspection, Mr. Clouatre stated that he:  "Visually assured all debris and pilings have been removed from inside cofferdam and excavator began backfilling with spoil in approx. 2' lifts and compacting to bottom of walers. . . .  No deficiencies observed."[158]

125.    The Corps ultimately accepted that the removal of the lift station and the backfilling of the excavation were complete.[159]

Concrete Block #004 ("Wedding Cake") at Boland Marine

126.    After demolition work began, WGII identified eight previously unknown subsurface concrete and steel foundations at the Boland Marine site, including a large concrete block commonly referred to as Concrete Block #004, "the southern block," or the "wedding cake."[160]

127.    Because these concrete/steel structures were not contemplated in any of the Corps' existing SOWs for the project (or in any of WGII's proposals in response to the SOWs), in August 2001, the Corps issued Modification 10 to Task Order 26.[161]

---

[157] *See, e.g.*, QAR #220 [Ex. 70 at 2]; QAR # 221, Nov. 7, 2001 [Ex. 80 at 2]; QAR # 225, Nov. 13, 2001 [Ex. 81 at 2].

[158] QAR #220 [Ex. 70 at 2].

[159] Guillory II at 146:10-23.

[160] *See* Statement of Work ("SOW") for Mod. 10, Aug. 6, 2001 [Ex. 20 at 2]; Sketch 1 – Boland Marine Subsurface Foundations [Ex. 82]; Guillory II at 114:9-115:8, 121:21-122:3; *see also* Montegut at 60:16-23; Guillory II 115:9-19.

[161] *See* Statement of Work ("SOW") for Mod. 10 [Ex. 20 at 2].

*Plans/specifications were reviewed and approved by the Corps*

128.    The Corps' SOW for removal of the wedding cake directed WGII to remove the subsurface slabs, as well as any "concrete, steel and pilings" associated with the slabs, "in their entirety."[162]   The SOW also specified that an excavation plan must be submitted to the Corps with a cofferdam design that was "approved by a Louisiana State Registered, P.E."[163]

129.    WGII submitted a proposal on August 31 for removal of the "wedding cake."[164]

130.    The Corps conducted a Technical Analysis of WGII's proposal and made comments, which WGII negotiated and incorporated into a revised proposal that the Corps accepted on September 25, 2001.[165]

131.    During a Preparatory Phase meeting on November 14, 2001, WGII's subcontractors presented their initial work plan to WGII and the Corps.[166]

132.    Although the Corps approved the subcontractor's "pre-job submittal" of the work plan at the meeting, it indicated that a final plan with a cofferdam design for removal of the wedding cake still needed to be approved before work on that particular structure could begin.[167]

133.    The Corps approved WGII's submittal of a Cofferdam Installation Plan for removal of the wedding cake on December 13, 2001.[168]

---

[162] *See id.*

[163] *See id.*

[164] WGII Revised – Final Proposal #113, Sept. 24, 2001 [Ex. 29]

[165] *Id.*; *see* Technical Analysis of Proposal #113 [Ex. 28 at 2].

[166] *See* Prep. Phase Mtg. Min., Concrete Blocks, Nov. 14, 2001 [Ex. 83]; Guillory II at 119:3-25.

[167] *See* Prep. Phase Mtg. Min., Concrete Blocks [Ex. 83 at 1-2].

[168] Wedding Cake Final Work Plan [Ex. 63]; *see* Guillory II at 122:18-123:8; Technical Completion Rep. [Ex. 24 at 63].

959677v.1

134.    Among other things, this work plan provided drawings/measurements for excavation and cofferdam installation, instructions for backfilling the excavations, specifics on equipment and crew to be used, and an activity hazard analysis.[169]

135.    Mr. Guillory opted not to seek advice from the Corps' geotechnical experts before approving the work plan because he did not have any concerns about the impact of the wedding cake removal on the levees and floodwalls:

> The location and proximity of those concrete foundations with respect to the floodwall and the levee were quite a bit far away as opposed to McDonough Marine borrowing area.  Also, where those concrete block foundations were located were within the footprint of where the future bypass channels were to be dredged . . . in a stairstep fashion to -22 NGVD and -31 NGVD, and those concrete foundations and their cofferdams fit within those footprints.  So that – those braced structural excavations were designed by a professional engineer . . . hired by WGI and their subcontractors – professionally reviewed by all parties, and constructed, and intense quality control and quality assurance inspection followed on how those were installed and removed.[170]

136.    WGII was not aware of any potential danger to the levees and floodwalls from this excavation.[171]

*WGII's work conformed with approved plans/specifications and was accepted by the Corps*

137.    During the wedding cake excavation, WGII and the Corps continually monitored and inspected the subcontractors' work to verify compliance with the work plan's specifications. For example, in a December 2001 follow-up inspection, Messrs. Clouatre and Ariatti noted that "no deficiencies [were] observed" in connection with the installation of sheet piling for the

---

[169] *See* Wedding Cake Final Work Plan [Ex. 63 at 3-11, 13-31, 39-56].

[170] Guillory I at 210:17-212:2.

[171] *See* O'Conner at 206:10-208:20.

-29-

construction of the cofferdam.[172]  In February 22 and 24 inspections, a Corps QA Inspector reported that he "[v]isually assured all debris and pilings above el. -23 are removed from cofferdam," and that "cofferdam is backfilled in 2' lifts and compacted with bucket."[173]

138.    On March 21, 2002, WGII and the Corps conducted a Pre-Final Inspection of the excavation of the concrete/steel foundations at Boland Marine, and identified punch list items that the subcontractors needed to complete before demobilization.[174]

139.    One week later, upon completion of the punch list items, the Corps signed a Final Acceptance Report for the removal of the concrete blocks, including the wedding cake, and confirmed that "all work is complete, acceptable, and complies with contract requirements."[175]

<u>Submerged Fuel Tanker Car</u>

140.    In addition to demolishing and removing obstructions on land in the EBIA, the Corps' SOW also required WGII to remove sunken or partially sunken barges from the eastern edge of the canal.[176]

141.    One such submerged structure, a railroad fuel tanker car, was located in the canal adjacent to the EBIA near Boland Marine.[177]

*Plans/specifications were reviewed and approved by the Corps*

142.    In December 2001, WGII and the Corps selected a local subcontractor, Stewart Construction ("Stewart"), to excavate the tanker car from the canal.[178]

---

[172] QAR #245 [Ex. 71 at 2]; *see* Guillory II at 123:9-124:19; *see also* QAR #267 [Ex. 37 at 2].

[173] QAR #297 [Ex. 84, at 2]; QAR #299 [Ex. 85 at 2]; *see* Guillory II at 124:20-127:8.

[174] Pre-Final Inspection Rep., Concrete Blocks, Mar. 21, 2002 [Ex. 86 at 1]; *see* Guillory II at 129:3-11.

[175] Final Acceptance Rep., Concrete Blocks, Mar. 27, 2002 [Ex. 86 at 2]; *see* Guillory II at 129:12-130:6.

[176] *See, e.g.*, SOW, May 15, 2000 [Ex. 48 at 2]; PWP [Ex. 4 at 48].

[177] Guillory II at 142:9-16; *id.* at 148:1-13.

-30-

143.    On January 16, 2002, the Corps, WGII and Stewart held a Preparatory Phase meeting for barge and fuel tanker removal.[179]

144.    At the preparatory meeting, Stewart gave "a detailed description of their work plan with equipment and personnel that will be utilized." [180]

145.    The Corps praised Stewart "for a very detailed Proposal Submittal/Work Plan,"[181] and reiterated "that all Plans developed would [still] have to be submitted and approved by USACE prior to starting each operation," including the "Product Removal Plan, Cofferdam Design, or any changes in the work plan."[182]

146.    The Corps later commented on and approved Stewart's work plan and cofferdam design before the tanker car removal work began.[183]

*WGII's work conformed with approved plans/specifications and was accepted by the Corps*

147.    On March 19, 2002, the Corps' QA Inspector observed construction of the cofferdam for the tanker car, and reported:  "No deficiencies observed."[184]

148.    The Corps, WGII and its subcontractor held an Initial Phase Inspection on March 26, 2002.[185]

---

(continued…)

[178] *See* Stewart Submittal for Removal/Disposal of Barge and Tanker, Dec. 2001, [Ex. 87]; *see also* Guillory II at 148:1-13.

[179] QAR #267 [Ex. 37 at 7-11]; Guillory II at 144:17-145:2.

[180] QAR #267 [Ex. 37 at 7-8].

[181] *Id*.

[182] *Id*. at 7.

[183] Guillory II at 142:25-143:9.

[184] QAR #318 [Ex. 38 at 2]; *see* Guillory II at 145:6-146:3.

[185] QAR #324 [Ex. 39 at 6-8] (Initial Phase Inspection); Guillory II at 147:18-25.

-31-

149.    The inspection confirmed that Stewart's preliminary work was "complete and correct" and "in full compliance with work plans."[186]

150.    When the tanker car removal ended, the Corps accepted this feature of work as complete.[187]

Soil Remediation (Including Remediation of the Canal Bank)

151.    In addition to demolition, the Corps tasked WGII with remediating contaminated soil at the EBIA in accordance with the LDEQ's RECAP standards.[188]

152.    The Corps directed WGII to drill for potential contamination in the EBIA down to a maximum depth of twenty-two feet below ground surface because "of the proposed future lane and transit bypass channels that the Corps was going to dredge through the EBIA for construction of the new lock."[189]

*Plans/specifications were reviewed and approved by the Corps*

153.    In its third modification to Task Order 26, the Corps directed WGII to draft a Sampling and Analysis Plan ("SAP"), consisting of a Field Sampling Plan ("FSP") and Quality Assurance Project Plan ("QAPP") "to provide a comprehensive plan that covers all aspects and definable features of field sampling and analysis . . . in accordance with the 19 Jan 00 USACE-approved Recommendation Report."[190]

154.    The SAP "expressly discusses how [WGII] will design and implement a grid[d]ed sampling and analysis system . . . to determine the various hot spots, contaminants of concern

---

[186] QAR #324 [Ex. 39 at 6-7].

[187] Guillory II at 148:14-18.

[188] *See* PWP [Ex. 4 at 50]; SOW, Aug. 28, 2000 [Ex. 88 at 6-9].

[189] Guillory II at 88:18-89:17; SAP [Ex. 8 at 58-59].

[190] SOW, May 15, 2000 [Ex. 48 at 4]; *see* SAP [Ex. 8 at 7].

-32-

across each of the six sites, and from that will determine . . . which contaminant sources need to be removed and remediated from the site and disposed of  . . . ."[191]

155.    The Corps reviewed and commented on WGII's drafts before approving the SAP in February 2001.[192]

156.    Later in 2001, the Corps "tasked [WGII] to come up with [a] RECAP criteria document listing all the regulatory levels and limits that we'd have to remediate the various six sites to in order to acquire a final clean or [No Further Action At This Time] letter from the Louisiana DEQ . . . ."[193]

157.    Mr. Guillory and his "entire six-person HTRW team" at the Corps reviewed and commented on the criteria document in draft form before approving it.[194]

158.    Thereafter, WGII provided "supplemental submittals" to the Corps and LDEQ for each of the six individual sites on the EBIA that it sampled for contamination and planned to remediate.[195]

159.    In accordance with RECAP, after identifying the contaminated soils at a site, WGII had to produce a RECAP Corrective Action Plan ("CAP") for each of the six EBIA sites.[196]  The purpose of the CAP was to:

> [Identify] the specific sites . . . and contaminated hot spots of the
> six industrial sites to determine what the . . . lateral and vertical
> depths of excavation for each one of the hot spots will be and what
> the backfill will be…[T]hen this CAP report was submitted to

---

[191] Guillory II at 86:6-21.

[192] *See* SAP [Ex. 8 at 2]; Cmt. Submittal, Refined SAP, Feb. 1, 2001 [Ex. 89]; Guillory II at 86:6-87:7.

[193] Guillory II at 182:5-183:3; *see* RECAP Submittal Rpt. – Criteria Doc., June 2001 [Ex. 90].

[194] Guillory II at 183:4-16; *see* RECAP Submittal Rpt. – Criteria Document, [Ex. 90].

[195] RECAP Submittal Rpt. – Criteria Document [Ex. 90 at 18-19].

[196] *See* RECAP Corrective Action Plan ("CAP") – Saucer Marine, May 2002 [Ex. 91]; RECAP CAP – Boland Marine, Nov. 2002 [Ex. 92].

-33-

[L]DEQ for their review and approval, and to the Corps also, saying this is what we intend to do to remediate that industrial portion of this site.  Once approval was granted by DEQ and the Corps, . . . then [WGII] could implement this CAP for that particular six-site.[197]

160.    On April 16, 2002, WGII and the Corps held a Preparatory Phase meeting to discuss in detail the "Remediation Procedures and Work Plan" before starting actual work at the southern end of the EBIA.[198]  At the end of the meeting the "USACE advised they would like to inspect each excavation and confirm measurements prior to backfilling."[199]

161.    In June 2002, the Corps agreed that the EBIA's canal bank—an area fifteen feet from the water—also needed to be tested for contamination and remediated in accordance with RECAP.[200]

162.    Because of the proximity to the canal, these areas required "special" "excavation and remediation techniques."[201]

163.    The Corps separately "tasked [WGII] to develop this RECAP work plan."[202]

164.    The RECAP Work Plan Amendment required WGII to remediate the bank in two phases:  "in-the-dry" and "in-the-wet."[203]

165.    Although the RECAP Work Plan Amendment generally required WGII to limit excavations to a depth of four feet below ground surface, it allowed excavations to extend deeper

---

[197] Guillory II 186:1-187:16, 190:1-22; *see* RECAP CAP – Saucer Marine [Ex. 91 at 2]; RECAP CAP – Boland Marine [Ex. 92 at 2].

[198] QAR #340 [Ex. 93 at 7-10].

[199] *Id*. at 8.

[200] *See* RECAP Workplan Amend. – Bank Remediation, June 2002 [Ex. 94 at 10].

[201] Guillory II at 198:20-200:6.

[202] *Id*. at 198:20-199:18.

[203] *See* RECAP Workplan Amend – Bank Remediation [Ex. 94 at 12, 15-17]; Guillory II at 199:19-200:18.

-34-

inland (*i.e.*, to the east) "based on levels of contamination, soils stability and distance from water."[204]

166.     The Corps reviewed and revised WGII's plan for the canal bank amendment before approving it.[205]  WGII and the Corps also met on at least one occasion to "collaborate" and "finalize" the remediation plan and accompanying figures.[206]

167.     WGII submitted its final draft of the bank remediation amendment in July 2002, and the Corps formally approved it on August 12, 2002.[207]

168.     WGII and the Corps attended a Preparatory Phase meeting to further discuss the details for the canal bank remediation on August 19, 2002.[208]

> *WGII's work conformed with approved plans/specifications and was accepted by the Corps*

169.     After remediation work began, WGII and a Corps QA Inspector immediately conducted an Initial Phase Inspection.[209]

170.     The inspection checklist form indicated the preliminary work was "complete and correct" and "in full compliance with work plans."[210]

171.     WGII and the Corps conducted daily follow-up inspections.  On June 21, 2002, for example, Mr. Montegut monitored WGII's remediation activities at Saucer Marine and reported:  "Assured that excavation was initially dug to the dimensions required by the CAP.

---

[204] RECAP Workplan Amend – Bank Remediation [Ex. 94]; Guillory II at 200:19-201:22; QAR #430, Aug. 18, 2002 [Ex. 95 at 22-24].

[205] *See, e.g.*, Email from L. Guillory, June 25, 2002 [Ex. 96]; Guillory II at 203:9-204:16.

[206] Email from L. Guillory, June 25, 2002 [Ex. 96 at 1]; Guillory II at 204:12-16.

[207] RECAP Workplan Amend-Bank Remediation [Ex. 94 at 1].

[208] QAR #430 [Ex. 95 at 22-24].

[209] QAR #340 [Ex. 93 at 26-27]; *see* Guillory II at 192:22-193:8.

[210] QAR #340 [Ex. 93 at 26].

Final dimensions expanded to 10' x 10'x 6' and 16' x 23'x 6' . . . as a result of field screening and visual observations of EM [("Environmental Manager")]. . . . Excavation was backfilled with clean material from borrow pit at McDonough Marine. . . . No deficiencies observed."[211]

172.     Similar inspections also were conducted and recorded for the remediation of the canal bank.[212]

173.     At the end of the remediation process for each site, WGII drafted No Further Action At This Time ("NFAATT") reports on behalf of the Corps to submit to the LDEQ for approval.[213]

174.     The NFAATT report "documents the remediation of [each site] by WGI[I] in accordance with LDEQ and USACE accepted plans and procedures for a non-industrial exposure scenario and for protection of groundwater under RECAP."[214]

175.     For Saucer Marine, the NFAATT describes, *inter alia*, "the sixteen areas that were remediated on [that site], their applicable boreho[l]es or bank locations that were excavated, the dates they were excavated, the dimensions . . . of each of the excavations, and the calculated excavated volume of each of the areas in cubic yards."[215]

176.     Per the Corps' directives at the preparatory meeting, the NFAATT also included an "Excavation Log," which documented the precise location, size and amount of backfill used

---

[211] QAR #389 [Ex. 97 at 1-2]; *see also, e.g.*, QAR #759 [Ex. 98 at 2]; QAR #949 [Ex. 99 at 2]; QAR #999 [Ex. 100 at 2].

[212] *See, e.g.*, QAR #471 [Ex. 101 at 12-13]; QAR #483 [Ex. 102 at 2].

[213] *See, e.g.*, NFAATT Submittal Rep. – Saucer Marine, May 2003 [Ex. 103]; NFAATT Submittal Rep. – Boland Marine, June 2005 [Ex. 104].

[214] NFAATT Submittal Rep. – Saucer Marine [Ex. 103 at 9].

[215] Guillory II at 195:16-196:2.

for each excavation on the site.[216]  WGII and the Corps signed each excavation log as field work was completed.[217]

177.    After the NFAATT for a particular site was reviewed and approved by the Corps and then LDEQ, the LDEQ sent the Corps a letter verifying that the site "needs no further action at this time, which is a clean bill of health for that particular site."[218]

<u>Borrow Pit at McDonough Marine Site</u>

178.    The Corps determined in the early planning stages of Task Order 26 that to the extent possible, excavations at the EBIA should be backfilled with native clay from an on-site "borrow pit" rather than with imported material.[219]

179.    The Corps' concerns in this regard were two-fold:  (1) using off-site commercial material would increase the cost of remediation since the Corps would have to pay for the material and transport it to the site; and (2) adding new material to the site would increase the future cost of hydraulically dredging and disposing of soil during construction of the bypass channel.[220]

180.    The "primary source" of backfill at the EBIA was the borrow pit on the McDonough Marine site;[221] however, if there was insufficient borrow pit material, WGII could import backfill material with Corps' approval as to source, quality and cost.[222]

---

[216] *See* NFAATT Submittal Rep. – Saucer Marine [Ex. 103 at 49-75]; Guillory II at 196:6-197:6; *see also* NFAATT Submittal Rep. – Boland Marine [Ex. 104 at 45-72].

[217] *See* NFAATT Submittal Rep. – Saucer Marine [Ex. 103 at 49-75]; NFAATT Submittal Rep. – Boland Marine [Ex. 104 at 45-72]; Guillory II at 196:6-197:6, 201:23-202:9.

[218] Guillory II at 194:8-20; Technical Completion Rep. [Ex. 24 at 1-22].

[219] *See* PWP [Ex. 4 at 26]; *see also* Staggs at 151:4-17; Guillory I at 194:6-14.

[220] Guillory II at 116:21-118:4; Technical Analysis of Proposal #113 [Ex. 28 at 2]; SAP [Ex. 8 at 4-3].

[221] Technical Analysis of Proposal #113 [Ex. 28 at 2].

[222] Guillory II at 103:8-104:17.

*Plans/specifications were reviewed and approved by the Corps*

181.    In [223] August 2001, WGII submitted a plan for an on-site borrow pit on McDonough Marine to the Corps and the LDEQ for review and approval.[224]

182.    By late 2001, remediation work had increased the need for backfill material, so WGII and the Corps asked the LDEQ for permission to expand the borrow pit on McDonough Marine from 0.84 acres to 1.55 acres.[225]

183.    Mr. Guillory and the Corps' Geologist, Dr. Bacuta, reviewed WGII's initial proposal for the extension and expressed concern about the impact a larger borrow pit might have on the "structural integrity of the adjacent levee/floodwall."[226]

184.    WGII's Construction Manager had no knowledge that the proposed borrow pit design might possibility impact the levees/floodwalls until he was informed by the Corps.

185.    Prior to excavating any additional borrow, Mr. Guillory asked engineers in the Corps' Geotechnical Branch to, not WGII, "to evaluate the stability analysis of the levee/floodwall with respect to the [proposed] fully excavated borrow area":[227]

> We had two ways we could have gone with it; we could have asked [WGII] to evaluate the structural stability of it and submit that to the Corps for final review and approval, or we could just do [the analysis] in-house.  And for expediency, and being that Corps had the final say-so in the structural stability analysis, . . . myself and the HTRW team tasked [WGII] to provide us with accurate cross-sections and surveys of the area, and from that I specifically

---

[223] Staggs at 98:15-99:16.

[224] *See* RECAP Submittal Rep. – Borrow Pit, Aug. 2001 [Ex. 105 at 8]; *see also* Cmt. Submittal, Borrow Pit RECAP Submittal Rep., July 3, 2001 [Ex. 106]; Transmittal, Borrow Pit RECAP Submittal Rep., Sep. 7, 2001 [Ex. 107].

[225] Borrow Pit Extension App., Rev. Jan. 8, 2002 [Ex. 108 at 2-3, 10-11]; *see* Guillory II at 149:11-150:2.

[226] Transmittal and Cmts., Borrow Pit Ext. App., Feb. 4, 2002 [Ex. 109 at 3-4]; *see* Guillory II at 152:17-153:2.

[227] Transmittal and Cmts., Borrow Pit Ext. App. [Ex. 109 at 3-4].

959677v.1

requested, by memo, to our geotechnical engineering branch in engineering division to perform that analysis.[228]

186.    After receiving a formal written response from the Corps' Engineering Division and meeting with a geotechnical engineer at the NOD,[229] Mr. Guillory "took the recommendations and stability control lines from our . . . geotechnical branch and translated those dimensions so that [the Corps] could reference them off of the floodwall itself."[230]

187.    The Corps' directions were incorporated into a "design template" for WGII to use in excavating the extended borrow pit.[231]

188.    The Corps did not expect WGII to perform any of its own geotechnical engineering review with respect to the borrow pit design, other than to "implement what [the Corps] recommended."[232]

189.    At the conclusion of Task Order 26, the Corps specifically directed WGII to "slowly breach[]" the dikes between the IHNC and the borrow area "to allow the IHNC water to fill the borrow area and allow intertidal flow between the two water-bodies."[233]

190.    The Corps did not believe that the borrow pit filled with water would pose a threat to the nearby levees and floodwalls, and, in fact, considered it advantageous.[234]

---

[228] *See* Memo. for Eng'g Div., Geotech. Stability Analysis, Apr. 15, 2002 [Ex. 110 at 2]; Guillory II at 153:3-20; *see also* O'Conner at 196:13-197:24; Staggs at 153:18-154:12.

[229] *See* Memo. for Constr. Div., Geotech. Stability Analysis, May 2, 2002 [Ex. 110 at 1]; Guillory I at 172:24-173:18.

[230] Guillory II at 160:18-161:2; *see also* Transmittal and Cmts., Borrow Pit Ext. App. [Ex. 109 at 5].

[231] *See* Fax from J. Montegut, June 10, 2002 [Ex. 111 at 2-3]; *see also* Guillory I at 175:23-178:21; Staggs at 236:13-21, 239:25-240:19.

[232] Guillory II at 157:17-158:2.

[233] Transmittal and Cmts., Borrow Pit Ext. App. [Ex. 109 at 5].

[234] Guillory II at 154:10-155:10.

959677v.1

*WGII's work conformed with approved plans/specifications and was accepted by the Corps*

191.    The Corps' QA Inspectors oversaw WGII's subcontractors moving material from the borrow pit to adjacent sites for use as backfill.[235]  The Corps also observed general maintenance activities, including draining the borrow pit of excess water.[236]

192.    The Corps monitored the borrow pit extension excavation to verify that WGII's work conformed to the exact design specifications provided by the Corps.[237]

193.    On January 18, 2005, the Corps inspected the McDonough Marine site and watched WGII remove a dam on the west side of the borrow pit to allow canal water to flow into the excavation.[238]

194.    The Corps ultimately accepted WGII's work on the borrow pit as complete.[239]

Excavation Under Surekote Road at McDonough Marine

195.    As part of its remediation effort and in accordance with RECAP procedures, in late 2004, WGII excavated a contamination "hot spot" directly beneath Surekote Road at the McDonough Marine site.

196.    Surekote Road was approximately 24 or 25 feet wide and located roughly 15 to 20 feet west of the floodwall bordering the eastside of the EBIA.[240]

---

[235] *See, e.g.*, QAR #220 [Ex. 70 at 2].

[236] *See, e.g.*, QAR #267 [Ex. 37 at 2].

[237] *See, e.g.*, QAR #389 [Ex. 97 at 2]; QAR #759 [Ex. 98 at 2]; QAR #948, Oct 29, 2004 [Ex. 120 at 2]; *see* Guillory II at 165:20-166:7, 167:4-13.

[238] QAR #999 [Ex. 100 at 2]; Guillory II at 167:15-169:1.

[239] *See* Guillory II at 169:2-6.

[240] *See* Memo. for Constr. Div., Geotech. Stability Analysis [Ex. 110 at 4]; *see also* Guillory II at 161:18-162:1.

*Plans/specifications were reviewed and approved by the Corps*

197.    The initial plans for removing the contaminants beneath Surekote Road were described in the January 2002 McDonough Marine Corrective Action Plan ("CAP").[241]

198.    The CAP was substantively reviewed and approved by the Corps.[242]

199.    Due to concerns relating to the impact of "excavation Area 2" of the Surekote Road excavations on the levees and floodwalls, in April 2002, Mr. Guillory requested that the Corps' Engineering Division conduct a stability analysis for the excavation.[243]

200.    The Corps' Geotechnical Branch performed the analysis and found that the Surekote Road excavation "did not present a stability problem" for the nearby levees and floodwalls.[244]

201.    At Mr. Guillory's request, the Geotechnical Branch also provided specific guidance to the Corps' Construction Division for backfilling and compacting the excavation under Surekote Road.[245]

*WGII's work conformed with approved plans/specifications and was accepted by the Corps*

202.    In a follow-up inspection in the Fall of 2004 for remediation under Surekote Road, the Corps' QA Inspector reported:  "Assured compacted backfill placed in eight-inch lifts with each lift given four passes with the dozer.  Observed semi-compacted backfill placed in

---

[241] RECAP CAP –  McDonough Marine, Jan. 2002 [Ex. 112 at 14-15, 23, 37-38].

[242] Transmittal and Cmts., RECAP CAP – McDonough Marine, Feb. 26, 2002 [Ex. 113]; Guillory II at 190:14-15.

[243] Memo. for Eng'g Div., Geotech. Stability Analysis [Ex. 110 at 2]; Guillory II at 153:17-20, 156:7-13, 158:3-18.

[244] Memo. for Constr. Div., Geotech. Stability Analysis [Ex. 110 at 1].

[245] *Id.*

remaining excavation with the PC270 excavator and compacted . . . .   No deficiencies observed."[246]

203.    The Corps acknowledged that WGII's work on the Surekote Road excavations was consistent with the specifications recommended by the Corps' Geotechnical Engineering Branch.[247]

204.    In December 2004, WGII submitted an NFAATT Report for the McDonough Marine site to the Corps and LDEQ, which included a detailed description of the Surekote Road excavation.[248]

205.    The Corps reviewed and commented on the NFAATT report in draft form and then accepted WGII's remediation work under Surekote Road as complete.[249]

**H.    Phase V:  Close Out of EBIA Work Site**

206.    In 2004, years after WGII concluded excavations at the sewer lift station and the wedding cake structure, Hurricane Ivan flooded the EBIA work site up to the "base of the concrete portion of the floodwall."[250]   After the hurricane, the Corps and WGII inspected the protected side of the floodwall along the EBIA and did not detect any visible signs of damage to the levees and floodwalls.[251]

---

[246] QAR #949 [Ex. 99 at 2]; Monthly Photo Log, Nov. 29, 2004 [Ex. 60]; Guillory II at 178:20-181:25.

[247] Guillory II at 178:9-19.

[248] NFAATT Submittal Rep. – McDonough Marine, Dec. 2004 [Ex. 114 at 22, 66-67].

[249] Transmittal and Cmts., NFAATT Submittal Rep. – McDonough Marine, Mar. 9, 2006 [Ex. 115]; NFAATT Submittal Rep. – McDonough Marine [Ex. 114 at 2]; Guillory II at 197:7-12.

[250] Guillory II at 173:4-175:1.

[251] Guillory II at 173:4-175:1.

959677v.1

Final site inspection and "substantial completion"

207.    Mr. Montegut, Mr. Guillory, Mr. John Weatherly (Corps –Tulsa Div.), Mr. Bobby

Smith (WGII Field Supervisor) and Mr. Rick Hedrick (Corps –Tulsa Div.) conducted a final site

visit and inspection of the EBIA on May 26, 2005.[252]

208.    On that day, all field operations officially concluded and Mr. Montegut declared

Task Order 26 substantially complete.[253]

209.    The significance of "substantial completion" of the contract "is that it stops the

time, and [the Corps] declared the contract physically complete."[254]

210.    After WGII left the EBIA site on May 26, 2005, the Corps continued to visit the

EBIA in connection with the next phase of the Lock Replacement Project.[255]

Technical Completion Report

211.    After the final site inspection, WGII worked on its "final deliverable" under the

contract, the Technical Completion Report, which is "a summary report to roll-up all definable

features of work that occurred on the project, all clearance NFAATT letters from Louisiana DEQ

to the Corps, [and] a tabular listing of all . . . subcontractors and vendors that worked on the

project."[256]

212.    The Technical Completion Report was "a final document to conclude Task Order

26."[257]

---

[252] Letter from J. Montegut, May 26, 2005 [Ex. 116]; *see also* Guillory II at 204:19-205:9.

[253] Letter from J. Montegut, May 26, 2005 [Ex. 116].

[254] Guillory II at 30:3-17.

[255] *See, e.g.*, Email from J. Agan , Aug. 9, 2005 [Ex. 117 at 1-2].

[256] Guillory II at 30:18-24; Guillory II at 207:16-208:3.

[257] Guillory II at 207:16-208:3.

-43-

213.    WGII submitted a draft of the report for the Corps' review and comment in July

2005, and the Corps later approved it on August 23, 2005.[258]


Dated:  December 31, 2008                    Respectfully submitted,

                                             /s/Heather S. Lonian _____
                                             William D. Treeby, 12901
                                             Carmelite M. Bertaut, 3054
                                             Heather S. Lonian, 29956
                                             Stone Pigman Walther Wittmann L.L.C.
                                             546 Carondelet Street
                                             New Orleans, Louisiana  70130
                                             Telephone:    (504) 581-3200
                                             Facsimile:    (504) 581-3361

                                             Adrian Wager-Zito
                                             Debra S. Clayman
                                             Jones Day
                                             51 Louisiana Avenue, N.W.
                                             Washington, D.C. 20001-2113
                                             Telephone:    (202) 879-4645
                                             Facsimile:    (202) 626-1700

                                             Attorneys for
                                             Washington Group International, Inc.

---

[258] Technical Completion Rep.[Ex. 24 at 5-9]; Guillory II at 30:18-24, 208:23-209:1.

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the above and foregoing Statement of Undisputed Material

Facts in Support of Motion for Summary Judgment have been served upon all counsel of record

through the Court's CM/ECF electronic filing system or by placing same in the United States

mail, postage prepaid and properly addressed, this 31st day of December, 2008.


*/s/Heather S. Lonian*_____

959677v.1