UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:  KATRINA CANAL BREACHES CONSOLIDATED LITIGATION | CIVIL ACTION NUMBER:  05-4182 "K"(2) JUDGE DUVAL MAG. WILKINSON |
| PERTAINS TO:  *Robinson* (No. 06-2268) | |

**PLAINTIFFS' REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY JUDGMENT ON
THE DISCRETIONARY FUNCTION EXCEPTION**

## <u>TABLE OF CONTENTS</u>

I.    INTRODUCTION ...................................................................................................... 1

II.   THE ARMY CORPS VIOLATED THE FWCA ........................................................ 2

      A.  Summary of Argument ...................................................................................... 2

      B.  The 1946 Version of the FWCA ........................................................................ 3

            1.  Plain Statutory Language ........................................................................ 3

            2.  Legislative History .................................................................................. 5

            3.  The Corps' Initial Planning Occurred Without Coordination .................... 6

      C.  The 1958 Version of the FWCA ........................................................................ 7

            1.  The 1958 Revision to the FWCA Did Not Change the Pre-Authorization
                Consultation Mandate of the 1946 Act .................................................... 7

            2.  New Language But Same Reporting Mandate .......................................... 11

III.  THE CORPS' PROVEN AND CONCEDED VIOLATIONS OF NEPA DEFEAT
      DISCRETIONARY FUNCTION IMMUNITY ...................................................... 12

            A.  The Corps' Multiple NEPA Violations For Three Decades. ................... 13

                  1.  The Corps' Failure To Prepare A Comprehensive EIS Violated  NEPA. ....... 15

                  2.  The Corps's Failure To Evaluate Relevant Factors and To Reach Reasoned
                      Decisions Regarding Its NEPA Compliance. ........................................ 15

            B.  The Corps' Proven and Admitted Abuse of Discretion Establishes Violation of
                  Mandatory Legal Duties and Negates DFE Immunity. ...................... 18

            C.  The Government Offers No Support That The Corps' Violation of NEPA Is A
                  Protected Discretionary Act Under the DFE Immunity Standard. ........... 20

IV.   THE STATUTORY VIOLATIONS ARE RELATED TO THE HARM SUFFERED ...... 22

V.    CONCLUSION ...................................................................................................... 25

## TABLE OF AUTHORITIES

**Cases**

*Adams v. United*, 2006 WL 3314571 (D. Idaho 2006) at *2 ............................................. 19, 20, 25

*Ashford v. United States,* 511 F.3d 501, 505 (5th Cir. 2007)..................................................... 7, 12

*Berkovitz v. United States,* 486 U.S. 531, 536 (1988........................................................ 7, 12, 19

*Collins v. United States,* 783 F.2d 1225, 1230 (5th Cir. 1986)................................................ 19, 25

*Franklin Sav. Corps. v. United States*, 180 F.3d 1124 (10th Cir 1999)............................ 21, 22, 23

*Great Basin Mine Watch v. Hankins,* 456 F.3d 955 (9th Cir. 2006) ............................................ 20

*Holy Cross et al. v. U.S. Army Corps of Engineers,* 455 F. Supp. 2d 532 (E.D. La. 2006) ......... 13

*In re Katrina Canal Breaches Consol. Litig.*, 471 F. Supp. 2d 684 (E.D. La. 2007) ................... 13

*Jayvee Brand, Inc., v. United States*, 721 F.2d 385 (D.C. Cir 1983)........................................... 21

*Johnson v. United States Dept. of Int.*, 949 F.2d 332 (10th Cir. 1991)........................................ 22

*Marsh v. Oregon Resources Council*, 490 U.S. 360 (1989) ........................................................ 18

*Quechan Indian Tribe v. United States*, 535 F.Supp.2d 1072 (S.D. Cal. 2008)........................... 20

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, (1989)......................................... 14

*Sabine River Authority v. U.S. Dept of Interior*, 951 F.2d 669 (5th Cir. 1992)........................... 14

*State of Louisiana v. Lee,* 758 F.2d 1081 (5th Cir. 1985)........................................................... 14

*Tom Rice Buick-Pontiac v. General Motors Corp.*, ___ F.3d ___, 2008 WL 5387751 (2d Cir., Dec. 29, 2008).......................................................................................................................... 10

*United States v. Cadarr*, 197 U.S. 475 (1905)........................................................................... 10

*United States v. Gaubert,* 499 U.S. 315 (1991) .......................................................... 7, 12, 18, 19

*United States v. Montgomery County, Md.*, 761 F.2d 998 (4th Cir. 1985).................................. 10

*United States v. Tapert*, 625 F.2d 111 (6th Cir. 1980).............................................................. 10

*Van Abbema v. Fornell*, 807 F2d 633 (7th Cir. 1986) ............................................................... 15

**Statutes**

28 U.S.C. § 2680(a)..........................................................................................................19

**Regulations**

40 CFR § 1508.8(b). ........................................................................................... 16

40 CFR §§ 1500.7 ............................................................................................... 16

## I.      INTRODUCTION

Defendant's Opposition to Plaintiffs' Motion for Partial Summary Judgment on the Discretionary Function Exception ("Opposition") (Doc. No. 16789) fails to raise any triable issues of material fact or convincingly refute Plaintiffs' interpretation, and application to the uncontested facts, of the Fish and Wildlife Coordination Act ("FWCA") and National Environmental Policy Act ("NEPA").  Since the Government cannot carry its burden on the first prong of the Discretionary Function Exception ("DFE"), partial summary judgment should be granted.

With respect to the FWCA, the Government must concede two dispositive facts:  it never coordinated (consulted) with the designated federal and state fish and wildlife agencies prior to the MR-GO's authorization, and it never sent to Congress, at any time, a report containing the conservation agencies' serious concerns about the MR-GO's destruction of wetlands.  In an attempt to overcome these fatal facts, Defendant advances a tortured construction of the FWCA that conveniently dispenses with both requirements for the MR-GO and leads to the absurd conclusion that the Corps was *never* legally required to coordinate or to tell Congress about the MR-GO's defects.  This contortion is unavailing since the plain language, legislative history, and case law conclusively reject any such interpretation tailor made for only the MR-GO.

With respect to NEPA, the Government makes no bones about its argument: because NEPA supposedly imposed no mandatory environmental reporting duties on the Corps, the agency was free to exercise its unfettered discretion to not inform Congress and the public about the MR-GO's well known, significant adverse effects on the environment or about feasible mitigation measures and alternatives.  This argument is refuted by the clear language of the statute and regulations and numerous cases invalidating agencies' failures to disclose this type of

information.  The fact that the Corps had some initial "discretion" about environmental

reporting—in the sense that some choice was involved—hardly means that the Corps was not

"arbitrary and capricious" in failing, for over three decades, to perform *any* environmental

assessment of the channel's admittedly worsening condition and mounting risk to life and

property from O&M dredging activities, massive loss of wetlands, and the more than three fold

widening of the channel beyond authorized dimensions.  When it came to NEPA, the Corps had

no room for choice in preparing adequate environmental disclosures when confronted with the

channel's glaring adverse effects.  The agency was obligated to comply, and it simply did not.

Finally, Plaintiffs have adequately alleged a direct causal connection between the Corps'

failure to comply with these statutes and the resulting devastation of the wetlands and

catastrophic flooding.  Indeed, it takes little imagination to envision that if the Corps had

complied with the mandatory disclosure requirements in the FWCA and NEPA, Congress would

have known about one of the nation's worst environmental disasters and catastrophic flood

hazards.  Consistent with the salutary purposes of both statutes, an informed Congress would

have been able to decide whether to authorize remedial measures.  By concealing this vital

information, the Corps prevented authorization of any remediation, paving the way for the

drowning of Greater New Orleans.

## II.  THE ARMY CORPS VIOLATED THE FWCA

### A.  Summary of Argument

In response to Plaintiffs' contention that the Corps violated the FWCA, the Government

advances two arguments:

(1) "At no time prior to the authorization of the MRGO was the Corps required to

coordinate its activities with state or federal fish and wildlife agencies."  Opposition at p. 2.

(2)  The 1958 Act did not "impose[] an independent obligation that the Corps create an additional, post-authorization report to Congress integrating the views of fish and wildlife agencies."  *Id.* at p. 8.

These contentions are clearly erroneous.  First, the FWCA as enacted in 1946 applied to the MR-GO.  The Corps was required to coordinate and consult with the state and federal fish and wildlife agencies during the project's initial planning.  The Government concedes that no such coordination with the appropriate agencies occurred prior to submission of its 1951 MR-GO Report to Congress.  *See* Opposition at pp. 4-7; PUF 12 (Department of Interior confirms that Corps did not comply with FWCA).  Second, the 1946 version of the FWCA and 1958 amendments required post-authorization that the Corps both continue coordination with the federal and state agencies and communicate their criticisms and recommendations to Congress in any reports on the MR-GO.  However, no reports were ever transmitted to Congress—either before or after authorization—containing these agencies' escalating concerns about the looming eco-disaster posed by the MR-GO.

B.  The 1946 Version of the FWCA

1.  Plain Statutory Language

The 1946 FWCA amendments significantly expanded the federal government's commitment to preservation of fish and wildlife and their habitats by introducing for water development projects, like the MR-GO, a requirement of coordination (consultation).  In particular, the 1946 amendments unambiguously mandated that the Army Corps, while planning a project, consult with the United States Department of Interior Fish and Wildlife Service ("FWS") and the Louisiana Department of Wildlife about the MR-GO's potential environmental

impact *and* inform Congress of its concerns in any report submitted to Congress *before* the MR-GO's authorization.[1]

Forced to retreat from its position in 2006 that it consulted with the statutorily-designated government officials before submitting the 1951 MR-GO Report to Congress (PUF 13), Defendant now offers a fantastic interpretation of the FWCA that coordination was not required until *after* the MR-GO's authorization and *after* the critical planning was completed. Opposition at pp. 4-7. According to the Government, the FWCA provides that Congress approves the MR-GO, appropriates $88 million for its construction, and *only thereafter* is the Corps obligated—after critical project planning and Congressional authorization—to consult with the conservation agency experts about this *fait accompli's* environmental devastation. Such a tortured interpretation defies the FWCA's plain language, clear Congressional intent, and common sense.

The language of the 1946 version of the FWCA quoted in note 1 unambiguously required that the Army Corps "first shall consult" with the FWS and the Louisiana Department of Wildlife and report these agencies' recommendations to Congress in the pre-authorization 1951 MR-GO Report. *See* Plaintiffs' Exh. 2.[2] Why? Because Congress demanded meaningful

---

[1] The Corps "*first shall consult with* the Fish and Wildlife Service and the head of the agency exercising administration over the wildlife resources of the State wherein the [water] impoundment, diversion or other control facility is to be constructed with a view of preventing the loss of and damage to wildlife resources . . . ." Plaintiffs' Exh. 2 (Fish and Wildlife Coordination Act of 1946, § 2 (60 Stat. 1080)) (emphasis added). *See also* Appendix "C" at pp. 2-5, 7, 10.

[2] The Corps well knew that the FWCA required coordination during initial project planning and before Congressional authorization of a project. In its 1965 transmittal to Congress of the pre-authorization Report of the Chief Engineer on the Lake Pontchartrain and Vicinity, Louisiana Hurricane Protection Plan, the Army Corps, in its discussion of "Coordination With Other Agencies," confirmed that it had consulted extensively with the FWS and Louisiana Wild Life and Fisheries Commission, reported to Congress these agencies' concerns about salinity increases in Lake Pontchartrain and environs, and attached a 20-page FWS scientific study. Plaintiffs' Exh. 120 (House Document No. 231, Lake Pontchartrain and Vicinity, Louisiana (July 6, 1965) at pp. xvi-xvii, 76-79, 209-228). In stark contrast, the 1951 MR-GO Report has no such

consultation during project planning "with a view to preventing loss and damage to wildlife

resources . . . ." *Id.* This conclusion is also compelled by the further statutory directive that

these state and federal agencies' "reports and recommendations . . . *shall be made an integral*

*part of any report* submitted by any agency of the Federal government . . . ." *Id.* §2 (emphasis

added); *see also* Appendix "C" (relevant excerpts of House and Senate Hearings on the FWCA).

### 2.   Legislative History

Besides the statute's plain language, its legislative history—both the committee reports

and hearings—makes abundantly clear exactly what Congress intended with the FWCA, namely,

that coordination must occur during *initial planning*:

> As drafted, these two sections require coordination between constructing and
> operating agencies of both the Federal and State Governments *not alone after*
> flood control, irrigation, or impoundment *projects have been started but also in*
> *connection with the initial planning for such projects*. This type of coordination
> is extremely important from the standpoint of effectuating conservation of
> wildlife.

PUF 11; Plaintiffs' Exh. 3 at p. 3 (House Report) (emphasis added); *see also* Exh. 4 at p. 2

(Senate Report) (adopting same); *see also* Appendix "C" at pp. 2-7.

The 1946 amendments were designed to remedy proven defects in the original 1934

legislation by providing for "more adequate procedures" to protect this "great national resource"

and by insisting that "the plans for wildlife management be intelligently coordinated . . . ."

Plaintiffs' Exh. 3 at p. 1. The author of the 1946 legislation emphasized that the critical stage of

project development for maximizing protection was during initial planning and Congressional

consideration. *See* Appendix "C" at pp. 2-4; *see also* Plaintiffs' Exh. 3 at p. 3. Thus, in order to

maximize the protection of these precious natural resources, the 1946 version of the FWCA—

---

discussion (PUF 12), and the Government must concede that no consultation or coordination
with the designated federal and state fish and wildlife agencies occurred before the MR-GO's
authorization. *See* Opposition at pp. 4-7.

without considering the 1958 amendments—required coordination during "initial planning"

*before authorization* as well as "after . . . projects have been started . . . ." *Id.*

### 3. The Corps' Initial Planning Occurred Without Coordination

The Government admits that the MR-GO's initial planning occurred prior to the MR-GO's authorization. *See* Defendant's Response to Plaintiffs' Uncontested Facts (Doc. No. 16789-2) at p. 6, no. 6. The 1951 MR-GO Report embodied the Corps' "initial planning" of the MR-GO. *See* Plaintiffs' Exh. 101. The 1951 MR-GO Report was the only report concerning the MR-GO's initial planning submitted to Congress.

The Corps' mandate – and subsequent failure – to consult with the relevant agencies prior to submitting the 1951 MR-GO Report was indisputably confirmed when the FWS succinctly stated in 1957:

> This plan was transmitted to the Chief of Engineers on September 30, 1946, almost two months (46 days) after passage of the Act of August 14, 1946 (60 Stat. 1080) and was published in House Document 245 in 1951 *without having been submitted to the Fish and Wildlife Service for comment as required under the terms of this Act.* Further activity relative to Mississippi River – Gulf Outlet project was not noted until its authorization on March 29, 1956. At this time *engineering plans were in an advanced stage and no coordination with the Service had yet been attempted.*

Plaintiffs' Exh. 6 at p. 2 (emphasis added); *see also* PUF 12.

At bottom, the 1946 version of the FWCA absolutely required consultation during the MR-GO's initial planning before "engineering plans were in an advanced stage" and the most critical decisions about the environment—such as the route and not installing salt water barriers and channel bank protection—were being made. *See* PUF 19-21. This decisive planning occurred before the Corps submitted the 1951 MR-GO Report to Congress and before Congress authorized the MR-GO five years later. PUF 8. Because the Defendant admittedly failed to adhere to these mandatory consultation and reporting directives, it fails the first prong of the

discretionary function test.  *See United States v. Gaubert,* 499 U.S. 315, 324 (1991); *Berkovitz v. United States,* 486 U.S. 531, 536 (1988); *Ashford v. United States,* 511 F.3d 501, 505 (5th Cir. 2007).

### C.     The 1958 Version of the FWCA

The 1958 amendments to the FWCA effected no material change in the Corps' pre-existing legal duties under the statute's 1946 version.  *See* Plaintiffs' Exh. 16 (Pub L. No. 85-624).  The obligation to coordinate during initial planning and to report to Congress remained the same, and it is not disputed that the 1946 version of the FWCA governed the Corps' consultation and reporting requirements at the time that it submitted the 1951 MR-GO Report to Congress.  *See* Opposition at p. 4.  As demonstrated in the comparison of the two texts in Appendix "B," the language added in 1958 clarified and strengthened, but did not dilute, these pre-existing 1946 requirements—a conclusion bolstered by the legislative history.

### 1.     The 1958 Revision to the FWCA Did Not Change the Pre-Authorization Consultation Mandate of the 1946 Act

Acknowledging that it failed to consult, the Government now claims it did not have to consult.  It does so by interpretive acrobatics.  The Government's extreme construction is the product of selective (and misleading) quotations of the FWCA and its legislative history.  In fact, most of the new language concerning the FWCA focused on the Secretary of the Interior recommending mitigation measures, enhanced authority for federal water project construction agencies to incorporate those recommendations, and treatment of costs of such improvements.  *See* Plaintiffs' Exh. 16 (Pub. L. No. 85-264); Appendix "B."

The Government argues that since the 1958 version of the FWCA adds the words "proposed or" before the word "authorized" (Appendix "B," §2(a)), it must follow that the intent of the 1946 Act was to require consultation *only after there had been authorization.*  Opposition

at 4-8.  In other words, Defendant argues, the addition of the word "proposed or" had some

(unexplained) impact on interpreting the coordination requirement.  Not only does the

Government ignore the pre-existing, unchanged consultation trigger of "authorized" in the 1946

statute, its argument that the addition of "proposed or" somehow limited "authorized"

retroactively is predicated solely on the slender reed of its truncated rendition of legislative

history from the Senate Report on Interstate and Foreign Commerce.  *See* Opposition at p. 6.

The complete quotation—with the missing text set forth in bold—is as follows:

> This amendment to the Coordination Act would grant authority to the
> agencies of Government engaged in construction to consult with the Fish and
> Wildlife Service before and during the building of Federal water development
> projects.
> **The Fish and Wildlife Service would make known to these
> construction agencies such as the Corps of Engineers and the Bureau of
> Reclamation, the project necessary to protect fish and wildlife.  Considerable
> study would be required in some cases, with suggested changes in
> construction plans to the great advantage to [our] wildlife resource.**  Under
> the bill suggestions regarding changes could be made previous to the
> commencement of constructions.  Such plans, or recommendations, whether
> accepted or rejected by the construction agency, would be submitted to the
> Congress at the time authorization legislation for the project was under
> consideration.
> **The bill would amend the Watershed Protection and Flood Prevention
> Act which is administered by the Department of Agriculture.  It is designed
> to provide greater consideration of fish and wildlife conservation in the
> federal water resource development program.  Enactment of the bill would
> not retard that program but should help significantly in permitting federal
> water development to serve the interests of a much larger share of our
> population.**

Plaintiffs' Exh. 17 at p. 1 (1958 USCCAN 3446).

This statement does not support the Government's rewriting of the statute.  First, the

Senate Report explicitly reiterates what the 1946 FWCA already required:  "Such plans, or

recommendation, whether accepted or rejected by the construction agency, would be *submitted*

*to the Congress at the time of authorization legislation for the project was under consideration.*"
*Id.* (emphasis added).

Second, the language quoted above indicates that a primary purpose of the bill is to amend the Watershed Protection and Flood Prevention Act (something omitted from the Government's quote and subsequent discussion).  *See* Plaintiffs' Exh. 16 (Pub. L. 85-624 at §3).

Third, nothing in this quote supports (much less compels) the Government's counter-intuitive construction of the words "proposed or."

Fourth, the addition of "proposed or" is not the only change.  Compare the first part of Section 2 of the 1946 (Exh. 2) statute to the 1958 version (Exh. 16 at p. 2) (changes in bold):

### 1946 Act

Whenever the waters of any stream or other body of water are authorized to be impounded, diverted, or otherwise controlled for any purpose whatever by any department or agency of the United States, or by any public or private agency under Federal permit, such department or agency first shall consult with the Fish and Wildlife Service . . . .

### 1958 Act

**(a) Except as hereafter stated in subsection (h) of this section,** whenever the waters of any stream or other body of water are **proposed or** authorized to be impounded, diverted, **the channel deepened** or **the stream or other body of water** otherwise controlled **or modified** for any purpose whatever, **including navigation and drainage,** by any department or agency of the United States, or by any public or private agency under Federal permit **or license**, such department or agency first shall consult with the Fish and Wildlife Service . . . .

*See also* Appendix "B" (merged version of the 1948 and 1956 Acts to show changes).

If the Government's argument is correct, it means that although the 1946 Act uses the phrase "impounded, diverted or otherwise controlled," this did not include channel deepening or modification.  This spin is untenable.  What the 1958 Amendments did, in large part, was clarify the purport of the 1946 Act by, for example, clarifying that "otherwise controlled" includes "modified."

Likewise, the words "proposed or" clarified the consultation requirement to include *post-authorization* coordination for a proposed activity that would have the effect of impounding, diverting, controlling, or modifying waters "for any purpose." One such post-authorization undertaking could be "channel deepen[ing]." It is axiomatic in legislative interpretation that words are often added merely to clarify language already existing in the statute. *United States v. Tapert*, 625 F.2d 111, 121 (6th Cir. 1980) ("It is a common and customary legislative procedure to enact amendments strengthening and clarifying existing laws."); *United States v. Montgomery County, Md.*, 761 F.2d 998, 1003 (4th Cir. 1985) ("[ch]anges in statutory language need not *ipso facto* constitute a change in meaning or effect. Statutes may be passed purely to make what was intended all along even more unmistakably clear.").

In short, the 1958 legislation largely confirmed and bolstered the authority of the Secretary of the Interior to consult with federal construction agencies before and after construction. Nowhere does the statute or Senate report explicitly reference a change—much less the Government's suggested radical change—in the existing law's pre-authorization consulting requirements. *See United States v. Cadarr*, 197 U.S. 475, 479-80 (1905) ("If it had been the purpose of Congress to work so radical a change in the law . . . we think it would require clear and specific language to indicate a legislative intent . . . ."); *Tom Rice Buick-Pontiac v. General Motors Corp.*, ___ F.3d ___, 2008 WL 5387751, *6 (2d Cir., Dec. 29, 2008) ("A change in long established rules of law is not deemed to have been intended by the legislature in the absence of a clear manifestation of such intention." (internal cites omitted)). The addition of words like "proposed or " and "modified" in no way implicitly altered or diluted the pre-existing, fundamental requirement—which is retained in the 1958 legislation—that the Corps "first consult with" the specified state and federal agencies whenever "the waters of any

10

stream or other body of water are *authorized* to be impounded, diverted or otherwise controlled."
Appendix "B," §2(a) (emphasis added).

### 2. New Language But Same Reporting Mandate

The 1958 amendments left unchanged the statute's mandate that the Corps must continue consulting with the FWS and the Louisiana Department of Wildlife *during the MR-GO's construction* and include these agencies' concerns about the MR-GO's environmental devastation in any report submitted to Congress. Plaintiffs' Exh. 16 at §2(b).[3] Specifically, the 1958 version of the FWCA likewise required that the state and federal conservation agencies' concerns "be made an integral part of *any* [Corps] report. . . *when* such [Corps] reports are presented to the Congress." *Id.* (emphasis added). Critically, this language does not limit reporting to the initial pre-authorization report but expressly covers "any report" to Congress without any restriction or qualification.

The evidence shows that the Corps annually reported to Congress about the MR-GO but consistently omitted any discussion about the state and federal agencies' mounting concerns about the MR-GO. Every year after the Corps first submitted the 1951 MR-GO Report to Congress (without any discussion of consultation with the FWS and Louisiana Department of Wildlife), it submitted its Annual Report of the Chief of Engineers on the Corps. *See* Plaintiffs' Exh. 121. In these Annual Reports, the Corps supplied Congress with progress reports of the MR-GO's construction, the costs incurred to date, and percentage of completion. *See, e.g.*, *id.* at pp. 6-13. What is conspicuously absent from these Annual Reports, however, is any mention of

---

[3] The 1958 amendments also addressed Congress' concerns about the Corps' "650 active authorized projects"—like the MR-GO—by making certain "the policies and procedures of the Coordination Act [are] applicable to them." Plaintiffs' Exh. 17 at p. 4.

the FWS and Louisiana Department of Wildlife's predictions about, and recommendations to mitigate, the environmental devastation from the MR-GO's construction.  PUF 19-21.

Once the Corps undertook to send "any report" to Congress about the MR-GO, it was obligated to inform Congress about the federal and state wildlife agencies' warnings about the destruction of the wetlands from saltwater intrusion and their requests that the Army Corps delay the MR-GO's construction to allow for studies about the MR-GO's environmental impact, potential mitigation measures, and possible alternative routes other than the most environmentally harmful route through the marshes selected by the Army Corps.  PUF 19, 20. This failure to include these agencies' concerns in *any* Annual Reports is a violation of the Corps' reporting duty under the both the 1946 and 1958 versions of the FWCA.  PUF 30.[4] Because the Corps also failed to adhere to the mandatory reporting directives in the 1958 version of the FWCA, it has failed the first prong of the discretionary function test for this additional reason.  *See United States v. Gaubert*, 499 U.S. 315, 324 (1991); *Berkovitz v. United States*, 486 U.S. 531, 536 (1988); *Ashford v. United States,* 511 F.3d 501, 505 (5th Cir. 2007).

## III.   THE CORPS' PROVEN AND CONCEDED VIOLATIONS OF NEPA DEFEAT DISCRETIONARY FUNCTION IMMUNITY

Foregoing a principled defense of the Corps' proven NEPA noncompliance for over three decades, the Government is forced to argue that "the worst that can be said of the Corps's decision to forgo the production of an EIS is that it amounted to an abuse of discretion." Opposition at p. 15.  This concession, while hardly starting in light of  the massive evidence and

---

[4] The Government devotes much attention to arguing that the Congressional directive in the FWCA to give "full consideration" to the views of federal and state fish and wildlife agencies does not prescribe a "specific direction" that limits the Corps' discretion.  Opposition at pp. 9-11. Plaintiffs make no such argument.  The violation of law here was the Corps' admitted failure to honor its specific, *nondiscretionary* legal duty to coordinate before the MR-GO's authorization and to report the agencies' recommendations to Congress.

legal authorities presented by Plaintiffs and the Corps' own internal findings (PUF 119), is a conclusive admission that the Government cannot meet its burden under the first DFE prong to prove that it complied with NEPA's obligatory requirements.  *See In re Katrina Canal Breaches Consol. Litig.,* 471 F. Supp. 2d 684, 697, 699, 705 (E.D. La. 2007).  That should be the end of the matter.

Ignoring a half century of DFE jurisprudence, however, the Government desperately falls back to an alternative defense:  Despite multiple violations of specific legal mandates, all of the Corps' conduct is immunized under the DFE because the agency has discretion to ignore the law and do as it pleases.  Not surprisingly, Defendant cites no case—because none exists—where a court held that an arbitrary and capricious decision is nevertheless entitled to DFE immunity.

### A.  The Corps' Multiple NEPA Violations For Three Decades

The record overflows with undisputed evidence that the Corps violated NEPA and the implementing CEQ and Corps regulations beginning in 1976 with its defective FEIS and thereafter for the next 30 years with 26 inadequate EAs related to ongoing O&M activities.  *See* Opening Memorandum at pp. 13-16; PUF 48, 54-82.  The Corps dredged more than it excavated in originally constructing the MR-GO without informing Congress and the public of the worsening condition of the wetlands and widening channel banks, the escalating threat of storm surge flooding, and feasible mitigation measures and alternatives.  PUF 111, 118.  The Corps' own internal review in 2005 confirmed decades of illegal segmentation.  PUF 119. This case is a paradigm of an agency's prejudicial abuse of discretion due to "arbitrary and capricious" conduct.

In *Holy Cross et al. v. U.S. Army Corps of Engineers,* 455 F. Supp. 2d 532, 537-38 (E.D. La. 2006), this Court held that NEPA's purpose is to ensure careful consideration of environmental impacts and to guarantee that relevant information will be made available during

both the decision-making process and the implementation of decisions.  That decision echoed the

Fifth Circuit's reliance on *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349, 350

(1989) for the proposition that:

> NEPA is a procedural statute that demands an environmentally conscious
> decision… which commands that the agency make its decision to proceed with
> the action after taking a "hard look at the environmental consequences."

*Id.* at 333 (citation omitted); *see also Sabine River Authority v. U.S. Dept of Interior*, 951

F.2d 669, 676 (5th Cir. 1992).

The Government does not dispute that NEPA compliance *requires* the preparation of a

detailed EIS for all major federal actions significantly affecting the quality of the human

environment, including O&M dredging.  Opposition at p. 12.  In a half-hearted argument, the

Government seeks to excuse the Corps' failure to prepare an EIS for O&M and dredging

activities on the ground that this decision is a non-reviewable "judgment" call by the Corps

whether the impact will be "significant."  Opposition at pp. 12-14.  This is not the law.  As

illustrated by the 54 published cases in Appendix "A" to Plaintiffs' Opening Memorandum

finding Corps violations of federal environmental laws, federal courts routinely review—and

invalidate—decisions to issue a FONSI (and not prepare an EIS) as "arbitrary and capricious."

*See, e.g., State of Louisiana v. Lee,* 758 F.2d 1081 (5th Cir. 1985) (EIS required for

"environmentally disruptive" dredging that inherently "would have a significant environmental

effect").  Whether the agency's exercise of discretion rises to the level of "a protected

discretionary function" (Opposition at p. 14) depends on a separate DFE analysis as discussed in

Section III.B, *infra.* By no means, however, does the ability to exercise discretion equate either

to non-reviewable or DFE immunized discretion.

1.    **The Corps' Failure To Prepare A Comprehensive EIS Violated NEPA**

Even a cursory review of  the Corps' putative environmental disclosure documents reveals that the agency failed to follow required procedures for compliance with NEPA (PUF 32, 117-120); failed to evaluate relevant factors significantly affecting the environment (PUF 48-53); and failed to reach reasoned decisions with regard to its NEPA compliance.  *See Van Abbema v. Fornell*, 807 F2d 633, 636 (7th Cir. 1986).  These glaring violations of the most rudimentary NEPA requirements, coupled with the Corps' admission of illegal segmentation of its environmental reviews (PUF 32, 117-20), constitute an abuse of discretion because the Corps cannot remotely satisfy the applicable "arbitrary and capricious" standard of review for agency conduct under NEPA.  *See* Opening Memorandum at pp. 26-27; *see also* Appendix "A" to Plaintiffs' Opening Memorandum (Doc. No. 16510-5) (listing 54 published decisions where Corps' environmental compliance was invalidated as "arbitrary and capricious.")

As set forth in the Plaintiffs' Opening Memorandum and the NEPA Amicus Brief, mandatory environmental analysis (*i.e.*, required by CEQ regulations) was omitted from the Corps' NEPA documentation.  Among those unevaluated issues were the significant environmental impacts inherent in the O&M of the MR-GO, the cumulative effects of the O&M of the MRGO on the storm hazard potential of the channel, known proposals for mitigation and alternatives in the O&M of the channel including consideration of closure of the MR-GO, and any substantive response to the pertinent issues raised in the inter-agency comments received during this review process.  PUF 48, 65-80.  This conduct is simply indefensible.

2.    **The Corps' Failure To Evaluate Relevant Factors and To Reach Reasoned Decisions Regarding Its NEPA Compliance**

NEPA and the CEQ NEPA Regulations require study of the "environmental impact" of a federal action.  Such "impacts" (or "effects") include both direct and indirect impacts, "which are

caused by the action and are later in time or further removed in distance, but are still reasonably foreseeable." 40 CFR § 1508.8(b). The Corps does not contest that its NEPA-related documents—in either the form of an EA or an EIS—wholly omit the significant and foreseeable impact of the MR-GO on hurricane-caused storm surges. PUF 48, 54-82. Indeed, as illustrated by the mere existence of Corps' report on "Storm Surge Effects of the Mississippi River Gulf Outlet" (1966) and as acknowledged in the Corps' Draft Environmental Statement of 1972, this significant impact was reasonably foreseeable. PUF 43, 44. Nonetheless, the Corps never prepared an EIS addressing this issue. *See* Defendant's Response to Plaintiffs' Uncontested Facts 56 at p. 41.

Defendant acknowledges the Corps' failure to evaluate the cumulative impacts of its many actions as required by 40 CFR §§ 1500.7 and 1500.8. *See* Defendant's Response to Plaintiffs' Uncontested Facts 60-64; p. 60, no. 81 at pp. 44-47. From 1976 to Katrina, the Corps admittedly segmented its analyses, preparing EAs on discrete segments of the MR-GO without ever examining the cumulative impacts of the MR-GO as a whole. PUF 119. In drafting its multiple NEPA documents, the Corps recognized that it was taking "actions" which implicated NEPA, but subsequent to its 1976 EIS, the agency never examined the cumulative impacts of its actions with respect to MR-GO, despite having learned that such cumulative impacts had in fact occurred. Indeed, Defendant acknowledges that "the decision was made to prepare a supplemental EIS to the existing MR-GO EIS, which was prepared in 1976." Nonetheless, "it is uncontested that a SEIS was never completed" *See* Defendant's Response to Plaintiffs' Uncontested Facts 53 at p. 39.

Similarly, Defendant does not contest that the Corps' NEPA documents failed to address the significant impacts of the O&M on adjacent marshes such as channel widening due to bank

16

erosion and a general degradation of wetlands.  *See* Defendant's Response to Plaintiffs'

Uncontested Facts 120-127 at pp. 92-98.  Over the history of the MR-GO's O&M, the Corps

clearly recognized this omission.  In a variety of internal reports, the Corps noted the significant

changes in the environment created by the O&M of the MR-GO.[5]  Indeed, seventeen years after

the defective 1976 FEIS, the Corps, in a 1993 memorandum, considered shore protection

measures but recognized that such measures would require preparation of a full EIS, thereby

alerting Congress to the environmental concerns inherent in the MR-GO and inviting challenges

to their contemplated plan. Worse yet, this legally-mandated disclosure would have prompted

Congressional consideration of closing the MR-GO.  PUF 103, 104 and 110.  Still no EIS was

prepared.

        Similarly, another "significant new circumstance or information" requiring a

supplemental EIS was recognized in 1997.  The Corps found that larger than anticipated vessels

were causing impacts on the marshes adjacent to the channel far greater than had been earlier

envisioned.  *See* Plaintiffs' Exh. 125 (1997 Feasibility Report Wetlands Creation and Protection

Project Mississippi River - Gulf Outlet, Mile 14 to Mile 11, Marsh Creation, St. Bernard and

Plaquemines Parishes, Louisiana) at p. 2.

        Not surprisingly, therefore, the Corps was forced to admit in an April 11, 2005 internal

environmental review that "the cumulative impact of all the changes that have already occurred,

since preparation of the 1976 EIS, alone constituted a significant impact on the environment,

compared to the O&M plan described in the EIS, although there has been no supplemental EIS

(SEIS) prepared."  PUF 119.  In short, the Defendant did not dispute that the 1976 EIS was

---

[5] *See, e.g.,* Plaintiffs' Exh. 83 (1988 Mississippi River-Gulf Outlet, St. Bernard Parish, La., Bank
Erosion Reconnaissance Report) at pp. 7, 24; Plaintiffs' Exh. 124 (1996 Mississippi River-Gulf
Outlet North Bank Foreshore Protection Evaluation Report) at pp. 26, 29.

deficient under the CEQ guidelines and that under the mandatory regulations, a supplemental EIS was required by either the time of the 1988 Bank Erosion Reconnaissance Report or, at the very latest, by the time of the Corps' 1996 Foreshore Protection Evaluation Report Accordingly, on this substantial record, the Corps failed to reach a reasoned decision to forego a comprehensive EIS, thereby acting in an "arbitrary and capricious" manner.

### B.   The Corps' Proven and Admitted Abuse of Discretion Establishes Violation of Mandatory Legal Duties and Negates DFE Immunity

Without authority or explanation, the Government advances the *non sequitur* that the Corps' manner of compliance with these "mandatory duties" under NEPA is within its "discretion."  Opposition at p. 12   Thus, according to this twisted reasoning, although the agency's proven and admitted failures to file legally-required EISs amount to an "abuse of discretion," this abuse of discretion is nevertheless immunized by the DFE.  *Id.* at p. 15.  In other words, the Government argues, the Corps had discretion to abuse its discretion.  This is sheer tautology writ large.

The obvious flaw in the Government's argument is that it impermissibly conflates two separate concepts based on the coincidence of the word "discretion."  "Abuse of discretion" is a judicial review standard for evaluating an administrative agency's compliance with statutes and regulations. Thus, under the Administrative Procedure Act, the Corps here committed a prejudicial (and reversible) abuse of discretion if its decision not to prepare an EIS was "arbitrary and capricious."  *Marsh v. Oregon Resources Council,* 490 U.S. 360, 378 (1989).

"Discretion" as used in the DFE context, however, has a different and particularized meaning: it is a certain type of discretionary policy judgment "grounded in social, economic and political" considerations.  *United States v. Gaubert*, 499 U.S. 315, 323 (1991). One has nothing to do with the other.  An agency's abuse of discretion by not complying with the law precludes

any DFE defense. *Gaubert,* 499 U.S. at 324; *Collins v. United States,* 783 F.2d 1225, 1230 (5th Cir. 1986). Here, therefore, the existence of discretion to make an administrative finding of no significant effect on the environment (and thus no EIS) does not automatically compel the conclusion that it was *per se* an immunized exercise of discretion under the DFE. The proper analysis is just the opposite: once you find an abuse of discretion, you have found an abuse of discretion that defeats DFE immunity because the agency "had no room for choice" whether or not to comply with the legal mandates. *Gaubert,* 499 U.S. at 324.

If the first prong of the DFE test means anything, the "arbitrary and capricious" standard of review, while deferential, cannot equate to the *permissible* exercise of discretion qualifying for DFE under 28 U.S.C. § 2680(a). Contrary to the Defendant's assertions, federal courts have routinely scrutinized agency—and indeed, the *Corps'*—conduct to assess the appropriateness of compliance with mandatory environmental statutes and regulations. *See* Appendix "A" to Plaintiffs' Opening Memorandum. Where, as here, there is a proven and admitted abuse of discretion (*i.e.* unlawful conduct) with regard to over three decades of noncompliance with NEPA and the implementing regulations, nothing more need be demonstrated in order to establish the first prong of the DFE test. *Gaubert*, 499 U.S. at 324 ("If the employee violates the mandatory regulation, there will be no shelter from liability because there is no room for choice and the action will be contrary to policy."); *Berkovitz v. United States*, 486 U.S. 531, 536 (1988)(The discretionary function will not apply where a federal statute, regulation or policy specifically prescribes a course of action to follow.") In other words, a judicial determination that the Corps abused its discretion is tantamount to a finding of violation of a mandatory legal duty for which the agency by law *had no discretion. See, e.g.*, *Adams v. United*, 2006 WL 3314571 (D. Idaho 2006) at *2 and cases cited in Appendix "A."

The Government sets up a "straw man" by arguing that NEPA does not create a private right of action.  *See* Opposition at p. 17, n. 4.  Absence of a private right of action under NEPA is of no consequence to Plaintiffs' case here because their negligence claims are predicated on Louisiana law and not NEPA.  *See Adams* at *2 ("The BLM argues that NEPA provides no private right of action.  This misconstrues plaintiffs' use of NEPA.  They use it not to recover any remedy but to argue that the BLM was under a mandatory duty.  That is not an improper use of NEPA.")[6]

### C.  The Government Offers No Support That The Corps' Violation of NEPA Is A Protected Discretionary Act Under the DFE Immunity Standard

Trivializing the NEPA mandatory scheme as a toothless tiger and relying on three inapposite cases, the Defendant incorrectly contends that the DFE protects it from its conceded "abuse of discretion" in its NEPA compliance.  *See* Opposition at pp. 16-17.  In each of the cited cases, however, the DFE did not protect the agency from its abuse; rather, the legal mandate

---

[6] The Government criticizes *Adams* for erroneously relying on *Great Basin Mine Watch v. Hankins,* 456 F.3d 955 (9th Cir. 2006).  Defendant contends that *Great Basin* actually supports the position that "agencies have discretion in deciding whether to produce a series of EA's rather than a single comprehensive EIS." Opposition at p. 14.  This is a tempest in a teapot because the Corps here produced neither an EA or an EIS that addressed the admittedly significant environmental impacts of the O&M of the MR-GO on storm hazards.

Similarly, Defendant asserts that *Quechan Indian Tribe v. United States*, 535 F.Supp.2d 1072 (S.D. Cal. 2008) reaches "the opposite conclusion from that reached in *Adams*" because "the court recognized that whether to prepare an EIS is both discretionary and 'clearly grounded in public policy considerations.'"  Opposition at p. 14.  This is patently untrue.  The *Quechan* court *did not address the preparation of EISs,* but instead considered the propriety of a "non-public 'categorical exclusion'" (40 CFR 1508.4) rather than a public environmental analysis. *Quechan*, 535 F.Supp.2d at 1111.  *Quechan* held that "[t]he decision to complete a 'categorical exclusion' is clearly grounded in public policy considerations. Accordingly, *to the extent the decision to prepare a "categorical exclusion"* rather than an environment analysis or impact statement is the basis for Plaintiff's tort claims, the tort claims must be dismissed." *Id.* at 1112 (emphasis added).  Like the *Adams* Court, this Court is evaluating the failure to prepare an EIS and not preparation of a "categorical exclusion."

alleged to be breached did not form the basis for an actionable tort under the FTCA. These cases are not remotely relevant here.

For example, *Jayvee Brand, Inc., v. United States*, 721 F.2d 385, 390 (D.C. Cir 1983) does not hold that the DFE immunity insulates proven "abuse of discretion" by a federal agency. There the manufacturer of children's sleepwear brought an action against the Consumer Product Safety Commission for monetary damages caused when it enacted regulations banning a particular flame-retardant compound.  Plaintiff challenged the Commission's actions on the ground that it failed to follow hearing procedures in promulgating its regulations.  Holding that failure to follow the regulatory procedures was in fact a "wrongful act," the Court of Appeal also noted that the Government was immune because a private person could not be liable under local law for such deficient policy promulgation.  "Thus, there is here no jurisdiction to entertain a suit against the federal government."  *Id*.  Accordingly, the Commission's actions "may be characterized as an abuse in the exercise of *policy making*, and hence an abuse of discretion shielded from liability by section 2680(a)."  *Id*. at 389 (emphasis added).  In stark contrast here, the Corps' failure was not one of policy grounded in social, economic or political concerns, but rather, it was a failure to carry out legally prescribed mandates for such impermissible reasons as avoiding Congressional oversight and sheer expediency.

Defendant also cites to a footnote in *Franklin Sav. Corps. v. United States*, 180 F.3d 1124, 1132 n.11 (10th Cir 1999).  Again, however, the case is inapposite.  First, in *Franklin*, plaintiff contended that the RTC failed to memorialize its decision-making process in writing in violation of a regulation.  The court dismissed the complaint because nowhere in plaintiff's "complaint or in their response to the government's motion to dismiss did plaintiffs allude in any way to the specific duty to draft case memoranda." *Franklin*, 180 F.3d at 1133.  Furthermore, the

cited footnote 11 references *Johnson v. United States Dept. of Int.*, 949 F.2d 332 (10th Cir. 1991), involving an attempt to bootstrap to boot strap the discretionary ability to engage in a rescue activity with an alleged non-discretionary duty to collect information about an accident. In *Johnson,* however, no specific mandatory requirement governed the information-gathering or communication.  *See Johnson*, 949 F.2d at 340 n.10.  Thus, as the *Franklin* court noted, *Johnson* "does not foreclose an FTCA suit based on negligence that did violate such a requirement." *Franklin,* at 1132 n.11.

## IV.   THE STATUTORY VIOLATIONS ARE RELATED TO THE HARM SUFFERED

In a last ditch attempt to overcome the Corps' FWCA and NEPA violations, the Government argues that "the [causal] connection between the alleged violations and Plaintiffs' asserted damages is nonexistent."  Opposition at p. 8.  This is simply untrue, and the cases cited by the Government do not support its argument.

Plaintiffs have alleged and offered substantial evidence that the MR-GO had four serious defects—no surge barriers, the "funnel effect," no safeguards against saltwater destruction of wetlands, and unmitigated bank erosion/channel widening—that were a substantial factor in causing the catastrophic flooding of their homes.  *See* Plaintiffs' Opposition to Defendant's Motion for Partial Summary Judgment (Causation) (Doc. No. 16063) and Plaintiffs' Separate Statement of Uncontested Facts in Support of Plaintiffs' Opposition to Defendant's Motion for Partial Summary Judgment (Causation) (Doc. No. 16063-5).  In addition, Plaintiffs have alleged, and offered substantial evidence, that there were feasible mitigation measures available to the Corps that could have remedied these defects *before the MR-GO was authorized.*  PUF 163 (Doc. No. 16790-2).  Moreover, Plaintiffs have offered unrebutted evidence that the FWS and Louisiana Department of Wildlife warned about the destruction of wetlands, but these concerns were never reported to Congress.  PUF 19-21.

As demonstrated in Section II, *supra*, the fundamental purpose of the FWCA is to allow Congress, not the Corps, to make the judgment calls about whether to proceed with a project as proposed or to require modifications to protect the environment.  By its violation of both the coordination and reporting mandates, the Corps deprived Congress of the ability to authorize remedial measures that would have substantially mitigated or eliminated the MR-GO's hazardous conditions.  This plausible chain of potential events satisfies any required nexus.

The cases cited by the Government (Opposition at pp. 18-20) do not support the Government's assertion about the putative missing link between FWCA and NEPA violations and the destruction of New Orleans East, Lower 9th Ward, and St. Bernard Parish.  Naturally, none of these cases involved the FWCA or NEPA.  Indeed, they support Plaintiffs' position that the link here between statutory violations and damages is direct and compelling.

*Montijo-Reyes v. United States*, 436 F.3d 19 (1st Cir. 2006) involved the Corps dumping dredged materials in front of beach front housing.  The aggrieved homeowners claimed that the Corps violated the Clean Water Act ("CWA") and local regulations.  Summary judgment based on the DFE was granted because there was no demonstrated connection between the claimed damages and the Corps' failure to request a necessary exemption (which had been granted in the past).  *Id.* at 25.  Most importantly, "Plaintiffs [did] not allege that the Corps failure to obtain a certificate or waiver caused the damage to their homes."  *Id.*[7]

Unlike the plaintiffs in *Montijo-Reyes* who never even attempted to prove a nexus between the alleged violation of an environmental law and their injury, Plaintiffs here have

---

[7] The other two cases cited by the Government—*Sloan v. United States Dept. of H.U.D.*, 236 F. 3d 756 (D.C. Cir. 2001) and *Franklin Savings Corp. v. Unites States,* 180 F.3d 1124 (10th Cir. 1999)—did not deal with the required nexus between the alleged violation of law and plaintiffs' damages.

demonstrated a causal connection between the Corps' violation of NEPA and their harm.  In our case, the causal chain is compelling:

(1) the Corps' violation of the NEPA mandates in failing to report known, foreseeable consequences of its MR-GO O&M prevented the relevant decision-maker, *i.e.,* Congress (acting as steward of the Nation's environmental policy), from fully appreciating and addressing the harm inflicted by the Corps' O&M;

(2) the Corps' violation of NEPA in turn caused the harm that Congress specifically sought to prevent – the inability to make informed decisions regarding government actions that impact the quality of the human environment; and

(3) the lawmakers' inability to make an informed decision regarding environmental policy caused Plaintiffs' harm in that it allowed the Corps to continue its tortious O&M without scrutiny as to its conduct's environment impacts and the ability of Congress to mandate corrective measures that would have avoided or materially reduced the catastrophic flooding.

Plaintiff's experts' reports and the Corps' own documents establish several ways in which allowing the MR-GO to expand more than 300% and to destroy tens of thousands of acres of surge-buffering wetlands significantly impacted the LPV flood structures.  For example, the wider channel increased the fetch during the storm, resulting in waves striking the Earthen Berm Spoil Banks along Reach 2 with much more velocity and power. As the Dutch modelling demonstrates, the O&M of the channel altered the channel dynamics, resulting in an almost a five-fold increase in wave energy.  *See* Plaintiffs' Exh. 27 (Expert Report of G. Paul Kemp) at p. 93; *see also* Kemp Supp Decl. re Causation (Doc. No. 16063-3) at ¶¶28-33.  At this stage, Plaintiffs have made a sufficient showing of causation since the Court has recently denied the Government's motion for partial summary judgment, finding that Plaintiffs' experts have offered

credible evidence that the Corps' O&M was a substantial factor in causing the catastrophic flooding of Plaintiffs' property.

In sum, under the law and facts, the Corps has not satisfied its burden to demonstrate that it complied with the FWCA or NEPA. Because the FWCA unequivocally directed the Corps to consult and report so that Congress could be fully informed about ecological effects, "strict compliance with FWCA should be required." *Nat'l Wildlife Fed. v. Andrus*, 440 F. Supp. 1245, 1255 (D. D.C. 1977). The catastrophic (and predicted) effects of these FWCA and NEPA violations could have been prevented or mitigated if the Corps had obeyed the law, and any uncertainty in this regard inures to the Government's detriment. Failure to comply eliminates DFE immunity. *See Adams v. United States, supra,* at *2; *Collins v. United States Mine Safety and Health Admin.*, 783 F.2d 1225, 1230-31 (5th Cir. 1986).

## V.      CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Partial Summary Judgment should be granted.

Dated: January 2, 2009                                      Respectfully submitted,


**O'Donnell & Associates P.C.**

By: s/ Pierce O'Donnell

Pierce O'Donnell (*pro hac vice*)
550 S. Hope St., Suite 1000
Los Angeles, California 90071
Phone:  (213) 347-0290
Fax:  (213) 347-0298


**Law Offices of Joseph M. Bruno**
By: s/ Joseph M. Bruno
Joseph M. Bruno (LSBA No. 3604)

855 Baronne Street
New Orleans, Louisiana 70133
Telephone: (504) 525-1335
Facsimile:  (504) 581-1493

**The Andry Law Firm, LLC**
By: s/ Jonathan B. Andry
Jonathan B. Andry (LSBA No. 20081)
610 Baronne Street
New Orleans, Louisiana 70113
Telephone: (504) 586-8899
Facsimile:  (504) 585-1788

**Domengeaux Wright Roy & Edwards LLC**
Bob F. Wright (LSBA No. 13691)
James P. Roy (LSBA No. 11511)
556 Jefferson Street, Suite 500
P.O. Box 3668
Lafayette, Louisiana 70502-3668
Telephone: (337) 233-3033
Facsimile:  (337) 233-2796

**Fayard & Honeycutt**
Calvin C. Fayard, Jr. (LSBA No. 5486)
Blayne Honeycutt (LSBA No. 18264)
519 Florida Avenue, S.W.
Denham Springs, Louisiana 70726
Telephone: (225) 664-4193
Facsimile:  (225) 664-6925

**Girardi & Keese**
Thomas V. Girardi (*pro hac vice*)
1126 Wilshire Boulevard
Los Angeles, CA 90017
Telephone: (213) 489-5330
Facsimile:  (213) 481-1554

**Ranier, Gayle & Elliot, LLC**
N. Frank Elliot III
1419 Ryan Street
Lake Charles, LA 70601
Telephone: (337) 494-7171
Facsimile: (337).494.7218

**Levin, Papantonio, Thomas, Mitchell Echsner & Proctor, P.A.**
Clay Mitchell (*pro hac vice*)
Matt Schultz (*pro hac vice*)
316 S. Baylen Street, Suite 600
Pensacola, Florida 32502-5996
Telephone: (850) 435-7140
Facsimile:  (850) 436-6123

**McKernan Law Firm**
Joseph Jerry McKernan (LSBA No 10027)
John Smith (LSBA No. 23308)
8710 Jefferson Highway
Baton Rouge, Louisiana 70809
Telephone: (225) 926-1234
Facsimile:  (225) 926-1202

**Gainsburgh, Benjamin, David, Meunier & Warshauer, LLC**
Gerald E. Meunier  (LSBA 9471)
2800 Energy Centre
1100 Poydras Street
New Orleans, Louisiana 70163
Telephone: (504) 522-2304
Facsimile:  (504) 528-9973

26

**Law Office of Elwood C. Stevens, Jr., a Professional Law Corporation**
Elwood C. Stevens, Jr.  (LSBA No. 12459)
1205 Victor II Boulevard
P.O. Box 2626
Morgan City, Louisiana 70381
Telephone: (985) 384-8611
Facsimile:  (985) 385-4861

**Cotchett, Pitre, Simon & McCarthy**
Joseph W. Cotchett  (*pro hac vice*)
840 Malcolm Road, Suite 200
Burlingame, California 94010
Telephone:  (650) 697-6000
Facsimile:  (650) 697-0577

**Law Office of Frank J. D'Amico, Jr. APLC**
Frank J. D'Amico, Jr. (LSBA No. 17519)
Richard M. Exnicios, Esq. (LSBA No. 25666)
622 Baronne Street
New Orleans, LA 70113
Telephone: (504) 525-9561
Fax: 504-525-9522

**Robinson, Calcagnie & Robinson, Inc.**
Mark Robinson (Cal State Bar No. 54426
620 Newport Center Drive – 7th Floor
Newport Beach, CA 92660
1-888-701-1288

## <u>CERTIFICATE OF SERVICE</u>

I, Pierce O'Donnell, hereby certify that on January 9, 2009, I caused to be served

**PLAINTIFFS' REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION**

**FOR PARTIAL SUMMARY JUDGMENT ON THE DISCRETIONARY FUNCTION**

**EXCEPTION**, upon Defendants' counsel, Robin D. Smith, George Carter, Keith Liddle, and

Richard Stone by ECF and email at robin.doyle.smith@usdoj.gov; george.carter@usdoj.gov,

keith.liddle@usdoj.gov, and richard.stone@usdoj.gov.

<u>/s/ Pierce O'Donnell</u>