**APPENDIX "C"**

**EXCERPTS FROM THE LEGISLATIVE HISTORY OF THE
FISH AND WILDLIFE COORDINATION ACT**

I.     Hearings Before the Committee on Agriculture House of Representatives, 79th Congress, Second Session on H.R. 3821 and H.R. 6097 (Feb. 13 and April 15, 1946) (Plaintiffs' Exh. 122)

# CONSERVATION OF WILDLIFE

## HEARINGS

BEFORE

### THE COMMITTEE ON AGRICULTURE
### HOUSE OF REPRESENTATIVES

SEVENTY-NINTH CONGRESS

SECOND SESSION

ON

## H. R. 3821 and H. R. 6097

BILLS AMENDING ACTS PROMOTING THE CONSERVATION OF WILDLIFE, FISH, AND GAME, AND FOR OTHER PURPOSES

FEBRUARY 13 AND APRIL 15, 1946

**Serial I**

Printed for the use of the Committee on Agriculture



UNITED STATES
GOVERNMENT PRINTING OFFICE
WASHINGTON : 1946

**Statements from Hon A. Willis Roberston, author of the 1946 amendment to the FWCA.**

> The essence of this bill is that from the inception of a project to the time that a congressional committee approves the project consideration shall be given to what is to be done to the wildlife interests when the project is undertaken.

Plaintiffs' Exh. 122 at p. 3.

> refuge to be located there. The purpose of this bill is to require the Army engineers, because they are the ones that do most of the building, to make a part of their records what is going to happen to your wildlife interests. Then the Board of Army Engineers, which must act first before a project is approved, will have that information before them, and then if they say, "We will go ahead," they must indicate in their report what steps they are going to take. Will they have fish ladders, for instance, or not; will they draw down these pools or not draw them down?

Plaintiffs' Exh. 122 at p. 4.

> The CHAIRMAN. Mr. Robertson, the legislation would require the Army engineers to make certain findings in their report?
>
> Mr. ROBERTSON. That is right.
>
> The CHAIRMAN. Suppose they do make certain findings that the Fish and Wildlife Administration does not agree with. How would that controversy be settled?
>
> Mr. ROBERTSON. By the congressional committee that had to approve the project. And this bill will say that whatever is done or recommended for wildlife must be consistent with the primary purpose of what the project is to be for. We don't expect the Government to spend hundreds of millions of dollars and just give primary consideration to fish and game.
>
> The CHAIRMAN. Let me get this straight: the Army engineers have made certain recommendations, have made certain determinations which would be set out in their report.
>
> Mr. ROBERTSON. That is correct.
>
> The CHAIRMAN. The Fish and Wildlife Administration does not agree with that——
>
> Mr. ROBERTSON. Yes, sir.
>
> The CHAIRMAN. Then the issue would be brought before a congressional committee?
>
> Mr. ROBERTSON. That is right. We have an illustration of that in

Plaintiffs' Exh. 122 at pp. 4-5.

> Suppose the Board of Engineers had agreed with the district engineer, then the issue would have come to Congress for final decision. But you would have a record to go on, and that is what this bill does.

Plaintiffs' Exh. 122 at p. 5.

> Mr. ROBERTSON. That is the situation now. The Army engineers can plan a project and start construction on it before anybody knows what they are up to, and then it is too late, sometimes, to find out what is going to happen. Under this bill they have to notify the Fish and Wildlife Service they are going to do this work.

Plaintiffs' Exh. 122 at. 7.

3

> Mr. ROBERTSON. If you are establishing a new project in Virginia the Army engineers would notify the Fish and Wildlife Service what they were going to do, and they would also notify the State of Virginia. They now notify the State what they are going to do, but not with a view to having recommendations about wildlife interests. The Wildlife Service would submit its views to the district engineer before he had submitted his report and before you had public hearings before the board of Army engineers to see whether the Army was going to approve the project or not, and that becomes a part of the record, and you start from the ground floor and work up with everything that is going to be considered as being involved. Heretofore we have often acted on the assumption that we had an abundant supply of wildlife and it didn't make much difference what was done with it. We know now that is not true.
>
> The CHAIRMAN. Let us get in the record what happens. The Federal Government contemplates the establishment of a project in Virginia; then the district engineers would notify the State authority and the Wildlife Service?
>
> Mr. ROBERTSON. That is right.
>
> The CHAIRMAN. Now, would we have hearings?
>
> Mr. ROBERTSON. They could have hearings, or they could submit briefs. But they would get their views to him.
>
> The CHAIRMAN. They could either have a hearing or submit briefs?
>
> Mr. ROBERTSON. That is right.
>
> The CHAIRMAN. Would that go into the record?
>
> Mr. ROBERTSON. That would become a part of the record.
>
> The CHAIRMAN. That would become a part of the record. Then when it came up to the officials here in Washington for determination they would have a complete record?
>
> Mr. ROBERTSON. They would have a complete record. And here is the new phase of this that does not now exist. After the State game department and the Fish and Wildlife Service and the other conservation agencies tell this district engineer what was involved here from a wildlife standpoint he would have to put in his report what he was going to do about it, if anything.
>
> The CHAIRMAN. He would put that in?
>
> Mr. ROBERTSON. Yes, sir.
>
> The CHAIRMAN. Then it comes up here for approval or disapproval?
>
> Mr. ROBERTSON. Then the whole record comes before the committee that has to approve the project, which will be Flood Control or Rivers and Harbors, and they can decide whether or not the primary purpose, whether flood control or whatever it may be, is so important that the protest can be overridden.
>
> The CHAIRMAN. When it comes before the committee the committee will have the complete record showing the views of not only the Army engineers, but of the Fish and Wildlife Service, and of the State in which the project is located?
>
> Mr. ROBERTSON. That is correct.

Plaintiffs' Exh. 122 at pp. 12-13.

**Statements of Albert M. Day, Assistant Director, United States Fish and Wildlife Service**

> That, as Mr. Robertson explained, provides that the State reports, and the Fish and Wildlife reports shall be included in the report which will go eventually to the Congress.

Plaintiffs' Exh. 122 at p. 24.

**II.** Hearings before the Committee on Agriculture and Forestry on H.R. 6097, (July 19, 1946) (Plaintiffs' Exh. 123)

Vol. 1

# The United States Senate

Report of Proceedings

Hearing held before

Committee on Agriculture and Forestry

H. R. 6097

# ORIGINAL

July 19, 1946

Washington, D. C.

WARD & PAUL
(ELECTREPORTER, INC.)
OFFICIAL REPORTERS
1760 PENNSYLVANIA AVE, N. W.
WASHINGTON, D. C.

NATIONAL (4266 / 4267 / 4268)

**Statements from Hon A. Willis Robertson, author of the 1946 amendment to the FWCA.**

> I would also say, with all due deference to the Army Engineers, that ten years from now they would be as much opposed to any other agencies telling them what they have to do on any one of their projects as they are today. That is the essence of their objection, except section 7.

Plaintiffs' Exh. 123 at p. 36.

> Now the purpose of this bill, which the Isaac Walton League approves as Mr. Reid will tell you, is when they plan a project, let the Congress know, before we appropriate the money, all that is involved, including what that project is going to do to a great natural resource, and then the Congress appropriates the fund, and if the War Department

Plaintiffs' Exh. 123 at pp. 38-39.

7

**Statements of Kenneth Reid, Executive Director, Izaak Walton League, Chicago, Illinois**

> All of this talk of cooperating with the Fish and Wildlife Service is just a gesture. But if what the Fish and Wildlife Service says is necessary to be done to protect the public aquatic values, if it in the slightest degree interferes with the plans of the Army Engineering Corps, they throw it out the window. They are very reluctant in even letting the Fish and Wildlife Service, or anyone else, get in on their plans at all.

Plaintiffs' Exh. 123 at p. 53.

III.  House Report, Committee on Agriculture, 79th Congress, Second Session, H.R. 6097 (April 17, 1946) (Plaintiffs' Exh. 3)

| 79TH CONGRESS 2d Session | HOUSE OF REPRESENTATIVES | REPORT No. 1944 |
|---|---|---|

## RELATING TO THE COORDINATION OF ACTIVITIES FOR THE CONSERVATION OF WILDLIFE, FISH, AND GAME

APRIL 17, 1946.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

Mr. FLANNAGAN, from the Committee on Agriculture, submitted the following

## REPORT

[To accompany H. R. 6097]

The Committee on Agriculture, to whom was referred the bill (H. R. 6097) to amend the act of March 10, 1934, entitled "An act to promote the conservation of wildlife, fish, and game, and for other purposes," having considered the same, report thereon with a recommendation that it do pass.

### STATEMENT

The proposed bill would place in effect a much-needed program and facilities for the effectual planning, maintenance, and coordination of wildlife conservation, management, and rehabilitation. Although such a program was contemplated by the act of March 10, 1934 (48 Stat. 401), that legislation has proved to be inadequate in many respects and it now is proposed that it be amended to provide for more adequate procedures. With the ever-increasing pressure on the important national wildlife resources of the country, both because of extensive economic developments that have materially reduced the habitat heretofore available in the production of wildlife and because of the extended interest in the resource as a source of food and recreational enjoyment, it is essential that the plans for wildlife management be intelligently coordinated and given the necessary Federal assistance if this great national resource is to maintain its proper relation to the other resources of the country. Notwithstanding the widespread interest in wildlife of the hunting public, which represents an extremely large cross section of humanity, no unified effort, except with respect to certain migratory species, has been possible in the past.

A number of public hearings on several similar measures were held by the committee and, as a result of these hearings, the more important features of those measures together with suggested amendments

H. Repts., 79-2, vol. 6——8

> From time to time both Federal and State agencies have made many impoundments, diversions, or other uses of waters that needlessly have destroyed the habitat upon which wildlife is dependent. Such destruction has been needless in the sense that these otherwise necessary economic developments could have been carried out, in many instances, without destroying wildlife or its habitat if adequate and reasonable provision had been made for the use of the lands and waters involved in such developments for wildlife conservation as a secondary use. Restoration of the proper balance between uses of the lands and waters made by man and those made by wildlife may involve difficult problems and require considerable thought, but the solving of such problems is not impossible if intelligently handled.

Plaintiffs' Exh. 3 at p. 2.

> proper coordination of these seemingly diverse interests. As drafted, these two sections require coordination between constructing and operating agencies of both the Federal and State Governments not alone after flood control, irrigation, or impoundment projects have been started but also in connection with the initial planning for such projects. This type of coordination is extremely important from the standpoint of economical planning and construction as well as from the standpoint of effectuating conservation of wildlife. There have been many instances in the past where minor changes in construction plans could have been made for the benefit of wildlife resources without increasing materially the cost of a project if consideration of the possible wildlife interests had been included in the initial planning of

Plaintiffs' Exh. 3 at p. 3.

**IV.     Senate Report, Amendments to FWCA, 1958 U.S.C.C.A.N. 3446 (July 28, 1958) (Plaintiffs'
Exh. 17)**

```
S. REP. 85-1981                                                                  Page 1
S. REP. 85-1981, S. Rep. No. 1981, 85TH Cong., 2ND Sess. 1958, 1958 U.S.C.C.A.N. 3446, 1958 WL 3911
(Leg.Hist.)
(Cite as: 1958 U.S.C.C.A.N. 3446)




             *3446 P.L. 85-624, FISH AND WILDLIFE CONSERVATION AND WATER-
                       RESOURCE DEVELOPMENTS-- COORDINATION
                              SENATE REPORT NO. 85-1981,
                    JULY 28, 1958 (TO ACCOMPANY H.R. 13138)
                               HOUSE REPORT NO. 85-2183,
                    JULY 16, 1958 (TO ACCOMPANY H.R. 13138)
                        THE SENATE REPORT IS SET OUT.

 (CONSULT NOTE FOLLOWING TEXT FOR INFORMATION ABOUT OMITTED MATERIAL.  EACH
 COMMITTEE REPORT IS A SEPARATE DOCUMENT ON WESTLAW.)

                               SENATE REPORT NO. 85-1981
                                      JULY 28, 1958
    THE COMMITTEE ON INTERSTATE AND FOREIGN COMMERCE, TO WHOM WAS REFERRED THE BILL
 (H.R. 13138) TO AMEND THE ACT OF MARCH 10, 1934, TO PROVIDE FOR MORE EFFECTIVE
 INTEGRATION OF A FISH AND WILDLIFE CONSERVATION PROGRAM WITH FEDERAL WATER-RESOURCE
 DEVELOPMENTS, AND FOR OTHER PURPOSES, HAVING CONSIDERED THE SAME, REPORT FAVORABLY
 THEREON WITHOUT AMENDMENT AND RECOMMEND THAT THE BILL DO PASS.

                                   PURPOSE OF THE BILL

    THIS AMENDMENT TO THE COORDINATION ACT WOULD GRANT AUTHORITY TO THE AGENCIES OF
 GOVERNMENT ENGAGED IN CONSTRUCTION TO CONSULT WITH THE FISH AND WILDLIFE SERVICE
 BEFORE AND DURING THE BUILDING OF FEDERAL WATER DEVELOPMENT PROJECTS.
    THE FISH AND WILDLIFE SERVICE WOULD MAKE KNOWN TO THESE CONSTRUCTION AGENCIES,
 SUCH AS THE CORPS OF ENGINEERS AND THE BUREAU OF RECLAMATION, THE PROJECT NECESSARY
 TO PROTECT FISH AND WILDLIFE.  CONSIDERABLE STUDY WOULD BE REQUIRED IN SOME CASES,
 WITH SUGGESTED CHANGES IN CONSTRUCTION PLANS TO THE GREAT ADVANTAGE TO OUT WILDLIFE
 RESOURCE.  UNDER THE BILL SUGGESTIONS REGARDING CHANGES COULD BE MADE PREVIOUS TO
 THE COMMENCEMENT OF CONSTRUCTION.  SUCH PLANS, OR RECOMMENDATIONS, WHETHER ACCEPTED
 OR REJECTED BY THE CONSTRUCTION AGENCY, WOULD BE SUBMITTED TO THE CONGRESS AT THE
 TIME AUTHORIZATION LEGISLATION FOR THE PROJECT WAS UNDER CONSIDERATION.
    THE BILL WOULD AMEND THE WATERSHED PROTECTION AND FLOOD PREVENTION ACT WHICH IS
 ADMINISTERED BY THE DEPARTMENT OF AGRICULTURE.  IT IS DESIGNED *3447 TO PROVIDE FOR
 GREATER CONSIDERATION OF FISH AND WILDLIFE CONSERVATION IN THE FEDERAL WATER-
 RESOURCE DEVELOPMENT PROGRAM.  ENACTMENT OF THE BILL WOULD NOT RETARD THAT PROGRAM
 BUT SHOULD HELP SIGNIFICANTLY IN PERMITTING FEDERAL WATER DEVELOPMENT TO SERVE THE
 INTERESTS OF A MUCH LARGER SHARE OF OUR POPULATION.
    THE SECRETARY OF AGRICULTURE WOULD BE REQUIRED TO NOTIFY THE DEPARTMENT OF THE
 INTERIOR ON ANY CONSTRUCTION PLANS WHICH CONCERN THE CONSERVATION AND DEVELOPMENT
 OF WILDLIFE RESOURCES.  THE SECRETARY OF AGRICULTURE WOULD GIVE FULL CONSIDERATION
 TO ANY PLANS SUBMITTED TO HIM BY THE FISH AND WILDLIFE SERVICE.
    THE CONGRESS RECOGNIZED THE NEED FOR GREATER EMPHASIS ON FISH AND WILDLIFE
 CONSERVATION THROUGH THE ENACTMENT OF THE FISH AND WILDLIFE ACT OF AUGUST 8, 1956
 (70 STAT. 1119).  THIS ACT SPECIFICALLY POINTED TO THE NEED TO MAINTAIN AND
 INCREASE THESE RESOURCES THROUGH PROPER DEVELOPMENT AND MANAGEMENT.  THE CONGRESS




                    © 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.
```

> THIS AMENDMENT TO THE COORDINATION ACT WOULD GRANT AUTHORITY TO THE AGENCIES OF GOVERNMENT ENGAGED IN CONSTRUCTION TO CONSULT WITH THE FISH AND WILDLIFE SERVICE BEFORE AND DURING THE BUILDING OF FEDERAL WATER DEVELOPMENT PROJECTS.
> THE FISH AND WILDLIFE SERVICE WOULD MAKE KNOWN TO THESE CONSTRUCTION AGENCIES, SUCH AS THE CORPS OF ENGINEERS AND THE BUREAU OF RECLAMATION, THE PROJECT NECESSARY TO PROTECT FISH AND WILDLIFE. CONSIDERABLE STUDY WOULD BE REQUIRED IN SOME CASES, WITH SUGGESTED CHANGES IN CONSTRUCTION PLANS TO THE GREAT ADVANTAGE TO OUT WILDLIFE RESOURCE. UNDER THE BILL SUGGESTIONS REGARDING CHANGES COULD BE MADE PREVIOUS TO THE COMMENCEMENT OF CONSTRUCTION. SUCH PLANS, OR RECOMMENDATIONS, WHETHER ACCEPTED OR REJECTED BY THE CONSTRUCTION AGENCY, WOULD BE SUBMITTED TO THE CONGRESS AT THE TIME AUTHORIZATION LEGISLATION FOR THE PROJECT WAS UNDER CONSIDERATION.
> THE BILL WOULD AMEND THE WATERSHED PROTECTION AND FLOOD PREVENTION ACT WHICH IS ADMINISTERED BY THE DEPARTMENT OF AGRICULTURE. IT IS DESIGNED *3447 TO PROVIDE FOR GREATER CONSIDERATION OF FISH AND WILDLIFE CONSERVATION IN THE FEDERAL WATER-RESOURCE DEVELOPMENT PROGRAM. ENACTMENT OF THE BILL WOULD NOT RETARD THAT PROGRAM BUT SHOULD HELP SIGNIFICANTLY IN PERMITTING FEDERAL WATER DEVELOPMENT TO SERVE THE INTERESTS OF A MUCH LARGER SHARE OF OUR POPULATION.

Plaintiffs' Exh. 17 at p. 1.

> EXISTING LAW IS OF QUESTIONABLE APPLICATION TO MANY AUTHORIZED PROJECTS, A VERY SERIOUS SHORTCOMING. THE CORPS OF ENGINEERS, FOR EXAMPLE, HAS A BACKLOG OF 650 ACTIVE AUTHORIZED PROJECTS WITH AN ESTIMATED COST OF ABOUT $6 BILLION ON WHICH CONSTRUCTION HAS NOT YET STARTED. MANY OF THESE COVER VAST AREAS, CONTAINING SOME OF THE MOST IMPORTANT FISH AND WILDLIFE RESOURCES OF THE NATION. THE BUREAU OF RECLAMATION HAS ABOUT 150 PROJECTS OR UNITS AT AN ESTIMATED COST OF $3.7 BILLION IN THIS CATEGORY. MOST OF THESE PROJECTS HAVE NEVER BEEN INVESTIGATED FROM THE STANDPOINT OF THEIR EFFECTS ON FISH AND WILDLIFE RESOURCES. MANY OF THEM WERE AUTHORIZED 15 OR 20 YEARS AGO OR MORE. IT WOULD MAKE GOOD SENSE TO HAVE THE POLICIES AND PROCEDURES OF THE COORDINATION ACT APPLICABLE TO THEM IN ORDER THAT THE WISHES OF THE CONGRESS IN ENACTING THE 1946 STATUTE AND THE PROPOSED AMENDMENTS CAN BE OBSERVED.

Plaintiffs' Exh. 17 at pp. 3-4.

> THE AMENDMENTS PROPOSED BY THIS BILL WOULD REMEDY THESE DEFICIENCIES AND HAVE SEVERAL OTHER IMPORTANT ADVANTAGES. THE AMENDMENTS, WOULD PROVIDE THAT WILDLIFE CONSERVATION SHALL RECEIVE EQUAL CONSIDERATION WITH OTHER FEATURES IN THE PLANNING OF FEDERAL WATER RESOURCE DEVELOPMENT PROGRAMS. THIS WOULD HAVE THE EFFECT OF PUTTING FISH AND WILDLIFE ON THE BASIS OF EQUALITY WITH FLOOD CONTROL, IRRIGATION, NAVIGATION, AND HYDROELECTRIC POWER IN OUR WATER RESOURCE PROGRAMS, WHICH IS HIGHLY DESIRABLE AND PROPER, AND REPRESENTS AN OBJECTIVE LONG SOUGHT BY CONSERVATIONISTS OF THE NATION.

Plaintiffs' Exh. 17 at p. 4.

> UNQUESTIONABLY, THE BILL, IF ENACTED, WOULD RESULT IN THE CONGRESS HAVING BETTER INFORMATION ON THE EFFECTS OF WATER PROJECTS ON FISH AND WILDLIFE RESOURCES WHILE CONSIDERING PROJECT-AUTHORIZING LEGISLATION. IT WILL THEN, OF COURSE, BE FOR THE CONGRESS TO DECIDE WHAT CONSERVATION MEASURES SHOULD BE INCORPORATED IN ANY PROJECT.

Plaintiffs' Exh. 17 at p. 5.